1
2
3
4
5
6
7
8
9

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

10   MICROSOFT CORPORATION, a
Washington corporation,

11

12                              Plaintiff,

13           vs.

14   MOTOROLA, INC., and MOTOROLA
MOBILITY, INC.,

15

16                              Defendants

Case No.

COMPLAINT

17      Plaintiff Microsoft Corporation ("Microsoft") alleges as follows for its Complaint

18   against Motorola, Inc. and Motorola Mobility, Inc. (collectively "Motorola"):

19                              **NATURE OF THE ACTION**

20      1.      Microsoft brings this action for Motorola's breach of its commitments to the

21   Institute of Electrical and Electronics Engineers Standards Association ("IEEE-SA"),

22   International Telecommunications Union ("ITU"), and their members and affiliates – including

23   Microsoft.  Motorola broke its promises to license patents it asserted as related to wireless

24   technologies known as "WLAN" and to video coding technologies generally known as

25

COMPLAINT - 1

"H.264" under reasonable rates, with reasonable terms, and under non-discriminatory conditions.

2.      Participants in IEEE-SA standards setting efforts, including those directed to WLAN technology, were subject to the IEEE-SA Standard Board Bylaws concerning the submission of Letters of Assurance related to patent claims deemed "essential" by a submitting party.  Clause 6 of those Bylaws (which was revised slightly over the years) generally provides in pertinent part:

> A Letter of Assurance shall be either:
>
> a) A general disclaimer to the effect that the submitter without conditions will not enforce any present or future Essential Patent Claims against any person or entity making, using, selling, offering to sell, importing, distributing, or implementing a compliant implementation of the standard; or
>
> b) A statement that a license for a compliant implementation of the standard will be made available to an unrestricted number of applicants on a worldwide basis without compensation or under reasonable rates, with reasonable terms and conditions that are demonstrably free of any unfair discrimination.

3.      Motorola openly and publicly submitted Letters of Assurance pursuant to Clause 6 of the IEEE-SA Standards Board Bylaws that it would offer to license any of its patents that it identified as "essential" to the applicable WLAN standard(s) to any entity under reasonable rates on a non-discriminatory basis.  IEEE-SA and its participants and affiliates relied on Motorola's promises in developing, adopting and implementing IEEE-SA technical standards.  These standards are now implemented worldwide in a variety of electronic devices that have become commonplace.  Microsoft invested substantial resources in developing and marketing products in compliance with these standards, relying on the assurances of participating patent holders – including Motorola – that any patents asserted to be "essential" by such patent holders would be available for licensing on such terms, regardless of whether such patents were, in fact, used in any particular implementation.

**COMPLAINT -** 2

4.      Participants in ITU standards setting efforts, including those directed to H.264 technology, were subject to the ITU-T Common Patent Policy concerning the submission of Patent Statement and Licensing Declaration related to patents identified by a submitting party. ITU-T Common Patent Policy generally provides, in pertinent part, that a patent holder's statement may declare that :

    (2.1) The patent holder is willing to negotiate licenses free of charge with other parties on a non-discriminatory basis on reasonable terms and conditions.
    (2.2) The patent holder is willing to negotiate licenses with other parties on a non-discriminatory basis on reasonable terms and conditions.

5.      Motorola openly and publicly submitted Patent Statement and Licensing Declarations pursuant to the ITU's Common Patent Policy that it would offer to license any of its patents that it identified for the H.264 technologies to any entity under reasonable rates on a non-discriminatory basis.  The ITU and its participants and affiliates relied on Motorola's promises in developing, adopting and implementing ITU H.264 technical standards.  These standards are now implemented worldwide in a variety of electronic devices and software that have become commonplace.  Microsoft invested substantial resources in developing and marketing products in compliance with these standards, relying on the assurances of participating patent holders – including Motorola – that any patents identified pursuant to ITU's Common Patent Policy by such patent holders would be available for licensing on such terms, regardless of whether such patents were, in fact, used in any particular implementation.

6.      Motorola broke its promise to IEEE-SA and its members and affiliates by refusing to offer to Microsoft a license that is consistent with Clause 6 of IEEE-SA Standards Board Bylaws, instead demanding royalties that are excessive and discriminatory.  Motorola broke its promise to ITU and its members and affiliates by refusing to offer to Microsoft a

**COMPLAINT** - 3

1   license that is consistent with the Common Patent Policy of the ITU, instead demanding

2   royalties that are excessive and discriminatory.

