# Exhibit 4



IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| ***RESEARCH IN MOTION LIMITED*** and<br>***RESEARCH IN MOTION CORPORATION,***<br><br>     **Plaintiffs,**<br><br>**v.**<br><br>***MOTOROLA, INC.,***<br><br>     **Defendant.** | **CIVIL ACTION NO. 3:08-CV-0284-G**<br>**ECF** |

### DECLARATION OF BRIAN BLASIUS

I, Brian Blasius, declare

1. I make this declaration in support of Defendant Motorola, Inc.'s Brief In Support Of Its Motion To Dismiss Or Stay Plaintiffs' Antitrust And Contract Claims; And To Dismiss, Stay Or Transfer Plaintiffs' Declaratory Judgment Patent Claims. Unless otherwise stated, I make this declaration based on personal knowledge.

2. I am currently employed by Motorola, Inc. as Director of Intellectual Property Outbound Licensing in its Mobile Devices business.

3. As part of its participation in standards organizations, Motorola has declared the existence of patents that it considers "essential" to a standard, and has agreed to license them on "FRAND" (Fair, Reasonable and Non-Discriminatory) terms as required by standards organizations. Motorola has licensed its "essential" patents to dozens of companies, including many of Motorola's competitors in the industry.

4. From 2003 through the end of 2007, Research In Motion Limited (RIM) was licensed under a number of Motorola's "essential" and "non-essential" patents. One of the terms

3579008_1.DOC

of that license provided for RIM's payment to Motorola of an up-front, lump sum amount for use of certain "essential" and "non-essential" Motorola patents. Based on information I have reviewed and my personal knowledge, this lump sum amount was based on a typical essential patent royalty rate used in other Motorola licenses, applied to an estimate of RIM's future sales over the five-year term of the license, which estimate turned out to be significantly lower than RIM's actual performance.

5.     In late 2007, RIM and Motorola had negotiations to renew their license. During those renewal negotiations, Motorola offered RIM a license under its "essential" and certain "non-essential" patents. This offer attributed a royalty rate to the "essential" patents that is comparable to that used by Motorola to arrive at the lump sum payment offered to and accepted by RIM in 2003 as well as the rate offered to and accepted by other companies.

6.     Motorola has been, and remains, willing to license its "essential" patents without requiring that a licensee also take a license under any "non-essential" patents. Most of Motorola's agreements that cover licenses under "essential" patents provide no license for "non-essential" patents.

7.     During the 2007 negotiations, Motorola and RIM entered into a Standstill Agreement effective December 5, 2007, to provide additional time for the negotiations. That Standstill Agreement expired at "the end of the day" on February 15, 2008.

I declare under penalty of perjury that the foregoing is true and correct.

Executed in Libertyville, Illinois on April 9th, 2008.

_____
Brian Blasius

3579008_1.DOC



IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| *RESEARCH IN MOTION LIMITED* and | § | |
| *RESEARCH IN MOTION CORPORATION,* | § | |
| | § | |
| Plaintiffs, | § | |
| | § | CIVIL ACTION NO. 3:08-CV-0284-G |
| v. | § | ECF |
| | § | |
| *MOTOROLA, INC.,* | § | |
| | § | |
| Defendant. | § | |

## DECLARATION OF JOHN M. PICKETT

I, John M. Pickett, hereby declare the following:

### I.    INTRODUCTION

1.    I am a member of the law firm of Young, Pickett & Lee, 4122 Texas Boulevard, Texarkana, Texas 75503.

2.    Our firm has been retained by Motorola, Inc. ("Motorola") to serve as local counsel in two patent infringement lawsuits currently pending in the Eastern District of Texas. The first lawsuit (Motorola, Inc. v. Research In Motion Limited and Research In Motion Corporation, 2:08-cv-69) is pending in Marshall ("the Marshall action"), the Honorable Judge T. John Ward, presiding. The second lawsuit (Motorola, Inc. v. VTech Communications, Inc. and VTech Telecommunications Ltd., 5:07-cv-171) is pending in Texarkana, the Honorable Judge David Folsom, presiding.

3.    I am admitted to practice law in the States of Texas and Arkansas, in the U.S. District Court for the Western District of Arkansas, the U.S. District Court for the

Eastern and Northern Districts of Texas, and before the United States Court of Appeals for the 5th and 8th Circuits.

## II.   EASTERN DISTRICT OF TEXAS ECF FILING PROCEDURES

4.  The Eastern District of Texas permits parties to file complaints using the Electronic Case Filing System ("ECF").

5.  In order to file a complaint in the Eastern District of Texas using ECF, a party must create a new case file and subsequently upload a Civil Cover Sheet, the complaint, any exhibits, and the form of payment for the filing fee.

6.  The date and time of filing for ECF is determined by the time the case file is created and the uploaded filing documents are submitted, including the payment of the filing fee electronically through Pay.gov, the official Website for making online payments to federal government agencies, such as the United States District Court Clerk's office.

7.  The time period between the creation of a case file and submission of the filing documents, including the payment electronically of the filing fee, is dependant upon the time it takes to upload the filing documents and pay the filing fee.  This time period can vary based on several factors, *e.g.*, the length of the complaint, the amount and length of the exhibits, and the speed of the computer used for filing.

## III.   FILING OF FEBRUARY 16, 2008 MOTOROLA V. RIM COMPLAINT

8.  In order to avoid an erroneous filing date of Friday, February 15, 2008, the creation of the case file for the Marshall action did not commence until 00:01 a.m. Central time on Saturday, February 16, 2008.

9.      The process of creating the case file, uploading the filing documents (Civil Cover Sheet, 11-page complaint, and Exhibits A-G), submitting the filing documents and paying the filing fee electronically was completed at 00:23 a.m., which was the time entered on the ECF confirmation notice that I received.

10.     Attached hereto as Exhibit A is a true and correct copy of the ECF notice showing a date filed of February 16, 2008, and a time filed of 00:23 a.m. Central time.

11.     It is my understanding that RIM has alleged that Motorola commenced the filing of the Marshall action before midnight on February 16, 2008, in its motion to transfer papers filed in the Marshall action and the District of Delaware action (Motorola, Inc. v. Research In Motion Limited and Research In Motion Corporation, 1:08-cv-104). RIM's allegations are untrue, and thus without merit. As stated above in ¶¶8-9, the filing of the Marshall action did not begin until after midnight on February 16, 2008.

I declare under penalty of perjury that the foregoing is true and correct.


Dated: April 4, 2008
        at Texarkana, TX

                                        John M. Pickett

Case 2:10-cv-01823-JLR   Document 413-4   Filed 01/07/11   Page 7 of 81

# EXHIBIT A

Case 3:08-cv-00284-K Document 33-3 Filed 04/10/08 Page 7 of 26 PageID 614
Case 2:08-cv-01823-JLR Document 141-3 Filed 01/07/11 Page 8 of 81

Page 1 of 2

**Misti McLelland**

| | |
|---|---|
| **From:** | txedCM@txed.uscourts.gov |
| **Sent:** | Saturday, February 16, 2008 12:24 AM |
| **To:** | txedcmcc@txed.uscourts.gov |
| **Subject:** | Activity in Case 2:08-cv-00069 Motorola, Inc. v. Research In Motion Limited Complaint |

**This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.**
**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\* You may view the filed documents once without charge. To avoid later charges, download a copy of each document during this first viewing.**

### U.S. District Court [LIVE]

### Eastern District of TEXAS

**Notice of Electronic Filing**

The following transaction was entered by Pickett, John on 2/16/2008 at 0:23 AM CST and filed on 2/16/2008

| | |
|---|---|
| **Case Name:** | Motorola, Inc. v. Research In Motion Limited |
| **Case Number:** | 2:08-cv-69 |
| **Filer:** | Motorola, Inc. |
| | Research In Motion, Corporation |

**Document Number:** 1

**Docket Text:**
COMPLAINT *for Patent Infringement* against Research In Motion, Corporation, Research In Motion Limited ( Filing fee $ 350 receipt number 1433502.), filed by Research In Motion, Corporation, Motorola, Inc.. (Attachments: # (1) Exhibit A# (2) Exhibit B# (3) Exhibit C# (4) Exhibit D# (5) Exhibit E# (6) Exhibit F# (7) Exhibit G# (8) Civil Cover Sheet)(Pickett, John)


**2:08-cv-69 Notice has been electronically mailed to:**

Motorola, Inc.    jpickett83@aol.com

John Michael Pickett    jpickett@youngpickettlaw.com, jpickett83@aol.com

**2:08-cv-69 Notice has been delivered by other means to:**

The following document(s) are associated with this transaction:

**Document description:**Main Document
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1041545818 [Date=2/16/2008] [FileNumber=2183890-0
] [69b3ab357877d7c124333e976b7dc16c0bbc48f10500d3eabd42873a26a9a2c91e7

64c65d6b4fde240ce49ab4cdcd3e89db6969df036717d2e9d75b1c4ee38cb]]
**Document description:**Exhibit A
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1041545818 [Date=2/16/2008] [FileNumber=2183890-1
] [4175743f1d8a86c9a6d1b9282cca3ebd7059211e69b5d96ba033a6e76082238d428
0333f243694548d4e29363a6f665fe2f5a33c465a5c8818a061bd92cfff10]]
**Document description:**Exhibit B
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1041545818 [Date=2/16/2008] [FileNumber=2183890-2
] [0979ce171de151dbb004d8ff55f05eabfbc013800e09ac710c3d6d266fad2936ced
44c84973c8df810082b8821768a248335459f0cbf8c1a398a934963f79f0d]]
**Document description:**Exhibit C
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1041545818 [Date=2/16/2008] [FileNumber=2183890-3
] [bcec540b7c9eaf0e3d4920036346601412387 2b407d59bf98ae4d664afd41634a90
9624573740c2866659418cc3d42ed618f5e885efb57af550df51b18714d3d]]
**Document description:**Exhibit D
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1041545818 [Date=2/16/2008] [FileNumber=2183890-4
] [7e65bd3d72a2ce60e4ea569b37ab2f5d33ceec6cb66cc84a5d0849dddcff75ff371
ddb46c8cb9c538a18f5006a5f745fc9372d2a604356eaf66211db93e15f8e]]
**Document description:**Exhibit E
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1041545818 [Date=2/16/2008] [FileNumber=2183890-5
] [3dcd666e3b4e6f8a30945518272c47fe3a566c031b24aed2c2eefac296d22e5f4cf
6e3b059d853506b5e4837311158a39615f2dab3dc27111351771b854a3b48]]
**Document description:**Exhibit F
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1041545818 [Date=2/16/2008] [FileNumber=2183890-6
] [54cd881b636495ab74a30430a9eaa499cdaf040bd5142a1bdc111a540b4096e3d35
2da898af48aa50e793bfd9beca2be3532534feb2a9596bb6778a1d9c236d4]]
**Document description:**Exhibit G
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1041545818 [Date=2/16/2008] [FileNumber=2183890-7
] [3b06e3fd58b618860a8f9ebf71261f0566820f3325981a9f2e62d4187675ecdd896
aa9a036732cfc8a2f83e570753baf966d7f55b762080e98fae8521b7e7a32]]
**Document description:** Civil Cover Sheet
**Original filename:**n/a
**Electronic document Stamp:**
[STAMP dcecfStamp_ID=1041545818 [Date=2/16/2008] [FileNumber=2183890-8
] [00ea46104a83c4ef6c33e16fc7f3ac0d66baf52c5e07a22c5ee18bc4e5584223dd5
298ec388b6089f2977f0896319b5c02205bfde2b2a77e08118055eaafed5f]]

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| *RESEARCH IN MOTION LIMITED* and *RESEARCH IN MOTION CORPORATION,* | § § § | |
| Plaintiffs, | § § | **CIVIL ACTION NO. 3:08-CV-0284-G** |
| v. | § § | **ECF** |
| *MOTOROLA, INC.,* | § § | |
| Defendant. | § | |

## DECLARATION OF NORMAN H. BEAMER

I, Norman H. Beamer, declare as follows:

1.      I am a member of the firm of Ropes & Gray LLP, 525 University Avenue, Palo Alto, California, counsel to Defendant Motorola, Inc. in this action. I make this declaration in support of Defendant Motorola, Inc.'s Brief In Support Of Its Motion To Dismiss Or Stay Plaintiffs' Antitrust And Contract Claims; And To Dismiss, Stay Or Transfer Plaintiffs' Declaratory Judgment Patent Claims. Unless otherwise stated, I make this declaration based on personal knowledge.

2.      In addition to the above captioned action, the parties are involved in two other pending actions, both captioned as *Motorola, Inc. v. Research In Motion Limited and Research In Motion Corporation.* (Collectively, I refer to Research In Motion Limited and Research In Motion Corporation in this declaration as "RIM").

3.      At one minute past midnight EST on February 16, 2008, Motorola filed an infringement action in the District of Delaware (1:08-cv-104-SLR), asserting a declaratory

judgment that certain RIM patents were invalid or non infringed. As amended, the complaint encompasses the nine RIM patents in suit in this action.

4.     On February 16, 2008, Motorola also filed a patent infringement action against RIM in the District Court for the Eastern District of Texas, Marshall Division (2:08-cv-69). As amended, the Marshall action encompasses the eleven Motorola patents in suit in this action.

5.     Motorola is currently a party in another suit in the Eastern District of Texas involving some of the same Motorola patents in suit in this action (*Motorola v. Vtech Communications, Inc.*, 5:07-CV-00171).

6.     Attached hereto as Exhibit A is a copy of selected pages from Motorola's Form 10-K Annual Report for the fiscal year ended December 31, 2007, filed with the Securities and Exchange Commission on February 28, 2008.

7.     Attached hereto as Exhibit B is a web page (at webapp.etsi.org/ipr) that allows the user to search for patents that have been designated as essential to one or more ETSI standards. I navigated via a web browser to this page on April 7, 2008 (April 8 in Europe). According to that web page, there were on that date 18,296 patent or other intellectual property right entries designated as essential, organized in 73 projects (*i.e.*, standards), as designated by 144 different companies.

8.     Attached as Exhibit C is a copy of a search (performed through the search page described in the previous paragraph) for essential patents designated by RIM. According to that search, RIM has designated four United States patents as "essential" to an ETSI standard. All of these designations were made during or after 2006. Two of these patents, U.S. Patents Nos. 5,699,485 and 5,664,055, are among the patents included in RIM's patent infringement claims in

this action. According to publicly available assignment data, these two patents were purchased by RIM shortly before RIM filed this lawsuit.

9.      A search of the type described in the previous paragraph was also performed for Motorola essential patents. According to that search, Motorola has filed 1,357 designations with ETSI.

10.     None of the Motorola patents asserted against RIM have been designated by Motorola as "essential" to any standard.

11.     Attached as Exhibit D is a copy of a January 25, 2008 press release of IDC, a market research organization, listing market share information for the mobile phone market.

12.     Section 8.11 of the 2003 Motorola/RIM cross-license agreement specifies that, "With respect to matters of contract construction and interpretation, the substantive law of the state of Delaware ... shall apply."

13.     Attached hereto as Exhibit E is a copy of an article, Treacy and Lawrance, "FRANDly fire: are industry standards doing more harm than good?" *Journal of Intellectual Property Law & Practice*, 2007.

14.     Attached hereto as Exhibit F is a copy of selected pages from the October 17, 2007 "Amended Public Version" of Plaintiffs Nokia Corporation and Nokia, Inc.'s Reply Brief In Support Of Their Motion To Stay And/Or Dismiss, *Nokia Corp. v. Qualcomm, Inc.*, C.A. NO. 2330-VCS, Dkt. 316 (Del. Ch.).

15.     Attached hereto as Exhibit G is a copy of selected pages from the August 9, 2006 Complaint in *Nokia Corp. v. Qualcomm, Inc.*, C.A. NO. 2330-VCS, Dkt. 1 (Del. Ch.).

16.     Attached hereto as Exhibit H is a copy of "Amended Public Version" of the March 12, 2008 First Amended Verified Complaint in *Nokia Corp. v. Qualcomm, Inc.*, C.A. NO. 2330-VCS, Dkt. 354 (Del. Ch.).

17.     Attached hereto as Exhibit I is a copy of Docket Entry 1-11 in this action, which I understand consists of emails exchanged between counsel for RIM and employees of this District.

18.     Attached hereto as Exhibit J is a copy of a slip opinion entered in *Research in Motion Limited, et al. v. Visto Corporation,* CA 3:06-CV-0783-D (N.D. Texas May 17, 2007).

19.     Based on PACER searches performed under my direction and supervision, I am informed and believe that the following actions are examples of litigations where RIM has been sued in the Eastern District of Texas, and has not sought to transfer those actions elsewhere: *Antor Media Corp. v. Nokia, Inc.*, 2:2005cv00186; *Minerva Industries, Inc. v. Research In Motion Corp*, 2:2007cv00230; *Minerva Industries, Inc. v. Research In Motion Corporation et al*, 2:08cv00020; *Reese v. Samsung Telecommunications America, LP*, 2:2005cv00415; *Saxon Innovations LLC v. Nokia Corp.*, 6:2007cv00490; and *Williams Wireless Technologies Inc v. Research In Motion*, 4:2006cv00305.

20.     Attached hereto as Exhibit K is a copy of selected pages from RIM's Form 40-F Annual Report for the fiscal year ended March 3, 2007, filed with the Securities and Exchange Commission on May 17, 2007.

21.     Based on information provided to me by Motorola, and also based on evidence provided by RIM in connection with its motions to transfer filed in the Delaware and Marshall actions, I am informed and believe that all but two of the named inventors of the eleven Motorola patents in suit are located at various points around the country outside of Texas.  The remaining

two live in the Dallas area, are within 165 miles of the Marshall Court, and are subject to process in the Eastern District of Texas.

22.     According to Motorola's complaint against RIM in the Marshall action, the eleven Motorola patents are asserted against 23 models of RIM products, and associated software. Based on RIM's complaint in this action, the nine RIM patents in suit are apparently asserted against at least five specific models of Motorola products and three broad categories of Motorola products, *i.e.*, "wireless handsets," "base stations" and "other wireless communication, enterprise, and network related equipment and services."

23.     Based on my reading of the patents, and without purporting to characterize them comprehensively or for such purposes as claim construction, I understand that Motorola's patents generally relate to graphical user interface features for cell phones and sending/receiving messages within a wireless communications system. I also understand that RIM's patents generally relate to the physical keyboard layout and advanced signal processing for coding human speech using factors like pitch, lag and excitation. It is my present understanding and belief that the parties will likely present testimony from a number of different technical experts on these different patents.

24.     Attached hereto as Exhibit L is a copy of a slip opinion, *Research In Motion Limited, et al. v. Visto Corporation*, CA No. 3:06-CV-0783-D (N.D. Texas Oct. 19, 2006).

