252   NYU ANNUAL SURVEY OF AMERICAN LAW   [Vol. 65:217

There are several interesting elements to the *Rambus* decision, though its fundamental premise is the most important for the purposes of this Article. The FTC's contention that, but for the lack of disclosure, Rambus would have agreed to license on RAND terms formed the basis for its finding of liability.[170] In particular, it reasoned that the absence of RAND assurances "significantly contributed to its acquisition of monopoly power . . . ."[171] The D.C. court's rejection of that finding would initially appear to be a resounding rejection of the entire notion of RAND licensing. Indeed, if one accepts the premise that promising to license at no more than a "reasonable" price amounts to no meaningful promise at all, then the loss of an opportunity to receive such an assurance would have precisely no effect on ex post monopoly pricing power.[172]

Encouragingly, the D.C. Circuit discounted the FTC's reliance on *Qualcomm*. It noted the Third Circuit's position that a patentee's intentionally false promise to an SSO to license its technology on RAND terms enhances "the likelihood that patent rights will confer monopoly power on the patent holder" and constitutes an antitrust offense for that reason.[173] Yet the court held that "to the extent that [*Qualcomm*] may have rested on a supposition that there is a cognizable violation of the Sherman Act when a lawful monopolist's deceit has the effect of raising prices (without an effect on competitive structure), it conflicts with [Supreme Court precedent]."[174]

Unfortunately, the D.C. Circuit did not base its conclusion on RAND's lack of efficacy. Instead, the court based its determination on the notion that, irrespective of whether RAND creates a meaningful constraint on ex post pricing or not, acquiring the ability to increase price through deception does not amount to a violation of § 2 of the Sherman Act.[175] The court's decision is definitively inconsistent with the idea that RAND is a vacuous, indeterminate, and ultimately non-meaningful concept. The court explicitly stated that a RAND commitment would constrain ex post prices in a meaningful way, noting that "had [the SSO] limited Rambus to reasonable royalties . . . we would expect *less* competition from alterna-

---

170. *See* In re Rambus, Inc., No. 9302, 2006 FTC LEXIS 60, *159–60 (F.T.C. Aug. 2, 2006).
171. *Id.* at *284.
172. *See* discussion *supra* Part II.B.
173. *Rambus*, 522 F.3d at 466.
174. *Id.* (holding that *Qualcomm* conflicts with *NYNEX Corp. v. Discon, Inc.*, 525 U.S. 128 (1998)).
175. *Id.*

Imaged with the Permission of NYU Annual Survey of American Law
HeinOnline -- 65 N.Y.U. Ann. Surv. Am. L. 252 2009-2010

98

tive technologies, not more; high prices and constrained output tend to attract competitors, not to repel them."[176] In short, the court held that the acquisition of monopoly pricing power through deception does not constitute a violation of the Sherman Act, if the competitive process itself is not hurt.

This particular aspect of the court's opinion can be questioned. A price theoretic view of competition policy looks to an entity's ability to increase price and therefore create allocative inefficiency by reducing output.[177] The artificial acquisition of an ability to increase price to monopoly levels—irrespective of its effect on the level of competition in the market—creates precisely such distortions. From a policy perspective, there may be prudent reasons to allow activity that does not endanger the depressing effect of competition—in particular, the risk of false positives may lead us to err on the side of permissibility.[178] However, the context of the court's decision in *Rambus* is not amenable to this concern. The fact of ex post acquisition of monopoly power through lock-in means that the constraining presence of competition is by definition removed.[179] This removal need not be objectionable in most instances—indeed, it is inevitable in the standardization process. But when that lock-in occurs in the presence of deception, one can no longer say that the cost suffered is unavoidable. If RAND is an efficacious constraint on ex post price, Rambus's allegedly deceptive actions in escaping such commitments should constitute an an-

---

176. *Id.* (emphasis in original).

177. *See, e.g.*, ROBERT H. BORK, THE ANTITRUST PARADOX 107–15 (1978).

