# Exhibit
# 5

*Approved by the IEEE-SA Board of Governors December 2009*

# IEEE-SA Standards Board Bylaws

The Institute of Electrical and Electronics Engineers, Inc.
3 Park Avenue, New York, NY 10016-5997, USA

Copyright © 2010 by the Institute of Electrical and Electronics Engineers, Inc.
All rights reserved. Published 2010. Printed in the United States of America.

*Reproduction and distribution of this document in whole or in part by any medium is permitted. Appropriate acknowledgement of the source and ownership of the material should be made with any such reproduction and distribution.*

*Please note that this document may be revised periodically. The latest edition will be made available at the IEEE Standards website at no charge. The document on the IEEE Standards website is considered to be the definitive version. For further information, contact the IEEE Standards Department, 445 Hoes Lane, Piscataway, NJ 08855-1331, USA.*

# Contents

1. IEEE-SA Standards Board ................................................................................................ 1

2. IEEE standards ............................................................................................................... 2
  2.1 Role of IEEE Standards ............................................................................................. 2
  2.2 Purpose of IEEE standardization ............................................................................... 2

3. Governance .................................................................................................................... 3

4. IEEE-SA Standards Board organization .......................................................................... 4
  4.1 Membership .............................................................................................................. 4
  4.2 Standing committees of the IEEE-SA Standards Board ............................................. 5
  4.3 Other committees and bodies .................................................................................... 7

5. IEEE-SA Standards Board procedures and responsibilities ............................................ 8
  5.1 Transaction of business ............................................................................................. 8
  5.2 Standards-development process ................................................................................ 8
  5.3 Review cycles ........................................................................................................... 12
  5.4 Appeals .................................................................................................................... 12
  5.5 Interpretations ......................................................................................................... 13

6. Patents ......................................................................................................................... 14
  6.1 Definitions ............................................................................................................... 14
  6.2 Policy ...................................................................................................................... 15

7. Copyright ...................................................................................................................... 17
  7.1 Definitions ............................................................................................................... 17
  7.2 Policy ...................................................................................................................... 17

8. Modifications to the *IEEE-SA Standards Board Bylaws* ................................................ 18
  8.1 Interpretations of the *IEEE-SA Standards Board Bylaws* ........................................ 18

# IEEE-SA Standards Board Bylaws

## 1. IEEE-SA Standards Board

The IEEE-SA Standards Board is established by the IEEE-SA Board of Governors according to clause 5.1 of the *IEEE Standards Association Operations Manual*. The details of its responsibilities beyond that specified in the *IEEE Standards Association Operations Manual* are stipulated by these bylaws, as supplemented by the *IEEE-SA Standards Board Operations Manual*.

The IEEE-SA Standards Board is responsible on an Institute-wide basis for

a) Encouraging and coordinating the development of IEEE standards

b) Reviewing all proposed IEEE standards to determine whether the proposed standards conform to the requirements established by the IEEE-SA Standards Board and whether consensus has been achieved for approval of the proposed standards

Matters of standards policy, financial oversight, new directions in standardization, and other standards-related activities in fields of interest to the Institute as stated in the *IEEE Constitution* are the responsibility of the IEEE-SA Board of Governors (BOG).

1

# 2. IEEE standards

## 2.1 Role of IEEE Standards

IEEE-SA develops and publishes standards that include but are not limited to definitions and terminology; methods of measurement and test; systems; products; technology; ratings structures; temperature limits and application guides; recommended practices; and safety. Rating and dimensional information included in an IEEE standard result from technical considerations. Rating information developed by other competent organizations may be included provided it is consistent with good engineering practice.

The approval and publication of an IEEE standard implies that the document represents a consensus of the parties who have participated in its development and review. Since every attempt is made to involve all interests in the activity, it can be presumed that the document represents a consensus of interests concerned with the scope of the standard. Consensus is established when, in the judgment of the IEEE-SA Standards Board, substantial agreement has been reached by directly and materially affected interest categories. Substantial agreement means much more than a simple majority, but not necessarily unanimity. Consensus requires that all views and objections be considered, and that a concerted effort be made toward their resolution.

## 2.2 Purpose of IEEE standardization

IEEE standards provide a common ground for communication in some specific area of electrotechnology. They also provide criteria for measuring the acceptable performance of equipment or materials pertinent to the field of electrotechnology.

The purpose of the review by the IEEE-SA Standards Board is to ensure that IEEE standards represent a consensus of interests from those that are materially affected by these standards and that proper procedures have been followed during the development of these standards.

An IEEE standard gives an authoritative reference that is kept up to date through review at least every five years by the Sponsor responsible for its preparation. Alternatively, IEEE standards may be stabilized. These standards are considered for continued stabilization through review at least every ten years.

Case 2:10-cv-01823-JLR   Document 58-5   Filed 03/09/11   Page 6 of 49

## 3. Governance

The policies, procedures, rules, and regulations by which the IEEE and IEEE-SA Standards Board activities are governed are embodied in six documents. The *IEEE Certificate of Incorporation* legally establishes the IEEE. The *IEEE Constitution*, which can be approved and amended only by the voting members of the IEEE, contains IEEE's fundamental objectives and organization. Implementation of the constitutional provisions, in specific organizational units and their policies, is contained in the *IEEE Bylaws*, which are approved and amended by the IEEE Board of Directors. The *IEEE Policies* contain more detailed statements of specific policies, objectives, and procedures that may be approved only by the IEEE Board of Directors. The *IEEE Standards Association Operations Manual* provides specific objectives and policies that relate to standards activities in the IEEE. The *IEEE Standards Association Operations Manual* is created and amended by the IEEE-SA BOG. The sixth document, the *IEEE-SA Standards Board Bylaws*, is published herewith. Its purpose is to provide specific policies that relate to the management and creation of approved IEEE standards. The *IEEE-SA Standards Board Bylaws* are created and amended by the IEEE-SA Standards Board, with final approval by the IEEE-SA BOG.

The precedence of these documents should be remembered by all those engaged in IEEE management duties. The *IEEE Bylaws* shall not be in conflict with the New York Not-For-Profit Corporation Law, the *IEEE Certificate of Incorporation*, or the *IEEE Constitution*. The *IEEE Policies* must conform to the provisions of all of these documents. Accordingly, the *IEEE Standards Association Operations Manual* shall conform to and not conflict with the provisions of the IEEE governing documents cited above. The *IEEE-SA Standards Board Bylaws* shall conform to the policies of the *IEEE Standards Association Operations Manual*. Questions of procedure or interpretation shall be addressed to the Managing Director, Standards.

# 4. IEEE-SA Standards Board organization

## 4.1 Membership

As stated in the *IEEE Standards Association Operations Manual*, the IEEE-SA Standards Board shall consist of no fewer than 18 nor more than 26 voting members, who shall be of Member or higher grade of the IEEE and members of the IEEE Standards Association, including a chair, vice chair, and the most recent past chair available to serve. Voting members of the IEEE-SA Standards Board shall be appointed by the IEEE-SA BOG. In addition, a representative appointed by the IEEE Technical Activities Board (TAB) shall be a voting member. In addition, the IEEE-SA Standards Board may include nonvoting participants as described below:

— Liaison representatives to provide coordination and communication between the IEEE-SA Standards Board and other IEEE entities, as well as other organizations involved in standards activities.

— Members emeriti appointed for life by the IEEE-SA Standards Board and ratified by the IEEE-SA BOG based on long years of prior distinguished service on the IEEE Standards Board and its committees. Only those members emeriti currently named to this position as of 31 December 1997 shall serve on the IEEE-SA Standards Board.

### 4.1.1 Officers

a) *Chair:* The Chair of the IEEE-SA Standards Board shall be appointed for a term of one year by the IEEE-SA BOG.

b) *Vice Chair:* The Vice Chair of the IEEE-SA Standards Board shall be appointed by the IEEE-SA Standards Board from among the voting members for a term of one year.

c) *Past Chair:* The most recent Past Chair of the IEEE-SA Standards Board available to serve shall be an officer of the IEEE-SA Standards Board.

d) *Secretary:* The Managing Director of Standards, a member of the IEEE staff as designated by the IEEE Executive Director, is the Secretary of the IEEE-SA Standards Board. The Secretary shall serve *ex officio* without vote.

### 4.1.2 Liaison representatives

The following persons serve as nonvoting (unless already voting members) liaison representatives to the IEEE-SA Standards Board and its standing committees to assist in coordinating standardization work with their respective organizations:

a) The chair of each IEEE Standards Coordinating Committee (SCC) appointed by the IEEE-SA Standards Board.

b) Representatives of IEEE Societies and Councils (and their Technical Committees), appointed by the Presidents or Chairs of these bodies. Sponsor Committees may also designate liaison representatives where committee standards activity indicates the need for representation.

c) Liaison representatives designated by other major IEEE Boards.

d) Such other liaison representatives as the IEEE-SA Standards Board may authorize.

The responsibilities of the liaison representatives are given in the *IEEE-SA Standards Board Operations Manual*.

### 4.1.3 SCC Coordinator

The SCC Coordinator shall ensure oversight of the SCCs and shall facilitate the work of the SCCs. The SCC Coordinator shall be appointed by the Chair of the Standards Board for a term of one year.

### 4.1.4 Tenure

Members of the IEEE-SA Standards Board may serve up to three consecutive one-year terms, except that chairs of standing committees or members of the Administrative Committee may be appointed to additional terms to provide experience and continuity.

## 4.2 Standing committees of the IEEE-SA Standards Board

All members of the standing committees of the IEEE-SA Standards Board shall be members of the IEEE Standards Association, and shall act in accordance with IEEE Standards policies and procedures, *IEEE Policies* including, but not limited to, Section 9.8 on Conflict of Interest, and the IEEE Code of Ethics.

### 4.2.1 Procedures Committee (ProCom)

#### 4.2.1.1 Scope

This committee shall be responsible for recommending to the IEEE-SA Standards Board improvements and changes in its bylaws, procedures, and manuals to promote efficient discharge of responsibilities by the IEEE-SA Standards Board and its committees.

#### 4.2.1.2 Organization

This committee shall be comprised of at least six members. The chair and other members of the committee shall be members of the IEEE-SA Standards Board and shall be appointed by the Chair of the IEEE-SA Standards Board for a term of one year.

### 4.2.2 New Standards Committee (NesCom)

#### 4.2.2.1 Scope

This committee shall be responsible for ensuring that proposed standards projects are within the scope and purpose of the IEEE, that standards projects are assigned to the proper Society or other organizational body, and that interested parties are appropriately represented in the development of IEEE standards. The committee shall examine Project Authorization Requests (PARs) and make recommendations to the IEEE-SA Standards Board regarding their approval.

#### 4.2.2.2 Organization

This committee shall be comprised of at least 10 but not more than 15 IEEE members, at least four of whom, including the chair, shall be voting members of the IEEE-SA Standards Board. The chair and other members of the committee shall be appointed by the Chair of the IEEE-SA Standards Board for a term of one year. In making nominations, the nominations committee shall give consideration to attaining membership from various IEEE Technical Divisions.

IEEE-SA Standards Board members not appointed to NesCom may serve as *ex officio* members without voting privileges.

