# Exhibit 3

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | | |
|---|---|---|
| WI-LAN, INC., | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 2:08-CV-247-TJW |
| | ) | |
| v. | ) | |
| | ) | Hon. T. John Ward |
| RESEARCH IN MOTION | ) | |
| CORPORATION, | ) | JURY TRIAL REQUESTED |
| et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |

**DEFENDANT MOTOROLA, INC.'S FIRST AMENDED ANSWER,
AFFIRMATIVE DEFENSES, AND COUNTERCLAIMS TO WI-LAN, INC.'S THIRD
AMENDED COMPLAINT**

Defendant Motorola Inc. ("Motorola") answers plaintiff Wi-LAN Inc.'s ("Wi-LAN")

Third Amended Complaint as follows:

**PARTIES**

1.     On information and belief, Motorola admits that plaintiff Wi-LAN Inc. is a

corporation existing under the laws of Canada with its principal place of business at 11 Holland

Ave., Suite 608, Ottawa, Ontario, Canada.

2.     Motorola admits that it is a Delaware corporation with its principal place of

business at 1303 E. Algonquin Rd., Schaumburg, Illinois 60196.  Motorola further admits that it

may be served with process by serving its registered agent, CT Corporation System, at 350 N. St.

Paul Street, Dallas, Texas 75201.  As to the second sentence, Motorola admits it offers products

with 802.11 and CDMA2000 functionalities, however, the allegations fail to set forth definitions

for terms in the allegations, and, in light of the ambiguities of the second sentence, Motorola

K&E .

lacks information sufficient to form a belief as to the truth of the matters asserted and therefore denies the allegations. Motorola denies any remaining allegations of paragraph 2.

3.     The allegations of paragraph 3 are not directed to Motorola, and therefore no answer is required. Motorola is without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 3, and therefore denies them.

4.     The allegations of paragraph 4 are not directed to Motorola, and therefore no answer is required. Motorola is without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 4, and therefore denies them.

5.     The allegations of paragraph 5 are not directed to Motorola, and therefore no answer is required. Motorola is without knowledge or information sufficient to form a belief as to the truth of the allegations of paragraph 5, and therefore denies them.

## JURISDICTION AND VENUE

6.     These allegations set forth legal conclusions to which no response is required. Motorola admits that Wi-LAN's complaint alleges infringement under the United States patent laws. Motorola denies any remaining allegations in this paragraph.

7.     Motorola admits that this Court has subject matter jurisdiction over patent law claims. Consistent with the denial of the allegations of paragraphs 10 and 12 below, on information and belief Motorola denies that Wi-LAN has standing, and accordingly denies that this Court has subject matter jurisdiction over Wi-LAN's patent claims in this particular case and denies any allegations in this paragraph.

8.     Motorola admits that this Court has personal jurisdiction over it in this particular action, and that it has conducted business in the State of Texas. Motorola admits that its products have been sold in the United States, the State of Texas, and the Eastern District of

2

36

Texas. To the extent the remaining allegations of paragraph 8 are directed at Motorola, they are

denied. To the extent the allegations of paragraph 8 are directed to other entities, Motorola lacks

sufficient information to admit or deny the allegations of paragraph 8, and therefore denies them.

9.      Motorola admits that venue is proper in the Eastern District of Texas for purposes

of this particular action.

## COUNT 1: PATENT INFRINGEMENT

10.      With respect to the first sentence of paragraph 10, Motorola admits that U.S.

Patent No. RE37,802 (the "'802 patent") is entitled "Multicode Direct Sequence Spread

Spectrum," and that the '802 patent bears an issuance date of July 23, 2002. With respect to the

second sentence of paragraph 10, Motorola is without knowledge or information sufficient to

form a belief as to whether Wi-LAN is the assignee of rights to the '802 patent and therefore

denies the allegations of the second sentence. Motorola denies all other allegations of paragraph

10.

11.      Denied.

12.      With respect to the first sentence of paragraph 12, Motorola admits that U.S.

Patent No. 5,282,222 (the "'222 patent") is entitled "Method and Apparatus for Multiple Access

Between Transceivers in Wireless Communications Using OFDM Spread Spectrum," and that

the '222 patent bears an issuance date of January 25, 1994. With respect to the second sentence

of paragraph 12, Motorola is without knowledge or information sufficient to form a belief as to

whether Wi-LAN is the assignee of rights to the '222 patent and therefore denies the allegations

of the second sentence. Motorola denies all other allegations of paragraph 12.

13.      Denied.

14.      Denied.

37

15.     Denied.

16.     Denied.

17.     Denied.

18.     Denied.

19.     Denied.

20.     Denied.

21.     Denied.

22.     Denied.

23.     Denied.

24.     Denied.

25.     Denied.

## PRAYER FOR RELIEF

These paragraphs set forth the statement of relief requested by Wi-LAN to which no response is required.  Motorola denies that Wi-LAN is entitled to any of the requested relief and denies any allegations.

## DEMAND FOR JURY TRIAL

This paragraph sets forth Wi-LAN's request for a jury trial to which no response is required.

## AFFIRMATIVE DEFENSES

Subject to the responses above, Motorola alleges and asserts the following defenses in response to the allegations, undertaking the burden of proof only as to those defenses deemed affirmative defenses by law, regardless of how such defenses are denominated herein.  In addition to the affirmative defenses described below, subject to their responses above, Motorola

specifically reserves all rights to allege additional affirmative defenses that become known
through the course of discovery.

1.      Motorola does not infringe and has not infringed (not directly, contributorily, or
by inducement) any claim of the '222 and '802 patents.

2.      The claims of the '222 patent are invalid for failure to satisfy one or more of the
requirements of Sections 100 et seq., 101, 102, 103, 112 and 132 of Title 35 of the United States
Code.

3.      The claims of the '802 patent are invalid for failure to satisfy one or more of the
requirements of Sections 100 et seq., 101, 102, 103, 112, 132 and 251 of Title 35 of the United
States Code.

4.      The claims of the '222 and '802 patents are unenforceable as asserted, in whole or
in part, by doctrines of waiver (express or implied), laches, and/or estoppel.

5.      The claims of the '222 and '802 patents are unenforceable as asserted, in whole or
in part, by the doctrine of equitable estoppel.

6.      The claims of the '222 and '802 patents are unenforceable as asserted, in whole or
in part, by the doctrine of promissory estoppel.

7.      The claims of the '222 and '802 patents are unenforceable due to unclean hands as
specifically alleged below in Motorola's counterclaim no. 12, which is fully incorporated by
reference.

8.      The claims of the '222 and '802 patents are unenforceable due to inequitable
conduct as specifically alleged below in Motorola's counterclaim nos. 3 and 6, which are fully
incorporated by reference.

9.      Motorola and its accused products are licensed, expressly or implicitly.

39

10.     Wi-LAN cannot satisfy the requirements applicable to its request for injunctive relief and has an adequate remedy at law.

11.     Wi-LAN's alleged damages are limited because it has not satisfied the requirements for obtaining damages under 35 U.S.C. § 287, and the limitations period further bars past damages claims.

12.     One or more of the claims of the '802 patent are barred by intervening rights.

13.     One or more of the claims of the '802 patent are invalid under the doctrine of recapture.

14.     Wi-LAN's claims for relief are limited by the doctrines of full compensation, exhaustion, and/or first sale, and Wi-LAN is not entitled to a double recovery.

## COUNTERCLAIMS

Motorola, for its Counterclaims against Wi-LAN and upon information and belief, states as follows:

## THE PARTIES

1.     Defendant Motorola Inc. ("Motorola") is a Delaware corporation organized and existing under the laws of the State of Delaware with its principal place of business at 1303 E. Algonquin Road, Schaumburg, Illinois, 60196.

2.     On information and belief, plaintiff Wi-LAN Inc. ("Wi-LAN") is a corporation existing under the laws of Canada with its principal place of business at 11 Holland Ave., Suite 608, Ottawa, Ontario, Canada.

