# EXHIBIT 11

Charles K. Verhoeven (State Bar No. 170151)
    *charlesverhoeven@quinnemanuel.com*
David Bilsker (State Bar No. 152383)
    *davidbilsker@quinnemanuel.com*
Quinn Emanuel Urquhart & Sullivan LLP
50 California Street, 22nd Floor
San Francisco, CA 94111
(415) 875-6600 Phone
(415) 875-6700 Fax

Edward J. DeFranco (State Bar No. 165596)
    *eddefranco@quinnemanuel.com*
Quinn Emanuel Urquhart & Sullivan LLP
51 Madison Avenue, 22nd Floor
New York, NY 10010
(212) 849-7000 Phone

David A. Nelson (*pro hac vice* forthcoming)
    *davenelson@quinnemanuel.com*
Quinn Emanuel Urquhart & Sullivan LLP
500 West Madison St., Suite 2450
Chicago, IL 60661
(312) 463-2965 Phone

E-filing

Attorneys for Counterclaimant
MOTOROLA MOBILITY, INC.

PSG

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA
### SAN JOSE DIVISION

CV 11 3136

| | |
|---|---|
| MOTOROLA MOBILITY, INC. | |
| Counterclaimant, | Case No: |
| v. | |
| MICROSOFT CORPORATION | **NOTICE OF REMOVAL** |
| Counterclaim Defendant. | |

02426.51745/4177139.2

1          PLEASE TAKE NOTICE that Counterclaimant Motorola Mobility, Inc. ("Motorola")

2   hereby gives Notice of Removal of their Counterclaims filed in the below-described proceeding

3   currently pending in the United States International Trade Commission ("ITC"), pursuant to 19

4   U.S.C. § 1337(c) and 28 U.S.C. §§ 1332(a), 1391 and 1446(f).

5          As grounds for removal, Motorola states as follows:

6          1.      Motorola is a respondent in an investigation pursuant to Section 337 of the Tariff

7   Act of 1930, 19 U.S.C. § 1337, pending in the ITC, entitled *In the Matter of Certain Mobile*

8   *Devices, Associated Software, and Components Thereof*, Investigation No. 337-TA-744.

9          2.      On June 22, 2011, Motorola filed Counterclaims against the complainant in the ITC

10  proceeding, Microsoft Corporation ("Microsoft"), pursuant to 19 U.S.C. § 1337(c) and 19 C.F.R.

11  § 201.14(e). A copy of Motorola's Counterclaims are attached hereto as Exhibit A.

12         3.      Pursuant to 19 C.F.R. § 201.14(e), an ITC respondent who files a counterclaim in

13  the ITC "shall immediately file a notice of removal with a United States district court in which

14  venue for any of the counterclaims raised by the respondent would exist under 28 U.S.C. 1391."

15         4.      Venue is proper in this District for at least the following reasons: (1) Motorola's

16  claims arise out of the subject matter of agreements entered into by Microsoft with the SDA,

17  which contain a forum selection clause requiring that all suits arising out of the agreements be

18  finally settled by the federal or state courts located in the County of Santa Clara in this District;

19  (2) Microsoft maintains a regular and established place of business, has agents, and/or transacts

20  business in this District, and has committed and continues to commit unlawful acts in this District;

21  (3) venue is proper under 28 U.S.C. §§ 1391(b) and (c), and sections 4, 12, and 16 of the Clayton

22  Antitrust Act, 15 U.S.C. §§ 15, 22, 26; and (4) Microsoft's deceptive, unfair, and unlawful

23  conduct with respect to its participation in the standard-setting process has had harmful and

24  anticompetitive effects in this District.

25         5.      This Court would also have had original jurisdiction over Motorola's counterclaim

26  pursuant to 19 U.S.C. § 1337(c) and 28 U.S.C. § 1332(a), as Motorola and Microsoft are citizens

27  of different states and the amount in controversy exceeds the sum or value of $75,000.00,

28  exclusive of interest and costs.

6.     This Notice of Removal is timely because it was filed the same day as the filing of the Counterclaims in the ITC, and the Counterclaims were filed more than ten days before the commencing of the evidentiary hearing in the ITC investigation.

7.     Pursuant to Civil L.R. 3-16, a Certification of Interested Entities or Persons is also being filed herewith.

WHEREFORE, this action should proceed in the United States District Court for the Northern District of California, as an action properly removed thereto.

Dated: June 22, 2011

Respectfully submitted,

QUINN EMANUEL URQUHART & SULLIVAN LLP

By: _____

*Attorneys for Counterclaimant*
*MOTOROLA MOBILITY, INC.*

# EXHIBIT A

CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER

### UNITED STATES INTERNATIONAL TRADE COMMISSION
### WASHINGTON, D.C.

**Before The Honorable Theodore R. Essex**
**Administrative Law Judge**

| | |
|---|---|
| In the Matter of<br><br>CERTAIN MOBILE DEVICES,<br>ASSOCIATED SOFTWARE, AND<br>COMPONENTS THEREOF<br><br>MOTOROLA MOBILITY, INC.<br><br>        Respondent/<br>        Counterclaimant,<br><br>   v.<br><br>MICROSOFT CORPORATION<br><br>        Complainant/<br>        Counterclaim Defendant | Investigation No. 337-TA-744 |

## COUNTERCLAIMS

Pursuant to 19 U.S.C. § 1337(c) and 19 C.F.R. § 210.14(e) of the U.S. International Trade Commission's Rules of Practice and Procedure, Respondent/Counterclaimant Motorola Mobility, Inc., hereby asserts these Counterclaims against Complainant/Counterclaim Defendant Microsoft Corporation ("Microsoft") and in support thereof allege as follows:

## THE PARTIES

1.     Respondent/Counterclaimant Motorola Mobility, Inc. ("Motorola") is a Delaware corporation having its principal place of business at 600 North U.S. Highway 45, Libertyville, Illinois, 60048.

2.     Motorola (and its predecessors) have an extensive history of technical innovation in the telecommunications and related industries.  Motorola's products include Android

CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER

smartphones and tablets, various versions of which have been sold to consumers since 2009.
The Android operating system has exploded in popularity over the years, and is now the most
widely-distributed smartphone operating system in the United States.

3.     Microsoft is a corporation organized under the laws of the State of Washington
and has its principal place of business at One Microsoft Way, Redmond, WA 98052.  Microsoft
has offices around the United States and the world, and operates several business units.
Microsoft typically licenses its intellectual property rights through its "Microsoft Intellectual
Property Licensing group," a division of Microsoft responsible for licensing the patents at issue
and other forms of intellectual property.

## JURISDICTION AND VENUE

4.     The filing of these Counterclaims in the U.S. International Trade Commission is
authorized by 19 U.S.C. § 1337(c) and 19 C.F.R. § 210.14(e), with the condition that the
respondent/counterclaimant "shall immediately file a notice of removal with a United States
district court in which venue for any of the counterclaims raised by the respondent would exist
under 28 U.S.C. 1391."

5.     Concurrently with this filing, Motorola is filing a notice of removal of these
Counterclaims with the United States District Court for the Northern District of California.

6.     The United States District Court for the Northern District of California has subject
matter jurisdiction over these Counterclaims pursuant to 19 U.S.C. § 1337(c) and 28 U.S.C.
§ 1332(a) because Motorola and Microsoft are citizens of different states and the amount in
controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs; section 4 of
the Sherman Act, 15 U.S.C. § 4; and sections 4 and 16 of the Clayton Antitrust Act, 15 U.S.C.
§§ 15, 26.

7.     The United States District Court for the Northern District of California also has

2

CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER

pendent and supplemental jurisdiction over the state law claims asserted in these Counterclaims under 28 U.S.C. §1367 because the state and federal claims arise from a common nucleus of operative facts.

