The Honorable James L. Robart

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

MICROSOFT CORPORATION, a Washington corporation,

                Plaintiff,

        v.

MOTOROLA, INC., MOTOROLA MOBILITY, INC., and GENERAL INSTRUMENT CORPORATION.,

                Defendants.

CASE NO. C10-1823-JLR

**DEFENDANTS' OPPOSITION TO MICROSOFT'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

**NOTED ON MOTION CALENDAR:
Friday, September 30, 2011**

**ORAL ARGUMENT REQUESTED**

**[REDACTED]**

DEFENDANTS' OPPOSITION TO MICROSOFT'S MOTION
FOR PARTIAL SUMMARY JUDGMENT
CASE NO. C10-1823-JLR

# TABLE OF CONTENTS

**Page(s)**

I.    INTRODUCTION .................................................................................................. 1

II.   FACTUAL BACKGROUND ................................................................................. 2

III.  MICROSOFT'S MOTION SHOULD BE DENIED BECAUSE IT IS
      PREMATURE AND IS AN ATTEMPT TO CIRCUMVENT THE COURT'S
      SCHEDULE .......................................................................................................... 5

IV.   MOTOROLA DID NOT BREACH ITS RAND OBLIGATIONS; AT THE VERY
      LEAST, THERE ARE GENUINE FACT ISSUES THAT REQUIRE DENIAL OF
      MICROSOFT'S MOTION ..................................................................................... 7

      A.    Legal Standard ........................................................................................... 7

      B.    Motorola's RAND Obligations Relate to Licenses, Not Licensing Offers ............ 8

      C.    In Fact, The Terms And Conditions In Motorola's Letters Were RAND ............ 11

            1.    Motorola's Opening Offer of 2.25% Was Reasonable ............................. 12

            2.    Basing a Royalty Rate on the Price of an End Product is Reasonable ...... 15

            3.    The Patent Pools Identified by Microsoft Are Irrelevant ......................... 19

V.    MICROSOFT'S FAILURE TO REQUEST A LICENSE AND NEGOTIATE
      TERMS ALSO PRECLUDES SUMMARY JUDGMENT ................................ 21

VI.   CONCLUSION ................................................................................................... 23

DEFENDANTS' OPPOSITION TO MICROSOFT'S MOTION
FOR PARTIAL SUMMARY JUDGMENT - i
CASE NO. C10-1823-JLR

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone: (206) 676-7000
Fax: (206) 676-7001

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

Aetna Health Inc. v. Fox,
No. 09-5647, 2011 WL 2413267 (W.D. Wash. June 13, 2011) ...............................7

Anderson v. Liberty Lobby, Inc.,
477 U.S. 242 (1986) ...............................................................................................7

Bryan's One Stop, Inc. v. Ho,
No. 62583-4-1, 2010 Wash. App. LEXIS 2489 (Nov. 8, 2010) .........................22

Celotex Corp. v. Catrett,
477 U.S. 317 (1986) ...............................................................................................6

Chance v. Avenue A, Inc.,
165 F. Supp. 2d 1153 (W.D. Wash. 2001) .............................................................6

Commonwealth Scientific & Indus. Research Org. v. Buffalo Tech. Inc.,
492 F. Supp. 2d 600 (E.D. Tex. 2007) .................................................................23

Denton v. BP W. Coast Prods., LLC,
No. C09-1344-JCC, 2011 WL 1883805 (W.D. Wash. May 17, 2011)...............7, 8

Dequilettes v. Moffat,
No. 51661-2-1, 2004 WL 370769 (Wash. Ct. App. Mar. 1, 2004)......................22

Johnson v. Holland Am. Line,
No. C11-0435JLR, 2011 WL 2976886 (W.D. Wash. July 21, 2011) ....................6

Lucent Techs., Inc. v. Gateway, Inc.,
580 F.3d 1301 (Fed. Cir. 2009).............................................................................16

Metabolife Int'l, Inc. v. Wornick,
264 F.3d 832 (9th Cir. 2001) ..................................................................................6

Quanta Computer, Inc. v. LG Elecs., Inc.,
553 U.S. 617 (2008) .............................................................................................17

Sec. & Exch. Comm'n v. Liberty Capital Group, Inc.,
75 F. Supp. 2d 1160 (W.D. Wash. 1999) ...............................................................6

DEFENDANTS' OPPOSITION TO MICROSOFT'S MOTION
FOR PARTIAL SUMMARY JUDGMENT - ii
CASE NO. C10-1823-JLR

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone: (206) 676-7000
Fax: (206) 676-7001

*Symbol Techs., Inc. v. Proxim, Inc.*,
   No. 01-801-SLR, 2004 WL 1770290 (D. Del. July 28, 2004) ................................. 13

*Visa Int'l Serv. Ass'n, v. Bankcard Holders of Am.*,
   784 F.2d 1472 (9th Cir. 1986) ........................................................................ 17

**OTHER AUTHORITIES**

10B Charles Wright, et al., Fed. Prac. & Proc. § 2740 (3d ed. 1998) ............................ 6

Fed. R. Civ. P. 56 ............................................................................................... 6

DEFENDANTS' OPPOSITION TO MICROSOFT'S MOTION
FOR PARTIAL SUMMARY JUDGMENT - iii
CASE NO. C10-1823-JLR

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone: (206) 676-7000
Fax: (206) 676-7001

**TABLE OF ABBREVIATIONS AND DEFINITIONS**

| | |
|---|---|
| ITU | International Telecommunications Union. |
| IEEE | Institute of Electrical and Electronics Engineers. |
| SSO | Standards Setting Organization.  These organizations determine and disseminate industry standards used in the telecommunications and electronics fields.  The term "SDO" refers to "Standards Development Organization"; the terms are used interchangeably. |
| IPR | Intellectual Property Rights. |
| RAND | Reasonable And Non-Discriminatory.   The term "FRAND" is also used by some organizations and stands for "Fair, Reasonable And Non-Discriminatory." |

DEFENDANTS' OPPOSITION TO MICROSOFT'S MOTION
FOR PARTIAL SUMMARY JUDGMENT - iv
CASE NO. C10-1823-JLR

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

1    Defendants Motorola, Inc. (now Motorola Solutions, Inc.), Motorola Mobility, Inc. and

2 General Instrument Corporation (collectively, "Motorola") respectfully submit this Opposition to

3 Microsoft's Motion for Partial Summary Judgment (ECF No. 77).

## I.   INTRODUCTION

5    Microsoft's motion asks the Court to determine on summary judgment that Motorola did

6 not offer to Microsoft reasonable and non-discriminatory ("RAND") license terms for Motorola's

7 802.11 and H.264 essential-patent portfolios. *See id.* at 4. Determining whether an offer is

8 reasonable and non-discriminatory is a fact-sensitive inquiry that requires an analysis of a well-

9 developed factual record. Even assuming such a heavily fact-dependent determination can be

10 made on summary judgment, there is an insufficient factual record at this early stage of discovery

11 to make such a determination.

12    For example, to decide this motion properly, the factual record must include at least:

13 (1) Motorola's licensing history and practice, including what offers were made previously by

14 Motorola for the technology and patents at issue, what licenses resulted from those offers and the

15 value Motorola received from the licensing party as part of the agreement; (2) Microsoft's

16 licensing history and practice, including what offers were made previously by and to Microsoft for

17 similar technology and what licenses resulted from those offers; (3) what value Motorola,

18 Microsoft and others place on the 802.11 and H.264 patents and technology in relation to each

19 company's product lines; (4) the terms under which other 802.11 and H.264 patent portfolios have

20 been licensed in the industry (and any negotiations surrounding those licenses); (5) the IEEE's and

21 ITU's understanding of a party's obligations under their respective IPR Policies; (6) the extent of

22 Microsoft's infringement of Motorola's 802.11 and H.264 essential-patent portfolios; (7) the cost

23 to Microsoft of implementing potential alternatives and substitutes to the essential technology-at-

24 issue; and (8) the value and cost of potential alternative technologies and substitutes to the

25 Motorola patented technology at the time they were incorporated to the 802.11 and H.264

26 standards by the IEEE and ITU, respectively.

