# EXHIBIT 9



# LICENSING ECONOMICS REVIEW
## THE ROYALTY RATE JOURNAL OF INTELLECTUAL PROPERTY

No. 2010–6                                    December 2010



---

## IN THIS ISSUE

Transactions and Agreements in the News......................Page 2

Industry Royalty Rate Data Summary ............................Page 6

Government and Litigation............................................Page 8

**Licensing Economics Review**
is published by
AUS Consultants

David G. Weiler, Publisher
Cathy A. Smith, Ph.D., Editor
Beth McAndrews, Subscription Manager

All of the information in this publication is obtained from reputable and reliable sources and is therefore believed to be accurate but Licensing Economics Review and its publisher do not accept any liability for injuries that might occur from reliance on the information or articles presented. The contents are provided as authoritative information about the subject matter covered but represent the views of contributors and not necessarily those held by the publisher.

Licensing Economics Review welcomes contributions. Address submissions to the publisher and provide hard copy of the submission along with a computer disk containing the submission.

Annual subscriptions are US$350 in the United States-plus applicable taxes, and US$400 outside the United States. An on-line searchable database of archives is available for an additional US$100.

Licensing Economics Review
155 Gaither Drive, Suite A
Mt. Laurel, NJ 08054
(856) 234-1199

## TRANSACTIONS AND AGREEMENTS IN THE NEWS

**Spice Depot and EverFresh Spice.** The Spice Depot Inc. announced the granting of an exclusive global marketing license to EverFresh Spice Company, Inc. Spice Depot reported that the license is in response to an inability to meet established growth targets, due primarily to insufficient funds for inventory and expansion. The grant of an outside sales and marketing license is hoped to facilitate sales outside of the structural restrictions of the company. The license provides for an annual royalty of **5% of annual gross sales**.

The Spice Depot is a provider of all-natural spices, spice blend products, and organic herbs to supermarkets and groceries, along with other retail and wholesale food services. It is best known for grinder-top glass bottles of premium spices and spice blends grown primarily by boutique farmers on the Spice Islands but also in Southern Asia, Africa and North America. The spices are packaged on-site in the company's organic-certified processing and packaging facility in Indonesia.

Fiscal year 2008 financial statements show that the company has sustained substantial losses from operations since inception. In addition, the company is low on cash. As of April 30, 2008, the company had utilized all of its available funding. Without realization of additional capital, auditors concluded that it was unlikely for the company to continue as a going concern.

The company is considered to be in the development stage. No financial data was publically available for 2009 or 2010.

The EverFresh Spice Company, Inc. is a Nevada Corporation, newly

## INDUSTRY ROYALTY RATE
## DATA SUMMARY

This annual analysis of royalty rates provides benchmarks for licensing rates covering 15 industries. Data for the analysis is provided by AUS Consultants, Inc. and is derived from the RoyaltySource® royalty rates database. RoyaltySource® now contains over 9,000 public and private licensing transactions from over 24 years of tracking. This data was used to analyze average royalty rates (based on a percent of sales) by industry.

Four thousand three hundred and eighty-five selected observations from 15 industries in the database were analyzed with the results presented in Table 1. There are fewer transactions in the summary than the total number of transactions in the database for several reasons.

First, only technology licenses from public sources are included in the analysis -- and trademark license transactions are eliminated. Second, some transactions do not fit in the 15 industry groupings we have chosen to report. RoyaltySource® transactions cover more industries than the 15 reported. Other transactions are eliminated from the analysis because they have a royalty base of something other than some variation of sales.

Also worth noting is that every year transactions are moved from one category to another as additional information is obtained and the database is further refined.

### Table 1: RoyaltySource® Transaction Analysis

| Industry | Average | Median | Maximum | Minimum | Count |
|---|---|---|---|---|---|
| Chemicals | 4.7% | 4.5% | 30.0% | 0.1% | 133 |
| Internet | 16.3% | 12.5% | 80.0% | 0.3% | 215 |
| Telecom (excluding Media) | 5.6% | 4.5% | 50.0% | 0.3% | 138 |
| Consumer Goods, Retail & Leisure | 6.2% | 5.0% | 40.0% | 0.1% | 225 |
| Media & Entertainment | 11.3% | 6.8% | 50.0% | 0.1% | 52 |
| Food | 4.6% | 3.5% | 30.0% | 0.3% | 76 |
| Medical\Health Products | 5.8% | 4.5% | 80.0% | 0.1% | 595 |
| Pharmaceuticals & Biotechnology | 8.0% | 5.3% | 90.0% | 0.1% | 1,675 |
| Energy & Environment | 5.6% | 4.5% | 75.0% | 0.1% | 327 |
| Machines/Tools | 5.4% | 4.3% | 25.0% | 0.5% | 116 |
| Automotive | 5.1% | 4.3% | 30.0% | 0.5% | 97 |
| Electrical & Electronics | 4.5% | 4.0% | 20.0% | 0.5% | 188 |
| Semiconductors | 4.8% | 3.8% | 30.0% | 0.3% | 119 |
| Computers & Office Equipment | 5.5% | 4.0% | 30.0% | 0.1% | 107 |
| Software | 12.2% | 7.6% | 77.0% | 0.0% | 322 |
| **Industry Summary** | **7.5%** | **5.0%** | | | **4,385** |

**Figure 1:  Average Royalty Rates by Industry (comparing database transactions for years 2008 - 2010)**



The number of observations in the summary is a 12% increase as compared to 2009, with 474 transactions added in 2010.  Medical/ Health Products and Pharmaceuticals/ Biotechnology, by far have the most transactions.  The observations in these two categories account for over 50 percent of the total transactions added.

Electrical/electronics remains the category with the lowest average percentage royalty rate (4.5%).  Internet-related transactions continued to exhibit the highest average royalty rate, at 16.3%.

Pharmaceuticals and biotechnology (the category with the largest number of transactions) increased slightly with an average royalty rate of 8.0% of sales.  The average royalty rate in Media/Entertainment rose from 10.7% in 2009 to 11.3% this year.

Figure 1 presents the 2010 data with a comparison to the last two years of royalty rate data.  The **average royalty rate for all the transactions was 7.5% of sales**.  This is slightly higher than 2009's average of 7.4%.

(continued from Page 5)

Abstral® is promoted as the only fast-acting sublingual tablet for breakthrough cancer pain on the U.S. market. The value of the annual market for fast-acting fentanyl products is $550 million.

