# EXHIBIT 16

**STATEMENT OF BARYN S. FUTA,
CEO and Manager, MPEG LA, LLC**

*Before The United States Department of Justice Antitrust Division and the
Federal Trade Commission Joint Hearings on
Competition and Intellectual Property Law and Policy in the Knowledge-Based Economy*

As a recipient of one of the principal Business Review Letters from the Antitrust Division that addresses patent or intellectual property pools,[1] MPEG LA is pleased for the opportunity to bring our licensing experience over the last five years to this discussion.

**MPEG LA**

First, some information about our company[2]:

MPEG LA's business is to offer fair, reasonable, nondiscriminatory access under a single license to patents that are essential for the use of standards-based or other platform technologies. Absent a pool license, users of the technology at issue would have to negotiate individual licenses under many patents with many patent holders in order to use these technologies. But, as a convenience to users who would like to acquire patent rights from multiple parties in a single transaction, MPEG LA offers a one-stop license. The MPEG LA license, however, is nonexclusive and does not preclude any party from negotiating bilateral licenses under one or more patents with any patent holder under whatever terms the parties to the license can agree. MPEG LA is itself neither a patent owner nor (except for securing the legal rights necessary to offer the license to others) a Licensee.

---

[1] Business Review Letter from Hon. Joel I. Klein to Garrard R. Beeney (June 26, 1997), available at http://www.usdoj.gov/atr/public/busreview/1170.htm.
[2] MPEG LA is headquartered in Denver, CO and has offices in Chevy Chase, MD and London, England. See http://www.mpegla.com

In July 1997 following issuance of the Division's Business Review Letter, MPEG LA began licensing a worldwide portfolio of patents that are essential for the international digital video compression standard known as MPEG-2. For the convenience of MPEG-2 users, MPEG LA's objective is to provide fair, reasonable, nondiscriminatory, worldwide access to as much MPEG-2 essential intellectual property as possible under a single license known as the MPEG-2 Patent Portfolio License. Independent patent experts in various jurisdictions evaluate patents for their essentiality. Since the program's inception, 13 new patent owners and more than 300 essential patents have been added. The MPEG-2 Patent Portfolio License has grown from the original 8 patent owners and 100 essential patents (25 patent families) to include more than 425 essential patents (100 patent families) in 39 countries owned by 20 companies and a leading university. Yet despite this enormous increase in value, the royalty rates have never increased and in fact, recently declined in response to marketplace needs.

**MPEG-2**

MPEG-2 refers to a fundamental technology underlying the efficient transmission, storage and display of digitized moving images and sound tracks on which high definition television (HDTV), Digital Video Broadcasting (DVB), direct broadcast by satellite (DBS), digital cable television systems, multichannel-multipoint distribution services (MMDS), personal computer video, digital versatile discs (DVD), interactive media and other forms of digital video delivery, storage, transport and display are based.

MPEG-2 is an open technology, giving users a wide interoperable range of cost and quality options within the computation that compresses data to produce a video stream meeting the MPEG-2 standard, and as an open technology, anyone may have access to it. The MPEG-2 standard does not set hardware requirements; it is flexible within a broad functional range, thereby assuring the interoperability of myriad MPEG-2 applications. For example, MPEG-2 applies to conventional and HDTV quality formats of both "progressive scan video" used in computer screens and "interlaced video" used in television sets. It is used in all video formats adopted by the Advanced Television Systems Committee (ATSC) for standard and high definition television for U.S. broadcasts and in the Digital Video Broadcasting (DVB) standard used in Europe, North and South America, Africa, Asia and Australia.

**The Success of MPEG-2**

Widespread adoption of MPEG-2 technology has enabled the interoperability and implementation of digital video across myriad applications throughout the world. Today MPEG-2 video technology is used in some 300 million decode, encode and transport product units - and by 2006 is expected to increase by more than six-fold. Included are cable, satellite and terrestrial digital set-top boxes; digital television sets; DVD players; video game systems; personal computers; digital video recorders, encoders and multiplexers. And that doesn't even count the billions of DVD discs being produced. All told, through 2006, the estimated value of MPEG-2 products in the world market is projected to exceed half a trillion dollars – and that doesn't even begin to measure the

materials that go into the products, the services that surround them or the content that comes out. This is a vigorous market. Thousands of companies employing countless people in the US and around the world make products using or relying on MPEG-2 technology. MPEG-2 has made video communication interoperable, global, competitive, innovative and efficient.

