# EXHIBIT 18

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION



U.S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
**FILED**

FEB 16 2008

**CLERK, U.S. DISTRICT COURT**
By _____
 Deputy

| | |
|---|---|
| RESEARCH IN MOTION LIMITED and RESEARCH IN MOTION CORPORATION | § § § |
| Plaintiffs, | § § Civil Action No. |
| v. | § § **3-08 CV 0 2 8 4 - G** |
| MOTOROLA, INC., | § § **Jury Trial Demanded** |
| Defendant. | § § § |

## COMPLAINT

Plaintiffs Research In Motion Limited and Research In Motion Corporation

(collectively "RIM"), on personal knowledge as to their own acts, and on information and

belief as to all others based on their own and their attorneys' investigation, allege as follows:

## NATURE OF THE ACTION

1.     This is an action brought by RIM against Motorola, Inc. ("Motorola") for

Motorola's infringement of RIM's patents, as well as its continuing pattern of unfair and

anticompetitive conduct with respect to its own patents that it has committed to licensing to

others on fair, reasonable and non-discriminatory terms.  In particular, RIM seeks remedies

for (a) Motorola's infringement of RIM's U.S. Patent Nos. 5,664,055  ("the '055 Patent"),

5,699,485 ("the '485 Patent"), 6,278,442 ("the '442 Patent"), 6,452,588 ("the '588 Patent"),

6,489,950 ("the '950 Patent"), 6,611,254 ("the '254 Patent"), 6,611,255 ("the '255 Patent"),

6,919,879 ("the '879 Patent), and 7,227,536 ("the '536 Patent"); (b) Motorola's breaches of

its commitments to multiple standard development organizations ("SDOs") to license patents

that it claims are essential to wireless industry standards on fair, reasonable, and non-

1620477_2.DOC

177

discriminatory terms ("FRAND") (in some cases, alternatively referred to as "reasonable and non-discriminatory," or "RAND," terms); (c) Motorola's violations of Section 2 of the Sherman Act arising out of its false promises to various SDOs that it would continue to license patents that it claims are essential to implementing standards on FRAND or RAND terms; and (d) Motorola's breach of its 2003 license to RIM (the "2003 Cross-License Agreement"), which requires Motorola to negotiate in good faith an extension of that license beyond the January 2008 termination date. In addition, RIM seeks judicial declarations that certain additional Motorola patents – that Motorola has injected into the parties' negotiations and that it has threatened to assert against RIM in an effort to enjoin RIM's business, if RIM does not agree to its excessive licensing demands – are invalid, and that RIM's products do not infringe any valid claims of these patents.

2.      Motorola has infringed, and is continuing to infringe, multiple RIM patents, and has refused to compensate RIM for its use of RIM's patented technologies.

3.      In addition to its infringement of RIM's patents, Motorola has manipulated and subverted various standards development processes with respect to its own patents that it claims are essential to industry standards, in order to injure RIM, a successful competitor and rival. Motorola made promises to multiple SDOs to license its essential patents on FRAND or RAND terms. The SDOs and other participants in those SDOs relied on Motorola's promises in adopting Motorola's technologies into technical standards that were being developed. These standards have been implemented and are now used by mobile wireless companies all over the world, including RIM. RIM has invested substantial resources in developing and marketing mobile wireless products and services, relying on the availability of

licenses on FRAND or RAND terms of proprietary technology that are required to implement the standard.

4.      Motorola has now broken its promises to the various SDOs by demanding that RIM pay exorbitant royalties for its patents that it claims are essential. Indeed, Motorola is now seeking license payments that represent an effective royalty rate multiple times the imputed percentage-based royalty that RIM has paid under the 2003 Cross-License Agreement. The royalty Motorola is seeking is also substantially in excess of royalties RIM has paid and is paying other parties claiming to own patents essential to the same widely-implemented standards as those Motorola claims to own.

5.      Motorola's unlawful conduct has not only threatened injury to RIM, but also has had substantial anticompetitive effects in markets for technologies that perform functions within various wireless communication technology standards. These technologies are essential inputs into the manufacture of products and services that comply with the standard. Before the relevant standards were established, there were alternative technologies to Motorola's that were available for selection to perform functions incorporated in the relevant standards. Once the SDOs incorporated Motorola's technologies in the relevant standards as a result of Motorola's promises, however, those alternative technologies were no longer viable because compliance with each of the pertinent standards requires the use of each of the selected technologies in all of its standard-compliant products. Motorola's unlawful conduct, if not constrained, will also cause anticompetitive effects in the downstream markets for standards-compliant products.

6.      RIM therefore seeks (a) a judicial declaration and compensation for Motorola's infringement of the '055, '485, '442, '588, '950, '254, '255, '879, and '536 Patents; (b) a

- 3 -

judicial declaration that Motorola's FRAND/RAND commitments constitute binding and enforceable contractual obligations to license to RIM on FRAND/RAND terms the patents Motorola asserts are essential to the implementation of several pervasive standards for wireless voice and data communications; (c) a judicial declaration that, by contracting to license its declared essential patents to SDOs and their members, including RIM, on FRAND/RAND terms, Motorola has waived its right to seek injunctive relief to prevent the use of its patents; (d) a judicial determination of what constitutes a FRAND/RAND royalty rate in this case and an order compelling specific performance by Motorola of its contractual obligation to license to RIM the patents Motorola claims are essential on FRAND/RAND terms; (e) a judicial determination of and compensation for Motorola's breaches of contract and violations of Section 2 of the Sherman Act; and (e) judicial declarations that Motorola's United States Patent Nos. 5,359,317, 5,075,684, 5,764,899, 5,771,353, 5,958,006, 5,706,211, and 6,101,531 (collectively, the "Motorola patents") are invalid, and that RIM's manufacture, use, offer for sale, and sale of its products does not infringe any valid claim of any of the Motorola patents.

## **PARTIES**

7.      Research In Motion Limited is a corporation organized and existing under the laws of Canada, having a principal place of business at 295 Phillip Street, Waterloo, Ontario, N2L 3W8 Canada.  Research In Motion Corporation is a corporation organized and existing under the laws of Delaware, having a principal place of business at 5000 Riverside Drive, Irving, Texas 75039.  At all times relevant to this Complaint, RIM conducted business in the state of Texas.

1620477_2.DOC

180

8.      Founded in 1984, RIM has grown rapidly to become a leading designer, manufacturer and marketer of innovative wireless solutions for the worldwide mobile communications market.  RIM markets its popular line of BlackBerry® "smart" phones that provide phone service, e-mail, Internet access, and text message communications to over twelve million subscribers, including many national, state and local governmental agencies.

9.      Through the development of integrated hardware, software and services that support multiple wireless network standards, RIM provides platforms and solutions for seamless access to time-sensitive information including e-mail, phone, text messaging (SMS and MMS), Internet and intranet-based applications.  RIM technology also enables a broad array of third-party developers and manufacturers to enhance their products and services with wireless connectivity to data.

10.      Motorola is a corporation organized and existing under the laws of Delaware, having a principal place of business at 1303 E. Algonquin Road, Schaumburg, IL 60196.  At all times relevant to this Complaint, Motorola conducted business in the Northern District of Texas.  Motorola has, for many years, developed and marketed wireless handsets and wireless enterprise and network equipment.  More recently, Motorola has begun marketing "smart phones" (phones with email, Internet, messaging, and other advanced features) that compete with RIM's BlackBerry® devices.  Motorola's subsidiary, Good Technology Group, also markets mobile computing software and services that compete with RIM's BlackBerry® Enterprise Server technology.

## JURISDICTION AND VENUE

11.     The Court has jurisdiction over this action pursuant to the Federal Patent Act, 28 U.S.C. §§ 1331, 1338(a), 2201, and 2202, and pursuant to Section 4 of the Sherman Act, 15 U.S.C. § 4, and 28 U.S.C. §§ 1331, 1337.

12.     The Court also has supplemental jurisdiction over the state law claims asserted in this action pursuant to 28 U.S.C. § 1367.  The federal and state law claims asserted in this action arise from a common nucleus of operative facts.

13.     Motorola's infringement of RIM's patents, its unfair and anticompetitive conduct, and its wrongful patent assertions, as described herein, have affected and are affecting interstate and foreign commerce, including commerce in this District.

14.     Venue is proper in this District under § 12 of the Clayton Act, 15 U.S.C. § 22, and under 28 U.S.C. § 1391 and § 1400(b).  Motorola maintains a regular and established place of business in this District, and has committed and continues to commit acts of infringement in this District.  Further, Motorola's unfair and unlawful conduct with respect to its own patents has had harmful effects in this District.

## BACKGROUND

### 1. The Mobile Wireless Industry

15.     The mobile wireless communication devices developed and marketed by RIM and Motorola connect to the networks of mobile wireless carriers to provide telecommunications service to consumers.  Carriers operate the mobile wireless systems that enable consumers to place and receive telephone calls, send and receive e-mails, and connect to the Internet through mobile wireless handsets.  Leading carriers in the United States include AT&T (formerly Cingular), T-Mobile USA, Verizon Wireless, and Sprint Corp.

1620477_2.DOC

182

16.     A number of companies around the world manufacture mobile wireless handsets. These manufacturers typically sell their handsets to the mobile wireless carriers, which in turn sell the handsets to consumers. Mobile wireless handsets contain, among other components, one or more computer chipsets that enable the phone to communicate with the carriers' wireless systems. Carriers, handset manufacturers, and chipset manufacturers must create equipment and devices compatible with each other by using common mobile wireless technology. Since carriers, handset manufacturers, and chipset manufacturers must create equipment and devices compatible with each other to provide mobile wireless services to consumers, developers and manufacturers participate in the crucial process of standards development.

17.     The progression from cell phones, which primarily focus on voice communications, to smart phones required more advanced mobile wireless technologies for transmission of data such as e-mail. Since the mass market introduction of the cell phone in 1980s, mobile wireless technology has evolved to keep pace with the rising volume of voice traffic as well as incorporate the data transmission capabilities necessary to support increasingly sophisticated phones and other handheld devices. The technology has evolved in what are commonly referred to as "generations" of mobile wireless technology.

18.     The first generation of mobile wireless technology (1G) consisted of analog devices and networks that carried only voice traffic. The second generation of mobile wireless technology (2G) began the transition to digital devices and networks providing more efficient use of available spectrum for voice traffic and limited support for data-intensive applications such as paging and text messaging. The emergence of 2G technologies coincided with the growing commercial use of the Internet. The greater data capacity of advanced 2G

- 7 -

1620477_2.DOC

183

networks allowed for the development of the first smart phones, which offered consumers new capabilities such as taking and transmitting photographs, sending and receiving email, and limited web browsing. Third generation (3G) wireless technology supports more advanced data intensive services, such as multimedia, web browsing, music and video downloads, e-commerce, and position location. Almost all wireless carriers currently support and provide 2G technology; many are also introducing 3G networks and services.

### 2. **The Importance of Standards**

19.     Before new wireless technologies can be broadly commercialized, service providers and device manufacturers must agree on common technology specifications to which each will build products or provide services. For all successful wireless technologies, that process has involved inclusive, multi-participant standards development efforts conducted under the auspices of leading standards development organizations.

