# EXHIBIT A

UNITED STATES INTERNATIONAL TRADE COMMISSION
WASHINGTON, DC

Before the Honorable Theodore R. Essex
Administrative Law Judge

|  |  |  |
|---|---|---|
| In the Matter of | ) | |
| | ) | |
| | ) | |
| CERTAIN GAMING AND ENTERTAINMENT | ) | Investigation No. 337-TA-752 |
| CONSOLES, RELATED SOFTWARE AND | ) | |
| COMPONENTS THEREOF | ) | |
| | ) | |
| | ) | |

## REBUTTAL EXPERT REPORT OF RICHARD J. HOLLEMAN

**July 15, 2011**

1

## INTRODUCTION AND BACKGROUND

1.      My name is Richard J. Holleman.  I have been retained by Complainants

Motorola Mobility, Inc. and General Instrument Corp. ("Motorola") as an expert in this case.  I

have been asked by counsel for Motorola Mobility to respond to the opinions and conclusions in

the expert report of Professor Kevin M. Murphy.  After reviewing Professor Murphy's report, I

conclude that Professor Murphy has reached a number of critically incorrect conclusions in his

report.

## QUALIFICATIONS AND EXPERIENCE

2.      I graduated from the United States Military Academy, West Point, NY with a BS

in Engineering in 1960. After serving three years in the U.S. Army, I started my career at IBM in

1963, where I worked until July 2000. While at IBM, I held various positions including Program

Director of Standards Relations (1977-1989), Director of Standards Practices (1989-1998), and

Director of Standards, Intellectual Property and Licensing, Corporate Staff (March 1998-July

2000).

3.      During the 1980s and 1990s, I was IBM's representative to various national and

international standards organizations and committees including American National Standards

Institute ("ANSI"), the Institute of Electrical and Electronics Engineers ("IEEE"), and the

International Telecommunication Union ("ITU").  I have also been an active participant in the

Internet Engineering Task Force ("IETF"), the Telecommunications Industry Association

("TIA"), the Asynchronous Transfer Mode Forum ("ATM"), the World Wide Web Consortium

("W3C"), and other technology-related groups. During this period, I was responsible for IBM's

intellectual property rights/standards contractual negotiations in standards consortia and special

interest groups worldwide. I also attended a few of the early European Telecommunications

6

Standards Institute ("ETSI") General Assembly meetings, including the first ETSI General

Assembly meeting in 1988.

4.      I joined the IEEE in January 1991 and participated actively until January 2006.

During this time, I served in a variety of capacities including the following:

- Chairman, IEEE Standards Board Patent Committee (1/94-12/97)

- Standards Board member (1993-95)

- Vice Chairman, IEEE-SA Standards Board (1998)

- Chairman, IEEE-SA Standards Board (1/98-12/99)

- IEEE-SA Board of Governors (1/98-12/01)

- IEEE-SA Representative to IEEE Finance Committee (1/98-12/02)

- Board Chairman, IEEE-Industry Standards and Technology Organization (1/99-6/00)

- IEEE-SA Treasurer (1/02-12/02)

- IEEE-SA Past Standards Board Chairman (1/04-1/05)

5.      The IEEE-SA Standards Board is responsible for encouraging and coordinating

the development of IEEE standards, which includes the review of all proposed standards to

determine conformance with established requirements and whether consensus has been achieved

for approval as an IEEE standard.  As Chairman of the IEEE-SA Standards Board from 1998

through 1999, my responsibility was to oversee the operations of the Standards Board and to

ensure that it met its responsibilities in a timely and efficient manner.

6.      From January to May 2003, I served as President and CEO of the Institute of

Electrical and Electronic Engineers-Industry Standards and Technology Organization (IEEE-

7

ISTO), which provided executive leadership and general management of ISTO business activities.

7.      Since February 2006, I have been employed on a part-time basis as President of SD-3C, LLC, a company that licenses technology for the manufacture and sale of secure digital memory cards.

8.      For about the last ten years, I have served as a consultant and/or expert witness in more than a dozen activities – including several patent-related matters -- concerning industry standardization and standards participation and processes.  In the last six years, I have provided written or oral testimony in a number of cases involving issues relating to standard activities.  I have also provided written comments and oral testimony for hearings held jointly by the U.S. Department of Justice and the Federal Trade Commission regarding Competition and Intellectual Property in the area of standards setting activities.

