# EXHIBIT 3

# Microsoft®

June 14, 2011

Federal Trade Commission
Office of the Secretary
Room H-113 (Annex X)
600 Pennsylvania Avenue
Washington, DC  20580

Re:  Patent Standards Workshop, Project No. P11-1204

Dear Commissioners and FTC executive staff:

Microsoft appreciates the opportunity to provide comments in response to the Request for Comments and Announcement of Workshop on Standards-Setting Issues regarding "patent hold-up" in connection with standardization efforts.

At their most fundamental, technical standards are tools that promote efficiency and innovation by making it easier to create products and services that work together—or "interoperate"—better.  This is especially true in the information and communications technology (ICT) environment.  With new ICT solutions and services appearing in the market almost daily, often connected to one another by the Internet or other networks, interoperability has become a market imperative.  The development and implementation of standards is one of the ways in which the technology industry is able to meet consumer demand for interoperability.[1] By helping to enhance interoperability among products or services within a market, and being responsive to real marketplace needs, standards can help promote innovation, fuel market growth, and protect investments in new technologies.

Microsoft plays a dual role in standardization activities.  First, we actively contribute innovative technology to standardization related to computing hardware, software and associated devices, the Internet and its infrastructure, consumer electronics devices, and telecommunications systems.  Second, we are an active implementer of standards.  Microsoft supports a very large number of standards that are formulated by a broad diversity of standards-setting organizations (SSOs) in our products.  For example, Microsoft's Windows 7 operating

---

[1] Microsoft's commitment to standardization to help further interoperability is reflected in our Interoperability Principles, available at http://www.microsoft.com/interop/principles/default.mspx. Additional information about Microsoft's standards policies and activities can be found at: http://www.microsoft.com/standards/.

system supports more than sixty industry standards (by a conservative count). [2]  Ultimately, both of these roles are deeply informed by the market, and in particular by feedback on the way customers use ICT products and services in their day-to-day lives.

Because of this dual role as contributor and implementer, Microsoft takes a balanced approach to standards development and related intellectual property rights (IPR) issues.  We understand the particular needs and concerns of those contributing time, resources, and innovative technologies to the development of standards, but we are equally sensitive to the needs of those who are implementing the resulting standards in their products and services. Patents are of particular concern to Microsoft because Microsoft is perhaps the No. 1 target of patent infringement actions in the ICT industry (given the breadth of its product portfolio and large revenue).  Our involvement on both sides of the standards fence frames our perspective that a diverse standards ecosystem that supports multiple technologies is good for the U.S. and global economies.

Our comments in response to the RFC can be summarized as follows:

- Microsoft strongly supports President Obama's focus on technology and the promotion of innovation.  In looking at issues relating to the inclusion of IPR (primarily patent rights) in standards, it is critical to preserve and cultivate incentives to innovate.  In addition, the United States should promote respect for the value of IPR on a global basis, including the IPR reflected in standards.

- Government should take an inclusive view of SSOs' diverse IPR policies and not promote one approach over the other.

- Concerns about "patent hold-up" should not extend to any bi-lateral business disagreement between two companies regarding proposed licensing terms.  These discussions typically pertain to a broader set of questions than just the proposed licensing terms for essential patent claims reading on a standard.  In addition, if

---

[2] A typical personal computer running Windows 7 will support more than 200 additional standards, facilitating compatibility among hardware components from various vendors and promoting interoperability between PCs and other computers.  These standards were developed by a broad range of SSOs with diverse processes and IPR policy approaches (including those that seek commitments to offer patent licenses on reasonable and non-discriminatory terms and conditions, whether with compensation or on a royalty-free basis).

MOTM_WASH1823_0053366

the Government were to attempt to quasi-regulate RAND licensing terms, then they arguably should review the inter-play among all of the substantive terms (and not just the monetary component) for all aspects of patent licensing terms. Yet that would likely be unworkable.

- Disclosure-based IPR policies help provide useful information as to which patent holders likely will have essential patent claims vis-à-vis the final standard, which enables parties to make an informed decision whether to engage in patent licensing negotiations and the scope of such discussions.

