EXHIBIT 4



MOTM_WASH1823_0054693



# Standards Development Patent Policy Manual

American Bar Association
Committee on Technical Standardization
Section of Science & Technology Law

Jorge L. Contreras, Editor



American Bar Association
Defending Liberty
Pursuing Justice



ABA SECTION OF
SCIENCE & TECHNOLOGY LAW

MOTM_WASH1823_0054694

The materials contained herein represent the opinions of the authors and editors and should not be construed to be the action of either the American Bar Association or the Section of Science and Technology Law unless adopted pursuant to the bylaws of the Association. Nothing contained in this book is to be considered as the rendering of legal advice for specific cases, and readers are responsible for obtaining such advice from their own legal counsel. This book and any forms and agreements herein are intended for educational and informational purposes only.

No part of this publication may be reproduced, stored in a retrieval system, or transmitted in any form or by any means, electronic, mechanical, photocopying, recording, or otherwise, without the prior written permission of the publisher. Permission requests should be sent to the ABA Copyrights & Contracts Department via e-mail at copyright@abanet.org or via fax at (312) 988-6030.

© 2007 by the American Bar Association. All rights reserved.

Printed in the United States of America

ISBN: 978-1-59031-928-4

Library of Congress Cataloging-in-Publication Data

Standards development patent policy manual / edited by Jorge L. Contreras. — 1st ed.
   p. cm.
Includes bibliographical references and index.
ISBN 978-1-59031-928-4
1. Patent laws and legislation—United States. I. Contreras, Jorge L. II. American Bar Association. Section of Science and Technology

KF3114.3.S73 2007
346.7304'86—dc22
                                           2007028218

Discounts are available for books ordered in bulk. Special consideration is given to state bars, CLE programs, and other bar-related organizations. Inquire at Book Publishing, ABA Publishing, American Bar Association, 321 North Clark Street, Chicago, Illinois 60610-4714.

For a complete list of ABA publications, visit www.ababooks.org

10 09 08 07   5 4 3 2 1

# CONTENTS

FOREWORD     v
PREFACE     vii
INTRODUCTION     ix
HOW TO USE THIS MANUAL     1
ANNOTATED POLICY CLAUSES     5
I.   DEFINITIONS     5
II.   GENERAL     27
    A. Effect of Policy     27
    B. Noncompliance     27
       1. Violation     28
       2. Rejection of Violator's Contributions/Standards     28
       3. Posting of Warning     28
       4. Ejection from the SDO     29
       5. Automatic License Grant     29
III.   PATENT DISCLOSURES     31
    A. Obligation to Disclose     32
       1. Participant's Patents Covering Its Own Contributions     32
       2. Participant's Patents Covering Any Standards Document     34
       3. Third-Party Claims     35
    B. Timing of Patent Disclosures     36
       1. Upon Entry in SDO     37
       2. Participant's Claims Covering Its Own Contributions     37
       3. Participant's Claims Covering Any Standards Document     37
       4. For Third-Party Claims     38
    C. Format of Patent Disclosures     38
       1. Required or Optional Format     38
       2. Content and Specificity of Patent Disclosure     40
       3. Blanket Patent Disclosures     41
       4. Updating Patent Disclosures     42
    D. Disclosure Exclusions, Exemptions, and Opt-Out     43
       1. Disclosure Opt-Out for Noninvolvement     43
       2. Exemption from Disclosure If Licensing Commitment Is Made     44
       3. Exceptions ("Negative Disclosure")     45
    E. Duration of Patent Disclosure Obligation     46

