# EXHIBIT 18

| DOCUMENT #: | GSC13-IPR-14r1 |
|---|---|
| FOR: | Presentation |
| SOURCE: | TIA |
| AGENDA ITEM: | IPR WG Agenda Item 9 |
| CONTACT(S): | Kent Baker/Dan Bart/Amy Marasco |

# Considerations for Developing or Revising PSO IPR Policies

GSC-13
IPR WG
Agenda Item 9
TIA

Submission Date: July 16, 2008

TRANSFORMING THE NETWORK THROUGH GLOBAL COLLABORATION

MOTM_WASH1823_0402454

681



# Best Practices from GSC

- GSC-12 **IPR Policies** Resolution (12/22), **"Open Standards"** Resolution (12/05); and **Cooperation with Patent and Trademark Offices** Resolution (12/23)
- Taken together support effectiveness of traditional **RAND/FRAND-based IPR policies**
  - Balance interests of all stakeholders
  - Encourage high technology companies to participate in SDOs and contribution of valuable innovative technology
  - Encourage patent holders to make RAND/FRAND licensing commitments
    - potential licensors have every incentive to negotiate early agreements – i/e., before standard is adopted to gain support for their technology from SDO members
    - Implementers and SDOs recognize innovation and invention are results of significant R&D investments and it is equitable and fair that patent holders receive a reasonable return on that investment
  - Stimulate innovation and dynamic efficiency (both within and around the scope of the standard)

TRANSFORMING THE NETWORK THROUGH GLOBAL COLLABORATION

MOTM_WASH1823_0402455



# Best Practices from GSC

- Disclosure is limited to patent claims that are **likely 'essential'** to the implementation of the standard

- License commitment or Letter of Assurance (LoA) on **RAND/FRAND basis** for claims that end up being essential

- **Actual license** terms are discussed **outside** of the SDO process and negotiated frequently in advance of a final standard on a bi-lateral basis
    - Each negotiation is unique
    - Voluntary "ex ante" disclosure of proposed license terms is generally not a problem, but substantial antitrust or competition law risks if SDOs permit any group discussion of licensing terms during the standards development organization's meetings or activities
    - Implementers or proponents of alternative technologies might unreasonably collude in terms of (a) group discussions of licensing terms or (b) group decisions to avoid a certain technology.

TRANSFORMING THE NETWORK THROUGH GLOBAL COLLABORATION

3

MOTM_WASH1823_0402456



# The Reality

- IP laws grant exclusive rights in order to <u>encourage innovation</u> and the undertaking of <u>risky investments</u>; the IPR holders may desire a <u>reasonable return on that investment</u>.

- IP rights should <u>not</u> be viewed as protecting owners *from* competition but as <u>encouraging</u> firms to engage *in* competition; this is also the basis for most competition law enforcement actions, <u>protect competition not competitors</u>

- A licensing commitment or Letter of Assurance (LoA) is an <u>important</u> commitment as IPRs grant the <u>right to exclude</u>, *i.e.*, <u>not to provide a license at all</u>
  – RAND/FRAND commitment, LOA commitment, etc. modifies the right to exclude
- We are seeing <u>enforcement actions</u> targeted at enforcing the LoAs, even when given by a prior owner of the underlying patents containing the essential patent claims (*e.g.*, *FTC vs N-DATA*)

TRANSFORMING THE NETWORK THROUGH GLOBAL COLLABORATION

MOTM_WASH1823_0402457



# The Reality

- Today there are more than 16,455 International Standards (with many more in process)
  - Thousands more are adopted by industry associations, consortia, and other SSOs on a global basis
- The number of <u>real disputes</u> brought to the attention of judicial or regulatory bodies over IP-related issues in our sector per year typically is <u>less than 10</u>!
  - Some of the disputes are between or among competitors in a competitive market
  - Some of the disputes are enforcement actions by competition law agencies
  - Most of these involve a patent holder that is accused of intentionally hiding its IP and not disclosing it until after investments are made with regard to implementations – the "<u>bad actor</u>" syndrome
  - Recent cases related to enforcing terms of a LoA given by a prior owner of the underlying patent claims
  - There are <u>so few disputes</u>, most standards folks can recite the names of the cases: 'Dell,' 'Rambus,' 'FTC N-DATA,' etc.
  - The fact there are <u>so few disputes</u> is not evidence the system is broken, but evidence <u>the system works</u> and works in a <u>highly competitive market</u>!

