1          HONORABLE JAMES L. ROBART

2

3

4

5

6

7

8

9

10                    IN THE UNITED STATES DISTRICT COURT
                  FOR THE WESTERN DISTRICT OF WASHINGTON
11                                AT SEATTLE

12  MICROSOFT CORPORATION,

                                          No. C10-1823-JLR
13                Plaintiff,

          v.                              **REDACTED**
14
    MOTOROLA INC., et al.,                MICROSOFT'S MOTION FOR
15                                        SUMMARY JUDGMENT OF BREACH
                          Defendant.      OF CONTRACT
16

17                                        Noted:     **April 20, 2012**
                                          Hearing:  **May 7, 2012**
18

19  MOTOROLA MOBILITY, INC., et al.,      **ORAL ARGUMENT REQUESTED**

20                Plaintiffs,

          v.
21
    MICROSOFT CORPORATION,
22
                          Defendant.
23

24

25

26

MICROSOFT'S MOTION FOR PARTIAL
SUMMARY JUDGMENT OF BREACH OF
CONTRACT - i

LAW OFFICES
**DANIELSON HARRIGAN LEYH & TOLLEFSON LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL. (206) 623-1700 FAX, (206) 623-8717

# TABLE OF CONTENTS

I.  THERE IS NO CONFLICT OF LAW BETWEEN THE POTENTIALLY-APPLICABLE JURISDICTIONS WITH RESPECT TO THE RELEVANT CONTRACT ISSUES......... 5

II.  RAND COMMITMENTS REQUIRE RAND OFFERS. ................................................. 7

   A.  The IEEE Policies Are Unambiguous on This Point. ...................................... 7

   B.  The ITU Policies Are Also Unambiguous on This Point. .............................. 11

III.  THE UNDISPUTED FACTS SHOW THAT MOTOROLA'S OCTOBER 2010 DEMAND LETTERS FAILED TO SATISFY ITS RAND OBLIGATIONS BECAUSE THEY WERE BLATANTLY UNREASONABLE........................................................ 12

   A.  The Offers Were Blatantly Unreasonable In Light Of Facts Known To Motorola. ....... 13

      1.  The Total Cash Payments Sought By Motorola Were Blatantly Unreasonable. ........ 13

      2.  The Royalty Base Demanded by Motorola Was Blatantly Unreasonable. ................. 15

      3.  Motorola's Attempt to Equate the Value of Its H.264 and 802.11 Standard-Essential Patents With the Value of Its Cellular Telephony Standard-Essential Patents Is Completely Unreasonable. ............................................... 18

      4.  Motorola's Prior Licenses Do Not Even Suggest That Its 2.25% Royalty Demand Could Be Considered Reasonable............................................... 18

   B.  Motorola Ignored Crucial Information Concerning the Standards, Its Patents, and Microsoft's Products In Formulating Its Offer. ............................... 20

      1.  A Reasonable Offer Would Have Reflected Motorola's Actual Technical Contribution to the 802.11 and H.264 Standards........................................ 20

      2.  A Reasonable Offer Would Have Reflected That Other Holders of Standard-Essential Patents Might Also Seek Royalty Payments. .......................... 21

      3.  Motorola's "Grant Back" Clause Made Its Offer Even More Unreasonable............. 21

IV.  MICROSOFT HAS NOT REPUDIATED THE CONTRACTS. ..................................... 22

MICROSOFT'S MOTION FOR PARTIAL
SUMMARY JUDGMENT OF BREACH OF
CONTRACT - ii

LAW OFFICES
**DANIELSON HARRIGAN LEYH & TOLLEFSON LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700 FAX, (206) 623-8717

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Bailey v. Fish & Neave,*
868 N.E.2d 956 (N.Y. Ct. App. 2007) ....................................................................5

*Biegas v. Quickway Carriers, Inc.,*
573 F.3d 365 (6th Cir. 2009) ..................................................................................6

*Broadcom Corp. v. Qualcomm Inc.,*
501 F.3d 297 (3d Cir. 2007) ..................................................................................10

*Brown v. Hereford,*
2011 Wash. App. LEXIS 1986 (Wash. Ct. App. Aug. 23, 2011) ............................7

*Cary Oil Co., Inc. v. MG Refining & Marketing, Inc.,*
230 F.Supp.2d 439 (S.D.N.Y. 2002) ......................................................................9

*Cent. Ill. Light Co. v. Home Ins. Co.,*
821 N.E.2d 206 (Ill. 2004) ......................................................................................5

*Considine v. Reliance Ins. Co.,*
35 A.3d 1232 ............................................................................................................5

*Coughlan v. NXP B.V.,*
2011 WL 5299491 (Del Ch. Nov. 4, 2011) ............................................................5

*Fisher v. A.W. Miller Technical Sales, Inc.,*
762 N.Y.S.2d 205 (N.Y.A.D. 2003) ........................................................................6

*Gasaway v. Northwestern Mut. Life Ins. Co.,*
26 F.3d 957 (9th Cir. 1994) ....................................................................................6

*Go2Net, Inc. v. C I Host, Inc.*
60 P.3d 1245 (Wash. App. 2003)............................................................................6

*Hall v. Board of Education,*
593 A.2d 304 (N.J. 1991) ........................................................................................6

*Hanna v. Plumer,*
380 U.S. 460 (1965) ................................................................................................6

MICROSOFT'S MOTION FOR PARTIAL
SUMMARY JUDGMENT OF BREACH OF
CONTRACT - iii

LAW OFFICES
**DANIELSON HARRIGAN LEYH & TOLLEFSON LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700 FAX, (206) 623-8717

*In the Matter of Certain Dynamic Random Access Memories, Components Thereof, and Products Containing Same*,
   Inv. No. 337-TA-242, 1987 ITC LEXIS 95 (May 21, 1987) ....................................4

*Lucent Techs. Inc. v. Gateway, Inc.*,
   580 F.3d 1301 (Fed. Cir. 2009) ...................................................................15, 16

*Midland Hotel Corp. v. Reuben H. Donnelley Corp.*,
   515 N.E.2d 61 (Ill. 1987) ....................................................................................6

*Milne v. USA Cycling Inc.*,
   575 F.3d 1120 (10th Cir. 2009) ..........................................................................6

*Nester v. O'Donnell*,
   693 A.2d 1214 (N.J. Super. Ct. App. Div. 1997) ...............................................6

*Paradise Orchards Gen. P'ship v. Fearing*,
   94 P.3d 372 (Wash. App. 2004)........................................................................5, 6

*Potter Instrument Co. v. Storage Technology Corp.*,
   1980 U.S. Dist. LEXIS 14348 (E.D. Va., March 25, 1980) ...............................9

*Qualcomm, Inc. v. Broadcom Corp.*,
   548 F.3d 1004 (Fed. Cir. 2008) ..........................................................................4

*Rambo v. Greene*,
   906 A.2d 1232 (Pa. Super. 2006) .......................................................................6

*Research in Motion Ltd. v. Motorola, Inc.*,
   644 F. Supp. 2d 788 (N.D. Tex. 2008) .............................................................10

