```
1                 UNITED STATES DISTRICT COURT
                 WESTERN DISTRICT OF WASHINGTON
2                         IN SEATTLE

3   ----------------------------------------------------------

4   MICROSOFT CORPORATION,          )
                                    )
5              Plaintiff,           )   No. C10-1823JLR
                                    )
6       v.                         )
                                    )
7   MOTOROLA, INCORPORATED,         )
                                    )
8              Defendant.           )

9
    ----------------------------------------------------------
10
                        MARKMAN HEARING
11
    ----------------------------------------------------------
12
            BEFORE THE HONORABLE JAMES L. ROBART
13            UNITED STATES DISTRICT COURT JUDGE

14                      March 9, 2012

15  APPEARANCES:

16  For the Plaintiff:        Richard A. Cederoth
                              SIDLEY AUSTIN
17                            Arthur Harrigan
                              DANIELSON HARRIGAN LEYH &
18                            TOLLEFSON

19  For the Defendant:        Jesse J. Jenner
                              Gabrielle Elizabeth Higgins
20                            ROPES & GRAY
                              Ralph H. Palumbo
21                            SUMMIT LAW GROUP

22  Also Present:             Christopher Wion
                              Douglas Lewis
23                            Philip McCune
                              Andy Culbert
24                            David Pritikin
                              Herman Webley
25                            Matthew Clements
                              Ian Brooks
```

```
1            THE COURT:  The clerk will call this matter.
2            THE CLERK:  Case C10-1823, Microsoft versus
3     Motorola.  Counsel, please make your appearances.
4            MR. HARRIGAN:  Good morning, your Honor.  Art
5     Harrigan representing Microsoft, here with my partner
6     Mr. Wion.  And from the Sidley firm, proceeding from the
7     court's left to right we have Mr. Rick Cederoth, who will
8     be making the Markman presentation for Microsoft.
9     Mr. Doug Lewis.
10           MR. LEWIS:  Good morning, your Honor.
11           MR. HARRIGAN:  David Pritikin.
12           MR. PRITIKIN:  Good morning, your Honor.
13           THE COURT:  And in the first row back there, we
14    have Mr. Herman Webley, also from the Sidley firm.
15           MR. WEBLEY:  Good morning.
16           MR. HARRIGAN:  And Andy Culbert from Microsoft,
17    whom the court has met before.
18           THE COURT:  Nice to see we put the client in the
19    back row.
20           MR. HARRIGAN:  Introducing from the bleachers
21    David Killough from Microsoft.
22           MR. PALUMBO:  Ralph Palumbo, your Honor, with my
23    partner, Phil McCune, and Mr. Jenner, and Ms. Higgins.
24    Mr. Jenner will introduce the Ropes & Gray people.
25           MR. JENNER:  Good morning again, your Honor.  We
```

```
 1    have our retinue as well.

 2        Jesse Jenner of Ropes & Gray.  My partner Gabbie

 3    Higgins, Matt Clements, and at the far end, Ian Brooks,

 4    and Dave McCollom, who is our electronics operator.  Also

 5    with us today from Motorola Mobility is Robert Pluta.

 6            THE COURT:  Thank you.  Counsel, let me give you

 7    some direction, and then ask if you have any matters you

 8    would like to raise.  I am not sure that all of the ten

 9    claims deserve equal attention.  I am not sure that the

10    court isn't going to throw you a couple of curve balls

11    here.  If you have excess time, I would urge you to

12    concentrate on Claim Term 1, which is a proposed

13    construction for "macroblock," for the reason that we were

14    not completely satisfied with either of the proposed

15    definitions, and therefore are inclined to venture out on

16    our own.  And so we would like your guidance on why you

17    defined that term the way that you did.

18        And then secondly, in terms -- instead of arguing in

19    regards to Claim 3, Claim 4, Claim 5, Claim 7 and Claim 8,

20    all of which are means plus function claims, I would like

21    to hear from Motorola why we should not find those to be

22    invalid for lack of an algorithm, explaining the

23    structure, either an algorithm or a flowchart or some of

24    the other alternatives that have been proposed in the

25    cases.  That will give you some sense of our struggle with
```

 1    this particular set of claims.

 2        Finally, thank you for affording Mr. Fortney and I an

 3    opportunity to do the only thing that is potentially more

 4    painful than going to the dentist.  I was telling a former

 5    friend of mine that, who said, Jim, you need to

 6    understand, we feel the same way about arguing in front of

 7    you.  I guess the feeling is mutual.

 8        You were going to do a tutorial first, but before I do

 9    that, let me call on both sides to se if they have any

10    matters they want to bring to the court's attention.

11        Yes, sir.

12            MR. CEDEROTH:  Your Honor, Rick Cederoth.  I

13    wonder if I might weigh in here on the terms.  In the last

14    24 hours we have had a chance to sit down, both parties --

15    our side and discuss with Motorola, and actually winnow

16    down the terms which do need to be resolved.

17        Coincidentally, with respect to the means plus

18    function claims, I think the parties have come to a

19    realization that the court has, that the fundamental issue

20    there is one of validity, and to crystallize the issues,

21    both for resolution today, and specifically with regard to

22    the invalidity or, as Motorola would say, the lack of, on

23    the means plus function.  What we have agreed is that

24    Microsoft will agree on Term Number 2 to Motorola's

25    proposed construction of "decoding."

1        As to Term Number 6, which is the "using" phrase,

2   Microsoft has agreed to Motorola's proposal that that does

3   not require construction, but "plain and ordinary" can be

4   used there.

5        As to the five means plus function terms that the

6   court just read off, 3, 4, 5, 7 and 8, Microsoft agrees to

7   the statement of function that Motorola has articulated.

8   And that has a natural impact then in terms of what the

9   structure is.

10       The way we had written this out yesterday, if I could

11  ask for the court's indulgence to simply read it in, as an

12  exchange between the parties, and then perhaps we should

13  discuss how to proceed at the court's pleasure with

14  respect to this issue.

15       But as to the structure for the means terms, the

16  parties agree that each side reserves all aspects of its

17  invalidity defenses or response to invalidity defenses.

18  And, specifically, by way of example, as to the structure

19  for the decoder, Microsoft does wish to argue that the WMS

20  Gaming line of cases applies, and we have articulated that

21  in our invalidity defenses and invalidity contentions.

22       But Motorola reserves the right to argue that the

23  case -- the line of cases is not applicable, but that if

24  the line is applicable, that pseudo-algorithms have been

25  disclosed, and that Motorola may identify such algorithms,

1    as necessary.

2        That is where we came down yesterday, so that the

3    statement that Motorola offers for these -- the structure

4    of these terms, that is an encoder -- I'm sorry, a

5    decoder, and equivalence thereof, simply poses the issue

6    of whether in fact those claims are valid.

7            THE COURT:  Well, counsel, first off, I will tell

8    you, I wish you guys had gotten together two weeks ago,

9    because you would have saved us an immense amount of work.

10       I am uncertain as to the status of the law, in that

11   I'm not sure that the train hasn't left the station.  Once

12   these matters have been presented to the court, and they

13   are ripe for adjudication, we adjudicate them.  I'm not

14   sure a stipulation between the parties that Motorola is

15   going to get a second bite at the apple is going to carry

16   the day.

17       On the other hand, we try to decide things on the

18   merits.  And if we are missing the merits, then we need to

19   know that.  So I will accept your stipulation, and let's

20   chat at the end of the day about some kind of a briefing

21   schedule for you both to present your contentions.

22       I'm not sure how much clearer I could hold up a signal

23   that we have pretty exhaustively looked at this, and we

24   just can't get there.

25            MR. JENNER:  Can I be heard on that or do you want

1    to wait until later?

2         THE COURT:  Wait until later.  Just know that's

3    how we will deal with that.

4       What I understand is, in regards to 2 and 6, you have

5    stipulated to a proposed construction.  And for 3, 4, 5, 7

6    and 8, we are going to chat at the end as to how you can

7    present your legal arguments, as opposed to your factual

8    arguments.  I didn't say that very well.  I understand

9    that Motorola wants to take me back into the patent and

10   show that there is an appropriate algorithm in there, or

11   an alternative to it.  But it seems to me it is more a

12   legal question at this point under the line of cases that

13   you have talked about.

14      Now, Mr. Jenner, you look like you are ready to jump

15   up and say something, so now is the time.

16         MR. JENNER:  If your Honor would allow me, I would

17   like to have the opportunity to press the issue on that,

18   your Honor.  This is one of those unique areas that

19   everybody loves about patent law, the interface between

20   Markman proceedings like this and what comes in on the

21   merits, in terms of raising subsequently things like

22   motions for summary judgment of non-infringement based on

23   the Markman, or motions for summary judgment and

24   invalidity based on the Markman.

25         THE COURT:  You heard my recent lunch speech.

1          MR. JENNER:  We probably think along parallel

2    lines then.

3        I realize it is pretty arcane, but, your Honor, I

4    submit that we are a little bit whipsawed, in the sense

5    that we are trying to tell your Honor in this proceeding

6    what we think the right construction is.

7        And the means plus function, we have now agreed on the

8    function, we have agreed on the structure.  We told you

9    what we thought the right structure is.  And in the

10   context of finding that the right structure is a decoder,

11   we submit that when you go outside of Markman, now the

12   consequence is, does Microsoft make a motion for summary

13   judgment of invalidity, which they haven't made yet.  We

14   know they want to make it.  We discussed that in an e-mail

15   exchange.  They are going to make a motion for summary

16   judgment.  And we submit that we ought to have the

17   opportunity to oppose the motion on all applicable grounds

18   which could not necessarily be provided to the court in

19   the context of Markman.

20       We would tell your Honor in summary judgment that the

21   decoder is such a well-known term of art in this video

22   coding area, that when you mention it to a person of

23   ordinary skill in the art, he knows what it is.  And under

24   the case law, that is sufficient.

25       We would tell your Honor that under the WMS Gaming

    1    line of cases, those cases all deal with microprocessors

    2    and general purpose computers, where the court in

    3    Aristocrat and Harris and all the other cases have said

    4    you have to have an algorithm.  I could show you another

    5    Aristocrat case where the court found it wasn't necessary.

    6        Even in the third instance where the court wants to

    7    see what algorithms might be in the patent that would

    8    apply to the decoder, we are prepared to provide to the

    9    court information about where algorithms may be found,

   10    even though, for purposes of the Markman, we don't think

   11    they are part of the structure, and didn't think we had to

   12    provide that, because we think -- we have all agreed that

   13    the right structure is the decoder.  So the consequences

   14    of that, both legal and factual, really ought to be on a

   15    motion for summary judgment of invalidity.  And we are

   16    prepared to brief that.

   17            THE COURT:  Mr. Jenner, you look a little bit

   18    younger than me.  Do you remember what radio character it

   19    was where you got the secret decoder ring?

   20            MR. JENNER:  I doubt that --

   21            THE COURT:  That will be your homework before you

   22    come back.

   23        I have looked at these lines of cases, including a

   24    Motorola case, so I am not unfamiliar with this area.

   25    That is why you have more eloquently said what I tried to

1     convey, which is, I think the fairer way is to tee this up

2     immediately at the conclusion of this.  I don't care if we

3     call it a motion for summary judgment on invalidity or we

4     talk about motions opposing the court's foolish rulings.

5     But we are going to get that decided.  And you will get an

6     additional opportunity to --

7             MR. JENNER:  We appreciate that.  All we ask is to

8     put in the full record appropriate for a summary judgment.

9             THE COURT:  I will tell you, I think you've got an

10    uphill battle, because if "computer" isn't a sufficient

11    term, "decoder" -- other than if it is a ring you got in

12    the mail or a cereal box, I think you have a real chore

13    there.

14            MR. JENNER:  If we have to swim upstream or

15    uphill, we will do what we have to do.

16            MR. CEDEROTH:  Thank you, your Honor.  One caveat

17    to what Mr. Jenner said.  The parties haven't exactly

18    agreed that the structure is a decoder.  Our position is

19    that a decoder has to also have an algorithm.  That is

20    exactly the dispute that the court recognized.

21       One other potential housekeeping matter for the end of

22    the hearing, your Honor, when we take this up:  If the

23    court would indulge the parties to discuss some of the

24    additional going-forward activities in the case that

25    relate also to the RAND issues, as we should have some

```
 1   time available.
 2          THE COURT:  I would love to do that, because my
 3   terrorist trial in May has been continued, and I am
 4   thinking about slotting you guys in.  That would be a good
 5   opportunity to discuss further at that time.
 6          MR. CEDEROTH:  Thank you.
 7          THE COURT:  Motorola, you are going to do a
 8   tutorial?
 9          MR. JENNER:  Yes, your Honor.  Your Honor, I would
10   like to introduce to the court Dr. Timothy Drabik.
11   Dr. Drabik has a Ph.D. in electrical engineering from
12   Georgia Tech.  He has been both an associate professor at
13   Georgia Tech, as well as a visiting professor at Stanford.
14   He has done research and taught courses in digital signal
15   processing, which relates to the subject matter of this
16   proceeding, both at the graduate level and the
17   undergraduate level.  He has had over 30 years of
18   experience in the field, both in academia, as well as in
19   industry.  So we would submit him to the court solely for
20   the purpose of providing a tutorial.  The parties having
21   previously agreed that there would be no expert testimony
22   submitted, and there was none as part of the Markman term
23   interpretation.
24          THE COURT:  We can always use the help.
25   Professor, come on down.
```

1          PROFESSOR DRABIK:  Thank you, your Honor.  It is

2     my pleasure to have the opportunity to present this

3     tutorial on behalf of Motorola.

4          THE COURT:  Did they make you teach that class or

5     did you want to?

6          PROFESSOR DRABIK:  It was always one of my

7     favorites.

8          THE COURT:  Do you get a lot of students?

9          PROFESSOR DRABIK:  Yes, it is very popular at

10    Georgia Tech.  It was one of the earliest institutions to

11    have a specialty in digital signal process.

12          THE COURT:  Please proceed, sir.

13          PROFESSOR DRABIK:  Thank you, your Honor.  This

14    relates to the '374 patent, '375 patent and '376 patent.

15    These patents share a common specification, and they all

16    relate to video coding, in particular, the techniques used

17    in the video coding standard called H.264.

18        Here is the cover picture of the H.264 standard.  It

19    is also sometimes referred to as MPEG-4 Part 10, or AVC,

20    which stands for advanced video coding.  Motorola

21    inventors on these patents participated in the development

22    of this standard.  The draft of this standard is

23    incorporated by reference in the patents in suit.  And the

24    H.264 standard was published in 2003.

25        The patents and the H.264 standard concerned video

1    coding.  Video coding is the process of coding and

2    decoding digital video.  Encoding is compressing a stream

3    of pictures, and decoding is decompressing a stream of

4    pictures.

