# TAB A

**Translation**                                        Orange-Book-Standard

EC Art. 82; GWB Sec. 20 Para. 1; BGB Sec. 242 Cd

a) A defendant sued based on a patent is able to defend himself against the claim for injunctive relief asserted by the patent proprietor filing the action, by pleading that the latter abuses a dominant position on the market if he refuses to conclude a patent license agreement with the defendant on non-discriminatory and non-restrictive terms and conditions.

b) Yet the patent proprietor is only culpable of abusive behaviour if the defendant has made him an unconditional offer to conclude a license agreement to which he stays bound and which the patent proprietor must not reject without violating the prohibition of discrimination or anti-competitive behaviour, and if the defendant, for the time that he is already using the subject matter of the patent, complies with the obligations that the license agreement yet to be concluded imposes in return for the use of the licensed subject matter.

c) If the defendant considers the patent proprietor' license demands to be excessive or if the patent proprietor refuses to quantify the royalties, an offer to conclude a license agreement in which the licensor determines the amount of royalties according to its own reasonable discretion meets the requirement of such an unconditional offer.

Federal Supreme Court [BGH], decision taken on May 6, 2009, - KZR 39/06 -
                                                OLG Karlsruhe
                                                LG Mannheim

15



# FEDERAL SUPREME COURT

## IN THE NAME OF THE PEOPLE

## JUDGEMENT

KZR 39/06

Pronounced on
May 6, 2009
Bott
Registrar of the
Court

in the legal dispute

Following the oral hearing on February 10, 2009 by the President of the Federal Court Prof. Dr. Tolksdorf, the Presiding Judge Prof. Dr. Bornkamm and the Judges Prof. Dr. Meier-Beck, Dr. Strohn and Dr. Kirchhoff, the Cartel Division of the Federal Court

passed the following judgement:

The appeal on points of law against the decision of the 6th Civil Division of the Higher Regional Court Karlsruhe taken on December 13, 2008 is dismissed; the defendants 3 to 8 are to bear the costs of the proceedings.

By law

Facts of the Case:

The plaintiff is the proprietor of the European patent 325 330 (patent in suit) granted with effect for the Federal Republic of Germany, based on an application filed on January 17, 1989 which has expired during the appellate proceedings due to lapse of time.

The wording of patent claims 1 and 2 as asserted is as follows:

1. An optically readable record (1) carrier of the inscribable type, comprising a recording layer (6) intended for recording an information pattern of optically detectable recording marks, which record carrier (1) is provided with a servo track (4) which in an area intended for information recording exhibits a periodic track modulation which can be distinguished from the Information pattern, characterized in that the frequency of the track modulation is modulated in conformity with a position-information signal comprising

position-code signals (12) which alternate with position-synchronisation signals (11).

2. An optically readable record carrier as claimed in Claim 1, characterized in that the position-code signals (12) are biphase-mark-modulated signals, the position-synchronisation signals (11) having signal waveforms which differ from the biphase-mark-modulated Signal.

The nullity action filed by defendant 4 was dismissed by the Federal Supreme Court in its judgement taken on April 3, 2007 (X ZR 36/04).

Defendant 4, whose personally liable partner is defendant 5, whose business is managed, in turn, by defendant 6 distributes recordable and rewritable optical data carriers (CD-R and CD-RW) throughout Europe. Defendant 4 receives deliveries of CD-Rs from defendant 7, among other suppliers; defendants 3 and 6 are the managing directors of the personally liable partner of defendant 7; defendant 8 was the managing director of the legal predecessor of defendant 7.

The Regional Court prohibited defendants 3 to 8 (hereafter also referred to as defendants) from manufacturing, offering for sale, placing into circulation, using or possessing or importing for the above purposes CD-Rs und CD-RWs without the consent of the plaintiff. Furthermore, the Regional Court ordered the defendants to provide information and to render accounts and also to return to a bailiff all the CD-Rs and CD-RWs still in their possession in order that they be destroyed. The Court also ordered the defendants to pay damages. The defendants' appeal was without success for the most part (OLG Karlsruhe InstGE 8, 14 = GRUR-RR 2007, 177). The appellate court worded the operative provisions of the judgement "by way of clarification" so that the decision against defendants 3, 7 and 8 was limited to actions concerning CD-Rs.

