# EXHIBIT 28

22

Page 1

1              IN THE UNITED STATES DISTRICT COURT

2           FOR THE WESTERN DISTRICT OF WASHINGTON

3                         AT SEATTLE

4

5   MICROSOFT CORPORATION, a

6   Washington corporation,

7            Plaintiff,

8   vs.       No. C10-1823-JLR

9   MOTOROLA, INC., MOTOROLA

10  MOBILITY, INC., and GENERAL

11  INSTRUMENT CORPORATION,

12           Defendants.

13  _____

14

15            DEPOSITION OF DAVID A. HEINER

16          Taken on behalf of the Defendants

17                   March 28, 2012

18                       - - -

19  BE IT REMEMBERED THAT, pursuant to the Washington Rules of

20  Civil Procedure, the deposition of DAVID A. HEINER, was

21  taken before Tia B. Reidt, #2798, a Certified Shorthand

22  Reporter, and a Notary Public for the State of Washington,

23  on March 28, 2012, commencing at the hour of 8:48 a.m., the

24  proceedings being reported at 315 5th Avenue South,

25  Suite 1000, Seattle, Washington. TSG Job # 47848.

```
                                           Page 2                                              Page 3
 1            APPEARANCES                            1    Appearing on behalf of the Defendant
 2                                                   2    LYNN ENGEL
 3   Appearing on behalf of the Plaintiff            3    SUMMIT LAW GROUP
 4   ARTHUR W. HARRIGAN, JR.                         4    315 Fifth Avenue South
 5   DANIELSON HARRIGAN LEYH & TOLLEFSON             5    Seattle, WA 98104
 6   999 3rd Avenue                                  6
 7   Seattle, WA 98104                               7
 8                                                   8
 9                                                   9
10                                                  10    ALSO PRESENT:
11                                                  11
12   Appearing on behalf of the Defendant           12    Sid Fox,
13   PAUL M. SCHOENHARD                             13    Videographer
14   MATTHEW RIZZOLO                                14
15   ROPES & GRAY                                   15
16   One Metro Center                               16
17   700 12th Street NW                             17
18   Washington, DC 20005                           18
19                                                  19
20                                                  20
21                                                  21
22                                                  22
23                                                  23
24                                                  24
25                                                  25
```

```
                                           Page 4                                              Page 5
 1         EXAMINATION INDEX                         1         EXHIBIT INDEX CONTINUED
 2                                                   2   EXHIBIT NO.     DESCRIPTION              PAGE
 3   EXAMINATION BY              PAGE                3   Exhibit 8  1-page Google/Motorola Mobility Q1    49
 4   Mr. Schoenhard                8                 4         Questionnaire to competitors.
 5                                                   5   Exhibit 9  22-page 802.11 Patent License        53
 6          EXHIBIT INDEX                            6         dated October 21, 2010.
 7                                                   7   Exhibit 10  24-page H.264 Patent License dated  53
 8   EXHIBIT NO.   DESCRIPTION          PAGE         8         10/29/2010.
 9   Exhibit 1  10-page Defendant Motorola Mobility,   12   9   Exhibit 11  3-page Interoperability: The other   54
10         Inc.'s notice of deposition of          10         Side of Our Settlement with
11         Microsoft Corporation.                  11         the European Commission document.
12   Exhibit 2  17-page letter re: Patent Standards   27   12   Exhibit 12  4-page Frequently Asked Questions   55
13         Workshop, Project No. P11-1204,         13         about Interoperability document.
14         dated June 14, 2011.                    14   Exhibit 13  3-page Microsoft Open Specifications   56
15   Exhibit 3  1-page Microsoft's Support for     40   15         document.
16         Industry Standards document.            16   Exhibit 14  14-page Patent Covenant Agreement,    58
17   Exhibit 4  2-page e-mail string re:           42   17         Microsoft Exchange Outlook Protocol.
18         Microsoft statement.                    18   Exhibit 15  21-page Patent Covenant Agreement,    60
19   Exhibit 5  3-page Microsoft's Support for     45   19         Microsoft Sharepoint Protocols.
20         Industry Standards document.            20   Exhibit 16  27-page Patent Covenant Agreement,    61
21   Exhibit 6  1-page e-mail string re: We just   46   21         Windows Client PC Operating System
22         posted a blog.                          22         (Including .net framework) protocols.
23   Exhibit 7  2-page e-mail string re: Google    47   23   Exhibit 17  11-page Patent License Microsoft   62
24         Pushing FTC letter now with CNET.       24         Exchange Server 2010 Protocols.
25                                                 25
```

