# EXHIBIT 44

ASPEN PUBLISHERS

# DRAFTING LICENSE AGREEMENTS

## Fourth Edition

## Volume 2

Michael A. Epstein
Frank L. Politano
Editors



Wolters Kluwer
Law & Business

2011-2 SUPPLEMENT

This publication is designed to provide accurate and authoritative information in regard to the subject matter covered. It is sold with the understanding that the publisher and the author(s) are not engaged in rendering legal, accounting, or other professional services. If legal advice or other professional assistance is required, the services of a competent professional should be sought.

—From a *Declaration of Principles* jointly adopted by
a Committee of the American Bar Association and
a Committee of Publishers and Associations

Copyright © 2011, 2010–2003 CCH Incorporated. All Rights Reserved.

Chapter 15 Copyright © 1992–2010 Al Kohn and Bob Kohn

No part of this publication may be reproduced or transmitted in any form or by any means, including electronic, mechanical, photocopying, recording, or utilized by any information storage or retrieval system, without written permission from the publisher. For information about permissions or to request permissions online, visit us at *www.aspenpublishers.com/licensing/default.aspx*, or a written request may be faxed to our permissions department at 212-771-0803.

Published by Wolters Kluwer Law & Business in New York.

Wolters Kluwer Law & Business serves customers worldwide with CCH, Aspen Publishers and Kluwer Law International products.

Printed in the United States of America

1 2 3 4 5 6 7 8 9 0

**Library of Congress Cataloging-in-Publication Data**

Drafting license agreements / Michael A. Epstein, Frank L. Politano, editors. — 4th ed.
   p. cm.
   Includes index.
   ISBN 978-0-7355-3379-2 (set) — ISBN 978-0-7355-3488-8 (v. 1) — ISBN 978-0-7355-3489-6 (v. 2)   1. Intellectual property — United States.   2. License agreements — United States.   3. License agreements — United States — Forms.   I. Epstein, Michael A.   II. Politano, Frank L.

KF2979.D6922
346.7304'8-dc21

   2002074782

**2011-2 SUPPLEMENT**

301

Also, premium pricing and the rate of return must be taken into consideration. In addition, to determine the length of the future income stream, the economic remaining life must be determined.

### [c] Disadvantages

There are disadvantages with this method also. Most notably, it is extremely difficult to predict what benefits will be derived in the future. This is tied to the difficulty in trying to determine the economic life. Another disadvantage is the difficulty inherent in trying to select an accurate discount rate. If the chosen discount rate is too high or too low, the determined value of the property may be noticeably inaccurate.

### [4] Combination of Approaches

There is no one best approach that can be relied upon to provide a single valuation for patented assets. A blend is preferred, but in what proportion? And the presence, absence, and degree of exclusivity associated with intangible intellectual property make valuation even more difficult.[58]

## § 20.05 METHODS OF MEASURING ROYALTY RATES

Once a method of valuation has been determined and applied to the intellectual property, a basis for measuring the royalty rate must also be determined. Typically, the royalty rate is based on a percentage of either the sales or profits of the product that is the subject of the license agreement. In addition, the royalty rate may be determined on a per-unit basis. These methods of measuring the royalty rate are discussed in more detail below.

---

[58] Some useful references include:

G.V. Smith, & R.L. Parr, *Intellectual Property: Valuation, Exploitation and Infringement Damages*, J. Wiley & Sons, New York, 2005.

R. Goldscheider, *Licensing and the Art of Technology Management*, West Publishing, New York, 2007.

P.B. Bell, & J. Simon, *The Law And Business of Licensing*, Clark, Boardman, Callaghan, New York, 1997.

M.B. Finnegan, & R. Goldscheider, *The Law And Business of Licensing*, Clark Boardman Company, New York, 1980.

## [A] Gross or Net Sales

To reiterate the comparison provided in Section 1, gross sales are the total of all sales at invoice prices, whereas net sales are gross sales minus returns, allowances, rebates, and discounts. Net sales can also exclude sales taxes, installation, freight and packing expenses, and other expenses.[59]

Gross sales and net sales are favored by licensors because they are relatively easy to measure, relatively hard to manipulate, and account for increases due to inflation. Licensees also prefer basing the royalty rate on gross or net sales because it allows proper accounting to the licensor without having to disclose profit information. For these reasons, the majority of licenses use sales as the royalty rate base, with net sales predominating because they allow deductions for certain expenses that are not related to the protected technology.

One method that uses net sales as the basis for measuring royalty rates is the "5% of Sales Method." As is obvious from its name, the "5% of Sales Method" bases the royalty rate on 5% of the net sales. The major disadvantage of the "5% of Sales Method" is that it does not take into account other financial considerations, the scope of the license grant, the risk associated with licensing the intellectual property, the capital investment necessary to implement the intellectual property, profits, manufacturing expenses, and operating expenses. Therefore, although this method may be used as a baseline, most negotiated royalty rates actually fall between 1% and 5% of the net sales.

## [B] Profits

Another method of measuring the royalty rate is to use the profits resulting from the sale of the licensed product. Gross profit is determined by subtracting from gross sales the cost of the goods sold, which generally includes directly allocable expenses, such as manufacturing expenses, raw material costs, direct labor costs, utility expenses, and depreciation expenses for the manufacturing facility.[60]

One problem with the gross profits method is that operating expenses are not considered. Typical operating expenses include sales expenses, advertising, administrative costs, rent, basic utilities, and other expenses needed to keep the business running but that are not directly

---

[59] *See* 1 Harold Einhorn, Patent Licensing Transactions § 3.04[3] (1997).

[60] Russell L. Parr & Gregory J. Battersby, 1999 Licensing Update, Aspen Publishers, Inc., *Chapter 8: Royalty Rate Trends*, p. 224 (1999).