```
 1              UNITED STATES DISTRICT COURT

 2          WESTERN DISTRICT OF WASHINGTON AT SEATTLE

 3  _____

 4   MICROSOFT CORPORATION,           )
                                      )
 5                    Plaintiff,      )  10-01823-JLR
                                      )
 6   v.                               )  SEATTLE, WASHINGTON
                                      )
 7   MOTOROLA INC., et al,            )  April 11, 2012
                                      )
 8                    Defendants.     )  Argument on TRO
                                      )
 9  _____

10              VERBATIM REPORT OF PROCEEDINGS
            BEFORE THE HONORABLE JAMES L. ROBART
11               UNITED STATES DISTRICT JUDGE
    _____

12

13

     APPEARANCES:
14

15


16    For the Plaintiff:     Arthur Harrigan, Christopher
                             Wion, David Pritikin and Andy
17                           Culbert


18

19


20    For the Defendants:    Jesse Jenner, Ralph Palumbo, Mark
                             Rowland, Philip McCune and Neill
21                           Taylor

22

23

24

25
```

1          THE CLERK:  C 10-1823, Microsoft versus Motorola.

2     Counsel, please make your appearances.

3          MR. HARRIGAN:  Art Harrigan representing Microsoft,

4     and with me at counsel table is my partner Chris Wion; David

5     Pritikin from the Sidley firm; and Andy Culbert from

6     Microsoft.

7          MR. JENNER:  Jesse Jenner on behalf of Motorola.

8     With me is Ralph Palumbo, Neill Taylor from Motorola, and

9     Mark Rowland who spoke this morning.

10          THE COURT:  Counsel, because I want to be fair to all

11     of you, if we are proceeding under the ITU agreement it has

12     different language in it and the language talks about

13     worldwide impact.  And so I want to make sure that you're

14     aware of the fact that that weighs heavily on the court so

15     that you don't get surprised, and I head off in a direction

16     that all of you think is somewhere down the rabbit hole.  So

17     if you need to reduce your presentations to first-grade

18     level, I won't be offended.

19       Mr. Harrigan.

20          MR. HARRIGAN:  I'm still working on getting there,

21     Your Honor.  Thank you.

22       First of all, Your Honor, we agree that the *Gallo* case is

23     what this is about.  And I don't think it's contested that

24     the parties are the same, functionally the same in the two

25     cases.  The question then is whether the issues are the same,

1    which in this circuit boils down to whether this action would

2    be dispositive of the claims in the German action.  And I

3    will start by explaining why we believe that that is true.

4    And I'm just citing for that, *Applied Medical,* which says

5    that the issues are functionally the same if one action is

6    dispositive of the other.

7         We've handed up a notebook, Your Honor, and if you could

8    turn to Tab 1.

9              THE COURT:  I have a plethora of notebooks up here.

10             MR. HARRIGAN:  This is a skinny little one.

11             THE COURT:  It has six tabs in it?

12             MR. HARRIGAN:  It does.

13             THE COURT:  Then I've got it.

14             MR. HARRIGAN:  Tab 1 is the Motorola letter relating

15   to the H.264 standard that was sent to Microsoft on

16   October 29, 2010.  And the little purple tabs are the pages

17   where there is, in yellow highlighting, the two patents that

18   are at issue in Germany.  So those two patents were part of

19   this letter.  And not only does the standard, as the court

20   just noted, require that the license be worldwide, but this

21   letter and the attachment indicates that it was intended to

22   apply to those specific patents that are at issue in Germany.

23   And the very first line confirms Motorola's offer to grant

24   Microsoft a worldwide non-exclusive license.

25        So, a ruling in this case that Microsoft is entitled to a

1  RAND license to the patents that were offered in this letter

2  would remove any basis for -- for further action in Germany

3  on infringement, assuming that Microsoft actually got the

4  license.

5      Now, where we stand on that is that first of all we are

6  asking this court, and we have been -- we have had it in our

7  pleadings from day one -- to determine a RAND rate under

8  these standards.  And we have also stated, I believe

9  unequivocally for the first time in September of 2011, not in

10  April of 2012 as Motorola suggests, that we are committing to

11  take such a license, and if the court agrees that we are

12  entitled to one -- which we believe is simply a function at

13  this point of whether the court agrees that we have not

14  repudiated by filing this lawsuit seeking to enforce the

15  contract.

16      So, we believe that because at the end of the day, and

17  that day is hopefully not too far off, the court should rule

18  and we hope will rule that we are entitled to a license

19  worldwide that includes the German patents, that will dispose

20  of all of the issues in the German case, but in particular

21  will clearly dispose of the one issue that this TRO is

22  focused on, and the preliminary injunction request, which

23  that is whether Motorola can get an injunction.

24      I'd like to point out, I think it's significant here in

25  terms of comity, to the extent comity is even involved, which

1    I'll get to in a minute, that the anti-suit injunction that

2    we are asking for is only about the injunction.  We are not

3    asking the court to stop Motorola from proceeding in Germany.

4    It can proceed to establish whatever it needs to over there

5    with regard to infringement and ask for royalties and damages

6    and so forth.

7        All we're asking the court to do is to prevent them from

8    enforcing an injunction in Germany, which is a much narrower

9    request than all.  But the *Medtronic* case was very similar,

10   and I'll get that one out of the way right now.  In that case

11   the court didn't use the anti-suit standard as such, but it

12   determined because there was a likelihood that a contract

13   would preclude injunctive relief, the court as -- and

14   irreparable harm would result if there were injunctive relief

15   granted in the other forum, the court would enjoin the

16   enforcement of the injunction, in effect, but let the

17   infringement part of the case go forward.  That's what we're

18   asking for.

19       And I believe that since really the only issue is

20   repudiation, and this court has already expressed doubt about

21   the validity of that argument, that we have a close parallel

22   here to the *Medtronic* case, because of the limited relief

23   we're asking for, particularly.

24       Let's move on here for a second to establish a couple

25   other preliminary items.  In Tab 2 we have quoted from our

 1   original complaint, and it has been suggested by Motorola

 2   that Microsoft did not ask the court to determine a RAND

 3   rate, and you'll see from the underlying "triple I" section

 4   there that we, in fact, did so in the original complaint and

 5   the same language appears in the amended complaint.

 6        And then pinning down what I just said with regard to

 7   Microsoft's having committed to take the license back in

 8   September of 2011 we said, "Microsoft is seeking and remains

 9   ready and willing to take a license to Motorola's H.264 and

10   802.11 declared-essential patents on RAND terms."  That

11   statement was repeated several times.  Then if you turn to

12   the next page in the March 28, 2012, pleading referred to

13   here in our motion for TRO and preliminary injunction, we

14   said, in the second underlined portion:  Coupled with

15   Microsoft's express commitment to accept a RAND license, and

16   this necessarily means Motorola cannot enjoin Microsoft, et

17   cetera.

18        So, we have the prayer in the complaint to set a RAND

19   rate, we have a commitment to take the license at that rate

20   that the court sets, and therefore the only issue here that

21   could preclude Microsoft from having a RAND license is if the

22   court decides this lawsuit was a repudiation instead of an

23   effort to enforce the contract.

24        So therefore we believe this case is dispositive of the

25   German action for that reason, and certainly of their right

```
1   to injunctive relief.
2       Secondly, this case could be --
3           THE COURT:  Let me stop you there for a moment.  In
4   looking at the cases that followed Gallo, it has been
5   important to the court if this was a question of United
6   States law or foreign country law.  And if it's foreign
7   country law, is it something that would traditionally belong
8   in their courts?  What jurisdiction do I have to tell a
9   German court how to administer German law in regards to
10  German patents?
11          MR. HARRIGAN:  Your Honor, the anti-suit standard is
12  whether this case will be dispositive of the issues in the
13  German action, which was filed long after this one.  And Your
14  Honor has the authority to -- and the discretion to order
15  Motorola not to enforce the injunction.  We can't order the
16  court not to grant one, and we're not asking you to.  But the
17  granting of -- the enforcement of that injunction will be
18  barred by the decision of this court that Microsoft has a
19  license.
20      One of the things that is unique -- I don't know if it's
21  unique, but it's German -- about this case is that in Germany
22  they don't care why you don't have a license.  They don't
23  care whether you don't have a license because Motorola
24  breached its RAND commitments.  They don't care whether you
25  don't have a license because they never offered you one on
```

1    reasonable terms.  If you don't have a license and you get

2    enjoined, unless you jump through these various hoops that

3    Motorola has described, and those hoops are designed with --

4    the only boundaries around the award, in effect, or the

5    royalty that's established is failing to -- is avoiding

6    antitrust violations.

