# EXHIBIT 56

15



Suite 2200
1201 Third Avenue
Seattle, WA 98101-3045

**Michele Herman**
206.757.8203 tel
206.757.7700 fax

micheleherman@dwt.com

June 14, 2011

Federal Trade Commission
Office of the Secretary, Room H–113 (Annex X)
600 Pennsylvania Avenue, NW
Washington, DC 20580

Re: <u>Patent Standards Workshop, Project No. P11–1204 (76 Fed. Reg. 28036)</u>

Dear Commissioners:

I appreciate this opportunity to respond to the Federal Trade Commission ("FTC") Request for Comments and Announcement of Workshop on Standard-Setting Issues dated May 13, 2011 ("RFC"). I am writing to urge the FTC to first consider what constitutes "patent hold-up" in the standards context for the purposes of the upcoming workshop before delving into (i) how standards setting organization ("SSO") patent policies should be crafted to avoid patent hold-up, and (ii) how reasonable and non-discriminatory ("RAND") patent license commitments should be interpreted and enforced against standards participants that have undertaken such commitments. Legal practitioners, academia, and business communities have proffered various definitions of patent hold-up based on differing scenarios involving patentee and implementer conduct, as well as the impact that patented technology may have on competition and consumers when incorporated into a standard. In order to obtain a meaningful outcome from the workshop, the definition of patent hold-up should be sufficiently narrow so that pro-competitive conduct that tends to drive innovation is not unintentionally curbed. In my view, the workshop should focus on those scenarios (i) that have resulted in *actual* harm to competition or consumers, and (ii) where there has been deceptive conduct that has subverted the standards process.

I am a partner with Davis Wright Tremaine LLP and I represent a number of SSOs as well as clients who participate as members in SSOs in connection with the development of technical standards. I am a patent attorney whose practice has focused on standards setting issues for more than a dozen years. I am also an adjunct professor at Seattle University School of Law where I teach a class on industry standards and open source software. I have held or currently hold leadership positions in standards committees in the American Bar Association, American Intellectual Property Law Association, and the Intellectual Property Owners Association. My comment offers background based on my personal observations and experience representing numerous clients in matters that involve patents and standards, and in particular, standards-related patent licensing issues.

DWT 17345660v1 0050033-001905

Anchorage  New York     Seattle
Bellevue    Portland     Shanghai
Los Angeles San Francisco Washington, D.C.

www.dwt.com

100%

MOTM_WASH1823_0392160

Federal Trade Commission
June 14, 2011
Page 2

## I. Patented Technology Should Be Incorporated into Standards As a Way to Drive Innovation, Competition, and Economic Development

At the outset, I would like to highlight that the RFC does not mention the importance of patented technology to innovation, competition, and economic development in general.[1] Instead, the RFC starts from the premise that patents may hold up adoption of new technology, thereby harming competition and consumers. While it is possible that patents could hold up the adoption of new technology, such a view seems contrary to the views the United States has taken in the past.[2] Perhaps David J. Kappos, Under Secretary of Commerce for Intellectual Property and Director of the U.S. Patent and Trademark Office stated it best:

> Innovation continues to be a principal driver of economic growth and job creation in the United States, and intellectual property (IP) delivers that innovation to the marketplace. We at the USPTO are proud of the role we play in serving America's innovators, and granting the patents and registering the trademarks they need to secure investment capital, build companies, and bring new products and services to the marketplace. The work we do at the USPTO directly contributes to strengthening our economy and creating jobs and helps move us toward the President's goal of winning the future by out-innovating our competitors.[3]

If patents help drive innovation, job creation, and so many other benefits generally, there is little reason to assume that patented technology incorporated into standards will have a contrary effect. Over the past decade or two, we have seen unprecedented growth in the information and communications technology ("ICT") industry. Much of this growth was brought about by ICT standards, many of which incorporate patented technology. Such ICT standards are adopted in

---

[1] The RFC, however, does mention the importance of standards in promoting innovation: "[c]ollaborative standard setting plays an important role in the modern economy" and "[i]t can lead to innovation, better products and more competition." FTC Request for Comments and Announcement of Workshop on Standard-Setting Issues, 76 Fed. Reg. 28036, 28036 (May 13, 2011).

