# EXHIBIT 57

29



One North Castle Drive
Armonk, NY 10504

August 5, 2011

Federal Trade Commission
Office of the Secretary
Room H-113 (annex X)
600 Pennsylvania Avenue NW
Washington, D.C. 20580

Re: Federal Trade Commission Request for Comments Concern Patent Holdup

To the Federal Trade Commission:

IBM appreciates the opportunity to respond the Federal Trade Commission Request for Comments on "Patent Holdup in Standard-Setting Process" aimed at "examining the legal and policy issues surrounding the competition problem of 'hold-up' when patented technologies are included in collaborative standards."

Our comments include the following sections: IBM's interest, the Patent Holdup concern, topics relating to Disclosure of Patents, topics relating to the RAND Commitment, and topics relating to Ex ante Disclosure and Joint Discussion of Licensing Terms.

Topics for further consideration are highlighted and labeled "Items for Consideration."

Respectfully submitted,

*Gerald Lane*
Gerald Lane
Director of Standards

*Marc Sandy Block*
Marc Sandy Block
Staff Counsel

30
CONFIDENTIAL BUSINESS INFORMATION,
SUBJECT TO PROTECTIVE ORDER

MS-MOTO_1823_00002280003

1. IBM INTEREST

   IBM Corporation is a member of and contributor of technology to hundreds of standards setting organizations (SSOs) in the high technology computer, information and communication fields. IBM implements thousands of standards in its many products. IBM recognizes the importance of standards in achieving safety, security, accessibility, quality, and interoperability requirements essential to the businesses of IBM and others and in promoting national and global economic growth and opportunity.

   As a holder of approximately 30,000 patents (leading in U.S. patent issuances for the last 18 years) and as an assignor and world-recognized licensor of patents, IBM has a strong interest in promoting the advancement of technology and innovation, in realizing a reasonable return on its R&D investment, and in deriving value from intellectual property (including patents).

   In the standards world, IBM wears many hats: as a standard developer, as a patent holder and inventor who contributes needed technology to SSOs, as a standard implementer who provides standardized products to consumers, as a partner to others implementing standards, as a party who makes patented technology available to others, and as a user of standardized products. IBM also participates in the development and revision of SSO Patent (or IPR) Policies, along with other stakeholders.

   It is through this prism of interests that IBM considers the questions asked by the FTC in its RFC. IBM appreciates the opportunity to comment on the topics raised by the FTC and to participate in the exchange of ideas aimed at improving the standards system.

2. PATENT HOLDUP IN GENERAL

   The focus of the FTC Request for Comments is on "patent holdup." The FTC defines holdup as "a demand for higher royalties or other more-costly or burdensome licensing terms after the standard is implemented than could have been obtained before the standard was chosen."[1] The Report recognizes a narrower definition[2] but opts for the more robust one. Some contend that holdup should be further limited to instances in which the failure to disclose is intentional. Such limited interpretations are less useful, first because proving intent is difficult and second because the adverse impact of stalling or stopping a standard is the same whether there is intent or not.

   It is also argued that instances of holdup are rare and overstated. However, that perspective ignores legitimate concerns among many in the standards community, especially in high technology fields where not only standards but patents have been growing in importance.[3] Moreover, in recent

---

[1] In the March 2011 FTC Report, "The Evolving IP Marketplace: Aligning Patent Notice and Remedies with Competition" ("IP Marketplace Report") "holdup was similarly defined as "a patentee's ability to extract a higher licensing fee after an accused infringer has sunk costs into implementing the patented technology than the patentee could have obtained at the time of design decisions, when the patented technology competed with alternatives."
[2] "A patent owner fails to disclose his patents to a standard setting organization and attempts to license after an industry is locked into using the standard." See IP Marketplace Report at page 191.
[3] See "Leveraging Intangible Assets: How a Rating Can Help Measure and Communicate Performance," by Dr. Helena Barton, 2005 http://www.ahcgroup.com/res_art_cst11b.htm ("over 70% of corporate value today lies not in inventory or buildings, but in intangibles – such as intellectual property…").

2

31
CONFIDENTIAL BUSINESS INFORMATION,
SUBJECT TO PROTECTIVE ORDER

MS-MOTO_1823_00002280004

years, the number and impact of patent assertion entities ("PAEs"), who neither produce marketable products nor implement standards and thereby enjoy asymmetric leverage, have raised concerns inside and outside the standards community.

At the June 21, 2011 FTC Workshop ("FTC Workshop"), Dr. Farrell, the Chief Economist at the FTC, observed that he is not "ready to take the leap" from patent litigation relating to standards to there being a "breakdown in the system."[4] After all, lawsuits may result from one party simply being unreasonable.

