developed standards, the pecuniary debate is with the patent holder and the implementer whose products and business may be at risk. Even if the SSO does engage in an action, remedies would seem limited and inadequate.

*4.2  RAND Commitment and Patent Disclosure.*  The licensing commitment can influence the disclosure obligation (if any). A broad licensing commitment [especially one without a royalty] can reduce the importance of a patent disclosure duty. If a patent will be licensed at no charge or if there is a RAND commitment, one might ask "why is disclosure needed?"

First, given the vagueness of RAND, developers might be skeptical even if there is a RAND licensing commitment. In *Lucent v Gateway*,[52] a case involving the issue of "reasonableness" in a damages context,[53] the patent holder asked the jury to award $560 million as "reasonable" royalties in a damages calculation, a defendant proposed $6.5 million, the jury awarded just over $350 million, and the court challenged the premises on which the expert evaluating "reasonableness" relied. Moreover, the vagueness is further highlighted in the *Georgia Pacific* analysis[54] which includes 15 factors to be weighed, which can understandably lead to disparate results.

With RAND being vague, a disclosure requirement can help identify at least some of the patents that may be subject to the RAND process to fence the issue.

Second, at the FTC Workshop, some of the panelists noted the importance of identifying who the patent holders are. Does the implementer have a cross-license with the patentee? What rates and terms is the patentee known for? How many patentees will the implementer be negotiating with? Is the patentee a member of a related patent pool – which can inform the implementer's perspective on the patent? Patent disclosure can help uncover such information.

Third, if there are multiple alternative technologies of like merit, patent information may be a factor to consider. Oftentimes, patented technology – deemed valuable enough to warrant patenting – is superior to alternatives and provides added value to the standard.[55] However, in other instances, SSOs may select an alternative with no known patents involved or may seek a design around.

Fourth, disclosure can help clarify whether a patent is considered "essential", at least to the patent holder, and may be subject to the RAND commitment.

The disclosure obligation is often limited. Nonetheless, where the RAND commitment may be vague and without a recognized meaning, whatever information the disclosure mechanism can provide can be helpful.

*4.3  What are "Reasonable" and "NonDiscriminatory" – SSO  Guidance?*  The RAND model has been part of standards practice for decades with considerable success in many fields and standards. However, in emerging growth fields where the value of patents and standards are increasingly appreciated, local and global disputes have become more common.

---

[52]  See *Lucent Techs., Inc. v. Gateway,* 580 F.3d 1301 (Fed. Cir. 2009)
[53]  See 35 USCode 284 in which damages shall, "in no event be less than a reasonable royalty."
[54]  See *Georgia-Pacific Corp. v. United States Plywood Corp.,* 318 F. Supp. 1116 (SDNY 1970)[54]
[55]  In the *Princo* case, a Lagadec patent could be essential to the standard and could be used outside the standard. A patent pool member agreed  not to license  Lagadec outside the standard, which could add value to the standard. [As an aside, the court found no antitrust violation.]

13

CONFIDENTIAL BUSINESS INFORMATION,
SUBJECT TO PROTECTIVE ORDER

MS-MOTO_1823_00002280015

At the FTC Workshop, a number of soft spots were identified in defining the RAND elements. Several panelists indicated that for each implementer, the patent holder would gather information about field, product projections, geography, etc. Each licensee would receive its own tailored agreement. It was also noted that licensees frequently license products or portfolios and do not acquire licenses to just the standard or "essential claims." Also, some patents can be essential in some contexts and nonessential in other contexts.

Another panelist discussed difficulty in approaching the owner of an essential patent(s), observing that the prospective licensee was asked to sign a confidentiality agreement as a precondition to negotiation.

These premises present a difficult puzzle which has been further complicated by recent court decisions. In *Lucent v Microsoft*[56] and *ResQnet v Lansa*,[57] the use of "comparables" in assessing "reasonableness" has been tightened. Lump sum versus royalty bearing agreements were distinguished and, before relying on rates for patents on other inventions, the patentee had to closely tie prior agreements to the subject invention.[58]

These cases further underscore the complicated nature of the RAND paradigm.

The *Georgia Pacific* case provides some guidance on "reasonableness" but must be tailored for use in standards. For example, factor five discusses "The commercial relationship between the licensor and licensee, such as, whether they are competitors in the same territory in the same line of business; or whether they are inventor and promotor." When a company joins a standards effort, it recognizes that technology other than its own may be selected and that a prevailing competitor may realize benefits from the selection. However, the company looks to RAND and a tacit understanding that it will not be unfairly "disadvantaged" because it is a competitor and not a customer.[59]

The FTC Marketplace Report provides some principles that warrant consideration in assessing RAND. Royalties should reflect the economic value of the invention contributed by the inventor. Standards represent an accepted singularity in an otherwise competitive market – providing an industry and sometimes government approved monopoly for a specific technology. To the extent that this approach focuses value on the invention itself as opposed to standardization effects, it provides fair return to the inventor and provides fairness to the implementer and user.

