# EXHIBIT 58



August 5, 2011

Secretary
Federal Trade Commission
600 Pennsylvania Avenue, N.W.
Room H-135 (Annex X)
Washington, D.C. 20580

**Re: Patent Standards Workshop, Project No. P11-1204**

Dear Mr. Clark:

The Innovation Alliance ("IA") is pleased to submit these comments in response to the request of the Federal Trade Commission ("Commission") for public comment on standards-setting issues ("Request") in connection with the Patent Standards Workshop held by the Commission on June 21, 2011, and to supplement the comments submitted by IA in connection with the Commission's public hearings on "The Evolving IP Marketplace" dated February 5, 2011 ("IP Marketplace Comments").[1]

The IA is a coalition of companies seeking to enhance America's innovation environment by improving the quality of patents and protecting the integrity of the U.S. patent system.[2] IA represents innovators, patent owners, and stakeholders from a diverse range of industries that believe in the critical importance of maintaining a strong patent system that supports innovative enterprises of all sizes. In our IP Marketplace Comments, we urged the Commission to use a "judicious approach in evaluating IP-related conduct under competition and antitrust laws," and "to challenge such conduct only if it is determined, based on objective evaluation and a full consideration of all competitive interests, that the conduct has or will likely cause anticompetitive effects."[3] In this regard, IA pointed out that:

> [E]very technological revolution (whether fueled by the Internet or the steam engine) has led to an increase in patenting activity and concerns about patent quality and excessive litigation. Congress's consistent response has been to right the ship through measured reforms, not sink it.[4]

---

[1] Letter from The Innovation Alliance to Mr. Donald S. Clark, Sec'y, Fed. Trade Comm'n. (Feb. 5, 2009), *available* at http://www.ftc.gov/os/comments/ipbearings/540872-00028.pdf.

[2] To learn more, visit www.innovationalliance.net.

[3] Letter from The Innovation Alliance to Mr. Donald S. Clark, Sec'y, Fed. Trade Comm'n. 15 (Feb. 5, 2009).

[4] *Id.* at 8 (citing Senate Report Accompanying Senate Bill No. 239, 24th Cong., 1st Sess. (Apr. 28, 1836).

1

MOTM_WASH1823_0392282

IA, thereafter, enumerated a number of important principles that should guide effective competition policy and antitrust law as they relate to IP-related conduct, and IA now asks the Commission to consider these principles in preparing any report in response to the Request and recent Patent Standards Workshop.[5]

> *First*, as identified in the 2003 IP Report, competition and antitrust law and policy must be defined to accommodate the common purpose of both the antitrust laws and intellectual property laws, *i.e.*, to promote consumer welfare. This requires a strong IPR environment that fosters innovation and competitiveness. Moreover, competition and antitrust law should play a role only to address conduct that has a demonstrable anticompetitive effect based on empiric and objective criteria. Otherwise, the risk of over-deterrence and condemnation of potentially pro-competitive conduct will exist to the detriment of innovation, competition and consumers. *Second*, competition policy and antitrust law, especially when considered in relation to intellectual property, must recognize the varying legitimate interests that exist among different entities with different business models, *e.g.*, vertically integrated manufacturers and aggregators of IP developed by third-parties, small manufacturing entities, technology developers, software companies, universities, and others. Accordingly, enforcement and policy determinations should not be made based on the type of entity that seeks to enforce its IPR or realize the value of that IPR. Here, too, evaluation of specific conduct is required rather than the adoption of rules based on types of business entity or strategy. *Third*, consideration, and even deference, should be appropriately given to the evolution of legal principles in the patent context before antitrust and competition enforcement agencies consider addressing conduct that may be better addressed under non-competition law legal principles.[6]

The Request and the questions posed to panelists at the Patent Standards Workshop specifically solicited views on a variety of topics regarding the enforcement of patents rights subject to a RAND commitment undertaken in the context of standards setting. The aforementioned IA principles should apply with equal force when patented technology is standardized and the patentee has committed to license essential patent claims on reasonable and non-discriminatory terms and conditions (RAND). IA offers these comments in view of two specific areas of inquiry by the Commission:

> Absent an SSO's definition or express limitations given by the patent holder in its commitment, by what standards should "reasonable" and "nondiscriminatory" be determined? What principles should a court or tribunal look to in resolving a dispute between a potential licensor and licensee concerning whether proffered terms are RAND?[7]

---

[5] FTC Request for Comments and Announcement of Workshop on Standard-Setting Issues, 76 Fed. Reg. 28036 (May 13, 2011).
[6] Letter from The Innovation Alliance to Mr. Donald S. Clark, Sec'y, Fed. Trade Comm'n, 1–2 (Feb. 5, 2009).
[7] FTC Request for Comments and Announcement of Workshop on Standard-Setting Issues, 76 Fed. Reg. 28036, 28037 (May 13, 2011).

