# EXHIBIT 63

2011 WL 4390726
Only the Westlaw citation is currently available.

UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.

Court of Chancery of Delaware.

PHARMATHENE, INC., a Delaware corporation, Plaintiff,
v.
SIGA TECHNOLOGIES, INC., a Delaware corporation, Defendant.

Civil Action No. 2627–VCP. | Submitted: April 29, 2011. | Decided: Sept. 22, 2011.

**Attorneys and Law Firms**

A. Richard Winchester, Esq., Christopher A. Selzer, Esq., McCarter & English, LLP, Wilmington, Delaware; Roger R. Crane, Esq., Christopher R. Carton, Esq., K & L Gates LLP, New York, New York, Attorneys for Plaintiff.

Andre G. Bouchard, Esq., Sean M. Brennecke, Esq., Bouchard Margules & Friedlander, P.A., Wilmington, Delaware; Harold P. Weinberger, Esq., Jennifer L. Rochon, Esq., Seth F. Schinfeld, Esq., Kramer Levin Naftalis & Frankel LLP, New York, New York, Attorneys for Defendant.

Opinion

## OPINION

PARSONS, Vice Chancellor.

**\*1** This action arises out of a dispute between two companies involved in the development of pharmaceuticals. The plaintiff and the defendant expressed mutual interest in a transaction through which both parties would collaborate to develop a promising drug that the defendant had acquired. The parties previously had explored a merger and, in light of that history, the defendant insisted that the parties first negotiate a license agreement under which it was certain to obtain timely financing necessary to further develop its drug. The parties then actively negotiated and agreed upon a term sheet for the license agreement. Shortly thereafter, the plaintiff suggested that the parties also explore the possibility of a merger with the understanding that, if it did not occur, they would proceed with the license agreement. The defendant agreed to pursue merger discussions provided the plaintiff gave it a bridge loan to cover its financing needs in the interim. The plaintiff did provide such a loan. While the license agreement term sheet was never signed, it was attached as an exhibit to a later merger term sheet, a merger agreement, and a bridge loan agreement, all of which the parties did sign. Each of these agreements expressly provided that if the merger was not completed, the parties would negotiate in good faith to execute a license agreement in accordance with the terms of the term sheet.

As the parties worked toward closing the proposed merger, the drug at issue passed a number of key development milestones which increased its value. After the merger failed to close within the prescribed timeframe, the defendant terminated the merger agreement and the parties entered a contractually-stipulated ninety-day exclusive negotiating period regarding a license. During these negotiations, the defendant proposed economic terms vastly different than those contained in the term sheet attached to the merger agreement and bridge loan. The plaintiff objected to the defendant's approach and insisted that the defendant was obligated to execute a license agreement with the same or similar terms to those contained in the term sheet. When it became apparent that the parties had reached an impasse, the plaintiff commenced this action.

In its Amended Complaint, the plaintiff has asserted a number of claims that were the subject of an eleven-day trial in

January 2011. These claims include: (1) that the defendant breached a binding license agreement containing the same economic terms as those in the term sheet attached to the merger and bridge loan agreements; (2) that the defendant breached its obligations under the merger and bridge loan agreements to negotiate in good faith a license agreement in accordance with the terms contained in the term sheet; (3) that the defendant promised that the plaintiff ultimately would control the drug at issue, either through a license agreement or merger, and that the plaintiff reasonably relied on the defendant's promise to its detriment; and (4) that the defendant was unjustly enriched by the capital and assistance that the plaintiff provided to the defendant during the period in which the parties were working toward closing the merger. The defendant has counterclaimed for damages based on its allegation that the plaintiff breached its obligation to negotiate in good faith by causing the defendant to draft a lengthy proposed agreement that the plaintiff knew it would not consider.

**\*2** For the reasons stated in this Opinion, I reject the plaintiff's claim that the defendant breached a binding license agreement, but find that the defendant did breach its obligations to negotiate in good faith and that the defendant is liable to the plaintiff under the doctrine of promissory estoppel. Furthermore, I reject the defendant's claim that the plaintiff breached its obligation to negotiate in good faith. In terms of relief, I deny the plaintiff's claims for specific performance of a license agreement with the terms set forth in the term sheet or, alternatively, for a lump sum award of its expectation damages. I conclude, however, that the plaintiff is entitled to share in any profits realized from the sale of the drug in question, after an adjustment for the upfront payments it likely would have had to make had the parties negotiated in good faith a license agreement in accordance with the terms of the term sheet. In addition, the plaintiff is entitled to recover from the defendant a portion of the attorneys' fees and expenses the plaintiff incurred in pursuing this action.

## I. BACKGROUND

### A. The Parties

Plaintiff, PharmAthene, Inc. ("PharmAthene"), a Delaware corporation with its principal place of business in Annapolis, Maryland, is a biodefense company engaged in the development and commercialization of medical countermeasures against biological and chemical weapons.

Defendant, SIGA Technologies, Inc. ("SIGA"), is a Delaware corporation with its principal place of business in New York City. SIGA is also a biodefense company concentrated on the discovery and development of oral antiviral and antibacterial drugs to treat, prevent, and complement vaccines for high-threat biowarfare agents.

### B. Facts

#### 1. SIGA acquires ST–246

In 2004, SIGA paid $1 million and issued one million shares of SIGA stock to ViroPharma Inc. to acquire the technology for a product now known as ST–246,[1] an orally administered antiviral drug for the treatment of smallpox.[2] At that time, the viability of ST–246, its potential uses, safety, and efficacy, and the possibility of its obtaining government approvals and being the subject of government supply contracts were all unknown. The possibility existed, however, that with the help of cash, marketing, and technical knowledge, ST–246 might become an important weapon against smallpox and, therefore, extremely valuable. There was also the possibility that any money or effort invested in ST–246 would be for naught.

[1]    ST–246 is alternately referred to as "SIGA–246" and "246."

2    In many cases, the facts recited in this Opinion are undisputed and, therefore, are not accompanied by citations to the evidentiary record. Where there is any dispute about factual findings, appropriate citations are provided.

### 2. SIGA's financial capacity becomes stretched and it approaches PharmAthene to discuss aiding the development of ST–246

By late 2005, SIGA had experienced some difficulties developing ST–246 and bringing it to market. SIGA had invested an additional $500,000 to develop the drug and was running out of money.3 It estimated, however, that it needed an additional investment of approximately $16 million to complete the development process.4 Furthermore, NASDAQ had threatened to de-list SIGA shares in August 2005 and SIGA's largest shareholder, MacAndrews & Forbes ("M & F"), was unwilling to invest additional money. As a result, SIGA lacked the financial wherewithal to fund development of the drug by itself and required a substantial financial investment to bring ST–246 to market. SIGA also had never taken a drug to market and lacked much of the administrative infrastructure necessary to do so, including employees with expertise in areas such as regulatory or government affairs, quality assurance, quality control, clinical trials, manufacturing, and business development.

3    Trial Transcript ("T.Tr.") 1221–22 (Drapkin), 1373 (Konatich). In citations to the trial transcript, where the identity of the witness is not clear from the text, the witness's surname is indicated parenthetically.

Because SIGA's stock was trading at less than $1 at the time, raising additional equity capital would have been significantly dilutive. Consequently, there was little interest in that option.

4    T. Tr. 1397 (Konatich); *see also* JTX 180.

**\*3** With this as a backdrop, in late 2005 SIGA and PharmAthene began discussing a possible collaboration. Through an exchange of oral and written communications, SIGA and PharmAthene negotiated a framework for their collaboration regarding the development and commercialization of ST–246. Thomas Konatich, SIGA's Chief Financial Officer, contacted Eric Richman, PharmAthene's Vice President of Business Development and Strategies, to discuss the possibility of the companies working together. Richman attempted to discuss a merger, but SIGA resisted that approach because it had tried to accomplish a merger with PharmAthene before, only to be left high and dry when PharmAthene got cold feet.5 According to Richman's contemporaneous notes, SIGA insisted on working out the framework of a license agreement before talking about a merger because of the previous failed merger attempt.6 Moreover, SIGA wanted to focus on getting a cash investment as soon as possible to ensure the development of ST–246.

5    T. Tr. 26–27 (Wright). In or about December 2003, SIGA and PharmAthene discussed a potential merger. Ultimately, those discussions failed because of reservations by PharmAthene board members.

6    JTX 678; T. Tr. 122–24 (Richman).

As of the end of 2005, both SIGA and PharmAthene recognized that, by a conservative estimate, the market potential for ST–246 was in the range of $1 billion to $1.26 billion. On December 29, 2005, Ayelet Dugary, SIGA's controller, responded to a request from Konatich by forwarding to him a "potential market and gross margin analysis for SIGA–246" reflecting those values.7 The same day, Konatich transmitted that analysis to Richman of PharmAthene and advised him that it was "a rough, and we believe conservative, overview of the market potential of our smallpox drug."8

7    JTX 166.

Pharmathene, Inc. v. Siga Technologies, Inc., Not Reported in A.3d (2011)

8      *Id.*

### 3. SIGA and PharmAthene negotiate a license agreement framework

In late 2005 and early 2006, negotiations regarding a license agreement between the parties were conducted primarily by Richman and Konatich. Konatich, however, kept Donald Drapkin, the Chairman of SIGA's board and Vice Chairman of M & F, well informed regarding the status of these negotiations. Drapkin denied having any significant involvement in the negotiations for a license agreement, testifying that he "had no knowledge of that license agreement, or its terms."[9] Notwithstanding that testimony, however, the evidence shows that Drapkin provided Konatich with guidance about how to proceed throughout the negotiations.[10] Drapkin was particularly focused on getting an infusion of cash as soon as possible to fund the development of ST–246. Moreover, when asked who was running the negotiations for SIGA regarding a license for ST–246, Konatich credibly responded that "[t]he project—program was being run by Mr. Drapkin and I was his instrument."[11]

9      T. Tr. 1252.

10      T. Tr. 1250–51 (Konatich).

11      T. Tr. 1406–07.

Both companies put together teams to assist their side in negotiating a license agreement. PharmAthene's team, assembled by Richman, included its Chief Executive Officer, David Wright, Chief Financial Officer, Ronald Kaiser, a board member, Elizabeth Czerepak, as well as its Chief Scientific Officer, Government Affairs Officer, and a member of its business development team. Working on the deal for SIGA were Konatich, Drapkin, Dr. Dennis Hruby, who was SIGA's Chief Scientific Officer, and Michael Borofsky, an in-house lawyer at M & F. On January 3, 2006, Richman sent a proposed term sheet to Konatich and Hruby that he drafted based on his discussions with SIGA.[12] In a January 4 reply, Hruby stated: "Thanks for the prompt response. We are most interested in trying to make this a mutually agreeable term sheet and moving on to the next step."[13] That same day, Konatich wrote to his colleague Hruby that, "[m]y major problem is with the $2.0 [million] up front. I would like to have at least $3 [million] in cash which would permit the completion of the build out and get us through 2006 without too much trouble...."[14]

12      JTX 172.

13      JTX 173.

14      JTX 171; T. Tr. 1416 (Konatich).

**\*4** Richman forwarded Hruby's comments to other members of PharmAthene's team and subsequently reported to Konatich that "all news is positive—we had a board call at 2:30 today—just ended and Board is very supportive."[15] Konatich sent Richman's email to Drapkin and Hruby to which Drapkin replied, "great push hard on cash and guarantees."[16] On January 6, 2006, Richman emailed a revised license term sheet to the PharmAthene team based on his communications with Hruby. Richman noted specifically that he "increased up front and total milestones...."[17]

15    JTX 410.


16    JTX 175.


17    JTX 721.


Konatich continued to negotiate the specifics of a license agreement term sheet with Richman. On January 9, Konatich obtained an assurance from Richman that he was working on getting a revised draft term sheet to SIGA that day.[18] Konatich so advised Drapkin and undertook to forward the proposal as soon as he received it.[19] Richman followed up later that day with a revised term sheet. In forwarding that draft to Drapkin, Konatich observed that it was "light on the front end money," but that "[i]f we can turn their stock offer into cash it would be much more attractive."[20] Konatich also circulated the revised term sheet and mentioned his concerns about the upfront payment and the proposed private stock component to another SIGA board member involved in the project, Paul Savas.[21] Also on January 9, Hruby expressed a generally positive reaction to the PharmAthene proposal, saying that "we shouldn't lose sight of the fact that they are committing to fund all development costs, which is probably worth $10–20 [million], and they are committing to fund product related research at SIGA which might alleviate some burn and free up ."[22] Konatich expressed a similar view saying, "[i]f we can get hard cash up another million or so it might be worth it...." Further commenting to Hruby on what he believed Drapkin's reaction would be, Konatich wrote that "[i]f the five million could be 'guaranteed' payments (over the next 12 months) I think Donny would do it in a minute and I probably would too."[23]

18    JTX 181.


19    JTX 424.


20    JTX 425.


21    JTX 180; T. Tr. 1428–29 (Konatich). PharmAthene's January 9 draft term sheet called for an upfront license fee of $5 million, of which $2 million would be paid in PharmAthene stock. JTX 425 at 2. Both Konatich and Drapkin were uninterested in the prospect of owning stock in a private company. JTX 425 at 1; T. Tr. 1224 (Drapkin).


22    JTX 180.


23    JTX 182.


On January 16, 2006, Richman sent Konatich a further revised term sheet that included changes requested by SIGA. This revised term sheet "replaced the $2MM PHTN stock with cash as a milestone, kept the total deal size at $16 [million] and increased the upfront payment to $6MM." In that same email, Richman mentioned that he planned to call Drapkin, as Konatich had suggested.[24] Konatich forwarded the revised license term sheet to Drapkin and recommended that he speak to Richman directly to present the position of SIGA's board.

24    JTX 9.

On January 17, Drapkin apparently called Richman to discuss the licensing term sheet. According to Richman, in that call, Drapkin stated that he had the draft term sheet in front of him and had two proposed changes. Richman further testified that Drapkin told him that if the changes were acceptable to PharmAthene, then "[w]e have got a deal on the term sheet, and it's ready to present to your board for approval."[25] Drapkin does not recall that call and denies saying the parties would have a deal if PharmAthene agreed to two changes.[26] Based on the testimony of other witnesses, the relevant documentary evidence, and the facts recited above, I find Drapkin's testimony in this respect unreliable. In particular, I find that the call between Richman and Drapkin did occur and that Drapkin did request the two changes Richman identified.

25   T. Tr. 152.

26   T. Tr. 1225. One of the changes was for SIGA to receive 50% of any amounts by which net profits on any U.S. government sales exceeded 20%. JTX 11.

**\*5** At a January 18 PharmAthene board meeting, Richman went over the January 16 term sheet with the directors and explained the changes Drapkin proposed. The minutes of that meeting make no mention of the board having approved the term sheet, and the term sheet was not signed. Jeffrey Baumel, outside counsel to PharmAthene who drafted the minutes, credibly testified, however, that the lack of mention of the term sheet stemmed from his practice of only including such documents in the minutes at the time they were signed.[27]

27   T. Tr. 358–59.

On January 19, Richman spoke with Drapkin again and told him that the PharmAthene board had approved the license agreement term sheet as revised to reflect the changes they had discussed two days earlier.[28] PharmAthene alleges that by this time the discussions relating to a license agreement were complete, the parties had "a deal," and Richman, therefore, believed the parties "could now talk about a merger."[29] Nevertheless, Richman did not send a copy of the revised term sheet to Drapkin until February 10, 2006. When asked why, Richman explained that Drapkin did not ask for one and that he assumed that Drapkin already had made the changes in his own version.[30]

28   T. Tr. 159–60 (Richman).

29   *Id.*

30   T. Tr. 160–62, 335.

### 4. The contents of the license agreement term sheet

On January 26, a clean copy was made of the two-page license agreement term sheet that incorporated Drapkin's two changes (the "LATS").[31] The document describes the parties' objective: "[t]o establish a partnership to further develop & commercialize SIGA–246 for the treatment of Smallpox and orthopox related infections and to develop other orthopox virus therapeutics."[32] The LATS also sets forth terms relating to, among other things, patents covered, licenses, license fees, and royalties. The LATS is not signed, however, and contains a footer on each page that states "Non Binding Terms."

31    JTX 11, LATS.


32    LATS at 1.


Without attempting to cover all the details, the LATS contemplates a license agreement along the following lines to support the further development and commercialization of ST–246 for the treatment of smallpox. First, SIGA would grant to PharmAthene "a worldwide exclusive license and [sic] under the Patents, Know–How and Materials to use, develop, make, have made, sell, export and import Products in Field. The right to grant sublicenses shall be specifically included in the license." Second, the license would cover ST–246 and all other related products worldwide covered by the patents and know-how relating to ST–246 and its development and manufacture. Third, the LATS described the makeup of a research and development committee, which would include representatives from both PharmAthene and SIGA. The parties identified twelve categories of tasks relevant to that committee and assigned responsibility for each one to either SIGA or PharmAthene. In addition, PharmAthene agreed to fund the research and development based on a defined budget.

Fourth, the LATS included economic terms. PharmAthene was scheduled to pay a "License Fee" of $6 million in total, which consisted of $2 million cash upfront, $2.5 million as a deferred license fee to be paid twelve months after execution of a license agreement if certain events occurred, and $1.5 million after SIGA obtained financing in excess of $15 million. In addition, the LATS contained a provision under which PharmAthene would pay an additional $10 million based on the achievement of specific milestones relating to certain sales targets and regulatory approvals. The LATS also provided for PharmAthene to make annual royalty payments of 8% on "yearly net sales of Patented Products"[33] of less than $250 million, 10% on sales greater than $250 million, and 12% on sales greater than $1 billion. Lastly, the LATS stated that, "[i]n addition, SIGA will be entitled to receive 50% of any amounts by which net margin exceeds 20% on sales to the U.S. Federal Government."[34]

33    Neither party introduced evidence as to the intended meaning of the term "net sales." As customarily employed in the patent licensing context, however, the term "net sales" normally refers to sales by the licensee to its third-party customers less customary deductions such as for discounts and rebates, allowances for returned product, shipping, and distribution costs. Paul A. Thompson, *Patent and Technology Licensing,* 1025 PLI/Pat 459, 469 (2010).


34    LATS at 2.


### 5. Having agreed upon the principal terms of a license agreement, the parties begin to discuss a merger

**\*6** At the PharmAthene board meeting on January 18, 2006, the board also decided that it preferred a merger with SIGA over a license agreement. Richman promptly informed Konatich of that preference. Representatives of PharmAthene and SIGA met on January 23, 2006, at Drapkin's office in M & F's headquarters in New York City, which M & F refers to as the "Townhouse." At this meeting, the parties decided to proceed with merger discussions.[35] Because of SIGA's precarious financial position, however, SIGA asked PharmAthene to provide bridge financing to allow SIGA to continue developing ST–246 while merger negotiations proceeded. PharmAthene did not have adequate resources to provide such a loan at the time, but agreed to consider raising the funds for it on the condition that PharmAthene would get at least a license for ST–246 if merger negotiations fell through.[36] As Czerepak testified at her deposition, "we [PharmAthene] didn't want to start putting resources and money into a product that we weren't absolutely sure that we at least had a license to. So we were willing to talk about a merger but we didn't want to hold up or put at risk the ability to have a license at least as a fallback."[37] Wright similarly testified that "[t]he board and Elizabeth [Czerepak] in particular, was concerned that we could end up being a bank to SIGA. They wanted to ensure ... that we received either a license for ST–246 or we completed the merger agreement."[38] SIGA generally agreed to pursue that approach with the understanding that, in the meantime, PharmAthene would supply it

with a bridge loan of $3 million.

35    JTX 15 at 31.

36    T. Tr. 184 (Richman); Dep. of Elizabeth Czerepak ("Czerepak Dep.") 85–86, 88–89, 104, 108–10; T. Tr. 35–36 (Wright) ("The direction of PharmAthene's board was that we would do a bridge loan if it was, you know clear and it was guaranteed that we either received a license to the product, under the terms that had already been negotiated and agreed to by both parties, or a merger went through.").

37    Czerepak Dep. 85–86.

38    T. Tr. 35.

On February 10, 2006, Wright sent a draft merger term sheet to Drapkin. PharmAthene's draft included the following provision regarding a license agreement:

> SIGA and PharmAthene will negotiate the terms of a definitive License Agreement in accordance with the terms set forth in the Term Sheet ... attached on Schedule 1 hereto. The License Agreement will be executed simultaneously with the Definitive [Merger] Agreement and will become effective only upon the termination of the Definitive Agreement.[39]

39    JTX 194 at 3.

Drapkin claims that he thought PharmAthene must have been confused about what it wanted[40] and that Richman told him that PharmAthene "had no interest in a license agreement .... [but rather] wanted to go back to a merger."[41] Yet, Drapkin's testimony in this regard is undermined by his own admission that he understood that PharmAthene wanted to negotiate two documents at once when he received the draft merger term sheet with the license agreement attached.[42] It would make little sense for PharmAthene to press for the negotiation of a license simultaneously with a merger agreement if it had no interest in a licensing arrangement.

40    T. Tr. 1231 (stating he thought PharmAthene included the provision in the merger term sheet regarding a license agreement "by error").

