# ATTACHMENT A

Highly Confidential - Attorneys' Eyes Only

Page 1

1              IN THE UNITED STATES DISTRICT COURT

2           FOR THE WESTERN DISTRICT OF WASHINGTON

3                          AT SEATTLE

4

5    MICROSOFT CORPORATION, a

6    Washington corporation,

7              Plaintiff,

8    vs.        No. C10-1823-JLR

9    MOTOROLA, INC. MOTOROLA

10   MOBILITY, INC., and GENERAL

11   INSTRUMENT CORPORATION,

12             Defendants.

13   _____

14                          REVISED

15          DEPOSITION OF HORACIO E. GUTIERREZ

16           Taken on behalf of the Defendants

17                      April 4, 2012

18   BE IT REMEMBERED THAT, pursuant to the Washington Rules of

19   Civil Procedure, the deposition of HORACIO E. GUTIERREZ, was

20   taken before Tia B. Reidt, #2798, a Certified Shorthand

21   Reporter, and a Notary Public for the State of Washington,

22   on April 4, 2012, commencing at the hour of 9:08 a.m., the

23   proceedings being reported at 315 5th Avenue South,

24   Suite 1000, Seattle, Washington.

25   Job Number: 48313

Highly Confidential - Attorneys' Eyes Only

Page 2

1                                APPEARANCES

2

3       Appearing on behalf of the Plaintiff

4       DAVID T. PRITIKIN

5       SIDLEY AUSTIN

6       One South Dearborn

7       Chicago, IL 60603

8

9

10

11

12      Appearing on behalf of the Defendant

13      PAUL M. SCHOENHARD

14      ROPES & GRAY

15      One Metro Center

16      700 12th Street NW

17      Washington, DC 20005

18

19

20

21

22

23

24

25

Highly Confidential - Attorneys' Eyes Only

Page 3

APPEARANCES CONTINUED

Appearing on behalf of the Defendant

RALPH H. PALUMBO

SUMMIT LAW GROUP

315 Fifth Avenue South

Seattle, WA 98104

ALSO PRESENT:

Michael Carter,

Videographer

Highly Confidential - Attorneys' Eyes Only

Page 4

1                          EXAMINATION INDEX

2

3    EXAMINATION BY                                      PAGE

4    Mr. Schoenhard                                      6

5

6                           EXHIBIT INDEX

7

8    EXHIBIT NO.       DESCRIPTION                       PAGE

9    EXHIBIT 1         24-page confidential patent       83

10                     license agreement.

11   EXHIBIT 2         18-page confidential patent       88

12                     license agreement.

13   EXHIBIT 3         18-page confidential patent       91

14                     license agreement.

15   EXHIBIT 4         12-page confidential patent       95

16                     covenant agreement.

17   EXHIBIT 5         25-page settlement, release,      97

18                     and license agreement.

19   EXHIBIT 6         16-page WiLAN Microsoft document  101

20                     dated 8/17/06.

21

22

23

24

25

Highly Confidential - Attorneys' Eyes Only

Page 5

1                    HORACIO E. GUTIERREZ

2              DEPOSITION OF HORACIO E. GUTIERREZ

3                    Wednesday, April 4, 2012

4                         9:08 a.m.

5

6         THE VIDEOGRAPHER:  This is the start of tape

7    labeled No. 1 of the video deposition of Horacio Gutierrez

8    in the matter of Microsoft versus Motorola in the District

9    Court, Western District of Washington at Seattle, Case

10   No. C10-1823-JLR.  This deposition is being held at the

11   Summit Law Group, 315 5th Avenue South, Seattle, Washington,

12   on April 4th, 2012, at approximately 9:09 a.m.

13         My name is Michael B. Carter from TSG Reporting,

14   Inc., and I'm the legal video specialist.  The court

15   reporter is Tia Reidt in association with TSG Reporting.

16         Will counsel please introduce themselves.

17         MR. SCHOENHARD:  Good morning.  My name is Paul

18   Schoenhard.  I'm an attorney with Ropes & Gray, LLP.  I am

19   here today representing the Motorola defendants.  And with

20   me is Ralph Palumbo from the Summit Law Group.

21         MR. PRITIKIN:  David Pritikin, Sidley Austin, LLP,

22   on behalf of Microsoft and on behalf of the witness.

23         THE VIDEOGRAPHER:  Will the court reporter please

24   swear the witness.

25

Highly Confidential - Attorneys' Eyes Only

Page 6

1                           HORACIO E. GUTIERREZ

2               HORACIO E. GUTIERREZ, having been first duly sworn,

3       was examined and testified as follows:

4

5       EXAMINATION

6       BY MR. SCHOENHARD:

7          Q.      Good morning, sir.

8          A.      Good morning.

9          Q.      Please state your name and home address for the

10      record.

11         A.      It's Horacio Gutierrez. ██████████████

   ██ ████████████████████████████

13         Q.      And you understand that you're testifying under

14      oath here today?

15         A.      I do.

16         Q.      Is there any reason of which you're aware that you

17      cannot provide honest testimony today?

18         A.      No.

19         Q.      Have you been deposed before?

20         A.      Yes.

21         Q.      Approximately how many times?

22         A.      Once before.

23         Q.      Can you tell me briefly about the circumstances of

24      that earlier deposition?

25         A.      That concerned a litigation with defendant Barnes

Highly Confidential - Attorneys' Eyes Only

Page 7

HORACIO E. GUTIERREZ

2    & Noble.

3        Q.       You're currently employed by Microsoft?

4        A.       Correct.

5        Q.       What is your current position?

6        A.       I'm corporate vice president and deputy general

7    counsel in charge of the intellectual property group.

8        Q.       What are your responsibilities as corporate vice

9    president and deputy general counsel?

10       A.       I manage the portion of the legal department of

11   Microsoft that counsels the company in connection with the

12   full range of intellectual property issues, from patents to

13   trademarks, copyrights, trade secrets, and IP licensing

14   issues.

15       Q.       To whom do you report?

16       A.       I report to the general counsel of Microsoft, Brad

17   Smith.

18       Q.       And do you have any direct reports?

19       A.       I have a number of direct reports in each of the

20   areas that I mentioned before: patents, copyrights,

21   trademarks, licensing, and other areas.   The organization as

22   a whole is about 200 people.

23       Q.       Approximately how many direct reports do you have?

24       A.       I believe the number of direct reports is nine or

25   ten people.

Highly Confidential - Attorneys' Eyes Only

Page 8

HORACIO E. GUTIERREZ

1

2    Q.     If you are able, can you list those nine or ten

3    people for me?

4    A.     Sure.  Bart Eppenauer is the chief patent counsel.

5    Tom Rubin is the head of the copyright and trademark team.

6    David Kaefer is the head of the IP licensing function.  Matt

7    Penarczyk is the head of the IP licensing legal team.  Jason

8    Albert is the head of the IP policy team.

9         Andrea Silvestrini is the chief financial officer

10   of the group.  Sandy Gupta is the head of the open solutions

11   group, which manages strategic alliances and partnerships.

12   Jennifer Norris is the business manager for my group.  And

13   Melaina Chambers is my executive assistant.  That's nine.

14   Q.     I'm not going to go through each individual, but I

15   would like to walk through a few of these individuals and

16   what their respective responsibilities are.

17   A.     Sure.

18   Q.     The first individual, Bart Eppenauer.  Can you

19   spell Mr. Eppenauer's name for us?

20   A.     Bart is B-A-R-T.  Eppenauer is E-P-P-E-N-A-U-E-R.

21   Q.     What are Mr. Eppenauer's responsibilities?

22   A.     He manages the patent group at Microsoft.  That's

23   a group of approximately 100 people that manage the process

24   of preparing to file patent applications, prosecuting the

25   patent applications, the maintenance of the patent portfolio

Highly Confidential - Attorneys' Eyes Only

Page 9

1              HORACIO E. GUTIERREZ

2  around the world, as well as performing patent analysis and

3  counseling services for the group as well as for the

4  business divisions of the companies that rely on their

5  advice.

6      Q.     Does Mr. Eppenauer have any role in patent

7  litigation functions?

8      A.     Indirectly.  The patents group includes a patent

9  analysis team.  The patent analysis team performs patent

10 analysis, analysis of a legal nature relating to patents

11 that are both asserted against Microsoft in litigation as

12 well as patents that Microsoft assert against others, both

13 in the context of licensing and litigation scenarios.

14     Q.     And Mr. Eppenauer is responsible for that patent

15 analysis team?

16     A.     The patent analysis team reports directly to

17 Mr. Eppenauer, yes.

18     Q.     Is there an individual that is the lead of the

19 patent analysis team?

20     A.     Yes.  His name is John Mulgrew, M-U-L-G-R-E-W.

21     Q.     Let's move on to David Kaefer.

22     A.     Yes.

23     Q.     Are you able to spell Mr. Kaefer's last name?

24     A.     K-A-E-F-E-R.

25     Q.     And what are Mr. Kaefer's responsibilities?

Highly Confidential - Attorneys' Eyes Only

Page 10

1                    HORACIO E. GUTIERREZ

2      A.      He is responsible for the IP licensing group.

3   That is a group comprised of lawyers as well as licensing

4   executives of different backgrounds whose job is to handle

5   negotiations relating to licensing, be them cross-licensing

6   transactions or unilateral licensing transactions.

7      Q.      Does Mr. Kaefer have responsibility both for

8   inbound and outbound licensing?

9      A.      Yes.  Although in a company like Microsoft,

10  there's a whole range of inbound licensing transactions that

11  happen even at the product group level.  There's a lot of

12  inbound copyright licensing from third parties.  But when it

13  comes to inbound patent licenses, I would say he's largely

14  responsible for the whole area.

15     Q.      Let's move on to Matt Penarczyk.

16     A.      Yes.

17     Q.      Are you able to spell Mr. Penarczyk's last name?

18     A.      That's a little harder.  His name -- his last name

19  is spelled P-E-N-A-R-C-Z-Y-K.

20     Q.      What are Mr. Penarczyk's responsibilities?

21     A.      He manages a group of attorneys that provide legal

22  and transactional support for both our licensing activities

23  as well as generally provide legal counsel to the product

24  groups on issues related to licensing.

25     Q.      Does Mr. Penarczyk have a litigation function?

Highly Confidential - Attorneys' Eyes Only

Page 11

1                         HORACIO E. GUTIERREZ

2       A.      No, he does not.

3       Q.      What are Mr. Albert's responsibilities?

4       A.      He manages a small group that tracks legislative

5    and regulatory developments around the world concerning

6    intellectual property matters.  That would be the team that

7    would represent Microsoft in the context of patent or other

8    IP reform efforts around the world, typically working

9    through industry associations or sometimes directly.

10      Q.      For how long have you been with Microsoft?

11      A.      For a little over 13 years now.

12      Q.      So you arrived at Microsoft in approximately 1999?

13      A.      November of 1998.

14      Q.      For how long have you held your current position?

15      A.      Since the summer of 2006.

16      Q.      What was your immediate prior position before the

17   summer of 2006?

18      A.      I was the associate general counsel in charge of

19   the legal group for the EMEA region - that's Europe, Middle

20   East and Africa - based in Europe.  So in fact, you could

21   describe it as being the chief legal counsel for Microsoft

22   in that region.

23      Q.      You returned stateside in approximately the summer

24   of 2006?

25      A.      Correct.

Highly Confidential - Attorneys' Eyes Only

Page 12

                        HORACIO E. GUTIERREZ

1

2     Q.      And you've been here since that time?

3     A.      Correct.

4     Q.      In your current position?

5     A.      Yes.

6     Q.      Have you personally had any involvement with

7     standard-setting organizations?

8     A.      No, I have not.

9     Q.      Do you oversee any of Microsoft's standards-

10    related activities?

11    A.      No, I don't.

12    Q.      In approximately October of 2010, you came to be

13    involved in a dispute between Motorola and Microsoft,

14    correct?

15    A.      Correct.

16    Q.      Mr. Gutierrez, I've handed you a document that was

17    previously marked as Heiner Exhibit 9.  For the record, it

18    bears Production Nos. MOTM_ITC0064417 through 438.

19            Please take a moment to review this document and

20    tell me whether you recognize it.

21    A.      Would it be possible to do something about the

22    lighting?  I'm having trouble seeing the document.

23    Q.      Sure.  Why don't we take a short break off the

24    record and we'll see if we can...

25            MR. PALUMBO:  If I could -- there's nothing that

Highly Confidential - Attorneys' Eyes Only

Page 13

```
1                     HORACIO E. GUTIERREZ
2   can be done, I don't think.
3              MR. PRITIKIN:  Might be able to --
4              THE VIDEOGRAPHER:  The time is --
5              MR. PRITIKIN:  I don't think we need to -- let's
6   just...
7              MR. PALUMBO:  I don't think we can get it any...
8              MR. PRITIKIN:  What if we open the blinds here?
9              MR. SCHOENHARD:  Let's go ahead and take a quick
10  break.
11             MR. PRITIKIN:  Okay.  Let's see what we can do.
12             THE VIDEOGRAPHER:  The time is 9:22.
13             We are going off the record.
14             (Pause in the proceedings.)
15             THE VIDEOGRAPHER:  The time is 9:26.
16             We are going back on the record.
17             Proceed.
18  BY MR. SCHOENHARD:
19     Q.     I believe there was a question pending, but I'll
20  go ahead and withdraw it and restate.
21             Mr. Gutierrez, you have been handed a document
22  that was previously marked as Heiner Exhibit 9.  For the
23  record, it bears Production Nos. MOTM_ITC0064417 through
24  438.
25             Please take a moment to review this document and
```

Highly Confidential - Attorneys' Eyes Only

Page 14

1                    HORACIO E. GUTIERREZ

2   tell me whether you recognize it.

3        A.      (Witness peruses document.)

4             I do.

5        Q.      What do you recognize this document to be?

6        A.      This is a letter sent by Mr. Kirk Daily of

7   Motorola addressed to me.

8        Q.      Did you receive this letter?

9        A.      I did.

10       Q.      Do you understand that you have been designated to

11  testify today on Microsoft's behalf with respect to

12  Microsoft's actions and response to receiving this letter?

13       A.      I do.

14            MR. PRITIKIN:   I think we should be clear as to

15  which questions are being posed as part of the 30(b)(6)

16  deposition and which are being posed to Mr. Gutierrez in his

17  personal capacity.   And, you know, however you want to

18  handle it is fine with me, so long as it's clear on the

19  record when you're asking questions pursuant to the 30(b)(6)

20  notice.

