# EXHIBIT 3

**B.**

The Defendant cannot cite a use right to the Patent in suit.

**I.**

No license agreement was concluded between the parties.

**II.**

The Defendant is also not entitled to any use rights to the Patent in suit on the basis of the declarations of willingness to license ("Patent Statement and Licensing Declaration Form," Exhibit set FBD-8) submitted by the Plaintiff and its parent company to the International Telecommunication Union (ITU) standards organization.

Contrary to the Defendant's view, neither the general ITU declaration of willingness to license from the Plaintiff from December 2002 nor the specific ITU declaration of willingness to license from Motorola Inc., predecessor of the Plaintiff's parent company constitutes a contract to the benefit of a

third party (in this case: of the Defendant) for the Patent in suit of October 8, 2007 or a waiver of prohibition.

The assessment of a possible use right based on the declaration of willingness to license submitted to the ITU is subject to German substantive law. The question as to which legal system should be used for granting a use right to an intellectual property right must be answered in accordance with the law of the country of protection in question (see District Court of Mannheim InstGE 13, 65 – *UMTS-fähiges Mobiltelefon II* [*UMTS-capable mobile phone II*], margin no. 161, with further references, quoted according to Juris; Kühnen, Hdb. Patentverletzung [Patent Infringement Manual], 5th ed., margin no. 1298).

On the basis of the court's view that a simple license should be classified as a property right (Higher Regional Court of Karlsruhe, GRUR Int 1987, 788 ff. *Offenendspinnmaschine* [*Open-ended spinning machine*]; extensive discussions District Court of Mannheim loc. cit., margin no. 166, with further references; BGH, GRUR 2009, 945 margin no. 20, quoted according to Juris – *Reifen Progressiv* (relating to copyright law); of another view (reified obligation): McGuire, Die Lizenz, zugl. Habil. [The License, simultaneously published as a Habilschrift [professorship qualification thesis], Osnabrück 2009), a use authorization for the Defendant would at most come into consideration if one were to view the submission of the declaration of willingness to license to the ITU standards organization and its acceptance as a contract to the benefit of a willing-to-license third party. Such a granting of a license with a dispositive character by means of a contract to the benefit of a third party, however, conflicts with the fact that German law does not recognize a real contract to the benefit of a third party. §§ 328 ff. BGB cannot be used either directly analogously to real contracts (see District Court of Mannheim, loc. cit., margin no. 167 with further references).

In the declaration of willingness to license, there is also no waiver of claims for injunctive relief, that would result in the Plaintiff being limited to submitting or accepting a FRAND offer and demanding payment of licensing fees under FRAND terms, if need be as part of a claim for damages. Such a waiver of the exclusivity authorization arising from the patent could at most have a character relating purely to the law of obligations, but would not have any enforcing action that would affect the existence of patent rights and that would limit the Plaintiff as the patent owner directly with regard to its rights arising from the patent. The latter would not be legally possible at all, with regard to the real nature of the claim for injunctive relief that is intrinsically tied to the patent as such (see District Court

of Mannheim InstGE 11, 9, margin no. 99 f. *UMTS-fähiges Mobiltelefon* [*UMTS-capable mobile phone*], quoted according to Juris; Kühnen, loc. cit., margin no. 1298).

The declaration of willingness to license that the Plaintiff and/or of its former parent company submitted to the ITU can, however, also not be understood as a binding license offer to a multitude of third parties not yet known to the Plaintiff, that requires only the acceptance of a third party, but also as a requirement to in turn submit a FRAND offer to prospective licensees (also see number 2 at the end: "*Negotiations of licenses are left to the parties concerned and are performed outside the ITU-T/ISO/IEC*"). The declaration of willingness to license therefore does not in the final analysis contain any declaratory concretization of the obligation to conclude a contract that already exists under cartel law (see Kühnen, loc. cit., margin no. 1298). It creates, with the consent to grant third parties a license under FRAND conditions, only the claim basis for which the prospective licensee must formulate a specific demand with the grounds for the claim filled in (Higher Regional Court of Karlsruhe, InstGE 12, 220 – *MP3 standard*).

