# EXHIBIT 4

*- Official copy*



| | | |
|---|---|---|
| Reference number:<br>2 0 387/11 | | Pronounced on<br>02 May 2012 |
| | | Freisinger, Senior<br>Court Secretary<br>as Registrar of the |

# Mannheim Regional Court

## 2nd Civil Chamber

# In the Name of the People
# Judgment

In the legal dispute

**General Instrument
Corporation** Horsham PA 19044
/USA

- Plaintiff -

Attorneys of Record:
Lawyers quinn emanuel and colleagues, Mannheim, court box 227

**versus**

1. **Microsoft Corporation**
   represented by the  President and Chief Executive Officer of Microsoft Corp.
   Steve Ballmer
   One Microsoft Way, Redmond, I Washington 98052-6399 USA

2. **Microsoft Ireland Operations Limited**
   Blackthorn Road, Sandyford Industrial Estate, Dublin, 181 Ireland

   - Defendant -

   Attorneys of Record for 1 and 2:
   Lawyers Freshfields Bruckhaus Deringer and colleagues, Prannerstr. 10, 80333
   Munich

**on the grounds of** patent infringement

following the oral hearing of 07 February 2012, the 2nd Civil Chamber of the
Mannheim Regional Court with the participation of

the Presiding Judge at the Regional Court Dr. Kircher

Judges at the Regional Court Dr. Beauer-Gerland

Judge at the Regional Court

Wedler

**adjudged** as follows:

I. 1.a)

Defendants are ordered to cease and desist from offering, marketing, using or importing or possessing for said purposes in the territory of the Federal Republic of Germany decoder apparatus (in particular Xbox 360),

 if those comprise:

- means for receiving superblocks of adaptively compressed digital video data,

- said superblocks containing individual blocks each compressed using one of a plurality of different compression modes comprising a first compression mode and a second compressing mode,

- said compressed superblocks including selection overhead data identifying the compression mode used for each superblock and/or the blocks contained in each superblock,

- means coupled to said receiving means for retrieving from each received superblock, one of:

    o first overhead data indicative of said first compression mode used to compress all blocks of the superblock, or

    o second overhead data indicative of said second compression mode used to compress all blocks of the superblock, or

    o third overhead data indicating that the individual blocks contained in said superblock were compressed using one compression mode of said plurality of different compression modes;

- means responsive to said retrieved first overhead data for decoding the received superblock using a decompression mode corresponding to said first compression mode;

- means responsive to said retrieved second overhead data for decoding a received superblock using a decompression mode corresponding to said second compression mode; and

- means responsive to said retrieved third overhead data for identifying the compression modes used to compress each individual block in a received superblock and decoding the blocks using a decompression mode for each individual block that corresponds to the compression mode used to compress the block.

(EP 0 615 384 B1, , Claim 17, direct infringement).

1.b) Defendant No. 1 is ordered to cease and desist from offering and/or supplying in the territory of the Federal Republic of Germany computer software (in particular Windows 7 and/or Internet Explorer 9)

if such software is suited to the purpose of building a decoder apparatus on a computer after its installation

if such apparatus comprises:

- means for receiving superblocks of adaptively compressed digital video data,

- said superblocks containing individual blocks each compressed using one of a plurality of different compression modes comprising a first compression mode and a second compressing mode,

- said compressed superblocks including selection overhead data identifying the compression mode used for each superblock and/or the blocks contained in each superblock,

- means coupled to said receiving means for retrieving from each received superblock, one of:

- first overhead data indicative of said first compression mode used to compress all blocks of the superblock, or

- second overhead data indicative of said second compression mode used to compress all blocks of the superblock, or

- third overhead data indicating that the individual blocks contained in said superblock were compressed using one compression mode of said plurality of different compression modes;

- means responsive to said retrieved first overhead data for decoding the received superblock using a decompression mode corresponding to said first compression mode;

- means responsive to said retrieved second overhead data for decoding a received superblock using a decompression mode corresponding to said second compression mode; and

- means responsive to said retrieved third overhead data for identifying the compression modes used to compress each individual block in a received superblock and decoding the blocks using a decompression mode for each individual block that corresponds to the compression mode used to compress the block.

(EP 0 615 384 B 1, Claim 17, indirect infringement).

1.c) Defendant 1 is ordered to cease and desist from offering and/or supplying in the territory of the Federal Republic of Germany computer software (in particular Windows Media Player 12)

if such software is suited to the purpose of interacting with a computer software in accordance with section 1.1 b) (in particular Windows 7) after its installation on a decoding device in accordance with 1.1 b).

(EP 0 615 384 B 1, Claim 17, indirect infringement).

1.d) For each case of violation against the prohibition in accordance with section 1.1.a) and for each case of violation against one of the prohibitions in accordance with section 1.1.b) and section 1.1.c) Defendant 1 shall face a disciplinary fine of up to EUR 250,000 or alternatively confinement for contempt of court , or up to 6 months confinement for contempt of court, with the confinement to be executed upon the legal representatives of Defendant.

I.2.

Defendants are ordered to render accounts to Plaintiff in writing and in an organized fashion (divided into calendar quarters) indicating to which extent they have committed the actions specified in section 1.1.a) since 20 October 2000, and Defendant 1 is ordered to render accounts to Plaintiff in writing and in an organized fashion (divided into calendar quarters) indicating to which extent it has committed the actions specified in section 1.1.b) and section 1.1.c) since 20 October 2000, and Defendants are to indicate in each case

   a)      the individual deliveries (submitting at the same time invoices and/or delivery notes) indicating

   aa) delivery quantities, times and prices,
   bb) brands of the respective products as well as all identification features such as type designation, item name, serial product number, cc) names and addresses of the buyers,

   b)      the individual offers (at the same time submitting offers in

   writing) indicating aa) offer quantities, times and prices,

   bb) brands of the respective products as well as all identification features such as type designation, item name, serial product number, cc) names and addresses of the commercial offer recipients,

   c)      the production costs and the generated profit broken down by individual cost factors

d)      names and addresses of the manufacturers, suppliers and other previous owners, always including the number of the manufactured, received or ordered products,

e)      advertising made, itemized according to advertising media, circulation figures, period of dissemination and area of dissemination,

whereby the statements made in accordance with a) and d) have to be evidenced through the submission of the order receipts, order confirmations, invoices and delivery and customs documents,

with Defendants having the choice to provide the names and addresses of their non-commercial buyers not to Plaintiff but to a certified public accountant with seat in the Federal Republic of Germany, to be nominated by Plaintiff and sworn to secrecy towards Plaintiff, instead, if Defendants bear the costs of such certified public accountant and authorize and obligate him/her to tell Plaintiff upon its specific inquiry whether or not a specific non-commercial buyer or a specific offer recipient is included in the accounting documents.

I.3.

Defendants are ordered to recall the products described under section 1.1.a) in the possession of third parties that are not end customers, which have been brought into the market after 29 April 2006 from the distribution channels by earnestly demanding from such third parties which were granted possession in the products by Defendants or with Defendants' consent under reference to the fact that the chamber decided with the present judgment that the patent in suit was infringed, to return the products to Defendants and that third parties were granted a repayment of the already paid purchase price in case of a return of the products as well as payment of the costs of the return

and

to ultimately remove products described under section I. 1. a) in possession of third parties that are not end customers, which have been brought into the market since 01 September 2008. This shall be done through repossession of the Defendants in the products or their destruction at the respective possessor.