3          7.      Microsoft does not accept Motorola's representation that any of its patents that

4   it has identified to the IEEE or ITU are, in fact, necessary to the implementation of compliant

5   implementations of WLAN or H.264 technologies; nor does Microsoft concede that the

6   particular implementations of such technologies in its products practice any Motorola patents,

7   including those identified by Motorola in relation to these technologies.  Nonetheless,

8   Microsoft has relied upon Motorola's, and other similarly-situated patent holders',

9   representations that all patent controversies may be avoided based on the offer of patent

10  licenses on reasonable rates and non-discriminatory terms.

11         8.      Motorola's breach of its commitments does not depend on whether any

12  Motorola patents which Motorola has identified in relation to standards are, in fact, "essential"

13  to practicing those standards, whether those standards can be practiced in ways that do not

14  infringe the identified Motorola patents or whether Microsoft has infringed any valid Motorola

15  patents.  Because Motorola promised that it would license any such patents on reasonable and

16  non-discriminatory terms, companies that rely on those commitments are entitled to avoid

17  becoming embroiled in patent controversies and to receive the benefit of an offer of a

18  reasonable and non-discriminatory license.

19         9.      Accordingly, Microsoft seeks: i) a judicial declaration that Motorola's promises

20  to IEEE-SA, the ITU, and their respective members and affiliates constitute contractual

21  obligations that are binding and enforceable by Microsoft; ii) a judicial declaration that

22  Motorola has breached these obligations by demanding excessive and discriminatory royalties

23  from Microsoft; iii) a judicial accounting of what constitutes a royalty rate in all respects

24

25

**COMPLAINT - 4**

LAW OFFICES
**DANIELSON HARRIGAN LEYH & TOLLEFSON LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700    FAX, (206) 623-8717

consistent with Motorola's promises for WLAN patents identified as "essential" by Motorola and for H.264 patents identified by Motorola; and iv) a judicial determination of and compensation for Motorola's breach.

## PARTIES

10.     Plaintiff Microsoft is a Washington corporation having its principal place of business at One Microsoft Way, Redmond, Washington 98052.

11.     Founded in 1975, Microsoft is a worldwide leader in computer software, services, and solutions for businesses and consumers.  Since 1979, Microsoft has been headquartered in the Redmond, Washington area.  Microsoft currently employs nearly 40,000 people in the Puget Sound region and occupies nearly 8 million square feet of facilities at its Redmond campus.

12.     Microsoft has a long history of technical innovation in the software and hardware products it develops and distributes.

13.     Microsoft's products include Xbox video game consoles, various versions of which have been sold to consumers since 2001.  Xbox has grown in popularity over the years and is now one of the most widely-sold video game consoles on the market.

14.     Over the years that Xbox has been sold, some versions have had wireless Internet connectivity ("WLAN") built-in and some versions have had optional WLAN connectivity.  All versions of Xbox that include hardware and software that allows for WLAN connectivity also offer an alternative, wired connection to the Internet.  Xbox video game consoles function as video game consoles, regardless of their ability to connect to the Internet.

15.     Microsoft relies upon third-party suppliers to provide an interface to WLAN connections.  The WLAN interface provided by these third-parties is one of many components

**COMPLAINT - 5**

1   that underlie the operation and functionality of the Xbox consoles.  The WLAN interface does

2   not enable any of Xbox's core video gaming functionality.  Instead, it simply enables WLAN

3   connectivity for those consumers who choose to use that functionality.

4           16.     Microsoft hardware and software products that provide users with H.264

5   technologies further provide substantial other features and functions.  By way of non-limiting

6   example, personal computers in various configurations offer the end-user myriad features and

7   functionality.  H.264 technologies provided through Microsoft software supplied to computer

8   and other equipment makers represent but a fraction of the end price for such products.  By

9   way of further non-limiting example, Microsoft's Xbox video game console provides video

10  game play without reliance upon any H.264 technologies that may be made available to users

11  through other features and functions.

12          17.     Microsoft also relies upon third-party suppliers in at least some instances for

13  H.264 technologies.

14          18.     Upon information and belief, Defendant Motorola, Inc. is a corporation

15  organized under the laws of Delaware with its principal place of business at 1303 East

16  Algonquin Road, Schaumburg, Illinois 60196.  On information and belief, Defendant Motorola

17  Mobility, Inc. is a wholly-owned subsidiary of Motorola, Inc. and is organized under the laws

18  of Delaware having a principal place of business at 600 North U.S. Highway 45, Libertyville,

19  Illinois 60048.  Motorola, Inc. and Motorola Mobility, Inc. will be referred to collectively

20  herein as "Motorola" or "Defendant".