25.     The 2007 Annual Report of the Director of the Administrative Office of the U.S. Courts, Table C-10, states that the median time interval from filing to trial, in which trials were completed, during the 12-month period ending September 30, 2007, for jury trials, in the Northern District of Texas was 21 months (for 29 trials). That figure for the Eastern District of Texas was 17 months (for 40 trials).

26.     Attached hereto as Exhibit M is a copy of Defendant Research In Motion's

Motion To Transfer Venue Pursuant To 28 U.S.C. § 1404(a), filed March 31, 2008 in *Motorola,*

*Inc. v. Research In Motion Limited and Research In Motion Corporation* (E.D. Texas 2:08-cv-

69).

I declare under penalty of perjury that the foregoing is true and correct.

Executed in New York, New York on April 9, 2008.

Norman H. Beamer

**APP. 14**

Case 2:10-cv-01823-JLR Document 113 Filed 01/07/11 Page 16 of 81

# EXHIBIT A

Table of Contents

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**Washington, D.C. 20549**

# FORM 10-K

☑ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

## For the fiscal year ended December 31, 2007
or

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the transition period from        to
Commission File number 1-7221

# MOTOROLA, INC.
(Exact name of registrant as specified in its charter)

| DELAWARE | 36-1115800 |
|---|---|
| (State of Incorporation) | (I.R.S. Employer Identification No.) |

**1303 East Algonquin Road, Schaumburg, Illinois 60196**
(Address of principal executive offices)
**(847) 576-5000**
(Registrant's telephone number)

**Securities registered pursuant to Section 12(b) of the Act:**

| Title of Each Class | Name of Each Exchange on Which Registered |
|---|---|
| Common Stock, $3 Par Value per Share | New York Stock Exchange |
| | Chicago Stock Exchange |

**Securities registered pursuant to Section 12(g) of the Act:**
**None**

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes ☑   No ☐

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934. Yes ☐   No ☑

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☑   No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer or a smaller reporting company. See definition of "large accelerated filer", "accelerated filer" and "smaller reporting company" in Rule 12b-2 of the Exchange Act.

Large accelerated filer ☑   Accelerated filer ☐   Non-accelerated filer ☐   Smaller reporting company ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). Yes ☐   No ☑

The aggregate market value of voting and non-voting common equity held by non-affiliates of the registrant as of June 30, 2007 (the last business day of the Registrant's most recently completed second quarter) was approximately $40.6 billion (based on closing sale price of $17.70 per share as reported for the New York Stock Exchange-Composite Transactions).

The number of shares of the registrant's Common Stock, $3 par value per share, outstanding as of January 31, 2008 was 2,254,786,558.

## DOCUMENTS INCORPORATED BY REFERENCE

Portions of the registrant's definitive Proxy Statement to be delivered to stockholders in connection with its Annual Meeting of Stockholders, which Proxy Statement will be filed no later than April 29, 2008, are incorporated by reference into Part III.

Case 2:16-cv-01823-JLR Document 113 Filed 01/07/11 Page 18 of 81

**Table of Contents**

| | | Page |
|---|---|---|
| **PART I** | | 1 |
| Item 1. | Business | 1 |
| *General* | | 1 |
| *Business Segments* | | 1 |
| | Mobile Devices Segment | 1 |
| | Home and Networks Mobility Segment | 5 |
| | Enterprise Mobility Solutions Segment | 10 |
| *Other Information* | | 15 |
| | 2007 Change in Organizational Structure | 15 |
| | Financial Information About Segments | 15 |
| | Customers | 15 |
| | Backlog | 16 |
| | Research and Development | 16 |
| | Patents and Trademarks | 16 |
| | Environmental Quality | 16 |
| | Employees | 16 |
| | Financial Information About Foreign and Domestic Operations | 16 |
| *Available Information* | | 16 |
| Item 1A. | Risk Factors | 18 |
| Item 1B. | Unresolved Staff Comments | 27 |
| Item 2. | Properties | 27 |
| Item 3. | Legal Proceedings | 27 |
| Item 4. | Submission of Matters to a Vote of Security Holders | 33 |
| Executive Officers of the Registrant | | 33 |
| **PART II** | | 34 |
| Item 5. | Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities | 34 |
| Item 6. | Selected Financial Data | 36 |
| Item 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 37 |
| Item 7A. | Quantitative and Qualitative Disclosures About Market Risk | 71 |
| Item 8. | Financial Statements and Supplementary Data | 75 |
| Item 9. | Changes in and Disagreements with Accountants on Accounting and Financial Disclosure | 122 |
| Item 9A. | Controls and Procedures | 122 |
| Item 9B. | Other Information | 124 |
| **PART III** | | 124 |
| Item 10. | Directors, Executive Officers and Corporate Governance | 124 |
| Item 11. | Executive Compensation | 124 |
| Item 12. | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 124 |
| Item 13. | Certain Relationships and Related Transactions, and Director Independence | 124 |
| Item 14. | Principal Accounting Fees and Services | 124 |
| **PART IV** | | 125 |
| Item 15. | Exhibits and Financial Statement Schedules | 125 |
| 15 (a) (1) | Financial Statements | 125 |
| 15 (a) (2) | Financial Statement Schedule and Independent Auditors' Report | 125 |
| 15 (a) (3) | Exhibits | 125 |
| Motorola Omnibus Incentive Plan of 2006 | | |
| Motorola, Inc. Award Document for the Motorola Omnibus Incentive Plan of 2006 | | |
| Form of Motorola Stock Option Consideration Agreement | | |
| Form of Motorola, Inc. Restricted Stock Unit Award Agreement | | |
| Form of Motorola, Inc. Award Document for the Motorola Omnibus Incentive Plan of 2006 | | |
| Form of Motorola, Inc. Award Document for the Motorola Omnibus Incentive Plan of 2006 | | |
| Form of Motorola Stock Option Consideration Agreement | | |
| Form of Motorola, Inc. Restricted Stock Unit Award Agreement | | |
| Form of Motorola, Inc. Restricted Stock Unit Award Agreement | | |
| Motorola 2006 Incentive Plan | | |
| Motorola Long-Range Incentive Plan | | |
| Motorola Long-Range Incentive Plan | | |
| Description of Certain Compensatory Arrangements | | |
| Description of Certain Compensatory Arrangements | | |
| Chairman/CEO Retirement Term Sheet | | |

Case 2:10-cv-01823-JLR Document 113 Filed 01/07/11 Page 19 of 81

Amended and Restated Employment Agreement
Agreement with Ruth Fattori
Statement regarding Computation of Ratio of Earnings to Fixed Charges
Subsidiaries of Motorola
Certification of Gregory Q. Brown
Certification of Thomas J. Meredith
Section 906 Certification of Gregory Q. Brown
Section 906 Certification of Thomas J. Meredith

Table of Contents

1

# PART I

Throughout this 10-K report we "incorporate by reference" certain information in parts of other documents filed with the Securities and Exchange Commission (the "SEC"). The SEC allows us to disclose important information by referring to it in that manner. Please refer to such information.

We are making forward-looking statements in this report. In "Item 1A: Risk Factors" we discuss some of the risk factors that could cause actual results to differ materially from those stated in the forward-looking statements.

"Motorola" (which may be referred to as the "Company," "we," "us," or "our") means Motorola, Inc. or Motorola, Inc. and its subsidiaries, or one of our segments, as the context requires. "Motorola" is a registered trademark of Motorola, Inc.

## Item 1: Business

*General*

We provide technologies, products and services that make a broad range of mobile experiences possible. Our portfolio includes wireless handsets, wireless accessories, digital entertainment devices, wireless access systems, voice and data communications systems, and enterprise mobility products. With the rapid convergence of fixed and mobile broadband Internet and the growing demand for next-generation mobile communications solutions by people, businesses and governments, we are focused on high-quality, innovative products that meet the expanding needs of our customers around the world.

Motorola is a market leader in the following businesses:

- The **Mobile Devices** business designs, manufactures, sells and services wireless handsets with integrated software and accessory products, and licenses intellectual property.

- The **Home and Networks Mobility** business designs, manufactures, sells, installs and services: (i) digital video, Internet Protocol ("IP") video and broadcast network interactive set-tops ("digital entertainment devices"), end-to-end video delivery solutions, broadband access infrastructure systems, and associated data and voice customer premise equipment ("broadband gateways") to cable television and telecom service providers, and (ii) wireless access systems ("wireless networks"), including cellular infrastructure systems and wireless broadband systems, to wireless service providers.

- The **Enterprise Mobility Solutions** business designs, manufactures, sells, installs and services analog and digital two-way radio, voice and data communications products and systems for private networks, wireless broadband systems and end-to-end enterprise mobility solutions to a wide range of enterprise markets, including government and public safety agencies, as well as retail, utility, transportation, manufacturing, healthcare and other commercial customers.

Motorola is a corporation organized under the laws of the State of Delaware as the successor to an Illinois corporation organized in 1928. Motorola's principal executive offices are located at 1303 East Algonquin Road, Schaumburg, Illinois 60196.

*Business Segments*

Motorola reports financial results for the following three operating business segments:

### *Mobile Devices Segment*

The Mobile Devices segment ("Mobile Devices" or the "segment") designs, manufactures, sells and services wireless handsets with integrated software and accessory products, and licenses intellectual property. In 2007, the segment's net sales represented 52% of the Company's consolidated net sales.

Table of Contents

2

*Principal Products and Services*

Our wireless subscriber products include wireless handsets with related software and accessory products. We also sell and license our intellectual property. We market our products worldwide to carriers and consumers through direct sales, distributors, dealers, retailers and, in certain markets, through licensees.

*Our Industry*

The overall wireless handset industry remains strong. Total industry shipments of wireless handsets (also referred to as industry "sell-in") increased to approximately 1.14 billion units in 2007, an increase of approximately 16% compared to 2006. Demand from new subscribers was strong in emerging markets, led by India and China. Replacement sales in highly-penetrated markets were also strong due to generally favorable economic conditions, as well as compelling new handset designs, attractive handset features and the increased roll-out of high-speed data networks, all creating greater demand.

Industry forecasters predict that the wireless handset industry will continue to grow over the next several years, although the annual rate of growth is expected to be in the 10% range as opposed to the approximately 20% average annual growth the industry experienced from 2003 through 2007. Continued growth is expected to be driven primarily by demand from new subscribers in emerging markets and replacement sales from the current subscriber base.

*Our Strategy*

Motorola seeks to be a leading supplier of wireless handsets and mobile experiences to customers globally. To accomplish this objective, our strategy is focused on improving our product portfolio to meet consumer demands and improving our financial performance. This includes transitioning to silicon and software platforms that enable us to lower costs, get to market faster and offer richer consumer experiences.

We have structured our mobile device product portfolio and development into four primary product segments: Mass Market, Feature, Multimedia and Productivity. Our strategy is to offer a broad array of products in each of these product segments.

The Mass Market product segment focuses on voice-centric devices with targeted features. While this segment is maturing in North America, Europe and parts of Asia, it is growing significantly in developing regions. To address this market, we are expanding our handset offerings around our new W Series of handsets. These handsets satisfy everyday communications needs, include targeted features and are offered at affordable price points across all regions and in both CDMA and GSM technologies. The key to our success in the Mass Market product segment is offering products at competitive price points.

The Feature product segment focuses on delivering iconic, fashionable phones with high-end features. During 2007, we refreshed our flagship RAZR franchise with the RAZR2, the luxurious RAZR2 V8, and a RAZR classic with video playback and a digital audio processor music player. We are focused on building an enhanced portfolio of Feature phone devices that deliver compelling 2G and 3G mobile experiences.

The Multimedia product segment is focused on the convergence of voice capabilities with multimedia experiences on a single mobile device. In the recent past, many of our customers have purchased and used different devices from multiple consumer electronics segments to meet their lifestyle needs. In addition to mobile phones, they use devices such as cameras, mobile music and video players, mobile gaming devices and portable navigation devices. Increasingly, these experiences will be delivered through compelling applications and services on a single device. We are developing handsets designed to strengthen our Multimedia product offerings, such as the MOTOROKR Z6 and the S9 headset, a 2008 mobile music offering. We are particularly focused on developing a broader offering of 3G products for the Multimedia product segment.

The Productivity product segment is growing as workforces around the world continue to demand increasingly robust wireless handsets and consumers want their email "on the go." In 2007, we expanded our Q franchise across all regions and major technologies with the launch of the GSM Q8 and UMTS Q9h. We are planning to capitalize on new opportunities in this growing product segment.

Throughout each of these product segments, we have increased our focus in our accessories portfolio to deliver complete mobile experiences and to complement the features and functionalities of the wireless handsets.

93

Table of Contents

3

Additionally, we are expanding our accessory compatibility across all brands of wireless handsets and Bluetooth-enabled devices.

We are investing in next-generation technologies, such as WiMAX, HSDPA and Long Term Evolution ("LTE"). We believe a strong intellectual property portfolio is critical to our long-term success and to ensuring that we maintain a favorable strategic position in these technologies. We will continue to identify opportunities to generate licensing revenue from these investments. We also believe that innovation is critical to offering devices that demonstrate unique experiences and value propositions for consumers. As an example, in 2007 we began shipping our flagship RAZR2 devices with Crystal Talk, a proprietary technology that automatically adjusts audio quality based on ambient noise conditions to provide the optimal conversational experience. In application services, we continue to work with third parties to improve upon and develop our services and applications, which will deliver rich experiences to the customer. Motorola is committed to investing in evolving technologies to ensure that we continue to deliver enhanced and differentiated wireless handset experiences to consumers.

In January 2008, we announced that we are evaluating alternatives for the structural and strategic realignment of our Mobile Devices business to better equip it to recapture global market leadership and to enhance shareholder value. This may include the separation of the Mobile Devices business from Motorola's other businesses to permit each to grow and better serve their customers.

*Customers*

We continue to focus on strengthening our relationships with our customers. The segment has several large customers worldwide, the loss of one or more of which could have a material adverse effect on the segment's business. The largest of the segment's end customers (including sales through distributors) are Sprint Nextel, AT&T, Verizon, China Mobile and America Movil. In 2007, aggregate net sales to these five customers represented approximately 42% of the segment's net sales.

In addition to selling directly to carriers and operators, our Mobile Devices business also sells products through a variety of third-party distributors and retailers, which account for approximately 33% of the segment's net sales. The largest of these distributors is Brightstar Corporation.

The U.S. market continued to be the segment's largest individual market, accounting for approximately 46% of the segment's net sales in 2007, compared to approximately 35% of the segment's net sales in 2006. Approximately 54% of the segment's net sales in 2007 were to markets outside the U.S., the largest of which were Brazil, China and Mexico. Compared to 2006, the segment experienced sales declines in each of its four major sales regions: Asia, the Europe, Middle East and Africa region ("EMEA"), North America and Latin America.

*Competition*

The segment believes its overall market share for the full year 2007 was approximately 14%, making it the third-largest worldwide supplier of wireless handsets. The segment experiences intense competition in worldwide markets from numerous global competitors, including some of the world's largest companies, such as Nokia, Samsung, Sony-Ericsson and LG. In 2007, consolidation in the wireless handset industry slowed compared to previous years, and the five largest vendors together held an aggregate market share of approximately 83%, compared to 84% at the end of 2006. During 2007, regulatory changes in China precipitated a substantial increase in the number of manufacturers producing handsets in that market. The increased competition, primarily in the very low tier of the Mass Market product segment, has impacted shipment volumes in China for global vendors, as local vendors gained market share in the fourth quarter of 2007.

Major competitors in the industry are moving to applications and services as key sources of value and are increasing their focus and investments in these areas. In response, Motorola has created a global applications and services team within the Mobile Devices segment to focus on building the applications and services business.

General competitive factors in the market for the segment's products include: design; time-to-market; brand awareness; technology offered; price; product proposition, performance, quality, delivery and warranty; the quality and availability of service; and relationships with key customers.

Table of Contents

4

*Payment Terms*

The segment's customers and distributors buy from us regularly with payment terms that are competitive with current industry practices. These terms vary globally and generally range from cash-with-order to 60 days. Extended payment terms beyond 60 days are provided to customers on a limited basis. A customer's outstanding credit at any point in time is limited to a predetermined amount as established by the Company.

*Regulatory Matters*

Radio frequencies are required to provide wireless services. The allocation of frequencies is regulated in the U.S. and other countries, and limited spectrum space is allocated to wireless services. The growth of the wireless and personal communications industry may be affected if adequate frequencies are not allocated or, alternatively, if new technologies are not developed to better utilize the frequencies currently allocated for such use. Industry growth may also be affected by the cost of the new licenses required to use frequencies and any related frequency relocation costs.

The U.S. leads the world in spectrum deregulation, allowing new wireless communications technologies to be developed and offered for sale. Examples include wireless local area network systems, such as WiFi, and wide area network systems, such as WiMAX and LTE. Other countries have also deregulated portions of their available spectrum to allow deployment of these and other new technologies, which can be offered without spectrum license costs. Deregulation may introduce new competition and new opportunities for Motorola and our customers. In addition, Mobile WiMAX was recently approved as a global IMT (International Mobile Telecommunications) standard. This action lays the foundation to further expand mobile WiMAX in key bands, making additional spectrum available globally.

In January 2008, the Federal Communications Commission ("FCC") began its auction of 700 MHz band spectrum licenses in the United States. This spectrum can carry large amounts of data across long distances and penetrate walls easier than higher frequencies, enhancing in-building coverage. The open-access conditions are intended to help foster innovation in handsets and applications, however the actual impact of the new licenses is unclear. The open access provision applies to approximately one-third of the U.S. spectrum being auctioned and prevents the licensee from blocking devices or applications that are compatible with the network.

*Backlog*

The segment's backlog was $647 million at December 31, 2007, compared to $1.4 billion at December 31, 2006. This decrease in backlog is primarily due to a decline in customer demand driven by gaps in the segment's product portfolio. The 2007 backlog is believed to be generally firm and 100% of that amount is expected to be recognized as revenue in 2008. The forward-looking estimate of the firmness of such orders is subject to future events that may cause the amount recognized to change.

*Intellectual Property Matters*

Patent protection is extremely important to the segment's operations. The segment has an extensive portfolio of patents relating to its products, technologies and manufacturing processes. The segment licenses certain of its patents to third parties and generates revenue from these licenses. Motorola is also licensed to use certain patents owned by others. Royalty and licensing fees vary from year to year and are subject to the terms of the agreements and sales volumes of the products subject to licenses. The protection of these licenses is also important to the segment's operations. Reference is made to the material under the heading "Other Information" for additional information relating to patents and trademarks and research and development activities with respect to this segment.

*Inventory, Raw Materials, Right of Return and Seasonality*

The segment's practice is to carry reasonable amounts of inventory in manufacturing and distribution centers in order to meet customer delivery requirements in a manner consistent with industry standards. At the end of 2007, the segment had a lower inventory balance than at the end of 2006. The decrease reflects the significant decline in sales volumes during 2007, as well as an ongoing emphasis on managing inventory levels.