178. The U.S. Justice Department embraced this principle in its 2008 Guidelines for Section 2 enforcement. *See* U.S. DEP'T OF JUSTICE, COMPETITION AND MONOPOLY: SINGLE-FIRM CONDUCT UNDER SECTION 2 OF THE SHERMAN ACT (2008), *available at* http://www.usdoj.gov/atr/public/reports/236681.pdf. However, upon the arrival of President Obama's Assistant Attorney General for the Department's Antitrust Division, Christine A. Varney, the report was promptly withdrawn. *See* Dep't of Justice, Press Release, Justice Department Withdraws Report on Antitrust Monopoly Law: Antitrust Division to Apply More Rigorous Standard With Focus on the Impact of Exclusionary Conduct on Consumers, (May 11, 2009), *available at* http://www.usdoj.gov/atr/public/press_releases/2009/245710.htm. For the classic expression of this point, see Frank H. Easterbrook, *The Limits of Antitrust*, 63 TEX. L. REV. 1, 16 (1984). The interested reader should note the F.T.C.'s vociferous reaction, releasing a series of statements blasting the Justice Department's report. *See* STATEMENT OF FTC CHAIRMAN WILLIAM E. KOVACIC 1 (2008), *available at* http://www.ftc.gov/os/2008/09/080908section2stmtkovacic.pdf; STATEMENT OF COMM'RS HARBOUR, LEIBOWITZ AND ROSCH ON THE ISSUANCE OF THE SECTION 2 REPORT BY THE DEP'T OF JUSTICE 1 (2008), *available at* http://www.ftc.gov/os/2008/09/080908section2stmt.pdf.

179. *See* Carrier, *supra* note 70, at 2024.

Imaged with the Permission of NYU Annual Survey of American Law
HeinOnline -- 65 N.Y.U. Ann. Surv. Am. L. 253 2009-2010

titrust violation, at least insofar as higher prices will lead to diminished output.[180]

*Rambus v. FTC* represents something of a squandered opportunity. Rather than recognizing RAND as a meaningless constraint and rejecting the idea of competitive harm from the loss of that guarantee, the D.C. Circuit employed the questionable contention that the deceptive acquisition of monopoly power, without injuring competition, is necessarily lawful.[181] The fact that the decision can be squared with *Qualcomm* is equally disappointing.[182] Nevertheless, the court deserves some merit for the decision. At its most fundamental, *Rambus* holds that an SSO's loss of an opportunity to acquire RAND licensing assurances does not constitute an antitrust offense, even if that loss emanates exclusively from a member's deception.[183] That holding diminishes the force of RAND commitments and thus decreases the incentive for SSOs to rely upon them. The necessary corollary is that alternative means of acquiring ex ante commitments will become more appealing in the standardization process.

This is unquestionably a step in the right direction, though as a normative matter, greater leaps are needed. One should not overemphasize the impact of the *Rambus* decision and its likely effect on drawing standard-setting entities away from RAND assurances—implicit in its holding was the contention that ex ante RAND commitments act as a meaningful constraint on ex post monopoly pricing. This Article has argued that this is not so. Future case law should bestow such assurances with the legal recognition they deserve—namely, none beyond the possible deprivation of injunctive relief.

### C. Tempering Antitrust Oversight

Solving the critical absence of price competition requires more than a dilution in the legal potency of RAND licensing assurances. It is critical that antitrust oversight be suitably tempered to assuage the concerns of prospective SSO members, who might otherwise forego the SSO process in favor of de facto standardization. Such an unintended effect would have myriad undesirable consequences in terms of the foregone efficiency of collaborative standardiza-

---

180. Others have noted that the precedential value the D.C. Circuit relies upon in this regard is itself questionable. *See* Cary et al., *supra* note 1, at 1252–53. This Article offers no opinion on this point, concerning itself only with the normative question of whether the court's rule is desirable.

181. *See* BORK, *supra* note 177, at 107–15.

182. *See* Cary et al., *supra* note 1, at 1252.

183. *Rambus*, 522 F.3d at 466–67.

tion.[184] At the same time, blanket antitrust immunity would be inappropriate, given the undeniable risk inherent in all cases where horizontal competitors agree to discuss price. The enforcement agencies have taken numerous steps to mollify the ostensibly dogmatic antitrust rules that govern the horizontal negotiation of price in the SSO context. This Subpart charts three major developments, all of which are highly commendable, and then discusses appropriate steps for the future.

### 1. Application of the Rule of Reason

Antitrust oversight—at least in its current form—must go. Crucially important royalty competition is being hindered, and ultimately foreclosed, by the very body of law meant to foster it.[185] As with the issue of treble damages, discussed below, the prospects of a plaintiff's success in bringing an antitrust action against SSO participants directly affects prospective members' propensity to engage in risky, though socially desirable, conduct. An underappreciated fact is that few antitrust plaintiffs ultimately prevail at trial except in cases involving per se illegality.[186] Although the Supreme Court has reserved such treatment to a narrow—and, indeed, narrowing[187]—sphere of pernicious activity, the prohibition on horizontal price fixing is a staple of fundamental antitrust doctrine.[188] Even though SSOs' internal debate over royalty rates may produce highly desirable benefits in the form of lower downstream prices to consumers and more efficient standardization, the fact remains that royalty discussions within an organization comprised of competitors can easily be mistaken for price fixing.[189] Where a plaintiff is capable of convincing a fact-finder that the discussions at issue in a particular case amount to such activity, an antitrust violation will surely follow.