### 4.2.3 Standards Review Committee (RevCom)

#### 4.2.3.1 Scope

This committee shall be responsible for reviewing proposals for the approval of new and revised standards and for the reaffirmation or withdrawal of existing standards to ensure that the proposals represent a consensus of the members of the official IEEE Sponsor balloting group. The committee shall routinely examine submittals to ensure that all applicable requirements of the *IEEE-SA Standards Board Operations Manual* have been met and make recommendations to the IEEE-SA Standards Board regarding their approval.

#### 4.2.3.2 Organization

This committee shall be comprised of at least 12 but not more than 15 members, at least three of whom, including the chair, shall be voting members of the IEEE-SA Standards Board. The chair and other members of the committee shall be appointed by the Chair of the IEEE-SA Standards Board for a term of one year. In making nominations, the nominations committee shall give consideration to attaining membership from various IEEE Technical Divisions.

IEEE-SA Standards Board members not appointed to RevCom may serve as *ex officio* members without voting privileges.

### 4.2.4 Audit Committee (AudCom)

#### 4.2.4.1 Scope

This committee shall provide oversight of the procedures used in the standards-development activities of IEEE Standards Sponsors as defined by 5.2.2 and review of the procedures used by the Accredited Standards Committees for whom the IEEE serves as (co-)secretariat.

#### 4.2.4.2 Organization

This committee shall be comprised of at least five members. Five of the committee members, including the chair, shall be current or former members of the IEEE-SA Standards Board. The chair and other members of the committee shall be appointed by the Chair of the IEEE-SA Standards Board for a term of one year.

### 4.2.5 Patent Committee (PatCom)

#### 4.2.5.1 Scope

This committee shall provide oversight for the use of any patents and patent information in IEEE standards. This committee shall review any patent information submitted to the IEEE Standards Department to determine conformity with patent procedures and guidelines.

#### 4.2.5.2 Organization

This committee shall be comprised of at least four but not more than six voting members. A member of the IEEE Standards staff, as designated by the Managing Director of Standards Activities, shall be an *ex officio*, nonvoting member. The chair and additional voting members of the committee shall be voting members of the IEEE-SA Standards Board or the IEEE-SA Board of Governors and shall be appointed by the Chair of the IEEE-SA Standards Board for a term of one year.

**4.2.6 Administrative Committee (AdCom)**

The Administrative Committee shall act for the IEEE-SA Standards Board between meetings and make recommendations to the IEEE-SA Standards Board for its disposition at regular meetings. AdCom shall comprise the officers of the IEEE-SA Standards Board, the chairs of each standing committee of the IEEE-SA Standards Board, and the SCC Coordinator. The Chair of the IEEE-SA Standards Board shall be the chair of AdCom.

## 4.3 Other committees and bodies

### 4.3.1 Standards Coordinating Committees (SCCs)

Proposed standards are normally developed in the technical committees of the IEEE Societies. There are occasions when the scope of a standards activity is too broad to be encompassed in a single Society, or a Society may find itself in a position where it is unable to carry out the work needed to meet an identified need. In such instances, the IEEE-SA Standards Board shall establish its own committees to perform the required functions. These committees shall be known as Standards Coordinating Committees (SCCs) and shall report to the IEEE-SA Standards Board.

There shall be two types of SCCs. The first (type 1) shall serve as a forum for the exchange of information between and among standards-developing activities of the IEEE. (Opportunities for sharing information about standards projects, trends, and Society directions will serve to minimize duplication among programs and will enhance the content of standards of interest to more than one Society.)

This type of SCC shall not develop standards. If this type of SCC is to take on a standards-development role, it shall apply for SCC type 2 status (see subclause 4.3.2 of the *IEEE-SA Standards Board Operations Manual*).

The second type of SCC (type 2) shall act as Sponsor for individual standards projects, in addition to having the coordination responsibilities of a type 1 SCC. It shall meet all the requirements of IEEE sponsorship (including clause 5 of the *IEEE-SA Standards Board Operations Manual*).

For information on the formation of SCCs, see 4.3 in the *IEEE-SA Standards Board Operations Manual*. For information on the organization of SCCs, see 4.4 in the *IEEE-SA Standards Board Operations Manual*.

Case 2:10-cv-01823-JLR   Document 58-5   Filed 03/09/11   Page 11 of 49

# 5. IEEE-SA Standards Board procedures and responsibilities

## 5.1 Transaction of business

Regular meetings of the IEEE-SA Standards Board shall be held quarterly, in accordance with a schedule approved at the first meeting of each year. Special meetings may be called, when deemed necessary, by the Chair or at the request of five members.

Unless otherwise provided in the *IEEE Certificate of Incorporation*, the *IEEE Constitution*, the *IEEE Bylaws*, or the New York Not-For-Profit Corporation Law, the vote of a majority of the voting members of the IEEE-SA Standards Board present at the time of the vote, if a quorum is present at such a time, shall be the act of the IEEE-SA Standards Board.

Approval of proposed IEEE standards, or proposed withdrawal of such standards, shall require affirmative votes by at least 75% of the voting members present at the time of the vote, if a quorum is present. Except as otherwise specified in these bylaws, meetings of the IEEE-SA Standards Board shall be run in accordance with the parliamentary procedures of *Robert's Rules of Order* (latest edition).

## 5.2 Standards-development process

### 5.2.1 Participation in IEEE standards development

Participants in the IEEE standards development individual process shall act based on their qualifications and experience. Entity representative participants in the IEEE standards development entity process are appointed by an entity to represent that entity and act on its behalf. Such representatives may participate in IEEE standards development activities and take action based upon instruction from the entity for which they have been appointed as an entity representative.

While participating in IEEE standards development activities, all participants, including but not limited to, individuals, entity representatives, entity members, entities participating directly in the entity process, and entities participating indirectly in the individual process shall act in accordance with all applicable laws (nation-based and international), the IEEE Code of Ethics, and with IEEE Standards policies and procedures. Participants in IEEE standards development who are authenticated into any IEEE-SA database shall acknowledge the Obligations for Participation and Code of Ethics.

Participants on standards committees or working groups with governance authority or the authority to enter into a financial transaction with another party shall also act in accordance with *IEEE Policies* Section 9.8 on Conflict of Interest.

IEEE Standards Sponsor chairs and Sponsor liaison representatives shall be members of IEEE-SA and shall also be either IEEE members of any grade or IEEE affiliates.

The IEEE-SA shall maintain the authoritative database of participants in the development of standards. Such database shall be maintained by the Secretary of the IEEE-SA Standards Board.

### 5.2.1.1 Membership requirements for standards developed under the individual method

Chairs of IEEE standards working groups developing standards under the individual method shall be members of IEEE-SA and shall also be either IEEE members of any grade or IEEE affiliates. Designees (those designated to manage the Sponsor ballot) in the IEEE Standards Sponsor individual ballot process shall be members of IEEE-SA and shall also be either IEEE members of any grade or IEEE affiliates.

### 5.2.1.2 Membership requirements for standards developed under the entity method

Chairs of IEEE standards working groups developing standards under the entity method shall be representatives of entity IEEE-SA members. Designees (those designated to manage the Sponsor ballot) in the IEEE Standards Sponsor entity ballot process shall be representatives of entity IEEE-SA members.

Every entity observing a project within an IEEE-SA entity standards working group is required to be an Entity Member of the IEEE-SA, and only Advanced Entity Members can contribute and hold voting privileges. Entity nonmembers may observe at one IEEE-SA entity standards working group meeting per project.

Each entity project shall have at least three voting participants in good standing to maintain its validity.

### 5.2.1.3 Dominance

The standards development process shall not be dominated by any single interest category, individual, or organization.

Dominance is normally defined as the exercise of authority, leadership, or influence by reason of superior leverage, strength, or representation to the exclusion of fair and equitable consideration of other viewpoints. Dominance can also be defined as the exercise of authority, leadership, or influence by reason of sufficient leverage, strength, or representation to hinder the progress of the standards development activity. Such dominance is contrary to open and fair participation by all interested parties and is unacceptable.

If evidence of dominance exists, corrective action shall be initiated. If the Sponsor's official P&P contain corrective action(s), the Sponsor shall implement such action(s) and promptly notify the IEEE-SA Standards Board. If the Sponsor's official P&P do not contain corrective actions, the Sponsor shall initiate corrective action(s), but only after such action(s) have been approved by the IEEE-SA Standards Board.

In the absence of effective corrective action(s) by the Sponsor, the IEEE-SA Standards Board shall implement either the corrective action specified in 5.2.1.3.1 or, at its discretion, an alternative corrective action [e.g., withdrawal of the PAR, limiting the number of voting members, one vote per organization, etc.]. The IEEE-SA Standards Board may impose further corrective action(s) if previous corrective action(s) prove to be insufficient.

### 5.2.1.3.1 Default corrective action

*Fees for committee voting membership*

The IEEE-SA Standards Board shall instruct the Sponsor to implement an organization fee for any individual wishing to maintain voting rights in the standards development committee. Frequency of collection and duration of voting rights covered by collected fees shall be decided by the IEEE-SA Standards Board, which shall work in conjunction with the Sponsor. An individual's status as representing an organization shall be based on self-disclosure of affiliation in compliance with the IEEE-SA policy on Disclosure of Affiliation and on other information that may be available to the IEEE-SA Standards Board and the Sponsor.

All fees collected shall be forwarded to the IEEE Standards Association and are non-refundable.

This corrective action shall remain in force until withdrawn or amended by the IEEE-SA Standards Board.

### 5.2.1.4 Openness

Openness is defined as the quality of being not restricted to a particular type or category of participants. All meetings involving standards development shall be open to all interested parties.

### 5.2.1.5 Disclosure of affiliation

Every member and participant in a working group, Sponsor ballot, or other standards development activity shall disclose his or her affiliation. An individual is deemed "affiliated" with any individual or entity that has been, or will be, financially or materially supporting that individual's participation in a particular IEEE standards activity. This includes, but is not limited to, his or her employer and any individual or entity that has or will have, either directly or indirectly, requested, paid for, or otherwise sponsored his or her participation. Failure to disclose every such affiliation may result in complete or partial loss of rights to participate in IEEE-SA activities. An individual is not excused from compliance with this policy by reason of any claim of a conflicting obligation (whether contractual or otherwise) that prohibits disclosure of affiliation.

A person who believes that a participant's disclosure is materially incomplete or incorrect should report that fact to the Secretary of the IEEE-SA Standards Board and the appropriate Sponsor(s).

### 5.2.2 Sponsor

A Sponsor shall be made up of any of the categories of membership described in IEEE Bylaw I-403. This Sponsor shall have a professed interest in the development of standards (either by direct participation or by the process of review) in technological areas that fall under the general scope of interest to the IEEE.

All IEEE standards development shall be based on projects that have been approved by the IEEE-SA Standards Board, and each project shall be the responsibility of a Sponsor. Sponsors of IEEE standards projects are committees that are responsible for the development and coordination of the standards project and the maintenance of the standard after approval of the standard by the IEEE-SA Standards Board.