## JURISDICTION AND VENUE

3.     Subject to Motorola's affirmative defenses and denials, including those concerning Wi-LAN's lack of standing, Motorola alleges that this Court has jurisdiction over the

40

subject matter of these Counterclaims under, without limitation, 28 U.S.C. §§ 1331, 1367, 1338(a), 2201, and 2202, and venue for these Counterclaims is proper in this district.

4.      This Court has personal jurisdiction over Wi-LAN.

## FACTUAL BACKGROUND

5.      In its Complaint, Wi-LAN asserts that Motorola has infringed U.S. Patent Nos. RE37,802 (the "'802 patent") and 5,282,222 (the "'222 patent").

6.      The '802 and '222 patents are invalid and/or have not been and are not infringed by Motorola, directly or indirectly.  Additionally, as alleged herein, Wi-LAN has engaged in misconduct rendering the patents unenforceable.

7.      Consequently, there is an actual case or controversy between the parties over the non-infringement, invalidity, and/or unenforceability of the '802 and '222 patents.

## COUNT ONE

## Declaratory Judgment of Non-Infringement of U.S. Patent No. RE37,802

8.      Motorola restates and incorporates by reference its allegations in paragraphs 1 through 7 of its Counterclaims.

9.      An actual case or controversy exists between Motorola and Wi-LAN as to whether the '802 patent is not infringed by Motorola.

10.     A judicial declaration is necessary and appropriate so that Motorola may ascertain its rights regarding the '802 patent.

11.     Motorola has not infringed and does not infringe, directly or indirectly, any valid and enforceable claim of the '802 patent.

12.     This is an exceptional case under 35 U.S.C. § 285 including without limitation because Wi-LAN filed its Complaint with knowledge of the facts stated in this Counterclaim.

41

## COUNT TWO

### Declaratory Judgment of Invalidity of U.S. Patent No. Re 37,802

13.     Motorola restates and incorporates by reference its allegations in paragraphs 1 through 12 of its Counterclaims.

14.     An actual case or controversy exists between Motorola and Wi-LAN as to whether the '802 patent is invalid.

15.     A judicial declaration is necessary and appropriate so that Motorola may ascertain its rights as to whether the '802 patent is invalid.

16.     The '802 patent is invalid for failure to meet the conditions of patentability and/or otherwise comply with one or more of 35 U.S.C. §§ 100 et seq., 101, 102, 103, 112, 132 and 251.

17.     This is an exceptional case under 35 U.S.C. § 285 including without limitation because Wi-LAN filed its Complaint with knowledge of the facts stated in this Counterclaim.

## COUNT THREE

### Declaratory Judgment of Unenforceability of U.S. Patent No. Re 37,802

18.     Motorola restates and incorporates by reference its allegations in paragraphs 1 through 17 of its Counterclaims.

19.     Individuals subject to the duty of candor under 37 C.F.R. § 1.56 ("Applicants"), including without limitation listed inventors Michel Fattouche ("Fattouche") and Hatim Zaghloul ("Zaghloul") and counsel, engaged in inequitable conduct by withholding material information with the intent to deceive the United States Patent and Trademark Office ("USPTO") in connection with prosecuting U.S. Patent No. RE 37,802 ("the '802 patent"), which is a reissue of

8

U.S. Patent No. 5,555,268 ("the '268 patent").  The '802 and '268 patents share the same specification.

20.     Prior to the issuance of the '268 patent, Applicants became aware of prior art material to the patentability of the '268 and '802 patents, including at least Leonard J. Cimini, "Analysis and Simulation of a Digital Mobile Channel Using Orthogonal Frequency Division Multiplexing," IEEE Transactions on Communications, Vol. Com-33, No. 7 (July 1985) ("Cimini"); United States Patent No. 5,063,560 ("Yerbury"); John A. C. Bingham "Multicarrier Modulation for Data Transmission: An Idea Whose Time Has Come," IEEE Communications (May 1990) ("Bingham") and other publications and patents by John A. C. Bingham; and B. Hirosaki, A. Yoshida, O. Tanaka, S. Hasegawa, K. Inoue, and K. Watanabe, "A 19.2 Kbps voiceband data modem based on orthogonally multiplexed QAM technique," IEEE (1985) ("Hirosaki").  Prior to the issuance of the '802 patent, Applicants became aware of prior art that is material to the patentability of the '802 patent, including at least U.S. Patent No. 4,583,236 ("Kromer"); U.S. Patent No. 4,665,404 ("Christy"); U.S. Patent No. 5,430,759 ("Yokev"); Bruce Carlson, Communication Systems: An Introduction to Signals and Noise in Electrical Communication (3d ed. McGraw-Hill 1986) ("Carlson"); and Jinkang Zhu, Shigenobu Sasaki, and Gen Marubayashi, "Proposal of Parallel Combinatory Spread Spectrum Communication System," Transactions of the Institute of Electronics, Information and Communication Engineers, Vol. J74-B-II No. 5 (May 1991) ("Zhu").

21.     For example, Fattouche and Zaghloul were aware of Cimini at least by August 10, 1992, when they listed the article in an Information Disclosure Statement submitted to the USPTO during the prosecution of the '222 patent.  Additionally, Fattouche and Zaghloul were aware of Yerbury in December 1992 when the Examiner cited Yerbury during the prosecution of

the '222 patent.  On information and belief, the Bingham article was one of the papers that

Fattouche and Zaghloul used prior to filing of the application for the '268 patent.  As a further

example, Fattouche and Zaghloul were aware of the Hirosaki article at least by August 10, 1992,

when they listed the article in an Information Disclosure Statement submitted to the USPTO

during the prosecution of the '222 patent.  For example, Kromer was cited in an Office Action

rejection during prosecution of U.S. Patent No. 5,127,024 ("the '024 patent").  Additionally,

Fattouche and Zaghloul listed the Christy abstract in an Information Disclosure Statement

submitted to the USPTO during prosecution of U.S. Patent No. 5,890,068 ("the '068 patent").  As

a further example, Fattouche cited Yokev in an Information Disclosure Statement submitted to

the USPTO during prosecution of U.S. Patent No. 5,887,022 ("the '022 patent").  Fattouche also

published a 1989 paper, "An Adaptive Minimum Redundancy Array for Digital

Communications," in which the Carlson reference was cited.

22.     Under Wi-LAN's improper assertions of infringement and improper application of

the claims, Cimini is at least material to the patentability of at least independent claims 1, 17, and

23 of the '268 patent and claims that depend from those claims.  For example, figure 1(a) of

Cimini, described in Part II.A, shows that a serial stream of data can be input to a serial-to-

parallel converter to produce sets of "N serial data elements."  This is material to the patentability

of at least claims 1, 17, and 23.  As a further example, Figure 1(a) and the description in Part II.A

show that the "N serial data elements" are modulated by "N carrier frequencies" and that the "N

serial data elements" are spaced by an interval equal to the inverse of the symbol rate frequency.

This is material to the patentability of at least claims 1, 17, and 23.  Another example is shown in

Figure 1(a) and the accompanying description in Part II.A of the Cimini article in which the

parallel data streams are frequency division multiplexed to produce a single waveform for data

Case 2:08-cv-00247-TJW   Document 133   Filed 04/26/10   Page 12 of 43

transmission.  This is material to the patentability of at least claims 1, 17, and 23.  As a further

example, Figure 1(b) shows a receiver for receiving the modulated data symbols, which is

material to the patentability of at least claim 17, and also shows a means for operating on the

sequence of modulated data symbols to generate an estimate of the second data stream, and a

parallel-to-serial converter to convert the parallel streams into a single output which are material

to the patentability of at least claim 17.  Additionally, the Cimini article is not cumulative of the

references cited during the prosecution of the '268 patent, including at least because the

references cited during prosecution do not show the claim limitations as presented by Cimini.

23.      Applicants deliberately failed to disclose the Cimini article to the USPTO with an

intent to deceive during the prosecution of the '268 patent.  For example, Fattouche and Zaghloul

identified the Cimini article during the prosecution of '222 patent prior to filing the application

for the '268 patent.  Moreover, in the specification for the '268 patent, Fattouche and Zaghloul

state that "[w]hen L=2 with the first N-point transform being a DFT and the second being a RT,

we have a system identical to the ['222] patent," confirming their belief in the materiality of the

'222 patent to the '268 patent, and under that belief the corresponding need to disclose the Cimini

article in connection with the prosecution of the '268 patent.  Fattouche and Zaghloul further

confirmed their belief in the materiality of the Cimini article by providing it to the USPTO

during prosecution of the '802 patent.