8.     The United States District Court for the Northern District of California has personal jurisdiction over Microsoft under Cal. Civ. Proc. § 410.10 (2011), which permits exercise of jurisdiction on any basis not inconsistent with the Constitution of the state of California or of the United States.  The Northern District of California has personal jurisdiction over Microsoft for at least the following reasons:  (1) Microsoft has designated an agent for service of process in the State of California; (2) Motorola's claims arise out of the subject matter of agreements entered into by Microsoft with a standards setting organization ("SSO"), the SD Card Association ("SDA"), that contain a forum selection clause requiring that all suits arising out of the agreements be finally settled by the federal or state courts located in the County of Santa Clara in this District; (3) Microsoft regularly does business or solicits business, engages in other persistent courses of conduct, and/or derives substantial revenue from products and/or services provided to individuals in this District and in this State; (4) Microsoft has initiated litigation in this judicial District; and (5) Microsoft's continued course of deceptive and anticompetitive conduct while participating in the SDA has affected and is affecting interstate and foreign commerce, including commerce in the Northern District of California.

9.     Venue is proper in the United States District Court for the Northern District of California for at least the following reasons:  (1) Motorola's claims arise out of the subject matter of agreements entered into by Microsoft with the SDA, which contain a forum selection clause requiring that all suits arising out of the agreements be finally settled by the federal or state courts located in the County of Santa Clara in this District; (2) Microsoft maintains a regular and

3

CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER

established place of business, has agents, and/or transacts business in this District, and has

committed and continues to commit unlawful acts in this District; (3) venue is proper under 28

U.S.C. § 1391(b) and (c), and sections 4, 12, and 16 of the Clayton Antitrust Act, 15 U.S.C.

§§ 15, 22, 26; and (4) Microsoft's deceptive, unfair, and unlawful conduct with respect to its

participation in the standard-setting process has had harmful and anticompetitive effects in this

District.

## GENERAL ALLEGATIONS

10.    Motorola asserts these Counterclaims against Microsoft for breaching its

commitments to an SSO and its members, and for engaging in a pattern of deliberate, deceptive,

and anticompetitive conduct, which allowed it to exert improper influence over standard-setting

processes for telecommunication technology standards and to acquire unlawful monopoly power

in several markets.  Microsoft manipulated the standard-setting process to ensure standards were

adopted into the relevant technology standards that would allow it to claim that it owns

intellectual property rights (patents) that are essential to practicing certain industry standards

("Essential Patent Claims").  Microsoft knew it would acquire monopoly power if these

technologies were adopted into the relevant standards and that it could misuse even the assertion

of monopoly power to make license demands far in excess of what could be demanded without

inclusion in adopted standards.  These demands run counter to the commitments Microsoft made

to the SDA during the standard-setting process, and representations it made to the public, that it

would grant licenses to any such allegedly Essential Patent Claims on reasonable, and non-

discriminatory ("RAND") terms.  Microsoft is now seeking to exercise that illicitly-obtained

power by asserting infringement of its patents based on the standards.

11.    In particular, Motorola asserts these counterclaims for Microsoft's breach of a

Host/Ancillary Product License Agreement ("HALA") entered into by Microsoft with the SDA.

4

CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER

Under this HALA, Microsoft is required to license on RAND terms certain patents relating to implementation of standards proposed by Microsoft and adopted by the SDA for SD Cards in host devices such as smartphones. These patents include U.S. Patent Nos. 5,579,517 ("the '517 Patent") and 5,758,352 ("the '352 Patent") (collectively, the "patents at issue"). Microsoft has asserted that these patents are "essential" to a computer file format standard, proposed by Microsoft and adopted by the SDA, known as File Format Specification Versions 2.00 and 3.00.

12.     Motorola also asserts these counterclaims for Microsoft's breach of its commitments to the SDA arising out of its membership in the SDA. These commitments include the commitment to license on RAND terms patents that Microsoft has disclosed as essential to practice any change to the SDA Specifications proposed by Microsoft and adopted by the SDA. These patents include the patents at issue.

13.     Motorola also asserts these counterclaims for Microsoft's breach of its repeated promises made over several years under its IP Licensing Program to license a portfolio of patents including the '517 Patent and '352 Patent, at $0.25 per unit with a $250,000 cap.

14.     Microsoft now seeks to exclude from the United States certain of Motorola's products that allegedly practice the very technologies that Microsoft — despite its explicit agreements — has refused to license on RAND terms. Motorola brings these Counterclaims to remedy Microsoft's unlawful monopolization, patent misuse, violation of its RAND commitments, and other wrongful acts. Microsoft has abused the standard-setting process crucial to bringing pro-competitive benefits to innovators, telecommunications equipment and network suppliers, and consumers alike. Microsoft has breached its contractual RAND commitments by refusing to offer Motorola a license to the '517 and '352 patents and then suing Motorola for infringement of these patents. Motorola seeks to end Microsoft's misconduct and

5

CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER

prevent further harm to Motorola, the mobile wireless communications industry, and consumers.

15.     As explained in more detail below, Motorola and consumers have been injured by Microsoft's conduct.

## BACKGROUND

16.     Motorola has been a pioneer in the communications industry for over 80 years. In 1983, Motorola introduced the world's first commercial portable cellular phone. Motorola's longstanding commitment to research and development has produced numerous innovations that have been embodied in patents granted by the United States Patent Office ("USPTO").

17.     Microsoft and Motorola historically had a productive business relationship. For example, the parties have entered into at least a hundred technology licensing agreements. But beginning around 2009, the relationship between Microsoft and Motorola began to change. Microsoft's mobile operating system platform, Windows Mobile, was slow to innovate, began to lose promise in the eyes of customers, and was widely perceived to have been surpassed in functionality and ease of use by other mobile operating systems. A number of operating systems also emerged, such as Linux, competing with Microsoft for the first time on both feature and price at the desktop, laptop, and server level.

18.     One of these new mobile operating systems was Google, Inc.'s Android system. Motorola released its first Android mobile handset on November 6, 2009.

19.     Hoping to revitalize the Windows Mobile platform, Microsoft announced the Windows Phone 7 on February 15, 2010 at the Mobile World Congress 2010 in Barcelona, Spain. Motorola was not announced as one of the hardware makers set to develop Windows Phone 7 handsets.

20.     Meanwhile, Motorola's Android products, which were receiving wide critical acclaim, helped legitimize the Android platform as a viable alternative to mobile operating

CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER

systems such as Blackberry, Symbian, iOS, and Windows Mobile.

21.     According to the comScore MobiLens survey, Microsoft's share of total U.S. smartphone subscribers aged 13 and over fell from 19.7% to 15.7% between October 2009 and January 2010, and to 9.7% by October 2010.  During this same period, the share for Google's Android operating system on smartphones increased from 2.8% to 7.1% and then to 23.5%. Upon information and belief, since its release in the fall of 2010, Windows Phone 7 has not resulted in an increase in Microsoft's share of total U.S. smart phone subscribers.  In a more recent report, comScore indicates that from October 2010 to January 2011, Microsoft's share of the U.S. smartphone market fell an additional 1.7 percent from 9.7% to 8.0%.

22.     On October 1, 2010, Microsoft requested that the U.S. International Trade Commission ("ITC") institute an investigation to determine, in part, whether certain Motorola products infringe the patents at issue.  On November 5, 2010, the ITC granted Microsoft's request and instituted Investigation No. 337-TA-744 (the "744 Investigation").

23.     Also on October 1, 2010, Microsoft Corporation filed a Complaint for patent infringement against Motorola Mobility, Inc., among others, in the Federal District Court for the Western District of Washington, Case No. 10-CV-01577 (the "Washington Action").  As in the 744 Investigation, Microsoft alleged in the Washington Action that various Motorola products infringe the patents at issue.  The Washington Action and the 744 Investigation are collectively referred to as the "Patent Actions."

24.     To date, Microsoft has refused to provide an offer on any terms, let alone RAND terms, to Motorola for the technology purportedly covered by the patents at issue that Microsoft claims is implemented by the Motorola products accused of infringing these patents.

25.     The Motorola products accused of infringing the patents at issue in the Patent

CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER

Actions involve flash memory cards, known as SD Cards. The Motorola smartphones at issue "host" these cards. The technology required to manufacture and host SD Cards is the subject of industry standards developed and promulgated by the SDA.

26.      On information and belief, Microsoft has been a member of the SDA since at least April 2003 and is currently an Executive Member of the SDA. Before the institution of the 744 Investigation, Microsoft participated in developing industry standards with the SDA.