DEFENDANTS' OPPOSITION TO MICROSOFT'S MOTION
FOR PARTIAL SUMMARY JUDGMENT - 1
CASE NO. C10-1823-JLR

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone: (206) 676-7000
Fax: (206) 676-7001

1   Because many of these facts are not within its control, Motorola must be given the

2   opportunity to conduct discovery into these issues – discovery that will further confirm that

3   Motorola acted in compliance with its RAND obligations.  Accordingly, as discussed in greater

4   detail below, Motorola respectfully requests that the Court deny Microsoft's motion without

5   prejudice pursuant to Rule 56(d), Fed. R. Civ. P., to allow for this discovery to take place.  *See*

6   Section III, *infra*.

7   In the event the Court decides to rule based on the existing, incomplete record, Microsoft's

8   motion should be denied.  When considering a motion for summary judgment, this Court must

9   view all facts in the light most favorable to the non-moving party – Motorola.  When viewed in

10   this light, the facts show that Motorola's offered rate of 2.25% applied to the sales price of

11   licensed products is consistent with (1) what Motorola has offered previously to at least

12   for the same technology, (2) the rates in licenses Motorola ultimately negotiated with these

13   third parties and (3) established royalty rates in the software and telecom industries.  The facts also

14   show that applying this royalty rate to the sales price of the end product is the most common and

15   preferred royalty base for patent licenses and is, therefore, ***inherently reasonable***.  These facts,

16   viewed in the light most favorable to Motorola, require denial of Microsoft's motion.

17   ## II.   FACTUAL BACKGROUND

18   Microsoft tries to justify this premature summary judgment motion by arguing that "the

19   need for prompt judicial relief is both urgent and compelling," and then proceeds to portray

20   Motorola as an opportunistic party who made unreasonable licensing demands as a pretext for

21   filing a lawsuit.  *See* ECF No. 77 at 1, 2.  In reality, it was ***Microsoft***, not Motorola, who instigated

22   the global dispute between the parties.

23   Historically, Motorola and Microsoft worked together to develop and sell smartphones that

24   utilized Microsoft's Windows Mobile operating system.  Because Windows Mobile was slow to

25   evolve, Motorola began to work with Google in about 2008 to develop new devices based on

26   Google's Android Operating System.  Unlike Windows Mobile, the Android Operating System is

DEFENDANTS' OPPOSITION TO MICROSOFT'S MOTION
FOR PARTIAL SUMMARY JUDGMENT - 2
CASE NO. C10-1823-JLR

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

1  "open source," meaning that the source code is freely available to the public without a license fee.

2  In late 2009, Motorola introduced its first Android-powered smartphone. As the Windows Mobile

3  platform continued to decline and with the success of its Android-based phones, Motorola

4  eventually transitioned to an Android-only product line.

5       As discovery will show, Microsoft initiated patent infringement suits to dissuade Motorola

6  from this "non-Windows" path. Indeed, on October 1, 2010, just ten days prior to the launch of

7  Microsoft's new mobile operating system – Windows Phone 7 – Microsoft sued Motorola in the

8  International Trade Commission ("ITC") (Investigation No. 337-TA-744), alleging infringement

9  of nine Microsoft patents by Motorola's Android smartphones. Two days later, Microsoft's CEO,

10  Steve Ballmer, gave an interview to the Wall Street Journal, in which he stated that:

11       Android has a patent fee. It's not like Android's free. You do have to license
     patents. HTC's signed a license with us and you're going to see license fees

12       clearly for Android as well as for Windows.[1]

13  The substance and timing of Mr. Ballmer's statements make plain Microsoft's motivation for its

14  lawsuit against Motorola – use litigation (including the threat of a potential injunction or exclusion

15  order) to force Motorola and other implementers of Android to take a license under Microsoft's

16  patents, thereby making the use of the Android platform more expensive.

17       Motorola, however, sought to avoid unnecessary conflict and attempted to initiate a

18  conversation with Microsoft regarding a mutually beneficial licensing arrangement. To open this

19  discussion, Kirk Dailey (Motorola's Corporate Vice President for Intellectual Property) sent two

20  letters to Microsoft's Deputy General Counsel, Horacio Gutiérrez, in October 2010, offering to

21  license Motorola's 802.11 and H.264 patent portfolios. Exs. 2, 3. Thus, Motorola's licensing

22  offer was not an attempt to demand unreasonable royalties from Microsoft or a pretext to a

23

24

25      [1] Ex. 1, "Ballmer Aims to Overcome Mobile Missteps," available at http://online.wsj.com/article/

26  SB10001424052748703466104575529861668829040.html (last accessed September 22, 2011). "Ex. ___" refers to the
stated Exhibit to the accompanying Declaration of Kevin J. Post ("Post Decl.").

DEFENDANTS' OPPOSITION TO MICROSOFT'S MOTION
FOR PARTIAL SUMMARY JUDGMENT - 3
CASE NO. C10-1823-JLR

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone: (206) 676-7000
Fax: (206) 676-7001

1  lawsuit.  Rather, it was a response to Microsoft's lawsuit intended to seek appropriate

2  counterbalancing value for Microsoft's use of Motorola's portfolio of essential patents.[2]

3      These letters, which Microsoft attacks vigorously in its motion, offered Microsoft "a

4  worldwide non-exclusive license under Motorola's portfolio of patents and pending applications

5  [(1)] having claims that may be or become Essential Patent Claims ... for a compliant

6  implementation of the IEEE 802.11 Standards" and (2) "covering the subject matter of ITU-T

7  Recommendation H.264."  *Id.*  According to these offer letters, the 2.25% rate was "subject to a

8  grant back license ...."  *Id.*  And as Motorola stated, "[i]f Microsoft is only interested in licensing

9  some portion of this [802.11 or H.264] portfolio, Motorola is willing to enter into such a license,

10  also on RAND terms."  *Id.*

11      This was a fair and reasonable invitation to Microsoft to negotiate, but Microsoft never

12  even answered Motorola's letters.  Instead, on November 9, Microsoft filed yet another complaint

13  – its complaint in this action – claiming that Motorola had breached its RAND obligations to both

14  the IEEE (for 802.11) and ITU (for H.264).  Complaint, Nov. 9, 2011, ECF No. 1.  Faced with this

15  outright repudiation of Motorola's offer, and Microsoft's refusal to negotiate a business solution,

16  Motorola then had no choice but to file lawsuits to protect its own patent rights.  On November 22,

17  2010, Motorola filed suit in the ITC (Investigation No. 337-TA-752), alleging, *inter alia*,

18  infringement of certain 802.11 and H.264 patents by Microsoft's Xbox 360 consoles and related

19  software.  Over the next several months, the parties' dispute escalated, with additional patent

20  complaints and counterclaims filed in Wisconsin and Florida, which were ultimately transferred at

21

22

---

23  [2] Microsoft knows that such a response is both usual and appropriate.  In a June 14, 2011 letter to the FTC regarding
   standards licensing, Microsoft acknowledged that it is common for a party (like Motorola) to initiate licensing
   discussions after first being accused of patent infringement by a party (like Microsoft):

24      Depending on their applicable business model, *many companies largely use their patents vis-à-*
       *vis standards defensively*.  Far from seeking to hold up implementers, these firms will not seek

25      patent royalties at all in the ordinary course of business.  *Rather, they will seek a patent license*
       *from an implementer only when that implementer has first challenged them on other patent*

26      *infringement issues.*

   Ex. 4 at 7 (emphasis added).

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

1   Microsoft's request to this Court.  Then, on August 18, Microsoft filed the present motion.  ECF

2   No. 77.

3   **III.  MICROSOFT'S MOTION SHOULD BE DENIED BECAUSE IT IS PREMATURE
       AND IS AN ATTEMPT TO CIRCUMVENT THE COURT'S SCHEDULE**

4

5       In the parties' Second Revised Joint Status Report, Microsoft argued that "Motorola's

6   obligations to license its purportedly essential patents to Microsoft on RAND terms and conditions

7   can and should be resolved before engaging in complex, protracted and expensive patent litigation

8   that those commitments were designed to avoid."  ECF No. 69 at 3-4.  Microsoft then proposed a

9   short RAND-based discovery period to conclude on November 1, 2011.  *Id.* at 8.  But

10  consideration of RAND issues is a complex task that is heavily fact dependent.  *See* Section I,

11  *supra.*  In contrast to Microsoft's abbreviated RAND discovery schedule and in recognition of the

12  complex fact issues and underlying discovery that relate to Microsoft's RAND claims, Motorola

13  proposed that discovery follow a more typical track, with a November 2012 trial date.  *Id.* at 11-
    15, 19.