Abstral® is the first product for transmucosal immediate release fentanyl to be approved in the U.S. with the FDA mandated class Risk Evaluation and Mitigation Strategy (REMS). The Abstral® REMS allows appropriate prescriptions to be filled at retail pharmacies as well as providing access to Abstral® within hospitals. The product offers an alternative therapeutic choice to patients and clinicians with a simple, patient friendly and predictable way of delivering fentanyl transmucosally while retaining the individualized dose titration aspects required for optimal treatment of breakthrough pain.

Breakthrough pain is an acute and often severe flare of pain, experienced by patients suffering from cancer. It occurs even though a person maybe taking opioid pain relief medicine regularly for persistent pain. It is known as breakthrough pain because it "breaks through" a regular pain medicine schedule. It may be caused by the cancer itself or it may be related to cancer treatment.

Abstral® has been a significant driver of growth for ProStrakan in Europe. The product is now marketed by ProStrakan across the principal European markets - UK, Germany, France, Spain, Italy and Sweden. By June 2010 the product had gained an average market share of 24% of the fast-acting fentanyl market across these countries.

Orexo is developing proprietary products based on its reformulation technologies, targeted at the Specialty Pharmaceutical market. Today, Orexo has four products on the market of which Abstral® is a leading product. Orexo also has three significant partnerships with major pharmaceutical companies for research and development programs: discovery stage collaborations with Ortho-McNeil Janssen and Janssen Pharmaceutica in respiratory inflammation and with Boehringer Ingelheim for inflammation and pain, both within the arachidonic acid cascade and a clinical stage development agreement with Novartis for the treatment of gastrointestinal disorders.

ProStrakan Group is a specialty pharmaceutical company engaged in the development and commercialization of prescription medicines for the treatment of unmet therapeutic needs in major markets. ProStrakan's head office is in Scotland.

### Government and Litigation

**EMI, Apple, and Chrysalis.** A video game featuring the Beatles' back catalogue is at the center of

sively tolerated its use where its acceptability had not been the focus of the case. The court found that relying on the 25 percent rule of thumb in a reasonable royalty calculation is far more unreliable and irrelevant than reliance on parties' unrelated licenses, which were rejected in the cases involving ResQNet and Lucent Technologies. There, the prior licenses involved the same general industry and some of the same parties as the hypothetical negotiations at issue.

The court continued that lacking even these minimal connections, the 25 percent rule of thumb would predict that the same 25%/75% royalty split would begin royalty discussions between, for example, (a) TinyCo and IBM over a strong patent portfolio of twelve patents covering various aspects of a pioneering hard drive, and (b) Kodak and Fuji over a single patent to a tiny improvement in a specialty film emulsion.  Because it does not provide evidence of what would happen in a particular hypothetical negotiation or a particular technological area, the 25% rule is a flawed tool for determining a baseline royalty rate in a hypothetical negotiation. Evidence relying on the 25 percent rule of thumb is thus inadmissible under Daubert and the Federal Rules of Evidence, because it fails to tie a reasonable royalty base to the facts of the case at issue.

**LICENSING ECONOMICS REVIEW**

**The Royalty Rate Journal
of Intellectual Property**

**Editorial Advisory Board**

**Gordon V. Smith**
Chairman, Editorial Advisory Board,
President, AUS Consultants, and Distinguished
Professor of Intellectual Property Management,
Franklin Pierce Law Center

**Michael F. Clayton, Esq.**
Morgan, Lewis & Bockius LLP

**Robert Goldscheider, Esq.**
Chairman, The International Licensing
Network, Ltd.

**Serge B. Hadji, Esq.**
Senior Counsel, TRW

**Richard Razgaitis**
Senior Advisor
CRA International

**Karl F. Jorda**
David Rines Professor of Intellectual
Property Law and Industrial Innovation
Franklin Pierce Law Center

**Takeru Ohe**
President, T. Ohe & Associates

**James P. O'Shaughnessy, Esq.**
Rockwell International Corp.

**Weston Anson**
Chairman, Consor

**Russell L. Parr**
President, Intellectual Property
Research Associates

# EXHIBIT 10

# Technology Royalty Rates In SEC Filings

*By Thomas R. Varner*

## I. Introduction

Previous studies of technology license agreements have been limited either to analyzing relatively small sets of agreements or to analyzing a mix of complete agreements and general descriptions of agreements from a variety of sources. This study is unique in that it considers a large number of complete, publicly available agreements from one source, agreements submitted to the U.S. Securities & Exchange Commission (SEC) from 1994 to 2009. The dataset used for this study is also unique in that it contains a large number of royalty-based agreements previously granted Confidential Treatment by the SEC and obtained in unredacted form under the Freedom of Information Act.

I collected a total of 2,963 agreements as part of this study by searching for agreements submitted by high-tech and biotech firms to the SEC—covering over 40 Standard Industrial Classification (SIC) codes—that contained a running, or earned, royalty expressed as a percentage of licensed product sales. This unique dataset is comprised of actual license agreements submitted to the SEC as exhibits rather than simply general descriptions of those agreements, and is based on licenses that meet the SEC's threshold of materiality. These characteristics, along with the large number of agreements collected, make this dataset well suited to conducting a variety of analyses across multiple industries, as well as analyses of selected subsets of agreements. After presenting my analysis of all agreements in the dataset, I devote the remainder of this paper to findings related to analysis of almost a thousand patent licenses in the dataset. These patent licenses are comprised of Bare Patent licenses (i.e., rights to use patented technology only), Patent plus Know-How licenses (i.e., rights to use patented technology plus rights to additional information such as laboratory data, market analysis, or related studies), and Patent Settlement agreements.

There are several notable findings of this study. First, royalty rates are highly dependent on the nature of the agreements, with product licenses and distribution agreements exhibiting among the highest royalty rates, and Bare Patent licenses exhibiting among the lowest royalty rates for each industry category. Second, royalty rates for patent licenses that include technology "Know-How" generally have higher royalty rates than licenses that cover only Bare Patent rights. Third, patent licenses in which the licensor is a commercial entity generally have higher royalty rates than patent licenses in which the licensor is an individual, an educational institution, a government agency, or a non-profit organization. Fourth, observed Patent Settlement agreements generally have higher royalty rates than Bare Patent licenses. (I discuss later in this paper a likely bias in the dataset toward settlement agreements in which a court has made determinations favorable to the patent holder). Additional findings presented in this paper relate to the relationship between royalty rates and the selection of a royalty base, analysis of agreements with variable or "mixed" royalty rates, and analysis of non-royalty financial provisions.