Wide acceptance of the MPEG-2 Patent Portfolio License is recognized as having played a large role in the worldwide utility of MPEG-2. MPEG LA's MPEG-2 licensees, now more than 400, make most of the MPEG-2 products in the current world market. Like the MPEG-2 Standard, the MPEG-2 Patent Portfolio License encourages technological improvement, competition and innovation in and outside of the Standard. Licensees are free to develop competing products within or outside of the standard and in fact in addition to the variety of products that use MPEG-2, the marketplace utilizes many different video compression standards.

**Nondiscrimination**

There has been much discussion today on the characteristics that make intellectual property pools pro-competitive: defined fields of use, essentiality of patents, determination of essentiality, terms that are fair and reasonable, nonexclusivity, licensees and licensors should be free to develop competing products and standards, nondiscrimination, and confidentiality of competitively sensitive information from competing Licensors, to name a few. Apart from the fact that these characteristics promote the pro-competitiveness of an intellectual property pool, most of them are determined and assured by the marketplace itself.

For example, if a license is not well defined, the customer won't know what it is buying and simply won't buy it. Similarly, if license requires a royalty for non-essential patents, the customer who doesn't need them won't pay for them. A license with patents that have not been evaluated by an independent patent expert will lack credibility and be difficult to sell. Marketplace acceptance is the best gauge of fair and reasonable; if the royalty is too high or the license terms are perceived as unbalanced, users will opt not to take the license and will invest their money elsewhere. Every license must be priced to sell. In the end, we are dealing with very sophisticated users who have many market choices.

I would like to use the remainder of my time today to share some brief thoughts on one of these characteristics - nondiscrimination. Many people write about nondiscrimination but it is rarely defined. Yet, it raises several important issues.

First, how broadly should nondiscrimination apply across licensees?

To meet the needs of the marketplace, nondiscrimination must apply to licensees who are similarly situated. This means there can be no discrimination among those selling the same products in the same place in the distribution chain. It also means that parties that compete directly with each other should be treated on a nondiscriminatory basis.

164

Products with like functionality and application entering similar markets should be treated the same, and the royalty rates should be applied neutrally so the products themselves can compete on a level playing field.

Second, to what extent does nondiscrimination apply to both licensor and licensee?

We agree that licensors who are licensees should be treated the same as any other similarly situated licensee (whether or not a licensor). This means that they sign the same license agreement, are subject to the same terms and pay the same royalty rates as others. Some have questioned the practice in programs administered by others whereby licensors are licensed under terms different from those set forth in the portfolio license. MPEG LA does not engage in such practice in any of the license programs we administer, but our reasons for refraining from it are practical having to do with marketing and the perception of fairness rather than legality.

In MPEG LA's licensing programs, licensees pay the same royalties to MPEG LA whether or not they are patent owners. Licensees, of course, have the right separately to negotiate a license with any or all of the licensors under any and all of the patents under terms and conditions to be independently negotiated, but MPEG LA has nothing to do with such negotiations. If a licensee independently negotiates a license directly with a patent owner, that is a matter to be worked out directly between them. MPEG LA does not become involved in such negotiations, and any adjustments the parties may wish to make as a result of their bilateral license is a matter between them, not MPEG LA. We have maintained this policy not because we believe it is or should be legally mandated but because we have found that it is important to licensees to know that they will be treated the same and pay the same royalties as any other similarly situated licensee (whether or not a patent holder). If the licensing administrator is hesitant to provide that assurance, users are reluctant to sign. Licensees do not begrudge patent holders their right to collect royalties for their patents as long as that revenue stream is separate from the royalties they pay so that its fairness is apparent.