20.     Standards play a critical role in the development of wireless data and telecommunications technologies. Standards facilitate the adoption and advancement of technology as well as the development of products that can interoperate with one another. Companies that produce products implementing a standard can make products by referencing only the standard, without the need to communicate separately with every other company with which their products may need to interoperate. Companies producing products implementing a standard can therefore be confident that their products will operate with other companies' products that also implement that standard, and consumers of those products can be confident that products from multiple vendors will work together.

21.     In addition to achieving interoperability, standards development facilitates (a) lower costs by increasing product manufacturing volume, (b) increased price competition by

- 8 -

eliminating 'switching costs' for consumers that desire to switch from products manufactured by one firm to those manufactured by another, and (c) earlier adoption of new technology.

22.     As a practical matter, the technologies that are used to transmit radio signals between base stations maintained by wireless service providers and devices used by subscribers must be described in standards adopted by a recognized SDO in order to be commercially successful.

23.     Once a standard has been adopted, patents that are essential to that standard – i.e., those that claim technologies selected by the participants in the standards development process for inclusion in a standard – gain undue significance that they would not have had but for adoption of the standard.  Companies that produce products implementing a standard can become "locked in" to the technologies included in the standard if, because of cost or other considerations, it is not practical to develop or switch to other technologies, or if customers for their products have no practical choice other than to purchase products that comply with the standard.  The owners of patents essential to a standard gain market power that is unrelated to the inherent value of the inventions claimed in their patents and is instead derived from the fact that their patented technologies have been incorporated in the standard.

24.     The inclusion of patented technology into a standard can thus enable the holders of patents that are essential to the standard, if not otherwise constrained, to extract monopoly rents from implementers of a standard and/or to prevent others from implementing the standard by refusing to license the patents on terms that would enable its implementation.

25.     In order to reduce the likelihood that implementers of their standards will be subject to abusive practices by patent holders, SDOs have adopted rules, policies and procedures that control the disclosure and licensing of patents that implementers may require

- 9 -

in order to practice the standard under consideration, and to commit to licensing these technologies to others on fair, reasonable, and non-discriminatory terms. These rules, policies and/or procedures are set out in the intellectual property rights policies ("IPR policies") of the SDOs.

26.     The IPR policies applicable to the standards at issue in this matter expect or require participants to disclose on a timely basis IPR, such as patents or patent applications, that they believe are relevant to standards under consideration. These disclosures permit the SDOs and their members to evaluate and select from competing technologies with full knowledge of claimed IPR rights that may affect the costs of implementing the standard.

27.     In addition, the IPR policies that governed the development of the standards at issue in this dispute encourage or require participants claiming to own essential patents to license those patents to any implementer of the standard on FRAND or RAND terms. As their inclusion in the IPR policies of various standards development organizations suggests, FRAND or RAND commitments are crucial to the standards development process. They enable participants in standards development to choose between competing technologies with the expectation that an owner of patented technology will be prevented from demanding unfair, unreasonable, or discriminatory licensing terms and thereby prevented from keeping parties seeking to implement the standard from doing so or imposing undue costs or burdens on them. Indeed, competing technologies may become obsolete as a result of not being selected for the standard.

28.     Patent owners that fail to honor FRAND commitments they have made are able to frustrate the implementation of the standard in commercial products by imposing

- 10 -

unfair, unreasonable, and discriminatory terms on their commercial rivals.  That is precisely what Motorola is seeking to do to RIM.

### 3. Competition Between RIM and Motorola

29.    As consumers have transitioned from voice-only cell phones to more dynamic and multi-functional devices such as the BlackBerry®, competition has increased in the markets for mobile wireless handsets and for mobile wireless computing platforms.

30.    Motorola is and has been a supplier of wireless handsets and other wireless equipment, including its RAZR line of cell phones.  Motorola has enjoyed success in the marketplace as a supplier of handsets designed primarily for voice communications., but has more recently begun marketing a more advanced commercial wireless e-mail device.

31.    RIM is a leading supplier of smart phones, which feature data-centric functions such as e-mails.  Throughout most of RIM's existence as a company, it has focused its technological efforts on wireless data communications.

32.    In 1999, RIM introduced the BlackBerry® mobile e-mail system, which included the BlackBerry® handheld device.  Motorola's Wireless Data Group, despite efforts, was not as successful in selling comparable mobile wireless handheld data devices.

33.    RIM's products and services in mobile wireless data have become broadly available throughout the United States, Canada, Europe, and Asia.  RIM's BlackBerry® has become a leading platform used to provide e-mail and Internet connectivity to handheld devices.

34.    In response to RIM's success, Motorola has devoted significant resources to developing commercial wireless e-mail handheld devices.  In mid-2006, Motorola introduced the "Q", which, like most BlackBerry® devices, contains a full QWERTY keyboard.

- 11 -

Industry analysts covering the launch of the "Q" initially referred to Motorola's new handheld as a "BlackBerry-killer." However, the "Q" has not achieved the commercial success that RIM's BlackBerry® has enjoyed.

35.     As smart phones have become more sophisticated, RIM and Motorola have become direct competitors in the handset market. For example, RIM offers BlackBerry® devices with built-in Wi-Fi capabilities. The devices enable the user to access the Internet from local Wi-Fi networks at home, in work, or at school. RIM anticipates deploying Wi-Fi in more handheld devices as it introduces new models in the future. Motorola has also attempted to make inroads with its own Wi-Fi compatible handsets, placing its devices in direct competition with RIM's Wi-Fi compatible devices.

36.     Motorola's competition with RIM now extends beyond handheld devices and into e-mail server technology. Unable to successfully develop commercially successful wireless data technology internally, in November 2006, Motorola announced the acquisition of Good Technology, which had developed mobile computing technology that competes with RIM's BlackBerry Enterprise Server technology.

37.     By consummating its purchase of Good Technology in January 2007, Motorola sought to expand into markets in which it previously did not successfully compete, and hoped to increase its share of the coveted "enterprise" user population – the lucrative segment of mobile computing consumers who use mobile wireless technology primarily for business and/or employment purposes. However, Motorola's Good Technology has not been able to capture a greater share of the "enterprise" market – the customer base among which RIM has served well and cultivated a loyal consumer following.

- 12 -

38.     In spite of Motorola's acquisition of Good Technology and development of the "Q" model series, Motorola has suffered declines in market share for mobile wireless handsets. Motorola has been unable to stem its loss of market share in handsets over the past year. Indeed, when Motorola recently announced that it is considering spinning off or selling its handset business, Motorola's share priced increased over ten percent in one day.

39.     Having suffered losses in the marketplace, Motorola has now resorted to demanding exorbitant royalties from its competitor, RIM, for patents that Motorola claims are essential to various standards for mobile wireless telecommunications and wireless computing that RIM practices. It also has demanded exorbitant royalties for additional patents, not essential to the standards, many of which were subject to the parties' 2003 Cross-License Agreement. Motorola's royalty demands violate the promises Motorola made to the SDOs that developed and adopted these standards: to license patents it believes are essential on FRAND or RAND terms. Motorola never told SDOs that it would not be willing to license its essential patents on FRAND or RAND terms when it considered the prospective licensee to be a competitive threat. However, that is precisely what Motorola has done. RIM succeeded in developing and marketing its popular BlackBerry® devices in direct competition with Motorola, and Motorola is trying to obtain through its subversion of the standard setting process and breach of FRAND and RAND commitments what it could not achieve through fair and open competition for the sale of products and services in the marketplace.

40.     Moreover, at the same time that Motorola has demanded exorbitant royalties for its own patents that it claims are essential to the standards, it is refusing to acknowledge or pay royalties for RIM's patents.

### 4. **GSM and WLAN Technologies**

41.     Motorola's licensing demands pertain to patents that it claims are essential to widely practiced standards for mobile wireless telecommunications and wireless computing. Motorola played an active role in the development of these standards.

#### *(i) The GSM Family of Mobile Wireless Telecommunications Standards*

42.     When mobile wireless technology transitioned from first generation technology (analog cell phones) to second generation technology supporting digital devices and data-intensive applications such as paging and text messaging, distinct technology "families" emerged to provide functionality for mobile wireless telecommunications.  The most widely used family of mobile wireless technologies is based on Global System for Mobile Communications ("GSM") technology.  GSM was initially standardized by the European Conference of Postal and Telecommunications Administration ('CEPT") and subsequently by the European Telecommunications Standards Institute ("ETSI").  ETSI is an independent, non-profit SDO founded in 1988 and headquartered in France.  It is a consensus-oriented private SDO that produces global standards for information and communications technology, and currently has nearly 700 members in about 60 countries, including Motorola, RIM, and other leading telecommunications companies.  GSM is deployed in the United States by AT&T (formerly Cingular Wireless) and T-Mobile, among others.

43.     Subsequent generations of GSM technology (GPRS and UMTS) are backward-compatible with earlier generations.  The 2G standards have been supplemented by evolutionary improvements and advancements that permit greater data rates and increased voice capacity.  Many GSM carriers have adopted a technology known as GSM Packet Radio Service ("GPRS"), which is often referred to as a "2.5G" technology.

- 14 -

44.     As demand for wireless systems that carry both data at faster speeds and voice at higher capacity has increased significantly, "3G" wireless standards have been proposed and adopted by SDOs.  GSM carriers have deployed the Universal Mobile Telecommunications System (UMTS), which employs Wide-band CDMA (WCDMA) technology.

45.     UMTS has been standardized by ETSI and the 3rd Generation Partnership Project (3GPP).  ETSI inspired the creation of, and is an organizational partner in, 3GPP. 3GPP is a collaboration among groups of telecommunications associations to make a globally applicable third generation (3G) mobile phone system specification based on GSM technology.

### *(ii) WLAN*

46.     Wireless local area networking ("WLAN"), commonly referred to as "Wi-Fi" technology, enables a personal computer or other portable device, such as a PDA or cell phone, to access the internet wirelessly at high speeds over short distances.  Wi-Fi networks typically consist of one or more access points that are connected to an Ethernet local area network, each of which communicates by radio signals with devices such as notebook computers, and, increasingly, so-called "dual mode" cellular telephones.

47.     The use of Wi-Fi technology has grown quickly in the United States since its introduction in the 1990s.  With the deployment of numerous home and business Wi-Fi networks, as well as public-access "hot spots" at coffee shops, hotels, and elsewhere, makers of handheld devices like RIM have added Wi-Fi functionality to their devices as an additional access technology in addition to GSM-based mobile wireless telecommunications standards. Wi-Fi complements mobile wireless telecommunications standards by offering much faster

- 15 -

connection speeds, but over much shorter distances, and with limited mobility.  In addition,
Wi-Fi networks are often present within buildings where cellular signals are weak.

48.     Wi-Fi is based on the 802.11 wireless networking standard developed by the
Institute of Electrical and Electronics Engineers ("IEEE") beginning in the early 1990s.  The
initial 802.11 protocol ("legacy 802.11") was released in 1997.  Since then, there have been a
number of amendments issued, the most important of which are 802.11a (released in 1999),
802.11b (released in 1999), and 802.11g (released in 2003).  Additional amendments, notably
802.11n, are currently under development.