9.      I have been an active participant in ANSI's patent policy committee activities.  I was directly involved in the drafting of the initial ANSI patent policy Guidelines as well as in subsequent reconsideration of those Guidelines.  Issues addressed during the time I have served on ANSI's patent committee include ANSI's patent disclosure policy.  I was a member of official U.S. government delegations to international conferences.  I have often served as lead industry advisor to the U.S. State Department on telecommunications standards before the ITU.

10.      I participated as a panelist in the DOJ/FTC hearings on the Implications of Competition and Patent Law and Policy, and in the George Washington University Law School symposium on standards. I have also been an invited speaker on patent-related standards and licensing issues at the Licensing Executives Seminar, the American Intellectual Property Law

8

Association, the Intellectual Property Owners Association, the Tilburg Law and Economics Center, and other similar events.

**MATERIALS AND DOCUMENTS REVIEWED**

11.     As part of my analysis, I have considered numerous documents and other information, including the documents listed in Attachment B.  However, my study of documents and materials relevant to this matter is ongoing.

12.     I reserve the right to supplement this report with any opinions I reach after further study, particularly if new or additional relevant information becomes available.

**SUMMARY OF CONCLUSIONS**

13.     Based on (1) my extensive first-hand knowledge and experience with the intellectual property policies of telecommunications and information technology SSOs including ETSI, IEEE, TIA and ITU-T, (2) my experience as IBM's Director of Standards for Intellectual Property and Licensing, (3) my understanding of the factors that SSOs consider when establishing and implementing a patent policy, (4) my review of relevant ITU and IEEE documents, and (5) other related information concerning this matter, I reach the following conclusions:

- I disagree with Professor Murphy that the ITU or the IEEE Policies, or Motorola's Letters of Assurance to the ITU or the IEEE, impose a duty to license essential patents on RAND terms.  Based on my review of the Policies and Motorola's Letters of Assurance, and based on my extensive experience with SSOs, once a disclosure of potentially essential patents is made, the Policies simply result in a request to the patent holder for a FRAND undertaking.  Neither the ITU nor the

9

IEEE policy compels licensing, and compulsory licensing schemes are generally disfavored among SSOs.

- Professor Murphy's conclusion that "Motorola did not offer to license its patents allegedly related to the 802.11 and H.264 standards to Microsoft on RAND terms and conditions" is flawed because it assumes that Motorola's Letters of Assurance to the ITU and the IEEE obliged Motorola unilaterally to propose specific terms to Microsoft.  For the following reasons, Motorola's Letters of Assurance to and relationships with these SSOs impose no such obligation.

    i.   SSOs encourage negotiation between patent holders and potential licensees.  SSOs recognize that relationships between patent holders and potential licensees are unique, and terms that may be relevant for one relationship may not be relevant for another.  Therefore, SSOs encourage a back-and-forth negotiation between patent holders and potential licensees to arrive at reasonable and relevant licensing terms.

    ii.  It is my understanding that Motorola's Letters to Microsoft (the October 21 Letter and the October 29 Letter) constitute Motorola's attempt to engage Microsoft in licensing negotiation.  It is also my understanding that Microsoft did not respond to Motorola's Letters to Microsoft and did not attempt to engage Motorola in licensing negotiation.

    iii. Motorola's Letters of Assurance to and its relationships with the ITU and the IEEE do not compel Motorola to permit infringement.  Based on my understanding, Motorola attempted to engage Microsoft in good faith

-6-

licensing negotiations, and Microsoft expressed no interest in doing so.

Based on my experience and knowledge of SSO patent rules and policies,

there is no prohibition on Motorola's subsequent seeking of judicial

intervention to enforce its patents in this situation.

## INDUSTRY STANDARD SETTING POLICIES INCLUDING THE ITU AND IEEE POLICIES

14.     Standard Setting Organizations ("SSOs") are voluntary organizations.  There are

SSOs whose participants engage in the development of telecommunication and information

technology standards.  IEEE is one example of an SSO.

15.     One important goal of many SSOs, including IEEE, is to approve, publish, and

promote standards that incorporate the best technology available, regardless of whether those

standards include the use of known patents.