  - o   However, it is not possible for an SSO technical committee to have full and complete information regarding the patent rights implicated by a draft standard, especially those rights held by non-participants in the process. IPR policies ideally should take a balanced approach that does not unduly burden patent holders and encourages them to participate and contribute innovative technology.

- RAND-based IPR policies provide a flexible framework to help enable customized bi-lateral negotiations for patent licenses that generally are not limited to just the essential patent claims in connection with a standard.

- While almost all of the ICT industry stakeholders support policies that permit the voluntary and unilateral —"ex ante" disclosure of specific licensing terms by a patent holder, proposals for the U.S. Government to promote a mandatory —"ex ante" IPR policy approach or promote the group discussion of proffered licensing terms are not widely supported because such an approach is viewed as:

  - o   being of little value,

  - o   creating many practical inefficiencies and possible legal challenges, and

  - o   something that could be used internationally to undermine the value of patented technology that is included in standards used in other countries.

3

MOTM_WASH1823_0053367

**In looking at issues relating to the inclusion of intellectual property in standards, it is critical to ensure that incentives to innovate are preserved**

      We strongly support President Obama and his Administration's focus on technology and the promotion of innovation. Innovation historically has been a catalyst for economic growth and the creation of jobs. The United States, in recognizing the need to preserve incentives for innovation through a healthy patent system and marketplace competition, has been and remains a global technology leader. It is therefore important to ensure that the treatment of patented technology in standards does not undermine incentives to continue to invest in new innovation in standardized technology areas.

      As the Antitrust Division of the U.S. Department of Justice has observed:

      The goal of policies involving IP, licensing, and standards should be to promote efficiency, just as it is with antitrust policy. . . . Static efficiency occurs when firms compete within an existing technology to streamline their methods, cut costs, and drive the price of a product embodying that technology down to something close to the cost of unit production. **Static efficiency is a powerful force for increasing consumer welfare, but an even greater driver of consumer welfare is dynamic efficiency, which results from entirely new ways of doing business. Economists now recognize that the gains from dynamic efficiency, also called "leapfrog" competition, can far outstrip the gains from incremental static improvements.** It follows that policymakers should pay particular attention to the impact of laws and enforcement decisions on dynamic efficiency."[3] (Emphasis added.)

      In developing policy positions relating to standards, governments should pay special attention to the importance of promoting the dynamic efficiencies that arise from preserving incentives for innovation. Through balanced IPR policies that help make innovative technology available to implementers on reasonable terms, and that do not undercut the value of patented

---

[3] *See* Gerald F. Masoudi, Deputy Assistant Attorney Gen., Antitrust Div., U.S. Dep't of Justice, Address at the High-Level Workshop on Standardization, IP Licensing, and Antitrust, Tilburg Law & Economic Center, Tilburg University: Efficiency in Analysis of Antitrust, Standard Setting, and Intellectual Property 2–3 (Jan. 18, 2007), *available at* http://www.justice.gov/atr/public/speeches/220972.pdf.

MOTM_WASH1823_0053368

technology or overly burden patent holders, standards can help to catalyze innovation by encouraging companies to contribute their innovative technology to collaborative standards-setting activities and to share their intellectual property with others via the standardization process. Standards will not fulfill their salutary purposes if standards policies deter innovators from contributing patented technologies or investing in further innovation related to standardized technology.

In addition, the United States Government should continue to advocate for the fair treatment of patented technology in standards on a global basis.