MOTM_WASH1823_0054695

iv  CONTENTS

| | | |
|---|---|---|
| IV. | LICENSING COMMITMENTS AND LICENSING STATEMENTS | 47 |
| | A. Licensing Commitment | 47 |
| |    1. Terms of the Licensing Commitment | 49 |
| |    2. Reciprocity | 61 |
| |    3. Defensive Suspension | 62 |
| | B. Obligation Structure of the Licensing Commitment | 67 |
| |    1. Events Triggering the Imposition of a Licensing Commitment | 67 |
| |    2. Events That Render Licensing Commitment Effective | 68 |
| |    3. Establishment of Licensing Commitments by Working Groups | 69 |
| |    4. Reduction of Licensing Commitment | 70 |
| | C. Licensing Statements | 72 |
| |    1. Elements and Types of Licensing Statements | 72 |
| |    2. Timing of Licensing Statements | 74 |
| |    3. Format of Licensing Statements | 76 |
| |    4. Licensing Statement Made by Whom | 81 |
| |    5. Duration of Licensing Commitments | 82 |
| V. | NORMATIVE AND INFORMATIVE REFERENCES | 87 |
| |    1. Claims Expressly Not Covered | 87 |
| |    2. Consistency Required | 89 |
| |    3. Disclosure Requested | 89 |
| VI. | SDO ACTIONS AND RESPONSIBILITIES | 91 |
| | A. Treatment of Patent Disclosures and Licensing Statements | 91 |
| |    1. Publication of Patent Disclosures and Licensing Statements | 91 |
| |    2. Retention of Patent Disclosures and Licensing Statements | 91 |
| | B. Review of Patent Disclosures and Licensing Statements by the SDO | 92 |
| |    1. Rejection by the SDO | 92 |
| |    2. Correction of Clerical Errors | 92 |
| |    3. Resubmission to the SDO | 93 |
| |    4. Verification by the SDO | 94 |
| | C. SDO Notification and Disclaimer | 94 |
| | D. Policy Guidelines and Guidance | 94 |
| EXHIBIT A: | The "Ex Ante" Question | 97 |
| EXHIBIT B: | Considerations for Creating Forms to Accompany SDO Patent Policies | 99 |
| EXHIBIT C: | Links to IPR Policies | 103 |
| Index | | 105 |

# FOREWORD

The Section of Science and Technology of the American Bar Association is pleased to present the *Standards Development Patent Policy Manual*. We are hopeful that this publication will serve as a valuable resource for technical standards organizations, standards developers, and lawyers with an interest in technical standards for many years to come.

This publication was prepared under the auspices of the Committee on Technical Standardization. Jorge L. Contreras, Chair, served as its primary editor, with substantial editorial and substantive assistance from Marc Sandy Block, Michele Herman, Susan Hoyler, and Amy Marasco. This publication also benefited from the regular input and advice of a dedicated subcommittee of experts from industry, academia, and private practice including Chuck Adams, Kent Baker, Dan Bart, Larry Bassuk, Robert Bauer, Scott Bradner, Marc Braner, Pamela Deese, Ed Fiorito, Patricia Griffin, Hung Ling, Alan McGrath, Gil Ohana, Dorothy Raymond, Michelle Stamnes, Richard Taffet, George Willingmyre, and, of course, the founder of the Committee, Ollie Smoot.

We are grateful to the Section of Antitrust Law and the Section of Intellectual Property for their support in the preparation and discussion of this publication.

We would also like to thank Shawn Kaminski, Director of the Science and Technology Section, as well as the members of the Publications Committee who helped to make this project a reality.

William S. Coates
Chair, Section of Science and Technology Law
American Bar Association

v

## E. DURATION OF PATENT DISCLOSURE OBLIGATION

SDO Participants may generally withdraw from the SDO and/or particular Working Groups at any time. A Participant's disclosure obligation should continue during the entire period of its Participation in the SDO. The SDO may wish to address the possibility of a prospective Participant transferring Essential Claims in anticipation of joining the SDO (see Section III.A.1). While an SDO might be concerned about a Participant withdrawing and then filing patent applications to cover aspects of a Standard initiated during its period of Participation, imposing a duty to disclose after withdrawal from the SDO is generally viewed as unnecessarily burdensome on Patent Holders. This concern is often addressed in the Licensing Commitment (see Section IV.E.1.a), which may require a withdrawing Participant to continue to offer licenses with respect to Essential Claims covering Standards developed during its period of Participation in the SDO under certain prescribed circumstances.