**TRANSFORMING THE NETWORK THROUGH GLOBAL COLLABORATION**

5



## *Ex Ante* Debate

- Many companies support disclosure of specific licensing information on a <u>voluntary</u> basis, before approval (*i.e.*, *ex ante*) of the standard, where supported by the standards body membership via the SDO's IPR policy

- The debate sharpens regarding:
  – <u>Mandatory</u> *ex ante* approaches
  – <u>Group discussion</u> of licensing terms

- Those SDOs who consider the *ex ante* issue and with competent legal counsel about the risks for the SDO and participants in the SDO, generally conclude that they will **NOT permit** any group discussion of specific licensing terms during the standards development organization's meetings or activities
  – The GSC Resolution on effective IPR Polices should be revised to make this point more explicit

TRANSFORMING THE NETWORK THROUGH GLOBAL COLLABORATION

MOTM_WASH1823_0402459



# Ex Ante Debate

- Mandatory *ex ante* approaches
  - May imply necessity of <u>patent searches</u>, which are very expensive and not conclusive
  - Adding such expensive process steps <u>discourages</u> innovative <u>companies</u>, particularly those with large patent portfolios, from <u>participating</u> in that SDO's standardization activities

- Group discussion of licensing terms
  - Proponents' objective is to facilitate the group discussions or negotiations of licensing terms by technical committees at an SSO
    - Potential for anti-competitive conduct and thus <u>legal risk</u> for participants and the SDOs
    - <u>Disincentives</u> for innovation in and around standardized technology areas
    - <u>Increased costs, burdens, and risks</u> on the standards-setting process
    - Technical committees are populated by <u>technical personnel</u> and not attorneys or those charged by their companies with license negotiations
    - Many more technical committees than company personnel with licensing responsibilities
    - <u>Slows adoption</u> of new technologies to the detriment of consumers
    - <u>Favors</u> certain company business models over other business models
  - Many companies challenge whether a "solution" is needed or properly scoped to address the <u>perceived</u> "problems"
    - Inefficiency trade-offs (static vs. dynamic)

TRANSFORMING THE NETWORK THROUGH GLOBAL COLLABORATION



# Impact of Business Models

- Many of the companies participating in the SDOs engaged on <u>both</u> sides of the debates are <u>patent holders</u>, but not all
- Participants in the discussions are mostly <u>for-profit</u> companies
- Viewpoints are colored by <u>business strategy</u>, <u>scope of patent portfolios and relevant business models</u>
- From the SDO's perspective, developing IPR policies that <u>include all business models and favor none</u> is key.
- Successful SDOs and successful standards processes are 'company neutral' and 'technology neutral'
  - Competition should occur in the marketplace, <u>NOT</u> in the SDO or standards process

TRANSFORMING THE NETWORK THROUGH GLOBAL COLLABORATION

MOTM_WASH1823_0402461



# Business Models Drive IPR Policy Debates

- Different standards activities or policies impact different business models and IP portfolios differently:
  - *Licensing model* – seeking <u>reasonable</u> return on R&D investments
  - *Product model* – monetize IP through <u>products</u>
    - Often <u>defensive</u> approach in standards
      - Do not actively seek licenses from implementers
    - May want to pay lower royalties to reduce costs
    - May want to raise rivals' costs
  - *Service providers* – use <u>loss-leader</u> business model (*e.g.*, subsidized handsets) to drive monetization of services
  - *Consulting model* – seeking to transfer value quotient from product/licensed IP to consulting services (and possibly up-sell to proprietary offerings)

TRANSFORMING THE NETWORK THROUGH GLOBAL COLLABORATION

MOTM_WASH1823_0402462



# Why do SDOs generally not allow licensing discussions?

- Most SDOs in our sector have <u>prohibitions</u> against discussion of licensing terms in technical meetings of the SDO
  - Whether a standard is widely adopted depends on its <u>technical</u> content, viable commercial environment and timely responsiveness to market needs
  - Collaborative efforts are best focused on the <u>technical content</u>
    - Participants make their own informed decisions about commercial/market issues from their own company's perspective
      - Voting member might determine how to vote based upon his/her company position
    - Discussion of commercial issues raises both <u>legal</u> and <u>practical</u> hurdles, for SDOs and participants
- Also a "<u>myth</u>" that lower IP costs for a standard or technology guarantees market success
  - For example, a <u>RAND/FRAND</u> memory card can cost less and gain larger market acceptance based on <u>technical</u> merits than an alternative royalty-free design

TRANSFORMING THE NETWORK THROUGH GLOBAL COLLABORATION

10



## What RAND/FRAND Really Means

- Patent holder agrees to make licenses available for those patent claims covered by RAND/FRAND commitment: gives up right to refuse to license on reasonable terms and conditions (*i.e.*, keep patented technology for own sole use or limited licensing to selected licensees)

- Patent holder agrees it is prepared to make licenses available under "[fair and] reasonable ... terms and conditions" including:
  - financial terms (*e.g.*, up-front fees and/or running royalties) and
  - other non-financial "terms and conditions" (*e.g.*, cross-licences, scope of use, non-sublicenability, reciprocity)

- Patent holder agrees to make licenses available to all interested parties: gives up the right (often exercised in non-standards situations) to grant exclusive licenses or "pick and choose" who to license

- Patent holder agrees to make licenses available on terms and conditions that are "non-discriminatory"

TRANSFORMING THE NETWORK THROUGH GLOBAL COLLABORATION

11

MOTM_WASH1823_0402464

691



## What RAND/FRAND Really Means

- RAND/FRAND means licensor is prepared to negotiate in good faith to determine licensing terms <u>provided that counterparty also demonstrates good faith</u>
- "It takes two to make a license agreement":
  - All a patent owner can do is make genuine *bona fide* licensing offer
- Terms and conditions of <u>any</u> license subject to RAND/FRAND result from <u>normal</u> commercial negotiations between licensor and licensee, <u>outside</u> the SDO processes
- RAND/FRAND <u>does not mandate</u> a specific royalty level:
  - What is RAND/FRAND in one situation may not be RAND/FRAND in another
- There are <u>important</u> elements of 'consideration' <u>other than</u> royalties
  - *i.e.*, pass through rights, etc.