*Rite–Hite Corp. v. Kelley Co.*,
   56 F.3d 1538 (Fed. Cir. 1995) ...........................................................................15

*Sea-Van Investments Associates v. Hamilton*,
   881 P.2d 1035 (Wash. 1994) ..............................................................................9

*Spruill v. The Body Beaute Inc.*,
   2001 WL 1456872 (Del. Super. Ct. Apr. 30, 2002) ..........................................6

*Uniloc USA Inc. v. Microsoft Corp.*,
   632 F.3d 1292 (Fed. Cir. 2011) .........................................................................15

*Utica Mut. Ins. Co. v. Vigo Coal Co.*,
   393 F.3d 707 (7th Cir. 2004) ............................................................................23

MICROSOFT'S MOTION FOR PARTIAL
SUMMARY JUDGMENT OF BREACH OF
CONTRACT - iv

*W.L. Gore & Assoc., Inc. v. Carlisle Corp.,*
    529 F.2d 614 (3d Cir. 1976) ...................................................................7

*Wallace Real Estate Inv., Inc. v. Groves,*
    881 P.2d 1010 (Wash. 1994) (en banc) .............................................23

*Wm. Dickson Co. v. Pierce Cnty.,*
    116 P.3d 409 (Wash. Ct. App. 2005)...................................................6

**STATUTES**

19 U.S.C. § 1337.........................................................................................4

**OTHER AUTHORITIES**

Adrian U. Dorig, *The Finality of U.S. Judgments in Civil Matters as a Prerequisite for*
    *Recognition and Enforcement in Switzerland,* 32 Tex. Int'l L.J. 271 (1997)...........................6

Fed. R. Civ. P. 56...................................................................................6, 7

*Restatement (Second) of Contracts* § 250 (1981) ........................................23

LAW OFFICES
**DANIELSON HARRIGAN LEYH & TOLLEFSON LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700 FAX, (206) 623-8717

Plaintiff Microsoft Corporation ("Microsoft") hereby renews its motion for partial summary judgment on its breach of contract claim.  Because the undisputed facts establish that Motorola failed to make a RAND offer to license its standard-essential patents, and instead made a blatantly unreasonable demand, it breached the contract.  Therefore, the Court should enter judgment for Microsoft on that question.[1]

## **INTRODUCTION**

The Court has ruled that Motorola has a contractual obligation to license its standard-essential patents on RAND terms. (Dkt. No. 188, Order on Plaintiff's Motion for Partial Summary Judgment ("Order") 17.)  The Court has also ruled that Microsoft is a third-party beneficiary of that contract.  (*Id.*)  And, it is undisputed that Motorola breached that contract if it made an offer to license its standard-essential patents on terms that were blatantly unreasonable.  (*Id.* 15.)  The issue this motion presents is whether Motorola committed such a breach.  The undisputed record establishes that it did.

Motorola's October 2010 demand letters were nothing more than facially outrageous ultimatums intended solely to give Motorola a pretext for using its RAND-committed, standard-essential patents to sue Microsoft on commercially successful products rich in features, just one of which happened to include compliance with the standard.  Motorola's demand was so over-reaching that no rational company could ever have accepted it or even viewed it as a legitimate offer.  For its approximately 50 designated H.264 patents, for example, Motorola sought $4 billion in annual royalties from Microsoft, while the 29 companies with 2,339 standard-essential patents in the H.264 patent pool, as a group, would

---

[1] Microsoft has separately moved for summary judgment that injunctive relief is unavailable to Motorola on its infringement claims because (1) Microsoft has committed to take a license on RAND terms (*see, e.g.*, Dkt. No. 152 at 5); (2) Microsoft has not repudiated the RAND contract (*see* Section IV, infra); (3) if necessary, the Court will determine the specific terms of that license; and (4) the resulting inevitability of such a license removes any basis for injunctive relief—as does Motorola's implicit admission in its demand letters that monetary relief is an adequate remedy for any infringement (*see* Dkt. No. 139 at 8–11).  The preliminary relief Microsoft requested in its motion filed on March 28 will preserve the status quo to allow this Court to make the necessary determinations and to prevent irreparable harm to Microsoft and the public in the meantime.

MICROSOFT'S MOTION FOR PARTIAL
SUMMARY JUDGMENT OF BREACH OF
CONTRACT - 1

receive only $6.5 million from the same number of unit sales of Microsoft Windows.  *See*

Declaration of Christopher T. Wion in Support of Microsoft's Motion for Summary Judgment

of Breach of Contract ("Wion Dec."), Ex. 1 (license terms); Ex. 2 (pooled patents).





Rather than seeking genuinely to fulfill its contractual duties, Motorola's obvious

strategy was just the opposite—to make an offer that Microsoft was sure to refuse so that

Motorola then would be free (in its view) to sue on its standard-essential patents to gain

leverage in other disputes with Microsoft.  In addition to being transparently obvious from the

objective facts at the time, Motorola's strategy was confirmed by the testimony of both Kirk

Dailey, the Corporate Vice President of Intellectual Property for Motorola Mobility, Inc.

("Motorola"), and K. McNeill Taylor, Jr., Motorola's Corporate Vice President and Chief IP

Counsel, who worked with Dailey to draft the October 2010 letters.  Dailey and Taylor

admitted, for example, that Motorola

**REDACTED**

LAW OFFICES
**DANIELSON HARRIGAN LEYH & TOLLEFSON LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700 FAX, (206) 623-8717

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

Motorola seeks to shield its outrageous conduct by comparing its demands with offers that it customarily made when licensing its portfolio of cellular telephony standard-essential patents to competitors in the cell phone industry.  But this is meaningless in the context of this case.  Motorola's cellular telephony standard-essential patent portfolio was, by its own account, the strongest in the world.  Taylor admitted, though, that Motorola

**REDACTED**

Whether charging 2.25% of the cell phone handset price in the context of cellular telephony standard-essential patents is reasonable has no bearing on the issue presented here. The ability to communicate via cellular telephony, after all, is what makes a cell phone a cell phone.  By contrast, the ability to play one particular type of compressed video (what the H.264 standard enables) is at most one feature among thousands in a Windows-based computer.  Similarly, the ability to employ WiFi networking (what the 802.11 standard enables) is at most an ancillary (and technically redundant) feature of an Xbox 360 game console.  Moreover, both computer and Xbox prices vary widely based on features entirely unrelated to H.264 and 802.11 (*e.g.*, larger hard drives or other peripherals).  (*See* Dkt. No. 77, Microsoft's Mot. for Partial Summary J. 8–10.)  Therefore, the relevant royalty base for assessing a "reasonable" royalty is not the selling price of a laptop computer or an Xbox 360 game console, but rather is—at most—the value of the specific component or feature that incorporates the patented invention.  Viewed from the perspective of that royalty base, the royalty rate that Motorola demanded in 2010 was not 2.25%, but well over 100%.