5         Here, I will show an example of a video coding

6    process.  The video camera on the left captures a stream

7    of pictures and sends it to an encoder.  The encoder

8    compresses the stream of video data by eliminating

9    redundancies in the video.  The output of the encoder is a

10   bitstream of compressed video data that can be transported

11   and stored, as represented here by the cloud.

12        This compressed video stream takes up much less space

13   in storage than the uncompressed content, or requires much

14   less bandwidth for transmission.

15        After the compressed video data has been transmitted,

16   it must be decoded or decompressed.  And here, I am

17   showing the decoder having constructed a decoded picture

18   highlighted in yellow.  After decoding, the decoded

19   pictures can be displayed, for example, on a monitor, as I

20   have shown there on the right.

21        Now, video coding operates on a stream of pictures.

22   Each picture is divided into basic units called

23   macroblocks.  For example, we will see a red box around

24   the baby leopard's eye.  That is a macroblock.

25        Now, Figure 2 shows the macroblock having 16 by 16

1   pixels.   A pixel is frequently defined as the smallest

2   independent unit of picture information.   For a very

3   important step, referred to as depiction, each macroblock

4   can be further divided into smaller-size blocks, as

5   depicted on the left.

6      Here, we see a 16 by 8 block size in the figure, as

7   well as on the macroblock.   And now we see an 8 by 16

8   block size.   Then an 8 by 8 block size, 8 by 4 block size,

9   4 by 8 block size, and a 4 by 4 block size.   These blocks

10   allow us to predict different size portions of the

11   macroblock separately.

12      Now, macroblocks also contain luma and chroma

13   components.   The luma components represent the brightness

14   of the picture, as in the black and white picture.   The

15   chroma components, and there are two of them, provide

16   color information.   Merging all three of these components

17   gives you a color picture.   Because the human eye is less

18   sensitive to color changes than to brightness changes, it

19   is common for a macroblock to have fewer chroma samples

20   than luma samples.

21         THE COURT:   Are you familiar anywhere where the

22   terms "luma" or "chroma" are used in the patent?

23         PROFESSOR DRABIK:   Off the top of my head, I can't

24   recall.   Luma and chroma are abbreviations used in the art

25   for luminance and chrominance.   The luminance and

1   chrominance representation in the video has been used

2   since, I think, at least as early as 1953, or it might be

3   1947, when the NTSC analogue color broadcast standard was

4   adopted.  So those are longstanding terms.  And whenever

5   color video is discussed, luminance and chrominance are

6   well understood.

7           THE COURT:  All right.

8           PROFESSOR DRABIK:  I would like to discuss

9   encoding in detail now.  Here we are back with our

10  encoder.  I would like to blow up that box, and show an

11  example of the general process for encoding digital video

12  into the coded bitstream.

13      The coded bitstream is compressed for easier

14  transmission or storage, as I have said.  And the encoding

15  operations proceed from left to right, as indicated by the

16  arrows.  And the details of each step are well known.

17      Before going on to the next segment, I would just like

18  to point out that each encoding step makes headway toward

19  eliminating the redundancy in the video signal.  We can

20  think of these decoding steps as layers of an onion that

21  we peel back gradually.  Of course, one can only peel an

22  onion in one order.  So these blocks all fit together in

23  only one order.

24      The first block here is labeled "prediction."  The

25  basic idea of prediction is to eliminate redundancy in the

1   video stream from picture to picture in order to reduce

2   the number of bits that need to be transported or stored.

3       So, broadly speaking, if you want to represent a part

4   of the picture, you look for another part of the same

5   picture or a different picture that is very similar.  Here

6   is what we are trying to represent, and be found, a

7   so-called predictor, somewhere else that is a lot like it.

8   We compute the difference between those two parts, and

9   that gives us a residual.  We process only that.  And that

10  is easier to compress.

11      The second box is labeled "transformer."  The basic

12  idea of transformer is to convert pixel values into

13  frequency coefficients.  The frequency coefficients are

14  easier to compress than the pixel values themselves.  So

15  we are making more headway toward eliminating redundancy.

16      The third box --

17          THE COURT:  You might want to slow down a little

18  bit.  The thing is, when you are teaching your students,

19  they are taking notes.  Only, the person who takes notes

20  in my classroom has to get it verbatim.  Remember to

21  breathe every once in a while.

22          PROFESSOR DRABIK:  I will do that.  The third box

23  is labeled "quantization."  The basic idea there is to

24  reduce the number of bits required to represent each

25  coefficient.  Often certain of the smaller, generally

1   higher, frequency coefficients will quantize to zero.

2   Quantization is to exploit the fact that the human eye is

3   less sensitive to higher frequency components than to

4   lower frequency components.

5       The fourth box is labeled "frequency coefficient

6   scan."  This box scans the frequency coefficients from

7   locations in the two-dimensional array, and reorders them

8   into positions in a one-dimensional array.

9       The fifth box is labeled "entropy coding."  The basic

10  idea of entropy coding is to represent the sequence of

11  symbols, a shorter sequence of bits, by exploiting

12  statistics of the information stream.

13      Entropy decoding accepts a one-dimensional stream, a

14  sequence of signals, and that's why we needed the scanning

15  to convert the frequency coefficients into a linear

16  sequence.

17      Now I will discuss decoding.  As I mentioned, decoding

18  is the reverse of encoding.  And if we pause here with the

19  block diagram of the decoder, what we are doing is we are

20  replacing the layers on the onion.  Not that we ever do

21  that with an onion, but we do that with video coding.

22  And, of course, we have to replace them in the same order

23  we remove them, but in reverse.  So all of these blocks

24  are the inverse operations of the blocks that we discussed

25  in encoding.  And those inverses are well understood and

```
1    well known.
2            THE COURT:  If I took an algorithm for encoding,
3    and said that was my decoder, it wouldn't make any sense,
4    because it would be in reverse order?
5            PROFESSOR DRABIK:  I would say, understanding the
6    algorithm for encoding reveals the algorithm for decoding,
7    because it is understood that the steps have to occur in
8    reverse because of this onion-peeling requirement.  The
9    form of the information is different upon leaving each
10   constituent block of the encoder chain.  Those blocks can
11   go together in only one way.  So in order to perform
12   decoding, we have to undo those individual steps in
13   reverse order to meet that same requirement of having the
14   information representation between blocks be compatible.
15   In other words, the output of one decoding block has to be
16   compatible with the input of the next one.
17           THE COURT:  As an ignorant freshman, if I said the
18   encoding algorithm -- the decoding algorithm would need to
19   be the inverse of the encoding algorithm, that would be a
20   correct statement?
21           PROFESSOR DRABIK:  Yes, your Honor.  Another
22   possible analogy is disassembling a matryoshka doll and
23   putting it back together.  If I see you take it apart,
24   then I know how to put it back together again.
25           THE COURT:  Thank you.
```

1          PROFESSOR DRABIK:  You are welcome.  These boxes,

2   I will just tick through them very quickly.  We have

3   inverse entropy decoding, to take the bitstream and

4   produce the one array of quantized --

5          THE COURT:  I am hoping that you are reading these

6   remarks, as opposed to giving this contemporaneous

7   statement.

8          PROFESSOR DRABIK:  I am sort of in between, your

9   Honor.

10         THE COURT:  We are going to ask for a copy of it

11  when you are done.

12         PROFESSOR DRABIK:  I am very close to what I have

13  in front of you.

14         THE COURT:  Thank you.

15         PROFESSOR DRABIK:  Then there is the inverse

16  frequency coefficient scan, de-quantization, the inverse

17  transform and inverse prediction.

18      Now, the output of the inverse prediction box is a

19  decoded pixel block.  Decoded pixel blocks are used to

20  construct a decoded macroblock.  Decoded macroblocks, in

21  turn, are used to construct the current picture for

22  display.

23      So now I have discussed pictures, macroblocks,

24  encoding and decoding.  There is one aspect of the

25  background technology that is important, and that is the

1    difference between interlaced video and progressive video.

2    For progressive video, every line of a frame is captured

3    by a camera in a single pass from top to bottom.  As I

4    illustrate here, in progressive video, an entire frame is

5    sent every 30th of a second.

6        On the other hand, interlaced video operates by

7    scanning only every other line in each pass.  First, the

8    odd scan lines, called the odd or top field, are required.

9    And then the even scan lines, called the even or the

10   bottom field.  As I illustrate here, the odd and even

11   fields occur every 1/60th of a second.

12       These two fields are combined to form a picture.  We

13   should be combining them shortly.  But coding interlaced

14   video, as frames combine like this, presents problems for

15   images that contain moving objects.

16       So I will illustrate this problem using an example of

17   a moving red ball.  Here we see a video camera recording

18   the red ball as it moves across a still background.  When

19   the camera captures video in an interlaced form, it

20   captures half of the scan lines, the top field in the

21   first pass, and the other half of the scan lines, the

22   bottom field, in the second pass, a 60th of a second

23   later.

24       In this example the box around the ball is a

25   macroblock boundary.  The top field on the macroblock on

1    the left is captured a 60th of a second before the bottom

2    field of the macroblock on the right, so the ball is

3    slightly further to the right in the field on the right.

4        If we combine these two fields of the macroblock

5    directly, you can see that there is a cloning effect

6    around the edges of an object in motion, which I have

7    shown here in the inset.  By zooming in on the edge of the

8    ball, you can see how much it moved between the time that

9    the first field was captured and the time that the second

10   field was captured.

11       In prior art and coding, this single macroblock could

12   be encoded in one of two modes, in frame mode or in field

13   mode.  This is called adapted frame/field coding, or AFF.

14       In the frame mode, the two fields of the macroblock

15   were encoded jointly.  The combing effect caused by

16   combining the two fields of the moving image resulted in

17   less efficient compression.

18       In field mode, the two fields were encoded separately.

19   The macroblock was split into two eight-line groups, a top

20   field group and a bottom field group.  By eliminating the

21   combing effect, such a macroblock could be compressed more

22   efficiently.

23       Now, for prediction, macroblocks could be divided into

24   smaller-size blocks.  In the frame mode, the 16 by 16

25   macroblock could be divided seven different ways, as

1    depicted on the figure on the left.

2        In the field mode, because the macroblock was first

3    divided into a 16 by 8 top field, and a 16 by 8 bottom

4    field, the macroblock could only be divided five different

5    ways, as depicted in the figure on the left.   In

6    particular, the block sizes of 16 by 16 and 8 by 16 were

7    not available, because in field mode a block cannot

8    contain lines from both the top field and the bottom

9    fields.   This is called the single parity requirement.

10       So this was a basic problem with coding techniques

11   prior to the invention.   A macroblock in field mode could

12   not be divided the same seven ways as the frame mode

13   macroblock, because when all seven block sizes were not

14   available in field mode, the prediction performance

15   suffered.

16       The patent states, "This implies that the performance

17   of single macroblock-based AFF may not be good for some

18   sequences or applications that strongly favor field

19   coding.

20       The solution arrived at by the Motorola inventors was

21   to use multiple neighboring macroblocks instead of a

22   single macroblock for adaptive frame/field coding.   For

23   example, Figure 7 of the patent shows a vertical pair of

24   macroblocks that can be used in adaptive frame coding.

25       Figure 8 shows how the even and odd lines of a

1    vertical pair of macroblocks can be split into a top

2    macroblock with only odd lines and the bottom macroblock

3    with only even lines.

4        The specification describes Figure 8 as a pair of

5    macroblocks, each of which has 16 columns of pixels and 16

6    rows of pixels.

7        Now, because the top field macroblock and the bottom

8    field macroblock are now both 16 by 16, each macroblock

9    can be divided the same seven ways as a 16 by 16 frame

10   macroblock.  We get back this, and we get back this.

11       This provides greater flexibility for use in

12   predictions, which leads to better video compression.  The

13   larger block size is now available.  The 16 by 16 and the

14   8 by 16 provide efficient coding for uniformly predictable

15   regions in the pictures.  The numbers in the green and the

16   gray blocks represent the order in which each block of the

17   macroblock pair is processed.

18       Now, if a picture consists of some regions that are

19   moving and some regions that are not, it is typically more

20   efficient to code the nonmoving regions in frame mode and

21   the moving regions in field mode.  Using macroblock pairs

22   gives you the flexibility to frame code nonmoving regions

23   and field code moving regions while still using all seven

24   block sizes for prediction.

25       Here, I show a picture of one vertical pair of

1    macroblocks that is frame coded and one vertical pair that

2    is field coded.

3        A frame/field flag is included in the bitstream before

4    each pair.  This flag indicates whether the subsequent

5    pair of macroblocks in the bitstream is coded in frame

6    mode or in field mode.

7        Adaptive frame/field coding on macroblock pairs was

8    adopted by the video coding experts into the H.264

9    standard.  For example, Figure 6-8 of the H.264 standard

10   shows partitioning of a frame into macroblock pairs.

11       The H.264 standard refers to the use of macroblock

12   pairs as macroblock adaptive frame/field coding or MBAFF.

13       Each of the Motorola patents is directed to perform

14   that coding on pairs or groups of macroblocks.  In

15   addition, each patent further entails either inter-coding,

16   the '374 patent; intra-coding, the '375 patent; or a

17   particular scanning path, the '376 patent.

18       First, I would like to discuss inter-coding.  In

19   inter-coding, macroblocks are coded by first looking for

20   part of a different picture that is very similar to what

21   we are trying to encode, and which we already know.  That

22   is called the reference picture.

23       Then we compute the difference between the two parts,

24   which you call the residual, and restore or transmit only

25   that.  Inter-coding is also referred to as temporal

1    prediction with motion compensation.

2        As I explained earlier, a digital video is a sequence

3    of pictures, as shown in Figure 1 of the patents.

4        The '374 patent gives an example of inter-coding in

5    Figure 4.  In this example, we generate Image 402, in a

6    picture based on the corresponding Image 402 in the

7    reference picture.  As objects move across a camera's

8    field of view, they show up in different parts of the

9    picture as time passes.

10        Here, I illustrate a rectangular in red moving from

11    upper left to lower right as time passes.  We can predict

12    the P picture from the I picture.  We refer to the I

13    picture as a reference picture and the P picture as the

14    predictive picture.  I will put this into three dimensions

15    so it is easier to see what is happening here.