With the appeal on points of law - which has been admitted by the Court – the defendants are continuing to pursue their application that the action should be dismissed.

The plaintiff is countering the appeal on points of law with the proviso that, instead of pursuing the request to cease and desist, it should be established that the latter has been is settled on the merits.

Grounds for the decision:

The appeal on points of law is admissible, but not successful.

I. The appellate court assumed correctly that the attacked actions by defendants 4 and 7 make use of the subject matter of the patent in suit contrary to Sec. 9 PatG because the  writable CDs which were distributed by defendant 4 and obtained in part from defendant 7 are (normal) data carriers which realise all features of claims 1 and 2 of the patent in suit.

1. According to the statements made by the appellate court, the patent in suit deals with an optically readable recordable data carrier, in particular with a writable compact disc (CD). Data carriers of this type are manufactured without usage data. Data is subsequently written on to the data carrier by the user by means of a laser beam in a suitable recording device. For this purpose, the record carrier has a light-sensitive layer whose reflective properties can be selectively influenced by a low-divergence laser beam. The data is inscribed as recording marks (pits) on a track which runs from the centre of the record carrier in a spiral path towards the outer edge of the record carrier (servo track) in such a way as to form a sequence of pits and lands, i.e., reflective and non-reflective areas.

19

The information on the record carrier is encoded in such a way that sequences of data bits can be transformed into sequences of channel bits by means of EFM modulation (eight to fourteen modulation. For more details, see BGH decision taken on May 19, -2005 -XZR 188/01, GRUR 2005, 749, 750 - *Aufzeichnungsträger*). The track modulation of the servo track of data carriers known in the art exhibits a constant frequency from which a clock signal is derived which is used to control the recording or scanning process. The servo track is divided into information-recording areas (for recording the usage data) separated by synchronisation areas. The synchronisation areas contain position-relevant information in the form of the address of the adjacent information-recording area which is used to derive information by means of scanning as to which area of the record carrier is being read. This method makes it possible to find, quickly and exactly, a specific position on the disc.

The disadvantage of the record carriers known in the art, namely that the information-recording areas are interrupted by the synchronisation areas, a fact which is disadvantageous, in particular for the recording of EFM-encoded information, is to be overcome by the data carriers according to the invention, the features of which have been analysed by the appellate court with reference to the embodiment according to patent claim 2 as follows:

1.  An optically readable record carrier of the inscribable type.

2.  The record carrier comprises a recording layer intended for recording an information pattern of optically detectable recording marks.

3.  The record carrier is provided with a servo track which in an area intended for information recording exhibits a periodic track modulation which can be distinguished from the information pattern.

4.      The frequency of the track modulation is modulated in conformity with a position-information signal.

5.      The position-information signal comprises position-code signals which alternate with position-synchronisation signals.

6.      The position-code signals are biphase-mark-modulated signals.

7.      The position-synchronisation signals have signal waveforms which differ from the biphase-mark-modulated signal.

A data carrier of this type has the advantage that the information pertaining to the address is contained in the track modulation, meaning that synchronisation areas which interrupt the information-recording areas are no longer necessary.

The attacked, commercially available CD-Rs and CD-RWs exhibit, according to the further statements made by the appellate court, a track modulation (track wobble) in accordance with feature 3. This track wobble is also frequency-modulated, thus corresponding to a position information signal (feature 4).  This requires that the frequency of the track wobble various in accordance with the current level of the position-information signal. The information to the modulated is the position code signal which consists of 76 channel bits and which is biphase-mark modulated, derived from a position code consisting of 38 code bits. An average skilled person as addressed by the patent in suit would understand the frequency scanning used in the modulation of the position-information signal in which only two different frequencies occur according to whether the modulating signal exhibits the logic value of nought or one (23.05 KHz, if the channel bit rate is one, 21.05 KHz, if the channel bit rate is nought) to be equivalent to the frequency modulation in the sense meant by the patent in suit because this frequency scanning is explained in the description of the patent (column 22, lines 44 ff. = page 26, lines 20 ff. of the translation) and is illustrated in figure 9 patent in suit.