Page 6

1  EXHIBIT INDEX CONTINUED
2
3  EXHIBIT NO.      DESCRIPTION                      PAGE
4  Exhibit 18  2-page e-mail string re: Industry      63
5              understanding of FRAND.
6  Exhibit 19  18-page Google: Please Don't kill      67
7              video on the web document.
8  Exhibit 20  2-page letter from the United          71
9              States Department of Justice dated
10             3/15/21.
11 Exhibit 21  17-page letter re: Standardization     75
12             Feedback for Sub-Committee on
13             Standards dated 3/7/11.
14 Exhibit 22  37-page e-mail and attachment          75
15             Re: Proposed consent decree
16             Microsoft's.
17 Exhibit 23  3-page Microsoft's Proposed            77
18             Consent Decree Principles.

Page 7

1                DAVID A. HEINER
2           DEPOSITION OF DAVID A. HEINER
3            Wednesday, March 28, 2012
4                   8:48 a.m.
5
6       THE VIDEOGRAPHER:  This is the start of videotape
7  labeled No. 1 of the videotape deposition of David Heiner in
8  the matter of Microsoft Corporation verses Motorola Inc.,
9  et. al, in the United States District Court for the Western
10 District of Washington at Seattle, Civil Action
11 No. C10-1823-JLR.
12      This deposition is being held at Summit Law Group,
13 315 5th Avenue South, Suite 1000, Seattle, Washington, 98104
14 on March 28th, 2012, at approximately 8:45 a.m.
15      My name is Sid Fox from TSG Reporting, Inc., and
16 I'm the legal video specialist.  The court reporter is Tia
17 Reidt in association with TSG Reporting.
18      Will counsel please introduce yourselves.
19      MR. SCHOENHARD:  Good morning.  My name is Paul
20 Schoenhard.  I'm an attorney with Ropes & Gray, LLP.  I'm
21 here today representing the Motorola entities, the
22 defendants.
23      With me today are Matt Rizzolo, also with Ropes &
24 Gray, and Lynn Engel with the Summit Law Group.
25      MR. HARRIGAN:  Art Harrigan, Danielson Harrigan,

Page 8

1               DAVID A. HEINER
2  representing Microsoft and the witness.
3       THE VIDEOGRAPHER:  Will the court reporter please
4  swear the witness in.
5  DAVID A. HEINER, having been first duly sworn, was
6  examined and testified as follows:
7
8  EXAMINATION
9  BY MR. SCHOENHARD:
10    Q.   Good morning, Mr. Heiner.
11    A.   Good morning.
12    Q.   Please state your full name and home address for
13 the record.
14    A.   David A. Heiner, 14314 227th Avenue Northeast,
15 Woodinville, Washington, 98077.
16    Q.   And do you understand that you're testifying under
17 oath here today?
18    A.   I do.
19    Q.   Is there any reason you won't be able to provide
20 honest testimony today?
21    A.   No.
22    Q.   You are currently employed by Microsoft?
23    A.   Yes.
24    Q.   What is your current title?
25    A.   Vice president and deputy general counsel.

Page 9

1               DAVID A. HEINER
2     Q.   What are your responsibilities as vice president
3  and deputy general counsel?
4     A.   I'm responsible for two organizations within the
5  Microsoft law department.  One is our antitrust group, and
6  the other is the corporate standards group.
7     Q.   Do I understand correctly, based on your answer,
8  that the antitrust group and the corporate standards groups
9  are treated as two separate groups?
10    A.   They're often treated as one group, so it's --
11 there's no real answer.  It could be one or two.
12    Q.   But you have general responsibility for both?
13    A.   I do.
14    Q.   Could you please explain briefly what your
15 standards -- what your responsibilities are with respect to
16 the standards group?
17    A.   Well, I oversee the group.  The corporate
18 standards group is an organization that provides services to
19 the rest of Microsoft.  Those services include legal advice
20 in connection with participation in standards bodies,
21 standards policy work, and also includes people who
22 participate directly in standards-setting organizations, so
23 these are nonlawyers whose job function is to represent
24 Microsoft at standards bodies.
25      There are other people within Microsoft who are not