7        And the sole declaration that you have on German law

8    states that.  And it also states that no one has determined

9    that that means that they have to be what we would call RAND.

10   No one has equated those two things.

11           THE COURT:  Well, and since you've raised that

12   subject, borrowing from Judge Posner's remarks in another

13   Motorola case, and combining it with the substantial

14   experience in this district, why isn't Microsoft's remedy

15   here to amend its complaint and basically describe Motorola

16   as a patent troll, which is seemingly the conduct that's

17   going on here, in a pejorative sense, on enforcement of a

18   patent that they've acquired, and in an antitrust claim,

19   which in Judge Posner's view is really what this battle has

20   morphed into.

21           MR. HARRIGAN:  Well, Your Honor, we could do that.

22   But all we're doing today is trying to stop a German

23   proceeding that is duplicative of this case and of which this

24   case will be dispositive.

25       And under the anti-suit standard we obviously don't have

1   to establish that the conduct that's embodied in the foreign
2   court is an antitrust violation.  We merely need to establish
3   that the first-filed case will be dispositive of the issues
4   that are controlling in that case.
5       And, of course, we have to meet one of the other four
6   factors described in *Gallo* and *Seattle Totems*, which I'll get
7   to in a minute.  But the whole point of the *Gallo* case was
8   that it was taking -- it was an effort to elucidate what I
9   believe the court basically set as a standard for deciding
10  anti-suit cases.  And it basically said the preliminary
11  injunction standard is not applicable in this context.
12  Here's what you have to do.  And the first thing is it's
13  dispositive if the first-filed action is dispositive.  Second
14  thing is does one of these four criteria apply?  And the
15  third thing is, if one does, are we somehow or other having
16  an unacceptable impact on comity?
17      That's it.  I think that your thought about amending the
18  complaint to allege an antitrust violation is a good idea,
19  but it's not -- I don't believe it is a part of the current
20  -- of the analysis that the court has to go through in order
21  to decide this motion.
22          THE COURT:  Is there a choice of law provision in the
23  ITU agreement?
24          MR. HARRIGAN:  I don't believe so, subject to
25  correction.

1        It's a worldwide contract.  I don't believe there's any

2    choice of the law provision in it.

3            THE COURT:  Please continue.

4            MR. HARRIGAN:  So, Your Honor, you said you didn't

5    want to hear about *Seattle Totems*, and I won't spend much

6    time on it.  But, could we take a look --

7            THE COURT:  The law appears to have moved on, or at

8    least been clarified since *Seattle Totems*.

9            MR. HARRIGAN:  I'm sorry?

10           THE COURT:  The law has been clarified since Judge

11   Coughenour's opinion in *Seattle Totems*.

12           MR. HARRIGAN:  But I would like to just point

13   something out in the *Gallo* case, which is at Tab 5.  And

14   we've highlighted some sections of that case, and I'm looking

15   at page 4 of the Lexis printout.  And the third yellow

16   highlighted paragraph on the left side.  This is where the

17   court says that, "*Gallo* need only demonstrate the factors

18   specific to an anti-suit injunction weigh in favor of

19   granting the injunction."  And the last sentence they say,

20   "This test, the new one we're announcing, we conclude is

21   consistent with *Seattle Totems*."

22       So even though *Gallo* announces a new standard, it also

23   says *Seattle Totems* was correctly decided under this

24   standard.  And I'm only pointing that out because, Your

25   Honor, this is what the *Seattle Totems*' decision was based

1    upon, according to the Ninth Circuit in affirming it.

2        In the case before us, the validity of the '72-'74

3    agreements will be the central issue in both the Canadian and

4    American litigations.  Adjudicating this issue in two

5    separate actions is likely to result in unnecessary delay and

6    substantial inconvenience and expense to the parties and

7    witnesses --"

8            THE COURT:  You need to slow down, counsel.

9            MR. HARRIGAN:  Sorry?

10           THE COURT:  You need to slow down if you want to have

11   a record of what you're saying.

12           MR. HARRIGAN:  I gotcha, sorry.

13       "-- unnecessary delay and substantial inconvenience and

14   expense to the parties and witnesses.  Moreover, separate

15   adjudications could result in inconsistent rulings or even a

16   race to judgment."  And the German case is a blitz proceeding

17   that started long after this one and is very close to being

18   over.  And I believe that it's fair to say that those factors

19   that were in the *Totems* case are all present in this case.

20   And now I'm going to get to what the others are that are

21   present in this case that make it a much stronger case than

22   *Seattle Totems,* but which *Gallo* approved under the new

23   standards.

24       First of all, there's no doubt that if an injunction is

25   granted in Germany there will be irreparable harm.  That's

1    established in the Microsoft declarations.  And it's quite

2    clear that having to take Windows off the shelves, and so

3    forth, is going to be huge.  And even the preparations for

4    it, if an injunction were entered and Motorola posted a bond,

5    you know, within a week or so there would have to be all

6    kinds of preparations for it, which would be damaging to

7    Microsoft and its partners.

8        Now, so we have irreparable harm here even though I

9    believe personally that under the *Gallo* standard you don't

10   need to show irreparable harm.  It is just one of the

11   equitable factors under factor No. 4 that should be taken

12   into account.  But we have *Seattle Totems,* plus irreparable

13   harm.  There was no irreparable harm in that case at all.

14       Now, the other -- the answer to that, I guess is, well,

15   look at all these ways that you can avoid an injunction in

16   Germany.  Well, one of the ways, Your Honor, is first of all

17   as I said before there is no limitation in Germany to RAND.

18   There is only a limitation to avoiding an antitrust

19   violation.  That's the only protection Microsoft has with

20   regard to the amount of the royalty.

21       But think about this, Your Honor, Motorola is saying you

22   can avoid having an injunction, so I guess it's okay with

23   Motorola if there's no injunction, as long as they get an

24   Orange Book offer under one of the two ways of doing that.

25   But why, then, if all we have to do is go through a process

1   to get a rate, why do they want to have the threat of

2   injunction still hanging over that procedure?  The reason is,

3   they want to coerce Microsoft into paying more than a RAND

4   rate.  They want to get it right up there to the bottom of

5   wherever you cross the line into antitrust violations.

6        So the notion that there's some reasonable way to avoid

7   this in Germany is just plain wrong.  For example, when we

8   proposed to post a $300 million-dollar bond to support this

9   temporary restraining order, Motorola says, well, why don't

10  you just put that in escrow -- which is what they're

11  proposing -- and then Motorola can propose a rate, which it

12  may say is not only for the German patents, but that it wants

13  to be a worldwide rate, which they have suggested in the

14  German case.  And we know that's going to be 2.25 percent at

15  least, if not more.

16       And then if someone determines later that that was too

17  much, you can file a lawsuit and try and get the money back.

18  That is vexatious and oppressive.  And it also completely

19  supplants the jurisdiction of this court where we have asked

20  that a RAND rate be set, we have committed to take the

21  license, and that will preclude an injunction in Germany,

22  among other things.

23       So the other aspect of the German action that I believe

24  triggers the anti-suit, granting the anti-suit motion is that

25  it does violate a policy of the forum, which is the third one

1    that could potentially apply here as this is obviously not in

2    rem.