[2] *See, e.g.*, President Barack Obama, Remarks by the President to the Chamber of Commerce at the U.S. Chamber of Commerce Headquarters, Wash. D.C. (Feb. 7, 2011) ("We're reforming our patent system so innovations can move more quickly to market."), *available at* http://www.whitehouse.gov/the-press-office/2011/02/07/remarks-president-chamber-commerce; The White House, A Strategy for American Innovation: Securing Our Economic Growth and Prosperity, App. B, http://www.whitehouse.gov/innovation/strategy/appendix-b (last visited June 13, 2011) ("Timely prosecuted, high-quality patents drive innovation and protect creativity.").

[3] *Budget Hearing - Patent and Trademark Office - Under Secretary of Commerce for Intellectual Property Before the H. Subcomm. on Commerce, Justice, Science, and Related Agencies, Comm. on Appropriations*, 112th Cong. (Mar. 2, 2011) (statement of David J. Kappos, Under Secretary of Commerce for Intellectual Property and Director of the U.S. Patent & Trademark Office), *available at* http://www.uspto.gov/news/speeches/2011/kappos_house_2012budget.jsp.

DWT 17345660v1 0050033-001905

MOTM_WASH1823_0392161

Federal Trade Commission
June 14, 2011
Page 3

the marketplace and subsequently replaced with new ICT standards at staggering rates.[4] With more and more products and services being based on an ever-growing number of ICT standards, it is not surprising that there is a heightened focus on patent litigation involving standardized technology. Such litigation, however, should not cause us to develop policies that would discourage the use of patented technology in standards where, as here, we have significant market evidence that standards that incorporate patented technology have generated unprecedented innovation, numbers of new businesses and jobs, and economic growth consistent with U.S. Government objectives.[5]

In my view, the workshop inquiries should start with the assumption that patented technology incorporated in standards has been driving innovation not that patented technology in standards leads to patent hold-up.

## II.   Neither SSO Patent Policies nor RAND Enforcement Policies Should Be Established to Address Overly Broad Notions of Patent Hold-up

The RFC sets out an array of questions pertaining to the potential patent hold-up of collaboratively developed standards, specifically asking which SSO policies and enforcement regimes could help to prevent hold-up. Before these questions may be answered, however, there should be a common understanding of the term "patent hold-up" and which specific scenarios of patentee and implementer conduct we are trying to address. As discussed above, we should also begin any discussion by first acknowledging that, in general, patented technology will help drive innovation and competition irrespective of whether or not it has been incorporated into a standard.

Some may view the inclusion of any patented technology in a standard as patent hold-up simply because an implementer may need to license the patented technology.[6] Others may consider the

---

[4] Consider the wireless evolution starting with 1G (e.g., TACS, TDMA, etc.), evolving to 2G (e.g., GSM, CDMA, etc.), then to 2.5G (e.g., GPRS, EDGE, etc.), then to 3G (e.g., E-EDGE, UMTS, EVOD, etc.), then to 3.5G (e.g., HSDPA, 802.16d, etc.), and finally to 4G (e.g., LTE, 802.16e, etc.).

[5] According to the Telecommunications Industry Association ("TIA"), global telecommunications spending amounted to $4.1 trillion in 2010, up from $2.7 trillion in 2004. Spending is predicted to reach $5.3 trillion in 2014. TIA, Preview—2011 ICT Market Review & Forecast, Chapter 4: The Wireless Market, http://www.tiaonline.org/market_intelligence/mrf/index_MRF_page_1.cfm (last visited June 13, 2011).

[6] SSO participants often simply opt for technology for which they are unaware of essential patent claims over technology for which they are aware of essential patent claims, even if those claims will be licensed freely. Many incorrectly believe that there will be no need to take licenses if no patents are disclosed or that licenses will be required when patents are disclosed. See, e.g., Posting of Brian Kahin to opensource.com Law Blog, http://opensource.com/law/11/1/open-standards-and-royalty-problem (Jan. 20, 2011) ("what most implementers and other users care about is not having to pay royalties or ask for permission").