That said, IBM sees patent disputes and litigation in standards as reflecting risk and uncertainty, and thus reason for concern.

For example, various patent cases have involved patent holders who participated in or had obligations to an SSO. In a matter relating to *Dell*, an FTC Consent decree led to a patent being declared unenforceable when it was not disclosed as allegedly required by the VESA SSO policy. In *Stambler v Diebold*, the issue involved a participant who allegedly did not disclose an "essential" patent while the industry widely adopted a standard. In *OpenWave v 724 Solutions*, 5-09-cv-03511 (NDCal March 2010),[5] a court found that failure to disclose under a standards policy could render a patent unenforceable, not based on patent misuse but on estoppel or waiver. In a series of *Rambus* cases, a key issue was whether claims filed after the patent holder withdrew from an SSO (JEDEC) were subject to a disclosure obligation – some claims were added after withdrawal to patent applications pending while Rambus was a JEDEC participant. The seesawing holdings in the *Rambus* cases have suggested that the system did not work the way some had expected. *Actividentity v Intercede* (No. C08-4577 VRW, ND Cal 2009) also involves failure to disclose a patent needed for complying with a standard. Implementer's (defendant's) action for unenforceability of the patents was not dismissed, where it was alleged that another technology for updating smart cards remotely would have been selected for a standard "but for" the lack of disclosure.

Cases have also involved licensing commitments made to SSOs. Qualcomm and Broadcom have been engaged in multiple patent battles involving wireless and H.264 (data compression) standards and the RAND commitment.[6] Research In Motion filed suit against Motorola for allegedly not re-licensing essential patents on a FRAND basis.[7] In 2009, Zoran argued for arbitration pursuant to the SSO by-laws to consider RAND anticompetition issues.[8] Currently, Nokia and Apple are in a dispute over patents allegedly needed to implement technology relating to wireless standards (GSM, 3G, and Wifi) and handheld units – some of the key issues relating to the RAND commitment.[9] Also recently, Microsoft filed a complaint against Motorola Mobile based on a standards RAND commitment.[10] In another case, Unocal sought 5.75 cents per gallon [about eight years ago] against implementers of a gas reformulation standard – the matter was finally resolved

---

[4] See Closing Remarks, Joseph Farrell, Director, Bureau of Economics at Federal Trade Commission, FTC Workshop on Patents and Standards, June 21, 2011
http://meta.media.qualitytech.com/m/wm/woc-01/COMP008760MOD1/FTC_WM/062111_FTC_Sess3.wvx
[5] See also *Qualcomm Inc v Broadcom Corp*, 548 F.3d 1004 (Fed Cir 2009) at 1024
[6] See *Broadcom Corp. v. Qualcomm, Inc.*, 501 F.3d 297 (3d Cir. 2007)
[7] See *Research in Motion Ltd. v. Motorola Inc.*, 644 F.Supp. 2d 788 (N.D. Tex. 2008)
[8] See *Zoran Corp. v. DTS, Inc.*, 2009 U.S. Dist. LEXIS 6675 (N.D. Cal 2009)
[9] See *Apple Inc. v. Nokia Corp.*, C.A. No. 09-1002 (D. Del., filed February 24, 2010);
[10] See *Microsoft Corp. v. Motorola Inc.*, No. 2:10-cv-01823 (W.D. Wash., filed Nov. 9, 2010). See June 2, 2011 article outlining parties' actions. http://fosspatents.blogspot.com/2011/06/microsofts-dispute-with-motorola.html.

3

32
CONFIDENTIAL BUSINESS INFORMATION,
SUBJECT TO PROTECTIVE ORDER

MS-MOTO_1823_00002280005

when Chevron acquired Unocal and agreed not to enforce the patents.[11]

Unocal is also notable in that the standard involved was approved by a California government agency CARB ("California Air Resources Board")– entrenching the standard more solidly into the industry.

In the recent FTC N-Data matter,[12] the transferee of a patent contended that it was not bound by a license commitment made by a prior owner of the patent to SSO IEEE.[13]

The situations that, perhaps, warrant special attention are those that impact a host of implementers. Recently, Mosaid charged 17 companies with infringement of WiFi patents.[14] Similarly, CSIRO negotiated numerous licenses in 2009 after prevailing against Buffalo in an injunction action and notifying other companies of a 1996 patent allegedly covering the IEEE standards 802.11(a) and (g).[15] These cases reflect how a patent on a standard can influence an industry.

A notable instance of patents impacting standards does not revolve around litigation or a patentee waiting for implementers to adopt the standard before asserting a patent(s). The VITA Standards Organization is an SSO that develops bus architecture standards for embedded systems used in applications ranging from aircraft to medicine. Each of four VITA standards received patent disclosures on the eve of publication. Questions arose about the disclosed patents and whether the licensing terms offered were RAND, as required by the VITA Patent Policy at the time. Several of the standards were delayed and one standard was discontinued. Arguably, this may not be "patent holdup" under the current definition and it may be argued that the system "worked" – however, the interruption and disruption led VITA to revise its Patent Policy to avoid such events.