The FTC Marketplace Report also limits application of the Entire Market Value Rule, referencing the Uniloc decision.[60] Providing the correct "base" for computing royalties or damages helps ensure "reasonableness" especially in standards where the invention may be a single feature in a larger specification or product. It should be recognized, however, that the royalty is computed from the royalty rate and royalty base, and that the parties should have the flexibility to set terms that are workable and practical. For example, the prospective licensee may find it easier to report sales of a

---

[56] *Lucent Techs., Inc. v. Gateway,* 580 F.3d 1301 (Fed. Cir. 2009) at 1327-8
[57] 594 F.3d 860
[58] 594 F.3d at 871 (Fed Cir 2010): "The court must carefully tie proof of damages to the claimed invention's footprint in the marketplace...[requiring] sound economic proof of the nature of the market and likely outcomes with infringement factored out of the economic picture."
[59] See *Broadcom Corp. v. Qualcomm Inc.*, 2007 U.S. App. LEXIS 21092 (3rd Cir 2007) where Broadcom alleged discriminatory rates between customers and noncustomers.
[60] *Uniloc USA, Inc. v. Microsoft Corp.*, 2011 WL 9738 (Fed. Cir. 2011).

CONFIDENTIAL BUSINESS INFORMATION,
SUBJECT TO PROTECTIVE ORDER

43

MS-MOTO_1823_00002280016

product that it tracks, and the licensor may find it easier to audit the system sales rather than the sales of an included patented component. A one percent royalty applied to a $10 patented component that implements a standard is the same as a 1/10 percent royalty applied to a $100 product that includes the patented component, but for which the licensee has available sales information.

A particularly thorny topic involves "patent stacking." There may be numerous patented technologies of numerous parties incorporated into a standard, and multiple standards (with multiple essential patents) in a single product. In some instances, patent pools arise in such circumstances. In a pool, numerous patentees agree to license all their "essential" patents for a fixed cumulative price and the pool members divide up the income according to an algorithm.

Recently, ostensibly to address a "stacking" situation, a number of companies in a Next Generation Mobile Networks ("NGMN") Alliance[61] implemented, for the Long Term Evolution (LTE) standard, an approach by which patent holders confidentially submitted royalty rates to a trusted third party, who aggregated received information without disclosing what individuals submitted. A number of the parties have posted their respective [maximum] royalty rates. Such experimental approaches can be useful in addressing patent "stacking" and providing valuable business information to those implementing and using standards.

One commenter[62] has urged that the standard declare an aggregate royalty cap to address such stacking situations -- which would be akin to a patent pool. The aggregate royalty approach has been questioned by others and has not, to our knowledge, been adopted by an SSO (as opposed to a pool).

In considering a reasonable royalty for a patent in a "stacking" context, a court might consider how many patents have been disclosed to the SSO, how many companies have identified licensing terms and conditions (e.g., royalties) for essential patents in the standard, and how many other standards and non-standards technologies (with applicable patents) may relate to the product. This "patent context" inquiry finds basis in the *Georgia Pacific* case. Factor 13 provides that "The portion of the realizable profit that should be credited to the invention as distinguished from non-patented elements, the manufacturing process, business risks, or significant features or improvements added by the infringer." Also factor 15 proposes a hypothetical negotiation between a willing licensor and willing licensee – where the licensing context should be a consideration in such a negotiation. More recently, the licensing context approach seems supported by the FTC Marketplace Report which provides that the economic value of the invention be compared to the value of other portions of the standard and product in determining a reasonable royalty.

As a patent holder and licensor of its patents and technology, IBM appreciates that such measures strike a balance between promoting and rewarding innovation while recognizing the importance of nurturing competition in the standards world. As one commenter observed at the FTC Workshop, businesses, customers, and the economy all benefit when new and valuable technologies are introduced into and made available for standards.

*4.4 SSOs Prescribe License Terms.* One major SSO, OASIS, authorizes its working groups to

---

[61] http://www.slideshare.net/alexglee/strategic-patent-management-in-mobile-telecom (Nov 2009)
[62] Nokia Response, Contact Tim Frain, July 8, 2011.

15

CONFIDENTIAL BUSINESS INFORMATION,
SUBJECT TO PROTECTIVE ORDER

44

MS-MOTO_1823_00002280017

select from among four IPR modes.[63] One of the modes is "Royalty-free (RF) with Limited Terms" in which the major substantive terms are specified and only boilerplate (such as choice of laws) may be added to the license agreement. In this mode, the members, comprised of various stakeholders with varied interests, determine that they will forego royalties and that they will comply with a common set of terms. While having no payment provision facilitates the use of common terms, OASIS also sets out a framework of common terms for the other modes as well, including the RAND with royalty mode. The W3C, which also develops standards for the worldwide web, also includes a set of terms and conditions in Section 5 of its Patent Policy.[64]

This paradigm is convenient, saves the expense and time of negotiating independent licenses, and lessens concerns about discrimination. However, in this regime, patent holders forego much of the opportunity to tailor terms.