MOTM_WASH1823_0392283

Should a RAND commitment preclude a patent owner from seeking in patent litigation a preliminary injunction against practice of the standard? A permanent injunction?[8]

### *No Categorical Approach Should Be Used to Calculate a Reasonable Royalty*

In the IP Marketplace Report, the Commission offered its own views concerning the determination of a royalty rate consistent with a RAND commitment:

> A definition of RAND based on the ex ante value of the patented technology at the time the standard is chosen is necessary for consumers to benefit from competition among technologies to be incorporated into the standard.

> *Recommendation.* Courts should apply the hypothetical negotiation framework to determine reasonable royalty damages for a patent subject to a RAND commitment. Courts should cap the royalty at the incremental value of the patented technology over alternatives available at the time the standard was chosen.[9]

This recommendation does not follow the core principles articulated by IA, and is contrary to United States law and underlying policy. It appears to recognize only the business goals of pure IP consumers, i.e., implementing manufacturers, to the exclusion of other stakeholders, while ignoring Congress's determination reflected in the patent statute that the public interest is best served through a system that allows license terms to be determined in the market -- not a perfectly competitive or other market hypothesized by government -- to induce investment in risky R&D. It also fails to recognize how standards are developed in practice and the fact that many failures, representing significant R&D dollars, can and do occur in the innovation cycle before each success.

The current patent system allows the investment risks associated with both innovation and standardization to be shared among innovators and implementers. An absolute rule establishing as reasonable only those royalty rates based on ex ante considerations or "incremental" (as opposed to full) value is wholly inconsistent with the incentive scheme created by patent law. Under the Commission's recommendations, a patentee may offer an infringer a license to the patentee's essential patent claims and the infringer may refuse to negotiate and continue to infringe, awaiting the initiation of litigation by the patentee and the determination by the court of the ex ante incremental value of the patent. This would also provide the infringer an unfair competitive cost advantage over other manufacturers who had properly licensed the patentee's technology.

In addition, capping ongoing royalties based on assessments of the "incremental value" of the patented technology over available alternatives, *after* the patentee has sunk its investment but *prior* to investment by the infringer is directly at odds with over two centuries of patent law and could have a devastating impact on innovation incentives. At a minimum, proponents of this test should demonstrate through rigorous economic analysis that innovation incentives will not be

---

[8] *Id.* at 28037–38.
[9] FED. TRADE COMM'N, THE EVOLVING IP MARKETPLACE: ALIGNING PATENT NOTICE AND REMEDIES WITH COMPETITION 22–23 (Mar. 2011).

3

MOTM_WASH1823_0392284

harmed. As numerous panelists pointed out at the June 21st Patent Standards Workshop, differing technical proposals are rarely if ever presented as a menu of choices from which standards developers choose. In practice, patented technology is often incorporated into a standard without any competing alternatives being proposed by other participants. In other words, ex ante auctions among competing proposals is a theoretical construct that rarely, if ever, occurs. More importantly, the royalty rates that might be negotiated between a particular patentee and prospective licensee, ex ante or ex post, are dependent on the numerous terms and intellectual property rights exchanged in connection with each bilateral negotiation, e.g., licenses of non-essential claims, grant-backs, and indemnifications.

The Commission's recommendation is essentially a proposal to modify the application of the *Georgia Pacific* factors[10] to (i) shift the hypothetical negotiation from the time of infringement to a time ex ante to the adoption of the standard, and (ii) ignore all other *Georgia Pacific* factors in lieu of a categorical evaluation based on the theoretical incremental value between the standardized technology and the hypothetical value of the next best alternative (that may not have even been proposed at all during the standards development process). Such a modification would unfairly prejudice any patentee participating in the development of a standard by unnecessarily devaluing its essential patent claims. As we stated in our IP Marketplace Comment:

> Indeed, the tried and true principles that underlie *Georgia Pacific* and patent damages law generally are so firmly grounded in our legal system that it would be difficult to justify any significant departure without acknowledging an effort to transform patent rights into something far different, and far less valuable, than our forefathers intended.[11]

For these reasons, IA agrees with those panelists at the Patent Standards Workshop that expressed the view that the determination of a reasonable royalty for patent claims subject to a RAND license commitment should continue to be subject to the *Georgia Pacific* factors to the extent that a commercial dispute over royalties arises between a patentee and an implementer of the relevant standard.[12]

## No Absolute Rule Should Be Prescribed Regarding Injunctions

The Commission also stated its own views concerning whether or not patentees who have undertaken a RAND commitment as a participant in standards setting activities should be able to seek an injunction.