41    T. Tr. 1227.

42    T. Tr. 1288–89 (Drapkin).

On February 22, 2006, the parties met once again at the Townhouse. Present on behalf of SIGA were Drapkin and Savas. Baumel, on behalf of PharmAthene, had sought to have a formal license agreement executed simultaneously with the merger agreement as a backup in case the merger did not close, but Drapkin told the PharmAthene contingent that he was not going to pay lawyers to draft a formal license agreement.[43] Instead, Drapkin suggested that PharmAthene attach the LATS to the agreement. According to PharmAthene, Drapkin also told them that this approach would be as good as a license agreement and would guarantee PharmAthene, at a minimum, a license if negotiations for a merger fell through.[44] According to Baumel, Drapkin stated that "[i]f the deal doesn't close, we can negotiate a definitive license agreement in accordance with those [the

Pharmathene, Inc. v. Siga Technologies, Inc., Not Reported in A.3d (2011)

LATS] terms and you'll have the license."[45] Wright similarly testified that "[a]t one point in this meeting [Drapkin] even instructed Jeff Baumel to put language into the term sheet that would say if the merger didn't happen, then we would get a license based upon the terms that had already been agreed to."[46]

43    T. Tr. 353–55 (Baumel), 176–77 (Richman), 39 (Wright).

44    T. Tr. 353–56 (Baumel).

45    T. Tr. 355.

46    T. Tr. 39.

**\*7** PharmAthene accepted Drapkin's suggested approach. The final merger term sheet, as reviewed by the PharmAthene board on March 1, 2006, specifically referred to the LATS and included a copy of it as an exhibit.[47] During another meeting of the parties on March 6, Drapkin reiterated that "in any case, if the merger doesn't close, [PharmAthene] will get their license."[48] On March 10, 2006, the parties signed a merger letter of intent ("LOI") to which they attached the merger term sheet and the LATS. Drapkin signed for SIGA.

47    JTX 29.

48    T. Tr. 360–61 (Baumel), 188 (Richman), 44–45 (Wright).

### 6. The Bridge Loan Agreement

On March 20, 2006, SIGA and PharmAthene entered into the Bridge Note Purchase Agreement (the "Bridge Loan Agreement"), pursuant to which PharmAthene loaned SIGA $3 million. The Bridge Loan Agreement provided that the $3 million would be used for "(i) expenses directly related to the development of SIGA 246, (ii) expenses relating to the Merger and (iii) corporate overhead."[49] PharmAthene contends that it made the bridge loan in reliance on the parties' agreements that they would have a continuing relationship with respect to ST–246, whether the relationship ultimately took the form of a merger under a merger agreement or a license agreement in accordance with the LATS.

49    JTX 36, Bridge Loan Agreement ("BLA"), § 2.6.

The Bridge Loan Agreement explicitly recognized, however, that the parties ultimately might not agree on either a merger or a license agreement. Specifically, Section 2.3 provides that:

> Upon any termination of the Merger Term Sheet ..., termination of the Definitive Agreement relating to the Merger, or if a Definitive Agreement is not executed ..., SIGA and PharmAthene will negotiate in good faith with the intention of executing a definitive License Agreement in accordance with the terms set forth in the License Agreement Term Sheet attached as Exhibit C and [SIGA] agrees for a period of 90 days during which the definitive license agreement is under negotiation, it shall not, directly or indirectly, initiate discussions or engage in negotiations with any corporation, partnership, person or other entity or group

> concerning any Competing Transaction without the prior written consent of the other party or notice from the other party that it desires to terminate discussions hereunder.[50]

50      *Id.* § 2.3.

Representatives of PharmAthene viewed this 90–day exclusive negotiating window as more than sufficient time to negotiate the remainder of a license agreement because the key terms already had been negotiated and the rest was likely to be mere boilerplate.[51] By contrast, representatives of SIGA characterized the reference to, and attachment of, the LATS as documenting a mere "jumping off point" for future negotiations of a license agreement should the parties fail to merge successfully. Consistent with the possibility that the parties might not succeed in concluding a license agreement if the merger did not go forward, the Bridge Loan Agreement also included a loan maturity date of two years from the date of the loan and granted PharmAthene a security interest in SIGA's intellectual property.[52]

51      T. Tr. 48–49 (Wright), 269 (Richman).

52      T. Tr. 1517–19 (Grayer); BLA § 1.1 & Ex. D.

**\*8** The Bridge Loan Agreement also contains a choice of law provision designating New York law.[53]

53      BLA § 7.11.

### 7. The parties sign a merger agreement

On June 8, 2006, PharmAthene and SIGA signed a merger agreement (the "Merger Agreement").[54] Section 12.3 of that Agreement provides that, if the merger were terminated, the parties would negotiate a definitive license agreement in accordance with the terms of the LATS. Section 13.3 further stipulates that each of the parties would use their "best efforts to take such actions as may be necessary or reasonably requested by the other parties hereto to carry out and consummate the transactions contemplated by this Agreement." Section 12.4 provides for those and certain other provisions to survive the termination of the Merger Agreement.

54      JTX 40, Merger Agreement.

The Merger Agreement had a drop-dead date of September 30, 2006. At the time of signing, Drapkin apparently was concerned about the urgency of the parties. He explained to PharmAthene's representatives that he wanted a compressed timeline so that "everybody will rush. And if we need extensions [SIGA will] grant them."[55]

55      T. Tr. 367–68 (Baumel), 51 (Wright), 199 (Richman).

Key representatives of SIGA understood that a lasting relationship with PharmAthene was likely, if not inevitable, as a result of the talks between the parties. For example, on January 20, 2006, Hruby stated in an email to Konatich that "I don't want any human or monkey data too fast, until all the PharmAthene SIGA agreements are in place. I don't want to queer the deal with anything equivocal."[56] Then, in a February 25 report to Drapkin, Hruby commented that the PharmAthene team was "a really strong group of professionals with strengths in many areas of development (clinical, regulatory, manufacturing, etc.). I think they have the ability to facilitate and accelerate the development of ST–246...."[57] On March 6, he told other SIGA colleagues that "[a]s soon as the term sheet is signed, we should establish a ST–246 project team and coordinate development efforts...."[58] Indeed, even after Hruby was notified of a $5.4 million funding award from the National Institute of Allergy and Infectious Diseases ("NIAID"), a division of the National Institutes of Health ("NIH"), he still expected the drug to fall under

WestlawNext © 2012 Thomson Reuters. No claim to original U.S. Government Works.

Pharmathene, Inc. v. Siga Technologies, Inc., Not Reported in A.3d (2011)

the control of PharmAthene. When Konatich wrote to him that "it is a damn shame we had to merge," Hruby responded, "You got that right.... Had [the former CEO of SIGA] not gotten us behind the curve through ineptitude, we would still be an independent company and standing to make some real dough ... we could have gone all the way ourselves."[59]

56     JTX 189.

57     JTX 230 at 2.

58     JTX 232.

59     JTX 214.


### 8. The parties begin to integrate operations and ST–246 achieves several milestones

In March 2006, PharmAthene began providing operational assistance to SIGA in areas such as regulatory activities, quality assurance, quality control, and government affairs to help develop ST–246. During the next several months, PharmAthene assisted SIGA, to varying degrees, with several events critical to the drug's development. For example, SIGA's Audit Committee approved an agreement with a clinical trial organization to perform the first human test of ST–246 for $600,000. SIGA likely paid for that service in whole or in part with proceeds from the bridge loan. Similarly, PharmAthene representatives were present and apparently answered some questions during a reverse site visit between SIGA and the NIH in July. Soon thereafter, in September 2006, the NIH awarded SIGA $16.5 million for the development of ST–246.[60]

60     At trial, SIGA greatly downplayed the contributions of PharmAthene to the success ST–246 enjoyed with the NIH and other agencies. Although PharmAthene may have overstated the importance of its contributions, I find that they were not immaterial, as SIGA suggests, and contributed to the success of ST–246 in 2006.


### 9. SIGA terminates the merger

*9 As the September 30 closing date for the merger approached, the SEC still had not approved SIGA's draft proxy statement. Both parties had some responsibility for preparing that document and had expected a quicker approval.[61] To keep the prospect of a merger alive, PharmAthene asked SIGA to extend the termination date. The success of ST–246 in the interim, however, clearly affected the receptiveness of SIGA's representatives to the anticipated merger with PharmAthene. For example, after receiving the NIH grant, Hruby stated in an email to Drapkin (which he later acknowledged to be an exaggeration) that, "I have grave concerns about the merger as it is currently going forward in that the merged company will not be SBIR [Small Business Innovation Research program] compliant. In that case we would have to shut down [$]30 million in current grants and contracts."[62] In response to this email, Steven Fasman, an in-house lawyer at M & F, asked, "should SIGA continue with its merger plans or should it try to go it alone?"[63] Then, on October 4, SIGA's board met and, after a presentation by Hruby, decided to terminate the merger.[64]

61     T. Tr. 206 (Richman).

62     JTX 260.

63      JTX 436.

64      JTX 265.

Later in October 2006, SIGA announced that it had received the September three-year, $16.5 million NIH contract and that ST–246 had provided 100 percent protection against smallpox in a primate trial. In the wake of those announcements, SIGA sold 2 million shares of stock for $4.54 per share, more than three times the $1.40 per share it had traded for in 2005.

### 10. The parties attempt and fail to negotiate a definitive license agreement

After SIGA terminated the Merger Agreement, PharmAthene hired attorney Elliot Olstein to conclude a licensing agreement with SIGA. On October 12, PharmAthene's Baumel sent a proposed license agreement (the "Proposed License Agreement") that incorporated the terms of the LATS to James Grayer, outside counsel to SIGA. On October 26, 2006, Olstein sent an email to Nicholas Coch, another outside lawyer for SIGA, in which he expressed PharmAthene's readiness to sign the Proposed License Agreement because it contained "all the essential terms of a license agreement and is completely consistent with the [LATS]."[65] Coch responded that SIGA would not provide a revised license agreement before the parties met, stating that the "nature of the negotiations required under the Merger Agreement" necessitated "a robust discussion."[66]

65      JTX 419.

66      JTX 420.

Meanwhile, SIGA apparently had been discussing internally alternative structures for the definitive license agreement the parties were now pursuing in earnest. Though unclear who specifically, someone at SIGA asked Dugary to prepare a revised analysis of the total "past and future [ST–246] related investments and costs" and its potential market.[67] The apparent purpose of this request, ultimately, was for Dugary to suggest a revised payment that would support "buy[ing] into a 50% participation in future profits from the product."[68] On October 18, 2006, Dugary emailed Fasman, Borofsky, Savas, and Konatich her conclusions: total past and future development costs of ST–246 equaled $39.66 million and, therefore, "an up-front license fee of $40 million" would support a 50/50 deal in her view.[69]

67      JTX 437 & Attach. at 2.

68      JTX 437 Attach. at 2.

69      JTX 437 & Attach. at 2.

*10 On November 6, 2006, the parties met for the first time after the termination of the merger to discuss a license agreement. The meeting began with Fasman emphasizing the title of the LATS as a "Siga/PharmAthene *partnership* " and the need, given the clinical progress made on ST–246 since the negotiation of the LATS, to revise some of its economic

terms.[70] PharmAthene's representatives expressed confusion about SIGA's emphasis on a "partnership" and asserted their position that the parties were bound by the terms already contained in the LATS. Nevertheless, Olstein said PharmAthene was willing to listen to SIGA's proposal "in order to avoid a dispute," and pressed representatives of SIGA as to the specific changes SIGA wanted to make.[71] In response, SIGA suggested that an upfront payment of $40–45 million and a 50/50 profit split would be more appropriate.[72] The meeting ended with SIGA agreeing to draft a more formal proposal to send to PharmAthene.

70    T. Tr. 213–15 (Richman).

71    T. Tr. 216 (Richman).

72    T. Tr.2084–87 (Fasman); JTX 124 at 1; JTX 125 at 1.

On November 21, 2006, SIGA forwarded to PharmAthene a 102–page document, entitled "Limited Liability Company Agreement" (the "Draft LLC Agreement"). According to PharmAthene, this document completely ignored the LATS. For example, in comparison to the LATS, the Draft LLC Agreement included the following economic changes: (1) the upfront payment from PharmAthene to SIGA increased from $6 million to $100 million; (2) the milestone payments to SIGA increased from $10 million to $235 million; (3) the royalty percentages owed to SIGA increased from 8%, 10%, and 12% depending on the amount of sales to 18%,[73] 22%, 25%, and 28%; and (4) SIGA would receive 50% of any remaining profit whereas the LATS provided for profit sharing only from U.S. government sales having a margin of 20% or more.[74] In addition, several noneconomic terms were revised to favor SIGA heavily and to undermine PharmAthene's control of ST–246. These provisions included: (1) SIGA's right to resolve disputes unilaterally; (2) SIGA's ability to block any distribution to PharmAthene; (3) PharmAthene's obligation to fund fully the LLC's costs, despite having to split profits 50/50; and (4) SIGA's right to terminate the LLC under certain conditions, with PharmAthene having no right to cure and with all rights to the product reverting to SIGA.[75]

73    Section 6.5(c)(i) of the Draft LLC Agreement provides for a royalty of only 8% on the first $300 million of annual Net Sales. This percentage, however, appears to have been a typographical error; counsel clarified at trial that both parties understand the Draft LLC Agreement to provide for a royalty rate of 18%, not 8%, on the first $300 million of annual Net Sales. T. Tr. 953. Further references in this Opinion to Section 6.5(c), or to the royalties provided thereunder, thus incorporate that understanding.

74    JTX 48, Draft LLC Agreement, §§ 5.1(b), 6.5(b), 6.5(c), 6.1 & Schedule 1. In fact, Fasman intentionally drafted an extremely one-sided proposal. On November 18, Dr. Eric Rose, a SIGA board member and SIGA's current CEO, apparently recognized that the Draft LLC Agreement was almost too good to be true. Rose emailed Fasman to clarify whether "the new partnership entity will pay royalties to SIGA, and in addition SIGA will own half of the LLC?" Fasman responded: "Yes, that's the idea. SIGA will get to draw out the value of its half of the LLC first through the upfront, milestone and royalty payments. Any residual value can then get withdrawn through dividends or liquidation of the entity, so that PHTN can 'catch up' if there are sufficient funds available. In no situation, however, can SIGA ever be forced to give back money if there are insufficient funds to pay anything or PHTN's full share, to PHTN. Thus, SIGA will always be sure to get the value of its creation whether or not PHTN sees any value." JTX 465. This arrangement contrasts sharply with the LATS. As PharmAthene's damages expert Baliban reported, the license agreement contemplated by the LATS would have apportioned to PharmAthene approximately 70% of the total return from ST–246. Yet, under the Draft LLC Agreement proposed by SIGA, PharmAthene would have received only 16%. JTX 673, Baliban Report, ¶ 71.

75    Draft LLC Agreement § § 3.2, 3.3, 3.5, 4.2, 5.1(c).

After reviewing the Draft LLC Agreement, Olstein exchanged a series of letters with SIGA's Coch between late November and mid December 2006. Olstein asserted that the terms of the Draft LLC Agreement were "radically different from the terms

set forth in the [LATS]," but that PharmAthene was "willing to consider" changes to the LATS, including a 50/50 profit split.[76] For its part, SIGA disputed that the LATS was binding because of its "Non Binding Terms" footer and never addressed PharmAthene's proposal for an across-the-board profit split.[77] Finally, Coch issued an ultimatum on December 12 to which he sought a response by December 20: unless PharmAthene was prepared to negotiate "without preconditions" regarding the binding nature of the LATS, the parties had "nothing more to talk about...."[78] On December 20, 2006, PharmAthene commenced this action.

[76]   JTX 270.

[77]   JTX 109.

[78]   JTX 125.

### C. Additional Background Regarding Relief Sought by PharmAthene

**\*11** The primary form of relief PharmAthene seeks is specific enforcement of a license agreement that strictly conforms to the LATS. In the alternative, PharmAthene contends that it has proved a breach of SIGA's obligation to negotiate a license agreement in good faith in accordance with the terms of the LATS and is therefore entitled to expectation damages and the full benefit of its bargain. In support of its claim for expectation damages, PharmAthene introduced testimony from three different experts and extensive documentary evidence to show the degree of those damages. To the extent relevant to the decisions reached in this Opinion, much of that evidence is discussed *infra* in the Analysis section relating to remedies. To put this dispute in context, however, I briefly review here some of the facts underlying PharmAthene's damages claim.

As previously noted, SIGA received a $16.5 million development contract from the U.S. government in September 2006. In addition, it later received government contracts for over $75 million to support the development of ST–246.[79]

[79]   On September 1, 2008, SIGA received a five-year, $55 million contract from NIAID. Shortly thereafter, on September 18, 2008, SIGA received another $20 million from NIAID. Approximately one year later, on September 2, 2009, SIGA received a three-year, $3 million contract from NIH. JTX 151, Baliban Rebuttal Report, at 11–12 (citing SIGA SEC filings disclosing each government contract).

PharmAthene also presented evidence that as of the latter part of 2010 the U.S. government agency tasked with procuring medical countermeasures, the Biomedical Advanced Research Development Authority ("BARDA"), had taken actions which suggested that SIGA ultimately may be awarded a large contract to deliver its smallpox antiviral to the U.S. Strategic National Stockpile ("SNS"). BARDA initially issued a request for proposal for smallpox antivirals (the "Smallpox RFP") in March 2009 as a small business set-aside. In October 2010, BARDA informed SIGA of its intention to award it the contract under the RFP, with estimated revenues of approximately $2.8 billion if all options were exercised.[80] A subsequent challenge by an unsuccessful competitor for the contract resulted in a finding that SIGA did not qualify for small business status; that decision was on appeal at the time of trial. Even if the appeal fails, however, BARDA could resolicit proposals in a full and open competition under which a business of any size, including SIGA, would be eligible to receive the award. Indeed, PharmAthene adduced at least some evidence at trial to support an inference that BARDA likely would pursue such an approach if SIGA's appeal fails.

[80]   *See* SIGA press releases dated October 13, 2010 and November 7, 2010, JTX 666 and 669.

Pharmathene, Inc. v. Siga Technologies, Inc., Not Reported in A.3d (2011)

---

### D. Procedural History

PharmAthene's Complaint contained seven separate counts, asserting claims under theories of breach of contract, promissory estoppel, and unjust enrichment. On January 9, 2007, SIGA moved to dismiss the Complaint under Court of Chancery Rule 12(b)(6) for failure to state a claim upon which relief could be granted. I denied SIGA's motion in its entirety on January 16, 2008.[81]

81   *Pharmathene, Inc. v. SIGA Techs., Inc.,* 2008 WL 151855 (Del. Ch. Jan. 16, 2008) [hereinafter *SIGA I* ].

After extensive discovery, I granted a motion by PharmAthene to amend its Complaint on May 4, 2009. On May 18, 2009, SIGA filed an Answer and Counterclaim. The Counterclaim alleges that PharmAthene breached its contractual obligation to negotiate in good faith and seeks dismissal of the Amended Complaint, as well as reliance damages and SIGA's attorneys' fees and costs.

*12 On March 19, 2010, SIGA moved for partial summary judgment pursuant to Rule 56(c), seeking to dismiss Counts One through Four of the Amended Complaint and to preclude PharmAthene from obtaining either specific performance or expectation damages. The parties briefed that motion exhaustively and I heard argument on it on July 22, 2010. In a subsequent Memorandum Opinion, I denied SIGA's motion in its entirety.[82]

82   *Pharmathene, Inc. v. SIGA Techs., Inc.,* 2010 WL 4813553 (Del. Ch. Nov. 23, 2010) [hereinafter *SIGA II* ].

In January 2011, the Court presided over an eleven-day trial in this action.[83] After extensive post-trial briefing, counsel presented their final arguments on April 29, 2011.

83   Trial was held on January 3–7, 10–12, 18–19, and 21.

This Opinion constitutes the Court's post-trial findings of fact and conclusions of law on both PharmAthene's Amended Complaint and SIGA's Counterclaim.

---

### E. Parties' Contentions

In Counts One through Four of its Amended Complaint, PharmAthene alleges that SIGA had certain contractual obligations under the terms of the LATS, as incorporated in the Bridge Loan Agreement and the Merger Agreement. Count One seeks specific performance of an agreement in conformity with the terms of the LATS. Count Two acknowledges that a controversy exists regarding SIGA's obligations under the LATS, the Bridge Loan Agreement, and the Merger Agreement and seeks a declaration obligating SIGA to execute a license agreement with PharmAthene in accordance with the terms of the LATS and precluding it from entering into a joint venture with any other entity to develop ST–246. Count Three seeks damages for breach of contract, alleging that the parties intended to enter into an enforceable contract and commenced performance under it, but that SIGA breached the agreement when it repudiated the existence of any contract. Count Four seeks damages based on SIGA's alleged breach of its duty to execute a definitive license agreement.

As to the remaining counts of the Amended Complaint, Count Five seeks damages based on SIGA's alleged breach of (1) its obligation to negotiate in good faith and execute a license agreement in accordance with the terms of the LATS and (2) its duty to use its best efforts to complete the transactions envisioned under the LATS. Count Six seeks damages on grounds of promissory estoppel. It alleges that SIGA promised PharmAthene that either the parties would merge or it would get a license to ST–246, that PharmAthene reasonably relied on that promise and undertook to assist the development of ST–246, and that PharmAthene suffered harm as a result. Finally, Count Seven seeks damages on the grounds that SIGA was unjustly enriched by the management expertise, technical know-how, and capital it received from PharmAthene to help develop ST–246.

---

SIGA denies any liability to PharmAthene. Specifically, it denies that the parties ever reached a binding licensing agreement, both because the parties lacked any intent to be bound and because the LATS did not include all of the essential terms necessary to effect such an agreement. Rather, SIGA contends that any agreement the parties had regarding the LATS was merely an unenforceable agreement to agree. SIGA also denies that it promised PharmAthene control of ST–246, either through a merger or a license. Furthermore, SIGA contends that the assistance PharmAthene provided regarding the development of ST–246 was unsolicited and of little value to SIGA. Finally, SIGA asserts in its Counterclaim that it was PharmAthene, not SIGA, that breached its duty to negotiate in good faith a license agreement in accordance with the terms of the LATS. Thus, SIGA claims that PharmAthene caused it to incur unnecessary expense by improperly inducing SIGA to prepare the extensive Draft LLC Agreement and then refusing to consider it in good faith. SIGA accuses PharmAthene of unreasonably refusing to consider the LLC proposal, or a partnership alternative with economic terms that differed materially from the LATS.