21            MR. SCHOENHARD:   Understood.   I think that's

22  reasonable, especially given the limitations on the topics

23  for which Mr. Gutierrez was designated.   I think that it

24  would be appropriate to start from time at which Exhibit 9

25  was passed to Mr. Gutierrez, and I expect that we'll

Highly Confidential - Attorneys' Eyes Only

Page 15

1              HORACIO E. GUTIERREZ

2    continue in his corporate capacity for some duration now.

3         If you find a line of questioning you believe to be

4    outside the scope of that, please let me know, but otherwise

5    I think we'll probably find an appropriate end time when

6    we've done -- left this line of questioning.

7         MR. PRITIKIN:  That's fine.

8    BY MR. SCHOENHARD:

9    Q.    Mr. Gutierrez, do you feel comfortable testifying

10   with respect to that topic today?

11   A.    Yes.

12   Q.    Did you do anything to prepare for your

13   deposition?

14   A.    I reread this letter as well as a subsequent

15   letter received from Motorola on October 29th, and I had a

16   meeting yesterday afternoon with counsel to talk about what

17   to expect today.

18   Q.    Did you meet with any other Microsoft personnel to

19   refresh your recollection as to the circumstances

20   surrounding Microsoft's receipt of this letter, Heiner

21   Exhibit 9?

22   A.    No.

23   Q.    At the time Microsoft received the October 21

24   letter marked as Heiner Exhibit 9, Microsoft had already

25   filed suit against Motorola with respect to certain patents,

Highly Confidential - Attorneys' Eyes Only

Page 16



1           HORACIO E. GUTIERREZ

2    correct?

3    A.      Correct.

Highly Confidential - Attorneys' Eyes Only



Highly Confidential - Attorneys' Eyes Only

Page 18

1                    HORACIO E. GUTIERREZ

2   ████████████████████████████████████████████

   ██████████████████████████████████████

   ████████████

5      Q.      Returning your attention to the October 21 letter,

6   the October 21 letter reflects an offer by Motorola of a

7   patent license to Microsoft for certain patents and patent

8   applications relating to the 802.11 standards, correct?

9      A.      Correct.

10     Q.      Prior to receipt of the October 21, 2010 letter,

11  had Microsoft ever asked Motorola for a license to any of

12  its 802.11 standard-essential patents?

13     A.      Not that I'm aware of.

14     Q.      Prior to October 21 of 2010, was Microsoft aware

15  that Motorola had patents that were essential to the 802.11

16  standards?

17          MR. PRITIKIN:   I'm going to object to the question

18  as outside the scope of the 30(b)(6) topics for which

19  Mr. Gutierrez has been designated.

20          We can treat that as part of the personal

21  deposition if you would like.

22          MR. SCHOENHARD:   I'm comfortable treating that as a

23  personal question.

24          MR. PRITIKIN:   All right.   You can answer the

25  question.

Highly Confidential - Attorneys' Eyes Only

Page 19

1                    HORACIO E. GUTIERREZ

2          THE WITNESS:  I was personally not aware of

3    Motorola's patent ownership in the field.

4    BY MR. SCHOENHARD:

5      Q.     Do you know whether Microsoft as a corporation had

6    awareness of Motorola's ownership of certain

7    standard-essential patents?

8          MR. PRITIKIN:  Now we're off the 30(b)(6)

9    designation, so you're testifying in your personal capacity,

10   Mr. Gutierrez, if you know the answer.

11         THE WITNESS:  Your question is not limited to

12   802.11 anymore?  You're talking about standard-essential

13   patents generally?

14   BY MR. SCHOENHARD:

15     Q.     If so, I misspoke and I apologize.

16   ████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████

███  ███  ████████

███  ███  ██████████████████████████

███  █████████████████████████████████

███  ██████████████████

███  ███  ████████  █████████████████

███  ██████████████████████████████

███  ████████████████████████  ████

Highly Confidential - Attorneys' Eyes Only

Page 20



HORACIO E. GUTIERREZ

Highly Confidential - Attorneys' Eyes Only

Page 21



HORACIO E. GUTIERREZ

Highly Confidential - Attorneys' Eyes Only

Page 22

1               HORACIO E. GUTIERREZ

Highly Confidential - Attorneys' Eyes Only



Highly Confidential - Attorneys' Eyes Only

Page 24

1                    HORACIO E. GUTIERREZ

2       A.      I don't recall the timeline specifically.

3       Q.      Do you know whether Microsoft performed a

4   financial valuation of its 802.11 standards-essential patent

5   portfolio?

6               MR. PRITIKIN:   The same instruction, Mr. Gutierrez.

7               THE WITNESS:   Can you repeat the question?

8   BY MR. SCHOENHARD:

9       Q.      Do you know whether Microsoft performed a

10  financial valuation of its 802.11 standards-essential

11  patents?

12      A.      I don't believe so.

13      Q.      The October 21, 2010 letter suggests or -- let me

14  start over.

15              The October 21, 2010 letter marked as Heiner

16  Exhibit 9 includes a statement of an offer to license

17  Motorola's 802.11 standards-essential patents on reasonable

18  and nondiscriminatory condition- -- terms and conditions,

19  including a reasonable royalty of 2.25 percent per unit for

20  each 802.11 compliant product, correct?

21      A.      The letter has those terms, "reasonable" and

22  "nondiscriminatory."   I would strongly disagree with the

23  notion that the letter in fact contains an offer that is

24  reasonable and nondiscriminatory.

25      Q.      Why is that?

Highly Confidential - Attorneys' Eyes Only

Page 25

1               HORACIO E. GUTIERREZ

2     A.     There are many reasons.  I mean, anybody who

3  understands this field that reads this letter would

4  understand that there are condition upon condition that

5  would make it unreasonable.  And I can list a few, if you

6  want.

7     Q.     Please do.

8     A.     First of all, a royal -- the royalty rate is, in

9  my opinion, abusive for a couple of reasons.

10       First of all, the base that's used for the

11  calculation of the royalty base is not the value of the

12  product that Microsoft produces but instead is the overall

13  value of the ultimate device on which -- for which our

14  product is a component.  So the rate would be applied not on

15  the cost of the Microsoft software program that implements

16  the standard, but let's say on Dell's full server or PC,

17  which greatly inflates the royalty and essentially collects

18  on value that has nothing to do with the value of the

19  contribution of Motorola to the standard.

20       The royalty of two and a quarter percent per unit

21  is, in and of itself, in the realm of standard-essential

22  patents for products of this nature, outrageously high, and

23  it is especially excessive when one considers that that is

24  the net royalty they would expect to charge after having

25  received the benefit of a full cross-license of Microsoft

Highly Confidential - Attorneys' Eyes Only

Page 26

1                           HORACIO E. GUTIERREZ

2      patents in the field.  So it's basically a net royalty of

3      two and a quarter percent on top of what would be for them a

4      free license of the full Microsoft portfolio in the field.

5            So under those circumstances, ███████████████

       ████████████████████████████████████████████████████

       ██████████████ I took this letter to be essentially a formality

8      enabling Motorola to go ahead with filing litigation against

9      Microsoft and not really a serious attempt at negotiating a

10     license, because the terms were so out of the universe of

11     what is reasonable, given the nature of the technology.

12          Q.    I'd like to walk through a few of the items you

13     mentioned and talk through them in a bit more detail.  One

14     you mentioned, the relationship between the royalty and the

15     end product.

16          A.    Yes.

17          Q.    Which end products do you understand would be

18     implicated by the offer in the October 21, 2010 letter?

19          A.    Well, the letter really does not specify any

20     products.  It uses a couple products as examples.  So I took

21     that to mean that it really applied to any and all Microsoft

22     products that implemented the 802.11 standard.  And you

23     know, that, you know, to my mind, basically applied to a

24     large portion of the -- of the products that Microsoft

25     ships, or could potentially apply to a large portion of the

Highly Confidential - Attorneys' Eyes Only

Page 27

HORACIO E. GUTIERREZ

1                        HORACIO E. GUTIERREZ

2 products that Microsoft ships.

3      So this royalty demand alone would essentially, in

4 my mind, be a two and a quarter percent royalty demand on

5 the bulk of Microsoft revenues.

6    Q.    Did you ask anyone at Motorola whether this offer

7 was intended to cover a wide range of products beyond those

8 that are particularly identified here?

9    A.    I think the letter was actually quite clear about

10 it.  The letter says in the first paragraph that "Motorola

11 offers a license to license the patents for a two and a

12 quarter percent per unit royalty for each 802.11 compliant

13 product."

14      So there isn't really ambiguity there.  They're

15 basically saying that any product that implemented --

16 included a compliant implementation of 802.11 would be

17 subject to the royalty.

18    Q.    Do you know as of October 21, 2010, which

19 Microsoft products were 802.11 compliant?

20    A.    Well, 802.11, as far as I understand it, is the

21 predominant standard used for Wi-Fi connectivity.  So my

22 assumption was that the majority of personal computers,

23 Xboxes, tablets and phones, just to name a few, would rely

24 on some kind of implementation of the standard, whether that

25 be as part of the operating system or otherwise part of the

Highly Confidential - Attorneys' Eyes Only

Page 28

1                          HORACIO E. GUTIERREZ

2    device as a whole.

3        Q.      Do you know whether as of October 21, 2010,

4    Microsoft distributed any software for personal computers

5    that was 802.11 compliant?

6        A.      I don't know the answer to that, but I assume that

7    we did.

8        Q.      Did you perform any investigation to determine

9    whether you did?

10       A.      I believe the litigation team working with --

11             MR. PRITIKIN:  Well, you should not testify about

12   conversations that you had with lawyers that relate to the

13   subject matter of litigation, so I would instruct you not to

14   answer the question to the extent you need to reveal the

15   substance of privileged communications.

16             Let me hear the question back.

17             (The following encompasses the entire readback

18   portion.)

19             "Q. Did you perform any investigation to determine

20   whether you did?"

21             (Whereupon, the readback was concluded.)

22             THE WITNESS:  I didn't personally perform such

23   investigation.  I believe that to have been in the scope of

24   the review that others performed.

25   BY MR. SCHOENHARD:

Highly Confidential - Attorneys' Eyes Only

Page 29

1                       HORACIO E. GUTIERREZ

2       Q.       In response to receiving the October 21, 2010

3    letter, did Microsoft investigate which of its products

4    would be considered licensed under the offer in the

5    October 21 letter?

6            MR. PRITIKIN:  And that question also gets into the

7    subject matter that may be privileged.  You can answer the

8    question "yes" or "no" or you don't recall based on your own

9    personal knowledge, but you should not reveal the substance

10   of any information that you received from lawyers relating

11   to that subject.

12           THE WITNESS:  Yes.

13   BY MR. SCHOENHARD:

14      Q.       Did Microsoft determine that any of its products

15   other than Xbox 360 related products would be considered

16   802.11 compliant products under the terms of the offer of

17   the October 21 letter?

18           MR. PRITIKIN:  And I'm going to instruct the

19   witness not to answer the question on grounds of

20   attorney-client and work-product privilege.

21           MR. PALUMBO:  Could you raise your voice a little

22   bit?  I'm having trouble hearing you.

23           MR. PRITIKIN:  Sure.

24           Will you read back my objection?

25           THE COURT REPORTER:  I'm having a little trouble

Highly Confidential - Attorneys' Eyes Only

Page 30

                    HORACIO E. GUTIERREZ

1  hearing you, too.

2         MR. PRITIKIN:  Is the microphone not --

3         THE COURT REPORTER:  It's not very loud, no.

4         MR. PRITIKIN:  I'm going to instruct the witness

5  not to answer the question on grounds of attorney-client and

6  work-product privilege.

7         MR. PALUMBO:  Thank you.

8  BY MR. SCHOENHARD:

9     Q.    As of October 21, 2010, were you personally aware

10  of any Microsoft products other than the Xbox 360 that were

11  802.11 compliant?

12         MR. PRITIKIN:  Now, this is a question that is

13  outside the scope of the 30(b)(6) designation.  Do you want

14  to ask this in his personal capacity?

15  BY MR. SCHOENHARD:

16     Q.    Let me rephrase.

17         As of October 21, 2010, did Microsoft sell any

18  802.11 compliance products other than the Xbox 360 related

19  products?

20     A.    I don't know.

21         MR. PRITIKIN:  And I think that is outside the

22  scope of the 30(b)(6) topics, so we'll take that answer to

23  be in his personal capacity, if that's something that you're

24  interested in pursuing.  Pursuant to a 30(b)(6) designation,

Highly Confidential - Attorneys' Eyes Only

Page 31

1                    HORACIO E. GUTIERREZ

2    this is not the right witness for that question.

3    BY MR. SCHOENHARD:

4       Q.      A moment ago you also referred to the 2.25 percent

5    per unit number identified in the October 21, 2010 letter as

6    a net royalty, correct?

7       A.      Yes.  That's what I understood it to be.

8       Q.      Upon receipt of the October 21, 2010 letter, did

9    you understand that Motorola intended for the 2.25 percent

10   per unit royalty offer to be subject to a grant-back which

11   might ultimately lower the effective royalty percentage?

12      A.      No, I did not.  I read the letter to mean what it

13   said, which is that the royalty payable to Motorola would be

14   two and a quarter percent per unit for each 802.11 compliant

15   product subject to the grant-back; that is, including the

16   grant-back.

17

Highly Confidential - Attorneys' Eyes Only



Highly Confidential - Attorneys' Eyes Only



Highly Confidential - Attorneys' Eyes Only

Page 34

1                     HORACIO E. GUTIERREZ

2   ████  ████████████████████████████████████████

    █  ████████████████  ████████████████████████

    █  █████████████████████████████████████████

    █  ██████████████████████████████████████████████

    █  ████████████████████████████████████

7       Q.     Sitting here today, do you have any reason to

8   believe that in response to the October 21, 2010 letter,

9   Microsoft contacted Motorola to determine what Motorola

10  intended by the language "Subject to a grant-back license

11  under the 802.11 essential patents of Microsoft"?