Finally, an offer is a far cry from a "*pactum de non petendo*" ("negative license") under obligation law and therefore the patent owner's waiver of the right to apply the pressure of the claim for injunctive relief to assert its patent rights against a multitude of third parties not yet known to it (number 2: "*an unrestricted number of applicants*"). The patent owner declaring its willingness to license is merely offering to relinquish its exclusivity rights arising from the patent through conclusion of a license agreement – and not unconditionally (Kühnen, loc. cit., margin no. 1298).

In view of all of the above, the Defendant can cite neither a positive use authorization granted to it nor a waiver of prohibition with regard to the Plaintiff's ITU declaration of willingness to license.

**III.**

The Defendant is also not entitled to any use rights arising from the MPEG LA pool agreement (see Exhibit FBD 12).

The assessment of the claimed granting of use rights in the MPEG LA pool agreement is once again governed by the law of the country of protection in question (see item II. above.). According to the applicable German substantive law, Terayon and Tut Systems could not effectively have at their

– 39 –

disposal the Patent in suit that did not belong to them. It has not been pleaded nor is it even evident on what basis the MPEG LA pool licensees Terayon and Tut Systems should have a corresponding right of disposal with regard to the Patent in suit. When understood as a granting of a license to the Patent in suit, Art 8.3 of the MPEG LA pool agreement would, to the Plaintiff, constitute a decree to the detriment of third parties. As such, the claimed license is invalid.

In light of these facts, it is unnecessary to answer whether a license would actually extend to the Patent in suit and to the Defendant as a subsidiary of the licensor Microsoft Corporation.

### C.

The Defendant cannot successfully defend itself with the objection that the Plaintiff would have immediately granted it a license for the Patent in suit, for which reason the request for injunctive relief is supposedly an abuse of law. The Defendant is not entitled to raise a *dolo petit* objection due to its license agreement offer of December 23, 2012 (I.), nor in connection with the declaration of willingness to license submitted to the ITU (II.), nor due to the MPEG LA pool agreement (III.).

### I.

The Plaintiff is not prevented for cartel law reasons from enforcing its claim for injunctive relief against the Defendant arising from the infringement of the Patent in suit. The Defendant cannot counter the claim for injunctive relief by demanding the granting of a license pursuant to § 33 paragraph 1 GWB in connection with Art. 102 AEUV or §§ 19, 20 GWB.

1. The Plaintiff is the party addressed by Art. 102 AEUV and §§ 19, 20 GWB since according to its own pleading, anyone who manufactures, offers, and markets the H.265 decoding devices must comply with the H.264 standard and therefore necessarily also makes use of the Patent in suit. The granting of licenses to the Patent in suit thus substantially constitutes a private market that the Plaintiff dominates as the sole provider.

– 40 –

2. The license offer that was submitted to the Plaintiff by the parent company of the Defendant and is also valid for the Defendant (referred to hereinafter as: Defendant's license offer) does not fulfill all of the requirements that the Federal Supreme Court established in its decision *Orange-Book-Standard* (Decision dated May 6, 2009, KZR 39/09, GRUR 2009, 694 ff.).

   According to the above decision, the Defendant that is being sued for patent infringement can counter the claim for injunctive relief of the patent owner filing the suit by pleading that the latter is abusing a dominant position on the market if it refuses to conclude a patent license agreement with the Defendant on non-discriminatory and non-restrictive terms. (BGH, loc. cit., 1st head note, quoted according to Juris). The patent owner who asserts a claim for injunctive relief based on its patent, although the Defendant is entitled to be granted a license to the Patent in suit, is culpable of abusing its dominant market position and is acting in bad faith only if two conditions are met: Firstly, the prospective licensee must have made the Defendant an unconditional offer to conclude a license agreement which the patent owner cannot reject without unreasonably obstructing the prospective licensee or without violating the prohibition against discrimination, and the prospective licensee must remain bound by this offer. And secondly, the prospective licensee must comply with the obligations on which the use of the licensed subject matter depends according to the license agreement still to be concluded, if the prospective licensee is already using the subject matter of the patent before the patent owner has accepted his offer. This means in particular that the prospective licensee has to pay the licensing fees arising from the contract or ensure their payment (BGH, loc. cit., margin no. 29).