II.     It is determined that Defendants are as joint and several debtors obligated to compensate Plaintiff for all damages Plaintiff incurred through actions of the Defendants pursuant to section 1.1.a) since 20 October 2000 and still incurs and that Defendant 1 is obligated to compensate Plaintiff for any damages incurred through actions of Defendant 1 pursuant to section I.1.b) and section 1.1.c) since 20 October 2000 and still incurs   .

III.    The complaint is dismissed in regard to any other claims.

IV.    Defendant 1 shall bear $^3/_4$ and Defendant 2 $^1/4$ of the court costs and the out-of-court costs of Plaintiff.  The Defendants shall each bear their own lout-of-court costs.

V.     The judgment is temporarily enforceable.

1. In regard to Defendant 1 against provision of security in the amount of

- € 120 million regarding section 1.1 [cease and desist]
- € 10 million in regard to section 1.2. [rendering of accounting]

- € 10 million in regard to section 1.3. [recall/removal] whereas the security to be provided in case of isolated enforcement (without enforcement of the cease and desist order according to section I. 1.a) is set to 50 million.
- 120 % of the amount to be enforced in regard to section IV in each case;

2. In regard to Defendant 2 against provision of security in the amount of

- € 40 million regarding section 1.1a [cease and desist]
- € 3 million in regard to section 1.2. [rendering of accounting]
- € 3 million in regard to section 1.3. [recall/removal] whereas the security to be provided in case of isolated enforcement (without enforcement of the cease and desist order according to section I. 1.a) is set to 43 million.
- 120 % of the amount to be enforced in regard to section 1V in each case;

[...]

# Reasons for the decision

The admissible complaint is for the most part unsubstantiated.

The challenged embodiments use Claim 17 of the patent in suit (A.). Defendants are not authorized to use the patent in suit (B.), and Plaintiff is also not hindered in enforcing its cease and desist claim for antitrust law reasons (C.). Therefore, Plaintiff is for the most part entitled to the asserted claims (D.). A stay of the proceedings is also not indicated (E.)

## A.

Defendants infringe the patent in suit pursuant to Art. 64 para. 1 EPC in connection with Sec. 9 c. 2 no. 1 and Sec. 10 para. 1 PatG (Patent Act), since the challenged embodiments make literal use of Claim 17 of the patent in suit directly, (Xbox 360, both Defendants) and indirectly (Windows 7, Windows Internet Explorer 9, Windows Media Player 12, Defendant 1).

The patent in suit relates to the compression of digital video signals.

I. Since digital image transmission would generate very large data volumes if each individual image would be transfered individually, video data are usually coded with a combination of technologies to compress the image data as efficiently as possible. The prior art already knew video compression techniques using the spatial correlation between adjacent pixels in an individual image ("frame") (intra frame coding), and also compression systems using similarities between temporally adjacent frames to densify the data more. In the latter so-called inter frame coding the difference coding was known, in which only the difference between a current frame and the prediction of the current frame is

transmitted.  In addition, inter-frame video compression systems, which use motion compensation were also already known in the prior art. In the motion compensation it is sufficient to transfer a motion vector describing the shift of an unchanged image area compared to the reference image.  The patent in suit, for example, names the publication by Ninomiya and Ohtsuka „A Motion-Compensated Interframe Coding System for Television Pictures", IEEE Transactions an Communications, volume COM-30, no. 1, January 1982. According to it, a motion vector is determined for each block (image section) by matching a block in the previous frame, which is most similar to the determined block. The entire current frame can then be reconstructed at a decoder by sending the difference between the corresponding block pairs, together with the motion vectors that are required to identify the corresponding pairs [0007].

If the motion compensation functions well, the difference image - divided into blocks - can be coded more efficiently than the original image blocks.  The coded difference image and the information regarding the (coded) motion vectors are then transmitted together to the decoder device.

The performance of the block-matching method is dependent on how well the movement from one frame to the next can be modeled as a simple translation. Thus, often movements may involve zooming, rotation, and many other complex distortions that cannot be accurately modeled as a simple translation [0009]. The efficiency of block-based motion estimation algorithms can therefore depend on the size of the block used to adjust the current frame to the previous frame.  A large block size will function well in areas in which the image is still or is translated uniformly, since less overhead data is necessary to transmit the data linked to the image blocks. In other cases in which motion takes place from one frame to the other, a smaller block size can achieve better performance.   Against this background the static decision for a certain block size has the disadvantage of efficiency losses.

To address this problem, the prior art knew systems for adaptive compression of digital video data. For example, from US Patent 5.068.724 a method was known providing the opportunity to code data blocks either with or without

motion compensation in each case selecting the type of compression which used the least overall number of bits for a block [0010]. From US Patent 5.235.419 it was known to use a plurality of motion compensators using different block sizes for the compression of digital video data, always transmitting the data block which needed the least amount of compressed data from each motion compensator resulting from the motion [0011].

2. Based on this, it is the object of the patent in suit to provide a more efficient system for adaptively compressing digital video data [0012].

To solve this object the patent in suit teaches a coding apparatus, a method for adaptively compressing digital video data and a decoder apparatus for such adaptively compressing digital video data [0012 et seq.]. To optimize the (as small as possible) data amounts to be transmitted, the encoder first selects in two selection modes from a plurality of different compression modes that compression mode which can compress the individual blocks of a so-called superblock in each case most efficiently. From the individual blocks compressed in this manner one constructs a version of the superblock and compares its data amount in a second step with the data amounts which result from

the compression of all blocks of this superblock through a first compression mode and through a second compression mode. The version of the superblock containing the least amount of data to be transmitted for the superblock is released for transmission [0018]. The selected compression mode is disclosed through so-called overhead data.

According to the description of the patent in suit in a preferred embodiment the superblocks consists of blocks of 16x16 pixels, divided into 8x8 large blocks [0034].

On the receiver side the patent in suit proposes in Claim 17 a decoder device, whose features can be structured as follows. The chamber has based this on the feature structure submitted by Plaintiff as Exhibit KP2-K4.  The feature structure submitted by Defendants as Exhibit FBD 5 only deviates from this feature structure insofar as a different way of counting and partially different

paragraphs are shown and for the english word "compression mode(s)" the translation "KompressionsModus(i)" and not "Kompressions-Mode(n)" is used. However, these differences have no relevance.

1.  *Decoder apparatus comprising:*

2.  *means for receiving superblocks of adaptively compressed digital video data,*

3.  *said superblocks containing individual blocks each compressed using one of a plurality of different compression modes comprising a first compression mode and a second compressing mode,*

4.  *said compressed superblocks including selection overhead data identifying the compression mode used for each superblock and/or the blocks contained in each superblock,*

5.  *a.) where the compression mode has been determined by first comparing the amount of overall data for each block when compressed using the different compression modes and*

    *b.) selecting for each block the compression mode which results in the least amount of overall data for that bloc, and then*

    *c.) comparing the amounts of accumulated data for respective superblocks formed from:*

        *(0) blocks compressed by the compression modes selected by the first comparing step,*

        *(i) blocks compressed by the first compression mode, and*

        *(ii) blocks compressed by the second compression mode, and*

*to provide supberblocks wich are determined to have the least amount of data for transmission;*

*6. means coupled to said receiving means for retrieving from each received superblock, one of: •*

    *a.    first overhead data indicative of said first compression mode used to compress all blocks of the superblock, or*

    *b.    second overhead data indicative of said second compression mode used to compress all blocks of the superblock, or*

    *c.    third overhead data indicating that the individual blocks contained in said superblock were compressed using one compression mode of said plurality of different compression modes;*

*7. means responsive to said retrieved first overhead data for decoding the received superblock using a decompression mode corresponding to said first compression mode;*

*8. means responsive to said retrieved second overhead data for decoding a received superblock using a decompression mode corresponding to said second compression mode; and*

*9. means responsive to said retrieved third overhead data for identifying the compression modes used to compress each individual block in a received superblock and decoding the blocks using a decompression mode for each individual block that corresponds to the compression mode used to compress the block.*

## II.

The challenged embodiments literally use Claim 17 of the patent in suit (A.).