21                          **JURISDICTION AND VENUE**

22          19.     This Court has jurisdiction over the subject matter of this dispute pursuant to 28

23  U.S.C. § 1332, because this is an action between citizens of different states and because the

24

25

**COMPLAINT - 6**

value of declaratory and injunctive relief sought, the value of Microsoft's rights this action will protect and enforce, and the extent of the injury to be prevented exceed the amount of $75,000, exclusive of interest and costs.

20.     On information and belief, Defendant is subject to this Court's personal jurisdiction, consistent with the principles of due process and the Washington Long Arm Statute, at least because Defendant maintains offices and facilities in the Western District of Washington, offers its products for sale in the Western District of Washington, and/or has transacted business in this District.

21.     Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(a), 1391(c), and 1391(d).

## BACKGROUND
### Introduction to Standards

22.     New wireless and video coding technologies typically are only broadly commercialized after service providers and device manufacturers agree on compatible technology specifications for related products or services.  For virtually all successful wireless and video coding technologies, that process has involved inclusive, multi-participant standards development efforts conducted under the auspices of leading standards development organizations.

23.     Standards play a critical role in the development of wireless and video coding technologies.  Standards facilitate the adoption and advancement of technology as well as the development of products that can interoperate with one another.  Companies that produce products compatible with a standard can design products by referencing only the standard documentation, without the need to communicate separately with every other company with

**COMPLAINT** - 7

which their products may need to interoperate.  Companies producing products that implement and are tested to a standard can therefore be confident that their products will operate with other products that also are compatible with that standard, and consumers of those products can be confident that products from multiple vendors will work together as intended under the standard.

24.     As a practical matter, the technologies that are used to allow a consumer electronics device to connect wirelessly to the Internet must be described in standards adopted by a recognized SDO (standard development organization), and thereby accepted by key industry members, in order to be commercially successful.  For example, Microsoft could not purchase third-party goods that enable its Xbox devices to connect wirelessly to the Internet unless those goods were compatible with standards described by an SDO.

25.     Correspondingly, video technologies that are used to allow a consumer electronics device to display video encoded pursuant to any particular coding protocol must be described in standards adopted by a recognized SDO, and thereby accepted by key industry members, in order to be commercially successful.  For example, Microsoft and computer makers could not purchase third-party products or software that provide reliable video decoding and image generation unless those products or software were compatible with standards described by an SDO.

26.     In order to reduce the likelihood that implementers of their standards will be subject to abusive practices by patent holders, SDOs have adopted rules, policies and procedures that address the disclosure and licensing of patents that SDO participants may assert in relation to the practice of the standard under consideration.  These rules, policies and/or procedures are set out in the intellectual property rights policies ("IPR policies") of the

**COMPLAINT - 8**

SDOs.

27.     Many IPR policies – including those at issue in this litigation – encourage or require participants to disclose on a timely basis the IPR, such as patents or patent applications, that they believe are sufficiently relevant to standards under consideration.  These disclosures permit the SDOs and their members to evaluate technologies with full knowledge of disclosed IPR that may affect the costs of implementing the standard.

28.     IPR policies – including those at issue in this litigation – require participants claiming to own relevant patents to negotiate licenses for those patents with any implementer of the standard on reasonable and non-discriminatory terms.  As their inclusion in the IPR policies of various standards development organizations suggests, such commitments are crucial to the standards development process.  They enable participants in standards development to craft technology standards with the expectation that an owner of any patented technology will be prevented from demanding unfair, unreasonable, or discriminatory licensing terms and thereby be prevented from keeping parties seeking to implement the standard from doing so or imposing undue costs or burdens on them.

## Wireless LAN Standards

29.     Motorola's unlawful licensing demands pertain in part to patents that it claims are "essential" to a widely practiced standard for wireless Internet connectivity known as "WLAN," "Wi-Fi," and/or "802.11."

30.     WLAN enables an electronic device to access the Internet wirelessly at high speeds over short distances.  WLAN networks typically consist of one or more access points that are connected to an Ethernet local area network, each of which communicates by radio signals with devices such as notebook computers and other electronics devices.

COMPLAINT - 9

31.     The use of WLAN technology has grown in the United States since its introduction in the 1990s.  Manufacturers now offer WLAN connectivity in various devices for various reasons.