Table of Contents

5

Availability of materials and components required by the segment is relatively dependable, but fluctuations in supply and market demand could cause selective shortages and affect results. We currently source certain materials and components from single vendors. Any material disruption from a single-source vendor may have a material adverse impact on our results of operations.

Energy necessary for the segment's manufacturing facilities consists primarily of electricity and natural gas, which are currently in generally adequate supply for the segment's operations. In addition, the cost to operate our facilities and freight costs are dependent on world oil prices, which increased significantly during 2007 and increased our manufacturing and shipping costs. Labor is generally available in reasonable proximity to the segment's manufacturing facilities. However, difficulties in obtaining any of the aforementioned items or a significant cost increase could affect the segment's results.

The segment permits returns under limited circumstances to remain competitive with current industry practices.

The segment typically experiences higher sales in the fourth calendar quarter and lower sales in the first calendar quarter of each year due to seasonal trends in the wireless handset industry.

*Our Facilities/Manufacturing*

Our headquarters is located in Libertyville, Illinois. Our other major facilities are located in Plantation, Florida; Flensburg, Germany; Singapore; Beijing, Hangzhou and Tianjin, China; Jaguariuna, Brazil; Basingstoke, England; and Chennai, India. We have recently announced our intent to exit our Flensburg, Germany facility.

We also use several electronics manufacturing suppliers ("EMS") and original design manufacturers ("ODM") to enhance our ability to lower our costs and/or deliver products that meet consumer demands in the rapidly-changing technological environment. A portion of our handsets are manufactured either completely or substantially by non-affiliated EMS and ODM manufacturers and the percentage of total manufactured unit volume with these manufacturers increased moderately from 2006 to 2007.

In 2007, our handsets were primarily manufactured in Asia and we expect this to continue in 2008. Our largest manufacturing facilities are located in China, Singapore and Brazil. Each of these facilities serves multiple countries and regions of the world.

**Home and Networks Mobility Segment**

The Home and Networks Mobility segment ("Home and Networks Mobility" or the "segment") designs, manufactures, sells, installs and services: (i) digital video, Internet Protocol ("IP") video and broadcast network interactive set-tops ("digital entertainment devices"), end-to-end video delivery solutions, broadband access infrastructure systems, and associated data and voice customer premise equipment ("broadband gateways") to cable television and telecom service providers (collectively, referred to as the "home business"), and (ii) wireless access systems ("wireless networks"), including cellular infrastructure systems and wireless broadband systems, to wireless service providers. In 2007, the segment's net sales represented 27% of the Company's consolidated net sales.

*Principal Products and Services*

In the home business, the segment is a leading provider of end-to-end networks used for the delivery of video, data and voice services over hybrid fiber coaxial ("HFC") networks, digital subscriber line ("DSL") and passive optical networks ("PON"). Our portfolio includes: MPEG video encoding equipment for standard-definition and high-definition television ("HDTV" or "HD"); video processing and multiplexing systems; video on-demand, switched digital video and conditional access solutions used by network operators and programmers to deliver video programming. We provide a broad array of digital entertainment devices supporting analog, digital and IP video delivery including HD and digital video recording ("DVR") (together, "HD/DVR") applications. We support the delivery of high-speed data and voice services with head-end and central office equipment, along with data and voice modems and gateways for HFC and DSL networks and optical line terminals for PON networks.

In the wireless networks business, the segment provides end-to-end cellular networks, including radio base stations, base station controllers, associated software and services, application platforms and third-party switching for CDMA, GSM, iDEN® and UMTS technologies. The segment also offers a portfolio of WiMAX products to

**APP. 23**

Table of Contents

6

create mobile IP broadband access. WiMAX has the potential to make mobile bandwidth more affordable and accessible for mainstream consumer adoption.

Our products are marketed primarily to cable television operators, television programmers, telecom operators, wireless service providers and other communications providers worldwide and are sold primarily by our skilled sales personnel.

*Our Industry*

The home market is evolving rapidly as cable and telecom network operators expand their video, data and voice services (commonly known as the "triple play") to grow their subscriber base. The competition between cable and telecom service providers is increasing. Telecom operators are expanding their broadband networks and beginning to offer advanced video and data services using IPTV and PON technologies. Cable operators are responding by expanding their investment in HD programming, bundling voice-over-IP services, expanding their broadband data service through Data Over Cable Service Interface Specifications ("DOCSIS") 3.0 channel bonding, and maximizing utilization of network bandwidth using switched digital video.

Our home business is subject to regulation by the FCC in the United States and other governmental communication regulators throughout the world. On July 1, 2007, regulations enacted by the FCC became effective, requiring separation of security functionality from cable set-tops. A full two-way security interface continues to be refined. Once developed and implemented, these changes are expected to increase competition and encourage the sale of set-tops and integrated devices, such as televisions and DVRs, that will allow retail customers direct access to programming. Traditionally, service providers have leased digital entertainment devices to their customers.

In the wireless networks market, the majority of installed cellular infrastructure systems are based on CDMA, GSM, UMTS and iDEN technologies. We supply systems based on each of these technologies and are the sole supplier of proprietary iDEN networks. Advanced infrastructure systems based on these technologies include GPRS, CDMA-1X and EDGE. In addition, some segments of the cellular infrastructure industry have installed, or are in the process of migrating to, 3G networks, which are high-capacity radio access wireless networks providing enhanced data services, improved Internet access and increased voice capacity. The primary 3G technologies are W-CDMA (based on either UMTS or Freedom of Mobile Multimedia Access ("FOMA") technologies) and CDMA2000 1xEVDO. We supply 3G systems based on UMTS and CDMA 2000 1xEVDO technologies. An additional 3G technology standard is TD-SCDMA, driven primarily by the Chinese government and local Chinese vendors. We expect 3G licenses to be awarded in China during 2008.

Industry standards bodies are in the process of defining the next generation of wireless broadband systems after 3G. The Institute of Electrical and Electronics Engineers ("IEEE") is currently developing fixed and mobile broadband standards (802.16d and 802.16e) based on orthogonal frequency division multiplexing ("OFDM") technology, which will utilize wider channels and enable triple play services (voice, data, video). Based upon developments in the 802.16e standard, we expect to see the WiMAX market begin to develop in 2008 as several WiMAX networks come on-line and devices utilizing these networks become widely available. We are an early leader in next-generation wireless broadband products, including WiMAX technology.

The International Telecommunications Union ("ITU") is also adopting next-generation cellular wireless access standards ("4G") for the cellular infrastructure industry, also based on OFDM technology and known commonly as Long Term Evolution ("LTE"). LTE has widespread industry support, not only from current GSM/UMTS operators, but also from CDMA/EV-DO based carriers. Motorola has been chosen as a trial supplier for a joint Verizon/Vodafone LTE trial that is currently underway.

Licensing bodies of governments around the world are making spectrum available for advanced wireless technologies, including 4G, in recognition of growing demand for wireless broadband services. Currently, Motorola estimates that there are over 1,200 licenses available worldwide for advanced wireless technologies, such as 802.16e, with over 800 licenses outside North America.

Demand for our products depends primarily on: (i) capital spending by providers of cellular and broadband services for constructing, rebuilding or upgrading their communications systems, and (ii) the marketing of advanced communications services by those providers. The amount of spending by these providers, and therefore a majority of our sales and profitability, are affected by a variety of factors, including: (i) the continuing trend of consolidation within the cable, wireline and wireless industries, (ii) the financial condition of operators and alternative providers, including their access to financing, (iii) technological developments, (iv) standardization

# EXHIBIT B



**IPR online database**                                                    2008-04-08

HOME   PRINT                                                        HELP   HELPDESK

**IPR Declarations Search** Collapse ⌃

**Search for**
○ General IPR declarations only
○ IS&LD of IPR only
◉ Both

- Company name- ▼

- Country of Registration - ▼

- Project -
All Projects
(not available)

*The list of projects is **not exhaustive***
Multiple projects selection using :
◉ Or  ○ And

**Application No.**

**Patent No.**

**Patent Title**

- Countries applicable to app./pat
To be defined
ANDORRA - AD

Multiple selection using :
◉ Or  ○ And

**Declaration date to ETSI:** ⓘ

**ETSI Deliverable:** ⓘ

**Notes:** ⓘ

SEARCH   RESET

# IPR Search tool

Search the ETSI IPR Online database by using the selection criteria.
Clicking the "Search" button will display all the matching IPR declarations.

As of **2008-04-08**, the ETSI IPR Database contains **18296** entries

organized in **73** projects between **144** companies

**APP. 26**

Copyright © ETSI 2002 - All rights reserved | Legal Notice | ISO 9002 certified.

99

# Exhibit 5

1

2

3

4

5

6

7
UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
8
AT SEATTLE

9
DR. HERBERT R. PUTZ, an individual; and
PANONIA REALTY CORP., a foreign
10
corporation,

11
                            Plaintiffs,

12
       v.

13
MICHAEL H. GOLDEN and SUZANNE C.
GOLDEN, husband and wife, and the marital
14
community comprised therein, Societe Civile
Immobiliere Paepaepupure, a foreign
15
partnership,

16
                    Defendants.

17

No.

COMPLAINT FOR SPECIFIC
PERFORMANCE AND DAMAGES

18
        1.       Plaintiffs DR. HERBERT R. PUTZ ("Dr. Putz") and PANONIA REALTY

19
CORPORATION ("Panonia") (collectively, "Plaintiffs"), by and through their attorneys,

20
allege the following complaint against Defendants MICHAEL H. GOLDEN, SUZANNE C.

21
GOLDEN, ("the Goldens"), and Societe Civile Immobiliere Paepaepupure ("SCIP")

22
(collectively, "Defendants"):

23

24

25

COMPLAINT FOR SPECIFIC PERFORMANCE AND
DAMAGES – 1

CORR CRONIN MICHELSON
BAUMGARDNER & PREECE LLP
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154-1051
Tel (206) 625-8600
Fax (206) 625-0900

**INTRODUCTION**

2.      This action concerns the sale by the Goldens of eighteen (18) shares in "SCIP stock, which represent a stand-alone bungalow in Bora Bora, French Polynesia ("Bungalow #12").

3.      In 1987, the Goldens entered into a valid contract with Dr. Putz to sell Dr. Putz eighteen shares of SCIP stock representing Bungalow #12.

4.      In effect, the Goldens promised to transfer ownership of Bungalow #12 to Dr. Putz. To accomplish this, and fully perform their contractual obligations, the Goldens promised to perform two items: (a) transfer ownership of eighteen shares of SCIP stock to Dr. Putz, and (b) obtain proper SCIP board approval of the SCIP share transfer.

5.      In reliance on the Goldens' contractual representations, Dr. Putz fully performed his obligation under the 1987 contract, paying the Goldens $117,500.00.

6.      The Goldens, however, breached their 1987 contractual obligations in all respects. The Goldens had in 1987, and have now, both Dr. Putz's performance payment of $117,500.00 and the eighteen shares of SCIP stock representing Bungalow #12.

7.      The Goldens never validly transferred the eighteen shares of SCIP stock to Dr. Putz.

8.      The Goldens never obtained proper SCIP board approval of the transfer of eighteen shares of SCIP stock to Plaintiffs.

9.      The Goldens and Dr. Putz operated under the belief that Dr. Putz was the owner of Bungalow #12. But because the Goldens never obtained proper SCIP board approval of the SCIP share transfer, SCIP does not recognize Dr. Putz as the owner of Bungalow #12.

COMPLAINT FOR SPECIFIC PERFORMANCE AND
DAMAGES – 2

**CORR CRONIN MICHELSON
BAUMGARDNER & PREECE LLP**
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154-1051
Tel (206) 625-8600
Fax (206) 625-0900

10. As a result, SCIP ousted Dr. Putz from Bungalow #12. Since the ouster, Dr. Putz has been unable to rent Bungalow #12, and Bungalow #12 has fallen into disrepair.

11. Dr. Putz has informed Defendants of his ouster, his resultant loss of rental income from the property, and that Bungalow #12 has fallen into disrepair. The Goldens refused to fulfill their contractual obligations and end Dr. Putz's ouster, and Defendants have refused to allow Plaintiffs into Bungalow #12.

12. Defendants had the ability to prevent, and have the ability to abate Dr. Putz's ouster, and the Goldens have the ability to fulfill their contractual promises by either (a) converting the eighteen SCIP shares into a deed for Bungalow #12, and then transferring ownership of that deed to Dr. Putz; or (b) obtaining SCIP board approval of a transfer of the eighteen SCIP shares to Dr. Putz. The Goldens have done neither option.

13. Accordingly, the Goldens negligently misrepresented their contractual obligations to Dr. Putz and have breached the 1987 contract with Dr. Putz. Defendants are intentionally interfering with Dr. Putz's business expectations, and are intentionally engaged in an ongoing interference with Dr. Putz's property.

## **PARTIES**

14. Plaintiff Dr. Putz is a citizen and resident of Virginia, residing at eighteen25 Locust Grove Church Road, Orange, VA 22960.

15. Plaintiff Panonia is incorporated in New York with its principal place of business at eighteen25 Locust Grove Church Road, Orange, VA 22960.

16. The Goldens are residents of the state of Washington, residing at 10919 SE 25th Street, Bellevue, WA 98004.

17. SCIP is a partnership organized under the laws of Bora Bora, French Polynesia, but doing business in the United States. The CEO and Chairman of the Board of

COMPLAINT FOR SPECIFIC PERFORMANCE AND
DAMAGES – 3

CORR CRONIN MICHELSON
BAUMGARDNER & PREECE LLP
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154-1051
Tel (206) 625-8600
Fax (206) 625-0900

1  Directors for SCIP is Francois "Frank" Ergas. Upon information and belief, Mr. Ergas resides

2  in San Jose, California.

3  **JURISDICTION & VENUE**

4  18.    This Court has jurisdiction under 28 U.S.C. § 1332 as a civil action between

5  citizens of different states with an amount in controversy, exclusive of interest and costs,

6  substantially exceeding $75,000.00.

7  19.    Venue is proper in this Court under 28 U.S.C. § 1391(a), as Defendants are

8  residents of this judicial district and a substantial number of events giving rise to this action

9  occurred in King County, Washington.

10  **FACTS**

11  20.    SCIP is a real estate partnership located in Bora Bora, French Polynesia.

12  SCIP's main objective was the acquisition of residential property located in Paepaepupure, in

13  Bora Bora, and then construction on this property of 16 bungalows.

14  21.    SCIP bought residential property in Paepaepupure, including the property in

15  question, on behalf of its partners. The partners were then issued stock in the partnership

16  which represented specific bungalows. The partners owning stock shares have a right to

17  convert the stock into a deed for the respective property and the land underneath. The stock-

18  to-deed conversion does not require SCIP board approval.

19  22.    At some time prior to 1987, the Goldens were the rightful owners of eighteen

20  shares of SCIP stock– numbers 206 to 224. These shares were understood by all parties to

21  represent the ownership of Bungalow #12.

22  23.    On or about March 29, 1987, the Goldens contracted with Dr. Putz to transfer

23  these eighteen shares of SCIP stock to Dr. Putz for $117,500.00 (the "Contract"). *See* Exhibit

24  A, Real Estate Purchase and Sale Agreement.

25

COMPLAINT FOR SPECIFIC PERFORMANCE AND
DAMAGES – 4

CORR CRONIN MICHELSON
BAUMGARDNER & PREECE LLP
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154-1051
Tel (206) 625-8600
Fax (206) 625-0900

24. In the Contract, the Goldens made two contractual promises: (1) the Goldens promised to transfer ownership of the eighteen shares of SCIP stock to Dr. Putz; and (2) the Goldens promised to "arrange that the [SCIP] Board of Directors will approve the transfer of stocks as required by the By-Laws of" SCIP. *See* Ex. A, Addendum; Ex. B, Affidavit of Michael H. Golden, ¶ 2.

25. In August 1987, the Goldens were the "sole shareholders" and officers of Panonia. *See* Exhibit C, Corporate Documents of Panonia, at 20, 23; Ex. B, ¶ 6. The Goldens intended to transfer the eighteen SCIP shares representing Bungalow #12 first to Panonia, and then through Panonia to Dr. Putz. *See* Ex. B, ¶ 6.

26. On September 30, 1987, Defendants transferred their ownership of the eighteen shares of SCIP stock to Panonia. *See* Ex. B, ¶¶ 6, 7.

27. The Goldens assigned and transferred all of their shares in Panonia to Dr. Putz on October 2, 1987, which constituted an entire transfer of ownership of Panonia to Dr. Putz. *See* Ex. B, ¶ 9; Ex. C. Dr. Putz is still the owner of all of Panonia's shares.

28. To obtain SCIP board approval of the share transfer, Defendant Michael Golden sent a letter on April 16, 1987 to the SCIP board notifying them of the pending transfer of the eighteen SCIP shares to Dr. Putz. *See* Ex. D, April 16, 1987 Letter From Michael Golden to Board of Directors of Societe Paepaepupure; Ex. B, ¶ 4. At that time, Defendant Michael Golden was on the board of SCIP (*see* Ex. D), and the Goldens claim that they obtained proper SCIP board approval of the share transfer at the 1987 SCIP board meeting held in Los Angeles, California. *See* Ex. B, ¶ 5.

29. Dr. Putz performed the entirety of his obligation under the Contract, making payment in full of $117,500.00 to the Goldens.

COMPLAINT FOR SPECIFIC PERFORMANCE AND
DAMAGES – 5

**CORR CRONIN MICHELSON
BAUMGARDNER & PREECE LLP**
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154-1051
Tel (206) 625-8600
Fax (206) 625-0900

30.     Since 1987, in reliance on the Goldens' contractual representations, Dr. Putz operated under the belief that he was the owner of the eighteen shares of SCIP stock, and that Dr. Putz was entitled to redeem those shares for a deed and actual title to Bungalow #12.

31.     In reliance on the Goldens' contractual representations, Dr. Putz made regular payment of the SCIP maintenance dues totaling at least $175,151.00. Dr. Putz paid approximately $25,000.00 in necessary repairs to Bungalow #12, and Dr. Putz purchased considerable non-fixture improvements to Bungalow #12.

32.     Dr. Putz regularly rented Bungalow #12 for rental income property. SCIP was aware that Dr. Putz used, and would continue to use Bungalow #12 as rental property.

33.     From 1987 until August 2008, SCIP only sent Plaintiffs billing for maintenance and association fees. During this time, SCIP never sent the Goldens any billing for any maintenance fees, nor did the Goldens receive any invitation to a general assembly of SCIP stockholders.

34.     On or about April 17, 2003, Dr. Putz attempted to redeem the eighteen shares of SCIP stock he believed he owned in exchange for title to Bungalow #12.

35.     SCIP denied Dr. Putz's attempt to redeem the stock certificates. SCIP refused to recognize the 1987 transfer of the eighteen shares of SCIP stock to Panonia.

36.     The Contract has not been rescinded.

37.     Defendants have not transferred, or attempted to transfer, the eighteen SCIP shares to anyone other than Plaintiffs.