---

184. *See* discussion *supra* Part I.B (explaining the virtues of the SSO process over de facto standardization in at least some settings).

185. *See* discussion *supra* Part II.A.

186. *See* Marina Lao, Comment, *The Rule of Reason and Horizontal Restraints Involving Professionals*, 68 ANTITRUST L.J. 499, 503 (2000) ("All in all, plaintiffs . . . almost never prevail when the governing standard is the full rule of reason.").

187. *See, e.g.*, Leegin Creative Leather Prods., Inc. v. PSKS, Inc., 127 S. Ct. 2705, 2710 (2007) (overruling ninety-seven-year-old precedent that vertically imposed minimum prices are illegal per se).

188. As an aside, an interesting contemporary issue is whether the ban on horizontal price fixing should be lifted in certain circumstances. *See* Randal C. Picker, *Take Two: Stare Decisis in Antitrust/The Per Se Rule Against Horizontal Price-Fixing* 15–16 (John M. Olin Law & Econ. Working Paper No. 398, 2008), *available at* http://papers.ssrn.com/sol3/papers.cfm?abstract_id=1113513.

189. *See Promoting Innovation and Competition*, *supra* note 42, at 37.

Imaged with the Permission of NYU Annual Survey of American Law
HeinOnline -- 65 N.Y.U. Ann. Surv. Am. L. 255 2009-2010

Such automatic illegality need not exist, absent evidence that members are in fact using the process as a conduit for a naked cartel. Whatever the virtues of the per se rule in other contexts, the SSO setting is unique. Indeed, it would seem natural to construe the royalty competition within an SSO as an ancillary feature of a joint venture. Such ancillary restraints have long been judged under the rule of reason and typically upheld.[190] Interpreting ex ante royalty competition in this light would have a powerful effect in shifting relevant incentives toward beneficial risk-taking (i.e. engagement in royalty competition).

In 2007, the Justice Department and FTC issued a joint report on innovation and competition, following extensive hearings from economists, antitrust lawyers, and other experts.[191] In the context of private SSOs, the enforcement agencies made clear that "[b]ecause of the strong potential for procompetitive benefits, the Agencies will evaluate joint ex ante activity to establish licensing terms under the rule of reason."[192]

Standing alone, bare labels are of limited worth. The enforcement agencies clarified their conclusion through a series of specific examples. In particular, they emphasized the following: First, a prospective licensor's voluntary and unilateral disclosure of its licensing terms, including price, is per se legal under the antitrust laws.[193] Second, bilateral ex ante negotiations between an individual SSO member and an individual patentee outside the sphere of an SSO is unlikely to require antitrust scrutiny.[194] Third, intra-SSO activities designed to mitigate hold-up, such as joint ex ante licensing negotiations, will be analyzed under the rule of reason.[195] Fourth, the use of ex ante licensing discussions as a sham to cover naked agreements between horizontal competitors to agree on royalty rates or downstream prices will constitute a per se violation of the Sherman Act.[196] The agencies' clarification of their enforcement intentions with regard to specific SSO practices will go a long way toward spurring desirable ex ante behavior. By explicitly de-

---

190. *See* Mark A. Lemley & Christopher R. Leslie, *Categorical Analysis in Antitrust Jurisprudence*, 93 Iowa L. Rev. 1207, 1221 (2008).

191. *See Promoting Innovation and Competition*, *supra* note 42, at 3.

192. *Id.* at 54.

193. *Id.* (citing Michael A. Carrier, *Why Antitrust Should Defer to the Intellectual Property Rules of Standard-Setting Organizations*, 87 Minn. L. Rev. 2019, 2036–37 (2003)).

194. *Id.*

195. *Id.*

196. *Id.*

Imaged with the Permission of NYU Annual Survey of American Law
HeinOnline -- 65 N.Y.U. Ann. Surv. Am. L. 256 2009-2010

claring the presumptive legality of particular practices, SSO members know that opportunities beyond reliance on RAND exist.

The enforcement agencies came to the correct conclusions; however, the 2007 Report does not go far enough. In particular, an SSO's decision to require each prospective member to disclose its most onerous licensing conditions ex ante should be per se legal. The agencies fell short of this position, opining that "an SSO rule that requires intellectual property holders to announce their intended (or maximum) licensing terms for technologies being considered for adoption in a standard" would be judged under the rule of reason.[197]

### 2. Eliminating Treble Damages

Antitrust law creates a particularly powerful disincentive to violate its occasionally nebulous rules. In particular, the Clayton Act provides that a successful private litigant can recover treble damages from a company found guilty of anticompetitive conduct.[198] The danger created by overly harsh punishment lies in the reduction of socially valuable activity. Of course, there is little or no such danger in clear cases. It is difficult to see how prohibiting actual and attempted murder, for instance, will have any negative social consequence. In contrast, the imposition of heavy liability is problematic at the border of desirable conduct. With regard to practices whose relative burdens and benefits are difficult to weigh, excessive liability may suffocate ultimately desirable behavior. For instance, were society to punish anyone who breaks the speed limit with death, there would be a marked (and undesirable) reduction in driving.[199]