The Sponsor shall be one of the following:

    a)    A Technical Committee within an IEEE Society/Council

    b)    A Standards Committee or Standards Coordinating Committee of an IEEE Society/Council

    c)    A Standards Coordinating Committee established by the IEEE-SA Standards Board

    d)    A Standards Subcommittee organized by or reporting to one of the above

    e)    Other organizations as recommended by the IEEE-SA Standards Board and approved by the IEEE-SA BOG

The IEEE-SA Standards Board is not a Sponsor, but provides oversight and guidance to assist Sponsors when necessary.

### 5.2.2.1 Creation of Sponsors

Sponsors formed under rule (d) in 5.2.2 shall be officially recognized by the IEEE-SA Standards Board only after a 75% approval by the creating committee. Once formed, Sponsors automatically assume duties according to 5.1 of the *IEEE-SA Standards Board Operations Manual*.

### 5.2.2.2 Sponsor responsibility/accountability

The Sponsor accepts responsibility for oversight of any of its assigned standards, including overseeing coordination and balloting.

When the breadth of interest in a standard is great enough so that more than one technical committee wishes to have a role in its sponsorship, a joint committee of the two or more interested committees may be formed to sponsor the standard jointly. That joint committee, whose membership shall be determined by mutual agreement, shall assume all of the duties of the Sponsor (see 5.1.2 of the *IEEE-SA Standards Board Operations Manual*).

Changes in sponsorship of projects shall be approved by the IEEE-SA Standards Board.

### 5.2.2.3 Sponsor balloting group

Potential dominance in Sponsor ballots as evidenced by an unduly high proportion of individuals employed by or affiliated with a single entity or from a particular balloting classification is unacceptable, counter to open and fair participation by all interested parties, and deprecated by the IEEE-SA Standards Board. All individuals joining a ballot group shall declare their employer and affiliation (see subclause 5.3.3.1 of the *IEEE-SA Standards Board Operations Manual*). The Sponsor shall review the ballot group for balance and possible dominance. If it is determined that the ballot group may be dominated (see 5.2.1.3), the Sponsor shall recommend remedial actions to the IEEE-SA Standards Board to ensure a fair and open ballot. The IEEE-SA Standards Board may also take action independent of any Sponsor recommendation.

The balloting group shall consist of persons who are members of the IEEE-SA and non-IEEE-SA members. A person is an individual or entity. An entity can be any for-profit or not-for-profit enterprise, as defined in IEEE Bylaw I-403. In addition, with the approval of the IEEE-SA Standards Board, invited individual experts who are non-IEEE-SA members may participate in ballots of proposed IEEE standards.

A single type of balloting group for a standard, based on the type of sponsorship, shall be established at the time of PAR approval and officially approved prior to the formation of a balloting group. A statement of the type of balloting membership to be used shall be included in all versions of the draft standard and the final approved standard.

### 5.2.3 Project authorization

In order to avoid duplication, provide for effective management of overall efforts, and expedite approval of final documents, all requests for an initiation of a standards project, in the form of a PAR, shall be approved by the IEEE-SA Standards Board. The IEEE-SA Standards Board has assigned to NesCom the preliminary review of PARs and the responsibility for recommending final approval to the Board.

Sponsors are required to submit a PAR at the earliest opportunity when a standards project is contemplated or work is started. The Secretary of the IEEE-SA Standards Board shall submit PARs to NesCom for approval in accordance with its procedures. Unless specifically authorized by the IEEE-SA Standards Board, no proposed standard or revision shall be considered by RevCom without prior approval of the project by the IEEE-SA Standards Board. The lifetime of a PAR shall be four years.

### 5.2.4 Final review and approval to publish

All IEEE standards shall be approved by the IEEE-SA Standards Board prior to publication. The IEEE-SA Standards Board has assigned to RevCom the review of standards submittals and the responsibility for recommending final approval to the IEEE-SA Standards Board. Approval by the IEEE-SA Standards Board indicates that the requirements of the *IEEE-SA Standards Board Operations Manual* and these bylaws have been satisfied and, specifically, that the final results of the ballot and statements submitted by other coordinating bodies who participated in the development of the standard indicate that consensus has been

achieved and unresolved negative ballots have been considered together with reasons why the comments could not be resolved.

### 5.2.5 Notification of action on standards

Following each meeting of the IEEE-SA Standards Board, the IEEE Standards Department shall issue a statement, available to all interested parties, which shall detail the actions taken at the last meeting of the IEEE-SA Standards Board on approval, reaffirmation, stabilization, and withdrawal of standards documents and authorization of new standards projects. This may be in the form of the minutes of the IEEE-SA Standards Board meeting.

## 5.3 Review cycles

All IEEE standards should be reviewed as often as new information is available or in accordance with the established cycle set by the IEEE-SA Standards Board, but no later than five years from the date of publication or, in the instance of stabilized standards, ten years from the initial approval or last revision or amendment. When an IEEE standard has been in effect for four years, the Secretary of the IEEE-SA Standards Board shall notify the standards liaison representative of the Sponsor that the standard must be reviewed for a maintenance action within the next year. The entire document shall be reviewed; amendments cannot be substituted for the five-year review.

The Sponsor has the option of

    a)    Reaffirmation

    b)    Revision

    c)    Withdrawal

    d)    Stabilization

## 5.4 Appeals

Persons who have directly and materially affected interests and who have been, or could reasonably be expected to be, adversely affected by a standard within the IEEE's jurisdiction, or by the lack of action in any part of the IEEE standardization process, shall have the right to appeal procedural actions or inactions, provided that the appellant shall have first exhausted the appeals procedures of any relevant subordinate committee or body before filing an appeal with the IEEE-SA Standards Board.

All technical decisions shall be made at or below the Sponsor level and the IEEE-SA Standards Board shall not consider appeals of technical decisions based on technical grounds. Any person dissatisfied with a technical decision shall follow the procedures of the body that has made the decision and that body's Sponsor, including, but not limited to, making a technical comment during the applicable comment submission period.

The IEEE-SA Standards Board shall not consider any claim that is either based solely on ethical considerations or that does not seek to amend or reverse a decision of a lower body relating to the development or approval of a standard. The appellant shall be advised to bring such claims to the attention of the IEEE Ethics and Member Conduct Committee or the IEEE-SA Standards Conduct Committee, as appropriate.

Further instructions concerning appeals procedure can be found in subclause 5.8 of the *IEEE-SA Standards Board Operations Manual*.

## 5.5 Interpretations

While it is always the intent of standards-developing committees to use language that is so clear that it is unnecessary to explain or amplify the original intent of the committee, occasionally questions arise regarding the meaning of portions of standards as they relate to specific applications.

Questions relating to such interpretations require review and evaluation by a balance of committee interests. No single officer or member of an IEEE Sponsor or subgroup thereof shall provide a written or verbal opinion concerning any portion of the text of an IEEE standards document or an American National Standard developed under IEEE secretariat, unless that opinion has first been subjected to consideration by an interpretations subgroup that represents all interested parties on the committee. The actions to be taken shall be as specified in subclause 5.9 of the *IEEE-SA Standards Board Operations Manual*.

# 6. Patents

## 6.1 Definitions

The following terms, when capitalized, have the following meanings:

*"Accepted Letter of Assurance"* and *"Accepted LOA"* shall mean a Letter of Assurance that the IEEE-SA has determined is complete in all material respects and has been posted to the IEEE-SA web site.

"*Affiliate*" shall mean an entity that directly or indirectly, through one or more intermediaries, controls the Submitter, is controlled by the Submitter, or is under common control with the Submitter. For the purposes of this definition, the term "control" and its derivatives, with respect to for-profit entities, means the legal, beneficial or equitable ownership, directly or indirectly, of more than fifty percent (50%) of the capital stock (or other ownership interest, if not a corporation) of an entity ordinarily having voting rights. "Control" and its derivatives, with respect to nonprofit entities, means the power to elect or appoint more than fifty percent (50%) of the Board of Directors of an entity.

"*Blanket Letter of Assurance*" shall mean a Letter of Assurance that applies to all Essential Patent Claims for which a Submitter may currently or in the future (except as otherwise provided for in these Bylaws and in the *IEEE-SA Standards Board Operations Manual)* have the ability to license.

*"Enabling Technology"* shall mean any technology that may be necessary to make or use any product or portion thereof that complies with the [Proposed] IEEE Standard but is neither explicitly required by nor expressly set forth in the [Proposed] IEEE Standard (e.g., semiconductor manufacturing technology, compiler technology, object-oriented technology, basic operating system technology, and the like).

"*Essential Patent Claim*" shall mean any Patent Claim the use of which was necessary to create a compliant implementation of either mandatory or optional portions of the normative clauses of the [Proposed] IEEE Standard when, at the time of the [Proposed] IEEE Standard's approval, there was no commercially and technically feasible non-infringing alternative. An Essential Patent Claim does not include any Patent Claim that was essential only for Enabling Technology or any claim other than that set forth above even if contained in the same patent as the Essential Patent Claim.

"*Letter of Assurance*" and *"LOA"* shall mean a document, including any attachments, stating the Submitter's position regarding ownership, enforcement, or licensing of Essential Patent Claims for a specifically referenced IEEE Standard, submitted in a form acceptable to the IEEE-SA.

"*Patent Claim(s)*" shall mean one or more claims in issued patent(s) or pending patent application(s).

"*Reasonable and Good Faith Inquiry*" includes, but is not limited to, a Submitter using reasonable efforts to identify and contact those individuals who are from, employed by, or otherwise represent the Submitter and who are known to the Submitter to be current or past participants in the development process of the [Proposed] IEEE Standard identified in a Letter of Assurance, including, but not limited to, participation in a Sponsor Ballot or Working Group. If the Submitter did not or does not have any participants, then a Reasonable and Good Faith Inquiry may include, but is not limited to, the Submitter using reasonable efforts to contact individuals who are from, employed by, or represent the Submitter and who the Submitter believes are most likely to have knowledge about the technology covered by the [Proposed] IEEE Standard.

*"Statement of Encumbrance"* shall mean a specific reference to an Accepted LOA or a general statement in the transfer or assignment agreement that the Patent Claim(s) being transferred or assigned are subject to any encumbrances that may exist as of the effective date of such agreement. An Accepted LOA is an encumbrance.

"*Submitter*" when used in reference to a Letter of Assurance shall mean an individual or an organization that provides a completed Letter of Assurance. A Submitter may or may not hold Essential Patent Claims.

## 6.2 Policy

IEEE standards may be drafted in terms that include the use of Essential Patent Claims. If the IEEE receives notice that a [Proposed] IEEE Standard may require the use of a potential Essential Patent Claim, the IEEE shall request licensing assurance, on the IEEE Standards Board approved Letter of Assurance form, from the patent holder or patent applicant. The IEEE shall request this assurance without coercion.

The Submitter of the Letter of Assurance may, after Reasonable and Good Faith Inquiry, indicate it is not aware of any Patent Claims that the Submitter may own, control, or have the ability to license that might be or become Essential Patent Claims. If the patent holder or patent applicant provides an assurance, it should do so as soon as reasonably feasible in the standards development process once the PAR is approved by the IEEE-SA Standards Board. This assurance shall be provided prior to the Standards Board's approval of the standard. This assurance shall be provided prior to a reaffirmation/stabilization if the IEEE receives notice of a potential Essential Patent Claim after the standard's approval or a prior reaffirmation/stabilization. An asserted potential Essential Patent Claim for which an assurance cannot be obtained (e.g., a Letter of Assurance is not provided or the Letter of Assurance indicates that assurance is not being provided) shall be referred to the Patent Committee.