24.      Under Wi-LAN's improper assertions of infringement and improper application of

the claims, Yerbury is at least material to the patentability of at least independent claims 1, 17

and 23 of the '268 patent and claims that depend from those claims.  For example, Yerbury

shows a transmission system whereby "pseudo-noise (PN) codes are used asynchronously to

direct sequence modulate the channel carriers at a high rate relative to the data rate;" this allows

45

a number of information bearing channels to share the same medium and "approximately the same frequency band." *See, e.g.*, '560 patent, col. 1:10–17. Claim 1 of Yerbury and the related disclosure are material to the patentability of at least independent claims 1, 17, and 23 of the '268 patent and dependent claim 18 of the '268 patent. As a further example, Claim 10 of Yerbury describes the receiving means for the transmission system, which includes a "plurality of receiver channels," and a "correlation means" for collapsing the spread-spectrum signal to a narrow bandwidth "corresponding to the transmission channel signal bandwidth." *See, e.g., id.* at col. 9:5–18. Claim 10 of Yerbury, and the related description, is material to the patentability of at least dependent claims 10, 12, and 21 of the '268 patent. As another example, Claim 10 of Yerbury describes a receiver means and a correlation means "provided for each receiver channel to cause the spread-spectrum-signal received on a respective channel to be collapsed to a narrow bandwidth," and claim 27 of Yerbury specifies that to produce an estimate of the data stream, the collapsed signal is passed through a narrowband filter, which are material to the patentability of at least claims 10, 12, and 21 of the '268 patent. Additionally, Yerbury is not cumulative of the information in the references cited during the prosecution of the '268 patent, including at least because the references cited during prosecution do not show the claim limitations as presented by Yerbury.

25.     Applicants deliberately failed to disclose the Yerbury reference to the USPTO with an intent to deceive during prosecution of the '268 patent. For example, during prosecution of '222 patent, more than a year before Fattouche and Zaghloul filed for the '268 patent, the Examiner cited Yerbury in a December 10, 1992 Office Action, and stated that Yerbury was "pertinent to the applicant's disclosure." In the specification for the '268 patent, Fattouche and Zaghloul state that "[w]hen L=2 with the first N-point transform being a DFT and the second

being a RT, we have a system identical to the ['222] patent," confirming their belief in the

materiality of the '222 patent to the '268 patent, and their belief in the need to disclose Yerbury in

connection with the prosecution of the '268 patent.  Fattouche and Zaghloul further confirmed

their belief in the materiality of Yerbury by providing it to the USPTO during prosecution of the

'802 patent.

26.     Under Wi-LAN's improper assertions of infringement and improper application of

the claims, the Bingham article is material to the patentability of at least independent claims 1,

17, and 23 of the '268 patent and claims that depend from those claims.  For example, Figure 1 of

Bingham and the accompanying description in the Multiplexing section of the article show a

multicarrier modulation scheme, whereby input data are grouped into blocks of M bits; the M

bits are then used to modulate carriers spaced across a usable frequency band, and the modulated

carriers are summed for transmission.  This is material to the patentability of at least claims 1, 2,

17, 18, 23, and 24 of the '268 patent.  As a further example, Bingham describes demodulating the

received signal in the receiver by performing a real-to-complex Fast Fourier Transform.  This is

shown in Figure 7, and the accompanying description in the section Implementation, in which

the receiver performs a serial-to-parallel conversion followed by a Fast Fourier Transform; the

data is then sent through a decoder and a parallel-to-serial buffer.  These descriptions are

material to the patentability of at least claim 10 of the '268 patent.  Additionally, Bingham is not

cumulative of the references cited during the prosecution of the '268 patent, including at least

because the references cited during prosecution do not show the claim limitations as presented by

Bingham.

27.     Applicants deliberately failed to disclose the Bingham reference to the USPTO

with an intent to deceive during prosecution of the '268 patent.  Fattouche and Zaghloul

confirmed their belief in the materiality of the Bingham article by providing it to the USPTO
during prosecution of the '802 patent, a reissue of the '268 patent.

      28.     Under Wi-LAN's improper assertions of infringement and improper application of
the claims, the Hirosaki article is material to the patentability of at least independent claims 1,
17, and 23 of the '268 patent and the claims that depend from those claims.  For example, Part 2
of the Hirosaki article shows using the orthogonally multiplexed quadrature amplitude
modulation technique, whereby the "entire transmission band is divided into a number of
mutually spectrum overlapping subchannels."  The subchannels can be discriminated from each
other provided they are orthogonal.  This is material to the patentability of at least claims 1, 17,
and 23 of the '268 patent.  As a further example, Part 4 of the Hirosaki article shows a modem
composed of five functional blocks: the transmitter, the receiver, the 8-channel time division
multiplexer, the modem controller, and the time pulse generator.  A microprocessor at the
transmitter encodes the original data into a block of bits to be transmitted over each channel.
Part 4 further discloses applying the following processing to a received signal: low-pass filter,
gain control, and then digital conversion.  This is material to the patentability of at least claim 17
of the '268 patent.  Additionally, Hirosaki is not cumulative of the references cited during the
prosecution of the '268 patent, including at least because the references cited during prosecution
do not show the claim limitations as presented by Hirosaki.

      29.     Applicants deliberately failed to disclose the Hirosaki article to the USPTO with
an intent to deceive during the prosecution of the '268 patent.  For example, Fattouche and
Zaghloul included the Hirosaki article in an Information Disclosure Statement submitted to the
USPTO on August 10, 1992 during the prosecution of '222 patent, one and a half years before
filing for the '268 patent.  Fattouche and Zaghloul further confirmed their belief in the materiality

48

of the Hirosaki article by providing it to the USPTO during prosecution of the '802 patent, a
reissue of the '268 patent.

30.     Under Wi-LAN's improper assertions of infringement and improper application of
the claims, Kromer is material to the patentability of at least claims 1, 10, and 17 of the '802
patent and the claims that depend from those claims.  For example, Figure 2 of Kromer the
accompanying description at 4:29 through 5:41, and claims 1 and 10, are material to the
patentability of at least independent claims 1 and 10 of '802 patent.  As a further example, claim
1 of Kromer shows a transmitter having (1) "a convolutional encoder for transforming each of a
plurality of information bit sequences," and (2) a "modulated signal generating means, in
response to each of said expanded bit sequences" which are material to the patentability of at
least claims 1, 2, 17, 18, and 33 of the '802 patent.  As another example, claim 1 of Kromer
shows a receiver "having demodulation and slicer means for demodulating and detecting said
modulated carrier signal to obtain a plurality of received expanded bit sequences."  This is
material to the patentability of at least claim 17 of the '802 patent.  Additionally, Kromer is not
cumulative of the references cited during the prosecution of the '802 patent, including at least
because the references cited during prosecution do not show the claim limitations as presented by
Kromer.

31.     Applicants deliberately failed to disclose Kromer to the USPTO with an intent to
deceive during the prosecution of the '802 patent.  For example, during the prosecution of U.S.
Patent No. 5,127,024 ("the '024 patent") the examiner stated that Kromer shows "a data
modulator for transmitting a sequence of data symbols at a symbol rate 1/T, the modulator being
characterized as having a carrier frequency and data symbols, the data symbol is real or complex
and is the time index of the symbol."  The '024 patent lists Fattouche as an inventor.