### STANDARD SETTING ORGANIZATIONS AND THE SD CARD ASSOCIATION

27.      To facilitate interoperability among electronic devices including desktops, laptops, smartphones, cameras, and electronic books, companies such as Microsoft and Motorola participate in standard development organizations ("SSOs") that develop and establish technical standards for the industry.

28.      With respect to certain aspects of technological devices, interoperability standards are necessary in order to ensure proper functionality, particularly across products. To achieve that, different technologies must interface seamlessly. This means that regardless of which manufacturer makes the device, each device must be capable of interacting with other devices.

29.      For example, standards-compliant SD cards can be used to transfer pictures from standards-compliant digital cameras to standards-compliant desktops or laptops. File storage standards allow consumers the flexibility and convenience of storing and sharing digital content anytime, anywhere, while simultaneously avoiding incompatibility between file formats.

30.      Standards thus play a critical role in the development of data storage technologies. Standards facilitate the adoption and advancement of technology as well as the development of products that can operate with one another. Companies that produce products compatible with a standard or specification can design products by referencing only the standard or specification's documentation, without the need to communicate separately with every other company with

CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER

which their products may need to operate. Companies producing products that implement and are tested to a standard facilitate interoperability among different products, and consumers of those products can be confident that products from multiple vendors will work together as intended under the standard.

31.     As a practical matter, the technologies that are used to allow a consumer electronics device to store and transfer digital content must be described in standards adopted by a recognized SSO, and thereby accepted by key industry members, in order to be commercially successful. That adoption process is critical to the SSO's consideration of standards proposals. If the implementation of a standard requires the use of particular IP, such as a patent, the IP owner may have the ability to prevent, delay or distort the development of technology implementing that standard and thereby undermine the purpose of the SSO.

32.     Patents that must be used to implement a particular standard are known as "essential patents" for the standards to which they relate.

33.     Because implementation of a standard can require practicing patent rights that cover various aspects of the standard, SSOs often grant licenses to or require members to agree to license these "essential patent claims" to other entities seeking to implement the standard on RAND terms. SSOs have adopted practices that address disclosure and licensing of essential patent claims that cover various aspects of the standard and will be implicated by implementation of the standard. These practices include cross-licensing agreements, establishment of intellectual property policies setting out licensing obligations for owners of patents covering essential patent claims, disclosure requirements for essential patent claims, and procedures for proposing and adopting changes to the standard.

34.     Standard setting organizations such as the SDA require RAND commitments to

9

CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER

ensure the competitive dynamic that exists prior to the adoption of the standard is preserved once the standard is adopted. The adoption of the standard by the SSOs and later the industry eliminates competitive alternatives to technologies that are essential to the standard.

35.    In January 2000, Panasonic, SanDisk Corporation ("SanDisk"), and Toshiba Corporation ("Toshiba") established the SDA as a new SSO to develop and implement standards for memory card storage. These standards are currently used by over 400 brands and about 8000 models of products including digital cameras, televisions, personal navigation devices, mobile phones, smart phones, automobiles, computers, and video cameras.

36.    The SDA has promulgated standards for SD Cards and has adopted various changes to the standards over time. The SDA permits SDA members to contribute technology for incorporation into the SDA standards, if those contributions are made pursuant to certain requirements, including the requirement to license any patents that the member declares cover the contributed technology on RAND terms.

37.    The SDA also provides members with the opportunity to license technology owned by the SDA and by SD-3C, LLC ("SD-3C"), a limited liability company also established by Panasonic, SanDisk, and Toshiba. The SDA offers a license agreement, known as a Host/Ancillary Product License Agreement ("HALA"), for SDA members that seek to host SD Cards, and both the SDA and the SD-3C offer license agreements for entities that seek to manufacture SD Cards.

38.    Motorola has been an SDA Member since at least 2001. During its membership in the SDA, Motorola has been an active participant in the standard setting process, including: (1) attending subgroup meetings; (2) attending the Board's quarterly meetings; (3) voting as a Member; (4) voting as a Board Member; (5) participating in technical discussing during the

CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER

standard-setting process; and (5) communicating with other SDA members, including Microsoft.

## MICROSOFT'S COMMITMENTS TO
## THE SDA AS A HALA LICENSEE AND SDA MEMBER

39.     To protect against unscrupulous conduct by any entity that seeks to benefit

unfairly from, or to manipulate to its advantage, the SDA's standard-setting process, and to

enable the SDA and its members to develop standards free from potentially blocking patents, the

SDA has developed  policies and rules regarding the disclosure and licensing of patents

implicated by proposed or adopted SDA specifications.  At all relevant times alleged herein, the

SDA rules and policies required fairness and candor with respect to intellectual property and

required that SDA members who contribute technology for adoption into SDA standards must

agree to license on RAND terms any patents covering the contributed technology, if it is

incorporated into final SDA specifications.  These policies and rules are set out, among other

places, in the SDA Intellectual Property Policy ("IP Policy").

40.     In 2003, Microsoft entered into a HALA with the SDA, which gave Microsoft

certain license rights under technology owned by the SDA and SD-3C ("the Microsoft HALA").

The Microsoft HALA specifically incorporates by reference the SDA IP Policy and binds

Microsoft to its terms:

> Licensee agrees to abide by the terms and conditions of the SD Association
> Intellectual Property Policy, set forth as Schedule E and hereby incorporated by
> reference, and the term 'Member' shall be read to include Licensee where
> applicable, and the term 'participate in the SDA' shall be read to include entering
> into this Agreement.

(Microsoft HALA, Section 10.3.)

41.     In turn, Schedule E of the Microsoft HALA states:

> This Intellectual Property Policy ("IP Policy") is set forth to state clearly the
> expectation of the SD Card Association, hereafter referred to as the SDA, with
> regard to any individual member company's ("Member") intellectual property.
> The SDA is committed to an open standard, and strives to establish high quality

11

CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER

specifications that can be implemented in a compliant manner by any interested party. Therefore, the SDA will only include a Member's proprietary technology in the SDA's specifications if the owner of that technology agrees to reasonable and non-discriminatory licensing terms as set forth below.

Schedule E, Section 1, Policy. Schedule E further states:

each Member must be prepared to license in a non-discriminatory fashion, and on reasonable terms, to all other Members and non-member licensees (collectively, "Licensees") of the SDA-adopted specifications and any successive parts or versions thereof (collectively, the "Specifications"), such Member's patent claims, existing and pending, which are required to implement the released and published Specifications ("Essential Patent Claims") . . . . In keeping with the SDA's commitment to an open standard, each Member agrees that any changes for incorporation into the Specifications submitted by such Member will not be included into the Specifications if such Member is unwilling to license, under the terms discussed above, to all other Licensees, any Essential Patent Claims owned by such Member which cover such changes, or if such changes would incorporate Essential Patent Claims owned by third parties which are unwilling to license, under the terms discussed above, to all other Licensees.

Schedule E, Section 2, Patents.

42.     Section 5 of Schedule E, which governs disclosure of proprietary technology included in any proposal for inclusion in a Specification, states that "any party submitting a proposal for inclusion in a Specification is expected to disclose, at the time of submittal, all known proprietary technology included in the proposal." Section 5(ii) provides that a Member contributing proprietary technology for adoption as part of a specification has committed to provide a written statement to the SDA setting out the Member's agreement "to license in a non-discriminatory fashion for use in such implementation, upon reasonable terms and conditions as provided in Section 2, above, with or without charge, to all Licensees once the Specification is adopted by the SDA."

43.     Section 5 of Schedule E further provides that if the Member does not submit such a statement within 60 days after the recommendation is published (the "Notice Period"), "the Member will be deemed to have agreed to grant non-discriminatory licenses upon reasonable

12

CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER

terms in accordance with the provisions of Section 2 above, with or without charge."

44.     The Microsoft HALA includes, in Section 15.5, a choice of law provision, stating

that the agreement shall be governed and construed according to the laws of the state of

California, and, in Section 15.6, a forum selection clause, providing that all disputes will be

finally settled by the federal or state courts in the county of Santa Clara, California.