14      On August 5, 2011, this Court issued its schedule, setting various deadlines and due dates.

15  Rather than adopt Microsoft's aggressive, RAND-first schedule, the Court set deadlines consistent

16  with Motorola's proposal with discovery set to close on June 15, 2012 – nearly ***nine months*** from

17  now.  ECF No. 76 at 2.  A five-day trial is set to begin on November 26, 2012.  *Id.* at 1.

18      The parties have only engaged in limited discovery – only one party deposition has been

19  taken, no third-party depositions have been taken, and the parties are still producing documents

20  responsive to discovery requests specific to this matter.  Indeed, although Microsoft has produced

21  about one million pages so far, no patent licenses or communications regarding licensing have

22  been produced.  Motorola's review of Microsoft's production is ongoing, but additional time will

23  be required in order to review these licensing documents, once they are produced by Microsoft.

24  Post Decl., ¶¶ 22-37.

25      By filing this premature motion now, even before document production has been

26  completed and any other significant, substantive discovery has taken place, Microsoft seeks to

DEFENDANTS' OPPOSITION TO MICROSOFT'S MOTION
FOR PARTIAL SUMMARY JUDGMENT - 5
CASE NO. C10-1823-JLR

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

1    circumvent the Court's scheduling Order.  Because this motion cannot fairly be decided on the

2    extremely limited factual record developed to date, Motorola respectfully requests that the Court

3    deny Microsoft's motion without prejudice pursuant to 56(d), Fed. R. Civ. P., to allow Motorola

4    additional time to complete discovery.

5         "Rule 56([d]) allows the court to guard against premature summary judgment, particularly

6    in complicated factual disputes where there has not been a full opportunity for discovery."

7    *Chance v. Ave. A, Inc.*, 165 F. Supp. 2d 1153, 1157 (W.D. Wash. 2001) (citing *Texas Partners v.*

8    *Conrock Co.*, 685 F.2d 1116, 1119 (9th Cir. 1982)); *see also Johnson v. Holland Am. Line*, No.

9    C11-0435JLR, 2011 WL 2976886, at *4 (W.D. Wash. July 21, 2011) (denying defendant's motion

10   for summary judgment where "litigation is in its earliest stages"); *Sec. & Exch. Comm'n v. Liberty*

11   *Capital Group, Inc.*, 75 F. Supp. 2d 1160, 1164 (W.D. Wash. 1999) ("Rule 56([d]) gives a court

12   broad discretion to hear or defer ruling on an early summary judgment motion when the opposing

13   party objects to the motion as premature.").  As the Supreme Court observed, the Rule protects a

14   party from being "railroaded" by a premature motion for summary judgment.  *Celotex Corp. v.*

15   *Catrett*, 477 U.S. 317, 326 (1986).  Consistent with that purpose, the rule is "applied with a spirit

16   of liberality."  10B Charles Wright, et al., Federal Practice and Procedure § 2740, at 402 (3d ed.

17   1998).

18        "Although Rule 56([d]) facially gives judges the discretion to disallow discovery when the

19   non-moving party cannot yet submit evidence supporting its opposition, the Supreme Court has

20   restated the rule as requiring, rather than merely permitting, discovery 'where the nonmoving

21   party has not had the opportunity to discover information that is essential to its opposition.'"

22   *Metabolife Int'l, Inc. v. Wornick*, 264 F.3d 832, 846 (9th Cir. 2001) (quoting *Anderson v. Liberty*

23   *Lobby, Inc.*, 477 U.S. 242, 250 n.5 (1986)).  As the Ninth Circuit has recognized:

24        The cases construing Rule 56([d]) suggest that the denial of a Rule 56([d])
          application is generally disfavored where the party opposing summary judgment
25        makes (a) a timely application which (b) specifically identifies (c) relevant
          information, (d) where there is some basis for believing that the information
26

DEFENDANTS' OPPOSITION TO MICROSOFT'S MOTION
FOR PARTIAL SUMMARY JUDGMENT - 6
CASE NO. C10-1823-JLR

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone: (206) 676-7000
Fax: (206) 676-7001

sought actually exists.  Summary denial is especially inappropriate where the material sought is also the subject of outstanding discovery requests.

*Visa Int'l Serv. Ass'n, v. Bankcard Holders of Am.*, 784 F.2d 1472, 1475 (9th Cir. 1986).

Discovery in this case (including expert discovery) is not set to close until June 15, 2012, with dispositive motions due to be filed by July 24, 2012.  ECF No. 76 at 2.  As described above and in the supporting Declaration of Kevin J. Post, filed concurrently herewith, Motorola has specifically identified information that is highly relevant to Microsoft's motion, information that has not yet been discovered.  Post Decl., ¶¶ 22-37.  Microsoft's premature motion has prevented Motorola from having sufficient time to conduct that necessary discovery.  *Id.*  Accordingly, Motorola respectfully requests that the Court deny Microsoft's motion pursuant to Rule 56(d) without prejudice, so that the parties can fairly and sensibly proceed in accordance with the discovery schedule already set by the Court.

## IV.   MOTOROLA DID NOT BREACH ITS RAND OBLIGATIONS; AT THE VERY LEAST, THERE ARE GENUINE FACT ISSUES THAT REQUIRE DENIAL OF MICROSOFT'S MOTION

### A.   Legal Standard.

"The summary judgment procedure, which is authorized by Rule 56 of the Federal Rules of Civil Procedure, provides 'a method for promptly disposing of actions in which there is no genuine issue as to any material fact, or in which only a question of law is involved.'"  *Denton v. BP W. Coast Prods., LLC*, No. C09-1344-JCC, 2011 WL 1883805, at *2 (W.D. Wash. May 17, 2011) (quoting Wright & Miller, Federal Practice and Procedure: Civil 3d § 2712).  "Summary judgment is appropriate if, when viewing the facts in the light most favorable to the nonmoving party, there is 'no genuine issue as to any material fact,' and therefore 'the movant is entitled to judgment as a matter of law.'"  *Aetna Health Inc. v. Fox*, No. 09-5647, 2011 WL 2413267, at *1 (W.D. Wash. June 13, 2011) (quoting Fed. R. Civ. P. 56(c)); *see also Anderson*, 477 U.S. at 248.  "Summary judgment should be denied when the non-moving party offers evidence from which a reasonable jury could return a verdict in its favor."  *Aetna Health*, 2011 WL 2413267, at *1 (citing

DEFENDANTS' OPPOSITION TO MICROSOFT'S MOTION
FOR PARTIAL SUMMARY JUDGMENT - 7
CASE NO. C10-1823-JLR

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone: (206) 676-7000
Fax: (206) 676-7001

*Triton Energy Corp. v. Square D Co.*, 68 F.3d 1216, 1221 (9th Cir. 1995)). "If this Court were to apply a lower standard and render summary judgment while genuine issues of material fact remained outstanding, it would intrude upon a plaintiff's Seventh Amendment right to a trial by jury." *Denton*, 2011 WL 1883805, at *2 (citing *Griffeth v. Utah Power & Light Co.*, 226 F.2d 661, 669 (9th Cir. 1955)).

**B.    Motorola's RAND Obligations Relate to Licenses, Not Licensing Offers.**

In its motion, Microsoft requests a finding that the IPR Policies of the IEEE and the ITU obligate Motorola to make RAND offers. ECF No. 77 at 4. As discussed below, Motorola's letters *did include* RAND terms – terms that are fully consistent with (1) its previous RAND offers and (2) the RAND terms it has ultimately negotiated with its licensees.[3]  *See* Section IV.C, *infra*. The language of these policies, however, did not obligate Motorola to do so. Rather, these IPR Policies only specifically require that completed *licenses* be made available to willing licensees on RAND terms, clearly recognizing that negotiations are essential to get to that end result. For example, the IEEE's IPR Policy states in relevant part:

> A statement that *a license* for a compliant implementation of the standard will be made available to an unrestricted number of applicants on a worldwide basis without compensation or under reasonable rates, with reasonable terms and conditions that are demonstrably free of any unfair discrimination.