■ Thomas R. Varner,
Vice-President,
Economists Inc.,
Emeryville, CA
E-mail: varner.t@ei.com

The general findings of this study should not be interpreted as a strict formula for determining a royalty rate for a given license for several reasons. First, this analysis was based on the stated terms in agreements without additional research of the technology or parties involved. Thus, this study is not a substitute for a thorough knowledge of the specific circumstances of the parties, the contribution of the licensed technology to the licensed products, or the availability of substitute technologies.

Second, a large number of technology licenses filed with the SEC specify a "royalty" but do not include a "running" or "earned" royalty expressed as a percentage of sales. Such agreements may express royalties as a dollar ($) amount per licensed product sold, a series of fixed payments, or some other form of financial consideration. Although I collected these agreements as part of my general research on technology licenses, they were not included in the dataset used for this analysis.

Third, not all technology licenses specify a "royalty," so one should not assume that all royalty-based licenses reflect all technology licenses. As part of a separate research effort, I conducted a search for patent licenses submitted by SEC filers that did not include the term "royalty." The consideration in such "non-royalty" patent licenses can include fixed fees, nominal payments, and/or non-monetary

considerations (*e.g.*, release from pending litigation or cross-licensing rights).

Fourth, the dataset is limited to material agreements submitted to the SEC. My personal experience in reviewing technology agreements as part of consulting engagements (performed under confidentiality agreements or protective orders) is that the majority of firms' agreements often do not rise to the level of being material agreements as defined by the SEC. Furthermore, based on my analysis of licenses in the dataset, and supported by discussions with licensing practitioners, royalty rates expressed in agreements within firms' entire licensing portfolios are typically lower than royalty rates observed in the set of agreements analyzed in this dataset.

The remainder of this paper is divided into the following sections: Section II describes the methodology used in the selection, coding, and analysis of licenses in the dataset; Section III discusses findings of the analysis; and Section IV presents conclusions and suggestions for further research.

## II. Methodology

### A. Selection of License Agreements and Materiality

All of the agreements used in this study were obtained by searching company filings to the SEC including registration statements, annual and quarterly reports, proxy statements, and current reports. The SEC requires that registrants disclose in their filings "material definitive agreements not made in the ordinary course of business."[1] While all of the agreements in the dataset were submitted by filers to the SEC, some of the agreements are between parties that were not SEC registrants on the effective date of the agreements. For example, agreements included as part of initial registration statements to the SEC (e.g., S-1 forms) are often between parties that were not SEC registrants on the effective date of the agreements.

Many of the agreements filed with the SEC are available online only in redacted form, i.e., they are marked by the filer as "Confidential Treatment Requested."[2] In some industries, such as the pharmaceutical industry, over 75 percent of the technology agreements filed with the SEC are granted Confidential Treatment. When a filer's request for Confidential Treatment is granted by the SEC, those provisions related to financial consideration are typically in the redacted portions of the filing. Included in this study's dataset, however, are over 800 previously redacted royalty-based license agreements that were obtained under the Freedom of Information Act (FOIA) in their original unredacted form.

### B. Royalty Rate Versus Total Consideration

A frequently used measure of comparison between license agreements is a "running" or "earned" royalty rate expressed as a percentage of sales (e.g., a running royalty of 5 percent of net sales).[3] However, one should not rely solely on running royalty rates as the basis for comparison between agreements for a number of reasons. First, a royalty rate should not be considered in isolation from its "royalty base," that is, the revenues upon which the royalty rate is multiplied to arrive at total royalties. Second, an agreement's total consideration may include additional financial terms such as upfront or other fixed fees, milestone payments, minimum annual royalties, or equity transfers. Third, license agreements may also include non-financial considerations such as mutual releases from lawsuits, limitations on fields of use or geographic markets, or cooperative arrangements between the parties for joint development or marketing activities.

### C. Classification of Parameters

Once the set of agreements in the dataset was collected, selected information was identified and coded for each agreement. This information included: (1) the type of technology licensed (*e.g.*, software, electronics, or pharmaceutical); (2) the type of licensor and licensee (commercial, individual, educational, non-profit, or government entity); (3) the nature of the agreement (*e.g.*, Bare Patent, Patent Settlement, or Joint Venture); (4) whether the SEC filer was the licensor or licensee; and (5) the maximum and minimum running royalty rates. Additionally, for patent licenses, I also coded information about fixed license fees, minimum annual royalties, equity transfers, sublicensing provisions, and adjustments or reductions to base royalty rates.

I classified license agreements four separate ways: (1) by the nature or industry of the licensors' and licensees' business; (2) by the nature of the licensed technologies; (3) by the nature of the licensed products; and (4) by the SEC filer's industry. The general

---

1. *E.g.*, Form 8-K General Instructions, SEC 873, Item 1.01 Entry into a Material Definitive Agreement.

2. The SEC permits a registrant to redact for a specified period of time those portions of its filings that are "trade secrets."

---

3. A small number of agreements identified in the search specify a royalty based on a measure of gross or operating profits. These agreements are excluded from the dataset.

findings of this paper are similar under these four different classification approaches, so for consistency, this paper presents findings based on agreements classified by the SEC filer's industry.

I searched for technology license agreements submitted by SEC filers within 44 different SIC codes over the period 1994 through 2009 that I broadly group into High-tech and Biotech industries. There were over 5,000 firms listed as SEC filers in the High-tech category, which included computer software[4] and hardware industries[5] (computer hardware, electronic components, instrumentation, and telecommunication), and over 1,800 firms in the Biotech category, which included medical device[6] and pharmaceutical industries.[7]

**D. Agreement Dates**

Chart 1 is a distribution of licenses from the dataset organized by effective date of each agreement. Of the nearly 3,000 agreements included in the dataset, about half are dated 1999 or earlier and half are dated 2000 or later. Approximately 30 percent of all agreements in the dataset are previously redacted agreements granted Confidential Treatment by the SEC and obtained under the Freedom of Information Act.