Those who argue that "special deals" for licensors raise legal or competitive issues, however, ignore the R&D costs borne by the patent holder, the patent holder's expectation of a reasonable return on its patents and the right to recoup it in whatever equitable and equivalent fashion they please. If a patent holder is paying less royalties than some party who did not incur the substantial R&D cost necessary to become a patent holder, is that truly discrimination? Even though it's not something we do, I think not.

Third, what does nondiscrimination mean?

We know that such matters as royalty rate, scope of license, grant-back, duration and MFN which directly affect the ability of competitors to compete with each other must be included. But, nondiscrimination is a delicate balance and taking one factor out of the equation may upset the entire equation. Take price, for example. Some advocate that there should be a right to a division of the package license for those who want it – in effect, that they should be able to take a license to some patents and not others and that it

165

is unfair to charge them for patents they claim not to need. But, what those who advocate for this are really saying is that they want a discounted royalty rate for the patents they want as a proportion of the package license.

MPEG LA offers only one license to everyone. Since each patent is essential, the royalty rate and thus the value is the same whether a licensee uses one or more patents. The license, in effect, conveys the intellectual property rights necessary to enter the field. If MPEG LA were required to follow the path of those who advocate a right to division, however, we would in effect be offering a customized license to everyone. And, wholly apart from the administrative impossibilities, the principle of nondiscrimination would become meaningless. For example, when does a division become discriminatory? Can a licensee choose patents in one country and not others? The MPEG-2 License has patents in 39 countries. How about choosing a shorter term? A longer term? Some parts of the standard but not others? Where does one draw the line? Eventually (and I might add, very quickly), the right of division would defeat the purpose for which the license is created, and the benefit of lowest unit rate transaction costs afforded by standards-based licensing would be lost to the marketplace. The substantial savings of transaction costs would be lost, and a pool licensing administrator would no longer be a facilitator of a pool license but merely a conduit for individual license negotiations.

If those who seek a division really want to take a license under some patents and not others, the marketplace has a way to deal with this better than a package license ever could - licensees can achieve the same result through individual license negotiations with patent owners. MPEG LA does not become involved in these bilateral relationships and does not net out royalties one against the other, but with the written authorization of both licensor and licensee, MPEG LA will provide assistance in the form of information concerning how much of the licensee's royalties to MPEG LA were paid on account of the particular licensor's patents, thereby enabling the licensor and licensee to make these adjustments for themselves if they choose to do so.

Some say that that the alternative to a pool license of bilateral licensing relationships is not real, only theoretical; and some say that the increased efficiency resulting from the increasing quantity of patents under one license means that they should have an increasing ability to divide them up. But, what they are really saying is not that negotiating individual licenses is more theoretical (in fact, pool licenses co-exist quite nicely with bilateral licenses enabling companies large and small to have nondiscriminatory access to essential patent rights), but that the pool license has become so attractive that it is an alternative that they cannot refuse. That is not the fault of the pool license; it is its pro-competitive goal. While certain licensees may prefer endless permutations of the pool license – a contradiction in terms in my view – principles of non-discrimination, reducing transaction costs, and encouraging the formation of patent pools to ease blocking positions, among other things, require that licensees should choose between standard pool licenses and customized individual licenses. With this choice available, no legal principle should require the offering of a patent pool in endless permutations. Besides, a regulated result should not be substituted for the independent judgment of the parties to individual negotiations, especially where the marketplace is not

only doing the job but doing it well. For example, in many cases, a bilateral license may be used to deal with multiple intersection points between two companies' intellectual property where the companies' needs extend beyond a particular set of essential patents for a given standard, and no one is in a better position to make those judgments than the parties themselves.