## MOTOROLA'S INVOLVEMENT IN THE DEVELOPMENT OF MOBILE WIRELESS TECHNOLOGIES AND WLAN TECHNOLOGIES

49.     Motorola's ability to demand unfair, unreasonable and discriminatory licensing
terms is not a result of its superior product, skill or business acumen, but rather a result of its
false FRAND and RAND commitments made in connection with the standards development
processes for mobile wireless technologies and WLAN technologies.

### 1. Motorola's Participation in ETSI During the Development of the GSM, GPRS, and UMTS Technical Standards

50.     As set forth below, Motorola obtained the ability to demand and potentially
extract supra-competitive royalties for patents purportedly essential to the GSM, GPRS, and
UMTS standards because, as Motorola has asserted to RIM, its patented technology was
purportedly incorporated into those standards by the relevant SDOs, including ETSI and its
organizational partner 3GPP.  Had Motorola told ETSI and its members that it would not
continue to license its patents on FRAND terms when faced with a competitive threat,
Motorola would not possess the monopoly power it presently wields.  The SDOs or their
members would have chosen other viable alternative technologies competing to perform

1620477_2.DOC

192

functions incorporated in the standards, declined to incorporate into the standards the functions covered by Motorola's claimed patented technology, negotiated specific licensing terms before the technology was incorporated in the standards, or declined to adopt the standards altogether. Motorola's exercise of that monopoly power in its demand for non-FRAND royalties violates the condition on which Motorola obtained that power and is both unfair and anticompetitive.

### (i) Motorola's participation in ETSI and 3GPP and the development of GSM technologies

51.     As referenced above, since its inception, ETSI has set and developed technical standards and participated with other SDOs in standard-setting for various wireless communications technologies, including GSM, GPRS, and UMTS. To facilitate this standard setting activity, ETSI promulgated Rules of Procedure. Annex 6 to these Rules sets forth the organization's IPR policy.

52.     Clause 4 of the policy requires, among other things, that members timely disclose to the organization any IPR they own that may be essential to standards that have been developed or are being developed. Participants in ETSI standard development understand that this provision requires disclosure of all IPR that they believe might be essential to standards under consideration.

53.     Clause 6 of ETSI's IPR policy governs the availability of licenses to essential IPR. In relevant part, Clause 6.1 states:

> When an ESSENTIAL IPR relating to a particular STANDARD or
> TECHNICAL SPECIFICATION is brought to the attention of
> ETSI, the Director-General of ETSI shall immediately request the
> owner to give within three months an undertaking in writing that it
> is prepared to grant irrevocable licenses on fair, reasonable and
> non-discriminatory [FRAND] terms and conditions under such IPR
> to at least the following extent:

- 17 -

- MANUFACTURE, including the right to make or have made customized components and sub-systems to the licensee's own design for use in MANUFACTURE;

- sell, lease, or otherwise dispose of EQUIPMENT so MANUFACTURED;

- repair, use, or operate EQUIPMENT; and

- use METHODS.

The above undertaking may be made subject to the condition that those who seek licenses agree to reciprocate.

54.    If an owner of an essential IPR refuses to undertake a FRAND commitment

with respect to that IPR, then, as provided in Section 8 of the ETSI IPR Policy, ETSI may

suspend work on relevant parts of the standard or redesign the standard to render the IPR non-

essential.

55.    ETSI's IPR policy was designed to benefit all ETSI members, as well as other

parties who implement an ETSI standard.  In particular, the stated objective of the policy,

described in Clause 3.1, is to "reduce the risk" to those implementing the standards or other

technical specifications "that investment in the preparation, adoption and application of the

STANDARDS could be wasted as a result of an ESSENTIAL IPR for a STANDARD or

TECHNICAL SPECIFICATION being unavailable."

56.    During all times relevant to these allegations, Motorola has been a member of

ETSI through its affiliates, Motorola A/S, Motorola GmbH, Motorola Ltd., and Motorola

S.A.S.

57.    Motorola has participated in ETSI's development of communications standards

for GSM, GPRS, and UMTS.  As a result of its membership and participation in ETSI,

- 18 -

Motorola was and is bound by the ETSI Rules of Procedure, including the ETSI Intellectual Property Rights Policy.

58.     Motorola has represented to RIM that it owns a number of patents that are essential to the GSM, GPRS, and UMTS standards.  These patents are listed in Appendix A to the Complaint.  Motorola made promises to license the purportedly essential patents on FRAND terms – promises it has refused to honor.

### (ii) Motorola's False FRAND Commitments With Respect to Patents it Claims Are Essential to GSM, GPRS, and UMTS

59.     Motorola was a member of ETSI throughout ETSI's involvement in the development of the GSM, GPRS and UMTS standards, and Motorola disclosed to ETSI a number of patents it claimed as essential to the GSM, GPRS, and UMTS standards.  These patents are listed in Appendix A to the Complaint in Sections I–III.

60.     Motorola declared in filings with ETSI that it committed, on behalf of Motorola and all of its affiliates, to grant irrevocable licenses on FRAND terms under the IPR in accordance with Clause 6.1 of ETSI's IPR policy to the extent those intellectual property rights remain essential to the standard.

61.     At the time Motorola made these declarations to ETSI, promising to offer licenses to its patents essential to implementing the standard on FRAND terms, Motorola did not qualify its commitment or reserve the right to discontinue offering FRAND licenses in the future.

62.     Motorola's FRAND declarations were intended by Motorola to induce ETSI and its members to adopt standards based on technology covered by Motorola's patents.

63.     In fact, Motorola's FRAND declarations did induce ETSI into incorporating Motorola's patented technologies, rather than viable alternative technologies, into the

- 19 -

approved standards. But for Motorola's FRAND commitments, Motorola would not have obtained monopoly power in markets for technologies to perform functions necessary to practice the GSM, GPRS, and UMTS standards. Before the adoption of the relevant standards, there were multiple viable alternative technology solutions competing in markets for technologies to perform the relevant functions included in the standards. Once the SDO participants selected Motorola's technologies, however, all alternative technological solutions for those functions were excluded from use in connection with the relevant standards. Accordingly, it was the FRAND declarations, on which Motorola has reneged, that conferred market power on Motorola.

64.     In making these FRAND declarations, Motorola entered into an actual or implied contract with ETSI, for the benefit of ETSI and any entity that implements GSM, GPRS, or UMTS (or any other ETSI standards for which Motorola declared essential IPR and undertook a FRAND commitment). Motorola is bound by its agreement to offer FRAND licenses in accordance with Clause 6.1 of ETSI's IPR policy.

65.     RIM joined ETSI as associate member in 1999, became a full member in 2003, and remains an active member today.

66.     RIM and other members of ETSI understood Motorola's FRAND commitment to mean not only that Motorola would grant licenses to those patents and patents under application it claims are essential to implement an ETSI standard, but also that it would license those patents on fair, reasonable, and non-discriminatory terms. In particular, they relied on these commitments to ensure that the royalties Motorola and other holders of essential patents would permit efficient competitors such as RIM to offer standards-compliant products profitably in competition with Motorola and other owners of essential patents.

- 20 -

67.     RIM has invested tremendous resources in developing and marketing products compliant with the GSM, GPRS, and UMTS standards in reliance on Motorola's FRAND commitments.

### 2.  Motorola's Participation in IEEE and the Development of the WLAN Standard

68.     The standard setting arm of IEEE, the IEEE Standards Association ("IEEE-SA"), promulgates technical standards in a variety of fields, including telecommunications. Like the other SDOs at issue in this Complaint, IEEE-SA had an IPR policy at the time it was drafting the 802.11 (WLAN) protocols.  Under the IPR policy, when individuals participating in IEEE standards development came to believe that a company, university, or other patent holder owned patents or patent applications that might be essential to implement an IEEE standard under development, IEEE-SA would request letters of assurance from those entities.

69.     The letters of assurance sought by IEEE provide either a general disclaimer that the patentee would not enforce the patent(s), or a promise by the patentee that it would license the patent(s) to an unrestricted number of applicants at either no cost or under reasonable terms and conditions that are demonstrably free of any unfair discrimination (i.e., on RAND terms).

70.     IEEE's IPR policy also states that if any party who submitted a letter of assurance with respect to certain patents becomes aware of additional essential patents not covered by prior letter(s) of assurance, it must submit an additional assurance for the newly discovered patent(s).

71.     According to IEEE's IPR policy, letters of assurances, once provided, are irrevocable and shall be in force at least until the standard's withdrawal.  Additionally, any

- 21 -

subsequent assignee and transferee of the patent(s) must agree to abide by any assurances in place.

72.     If the letters of assurance were not provided for essential patents, the IEEE working group either would revise the standard so that compliance could be achieved without infringing the patent(s), or would discontinue work on the standard altogether.

73.     Motorola has represented to RIM that it owns a number of patents that are essential to comply with one or more amendments to the 802.11 standard. These patents are listed in Appendix A to the Complaint in Section IV. Motorola obtained rights to several of its WLAN essential patents through its recent acquisition of Symbol Technologies ("Symbol").

74.     Prior to the releases of the 802.11 protocols, Motorola and Symbol submitted letters of assurance to IEEE with respect to those protocols. The letters guaranteed that these essential patents would be licensed on RAND terms. Both Motorola's and Symbol's letters of assurance expressly apply to the essential patents they then held as well as any other essential patents they subsequently obtained.

75.     In reliance on these letters of assurance, IEEE released the 802.11 standard and various amendments to that standard incorporating Motorola's and Symbol's patented technology. Consistent with IEEE policy, absent the letters of assurance, the relevant IEEE working groups would have either revised the standards, employing other viable competing alternative technologies instead, or stopped working on the protocols.

76.     In making its RAND declaration, Motorola entered into an actual or implied contract with IEEE, for the benefit of IEEE members and any entity that implements the 802.11 standard. Motorola is bound by its agreements to offer RAND licenses.

- 22 -

77.     Similarly, Symbol, in making its RAND declarations, entered into an actual or implied contract with IEEE, for the benefit of IEEE members and any other entity that implements the 802.11 standard, and Motorola is bound by that commitment.

78.     RIM has participated in the work of IEEE, including its development of WLAN standards, through employees who are IEEE members.

79.     RIM and other companies participating in the development of Wi-Fi in IEEE understood Motorola's RAND commitment to mean that Motorola would license patents it claims are essential only on reasonable and non-discriminatory terms.  In particular, they relied on these commitments to ensure that the royalties Motorola and other holders of essential patents would seek would permit efficient competitors such as RIM to offer standards-compliant products profitably in competition with Motorola and other owners of essential patents.

80.     RIM has invested tremendous resources in developing and marketing products with Wi-Fi components in reliance on Motorola's RAND commitments in connection with the 802.11 standard.