16.     SSO rules and procedures govern the standards development processes of the

SSO and provide guidance for the fair and reasonable behavior of its participants.  The

participants rely on those rules and procedures to govern their actions. SSOs devote substantial

effort and care to formulating their written rules because of the importance of providing clear,

well-understood guidance to SSO participants.

17.     SSOs often request their participants to provide notice if they believe one or more

of their patent(s) read on a standard and are essential to practicing that standard. In that instance,

the SSO may request the participant to provide assurance that the participant is willing to offer a

patent license on fair, reasonable, and non-discriminatory terms ("FRAND").  This is often

memorialized in a "Letter of Assurance."  The SSO, however, typically does not ***require***

11

participants to disclose the patent interests of their companies, to certify the applicability of their patents, or to certify that they have identified all applicable patents.

18.     The process is not intended to create a contractual obligation in which the participant must submit a Letter of Assurance.  The Letter of Assurance provides an assurance that the patent holder will offer a license at a reasonable rate and with reasonable terms and conditions, but not that the patent(s) are automatically licensed.  The assurance of an offer does not become the license itself.  A license only exists after the patent holder and the potential licensee successfully negotiate a license agreement.

19.     If operating properly, SSOs can promote the interests of consumers by promoting interconnectivity and interoperability while utilizing the best available technology.  In my experience, SSOs permit, and even encourage, the use of patented technology in standards, where technically justified, to ensure that the standards include the best available technology.

20.     SSOs recognize that they can never guarantee that they will possess complete information regarding essential patents that might be required to practice a standard.  For example, if a non-member has an essential patent, it is possible that the SSO will not know about it, and no SSO rule could ensure that the patent will be known to the SSO.  Similarly, SSOs do not, in my experience, require members to search their patent portfolios to determine whether they hold patents essential to practice a standard; therefore, members may have essential patents that are not discovered until after a standard has been approved.

21.     Participation in SSOs is voluntary, and the IPR policies of SSOs are based on the willingness of the individual participants to disclose any known patents, the use of which might be required to practice the standard, and to license such patents on reasonable and

nondiscriminatory terms.  This approach has worked very successfully for more than thirty years in the development of telecommunications and information technology standards by protecting the rights of the patent holder while meeting the need for standards that incorporate the best technology, which can be promulgated throughout industry on a worldwide basis.

22.     The patent policies used by SSOs, including ITU and IEEE, are recognition of the critical need to properly balance the rights of patent owners with the need for standards that best meet the technical objectives of the SSOs.  For example, ITU's Common Patent Policy for ITU-T/ITU-R/ISO/IEC expressly recognizes this point by stating, among other things, that a standard's "objective is to ensure compatibility of technologies and systems on a worldwide basis;" and although the standard "must be accessible to everybody without undue constraints[,]" "[t]he detailed arrangements arising from patents (licensing, royalties, etc.) are left to the parties concerned, as these arrangements might differ from case to case."[1]  Also, the ITU Policy and its licensing declaration form further state that "negotiations are left to the parties concerned and are performed outside the [ITU]."[2]  Similarly, the IEEE's Policies and Procedures Section 6.2 recognize that "a [Proposed] IEEE Standard may require the use of a potential Essential Patent Claim[,]" and in such cases "the IEEE shall request licensing assurance . . . from the patent holder or patent applicant[,]" but "[n]o license is implied by the submission of a Letter of Assurance."[3]  The IEEE bylaws further state:

---

[1] ITU, *Common Patent Policy for ITU-T/ITU-R/ISO/IEC*, http://www.itu.int/en/ITU-T/ipr/Pages/policy.aspx (last visited July 8, 2011).

[2] *Id.*; Guidelines for Implementation of the Common Patent Policy for ITU-T/ISO/IEC, Annex 3 (Mar. 1, 2007), *available at* http://www.itu.int/dms_pub/itu-t/oth/04/04/T04040000010002PDFE.pdf.

[3] IEEE, *Policies and Procedures* § 6 (Patents), http://standards.ieee.org/develop/policies/bylaws/sect6-7.html (last visited July 8, 2011); *see also*

13

> The IEEE is not responsible . . . for determining whether any licensing terms or conditions provided in connection with submission of a Letter of Assurance, if any, or in any licensing agreements are reasonable or non-discriminatory.[4]

23.     The procedures used by ITU and IEEE for considering patent rights in standards developing activities are similar to those used in U.S. based ANSI-accredited SSOs.  ANSI's policy, in turn, is generally in line with the IPR policies of the International Organization for Standardization (ISO) and the International Electrotechnical Commission (IEC).