**Government should take an inclusive view towards SSOs' diverse IPR policies and not promote one approach over another.**

Most SSOs have an IPR (or patent) policy that seeks to balance the rights and interests of their stakeholders by seeking commitments from participating patent holders that they will offer patent licenses for their essential patent claims on reasonable and non-discriminatory (RAND) terms and conditions. Currently there is significant diversity with regard to how, and the detail with which, these policies are articulated by various SSOs. This diversity is healthy and should be encouraged, and any articulation by the government of one or more preferred approaches should be avoided. This diversity and breadth of SSOs has emerged as a result of market forces in response to varying business needs, and provides for flexibility, competition and choice. No one SSO or standardization process necessarily produces —better" standards; the test of success and relevance of a standard is the extent to which it ultimately gets used in the marketplace. This view is widely supported by the ICT industry.[4]

The FTC should encourage SSOs to ensure that their IPR policies are clearly worded, publicly available, and easy to find. Although many SSOs make their IPR policies easily available to the public on their websites, others make them difficult to find or available only to their members. In addition, we support FTC efforts to encourage SSOs to make any patent

---

[4] *See, e.g.,* Comments submitted by the Information Technology Industry Council in response to a recent NIST Request for Information (—ITI encourages the US Government to embrace a variety of ICT standards and standards-setting processes, and avoid policy decisions that might discourage a broad diversity of approaches to ICT standardization. This diversity provides for choice, competition and flexibility that further enable the ICT sector to respond to a rapidly changing marketplace with new, innovative solutions.") (http://standards.gov/standards_gov/mastercomments030711.cfm).

MOTM_WASH1823_0053369

declarations, letters of assurance, or other licensing information they receive from patent holders easily available to the public on their websites.  The information contained in IPR policies, and, if applicable, patent declarations, letters of assurance, or other licensing information is important to all stakeholders in the ICT industry, including current and potential SSO participants and standards implementers.

**The concept of "patent hold-up" should map to marketplace realities.**

The notion that "patent hold-up" is a substantial problem that should be addressed by government action seems to stem from a largely theoretical analysis of the situation.  If a patent holder can charge implementers more than a reasonable royalty because those implementers are (perhaps) "locked into" the standard, then is it not likely that it would take advantage of this opportunity?

We believe that this reasoning greatly over-simplifies—and obscures—the realities of standards-related patent licensing.  How any individual company will approach patent licensing will depend on many factors, such as:

- What is the company's primary business model implicated by the relevant standard?  Is it likely that the company will proactively seek patent licenses (either as a licensor, a licensee or both)?
- Who are the likely companies holding essential patent claims, and what are their business models, products and patent portfolios?
- What licensing or other agreements are already in place between the parties?
- If the parties decide to enter into an agreement, then what are all of the issues (including all of the IPR-related issues) that likely will be negotiated?
- Are there trade-offs that may be made with regard to royalty payments or other financial terms?
  - For example, there are companies who sometimes are willing to offer their essential patent claims to a particular standard free of charge, but they also include a defensive suspension clause that causes the free license in connection with these patent claims to terminate if the licensee commences litigation against the licensor on any grounds whatsoever.

6

MOTM_WASH1823_0053370

As a result, we respectfully suggest that a simplified and theoretical approach to defining ―patent hold-up‖ may not sufficiently map to complex marketplace realities.  It may pull in what are essentially routine business negotiations between two parties.  These negotiations almost always include considerations beyond the proposed licensing terms for just the essential claims in a standard (and just the royalty element of any such terms).  Many companies question whether these types of business negotiations should be labeled as ―patent hold-up‖ and scrutinized by regulators.  We believe that there is an important difference between intentional or deceptive conduct in connection with patents that read on standards and routine bilateral disagreements over licensing terms for the use of patented technology.

In the former context, there seems to be a dearth of examples of actual patent hold-up with regard to the essential patent claims reading on a standard.  Microsoft has never been accused of patent hold-up in this regard, nor has it accused any other company of such behavior.  This is not to say that Microsoft has never been a party to litigation where the parties disagree whether proffered licensing terms were consistent with the relevant patent licensing commitment (such as RAND).  When companies have such bilateral disagreements, it may make sense for them to seek resolution in the courts.  But such litigation is rarely limited to the proposed licensing terms for just the essential claims reading on a standard; typically such litigation is addressing other patent-related issues or even other business terms that the parties have been unable to reach agreement on.

Depending on their applicable business model, many companies largely use their patents vis-à-vis standards defensively.  Far from seeking to "hold up" implementers, these firms will not seek patent royalties at all in the ordinary course of business.  Rather, they will seek a patent license from an implementer only when that implementer has first challenged them on other patent infringement issues.