| A Participant's disclosure obligations under Section III.A shall terminate | |
|---|---|
| [upon its withdrawal from the SDO] [1] | [1] If the SDO wishes all of a Participant's disclosure obligations to terminate upon its withdrawal from the SDO, then this clause may be used. |
| and/or | |
| [with respect to Essential Claims relating to a particular Standard, upon its withdrawal from the relevant WG]. [2] | [2] In addition, if the SDO wishes to allow a Participant's disclosure obligations with respect to a particular Standard to terminate upon its withdrawal from the relevant WG, then this clause may be used in addition to the clause in [1] above. |

## IV. LICENSING COMMITMENTS AND LICENSING STATEMENTS

As defined in Section I, a Licensing Commitment is an obligation requiring a Participant to grant licenses under its Essential Claims. A Licensing Commitment is not itself a license grant. It is merely an obligation to grant a license on terms such as RAND or RANDz.

A Licensing Statement is a document containing an affirmative statement in which a Participant makes a Licensing Commitment or otherwise discloses the general nature of the terms on which it would be willing to grant licenses under its Essential Claims. However, some SDOs impose Licensing Commitments without requiring any particular Licensing Statement (for example, the Licensing Commitment may be embodied in the SDO's organizational documents, bylaws, Participation Agreement, or the like). Again, a Licensing Statement generally does not constitute the grant of a license, but generally states the nature of the terms (e.g., RAND or RANDz) on which the Participant is willing to grant licenses.

### A. LICENSING COMMITMENT

#### How a Licensing Commitment Arises

A Participant's Licensing Commitment may arise in various ways. As discussed in detail below, a Participant may be required to undertake a Licensing Commitment when it joins an SDO or a Working Group of an SDO, when it submits a Contribution, or when it submits a Licensing Statement. Some SDOs do not impose any obligation on Participants to make any Licensing Statement or to undertake any Licensing Commitment, although most do impose some form of Licensing Commitment.

#### Elements of a Licensing Commitment

A Licensing Commitment is not an actual license and generally does not include all of the terms that the Patent Holder may include in the licenses it offers to prospective licensees. The Licensing Commitment may, however, prescribe the general nature of some of the terms and/or prohibit other terms. The terms and conditions not expressly covered by the Licensing Commitment are typically negotiated on a bilateral basis between Patent Holders and Implementers, subject to any overarching requirements in the Licensing Commitment to be "reasonable" and "nondiscriminatory."

While negotiations are often bilateral, in an April 2007 FTC/DOJ Report, *Antitrust Enforcement and IP Rights: Promoting Innovation and Competition*, the agencies observed that "joint negotiation of licensing terms by standard-setting organization participants before the standard is set can be pro-competitive." Such negotiations are unlikely to constitute a per se antitrust violation. The agencies will usually apply a rule of reason analysis when evaluating these joint activities. The FTC/DOJ Report also concludes that, without more, a unilateral announcement of price terms does not violate section 2 of the Sherman Act. The agencies also took "no position as to whether SDOs should engage in joint ex ante discussion of licensing terms."

http://www.ftc.gov/reports/innovation/P040101PromotingInnovationsandCompetitionrpt0704.pdf

The FTC/DOJ Report is consistent with Recommendation No. 20 issued by the Antitrust Modernization Commission in its April 2, 2007 Report and Recommendations (AMC Report) that "joint negotiations with intellectual property owners by members of a standard-setting organization with respect to royalties prior to the establishment of the standard, without more, should be evaluated under the rule of reason" (one of twelve commissioners dissenting).

http://www.amc/gov/report_recommendation/toc.htm

47

MOTM_WASH1823_0054697

It is important for Participants to understand their Licensing Commitments so that they do not commit to grant more license rights than they intend or become involved with standards development activities that may require them to grant licenses that they did not contemplate. Patent Holders must weigh the potential benefit of fully exercising patent rights against the benefit of promoting the standard, the industry, and their own business prospects. It is equally important for Implementers to understand the range of license terms and conditions they can generally expect Participating Patent Holders to offer. Implementers generally do not want to invest in the development and deployment of standards-based products if they believe that they will not be offered acceptable patent licenses. The SDO, in creating its Policy, must find a satisfactory balance between the interests of the Patent Holders that participate and contribute to the Standard, and the Implementers, whose adoption of the standard is vital for the standard's success.