TRANSFORMING THE NETWORK THROUGH GLOBAL COLLABORATION

12

MOTM_WASH1823_0402465



## Does including IP in a standard give a company market power?

- Once technology is standardized are the market, competitors, service providers, and users "locked in" to one company or a small group of IP holders?
- Holders of essential IP face significant competitive constraints even after IP is included in a standard:
  - **Horizontal constraints**: prices commanded by complementary patents within standard and by competing standards within same field
  - **Vertical constraints**: patent holders without any downstream operations constrained by elasticity of consumer demand for product:
    - Vertically integrated licensor has stronger bargaining position because it has alternative of capturing profits through its own product sales
    - Vertically integrated firms have incentives to raise rival downstream firms' costs through licensing terms, while remaining open to cross-licensing agreements with other integrated companies
  - **Dynamic constraints**: the formal standard-setting process is a repeat game and essential IP holder committing abuses could find their reputations so damaged as to affect their effectiveness in discussions of subsequent standards etc.

TRANSFORMING THE NETWORK THROUGH GLOBAL COLLABORATION

13

MOTM_WASH1823_0402466



# Confusion over 'Open Source' and 'Open Standards'

- As covered earlier at GSC-13 IPRWG, there continues to be confusion over **"Open Source"** Software (OSS) and **"Open Standards"**
- Policies within SDOs and public policy debates or initiatives need to <u>clearly distinguish</u> the two
  - OSS typically is one way to implement at standard, but it is not itself a standard
  - With convergence, standards often can be implemented in hardware, software (OSS and/or proprietary), or a combination thereof
  - There are many OSS implementations of RAND-based standards
  - Special rules for OSS are not necessary
- TIA is generating a Open Standards White Paper to help with this education effort

TRANSFORMING THE NETWORK THROUGH GLOBAL COLLABORATION

14

MOTM_WASH1823_0402467

## Conclusion: RAND/FRAND Works and Works Well!

- RAND/FRAND regime has allowed successful development of innovative technologies (*e.g.*, mobile telephony, Internet, Wi-Fi®, DSL, etc.) and fostered competition

- <u>Abuses</u> of RAND/FRAND are <u>rare</u>:
  - Very little actual case-law
  - Involve intentional failures to disclose patents or non-member patent ambush, <u>not failures to disclose licensing terms</u>.
  - Have been and are being dealt with by private litigation or government enforcement actions
  - <u>**BUT**</u> lots of academic discussions currently taking place to understand the complexity of IPR issues in a standardization context and such education is good

- More tools being generated to <u>help in understanding SDO IPR</u> policies and how to interpret them, (*e.g.*, ABA book mentioned at GSC-12).

TRANSFORMING THE NETWORK THROUGH GLOBAL COLLABORATION

MOTM_WASH1823_0402468

695



# Conclusion: RAND/FRAND Works!

- Criticisms made against the RAND/FRAND regime <u>fail to convince</u> those who take the time to understand the issues
  - Efforts to move <u>away</u> from RAND/FRAND or to <u>re-interpret</u> it are essentially motivated by a desire to reduce prices paid for patented technology or get access to IPR

- Confiscatory SDO IPR policies drive IP holders and their innovative technologies <u>out of the SDO</u>
  - <u>Balanced</u> IPR policies encourage participation in the SDO
  - <u>Without participation</u> by 'high-tech' innovative and risk-taking companies, you produce low-tech or 'no-tech' standards that are not likely to be widely deployed or commercially successful
  - <u>Balancing of interests</u> based on a membership-wide consensus is what has <u>worked well</u> over time at ANSI, ETSI, TIA, ITU, ISO, IEC, etc.
    - Recently – ITU/ISO/IEC Common Patent Policy

TRANSFORMING THE NETWORK THROUGH GLOBAL COLLABORATION

MOTM_WASH1823_0402469

## Conclusion: GSC IPRWG Resolutions should be re-affirmed and revised

- TIA believes the GSC IPRWG Resolutions from GSC-12 have served the industry and stakeholders in GSC very well and should be re-affirmed at GSC-13

- TIA has offered a small revision to the effective IPR Policies Resolution to explicitly capture what is in fact the practice at most PSOs. **See Contribution No. 11**

TRANSFORMING THE NETWORK THROUGH GLOBAL COLLABORATION

17

MOTM_WASH1823_0402470