Moreover, the standards at issue here, 802.11 and H.264, are complex, incorporate contributions from dozens of companies, and involve by anyone's count thousands of essential patents.  Motorola's contributions form no more than a small portion of the standards, yet its demands were grossly outsized against any reasonable measure of an appropriate royalty.  Taylor conceded that **REDACTED**

MICROSOFT'S MOTION FOR PARTIAL
SUMMARY JUDGMENT OF BREACH OF
CONTRACT - 3

Wion Dec. Ex. 17 at 71–72.  If each of the others demanded similar royalties, the total royalty would exceed 50% of the end-product price and 3000% of the relevant component value.  But, according to Taylor, **REDACTED**

Indeed, Taylor admitted that **REDACTED**

In any event, the total royalties collected by industry pools associated with these standards were but a small fraction of what Motorola demanded for itself.

Motorola's 2010 royalty demands were therefore blatantly unreasonable, and breached any reasonable construction of Motorola's obligations under its binding SSO commitments. The testimony of its corporate officers confirms that Motorola had no objective basis for its demands, and that there is no disputed issue of material fact concerning Motorola's breach of its RAND obligation.  The Court can now issue partial summary judgment on Microsoft's breach of contract claim, and proceed to consider the appropriate relief in light of Motorola's breach.  Among other things, the Court may conclude that the breach bars Motorola from currently enforcing the patents that are subject to the RAND commitment it violated.  *See Qualcomm, Inc. v. Broadcom Corp.,* 548 F.3d 1004, 1025–26 (Fed. Cir. 2008) (holding that breach of obligations to SSO can foreclose infringement suit); *see also In the Matter of Certain Dynamic Random Access Memories, Components Thereof, and Products Containing Same,* Inv. No. 337-TA-242, 1987 ITC LEXIS 95 at *31-32  (May 21, 1987) (contractual commitment "that, if enforced, would be inconsistent with a suit . . . for an injunction . . .  is a complete defense to an action under 19 U.S.C. § 1337 and is sufficient to warrant termination of the investigation").

LAW OFFICES
**DANIELSON HARRIGAN LEYH & TOLLEFSON LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700 FAX, (206) 623-8717

1

## ARGUMENT

2

I.   **THERE IS NO CONFLICT OF LAW BETWEEN THE POTENTIALLY-
APPLICABLE JURISDICTIONS WITH RESPECT TO THE RELEVANT
CONTRACT ISSUES.**

3

4

Given this Court's rulings, and Motorola's concessions, it is settled that Motorola has a

5

contractual RAND licensing obligation, that Microsoft is a third-party beneficiary of that

6

obligation, and that blatantly unreasonable offers by Motorola breach its contract.  (Order 15,

7

17.)  There are no other contractual terms that need to be construed or other contractual

8

obligations that need to be established to rule in Microsoft's favor on this motion.  The

9

undisputed facts, including testimony from Motorola's own officers, make clear that

10

Motorola's 2010 royalty demands were blatantly unreasonable.  This provides an ample basis

11

for the Court to enter summary judgment on Microsoft's breach of contract claim without

12

reaching any choice of law question.

13

In any event, the governing principles of contract interpretation yield the same result in

14

all of the jurisdictions whose laws might potentially apply, making the choice of law question

15

moot.  The contracts here were formed by submission of letters of assurance by Motorola or its

16

subsidiaries (General Instrument Corporation and Symbol Technologies) to the ITU and IEEE

17

pursuant to their by-laws and intellectual property policies.  The letters were sent from

18

Motorola in Illinois, from General Instrument in Pennsylvania, and from Symbol in New York;

19

all three entities are Delaware corporations.  The letters were submitted to the ITU in

20

Switzerland and IEEE in New Jersey.

21

In all of these jurisdictions, and in Washington, whether a contract provision is

22

ambiguous is a question of law.  *See Paradise Orchards Gen. P'ship v. Fearing*, 94 P.3d 372,

23

377 (Wash. App. 2004); *Cent. Ill. Light Co. v. Home Ins. Co.*, 821 N.E.2d 206, 214 (Ill. 2004);

24

*Considine v. Reliance Ins. Co.*, 35 A.3d 1232, 1239 (Pa. Cmwlth. 2011); *Bailey v. Fish &
Neave,* 868 N.E.2d 956, 959 (N.Y. Ct. App. 2007); *Coughlan v. NXP B.V.*, 2011 WL 5299491,

25

26

LAW OFFICES
**DANIELSON HARRIGAN LEYH & TOLLEFSON LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700 FAX, (206) 623-8717

at *6 (Del Ch. Nov. 4, 2011); *Nester v. O'Donnell*, 693 A.2d 1214, 1220 (N.J. Super. Ct. App.

Div. 1997).[2]  And in each of these jurisdictions, courts may consider objective extrinsic

evidence of the parties' mutual intent to resolve any ambiguity, but subjective evidence is

irrelevant.  *See Paradise Orchards*, 94 P.3d at 377–78; *Go2Net, Inc. v. C I Host, Inc.* 60 P.3d

1245, 1251 (Wash. App. 2003); *Midland Hotel Corp. v. Reuben H. Donnelley Corp.*, 515

N.E.2d 61, 65 (Ill. 1987); *Rambo v. Greene*, 906 A.2d 1232, 1236 (Pa. Super. 2006); *Fisher v.

A.W. Miller Technical Sales, Inc.*, 762 N.Y.S.2d 205, 209 (N.Y.A.D. 2003); *Spruill v. The

Body Beaute Inc.*, 2001 WL 1456872 at *1 (Del. Super. Ct. Apr. 30, 2002); *Hall v. Board of

Education*, 593 A.2d 304, 307 (N.J. 1991); Swiss Civil Code of Obligations, Obligations

Arising by Contract Art. 18 (available online at http://www.admin.ch/ch/e/rs/2/220.en.pdf)

("When assessing the form and terms of a contract, the true and common intention of the

parties must be ascertained . . . .").  Regardless of which law is applied, the result here would

be the same.

Finally, as this Court is well aware, the choice of the substantive law that governs a

particular dispute does *not* affect the determination whether the evidence raises a genuine

material dispute of fact for purposes of summary judgment.  "[W]hether evidence is sufficient

to raise a question for the trier of fact" is governed by "federal law alone," even where the

substantive rule of decision is supplied by state law.  *Gasaway v. Northwestern Mut. Life Ins.

Co.*, 26 F.3d 957, 960 (9th Cir. 1994); *see also Milne v. USA Cycling Inc.*, 575 F.3d 1120, 1129

(10th Cir. 2009) (same); *Biegas v. Quickway Carriers, Inc.*, 573 F.3d 365, 374 (6th Cir. 2009)

(same).[3]  *See generally Hanna v. Plumer*, 380 U.S. 460, 473–74 (1965).

---

[2] Switzerland does not use juries in civil cases and therefore lacks a clear distinction between fact and law.  *See* Adrian U. Dorig, *The Finality of U.S. Judgments in Civil Matters as a Prerequisite for Recognition and Enforcement in Switzerland*, 32 Tex. Int'l L.J. 271, 291–92 (1997) ("Unlike Switzerland, which has no jury system for civil matters, the U.S. system of adjudicating civil claims distinguishes between questions of fact, which are for the jury to determine, and questions of law, which are for the court to decide.").