16        In order to encode an image in the predicted picture,

17    the (inaudible) in the motion vector tells us where to

18    find a related image of predictor in the reference

19    picture.

20        The image in the reference picture is used to create

21    the image in the predicted picture.  The motion vector

22    tells us where to find the predictor.  By overlaying the

23    reference picture atop the predicted picture, we can see

24    how this process looks in two dimensions.

25        We are trying to encode this picture.  We find a

1   predictor in a reference picture, and we have a motion

2   vector that tells us how to get there.

3        A motion vector can also be compressed.  A motion

4   vector is compressed by predicting it based on another

5   block's motion vector.

6        Here, I will illustrate two blocks, Block 1 and

7   Block 2.  The bold blocks represent where the blocks are

8   in the current image, and the faded blocks represent where

9   they are in the reference picture.  Block 1, moved by the

10  amount shown by Motion Vector 1, and Block 2, moved by the

11  amount shown by Motion Vector 2, except with the arrows in

12  the opposite sense.

13       So Motion Vectors 1 and 2 are different, because

14  Blocks 1 and 2 move by different amounts.

15       We can predict Motion Vector 1 based on Motion

16  Vector 2.  In that case, Motion Vector 2 becomes the

17  prediction motion vector for Block 1.

18       However, if we use only the prediction motion vector

19  to predict the position of Block 1 in the current picture,

20  we see that it points too far to the left.  That is the

21  hashed version of Block 1 that I have shown.

22       Because it points too far to the left, we calculate a

23  difference value, which I have shown as a green arrow.

24  This green arrow represents the difference between

25  Block 1's prediction of the motion vector, which was based

1    on Block 2, that's here, and the uncompressed motion

2    vector for Block 1.

3        The difference value is a compressed version of

4    Block 1's motion vector.  Only the difference value needs

5    to be coded.  And that's what is transmitted in the

6    bitstream.

7        When decoding the predicted picture, the difference

8    value is used to generate the uncompressed motion vector

9    for the block.

10       And that is all I have to say about inter-coding.  We

11   need to talk about intra-coding.

12       In intra-coding, macroblocks are predicted based on

13   the pixel values of their neighboring blocks within the

14   same picture.  Intra-coding is also referred to as spatial

15   prediction.  That means we don't have to use a different

16   reference picture.

17       Because the code pictures, starting from the upper

18   left corner and proceeding left to right, from top to

19   bottom, the only pixels from the neighboring blocks that

20   we know are those that are above and to the right of what

21   we are immediately trying to encode.  And this is

22   illustrated in Figure 14 of the patents.

23       Intra-coding can be performed in any of nine

24   directions as shown in Figure 15.  I will give the

25   vertical direction zero as an example.

1    For intra-prediction in the vertical prediction, the

2    value of the above neighbor pixel, capital A, is copied

3    downwards in the vertical direction into A, E, I and M.

4    Similarly, B is copied into B, F, J and M.  Likewise, C is

5    copied into C, G, K and O.  And again with D.  So the

6    result is a 4 by 4 block of pixels that approximates the

7    block being coded.

8        Intra-prediction works similarly in the horizontal and

9    other directions.  And we can think of this as taking a

10   brush loaded with the tone values of from A, B, C, D and

11   across, and sweeping the brush downward to create our

12   predictor.  For the other directions, we just sweep the

13   brush in other directions.  That concludes my discussion

14   of intra-coding.

15       Finally, I would like to discuss scanning paths.  The

16   scanning path determines the order in which macroblocks

17   are processed.

18       When AFF coding pairs a group of macroblocks, there

19   are two possible ways in which to scan macroblock pairs or

20   groups within a picture, vertical or.

21       Figure 9 depicts horizontal and vertical scanning

22   paths for a picture that has been partitioned into pairs

23   of macroblocks.

24       Both scanning paths start at the upper left corner of

25   the picture.  The horizontal scan path 900 scans each row

```
1    of macroblock pairs from left to right.  As shown in
2    Figure 9, the second row is skipped because vertically
3    adjacent pairs are scanned together.
4       Within a macroblock pair, the top macroblock is
5    encoded first, followed by the bottom macroblock.
6       That concludes my discussion of scanning paths and of
7    Motorola's technology tutorial.  Thank you, your Honor,
8    for your kind attention and patience.  I would be happy to
9    answer any questions you may have.
10             THE COURT:  I think I am fine.  Thank you.
11             MR. JENNER:  Your Honor, would you like a binder
12   and a DVD that has that in it for future reference?
13             THE COURT:  Yes.  And a copy of the remarks, if
14   that is included in the binder.
15             MR. JENNER:  We can provide that.
16             THE COURT:  You can submit it later.
17   Mr. Cederoth.
18             MR. CEDEROTH:  Your Honor, I was going to try to
19   fill my five minutes with as much words and as many words
20   as I could.  That was obviously a lot to digest in a very
21   short period of time.
22      My only real comment, one, just technical comment that
23   I don't think is really pertinent to the issues to be
24   discussed today, but it goes to the issue of whether the
25   encoding and decoding need to be mirror images.  I think
```

1    the state of the technology is they do not.   And there are

2    various reasons for that that go beyond anything we need

3    to get into today.

4       To the extent I have anything else in response to what

5    Dr. Drabik was saying, really goes to what is the

6    invention here.   With the court's pleasure, I would

7    reserve those comments for the discussion of "macroblock,"

8    and maybe take a little extra time.

9              THE COURT:   That would be helpful.

10             MR. CEDEROTH:   Then we have nothing further at

11   this point, your Honor.

12             THE COURT:   Mr. Jenner, do you want to take up

13   "macroblock"?

14             MR. JENNER:   Yes, sir.

15             THE COURT:   I must congratulate the professor.   He

16   managed to do an entire tutorial and have every one of

17   them be a square, with the exception of Figure 7, which is

18   a challenge.

19             MR. JENNER:   I have to say, your Honor, and

20   apologize to some extent, in that we repeatedly beat on

21   Dr. Drabik with the notion that it was important to try to

22   get this done, as it turns out with some foresight, in 20

23   minutes.   It would have been a lot more comfortable and

24   leisurely to take more time than that, but it turns out

25   our 20 guesstimate was probably pretty close to what the

1    schedule was going to provide for.

2         THE COURT:  Let me offer one practice pointer.  We

3    find tutorials to be helpful.  They would be more helpful

4    if they were to occur about three weeks before the Markman

5    hearing.  If you do them the morning of the Markman

6    hearing, we have spent three weeks figuring out most of

7    what we just learned.  Therefore, I think a more efficient

8    use of the court's time is to move those back in your

9    briefing schedules.  That works well in this court.  I'm

10   not sure all my colleagues feel the same way.

11        MR. JENNER:  We will take that into account for

12   the inevitable future Markman proceedings.

13     Your Honor, I am going to present --  Well, the

14   original plan was that I would present on the first five

15   terms and Ms. Higgins would present on the second five

16   terms.  That is now collapsing down to my presenting on

17   "macroblocks," and Ms. Higgins presenting on the two terms

18   that are left over of the last five.  So that is basically

19   what our plan is.

20     Do we have copies of this we can hand out?

21     So the first term, and the term that has gotten a lot

22   of prominence in the briefing, is "macroblock."  Here, we

23   juxtaposed the two proposed constructions for macroblock,

24   Motorola's being on the left.  And your Honor can see that

25   the two principal points of contention are, first, whether

1    or not a macroblock needs to be the size of 16 by 16

2    pixels.  We submit the answer to that question is yes.

3    And should the definition of macroblock refer to the luma

4    and the chroma samples that you saw and noted in the

5    tutorial, we submit that the answer to that is also yes.

6         First of all, and possibly, I would submit, most

7    compelling, is that the patent refers at least twice, and

8    I have cited them here on the left side of this slide, to

9    incorporating the then-pending MPEG-4 Part 10 standard by

10   reference.  It is made a part of the specification, done

11   deliberately, and when you look into the standard, which

12   was Exhibit N to the joint submission by the parties, it

13   has a specific definition of macroblock, which is both a

14   16 by 16 array, and referred to in terms of the luma

15   samples and the corresponding chroma samples.

16        As I believe Dr. Drabik said, it was well known in the

17   art, and still is, that there is a correspondence between

18   the luma and chroma samples with pixels.  So sometimes you

19   see it referred to as 16 by 16 pixels, sometimes you see

20   it referred to as 16 by 16 luma samples, with the

21   corresponding chroma samples.  Either way is right, and it

22   fits the appropriate definition, which we submit is here

23   on the left.

24             THE COURT:  Do you take the position that the 16

25   by 16 macroblock is the exclusive or the preferred size?

1          MR. JENNER:  Your Honor, I certainly acknowledge,

2     as I must, that there are references in the specification.

3     I will characterize them, frankly, as lawyers words that

4     call it "preferred."  And I know that has significance.

5     But both of the --

6          THE COURT:  Let me stop you, counsel.  One of the

7     wonderful things about our electronics is that if people

8     have their cell phones on silence, it will pick up the

9     activity.  So if you have a BlackBerry, you need to turn

10    it off.  You can't simply put it on silence.  If you get

11    close to a microphone, it will start making that buzzing

12    sound.

13         MR. JENNER:  It is not a phone, so it won't ring.

14    I will get rid of it.

15      Yes, your Honor, while acknowledging that there are

16    references to a preferable 16 by 16 size, we submit that,

17    for a number of reasons that I am going to go through, you

18    have to limit macroblock.  When you read the patent as a

19    whole, including the incorporations of the standard, which

20    I submit are important, if not controlling, as well as the

21    prosecution history, as well as the ways in which larger

22    and smaller blocks are used in the specification, to the

23    point that Dr. Drabik made, that you are creating the

24    opportunity to have these two sizes of smaller blocks, the

25    16 by 16 and the 8 by 16, that you can't get in field mode

1    unless you have two 16 by 16 macroblocks.  The whole

2    arrangement of the smaller blocks and the utilization of

3    those in the context of the decoder can't happen unless it

4    is a 16 by 16 block.

5         THE COURT:  In our analysis, size is the

6    determining question in this area.  And I am really hung

7    up on "preferred."  "Preferred" is not patentable,

8    exclusive.  "Preferred" is preferred.  It seems to me that

9    you have chosen in your patent language to try and seize

10   the entire field.  And now you are saying, Judge, don't

11   pay any attention to the man behind the curtain, it is 16

12   by 16.  That's the tension that I am struggling with.

13        MR. JENNER:  Your Honor, one of the things I will

14   show you in a minute is that the man behind the curtain,

15   actually, in the context of the prosecution history, if

16   there were any question about this, basically gave it up

17   in the way they distinguished the Obikane reference.  And

18   I will come to that.

19       But I think the various things I am prepared to show

20   you, taken together, show that this is one of those

21   situations, even if the word "preferable" were used, you

22   have to understand that the embodiment disclosed is the

23   only embodiment of the invention.  It is the only one that

24   works.

25       There are cases which we could submit to your Honor in

1   which the federal circuit has said, if the specification

2   actually consists of only one embodiment, then that's the

3   invention.  I submit that applies here.

4        This is a 16 by 16 macroblock invention.  And part of

5   the reason for it, as I have started out with, is because

6   that is what the technology was at the time.  The standard

7   that is incorporated by reference was a 16 by 16

8   macroblock standard.

9        I know that Microsoft submitted a couple of

10  counter-proposed standards, but that is all they were.

11  They were proposals that were never incorporated.  They

12  are not incorporated in the patent.  They didn't become

13  standards.  Nobody used them.  This is the standard that

14  people went on to use.  It is the standard that is

15  incorporated by reference.

16        And I submit, your Honor, that a significant case

17  which shows up here on Slide 6, that is right on the

18  money, is the LG versus Bizcom case, where the district

19  court had taken into account the language about a

20  preferred embodiment and said, well, if it is a preferred

21  embodiment, I don't care about the standard that is being

22  referred to.

23        And the federal circuit in this particular quote noted

24  that the district court had failed to consider the

25  standard as intrinsic evidence of the meaning to one of

1   ordinary skill in the art.  And the court concluded that

2   the proffered definition, based on the standard, is

3   correct.

4        THE COURT:  I think if you go back and look at

5   that case, what it said is, when they incorporate the

6   definitions in the standard, which this patent does not.

7   It, instead, uses it as an explanation for the invention.

8      You need to point me to some clearer authority that in

9   that context, where you don't incorporate the definitions,

10  that I am still bound by that line of authority.

11       MR. JENNER:  Your Honor, the thing that I would

12  submit that I would ask you to look at is back on Slide 5,

13  the bottom incorporation refers to the present invention

14  relating to frame mode/field mode encoding of digital

15  video content at a macroblock level, as used in the

16  standard.

17     I would submit --  Certainly, your Honor, it doesn't

18  say, I hereby incorporate definitions.  It is saying

19  content at a macroblock level as used in the standard.  I

20  submit that that comes pretty darn close to saying it is

21  the macroblock definition of this standard that we are

22  comporting with.  I think that is 99 and 44/100ths percent

23  of the way there.

24     So I would just urge your Honor to consider that, that

25  lower left incorporation on Slide 5 as really getting

1    there.  I think that makes Bizcom really right on the

2    money.  I would urge your Honor to consider that.

3        This is part of a progression of technology.  You see

4    on Slide 7 that this evolution of standards continuously

5    referred to the array in the same terminology.  In 1993,

6    it was 16 pels by 16 lines.  In 1995, it was four eight by

7    eight blocks, which is 16 by 16.  In '98, it was four

8    eight by eight blocks of luminance, coming from a 16 by 16

9    section.  And then in 19 -- sorry, 2002, it is the

10   standard which is incorporated into the patent that flat

11   out says, 16 by 16 luma samples.  And it continued on

12   right through 2010, in the H.264 standard, a 16 by 16

13   block of luma samples.

14       This is the knowledge that was being actually used by

15   persons of ordinary skill in the art, because that is the

16   standard of the industry.  It is what people out in the

17   world were using.  It is what was incorporated by

18   reference, not the discarded proposals that Microsoft

19   refers to in its papers.

20       This just really demonstrates what would have been

21   understood by a person of ordinary skill in the art of a

22   macroblock in 2002.

23       I'm sorry, your Honor?

24           THE COURT:  Take me back to my basic federal

25   circuit law on this.  It is my understanding that I look

1    to the definition found in the patent first, because the

2    patentee is free to adopt the most arbitrary and contrary

3    construction going, and doesn't have to be the

4    generally-accepted term of art by a person skilled in that

5    particular area.  I understand the argument.  I agree with

6    you, that you have seen this progression go through.  But

7    does that help you in regards to the language that is in

8    the patent?