2. The appeal against this decision on points of law is not successful.

a) The appeal on points of law criticises the fact that the appellate court has allegedly failed to realise that the defendants can only be accused at best of a contributory patent infringement because the inscribable CDs which were distributed do not exhibit an information pattern and therefore do not exhibit a periodic track modulation which can be distinguished from the information pattern. Rather, the information pattern is only applied subsequently when the CD-R is inscribed . In the case of the attacked embodiments, no frequency modulation in the sense of feature 4 is used. This would require that the current logic value of the binary address signal (in the sense of a position code) can be deduced at any position from the current frequency of the track wobble, as can be seen from the fact that the patent in suit refers to this as being the objective difference to the subject matter of the earlier European patent application 265 695 (column 2, lines 37-41). According to the defendants, the appellate court has failed to consider this disclaimer.

b) The appellate court has interpreted the patent in suit correctly. The court applied to agrees with the appellate court's understanding of the protected technical teaching which is in accordance with the understanding of the X Civil Division of the Federal Supreme Court in the patent nullity proceedings (judgement dated April 3, 2007, X ZR 36/04, no. 21 ff.),

The defendants are wrong in believing that, in the case of the writable CDs distributed by the defendants, feature 3 is only realised after the discs have been inscribed by the user   The protection of the patent in suit (already) covers the inscribable data carrier, and does not begin (only) after the disc has been inscribed, i.e., the patent protection covers the data carrier which has a servo track onto which the information pattern can be written using a suitable recording device. The periodic track modulation which can be distinguished from the information pattern is a type of modulation which differs in its structure from the information pattern which is subsequently to be inscribed.

22

This can clearly be seen from the patent claim.  According to feature 2, the record carrier does not have a recording layer with an information pattern, but a recording layer which is "intended for recording an information pattern". Therefore, as is stated in feature 3, the servo track also exhibits the track modulation in the area intended for recording the information pattern ("area intended for information recording").  Hence, the track modulation must differ from the information pattern which, in accordance with the convention adhered to by CD recorders, is recorded onto the recording layer when the CD is inscribed.  The appellate court has correctly established that this is indeed so in the case of the attacked embodiments, an opinion which is not opposed by  the defendants.

The appeal on points of law which expresses doubts as to whether a frequency modulation in the sense of feature 4 is used for the track modulation is incorrect.  The fact that the information to be modulated can be the position code signal consisting of 76 channel bits and the fact that the frequency scanning used in the modulation of this position-information signal is a frequency modulation in the sense of feature 4 has already been established by the Federal Supreme Court in the nullity proceeding son the basis of the information contained in the description of the patent in suit, in agreement with the decision taken by the appellate court (BGH ibid. no. 26). The appeal on points of law does not provide any new information  which would justify a different decision.  The question concerning the meaning of a "disclaimer" which has assumed a prominent position in the arguments expressed in the appeal on points of law is irrelevant. Neither in the patent claim, nor in the description of the patent in suit is frequency scanning excluded from the subject matter of the patent claim. Rather, it is explicitly described in the description of the patent in suit.

II.  The appeal against the fact that the appellate court denied the defendants to fend off the plaintiff's claim for injunctive relief following

23

from the infringement of the patent in suit according to Sec. 139 Para. 1 PatG by pleading that the plaintiff would have been obliged to grant a license under the patent in suit to defendants 4 and 7, is not successful, either.