Page 30

DAVID A. HEINER
the second paragraph on Page 12 of Exhibit 2.
A. Okay. (Witness peruses document.)
Okay.
Q. Is it fair to say that Microsoft believes that while there is no exhaustive list of traditional RAND licensing terms, in addition to a possible compensation element, such terms may include a field of use restriction, reciprocity, non sublicensability, defensive suspension, and other common patent licensing considerations?
A. Yeah. Generally I think that's correct.
As I think about one of the earlier questions you asked, though, maybe I should clarify one aspect. This is my letter to the Federal Trade Commission, and it was my view at the time. I am responsible for this function at Microsoft. But to go all the way to say that, you know, does Microsoft believe X, Y and Z is perhaps a bit of a stretch, since it's a corporate entity and there's not necessarily any one belief of such an entity.
But having said that, I am responsible for the subject matter generally, and so...
Q. And you do agree that Exhibit 2, the June 2011 letter, was submitted to the Federal Trade Commission on behalf of Microsoft, the corporate entity?
A. Yes.

Page 31

DAVID A. HEINER
Q. Can you explain what you understand the term "field of use restriction" to mean?
A. I'm sorry. Can you repeat the question?
Q. Can you explain to me what you understand the term "field of use restriction" to mean.
A. I understand the term "field of use restriction" to mean that a particular, say, patent might be licensed for one use and not another.
Q. Can you explain to me what you understand the term "reciprocity" to mean?
A. Let's see. I understand that term to mean that in a patent license, there might be a reciprocal grant of patent rights back to the licensor.
Q. Would that also be referred to as a grant-back?
A. I think so. I'm not sure if the terms are, you know, completely synonymous or not, but yes.
Q. What do you understand the term "defensive suspension" to mean?
A. I understand that to refer to the concept where a patent holder might grant a patent license to a licensee but have a provision that says that if the licensee engages in some specified act such as a lawsuit back against the licensor, then the license grant terminates.
Q. And what might other common patent licensing

Page 32

DAVID A. HEINER
considerations include?
A. I don't know offhand.
Q. Would licensing nonessential patents as part of the same transaction be a common patent licensing consideration?
A. Can you repeat the question?
Q. Would including as part of license discussion nonessential patents also be another common patent licensing consideration?
A. Yes. I think that happens.
Q. Would considerations of license term and termination also be common patent license considerations?
A. Yes.
Q. And each of these considerations would typically be fleshed out as part of bilateral negotiations between the perspective licensor and perspective licensee, correct?
A. Yes.
Q. Would you agree that whether terms are reasonable can be a matter of some debate?
A. Yes.
Q. And whether terms are reasonable can be resolved through litigation in the relatively rare circumstances where business discussions fail, correct?
A. I think that's right.

Page 33

DAVID A. HEINER
Q. You would typically expect for there to be business discussions prior to legal action, however, correct?
A. I don't know about that.
Q. You agree that RAND license terms are typically arrived at through bilateral negotiation, correct?
A. Typically, yes.
Q. Are there circumstances in which bilateral negotiation would not be involved?
MR. HARRIGAN: Object to the form of the question.
You can answer.
THE WITNESS: I think one important aspect of the standards system is that a firm that makes a RAND commitment when it initiates patent licensing discussions, that it do so in good faith and that any offer it makes that it believes that offer is RAND, recognizing that people may differ on that point.
And so if a firm were to come forward and put on the table an offer that is manifestly not RAND, that likely would not provide the basis for good-faith negotiations to proceed.
BY MR. SCHOENHARD:
Q. How might you determine if an offer is manifestly not RAND?