3        Germany does not recognize that Motorola's breach that we

4    allege in this case is a defense.  All they care about is, do

5    you have a license or do you not have a license?  That means

6    that Motorola can breach and get injunctive relief and use

7    that threat to extract excessive royalties.  No U.S. court

8    would enter the kind of injunction the German court is

9    potentially going to enter, where there was a serious issue

10   about whether the -- whether Motorola had breached and was

11   entitled to anything.  That would not happen in this

12   jurisdiction.

13       And the same is true if there were a serious issue with

14   regard to Microsoft's entitlement to a license.  A court in

15   this country would say:  Let's see if you've got a license

16   first; under RAND terms let's evaluate whether Motorola in

17   fact demanded outrageous royalties; and then we'll figure out

18   what kind of relief should be awarded if Microsoft still

19   doesn't have a license.

20       Those are judicial policies of contract enforcement.  In

21   this case it's a worldwide contract that therefore this

22   jurisdiction's policies of upholding such contracts will, in

23   fact -- does, in fact, have a worldwide application.  And

24   Motorola's tactic, combined with the way the German courts

25   work, is an attack on the effectiveness of the standards,

1    because the standards depend upon the courts enforcing RAND

2    when the parties are unable to agree on what RAND is, which

3    is all we are asking this court to do.

4        Now, there's been some discussion about how long we

5    waited.  And I'll get to -- so, Your Honor I guess the bottom

6    line here is, we believe we've satisfied three of the four

7    factors that are -- that the *Gallo* court approved to

8    determine whether you reached the issue of comity.  And I'll

9    get to comity in a second.

10       But with regard to the question of timing, I would like to

11   just explain what Microsoft did, and why, at various times.

12   The German action was begun in the summer, I believe, and I

13   can stand corrected on that, in August.  What Microsoft did

14   in response to that was, let's file a summary judgment motion

15   so that we can get a ruling that we're entitled to a license,

16   and subject to setting a rate, before this German thing

17   reaches its conclusion.  So we filed that motion in August.

18   We followed it up, which the court was not happy with, a bit

19   later with another summary judgment motion to ask the court

20   to rule specifically that injunctive relief was not

21   appropriate, both because we were entitled to a license and

22   because of lack of irreparable harm.

23       Now, what happened is that the court has now decided the

24   first two elements of our motion.  So that it's now

25   established, and it's actually eventually conceded, that

1   Motorola is bound by its RAND commitments and Microsoft is a

2   third-party beneficiary.

3       That set the stage for us to say, because we've committed

4   to take a license, and because we've asked the court to set a

5   rate, the court should stop this German proceeding because of

6   the fact that it is highly probable that we're going to end

7   up with a license, unless the court decides filing the

8   lawsuit was a repudiation.  So that was the sequence of

9   events.

10      And in terms of comity, as I said before, even in the

11  anti-suit motion itself we have limited it to the injunctive

12  relief issue.  We're not asking that the court order Motorola

13  to cease all activities in the German court.

14      So, now on the subject of comity, if we can look at the

15  *Gallo* case one more time.  So much is made of the fact that

16  the *Gallo* case involved a forum selection clause.  But I

17  believe that first of all with regard to its enunciation of

18  the new standard, that clearly was not -- it was clearly not

19  limited to that situation.  It was -- the court stated

20  specifically, and this is on page 3, that *Totems* had not

21  elucidated a precise framework for the courts to apply, when

22  deciding to issue an anti-suit injunction.  And that we now

23  turn to these issues, and they basically rejected the

24  preliminary injunction test, and adopted the four-factor

25  test.  So that was a general statement to guide the trial

1    courts in applying the anti-suit standard.

2        Then when they get to the issue of comity, they said two

3    things about that.  If you look at page 6, the first

4    statement they made relates to the forum issue, and what the

5    court says is that because there is a private agreement to

6    litigate disputes in a certain forum, one party's filing

7    first in a different forum does not implicate comity.

8        So the forum selection issue in that case was brought up

9    because it disposed of the issue of comity, because there was

10   a forum selection of the domestic case, and it disposed of

11   the fact that normally these things are done where the

12   domestic case is the first one file, and here the Venezuela

13   case was the first one filed.  And, of course, it doesn't

14   matter if there is a forum of selection clause, comity is out

15   the window.

16       Then it goes on to describe the general way in which

17   courts should deal with comity in this type of a case,

18   meaning a private dispute.  It says, "No public international

19   issue is raised in this case.  There is no indication that

20   the government of Ecuador is involved in the litigation.

21   Andina is a private party in a contractual dispute with

22   *Gallo,* another private party.  The case before us deals with

23   enforcing a contract and giving effect to substantive rights.

24   This in no way breaches norms of comity."

25       So I believe, Your Honor, that the comity analysis in this

1   case is just that simple.  The contract is the RAND contract.

2   Microsoft is seeking to enforce its rights under that

3   contract here.  If it succeeds, that will dispose of the

4   German action.  It's a private dispute between private

5   parties.  And everything that *Gallo* said about that case is

6   true of this case.  So that basically the Ninth Circuit is

7   saying, in private disputes of this type comity is not

8   breached, the norms of comity are not breached without some

9   extraordinary involvement of public international issues or

10   the government of the other country, et cetera.  And this is

11   part of *Gallo*'s elucidation of the new standard.

12      Now, I attempted here, in presenting this, to answer the

13   court's questions.  But I'm now going to quickly run down

14   those questions.

15         THE COURT:  I think you're fine.

16         MR. HARRIGAN:  All right.

17         THE COURT:  You've covered the things I want to know.

18   If you want to save any of your time you should probably just

19   wrap up.

20         MR. HARRIGAN:  Thank you, Your Honor.

21         THE COURT:  Mr. Jenner.

22         MR. JENNER:  Your Honor.

23         THE COURT:  Nice to see you in person again.

24         MR. JENNER:  Thank you.  I appreciate the court's

25   indulgence as to the affairs last week.

```
1         THE COURT:  It was fine.

2         MR. JENNER:  Your Honor, we certainly agree, because

3   we expressed it in our papers, that Gallo is the test.  Gallo

4   has a gloss put on it by Applied Medical, which is the

5   subsequent Ninth Circuit case.  I'll mention that in passing

6   I don't think it's terribly important, but it may play a role

7   here.

8      The first thing I'd like to do, because it's in the reply

9   brief that we didn't get a chance to respond to in writing,

10  is dispose of one thematic issue that runs through the reply

11  brief, which is a total red herring.  And that is all of

12  these references to first filed.  That's a red herring for

13  two reasons.

14     One, because on the facts of what they actually pleaded

15  and the prayer for relief, there is no request in the prayer

16  for relief that the court set a RAND rate, it's just not

17  there.  They're pointing to something that they said in the

18  background of the case in paragraph 9, of a 102-paragraph

19  complaint.  And when you look at the actual request for

20  relief that they made, at Tab 1, you will find conspicuously

21  absent from what they actually asked the court to decide --

22  sorry, Tab 2, I guess it is -- Tab 3.  Tab 3, the last page

23  of Tab 3, page 22 of the complaint, is what they actually

24  have asked the court to do in the amended complaint, and that

25  is very astutely asking Your Honor for determination decrees
```

 1   that Motorola hasn't offered reasonable rates.

 2       They don't ask you to set a rate.  They don't say they'll

 3   take a license.  They don't say they want a license.  They

 4   ask you simply to say -- decree that Motorola is required to

 5   offer them a license on RAND terms, so that they can keep

 6   that in their hip pocket, which was the original intent.  If

 7   things went south, they would ask for a license.  But they

 8   didn't ask you for a license.  They didn't ask you to set a

 9   rate.

10       If they want to amend their complaint to ask the court to

11   set a rate, that's another matter.  But they didn't do that.

12   So the first time they actually appeared to be asking Your

13   Honor to set a RAND rate is in this September brief that they

14   mentioned.  So that if first to file did matter, they first

15   asked for that after the German proceedings were instituted.

16   Microsoft's action, if they properly amended the complaint,

17   is the second-filed action, it is not the first-filed action.