Federal Trade Commission
June 14, 2011
Page 4

inclusion of patented technology in a standard as constituting patent hold-up only when the patented technology is not licensed on a RAND basis. This may occur, for example, when a third party owns essential patent claims, has no commitment to license, and admittedly refuses to do so on RAND terms.[7] Still others focus on the specific results of including patented technology in a standard when defining patent hold-up; namely, does such inclusion harm competition or consumers?[8] For example, in theory, if patented technology can extract a higher royalty because it is included in a standard, will that higher royalty harm competition or consumers to such a degree that it constitutes patent hold-up?[9] In this example, some have argued that any ability to charge higher royalties regardless of actual effects constitutes patent hold-up while others have argued that there must be evidence that charging higher royalties has harmed competition, not just particular competitors in the context of a commercial dispute, or consumers who must pay more with fewer choices.[10] Finally, some focus on both the effects and the conduct of the parties involved.[11] In other words, patent hold-up occurs if the patentee has (i) failed to abide by the relevant SSO patent policy, (ii) intentionally deceived the SSO participants, and (iii) in doing so, harmed competition and/or consumers because the patentee is able to extract higher royalties after "lock in" as a result of its patented technology being incorporated into the standard.

The RFC defines "patent hold-up" as "a demand for higher royalties or other more costly licensing terms after the standard is implemented than could have been obtained before the

---

[7] See, e.g., Carl Shapiro, *Navigating the Patent Thicket: Cross Licenses, Patent Pools, and Standard-Setting*, in 1 INNOVATION POLICY AND THE ECONOMY 119, 136 (Adam B. Jaffe et al. eds., 2001), *available at* http://www.nber.org/books/jaff01-1 ("Blocking patents are especially common in the context of standard setting: once a standard is picked, any patents (or copyrights) necessary to comply with that standard become truly essential. If the standard becomes popular, each such patent can confer significant market power on its owner, and *the standard itself is subject to holdup if these patent holders are not somehow obligated to license their patents on reasonable terms*.") (emphasis added).

[8] See, e.g., Joseph Farrell et al., *Standard Setting, Patents, and Holdup*, 74 ANTITRUST L.J. 603, 645 (2007) ("when a standard used in a fairly competitive industry is subject to *uniform* hold-up, direct buyers may bear little of the cost, which falls primarily on final consumers") (emphasis in original).

[9] See, e.g., Mark A. Lemley & Carl Shapiro, *Symposium: Frontiers of Intellectual Property: Patent Holdup and Royalty Stacking*, 85 TEX. L. REV. 1991, 1993 (2007) ("Such royalty overcharges act as a tax on new products incorporating the patented technology, thereby impeding rather than promoting innovation.").

[10] See, e.g., Michele K. Herman, *Negotiating Standards-Related Patent Licenses: How the Deal is Done, Part I*, LANDSLIDE, Sept.–Oct. 2010, at 36, *available at* http://www.dwt.com/portalresource/03-11_Herman_Landslide_part1.pdf.

[11] See, e.g., Joseph Farrell et al., *Standard Setting, Patents, and Hold-up*, 74 ANTITRUST L.J. 603, 604 (2007) ("'Bad' behavior (such as deception) is not logically necessary for such inefficiency, but hold-up can powerfully reward deception and concealment. Emphasizing how parties may inefficiently seek hold-up power, Oliver Williamson famously described opportunism as 'self-interest seeking with guile.'").

DWT 17345660v1 0050033-001905

MOTM_WASH1823_0392163

Federal Trade Commission
June 14, 2011
Page 5

standard was chosen"[12] because the patentee can "demand a royalty that reflects not only the ex ante market value of the patented invention, but also added value associated with changes in the marketplace and investments made to implement the standard."[13] I do not believe this is the best definition to use as the basis for the questions posed in the RFC. The definition of patent hold-up, in my view, should not be based exclusively on whether a patentee may charge a higher rate *ex post* (i.e., after the standard is adopted) for its patented technology than it could have charged *ex ante* (i.e., before the standard is adopted). Instead, the definition of patent hold-up should require either actual harm or at least "a dangerous probability"[14] of harm to competition or consumers.