The foregoing summary is intended to reflect the timeliness and value of the FTC's current effort in seeking comments to help understand the intersection between patents and standards, and in considering mechanisms that might help smooth issues arising at the intersection.

The FTC RFC breaks down the areas of inquiry into three sections based on approaches to address patent holdup: namely, Patent Disclosure, the RAND Commitment, and Ex Ante Disclosure of Patent Licensing Terms (which have arisen in the aforementioned cases). These approaches interplay but will be covered separately based on questions posed by the Commission. In addition, a number of "Items for Consideration" are offered for the FTC and standards community to consider in helping achieve widely accepted, state-of-the-art standards with appropriate longevity, success, and minimal interruption due to patent holdup and other IPR issues.

3. PATENT DISCLOSURE

---

[11] See *FTC v. Unocal*, FTC Docket No. 9305 (2003) ("A private business allegedly has used false and misleading statements to induce a government body to issue regulatory standards that conferred market power upon the firm.")
[12] See *In re Matter of Negotiated Data Solutions LLC*, No 0510094 at http://www.ftc.gov/os/caselist/0510094/080122do.pdf
[13] Other disputes have also arisen over the issue of standards licensing commitments and patent transfers. In Europe, IPCOM has asserted patents previously owned by Bosch, who allegedly made a licensing commitment to a standard.
[14] See http://www.engadget.com/2011/03/18/mosaid-gets-into-wifi-patent-game-sues-17-companies-including-d/
[15] *Commonwealth Scientific and Industrial Research Organization v Buffalo Tech Inc*, 542 F.3d 1363 (Fed Cir 2008). See also http://en.swpat.org/wiki/CSIRO_wifi_patent#Litigation_and_licensing

33
CONFIDENTIAL BUSINESS INFORMATION,
SUBJECT TO PROTECTIVE ORDER

MS-MOTO_1823_00002280006

Many, but not all, SSOs have an obligation to disclose "Essential Patents"[16] i.e., a patent containing one or more claims that are necessarily infringed when the standard is implemented.[17]

The holy grail of an SSO patent [claim] disclosure obligation is to uncover patents (or both patents and patent applications) that include claimed inventions which are unavoidably infringed when implementing the standard, without generating an unwarranted burden on patent holders, without discouraging patent holders from submitting innovations to the standards effort, and without generating efficiency-robbing false positives.

*3.1 Patent Applications*. The task of patent disclosure in standards could be characterized as trying to control two slippery objects[18] – recognizing that patent claims in a patent application can be revised while the specification for the standard is also under development. Some SSOs focus the identification on only issued patents, while others extend the disclosure requirement to patent applications which are being examined by a patent office.

Patent holders may be reluctant to provide detailed information about applications because (i) these inventions may also signal the companies' technical direction and strategy, and (ii) others could seek patent protection on variations which could impact a resulting patent's value. However, because of the currency of these inventions and the ability to revise the claims to track the standard, SSOs may deem these claims particularly important. Accordingly, disclosure of applications is often required but limited in nature, asking for only a claim or a reference to the applicable section of the standard's draft specification.

There is a distinction between published patent applications which are readily found in a search of patent office files and unpublished applications which may still be secret. Unpublished applications, which are generally less than 18 months old, may be further from commercialization and public disclosure and may be more sensitive to patent holders. Also, because unpublished applications are not in commercial databases, there is a greater likelihood of missing them and violating any "disclosure obligation" than for published applications. Hence, disclosure of unpublished applications (if any) is typically circumspect in its requirements.

A risk relating to the disclosure of patent applications surfaced in the *Rambus* cases.[19] Under U.S. patent law, claims in patent applications can be inserted and amended to track a standard provided that the original document "supports" (or has description of) the later filed claim. Such "late" claims are treated, with respect to prior art, as if they were filed initially in the original application.[20] In the *Rambus* case, late claims filed after Rambus withdrew from SSO JEDEC were not disclosed to JEDEC but were effectively asserted against standards implementers. JEDEC and other SSOs have since revised their policies to address this issue and cover current and

---

[16] Some SSOs refer to Essential Claims or Necessary Claims. This paper will refer to Essential Patents because patentees and licensees normally identify patents and not claims.
[17] The term "Necessary Claim" (or "Essential Claim") is often tailored to the SSO or follows the definition, akin to the one presented here, published in the American National Standards Institute ("ANSI") Patent Policy of the Essential Requirements.
[18] Closing Remarks, Joseph Farrell, Department of Economics at Federal Trade Commission, FTC Workshop
[19] See *Rambus Inc v Infineon Technologies AG*, 318 F.3d 1081 (Fed. Cir 2003)
[20] Accordingly, suppose a patent claim is first introduced in 2005 in a pending application filed in 2000 and there is a publication or patent with a date in 2002. A publication (or patent) that predates the filing of a patent by more than a year precludes patenting. In that the late claims are deemed filed in 2000, the publication or patent would not render the late claim unpatentable (or invalid) if the original application fully described the late invention.