*4.5  Reciprocity and Defensive Termination or Suspension* The *General Patent Statement and Licensing Declaration Form for ITU-T/ITU-R Recommendation* authorizes a patent discloser to select the following option along with a RAND license assurance: *"Also mark here if the Patent Holder's willingness to license is conditioned on reciprocity for the above ITU-T/ITU-R Recommendation."*

If a patent holder grants a license to patented technology needed to implement a standard, elemental fairness dictates that the patent holder can protect itself from being enjoined from implementing that same standard by licensee's essential patent(s).  Hence, a patent holder conditioning a royalty free license or a nonassert on reciprocity  should raise no issue.

Similarly, defensive termination (or suspension) should raise no issue when a granted license or covenant not to sue is revoked if the licensee (or beneficiary of the covenant) brings action against the grantor in a standards context. While defensive termination is triggered after a "grant" is made and reciprocity generally applies before a license entered, the same fairness notion applies.  The defensive measure is more suitable to some circumstances than is reciprocity – for example, in the Open Source world where posted promises not to assert are often used.

A standards-related patent case[65] recognized the appropriateness of reciprocity and  rejected a contention that a mandatory cross-license was anticompetitive or an antitrust violation: "Conexant has not identified any authority for the proposition that cross-licensing constitutes antitrust conduct. Generally, cross-licensing is considered procompetitive practice because it can facilitate the integration of complementary technologies. See U.S. Dept of Justice and FTC, Antitrust Guidelines for the Licensing of Intellectual Property (1995). In fact, the terms of the licensing proposal indicate that 3Com sought cross-licenses for technologies which 'are specified in the V.PCM Standard or are related to V.PCM technologies and are otherwise practically necessary or desirable, for technical or economic reasons, in order to make a commercially viable product compliant with the…standard.'"[66]

In the standards context where the SSO may impose a RAND commitment, the appropriateness of a grant back or reciprocity or defensive termination provision is influenced by the "reasonableness" requirement.  For example, an SSO might consider a grant back that covers

---

[63]  http://www.oasis-open.org/policies-guidelines/ipr
[64]  http://www.w3.org/Consortium/Patent-Policy-20040205/#def-RF
[65]  See *Townshend v Rockwell*, 2000 U.S. Dist LEXIS 5070, 55 USPQ2d 1011 (ND Cal 2000)
[66]  Id at *25

CONFIDENTIAL BUSINESS INFORMATION,
SUBJECT TO PROTECTIVE ORDER

45

MS-MOTO_1823_00002280018

interdependent standards (or standards developed by the same SSO) as reasonable.[67] That is, an SSO might consider that a member licensing another to practice one SSO standard ought not to be precluded from implementing an interdependent standard based on an essential patent of the licensee.

In the OASIS Policy (described above),[68] the scope of reciprocity and defensive termination is prescribed for its various IPR modes.

*4.6 Licensing Commitments and Transfers of "Essential" Patents.* Questions regarding standards and the transfer of "essential" patents cover two different interests. First, when a patent holder has granted a license, does the license survive a transfer of the licensed patent? Under U.S. law, the patent license continues.[69] However, under the laws of some countries, this premise is not followed as strictly.

Second, a question also arises when an "essential" patent, that is subject to a *commitment* to license but not a license itself, is transferred to a third party. U.S. law is not as certain regarding the survival of license commitments following transfer. Whether the principle of *nemo dat quod non habet* ["you can't give more than you have"] applies to the commitment – so that any transfer includes a carve out for prior commitments – is still to be clarified.

Recently, several cases have highlighted instances in which prior patent holders have made commitments and a later transferee questioned whether the commitment applied to them. In the *N-Data* case,[70] National Semiconductor transferred "essential" patents for an IEEE standard to Vertical who, in turn, transferred them to N-Data who sought royalties that far exceeded the $1000 commitment made by National. National made the commitment to persuade the standards developers to select its technology. The FTC found that the commitment flowed to N-Data.

In the recent Nortel bankruptcy,[71] a number of companies and a standards body[72] filed motions aimed at preserving licensing commitments related to patents being sold off by the debtor in bankruptcy. While the debtor (Nortel) proposal agreed that patent transfers would be subject to existing licenses, commitments made to SSOs were not addressed in the early proposal. Some of the concerned companies created an entity ["Rockstar"] that purchased the patents in an auction for a reported $4.5 billion and announced that the standards commitments would be honored. While this matter was resolved, more certainty is warranted.