> *Recommendation.* Courts should give careful consideration under each of *eBay's* four factors to the consequences of issuing an injunction prohibiting use of a patented

---

[10] Georgia-Pacific Corp. v. U.S. Plywood Corp., 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970), *modified and aff'd*, 446 F.2d 295 (2d Cir. 1971).

[11] Letter from The Innovation Alliance to Mr. Donald S. Clark, Sec'y, Fed. Trade Comm'n, 11 (Feb. 5, 2009).

[12] The application of the factors should take place at the point at which the patentee has sunk its investment and the prospective licensee conceivably has invested none; otherwise, the negotiations will be tilted heavily against the patent holder.

4

MOTM_WASH1823_0392285

invention incorporated into an industry standard. Whether the patent owner made a
RAND commitment will also be relevant to the injunction analysis.[13]

IA agrees that a patentee may seek an injunction with respect to any essential patent claims
subject to a RAND commitment and that the four factors enumerated in *eBay*[14] must be
considered by the court in deciding whether or not an injunction should be granted. IA also
agrees that a RAND commitment may be relevant to the *eBay* analysis, but in no way is the
RAND commitment dispositive.

Some panelists at the Patent Standards Workshop argued that there should be an absolute rule
prohibiting patentees who have undertaken a RAND commitment in connection with their
participation in a standards setting effort to seek an injunction against an implementer of the
relevant standard. IA disagrees with these views. The particular factual circumstances must be
considered on a case-by case basis and no strict across the board rule can or should be applied.
For example, there is no justification for automatically denying an injunction to a patentee that
has made a RAND commitment if the infringer either refuses (i) to accept any license where the
license proposal is RAND, or (ii) to negotiate in good faith to take a license on RAND terms and
continues to infringe. Similarly, a patentee should be able to seek an injunction against a
licensee that refuses to honor a license agreement it negotiated with the patentee. In that case,
the patentee must be able to enforce the agreement, or terminate it and seek an injunction.

As we stated in our IP Marketplace Comment:

> The innovation-chilling scenario described in *Fromson*[15] is exactly what would result if
> special injunction rules were adopted, including under the guise of competition or antitrust
> principles that would eliminate the ability of any class of patent owners to seek injunctive
> relief under the standards established by *eBay*. Infringers would choose to operate without a
> license and even if sued - which may not be a certainty - face only the worst-case outcome of
> paying the same as it would have under a license, but only later, and in many cases without
> many of the other requirements and safeguards a patentee requires of its licensees, such as
> grant-back rights and indemnification. In fact, such a compulsory license may be more
> advantageous to the infringer than the license the patentee has negotiated and entered into
> with an infringer's competitors. In the meantime, the cost to the patent holder of realizing
> reasonable compensation for the use of its property would be significantly increased and the
> ability of the patent owner to continue in efforts to bring patented inventions to market and
> make them available through licensing activities, would be undermined. Patent holders will,
> undoubtedly, either seek to pass on such added costs or, if not possible, make the calculation
> that further investment in innovation should be limited. If anything, therefore, competition
> and antitrust law and policy should carefully scrutinize efforts to limit patent holder's rights
> to seek permissible remedies, including injunctive relief, because of the negative competitive
> effects that might arise from such conduct.[16]

---

[13] FED. TRADE COMM'N, THE EVOLVING IP MARKETPLACE: ALIGNING PATENT NOTICE AND REMEDIES WITH
COMPETITION 28 (Mar. 2011).
[14] eBay, Inc. v. MercExchange, LLC, 547 U.S. 388, 391 (2006).
[15] Fromson v. Western Litho Plate & Supply Co., 853 F.2d 1568, 1574 (Fed. Cir. 1988), *overruled on other grounds*
*by* Knorr-Bremse Systeme Fuer Nutzfahrzeuge GmbH v. Dana Corp., 383 F.3d 1337, 1343-44 (Fed. Cir. 2004).
[16] Letter from The Innovation Alliance to Mr. Donald S. Clark, Sec'y, Fed. Trade Comm'n 9–10 (Feb. 5, 2009).