## II. ANALYSIS

**\*13** PharmAthene bears the burden of proving most of its contract and quasi-contract claims by a preponderance of the evidence.[84] Two notable exceptions are its specific performance and promissory estoppel claims. PharmAthene must prove each of those claims by clear and convincing evidence, *i.e.,* proof that is "highly probable, reasonably certain, and free from serious doubt."[85]

84    *See United Rentals, Inc. v. RAM Hldgs., Inc.,* 937 A.2d 810, 834 n. 112 (Del. Ch.2007) ("The burden of persuasion with respect to the existence of the contractual right is a 'preponderance of the evidence' standard.") (citations omitted).

85    *Utz v. Utz,* 2003 WL 22952579, at *2 n. 11 (Del. Ch. Dec. 5, 2003); *see also United Rentals* 937 A.2d at 834 n. 112.

### A. Did the LATS, Standing Alone, or as Attached to the Merger Term Sheet, the Bridge Loan Agreement, or the Merger Agreement, Constitute a Binding License Agreement or Form of Partnership Contract?

Counts One through Four of Plaintiff's Amended Complaint are premised on the notion that there is a binding agreement between the parties, encompassing the terms set forth in the LATS, such that it effectively constitutes a license agreement. In these four counts, respectively, PharmAthene asks this Court: (1) to order specific performance by requiring SIGA to execute the Proposed License Agreement that PharmAthene provided to SIGA on October 12, 2006 or another agreement that includes the terms of the LATS (Count One); (2) to enter a declaration that SIGA is obligated to execute such an agreement (Count Two); (3) to award damages for SIGA's breach and repudiation of the "contract" between the parties (Count Three); and (4) to award damages for SIGA's breach of its alleged contractual duty to execute a definitive license agreement in accordance with the terms of the LATS (Count Four). Thus, I first examine whether PharmAthene has proven the existence of a binding license agreement between itself and SIGA.

PharmAthene contends that the LATS—either when negotiated in January 2006 or later, when attached to the merger term sheet, Bridge Loan Agreement, and Merger Agreement—created a binding contract between the parties that obligated SIGA to enter into a license agreement with substantially the same terms as those contained in the LATS. By contrast, SIGA argues that the LATS was never intended to be binding, was controlled by PharmAthene, and was not even provided to SIGA until weeks after it allegedly was agreed to. SIGA also questions whether the LATS ever was ratified by the PharmAthene board. In addition, it asserts that the LATS, as attached to the merger term sheet, Bridge Loan Agreement, and Merger Agreement, only constituted an agreement to agree on terms at a later date and, thus, is unenforceable.

### 1. Standard for an enforceable contract

The elements necessary to prove that an alleged agreement constitutes an enforceable contract are: (1) the intent of the parties to be bound by it; (2) sufficiently definite terms; and (3) consideration.[86] Here, there is no dispute as to consideration. As with term sheets generally in Delaware, whether the LATS is enforceable depends on two questions: "(1) whether the parties intended to be bound by the document; and (2) whether the document contains all the essential terms of an agreement."[87] Courts measure intent to be bound by "overt manifestations of assent, rather than [ ] subjective desires," and look for "an objective manifestation of intent to be bound...."[88] An intention to be bound "may be evidenced by continued performance in accordance with an agreement's terms."[89] To determine whether a term sheet includes all essential terms, courts consider " 'all of the surrounding circumstances, including the course and substance of the negotiations, prior dealings between the parties, customary practices in the trade or business involved and the formality and completeness of the document (if there is a document) that is asserted as culminating and concluding the negotiations' .... "[90]

[86]     *Carlson v. Hallinan,* 925 A.2d 506, 524 (Del. Ch.2006).

[87]     *SIGA II,* 2010 WL 4813553, at *7 (quoting *Hindes v. Wilm. Poetry Soc'y,* 138 A.2d 501, 502–04 (Del. Ch.1958) and *SDK Invs., Inc. v. Ott,* 1996 WL 69402, at *7, 11 (E.D.Pa. Feb. 15, 1996)).

[88]     *BAE Sys. Info. & Elec. Sys. Integration, Inc. v. Lockheed Martin Corp.,* 2009 WL 264088, at *4 (Del. Ch. Feb. 3, 2009).

[89]     *Id.*

[90]     *Patel v. Patel,* 2009 WL 427977, at *3 (Del.Super.Feb.20, 2009) (quoting *Leeds v. First Allied Conn. Corp.,* 521 A.2d 1095, 1101–02 (Del. Ch.1986)).

### 2. The LATS was not a binding license agreement

#### a. The LATS as a stand-alone document

**\*14** PharmAthene and SIGA both had clear objectives when they began negotiating their strategic options. In December 2005, Konatich, SIGA's Chief Financial Officer, contacted Richman, PharmAthene's Vice President of Business Development and Strategies, about a possible collaboration between the companies to continue the development of ST–246. Because SIGA was quickly running out of cash, Konatich primarily sought a license agreement, which would get SIGA the funds it needed faster than a merger would.[91] PharmAthene's focus was on securing the rights to ST–246, either through a license agreement or a merger, but it preferred a merger. Nevertheless, PharmAthene focused on a license agreement initially because SIGA essentially insisted that it do so. A transaction in keeping with the LATS would have been consistent with PharmAthene's goal to obtain control of ST–246.

[91]     T. Tr. 1398, 1404 (Konatich), 124–25 (Richman).

Based on PharmAthene's account, it intended to be bound in late January 2006 when its board informally reviewed and approved the LATS. For several reasons, however, I find that the parties did not intend to be bound when the LATS originally was negotiated between Drapkin and Richman. First, although Richman allegedly received approval from the

PharmAthene board to accept the two revisions to the terms that Drapkin requested, there is no mention of the LATS or Drapkin's revisions to it or any approval of either of these items in the minutes of the PharmAthene board meeting on January 18. Second, PharmAthene did not send a copy of the revised and final LATS to SIGA for its review or its file for weeks. Indeed, the only evidence that PharmAthene conveyed its acceptance of the LATS to SIGA before February 10, 2006 is Richman's testimony that he told Drapkin by phone on January 19,[92] which Drapkin denied.[93] Moreover, the LATS was not executed by either party in January 2006 or at any time thereafter, and importantly, the parties included at the bottom of each of the two pages of the LATS the legend "Non Binding Terms—SIGA246 January 26, 2006." These facts indicate that, as of that date, the parties did not intend the LATS to be binding.

[92]   T. Tr. 157–58.

[93]   T. Tr. 1226 (characterizing the January 19 phone conversation as a discussion about proceeding with a potential merger instead of a licensing agreement).

The overall makeup of the LATS supports this conclusion. It is a two-page, typewritten document, entitled, "SIGA/PharmAthene Partnership." The first entry, labeled "Objective," states, "To establish a partnership to further develop & commercialize SIGA–246 for the treatment of Smallpox and orthopox related infections and to develop other orthopox virus therapeutics."[94] Beyond that, however the LATS generally outlines the terms of a potential license agreement. With the sole exception of the entry regarding the "R & D Committee," all of the topics addressed in the LATS relate to a license arrangement. Those topics include: the field of use of specified types of products, the territory of the license, the patents, know-how, and materials covered by the license, the nature of the licenses SIGA was to grant, the license fee, the deferred license fee, milestone payments, and royalties, including the royalty term. The document itself, however, says nothing about its being binding or even about an obligation of the parties to negotiate a license agreement consistent with the LATS.

[94]   LATS at 1.

**\*15** Early in this litigation, PharmAthene asserted that, as of January 26, 2006, "both parties understood and acknowledged that the [LATS] was a binding agreement."[95] By the time of its Post–Trial Opening Brief, however, PharmAthene's position had evolved, especially as relates to the significance of the "Non Binding" footer. There, PharmAthene stated: "Thus, it's clear what the footer meant—that as of Jan. 26, 2006 (the date of the final version of the LATS) the LATS terms standing alone were nonbinding. The footer says nothing, however, about the status of that document after Jan. 26."[96]

[95]   JTX 4, Aff. of Eric Richman, dated Mar. 22, 2007, ¶ 8.

[96]   Plaintiff's Post–Trial Opening Brief ("Pl.'s Post–T. Op. Br.") 39.

Based on a careful review of the evidence, I find that PharmAthene either has conceded that the LATS standing alone is nonbinding or has failed to prove by even a preponderance of the evidence that when the parties negotiated the LATS in January 2006 they intended it to constitute a binding license agreement.

### b. The LATS as it was incorporated into the merger term sheet, Bridge Loan Agreement, and Merger Agreement

Between February and June 2006, the parties executed three separate documents to which they attached the LATS. On March 10, they signed the merger LOI to which they attached the merger term sheet and LATS. On March 20, the parties entered into the Bridge Loan Agreement, to which they also attached the LATS. Finally, on June 8, SIGA and PharmAthene signed the Merger Agreement, which included the LATS as an attachment. Each of these three documents contains a provision

explicitly stating, in effect, that if the merger did not close, the parties would negotiate in good faith a license agreement of ST–246 in accordance with the terms set forth in the LATS.[97]

97    Because the Merger Agreement ultimately superseded the merger term sheet, I discuss only the Merger Agreement in the remainder of this Opinion. Similar analysis would apply to the merger term sheet.

The parties dispute whether the provision referencing the LATS in either the Bridge Loan Agreement or the Merger Agreement constitutes a binding and enforceable contractual obligation of SIGA. PharmAthene first argues that each of those provisions contractually obligates SIGA to enter into a license agreement with PharmAthene having the terms specified in the LATS.[98] SIGA denies that allegation, contending that neither the Bridge Loan Agreement nor the LATS requires it to enter into such a license because, again, (1) the parties did not intend to be bound to such an obligation, and (2) the LATS does not contain all the essential terms of a license agreement for a product like ST–246. Second, PharmAthene asserts that, in any event, the Bridge Loan Agreement and Merger Agreement both obligated SIGA to "negotiate in good faith with the intention of executing a definitive License Agreement in accordance with the terms set forth in the [LATS]."[99] The latter contention and the issue of whether SIGA violated any obligation to negotiate in good faith are discussed *infra* with respect to Count Five of the Amended Complaint. There is no dispute the Bridge Loan Agreement and the Merger Agreement bound the parties to negotiate in good faith. PharmAthene also contends, however, that those Agreements, in conjunction with the LATS, imposed a binding obligation on SIGA to enter into a license having the same terms as the LATS. I address that issue next.

98    In this regard, I note that the LATS does not include a choice of law term, but the Bridge Loan Agreement specifies that it is governed by Delaware Law and the Merger Agreement provides that it is subject to New York law. BLA § 7.11; Merger Agreement § 13.5. For the most part, the parties briefed and argued the issues in this case as though Delaware law applied. With one possible exception, they also did not identify any material differences between Delaware and New York law in terms of the issues currently before the Court. That arguable exception relates to the availability of expectation damages for a breach of the duty to negotiate in good faith. As discussed more fully *infra*, SIGA relies on *Goodstein Constr. Corp. v. City of N.Y.*, 80 N.Y.2d 366 (1992), a New York Court of Appeals case, for the proposition that reliance, not expectation, damages are PharmAthene's only available remedy. Defendant's Post–Trial Answering Brief ("Def.'s Post–T. Ans. Br.") 55. Accordingly, unless otherwise noted, I have analyzed the issues presented under Delaware law.

99    BLA § 2.6.

**\*16** For many of the same reasons discussed previously regarding the LATS, I am not convinced that both parties intended to be bound to a specific license agreement when they agreed to attach the LATS to executed versions of the Bridge Loan and Merger Agreements. As discussed *supra,* PharmAthene subjectively may have had such an intent to be bound. Its board of directors allegedly ratified the LATS in January 2006 and, by including language in the Bridge Loan and Merger Agreements referring to the LATS and attaching it to those agreements, PharmAthene sought to guarantee its control of ST–246, which was the primary goal of its negotiations with SIGA.

I am not persuaded, however, that SIGA intended to be bound to a license agreement reflecting the terms delineated in the LATS. The "Non Binding Terms" footer points away from an intent to be bound, but it is not outcome determinative. The factual record as to the purpose of that footer is murky, at best. PharmAthene's Richman attempted to avoid the impact of the footer by calling it a mistake and a mere vestige of the initial negotiations regarding the LATS.[100] Baumel testified that he deliberately left the "Non Binding Terms" legend on the LATS when it was attached to the Bridge Loan and Merger Agreements because that was the agreement of the parties.[101] In addition, SIGA asserts that its counsel always confirmed that the legend was included in the LATS when it was attached to later documents.[102] Because the date of the legend never changed and there is no evidence that the parties specifically discussed the legend, I accord it only limited weight. Specifically, I find that it supports the view that the parties did not intend the LATS as attached to these agreements to be a binding license agreement or to require that any later formal agreement include exactly the same terms as the LATS.[103]

100    T. Tr. 287–88 (Richman averred that he typically removes similar footers only when sending an execution version of a term sheet, but did not do so with the LATS because it was attached to another document that was signed); *see also* T. Tr. 366 (Baumel) ("This

is a dateline footer. It is clearly not a term of a term sheet.").

101  T. Tr. 366 ("[W]e were instructed by the parties to attach the term sheet, as it was last negotiated, to the agreement"), 387 ("The parties intended the last term sheet that had been negotiated between the parties to be attached to the agreement" and "[t]he legend is on the piece of paper").

102  *See* T. Tr. 1524–26 (Grayer) (testifying that if PharmAthene had sent a new version of the LATS omitting the "Non Binding Terms" legend, Grayer would have confirmed that change with SIGA before attaching the LATS to the Merger Agreement).

103  Nevertheless, as discussed further *infra*, I do not consider the "Non Binding Terms" legend to be inconsistent with the obligation of the parties to negotiate in good faith about executing a license agreement in accordance with the terms of the LATS. In particular, I reject as not supported by the evidence the position of SIGA and Drapkin that it represented simply a nonbinding "jumping off point" for a discussion about a license agreement. *See* T. Tr. 1235–36 (Drapkin).

Other provisions of the Bridge Loan and Merger Agreements further support my finding that the LATS as attached to these agreements did not bind SIGA to enter into a license agreement including the same terms. For example, Sections 2.3 of the Bridge Loan Agreement and 12.3 of the Merger Agreement expressly state that the parties will "negotiate" a license agreement in accordance with the terms of the LATS and recognize that the parties might never enter into a license agreement. In addition, the Bridge Loan Agreement has a maturity date and provides PharmAthene with a security interest in SIGA's assets. For these and the reasons previously stated in this section, I find that PharmAthene has not shown that, when the parties executed either the Bridge Loan Agreement or the Merger Agreement, they intended to bind themselves to enter into a license strictly conforming to the LATS.

### 3. The LATS does not contain all of the essential elements of a license agreement

The Bridge Loan Agreement and Merger Agreement provisions incorporating the LATS do not constitute a basis for binding SIGA to the terms of the LATS for a second and independent reason: they do not contain all the essential terms of a license agreement for a product like ST–246. In determining whether all essential terms are present, a court must decide whether a reasonable negotiator in the position of one asserting the existence of a contract would have concluded, in that setting, that the agreement reached constituted agreement on all of the terms that the parties themselves regarded as essential and, thus, that the agreement concluded the negotiation .104

104  *SIGA II,* 2010 WL 4813553, at *6 (citing *Loppert v. WindsorTech, Inc.,* 865 A.2d 1282, 1285 (Del. Ch.2004)).

**\*17** PharmAthene contends this issue should be answered in the affirmative. They emphasize, for example, that Drapkin, who took a lead role for SIGA in the negotiation of the LATS, never mentioned several terms that SIGA now characterizes as essential, such as dispute resolution and the governing law. PharmAthene also relies heavily on Drapkin's alleged statement that the parties "had a deal" as to the LATS around mid January 2006, from which they infer that any terms that remained to be negotiated were mere boilerplate.105 In addition, PharmAthene relies on the testimony and opinions of its licensing expert, Marc Edwards. He testified that the level of detail of the LATS was sufficient to effect a binding agreement between two parties in the biotechnology and pharmaceuticals industry.106 Specifically, from disclosures made to the SEC, Edwards identified six binding letters of intent that, like the LATS, lacked a number of terms SIGA claims were material and essential. Examples of such missing terms include those relating to: diligence, timetable obligations, indemnification, competing products, patent prosecution and litigation, confidentiality, ownership and licensing of new technology, and commercialization program particulars.107

105    As to whether a term sheet includes all essential terms of an agreement, the absence of a boilerplate provision may be immaterial. *See* Asten v. Wangner Sys. Corp., 1999 WL 803965, at *2–3 (Del. Ch. Sept. 23, 1999).

106    T. Tr. 977–78.

107    Edwards also attempted to equate the LATS to three different licensing agreements that were filed with the SEC. JTX 489 at 17 n. 11. As SIGA notes, however, each of those agreements was signed and explicitly labeled as binding. Def.'s Post–T. Ans. Br. 42.

In further support of its position that the LATS does not contain all the essential terms of a license agreement, SIGA presented its own licensing expert, Norman Jacobs. Speaking from a business, as opposed to a legal, perspective, Jacobs opined that significant terms either were completely missing from, or lacked sufficient clarity in, the LATS to form a workable long-term relationship, regardless of whether the LATS contemplated a straight license agreement or a partnership between SIGA and PharmAthene. The terms Jacobs alleged were material but missing from the LATS included: defined funding obligations; details as to the structure, composition, and dispute resolution procedures for the joint research and development committee or any other committees necessary for the development and commercialization of ST–246; delineation of the patent prosecution and infringement responsibilities of the parties; minimum sales or diligence obligations; and, if a partnership was contemplated, provisions detailing the structure of such an arrangement. SIGA also noted that PharmAthene's expert Edwards developed a template of best practices with respect to biotechnology licensing deals which describes numerous aspects of such arrangements that were not included in the LATS. The topics allegedly not addressed differ from the LATS in that they included patent ownership, defense and maintenance costs, governance and dispute resolution mechanisms for joint committees, termination rights, and license maintenance and diligence. In addition, while the LATS was being negotiated, Hruby of SIGA expressed concern to PharmAthene's Richman that important issues regarding patent prosecution and the operation of any joint research and development committee still needed to be discussed. Lastly, SIGA emphasizes the absence in either company's board minutes of a discussion, let alone approval, of a final binding term sheet.

**\*18** Regardless of whether the parties intended to be bound, "[w]here the[y] fail to agree on one or more essential terms, there is no binding contract."[108] Moreover, where, as in this case, a plaintiff seeks specific performance of an alleged contract, the plaintiff must prove by clear and convincing evidence that the agreement contains all essential terms and that they are sufficiently definite to be enforced.[109] Paraphrasing the statement of the applicable test in *SIGA II,* I must determine

108    *Patel v. Patel,* 2009 WL 427977, at *3 (Del.Super.Feb.20, 2009) (citation omitted); *Intellisource Gp., Inc. v. Williams,* 1999 WL 615114, at *4 (D.Del. Aug. 11, 1999).

109    *See Osborn v. Kemp,* 991 A.2d 1153, 1158 (Del.2010) (specific performance requires, *inter alia,* existence of a valid contract); *Patel,* 2009 WL 427997, at *3 (no contract exists where one or more essential terms are missing).

whether a reasonable negotiator in the position of [PharmAthene] would have concluded, in that setting, that the [LATS as attached to the Bridge Loan Agreement or the Merger Agreement] constituted agreement on all of the terms that the parties themselves regarded as essential and thus that the agreement concluded the negotiations....[110]

110    *SIGA II,* 2010 WL 4813553, at *8 (quoting *Loppert v. WindsorTech, Inc.,* 865 A.2d 1282, 1285 (Del. Ch.2004)).

Having carefully considered all of the relevant evidence, I conclude that the answer to that question is no. In particular, I find that a reasonable negotiator in the position of PharmAthene would not have concluded that the LATS, as attached to the Bridge Loan and Merger Agreements, manifested agreement on all of the license terms that SIGA and PharmAthene regarded

as essential. In that context, therefore, such a reasonable negotiator would not have believed that the LATS concluded the parties' negotiations.

In arguing to the contrary, PharmAthene relies primarily on three cases: *Loppert v. WindsorTech, Inc.,*[111] *Asten, Inc. v. Wangner Systems Corp.,*[112] and *Parker–Hannifin Corp. v. Schlegel Electronic Materials, Inc.*[113] Yet, none of these cases supports a finding that the LATS as attached to the Bridge Loan Agreement or Merger Agreement constituted an agreement between the parties on all essential elements of a license to ST–246.

111   865 A.2d 1282 (Del. Ch.2004), *aff'd*, 867 A.2d 903 (Del.2005).

112   1999 WL 803965 (Del. Ch. Sept. 23, 1999).

113   589 F.Supp.2d 457 (D.Del.2008).

PharmAthene likens this case to *Loppert* because it alleges that SIGA's Drapkin stated in mid to late January 2006 that "we have a deal" and that all that remained for the parties to negotiate was boilerplate. Drapkin denies making that statement, but even if he did, I find for the reasons discussed *supra* that Drapkin focused more narrowly on what he considered to be the key economic components of a license with PharmAthene regarding ST–246. Drapkin credibly denied having the expertise to know what all the essential terms of such a license would be, and there is no evidence that anyone among those who worked with him in the negotiations with PharmAthene in early 2006 possessed that expertise. Indeed, Hruby had told Richman that certain important terms, such as the makeup and operation of the research and development committee, remained to be negotiated.

In *Asten,* the court ordered specific performance of a term sheet. In reaching that conclusion, the court held that the intent of the parties to split the proceeds was clear and "an unresolved administrative issue as to how to effect the split does not constitute the omission of a material term."[114] The circumstances here are different. The issues SIGA and PharmAthene implicitly left for future negotiations involve far more than simply "unresolved administrative issues." In addition, PharmAthene has not proven that the parties believed they had reached agreement on all essential terms.

114   1999 WL 803965, at *3.

**\*19** Finally, I also consider PharmAthene's reliance on *Parker–Hannifin* to be misplaced. There, the issue was whether a series of communications constituted a binding agreement to settle a patent infringement case and grant cross licenses. The court upheld the agreement even though it included only the following three essential terms: (1) that no party would support a challenge to the validity or enforceability of the patents; (2) that the parties would exchange mutual releases regarding the matter in litigation; and (3) that the parties would grant each other paid-up cross-licenses under the patents in suit covering all past, present, and future marketed products. The key question before the court in *Parker–Hannifin* was whether all of the terms the parties themselves regarded as important had been resolved. There, the court held they had been.