12      A.     I'm sorry.  Repeat the question.

13           MR. SCHOENHARD:  Could you read that back, please?

14           (The following encompasses the entire readback

15  portion.)

16           "Q. Sitting here today, do you have any reason to

17  believe that in response to the October 21, 2010 letter,

18  Microsoft contacted Motorola to determine what Motorola

19  intended by the language 'Subject to a grant-back license

20  under the 802.11 essential patents of Microsoft'?"

21           (Whereupon, the readback was concluded.)

22           THE WITNESS:  I don't know if that happened.

23  BY MR. SCHOENHARD:

24      Q.     In response to the October 21, 2010 letter, did

25  Microsoft apply for a license to Motorola's 802.11

Highly Confidential - Attorneys' Eyes Only

Page 35

HORACIO E. GUTIERREZ

1

2    standard-essential patent portfolio?

3       A.    No.  And I don't believe that was Motorola's

4    expectation after sending this letter.

5       Q.    Does the October 21, 2010 letter specify any term

6    for the proposed license?

7       A.    They did mention at the end in the letter that the

8    offer would be open for 20 days.

9       Q.    Does the October 21, 2010 letter identify what the

10   license term would be?

11      A.    The letter doesn't identify it on its face, as far

12   as I can tell.

13      Q.    Does the October 21 letter identify whether such a

14   license would have a defensive suspension provision?

15      A.    No, it doesn't.

16      Q.    Would you agree that the October 21 letter is

17   lacking many of the terms of a typical patent license

18   agreement?

19      A.    The letter on its face doesn't purport to be a

20   detailed licensing contract, no.  But I think it is also

21   appropriate to assume that many -- that there are a set of

22   terms that are common in the industry that -- you know, and

23   there may be even special practices in specific areas of

24   technologies that constitute the custom of how those

25   licenses are done, so -- but I think the most important

Highly Confidential - Attorneys' Eyes Only

Page 36

1                          HORACIO E. GUTIERREZ

2       point is in reading this letter there were such significant

3       hurdles to Microsoft, even considering the economic terms

4       that were being offered, that discussion of subsidiary order

5       issues such as defensive suspension and things like that

6       were really out of the question.

7               Typically the economic terms are discussed and then

8       the details of some of the provisions that don't necessarily

9       affect the economics can be negotiated later.  And for the

10      most part, my experience is that once there is a general

11      economic agreement, the negotiation of the other terms is

12      less controversial.

13      Q.      Upon receipt of the October 21, 2010 letter, did

14      Microsoft view the letter as an offer to which it could

15      simply respond "we accept" and have a binding contract form?

16      A.      Well, the letter in and of itself stated that

17      Motorola expected an acceptance of the offer as stated in

18      the letter, so we took it to mean what it said,

19      understanding that there would be contractual formalities

20      that would follow in the event that we accepted the economic

21      offer.

22      Q.      You referred to the October 21, 2010 letter as

23      appearing to be something that Motorola could use to

24      ultimately fight a lawsuit, correct?

25      A.      Yes.  That was our interpretation, that they sent

Highly Confidential - Attorneys' Eyes Only

Page 37

HORACIO E. GUTIERREZ

1
2 this letter knowing full well that it would be unacceptable

3 to Microsoft and set a short term for acceptance that was

4 unrealistic given the nature of the analysis that would have

5 to be performed.  So the clear indication to us of those

6 circumstances was that they really had no intention of

7 having this effort conclude in a license but was just a

8 formality required by them to be able to file suit.

9     Q.    Does the October 21 letter include any direct

10 threat of suit?

11     A.    Well, the letter makes a royalty offer, has a --

12 indicates specific terms upon which we would have to accept

13 the offer.  And in the world of IP, the clear meaning of

14 that set of terms is that failing an acceptance of the

15 offer, Motorola would exercise its rights to enforce its

16 intellectual property.

17     Q.    Do you know what would have happened if Microsoft

18 had responded to Motorola with a counteroffer?

19     A.    You're asking me to speculate what Motorola would

20 have done in that case.  I'm not sure I can.

21     Q.    Did Microsoft, upon receipt of the October 21,

22 2010 letter, have any expectation as to what Motorola's

23 response would be to a counteroffer?

24 

Highly Confidential - Attorneys' Eyes Only

Page 38

1          HORACIO E. GUTIERREZ



15    Q.    Upon receipt of the October 21, 2010 letter, is it

16   correct to say that you did not believe the 2.25 percent per

17   unit offer was reasonable?

18    A.    Correct.

19    Q.    Has Microsoft ever engaged in other licenses that

20   involved royalties at the level of 2.25 percent per unit?

21       MR. PRITIKIN:  Now, this is outside the scope of

22   the 30(b)(6) designation, but you can answer that in your

23   personal capacity.

24       THE WITNESS:

Highly Confidential - Attorneys' Eyes Only

Page 39

HORACIO E. GUTIERREZ

1

2  type of approach of a percentage royalty at that level, but

3  I would say that it -- you know, not all technology fields

4  are the same when it comes to licenses, and the particular

5  contribution of a party's invention has to be measured

6  relative to the value that it confers to the product in

7  which it is incorporated.

8        So I would say from my experience in license, for

9  example, if you think of the cellular wireless patent

10 portfolio and you think of the largest patent holders in

11 this space, Qualcom or Broadcom or some of those companies,

12 I think you're -- you know, in the beginning of the

13 development of mobile devices, you probably will find patent

14 licenses that have that kind of royalty, because the

15 function of the mobile device or the phone was really to

16 make voice calls, and without, that technology wouldn't have

17 been different.

18       Here you're talking about technologies that are,

19 you know, really the subject of thousands of patents by

20 different parties around the world.  And the contribution of

21 the inventions of, you know, Motorola specifically to the

22 overall standard I think is, if anything, just minor and

23 incremental.

24       So I think royalty rates have to be judged based on

25 a case-by-case basis as opposed to making broad

Highly Confidential - Attorneys' Eyes Only

Page 40

                    HORACIO E. GUTIERREZ

1  generalizations about the adequacy of a rate.  I think

3  they're very context specific.

4       When we've used percentage rates, at least my

5  experience has been that generally the rate hasn't been

6  nearly as high as the percentage per unit rate that is being

7  sought by Motorola here, and certainly that it hasn't been

8  applied on a third party's finished product as opposed to on

9  the basis of the value of the product of the licensee.

10      MR. PRITIKIN:  We've been going for about an hour.

11  Is this a good time to take a break?

12      MR. PALUMBO:  Sure.

13  BY MR. SCHOENHARD:

14  Q.     Well, let me ask just one quick follow-up question

15  just while it's fresh in your mind, Mr. Gutierrez.

16      In your last answer, you referred to Microsoft's

17  contribution in this area as being incremental.  I assume

18  you're referring to the 802.11 space?

19  A.     I was not referring to Microsoft's contribution.

20  I was referring to Motorola's contribution.

21  Q.     I apologize.  I misspoke.

22      In your earlier answer, you referred to Motorola's

23  contribution in this area, to which I assumed you're

24  referring to 802.11, as incremental, correct?

25  A.     Yes, "incremental" meaning a partial contribution

Highly Confidential - Attorneys' Eyes Only

Page 41

1                         HORACIO E. GUTIERREZ

2     to the standard in a situation in which there were multiple

3     other companies also contributing IP to it.

4         Q.      On what do you base your view that Motorola's

5     contribution to the 802.11 standards is incremental?

6         A.      Just my general understanding of the number of

7     patent holders who claim to have essential patents in the

8     field.

9         Q.      And do you have knowledge as to what the

10    contribution of each of those patent holders is?

11        A.      No, not specifically.  That would require a level

12    of engineering analysis that I haven't performed.

13    █████    ████████████████████████████████████

█████  ███████████████████████████████████████

█████  ██████████████████████████████████

█████  ██████  ████████████████████████  ████████████

█████  ████████████████████████████████████████████

█████  ██████████████████████  ████████████████████

19    █████  ████████████████████████████

20    █████  ████████████████████████████████

█████  ████████████████████████████████████████

█████  ████████████████████████████████████████

█████  ████████████████████████████████████████

█████    ██████████████████████████████████████

█████  ████████████████████████████████████████

Highly Confidential - Attorneys' Eyes Only



Highly Confidential - Attorneys' Eyes Only

Page 43

1                    HORACIO E. GUTIERREZ

2              We are going off the record.

3              (Pause in the proceedings.)

4              THE VIDEOGRAPHER:  The time is 10:31.

5              We are going back on the record.

6              Proceed.

7    BY MR. SCHOENHARD:

8         Q.    In response to receiving the October 21, 2010

9    letter, did Microsoft investigate whether Motorola had

10   offered a 2.25 percent royalty for its 802.11

11   standard-essential patents to other parties?

12        A.    I recall having asked whether we were aware of any

13   previous --

14              MR. PRITIKIN:  Mr. Gutierrez, you should not

15   testify about any conversations you may have had with

16   attorneys relating to the subject matter.  So if you can

17   answer the question without reference to conversations you

18   had with counsel, that's fine; otherwise I would instruct

19   you not to answer.

20              We specifically objected to the scope of the

21   30(b)(6) notice insofar as it calls for privileged

22   information.

23              THE WITNESS:  Repeat the question, please.

24   BY MR. SCHOENHARD:

25        Q.    In response to the October 21, 2010 letter, did

Highly Confidential - Attorneys' Eyes Only

Page 44

1                    HORACIO E. GUTIERREZ

2  Microsoft investigate whether Motorola had offered a

3  2.25 percent royalty for its 802.11 standard-essential

4  patents to other parties?

5      A.    I don't know how to answer that question without

6  getting into the privilege issue.

7           MR. PRITIKIN:  Then you should not answer the

8  question.  I'll instruct you not to answer.

9  BY MR. SCHOENHARD:

10     Q.    Are you able to answer that "yes" or "no" or "I

11 don't know"?

12     A.    Yes, I think if that's fine from a privilege

13 perspective.

14     Q.    In response to the October 21, 2010 letter, did

15 Microsoft investigate whether Motorola had offered a

16 2.25 percent royalty for its 802.11 standard-essential

17 patents to any other parties?  And you can answer "yes,"

18 "no," or "I don't know."

19     A.    Yes.

20     Q.    Do you know what the results of that investigation

21 were?

22          MR. PRITIKIN:  You can answer the question "yes" or

23 "no" or you don't recall, but you shouldn't testify about

24 any communications you had with counsel.

25          THE WITNESS:  Yes.

Highly Confidential - Attorneys' Eyes Only

Page 45

HORACIO E. GUTIERREZ

1

2    BY MR. SCHOENHARD:

3        Q.      In response to the October 21, 2010 letter, did

4    Microsoft learn that Motorola had offered a 2.25 percent

5    royalty for its 802.11 standard-essential patents to other

6    parties?

7             MR. PRITIKIN:  Let me hear that question again.

8             (The following encompasses the entire readback

9    portion.)

10            "Q. In response to the October 21, 2010 letter, did

11   Microsoft learn that Motorola had offered a 2.25 percent

12   royalty for its 802.11 standard-essential patents to other

13   parties?"

14            (Whereupon, the readback was concluded.)

15            MR. PRITIKIN:  So Mr. Gutierrez, to the extent you

16   received information from counsel or as part of the work

17   product that was associated with the litigation, you should

18   not answer the question.  If he is asking you about

19   conversations that you had with Mr. Daily or others at

20   Motorola, you can testify about the conversations you had

21   with the Motorola representatives.

22            THE WITNESS:  I can't answer the question without

23   reference to attorney work product conversations.

24            MR. PRITIKIN:  Then I instruct you not to answer.

25   BY MR. SCHOENHARD:

Highly Confidential - Attorneys' Eyes Only

Page 46

HORACIO E. GUTIERREZ

1

2      Q.      At any time in the wake of the October 21, 2010

3   letter, did Motorola inform Microsoft that it was not

4   willing to negotiate the terms that it offered?

5      A.      I'm not aware of that.

6

16      Q.      In reaching its position that a 2.25 percent per

17   unit royalty was unreasonable, did Microsoft determine what

18   would have been a reasonable royalty rate?

19            MR. PRITIKIN:  Again, to the extent that the answer

20   would require you to reveal discussions or conversations you

21   had with counsel, I would instruct you not to answer.

22            THE WITNESS:  I can't answer the question.

23            I'm sorry.  Your guidance is if this results from

24   my conversations with others in the legal team, I can't -- I

25   shouldn't answer?

Highly Confidential - Attorneys' Eyes Only

Page 47

1                          HORACIO E. GUTIERREZ

2              MR. PRITIKIN:   That's correct.

3              THE WITNESS:   And the question is?

4              MR. PRITIKIN:   Can we have it back?

5              (The following encompasses the entire readback

6      portion.)

7              "Q. In reaching its position that a 2.25 percent

8      per unit royalty was unreasonable, did Microsoft determine

9      what would have been a reasonable royalty rate?

10             (Whereupon, the readback was concluded.)

11             THE WITNESS:   Let me just explain that the process

12     by which a reasonable royalty can be calculated is

13     incredibly complex and context specific and that it really

14     wasn't necessary to try to make that determination in that

15     context because we were on a path for a broader resolution

16     of the claims between the companies.

17             So you know, we -- we knew for a fact in reading

18     this letter that this royalty demand was clearly beyond

19     anything that could be considered reasonable and

20     nondiscriminatory, and that sort of, you know, was clear to

21     us on the face of the letter.

22     [redacted]

[redacted]

[redacted]

[redacted]

Highly Confidential - Attorneys' Eyes Only

Page 48

                    HORACIO E. GUTIERREZ

1

2   BY MR. SCHOENHARD:

3       Q.      You referred to the process of arriving at a

4   reasonable royalty rate as complex.

5       A.      Yes.

6       Q.      What is involved in arriving at a reasonable

7   royalty rate?

8               MR. PRITIKIN:   And I object to this as outside the

9   scope of the 30(b)(6) notice.   If we're back on the personal

10  deposition, he can answer it.

11  BY MR. SCHOENHARD:

12      Q.      Let's go ahead and proceed down this line of

13  questioning in your personal capacity.

14      A.      When you ask that question, I assume that you're

15  referring to reasonable royalty rates in the context of

16  standard-essential patents for which a RAND commitment has

17  been made.