3. Even if the *Orange-Book-Standard* decision is based on a de facto standard, the criteria established therein are likewise applicable to standards that have been developed by standards organizations (here, the ITU) in a standardization process (see District Court of Mannheim, InstGE 13, 65, margin no. 176, quoted according to Juris).

4. The Plaintiff can reject the Defendant's offer to conclude a license agreement without having unreasonably obstructed or discriminated against the Defendant.

   a. The present unconditional offer, taking into account the amendments made, essentially corresponds to the usual contractual conditions and has a sufficient degree of regulation. In its amended form, the offer contains among other things, in particular a clause giving the patent owner the right to rescind in the event of future challenges to the validity of the Patent in suit (see Higher Regional Court of Karlsruhe, January 23, 2012, page 6) and in connection with its offer, the Defendant also acknowledges on the merits an obligation to pay damages for use actions in the past (see District Court of Mannheim, decision of December 9, 2011, 7 O 122/11).

   b. Nevertheless, the license agreement offer by the Defendant is not an offer that the Plaintiff is entitled to reject without acting in contravention of cartel law. Specifically, the patent owner is not required to accept an offer for royalty rates that are below what it could require without violating cartel law.

   The Defendant, which considers the Plaintiff's royalty claims (2.25% of sales) abusively excessive, has made no use of the option that exists in such cases of setting the amount of the licensing fee in accordance with § 315 BGB at the discretion of the patent owner (BGH, loc. cit., margin no. 39). After the Defendant instead settled on a specific calculation basis (per-unit royalty) and a specific royalty rate (2 € cents and 1 € cent, respectively, per unit), it was necessary to examine whether the rejection of this offer by the Plaintiff on the grounds that the offered licensing fees were too low constituted a violation of cartel law.

   In the court's view, this examination can be limited to the question of whether, the rejection of the offer constituted an *obvious* violation of cartel law. As the Federal Supreme Court made clear in the *Orange-Book-Standard* decision, the patent infringement proceedings should to an avoidable degree be relieved of the difficult and time-consuming task of establishing the exact amount of a non-restrictive and

non-discriminatory licensing fee (BGH, loc. cit., margin no. 39). In the event of a license offer in accordance with § 315 BGB, the infringement court should therefore be able to satisfy itself with the determination that the patent owner is obliged to accept the license agreement offer and to determine at its own discretion if the prospective licensee in any case has on deposit a sufficient amount and also the remaining requirements for a "compulsory license objection" have been met (BGH, loc. cit., margin no. 40). In connection with the question of whether the amount on deposit (in any case) was reliably sufficient, a summary examination by the court should suffice (see Kühnen, loc. cit., margin no. 1296). This also does not cause any disadvantage to accrue to the prospective licensee since in a subsequent hearing to determine the compensation amount, the burden of demonstration and proof as to the reasonableness of the licensing fee is on the patent owner.

If the prospective licensee, however, offers a specific licensing fee that is reasonable in its view, which the patent owner rejects as too low, this raises the question as to what importance should be assigned to the prospective licensee's statement that the offered licensing fee is reasonable and whether a prospective licensee can in the final analysis force each offer to be met with an expensive and time-consuming taking of evidence, which in the view of the Federal Supreme Court, should specifically be avoided as much as possible in the infringement proceedings.

Since only an unambiguously excessive price is unreasonable as defined by Art. 102 AEUV, the rejection of the offer by the patent owner due to allegedly insufficient licensing fees is only a violation of cartel law if the prospective licensee offers such a high licensing fee that any change to it in favor of the patent owner would be unreasonable. However, if the terms in the offer of the prospective licensee are (only) adequate and if Art. 102 AEUV, §§ 19, 20 GWB nevertheless permit a deviation in favor of the patent owner, then the refusal of the patent owner to grant a license on these terms does not constitute grounds for an objection for abuse of law. An obligation to enter into a contract only exists under those terms that are reasonable *and* any change to them in favor of the dominant company would be unreasonable in such a way that insisting on these terms must be viewed as an abuse a dominant

position on the market (Higher Regional Court of Karlsruhe, 6 U 174/02, GRUR-RR 2007, 155f., margin no. 56, quoted according to Juris). As long as the patent owner can cite the fact that there is still room for maneuver in its favor within the range of what is reasonable, then it is not behaving in violation of cartel law. The fact that this "upper limit" of what still lies within the bounds of cartel law cannot easily be determined, even for the prospective licensee, it does not constitute a unreasonable burden to it because it is basically subject anyway to the burden of demonstration and proof for the requirements of the licensing claim under cartel law (see BGH, loc. cit., margin no. 37 f.) and as mentioned above, it still has recourse to the solution according to § 315 BGB.