The necessary interpretation of the patent in suit according to the understanding of the average person skilled in the art has to focus on the wording of the claim (Art. 69 para. 1 c. 1 EPC, Sec. 14 para. 1 c. 1 PatG (Patent Act); BGH GRUR 2004, 1023 et seq. - *bodenseitige Vereinzelungsvorrichtung),* the content of the description and of the drawings are to be used in addition for the interpretation (Art. 69 para. 1 c. 2 EPC, Sec. 14 para. 1 c. 2 PatG (Patent Act)). As far as the description is used to interpret the patent specification, the technical sense of the words and terms is decisive and not their pure philological or logical-scientific meaning (BGHZ 150, 149, 156 - *Schneidmesser I,* BGH GRUR 1999, 909 - *Spannschraube).*

In an interpretation of Claim 17 oriented in these principles the challenged embodiments use all of its features.

The indirect prove of the infringement of the patent in suit basing it on the characteristics of the standard is admissible since the challenged embodiments undisputedly support the H.264 standard. A comparison of the applicable provisions of the standard with the patent in suit shows that a decoder device pursuant to the standard realizes all features of Claim 17.

Due to correct patent law considerations, this is undisputed between the parties in regard to Features 7, 8 and 9.

I. Decoder devices pursuant to the standard (Feature I) however also comprise "means for receiving superblocks of adaptively compressed digital video data" (Feature 2), which also fulfills Features 3, 4 and 5.

Pursuant to Feature 2 the claimed decoder device has to be able to receive adaptively compress superblocks of digital video data compressed from a plurality of compression modes (Feature 3), and to decode these and finally to reestablish the video sequence.

Claim 17 contains a comprehensive description of encoder processes leading to the data which a decoder pursuant to the patent is established to decode. Features 3, 4 and 5 are part of the determination of the objective of the decoder

device pursuant to the patent *("for receiving superblocks..."* ) beginning with Feature 2 . This objective defines the protected decoder device more closely in such a way that it has to fulfill not only the spatial-physical features explictly formulated by the patent claim, but also has to be formed in such a way that it can fulfill the function mentioned in the patent claim (cf. BGH, GRUR 2009, 837 - *Bauschalungsstütze).* Within this definition of the objective <u>Feature 5</u> teaches the comparative and selection decisions, which have to be at first made by a coding device pursuant to the patent on the block level and then at the superblock level, and<u>Feature 4</u> determines that the compressed superblocks include selection overhead data identifying the compression mode pursuant to Feature 5. All these features included in the definition of the objective are features originally on the decoder side, which do not characterize the decoder beyond its suitability for decoding of such data.

The standard provides for decoder devices able to receive a data stream of digital video data. According to the requirements of the standard, adaptively compressed digital video data are decoded in form of macro-blocks consisting of 16 x 16 pixels (Exhibit KPI-K2, section 6.2. (p. 24), section 3.77).  The macro-blocks themselves contain sub-macro-blocks with 8 x 8 pixels each (section 3.148 (p. 12)). Thus, macro-blocks correspond to superblocks in terms fo the patent in suit [0034] and sub-macro-blocks correspond to blocks in terms of the patent in suit [0034]. Macro blocks and sub-macro-blocks can be subdivided into different partitions for the purpose of inter-coding.  The subsequently displayed figure 6-9 (section 6.4.2, p. 26) shows the partitionings for macro-blocks and sub-macro-blocks possible according to the standard:



Figure 6-9 – Macroblock partitions, sub-macroblock partitions, macroblock partition scans, and sub-macroblock partition scans

With this, the standard stipulates a compression format for digital video data and a decompression procedure for video data compressed according to this format. In the context of the *predictive* inter-coding there are several compression modes in the standard which result from the selection of certain partitions by the individual sub-macro blocks (=blocks) of a macro-block. From the here relevant perspective of the decoder pursuant to the standard it is here not decisive in which way the macro-blocks

(superblocks), which contain the lowest amount of data, were ultimately generated by the encoder (e.g. through comparison of the concrete determined amounts with the correct amount of the overall data or estimation of the coding costs).   This corresponds to the fact that the standard leaves the video coding process, namely the selection of compression modes, in the scope of the *predictive intercoding,* open (cf. section 0.6.1 (p. 3)).

Decoders pursuant to the standard are undisputedly (also) able to receive superblocks from adaptively compressing digital video data which went through the comparison and selection steps described in <u>Feature 5</u>.

Data coded pursuant to the standard also contain selection overhead data in terms of <u>Feature 4,</u> i.e. information at the syntax level identifying the compression mode used in coding a partition (section 7.4.5, S. 97, regarding macro-block level; section 7.4.5.2, S. 105, regarding sub-macro-block level),

Relevant is that the decoder device pursuant to the standard thus at least has means to receive macro-blocks (superblocks) coded in the manner described in Features 3-5.  This finding will not change should encoders pursuant to the standard actually make their comparison and selection decision based on a manner that does not realize Claim 1 or Feature 5 of Claim 17.  Contrary to Defendants' opinion, Claim 17 does not require a system which contains an encoder compressing data with the method shown in Claim 17 and a decoder. Already according to its wording, Claim 17 is not a system claim, but a (decoding) device claim. The description of the processes on the encoder side in Claim 17 is restricted to the information about the purpose according to which the decoder device has to be suitable to receive superblocks which were selected and generated in the described manner. The encoder itself is the object of Claim 1 which is not the subject matter of the patent in suit.

2. Pursuant to <u>Feature 6 </u>the decoder devices according to the standard also contain means coupled to said receiving means for retrieving from each received superblock, one of:

a.   first overhead data indicative of said first compression mode used to compress all blocks of the superblock, or

b.   second overhead data indicative of said second compression mode used to compress all blocks of the superblock, or

c.   third overhead data indicating that the individual blocks contained in said superblock were compressed using one compression mode of said plurality of different compression modes;

In the standard the coded data for a macro-block contain a syntax element mb_type indicating the macro-block type for each coded macro-block.  For a *predictive* macro-block type (P) the mb_type shows both type "P" and also the partition size which was used for the motion compensation (table 7-13, p. 100). In the context of the motion compensation a macro-block can be divided into a 16x16 partition (mb_type = P_LO_16x16), two 16x8 partitions (mb_type = P_LO_LO_16x8), two 8x16 partitions (mb_type

P LO LO 8x16) or in four 8x8 partitions (mb_type = P_8x8).