32.     WLAN is based on the 802.11 wireless networking standard developed by the Institute of Electrical and Electronics Engineers ("IEEE") beginning in the early 1990s.  The initial 802.11 protocol ("legacy 802.11") was released in 1997.  Since then, there have been a number of amendments issued, the most important of which are 802.11a (1999), 802.11b (1999), 802.11g (2003), and 802.11n (2009).

### H.264 Standards

33.     Motorola's unlawful licensing demands pertain in part to patents that it has identified to the ITU and its members in relation to H.264 technologies.

34.     H.264 technologies provide video decoding in such applications as DVD players, videos available for downloading or replay on the Internet, web software, broadcast services, direct-broadcast satellite television services, cable television services, and real-time videoconferencing.

35.     The use of H.264 technology has grown in the United States since its introduction.  Manufacturers now offer H.264 connectivity in various software and devices for various reasons.

36.     H.264 technology was developed as a standard set of technologies at least in part through the auspices of the International Telecommunications Union ("ITU").

### Motorola's Involvement in Development of the WLAN Standards

37.     The standard setting arm of IEEE, the IEEE Standards Association ("IEEE-SA"), promulgates technical standards in a variety of fields, including telecommunications.

**COMPLAINT - 10**

1  IEEE-SA had an IPR policy at the time it was drafting the 802.11 (WLAN) protocols.  Under

2  the IPR policy, when individuals participating in IEEE standards development came to believe

3  that a company, university, or other patent holder owned patents or patent applications that

4  might be "essential" to implement an IEEE standard under development, IEEE-SA would

5  request Letters of Assurance from those entities.

6      38.      The requirements for the Letters of Assurance sought by IEEE are set forth in

7  Clause 6 of the IEEE-SA Standards Board Bylaws.

8      39.      According to IEEE's IPR policy, Letters of Assurance, once provided, are

9  irrevocable and shall be in force at least until the standard's withdrawal.

10     40.      If the Letters of Assurance were not provided for  patents asserted to be

11  "essential" by participants, the IEEE working group either would revise the standard so that

12  compliance could be achieved without facing any potential issues related to such patent(s),

13  discontinue work on the standard altogether, or otherwise proceed in a manner consistent with

14  the non-disclosure and lack of Letters of Assurance so that participating and relying entities

15  would not be exposed to discriminatory patent assertions and/or unreasonable licensing terms.

16     41.      Motorola has represented to Microsoft that it owns rights in a number of patents

17  and pending applications that it asserts are or may become "essential" to comply with one or

18  more amendments to the 802.11 standard.  By way of example, Motorola has represented to

19  Microsoft that the following patents, among others, are or may become "essential" to comply

20  with one or more amendments to the 802.11 standard:  U.S. Patent Nos. 5,319,712; 5,311,516;

21  5,572,193; 5,311,516; and 5,636,223.  The full list of patents is provided in Appendix A.

22  Microsoft does not concede that such listed patents are either "essential" to the 802.11

23  standards or that such patents are practiced in the implementation of such standards in any

COMPLAINT - 11

Microsoft products.

42.     On information and belief, Motorola obtained rights to several of THE WLAN patents it has represented as "essential" through its recent acquisition of Symbol Technologies, Inc. ("Symbol").

43.     Prior to the releases of the 802.11 protocols, Motorola and Symbol submitted Letters of Assurance to the IEEE pursuant to Clause 6 of the IEEE-SA Standards Board Bylaws with respect to those protocols, guaranteeing that any "essential" patents would be licensed under reasonable and non-discriminatory terms and conditions.  Both Motorola's and Symbol's Letters of Assurance apply to any "essential" patents they then held as well as any other "essential" patents they subsequently obtained.

44.     In reliance on these letters of assurance, IEEE released the 802.11 standard and various amendments to that standard which Motorola asserts incorporated Motorola's and Symbol's patented technology.  On information and belief, absent the Letters of Assurance, the relevant IEEE working groups would have either revised the standards, employing alternative technologies instead, or stopped working on the protocols.

45.     In submitting its Letter of Assurance pursuant to the applicable IEEE IPR policy, Motorola entered into an actual or implied contract with IEEE, for the benefit of IEEE members and any entity that implements the 802.11 standard. Motorola is bound by its agreements to offer licenses consistent with the referenced IEEE bylaws.

46.     Similarly, Symbol, in submitting its Letter of Assurance pursuant to the applicable IEEE IPR policy, entered into an actual or implied contract with IEEE, for the benefit of IEEE members and any other entity that implements the 802.11 standard, and Motorola is bound by that commitment.