38.     Transfer of SCIP shares is governed by Article 13-A of the SCIP statutes. Transfer of SCIP shares to a third-party can only occur with the prior consent of SCIP board management. *See* Ex. E, Brief of SCIP to Court of Appeal of Papeete, Bora Bora, No. 144, RG 269/OR/05 (March 27, 2008), at 3 (English translation).

COMPLAINT FOR SPECIFIC PERFORMANCE AND
DAMAGES – 6

CORR CRONIN MICHELSON
BAUMGARDNER & PREECE LLP
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154-1051
Tel (206) 625-8600
Fax (206) 625-0900

106

39.     SCIP took the position that it "d[id] not [have] any documents related to the transfer of September 30, 1987" between the Goldens and Plaintiffs.  *See* Ex. E, at 4.  SCIP's position is that it had no deed of conveyance of partnership shares from the Goldens; SCIP had no registered letter from the Goldens requesting the approval of SCIP management for the share transfer; SCIP had no record of management approval of the share transfer; and SCIP had no notification of the transfer by extra judiciary act conforming to article 1690 of the Civil Code.  *See* Ex. E, at 4.  According to SCIP, satisfaction of all of these conditions was required before transfer of the eighteen shares of SCIP stock to Panonia could be approved by the SCIP board.  *See* Ex. E, at 4.

40.     SCIP took the position that because the SCIP board never approved the Goldens' transfer of the eighteen shares of SCIP stock to Panonia, when the Goldens transferred their entire interest in Panonia to Dr. Putz, Panonia did not own the eighteen shares of SCIP stock representing Bungalow #eighteen.

41.     Dr. Putz, through Panonia, brought suit in French Polynesia against SCIP in an effort to force SCIP to convey title in Bungalow #12 to Panonia.  The trial court (Court of First Instance of Papeete, Local Section of Raiatea), dismissed Panonia's suit for lack of jurisdiction.

42.     In May 2005, during appeal of the dismissal of the French Polynesian litigation, Dr. Putz contacted the Goldens to get assistance in obtaining title to Bungalow #12.

43.     The Goldens agreed to help Dr. Putz, and Defendant Michael Golden signed an affidavit averring that the Goldens transferred, and allegedly received proper board approval of the transfer of the eighteen shares of SCIP stock representing Bungalow #12.  *See* Ex. B.

COMPLAINT FOR SPECIFIC PERFORMANCE AND
DAMAGES – 7

**CORR CRONIN MICHELSON
BAUMGARDNER & PREECE LLP**
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154-1051
Tel (206) 625-8600
Fax (206) 625-0900

44.     On appeal, despite the Defendant Michael Golden's affidavit, the Court of Appeal of Papeete, Civil Chamber remanded the case to a lower court. No further action has occurred in the French Polynesian litigation.

45.     Between May 2005 and January 2009, Defendants and Dr. Putz had ongoing communications through email and telephone conversations. The Goldens attempted to assist Dr. Putz to complete the SCIP share transfer agreed to in the Contract. *See* Ex. F, Transcript of Evidentiary Hearing Before the Honorable B. Waugh Crigler, United States Magistrate Judge, *Putz v. Golden*, No. 3:09-cv-00003, (W.D. Va. May 28, 2009), at 39:12-40:10. SCIP, the Goldens and Dr. Putz communicated by mail, telephone, and email regarding Plaintiffs' ouster and a share-to-deed conversion.

46.     Plaintiffs repeatedly communicated to the Goldens that Plaintiffs were ousted by SCIP from Bungalow #12; and as a result, Plaintiffs could not rent the property and would continue to lose rental income from Bungalow #12 until the Goldens resolved the ouster.

47.     The communications proved fruitless. In late 2008, the Goldens stopped assisting Dr. Putz and refused to fulfill their contractual obligations. And the Goldens and SCIP refused to abate Plaintiffs' ouster.

48.     The Goldens have admitted that SCIP has told the Goldens that they are currently the owners of the eighteen SCIP shares. *See* Ex. G, Memorandum Opinion, *Putz v. Golden*, No. 3:09-cv-00003, (W.D. Va. Dec. 31, 2009), at 6 n.4. In communications with SCIP and its agents, Defendants acknowledged and acted as if the Goldens were the owners of the eighteen SCIP shares representing Bungalow #12.

49.     In August 2008, SCIP began sending the Goldens invoices for maintenance and association fees related to Bungalow #12.

COMPLAINT FOR SPECIFIC PERFORMANCE AND
DAMAGES – 8

CORR CRONIN MICHELSON
BAUMGARDNER & PREECE LLP
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154-1051
Tel (206) 625-8600
Fax (206) 625-0900

50.     The Goldens now have the $117,500.00 that Dr. Putz paid the Goldens for Bungalow #12, and they own Bungalow #12.  The Goldens have not fulfilled their contractual promises.

51.     Defendants could arrange for the redemption by the Goldens of the eighteen shares of SCIP stock that they own into a deed for Bungalow #12.  This stock-to-deed conversion would not require prior SCIP board approval.  The Goldens could then transfer the deed to Dr. Putz fulfilling their contractual obligations.  Dr. Putz has repeatedly requested Defendants perform the stock-to-deed conversion, but Defendants have not done so, and continue to refuse to perform this simple transaction.

52.     On January 27, 2009, Dr. Putz filed suit in the United States District Court for the Western District of Virginia against the Goldens to enforce his contractual rights to Bungalow #12 and recover damages from the Goldens' breach of contract and tortious conduct.  That suit was dismissed on December 31, 2009 for lack of personal jurisdiction. *See* Ex. G.  Nothing from the disposition of the Virginia lawsuit prevents this action before this Court.

53.     Because the Goldens breached the contract and failed to properly transfer the eighteen SCIP shares, the Goldens have both the $117,500.00 and ownership of Bungalow #12.  Because of the Goldens' representations and failures, Dr. Putz has been forced to spend additional monies in an attempt to properly affect the SCIP share transfer, including court costs and legal fees.

## FIRST CAUSE OF ACTION

### Breach of Contract – Against Defendants Michael and Suzanne Golden

54.     Plaintiffs reallege and incorporate by reference paragraphs 1 through 53 above.

COMPLAINT FOR SPECIFIC PERFORMANCE AND
DAMAGES – 9

CORR CRONIN MICHELSON
BAUMGARDNER & PREECE LLP
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154-1051
Tel (206) 625-8600
Fax (206) 625-0900

55.     The Contract is a valid and enforceable contract, supported by valuable consideration.

56.     Dr. Putz has fully performed all of his obligations under the Contract.

57.     The Goldens had a contractual obligation to transfer ownership of the eighteen shares of SCIP stock to Dr. Putz.

58.     The Goldens failed to transfer ownership of the eighteen shares of SCIP stock to Dr. Putz.

59.     The Goldens had a contractual obligation to obtain SCIP board approval in accordance with SCIP's by-laws of the transfer of the eighteen shares of SCIP stock to Dr. Putz.

60.     The Goldens failed to arrange for SCIP board approval of the transfer of the eighteen shares of SCIP stock.

61.     The Goldens have reaffirmed their obligation to both transfer the eighteen SCIP shares to Dr. Putz, and to obtain SCIP board approval of the transfer.

62.     By the acts and omissions described herein, the Goldens materially breached the Contract.

63.     As a direct and proximate result of the Goldens' breach of Contract, the Goldens caused reasonably foreseeable direct and consequential damages to Plaintiffs.

64.     Due to the Goldens' breach of contract, Plaintiffs are entitled to rescission of the Contract and damages in an amount not less than $517,571.00.

<div align="center">

**SECOND CAUSE OF ACTION**

**Breach of Implied Covenant of Good Faith and Fair Dealing – Against Defendants**

**Michael and Suzanne Golden**

</div>

65.     Plaintiffs reallege and incorporate by reference paragraphs 1 through 64 above.

COMPLAINT FOR SPECIFIC PERFORMANCE AND
DAMAGES – 10

CORR CRONIN MICHELSON
BAUMGARDNER & PREECE LLP
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154-1051
Tel (206) 625-8600
Fax (206) 625-0900

66.     The Contract includes implied covenants of good faith and fair dealing between the Goldens and Plaintiffs.

67.     The Goldens' conduct represents a breach of the covenants of good faith and fair dealing.

68.     As a proximate result of such breach, Plaintiffs have suffered injury in an amount to be proven at trial.

### THIRD CAUSE OF ACTION

### Negligent Misrepresentation – Against Defendants Michael and Suzanne Golden

69.     Plaintiffs reallege and incorporate by reference paragraphs 1 through 68 above.

70.     The Goldens represented that they would transfer the eighteen shares of SCIP stock representing ownership of Bungalow #12 to Dr. Putz.

71.     The Goldens represented that they would arrange SCIP board approval of the transfer of the eighteen shares of SCIP stock to Dr. Putz.

72.     The Goldens intended for Plaintiffs to rely and Plaintiffs did reasonably rely on such representations by entering into the Contract.

73.     The representations were material to the Contract.

74.     The Goldens negligently made the representations as the Goldens knew, or in the exercise of reasonable care should have known, that they were not able, or lacked the ability, to affect the transfer and obtain SCIP board approval of the eighteen shares of SCIP stock.

75.     As a result of the Goldens' material misrepresentations, Plaintiffs have been injured in an amount not less than $517,571.00.

COMPLAINT FOR SPECIFIC PERFORMANCE AND
DAMAGES – 11

CORR CRONIN MICHELSON
BAUMGARDNER & PREECE LLP
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154-1051
Tel (206) 625-8600
Fax (206) 625-0900

76.     As a result of the Goldens' material misrepresentations, Bungalow #12 has fallen into disrepair and decreased in property value.  Plaintiffs are entitled to recover damages for such physical harm to the property in amounts to be determined at trial.

## FOURTH CAUSE OF ACTION

### Intentional Interference With Property – Against Defendants Michael and Suzanne Golden, and SCIP

77.     Plaintiffs reallege and incorporate by reference paragraphs 1 through 76 above.

78.     SCIP has improperly ousted Plaintiffs from Bungalow #12.  Plaintiffs' removal from Bungalow #12 is ongoing and continuous.

79.     By ousting Plaintiffs from Bungalow #12, SCIP is the direct and proximate cause of Plaintiffs' continued and ongoing removal from Bungalow #12.

80.     By breaching the Contract, the Goldens have directly and proximately caused SCIP's ouster of Plaintiffs from Bungalow #12.

81.     By failing to perform on the Contract, the Goldens are the direct and proximate cause of Plaintiffs' continued and ongoing removal from Bungalow #12.

82.     By failing to convert the eighteen shares of SCIP stock into a deed for Bungalow #12, and then transferring that deed to Plaintiffs, the Goldens are the direct and proximate cause of Plaintiffs' continued and ongoing removal from Bungalow #12.

83.     Because of Defendants' intentional and continuing interference with, and failure to abate Plaintiffs' continued and ongoing ouster from, Bungalow #12, Plaintiffs have lost rental profits and sustained emotional damages, and the property has decreased in value and fallen into disrepair, in amounts to be proven at trial.

COMPLAINT FOR SPECIFIC PERFORMANCE AND
DAMAGES – 12

CORR CRONIN MICHELSON
BAUMGARDNER & PREECE LLP
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154-1051
Tel (206) 625-8600
Fax (206) 625-0900

112

**FIFTH CAUSE OF ACTION**

**Intentional Interference With Business Expectancy – Against Defendants Michael and Suzanne Golden, and SCIP**

84.     Plaintiffs reallege and incorporate by reference paragraphs 1 through 83 above.

85.     From 1987 until Plaintiffs were ousted, Plaintiffs routinely used Bungalow #12 as rental property.

86.     Plaintiffs fully expected to continue to use Bungalow #12 as rental property in the future.

87.     Defendants knew that Plaintiffs used Bungalow #12 as rental property.

88.     By ousting Plaintiffs and refusing to allow Plaintiffs to use Bungalow #12 as a rental property, SCIP has directly and proximately caused the continued removal of Plaintiffs from Bungalow #12.

89.     By breaching the Contract, the Goldens have directly and proximately caused an ouster of Plaintiffs from Bungalow #12.

90.     By failing to perform on the Contract, the Goldens are the direct and proximate cause of Plaintiffs' continued removal from Bungalow #12.

91.     By failing to abate Plaintiffs ouster, Defendants have directly and proximately caused the continued removal of Plaintiffs from Bungalow #12.

92.     By failing to convert the eighteen shares of SCIP stock into a deed for Bungalow #12, and then transferring that deed to Plaintiffs, the Goldens have evinced a desire to obtain and keep property rights to Bungalow #12 while keeping Plaintiffs' $175,500.00.

93.     The Goldens' breach of contract and Defendants failure to abate Plaintiffs' ouster have prevented Plaintiffs from using Bungalow #12 as rental property, caused Bungalow #12 to fall into disrepair, and caused a diminution in value to the property.

COMPLAINT FOR SPECIFIC PERFORMANCE AND
DAMAGES – 13

CORR CRONIN MICHELSON
BAUMGARDNER & PREECE LLP
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154-1051
Tel (206) 625-8600
Fax (206) 625-0900

113

94.     Because of Defendants' intentional interference with Plaintiffs' rental business expectations, Plaintiffs have lost rental profits and sustained emotional damages, and the property has decreased in value and fallen into disrepair in amounts to be proven at trial.

## SIXTH CAUSE OF ACTION

### Declaratory Judgment – Against Defendants Michael and Suzanne Golden, and SCIP

95.     Plaintiffs reallege and incorporate by reference paragraphs 1 through 94 above.

96.     Based on Defendants' improper conduct, a dispute exists between Plaintiffs and Defendants regarding breach of the Contract and ownership of the eighteen SCIP shares representing Bungalow #12.

97.     This is a justiciable controversy.  It is an actual, present, and existing dispute; it is between parties having genuine and opposing interests; these interests are direct and substantial; and judicial determination of this dispute will finally and conclusively establish the rights of the parties.

98.     Under 28 U.S.C. § 2201, Plaintiffs seek a declaration of rights to determine

    a.   If the Goldens breached the Contract; and

    b.   Who is the rightful owner of the eighteen SCIP shares representing Bungalow #12.

## REQUEST FOR RELIEF

99.     WHEREFORE, Plaintiffs pray that this Court enter judgment in their favor against Defendants jointly and severally as follows:

    a.       That the Contract be rescinded and Plaintiffs be awarded judgment against the Goldens in the amount of the compensatory, consequential, and restitution damages sustained of at least $517,571.00, or otherwise according to proof at trial;

COMPLAINT FOR SPECIFIC PERFORMANCE AND
DAMAGES – 14

**CORR CRONIN MICHELSON
BAUMGARDNER & PREECE LLP**
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154-1051
Tel (206) 625-8600
Fax (206) 625-0900

1    b.    Alternatively, that specific performance of the Contract be awarded
2    requiring Defendants to take all steps necessary to affect the transfer of Bungalow #12 to
3    Plaintiffs; and Defendants pay Plaintiffs consequential damages in an amount to be proven at
4    trial;
5    c.    That this Court grant a declaratory judgment that the Goldens breached
6    the Contract; and a declaration of the respective rights and duties of Plaintiffs and Defendants
7    as to the ownership of the eighteen SCIP shares representing Bungalow #12;
8    d.    That Plaintiffs be awarded judgment against Defendants for disrepair
9    and diminution to Bungalow #12, loss of rental profits, and emotional damages in an amount
10   to be proven at trial;
11   e.    That, as to each Count, Plaintiffs be awarded judgment against
12   Defendants for pre- and post-judgment interest as permitted by law;
13   f.    Plaintiffs be awarded their costs and attorneys' fees expended in this
14   matter; and
15   g.    That the Court grant Plaintiffs such other and further relief as the Court
16   may deem just and proper.
17
18   DATED this 30th day of April 2010.
19                                  CORR CRONIN MICHELSON
20                                  BAUMGARDNER & PREECE LLP
21
22                                  _____/s/_____
22                                  Steven W. Fogg, WSBA No. 23528
23                                  Patrick T. Jordan, WSBA No. 40292
                                    Attorneys for Plaintiffs
24
25

COMPLAINT FOR SPECIFIC PERFORMANCE AND
DAMAGES – 15

CORR CRONIN MICHELSON BAUMGARDNER & PREECE LLP
1001 Fourth Avenue, Suite 3900
Seattle, Washington 98154-1051
Tel (206) 625-8600
Fax (206) 625-0900

115

# Exhibit 6

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| DR. HERBERT R. PUTZ, an individual; and PANONIA REALTY CORP., a foreign corporation,<br><br>                              Plaintiffs,<br><br>v.<br><br>MICHAEL H. GOLDEN and SUZANNE C. GOLDEN, husband and wife, and the marital community comprised therein; and SOCIETE CIVILE IMMOBILIERE PAEPAEPUPURE, a foreign partnership,<br><br>                              Defendants. | NO.  2:10-cv-00741-JLR<br><br>**DEFENDANTS MICHAEL AND SUZANNE GOLDENS' MOTION TO DISMISS PLAINTIFFS' COMPLAINT**<br><br>**Noted for:  August 6, 2010**<br><br>**ORAL ARGUMENT REQUESTED** |

## I.    INTRODUCTION AND RELIEF REQUESTED

More than two decades ago, in 1987, Michael and Suzanne Golden ("Goldens"), then

residents of Bellingham, Washington entered into a contract with Herbert Putz ("Putz") for the

sale of 18 shares of a partnership located in French Polynesia by the name of Societe Civile

Immobilier Paepaepupure ("SCIP").  SCIP owned 16 bungalows in Paepaepupure, French

Polynesia, and each owner of shares in SCIP had the right to use a particular bungalow.  The

Law Offices of
**Wolfstone, Panchot & Bloch, P.S., Inc.**
**1111 Third Avenue, Suite 1800**
**Seattle, Washington  98101**
**Phone:    (206) 682-3840**
**Fax:       (206) 340-8837**

1   owner of the 18 shares in question had the right to bungalow number 12. *Plaintiffs' Complaint*

2   *for Specific Performance and Damages ("Complaint"), ¶¶ 20-23.*

3       For reasons unknown to the Goldens, Putz then formed a corporation named Panonia

4   Realty Corporation ("Panonia"), assigned the share contract to Panonia and arranged for the

5   Goldens to transfer the shares of SCIP first to Panonia and then to Putz. Putz admits that on

6   September 30, 1987 the Goldens transferred their ownership of the 18 shares of SCIP to Panonia.

7   *Complaint, ¶ 26.* Putz also admits that the Goldens then assigned and transferred all of their

8   shares in Panonia to Putz on October 2, 1987. *Complaint, ¶ 26.* Finally, Putz admits that he

9   remains today the sole owner of Panonia. *Complaint, ¶ 27.*

10

11      In 1987, after his corporation received the shares, Putz took possession of bungalow

12  number 12. From 1994 to 2001 Putz claimed to be the manager of SCIP. *Complaint, Ex. E, p.*

13  *56.*[1] In 2003 Putz attempted to convert his 18 shares into an actual deed for bungalow #12.