Applied to the SSO context, horizontal collaboration necessarily entails a risk of antitrust liability, regardless of precaution or good intent. As an evidentiary matter, it is too easy to confuse desirable instances of royalty competition with nefarious instances of collusion. To impose treble damages on a company held liable in such a context is to skew the ex ante calculus away from risk-taking behavior that may well be desirable. Fearing liability for three times

---

197. *Id.* at 54–55.

198. *See* 15 U.S.C. § 15(a) (2006).

199. *See* POSNER, *supra* note 108, at 221. Were all drivers capable of (costlessly) ensuring that they would never inadvertently exceed the limit, there would be no undesirable reduction in the level of driving. Of course, the limited ability of drivers to constrain their speed in all circumstances, including moments of mental lapse, would cause a socially harmful reduction in the quantity of driving.

Imaged with the Permission of N.Y.U. Annual Survey of American Law
HeinOnline -- 65 N.Y.U. Ann. Surv. Am. L. 257 2009-2010

Case 2:10-cv-01823-JLR Document 58-4 Filed 03/09/11 Page 7 of 17

the harm deemed to have been suffered by a plaintiff, prospective SSO members will either omit any ex ante extraction of specific royalty rates or, worse, forego the SSO process altogether. Given the indeterminacy inherent to RAND in the SSO format, it is imperative that a system be introduced that remedies the distortion caused by treble damages liability.

Congress introduced such a system in 2004, when it enacted the Standards Development Organization Advancement Act (SDOAA).[200] The SDOAA grants SSOs the same protections granted certain joint ventures by the National Cooperative Research and Production Act of 1993.[201] The latter requires that the legality of covered joint ventures be judged under the rule of reason. The SDOAA provides that SSOs will be subject only to actual damages, and not treble damages under the Clayton Act, if the parties to the joint venture notify the enforcement agencies in advance.[202]

While the terms of the SDOAA are eminently desirable, the Act itself suffers from a major deficiency in the form of under-inclusion. By its terms, the Act protects only SSOs themselves—not their constituent members.[203] Given prospective members' fear of antitrust liability, Congress ought to expand the SDOAA to cover SSO participants. Without such an amendment, the beneficial impact of the Act will be limited. The fact that the organization an IP holder joins is exempt from treble damages will be of little consolation to that IP holder if sued in its individual capacity. Given the perverse consequences of exposing SSO members to treble damages for inadvertent violations of the Sherman Act[204]—especially in a context of horizontal collaboration, which is perfectly facilitative of inadvertent breaches of antitrust law—Congress should move promptly to broaden the Act's scope.

3. Approving the Ex Ante Disclosure of Maximum Royalty Rates

Ex ante constraints on ex post hold-up could take numerous forms, though spurring the unilateral announcement of "most restrictive licensing terms"—construed here to include a maximum royalty rate—from prospective licensors is perhaps the most prom-

---

200. 15 U.S.C. § 4302 (2006).
201. 15 U.S.C. § 4303 (2006).
202. *Id.*
203. 15 U.S.C. § 4302.
204. 15 U.S.C. §§ 1–7 (2006).

ising. Other avenues prove problematic.[205] By contrast, allowing—or better yet, requiring—patentees to announce their most restrictive licensing should be entitled to per se legality under the antitrust laws, at least insofar as such announcements are made in the context of a ban on inter-member discussion of royalties. Such a policy would create rational incentives for IP holders to communicate their highest royalty rates honestly, which in turn would allow SSOs to make an informed judgment as to the relative virtues of competing standards and patented technologies. At the same time, concerns of excessive buyer-side market power would be largely avoided. In any event, permitting, or mandating, such ex ante disclosure would be superior in all respects to the indeterminate and costly concept of RAND.