A Letter of Assurance shall be either:

a)    A general disclaimer to the effect that the Submitter without conditions will not enforce any present or future Essential Patent Claims against any person or entity making, using, selling, offering to sell, importing, distributing, or implementing a compliant implementation of the standard; or

b)    A statement that a license for a compliant implementation of the standard will be made available to an unrestricted number of applicants on a worldwide basis without compensation or under reasonable rates, with reasonable terms and conditions that are demonstrably free of any unfair discrimination. At its sole option, the Submitter may provide with its assurance any of the following: (i) a not-to-exceed license fee or rate commitment, (ii) a sample license agreement, or (iii) one or more material licensing terms.

Copies of an Accepted LOA may be provided to the working group, but shall not be discussed, at any standards working group meeting.

The Submitter and all Affiliates (other than those Affiliates excluded in a Letter of Assurance) shall not assign or otherwise transfer any rights in any Essential Patent Claims that are the subject of such Letter of Assurance that they hold, control, or have the ability to license with the intent of circumventing or negating any of the representations and commitments made in such Letter of Assurance.

The Submitter of a Letter of Assurance shall agree (a) to provide notice of a Letter of Assurance either through a Statement of Encumbrance or by binding any assignee or transferee to the terms of such Letter of Assurance; and (b) to require its assignee or transferee to (i) agree to similarly provide such notice and (ii) to bind its assignees or transferees to agree to provide such notice as described in (a) and (b).

This assurance shall apply to the Submitter and its Affiliates except those Affiliates the Submitter specifically excludes on the relevant Letter of Assurance.

If, after providing a Letter of Assurance to the IEEE, the Submitter becomes aware of additional Patent Claim(s) not already covered by an existing Letter of Assurance that are owned, controlled, or licensable by

the Submitter that may be or become Essential Patent Claim(s) for the same IEEE Standard but are not the subject of an existing Letter of Assurance, then such Submitter shall submit a Letter of Assurance stating its position regarding enforcement or licensing of such Patent Claims. For the purposes of this commitment, the Submitter is deemed to be aware if any of the following individuals who are from, employed by, or otherwise represent the Submitter have personal knowledge of additional potential Essential Patent Claims, owned or controlled by the Submitter, related to a [Proposed] IEEE Standard and not already the subject of a previously submitted Letter of Assurance: (a) past or present participants in the development of the [Proposed] IEEE Standard, or (b) the individual executing the previously submitted Letter of Assurance.

The assurance is irrevocable once submitted and accepted and shall apply, at a minimum, from the date of the standard's approval to the date of the standard's withdrawal.

The IEEE is not responsible for identifying Essential Patent Claims for which a license may be required, for conducting inquiries into the legal validity or scope of those Patent Claims, or for determining whether any licensing terms or conditions provided in connection with submission of a Letter of Assurance, if any, or in any licensing agreements are reasonable or non-discriminatory.

Nothing in this policy shall be interpreted as giving rise to a duty to conduct a patent search. No license is implied by the submission of a Letter of Assurance.

In order for IEEE's patent policy to function efficiently, individuals participating in the standards development process: (a) shall inform the IEEE (or cause the IEEE to be informed) of the holder of any potential Essential Patent Claims of which they are personally aware and that are not already the subject of an existing Letter of Assurance, owned or controlled by the participant or the entity the participant is from, employed by, or otherwise represents; and (b) should inform the IEEE (or cause the IEEE to be informed) of any other holders of such potential Essential Patent Claims that are not already the subject of an existing Letter of Assurance.

# 7. Copyright

All contributions to IEEE standards development (whether for an individual or entity standard) shall meet the requirements outlined in this clause.

## 7.1 Definitions

The following terms, when capitalized, have the following meanings:

*"Public Domain"* shall mean material that is no longer under copyright protection or did not meet the requirements for copyright protection.

*"Published"* shall mean material for which a claim of copyright is apparent (e.g., the presence of the copyright symbol ©; an explicit statement of copyright ownership or intellectual property rights; stated permission to use text; a text reference that indicates the insertion of text excerpted from a copyrighted work; or a visual indication of an excerpt from another work, such as indented text).

"*Work Product*" shall mean the compilation of or collective work of all participants (e.g., a draft standard; the final approved standard).

## 7.2 Policy

The IEEE owns the copyright in all Work Products.

Participants are solely responsible for determining whether disclosure of any contributions that they submit to the IEEE requires the prior consent of other parties and, if so, to obtain it.

### 7.2.1 Contributions from previously Published sources

All contributions from previously Published sources that are not Public Domain shall be accompanied by a Copyright Permission Form that is completed by the copyright owner, or by a person with the authority or right to grant copyright permission. The Copyright Permission Form shall outline the specific material being used and the planned context for its usage in the IEEE standard.

### 7.2.2 Contributions not previously Published

For any contribution that has not been previously Published, and that is not Public Domain:

   a)    The IEEE has the non-exclusive, irrevocable, royalty-free, worldwide rights (i.e., a license) to use the contribution in connection with the standards project for which the contribution was made.

   b)    Upon approval of the standard, the IEEE has the right to exploit and grant permission to use the standard's content derived from the contribution in any format or media without restriction.

Copyright ownership of the original contribution is not transferred or assigned to the IEEE.

## 8. Modifications to the *IEEE-SA Standards Board Bylaws*

Proposed modifications to these bylaws may be submitted to the IEEE-SA Standards Board Procedures Committee (ProCom) for its consideration. Proposed modifications that have been agreed to by ProCom shall be submitted to the IEEE-SA Standards Board for recommendation to forward to the IEEE-SA BOG for approval (see clause 5.1 of the *IEEE Standards Association Operations Manual*).

Modifications to these bylaws and the reasons therefor shall be mailed to all members of the IEEE-SA Standards Board at least 30 days before the IEEE-SA Standards Board meeting where the vote on these modifications shall be taken. Two-thirds of the voting Board members present at the meeting shall be required to approve any modifications.

These bylaws shall be reviewed by legal counsel.

### 8.1 Interpretations of the *IEEE-SA Standards Board Bylaws*

Requests for interpretations of this document shall be directed to the Secretary of the IEEE-SA Standards Board. The Secretary of the Board shall respond to the request within 30 days of receipt. Such response shall indicate a specified time limit when such an interpretation will be forthcoming. The time limit shall be no longer than is reasonable to allow consideration of and recommendations on the issue by, for example, the Procedures Committee of the IEEE-SA Standards Board. The interpretation shall be delivered by the Chair of the Procedures Committee after committee discussion provided that at least 75% of the committee agrees. The IEEE-SA Standards Board shall be notified of these results. If less than 75% of the committee agrees, or if any single committee member requests, the issue shall be deferred to the next regularly scheduled IEEE-SA Standards Board meeting for the full Board to decide.

# Exhibit
# 6

# Guidelines for Implementation of the Common Patent Policy for ITU-T/ITU-R/ISO/IEC

(1 March 2007)

Part I – Common guidelines ........................................................................................................ 2
1     Purpose ................................................................................................................................ 2
2     Explanation of terms .......................................................................................................... 2
3     Patent disclosure ................................................................................................................ 3
4     Patent Statement and Licensing Declaration Form ........................................................... 4
       4.1    The purpose of the Declaration Form ...................................................................... 4
       4.2    Contact information .................................................................................................. 4
5     Conduct of meetings .......................................................................................................... 4
6     Patent Information database ................................................................................................ 5

Part II – Organization-specific provisions ................................................................................. 5
Specific provisions for ITU ....................................................................................................... 5
       ITU-1  General Patent Statement and Licensing Declaration Form ...................................... 5
       ITU-2  Notification ............................................................................................................... 6
Specific provisions for ISO and IEC .......................................................................................... 6
       ISO/IEC-1   Consultations on draft Deliverables ............................................................... 6
       ISO/IEC-2   Notification ...................................................................................................... 6

Annex 1  Common Patent Policy for ITU-T/ITU-R/ISO/IEC .......................................................... 8
Annex 2  Patent Statement and Licensing Declaration Form for ITU-T/ITU-R Recommendation |
ISO/IEC Deliverable ................................................................................................................. 10
Annex 3  General Patent Statement and Licensing Declaration Form for ITU-T/ITU-R
Recommendation ....................................................................................................................... 13

# Part I – Common guidelines

## 1        Purpose

ITU, in its Telecommunication Standardization Sector (ITU-T) and its Radiocommunication Sector (ITU-R), ISO and IEC have had patent policies for many years, the purpose being to provide in simple words practical guidance to the participants in their Technical Bodies in case patent rights matters arise.

Considering that the technical experts are normally not familiar with the complex issue of patent law, the Common Patent Policy for ITU-T/ITU-R/ISO/IEC (hereafter referred to as the "Patent Policy") was drafted in its operative part as a checklist, covering the three different cases which may arise if a Recommendation | Deliverable requires licences for Patents to be practiced or implemented, fully or partly.

The Guidelines for Implementation of the Common Patent Policy for ITU-T/ITU-R/ISO/IEC (hereafter referred to as the "Guidelines") are intended to clarify and facilitate implementation of the Patent Policy, a copy of which can be found in Annex 1 and also on the web site of each Organization.

The Patent Policy encourages the early disclosure and identification of Patents that may relate to Recommendations | Deliverables under development. In doing so, greater efficiency in standards development is possible and potential patent rights problems can be avoided.

The Organizations should not be involved in evaluating patent relevance or essentiality with regards to Recommendations | Deliverables, interfere with licensing negotiations, or engage in settling disputes on Patents; this should be left - as in the past - to the parties concerned.

Organization-specific provisions are contained in Part II of this document. However, it is understood that those Organization-specific provisions shall contradict neither the Patent Policy nor the Guidelines.

## 2        Explanation of terms

**Contribution**:  Any document submitted for consideration by a Technical Body.

**Free of charge**: The words "free of charge" do not mean that the Patent Holder is waiving all of its rights with respect to the essential patent.  Rather, "free of charge" refers to the issue of monetary compensation; *i.e.*, that the Patent Holder will not seek any monetary compensation as part of the licensing arrangement (whether such compensation is called a royalty, a one-time licensing fee, etc.).  However, while the Patent Holder in this situation is committing to not charging any monetary amount, the Patent Holder is still entitled to require that the implementer of the above document sign a license agreement that contains other reasonable terms and conditions such as those relating to governing law, field of use, reciprocity, warranties, etc.

**Organizations**: ITU, ISO and IEC.

**Patents**: Patents refer to essential patents or similar rights, utility models and other statutory rights based on inventions, including any applications for any of the foregoing.

**Patent Holder**: Person or entity that owns, controls and/or has the ability to license Patents.

**Reciprocity:** As used herein, the word "reciprocity" means that the Patent Holder shall only be required to license any prospective licensee if such prospective licensee will commit to license its essential patent(s) or essential patent claim(s) for implementation of the same above document free of charge or under reasonable terms and conditions.