32.     Under Wi-LAN's improper assertions of infringement and improper application of the claims, Christy is material to the patentability of at least claims 1, 2, 17, and 21 of the '802 patent and the claims that depend from those claims.  For example, claim 1 of Christy discloses a base station with "means for transmitting a spread spectrum signal," and claim 2 of Christy further specifies that the "means for transmitting comprises means for generating a pseudorandom noise code, means for generating a carrier signal and means for modulating said carrier signal with said pseudorandom noise code."  These descriptions are material to the patentability of at least claims 1, 2, and 17 of the '802 patent.  As a further example, Christy shows using pseudorandom noise codes to generate modulated data which is material to the patentability of at least claim 17 of the '802 patent.  As another example, dependent claim 4 of Christy discloses a "detection means" for "duplicating said pseudorandom noise codes" and a "means for cross correlating said receiver spread spectrum signal with said duplicated pseudorandom noise code."  These descriptions are material to the patentability of at least claims 12, 17, and 21 of the '802 patent.  Additionally, Christy is not cumulative of the references cited during the prosecution of the '802 patent, including at least because the references cited during prosecution do not show the claim limitations as presented by Christy.

33.     Applicants deliberately failed to disclose Christy to the USPTO with an intent to deceive during the prosecution of the '802 patent.  For example, Fattouche and Zaghloul listed the Christy abstract in an Information Disclosure Statement submitted to the USPTO during prosecution of U.S. Patent No. 5,890,068 ("the '068 patent"), which lists Fattouche and Zaghloul as inventors.

34.     Under Wi-LAN's improper assertions of infringement and improper application of the claims, Yokev is material to the patentability of at least claims 1 and 17 of the '802 patent

16

50

and the claims that depend from those claims.  For example, dependent claim 7 of Yokev shows

a carrier generator means for "producing a series frequencies for the frequency-hopped spread

spectrum carrier, selected in response to the repeating pseudo-random code sequence;" claim 7

further shows a "modulation means" for "modulating the information onto the frequency-hopped

spread spectrum carrier for transmission by the transmitter."  Also, claim 24 of Yokev shows that

collisions between signals can be avoided "through the use of an orthogonal set of selected

frequencies and patterns."  These descriptions are material to the patentability of at least claims 1

and 17 of the '802 patent.  Additionally, Yokev is not cumulative of the references cited during

the prosecution of the '802 patent, including at least because the references cited during

prosecution do not show the claim limitations as presented by Yokev.

35.      Applicants deliberately failed to disclose Yokev to the USPTO with an intent to

deceive during the prosecution of the '802 patent.  For example, Yokev was cited in an

Information Disclosure Statement submitted to the USPTO during prosecution of U.S. Patent

No. 5,887,022 ("the '022 patent") which lists Fattouche as an inventor.

36.      Under Wi-LAN's improper assertions of infringement and improper application of

the claims, Carlson is material to the patentability of at least claims 1, 2, and 17 of the '802

patent and the claims that depend from those claims.  For example, Carlson states: "Spread

spectrum communications systems employ special techniques designed to combat strong

interference and/or to prevent message recovery by unauthorized receivers.  As the name

suggests, these techniques spread the transmitted signal spectrum over a frequency range much

greater than the message bandwidth.  The spectral spreading involves an auxiliary pseudo-noise

(PN) process that looks random but can be replicated by authorized receivers."  This section,

which includes the structure at the receiver to demodulate the spread spectrum signal, is material

51

to the patentability of at least claims 1 and 17.  As a further example, Carlson shows using

multiple spread spectrum codes, which is material to the patentability of at least claims 1, 2, and

17 of the '802 patent.  Additionally, Carlson is not cumulative of the references cited during the

prosecution of the '802 patent, including at least because the references cited during prosecution

do not show the claim limitations as presented by Carlson.

37.     Applicants deliberately failed to disclose the Carlson reference to the USPTO

with an intent to deceive during the prosecution of the '802 patent.  For example, Fattouche

published a 1989 paper, "An Adaptive Minimum Redundancy Array for Digital

Communications," in which the Carlson reference was relied upon for its disclosures related to

the bit error probability in a communications system using QPSK signals.

38.     Under Wi-LAN's improper assertions of infringement and improper application of

the claims, Zhu is at least material to the patentability of at least independent claims 1, 17, and

23 of the '802 patent and claims that depend from those claims.  For example, Zhu shows two

methods for increasing frequency utilization in spread spectrum communications.  Zhu shows a

method whereby "different spread sequences" are assigned "to each bit state equal in numbers to

the number of transmission data points involved," and Figure 2 of Zhu and the accompanying

description shows an implementation of a parallel combinatory spread spectrum system,

including a serial to parallel converter for data, a combiner to combine the data prior to

transmission, and a modulator for modulating the data with a carrier.  These descriptions are

material to the patentability of at least claims 1, 17, and 23 of the '802 patent.  As a further

example, Figure 1 and the accompanying description shows the receiving means, including a

demodulator, "reverse spreading using N spread sequences," and a parallel to serial converter to

convert the data into a final output.  This is material to the patentability of at least claim 17 of the

'802 patent.  Additionally, Zhu is not cumulative of the references cited during the prosecution of

the '802 patent, including at least because the references cited during prosecution do not show

the claim limitations as presented by Zhu.

39.      Applicants deliberately failed to disclose Zhu to the USPTO with an intent to

deceive during the prosecution of the '802 patent.

40.      Additionally, during the prosecution of the '268 and '802 patents, Applicants made

knowingly false statements to the USPTO on topics material to the patentability of the '802

patent.  For example, during the prosecution of the '268 patent, Applicants falsely stated that

"[t]his is believed to be the first proposal for the use of spread spectrum for mobile transceivers"

in order to distinguish the application over prior art cited by the examiner.  *See* '268 Prosecution

History, Aug. 28, 1995 Response to Office Action at 16.  This statement was a primary basis on

which Applicants distinguished then claim 41, which issued as claim 23, and at the time this

statement was made, Applicants were aware of numerous prior art references showing the use of

spread spectrum for mobile transceivers.  For example, in 1991, Fattouche and Zaghloul cited the

EIA/TIA "Dual-Mode mobile station-base station compatibility standard" (Jan. 1990) in their

article entitled "Diversity for Indoor Radio Communications," and in 1992, during the

prosecution of the '222 patent, the USPTO provided U.S. Patent No. 5,063,560 to Applicants in

the course of an office action.  Both of these references show mobile spread-spectrum

transceivers.

41.      In addition, during the reissue proceedings, Applicants secured the '802 patent for

an alleged invention not disclosed in the '268 patent by submitting a declaration in which they

falsely and misleadingly claimed error.  *See* '802 prosecution history at Sep. 1998 Inventor

Declaration, ¶¶ 5–8.  For example, Applicants falsely stated that there was error in connection with claim elements concerning the number of data symbols, codes, and chips per code.

42.     Applicants engaged in a pattern and practice of deliberately withholding and misrepresenting material information during prosecution of the '268 and '802 patents with the intent to deceive the USPTO, rendering the '802 patent unenforceable for inequitable conduct. The permeation and extent of this misconduct throughout Applicants' prosecution, as noted above and as noted in connection with the additional patents-in-suit, further confirms that Applicants acted with intent to deceive.

43.     Furthermore, the '802 patent is unenforceable under the doctrine of infectious unenforceability because of Applicants' pattern of inequitable conduct during prosecution of other patents including the '268 patent.  In addition to revealing the intent to deceive at all relevant times, this pattern infects and renders the '802 patent unenforceable.

44.     As a result of the acts described in the foregoing paragraphs, there exists a substantial controversy of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

45.     A judicial declaration is necessary and appropriate so that Motorola may ascertain its rights regarding the '802 patent.

46.     This is an exceptional case under 35 U.S.C. § 285 including without limitation because Wi-LAN filed its Complaint with knowledge of the facts stated in this Counterclaim.

## COUNT FOUR

### Declaratory Judgment of Non-Infringement of U.S. Patent No. 5,282,222

47.     Motorola restates and incorporates by reference its allegations in paragraphs 1 through 46 of its Counterclaims.

54

48.     An actual case or controversy exists between Motorola and Wi-LAN as to whether the '222 patent is not infringed by Motorola.

49.     A judicial declaration is necessary and appropriate so that Motorola may ascertain its rights regarding the '222 patent.

50.     Motorola has not infringed and does not infringe, directly or indirectly, any valid and enforceable claim of the '222 patent.

51.     This is an exceptional case under 35 U.S.C. § 285 including without limitation because Wi-LAN filed its Complaint with knowledge of the facts stated in this Counterclaim.