45.     The SDA IP Policy is also incorporated by reference into the SDA's mandatory

Amended and Restated Bylaws. Section 2.2 of the Bylaws ("Conditions of Executive

Membership") requires Executive Members to "[a]gree to adhere to the Association's Bylaws, its

policies and regulations as adopted from time to time (including, without limitation, its Antitrust

Policy, its Intellectual Property Policy, and any rules and procedures promulgated by its

Technical or other Committees)." Similarly, Section 2.4 of the Bylaws ("Conditions of General

Membership") requires General Members to "[a]gree to adhere to the Association's Bylaws, its

policies and regulations as adopted from time to time (including, without limitation, its Antitrust

Policy, its Intellectual Property Policy, and any rules and procedures promulgated by its

Technical or other Committees)."

46.     Section 2 of the current IP Policy requires all Members to license on RAND terms

to other Members and non-member licensees ("Licensees") patent claims that are required to

implement the specifications formally adopted by the SDA as part of the standard. This

obligation also extends to Members that participate in a Technical Committee or other working

group. Section 2 further states that technical submissions by Members will not be incorporated

into the specification unless such Member agrees to license any essential patents on RAND

terms.

47.     When a Member such as Microsoft makes a Contribution of technology for

13

CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER

incorporation into a proposed specification (as defined by the IP Policy), such "Member making a Contribution . . . to a Specification shall disclose, at the time of submittal, all known proprietary intellectual property rights included in the Contribution and shall provide to the SDA a completed License Assurance / Disclosure Form either (i) at the time such Contribution is made in written form, or (ii) within twenty (20) days after an oral Contribution is memorialized in written documentation. . . ."

48.     Furthermore, the SDA includes a Technical Committee that is involved with considering and developing the relevant standards to be published. Members that participate in the Technical Committee can play an influential role in shaping the technical aspects of standards published by the SDA. Section 5 of the current IP Policy provides that an SDA member that participates in the Technical Committee "shall as a condition of participation agree to license in a non-discriminatory fashion, and on reasonable terms, to all other Licensees, such Participant's Essential Patent Claims."

49.     Under Section 6 of the current IP Policy, once a formal recommendation is published, Licensees are obligated to provide within sixty days an updated list of patents that were essential to the standard. Thus, even if a Licensee had already submitted a License Assurance/Disclosure Form, each Member was obligated to update its disclosure once a formal written recommendation is published: "When a formal written recommendation is published . . . each [Licensee] will be required to disclose to the SDA's Technical Committee all of its Essential Patent Claims that to its knowledge are required to implement the Proposed Specifications recommended by the Technical Committee, such notice to be given within sixty (60) days from the date such disclosure shall provide to the SDA a completed License Assurance / Disclosure Forum within the Notice Period." For the avoidance of doubt, the IP Policy states that if a

14

CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER

Licensee fails to "submit a License Assurance / Disclosure Form before the end of the Notice Period, the Licensee will be deemed to have agreed to grant non-discriminatory licenses upon reasonable terms in accordance with the provisions of this Section 5(ii) above, with or without charge."

50.     Further, "[u]pon becoming a Licensee, a Licensee shall be deemed to have agreed to license in a non-discriminatory fashion, and on reasonable terms, to all other Licensees, such Licensee's Essential Patent Claims in any Specifications adopted prior to becoming a Licensee and . . . any Specification adopted while a Licensee until such Licensee withdraws from membership and/or terminates its license." Upon information and belief, Microsoft was at all relevant times a licensee.

51.     Finally, the current IP Policy contains a mandatory forum selection clause stating: "The IP Policy will be governed by the laws of the State of California, USA and the federal and state courts located in California shall have exclusive jurisdiction regarding any matters under this IP Policy."

## MICROSOFT'S CONTRIBUTION OF TECHNOLOGY TO THE SDA

52.     Microsoft affirmatively sought to have the SDA incorporate its technology into SDA standards for the industry. In particular, in 2005, Microsoft made a "Contribution" to the SDA of technology it had developed relating to file systems and directory entries. In particular, the contribution related to the File Allocation Table ("FAT32") file system for storing and organizing a collection of data in a computer system. Such a file system may employ a directory structure and store data in the directory structure. In such a structure, data are stored among directly entries, with a directory entry comprising a space in a directory structure where data are stored. Microsoft's contribution of technology to the SDA included technology that provides support for long file names ("LFN" technology) in the directory, and backwards-compatibility of

15

CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER

these long file names with older operating systems.

53.     This "Contribution" represents an effort by Microsoft to persuade the SDA to

incorporate its technology into the industry standards, rather than specific alternative

technologies that were available that could have achieved the same result.  In return for

incorporation of its technology into the SDA standards, Microsoft was required, *inter alia*, under

the terms of the SDA IP Policy, to disclose patents that it alleged covered its Contribution, and to

agree to license those patents on RAND terms.

54.     Microsoft's contribution of the "FAT32" technology, including the "LFN"

technology, was set out in an August 31, 2005 letter to the SDA.  The letter was addressed to Mr.

Paul Reinhardt, then the Executive Director of the SDA, and carbon copied James Vickery, Esq.,

and the SDA Board of Directors.  The letter was sent via overnight mail to "SD Card

Association, c/o Global Inventures, Inc., 2400 Camino Ramon, Suite 375, San Ramon, CA

94583."

55.     In the letter, Microsoft defined its "Contribution" as consisting of three parts:  (1)

a FAT32 File System specification ("the Microsoft FAT32 Specification"); (2) a Long File Name

Support specification ("the Microsoft LFN Specification"); and (3) a compliance specification,

explaining how to test a device for compliance with the Microsoft FAT32 Specification ("the

Microsoft Compliance Test Specification") (defined collectively as the "Microsoft

Contribution").

56.     Microsoft stated that:

Microsoft desires to provide to the SD Card Association ("SDA") the Microsoft
Contribution for use in developing and publishing SDA file system specifications
and/or SDA test specification ("SDA Specification") that may incorporate the
Microsoft Contribution and/or portions thereof . . . In the event that SDA elects to
incorporate any portion of the Microsoft Contribution as an optional portion of an
SDA Specification, Microsoft agrees to provide the RAND license assurance set

16

CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER

forth below for those patents which are required to implement such optional
portions.

(Microsoft August 31, 2005 to the SDA.)

57.     The letter further included a section entitled "Essential Patent Claims Disclosure,"
in which Microsoft disclosed "Patents that have essential patent claims with respect to the
Microsoft Contribution." The '517 and '352 patents were among the patents Microsoft listed as
having essential patent claims.

58.     The letter also included a section entitled, "License Assurance." In this section,
Microsoft stated:

> [p]ursuant to Section 5(ii) of the SDA Intellectual Property Policy, Microsoft
> commits to the SDA that Microsoft will license its Essential Patent Claims in a
> non-discriminatory fashion and under reasonable terms and conditions to all SDA
> Member and non-SDA-Member licensees, solely to the extent required for such
> entities to implement finally-adopted SDA Specifications. Microsoft will grant
> such licenses to SDA Members and non-SDA-Members pursuant to separate
> agreements. . . . As stated above, Microsoft is willing to make licenses available
> for products implementing the Microsoft LFN Specification on a RAND, royalty-
> bearing basis. To the extent Microsoft has patent claims essential to
> implementing the Microsoft FAT 32 Specification, Microsoft will offer licenses
> to such patent claims on a RAND, royalty-free basis for products conforming to
> the specification.

59.     Microsoft therefore submitted: (1) a technical contribution for incorporation into
an SDA Specification; (2) an Essential Patent Claims Disclosure "as required by, and defined in
the SDA Intellectual Property Policy"; and (3) a License Assurance "pursuant to Section 5(ii) of
the SDA Intellectual Property Policy," stating that it would provide licenses on RAND terms to
patents it deemed essential to its technical contribution, specifically, licenses to patents covering
its proposed LFN Specification on a royalty-bearing basis and licenses to patents covering its
proposed FAT32 Specification on a royalty-free basis. These patents included the patents at
issue.

60.     In the letter, Microsoft also committed that "[a]t or before such time as SDA

17

CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER

adopts an SDA Specification incorporating some or all [sic] the Microsoft Contribution,

Microsoft will provide an updated Essential Patent disclosure relating to any finally-adopted

SDA Specifications." The SDA IP Policy explicitly required:

> each Member will be required to disclose to the SDA's Technical Committee all
> of its Essential Patent Claims that to the best of its knowledge are required to
> implement the Specifications recommended by the Technical Committee, such
> notice to be given within sixty (60) days from the date such recommendation is
> published ("Notice Period").