Ex. 5 at 15 (§ 6.2 Policy) (emphasis added). Similarly, the ITU states in relevant part that for patents disclosed as being essential to a standard, "[t]he patent holder is willing to *negotiate licenses* with other parties on a non-discriminatory basis on reasonable terms and conditions." Ex. 6 at 8 (Annex 1 at § 2.2).

Microsoft has not shown – and cannot show – that these IPR policies require the opening offer to reflect *all* terms of a final agreement, especially where at the outset of negotiations the parties may not have all the information that would normally be exchanged in such a process. The

---

[3] As Motorola has made clear in, for example, the letters themselves, it is Motorola's policy to license its essential patents on RAND terms, regardless of what legal obligations may in fact exist with respect to that technology. *See* Exs. 2, 3; *see also* Ex. 8 (Dailey Tr. at 56:7-12, 56:21 – 57:1, 63:25 – 64:9).

DEFENDANTS' OPPOSITION TO MICROSOFT'S MOTION
FOR PARTIAL SUMMARY JUDGMENT - 8
CASE NO. C10-1823-JLR

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone: (206) 676-7000
Fax: (206) 676-7001

1   determination of what is and what is not RAND is a highly fact-dependent inquiry that is unique to

2   each licensing situation and may, in fact, be contingent on information specific to that licensee

3   (e.g., inclusion of non-essential patents, term, geographic scope, "other business dealings between

4   the parties, such as distribution agreements, co-branding agreements, cross-licenses involving

5   other technologies," etc.). Ex. 7 at 8. Rarely do licensors have complete knowledge of a

6   prospective licensee's unique circumstances prior to making an offer. In recognition of this

7   reality, these IPR Policies leave the determination of what qualifies as "RAND" to the market.

8   Through negotiation, parties have an opportunity to explore one another's requirements, including

9   any unique factors that need to be considered.

10          Thus, through a natural give-and-take process, the parties' positions evolve and they can

11   negotiate to a final license that they both consider to be RAND. For this reason, neither the IEEE

12   nor the ITU has (1) promulgated any rules or guidelines requiring a RAND offer, (2) described

13   how RAND terms should be determined, or (3) defined what "RAND" terms are (including what

14   constitutes a "RAND" rate). Instead, the IEEE and ITU stress that the responsibility of

15   determining RAND terms is left to individual companies to negotiate on a bilateral basis. For

16   example, the Standards Organization Bylaws for the IEEE unambiguously state:

17          The IEEE is not responsible ... for determining whether any licensing terms or
            conditions provided in connection with submission of a Letter of Assurance, if
18          any, or in any licensing agreements are reasonable or non-discriminatory.

19   Ex. 5 at 16. Similarly, the "Common Patent Policy" for the ITU states:

20          The detailed arrangements arising from patents (licensing, royalties, etc.) *are left
            to the parties concerned*, as these arrangements might *differ from case to case*.
21

22   Ex. 6 at 8 (emphasis added). Both the ITU's Common Patent Policy, and its Patent Statement and

23   Licensing Declaration form, further state that "*negotiations are left to the parties concerned* and

24   are performed outside the [ITU]." *Id.* at 8, 11 (emphasis added).

25          Richard J. Holleman, former IEEE Standards Board Chairman and President and CEO of

26   the IEEE-ISTO, explains the rationale behind these policies:

DEFENDANTS' OPPOSITION TO MICROSOFT'S MOTION
FOR PARTIAL SUMMARY JUDGMENT - 9
CASE NO. C10-1823-JLR

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone: (206) 676-7000
Fax: (206) 676-7001

> SSOs encourage negotiation between patent holders and potential licensees. SSOs recognize that relationships between patent holders and potential licensees are unique, and terms that may be relevant for one relationship may not be relevant for another.  Therefore, SSOs encourage a back-and-forth negotiation between patent holders and potential licensees to arrive at reasonable and relevant licensing terms.

Decl., of Richard J. Holleman ("Holleman Decl."), filed herewith, ¶ 3, Ex. A at 6; *see also id.*, Ex. A at 11 ("SSOs do not engage in an attempt to determine what constitutes a reasonable royalty rate or what other terms and conditions are reasonable.  These matters are left for the patent holder and the potential licensee to decide upon through good faith negotiations.").

In a tacit admission that the IEEE and the ITU do not require RAND offers, Microsoft tellingly points to language in an ***unrelated*** organization's Bylaws – the Blu-Ray Disc Association ("BDA") – that does address a RAND-offer requirement.  ECF No. 77 at 16.  Specifically, the BDA explicitly states that disputes "over whether the [patent holding member] is offering a license under its Essential Patent(s) on fair, reasonable and non-discriminatory terms and conditions" must be arbitrated.  *Id.*[4]  But this language is not present in the IEEE's or ITU's IPR Policy or Bylaws.  Rather, these policies and bylaws at issue are limited to the end result – a RAND license that will be reached through bilateral negotiation between interested parties.

Apart from its litigation-inspired position here, Microsoft itself has agreed elsewhere that negotiation is critical for ensuring that any eventual license will be on RAND terms.  Microsoft's General Manager of Standards Strategy, Amy Marasco, stated in a presentation regarding IPR policies and essential licenses that "[a] prospective implementer [e.g., Microsoft] that has requested a license ***will negotiate on a private bilateral basis with the patent owner to determine whether they can arrive at a mutually acceptable agreement on RAND terms*.**"  Ex. 7 at 8 (emphasis added).  Similarly, in a June 14, 2011 submission to the FTC regarding a Patent Standards Workshop, Microsoft reiterated that:

---

[4] Moreover, it is highly unlikely that the Blu-Ray Disc Association contemplated that this arbitration provision (let alone litigation in Federal Court) would be invoked the moment a prospective licensee received an ***initial offer*** of a RAND license.

DEFENDANTS' OPPOSITION TO MICROSOFT'S MOTION
FOR PARTIAL SUMMARY JUDGMENT - 10
CASE NO. C10-1823-JLR

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone: (206) 676-7000
Fax: (206) 676-7001

1

2

> RAND-based IPR policies provide a *flexible framework* to help *enable customized bi-lateral negotiations for patent licenses* that generally are not limited to just the essential patent claims in connection with a standard.

3  Ex. 4 at 3 (emphasis added).  But Microsoft's motion fails to acknowledge this "flexible

4  framework" and Microsoft's position here is simply inconsistent with practice in the industry (and

5  indeed, the approach recognized as normal by its own General Manager of Standards).

6       Motorola believes that third-party discovery, depositions and document production in this

7  case will further confirm its understanding and the understanding of others in the industry that the

8  IEEE and ITU IPR Policies contemplate that a RAND license will result only as a product of a

9  bilateral negotiation.  In particular, Motorola believes that discovery will also show that

10  sophisticated parties in the industry (including Microsoft) understand that, in the real world,

11  RAND terms may differ from license to license and, as Microsoft's Ms. Marasco has stated, can

12  only be reached through bilateral negotiations leading to a RAND license.

13  **C.    In Fact, the Terms and Conditions in Motorola's Letters Were RAND.**

14       Microsoft knows full well that a proper RAND analysis requires an in-depth consideration

15  and complex analysis of many diverse facts.  In an attempt to circumvent this detailed analysis,

16  Microsoft argues that Motorola's offer was so "inherently unreasonable" that the Court can simply

17  conclude that Motorola breached its RAND commitments based on just the limited set of facts

18  Microsoft cherry-picked for its motion.  *See, e.g.*, ECF No. 77 at 2-4, 20-21.  Microsoft is

19  incorrect.  In the event the Court finds that Motorola was obligated to provide an opening RAND

20  offer (and Motorola submits it was not), the limited factual record developed to date, viewed in the

21  light most favorable to Motorola, leads to only one conclusion – Motorola's offer *was* a RAND

22  offer.  At the very least, there are genuine issues of fact that preclude a finding on summary

23  judgment that these terms were not RAND.