The agreements are skewed toward earlier years for two reasons. First, an agreement may be submitted to the SEC shortly after an agreement's effective date as in a Current Report (8-K), Quarterly Report (10-Q), or Annual Report (10-K). But an agreement also may be submitted as part of a registration statement (*e.g.*, S-1), in which case the agreement may predate the filing by several years. Second, the dataset includes previously redacted agreements in which a grant of Confidential Treatment has expired, a period that is often five or more years after the agreement is first filed in redacted form with the SEC. Thus, although approximately 30 percent of the dataset is composed of previously redacted agreements, the dataset includes a higher proportion of these agreements in earlier years.

## III. Findings Of Analysis

**A. Royalty Rates Vary by Type of Agreement**

Table 1 is a summary of royalty rates organized by type of agreement and industry. "Software" includes

prepackaged software, computer programming, systems design, processing, and data preparation firms; "Hardware" includes computer hardware, electronic components, instrumentation, and telecommunication firms; "Medical" includes medical, surgical, dental, ophthalmic, and orthopedic apparatus firms; and "Pharma" includes medicinal chemical, pharmaceutical preparation, diagnostic substances, biological product, medical laboratories, and biological research firms.

There are several noteworthy results of the findings shown in Table 1. First, royalty rates vary a great deal by type of agreement. The range of median royalty rates from Bare Patent licenses (among the lowest observed royalty rates in Table 1) to Product/Distribution licenses (among the highest observed royalty rates in Table 1) is over three-fold, from 3.0 percent to 10.0 percent for all industries.

Second, ranking of the agreements by royalty rates is relatively consistent across industries. For example, Product/Distribution licenses typically have among the highest median royalty rates among all types of agreements for each industry examined, whereas Bare Patent licenses typically have among the lowest median royalty rates among the agreement types shown in Table 1. Although not shown in Table 1, this relatively consistent ranking is also observed when the industries are further broken out by Standard Industrial Classification (SIC) codes. Third, in almost every industry and agreement category in Table 1, the average royalty rate is higher than the median royalty rate, thus indicating a positive skew (or long right-hand tail) to the distribution of royalty rates.



**Chart 1. Distribution of Agreement Dates in Dataset**

Number of Agreements (y-axis): 0, 50, 100, 150, 200, 250, 300, 350

Effective Date of Agreement (x-axis): Pre-1995, 1995, 1996, 1997, 1998, 1999, 2000, 2001, 2002, 2003, 2004, 2005, 2006, 2007, 2008

Legend:
Previously Redacted Agreements
Agreements Filed as Complete

---

4. Computer Software: SIC 7370-7374
5. Hardware: Computer Hardware: SIC 3570-3572, 3575-3577, 3651; Electronic Components: SIC 3670, 3672, 3674, 3679; Instrumentation: SIC 3821-3827, 3829; Telecommunications: SIC 3661, 3663, 3669, 4812, 4813, 4822, 4899
6. Medical Devices: SIC 3841-3845, 3851, 5047
7. Pharmaceutical: SIC 2833-2836, 8071, 8731

# Technology Royalty Rates

| Agreement Type | Industry | | | | |
|---|---|---|---|---|---|
| | **All** | **Software** | **Hardware** | **Medical** | **Pharma** |
| **All Types** | 5.0% (8.2%) n = 2,963 | 10.0% (17.3%) n = 515 | 5.0% (7.0%) n = 489 | 5.0% (5.6%) n = 520 | 5.0% (6.2%) n = 1,439 |
| **Product/ Distribution[2]** | 10.0% (15.4%) n = 339 | 14.4% (18.9%) n = 180 | 6.0% (12.8%) n = 58 | 5.0% (7.9%) n = 44 | 8.0% (12.6%) n = 57 |
| **Development/JV[3]** | 6.5% (9.5%) n = 482 | 17.0% (21.2%) n = 65 | 4.0% (8.1%) n = 71 | 6.0% (6.7%) n = 53 | 6.0% (7.7%) n = 293 |
| **Acquisition[4]** | 5.7% (9.1%) n = 350 | 10.0% (16.4%) n = 90 | 5.0% (6.4%) n = 78 | 5.0% (6.1%) n = 56 | 5.0% (6.8%) n = 126 |
| **Settlement[5]** | 5.0% (6.1%) n = 87 | 4.6% (7.6%) n = 10 | 6.0% (7.1%) n = 12 | 5.0% (5.5%) n = 33 | 4.6% (5.9%) n = 32 |
| **Patent (+)[6]** | 4.5% (5.1%) n = 570 | 4.0% (4.4%) n = 17 | 4.4% (4.9%) n = 95 | 5.0% (5.4%) n = 109 | 4.5% (5.1%) n = 349 |
| **Research[7]** | 4.0% (4.4%) n = 118 | 5.5% (5.5%) n = 2 | 3.0% (5.3%) n = 5 | 3.6% (4.0%) n = 18 | 4.0% (4.4%) n = 93 |
| **Bare Patent[8]** | 3.0% (3.7%) n = 343 | 3.0% (3.3%) n = 17 | 3.5% (3.9%) n = 17 | 3.5% (3.9%) n = 73 | 3.0% (3.6%) n = 197 |
| **Other[9]** | 5.0% (8.9%) n = 674 | 11.6% (18.1%) n = 134 | 5.0% (6.9%) n = 114 | 4.0% (5.6%) n = 134 | 5.0% (6.9%) n = 292 |

**Table 1. Running Rates by Agreement Type and Industry[1] Median (Average in Parentheses)**

1. All percentages refer to royalty rates applied to licensed product sales. Most agreements in the dataset specify a royalty base comprised of net sales as opposed to gross sales. Agreements that specify a royalty based on gross or operating profits are excluded from the dataset. Rates in Table 1 are base royalty rates prior to royalty reductions (e.g., patent stacking or combination product reductions).
2. Product licenses consist of licenses for defined or complete products. Distribution agreements include marketing and promotion agreements.
3. Joint Venture agreements include collaboration, cooperation, partnership, and strategic alliance agreements.
4. Acquisition agreements include purchase, merger, and acquisition agreements.
5. Settlement agreements include settlements from a number of different types of lawsuits including patent infringement, breach of contract, and class action suits.
6. Patent (+), or Patent plus Know-How, agreements refers to patent license agreements that also include a grant for additional intellectual property, e.g., know-how, confidential information, data, discoveries, and formulas.
7. Research agreements generally relate to sponsored research programs between educational or non-profit organizations and private firms.
8. Bare Patent licenses refer to license agreements that grant the licensee only rights to a patent (or to the technology covered by a pending patent application) and not to any additional information or technology (e.g., know-how).
9. Other licenses include consulting, employment, termination, manufacturing, supply, original equipment manufacturer (OEM), and database licenses.