# EXHIBIT 17





# Standards Development Patent Policy Manual

American Bar Association
Committee on Technical Standardization
Section of Science & Technology Law

Jorge L. Contreras, Editor



ABA SECTION OF
SCIENCE & TECHNOLOGY LAW



AMERICAN BAR ASSOCIATION
Defending Liberty
Pursuing Justice

The materials contained herein represent the opinions of the authors and editors and should not be construed to be the action of either the American Bar Association or the Section of Science and Technology Law unless adopted pursuant to the bylaws of the Association. Nothing contained in this book is to be considered as the rendering of legal advice for specific cases, and readers are responsible for obtaining such advice from their own legal counsel. This book and any forms and agreements herein are intended for educational and informational purposes only.

No part of this publication may be reproduced, stored in a retrieval system, or transmitted in any form or by any means, electronic, mechanical, photocopying, recording, or otherwise, without the prior written permission of the publisher. Permission requests should be sent to the ABA Copyrights & Contracts Department via e-mail at copyright@abanet.org or via fax at (312) 988-6030.

© 2007 by the American Bar Association. All rights reserved.

Printed in the United States of America

ISBN: 978-1-59031-928-4

**Library of Congress Cataloging-in-Publication Data**

Standards development patent policy manual / edited by Jorge L. Contreras. — 1st ed.
 p. cm.
 Includes bibliographical references and index.
 ISBN 978-1-59031-928-4
 1. Patent laws and legislation—United States. I. Contreras, Jorge L. II. American Bar Association. Section of Science and Technology

 KF3114.3.S73 2007
 346.7304'86—dc22

                              2007028218

Discounts are available for books ordered in bulk. Special consideration is given to state bars, CLE programs, and other bar-related organizations. Inquire at Book Publishing, ABA Publishing, American Bar Association, 321 North Clark Street, Chicago, Illinois 60610-4714.

For a complete list of ABA publications, visit www.ababooks.org

10 09 08 07    5 4 3 2 1

# CONTENTS

| | | |
|---|---|---|
| FOREWORD | | v |
| PREFACE | | vii |
| INTRODUCTION | | ix |
| HOW TO USE THIS MANUAL | | 1 |
| ANNOTATED POLICY CLAUSES | | 5 |
| I. | DEFINITIONS | 5 |
| II. | GENERAL | 27 |
| | A. Effect of Policy | 27 |
| | B. Noncompliance | 27 |
| |   1. Violation | 28 |
| |   2. Rejection of Violator's Contributions/Standards | 28 |
| |   3. Posting of Warning | 28 |
| |   4. Ejection from the SDO | 29 |
| |   5. Automatic License Grant | 29 |
| III. | PATENT DISCLOSURES | 31 |
| | A. Obligation to Disclose | 32 |
| |   1. Participant's Patents Covering Its Own Contributions | 32 |
| |   2. Participant's Patents Covering Any Standards Document | 34 |
| |   3. Third-Party Claims | 35 |
| | B. Timing of Patent Disclosures | 36 |
| |   1. Upon Entry in SDO | 37 |
| |   2. Participant's Claims Covering Its Own Contributions | 37 |
| |   3. Participant's Claims Covering Any Standards Document | 37 |
| |   4. For Third-Party Claims | 38 |
| | C. Format of Patent Disclosures | 38 |
| |   1. Required or Optional Format | 38 |
| |   2. Content and Specificity of Patent Disclosure | 40 |
| |   3. Blanket Patent Disclosures | 41 |
| |   4. Updating Patent Disclosures | 42 |
| | D. Disclosure Exclusions, Exemptions, and Opt-Out | 43 |
| |   1. Disclosure Opt-Out for Noninvolvement | 43 |
| |   2. Exemption from Disclosure If Licensing Commitment Is Made | 44 |
| |   3. Exceptions ("Negative Disclosure") | 45 |
| | E. Duration of Patent Disclosure Obligation | 46 |