### 3.   RIM's Reliance on FRAND and RAND Commitments with Respect to GSM and WLAN Technologies

81.     RIM and other manufacturers of mobile wireless communication devices necessarily relied on the commitments of Motorola and others to disclose and license their essential patents.  BlackBerry® handheld devices retrieve and transmit wireless data to/from corporate servers equipped with RIM's BlackBerry p software (BlackBerry® Enterprise Server) through wireless service providers.  RIM's BlackBerry® wireless devices and e-mail services use GSM, GPRS, and UMTS mobile wireless technologies to transmit data.  In order for BlackBerry® devices to connect to the standards-based wireless networks created by

- 23 -

service providers such as T-Mobile and AT&T, RIM has designed and manufactured its products to use these standards-based wireless technologies. RIM relied on the FRAND and RAND commitments of companies such as Motorola whose patented technology was selected as the basis of these standards.

82.     In the summer of 2007, RIM introduced its first BlackBerry® with built-in Wi-Fi capabilities. Currently, RIM offers three Wi-Fi products: the BlackBerry® Curve 8320 device, the BlackBerry® 8820 device, and the BlackBerry® Pearl 8120 device. The devices enable the user to access the Internet remotely from local Wi-Fi networks. In developing BlackBerry® devices to provide Wi-Fi capacity, RIM designed and manufactured its products to use standardized WLAN technologies. In so doing, RIM relied on the RAND declarations of Motorola and the other companies whose patented technologies were selected as the basis of WLAN standards.

## MOTOROLA HAS BREACHED ITS CONTRACTUAL OBLIGATION TO LICENSE ITS ESSENTIAL PATENTS ON FRAND TERMS AND IS USING THE THREAT OF INJUNCTION  TO EXTORT UNJUSTIFIED ROYALTIES

83.     In willful disregard of the commitments it made to ETSI and IEEE in order to persuade other participants in the standards development process to agree to include patented Motorola technology in the GSM, GPRS, UMTS, and WLAN standards, Motorola has refused to extend FRAND or RAND licensing terms to RIM for any of Motorola's purportedly essential patents on FRAND or RAND terms and has instead demanded of RIM terms that are unfair, unreasonable, and, on information and belief, discriminatory.

84.     Motorola's recent breach of these FRAND and RAND commitments stands in contrast to a pre-existing license agreement that it had entered into with RIM. RIM entered into a Cellular Essential Properties Cross License Agreement with Motorola on March 28,

- 24 -

2003 ("2003 Cross-License Agreement"). Under this agreement, Motorola granted RIM a non-exclusive worldwide license to practice patents that Motorola claimed were essential to various standards, including the GSM, GPRS, and UMTS standards described herein, as well as rights to a number of non-essential Motorola patents.

85.     The term of the 2003 Cross-License Agreement was five years. In addition, the agreement had a specific provision governing extension of its terms and conditions. Section 5.3 of the agreement states: "At least one year prior to termination of this Agreement, RIM and MOTOROLA agree to begin good faith negotiations, related to the terms and conditions of this Agreement to extend the terms and conditions hereof beyond the date of termination."

86.     During the five-year term of the 2003 Cross-License Agreement, RIM achieved substantial growth in its development and sale of smart phones and accompanying wireless e-mail services. During the 2003-2007 period, the BlackBerry® subscriber base grew from 534,000 to approximately 8 million. BlackBerry® service availability in that period grew from over fifty networks in thirty countries to over 300 networks in approximately 125 countries.

87.     As sales of Motorola's RAZR and other Motorola handsets declined, and in view of the rapid sales growth RIM has enjoyed, Motorola belatedly realized the need to develop more data-centric mobile wireless products and services. As explained above, Motorola responded to RIM's success in the sale of converged voice and data mobile wireless communications devices by marketing its own smart phone, the "Q", and by acquiring Good Technology. However, these efforts were not successful in preventing Motorola's loss of its share of sales of converged voice and data mobile wireless products. Analysts reports that, at

- 25 -

the end of 2007, Motorola's share of handset sales had fallen to thirteen percent or less, having decreased nearly one-half from a year earlier.

88. Motorola's response to the declining fortunes of its handset business can be seen in the dramatic change between the royalties provided for in the 2003 Cross-License Agreement and the royalties Motorola has sought in its 2007-08 negotiation with RIM. This change cannot be explained by any increase in the value of Motorola's patent portfolio. Instead, Motorola's demand for unfair, unreasonable, and discriminatory royalties with respect to the patents Motorola claims to be standards-essential, along with its exorbitant royalty demands with respect to patents that were part of the 2003 Cross-License Agreement but not standards-essential, can only be explained by the fact that from 2003 to 2008, RIM has become a more substantial competitor to Motorola for the sale of mobile wireless communication devices and services.

89. Indeed, Motorola is now seeking license payments that represent an effective royalty rate multiple times the imputed percentage-based royalty that RIM has paid under the 2003 Cross-License Agreement. The royalty Motorola is seeking is also substantially in excess of royalties RIM has paid and is paying other parties claiming to own patents essential to the same widely-implemented standards as those Motorola claims to own.

90. In addition, Motorola has threatened to seek an injunction unless RIM agrees to license the patents that are not essential to any standard.

91. In making these threats and demands in the course of the parties' negotiations, Motorola has breached its FRAND and RAND commitments.

1620477_2.DOC

202

## MOTOROLA'S UNFAIR, UNREASONABLE AND DISCRIMINATORY TERMS, AND ITS THREAT OF INJUNCTION VIOLATE ITS CONTRACTUAL OBLIGATION TO NEGOTIATE IN GOOD FAITH

92.     In repeatedly proposing to RIM terms that are unfair, unreasonable and discriminatory, and in demanding exorbitant royalties for the patents that are not standards-essential, Motorola has breached Section 5.3 of the 2003 Cross-License Agreement, which requires Motorola to negotiate in good faith regarding an extended or new license agreement.

93.     In demanding royalties that are multiple times the effective royalty rate of the 2003 Cross-License Agreement, multiple times greater than the royalty rates of FRAND licenses in the industry, and, on information and belief, far above the imputed licensing royalty rate that Motorola incurs for its own downstream products that compete with RIM, Motorola has repudiated its promise in the 2003 Cross-License Agreement.

## THE RELEVANT TECHNOLOGY MARKETS

94.     Motorola's unlawful conduct has had a substantial anticompetitive effect on several distinct and well-defined Mobile Wireless Technology Markets.

As a core part of the development of the standards at issue here, SDO participants sought to determine the appropriate technology to be used for each individual function required to practice the relevant standard.  SDO participants evaluated and selected among viable alternative competing technologies – including alternatives Motorola claims are covered by its patents – that are capable of performing each required function.  They selected among the alternatives based on technical and commercial merit and intellectual property considerations, including whether the alternative included technology protected by disclosed patents and, if so, whether the party claiming to own that technology had committed to make it available on

- 27 -

FRAND or RAND terms. Thus, before adoption of the standard, there were multiple competing alternative technology solutions in the market to perform each relevant function.

95. Each GSM, GPRS, UMTS, and WLAN standard consists of a number of different technological functions. The technologies that perform these functions are essential inputs into the manufacture of products and services that comply with the standard.

96. Because each of the standards at issue here specifies a set of distinct technologies to perform the various functions within the standard, once a standard was adopted there were, by definition, no substitutes for the standardized technologies on which each technology is based. For instance, if a manufacturer wishes to produce products, including wireless handsets, that incorporate UMTS technologies, it cannot do so without gaining access to UMTS technologies. Likewise, there are no commercially viable substitutes for GSM technologies, GPRS technologies, or WLAN technologies.

97. Once SDO participants selected a technology to perform a particular function needed to practice a standard, all alternative technological solutions for that standard were excluded from use in connection with that standard. Thus, the selection of a particular technology in that standardization process reduced to a single option the technology to perform each function necessary to practice the standard.

98. If the technology selected for inclusion in the standard was protected by patents, the patent owner would control the supply of that particular technological input for the standard. This is true for each function comprising the standard for which patented technology was selected.

- 28 -

99.     Motorola claims to own patents essential to practice the technologies that are used for certain individual functions of the GSM standard, GPRS standard, the UMTS standard, and the WLAN standard.

100.    The relevant markets in which to assess Motorola's conduct, therefore, are markets consisting of all competing technologies that perform the functions covered by Motorola's essential patents for the GSM standard (the "GSM technology markets"), the GPRS standard (the "GPRS technology markets"), the UMTS standards (the "UMTS technology markets"), and the WLAN standard (the "WLAN technology markets") (collectively, the relevant "Mobile Wireless Technology Markets").

101.    The standards described above are employed throughout the world. Accordingly, the geographic scope of each of the relevant Mobile Wireless Technology Markets described above is worldwide.

102.    Now that the relevant standards have been released and industry participants have developed products based upon those standards, if Motorola's claim of ownership of essential patents is correct, Motorola possesses a monopoly in each of the relevant Mobile Wireless Technology Markets and has obtained monopoly power in each.

103.    Motorola's monopoly power in each of these relevant Mobile Wireless Technology Markets is protected by high barriers to entry.  Among other things, implementation of each of the GSM, GPRS, UMTS, and WLAN standards requires that the specified technologies identified in each standard be used in each product that claims to comply with the standard.  Each selected technology is, in effect, locked in as the only method of providing the particular functionality to that standard.

## **MOTOROLA ENGAGED IN UNFAIR AND ANTICOMPETITIVE CONDUCT THAT WILL INJURE RIM AND COMPETITION IN THE DOWNSTREAM MARKETS FOR MOBILE WIRELESS DATA PRODUCTS AND SERVICES**

104.    Motorola's refusal to honor its FRAND and RAND commitments concerning the GSM, GPRS, UMTS, and WLAN standards, and its breach of its contractual obligation to negotiate in good faith an extension of the 2003 Cross-License Agreement, are driven by one objective – to harm a more successful competitor in the downstream markets for mobile wireless data products and services in which RIM and Motorola compete.

105.    By failing to comply with its commitments to offer FRAND and RAND licenses to implementers of the various relevant standards, Motorola seeks to raise the costs of its rival, RIM.  These forced cost increases will harm RIM, competition in the downstream markets, and consumers in the downstream markets.

106.    The relevant downstream markets in which to assess these anticompetitive effects are the markets for data products and services, which include RIM's BlackBerry® handhelds and BlackBerry® Enterprise Server, and Motorola's comparable product and service offerings, such as the "Q" and Good Technology's software platform.

107.    The effects of Motorola's acts and practices described above are harmful to RIM, reduce competition in the mobile wireless data products and services markets, and permit Motorola to wrongfully obtain and exercise monopoly power in the relevant GSM, GPRS, UMTS, and WLAN technology markets.

## **ANTICOMPETITIVE EFFECTS OF MOTOROLA'S CONDUCT**

108.    The foregoing conduct by Motorola has caused and threatens to cause substantial harm to competition.  These anticompetitive effects include each of the following:

1620477_2.DOC

206

a.      Motorola's conduct has improperly foreclosed competition in the GSM
technology markets, the GPRS technology markets, the UMTS technology markets, and the
WLAN technology markets by unlawfully conferring monopolies on Motorola and
eliminating competing, alternative technologies to perform each function necessary to practice
the standard.

b.      Motorola's conduct has increased and threatens to further increase
royalties associated with the manufacture and sale of downstream products and services that
employ the GSM standard, the GPRS standard, the UMTS standard, and the WLAN standard,
resulting in increased prices and decreased quality and innovation for downstream products
and services.