**FRAND UNDERTAKINGS**

24.     ITU's Common Patent Policy provides that "any party participating in the work of ITU . . . should, from the outset, draw the attention of the Director of ITU-TSB . . . to any known patent or to any known pending patent application" and that the participating party should indicate whether: 1) it "is willing to negotiate licenses free of charge with other parties on a non-discriminatory basis on reasonable terms and conditions;" 2) it "is willing to negotiate licenses with other parties on a non-discriminatory basis on reasonable terms and conditions;" or 3) it "is not willing to comply with" either of the previous two options.[5]  If a participating party indicates that it is willing to negotiate licenses with other parties on a non-discriminatory basis on reasonable terms and conditions (Option 2), "[s]uch negotiations are left to the parties concerned and are performed outside the ITU-T/ITU-R/ISO/IEC."[6]

---

IEEE-SA Standards Board Bylaws (2010), *available at* http://standards.ieee.org/develop/policies/bylaws/sb_bylaws.pdf.

[4] IEEE, *Policies and Procedures*, *supra* note 3.

[5] ITU, *Common Patent Policy*, *supra* note 1.

[6] *Id.*

25.      Other SSOs such as IEEE seek a similar commitment from IPR holders to license on reasonable and nondiscriminatory ("RAND") terms and conditions.  FRAND and RAND are typically understood to have the same meaning and impose the same obligation, and I will discuss them interchangeably.

26.      Based on my experience, SSOs focus on technical issues, and do not engage in negotiations about licensing terms and conditions.  Where a patent essential to practice a standard has been identified, the SSO may request licensing assurances from the patent holder (including, for example, an assurance that the patent holder will agree to license its technology on reasonable and non-discriminatory terms); the patent holder may provide such assurances; and any company may approach the patent holder outside of the activities of the SSO to inquire of available licensing terms.  But SSOs are not the place for licensing negotiations.  SSO participants are often not the persons knowledgeable about, or authorized to make, decisions about licensing terms.  Moreover, SSOs could face potential claims of facilitating anticompetitive conduct if such bodies were used as a forum for negotiating or settling licensing terms and conditions.

27.      SSOs do not engage in an attempt to determine what constitutes a reasonable royalty rate or what are other terms and conditions are reasonable.  These matters are for the patent holder and the potential licensee to decide upon through good faith negotiations.  The patent holder fulfills its obligation to the SSO by being willing to offer licensees to all who wish to negotiate.  Such negotiations however, do not guarantee that the result of the negotiations will be a license agreement.

15

28.     There is no absolute definition of FRAND terms.  The market, through bilateral negotiation, determines a FRAND license on a case-by-case basis, including reasonable commercial terms and conditions.

29.     Motorola, along with Symbol Technologies, which I understand from Counsel was acquired by Motorola in 2007, has submitted assurances to IEEE that it will license its essential patents "on a non-discriminatory basis offering fair and commercially reasonable terms," and to ITU that it will license essential patents on a "non-discriminatory basis and on reasonable terms and conditions."  *See* Motorola Letters of Assurance.

30.     In his Report, Professor Murphy appears to assume that, based on the various Letters of Assurance Motorola submitted to the IEEE, Motorola has a FRAND obligation with respect to each and every one of the patents in suit.  In addition to the reasons outlined elsewhere in my report, I believe that Professor Murphy is incorrect in his assumption with respect to the '712 patent and the '896 patent for the following reasons:

- Professor Murphy asserts that "SSOs such as the IEEE and ITU often require that SSO members agree to license on reasonable and nondiscriminatory terms and conditions any patents held by the member that are essential to the SSO standard."  This is not entirely true.  As discussed, SSOs do not require members to search for relevant patents.  If an SSO member is unaware that it possesses patents relevant to a developing standard, SSO policies do not compel Letters of Assurance for these unknown patents.  In the case of the IEEE, the relevant

-12-

knowledge regarding essential patents is only the personal knowledge of the individual(s) involved in the standard-setting process.[7]

- I understand from Counsel that Dr. Acampora will opine that the functionality embodied in the Accused Products in this investigation that Motorola has accused of infringing the '712 patent was added to the 802.11 standard in amendment 802.11i-2004.  My review of the Letters of Assurance submitted by Motorola does not show that Motorola submitted a Letter of Assurance for the 802.11i amendment.[8]  Based on my experience and my understanding of the IEEE rules and patent policy, Motorola therefore has not made any assurance to the IEEE that it will license the '712 patent on FRAND terms related to the accused functionality in this investigation.  As such, Professor Murphy was wrong to assume that Motorola, through its Letters of Assurance to the IEEE, committed itself to license the '712 patent on FRAND terms or otherwise to parties seeking a license related to the 802.11 standard.