In addition, it is important to consider the healthy competition among different business models and how that influences debates regarding ―patent hold-up‖ and whether there is a need to impose further restrictions on patent holders.  Some companies are largely innovators who predictably will seek a return on their investments in innovation through licensing their patents.  Some product-based companies take a more nuanced position, often using their patents vis-à-vis standards defensively (as described above).  Still others have a significant consulting or

7

MOTM_WASH1823_0053371

integration services focus, and they may benefit from having access to others' innovative technology in standards at a reduced cost if not for free.  The current RAND-based structure balances these different interests.  Proponents seeking to tilt that balance may largely be seeking reduced licensing costs and a related competitive advantage as opposed to solving a documented and widespread problem.[5]

## Disclosure-based IPR policies provide useful information regarding likely holders of essential patent claims.

There are hundreds of different SSO IPR policies and they vary significantly.  As a general matter, the IPR policies of most formal SSOs and many consortia are ―disclosure-based‖.  Under these types of IPR policies, participating companies generally are required (or encouraged) to disclose either (a) patents they hold that are likely to contain patent claims that will be essential to implementing the final standard, or (b) the fact that they likely hold such patents (but without identifying specific patents). The disclosing participant is then typically requested to declare its intention with regard to licensing such essential claims (such as RAND, RAND without a royalty, or ―will not agree to offer RAND licenses‖).  If specific patents were

---

[5]  See remarks by Keith Mallinson (a long-standing research analyst and consultant in the telecommunications industry) at http://ipfinance.blogspot.com/2011/05/fruits-of-labour-not-windfall-gains-in.html:  ―Regulatory price-setting in the arena of innovative technologies neither reflects the market reality of commercial negotiation nor is it related to the costs, efforts and technical or commercial risks involved in developing those technologies. Defining (F)RAND [fair, reasonable and non-discriminatory] according to an imposed pricing structure would severely limit the ability of licensors and licensees to negotiate bilateral commercial terms that reflect their respective positions and needs....

Further, minimizing the cost of licensed technologies may not result in a minimum cost solution.  In addition to providing higher performance and improved features, incorporating patented IP into a standard may actually reduce the cost of implementing the standard.  For example, patented IP might reduce the total cost of ownership to the end consumer of a product such as a mobile phone – including phone acquisition costs (with costs of design, development, bill of materials and assembly) and network service charges (reflecting costs of bandwidth acquisition, network equipment, operations, and maintenance). The impact of such cost reductions may far exceed any additional costs in licensing fees. Market forces are best at determining the value to be attributed to any input component in such a system, including technology licences. Regulators should be careful to avoid favouring particular business models or making decisions on which part of the value chain deserves to make the greater profit, especially where dynamic innovation is concerned....

The principle of (F)RAND licensing has been broadly adopted to ensure that patent owners who contribute technology to standards agree to make licences available to their standards-essential IP to all comers on terms that are reasonable and free from unfair discrimination, while maintaining the ability to achieve adequate reward for their innovations.  There will at times be significant contention between the patent owner and implementer about what constitutes reasonable licensing terms, but this is to be expected as with commercial negotiation on any input cost component and has, for the most part, been readily resolved through bilateral negotiations.  In the rare instances where such negotiations have not been successful, contract law is applicable to the (F)RAND commitment and the courts are able to deal with such disputes....‖

8

disclosed, then the licensing commitment will apply only to any claims in the identified patents that end up being essential vis-à-vis the final version of the standard.  In the case of a patent holder disclosing more generally that it likely will have essential claims, the licensing commitment generally will apply to any and all essential claims the patent holder has vis-à-vis the final standard.

A large number of SSOs, including ISO/IEC/ITU, CEN/CENELEC, ETSI, AFNOR, Ecma International, OMG (Object Management Group), PWG (Printer Working Group), TTA (Telecommunications Technology Association of Korea), TTC (Telecommunication Technology Committee in Japan) and ANSI-accredited SSOs (such as the IEEE, TIA, ATIS and ASTM), have some form of disclosure-based IPR policy.