Some SDOs also require different Licensing Commitments depending on a Participant's level of participation or authority within the SDO. For example, Participants who are part of the SDO's "steering committee" or "architecture board" may be required to grant licenses on RANDz terms, whereas more general Participants may be permitted to grant RAND licenses.

### Other Factors

In practice, not all Patent Holders may require Implementers to obtain a license under their Essential Claims, even if permitted to do so under the Policy or even if they have submitted a Licensing Statement indicating general terms on which licenses may be offered. Such forbearance could, however, impede the Patent Holders' ability to enforce such Essential Claims later under various equitable theories. Moreover, an Implementer who has sufficient awareness of Essential Claims covering an implementation of a Standard could be liable for willful infringement absent a license, and may be at some risk by operating without a license, even if the Patent Holder does not appear to be enforcing its Essential Claims actively. These suppositions have not yet been considered by the courts, however, and Implementers should seek legal advice before taking any such action.

Note that, in some instances, a Participant may be permitted to elect to structure these grants of rights as covenants (similar to that described in Section IV.C.3 below) rather than licenses. Some commentators maintain, however, that a Participant offering a covenant should also offer a license as an alternative to permit bilateral negotiation. In any case, any such covenant must still meet all of the requirements of the SDO's Licensing Commitment.

An SDO drafting a patent policy and a company joining an SDO should consider how the SDO's policy will affect applicable business and development models of a participating company. For example, the open source software development model has emerged in various standards-setting environments. If a client plans to implement a standard with open source software, counsel should consider the interplay between the open source license commitment the client may have and the SDO commitment it may have. Today there are many open source implementations of RAND-based standards, although the authors are not aware of the circumstances under which these implementations are being practiced.

Similarly, if the SDO wants to attract software developers including open source developers, it may consider the interplay between the respective SDO's commitments, the rights of Patent Holders, open source license commitments, and the incentives to innovate within the scope of the standardization activity. Distributors of all products, including those involving open source software, must also understand that permitted license limitations may affect their ability to distribute products as they might otherwise prefer to do. In addition, the SDO should seek to balance the interests of Implementers (who may rely on differing business models) and the rights of Patent Holders (who may also rely on different business models) in developing its IPR Policy in order to attract a balance of stakeholder interests.

In some SDOs, the Licensing Commitment is as simple as a commitment to RAND or RANDz licensing terms and conditions. Other SDOs require or permit the Licensing Commitment to contain some or all of the terms described below, and many SDOs expressly permit the inclusion of such terms as part of their RAND Licensing Commitment.

### 1. Terms of the Licensing Commitment

Participant shall, [upon request] [1], [grant/offer]

The Licensing Commitment is often stated as an absolute (i.e., that the Participant must grant the required licenses). However, it is reasonable to require that such licenses be granted only upon a request by a potential licensee and upon the conclusion of bilateral negotiations. It would be unreasonable for a Participant to be required to seek out its own licensees in this context, or to extend offers before being requested to do so.

[1] The Patent Holder must offer a license to a prospective Implementer upon request. If the Implementer and the Patent Holder do not agree on terms, the Implementer has three choices: (1) it can discourage the SDO from adopting the Standard if the Standard has not yet been adopted; (2) it can choose not to implement the Standard; or (3) it can implement the Standard without a license. If the Implementer chooses to implement the Standard without a license, the Patent Holder may in turn choose to sue the Implementer for patent infringement and seek all available remedies. The Implementer may rely on any applicable defense to infringement such as invalidity or noninfringement, and may also rely on other legal theories arguing that the license terms did not comply with the SDO's Licensing Commitment (e.g., they were not RAND).