[3] It is worth noting, however, that under the law in every relevant state, as under Federal Rule 56, interpretation as a matter of law of even an ambiguous contract is appropriate where only one reasonable inference can be drawn from any extrinsic evidence.  *See, e.g.*, *Wm. Dickson Co. v. Pierce Cnty.*, 116 P.3d 409, 412 (Wash. Ct. App.

MICROSOFT'S MOTION FOR PARTIAL
SUMMARY JUDGMENT OF BREACH OF
CONTRACT - 6

Under Rule 56, summary judgment is appropriate here.  Even Motorola admits that a blatantly unreasonable offer breaches its contract.  (Order 15.)  The undisputed evidence establishes that Motorola's 2010 offers were blatantly unreasonable.

## II.   RAND COMMITMENTS REQUIRE RAND OFFERS.

Consistent with Motorola's concession and this Court's ruling on this issue already, it is illogical and fundamentally inconsistent with the policies underlying RAND commitments to say that a party can open a "negotiation" with an outrageous, non-RAND demand coupled with an ultimatum, and then seek an injunction when the implementer refuses to bow to the demand. "A royalty demand which is so high as to preclude acceptance of a license offer is, after all, not appreciably different from a refusal to license upon any terms."  *W.L. Gore & Assoc., Inc. v. Carlisle Corp.*, 529 F.2d 614, 623 (3d Cir. 1976) (recognizing that in contrast with the standards context, in the non-RAND context "[a] patent empowers the owner to exact royalties as high as he can negotiate with the leverage of that monopoly").  A blatantly unreasonable demand seeks to leverage the monopoly created by standardization to produce non-RAND terms.  Permitting such offers would render SSO RAND commitments worthless.

### A.  The IEEE Policies Are Unambiguous on This Point.

The 802.11 standard was developed by the IEEE in the mid-1990s.[4]  The IEEE bylaws in place at the time provided that patented technology would not be included in a standard unless the "patent holder agrees to nondiscriminatory licensing at reasonable rates."  Wion Dec. Ex. 3 at 13.  This provision invited participants who wanted their technology to be incorporated in a standard to commit to RAND licensing—an invitation Motorola accepted for

---

2005) ("Summary judgment is proper if the written contract, viewed in light of the parties' objective manifestations, has only one reasonable meaning.").  *See also Brown v. Hereford*, 2011 Wash. App. LEXIS 1986, at *8 (Wash. Ct. App. Aug. 23, 2011) ("Had only one interpretation of the contract been reasonable, the court would have been required to grant summary judgment.").

[4] *See* Official IEEE 802.11 Working Group Project Timelines, Mar. 19, 2012, http://grouper.ieee.org/groups/802/11/Reports/802.11_Timelines.htm#tgma (noting  March 1991 project authorization and June 1997 final approval of the original 802.11-1997 standard).

MICROSOFT'S MOTION FOR PARTIAL
SUMMARY JUDGMENT OF BREACH OF
CONTRACT - 7

purposes of the 802.11 standard in a March 1, 1994 letter:  "In the event the proposed standard is adopted and the standard cannot be practiced without the use of one or more issued patents which are now or hereafter owned, controlled or assigned to Motorola, Motorola agrees to license those patents on a non-discriminatory basis *offering fair and commercially reasonable terms*."  Motorola agreed to "licensing at reasonable rates," and its letter of assurance required it to "offer[] fair and commercially reasonable terms." Wion Dec. Ex. 4.

Motorola's October 29, 2010 letter to Microsoft purported to offer a license to all patents "having claims that may be or become Essential Patent Claims . . . for a compliant implementation of the IEEE 802.11 Standards," which includes patents essential to the original 802.11 standard.  Motorola unambiguously promised to "offer[] fair and commercially reasonable terms" for a license to those patents, and therefore Microsoft is entitled to summary judgment if Motorola's offer was not commercially reasonable.

Since the IEEE originally adopted the 802.11 standard in 1997, it has regularly updated the standard, and at various times Motorola has reaffirmed its commitment to offer RAND licenses for patents essential to 802.11 amendments.  At the time Motorola sent these more recent commitment letters, or letters of assurance, the operative IEEE bylaws made the prohibition on commercially unreasonable offers even clearer:  the letter of assurance was required to include a promise that a license for compliant implementations "will be *made available* without compensation or under reasonable rates, with reasonable terms and conditions that are demonstrably free of any unfair discrimination." Wion Dec. Ex. 5 at 12 (emphasis added); *see also* Ex. 6 at 12.  Again, the bylaws require commitments to make patents available on reasonable terms, and in exchange the patentee enjoys the benefit of having its patented technology incorporated into the standard.  Motorola accepted this invitation for several of the 802.11 amendments by affirming that it "is prepared to grant a

LAW OFFICES
**DANIELSON HARRIGAN LEYH & TOLLEFSON LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700 FAX, (206) 623-8717

license . . . on reasonable terms,"[5] and for others by agreeing that "[t]he Patent Holder will grant a license under reasonable rates."[6]  These acceptances must have been on the same terms as the offer in the policy, or else no contract would have been formed.  *Sea-Van Investments Associates v. Hamilton*, 881 P.2d 1035, 1038 (Wash. 1994) ("The acceptance of an offer is always required to be identical with the offer").

At all times, Motorola has agreed to "make available" its standard-essential patents, *e.g.*, Wion Dec. Ex. 5 at 12, which from the beginning of Motorola's participation in the IEEE has included the promise to "offer[] fair and commercially reasonable terms."  Wion Dec. Ex 4.  As Motorola concedes, its offers must not be blatantly unreasonable.  (Order 15.)

Although Motorola's unambiguous contractual commitment renders extrinsic evidence unnecessary, all of the potentially relevant extrinsic evidence confirms that Motorola was correct to concede that a blatantly unreasonable offer is a breach.  For example, the American National Standards Institute ("ANSI"), which governs its member standards bodies, including IEEE, has explained that its patent policy requires patent owner assurances indicating "that the patent holder will *offer* to provide licenses [on RAND] terms and conditions."  Wion Dec. Ex. 7 at 11; *see also Potter Instrument Co. v. Storage Technology Corp.*, 1980 U.S. Dist. LEXIS 14348, *7 (E.D. Va., March 25, 1980) (under ANSI's policy patentee must "agree to offer licenses to members of the affected industry on [RAND] terms").  And the IEEE is bound by contract to "comply fully with the ANSI patent policy."  Wion Dec. Ex. 10 at 3.  Where, as here, a series of writings form "part of a single transaction"—obtaining assurances for the adoption of an ANSI-approved, IEEE standard—"and are designed to effectuate the same purpose," all of the writings must "be read together."  *Cary Oil Co., Inc. v. MG Refining & Marketing, Inc.*, 230 F.Supp.2d 439, 473–74 (S.D.N.Y. 2002) (quoting *Gordon v. Vincent*

---

[5] *See, e.g.*, Wion Dec. Ex. 8.

[6] *See, e.g.*, Wion Dec. Ex. 9.