9            MR. JENNER:  Yes, your Honor.  If you look at the

10   cases that say when the specification and drawings are

11   taken as a whole, it demonstrates that the disclosed

12   embodiment is the invention, it is the only actual

13   embodiment of the invention, then the claims should be

14   correspondingly construed.

15       There are cases.  We can submit them as a

16   supplementation if it would help.  We can give you a few

17   cases where the federal circuit says, in essence --  These

18   are my words.  I don't have a case to look at.  That when

19   the disclosed embodiment is in fact the invention, as a

20   result of reviewing the patent as a whole, then the claims

21   are appropriately limited to that disclosure.

22       I appreciate what your Honor is saying, that obviously

23   my biggest hurdle is what you are raising, is this usage

24   of the concept of "preferable."  But I believe the answer

25   to it is all the things I am taking your Honor through,

1   which demonstrate that the disclosure, taken as a whole,

2   shows that the disclosure of 16 by 16 is the one and only

3   invention contemplated by this patent.  And that is not

4   detracted from by the fact that the word "preferable" was

5   used.  Patent attorneys will use the word "preferable"

6   whenever they get the opportunity.  I have been an

7   offender myself.

8       You will find it in every patent, just the way you

9   find at the end of the patent, the little paragraph that

10  says this has been a disclosure of embodiments, this is

11  not the only way, and lots of other things will be

12  contemplated by people of skill in the art, so on and so

13  forth.

14      But when you read the invention, when you read the

15  patent, taken as a whole, and I will walk you through a

16  few of these things, I think the fair conclusion that one

17  comes to is that the disclosure of macroblock being 16 by

18  16, in order to accomplish what is intended by the

19  disclosure, makes it the only invention.

20      Just one additional point I would make about the

21  understanding of persons of skill in the art on Slide 8,

22  is that those who wrote about this at about the time,

23  including people from Microsoft, acknowledged that

24  macroblocks were understood to be 16 by 16 samples.

25      One of the authors is Mr. Sullivan of Microsoft, and

1  he certainly understood in 2003 that that's what a

2  macroblock was, as did others.

3      The utilization of 16 by 16, not withstanding the word

4  "preferable" in some places, is rampant throughout the

5  patent.  It is shown in Figure 2, where it says

6  "preferable," but the only thing it shows is a block of 16

7  by 16 pixels as being a macroblock.

8      The same thing turns up on Slide 10 in Figure 7, where

9  there is some more discussion about the N by M array that

10  constitutes a macroblock.  It says the N by M array is in

11  fact 16 by 16 rows.  Even though there is general

12  discussion about N by M arrays, when it does come time to

13  put the rubber to the road, it shows it as being 16 by 16,

14  and that is all it shows it as being.

15      This now falls into the context of talking about

16  different size structures.  One of the things the patent

17  does is to distinguish a macroblock from larger

18  structures.  The total structure on the screen is a

19  picture.  That is bigger than a macroblock.  This

20  particular reference to Figure 2 also talks about a slice,

21  the Row 202.  A slice is bigger than a macroblock.  So we

22  know there is a limitation.  At the end of the passage it

23  says, "As shown in Figure 2, a preferable macroblock size

24  is 16 by 16," but that is the only size that is shown

25  anywhere in the patent.

1      It has to be 16 by 16 for the reason of the problem

2   that Dr. Drabik explained was overcome.  In Figure 3, 3(a)

3   through (f), it shows that in frame mode you could divide

4   a macroblock into these other smaller sizes.  You couldn't

5   do that in field mode.  One of the goals of field mode was

6   to recapture the two boxes at the top, the full 16, which

7   is the macroblock, and the one on the right, the 8 by 16,

8   which you couldn't get unless you used the macroblock pair

9   to get you 32 by 16.

10      So the fact that you are needing to divide down

11   structures to get to these other processing sizes, forces

12   you to start with a 16 by 16 block, in order to get to

13   macroblock pairs, the invention, which enables you to do

14   this kind of processing both in frame and field mode.

15      Another place where the specification distinguishes

16   from smaller-size blocks is in Figure 6(a) through (d),

17   where it describes macroblocks again being divided into

18   different-size blocks.  And it shows four of the possible

19   sizes.  But the only way you get there is by starting with

20   16 by 16.

21      Similarly, there are claims, as shown in Slide 14,

22   which distinguish the various sizes.

23      Claim 22 refers to an encoded picture, which includes

24   a plurality of processing blocks.  The processing blocks

25   contain a pair or group of macroblocks, the macroblocks

1    contain the plurality of smaller blocks.  This is another

2    scheme that shows you that a macroblock is a particular

3    size that enables you to be smaller than pictures,

4    processing blocks and slices, but bigger than the blocks

5    that you want to achieve in Figures 3 and 6 in order to do

6    the processing in both frame and field mode that you can

7    do with all of the sizes.

8        Now, I mentioned the prosecution history, your Honor,

9    that also relates to this.  And I want to take a little

10   bit of time with Slides 15 and 16.  Slide 15 is an excerpt

11   from this prior art patent Obikane.  Obikane, as we have

12   highlighted, itself talks about macroblocks consisting of

13   16 by 16 arrays of picture elements.  We called it out

14   with the highlighting.  There are four 8 by 8 blocks that

15   when you do the geometry adds up to a 16 by 16 array.

16       So Obikane has already got and is processing a 16 by

17   16 array.  And this was cited as prior art against the

18   applications that led to the patents that we are talking

19   about here.  So that is called out right on Slide 15.

20       In order for the claimed invention --  The claimed

21   invention, your Honor will recall, processes pairs or

22   groups of macroblocks.  It has to be two or more

23   macroblocks that you are processing in the invention.

24   Obikane is only showing a macroblock and processing a

25   macroblock.

1           And when we get to the prosecution history, as

2      exemplified from one of the patents in Slide 16, you can

3      see that that is what was distinguished.  It isn't

4      distinguishing little itty-bitty sub-blocks, it is

5      distinguishing the decoding on a macroblock basis.

6      Obikane discloses decoding a macroblock, which we know

7      from Obikane is 16 by 16.

8           Then it goes on --  Obikane does not disclose encoding

9      and decoding processes involving more than one macroblock,

10     which is what the patents in suit do.  If a macroblock

11     could be 8 by 8, as Microsoft would suggest, then a pair

12     of macroblocks would be 8 by 16, four would be 16 by 16,

13     the pair and the group of macroblocks would not be

14     distinguishable from Obikane's 16 by 16 array on the basis

15     that was argued successfully to the examiner.

16          That shows that if there were any doubt about what

17     Motorola ever had in mind, Motorola gave up any claim in

18     distinguishing Obikane to macroblocks that could be less

19     than 16 by 16.  Otherwise, they could not have made this

20     argument, and the examiner would not have accepted it.

21          This shows that Motorola had limited itself to a

22     macroblock of 16 by 16, so that a pair of them would be

23     bigger than the Obikane 16 by 16 to allow the processing

24     of a pair of macroblocks to be distinguishable from

25     Obikane.  That is an unequivocal surrender.  If it needed

1   a surrender.  I submit that it didn't.  But this is an

2   unequivocal surrender of macroblocks that are less than 16

3   by 16 in order to successfully overcome the Obikane

4   reference.

5       This, to me, ultimately, on top of everything else,

6   ought to be dispositive of what a macroblock is in the

7   patents as issued after the completion of the prosecution

8   history.

9       Your Honor, should I pause here in case you have a

10  question on that?

11          THE COURT:  No, I think I understand your

12  argument.

13          MR. JENNER:  I will go on to 17.  What I have done

14  through Slide 16, your Honor, is to try to show that the

15  patent as a whole, when you look at the usages of

16  macroblock, the incorporation of the standard, including

17  one incorporation that actually talks about macroblock as

18  used in the standard, when you look at other claims which

19  differentiate different sizes of blocks from a macroblock,

20  from a picture, from a slice, from smaller blocks, when

21  you look at the efforts that were made to enable field

22  coding to be as useful as frame coding by creating 16 by

23  16 macroblocks to pairs of macroblocks, and then when you

24  look at the prosecution history, all of these independent

25  events and statements add up to a totality that,

1   regardless of the use of the word "preferable," the only

2   thing that was comprehended that was used, that was

3   disclosed, that was enabled -- able to distinguish the

4   prior art, was a macroblock that had to be at least 16 by

5   16 pixels.  Nothing else would have worked, and the

6   examiner would have held the patent invalid over Obikane

7   if macroblocks could have been smaller than 16 by 16.  The

8   distinction made to overcome the reference could not have

9   been made.

10       Now I will deal with the other issue, which is whether

11   or not luma and chroma should be included in the

12   definition.  That is Slide 17, your Honor.

13       And then what I put on here is -- up above, is the

14   incorporated definition again from the standard, in which

15   the standard itself, incorporated by reference,

16   characterizes the array in terms of luma samples and

17   chroma samples.

18       And then at the bottom, another excerpt from Obikane,

19   which is part of the intrinsic record.  This is prior art

20   that was cited and distinguished.  Obikane first described

21   the macroblock as being, again, a 16 by 16 array of

22   picture elements, which of course helps me on the first

23   point, and then goes on to characterize those in terms of

24   data blocks that represent color different signals, the

25   brightness data, Y[1] through Y[4] being the brightness

1   data, that is luma; and the data block Cb[5] and Cb[6]

2   representing the color differences, that is chroma.

3       In both the incorporated standard and in the prior art

4   it was understood that the 16 by 16 array of pixels means

5   luma samples and corresponding chroma samples.  So it is

6   appropriate to describe it either way.  It makes sense to

7   let the jury know that it is luma and chroma, to the

8   extent that is going to come up.

9       Slide 18, I just take my parting shot at why we submit

10  that Microsoft has ignored the relevant intrinsic

11  evidence.

12      I have five points here.  First, Microsoft downplays

13  or ignores the explicit incorporation of the standard

14  definition of macroblock.  And I submit to your Honor that

15  the LGE case is really very close on this point.

16      The specification consistently discloses macroblocks

17  as being only 16 by 16, no matter what my admitted concern

18  is about overcoming the use of the word "preferable."

19  There is a continuous and exclusive use of 16 by 16 in

20  ways that would only work.  Nothing else will work in the

21  context of what was disclosed.

22      That leads me to the third point, which is that

23  Microsoft has in fact failed to read the specification as

24  a whole in order to make it internally consistent, such as

25  the need to be able to render all of the smaller blocks

 1      that will be processed.

 2          The extrinsic evidence that Microsoft has submitted to

 3      your Honor is really -- it is inconsistent.  It is really

 4      irrelevant.  It is one patent that has nothing to do with

 5      this case, and it is two proposed standards that wound up,

 6      to paraphrase somebody else's writing, in the boneyard of

 7      abandoned standards.  They were not the ones that ever

 8      became used.  They didn't become standards.  The one that

 9      is incorporated by reference is the one that matters, and

10      it supports Motorola.

11          And then, finally, the intrinsic record makes it clear

12      that pixels correspond to luma and chroma.

13          And, finally, on Slide 19, I conclude with these

14      various internal patent references to the different other

15      sizes of kinds of blocks which Microsoft's definition

16      would improperly encompass.  We know that pairs of

17      macroblocks have to be 16 by 32, two 16 by 16s, and that

18      is explicitly called out in Column 7 in Figure 7.  We know

19      groups of four are 32 by 32.  That is expressed and called

20      out.  We know that the smaller-sized blocks that are

21      wanted for the processing techniques go from 16 by 8 down

22      to 4 by 4.  That is called out in several places.  The

23      only way you can accomplish all of this is if you

24      recognize the patent as a whole, this teaching, that a

25      macroblock has to be a 16 by 16 array.

```
 1        I have probably said enough.  Does your Honor have any

 2   questions?

 3            THE COURT:  One last one.  The '374 patent, you

 4   will get tired of me talking about this, states, "The

 5   documents establishing the standard are hereby

 6   incorporated by reference, including the joint final

 7   committee draft."

 8            MR. JENNER:  That is Column 4, your Honor?

 9            THE COURT:  That is Column 4.  And then the next

10   paragraph says, "Although this method of AFF encoding is

11   comparable with and will be explained using the standard

12   guideline, it can be modified and used as best serves in a

13   particular standard or application."  What does that

14   language mean?

15            MR. JENNER:  Your Honor, that is a statement that

16   says you could do it other ways.  It is like the statement

17   that generally appears at the back of the patent that says

18   persons of skill in the art will recognize that the

19   patents should not be limited.

20        I certainly acknowledge, your Honor --

21            THE COURT:  I want to know what it means.  Why is

22   it there?  You have already confessed to the cardinal sin

23   of importing from the specification.

24            MR. JENNER:  All I can tell you is my take on it.

25   My take on it is that the lawyer was trying to preserve
```

1     the opportunity to imagine other ways in which this could

2     be done.  He has said, in effect, although the standard is

3     important, there might be other ways to do this.  And I

4     have a problem with that.  Of course I do.

5         But I submit to your Honor, when you take all of the

6     things that I have pointed out to you together, and look

7     at those in light of the federal circuit cases that say

8     when it is clear on the reading of a patent as a whole

9     that the only disclosed embodiment is the invention, then

10    the claims should be limited to that.

11        If your Honor wants cases on that, we would be glad to

12    get them for you.

13            THE COURT:  Thank you, Mr. Jenner.

14            MR. CEDEROTH:  May I proceed, your Honor?

15            THE COURT:  Mr. Cederoth, go ahead.

16            MR. CEDEROTH:  Your Honor, to some extent I

17    hesitate to weigh in, because I think you have stolen all

18    my thunder with your questions.

19        Let me start first with where you always start with

20    claim construction, and that is the claims, what does the

21    language of the claims say.  Here, the claims use the

22    expression -- the term "macroblock."  All of the claims in

23    all three of these patents use the term "macroblock."

24    None of the claims specify a size.  None of the claims

25    specify luma.  None of the claims specify chroma.

1    You would think that if a particular size was key to

2  this invention, that some of the dependent claims might

3  have come along and said, oh, 16 by 16, or 32 by 32, or 8

4  by 8, or some other example.  That is sort of a typical

5  patent lawyer effort to get the specific while still

6  claiming the broad.  Here, they only claim macroblock.