1.    The appellate court assumed that the plaintiff did not violate the prohibition of discrimination according to Sec. 20 Para. 1 GWB [*Law against Restraints on Competition*]. According to the appellate court, it is true that the plaintiff is the addressee of this law, because according to its own submission, everyone who manufactures customary CD-R and CD-RW has to comply with the standard comprised of the specifications listed in the so-called Orange Book, and therefore inevitably has to use the patent in suit; the grant of licenses under the patent in suit therefore objectively constitutes an independent market which is controlled by the plaintiff as the only supplier. The grant of licenses is moreover a kind of commerce that is usually accessible to companies of the same kind, because the plaintiff has granted various licenses. Yet according to the appellate court, the plaintiff does not discriminate the defendants against other companies of the same kind. The defendants did not submit that there are or were licensees with whom the plaintiff had concluded license agreements which provided for the payment of a royalty of 3 % of the net sales price, which was the percentage considered reasonable by the defendants. According to the appellate court, the defendants made an ample statement regarding the fact that the plaintiff does not sufficiently monitor the compliance with its license agreements, does not enforce its rights, makes repayments and tolerates so-called "underreporting", so that the agreed minimum royalty per blank CD sold was actually not being paid. Yet the appellate court considers that there is nothing in the defendants' submission to prove that the actual and mutual handling of a license agreement which had formerly been concluded on different terms would now lead to only 3 % of the net sales price being paid to the plaintiff.

2. The criticism of this assessment raised in the appeal on points of law does not need to be discussed, because there are other reasons why the defendants cannot claim that the plaintiff has an obligation to grant a license under the patent in suit.

a) Still, a defendant who has been sued based on a patent is generally able to defend himself against the patent proprietor's claim for injunctive relief by submitting that the plaintiff who refuses to conclude a patent license agreement, inequitably prevents him from taking part in a commerce that is usually accessible to similar companies, or discriminates him against other companies, thus abusing its dominating position on the market.

aa) In its "Standard-Spundfass" decision (BGHZ 160, 67, 81 f.), the present court left the question as to whether a claim based on Sec. 33 Para. 1 GWB in conjunction with Art. 82 EC or Secs. 19, 20 GWB can be raised against the claim for injunctive relief based on Sec. 139 Para. 1 PatG unanswered. The courts of the first instance and literature have a controversial opinion about this question.

To the extent that the "compulsory license defence under cartel law" is accepted (in favour: LG Düsseldorf WuW/E DE-R 2120, 2121; Heinemann, ZWeR2005, 198, 2001; Kühnen in Festschrift für Tilmann, p. 513, 523; Schulte/Kühnen, PatG, 8th edition Sec. 24 no. 66 f.; Meinberg, Zwangslizenzen im Patent- und Urheberrecht als Instrument der kartellrechtlichen Missbrauchsaufsicht im deutschen und europäischen Recht (2006), p. 196; Benkard/Scharen, PatG, 10th edition Sec. 9 no. 73; Wirtz/Holzhäuser, WRP 2004, 683, 693 f.), it is based on the consideration that, although the party wishing to take a license acts unlawfully when using the patent without the consent of the patent proprietor, the patent proprietor can still not sue him for

injunctive relief, because with the request to cease and desist, he would ask for something he would have to immediately give back (in the form of the grant of a license) (dolo petit, qui petit quod statim redditurus est), thus violating the principle of good faith (Sec. 242 BGB).

According to the opposite opinion (OLG Düsseldorf InstGE 2, 168, no. 27; OLG Dresden GRUR 2003, 601, 603 f.; Jaecks/Dörmer in Festschrift für Säcker, p. 97, 106 ff.; Maaßen, Normung, Standardisierung und Immaterialgüterrechte (2006), p. 257 f.; Graf von Merveldt, WuW 2004, 19 ff.; Rombach in Festschrift für Günter Hirsch, p. 311, 321 f.), the compulsory license plea is not successful in infringement proceedings, because the prerequisites of a right to "self-help" pursuant to Sec. 229 BGB are not met, and because the grant of the license only has an effect for the future - as in the case of Sec. 24 PatG; as long as the proposed licensee has not enforced his right to a license by filing an action or a counterclaim, he is liable to cease and desist. In addition to that, Art. 31 of the TRIPS Agreement requires an act of a higher authority for a compulsory license to be granted.

bb) Generally, we agree with the first-mentioned opinion.