Page 34

1          DAVID A. HEINER
2     A.   If it had the characteristics that Microsoft
3  identified in an interrogatory response, I think in this
4  case but I'm not sure, where we listed a number of aspects
5  of what, is in our view, not RAND.
6     Q.   In such a circumstance, you believe that rather
7  than going back and saying this doesn't look quite right in
8  the general standards-setting context, it makes sense to go
9  ahead with a legal action?
10    A.   I think that's fair to say.
11    Q.   Please direct your attention to Page 13 of
12 Exhibit 2, the June 2011 letter.
13    A.   Okay.
14    Q.   Please feel free to read to yourself the first
15 full paragraph on this page.
16         MR. HARRIGAN:  I'm sorry.  I was typing and missed
17 it.  Where are we reading?
18         MR. SCHOENHARD:  Page 13, the first full paragraph.
19         MR. HARRIGAN:  Thanks.
20         THE WITNESS:  (Witness peruses document.)
21  Okay.
22 BY MR. SCHOENHARD:
23    Q.   Is it fair to say that as of June 2011, the time
24 this letter was submitted to the Federal Trade Commission,
25 you believed that the existence of a RAND commitment to

Page 35

1          DAVID A. HEINER
2  offer patent licences should not preclude a patent holder
3  from seeking a preliminary injunctive relief or commencing
4  an action in the International Trade Commission just because
5  the patent holder has made a licensing commitment to offer
6  RAND-based licenses in connection with the standard?
7     A.   Yes.
8     Q.   And would you agree that any uniform declaration
9  that such relief would not be available if the patent holder
10 has made a commitment to offer a RAND license for its
11 essential patent claims in connection with the standard may
12 reduce any incentives that implementers might have to engage
13 in good-faith negotiations with the patent holder?
14    A.   Yes.  I mean, generally I believe that, and I
15 think it's a commonplace notion, that anytime there's any
16 limit whatsoever on the scope of intellectual property
17 rights, that logically tends to reduce incentives to attain
18 those rights.
19         And on the other hand, if what's happening is that
20 there's greater sharing of those rights, then in the near
21 term there's the possibility of greater enervation by others
22 using those rights, and that's kind of a balancing and
23 tradeoff that has to be made.
24    Q.   Please direct your attention to Page 8 of
25 Exhibit 2, the June 2011 letter to the Federal Trade

Page 36

1          DAVID A. HEINER
2  Commission.
3     A.   (Witness complies.)
4     Q.   In Footnote 5 on Page 8 of Exhibit 2, do you see
5  reference to a Mr. Keith Mallinson, M-A-L-L-I-N-S-O-N?
6     A.   Yes.
7     Q.   Who is Mr. Keith Mallinson?
8     A.   I don't know beyond what is said in the
9  parenthetical.
10    Q.   The parenthetical to which you're referring reads,
11 "A longstanding research analyst and consultant in the
12 telecommunications industry"?
13    A.   Yes.
14    Q.   Do you believe that statement regarding
15 Mr. Mallinson to be correct?
16    A.   Let me take a minute and read this.  We're talking
17 about the statement that's the second sentence of the
18 footnote, or after the colon?
19    Q.   I was referring to the statement in the
20 parenthetical referring to who Mr. Mallinson is.
21    A.   Oh.  I assume that's correct.  I don't know
22 personally.
23    Q.   Please take a moment to read to yourself the final
24 paragraph of Footnote 5 on Page 8 of Exhibit 2.
25    A.   Okay.  (Witness complies.)

Page 37

1          DAVID A. HEINER
2         MR. HARRIGAN:  When you say "the final paragraph,"
3  you're talking about the one that starts, "The principal"?
4         MR. SCHOENHARD:  Correct.
5         MR. HARRIGAN:  Feel free to read the rest of that
6  footnote.
7         THE WITNESS:  (Witness peruses document.)
8  Okay.
9  BY MR. SCHOENHARD:
10    Q.   Do you agree with Mr. Mallinson's statement that
11 there will at times be significant contention between the
12 patent owner and implementer about what constitutes
13 reasonable licensing terms, but this is to be expected, as
14 with commercial negotiation on any input cost component, and
15 has for the most part been readily resolved through
16 bilateral negotiations?
17    A.   Yes.
18    Q.   Would you agree, then, that even in situations
19 where there may be significant contention between parties as
20 to what would ultimately be reasonable terms, bilateral
21 negotiation is an appropriate course?
22    A.   In general, yes.  This particular case I think of
23 as an outlier.
24    Q.   If a potential implementer of a standard is aware
25 that another entity owns a portfolio of potentially