18   But that doesn't really matter, because as I said it's a red

19   herring.

20       And I thank Microsoft actually for putting *Gallo* in here,

21   because if Your Honor will turn with me to Tab 5, where the

22   *Gallo* case is, you will see in the highlighted portion,

23   highlighted by Microsoft on page 6 of *Gallo* at Tab 5, they

24   call to Your Honor's attention that the foreign action was

25   the first-filed action.  That's the action that was enjoined

1    in *Gallo*.  So the policy of the Ninth Circuit --

2            THE COURT:  I'm sorry, I got mixed up.  What page are

3    you on?

4            MR. JENNER:  I'm on Tab 5, the *Gallo* case, it's

5    page 6, where they have highlighted for us in the right-hand

6    column, that the foreign action that they wanted to enjoin in

7    *Gallo* and did enjoin in *Gallo*, was the first-filed action.

8    So to suggest that the seminal case, *Gallo*, suggests that the

9    first-filed action gets precedence, you can't find that

10   anywhere.  Because in this case it's the first-filed action

11   that got enjoined.  There is no such rule.  The cases don't

12   support such a rule.  It's just not a *Gallo* requirement.

13       So all of that material in the argument and in the reply

14   brief about first to file being important, as if this were a

15   venue case, is just wrong.  It's not a requirement.  It

16   shouldn't be considered.

17       So let me go through the requirements.  The first

18   requirement is specifically whether or not the parties are

19   the same.  While the parties are not precisely the same, Your

20   Honor, we don't think that makes a real difference here.

21   They are, in fact, a little bit different.  But I don't think

22   that's going to affect how Your Honor acts, and whether the

23   issues are the same, and whether or not the first action is

24   dispositive of the action to be enjoined.

25       That's where the gloss of the *Applied Medical* case comes

1  in.  Because the *Applied Medical* case explains that that

2  factor means:  Will the domestic action be capable of

3  disposing of all the issues in the foreign action?  The two

4  actions, says *Applied,* are functionally the same if all

5  foreign claims can be resolved in the local action.  And

6  that's plainly not the case here.

7      This is a case, if you disregard for a moment the 1823

8  patent infringement claims, which I will come to, because

9  they're different from the ones in Germany, and just look at

10  the 1823 breach of contract claims, which are very limited in

11  terms of what Microsoft pleaded.  The German action, the

12  foreign action is a German patent infringement action.  We're

13  talking about Microsoft's suggestion that Your Honor should

14  interfere with a German patent infringement action that has

15  unique German remedy proceedings that are currently underway,

16  that are being interpreted and applied by a German court.

17      I'll come to the fact that that's a gargantuan intrusion

18  on comity.  But for purposes of factor No. 1, it's a

19  different proceeding with different issues.  What Microsoft

20  would like you to do in derogation of *Gallo* and *Applied*

21  *Medical,* is to cherry pick the RAND rate issue that they

22  haven't even asked for in Seattle, and equate that to the

23  Orange Book proceeding in Germany, which is a completely

24  different proceeding to set a remedy in Germany.

25      Let me talk about the Orange Book proceeding.

1     THE COURT:  You aren't getting any traction on the,

2  "I haven't been asked to set a RAND rate."  I mean, you stood

3  at that very podium and told me that you needed to do more

4  discovery to set the RAND rate, and because you wanted to put

5  in all these contracts you had gotten in for RAND rates.  So

6  that argument is just not going to make it, so know that.

7     MR. JENNER:  All right.  Then I'll leave that.  But

8  the fact of the matter is that the actions are still

9  different actions.  The German proceeding, number one, patent

10  infringement proceedings, has nothing to do with Seattle.

11  Seattle can't deal with that.  It wouldn't be appropriate for

12  Microsoft to have brought German declaratory judgment claims

13  here to raise that, because it's properly in Germany.

14     The other issue that the court is dealing with in

15  anticipation of its April 17th order is the Orange Book

16  proceeding.  And one of the questions I think Your Honor

17  asked is essentially what are the things that go on with the

18  Orange Book procedure?  What can Microsoft do?

19     Your Honor, my understanding of the Orange Book procedure,

20  to go into it a little bit --

21     THE COURT:  I find it quite ironic, by the way, that

22  Microsoft's former lawyers, Quinn Emanuel -- I assume are

23  former -- are now representing Motorola in Germany.

24     MR. JENNER:  Are they Microsoft's former lawyers?  I

25  don't think so.

```
 1              THE COURT:  No, they are.

 2              MR. CULBERT:  If they were, Your Honor, it was some

 3    time ago.

 4              THE COURT:  I understand.  But I certainly know that

 5    that's where they came from.

 6              MR. JENNER:  Well, Your Honor, that's news to me, but

 7    equally surprising.  The German Orange Book procedure is a

 8    unique remedy that we certainly don't have here, in which the

 9    German court, in finding infringement, gives the right to the

10    prevailing patentee to receive an injunction.  But it says

11    that the losing party can avoid the injunction entirely by

12    complying with the Orange Book remedy.

13         The Orange Book remedy calls upon Microsoft to make an

14    Orange Book offer, which it did make, it was one or two cents

15    per unit, and said this should be sufficient to avoid an

16    injunction.  Microsoft, you won't be surprised, rejected

17    that, thinking about the $5 and $10 per unit that Microsoft

18    is asking about.  Microsoft rejected that --

19              THE COURT:  Hold on, you said --

20              MR. JENNER:  Motorola.  Motorola rejected that as

21    being unreasonable.  And it's now up to the court, as part of

22    what it will decide on April 17th, to decide whether or not

23    it was reasonable for Motorola to turn down the 1-cent 2-cent

24    offer.  If it decides that the offer was adequate, then the

25    action will be dismissed.  Microsoft can use the patents just
```

1  as if they were licensed.  They will have to continue to

2  accrue payments if they go up on appeal, so that they will

3  have to continue to deposit money.

4      But that would be a situation where, because the offer has

5  been accepted there's no injunction.  So down that prong of

6  Orange Book, there is no harm of any kind to Microsoft at

7  all.  They've just been called to task for being an

8  adjudicated infringer in Germany, and they've paid what it

9  takes to get the Orange Book remedy.

10         THE COURT:  This is as good a place as any, because

11  I'm not sure what you're going to say in the future.  I'm

12  looking at the ITU agreement, which I gather everyone now

13  admits is what we're discussing, and the signed agreement

14  that you -- your client put in, checked Box 2.  And it says,

15  "The patent holder -- in this instance Motorola -- is

16  prepared to grant a license to an unrestricted number of

17  applicants on a worldwide non-discriminatory basis, and on

18  reasonable terms and conditions to make, use, and sell

19  implementation of the industry standard patents."  How is

20  that -- and further they checked the box that said they want

21  reciprocity.

22      If that's Motorola's commitment, and that issue is in

23  front of me here, how is it that I'm going to deal with this

24  German decision over here, and a Brazil decision over here,

25  when I'm supposed to come up with worldwide

1   non-discriminatory RAND terms?

2           MR. JENNER:  Well, Your Honor, I guess there are a

3   number of aspects of that.

4           THE COURT:  I assume there are.

5           MR. JENNER:  There are.

6       Number one, at the end of the day, the Orange Book

7   proceeding in Germany is going to set the payment that

8   Microsoft needs to pay for its infringement in Germany, and

9   it will deal with the German infringement.  That may or may

10  not be RAND.  That's probably an issue of first impression in

11  Germany.  People seem to think that it's RAND.  Microsoft has

12  made submissions that I can show you where it has called it

13  RAND.  It may or may not be RAND.

14      If it is RAND, it's a factor, when the day comes, that

15  Your Honor can take into account, or not take into account,

16  as some evidence of what the RAND rate ought to be.  You may

17  agree eventually with the German court.  You may not.  If it

18  isn't RAND you may look at that and dismiss it and say, I

19  don't think it's RAND in Germany, I'm going to set a

20  different rate.  And to the extent that my rate is lower than

21  the German rate, I'm going to order Motorola to pay back to

22  Microsoft the differential that it, quote/unquote, overpaid

23  in Germany.  In which case there will be like a remittitur.