An intentional failure to disclose essential patent claims on an *ex ante* basis might present such a probability of harm to competition or consumers, particularly when such patents are not made available for licensing on RAND terms. Even if one could establish that the patentee was charging higher rates, those higher rates might not result in harm to competition or consumers. For example, the standardized technology might be widely adopted resulting in a plethora of new product and service choices for consumers offered by numerous competitors. Indeed, there is overwhelming evidence in the marketplace, as discussed above, that ICT standards that incorporate patented technology are promoting competition, driving innovation, and creating more consumer choices than ever before. Further, commercial disputes that may result in harm to a competitor should not be viewed as harm to competition itself, especially given substantial market evidence to the contrary.[15]

The definition of patent hold-up should also take into account the conduct of both the patentee and the implementer. Because standards-essential patent claims are not licensed in isolation, it is necessary for parties to negotiate their own bilateral agreements irrespective of whether specific patents or license terms are disclosed to the SSO *ex ante*. What an SSO participant "knows" about potentially essential patent claims at the time it makes technology selections often depends on its own actions and risk aversions. If a patentee fails to disclose patents likely to be infringed

---

[12] FTC Request for Comments and Announcement of Workshop on Standard-Setting Issues, 76 Fed. Reg. 28036, 28036 (May 13, 2011).

[13] *Id.*

[14] The concept of "a dangerous probability" is borrowed from the proof required by the plaintiff for an attempted monopolization claim under § 2 of the Sherman Act, which is: "(1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power." *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456 (1993). To prove a dangerous probability of monopolization in an attempt case "requires inquiry into the relevant product and geographic market and the defendant's economic power in that market." *Spectrum Sports*, 506 U.S. at 459.

[15] Letter from Michele Herman, Davis Wright Tremaine LLP, to Dr. Patrick Gallagher, Co-Chair, Sub-Comm. on Standards, Nat'l Sci. and Tech. Council, Dir., NIST 3–4 (Mar. 4, 2011), *available at* http://standards.gov/standards_gov/sos_rfi_docs/26_Herman_DWTLLP.pdf.

DWT 17345660v1 0050033-001905

Federal Trade Commission
June 14, 2011
Page 6

by implementations of the standard, a participant has no reason to approach the patentee to assess whether the two parties might be able to negotiate mutually agreeable licensing terms on a bilateral basis. In this case, the patentee's conduct may be a relevant factor in determining whether or not the patents are being used to hold up implementers. If the patentee does disclose that it owns patents likely to be infringed by implementations of the standard and a participant chooses not to seek an *ex ante* license, a subsequent dispute over license terms would not be due to a deceptive manipulation of the process by the patentee. Such situations represent mere commercial disputes rather than patent hold-up.

SSO patent policies should be defined to promote a balanced playing field among all participants. SSO patent policies should not be defined to protect one class of participants at the expense of others. Similarly, enforcement of RAND license commitments should also balance the conduct of both parties if a dispute arises. For these reasons, the goals of the workshop should not be to suggest that SSO patent policies be defined to prevent all commercial disputes but rather to prevent patent hold-up that is based on the parties' conduct as well as the resulting harm to competition or consumers. SSO patent policies and RAND enforcement policies that are crafted to ensure that any patentee, regardless of the patentee's and implementer's conduct, cannot charge higher royalty rates *ex post*, irrespective of the effect those royalty rates would in fact have on competition or consumers, would unduly penalize those participants that invest in innovative technology for new standards, and would likely harm innovation, reduce competition, and diminish the other benefits derived from the inclusion of patented technology in standards.

### III.   Increased Transparency or Further Definition with Regard to Patent License Terms Is Not Needed nor Would It Be Useful in Preventing Hold-up

Although the RFC defines patent hold-up broadly, focusing solely on the ability of the patentee to charge higher royalty rates *ex post*, it also describes the scenario that could, according to the FTC, harm competition or consumers. In this regard, the RFC appears to presume that "incomplete" disclosure[16] results in patent hold-up. The RFC explains that hold-up defined in this way, "can subvert the competitive process of choosing among technologies and undermine the integrity of standard-setting activities."[17] The RFC does not cite to any actual examples where a different technology would have been selected had the standards developers known that higher royalties would be charged. The stated harm, however, focuses on a scenario where standards developers were not aware of the royalties or other onerous license terms at the time they selected the patented technology to be included in the standard.

---

[16] FTC Request for Comments and Announcement of Workshop on Standard-Setting Issues, 76 Fed. Reg. 28036, 28037 (May 13, 2011).

[17] *Id.* at 28036.

DWT 17345660v1 0050033-001905

Federal Trade Commission
June 14, 2011
Page 7

The RFC also suggests how consumers might be harmed under this definition of patent hold-up: "[c]onsumers can be harmed if manufacturers are able to pass on higher costs resulting from hold-up."[18] The RFC, however, does not identify any actual situations where consumers have paid higher prices because a patentee has been able to charge higher prices after having its patented technology included in the standard. Instead, the RFC seems to adopt the general view that consumers suffer harm in a scenario in which the standards developers did not know what royalties would be required when they incorporated the patented technology in the standard.