34
CONFIDENTIAL BUSINESS INFORMATION,
SUBJECT TO PROTECTIVE ORDER

MS-MOTO_1823_00002280007

future claims in patent applications pending at the time a member withdraws. Such a policy provision seems fair – if the U.S. Patent & Trademark Office treats the late claim as if it was filed at the time the application was filed (e.g., before the member withdraws), an SSO can do the same.[21]

One conventional practice in patent disclosure policy is not to "require participants to conduct a formal patent search." This recognizes that major companies involved in numerous standards with many features would be heavily burdened if they had to investigate sizable portfolios of patents, and especially patent applications, multiple times during standards development.

*3.2 Disclosure Policies Vary.* Patent disclosure policies features a number of attributes that further affect its scope. These attributes, which are discussed in the ABA Standards Development Patent Policy Manual (2007), include issues such as (i) who should be involved in identifying and disclosing Necessary Claims, (ii) when should investigations take place, (iii) what the bounds of the investigation are, and (iv) how the results should be updated. The SSO VITA, has outlined an approach in which members are asked to identify patents when they make a contribution of technology to the standard, when drafts are distributed for review, and when the final specification is distributed for vote. VITA also identifies those representing the company and working on technology and patents for the standardized technology as individuals whose "good faith" inquiry is solicited in the disclosure process.[22] Some SSOs limit the disclosure duty to just the personal knowledge of those individuals participating in the standard development, requesting disclosure promptly when they become aware of a Necessary Claim or at a time near final approval.[23] In that standard's representative alone may not be familiar with or aware of patents and in that third parties may have patents that may not be identified, the disclosure approach has distinct limitations.

Some commenters identify a problem when Patent Policies prompt overdisclosure. Overdisclosure, or false positives, can trigger risks that are not warranted. Under ANSI policy, for example, if an "essential" patent is identified without a RAND license assurance (with or without royalty) being made, the standard will not be accredited.[24] Since many SSOs have no process for evaluating disclosed patents, a patent of dubious relevance could stall or stop a standards effort unnecessarily.

Some SSOs provide processes by which this issue is addressed. For example, Ecma allows the approval of a standard with a 2/3 vote, provided that the standards developers and implementers receive notice of the unresolved patent claim. Other SSOs impose a RAND licensing commitment on parties who disclose patents, which may cause patent owners to be more careful when disclosing patents (or patent claims).

For SSOs in which there is a stable technology and few patents, the IP or Patent Policy may simply

---

[21] Some SSOs include a provision that members who withdraw are committed with regard to specifications distributed to them or approved by the SSO [at least x days] prior to their withdrawal. See OASIS IPR Policy at Article 11 http://www.oasis-open.org/policies-guidelines/ipr
[22] See Section 10 of VITA Patent Policy at VITA.org
[23] See the Wireless Gigabit Alliance (IPR policy available at http://wirelessgigabitalliance.org/join/) or the Peripheral Connect Interface Special Interest Group (PCI-SIG) (IPR policy available at http://www.pcisig.com/membership/about_us/bylaws/).
[24] See ANSI Patent Policy Section 3.1.1 ("Prior to approval of such a proposed American National Standard, the Institute shall receive from the identified party or patent holder...an assurance...in the form of a disclaimer or that a license will be made available...")

35
CONFIDENTIAL BUSINESS INFORMATION,
SUBJECT TO PROTECTIVE ORDER

MS-MOTO_1823_00002280008

adopt the brief ANSI policy. For SSOs involved in emerging high technology fields where patents are acquired to generate return on R&D investment and risk, more sophisticated policies are normally drafted with input from legal counsel and business and standards experts. It is noted that the ANSI Patent Policy includes no patent disclosure obligation and requires a license assurance only when an allegedly essential patent is identified. However, many SSOs (both ANSI accredited and not) have enacted Patent Policies in which members are obligated to both "promptly" disclose and commit to license essential patents.

A creative approach adopted by many SSOs is the "negative disclosure" policy. All of the members' essential patents are subject to a licensing commitment (or default licensing terms) if the member does not timely disclose an essential patent it wishes to exclude.[25] This requires vigilance on the part of the patent holding members, especially if the SSO provides a royalty-free default.