The bankruptcy of German company Qimonda AG ("QAG") also raises a question about bankruptcy transfers and licensing commitments to SSOs. In *In re Qimonda AG*,[73] a German insolvency administrator sent letters to terminate existing licenses. Qimonda has also taken steps to

---

[67] See ABA Standards Development Patent Policy Manual at pages 61-63.
[68] See OASIS Policy at Sections 10 and 11 at http://www.oasis-open.org/policies-guidelines/ipr
[69] See *Novon Int'l, Inc.*, 2003 U.S. Dist. LEXIS 4782 (ND Ill 2003) (the court found that "the assignee of a patent [took] 'subject to the licenses previously granted by assignor.'" (citing Walker on Patents § 19:22)); *Jac USA, Inc. v. Precision Coated Prods., Inc.*, 2003 WL 1627043, at *12 (N.D. Ill. Mar. 25, 2003); and *Sanofi, S.A. v. Med-Tech Veterinarian Prods., Inc.*, 565 F. Supp. 931, 939 (D.N.J. 1983) (the court held that "[T]he purchaser of a patent takes subject to outstanding licenses.") The principle is also discussed by Brunsvold & O'Reilly, *Drafting Patent License Agreements*, at § 12.00
[70] See *In re Matter of Negotiated Data Solutions LLC*, No 0510094 at http://www.ftc.gov/os/caselist/0510094/080122dc.pdf
[71] See *In re Nortel Networks Inc*, Chapter 11 Case No. 09-10138 (KG) (Bkcy Del 2011)
[72] Id at #5816 (See IEEE Objection to Nortel Sale Free and Clear)
[73] Case No. 09-14766-RGM, United States Bankruptcy Court for the Eastern District of Virginia

17

CONFIDENTIAL BUSINESS INFORMATION, SUBJECT TO PROTECTIVE ORDER

MS-MOTO_1823_00002280019

sell its patents "free and clear" of encumbrances, which could impact not only licenses but commitments to grant licenses.[74] A number of QAG patents have been listed on a JEDEC SSO patent list. Parties have raised standards issues in objections filed against QAG actions that would revoke licenses and commitments related to allegedly essential patents. The case is pending.

Unlike other patent transfer scenarios, the bankruptcy context overlays laws and rules that may impede a party's ability to enforce RAND or other standards' commitments.

While it would be beneficial if laws followed the premise of preserving licenses, SSOs can address some of these situations through Policy provisions. For example, the IEEE[75] and other SSOs have added provisions requiring transferors to notify transferees or somehow continue the rights after the transfer. This may be implemented by either flowing the obligations of transferor to transferee, or by the transferor reserving the right to grant licenses committed through standards. These approaches generally address "essential claims" that are transferred, without identifying the patents by number.

These measures do not come without a trade-off. The patent transfer process may be more complicated because of such "license preserving" provisions.

Recognition by courts and agencies or the legislature that license rights and license commitment rights in standards "run with the patent" could further recognize the rights and the expectations of the parties in a patent sale.

Such measures should help ensure that patents licensed and/or committed by a patent holder will not become a "third party patent" in the hands of a transferee or successor in interest.

> *Items for Consideration:  Prevent Patent Holdup by Clarifying the Span and Certainty of Licensing Commitment and Reducing the Number of Third Party Patents.  A number of the comments submitted to the FTC stress that "third parties" are not subject to SSO Policy. If a party wishes to steer clear of the standards process and, perhaps, even compete with it, it should be free to do so.*
>
> *However, SSO Policies should carefully consider how patents which should be "essential" do not avoid that status. A number of these measures are prompted by recent cases. Specifically,*
>
> - *Affiliates. Are corporate affiliates and employers of signatories subject to the licensing commitment? If not, they are like third parties. This can be especially problematic if the corporate member who owns  the "essential" patents is not the corporate member who is participating in and committing to license its "essential" patents. Many SSOs seek to cover corporate family members' patents. Consideration as to how these policies could be strengthened would be useful.*
>
> - *Member Withdrawal. Does a party withdrawing from a standards effort have any commitment? Does  its commitment continue with respect to any necessary patents or applications it owns or acquires, based on whatever standard it voted on, or had an opportunity to review, which is included in a final standard? SSOs can consider*

---

[74] The Administrator contends that German law (and U.S. cross-border bankruptcy law)  allows for termination of "executory" license contracts. The matter is in litigation.

[75] IEEE Patent Policy

CONFIDENTIAL BUSINESS INFORMATION,
SUBJECT TO PROTECTIVE ORDER

MS-MOTO_1823_00002280020

*properly framing the withdrawing party's obligations to avoid overcommitment while providing reasonable protection to other members. [Consider the Rambus case.]*

- *Opt-out. Some SSOs allow members to exclude patents from the licensing commitment by disclosing them. These patents are akin to third party patents except that they have been disclosed. The timing of such opt-out, which is a trade-off between patent holder review toward the end of the process versus standards developer risk in having to redesign after a lengthy development period, can impact licensing leverage and standard success. SSO consideration of opt-out terms can help address potential holdup.*

- *Experts and Feedback. If parties who contribute or provide feedback to a standards specification are not subject to the RAND commitment, those parties' "essential" claims may be asserted as third party patents. Consideration as to how expert inputs are regarded can help address a specific instance of potential holdup. One issue of interest is whether the license commitment is limited to the expert's controlled patents or extends to "essential" patents of its employer.*