5

MOTM_WASH1823_0392286

A RAND commitment does not prevent or alter the effect of such an "innovation-chilling scenario" and consequently, the mere existence of a RAND commitment should not be used as a basis for instituting a prohibition against injunctions.

### Non-Discriminatory Licensing Associated with Standards Setting Promotes Competition and Benefit Consumers

During the Patent Standards Workshop, the Commission's Chief Economist, Joseph Farrell, posited that consumers are unrepresented stakeholders, not only on the panel, but in the standards setting process and in licensing discussions.  While Dr. Farrell noted that the presence of patent disputes is no more indicative of patent hold up problems than the absence of patent disputes is indicative of the absence of patent hold up problems, he did conclude, without proof, that consumers are harmed if royalty rates that exceed ex ante incremental value are passed through to them by implementers of standards.  Dr. Farrell acknowledged that implementers share the same interests as consumers to obtain standardized technology as inexpensively as possible, but also contended that unlike consumers, such implementers have no incentives to seek lower royalties from patentees.  He reasoned that since patentees subject to a RAND commitment must license on a non-discriminatory basis to all implementers, the royalties can be passed through to such implementers equally to consumers who are then required to pay higher prices than justified for the patented technology.  Although in some instances a RAND commitment may result in identical royalties to implementers, often it will not.  Assuming that implementers are not motivated to negotiate lower royalties from patentees in the standards context simply ignores market reality.  In almost every case, patent license agreements contain a complex set of terms and conditions which include much more than a simple royalty amount.  As such, a RAND commitment often produces a range of royalties that are heavily negotiated by implementers, thereby negating Dr. Farrell's concern that implementers will simply concede a royalty amount to a patentee and pass on unjustifiably higher prices to consumers.

Dr. Farrell's conclusion is not only irreconcilable with the vigorous license negotiations that occur in practice, but also with implementers' persistent efforts to lobby Congress and competition law agencies abroad to lower license fees.  Some of the panelists did argue as implementers that they perceive patent hold up as a problem and that patentees should not be permitted to charge royalty rates that those panelists view as excessive.  Such panelists, while a vocal minority, do purport to represent the same interests that Dr. Farrell attributes to consumers and implementers – the desire to procure standardized technology that may include patented inventions at the least cost.  If the implementer representatives on the panels at the Commission's workshop were indifferent to patent fees, why have they devoted so much effort trying to change the law?

It is more important now than at any prior time for the United States to promote innovation, especially through information and communications technology ("ICT") standards.  Increasingly, ICT standards have and continue to fuel economic growth, job creation, and new businesses.  At the same time, ICT standardization has been deeply competitive and has resulted in a proliferation of new products and services offering a myriad of choices to consumers.  Because the market is so competitive for such products and services (and for standards as such) we see

6

MOTM_WASH1823_0392287

prices drop as new technologies are developed and standardized to replace existing products and services built on the older standards.

Competition from emerging markets around the world, such as China and India, coupled with the need to create new job-generating business opportunities domestically dictate the need to avoid innovation-chilling policies that are justified only by the theoretical possibility that excessive patent royalties are being passed on to consumers. Moreover, small and emerging innovative companies, as well as universities, will have little incentive to innovate to develop new technologies if they cannot monetize their innovations through standardization and licensing since manufacturing and commercialization may not be an option for such entities. As we stated in our IP Marketplace Comment: "competition and antitrust law should play a role only to address conduct that has a demonstrable anticompetitive effect based on empiric and objective criteria."[17] Here, there is simply no data to support Dr. Farrell's pass-through scenario.

Finally, IA is very concerned that if emerging countries see the United States adopt policies that diminish the value of IP, they will follow suit to devalue patents, at least when doing so will advantage their domestic industries. Further, because of their rigorous top-down regimes they will do so with efficiency that will severely disadvantage U.S. interests.

IA appreciates the opportunity to comment on topics related to standards and patents and to address questions raised in the Request and recent Patent Standards Workshop.

Respectfully submitted,


Brian Pomper
Executive Director
The Innovation Alliance

---

[17] Id. at 1.

MOTM_WASH1823_0392288