I cannot draw the same conclusion here. By the end of January 2006, the parties appear to have agreed on the main economic terms of a license agreement to ST–246. The logical next step would have been to turn the LATS over to the parties' respective counsel to incorporate those key terms into a formal license agreement. PharmAthene, however, effectively preempted this next step by expressing its preference for a merger agreement rather than a license. In fact, PharmAthene tried to secure the best of both worlds by attempting to include in the merger term sheet a requirement that the parties attach to the anticipated merger agreement a full-blown, executed license agreement in case the merger was not completed. But, SIGA, through Drapkin, balked. He refused to incur the time and expense of fully negotiating a license agreement that might never be needed and instead agreed only to include in the Bridge Loan Agreement and, ultimately, the Merger Agreement, provisions that required SIGA to "negotiate in good faith with the intention of executing a definitive License Agreement in accordance with the terms set forth in [the LATS]...."[115] These facts render the decision in *Parker–Hannifin* inapposite.

Pharmathene, Inc. v. Siga Technologies, Inc., Not Reported in A.3d (2011)

115      BLA § 2.3.

### B. Did SIGA Breach an Obligation to Negotiate in Good Faith a License Agreement Containing Substantially the Same Economic Terms As The LATS116

116      SIGA contends that PharmAthene waived its claim for breach of a duty to negotiate in good faith under Count Five of its Amended Complaint by failing to discuss that claim in its Post–Trial Opening Brief. I find that argument unpersuasive. PharmAthene sufficiently preserved its claim under Count Five by making multiple references in its Post–Trial Opening Brief to SIGA's duty to negotiate in good faith under the Bridge Loan and Merger Agreements. Although PharmAthene focused most heavily on its claim that an actual licensing contract existed between it and SIGA, it argued in the alternative that "this court has held that ... even an 'agreement to agree' can be specifically enforced" and cited authority that "an agreement to negotiate in good faith may be binding under Delaware law ... and specific performance could, in theory, be an appropriate remedy for breach of such a provision." Pl.'s Post–T. Op. Br. 46 n. 47 (citing *Great–West Investors LP v. Thomas H. Lee P'rs, LP*, 2011 WL 284992, at *9 (Del. Ch. Jan. 14, 2011)).

### 1. Key facts

Although I have concluded that SIGA and PharmAthene did not enter into a definitive licensing agreement when they attached the LATS to both the Bridge Loan and Merger Agreements, these documents still are critical to determining the nature of the relationship between the parties. Section 2.3 of the Bridge Loan Agreement, executed on March 20, 2006, states that if the parties failed to merge, "SIGA and PharmAthene will negotiate in good faith with the intention of executing a definitive License Agreement in accordance with the terms set forth in the [LATS]...." The Merger Agreement, executed on June 8, 2006, contains essentially the same language. Even after these agreements were signed, however, it was uncertain whether the parties would be able to effect a merger or what ultimate form any joint undertaking between them would take.

**\*20** A number of promising events happened in the development of ST–246 between the time the Merger Agreement was signed on June 8, 2006 and its termination on September 30, 2006. For example, on June 9, NIAID awarded SIGA $5.4 million to develop the drug. In July, SIGA successfully completed the first planned clinical safety trial of ST–246. And, in late September, SIGA was awarded a $16.5 million NIH contract, which SIGA considered sufficient to support the entire remaining development of ST–246. With these events in mind, SIGA denied PharmAthene's request for an extension of the September 30, 2006 termination date and advised Wright that it did not intend to pursue the merger further.

In the ensuing license negotiations, Drapkin played virtually no active role. Fasman and SIGA's outside counsel, Grayer and Coch, took the lead for SIGA. Although Drapkin was not directly involved, Fasman still described Drapkin as "a central participant," and said that he "was copied on every email [Fasman] sent out," "was a sounding board for [Fasman]," was one "of [the] members of SIGA's board kept aware of the terms of the LLC agreement .... [and he] certainly knew what was going on."117

117      T. Tr. 2224–26.

On October 12, 2006, Baumel sent Grayer PharmAthene's Proposed License Agreement, which incorporated the terms of the LATS in a more fully fleshed-out agreement. In an October 26 email to Coch, Olstein expressed PharmAthene's willingness to sign the Proposed License Agreement and suggested that the parties meet after SIGA sent a revised license agreement incorporating any proposed changes. Coch agreed to meet November 6, but stated that SIGA would not provide a revised draft in advance of that meeting. Coch also asserted that the Merger Agreement contemplated the need for "a robust discussion" regarding the license agreement.118

118      JTX 420.

At the November 6 meeting, Fasman proposed that the collaboration between the parties take a partnership structure, in the form of an LLC, rather than be a licensing transaction. SIGA claimed this was consistent with the "SIGA/PharmAthene partnership" title and intended purpose of the LATS. PharmAthene expressed surprise at this proposed structure because it understood the LATS to have envisioned a straight licensing deal in which PharmAthene would control the product within its own corporate structure and make certain payments back to SIGA. When pressed by PharmAthene, SIGA suggested that an upfront payment from PharmAthene of $40–45 million and a 50/50 profit split might be appropriate parameters for such a partnership or LLC transaction. These terms differed significantly from the original terms of the LATS, under which PharmAthene was scheduled to make an upfront payment of $6 million and SIGA was entitled to a profit split only as to U.S. government sales having a profit margin of 20% or more. Olstein responded that the parties were bound by the terms of the LATS but that, to avoid dispute, PharmAthene would consider economic terms somewhat different than those included in the LATS. PharmAthene's representatives also objected to Fasman's proposed LLC structure as inconsistent with the requirement that the parties negotiate a license agreement. The meeting ended with SIGA agreeing to put together a proposal in writing and PharmAthene undertaking to provide SIGA with the financial projections it had done for ST–246.

**\*21** On November 21, 2006, Coch sent SIGA's proposed 102–page Draft LLC Agreement to Baumel. Under this proposal, the parties jointly would own the prospective LLC and PharmAthene would make upfront, royalty, and milestone payments to SIGA. The LLC would hold an exclusive license under the patents to ST–246, but SIGA would receive a $300 million credit to its capital account to reflect its contribution of the patent rights and other research and development results to the entity.[119] PharmAthene would receive only the residual value from sales of the drug if adequate funds were left after the upfront, milestone, and royalty payments had been made.

119    Draft LLC Agreement § 5.1(a).

Virtually every term of the Draft LLC Agreement was more favorable to SIGA than the corresponding provision in the LATS. For example, the upfront payment had increased from $6 million in the LATS to $100 million in the Draft LLC Agreement; the milestone payments had increased from $10 million to $235 million; the royalty rates to be paid to SIGA had increased from a range of 8%–12% to 18%–28%; and SIGA would be entitled to 50% of any remaining profit from the LLC, not just when net margin exceeded 20% on sales to the U.S. Government, as provided for in the LATS.

SIGA also revised the noneconomic terms of the proposed relationship to favor itself significantly. Whereas PharmAthene would have been the principal decisionmaker under the LATS, operational control shifted to SIGA under the Draft LLC Agreement. For example, SIGA unilaterally could resolve disputes, block distributions to PharmAthene, and terminate the LLC if certain events occurred, without even affording PharmAthene a right to cure. Yet, PharmAthene still would have been responsible to fund and guarantee all of the LLC's operations and obligations, despite having less operational control and being subject to much greater risk in terms of its potential payout.

The parties met again on November 28, 2006, to discuss the Draft LLC Agreement, but that meeting was not productive. Thereafter, Olstein sent a letter to Coch on November 30, repeating PharmAthene's position that, although it believed the parties were bound by the terms of the LATS, it still was willing to consider certain changes. In a reply sent on December 4, Coch stated that ST–246 had increased in value due to SIGA's "investment of time, money and effort," but did not suggest any revised terms.[120] Instead, SIGA offered to continue negotiations if PharmAthene agreed that the LATS was nonbinding. The parties exchanged a bit more correspondence, but neither side altered their proposals. On December 20, 2006, Pharmathene filed this action.

120    JTX 109.

## 2. Did SIGA act in bad faith by proposing the Draft LLC Agreement?

By executing the Bridge Loan Agreement and the Merger Agreement, both SIGA and PharmAthene became bound by the

terms of those contracts. Accordingly, even if the parties were not obligated to execute a license agreement with terms identical to those in the LATS if the merger failed to close, the LATS still remained relevant to their relationship. This is because both Agreements expressly required the parties to "negotiate in good faith with the intention of executing a definitive License Agreement in accordance with the terms set forth in the License Agreement Term Sheet" and both included the LATS as an exhibit.

**\*22** Under Delaware law, bad faith constitutes "not simply bad judgment or negligence, but rather ... the conscious doing of a wrong because of dishonest purpose or moral obliquity; it is different from the negative idea of negligence in that it contemplates a state of mind affirmatively operating with furtive design or ill will."[121] Thus, a party seeking to prove that another party has breached an obligation to negotiate in good faith must establish that the defendant's conduct was "motivated by a culpable mental state" or "driven by an improper purpose" that "rise[s] to a high level of egregiousness."[122]

121   *CNL–AB LLC v. E. Prop. Fund I SPE (MS Ref) LLC,* 2011 WL 353529, at \*9 (Del. Ch. Jan. 28, 2011). Obliquity is defined as "deviation from moral rectitude or sound thinking." *Merriam–Webster's Collegiate Dictionary* 856 (11th ed.2004).

122   *Judge v. City of Rehoboth,* 1994 WL 198700, at \*2 (Del. Ch. Apr. 29, 1994); *Amirsaleh v. Bd. of Trade of N.Y., Inc.,* 2009 WL 3756700, at \*5 (Del. Ch. Nov. 9, 2009), *rev'd on other grounds,* 2011 WL 3585598 (Del.2011).

In considering the duty to negotiate in good faith, this Court has held that an attempt to condition future agreement on a previously "contested and compromised" point is "an unambiguous act of bad faith" where the other party performed in reliance on that compromise.[123] PharmAthene has made such a showing in this case. Specifically, the evidence proves that SIGA and PharmAthene contested and compromised the primary economic terms of a license to ST–246 in the LATS, that PharmAthene acted in reliance on that compromise, and that SIGA disregarded those terms and attempted to negotiate a definitive license agreement that contained economic and other terms drastically different and significantly more favorable to SIGA than those in the LATS.[124] Accordingly, I find that SIGA acted in bad faith in relation to its duty to negotiate the terms of a licensing agreement in accordance with the terms of the LATS.

123   *See RGC Int'l Investors, LDC v. Greka Energy Corp.,* 2001 WL 984689, at \*13 (Del. Ch. Aug. 22, 2001) [hereinafter *Greka* ].

124   *See id.* at \* 11, 14 (finding a breach of the duty to negotiate in good faith where the defendant made "a blatant attempt to force [the plaintiff] to give up a specifically negotiated provision in the Term Sheet—a provision that was already a settled item.") (citing *Abex Inc. v. Koll Real Estate Gp., Inc.,* 1994 WL 728827, at \*37 (Del. Ch. Dec. 22, 1994)).

### a. Did SIGA have a duty to negotiate a license agreement with economic terms similar to those in the LATS?

PharmAthene claims that the relevant clauses in the Bridge Loan and Merger Agreements required the parties to negotiate a license agreement with the same or similar economic terms as those in the LATS. According to PharmAthene, therefore, SIGA's proposed LLC structure, with economic terms that greatly differed from the terms in the LATS, could not have been proposed in good faith. SIGA, on the other hand, contends that the parties intended the LATS simply to provide a "jumping off point" by specifying the basic structure of a potential licensing agreement or partnership. Based on the facts surrounding the negotiation of the LATS and the subsequent dealings between the parties, I find that when the parties negotiated and compromised the terms of the LATS and the Bridge Loan and Merger Agreements, they mutually understood that any future license agreement would contain terms substantially similar to the LATS. Therefore, SIGA had a duty to negotiate a license agreement with PharmAthene having economic terms substantially similar to those agreed to in the LATS.

The evidence shows that the parties intended the LATS to provide more than just a basic framework for a future license agreement in which the amounts specified for various payments represented little more than mere placeholders. Throughout

January 2006, SIGA and PharmAthene engaged in significant negotiations regarding the economic terms of the LATS. As a result, they arrived at specific economic terms for a potential license and incorporated them into the LATS. These terms not only included specific dollar amounts and royalty percentages to be paid by PharmAthene to SIGA, but also contained agreements as to the triggers, timing, and form of the payments to be made. For example, based on a request from SIGA, PharmAthene agreed that SIGA would be entitled to "receive 50% of any amounts by which net margin exceeds 20% on sales to the U.S. Federal Government."[125] The parties did not conclude a license agreement in early 2006 because PharmAthene elected to focus instead on merger discussions. Nevertheless, the incorporation of the LATS into the Bridge Loan and Merger Agreements reflects an intent on the part of both parties to negotiate toward a license agreement with economic terms substantially similar to the terms of the LATS if the merger was not consummated.

[125]   LATS at 2; T. Tr. 156–57 (Richman).

**\*23** The extent to which the parties negotiated the economic terms of the LATS in January 2006 and the inclusion of the LATS in the Bridge Loan and Merger Agreements buttresses the conclusion that they intended those terms to be more than a mere "jumping off point" in later negotiations. SIGA's purported understanding of the LATS would render the January 2006 negotiations superfluous and the actual terms of the LATS virtually meaningless. I find it unlikely, especially considering SIGA's immediate cash needs in late 2005 and early 2006, that the parties would have wasted time and money negotiating specific economic terms for the LATS without intending to give those terms significance in later negotiations. I find it equally unlikely that the parties would have incorporated the LATS into the subsequent Bridge Loan and Merger Agreements if they intended the LATS to provide only a rough and easily modified outline of the basic structure of the licensing agreement.

PharmAthene's performance under the Bridge Loan and Merger Agreements also supports my finding that it understood the parties to have intended the terms of the LATS to be important. The evidence shows that PharmAthene had no interest in serving as a bank to SIGA—*i.e.*, in loaning SIGA the $3 million it sought with the sole expectation of being repaid the principal and a negotiated rate of interest. In early 2006, PharmAthene did not have $3 million in freely available cash to make such a loan. Instead, PharmAthene itself had to raise capital to make that loan.[126] The record supports a finding that PharmAthene agreed to make the Bridge Loan as an investment in ST–246 which would enable the parties to explore fully the possibility of a merger while maintaining PharmAthene's right to pursue a license in accordance with the LATS. In that regard, I credit the testimony and documentary evidence PharmAthene adduced that it would not have loaned $3 million to SIGA without an assurance from SIGA that PharmAthene reasonably could expect to control ST–246 through either a merger or a license agreement in accordance with the terms of the LATS. The evidence shows that, as PharmAthene asserts, it made the Bridge Loan to assuage SIGA's immediate need for cash and to facilitate PharmAthene's preference for a merger, if possible. Hence, the parties focused their energies between February and June 2006 on negotiating the terms of the Bridge Loan Agreement, effectuating the Bridge Loan, and negotiating the Merger Agreement with the understanding that if no merger occurred, they would negotiate a fallback licensing agreement in accordance with the basic economics of the LATS.

[126]   PharmAthene raised the requisite capital to extend the Bridge Loan from its original investors and from personal contributions by its senior management. T. Tr. 184 (Richman).

On or about September 30, 2006, SIGA terminated the Merger Agreement because the merger had not closed within the prescribed time period. As a result, the LATS-related clauses of the Bridge Loan and Merger Agreements became operative. For the reasons stated in this section, I find that those clauses required the parties to negotiate in good faith a license agreement with economic terms substantially similar to those contained in the LATS.

### b. Were the economic terms proposed by SIGA in the later negotiations so different from the LATS as to constitute bad faith?

**\*24** In expectation that it eventually would control ST–246 through either a merger or license agreement in accordance with

the LATS, PharmAthene gave SIGA a $3 million bridge loan and provided support for developing and commercializing ST–246 during the period from approximately March to September 2006. At least partially as a result of PharmAthene's loan and support, SIGA was able to move forward with development of the drug and, by late summer 2006, had received strong indications that ST–246 would be enormously successful.

At the same time, SIGA began experiencing "seller's remorse" for having given up control of what was looking more and more like a multi-billion dollar drug. Indeed, by the end of September 2006, SIGA had secured independent government funding to support the remaining development of ST–246, which it believed made PharmAthene's continued involvement unnecessary. Therefore, when PharmAthene asked for an extension of the merger deadline, SIGA declined. Against that background, PharmAthene turned its sights to negotiating a license agreement in accordance with the terms of the LATS as required under the Bridge Loan and Merger Agreements.

As discussed *supra,* SIGA was required to negotiate a license agreement with PharmAthene that included economic terms substantially similar to the economic terms of the LATS. The terms proposed under the Draft LLC Agreement, however, were not similar to the LATS, nor were they intended to be. Even though SIGA's projections of the value of the drug had increased by, at most, three to four times, it increased the amount of the upfront and milestone payments that would be required under the Draft LLC Agreement in comparison to the LATS by more than twelve and twenty-three times, respectively.[127] The Draft LLC Agreement also more than doubled the royalty rates provided for in the LATS and called for SIGA to receive 50% of *all* residual profits. In addition, SIGA would receive most of its payments first, and PharmAthene could only claim its share from any residual value remaining after SIGA was paid.

[127]  The initial projections for the market value of ST–246 in December 2005 were $1–1.26 billion. JTX 166. In November 2006, SIGA valued the drug between $3–5.6 billion. JTX 515.

I find that SIGA's Draft LLC Agreement reflects a complete disregard for the economic terms of the LATS. SIGA effectively admitted as much by claiming that the positive developments that had occurred during the summer and early fall of 2006 justified its position. SIGA's argument, however, ignores the negotiating history of the LATS, the parties' intent in incorporating it into the Bridge Loan and Merger Agreements, and PharmAthene's performance under the Bridge Loan Agreement. PharmAthene made the Bridge Loan to SIGA with the understanding that the terms of the LATS represented a baseline of what it would receive in exchange for the loan and its support of the development of the drug. When PharmAthene extended the loan, M & F, SIGA's largest investor, had refused to supply SIGA with any further funding and it was uncertain whether SIGA could continue to develop ST–246 without PharmAthene's help. Moreover, at the time of the Bridge Loan, it was still highly speculative whether ST–246 would prove valuable. In agreeing to make that loan, PharmAthene made clear to SIGA that it was doing so in anticipation of eventually controlling the drug through either a merger or a license agreement with terms similar to the LATS. PharmAthene then performed its part of the Bridge Loan Agreement and put its own money at risk. In addition, the evidence shows that PharmAthene's funding played a major role in allowing the drug to move forward.[128] In these circumstances, by trying substantially to renegotiate the economics of a license agreement in light of facts that occurred *after* PharmAthene had performed its obligations and undertaken an economic risk that SIGA and M & F intentionally avoided, SIGA acted in bad faith.

[128]  The record shows that by spring 2006, SIGA was quickly running out of money. *See* T. Tr. 1396–97 (Konatich); JTX 214 ("If we could have saved the $1.3 million wasted on [former SIGA executives] we could have gone forward on our own.") (Konatich); JTX 205 ("At this point the terrifying thing is if the deal falls through and we are back to no [money], no CEO and a pissed off Donny .") (Hruby). In fact, SIGA was able to use approximately $600,000 from the Bridge Loan to begin human safety trials in May 2006. JTX 203, 210.

**\*25** With the benefit of hindsight, it appears M & F and SIGA's board made a terrible business decision in opting to offer a major stake in ST–246 for a relatively small capital infusion. The evidence is unmistakable, however, that Drapkin and SIGA knew what they were doing and went ahead anyway. M & F, through Drapkin, categorically refused to invest more money in SIGA in late 2005 and early 2006. The emails of SIGA insiders Konatich and Hruby clearly reflect the extent to which SIGA was squeezed by that decision and its need for cash. They also demonstrate that SIGA knew just how much control of ST–246 it was offering to cede to PharmAthene to get the cash it needed to continue its development in 2006. Nevertheless,

SIGA took the cash.

By the end of September 2006, the tables had turned. It then appeared that ST–246 would be a fantastic success and that SIGA could obtain all the capital it might need in the future from sources independent of PharmAthene. Predictably, Hruby quickly claimed that SIGA deserved all the credit for ST–246's good fortune and determined that SIGA had no need for PharmAthene whatsoever.

The only brake on Hruby's willingness to cut PharmAthene out would have been if someone familiar with the earlier negotiations fairly and objectively reminded SIGA of what it already had agreed to with PharmAthene. The likely candidate for that role was Drapkin, but he abdicated that responsibility and resorted, instead, to a selective and biased memory of the parties' negotiations. Drapkin apparently took no active role in the post-September 2006 licensing negotiations other than to offer his counterfactual recollection that the LATS were nothing but a "jumping off point."[129] Beyond that, Drapkin, and SIGA for that matter, essentially left the negotiations of the license agreement to those who either had no involvement in the previous negotiations and agreements, most notably Fasman, or acting in their own self-interest, such as Hruby, were more than happy to disregard the economic importance of the LATS.

[129]   Drapkin's trial testimony may have been truthful, but it brought to mind the advice the Rockman gave to the boy Oblio in Nilsson's "The Point": "You see what you want to see ... You hear what you want to hear...." Nilsson, *The Point* (RCA Records 1971) (Storybook libretto) (ellipses in original). That is, Drapkin was so focused on obtaining from PharmAthene the money SIGA needed to continue pursuing the development of a potentially lucrative drug that he paid little attention to what PharmAthene wanted in return. As a result, Drapkin actually may have had as superficial an understanding of the situation as he claimed or simply may have forgotten the substance of the parties' communications. In any event, I find Drapkin's testimony to be largely subjective and otherwise unreliable, especially as it pertains to his belittlement of the LATS as a mere "jumping off point." In that regard, I note that because contractual interpretation is an objective exercise, a party's subjective, though truthful, understanding is largely irrelevant. 1 *Williston on Contracts* § 3:5 (4th ed.) ("[T]he law of contracts is concerned with the parties' objective intent, rather than their hidden, secret or subjective intent." (citing *Leonard v. Univ. of Del.,* 204 F.Supp.2d 784, 787 (D.Del.2002))).