18      Q.      Let's take a couple steps back, then.   And again,

19  this line of questioning will be in your personal capacity.

20  We'll shift back to your corporate role momentarily.

21              Are you familiar with the concept of RAND?

22      A.      Yes.

23      Q.      RAND stands for "reasonable and

24  nondiscriminatory," correct?

25      A.      Correct.

Highly Confidential - Attorneys' Eyes Only

Page 49

HORACIO E. GUTIERREZ

1

2      Q.      Does RAND mean the same thing to every standard-

3    setting organization?

4      A.      I think the fair answer would be that there's a

5    range of interpretations of what it is and that, you know,

6    the concepts are relatively well understood and talked

7    about, but the actual practical application has a lot of

8    variability.

9      Q.      Are you familiar with the concept of RAND within

10   the context of the IEEE?

11     A.      Yes.

12     Q.      And you would agree that determining what is

13   reasonable and nondiscriminatory in the context of an 802.11

14   related license would be complex?

15     A.      I think not necessarily as a function of the IEEE

16   process.  I think in general there are a number of

17   considerations to be taken into account in determining RAND,

18   and there are different -- a range of views, depending on

19   which firm you ask us, to what constitutes RAND.

20     Q.      What factors do you have in mind when you say

21   there are multiple factors that relate to what is RAND?

22     A.      Well, I think in the context of patents reading on

23   a standard, you know, the first thing you look at is does --

24   is the patent really essential to an implementation of the

25   standards.  So there's a question of essentiality, and there

Highly Confidential - Attorneys' Eyes Only

Page 50

HORACIO E. GUTIERREZ

-- standards organizations sometimes have processes to
determine that; although in other cases, firms just self-
declare certain patents as being standard. So the first
question that one needs to ascertain is, is the patent truly
essential.

And then the second question is, what is the
incremental inventive contribution, to refer to it in some
way, that the patent holder in that case made to the
standard? And that is obviously a determination that
depends on what the overall standard is, what the components
of the specification are, who contributed what and to what
extent does that contribution really add to the value of the
standard.

And then there's another set of principles -- and
this is just an enumeration. I don't think it would be
exclusive. But the next step is, is the royalty fairly
compensating the patent holder for the incremental
contribution that it did to the standard or is it really
capitalizing on the value -- the incremental value, the
standard achieved after being adopted; that is, the people
in the area would refer to this, are the royalties based on
an ex-ante analysis of the value of the technology itself
that was contributing to the standard or is it really taxing
the value that the standard achieved ex-post after being

Highly Confidential - Attorneys' Eyes Only

Page 51

HORACIO E. GUTIERREZ

1
2     adopted broadly by people in the technology field?
3           And then the last set of issues, and I said -- not
4     really the last, but another set of issues that one would
5     consider is, you know, is the royalty rate one that is
6     arrived at through the normal market base mechanisms for
7     negotiation or is it a royalty raised -- rate that is
8     arrived at essentially by threatening stoppage of the sales
9     of the products of the licensee.  So we do believe that the
10    injunction disturbs the normal market base negotiation of a
11    royalty rate, and it's the equivalent of conducting a
12    negotiation at gunpoint.
13          So these are a number of factors.  This is why it's
14    so complex, and I don't even think I've even mentioned all
15    of the dimensions that one would consider in determining
16    whether something is RAND.  But it is technology specific,
17    it's market specific, it is very dependent on the nature of
18    the standard and how it's described in the implementation.
19          It's also depending by, you know, the time at which
20    the contribution was made, as opposed to a later time when
21    the standard is broadly adopted and incorporated into a
22    larger or more complex product that has other elements
23    contributing to its utility and value.
24    Q.    You agree that a RAND royalty rate is typically
25    arrived at through a market-type process of bilateral

Highly Confidential - Attorneys' Eyes Only

Page 52

1                    HORACIO E. GUTIERREZ

2    negotiation, correct?

3         A.      That is one way through which those rates are

4    arrived at.   Another way that is not uncommon in the area of

5    standards is through the creation of patent pools that

6    provide an efficient way for broad licensing of IP rights

7    relating to a standard.

Highly Confidential - Attorneys' Eyes Only

Page 53

1                        HORACIO E. GUTIERREZ

2       ███████████████████████████████████████

3       Q.      In response to receiving the October 21, 2010

4   letter, did Microsoft endeavor to determine whether each of

5   the patents listed in the annex to the October 21 letter is

6   in fact essential to the 802.11 standard?

7           MR. PRITIKIN:  And again, this gets into the

8   subject matter of work-product and attorney-client

9   privilege.  If you would need to reveal communications you

10  had with counsel to answer the question, then I'm going to

11  instruct you not to answer.

12          THE WITNESS:  I cannot answer the question without

13  alluding to conversations with counsel.

14          MR. PRITIKIN:  You should not get into that subject

15  matter.

16  BY MR. SCHOENHARD:

17      Q.      Are you able to answer that question "yes" or "no"

18  or "I don't know"?

19          MR. PRITIKIN:  Let me hear the question again.

20          MR. SCHOENHARD:  Perhaps it would be easier if I

21  restated it.

22  BY MR. SCHOENHARD:

23      Q.      In response to receiving the October 21, 2010

24  letter, did Microsoft endeavor to determine whether each of

25  the patents or patent applications listed in the annex to

Highly Confidential - Attorneys' Eyes Only

Page 54

1                          HORACIO E. GUTIERREZ

2     the October 21 letter is in fact essential to the 802.11

3     standard?

4            MR. PRITIKIN:  And I think that intrudes on the

5     attorney-client work-product privilege, and I'm going to

6     instruct the witness not to answer based on what he told us

7     a few minutes ago.

8            MR. SCHOENHARD:  You will not permit the witness to

9     answer "yes" or "no"?

10           MR. PRITIKIN:  No.

11    BY MR. SCHOENHARD:

12    Q.     The October 21, 2010 letter states in its second

13    paragraph, "As a convenience to its licensees, Motorola

14    includes all of the patents listed on its 802.11 annex in

15    the license without regard to further proof of technical

16    essentiality to the 802.11 standards."

17           Do you see that?

18    A.     Yes.

19    Q.     Did you understand that statement to imply that

20    some of the patents identified in the annex to the October

21    21, 2010 letter may not in fact have been essential to the

22    802.11 standards?

23    A.     No, I did not.

24    Q.     What did you understand that statement to mean?

25    A.     Well, I believe the statement says that they

Highly Confidential - Attorneys' Eyes Only

Page 55

1                    HORACIO E. GUTIERREZ

2   consider them essential but that they're not providing proof

3   of technical essentiality, just providing a list for our

4   convenience.

5       Q.      Among the items you identified as contributing

6   factors to determine whether something is RAND was whether

7   patents are essential, correct?

8       A.      Correct.

9       Q.      In the second sentence of the second paragraph of

10  the October 21, 2010 letter, do you see the second sentence,

11  "If Microsoft is only interested in licensing some portion

12  of this portfolio, Motorola is willing to enter into such a

13  license also on RAND terms"?

14      A.      Yes, I do.

15      Q.      What did Microsoft understand that statement to

16  mean?

17      A.      I have to admit I was somewhat puzzled by that

18  statement.

19              If a patent -- you know, if a product implements a

20  standard in a compliant manner, and Motorola believes that

21  their patents are essential to the implementation of a

22  compliant implementation of the standard, then licensing

23  only a subset of the patents is not going to solve the

24  infringement process.

25              So it was really hard for me to envision how a

Highly Confidential - Attorneys' Eyes Only

Page 56

HORACIO E. GUTIERREZ

1

2  partial license would work, given the claims and the

3  statements they had made in the previous paragraph and in

4  the immediately preceding sentence.

5      Q.    Would you agree that a pending patent application

6  upon issuance may not in fact be standard essential, even if

7  it is expected to be during the time of prosecution?

8      A.    It is possible.  But on the other hand, why would

9  you enter into a license covering a field and leave patent

10 applications out that later on could be asserted against you

11 as a result of the implementation of the exact same

12 standard?

13     Q.    Upon receipt of the October 21, 2010 letter, did

14 Microsoft understand that the annex to the October 21 letter

15 included patent applications in addition to issued patents?

16     A.    Yes.  The annex refers to a small subset of the

17 assets listed in it as filed, I suppose, to granted, which I

18 take it to mean those relate to patents that are pending but

19 not granted yet.

20     Q.    And upon receipt of the October 21, 2010 letter,

21 Microsoft understood that pending patent applications may

22 not in fact issue, correct?

23     A.    I think that would come from general experience in

24 the field.  Sometimes patents don't issue or are abandoned

25 before issuance.

Highly Confidential - Attorneys' Eyes Only

Page 57

1                    HORACIO E. GUTIERREZ

2      Q.     And upon receipt of the October 21, 2010 letter,

3   Microsoft understood that the patent applications identified

4   in the annex to the October 21 letter upon issuance,

5   assuming they issued, may not in fact be standard essential,

6   correct?

7      A.     Yeah.  I think as I said, based on some general

8   experience in terms of how these things work, we understood

9   that some patents might not issue, or if issued, they might

10  not read on the standard; however, in the context of this

11  document, the patents that were not issued were a relatively

12  minor portion of the overall package.  And Motorola, being a

13  sophisticated patent filer in the area of industry

14  standards, I think it was fair to assume that there was a

15  high probability that the majority if not all of those

16  applications would eventually result in a granted patent.

17     Q.     Did Microsoft, upon receipt of the October 21,

18  2010 letter, ask Motorola what royalty rate it would expect

19  to receive for only the portion of the patent portfolio

20  identified in the annex of the October 21 letter that is in

21  fact essential to the 802.11 standards?

22     A.     As I mentioned before, I took the letter to state

23  on behalf of Motorola that they took the position that these

24  standards-essential patents and patent applications were, in

25  their view, essential to the standard.  So I don't believe

Highly Confidential - Attorneys' Eyes Only

Page 58

HORACIO E. GUTIERREZ

1

2   we would have had occasion or reason to pursue that kind of

3   discussion with Motorola.

4           Furthermore, as I said, the course of the licensing

5   negotiations between the parties that started around the

6   time when this letter was sent really took a different

7   course that did not involve a patent-by-patent analysis of

8   the patents listed in the annex to this letter.

9   Q.      Did Motorola state anywhere in the October 21,

10  2010 letter a position that each of the patents and patent

11  applications in the annex to the letter is in fact essential

12  to the 802.11 standards?

13  A.      That was my interpretation of the meaning of the

14  letter based on the language on the face of the letter.

15  Q.      And if I understood you correctly, Microsoft did

16  not approach Motorola and ask Motorola what its rate would

17  be for any subset of the portfolio identified in the annex

18  to the October 21, 2010 letter?

19  A.      No.  And to be clear, if you look at the first

20  paragraph of the letter, the two and a quarter percent rate

21  is defined at the top of the letter as referring to patents

22  and pending applications having claims that may be or become

23  essential patents.

24          So our reading of the letter, based on what the

25  letter says on its face, is that even if some of these

Highly Confidential - Attorneys' Eyes Only

1                        HORACIO E. GUTIERREZ

2    patent applications didn't issue or ended up being issued in

3    a way that don't read on the standard, that the subset that

4    is essential would command the two and a quarter percent

5    royalty rate set in there.

6              That is what the letter says.  The letter at the

7    top says, "This is to confirm Motorola's offer to grant

8    Microsoft a worldwide nonexclusive license under Motorola's

9    portfolio of patents and pending applications having claims

10   that may be or become essential patent claims as defined in

11   Section 6.1 on the IEEE bylaws."

12             So essentially they were providing for convenience

13   a list of patents that they believed were essential to the

14   standard and indicating at the top of the letter that the

15   offer and the royalty applied to those patents and patent

16   applications that contained essential patent claims.

17             So the offer -- you know, the way one reads the

18   letter is that Motorola believes they have essential patents

19   that read on the standard and they made an offer for a two

20   and a quarter percent per unit royalty based on the final --

21   the finished product that would cover any and all patents in

22   that field.  And that was without regard.

23             So when I say I was puzzled by the point they make

24   in the second sentence of the second paragraph, you know,

25   that was part of the reason why it was puzzling.  And it was

Highly Confidential - Attorneys' Eyes Only

Page 60

HORACIO E. GUTIERREZ

2  also because to the extent that the patents were essential,

3  you really couldn't rationally choose some essential patents

4  but not the others, because you would remain exposed for an

5  assertion of those patents.

6        So again, those kinds of things were things that

7  contributed to our reading of the letter as not really

8  representing objectively a RAND offer, but instead just a

9  step in the process that they had identified to us, which

10 would result in the filing of litigation against Microsoft.

20    Q.     Do I understand you correctly, then, that you did

21 not reach out to Motorola to convey your confusion about the

22 meaning of the second sentence of the second paragraph of

23 the October 21 letter?

24    A.     No.   I took that sentence to be subsidiary to the

25 content of the offer in the first paragraph, and I took it

Highly Confidential - Attorneys' Eyes Only

Page 61

HORACIO E. GUTIERREZ

2  to mean that generally they would expect a license covering

3  all of the essential patent claims at the royalty rate

4  stated in the first paragraph.

5      Q.     The sentence you've referred to in the first

6  paragraph refers to a portfolio of patents and patent

7  applications having claims that may be or become essential

8  patent claims, correct?

9      A.     Correct.

10      Q.     Do you understand the word "may" not to mean

11  "definitely are"?

12      A.     I do.  And I also understand that they're asking

13  for a two and a quarter percent per unit royalty for

14  whatever it is that ultimately ends up being a patent --

15  essential patent claim.

16      Q.     In the second paragraph of the October 21 letter,

17  did you understand the first sentence to be telling

18  Microsoft that Motorola has a list of patents that's

19  identified in the annex to the October 21 letter that may be

20  or become essential patents, but regardless of essentiality

21  Motorola is willing to include these patents in the license

22  to avoid any question of essentiality?

23      A.     I took it to mean that they believed those were

24  essential and that they would be included in the licensing

25  package because they believed they would be essential.

Highly Confidential - Attorneys' Eyes Only

Page 62

1                    HORACIO E. GUTIERREZ

2        Q.      Mr. Gutierrez, you've been handed a document that

3   was previously marked as Heiner Exhibit 10.   For the record,

4   the document bears Production Nos. MOTM_ITC 0064439 through

5   462.