Thus if summary examination reveals that the licensing fees offered by the prospective licensee are in any case not absolutely sufficient (so that any change upward would be clearly excessive), then the rejection by the patent owner is not a clear violation of cartel law. A taking of evidence with regard to the question of whether the offer (at any rate) is reasonable is therefore not required.

c.  The Defendant's offer does not stand up to an examination oriented toward these principles. It cannot be determined that the offered licensing fees would in any case be sufficient.

The *Orange-Book-Standard* decision did not have to address the question as to what criteria (pursuant to § 315 BGB) are to be used to determine the amount that will be sufficient in any case (e.g. generally comparable market, license pool, licensing practice of the patent owner, etc.)

In the present case, it is not necessary to answer the question of whether a patent pool in and of itself can constitute a convincing starting point and comparison criterion. On the one hand, the interests of patent owners that place their standard-essential patents in a pool cannot easily be compared to those of a patent owner that refrains from doing so. So it may not be uncommon, at least for producing members of a patent pool, for achieving the highest possible licensing income from the patents placed in the pool to be less important that being able to make the most

advantageous possible use of the patents belonging to other pool members. The suitability of the royalty rates of a patent pool as a comparison criterion can also be limited by the fact that – as in the MPEG LA pool – several of the largest patent owners have not become members of the pool.

Even setting aside these fundamental misgivings regarding the Defendant's calculation method, the court cannot in any case determine that the offered licensing fees are with certainty moving into such a height that a deviation upward would lead to clearly excessive fees.

d. This is particularly true given the result of the numerical breakdown of the fee determined for the Plaintiff's portfolio into (17) standard-essential patents to the two Patents in suit (2/17). As a result, the linear calculation mode of the MPEG LA patent pool is transferred one-to-one, even though the Plaintiff did not become a member of this pool. Specifically stated, it makes no difference whether the license percentage granted in the pool for each patent family and unit of 0.082 € cents is multiplied by ten (0.82 € cents) and then doubled to 1.64 € cents (two patents for which licenses are being sought) or whether first, the total percentage theoretically granted for the portfolio in the pool of (0.082 € cents x 17 patent families =) €1.394 is multiplied by ten (13.94 € cents) and then is numerically broken down to the number of Patents in suit (1/17 and 2/17 for both Patents in suit = 0.82 € cents and 1.64 € cents).

The court is well aware that the Defendant has taken into consideration the fact that it is as a rule relatively more advantageous to have a standard-essential patent as part of a patent pool than through an individual license in that it multiplies by ten the theoretically obtained portion of the pool license for the Plaintiff's portfolio. It is not, however, apparent that the Defendant has thus reached a licensing fee amount at which any deviation upward would be unreasonable. From the court's point of view, there is evidence to the contrary, merely due to the fact that the portfolio license thus determined corresponds to the licensing fees that AT&T receives from at least 9 licensees for its approximately comparable portfolio. It seems unlikely that AT&T

would have convinced 9 licensees to agree to a licensing fee that is not merely customary for the market, but comes close to the upper limit of what is still viewed as reasonable and cannot be viewed as restrictive or discriminatory.