In case of a P-macro-block-partitioning of 8x8 the standard provides for a (sub) partitioning at sub-macro-block level signaled by another syntax element sub_mb_type. A sub-macro-block can be partitioned into one 8x8 partition, two 8x4 partitions, two 4x8 partitions or four 4x4 partitions. These different partitionings of the individual sub-macro-blocks and also the associated syntax elements can be found in table 7-17 (p. 105 of the standard) copied below:

The compression at sub-macro-block level can be done uniformly for all four 8x8 sub-macro-blocks or non-uniformly for the four 8x8 sub-macro-blocks with different codings.

In this way, the compression at sub macro-block level can also be done

a)   uniformly for all four 8x8 sub-macro-blocks with a first coding, e.g. 4x8 (mb_type=P_8x8; sub_mb_type for all 8x8 sub-macro-blocks uniformly 4x8);

b)   uniformly for all four 8x8 sub-macro-blocks with a second coding, e.g. 8x4 (mb_type=P_8x8; sub_mb_type for all 8x8 sub-macro-blocks uniformly 8x4);

c)   for the four 8x8 sub-macro-blocks non-uniformly with different codings, e.g. 4x8 for two of the four 8x8 sub-macro-blocks (mb_type=P_8x8; sub_mb_type for these two blocks 4x8) and with one coding of 8x4 for the two remaining of the four 8x8 sub-macro-blocks (mb_type=P_8x8; sub_mb_type for these two blocks 8x4).

In this constellation the overhead data regarding lit. a) (mb_type=P_8x8; sub_mb_type for all 8x8 sub-macro-blocks uniformly 4x8) indicate the first compression mode, which was used to compress all blocks of the superblock

**Table 7-17 – Sub-macroblock types in P macroblocks**

| sub_mb_type[ mbPartIdx ] | Name of sub_mb_type[ mbPartIdx ] | NumSubMbPart ( sub_mb_type[ mbPartIdx ] ) | SubMbPredMode ( sub_mb_type[ mbPartIdx ] ) | SubMbPartWidth ( sub_mb_type[ mbPartIdx ] ) | SubMbPartHeight ( sub_mb_type[ mbPartIdx ] ) |
|---|---|---|---|---|---|
| inferred | na | na | na | na | na |
| 0 | P_L0_8x8 | 1 | Pred_L0 | 8 | 8 |
| 1 | P_L0_8x4 | 2 | Pred_L0 | 8 | 4 |
| 2 | P_L0_4x8 | 2 | Pred_L0 | 4 | 8 |
| 3 | P_L0_4x4 | 4 | Pred_L0 | 4 | 4 |

(=macro-block) (sub Feature 6.a.), the overhead data regarding lit.

b) (mb_type=P_9x8; sub_mb_type for all 8x8 sub-macro-blocks uniformly 8x4) indicate the second compression mode, which was used to compress all blocks of the superblock (=macro-block) (sub Feature 6.b.), and the overhead data regarding lit.

c) (mb_type=P_8x8; sub_mb_type for two blocks 4x8 and mb_type=P_8x8; sub_mb_type for the two additional blocks 8x4) indicate that the individual blocks contained in the superblock (=macro-block) were compressed using a compression mode from a plurality of different compression modes (sub Feature 6.c.).

As far as Defendant objects that the description of the coding at sub macro-block level is allegedly not done by the syntax element mb_type, but by an additional indication in form of syntax element sub_mb_type, while in Feature 6 with "overhead data" only *an* information part is said to teach, we have to object to that at first with the wording of the claim which uses the plural ("overhead data" (singular) / "overhead data" (plural)). On the other side, the description of the patent in suit in case of an overhead of two different code words also speaks for the superblock on one hand and the individual blocks of "overhead data" [0043] on the other hand.

According to all this it should be stated that in the standard at least in case of a P-macro-block partitioning 8x8 overhead data can be sent which realize the sub Features 6.a.) - 6.c.). That is why a decoder pursuant to the standard must have means to retrieve these data. As far as Feature 6 teaches a "means to retrieve from each received superblock" it is necessary, but also necessary that the decoder device is *suitable* to retrieve the first, second and third overhead data from each received superblock. This suitability is not questioned by the assumption that received superblocks possibly do not contain first, second and third overhead data according to sub features 6.a.) - 6.c.). Already the declaration that the standard decoding devices can regain the first, second and third overhead data according to subfeatures 6.a.) - 6.c.) shows the realization of the intended purpose described in Feature 6 through the means comprised by the standard decoding apparatus. Thus, this does not depends on the further question whether the patent in suit actually requires the coding to be carried out blockwise even in the case of of a superblock with 16xl6, 8xl6 or16x8 partitions or whether a uniform coding of the submacroblocks as a result of a uniform coding at the macroblock level.

**B.**

Defendants may not rely on the right to use the patent in suit.

# I.

The parties do not dispute that no license agreement has been concluded.

# II.

The Defendants are also not entitled to any right to use the patent in suit based on the licensing declarations *("Patent Statement and Licencing Declaration Form",Plaintiff's and its Group parent"s* set of Exhibits FBD-8) to the standard setting organization International Telecommunication Union (ITU).

Contrary to the view of the Defendants, neither the Plaintiff's general ITU declaration of willingness to license of December 2002 nor the specific ITU declaration of willingness to license of Motorola Inc., predecessor of the Plaintiff's parent company constitute a contract for the benefit of third parties ( here: the Defendants) for the patent in suit of October 8, 2007 or a waiver of prohibition.

The assessment of any entitlement to use the patent in suit from the licensing declaration to the ITU is subject to German substantive law. The question about what legal system should be applied to assess the grant of a right to use intellectual property rights must be answered according to the the laws of the country for for whose territory protection is sought (cf. Mannheim Regional Court, InstGE 13, 65 - *UBTS capable mobile telephone II,* mar. no. 161 with further proofs, cit. no. juris; Kühnen, Hdb. Patent infringement, 5. edition, mar. no. 1298).

Based on the classification of the simple license as a right in rem, which the court considered to apply ( Karlsruhe Higher Regional Court, GRUR Int 1987, 788 et seq. *Offenendspinnmaschine;* in detail Mannheim Local Court loc. cit., mar. no. 166, with further proofs; BGH, GRUR 2009, 946, mar. no.20, cit. no. juris - *Reifen Progressiv* (on copyright law); a.A. (only claim under the law of obligations:) BGHZ 83, 251 - *Verankerungsteil;* a.A. (reified obligation): McGuire, Die Lizenz, zugl. Habil. Osnabrück 2009) an entitlement to use the patent in suit by the Defendants might at best be considered if one were already to see a contract for the benefit of third parties

in the making of the licensing declaration to the standard setting organization ITU and its acceptance. Such a grant of license with an operative character through a contract for the benefit of third parties is excluded by the fact that German law does not acknowledge an in rem contract for the benefit of third parties. Sections 328 et seq. BGB are neither directly or by analogy applicable to in rem contracts (cf. Mannheim Regional Court, loc. cit., mar. no. 167 with further proofs).

The licensing declaration also does not contain a waiver of claims for injunctive relief with the effect that the Plaintiff would be restricted to making or accepting a FRAND offer and demanding payment of license fees in the FRAND amount, where necessary by means of a claim for damages. Such a waiver of the power of exclusivity from the patent could at best have a purely in personam character, but would not be an operative act having an effect on the continued existence of the patent right, which directly restricts the Plaintiff's rights as patent holder. The latter would not even be legally possible considering the in rem nature of the claim for injunctive relief inseparably associated with the property right as such (cf. Mannheim Local Court, InstGE 11, 9, mar. no. 99 et seq. - *UBTS capable mobile telephone,* cit. no. Juris; Kühnen, loc. cit., mar. no. 1298).