**COMPLAINT -** 12

LAW OFFICES
**DANIELSON HARRIGAN LEYH & TOLLEFSON LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700   FAX, (206) 623-8717

**Motorola's Involvement in Development of the H.264 Standards**

47.    ITU is the leading United Nations agency for information and communication technology issues, and the global focal point for governments and the private sector in developing networks and services.  ITU historically has coordinated the shared global use of the radio spectrum, promoted international cooperation in assigning satellite orbits, worked to improve telecommunication infrastructure in the developing world, established the worldwide standards that foster seamless interconnection of a vast range of communications systems and addressed the global challenges of our times, such as strengthening cybersecurity.

48.    In conjunction with its efforts to provide standards in support of its stated goals, the ITU requires that its members and participants adhere to the Common Patent Policy stated above.

49.    According to ITU's IPR policy, Patent Statement and Licensing Declarations, once provided, are irrevocable and shall be in force at least until the standard's withdrawal.

50.    If the Patent Statement and Licensing Declarations were not provided for relevant patents from participants, the ITU either would revise the standard so that compliance could be achieved without facing any potential issues related to such patent(s), discontinue work on the standard altogether, or otherwise proceed in a manner consistent with the non-disclosure and lack of Patent Statement and Licensing Declarations so that participating and relying entities would not be exposed to discriminatory patent assertions and/or unreasonable licensing terms.

51.    Motorola has represented to Microsoft and others that it owns rights in a number of patents and pending applications that are or may be embodied fully or partly within H.264 technologies as endorsed by ITU and has identified these patents to the ITU.   Microsoft

**COMPLAINT -** 13

does not concede that such listed patents are either "essential" to the 802.11 standards or that such patents are practiced in the implementation of such standards in any Microsoft products.

52.     Motorola submitted Patent Statement and Licensing Declarations to the ITU pursuant to its Common Patent Policy with respect to those protocols, guaranteeing that Motorola's identified patents would be licensed under reasonable and non-discriminatory terms and conditions.

53.     In reliance on these Patent Statement and Licensing Declarations, ITU proceeded with the H.264 standard and various amendments to that standard which Motorola asserts incorporated Motorola's patented technology.  On information and belief, absent the Patent Statement and Licensing Declarations, the ITU would have either revised the standards, employing alternative technologies instead, or stopped working on the protocols.

54.     In submitting its Patent Statement and Licensing Declarations pursuant to the applicable ITU policy, Motorola entered into an actual or implied contract with ITU, for the benefit of ITU members and any entity that implements the H.264 technologies.  Motorola is bound by its agreements to offer licenses consistent with the referenced ITU Common Patent Policy.

**Microsoft's Reliance on Commitments with Respect to WLAN and H.264 Technologies**

55.     Microsoft has participated in the development of the IEEE WLAN standards.

56.     Microsoft and other companies participating in the development of WLAN in IEEE relied on Motorola's commitments to ensure that the royalties Motorola would seek would conform to the promises made by Motorola.

57.     In reliance on the integrity of the SDO process and the commitments made by Motorola and others regarding WLAN patents they deem "essential," Microsoft began

**COMPLAINT** - 14

LAW OFFICES
**DANIELSON HARRIGAN LEYH & TOLLEFSON LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700   FAX, (206) 623-8717

providing its Xbox video game consoles with WLAN connectivity.  By way of example, Microsoft purchased and incorporated into its Xbox 360 video game consoles third-party-manufactured interfaces that provide Xbox 360 devices with WLAN connectivity.  Microsoft made its decision to provide its Xbox video game consoles with WLAN connectivity in reliance on, and under the assumption that, it and/or any third party supplier could avoid patent litigation and take a license to any patents that Motorola, or any other company, has disclosed to the WLAN standard under IEEE's well publicized IPR policy.

58.   Microsoft and other manufacturers of WLAN-compliant devices necessarily relied on the commitments of Motorola and others to disclose and license any identified patents under these terms to avoid any patent controversy even if such patents are not necessary to compliant implementations nor actually practiced in any particular implementation.

59.   Microsoft has participated in the development of the H.264 technologies.

60.   Microsoft and other companies participating in the development of H.264 under the auspices of the ITU relied on Motorola's commitments to ensure that the royalties Motorola would seek for identified patents would conform to the promises made by Motorola.

61.   Correspondingly, in reliance on the integrity of the SDO process and specifically the commitments made by Motorola and others regarding patents related to H.264 technologies, Microsoft began providing its H.264 technology capability in its Xbox video game consoles.  Microsoft made its decision to provide its Xbox video game consoles with H.264 technology in reliance on, and under the assumption that, it and/or any third party supplier could avoid patent litigation and take a license to any patents that Motorola, or any other company, has disclosed to the ITU under its well-publicized IPR policy.