14  *Complaint, Ex. G, Memorandum Opinion, Putz v. Golden, No. 3:09-cv-00003, (W.D. Va. Dec.*

15  *31,2009), at 107.* SCIP declined his request. *Id.*

16

17      Through his corporation Panonia, Putz filed suit against SCIP on July 27, 2004 in the

18  Court of First Instance of Pateete, French Polynesia.[2] *Complaint, Ex. E, p. 53.* The aim of this

19  action was apparently to force SCIP to convert Putz's shares in SCIP into a deed for bungalow

20  #12. In the litigation, the French Polynesian court stated: "In this specific case, the judge is

21

22  ---
    [1] Page references to exhibits to Plaintiffs' Complaint and the accompanying Declaration of Howard (Terry) Hall in
    Support of Defendants Goldens' Motion to Dismiss ("Hall Dec.") are to the Bates-stamped number in the lower left-
23  hand corner of the exhibit page.
    [2] Earlier litigation involving Putz and SCIP may have occurred in French Polynesia concerning the shares and the
24  bungalow. Exhibit E to Plaintiffs' Complaint contains a brief of SCIP that references a number of attachments,
    including a court order dated September 2001. *Complaint, Ex. E, p. 56.* While Plaintiffs were involved in the
    foreign litigation in which the SCIP brief was filed, and presumably served on Plaintiffs, they have never provided
    the attachments to the brief, either in the Virginia litigation discussed below or in the current litigation.

DEFS GOLDENS' MOTION TO DISMISS PLTFS' COMPLAINT - 2
NO. 2:10-cv-00741-JLR

Law Offices of
Wolfstone, Panchot & Bloch, P.S., Inc.
1111 Third Avenue, Suite 1800
Seattle, Washington 98101
Phone:   (206) 682-3840
Fax:     (206) 340-8837

1    asked to rule on the validity of a share transfer with respect not only to its formal legitimacy, but

2    also with respect to the applicable statutes and law No. 84-820 of September 6, 1984, modified,

3    giving autonomous status to the territory of French Polynesia." *Complaint, Ex. E, p. 50*

4    *(translation found at p. 13 of Ex. A to the accompanying Hall Dec.[3])* The case was appealed and

5    then remanded to the lower court where it remains pending today on the issue of the legitimacy

6
     of the share transfer. *Complaint, ¶ 44.*
7

8         With the French Polynesia action still pending, Plaintiffs filed suit in 2009 in the United

9    States District Court for the Western District of Virginia against the Goldens, who currently

10   reside in Bellevue, Washington.  Plaintiff initially asserted in the Virginia action that the SCIP

11   brief attached as part of Exhibit E to their Complaint in this action was a ruling of the French

12   Polynesian Appellate Court.[4]  In the brief, SCIP argues that its files did not have any documents

13   from seventeen years earlier, and that the documents Putz provided in English were not sufficient

14
     to show he was the owner of the 18 shares of SCIP. *Complaint, Ex. E, pp. 54, 55.* On December
15
16   31, 2009, Judge Norman Moon dismissed the Virginia action for a lack of personal jurisdiction.

17   *Complaint, Ex. G, p. 115.*

18        Now, twenty-two years after the Goldens transferred the SCIP shares to Plaintiffs and

19   with the case in French Polynesia still pending, Plaintiffs bring this action asserting that the

20

21   _____

22   [3] Plaintiffs did not include the English translation of that portion of Exhibit E to their Complaint that is in French.
     For the Court's convenience, a certified translation of the French portion of Exhibit E to the Complaint is attached as
     Exhibit A to the Hall Dec.

23   [4] Plaintiffs asserted in paragraph 19 of the Complaint filed in the Virginia action that "[t]he Papeete Court of
     Appeals has affirmed SCIP's position that the shares in question, under French Polynesian law, still belong to
24   Defendants."  That assertion may have led to the early favorable results Plaintiffs received from the Magistrate in
     Virginia.  It eventually became clear that the Papeete Court of Appeals had not made any such finding.  For the
     Court's convenience, a copy of the complaint filed by the plaintiffs in the Western District of Virginia is attached as
     Exhibit B to the Hall Dec.

DEFS GOLDENS' MOTION TO DISMISS PLTFS' COMPLAINT - 3
NO. 2:10-cv-00741-JLR

Law Offices of
**Wolfstone, Panchot & Bloch, P.S., Inc.**
**1111 Third Avenue, Suite 1800**
**Seattle, Washington  98101**
**Phone:   (206) 682-3840**
**Fax:      (206) 340-8837**

119

Goldens somehow breached the 1987 contract, that the Goldens are somehow responsible for

SCIP's ouster of Putz seventeen years after he moved into bungalow #12, and that the Goldens

somehow have a duty to help Putz in his dispute with SCIP.  In addition to breach of contract

claims, plaintiffs assert in their Complaint claims for negligent misrepresentation, "intentional

interference with property," intentional interference with business expectancy, and a declaratory

judgment.

Pursuant to Rule 12(b)(3), 12(b)(4), 12(b)(5) and 12(b)(6), the Goldens respectfully

move this Court to dismiss this case.  In the alternative, this Court should stay this case pending

the outcome of proceedings before the Court of First Instance in French Polynesia.  Absent a

dismissal or stay, parallel litigation in both the United States and French Polynesia will risk

interfering with norms of international comity through inconsistent outcomes, conflicts of law,

and waste of judicial resources.

## II.       STANDARD OF REVIEW

On a motion to dismiss, the Court must (1) construe the complaint in the light most

favorable to plaintiffs; (2) accept all well-pled factual allegations as true; and (3) determine

whether plaintiffs can prove any set of facts to support a claim that would merit relief.  *Cahill v.*

*Liberty Mut. Ins. Co.*, 80 F.3d 336, 337-38 (9th Cir. 1996).  However, the court need not accept

as true conclusory allegations, legal characterizations, unreasonable inferences or unwarranted

deductions of fact.  *Western Mining Council v. Watt*, 643 F.2d 618, 624 (9th Cir), *cert. denied*,

454 U.S. 1031, 102 S. Ct. 567 (1981); *In re DeLorean Motor Co.*, 991 F.2d 1236, 1240 (6th Cir.

1993); *Taylor v. FDIC*, 132 F.3d 753, 762 (D.C. Cir. 1997).  Also, even though the complaint is

construed favorably toward plaintiffs, it is not "proper to assume that the plaintiffs can prove

DEFS GOLDENS' MOTION TO DISMISS PLTFS' COMPLAINT - 4
NO. 2:10-cv-00741-JLR

**Law Offices of**
**Wolfstone, Panchot & Bloch, P.S., Inc.**
**1111 Third Avenue, Suite 1800**
**Seattle, Washington  98101**
**Phone:   (206) 682-3840**
**Fax:      (206) 340-8837**

1  facts that they have not alleged or that the defendants have violated the laws in ways that have

2  not been alleged." *Associated Gen. Contractors of Calif., Inc. v. California State Council of*

3  *Carpenters*, 459 U.S. 519, 526, 103 S. Ct. 897 (1983). If the Court finds in determining this

4  motion that plaintiffs cannot allege any set of facts consistent with those before the Court that

5  could possibly cure the defects in the complaint, leave to amend will not be granted. *Swartz v.*

6  *KPMG, LLC*, 401 F. Supp. 2d 1146 (W.D. Wash. 2004) ("Swartz I"), *aff'd in part, Swartz v.*

7  *KPMG, LLP*, 476 F.3d 756 (9th Cir. 2007) ("Swartz II").

8

9          Finally, the Court may "consider a writing referenced in a complaint but not explicitly

10  incorporated therein if the complaint relies on the document and its authenticity is

11  unquestioned." *Swartz II*, 476 F.3d at 763, *citing Parrino v. FHP, Inc.*, 146 F.3d 699, 706 (9th

12  Cir.), *cert. denied*, 525 U.S. 1001 (1998). Since plaintiffs' complaint explicitly refers to the

13  Societe Civile Immobilier Paepaepupure ("SCIP") statutes, *Complaint, ¶ 38*, this Court may

14  consider them in deciding this motion.[5] Further, since Plaintiffs' complaint explicitly refers to

15  the French Civil Code, *Complaint, ¶ 39 and Ex. E, p. 55,* this Court may consider in deciding

16  this motion the French Civil Code. Finally, since Plaintiffs' complaint explicitly refers to the

17  Code of Civil Procedure of French Polynesia *Complaint, Ex. E., p. 54*, this Court may consider in

18  deciding this motion the Code of Civil Procedure of French Polynesia.

19

20          A Rule 12(b)(6) motion to dismiss for failure to state a claim may also be utilized if

21  Plaintiff has included allegations in the Complaint, that on their face, disclose some absolute

22  defense or bar to recovery. *Weisbuch v. County of Los Angeles*, 119 F.2d 778, 783 (9th Cir.

23

24

---

[5] Plaintiffs' references to the SCIP "statutes" in their Complaint appear in fact to be references to SCIP's Articles of Association. Relevant portions of SCIP's Articles of Association are attached as Exhibit C to the accompanying Hall Dec.

DEFS GOLDENS' MOTION TO DISMISS PLTFS' COMPLAINT - 5
NO. 2:10-cv-00741-JLR

Law Offices of
**Wolfstone, Panchot & Bloch, P.S., Inc.**
**1111 Third Avenue, Suite 1800**
**Seattle, Washington 98101**
**Phone:   (206) 682-3840**
**Fax:      (206) 340-8837**

121

1 | 1997). Where the facts and dates alleged in the Complaint indicate that a claim is barred by the

2 | statute of limitations, a motion to dismiss for failure to state a claim lies. *Jablon v. Dean Witter*

3 | *& Co.*, 614 F.2d 677, 682 (9th Cir. 1980).

4 | 

5 | Finally, dismissal with prejudice is warranted when the Court determines that the

6 | allegation of other facts consistent with the Complaint could not possibly cure the deficiency.

7 | *Firestone v. Firestone*, 76 F.2d 1205, 1209 (D.C. Cir. 1996).

8 | ### III. ARGUMENT

9 | **A. This Court Should Abstain and Dismiss the Plaintiffs' Entire Complaint Based on International Comity Principles.**

10 | 

11 | **1. Dismissal is Proper when a Case is Currently Pending in a Foreign Court.**

12 | A court in the United States may "decline to exercise jurisdiction over a case before it

13 | when that case is pending in a foreign court with proper jurisdiction." *JP Morgan Chase Bank v.*

14 | *Altos Hornos de Mex., S.A. de C.V.*, 412 F.3d 418, 426 (2d Cir. 2005) (citing *Maxwell*

15 | *Communication Corp. v. Societe Generale*, 93 F.3d 1036, 1047 (2d Cir. 1996). For instance,

16 | American courts routinely decline to adjudicate creditor claims that are the subject of a foreign

17 | bankruptcy proceeding. *Finanz AG Zurich v. Banco Economico S.A.*, 192 F.3d 240, 246 (2d Cir.

18 | 1999) (*quoting Victrix S.S. Co., S.A. v. Salen Dry Cargo A.B.*, 825 F.2d 709, 713-14 (2d Cir.

19 | 1987).

20 | 

21 | The claims brought by Plaintiffs before this Court are the subject of a case currently

22 | pending in a foreign court with proper jurisdiction. Plaintiffs filed a lawsuit in the Court of First

23 | Instance of Papeete in French Polynesia to determine the ownership of shares in SCIP. That case

24 | is still pending today. *Complaint*, ¶ 44 ("the Court of Appeal of Papeete, Civil Chamber

DEFS GOLDENS' MOTION TO DISMISS PLTFS' COMPLAINT - 6
NO. 2:10-cv-00741-JLR

**Law Offices of**
**Wolfstone, Panchot & Bloch, P.S., Inc.**
**1111 Third Avenue, Suite 1800**
**Seattle, Washington 98101**
**Phone: (206) 682-3840**
**Fax: (206) 340-8837**

1    remanded the case to a lower court. No further action has occurred in the French Polynesian

2    litigation.")

3            The court in French Polynesia stated:

4
              In this specific case, the judge is asked to rule on the validity of a
5            share transfer with respect not only to its formal legitimacy, but
             also with respect to the applicable statutes and law No. 84-820 of
6            September 6, 1984, modified, giving autonomous status to the
             territory of French Polynesia.
7

8    *Complaint, Ex. E, p. 50 (translation found at p. 13 of Ex. A, Hall Dec.).*

9            Plaintiffs are asking this Court to do exactly the same thing "determine . . . who is the

10   rightful owner of the eighteen SCIP shares representing Bungalow #12". *Complaint, ¶ 98.b.*

11   Because litigation concerning a foreign property and foreign laws was initiated by the Plaintiffs

12   in a foreign country, and the litigation concerns the same issues as the suit brought by Plaintiffs

13   in the United States, and that foreign court has stated that foreign law will control the issue, and

14   because that foreign litigation has not concluded, international comity would suggest that this

15   Court decline to exercise jurisdiction.

16

17            **2.      Dismissal is Warranted because Allowing Plaintiffs to Proceed in
                        This Court Would Intrude on the Interests of a Foreign Government.**

18
             Dismissal of a suit on international comity grounds may also be appropriate when
19
     allowing a case to proceed in the United States would intrude on the interests of a foreign
20
     government. *See Ungaro-Benages v. Dresdner Bank AG*, 379 F.3d 1227, 1238 (11th Cir. 2004).
21
     Following an initial appeal, the Court of Appeal of Papeete, in remanding the case back to the
22
     Court of First Instance, stated: "In this specific case, the judge is asked to rule on the validity of
23
     a share transfer with respect not only to its formal legitimacy, but also with respect to the
24
     applicable statutes and law No. 84-820 of September 6, 1984, modified, giving autonomous

     DEFS GOLDENS' MOTION TO DISMISS PLTFS' COMPLAINT - 7
     NO. 2:10-cv-00741-JLR

Law Offices of
Wolfstone, Panchot & Bloch, P.S., Inc.
1111 Third Avenue, Suite 1800
Seattle, Washington 98101
Phone:    (206) 682-3840
Fax:       (206) 340-8837

123

1   status to the territory of French Polynesia." *Complaint, Ex. E, p. 50 (translation found at p. 13 of*

2   *Ex. A, Hall Dec.).*

3       Thus, the foreign court, in an action filed by Plaintiffs in that foreign court, clearly stated

4   that the issue of the validity of the share transfer shall be decided in that foreign court under the

5   foreign law No. 84-820 of September 6, 1984. Because the foreign litigation filed by Plaintiffs is

6   still pending, and because the foreign court held that the law of French Polynesia would

7   determine the issue, allowing the Plaintiffs' case to proceed in the United States would intrude

8   on the interests of a foreign government. Therefore, this Court should decline to exercise

9

10  jurisdiction.

11          **3.    Dismissal is Warranted because a Foreign Court First Assumed
                    Jurisdiction over the Property which is the Subject of Litigation.**
12

13      This Court should dismiss the Plaintiffs' case because the Court of First Instance of

14  Papeete in French Polynesia was the court first assuming jurisdiction over property which is the

15  subject of litigation. "A common-law rule of long standing prohibits a court, whether state or

16  federal, from assuming *in rem* jurisdiction over a *res* that is already under the *in rem* jurisdiction

17  of another court." *United States v. One 1985 Cadillac Seville*, 866 F.2d 1142, 1145 (9th Cir.

18  1989); *Penn General Casualty Co. v. Pennsylvania*, 294 U.S. 189, 195, 79 L. Ed. 850, 55 S. Ct.

19  386 (1935) (citations omitted); *Princess Lida v. Thompson*, 305 U.S. 456, 466, 83 L. Ed. 285, 59

20  S. Ct. 275 (1939). "This first-in-time rule has since been applied to federal cases as to which

21  there were cognate proceedings in the courts of another country." *SEC v. Banner Fund Int'l*, 211

22  F.3d 602, 611 (D.C. Cir. 2000); *See also Dailey v. NHL*, 987 F.2d 172, 175-78 (3d Cir. 1993)

23

24  (district court must yield to Canadian court, which was first to assert *quasi in rem* jurisdiction);

*Chesley v. Union Carbide Corp.*, 927 F.2d 60, 66 (2d Cir. 1991) ("The rule [is] equally

DEFS GOLDENS' MOTION TO DISMISS PLTFS' COMPLAINT - 8
NO. 2:10-cv-00741-JLR

**Law Offices of
Wolfstone, Panchot & Bloch, P.S., Inc.**
1111 Third Avenue, Suite 1800
Seattle, Washington 98101
Phone:  (206) 682-3840
Fax:     (206) 340-8837

124

applicable to requested interference by American courts with a *res* under the jurisdiction of a foreign court"). Because the bungalow in question is located in a foreign country and the shares in SCIP are of a foreign partnership and because the Plaintiffs, in having filed suit in the Papeete courts, first submitted their issues to the foreign court which took jurisdiction of the *res*, and because the case remains pending before the foreign court, the doctrine of international comity and the first-in-time rule indicates that this Court defer to the jurisdiction of the Papeete courts.

**B. This Court Should Dismiss the Plaintiffs' Entire Complaint As it Is Not Ripe.**

The lynchpin of all of Plaintiffs' claims is whether or not, as Plaintiffs assert in paragraph 7 of their Complaint, the Goldens validly transferred the eighteen shares of SCIP stock to Dr. Putz. That specific issue is currently before the Court of First Instance in French Polynesia. The Court of Appeal of Papeete, in remanding the case back to the Court of First Instance, where the case remains pending today, stated: "In this specific case, the judge is asked to rule on the validity of a share transfer with respect not only to its formal legitimacy, but also with respect to the applicable statutes and law No. 84-820 of September 6, 1984, modified, giving autonomous status to the territory of French Polynesia." *Complaint, Ex. E, p. 50 (translation found at p. 13, Ex. A, Hall Dec.).* Plaintiffs put that issue into the jurisdiction of the French Polynesian court system, and unless and until the Court of First Instance in French Polynesia makes a determination on the validity of the share transfer, and further determines that the share transfer was not validly made, Mr. Putz's Complaint is not ripe and must be dismissed. *See, e.g., Assiniboine and Sioux Tribes v. Board of Oil & Gas Conservation,* 792 F.2d 782, 787-788 (9th Cir. 1986) (ripeness doctrine prevents courts from deciding theoretical questions).