Given the overriding benefits likely to be associated with ex ante announcements of most restrictive licensing terms, the past few years have proven most encouraging. In 2006, for the first time, the Justice Department endorsed the ex ante disclosure by a patentee of its maximum royalty rate.[206] Pursuant to 28 C.F.R. § 50.6, the Justice Department issued a business review letter, expressing its intention not to bring an antitrust action against an arrangement in which SSO members were *required* to announce their most restrictive licensing terms ex ante.[207] The Justice Department noted:

> Requiring patent holders to disclose their most restrictive licensing terms in advance could help avoid [ex post hold-up] by preserving the benefits of competition between alternative

---

205. For instance, open discussion of royalties between holders of substitute patents, far from yielding meaningful commitments commensurate with ex ante value, would inevitably entail bid-rigging and the potential for further downstream collusion. Having SSOs require royalty-free licensing or unilaterally impose price caps on prospective licensors would yield superior results, in that hold-up would be avoided and a knowledgeable decision could be reached concerning the cost of choosing a particular standard. However, even these ostensibly attractive paths suffer a fatal flaw—namely, the danger of monopsony, which would result in an insufficient return on valuable IP and a resulting diminution on incentives to innovate. A fourth option would involve negotiations between all relevant IP holders and the SSO as to specific royalty terms. This avenue, however, may be unrealistic and detrimental in certain circumstances. SSOs typically operate on a time-critical schedule and ex ante delays to the standardization process are most undesirable. Having to complete negotiations over price and other licensing terms before that process even begins may prove unacceptable to an SSO operating on a time-critical schedule.

206. *See* Letter from Thomas O. Barnett, Assistant Att'y Gen., U.S. Dep't of Justice, to Robert A. Skitol, Esq., Drinker, Biddle & Reath, LLP (Oct. 30, 2006), at 5–6, *available at* http://www.usdoj.gov/atr/public/busreview/219380.pdf.

207. *Id.* at 10.

Imaged with the Permission of NYU Annual Survey of American Law
HeinOnline -- 65 N.Y.U. Ann. Surv. Am. L. 259 2009-2010

105

technologies that exist during the standard-setting process. Currently, [the SSO] working group members choose between alternative technologies primarily based on technical merit. They generally have little information about how eventual licensing terms for alternative technologies are likely to differ. Under the proposed policy, each working group member also will be able to compare the most restrictive licensing terms associated with each alternative technology, including freely-available public domain technologies, when deciding which technology to support for inclusion in the draft VSO specification. Disclosure of this information, enforced by the requirement that nondisclosed patents be licensed royalty-free, permits the working group members to make more informed decisions when setting a standard.[208]

Pursuant to this analysis, the Justice Department approved the arrangement, thus creating a precedent available for all future SSOs to mimic. The Justice Department was correct in its analysis. Motivating SSOs to adopt such policies represents the optimal way forward. Specific circumstances may occasionally lead SSOs to require specific ex ante commitments as to actual licensing rates and terms, which suggests that antitrust rules should be suitably subdued in the context of intra-SSO bilateral negotiations. Nevertheless, as a general matter, the ex ante disclosure of most restrictive licensing terms likely represents the best policy. Full ex ante negotiations over specific royalty rates threaten to delay the time-sensitive operation of the standardization process and inevitably invite temptation toward bid-rigging and downstream price fixing. Equally, the unilateral imposition of price caps or royalty-free licensing requirements threaten innovation by undercompensating IP holders. Given that the disclosure of most restrictive licensing terms allows SSOs to make informed decisions, SSOs should be encouraged to adopt the policy on a ubiquitous basis.

---

208. *Id.* at 9. The Justice Department continued:

They might decide, for example, that a cheaper, less technologically elegant solution would be best or they might determine that it is worth including the proffered technological elegance even on the most restrictive terms declared by the patent holder. At a minimum, the disclosure of most restrictive licensing terms decreases the chances that the standard-setting efforts of the working group will be jeopardized by unexpectedly high licensing demands from the patent holder.

*Id.*

#### 4. Continued Constraints on SSO Action

Recent developments in tempering the force of antitrust oversight have been most encouraging. In particular, the unequivocal application of a rule of reason standard, in conjunction with the SDOAA's elimination of treble damages, creates a superior environment for facilitating ex ante royalty competition. Such competition could take many forms, though this Article considers the most promising to be an SSO-imposed requirement that prospective licensors reveal their most restrictive licensing terms. Such an approach combines the beneficial effects of price competition between purveyors of substitute technologies with prompt initiation of the standardization process that might be delayed by protracted ex ante negotiations over specific royalties. The business review procedure in which the Justice Department approved precisely such an arrangement is commendable.[209] This decision may in itself pave the way for greater reliance on ex ante procedures as a means to counter ex post hold-up. Combined with a possible future dilution in the legal force of RAND assurances, the effect could be significant. Nevertheless, the agencies should revisit their 2007 determination that rule of reason analysis should apply to required disclosure of restrictive licensing terms. Given the paramount advantages to this requirement, per se legality presents the optimal approach.

One might be equally tempted to promote royalty caps or royalty-free (RF) licensing.[210] Indeed, the former would appear to have an impact similar to prospective licensors' announcements of the highest royalty rates at which they would willingly license. In both cases, an SSO can make qualitative comparisons between different technologies, knowing the highest possible cost of complying with either. This facilitates an efficient decision-making process that mimics that of a private market. Moreover, caps and RF approaches might appear to provide an effective solution to situations where no rival technologies exist. In such settings, ex ante and ex post monopoly power will be equivalent and so a constraint on that power might appear desirable.