**Recommendations | Deliverables**: ITU-T and ITU-R Recommendations are referred to as "Recommendations", ISO deliverables and IEC deliverables are referred to as "Deliverables". The various types of Recommendation(s) | Deliverable(s) are referred to as "Document types" in the Patent Statement and Licensing Declaration Form (hereafter referred to as "Declaration Form") attached as Annex 2.

**Technical Bodies**: Study Groups, any subordinate groups and other groups of ITU-T and ITU-R and technical committees, subcommittees and working groups in ISO and IEC.

## 3       Patent disclosure

As mandated by the Patent Policy in its paragraph 1, any party participating in the work of the Organizations should, from the outset, draw their attention to any known patent or to any known pending patent application, either their own or of other organizations.

In this context, the words "from the outset" imply that such information should be disclosed as early as possible during the development of the Recommendation | Deliverable. This might not be possible when the first draft text appears since at this time, the text might be still too vague or subject to subsequent major modifications. Moreover, that information should be provided in good faith and on a best effort basis, but there is no requirement for patent searches.

In addition to the above, any party not participating in Technical Bodies may draw the attention of the Organizations to any known Patent, either their own and/or of any third-party.

When disclosing their own Patents, Patent Holders have to use the Patent Statement and Licensing Declaration Form (referred to as the "Declaration Form") as stated in Section 4 of these Guidelines.

Any communication drawing the attention to any third-party Patent should be addressed to the concerned Organization(s) in writing. The potential Patent Holder will then be requested by the relevant Organization(s) to submit a Declaration Form.

The Patent Policy and these Guidelines also apply to any Patent disclosed or drawn to the attention of the Organizations subsequent to the approval of a Recommendation | Deliverable.

Whether the identification of the Patent took place before or after the approval of the Recommendation | Deliverable, if the Patent Holder is unwilling to license under paragraph 2.1 or 2.2 of the Patent Policy, the Organizations will promptly advise the Technical Bodies responsible for the affected Recommendation | Deliverable so that appropriate action can be taken. Such action will include, but may not be limited to, a review of the Recommendation | Deliverable or its draft in order to remove the potential conflict or to further examine and clarify the technical considerations causing the conflict.

## 4    Patent Statement and Licensing Declaration Form

### 4.1    The purpose of the Declaration Form

To provide clear information in the Patent Information databases of each Organization, Patent Holders have to use the Declaration Form, which is available on the web site of each Organization (the Declaration Form is included in Annex 2 for information purposes). They must be sent to the Organizations for the attention, for ITU, of the Directors of the TSB or the BR or, for ISO/IEC, of the CEOs. The purpose of the Declaration Form is to ensure a standardized submission to the respective Organizations of the declarations being made by Patent Holders and, most importantly, to require in the case of ITU, and to strongly desire in the case of ISO and IEC, supporting information and an explanation if a Patent Holder declares his/her unwillingness to license under option 1 or 2 of the Declaration Form (i.e., declares option 3 of the Declaration Form).

The Declaration Form gives Patent Holders the means of making a licensing declaration relative to rights in Patents required for implementation of a specific Recommendation | Deliverable. Specifically, by submitting this Declaration Form the submitting party declares its willingness/unwillingness to license, according to the Patent Policy, Patents held by it and whose licence would be required to practice or implement part(s) or all of a specific Recommendation | Deliverable.

The statement contained in the Declaration Form remains in force as long as it has not been replaced, e.g., in case of obvious errors.

Multiple Declaration Forms are appropriate if the Patent Holder has identified several Patents and classifies them in different options of the Declaration Form and/or if the Patent Holder classifies different claims of a complex patent in different options of the Declaration Form.

### 4.2    Contact information

In completing Declaration Forms, attention should be given to supplying contact information that will remain valid over time. Where possible, the "Name and Department" and e-mail address should be generic. Also it is preferable, where possible, that parties, particularly multinational organizations, indicate the same contact point on all Declaration Forms submitted.

With a view to maintaining up-to-date information in the Patent Information database of each Organization, it is requested that the Organizations be informed of any change or corrections to the Declaration Form submitted in the past, especially with regard to the contact person.

## 5    Conduct of meetings

Early disclosure of Patents contributes to the efficiency of the process by which Recommendations | Deliverables are established. Therefore, each Technical Body, in the course of the development of a proposed Recommendation | Deliverable, will request the disclosure of any known Patents essential to the proposed Recommendation | Deliverable.

Chairmen of Technical Bodies will, if appropriate, ask, at an appropriate time in each meeting, whether anyone has knowledge of Patents, the use of which may be required to practice or implement the Recommendation | Deliverable being considered. The fact that the question was asked shall be recorded in the meeting report, along with any affirmative responses.

As long as the Organization concerned has received no indication of a Patent Holder selecting paragraph 2.3 of the Patent Policy, the Recommendation | Deliverable may be approved using the appropriate and respective rules of the Organization concerned. It is expected that discussions in Technical Bodies will include consideration of including patented material in a Recommendation | Deliverable, however the Technical Bodies may not take position regarding the essentiality, scope, validity or specific licensing terms of any claimed Patents.

**6      Patent Information database**

In order to facilitate both the standards-making process and the application of Recommendations | Deliverables, each Organization makes available to the public a Patent Information database composed of information that was communicated to the Organizations by the means of Declaration Forms. The Patent Information database may contain information on specific Patents, or may contain no such information but rather a statement about compliance with the Patent Policy for a particular Recommendation | Deliverable.

The Patent Information databases are not certified to be either accurate or complete, but only reflect the information that has been communicated to the Organizations. As such, the Patent Information databases may be viewed as simply raising a flag to alert users that they may wish to contact the entities who have communicated Declaration Forms to the Organizations in order to determine if patent licenses must be obtained for use or implementation of a particular Recommendation | Deliverable.

# Part II – Organization-specific provisions

**Specific provisions for ITU**

**ITU-1      General Patent Statement and Licensing Declaration Form**

Anyone may submit a General Patent Statement and Licensing Declaration Form which is available on the web sites of ITU-T and ITU-R (the form in Annex 3 is included for information purposes). The purpose of this form is to give Patent Holders the voluntary option of making a general licensing declaration relative to material protected by Patents contained in any of their Contributions. Specifically, by submitting its form, the submitting party declares its willingness to license all Patents owned by it in case part(s) or all of any proposals contained in its Contributions submitted to the Organization are included in Recommendation(s) and the included part(s) contain items that have been patented or for which patent applications have been filed and whose licence would be required to practice or implement Recommendation(s).

The General Patent Statement and Licensing Declaration Form is not a replacement for the "individual" (see clause 4 of Part I) Declaration Form, which is made per Recommendation, but is expected to improve responsiveness and early disclosure of the Patent Holder's compliance with the Patent Policy.

The General Patent Statement and Licensing Declaration remains in force as long as it has not been replaced. It can be overruled by the "individual" (per Recommendation) Declaration Form from the same Patent Holder for any particular Recommendation (expectation is that this will rarely occur).

The ITU Patent Information database also contains a record of General Patent Statement and Licensing Declarations.

**ITU-2       Notification**

Text shall be added to the cover sheets of all new and revised ITU-T and ITU-R Recommendations, where appropriate, urging users to consult the ITU Patent Information database. The wording is:

"ITU draws attention to the possibility that the practice or implementation of this Recommendation may involve the use of a claimed Intellectual Property Right. ITU takes no position concerning the evidence, validity or applicability of claimed Intellectual Property Rights, whether asserted by ITU members or others outside of the Recommendation development process.

As of the date of approval of this Recommendation, ITU [had/had not] received notice of intellectual property, protected by patents, which may be required to implement this Recommendation. However, implementers are cautioned that this may not represent the latest information and are therefore strongly urged to consult the ITU Patent Information database."

**Specific provisions for ISO and IEC**

**ISO/IEC-1      Consultations on draft Deliverables**

All drafts submitted for comment shall include on the cover page the following text:

"Recipients of this draft are invited to submit, with their comments, notification of any relevant patent rights of which they are aware and to provide supporting documentation."

**ISO/IEC-2      Notification**

A published document for which no patent rights are identified during the preparation thereof, shall contain the following notice in the foreword:

"Attention is drawn to the possibility that some of the elements of this document may be the subject of patent rights. ISO [and/or] IEC shall not be held responsible for identifying any or all such patent rights."

A published document for which patent rights have been identified during the preparation thereof, shall include the following notice in the introduction:

"The International Organization for Standardization (ISO) [and/or] International Electrotechnical Commission (IEC) draws attention to the fact that it is claimed that compliance with this document may involve the use of a patent concerning (…subject matter…) given in (…subclause…).

ISO [and/or] IEC take[s] no position concerning the evidence, validity and scope of this patent right.

The holder of this patent right has assured the ISO [and/or] IEC that he/she is willing to negotiate licences under reasonable and non-discriminatory terms and conditions with applicants throughout the world. In this respect, the statement of the holder of this patent right is registered with ISO [and/or] IEC. Information may be obtained from:

142

-7-

name of holder of patent right …

address ...

Attention is drawn to the possibility that some of the elements of this document may be the subject of patent rights other than those identified above. ISO [and/or] IEC shall not be held responsible for identifying any or all such patent rights."

-8-

ANNEX 1

COMMON PATENT POLICY FOR ITU-T/ITU-R/ISO/IEC

The following is a "code of practice" regarding patents covering, in varying degrees, the subject matters of ITU-T Recommendations, ITU-R Recommendations, ISO deliverables and IEC deliverables (for the purpose of this document, ITU-T and ITU-R Recommendations are referred to as "Recommendations", ISO deliverables and IEC deliverables are referred to as "Deliverables"). The rules of the "code of practice" are simple and straightforward. Recommendations | Deliverables are drawn up by technical and not patent experts; thus, they may not necessarily be very familiar with the complex international legal situation of intellectual property rights such as patents, etc.

Recommendations | Deliverables are non-binding; their objective is to ensure compatibility of technologies and systems on a worldwide basis. To meet this objective, which is in the common interests of all those participating, it must be ensured that Recommendations | Deliverables, their applications, use, etc. are accessible to everybody.

It follows, therefore, that a patent embodied fully or partly in a Recommendation | Deliverable must be accessible to everybody without undue constraints. To meet this requirement in general is the sole objective of the code of practice. The detailed arrangements arising from patents (licensing, royalties, etc.) are left to the parties concerned, as these arrangements might differ from case to case.

This code of practice may be summarized as follows:

1        The ITU Telecommunication Standardization Bureau (TSB), the ITU Radiocommunication Bureau (BR) and the offices of the CEOs of ISO and IEC are not in a position to give authoritative or comprehensive information about evidence, validity or scope of patents or similar rights, but it is desirable that the fullest available information should be disclosed. Therefore, any party participating in the work of ITU, ISO or IEC should, from the outset, draw the attention of the Director of ITU-TSB, the Director of ITU-BR, or the offices of the CEOs of ISO or IEC, respectively, to any known patent or to any known pending patent application, either their own or of other organizations, although ITU, ISO or IEC are unable to verify the validity of any such information.