## COUNT FIVE

### Declaratory Judgment of Invalidity of U.S. Patent No. 5,282,222

52.     Motorola restates and incorporates by reference its allegations in paragraphs 1 through 51 of its Counterclaims.

53.     An actual case or controversy exists between Motorola and Wi-LAN as to whether the '222 patent is invalid.

54.     A judicial declaration is necessary and appropriate so that Motorola may ascertain its rights as to whether the '222 patent is invalid.

55.     The '222 patent is invalid for failure to meet the conditions of patentability and/or otherwise comply with one or more of 35 U.S.C. §§ 100 et seq., 101, 102, 103, 112 and 132.

56.     This is an exceptional case under 35 U.S.C. § 285 including without limitation because Wi-LAN filed its Complaint with knowledge of the facts stated in this Counterclaim.

## COUNT SIX

### Declaratory Judgment of Unenforceability of U.S. Patent No. 5,282,222

55

57.     Motorola restates and incorporates by reference its allegations in paragraphs 1 through 56 of its Counterclaims.

58.     Individuals subject to the duty of candor under 37 C.F.R. § 1.56 ("Applicants"), including listed inventors Fattouche and Zaghloul and counsel, engaged in inequitable conduct by withholding material information with the intent to deceive the USPTO in connection with prosecuting U.S. Patent No. 5,282,222 ("the '222 patent").

59.     Prior to the issuance of the '222 patent, Fattouche and Zaghloul became aware of prior art that is material to the patentability of the '222 patent, including at least John A. C. Bingham, "Multicarrier Modulation for Data Transmission: An Idea Whose Time Has Come," IEEE Communications (May 1990) ("Bingham"); John G. Proakis, Digital Communications (2d ed. McGraw-Hill 1989) ("Proakis"); and Bruce Carlson, Communication Systems: An Introduction to Signals and Noise in Electrical Communication (3d ed. McGraw-Hill 1986) ("Carlson").

60.     Under Wi-LAN's improper assertions of infringement and improper application of the claims, the Bingham article is material to the patentability of at least independent claims 1 and 7 of the '222 patent and claims that depend from those claims.  For example, in the section Multiplexing, Bingham shows a frequency division multiplexer for multiplexing information, where the information is spaced across any usable frequency band.  This is material to the patentability of at least claim 1 of the '222 patent.  As another example, in the section Modulation and Demodulation, Bingham specifies that the sub-bands are orthogonal, and describes processing the received information at the receiver.  These descriptions are material to the patentability of at least independent claim 7 of the '222 patent.  As a further example, the Bingham article also shows "Adaptive Loading," which requires the receiver to "measure the

sub-band SNRs, calculate the best power and bit assignments, and send this information back to

the transmitter."  This is material to the patentability of at least dependent claims 3 and 5.

Another example is found in the section "Correcting for the Effects of Channel Impairments," in

which Bingham describes linearly equalizing the received signal, and calculating the channel

characteristics.  This is material to the patentability of at least claims 1 and 7 of the '222 patent.

Additionally, Bingham is not cumulative of the references cited during the prosecution of the

'222 patent, including at least because the references cited during prosecution do not show the

claim limitations as presented by Bingham.

61.    Applicants deliberately failed to disclose the Bingham article to the USPTO with

an intent to deceive during prosecution of the '222 patent.  For example, Fattouche and Zaghloul

were aware of the Bingham article and confirmed their belief in the materiality of the Bingham

article by providing it to the USPTO during prosecution of the '802 patent.

62.    Under Wi-LAN's improper assertions of infringement and improper application of

the claims, the Proakis reference is material to the patentability of at least independent claim 1 of

the '222 patent and claims that depend from that claim.  For example, Figure 8.1.1 and the

accompanying description show the basic elements of a spread spectrum digital communications

system.  The figure shows a channel encoder and a channel decoder which are material to the

patentability of at least claim 1.  As a further example, Proakis shows the following receiver

elements: a bandpass filter for filtering the received signal and a local oscillator which are

material to the patentability of at least claim 1.  As another example, the communications system

in Proakis describes using a sampler for "sampling the output of the correlator," as shown in

Figure 8.2.2.  This is material to the patentability of at least claim 1.  A further example is shown

in section 4.5.1, which describes methods that can be used for estimating the phase difference of

the received signal.  Figure 4.5.1 illustrates one method of carrier recovery using a square-law device.  This illustration and the accompanying description are material to the patentability of at least claim 1.  Additionally, Proakis is not cumulative of the references cited during the prosecution of the '222 patent, including at least because the references cited during prosecution do not show the claim limitations as presented by Proakis.

63.     Applicants deliberately failed to disclose the Proakis reference to the USPTO with an intent to deceive during the prosecution of the '222 patent.  For example, Fattouche published a 1991 paper, "A Spread Spectrum Radiolocation Technique and Its Application to Cellular Radio," in which Proakis was relied upon for its disclosures related to the receiver structure in a communications system.  Then, in a paper published by inventors Fattouche and Zaghloul in 1992 during prosecution of the '222 patent, the inventors recognized that Proakis was relevant to modeling of the indoor radio propagation channel.  Applicants further confirmed the materiality of Proakis by referencing it in the '268 patent specification concerning commonly used spread spectrum techniques.

64.     Under Wi-LAN's improper assertions of infringement and improper application of the claims, Carlson is material to the patentability of at least claims 1 and 2 of the '222 patent. For example, in section 2.2, Carlson shows using Fourier transforms as a means to represent signals in either frequency-domain or time-domain representation.  This is material to the patentability of at least independent claim 1, and dependent claim 2 of the '222 patent.  As a further example, Carlson shows, in section 12.4, digital multiplexing, whereby two or more digital signals are interleaved.  This is material to the patentability of at least claim 1. Additionally, Carlson is not cumulative of the references cited during the prosecution of the '222

58

patent, including at least because the references cited during prosecution do not show the claim limitations as presented by Carlson.

65.     Applicants deliberately failed to disclose the Carlson reference to the USPTO with an intent to deceive during the prosecution of the '222 patent.  For example, Fattouche published a 1989 paper, "An Adaptive Minimum Redundancy Array for Digital Communications," in which the Carlson reference was relied upon for its disclosures related to the bit error probability in a communications system using QPSK signals.

66.     Accordingly, Applicants engaged in a pattern and practice of deliberately withholding and misrepresenting material information during prosecution with an intent to deceive the USPTO, rendering the '222 patent unenforceable for inequitable conduct.  The permeation and extent of this misconduct throughout Applicants' prosecution as noted above and as noted in connection with the additional patents-in-suit further confirms that Applicants acted with intent to deceive.

67.     Furthermore, the '222 patent is unenforceable under the doctrine of infectious unenforceability because of Applicants' pattern of inequitable conduct during prosecution of other patents to the extent alleged by Wi-LAN to be related to the '222 patent.  In addition to revealing the intent to deceive at all relevant times, this pattern infects and renders the '222 patent unenforceable.

68.     As a result of the acts described in the foregoing paragraphs, there exists a substantial controversy of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

69.     A judicial declaration is necessary and appropriate so that Motorola may ascertain its rights regarding the '222 patent.

59

70.     This is an exceptional case under 35 U.S.C. § 285 including without limitation because Wi-LAN filed its Complaint with knowledge of the facts stated in this Counterclaim.

**COUNT SEVEN**

**Fraud**

71.     Motorola incorporates and realleges paragraphs 1 through 70 above as if set forth fully herein.

**A.     The IEEE's Rules And Policies Regarding Standards**

72.     In this action, Wi-LAN has alleged that certain products having wireless capability compliant with the IEEE 802.11 standards infringe the '222 and '802 patents.

73.     The IEEE is a professional association and leading developer of technical standards.  IEEE members include engineers, scientists and allied professionals whose technical interests relate to electrical and computer sciences, engineering and related disciplines.  Members may participate in the standards-setting process in working groups and/or subgroups called task groups.

74.     To protect against unscrupulous conduct by any member who seeks to benefit unfairly from, or to manipulate to its advantage, the IEEE's standard-setting process, and to enable the IEEE and its members to develop standards free from potentially blocking patents, the IEEE instituted policies and rules regarding the disclosure and licensing of patents.