(Microsoft HALA, Schedule E, Section 5.) The IP Policy further provided that "[i]f a Member

does not provide such a statement before the end of the Notice Period, the Member will be

deemed to have agreed to grant non-discriminatory licenses upon reasonable terms in accordance

with the provisions of Section 2 above, with or without charge." (*Id.*)

61.     Upon information and belief, Microsoft never provided such an updated

disclosure.

62.     Microsoft's proposed specifications were submitted to the SDA as enclosures to

its August 31, 2005 letter. These proposed specifications were adopted by the SDA and

incorporated into Version 2.00 of the Part 2 File System specifications published on May 9,

2006, and Version 3.00 published on April 16, 2009. In particular, the Microsoft LFN

Specification was incorporated into Appendix C.3 of the SD Specifications Part 2 File System

Specification Version 2.00 and Version 3.00.

## MICROSOFT'S COMMITMENTS UNDER ITS IP LICENSING PROGRAM

63.     Independent of Microsoft's contractual obligations as defined by the Microsoft

HALA, Microsoft has demonstrated a pattern of misleading behavior going back to as early as

December 3, 2003, and continuing to this day.

64.     On December 3, 2003, Microsoft, via a press release, announced an "expanded

intellectual property (IP) policy to provide the IT industry with increased access to Microsoft's

CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER

growing IP portfolio." As a part of this Microsoft IP Policy, Microsoft agreed to license its FAT technology "under fair and reasonable terms." Microsoft claimed that, by "licensing documentation, sample code and patents to this technology," other companies could "take advantage of enhanced file transfer compatibility and build effective, compatible implementations of the FAT file system in their offerings."

65.     On information and belief, Microsoft's FAT System Technology License, in effect from December 3, 2003 until today, licenses a portfolio of patents including the patents at issue at "$0.25 per unit with a cap on total royalties of $250,000 per licensee." (December 3, 2003 Microsoft Press Release, entitled, "FAT File System Technology and Patent License.") On information and belief, this license was offered for at least "portable digital still cameras; portable digital video cameras; portable digital still/video cameras; portable digital audio players; portable digital video players; portable digital audio/video players; multifunction printers; electronic photo frames; electronic musical instruments; and standard televisions." (*Id.*)

66.     On information and belief, as recently as March 12, 2009, David Kaefer, Microsoft's General manager of Intellectual Property Licensing, stated that its "public pricing approach [to its FAT licensing program] is unchanged."

### MOTOROLA'S RELIANCE ON COMMITMENTS
### TO THE SDA TO WITH RESPECT TO SD CARD TECHNOLOGY

67.     The SDA and its members would not have incorporated Microsoft's technologies into the standards had they known that Microsoft would not honor its RAND commitments.

68.     Microsoft represented that (1) the '517 and '352 patents were essential to practicing certain industry standards; and (2) Microsoft would offer licenses to these patents on RAND terms. The SDA and its members, including Motorola, were aware of and relied on Microsoft's RAND commitments when they adopted specific technologies into technical

CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER

interoperability standards.  Companies that made substantial investments developing products designed to be compatible with the standards, including Motorola, relied on Microsoft's explicit and implicit commitments to license its purportedly Essential Patent Claims, including the '517 and '352 patents, on RAND terms.  However, Microsoft has refused to offer Motorola a license to the '517 and '352 patents on any terms, let alone RAND terms.

69.     Given the specific nature of the technologies at issue, there were alternative technologies that the SDA could have incorporated into the relevant standards instead of Microsoft's technology, had the SDA known that Microsoft would not honor its RAND commitments.

70.     On information and belief, once Microsoft declared that it held patents it believed were essential to its contribution of technology to the SDA, absent a licensing commitment from Microsoft to the effect that it would offer licenses to these purportedly "essential" patents on RAND terms and conditions, the SDA Technical Committee would have either revised the standards by incorporating alternative technologies, stopped working on the protocol, or taken other actions.  One of the factors that the SDA Technical Committee considered in agreeing to and establishing the technical content of File System Specification Versions 2.00 and 3.00 was the quantity, nature, scope, and ownership of patents disclosed by SDA members that purportedly covered the standards.

71.     Microsoft has asserted to the SDA and to the public that products implementing its contribution of technology to the SDA require a license to the patents at issue.  Microsoft's refusal to honor its commitments to the SDA and the public to license its purportedly essential patents on RAND terms and conditions and in accordance with the other terms of the SDA IP Policy has injured and continues to injure Motorola, the industry and competition, including by

20

CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER

interfering with the ability of companies to practice the SDA standard and with Motorola's ability to develop and market File System Specification Versions 2.00 and 3.00-, LFN Specification-, or FAT32-compliant smartphones, tablets, and other devices.

72.    In reliance on the integrity of the SDA's standards-setting process and the commitments made by Microsoft and other SDA members to license, on RAND terms, patents "essential" to implementing adopted SDA specifications, Motorola's Android devices implement the SDA FAT and LFN specifications. Motorola made its decision to provide FAT File System functionality in its Android devices under the assumption that it could avoid patent litigation and obtain licenses on RAND terms to any such "essential patents."

### MICROSOFT HAS BREACHED ITS COMMITMENTS TO OFFER LICENSES TO THE PATENTS AT ISSUE ON RAND TERMS, RESULTING IN AN ANTICOMPETITIVE HOLDUP

73.    Microsoft, intentionally and in bad faith has failed to make any offer to license the patents at issue to Motorola and is pursuing injunctive relief in litigation, in intentional disregard of promises Microsoft made to the SDA and its members, including Motorola. On information and belief, Microsoft's behavior against Motorola has been demonstrably discriminatory.

74.    Microsoft broke its promise to the SDA, its Members, and third parties by refusing to provide Motorola a license on RAND terms to the '517 and '352 patents according to its obligations under the Microsoft HALA, Microsoft's August 31, 2005 commitment, its obligations under the Clauses 2 and 5 of the SDA IP Policy, and its public representations regarding the Microsoft IP licensing policy. Instead of contacting Motorola to offer and subsequently negotiate a RAND license, Microsoft is pursuing the Patent Actions. Motorola has suffered material and irreparable harm as a result of Microsoft's pursuit of these infringement actions.

75.    Microsoft also broke its repeated promises under its IP licensing program to

21

CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER

license its '517 and '352 Patents on specified terms by refusing to offer Motorola any license to the patents at issue, let alone a license on RAND terms.

76.    Despite repeated requests from Motorola's counsel that Microsoft provide a RAND offer to Motorola to license the patents at issue pursuant to Microsoft's commitments to do so, Microsoft has declined to provide any such offer. As recently as May 26, 2011, shortly after Microsoft belatedly produced the Microsoft HALA to Motorola, Motorola's counsel again wrote to Microsoft's counsel, this time setting out Motorola's position that the Microsoft HALA constituted an incontrovertible contractual obligation by Microsoft to license the patents at issue on RAND terms. Motorola again received no written response from Microsoft. Microsoft refused to provide an offer to Motorola to license the patents at issue on RAND terms.

77.    Having declared the '517 and '352 patents essential to its FAT32 and LFN Specifications, and promising to provide licenses under pre-specified terms and to pre-specified devices implementing these specifications, Microsoft should have reasonably expected Motorola to rely on these promises. Motorola, in fact, has relied on these promises severely to its detriment.

78.    Microsoft has pursued this strategy of selectively asserting the patents at issue, purportedly essential to the LFN Specification and File System Specification Versions 2.00 and 3.00, against those who implement these specifications in Linux operating systems variants—first against TomTom (in *Microsoft Corp. v. TomTom, N.V., et al.*, Civil Action No. 09-247 (W.D. Wash. Feb. 25, 2009)), and now against Motorola—in furtherance of using its market power in file format standards to prevent the success of relatively new entrants such as Linux and Android. When Microsoft recently sued Barnes & Noble ("B&N") alleging patent infringement by B&N's Android devices, B&N counterclaimed for patent misuse, alleging, *inter alia*, that

22

CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER

Microsoft had stated in pre-suit discussions that the FAT patents, among others, allowed

Microsoft to dominate and control the Android operating system. *Microsoft Corp. v. Barnes &*

*Noble, Inc. et al.*, Civil Action No. 11-485 (W.D. Wash. April 25, 2011 (D.I. 12 at ¶ 39).)