24

25

26

DEFENDANTS' OPPOSITION TO MICROSOFT'S MOTION
FOR PARTIAL SUMMARY JUDGMENT - 11
CASE NO. C10-1823-JLR

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

1.   **Motorola's Opening Offer of 2.25% Was Reasonable.**[5]

Microsoft's allegation that only Microsoft has been singled out by Motorola to pay a 2.25% rate, ECF No. 77 at 13, is demonstrably untrue.  Motorola treated Microsoft in a non-discriminatory fashion when it made its standard license offer and expressed a willingness to negotiate.

. Teece Decl., ¶ 3, Rebuttal Report at 33 ¶¶ 158-160.[6]  For example, Motorola has offered to at least                      royalty rates in the range of 2.25% for licenses that involve its 802.11 and H.264 patent portfolios.  *Id.*, Rebuttal Report at Ex. 1.C.  Once those offers have been made, Motorola has exhibited a consistent pattern of considering counter-offers from prospective licensees, often in the light of the intellectual property that would be involved in a cross-license.  At least the                described above did, in fact, respond to Motorola's offer letters, engage in negotiations, and ultimately enter into licenses.  *Id.*  As the exhibit also makes clear,               have entered into licenses with Motorola for standards-essential patents where the maximum royalty rates                      Indeed, several of the patents listed in Motorola's 802.11 and H.264 letters are part of these previously licensed portfolios.  The mere fact that these licenses exist containing these rates raises genuine issues of material fact that require denial of Microsoft's motion.

Motorola believes that discovery relating to these license negotiations will further support a finding that it did not breach its RAND obligations.  For example, Research In Motion ("RIM"),

---

[5] Microsoft misleadingly presents tables showing a "Royalty Demand" of 4.5% for the Xbox accused products.  Motorola never stated that it stacks patent rates (i.e., charging 2.25% for one portfolio, but 4.5% for both), and discovery will show that it has not done so.  Indeed, Microsoft acknowledges this very fact: "[w]hile the two demand letters demand a total royalty of 4.5%, Microsoft expects that Motorola intended to cap the total at 2.25%." ECF No. 77 at 7-8.
          Ex. 8 (Dailey Tr. 58:9-22).

[6] "Teece Decl., __" refers to the Declaration of David J. Teece filed herewith, and the attached Rebuttal Expert Report of Professor David J. Teece.  Professor Teece is one of Motorola's experts in the 337-TA-752 Investigation pending between the parties.  As noted above, certain of Motorola's 802.11 and H.264 patents are asserted against Microsoft in that Investigation.

DEFENDANTS' OPPOSITION TO MICROSOFT'S MOTION
FOR PARTIAL SUMMARY JUDGMENT - 12
CASE NO. C10-1823-JLR

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone: (206) 676-7000
Fax: (206) 676-7001

1   a major Motorola competitor, negotiated and entered into an essential patent cross-license in 2003;

2                                                                                        . *Id.*,

3   Rebuttal Report at 38 ¶ 189.  Upon expiration of that license, the parties were involved in a

4   lengthy renegotiation process.  After they failed to reach agreement, litigation followed,

5   culminating after further negotiation

6                                               . *Id.*, Rebuttal Report at 38 ¶ 190.  That

7   license included                                          *Id.*, Rebuttal Report at

8   Exhibit 1.A.

9

10                                                       . *Id.*, Rebuttal

11  Report at 38 ¶ 190.  Motorola has produced documents that relate to these negotiations and intends

12  to produce additional discovery as the case proceeds.  Post Decl., ¶ 33.

13          As another example, a former Motorola, Inc. subsidiary, Symbol Technologies, had a long

14  history of licensing its 802.11 patent portfolio at                          In fact, following a trial, the

15  jury awarded Symbol a 6% royalty rate for Proxim's infringement of two of Symbol's patents –

16  both of which were included in Motorola's 802.11 offer to Microsoft.  *See Symbol Techs., Inc. v.*

17  *Proxim, Inc.*, No. 01-801-SLR, 2004 WL 1770290, at *10 (D. Del. July 28, 2004); Ex. 2.  At the

18  time of Motorola's 802.11 offer to Microsoft, Symbol's patent portfolio was owned by Motorola

19  and would have almost certainly been included in any license granted to Microsoft.  Ex. 2.

20          Motorola's 2.25% rate is also consistent with industry practice.  For example, a December

21  2010 survey of royalty rates in various industries indicates that the average royalty rate in the

22  telecom industry is 5.6%.  Ex. 9 at 6.  In another survey of licensing agreements and royalty rates,

23  Thomas Varner, of Economists, Inc., concluded based on a review of royalty rates published in

24  SEC filings that average rates for bare patent licenses in the "software" industry average 3.3%;

25

26

DEFENDANTS' OPPOSITION TO MICROSOFT'S MOTION
FOR PARTIAL SUMMARY JUDGMENT - 13
CASE NO. C10-1823-JLR

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

1  average rates in "hardware" average 3.9%.  Ex. 10 at 123.  Motorola believes discovery will

2  further confirm that 2.25% is well within the range of rates in the industry.[7]

3        Microsoft's claim of unreasonableness is also belied by its own sales and marketing

4  practices.  As advertised to the public on Microsoft's website, consumers may purchase an 802.11-

5  compliant adapter to add WiFi functionality for older Xbox gaming systems for approximately

6  40% of the purchase price of a new 802.11-compliant system.  In other words, Microsoft has

7  publicly valued 802.11 standard functionality at approximately 40% of the product's total market

8  value – far beyond the 2.25% in Motorola's opening offer.[8]  *See* Post Decl., ¶¶ 13, 14; Exs. 11, 12.

9  The value that the patents contribute to the product is a genuine issue of material fact that requires

10  denial of Microsoft's motion.

11        Finally, as described above, Microsoft's analysis completely ignores that Motorola's offers

12  were being made at 2.25%, "subject to a grant back license…."  Exs. 2, 3.  Thus, Microsoft was

13  encouraged to provide a counter-proposal or offer a license for its own essential patent technology

14  such that the ultimate negotiated rate would account for the value of Microsoft's intellectual

15  property included in the overall agreement.[9]  This approach is especially common in negotiations

16  for cross-licenses, where the parties typically obtain more information about the intellectual

17  property that will be cross-licensed during the negotiation process.  Teece Decl., ¶ 3, Rebuttal

---

18    [7] As an additional example, the results of a 1997 survey of licensing professionals, published in *les Nouvelles* (the

19  journal of the Licensing Executives Society) indicate that "revolutionary" patents on average earn royalty rates in the

  range of 7% to 14%, that "major improvement" patents on average earn royalty rates in the range of 4% to 9%, and

20  that "minor improvement" patents on average earn royalty rates in the range of 2% to 6%.  Teece Decl., ¶ 3, Rebuttal

  Report at 42 ¶ 215.

21    [8] As evidenced by the recent auction purchase of the Nortel patent portfolio for $4.5 billion (Microsoft was one of

  the high-value purchasers), and the announced acquisition of Motorola Mobility by Google for $12.5 billion, valuing

22  patent portfolios is very subjective.  Deciding whether a rate was reasonable on so bare an evidentiary record is

  inappropriate at this stage of the case.

23    [9] Once again, when dealing with the Government in other contexts, Microsoft has *agreed* with Motorola:

24        [C]ompanies make decisions about whether to initiate licensing discussions and, if so, what

      considerations beyond just the essential claims vis-à-vis the final standard will be included.  ***The***

25        ***negotiation associated with a standards-related patent license typically is no different from any***

      ***general patent licensing discussion and will involve trade-offs on all of the terms and***

26        ***conditions***.

  Ex. 4 at 12 (emphasis added).

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

Report at 12 ¶ 45.  A standard opening offer (such as Motorola's standard 2.25% offer) is typically made absent that information; offers and counter-offers will typically evolve as the parties' understanding of each other's portfolio grows.  Such evolution would be expected here, as Microsoft might possess significant intellectual property of its own that could be included in a cross-license agreement.

In short, Motorola's prior license offers and subsequent negotiations, the terms of executed licenses, established industry rates, and the value Microsoft has attached to 802.11 functionality (as demonstrated by the sales price of its stand-alone Xbox WiFi adapter) show that, at the very least, there are genuine issue of material fact that require denial of Microsoft's motion.  Indeed, these facts show that Motorola's offer was, in fact, RAND.