These results highlight the importance of distinguishing between different types of license agreements when analyzing royalty rates. For example, aggregating all types of software licenses together results in a median royalty rate of 10 percent. However, this aggregate royalty rate is considerably higher than the median royalty rate for Bare Patent software licenses (3 percent) and lower than the median royalty rate for software Product/Distribution agreements (14 percent).

## B. Adjustments to Royalty Rates

The royalty rates shown in Table 1 are the "base" or unmodified rates reflected in the agreements; however, many agreements include provisions that reduce these base royalty rates. Examples of royalty reduction provisions include royalty stacking, patent validity, combination, and competitor entry provisions. Royalty Stacking provisions allow for reductions in a royalty rate if the licensee is required to take a license from a third party in order to make

# Technology Royalty Rates

## Table 2. Provisions for Royalty Rate Adjustments in Patent Licenses

| Licensing Provision | Frequency of Occurrence | |
|---|---|---|
| | High-tech | Biotech |
| Royalty Stacking | 3% | 21% |
| Invalid or Unenforceable Patents | 4% | 12% |
| Combination of Products | 2% | 6% |
| Entry of Competition | 1% | 7% |

High-tech includes licenses from computer software, computer hardware, electronic components, instrumentation, and telecommunication firms. Biotech includes licenses from medical device and pharmaceutical firms.

or sell licensed products. Invalid or Unenforceable provisions allow for royalty reductions if a court determines that the licensed patents are found to be invalid or unenforceable. Combination of Product provisions allow for royalty reductions if the licensed product is sold in combination with other products. And Entry of Competition provisions allow for royalty reductions in the event that competitors with similar technology, such as generic pharmaceuticals, enter a given market. Table 2 presents the frequency of royalty reduction provisions in Bare Patent licenses and Patent plus Know-How licenses by broad industry category. While royalty reduction formulas can vary considerably from agreement to agreement, the median of the maximum royalty reduction among the licensing provisions shown in Table 2 is 50 percent of the base royalty rate.

High-tech includes licenses from computer software, computer hardware, electronic components, instrumentation, and telecommunication firms. Biotech includes licenses from medical device and pharmaceutical firms.

## C. Royalty Rate Premium for Patent Plus Know-How

Bare Patent licenses are those agreements that grant a licensee rights to use only technology covered by one or more U.S. patents.[8] In contrast, Patent plus Know-How, or "Patent (+)," licenses grant a licensee rights covered by a Bare Patent license plus rights to additional intellectual property. This additional intellectual property is often specified in agreements as "Know-How," but may also be described as laboratory or research data, databases, market analyses, forecasts, or materials in support of a patent application. Table 3 summarizes royalty rates from agreements in which there are over 40 patent licenses within a

---

8. Bare Patent licenses in the dataset typically grant rights to one or more issued U.S patents, but there are also instances of agreements in the dataset that grant rights only to a pending U.S. patent and/or to non-U.S. patents.

## Table 3. Median Royalty Rates for Bare Patent and Patent Plus Know-How Licenses

| Field/SIC Code | | Patent + Know-How Licenses [a] | Bare Patent Licenses [b] | Know-How Royalty Premium [c] = [a] − [b] |
|---|---|---|---|---|
| All High-tech and Biotech | All | 4.5% (n = 570) | 3.0% (n = 343) | 1.5% |
| Electromedical Apparatus (MED) | 3845 | 5.0% (n = 25) | 2.0% (n = 23) | 3.0% |
| Biological Products (PHR) | 2836 | 5.0% (n = 98) | 3.0% (n = 65) | 2.0% |
| Surgical & Medical Instr. (MED) | 3841 | 5.0% (n = 69) | 3.6% (n = 40) | 1.4% |
| Semiconductors (ELE) | 3674 | 3.5% (n = 31) | 2.4% (n = 10) | 1.1% |
| Pharmaceutical Preparations (PHR) | 2834 | 4.0% (n = 156) | 3.0% (n = 70) | 1.0% |
| Diagnostic Substances (PHR) | 2835 | 4.0% (n = 40) | 3.5% (n = 34) | 0.5% |
| Physical & Biological Research (PHR) | 8731 | 3.5% (n = 39) | 3.0% (n = 19) | 0.5% |

SIC 3845  Electromedical & Electrotherapeutic Apparatus
SIC 2836  Biological Products (No Diagnostic Substances)
SIC 3841  Surgical & Medical Instruments & Apparatus
SIC 3674  Semiconductors & Related Devices

SIC 2834  Pharmaceutical Preparations
SIC 2835  In Vitro & In Vivo Diagnostic Substances
SIC 8731  Services-Commercial Physical & Biological Research

# Technology Royalty Rates

single SIC code in the dataset.

Table 3 shows that across all industries included in the dataset there exists a royalty premium of 1.5 percent for a licensor's Know-How above the royalty rates observed for Bare Patent licenses (based on median royalty rates). The magnitude of this Know-How royalty premium varies across industries from a relatively small value of 0.5 percent among patent licenses for Physical & Biological Research (SIC 8731) firms, to a larger premium of 3.0 percent among patent licenses for Electromedical Apparatus (SIC 3845) firms.

## D. Royalty Rate Premium for Observed Patent Settlement Agreements Over Bare Patent Licenses

The dataset also includes agreements that relate to settlement of litigation. I divided Settlement agreements from the dataset into two categories, those relating to patent infringement suits and those relating to all other types of suits (typically breach of contract suits). Virtually none of the Patent Settlement agreements in the dataset include a grant for Know-How, so I compared royalty rates in Patent Settlement agreements with Bare Patent licenses. Table 4 shows that the average and median royalty

rates of Patent Settlement agreements are 2.2 percent and 2.0 percent higher than Bare Patent licenses (excluding settlements), respectively. [9]

However, one should not conclude from this table that there exists a royalty rate premium among all patent settlement agreements. This table reflects only those patent settlement agreements found in SEC filings; it does not reflect all patent settlement agreements. If there is a determination in a patent litigation proceeding that is not favorable to the patent holder, then it is reasonable to expect that such a determination will result in a lower royalty rate (or even no license agreement at all). Consequently, such agreements are less likely to be submitted to the SEC as a material agreement, and thus, are not included in this dataset.