| | | |
|---|---|---|
| IV. | LICENSING COMMITMENTS AND LICENSING STATEMENTS | 47 |
| | A. Licensing Commitment | 47 |
| |    1. Terms of the Licensing Commitment | 49 |
| |    2. Reciprocity | 61 |
| |    3. Defensive Suspension | 62 |
| | B. Obligation Structure of the Licensing Commitment | 67 |
| |    1. Events Triggering the Imposition of a Licensing Commitment | 67 |
| |    2. Events That Render Licensing Commitment Effective | 68 |
| |    3. Establishment of Licensing Commitments by Working Groups | 69 |
| |    4. Reduction of Licensing Commitment | 70 |
| | C. Licensing Statements | 72 |
| |    1. Elements and Types of Licensing Statements | 72 |
| |    2. Timing of Licensing Statements | 74 |
| |    3. Format of Licensing Statements | 76 |
| |    4. Licensing Statement Made by Whom | 81 |
| |    5. Duration of Licensing Commitments | 82 |
| V. | NORMATIVE AND INFORMATIVE REFERENCES | 87 |
| |    1. Claims Expressly Not Covered | 87 |
| |    2. Consistency Required | 89 |
| |    3. Disclosure Requested | 89 |
| VI. | SDO ACTIONS AND RESPONSIBILITIES | 91 |
| | A. Treatment of Patent Disclosures and Licensing Statements | 91 |
| |    1. Publication of Patent Disclosures and Licensing Statements | 91 |
| |    2. Retention of Patent Disclosures and Licensing Statements | 91 |
| | B. Review of Patent Disclosures and Licensing Statements by the SDO | 92 |
| |    1. Rejection by the SDO | 92 |
| |    2. Correction of Clerical Errors | 92 |
| |    3. Resubmission to the SDO | 93 |
| |    4. Verification by the SDO | 94 |
| | C. SDO Notification and Disclaimer | 94 |
| | D. Policy Guidelines and Guidance | 94 |
| EXHIBIT A: | The "Ex Ante" Question | 97 |
| EXHIBIT B: | Considerations for Creating Forms to Accompany SDO Patent Policies | 99 |
| EXHIBIT C: | Links to IPR Policies | 103 |
| Index | | 105 |

# FOREWORD

The Section of Science and Technology of the American Bar Association is pleased to present the *Standards Development Patent Policy Manual*. We are hopeful that this publication will serve as a valuable resource for technical standards organizations, standards developers, and lawyers with an interest in technical standards for many years to come.

This publication was prepared under the auspices of the Committee on Technical Standardization. Jorge L. Contreras, Chair, served as its primary editor, with substantial editorial and substantive assistance from Marc Sandy Block, Michele Herman, Susan Hoyler, and Amy Marasco. This publication also benefited from the regular input and advice of a dedicated subcommittee of experts from industry, academia, and private practice including Chuck Adams, Kent Baker, Dan Bart, Larry Bassuk, Robert Bauer, Scott Bradner, Marc Braner, Pamela Deese, Ed Fiorito, Patricia Griffin, Hung Ling, Alan McGrath, Gil Ohana, Dorothy Raymond, Michelle Stamnes, Richard Taffet, George Willingmyre, and, of course, the founder of the Committee, Ollie Smoot.

We are grateful to the Section of Antitrust Law and the Section of Intellectual Property for their support in the preparation and discussion of this publication.

We would also like to thank Shawn Kaminski, Director of the Science and Technology Section, as well as the members of the Publications Committee who helped to make this project a reality.

William S. Coates
Chair, Section of Science and Technology Law
American Bar Association

46   STANDARDS DEVELOPMENT PATENT POLICY MANUAL

## E. DURATION OF PATENT DISCLOSURE OBLIGATION

SDO Participants may generally withdraw from the SDO and/or particular Working Groups at any time. A Participant's disclosure obligation should continue during the entire period of its Participation in the SDO. The SDO may wish to address the possibility of a prospective Participant transferring Essential Claims in anticipation of joining the SDO (see Section III.A.1). While an SDO might be concerned about a Participant withdrawing and then filing patent applications to cover aspects of a Standard initiated during its period of Participation, imposing a duty to disclose after withdrawal from the SDO is generally viewed as unnecessarily burdensome on Patent Holders. This concern is often addressed in the Licensing Commitment (see Section IV.E.1.a), which may require a withdrawing Participant to continue to offer licenses with respect to Essential Claims covering Standards developed during its period of Participation in the SDO under certain prescribed circumstances.