109.    Such harm will continue unless and until the Court issues appropriate relief as
requested below.

## MOTOROLA'S ADDITIONAL PATENT ASSERTIONS

110.    In the course of the parties' 2007-08 negotiations to extend the term of the
2003 Cross-License Agreement, Motorola has accused RIM of infringing a number of
additional Motorola patents that it contends are not essential to any wireless industry
standards.  Motorola has threatened to sue RIM, and to attempt to enjoin its business, based
on these patents.  The parties' negotiations have since broken down.

111.    During the parties' negotiations, Motorola supported its infringement
accusations in part by providing RIM with claim charts purporting to compare certain claims
of the Motorola patents to various RIM products.  The claim charts contained claims from
U.S. Patent No. 5,359,317 ("the '317 patent"); U.S. Patent No. 5,075,684; U.S. Patent No.
5,764,899 ("the '899 patent"); U.S. Patent No. 5,771,353 ("the '353 patent"); U.S. Patent No.

- 31 -

5,958,006 ("the '006 patent"); U.S. Patent No. 5,706,211 ("the '211 patent"); and U.S. Patent No. 6,101,531 ("the '531 patent").

112.     RIM does not disclose the specifics of the Motorola claim charts here, because as part of Motorola's efforts to impose unfavorable terms on licensees, Motorola insists that parties seeking to negotiate a license enter into non-disclosure agreements that prevent disclosure of certain information relating to the negotiations.

113.     RIM believes that none of its products infringes any of the Motorola patents and that the Motorola patents are invalid.

114.     Motorola's accusations of infringement and the breakdown of the negotiations in which these accusations arose gives rise to a case of actual controversy within the jurisdiction of this Court, pursuant to 28 U.S.C. §§ 2201 and 2202.

## CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION

#### (Infringement of U.S. Patent No. 5,664,055)

115.     RIM repeats and re-alleges all of the allegations in all of the paragraphs above, as if set forth fully herein.

116.     On September 2, 1997, the United States Patent and Trademark Office duly and legally issued U.S. Patent No. 5,664,055 ("the '055 Patent") entitled "CS-ACELP Speech Compression System With Adaptive Pitch Prediction Filter Gain Based On A Measure Of Periodicity." A copy of the '055 Patent is attached hereto as Exhibit 1. RIM is the owner by assignment of the entire right, title and interest to the '055 Patent.

- 32 -

117.    Upon information and belief, Motorola has infringed and continues to infringe the '055 patent by making, using, selling and/or offering to sell, in this District and elsewhere in the United States, and/or by importing into this District and elsewhere in the United States, products and services, including wireless handsets, base stations, and other wireless communication, enterprise, and network related equipment and services, which embody and/or practice the claimed inventions of the '055 Patent in violation of 35 U.S.C. § 271.

118.    Upon information and belief, Motorola further has been and continues to induce others to infringe the '055 Patent and/or has and continues to contribute to infringement of the '055 Patent by others in violation of 35 U.S.C. § 271.

119.    Motorola's acts of infringement have caused damage to RIM, for which RIM seeks and is entitled to compensation in an amount to be determined at trial.

120.    Upon information and belief, Motorola has had knowledge of the '055 Patent and its infringement thereof, but nevertheless has been and continues to willfully infringe the same.  RIM therefore seeks and is entitled to an award of treble damages pursuant to 35 U.S.C. § 284 and reasonable attorneys fees and costs incurred in prosecuting this action pursuant to 35 U.S.C. § 285.

## SECOND CAUSE OF ACTION

### (Infringement of U.S. Patent No. 5,699,485)

121.    RIM repeats and re-alleges all of the allegations in all of the paragraphs above, as if set forth fully herein.

122.    On December 16, 1997, the United States Patent and Trademark Office duly and legally issued U.S. Patent No. 5,699,485 ("the '485 Patent") entitled "Pitch Delay Modification During Frame Erasures."  A copy of the '485 Patent is attached hereto as

- 33 -

Exhibit 2. RIM is the owner by assignment of the entire right, title and interest to the '485 Patent.

123. Upon information and belief, Motorola has infringed and continues to infringe the '485 patent by making, using, selling and/or offering to sell, in this District and elsewhere in the United States, and/or by importing into this District and elsewhere in the United States, products and services, including wireless handsets, base stations, and other wireless communication, enterprise, and network related equipment and services, which embody and/or practice the claimed inventions of the '485 Patent in violation of 35 U.S.C. § 271.

124. Upon information and belief, Motorola further has been and continues to induce others to infringe the '485 Patent and/or has and continues to contribute to infringement of the '485 Patent by others in violation of 35 U.S.C. § 271.

125. Motorola's acts of infringement have caused damage to RIM, for which RIM seeks and is entitled to compensation in an amount to be determined at trial.

126. Upon information and belief, Motorola has had knowledge of the '485 Patent and its infringement thereof, but nevertheless has been and continues to willfully infringe the same. RIM therefore seeks and is entitled to an award of treble damages pursuant to 35 U.S.C. § 284 and reasonable attorneys fees and costs incurred in prosecuting this action pursuant to 35 U.S.C. § 285.

## THIRD CAUSE OF ACTION

### (Infringement of U.S. Patent No. 6,278,442)

127. RIM repeats and re-alleges all of the allegations in all of the paragraphs above, as if set forth fully herein.

- 34 -

128.    On August 21, 2001, the United States Patent and Trademark Office duly and legally issued U.S. Patent No. 6,278, 442 ("the '442 Patent") entitled "Hand-Held Electronic Device With A Keyboard Optimized For Use With The Thumbs."  A copy of the '442 Patent is attached hereto as Exhibit 3.  RIM is the owner by assignment of the entire right, title and interest to the '442 Patent.

129.    Upon information and belief, Motorola has infringed and continues to infringe the '442 patent by making, using, selling and/or offering to sell, in this District and elsewhere in the United States, and/or by importing into this District and elsewhere in the United States, products, including wireless handsets, which embody and/or practice the claimed inventions of the '442 Patent in violation of 35 U.S.C. § 271.

130.    Upon information and belief, Motorola further has been and continues to induce others to infringe the '442 Patent and/or has and continues to contribute to infringement of the '442 Patent by others in violation of 35 U.S.C. § 271.

131.    Motorola's acts of infringement have caused damage to RIM, for which RIM seeks and is entitled to compensation in an amount to be determined at trial.

## FOURTH CAUSE OF ACTION

### (Infringement of U.S. Patent No. 6,452,588)

132.    RIM repeats and re-alleges all of the allegations in all of the paragraphs above, as if set forth fully herein.

133.    On September 17, 2002, the United States Patent and Trademark Office duly and legally issued U.S. Patent No. 6,452,588 ("the '588 Patent") entitled "Hand-Held E-Mail Device."  A copy of the '588 Patent is attached hereto as Exhibit 4.  RIM is the owner by assignment of the entire right, title and interest to the '588 Patent.

- 35 -

1620477_2.DOC

211

134.     Upon information and belief, Motorola has infringed and continues to infringe the '588 patent by making, using, selling and/or offering to sell, in this District and elsewhere in the United States, and/or by importing into this District and elsewhere in the United States, products, including wireless handsets, which embody and/or practice the claimed inventions of the '588 Patent in violation of 35 U.S.C. § 271.

135.     Upon information and belief, Motorola further has been and continues to induce others to infringe the '588 Patent and/or has and continues to contribute to infringement of the '588 Patent by others in violation of 35 U.S.C. § 271.

136.     Motorola's acts of infringement have caused damage to RIM, for which RIM seeks and is entitled to compensation in an amount to be determined at trial.

## FIFTH CAUSE OF ACTION

### (Infringement of U.S. Patent No. 6,489,950)

137.     RIM repeats and re-alleges all of the allegations in all of the paragraphs above, as if set forth fully herein.

138.     On December 3, 2002, the United States Patent and Trademark Office duly and legally issued U.S. Patent No. 6,489,950 ("the '950 Patent") entitled "Hand-Held Electronic Device With Auxiliary Input Device." A copy of the '950 Patent is attached hereto as Exhibit 5. RIM is the owner by assignment of the entire right, title and interest to the '950 Patent.

139.     Upon information and belief, Motorola has infringed and continues to infringe the '950 patent by making, using, selling and/or offering to sell, in this District and elsewhere in the United States, and/or by importing into this District and elsewhere in the United States, products, including wireless handsets, which embody and/or practice the claimed inventions of the '950 Patent in violation of 35 U.S.C. § 271.

1620477_2.DOC

140.    Upon information and belief, Motorola further has been and continues to induce others to infringe the '950 Patent and/or has and continues to contribute to infringement of the '950 Patent by others in violation of 35 U.S.C. § 271.

141.    Motorola's acts of infringement have caused damage to RIM, for which RIM seeks and is entitled to compensation in an amount to be determined at trial.

## SIXTH CAUSE OF ACTION

### (Infringement of U.S. Patent No. 6,611,254)

142.    RIM repeats and re-alleges all of the allegations in all of the paragraphs above, as if set forth fully herein.

143.    On August 26, 2003, the United States Patent and Trademark Office duly and legally issued U.S. Patent No. 6,611,254 ("the '254 Patent") entitled "Hand-Held Electronic Device With a Keyboard Optimized For Use With The Thumbs."  A copy of the '254 Patent is attached hereto as Exhibit 6.  RIM is the owner by assignment of the entire right, title and interest to the '254 Patent.

144.    Upon information and belief, Motorola has infringed and continues to infringe the '254 patent by making, using, selling and/or offering to sell, in this District and elsewhere in the United States, and/or by importing into this District and elsewhere in the United States, products, including wireless handsets, which embody and/or practice the claimed inventions of the '254 Patent in violation of 35 U.S.C. § 271.

145.    Upon information and belief, Motorola further has been and continues to induce others to infringe the '254 Patent and/or has and continues to contribute to infringement of the '254 Patent by others in violation of 35 U.S.C. § 271.

146.    Motorola's acts of infringement have caused damage to RIM, for which RIM

seeks and is entitled to compensation in an amount to be determined at trial.

## SEVENTH CAUSE OF ACTION

### (Infringement of U.S. Patent No. 6,611,255)

147.    RIM repeats and re-alleges all of the allegations in all of the paragraphs above,

as if set forth fully herein.

148.    On August 26, 2003, the United States Patent and Trademark Office duly and

legally issued U.S. Patent No. 6,611,255 ("the '255 Patent") entitled "Hand-Held Electronic

Device With a Keyboard Optimized For Use With The Thumbs."  A copy of the '255 Patent

is attached hereto as Exhibit 7.  RIM is the owner by assignment of the entire right, title and

interest to the '255 Patent.

149.    Upon information and belief, Motorola has infringed and continues to infringe

the '255 patent by making, using, selling and/or offering to sell, in this District and elsewhere

in the United States, and/or by importing into this District and elsewhere in the United States,

products, including wireless handsets, which embody and/or practice the claimed inventions

of the '255 Patent in violation of 35 U.S.C. § 271.

150.    Upon information and belief, Motorola further has been and continues to

induce others to infringe the '255 Patent and/or has and continues to contribute to

infringement of the '255 Patent by others in violation of 35 U.S.C. § 271.