- I understand from Counsel that Dr. Madisetti will opine that the functionality that Motorola has accused of infringing the '896 patent is not related to the 802.11

---

[7] *See* IEEE, Understanding Patent Issues During IEEE Standards Development 5 (answer to questions 13 & 17), *available at* http://standards.ieee.org/board/pat/faq.pdf.

[8] While Symbol Technologies, Inc. submitted a Letter of Assurance for 802.11i, the rules of the IEEE provide that this letter of assurance only obligates Symbol (and later Motorola, upon acquiring Symbol) to offer licenses on FRAND terms to patents essential to the 802.11i standard if those patents were owned by Symbol prior to acquisition by Motorola.  However, Symbol's letter of assurance for 802.11i does not apply to any essential patents owned by Motorola that were not owned by Symbol.  *See id.* at 14 (answer to question 46).  I understand from Counsel that the '712 patent has always been owned by Motorola and was never owned by Symbol. Therefore, Symbol's 802.11i letter of assurance does not affect Motorola's FRAND obligations with respect to the '712 patent.

standard, but rather is a protocol used by the Xbox 360 Console for communications with wireless peripheral devices, such as wireless controllers. Based on my review of the October 21, 2010 letter and its Annex (which included the '896 patent), it appears that in that letter, Motorola offered Microsoft a license to the '896 patent for use in compliance with the 802.11 standard. Based on my experience and my understanding of the IEEE rules and patent policy, a company does not have an obligation to offer a FRAND license to use patents that may be essential to an IEEE-promulgated standard such as 802.11 when these patents are being used to practice functionality that is unrelated to the standard. For example, even if a company has an obligation to offer a FRAND license for an essential patent's use in an 802.11-compliant router, the IEEE rules and patent policy do not require that the company offer a FRAND license for that same patent's use in a device that communicates via cellular telecommunications standards (i.e., not 802.11). Therefore, Professor Murphy was wrong to assume that Motorola committed itself to license the '896 patent on FRAND terms or otherwise for Microsoft's use of the patented technology by the Xbox 360 Console for communications with wireless peripheral devices.

31.    Motorola offered to license its declared-essential patents to Microsoft and expressed a willingness to negotiate with Microsoft. *See* October 21 Letter; October 29 Letter. But it is my understanding that Microsoft expressed no desire to negotiate with Motorola; Microsoft failed to contact Motorola prior to the expiration of Motorola's opening offers, and has yet to engage in good faith patent license negotiation with Motorola.

32.     SSO's can provide for mechanisms for addressing a member's failure to comply with the patent policy.  For example, the IEEE-SA Operations Manual Section 6.4 on suspensions includes a provision for failure to conform with provisions of the IEEE Bylaws or the Operations Manual.  I am not aware of any similar provisions in the ITU; however, the ITU does require members to agree with the conditions of participation in the ITU Constitution and Convention.  I have not heard of, nor am I aware of any disciplinary action taken against Motorola by IEEE or ITU.  During the time of my active involvement in IEEE, such actions were not taken against a participant.

33.     FRAND is a commitment by the patent owner to engage in good faith bilateral negotiations with all potential licensees to license the essential IPR on fair and reasonable terms and conditions.  There is no license until such negotiations have occurred and an agreement reached between the patent owner and potential licensees in order to implement the standard.  The actual negotiation of license terms is a process that occurs outside of the activities of ITU and IEEE.  Indeed, the ITU Common Patent Policy recognizes that license terms and arrangements "differ from case to case."[9]  If it wishes, a patent holder is also free publicly to state its license terms.