Some SSOs have adopted ‑participation-based" IPR policies. Under this type of IPR policy, a participating company undertakes a RAND (with or without a royalty) licensing commitment for any essential claims it may have vis-à-vis the final standard just by joining the SSO or by joining a technical committee of the SSO.  Standardization efforts under a participation-based IPR policy typically are scoped very narrowly.  They also often include safeguards for participants to opt out or exclude certain essential claims by disclosing the patents containing those essential claims and stating that the automatic commitment will not apply to them.  This provides some protection to participating patent holders in the event a competitor contributes their technology to the standardization effort, either inadvertently or in an effort to obtain access to such technology under the relevant IPR policy framework.

With ‑participation-based" IPR policies, sometimes the automatic commitments are RAND-RF (free of charge but with other RAND terms), as was the case with the popular USB standard and the W3C standards.  Some examples of SSOs that use a participation-based approach are Bluetooth SIG, GS1, BIAN (Banking Industry Architecture Network), DVB, Infiniband Association, MIPI Alliance, SD Card Association, Serial ATA International Organization, SIGIS, WiFi Alliance, WiMAX Forum and the W3C.

Typically, because SSOs want to encourage disclosures as early as possible during the development of a standard, disclosure is not limited to just known essential claims because those claims can only be accurately identified when the standard is almost final and the draft text is stable.  So there often is a trade-off in terms of getting more information early on in the process

9

MOTM_WASH1823_0053373

(recognizing that some portion of it likely will end up not being relevant), as opposed to having most (if not all) of the disclosed information be accurate and directly applicable to the final standard.

In some ways, the value of a disclosure-based policy is finding out which patent holders likely will have essential patent claims vis-à-vis the final standard.  Companies then typically consider that information in the context of its affected product(s) and make decisions, including whether to approach any of those patent holders to discuss licensing terms.  What they decide to do depends on a number of different factors, such as whether the parties have existing agreements that may be applicable, the patent portfolio positioning between the parties (which is not a consideration based on just the total number of patents but more likely focused on whether they have patents that read on the other's products, and which products), the companies' applicable business models (which may suggest whether or not the patent holder will proactively seek a license from implementers) and past experiences with each other.  In addition, these considerations will of necessity include patents that go beyond just the essential patent claims relating to a standard.  If an implementer is going to enter into a license agreement with the disclosing patent holder, such implementer will want to protect its entire product(s) and will need to consider a broader (and perhaps cross-) licensing arrangement.

The RFC also seeks feedback with regard to the fact that most disclosure-based policies do not require participating patent holders to conduct patent searches, nor do they bind non-participants.

As a practical matter, a requirement to conduct patent searches would be a strong disincentive for patent holders to participate in standards-setting activities and contribute their technology so that it can be used by others.  Many U.S.-based firms have hundreds of employees participating in hundreds of different SSO engagements, and thousands of patents in their portfolios.  The cost and resources needed to conduct multiple patent searches vis-à-vis a developing standard spread across a significant number of standards engagements would be very significant.[6]

---

[6] Assessing whether a single patent reads on a particular version of a draft standard could cost tens of thousands of dollars.  If patent searches were required in order for patent holders to make definitive disclosures, then there would be a need to conduct several such searches in connection with a single draft standard as it evolves.  Multiply that by hundreds of potential standards and the ongoing costs becomes prohibitive.

MOTM_WASH1823_0053374

This is why the ICT industry sought clarification from the FTC in connection with the *Dell* consent decree.[7]  The FTC clarified that the consent decree was not intended to support a ―disclose it or lose it‖ approach to patent disclosures in the standards context and that Dell's failure to disclose was ―not inadvertent‖. Similarly, back in the early 1990's the European Telecommunications Standards Institute (ETSI) proposed an IPR policy pursuant to which a patent holder's failure to make timely and complete disclosures would result in arguably compulsory licensing on ETSI-sanctioned terms (which were perceived to permit very low royalties). Working with U.S.-based trade associations, the U.S. Government intervened and the ETSI policy was modified to be more consistent with other disclosure-based SSO policies.