Unless the Policy states otherwise, it is generally understood that a Patent Holder's obligation to offer a license under a Licensing Commitment is initially discharged after the Participant makes a good-faith offer of such license. If an Implementer refuses the license, it is not clear, however, whether or how often or for how long the Patent Holder must continue to make a license available. On one hand, it may not be reasonable to allow a Patent Holder to refuse a license to an Implementer who previously could not reach agreement with the Patent Holder, but on the other hand an Implementer should not have the ability to wait until the last minute

MOTM_WASH1823_0054698

**a. licensee(s)**

to any [Implementer/Participant]

to demand a license (e.g., in the midst of a patent infringement action brought by the Patent Holder after the Infringer has attempted unsuccessfully to invalidate the relevant patents). An SDO that wishes to avoid disputes regarding these issues may wish to address them explicitly in its Policy.

SDOs must decide who will benefit from the Participants' Licensing Commitments—other Participants, or all Implementers.

Many SDOs seek to benefit all Implementers of a Standard. This approach is viewed by many to foster widespread adoption of a Standard.

Some SDOs, however, limit Licensing Commitments to other Participants, and Implementers who are not Participants cannot rely on such Licensing Commitments. Such limitations may be imposed because Participants may fear granting licenses to non-Participants that have no Licensing Commitments of their own. These restrictions may also encourage membership in the SDO by attracting Participants who seek licenses under the relevant Essential Claims. This limitation is seen more in "special interest groups" than in "traditional" SDOs.

So long as the Policy permits the Patent Holder to include a reciprocity provision in its license (see Section IV.A.2 below), the Patent Holder can obtain a reciprocal license from any non-Participant the Patent Holder chooses to license. Consequently Patent Holders would have an incentive to license both Participants and non-Participants even if the Policy imposes a Licensing Commitment only with respect to Participants. However, absent such a Licensing Commitment, non-Participants are not guaranteed that the Patent Holder will offer any license at all.

If it is anticipated that a Standard may be contributed to another standards organization that does not have this limitation, the SDO, in the Policy, may wish to consider extending the benefit of licenses to all Implementers. Another possibility would be to add a provision that would convert the Licensing Commitment to extend the benefit to all implementers *but only* in the event that the standard is contributed to such other standards organizations.

**b. nonexclusivity**

a nonexclusive

**c. worldwide**

worldwide

**d. nontransferable**

nontransferable/nonassignable

**e. duration**

[perpetual/____-year]

Perhaps the most common term included in a Licensing Commitment is nonexclusivity. The licenses offered by the Patent Holder must be nonexclusive to enable broad implementation of the standard.

Licensing Commitments often require the license to be "worldwide." However, "worldwide" does not necessarily mean that all worldwide rights are licensed under a single license or to each prospective licensee. Implementers may not want licenses to make, use, sell, etc., the standardized technology throughout the world and may seek licenses for only those regions where the Implementer anticipates practicing the Essential Claims.

Patent Holders may also want to offer different terms for practicing Essential Claims in different regions. This type of strategy, however, may raise questions about reasonableness and nondiscrimination if manufacturers in one jurisdiction are subject to substantially different terms from those in another.

Some SDOs may use the terminology "throughout the world" or "in any country" in the same context.

Some Licensing Commitments may permit the Patent Holder to offer licenses that are nontransferable or nonassignable. There may be a number of terms in the license that the Patent Holder believes are material to the license agreement with a specific licensee and therefore the Patent Holder does not want the license to be assigned or transferred without its knowledge and consent. Some licenses that are not transferable or assignable do include limited provisions permitting a licensee to transfer or assign its license upon notice to the Patent Holder and with its prior consent.

In a perpetual license, the license of each Essential Claim extends for the life of the applicable patent, unless there is some limiting condition expressed. Implementers often desire a perpetual license because they may not want to invest in a standardized technology believing that the license terms are acceptable, only to find out after the license terminates that the new terms offered by the Patent Holder are not acceptable to the licensee.

MOTM_WASH1823_0054699