MICROSOFT'S MOTION FOR PARTIAL
SUMMARY JUDGMENT OF BREACH OF
CONTRACT - 9

LAW OFFICES
**DANIELSON HARRIGAN LEYH & TOLLEFSON LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700 FAX, (206) 623-8717

*Youmans, Inc.*, 358 F.2d 261, 263 (2d Cir.1965)).  Moreover, the very purpose of the IEEE's

patent policy compels such a reading.  SSOs develop technical standards to improve

interoperability among complementary products.  Having standard dimensions for plugs for

electrical appliances, for example, allows manufacturers to make products and consumers to

buy them without either having to worry about whether the consumer can plug in and use the

products.  *See* NEMA Dimensional Specifications, http://www.nema.org/stds/wd6.cfm.  But

once a standard is adopted, the owner of a patent essential to implementing the standard may

acquire power to extract royalties that are out of all proportion to the value of the patented

invention—the adoption of a standard may give owners of essential patents the ability to use

the standard to "hold up" those who wish to practice it, for example by demanding an

exorbitant royalty based not on the value of its patented technology but on the value of

standardization itself.

Patent policies like the IEEE's prevent this kind of "hold up."  *See Broadcom Corp. v.*

*Qualcomm Inc.*, 501 F.3d 297, 310–14 (3d Cir. 2007); *Research in Motion Ltd. v. Motorola,*

*Inc.*, 644 F. Supp. 2d 788, 791, 794 (N.D. Tex. 2008).  Without licensing commitments from

patent holders like Motorola, the standards development process could not function.

Companies invest in developing and manufacturing standard-compliant products in reliance on

binding RAND assurances.  Once a company has done so, however, a patentee that ignores its

RAND obligations can demand virtually any royalty for a standard-essential patent because the

manufacturer's alternative is to sacrifice its investment in its standard-compliant products.

Without binding RAND assurances, patent holders will be less likely to contribute their

valuable technology to a standard—a company has no reason to give up the full value of a

significant patent only to see others capturing "hold up" royalties based on the contributing

company's innovative technology.  Even beyond the agreed prohibition on blatantly

MICROSOFT'S MOTION FOR PARTIAL
SUMMARY JUDGMENT OF BREACH OF
CONTRACT - 10

LAW OFFICES
**DANIELSON HARRIGAN LEYH & TOLLEFSON LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700 FAX, (206) 623-8717

unreasonable "offers," reading Motorola's contract with the IEEE to require reasonable offers

is the only way to give effect to the patent policy under which the contract was formed.

### B.  The ITU Policies Are Also Unambiguous on This Point.

Motorola's obligations for its H.264-essential patents are similarly straightforward.

The H.264 standard was adopted by the ITU in 2003.  ITU Work Programme,

http://www.itu.int/ITU-T/workprog/wp_item.aspx?isn=4946 (last visited Mar. 30, 2012)

(noting May 2003 approval of original standard).  The ITU's patent policy provides that a

patent holder who hopes to see his technology incorporated into a standard must be "*willing to*

*negotiate* licenses with other parties on a non-discriminatory basis *on reasonable terms* and

conditions."  Wion Dec. Ex. 11 at 8 (emphasis added).  The policy is clear:  negotiations, and

not just the ultimate license, must be "on reasonable terms."  The ITU's policy includes a form

letter of assurance; any patent holder willing to make the commitment the policy invites does

so by submitting the form.  Motorola did so for several iterations of the H.264 standard.  Some

of these forms provided that the patent holder "will grant a license . . . on reasonable terms,"[7]

while others provided that the patent holder "is prepared to grant a license . . . on reasonable

terms."[8]  By submitting these forms under the ITU bylaws, Motorola agreed to offer

reasonable terms, an obligation necessarily breached—as Motorola concedes—by a blatantly

unreasonable offer.  (Order 15.)

Again, all the potentially relevant extrinsic evidence confirms that offers must be

reasonable.  The ITU policy's very purpose would be defeated if extortionate demands were

permitted, for the policy is intended to ensure that anyone can implement the standard on

RAND terms, and an extortionate demand may or may not be followed by something

reasonable.  There is no evidence that the ITU believed that an extortionate opening offer was

---

[7] General Instrument Corporation, Dec. 2, 2002, and Dec. 2, 2003.

[8] Motorola, Inc., Oct. 29, 2008, ITU form submitted re:  "H.264 (2005)-update I.D. Number:H.264-30 submitted December 19, 2003, which discloses three specific U.S. patents (7,162,094; RE38564; 5,736,968).

MICROSOFT'S MOTION FOR PARTIAL
SUMMARY JUDGMENT OF BREACH OF
CONTRACT - 11

consistent with a RAND promise.  To the contrary, when the ITU adopted its new policy in 2007, it announced that the policy "allows for companies' innovative technologies to be included in standards as long as such intellectual property is *made available* under reasonable and non-discriminatory terms and conditions."[9] (emphasis added).  By making a RAND commitment in the ITU framework, Motorola promised to make its patented technology available on RAND terms, meaning that it would make reasonable offers, not blatantly unreasonable demands.

### III.     THE UNDISPUTED FACTS SHOW THAT MOTOROLA'S OCTOBER 2010 DEMAND LETTERS FAILED TO SATISFY ITS RAND OBLIGATIONS BECAUSE THEY WERE BLATANTLY UNREASONABLE.

Motorola drafted its demand letters with blatantly unreasonable terms because Motorola wanted to ensure Microsoft would reject them.  Motorola was attempting to set up a lawsuit.  According to Kirk Dailey, Motorola's Corporate Vice President of Intellectual Property and the author of the letters, the demand letters   **REDACTED**

(Wion Dec. Ex. 12 at 2493, 2495) **REDACTED**                                    (Wion Dec. Ex. 12 at 2621–22), **REDACTED**           Motorola apparently believed it could paper over its RAND obligations by delivering a blatantly unreasonable, sham offer to Microsoft, waiting for the 20 days Motorola prescribed, and suing on its standard-essential patents.

Motorola is wrong.  Blatantly unreasonable offers breach RAND commitments, *see* Section II, *supra*, and the undisputed evidence shows Motorola's demands were blatantly unreasonable—and Motorola knew it.  Having committed to license its patents on RAND terms, a patentee cannot simply fire off an outrageous offer to open the door to suing for an injunction, or even to set the bar for obtaining the highest possible royalty.  That is particularly true where, as here, the patentee ignores information in its possession or readily available to

---

[9] March 19, 2007 Press Release, Wion Dec., Ex. 20.

LAW OFFICES
**DANIELSON HARRIGAN LEYH & TOLLEFSON LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700 FAX, (206) 623-8717

the public concerning the standards, the technical contribution of its patents and those of other standard-essential patent holders, and the prospective licensee's products.  Although some non-public information, solely in the possession of the potential licensee, might in some instances impact "what would in fact constitute RAND terms for the offeree" (Order 15), that is not the situation here.  If Motorola had been interested in making reasonable and non-discriminatory offers to license its patents, its offers would have reflected the information it and the public had.  Instead, Motorola, by its own admission, ignored that information.