7    As counsel pointed out, though, if you look at the

8  claims -- again, just the claim language, each of the

9  claims refers to some portion of the picture that is

10  larger than a macroblock.  In the end, the invention that

11  was claimed in these various permutations in all three of

12  these patents is processing two or more macroblocks at the

13  same time.  I will come back to that when we discuss

14  Obikane and the prosecution history.

15    But they refer to these smaller portions of the

16  picture, but larger than a macroblock, as smaller portions

17  in the instance of all the claims of the '374 and '375.

18  And in the '376 they refer to them as processing blocks,

19  again, which comprise either a pair or a group of

20  macroblocks.

21    As a whole, the claim language manifests an effort not

22  to be limited to any particular size.  And this is

23  confirmed really with the specification.

24    A little bit --

25            MR. JENNER:  Could counsel provide a copy of the

```
1    slides?  I'm sorry.
2              THE COURT:  You may approach.
3              MR. CEDEROTH:  I will approach.
4        Let me start with the invention, your Honor -- what
5    the patent document purports to describe as the invention.
6    This concept of adaptive field/frame coding was something
7    that was known in the art.  Among his remarks this
8    morning, Dr. Drabik discussed that.  The patent describes
9    it, known in the art, as having been applied on a picture
10   basis, picture by picture.
11       The patent, as shown here in Column 4, purports, by
12   way of the present invention, to extend the concept of
13   picture-level AFF, or adaptive field/frame coding, to
14   macroblocks; and then as we see in the claims, to doing it
15   in some smaller portion of the picture that comprises
16   multiple macroblocks.
17       The picture as a whole could be --  A typical size
18   might be 480 by 720 pixels.  The patent takes pains not to
19   define what the size of the picture is.  And as we have
20   seen, they have always made clear that the 16 by 16 is the
21   preferred embodiment.
22       In terms of the notion of providing optimal sub-block
23   size for doing this AFF coding, the patent could have
24   described using some part of the picture by way of
25   relative size.  It could have described it as, for
```

example, dividing the picture in half, or taking a tenth of the picture or a twentieth of the picture, and processing it in that manner.

Instead, the patent refers to use of macroblocks.  And it tells us, at Column 5, 56 to 58, that a macroblock is a rectangular group of pixels.  In the immediately succeeding sentence it says, "A preferable macroblock is 16 by 16 pixels."

It comes back then later in Figure 5 with an even more generic description.  It says, "The macroblock has M rows of pixels and N columns of pixels."  Again, M and N are just held out as genetic variables.  They possibly could be the same, they possibly could be different.  The patent does not impose any specific limitation on the value of M or N.

Again, in the next sentence it says, "A preferable value of N and M is 16," making the preferred macroblock 16 by 16.

Motorola refers at length to the AVC standard that is referenced in the patent document.  And there is no doubt that it is referenced in the document.  But it expressly refers to it as an example.  This is the language the court was just asking counsel about.  While it says that the method of AFF coding is compatible and can be explained using the guidelines and the standard, it also

1    says it can be modified and used as best serves a

2    particular standard or application.

3        I submit we are here talking about 16 by 16, because,

4    in fact, the standard that was adopted was the AVC

5    standard.  It was a subsequent draft of what was attached.

6    And the accused products attempt to be compatible with the

7    standard.

8        I also submit that if a slightly different standard

9    had been adopted, counsel would have been up here pointing

10   to this language and saying, this patent is not limited to

11   this particular standard, you must be kidding me.  And the

12   patent document itself, as a whole, from front to back,

13   uses what the federal circuit has referred to as words of

14   inclusion as opposed to words of exclusion, in terms of

15   referring to the preferred embodiment.  And here, there is

16   no doubt that the preferred embodiment is 16 by 16.  But

17   that is not the only size that would work.

18       Further, that the claims don't require --  Dr. Drabik

19   did talk this morning about Figures 3 and 6 in terms of

20   dividing macroblock into subparts.  The claims,

21   particularly the independent claims, don't necessarily

22   require that operation.  They may cover it, but they don't

23   require it.  Again, they are drafted in a way to be broad

24   and inclusive.

25       To some extent --  I'm not sure whether counsel was

1     attempting to hinge arguments on Dr. Drabik's tutorial

2     this morning by way of testimony.  I think not, because

3     the parties have agreed expert testimony was not required

4     for resolving this issue.  Neither party submitted expert

5     testimony in conjunction with the briefing.

6        But to the extent there is reference to some size that

7     must necessarily be incorporated in order for the

8     invention to work, the patent doesn't say that, and the

9     claims don't require the division into sub-blocks on which

10    the argument rests.  And, frankly, when you get right down

11    to it, it is just an issue of math.  16 by 8 blocks would

12    work for this issue, other sizes can be made to work.

13    That is really a sub-issue.

14       Let me talk just briefly, your Honor, about the case,

15    the LG Electronics case that counsel pointed to.  In that

16    case, similar to here, the industry standard was

17    incorporated as a preferred embodiment.  On our Slide 7 we

18    printed part of the case, the text from the decision.  At

19    the bottom we provided a chart which shows the language

20    that was used in the patent at issue in the LG Electronics

21    case, and the language which is used in the '374 patent.

22       But in LG, the court did not find that the patent had

23    used the standard to define the disputed term.  The court

24    went on to say that the standard was in fact evidence of

25    how one of skill in the art would use the term.  There is

1   no doubt that the standard here is also an example of a

2   macroblock.

3       But there are other examples of macroblock.

4       One final word on the standard, your Honor.  When you

5   go to the standard document itself, it is not actually

6   trying to provide meaning of the terms as understood in

7   the industry at large.  In fact, what it is trying to do,

8   and what it purports to do, is provide definitions that

9   apply to that standard, presumably because these terms

10  were used differently or may well have different terms to

11  those of ordinary skill in the art when they pick up the

12  standard.

13      So for this standard, that is the size.  And that

14  makes perfect sense.  In every specific implementation,

15  when you are going to set out to do this type of coding,

16  you are going to have to pick a size.  The macroblock is

17  going to have to have a size.

18      But the issue before the court is the patent document,

19  and whether the patent document has been drafted by the

20  inventors and their attorneys in a manner which limits it

21  to a specific size.  And there is no evidence that it has

22  done that, or that the inventor sought to do that.

23      We have added a number of slides here, your Honor.

24  These are exhibits which were attached that the briefing

25  referred to.  These just provide additional examples of

1    how macroblock was used in the prior art to refer to a

2    block size, which is not 16 by 16.  There is no need to

3    read them.  It is simply Slide 7 through 11 of our chart.

4        There were some other issues, though, that counsel

5    raised that I would like to address.  One is the issue of

6    the Obikane reference in the prosecution history.  There,

7    counsel put up a slide describing Obikane, and a quote

8    from it, that the macroblock there is 16 by 16.  And he

9    put up a slide which included the argument from Motorola's

10   patent lawyer as to why Obikane did not anticipate.

11       The problem is that the examiner did not accept that

12   argument.  The argument stated was not the basis upon

13   which the examiner allowed the claims or found that the

14   claims distinguished from Obikane.

15       In fact, what the examiner required, and as was each

16   of the independent claims in all three patents, were

17   amended to add the phrase "At a time" in multiple

18   instances, and the reasons for allowance.  These are

19   attached, your Honor -- the amendments are attached to our

20   brief, I believe at Exhibits D and E, in terms of the

21   reasons for allowance in the amendments.  There are

22   other --  The same amendment was made in each of the

23   prosecution histories.  We attached just the one example.

24       But in each reason for allowance, the examiner

25   underscores that the distinction over the art hinged upon

 1    the language that the examiner added, "at a time," not the

 2    other language in the claim.

 3        So I agree with counsel, in the absence of that,

 4    Obikane would anticipate.  I mean, that's the way

 5    anticipation works.  16 by 16 is an example of a

 6    macroblock.  And Obikane had 16 by 16 macroblocks.

 7        Briefly, there was mention that a Microsoft author had

 8    referred to 16 by 16 macroblocks.  The document that

 9    flashed up on the screen was in fact the document about

10    the standard.  And I don't think anybody disputes the

11    standard, the AVC standard that was being referred to,

12    uses 16 by 16 macroblocks.  That is simply chronological.

13    The standard has to have a standard size, and that is the

14    size that standard uses.  But that begs the question of

15    whether this patent document is limited to 16 by 16.

16        Again, the same in terms of the standard and this

17    issue of subdividing the macroblock into sub-blocks.  The

18    standard doesn't require that either.  It can be done, or

19    it need not be done.  Sometimes macroblocks can be

20    processed as the entire macroblock itself.

21        The luma and chroma issue, your Honor:  First, let me

22    go back to the claim language on that issue.  Each of the

23    claims referred to -- that are at issue here, refer to

24    decoding a picture.  There is no limitation that that

25    picture be a color picture.  The picture is what the

picture is.  There would not be separate luma and chroma
information for a black and white picture.

Again, the claims are drafted at the general level,
not at a specific level.  So layering in luma and chroma
is contrary to the language of the claims itself.

Further, when you go to the actual processing details,
whether it is in Obikane or in the standard, all that
shows is that luma and chroma are processed separately.
They are still talking about a macroblock of a particular
size in each standard.  And a macroblock in the patent is
this generic size, again, with the preferred embodiment
being 16 by 16.

It is a little bit of a strange hat I am wearing
today, your Honor, as the accused infringer, standing here
saying that patents should not be limited to its preferred
embodiment.  I suspect the court has heard that turned the
other way many times in other cases.

This patent is drafted not unlike many of the others
you have encountered, as the pro forma paragraphs at the
end.  But, again, looking at the document as a whole, it
is drafted in terms of exclusion/not exclusion.  It would
have been a simple thing to say that the invention is 16
by 16 macroblocks.  It would have been a simple thing to
write that size into the claims.  To try to incorporate it
by reference seems a very odd way for inventors to

1  articulate a limitation that counsel now argues to be

2  critical to the invention.

3      Your Honor, I am finished, unless there is anything I

4  can answer for the court.

5          THE COURT:  I understand the argument.

6      Mr. Jenner, you have three or four minutes, and then

7  you are done.

8          MR. JENNER:  I would like to make five or six

9  points, your Honor.

10      The first one is, I think that counsel's first point

11  actually supports my position.  Counsel is wondering why

12  there weren't dependent claims that called out specific

13  sizes, such as a dependent claim that might say, wherein

14  the macroblock is 16 by 16, or some other block is 8 by 8.

15      I submit, your Honor, that actually turns the other

16  way.  If there had been a dependent claim in this patent

17  that says the macroblock is 16 by 16, that would be

18  evidence by claim differentiation that the independent

19  claim is not limited to a macroblock of 16 by 16.

20      The fact that they didn't add that kind of dependent

21  claim is actually some evidence they were not thinking of

22  16 by 16 as a subset of something larger.  So I think that

23  actually should be taken the other way.

24      Your Honor, I would like you to look, if you can --

25  unless counsel can do it for me, at Microsoft's Slide 7,

1    which is the slide in which they characterize and compare

2    the LGE case.  I think that actually also helps to make

3    our point.  They note that in LGE the industry standard

4    was incorporated, but as a preferred embodiment.

5        And then they have a second quote that says the

6    specification makes this clear by saying that although we

7    will describe this in a Multibus II environment, it can be

8    appreciated and used in other ways.  That is exactly what

9    we have got with the '374, '5 and '6 patents.

10       Then in the bottom lower left they say again, although

11   the method and apparatus will be described in the context

12   of multi BUS two, the standard, it should be appreciated,

13   can be practiced in many digital computer systems having

14   other BUS arrangements.

15       In the lower right, although the method was AFF

16   coding, they can compare it to what was said in LGE.  The

17   interesting factor is, the federal circuit went on to say

18   that is precisely the situation where it was wrong to

19   limit it to the preferred embodiment, and you should have

20   adopted the definition of the standard.  So I submit that

21   Microsoft's own chart helps to make my point that LGE is

22   very much on point for what happened in this case.

23       Counsel referred to the prior art Legall --

24   L-E-G-A-L-L, patent as having some different size.  Slides

25   10 and 11 referred to those other two proposals.  Those

 1   are the things I characterized, your Honor, as extrinsic

 2   evidence, that, number one, can't be used to contradict

 3   intrinsic evidence.

 4       In any event, those proposals are the ones that wound

 5   up in the boneyard of abandoned proposals.  They were

 6   never adopted, never became anybody's state of the art

 7   recognition of anything.

 8       It is the H.264 standards that we charted through time

 9   in Slide 6 and 7 of our slides that show what actually did

10   become the paradigm for the level of knowledge and skill

11   in the art.  So this extrinsic reference to other

12   documents really cannot be used to contradict all the

13   intrinsic evidence that I showed you.

14       Counsel characterized the invention as being a 16 by

15   16 macroblock.  That is not the invention.  When your

16   Honor reviews the patent, what you will see is that the

17   invention was the utilization of macroblock pairs.

18   Macroblock pairs.  So that you have a 16 by 32 array that

19   would enable you to get those additional smaller blocks

20   that could be used in frame mode but not in field mode.

21   And that's what is claimed in the claims.

22       When you look in the claims, you will see that the

23   invention is characterized in terms of pairs or groups,

24   larger numbers of macroblocks, not a single macroblock.

25   The invention here wasn't 16 by 16.  That was what was

1    known in the art by virtue of the standard.  That's what

2    everybody knew a macroblock was.

3        The invention was working on processing blocks, which

4    the claims defined to be two or more macroblocks.  It is

5    right in the claims.  Or on smaller portions.  In the

6    spec, a smaller portion is defined to be one, two or four

7    macroblocks, and the claims then go on to refer to two

8    smaller portions.

9        So in all of the cases, the claims, in one variation

10   or another, are talking about two macroblocks or more as

11   providing the advance in processing that gives you the

12   invention.  The invention was not a 16 by 16, or any other

13   size, macroblock.  It was already known that a macroblock

14   was 16 by 16.

15       My last point is the differentiation of Obikane.  If

16   we could have up one more time our slide.  I think it is

17   18.  It is 16.  Slide 16, which we are landing on, makes

18   it very clear that what Motorola argued, which would be

19   the basis for any limitation by Motorola, is that Obikane

20   discloses processing on a single macroblock basis, which

21   Obikane called 16 by 16.

22       Obikane does not disclose processing involving more

23   than one macroblock, or a scanning path to encode or

24   decode plural macroblocks, two or more macroblocks.  That

25   was the distinction of the prosecution by Motorola over

1    Obikane.

2        That is the reason why the examiner in his amendment

3    put "at a time," because he was saying you took a

4    processing block of two macroblocks or two smaller

5    portions, two macroblocks, and you processed the two

6    macroblocks at a time.  That is what "at a time" meant.