If a company with a dominant position on the market discriminates the company seeking a license in a commerce usually accessible to similar companies, or if it inequitably obstructs the proposed licensee by refusing to conclude a patent license agreement it has been offered, the enforcement of the patent-law claim for injunctive relief constitutes an abuse of its dominant position on the market, because the dominant company prevents the other company from gaining the very access to the market that it is obliged grant by entering into the license agreement. The enforcement of the claim for injunctive relief is therefore just as prohibited as the refusal to conclude the license agreement that would annihilate the claim for injunctive relief.

However, the public courts cannot order a behaviour that contravenes cartel law.

Art. 31 of the TRIPS Agreement does not say anything different, because this provision generally permits the grant of a right to use the subject matter of a patent without the authorization of the right holder, provided the authorization of such use shall be considered on its individual merits. The further precondition, according to which the proposed user must have made efforts to obtain authorization from the right holder on reasonable commercial terms and conditions, and such efforts have not been successful, (Art. 31 lit. b)) is not binding on the member states according to Art. 31 lit. k), if the use is permitted in order to remedy a practice determined after judicial or administrative process to be anti-competitive. Moreover, this precondition is also met if the infringer of the patent in suit has unsuccessfully tried to obtain a license on non-discriminatory terms prior to taking up the use of the patent. It does not matter if the Agreement requires the member states to grant the right of use conferred by cartel law through a higher authority, as the plaintiff wants to infer from Art. 31 lit. a) and i) in its reply to the appeal on points of law with reference to Rombach (ibid., p. 322), because a judicial review in infringement proceedings alone is sufficient for this, establishing in a binding manner if and to which extent the user of the invention has a right to be granted a license.

b) However, the patent proprietor who asserts a claim for injunctive relief based on his patent, although the defendant is entitled to be granted a license under the patent in suit, only abuses his dominant position on the market and only acts in bad faith if two conditions are met: Firstly, the party wishing to obtain a license must have made an unconditional offer to conclude a license

agreement which the patent proprietor cannot reject without unreasonably obstructing the party wishing to take a license or without violating the prohibition of discrimination, and the proposed licensee must stay bound by this offer. And secondly, the proposed licensee has to comply with the obligations on which the use of the licensed subject matter depends according to the license agreement still to be concluded, if he already uses the subject matter of the patent before the patent proprietor has accepted his offer.  This means in particular that the proposed licensee has to pay the royalties resulting from the contract or ensure their payment.

aa) The fact that the proposed licensee must have made an offer on acceptable contracting terms that the patent proprietor cannot refuse without discriminating the proposed licensee against similar companies without objective reason or without unduly obstructing him, is, to our knowledge, generally recognized, because the patent proprietor with a dominant position on the market is not obliged to offer to permit the use of the invention; only if he declines an offer to conclude an agreement on non-restraining or discriminating terms, does he abuse his dominant position on the market. He does not have to tolerate the use of his patent by a company who is not ready to enter into a license agreement on such terms and conditions.

The present case does not warrant a detailed discussion of what kind of terms and conditions such a license offer has to include in detail. If the proposed licensee makes an offer on customary terms and conditions, the patent proprietor is only able to claim that he does not have to accept individual contract terms if he offers other terms instead, which agree with his obligations under cartel law.