Page 38

DAVID A. HEINER

1  standard-essential patents, do you believe that the
2  implementer has an obligation to seek a license to those
3  patents?
4  A.  I don't know about that.  The current practice in
5  the industry is often that no such license is sought and so
6  no such license is put in place, but rather firms simply
7  implement standards and rely on the fact that if they needed
8  a license - in other words, if the patent holder came
9  knocking - there's a RAND commitment.
10     And so I think often in the industry, firms simply
11 implement and don't actually obtain licences from everyone
12 who might have IP that reads on implementation.
13 Q.  Does that practice create free-rider issues?
14 A.  What do you mean?
15 Q.  Doesn't that type of practice encourage
16 implementers to effectively operate in an unlicensed
17 capacity with respect to existing IP rights in the hopes
18 that never shall a license need to be paid?
19 A.  I don't know.  I'm just commenting on what I think
20 happens in the industry.
21 Q.  When a patent holder comes knocking on the
22 implementer's door, what do you believe to be the common
23 practice?
24 A.  The common practice is that the patent holder, if

Page 39

DAVID A. HEINER

1  he's knocking on someone's door, apparently is seeking
2  licensing fees and then is obliged to offer a license that
3  is compliant with RAND.
4  Q.  How do you determine if the license that's offered
5  is compliant with RAND?
6  A.  Well, that's a very big question, and people go to
7  conferences and have debates about what is RAND and the
8  like, so there's no definitive answer to that.
9  Q.  In large part, the parties collectively and
10 bilaterally determine what is RAND in their specific
11 contexts through negotiations, correct?
12 A.  Typically.
13    MR. SCHOENHARD:  I think I've had you on the record
14 for approximately an hour.  Why don't we go ahead and take
15 our first break, and then we'll resume in a few moments.
16    THE VIDEOGRAPHER:  The time is approximately
17 9:35 a.m.  We are off the record.
18    (Pause in the proceedings.)
19    THE VIDEOGRAPHER:  We are back on the record.  The
20 time is approximately 9:54 a.m.
21 BY MR. SCHOENHARD:
22 Q.  Mr. Heiner, do you understand that you've been
23 designated to testify today additionally with respect to
24 Topic 36 in Motorola's Notice of Deposition --

Page 40

DAVID A. HEINER

1  A.  Yes.
2  Q.  -- relating to a February 8th, 2012 statement,
3  "Microsoft Support for Industry Standards"?
4  A.  Yes.
5  Q.  Do you believe that you are prepared today to
6  speak with respect to that topic?
7  A.  Yes.
8     (Whereupon, a 1-page Microsoft's Support for
9  Industry Standards document was marked Exhibit 3 for
10 identification.)
11    THE COURT REPORTER:  Exhibit 3.
12 BY MR. SCHOENHARD:
13 Q.  Mr. Heiner, you have been handed a document that
14 has been marked as Heiner Exhibit 3, bearing Production No.
15 MS-MOTO_1823_00005196256.
16    Please take a moment to review this document and
17 tell me whether you recognize it.
18 A.  Yes, I recognize this document.
19 Q.  What is this document, Heiner Exhibit 3?
20 A.  This document is a printout of a web page where
21 Microsoft made a statement regarding its support for
22 industry standards.
23 Q.  As part of this February 8th, 2012 statement,
24 Microsoft stated, under the No. 2, "This means that

Page 41

DAVID A. HEINER

1  Microsoft will not seek an injunction or exclusion order
2  against any firm on the basis of those essential patents,"
3  correct?
4  A.  Correct.
5  Q.  As of today, is that Microsoft's official
6  position?
7  A.  Yes.
8  Q.  As of today, is it Microsoft's position that it is
9  inappropriate for standards-essential patent holders to seek
10 injunctive-style relief?
11 A.  Yes.
12 Q.  That position is directly contrary to the position
13 taken at Page 13 of the June 2011 Federal Trade Commission
14 letter we discussed a moment ago, correct?
15 A.  Our position changed from June 14th to more
16 recently, yes.
17 Q.  Why did Microsoft's position change?
18 A.  Based on experience since then, based on thinking
19 about the subject more deeply, and based on discussions with
20 the US Department of Justice.
21 Q.  When you say "based or our experience since then,"
22 are you referring to your experience as, for example, a
23 defendant against the Motorola entities?
24 A.  Yes.