24      But that's not irreparable harm, that's a damages claim.

25  That doesn't prevent Your Honor from deciding those issues,

1    or even deciding if you thought it was appropriate and that

2    Germany was RAND, that you want to carve Germany out and say,

3    we know what the rate is for Germany, I think the rate should

4    be different worldwide, and I'm going to set a different rate

5    if it comes down to that.

6        The fact that there's going to be a worldwide license

7    doesn't mean that the rate is the same in every country.

8    Motorola has licenses with rates that are different in

9    different countries.  The number of H.264 patents may be

10   different in different countries.  It doesn't necessarily

11   follow, if you go down that particular possibility, that

12   you're going to decide that the rate in every country is

13   supposed to be the same.  That's not a given.

14       So, whatever happens in Germany, it doesn't preclude Your

15   Honor from coming up with a number of different results that

16   might embrace the German decision, or may say, "I'm going to

17   ignore the German decision."

18           THE COURT:  Is any of that argument in your briefing?

19           MR. JENNER:  I'm sorry, Your Honor?

20           THE COURT:  Is any of that argument in your briefing?

21           MR. JENNER:  I don't think so, Your Honor.  I guess

22   it flows from the Orange Book remedy.  It flows from the

23   Orange Book remedy.

24           THE COURT:  It was news to me.  I've never heard that

25   particular take on it before.

1              MR. JENNER:  The way that it's in there collapses

2    down to this.  It collapses down to the fact that whatever

3    Microsoft is ordered to pay, pursuant to the Orange Book in

4    Germany, as a consequence of the infringement in Germany,

5    will result in a payment -- all this business about job

6    losses, shutting down plants, none of that will ever happen.

7         And to the extent Your Honor finds something different

8    from Germany that you don't agree with, Your Honor will have

9    the opportunity, should you deem it appropriate, simply to

10   tell Motorola to pay back the difference in Germany.  That's

11   not an encroachment on your jurisdiction.  I guess that goes

12   to the comity part as well.  That's not an encroachment on

13   your jurisdiction.  You will simply find that the court

14   didn't determine a RAND rate in Germany.  You did determine a

15   RAND rate in Germany, to the extent that Motorola ought to

16   pay some German money back to Microsoft.  Microsoft has got a

17   damages claim for that money, and that's a damages claim,

18   it's not irreparable harm.

19             THE COURT:  But I think what Mr. Harrigan was trying

20   to tell me was that all they want is an injunctive relief

21   against an injunction prohibiting the sale of the product.

22   And that if we set, as I suspect we will in September, the

23   RAND rate, and Germany decides the RAND rate in Germany is

24   higher or lower, money may flow one of two directions.  You

25   may be getting more money.  You may be having to pay

1    Microsoft money.

2         MR. JENNER:  But, Your Honor, why would that be the

3    kind of harm, being a damages claim, that would move into

4    comity, justify a U.S. court in stepping in and interfering

5    with the implementation of German laws by a German court in a

6    patent infringement case?

7         THE COURT:  Well, first off I'm not sure irreparable

8    injury is even required in this instance.  I mean, that's an

9    open question under the interplay of *Gallo* and the *Winter*

10   standards.

11        MR. JENNER:  I think it's murky, Your Honor, because

12   what *Gallo* says is that it's -- it is substituting the

13   three-part anti-suit injunction factors for the necessity to

14   prove a likelihood of success on the merits.  It substitutes

15   those two factors.  It doesn't say definitively whether it's

16   removing the others or not.

17        THE COURT:  Right.

18        MR. JENNER:  And as I think counsel alluded to, the

19   issue of whether or not there's irreparable harm could come

20   back under the second anti-injunction factor under the rubric

21   of other equitable considerations.

22      So it's hard to say whether it's there or not, because

23   this again is another issue of first impression.

24        THE COURT:  Well, I'm much taken with one of my

25   learned colleagues here, Judge Davila, in the *Zynga* case.

1    He's another one laboring in the trenches and not from the

2    heights of the circuit.  The footnote that he wrote I think

3    captures this nicely.  He says, "It is arguably unclear from

4    the Ninth Circuit case law whether the three anti-suit

5    injunction factors replace all four *Winter* preliminary

6    injunction factors, or whether they replace only the

7    requirement that the movant show a likelihood of success on

8    the merits of the underlying claim."

9              MR. JENNER:  Right.

10             THE COURT:  I think that's what you just said.

11       Then he quotes *Gallo* saying, "Movant need not meet the

12   usual test of the likelihood of success on the merits on the

13   underlying claim to obtain an anti-suit injunction, rather

14   movant need only demonstrate that the factors specific to the

15   anti-suit injunction weigh in favor of granting the

16   injunction."  He then goes on to add some law saying, "Under

17   a literal reading of *Gallo*, a showing of irreparable harm,

18   balance of equities and public interest might still be

19   required to obtain an anti-suit injunction.  But the absence

20   of any mention of the *Winter* factors by the *Applied Medical*

21   *Distribution* court suggests otherwise."  And then he says,

22   "The Third Circuit expressly supports the replacement of all

23   four *Winter* factors."

24       That leads me to think that, you know -- I won't call

25   anything my betters do unclear, but it seems somewhat murky.

1          MR. JENNER:  That's why I agree with you.  I think I

2     used the word "murky" myself, Your Honor.  I agree it's not

3     clear, if irreparable harm is required still, either because

4     it carries over from the old test, or because it is subsumed

5     in factor two of the anti-suit injunction factors, then I

6     think we have explained in spades why there won't be any

7     irreparable harm here, unless Microsoft decides to inflict

8     the wound itself of not complying with the Orange Book

9     procedure.

10         If it wants to do away with its parents and then complain

11    that it's an orphan, it can do that.  But the fact of the

12    matter is that it has within its power the total ability to

13    comply with the law in Germany and remove every vestige of

14    irreparable harm that it put in its opening papers.

15         And as far as *Zynga* is concerned, Your Honor -- just

16    staying with that for a second -- *Zynga* is a case where while

17    they granted a TRO at the outset, they came back a couple of

18    months later and tossed out the TRO, in substantial part

19    because, like this case, there were foreign proceedings on

20    foreign copyright law, and the court concluded that it

21    wouldn't be appropriate for the U.S. court to interfere with

22    foreign copyright proceedings.  And that's really what

23    they're asking you to do here.

24         So that all goes to the differences in the nature of the

25    proceedings.  The proceedings are really different.  When you

 1    look at *Applied Medical*'s references to functionally

 2    disposing of all the issues of the case, the Seattle case

 3    can't do that.  The Seattle case -- the way that Microsoft is

 4    serving it up is, ignore the fact that it's a German patent

 5    infringement proceeding, with German remedies that are quite

 6    well elucidated, and just focus on the monetary compensation

 7    aspects of both of them, and consider them to be the same.

 8    They don't have to be the same, and Your Honor has many ways

 9    down the road in which you might deal with that, including

10    either embracing what they do, or rejecting it as not being

11    RAND.

12        It doesn't usurp your ability to go ahead in the fall,

13    decide what the RAND rate is, decide where it's going to

14    apply, decide whether it's going to be different in different

15    countries, decide whether you like what Germany came up with

16    or not.  And if you don't, tell Motorola, you've got a

17    remittitur here, as part of my ruling you're going to have to

18    pay some money back.

19        That doesn't interfere enough with what Your Honor will be

20    looking at to justify invading the province of the German

21    court.

22            THE COURT:  Does that mean that Motorola is prepared

23    to post a $300 million bond?

24            THE COURT:  I don't think it works that way.  Well, I

25    shouldn't say that.  If Motorola decides --

 1          THE COURT:  You just told me that you may be paying

 2    money back.  And I'm just asking you what security you're

 3    going to post for Microsoft.  And now I hear you're running

 4    away from that argument.