It appears then that the RFC is seeking input on how standards developers can determine the cost associated with implementing patented technologies at the time the standards developers are deciding whether or not to include the patented technology in the relevant standard. And to achieve this, the RFC appears to be soliciting information concerning (i) how to promote more specific disclosure of patents and license terms *ex ante*, and (ii) enforcement of what would be deemed *ex ante* terms, had such terms been disclosed.

Irrespective of the definition of patent hold-up, the notion that the disclosure of more licensing information and/or *ex ante* RAND licensing terms would in some way enable standards developers to more effectively choose when to include patented technology in a standard is at best a theoretical scenario. In practice, there is little use in knowing what a patentee will charge or what licensing terms will be mandated with respect to the patentee's standards-essential patent claims. As discussed in the following sections, the value of and terms associated with essential patent claims are not meaningful in practice because such claims are rarely if ever licensed in isolation. For a number of business and other practical reasons, implementers generally do not negotiate *ex ante* licenses for the purpose of making such choices when they have an opportunity to do so. That said, there is no way to assess whether or not a participant would have made a different decision concerning the inclusion of patented technology if the participant was unaware that a patentee had essential patent claims. So, although SSOs should be free to adopt whatever patent policies meet the needs of their participants given the standards development process, technology area, and other factors, participants should at least be given an opportunity to negotiate bilateral *ex ante* RAND agreements with those patentees that believe they own essential patent claims.[19] The need for disclosure in this case should not disproportionately

---

[18] *Id.*

[19] Disclosure of the relevant patentees is less important in a RAND-RF (RAND on royalty-free terms) SSO. When parties agree to a RAND-RF policy, in practice, they are in effect more interested in implementing the standard and promoting its widespread use than in generating patent revenue from the standardized technology. Generally, parties that license their portfolios to generate revenue as a significant part of their business model are reluctant to join RAND-RF SSOs because (i) they may be asked to carve out certain patent claims from their licenses, which could result in licensees seeking lower royalty rates for the portfolio package even though many of the patent claims are not essential; (ii) these carve outs could increase their overhead in that they would have to evaluate the essentiality of various claims; and (iii) such issues might protract their negotiations. In other words, such patentees

DWT 17345660v1 0050033-001905

MOTM_WASH1823_0392166

Federal Trade Commission
June 14, 2011
Page 8

burden patentees or discourage their participation in the SSO but should be limited to achieve this narrow objective; namely, ensuring that a participant (who is a prospective implementer) knows who to approach for *ex ante* licensing terms if the participant plans to use that information in making technology selections in the standards development process.

### A. *License Terms for Essential Patent Claims Are Not Useful Because Such Claims Are Not Licensed in Isolation*

The RFC questions whether RAND is too uncertain because the details of a license are not sufficiently defined by a RAND license commitment. Even if the precise terms for each standards-essential patent claim were disclosed to participants by a patentee at the time the patentee submitted a contribution to the standard, those terms would have little meaning for most prospective implementers. ICT products often include dozens if not hundreds of standards and other technology.[20] No one producing an ICT product would expect to negotiate a license with a patentee solely for the patentee's essential patent claims on one standard without also expecting to need licenses to additional patent claims that cover the ICT product or at least other related features. Even if an SSO were to define the license terms and conditions for all participant patentees, products that implement the standardized technology would almost certainly infringe other non-essential patent claims owned by the participant patentees. Moreover, if the defined terms and conditions for essential patent claims are royalty-free and unrestricted, the patentees could pursue licenses for their non-essential patent claims for fees that could offset what they had agreed to license on royalty-free and unrestricted terms.[21]

In practice, however, patentees and implementers do not separately license essential patent claims and non-essential patent claims; they license portfolios that include both, or enter cross-licenses that include both, or form business relationships that involve transactions that expressly

---

only join SSOs with mandatory RAND-RF policies in exceptional circumstances when there are compelling business reasons to do so. In the end, most parties that join an SSO with a RAND-RF policy have no intention of enforcing essential or non-essential patent claims related to the relevant standard, but consider those patent claims very important for defensive purposes and for securing freedom to operate, i.e., through cross-licensing. Given these practical objectives, any patent disclosure requirements may seem overly burdensome to participants joining RAND-RF SSOs.