Variations in patent disclosure policy can also depend on (i) the industry's perspective on patents and licensing (semiconductor and wireless technologies being more adapted to patents and royalty-based models than software interoperability technologies); (ii) the policies of competing and complementary SSOs; and (iii) the difficulty in uncovering "essential" patents (e.g. are patents tightly bound to the standardized products? are there a small number of patent holders in the field? are there tools useful in searching the field? are the new, key features of the standard easily identified for searching?).

Moreover, some SSOs may be in traditionally patent-dense fields. For example, the personal computing industry includes major companies who have numerous cross licenses that provide each party freedom of action to develop and market superior products with authorization to use others' patented technologies.

In technologies where patent assertions and litigation are more common [see the chart above for the mobile business], SSO would likely draft a more detailed Patent Policy.

Some SSOs, who operate openly and allow all interested parties to participate, may include participants who do not plan to implement the standard and perhaps have no marketed products. Such patent asserting entities ("PAEs"), or non-product entities, may also affect the sensitivity of the SSO group to patents, where self-controlling mechanisms may not come into play.[26] PAE's can operate from an asymmetric threat position that can impact the SSO, where such entities have no needs under other companies' patents. Hence, a very significant factor in SSO Policy is the composition of the SSO membership. Although most SSOs have a goal of balancing stakeholder interests,[27] the fulcrum may not always rest in the middle. At the FTC Workshop, Dr. Farrell of the FTC noted the absence of a "consumer interest" at the workshop.

Different SSOs view the status quo and risk aversion through different lenses. Accordingly, IBM appreciates that one Patent Policy will not fit all SSOs. However, that bromide should not be misinterpreted to preclude measures that, at least in some industries and technologies, are

---

[25] See DVB Project "Negative Disclosure" at http://www.igi-global.com/bookstore/article.aspx?titleid=2593
[26] Where today's patent holder might be tomorrow's licensee, there is some self-regulation concerning royalties assessed. Moreover, where parties may contribute technology to future standards, there may be some regulation. However, as new patent monetizing models emerge, such regulation diminishes in effect.
[27] Balancing stakeholder interests is an Essential requirement for ANSI accreditation. See Essential Requirements at ansi.org.

36
CONFIDENTIAL BUSINESS INFORMATION,
SUBJECT TO PROTECTIVE ORDER

MS-MOTO_1823_00002280009

preferable or best practices. The American National Standards Institute ("ANSI"), for example, includes a number of Essential Requirements with which SSOs must comply in order for standards to be accredited by ANSI (as "American National Standards", or "ANS").[28]  Similarly, that "SSOs should have flexibility in drafting their policies" should not preclude consideration of practices or measures that can generally help achieve openness, transparency, balance, and standards' success, and that can help reduce the instances of patent holdup.

While different SSOs can adopt different Patent Policies that are tailored to member needs, some Policies are more sensitive to patent issues and potential for opportunism than others. For example, a Patent Policy that does not provide for patent disclosure and does not provide ready access to disclosed patents, or that overly limits the "who, when, and what" of the disclosure duty may not be as effective as a more robust Policy.

By way of further observation, IBM recognizes that the standards community comprises many varied stakeholders and that stakeholder interests should be considered in addressing patent matters. However, while participation should be open and while technical merit of the contributions submitted by all should be assessed under rules of due process, all business models do not nurture standards and standard implementation equally. An SSO may prefer a patentee's contribution that demands a lower royalty where the patentee is also an implementer who derives profits from selling products, over a party with interests – albeit legitimate business interests -- of only maximizing royalties.

*3.3 Ambiguity in Disclosure.* Patent claims are particularly difficult legal documents to interpret.[29] In fact, patent cases often include hearings to determine the meaning of terms used in the claims.[30] In addition, claims can extend beyond their literal meaning to "equivalent s" by either judicial doctrine[31] or statute[32]. The meaning and breadth of the claim is not always precise and the matching of the claim to the standard's specification – to determine if a claim is infringed by the specification -- requires skill. Patent claims carry with them some ambiguity.

In addition, SSO's normally define the word "essential" in a particular way. The requirement that an "essential" claim is "necessarily infringed" may specify that "there is no noninfringing *technical alternative*" or "no *commercially feasible* alternative." While the "commercially feasible" alternative ensures that implementers can practically comply with the standard, the test is not precise. At what price is the alternative no longer "feasible"? Specification definitions thus  inject some ambiguity into the disclosure obligation.