- *"Essential Claim" Definition. A narrow definition of what an "essential" claim can take a patent outside the range of what is to be disclosed and subject to licensing commitment. For example, some definitions of "essential claim" include exclusions or limitations that could turn a necessary or essential claim into a nonessential one to which the RAND commitment does not attach. The definition of "essential claim" is drafted by those who wish to understand and circumscribe what patents they commit to license, on the one hand, and by those who wish to avoid standards that require access to patent claims defined as nonessential and not subject to a RAND commitment. If an SSO references other standards – which themselves may have "essential" patents – the SSO Policy should clearly indicate if those patents are subject to the licensing commitment. Clarity in the "essential" claim definition can help avoid patent disputes.*

- *"Essential Claim" Survival. Can an "essential claim" lose its status (and regain it)? Consider a claim that is designated "essential" today [when the standard is approved], but a noninfringing alternative arises a year later after manufacturing costs have been sunk in. In some SSOs, the alternative may not even be a commercially viable alternative but the "essential claim" could become "not essential" and not subject to the licensing commitment. An SSO might consider whether it wishes to address this potential holdup.*

*4.7 Commitment and injunction* A number of cases[76] have arisen which raise the question "When can a patent holding SSO member, who is committed to licensing "essential" patents RAND, seek injunction against an allegedly infringing implementation of the standard?" In *CSIRO v Buffalo*,[77] an injunction was granted to a patent holder who committed to license the subject patents under RAND terms for one of the involved standards, where the patent holder allegedly made license offers that defendant rejected.

---

[76] See the "Orange Book decision" in the German Federal Supreme Court [May 2009] and *Philips v Kassetten* [Dutch Court March 2010].

[77] See IEEE Patent Policy at http://www.ieee802.org/1/pages/patent.html

19

CONFIDENTIAL BUSINESS INFORMATION,
SUBJECT TO PROTECTIVE ORDER

MS-MOTO_1823_00002280021

For those SSOs that include a RAND commitment, the importance of that commitment to the standards ecosystem must be recognized. However, it is also recognized that situations apply in which patent holders should be entitled to seek injunction or other remedies. For example, an implementer who rejects a bona fide RAND license offer and refuses to negotiate should not seek cover under the commitment. An implementer who asserts its essential patents against a member could likewise be outside the commitment. In such circumstances, injunction and other remedies may be available.

Whether a patent holder seeking an injunction is an SSO member or not, the court should include in its assessment of factors under the *eBay v MercExchange* case,[78] patent holdup and other consequences that will impact standards, implementers, users, and industries. As noted in the FTC Marketplace report:

> Courts should give careful consideration under each of *eBay's* four factors to the consequences of issuing an injunction prohibiting use of a patented invention incorporated into an industry standard. Whether the patent owner made a RAND commitment will also be relevant to the injunction analysis.[79]

SSO efforts to clarify when an injunction may be sought notwithstanding a licensing commitment can be procompetitive in better informing the parties of their rights and obligations and expectations in avoiding patent holdup in vital technologies.

### *Items for Consideration:  RAND Commitment and  Patent Holdup*

- *Notice before Payments. Patent holders can, in some instances, recover damages before notifying a standards implementer of the "essential" patent.[80] An SSO Policy could provide that SSO members/participants can collect royalties (or damages) only for infringements that first occur after an "essential" patent has been actually noticed  to the implementer or disclosed to the SSO.  This measure would also promote early disclosure of the "essential" patent. It may be argued that this limits patent holder rights. On the other hand,  if the member has delayed disclosure, should s/he be rewarded? If the member was unaware of the infringement, a balance may be drawn between allowing enforcement of rights under the statute resulting in an unexpected return and disrupting the standard and the other SSO members and implementers.[81]*

- *Notice to SSO before Targeting Standard. The recent Fujitsu v Netgear decision[82] allows a patent holder to show infringement of  an "essential" claim based on standards compliance.[83]  Enforcement tribunals should consider delaying or staying the start  of an injunction that is based on the standard (rather than a product) until a specified time has*

---

[78] 547 U.S. 388 (2006)

[79] FTC Marketplace Report at page 28

[80] In the U.S., patent marking (on the product) and method claims may permit the recovery of damages before actual patent notice under 35 USCode 287. Outside the U.S., damages may be recovered for the past. This provision would cover these instances.

[81] This measure is in the TMForum Policy. Contact  http://www.tmforum.org/ContactUs/746/home.html

[82] See *Fujitsu v Netgear*, Case: 3:07-cv-00710- bbc (WD Wisconsin 2009),

[83] This facilitates the infringement proceeding for the patent holder, although the implementer has an opportunity to respond that the claim is not "essential", the product does not comply with the "required" portion of the standard referenced in the infringement, or the product does not infringe. While use of the syllogism was affirmed by the court, the implementers (defendants) prevailed in the Fujitsu case.

20

CONFIDENTIAL BUSINESS INFORMATION,
SUBJECT TO PROTECTIVE ORDER

MS-MOTO_1823_00002280022

elapsed after the patent holder has disclosed the essential patent to the SSO. This can apply to third parties and instances in which a member seeks injunction. This is a modest measure which can provide the SSO with time to notify members of the alleged infringement by the standard and for the standards developers to respond. This measure can mitigate disruption that a late-disclosed patent can cause. This measure is in sync with the section on "Delaying Injunction" included in the FTC Marketplace report.[84] This measure could also prompt (third) parties to disclose their patents to an SSO.