In many respects, the facts of this case are similar to those presented in *Greka.*[130] In *Greka,* the acquirer of a target oil company negotiated a term sheet with the target's preferred shareholders, RGC, in anticipation of its acquisition of the target. Under the provisions of a preferred stock agreement with the target, RGC possessed a mandatory redemption option that, if exercised, effectively would have killed any prospect for the proposed merger. To avoid that situation, the acquirer negotiated a term sheet with RGC under which RGC would abstain from exercising its redemption option. An important aspect of the term sheet from RGC's point of view was that it still could engage in short-selling of the acquirer's stock after the acquisition. Although the acquirer and RGC did not finalize their agreement before the shareholder vote, RGC allowed the merger to go forward in reliance on its expectation that, after the closing, the parties would work out an agreement in accordance with the provisions of the term sheet. In relevant part, the term sheet stated that the parties mutually agreed "to negotiate in good faith the contemplated transaction...."[131] Yet, after the merger closed, the acquirer attempted to renegotiate the short selling provision of the term sheet to prohibit any short selling by RGC. As a result, the parties failed to reach an agreement and RGC sued, claiming breach of the acquirer's contractual obligation to negotiate in good faith and promissory estoppel.

[130]   2001 WL 984689 (Del. Ch. Aug. 22, 2001).

[131]   *Greka,* 2001 WL 984689, at *7.

**\*26** In deciding whether the acquirer in *Greka* had acted in bad faith in attempting to renegotiate a term previously negotiated and agreed to in the term sheet, the court found that, regardless of whether the term sheet itself was an enforceable contract, neither party "could in good faith insist on specific terms that directly contradicted a specific provision found in the Term Sheet."[132] Because the acquirer had insisted on a term that contradicted a specific provision of the term sheet, the court held the acquirer liable for a bad faith breach of the duty to negotiate in good faith that resulted in the failure to reach a final agreement.[133]

132   *Id.* at *14. The term sheet in *Greka* related to a secured Note Exchange, the closing of which was dependent on the parties reaching agreement on "definitive documentation," completion of the contemplated merger between the acquirer and the target, and cancellation of certain preferred shares. The term sheet also expressly "acknowledged [the parties'] mutual agreement to the above terms [of the Term Sheet] and their intention to negotiate in good faith the contemplated transaction in an expedited manner." *Id.* at *7 (emphasis omitted). Based on the circumstances surrounding the inclusion of the LATS in the Bridge Loan and Merger Agreements, I do not perceive any material difference between the quoted language in the term sheet in *Greka* and the term sheet at issue here.

133   *Id.* at * 14.

Similarly to *Greka,* the parties here reached a negotiated agreement in the LATS on specific economic terms that they intended would serve as the basis for a final license agreement in the event the parties failed to conclude the merger. Several of these terms were the subject of active negotiation by the parties. For example, the LATS, as agreed to, called for a total upfront payment by PharmAthene of $6 million, with $2 million being paid in "cash upfront," $2.5 million in cash as a " 'Deferred License Fee[ ] payable 12 months from [the] date of the agreement," and $1.5 million "post financing > $15 [million]."[134] In the negotiations that led up to the LATS, however, PharmAthene initially proposed that the upfront payments be structured as $2 million "cash upfront," $2 million in PharmAthene stock, and $1 million "post financing > $15 [million]," for a total of $5 million.[135] Internally, SIGA's Konatich advised Hruby that he had a problem with the $2 million up front, because "[he] would like to have at least $3 [million] in cash which would permit the completion of the build out and get us through 2006 without too much trouble...."[136] Furthermore, Drapkin encouraged Konatich to "push hard on cash and guarantees."[137] When PharmAthene continued to propose the use of stock for part of the upfront payment, SIGA also expressed a strong preference for cash. Ultimately, in the final version of the LATS, PharmAthene agreed to increase the total amount of the upfront licensing fee from $5 to $6 million and to provide the entire amount in cash.[138]

134   LATS at 1.

135   JTX 425.

136   JTX 171.

137   JTX 175.

138   JTX 9.

While the economic terms proposed in the Draft LLC Agreement may not have "directly contradict[ed]" the LATS in the same way that the prohibition on short selling did in *Greka,* they differed dramatically from the LATS in favor of SIGA. Furthermore, I have concluded that SIGA agreed to give the economic terms of the LATS substantial weight in the later licensing negotiations. By its own admission, however, SIGA did not believe those terms to be controlling or even deserving of considerable weight, relegating them instead to being a mere "jumping off point." In fact, SIGA virtually disregarded the economic terms of the LATS other than using them as a skeletal framework for the *types* of payments that would be made without giving any meaningful weight to the dollar amounts or percentages it had negotiated earlier.[139] The Draft LLC Agreement, therefore, bore no resemblance to the economic terms of the LATS and, not surprisingly, resulted in the parties failing to reach agreement on a license agreement. Therefore, I find that SIGA breached its duty to negotiate a license agreement in good faith in accordance with the terms of the LATS.[140]

139    In its pre-trial brief, SIGA relied heavily on *Transamerican S.S. Corp. v. Murphy, 1989 WL 12181 (Del. Ch. Feb. 14, 1989),* in arguing that SIGA was not bound by the terms of the LATS because the parties did not intend the LATS to be binding. *Transamerican* stands for the principle that a party cannot be bound to a contract where it has expressly conditioned its consent on the satisfaction of a condition precedent which was not fulfilled. *Id.* at * 1. Because SIGA did not condition its obligation to negotiate in good faith on such a condition precedent, the holding in *Transamerican* is inapposite. In this case, it is true that the LATS does not constitute a binding license agreement. The relevant inquiry, however, is not whether the LATS created a binding contract, but whether the terms negotiated in the LATS were entitled to deference in later negotiations, a point which *Transamerican* does not address.

140    Furthermore, I note that the overall *structure,* as much as the specific terms, of the Draft LLC Agreement contributes to my finding that SIGA breached its obligations under the Bridge Loan and Merger Agreements to negotiate a license agreement for ST–246 in good faith. Under Section 5.1(a), SIGA's only capital contribution to the LLC would be "a worldwide, exclusive license" for ST–246. Thus, regardless of any agreement on the Draft LLC Agreement, the parties still would need to agree on an independent license agreement between SIGA and the newly formed LLC. Though, in the abstract, a license agreement could have taken the form of an LLC, *see* JTX 489, Edwards Report, ¶ 68, PharmAthene apparently never anticipated such an arrangement. T. Tr. 214–15 (Richman). Moreover, in so far as the title of the LATS calls for a "partnership," PharmAthene's expert Edwards testified credibly that the word "partnership" "is used rather loosely" in the biopharmaceutical industry. T. Tr. 982–83. In fact, of twenty-three SEC-filed biopharmaceutical agreements referred to as "partnerships" found by Edwards, only two formed legal partnerships; the remainder constituted licenses, asset purchases, or other similar transactions. T. Tr. 982–83. Accordingly, SIGA's proposed LLC structure and its one-sided terms support my finding that SIGA did not satisfy its obligation under the Bridge Loan and Merger Agreements to negotiate in good faith.

## C. Is SIGA Entitled to Relief Under the Doctrine of Promissory Estoppel?

**\*27** Alternatively, PharmAthene claims it is entitled to relief under a theory of promissory estoppel. Under Delaware law, a plaintiff asserting a claim for promissory estoppel must show by clear and convincing evidence that: (1) a promise was made; (2) the promisor reasonably expected to induce action or forbearance by the promisee; (3) the promisee reasonably relied on the promise and took action to its detriment; and (4) the promise binds the parties because injustice can be avoided only by its enforcement.[141] Promissory estoppel requires a real promise, not just mere expressions of expectation, opinion, or assumption.[142] The promise also must be reasonably definite and certain.[143]

141    *Territory of U.S. V.I. v. Goldman, Sachs & Co.,* 937 A.2d 760, 804 (Del. Ch.2007) (citing *Chrysler Corp. (Del.) v. Chaplake Hldgs.,* 822 A.2d 1024, 1032 (Del.2003)), *aff'd,* 956 A.2d 32 (Del.2008) (TABLE).

142    *Metro. Convoy Corp. v. Chrysler Corp.,* 208 A.2d 519, 521 (Del.1965).

143    *Cont'l Ins. Co. v. Rutledge & Co.,* 750 A.2d 1219, 1233 (Del. Ch.2000).

As discussed *supra,* SIGA promised PharmAthene that, at the very least, it could expect to receive control over ST–246 through a license agreement with economic terms similar to the LATS. SIGA negotiated the LATS with PharmAthene in expectation of receiving funding for the development of ST–246, and PharmAthene provided both financial and operational assistance to SIGA in reliance on the LATS and its incorporation into the Bridge Loan and Merger Agreements. SIGA counters by arguing that promissory estoppel cannot apply because the "loan was repaid and [PharmAthene] never provided it with any meaningful management, expertise, technical know-how or capital."[144] I disagree, because PharmAthene made the Bridge Loan and assumed the risks thereunder and provided the operational support it did in reliance on SIGA's promise to afford it a good faith opportunity to obtain control of ST–246, and not solely in exchange for interest on a secured loan.

Therefore, justice would not be done by treating PharmAthene as a bank to SIGA, something it specifically sought to avoid.[145] Accordingly, I find that PharmAthene has shown the existence of the elements of promissory estoppel.

144   Def.'s Post–T. Ans. Br. 56. PharmAthene disputes the allegation that the expertise and services it provided were meaningless. I find that the expertise and services were valuable, but probably not to the full extent PharmAthene claims.

145   *See Chaplake Hldgs., Ltd.,* 822 A.2d at 1034 ("The prevention of injustice is the 'fundamental idea' underlying the doctrine of promissory estoppel.").

### D. Was SIGA Unjustly Enriched by the Assistance Provided by PharmAthene to Develop ST–246?

PharmAthene's final claim that SIGA has been unjustly enriched is based largely on the same facts underlying its promissory estoppel claim. That is, in addition to providing the Bridge Loan, PharmAthene alleges that it contributed regulatory, quality assurance, quality control, clinical, manufacturing, government affairs, and business development assistance that helped SIGA develop and now control a product potentially worth billions of dollars. PharmAthene contends that it provided this assistance based on its understanding that it ultimately would control the product, that SIGA knew of PharmAthene's expectation, and that SIGA did nothing to prevent or dissuade PharmAthene from providing such assistance. SIGA, by contrast, contends that any assistance it received from PharmAthene was *de minimis* and officious, thereby precluding a finding of unjust enrichment.

Unjust enrichment is the "unjust retention of a benefit to the loss of another, or the retention of money ... of another against the fundamental principles of justice or equity...."[146] To succeed on a claim for unjust enrichment, a party must show: (1) an enrichment; (2) an impoverishment; (3) a relation between the enrichment and the impoverishment; (4) the absence of a justification; and (5) the absence of a remedy at law.[147] "A person who officiously confers a benefit upon another is not entitled to restitution,"[148] however, absent having first afforded the recipient an opportunity to reject the benefit.[149] Moreover, unjust enrichment involves a threshold inquiry: "whether a contract already governs the relevant relationship between the parties."[150] If so, "then the contract remains 'the measure of [the] plaintiff's right.' "[151]

146   *MetCap Sec. LLC v. Pearl Senior Care, Inc.,* 2009 WL 513756, at *5 (Del. Ch. Feb. 27, 2009) (quoting *Schock v. Nash,* 732 A.2d 217, 232 (Del.1999)), *aff'd,* 977 A.2d 899 (Del.2009) (TABLE)) [hereinafter *MetCap II* ].

147   *Jackson Nat'l Life Ins. Co. v. Kennedy,* 741 A.2d 377, 393 (Del. Ch.1999).

148   Restatement (First) of Restitution § 112 cmt. a (1937); *see also id.* § 112 ("A person who without mistake, coercion, or request has unconditionally conferred a benefit upon another is not entitled to restitution...."); *MetCap II,* 2009 WL 513756, at *10 ("Delaware has expressly adopted § 112 [of the Restatement (First) of Restitution].").

149   *See MetCap II,* 2009 WL 513756, at *11 n. 59 (Section 112 reflects the principle that, without affording the recipient an opportunity to reject the benefit, the person who conferred it has no equitable claim.); *cf.* Restatement (First) of Restitution § 112 cmt. c (distinguishing as outside the scope of § 112 a purported agent's entitlement to compensation for services officiously rendered and accepted by the purported principal under the agency law doctrine of ratification).

150   *BAE Sys. Info. & Elec. Sys. Integration, Inc. v. Lockheed Martin Corp.,* 2009 WL 264088, at *7 (Del. Ch. Feb. 3, 2009).

Pharmathene, Inc. v. Siga Technologies, Inc., Not Reported in A.3d (2011)

---

151 *MetCap Sec. LLC v. Pearl Senior Care, Inc.,* 2007 WL 1498989, at *5 (Del. Ch. May 16, 2007) (quoting *Wood v. Coastal States Gas Corp.,* 401 A.2d 932, 942 (Del.1979)) [hereinafter *MetCap I* ].

**\*28** To the extent PharmAthene's claim for unjust enrichment relies on its provision of capital in the form of the Bridge Loan, the Bridge Loan Agreement alone provides the measure of PharmAthene's rights. Once the merger had been terminated, the Bridge Loan Agreement required SIGA to "negotiate in good faith with the intention of executing a definitive License Agreement in accordance with the terms set forth in the [LATS]."152 As discussed *supra,* SIGA breached that duty and thereby breached that contract. Therefore, PharmAthene must look to the Bridge Loan Agreement to enforce its rights in that regard, and it cannot pursue an independent claim for unjust enrichment based on SIGA's use of the capital it provided under that Agreement.153

152 BLA § 2.3.

153 *See, e.g., Bakerman v. Sidney Frank Importing Co.,* 2006 WL 3927242, at *18 (Del. Ch. Oct. 16, 2006) ("When the complaint alleges an express, enforceable contract that controls the parties' relationship, however, a claim for unjust enrichment will be dismissed."); *Albert v. Alex Brown Mgmt. Servs., Inc.,* 2005 WL 2130607, at * 11 (Del. Ch. Aug. 26, 2005) (dismissing an unjust enrichment claim "when the existence of a contractual relationship [was] not controverted").

PharmAthene, however, has not predicated its claim for unjust enrichment solely on the monetary capital it provided. It also relies on its provision of operational support to SIGA. Because PharmAthene has demonstrated that SIGA was enriched, to some degree, by that support, the first element of unjust enrichment is satisfied. Second, PharmAthene was impoverished by its extension of the operational support it provided. Although PharmAthene has not presented evidence to demonstrate a dollar value of that assistance, I am convinced that its employees expended considerable time that they would have spent on other PharmAthene matters were it not for their expectation that PharmAthene would control ST–246. Third, SIGA's enrichment—*i.e.,* its receipt of free development assistance—directly resulted from PharmAthene's provision of it.

The fourth element of unjust enrichment is the absence of justification. This element "usually entails some type of wrongdoing or mistake at the time of the transfer,"154 such that a defendant "could not retain any benefit resulting from the disputed transaction 'justifiably' or in accordance with 'the fundamental principles of justice or equity and good conscience.' "155

154 *Territory of U.S. V.I. v. Goldman, Sachs & Co.,* 937 A.2d 760, 796 n. 161 (Del. Ch.2007), *aff'd,* 956 A.2d 32 (Del.2008) (TABLE).

155 *Jackson Nat'l Life Ins. Co. v. Kennedy,* 741 A.2d 377, 394 (Del. Ch.1999).

Here, SIGA contends that any enrichment was not unjust and that the services rendered by PharmAthene were officious because (i) Grayer "reminded [Baumel] on several occasions that the entities needed to be completely separate legal entities"156 until the merger closed and (ii) Hruby asked several PharmAthene representatives, including Wright, for greater autonomy with respect to SIGA's clinical development of ST–246.157 I reject this argument. First, Grayer's testimony that he reminded Baumel to respect the legal independence of SIGA until after the merger closed was given at trial in response to direct examination concerning preparation of SIGA's proxy statement, not concerning PharmAthene's involvement in ST–246.158 Second, although Wright recalled the conversation with Hruby and even characterized it as an "argument,"159 Hruby's own account of it was: "I became uncomfortable with the *amount* of control that PharmAthene executives were trying to exert over ST–246 ... and, ultimately, that was relayed to Mr. Wright."160 A request that PharmAthene be less involved in clinical development of ST–246 is not an outright rejection of the assistance PharmAthene provided. Indeed, it implies acceptance of at least some part of it. Lastly, PharmAthene provided ongoing assistance to SIGA for over six months, from March to September 2006. Throughout that period, SIGA knew that PharmAthene was providing its assistance only because it reasonably anticipated that it soon would control ST–246, and SIGA had every opportunity to refuse to accept the

assistance. Under these circumstances, where SIGA knowingly accepted the benefits of an ongoing, personal services relationship for an extended period of time without rejecting those services, I find that PharmAthene did not confer a benefit officiously. Accordingly, SIGA lacks justification for retaining the benefits PharmAthene conferred.

156    T. Tr. 1532 (Grayer).

157    T. Tr. 1588–89 (Hruby).

158    T. Tr. 1530–32.

159    T. Tr. 100.

160    T. Tr. 1588–89 (emphasis added). SIGA attempts to characterize Wright's recollection of the argument as a "demand" by Hruby that PharmAthene, quoting the transcript, "back away from SIGA's development program until a merger was closed." Def.'s Post–T. Ans. Br. 15. I consider that allegation to be overstated, however, and accord it no weight.

**\*29** Fifth and finally, PharmAthene must not have an adequate remedy at law. "This element turns on the adequacy of the legal remedy as a practical matter."[161] Although PharmAthene theoretically could pursue a remedy at law for reimbursement of the portion of its employees' salaries attributable to their time spent working on ST–246,[162] such a remedy would not adequately redress the harm alleged here. Rather, fundamental principles of justice or equity arguably might require an accounting to disgorge the increase in value of ST–246 attributable to PharmAthene's assistance.[163] Conceptually, therefore, the fifth element of unjust enrichment might be satisfied. In this case, however, PharmAthene did not introduce evidence of such harm other than in connection with the overall relief it seeks based on its claims for SIGA's breach of its contractual obligation to negotiate in good faith and promissory estoppel. A further finding of unjust enrichment would not lead to different or additional relief. Thus, I conclude that PharmAthene's unjust enrichment claim effectively is subsumed in its breach of contract and promissory estoppel claims.[164]

161    *Reserves Dev. LLC v. Severn Savs. Bank, FSB,* 2007 WL 4054231, at \* 12 (Del. Ch. Nov. 9, 2007), *aff'd,* 961 A.2d 521 (Del.2008).

162    *See* Restatement (Third) of Restitution & Unjust Enrichment § 49(3) (2011) ("Enrichment from the receipt of nonreturnable benefits may be measured by ... the cost to the claimant of conferring the benefit....").

163    *See id.* § 51(4) ("[T]he unjust enrichment of a conscious wrongdoer ... is the net profit attributable to the underlying wrong.").

164    *See supra* note 153 and accompanying text.

For these reasons, I need not discuss the unjust enrichment claim further.

### E. Remedies

As discussed above, I have found SIGA liable (1) for breach of its obligations under Section 2.3 of the Bridge Loan Agreement and Section 12.3 of the Merger Agreement to "negotiate in good faith with the intention of executing a definitive License Agreement in accordance with the terms set forth in the [LATS]" and (2) under the doctrine of promissory estoppel. I now address an appropriate remedy for those wrongs.

### 1. Remedy for breach of contract and promissory estoppel

As a threshold matter, the remedies for breach of contract and under the doctrine of promissory estoppel can, and often do, overlap. As applied in Delaware, promissory estoppel serves fundamentally to prevent injustice and, in so doing, may entitle a party to recovery of its expectation interest.[165] Therefore, I address the appropriate remedy for both the breach of contract and promissory estoppel claims together in the following subparts.

[165]   *Chrysler Corp. v. Quimby,* 144 A.2d 123, 133–34 (Del.), *aff'd on reh'g,* 144 A.2d 885 (Del.1958); *see also Greka,* 2001 WL 984689, at *15–16 (determining that expectation damages properly remedied both the breach of contract and promissory estoppel claims).

### a. Parties' contentions

PharmAthene first requests an order of specific performance compelling SIGA to perform its contractual obligations. In the alternative, PharmAthene asks for an award of expectation damages based on the expert reports and testimony of Jeffrey Baliban, who considered various, alternative sets of assumptions to determine a specific dollar amount of damages. Lastly, PharmAthene asks me to consider awarding "an equitable payment stream on sales [of ST–246] that would be *economically equivalent* to the lump sum damages amounts determined by Baliban."[166] That is, because no sales of ST–246 have taken place yet, a lump sum damages award might be premature or too speculative at this time or even place PharmAthene in a better position than if the parties had agreed to a license. Elsewhere, PharmAthene described that form of relief as an on-going profit participation in future sales, if any, of ST–246.[167]

[166]   Pl.'s Post–T. Op. Br. 65.

[167]   PharmAthene's description of its so-called "equitable payment stream" is not entirely consistent. By requesting a payment stream "economically equivalent to the lump sum damages amount determined by Baliban," PharmAthene seems to request, in effect, an annuity with a net present value equal to Baliban's estimate of its expectation damages. Nevertheless, PharmAthene argues that its requested relief would mirror SIGA's return on sales of ST–246 and, thus, "mitigate any uncertainties around the future sales of ST–246...." *Id.* at 66. Based on this latter argument, I understand PharmAthene's use of the phrase "equitable payment stream" to mean an on-going profit participation in future sales, if any, of ST–246.