6              Please take a moment to review this document and

7   tell me whether you recognize it.

8        A.      (Witness peruses document.)

9              I do.

10       Q.      What is Exhibit 10?

11       A.      It's a letter from Mr. Kirk Daily addressed to me

12  dated October 29, 2010, in which Motorola makes, once again,

13  an offer to license a portfolio of patents that in their

14  estimation are relevant to the H.264 standard and for which

15  they make a royalty demand of an additional two and a

16  quarter percent per unit, subject to a grant-back license

17  from Microsoft.

18       Q.      Did you personally receive the October 29, 2010

19  letter?

20       A.      I did.

21       Q.      Do you understand that you have been designated to

22  testify on Microsoft's behalf today with respect to

23  Microsoft's actions and response to receiving the

24  October 29th, 2010 letter?

25       A.      I do.

Highly Confidential - Attorneys' Eyes Only

Page 63

1                    HORACIO E. GUTIERREZ

2      Q.    Do you feel prepared to testify in that capacity?

3      A.    Yes.



22      Q.    Prior to receiving the October 29, 2010 letter,

23   had Microsoft ever applied for a license to Motorola's H.264

24   patent portfolio?

25      A.    I'm not aware of that having happened, no.

Highly Confidential - Attorneys' Eyes Only

Page 64

HORACIO E. GUTIERREZ

1

2   Q.      In response to receiving the October 29, 2010

3   letter, did Microsoft apply for a license to Motorola's

4   H.264 patent portfolio?

5   A.      What do you mean by "applied to"?



Highly Confidential - Attorneys' Eyes Only

Page 65

1                      HORACIO E. GUTIERREZ

2   ███████████████████████████████████████████

    ███████████████████████████████████████

    █████████████

    ████████████████████████████████████████

    ████████████████████████████████████████████

    ████████████████   ███████████████████████████

    ████████████████████████████████████████████

    ███████████████████████████████████████████

    ██  ███████████████████████

11      Q.      In response to receiving the October 29, 2010

12  letter, did Microsoft perform a financial valuation of

13  Motorola's H.264 patent portfolio?

14          MR. PRITIKIN:  We're getting into the same subject

15  we did before.  You should not reveal any communications

16  that you had with counsel.  If you can't answer the question

17  without getting into discussions with counsel, then I would

18  instruct you not to answer.

19          THE WITNESS:  Would you repeat the question?  I'm

20  sorry.

21  BY MR. SCHOENHARD:

22      Q.      In response to receiving the October 29, 2010

23  letter, did Microsoft perform a financial valuation of

24  Motorola's H.264 patent portfolio?

25      A.      I'm not aware of that.

Highly Confidential - Attorneys' Eyes Only

Page 66

1                    HORACIO E. GUTIERREZ

2        Q.      In response to receiving the October 29, 2010

3    letter, did Microsoft perform an analysis of the

4    essentiality of any of the patents identified in the annex

5    to the October 29 letter?

6            MR. PRITIKIN:   In answering the question, you

7    should not testify about matters that may or may not have

8    been performed by counsel.   You can answer the question with

9    respect to what you personally did.

10           THE WITNESS:   Okay.   I did not personally perform

11   that analysis.

12           MR. PRITIKIN:   Okay.

13   BY MR. SCHOENHARD:

14       Q.      In response to receiving the October 29th, 2010

15   letter, did Microsoft perform an analysis of the

16   essentiality of the patents identified in the annex to the

17   October 29 letter?

18           MR. PRITIKIN:   The same instruction.   I'm going to

19   object to that to the extent that it encompasses work that

20   was done by lawyers.   Again, you can testify about what you

21   did personally.   You should not testify about what counsel

22   did in connection with the litigation.

23           THE WITNESS:   So I already testified personally on

24   the issue, and I don't believe I can go further without

25   answering into attorney-work product.

Highly Confidential - Attorneys' Eyes Only

Page 67

                    HORACIO E. GUTIERREZ

1

2          MR. PRITIKIN:  Then you should not do so.

3          MR. SCHOENHARD:  Just to try and speed things up a

4    bit, Mr. Pritikin, it would be helpful if you try to limit

5    your objection to the basis for it and a brief instruction

6    to the witness.

7          If the two of you need to confer off the record to

8    determine whether and to what extent we are approaching into

9    privileged matter, I'm always welcome, of course, to go off

10   the record if need be.  But it would be helpful if we could

11   try to get a briefer instruction so that we can keep moving

12   forward.

13         MR. PRITIKIN:  It's pretty hard to do it when

14   you're getting into privileged subject matter, but we'll

15   take it question by question.

16   BY MR. SCHOENHARD:

17   Q.     In response to receiving the October 29, 2010

18   letter, did Microsoft investigate whether Motorola had

19   previously offered a 2.25 percent royalty rate to other

20   parties?

21         MR. PRITIKIN:  Again, the same instruction,

22   Mr. Gutierrez.  You should not testify about any work that

23   was done by counsel in connection with the litigation or the

24   anticipated litigation.  You can testify as to what you

25   personally did or did not do.

Highly Confidential - Attorneys' Eyes Only

Page 68

1                           HORACIO E. GUTIERREZ

2           THE WITNESS:  I did not personally conduct such an

3    investigation.

4    BY MR. SCHOENHARD:

5       Q.     Can you answer with respect to whether Microsoft

6    conducted such an investigation?

7           MR. PRITIKIN:  Same instruction.

8           THE WITNESS:  Not without getting into privilege

9    issues.

10   BY MR. SCHOENHARD:

11      Q.     Did Microsoft investigate which of its products

12   would be impacted by the proposed license in the October 29

13   letter?

14          MR. PRITIKIN:  I'm going to instruct the witness

15   not to answer the question on grounds of attorney-client

16   work-product privilege.

17   BY MR. SCHOENHARD:

18      Q.     In response to receiving the October 29, 2010

19   letter, did Microsoft investigate what portion of its patent

20   portfolio would be subject to proposed grant-back?

21          MR. PRITIKIN:  Same instruction.

22          THE WITNESS:  Unfortunately, this is a field in

23   which, you know, my knowledge all derives from discussions

24   with in-house and outside counsel on a topic that I believe

25   would be the subject of attorney work-product privilege.

Highly Confidential - Attorneys' Eyes Only

Page 69

                    HORACIO E. GUTIERREZ

1

2          MR. PRITIKIN:  You should not testify about that.

3          MR. PALUMBO:  Let's take a quick break.

4          MR. SCHOENHARD:  Let's go ahead and take a quick

5   break.

6          THE VIDEOGRAPHER:  The time is 11:16.

7          We are going off the record.

8          Here marks the end of Tape No. 1 in the video

9   deposition of Horacio Gutierrez.

10         (Pause in the proceedings.)

11         THE VIDEOGRAPHER:  The time is 11:28.

12         We are going back on the record.

13         Here marks the beginning of Tape No. 2 in the video

14   deposition of Horacio Gutierrez.

15         Proceed.

16   BY MR. SCHOENHARD:

17     Q.    Earlier, if I heard you correctly, you referred to

18   the 2.25 percent royalty rate offered in the October 29,

19   2010 letter as an additional 2.25 percent.

20         What did you mean by "additional 2.25 percent"?

21     A.    I meant that -- sorry.  I meant that I understood

22   the letter to state that that would be a net royalty rate

23   that we would pay to Motorola on top of a cross-licensing of

24   the -- in that case in our conversation really related to

25   the 802.11 portfolio.

Highly Confidential - Attorneys' Eyes Only

1                    HORACIO E. GUTIERREZ

2      Q.     It was your understanding, then, upon reading the

3  October 29, 2010 letter that Motorola would stack the

4  2.25 percent royalties?

5      A.     I think -- when you talk about stacking, I think

6  you may -- are you referring to the stacking of the two and

7  a quarter percent offer on H.264 on top of the 802.11 two

8  and a quarter percent?

9      Q.     Is that what you were understanding the -- was

10 that your understanding?

11     A.     Yes.  I think when -- the reading of the letter

12 would indicate that those royalties were independent and

13 that they read on the -- on each of the fields of

14 technology.

15            But whether they were or not, even one of those

16 2.25 percent royalty rates calculated on the finished

17 products on which our components are installed would have

18 been an excessive amount of money.  So the stacking of the

19 royalties, you know, would have made a horrible economic

20 deal unfathomably bad.

21     Q.     Did Microsoft ever inquire of Motorola whether

22 Motorola intended for the 2.25 percent royalty offer in the

23 October 29 letter to be an additional royalty on top of the

24 2.25 percent offered in the 802.11 letter?

25     A.     I actually believe that that question was asked in

Highly Confidential - Attorneys' Eyes Only

1         HORACIO E. GUTIERREZ

2    open court in one of the proceedings between the two

3    companies, by outside counsel.

4    Q.      In response to receiving the October 29, 2010

5    letter, did Microsoft inquire of Motorola whether the

6    2.25 percent royalty offered in the October 29 letter was

7    contemplated as being in addition to the 2.25 percent

8    royalty offered in the October 21 letter?

9    A.      I'm having trouble understanding how that question

10   is different from the previous one that I already answered.

11   Q.      Prior to filing the present lawsuit relating to

12   RAND issues, did Microsoft inquire of Motorola whether

13   Motorola intended for the 2.25 percent royalty offer in the

14   October 29 letter to be additional to the 2.25 percent

15   royalty offered in the October 21 letter?

16   A.      I don't believe so.

17   Q.      Prior to filing the present RAND related lawsuit,

18   did Microsoft inquire of Motorola what royalty rate Motorola

19   might expect for any subset of the patents identified in the

20   annex to the October 29, 2010 letter?

21   A.      You know, I think our discussion relating to the

22   802.11 situation applies here too.  I think the offer, we

23   read it on its face to be an offer of a license on the

24   patent portfolio of Motorola reading on the H.264 standard.

25   And it was very hard, and it's still very hard, to envision

Highly Confidential - Attorneys' Eyes Only

Page 72

1                    HORACIO E. GUTIERREZ

2    a situation where having implemented a compliant version of

3    the standard, one could license only a portion of the

4    patents that are believed to be essential on the standard,

5    because that would really not solve the legal risk.  So

6    that -- you know, a partial licensing was not really a topic

7    that was viewed as relevant at the time.

8    ████████████████████████████████████████

9    ██████████████████████████████████████████████

10   ███████████████████████████████████████████████

11   ████████████████████████████████████████████████

12   ████████████████████████████████████████████████

13   ██████████████████████████████  ██████████████████

14   ████████████████████

15   ███████████████████████████████████

16   █████████████████████████████████████████████████████

17   █████████████████████████████████████████████████████

18   ████████████████████████████████████  ███

19   ████████████████████████████████████████████████████████

20   ████████████████████████████████████████████████████████

21   ███████████████████████████

22       Q.     Upon receiving the October 29, 2010 letter, did

23   Microsoft understand that one or more of the patents in the

24   annex attached to the October 29 letter may not in fact be

25   essential to the practice of the H.264 standard?

Highly Confidential - Attorneys' Eyes Only

Page 73

HORACIO E. GUTIERREZ

1

2      A.      Yeah.   Motorola did not make in this letter, like

3  they did in the previous letter, an open claim of

4  essentiality.  But what they did say is that they would

5  still expect a two and a quarter percent royalty calculated

6  on the basis of a finished product that, you know,

7  implemented the standard.

8          So I don't think it was really -- it is really as

9  important, you know, what the language is on essentiality

10  here, because they're basically saying they have a group of

11  patents that cover the subject matter of H.264.  That's the

12  language that they chose to use in this particular version

13  and that they expect that we would accept a two and a

14  quarter percent per unit royalty for a license under that

15  portfolio that they believe covered the subject matter of

16  H.264.

17      Q.      Upon receipt of the October 29, 2010 letter, did

18  Microsoft understand that only a subset of the patents

19  identified in the annex to the October 29 letter was in fact

20  H.264 standard essential?

21      A.      No.   I don't think that we would say that.

22      Q.      Did Microsoft investigate whether only a subset of

23  the patents listed in the annex to the October 29, 2010

24  letter was in fact H.264 standard essential?

25              MR. PRITIKIN:   Now, you shouldn't testify about any

Highly Confidential - Attorneys' Eyes Only

Page 74

                    HORACIO E. GUTIERREZ

1   work that was done by counsel.  So if you can answer it

2   without getting into that, that's fine.  But if you can't

3   answer the question without disclosing the work product or

4   the privileged communications, you should not do so.

5        THE WITNESS:  I can't answer it without disclosing

6   work product.

7        MR. PRITIKIN:  All right.

8   BY MR. SCHOENHARD:

9        Q.    You can set aside Exhibit 10 for now.  I think

10  we'll move into a portion of your deposition that's

11  principally in your personal capacity.  We may return to

12  your corporate role at a later time after I've had a chance

13  to review notes over lunch.  But in the interest of

14  efficiency, let's move on now to your role as a personal

15  deponent today.

16       (Ending of 30 (b)(6) questioning, beginning

17  personal questioning.)

18  By MR. SCHOENHARD:

19       Q.    Mr. Gutierrez, you've been handed a document that

20  was previously marked as Heiner Exhibit 14.  For the record,

21  the document bears Production Nos. MOTM_WASH1823_0394190

22  through 203.

23       Please take a moment to review this document and

24  tell me whether you recognize it.

Highly Confidential - Attorneys' Eyes Only

Page 75

1                    HORACIO E. GUTIERREZ

2        A.       (Witness peruses document.)

3            I have seen documents like this at Microsoft.  I

4    should caution that there is a large number of versions of

5    these documents as well as versions not only in terms of

6    updates of the agreements but also in terms of the range of

7    technology that it provides, and they may have variations

8    between another.

9            But this appears to be a draft or a template of a

10   Microsoft covenant agreement for -- covering Microsoft

11   patents implemented in the Microsoft Exchange Outlook

12   product or set of products.

13       Q.       Do you know who is responsible for the contents of

14   this license template?

15       A.       At the time when this agreement appears to have

16   been created -- so the ownership has changed relatively

17   recently.  I think the ownership of this program was in

18   Mr. Heiner's group until recently.  I believe we had an

19   attorney move from that group into our group, and it is

20   possible that some aspects of the management of the program

21   is now housed in Mr. Matt Penarczyk's organization, in my

22   group.