It does not appear in any way certain to the court that the maximum licensing fee for the two Patents in suit should be exactly 2/17 of the licensing fee determined for the portfolio belonging to the Plaintiff and its parent company. This would require not only the at least questionable use of the licensing fee calculation approach for the pool license percentages to individual licensing fees, but also the certainty that the two Patents in suit by themselves are not – even a little bit – more valuable than the other 15 patents in the portfolio belonging to the Plaintiff and its parent company.

e. Also, a comparison to the patent pool for a predecessor technology for video compression, the H.262 (MPEG 2) standard leaves room for doubt that the royalty rates offered by the Defendant are coming close to the level at which a deviation upward would result in clearly excessive fees. The H.262 pool first provided for licensing fees of US$4 per device (without a cap); after reductions, currently US$2 per unit is still being charged. These licensing fees are significantly higher than that of the MPEG LA patent pool (US$0.2 and US$0.1, respectively), which the Defendant used as a basis for its calculations, without the court having any evidence that the fees of the H.262 pool would be (have been) for their part unreasonable, restrictive, or discriminatory. Even taking into consideration the Defendant's pleading according to which the MPEG 2 pool was formed in the year 1997 and therefore at a time at which the products working with compressed data were relatively expensive and worked with a few implemented standards, at least the licensing fee for the MPEG 2 pool – which is also still considerably higher – inspires doubt that the 2 € cents and 1 € cent, respectively, per unit offered by the Defendant for the Patents in suit is actually at the upper limit of what is reasonable.

f. A more detailed examination of the disputed methodology and the validity of the so-called citation analysis by the Defendant is not required since the Defendant did not

end up modeling the royalty rates that it offered on the alleged quoted value. To this extent, the Defendant has also only mentioned the alleged quoted value of the portfolio (3.8% of the total quoted value; Bekkers expert opinion, Exhibit FBD-22, p. 31), but has not mentioned the two Patents in suit. Given this situation, regardless of the disputed value of the citation method, it is in any case it is not possible to determine that the offered royalty rates were moving toward the upper limit of what would be reasonable for patents in a corresponding "quoted value."

5. To the extent that the Plaintiff has clarified in the oral proceedings that its offer, as a supplementary component, included a cross-licensing in return for payment at the royalty rates determined by it, this also does not result in any other assessment of the offer.

The mere fact that the prospective licensee would be satisfied with a certain royalty rate for its own patents does not permit the inference that this royalty rate would also have to be accepted for the patents of the patent owner.

On the one hand, the interests with regard to the respective patents on the part of the prospective licensee may be entirely different from those of the patent owner. This is particularly true if the two sides manufacture and/or market significantly different numbers of units. Thus the one that sells higher numbers of units would as a rule prefer a lower reciprocal royalty rate and the one with the lower number of its own units would prefer a higher reciprocal royalty rate. In the present case, the low interest of the Plaintiff in the standard-essential patents of the Defendant is also demonstrated by the fact that in the past, the Plaintiff did not obtain a license for the MPEG LA pool into which the Defendant had placed its own standard-essential patents.

On the other hand, the prospective licensee would otherwise have had the power to force the patent owner to grant a license by means of a cross-licensing offer on the same terms in which the amount of the licensing fee could not be modeled on the patents being inquired about, but on the prospective licensee's own patents and on their – possibly low – value. The fact that a cross-licensing in return for payment is not per se necessarily in the interests of

both sides is also corroborated by the Defendant and its parent company, even though they in turn reject the cross-licensing in return for payment offered by the Plaintiff on its terms (2.25% of sales).

The fact that the prospective licensee is ready to license its own patents in a cross-licensing in return for payment at the same fee rates that it is offering for the patents it is inquiring about therefore does not automatically mean that the offered fee rates are so high in any case that the patent owner could reject the offer only by violating cartel law. Given that the offered royalty rates, taken separately, are not obviously sufficient in every case (see above), the additional worldwide cross-licensing could only result in the fact that the Plaintiff could not reject the offer without violating cartel law if the portfolio of the Defendant, for the Plaintiff (i.e. not objectively, the latter being disputed between the parties), would have at least the same value as the portfolio of the Plaintiff would for the Defendant, which can be assessed, for example, based on the necessity for using the patents and the quantity of manufactured or sold patented products or the sales generated from them.

6. To the extent that in the brief of March 2, 2012 (sheet 382 f., 391 f.), the Defendant has finally declared its readiness to grant the Plaintiff, in addition to the licensing fees offered for the two Patents in suit granted in Germany, a worldwide free license to its portfolio of H.264 standard-essential patents, the above considerations apply correspondingly to cross-licensing in return for payment. To this extent, there is no difference between whether the prospective licensee wishes to license the respective patents at a royalty rate that is not sufficient in every case, at least with regard to the patents belonging to the patent owner, or wishes to license them reciprocally for free at the same time. Even a free cross-licensing is not without payment; the latter is conferred through the granting of licenses to the patents belonging to the licensee and can therefore likewise be too low. Even in the case of a free cross-licensing, the court cannot, for the reasons mentioned above (see number 5), determine that the Plaintiff could reject the offer only by violating cartel law.