The Plaintiff's or rather its former parent company's licensing declaration to the ITU can however also not be understood as a binding licensing offer to a large number of third parties still unknown to the Plaintiff, which only requires acceptance by a third party but as an invitation to parties concerned for their part to make a FRAND offer (cf. also section 2 at the end: *"Negotiations of licences are left to the parties concerned and are performed outside the ITU-TASO/IEC").* The license declaration thus merely comprises a declarative specification of the obligation to contract existing anyway under antitrust law (cf. Kühnen, loc. cit.., mar. no. 1298). With the promise to grant a license to third parties under FRAND conditions it only creates a basis for a claim, for which the party concerned must formulate a specific request fleshing out the basis of the claim (Karlsruhe Higher Regional Court, InstGE 12, 220 - *BP3-Standard).*

Finally, an offer of an in personam *"pactum de non petendo"* ("negative license") and thus the patent holder's waiver of the form of pressure of the claim for injunctive relief for enforcing its patent law claims against a large number of potential patent infringers

unknown to it (sec. 2 :"an *unrestricted number of applicants")*  is improbable. The patent holder declaring its willingness to license merely offers to cause the downfall of the exclusivity rights under the patent by concluding a license agreement - and precisely not unconditionally (Kühnen, loc. cit., mar. no. 1298).

In the light of the foregoing, with regard to the Plaintiff's ITU licensing declaration, the Defendants can rely neither on a positive right of use granted to it nor on a waiver of prohibition.

# III.

The Defendants are not entitled to any right to use the parent in suit under the MPEG LA Pooling Agreement (cf. Exhibit FBD 12).

The assessment of the alleged grant of right of use in the MPEG LA Pooling Agreement is again in accordance with the laws of the country for for whose territory protection is sought (cf. above at sec. 11.). According to German substantive law do be applied accordingly, Terayon and Tut Systems could not validly dispose of the patent in suit belonging to them. It is neither submitted nor otherwise evident where the MPEG LA Pool licensees Terayon and Tut Systems' corresponding power of disposal of the patent in suit is supposed to have come from. Understood as grant of a license to the patent in suit, Art. 8.3 of the MPEG LA Pooling Agreement would constitute a disposal for the benefit of third parties, the Plaintiff. As such, the alleged license is invalid.

Against this background, it does not matter whether a license would apply to the patent in suit and to the Defendant no. 2 as subsidiary of the licensor Microsoft Corporation at all.

# C.

The Defendants cannot successfully defend themselves with the objection that the Plaintiff would have to grant it a license for the patent in suit immediately, which is why the request for injunctive relief was an abuse of law. The Defendants are not entitled to a do/o-petit objection either due to their offer of a license agreement of December 23, 2012 (l.) or in connection with the licensing declaration to the ITU (ll.) or due to the MPEG LA Pooling Agreement (III.).

# I.

The Plaintiff is not hindered under antitrust law from enforcing its claim for injunctive relief against the Defendants resulting from the infringement of the patent in suit. The Defendants cannot exclude any claim for the grant of a license under section 33 para. 1 of the German Restrictive Practices Act [Gesetz gegen Wettbewerbsbeschränkungen(GWB) in conjunction with Art. 102 TFEU or sections 19, 20 GWB from the claim for injunctive relief.

1.  The Plaintiff is the relevant addressee of Art. 102 AEUV or sections 19, 20 GWB, since according to its own submission, anyone who manufactures, offers, sells and distributes H.264 decoding apparatus must comply with the H.264 standard and this necessarily also makes use of the patent in suit. The grant of licenses to the patent in suit thus objectively forms a market of its own, which the Plaintiff controls as the only supplier.

2.  The license offer to the Plaintiff made by Defendant no. 1 also with effect for Defendant no. 2 (hereinafter referred to as: Defendants' license offer) does not meet all requirements that the Federal Supreme Court have listed in its decision *Orange‑Book‑Standard* (judgment of May 6, 2009, KZR 39/09, GRUR 2009, 694 et seq.).

Accordingly, the Defendant against which a claim is brought under a patent may raise as an objection against the patent holder bringing an action that it would be abusing a market dominance if it were to refuse to conclude a patent licensing agreement under non-discriminatory and non-restrictive conditions with the Defendant (BGH, loc. cit.., 1st guiding principle, cit. no. juris). However, the patent holder, which asserts a claim for injunctive relief under its patent, although the Defendant is entitled to a claim for the grant of a license to the patent in suit, only abuses its market dominance and only acts contrary to principles of good faith if two requirements are met: on the one hand, the party requesting the license must have made it an unconditional offer to conclude a license agreement, which the patent holder may not reject, without unduly

restricting the party requesting the license or contravening the prohibition of discrimination, and consider itself bound by this offer. On the other hand, if it has already used the object of the patent before the patent holder has accepted its offer, the party requesting the license must comply with the obligations that the licensing agreement to be concluded links to the use of the licensed object. This especially means that the party requesting the license must pay or guarantee the payment of the license fees resulting from the agreement (BGH, loc. cit., mar. no. 29).

3. Even if the *Orange-Book-Standard* decision had correlated a de facto standard, the criteria listed there are likewise applicable to standards which have been elaborated by standard setting organizations (here: ITU) in a standardizing process (cf. Mannheim Regional Court, InstGE 13, 65, mar. no.176, cit.no.juris).

4. The Plaintiff should reject the Defendant's offer to conclude a license agreement without thereby having unduly restricted or discriminated against the Defendant •

   a. While the foregoing unconditional offer essentially conforms to usual contract terms and shows a sufficient degree of regulation taking into account the amendments made [..] The offer in its amended wording among other things especially includes a right of termination by the patent holder in the event of future attacks against the legality of the patent in suit (cf. Karlsruhe Higher Regional Court, January 23, 2012, p. 6), and the Defendant also acknowledges in connection with its offer an obligation to pay damages for use actions in the past based on the merits of the case(cf. Mannheim Regional Court, judgment of December 9, 2011, 7 0 122/11).

   b.    The Defendant's offer of a licensing agreement is nevertheless not an offer, which the Plaintiff may not reject, without being in violation of antitrust law. The patent holder is namely not required to accept an offer at licensing rates that are below what it could demand without being in violation of antitrust law.

The Defendant, which considers the Plaintiff's claim for a license (2.25 % of the revenue) to be excessive and an abuse of law, has not made any use of the possibility exisiting in such cases to leave the amount of the license fee according to section 315 BGB to the patent holder's fair discretion (BGH, loc. cit., mar. no. 39). After the Defendant rather committed itself to a specific calculation basis (quota license) and a specific licensing rate (2 €Cents or 1 € cent per unit), it had to be considered whether the rejection of this offer by the Plaintiff on the grounds that the license fees offered were too low is in violation of antitrust law.