**COMPLAINT** - 15

62.     Microsoft made similar investments in other fields, including Windows 7 and Windows Phone 7, based upon Motorola's representations in relation to the H.264 technology standards.

63.     Microsoft and other manufacturers and suppliers of H.264 compliant technology necessarily relied on the commitments of Motorola and others to license their identified patents under these terms to avoid any patent controversy even if such patents are not necessary to compliant implementations nor actually practiced in any particular implementation.

**Motorola's Breach of Its Contractual Obligation to License Its Identified Patents on The Promised Terms**

64.     In willful disregard of the commitments it made to IEEE and the ITU, Motorola has refused to extend to Microsoft a license consistent with Motorola's promises for any of Motorola's identified patents.

65.     Instead, Motorola is demanding royalty payments that are wholly disproportionate to the royalty rate that its patents should command under any reasonable calculus.  Motorola has discriminatorily chosen Microsoft's Xbox product line and other multi-function, many-featured products and software, such as Windows 7 and Windows Phone 7 and products incorporating Microsoft software, for the purpose of extracting unreasonable royalties from Microsoft.

66.     By way of non-limiting example, each Xbox device includes substantial software and many computer chips and modules that perform various functions, including to enable Xbox's core functionality as a video gaming machine.  Of those, the Xbox console includes one – an interface provided to Microsoft by third-parties – that allows consumers optionally to connect an Xbox to the Internet using a WLAN connection.

**COMPLAINT -** 16

LAW OFFICES
**DANIELSON HARRIGAN LEYH & TOLLEFSON LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700   FAX, (206) 623-8717

67.     The third-party WLAN interface does not enable any of Xbox's core video gaming functionality.  In addition, Microsoft allows consumers an alternative, wired method to connect to the Internet.  This alternative method does not require use of any WLAN technology.

68.     By way of further non-limiting example, each personal computer running Windows 7 includes substantial software and many computer chips and modules that perform various functions, including those related to the general operation of a computing device.  Of those, each personal computer includes just a portion directed to H.264 technologies.

69.     By way of further non-limiting example, each smartphone running Windows Phone 7 includes substantial software and many computer chips and modules that perform various functions, including those related to the general and particularized operation of a smartphone independent of H.264 technology.  Of those, each smartphone includes just a portion directed to H.264 technologies.

70.     By letter to Microsoft, dated October 21, 2010, Kirk Dailey, Motorola's Corporate Vice President Intellectual Property, stated that a royalty for a license to its purported "essential" patents must be based on "the price of the end product (e.g., each Xbox 360 product) and not on component software."  The cost of the chips and associated components that provide wireless connectivity for Xbox 360 consoles is a small fraction of the overall cost of the device.  Motorola thus seeks a royalty on components of Xbox 360 which are disproportionate to the value and contribution of its purportedly "essential" patents and has declined to offer a license to its purported "essential" patents unless it receives exorbitant and discriminatory royalty payments to which it is not entitled.  On information and belief, Motorola has not previously entered into a license agreement for its purported "essential"

**COMPLAINT** - 17

patents that is comparable to the demand made of Microsoft.  Motorola has thereby refused to offer to license the patents at a reasonable rate, with reasonable terms, under conditions that are demonstrably free of any unfair discrimination.

71.    By letter to Microsoft, dated October 29, 2010, Kirk Dailey, Motorola's Corporate Vice President Intellectual Property, stated that a royalty for a license to its identified patents must be based on "the price of the end product (e.g., each Xbox 360 product, each PC/laptop, each smartphone, etc.) and not on component software (e.g., Xbox 360 system software, Windows 7 software, Windows Phone 7 software, etc.)."  The cost such component software and any inter-related hardware is a small fraction of the overall cost of the listed devices.  Motorola thus seeks a royalty on software and hardware components of Xbox 360 and other devices which are unrelated to its identified patents and has declined to offer a license unless it receives exorbitant royalty payments to which it is not entitled.  On information and belief, Motorola has not previously entered into a license agreement for its identified patents that is comparable to the demand made of Microsoft.  Motorola has thereby refused to offer to license the patents at a reasonable rate, with reasonable terms, on a non-discriminatory basis.

72.    Regardless of whether there exists any actual use of Motorola patent claims in any specific implementation that is compliant with the applicable standards, Motorola has represented that it possesses patents relevant to such implementations.  On that basis, Motorola is required to tender an offer to license its identified patents in all respects consistent with its binding assurances to the IEEE, the ITU, and participating members.