**Law Offices of**
**Wolfstone, Panchot & Bloch, P.S., Inc.**
**1111 Third Avenue, Suite 1800**
**Seattle, Washington 98101**
**Phone: (206) 682-3840**
**Fax: (206) 340-8837**

**C.**    **Plaintiffs' Entire Complaint Should Be Dismissed Under An Improper Forum Analysis.**

The Supreme Court clearly supports the enforcement of forum selection clauses. *See Carnival Cruise Lines, Inc. v. Shute*, 499 U.S. 585, 111 S. Ct. 1522, 113 L. Ed. 2D 622 (1991). ("[A] clause establishing *ex ante* the forum for dispute resolution has the salutary effect of dispelling any confusion about where suits arising from the contract must be brought and defended . . ." *Id.* at 593-94.).  Lower courts have also enforced forum selection clauses. *See Brennen v. Phyto-Riker Pharmaceuticals, Ltd.*, 2002 WL 1349742 (S.D.N.Y. 2002) (court dismissed action based on Ghana forum selection clause in employment agreement).  Plaintiffs admit that the transfer of SCIP shares is governed by the SCIP statutes. *Complaint, ¶ 38.* Article 35 of the SCIP Articles of Association states that

> Any claim which may arise during the duration or the liquidation of the Company, related to Company matters, or among the partners themselves, or between the Company and the partners, or between surviving partners and the heirs, assigns or representatives of a deceased partner, shall be judged by the courts which have jurisdiction over the area in which the real property is located.

*Hall Dec., Ex. C, p. 27.*

The Plaintiffs should be bound by the forum selection clause in the statutes which the Plaintiffs admit are controlling.  According to that forum selection clause, the Plaintiffs' claims should be litigated in the courts of French Polynesia, which clearly have jurisdiction over the area in which the real property is located, as where Plaintiffs originally filed suit.  Therefore, this Court should dismiss the Plaintiffs' Complaint and allow the French Polynesian court to determine this matter as set forth in Article 35 of the Articles of Association.

DEFS GOLDENS' MOTION TO DISMISS PLTFS' COMPLAINT - 10
NO.  2:10-cv-00741-JLR

Law Offices of
Wolfstone, Panchot & Bloch, P.S., Inc.
1111 Third Avenue, Suite 1800
Seattle, Washington  98101
Phone:  (206) 682-3840
Fax:     (206) 340-8837

126

**D.     Plaintiffs' Entire Complaint Should Be Dismissed Under an Inconvenient Forum Analysis.**

"A trial court has broad discretion in deciding a motion to dismiss based on forum *non conveniens* and that decision will be overturned only for an abuse of discretion." *EFCO Corp. v. Aluma Systems USA, Inc.*, 268 F.3d 601, 603 (8th Cir. 2001). This Court should dismiss this action in favor of a French Polynesian forum under forum *non conveniens* principles. A party must show "the existence of an available and adequate alternative forum and that the balance of relevant private and public interest factors favor dismissal." *Vasquez v. Bridgestone/Firestone, Inc.*, 325 F.3d 665, 671 (5th Cir. 2003). The Plaintiffs originally "brought suit in French Polynesia" in the Court of First Instance of Papeete, Local Section of Raiatea. *Complaint, ¶ 41.* By choosing to file a lawsuit in a foreign forum Plaintiffs are estopped from asserting that the foreign forum is not available and adequate. In addition, the Court in Papeete, Tahiti is an adequate alternative forum. It is subject to French law and procedure. A United States District Court in New York carefully examined the Tahitian Court system and found, "The French legal system, while different from our own, is sophisticated and competent . . . the Tahitian Court is an "adequate" alternative forum." *Conti Zweite Cristallo Schiffarhrts Gmbh & Co. KG v. PPG Indus.*, 2001 U.S. Dist. LEXIS 15579 (S.D.N.Y. 2001).

The Supreme Court has set forth factors to consider in weighing the private interests of the litigants, such as the relative ease of access to sources of proof, availability of compulsory process for attendance of unwilling, and the cost of obtaining attendance of willing, witnesses, and possibility of view of premises. *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 508 (1947). An examination of those factors clearly show that French Polynesia is the most convenient forum. One of the named defendants is the Societe Civile Immobilier Paepaepupure, a real estate

DEFS GOLDENS' MOTION TO DISMISS PLTFS' COMPLAINT - 11
NO.  2:10-cv-00741-JLR

Law Offices of
Wolfstone, Panchot & Bloch, P.S., Inc.
1111 Third Avenue, Suite 1800
Seattle, Washington  98101
Phone:    (206) 682-3840
Fax:      (206) 340-8837

1  partnership located in Bora, Bora, French Polynesia. *Complaint, ¶ 20.* SCIP's main office is in

2  Bora Bora Faanui terre Paepaepupure. *Complaint, Ex. E, p. 46 (translation found at pp. 3-4, Ex.*

3  *A, Hall Dec.).* As such, the corporate records are located in Bora, Bora. Bungalow #12 is

4  located in Paepaepupure, French Polynesia. *Complaint, ¶ 20.* Plaintiffs claim to have made

5  payments for necessary repairs to Bungalow #12 in French Polynesia. *Complaint, ¶ 31.*

6  Plaintiffs claim to have purchased considerable non-fixture improvements to Bungalow #12.

7  *Complaint, ¶ 31.* Witnesses and documents regarding such repairs and improvements are all

8  located in Paepaepupure, French Polynesia. Plaintiffs claim that Bungalow #12 has fallen into

9
10  disrepair and diminished in value. *Complaint, ¶¶ 93, 94.* Witnesses and documents regarding

11  the alleged disrepair and diminished value are all located in Paepaepupure, French Polynesia.

12  The court documents, exhibits, affidavits, and other information in the case pending in the Court

13  of First Instance of Papeete are both located in French Polynesia and are in French. Surely, it is

14  more convenient to let the courts there, having already taken jurisdiction over this issue, and

15  already having within their files the relevant documents, address the issues between the parties.

16
17        For all of these reasons, this Court should dismiss the Plaintiffs' Complaint, and allow the

18  action to proceed in French Polynesia, where it is already pending.

19        **E.     Plaintiffs' First Cause of Action for Breach of Contract is Barred by the**
         **Statute of Limitations.**
20
21        A cause of action for breach of a written contract accrues upon breach. *1000 Virginia*

22  *Ltd. P'ship v. Vertecs*, 158 Wn.2d 566, 576, 146 P.3d 423 (2006).[6] The statute of limitation for

23  actions based on a written contract or on liability arising out of a written agreement is six years.

24

DEFS GOLDENS' MOTION TO DISMISS PLTFS' COMPLAINT - 12
NO.  2:10-cv-00741-JLR

**Law Offices of**
**Wolfstone, Panchot & Bloch, P.S., Inc.**
**1111 Third Avenue, Suite 1800**
**Seattle, Washington  98101**
**Phone:   (206) 682-3840**
**Fax:      (206) 340-8837**

128

1    R.C.W. 4.16.040(1). The contract at issue was dated in 1987. There is no specific time for

2    performance set forth in the contract. Therefore, the Goldens were to have performed within a

3    reasonable time thereafter. *Taylor v. Puget Sound Power & Light Co.*, 64 Wn.2d 534, 537, 392

4    P.2d 802 (1964) ("It is our conclusion that, as a matter of law, plaintiff's cause of action accrued

5    within a reasonable time after the execution on June 17, 1940, of the "Receipt for Service Line

6    Cost."). Even if "reasonable" were defined liberally as a full year, the Goldens alleged breach

7    occurred in 1988, twenty-two years ago. As such, the six-year statute of limitations for actions

8    based on written contracts bars the plaintiff's first cause of action.

9

10       Plaintiffs assert in their current Complaint that the 1987 contract imposes upon the

11   Goldens a current and continuing contractual duty.[7] That assertion was specifically rejected by

12   the United States District Court for the Western District of Virginia in the lawsuit filed by

13   Plaintiffs there in 2009. Judge Moon in his Memorandum Opinion dated December 31, 2009

14   held:

15

16       The R&R's findings and the contract itself confirm that the
         underlying contract was for the transfer of SCIP shares. However,
17       it is clear that Defendants did not contract to assist Putz in his
         attempt to convert those shares into title in the bungalow more than
18       fifteen years after they performed on the 1987 contract. Plaintiffs
         assert and the R&R finds that the litigation in French Polynesia
19       was to effectuate this conversion of Putz's shares into title for the
         bungalow. Thus, the 2005 affidavit was a gratuitous act intended
20

21   ──────────────────────────────

     [6] A federal court sitting in diversity applies the forum state's choice of law rules. *Jorgensen v. Cassidy*, 320 F.2d
22   906, 913 (9th Cir. 2003). Under Washington's choice of law rules, the law of the forum is presumed to control.
     *Burnside v. Simpson Paper Co.*, 123 Wn.2d 93, 100-01, 864 P.2d 973 (1994).
     [7]"Dr. Putz has informed Defendants of his ouster [from bungalow #12 in approximately 2004]"; "The Goldens
23   refused to fulfill their contractual obligations and end Dr. Putz's ouster . . ." *Complaint*, ¶ 11. "Goldens have the
     ability to fulfill their contractual promises by either (a) converting the eighteen SCIP shares into a deed for
24   Bungalow #12, and then transferring ownership of that deed to Dr. Putz; or (b) obtaining SCIP board approval of a
     transfer of the eighteen shares to Dr. Putz." *Complaint*, ¶ 12. "The Goldens have not fulfilled their [1987]
     contractual promises." *Complaint*, ¶ 50. "Because of Defendants' . . . continuing . . . failure to abate Plaintiff's
     continued and ongoing ouster from, Bungalow #12 . . ." *Complaint*, ¶ 83.
     DEFS GOLDENS' MOTION TO DISMISS PLTFS' COMPLAINT - 13
     NO. 2:10-cv-00741-JLR

Law Offices of
Wolfstone, Panchot & Bloch, P.S., Inc.
1111 Third Avenue, Suite 1800
Seattle, Washington 98101
Phone:   (206) 682-3840
Fax:     (206) 340-8837

129

for Putz's use in litigation in French Polynesia, not partial
contractual performance in Virginia.

*Complaint, Ex. G, at p. 110, f.n. 4.*

An examination of the terms of the contract reveals no provisions
related to future litigation support. The terms of the contract call
for the transfer of SCIP shares from the Goldens to Putz;
significantly, the terms of the contract do not call for the
conversion of SCIP shares into title for the bungalow.

*Complaint, Ex. G, at p. 113, f.n. 5.*

As the Goldens' only contractual obligation was to have occurred in 1987, and they have

no current ongoing obligation under the 1987 contract, that statute of limitations on any possible

breach of contract claim would have begun running in 1988 at the very latest. As such, the six

year statute of limitations bars the Plaintiffs' breach of contract cause of action.

**F.    Plaintiffs' Second Cause of Action for Breach of the Implied Covenant of
       Good Faith is Barred by the Statute of Limitations.**

"There is in every contract an implied duty of good faith and fair dealing." *Badgett v.*

*Sec. State Bank*, 116 Wn.2d 563, 807 P.2d 356, 360 (1991). This duty, however, is not "free-

floating" and exists "only in relation to performance of a specific contract term." *Id.* at 569-570.

Therefore, the implied duty would have arisen at the time the contract was executed in

1987. As set forth above, the Goldens' only contractual duties were to have occurred in 1987 or

1988 at the latest. Any failure to have acted in good faith to fulfill those obligations would have

also occurred in 1987 or 1988 at the latest. The statute of limitations for actions based on a

breach of an implied covenant of good faith and fair dealing is three years. R.C.W. 4.16.080.

Therefore, the three-year statute of limitations bars the Plaintiffs' action based on a breach of an

implied covenant of good faith and fair dealing.

DEFS GOLDENS' MOTION TO DISMISS PLTFS' COMPLAINT - 14
NO.  2:10-cv-00741-JLR

**Law Offices of**
**Wolfstone, Panchot & Bloch, P.S., Inc.**
**1111 Third Avenue, Suite 1800**
**Seattle, Washington 98101**
**Phone:   (206) 682-3840**
**Fax:      (206) 340-8837**

**G.** **Plaintiffs' Third Cause of Action for Negligent Misrepresentation is Barred by the Statute of Limitations and the Economic Loss Doctrine.**

**1.** **Statute of Limitations.**

The statute of limitations for negligent misrepresentation is three years. R.C.W. 4.16.080; *Sabey v. Howard Johnson & Co.*, 101 Wash. App. 575, 593, 5 P. 3d 730 (2000). As set forth above, the contract in this case was executed in 1987. The Complaint states that the Goldens made two negligent representations. *Complaint, ¶ 70, ¶ 72.* Further, the Complaint states that the Goldens intended for Plaintiffs to rely and Plaintiffs did reasonably rely on such representations "by entering into the Contract." *Complaint, ¶ 72.* Therefore, if Putz relied upon the representations at the time he signed the contract in 1987 the allegedly negligent representations must have occurred prior to that time. Therefore, as 23 years have passed since then, Plaintiffs' cause of action for negligent representation is barred by the three year statute of limitations.

**2.** **Economic Loss Doctrine.**

The economic loss rule also bars the plaintiffs' negligent misrepresentation claim. *Manay v. Academic Exch. of Am.*, 2008 U.S. Dist. LEXIS 30531 (W.D. Wash. 2008) *quoting Alejandre v. Bull*, 159 Wn.2d 674, 689, 153 P.3d 864 (2007). "Where the relationship between two parties is governed by a contract, and one of the parties allegedly suffers an economic loss, that party may not bring a tort claim against the other for negligent representation." *Bybee Farms, LLC v. Snake River Sugar Co.*, 625 F. Supp. 2d 1073, 1081 (E.D. Wash. 2007). The economic loss rule maintains the "fundamental boundaries of tort and contract law." *Berschauer/Phillips Constr. Co. v. Seattle Sch. Dist. No. 1*, 124 Wn.2d 816, 826 (1994). "In short, the purpose of the economic loss rule is to bar recovery for alleged breach of tort duties

DEFS GOLDENS' MOTION TO DISMISS PLTFS' COMPLAINT - 15
NO. 2:10-cv-00741-JLR

Law Offices of
Wolfstone, Panchot & Bloch, P.S., Inc.
1111 Third Avenue, Suite 1800
Seattle, Washington 98101
Phone:    (206) 682-3840
Fax:       (206) 340-8837

where a contractual relationship exists and the losses are economic losses." *Alejandre v. Bull*,

159 Wn.2d 674, 689, 153 P.3d 864 (2007).

      **H.**      **Plaintiffs Fourth Cause of Action for Intentional Interference with Property is Barred as it Does Not State a Valid Cause of Action, it is Barred by the Statute of Limitations, and it is Barred by the Economic Loss Doctrine.**

            **1.**      **Plaintiffs do not state a valid cause of action for intentional interference with property.**

The Plaintiffs do not state a valid cause of action for intentional interference with property. The Goldens' counsel are unaware of any Washington case recognizing a cause of action for "intentional interference with property." Even if such a cause of action did exist, plaintiffs' Complaint utterly fails to state such a claim.

First, the Plaintiffs allege that "[b]y breaching the Contract, the Goldens have directly and proximately caused SCIP's ouster of Plaintiffs from Bungalow #12." *Complaint, ¶ 81.* The Plaintiffs do not allege that the Goldens' alleged breach twenty three years ago was intentionally done, or done with the purpose or goal of interfering with the Plaintiffs' property.

Second, the Plaintiffs allege that "[b]y failing to convert the eighteen shares of SCIP stock into a deed for Bungalow #12, and then transferring that deed to Plaintiffs, the Goldens are the direct and proximate cause of Plaintiffs' continued and ongoing removal from Bungalow #12." *Complaint, ¶ 82.* Plaintiffs have not asserted, as they are required, that the Goldens intentionally failed to convert the eighteen shares of SCIP stock into a deed for Bungalow #12. In fact, Plaintiffs are estopped from arguing that the Goldens had any obligation to ever convert the eighteen shares of SCIP stock into a deed. Again, that assertion was specifically rejected by Judge Moon:

DEFS GOLDENS' MOTION TO DISMISS PLTFS' COMPLAINT - 16
NO. 2:10-cv-00741-JLR

**Law Offices of**
**Wolfstone, Panchot & Bloch, P.S., Inc.**
**1111 Third Avenue, Suite 1800**
**Seattle, Washington 98101**
**Phone:   (206) 682-3840**
**Fax:     (206) 340-8837**

However, it is clear that Defendants did not contract to assist Putz
in his attempt to convert those shares into title in the bungalow
more than fifteen years after they performed on the 1987 contract.

*Complaint, Ex. G, at p. 110, f.n. 4.*

Finally, Plaintiffs allege that the Goldens have failed to assist Plaintiff in his lawsuit

against SCIP to abate Plaintiffs' ouster from Bungalow #12. *Complaint, ¶ 83.* Again, the

Plaintiffs are estopped from arguing that the Goldens had any ongoing duty to do anything with

regard to the property, much less to abate any ouster twenty three years after they transferred the

property.  As Judge Moon held:

An examination of the terms of the contract reveals no provisions
related to future litigation support.  The terms of the contract call
for the transfer of SCIP shares from the Goldens to Putz;
significantly, the terms of the contract do not call for the
conversion of SCIP shares into title for the bungalow.

*Complaint, Ex. G, at p. 113, f.n. 5.*

### 2.    Plaintiffs' Claim is Barred by the Statute of Limitations.

First, the Plaintiffs allege that "[b]y breaching the Contract, the Goldens have directly and

proximately caused SCIP's ouster of Plaintiffs from Bungalow #12." *Complaint, ¶ 81.*  As set

forth above with regard to the breach of contract cause of action, any breach occurred at the very

latest in 1998.  Therefore, even assuming Plaintiffs have a cause of action and assuming the

Goldens' alleged breach was intentionally done for the purpose of interfering with Plaintiffs'

property interests, it occurred twenty three years ago, and any action based on the same is barred

by either Washington's three-year statute of limitations on such claims; R.C.W. 4.16.080 or the

two-year catchall statute of limitations.  R.C.W. 4.16.130.

**Law Offices of**
**Wolfstone, Panchot & Bloch, P.S., Inc.**
**1111 Third Avenue, Suite 1800**
**Seattle, Washington  98101**
**Phone:    (206) 682-3840**
**Fax:        (206) 340-8837**

Second, the Plaintiffs allege that "[b]y failing to convert the eighteen shares of SCIP stock into a deed for Bungalow #12, and then transferring that deed to Plaintiffs, the Goldens are the direct and proximate cause of Plaintiffs' continued and ongoing removal from Bungalow #12." *Complaint*, ¶ 82. Even assuming that the factual finding of Judge Moon in Virginia that the Goldens had no duty to convert the shares into a deed does not estop the Plaintiffs, and even assuming that the Goldens intentionally failed to convert the eighteen shares of SCIP stock into a deed for Bungalow #12, that failure occurred in 2004. As such to the extent this cause of action is based on the Goldens' alleged failure, it is barred by either applicable statute of limitations.

Finally, Plaintiffs argue that the Goldens had some duty to assist Putz with his litigation against SCIP. As set forth above, Judge Moon in the Virginia action made a specific factual finding that the Goldens had no such duty. But, even assuming that the Goldens did have such a duty, their alleged failure occurred in 2004 or 2005 at the latest. As a result, a cause of action based on the Goldens' alleged failure is barred by the statute of limitations.