However, both royalty caps and RF licensing—unilaterally imposed by an SSO—create a significant antitrust problem in the

---

209. *Id.* at 1–10.

210. A royalty cap is simply an upper limit on the royalty an IP holder can charge.

262    NYU ANNUAL SURVEY OF AMERICAN LAW    [Vol. 65:217

form of monopsony.[211] In such situations, IP holders may be denied compensation commensurate with the social value of their technological contributions, thus reducing ex post rewards to undesirable levels. The effect of monopsonistic prices being forced on IP holders in the SSO context may be to reduce ex ante incentives to invent below the socially optimal level. More fundamentally, any attempt to impose a cap or RF licensing requirement on the holder of a patent for which there is no technological substitute is futile in the absence of cultural or other pricing constraints. For such a patentee, the attempted imposition of an unwanted term will simply induce her to leave the SSO and impose her royalty requirements ex post.

For these reasons, neither unilaterally imposed royalty caps nor RF licensing requirements are deserving of a presumption of legality under the antitrust laws. In fact, courts and enforcement agencies would do well to view cases in which such obligations are imposed with some consternation. Antitrust policy would be best served by promoting intra-SSO competition that results in specific royalty guarantees, a requirement of pre-disclosure, or individual negotiations between licensors and licensees. Competition policy has no role dictating one path over another, as the relative virtues of these different avenues will change depending on the context of the relevant SSO. Accordingly, courts and enforcement agencies should lay down clear rules concerning the antitrust standards applied to various forms of ex ante constraints on future hold-up and demarcate the limits of acceptable behavior.

### 5. Closing Thoughts

There is little doubt that antitrust law has played a perverse, albeit unintentional, role in the standardization process. For this reason alone, there is significant force to Professor Lemley's suggestion that "antitrust law should get out of the way of SSOs."[212] Recent actions by Congress and the enforcement agencies have largely accomplished this goal, and have done so in a responsible way.[213] Nevertheless, further steps are warranted, in particular with regard to expanding the reach of the SDOAA, deeming per se legal an SSO's requirement that prospective licensors announce their most restrictive terms, and creating a rebuttable presumption of legality

---

211. *See generally* Alan Devlin, *Questioning the Per Se Standard in Cases of Concerted Monopsony*, 3 HASTINGS BUS. L.J. 223 (2007) (presenting the author's view on the economics of monopsony).

212. *See* Lemley, *supra* note 6, at 167.

213. *See* discussion *supra* Part III.C.2.

with regard to intra-SSO royalty competition that bans inter-rival communications with respect to price, but yields binding royalty rates ex ante.

The influence of antitrust enforcement goes beyond the text of the law and also tracks the force with which it is applied. There is room for improvement on this score as well. In traversing the SSO terrain, attempting to balance the need to prevent improper collusion whilst fostering proper ex ante royalty competition, competition enforcers must resist the temptation to view the world in a frozen, ex post state. The agencies must consider the threat to the entire SSO enterprise created by any enforcement actions that increase the expected costs of joining that enterprise at all. Nothing is likely to create a greater disincentive to SSO membership than publicly visible and inordinately costly antitrust actions on cases other than monopsonistic or downstream monopolistic collusion, or instances of outright fraud that result in ex post hold-up. Antitrust actions for violating ill-defined, unwritten, communal policies that potentially discourage membership are apt to be especially harmful.[214] Enforcement actions in such cases have been initiated—a worrying fact—though on this ground *Rambus* is to be strongly commended.[215] In that decision, the D.C. Circuit blasted the FTC for finding an antitrust violation on the basis of failing to abide by an agreement of questionably clarity.[216] Constraint on the part of the enforcement agencies, which will hopefully abide by the D.C. Circuit's directions in the future, will do much to spur more widespread involvement in the SSO process. Unfortunately, the FTC has made its intention clear that it will bring similar enforcement actions under § 5 of the FTC Act, which gives it power to challenge activities beyond those proscribed by the Sherman Act.[217]

By creating a demonstrable enforcement history against hardcore offences, backed by tangible evidentiary proof, the enforcement agencies can create optimal legal incentives. Prospective SSO members can be encouraged to engage in properly transparent and contained royalty competition, while simultaneously being deterred from engaging in the various forms of nefarious conduct

---

214. *See generally* Nicos L. Tsilas, *Toward Greater Clarity and Consistency in Patent Disclosure Policies in a Post-Rambus World*, 17 HARV. J.L. & TECH. 475 (2004).