2        If a Recommendation | Deliverable is developed and such information as referred to in paragraph 1 has been disclosed, three different situations may arise:

2.1      The patent holder is willing to negotiate licences free of charge with other parties on a non-discriminatory basis on reasonable terms and conditions. Such negotiations are left to the parties concerned and are performed outside ITU-T/ITU-R/ISO/IEC.

2.2      The patent holder is willing to negotiate licences with other parties on a non-discriminatory basis on reasonable terms and conditions. Such negotiations are left to the parties concerned and are performed outside ITU-T/ITU-R/ISO/IEC.

2.3      The patent holder is not willing to comply with the provisions of either paragraph 2.1 or paragraph 2.2; in such case, the Recommendation | Deliverable shall not include provisions depending on the patent.

3       Whatever case applies (2.1, 2.2 or 2.3), the patent holder has to provide a written statement to be filed at ITU-TSB, ITU-BR or the offices of the CEOs of ISO or IEC, respectively, using the appropriate "Patent Statement and Licensing Declaration" Form. This statement must not include additional provisions, conditions, or any other exclusion clauses in excess of what is provided for each case in the corresponding boxes of the form.

-10-

ANNEX 2

PATENT STATEMENT AND LICENSING DECLARATION FORM FOR ITU-T/ITU-R
RECOMMENDATION | ISO/IEC DELIVERABLE

      

**Patent Statement and Licensing Declaration**
**for ITU-T/ITU-R Recommendation | ISO/IEC Deliverable**

*This declaration does not represent an actual grant of a license*

Please return to the relevant organization(s) as instructed below per document type:

| | | | |
|---|---|---|---|
| Director | Director | Secretary-General | General Secretary |
| Telecommunication | Radiocommunication Bureau | International Organization for | International Electrotechnical |
| Standardization Bureau | International Telecommunication | Standardization | Commission |
| International Telecommunication | Union | 1 chemin de la Voie-Creuse | 3 rue de Varembé |
| Union | Place des Nations | CH-1211 Geneva 20 | CH-1211 Geneva 20 |
| Place des Nations | CH-1211 Geneva 20, | Switzerland | Switzerland |
| CH-1211 Geneva 20, | Switzerland | Fax: +41 22 733 3430 | Fax: +41 22 919 0300 |
| Switzerland | Fax: +41 22 730 5785 | Email: | Email: |
| Fax: +41 22 730 5853 | Email: brmail@itu.int | patent.statements@iso.org | inmail@iec.ch |
| Email: tsbdir@itu.int | | | |

**Patent Holder**:
Legal Name _____

**Contact for license application:**
Name &
Department _____
Address _____
_____
_____
Tel. _____
Fax _____
E-mail _____
URL (optional) _____

**Document type:**

☐ **ITU-T Rec. (*)**   ☐ **ITU-R Rec. (*)**   ☐ **ISO Deliverable (*)**   ☐ **IEC Deliverable (*)**
(please return the form to the relevant Organization)

☐ **Common text or twin text (ITU-T Rec. | ISO/IEC Deliverable (*))** (for common text or twin text,
please return the form to each of the three Organizations: ITU-T, ISO, IEC)

☐ **ISO/IEC Deliverable (*)** (for ISO/IEC Deliverables, please return the form to both ISO and IEC)
(*)Number _____
(*)Title _____

146

**Licensing declaration:**

The Patent Holder believes that it holds granted and/or pending applications for patents, the use of which would be required to implement the above document and hereby declares, in accordance with the Common Patent Policy for ITU-T/ITU-R/ISO/IEC, that (check <u>one</u> box only):

☐  1.      The Patent Holder is prepared to grant a <u>free of charge</u> license to an unrestricted number of applicants on a worldwide, non-discriminatory basis and under other reasonable terms and conditions to make, use, and sell implementations of the above document.

Negotiations are left to the parties concerned and are performed outside the ITU-T, ITU-R, ISO or IEC.

*Also mark here __ if the Patent Holder's willingness to license is conditioned on <u>reciprocity</u> for the above document.*

   *Also mark here __ if the Patent Holder reserves the right to license on reasonable terms and conditions (but not <u>free of charge</u>) to applicants who are only willing to license their patent claims, whose use would be required to implement the above document, on reasonable terms and conditions (but not <u>free of charge</u>).*

☐  2.      The Patent Holder is prepared to grant a license to an unrestricted number of applicants on a worldwide, non-discriminatory basis and on reasonable terms and conditions to make, use and sell implementations of the above document.

Negotiations are left to the parties concerned and are performed outside the ITU-T, ITU-R, ISO, or IEC.

*Also mark here __ if the Patent Holder's willingness to license is conditioned on <u>reciprocity</u> for the above document.*

☐  3.      The Patent Holder is unwilling to grant licenses in accordance with provisions of either 1 or 2 above.

In this case, the following information must be  provided to ITU, and is strongly desired by ISO and IEC, as part of this declaration:
- -   granted patent number or patent application number (if pending);
- -   an indication of which portions of the above document are affected;
- -   a description of the patent claims covering the above document.

<u>Free of charge</u>:  The words "free of charge" do not mean that the Patent Holder is waiving all of its rights with respect to the essential patent.  Rather, "free of charge" refers to the issue of monetary compensation; *i.e.*, that the Patent Holder will not seek any monetary compensation as part of the licensing arrangement (whether such compensation is called a royalty, a one-time licensing fee, etc.).  However, while the Patent Holder in this situation is committing to not charging any monetary amount, the Patent Holder is still entitled to require that the implementer of the above document sign a license agreement that contains other reasonable terms and conditions such as those relating to governing law, field of use, reciprocity, warranties, etc.

<u>Reciprocity</u>:  As used herein, the word "reciprocity" means that the Patent Holder shall only be required to license any prospective licensee if such prospective licensee will commit to license its essential patent(s) or essential patent claim(s) for implementation of the same above document free of charge or under reasonable terms and conditions.

**Signature:**

| | |
|---|---|
| Patent Holder | |
| Name of authorized person | _____ |
| Title of authorized person | _____ |
| Signature | _____ |
| Place, Date | _____ |

FORM: 1 March 2007

-12-

| **Patent Information** (desired but not required for options 1 and 2; required in ITU for option 3 (NOTE)) | | | | |
|---|---|---|---|---|
| **No.** | **Status**<br><br>[granted/ pending] | **Country** | **Granted Patent Number**<br>**or**<br>**Application Number (if pending)** | **Title** |
| 1 | | | | |
| 2 | | | | |
| 3 | | | | |

*NOTE:  For option 3, the additional minimum information that shall also be provided is listed in the option 3 box above.*

-13-

ANNEX 3

GENERAL PATENT STATEMENT AND LICENSING DECLARATION FORM FOR ITU-T/ITU-R RECOMMENDATION

**ITU**
International Telecommunication Union



### <u>General Patent Statement and Licensing Declaration</u>

### <u>for ITU-T/ITU-R Recommendation</u>

*This declaration does not represent an actual grant of a license*

Please return to the relevant bureau:

| | |
|---|---|
| Director | Director |
| Telecommunication Standardization Bureau | Radiocommunication Bureau |
| International Telecommunication Union | International Telecommunication Union |
| Place des Nations | Place des Nations |
| CH-1211 Geneva 20, | CH-1211 Geneva 20, |
| Switzerland | Switzerland |
| Fax: +41 22 730 5853 | Fax: +41 22 730 5785 |
| Email: tsbdir@itu.int | Email: brmail@itu.int |

| | |
|---|---|
| **Patent Holder**: | |
| Legal Name | |
| **Contact for license application:** | |
| Name & | |
| Department | |
| Address | |
| | |
| Tel. | |
| Fax | |
| E-mail | |
| URL (optional) | |

**Licensing declaration:**

In case part(s) or all of any proposals contained in Contributions submitted by the Patent Holder above are included in ITU-T/ITU-R Recommendation(s) and the included part(s) contain items that have been patented or for which patent applications have been filed and whose use would be required to implement ITU-T/ITU-R Recommendation(s), the above Patent Holder hereby declares, in accordance with the Common Patent Policy for ITU-T/ITU-R/ISO/IEC (check one box only):

☐      1.      The Patent Holder is prepared to grant a free of charge license to an unrestricted number of applicants on a worldwide, non-discriminatory basis and under other reasonable terms and conditions to make, use, and sell implementations of the relevant ITU-T/ITU-R Recommendation.

     Negotiations are left to the parties concerned and are performed outside the ITU-T/ITU-R.

     *Also mark here __ if the Patent Holder's willingness to license is conditioned on reciprocity for the above ITU-T/ITU-R Recommendation.*

         *Also mark here __ if the Patent Holder reserves the right to license on reasonable terms and conditions (but not free of charge) to applicants who are only willing to license their patent claims, whose use would be required to implement the above ITU-T/ITU-R Recommendation, on reasonable terms and conditions (but not free of charge).*

☐      2.      The Patent Holder is prepared to grant a license to an unrestricted number of applicants on a worldwide, non-discriminatory basis and on reasonable terms and conditions to make, use and sell implementations of the relevant ITU-T/ITU-R Recommendation.

     Negotiations are left to the parties concerned and are performed outside the ITU-T/ITU-R.

     *Also mark here __ if the Patent Holder's willingness to license is conditioned on reciprocity for the above ITU-T/ITU-R Recommendation.*

Free of charge:  The words "free of charge" do not mean that the Patent Holder is waiving all of its rights with respect to the essential patent.  Rather, "free of charge" refers to the issue of monetary compensation; *i.e.*, that the Patent Holder will not seek any monetary compensation as part of the licensing arrangement (whether such compensation is called a royalty, a one-time licensing fee, etc.).  However, while the Patent Holder in this situation is committing to not charging any monetary amount, the Patent Holder is still entitled to require that the implementer of the ITU-T/ITU-R Recommendation sign a license agreement that contains other reasonable terms and conditions such as those relating to governing law, field of use, reciprocity, warranties, etc.

Reciprocity:  As used herein, the word "reciprocity" means that the Patent Holder shall only be required to license any prospective licensee if such prospective licensee will commit to license its essential patent(s) or essential patent claim(s) for implementation of the same ITU-T/ITU-R Recommendation free of charge or under reasonable terms and conditions.

| **Signature:** | |
| --- | --- |
| Patent Holder | _____ |
| Name of authorized person | _____ |
| Title of authorized person | _____ |
| Signature | _____ |
| Place, Date | _____ |

FORM: 1 March 2007

_____

# Exhibit 7

United States • Support

Search Site

Free.

Join Now    Sign In

**Xbox 360 + Accessories**    Xbox LIVE    Games + Marketplace    Community    My Xbox    KINECT

Home > Xbox 360 + Accessories > Xbox 360 4GB Console



# Xbox 360 4GB Console

The new Xbox 360 4GB console has built-in wi-fi, a black wireless controller, a standard definition composite A/V cable, and comes with a free one-month Xbox LIVE Gold Membership.

**Price: $199.99**

Find a Retailer

Overview            What You Get            Related Accessories

## Overview

The new Xbox 360® 4GB Console. Here today, ready for tomorrow with a brand new, leaner machine. Wi-Fi is built in for easier connection to the world of entertainment on Xbox LIVE, where HD movies and TV stream in an instant. It's ready for the controller-free experiences of Kinect—you don't just play the game, you are the game. Xbox 360 is more games, entertainment, and fun.