75.     At all relevant times alleged herein, the IEEE's rules and policies required fairness and candor with respect to intellectual property.  By way of example only, the IEEE required its members to submit letters of assurance including either a general disclaimer to the effect that the patentee will not enforce any of its present or future patents whose use would be required to implement the proposed IEEE standard against any person or entity using the patents to comply with the standard or a statement that a license will be made available to all applicants without

26

compensation or under reasonable rates, with reasonable terms and conditions that are

demonstrably free of any unfair discrimination.  For example, the IEEE's Standards Board

Bylaws state that "IEEE standards may include the known use of patent(s), including patent

applications, if there is technical justification in the opinion of the standards-developing

committee and provided the IEEE receives assurance from the patent holder that it will license

applicants under reasonable terms and conditions for the purpose of implementing the standard."

Additionally, the IEEE's Standards Board Bylaws further state that the assurance "shall be a

letter that is in the form of either a) A general disclaimer to the effect that the patentee will not

enforce any of its present or future patent(s) whose use would be required to implement the

proposed IEEE standard against any person or entity using the patent(s) to comply with the

standard or b) A statement that a license will be made available to all applicants without

compensation or under reasonable rates, with reasonable terms and conditions that are

demonstrably free of any unfair discrimination."

76.     The IEEE formed the 802.11 working group in 1990.  The IEEE 802.11 standard

is entitled "Wireless LAN Media Access Control (MAC) and Physical Layer (PHY)

Specifications" and concerns wireless local area networking ("wireless LAN").

77.     In 1997, the IEEE formed two task groups: the 802.11a and 802.11b.  The

802.11a task group was concerned with a standard for wireless LAN in the 5 GHz frequency

band.  The 802.11b task group was concerned with a standard for wireless LAN in the 2.4 GHz

frequency band.

78.     Members of the IEEE participating in the standards setting process for 802.11a

and 802.11b included Wi-LAN.  As a result of its membership in the IEEE, Wi-LAN agreed,

both explicitly and implicitly, that it would abide by the rules and policies of the IEEE.

61

**B.  Wi-LAN's Bad Faith Misrepresentations And Omissions**

79.     Wi-LAN intentionally and knowingly made material misrepresentations and/or omissions in connection with standards-setting organizations, including as alleged below.

80.     On July 6-11, 1998, the 802.11 working group met in La Jolla, California in connection with the standards-setting process.

81.     Wi-LAN's president and CEO, Hatim Zaghloul, and Vice President of Engineering, Steven Knudsen, attended the July 1998 802.11 meeting in La Jolla.

82.     Numerous proposals had been submitted to the 802.11b task group for consideration prior to the July 1998 meeting in La Jolla, including proposals from Alantro Communications ("Alantro"), Micrilor Inc. ("Micrilor"), Raytheon, KDD, Golden Bridge Technology, Harris Semiconductor ("Harris"), and Lucent Technologies ("Lucent").

83.     On the first day of the 802.11 meeting, July 6, 1998, Harris and Lucent submitted a joint proposal (the "Harris/Lucent Proposal") to the 802.11b task group.

84.     On July 7, 1998, Alantro, Micrilor, Harris and Lucent presented their proposals to members of the 802.11b task group.

85.     On July 7, 1998, Wi-LAN submitted a letter to the chairman of the 802.11 working group offering to license its patents on fair, reasonable and non-discriminatory terms and conditions with respect to 802.11b.

86.     On July 9, 1998, the 802.11b task group voted in favor of pursuing the Harris/Lucent Proposal, and decided not to pursue other proposals.  For example, the 802.11b task group also considered proposals submitted by Alantro and Micrilor.  The task group could have decided not to pursue any of the pending proposals.

87.     After the 802.11b task group voted to pursue the Harris/Lucent Proposal, it then recommended the Harris/Lucent Proposal to the 802.11 working group as the base for the

62

802.11b standard.  The 802.11 working group accepted the 802.11b task group's

recommendation.

88.      The IEEE 802.11 working group met again in September 1998 in Westford,

Massachusetts.

89.      On September 10, 1998, four days before the September 1998 802.11 meeting ,

Wi-LAN filed an application to reissue U.S. Patent No. 5,555,268 (the "'268 patent").  This

patent application (hereinafter, the "Reissue Application") later issued as the '802 patent.  In

prosecuting the Reissue Application, Wi-LAN submitted claims which Wi-LAN alleges are

infringed by certain products having wireless capability compliant with the IEEE 802.11

standards.

90.      On September 14, 1998, after filing the Reissue Application, Wi-LAN submitted

a letter to the chairman of the 802.11 working group stating that Wi-LAN believed that the then-

pending Reissue Application was not necessary to the practice of 802.11b.  Wi-LAN's letter

states that "Wi-LAN Inc. hereby withdraws its previous IP statement dated July 9, 1998 to the

extent that it implied that Wi-LAN existing US patent on multicode technology, US patent #

5,555,268, or another pending patent are necessary for the implementation of devices

incorporating the IEEE802.11b draft standard."

91.      The IEEE 802.11 working group met again in November 1998 in Albuquerque,

New Mexico.  Wi-LAN's president and CEO, Mr. Zaghloul, and Vice President of Engineering,

Mr. Knudsen, attended the November 1998 meeting in Albuquerque, New Mexico.  In particular,

Mr. Zaghloul attended a meeting of the 802.11b task group at the November 1998 Albuquerque

802.11 meeting.  With Mr. Zaghloul in attendance at that meeting, the 802.11b task group

addressed Wi-LAN's September 14, 1998 letter.  At the meeting, Wi-LAN continued to represent

63

that it believed that the Reissue Application was not necessary to the practice of 802.11b. The meeting minutes for the 802.11b task group state "270 - r1 WLAN IP statement (They no longer feel that they have any IP related to standard)." Based on Wi-LAN's assertions, the 802.11b task group confirmed that it "no longer feel[s] that WiLAN IP position applies to the proposed 802.11b standard."

92.     At all relevant times, Wi-LAN intentionally and in bad faith failed to inform the IEEE that Wi-LAN had filed the Reissue Application or of its contents, or that Wi-LAN intended to assert its patents in bad faith against the 802.11b standard, without offering licenses on fair, reasonable, and non-discriminatory terms.

93.     Wi-LAN, Fattouche, and/or Zaghloul made numerous other misrepresentations and/or omissions regarding Wi-LAN's patents with intent to deceive. For example, in or around the same time period that Wi-LAN was contemplating or pursuing the reissue application that eventually issued as the '802 patent, Wi-LAN, Fattouche, and/or Zaghloul were aware that the patents-in-suit were invalid, were unenforceable, and/or did not apply to the accused products. For instance, Wi-LAN obtained information confirming the invalidity of the claims applied for in connection with the reissue application/'802 patent. Wi-LAN was also aware of facts revealing numerous acts of inequitable conduct, rendering the claims unenforceable, as alleged above, and continued to engage in inequitable conduct during prosecution of the reissue application/'802 patent. See Paragraphs 18–46 and 57–70. Despite this knowledge, Wi-LAN intentionally and in bad faith made misrepresentations and/or omissions concerning the validity and enforceability of the patents. As another example, Wi-LAN was aware of limitations on its ability to obtain monetary recoveries and injunctive relief with respect to its patents, but continued to seek licenses on unreasonable and discriminatory terms. For instance, Wi-LAN was aware of facts

64

revealing that products allegedly embodying the inventions of the patents-in-suit were sold by Wi-LAN without being properly marked.  Wi-LAN also sought unreasonable and discriminatory licenses with intentional disregard of promises Wi-LAN and/or Wi-LAN's predecessors-in-interest made to standards-setting organizations and their members, including to Intel, and notwithstanding its knowledge of the facts alleged herein.

### C.  Wi-LAN's Letters Of Assurance Regarding 802.11a And 802.11g

94.     On July 7, 1998, Wi-LAN submitted a letter to the chair of the IEEE 802.11 working group referencing the "Standards Recommendation Relating to Technology Being Proposed by Lucent Technologies and NTT for Inclusion in the IEEE P802.11a (OFDM) Standards Project" in the subject line and confirming that it was "prepared to license its existing patents directed to and necessary for the practice of the referenced OFDM Technology, if Lucent and NTT's proposal is adopted by the IEEE, on fair, reasonable and non-discriminatory terms and conditions."  The 802.11 working group adopted the referenced proposal.