Microsoft has also brought these cases in the wrong fora—in the Western District of Washington

and the International Trade Commission, rather than a state or federal court in California.

79.    By failing to comply with its commitments to offer RAND licenses to

implementers of File System Specification Versions 2.00 and 3.00, FAT32 Specification

(royalty-free), and LFN Specification, Microsoft seeks to raise the costs of its rival, Motorola, in

violation of Microsoft's repeated promises to the SDA, SDA members, and the public under its

IP licensing program.  This discriminatory and anti-competitive conduct is demonstrated by a

well-known statement by Microsoft CEO Steve Ballmer in an interview with the Wall Street

Journal just two days after filing the Patent Actions, when he stated "It's not like Android's free."

This discriminatory behavior has harmed and will continue to harm Motorola.

## THE RELEVANT TECHNOLOGY MARKETS

80.    Microsoft claims that the patents at issue are "essential" to the File System

Specification Versions 2.00 and 3.00 FAT32 Specification and LFN Specification.

81.    As described above, SSOs and their members evaluate alternative competing

technologies, or even the need for a standard, before selecting particular technologies for

adoption into the relevant standards.  Once an SSO adopts a specific technology as essential to

practicing the standard, otherwise interchangeable or substitute technologies are no longer viable

alternatives.  Companies cannot market or sell standards compliant products without access to

the standard essential technologies.  Among the technologies selected for the standards at issue

here are those for which Microsoft claims the patents at issue are essential.

82.    The relevant markets in which to assess the anticompetitive effects of Microsoft's

CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER

conduct, therefore, are the various markets for technologies that — before the standards were

implemented — were alternatives to performing each of the various functions covered by

Microsoft's purported Essential Patents for the FAT32 and LFN specifications (collectively, the

relevant "Wireless Technology Markets"). These functions relate to file systems and directory

entries. A file system is a means of storing and organizing a collection of data in a computer

system. A file system might employ a directory structure and store data in the directory

structure. In such a structure, the data would be stored among directory entries, with a directory

entry comprising a space in a directory where data are stored. In particular, the '517 and '352

patents relate to the use of longer file names in directories and backwards-compatibility of these

longer file names with older operating systems. These functions, and the alternative

technologies available for performing them, accordingly comprise discrete relevant antitrust

markets. Prior to standardization, the sellers in these Wireless Technology Markets were the

companies producing technologies capable of performing each of the functions incorporated in

the standard, and the buyers were device manufacturers that either acquired these technology

inputs or developed them themselves.

83.     The technologies described above are employed throughout the world.

Accordingly, the geographic scope of each of the relevant Wireless Technology Markets

described above is worldwide.

84.     Once the relevant mobile and wireless communications standards at issue were

adopted, and technology providers developed products in compliance with those standards,

Microsoft's alleged essential patents provide Microsoft with a monopoly in each of the Wireless

Technology Markets. Consequently, Microsoft possesses and has obtained market power in each

of the relevant Wireless Technology Markets through its affirmative contribution of its

CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER

technology to the SDA. The SDA would not have considered Microsoft's contributed

technology for incorporation into an industry standard, let alone have incorporated it, without

Microsoft's commitment to license the patents it declared covered the contributed technology on

RAND terms.

85.     By virtue of its dominant position and market power (obtained via its deceptive

breach of RAND commitments), Microsoft can demand higher than competitive prices and other

terms and conditions for access to technologies it claims to own. As a result, Motorola and other

technology providers were placed in a severe competitive disadvantage in the production and

sale of standard-compliant products. Microsoft's conduct further harms consumers, who are left

with fewer choices, higher prices, and lower-quality products. Microsoft obtained its monopoly

power in each of the relevant Wireless Technology Markets not by any superior product,

business acumen or historic accident but making false and deceptive RAND commitments.

86.     High barriers to entry protect Microsoft's market power and monopoly position in

each of the relevant Wireless Technology Markets. These barriers to entry were created when

Microsoft's contributed technology was incorporated into the SDA specifications. Because

implementation of a standard requires using specified technologies to comply with the standard,

each specified technology is effectively "locked in" as the only method of providing functionality

to that standard. Providing devices compatible with the SDA standard, moreover, is

commercially important, given the widespread use of SD Cards. Consequently, entry is not

possible to unseat Microsoft's dominant position in the relevant Wireless Technology Markets.

## ANTICOMPETITIVE EFFECTS OF MICROSOFT'S CONDUCT
## HAVE INJURED MOTOROLA, COMPETITION, AND CONSUMERS

87.     The foregoing conduct by Microsoft has caused, will continue to cause, and

threatens to cause substantial harm to Motorola, competition, and consumers in each of the

CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER

relevant Wireless Technology Markets.

88. By making false RAND commitments to the SDA, Microsoft has unlawfully monopolized and foreclosed competition in each of the relevant Wireless Technology Markets. Now that worldwide standards have been established, competing alternative technologies to the functions necessary to practice these standards no longer are viable. Further, Microsoft's conduct significantly threatens to further increase the costs associated with the manufacture and sale of standards compliant downstream products. Microsoft's conduct injures competition and consumers who face fewer choices, higher prices and lower- quality products.

89. The above-described harm to Motorola, competition, and consumers will continue unless and until the Court issues appropriate relief as requested below.

## COUNT I
## BREACH OF CONTRACT TO WHICH MOTOROLA
## IS A THIRD-PARTY BENEFICIARY – THE MICROSOFT HALA

90. Motorola incorporates herein by reference the allegations set forth in paragraphs 1-89, above.

91. As set forth above, by entering into the Microsoft HALA with the SDA, Microsoft committed to license the patents at issue on RAND terms.

92. The Microsoft HALA, and in particular, the SDA IP Policy incorporated by reference in its entirety, evinces a clear intent that the contract benefit Motorola and other third parties who would require a license to the patents at issue. Each third party that would potentially implement the File System Version 2.00 or 3.00 Specifications, Microsoft's LFN Specification, or Microsoft's FAT32 Specification, was an intended beneficiary of that contract.

93. These same contractual commitments create a duty on behalf of Microsoft to license the patents at issue on RAND terms.

94. It is only by Microsoft's fulfilling its promise to license on RAND terms that

CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER

Motorola will receive the intended benefit of being able to practice the implicated standards free from unreasonably high and discriminatory licensing demands.

95.    Microsoft breached its contract with the SDA by refusing to offer to license the patents at issue to the contract's third-party beneficiary, Motorola, on RAND terms.

96.    Microsoft's filing of the Patent Actions in districts other than state or federal court in California violates the Microsoft HALA forum selection clause, and further constitutes a breach of contract.

97.    As a result of these multiple contractual breaches, Motorola has been injured, including in its business or property.  Motorola has been forced to expend resources resolving this licensing dispute, and is threatened, in particular, by loss of profits, loss of customers and potential customers, loss of goodwill and product image and, uncertainty among customers and potential customers.

## COUNT II
## BREACH OF CONTRACT TO WHICH
## MOTOROLA IS A THIRD-PARTY BENEFICIARY – THE SDA IP POLICY

98.    Motorola incorporates herein by reference the allegations set forth in paragraphs 1-97, above.

99.    As a Member of the SDA, Microsoft represented to the SDA, its Members, and third parties that it would comply with the SDA IP Policy and grant licenses to the patents at issue under RAND terms.

100.    The conduct of Microsoft as alleged above constitutes breach of contract.

101.    As set forth above, Microsoft entered into an express or implied contract with the SDA, its members, and designers and sellers of products designed to be compliant with SDA standards, including Motorola, to license the patents at issue on RAND terms.

102.    The SDA IP Policy benefits Motorola and other third parties who would require a

27

CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER

license to the patents at issue. Each third party that would potentially implement the File System

Version 2.00 or 3.00 Specifications, Microsoft's LFN Specification, or Microsoft's FAT32

Specification, was an intended beneficiary of that contract.