     **2.**    **Basing a Royalty Rate on the Price of an End Product is Reasonable.**

In its motion, Microsoft also argues that Motorola's offer was not RAND because it was based on the price of the end product.  ECF No. 77 at 2-3.  This royalty base, like the other terms set forth in Motorola's offer letters, was Motorola's standard offer and was subject to negotiation.  Ex. 2, 3.  At least          have entered into licenses with Motorola that use net selling price of an end product as a royalty base.  Teece Decl., at ¶ 3, Rebuttal Report at Exhibit 1.A.  But discovery will show that

           .  For example, Motorola has licensed its essential patents to third parties on a           or based on           .  *Id.*, Rebuttal Report at 1.B.  As another example,      , a company that primarily does not sell to end users, entered into an agreement with Motorola in which          .  *Id.*, Rebuttal Report at Exhibit 2.A.  And          .  *Id.*, Rebuttal Report at 1.B.  But unlike these licensing partners, Microsoft simply chose not to negotiate.

The fact that companies have licensed repeatedly Motorola's patents based on net selling price of an end product confirms that there is nothing inherently unreasonable about using this as a

DEFENDANTS' OPPOSITION TO MICROSOFT'S MOTION
FOR PARTIAL SUMMARY JUDGMENT - 15
CASE NO. C10-1823-JLR

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone: (206) 676-7000
Fax: (206) 676-7001

1   royalty base.  In fact, this is a common and preferred royalty base.  As noted by the Federal

2   Circuit, "sophisticated parties routinely enter into license agreements that base the value of the

3   patented inventions as a percentage of the ***commercial products' sales price***."  *See Lucent Techs.,*

4   *Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1339 (Fed. Cir. 2009) (emphasis added).[10]  The Federal

5   Circuit's endorsement of using a percentage of the sales price as a royalty base is not surprising –

6   this is a readily identifiable and auditable value that is difficult to manipulate, easy to administer

7   and accounts for the introduction of new features or products in the future.[11]  Well-known

8   licensing treatises further confirm that Motorola's use of net sales price is reasonable.  For

9   example, according to a treatise titled Drafting Licensing Agreements (4th ed.), "*[t]ypically*, the

10  royalty rate is based on a percentage of either the sales or profits of the product that is the subject

11  of the license agreement."  Ex. 13 at 20-47.  The treatise explains that:

> ***Gross sales and net sales*** are ***favored*** by licensors because they are relatively
> easy to measure, relatively hard to manipulate, and account for increases due to
> inflation.  Licensees also ***prefer*** basing the royalty rate on ***gross or net sales***
> because it allows proper accounting to the licensor without having to disclose
> profit information.  For these reasons, the majority of licensees use sales as the
> royalty base, ***with net sales predominating*** because they allow deductions for
> certain expenses that are not related to the protected technology.

12
13
14
15
16

17  *Id.* at 20-48 (emphasis added).  Similarly, another well-known treatise, titled Drafting Patent

18  License Agreements (5th ed.), also acknowledges that "***The most common royalty bases*** are the

19  ***sales price (net or gross) of the licensed product*** or a fixed amount for each licensed product sold

20  or manufactured."  Ex. 14 at 113.  Thus, there is nothing unreasonable or even unusual about using

21  the sales price as a royalty base.  If Microsoft did not like this approach, all it had to do in

22  ───────────────────────

    [10] Microsoft's reliance on the Entire Market Value Rule misses the point.  ECF No. 77 at 19-20.  The Entire Market
23  Value Rule relates to calculating patent damages in a litigation context and has no relevance to licensing negotiations.

    [11] Another advantage is that the parties may find it much easier to agree on a single percentage-based royalty rate to
24  apply across all licensed products than to try to either (1) agree on a set of different percentage-based royalty rates to
    apply across different categories of licensed products or (2) agree on a set of different fixed dollars-per-unit royalties
25  to apply to particular licensed products (or categories of licensed products).  Teece Decl., ¶ 3, Rebuttal Report at 46
    ¶ 234.  And perhaps the most significant advantage of a percentage-based running royalty is that it automatically
26  adjusts the royalty amount paid to reflect changing economic conditions, in a way that, to a significant degree, aligns
    the incentives of the parties.  *Id.*, Rebuttal Report at 46 ¶ 235.

DEFENDANTS' OPPOSITION TO MICROSOFT'S MOTION
FOR PARTIAL SUMMARY JUDGMENT - 16
CASE NO. C10-1823-JLR

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

1   negotiations was raise an objection or make a counteroffer.  To claim a breach of a RAND

2   obligation on this basis is nonsense.[12]  And there is certainly no basis for granting summary

3   judgment of unreasonableness on this issue.

4       Motorola's proposal of applying a royalty rate to the end price of products sold to

5   consumers is also appropriate in light of the Supreme Court's decision in *Quanta Computer, Inc.*

6   *v. LG Elecs., Inc.*, 553 U.S. 617 (2008).  In that case, the Supreme Court held that "[t]he

7   authorized sale of an article that substantially embodies a patent exhausts the patent holder's rights

8   and prevents the patent holder from invoking patent law to control postsale use of the article." *Id.*

9   at 638.  Accordingly, in order to ensure that its downstream rights were protected, Motorola's

10  opening offer made clear that it wanted to hold Microsoft responsible for its fair share of royalties.

11  As discussed above, if Microsoft believed that certain adjustments or carve outs were necessary to

12  balance the royalty base properly, they were free to make that counter-proposal, as others have

13  done in similar circumstances.

14      Microsoft has raised other objections to using the price of the end product as the royalty

15  base.  Microsoft argues that using the price of the end product is unreasonable because

16  (1) Microsoft does not sell certain end products (e.g., PCs and laptops) that incorporate H.264

17  technology directly to consumers and (2) the same wireless functionality exists in products that

18  vary in end price.[13]  When dealing with similarly situated licensees, Motorola has shown

19

20  ───────────────
    [12] Merely pointing to certain (claimed) adverse implications of a percentage-based royalty structure, without
21  performing a comparable analysis of alternative royalty structures, proves nothing about the relative merits – or
    reasonableness – of a percentage-based royalty structure.

22  [13] The "economic value" of a high technology system such as the Xbox is not simply the sum of the "economic
    value" of its components; those components act together synergistically to deliver a system value.  Teece Decl., ¶ 3,
23  Rebuttal Report at 13 ¶ 55.  It is by no means self-evident that the "economic value" of enabling WiFi and / or H.264
    functionality to a user does not increase with hard disk capacity and / or with its Kinect capability of the
24  consumer's system; indeed some relationship would be expected.  *Id.*  Moreover, it is worth noting here that Motorola
    has no control over (a) how Microsoft chooses to price its products, or (b) how Microsoft chooses to bundle its
25  products, or (c) how Microsoft chooses to price bundles of products relative to the price of "equivalent" unbundled
    sales.  Motorola proposed a simple and straightforward royalty structure of 2.25% of the price of the various licensed
    products in the manner in which they were sold.  If Microsoft chooses to sell various products both separately and
26  bundled together, at various prices for the standalone products and the different bundles, in ways that result in
    different royalties for "essentially equivalent" outcomes, that is not something over which Motorola has any control.

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

1   flexibility in structuring royalty schemes that account for the unique situation of licensees and

2   their particular product lineup.  In fact,

3

4

5   .  Teece Decl., ¶ 3, Rebuttal Report at 74 ¶ 348.  Similarly, in reaching an agreement with

6

7                                                                  .  Ex. 15 at 4-5.

8        Prior to entering into negotiations with

9   Motorola did not have sufficient information to predict accurately what terms and conditions were

10  appropriate for their respective businesses.  Similarly, when making its initial offer here, Motorola

11  could not anticipate what particular variations would be necessary to create an appropriate

12  licensing structure for Microsoft.  Motorola could have made appropriate modifications (

13                        ) if Microsoft had simply responded in good faith and engaged in a

14  discussion, rather than refusing to engage in negotiations and bringing this lawsuit.  A Motorola-

15  Microsoft license could have, for example, (1) carved out the price of add-on components, like

16  games, hard drives and/or the Kinect sensor; (2) reduced the royalty rate to account for including

17  hardware or add-on components in the royalty base; (3) limited the royalty base to the price of

18  Microsoft's hardware; and/or (4) capped royalty payments for certain computer products in order

19  to tailor the license to Microsoft's business.  The existence of individualized licensing

20  requirements, such as these, is precisely why the SSOs' IPR Policies acknowledge that negotiation

21  is necessary.  It is also the reason that licenses of this kind are, in fact, always the result of

22  negotiations.