## E. Patent License Royalty Rates by Type of Licensor

The licensor for each agreement in the dataset was categorized as either a commercial or non-commercial entity, in which non-commercial entities include educational institutions, individuals, government agencies, and non-profit organizations. Tables 5A and 5B present median royalty rates by type of licensor for: all industries in the dataset; the medical device industry; and the pharmaceutical industry. Tables 5A and 5B show that patent licenses in which the licensor was a commercial entity had a higher median royalty rate than licenses in which the licensor was a non-commercial entity. This difference could exist for a number of reasons; for example, it could be that commercial entities as licensors command higher royalty rates because of the nature of the technology (*e.g.*, greater commercial applications or more developed technology) or because commercial entities may have greater negotiating

| Table 4. Patent Settlement Royalty Rates and Bare Patent Royalty Rates | | | |
|---|---|---|---|
| | Patent Settlement Agreements [a] | Bare Patent Licenses [b] | Settlement Royalty Premium [c] = [a] − [b] |
| Count | 55 | 343 | |
| Average Royalty Rate | 5.9% | 3.7% | 2.2% |
| Median Royalty Rate | 5.0% | 3.0% | 2.0% |

Table includes Bare Patent licenses and Patent Settlement agreements from all High-tech and Biotech industries in dataset.

| Table 5A. Median Royalty Rates by Type of Licensor Patent + Know-How Agreement Royalty Rates | | | |
|---|---|---|---|
| Industry | Licensor Type | | |
| | Commercial [a] | Non-Commercial [b] | Difference [c] = [a] − [b] |
| All | 5.0% (n = 357) | 3.8% (n = 213) | 1.2% |
| Medical | 5.0% (n = 73) | 4.0% (n = 36) | 1.0% |
| Pharma | 5.0% (n = 193) | 3.0% (n = 156) | 2.0% |

9. The average and median royalty rates for the 32 Settlement agreements in the dataset that were not associated with patent infringement suits were 6.5 percent and 4.6 percent, respectively.

| Table 5B. Median Royalty Rates by Type of Licensor Bare Patent Agreement Royalty Rates | | | |
|---|---|---|---|
| Industry | Licensor Type | | |
| | Commercial [a] | Non-Commercial [b] | Difference [c] = [a] − [b] |
| All | 3.5% (n = 139) | 3.0% (n = 204) | 0.4% |
| Medical | 4.0% (n = 27) | 3.4% (n = 46) | 0.6% |
| Pharma | 4.0% (n = 57) | 3.0% (n = 140) | 1.0% |

power relative to non-commercial licensors.

**F. No Patent Royalty Rate Premium Between Licensees with Low and High Revenues**

I also examined financial data of licensees to patent agreements (Bare Patent and Patent plus Know-How agreements) who were SEC filers over the subject period. I divided the licensees into those firms with relatively low revenues over the reported period (less than $10 million in total revenues), those firms with medium revenues ($10 million to $100 million in total revenues), and those firms with high revenues (greater than $100 million in total revenues). There was no statistically significant difference between patent license royalty rates observed for firms among these three categories, even when agreement type, licensor type, and industry distinctions were included in the analysis.

**G. Importance of Selecting the Appropriate Royalty Base**

The discussion so far has focused on royalty rates as opposed to the royalty base, that is, the sales upon which a royalty rate is multiplied to arrive at total royalties. As part of this study I examined not only royalty rates but also the licensed technology and the licensed products. The relationship observed between a licensed technology and a licensed product is typically straightforward; for example, if a compound is licensed for use in a specified pharmaceutical drug, then sales of that drug will typically be designated as the royalty base. Another example would be software technology that is licensed for use in a software product, and sales of that software product will typically be designated as the royalty base.

However, there are exceptions to this general relationship. For example, there are Bare Patent licenses in the dataset in which software technology is licensed for use in non-software products such as electronic components or computer hardware devices. Whereas the median royalty rate for Bare Patent licenses cov-

ering software technology for use in software products is 4.0 percent, the median royalty rate for Bare Patent licenses covering software technology for use in computer hardware devices is 1.3 percent. This lower royalty rate could reflect relatively higher sales prices for the hardware devices than for software products, or it also could reflect a lower relative contribution of the software technology to the hardware product. Thus, any prudent analysis of royalty rates for individual agreements should involve consideration of the applicable royalty base.

**H. Analysis of Mixed Versus Flat Patent Royalty Rates**

Many technology license agreements specify a range of royalty rates rather than a single rate. For example, an agreement may specify a 3 percent running royalty rate for revenues less than $10 million and a 5 percent rate for revenues greater than $10 million. I refer to such agreements as having "mixed royalty rates" as opposed to a "flat" or single royalty rate. The applicable royalty rate in mixed royalty rate agreements may be based on a number of factors, such as the cumulative amount of revenues, the date of the relevant revenue, or performance in meeting certain milestones (*e.g.*, receiving regulatory approval for a pharmaceutical product).

My analysis of patent licenses in the Pharmaceutical industry with mixed royalty rates shows that approximately 60 percent called for either higher royalty rates as licensed product revenues increased or royalty rates that increased over time. For all other industries in the dataset almost 90 percent of the patent licenses that specified mixed royalty rates called for either lower royalty rates as licensed product revenues increased or royalty rates that decreased over time.

**I. Analysis of Additional Patent Licensing Provisions**

Technology licenses often specify a number of financial terms in addition to a running royalty. For example, over 75 percent of all Bare Patent and Patent plus Know-How licenses in the dataset include upfront payments, milestone payments, or equity transfers. Table 6 is a summary of the frequency of selected additional financial provisions in patent licenses.

# Technology Royalty Rates

## Table 6. Additional Financial Provisions in Patent Licenses

| Licensing Provision | Frequency of Occurrence | |
| --- | --- | --- |
| | High-tech | Biotech |
| Upfront Fee (Cash) | 52% | 69% |
| Minimum Annual Royalty | 16% | 36% |
| Equity/Shares Granted or Exchanged | 19% | 26% |
| Separate Sublicensing Royalty Rates | 8% | 17% |

**High-tech includes licenses from computer software, computer hardware, electronic components, instrumentation, and telecommunication firms. Biotech includes licenses from medical device and pharmaceutical firms.**

## IV. Conclusions

In this paper, I examine observable factors in technology license agreements collected from SEC filings and which specified a running royalty rate. Of course, these observed factors are not the only factors that would enter into the minds of parties to a license agreement. Among other factors, parties also would consider substitute technologies, they would have insights into the contribution of the licensed technology to consumer demand for the licensed products, and they would have an understanding of the effects of the contract terms (both financial and non-financial) on their businesses. All of these additional factors could affect an individual agreement's specified royalty rate.