| | |
|---|---|
| A Participant's disclosure obligations under Section III.A shall terminate<br><br>[upon its withdrawal from the SDO] **[1]**<br><br>and/or<br><br>[with respect to Essential Claims relating to a particular Standard, upon its withdrawal from the relevant WG]. **[2]** | **[1]** If the SDO wishes all of a Participant's disclosure obligations to terminate upon its withdrawal from the SDO, then this clause may be used.<br><br>**[2]** In addition, if the SDO wishes to allow a Participant's disclosure obligations with respect to a particular Standard to terminate upon its withdrawal from the relevant WG, then this clause may be used in addition to the clause in [1] above. |

## IV. LICENSING COMMITMENTS AND LICENSING STATEMENTS

As defined in Section I, a Licensing Commitment is an obligation requiring a Participant to grant licenses under its Essential Claims. A Licensing Commitment is not itself a license grant. It is merely an obligation to grant a license on terms such as RAND or RANDz.

A Licensing Statement is a document containing an affirmative statement in which a Participant makes a Licensing Commitment or otherwise discloses the general nature of the terms on which it would be willing to grant licenses under its Essential Claims. However, some SDOs impose Licensing Commitments without requiring any particular Licensing Statement (for example, the Licensing Commitment may be embodied in the SDO's organizational documents, bylaws, Participation Agreement, or the like). Again, a Licensing Statement generally does not constitute the grant of a license, but generally states the nature of the terms (e.g., RAND or RANDz) on which the Participant is willing to grant licenses.

### A. LICENSING COMMITMENT

#### How a Licensing Commitment Arises

A Participant's Licensing Commitment may arise in various ways. As discussed in detail below, a Participant may be required to undertake a Licensing Commitment when it joins an SDO or a Working Group of an SDO, when it submits a Contribution, or when it submits a Licensing Statement. Some SDOs do not impose any obligation on Participants to make any Licensing Statement or to undertake any Licensing Commitment, although most do impose some form of Licensing Commitment.

#### Elements of a Licensing Commitment

A Licensing Commitment is not an actual license and generally does not include all of the terms that the Patent Holder may include in the licenses it offers to prospective licensees. The Licensing Commitment may, however, prescribe the general nature of some of the terms and/or prohibit other terms. The terms and conditions not expressly covered by the Licensing Commitment are typically negotiated on a bilateral basis between Patent Holders and Implementers, subject to any overarching requirements in the Licensing Commitment to be "reasonable" and "nondiscriminatory."

While negotiations are often bilateral, in an April 2007 FTC/DOJ Report, *Antitrust Enforcement and IP Rights: Promoting Innovation and Competition,* the agencies observed that "joint negotiation of licensing terms by standard-setting organization participants before the standard is set can be pro-competitive." Such negotiations are unlikely to constitute a per se antitrust violation. The agencies will usually apply a rule of reason analysis when evaluating these joint activities. The FTC/DOJ Report also concludes that, without more, a unilateral announcement of price terms does not violate section 2 of the Sherman Act. The agencies also took "no position as to whether SDOs should engage in joint ex ante discussion of licensing terms."

http://www.ftc.gov/reports/innovation/P040101PromotingInnovationsandCompetitionrpt0704.pdf

The FTC/DOJ Report is consistent with Recommendation No. 20 issued by the Antitrust Modernization Commission in its April 2, 2007 Report and Recommendations (AMC Report) that "Joint negotiations with intellectual property owners by members of a standard-setting organization with respect to royalties prior to the establishment of the standard, without more, should be evaluated under the rule of reason" (one of twelve commissioners dissenting).

http://www.amc/gov/report_recommendation/toc.htm

It is important for Participants to understand their Licensing Commitments so that they do not commit to grant more license rights than they intend or become involved with standards development activities that may require them to grant licenses that they did not contemplate. Patent Holders must weigh the potential benefit of fully exercising patent rights against the benefit of promoting the standard, the industry, and their own business prospects. It is equally important for Implementers to understand the range of license terms and conditions they can generally expect Participating Patent Holders to offer. Implementers generally do not want to invest in the development and deployment of standards-based products if they believe that they will not be offered acceptable patent licenses. The SDO, in creating its Policy, must find a satisfactory balance between the interests of the Patent Holders that participate and contribute to the Standard, and the Implementers, whose adoption of the standard is vital for the standard's success.