151.    Motorola's acts of infringement have caused damage to RIM, for which RIM

seeks and is entitled to compensation in an amount to be determined at trial.

- 38 -

## EIGHTH CAUSE OF ACTION

### (Infringement of U.S. Patent No. 6,919,879)

152. RIM repeats and re-alleges all of the allegations in all of the paragraphs above, as if set forth fully herein.

153. On July 19, 2005, the United States Patent and Trademark Office duly and legally issued U.S. Patent No. 6,919,879 ("the '879 Patent") entitled "Hand-Held Electronic Device With a Keyboard Optimized For Use With The Thumbs." A copy of the '879 Patent is attached hereto as Exhibit 8. RIM is the owner by assignment of the entire right, title and interest to the '879 Patent.

154. Upon information and belief, Motorola has infringed and continues to infringe the '879 patent by making, using, selling and/or offering to sell, in this District and elsewhere in the United States, and/or by importing into this District and elsewhere in the United States, products, including wireless handsets, which embody and/or practice the claimed inventions of the '879 Patent in violation of 35 U.S.C. § 271.

155. Upon information and belief, Motorola further has been and continues to induce others to infringe the '879 Patent and/or has and continues to contribute to infringement of the '879 Patent by others in violation of 35 U.S.C. § 271.

156. Motorola's acts of infringement have caused damage to RIM, for which RIM seeks and is entitled to compensation in an amount to be determined at trial.

## NINTH CAUSE OF ACTION

### (Infringement of U.S. Patent No. 7,227,536)

157. RIM repeats and re-alleges all of the allegations in all of the paragraphs above, as if set forth fully herein.

- 39 -

158.    On June 5, 2007, the United States Patent and Trademark Office duly and legally issued U.S. Patent No. 7,227,536 ("the '536 Patent") entitled "Hand-Held Electronic Device With a Keyboard Optimized For Use With The Thumbs."  A copy of the '526 Patent is attached hereto as Exhibit 9.  RIM is the owner by assignment of the entire right, title and interest to the '536 Patent.

159.    Upon information and belief, Motorola has infringed and continues to infringe the '536 patent by making, using, selling and/or offering to sell, in this District and elsewhere in the United States, and/or by importing into this District and elsewhere in the United States, products, including wireless handsets, which embody and/or practice the claimed inventions of the '536 Patent in violation of 35 U.S.C. § 271.

160.    Upon information and belief, Motorola further has been and continues to induce others to infringe the '536 Patent and/or has and continues to contribute to infringement of the '536 Patent by others in violation of 35 U.S.C. § 271.

161.    Motorola's acts of infringement have caused damage to RIM, for which RIM seeks and is entitled to compensation in an amount to be determined at trial.

## TENTH CAUSE OF ACTION

### (Breach of Contract – FRAND/RAND)

162.    RIM repeats and re-alleges all of the allegations in all of the paragraphs above, as if set forth fully herein.

163.    As set forth above, Motorola entered into express or implied contractual commitments with ETSI relating to the GSM, GPRS and UMTS standards, and with IEEE-SA relating to the WLAN standard.

- 40 -

164. Each potential third party implementing each of the standards adopted by the SDOs – including RIM – was an intended beneficiary of those contracts.

165. Motorola breached these contracts by refusing to offer licenses to patents it claims are essential to the various standards on FRAND/RAND terms and instead demanding unfair, unreasonable, and discriminatory royalties and threatening to seek an injunction unless RIM agrees to license a number of Motorola patents that are not essential to any standard.

166. As a result of these multiple contractual breaches, RIM has been injured in its business or property, and is threatened by imminent loss of profits, loss of customers and potential customers, and loss of goodwill and product image.

167. RIM will suffer irreparable injury by reason of the acts, practices, and conduct of Motorola alleged above until and unless the Court enjoins such acts, practices, and conduct.

## ELEVENTH CAUSE OF ACTION

### (Promissory Estoppel)

168. RIM repeats and re-alleges all of the allegations in all the paragraphs above as if set forth fully herein.

169. Motorola made a clear and definite promise to potential licensees through its commitments to various SDOs that it would disclose relevant IPR, including potentially essential patents, and would license its essential IPR, including patents, on FRAND terms.

170. The intended purpose of Motorola's promises was to induce reliance. Motorola knew or should have reasonably expected that this promise would induce mobile wireless device companies, like RIM, to develop products compliant with the relevant standards.

- 41 -

171.    RIM developed and marketed its products and services in reliance on Motorola's promises, as described above, including making its products and services compliant with GSM, GPRS, UMTS, and WLAN technical standards. RIM also relied on Motorola's promises in taking or refraining from taking actions in connection with certain standard-setting processes.

172.    Motorola is estopped from reneging on these promises to the various SDOs under the doctrine of promissory estoppel.

173.    RIM has been harmed as a result of its reasonable reliance on Motorola's promises and is threatened by the imminent loss of profits, loss of customers and potential customers, and loss of goodwill and product image.

174.    RIM will suffer irreparable injury by reason of the acts and conduct of Motorola alleged above until and unless the court enjoins such acts, practices and conduct.

## TWELFTH CAUSE OF ACTION

### (Breach of Contract – Breach of § 5.3 of the 2003 Cross-License Agreement)

175.    RIM repeats and realleges all of the allegations in all of the paragraphs above, as if set forth fully herein.

176.    As set forth above, Motorola entered into a 2003 Cross-License Agreement with RIM, and assumed a contractual obligation to negotiate in good faith with respect to extending the terms and conditions of the 2003 Cross-License Agreement beyond the date of termination.

177.    Motorola breached this contract by refusing to negotiate in good faith the extension of the 2003 Cross-License Agreement. Motorola has sought an increase in royalties multiple times that of the pre-existing royalties under the 2003 Cross-License Agreement and

- 42 -

also has demanded exorbitant royalties for the patents that are not standards-essential, using the threat of an injunction with respect to patents it does not claim essential to any standard to extract unreasonable royalties on both.

178.    As a result of this contractual breach, RIM has been injured in its business or property and is threatened by the imminent loss of profits, loss of customers and potential customers, and the loss of goodwill and product image.

179.    RIM will suffer irreparable injury by reason of the acts, practices, and conduct of Motorola alleged above until and unless the Court enjoins such acts, practices, and conduct.

## THIRTEENTH CAUSE OF ACTION

### (False FRAND Commitments in Violation of Section 2 of the Sherman Act)

180.    RIM repeats and re-alleges all of the allegations in all of the paragraphs above, as if set forth fully herein.

181.    Motorola has unlawfully monopolized the GSM technology markets, the GPRS technology markets, the UMTS technology markets, and the WLAN technology markets by making false FRAND/RAND commitments to ETSI and IEEE, that it used to induce SDOs into incorporating Motorola's patented technologies into the approved standards.  Motorola's FRAND and RAND commitments were false because it never told the SDOs that it would be willing to license its essential patents on FRAND and RAND terms only if it did not face a competitive threat from its prospective licensee.  The SDOs and other SDO members relied on Motorola's unconditional FRAND and RAND commitments in adopting the GSM, GPRS, UMTS, and WLAN technical standards.

182.    Motorola's monopoly power in these relevant technology markets was therefore unlawfully acquired.  With the adopted standards effectively locking RIM and the

rest of the wireless data industry into using the technologies Motorola claims to be covered by its essential patents, Motorola obtained, through deception, monopoly power over the relevant wireless technologies markets – monopoly power that was conditioned on its FRAND and RAND commitments.  Motorola has unlawfully exercised monopoly power in the relevant Mobile Wireless Technology Markets by breaching the very commitments that enabled it to obtain its conditional monopoly power.

183.    Motorola's conduct has foreclosed competition in each of the relevant Mobile Wireless Technology Markets.

184.    Motorola's exclusionary practices have left RIM unable to obtain – on fair, reasonable and non-discriminatory terms – licenses to practice technologies that Motorola claims are necessary to the continued manufacture and sale of many of its products.  Thus, as a direct and proximate result of Motorola's illegal and anticompetitive conduct and continuing violation of Section 2 of the Sherman Act, RIM has suffered injury to its business and property and is threatened by the imminent loss of profits, loss of customers and potential customers, and loss of goodwill and product image.

185.    RIM will suffer irreparable injury until and unless the Court enjoins such acts, practices, and conduct.

## FOURTEENTH CAUSE OF ACTION

### (Declaratory Relief – Breach of Contract)

186.    RIM repeats and re-alleges all of the allegations in all of the paragraphs above, as if set forth fully herein.

187.    An actual and justiciable controversy has arisen and now exists between RIM and Motorola with respect to whether Motorola can assert the patents it claims are essential

1620477_2.DOC

220

against RIM in the face of its breach of its contractual obligation to license the essential patents on FRAND/RAND terms and its other unfair and anticompetitive conduct.

188. As set forth above, Motorola entered into contractual commitments with various SDOs requiring it to license on FRAND/RAND terms patents that Motorola claims are essential to the GSM, GPRS, UMTS, and WLAN standards. By obligating itself to license patents it claims are essential on FRAND/RAND terms, Motorola waived its right to seek injunctive relief or an exclusionary order that would bar RIM from practicing Motorola's claimed essential patents.

189. Each potential third party implementing each of the standards adopted by the SDOs – including RIM – was an intended beneficiary of those contracts.

190. Allowing Motorola to insist on highly inflated royalties or threaten an injunction would defeat the purpose of the FRAND or RAND commitment. Technology developers, product manufacturers and the consuming public cannot enjoy the benefits of standardization without compliance with FRAND or RAND licensing commitments that prevent parties from exploiting the monopoly power they acquire in the various technology markets when their patented technologies are selected for a standard. Motorola should not be permitted to extort unfair, unreasonable and/or discriminatory royalties with impunity by threatening to enjoin implementers of standards, who as a practical matter have no choice but to continue implementing those standards, from using the patents Motorola claims are essential.

191. This controversy between RIM and Motorola is real and adverse. Negotiations regarding the extension of the 2003 Cross-License Agreement have broken down, and Motorola has refused to license its declared patents on FRAND or RAND terms. Motorola is

- 45 -

seeking injunctive relief against RIM to prevent RIM from practicing Motorola's purportedly essential patents as a result of RIM's refusal to accede to Motorola's unreasonable demands. This would have an anticompetitive effect on RIM and consumer's of R IM's products.

192.    If Motorola is allowed to continue to insist on highly inflated royalties for its claimed essential patents and to threaten an injunction with respect to its non- standards essential patents in order to extract unreasonable royalty rates, RIM will face undue coercion and be forced to accept an unfair and anticompetitive license to the claimed essential patents. RIM would have no redress for Motorola's misconduct.  Alternatively, if RIM does not acquiesce to Motorola's unfair and unreasonable demands, then RIM is exposed to the threat of an injunction.

193.    RIM, therefore, seeks a declaratory judgment that Motorola is not entitled to injunctive or exclusionary relief for any alleged infringement of the patents that Motorola claims are essential to GSM, GPRS, UMTS, and WLAN or for infringement of the non-essential patents that Motorola previously was willing to make subject to the 2003 Cross-License Agreement but is now using as a coercive threat.  RIM further seeks a declaratory judgment that Motorola's sole remedy for any alleged infringement of such claimed essential patents is RIM's agreement to fair, reasonable, and non-discriminatory licensing terms.