34.     However, it also is important to recognize that "terms and conditions" of a license agreement encompass much more than just royalty rates.  There are numerous licensing terms that may be relevant to a particular negotiation, and they can vary greatly from negotiation to negotiation.  These non-royalty terms and conditions may influence the actual royalty rate

---

[9] ITU, *Common Patent Policy*, *supra* note 1.  The ANSI Patent Policy Guidelines, which as I comment above I was an original drafter, is to similar effect. It provides: "It should be reiterated . . . that the determination of specific license terms and conditions, and the evaluation of whether such license terms and conditions are reasonable and demonstrably free of unfair discrimination, are not matters that are properly the subject of discussion or debate at a development meeting. Such matters should be determined only by the prospective parties to each license . . . ."

present in a particular agreement.  All of these "terms and conditions" have to be considered in determining what is fair and reasonable, and the concept of FRAND is not one that is capable of a having a single definition.

35.     By declaring that it is prepared to grant FRAND licenses, a patent owner has only committed to engage in good faith negotiations.  A FRAND undertaking made to a standards organization in general, and to ITU or IEEE in particular, does not constitute a grant of a license to either other organization members or implementers of the standard.  The IEEE Policies and Procedures explicitly disclaim:  "No license is implied by the submission of a Letter of Assurance."[10]

36.     Because FRAND requires bilateral negotiations between the patent holder and many potential licensees, and those licensees may be a diverse group with different commercial backgrounds and positions with respect to the patent owner, the outcome of FRAND negotiations will not necessarily be the same terms and conditions for all licensees. That does not mean that some licensees have received terms and conditions that are not fair, reasonable, or nondiscriminatory.

37.     In particular, SSO IPR policies do not contemplate that FRAND licenses necessarily will have a single common royalty rate for all licensees.  For example, crosslicensing of IPR is common in FRAND licenses, and the resulting terms and conditions for licensees may vary according to the value particular licensees have to offer to the IPR holder in return.

---

[10] IEEE, *Policies and Procedures* § 6 (Patents), *supra* note 3.

38.     The patent policy of the ITU-T, for example, recognizes this position.  It states that "[t]he detailed arrangements arising from patents (licensing, royalties, etc.) are being left to the parties concerned, as these arrangements might differ from case to case."[11]

39.     IEEE's bylaws state that the IEEE "is not responsible . . . for determining whether any licensing terms or conditions provided . . . are reasonable or non-discriminatory.[12]  Also, the patent policy of the IEEE authorizes, but does not require, patent holders to include maximum license fee commitments or other material licensing terms in their Letters of Assurance.[13]  A patent holder declining to provide such terms in a Letter of Assurance cannot be deemed to have agreed to any specific patent licensing terms in advance of good faith negotiations.

40.     In my experience, FRAND commitments made under SSO IPR policies also are not understood to limit the IPR holder's legal rights to enforce its patents, in the event good faith FRAND negotiations with a party do not lead to a license agreement.  Otherwise, a patent holder might have no recourse in the event an infringer rejected any attempt to engage in good faith licensing negotiations.

41.     SSOs generally do not require compulsory licensing.  The development of the ETSI IPR Policy, in which I was involved, demonstrates the need to take into account patent owners' rights. When the ETSI IPR Policy was in development in the early 1990's, the proposed policy required compulsory licensing of patents included in a standard unless the patent owner specifically identified patents it did not wish to license at the outset of a new standards development project.  This policy was unacceptable to many U.S. businesses holding patents that

---

[11] ITU, *Common Patent Policy*, *supra* note 1.

[12] IEEE-SA Standards Board Bylaws (2010), *supra* note 3.

[13] IEEE, *Policies and Procedures* § 6 (Patents), *supra* note 3.

wanted to participate in ETSI, but were opposed to the proposed IPR policy.  I and others

worked with what was then called the Computer Business Equipment Manufacturers Association

(CBEMA), ANSI, and the U.S. Government to cause the proposed policy to be modified to

essentially its current state, by eliminating provisions that would have caused compulsory

licensing.  For reasons similar to those discussed here, many other SSOs, including the ITU and

IEEE, do not compel licensing.

**CONCLUSIONS**

42.      Motorola's Letters of Assurance to the ITU and IEEE do not compel Motorola to

license its Patents on any specific terms.  Patent licensing terms are specific to the parties

involved and can only be reached through good faith negotiations.  SSOs generally, and the ITU

and IEEE specifically, do not dictate the terms or procedures for licensing negotiation; instead,

they recognize that such negotiations are best left to patent holders and interested licensees.