It is difficult to envision how an SSO IPR policy would apply to non-participants. It is estimated that there are at least 1,000 ICT SSOs around the world. Any absolute disclosure policy would create a huge burden on ICT companies to police all of those developing standards, conduct interminable patent searches, and make definitive disclosures or risk losing valuable patent rights. When the Standardization Administration of China (SAC) released its draft *Interim Provisions on Formulation and Revision of Patent-related National Standards* for public comment on November 2, 2009, a number of U.S.-based trade associations provided comments seeking clarification that the proposed IPR policy would only cover those patent holders who were participating in the development of the relevant Chinese National Standard (and, for example, not patent holders who may have made a licensing commitment in connection with an ISO/IEC-related standard being modified during the Chinese standardization process).

There rarely will be a complete and accurate portrait of the patents that contain essential claims with regard to a particular draft standard. This is not surprising. Standards are often lengthy technical documents. Many of the essential patents are not included as the result of a formal contribution or a technology ―bake off‖ pursuant to which the technical committee makes a decision among competing patented technologies. Engineers create a technical document that, not surprisingly, affects a range of patented technology. That said, there still seems to be only limited patent infringement litigation based solely on essential patent claims vis-à-vis a standard where the essential patents were unknown to the participants at the time the participants selected among competing proposals to include in the standard. And those cases, although very limited in

---

[7] *In re Dell Computer Corp.*, 121 F.T.C. 616 (May 20, 1996).

11

MOTM_WASH1823_0053375

number, typically have involved allegations that the patent owner intentionally failed to disclose its patents in violation of the applicable SSO IPR policy.

## RAND licensing commitments provide a balanced and flexible approach to patent licensing.

RAND is a time-tested and effective approach to licensing commitments. Like other —reasonableness" standards, it does not dictate specific licensing terms, but it does provide flexibility across a diverse range of situations. As mentioned above, companies make decisions about whether to initiate licensing discussions and, if so, what considerations beyond just the essential claims vis-à-vis the final standard will be included. The negotiation associated with a standards-related patent license typically is no different from any general patent licensing discussion and will involve trade-offs on all of the terms and conditions.

While there is no exhaustive list of traditional RAND licensing terms, in addition to a possible compensation element, such terms may include a field-of-use restriction, reciprocity, non-sublicenseability, defensive suspension and other common patent licensing considerations. Whether specific articulations of these types of terms are RAND can be a matter of some debate. For example, if a standard acquires market power (most don't), a patent owner who requires broad grant backs in the form of reciprocity or broad defensive termination provisions in exchange for its license of essential patent claims to implement such standard arguably may not be offering a RAND license. With regard to defensive termination, if the standard has market power and if the —trigger" for suspension is much broader than the actual license grant, it is not clear that the term is RAND. For example, if the defensive suspension is triggered by the implementer asserting any type of IPR against the patent holder (or even any litigation claim on any topic), then arguably the patent holder is receiving a free-of-charge cross-license to the implementer's entire IPR portfolio in exchange for a license to just the patent holder's essential claims vis-à-vis a standard. As with other —reasonableness" tests, these and other questions can be resolved through litigation in the relatively rare circumstances where business discussions fail (and the risks for each side inherent in such litigation of course inform the business discussions).

Proposals to somehow reduce —RAND" to some uniform formula could undermine the value of current practices and restrict some of the flexibility that helps to enable current licensing practices and protect the defensive value of contributed patent technology. There are many

12

existing patent licenses that include access to essential patent claims vis-à-vis one or more standards that reflect a customized solution between the two parties that takes into consideration all of the licensing terms (and not just the financial component).

In addition, the existence of a RAND commitment to offer patent licenses should not preclude a patent holder from seeking preliminary injunctive relief or commencing an action in the International Trade Commission just because the patent holder has made a licensing commitment to offer RAND-based licenses in connection with a standard. Whether such relief is available should be assessed under the current legal framework in the applicable jurisdiction, which often is premised substantially on the specific facts and circumstances at issue. Any uniform declaration that such relief would not be available if the patent holder has made a commitment to offer a RAND license for its essential patent claims in connection with a standard may reduce any incentives that implementers might have to engage in good faith negotiations with the patent holder.