>    **A.  The Offers Were Blatantly Unreasonable In Light Of Facts Known To Motorola.**

>    >    **1.   The Total Cash Payments Sought By Motorola Were Blatantly Unreasonable.**

Motorola's letters demanded a royalty on the price of end products—in the case of 802.11, on the sale price of Xbox, and in the case of H.264, on the sale prices of Xbox and of laptops and PCs running Microsoft Windows.  Wion Dec. Ex. 13; *id.* Ex. 14.  Based on the conservative assumption that the average price of a Windows-based computer was $500 and publicly-available projections of the number of Windows-based computers sold in 2010, Motorola was demanding roughly $4 billion per year from Microsoft for a license to just its H.264 patents.  As shown below, this amount was

>    **REDACTED** Wion Dec. Ex. 12 at 2546-49; *id.* Ex. 15 at 12.

MICROSOFT'S MOTION FOR PARTIAL
SUMMARY JUDGMENT OF BREACH OF
CONTRACT - 13

LAW OFFICES
**DANIELSON HARRIGAN LEYH & TOLLEFSON LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700 FAX, (206) 623-8717

1

2          **REDACTED**

3

4

5

6

7

8

9

10

11          And this is before consideration of the royalties Motorola was demanding on Xbox for

12   a license to Motorola's 802.11 patents, which would have added another **REDACTED**

13          **REDACTED**

14          *See* Wion Dec. Ex. 16 at 3 (noting **REDACTED**).  In just three years, the cash royalties

15   Motorola was demanding from Microsoft would have exceeded the $12.5 billion that Google

16   agreed to pay for all of Motorola.

17          There is no dispute that Motorola appreciated the magnitude of its demands.  Kirk

18   Dailey has admitted that **REDACTED** (Wion Dec. Ex. 12 at 2544–45);

19          (*id.* at 2544); and **REDACTED**

20                                      And Motorola revealed that it fully understood the

21   implications of its demands by identifying in its demand letters the end products ("each Xbox

22   360 product, each PC / laptop, each smartphone, etc.") on which it sought to base the royalty.

23   Wion Dec. Ex. 14.  Motorola knew how unreasonable its demands were when it made them—it

24   needed to be sure Microsoft would reject them.

25

26

MICROSOFT'S MOTION FOR PARTIAL
SUMMARY JUDGMENT OF BREACH OF
CONTRACT - 14

### 2.   The Royalty Base Demanded by Motorola Was Blatantly Unreasonable.

Motorola's letters demanded a royalty rate applied to a royalty base of the sales of Xboxes and computers running Windows.  A single chip provides 802.11 capability in an Xbox; Motorola's patents do not relate to the hardware of that component, and certainly not to the *entire* standard it uses.  And Motorola's H.264 patents cover only a portion of the H.264 video standard, a capability that is but one tiny aspect of Windows software which, in turn, is but one component of the computer upon which Motorola sought to base its royalty.

Motorola's attempt to base its royalty on the end-product price runs counter to fundamental principles that govern the determination of a "reasonable" royalty.  In the litigation context, the Federal Circuit has explained that "[t]he entire market value rule allows a patentee to assess damages based on the entire market value of the accused product only where the patented feature creates the 'basis for customer demand' or 'substantially create[s] the value of the component parts.'"  *Uniloc USA Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1318 (Fed. Cir. 2011), quoting *Lucent Techs. Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1336 (Fed. Cir. 2009), and *Rite–Hite Corp. v. Kelley Co.*, 56 F.3d 1538, 1549–50 (Fed. Cir. 1995).  The purpose of the EMV rule is to prevent a patentee—even a patentee who, unlike Motorola, has actually proven infringement and established that its patent is valid—from capturing as a royalty the value of unpatented features in a multi-faceted product that incorporates some patented technology, *unless* that patented technology is actually the basis for customer demand for the product.  *See Lucent*, 580 F.3d at 1337 (rejecting use of the sale price of software as a royalty base where the patented feature was "a very small component of a much larger software program" and "[t]he vast majority of the features, when used, [did] not infringe").

Even ignoring the fact that Motorola had committed to license its patents on RAND terms, Motorola made a royalty demand that it knew, as a matter of established patent law, vastly exceeded what it ever could have obtained by suing for patent infringement and

MICROSOFT'S MOTION FOR PARTIAL
SUMMARY JUDGMENT OF BREACH OF
CONTRACT - 15

LAW OFFICES
**DANIELSON HARRIGAN LEYH & TOLLEFSON LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700 FAX, (206) 623-8717

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

winning.  Motorola knew that H.264 capabilities (especially those capabilities claimed by Motorola's patents) were a very small component of Windows—but Motorola went even further in its letters, demanding a royalty untethered to the features of H.264 covered by the patents, to H.264 as a whole, or even to Windows itself, but instead based on the entire value of the computers on which Windows would run.  The Federal Circuit has explicitly barred even a successful infringement plaintiff from doing what Motorola did here:  demanding extortionate royalties on the selling price of PCs running Windows, based on a patent on a small software feature.  *See Lucent*, 580 F.3d at 1338 (approving of district court's preclusion of damages expert's use of the sale price of a Windows computer as a royalty base).

Motorola used the end-product price as the royalty base in its demand letters in a thinly veiled attempt to conceal the blatantly unreasonable nature of its royalty demand.  When applied even to the least expensive Xbox, Motorola's royalty demand was more than the entire market price of the 802.11 chipset in the Xbox (Wion Dec. Ex. 12 at 1941; Dkt. 78 at 2).  Thus, when judged in terms of a potentially legally-plausible royalty base, Motorola wanted a royalty of more than 100%.

MICROSOFT'S MOTION FOR PARTIAL
SUMMARY JUDGMENT OF BREACH OF
CONTRACT - 16

1
2
3
4
5
6
7
8
9



Xbox 360

Marvell Chip
Implementing
802.11

Motorola "RAND"
Royalty

$4.48

10    Motorola was fully aware of all of this when it made its 2010 demands.  Kirk Dailey,

11  who signed the 2010 demand letters, **REDACTED**

12    Wion Dec. Ex. 12 at 2524–25.  And Neill Taylor, **REDACTED**

13    (Wion Dec. Ex. 17 at 12, 113), **REDACTED**

14

15  (*id.* at 73–74) **REDACTED**

16  (*id.* at 91).  In other words, Motorola was engaged in a classic "hold up" because Motorola

17  wanted to be paid for the value of the entire 802.11 standard, not just its contribution to it.

18    Applied to sales of higher-end Xboxes (those with additional components like larger

19  hard drives or the Kinect sensor), Motorola's offer even more plainly would capture value

20  entirely unrelated to Motorola's marginal contribution to the 802.11 standard, because the

21  royalty demand on such units is more than twice the price of the entire 802.11 chip—i.e.,

22  Motorola was demanding an effective royalty rate of more than 200%.  Likewise, even for a

23  low-end $500 computer, Motorola demanded a royalty of $11.25, which is a substantial portion

24  of the average price of Windows—of which support for H.264 video decoding is only a tiny

25  part.