7        There was nothing in this prosecution about Obikane

8    disclosing smaller units, and whether or not you could

9    process smaller units.  The distinction Motorola made and

10   that the examiner accepted with his amendment was that

11   Motorola processes two or more macroblocks at a time,

12   unlike Obikane.  That is the "at a time" with the claims.

13       All of this evidence adds to what I submitted at my

14   opening, a macroblock needs to be understood as being a 16

15   by 16 array.  That was the understanding in the art, the

16   patent, the claims, the prosecution history.  I submit,

17   your Honor, it is the right instruction.

18           THE COURT:  All right.  We will take our morning

19   break at this time, which will be 15 minutes or so.  When

20   we come back, we will do Claims 9 and 10.  I am going to

21   give you 15 minutes for each of them, divided seven and a

22   half, seven and a half.

23       I will tell you that the constructions proposed on 9,

24   in particular, do not make sense to us.  They may be

25   staking out some further position in the litigation, but

1    they certainly have nothing to do with the patent.  Know

2    that you have a selling job to do on that one.

3        We will finish that at approximately 11:20 or so, and

4    that will give us 40 minutes to talk about where we go

5    from here.  We will be in recess for 15 minutes.

6    (At this time a short break was taken.)

7            THE COURT:  Counsel, Term 9.

8            MS. HIGGINS:  Yes, your Honor.  Good morning.

9    Close to afternoon now.

10           THE COURT:  You are starting with a level playing

11   field by my having said I don't like either side's terms.

12           MS. HIGGINS:  That leads me to wonder which side's

13   construction you like less.  I will do my best to persuade

14   you that Motorola's construction is the correct one.

15           THE COURT:  Let me help you.  I think our problem

16   is, in part, we have done back-to-back jury trials, and we

17   had a jury that couldn't figure out what the word

18   "furtherance," as in "in furtherance of a conspiracy,"

19   meant.  I don't know how you all expect someone to

20   understand, "Wherein at least one block within said

21   plurality of smaller portions at a time is encoded in

22   inter-coding mode."

23       Folks, they come in here, we pay them $10 a day, they

24   try really hard.  Our job is to be helpful.  That is just

25   not helpful.

 1          I think Motorola's proposed construction is a

 2     regurgitation of the patent terms, which is good.

 3     "Inter-coding mode" is not a -- that is just not in their

 4     vocabulary.  I don't think they are going to figure it out

 5     at trial.  I am looking for a way to give them terms that

 6     they are going to be able to understand.  That's what my

 7     concern is on 9.

 8          MS. HIGGINS:  Okay.  If you could bring up

 9     Slide 62, please.  I am actually going to our brief,

10     because we had dropped from the construction here a

11     definition of inter-coding mode.  So if you can turn to

12     63.

13          The parties during the exchange had exchanged

14     definitions for inter-coding mode, and there didn't appear

15     to be any dispute.  So we dropped ours.  But let me see if

16     I can bring that up.

17          In Motorola's brief, at Page 8, we provided a

18     construction for the words "inter-coding mode."  And we

19     said that it is a mode that uses information from both

20     within the picture and from other pictures.  The concept

21     there, your Honor, is just to try to distinguish this

22     inter-coding from intra-coding.  Both intra and inter are

23     forms of prediction.  We would definitely have testimony

24     to explain prediction.  And obviously intra is what

25     happens within a picture frame, and inter is what happens

```
 1    when you are using information from one picture frame to

 2    predict within another picture frame.

 3        I propose that if the court seeks to define

 4    inter-coding, we have provided a definition.  I don't

 5    think that Microsoft has provided one in return.

 6        As to --

 7             THE COURT:  What if we defined it more along the

 8    lines of:  Is encoded in inter-coding mode, dash, a coding

 9    mode which uses information from both within the picture

10    and from other pictures?  I think they could understand

11    that.

12             MS. HIGGINS:  That sounds fine, your Honor.

13             THE COURT:  Good.  Would you like to sit down

14    then?

15             MS. HIGGINS:  If you say so.

16             THE COURT:  That was a joke.

17             MS. HIGGINS:  If you are good with that, I would

18    be happy to sit down.

19             THE COURT:  All right.  Let's hear what Microsoft

20    says.

21             MS. HIGGINS:  There is another dispute, and that

22    is the term "is encoded."

23             THE COURT:  All right.  Please be heard on that.

24             MS. HIGGINS:  As you can see in Slide 63, Motorola

25    proposes that the words "is encoded" is clear on its face.
```

1  Microsoft, on the other hand, would change the words "is

2  encoded" into an active verb, and require that there be a

3  separate encoding step within the overall decoding

4  process, which is what is claimed in the claims.

5      And so we have framed the dispute in Slide 64 as,

6  "Does the language 'is encoded' describe the state of

7  already being coded in inter-coding mode, and not a

8  separate step of encoding?"

9      I submit to you if we turn to Slide 65, and we look at

10  the claims in which the term "is encoded" appears, in the

11  context of the whole claim, "is encoded" is referring to

12  the state of certain information, for instance, the state

13  of a picture, the state of a block as it is received by

14  the decoder.

15      And one of the things, just in terms of the overall

16  context of this patent, you will notice, your Honor, that

17  in all three of the patents there are separate steps to

18  encoding, and there are other steps -- excuse me, other

19  claims to decoding.  And here we are dealing with the two

20  claims that are at issue here that contain the words "is

21  encoded," are both claims to decoding.

22      As is clear from the claims, we are talking about

23  decoding an encoded picture.  And what is important there

24  is, one of the distinctions between the encoding claims

25  and the decoding claims, is that the person who wrote the

1   claims is telling us about the state of the information

2   that is received from the encoder.  So certain actions

3   took place in the encoder, and now these decoding claims

4   are describing active steps, but they are also describing

5   the state of the information.

6           THE COURT:  All right.

7           MS. HIGGINS:  If we look at the claims --

8           THE COURT:  We have debated this question at some

9   length.  I think I understand your argument.

10     Is the person who wrote Claim 8 still alive?

11          MS. HIGGINS:  I believe so, your Honor.  That's --

12          THE COURT:  Hopefully they are old enough that

13  they are no longer contributing to the gene pool.  That is

14  the singularly worst written claim.  We have tried

15  everything, and you cannot make sense out of that claim.

16  I am happy to hear he or she is still with us.  Thank you,

17  counsel.

18     Mr. Cederoth, can you limit your remarks to the

19  encoding portion of this?  It seems to me that the

20  Microsoft argument is absolutely correct, in that you have

21  added an additional step in here.  You do it several times

22  during the course of your claim construction, where you

23  are taking an I-N-G word and construing it in a manner

24  that it is both the activity and then the result.  So help

25  me with why you do that.

1          MR. CEDEROTH:  For two reasons, your Honor.  If I

2     could put up the claim language with this term, and just

3     close the loop you started with counsel.

4        We are in agreement with the court's phrasing on what

5     inter-coding mode means.  That's great.  We have defined

6     what that means.  That is tacked on to our construction as

7     well.

8        Specifically the court's question:  The claims are

9     themselves not particularly clear.  And if you read all

10    the claims in the patent, these claims that we are looking

11    at right now, as in the '374 patent, this phrasing is used

12    in every one of the claims of the '374 and the '375,

13    except in the '375 it refers to intra-coding mode, so that

14    the same issue awaits us in the '375.

15       The next term on the docket today is this issue of "is

16    received."  And we will come back to that.

17       But looking at Claim 2 of the '374 patent, your Honor,

18    this is a claim that -- it's a method claim, and refers in

19    fact to an encoding method.  It is the dependent claim of

20    Claim 1, which is a method of encoding.  But in Claim 2,

21    it says the method of Claim 1, "Wherein at least one

22    motion vector is computed for at least one block,"

23    et cetera.  The same English phrasing is used,

24    "Wherein --"

25             THE COURT:  Counsel, what column are you in in the

1   '374 patent?

2          MR. CEDEROTH:  I'm sorry, your Honor.  I am in

3   Column 18, Lines 4 through 6, Claim 2.

4          THE COURT:  Thank you.

5          MR. CEDEROTH:  The same phrasing is repeated in

6   the next claim, Claim 3, which is Column 18, Lines 7 to

7   19.  There, it refers to, "Wherein at least one motion

8   vector is spatially predictive coded."

9       So the patent document, the author here, has used this

10  phrasing to refer to an actual operation, in contrast to

11  an operation which occurred in the past which creates a

12  state for a particular -- in the instance of Claim 8, for

13  this particular block.

14      So just looking at the document itself, it is not

15  clear in any particular instance when this phrasing

16  technique is used, whether it is referring to an operation

17  or to the status of a particular entity.

18      In Claim 8, as with all the independent claims in all

19  of these patents, it has the added phrase of "at a time"

20  in multiple instances.  This is something the examiner

21  added in the examiner's amendment in each of the patents.

22      In the context of Claim 8, it occurs -- look, your

23  Honor, at Column 18 of the '374 at line 44.  The "at a

24  time" first appears at line 47, where it says "Decoding at

25  least one of said plurality of smaller portions at a

1    time."  And it occurs in the next line, where it again

2    refers to "smaller portion at a time."  And then the

3    language that we are discussing now appears at lines 50

4    through 52, where it refers to these smaller portions, and

5    "at a time" is encoded in inter-coding mode.

6        As we discussed in the context of the amendment to the

7    distinguish Obikane reference, the examiner was importing

8    this temporal limitation.  Counsel has explained that the

9    notion of the invention was that multiple macroblocks were

10   being processed together at a time.

11       And just trying to make sense out of this language,

12   your Honor --  It is used clearly elsewhere in the patent

13   to refer to an operation which is performed, it is linked

14   to the decoding operation, which is clearly an operation

15   that is performed and is linked to this temporal

16   limitation of "at a time."

17       And, frankly, to turn it around, it doesn't make a lot

18   of sense to have "at a time" appended to the status of

19   this block.  I am not really sure what that would mean

20   then.

21       Interestingly -- maybe not interestingly, your Honor,

22   but when we get to the '375 patent, the phrasing there,

23   the "at a time" is moved in the language to a slightly

24   different place, but also again in relation to this "is

25   encoded."

1       Your Honor, it is far from perfect, but it is the best
2   we can make of it, is that it refers to an actual
3   operation as opposed to the status of the block.
4           THE COURT:  All right.  Thank you.
5           MS. HIGGINS:  Your Honor, can I make a few
6   comments?
7           THE COURT:  You used up all of your time.  If you
8   want a minute, we will take it out of your Claim Term 10.
9           MS. HIGGINS:  Very, very quickly, your Honor.
10      Can you bring up Slide 65, please?  Mr. Cederoth
11  suggested that the "at a time" language modifies
12  processing.  But in fact, the "at a time" language
13  modifies the "at least one of said plurality of smaller
14  portions."
15      And in the claim language, where it is referring to
16  "at least one block within at least one of said plurality
17  of smaller portions at a time," the "said plurality of
18  smaller portions at a time" is an antecedent reference
19  back to the smaller portions above.  It is not suggesting
20  that there is an action there.  As I said, I believe from
21  the overall context of the claim, we are talking about the
22  state of the blocks, just as we are talking about the
23  state of the pictures, not any actions.  It wouldn't make
24  sense to add an encoding step into a claim that is
25  claiming decoding.

```
 1              THE COURT:  All right.  You are up next, counsel.
 2              MS. HIGGINS:  Yes.  If you would give me one
 3    moment?
 4         May I have Slide 67, please?  The next claim term is
 5    another "wherein" clause.
 6         68, please.  Once again, your Honor, Motorola has
 7    proposed that no construction is necessary here.  The main
 8    issue in dispute, Slide 69, please, is really whether a
 9    received motion vector can be a value that represents the
10    amount of motion as opposed to a value that contains,
11    i.e., is the amount of motion.
12         70, please.  Now, Dr. Drabik, in his tutorial,
13    discussed the calculation of motion vectors.  And he
14    referred to motion vectors in both their compressed and
15    uncompressed form.  And I think that is an important
16    concept to note, that the motion vectors, just like all of
17    the information that you want to encode, are compressed.
18    You do that because motion vectors themselves take up
19    bits, and you only want to send as few bits as you can
20    over the bitstream.
21         Motorola's proposed construction --  We propose the
22    words "value that represents the amount of motion" is more
23    accurate than "value that contains the amount of motion,"
24    because "contains the amount of motion" would refer only
25    to the fully uncompressed motion vector.  It is clear from
```

1    the specification and the claims that motion vector is

2    referring to both the compressed version of the motion

3    vector and the uncompressed version of the motion vector.

4        Let's take a look at the patent specification on

5    Slide 70.  Here, as Dr. Drabik explained, within the

6    encoder motion vectors are compressed.  And it can be

7    complicated the way that is done, but very simply -- not

8    very simply, but what you are doing to compress the motion

9    vector is, you calculate something that is called a

10   predicted motion vector.  And then in simple terms you

11   subtract your predicted motion vector from your fully

12   uncompressed motion vector, and you get a difference

13   value.

14       What is sent in the bitstream to the decoder can be a

15   compressed version of the motion vector.  It can also be

16   an uncompressed version.  It can be either.

17       And the second -- the first statement here in the

18   specification, I have highlighted the specification in the

19   first block, the last line, where it says, "This generates

20   compressed bits for motion vectors," which supports the

21   fact that motion vectors can be represented with

22   compressed bits.  And those compressed motion vectors can,

23   in turn, be transmitted in the bitstream.

24       Next slide, please.  Now, one of the very large

25   concerns that we have with Microsoft's proposed

1   construction is that they have actually based their

2   construction on language right out of the specification,

3   except it is not language right out of the specification.

4   They actually took the words "containing in the amount" --

5   "containing the amount of temporal motion required for the

6   image to move to a new temporal position in the picture,"

7   they took out the word "containing" and they replaced it

8   with -- Excuse me.  They took out the word "represent."

9   I'm sorry.  I had that backwards.  The specification is

10  shown at the bottom of the page.  The specification uses

11  the word "represent."  Motorola's construction took out

12  the word "represent" and replaced it with "containing."

13  And in doing so, that leaves room for Microsoft to argue

14  that the motion vector then only refers to the fully

15  uncompressed motion vector, as opposed to information that

16  represents the motion vector, which can be either the

17  compressed or uncompressed form.