It likewise results from what has been said above that an abuse of a dominant position on the market is not present if the proposed licensee only

makes a conditional license offer, i.e. if he offers to conclude an agreement only on the condition that the infringement court affirms the infringement of the patent in suit by the attacked embodiment that he denies. The patent proprietor does not have to accept such an offer under other circumstances, either; it can therefore not be used as a defence against his claim for injunctive relief.

bb) Yet the unconditional, acceptable contract offer is not sufficient in order to make the "compulsory license defence" effective against the patent proprietor's request for injunctive relief. The grant of a license generally only has an effect for the future (Rombach ibid. p. 322). The licensee is not authorized to use the subject matter of the license agreement until he has been granted the license; at the same time, every act of use (unless a consideration has been agreed that is independent of use) establishes a claim of the licensor to the contractual consideration which - as in the case at issue - is typically a unit or sales-related royalty. The proposed licensee who starts using the patent in suit in anticipation of the license to be granted to him must not only "anticipate" his contractual rights, but also his contractual obligations. He is able to raise the *dolo-petit* defence against the request for injunctive relief only if he has not just made an offer to the patent proprietor that the patent proprietor must not reject, but if he likewise behaves as if the patent proprietor had already accepted his offer. In this case he would not only be entitled to use the subject matter of the patent, but he would in particular be obliged to account for the use on a regular basis and to pay the royalties resulting from his accounts to the patent proprietor. On the other hand, the patent proprietor neither commits and abuse nor an act of bad faith if he asserts claims based on the patent against someone who claims a licensee's authorization to use the patent, but does not pay

the consideration that the licensee would be obliged to pay according to a non-discriminatory or non-restrictive license agreement.

This also takes into account the considerations that led the Federal Supreme Court to rule that it is not possible to raise the defence of misuser against a claim to injunctive relief under copyright law because the user has a right to be granted a license. The main reason given by the Federal Supreme Court for this ruling was that this would amount to a statutory license which puts the author in a worse position than a compulsory license under copyright law, because he would have to assert his claim to remuneration after the work has already been used, instead of being able to make the grant of his consent dependent on the payment of the remuneration owed (BGHZ 148, 221, 231 f. - SPIEGEL-CD-ROM, see also Jaecks/Dörmer, ibid. p. 108 f.).

It is not possible to object to the requirement of the "contractual fidelity" of the proposed license by maintaining that the fact that the consideration for the license is not paid is the sole responsibility of the patent proprietor who is refusing to enter into a contract (see e.g. Kühnen, ibid., p. 523; however, Kühnen also requires that the user must not only be willing to perform, but also capable of performing). In the same manner as the proposed licensee cannot be denied the possibility to defend himself first and foremost against the accusation of infringement, the consequence being that the action has to be dismissed in its entirety if the accusation of infringement turns out to be unjustified, the patent proprietor cannot be prohibited from first and foremost asserting the claim for injunctive relief based on the patent, the consequence being that this claim must be awarded if the infringement is confirmed and if the court negates a dominant position on the market or an abuse of the same. However, in this case, the mere fact that the patent proprietor refuses to conclude the license agreement offered to him because he believes he has a right to do so, does not justify to prefer the proposed licensee over the licensor, by ultimately excusing him from observing the mutuality of contractual performance and counter-performance.

30

In the same manner as the patent proprietor has to accept being treated as if he had granted the license owed, the party wishing to take a license must behave as if it had been granted a license.

This means that the proposed licensee has to account for the scope of his acts of use based on the terms and conditions of a non-discriminatory contract on the one hand, and that he has to meet his payment obligations arising from the accounts on the other hand. However, the proposed licensee does not have to make payment to the patent proprietor, but he can deposit the royalties according to Sec. 372 sentence 1 BGB, waiving the right of withdrawal, because the refusal of the patent proprietor to conclude the license agreement justifies the application of the provisions regarding the delay of the creditor, either because the patent proprietor is not ready to accept the offered payment (Sec. 293 BGB), or because he is ready to accept the payment, but not ready to render the counter-performance in the form of the grant of a license (Sec. 298 BGB). On the merits, this takes into account the interest of the proposed licensee in securing his claim for a payback of royalties already paid in the case that the action should be dismissed for a lack of infringement.

c) In terms of amount, the royalty and therefore the proposed licensee's obligation to perform, is limited to the amount resulting from the terms and conditions of an agreement that is unobjectionable under cartel law.

The fact that it is not easy for the proposed licensee to determine this amount does not constitute an undue burden for him, because he bears the onus of presentation and proof for the prerequisites of his licensing claim anyway.