| Page 54 | Page 55 |
|---|---|
| 1            DAVID A. HEINER | 1            DAVID A. HEINER |
| 2   Q.   Do you recall whether you have seen these | 2   the European Commission regarding interoperability. |
| 3   documents before? | 3   Q.   What is interoperability? |
| 4   A.   I don't think I have.  I'm not certain. | 4   A.   That's another one of those $64,000 questions. |
| 5   Q.   You can set them aside. | 5   But generally it's the ability of two products to -- at |
| 6   A.   Okay. | 6   least in the computer context, two products to exchange |
| 7        (Whereupon, a 3-page Interoperability: The other | 7   information and interact with one another. |
| 8   Side of Our Settlement with the European Commission document | 8   Q.   And in connection with the European Commission's |
| 9   was marked Exhibit 11 for identification.) | 9   investigation, were there concerns about the availability of |
| 10       THE COURT REPORTER:  Exhibit 11. | 10  interoperability with Microsoft products? |
| 11  BY MR. SCHOENHARD: | 11  A.   Yes. |
| 12  Q.   Mr. Heiner, you've been handed a document that has | 12  Q.   As part of this and other investigations, |
| 13  been marked as Heiner Exhibit 11. | 13  Microsoft created a set of principles regarding |
| 14       Please take a moment to review this document and | 14  interoperability that it intends to follow, correct?  Do you |
| 15  tell me whether you recognize it. | 15  have any responsibility for the principles of |
| 16  A.   (Witness peruses document.) | 16  interoperability at Microsoft? |
| 17       Okay. | 17  A.   Yes. |
| 18  Q.   Do you recognize this document? | 18  Q.   What is that responsibility? |
| 19  A.   Yes. | 19  A.   The responsibility is counseling clients with |
| 20  Q.   What is Heiner Exhibit 11? | 20  respect to living up to those principles. |
| 21  A.   It appears to be a printout of a blog post that I | 21  Q.   And when you say "counseling clients," you're |
| 22  did apparently on December 18th of 2009. | 22  referring to clients within Microsoft, correct? |
| 23  Q.   To what does the blog post marked as Heiner | 23  A.   Yes. |
| 24  Exhibit 11 relate? | 24       (Whereupon, a 4-page Frequently Asked Questions |
| 25  A.   It relates to a settlement of inquiries made by | 25  about Interoperability document was marked Exhibit 12 for |