 5          MR. JENNER:  They have to post security in Germany in

 6    order to enforce the injunction.  So there will be security

 7    imposed.  There will probably be a pretty substantial bond

 8    put up required by the German court, if Motorola decides to

 9    go ahead and implement the injunction.  So there is going to

10    be money put up by Motorola, quite a bit.  That's going to

11    happen.  So those are a lot of the issues on the first prong

12    of this.

13          As far as the second prong is concerned, this is the one

14    that has to do with equitable factors that would justify

15    intervening in the foreign proceedings.  In *Gallo,* the court

16    only looked at the first one from the Fifth Circuit, "Will

17    the foreign litigation frustrate a policy of the domestic

18    forum."  And the reason the court in *Gallo* only looked at

19    that one of the four is because that's the one that involved

20    the forum selection clause.  And no matter what Microsoft

21    wants to say, *Gallo* is all about a forum selection clause.

22          In fact, the case ends -- something that's not highlighted

23    -- on page 7, in Roman III, the last two paragraphs, the

24    court says, "Andina has involved Gallo in messy, protracted,

25    and potentially fraudulent litigation in Ecuador, in direct

 1   contravention of a valid and enforceable forum selection

 2   clause.  This is a paradigmatic case for a preliminary

 3   anti-injunction suit."

 4     So *Gallo* is all about forum selection clauses.  So was

 5   *Applied Medical*.  So was one of the district court cases that

 6   Microsoft brought up, strategic intent, which was essentially

 7   a clause that gave the right to the moving party to choose

 8   where to bring the case.  And the court called that

 9   tantamount to a forum selection clause.  So all those cases

10   are quite different.  And there was a policy of the court

11   involved.

12          THE COURT:  In your client's letter in this matter,

13   which is in one of these notebooks, don't you offer to

14   license this worldwide at one rate?

15          MR. JENNER:  We offer a rate.  We offer a rate going

16   in, absolutely.  We offer a rate of two-and-a-quarter

17   percent.  That was the opening rate offer, no question about

18   it.

19          THE COURT:  Confirm Motorola's offer to grant

20   Microsoft a worldwide non-exclusive license at that

21   particular rate?

22          MR. JENNER:  That was the offer.

23          THE COURT:  And now I hear you saying, well, judge,

24   that's true.  But we can also have a German rate, and we can

25   have a French rate, and we can have a Canadian rate.  And

 1   that's not inconsistent with granting a worldwide

 2   non-exclusive rate.

 3            MR. JENNER:  Absolutely not.  The parties do that all

 4   the time when they negotiate.  And that likely would have

 5   happened here if Microsoft had ever engaged and negotiated.

 6   Parties negotiate because they learn from each other what

 7   each other thinks the relevant terms are in different

 8   countries.  Somebody will come along and say, I'm not going

 9   to pay you two-and-a-quarter percent in China, because you

10   have one crummy patent in China.  And no Chinese court will

11   ever enforce this, so the rate in China has got to be a lot

12   lower.  That happens.  And there are agreements that reflect

13   that.

14     That could have happened here if Microsoft had engaged and

15   negotiated.  That's the problem with not negotiating.  And I

16   submit Your Honor is going to have to look at factors like

17   that in order to decide whether or not there should, in fact,

18   be one uniform rate, or there should be differences in

19   different places.  That happens all the time.

20            THE COURT:  Well, that strikes me as arguing -- say

21   that again.  I want to make sure I understand that.

22            MR. JENNER:  Motorola offered a going-in rate.

23            THE COURT:  Worldwide.

24            MR. JENNER:  Right.  And it anticipated that

25   Microsoft would come back and say something.  They're going

1    to come back and say, your offer is no good; there's at least

2    ten reasons why your offer doesn't work for us, we want to

3    tell you about what our circumstances are and why we think

4    that license agreements should have differing terms from what

5    you're proposing.  That's what almost always happens.  That's

6    what's happened in every other licensing situation.

7            THE COURT:  But your client is the one that said they

8    wanted -- they're offering a worldwide rate.  This is where

9    I'm having trouble.  I've got U.S. companies on an

10   international agreement, your client offers a worldwide rate,

11   and now you're saying that's completely illusory because

12   they're going to come back and everybody knows.  And one of

13   their points in, I think it's the Prieto, or somebody,

14   declaration is:  Judge, if Germany gets this rate, that's

15   going to impact what happens in China, what's going to happen

16   in the United States.  Oh, the United States?  Gosh, you

17   know, for a worldwide rate in the United States, then you

18   know, it's going to interfere with your prerogative to set

19   this rate, or the jury's prerogative.

20       So it seems to me that argument cuts, to some extent, both

21   ways.

22           MR. JENNER:  Your Honor, I really submit that it

23   doesn't.  Parties in negotiation situations always make an

24   opening offer.  This is a simple offer, two-and-a-quarter

25   percent.  Nobody assumed that Microsoft was just going to

1   pick up the phone and say, "That's great, where do we send

2   the check?"  These situations are always situations where the

3   other party comes back and says, "We'll come and talk to you,

4   we want to make a presentation as to what we think the

5   appropriate conditions and terms for a license would be."

6       The fact that Motorola started out by saying

7   two-and-a-quarter percent worldwide doesn't mean that anybody

8   expected that it would end up there.  That's a typical offer.

9   In Motorola's case it has made it to dozens of licensees that

10  have resulted in negotiated licenses with different terms in

11  them.

12          THE COURT:  Well, let me ask you this question, then,

13  because I want to make sure I understand this.  Does that

14  mean I'm setting an American rate, and that every other

15  country is entitled to set its own rate?

16          MR. JENNER:  It's to be determined I guess, Your

17  Honor, because there's no precedent for this.  We don't have

18  anything we can show you that says that this is the way that

19  it's done.  No court has ever gotten to the point of doing

20  this.  These have always been resolved between the parties,

21  even in the heat of litigation.

22      If this is the one that has to go, we will be having

23  extensive discussions with Your Honor about what the

24  possibilities are and why they make sense, because we haven't

25  got a blueprint for you.  There is no blueprint for how to do

1   this.  That's part of the problem.

2          THE COURT:  Well, I know your extensive discussions

3   are going to be ten days for both of you.  So I'm not sure

4   how extensive that's going to be.

5          MR. JENNER:  But my point is, Your Honor, there isn't

6   any record that we can give you on -- when you get to the

7   point of actually considering all the relevant circumstances

8   and deciding what the terms of a license here ought to be,

9   you're writing on a clean slate, and neither we nor Microsoft

10  can tell you, look at this case, and that case, and some

11  other case, here's how you do it.  It doesn't exists.

12      All I'm saying is whatever you do it doesn't have to be

13  and it won't be inconsistent with what the German court does,

14  if the German court even gets to finality before you do this,

15  which it may not, up on appeal.

16      But, whatever the German court does, if it's your decision

17  to do so, you will have the ability to say, "I don't agree

18  with a piece that the German court did, here's my ruling as

19  to Germany."  And if that means that Microsoft paid too much

20  to get out of the way of a speeding train, then it has the

21  claim to get the money back.  And it gets the money back as

22  an overpayment.

23      The real issue is, is Microsoft going to stand in front of

24  the train, or is it going to get off the track and comply

25  with the law in Germany?  We're talking about complying with

1   the law in Germany.  They're asking you to interfere with

2   that.

3        Another analogy, Your Honor, just for the sake of

4   analogies is, picture Microsoft on the Autobahn in Germany,

5   lying down in the road in front of speeding cars in Germany,

6   and instead of picking itself up and getting off the road,

7   which it has the ability to do, it gets on the phone and

8   calls for a Washington State Patrolman to come over and stop

9   traffic.  That's what they're asking you to do, instead of

10  getting off the road.