[20] Brad Biddle, Andrew White & Sean Woods, *How Many Standards in a Laptop? (And Other Empirical Questions)*, Soc. Sci. Res. Network, Sept. 10, 2010, *available at* http://ssrn.com/abstract=1619440 (identifying 251 interoperability standards that are embodied in or directly used by a laptop computer).

[21] Participation-based policies that are RAND-RF tend to include very narrow definitions of essential patent claims. In fact, some are so narrow it is conceivable that few if any patent claims would be subject to the RAND-RF policy at all. Narrowing the scope of applicable patent rights is not a surprising result for RAND-RF policies because members are going to be reluctant to commit to RF licensing up front when the scope of the standard may not yet be determined and the patentee may not yet know if it will support the resulting standard.

DWT 17345660v1 0050033-001905

MOTM_WASH1823_0392167

Federal Trade Commission
June 14, 2011
Page 9

or impliedly involve both essential and non-essential patent claims.[22] Furthermore, such arrangements typically are in regard to multiple standards, although they may be related within a given field of use. As a result, in the "real world," disclosure of specific terms for essential patent claims is not useful to either party given that they will likely need to negotiate a broader more comprehensive agreement. Similarly, in the "real world," defining RAND terms solely for essential patent claims is equally meaningless because it does not serve to provide additional certainty for most implementers.

### B. *Specific Patent Information Is Rarely Used by Participants in Deciding Whether or Not to Incorporate Patented Technology in the Standard*

The point of a disclosure-based policy is to (i) procure a RAND license commitment for the essential patent claims in the disclosed patents, and (ii) permit participants to negotiate licenses *ex ante* so that they can be sure that the standard can be reasonably implemented once adopted. In practice, few parties negotiate licenses *ex ante* even when they know which parties have declared essential patent claims. This is because some implementers may have existing cross-licenses, portfolio licenses, or other business arrangements involving the same patent claims with the disclosing patentee and therefore have no need to negotiate a special standards-related patent license. Other implementers may rely on patent détente with the patentee that those implementers have no desire to disturb. Still other implementers may wish to take a wait-and-see approach to licensing as opposed to sharing their confidential business and technical plans early on with a potentially adverse party. In the end, however, virtually no implementers will negotiate an *ex ante* license for solely standards-essential patent claims for the reasons discussed above in Part III.A.[23]

While many companies have formalized standards participation policies that require employees to obtain internal approval before joining an SSO and contributing to that SSO, very few companies have a process for evaluating the risks associated with implementing standards. Yet some companies are calling for SSOs to adopt policies that require more patent licensing information to be made public, to provide more information about who is contributing to the standard, to provide more information about who is participating in the development of the

---

[22] For example, a cross-licensing agreement between Samsung and Ericsson, analyzed during patent infringement litigation after the parties were unable to agree on renewal terms, included both essential and non-essential patent claims for WCDMA cellular technology. Michele K. Herman, *Negotiating Standards-Related Patent Licenses: How the Deal is Done, Part II*, LANDSLIDE, Nov.–Dec. 2010, at 33, *available at* http://www.dwt.com/portalresource/03-11_Herman_Landslide_part2.pdf. In another example, Motorola and Research in Motion reached a settlement agreement ending litigation regarding extension of a 2003 cross-licensing agreement that included patents that Motorola claimed were essential to the GSM, GPRS, and UMTS standards, as well as rights to several non-essential Motorola patents. *Id.*

[23] On occasion, some SSO participants will negotiate broader bilateral deals *ex ante*.

DWT 17345660v1 0050033-001905

MOTM_WASH1823_0392168

Federal Trade Commission
June 14, 2011
Page 10

standard, and to disclose more information about third party patent claims. These requests for SSOs to make more information available have nothing to do with the selection of technology during the standards development process because most companies do not even evaluate the information that is available before they implement a standard, nor do they enter into bilateral *ex ante* license negotiations as mentioned above. Rather, they want this information to assist with any *ex post* negotiation should they be caught implementing a standard without a license. In other words, the information is useful to such companies only after a dispute over terms has arisen, not for the selection of technology during standards development.[24]

The problems associated with requiring *ex ante* disclosure of specific patents, and especially license terms, have been discussed at length elsewhere in the literature.[25] And there is no evidence whatsoever that such disclosure has increased the number of bilateral *ex ante* negotiations between participants and the contributors of competing technical proposals. The idea that more transparency into the patent landscape and license terms that might be required to implement competing alternative proposals is needed to effectively prevent hold-up is simply a red herring intended to unnecessarily shift burdens to SSOs and standards technology innovators.