The various ambiguities are addressed in some SSO Patent Policies by providing disclosure if a claim *may be* "essential" or *is reasonably believed to be* "essential." This measure of latitude is deemed acceptable to comply with disclosure requirements, but more certainty may be applied to licensing where patent holders generally intend to license only claims that *are*  essential. To avoid

---

[28] ANSI is the organization approved by legislation as the "accrediter" of U.S. standards. ANSI also represent the U.S. in international standards discussions.
[29] As Justice Story observed in *Folsom v Marsh*, 9 F. Cas. 342 (D Mass 1841): "In many cases, indeed, what constitutes an infringement of a patented invention, is sufficiently clear and obvious, and stands upon broad and general agreements and differences; but, in other cases, the lines approach very near to each other, and, sometimes, become almost evanescent, or melt into each other."
[30] See *Markman v Westview Instruments Inc.*, 517 U.S. 370(1996)
[31] *Warner-Jenkinson Company Inc v Hilton-Davis Chemical Company*, 529 U.S. 17 (1997)
[32] See 35 USC 112 paragraph 6

37
CONFIDENTIAL BUSINESS INFORMATION,
SUBJECT TO PROTECTIVE ORDER

MS-MOTO_1823_00002280010

imposing strict obligations where parameters are ambiguous, some SSOs merely request or encourage disclosure.

To make the disclosure policy meaningful, submitted information should be readily accessible by interested parties. While some SSOs provide all standards information to the public at no charge, others rely on the sale of standards to sustain themselves and hence charge a reasonable fee for access. Still other SSOs have reasonable membership fees that enable access to SSO information. In any event, once available on the website, users should have easy access to the information.[33]

> *Items for Consideration: Uniform specification for posting standards information* A practice worth SSOs consideration would be a "standard for standards information" – including a specification on where and how disclosed patents, opted out patents, withdrawn members, patent policy, and other patent issues (such as "essential" claims without assurances, etc.) are located on an SSO's website. Attorneys have noted the difficulty and unsure results obtained when, for various reasons, their clients have sought patent-related information on standards.[34] It is appreciated that SSOs have their own web designs, requirements, and formats, but some uniformity on essential elements could be helpful.

3.5 *Disclosure of Third Party Essential Patents.* At the FTC Workshop, there was a question about prompting patent disclosures by third parties. "Essential" patents held by third parties raise a number of issues. Parties who do not wish to participate in an open, voluntary standard should be free not to join and to avoid SSO obligations. Accordingly, those who implement or use a standard may be subject to patents that are not subject to the SSO Patent Policy (including any associated RAND licensing commitment). The topic of third party patents, which can lead to patent holdup, will be considered in the following subsections.

3.5.1 *Member Disclosure of Third Party Patents.* Many SSOs request or encourage members to disclose third party "essential" patents. However, SSOs typically do not require such disclosure for various reasons. Although the *Seagate* case[35] has imposed a higher threshold (of "objective recklessness") for willful infringement and enhanced damages, parties are still reluctant to identify third party patents they have a belief may be infringed over willfulness concerns. Moreover, disclosing another's patent as potentially "essential" may also be used against the discloser in future litigation.

The case of *Telcordia v Cisco*,[36] although not involving a third party patent, raises some interesting considerations. In the *Telcordia* case, one of the grounds the court relied on to show willfulness was that Cisco argued that Telcordia technology should not be included in an ATM Forum standard because it would not be licensed under what Cisco considered RAND terms.[37] Because the patent was not disclosed to the standard group, however, enhanced damages were not

---

[33] The European Telecommunications Standards Institute (ETSI) recently initiated an IPR database. "The ETSI IPR Database allows public access to information at any time with respect to IPRs which have been notified to ETSI as being essential, or potentially essential, to ETSI Standards and Technical Specifications. Unless otherwise specified, all IPRs contained in the ETSI IPR Database have been notified to ETSI, with an undertaking from the IPR owner to grant licenses according to the terms and conditions of Clause 6.1 of the ETSI IPR Policy." See article at http://www.etsi.org/WebSite/AboutETSI/LegalAspects/iprdb.aspx
[34] AIPLA delegates meeting with DoJ in September 2009.
[35] *In re Seagate LLC*, 497 F.3d 1360 (Fed Cir 2007)
[36] *Telcordia Techs., Inc. v. Cisco Sys.*, 592 F. Supp. 2d 727 (D Del 2009)
[37] 592 F. Supp. 2d at 746

9

38
CONFIDENTIAL BUSINESS INFORMATION,
SUBJECT TO PROTECTIVE ORDER

MS-MOTO_1823_00002280011

awarded.

The *Telcordia* case points out a Hobson choice for an SSO member who uncovers a potentially problematic patent. If the member does not disclose a potentially essential patent, it could later hold up the standard and block the member from implementing. However, if the member discloses the patent, it risks a willfulness charge.