- _Explicit Waiver._  To waive a licensing commitment made by the holder of an "essential" patent, an implementer should affirmatively refute the commitment by statement or action.  In a recent case,[85]  an implementer was found to have apparently waived a patent holder's commitment to license an "essential" claim[86] RAND based on a settlement agreement covering another matter. The settlement  agreement license allegedly excluded the essential patent in the field of the standard.[87]  The defendant, however,  had worked with the patent holder in having the patented invention technology ("UTDOA") included in the standard. Defendant (one of the patent holder's major competitors) was enjoined and subject to enhanced damages for its implementation of the standard.  Clarity in the SSO Policy in defining "essential" claims and in specifying when waiver occurs could help mitigate concerns over when an ancillary agreement  impacts access to patent license commitments to a standard.

_4.8  SSOs and pools._ Patent pools establish royalty rates for a collection of companies' patents, often involving a standard. MPEG LA  has formed a number of patent pools. Recently, the IEEE SSO joined with Via to form pools for some IEEE standards. SSOs should have latitude in experimenting with patent pools whose procompetitive aspects generally outweigh anticompetitive effects, as reflected in various business review letters ("BRL's") from the Department of Justice.[88]

While patent pools have numerous benefits, they involve costs as well. Pools can cut administrative costs, can offer implementers a one-stop option to license many patent holders' patents (thereby avoiding "the stacking problem"), can offer a cumulative and often fixed royalty that is typically lower than all the individual rates combined, and can provide the separate patent owners a "fair" share based on a mutually acceptable formula. However, pools can result in patent holders losing some control over the enforcement of their patents. Also, patent holders can

---

[84]   See FTCMarketplace Report at page 238 citing _i4i Ltd. Partnership v. Microsoft Corp._, 598 F.3d 831, 863-64, 1276-78 (Fed. Cir.), _cert. granted,_ 79 U.S.L.W. 3326 (U.S. Nov. 29, 2010) (No. 10-290). See also "Patent Holdup and Patent Stacking" by Mark Lemley and Carl Shapiro, 85 Texas LR 1991 (2007) ("Holdup problems caused by the threat  of injunction can be reduced if courts regularly grant stays...to give defendants time to redesign their products...")

[85]   See _TruePosition Inc v Andrews Corp,_  568 F. Supp. 2d 500 (DDel  2009)

[86]   The patent holder argued the claim was not essential because it was one of six alternative technologies, one of which had to be implemented to comply with the standard. The court viewed each "option" as a separate standard.

[87]   The Settlement Agreement resolved a dispute (not involving the standard) but excluded  the "essential" patent in the relevant field. The patent holder agreed to a RAND commitment before the Agreement was concluded and also before the standard was concluded and the "essential" patent technology was included in the standard, and before the implementer constructed a standardized system that needed the "essential" patent technology.

[88]   See 2006 VITA BRL at  http://www.justice.gov/atr/public/busreview/219380.htm and 2007  IEEE BRL at http://www.justice.gov/atr/public/busreview/222978.htm

CONFIDENTIAL BUSINESS INFORMATION,
SUBJECT TO PROTECTIVE ORDER

50

MS-MOTO_1823_00002280023

confront actions by the pool that they oppose but which are approved by the majority and which could entail liability. In addition, although "standards" pools, which often include patent holders who worked on the standard, pass antitrust muster, pools may still be subject to antitrust questions.[89]

5. <u>EX ANTE DISCLOSURE AND JOINT DISCUSSION OF LICENSING TERMS</u>

Disclosure of licensing terms during standards development ("ex ante" disclosure) has been discussed by the global standards community in the context of reducing incidents of patent holdup. The distinction between voluntary *ex ante*, in which patent holders (of their own volition) post their licensing terms, and mandatory *ex ante* in which an SSO requires its members to disclose licensing terms while the standard is being developed have been discussed as well. A further aspect of *ex ante* disclosure involves what use the members or SSO make of disclosed licensing terms.

Overall, *ex ante* disclosure has not been widely embraced by SSOs. The most observed example involves the VITA Standards Organization. After confronting four different patent disclosures late in the standards development process, VITA initiated a mandatory *ex ante* disclosure policy in 2006. The VITA experience would be summed up as follows:

- The VITA mandatory *ex ante* policy was re-accredited by ANSI.
- There have been no patent issues arising in VITA since its new *ex ante* policy was adopted
- Less than 10 disclosures have been posted
- VITA members, except for one, continued membership after the new "*ex ante*" policy was adopted
- VITA members are overall satisfied with the organization's performance
- VITA is a relatively small organization with a limited scope relating to a standardized bus system for processors
- Standards parameters are not seriously impacted by the ex ante policy[90]

SSOs, other than VITA, have not adopted mandatory *ex ante* disclosure.