**\*30** Most of PharmAthene's arguments, however, and virtually all of its expert evidence regarding remedies are predicated on the theory that the LATS constituted an enforceable license agreement and that SIGA's breach of the LATS warrants specific performance, expectation damages, or an equitable payment stream. As discussed *supra,* I have found that the LATS does not constitute an enforceable license agreement. Rather, liability arises from SIGA's breach of its express obligations under the Bridge Loan and Merger Agreements to negotiate in good faith. And, while breach of a duty to negotiate in good faith warrants a remedy, that remedy need not implement (via specific performance) or compensate for (via monetary damages) the aborted license.[168] In this context, PharmAthene's request for specific performance must be construed as a request for an order compelling SIGA to negotiate in good faith toward a license agreement for ST–246 and not for an order specifically enforcing the LATS. Similarly, I construe PharmAthene's alternative request for monetary damages as a request for the damages PharmAthene suffered as a result of SIGA's failure to negotiate a license agreement in good faith and not for

the damages it suffered because it did not obtain a license strictly conforming to the LATS. Because PharmAthene's briefs and expert evidence focus mostly on the damages that would have been due if a license in strict conformance with the LATS had been formed, however, they provide only limited guidance in determining the precise bounds of an appropriate remedy.

168    *J.W. Childs Equity P'rs, L.P. v. Paragon Steakhouse Rests., Inc.,* 1998 WL 812405, at *3 (Del. Ch. Nov. 6, 1998).

For its part, SIGA contends that none of PharmAthene's requested remedies are appropriate. As to specific performance, SIGA argues that a "court-ordered collaboration between SIGA and PharmAthene risks the creation of a dysfunctional and unproductive development team for ST–246" given the parties' current relationship and that judicial oversight of an order to negotiate in good faith would be impractical.169 With respect to expectation damages, SIGA argues that lost profits are too speculative to award. In addition, SIGA cites *Goodstein Construction Corp. v. City of New York,*170 a case applying New York law, for the proposition that reliance damages, not expectation damages, are the only remedy available to PharmAthene for its breach-of-good-faith claim.171 Lastly, SIGA objects to PharmAthene's request for a running payment stream on the following grounds: (i) a payment stream is no different than a "reasonable royalty" under the patent laws, which remedy I rejected before trial;172 (ii) the structure of a payment stream—*i.e.,* funds running from SIGA, as effective licensee, to PharmAthene, as effective licensor—reverses the deal structure contemplated by the LATS; (iii) the dollar amounts requested rely on flawed assumptions in Baliban's expert reports; (iv) PharmAthene cites no authority recognizing the availability of such a remedy where, as SIGA contends is the case here, expectation damages are speculative; and (v) such a remedy fails to account for the remaining risk involved in further developing and marketing ST–246 that PharmAthene would have had to assume under a license agreement.

169    Def.'s Post–T. Ans. Br. 49 & n. 36. Like PharmAthene, SIGA briefed its arguments as if the failure to implement the LATS itself, rather than the failure to negotiate in good faith, were the relevant wrong. For this reason, SIGA's other arguments against specific performance are generally irrelevant to the issue now before me.

170    80 N.Y.2d 366 (N.Y.1992).

171    The Bridge Loan Agreement is governed by New York law, while the Merger Agreement is subject to Delaware Law. *See* BLA § 7.11; Merger Agreement § 13.5.

172    Def.'s Post–T. Ans. Br. 69 (citing *SIGA II,* 2010 WL 4813553, at * 13).

### b. Relevant legal principles

#### 1. Specific performance

**\*31** Specific performance is an equitable remedy "firmly committed to the sound discretion of the Court"173 and, therefore, dependent on the circumstances of each case. At a minimum, "[a] party seeking specific performance must show by clear and convincing evidence that: (1) a valid contract exists; (2) the party is ready, willing, and able to perform; and (3) the balance of the equities tips in favor of the party seeking performance."174

173    *Szambelak v. Tsipouras,* 2007 WL 4179315, at *4 (Del. Ch. Nov. 19, 2007) (citing *Safe Harbor Fishing Club v. Safe Harbor Realty Co.,* 107 A.2d 635, 638 (Del. Ch.1953)).

Pharmathene, Inc. v. Siga Technologies, Inc., Not Reported in A.3d (2011)

174 *Corkscrew Min. Ventures, Ltd. v. Preferred Real Estate Invs ., Inc.,* 2011 WL 704470, at *6 (Del. Ch. Feb. 28, 2011) (citing *Osborn v. Kemp,* 991 A.2d 1153, 1158 (Del.2010)).

Under Delaware law, specific performance is likely a permissible remedy for breach of an agreement to negotiate in good faith, but it is equally likely to engender significant practical problems.[175] As Chancellor Allen put it in *VS & A Communications Partners, L.P. v. Palmer Broadcasting Ltd. Partnership,*[176] "courts of equity could not be expected to enter such orders except where any violation of the order (*i.e.,* any bad faith negotiation) would be easily detected." Vice Chancellor Noble's recent decision in *Great–West Investors*[177] provides an illustrative example of this concern. There, the Court noted that a failure to negotiate in good faith due to an informational imbalance could be remedied by an order requiring the informed party to provide the other with the missing information, but that "it might be difficult to win an order enforcing other aspects of the duty to negotiate in good faith ."[178] These doubts as to the appropriateness of specific relief for a breach of a duty to negotiate in good faith derive from the black-letter principle that courts should not order specific performance where the qualitative character of the performance would force the court into an onerous enforcement or supervisory role.[179]

175 *Great–West Investors, LP v. Thomas H. Lee P'rs, L.P.,* 2011 WL 284992, at *9 (Del. Ch. Jan. 14, 2011).

176 1992 WL 167333, at *4 (Del. Ch. July 14, 1992).

177 2011 WL 284992, at * 10.

178 *Id.*

179 *See* Restatement (Second) of Contracts § 366 & cmt. a (1981) ("Granting specific performance may impose on the court heavy burdens of enforcement or supervision. Difficult questions may be raised as to the quality of the performance rendered under the decree.... Specific relief will not be granted if these burdens are disproportionate to the advantages to be gained from enforcement and the harm to be suffered from its denial.").

### 2. Expectation damages

The "standard remedy" in Delaware, as elsewhere, "for breach of contract is based upon the reasonable expectations of the parties *ex ante.* This principle of expectation damages is measured by the amount of money that would put the promisee in the same position as if the promisor had performed the contract."[180] As I stated in *SIGA II,* "a plaintiff can only recover those damages which can be proven with reasonable certainty. Moreover, no recovery can be had for loss of profits which are determined to be uncertain, contingent, conjectural or speculative."[181] Nevertheless, damages are not "speculative" merely because they are difficult to calculate. Rather than mathematical precision, "the law requires only that there be a sufficient evidentiary basis for making a fair and reasonable estimate of damages...."[182]

180 *Duncan v. Theratx, Inc.,* 775 A.2d 1019, 1022 (Del.2001) (citing Restatement (Second) of Contracts § 347 cmt. a).

181 2010 WL 4813553, at * 11 (internal quotation marks and citations omitted).

Pharmathene, Inc. v. Siga Technologies, Inc., Not Reported in A.3d (2011)

182   *Vianix Del. LLC v. Nuance Commc'ns, Inc.,* 2010 WL 3221898, at *6 (Del. Ch. Aug. 13, 2010) (citing *Henne v. Balick,* 146 A.2d 394, 396 (Del.1958)).

This case presents a particularly vexing question as to the difference between damages that are speculative and those that merely lack mathematical precision. On the one hand, even a consummated license agreement between PharmAthene and SIGA in accordance with the LATS still would subject PharmAthene to the possibility that it might not profit at all for a host of reasons. For example, ST–246 might never receive FDA approval, there are no guaranteed purchasers of ST–246, and research delays or problems in animal trials might prevent ST–246 from reaching a viable market in a timely fashion. Because under even a fully-consummated license agreement there would be a plausible chance that PharmAthene would make no profit, PharmAthene's claimed expectation damages could be considered, in a literal sense, to be merely speculative. **\*32** For these reasons, SIGA contends that this Court should rule similarly to the New York Court of Appeals in *Goodstein.*183 There, the City of New York and a real estate developer entered into several letters of intent for the purchase of land from the City. Although the letters of intent established the sales price, they conditioned the sale on a more formal Land Disposition Agreement ("LDA"), which would subject the development to various conditions and covenants. Moreover, the City agreed in the letters of intent to negotiate the LDA exclusively with the developer. Critically, any mutually agreeable LDA negotiated by the City and the developer would not become effective until it received independent approval by various administrative agencies. When the City failed to negotiate with the developer and thereby breached its implied duty of good faith and fair dealing under the letters of intent, the developer sought to recover expectation damages in the form of its lost profits on the development.184

183   80 N.Y.2d 366 (1992).

184   *Id.* at 368–70.

The Court of Appeals ruled that "both the law and logic preclude[d]" recovery of the developer's expectation damages.185 Emphasizing that the obligation breached was merely to negotiate an LDA and that even a final LDA could be denied by the independent agencies, the court concluded that an award of expectation damages "would, in effect, be transforming an agreement to negotiate for a contract into the contract itself."186 Because the court could not determine "what agreement would have been reached, there [wa]s no way to measure the lost expectation."187 Therefore, the court limited the relief available to the developer to its reliance interests.

185   *Id.* at 373.

186   *Id.*

187   *Id.* at 374 (quoting 1 Farnsworth, *Contracts* § 3.26a).

Fairly read, however, *Goodstein* does not preclude expectation damages whenever a contract contains some business risk, nor does it necessarily establish a rule more stringent than Delaware's "sufficient evidentiary basis" requirement. Indeed, according to Professor Farnsworth, the general rule against recovery of uncertain damages has been relaxed to permit recovery of the lost business opportunity of an aleatory contract, *i.e.,* a contract dependent on an uncertain contingency, so long as the value of the "lost chance" is fairly measurable.188 Although Delaware courts understandably have refused to take such a principle to its extreme,189 they have awarded expectation damages fairly approximating the value of a lost business opportunity. Some of these principles were involved in the court's award of damages in *Greka* for breach of a party's duty to

negotiate a transaction in good faith in the context of a nonbinding terms sheet.[190]

188   3 Farnsworth, *Contracts* § 12.15, at 276–78 (2004); *see also United States v. Locke,* 283 F.2d 521, 524–25 (Ct.Cl.1960) ("We are here concerned with the value of a chance for obtaining business and profits .... [and] where it is fairly measurable by calculable odds and by evidence bearing specifically on the probabilities[,] the court should be allowed to value that lost opportunity.").

189   *See Callahan v. Rafail,* 2001 WL 283012, at *8 (Del.Super.Mar.16, 2001) (holding expected winnings of an injured race horse too speculative to award as expectation damages).

190   *Greka,* 2001 WL 984689, at *5, 7.

Upon Greka's failure to negotiate in good faith the long-form agreement, the court awarded expectation damages based primarily on the economic terms already agreed to and contained in the term sheet. That is, the court awarded expectation damages to RGC, the prospective note holder, of 120% of the preferred shares' stated value plus all accrued and unpaid interest, dividends, and registration payments as provided for in the term sheet.[191] In determining the amount of damages, the court stressed that it was guided "not by speculation, but by how the parties themselves agreed to value Greka's obligations to RGC as embodied in the Term Sheet."[192] Based on the specificity of the term sheet and Greka's breach of its obligation to negotiate in good faith, the court awarded RGC's expectation damages "in the amount equal to what RGC should have received if the Note Exchange had been consummated."[193]

191   *Id.* at *16. RGC did not seek a damages award based, for example, on the possibility that it might have exercised its conversion right for Greka shares or invested the note proceeds in another profitable enterprise. *Id.* at *16 n. 88.

192   *Id.* at *16.

193   *Id.*

**\*33** Viewed in their respective factual contexts, the outcomes in *Goodstein* and *Greka* are not as disparate as they initially might seem. Both cases involved expectancy interests arising from breaches of agreements to negotiate ultimate transactions, of which the precise terms were unknown. The damages awarded in *Goodstein* excluded the lost profits on that contemplated, but not precisely defined, transaction, and those awarded in *Greka* were based primarily on what the parties had agreed upon before the breach. Moreover, in *Greka,* the court found that most of the principal, open terms "were or would have been resolved" during good faith negotiations for the long-form agreement.[194] In *Goodstein,* by contrast, negotiations for a binding LDA were subject to significantly greater uncertainty because "the required approval [for any LDA to become binding] contemplated a discretionary legislative action that was political in nature and not subject to judicial review."[195] Thus, a critical distinction between these two cases was whether the contingencies remaining after the parties had agreed to agree were such that the value of the lost opportunity was fairly measurable. In *Goodstein,* the court appears to have concluded that there was no reasonable basis upon which to conclude that the LDA would have received the required discretionary approval by an independent agency. In *Greka,* the court found that, had the defendant negotiated in good faith, the parties likely would have reached an agreement, and that the value of that agreement could be responsibly estimated.

194   *Id.* at *11. Greka considered five points "absolutely critical" to a final agreement. "[S]ubstantial progress" was made on three of those five, and a fourth "did not seem likely to terminate the negotiation." *Id.* at *8.

195   *Goodstein,* 80 N.Y.2d at 372–73 (internal citations omitted).

Applying these precedents to the facts before me, I conclude that I cannot award PharmAthene the present value of its estimated lost profits on a license agreement that (1) would have contained the risk of receiving no profits and (2) was never consummated, because such an award would be speculative. Nevertheless, it is possible that, in an appropriate case, permissible expectation damages for breach of an agreement to negotiate in good faith may include the net present value of whatever the parties had, or in good faith demonstrably would have, agreed to exchange at the time that the breach occurred.

### 3. Equitable payment stream

Admittedly, there is little precedent to aid this Court in fashioning an appropriate remedy for the breach SIGA committed. In *Venture Associates Corp. v. Zenith Data Systems Corp.,*196 then Chief Judge Richard Posner of the U.S. Court of Appeals for the Seventh Circuit grappled with the damages implications of a breach of an express obligation to negotiate in good faith. Specifically, the court wrote:

196    *96 F.3d 275 (7th Cir.1996).*

Damages for breach of an agreement to negotiate may be, although they are unlikely to be, the same as the damages for breach of the final contract that the parties would have signed had it not been for the defendant's bad faith. If, quite apart from any bad faith, the negotiations would have broken down, the party led on by the other party's bad faith to persist in futile negotiations can recover only his reliance damages—the expenses he incurred by being misled, in violation of the parties' agreement to negotiate in good faith, into continuing to negotiate futilely. But if the plaintiff can prove that had it not been for the defendant's bad faith the parties would have made a final contract, then the loss of the benefit of the contract is a consequence of the defendant's bad faith, and, provided that it is a foreseeable consequence, the defendant is liable for that loss—liable, that is, for the plaintiff's consequential damages. The difficulty, which may well be insuperable, is that since by hypothesis the parties had not agreed on *any* of the terms of their contract, it may be impossible to determine what those terms would have been and hence what profit the victim of bad faith would have had. But this goes to the practicality of the remedy, not the principle of it. Bad faith is deliberate misconduct, whereas many breaches of "final" contracts are involuntary—liability for breach of contract being, in general, strict liability. It would be a paradox to place a lower ceiling on damages for bad faith than on damages for a perfectly innocent breach, though a paradox that the practicalities of proof may require the courts in many or even all cases to accept.197

197    *Id.* at 278–79 (internal citations omitted).

**\*34** These concepts must be considered in the context of the maxim of equity that "[e]quity will not suffer a wrong without a remedy."198

198    *See* 1 Donald J. Wolfe, Jr. & Michael A. Pittenger, *Corporate and Commercial Practice in the Delaware Court of Chancery* viii (2010) [hereinafter "Wolfe & Pittenger"].

To that end, the Court of Chancery will award "such relief as justice and good conscience may require"199 and "has broad discretion to form an appropriate remedy for a particular wrong."200 One such equitable remedy this Court has utilized in appropriate circumstances is a constructive trust, which

199    *Lichens Co. v. Standard Commercial Tobacco Co.,* 40 A.2d 447, 452 (Del. Ch.1944).

200    *Whittington v. Dragon Gp. LLC,* 2011 WL 1457455, at *15 (Del. Ch. Apr. 15, 2011).

compel[s] a person who wrongfully has obtained or asserted title to property, by virtue of fraud or unfair and unconscionable conduct, to hold such property in trust for the person by whom in equity it should be owned and enjoyed and to convey it to that rightful owner.... As a remedial measure, the constructive trust resembles the enforcement of a quasi-contractual obligation in that both remedies seek to prevent unjust enrichment in the absence of an express agreement.[201]

201    Wolfe & Pittenger § 12.07[b], at 12–88 to 12–89; *see also Adams v. Jankouskas,* 452 A.2d 148, 152 (Del.1982) (holding that a constructive trust may be imposed to remedy a defendant's enrichment by fraudulent, unfair, or unconscionable conduct to the plaintiff where the defendant also owed some duty to the plaintiff).

The design of a constructive trust is not "to effectuate the presumed intent of the parties, but to redress a wrong," and, in this way, "[i]t is an equitable remedy of great flexibility and generality...."[202] Although Delaware law requires that the corpus of a constructive trust be specific property, identifiable proceeds of specific property can satisfy that requirement.[203]

202    *Hogg v. Walker,* 622 A.2d 648, 652 (Del.1993).

203    *Id.*

Another equitable remedy, similar in purpose and operation to a constructive trust, is an equitable lien. Such a lien may be appropriate "to recognize a plaintiff's equitable ownership in only part of [a] specific property."[204] If one were to consider applying either or both concepts of a constructive trust and an equitable lien in the circumstances of this case, the specific property might be the patent and other intellectual property rights in ST–246, and the proceeds from that property might in some way be subject to an equitable lien.

204    Wolfe & Pittenger § 12.07[d], at 12–103.

### c. Analysis of the relief sought

### 1. Specific performance

PharmAthene's primary claim for relief seeks specific performance. As to the elements for specific performance, there is no dispute that at least two valid contracts requiring negotiation based on the LATS exist. SIGA's obligation to negotiate in good faith a license agreement for ST–246 in accordance with the terms in the LATS was made both explicit and plain in Section 2.3 of the Bridge Loan Agreement and Section 12.3 of the Merger Agreement. Both of these agreements were executed by PharmAthene and SIGA and otherwise constitute valid contracts. Additionally, PharmAthene has shown that it is "ready, willing, and able to perform" its obligation to negotiate under those contracts.[205] Indeed, this is not a situation where two parties simply failed to come to terms on a prospective transaction. Rather, it is one where SIGA, in bad faith, torpedoed the negotiations that it had agreed to conduct. Finally, but for PharmAthene's reasonable belief that, in its worst case scenario, it could control ST–246 by negotiating a license for it in accordance with the terms of the LATS, it would not have provided SIGA with the financing SIGA needed in early 2006. Under these facts, the balance of equities favors PharmAthene.

205    *See Osborn v. Kemp,* 991 A.2d 1153, 1158 (Del.2010). After termination of the Merger Agreement, PharmAthene prepared and

transmitted to SIGA on October 12, 2006 the Proposed License Agreement, which incorporated the terms of the LATS, and offered to meet to discuss the draft. JTX 46. As Wright testified at trial, PharmAthene was prepared to sign that Proposed License Agreement as written if SIGA had accepted it, T. Tr. 54, but also was prepared to enter into a license agreement on terms that "varied to some extent from the LATS." T. Tr. 57. The evidence also shows that PharmAthene *remains* ready, willing, and able to perform an agreement consistent with the LATS.

SIGA questions PharmAthene's ability to complete the development and commercialization of ST–246 as provided for by the LATS. Def.'s Post–T. Ans. Br. 45. The relevant wrong is not breach of the LATS, however, but breach of the obligation to negotiate faithfully a license agreement in accordance with the LATS. I find that PharmAthene has shown its ability to perform the latter obligation.

**\*35** In this case, an order of specific performance would require SIGA to resume licensing negotiations with PharmAthene and to do so faithfully. But faithful negotiation is an inherently qualitative performance and an order requiring it implicates the very concerns Chancellor Allen and Vice Chancellor Noble articulated in *VS & A Communications* and *Great–West Investors,* respectively. The positions SIGA took when it proposed the Draft LLC Agreement in late 2006 were so far removed from the terms of the LATS that they amounted to bad faith. The gulf between those LLC terms and the LATS is immense. That gulf and the long and contentious history of this dispute indicate that the parties would approach any mandated negotiations from extremely different perspectives. In such circumstances, it would be difficult to distinguish a violation of a specific performance order (*i.e.,* a bad faith negotiation), on the one hand, from faithful, but hard-fought negotiations, on the other. In other words, enforcement of the order would force me to assume an ongoing and onerous supervisory role, which black-letter principles caution courts to avoid.206 Based on these considerations and the fact that the propriety of ordering specific performance is firmly committed to the sound discretion of the Court,207 I deny PharmAthene's request for an order compelling SIGA to engage in faithful negotiations of a license agreement for ST–246 in accordance with the LATS.

206    *See* Restatement (Second) of Contracts § 366 & cmt. a (1981).

207    *Szambelak v. Tsipouras,* 2007 WL 4179315, at *4 (Del. Ch. Nov. 19, 2007).

### 2. Expectation damages

In the alternative, PharmAthene seeks an award of its expectation damages for breach of SIGA's obligation to negotiate in good faith. In that respect, this case more closely resembles *Greka* than *Goodstein.* As in *Greka,* the parties memorialized the basic terms of a transaction in a term sheet, the LATS, and expressly agreed in the Bridge Loan and Merger Agreements that they would negotiate in good faith a final transaction in accordance with those terms. Based on the evidence presented here, I find that the parties also recognized that the negotiations probably would introduce new terms and lead to some adjustment of terms expressly embodied in the LATS, while other terms in the LATS were almost certain to remain. Unlike *Greka,* however, PharmAthene expected to be compensated not by any return payments from SIGA, but by obtaining "a worldwide exclusive license under the [broadly defined] Patents, Know–How and Materials to use, develop, make, have made, sell, export and import Products in Field" (which included ST–246), including the right to grant sublicenses.208

208    LATS at 1.

In resisting an award of expectation damages for breach of its obligation to negotiate in good faith or as a remedy under the doctrine of promissory estoppel, SIGA effectively argues that, in terms of a remedy, this Court has only two choices. First, it could award expectation damages in the form of a specific sum of money, which SIGA further contends would be unduly speculative and, therefore, impermissible. Alternatively, the Court could award PharmAthene its "reliance" damages or interest, which SIGA asserts is limited to what PharmAthene actually spent or gave up in connection with the Bridge Loan

and Merger Agreements. In this case, reliance damages in the narrow way SIGA defines them would be on the order of a few hundred thousand dollars—basically *de minimis*—in the context of the billion dollar business opportunity at issue.