23       Q.       You used the words "this program."  What do you

24   mean by "this program"?

25       A.       This appears to be a document relating to a

Highly Confidential - Attorneys' Eyes Only

Page 76

HORACIO E. GUTIERREZ

1

2  license that we provide in the context of the Microsoft

3  interoperability program based on the notation at the bottom

4  of the page that relates to MIP, M-I-P.  So I take that to

5  mean this is one of the licenses that we provide or at some

6  point provided in the context of the Microsoft

7  interoperability program.

8    Q.    What is the Microsoft interoperability program?

9    A.    It's a voluntary licensing program created by

10 Microsoft in which we offer for license Microsoft patents

11 that read on certain interoperability technology between

12 Microsoft's high-volume program, that is the most successful

13 widely adopted Microsoft programs, and third-party products.

14    It was a program created in order to promote

15 interoperability, and it's a program that goes beyond what

16 was required of Microsoft in the context of some regulatory

17 consent decrees and undertakings, both in the US and in

18 Europe.

19    Q.    As part of the Microsoft interoperability program,

20 Microsoft has committed to license certain of its patents on

21 reasonable and nondiscriminatory terms, correct?

22    A.    That's correct.

23    Q.    Do you understand the license template that's been

24 marked as Heiner Exhibit 14 to reflect what Microsoft

25 believes to be reasonable and nondiscriminatory terms for

Highly Confidential - Attorneys' Eyes Only

Page 77

HORACIO E. GUTIERREZ

1

2    the license that would be conveyed by this document?

3       A.    Yes.  At least at the point when this template was

4    created, that was the view; although I should say that that

5    is a dynamic determination that over time royalty rates get

6    adjusted to take account of the actual experience that one,

7    you know, has learned and the evolution of the technology.

8       Q.    At the bottom of the document that's been marked

9    as Heiner Exhibit 14, do you see reference to posted and

10   updated Exhibit A, 18 November 2011?

11      A.    I see that.

12      Q.    Does that indicate to you that Heiner Exhibit 14

13   is a recent version of this license template?

14      A.    I really don't know what that means.  I don't know

15   what this is an exhibit to, and I'm not -- it's not clear to

16   me whether in fact this was in effect or remains in effect

17   at this point, but that would seem to indicate that at least

18   this document, whatever it is, was a version that someone

19   thought was updated as of November 2011.

20      Q.    If you wanted to determine what the most recent

21   version of this document is, who would you ask?

22      A.    Probably this person, this attorney in Matt

23   Penarczyk's team that came from Mr. Heiner's team who is the

24   person with the most up to date -- most -- the closest

25   connection with these agreements and its subsequent

Highly Confidential - Attorneys' Eyes Only

Page 78

HORACIO E. GUTIERREZ

1

2    revisions.

3        Q.      Do you recall that individual's name?

4        A.      His name is Stewart -- oh, gosh, I'm blanking.

5    This is so embarrassing.   The last name will come back to

6    me.

7        Q.      Please direct your attention to Page 4 of the

8    document that's been marked as Heiner Exhibit 14.

9        A.      Yes.

10       Q.      And in particular to Section 3.2 of "Royalties."

11   Do you see that?

12       A.      Yes.

13       Q.      Do you see within Section 3.2 a table identifying

14   product types, royalty rates, and minimum royalties?

15       A.      Yes.

16       Q.      The royalty rates identified for the template

17   license Exhibit 14 are all consistently 1 percent, correct?

18       A.      In this version of the document, yeah.

19       Q.      And that 1 percent is also subject to minimum

20   royalties, depending on the type of product, correct?

21       A.      That's correct.

22       Q.      And that 1 percent royalty may include, for

23   example -- there's a product type "device, products that

24   consistent of combinations of hardware and software intended

25   for use" [inaudible] --

Highly Confidential - Attorneys' Eyes Only

Page 79

HORACIO E. GUTIERREZ

1

2      THE COURT REPORTER:  I'm sorry.  Can you speak a

3   little slower?

4      MR. SCHOENHARD:  I apologize.

5   BY MR. SCHOENHARD:

6   Q.      One of the product types identified is "device,

7   products that consist of combinations of hardware and

8   software intended for use by a single user."  Correct?

9   A.      That's correct.

10      But there is a very stark difference between this

11   royalty approach and the base that was proposed in

12   Motorola's letter.  The 1 percent in the case of this

13   agreement does not apply to a finished product to which a

14   licensee's component is added, which is the Motorola

15   approach.

16      This agreement uses as the base the product that

17   the licensee sells.  So if the licensee sells a finished

18   device, then the 1 percent is applied on the cost of the --

19   on the selling price of the device the licensee sells.  If

20   the licensee sells software that then becomes incorporated

21   in a high-end server or laptop, then the 1 percent is not

22   attached to the price of the hardware product, it is only

23   attached to the price of the software component the licensee

24   sells.

25      And that's precisely why we needed a minimum

Highly Confidential - Attorneys' Eyes Only

Page 80

1                    HORACIO E. GUTIERREZ

2    royalty here, because sometimes software products are

3    offered for free and therefore the base would be zero, even

4    though they would be installed in a server or a mainframe

5    that could be worth tens or hundreds of thousands of

6    dollars.  So that's why the minimum is there.

7              But you know, there are at least two very

8    significant differences between this approach and the

9    Motorola one.  One is, the rate is less than half than the

10   Motorola rate.  Number two, it covers all patents of

11   Microsoft, all of the 70,000 patents and pending

12   applications of Microsoft around the world as opposed to

13   just a subset of the patents that are attached to the

14   exhibit.

15             And number three, and very significantly, the base

16   upon which the 1 percent is applied is not a third party's

17   product but the very product that the licensee ships.

18             So I think if anything, this agreement demonstrates

19   what a reasonable approach to royalty could or should be in

20   contrast to the Motorola approach.

21   Q.      Now if you would return your attention to Exhibit

22   Heiner 9 (Exhibit 9), the 802.11 letter, the October 21st

23   letter.

24             I believe earlier you agreed that you weren't

25   aware of any third-party products that would ultimately be

Highly Confidential - Attorneys' Eyes Only

Page 81

HORACIO E. GUTIERREZ

1

2   implicated by the 2.25 percent royalty rate there.

3         Do I remember correct?

4   A.     No, I don't.  I'm not sure what you're referring

5   to.

6   Q.     Are you aware of any third-party downstream

7   products that would be implicated by the 2.25 percent

8   royalty rate proposed in the October 21 letter?

9   A.     Well, the letter refers to any 802.11 compliant

10  product, and then it says that as per Motorola standard

11  terms, the royalty is calculated based on the price of the

12  end product and not on component software.

13        Now, we are primarily a component software

14  supplier, and the end products with respect to our component

15  software, such as the Windows operating system or the

16  Microsoft Office productivity suite, the end product is the

17  hardware on which -- you know, the actual hardware machine,

18  the computer or the server on which it is installed.

19        So you know, the only reasonable reading of this is

20  that the royalty is applied to the base of the finished

21  product in which our component software is incorporated.

22  That's what "component software" means.  I believe that's

23  the intent of the last sentence of the first paragraph.

24  Q.     Does Microsoft provide any 802.11 component

25  software?

Highly Confidential - Attorneys' Eyes Only

Page 82

HORACIO E. GUTIERREZ

1

2     A.     I don't believe I can answer that question without

3     reference to attorney work-product communications.

4            MR. PRITIKIN:  Then you shouldn't do so.

5     BY MR. SCHOENHARD:

6     Q.     Do you personally know whether Microsoft sells any

7     802.11 compliant component software?

8            MR. PRITIKIN:  And again, if you would need to rely

9     on conversations you had with counsel to answer the

10    question, then I would instruct you not to answer it.

11           THE WITNESS:  I can't answer it.

12           MR. SCHOENHARD:  Mr. Pritkin, with respect, I fail

13    to see how knowing whether Microsoft sells certain products

14    would reflect attorney advice.

15           Could you perhaps fill me in.

16           MR. PRITIKIN:  Yeah.  You've asked about whether or

17    not it's 802.11 compliant, and that -- I mean, it's up to

18    the witness.  But if it implicates some legal analysis as to

19    whether or not it's 802.11 compliant and he -- his knowledge

20    is based only on what he learned from the lawyers, then he

21    can't answer the question.

22           THE WITNESS:  Can I just make a point?  You know,

23    you obviously can advise me otherwise, but I believe the

24    question you're answering me -- you're asking me would

25    require an answer that would constitute an admission of

Highly Confidential - Attorneys' Eyes Only

Page 83

1                    HORACIO E. GUTIERREZ

2    infringement of Motorola patents.

3    BY MR. SCHOENHARD:

4       Q.     Do you know whether Microsoft sells any component

5    software that it markets as being 802.11 compliant?

6       A.     I'm not aware of -- you know, we sell hundreds of

7    products and make tons of marketing claims.  I really

8    can't -- I'm not aware of all of those claims.  I couldn't

9    answer specifically.

10          But if I may, I'd just go back to the third

11   sentence of that first paragraph of Exhibit 9.  Motorola

12   specifically uses the example of Windows Mobile software as

13   not being the basis upon which the royalty is calculated.

14   So it's basically saying the operating system we supply is

15   component software.  So what they're saying is that the

16   price of our software is not the basis for calculation.  It

17   would be the price of the finished phone device on which the

18   operating system is installed.

19          So I believe it's pretty clear what the intent of

20   the letter is on the face of those statements.

21   ███████████████████████████████

██  ████████████████████████████████

23   BY MR. SCHOENHARD:

24      Q.     Mr. Gutierrez, you have been handed a document

25   that has been marked as Gutierrez Exhibit 1.  For the

Highly Confidential - Attorneys' Eyes Only

Page 84

HORACIO E. GUTIERREZ

1

2   record, it bears Production Nos. MS-MOTO_1823_00002244552

3   through 575.

4           Please take a moment to review this document and

5   tell me whether you recognize it.

6       A.      (Witness peruses document.)

7           I do.

8       Q.      What is this document?



Highly Confidential - Attorneys' Eyes Only



Highly Confidential - Attorneys' Eyes Only



Highly Confidential - Attorneys' Eyes Only



Highly Confidential - Attorneys' Eyes Only

Page 88

1               HORACIO E. GUTIERREZ



23         MR. PRITIKIN:  I'm going to designate the

24  transcript as highly confidential under the protective

25  order.

Highly Confidential - Attorneys' Eyes Only

Page 89

1                    HORACIO E. GUTIERREZ

2          MR. SCHOENHARD:   Understood.

3    BY MR. SCHOENHARD:

4      Q.      Mr. Gutierrez, you have been handed a document

5    that has been marked as Gutierrez Exhibit 2.  For the

6    record, it bears Production Nos. MS-MOTO_1823_00002244516

7    through 533.

8            Please take a moment and tell me whether you

9    recognize this document.

10     A.      (Witness peruses document.)

11          I do.

12     Q.      What is Gutierrez Exhibit 2?

13

Highly Confidential - Attorneys' Eyes Only

Page 90

HORACIO E. GUTIERREZ



Highly Confidential - Attorneys' Eyes Only

Page 91



1          HORACIO E. GUTIERREZ

14   BY MR. SCHOENHARD:

15        Q.     Mr. Gutierrez, you've been handed a document that

16   has been marked as Gutierrez Exhibit 3.  For the record, it

17   bears Production Nos. MS-MOTO_1823_00002244534 through 551.

18             Please take moment to review this document and

19   tell me whether you recognize it.

20        A.     I do.

21        Q.     What is Gutierrez Exhibit 3?

Page 92

1

HORACIO E. GUTIERREZ

2   ██  ████████████████

██  ██  ████

██  ██  █████

██  ██  ██████████████████████████████████████

██  ██  ██████

██  ██  ███████████████████████████

██  █████████████████████████████████

██  ██  ██████████████

██  ██  ██████████████████████████████

██  █████████████

██  ██  ████

██  ██  ████████████████████████████

██  █████████████

██  ██  █████████████████████████

██  ██████████████████████████████████

██  ██  ██████████████████████████

██  ████████████████████████████████████

██  ████████████████████

██  ██  ████████████████

██  ██  ████████████████████████

██  ████████████████████████████████████

██  ██████████████████

██  ██  ██████████████████████████

██  ████████████████████████████████

Highly Confidential - Attorneys' Eyes Only

Page 93

1
HORACIO E. GUTIERREZ

2

Highly Confidential - Attorneys' Eyes Only



Page 94

1                          HORACIO E. GUTIERREZ

17            MR. SCHOENHARD:  Rather than move on to the next

18   exhibit, I note that we have now hit 12:15.  I think now

19   would be a good time for a break.

20            MR. PRITIKIN:  Sure.  That would be fine.

21            THE VIDEOGRAPHER:  The time is 12:13.

22       We are going off the record.

23       (Pause in the proceedings for lunch.)

24            THE VIDEOGRAPHER:  The time is 1:02 p.m.

25       We are going back on the record.

Highly Confidential - Attorneys' Eyes Only

Page 95

HORACIO E. GUTIERREZ



1

2       Proceed.

3       ████████████████████████████████████

4  █  ██████████████████████████████████████

5   BY MR. SCHOENHARD:

6       Q.      Mr. Gutierrez, you've been handed a document that

7   has been marked as Gutierrez Exhibit 4.  For the record, it

8   bears Production Nos. MS-MOTO_1823_00002244347 through 358.

9            Please take a moment to review this document and

10  tell me whether you recognize it.

11       A.      (Witness peruses document.)

12           I do.

13       Q.      What is this document?

14       ██  ████████████████████████████████

   ██  ████████████████████████

   ██  ██  ████████████████████████████

   ██  ████

   ██  ██  ████████████████

   ██    ████████

   ██  ██  ██████████████████████████

   ██  ████████████████████████████

   ██  ██████

   ██  ██  ██████████████

   ██    ████

   ██  ██  ████████████████████

Highly Confidential - Attorneys' Eyes Only



Highly Confidential - Attorneys' Eyes Only

Page 97



1                    HORACIO E. GUTIERREZ

7   BY MR. SCHOENHARD:

8       Q.      Mr. Gutierrez, you've been handed a document that

9   has been marked as Gutierrez Exhibit 5.  For the record, it

10  bears Production Nos. MS-MOTO_1823_00005195128 through 152.