– 48 –

Therefore the question of whether the *Orange-Book-Standard* offer [sic – should be "decision"] of December 23, 2011 according to § 296 paragraph 1 ZPO and the offer – which was submitted for the first time in the as yet undiminished brief of March 2, 2012 after the adjournment of the oral proceedings – of an additional free worldwide cross-licensing in accordance with § 296a ZPO are precluded anyway is unimportant.

In view of all of this, the Plaintiff did not violate cartel law by not accepting the licensing agreement offer from the parent company of the Defendant, submitted in various variants, for which reason the Defendant cannot respond to the claim for injunctive relief by the Plaintiff by raising a *dolo petit* objection (§ 242 BGB in connection with Art. 102 AEUV and §§ 19, 20 GWB).

II.

The Defendant cannot successfully defend itself with the objection that the Plaintiff would have immediately granted it a license for the Patent in suit based on the ITU declaration of willingness to license, for which reason the request for injunctive relief is supposedly an abuse of law (*dolo petit* objection, § 242 BGB). For the case of the declaration of willingness to license, the rules set forth under item 1 apply in the same way with regard to the necessity of a license offer by the prospective licensee. If the prospective licensee could successfully parry claims for injunctive relief by the Plaintiff with the argument that in the end, the latter has the obligation anyway to grant it a license – of its own accord –, then one would be handing the patent owner over to every dishonest licensee for whom there would no longer be any incentive to conduct licensing negotiations (see Kühnen, loc. cit., margin no. 1298). In the final analysis, the declaration of willingness to license contains nothing more than a declaratory concretization of the obligation to conclude a contract that already exists under cartel law; based on the obligations, freely assumed by the declarant, for non-discriminatory, non-abusive licensing, this declaration suspends from cartel law examination the question of whether the patent owner has a dominant position on the market (see Kühnen, margin no. 1298 f.)

### III.

A justified *dolo petit* objection also does not arise from the MPEG LA pool agreement because there is no contractual obligation on the part of the Plaintiff to make the Defendant an offer on the terms set forth in the MPEG LA pool agreement.

According to item 8.3 of the agreement, the licensees Terayon and Tut Systems were obligated to grant licenses for their own standard-essential patents and those of their "*Affiliates.*" According to item 1.1 of the agreement, "*Affiliates*" also include those companies that are held by a common parent company ("*… or is under common control with the Licensee*"). Terayon and Tut Systems may indeed have been held from 2007 (until their merger with the Plaintiff) by the same parent company (Motorola, Inc., later Motorola Mobility, Inc.) as the Plaintiff (the beginning of its affiliation with the group has not been presented). But this circumstance would at all events have given rise to obligations on the part of the licensees Terayon and Tut Systems, but not of the Plaintiff, which was not a party to the MPEG LA pool agreement. But even the merger of the Plaintiff with Terayon and Tut Systems in 2011 could not justify any licensing obligation of the Plaintiff arising from the MPEG LA pool agreement (as part of the claimed universal succession): the MPEG LA pool agreement was specifically terminated by the acquisition of the licensees Terayon and Tut Systems by Motorola, Inc. in January 2007 pursuant to item 8.1.2. Item 6.6.4 of the MPEG LA pool agreement does indeed provide that the obligation of the licensee from item 8.3 outlives the termination of the agreement. Such an obligation, which outlives the termination of the agreement, on the part of the licensees Terayon and Tut Systems to license patents of the Plaintiff did not exist, however, at the time of the termination of the agreement, i.e. the acquisition of Terayon and Tut Systems by Motorola, Inc. in January 2007 because the Plaintiff was not an "*Affiliate*" of the two licensees at that time.

Therefore, it is not necessary to answer the question of whether a license-granting obligation would even extend to the Patent in suit and to the Defendant as a subsidiary of the licensee Microsoft Corporation.