In the opinion of the Court, this consideration may be restricted to the question whether the offer constitutes a *blatant* violation of antitrust law. As the Federal Supreme Court makes clear in the *Orange-BookStandard* decision, the infringement proceedings is to be relieved to an avoidable extent from the difficult and time-consuming task of determining the precise amount of a non-restrictive or discriminatory license fee (BGH, loc. cit. mar. no. 39). In the case of an offer of a license in accordance with section 315 BGB, the infringement court is therefore to be able to be satisfied that the patent holder is obliged to accept the offer of a licensing agreement and determine according to its fair discretion when the party requesting the license has deposited an amount sufficient in any case and the other requirements of the "compulsory license plea" are also met (BGH, loc. cit. mar. no. 40). In connection with the question whether the deposited amount (in any casel) is certainly sufficient, a summary consideration by the Court will be sufficient (cf. Kühnen, loc. cit.., mar. no. 1296). Inasmuch, the party requesting a license also does not incur any disadvantage, since in subsequent proceedings on the amount of the compensation the burden of production and the burden of proof for the reasonableness of the amount of the license fee agreed lie with the patent holder.

If, one the other hand, the party requesting the license offers a specific license fee which it considers to be reasonable, which the patent holder rejects as too low, the question is raised what significance is given to the party requesting the license's assertion that the license fee offered is reasonable and whether in the end the party requesting the license can force a costly and time-consuming

hearing of evidence with each offer, which in the view of the Federal Supreme Court must particularly be avoided in infringement proceedings.

Since only a clearly excessive price is unreasonable within the meaning of Art. 102 TFEU, the rejection of the offer by the patent holder due to allegedly to low license fees is only in violation of antitrust law if the party requesting the license offers such a high license price that any change compared with this for the benefit of the patent holder would be unreasonable.

If, on the other hand, the conditions in the offer by the party requesting a license are (only) unreasonable, but Art. 102 TFEU, sections 19, 20 GWB allow a deviation for the benefit of the patent holder, the patent holder's refusal to grant a license under there conditions does not establish the objection of an abuse of law. An obligation to contract only exists under conditions which are reasonable *and* in respect of which any change for the benefit of the party with market dominance is unreasonable in such a way that the insistence on these conditions must be regarded as an abuse of law by a party with market dominance (Karlsruhe Higher Regional Court, 6 U 174/02, GRUR-RR 2007, 177 et seq., mar. no. 56, cit. no. juris). As long as the patent holder can rely on there still being maneuvering room for its benefit within what is reasonable, it is not in violation of antitrust law. That this "upper limit" of the party not yet in violation of antitrust law is also not automatically ascertainable for the party requesting the license does not unduly encumber it, for it basically bears the burden of production and proof for the requirements of the licensing claim under antitrust law anyway (cf. BGH, loc. cit, mar. no. 37 et seq.) and as shown, the solution is left up to it section 315 BGB.

If, upon a summary consideration, this means that the license fees offered by the party requesting a license are in any case not certainly sufficient (so that each deviation upwards would be clearly unreasonable), the rejection by the patent holder is not blatantly in violation of antitrust law. A hearing of evidence on the question whether the offer (in any case) is reasonable is not required therefore.

c. The Defendant's offer does not stand up to a review oriented to these principles. It cannot be established that the license fees offered would be sufficient in any case.

The *Orange-Book-Standard* decision did not have to consider the question about what standards the amount sufficient in any case (there in accordance with section 315 BGB) have to be determined by )e.g. general comparable market, license pools, patent holder's licensing practice etc.)

In the present case, there is not need to consider whether a patent pool considered by itself can be a convincing point of departure and relevant benchmark. Inasmuch, in the opinion of the Court, there are at least some concerns. On the one hand, the patent holder's interests in introducing its standard-setting essential patents into a pool is not automatically comparable with the patent holder which waives these. Thus, at least for producing members of a patent pool, this should often depend on obtaining the maximum amount of licensing revenues from the patents introduced than on the possibility of being able to use the patents of other pool members as economically favorably as possible. The suitability of the licensing rates of a patent pool as a relevant benchmark may also not be restricted by - as in the case of the MPEG LA Pool - several of the largest patent holders not having joined the pool.

Also if these basic concerns regarding the Defendant's calculation method are disregarded, the court can in any case not determine that the license fees offered certainly move in such an amount that a deviation upwards would lead to clearly excessive fees.

d. `This is especially true against the background of the numerical downward calculation of the fee for both patents in suit calculated for the Plaintiff's (17) standard-setting essential patents (2/17). As a result, the linear billing method of the MPEG LA patent pool is transferred one to one, although the Plaintiff has precisely not joined this pool. Namely, it does not make any difference whether the € 0.082 cent share of the license granted in the pool per patent family and unit is directly increased tenfold (€ 0.82 cent) and is then doubled to € l.64 cent (two patents whose licensing is requested) or whether first of all the total amount of (€ 0.082 cent x 17 patent families =) € 1,394 theoretically granted for the portfolio in

the pool is increased tenfold (€ 13.94 cent) and then calculated numerically downward to the number of the patents in suit (l/17 or 2/17 for both patents in suit = € 0.82 cent or € 1.64 cent).

The Court does not deny that the Defendant has taken into account that a standard-setting essential patent can generally be had relatively more economically favorably as part of a patent pool than through an individual license by increasing the share of the pool license theoretically accruing for the Plaintiff's portfolio tenfold.

But it is not recognizable that the Defendant thereby reaches an amount of licenses in which any further deviation upwards would be unreasonable. On the other hand, it is already apparent in the opinion of the Court that the thus determined portfolio license corresponds to the license fees that AT&T receives from at least 9 licensees for its more or less comparable portfolio. That AT&T inasmuch would have enforced a license fee equally against 9 licensees, which is not only usual in the market, but moves at its upper limit, which precisely can be regarded as reasonable and not restrictive or discriminating, does not appear obvious.

It also does not at all appear certain to the Court that the maximum amount of licenses for both patents in suit is to lie exactly at 2/17 of the amount of licenses determined for the Plaintiff's and its Group parent's portfolio. This would not only require the at least questionable application of the license calculation method for parts of pool licenses to individual license fees, but also the certainty that both patents in suit taken by themselves are actually not - as appropriate also only minimally - more valuable than the other 15 patents of the Plaintiff's and its Group parent's portfolio.

e. Also a comparison with the patent pool for a predecessor technology for video compression, the H.262 (MPEG 2) standard gives rise to doubts that the licensing rates offered by the Defendant move in an amount in which a deviation upwards would lead to clearly excessive fees. The H.262 pool initially provided for license fees of US-$ 4 per device (without cap limit), after reductions, currently still US-$ 2 per item is requested. These license fees lie clearly above those of the MPEG LA patent pool ( US-$ 0.2 or US-$ 0.1), which Defendant took as a basis for its

calculations, without the Court having any evidence for the fees of the H.262 pool for their part being (having been) unreasonable, restrictive or discriminating. sAlso taking into account the Defendant's submission according to which the MPEG 2 pool had been formed in the year 1997 and thus at a time in which the products working with compressed data were relatively expensive and worked with less implemented standards, at least the even currently clearly higher license fee of the MPEG 2 pool raises doubts that the € 2 cents or € 1 cent per item offered by the Defendant are actually at the upper limit of what is reasonable.

f. A more detailed analysis of the controversial methodology and the validity of the so-called analysis of citations referred to by the Defendant is not required, since the Defendant has ultimately not oriented the licensing rates offered by it to the alleged citation value. Inasmuch, the Defendant has also only stated the alleged citation value of the portfolio (3.8 % of the total citation value; expert opinion by Bekker, Exhibit FBD-22, S. 31), but not of both of the patent in suit. Against this background, notwithstanding the disputed value of the citation method it is in any case not discernible that the licensing rates offered moved at the upper limit of what would be reasonable for patents with a corresponding "citation value".