73.    Motorola's demands constitute a breach of its WLAN and H.264 commitments.

**COMPLAINT -** 18

# CLAIMS FOR RELIEF

# FIRST CAUSE OF ACTION

## (Breach Of Contract)

74.     Microsoft realleges and incorporates by reference the allegations set forth in paragraphs 1-73 above.

75.     Motorola entered into express or implied contractual commitments with IEEE-SA, the ITU and their respective members and affiliates relating to the WLAN standard and H.264 technologies.

76.     Each third party that would potentially implement WLAN and H.264 technologies was an intended beneficiary of those contracts.

77.     Motorola was contractually obligated to offer a license to its identified patents consistent with the applicable patent policy of the IEEE-SA Standards Board Bylaws and the ITU, respectively.

78.     Motorola breached these contracts by refusing to offer licenses to its identified patents under reasonable rates, with reasonable terms, and on a non-discriminatory basis.

79.     As a result of this contractual breach, Microsoft has been injured in its business or property, and is threatened by imminent loss of profits, loss of customers and potential customers, and loss of goodwill and product image.

80.     Microsoft will suffer irreparable injury by reason of the acts, practices, and conduct of Motorola alleged above until and unless the Court enjoins such acts, practices, and conduct.

**COMPLAINT -** 19

## SECOND CAUSE OF ACTION

### (Promissory Estoppel)

81.     Microsoft realleges and incorporates by reference the allegations set forth in paragraphs 1-73.

82.     Motorola made a clear and definite promise to potential licensees through its commitments to IEEE and the ITU that it would license identified patents under reasonable rates, with reasonable terms, and on a non-discriminatory basis.

83.     The intended purpose of Motorola's promises was to induce reliance.  Motorola knew or should have reasonably expected that this promise would induce companies producing products in wireless networking and H.264 technologies, like Microsoft, to develop products compliant with the relevant standards.

84.     Microsoft developed and marketed its products and services in reliance on Motorola's promises, as described above, including making its products and services compliant with WLAN technical standards and including H.264 technologies in various Microsoft product offerings.

85.     Motorola is estopped from reneging on these promises to the IEEE and the ITU under the doctrine of promissory estoppel.

86.     Microsoft has been harmed as a result of its reasonable reliance on Motorola's promises and is threatened by the imminent loss of profits, loss of customers and potential customers, and loss of goodwill and product image.

87.     Microsoft will suffer irreparable injury by reason of the acts and conduct of Motorola alleged above until and unless the court enjoins such acts, practices and conduct.

**COMPLAINT -** 20

**THIRD CAUSE OF ACTION**

**(Waiver)**

88.     Microsoft realleges and incorporates by reference the allegations set forth in paragraphs 1-73.

89.     Motorola expressly stated in its declarations to IEEE and the ITU that it would license its identified patents under reasonable rates and non-discriminatory terms.

90.     Through this express statement, Motorola voluntarily and intentionally waived its rights to obtain compensation for its identified patents for the WLAN and H.264 standards other than at reasonable rates and on non-discriminatory terms.

91.     Microsoft will suffer irreparable injury by reason of the acts and conduct of Motorola alleged above until and unless the court enjoins such acts, practices, and conduct.

**FOURTH CAUSE OF ACTION**

**(Declaratory Judgment That Motorola's Offers Do Not Comply with Its Obligations)**

92.     Microsoft realleges and incorporates by reference the allegations set forth in paragraphs 1-73.

93.     There is a dispute between the parties concerning whether Motorola has offered to license to Microsoft patents consistent with Motorola's declarations and the referenced policy of the IEEE-SA Standards Board and the ITU.

94.     The dispute is of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

95.     Microsoft is entitled to a declaratory judgment that Motorola has not offered license terms to Microsoft conforming to applicable legal requirements.