### 3. The Economic Loss Rule Bars the Plaintiffs' Claim.

Where the relationship between two parties is governed by a contract, and one of the parties allegedly suffers an economic loss, the economic loss doctrine bars recovery under a tort cause of action. *Bybee Farms, LLC v. Snake River Sugar Co.*, 625 F. Supp. 2d 1073, 1081 (E.D. Wash. 2007). The economic loss rule maintains the "fundamental boundaries of tort and contract law." *Berschauer/Phillips Constr. Co. v. Seattle Sch. Dist. No. 1*, 124 Wn.2d 816, 826 (1994). "In short, the purpose of the economic loss rule is to bar recovery for alleged breach of tort duties where a contractual relationship exists and the losses are economic losses." *Alejandre v.*

DEFS GOLDENS' MOTION TO DISMISS PLTFS' COMPLAINT - 18
NO. 2:10-cv-00741-JLR

Law Offices of
Wolfstone, Panchot & Bloch, P.S., Inc.
1111 Third Avenue, Suite 1800
Seattle, Washington 98101
Phone:  (206) 682-3840
Fax:     (206) 340-8837

134

1    *Bull*, 159 Wn.2d 674, 689, 153 P.3d 864 (2007).  Therefore, the Plaintiffs' cause of action for

2    intentional interference with property should be dismissed.

3    **I.      Plaintiffs' Fifth Cause of Action for Intentional Interference with Business
            Expectancy Fails to State a Cause of Action, is Barred by the Statute of
4            Limitations, and is Barred by the Economic Loss Rule.**

5          **1.      Plaintiffs fail to state a valid cause of action.**

6          The Plaintiffs do not state a valid cause of action for intentional interference with

7    business expectancy.  A party to a contract cannot be liable in tort for breaching its own contract.

8    *Houser v. Redmond,* 16 Wn. App. 743, 746, 559 P.2d 577, *aff'd.,* 91 Wn.2d 36, 586 P.2d 482

9    (1978).

10

11         First, the Plaintiffs allege that "[b]y breaching the Contract, the Goldens have directly and

12   proximately caused an ouster of Plaintiffs from Bungalow #12." *Complaint,* ¶ *89.* The Plaintiffs

13   do not allege that the Goldens' alleged breach twenty three years ago was intentionally done, or

14   done with the purpose or goal of interfering with the Plaintiffs' property.  Second, the Plaintiffs

15   allege that "[b]y failing to perform on the Contract, the Goldens are the direct and proximate

16   cause of Plaintiffs' continued removal from Bungalow #12." *Complaint,* ¶ *90.*

17

18         Plaintiffs further assert that "[b]y failing to abate the Plaintiffs' ouster, Defendants have

19   directly and proximately caused the continued removal of Plaintiffs from Bungalow #12.

20   *Complaint,* ¶ *91.* The Plaintiffs are estopped from arguing that the Goldens had any ongoing

21   duty to do anything with regard to the property, much less to abate any ouster twenty-three years

22   after they transferred the property.  Again, Judge Moon, in his Memorandum Opinion dated

23   December 31, 2009 held:

24                 An examination of the terms of the contract reveals no provisions
                   related to future litigation support.  The terms of the contract call

DEFS GOLDENS' MOTION TO DISMISS PLTFS' COMPLAINT - 19
NO.  2:10-cv-00741-JLR

**Law Offices of**
**Wolfstone, Panchot & Bloch, P.S., Inc.**
**1111 Third Avenue, Suite 1800**
**Seattle, Washington  98101**
**Phone:    (206) 682-3840**
**Fax:       (206) 340-8837**

135

for the transfer of SCIP shares from the Goldens to Putz; significantly, the terms of the contract do not call for the conversion of SCIP shares into title for the bungalow.

*Complaint, Ex. G, at p. 113, f.n. 5.*

### 2.  Statute of Limitations.

The first two alleged interfering actions took place in 1987 or 1988 at the latest. The third alleged interference took place in 2003. Thus this cause of action is barred by the three year statute of limitations on such claims. R.C.W. 4.16.080.

### 3.  The Economic Loss Rule Bars the Plaintiffs' Claim.

Where the relationship between two parties is governed by a contract, and one of the parties allegedly suffers an economic loss, the economic loss doctrine bars recovery under a tort cause of action. *Bybee Farms, LLC v. Snake River Sugar Co.*, 625 F. Supp. 2d 1073, 1081 (E.D. Wash. 2007). The economic loss rule maintains the "fundamental boundaries of tort and contract law." *Berschauer/Phillips Constr. Co. v. Seattle Sch. Dist. No. 1*, 124 Wn.2d 816, 826 (1994). "In short, the purpose of the economic loss rule is to bar recovery for alleged breach of tort duties where a contractual relationship exists and the losses are economic losses." *Alejandre v. Bull*, 159 Wn.2d 674, 689, 153 P.3d 864 (2007). Therefore, the Plaintiffs' cause of action for intentional interference with business expectations should be dismissed.

### J.  Plaintiffs Sixth Cause of Action a Declaratory Judgment is Barred.

Plaintiffs argue that a dispute exists regarding the ownership of the eighteen shares of SCIP. As set forth earlier in this Motion, that specific dispute is the subject of litigation brought by Plaintiffs in French Polynesia and currently pending there. This Court should dismiss Plaintiffs' attempt to bring the issue to this Court when a) a foreign court has taken jurisdiction

Law Offices of
**Wolfstone, Panchot & Bloch, P.S., Inc.**
**1111 Third Avenue, Suite 1800**
**Seattle, Washington  98101**
**Phone:     (206) 682-3840**
**Fax:         (206) 340-8837**

136

of the *res* of the 18 shares and as such the first-in-time doctrine precludes this Court from now

taking jurisdiction, b) the statutes of SCIP contain a forum selection clause specifically requiring

that all controversies be litigated in the courts that have jurisdiction over the real property (which

only the French Polynesian court has), and c) the French Polynesian court is the most appropriate

and convenient forum given the nature of the dispute, the location of SCIP, the location of the

real property, the location of many witnesses and evidence, the location of the court documents

in the ongoing foreign litigation.

A declaratory judgment cause of action is barred if the underlying claim is barred by the

statute of limitations.  This concept has been explained by the Sixth Circuit:

> A request for declaratory relief is barred to the same extent that the
> claim for substantive relief on which it is based would be barred. .
> . . A contrary rule would allow a plaintiff to "mak[e] a mockery of
> the statute of limitations by the simple expedient of creative
> labelling."

*International Ass'n of Machinists & Aerospace Workers v. TVA*, 108 F.3d 658, 668 (6th Cir.

1997) quoting, *Gilbert v. City of Cambridge*, 932 F.2d 51, 57 (1st Cir.), *cert. denied*, 502 U.S.

866, 116 L. Ed. 2d 153, 112 S. Ct. 192 (1991) (other citations omitted).

First, as to the whether Goldens breached the contract, because the underlying breach of

contract action is barred by the six year statute of limitations, as set forth in more detail above, a

declaratory judgment action would likewise be barred.

Second, whether or not the Plaintiffs have a right to the 18 shares is barred by three year

statute of limitations set forth in R.C.W. 4.16.080(2).  That statute is applicable to actions for

taking, detaining, or injuring personal property, including an action for the specific recovery

DEFS GOLDENS' MOTION TO DISMISS PLTFS' COMPLAINT - 21
NO.  2:10-cv-00741-JLR

**Law Offices of**
**Wolfstone, Panchot & Bloch, P.S., Inc.**
**1111 Third Avenue, Suite 1800**
**Seattle, Washington  98101**
**Phone:   (206) 682-3840**
**Fax:       (206) 340-8837**

thereof.  Plaintiffs first raised the issue of ownership of the 18 shares in 2003[8].  Therefore, the

three year statute of limitations bars any claim regarding ownership of these shares.

## IV.   CONCLUSION

Pursuant to Rule 12(b)(3), 12(b)(4), 12(b)(5) and 12(b)(6), Defendants Michael H.

Golden and Suzanne C. Golden ("Goldens") respectfully move this Court to dismiss this case.  In

the alternative, this Court should stay this case pending the outcome of proceedings before the

Court of First Instance in French Polynesia.  Absent a dismissal or stay, parallel litigation in both

the United States and French Polynesia will risk interfering with norms of international comity

through inconsistent outcomes, conflicts of law, and waste of judicial resources.

Respectfully submitted,

/s/ John H. Kitzmann
John H. Kitzmann, Esq.
VSB# 44253
DAVIDSON & KITZMANN, PLC
211 E. High Street
Charlottesville, Virginia  22902
TEL:   (434) 972-9600
FAX:   (434) 220-0011
jhk@dklawyers.com
Admitted *pro hac vice*


/s/ Howard (Terry) Hall
Howard (Terry) Hall, Esq.
WSBA #10905
WOLFSTONE, PANCHOT & BLOCH, P.S., INC.
1111 Third Avenue, Suite 1800
Seattle, WA  98101
TEL:   (206) 682-3840
FAX:   (206) 340-8837
thall@wpblaw.com
Attorneys for Defendants

---

[8] Or 2001, depending on whether the September 2001 court order attached to the SCIP brief in the appellate proceedings in French Polynesia dealt with the 18 shares.

DEFS GOLDENS' MOTION TO DISMISS PLTFS' COMPLAINT - 22
NO.  2:10-cv-00741-JLR

Law Offices of
**Wolfstone, Panchot & Bloch, P.S., Inc.**
**1111 Third Avenue, Suite 1800**
**Seattle, Washington  98101**
**Phone:   (206) 682-3840**
**Fax:      (206) 340-8837**

138

1
2
<div align="center">CERTIFICATE OF SERVICE</div>

I certify that on July 15, 2010, I electronically filed the foregoing with the Clerk of the

Court using the CM/ECF system, which will send notification of such filing to Steven W. Fogg

and Patrick T. Jordan, counsel of record for Plaintiffs.

/s/ Patricia Jacobsen
Patricia Jacobsen, Paralegal
Wolfstone, Panchot & Bloch, P.S., Inc.

DEFS GOLDENS' MOTION TO DISMISS PLTFS' COMPLAINT - 23
NO.  2:10-cv-00741-JLR

Law Offices of
Wolfstone, Panchot & Bloch, P.S., Inc.
1111 Third Avenue, Suite 1800
Seattle, Washington  98101
Phone:   (206) 682-3840
Fax:       (206) 340-8857

Exhibit 7

1                                                    Honorable James L. Robart

2

3

4

5

6

7                    UNITED STATES DISTRICT COURT
8                   WESTERN DISTRICT OF WASHINGTON
                              AT SEATTLE
9

DR. HERBERT R. PUTZ, an individual; and
10   PANONIA REALTY CORP., a foreign          NO.  2:10-cv-00741-JLR
     corporation,
11                                            **DEFENDANTS MICHAEL AND**
                                              **SUZANNE GOLDEN'S REPLY TO THE**
12                          Plaintiffs,       **PLAINTIFFS' OPPOSITION TO THE**
                                              **MOTION TO DISMISS PLAINTIFFS'**
13   v.                                       **COMPLAINT**

14   MICHAEL H. GOLDEN and SUZANNE C.
     GOLDEN, husband and wife, and the marital   **NOTED FOR:  SEPTEMBER 3, 2010**
15   community comprised therein; and SOCIETE
     CIVILE IMMOBILIERE PAEPAEPUPURE,          **ORAL ARGUMENT REQUESTED**
16   a foreign partnership,

17                          Defendants.

18
     **I.      This Court Should Abstain and Dismiss the Plaintiffs' Entire Complaint Based**
19           **on International Comity Principles.**

20           **A.      Dismissal is Proper Because a Case is Currently Pending in a Foreign**
                     **Court.**
21

22           In their Opposition to the Goldens' Motion to Dismiss ("Opposition"), the Plaintiffs assert

23   for the first time that the legal proceedings in French Polynesia are not currently pending.  Before

24   now, everyone involved in this case, including the Plaintiffs, the Defendants, and the United States

DEFS GOLDENS' REPLY RE MOTION TO DISMISS - 1
NO.  2:10-cv-00741-JLR
                                          **Law Offices of**
                                          **Wolfstone, Panchot & Bloch, P.S., Inc.**
                                          **1111 Third Avenue, Suite 1800**
                                          **Seattle, Washington  98101**
                                          **Phone:    (206) 682-3840**
                                          **Fax:        (206) 340-8837**

141

1  District Court for the Western District of Virginia, have all agreed that the legal proceedings in

2  French Polynesia are currently pending.

3  First, in the case filed by Plaintiffs in the United States District Court for the Western

4  District of Virginia ("Virginia Litigation"), an evidentiary hearing was conducted, and the

5  Honorable B. Waugh Crigler, U.S. Magistrate Judge, issued a Report and Recommendation

6  setting forth the evidence adduced at such hearing. The Report and Recommendation is attached

7  as Exhibit A to the Supplemental Declaration of Howard (Terry) Hall ("Supp. Hall Dec."). The

8

9  Report and Recommendation states:

> The parties agree that Panonia appealed, and on March 7, 2005, the reviewing
> court delivered a "judgment" which granted the appeal, concluded that the first
> court possessed jurisdiction over the subject matter, found the existence of a
> "serious dispute," declared (mandated) that "summary proceedings" be held,
> essentially remanding the case to the lower court for those proceedings, and
> essentially dismissed SCIP's claims by apportioning costs without assessing
> further damaged. The parties informed this court that, to date, no further
> proceedings have been held in the lower French Polynesian court."

15  *Report and Recommendation, p. 7 [Supp. Hall Dec., Ex. A].*

16  The Honorable Judge Norman K. Moon, in his Memorandum Opinion dated December 31,

17  2009 ("Memorandum Opinion") dismissing the Virginia Litigation states clearly ". . . the litigation

18  in the French Polynesian courts *has not been concluded." Memorandum Opinion, p. 3* [attached as

19  Exhibit G to Complaint](emphasis added). The Memorandum Opinion further states ". . . the facts

20  stated herein are uncontroverted." *Id.* at p. 2, f.n. 2.

22  In paragraph 44 of their current complaint, the Plaintiffs again assert "the Court of Appeal of

23  Papeete, Civil Chamber remanded the case to a lower court." Only now, after the Goldens pointed

24  out that pending foreign litigation would bar Plaintiffs from proceeding here, do Plaintiffs attempt to

assert a new set of facts. The Plaintiffs submit the Declaration of Meredith Rugani, a lawyer in the

DEFS GOLDENS' REPLY RE MOTION TO DISMISS - 2
NO. 2:10-cv-00741-JLR

Law Offices of
Wolfstone, Panchot & Bloch, P.S., Inc.
1111 Third Avenue, Suite 1800
Seattle, Washington 98101
Phone: (206) 682-3840
Fax: (206) 340-8837

142

Seattle firm representing Plaintiffs. *Fogg Dec., Ex. A.* Ms. Rugani apparently telephoned a lawyer from French Polynesia and repeats, as hearsay, a summary of their conversation in her Declaration. Plaintiffs notably do not assert that the French Polynesian lawyer reviewed the file at the Court of First Instance or has any knowledge of its contents. Plaintiffs presumably could have, but did not, offer any statement from Mr. Jacquet or Mr. Lau, their attorneys of record in the French Polynesian case. *See Complaint, Ex. E, p. 52.* Nor do Plaintiffs offer any statement or document from the Court of First Instance.

Ms. Rugani's Declaration is hearsay in violation of FRE 801 and lacks foundation in violation of FRE 803. Accordingly, pursuant to CR 7(g) the Goldens request that Ms. Rugani's declaration attached as Exhibit A to the Fogg Declaration be stricken and not considered by the Court.

A Court in the United States may "decline to exercise jurisdiction over a case before it when that case is pending in a foreign court with proper jurisdiction." *JP Morgan Chase Bank v. Altos Hornos de Mex., S.A. de C.V.*, 412 F.3d 418, 426 (2d Cir. 2005) (*citing Maxwell Communication Corp. v. Societe Generale*, 93 F.3d 1036, 1047 (2d Cir. 1996). Despite Plaintiffs' effort to rewrite the facts, it is clear that a case is pending in French Polynesia, and international comity would suggest that this Court decline to exercise jurisdiction.

**B.    Dismissal is Proper Because the Courts Of Papeete Have Clearly Indicated their Interest in the Matter.**

After being ordered to pay costs, the Plaintiffs are obviously reluctant to continue in the French Polynesian courts. Nevertheless, international comity should bar the Plaintiffs' attempt at forum shopping. *Ungaro-Benages v. Dresdner Bank AG*, 379 F.3d 1227, 1238 (11th Cir. 2004).

The Court of Appeal of Papeete, in remanding the case back to the Court of First Instance, stated:

DEFS GOLDENS' REPLY RE MOTION TO DISMISS - 3
NO. 2:10-cv-00741-JLR

Law Offices of
Wolfstone, Panchot & Bloch, P.S., Inc.
1111 Third Avenue, Suite 1800
Seattle, Washington 98101
Phone:   (206) 682-3840
Fax:      (206) 340-8837

"the judge is asked to rule on the validity of a share transfer . . . with respect to the applicable statutes and law No. 84-820 of September 6, 1984, modified, giving autonomous status to the territory of French Polynesia." *Hall Dec., Ex. A, p. 13.*

Plaintiffs, however, have never submitted the applicable statutes to this Court. It is clear that these issues need to be resolved by the Court where the Plaintiffs themselves first filed suit. In their Opposition the Plaintiffs state, without authority, that "Under French Polynesian law, Dr. Putz would have had to re-file the case to continue the litigation." *Opposition, p. 7.* With all due respect to the Plaintiffs, it appears as if we are all blindly pushing forward in this Court, when the case should be continued in the court where it was originally brought and where all concerned are familiar with the underlying statutes. This Court should decline jurisdiction and allow the French Polynesian litigation to proceed in its courts.

**C.  Dismissal is Warranted because a Foreign Court First Assumed Jurisdiction over the Property which is the Subject of Litigation.**

The Plaintiffs cite to *Princess Lida of Thurn & Taxis v. Thompson*, 305 U.S. 456, 458 (1939) as support for their argument that the first in time rule does not apply to cases such as the one before this Court. *Opposition, p. 9. Princess Lida* actually directly supports the Goldens' position. In *Princess Lida* a suit to compel specific performance of a trust was filed in state court. While the state court action was pending, a federal action concerning the trust was filed. The Supreme Court held that because the state court had already taken control of the trust, the federal case could not proceed. *305 U.S. at 466.* Here, like in *Princess Lida*, the Plaintiffs' Complaint is one for specific performance. In their prayer for relief, Plaintiffs' ask the Court to order steps to be taken to effect the transfer of Bungalow #12 to Plaintiffs. *Complaint, p. 15.* However, the Bungalow, and this

DEFS GOLDENS' REPLY RE MOTION TO DISMISS - 4
NO. 2:10-cv-00741-JLR

Law Offices of
**Wolfstone, Panchot & Bloch, P.S., Inc.**
**1111 Third Avenue, Suite 1800**
**Seattle, Washington 98101**
**Phone:  (206) 682-3840**
**Fax:    (206) 340-8837**

144

1    issue, is already before the French Polynesian court.  Therefore, the doctrine of international comity

2    and the first-in-time rule indicates that this Court defer to the jurisdiction of the Papeete courts.