215. Rambus Inc. v. FTC, 522 F.3d 456 (D.C. Cir. 2008).

216. *Id.* at 469.

217. *See* J. Thomas Rosch, Commissioner, Fed. Trade Comm'n, Patent Trolls: Broad Brush Definitions and Law Enforcement Ideas, Remarks at the Newport Summit on Antitrust and Economics 4–8 (May 31, 2008), *available at* http://www.ftc.gov/speeches/rosch/080531roschlecg.pdf; *see also* 15 U.S.C. § 45 (2006); *see generally* 15 U.S.C. §§ 41–58 (2006).

Imaged with the Permission of NYU Annual Survey of American Law

HeinOnline -- 65 N.Y.U. Ann. Surv. Am. L. 263 2009-2010

109

that an environment of horizontal collaboration can make so tempting.

## IV.
## CONCLUSION

Standard-setting organizations often provide a qualitatively superior mechanism for achieving interoperability than does the open market. Reliance on the market, which would yield de facto standards pursuant to elongated winner-takes-all competition, suffers from numerous drawbacks. De facto standard-setting inevitably invites socially excessive levels of entry, results in sunk, wasted capital being invested in technologies that are not destined to prevail, delays consumer acceptance of a particular standard until the markets "tip," and, perhaps worst of all, may not reliably provide society with the optimal technology.[218] Given these shortcomings, the normative case for relying on SSOs in at least some settings is compelling and one should not be surprised by their ubiquity in new economy markets.

That the SSO process offers overriding benefits is separate from a systemic weakness that underlies it. SSO members face the quandary of either spurring royalty competition between purveyors of rival technologies, but delaying the standardization process and inviting unwelcome attention from antitrust enforcement agencies, or foregoing such competition and resolving pricing issues ex post.[219] The former option has been largely discarded on antitrust grounds. The latter path, however, is highly undesirable. Without any binding contractual commitment to make its IP available at a particular royalty rate, and with realistic substitutes having been eliminated following the SSO's decision, a patentee whose exclusive rights are infringed by a standard may be able to extract excessive wealth.[220] Ex post hold-up by IP owners necessarily follows, which

---

218. *See* discussion *supra* Part I.B.

219. It is in the context of this tension that one should note the relative advantage offered by de facto standardization. Open market competition ensures that a standard is qualitatively assessed on the grounds of both technological primacy and cost. Holders of IP rights for which there are multiple substitute technologies have powerful incentives to license their rights at low royalty rates—combined with the especially pronounced price competition that characterizes entry into network effect-driven markets, consumers can therefore be expected to reap the reward. In contrast, SSOs select standards with regard to technological criteria only.

220. As explored above, reputational and other economic effects may constrain the price at which a patentee may set its royalty rates in an ex post setting. Nevertheless, the circumstances in which these constraints will be powerful are

increases both the cost of complying with a standard and the final downstream price for consumers.[221]

Both of these effects are contrary to widely-accepted goals of competition policy, yet are perversely caused by the very presence of antitrust rules themselves.[222] Such laws have fostered a fear of liability in those IP holders who would otherwise compete for inclusion in a standard on the price at which they would license their respective technologies.[223] In doing so, antitrust rules have driven standard-setters to employ second-best methods to moderate the effect of hold-up. The principal prophylactic tool relied upon by standard-setting bodies is insistence that members license their intellectual property on reasonable and non-discriminatory terms.[224] Unfortunately, RAND licensing requirements operate as an inefficacious constraint on ex post monopoly pricing.[225] As a result, there is a compelling need to remedy the deficiency in price competition that currently defines the SSO process.[226]

The solution is not as straightforward as simply absolving SSOs and their constituent members of all potential antitrust liability. Although doing so would certainly facilitate vigorous competition on royalty rates, per se legality would also create opportunities for nefarious conduct of an especially dangerous kind.[227] Were members free to discuss royalty rates, SSOs would become the perfect vehicle for collusion.[228] Crafting a solution therefore requires sensitivity to two offsetting factors. Clearly, collusion between horizontal competitors must be avoided. However, it is also unacceptable to administer a regulatory regime that results in a dearth of price competition.

This Article articulates a two-prong solution to the tension between the two preceding issues. First, SSOs should be induced away

---

limited. Therefore, there are strong policy reasons to be concerned about the critical absence of ex ante price competition in SSOs.

221. *See* Lemley, *supra* note 6, at 153.

222. For the authoritative discussion of the proper aims of antitrust policy, see BORK, *supra* note 177, at 50–89.

223. *See* Lemley, *supra* note 1, at 1964–65.

224. *See* Miller, *supra* note 1, at 353.

225. *See* discussion *supra* Part II.B.