## Move content from one console to another

Easily transfer all your data from your original Xbox 360 hard drive to the next. Sold separately.

**Learn more**



Support    Press    For Developers    Games for Windows    Jobs    Feedback

Privacy Statement    Xbox.com Terms of Use    Code of Conduct    About Our Ads

© 2010 Microsoft

United States • Support

Search Site

**Xbox 360 + Accessories**        Xbox LIVE        Games + Marketplace        Community        My Xbo

Home > Xbox 360 + Accessories > Xbox 360 4GB Console



# Xbox 360 4GB Console

The new Xbox 360 4GB consol
a standard definition composite
Xbox LIVE Gold Membership.

**Price: $199.99**

Overview        What You Get        Related Accessories

# What You Get

- **Built-in Wi-Fi:** The new Xbox 360 is the only console with 802.11n Wi-Fi built-in for a faster and easi
  movies and TV or download games from Xbox LIVE in 1080p and 5.1 surround sound from anywhere
  networks.
- **Xbox LIVE:** Xbox LIVE brings a world of entertainment to you. Instantly stream movies and TV from
  game add-ons like new levels, characters, maps, and songs. Easily jump right into online multiplayer
  world. Plus, get your favorite music from Last.fm, connect with friends on Facebook® and post tweets
  to more games, entertainment, and fun.*
- **Kinect ready:** Kinect brings games and entertainment to life in extraordinary new ways—no controlle
  Kinect gets everyone off the couch moving, laughing, and cheering. See a ball? Kick it. Want to join a
  control an HD movie with a wave of your hand. Featuring a dedicated, specialized port, the Xbox 360
  the Kinect Sensor.
- **Xbox 360 wireless controller (black):** This award-winning high performance wireless controller feat
  life of 30 hours on two AA batteries.

153

# Exhibit 8

United States  •  Support

Search Site

**Free.**

Join Now    Sign In

**Xbox 360 + Accessories**        Xbox LIVE        Games + Marketplace        Community        My Xbox        KINECT

Home > Xbox 360 + Accessories > Accessories > Xbox 360 Wireless N Networking Adapter

# Xbox 360® Wireless N Networking Adapter

**Price:** **$99.99**

**Find a Retailer**

Overview

With no cords to tie you down, the Xbox 360 Wireless N Networking Adapter is your connection to the fun of Xbox LIVE. Quickly download or stream HD movies, TV episodes, game demos, game add-ons, and more. The dual band adapter offers fast speed and great range* and contains an extension cable for off-board placement.

*Range up to 2x that of a/b/g networks

- Connect to Xbox LIVE wirelessly with ease.
- Highest Wireless N technology standard and dual band for maximum speed, coverage and reliability
- The best solution for streaming and downloading HD movies
- Works great with existing 802.11g and 802.11b wireless routers and access points



Support    Press    For Developers    Games for Windows    Jobs    Feedback

Privacy Statement    Xbox.com Terms of Use    Code of Conduct    About Our Ads

© 2010 Microsoft

155

# Exhibit 9



# Standards Development Patent Policy Manual

American Bar Association
Committee on Technical Standardization
Section of Science & Technology Law

Jorge L. Contreras, Editor





# Standards Development Patent Policy Manual

American Bar Association
Committee on Technical Standardization
Section of Science & Technology Law

Jorge L. Contreras, Editor



# CONTENTS

FOREWORD — v

PREFACE — vii

INTRODUCTION — ix

HOW TO USE THIS MANUAL — 1

ANNOTATED POLICY CLAUSES — 5

I.   DEFINITIONS — 5

II.  GENERAL — 27

   A. Effect of Policy — 27

   B. Noncompliance — 28

     1. Violation — 28

     2. Rejection of Violator's Contributions/Standards — 28

     3. Posting of Warning — 29

     4. Ejection from the SDO — 29

     5. Automatic License Grant — 29

III. PATENT DISCLOSURES — 31

   A. Obligation to Disclose — 32

     1. Participant's Patents Covering Its Own Contributions — 32

     2. Participant's Patents Covering Any Standards Document — 34

     3. Third-Party Claims — 35

   B. Timing of Patent Disclosures — 36

     1. Upon Entry in SDO — 37

     2. Participant's Claims Covering Its Own Contributions — 37

     3. Participant's Claims Covering Any Standards Document — 37

     4. For Third-Party Claims — 38

   C. Format of Patent Disclosures — 38

     1. Required or Optional Format — 38

     2. Content and Specificity of Patent Disclosure — 40

     3. Blanket Patent Disclosures — 41

     4. Updating Patent Disclosures — 42

   D. Disclosure Exclusions, Exemptions, and Opt-Out — 43

     1. Disclosure Opt-Out for Noninvolvement — 43

     2. Exemption from Disclosure If Licensing Commitment Is Made — 44

     3. Exceptions ("Negative Disclosure") — 45

   E. Duration of Patent Disclosure Obligation — 46

iii

The materials contained herein represent the opinions of the authors and editors and should not be construed to be the action of either the American Bar Association or the Section of Science and Technology Law unless adopted pursuant to the bylaws of the Association. Nothing contained in this book is to be considered as the rendering of legal advice for specific cases, and readers are responsible for obtaining such advice from their own legal counsel. This book and any forms and agreements herein are intended for educational and informational purposes only.

No part of this publication may be reproduced, stored in a retrieval system, or transmitted in any form or by any means, electronic, mechanical, photocopying, recording, or otherwise, without the prior written permission of the publisher. Permission requests should be sent to the ABA Copyrights & Contracts Department via e-mail at copyright@abanet.org or via fax at (312) 988-6030.

© 2007 by the American Bar Association. All rights reserved.

Printed in the United States of America

ISBN: 978-1-59031-928-4

Library of Congress Cataloging-in-Publication Data

Standards development patent policy manual / edited by Jorge L. Contreras. — 1st ed.

   p. cm.

   Includes bibliographical references and index.

   ISBN 978-1-59031-928-4

   1. Patent laws and legislation—United States. I. Contreras, Jorge L. II. American Bar Association. Section of Science and Technology

KF3114.3.S73 2007

346.730486—dc22

                   2007028218

Discounts are available for books ordered in bulk. Special consideration is given to state bars, CLE programs, and other bar-related organizations. Inquire at Book Publishing, ABA Publishing, American Bar Association, 321 North Clark Street, Chicago, Illinois 60610-4714.

For a complete list of ABA publications, visit www.ababooks.org

10 09 08 07   5 4 3 2 1

159

# FOREWORD

The Section of Science and Technology of the American Bar Association is pleased to present the *Standards Development Patent Policy Manual*. We are hopeful that this publication will serve as a valuable resource for technical standards organizations, standards developers, and lawyers with an interest in technical standards for many years to come.

This publication was prepared under the auspices of the Committee on Technical Standardization. Jorge L. Contreras, Chair, served as its primary editor, with substantial editorial and substantive assistance from Marc Sandy Block, Michele Herman, Susan Hoyler, and Amy Marasco. This publication also benefited from the regular input and advice of a dedicated subcommittee of experts from industry, academia, and private practice including Chuck Adams, Kent Baker, Dan Bart, Larry Bassuk, Robert Bauer, Scott Bradner, Marc Braner, Pamela Deese, Ed Fiorito, Patricia Griffin, Hung Ling, Alan McGrath, Gil Ohana, Dorothy Raymond, Michelle Stannes, Richard Taffet, George Willingmyre, and, of course, the founder of the Committee, Ollie Smoot.

We are grateful to the Section of Antitrust Law and the Section of Intellectual Property for their support in the preparation and discussion of this publication.

We would also like to thank Shawn Kaminski, Director of the Science and Technology Section, as well as the members of the Publications Committee who helped to make this project a reality.

William S. Coates
Chair, Section of Science and Technology Law
American Bar Association

v

iv   CONTENTS

IV.   LICENSING COMMITMENTS AND LICENSING STATEMENTS ... 47
  A.  Licensing Commitment ... 47
    1.  Terms of the Licensing Commitment ... 49
    2.  Reciprocity ... 61
    3.  Defensive Suspension ... 62
  B.  Obligation Structure of the Licensing Commitment ... 67
    1.  Events Triggering the Imposition of a Licensing Commitment ... 67
    2.  Events That Render Licensing Commitment Effective ... 68
    3.  Establishment of Licensing Commitments by Working Groups ... 69
    4.  Reduction of Licensing Commitment ... 70
  C.  Licensing Statements ... 72
    1.  Elements and Types of Licensing Statements ... 72
    2.  Timing of Licensing Statements ... 74
    3.  Format of Licensing Statements ... 76
    4.  Licensing Statement Made by Whom ... 81
    5.  Duration of Licensing Commitments ... 82
V.    NORMATIVE AND INFORMATIVE REFERENCES ... 87
  1.  Claims Expressly Not Covered ... 87
  2.  Consistency Required ... 89
  3.  Disclosure Requested ... 89
VI.   SDO ACTIONS AND RESPONSIBILITIES ... 91
  A.  Treatment of Patent Disclosures and Licensing Statements ... 91
    1.  Publication of Patent Disclosures and Licensing Statements ... 91
    2.  Retention of Patent Disclosures and Licensing Statements ... 91
  B.  Review of Patent Disclosures and Licensing Statements by the SDO ... 92
    1.  Rejection by the SDO ... 92
    2.  Correction of Clerical Errors ... 92
    3.  Resubmission to the SDO ... 93
    4.  Verification by the SDO ... 94
  C.  SDO Notification and Disclaimer ... 94
  D.  Policy Guidelines and Guidance ... 94

EXHIBIT A:  The "Ex Ante" Question ... 97

EXHIBIT B:  Considerations for Creating Forms
    to Accompany SDO Patent Policies ... 99

EXHIBIT C:  Links to IPR Policies ... 103

Index ... 105

160

## 46   STANDARDS DEVELOPMENT PATENT POLICY MANUAL

### E. DURATION OF PATENT DISCLOSURE OBLIGATION

SDO Participants may generally withdraw from the SDO and/or particular Working Groups at any time. A Participant's disclosure obligation should continue during the entire period of its Participation in the SDO. The SDO may wish to address the possibility of a prospective Participant transferring Essential Claims in anticipation of joining the SDO (see Section III.A.1). While an SDO might be concerned about a Participant withdrawing and then filing patent applications to cover aspects of a Standard initiated during its period of Participation, imposing a duty to disclose after withdrawal from the SDO is generally viewed as unnecessarily burdensome on Patent Holders. This concern is often addressed in the Licensing Commitment (see Section IV.E.1.a), which may require a withdrawing Participant to continue to offer licenses with respect to Essential Claims covering Standards developed during its period of Participation in the SDO under certain prescribed circumstances.

A Participant's disclosure obligations under Section III.A shall terminate

[upon its withdrawal from the SDO] [1]

and/or

[with respect to Essential Claims relating to a particular Standard, upon its withdrawal from the relevant WG]. [2]

[1] If the SDO wishes all of a Participant's disclosure obligations to terminate upon its withdrawal from the SDO, then this clause may be used.