95.     On November 9, 1998, Wi-LAN submitted a letter of assurance referencing the "Standards Recommendation Relating to the IEEE P802.11a (OFDM) Draft Standards" in the subject line and confirming that it was "prepared to license its existing and future patents directed to and necessary for the practice of the referenced OFDM Technology, if the IEEE802.11a Draft Standard is adopted by the IEEE, on fair, reasonable and non-discriminatory terms and conditions."  The 802.11 working group adopted the referenced standard.

96.     On November 29, 2000, Wi-LAN submitted a letter of assurance referencing the "Standards Recommendation Relating to the IEEE P802.11b Task Group G (OFDM) Draft Standards" in the subject line and confirming that it was "prepared to license its existing and future patents directed to and necessary for the practice of the referenced OFDM Technology, if

31

the IEEE802.11b Task Group G Draft Standard is adopted by the IEEE, on fair, reasonable and non-discriminatory terms and conditions."

97.    Wi-LAN, intentionally and in bad faith, failed to offer licenses on fair, reasonable and non-discriminatory terms, and instead is pursuing excessive royalties and injunctive relief in litigation, in intentional disregard of promises Wi-LAN made to standards setting organizations and their members, including Motorola, notwithstanding Wi-LAN's knowledge of the facts alleged herein.

98.    Wi-LAN intentionally and knowingly made material misrepresentations and/or omissions to the IEEE, its members, others relying on 802.11 including Defendants in this action, and the public, including, as alleged herein, misrepresentations and/or omissions regarding its alleged patents and/or patent applications.  Wi-LAN had a duty to disclose facts regarding its alleged intellectual property, including as a result of its representations to the IEEE and other representations, as alleged herein.

99.    Wi-LAN's misrepresentations and/or omissions were knowingly false and made in bad faith with the intent to induce reliance.

100.    The IEEE and its members, including Motorola, reasonably relied on the foregoing misrepresentations and/or omissions in adopting the 802.11 standards.  Motorola further relied on the foregoing misrepresentations and/or omissions, and/or the 802.11 standards, in investing substantial resources developing and marketing products accused of alleged infringement in this action.

101.    The foregoing actions and conduct by Wi-LAN have damaged and continue to damage Motorola.  Wi-LAN's conduct was malicious and willful, and Motorola is entitled to punitive damages.

66

## COUNT EIGHT

### Constructive Fraud

102.    Motorola incorporates and realleges paragraphs 1 through 101 above as if set forth fully herein.

103.    Wi-LAN intentionally and knowingly made material misrepresentations and/or omissions to the IEEE, including, as alleged herein, misrepresentations and/or omissions regarding its alleged patents and/or patent applications.  Wi-LAN had a duty to disclose facts regarding its alleged intellectual property, including as a result of its representations to the IEEE, as alleged herein.

104.    Wi-LAN's misrepresentations and/or omissions were knowingly false and made in bad faith with the intent to induce reliance.

105.    The IEEE and its members, including Motorola, reasonably relied on the foregoing misrepresentations and/or omissions in adopting 802.11 standards.  Motorola further relied on the foregoing misrepresentations and/or omissions, and/or the 802.11 standards, in investing substantial resources developing and marketing products accused of alleged infringement in this action.

106.    The foregoing actions and conduct by Wi-LAN have damaged and continue to damage Motorola.  Wi-LAN's conduct was malicious and willful, and Motorola is entitled to punitive damages.

### COUNT NINE

### Negligent Misrepresentation

107.    Motorola incorporates and realleges paragraphs 1 through 106 above as if set forth fully herein.

33

67

108.     Wi-LAN made material misrepresentations and/or omissions without reasonable belief as to their truth, including, as alleged herein, misrepresentations and/or omissions regarding its alleged patents and/or patent applications.  Wi-LAN had a duty to disclose facts regarding its alleged intellectual property, including as a result of its representations to the IEEE, as alleged herein.

109.     Wi-LAN's misrepresentations and/or omissions were false and made with the intent to induce reliance.

110.     The IEEE and its members, including Motorola, reasonably relied on the foregoing misrepresentations and/or omissions in adopting 802.11 standards.  Motorola further relied on the foregoing misrepresentations and/or omissions, and/or the 802.11 standards, in investing substantial resources developing and marketing products accused of alleged infringement in this action.

111.     The foregoing actions and conduct by Wi-LAN have damaged and continue to damage Motorola.

## COUNT TEN

### Promissory Estoppel

112.     Motorola incorporates and realleges paragraphs 1 through 111 above as if set forth fully herein.

113.     Wi-LAN made representations and engaged in other conduct, including Wi-LAN's representations that it did not have intellectual property necessary to practice 802.11b, and that it would license its existing and future patents relating to 802.11 on fair, reasonable and non-discriminatory terms and conditions.

114.    Wi-LAN's representations and other conduct constituted promises to the IEEE and its members, including Motorola.  By making those promises, Wi-LAN knew or reasonably should have known that they would be relied upon.

115.    The IEEE and its members, including Motorola, reasonably relied on the foregoing promises in adopting 802.11 standards.  Motorola further reasonably relied on the foregoing promises, and/or the 802.11 standards, in investing substantial resources developing and marketing products accused of alleged infringement in this action.

116.    Motorola has been damaged as a result of its reasonable reliance as alleged herein, in developing and marketing products that have been accused by Wi-LAN of alleged infringement.  Injustice can be avoided only by enforcement of Wi-LAN's promises.

## COUNT ELEVEN

### Breach of Contract

117.    Motorola incorporates and realleges paragraphs 1 through 116 above as if set forth fully herein.

118.    For consideration, including IEEE membership and participation, Wi-LAN entered into an express and/or implied contract with the IEEE's members, or alternatively, with the IEEE to which IEEE members and others are third-party beneficiaries, in which Wi-LAN agreed, among other things, to abide by the IEEE's policies and rules.  The IEEE rules and policies, whether formal or informal, including all stipulations, requirements and representations in any form, constitute a contract between Wi-LAN and the IEEE's members, or alternatively between Wi-LAN and the IEEE, to which IEEE members and others are third-party beneficiaries.

69

119. In accordance with the foregoing, the IEEE's rules and policies require its members to submit letters of assurance including either a general disclaimer to the effect that the patentee will not enforce any of its present or future patents whose use would be required to implement the proposed IEEE standard against any person or entity using the patents to comply with the standard or a statements that a license will be made available to all applicants without compensation or under reasonable rates, with reasonable terms and conditions that are demonstrably free of any unfair discrimination.

120. Furthermore, Wi-LAN's representations and other conduct, including the letters of assurance offering licenses on fair, reasonable and non-discriminatory terms, created express and/or implied contracts with the IEEE and its members, or alternatively between Wi-LAN and the IEEE, to which IEEE members and others are third-party beneficiaries.

121. Wi-LAN breached its contractual obligations, including by failing to offer licenses for the '802 and '222 patents on fair, reasonable and non-discriminatory terms, by seeking to enjoin Motorola from making and selling 802.11 compliant products, and through misrepresentations and/or omissions regarding its patents and/or patent applications.

122. Motorola has incurred damages, and will be further damaged in the future due to Wi-LAN's breach of its contractual obligations.

## COUNT TWELVE

### Unclean Hands

123. Motorola restates and realleges paragraphs 1 through 122 above as if set forth fully herein.

124. Wi-LAN has engaged in conduct comprising unclean hands rendering the patents unenforceable in this action. Wi-LAN has engaged in a pattern and practice of improper activity

70

to acquire, license, and assert the patents-in-suit in bad faith, including by making false and objectively baseless claims of patent infringement either without a reasonable investigation or basis in fact or law, and with knowledge that the patents-in-suit are invalid, unenforceable, and/or not infringed by the accused standards and products.  Defendants, including Motorola, manufacture and sell products accused in this action, and Wi-LAN's assertions have thus caused Defendants, including Motorola, to incur substantial damages as a result of Wi-LAN's bad faith conduct.