103.    Microsoft breached this contract by failing to offer to license the patents at issue

on RAND terms.

104.    Microsoft's filing of the Patent Actions in districts other than state or federal court

in California violates the SDA IP Policy forum selection clause, and further constitutes a breach

of contract.

105.    As a result of these contractual breaches, Motorola has been injured, including in

its business or property. Motorola has been forced to expend resources resolving this licensing

dispute, and is threatened, in particular, by loss of profits, loss of customers and potential

customers, loss of goodwill and product image, and uncertainty among customers and potential

customers.

## COUNT III
## PROMISSORY ESTOPPEL

106.    Motorola incorporates herein by reference the allegations set forth in paragraphs

1- 105, above.

107.    Microsoft made clear and definite promises to potential licensees, including

Motorola, through its commitments to the SDA that it would license the patents at issue on

RAND terms. By entering into the Microsoft HALA, and through its promises to adhere to the

SDA IP Policy as a condition of its SDA membership, Microsoft also agreed that it would assert

patent infringement actions, if at all, in a federal court in California.

108.    Microsoft also made clear and definite promises to potential licensees, including

Motorola, through its commitments under its IP licensing program that it would license its FAT

28

CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER

technology under RAND terms.

109.    The intended purpose of Microsoft's promises was to induce reliance.  Microsoft knew or should have reasonably expected that this promise would induce sellers of mobile wireless devices, such as Motorola, to develop products implementing the Microsoft technology.

110.    Motorola made substantial investments in the applicable technology and developed and marketed products and services in reliance on the commitments of Microsoft and any other SDA members that contributed technology incorporated into the SDA final specifications, as described above, including designing its products and services to be compliant with the SDA's adopted standards.

111.    Microsoft is estopped from reneging on these promises under the doctrine of promissory estoppel.

112.    Motorola has been irreparably harmed and continues to be threatened with irreparable harm as a result of its reasonable reliance on Microsoft's promises and the unlawful conduct of Microsoft.  Motorola has been forced to expend resources resolving this licensing dispute, and is threatened by the loss of profits, loss of customers and potential customers, loss of goodwill and product image, uncertainty in business planning, and uncertainty among customers and potential customers.

113.    Motorola lacks an adequate remedy at law.

### COUNT IV
### FALSE RAND COMMITMENTS AND DECEPTIVE ACTS TO MONOPOLIZE IN VIOLATION OF SECTION 2 OF THE SHERMAN ACT

114.    Motorola incorporates herein by reference the allegations set forth in paragraphs 1-113, above.

115.    In response to Microsoft's infringement allegations, Motorola asserted affirmative defenses including actual license, implied license, and estoppel.  Motorola also diligently

29

CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER

pursued and continues to pursue discovery from Microsoft relevant to Microsoft's obligations to license the patents at issue on RAND terms.

116.    In the course of discovery, which is ongoing, Motorola learned that Microsoft had affirmatively sought to have the SDA incorporate the Microsoft technology purportedly covered by the patents at issue into final SDA specifications. Motorola subsequently learned that Microsoft had entered into the Microsoft HALA with the SDA. Microsoft did not produce the Microsoft HALA to Motorola until May 16, 2011.

117.    On April 28, 2011, during Motorola's investigation of Microsoft's licensing obligations regarding the patents at issue, Motorola's counsel requested that Microsoft provide Microsoft's standard terms and rates for a license to the Microsoft technology purportedly covered by the patents at issue for the Motorola products accused of infringement in connection with the implementation of the LFN specification and/or the FAT32 specification.

118.    On May 4, 2011, Microsoft's counsel responded that Motorola's in-house representatives should take up the issue with Microsoft's in-house representatives, but declined to provide the requested licensing terms.

119.    On May 6, 2011, counsel for Motorola informed Microsoft's counsel that it was Motorola's position that Microsoft was required to provide promptly an offer to Motorola to license the patents at issue on RAND terms and noted that there was no record of Microsoft's ever having made such an offer, before or during the 744 Investigation. Motorola's counsel further stated that it was Motorola's understanding that Microsoft believed that Motorola was not licensed to practice the patents at issue and that Microsoft was unwilling to discuss a standalone license to the patents at issue without also discussing licenses to other Microsoft patents. Motorola received no written response to this communication. Microsoft refused to provide an

CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER

offer to Motorola to license the patents at issue on RAND terms.

120.    On May 26, 2011, after Microsoft's belated production of the Microsoft HALA,
Motorola's counsel again wrote to Microsoft's counsel, this time setting out Motorola's position
that the Microsoft HALA constituted an incontrovertible contractual obligation by Microsoft to
license the patents at issue on RAND terms. Motorola again received no written response from
Microsoft. Microsoft refused to provide an offer to Motorola to license the patents at issue on
RAND terms.

121.    Microsoft has unlawfully monopolized each of the Wireless Technology Markets
in violation of § 2 of the Sherman Act, 15 U.S.C. § 2, by intentionally making false and
deceptive RAND commitments in violation of the Microsoft HALA, the SDA IP Policy, and
Microsoft's publicly announced IP licensing program. These acts were designed to induce the
SDA to incorporate into standards technology purportedly owned by Microsoft. Microsoft's
RAND commitments were false because it represented to the SDA that it would license the
patents at issue on RAND terms. The SDA and its members, including Motorola, relied on
Microsoft's false RAND commitments in deciding to adopt the relevant standards, rather than
adopting different standards based on alternative competing technologies or omitting the feature,
thereby conferring monopoly market power on Microsoft. Had Microsoft disclosed its
unwillingness to license the patents at issue on RAND terms, the SDA would have adopted a
different standard based on alternative competing technologies, or not established the standard at
all.

122.    Through its unlawful conduct, Microsoft has improperly acquired a monopoly in
the relevant Wireless Technology Markets. With the adopted standards effectively locking
Motorola and the rest of the wireless technology industry into using technologies Microsoft

31

CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER

claims to be covered by its patents, Microsoft obtained, through deception, monopoly power over

the Wireless Technology Markets — monopoly power that was conditioned on its RAND

commitments. Microsoft has unlawfully exercised monopoly power in the relevant Wireless

Technology Markets by engaging in deceptive conduct and breaching the commitments that

enabled it to obtain its conditional monopoly power.

123.    Microsoft's monopoly power in the Wireless Technology Markets has not been

achieved as a result of business growth or developed as a consequence of superior technology,

business acumen, or historic accident. Instead, Microsoft has obtained and maintained its

monopoly power through anticompetitive conduct.

124.    Microsoft's conduct has foreclosed competition in each of the relevant Wireless

Technology Markets and harmed consumers in the form of fewer choices, higher prices, lower-

quality products, and other competitive harms relating to products that rely on the standards.

125.    Microsoft's deceptive and exclusionary practices have allowed it to willfully and

unlawfully wield its monopoly power in the Wireless Technology Markets. Competitors and

other customers for these technologies have been injured. Motorola is unable to obtain an offer

from Microsoft to license on RAND terms patents that Microsoft claims are practiced by

Motorola products. Thus, as a direct and proximate result of Microsoft's illegal and

anticompetitive conduct and continuing violation of Section 2 of the Sherman Act, 15 U.S.C. § 2,

Motorola has suffered injury to its business and property and is threatened by the imminent loss

of profits, loss of customers and potential customers, and loss of goodwill and product image.

Motorola and others have been deprived of the benefit of an above-board competitive process in

the establishment of standards applicable to the Wireless Technology Markets. Consumers also

have been harmed in the form of fewer choices, higher prices, lower-quality products, and other

32

CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER

competitive harms relating to products that rely on the standards.

126.    Motorola will suffer irreparable injury until and unless the Court enjoins such

acts, practices, and conduct.

## COUNT V
## UNFAIR COMPETITION AND UNLAWFUL BUSINESS PRACTICES
## IN VIOLATION OF CAL. BUS. & PROF. CODE § 17200, ET SEQ.

127.    Motorola incorporates herein by reference the allegations set forth in paragraphs

1-126, above.