23        As an aid to resolution of this fact issue, further discovery of Microsoft and third parties,

24  along with experts in the industry, will confirm that basing a proposed royalty rate on net selling

25  price amounts is well accepted and common.  For example, discovery may show that Microsoft

26

DEFENDANTS' OPPOSITION TO MICROSOFT'S MOTION
FOR PARTIAL SUMMARY JUDGMENT - 18
CASE NO. C10-1823-JLR

1    enters into a variety of licenses, including agreements (both as a licensor and licensee) in which

2    royalties are based on the net selling price of the end product sold to consumers.

3        **3.      The Patent Pools Identified by Microsoft Are Irrelevant.**

4        Attempting to bolster its position, Microsoft identifies the lowest industry royalty rates it

5    can find, suggesting that these low rates are necessarily indicative of reasonable rates for all

6    circumstances.  ECF No. 77 at 20-21.  To this end, Microsoft selectively relies on the rates

7    published by VIA Licensing and MPEG LA (patent pools for certain 802.11 and H.264

8    technology, respectively) to argue that Motorola's license offer was higher and, therefore,

9    presumptively unreasonable.  These pool rates, however, are irrelevant to the present motion.

10       Patent pools typically establish ***non-negotiable*** rates that are lower (sometimes

11   dramatically lower) than what would be found in one-off licenses between two parties.  Patent

12   holders join patent pools and accept these lower rates for different reasons.[14]  For example, a

13   patent holder may desire to license its portfolio in a single transaction, minimizing the time and

14   expense spent negotiating many separate deals.  Patent holders may also join a pool and accept

15   these lower rates to obtain access to a large collection of other patents – owned by many licensors

16   – that are essential to a standard related to their business.  Similarly, a prospective licensee may

17   take a license from a pool to obtain a group license to patents from many different licensors

18   without having to engage in one-off negotiations with each licensor.  Because the "patent holder"

19   (i.e., the "pool") and licensee in a patent pool are in a completely different posture and do not

20   engage in negotiations, patent pool rates have little relevance in determining whether the rate

21   Motorola offered to Microsoft was reasonable.

22       Additionally, patent pools and their compromised rates also do not necessarily inform how

23   the market operates outside of the pool context.  Indeed, the CEO and Manager of MPEG LA,

24   Baryn Futa, noted the difference between pool licensing and one-on-one licensing:

25

26

---

[14] Motorola has not joined VIA Licensing's 802.11 or MPEG LA's H.264 patent pools.

DEFENDANTS' OPPOSITION TO MICROSOFT'S MOTION
FOR PARTIAL SUMMARY JUDGMENT - 19
CASE NO. C10-1823-JLR

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

In MPEG LA's licensing programs, licensees pay the same royalties to MPEG LA whether or not they are patent owners. Licensees, of course, have the right separately to negotiate a license with any or all of the licensors under any and all of the patents *under terms and conditions to be independently negotiated*, but MPEG LA has nothing to do with such negotiations. *If a licensee independently negotiates a license directly with a patent owner, that is a matter to be worked out directly between them*. MPEG LA does not become involved in such negotiations, and any adjustments the parties may wish to make as a result of their bilateral license is a matter between them, not MPEG LA. We have maintained this policy not because we believe it is or should be legally mandated but because we have found that it is important to licensees to know that they will be treated the same and pay the same royalties as any other similarly situated licensee (whether or not a patent holder).

\*             \*             \*

Those who argue that "special deals" for licensors raise legal or competitive issues, however, ignore the R&D costs borne by the patent holder, the patent holder's expectation of a reasonable return on its patents and the right to recoup it in whatever equitable and equivalent fashion they please. If a patent holder is paying less royalties than some party who did not incur the substantial R&D cost necessary to become a patent holder, is that truly discrimination? Even though it's not something we do, I think not.

Ex. 16 at 4 (emphasis added). As Mr. Futa acknowledges, pools are different from one-on-one negotiations between a licensee and a patent owner, like here. And pools do not always account for a patent holder's research and development and contribution to the development of new technology. In certain cases, an innovator must engage in bilateral negotiations to properly obtain fair value for its portfolio.[15] Motorola has done exactly that here.

Motorola intends to conduct third-party discovery relating to patent pools (possibly including MPEG LA and VIA Licensing) regarding communications between third parties and the

---

[15] There are many reasons that a patent holder would feel this way. For example, the patent holder may believe that (1) the way in which the pool divides up the royalties received from licensees among the various pool participants – the "sharing rule" used by the pool – gives the patent holder too small a share of the overall pool revenues to reflect the value of the patent holder's technology, or (2) the aggregate royalty charged by the pool is insufficient to fully compensate all of the pool participants for the use of the technology. Because of this perceived inequity, the pool arrangement would not be beneficial for that patent holder. In recognition that patent pools are not the right construct for every party, "[t]he MPEG LA license ... does not preclude any party from negotiating bilateral licenses under one or more patents with any patent holder under whatever terms the parties to the license can agree." Ex. 16 at 1. "[I]n many cases, a bilateral license may be used to deal with multiple intersection points between two companies' intellectual property where the companies' needs extend beyond a particular set of essential patents for a given standard, and no one is in a better position to make those judgments than the parties themselves." *Id.* at 6.

DEFENDANTS' OPPOSITION TO MICROSOFT'S MOTION
FOR PARTIAL SUMMARY JUDGMENT - 20
CASE NO. C10-1823-JLR

1   pools regarding their pooling arrangement, rate structure, patent disclosures, and the benefits they

2   believe they provide to their members.  Post Decl., ¶ 37.  Motorola believes that this discovery

3   will confirm the inapplicability of patent pool rates to the parties' current dispute.  At the very

4   least, there is a genuine issue of material fact concerning whether the rates utilized in patent pools

5   are merely special rates at the low end of reasonableness due to the circumstances of pools or,

6   indeed, have any relationship at all to a one-off, bilateral licensing agreement between

7   competitors, as in this action.

8   **V.   MICROSOFT'S FAILURE TO REQUEST A LICENSE AND NEGOTIATE
       TERMS ALSO PRECLUDES SUMMARY JUDGMENT**

9

10          Regardless of whether Motorola met its RAND obligations (which it did), Microsoft's own

11   actions require denial of its summary judgment motion.

12          Under typical SSO policies, a RAND license is only available to willing licensees.  As

13   stated by the American Bar Association:

14          [RAND] licensing commitment[s are] often stated as an absolute (i.e., that the
       [patent owner] must grant the required licenses).  However, it is reasonable to
15       require that such licenses be granted ***only upon a request by a potential licensee
       and upon the conclusion of bilateral negotiations***.  It would be unreasonable for
16       a [patent owner] to be required to seek out its own licenses in this context, or to
       extend offers before being requested to do so.

17   Ex. 17 at 49 (emphasis added).

18          Consistent with this, the contractual obligations to which Microsoft claims beneficiary

19   status are designed to benefit "applicants" for RAND licenses.  *See, e.g.*, Ex. 5 at 15 (IEEE bylaw

20   provision, requiring a "statement that a license for a compliant implementation of the standard will

21   be made available to an unrestricted number of ***applicants***") (emphasis added); Ex. 6 at 11 (ITU

22   form Patent Statement and Licensing Declaration provision, stating that "The Patent Holder is

23   prepared to grant a license to an unrestricted number of ***applicants***.") (emphasis added).