There are several findings of this analysis. First, royalty rates vary significantly based on the type of license agreement. For example, Bare Patent licenses generally have lower royalty rates than patent licenses that incorporate technology Know-How, and these licenses in turn generally have lower royalty rates than Product/Distribution, Development, and Acquisition agreements. Also, royalty rates tend to be higher when the licensor is a commercial entity as opposed to a non-commercial entity, such as an individual, educational institution, non-profit organization, or government agency.

There are several areas in which to extend the analysis presented in this paper. One could examine the differences between technology licenses that specify running royalty rates and those that specify other forms of consideration. One could develop multi-factor regression models to examine how the combination of observable factors affects royalty rates. One could examine more closely the nature of the technology being licensed for each industry type (e.g., therapeutic vs. diagnostic or small molecule vs. large molecule technology for pharmaceutical licenses), then evaluate the impact of such distinctions on royalty rates. Or, for patent license agreements, one could examine more closely the licensed patents to determine the availability of similar patented technology, the issuance of related foreign patents, or the number of references made to the covered patents by other patents.

Finally, although this analysis was based on a large dataset of material agreements, the general findings of this study should not be interpreted as a strict formula for setting royalty rates for a specific agreement. The findings of this study are not a substitute for a thorough knowledge of the specific circumstances of the parties to an individual agreement, the contribution of the licensed technology to the licensed products, or the availability of acceptable substitutes. ■

# EXHIBIT 11

**Free.**
My Account    Join Now    Sign In

Xbox 360 + Accessories      Kinect      Xbox LIVE      Games      Community      My Xbox      Support      Search All

Home > Xbox 360 + Accessories > Consoles > Xbox 360 4GB Console



# Xbox 360 4GB Console

The new Xbox 360 4GB console has built-in wi-fi, a black wireless controller, a standard definition composite A/V cable, and comes with a free one-month Xbox LIVE Gold Membership.

**Price: $199.99**

Find a Retailer

Overview                    What You Get                    Related Accessories

## Overview

The new Xbox 360® 4GB Console. Here today, ready for tomorrow with a brand new, leaner machine. Wi-Fi is built in for easier connection to the world of entertainment on Xbox LIVE, where HD movies and TV stream in an instant. It's ready for the controller-free experiences of Kinect—you don't just play the game, you are the game. Xbox 360 is more games, entertainment, and fun.



139

## Xbox 360 250GB Hard Drive

Upgrade your 4GB Xbox 360 console and take your entertainment to the next level! Play, watch, save, store. The massive 250GB hard drive has plenty of space for games, high-definition TV and movies, Games on Demand, game demos and add-ons, music, plus so much more. It's the easiest way to get the most from your Xbox 360.

**Learn more**



## Move content from one console to another

Easily transfer all your data from your original Xbox 360 hard drive to the next. Sold separately.

**Learn more**



Support    Press    For Developers    Jobs    Feedback

**United States**    **Mobile version**    Privacy Statement    Xbox.com Terms of Use    Code of Conduct    About Our Ads

© 2011 Microsoft

140

**Free.**

My Account    Join Now    Sign In

Xbox 360 + Accessories    Kinect    Xbox LIVE    Games    Community    My Xbox    Support    Search All

Home > Xbox 360 + Accessories > Consoles > Xbox 360 4GB Console



# Xbox 360 4GB Console

The new Xbox 360 4GB console has built-in wi-fi, a black wireless controller, a standard definition composite A/V cable, and comes with a free one-month Xbox LIVE Gold Membership.

**Price: $199.99**

Find a Retailer

Overview                      What You Get                      Related Accessories

## What You Get

- **Built-in Wi-Fi:** The new Xbox 360 is the only console with 802.11n Wi-Fi built-in for a faster and easier connection to Xbox LIVE. Stream HD movies and TV or download games from Xbox LIVE in 1080p and 5.1 surround sound from anywhere in the house.* Compatible with b/g/n networks.
- **Xbox LIVE:** Xbox LIVE brings a world of entertainment to you. Instantly stream movies and TV from Netflix in crystal clear HD, or download game add-ons like new levels, characters, maps, and songs. Easily jump right into online multiplayer fun and play along with friends around the world. Plus, get your favorite music from Last.fm, connect with friends on Facebook® and post tweets on Twitter. Xbox LIVE is your connection to more games, entertainment, and fun.*
- **Kinect ready:** Kinect brings games and entertainment to life in extraordinary new ways—no controller required. Easy to use and instantly fun, Kinect gets everyone off the couch moving, laughing, and cheering. See a ball? Kick it. Want to join a friend in the fun? Simply jump in. Even control an HD movie with a wave of your hand. Featuring a dedicated, specialized port, the Xbox 360 4GB is built to connect seamlessly with the Kinect Sensor.
- **Xbox 360 wireless controller (black):** This award-winning high performance wireless controller features a range of up to 30 feet and a battery life of 30 hours on two AA batteries.
- **More ports:** Connect more accessories and storage solutions with added USB ports. Now with a total of five (three back/two front), you'll find more places to plug and play. Plus, in addition to the standard Ethernet port and HDMI output, we've added an integrated optical audio out port for an easier connection to the booming sound of your A/V receiver.

Support    Press    For Developers    Jobs    Feedback

**United States**    **Mobile version**    Privacy Statement    Xbox.com Terms of Use    Code of Conduct    About Our Ads

© 2011 Microsoft

141

# EXHIBIT 12

Case 2:10-cv-01823-JLR   Document 87-4   Filed 09/23/11   Page 22 of 27

**Free.**

My Account    Join Now    Sign In

Xbox 360 + Accessories        Kinect        Xbox LIVE        Games        Community        My Xbox        Support        Search All

Home > Xbox 360 + Accessories > Accessories > Xbox 360 Wireless N Networking Adapter



# Xbox 360® Wireless N Networking Adapter

Seamlessly synchronize your wireless network with Xbox 360 using the newest Wireless N standard for a lightning-quick connection. Easily stream HD movies, videos, and music to your console from Xbox LIVE.

**Price: $79.99**

Find a Retailer

**Overview**

With no cords to tie you down, the Xbox 360 Wireless N Networking Adapter is your connection to the fun of Xbox LIVE. Quickly download or stream HD movies, TV episodes, game demos, game add-ons, and more. The dual band adapter offers fast speed and great range* and contains an extension cable for off-board placement.