Some SDOs also require different Licensing Commitments depending on a Participant's level of participation or authority within the SDO. For example, Participants who are part of the SDO's "steering committee" or "architecture board" may be required to grant licenses on RANDz terms, whereas more general Participants may be permitted to grant RAND licenses.

**Other Factors**

In practice, not all Patent Holders may require Implementers to obtain a license under their Essential Claims, even if permitted to do so under the Policy or even if they have submitted a Licensing Statement indicating general terms on which licenses may be offered. Such forbearance could, however, impede the Patent Holders' ability to enforce such Essential Claims later under various equitable theories. Moreover, an Implementer who has sufficient awareness of Essential Claims covering an implementation of a Standard could be liable for willful infringement absent a license, and may be at some risk by operating without a license, even if the Patent Holder does not appear to be enforcing its Essential Claims actively. These suppositions have not yet been considered by the courts, however, and Implementers should seek legal advice before taking any such action.

Note that, in some instances, a Participant may be permitted to elect to structure these grants of rights as covenants (similar to that described in Section IV.C.3 below) rather than licenses. Some commentators maintain, however, that a Participant offering a covenant should also offer a license as an alternative to permit bilateral negotiation. In any case, any such covenant must still meet all of the requirements of the SDO's Licensing Commitment.

An SDO drafting a patent policy and a company joining an SDO should consider how the SDO's policy will affect applicable business and development models of a participating company. For example, the open source software development model has emerged in various standards-setting environments. If a client plans to implement a standard with open source software, counsel should consider the interplay between the open source license commitment the client may have and the SDO commitment it may have. Today there are many open source implementations of RAND-based standards, although the authors are not aware of the circumstances under which these implementations are being practiced.

Similarly, if the SDO wants to attract software developers including open source developers, it may consider the interplay between the respective SDO's commitments, the rights of Patent Holders, open source license commitments, and the incentives to innovate within the scope of the standardization activity. Distributors of all products, including those involving open source software, must also understand that permitted license limitations may affect their ability to distribute products as they might otherwise prefer to do. In addition, the SDO should seek to balance the interests of Implementers (who may rely on differing business models) and the rights of Patent Holders (who may also rely on different business models) in developing its IPR Policy in order to attract a balance of stakeholder interests.

In some SDOs, the Licensing Commitment is as simple as a commitment to RAND or RANDz licensing terms and conditions. Other SDOs require or permit the Licensing Commitment to contain some or all of the terms described below, and many SDOs expressly permit the inclusion of such terms as part of their RAND Licensing Commitment.

| 1. Terms of the Licensing Commitment | |
|---|---|
| Participant shall, [upon request] [1], [grant/offer] | The Licensing Commitment is often stated as an absolute (i.e., that the Participant must grant the required licenses). However, it is reasonable to require that such licenses be granted only upon a request by a potential licensee and upon the conclusion of bilateral negotiations. It would be unreasonable for a Participant to be required to seek out its own licensees in this context, or to extend offers before being requested to do so. |
| | [1] The Patent Holder must offer a license to a prospective Implementer upon request. If the Implementer and the Patent Holder do not agree on terms, the Implementer has three choices: (1) it can discourage the SDO from adopting the Standard if the Standard has not yet been adopted; (2) it can choose not to implement the Standard; or (3) it can implement the Standard without a license. If the Implementer chooses to implement the Standard without a license, the Patent Holder may in turn choose to sue the Implementer for patent infringement and seek all available remedies. The Implementer may rely on any applicable defense to infringement such as invalidity or noninfringement, and may also rely on other legal theories arguing that the license terms did not comply with the SDO's Licensing Commitment (e.g., they were not RAND). |
| | Unless the Policy states otherwise, it is generally understood that a Patent Holder's obligation to offer a license under a Licensing Commitment is initially discharged after the Participant makes a good-faith offer of such license. If an Implementer refuses the license, it is not clear, however, whether or how often or for how long the Patent Holder must continue to make a license available. On one hand, it may not be reasonable to allow a Patent Holder to refuse a license to an Implementer who previously could not reach agreement with the Patent Holder, but on the other hand an Implementer should not have the ability to wait until the last minute |