### FIFTEENTH CAUSE OF ACTION

### (Declaratory Relief – Promissory Estoppel)

194.    RIM repeats and re-alleges all of the allegations in all of the paragraphs above, as if set forth fully herein.

195.    An actual and justiciable controversy has arisen and now exists between RIM and Motorola with respect to the FRAND/RAND terms.

- 46 -

196.    Motorola made a clear and definite promise to potential licensees of its declared essential patents through its promise to various SDOs that it would disclose relevant IPR, including potentially essential patents and would license its essential IPR, including patents, on FRAND or RAND terms. As a result, Motorola committed to license on FRAND/RAND terms patents that Motorola claims as essential to GSM, GPRS, UMTS, and WLAN.

197.    Each potential third party implementing each of the standards adopted by the SDOs – including RIM – was an intended beneficiary of those FRAND or RAND promises.

198.    The intended purpose of Motorola's promises was to induce reliance. Motorola knew or should have reasonably expected that these promises would induce potential licensees such as RIM to take (or refrain from taking) certain actions.

199.    RIM developed its products and services in reliance on Motorola's promises, as described above.

200.    RIM has been harmed by virtue of its reasonable reliance on Motorola's broken promises.

201.    This controversy between RIM and Motorola is real and adverse. Negotiations regarding extending the 2003 Cross-License agreement have broken down, Motorola has refused to license its declared essential patents on FRAND or RAND terms, and is threatening to seek an injunction with respect to the patents that are not standards-essential to extract unreasonable royalty rates. Because RIM has refused to accede to Motorola's unfair and unreasonable royalty demands, RIM is at risk of Motorola seeking injunctive relief against RIM to prevent RIM from practicing Motorola's patents.

- 47 -

202.    RIM, therefore, seeks a declaratory judgment that Motorola is estopped from reneging on its promises to the various SDOs and is estopped from seeking injunctive or exclusionary relief for any alleged infringements of the patents that Motorola claims are essential to GSM, GPRS, UMTS, and WLAN standards or the other patents that are not standards-essential but which Motorola is using as a coercive threat.  RIM further seeks a declaratory judgment that Motorola's sole remedy for any alleged infringement of such claimed essential patents is RIM's agreement to reasonable and non-discriminatory license terms.

## SIXTEENTH CAUSE OF ACTION

### (Declaratory Judgment '317 Patent)

203.    RIM repeats and re-alleges all of the allegations in all of the paragraphs above, as if set forth fully herein.

204.    A copy of the '317 Patent is attached hereto as Exhibit 10.

205.    Each of the claims of the '317 patent is invalid for failure to comply with the conditions of patentability of, *inter alia*, 35 U.S.C. §§ 101, 102, 103 and/or 112.

206.    RIM has not infringed, directly, indirectly, or otherwise any valid claim of the '317 patent.

207.    To resolve the legal and factual questions raised by Motorola and to afford relief from the uncertainty and controversy which Motorola's accusations have precipitated, RIM is entitled to a declaratory judgment that it does not infringe the '317 patent and that the '317 patent is invalid.

1620477_2.DOC

224

## SEVENTEENTH CAUSE OF ACTION

### (Declaratory Judgment '684 Patent)

208.    RIM repeats and re-alleges all of the allegations in all of the paragraphs above, as if set forth fully herein.

209.    A copy of the '684 Patent is attached hereto as Exhibit 11.

210.    Each of the claims of the '684 patent is invalid for failure to comply with the conditions of patentability of, *inter alia*, 35 U.S.C. §§ 101, 102, 103 and/or 112.

211.    RIM has not infringed, directly, indirectly, or otherwise any valid claim of the '684 patent.

212.    To resolve the legal and factual questions raised by Motorola and to afford relief from the uncertainty and controversy which Motorola's accusations have precipitated, RIM is entitled to a declaratory judgment that it does not infringe the '684 patent and that the '684 patent is invalid.

## EIGHTEENTH CAUSE OF ACTION

### (Declaratory Judgment '899 Patent)

213.    RIM repeats and re-alleges all of the allegations in all of the paragraphs above, as if set forth fully herein.

214.    A copy of the '899 Patent is attached hereto as Exhibit 12.

215.    Each of the claims of the '899 patent is invalid for failure to comply with the conditions of patentability of, *inter alia*, 35 U.S.C. §§ 101, 102, 103 and/or 112.

216.    RIM has not infringed, directly, indirectly, or otherwise any valid claim of the '899 patent.

- 49 -

217.   To resolve the legal and factual questions raised by Motorola and to afford relief from the uncertainty and controversy which Motorola's accusations have precipitated, RIM is entitled to a declaratory judgment that it does not infringe the '899 patent and that the '899 patent is invalid.

## NINETEENTH CAUSE OF ACTION

### (Declaratory Judgment '353 Patent)

218.   RIM repeats and re-alleges all of the allegations in all of the paragraphs above, as if set forth fully herein.

219.   A copy of the '353 Patent is attached hereto as Exhibit 13.

220.   Each of the claims of the '353 patent is invalid for failure to comply with the conditions of patentability of, *inter alia*, 35 U.S.C. §§ 101, 102, 103 and/or 112.

221.   RIM has not infringed, directly, indirectly, or otherwise any valid claim of the '353 patent.

222.   To resolve the legal and factual questions raised by Motorola and to afford relief from the uncertainty and controversy which Motorola's accusations have precipitated, RIM is entitled to a declaratory judgment that it does not infringe the '353 patent and that the '353 patent is invalid.

## TWENTIETH CAUSE OF ACTION

### (Declaratory Judgment '006 Patent)

223.   RIM repeats and re-alleges all of the allegations in all of the paragraphs above, as if set forth fully herein.

224.   A copy of the '006 Patent is attached hereto as Exhibit 14.

225.    Each of the claims of the '006 patent is invalid for failure to comply with the conditions of patentability of, *inter alia*, 35 U.S.C. §§ 101, 102, 103 and/or 112.

226.    RIM has not infringed, directly, indirectly, or otherwise any valid claim of the '006 patent.

227.    To resolve the legal and factual questions raised by Motorola and to afford relief from the uncertainty and controversy which Motorola's accusations have precipitated, RIM is entitled to a declaratory judgment that it does not infringe the '006 patent and that the '006 patent is invalid.

### TWENTY-FIRST CAUSE OF ACTION

### (Declaratory Judgment '211 Patent)

228.    RIM repeats and re-alleges all of the allegations in all of the paragraphs above, as if set forth fully herein.

229.    A copy of the '211 Patent is attached hereto as Exhibit 15.

230.    Each of the claims of the '211 patent is invalid for failure to comply with the conditions of patentability of, *inter alia*, 35 U.S.C. §§ 101, 102, 103 and/or 112.

231.    RIM has not infringed, directly, indirectly, or otherwise any valid claim of the '211 patent.

232.    To resolve the legal and factual questions raised by Motorola and to afford relief from the uncertainty and controversy which Motorola's accusations have precipitated, RIM is entitled to a declaratory judgment that it does not infringe the '211 patent and that the '211 patent is invalid.

1620477_2.DOC

227

## TWENTY-SECOND CAUSE OF ACTION

### (Declaratory Judgment '531 Patent)

233.  RIM repeats and re-alleges all of the allegations in all of the paragraphs above, as if set forth fully herein.

234.  A copy of the '531 Patent is attached hereto as Exhibit 16.

235.  Each of the claims of the '531 patent is invalid for failure to comply with the conditions of patentability of, *inter alia*, 35 U.S.C. §§ 101, 102, 103 and/or 112.

236.  RIM has not infringed, directly, indirectly, or otherwise any valid claim of the '531 patent.

237.  To resolve the legal and factual questions raised by Motorola and to afford relief from the uncertainty and controversy which Motorola's accusations have precipitated, RIM is entitled to a declaratory judgment that it does not infringe the '531 patent and that the '531 patent is invalid.

## PRAYER FOR RELIEF

WHEREFORE, RIM requests that the Court:

Adjudge and decree that Motorola has infringed U.S. Patent Nos. 5,664,055; 5,699,485; 6,278,442; 6,452,588; 6,489,950; 6,611,254; 6,611,255; 6,919,879; and 7,227,536;

Adjudge and decree that Motorola's conduct violates its express and implied contracts with ETSI and IEEE-SA and their members; that Motorola is estopped from denying its promises to license its claimed essential patients on FRAND or RAND terms; that Motorola breached its contractual commitment to negotiate in good faith with respect to extending the terms and conditions of the 2003 Cross-License Agreement; and that Motorola has violated Section 2 of the Sherman Act, 15 U.S.C. § 2.

- 52 -

1620477_2.DOC

228

Adjudge and decree that Motorola has waived any right to seek, or is otherwise barred from seeking injunctive relief, including an exclusion or cease-and-desist order by the International Trade Commission, to prevent RIM from using technology encompassed by any patents that Motorola has declared as essential to GSM, GPRS, UMTS, or WLAN or any of the other patents that are not standards-essential but which Motorola is using as a coercive threat;

Adjudge and decree that Motorola's commitment to license patents it claims are essential to GSM, GPRS, UMTS, or WLAN on FRAND or RAND terms is a binding contractual obligation, enforceable by RIM;

On RIM's First through Ninth claims for relief, enter judgment against Motorola, pursuant to 35 U.S.C. §284, in an amount sufficient to compensate for the damage suffered by RIM arising out of Motorola's acts of infringement as alleged herein, together with pre-judgment and post-judgment interest, and costs;

On RIM's First and Second claims for relief, enter judgment against Motorola for treble the amount of RIM's damages, pursuant to 35 U.S.C. §284, for Motorola's willful infringement, find this case exceptional, and award RIM its reasonable attorneys fees pursuant to 35 U.S.C. §285;

On RIM's Tenth though Thirteenth claims for relief, enter judgment against Motorola for the amount of damages proven at trial;

On RIM's Thirteenth claim for relief, enter judgment against Motorola for treble the amount of RIM's damages, pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15;

Enjoin Motorola's continuing violations of law by (a) barring Motorola from asserting the patents and other IPR that it has claimed are essential to practice the relevant standards

- 53 -

against RIM; or (b) requiring Motorola to grant RIM a license to those patents and other IPR on FRAND/RAND terms;

On RIM's Sixteenth through Twenty-Second claims for relief, determine and declare that the claims of the '317, '684, '899, '353, '066, '211, and '531 patents are invalid and not infringed by RIM;

Award RIM its costs and expenses of litigation, including attorneys' fees; and

Enter judgment against Motorola for such other and further relief as the Court deems just and proper.

1620477_2.DOC

230

## DEMAND FOR JURY TRIAL

Plaintiff RIM hereby demands trial by jury in this action on all issues so triable.