43.      Professor Murphy wrongly assumed that, through its Letters of Assurance to the

IEEE, Motorola committed itself to license the '712 and the '896 patents for *any* use on FRAND

terms.  Based on my review of the relevant materials and based on my discussions with Counsel,

Motorola never submitted a Letter of Assurance to the IEEE that implicates the '712 patent.

Also, Motorola's Letters of Assurance regarding the 802.11 standard do not constitute FRAND

promises for uses of Motorola's technology (including but not limited to the '896 patent) outside

the standard.

44.      Motorola's October 21, 2010 and October 29, 2010 letters to Microsoft

constituted offers to open negotiations.  Motorola's attempt to engage Microsoft in good faith

negotiations for patent licenses satisfied any obligations Motorola had with respect to its Letters of Assurance to the ITU and IEEE.

45.     Microsoft rejected Motorola's offers to license patents, which Microsoft was accused of infringing.  Also, it is my understanding that Microsoft expressed no desire to enter good faith negotiations with Motorola.  Under these circumstances, Motorola had no duty to Microsoft, or to the ITU or IEEE, to refrain from asserting its patent rights against Microsoft.

Executed July _15_, 2011, at Stuart, Florida.


                                        Richard J. Holleman

23

# Attachment A

Richard J. Holleman
Industry Standards Consulting

18 Arrowhead Road          2600 S.E. Ocean Blvd. N-15
Plymouth, MA. 02360        Stuart, FL. 34996
508-759-6184               772-287-7348
r.j.holleman@att.net

**Education:**
United States Military Academy, West Point, NY
B.S., Engineering
June 1960

**Professional Experience:**
Consultant, Industry Standards and Intellectual Property, 7/00-present
Retained by clients for expert advice and guidance on industry standards activities, processes and patent-related matters.

SD-3C, LLC
President, 2/06-present
Part-time position with responsibility for the operational management of the company which licenses Secure Digital (SD) memory card technology.

Institute of Electrical and Electronic Engineers-Industry Standards and Technology Organization (IEEE-ISTO)
President and CEO, 1/03-5/03
Provided executive leadership and general management of ISTO business activities.

IBM Corp., Armonk, NY
Director of Standards, Intellectual Property and Licensing, Corporate Staff, 3/98-7/00
Responsible for the management of IBM's worldwide standards program.

Director of Standards Practices, 3/89-3/98
In addition to standards, also responsible for telecommunications practices and IBM's activities with the FCC.

Program Director of Standards Relations, 2/77-3/89
Responsible for IBM's internal standards programs and numerous external industry standards activities.

Senior Marketing Manager, 6/75-2/77
Responsible for supermarket store systems marketing and systems in greater NY area.

Program Manager for Management Development, 1/73-75

Staff instructor in Middle Management Development School, Sands Point, NY.

Marketing Manager, 1/69-1/73
Responsible for distribution industry marketing in NY Distribution Branch Office.

Marketing Representative, 4/64-1/69
New account and general territory salesman in Garden City, NY Branch Office.

Sales Trainee, 6/63-4/64
New hire/trainee in data processing sales in Garden City, NY Branch Office.

**Professional Activities:**
Invited panelist in the DOJ/FTC IPR hearings on industry standards setting and in the GWU Law School symposium on standards. 4/02

IBM Representative to National and International Standards Organizations, 2/77-7/00
Participated in standards committees of the ITU, ANSI, the IEEE and others. Also a member of U.S. government delegations to international conferences and mission activities.

IBM Representative to Patent Policy Committees, 1/83-7/00
Participated in the standards-related patent policy activities of ANSI, the IETF, TIA, the ATM Forum, the W3C and other telecommunications and information technology groups.

IBM Intellectual Property and Licensing Activity, 1/84-7/00
Represented IBM's interest in the patent-related standards aspects of contractual negotiations in industry consortia and special interest groups.