With regard to the issue whether the licensing commitment should be binding on the successor-in-interest of the implicated patent rights, we believe that there is a fairly broad consensus that this outcome would be ideal. The issue is how to effectuate this in practice. If a patent holder makes a specific patent disclosure to a SSO, then it should be able to track that commitment and bind the transferee as part of the transfer agreement.

This becomes more challenging when the patent holder has made a more general licensing commitment that it will license any essential claims that it has (and when the patent holder has made such general commitments to many SSOs). In order to bind a transferee, such patent holder would have to conduct patent searches to determine what patent claims were implicated by the commitment(s). Many patent holders that use their patents largely for defensive purposes vis-à-vis standards do not want to undertake this significant expense. This is especially true when the patent holder has made a commitment to license on RAND terms on a royalty-free (or compensation-free) basis. If such patent holders are required to conduct patent searches to determine what they are giving away for free, then they may be less willing to agree to a RAND-RF licensing commitment. We believe that SSOs should seek to help address this issue in their IPR policy, but it is not realistic to expect that they alone can fully solve this issue.

13

MOTM_WASH1823_0053377

**Proposals for the U.S. Government to promote a mandatory "ex ante" IPR policy approach are not supported by the broader ICT industry because such an approach is viewed as (a) being of little value, (b) creating many practical inefficiencies and possible legal challenges, and (c) something that could be used internationally to possibly undermine the value of patented technology that is included in standards.**

Almost all disclosure-based IPR policies address (a) the extent to which patent holders have to disclose whether they have any patent claims that likely will be essential to implement the standard under development and/or (b) the choices such patent holders have with regard to the licensing commitment they can make vis-à-vis those claims (such as a commitment to license under RAND terms and conditions).

If a patent holder makes a disclosure about its essential patent claims, potential implementers can decide when (or even whether) to contact the patent holder to obtain information about actual license terms. Depending on when the patent holder makes such a patent disclosure, this may occur *ex ante* (before the standard is finalized). Any negotiations typically are conducted bilaterally and outside the SSO.

"Ex ante" IPR policies typically refers to those disclosure-based policies that either permit or require patent holders to disclose specific licensing terms, including royalty rates, to the standards body before the standard is finalized. While almost all ICT industry stakeholders (including Microsoft) support policies that permit the voluntary and unilateral "ex ante" disclosure of specific licensing terms by a patent holder, there are differing views with regard to proposed IPR policies that would <u>mandate</u> the "ex ante" disclosure of specific licensing terms and/or permit group discussions of those terms. Advocates of mandatory "ex ante" IPR policies argue that this is necessary to prevent patent holders from "holding up" implementers and extracting onerous terms after the standard is completed and everyone is attempting to implement the standard as written. Opponents highlight that "patent hold-up" occurs rarely when viewed across thousands of ICT standards, and such policies would unduly burden the standardization process and create many unnecessary practical inefficiencies and potential legal problems.

14

There are literally thousands of ICT standards in existence today. Hundreds of these standards have been referenced in eGovernment Interoperability Frameworks,[8] with no apparent documented problems relating to IPR issues.[9] There have been a relatively small number of noteworthy litigations that have been commenced when two parties have been unable to agree on whether proffered licensing terms were RAND and/or otherwise met the requirements of the applicable SSO's IPR policy. These are very much the exception, not the rule. Most SSOs review and regularly update their IPR policy to address broad issues, but they often are reluctant to add substantial burdens to the process to address relatively rare, potential "one-off" disputes that are fact-specific and can be litigated if the two parties cannot come to an agreement.