26

MICROSOFT'S MOTION FOR PARTIAL
SUMMARY JUDGMENT OF BREACH OF
CONTRACT - 17

3. **Motorola's Attempt to Equate the Value of Its H.264 and 802.11 Standard-Essential Patents With the Value of Its Cellular Telephony Standard-Essential Patents Is Completely Unreasonable.**

According to Motorola's Taylor, **REDACTED**

Wion Dec. Ex. 17

at 20.  But Taylor clarified that **REDACTED**

Wion Dec. Ex. 17 at 21–22, 24–25; *see also id.*

Ex. 12 at 2570–71.  Taylor agreed that **REDACTED**

*Id.* Ex. 17 at 208–09; *see also id.* Ex. 12 at 2567.

Motorola's cellular patents may or may not be a key driver of the value of cell phones and cellular base stations, but Motorola's 802.11 and H.264 standard-essential patents provide at most a small fraction (if any) of the value of computers and Xboxes.  Moreover, Taylor

**REDACTED**

Wion Dec. Ex. 17 at 213, 219.  Accordingly, Motorola has no basis to equate the royalties it might receive from cell phone handset makers for cellular standard-essential patents to reasonable royalties for its 802.11 and H.264 standard-essential patents, as used in Microsoft's Xbox or computers running Windows.  Nothing about Motorola's 802.11 and H.264 patents or the standard-compliant end-products remotely suggests that the same "standard offering rate" of 2.25% of the end-product price could possibly be reasonable.

4. **Motorola's Prior Licenses Do Not Even Suggest That Its 2.25% Royalty Demand Could Be Considered Reasonable.**

The two other licenses Motorola has previously identified in defense of its outrageous "standard offering rate" of 2.25%— **REDACTED**—are irrelevant.  With respect to **REDACTED**, in addition to Motorola's 802.11 and H.264 patents, the licenses also involved:

(i) a global settlement of wide-ranging litigation **REDACTED**

MICROSOFT'S MOTION FOR PARTIAL
SUMMARY JUDGMENT OF BREACH OF
CONTRACT - 18

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

(ii) a license to virtually all of Motorola's more than 24,000 patents (including, in the case of cellular patents, those which could arguably satisfy the EMV rule for **REDACTED**; and (iii) on-going cooperation between the parties with respect to **REDACTED**.  Wion Dec. Ex. 17 at 119, 130; *id.* Ex. 12 at 2584-86; *id.* Ex. 18 at § 5.  And even though the **REDACTED** license covered many more patents and standards, the royalty rate of **REDACTED** was subject to a **REDACTED**          Wion Dec. Ex. 18 at § 5.1.4.  In light of these vast differences, Motorola's **REDACTED** in no way suggests that a 2.25% royalty based on the prices of end-products compliant with the 802.11 and H.264 standards would be reasonable.

The **REDACTED** license is also irrelevant.  Given the December 2011 date of the agreement, Motorola could not have relied upon it in formulating its "offers" to Microsoft in October 2010.  Moreover, **REDACTED** sought a license under Motorola's 802.11 and H.264 patents in connection with **REDACTED**

**REDACTED**                       Wion Dec. Ex. 12 at 68–69, 2588–91.

In any event, neither the **REDACTED** agreement, nor any of Motorola's other agreements, provides a benchmark that supports Motorola's demands on Microsoft.  As Dailey acknowledged, **REDACTED**

**REDACTED** as Motorola demanded that Microsoft do for computers incorporating Windows software.  Wion Dec. Ex. 12 at 2530–31.  Demanding that Microsoft pay royalties on a royalty base that the Federal Circuit rejects and that Motorola itself has never used in its entire corporate history was blatantly unreasonable.  Moreover, as noted above, Motorola sought royalties from Microsoft that were several times greater than the total royalty revenue that Motorola receives from all of its other licensees combined.  It is nonsensical to say that *any* of these other licenses—much less a portion of **REDACTED**

—could justify the exorbitant royalties Motorola sought from Microsoft.

MICROSOFT'S MOTION FOR PARTIAL
SUMMARY JUDGMENT OF BREACH OF
CONTRACT - 19

**B.  Motorola Ignored Crucial Information Concerning the Standards, Its Patents, and Microsoft's Products In Formulating Its Offer.**

**1.  A Reasonable Offer Would Have Reflected Motorola's Actual Technical Contribution to the 802.11 and H.264 Standards.**

It is undisputed that Motorola's patents concern only aspects of the 802.11 and H.264 standards—not the entire standards.  It is also undisputed that Motorola formulated its demands to Microsoft without considering the value of the patented technology it contributed to the standards.  Any reasonable offer to license a small subset of patents essential to these two standards would have had to reflect their relative contribution.  Motorola admits its demands to Microsoft did not do so.

Taylor testified that Motorola **REDACTED**

**REDACTED** Wion Dec. Ex. 17 at 73–74, 147–48.  In fact, when Motorola sent these letters, it did not even know, for either standard, whether Motorola **REDACTED**

*Id.* at 73–74, 150.  When asked whether Motorola's standard-essential patents **REDACTED**

*Id*. at 93; *id.* Ex. 19 at 4–5.

Kirk Dailey, who signed Motorola's letters to Microsoft, **REDACTED**

**REDACTED** Wion Dec. Ex. 12 at 2513–18, 2532–34.  Even years later, Dailey **REDACTED**

**REDACTED** (*id.* at 2519),                                    **REDACTED**

**REDACTED**

*Id.* at 2535.

LAW OFFICES
**DANIELSON HARRIGAN LEYH & TOLLEFSON LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700 FAX, (206) 623-8717

### 2. A Reasonable Offer Would Have Reflected That Other Holders of Standard-Essential Patents Might Also Seek Royalty Payments.

Because Motorola is only one of dozens of holders of standard-essential patents for the 802.11 and H.264 standards, a reasonable offer to license Motorola's patents would have accounted for the fact that other holders of standard-essential patents might also seek royalties. According to publicly available information, 34 other patent owners submitted letters of assurance to IEEE in connection with 802.11 standard-essential patents. *See* Wion Dec. Ex. 21. Had each of them obtained a 2.25% royalty on the Xbox, the total royalty would have been 78.54% of the Xbox price. Taylor admitted that **REDACTED**

Wion Dec. Ex. 17 at 67. By the same token, he

*Id.* at 71–72.

For the H.264 standard, Taylor admitted that **REDACTED**

**REDACTED** Wion Dec. Ex. 17 at 141. When asked whether the total H.264 royalty would be reasonable if each of them demanded a 2.25% royalty on the end-product price, Taylor **REDACTED**

**REDACTED** *Id.* at 151. For Motorola to have made its demands without even considering the obvious consequences of others doing the same was blatantly unreasonable.