18      Slide 72, please.  The next slide in that sequence.

19  The claims also support the fact that the motion vector

20  can be the motion vector in uncompressed form or

21  compressed form.  Both of them are supported by the claim

22  language.  And that is because Claim 10 refers to the

23  motion vector that is spatially predicted.  And so it is

24  referring to the state of the motion vector as it is

25  received by the decoder.  "Spatially predicted" means that

```
 1        it is a compressed version of the motion vector.
 2            And then down in Claim 12 -- here in Claim 12 the
 3        motion vector is then being reconstituted.  We are
 4        generating a motion vector from the predicted motion value
 5        and the difference value.  And so Claim 9 must necessarily
 6        be broad enough to encompass each of the independent
 7        claims.
 8            And so, overall, your Honor, it is Motorola's position
 9        that the motion vector should be construed to cover both
10        the compressed and uncompressed version of the motion
11        vector.
12                THE COURT:  Thank you.  Mr. Cederoth.
13                MR. CEDEROTH:  Yes, your Honor.  If I could, your
14        Honor, start where counsel ended.  The language that is
15        highlighted in 72 goes on to say, "Wherein at least one
16        prediction motion vector and a difference value received
17        in the bitstream are used to derive at least one motion
18        vector of said current Y."
19            If you go back to Claim 9, and the language that we
20        are attempting to construe here, it is "Wherein at least
21        one motion vector is received."
22            The dispute is simple, whether the motion vector is
23        received or whether it is calculated at the decoding.  And
24        this claim, Claim 9, says the motion vector is received.
25        That is 100 percent consistent with the specification in
```

1   relation to a motion vector as opposed to the predicted

2   motion vector.

3       This is the same quote from the specification counsel

4   just had up there, Column 6, lines 29 to 31.  It says,

5   "The motion vectors used for the temporal prediction with

6   motion compensation need to be encoded and transmitted."

7   They are being transmitted on the encoding end, and being

8   received at the decoding end, which is what Claim 9 refers

9   to.

10      Claim 12, that counsel refers to, adds on and goes

11  beyond that, and refers to additional values that can be

12  in the bitstream.  I think that's as simple as it gets.

13  That is where we are.

14          THE COURT:  Thank you.

15          MR. CEDEROTH:  Nothing further.

16          MS. HIGGINS:  Can I make one statement along this

17  line?

18          THE COURT:  Yes.

19          MS. HIGGINS:  Just to make clear, your Honor,

20  Motorola does not dispute that we are talking in the claim

21  at issue about the received motion vector.  The motion

22  vector is received by the bitstream.  The issue is whether

23  that motion vector can be both the uncompressed version of

24  the motion vector and the compressed motion vector.  We

25  submit it can.  Microsoft's proposal would be limited to

```
 1    only the uncompressed version of the motion vector.

 2        As for the word "receiving," there are other claims in

 3    different form that use the word "receiving."  For

 4    instance, the '375 patent, Claim 10, which uses the word

 5    "receiving" as a gerund, and this claim uses "is

 6    received."  So I would suggest that in this claim we are

 7    talking about the state of the received motion vector,

 8    versus an action which Microsoft would like to add to the

 9    claim.

10        But the real dispute, your Honor, is over what motion

11    vector is the received motion vector.  And clearly the

12    specification and the claims suggest that it can be both

13    the compressed and the uncompressed version.

14        And there is no reason to change the word "represent,"

15    which is in the specification, which Microsoft has changed

16    to the word "containing."

17            THE COURT:  Counsel, thank you.  I appreciate the

18    reminder on gerund.  I am sure I am going to be able to

19    use it in a crossword puzzle at some point.

20        We will take the construction of the terms under

21    advisement.  I am going to announce what I think is how we

22    should proceed, ask for comment on it, and then issue a

23    final decision.

24        It seems to me that what you have said today is that

25    Motorola's construction of the function component for
```

1    Terms 3, 4, 5, 7 and 8 is stipulated to by the parties.  I

2    went back and looked at the cases on the proper procedural

3    posture to then look at the question of how we deal with

4    that.  I think the appropriate way to do it is to allow an

5    opportunity based -- the court having accepted those

6    functions, to then argue the algorithm question.

7         I am going to --  Let me stop there.  Does anyone

8    disagree with that as a premise?  Mr. Jenner?

9              MR. JENNER:  I don't think I disagree, your Honor.

10   I think I understand what you are saying, is that you are

11   going to permit a follow-on motion.

12             THE COURT:  We will get to that in a moment.  We

13   are doing these in pieces.  Mr. Cederoth.

14             MR. CEDEROTH:  So far, so good, your Honor.

15             THE COURT:  Then the next step will be Microsoft

16   will file its motion in regards to 3, 4, 5, 7 and 8

17   under --  I am going to call it a motion for summary

18   judgment.  That seems to be what the cases refer to it as.

19   They seem to arise after the question of function has been

20   decided.  And you all now have decided it in this context.

21        Their motion for summary judgment by March 22nd.

22   Motorola will respond to that motion by April 6th.  And,

23   as I understand it, Mr. Jenner threw himself in front of

24   the train and said he wanted to argue both, Judge, you are

25   doing this in an incorrect procedural manner, and on the

1    merits.  So I would expect that both of those will be

2    covered if Motorola chooses to continue to assert the

3    former.

4        Microsoft's reply then will be due on April 13th.  And

5    the court will issue its decision then on the precise

6    question of, is there a sufficient structure described in

7    the claims that can withstand this challenge.

8        That leaves us Claims 1, 9 and 10, which we will

9    probably not issue an order on until after we get that

10   question resolved, because if we decide that we do need to

11   construe the terms, then we will do so.

12       Let me go back.  Mr. Jenner, do you have any comment

13   on that as a proposal?

14           MR. JENNER:  No, your Honor.  I think that's fine.

15   Just to confirm, I understand that from underneath the bus

16   I have leave from the court to argue all the things that

17   we think would be appropriate in response to whatever

18   exactly Microsoft files?

19           THE COURT:  Yeah.  I don't want you to go back and

20   change your definitions on structure.

21           MR. JENNER:  No.

22           THE COURT:  Yes, your argument, as I understand

23   it, is, Judge --

24           MR. JENNER:  We don't need an algorithm, but if we

25   do, here is what it is.

 1          THE COURT:  Yes.  Mr. Cederoth.

 2          MR. CEDEROTH:  Your Honor, on that point, there

 3   have been a number of contentious exchanges over the

 4   course of the case, according to the local rules and such.

 5   The one piece of this that we don't have a window into at

 6   this point is what Motorola would contend that that

 7   algorithm is.

 8          THE COURT:  They are going to have to explain it

 9   to us.

10          MR. CEDEROTH:  I wonder if we could have that

11   disclosure before we kind of swing at ghosts in our

12   motion.

13          THE COURT:  The answer is no, because you are

14   going to basically tell me all these cases that say what

15   they said.  You are going to get to comment on their

16   algorithm as part of your reply.

17          MR. CEDEROTH:  All right.  It isn't a whole

18   argument issue at that point.  Thank you, your Honor.

19          THE COURT:  That will be in the court's order on

20   how to proceed.  What won't be in the court's order on how

21   to proceed is taking all of you back to the woodshed.

22   Please don't do this to the court again.  We have limited

23   resources.  We prepare, as is hopefully apparent here,

24   really hard to do these Markman hearings.  When you come

25   in the morning of the hearing and announce, Judge, great

1   news, we have eliminated seven of the ten terms, we

2   appreciate you doing that, but please don't do it the day

3   of the hearing.

4       I guess I will order counsel to meet and really confer

5   on claim terms in the near future, because you have

6   another Markman hearing coming up in June.  And if you do

7   that to us again, you are going to have a very unhappy

8   judge, and an even more unhappy clerk.

9       Secondly, it is just a waste of the resources of the

10  court.  We do not have resources to waste.

11      That June date is somewhat up in the air, in that I do

12  not want you to do another ten terms until we get these

13  done.  So we will try and get these ten processed as

14  quickly as we can, given that I have opened you up for

15  further briefing.

16      The last topic then that I thought we would talk about

17  is, I am happy to hear your constructive proposals on RAND

18  terms, on how to move that forward.  Mr. Jenner, you said

19  you had some thoughts on that.  I'm not sure who is going

20  to speak for the parties.

21          MR. JENNER:  I think Mr. Cederoth had some

22  comments, but as your Honor might imagine, so do I.  I

23  would be glad to be heard on that.

24          MR. HARRIGAN:  I will be the one talking about

25  that, your Honor.  I am ready to do so now, if you wish.

1      THE COURT:  Mr. Harrigan, always nice to hear you

2  talk.

3      MR. HARRIGAN:  Well, the court said something

4  earlier about a potential opening in May.  My basic

5  message is, yes, please.  We would like to have this

6  mini-trial happen in May.  We think there should be no

7  reason why it can't happen in May.

8    The RAND issues that are presented here overlap very

9  significantly with issues that have already been presented

10  in the ITC case.  The experts have filed reports and

11  testified, the witnesses' depositions have been taken.  In

12  fact, we could, I believe, agree to have that record used

13  in part in this case, to the extent it has bearing.

14    Anyway, the bottom line is, Microsoft would be

15  prepared to proceed on that basis, and sit down in the

16  next few days with Motorola and work out a schedule that

17  would accommodate a date in May.

18    We actually came in here this morning, your Honor,

19  with the intention of asking the court for permission to

20  file a motion, which we understand that's what we need to

21  do.  So we are about to do that.  And this May date would

22  greatly mitigate the problem that we were going to be

23  addressing in the motion we were going to ask the court to

24  allow us to file, which is an anti-suit motion relating to

25  the imminent potential for an injunction to be entered

1     that literally would wipe Microsoft out of a $1 billion

2     market in Germany, based upon a set of rules that -- based

3     upon the very same issues that are before this court.

4         I will not argue my anti-suit motion, but we came in

5     here today with the intention of getting permission to

6     file that.  Because of the immense imminent damage that

7     would be done to Microsoft if the German court issued an

8     injunction, when the issue in this case of whether an

9     injunction is allowed worldwide, based upon the RAND

10    interchanges that have occurred, is the very issue for the

11    court to decide.  In other words, this court's ruling on

12    the issue of whether there is an injunction available to

13    Motorola will decide the German issue, and it will decide

14    for the entire world, because the RAND contract has a

15    worldwide base.

16        At any rate, your Honor --

17             THE COURT:  Don't you have that motion on file

18    right now?

19             MR. HARRIGAN:  We have a motion on file to the

20    effect that no injunction should be issued.  The reason --

21             THE COURT:  I think it is phrased in terms of no

22    injunctive relief is available.

23             MR. HARRIGAN:  Correct.  That's correct, your

24    Honor.

25             THE COURT:  How is your new motion going to be any

1    different?

2            MR. HARRIGAN:  The new motion, your Honor, is an

3    anti-suit motion that enjoins Motorola from enforcing an

4    injunction in Germany should one be granted on April 17th.

5    We believe, especially in the Ninth Circuit, such a motion

6    is highly appropriate.  There is quite a difference among

7    the circuits in the freedom with which such motions are

8    granted and the standards under which they are decided.

9        For example, your Honor, in Germany, they don't

10   recognize third-party beneficiaries, they don't recognize

11   injunctions involve equitable considerations, they don't

12   recognize a RAND defense.  Basically if you don't have a

13   license, you get enjoined.  It doesn't matter how

14   outrageous the license demand was.

15       So under those circumstances, we believe we are

16   entitled under the applicable law to have this court enter

17   an order that precludes Motorola from enforcing any such

18   injunction, because this court should decide the issue

19   under the law that is applicable in this case.

20       However, given the fact that April 17th is the date on

21   which that ruling will be made --  By the way, your Honor,

22   that case was filed eight months after this one.  Just

23   like in World War II, apparently they believe that

24   everything happening on a blitzkrieg schedule in Germany.

25   So it is already over.  And that's why Microsoft faces the

 1    potential literally to be stopped from selling Windows in

 2    Germany.   That is an enormous market.

 3        However, it may well be if we have this mini-trial in

 4    May that we can simply make an agreement with Motorola

 5    that, abiding the decision of this court, they will hold

 6    off in enforcing the injunction.   It is not

 7    self-enforcing.   And Microsoft will put up a $300 million

 8    bond in order to allow this court to proceed without any

 9    post-potential downside monetary risk to Motorola as a

10    result.

11        At any rate, your Honor, the bottom line is, we

12    believe a May date would solve a lot of problems.   It

13    would mitigate this issue.   It may obviate the need for us

14    to file any motion if we can reach agreement with Motorola

15    that, you know, however long it takes for this court to

16    decide, there will not be an injunction enforced in

17    Germany.   So we propose that we sit down next week and

18    work on a schedule to accommodate a May date.

19            THE COURT:   Mr. Jenner, I will hear you in a

20    moment.   Let me ask a couple of questions -- not

21    questions, offer some observations.   One, I am flattered

22    that I can tell the German courts what to do, but I'm not

23    sure how they are going to react to that.

24            MR. HARRIGAN:   It would actually be Motorola you

25    would be telling what to do.

1          THE COURT:  I was just going to say, you have now

2    couched it in terms of my telling Motorola that they can't

3    enforce a valid judgment they received in Germany.

4          MR. HARRIGAN:  It is analogous to the

5    first-to-file cases where the first-to-file court enjoins

6    the party from proceeding in the second filed case, except

7    it is international.  There is a fair amount of case law

8    on it.  One of the main factors is the risk of

9    inconsistent judgments between the U.S. District Court and

10   the foreign court.

11       And here the issue is a contract, the RAND contract.

12   The inconsistent judgment would be they don't even pay any

13   attention to it.  And yet, here, we are entitled to get a

14   RAND license, either because Motorola breached when it

15   made its demands, or because we didn't repudiate, and

16   therefore we are entitled to a RAND license.  If the court

17   makes either one of those rulings, there is no basis for

18   injunctive relief.

19          THE COURT:  All right.  Mr. Harrigan, you can go

20   ahead and sit down, but you are going to get called back

21   up here.

22       The difficulty that I encounter with my beloved notion

23   of having either a mini-trial or an expedited trial is how

24   to get around, or how to incorporate, the fact that under

25   an unusual set of Washington cases, construction of

1    contracts can, in some circumstances, be a question of

2    fact.  I'm not sure how they reach that, but that's what

3    they said.

4        Without getting into this, it seems to me that it may

5    well be that the appropriate way to do this is to ask you

6    to move for cross-motions for summary judgment on RAND,

7    put in your affidavits and whatever, and if I stumble into

8    the area where a jury needs to consider and make findings

9    of fact in order for me to construe the contract as a

10   matter of law, we will isolate those and see where it

11   leaves us.  And then take that time in May to hold a

12   proceeding two or three days in length, where you are

13   permitted to, in lieu of affidavits or declarations,

14   actually put on live witnesses, and they would be subject

15   to cross-examination, or put in witness statements,

16   declarations, and have only cross-examination.  That's the

17   most inventive way that I have come up with to try and

18   proceed.