31

However, if the proposed licensee considers the patent proprietor's royalty claims to be excessive, or if the patent proprietor refuses to quantify the royalties because he e.g. believes to be entitled to refuse to license the patent in suit anyway, the proposed licensee has the right to direct the offer to conclude a license agreement not to the agreement of a specific royalty rate, but to a royalty to be determined by the patent proprietor using his reasonably exercised discretion. Otherwise, the deposit of a higher amount than the one that the proposed licensee himself deems adequate could not prevent a judgement against him, unless it is accompanied by a license offer in the same amount. On the other hand, an offer that has been increased "to be on the safe side" could give the patent proprietor the possibility to secure himself an excessive royalty by accepting this offer. This would not only be inequitable, but would also burden the patent infringement proceedings with the avoidable task of having to establish the exact amount of a fair or non-discriminatory royalty. This is because the proposed licensee will tend to be more ready to deposit a higher amount than the one that he deems appropriate under cartel law, if he is not estopped from asserting that a determination of the royalty by the patent proprietor in this amount is inequitable - for which assertion he still bears the onus of presentation and proof. On the other hand, the patent proprietor is completely free in determining the royalty amount; his determination is inequitable only if it does not stay within the limits set by cartel law and if it unjustly obstructs the licensee or discriminates him against other licensees.

Pursuant to Sec. 11 Para. 2 UrhWG, it does not matter for the deposit of the royalty that the amount owed has not been determined yet, i.e. that the amount depends on the appraisal of the performance according to Sec. 315 BGB in this case.

If a sufficient amount has been deposited, and if the other prerequisites of the "compulsory license defence" are met, the infringement court may simply establish that the patent proprietor is obliged to accept the license offer and to determine the royalty as appears just.

d) Accordingly, the appellate court was right to deny the defendants the plea that the plaintiff was abusing its dominant position on the market by refusing to enter a license agreement at a royalty of 3 %, because the appellate court, apart from not having made any statements about the other content of the defendants' contract offer, did not establish that the defendants had accounted for the royalties they owed according to their own opinion and deposited a corresponding amount.

III.   The part of the judgement ordering the defendants to render accounts and establishing their obligation to pay damages is also correct.

1. The appellate court stated on this subject that the defendants cannot successfully plead an abuse of legal right against the plaintiff's request to establish the defendants' obligation to pay damages, because the defendants would also have been liable to pay damages if they had had a claim against the plaintiff for the grant of a license. Such a claim would not have changed the fact that the defendants made use of the plaintiff's property right without its consent and thus acted unlawfully. Since the defendants did not claim a free license, but the grant of a license against payment of a royalty of 3 % of the net sales price, the plaintiff would at least have incurred a damage worth the amount it could have claimed if it had concluded a corresponding license agreement with the defendants.

According to the appellate court, since the defendants undisputedly manufactured and sold CD-R, it was thus ascertained, also on the basis of the defendants' submissions, that the plaintiff had incurred a minimum damage. This was sufficient in order to sustain the plaintiff's request for a finding in this respect.

2. It does not matter whether these reasons would withstand a review on all counts, because, since the plaintiff was entitled to an enforceable claim to injunctive relief according to what has been stated in II 2, according to Sec. 139 para. 2 PatG the defendants, whose negligent behaviour was affirmed by the appellate court  without error in law, are also obliged to reimburse the plaintiff for the damage it has incurred by the defendants having made use of the patented invention contrary to Sec. 9 PatG.

IV. The same applies with respect to the claim according to Sec. 140 a Para. 1 PatG for the destruction of the unlawfully manufactured data carriers which was also awarded by the appellate court.

Tolksdorf                          Bornkamm                          Meier-Beck

              Strohn                                  Kirchhoff

Previous instances:

LG Mannheim, decision dated 13.09.2002 - 7 O 35/02 -

OLG Karlsruhe, decision dated 13.12.2006 - 6 U 174/03 -