| Page 56 | Page 57 |
|---|---|
| 1            DAVID A. HEINER | 1            DAVID A. HEINER |
| 2   identification.) | 2   A.   Yes. |
| 3        THE COURT REPORTER:  Exhibit 12. | 3   Q.   One of the interoperability principles is |
| 4   BY MR. SCHOENHARD: | 4   identified with the numeral 4 at the bottom of the page |
| 5   Q.   Mr. Heiner, you've been handed a document that has | 5   carrying over to the second page of the bottom, "RAND Patent |
| 6   been marked as Heiner Exhibit 12, bearing Production Nos. | 6   Terms." |
| 7   MOTOM_WASH1823_0394353 through 356.  Please take a moment to | 7        Do you see that? |
| 8   review this document and tell me whether you recognize it. | 8   A.   Yes. |
| 9   A.   (Witness peruses document.) | 9   Q.   As one of Microsoft's interoperability principles, |
| 10       I see it appears to be a printout of a Microsoft | 10  Microsoft has committed to provide licenses to certain of |
| 11  website relating to the interoperability principles we | 11  its patents covering Microsoft open protocols on reasonable |
| 12  announced.  I don't specifically recall the document. | 12  and nondiscriminatory terms, correct? |
| 13       (Whereupon, a 3-page Microsoft Open Specifications | 13  A.   Yes. |
| 14  document was marked Exhibit 13 for identification.) | 14  Q.   Is the term "RAND" with respect to reasonable and |
| 15  BY MR. SCHOENHARD: | 15  nondiscriminatory licensing terms, as used in the context of |
| 16  Q.   Mr. Heiner, you've been handed a document marked | 16  Microsoft's interoperability principles, substantially the |
| 17  as Heiner Exhibit 13 which bears Production Nos. | 17  same, in your view, as RAND is understood in these standards |
| 18  MOTM_WASH1823_0394414 through 416. | 18  context? |
| 19       Please take a moment to review this document and | 19  A.   I'm not sure about that.  You know, here we're |
| 20  tell me whether you recognize it. | 20  talking about making available proprietary technologies. |
| 21  A.   Yes.  I recognize this document to be a printout | 21  And in the standard-setting context, you know, we're talking |
| 22  from the Microsoft website of the interoperability | 22  about firms coming together to contribute technology which |
| 23  principles that Microsoft articulated. | 23  may come from many different places into one standard and |
| 24  Q.   Are you familiar with the set of interoperability | 24  then that standard being one of many that gets implemented |
| 25  principles reflected in Exhibit 13? | 25  in products. |

```
                                              Page 82                                                    Page 83
 1           DAVID A. HEINER                              1           DAVID A. HEINER
 2   BY MR. SCHOENHARD:                                   2      MR. HARRIGAN:  Yeah.
 3     Q.   Mr. Heiner, are you aware of any time prior to the   3      THE COURT REPORTER:  Thank you.
 4   fall of 2011 at which Microsoft took the position that     4      (Whereupon, the deposition was concluded at
 5   injunctive relief should not be available to standard-     5   11:59 a.m.)
 6   essential patent holders?                            6
 7         MR. HARRIGAN:  Object to the form of the question.   7       (Signature waived.)
 8         THE WITNESS:  No.                              8
 9         MR. SCHOENHARD:  Mr. Heiner, I don't believe I have  9
10   anything further.  I thank you very much for your time this 10
11   morning.                                           11
12         THE WITNESS:  Okay.  Thank you.              12
13         THE COURT REPORTER:  Any questions?          13
14         MR. HARRIGAN:  Nope.                         14
15         THE VIDEOGRAPHER:  Here marks the end of videotape 15
16   labeled No. 2 in the deposition of David Heiner.   16
17         The time is approximately 11:56 a.m.  We are off 17
18   the record.                                        18
19         THE COURT REPORTER:  And before I go off the 19
20   record, would you like the standing order?         20
21         MR. SCHOENHARD:  Please.                     21
22         THE COURT REPORTER:  And would you like a copy, 22
23   standing order?                                    23
24   //                                                 24
25   CONTINUED ON THE NEXT PAGE TO INCLUDE JURAT.       25
```

```
                                              Page 84                                                    Page 85
 1              CERTIFICATE                               1              CORRECTION SHEET
 2                                                        2   Deposition of:  David Heiner    Date: 03/28/12
 3      I, Tia B. Reidt, do hereby certify that           3   Regarding:     Microsoft  Vs.  Motorola
 4   pursuant to the Rules of Civil Procedure, the witness 4   Reporter:      Tia Reidt
 5   named herein appeared before me at the time and place 5   _____
 6   set forth in the caption herein; that at the said time 6   Please make all corrections, changes or clarifications
 7   and place, I reported in stenotype all testimony     7   to your testimony on this sheet, showing page and line
 8   adduced and other oral proceedings had in the       8   number.  If there are no changes, write "none" across
 9   foregoing matter; and that the foregoing transcript  9   the page.  Sign this sheet on the line provided.
10   pages constitute a full, true and correct record of 10   Page   Line   Reason for Change
11   such testimony adduced and oral proceeding had and 11   ____  ____  _____
12   of the whole thereof.                             12   ____  ____  _____
13                                                    13   ____  ____  _____
14      IN WITNESS HEREOF, I have hereunto set my hand 14   ____  ____  _____
15   this 9th day of April, 2012.                      15   ____  ____  _____
16                                                    16   ____  ____  _____
17                                                    17   ____  ____  _____
18                                                    18   ____  ____  _____
19                                                    19   ____  ____  _____
     _____
20     Tia B. Reidt                                   20   ____  ____  _____
21                                                    21   ____  ____  _____
22   Commission Expiration: June 3, 2014              22   ____  ____  _____
23                                                    23   ____  ____  _____
24                                                    24         Signature_____
25                                                    25            David Heiner
```