11       They ought to comply with the law in Germany.  And down

12  the road, if Your Honor thinks the numbers come out

13  differently, you can fix that.  There's no intrusion with a

14  forum selection clause.  There is no avoidance of this court

15  with a compulsory counterclaim being filed in Canada, as

16  happened in *Seattle Totems,* which is why, like *Gallo* and

17  *Applied Medical,* they saw a direct intrusion with local

18  jurisdiction.  You don't have that here.  There isn't any

19  frustration of a policy of this court.  This court doesn't

20  have any more unique policy to determine damages than the

21  German court does.

22       If anything, this is a situation where we're talking about

23  local courts setting damages rates.  When Your Honor gets to

24  a RAND rate and you think it's inconsistent with Germany, you

25  can fix it.  It doesn't keep you from doing what you're going

1    to have to do.  It's not a good enough reason to intervene

2    with and shut down the ongoing procedures of the German

3    federal court.

4            THE COURT:  Well, counsel, I'm troubled by what you

5    just said for the following reason:  I've got two American

6    companies in front of me.  I've got an ITU agreement, with no

7    choice of law provision to help me one way or the other.

8            MR. JENNER:  Or choice of forum.

9            THE COURT:  Or choice of forum.  I've got an offer

10   letter drafted by your client, sent to Microsoft in the

11   United States, that says both U.S. and foreign patents, and

12   I've got a Microsoft allegation that that offer letter

13   breached the ITU agreement.  It seems to me that those facts

14   strongly imply that I have jurisdiction to adjudicate the

15   terms of the ITU agreement on a worldwide basis.  And you've

16   just said, quite passionately, "Judge, no, that's just not

17   right."

18           MR. JENNER:  I'm saying Your Honor does have

19   jurisdiction to deal with that.  But the fact that the German

20   court reaches a remedy in Germany may be embraced or rejected

21   by Your Honor.  It won't keep you from doing what you have to

22   do, like a forum -- the violation of a forum selection clause

23   would do that.  It would eradicate local jurisdiction.  It

24   would a direct intrusion on the court if there was a forum

25   selection clause, which there isn't.  Whatever the German

 1   court does, Your Honor has the ability, in going forward, to

 2   accept it or reject it.

 3           THE COURT:  All right.  Please continue.

 4           MR. JENNER:  The other aspects of the equitable

 5   justifications, the one we've been talking about is

 6   frustrating a policy of the domestic forum.  And for the

 7   reasons I've said, I don't think it does.  If anything, to

 8   some extent if Your Honor acted the way Microsoft wants, you

 9   would be actually be frustrating a policy of the German

10   forum.  So I think that's something that's fairly taken into

11   account, too, in enabling the German court to run the gamut

12   of its procedures and reach a result that applies in Germany.

13           THE COURT:  Is that fact any clearer than this

14   ambiguity that you've written large today?

15           MR. JENNER:  Well, you will be stopping the Orange

16   Book procedures if you grant the injunction.  Microsoft says

17   all that does is prevent the award of an injunction.  That's

18   not really true, because what the Orange Book procedure does

19   is enable a negotiation.  The negotiation is that Microsoft

20   knows it needs to come up to an appropriate level.  If it

21   doesn't the German court is going to tell it, it's not

22   acceptable, you're going to be enjoined.  Motorola knows it

23   has to come down, because if its offer is found to be

24   unreasonably high, there are issues that face Motorola as

25   well.

1      So, the way the German system has it configured, there are

2  pressures on both sides that encourage the parties, with or

3  without the German court's assistance, to arrive at an

4  acceptable rate.  If you take the threat of injunctive relief

5  in Germany out of that, you are not just removing the

6  injunction, you are negating the way the Orange Book

7  procedures work.  You can't get around that.

8          THE COURT:  I've never seen anyone suggest that I'm

9  going to enjoin the German court.  I'm going to enjoin

10  Motorola, if I granted Microsoft's proposed relief.

11          MR. JENNER:  But it has the same effect.  And the

12  cases note that.  The cases note that all anti-injunction

13  suits are against the parties, but they note that it has

14  severe impacts on the workings of the foreign courts.  If

15  Motorola is enjoined here from exercising the remedy

16  procedures in Germany, it has the effect of negating the

17  working of the Orange Book procedure.  The way the German law

18  has it set up, it will do that.

19          THE COURT:  Where is that in the record, because

20  we've searched for that?

21          MR. JENNER:  I guess, Your Honor, it's my reply

22  orally to Microsoft's reply brief, which I don't get a chance

23  to do in writing.  I appreciate Your Honor wanted to know

24  more about the Orange Book proceeding and what Microsoft can

25  do, and that's why I'm going there.  It has the total ability

1    to deal with the injunction, to maintain itself, doing what

2    it's doing in Germany.  All that it really has to do, Your

3    Honor, when you think about it, is to take the $300 million

4    that it was perfectly prepared to put on hold here, and

5    instead take the same $300 million and put it in escrow in

6    Germany where the proceedings are that require it, where it

7    will be in escrow.  And by the way, I think there was

8    something Microsoft said, where Motorola then takes that

9    $300 million and runs.  That's not true.  Motorola can't take

10   any of the money until Microsoft says so, or the court says

11   so.

12      And that will be an appropriate remedy in Germany to

13   prevent the injunction from going into place.  Microsoft is

14   in complete control of that.  It's not a reason for an

15   invasion of comity.

16      And that brings me then just to the last factor, which is

17   would an injunction of the kind Microsoft is asking, offend

18   international comity?  And I submit, Your Honor, that with

19   respect to this court, the answer is, yes.  You're being

20   asked that the U.S. court interfere with a German court's

21   enforcement of German patents, German patent infringement

22   proceedings, and the German remedy proceedings that go with

23   that, and I submit that that is an intolerable intrusion on

24   another country's prerogatives.

25      I submit that if I were a U.S. court and a German or

1    Brazilian court were to take the steps to say that I cannot

2    proceed with enforcement proceedings on a U.S. patent, I

3    would find that to be an intrusion, to be an intolerable

4    intrusion on comity, and invasion of the rights of the U.S.

5        It's even more so, because in seeking that invasion on

6    comity, Microsoft is doing it when they have available to

7    them the ways to avoid the speeding train.  All they have to

8    do is comply with the procedures that the German courts have

9    given them, which you don't find in other countries.  It's a

10   benefit to them in Germany that they can get out of the way

11   of an injunction simply by complying with German law.

12       And once again, that would avoid the intrusion on comity,

13   and whatever Your Honor needs to do later could remedy that,

14   take it into account, accept it, not accept it.  You don't

15   have to interfere with the German proceedings in order to

16   effectuate whatever you will decide later.

17       And I want to emphasize contrary to the suggestion that I

18   heard back in argument two months ago that this is something

19   that ought to happen in the Ninth Circuit, because the Ninth

20   Circuit is so liberal in granting anti-suit injunctions.  I

21   don't know where that came from.  I read the cases that say

22   that.  They talk about *Seattle Totems*, *Gallo* and *Applied*,

23   because they granted injunctions.  Two of them had forum

24   selection clauses, the third one of them had the compulsory

25   encounter claim in Canada.  Any court would have put a stop

1    to that.  And all three of those courts say that

2    anti-injunction suits should be sparingly granted.  So it's

3    just not true that this ought to be looked at much more

4    because the Ninth Circuit has some sort of a give-away

5    attitude about anti-injunction suits.

6        Your Honor, I don't know if I've exceeded my time.

7            THE COURT:  You have about two minutes left if you

8    want to use it.

9            MR. JENNER:  The only other point I want to make, I

10   think I've covered most of what counsel said.  Counsel made a

11   reference to their motions for summary judgment.  Their

12   motions for summary judgment are -- what Your Honor gave them

13   leave to continue is whether or not Motorola was required to

14   make a RAND offer, as opposed to reach a RAND license.  And

15   did Motorola, in fact, make a RAND offer.  None of that will

16   lead to a determination of the RAND rate.