### C. *Nothing More Than Blanket Disclosure Statements and RAND License Commitments Are Needed to Avoid Patent Hold-up*

Notwithstanding the fact that few, if any, implementers will negotiate bilateral agreements with a patentee prior to choosing technology to be included in a standard or even before implementing the standard, it is nonetheless important that patentees and implementers have the opportunity to do so. It is impossible to conclude that an implementer would not have engaged in good faith negotiations if the implementer was unaware that a patentee believes its patents are likely to contain essential patent claims.

---

[24] Under these circumstances, it is not appropriate for an infringer, who would have made no attempt during standards development to enter into bilateral *ex ante* negotiations or even prior to implementation to enter into bilateral *ex post* negotiations, to expect that the SSO and its participants would undertake such a heavy burden to disclose and collect such information. SSOs typically do not have the resources to efficiently track all feedback and contributions, particularly nominal ones. While most technical working groups do prepare summaries of their respective meetings, such summaries are often high level. Importantly, any public disclosure of the details of such meetings may breach confidentiality obligations or at a minimum chill participation in the working group.

[25] *See, e.g.*, Michele K. Herman, *Negotiating Standards-Related Patent Licenses: How the Deal is Done, Part I*, LANDSLIDE, Sept.–Oct. 2010, at 38–39, *available at* http://www.dwt.com/portalresource/03-11_Herman_Landslide_part1.pdf; Damien Geradin et al., *The Complements Problem Within Standard Setting: Assessing the Evidence on Royalty Stacking*, 14 B.U. J. SCI. & TECH. L 144, 171–73 (2008); Michele Herman & Tom Watson, *A Little Knowledge Can Hurt! The Quandary of a Balanced IPR Policy,* OPEN BAR, Mar. 2006, at 4–6, *available at* http://www.open-bar.org/docs/AIPLA-Paper-FINAL.pdf.

DWT 17345660v1 0050033-001905

Federal Trade Commission
June 14, 2011
Page 11

Commercial disputes may arise over patented technology incorporated in standards, but without deceptive or bad faith conduct on the part of a participant, there is no subversion of the standards process. The only information needed from patentees participating in standards setting activities is whether they own patents likely to contain essential patent claims and whether they will make such essential patent claims available on RAND terms. Some SSOs refer to such disclosure statements as "blanket disclosures" because the patentee states that it believes it owns patents likely to contain essential patent claims but does not disclose the specific patents or patent applications. Typically, a blanket disclosure is accompanied with a license commitment, usually on RAND terms (with or without compensation) for all essential patent claims owned by the disclosing patentee. It is then up to each standards participant to seek more information as to whether or not that participant might be able to reach a mutually acceptable bilateral agreement with the patentee to the extent that the information would affect that participant's support for the inclusion of the patented technology in the standard. As long as there is a RAND commitment and some identification of the patentees that have declared patents, the standards process is not subverted as a result of any missing information. SSO patent policies do not require further transparency into specific patents or licensing terms because standards participants and implementers will know who to contact to negotiate appropriate agreements on a bilateral basis. Decisions by standards participants and implementers not to do so may result in commercial disputes between the parties *ex post*, but those commercial disputes are not patent hold-up situations that an SSO or patentee should be expected to eliminate.

### D. The Risks of Onerous Patent Policies Aimed at Preventing Patent Hold-up Outweigh the Usefulness of Information Obtained Through Compliance with Such Policies

If SSOs mandate patent policies that require further transparency into specific patents or licensing terms, the risk is that technology innovators might refrain from participating in standards development. Technology innovators in the standards setting context usually include patentees with relevant technological expertise; these are the participants that likely have the most to offer during standards development. Without the contributions of such innovators, the standards development process may be inefficient and protracted and the resulting standard is more likely to be technically inferior and less successful in the marketplace.