The case also points out to the patent holder a possible consequence of not disclosing an "essential" patent to the SSO.[38]

   3.5.2 *Third Party Interests*. The third party patent holder has various reasons for not disclosing its patent to an SSO, aside from being unaware of the standards activity. Once identified, a patent can be designed around by an SSO, if alternatives are available. Moreover, if the patent holder waits until the standard is approved and widely adopted and difficult to change because of lock-in, loyalty, and switching costs, better terms and rates can be realized. Staying outside the SSO also leaves injunction more readily available – if the third party has not entered any licenses or made any licensing commitment, a court may be more disposed toward granting an injunction.

That said, a third party has reasons for not remaining quiet. Its technology might never be considered for or supported for inclusion in the standard and the patent holder may forego return on its R&D investment. Moreover, a product maker who may have already paid a patent pool or others to access their patented technology may be reluctant to pay a new licensor. In addition, although other factors may also be considered, rates set by other patent holders may become customary for the field and could influence the royalties available to the delaying patent holder.

Further, in that injunction and enhanced damages involve judicial discretion and equities, a patent holder may improve its position by disclosing its essential patent. Recently, the FTC proposed that all of the *eBay* factors should be informed by the impact on and interests of standards.[39] Evidence of patent holdup – especially under the limited situation of a knowing nondisclosure of an "essential" patent until after its necessary technology is locked in – could steer away from injunction.

   3.5.3 *Risks of SSOs Identifying Third Party Patents*. In addition to asking patent holders to disclose patents believed to be "essential", the question of SSOs themselves investigating the patent landscape has been considered. The process would include SSO members identifying major features of the standard and asking a private (e.g. law firm) or governmental organization (e.g. patent office) to conduct a search. Results could then be reviewed.[40] However, many in the standards community have been unreceptive to this suggestion. Although search strategies have improved over the years,[41] it is argued that such an endeavor would be costly, would uncover too many patents – including some "false positives" – and would miss some relevant essential patents,

---

[38] The question of when a patent holding member can seek injunction and/or enhanced damages is another difficult issue which is discussed elsewhere in this Comment.
[39] See *FTC IP Marketplace Report* at page 28: "Courts should give careful consideration under each of eBay's four factors to the consequences of issuing an injunction prohibiting use of a patented invention incorporated into an industry standard. Whether the patent owner made a RAND commitment will also be relevant to the injunction analysis."
[40] The European Patent Office has indicated it would perform such a search.
[41] Over the years, more sophisticated searching techniques have been developed and the possibility of lost or misfiled patents [as in the days of paper] have been reduced in the electronic era.

CONFIDENTIAL BUSINESS INFORMATION, SUBJECT TO PROTECTIVE ORDER

MS-MOTO_1823_00002280012

and would cause undesired delay in standard approval, especially where a standard has many features.[42] While it may be better to uncover "essential" patents before the standard is widely adopted and costs are sunk into the technology, SSOs have generally not seen the potential benefit warranting the cost of such an effort. Moreover, traditional SSOs generally eschew patent issues.[43]

*Items for Consideration: No Enhanced Damages for Nonresponsive Third Party.* Currently, SSOs can avoid antitrust liability when engaged in standards development activities related to standards registered under the Standards Development Organization Advancement Act of 2004 (SDOAA). Analogously, should nonresponsiveness be a factor operating against enhanced damage liability if a third party patent holder fails to respond to a bona fide request for information from an SSO about a specific patent claim(s), where the standard's specification standard is made available to the patent holder for the purpose of reviewing it against such claims? [It might not be reasonable to urge a patent holder to conduct a review and then make it buy the standard's specification.] With this measure, SSOs are not penalized for good behavior – asking a patent holder about a potential "essential" patent – and a third party who is provided with information to investigate is not rewarded for sitting on its rights. The third party is not precluded from injunction or compensatory damages.

Commentators have noted other potential risks with SSOs identifying third party patents. Parties who use patents defensively might be urged to take more aggressive licensing postures if they receive inquiries about their essential patents. Also, patent holders unaware of their "essential" patents might be awakened.

- On the other hand, many implementers would prefer to surface "essential" patents early so they can be addressed in the early stages of the standard development. Specifically, such patents can be designed around or reasonable licensing terms can be solicited and negotiated when bargaining positions are more even. Moreover, defensive patent holders may advise others that they will assert only when attacked. Courts and agencies should respect such defensive actors who promote competition and should not impose estoppel or laches if the defensive patent holder is triggered into asserting its patent.

4. RAND COMMITMENT

*4.1 Enforceability.* Many SSO membership agreements, bylaws, and policies are between the member and the SSO. In these instances, the question arises as to whether members and non-member implementers have enforceable rights under those documents. There are various legal bases to support enforceability.