*5.1 Business Considerations with Ex Ante* In mandatory *ex ante*, patent holders are required to state rates and terms before the standard is finalized, perhaps before the market and value of the patent are fully realized. Hence, there is a possibility of being bound to terms which become inadequate over time, as the fields and uses of the patent(s) become better understood. Moreover, the patent holder may be announcing its royalties and terms before other patent holders – which could result in undervaluing the asset. There may also be a cost in negotiating a license agreement upfront, only to discover that "essential" claims are not embodied in the final standard or that the agreement is otherwise ineffective.

Similar considerations influence a party's interest in making a voluntary *ex ante* disclosure, except

---

[89] MPEGLA operates patent pools relating to standards. One pool is directed to a data compression standard. Recently, MPEGLA issued a call for patents on VP8, a technology of Google that allegedly competes with the data compression standard. MPEGLA has reportedly received a number of patents that allegedly read on VP8. The possibility of a pool has been raised. The Justice Department is reportedly investigating. http://www.jhtl.org/archives/2011/03/entry_64.html

[90] Comments by Professor Jorge Contreras at the FTC Workshop

CONFIDENTIAL BUSINESS INFORMATION, SUBJECT TO PROTECTIVE ORDER

51

MS-MOTO_1823_00002280024

that the discloser may be one of a few who make licensing terms known.

These risks and costs are balanced against the value of standards developers and implementers knowing the risk of incorporating standardized features into a standard and the cost of including the feature in a product. With RAND having a flexible, ambiguous span, launching into a standards field without knowing the potential patent costs can impact product plans and business strategy. For the patent holder, competitive disclosed licensing terms could make standards developers more comfortable than with alternatives where patent terms are vague or unknown. In addition, *ex ante* disclosure helps ensure that standardization effects, as opposed to the invention's economic value, do not leverage the licensing terms.

While there are substantial trade-offs in *ex ante*, some concerns are less significant. Some contend that if terms are disclosed *ex ante*, technical people, without legal or business expertise, will engage in licensing issues. As a practical matter, such issues would likely be directed to the member's licensing and legal experts, as they would be if such issues arose after the standard is approved. There is also a contention that standard approval would be delayed as negotiations proceeded. The trade-off here is whether delay before approval (when alternatives are possible) is more problematic than encountering unacceptable terms after the standard is approved with implementers locked in with sunk costs.

*5.2 Anticompetition Issues in Ex ante Joint Discussions*   Concerns over antitrust may have dissuaded standards participants and SSOs from considering *ex ante* policies. A 2007 article by Joel Miller[91] discusses why SSOs do not negotiate detailed license terms before a standard is approved. The author submits that "the prospect of antitrust liability deters an SSO from being a forum for adopters to bargain as a group with participant patentees...SSOs fearing liability for acting, in effect, as a buyers' cartel that artificially suppresses the price the patentee can command for its access to technology."

In recent years, however, the FTC and DoJ and some European agencies have assuaged many of the antitrust concerns with regard to *ex ante* disclosure and to some extent joint discussion of terms.[92] Former FTC Chair Deborah Majoras in September 2005 at Stanford University commented that "joint ex ante royalty discussions that are reasonably necessary to avoid holdup do not warrant per se condemnation. Rather they merit the balancing undertaken in a rule of

---

[91]  "Standard-Setting, Patents, and Access Lock-in: RAND Licensing and the Theory of the Firm" by Joseph Miller, 40 Ind. L. R. 351 (2007)

[92]  See http://eur-lex.europa.eu/LexUriServ/LexUriServ.do?uri=CELEX:52011XC0114%2804%29:EN:HTML paragraphs 287 et seq. [F/RAND ] ("In an appropriate case, it may also be possible to refer to *ex ante* disclosures of licensing terms in the context of a specific standard-setting process. This also assumes that the comparison can be made in a consistent and reliable manner. The royalty rates charged for the same IPR in other comparable standards may also provide an indication for FRAND royalty rates." See Section 290.) See also Section 299. ("Finally, standard-setting agreements providing for *ex ante* disclosures of most restrictive licensing terms, will not, in principle, restrict competition within the meaning of Article 101(1). In that regard, it is important that parties involved in the selection of a standard be fully informed not only as to the available technical options and the associated IPR, but also as to the likely cost of that IPR. Therefore, should a standard-setting organisation's IPR policy choose to provide for IPR holders to individually disclose their most restrictive licensing terms, including the maximum royalty rates they would charge, prior to the adoption of the standard, this will normally not lead to a restriction of competition within the meaning of Article 101(1) [124]. Such unilateral *ex ante* disclosures of most restrictive licensing terms would be one way to enable the standard-setting organisation to take an informed decision based on the disadvantages and advantages of different alternative technologies, not only from a technical perspective but also from a pricing perspective.")