**\*36** Although the facts of *Greka* differ in some important respects from this case, the court's discussion of damages provides helpful guidance here. First, in *Greka*, then Vice Chancellor, now Chancellor Strine held that the "doctrine of promissory estoppel as applied in Delaware does not require an award of damages to be limited to a party's reliance interest."[209] Citing *Chrysler Corp. v. Quimby,*[210] the court noted that the promissory estoppel cases embody the fundamental idea of the prevention of injustice and, therefore, can support damages that, among other possibilities, "secure[ ] for the promisee the expectancy or its value."[211] Thus, Chancellor Strine concluded that, "If the facts of a case so merit, a plaintiff may recover[ ] its expectation interest from a recovery of damages in a promissory estoppel case."[212]

[209]   2001 WL 984689, at * 15.

[210]   144 A.2d 123 (Del.), *aff'd on reh'g,* 144 A.2d 885 (Del.1958).

[211]   *Greka,* 2001 WL 984689, at *15.

[212]   *Id.* (footnote omitted).

At the outset, I note that one important difference between *Greka* and this case is that, in *Greka,* RGC had not asked the court to grant it "an indeterminable estimation of future profits."[213] Here, SIGA contends that is exactly what PharmAthene seeks in its claim for damages of anywhere from $400 million to more than $1 billion, depending on the scenario and assumptions used. Before analyzing that aspect of SIGA's argument, however, I review briefly the particulars of PharmAthene's damages claim.

[213]   *Id.* at *16.

In addition to its damages expert, Baliban, PharmAthene relied on two other experts regarding damages: an FDA expert, Dr. Carl Peck, and a biotechnology licensing expert, Marc Edwards. In estimating PharmAthene's expectation damages, Baliban conducted a discounted future earnings (DFE) analysis, forecasting over a ten-year period the earnings PharmAthene would have received under a license for ST–246 consistent with the terms of the LATS. To do so, Baliban: (1) forecasted future revenues by multiplying estimated sales quantities by an estimated price per treatment; (2) deducted from those revenues estimated costs of goods sold (COGS), selling, general, and administration (SG & A) expenses, and continuing R & D expenses to determine future earnings; (3) allocated those future earnings to either PharmAthene or SIGA in accordance with the milestone, royalty, and profit-sharing terms of the LATS; (4) applied a multiplier reflecting the probability of successful development of ST–246, which PharmAthene's FDA expert Peck determined in an independent report, to PharmAthene's share of future earnings; and (5) discounted PharmAthene's expected future earnings to their net present value as of December 2006, the date SIGA's breach occurred.[214] Moreover, Baliban independently performed his DFE analysis on two different bases. Basis I employed data inputs derived from information the parties knew as of December 2006, and Basis II updated those inputs to account for new information the parties had learned as of a date shortly before trial.[215]

[214]   Baliban Report ¶ 41.

[215]   *Id.* ¶ 6. In both scenarios, Baliban discounted expected returns to their present value as of December 2006. *Id.* ¶ 7. Thus, both Bases purport to model PharmAthene's damages at the time of breach, but Basis II attempts to improve the accuracy of the model by incorporating more current information, to the extent possible. *See SIGA II,* 2010 WL 4813553, at *13 ("[E]xpectation damages are to be measured as of the date of the breach.").

Under the Basis I model, Baliban estimated PharmAthene's expectation damages as $1.07 billion.[216] Baliban ran the Basis II model twice, first using information available as of November 2009 and then again as of April 2010, after incorporating more recent information from correspondence between SIGA and BARDA regarding the RFP.[217] According to the 2009 Basis II model, PharmAthene's expectation damages were $1.017 billion,[218] while the 2010 Basis II model indicated those damages would be approximately $402 million.[219]

216    Baliban Report ¶ 67 & Ex. 6A.

217    JTX 159, Baliban Suppl. Report, ¶ 3. On February 23, 2010, SIGA responded to BARDA's RFP with additional information concerning the quantity and timing of deliveries to the U.S. government, the price of those deliveries, the inclusion of milestone and performance-based payments providing additional revenue, and estimates of COGS, SG & A expenses, and future R & D spending. *Id. passim.*

218    Baliban Report ¶ 69 & Ex. 6B

219    Baliban Suppl. Report ¶ 5 & tbl. 2.

**\*37** Having carefully reviewed the testimony and reports of PharmAthene's experts, including especially Baliban, I find that PharmAthene's claims for expectation damages in the form of a specific sum of money representing the present value of the future profits it would have received absent SIGA's breach is speculative and too uncertain, contingent, and conjectural.[220] Therefore, I decline to award such relief. The evidence adduced at trial proved that numerous uncertainties exist regarding the marketability of ST–246 and that it remains possible that it will not generate any profits at all. These uncertainties relate to, among other things, regulatory matters, questions of demand, price, competition, and the parties' marketing competency. Moreover, when it comes to expert evidence, reliability is of the essence.[221] In appraisal proceedings, for example, this Court often accepts discounted cash flow (DCF) calculations prepared by experts, but also "repeatedly has recognized that the reliability of a DCF analysis depends on the reliability of the inputs to the model."[222] Similarly with breach of contract claims to recover lost profits, "[r]eliability of the lost profits projections is essential in making a determination of lost profits."[223] The huge fluctuations in Baliban's estimated damages (in the hundreds of millions of dollars) based on changes to a few variables in his analysis confirm that it would be unduly speculative to attempt to fix a specific sum of money as representative of PharmAthene's expectation damages.[224]

220    *See SIGA II,* 2010 WL 4813553, at * 11.

221    *See Daubert v. Merrell Dow Pharms. Inc.,* 509 U.S. 579, 590 (1993) ("[T]he trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable."); *M.G. Bancorporation, Inc. v. Le Beau,* 737 A.2d 513, 522 (Del.1999) (adopting *Daubert* as the standard for assessing admissibility of expert evidence in Delaware).

222    *In re U.S. Cellular Operating Co.,* 2005 WL 43994, at * 10 (Del. Ch. Jan. 6, 2005) (citing *Dobler v. Montgomery Cellular Hldg. Co.,* 2004 WL 2271592, at *9 (Del. Ch. Oct. 4, 2004) and *Doft & Co. v. Travelocity.com, Inc.,* 2004 WL 1152338, at *5 (Del. Ch. May 20, 2004)).

223    *Pfizer Inc. v. Advanced Monobloc Corp.,* 1999 WL 743927, at *6 (Del.Super.Sept.2, 1999).

224   The disparity of outcomes between, on the one hand, the Basis I and 2009 Basis II models and, on the other hand, the 2010 Basis II model highlights the inherently speculative nature of Baliban's damages calculations. With the benefit of slightly more current information, PharmAthene's estimated damages diminished by over $600 million, or more than 50%. Moreover, the 2010 Basis II model still contains a number of uncertainties. For example, as of April 2010, no final contract with BARDA yet existed. Even assuming consummation of the BARDA RFP negotiation, the model contains assumptions that could influence the bottom line in either direction. For example, BARDA offered to commit to purchase 1.7 million treatments from SIGA over three years with options to purchase another 17 million treatments over the following seven years. Baliban Suppl. Report ¶¶ 7–9. Baliban assumed BARDA would exercise all of these options, which clearly could overstate estimated revenues. Conversely, Baliban assumed certain improvements to ST–246's shelf-life that would enable BARDA to purchase fewer treatments. Had Baliban not assumed such improvements, the model would have generated a damages calculation of over $700 million. T. Tr. 767–78 (Baliban). SIGA's damages expert Ugone identified additional examples of the sensitivity within Baliban's 2010 Basis II model. For example, were sales to commence one year later than assumed in the model, the ultimate damages amount would decrease by over $90 million, a decrease of over 20%. T. Tr. 2524–25. Similarly, a 1% increase to the discount rate Baliban employed would cause the net present value of PharmAthene's estimated damages to decrease by $33 million, a decrease of over 8%. T. Tr. 2538.

Nevertheless, the court's reasoning in *Greka* supports giving careful consideration to PharmAthene's request for expectation damages in the form of a future payment stream or share of the profits that SIGA ultimately can expect to reap from its wrongful usurpation of ST–246 and related intellectual property. After noting that RGC was not seeking an "indeterminable estimation of future profits," the court in *Greka* stated:

> Rather, RGC asks only to be awarded exactly *what* Greka agreed to give Greka in the written Term Sheet (money and security), exactly *when* Greka should have given it, and at the rate (120% of principal) that Greka agreed to pay it. In determining the amount of damages to award, the Court is guided not by speculation, but by how the parties themselves agreed to value Greka's obligations to RGC as embodied in the Term Sheet. Put another way, the best measure of what RGC gave up (*i.e.,* its lost reliance interest) is the price that these two aggressive adversaries put on it after arms-length bargaining. Based on the facts of this case, where Greka breached its obligation to negotiate in good faith *and* RGC reasonably relied on the promises made by Greka and thereby took action to its detriment, the court may award damages and security in the amount equal to what RGC should have received if the Note Exchange had been consummated.225

225   *Id.* (footnotes and internal quotation marks omitted).

I find a similar approach appropriate in this case.

### 3. Equitable lien on anticipated proceeds

**\*38** Turning to PharmAthene's request for expectation damages in the form of an equitable payment stream that would share at least some of the characteristics of a constructive trust or equitable lien, I find that SIGA did owe a duty to PharmAthene and that SIGA has been enriched by its bad faith breach of that obligation.226 SIGA had a duty under the Bridge Loan and Merger Agreements to negotiate in good faith. SIGA's breach of that obligation, for all of the reasons discussed *supra,* was inequitable to PharmAthene. In addition, SIGA has been enriched by its inequitable conduct. SIGA continues to possess, for example, exclusive rights in the patents to ST–246 and related products. Those rights are valuable in and of themselves.

226   *Cf. Adams v. Jankouskas,* 452 A.2d at 152 (stating the standard for imposition of a constructive trust to remedy inequitable conduct).

I also find that, but for SIGA's bad faith negotiations, the parties likely would have reached agreement on a transaction generally in accordance with the LATS. PharmAthene was willing to agree to a license agreement for ST–246 on terms that

varied "to some extent" from the LATS.[227] I find that one such variation PharmAthene would have accepted is the use of a 50/50 profit split.[228] SIGA countered PharmAthene's Proposed License Agreement, however, with the Draft LLC Agreement, which included economic terms that bore no meaningful resemblance to the LATS.[229] Although PharmAthene objected to the Draft LLC Agreement on that basis, it expressed a willingness to consider increasing the upfront payments to SIGA prescribed by the LATS and to introduce a broader profit sharing component. Without making concessions of its own, SIGA ultimately responded that it would terminate negotiations unless PharmAthene stopped "conditioning" negotiations on strict adherence to the LATS. Had SIGA engaged in good faith negotiations, I am convinced that a license agreement between PharmAthene and SIGA for ST–246 would have resulted in terms no less favorable to PharmAthene than the 50/50 profit split it already had mentioned and an increase in the upfront and milestone payments from a total of $16 million, as specified in the LATS to something in the range of $40 million.

227   T. Tr. 57 (Wright).

228   It is not entirely clear from the record whether PharmAthene definitively offered an across-the-board 50/50 profit split in lieu of royalty payments. Richman testified that, after receiving SIGA's Draft LLC Agreement, PharmAthene conveyed to SIGA that PharmAthene was "willing to *consider* " a 50/50 profit split. T. Tr. 228 (emphasis added). Subsequent correspondence between PharmAthene's counsel Olstein and SIGA's counsel Coch, however, presents a more ambiguous account. On the one hand, Olstein wrote on November 30, 2006, "we are even willing to consider some amendments to [the LATS]; for instance instead of the royalty and excess margin payments presently payable, there could be a 50–50 split of the profits...." JTX 270 at 2. That language suggests an objective offer on PharmAthene's part to an across-the-board profit split. Consistent with that view, PharmAthene's Pre–Trial Brief criticizes Coch's reply to the November 30 letter for, among other things, not "respond[ing] to Olstein's *offer* of a 50/50 profit split in any way." Pl.'s Pre–T. Br. 23 (emphasis added). Similarly, PharmAthene's Pre–Trial Brief criticized SIGA's "failure to acknowledge PharmAthene's major concession in *proposing* a 50/50 profit split...." *Id.* at 36 (emphasis added). On the other hand, Olstein later wrote on December 6, 2006, "At no time, did we indicate that we were prepared to accept a 50–50 proposal or any other proposal in lieu of the binding terms of the [LATS]." JTX 124. In addition, PharmAthene's Pre- and Post–Trial Briefs frequently stated that PharmAthene was only "willing to consider" a 50/50 profit split. *See* Pl.'s Pre–T. Br. 18, 21, 23; Pl.'s Post–T. Op. Br. 34–35. Having considered all the evidence, I find (1) that PharmAthene would have agreed to a license agreement containing a pure 50/50 profit split in lieu of royalty payments had SIGA negotiated in good faith, and (2) that PharmAthene, in fact, did make such an offer.

229   At the November 6, 2006 meeting between the parties and before SIGA proposed its Draft LLC Agreement, SIGA's representatives stated they would be seeking upfront license fees in the range of $40 to $45 million. T. Tr.2084–85 (Fasman).

Thus, SIGA retained its exclusive interest in ST–246 only as a result of its bad faith conduct toward PharmAthene, and SIGA is enriched thereby. Under these facts, expectation damages in the form of an equitable payment stream akin to a constructive trust or an equitable lien on a share of the proceeds from ST–246 deserves serious consideration.

Applying the equitable principles and remedies discussed *supra* to the facts of this case, I conclude that an appropriate remedy would be to afford PharmAthene a stream of future payments if and when commercial sales of ST–246 commence, after accounting for certain marginal expenses. Such a remedy would operate somewhat similarly to an award of a constructive trust or of an equitable lien on a partial interest in the proceeds derived from the patents and related intellectual property for ST–246. A remedy of this sort would comport with the Court's authority to provide relief "as justice and good conscience may require"[230] and the requirement to avoid speculative damages.

230   *Lichens Co. v. Standard Commercial Tobacco Co.,* 40 A.2d 447, 452 (Del. Ch.1944).

**\*39** Viewing PharmAthene's request for an equitable payment stream as akin to a request for imposition of an equitable lien addresses most of SIGA's remaining objections to that request. First, unlike a "reasonable royalty" under the patent laws, the equitable remedy of an equitable lien is independent of and does not rely on federal patent law doctrine. Second, relief akin to an equitable lien would not require reducing expectation damages to specific monetary amounts representing a present value

and, therefore, would not involve reliance on the more speculative aspects of Baliban's expert reports. Instead, the Court would need to be satisfied that the proportionate interest in proceeds from ST–246 and any adjustment for upfront expenses that it orders are supported by the evidence. Third, because the remedy would be prospective in this case—*i.e.*, a share in the future proceeds from ST–246, if any—PharmAthene would not be relieved of the risk that ST–246 generates no profits. Furthermore, the prescribed share can be tailored to account for payments PharmAthene would have had to make under a negotiated agreement consistent with the LATS. In this way, a payment stream similar to an equitable lien would not relieve PharmAthene disproportionately of risks or costs it otherwise would have had to bear under a formal licensing agreement.

SIGA further objects to a remedy in the form of a payment stream on the ground that it would reverse the structure of the transaction contemplated by the LATS. Under the LATS, PharmAthene would control the ST–246 patents and product and any royalty payments would be due from PharmAthene, as licensee, to SIGA. By contrast, under a payment stream remedy as suggested by PharmAthene, SIGA would hold the patent, but it would have to make payments to PharmAthene. The structure is reversed, but SIGA's wrongdoing necessitates that. Absent SIGA's failure to negotiate a license agreement in good faith, PharmAthene would have controlled the ST–246 patents and product. Yet, due to its misconduct, SIGA currently controls those items and will in the future.[231] In these circumstances, as in the case of an equitable lien, it is appropriate to recognize PharmAthene's legitimate claim to share in the proceeds of ST–246.

[231]   For the reasons previously stated, PharmAthene is not entitled to a form of relief that would interfere with SIGA's control of ST–246 or the patents related to it. PharmAthene could have proceeded from the LATS to conclude a definitive license agreement with SIGA in early 2006 or it could have held fast to its original suggestion in February 2006 that a complete license agreement be incorporated as an exhibit to the merger term sheet and later related agreements. In fact, PharmAthene did neither nor did they otherwise secure the right to insist that the terms of the LATS be strictly adhered to in an ultimate license agreement. As a result, I have concluded that PharmAthene is not entitled to a license to ST–246 and the patents related to it. Rather, the relief I am ordering will afford PharmAthene an interest in the *proceeds* from the sale of ST–246 products and, conceivably, the related patents. In this sense, SIGA may be correct that the structure of the transaction contemplated by the LATS has been reversed, but it has no equitable basis to complain about such a reversal. Under the LATS, PharmAthene would have enjoyed a significant degree of control over ST–246 and the related patents. Instead, that control, and the benefit likely to flow from it, will remain with SIGA.

### 4. Specific terms of the equitable payment stream ordered

In deciding the precise bounds of the payment stream to award, the Court's task is, first, to derive a responsible estimate of "what [PharmAthene] should have received if the [licensing agreement] had been consummated"[232] (*i.e.*, to determine PharmAthene's expectancy interest) and, second, to provide a remedy that reasonably compensates PharmAthene for that lost expectancy. In providing a reasonably compensatory remedy, I find guidance in the primary purpose of a constructive trust: to redress a wrong rather than "to effectuate the presumed intent of the parties...."[233] In other words, I need not award a payment stream on proceeds from ST–246 that mirrors the terms of the LATS. My focus, therefore, is on what cashflows, with reasonable certainty, PharmAthene would have received had good faith negotiations yielded a definitive license agreement and on how best to compensate PharmAthene for the loss of those cashflows.

[232]   *Greka,* 2001 WL 984689, at *16 (Del. Ch. Aug. 22, 2001).

[233]   *Hogg v. Walker,* 622 A.2d 648, 652 (Del.1993).

**\*40** At all stages of negotiation between PharmAthene and SIGA, a license agreement for ST–246 comprised, at a minimum, (1) some combination of upfront, deferred, and milestone payments from PharmAthene to SIGA[234] and (2) some combination of revenue sharing in the form of royalty payments on net sales and 50/50 profit splits on all or part of certain net margins.[235] Under the LATS or its own Proposed License Agreement, PharmAthene would have expected those cashflows to be as follows: (1) aggregate guaranteed payments to SIGA of $16 million and (2) royalty payments of no more than 12% on net sales as well as profit sharing of 50% on the excess of net margins above 20% on sales to the U.S.

government.[236]

234   LATS at 1–2 (providing for License Fees, Deferred License Fees, and Milestones of, in the aggregate, $16 million); Proposed License Agreement §§ 4.1–4 (providing for Upfront Payment, Development Milestone Payments, Deferred Payments, and Additional Payment of, in the aggregate, $16 million); T. Tr.2084–85 (Fasman) (testifying that SIGA suggested an upfront license fee in the range of $40–45 million in November 2006); Draft LLC Agreement §§ 5.1(b) & 6.5(b) (providing for Initial Distribution, pre-funding of the [LLC's] initial budget, and Milestone Payments of, in the aggregate, $335 million).

235   LATS at 2 (providing for incremental royalties of 8%, 10%, and 12% on yearly net sales of Patented Products less than or equal to $250 million, greater than $250 million, and greater than $1 billion, respectively, as well as "50% of any amounts by which net margin exceeds 20% on sales to the U.S. Federal Government"); Proposed License Agreement §§ 4.4(b) & 5.1 (providing for royalties as specified by the LATS); Draft LLC Agreement §§ 6.1, 6.5(c) & Schedule 1 (providing for royalties of 18%, 22%, 25%, and 28% on net sales of less than or equal to $300 million, greater than $300 million, greater than $600 million, and greater than $1 billion, respectively, as well as equal distributions to each member thereafter).

    Although the LATS refers to "net sales," that term seems roughly to equate to gross sales revenues. *See* Proposed License Agreement § 1.4 (" 'Net Sales' means, with respect to any Product licensed to PharmAthene or any of its Sublicensees, the amount received on account of sales, or other disposition, of Product by PharmAthene or its sublicensees."); Draft LLC Agreement § 1.1 (defining "Net Sales" as "[w]ith respect to any Product, the amount received on account of sales, or other disposition, of Product by the [LLC], PharmAthene or either of their sublicensees. All calculations of Net Sales shall be based on bona fide arms' length transactions and not on any bundled, loss-leading or other blended or artificial selling or transfer price, and shall be in accordance with GAAP.").

236   Both when it negotiated the LATS in January 2006 and when it attempted to negotiate a definitive license agreement after termination of the Merger Agreement in late 2006, PharmAthene believed the market potential for ST–246 exceeded $1 billion and, thus, expected the highest marginal royalty percentage (*i.e.,* 12%) to apply. Additionally, PharmAthene's damages expert, Baliban, concluded that margins on sales to the U.S. government probably would have exceeded 20%, which would have triggered the 50/50 profit split on the excess margins. *See* Baliban Report ¶ 63 & Ex. 6A (estimating positive values for "SIGA's Profit Split on U.S. Margin" commencing in 2008, the same year that sales were assumed to begin).