11          Please take a moment to review this document and

12  tell me whether you recognize it.

13      A.      (Witness peruses document.)

14          I don't believe I've ever seen this document

15  before.

Highly Confidential - Attorneys' Eyes Only

Page 98



HORACIO E. GUTIERREZ

Highly Confidential - Attorneys' Eyes Only



Highly Confidential - Attorneys' Eyes Only



Page 100

HORACIO E. GUTIERREZ

Highly Confidential - Attorneys' Eyes Only



Page 101

1                    HORACIO E. GUTIERREZ

17  BY MR. SCHOENHARD:

18.     Q.     Mr. Gutierrez, you've been handed a document that

19  has been marked as Gutierrez Exhibit 6 bearing Production

20  Nos. MS-MOTO_1823_00002247100 through 115.

21          Please take a moment to review this document and

22  tell me whether you recognize it.

23      A.     (Witness peruses document.)

24          I don't believe I've ever seen this document

25  before.

Highly Confidential - Attorneys' Eyes Only

Page 102

HORACIO E. GUTIERREZ



16    Q.    I note that Exhibit 6 has a date on the first page

17  of August 17th, 2006.

18    A.    That's correct.

19    Q.    Earlier you stated that you assumed your current

20  role back in the United States in the summer of 2006.

21          Do you know whether you would have been back

22  stateside before or after this time period?

23    A.    I was back in the United States before this date.

24  And at that time, I was transitioning into my role.

25          My predecessor Marshall Phelps actually stayed in

Highly Confidential - Attorneys' Eyes Only

Page 103

1                         HORACIO E. GUTIERREZ

2    the company for a couple years after I transitioned into the

3    role and only later fully retired from the company.  So I

4    would say at that time I was in the early stages of my ramp-

5    up period in the job, which, I'm sorry to say, continues

6    today.

7         Q.    Mr. Gutierrez, I have handed you a document that

8    was previously marked as Heiner Exhibit 15.  For the record,

9    it bears Production Nos. MOTM_WASH1823_0394258 through 278.

10            Please take a moment to review this document and

11   tell me whether you recognize it.

Highly Confidential - Attorneys' Eyes Only

Page 104

1                    HORACIO E. GUTIERREZ



14      Q.      Mr. Gutierrez, I've handed you two documents

15 previously marked as Heiner Exhibits 16 (Exhibit 16) and 17

16 (Exhibit 17).  Please take a moment to review these and tell

17 me whether you recognize them.

18            And for the record, Heiner Exhibit 16 is marked

19 with Production Nos. MOTM_WASH1823_0394299 through 325.  And

20 Heiner Exhibit 17 bears Production Nos.

21 MOTM_WASH1823_0394402 through 413.

22      A.      (Witness peruses document.)

23

Highly Confidential - Attorneys' Eyes Only



Page 105

1          HORACIO E. GUTIERREZ

2

14     Q.

20     Q.        Recently Microsoft has taken the position with

21  various governmental organizations and standard-setting

22  organizations that it is inappropriate to seek injunctive

23  relief in the context of standard-essential patents; is that

24  correct?

25     A.        That's correct.

Highly Confidential - Attorneys' Eyes Only

Page 106

HORACIO E. GUTIERREZ

1

2     Q.     And you have been involved in that effort,

3     correct?

4     A.     Yes.

5     Q.     Do you understand that Microsoft previously had

6     taken the position that injunctive relief was appropriate in

7     the context of standard-essential patent assertions?

8     A.     I'd have to say that as a matter of policy of the

9     company, the position that injunctive relief is

10     inappropriate in the case of standard-essentials IP is

11     clearly a public position we've taken, and we've actually

12     made public statements and posted to our website that

13     policy.

14           The policy -- the position that we took before, you

15     know, I think it depends on -- you know, different people in

16     the company might have had different opinions of the topic,

17     but I am aware of the fact that the standard team in certain

18     contexts took positions that indicated that injunctive

19     relief might be appropriate in certain circumstances.

20           That position, however, now has changed as a result

21     of a number of developments in the legal system and in the

22     market, and some of them affecting us, and particularly in

23     the context of the current litigation between Motorola and

24     Microsoft, that has really illustrated to Microsoft the

25     pitfalls of enabling injunctive relief in the

Highly Confidential - Attorneys' Eyes Only

Page 107

1                          HORACIO E. GUTIERREZ

2      standard-essential patent setting.

3          Q.     As part of these efforts, you have communicated

4      with your counterparts at other corporations, including

5      Apple, correct?

6          A.     Yes, Apple among a relatively -- a sizable number

7      of other companies.

8          Q.     Why have you been communicating with other

9      companies as you develop this position?

10         A.     Well, first of all to try to gauge their position

11     on the topic and try to determine if there is an industry-

12     wide position in the technology sector or in the computer

13     technology area on the issue and try to gauge their

14     sentiments on the issue.  And also in part to try to

15     determine that if -- if there is a common position on those,

16     whether those companies can work together with Microsoft in

17     advocating that position.

18         Q.     I'd like to turn your attention back to the

19     October 21 and 29, 2010 letters marked as Heiner Exhibits 9

20     (Exhibit 9) and 10 (Exhibit 10).

21             MR. SCHOENHARD:  Mr. Pritikin, I believe we'll now

22     be heading back into a line of questioning for which

23     Mr. Gutierrez has been designated as a corporate deponent.

24             MR. PRITIKIN:  Okay.

25             (Ending of personal questioning, resuming 30 (b)(6)

Highly Confidential - Attorneys' Eyes Only

Page 108

HORACIO E. GUTIERREZ

1
2  questioning.)

3  BY MR. SCHOENHARD:

4      Q.      Redirecting your attention, Mr. Gutierrez, to

5  Heiner Exhibit 10, the October 29, 2010 letter.

6      A.      Yes.

7      Q.      In response to receipt of the October 29, 2010

8  letter, Microsoft ultimately reached a determination that in

9  its view, the offer of 2.25 percent per unit royalty was

10  unreasonable, correct?

11     A.      We reached the determination that that royalty,

12  given the nature and scope of the license being offered and

13  the base upon which it was calculated, was unreasonable,

14  yes.

15     Q.      Do you know when Microsoft reached that

16  determination?

17     A.      I believe that -- you know, that was a conclusion

18  that we reached soon after receiving the letter, because we

19  felt that the terms of the letter were blatantly outside of

20  the scope of what could be considered reasonable.

21          While reasonable people may disagree on what RAND

22  means, we felt this royalty demand fell way outside of any

23  rational room for disagreement among reasonable people.

24     Q.      What did Microsoft believe would have been in the

25  realm of rational disagreement between people?

Highly Confidential - Attorneys' Eyes Only

Page 109

                              HORACIO E. GUTIERREZ

1

2        A.       Well, a royalty that was based on the contribution

3    that Motorola had made to the standard and that took into

4    account the ex-ante value of that contribution as opposed to

5    essentially becoming a tax through innovation that Microsoft

6    and hardware vendors and many other companies had made to

7    the devices on which they were attempting to impose a

8    license; so something that took into account the actual

9    value -- intrinsic value of their inventive contribution to

10   the standard at the time when they made it.

11            And, you know, you can -- you can know generally

12   what the ballpark is by looking at the patent pool rates and

13   by looking at other similar ones, and this was so many times

14   larger and pegged to a base that had no relationship with

15   Motorola's contribution that it was, on its face,

16   unreasonable and discriminatory.

17       Q.       What value did Microsoft believe Motorola's

18   contribution did represent?

19   ███  ████████████████████████████

██  ██████████████████  ████████████████

██  ██████████████████████████████████

██  ████  ████████████████████████████████

██  ████████████████████████████████████

██  ██████████████████

25            But you really didn't have to determine what the

Highly Confidential - Attorneys' Eyes Only

Page 110

HORACIO E. GUTIERREZ

1

2 actual rate might be to know that the royalty demand was

3 completely out of touch with, you know, anywhere that would

4 be considered reasonable.



Highly Confidential - Attorneys' Eyes Only

Page 111

1               HORACIO E. GUTIERREZ



19      Q.      If Motorola's October 29 letter had offered a

20  2.25 percent per unit royalty to Motorola's entire

21  portfolio, including both standard-essential and

22  nonessential patents, would that have been reasonable and

23  nondiscriminatory?

24          MR. PRITIKIN:   And I'm going to object to that as

25  outside the scope of the 30(b)(6) topic.  But again, if you

Highly Confidential - Attorneys' Eyes Only

Page 112

1                         HORACIO E. GUTIERREZ

2    want to pose it to him in his individual capacity and if he

3    has an answer to the question, he can provide it.

4              THE WITNESS:  I mean, you're asking me a

5    hypothetical question and asking me to speculate.  First of

6    all, I would try to resist off-the-cuff conclusions.

7              On an issue like that, I would consider that offer.

8    I would first ask the question what would be the base upon

9    which the two and a quarter percent is imposed.  Is it

10   really Microsoft's products or is it a third-party's product

11   downstream?  Because that would be a significant element to

12   determine the reasonableness of the offer.  Your question

13   doesn't indicate what the base is.

14             But I would look into that and then make a

15   determination based on our assessment of, you know, what

16   belief the elements are of a reasonable royalty -- what we

17   believe the elements are of a reasonable royalty.

18   BY MR. SCHOENHARD:

19       Q.      In response to receiving the October 29, 2010

20   letter, did Microsoft take into account the extent to which

21   Motorola had experience in outbound licensing of its patents

22   to non end user product suppliers?

23   ████  ████████████████████████████████████████

████ ████████████████████████████████████████████████████

████ ████████████████████████████████████████████████

Highly Confidential - Attorneys' Eyes Only

Page 113

1                    HORACIO E. GUTIERREZ



17     Q.        In response to receiving the October 29, 2010

18   letter, did Microsoft make any efforts to determine what a

19   RAND offer would have looked like?

20     A.        I don't believe I can answer that question without

21   getting into attorney work-product issues.

22          MR. PRITIKIN:  Then you should not provide

23   privileged information.

24          MR. SCHOENHARD:  Mr. Pritikin, I'd like to briefly

25   express a concern I've had that's come up over the course of

HORACIO E. GUTIERREZ

1 today in terms of where the boundaries are with respect to

2 attorney-client privilege and work product in this case

3 generally and in particular within the context of this

4 deposition.

5     It appears that Microsoft will not permit

6 Mr. Gutierrez to testify with respect to any determination

7 that Microsoft made as to what terms would have been RAND

8 terms for Motorola's 802.11 and H.264 essential patent

9 portfolios, and further appears to refuse to permit

10 Mr. Gutierrez to testify if such a determination was made,

11 when the determinations were made, and what terms, you know,

12 would ultimately have been RAND.

13     Because we expect that those will ultimately be

14 issues in this case, if Microsoft continues to refuse

15 Mr. Gutierrez to testify on these subjects, I believe it

16 would be appropriate for Motorola to ultimately seek to

17 prevent Microsoft from presenting evidence of what would

18 have been a RAND offer at the time these offers were made.

19     MR. PRITIKIN:  We respectfully disagree.

20     MR. SCHOENHARD:  Well, do you intend to maintain

21 the privilege objections and the line that's been set out

22 today as to scope of privilege?

23     MR. PRITIKIN:  You know, we've taken it question by

24 question.  I'm not going to enter into discussions on

HORACIO E. GUTIERREZ

today in terms of where the boundaries are with respect to

attorney-client privilege and work product in this case

generally and in particular within the context of this

deposition.

It appears that Microsoft will not permit

Mr. Gutierrez to testify with respect to any determination

that Microsoft made as to what terms would have been RAND

terms for Motorola's 802.11 and H.264 essential patent

portfolios, and further appears to refuse to permit

Mr. Gutierrez to testify if such a determination was made,

when the determinations were made, and what terms, you know,

would ultimately have been RAND.

Because we expect that those will ultimately be

issues in this case, if Microsoft continues to refuse

Mr. Gutierrez to testify on these subjects, I believe it

would be appropriate for Motorola to ultimately seek to

prevent Microsoft from presenting evidence of what would

have been a RAND offer at the time these offers were made.

MR. PRITIKIN:  We respectfully disagree.

MR. SCHOENHARD:  Well, do you intend to maintain

the privilege objections and the line that's been set out

today as to scope of privilege?

MR. PRITIKIN:  You know, we've taken it question by

question.  I'm not going to enter into discussions on

Highly Confidential - Attorneys' Eyes Only

Page 115

1                    HORACIO E. GUTIERREZ

2    generalities with you.  We've taken it question by question.

3    We don't intend to waive privilege, but obviously people can

4    do a lot of work that is subject to the work product

5    privilege and use materials at trial.

6         So if I ask you about the work that your experts

7    have been doing to prepare your case, you're not going to

8    disclose it and your fact witnesses aren't going to disclose

9    it, but you're not going to be barred from having your

10   experts testify at trial or marshalling arguments.  But

11   you're not entitled to get at those things with a fact

12   witness.

13        MR. SCHOENHARD:  But here I have not been asking

14   about expert preparation in the context of litigation.  I've

15   been asking about Microsoft's determination that in its view

16   Motorola's offers were not RAND, and on the basis of that,

17   Microsoft's decision to bring suit.

18        Absent any understanding of what Microsoft actually

19   substantive did to reach that conclusion in addition to what

20   Microsoft might have determined would have been RAND puts us

21   at a dramatic disadvantage when we try to, you know,

22   demonstrate that in fact reasonable efforts were made to

23   enter into good-faith negotiations here.

24        MR. PRITIKIN:  Well, we disagree.  I don't think

25   there's any point in arguing about this on the record here.

Highly Confidential - Attorneys' Eyes Only

Page 116

HORACIO E. GUTIERREZ

1

2  We've taken it question by question.  I think that's the

3  only way one can approach it.

4         He's provided you with a good deal of information

5  today, but in -- he has testified that -- in answer to many

6  of the questions that you've posed that he could not answer

7  the question without disclosing information he had gotten as

8  part of the attorney-client privilege and the work product

9  of the Microsoft lawyers, and you don't have a right to

10  discover that.