If the Defendants have stated clearly in the oral proceedings that their offer included as additional components a remunerated cross license regarding the licensing rates determined by them, this too does not lead to a different assessment of the offer.

From the fact alone that the party requesting a license would be satisfied with a certain licensing rate it cannot be inferred that this licensing rate would also have to be accepted for the patent holder's patents.

On the one hand, the interests regarding the respective patents on the party requesting the licenses' side may be completely different than on the patent holder's side. This is especially true if both sides manufacture and / or sell and distribute completely different quantities. Thus, the party which sells higher quantities will generally prefer a lower reciprocal licensing rate and the party with lower own quantities will generally prefer a higher reciprocal licensing rate.

The present case also shows the Plaintiff's minimal interest in the Defendant's standard-setting essential patents in the fact that the Plaintiff did not take any license for the MPEG LA pool, in which Defendant introduced its own standard-setting essential patents in the past.

On the other hand, it would otherwise have been obvious to the party requesting a license to force the patent holder to a licensing through an offer of a cross license under the same conditions, during which the amount of licenses could precisely not be oriented to the requested patents, but to the party requesting a license's own patents - and their possibly lower value. That a remunerated cross license does not per se have to be in accordance with their interests for both parties, is in other respects also shown by the Defendant's themselves when for their part they reject the remunerated cross license offered by the Plaintiff under its conditions (2.25 % of the revenues) as being unreasonably high.

That the party requesting a license is prepared to license its own patents under a remunerated cross license under the same conditions that it offers for the patents requested by it therefore does not automatically militate in favor of the fee rates offered in any case being so high that the patent holder could only reject the offer in violation of antitrust law. In view of the fact that the licensing rates offered taken by themselves are not obviously sufficient in any case (cf. above), the additional worldwide cross license could only lead to Plaintiff being able to reject the offer without being in violation of antitrust law if Defendant's portfolio had at least the same value for Plaintiff (i.e. not only objectively, in which case also the latter is disputed between the parties) as the Plaintiff's portfolio for the Defendant, which could be measured for example by the necessity of using the patents, and the quantity of products according to the patent manufactured or sold or the turnover thereby generated.

6. If the Defendants finally declared in the pleading of March 2, 2012 (sheet. 489 et seq., 498 et seq.) their willingness to grant the Plaintiff a worldwide, non-remunerated cross license to its portfolio of H.264 standard-setting essential patents in addition to the patients in suit granted in Germany, the aforementioned considerations on the remunerated cross license applies accordingly. Inasmuch, it makes no difference whether the party requesting a license wishes to license the respective patents at a licensing rate not sufficient in any case, in any case

regarding the patent holder's patents or equally reciprocally free of charge. A cross license free of charge is not without remuneration; the latter is granted by the grant of the licenses to the patents to which the licensee is entitled and may consequently likewise be too low. Also in the case of the cross license free of charge, for the reasons stated above (cf. section 5), the Court can consequently not determine that the Plaintiff could only reject the offer in violation of antitrust law.

It therefore does not depend on the question whether the *Orange-Book-Standard* offer of December 23, 2011 pursuant to section 296 para. 1 ZPO and the offer of an additional further cross license free of charge pursuant to section 296a ZPO first made in the pleading of March 2, 2012, which no extension was granted in this regard, after the end of the oral proceedings are precluded in any case.


In accordance with the aforesaid, the Plaintiff did not violate antitrust law by not accepting Defendant's offer of a licensing agreement made in various forms, which is why the Defendants cannot cite the *dolo-petit* objection (section 242 BGB in conjunction with Art. 102 TFEU or sections 19, 20 GWB) against the Plaintiff's claim for injunctive relief.

## II.

The Defendants cannot successfully defend themselves with the objection that the Plaintiff would have to grant it a license for the patent in suit immediately, which is why the request for injunctive relief was an abuse of law (do/o-petit objection, section 242 BGB). In the case of the licensing declaration, the rules on the necessity of an offer of a license by the party requesting a license set forth under section 1 apply in the same way. If the party requesting a license could successfully fend off the patent holder's claims for injunctive relief with the argument that the patent holder would in the end in any case be obliged to deliver it a license - voluntarily if one were to hand over the patent holder to any dishonest licensee for which there would no longer be any incentive to commence licensing negotiations (cf. Kühnen, loc. cit., mar. no. 1298).

The licensing declaration finally no longer includes a declaratory specification of the obligation to contract existing in any case under antitrust law, whereby it suspends from the review under antitrust law whether the patent holder has a market dominating position as a result of the obligations to license free from discrimination and abuse (cfl. Kühnen, mar. no. 1298 et seq.).

## III.

A justified do/o-petit objection also does not result from the MPEG LA pooling agreement because a contractual obligation by the Plaintiff, to make the Defendants an offer under the conditions outlined in the MPEG LA pooling agreement does not exist.

According to section 8.3 of the agreement, the licensees Terayon and Tut Systems were obliged to grant licenses for own standard-setting eessential patents and those of their *"Affiliates"* . *"Affiliates"* are according to section 1.I of the agreement also undertakings that are held by a common parent company *("...or is under common control with Licensor").* While Terayon and Tut Systems should have been held by the same parent company (Motorola, Inc., later Motorola Mobility, Inc.) as the Plaintiff from 2007 (up until its merger with the Plainjtff) (the start of the affiliation with the Group is not submitted). Based on this circumstance, however, at best obligations of the licensees Terayon and Tut Systems, but not Plaintiff, which was not a contractual party to the MPEG LA pooling agreement, could have resulted. But also the Plaintiff's merger with Terayon und Tut Systems in the year 2011 could not establish any licensing obligation of Plaintiff under the MPEG LA pooling agreement (by way of the alleged universal succession): the MPEG LA pooling agreement was namely pursuant to section 8.I.2 already terminated through the takeover of the licensees Terayon and Tut Systems by Motorola, Inc. in the year 2007. While section 6.6.4 of the MPEG LA pooling agreement provides that the licensee's obligation under section 8.3 outlasts the termination of the agreement. But such an obligation of the licensees Terayon and Tut Systems to license Plaintiff's patents outlasting the termination of the agreement did not exist at the time of the termination of the agreement, i.e. the takeover of Terayon and Tut Systems by Motorola, Inc. in the year 2007, because the Plaintiff was not an *"Affiliate"* of both licensees at the time.

It can be thus left open whether an obligation to grant a license would even apply to the patent in suit and against the Defendant no. 2 as subsidiary of the licensee, Defendant no. 1.

**D.**

The Plaintiff's claims for the thus established infringement of the patent in suit are determined pursuant to Art. 64 EPC in accordance with the regulations of the German Patent Act [Patentgesetz].

1. Since the Defendants have used the subject matter of the patent in suit in violation of section 9 no. 1 PatG (Xbox 360, both Defendants) and section 10 PatG (Windows 7, Media Player 12 and Internet Explorer 9, Defendant no. I), they obliged to the Plaintiff to forbear from this, section 139 para. 1 PatG in conjunction with Art 64 EPC. The danger of repetition results from the already occurring infringing acts through the sale and distribution of the challenged embodiments.