**COMPLAINT -** 21

LAW OFFICES
**DANIELSON HARRIGAN LEYH & TOLLEFSON LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700   FAX, (206) 623-8717

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## **PRAYER FOR RELIEF**

WHEREFORE, Microsoft prays for relief as follows:

A.      Adjudge and decree that Motorola is liable for breach of contract;

B.      Adjudge and decree that Motorola is liable for promissory estoppel;

C.      Enter judgment against Motorola for the amount of damages that Microsoft proves at trial;

D.      Enter a judgment awarding Microsoft its expenses, costs, and attorneys fees in accordance with Rule 54(d) of the Federal Rules of Civil Procedure;

E.      Enjoin Motorola from further demanding excessive royalties from Microsoft that are not consistent with Motorola's obligations;

F.      Decree that Motorola has not offered royalties to Microsoft under reasonable rates, with reasonable terms and conditions that are demonstrably free of any unfair discrimination;

G.      Decree that Microsoft is entitled to license from Motorola any and all patents that Motorola deems "essential" to WLAN technology under reasonable rates, with reasonable terms and conditions that are demonstrably free of any unfair discrimination;

H.      Decree that Microsoft is entitled to license from Motorola any and all patents that Motorola has identified to the ITU in relation to H.264 technology on a non-discriminatory basis on reasonable terms and conditions; and

I.      For such other and further relief as the Court deems just and proper.

**COMPLAINT -** 22

1    DATED this 9th day of November, 2010.

2                  DANIELSON HARRIGAN LEYH & TOLLEFSON LLP

3

4

                By _____/s/ Shane P. Cramer_____

5                        Arthur W. Harrigan, Jr., WSBA #1751
                        Christopher Wion, WSBA #33207

6                        Shane P. Cramer, WSBA #35099

7                T. Andrew Culbert
                David E. Killough

8                MICROSOFT CORPORATION
                1 Microsoft Way

9                Redmond, WA  98052
                Phone:  425-882-8080

10              Fax:  425-869-1327

11

12              John W. McBride, of Counsel
                David T. Pritikin, of Counsel

13              Richard A. Cederoth, of Counsel
                Douglas I. Lewis, of Counsel

14              SIDLEY AUSTIN LLP
                One South Dearborn

15              Chicago, IL  60603
                Phone:  312-853-7000

16              Fax:  312-853-7036

17              Brian R. Nester, of Counsel
                Kevin C. Wheeler, of Counsel

18              SIDLEY AUSTIN LLP
                1501 K Street NW

19              Washington, DC  20005
                Telephone:  202-736-8000

20              Fax:  202-736-8711

21              Counsel for Plaintiff Microsoft Corp.

22

23

24

25

**COMPLAINT -** 23

LAW OFFICES
**DANIELSON HARRIGAN LEYH & TOLLEFSON LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700    FAX, (206) 623-8717

# APPENDIX A

APPENDIX A

| PATENT NO. | TITLE |
|---|---|
| 4,860,003 | Communication System Having a Packet Structure Field |
| 5,142,533 | Method for Controlling the Scheduling of Multiple Access to Communication Resources |
| 5,164,986 | Formation of Rekey Messages in a Communication System |
| 5,239,294 | Method for Authentication and Protection of Subscribers in Telecommunication Systems |
| 5,572,193 | Method for Authentication and Protection of Subscribers in Telecommunications Systems |
| 5,272,724 | Wideband Signal Synchronization |
| 5,319,712 | Method and Apparatus for Providing Cryptographic Protection of a Data Stream in a Communication System |
| 5,329,547 | Method and Apparatus for Coherent Communication in a Spread-Spectrum Communication System |
| 5,467,398 | A Method of Messaging in a Communication System |
| 5,560,021 | A Power Management and Packet Delivery Method for Use in a Wireless Local Area |
| 5,636,223 | Methods of Adaptive Channel Access Attempts |
| 5,689,563 | Method and Apparatus for Efficient Real-Time Authentication and Encryption in a Communication System |
| 5,822,359 | A Coherent Random Access Channel in a Spread-Spectrum Communications System and Method |
| 5,311,516 | Paging System Using Message Fragmentation to Redistribute Traffic |
| 6,069,896 | Capability Addressable Network and Method Therefor |
| 6,331,972 | Personal Data Storage and Transaction Device System and Method |
| 5,495,482 | Voice and Data Packet Communication Method and Apparatus |
| 5,357,571 | A Method for Point-to-Point Communications within Secure Communication Systems |
| 5,412,722 | Encryption Key Management |
| 5,029,183 | Packet Data Communication System |
| 5,479,441 | Packet Data Communication System |
| 5,519,730 | Communication Signal Having a Time Domain Pilot Component |
| 6,236,674 | Transceiver Control with Sleep Mode Operation |
| 6,404,772 | Voice and Data Wireless Communications Network and Method |
| 6,473,449 | High-Data-Rate Wireless Local Area Network |
| 7,143,333 | Method and Apparatus for Encoding and Decoding Data |
| 7,493,548 | Method and Apparatus for Encoding and Decoding Data |
| 7,165,205 | Method and Apparatus for Encoding and Decoding Data |