3    **II.      This Court Should Dismiss the Plaintiffs' Entire Complaint As it Is Not Ripe.**

4           Plaintiff's Opposition does not directly address the ripeness issue.  Until the French

5    Polynesia court determines the validity of the share transfer, Plaintiffs' Complaint is not ripe and

6    must be dismissed.

7    **III.     Plaintiffs' Entire Complaint Should Be Dismissed Under An Improper Forum
               Analysis.**

8

9           Plaintiffs assert "[t]ransfer of SCIP shares is governed by Article 13-A of the SCIP statutes."

10   *Complaint, ¶ 38.*  Plaintiffs cannot now argue, as they do in their Opposition, that the SCIP statutes,

11   or Articles of Association, do not govern this action.  As Plaintiffs assert in their Complaint, the

12   SCIP statutes do govern and those statutes provide in Article 35 that litigation occur in French

13

14   Polynesia.  Clearly, that is why Plaintiffs first filed suit in French Polynesia.

15          The Plaintiffs then assert without citation that "The French Polynesian courts have no

16   jurisdiction over the Goldens."  *Opposition, pp. 12-13.*  Plaintiffs should not be allowed to offer

17   conclusory statements concerning the procedural law of a foreign territory.  Plaintiffs' unsupported

18   statement as to French Polynesian law again illustrates that blindly pushing forward in this Court is

19
     not the proper course.
20

21          Plaintiffs' argument that their tort claims should be exempted from Article 35 must fail, as

22   Article 35 covers "All claims...relating to [SCIP] matters."  The Plaintiffs should be bound by the

23   forum selection clause in the statutes which the Plaintiffs themselves admit are controlling.

24   Therefore, this Court should dismiss the Plaintiffs' Complaint and allow the French Polynesian court

     to determine this matter as set forth in Article 35 of the SCIP statutes.

DEFS GOLDENS' REPLY RE MOTION TO DISMISS - 5
NO.  2:10-cv-00741-JLR

**Law Offices of**
**Wolfstone, Panchot & Bloch, P.S., Inc.**
**1111 Third Avenue, Suite 1800**
**Seattle, Washington  98101**
**Phone:    (206) 682-3840**
**Fax:        (206) 340-8837**

IV.  **Plaintiffs' Entire Complaint Should Be Dismissed Under an Inconvenient Forum Analysis.**

The Plaintiffs do not address the Goldens' point that French Polynesia is the location of the evidence and witnesses concerning "the disrepair and diminution to Bungalow #12," "loss of rental profits," and Plaintiffs' other alleged damages.  Rather, Plaintiffs' argument seems to be that it would be difficult for the Plaintiffs to go to French Polynesia.

This argument has no weight.  Plaintiffs themselves first chose the French Polynesian court system.  Mr. Putz served for many years on the Board of SCIP, and he apparently managed the rental of Bungalow #12 in French Polynesia for many years.  *Complaint, ¶ 32; Complaint, Ex. E, p. 56.* The Plaintiffs also argue, without authority, that it would not be fair to have the case proceed in French Polynesia because the French Polynesian court cannot exercise jurisdiction over the Goldens. Plaintiffs offer absolutely no authority for their assertion.

Defendants have offered numerous and valid reasons why this matter should proceed in the French Polynesian courts.  Plaintiffs unsupported conclusions as to the jurisdiction of the French Polynesian courts is not a valid response.  Therefore, this matter should be dismissed on the grounds of forum *non conveniens.*

V.  **Plaintiffs' First Cause of Action for Breach of Contract is Barred by the Statute of Limitations.**

The Plaintiffs' Opposition misstates the law regarding the statute of limitations applicable to written contracts in Washington State.  Plaintiffs allege that *Allyn v. Boe*, 943 P.2d 364 (Wash. Ct. App. 1997) establishes a discovery rule for written contracts.  *Opposition, pp. 3, 16, 18.  Allyn* has nothing to do with statutes of limitations for breach of contract claims.  *Allyn* involved a timber trespass case.  Specifically, the court held "[W]e hold that the discovery rule applies to timber

DEFS GOLDENS' REPLY RE MOTION TO DISMISS - 6
NO.  2:10-cv-00741-JLR

**Law Offices of**
**Wolfstone, Panchot & Bloch, P.S., Inc.**
**1111 Third Avenue, Suite 1800**
**Seattle, Washington  98101**
**Phone:  (206) 682-3840**
**Fax:      (206) 340-8837**

1    trespass actions at least where, as here, the defendant conceals his wrongdoing." *943 P.2d at 372.*

2    Neither the word "contract" nor "breach" even appears in *Allyn.*

3        In Washington, the discovery rule generally does not apply to breach of contract actions. A

4    cause of action for breach of a written contract accrues upon breach. *1000 Virginia Ltd. P'ship v.*

5    *Vertecs,* 158 Wn.2d 566, 576 (2006); *Schwindt v. Commonwealth Ins. Co.,* 140 Wn.2d 348, 353, 997

6    P.2d 353 (2000); *Safeco Ins. Co. v. Barcom,* 112 Wn.2d 575, 583, 773 P.2d 56 (1989); *Taylor v.*

7    *Puget Sound Power & Light Co.,* 64 Wn.2d 534, 537-38, 392 P.2d 802 (1964).

8

9        This Court is well aware of this issue. In July the Court, referring to *1000 Virginia,* offered a

10    concise explanation in *O.B. Williams Co. v. S.A. Bendheim W., Inc.,* 2010 U.S. Dist. LEXIS 70779

11    (W.D. Wash. July 13, 2010): "The Washington Supreme Court, however, has strictly limited the

12    application of the discovery rule in breach of contract actions." *Id.* at p. 29.

13        The statute of limitations for actions based on a written contract or on liability arising out of

14    a written agreement is six years. R.C.W. § 4.16.040(1). The contract at issue was dated in 1987. As

15    there is no specific time for performance set forth in the contract, the Goldens were to have

16    performed within a reasonable time thereafter. *Taylor v. Puget Sound Power & Light Co.,* 64 Wn.2d

17    534, 537 (1964). Even if "reasonable" were defined liberally as a full year, the Goldens' alleged

18    breach occurred in 1988, twenty-two years ago. As set forth in *1000 Virginia,* the statute begins to

19    run upon breach. As such, the six-year statute of limitations for actions based on written contracts

20    expired in 1993 and bars the Plaintiffs' first cause of action.

21        Even if the discovery rule applied, the Washington Supreme Court explains that rule as a

22    "person who has notice of facts that are sufficient to put him or her upon inquiry notice is deemed to

23

24

DEFS GOLDENS' REPLY RE MOTION TO DISMISS - 7
NO. 2:10-cv-00741-JLR

**Law Offices of**
**Wolfstone, Panchot & Bloch, P.S., Inc.**
**1111 Third Avenue, Suite 1800**
**Seattle, Washington 98101**
**Phone: (206) 682-3840**
**Fax: (206) 340-8837**

147

1   have notice of all facts that reasonable inquiry would disclose." *O.B. Williams Co. v. S.A. Bendheim*

2   *W., Inc.*, 2010 U.S. Dist. LEXIS 70779 (W.D. Wash. July 13, 2010) (*citing 1000 Virginia* at 431).

3       Clearly, Plaintiffs had notice of facts that were sufficient to put them on inquiry notice.

4   Putz was the manager of SCIP from 1994 through 2001. *Complaint, Ex. E, p. 56*. He was

5   involved in litigation with SCIP at some point prior to September 27, 2001 when the Court of

6   Uturoa issued an order concerning Putz and SCIP. *Id.* Plaintiffs admit in their Complaint that

7   "[o]n or about April 17, 2003, Dr. Putz attempted to redeem the eighteen shares of SCIP stock he

8   believed he owned in exchange for title to Bungalow #12." *Complaint, ¶ 34*. Further, in their

9   Opposition, Plaintiffs state "[i]n 2003, when SCIP blocked Dr. Putz's attempt to convert the

10  SCIP shares into a deed, Dr. Putz exercised reasonable diligence to resolve the issue."

11  *Opposition, p. 17*. Therefore, even under a discovery rule, Plaintiffs were on inquiry notice no

12  later than 2003, and the six-year statute of limitations bars their action.

13      Plaintiffs also argue that the statute of limitations should be equitably tolled. Their argument

14  should fail. First, for Plaintiffs' equitable tolling argument to succeed, Plaintiffs would have to show

15  that the Defendants took some action prior to 1993, when the statute of limitations expired, that

16  prevented the Plaintiffs from timely filing their claim. By Plaintiffs' own admission, between 1987

17  and 2005 Plaintiffs had no contact with the Goldens. *Opposition, p. 18*. Plaintiffs do not identify a

18  single act or statement of the Goldens between 1987 and 1993 that would have prevented Plaintiffs

19  from timely filing their claim. Second, in Washington, before a court can determine if equitable

20  tolling is appropriate, it must first determine whether tolling is consistent with both the purpose of

21  the statute providing the cause of action and the purpose of the statute of limitations. *Douchette v.*

22  *Bethel Sch. Dist. No. 403*, 818 P.2d 1362 (Wash. 1991). Plaintiffs have failed to provide any factual

DEFS GOLDENS' REPLY RE MOTION TO DISMISS - 8
NO.  2:10-cv-00741-JLR

Law Offices of
**Wolfstone, Panchot & Bloch, P.S., Inc.**
**1111 Third Avenue, Suite 1800**
**Seattle, Washington  98101**
**Phone:    (206) 682-3840**
**Fax:       (206) 340-8837**

or legal basis on which this Court can determine whether tolling of the statute of limitations is consistent with the purpose of the statute providing the cause of action and the purpose of the statute of limitations. Finally, even if Plaintiffs could overcome these hurdles, their basis for seeking equitable tolling is fatally flawed. Plaintiffs argue that the predicates for equitably tolling have been satisfied because the Goldens "made assurances, later proven to be false, that the transfer was proper and complete." *Opposition, p. 19*. These "assurances," according to Plaintiffs, can be found in Exhibit B to their Complaint. *Opposition, p. 20*. Exhibit B to the Complaint is a 2005 affidavit signed by Michael Golden. But as Judge Moon stated in the Memorandum Opinion, Mr. Putz prepared the affidavit with "no input" from Mr. Golden. *Memorandum Opinion, p. 4 [Complaint, Ex. G]*. Thus, the so-called false assurances that Plaintiffs rely on are contained in an affidavit Mr. Putz himself prepared with no input from Mr. Golden.

Because the six-year statute of limitations bars the Plaintiffs' breach of contract cause of action, that cause of action should be dismissed.

## VI. Plaintiffs' Second Cause of Action is Barred by the Statute of Limitations.

"There is in every contract an implied duty of good faith and fair dealing." *Badgett v. Sec. State Bank*, 807 P.2d 356, 360 (Wash. 1991). The duty of good faith exists only in relation to performance of a specific contract term, not to create obligations on the parties in addition to those contained in the contract. *Id.* Thus, there is no independent cause of action for an implied duty of good faith and fair dealing. Because this implied duty only exists as part of the contract, it is subject to the same statute of limitation analysis as the contract. As discussed above, the statute of limitation has run on the contract between the parties.

DEFS GOLDENS' REPLY RE MOTION TO DISMISS - 9
NO. 2:10-cv-00741-JLR

**Law Offices of**
**Wolfstone, Panchot & Bloch, P.S., Inc.**
**1111 Third Avenue, Suite 1800**
**Seattle, Washington 98101**
**Phone: (206) 682-3840**
**Fax: (206) 340-8837**

149

**VII.   Plaintiffs' Third Cause of Action is Barred by the Statute of Limitations and the Economic Loss Doctrine.**

Plaintiffs offer no formal opposition to the Goldens' Motion to Dismiss Plaintiffs' Third Cause of Action.  Therefore, it should be dismissed.

**VIII.   Plaintiffs' Fourth Cause of Action for "Intentional Interference with Property" is Barred as it Does Not State a Valid Cause of Action, it is Barred by the Statute of Limitations, and it is Barred by the Economic Loss Doctrine.**

    **A.   Plaintiffs do not state a valid cause of action for intentional interference with property.**

For the first time Plaintiffs call their claim for "intentional interference with property" a trespass claim. *Opposition, p. 21.*  As a trespass claim, Plaintiffs' claim cannot survive this motion. Under Washington law, an essential element of a trespass claim is an "invasion of property." *Wallace v. Lewis County,* 137 P.3d 101, 108 (Wash. Ct. App. 2006).  That invasion must be a direct or indirect physical invasion. *See, Bradley v. ASARCO,* 104 Wn.2d 677, 684-691, 709 P.2d 782 (1985).  Plaintiffs make no claim that the Goldens physically invaded Bungalow #12.  Their trespass claim necessarily fails.

    **B.   Plaintiffs' Claim is Barred by the Statute of Limitations.**

Because Plaintiffs fail to state a cause of action for trespass, and Plaintiffs have not alleged, nor can they, that the Goldens have been anywhere near Bungalow #12 since 1987, the three-year statute of limitations clearly bars the Plaintiffs' cause of action for trespass.

    **C.   The Economic Loss Rule Bars the Plaintiffs' Claim.**

Plaintiffs argue that the damages they are seeking are independent from their contract with the Goldens and thus not barred by the economic loss rule. *Opposition, p. 23.*  But Plaintiffs' claimed damages all relate to the subject of the contract with the Goldens – Bungalow

DEFS GOLDENS' REPLY RE MOTION TO DISMISS - 10
NO.  2:10-cv-00741-JLR

Law Offices of
**Wolfstone, Panchot & Bloch, P.S., Inc.**
**1111 Third Avenue, Suite 1800**
**Seattle, Washington  98101**
**Phone:   (206) 682-3840**
**Fax:        (206) 340-8837**

#12. When the damages sought are the subject of the contract itself, the economic loss rule

applies, and the parties are limited to their contract remedies. *Stieneke v. Russi,* 190 P.3d 60, 66

(Wash. Ct. App. 2008). The economic loss rule bars Plaintiffs' trespass claim.

IX. **Plaintiffs Fifth Cause of Action for Intentional Interference with Business Expectancy Fails to State a Cause of Action, is Barred by the Statute of Limitations, and is Barred by the Economic Loss Rule.**

A. **Plaintiffs fail to state a valid cause of action.**

Plaintiffs' attempt to argue their way around Washington case law that a party cannot

interfere with its own contract borders on the nonsensical. According to Plaintiffs, the Goldens

interfered with Plaintiffs' "rental expectancy." *Opposition, p. 21.* That rental expectancy is not

a third party – it is an element of Plaintiffs' damages. Tortious interference with a business

expectancy requires a "third party," not simply additional damages. *Houser v. Redmond,* 586

P.2d 482, 484 (Wash. 1978).

B. **Statute of Limitations.**

Even if Plaintiffs had a claim for tortious interference, it would be barred by the statute of

limitations. Plaintiffs' assertion that a six-year statute of limitations applies to such a claim is simply

wrong. *See City of Seattle v. Blume,* 947 P.2d 223, 226 (1997)(three year statute of limitations

applies to tortious interference claim). Plaintiffs' tortious interference claim focuses on their

"ouster" from Bungalow #12. That so-called ouster necessarily had to occur no later than when

Plaintiffs filed suit in French Polynesia, August 23, 2004. *Hall Dec., Ex. A, p. 5.*

C. **The Economic Loss Rule Bars the Plaintiffs' Claim.**

For the reasons stated above, *see supra p. 10,* Plaintiffs' claim for tortious interference is

also barred by the economic loss rule.

DEFS GOLDENS' REPLY RE MOTION TO DISMISS - 11
NO. 2:10-cv-00741-JLR

**Law Offices of**
**Wolfstone, Panchot & Bloch, P.S., Inc.**
**1111 Third Avenue, Suite 1800**
**Seattle, Washington 98101**
**Phone: (206) 682-3840**
**Fax: (206) 340-8837**

## X.   Plaintiffs' Sixth Cause of Action is Barred.

Plaintiffs only opposition to the Motion to Dismiss their claim for a declaratory judgment is their assertion that no litigation is currently pending in French Polynesia, and Plaintiffs' claims are not time barred. *Opposition, p. 24*. As set forth above, both of these assertions are without support, and thus the Sixth Cause of Action should be dismissed.

### Conclusion

Pursuant to Rule 12(b)(3) and 12(b)(6), the Goldens' motion to dismiss should be granted. In the alternative, this Court should stay this case pending the outcome of proceedings before the Court of First Instance in French Polynesia. Absent a dismissal or stay, parallel litigation in both the United States and French Polynesia will risk interfering with norms of international comity through inconsistent outcomes, conflicts of law, and waste of judicial resources.

Respectfully submitted,

/s/ John H. Kitzmann
John H. Kitzmann, Esq., VSB# 44253
Counsel for Defendants
DAVIDSON & KITZMANN, PLC
211 E. High Street
Charlottesville, Virginia 22902
TEL:   (434) 972-9600/FAX: (434) 220-0011
jhk@dklawyers.com
Admitted *pro hac vice*

/s/ Howard (Terry) Hall
Howard (Terry) Hall, Esq., WSBA #10905
WOLFSTONE, PANCHOT & BLOCH, P.S., INC.
1111 Third Avenue, Suite 1800
Seattle, WA 98101
TEL:   (206) 682-3840/FAX:  (206) 340-8837
thall@wpblaw.com
Attorneys for Defendants

DEFS GOLDENS' REPLY RE MOTION TO DISMISS - 12
NO. 2:10-cv-00741-JLR

Law Offices of
Wolfstone, Panchot & Bloch, P.S., Inc.
1111 Third Avenue, Suite 1800
Seattle, Washington 98101
Phone:   (206) 682-3840
Fax:      (206) 340-8837

152

1

2

<u>CERTIFICATE OF SERVICE</u>

3

I certify that on September 3, 2010, I electronically filed the foregoing with the Clerk of

4

the Court using the CM/ECF system, which will send notification of such filing to Steven W.

5

Fogg and Patrick T. Jordan, Counsel of Record for Plaintiffs.

6

/s/ Patricia Jacobsen
Patricia Jacobsen, Paralegal

7

Wolfstone, Panchot & Bloch, P.S., Inc.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

DEFS GOLDENS' REPLY RE MOTION TO DISMISS - 13
NO.  2:10-cv-00741-JLR

**Law Offices of**
**Wolfstone, Panchot & Bloch, P.S., Inc.**
**1111 Third Avenue, Suite 1800**
**Seattle, Washington  98101**
**Phone:   (206) 682-3840**
**Fax:       (206) 340-8837**

153