226. One conceivable possibility would be to prohibit SSOs altogether and allow open market competition to yield de facto standards. However, this is far from a desirable option, given the many relative advantages offered by the private standard-setting process. *See* discussion *supra* Part I.B.

227. Cartel behavior is the ultimate evil of competition policy and has been summarily condemned under the per se rule for that reason.

228. *See Promoting Innovation and Competition, supra* note 42, at 33–56.

Imaged with the Permission of NYU Annual Survey of American Law

HeinOnline -- 65 N.Y.U. Ann. Surv. Am. L. 265 2009-2010

111

from relying on RAND licensing assurances as a solution to the hold-up problem. The most promising mechanism for achieving this would be to eviscerate the legal enforcement of those commitments. In particular, the law should recognize the fatally indeterminate nature of an agreement to license on RAND terms and discount its force accordingly. The idea that a failure to abide by such an agreement can constitute an antitrust offense is particularly objectionable.[229] A number of courts have recognized this in recent times,[230] though they have been superseded by the Third Circuit's holding in *Qualcomm* that a conscious violation of a RAND commitment creates antitrust liability.[231] The D.C. Circuit's 2008 agency review in *Rambus* bore the potential to undo much of the harm created by *Qualcomm*, particularly given the latter's close reliance on the FTC decision that the D.C. Circuit was reviewing.[232] The outcome in *Rambus* ostensibly bore out this potential, holding that an SSO's loss of an opportunity to extract RAND assurances fails to create a cause of action in antitrust, even if that loss emanates exclusively from deceit.[233] The source of that decision left much to be desired, however, turning not on RAND assurances' lack of efficacy, but on the dubious notion that ex post acquisition of market power through deceit does not equate with consumer harm. *Rambus* therefore stands as something of a squandered opportunity.

The second step lies in suitably containing the presence and oversight of antitrust in the SSO field. Blanket immunity for intra-SSO conduct would be inappropriate, but a safe harbor should nevertheless be identified. Moreover, prudent policy would display sensitivity to the heterogeneous nature of various industries and therefore decline to mandate a particular form of ex ante royalty competition.[234] This Article specifically counsels the following: (1) an SSO should have an absolute right to require its prospective licensors to state their most restrictive terms, including the maxi-

---

229. Assuming, indeed, that one can satisfactorily identify an actual breach of a promise to license at no greater than a "reasonable" price.

230. *See, e.g.*, Townshend v. Rockwell Int'l Corp., No. C 99-0400 SBA, 2000 U.S. Dist. LEXIS 5070 (N.D. Cal. Mar. 28, 2000); Broadcom Corp v. Qualcomm, Inc., No. 05-3350, 2006 U.S. Dist. LEXIS 62090, at *22 (D.N.J. Aug. 31, 2006), *rev'd in part*, 501 F.3d 297 (3d Cir. 2007).

231. Broadcom Corp. v. Qualcomm Inc., 501 F.3d 297 (3d Cir. 2007).

232. *See id.* at 314.

233. Rambus Inc. v. FTC, 522 F.3d 456, 466–67 (D.C. Cir. 2008).

234. *See* John R. Allison & Mark A. Lemley, *The Growing Complexity of the United States Patent System*, 82 B.U. L. Rev. 77, 79–80, 143–44 (2002) (noting that patents are highly heterogeneous across industries).

Imaged with the Permission of NYU Annual Survey of American Law
HeinOnline -- 65 N.Y.U. Ann. Surv. Am. L. 266 2009-2010

112

mum royalty rates at which they would license their technologies; (2) intra-SSO royalty competition that yields specific licensing terms should enjoy a presumption of legality and should continue to be judged under the rule of reason; (3) greater reliance should be placed on agency pre-clearance pursuant to 28 C.F.R. § 50.6, and the reach of the Standards Development Organization Advancement Act of 2004 should be broadened to encompass individual SSO members to protect them from exposure to treble damages; (4) antitrust law should view an SSO's action in requiring royalty-free licensing or unilaterally imposing a royalty cap with consternation, given the possible nefarious presence of monopsonistic effects; and (5) royalty negotiations between individual licensors and licensees outside the SSO framework should be per se legal.

The adoption of such standards, in conjunction with efforts to strip RAND licensing of legal enforceability, would lead to categorically superior outcomes in the future, as SSOs move from reliance on inefficacious constraints on ex post hold-up to meaningful ex ante limitations on future royalty rates.

Imaged with the Permission of NYU Annual Survey of American Law
HeinOnline -- 65 N.Y.U. Ann. Surv. Am. L. 267 2009-2010

113

268        NYU ANNUAL SURVEY OF AMERICAN LAW        [Vol. 65:217

Imaged with the Permission of NYU Annual Survey of American Law
HeinOnline -- 65 N.Y.U. Ann. Surv. Am. L. 268 2009-2010