[2] In addition, if the SDO wishes to allow a Participant's disclosure obligations with respect to a particular Standard to terminate upon its withdrawal from the relevant WG, then this clause may be used in addition to the clause in [1] above.

# IV. LICENSING COMMITMENTS AND LICENSING STATEMENTS

As defined in Section I, a Licensing Commitment is an obligation requiring a Participant to grant licenses under its Essential Claims. A Licensing Commitment is not itself a license grant. It is merely an obligation to grant a license on terms such as RAND or RANDz.

A Licensing Statement is a document containing an affirmative statement in which a Participant makes a Licensing Commitment or otherwise discloses the general nature of the terms on which it would be willing to grant licenses under its Essential Claims. However, some SDOs impose Licensing Commitments without requiring any particular Licensing Statement (for example, the Licensing Commitment may be embodied in the SDO's organizational documents, bylaws, Participation Agreement, or the like). Again, a Licensing Statement generally does not constitute the grant of a license, but generally states the nature of the terms (e.g., RAND or RANDz) on which the Participant is willing to grant licenses.

## A.   LICENSING COMMITMENT

### How a Licensing Commitment Arises

A Participant's Licensing Commitment may arise in various ways. As discussed in detail below, a Participant may be required to undertake a Licensing Commitment when it joins an SDO or a Working Group of an SDO, when it submits a Contribution, or when it submits a Licensing Statement. Some SDOs do not impose any obligation on Participants to make any Licensing Statement or to undertake any Licensing Commitment, although most do impose some form of Licensing Commitment.

### Elements of a Licensing Commitment

A Licensing Commitment is not an actual license and generally does not include all of the terms that the Patent Holder may include in the licenses it offers to prospective licensees. The Licensing Commitment may, however, prescribe the general nature of some of the terms and/or prohibit other terms. The terms and conditions not expressly covered by the Licensing Commitment are typically negotiated on a bilateral basis between Patent Holders and Implementers, subject to any overarching requirements in the Licensing Commitment to be "reasonable" and "nondiscriminatory."

While negotiations are often bilateral, in an April 2007 FTC/DOJ Report, *Antitrust Enforcement and IP Rights: Promoting Innovation and Competition*, the agencies observed that "joint negotiation of licensing terms by standard-setting organization participants before the standard is set can be pro-competitive." Such negotiations are unlikely to constitute a per se antitrust violation. The FTC/DOJ Report also concludes that, without more, a unilateral announcement of price terms does not violate section 2 of the Sherman Act. The agencies also took "no position as to whether SDOs should engage in joint ex ante discussion of licensing terms."

http://www.ftc.gov/reports/innovation/P040101PromotingInnovationandCompetitionrpt0704.pdf

The FTC/DOJ Report is consistent with Recommendation No. 20 issued by the Antitrust Modernization Commission in its April 2, 2007 Report and Recommendations (AMC Report) that "joint negotiations with intellectual property owners by members of a standard-setting organization with respect to royalties prior to the establishment of the standard, without more, should be evaluated under the rule of reason" (one of twelve commissioners dissenting).

http://www.amc/gov/report_recommendation/toc.htm

It is important for Participants to understand their Licensing Commitments so that they do not commit to grant more license rights than they intend or become involved with standards development activities that may require them to grant licenses that they did not contemplate. Patent Holders must weigh the potential benefit of fully exercising patent rights against the benefit of promoting the standard, the industry, and their own business prospects. It is equally important for Implementers to understand the range of license terms and conditions they can generally expect Participating Patent Holders to offer. Implementers generally do not want to invest in the development and deployment of standards-based products if they believe that they will not be offered acceptable patent licenses. The SDO, in creating its Policy, must find a satisfactory balance between the interests of the Patent Holders that participate and contribute to the Standard, and the Implementers, whose adoption of the standard is vital for the standard's success.

Some SDOs also require different Licensing Commitments depending on a Participant's level of participation or authority within the SDO. For example, Participants who are part of the SDO's "steering committee" or "architecture board" may be required to grant licenses on RANDz terms, whereas more general Participants may be permitted to grant RAND licenses.

## Other Factors

In practice, not all Patent Holders may require Implementers to obtain a license under their Essential Claims, even if permitted to do so under the Policy or even if they have submitted a Licensing Statement indicating general terms on which licenses may be offered. Such forbearance could, however, impede the Patent Holders' ability to enforce such Essential Claims later under various equitable theories. Moreover, an Implementer who has sufficient awareness of Essential Claims covering an implementation of a Standard could be liable for willful infringement absent a license, and may be at some risk by operating without a license, even if the Patent Holder does not appear to be enforcing its Essential Claims actively. These suppositions have not yet been considered by the courts, however, and Implementers should seek legal advice before taking any such action.

Note that, in some instances, a Participant may be permitted to elect to structure these grants of rights as covenants (similar to that described in Section IV.C.3 below) rather than licenses. Some commentators maintain, however, that a Participant offering a covenant should also offer a license as an alternative to permit bilateral negotiation. In any case, any such covenant must still meet all of the requirements of the SDO's Licensing Commitment.

An SDO drafting a patent policy and a company joining an SDO should consider how the SDO's policy will affect applicable business and development models of a participating company. For example, the open source software development model has emerged in various standards-setting environments. If a client plans to implement a standard with open source software, counsel should consider the interplay between the open source license commitment that they have and the SDO commitment it may have. Today there are many open source implementations of RAND-based standards, although the authors are not aware of the circumstances under which these implementations are being practiced.

Similarly, if the SDO wants to attract software developers including open source developers, it may consider the interplay between the respective SDO's commitments, the rights of Patent Holders, open source license commitments, and the incentives to innovate within the scope of the standardization activity. Distributors of all products, including those involving open source software, must also understand that permitted license limitations may affect their ability to distribute products as they might otherwise prefer to do. In addition, the SDO should seek to balance the interests of Implementers (who may rely on differing business models) and the rights of Patent Holders (who may also rely on different business models) in developing its IPR Policy in order to attract a balance of stakeholder interests.

In some SDOs, the Licensing Commitment is as simple as a commitment to RAND or RANDz licensing terms and conditions. Other SDOs require or permit the Licensing Commitment to contain some or all of the terms described below, and many SDOs expressly permit the inclusion of such terms as part of the RAND Licensing Commitment.

## 1. Terms of the Licensing Commitment

Participant shall, [upon request] [I], [grant/offer]

The Licensing Commitment is often stated as an absolute (i.e., that the Participant must grant the required licenses). However, it is reasonable to require that such licenses be granted only upon a request by a potential licensee and upon the conclusion of bilateral negotiations. It would be unreasonable for a Participant to be required to seek out its own licenses in this context, or to extend offers before being requested to do so.

[I] The Patent Holder must offer a license to a prospective Implementer upon request. If the Implementer and the Patent Holder do not agree on terms, the Implementer has three choices: (1) it can discourage the SDO from adopting the Standard if the Standard has not yet been adopted; (2) it can choose not to implement the Standard; or (3) it can implement the Standard without a license. If the Implementer chooses to implement the Standard without a license, the Patent Holder may in turn choose to sue the Implementer for patent infringement and seek all available remedies. The Implementer may rely on any applicable defense to infringement such as invalidity or noninfringement, and may also rely on other legal theories arguing that the license terms did not comply with the SDO's Licensing Commitment (e.g., they were not RAND).

Unless the Policy states otherwise, it is generally understood that a Patent Holder's obligation to offer a license under a Licensing Commitment is initially discharged after the Participant makes a good-faith offer of such license. If an Implementer refuses the license, it is not clear, however, whether or how often or for how long the Patent Holder must continue to make a license available. On one hand, it may not be reasonable to allow a Patent Holder to refuse a license to an Implementer who previously could not reach agreement with the Patent Holder, but on the other hand an Implementer should not have the ability to wait until the last minute

## 50   STANDARDS DEVELOPMENT PATENT POLICY MANUAL

**a. licensee(s)**
to any [Implementer/Participant]

to demand a license (e.g., in the midst of a patent infringement action brought by the Patent Holder after the Infringer has attempted unsuccessfully to invalidate the relevant patents). An SDO that wishes to avoid disputes regarding these issues may wish to address them explicitly in its Policy.

SDOs must decide who will benefit from the Participants' Licensing Commitments—other Participants, or all Implementers.

Many SDOs seek to benefit all Implementers of a Standard. This approach is viewed by many to foster widespread adoption of a Standard.

Some SDOs, however, limit Licensing Commitments to other Participants, and Implementers who are not Participants cannot rely on such Licensing Commitments. Such limitations may be imposed because Participants may fear granting licenses to non-Participants that have no Licensing Commitments of their own. These restrictions may also encourage membership in the SDO by attracting Participants who seek licenses under the relevant Essential Claims. This limitation is seen more in "special interest groups" than in "traditional" SDOs. So long as the Policy permits the Patent Holder to include a reciprocity provision in its license (see Section IV.A.2 below), the Patent Holder can obtain a reciprocal license from any non-Participant the Patent Holder chooses to license. Consequently Patent Holders would have an incentive to license both Participants and non-Participants even if the Policy imposes a Licensing Commitment only with respect to Participants. However, absent such a Licensing Commitment, non-Participants are not guaranteed that the Patent Holder will offer any license at all.

If it is anticipated that a Standard may be contributed to another standards organization that does not have this limitation, the SDO, in the Policy, may wish to consider extending the benefit of licenses to all Implementers. Another possibility would be to add a provision that would convert the Licensing Commitment to extend the benefit to all Implementers *but only* in the event that the Standard is contributed to such other standards organizations.

## ANNOTATED POLICY CLAUSES   51

**b. nonexclusivity**
a nonexclusive

Perhaps the most common term included in a Licensing Commitment is nonexclusivity. The licenses offered by the Patent Holder must be nonexclusive to enable broad implementation of the standard.

**c. worldwide**
worldwide

Licensing Commitments often require the license to be "worldwide." However, "worldwide" does not necessarily mean that all worldwide rights are licensed under a single license or to each prospective licensee. Implementers may not want licenses to make, use, sell, etc., the standardized technology throughout the world and may seek licenses for only those regions where the Implementer anticipates practicing the Essential Claims.

Patent Holders may also want to offer different terms for practicing Essential Claims in different regions. This type of strategy, however, may raise questions about reasonableness and nondiscrimination if manufacturers in one jurisdiction are subject to substantially different terms from those in another.

Some SDOs may use the terminology "throughout the world" or "in any country" in the same context.

**d. nontransferable**
nontransferable/nonassignable

Some Licensing Commitments may permit the Patent Holder to offer licenses that are non-transferable or nonassignable. There may be a number of terms in the license that the Patent Holder believes are material to the license agreement with a specific licensee and therefore the Patent Holder does not want the license to be assigned or transferred without its knowledge and consent. Some licenses that are not transferable or assignable do include limited provisions permitting a licensee to transfer or assign its license upon notice to the Patent Holder and with its prior consent.

**e. duration**
[perpetual/___year]

In a perpetual license, the license of each Essential Claim extends for the life of the applicable patent, unless there is some limiting condition expressed. Implementers often desire a perpetual license because they may not want to invest in a standardized technology believing that the license terms are acceptable, only to find out after the license terminates that the new terms offered by the Patent Holder are not acceptable to the licensee.