125.    For example, Wi-LAN committed fraud in connection with standards-setting organizations and engaged in other bad faith actions.  In particular, Wi-LAN and/or Wi-LAN's predecessors in interest intentionally and knowingly made material misrepresentations and/or omissions relating to the patents-in-suit in connection with standards-setting organizations, including to the IEEE 802.11 working group.  Wi-LAN's pattern of bad faith also includes seeking licenses on unreasonable and discriminatory terms in intentional disregard of promises Wi-LAN and/or Wi-LAN's predecessors-in-interest to the patents-in-suit made to standards-setting organization and their members, including Motorola.  *See, e.g.*, Paragraphs 112–122.

126.    Similarly, prior to and during the time that Wi-LAN was asserting the patents-in-suit against Defendants, including Motorola, Wi-LAN had knowledge that the patents-in-suit are invalid and unenforceable.  For example, Wi-LAN obtained information confirming the invalidity of the claims applied for in connection with the '802 patent.  Wi-LAN is also aware of facts revealing numerous acts of inequitable conduct, rendering the patents-in-suit unenforceable, as alleged above.  See Paragraphs 18–46 and 57–70.  Nevertheless, Wi-LAN asserted the patents-in-suit against products relating to the accused standards in bad faith.

71

127.    Wi-LAN has also asserted bad faith claims for injunctive relief and monetary recoveries for Defendants', including Motorola's, alleged infringement of the patents-in-suit.  For example, despite having exited the products business to become a patent licensing company and having knowledge that it is not entitled to an injunction, Wi-LAN has engaged in an effort to publicize sham research and development activities unrelated to the accused standards.  As another example, Wi-LAN is claiming damages for sales occurring before any legally-proper notice was provided under 35 U.S.C. § 287, despite Wi-LAN's knowledge of the absence of such notice, including because of Wi-LAN's awareness of facts revealing that products allegedly embodying the inventions of the patents-in-suit were sold by Wi-LAN or its predecessors-in-interest without being properly marked.  Wi-LAN also deliberately destroyed, otherwise disposed of, or failed to prevent the destruction of highly relevant and discoverable evidence at a time when Wi-LAN was asserting the patents-in-suit against Defendants, including Motorola, and third parties.

128.    Wi-LAN's pattern of asserting patents known to be invalid, unenforceable, and/or not infringed, including the patents-in-suit, has facilitated Wi-LAN's acquisition of additional patents which Wi-LAN then, in turn, has improperly asserted against others.

129.    Additionally, Wi-LAN has been accused of bad faith conduct in connection with ownership of the patents in suit.  *See Telus Corp. v. Wi-LAN Inc.*, Action No. 0901-06070 (Queen's Bench of Alberta, filed Apr. 23, 2009).  For example, according to Telus Corporation ("Telus"), Telus has ownership rights in patents allegedly assigned to Wi-LAN, including the '268 and '802 patents.  According to Telus, Wi-LAN wrongfully attempted to transfer ownership of patents from Telus to Wi-LAN.

130.   In accordance with the doctrine of unclean hands, Wi-LAN's acts, practices, and misconduct described above have damaged Motorola and bar Wi-LAN's enforcement of the patents-in-suit against Motorola

131.   As a result of the acts described in the foregoing paragraphs, there exists a substantial controversy of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

132.   A judicial declaration is necessary and appropriate so that Motorola may ascertain its rights regarding the patents-in-suit.

## COUNT THIRTEEN

### Unfair Business Practices Under Cal. Bus. & Prof. Code § 17200

133.   Motorola restates and realleges paragraphs 1 through 132 above as if set forth fully herein.

134.   Unfair business practices under Cal. Bus. & Prof. Code § 17200 *et seq.* includes any unfair, unlawful, or fraudulent business act or practice.  The conduct described above in paragraphs 18–46, 57–70, and 71–132 above comprises unfair business practices under Section 17200 *et seq.*

135.   Misconduct and injuries pertaining to the above-referenced conduct have occurred within California, either of which gives rise to a § 17200 claim.  With respect to injury in California, Defendants, including Motorola, conduct business related to the accused standards and products in California, and sell accused products to customers located in California.

136.   In addition to injuries in California, various acts of misconduct alleged in the preceding counts occurred in California, including relevant meetings of standards-setting

73

organizations and Wi-LAN's bad faith assertion of the patents-in-suit against Defendants,
including Motorola.

137.    Defendants, including Motorola, are entitled to remedies, including attorneys fees,
and disgorgement of Wi-LAN's ill-gotten gains, including investments, licensing royalties, or
any recoveries obtained through the inappropriate conduct set forth in paragraphs 18–46, 57–70,
and 71–132 above.

## COUNT FOURTEEN

### Waiver, Equitable Estoppel, and Estoppel

138.    Motorola incorporates and realleges paragraphs 1 through 137 above as if set
forth fully herein.

139.    Motorola has denied that the claims of the '222 and '802 patents are enforceable
and has asserted that such patent claims are unenforceable, in whole or in part, pursuant to the
doctrines of express or implied waiver, equitable estoppel, and estoppels, including in
accordance with the facts alleged above and incorporated by reference herein.

140.    As a result, Motorola is entitled to judgment from this Court finding that the
claims of the '222 and '802 patents are unenforceable.

## PRAYER FOR RELIEF

WHEREFORE, Motorola prays for judgment as follows:

a.      A judgment dismissing Wi-LAN's complaint against Motorola with prejudice;

b.      A judgment in favor of Motorola on all of its Counterclaims;

c.      A declaration that Motorola has not infringed, contributed to the infringement of,
        or induced others to infringe, either directly or indirectly, any valid claims of the
        '222 and '802 patents;

d.    A declaration that the '222 and '802 patents are invalid;

e.    A declaration that the '222 and '802 patents are unenforceable;

f.    An injunction against Wi-LAN and its affiliates, subsidiaries, assigns, employees, agents or anyone acting in privity or concert with Wi-LAN from charging infringement or instituting any legal action for infringement of the '222 and '802 patents against Defendants or anyone acting in privity with Defendants;

g.    An award to Motorola for the amount of damages as proven at trial, including punitive damages and restitution;

h.    A declaration that this case is exceptional and an award to Motorola of its reasonable costs and expenses of litigation, including attorneys' fees and expert witness fees;

i.    A judgment limiting or barring Wi-LAN's ability to enforce the '222 and '802 patents in equity;

j.    A judgment requiring Wi-LAN's specific performance under its contract with IEEE and/or IEEE members to grant licenses to Motorola on fair, reasonable, and non-discriminatory terms and conditions;

k.    An award to Motorola of, and a declaration that Motorola has, a royalty-free license for the '222 and '802 patents;

l.    Such other and further relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

In accordance with Rule 38 of the Federal Rules of Civil Procedure and Local Rule CV-38, Motorola respectfully demands a jury trial of all issues triable to a jury in this action.

75

41

Dated:  April 16, 2010                          Respectfully submitted,


                                                By: _____ /s/ Michael E. Jones _____
                                                    Michael E. Jones
                                                    SBN: 10929400
                                                    Allen F. Gardner
                                                    SBN: 24043679
                                                    POTTER MINTON
                                                    A Professional Corporation
                                                    110 N. College, Suite 500 (75702)
                                                    P.O. Box 359
                                                    Tyler, Texas 75710
                                                    (903) 597-8311
                                                    (903) 593-0846 (Facsimile)
                                                    mikejones@potterminton.com
                                                    allengardner@potterminton.com

                                                **Attorneys for Defendant Motorola, Inc.**

76

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that counsel of record who are deemed to have

consented to electronic service are being served with a copy of this **DEFENDANT**

**MOTOROLA INC.'S FIRST AMENDED ANSWER, AFFIRMATIVE DEFENSES, AND**

**COUNTERCLAIMS TO WI-LAN'S THIRD AMENDED COMPLAINT**, via the Court's

CM/ECF system per Local Rule CV-5(a)(3) .

Dated:  April 16, 2010

By: _____ */s/ Michael E. Jones* _____
        Michael E. Jones