128.    The Unfair Competition Law, Business & Professions Code § 17200, *et seq.*

("UCL") defines unfair competition to include any unfair, unlawful, or fraudulent business act or

practice.  Unlawful business acts are those that violate federal, state, county, or municipal

statutes or codes, common law, or federal and state regulations.

129.    Microsoft's business acts and practices as alleged above are unlawful and violate

the laws and statutes alleged herein, including § 2 of the Sherman Act, and breach of Microsoft's

contractual obligations to Motorola.

130.    Microsoft's business acts and practices are unfair in violation of the UCL,

because, among other things, the injury to Motorola is and has been substantial and greatly

outweighs any alleged countervailing benefit to consumers or competition under all

circumstances (which in this case is nonexistent).  By intentionally making false and deceptive

RAND commitments in violation of the Microsoft HALA, the SDA IP Policy, and the Microsoft

publicly declared IP licensing policy, Microsoft obtained monopoly power in the Wireless

Technology Markets.  Following its improper achievement of monopoly power, Microsoft has

wielded such power willfully:  Microsoft has refused to offer a license to the patents at issue to

Motorola on RAND terms, thereby injuring or threatening to injure Motorola, competition, and

consumers.  Microsoft's unlawful exercise of monopoly power threatens to deprive customers of

CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER

the most popular wireless technology devices currently on the market, while protecting its own

market position from such competition.  Competitors and consumer welfare will suffer as a result

if Microsoft's conduct is not corrected.

131.    Microsoft's business acts and practices also are unfair because Motorola

justifiably relied upon Microsoft's professed RAND commitments during the standard-setting

process and could not have avoided the willful conduct imposed by Microsoft once it acquired a

monopoly in the relevant Wireless Technology Markets.  With the adopted essential features and

mandatory implementations of the standards effectively locking Motorola and the rest of the

wireless technology industry into using technologies Microsoft claims to be covered by its

patents, there are no reasonably available alternatives to Motorola to avoid Microsoft's unfair

conduct.

132.    Microsoft's business acts and practices also are fraudulent and deceptive, given its

false RAND commitments in violation of the Microsoft HALA, the SDA IP Policy, and the

Microsoft publicly declared IP licensing policy.  Microsoft's fraudulent and deceptive conduct

enabled it to achieve monopoly power unlawfully and anticompetitively in the Wireless

Technology Markets.  Microsoft's subsequent refusal to offer to license the patents at issue to

Motorola on RAND terms constitutes the willful exercise of such unlawfully obtained monopoly

power, which violates and threatens to violate the policy of the antitrust laws and has caused or

threatens to cause substantial injury to Motorola, competition, and consumers.

133.    As a direct, proximate, and foreseeable result of Microsoft's wrongful conduct, as

alleged above, Motorola has suffered substantial harm in California (and elsewhere), including

the unavailability of a license to the patents at issue on RAND terms, despite Microsoft's RAND

commitments, being forced to expend resources to defend a suit, for patent infringement, and

CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER

being threatened, in particular, by loss of profits, loss of customers and potential customers, loss of goodwill and product image, uncertainty in business planning, and uncertainty among customers and potential customers.

134.    As a direct, proximate, and foreseeable result of Microsoft's wrongful conduct, as alleged above, competition has been substantially injured in the Wireless Technology Markets, and there is a significant threat of substantial injury in downstream markets for mobile wireless communication devices, thereby causing injury to consumers in California and elsewhere, including the inevitable passing on to consumers of excessive and disproportionate royalties demanded by Microsoft.

## DEMAND FOR JURY TRIAL

135.    Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Motorola demands a trial by jury of this action.

## PRAYER FOR RELIEF

136.    WHEREFORE, Motorola respectfully prays for relief as follows:

a.    A judgment that Microsoft has breached its agreement with Motorola through its failure to offer Motorola a license to the patents at issue on RAND terms;

b.    A judgment that Microsoft is estopped by its promises from refusing to offer Motorola a license to the patents at issue on RAND terms;

c.    A judgment awarding Motorola all damages to compensate Motorola for Microsoft's breach of contract and inequitable conduct;

d.    A judgment that Microsoft's deceptive and anticompetitive conduct is and has been in violation of § 2 of the Sherman Act, 15 U.S.C. § 2;

e.    A judgment awarding Motorola treble the amount of its damages, as well as the cost of this action and reasonable attorney's fees, pursuant to § 4 of the Clayton Act, 15

35

CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER

U.S.C. § 15;

        f.      An order requiring Microsoft to grant Motorola a license to the patents at issue on RAND terms, to the extent the patents at issue are enforceable;

        g.      An order permanently enjoining and restraining Microsoft from making false statements, engaging in deceptive conduct, or otherwise carrying out unfair methods of competition in connection with its participation in the SDA, pursuant to § 16 of the Clayton Act, 15 U.S.C. § 26;

        h.      An order permanently enjoining Microsoft from refusing to offer to license the patents at issue on RAND terms or licensing or attempting to license the patents at issue on non-RAND terms, pursuant to § 16 of the Clayton Act, 15 U.S.C. § 26;

        i.      A judgment that Microsoft's conduct is and has been in violation of Cal. Bus. & Prof. Code § 17200;

        j.      A judgment awarding Motorola all available damages, injunctive relief, and attorney's fees and litigation expenses under Cal. Bus. & Prof. Code § 17200;

        k.      A judgment declaring that Microsoft is not entitled to seek injunctive relief preventing Motorola from practicing the SDA standards;

        l.      A judgment declaring that the patents at issue are unenforceable by virtue of Microsoft's patent misuse; and

        m.      Such other relief as the Court may deem just and equitable.

36

CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO THE PROTECTIVE ORDER

*Certain Mobile Devices, Associated Software, And Components Thereof*
*Inv. No. 337-TA-744*

## CERTIFICATE OF SERVICE

The undersigned certifies that, on June 22, 2011, she caused a copy of
**Respondent Motorola Mobility, Inc.'s Counter Claims**
to be served upon the following parties as indicated below:

| | |
|---|---|
| The Honorable James Holbein<br>Secretary<br>U.S. International Trade Commission<br>500 E Street, SW, Room 112-F<br>Washington, DC 20436 | ☐  Via First Class Mail<br>☑  Via Hand Delivery<br>   *(Original plus six)*<br>☐  Via Electronic Filing (EDIS)<br>☐  Via Overnight Courier<br>☐  Via Facsimile<br>☐  Via E-mail (PDF) |
| The Honorable Theodore R. Essex<br>Administrative Law Judge<br>U.S. International Trade Commission<br>500 E Street, SW<br>Washington, DC 20436 | ☐  Via First Class Mail<br>☑  Via Hand Delivery<br>   *Two Copies*<br>☐  Via Overnight Courier<br>☐  Via Facsimile<br>☐  Via E-mail *(PDF)* |
| Brian R. Nester, Esq.<br>Sidley Austin LLP<br>1501 K Street, NW<br>Washington, DC 20005<br><br>*Counsel for Complainant, Microsoft<br>Corporation* | ☐  Via First Class Mail<br>☑  Via Hand Delivery<br>☐  Via Overnight Courier<br>☐  Via Facsimile<br>☑  Via E-mail *(PDF)*<br><br>ProjectMS-Moto_ITC_744@Sidley.com |

Timaka R. Senior
Paralegal Specialist

CONTAINS CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER

Dated: June 22, 2011

Respectfully submitted,

*Charles F. Schill*

Charles F. Schill
Jamie B. Beaber
Steptoe & Johnson LLP
1330 Connecticut Avenue, N.W.
Washington, DC 20036
Phone No. (202) 429-8162

Charles K. Verhoeven
David Bilsker
Quinn Emanuel Urquhart & Sullivan LLP
50 California Street, 22nd Floor
San Francisco, CA 94111
Phone No. (415) 875-6600

Edward J. DeFranco
Quinn Emanuel Urquhart & Sullivan LLP
51 Madison Avenue, 22nd Floor
New York, NY 10010
Phone No. (212) 849-7000

David A. Nelson
Quinn Emanuel Urquhart & Sullivan LLP
500 West Madison St., Suite 2450
Chicago, IL 60661
Phone No. (312) 463-2965

*Attorneys for Respondent Motorola Mobility, Inc.*