24          Microsoft asserts that "Microsoft, IEEE, and ITU relied on Motorola's commitment that it

25   would make licenses available to applicants on RAND terms for this Motorola-unique

26   technology."  Microsoft's Opposition to Motorola's Renewed Motion to Dismiss, Mar. 28, 2011,

DEFENDANTS' OPPOSITION TO MICROSOFT'S MOTION
FOR PARTIAL SUMMARY JUDGMENT - 21
CASE NO. C10-1823-JLR

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone: (206) 676-7000
Fax: (206) 676-7001

1   ECF No. 60 at 6.  And yet, although aware of Motorola's 802.11 and H.264 essential-patent

2   holdings, Microsoft elected not to apply for a license from Motorola as called for by the ITU and

3   IEEE IPR Policies.  Then, when offered the opportunity to discuss entering into a license,

4   Microsoft refused to negotiate and instead rushed to the courthouse to file this suit.  Even now,

5   Microsoft has not asserted that it has any intention to request or negotiate a license on any terms,

6   RAND or otherwise, even if those terms were to be established by this Court.[16]

7         Where, as here, Microsoft's response to an opening offer is to file suit, any contractual or

8   other duty Motorola might have had to negotiate a RAND license is extinguished and any RAND

9   obligation that Motorola owed to Microsoft likewise was nullified.  By filing the original

10  complaint, instead of responding to Motorola's letters with a counteroffer or a request to negotiate,

11  as a reasonable party would have done, Microsoft anticipatorily breached and repudiated any

12  third-party beneficiary status that it had enjoyed.[17]

13        Given Microsoft's anticipatory breach and repudiation of any benefit from Motorola's

14  RAND obligations, Motorola cannot be in breach of its RAND obligations and Microsoft, having

15  elected to sue rather than negotiate, should not be heard now to claim a contractual right it

16

17

18

19   [16] In this way, the present circumstances are readily distinguishable from those involved in *Research In Motion Ltd. v. Motorola, Inc.*, 644 F. Supp. 2d 788 (N.D. Tex. 2008), cited by Microsoft. ECF No. 77 at 15.  As an initial matter, that decision was made in the context of a motion to dismiss, which requires application of a different standard by the court based only on the pleadings. Furthermore, in that case, RIM was indeed an "applicant" and only alleged that Motorola violated its RAND commitments after extensive negotiations had taken place for at least a year prior to the expiration of a prior license agreement. Ex. 18 at ¶¶ 84-85, 88-90, 92-93, 110, 165-66.  Upon expiration of the license, the parties extended their negotiations for 45 days under a standstill agreement. *See* Ex. 19 at ¶ 7.  In contrast, here, Microsoft's claims rest on Motorola's initial offer letters without any history of Microsoft having applied for a license and then no negotiations (not even a response) whatsoever.

23   [17] "An anticipatory breach occurs when one of the parties to a bilateral contract either expressly or impliedly repudiates the contract prior to the time for performance.... Anticipatory breach relieves the other party of the duty to perform." *Dequilettes v. Moffat*, No. 51661-2-1, 2004 WL 370769, at *4 (Wash. Ct. App. Mar. 1, 2004) (citation and quotation omitted); *see also Bryan's One Stop, Inc. v. Ho*, No. 62583-4-1, 2010 Wash. App. LEXIS 2489, at *24 (Wash. Ct. App. Nov. 8, 2010) ("Anticipatory repudiation [of a contract] occurs when one of the parties to a bilateral contract either expressly or impliedly repudiates the contract prior to the time of performance.  An anticipatory breach ... is a positive statement or action by the promisor indicating distinctly and unequivocally that he either will not or cannot substantially perform any of his contractual obligations.") (internal quotation marks removed).

DEFENDANTS' OPPOSITION TO MICROSOFT'S MOTION
FOR PARTIAL SUMMARY JUDGMENT - 22
CASE NO. C10-1823-JLR

1  rejected.  At minimum, there is no basis for summary judgment to the contrary.  Accordingly,

2  Microsoft's motion should be denied.[18]

3  **VI.  CONCLUSION**

4  Microsoft's motion, which attempts to prevent Motorola and the Court from properly

5  considering the entire record regarding Motorola's 802.11 and H.264 offer letters, should be

6  denied.  Despite Microsoft's proclamation that Motorola offered rates "no rational company in

7  Microsoft's position could possibly have accepted," discovery will show that this is simply not the

8  case.  And, as described above, Motorola has met any burden under its RAND commitments.  It is

9  Microsoft who failed to act reasonably, by failing to negotiate (or even respond to) Motorola's

10  offers.  This was not commercially reasonable behavior.  At the very least, there are many

11  disputed material facts that remain at issue.  Accordingly, summary judgment in favor of

12  Microsoft, based on this limited record, is inappropriate and should be denied.

13  DATED this 23rd day of September, 2011.

14  SUMMIT LAW GROUP PLLC

15  

16  By /s/ Philip S. McCune
       Philip S. McCune, WSBA #21081

17     Lynn M. Engel, WSBA #21934
       *philm@summitlaw.com*

18     *lynne@summitlaw.com*

19

20

21

22  [18] In fact, once Microsoft instituted this lawsuit, Motorola was free to seek whatever remedies it deemed appropriate.  *See Commonwealth Scientific & Indus. Research Org. v. Buffalo Tech. Inc.*, 492 F. Supp. 2d 600 (E.D. Tex. 2007), *vacated on other grounds*, 542 F.3d 1363 (Fed. Cir. 2008) (permitting a standards-essential patent holder

23  to seek injunctive relief in circumstances similar to these, where the defendant failed to negotiate or accept a license on RAND terms); Ex. 4 at 13 ("[T]he existence of a RAND commitment to offer patent licenses should not preclude a

24  patent holder from seeking preliminary injunctive relief or commencing an action in the International Trade Commission just because the patent holder has made a licensing commitment to offer RAND-based licenses in

25  connection with a standard.  Whether such relief is available should be assessed under the current legal framework in the applicable jurisdiction, which often is premised substantially on the specific facts and circumstances at issue."); Ex. 17 at 49 ("If the Implementer chooses to implement the Standard without a license, the Patent Holder may in turn

26  choose to sue the Implementer for patent infringement and seek all available remedies.").

DEFENDANTS' OPPOSITION TO MICROSOFT'S MOTION
FOR PARTIAL SUMMARY JUDGMENT - 23
CASE NO. C10-1823-JLR

And by

> Jesse J. Jenner (*pro hac vice*)
> Steven Pepe (*pro hac vice*)
> Ropes & Gray LLP
> 1211 Avenue of the Americas
> New York, NY  10036-8704
> (212) 596-9046
> *jesse.jenner@ropesgray.com*
> *steven.pepe@ropesgray.com*

> Norman H. Beamer (*pro hac vice*)
> Ropes & Gray LLP
> 1900 University Avenue, 6th Floor
> East Palo Alto, CA  94303-2284
> (650) 617-4030
> *norman.beamer@ropesgray.com*

> Paul M. Schoenhard (*pro hac vice*)
> Kevin J. Post (*pro hac vice pending*)
> Ropes & Gray LLP
> One Metro Center
> 700 12th Street NW, Suite 900
> Washington, DC  20005-3948
> (202) 508-4693
> *paul.schoenhard@ropesgray.com*
> *kevin.post@ropesgray.com*

> ***Attorneys for Defendants Motorola, Inc., Motorola Mobility, Inc., and General Instrument Corp.***

DEFENDANTS' OPPOSITION TO MICROSOFT'S MOTION
FOR PARTIAL SUMMARY JUDGMENT - 24
CASE NO. C10-1823-JLR

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

**CERTIFICATE OF SERVICE**

I hereby certify that on this day I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Arthur W. Harrigan, Jr., Esq.
Christopher T. Wion, Esq.
Shane P. Cramer, Esq.
Danielson Harrigan Leyh & Tollefson
*arthurh@dhlt.com*
*chrisw@dhlt.com*
*shanec@dhlt.com*

Brian R. Nester, Esq.
David T. Pritikin, Esq.
Douglas I. Lewis, Esq.
John W. McBride, Esq.
Richard A. Cederoth, Esq.
Sidley Austin LLP
*bnester@sidley.com*
*dpritikin@sidley.com*
*dilewis@sidley.com*
*jwmcbride@sidley.com*
*rcederoth@sidley.com*

T. Andrew Culbert, Esq.
David E. Killough, Esq.
Microsoft Corp.
*andycu@microsoft.com*
*davkill@microsoft.com*

DATED this 23rd day of September, 2011.


/s/      *Marcia A. Ripley*
         Marcia A. Ripley

DEFENDANTS' OPPOSITION TO MICROSOFT'S MOTION
FOR PARTIAL SUMMARY JUDGMENT - 25
CASE NO. C10-1823-JLR

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone: (206) 676-7000
Fax: (206) 676-7001