*Range up to 2x that of a/b/g networks*



- Connect to Xbox LIVE wirelessly with ease.
- Highest Wireless N technology standard and dual band for maximum speed, coverage and reliability
- The best solution for streaming and downloading HD movies
- Works great with existing 802.11g and 802.11b wireless routers and access points

Support    Press    For Developers    Jobs    Feedback

**United States**    **Mobile version**    Privacy Statement    Xbox.com Terms of Use    Code of Conduct    About Our Ads

© 2011 Microsoft

143

# EXHIBIT 13

ASPEN PUBLISHERS

# DRAFTING LICENSE AGREEMENTS

## Fourth Edition

## Volume 2

**Michael A. Epstein**
**Frank L. Politano**
**Editors**

 Wolters Kluwer

Law & Business

**2011-2 SUPPLEMENT**

This publication is designed to provide accurate and authoritative information in regard to the subject matter covered. It is sold with the understanding that the publisher and the author(s) are not engaged in rendering legal, accounting, or other professional services. If legal advice or other professional assistance is required, the services of a competent professional should be sought.

—From a *Declaration of Principles* jointly adopted by
a Committee of the American Bar Association and
a Committee of Publishers and Associations

Copyright © 2011, 2010–2003 CCH Incorporated. All Rights Reserved.

Chapter 15 Copyright © 1992–2010 Al Kohn and Bob Kohn

No part of this publication may be reproduced or transmitted in any form or by any means, including electronic, mechanical, photocopying, recording, or utilized by any information storage or retrieval system, without written permission from the publisher. For information about permissions or to request permissions online, visit us at *www.aspenpublishers.com/licensing/default.aspx*, or a written request may be faxed to our permissions department at 212-771-0803.

Published by Wolters Kluwer Law & Business in New York.

Wolters Kluwer Law & Business serves customers worldwide with CCH, Aspen Publishers and Kluwer Law International products.

Printed in the United States of America

1 2 3 4 5 6 7 8 9 0

**Library of Congress Cataloging-in-Publication Data**

Drafting license agreements / Michael A. Epstein, Frank L. Politano, editors. — 4th ed.
    p. cm.
    Includes index.
    ISBN 978-0-7355-3379-2 (set) — ISBN 978-0-7355-3488-8 (v. 1) — ISBN 978-0-7355-3489-6 (v. 2) 1. Intellectual property — United States. 2. License agreements — United States. 3. License agreements — United States — Forms.     I. Epstein, Michael A.     II. Politano, Frank L.

KF2979.D6922
346.7304'8-dc21

2002074782

**2011-2 SUPPLEMENT**

Also, premium pricing and the rate of return must be taken into consideration. In addition, to determine the length of the future income stream, the economic remaining life must be determined.

### [c]  Disadvantages

There are disadvantages with this method also. Most notably, it is extremely difficult to predict what benefits will be derived in the future. This is tied to the difficulty in trying to determine the economic life. Another disadvantage is the difficulty inherent in trying to select an accurate discount rate. If the chosen discount rate is too high or too low, the determined value of the property may be noticeably inaccurate.

### [4]  Combination of Approaches

There is no one best approach that can be relied upon to provide a single valuation for patented assets. A blend is preferred, but in what proportion? And the presence, absence, and degree of exclusivity associated with intangible intellectual property make valuation even more difficult.[58]

## § 20.05   METHODS OF MEASURING ROYALTY RATES

Once a method of valuation has been determined and applied to the intellectual property, a basis for measuring the royalty rate must also be determined. Typically, the royalty rate is based on a percentage of either the sales or profits of the product that is the subject of the license agreement. In addition, the royalty rate may be determined on a per-unit basis. These methods of measuring the royalty rate are discussed in more detail below.

---

[58] Some useful references include:

G.V. Smith, & R.L. Parr, *Intellectual Property: Valuation, Exploitation and Infringement Damages*, J. Wiley & Sons, New York, 2005.

R. Goldscheider, *Licensing and the Art of Technology Management*, West Publishing, New York, 2007.

P.B. Bell, & J. Simon, *The Law And Business of Licensing*, Clark, Boardman, Callaghan, New York, 1997.

M.B. Finnegan, & R. Goldscheider, *The Law And Business of Licensing*, Clark Boardman Company, New York, 1980.

### [A]    Gross or Net Sales

To reiterate the comparison provided in Section 1, gross sales are the total of all sales at invoice prices, whereas net sales are gross sales minus returns, allowances, rebates, and discounts. Net sales can also exclude sales taxes, installation, freight and packing expenses, and other expenses.[59]

Gross sales and net sales are favored by licensors because they are relatively easy to measure, relatively hard to manipulate, and account for increases due to inflation. Licensees also prefer basing the royalty rate on gross or net sales because it allows proper accounting to the licensor without having to disclose profit information. For these reasons, the majority of licenses use sales as the royalty rate base, with net sales predominating because they allow deductions for certain expenses that are not related to the protected technology.

One method that uses net sales as the basis for measuring royalty rates is the "5% of Sales Method." As is obvious from its name, the "5% of Sales Method" bases the royalty rate on 5% of the net sales. The major disadvantage of the "5% of Sales Method" is that it does not take into account other financial considerations, the scope of the license grant, the risk associated with licensing the intellectual property, the capital investment necessary to implement the intellectual property, profits, manufacturing expenses, and operating expenses. Therefore, although this method may be used as a baseline, most negotiated royalty rates actually fall between 1% and 5% of the net sales.

### [B]    Profits

Another method of measuring the royalty rate is to use the profits resulting from the sale of the licensed product. Gross profit is determined by subtracting from gross sales the cost of the goods sold, which generally includes directly allocable expenses, such as manufacturing expenses, raw material costs, direct labor costs, utility expenses, and depreciation expenses for the manufacturing facility.[60]

One problem with the gross profits method is that operating expenses are not considered. Typical operating expenses include sales expenses, advertising, administrative costs, rent, basic utilities, and other expenses needed to keep the business running but that are not directly

---

[59] *See* 1 Harold Einhorn, Patent Licensing Transactions § 3.04[3] (1997).

[60] Russell L. Parr & Gregory J. Battersby, 1999 Licensing Update, Aspen Publishers, Inc., *Chapter 8: Royalty Rate Trends*, p. 224 (1999).