**a. licensee(s)**

to any [Implementer/Participant]

to demand a license (e.g., in the midst of a patent infringement action brought by the Patent Holder after the Infringer has attempted unsuccessfully to invalidate the relevant patents). An SDO that wishes to avoid disputes regarding these issues may wish to address them explicitly in its Policy.

SDOs must decide who will benefit from the Participants' Licensing Commitments—other Participants, or all Implementers.

Many SDOs seek to benefit all Implementers of a Standard. This approach is viewed by many to foster widespread adoption of a Standard.

Some SDOs, however, limit Licensing Commitments to other Participants, and Implementers who are not Participants cannot rely on such Licensing Commitments. Such limitations may be imposed because Participants may fear granting licenses to non-Participants that have no Licensing Commitments of their own. These restrictions may also encourage membership in the SDO by attracting Participants who seek licenses under the relevant Essential Claims. This limitation is seen more in "special interest groups" than in "traditional" SDOs.

So long as the Policy permits the Patent Holder to include a reciprocity provision in its license (see Section IV.A.2 below), the Patent Holder can obtain a reciprocal license from any non-Participant the Patent Holder chooses to license. Consequently Patent Holders would have an incentive to license both Participants and non-Participants even if the Policy imposes a Licensing Commitment only with respect to Participants. However, absent such a Licensing Commitment, non-Participants are not guaranteed that the Patent Holder will offer any license at all.

If it is anticipated that a Standard may be contributed to another standards organization that does not have this limitation, the SDO, in the Policy, may wish to consider extending the benefit of licenses to all Implementers. Another possibility would be to add a provision that would convert the Licensing Commitment to extend the benefit to all implementers *but only* in the event that the standard is contributed to such other standards organizations.

**b. nonexclusivity**

a nonexclusive

**c. worldwide**

worldwide

**d. nontransferable**

nontransferable/nonassignable

**e. duration**

[perpetual/___-year]

Perhaps the most common term included in a Licensing Commitment is nonexclusivity. The licenses offered by the Patent Holder must be nonexclusive to enable broad implementation of the standard.

Licensing Commitments often require the license to be "worldwide." However, "worldwide" does not necessarily mean that all worldwide rights are licensed under a single license or to each prospective licensee. Implementers may not want licenses to make, use, sell, etc., the standardized technology throughout the world and may seek licenses for only those regions where the Implementer anticipates practicing the Essential Claims.

Patent Holders may also want to offer different terms for practicing Essential Claims in different regions. This type of strategy, however, may raise questions about reasonableness and nondiscrimination if manufacturers in one jurisdiction are subject to substantially different terms from those in another.

Some SDOs may use the terminology "throughout the world" or "in any country" in the same context.

Some Licensing Commitments may permit the Patent Holder to offer licenses that are nontransferable or nonassignable. There may be a number of terms in the license that the Patent Holder believes are material to the license agreement with a specific licensee and therefore the Patent Holder does not want the license to be assigned or transferred without its knowledge and consent. Some licenses that are not transferable or assignable do include limited provisions permitting a licensee to transfer or assign its license upon notice to the Patent Holder and with its prior consent.

In a perpetual license, the license of each Essential Claim extends for the life of the applicable patent, unless there is some limiting condition expressed. Implementers often desire a perpetual license because they may not want to invest in a standardized technology believing that the license terms are acceptable, only to find out after the license terminates that the new terms offered by the Patent Holder are not acceptable to the licensee.