Dated: February 16, 2008

Respectfully submitted,

George W. Bramblett, Jr.
george.bramblett@haynesboone.com
Texas State Bar No. 02867000
Phillip B. Philbin
phillip.philbin@haynesboone.com
Texas State Bar No. 15909020
John R. Emerson
russ.emerson@haynesboone.com
Texas State Bar No. 24002053

HAYNES AND BOONE, LLP
901 Main Street, Suite 3100
Dallas, Texas 75202-3789
Tel: 214-651-5000
Fax: 214-651-5940

William F. Lee
Michelle D. Miller
William J. Bohler

WILMER CUTLER PICKERING HALE AND DORR
LLP
60 State Street
Boston, MA 02109
Tel: 617-526-6000
Fax: 617-526-5000

ATTORNEYS FOR PLAINTIFFS, RESEARCH IN
MOTION LIMITED AND RESEARCH IN MOTION
CORPORATION

- 55 -

# APPENDIX A

## PATENTS CLAIMED BY MOTOROLA AS
## ESSENTIAL TO GSM, GPRS, UMTS, OR WLAN STANDARD

**1. Patents Alleged in 2007 Negotiation as Essential to GSM**

1. U.S. 6,212,391
   Method for positioning GSM mobile station

2. U.S. 5,608,779
   Method for communications between mobile units using single and multiple switching center configurations

3. U.S. 5,659,622
   Method and apparatus for suppressing noise in a communication system

4. U.S. 6,091,969
   Method and apparatus for inband signaling control of vocoder bypass

5. U.S. 6,104,993
   Apparatus and method for rate determination in a communication system

6. U.S. 4,833,701
   Trunked communication system with nationwide roaming capability

7. U.S. 4,942,570
   Multiple control slot TDM/FDM communication system

8. U.S. 5,127,100
   Digital Radio communication system and two way radio

9. U.S. 5,359,696
   Digital speech coder having improved sub-sample resolution long-term predictor

10. U.S. 5,490,230
    Digital speech coder having optimized signal energy parameters

11. U.S. 5,241,650
    Digital speech decoder having a postfilter with reduced spectral distortion

12. U.S. 5,253,269
    Delta-coded lag information for use in a speech coder

13. U.S. 5,265,219
    Speech encoder using a soft interpolation decision for spectral parameters

14. U.S. 5,434,947
    Method for generating a spectral noise weighting filter for use in a speech coder

15.    U.S. 5,675,702
Multi-segment vector quantizer for a speech coder suitable for use in a radiotelephone

16.    U.S. 5,528,723
Digital speech coder and method utilizing harmonic noise weighting

17.    U.S. 5,692,101
Speech coding method and apparatus using mean squared error modifier for selected speech coder parameters using VSELP techniques

18.    U.S. 5,642,368
Error protection for multimode speech coders

19.    U.S. 4,852,090
TDMA communications system with adaptive equalization

20.    U.S. 6,453,291 B1
Apparatus and method for voice activity detection in a communication system

21.    U.S. 5,583,869
Method for dynamically allocating wireless communication resources

22.    U.S. 5,742,592
Method for communicating data in a wireless communication system

23.    U.S. 5,745,695
Radio system with suspension of packet data service during non-data service connection

24.    U.S. 5,404,580
Radio having memory means for storing radio user validation code

25.    U.S. 5,444,438
Method and apparatus for remote memory management in an acknowledge-back selective call communication system

26.    U.S. 6,429,811 B1
Method and apparatus for compressing GPS satellite broadcast message information

27.    U.S. 4,992,753
Power amplifier for a radio frequency signal

28.    U.S. 4,887,050
Frequency control apparatus and method for a digital radio receiver

29.    U.S. 5,729,542
Method and apparatus for communication system

- 2 -

30.  U.S. 4,887,265
Packet-switched cellular telephone system

**2. Patents Alleged in 2007 Negotiation as Essential to GPRS**

1.  U.S. 4,837,858
Subscriber unit for a trunked voice/data communication

2.  U.S. 5,583,869
Method for dynamically allocating wireless communication resources

3.  U.S. 5,742,592
Method for communicating data in a wireless communication system

4.  U.S. 5,729,542
Method and apparatus for communication system access

5.  U.S. 6,359,898
Method For Performing A Countdown Function During A Mobile-Originated
Transfer For A Packet Radio System

6.  U.S. 5,515,379
Time slot allocation method

7.  U.S. 5,745,695
Radio system with suspension of packet data service during non-data service
connection

8.  U.S. 6,714,781 B2
Method for enabling receipt of a packet-switched page by a mobile station

9.  U.S. 5,752,193
Method and apparatus for communicating in a wireless communication system

**3. Patents Alleged in 2007 Negotiation as Essential to UMTS**

10.  U.S. 4,887,265
Packet-switched cellular telephone system

11.  U.S. 5,659,622
Method and apparatus suppressing noise in a communication system

12.  U.S. 6,291,756
Method and apparatus for encoding music into seven-bit characters that
can be communicated in an electronic message

13.  U.S. 6,175,559
Method for generating preamble sequences in a code division multiple
access system

234

14.    U.S. 4,833,701
       Trunked communication system with nationwide roaming capability

15.    U.S. 5,359,696
       Digital speech coder having improved sub-sample resolution long-term
       predictor

16.    U.S. 6,067,324
       Method and system for transmitting and demodulating a communications
       signal using an adaptive antenna array in a wireless communication
       system

17.    U.S. 6,038,263
       Method and apparatus for transmitting signals in a communication system

18.    U.S. 5,329,547
       Method and apparatus for coherent communication in a spread-spectrum
       communication system

19.    U.S. 6,246,697
       Method and system for generating a complex pseudonoise sequence for
       processing a code division multiple access signal

20.    U.S. 5,999,826
       Devices for transmitter path weights and methods therefor

21.    U.S. 5,127,100
       Digital radio communication system and two way radio

22.    U.S. 5,404,580
       Radio having memory means for storing radio user validation code

23.    U.S. 5,444,438
       Method and apparatus for remote memory management in an
       acknowledge-back selective call communication system

24.    U.S. 5,659,573
       Method and apparatus for coherent reception in a spread-spectrum
       receiver

25.    U.S. 6,429,808
       Method and apparatus for assisted GPS integrity maintenance

26.    U.S. 6,091,969
       Method and apparatus for inband signaling control of vocoder bypass

27.    U.S. 5,946,356
       Method and apparatus for data transmission within a broad-band
       communications system

- 4 -

28.  U.S. 5,490,230
     Digital speech coder having optimized signal energy parameters

29.  U.S. 5,729,542
     Method and apparatus for communication system access

30.  U.S. 5,586,119
     Method and apparatus for packet alignment in a communication system

31.  U.S. 5,752,162
     Methods for assigning subscriber units to visited gateways

32.  U.S. 6,308,294 B1
     Adaptive hybrid ARQ using turbo code structure

33.  U.S. 4,837,858
     Subscriber unit for a trunked voice/data communication system

34.  U.S. 6,212,391
     Method for positioning GSM mobile station

35.  U.S. 6,104,993
     Apparatus and method for rate determination in a communication system

36.  U.S. 5,608,779
     Method for communications between mobile units using single and
     multiple switching center configurations

37.  U.S. 4,811,380
     Cellular radiotelephone system with dropped call protection

**4. Patents Alleged in 2007 Negotiation as Essential to WLAN**

38.  U.S. 4,860,003
     Communication system having a packet structure field

39.  U.S. 5,560,201
     Power management and packet delivery method for use in a Wireless
     Local Area Network (LAN)

40.  U.S. 5,029,183
     Packet data communication network

41.  U.S. 5,479,441
     Packet data communication system

42.  U.S. 6,473,449
     High-data-rate wireless local-area network

43.  U.S. 6,580,700
     Data rate algorithms for use in wireless local area networks

- 5 -

44. U.S. 5,272,724
Wideband signal synchronization

45. U.S. 5,519,730
Communication signal having a time domain pilot component

46. U.S. 6,404,772
Voice and data wireless communications network and method.

## NON STANDARDS-ESSENTIAL PATENTS ASSERTED IN 2007 NEGOTIATIONS

47. U.S. 5,706,211

48. U.S. 5,771,353

49. U.S. 5,764,899

50. U.S. 6,101,531

51. U.S. 5,958,006

52. U.S. 5,974,447

53. U.S. 6,157,630

54. U.S. 5,134,717

55. U.S. 5,430,436

56. U.S. RE39,683

57. U.S. 5,903,852

58. U.S. 5,075,684

59. U.S. 5,359,317

60. U.S. 5,394,140

61. U.S. 5,157,391

237

JS 44 (Rev. 12/07)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

| I. (a) PLAINTIFFS | DEFENDANTS |
|---|---|
| Research in Motion Corporation and Research in Motion Limited | Motorola, Inc. |

**(b)** County of Residence of First Listed Plaintiff   Dallas County, Texas     County of Residence of First Listed Defendant   Cook County, Illinois
(EXCEPT IN U.S. PLAINTIFF CASES)              (IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)      Attorneys (If Known)

John Russell Emerson; Haynes and Boone, LLP; 901 Main Street, Ste. 3100; Dallas, TX 75202; (214) 651-5940

## 3-08CV0284-G

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

- ☐ 1 U.S. Government Plaintiff
- ☒ 3 Federal Question (U.S. Government Not a Party)
- ☐ 2 U.S. Government Defendant
- ☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff
(For Diversity Cases Only) and One Box for Defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury - Med. Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury - Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | **PERSONAL PROPERTY** | ☐ 650 Airline Regs. | ☒ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 370 Other Fraud | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 480 Consumer Credit |
| | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 690 Other | | ☐ 490 Cable/Sat TV |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | **LABOR** | **SOCIAL SECURITY** | ☐ 810 Selective Service |
| ☐ 160 Stockholders' Suits | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 190 Other Contract | | | ☐ 720 Labor/Mgmt. Relations | ☐ 862 Black Lung (923) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 195 Contract Product Liability | | | ☐ 730 Labor/Mgmt.Reporting & Disclosure Act | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | | | ☐ 740 Railway Labor Act | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 790 Other Labor Litigation | ☐ 865 RSI (405(g)) | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | ☐ 791 Empl. Ret. Inc. Security Act | **FEDERAL TAX SUITS** | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment | **Habeas Corpus:** | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | ☐ 530 General | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 895 Freedom of Information Act |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | **IMMIGRATION** | | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 540 Mandamus & Other | ☐ 462 Naturalization Application | | |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | ☐ 550 Civil Rights | ☐ 463 Habeas Corpus - Alien Detainee | | ☐ 950 Constitutionality of State Statutes |
| | ☐ 440 Other Civil Rights | ☐ 555 Prison Condition | ☐ 465 Other Immigration Actions | | |

## V. ORIGIN (Place an "X" in One Box Only)

- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from another district (specify)
- ☐ 6 Multidistrict Litigation
- ☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):

Brief description of cause:
Patent infringement litigation

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23     DEMAND $      CHECK YES only if demanded in complaint:
JURY DEMAND: ☒ Yes ☐ No

## VIII. RELATED CASE(S) PENDING OR CLOSED

(See instructions):     JUDGE                DOCKET NUMBER

DATE 2/16/08      SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT #     AMOUNT     APPLYING IFP     JUDGE     MAG. JUDGE

238