**Associations:**
The Institute of Electrical and Electronic Engineers (IEEE), 1/91-present
Participant in a variety of activities for IEEE and IEEE Standards Association (IEEE-SA)

IEEE-SA Past Standards Board Chairman, 1/04-1/05

IEEE-SA Treasurer, 1/02-12/02

IEEE-SA Representative to IEEE Finance Committee, 1/98-12/02

IEEE-SA Board of Governors, 1/98-12/01

Board Chairman, IEEE-Industry Standards and Technology Organization, 1/99-6/00

Chairman, IEEE-SA Standards Board, 1/98-12/99
Chairman, IEEE Standards Board Patent Committee, 1/94-12/97

Association of Graduates, USMA, West Point, NY, 6/60-present

25

**Publications:**
"Comments on Standards Setting and Intellectual Property". Published on the FTC web site. 4/02.

"A Response: Government Guidelines Should Not be Issued in Connection with Standards Setting". Published on the FTC web site, the ABA FTC Watch and in the GWU Symposium proceedings. 4/02

"IEEE Standards Association Comments Regarding Competition and Intellectual Property". Prepared initial draft for submission to the DOJ/FTC. Published on the FTC web site. 4/02

"Comments of the IEEE Standards Board". Prepared initial draft for submission to the FTC in the Dell case. Published as documentation in the FTC proceeding. 1/96

"Guidelines for Implementation of the ANSI Patent Policy". Participated as a member of the ad hoc group which drafted the guidelines. Published on the ANSI web site. 1991-1992

"ITU-T Patent Policy Guidelines" - Authored initial draft of the guidelines. Published on the ITU-T web site. 1995-1996.

"IETF Intellectual Property Policy- RFC2026" - Participated as a member of the ad hoc group which drafted RFC 2026. Published on the IETF web site. 1996-1997

"TIA Engineering Handbook- Section 7". Participated as a member of the ad hoc group drafting revisions to the handbook. Published on the TIA web site. 1999

**Oral Presentations:**
Presentations on patent-related standards and licensing issues, 1/93-present.
Examples are:
International Intellectual Property Society Panel, 5/03
Intellectual Property Owners Association, 12/02
American Intellectual Property Law Association, 4/98
Licensing Executives Seminar, 3/97

**Military Experience:**
U.S. Army Corps of Engineers, 101st Airborne Div., Ft. Campbell, KY, 2/61-6/63
        Responsible for atomic demolitions, staff intelligence office and airborne platoon.
U.S. Army Ranger School, Ft. Benning, GA., 12/60- 2/61
        Attended and graduated.
U.S. Army Airborne School, Ft. Benning, GA., 10/60-11/60
        Attended and graduated.
U.S. Army Corps of Engineers Officers School, Ft. Belvoir, VA. 8/60-10/60
        Attended and graduated.

January 7, 2007

# Attachment B

ETSI Intellectual Property Rights Policy
ETSI Guide on Intellectual Property Rights
ETSI IPR Policy FAQs
IEEE-SA Operations Manual
IEEE-SA Standards Board Bylaws
IEEE-SA Standards Board Operations Manual
IEEE-SA Standards Style Manual
IEEE-SA FAQ "Understanding Patent Issues During IEEE Standards Development"
Common Patent Policy for ITU-T/ITU-R/ISO/IEC
Guidelines for Implementation of the Common Patent Policy for ITU-T/ISO/IEC
Constitution of the ITU
Convention of the ITU
Expert Report of Kevin M. Murphy Regarding Motorola's Letters to Microsoft and
    attachments
Letter from Kirk Dailey, Corporate Vice President, Intellectual Property, Motorola Mobility to
    Horacio Gutierrez, Corporate Vice President and Deputy General Counsel, Microsoft
    Corporation (October 21, 2010) ("October 21 Letter")
Letter from Kirk Dailey, Corporate Vice President, Intellectual Property, Motorola Mobility to
    Horacio Gutierrez, Corporate Vice President and Deputy General Counsel, Microsoft
    Corporation (October 29, 2010) ("October 29 Letter")
**Motorola Letters of Assurance**
- Letters of Assurance from Motorola to IEEE dated:
    o March 1, 1994
    o September 15, 2003
    o January 12, 2005
    o April 21, 2005
    o August 11, 2006
- Letters of Assurance from Symbol to IEEE dated:
    o April 23, 1996
    o April 11, 2006
- Letters of Assurance from Motorola to ITU dated:
    o October 29, 2008
    o June 28, 2006
    o March 1, 2007
    o August 10, 2007
    o October 29, 2008
    o December 8, 2010
- Letters of Assurance from General Instrument Corp. to ITU dated:
    o December 2, 2003

27