The debate over mandatory "ex ante" IPR policies has been underway for more than a decade. During this time, many ICT SSOs and their members with disclosure-based IPR policy approaches have thoughtfully considered whether to adopt such a policy, and with the exception of the VITA standards body, they largely have rejected adopting such an approach. The principle reasons typically include the following considerations:

- A mandatory "ex ante" IPR policy would require patent holders to disclose proposed licensing terms for their essential patent claims. Most stakeholders have observed that, for various reasons, such a disclosure is of little practical value. When a patent holder discloses to a SSO that it likely holds essential patent claims, a prospective implementer makes a decision whether to approach this patent holder to discuss possible licensing terms (and that decision is dependent on a number of factors). Any implementer actually deciding to negotiate a license will rarely, if ever, want a license for just the patent holder's essential patent claims in connection with that standard. An implementer seeking a license likely will want to negotiate a bi-lateral, customized agreement that will include other IPR (including related patent claims that it may be infringing) that impact its entire product or at least those product features that relate to and utilize the standard. The license also likely will reflect a range of possible trade-offs between the two parties based on their respective IPR portfolios and other business

---

[8]   *See* "Government Interoperability: A comparative analysis of 30 countries" by CSTransform at http://www.cstransform.com/white_papers/InteropAnalysisV2.0.pdf.

[9]   The existence of competing standards also can help reduce the threat of possible patent "hold up".

MOTM_WASH1823_0053379

opportunities. So adding a requirement to an SSO IPR policy to the effect that disclosing patent holders must prepare and submit licensing terms for just its essential patent claims creates an obligation and burden on patent holders that arguably adds little or no value to the standardization process.

- Standards technical committees make hundreds of technical decisions and, as has been much noted, the process is often lengthy. Experienced stakeholders have noted that injecting licensing terms into the standardization process will inevitably delay the process further still without improving the technical value of the standard.

- Some patent holders make RAND licensing commitments largely for defensive purposes to further their own freedom of action, such as seeking to protect their products that implement standards from patent infringement claims asserted by others. As a result, quite often they will not proactively seek to obtain licenses from implementers. It has been observed during stakeholder debates on the –ex ante" issue that requiring these patent holders to prepare patent licensing terms unnecessarily creates burdens and complications for them without adding value to the standardization effort.

- There is little evidence that –patent hold-up" in the standards context is a real problem. Most patent holders also are implementers, whether with regard to the same standard or in terms of the broader ICT standards landscape, and thus share an interest in maintaining reasonable royalty rates. This ecosystem generates few IPR-related disputes as a result.

- Under a mandatory –ex ante" IPR policy, there is a substantial risk—even a likelihood—of buyer cartel or group boycott behavior. An SSO obviously is a forum for participants to discuss the development of technical standards. Those discussions are likely to extend to price if price terms are disclosed in connection with the offer of technology to a standard-setting effort. The technical committee members may explicitly or implicitly pressure a disclosing patent holder to modify its proposed licensing terms or risk not having its technology included in the standard. This is especially true if the IPR policy permits the group discussion of proposed licensing terms as part of the standardization process. For this reason, mandatory –ex ante" IPR

16

MOTM_WASH1823_0053380

policy approaches also may discourage key patent holders from participating in the process and contributing their valuable patented technology. They also could create disincentives to invest further in innovation in that technology area.

Most of the SSOs and their stakeholders that have considered these proposals over the years have determined that there are only a limited number of situations where "patent hold-up" takes place in the context of standards-setting. The industry has determined that those situations generally are best addressed through bi-lateral negotiation (and, in rare cases, litigation) as opposed to modifying the SSO's IPR policy and arguably unnecessarily burdening the standardization process for the many ICT standards that are being widely implemented in the marketplace with no apparent IPR-related challenges.

Accordingly, we support the majority of ICT companies who believe that SSOs should develop their IPR policies based on a consensus of their stakeholders, and that governments should not promote one approach over another, including a mandatory "ex ante" IPR policy regime and the group discussion of proposed licensing terms.

In conclusion, we thank you for the opportunity to provide comments in response to the RFC.

Respectfully submitted,
Microsoft Corporation

David Heiner
Vice President and Deputy General Counsel

Amy Marasco
General Manager, Standards Strategy and Policy

17