### 3. Motorola's "Grant Back" Clause Made Its Offer Even More Unreasonable.

Motorola's suggestion that somehow its 2.25% demand could be rendered reasonable by the "subject to a grant back" language in its letters (Dkt. No. 86 at 14) is meritless. First, Motorola's letters did *not* say that the 2.25% would be reduced depending on the value of patents that would be granted back—to the contrary, the letters clearly state that Motorola was demanding a *royalty-free* license to Microsoft's standard-essential patents. Second, Motorola's new, litigation-devised position on this point—that the 2.25% may have been reduced by other "significant intellectual property" that Microsoft "might possess" (Dkt. No. 86 at 15)—only

MICROSOFT'S MOTION FOR PARTIAL
SUMMARY JUDGMENT OF BREACH OF
CONTRACT - 21

LAW OFFICES
**DANIELSON HARRIGAN LEYH & TOLLEFSON LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700 FAX, (206) 623-8717

establishes that Motorola was demanding compensation equivalent to a 2.25% royalty no matter what.  The "grant-back" clauses in Motorola's letters thus confirm Motorola's impermissible strategy of leveraging the "bullets" of its standard-essential patents to wrest either crippling royalties, or licenses to Microsoft patents (including non-standard-essential patents), from Microsoft.

## IV.    MICROSOFT HAS NOT REPUDIATED THE CONTRACTS.

Microsoft filed this suit to affirm and enforce its contract right under Motorola's RAND commitments—a right to license Motorola's standard-essential patents on RAND terms.  Motorola's "anticipatory breach and repudiation" argument (Dkt. No. 86, Defs.' Opp. to Microsoft's Mot. for Partial Summary J. 22) is, at bottom, an illogical argument that a party repudiates a contract by asking a court to enforce it.  Claims like Motorola's—that by filing this action to enforce the contract Microsoft "breached [the] alleged contract" (Dkt. No. 68, Motorola Countercl. ¶ 73)—have been properly rejected elsewhere.  *See, e.g.*, *Utica Mut. Ins. Co. v. Vigo Coal Co.*, 393 F.3d 707, 715 (7th Cir. 2004) (rejecting argument that a party breached a contract by attempting to enforce it).  And this Court has aptly described Motorola's repudiation argument as "perplex[ing]" and "illogical."  (Order 15–16.)  As the Court explained, the courthouse may be the "only viable arena to determine the meaning" of a contractual term, and thus seeking a judicial interpretation of a contract can hardly be a repudiation or breach.  (*Id.*)

Microsoft's suit to enforce Motorola's RAND commitments is neither an "anticipatory breach" nor a "repudiation" because Microsoft seeks to perform and enforce the contract by obtaining a license on RAND terms. *Cf. Restatement (Second) of Contracts* § 250 (1981) ("A repudiation is (a) a statement by the obligor to the obligee indicating that the obligor will commit a breach . . . or (b) a voluntary affirmative act which renders the obligor unable or apparently unable to perform without such a breach.").  A repudiation requires a "positive

MICROSOFT'S MOTION FOR PARTIAL
SUMMARY JUDGMENT OF BREACH OF
CONTRACT - 22

statement or action by the promisor indicating distinctly and unequivocally that he either will not or cannot substantially perform any of his contractual obligations." *Wallace Real Estate Inv., Inc. v. Groves*, 881 P.2d 1010, 1019 (Wash. 1994) (en banc) (quotation marks omitted). That repudiation must occur *before* the other party's performance is due. *See id.* ("[A]nticipatory breach occurs when one of the parties to a bilateral contract either expressly or impliedly repudiates the contract *prior to the time of performance*.") (emphasis added).

Here, Microsoft's conduct reflects neither an anticipatory breach nor a repudiation. Motorola's blatantly unreasonable offers to Microsoft breached Motorola's RAND obligations—so Microsoft's filing of this suit was not "anticipatory" because Microsoft acted *after* Motorola breached.  Most critically, Microsoft's complaint here is *not* a statement that Microsoft "will not or cannot substantially perform" its contractual obligations.  To the contrary, Microsoft's complaint unequivocally sought this Court's assistance in ensuring *performance* of the contracts—a "[d]ecree that Microsoft is entitled to license from Motorola" the declared standard-essential H.264 and 802.11 patents.  (Dkt. No. 1, Compl. 22 (Prayer for Relief G, H).)  Microsoft wants a RAND license and will pay for one.

## CONCLUSION

Motorola's 2010 demands to Microsoft were blatantly unreasonable in light of objective facts known to, and ignored by, Motorola.  As Motorola concedes, a blatantly unreasonable offer to a prospective licensee like Microsoft is a breach of Motorola's RAND commitment.  Summary judgment is therefore appropriate whether or not the contracts require that a patentee's initial license offer be a RAND offer.  The Court should enter partial summary judgment on Microsoft's breach of contract claim.

LAW OFFICES
**DANIELSON HARRIGAN LEYH & TOLLEFSON LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700 FAX, (206) 623-8717

1    DATED this 30th day of March, 2012.

2
                              DANIELSON HARRIGAN LEYH & TOLLEFSON LLP
3
4                             By   s/ Arthur W. Harrigan, Jr.
                                   Arthur W. Harrigan, Jr., WSBA #1751
5                                  Christopher Wion, WSBA #33207
                                   Shane P. Cramer, WSBA #35099
6
7                             By   s/ T. Andrew Culbert
                                   T. Andrew Culbert, WSBA #35925
8                                  David E. Killough, WSBA #40185
                                   MICROSOFT CORPORATION
9                                  1 Microsoft Way
                                   Redmond, WA 98052
10                                 Phone: 425-882-8080
                                   Fax: 425-869-1327
11
                                   David T. Pritikin, *Pro Hac Vice*
12                                 Richard A. Cederoth, *Pro Hac Vice*
                                   Constantine L. Trela, Jr., *Pro Hac Vice*
13                                 Douglas I. Lewis, *Pro Hac Vice*
                                   John W. McBride, *Pro Hac Vice*
14                                 SIDLEY AUSTIN LLP
                                   One South Dearborn
15                                 Chicago, IL 60603
                                   Phone: 312-853-7000
16                                 Fax: 312-853-7036
17
                                   Carter G. Phillips, *Pro Hac Vice*
18                                 SIDLEY AUSTIN LLP
                                   1501 K Street, N.W.
19                                 Washington, D.C. 20005
                                   Phone: 202-736-8000
20                                 Fax: 202-736-8711
21
                                   Counsel for Microsoft Corporation
22

23

24

25

26

MICROSOFT'S MOTION FOR PARTIAL
SUMMARY JUDGMENT OF BREACH OF
CONTRACT - 24

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

## CERTIFICATE OF SERVICE

I hereby certify that on March 30, 2012, I electronically filed the foregoing document

with the Clerk of the Court using the CM/ECF system, which will send notification of such

filing to the following:

**Attorneys for Defendants Motorola Solutions, Motorola Mobility and General Instrument Corporation**

Ralph Palumbo
Philip S. McCune
Lynn M. Engle
Summit Law Group

Steven Pepe
Jesse J. Jenner
Norman Beamer
Paul M. Schoenhard
Ropes & Gray

s/ Linda Bledsoe_____
LINDA BLEDSOE

MICROSOFT'S MOTION FOR PARTIAL
SUMMARY JUDGMENT OF BREACH OF
CONTRACT - 25