19       I understand enough about the concept of leverage that

20   I understand that Motorola thinks that 2013 is just fine,

21   but I am not willing to extend out that far.

22       Mr. Jenner, I welcome your wisdom on these questions.

23           MR. JENNER:  Your Honor, I particularly appreciate

24   counsel's reference to a blitzkrieg.  I feel that this is

25   a little bit of a blitzkrieg being visited upon us, since

1    we didn't have any inkling this was coming until this

2    morning.

3        Let me take this in pieces.  First, I am very

4    surprised that counsel would think it is appropriate --

5    with all due respect to this court, and every other

6    federal district court, to seek to have the court dictate

7    what a German court can do.

8            THE COURT:  Welcome to the Ninth Circuit, sir.

9            MR. JENNER:  It may be.  I have to play on the

10   field I am trotting out onto, your Honor.  I note that

11   counsel goes so far as to say that the German standards

12   may well be different.  I don't know what the German

13   standards are.  Counsel suggests they may have a very

14   different view of how you interpret a contract.  There are

15   questions in this case of how certain standards that are

16   international in nature may be construed, how you

17   interpret a contract, what the potential remedies might

18   be.  But even though those are different, counsel would

19   have your Honor issue an edict to a German court, when

20   they have full opportunity to go to the German court and

21   litigate those issues, which in fact they are doing.

22           THE COURT:  I think they want the edict to be read

23   to you, as opposed to the German court.

24           MR. JENNER:  It would be phrased in terms of,

25   Motorola, you can't do this.  But the effect of that is to

1    speak to Motorola, and effectively say that a German court

2    shouldn't have the opportunity to adjudicate a German

3    dispute.   A piece of this is a German dispute.

4        I think there is an open question as to how much your

5    Honor will ultimately adjudicate here, as to whether or

6    not Microsoft can be enjoined by Motorola from

7    distributing products in the United States, may or may not

8    be the same question about whether or not Microsoft can be

9    enjoined in Germany, and whether a German court ought to

10   be the institution that speaks to that.

11       They are in Europe.   They are in front of the European

12   Commission.   They are in front of the German courts.   I

13   suspect they may be in front of other courts.   I'm not

14   quite sure, frankly.   And they come and say, oh, that is

15   not good enough, we can't seek process in the courts of

16   Germany or the European community, we want this court to

17   disrupt that process under the guise of telling Motorola

18   what you can or can't do.

19       I submit there are questions of --

20           THE COURT:   Stop for a second.   I don't need to

21   here the merits of this right now.   I agree with you, it

22   is a very interesting question.   It certainly is outside

23   the realm of what I normally do.   Is there a reason why

24   they shouldn't file it, and then we can hear it on the

25   merits?

1          MR. JENNER:  Your Honor, I think it is appropriate

2    for the court to hear motions.  I am certainly not going

3    to be the person to say that is not an appropriate thing

4    for the court to do.  I think it is a waste of time.  I

5    think it is inappropriate.

6        I really have the same feelings I had when we had that

7    telephone conference a few weeks ago, and I heard counsel

8    argue fact issue after fact issue.  My response is, your

9    Honor, we are not on a summary judgment motion.  I don't

10   think this is appropriate.  I think it is a waste of your

11   time.  That's all I can say on that subject.

12          THE COURT:  Continue on.

13          MR. JENNER:  Now, as far as having a trial or

14   mini-trial proceeding accelerated to May, the very

15   blitzkrieg that Microsoft says it doesn't want to be

16   subjected to is the blitzkrieg they are perfectly happy to

17   subject us to.

18       We have served quite a bit of discovery.  So has

19   Microsoft.  We have 30(b)(6) notices out to Microsoft.  We

20   have party deposition notices out to Microsoft witnesses.

21   We have third-party deposition notices out to third

22   parties.  We have document discovery that is ongoing, we

23   have written discovery.  It is going to take at least what

24   is remaining of 30 days to get the interrogatories and

25   document requests finished.  It is going to take whatever

1    time it requires to get depositions taken.  That is before

2    you start doing the normal pretrial prep for a trial.

3        I think I have told your Honor before, we are

4    perfectly happy to slot a trial on the merits, if that's

5    necessary, into the place in November where you had it,

6    because it contemplated the fact discovery we submit we

7    need, it contemplated the expert discovery that I think

8    the court will need.  I know you have expressed some

9    questions about that.  But we think that there is a

10   considerable amount of expert discovery regarding

11   standards that will be appropriate here.

12       Counsel says this was dealt with in the ITC.  I said

13   last time, aspects were dealt within the ITC, but the full

14   panoply of issues before this court were not.  That's why

15   we are taking discovery.

16       I submit, your Honor, to get all of this accomplished,

17   both in the form of any discovery that can possibly be

18   mustered, along with good pretrial preparation, to have a

19   meaningful trial-like procedure in May is too fast.

20       We are happy to keep the schedule you originally had

21   in November, live with the discovery deadlines, do all of

22   the things that need to get done to get that marshaled, if

23   a summary judgment motion in the meantime does not prove

24   to be effective.  I think Microsoft may be planning to

25   file a summary judgment motion.  If they do, so be it.

1   They are certainly entitled to do that.  You told them

2   they could do it.  We will deal with that.

3       Getting to a trial on the merits on these issues all

4   of a sudden in May, your Honor, we submit that would be a

5   burden that would disrupt the discovery processes that are

6   going on, and the other things that we should have the

7   opportunity to do before trial.  I would ask you not to do

8   that.

9           THE COURT:  Let me see if I can make myself clear.

10  If this were a breach of contract case, and one party came

11  in and said, Judge, here is the contract, here are the

12  facts, this is what I did, this is what they did, I can

13  dispose of that on summary judgment, because the facts

14  that are in disagreement are not -- I mean, if one person

15  says, it was day, and the other person says night, then,

16  yes, we have an issue of fact.  On the other hand, what

17  has been represented here is that the record is clear, I

18  mean there was an exchange of letters, whatever.  That

19  sounds like it is a motion that can be disposed of on

20  summary judgment.

21      Where I get into trouble is when we get into this

22  issue of, yes, the contract has words in it, but what do

23  they mean?  That normally is a question of law for the

24  court to decide, other than the somewhat different

25  Washington rules, that Mr. Palumbo, and Mr. Harrigan can

1   share with out-of-town counsel, that says, under certain

2   fairly different circumstances they can become issues of

3   fact.

4       I guess what I have in mind is at least trying in this

5   window in May to see if the contract can be interpreted,

6   and is the conduct of the parties really in dispute.  And

7   so start with that as the premise.

8       I agree with you, we are not abolishing the November

9   trial if indeed that is necessary, but I would like to

10  test if it is necessary.

11          MR. JENNER:  Your Honor, I guess I am not entirely

12  sure then what the issue or issues for the May proceeding

13  would be.

14          THE COURT:  Well, I think they are going to say

15  under the contract is Motorola required to --  We have

16  already established that you satisfied two of the four

17  terms of their original issues.  It was the last two that

18  were causing me problems.  What I am, I guess, proposing

19  is a motion for summary judgment on those two remaining

20  terms, which I can find in favor of Motorola, I can find

21  in favor of Microsoft, or I can find that I have to have a

22  trial.  That's what I am proposing.

23          MR. JENNER:  Your Honor, I would say --  As I

24  understand it --  I still think that we should have an

25  opportunity to take the discovery, because I think the

1    discovery potentially bears on those issues.

2              THE COURT:  Okay.  Thank you.  Mr. Harrigan.

3              MR. HARRIGAN:  Yes, your Honor.  I will reiterate

4    that we believe that a May mini-trial will very likely

5    resolve this entire RAND issue, for the reasons the court

6    has already alluded to.

7        If the court finds there was no remediation, that

8    means Microsoft is entitled to a license, which disposes

9    of the injunction issue, which is what this is really all

10   about.  It is really all about can Motorola get an

11   injunction against these various products.

12       If the court finds that Motorola's offer was

13   outrageous, there is no contract interpretation issue,

14   because the court has already said that they can't make an

15   outrageous offer, and therefore that would be breach, that

16   would decide the case.

17       Then, if the court does need to interpret the

18   contract, it may or may not require some input from a

19   jury, but we do not need massive amounts of discovery to

20   interpret the RAND contract language.  And there is no

21   issue with regard to third-party beneficiary status.

22       So I believe --  We are all operating here on what is

23   the probability that a great deal of time can be saved and

24   this matter resolved expeditiously.  I believe there is a

25   very high probability that the court can rule up or down

1    on the controlling issues, probably without a jury, but,

2    if need be, with a jury, and that this whole matter can be

3    easily presented in two or three days.

4         And it solves the -- it largely solves, subject to

5    some --  If necessary, we file this motion.  But all we

6    really are asking is --  The injunction, if the court

7    decides to issue it, it will issue.  The question is, will

8    Motorola enforce it?  So the court isn't even indirectly

9    telling the German court not to do something.  What we are

10   saying is if Motorola will just hang onto the status quo,

11   which is the products get sold and we litigate the issue

12   of whether -- litigate the RAND issues here, if that takes

13   an extra month or two past the April 17th date, a

14   $300 million bond ought to cover the problem.  And we

15   would just keep the status quo in place.  You are not

16   telling anybody that no injunction order will be entered,

17   only that Motorola can't enforce it until this court

18   decides the answers to the controlling questions.  Thank

19   you.

20              THE COURT:  All right.  This will be confirmed in

21   the minute order that we issue.  I am granting permission

22   for Microsoft to file its motion in regards to ordering

23   Motorola to not enforce the hypothetical German judgment.

24   I don't know Ninth Circuit law well enough.  I know

25   somehow a jury in San Francisco deciding something that

1   happened in Honduras or Ecuador was a violation of

2   Ecuadorian law.  I am willing to look at the law and be

3   convinced one way or the other.

4      I am also authorizing Microsoft to file its motion for

5   summary judgment on the remaining two questions that are

6   left over from the court's prior ruling.  One and two, I

7   think I found, three and four, I did not.  You are moving

8   on three and four.

9            MR. HARRIGAN:  That is three and four issues in

10  our original motion?

11           THE COURT:  Yes.

12           MR. HARRIGAN:  Yes.  Thank you, your Honor.

13           THE COURT:  I would like that filed by March 30th.

14  That will give the parties an opportunity to have it fully

15  briefed.

16     I understand what Mr. Jenner is saying.  I think I

17  will know a lot more about where we are after I see the

18  briefing on that.  You need to lay out what are the

19  non-contested facts, which Microsoft has said on occasion

20  are truly uncontested.  I don't think I have ever heard if

21  Motorola contests them or not.  It seems to me part of

22  that is what facts are necessary for me to reach the next

23  issues, Issues 3 and 4 in the case.  And I don't want to

24  try and predict that without knowing better what they are.

25      That motion will be briefed and filed in accordance

1    with the rules in the Western District, with the thought

2    that we will use some of that May time to give you an

3    extended opportunity to argue the case if that is what we

4    turn out to be doing.  I am not sure until I know more

5    what, if any, witnesses will be heard at that time.

6        Mr. Jenner, any questions on behalf of Motorola, sir?

7            MR. JENNER:  Your Honor, I think I understand what

8    the schedule is.  We will certainly do everything

9    necessary to comply with that.

10           THE COURT:  Your summer associates are coming

11   soon.  It will give them something to do.

12           MR. JENNER:  I was hoping they would give me an

13   opportunity to go down to Honduras and get those answers

14   for you.

15           MR. HARRIGAN:  Your Honor, do you have any time

16   frame in May -- range that you have in mind?

17           THE COURT:  As part of our minute order we will

18   pick out a day in there that is available, or two days

19   that are available.

20       Counsel, we will be in recess.  Thank you very much.

21           MR. PALUMBO:  Your Honor, one thing for

22   clarification purposes.

23           THE COURT:  You are going to earn your three hours

24   this morning.

25           MR. PALUMBO:  As surprised as you were when we

1    learned last night about 5:00 that Microsoft was agreeing

2    to seven of our ten proposed constructions.

3        Just for clarity, it sounds like for the next Markman

4    hearing, in addition to discussing the different

5    constructions before we file briefs, after the parties

6    file briefs we should have another meet and confer, see if

7    we can't eliminate some of the terms where we think we

8    have a disagreement, and then advise the court that we are

9    either going to go forward on all ten terms that are in

10   the briefing, or where we managed to reach agreement.  I

11   wanted to have a clarification that there would be another

12   meet and confer to try to avoid what happened this time

13   around.

14          THE COURT:  Why don't you all be seated.  Counsel,

15   it became clear to us as we were working our way through

16   these that many of these --  I won't use the word

17   "disingenuous."  I will simply use the word "creative."

18   And I understand creative constructions are permitted.

19   They are to be discouraged.

20       So what I would like you to do is go back, figure out

21   how many claim terms you have left, ask yourselves, you

22   know, are they really essential or are we simply trying to

23   run this as long as we can run it.

24       Picking out those ten claim terms, discussing the

25   question of a tutorial, if they were going to involve

```
 1    different components --  I might stress my appreciation to

 2    the people who put on the tutorial today.  I thought that

 3    was helpful.  But a lot of it was stuff that we had spent

 4    hours puzzling through, so you can save us that next time.

 5    Once you have exchanged your proposed claim constructions,

 6    that is when I would like you to sit down and really ask,

 7    are we in disagreement?  Knowing that you have to come in

 8    here and put up with me, is this really something that we

 9    need to bother the court with?  And I think if we know

10    that earlier, as opposed to later, it will save you all an

11    immense amount of money to not have these folks grind away

12    on ten terms, only to find out seven of them you are in

13    agreement on.  Last time I checked, companies like to save

14    money.  Does that answer your question?

15            MR. PALUMBO:  That is helpful.  I think we will

16    endeavor, but it sounds like we should redouble our

17    efforts on that.

18            THE COURT:  Endeavor harder.  We will be in

19    recess.

20                    (Adjourned.)

21

22

23

24

25
```

1                              **CERTIFICATE**

2

3

4

5

6

7

8

           I, Barry L. Fanning, Official Court Reporter, do hereby

9    certify that the foregoing transcript is true and correct.

10

11                                   S/Barry L. Fanning

12                                   _____

13                                   Barry L. Fanning

14

15

16

17

18

19

20

21

22

23

24

25