17       There is a separate summary judgment motion pending as to

18   whether or not they're entitled to an injunction.  I submit

19   to Your Honor that had nothing to do with Germany.  It came

20   after the German proceedings, but it was not focused on

21   Germany any more than the other summary judgment motion was.

22   The fact of the matter is to the extent that Your Honor

23   cares, these German proceedings have been pending since the

24   summer of 2011.  Microsoft didn't do anything about this.

25   They, shall we say, inequitably sat on their rights until a

1   month ago, when they could have taken steps a lot longer ago

2   to do something about this.

3       So to the extent that it matters, that's another factor

4   Your Honor can take into account.

5           THE COURT:  Well, since you ventured into German law,

6   what prevents Microsoft from making an offer in Germany right

7   now?

8           MR. JENNER:  They've already made one, and they can

9   make another.  They're waiting for the April 17th

10  determination, understandably, because the court in Germany

11  is going to say on April 17th, assuming it finds

12  infringement, it will say on April 17th whether or not the

13  first offer, it was reasonable for Motorola to reject it.  If

14  the court says that, and that offer is then off the table,

15  the Orange Book proceeding provides the right for Microsoft

16  to ratchet up the offer.  It can do that.

17          THE COURT:  All right.  Anything else, sir?

18          MR. JENNER:  Not at this time, unless Your Honor has

19  got more questions.

20          THE COURT:  No, I think I'm there.  Thank you.

21          MR. JENNER:  Thank you.

22          MR. HARRIGAN:  I will be I think brief, Your Honor.

23  What's happening here is that Microsoft, looking at the

24  letter that was sent to us for a worldwide license for 100

25  patents, is asking this court to determine what a reasonable

1    rate -- what a RAND rate is for those patents, which include

2    the two patents in Germany.

3        And what Motorola has done is it's lifted two of those

4    patents out of that list and gone to Germany with them.  Why?

5    In order to ask for an injunction so that they can extract an

6    unreasonable royalty.

7        If all they want is for a German court to set the rate on

8    these patents, they don't need to get an injunction.  What

9    they want -- the reason they're opposing this motion is they

10   want the threat of the injunction so they can extract

11   something for it.

12       And the comity issue here is that Motorola has taken these

13   two patents that were before this court, along with the other

14   98, and gone to Germany with them for what we believe are

15   nefarious reasons, just as they demanded an exorbitant

16   royalty for the 100 patents worldwide.  And the affront

17   here --

18            THE COURT:  Is making a profit nefarious?

19            MR. HARRIGAN:  I'm sorry, Your Honor?

20            THE COURT:  Is making a profit nefarious?

21            MR. HARRIGAN:  Well, it's nefarious if it's a breach

22   of contract.

23       And if there's an affront to a court here, it's to this

24   one.  I believe from basically saying, well, we've got a way

25   around having this court set a reasonable rate, we're going

1   to Germany and see if they can extract an unreasonable rate.

2   Now, I'm not saying that the court has to find that's what's

3   going on here.  But if you look at it, why is Motorola

4   opposing this court's stopping the injunction?  We could --

5   they could go through the rate-setting process in Germany

6   without that, if that's all they're after.

7        The second thing, Your Honor, that I'd like to mention is

8   that -- this is a quote from the *RIM* case.  And the last time

9   the court heard about this case I believe was in my argument

10  in opposition to the motion to dismiss.  So very early in

11  this case.  And in the *RIM* Case the court says,  "Motorola

12  argues that RIM has two paths before it, to get a RAND rate,

13  both of which lead to fair licensing terms.  One of these

14  paths is this court.  The other is negotiation outside the

15  court."  And then the court says, "Motorola is correct that

16  in the end RIM will receive fair licensing terms.  But if

17  those terms must be dictated by this court, it cannot dismiss

18  the action before it has a chance to do so."

19       This is the same behavior pattern.  They demanded

20  unreasonable rates from RIM.  They said, well, Your Honor,

21  you can't hear this case because we have to negotiate first.

22  And the court basically said -- but Motorola said, and by the

23  way, they're going to get a reasonable license because this

24  court is going to decide what it is if we can't negotiate it.

25  And that is all we're asking this court to do.

1      And we have not heard, Your Honor, we have not heard from

2  Motorola that this court lacks jurisdiction to decide what

3  the RAND rate is for the 100 patents that are the subject of

4  the letter that we've been talking about.  Motorola agrees

5  this court can do that.  And so why should Microsoft be

6  subject to an injunction in Germany in a situation where in a

7  relatively short time this court is going to set a worldwide

8  rate for all of those patents?

9      So, it doesn't make sense to oppose this motion, unless

10  you have some other reason for wanting to use the threat of

11  an injunction.  And it's pretty clear what that reason is.

12      And by the way, with regard to the balkanization argument

13  that the court's going to have to set rates for all these

14  different countries, that is not going to happen.  If the

15  court concludes that Motorola is right, I guess the court

16  could set different rates for different countries.  There's

17  nothing that says you can't do that.  But their own letter

18  says this is a worldwide -- we're offering you a worldwide

19  license at one rate.  It's an outrageous rate, but it's one

20  rate.  And they don't say, and by the way we're going to talk

21  about all the different rates for the different countries.

22      And we have, in this case, asked the court to set a RAND

23  rate, and we have committed to take a license.  So this case

24  will dispose of the matter.

25      I just want to make a couple of additional comments.  One

1    is that this is a TRO preliminary injunction matter.  We have

2    amply demonstrated that if there's an injunction entered in

3    Germany there will be irreparable harm to Microsoft.  The

4    question of whether there is some way that we could avoid it

5    through these German procedures, I've already talked about,

6    it's a way that is designed to produce a rate that is not

7    RAND.

8        But the bottom line is, we're not asking the court to stop

9    the German court from figuring out what the rate should be,

10   we're asking the court to stop Motorola from enforcing an

11   injunction.  And the other side of that coin from the

12   standpoint of equitable relief, which is what we're seeking

13   here, is we are willing to post a $300 million bond to

14   protect Motorola from any damage it could possibly suffer.

15   And Motorola doesn't compete with Microsoft in Germany.  It

16   doesn't need to have an injunction to stop Microsoft from

17   selling Windows because it's competing.  Its only damage in

18   the period between now and whenever the court sets the rate,

19   is whatever money is owed at the end of the day.  And that

20   bond will cover it.  So if you're balancing harm, it's clear

21   which side of the seesaw we're on.

22       So, Your Honor, I think I'll conclude with that.  Thank

23   you.

24           THE COURT:  Thank you, counsel.

25           MR. JENNER:  Your Honor, since we did not get a

1   chance to submit anything in reply, surrebuttal or anything

2   like that, I wonder if Your Honor would just take two

3   examples to look at of where Microsoft has represented in a

4   complaint actually to the EU, and in a letter that it sent to

5   Motorola, that it at least understood RAND rate to be

6   equivalent to Orange Book.  I don't know whether, in fact, it

7   is or is not.  But at least Microsoft at some juncture has

8   thought that it is.

9           THE COURT:  If you want to hand them up, that's fine.

10  We'll give them what weight they deserve after we look at

11  them.

12      Counsel, thank you.  This is an interesting question.  We

13  have gone back and forth a number of times and we'll do some

14  more of that.  Given that you've given me an additional ten

15  minutes before lunch, I'll move it up until 3:15.  And I'm

16  sure that just kills everyone who has to get on an airplane

17  and fly somewhere, but I want to get this right.  So we'll

18  see you all at 3:15 for the court's oral ruling on the

19  motion.  We'll be in recess.

20              (The proceedings recessed.)

21

22

23

24

25

# C E R T I F I C A T E

        I, Debbie K. Zurn, RPR, CRR, Court Reporter for the United States District Court in the Western District of Washington at Seattle, do hereby certify that I was present in court during the foregoing matter and reported said proceedings stenographically.

        I further certify that thereafter, I have caused said stenographic notes to be transcribed under my direction and that the foregoing pages are a true and accurate transcription to the best of my ability.

        Dated this 12 day of April, 2012.

        /s/ _Debbie Zurn_

        Debbie Zurn