There is also a practical concern that once specific terms are disclosed, the SSO participants will jointly engage in pressuring the patentee to make significant licensing concessions or will reject the patented technology altogether. Such negotiations could protract and complicate standards development, could raise antitrust concerns, and would not yield much useful information. As discussed above, even if the license terms for the standards-essential patent claims are jointly negotiated and approved, each individual implementer might still need to negotiate a bilateral agreement if one was not already in place with the patentee tailored to the needs of that

DWT 17345660v1 0050033-001905

Federal Trade Commission
June 14, 2011
Page 12

implementer and patentee.[26] The specific terms for those essential patent claims from that particular patentee would not be a reliable measure of the overall costs to any specific implementer without a bilateral agreement that covered the parties' broader interests. While the competition concerns arising from joint negotiations may be mitigated through appropriate counseling from the parties' lawyers, it seems that there are few, if any, benefits from such proposals in contrast to their many identifiable risks.

## IV. RAND Enforcement Policies Should Not Ignore the Implementer's Conduct

The RFC asks a number of questions concerning the enforcement of a RAND license commitment and its impact on patent hold-up. As discussed above, the inquiries should be based on an assumption that the inclusion of patented technology in standards will promote innovation, encourage competition, generate economic growth, and create jobs, not that the inclusion of patented technology in standards will result in patent hold-up. In this regard, RAND enforcement policies should not be defined to prevent a patentee from obtaining higher royalty rates under all circumstances but should focus on a more narrow set of conduct and market effects. If patent hold-up occurs when the patentee has (i) failed to abide by the relevant SSO patent policy, (ii) intentionally deceived the SSO participants, and (iii) in doing so, harmed competition and/or consumers because the patentee is able to extract higher royalties after "lock in" as a result of its patented technology being incorporated into the standard, then a RAND enforcement policy should come into effect. There are a number of legal and equitable doctrines that are available to adequately address the harm caused by a patentee's deceptive conduct.[27]

But where there has been no hold-up because the three criteria have not been satisfied, the patentee should be able to require that the infringer enter into a RAND license considering the specific facts and circumstances. Those facts and circumstances should not only take into account the patentee's conduct but also the infringer's conduct. For example, did the infringer participate in the standards development and have access to the patentee's patent declaration but fail to seek a license? Did the patentee offer the infringer a license that the infringer refused to negotiate in good faith? Did the patentee fail to declare that it owned patents likely to contain

---

[26] Letter from Thomas O. Barnett, Assistant Attorney Gen., U.S. Dep't of Justice, to Robert A. Skitol, Esq., Drinker, Biddle & Reath, LLP (Oct. 30, 2006), *available at* http://www.usdoj.gov/atr/public/busreview/219380.htm ("[W]orking group members will not set actual licensing terms. The patent holder and each prospective licensee will negotiate separately, subject only to the restrictions imposed by the patent holder's unilateral declaration of its most restrictive terms.").

[27] These could include allegations of misrepresentation, fraud, breach of contract, promissory estoppel, waiver, patent misuse, monopolization and attempted monopolization under § 2 of the Sherman Act, unfair methods of competition under § 5 of the FTC Act, and similar state-based claims.

DWT 17345660v1 0050033-001905

MOTM_WASH1823_0392171

Federal Trade Commission
June 14, 2011
Page 13

essential patent claims, albeit not in bad faith, but nonetheless depriving the infringer of the opportunity to seek an *ex ante* agreement? These questions would need to be explored before making any judgment about the appropriate use of an injunction or the formulation of damages and future royalty payments.

## V. Conclusion

In my view, the inquiry for the workshop should start with the assumption that patented technology in standards has been driving innovation not that patented technology in standards leads to patent hold-up. Then the term "patent hold-up" should be more precisely defined, taking into account both the conduct of the parties and market effects. Finally, the FTC should seek solutions to "real world" patent hold-up problems not merely theoretical patent hold-up problems. In this regard, it is important to consider SSO patent policies and RAND enforcement goals in the context of a narrowly defined patent hold-up scenario, and not as a means to prevent all potential *ex post* commercial disputes.

Again, I appreciate this opportunity to submit these comments for consideration in connection with the upcoming workshop as well as the opportunity to supplement them prior to the July 8, 2011, deadline with responses to the specific questions posed in the RFC.

Respectfully submitted,


Michele Herman
Davis Wright Tremaine LLP

DWT 17345660v1 0050033-001905