Although the parties may not sign the membership agreement at the same time, there is an expectation by one member that the other members will comply with their obligations. Hence, there is an understanding among the members that each will perform its obligations. Depending on the SSO, members may agree to disclose their "essential" patents [as described in the prior section] and/or make their "essential" patents available for licensing under terms that are Reasonable And NonDiscriminatory ("RAND"). More generally, the parties at least tacitly agree to set a

---

42 The suggestion was raised at an ETSI meeting where opposition was voiced.
43 The ANSI Patent Policy, for example, states that "The Institute [SSO] shall not be responsible for identifying all patents for which a license may be required by an American National Standard or for conducting inquiries into the legal validity or scope of those patents that are brought to its attention." ANSI Patent Policy 3.1.4

11

40
CONFIDENTIAL BUSINESS INFORMATION,
SUBJECT TO PROTECTIVE ORDER

MS-MOTO_1823_00002280013

technology, possibly not their own, as the standard the industry will use.[44] Hence, there is arguably a contract among the members of the SSO.

In addition, as between members, estoppel and implied license may apply, especially in a context where parties have agreed to specific license terms or have agreed not to assert patents.[45]

In a November 2010 complaint, Microsoft alleged breach of actual or implied contract, promissory estoppel, waiver, and declaratory judgment against patent holder Motorola (later Motorola Mobility), for allegedly not licensing essential patents under RAND terms as committed under the policies of the IEEE and ITU for the H.264 and WLAN standards. Microsoft alleged that Motorola entered an agreement for the benefit of members and implementers of the standard – making Microsoft a third party beneficiary. Microsoft seeks to enjoin Motorola from demanding royalties that allegedly exceed RAND.[46]

In other cases, implementers have asserted fraud,[47] antitrust claims,[48] and patent misuse and unenforceability claims[49] against patent holders who allegedly refused to honor licensing commitments. An implementer's claim for specific performance as a third party beneficiary seeking a license on RAND terms was not dismissed.[50]

Where many implementers are not SSO members and may not have agreed to the SSO Patent Policy or bylaws, direct contractual theories may be less applicable. However, third party beneficiary rights are available. To help assure these rights, SSOs might consider stating in their policy documents (bylaws, Policies, and membership agreements) that implementers are "intended beneficiaries of the policy"[51] (as opposed to merely incidental beneficiaries whose rights are more speculative).

Assuming that the standard is not closed (i.e. limited to members only), there are practical reasons for non-members enforcing a commitment made pursuant to an SSO policy and/or patent holder statement. Who else will enforce the commitment? Many thinly capitalized SSOs do not have the interest or finances or incentive to pursue an action, and may also wish to avoid being caught in the middle between two battling members. Moreover, while the SSO has an interest in supporting its

---

[44] In the competitive market, the standard is a singularity in which parties agree to a common technology. Members are generally free to develop products and even standards that compete with a standard but, in the standard itself, a single technology normally is approved to the exclusion of others in order to achieve a higher public or industry purpose.

[45] See *OpenWave* case (supra) where a court found a patent unenforceable for estoppel and waiver. See also TEN THINGS TO DO ABOUT PATENT HOLDUP OF STANDARDS (AND ONE NOT TO) by Mark Lemley, 47 B.C. L. Rev 149 at 157 (2007).

[46] On May 31, 2011, the court refused to dismiss any of Microsoft's counts except for the declaratory judgment count which was viewed as "duplicative" and the "waiver" count, waiver being a defense predicated on injunctive relief sought by patentee. See Microsoft Corp v Motorola Mobility Inc, C10-1823jLR and C11-343JLR (WD Wash 2011).

[47] In *Rambus v Infineon*, 318 F.3d 1081 (Fed. Cir 2003), the court found no fraud in that the withdrawing SSO member warned JEDEC and its members that it may acquire essential patents and assert them.

[48] In *Broadcom v Qualcomm* (3rd), 2007 U.S. App. LEXIS 21092 (3rd Cir 2007), the court did not dismiss an antitrust claim premised on a patent holding SSO member "deceiving" an implementer by demanding non-RAND terms.

[49] See *Princo v ITC and Philips*, 563 F3d 1301 (Fed Cir 2009) in which defendant alleged tying between nonessential and essential claims to standard and failed to prevail on patent misuse where court found that patent could be essential.

[50] *ESS Technology Inc v PC-Tel Inc*, No.. C-99-20292 RMW, 1999 U.S. Dist Lexis (ND Cal 1999)

[51] See *ESS Tech v PC-Tel*. [No.C-99-20292 at 5 (ND Cal. 1999).]

41
CONFIDENTIAL BUSINESS INFORMATION,
SUBJECT TO PROTECTIVE ORDER

MS-MOTO_1823_00002280014