23

CONFIDENTIAL BUSINESS INFORMATION,
SUBJECT TO PROTECTIVE ORDER

MS-MOTO_1823_00002280025

reason. We would apply the rule of reason to joint *ex ante* royalty discussions because, quite simply, they can be a sensible way of preventing holdup, which can itself be anticompetitive...Transparency on price can increase competition among rival technologies striving to be incorporated into the standard at issue..."[93]

A speech by Hewitt Pate, Assistant Attorney General for Antitrust Division, Department of Justice has remarked that  "It would be a strange result if antitrust policy is being used to prevent price competition. There is a possibility of anticompetitive effects from ex ante license fee negotiations, but it seems only reasonable to balance that concern against the inefficiencies of ex post negotiations and licensing holdup."[94]

There may be instances in which antitrust may arise from joint activities. If considering  licensing terms leads to product "price fixing", or if the parties collude to exclude a party's technology, or if the buyers use their market power to form an anticompetitive cartel, antitrust concerns may arise. Although such instances may be rare, SSOs and their members may, in abundance of caution, avoid even the possibility of impropriety.[95]

Statements or guidance by agencies clarifying what conduct gives rise to potential issues in the joint discussion context would be helpful to those SSOs who might consider *ex ante* disclosure.

### *Items for Consideration:  Patent Holdup, Joint Discussions and Alternative Dispute Resolution*

* *Patent Holder and ADR Benefit. It is suggested that the use of alternate dispute resolution, under SSO Policy, could be a useful tool in potential holdup situations.[96] Implementers have charged patent holders with anticompetition charges based on non-compliance with a RAND commitment.[97] To avoid the delay and expense of litigation, SSOs might consider options for alternative dispute resolution (ADR),[98] such as third party mediation, to address RAND anticompetition issues.  ADR was the subject of a recent standards–related case. In a case involving two SSO members,  implementer Zoran alleged that DTS was not licensing its essential patents on RAND terms and asserted antitrust and patent misuse allegations. DTS argued that the dispute was subject to an arbitration provision in the Blu-Ray Disk Association SSO Policy.  Zoran contended that the arbitration only covered F/RAND determination and not antitrust remedies. The court limited the arbitration to F/RAND -- what the SSO policy provided for.[99] This case raises the following questions. Should SSOs consider ADR and, if so, for what issues? Second, if an implementer/member rejects a member/patentee's offer to engage in an ADR pursuant*

---

[93] Remarks at *Standardization and the Law: Developing the Golden Mean for Global Trade: Recognizing the Procompetitive Potential of Royalty Discussions in Standard Setting* 7-8 (Sept. 23, 2005), available at http://www.ftc.gov/ speeches/majoras/050923stanford.pdf

[94] A speech by Hewitt  Pate, Assistant Attorney General for Antitrust Division, Department of Justice,  with a similar message is also cited.

[95] See *COMMENT: RAMBUS, N-DATA, AND THE FTC: CREATING EFFICIENT INCENTIVES IN PATENT HOLDERS AND OPTIMIZING CONSUMER WELFARE IN STANDARDS-SETTING ORGANIZATIONS* by Theresa Stadheim, , 19 Alb. L.J. Sci. & Tech. 483 (2009) at 490

[96] Vita Standards Organization and other SSOs also have included ,provisions in their Policies.

[97] See *Townshend v Rockwell*, 2000 U.S. Dist LEXIS 5070, 55 USPQ2d 1011 (ND Cal 2000), Zoran Corp v DTS Inc., Case No. C 08-4655 JF (HRL), 2009 U.S. Dist. LEXIS 6675 (ND Cal 2009)

[98] Where situations can differ, participants may be generally more receptive to nonbinding proceedings.

[99] Id.

CONFIDENTIAL BUSINESS INFORMATION,
SUBJECT TO PROTECTIVE ORDER

53

MS-MOTO_1823_00002280026

*to a process established by the SSO for such issues, what are the consequences? And, third, how may the results be used? ADR is becoming more accepted in the IP community and might warrant more consideration in the IP standards community.*

- *Patent Implementers and ADR Benefit. Joint discussion by standards implementers of license terms has been targeted with the labels of buyer cartel, conspiracy, and monopsony.[100] It is suggested that an SSO may include an ADR process to assess alleged anticompetitive conduct relating to joint discussions involving patent license terms and conditions. Moreover, if implementers agree to have an offer/counteroffer made to the holder of an essential patent(s) submitted to the ADR process and the patent holder refuses, such implementers could be presumed nonviolative of competition law with respect to the offer/counteroffer.*

6. CONCLUSION

IBM appreciates the FTC initiative to address issues relating to patent holdup in standards. IBM also appreciates the opportunity to share our perspective and propose "items" that the FTC and others may consider that might add to clarity and address issues arising at the intersection of patents, standards, and competition.

---

[100] See Complaint in *TruePosition v LM Ericcson Telephone Company, Qualcomm Inc, Alcatel-Lucent SA, 3GPP, European Telecommunications Standards Institute (ETSI)*, No 11 4564 (ED Pa 2011) in which it is alleged that companies and SSOs, "in concert and conspiracy", are excluding patent holder's technology (UTDOA) from being incorporated into new wireless standards.

25

CONFIDENTIAL BUSINESS INFORMATION,
SUBJECT TO PROTECTIVE ORDER

54