At least one critical assumption had changed, however, between the time the parties negotiated the LATS in January 2006 and when they met again in November to negotiate a definitive license agreement. By its own estimate, PharmAthene believed that the total market potential of ST–246 had increase roughly three times, from approximately $1 billion to approximately $3 billion. This may explain PharmAthene's willingness to consider increasing its aggregate payments to SIGA and to include a more generous profit split in the deal in lieu of the more complicated royalty scheme set forth in the LATS.[237] As previously discussed, PharmAthene offered an across-the-board 50/50 profit split and, thus, presumptively would have agreed to that term. Moreover, given that its own estimate of the market potential had increased roughly threefold, a commensurate multiple represents a responsible estimate of the amount by which PharmAthene would have agreed to increase its aggregate payments under the LATS—*i.e.,* an increase from aggregate payments of $16 million to something in the range of $40 to $45 million. Accordingly, as of late November 2006, PharmAthene reasonably could have expected to consummate a license agreement under which it would pay SIGA, in the aggregate, $40 to $45 million in exchange for an across-the-board share of the proceeds derived from ST–246—that is, of course, if SIGA were also amenable to such a deal.

237   T. Tr. 228 (Richman).

SIGA was, in fact, amenable. Even before the November 6 meeting and preparation of the November 21 Draft LLC Agreement, SIGA had begun to contemplate a transaction comprising a lump sum payment to buy into a 50% profit participation in ST–246. To that end, someone at SIGA apparently asked its controller, Dugary, to suggest a dollar amount for such a lump sum payment supporting a 50/50 profit split. On October 18, Dugary emailed Fasman, Borofsky, Savas, and Konatich a four-page presentation, which concluded that "past *and future* [ST–246] related investments and costs" equaled $39.66 million, "supporting an up-front license fee of $40 million[ ] to buy into a 50% participation in future profits from the

product."[238] Although Dugary used the term "up-front license fee," the weight of the evidence convinces me that she used that term loosely to include all the *non*-royalty payments mentioned in the LATS, *i.e.,* the upfront licensee fee, the deferred license fee, and milestone payments. In late 2005, when negotiations for the LATS first began, SIGA estimated that it needed approximately $16 million to complete development of ST–246.[239] After active negotiations, the LATS provided SIGA an aggregate of $16 million, apportioned between upfront license fees, deferred license fees, and milestone payments. Dugary's use of the language "past *and future* " ST–246 expenses shows that, by October 2006, SIGA had revised its estimated needs to complete development of ST–246. Just as the LATS fully provided for ST–246's then estimated development costs, the $40 million payment suggested by Dugary would be sufficient to cover all of ST–246's newly estimated development costs. Accordingly, it is reasonable to infer from the evidence that, as of October 2006, SIGA would have considered an aggregate payment of $40 million adequate to support a 50/50 split of future profits from ST–246.

238      JTX 437 Attach. at 2 (emphasis added).

239      T. Tr. 1397 (Konatich).

**\*41** Fasman's statement at the November 6 meeting with PharmAthene that the upfront payment would need to be increased to "$40 to $45 million or more" likely originated from Dugary's October 18 presentation. Had SIGA negotiated in good faith, it would have proposed a transaction consistent with Dugary's presentation: a lump sum payment in an amount sufficient to cover the revised development costs of ST–246, *i.e.,* $39.66 million or more, in exchange for a 50% profit participation without any further license, milestone, or royalty payments. Instead, SIGA proposed the Draft LLC Agreement, which called for upfront and milestone payments of $335 million and a royalty of 18% to 28% on net sales as well as a pure 50/50 profit split thereafter. The stark contrast between Dugary's October 18 presentation and the later Draft LLC Agreement underscores SIGA's lack of good faith in proposing the Draft LLC Agreement.

The term of the prospective license also remained relatively constant throughout all stages of negotiation. The LATS provides for a Royalty Term, on a country-by-country basis, of the later of the last relevant patent to expire or ten years from ST–246's first commercial sale.[240] Similarly, PharmAthene's Proposed License Agreement provides for a Royalty Term of, "with respect to each country, the later of (a) the last Siga Patent to expire in that country that claims the composition, manufacture, or use of Product or (b) ten (10) years after the date of the first commercial sale of a Product in such country."[241] SIGA's Draft LLC Agreement generally preserved this same licensing term. Under Section 2. 1, the LLC expires on the date of the last Additional Distribution Period to expire or upon any Dissolution Event (*e.g.,* written consent of all Members or a judicial dissolution).[242] The Draft LLC Agreement defines "Additional Distribution Period" as ending, on a country-by-country basis, "upon the later to occur of: (a) the latest date on which such Product is covered by one or more SIGA Patent claims ... in such country; and (b) the expiration of ten (10) years from such date of the first commercial sale of such Product in such country."[243] Accordingly, the Draft LLC Agreement also generally provides for a license term lasting from execution of the agreement to at least ten years after the date of the first commercial sale of ST–246 or any product derived from it.

240      LATS at 2.

241      Proposed License Agreement at 1.

242      *See* Draft LLC Agreement §§ 1.1, 12.1 (defining "Dissolution Event").

243      *Id.* § 1.1.

Because neither party presented evidence regarding specific patents relating to ST–246 or the countries in which such patent coverage exists, I will limit the equitable lien on sales of ST–246 to a term of ten years from ST–246's, or a closely related product's, first commercial sale. Any attempt to expand the term to encompass countries and sales for which patent coverage does not expire until after ten years from the first commercial sale would force this Court into an unacceptably onerous enforcement or supervisory role.

Finally, at all stages of negotiation, PharmAthene undertook to fund all R & D expenses related to ST–246.[244] The passage of time, however, largely has mooted this aspect of the parties' prospective license. Between initiation of negotiations for the LATS in late 2005 and trial in 2011, SIGA received nearly $100 million in development funds from the U.S. government. For example, the NIH and NIAID awarded SIGA $4.8 million in August 2006, $16.5 million in September 2006, $75 million (in two distinct grants) in September 2008, and $3 million in September 2009.[245] Indeed, the same day that SIGA received the $16.5 million contract from the NIH in September 2006, Hruby emailed Drapkin, saying the "[b]ottom line is the product's entire development is supported...."[246] As stated above, Dugary later revised the estimated past and future development costs of ST–246 to $39.66 million. Even assuming additional changed circumstances or mere exaggeration or optimism by Hruby and Dugary, SIGA has received close to $80 million in government support since Hruby and Dugary estimated ST–246's R & D costs in late 2006.

[244]   LATS at 1 ("PHTN would fund research at SIGA"); Proposed License Agreement § 2.2 ("PharmAthene will fund research at Siga"); Draft LLC Agreement § 5.1(c) ("PharmAthene shall fund and guarantee ... the payment of one hundred percent (100%) of all operations, activities, obligations, and expenditures of the [LLC].... This will include, without limitation, ... SIGA and PharmAthene research and Development ...").

[245]   Baliban Report ¶ 25 (citing SIGA SEC filings disclosing each government contract); Baliban Rebuttal Report at 11–12 (same).

[246]   JTX 260 ¶ 9.

**\*42** Moreover, to whatever extent PharmAthene's expectancy may have included the expense to fund fully R & D of ST–246, its expectancy also would have included the intangible right to exercise significant, if not exclusive, control over the development of ST–246.[247] In fact, SIGA has and will continue to have full control over ST–246. Appropriate relief, therefore, requires taking into account PharmAthene's loss of that right. In this regard, I find informative Edwards's expert opinion that, with respect to pharmaceutical license agreements generally, "control over the pace of development and expenditures required for commercialization" is the compensation received for undertaking the substantial cost and risk to fund R & D expenditures.[248] The equitable payment stream discussed in this Opinion does not provide PharmAthene with "control over the pace of development and expenditures required for commercialization." To the contrary, the only means to provide PharmAthene with that control would be to compel specific performance of the LATS or a license agreement based thereon. For the various reasons previously discussed, specific performance is not appropriate in this case. Accordingly, the best alternative to compensate PharmAthene for this loss of control over the development of ST–246 is to relieve it of the attendant operational costs it would have paid for it. In sum, based on the level of government funding and my decision to include an initial setoff loosely corresponding to the aggregate license fee and milestone payments, I perceive no remedial justification for the equitable payment stream I am ordering to provide SIGA any additional setoffs based on R & D costs PharmAthene would have borne under a consummated license agreement. Were I to do otherwise, SIGA would reap a windfall.

[247]   LATS at 1 (granting PharmAthene a "worldwide *exclusive* license" to develop ST–246 (emphasis added)); Proposed License Agreement § 3.1 (granting PharmAthene "an *exclusive[ ]* right and license" to develop ST–246 (emphasis added)); Draft LLC Agreement § 3.2(a) (granting PharmAthene the power to appoint half of the LLC's managers).

[248]   Edwards Report ¶ 21.

In the final analysis, a responsible estimate of what PharmAthene should have received had SIGA negotiated in good faith (*i.e.,* its expectancy interest) is a definitive license agreement providing, at the least, an interest in ST–246 for which, after paying SIGA approximately $40 million, PharmAthene would receive 50% of all profits derived from sales of ST–246 and related products. Moreover, PharmAthene should have received this benefit for a period of at least ten years following the first commercial sale of any product derived from ST–246. Employing what Chancellor Strine termed "remedial discretion" in *Greka,*[249] I find that a payment stream consistent with the above terms would compensate PharmAthene for its expectancy interest with sufficient certainty to meet the requirements for relief from a breach of contract and promissory estoppel and to prevent injustice in the circumstances of this case.

249    *Greka,* 2001 WL 984689, at *17.

Accordingly, I grant PharmAthene's request for expectation or reliance damages in the form of an "equitable payment stream" or an equitable lien on all sale proceeds from ST–246 and related products as follows: once SIGA earns $40 million in net profits or margin from net sales of ST–246, PharmAthene shall be entitled to 50% of all net profits from such sales thereafter for a period from entry of this judgment until the expiration of ten years following the first commercial sale of any product derived from ST–246.[250] Additionally, SIGA shall be required to keep records showing the sales or other dispositions of ST–246 and related products and showing any deductions from such sales or dispositions in deriving "net sales" or profits in sufficient detail to enable the amount due to PharmAthene to be determined. Furthermore, PharmAthene shall be entitled to examine those records on an annual basis to the extent necessary to verify the payments, if any, to which it is entitled under this Opinion.

250    I employ the terms "net sales" and "net margin" or profits from the LATS and in accordance with their customary and ordinary usage in the patent licensing context. I leave to the parties, however, the task of providing a working definition for "net sales" and "net profits" when submitting a proposed form of final judgment conforming to this Opinion. *See supra* note 33 (regarding the customary meaning of "net sales"); *see infra* Part III (requiring the parties to submit a proposed form of final judgment). In this instance, however, the parties should include in the definition of "net sales," or elsewhere in the proposed judgment, proceeds from any dispositions of the intellectual property rights to ST–246 within the specified term (*e.g.,* should SIGA license, assign, or otherwise transfer any such rights to ST–246 to a third party). To the extent the parties cannot agree, the Court will impose the required terms in accordance with industry practice.

## 2. Attorneys' fees

**\*43** The Court of Chancery is empowered by statute to "make such order concerning costs in every case as is agreeable to equity."[251] The term "costs" in this context is interpreted to include attorneys' fees in an appropriate case.[252] Delaware courts follow the general "American Rule" that courts do not award attorneys' fees to the prevailing party.[253] Exceptions to the rule may exist, however, where, among other things, (1) there is a contractual provision entitling a party to attorneys' fees[254] or (2) the party against whom attorneys' fees are assessed has acted in bad faith.[255] As to the contractual entitlement exception, under both Delaware and New York law, courts will interpret a clear and unambiguous contract in accordance with the ordinary and usual meaning of its language.[256] With respect to the bad faith exception, the conduct warranting attorneys' fees may include the "behavior that underlies and forms the basis of the action ... [but] in only the most egregious instances of fraud or overreaching."[257]

251    10 *Del. C.* § 5106.

252    *Kerns v. Dukes,* 707 A.2d 363, 369 (Del.1998) ("[T]he Court of Chancery may award attorneys' fees as costs pursuant to 10 *Del. C.* § 5106 ... where, in its discretion, the equities so dictate.") (citing *Wilmington Trust Co. v. Coulter,* 208 A.2d 677, 681–82 (Del. Ch.1965)).

Pharmathene, Inc. v. Siga Technologies, Inc., Not Reported in A.3d (2011)

253    *Arbitrium (Cayman Is.) Handels v. Johnson,* 705 A.2d 225, 231 (Del. Ch.1997).

254    *NW. Nat'l. Ins. Co. v. Esmark, Inc.,* 672 A.2d 41, 43–44 (Del.1996) (holding a hold-harmless agreement provided for reimbursement for expenses and attorneys' fees).

255    *Reagan v. Randell,* 2002 WL 1402233, at *3 (Del. Ch. June 21, 2002) (quoting *Arbitrium,* 705 A.2d at 225).

256    *NW Nat'l. Ins. Co.,* 672 A.2d at 43 (citing *Rhone–Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co.,* 616 A.2d 1192, 1195 (Del.1992)); *Greenfield v. Phillies Records, Inc.,* 780 N.E.2d 166, 170 (N.Y.2002) ("[A] written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms.").

257    *Arbitrium,* 705 A.2d at 231; *see also Kaung v. Cole Nat'l Corp.,* 2004 WL 1921249, at *6 (Del. Ch. Aug. 27, 2004) (awarding attorneys' fees under bad faith exception where litigation conduct rose to "glaring egregiousness"), *aff'd in part, rev'd in part,* 884 A.2d 500 (Del.2005).

PharmAthene is entitled to an award of a portion of its attorneys' fees under both the contractual entitlement and the bad faith exceptions. I address first the contractual entitlement. Section 7.5 of the Bridge Loan Agreement provides as follows:

> The Issuer [SIGA] shall pay, and hold the Holder [PharmAthene] harmless against all liability for the payment of, all costs and other expenses incurred by any such Holder in connection with the Issuer's performance of and compliance with all agreements and conditions set forth herein....

Similarly, Section 7.6 provides:

> The Issuer will defend, indemnify, and hold harmless the Holder ... from and against any and all claims, demands, penalties, causes of action, fines, liabilities, settlements, damages, costs, or expenses of whatever kind or nature ... (including, without limitation, counsel and consultant fees and expenses ... ) arising out of this Agreement ... or the transactions contemplated hereby ...; or in any way related to the inaccuracy, breach of or default under any representations, warranties or covenants of the Issuer set forth herein....

There can be no dispute that PharmAthene incurred its attorneys' fees, in part, in connection with SIGA's non-performance of and non-compliance with its obligations under Section 2.3 of the Bridge Loan Agreement to negotiate in good faith a definitive license agreement in accordance with the LATS. Similarly, PharmAthene's claims, damages, costs, and expenses incurred in this action arise, in part, out of Section 2.3, and at least a portion of PharmAthene's attorneys' fees relate to SIGA's breach of its express covenant to negotiate in good faith under that section.258 Based on the plain meanings of SIGA's obligations under Section 7.5 to "pay all costs and other expenses incurred by [PharmAthene] in connection with [SIGA's] performance" of the Bridge Loan Agreement as well as under Section 7.6 to "defend, indemnify, and hold harmless" PharmAthene from "expenses of whatever kind or nature ... (including, without limitation, counsel and consultant fees and expenses)" that "in any way relate[ ] to ... [SIGA's] breach of ... any ... covenants," I also conclude that PharmAthene is entitled to recover its attorneys' fees and expenses in this action related to SIGA's breach.

258    I do not interpret the language in Section 7.6 referring "in any way ... to a breach of ... any representations, warranties or covenants of the Issuer" as strictly limited only to breaches of Articles III, entitled "Representations and Warranties," or V, entitled "Covenants." Rather, the legal definition of "covenant" is simply "[a] formal agreement or promise, usu. in a contract." *Black's Law Dictionary* 391 (8th ed.2004). SIGA formally agreed and promised in Section 2.3 to negotiate in good faith, and it breached that promise. Therefore, the provisions of Section 7.6 apply to SIGA's breach of Section 2.3.

Pharmathene, Inc. v. Siga Technologies, Inc., Not Reported in A.3d (2011)

**\*44** Alternatively, PharmAthene is entitled to its attorneys' fees under the bad faith exception to the American Rule. In *Greka,* Chancellor Strine awarded attorneys' fees because "RGC was forced by Greka's bad faith conduct to litigate to consummate the transaction contemplated by the Term Sheet."[259] Here, SIGA had contractual obligations to negotiate in good faith a license agreement for ST–246 in accordance with the terms of the LATS. Yet, SIGA insisted, among other things, that the $16 million of upfront, deferred, and milestone payments contemplated by the LATS be increased to an astronomical $335 million. Moreover, it proposed and maintained that the royalty of, at most, 12% contemplated by the LATS be increased to a maximum and likely widely applicable royalty of 28% *and* a 50/50 split on all profits thereafter under the Draft LLC Agreement. Based on these and other relevant facts, I find that SIGA breached its contractual obligations and engaged in a glaringly "egregious instance[ ] of ... overreaching"[260] sufficient to warrant an award of attorneys' fees under the bad faith exception to the American Rule.

259    *Greka,* 2001 WL 984689, at \*19 (Del. Ch. Aug. 22, 2001).

260    *See Arbitrium,* 705 A.2d at 231.

At the same time, however, I conclude that PharmAthene is entitled to only a portion of the attorneys' fees and expenses it actually incurred. Throughout this litigation, PharmAthene has split its case into roughly equal parts: first, in Counts One through Four, it claimed that the LATS itself was binding and justified specific enforcement of a license agreement, and second, in Counts Five through Seven, PharmAthene asserted that SIGA breached its obligation to negotiate in good faith and unjustly benefitted by so doing. The contractual and bad faith exceptions to the American Rule that justify attorneys' fees in this case relate only to the latter set of claims. At a maximum, therefore, PharmAthene should recover only one-half of its attorneys' fees.[261] Moreover, although liability rests on approximately half of PharmAthene's claims, PharmAthene devoted the majority of its pretrial and trial arguments, as well as time and expense, to its ultimately unsuccessful requests for relief in the form of either specific performance or a specific dollar amount of expectation damages based primarily on its position that the LATS was enforceable. Because I found the LATS unenforceable, much of that time and expense is not reimbursable. Rather, my sense is that only one-third of PharmAthene's arguments, time, and expense relate to the bases of liability and form of relief I have found and ordered, respectively. To a degree, PharmAthene's proof and arguments interrelate with one another. Consequently, it might not be possible as a practical matter to distinguish billings related solely to one set of issues versus another. Thus, in an exercise of the discretion granted to me by statute, I award PharmAthene one-third of the reasonable attorneys' fees it incurred in this action.[262]

261    *See Great Am. Opportunities, Inc. v. Cherrydale Fundraising, LLC,* 2010 WL 338219, at \*29 (Del. Ch. Jan. 29, 2010) (awarding one-half attorneys' fees where plaintiff prevailed on only approximately half of its claims).

262    *See* 10 *Del. C.* § 5106 (affording the Court equitable discretion in its award of attorneys' fees).

### 3. Expert witness fees

**\*45** The Court of Chancery also possesses discretionary authority to tax expert witness fees as among the costs generally borne by the non-prevailing party.[263] In an exercise of that discretion, the Court may decline to tax expert witness fees as costs where the expert's testimony was not helpful.[264] Expert reports and testimony presented to the Court in this case addressed primarily whether the LATS is an enforceable contract and, if so, the appropriate measure of damages for its breach. Here too, because the Court found the LATS unenforceable, expert testimony to the contrary and in support of

Pharmathene, Inc. v. Siga Technologies, Inc., Not Reported in A.3d (2011)

assessing damages on the premise that the LATS was enforceable ultimately was of only limited value to the Court. Nonetheless, at various times throughout this litigation and in this Opinion, the Court has relied on certain evidence provided by PharmAthene's experts to understand important aspects of the context and background regarding biopharmaceutical patent licensing and ST–246, generally, and the market for it, in particular.[265] As with attorneys' fees, this proportion of helpful to unhelpful expert evidence cannot be computed with mathematical precision, but I find that approximately one-third of that expert evidence, in fact, was helpful. Accordingly, the costs taxed to SIGA shall include one-third of the expert witness fees incurred by PharmAthene.

263   10 Del. C. § 8906 ("The fees for witnesses testifying as experts ... shall be fixed by the court in its discretion, and such fees so fixed shall be taxed as part of the costs in each case...."); Ct. Ch. R. 54(d) ("Except when express provision therefor is made either in a statute or in these Rules, costs shall be allowed as of course to the prevailing party....").

264   Oliver v. Boston Univ., 2009 WL 1515607, at *3 (Del. Ch. May 29, 2009) (declining to tax as costs expert fees where the court "did not rely upon" and "was not helped by" the expert testimony); Barrows v. Bowen, 1994 WL 514868, at *3 (Del. Ch. Sept. 7, 1994) (declining expert witness fees where court "did not find [the expert]'s opinion helpful").

265   See, e.g., supra notes 74, 140, 248.

# III. CONCLUSION

For the foregoing reasons, I find that SIGA is not liable for Counts One through Four and Count Seven of Plaintiff's Amended Complaint, but that SIGA is liable to PharmAthene for Counts Five and Six—namely the claims for breach of contractual obligations to negotiate a license agreement in good faith and promissory estoppel. Judgment, therefore, will be entered for an equitable payment stream or equitable lien on the profits or other qualifying proceeds associated with the commercial sale of ST–246 or products derived from it in accordance with the terms specified in Part II.E.1.c. of this Opinion. In addition, PharmAthene is awarded one-third of its reasonable attorneys' fees and expert witness costs, as well as its other costs under Rule 54(d).

Counsel for PharmAthene shall submit, on notice, a proposed form of final judgment reflecting these rulings within twenty (20) days of the date of this Opinion. The proposed form of final judgment should include a request for attorneys' fees and expenses in accordance with the procedures prescribed in Rule 88.

End of Document                                        © 2012 Thomson Reuters. No claim to original U.S. Government Works.

WestlawNext © 2012 Thomson Reuters. No claim to original U.S. Government Works.                53

193