11         THE WITNESS:  And if I may just add --

12         MR. PRITIKIN:  No, no.  You shouldn't say anything.

13         THE WITNESS:  Okay.

14  BY MR. SCHOENHARD:

15    Q.    Mr. Gutierrez, returning your attention just

16  briefly to Heiner Exhibit 10, the October 29 letter, upon

17  receipt of the October 29, 2010 letter, did you do anything

18  before you forwarded the letter to your litigation team?

19    A.    I probably opened it and glanced at it.

20    Q.    Did you do any substantive analysis before

21  forwarding the letter to your litigation team?

22    A.    No, I don't believe I did.

23    Q.    And with respect to the October 21, 2010 letter

24  which has been marked as Heiner Exhibit 9, upon receipt of

25  the October 21 letter, did you perform any substantive

Highly Confidential - Attorneys' Eyes Only

Page 117

HORACIO E. GUTIERREZ

2    analysis prior to forwarding the letter to your litigation

3    team?

4        A.      No.

5             And I wouldn't be the right person to perform that

6    substantive analysis anyway.  This would require a level of

7    expertise both on the technical matters and a level of

8    analysis of the patents attached to it that I'm not in a

9    position to do myself, given my background.

10       Q.      Who would be the appropriate person?

11       A.      That would be the litigation team working with the

12   patent analysis team and working with external consultants

13   and counsel.

14       Q.      Before you forwarded the October 21 letter to your

15   litigation team, did you initiate any actions by the patent

16   analysis team?

17       A.      It is possible that when I forwarded the letter, I

18   forwarded it both to the litigation team as well as some

19   people in the patent team, including the patent analysis

20   team.  But your question is whether I did that before I

21   forwarded it to litigation, and the answer to that would be

22   no.

23            MR. SCHOENHARD:  Why don't we take another,

24   ideally, pretty brief break while I review my notes and see

25   if I have anything further for you today.

Highly Confidential - Attorneys' Eyes Only

Page 118

1                    HORACIO E. GUTIERREZ

2              THE WITNESS:  Thank you.

3              THE VIDEOGRAPHER:  The time is 1:45.

4          We are going off the record.

5          (Pause in the proceedings.)

6              THE VIDEOGRAPHER:  The time is 1:56.

7          We are going back on the record.

8          Proceed.

9    BY MR. SCHOENHARD:

10      Q.    Mr. Gutierrez, I have just a short handful of

11   questions for you, and I think we'll be wrapped up for the

12   day.

13          Earlier I believe you testified that bilateral

14   negotiations are typically needed between parties in order

15   to arrive at what the parties will consider to be reasonable

16   and nondiscriminatory terms for a license.

17              MR. PRITIKIN:  Now we're in the individual

18   deposition?

19              MR. SCHOENHARD:  I'm comfortable with his response

20   here being in his personal capacity.

21              MR. PRITIKIN:  All right.

22              THE WITNESS:  Yes.  That tends to be a common way

23   of doing it.  And of course there are other ways in which,

24   through patent pools or other mass-market type of licensing

25   approaches, one can announce a relatively stable set of

Highly Confidential - Attorneys' Eyes Only

Page 119

1                    HORACIO E. GUTIERREZ

2  royalty rates and people can just take them.  So that's also

3  one way of arriving at it.

4            But it is not uncommon for parties to engage in

5  bilateral negotiations and establish the rate, particularly

6  when their license is going both ways.

7  BY MR. SCHOENHARD:

8       Q.     What is the purpose of the bilateral negotiation?

9       A.     Well, outside of the standards world, there can be

10  a number of considerations that would affect the economics

11  of the license.  So one purpose of the bilateral negotiation

12  is to really understand, you know, the rights that are

13  flowing both ways and the scope of the license that's being

14  offered.

15            When parties commence these negotiations, you know,

16  they really don't start through a letter like the one

17  Motorola sent us on October 21st or October 29th of 2010.

18  The conversation starts from a much broader perspective, and

19  the parties are exploring opportunities for licensing where

20  the scope is not so well-defined.

21            So there's a process of determining what each party

22  thinks it needs from the other and then the scope of the

23  rights being granted to one another and then the economics

24  that would apply given those considerations.

25       Q.     One of the -- one of the types of information that

Highly Confidential - Attorneys' Eyes Only

Page 120

HORACIO E. GUTIERREZ

1
2  the parties will learn through bilateral negotiations will
3  be information related to what an appropriate royalty base
4  would be, correct?

5      A.      That's correct.

6      Q.      And parties may also learn through negotiation
7  what standard licensing terms the other parties might
8  typically adhere to, correct?

9      A.      That's correct.

10     Q.      Parties may also learn during bilateral
11  negotiations what their counterparty's cost structures are,
12  correct?

13     A.      That's correct.

14     Q.      And all of this information, both in the standards
15  context and outside the standards context, is useful in
16  enabling the parties to understand ultimately what the
17  structure would be for a reasonable royalty in that given
18  case, correct?

19     A.      That is possible, yeah.

20     Q.      In response to receiving the October 21 and
21  October 29, 2010 letters, did Microsoft evaluate the extent
22  to which Motorola would have necessary information in its
23  possession in order to put together the terms for a
24  reasonable and nondiscriminatory license?

25     A.      I'm not sure I understand the question.  Can you

Highly Confidential - Attorneys' Eyes Only

Page 121

HORACIO E. GUTIERREZ

1
2   maybe rephrase that?

3       Q.      Let me back up a couple steps.

4           Do you know what percentage of the sale price of,

5   for example, a Dell computer the Microsoft operating system

6   comprises?

7       A.      Not specifically.  But if you assume that a laptop

8   is somewhere between 700 and $1,000 and that the operating

9   system is just one component of that product and that Dell

10  may pay -- I don't know the prices for sure, but I think

11  they may be in the area of, depending on the version,

12  somewhere between 50 and $80, then they're, you know,

13  probably 10 percent or less of the value of the finished

14  product.

15      Q.      Do you know if that information is public?

16      A.      I think -- you know, I'm actually -- the exercise

17  that I'm doing is more based on information I learn as a

18  consumer of technology devices and set of information that I

19  acquire just as a private person as opposed to information

20  that I'm privy to as a result of my involvement at

21  Microsoft.  And the numbers may not be exact, but I think

22  they're generally in the order of magnitude of those

23  figures.

24      Q.      As of October 21 and 29 of 2010, do you know

25  whether Motorola was familiar with the cost structure for

Highly Confidential - Attorneys' Eyes Only

Page 122

1                         HORACIO E. GUTIERREZ

2      laptop computers?

3          A.      Well, Motorola had been a licensee of the Windows

4      operating system, both on phones and on PCs, and therefore

5      had been a signatory to the Microsoft OEM, original

6      equipment manufacturer, the license agreements.  So I think

7      there would be reason to believe that they had some

8      familiarity with it.

9          Q.      Do you know whether Microsoft -- do you know

10     whether Motorola did in fact know what percentage of a

11     laptop was comprised of Microsoft software at the time they

12     sent the October 21 and 29, 2010 letters?

13         A.      There's no way for me to know what they were

14     thinking, no, or what they knew.

15         Q.      In response to receiving the October 21 and

16     October 29, 2010 letters, did Microsoft inform Motorola that

17     Microsoft believed that Motorola was targeting the wrong

18     royalty base?

19         A.      I am sure that we've had discussions with Motorola

20     in which we've made that point to them on more than one

21     occasion.  If you ask me to pinpoint at what point in time

22     those conversations happened, I really couldn't -- wouldn't

23     be able to.

24                 But again, I'm going to refer back to the fact that

25     as a licensee of the Microsoft software until just a couple

Highly Confidential - Attorneys' Eyes Only

Page 123

HORACIO E. GUTIERREZ

1

2   of years before these letters were sent, Motorola had to

3   have had a relatively good understanding of the cost of an

4   operating system platform compared to the cost of their own

5   products, because one of the skills that companies in the

6   hardware business have to develop as a means of surviving is

7   to be able to manage the build of materials, the cost that

8   goes into building a device.  And the cost of the operating

9   system relative to the overall device should be something

10   that anybody with some, you know, basic business

11   understanding in the Motorola hardware division ought to be

12   able to know.

13   Q.      When you refer to hardware, do you understand

14   Motorola traditionally to be a hardware manufacturer?

15   A.      Well, their main products are in the hardware

16   space.  Obviously creating those products requires more

17   hardware.  It requires everything from the operating system,

18   and Motorola had developed even their own proprietary

19   operating systems at some point and had also tried a variety

20   of other ones, including the Windows operating system as

21   well as the applications that run on it and the full set of

22   features and services that go with it.

23          So they're, you know, one of the most sophisticated

24   device manufacturers, and that gives them, I think, a really

25   good look into both software and hardware elements of the

Highly Confidential - Attorneys' Eyes Only

Page 124

1                         HORACIO E. GUTIERREZ

2    devices they manufacture.

3        Q.      Traditionally Motorola has sold hardware devices

4    to end consumers, correct?

5        A.      I think that's accurate generally.

6        Q.      And, you know, traditionally Microsoft is

7    predominantly a software company, correct?

8        A.      Predominately in terms of the percentage of the

9    revenue of Microsoft that comes from software, the answer

10   would be yes.  But Microsoft has actually made hardware in

11   certain segments for, you know, over a decade.

12       Q.      Would you agree that Motorola's competitors

13   traditionally have been other device manufacturers?

14       A.      I think it is fair to say that that's the case

15   with respect to the business that is Motorola Mobility's

16   business.  Obviously, you know, a year and a half ago or so,

17   Motorola split from Motorola, Inc., and they had other lines

18   of businesses that I think may include services to

19   governments and other things.

20            But if you mean the handset business, which I think

21   is the bulk of the business that is now part of what is

22   called Motorola Mobility, I think they're -- a majority

23   segment of competition for them would come from other

24   hardware devices, manufacturers.

25       Q.      Upon receiving the October 21 and 29, 2010

Highly Confidential - Attorneys' Eyes Only

Page 125

HORACIO E. GUTIERREZ

1
2    letters, did Microsoft take into account that Motorola's
3    traditional experience in licensing was predominantly with
4    other device manufacturers?
5        A.      I don't -- I don't -- to be honest, I don't think
6    we did.
7            What we did know is that they had had ample
8    experience in licensing standard-essential patents.  We knew
9    them to be very active, particularly in the licensing and
10   cross-licensing of cellular wireless IP, CDMA, GSM types of
11   technologies, which really are not implemented exclusively
12   on hardware but are significantly implemented in software,
13   and their expertise in licensing in that area indicated to
14   us that they're a very sophisticated licensor in the
15   standards area.
16           So we read these letters assuming, I think
17   correctly, that they were coming from someone who knew
18   exactly what these terms meant and, because of their
19   familiarity with both the hardware and software space, you
20   know, meant what they said in that letter.
21       Q.     At the time you received the October 21 and 29,
22   2010 letters, were you aware of any instance in which
23   Motorola had entered into a license agreement that was not
24   based on the price of the end product?
25       A.      I did not know that.  I -- I'm afraid to say, I

Highly Confidential - Attorneys' Eyes Only

Page 126

HORACIO E. GUTIERREZ

1

2    still don't know.

3           MR. SCHOENHARD:  Mr. Gutierrez, I thank you very

4    much for your time.

5           THE WITNESS:  Thank you.

6           MR. PRITIKIN:  And I have no questions for the

7    witness.

8           THE VIDEOGRAPHER:  This concludes today's

9    proceeding in the video deposition of Horacio Gutierrez, and

10   the time is 2:10 p.m.

11          THE COURT REPORTER:  Before we go off the record,

12   would you like to order the transcript of the deposition?

13   Standard order?

14          MR. SCHOENHARD:  Yes, please.

15          THE COURT REPORTER:  Standard order?

16          MR. PRITIKIN:  Yeah, and we're going to reserve the

17   right to review and make corrections.

18          THE COURT REPORTER:  Okay.

19          THE VIDEOGRAPHER:  Same with the video?

20          MR. SCHOENHARD:  Standard order.

21          MR. PRITIKIN:  Standard order.

22          (Whereupon, the deposition was concluded at

23   2:10 p.m.)

24          (Signature reserved.)

25

Highly Confidential - Attorneys' Eyes Only

Page 127

1                         CERTIFICATE

2

3        I, Tia B. Reidt, do hereby certify that

4    pursuant to the Rules of Civil Procedure, the witness

5    named herein appeared before me at the time and place

6    set forth in the caption herein; that at the said time

7    and place, I reported in stenotype all testimony

8    adduced and other oral proceedings had in the

9    foregoing matter; and that the foregoing transcript

10   pages constitute a full, true and correct record of

11   such testimony adduced and oral proceeding had and

12   of the whole thereof.

13

14       IN WITNESS HEREOF, I have hereunto set my hand

15   this 12th day of April, 2012.

16

17

18

19

20   /S/  Tia B. Reidt

21

22   Commission Expiration: June 3, 2014

23

24

25

Highly Confidential - Attorneys' Eyes Only

Page 128

1                          CORRECTION SHEET

2    Deposition of: Horacio Gutierrez      Date: 04/04/12

3    Regarding:    Microsoft  Vs.  Motorola

4    Reporter:    Tia Reidt

5    _____

6    Please make all corrections, changes or clarifications

7    to your testimony on this sheet, showing page and line

8    number.  If there are no changes, write "none" across

9    the page.  Sign this sheet on the line provided.

10   Page   Line   Reason for Change

11   _____  _____  _____

12   _____  _____  _____

13   _____  _____  _____

14   _____  _____  _____

15   _____  _____  _____

16   _____  _____  _____

17   _____  _____  _____

18   _____  _____  _____

19   _____  _____  _____

20   _____  _____  _____

21   _____  _____  _____

22   _____  _____  _____

23   _____  _____  _____

24                 Signature_____

25                        Horacio Gutierrez

Highly Confidential - Attorneys' Eyes Only

Page 129

1                           DECLARATION

2

3    Deposition of: Horacio Gutierrez      Date: 04/04/12

4    Regarding:     Microsoft  Vs.  Motorola

5    _____

6

7

8    I declare under penalty of perjury the following to

9    be true:

10

11   I have read my deposition and the same is true and

12   accurate save and except for any corrections as made

13   by me on the Correction Page herein.

14

15   Signed at _____, _____

16   on the _____ day of _____, 2012.

17

18

19

20

21

22

23                           _____

24                           Horacio Gutierrez

25