   The obligation of forbearance had to be expressed without any restriction because a non-infringing use of the apparatus of the challenged embodiments for decoding H.264 video data is not recognizable. The other functions of the challenged embodiments are not dependent on decoding apparatus in accordance with the invention, which is why Defendant does not have any recognizable interest in continuing to offer, sell and distribute the challenged embodiments in a design enabling the use of the patent in suit.

   Defendants did not have to be granted a grace period. Inasmuch, there is an insuffiicient specification of the serious consequences of an immediately applicable obligation of forbearance alleged by the Defendant.

   Defendants were ordered to forbear, under section 890 ZPO, at the Plaintiff's request, they must be threatened with the legal consequences of a contravention of the obligation of forbearance.

2.   The promised claim for furnishing information and presentation of invoices results from

§ 140b PatG und § 242 BGB in conjunction with Art. 64 EPC. If no reservation of auditor was provided at the Plaintiff's request, this had to be amended (cf. Kühnen, loc. cit, WL 1045 et seq. with further proofs) and to dismiss the further action to this extent.

3.   The claim for recall and removal asserted for the products which have reached the marketing channels since September 9, 2008 results from section 140a para..3 s. 1 PatG new version in conjunction with  Art. 64 EPC. For the products which reached the marketing channels before September 9, 2008, there is merely a claim for recall from the marketing channels to an extent corresponding to section 140a para. 3 s. 1 PatG new version, but not for the removal from the marketing channels.

The contractual relationship already resulting from (culpable) infringing acts before the entry into force of the German Act on the Improvement of the Enforcement of Intellectual Property Rights [Gesetz zur Verbesserung der Durchsetzung von Rechten des geistigen Eigentums] (BGBl. 2008 l, p. 1191) on September 01, 2008 - in the absence of express statutory transitional provisions regarding its content and its effects - solely subject to the right which applied at the time of its coming into existence, i.e. by September 1, 2008 (cf. BGH, GRUR 2009, 515, 517 - *Botorradreiniger).* The claim for recall already results under earlier legislation - without this depending on an interpretation in accordance with guidelines - pursuant to sections 139 para. 2 PatG, 249 para. 1 BGB as damages by means of specific performance or as a claim for a remedy independent of fault pursuant to section 1004 para. 1 p. 1 BGB by analogy (Mannheim Regional Court, judgment of November 13, 2009, 7 0 92/08 - not published). Such a claim for the removal of a danger with the same content aimed at recall under section 140a para. 3 s. 1 PatG new version in accordance with earlier legislation does not require a power of disposal of the infringer of the objects to be recalled in the sense of a legal handling of the intermediate customer in the marketing channel (otherwise on the simple recall indeed also BGH, GRUR 1974, 666, 669 - Reparaturversicherung, with further proofs). This does not apply regarding the

removal from the marketing channels. Since the removal from the marketing channels by the infringer beyond the appeal to a voluntary surrender (recall) requires the outcome of the "final removal" itself , under earlier legislation it is in principle required that the infringer has power of disposal

of the objects to be recalled in the sense of a legal handling of the intermediate customer in the marketing channel (cf. BGH, GRUR 1974, 666, 669 - Reparaturversicherung, with further proofs). Plaintiff has not set forth such a power of disposal of the Defendant and this is otherwise not evident. A different application of the law as a result of the delayed implementation of the so-called Enforcement Guideline may not be considered. The Guideline does not bring about a direct horizontal effect between the parties and to this extent a guideline-conforming legislative continuation of the general claims for removal of the consequences is not possible since the Court to this extent would replace the legislator (Mannheim Regional Court, InstGE 12, 200 mar. no. 42 - *Stickstoffmonoxyd-Nachweis;* loc. cit. Düsseldorf Higher Regional Court, InstGE 13, 15 - *Faktor VIII-Konzentrat).*

According to the wording of the statute (considering "marketing channels") it still had to be clarified that objects that are held by private or commercial final consumers are not covered by the operative provisions of the judgment (cf. Mannheim Regional Court, InstGE 12, 200, 208-210 — subparagraph 45 et seq. *Stickstoffmonoxyd-Nachweis;* a.A. Kühnen, loc. cit., mar. no. 1082).

4. The Defendants must bear at least the charge of negligence regarding the declared patent infringement from October 20, 2000, one month after publication of the reference to the grant of the patent in suit, which is why they are also obliged to pay damages to the Plaintiff from this date pursuant to section 139 para. 2 PatG in conjunction with Art. 64 EPC. Plaintiff is currently unable to put a figure ofn its claim for damages; this justifies the petition for a determination of the location, section 256 ZPO.

**E.**

A stay of the proceedings pursuant to section 148 ZPO also not indicated

# I.

The legal dispute did not have to be stayed until the decision on the action for nullity brought against the patent in suit. While the decision on the action for nullity is

has precedence within the meaning of section 148 ZPO. The Court has however exercised the discretion granted to it by this regulation to ensure than a stay of the infringement proceedings is refrained from. After the Plaintiff in an action for nullity applied for the suspension of the nullity proceedings and declared that it would refrain from filing a further petition to the court in the nullity proceedings as long as it and the Defendants considered themselves bound by their offer of a licensing agreement, it is unlikely for the time being that there will be a destruction of the patent in suit.

# II.

A stay pursuant to section 148 ZPO may also not be considered regarding the review of the admissibility of the takeover of the Plaintiff's parent company by Google Inc. by the antitrust authority, because the decision by the antitrust authority does not have precedence. Any future changes in the legal situation do not have precedence over the decision to be taken based on the current legal situation (cfl. Zöller/Greger, ZPO, 29. edl., § 148, mar. no. 6a).

# F.

The decision on costs results from sections 92 para. 2 no. I, 100 para. 1 ZPO.

The decision on the provisional enforceability is based on section 709 s. 1 and s. 2 ZPO.

In the determination of the provision of security regarding the obligation to recall and remove the products described under section I.I.a) (Xbox 360) the Court takes into account that the isolated enforcement of these obligations serving to remove the patent-infringing state of affairs virtually corresponds to the enforcement of the claim for injunctive relief.

Defendant's application for a stay of execution pursuant to section 712 ZPO shall remain unsuccessful. Defendant's submission that it is threatened by financial losses,

the loss of market shares and harm to its image is not sufficient to substantiate the requirements of section 712 para. 1 s. 1 ZPO.

The enforcement of claims for injunctive relief under technical property rights regularly results in the discontinuation of business activities in connectioj with the patent-infringing products and therefore does not per se open th scope of application of section 712 para. 1 s. 1 ZPO (Düsseldorf Higher Regional Court, InstGE 8, 117, 121 - Fahrbare Betonpumpe). That the Defendant's economic existence also taking account the Plaintiff's fault-free liability pursuant to section 717 para. 2 sentence 1 of the German Code of Civil Procedure [Zivilprozeßordnung (ZPO)] would be threatened, has not been set forth or submitted as prima facie evidence. Regarding the possible disadvantages for the user of the challenged embodiments (undertakings, public administration) submitted by the Defendant, these are not irredeemable disadvantages threatening the Defendant itself. However, section 712 ZPO does not serve to protect third parties.

Dr. Kircher        Dr. Bauer-Gerland        Wedler

Presiding Judge at the          Judge at the Regional Court Judge at the Regional
Court
La nc_ Jeiaht,

Executed:        ,------

as registrar of the court registry