```
 1              UNITED STATES DISTRICT COURT

 2           WESTERN DISTRICT OF WASHINGTON AT SEATTLE

 3    _____

 4    MICROSOFT CORPORATION,          )
                                      )
 5                   Plaintiff,       ) 10-01823-JLR
                                      )
 6    v.                              ) SEATTLE, WASHINGTON
                                      )
 7    MOTOROLA INC., et al,           ) May 7, 2012
                                      )
 8                   Defendants.      ) Motions
                                      )
 9    _____

10              VERBATIM REPORT OF PROCEEDINGS
            BEFORE THE HONORABLE JAMES L. ROBART
11              UNITED STATES DISTRICT JUDGE
      _____

12

13

      APPEARANCES:
14

15


16    For the Plaintiff:     Arthur Harrigan, Christopher
                             Wion, David Pritikin, Richard
17                           Cederoth, Andy Culbert, David
                             Killough, David Howard and Shane
18                           Cramer

19

20

21    For the Defendants:    Jesse Jenner, Ralph Palumbo,
                             Norman Beamer, Philip McCune,
22                           Kevin Post and Neill Taylor

23

24

25
```

 1            THE COURT:  The clerk will please call this matter.

 2            THE CLERK:  C-10-1823, Microsoft versus Motorola.

 3   Counsel, please make your appearance.

 4            MR. HARRIGAN:  Good morning, Your Honor.  Art

 5   Harrigan from Danielson Harrigan, representing Microsoft; and

 6   to the left here my partner Mr. Chris Wion; and David

 7   Pritikin from the Sidley firm; Rick Cederoth from the Sidley

 8   firm; Andy Culbert from Microsoft.  And in the bleachers,

 9   David Killough from Microsoft; David Howard from Microsoft;

10   and Shane Cramer from our firm.

11            MR. PALUMBO:  Good morning, Your Honor.  Ralph

12   Palumbo, Summit Law Group for Motorola.  Jesse Jenner who you

13   know from Ropes & Gray.

14            THE COURT:  Good morning.

15            MR. PALUMBO:  And then starting at the end, Norm

16   Beamer from Ropes & Gray; David LaComb from Ropes & Gray;

17   Phil McCune from Summit Law Group; Neill Taylor from

18   Motorola; and Kevin Post from Ropes & Gray.

19            THE COURT:  Counsel, as usual we tried to give you

20   some direction as to questions that we had that we thought

21   were important.  And we will follow more or less the schedule

22   that we sent you in terms of who is speaking when.

23        It made more sense to me that each side address what --

24   not cross motions for summary judgment, but which go to

25   somewhat the same area at the same time.  And then we set

1    aside, at the very end, the question of the injunction.  So,

2    if that doesn't work you can blame me.  But it seemed to me

3    that was the most expedient way.

4        We are going to be issuing a written order on all of this,

5    but if I feel it's appropriate, at the conclusion of today's

6    hearing I will give you some preliminary observations, which

7    would give you a chance to continue to work on your various

8    matters in a manner with some greater guidance from the

9    court.  So, know that that is the situation that we're in

10   right now.

11       And I guess the last thing I would say is, in getting

12   ready for today's hearing, I think my principal frustration

13   had to do with the fact that you are well into the law.  I'm

14   not sure you have done as helpful a job as I would have hoped

15   on the facts.  So don't be surprised if I interrupt you and

16   take you back to the facts on some of these matters, because

17   it would be helpful for us to get a better understanding of

18   that.

19       So, that having been said, Mr. Jenner, are you carrying

20   the flag today?

21           MR. JENNER:  I'm carrying two-thirds of the flag,

22   Your Honor, and Mr. Palumbo will carry the rest of the flag.

23           THE COURT:  All right.  Then I'll hear from you

24   first, please.

25           MR. JENNER:  Your Honor, let me begin by saying a

1    couple of things.  First of all, we're as usual providing

2    bench books of the graphics that we will use.  I do want to

3    point out that because of the nature of what's in these

4    motions, the bench books contain some company business

5    confidential information.  What we have attempted to do, in

6    order to try to protect that, is to redact confidential

7    information from what will show up on the screen, but to

8    include it in the bench books that Your Honor and counsel

9    have, so that if I can hopefully adequately refer to things

10   like "company X" and on the date you see with bullet 4, we'll

11   call to your attention what I would like you to see without

12   inadvertently putting confidential business information on

13   the record.

14           THE COURT:  That's fine, thank you.

15           MR. JENNER:  The other thing that I would mention is

16   that we have attempted to work into our presentation what we

17   think would be helpful on the court's questions from Friday

18   afternoon.  I want to say in advance there's at least one

19   question where I suspect, in the nature of what I think

20   you're looking for or might be looking for, we could not get

21   all of the information that you might want, over the weekend.

22   I'll deal with that when we come to it, but I just want to

23   let Your Honor know that we will attempt to address all the

24   court's questions in going through the material.

25       So we are addressing the first two motions, what I would

 1   call the March 30th cross motions.  On Motorola's side, did

 2   Microsoft repudiate its claim to a RAND license for the

 3   reasons that we will discuss?  And on Microsoft's side, the

 4   two aspects that remain from Your Honor's order.  First of

 5   all, did the opening offer need to be RAND as a requirement?

 6   And if it did, was Motorola's opening offer consistent with

 7   RAND?  So those are the motions that I'm going to address,

 8   and Mr.  Palumbo will take up the injunctive issues later.

 9            THE COURT:  All right.

10            MR. JENNER:  Topically here's what I would like to do

11   is to give Your Honor a little background in brief in terms

12   of summarizing what we think is important about Motorola's

13   licensing program.  I will go from that into the contracts

14   discussing the relevant standards body's documents, what we

15   think the contract is, and some things that flow from what

16   the contract is or may not be.  And then following on that

17   I'll talk about Motorola's motion first and how we think the

18   facts play into that.  And then finally Microsoft's motion.

19   I will, since Your Honor received an extra present on like

20   Friday, I guess it was, of the determination in the ITC, it

21   has some information which appears to be on the general

22   subject matter of RAND licensing.  And I would like to take a

23   little bit of time to talk about two or three things that we

24   think are salient there.

25            THE COURT:  All right.  Of that agenda, the one you

1   should probably spend the least amount of time on is

2   Motorola's licensing program.  I'm not sure that's as germane

3   to me right now as some of the other topics, particularly

4   your second one, which is the language.

5            MR. JENNER:  Okay.  So I will probably go into my

6   accelerated voice mode and try to get that a little faster.

7   So first of all the program -- I think what I want you to

8   know about this, because it plays into the expectations

9   certainly of Motorola, and we think others in the industry,

10  is that this is a well-established program that people know

11  about.  It's got at least a 20-year history.  It's based on

12  substantial investments by Motorola in the technology.  It's

13  resulted in over 60 standard essential licenses that involve

14  the various standards you see on the slide, including 802.11

15  and H.264.

16      What's important here, because I think it relates to the

17  expectation of parties in the industry, that should be

18  considered along with the contracts, they've all been the

19  product of bilateral negotiations.  Nobody ever presents a

20  license agreement and says, "Sign here."  Nobody would do

21  that.  These are all situations in which the information is

22  discussed in bilateral negotiations and the parties, after a

23  period of time in which they essentially knock out what all

24  the terms should be, result in a license agreement.

25            THE COURT:  Well, let me read you a line out of a

1    letter that -- "Motorola will leave this offer open for

2    20 days.  Please confirm whether Microsoft accepts the

3    offer."  That's the last line in your letter.  You're telling

4    me that that's an invitation to negotiation?  Sounds to me

5    like it's an ultimatum.

6        MR. JENNER:  Well, Your Honor, I can see that.  But

7    it is really in an entreaty for a party to respond.  Motorola

8    has done that in other situations.  It's extended it when

9    parties have come back and said, we're not ready to talk yet,

10   we'd like another few weeks.  And the deadline gets extended.

11   It's really an entreaty to the party to come back and engage

12   in negotiations.

13       THE COURT:  So what you're telling me is you said

14   that but it didn't really -- that's not what you meant?

15       MR. JENNER:  Well, I'm a little constrained here.  I

16   guess something else I probably ought to tell you, Your

17   Honor, is that -- I think you've probably gleaned by the

18   papers so far that there have, in fact, been continued

19   meetings and negotiations between the parties.  The parties

20   did, in fact, engage.  I'm limited in what I can say about

21   that, because of an agreement between the parties.  Things

22   that did not make it into the record, we're not now anyway in

23   a position to talk about.  Things that did make it into the

24   public record you can see in the briefs and you've seen some

25   of it.  This is something that parties routinely do.  And

1    routinely parties either come back and have a first meeting,

2    or they say, we're not ready yet, we want another three

3    weeks.  And three weeks get granted.

4        So, parties in the business understand that deadlines get

5    set, the deadlines are flexible.  They always have been.

6            THE COURT:  I rather enjoy watching you argue with

7    one hand tied behind your back.  So I appreciate the dilemma

8    that puts you in.

9            MR. JENNER:  Well, maybe we'll get to a point some

10   day that the parties will agree that we ought to lay out for

11   Your Honor all the discussions that have actually happened,

12   waive whatever agreements regarding 408 and

13   non-confidentiality there are, and we can just all let our

14   hair down.  But, we're stuck.  Again, there are things I

15   would like to discuss, I can't discuss.

16       So, these are products of negotiation.  There have always

17   been a variety of terms introduced.  Motorola is flexible

18   that way.  The licensing negotiating parties themselves are

19   flexible that way.  We would expect Microsoft to be flexible

20   that way.  You talk.  You negotiate.  New terms get brought

21   up, they get changed.  And ultimately it results in

22   agreements.

23       And we've tried to point out to Your Honor by way of one

24   example in the papers that these are not trivial one-page

25   October 20th offering letters.  That's not a complete offer.

1  This is a complete offer, which was signed by RIM after the

2  parties had these negotiations and arrived at an 80-page

3  document fully setting out the agreement between the parties.

4  So the October letters may have offered certain terms for

5  discussion, but by no means was that a complete offer that

6  anybody would ever have contemplated signing as an agreement.

7          THE COURT:  In your slide that you have up, you make

8  the statement, "Over 60 standard essential licenses involving

9  various standards."

10         MR. JENNER:  Yes.

11         THE COURT:  Cellular standards for 2G / 3G / 4G.

12  Wireless communications.  The 802.11, and the ITU H.264.

13         MR. JENNER:  Yes.

14         THE COURT:  We've had a terrible problem trying to

15  understand what patents are covered, because going back to

16  the letter that we were just talking about, "Enclosed is

17  Motorola's 802.11 annex, which includes a non-exhaustive list

18  of patents included in the license."

19         MR. JENNER:  What does that mean?

20         THE COURT:  Well, you know, when we talk about

21  document language, contract language, don't I need to know

22  what patent is covered by what -- I'll call them a

23  convention, or an industry-standard agreement.

24         MR. JENNER:  I think that's another one of the quirks

25  -- the term of art at the last hearing was "murky".  Today

1    it's going to be quirky or opaque, I suppose.  But one of the

2    quirks of this is, Your Honor, is in the position that the

3    licensees are ordinarily agreeing, here are a set number of

4    patents that Motorola believes are essential patents.  There

5    may be others.  You may come to us and you may tell us that

6    we have got a patent that you think you have to have a right

7    to use to be able to practice wireless technology.  And if

8    you do, and the parties agree that it's an essential patent,

9    you will be licensed, even though it's not in the annex.

10        So the annex can't cover or anticipate every patent that

11    might come along, which the parties may agree that a licensee

12    like Microsoft needs to have a right to use.  If it becomes

13    essential they will get it, even though it's not listed.

14        THE COURT:  But how do I ascertain, then, the

15    language that governs the procedure to get that license?  You

16    can see there are multiple versions of the language.

17        MR. JENNER:  Yes.

18        THE COURT:  You love the ones that say "negotiate,"

19    Microsoft loves the one that says, "grant."  That's not the

20    exclusive terms and the language wanders all over the

21    countryside.  So what I'm trying to find out is, I mean, do I

22    assume that whatever started in 1996 was replaced by multiple

23    versions along the way, and it's the last one that now is the

24    controlling language for everything going back to 1996?

25        MR. JENNER:  No.  The best way I can explain that,

 1    which we'll come to, is in the case of the ITU and the

 2    Letters of Assurance, the LOA's that are in exhibit, I think

 3    it's 16 -- 15 for ITU.  Those show patents.  For each of the

 4    letters, attached to the letter there is normally a list of

 5    patents for which that LOA is being submitted.  So you can

 6    correlate the ITU LOAs with patents for which those LOAs were

 7    being submitted.

 8            THE COURT:  All right.  Well, you unfortunately

 9    wandered into something I want to know more about.

10            MR. JENNER:  Yes.

11            THE COURT:  I'm looking at the Letter of Assurance

12    for essential patents signed by Jonathan Meyer, senior vice

13    president, dated April 21st.  I've come to the conclusion

14    that it's 2005.  His handwriting is worse than yours and

15    mine.  And it says, "Patent Holder is prepared to grant a

16    license."  There is no attachment to it.

17            MR. JENNER:  That's probably an IEEE version.

18            THE COURT:  It is.

19            MR. JENNER:  For the ITU there are patents, for the

20    IEEE there are not.

21            THE COURT:  But for the ITU you describe them as

22    non-exclusive lists.  Help me with that.

23            MR. JENNER:  The parties would negotiate and agree on

24    a need for additional -- that's the problem with judicial

25    resolution of a term like this.  I understand Your Honor's

1    difficulty in trying to understand what precise set of

2    patents are we talking about.  The parties know that they're

3    not talking about a precise set of patents, they are talking

4    about the ones that are listed.  That's on the table.  But

5    the parties appreciate that other patents may come along

6    which are essential for the benefit of the licensee, and they

7    become included because they are essential.  There's no way

8    for you to know that.

9           THE COURT:  Let me ask you this question, then.  Is

10   there any patent which is in dispute in this matter before me

11   that is not covered by either the ITU or the IEEE?

12          MR. JENNER:  Let me answer that one this way:  To the

13   extent that --

14          THE COURT:  I think yes or no would be a great

15   answer.

16          MR. JENNER:  Then the answer has to be yes.  And I'll

17   give you a concrete example, because I think we've alluded to

18   it in our briefs.  One of the patents under the IEEE, the

19   802.11 standard, is a patent that we call Finkelstein.

20   Finkelstein, the '712 patent.  It's one of the patents

21   litigated in the International Trade Commission case.  The

22   record on Finkelstein is a little bit different, because the

23   IEEE expects you to submit continuing Letters of Assurance as

24   additional portions of the standard get added, your letter is

25   applicable to the new standard and the new portion.  And

1    you've seen that.

2        One of the portions is 802.11-I, had to do with new

3    security techniques.  Finkelstein relates to new security

4    techniques.  Finkelstein would relate to 802.11-I.  Motorola

5    did not submit a Letter of Assurance for 802.11-I.  There is

6    no LOA covering Finkelstein, even though Finkelstein would be

7    considered in the 802.11 patent.  So that's a wrinkle.  There

8    may be other patents like that that we're not litigating at

9    this point that fall into a similar wrinkle.

10       And I just don't know, because when we saw your order on

11   Friday and thought about what it might mean, one of the

12   things I thought it might mean is that you're, in fact,

13   wanting to know how can we correlate at least the 802.11

14   patents with the individual Letters of Assurance.  And Friday

15   afternoon at 5 o'clock I can't get Motorola engineers to help

16   me with that.  If Your Honor wants that information, we will

17   get it for you.  But it's going to take time to get engineers

18   to dive into the standard, which is about 1400 pages long of

19   technology, and to figure out how to correlate the individual

20   listed patents with the adds to the standard, which patents

21   go with 802.11-I, which ones go with N, which goes with E.

22   That's not a trivial exercise to go through, and I just can't

23   do that today.

24            THE COURT:  Well, I think what would be helpful for

25   us and you've already answered this, you've said it's a

1    non-exclusive listing, so there may be additional ones.  Some

2    of them may be in the wrinkle-free zone, and some may be in

3    wrinkles.

4            MR. JENNER:  Or others, yes.

5            THE COURT:  But I can look to IEEE or ITU as the

6    mechanism that's being employed for those patents which are

7    industry essential.

8            MR. JENNER:  Yes.  And as I will get to, we don't

9    think it makes a difference.  Microsoft may disagree with

10   that.  We don't think the analysis that the court should go

11   through will cause that to make a difference, and I'm

12   prepared to explain why.

13           THE COURT:  All right.

14           MR. JENNER:  So just to kind of wrap up with a little

15   bit on the standard.  I've mentioned aspects of the program

16   that many companies have joined in, large substantial

17   companies, all of whom negotiated with Motorola the way we

18   think is required in a sensible industry like way.  They

19   arrived at agreements.

20       We're dealing with what that offer is.  And the reason I

21   include slide 6 is because we're in part dealing with the

22   reasonableness of Motorola offering to Microsoft, as a

23   starting point, what it offered to all these other companies.

24   It's, "2.25 percent of the net selling price of the end

25   product, subject to a grant-back of licensee's essential

1    patents."  That's by no means a license agreement.  It's some

2    fundamental terms to consider.  There were issues.  Microsoft

3    apparently thought that 2.25 percent for each license meant

4    4.5 percent total.  We call that stacking.  Motorola has

5    never stacked any of the licenses.  That's something you find

6    out by negotiating.  If Microsoft had asked, they would have

7    been told.

8        "Subject to the grant-back license" means logically if

9    you've got patents to grant back to me, I'm going to value

10   them.  My demand from you is going to go down.  And that's

11   also what happens in all Motorola licenses.  There are lower

12   resulting royalty rates.  There are some royalty rates with

13   substantial companies -- that I could whisper in your ear,

14   but I won't say out loud -- where, in fact, it's a zero/zero

15   cross license, because they had a lot to come back with.  So

16   the idea that it's a royalty-free license that Motorola was

17   asking for is just wrong, as shown by history.

18             THE COURT:  Let me take you down another rabbit hole,

19   then.  You just used a phrase that appears frequently in your

20   pleadings, but is inconsistent with your position, which is

21   you said, "I'm going to value them," referring to Microsoft's

22   patents.  Your position in the litigation is, you don't value

23   the patents, you value the product.  I've run into this

24   dichotomy --

25             MR. JENNER:  We value both.  We value both.  One of

1  the things that would be given credit is the patent portfolio

2  that Microsoft would be willing to license back.  If they

3  have valuable patents to license back, that's enormously

4  important to Motorola.  It would decrease what it asks for.

5      You also value the products in terms of what the resulting

6  royalty cost will be that the licensee has to pay.  And if

7  the licensee comes in and says in a negotiation, here is what

8  you're asking from me, it's too much, it's too much, you need

9  to decrease your royalty, then to use the words of Judge

10  Posner, that I'm going to show you later, "Tell them that

11  they're asking too much, and negotiate."  And the price for

12  the products comes down.  People put in place caps, for

13  example.

14      THE COURT:  We've done a fairly exhaustive literature

15  search, and there's this fellow who is a law school

16  professor, he's at Berkeley but seems to be on leave to

17  Stanford right now, and his writing is as close as I can find

18  to addressing the issue of valuing royalties.  And what he

19  says is, "You don't look to the value of the end product, you

20  look to the contribution of the patent and determine its

21  value in the context of the value of the product."

22      I need you to pick which argument you want to make.

23      MR. JENNER:  Your Honor, it has to be both.  The man

24  said what he said in his article, and I'm happy that he said

25  it.  I don't think he's right.  I think that when you

1   negotiate licenses you look at the licensee's portfolio in

2   terms of value going back to them, and the impact on the

3   product line, which will dictate the value coming to you.

4   And you start to negotiate trade-offs.  You negotiate both.

5   And I respectfully say to that author, if he thinks it's one

6   and not the other, he doesn't know what he's talking about,

7   Your Honor.  That's my position.  I don't know how many

8   licenses he's negotiated.  Maybe he's an Ivy Tower guy, I

9   don't know.

10      But when you license portfolios, you look at the value of

11   the adversary's portfolio as a benefit to them.  You look at

12   the royalty that will relate by applying royalties to their

13   products, which will either be cash payment, they could be

14   lump sum, they could be percentage royalty rates, they could

15   be cap numbers, all of this gets negotiated as to what's

16   coming back to you.  And you have to factor both in.  It's

17   both not one or the other.

18            THE COURT:  Well, then how can you tell me, then,

19   that you have this 2.25 standard royalty rate that you

20   offered everyone at the start?  I mean, that seems to me to

21   be intellectually inconsistent with what you've just said.

22            MR. JENNER:  I don't see why, Your Honor.  We say

23   this is a rate that we've offered to others, we're offering

24   it to you.  The probable first thing that's going to happen,

25   in a typical negotiation, is that the potential licensee is

1  going to come to a first meeting and say, here's why that

2  doesn't work for us.  It's going to result in too high a

3  payment.  We have certain enduser products you shouldn't be

4  able to reach.  There could be a panoply of things that

5  people come back and say as to why we've got to get off your

6  opening number and go on and negotiate different terms.

7  That's why these things have to be negotiated.

8          THE COURT:  But help me here.  Let's assume two

9  situations:  One, a company that has an extremely valuable

10 library of patents.

11          MR. JENNER:  Like Motorola.

12          THE COURT:  All right, Motorola.  Well, actually

13 since you're going to get the money, I'll pick Microsoft.  I

14 have no idea if they do or not.

15          MR. JENNER:  They do.

16          THE COURT:  Okay.  They've got valuable patents and

17 you ask 2.25 percent of the end value of the product.

18          MR. JENNER:  Right.

19          THE COURT:  If we had a company that had one patent

20 and it was worthless, but it's an industry-essential patent

21 that's easily duplicated technology from other sources, you

22 would still say, cross license that worthless patent, but by

23 the way pay us 2.25 percent.

24          MR. JENNER:  No, it may get some value back.

25 Motorola would like the cross license, because one of the

1  things you're trying to do is get what we call freedom of

2  action.  You don't want to find yourself a year later being

3  sued by that patent.  So, it will be assessed as to having

4  some value.  And it could result in a cross payment or a

5  reduction of the royalty rate.  If it's one patent that's a

6  crummy patent, as you say, it's not going to get a lot of

7  value.  And the likelihood is that a company like Microsoft

8  or Motorola is not going to make a huge diminution of the

9  royalty rate.

10       But if you take a completely different situation where you

11  have a company, and I won't get into details, but think in

12  terms of the Ericssons, the Nokias, the IBMs of the world,

13  that show substantial patent portfolios, those are going to

14  be valued very highly, and they can result in incredible

15  diminution of the royalty rate from 2.25 percent all the way

16  to zero, or maybe money going to the other company.

17            THE COURT:  So logically, then, what I hear you

18  saying is 2.25 is a ceiling.  You would never ask above it

19  and you go down from there.

20            MR. JENNER:  As a practical matter, that's right.

21            THE COURT:  You're making this offer knowing nothing

22  about the other side's patent.

23            MR. JENNER:  As a practical matter 2.25 is the

24  starting point, show me what you've got.  That's the

25  "subject to the grant-back."  Show me what you've got and it

 1   will go down.  There have been a couple of higher numbers.

 2   We mentioned in our papers the agreement with Simple

 3   Technologies, for example, where there was a six percent jury

 4   award.  There was another number that was higher.  But

 5   typically Motorola starts with this number as a starting

 6   point, because it's where the starting point has been, and

 7   says, show me what you've got and I'll work with you.  And

 8   the number goes down.  It doesn't go up.

 9          THE COURT:  All right.  Why don't you go to slide 10,

10   because I've used up a bunch of your time here.

11          MR. JENNER:  I'll breeze quickly by slide 7, because

12   I want you to see there are these substantial companies, they

13   provide grant-back rights, and that's been important.

14      So breezing through to slide 10, this is the first slide

15   of the section on the contract.  We wanted to hit quickly

16   some principles of contract interpretation.  The only one

17   I'll linger on, Your Honor, is the one at the bottom,

18   "Washington courts follow the context rule which permits you

19   to look at extrinsic evidence, whether or not there is

20   ambiguity."  So you can, and we submit you should, look at

21   information outside the contract.

22      Slide 11 is simply to show you the typical operative

23   language of the Letters of Assurance.  The Patent Holder will

24   grant or is prepared to grant a license to applicants, an

25   unrestricted number of applicants.  And that, as you know,

1   leads to some of our arguments.  This is typical language,

2   it's not the only language, and I'll show you some more

3   language shortly.

4       On slide 12, here I want to stick my neck out, Your Honor,

5   and tell you as of today what I think the operative contract

6   is.  And the reason I'm sticking my neck out is that I admit

7   in advance this is a little bit different from the conclusion

8   you came to in February.  But I'm going to tell you I don't

9   think it leads to a different result.

10      We believe at this point that the Letters of Assurance are

11  unilateral offers made by Motorola that it will grant

12  licenses on reasonable terms, and that offerees, like

13  Microsoft, if they satisfy the conditions to apply for a

14  license in some form and negotiate, are entitled to the

15  license.

16      So the offer is -- there's never a signed piece of paper

17  constituting the contract.  The offer is unilaterally made by

18  Motorola.  It's like, I'll give a reward of $500 to somebody

19  who brings my cat.  Show up with the cat, then you've

20  accepted and you get the reward.  You didn't have to sign a

21  piece of paper.  If you apply for a license and negotiate

22  with me, then you have formed a contract under the Letter of

23  Assurance.

24          THE COURT:  Just a minute.  I may not understand your

25  entire argument, but I think you've changed the entire

 1   footing of your case.

 2          MR. JENNER:  I think it gets to the same result.

 3   Give me one more slide to explain it.

 4          THE COURT:  All right.

 5          MR. JENNER:  I think what happens here is that you

 6   have a contract where Microsoft is obliged to be an applicant

 7   for a license, as you've heard endlessly from us in some form

 8   or another, and they are required to negotiate in good faith

 9   towards a contract.

10      If you look at slide 13, there are two other ways that

11   we've seen this formulated, but I believe they come back to

12   the same point.  Your Honor has -- I think Your Honor has

13   concluded, I'm always worried about putting words in your

14   mouth, but I think Your Honor has concluded that the LOA is

15   in agreement with the SSO.  Microsoft is therefore a

16   third-party beneficiary.  And we agreed to that back in

17   February.  But that still gets you to the implementation of

18   an agreement.  That still requires Microsoft to comply with

19   the Letter of Assurance on its part.  It's still going to

20   call upon Microsoft to do the same things.  I don't think it

21   leads to a different result.

22      The other implementation is from the Apple case.  I don't

23   know if you've seen this, but in the Apple case, Apple took

24   the position that it's a flip.  It's the SSOs who make the

25   offer through their policies.  And a company like Motorola,

1   by joining into the SSO and participating, accepts the SSO

2   policies.  And that makes the LOA just something submitted

3   pursuant to the policies.  And Microsoft can be a third-party

4   beneficiary of that.

5       Judge Crabb essentially didn't rule on that, but for

6   purposes of a motion to dismiss, she acknowledged Apple's

7   position and discussed it in her order.

8       I submit to the court that no matter which of these three

9   ways you look at it, there is ultimately an arrangement

10  between Motorola, as the submitter of the LOA, and Microsoft

11  as the intended beneficiary of the LOA, where if Microsoft

12  applies for the license and negotiates in good faith, it's

13  entitled to the grant of a RAND license.  I don't think

14  there's any difference in result.

15          THE COURT:  Didn't you just read the industry

16  essential patents out of your argument, then?  I mean, what

17  you're telling me is that everyone is going to do this

18  unilaterally.  Motorola on one side, Microsoft on the other.

19  I'm missing something.  You just took away the whole concept

20  of industry essential.

21          MR. JENNER:  No, it doesn't, Your Honor, because the

22  LOA is still submitted to the standards organization in

23  relation to a portion of the standard that invokes the

24  standards essential patent.  So the LOAs all relate to

25  standards essential patents.  The patents are still there.

1     For example, Motorola submits an LOA for 802.11-N.

2  802.11-N has certain patents that relate to it.  Microsoft

3  wants the license.  Microsoft simply applies for a license

4  and negotiates in good faith with Motorola.  It is entitled

5  to the grant of a license negotiated by the parties that will

6  apply to those standards essential patents.

7     So they are basically there by virtue of the Letters of

8  Assurance.  They relate to standards essential patents.  It

9  doesn't read them out at all.

10       THE COURT:  All right.  I mean, it seems to me that

11  you're missing what the court is inclined to see as the way

12  that this works, which is that you have, in effect, a hybrid

13  situation.  You have -- at this point Microsoft has a license

14  to use these industry essential patents that you have given

15  to the licensing organization.  They, however, in their

16  bylaws disclaim any involvement in the negotiation of the

17  terms.  That's why I say, you know, we basically have got a

18  dual situation.  And I'm not quite sure why they did this,

19  but the IEEE and the ITU both say, we don't have a dog in

20  that fight.  You, and in this instance Motorola and

21  Microsoft, you sort that out.

22     However, you have already conceded that they have the

23  right to use this patent.

24       MR. JENNER:  No.

25       THE COURT:  I think you need to let me finish.

1          MR. JENNER:  Oh, I'm sorry.

2          THE COURT:  You have conceded that they have the

3    right to use this patent.  What you're fighting about is the

4    terms for it.  Otherwise, the whole industry-essential patent

5    system collapses.  Why go through this?  Why list them in the

6    first place, if I accept your analysis?

7          MR. JENNER:  Let me first jump ahead to slide 17 and

8    point out some of the language in the LOA.  If you look at

9    the bottom box, there is explicit language --

10          THE COURT:  Hold on a minute.  Let me get to slide

11    17.  Okay.

12          MR. JENNER:  There is explicit language in all the

13    LOAs that says, "No license is implied simply by submission

14    of the letter."  And it has to be that way.  The parties have

15    to negotiate in order to create a license.  It is disavowed

16    that simply submitting LOAs creates a license.  There is no

17    license until the parties negotiate and sign one.

18      So, I think there is a misimpression if merely submitting

19    LOAs is thought to create licenses.  They do not.  And that's

20    well understood by everybody in the business.  You need to

21    negotiate a license.  I think we have some quotes in the

22    briefs from people, even at Microsoft, that acknowledge that.

23    And that every license will be different.

24      Every license is going to be different after you negotiate

25    it, because the circumstances of the parties in any bilateral

 1   situation are always different.  Somebody may wind up paying

 2   a lot of money, somebody may not.  Somebody may have a lot to

 3   cross license, somebody may not.  Somebody may want different

 4   terms in China, somebody else may not care about China.

 5   Somebody may want a defensive suspension clause in order to

 6   protect themselves in future litigation, somebody else might

 7   not care about it.  There is no license implied by a

 8   submission of a Letter of Assurance.  There is no license

 9   until one is negotiated and executed.

10        THE COURT:  What is a defensive suspension clause?

11   Either that or tell me that it doesn't matter.

12        MR. JENNER:  It matters only because it's another

13   important term.  In brief what it does is it allows a

14   licensing party to suspend a license as to customers of a

15   licensee.  If the customer of the licensee turns around and

16   sues me, it gives me the ability to get my patents back.  It

17   doesn't negate your license as to all the rest of your

18   customers.  But if customer X sues me, I can defensively

19   suspend my license to you, so that X is no longer licensed, I

20   can fight back with them, I can defend myself.  And parties

21   negotiate for this.  There was extensive testimony by

22   Jennifer Oakes in the ITC about defensive suspension clauses.

23        THE COURT:  Counsel, I want to make sure I choose my

24   words carefully here.  I understand and accept your argument

25   that -- and you don't like my phrase, "they have a license."

1    I'm using that in a slightly different sense than you are.

2    They have a right to a license.  What you are arguing about

3    are the terms for that license.

4        However, the fact that you all are here and asking the

5    court to ultimately determine the terms of that license,

6    seems to me to imply that there is an obligation on the part

7    of Motorola by having sent in this Letter of Assurance.

8            MR. JENNER:  Well, the thrust of our motion, leaving

9    aside Microsoft's, is that if Microsoft had responded to our

10   letters by effectively becoming an applicant, if they had

11   engaged, put it that way, and sat down to negotiate with us

12   in good faith, they would have satisfied the only conditions

13   of these licenses that apply to them.  And they would be

14   entitled to proceed.

15       They chose not to do that for strategic reasons.  They

16   chose not to do it.  And we submit by doing that they

17   preferred litigation for strategic reasons over engaging with

18   Motorola pursuant to these policies and Letters of Assurance

19   to lead to a license.  Now they cry foul because they find

20   themselves in situations where courts are saying, "Microsoft,

21   you lose."

22       And, Your Honor, we've submitted extensive statements by

23   people in the industry, showing the knowledge of the

24   industry, that say that the licensor, until such time as

25   there's a license, the licensor retains all the benefits of

1    the patents, as they must, so that the licensee will have an

2    incentive to negotiate.

3        In the absence of a threat of an injunction, even as to

4    essentials, until there's a license, Microsoft has no

5    incentive to do anything.  They can sit back and litigate for

6    years.  They can decline to engage.  They have no incentive,

7    because the usual incentive in licensing negotiations is

8    stripped away.  That's been noted -- I anticipate

9    knowledgeably that Mr. Palumbo may have something to say

10   about that.  But that is basically part of the negotiation

11   process.  And I submit that, Your Honor, we would all be

12   better off if you left that out there so that they would have

13   an incentive to come to the table and negotiate.

14       THE COURT:  Well, the pleadings in this case, both

15   sides now say that you have an offer out there, and they have

16   unambiguously accepted that offer, which is why we're on

17   point 3, and not on point 1, of our analysis.

18       MR. JENNER:  No, we said that they're a third-party

19   beneficiary.  We didn't say they accepted anything.  Point 2

20   of the motion is are they a third-party beneficiary?  And

21   under one formulation or another, they are.  They have the

22   right to accept the offer.  They never accepted it.  We never

23   said they accepted it.  We say quite clearly they rejected

24   it.  They could accept it.  They could have done that by

25   being a third-party beneficiary.  They simply didn't do it.

1    THE COURT:  You've got about 20 minutes left.  So I'm

2  going to stop asking you questions unless you provoke another

3  one here.

4    MR. JENNER:  I'm happy to have them, because I want

5  to know what you're interested in.  I appreciate that.  So

6  let me go back to the extent that this is something else on

7  Your Honor's mind.

8    These are the various iterations of the IEEE, the 802.11

9  LOAs.  And I suspected that Your Honor was caught up on all

10  of this.  This was the one where we simply could not, over

11  the weekend, deal with engineers in a way that would enable

12  us to tie individual patents to individual letters.  We

13  submit that it doesn't make any difference, because all of

14  these say the Patent Holder is prepared to grant a license,

15  and will grant a license to somebody who comes in and asks

16  for one.

17    The thing that flows from that is it's granting a license.

18  There's nothing in the LOAs that says the initial offer must

19  somehow be a precise set of RAND terms.  Nobody knows what

20  RAND is going in, in a particular case.

21    THE COURT:  Well, here is what is troubling me,

22  Mr. Jenner.  I'm looking at the ITU what I think is

23  Exhibit 4, Document 79.  The operative language signed by a

24  representative of General Instrument Corporation, looks like

25  a Mr. Bawel, B-A-W-E-L.  He checks the box that says, "The

1  Patent Holder will grant a license," then the language

2  continues.  "Will grant."  In that context, it's mandatory.

3  It says, "You will grant."

4      Then I look at the IEEE, the same Letter of Assurance, or

5  same form Letter of Assurance signed in this case by

6  Mr. Meyer, and it says, "The Patent Holder is prepared to

7  grant a license."  Now, you make a big, big thing out of the

8  difference in the language here.  And now when it serves both

9  sides, they kind of sweep that whole argument away and say,

10  this is what it means.  And that's what's troubling me, the

11  language changes.

12          MR. JENNER:  Your Honor, I submit to you that the

13  important aspect of the language doesn't differ.  Because I

14  think all of these formulations say that the patent owner is

15  prepared to or will grant a license.  The patent owner will

16  grant a license to applicants who request a license and

17  negotiate in good faith.  And there is an intention to do

18  this.  That doesn't mean, as we see here, that the parties

19  are going to be able to get through negotiations.

20      You can have good-faith negotiations by parties on both

21  sides and not get there.  Just as a matter of logic, these

22  things are so complicated, it is quite possible for each

23  party to get hung up on the other end of various terms and

24  simply not be able to figure out where the middle is.

25      So the fact that you agree to negotiate in good faith does

 1  not guarantee that you can get to a license.  And these

 2  organizations acknowledge that.  They don't tell you what the

 3  terms should be.  They don't tell you what any of the terms

 4  are.  They don't tell you how to negotiate an agreement.

 5  Totally ambiguous on that.  They leave it silent.  They just

 6  say it's left to the parties to figure out how to do it.

 7      So, there's no formulation anywhere in the world on what a

 8  RAND license is in a particular circumstance or how to get

 9  there.  And the only way that anybody has been able to try to

10  steer you there is to say, "We want you to negotiate -- we

11  want you to agree to negotiate in good faith.  We want you to

12  negotiate towards granting a license on RAND terms."  Then

13  it's left to the parties to do that.

14      The parties ordinarily are able to do that.  The parties

15  ordinarily negotiate.  The parties here, at least prior to

16  the filing of the complaint, did not negotiate.  And I hasten

17  to say to you in my footnote, in fact, there have been

18  further negotiations.

19          THE COURT:  Counsel, the good faith argument doesn't

20  get very far with me, because I'm troubled by the fact that

21  Microsoft's position in this litigation is, your initial

22  offer -- not you personally -- but Motorola's initial offer

23  was not in good faith.  And, judge, on that basis you should

24  find they breached the contract.

25      You say, their rejection of your offer was not in good

1  faith in their decision to pursue a court resolution.  And,

2  you know, they have obligation of good faith, and therefore

3  they've, in effect, repudiated the contract.

4     It strikes me that I'm back to my dilemma.  It is nearly

5  impossible for me to evaluate either of those until I know

6  what RAND terms are.  And I'm not going to know what RAND

7  terms are until November 19th when you start your trial.

8         MR. JENNER:  That's a problem.  It is a fundamental

9  flaw that everybody acknowledges in the SSO policies and

10  procedures.  It's what led some people, and we've alluded to

11  this in the past, it's what's led some people to say that

12  these are nothing more than agreements to agree, that don't

13  mean anything, because they've got no substance to them, that

14  tell you anything about what it is you're agreeing on.

15  That's the problem with these policies.  And as a result of

16  that, no other adjudicator has ever adjudicated what RAND is,

17  or RAND should be, from one of these 80-page agreements.

18         THE COURT:  Well, let me stop you there.  And I

19  apologize, because I'm using up your time here still.  It

20  strikes me that we have been unable to find a legal authority

21  for the proposition that a failure to agree on RAND terms

22  then goes to a court, and the court sets up RAND terms.

23  Mostly because every time that nightmare scenario has arisen,

24  the parties have retreated to being reasonable.

25         MR. JENNER:  Right.

1          THE COURT:  And entered into, many times, some

2    industry-wide resolution of this.

3      However, there is abundant case law, Black Letter

4    authority for the proposition that the parties can have a

5    contract and the court can impose terms which are not

6    determined in the contract.  Do you disagree that that's the

7    status of the law?

8          MR. JENNER:  I think I've seen one case, maybe, where

9    a court declined to enforce an obligation to negotiate in

10   good faith, went on to say what a substitute damages remedy

11   might look like, and said, I can deal with that by figuring

12   out what the parties would have agreed to.  Of course, the

13   court never went on to do it.  I don't know of any other case

14   -- well, there was the earlier RIM litigation in Texas, where

15   the court on a motion to dismiss reserved the ability to do

16   this, but never went forward and did anything or said how to

17   do anything.

18     I don't know of any court that's ever said how you would

19   go about trying to do this.  I know of one agency that tried

20   to do it.  And after a year or two's worth of proceedings and

21   a multi-hundred page report, it was vacated by the district

22   judge.

23     I don't know of anyone who has ever said anything more

24   than courts have various powers to do various things.  Nobody

25   has ever suggested how to do this, much less done it.  Ever.

 1          THE COURT:  Okay.  And I'm going to put words in your

 2   mouth now.  You're agreeing that you don't know a court

 3   that's done it in this context.  But you don't disagree that

 4   that's a fairly common procedure in courts supplying missing

 5   terms in contracts.

 6          MR. JENNER:  In relatively simple -- yes, in

 7   certainly non-standard settings, in ordinary garden-variety

 8   non-patent contract cases, courts are asked to look at

 9   disagreements between the parties about whether or not a

10   contract has been made, so as to enforce the contract.  And

11   they specify missing terms if they can determine the intent

12   of the parties.  I think that's light years away from what

13   we've got here.

14          THE COURT:  Because I don't want you to run out of

15   time here, another issue that's troublesome to us is both

16   sides interchangeably drop in the bylaws periodically when

17   they help their particular position.  What is the

18   relationship of the bylaws to the Letters of Assurance?

19          MR. JENNER:  Your Honor, I submit that -- if I could

20   help myself here a little bit -- the bylaws are incorporated

21   by reference.  And there's even a Washington case that tends

22   to support that.  If you look at slide 12.

23          THE COURT:  Well, let's take the Letter of Assurance

24   in the IEEE.  It has some language that says, "In accordance

25   with clause 6 of the IEEE standards review bylaws."

1           MR. JENNER:  That's the patent policy.

2           THE COURT:  Should I assume that those are then

3   incorporated into the Letters of Assurance?

4           MR. JENNER:  Absolutely.  If you look at the footnote

5   at the bottom of slide 12 there's a Washington court case

6   that construed the term "in accordance with" to result in

7   incorporation by reference of the reference document.  We

8   believe and we submit, and consistent with this case, that

9   the patent policies are, indeed, incorporated with --

10  incorporated by the Letters of Assurance.

11          THE COURT:  All right.

12          MR. JENNER:  And you consider them together.

13          THE COURT:  Thank you.

14          MR. JENNER:  Your Honor, I'm never going to get

15  through all of this.  Let me just hit some highlights.

16          THE COURT:  Please do.

17          MR. JENNER:  We've made a number of references to the

18  understanding of people in the industry, notably Microsoft,

19  I'd like to just stop briefly on slide 19, where there are

20  several statements that have been made by Microsoft which

21  demonstrate that before they had litigation motives they

22  repeatedly recognized the obligation to negotiate in good

23  faith.  That includes the redacted second item.

24      Similarly, on slide 20, there are three additional

25  statements made by Microsoft that explain that the RAND

 1   framework is a framework to allow people to negotiate.  And

 2   that's what you have to get to, is to negotiate.  It's a

 3   mistake to focus unduly on an opening offer, especially where

 4   it's consistent with what Motorola has ever done.  I've posed

 5   the question, Your Honor, in terms of thinking of a starting

 6   point, which would not be just a giveaway, what more logical

 7   place would there be to start than where you did it in the

 8   past.

 9       Surely Motorola can come in and say, we'll come up with

10   some low-ball offer and just give Microsoft what they want,

11   bid against ourselves.  I'm sure Microsoft would be happy to

12   have that.  We'll give you everything you want for a penny a

13   pop.  That's not rational.  No licensor is going to do that.

14   The rational starting place has to be where you did it

15   before.  And other people negotiated with you.  They arrived

16   at licenses.  That shows that it's reasonable.

17       The argument that Microsoft ultimately makes as the

18   supervening argument, is when you run the numbers the way

19   they ran the numbers, you come up with $4 billion.  And

20   that's got to be unreasonable.  First of all, put aside the

21   fact that Microsoft is a very big company, so that any

22   royalty rate you apply to their products is going to look a

23   lot larger than anybody else.  But get into the context of

24   negotiations, and what is going to happen here is Microsoft

25   is going to say, okay, that's your "ask," here's what I don't

 1   like about your "ask," including the fact that it's large.

 2   Here is my "ask."  I've got a lot of patents I want back from

 3   you, I want so much money for phones, I want so much money

 4   for set-top boxes.  I would say to Your Honor, even though

 5   this is not what is going to happen, when you have a

 6   fully-formed negotiated contract, you could have as much as

 7   $4 billion going one way, and $3.96 billion going the other

 8   way, so that the net is a cross license with not much money

 9   following at all.

10       So, if you were to ask me the question, I'll put it with

11   apologies in the court's mouth, is this an offer that

12   Microsoft could have accepted?  Because that came up in the

13   ITC.  The answer is, there was no offer that could be

14   accepted, because the letters of October 2010 were not

15   offers.  Fully-formed license agreements with all the terms

16   negotiated might or might not have had this kind of a

17   2.25 percent royalty.  Maybe yes, maybe no.  But in the

18   context of a fully-formed offer, sure it could have been

19   accepted.  Now, I would like --

20           THE COURT:  At the risk -- it is the philosophy of

21   this court that we're here to resolve disputes.  But I think

22   for the fourth time today I've heard you say, if they would

23   just talk.  And you've also said, outside the four corners of

24   the docket those discussions are underway.  Are you

25   implicitly asking me to order you to go somewhere, or are you

```
1   doing that on your own?

2         MR. JENNER:  I wouldn't put it in terms of an order.

3   I think Your Honor can recognize, if you don't grant our

4   repudiation motion, which would end the whole thing for now,

5   but Your Honor could simply recognize that there's a duty to

6   negotiate in good faith, and advise the parties, for example,

7   that if we don't have a result based on good faith by

8   negotiations by November 26th, that I'm --

9         THE COURT:  19th.

10        MR. JENNER:  The 19th?  November 19th.

11        THE COURT:  It moved to the 19th.  We wanted you to

12  have Thanksgiving in Seattle.

13        MR. JENNER:  We appreciate that.  If it's like it is

14  today, we'll stay for weeks.

15        Your Honor, you could say, I'm going to do whatever it is,

16  I the court, figure out that I need to do, if you the parties

17  don't do it first.  And by the way, maybe one of the things

18  that I will look at is how you negotiated to see whether I

19  think somebody didn't negotiate in good faith, because that

20  could lead to results, too.

21        But basically what you could say if you choose to do it is

22  you've got whatever the time is, six months, eight months to

23  continue to process this.  And if you succeed, God bless you.

24  If you don't succeed, I the court, am going to figure out

25  exactly what it is I think I should be deciding, have the
```

1  authority to decide, and then you're all going to be sorry

2  because I'm going to do what I think is right.

3      THE COURT:  To open the door to the skeleton in that

4  closet is you all have asked for a jury.  I'm just going to

5  sit up here and watch six good citizens of the Pacific

6  Northwest decide what the royalty is.  So, if you don't want

7  that to happen, you want to start discussing that question,

8  because that's where you're headed right now.

9      MR. JENNER:  Your Honor, let me take you quickly to

10  slide 48.  Because I anticipate Microsoft feels that they got

11  some good things out of Judge Shaw and the ITC.  And I don't

12  want you to think that we agree necessarily with that.  I've

13  quoted three of the judge's conclusions from pages 300 to 303

14  where the judge focused on RAND.

15      THE COURT:  Before do you that, Judge Shaw is an

16  administrative law judge?

17      MR. JENNER:  Yes.

18      THE COURT:  And there's an appeal process?

19      MR. JENNER:  There's a petition for review by the

20  full commission.  The petitions are actually getting filed

21  today.  I think they are getting filed today.  That will

22  result in a determination by the commission of what it wishes

23  to review, probably further briefing.  And they will issue a

24  final determination sometime in late August.

25      THE COURT:  So, would it be correct to characterize

1   Judge Shaw's comments, then, as informed opinion but not

2   legally binding precedent?

3            MR. JENNER:  Certainly not res judicata.  Nothing

4   that you are bound to follow.  You can take it for what it's

5   worth because it's not a final determination.  In fact, it's

6   called an initial determination.

7            THE COURT:  I just wanted to make sure I understood

8   that.

9            MR. JENNER:  So the first thing he said, quoted on

10  slide 48, is that the offer, "Could not possibly have been

11  accepted by Microsoft."  And I think I've spoken to that a

12  little bit.  Nobody contends that anybody would simply accept

13  what was in the October 20th letter.  It was not a

14  fully-formed offer that could be accepted.  And again it

15  requires negotiation.  Providing a rate was not providing a

16  complete offer.  There was nothing to accept.  The terms had

17  to be acknowledged.

18       And very significantly, the last bullet on that page, Your

19  Honor, that I call your attention to was Judge Shaw's

20  conclusions.  He says on page 302, "Motorola's offers may not

21  be the same as the terms that might eventually be contained

22  in a RAND license."  To the extent that what Judge Shaw says

23  you find persuasive, he's actually answered from his

24  perspective the first part of Microsoft's motion by saying,

25  it doesn't have to be a RAND offer, it needs to get to RAND

1    terms.

2        And I end with that statement by Judge Posner, "If you

3    think it's too high, just tell them they're charging too

4    much."

5        The second slide, 49, Judge Shaw said, "The offers made to

6    Microsoft show that although Motorola assured the standards

7    organizations and the public that it would provide reasonable

8    non-discriminatory licenses, those communications were

9    misleading."  That sounds bad.  It's in the context of

10   deciding legal estoppel.  Estoppel requires a determination

11   of whether the statements to the SSOs were misleading when

12   made.  We're not talking October 2010.  We're talking the

13   original Letters of Assurance.  Those were made over a period

14   of 15 years.  And what we do know that happened in those

15   15 years is that Motorola has signed dozens of agreements

16   with licensees, none of them contend the agreement was not

17   RAND.

18       So, given that Judge Shaw found the opening offer doesn't

19   have to be RAND, and that Motorola has repeatedly negotiated

20   RAND licenses, how could the Letters of Assurance have been

21   misleading when they were made?  I submit the judge did not

22   have an evidentiary basis to say that.  Just the fact that

23   there's an unresolved dispute with Microsoft doesn't make the

24   Letters of Assurance themselves misleading.

25       And finally on slide 50, Judge Shaw said, "The evidence

1    supports Microsoft's conclusion that Motorola was not

2    interested in good-faith negotiations in extending a RAND

3    license to it."

4         Well, the evidence here is quite different and includes

5    things Judge Shaw didn't have.  The evidence here includes

6    Mr. Taylor's deposition where he explained, at length, how

7    Motorola intended and expected to have negotiations with

8    Microsoft.  And Microsoft's Gutierrez testified, far from

9    saying, we didn't think they had any interest in negotiating,

10   he testified he had no idea what Motorola would do if

11   Microsoft countered, he simply turned it over to the

12   litigators, and the litigators proceeded with what they

13   characterized as "litigation tactics."

14        So, there's no support in this case for Judge Shaw's

15   belief that Motorola had no intention to negotiate in good

16   faith.  And all the slides between 20 and 50 that I haven't

17   had a chance to show you, but they're in our briefs, lay out

18   all the factual basis on which negotiations have always

19   proceeded, terms have always been arrived at, cross licenses

20   have been agreed to, caps have been put in place for parties

21   like Microsoft that think they're going to have to pay too

22   much, termination and term clauses have been determined.

23   Some cases -- some licenses have different rates in different

24   countries, which is something else you may have to think

25   about some day.  All of these different things wind up in

 1   these 80-page agreements.  And that's why you have to do it,

 2   and everybody always does it, the way that Motorola submits

 3   was required here.

 4          THE COURT:  We got started about ten after nine, so

 5   you technically have about two minutes left.

 6          MR. JENNER:  That's kind of why I'm into my windup.

 7          THE COURT:  Well, tell me what happened in Germany.

 8   I will tell you, we have not had the opportunity to analyze

 9   that in the care that I would like.

10          MR. JENNER:  I will tell you in brief.  It may be

11   that Mr. Taylor, who had been there, can elaborate.  But

12   basically in Germany, as everybody expected, the German court

13   came down with a decision in which it concluded that

14   Microsoft had infringed Motorola H.264 patent.  Two patents,

15   sorry, two patents.  And the court found Microsoft had not

16   complied with the German Orange Book, that its offer of one

17   cent and two cents per unit, it was not unreasonable for

18   Motorola to reject that offer.

19      So as the matter sits right now, were it not for your TRO

20   which of course I'd love to ask you to vacate, but were it

21   not for Your Honor's TRO, there would be the normal pressures

22   of an adjudicated court decision that would be giving impetus

23   from the bottom to Microsoft to up it's offer, just as

24   Motorola has impetuses in Germany to bring down an offer.

25   There would be offers made of additional rates.  That isn't

1   going to happen, because everything in Germany is now on dead

2   hold because of the preliminary injunction.

3          THE COURT:  Help me with one aspect of this, because

4   I want to make sure I have the chronology right.  Microsoft

5   files the pending lawsuit, and eight months later you file an

6   action in Germany.  Is that basically the chronology?

7          MR. JENNER:  Roughly, right.  Eight months, yeah.

8   I'd say so.

9          THE COURT:  I mean, didn't you put yourself in the

10  crosshairs of inconsistent rulings?  I mean, it sounds to me

11  like you were attempting to manufacture, for negotiating

12  leverage, which is an honorable trait, the potential of a

13  conflicting resolution of this.

14         MR. JENNER:  Let me not be cute in answer to that.

15  Number one, we were certainly looking for additional ways to

16  defend ourself.  Don't forget, they started this.  We didn't

17  start this.  They filed the initial lawsuits on October 1st.

18         THE COURT:  Spare me that argument.  There's already

19  way too much --

20         MR. JENNER:  Okay.  Just so you don't think that we

21  were out there in the woods with rifles, the remedies in

22  Germany are certainly additional remedies that can be brought

23  to bear in order to try to get this to a resolution.  They're

24  not inconsistent results.  If you litigate the U.S.

25  counterparts of those two German patents, you could find the

1    U.S. counterparts invalid not infringed, at the same time

2    they're found valid and infringed, because they're different

3    instruments being interpreted differently in two different

4    legal systems.

5              THE COURT:  All right.

6              MR. JENNER:  So, it's not circumventing this court.

7    And I have to tell you, Your Honor, we filed that German

8    action before they ever actually asked Your Honor to make a

9    rate determination.  They did not do that in the complaint.

10   They didn't do it until September, two months after we filed

11   in Germany.  We did not jump the gun.

12             THE COURT:  Why don't you take one minute further and

13   then we'll take our morning break.

14             MR. JENNER:  All right, Your Honor.  I will eschew

15   any further slides.  I appreciate that there are some aspects

16   of these agreements, which to use my anticipated word, are a

17   little opaque.  But the fact of the matter is all of these

18   agreements, properly interpreted, require that Microsoft have

19   been an applicant and have negotiated in good faith with

20   Motorola.  There's nothing to their argument that we usurped

21   their ability to be an applicant by sending the letters

22   first.  All they had to do is respond and they're an

23   applicant.  So that's silly.  They needed to respond to the

24   letter to engage and negotiate.  They didn't do that.  That's

25   all over the LOAs and the patent policies.  You really ought

1    to end this inquiry by saying, if the words of the contract

2    mean what they say, and we enforce the words of the contract

3    for what say, there was repudiation because they did not

4    fulfill either of the conditions precedent in order to come

5    in and get the RAND license.

6        If you don't go there, then the fact of the matter is,

7    number one, there is no rational requirement to make a RAND

8    offer.  Nobody has any idea what a RAND offer is in any

9    particular case.  Judge Shaw found that, for the sake that it

10   is of interest to Your Honor.  You need to come in with

11   something that's reasonable.

12       I know Microsoft now loves "blatantly unreasonable."

13   Well, the counterpart of that is "reasonable."  And once you

14   get rid of the patent pools they love to run to, which have a

15   completely different purpose, and one of their own people

16   admitted it is a non-revenue generating purpose, it has

17   nothing to do with bilateral association, the only reasonable

18   starting point is where Motorola started.  The 2.25 percent

19   of end products that it has offered everybody for 15 years,

20   in which everybody prior to this has come in and engaged.

21   There have been a couple of litigations.  One of them got

22   settled, because they engaged.  There is another one going on

23   with Apple.  We'll see what happens with that one.  Everybody

24   over 15 years have engaged.  They've negotiated.  And it has

25   resulted in the RAND license, that's required, not the RAND

1    offer.

2        If Your Honor were to find that a RAND offer is required,

3    I therefore submit to Your Honor that Motorola's offer was

4    consistent with RAND.  It was as consistent as it could be,

5    without Motorola knowing what all the impacts are on

6    Microsoft, that it can only learn in negotiation.

7        The thing that is being eliminated from this process by

8    Microsoft that I urge Your Honor to put back into this, is

9    commercial reality in the commercial real world.  People

10   negotiate, whether you're buying a car, whether you're buying

11   a house, whether you want an 802.11 patent portfolio.  People

12   negotiate.  They have to engage.  They've got to talk to each

13   other.  The standards organizations know it.  They tell you

14   that.  They don't have anything to do with it.  They don't

15   tell you how to go about it.  The parties have to engage to

16   do it, and Microsoft simply refused to go there.

17       So if there's an opportunity for that to happen, that

18   would be great.  But we submit there's been repudiation.  If

19   there hasn't been, Motorola sure hasn't breached any

20   contract.  It has acted in good faith and it stood ready to

21   engage with a company that would not engage back.

22            THE COURT:  All right.  We will be in recess for ten

23   minutes.  I'll be back out at 10:25 and we'll hear from

24   Microsoft.

25                 (Court recessed.)

1        THE COURT:  Mr. Harrigan, who is carrying the flag on

2  your side?

3        MR. HARRIGAN:  That will be me, Your Honor.

4        THE COURT:  All right.

5        MR. HARRIGAN:  Your Honor, I'd like to pick up on

6  some of the questions the court was asking a few minutes ago

7  initially, even though it's out of sequence.  But I think

8  Mr. Jenner was out of sequence, too.  So I think that seems

9  to be the order of the day, which is good.

10     One point the court made was that under the RAND system

11  Microsoft has a license that is essentially subject to

12  arriving at the terms, or alternatively the court said at

13  least Microsoft has a right to a license under that contract

14  subject to arriving at the terms.  We concur with that and we

15  believe that that is why here, in order to avoid having that

16  contract be illusory, if necessary the court has to figure

17  out what the terms are.

18     And I would refer the court to the authority that's

19  probably getting a little worn in this case, but there is a

20  case at least that says that the court can do that.  In fact,

21  Motorola argued that the court could do that in the *RIM* case.

22  That's *RIM v. Motorola*, 644 F.Sup., Texas 2008.

23     "Motorola's second argument in support of dismissing the

24  contract claim is that RIM has not suffered any damages,

25  contending that even if it has breached eventually RIM will

1    receive a FRAND license.  Either this court will determine

2    FRAND terms, or the parties will settle on FRAND terms.

3    Either way Motorola contends RIM will incur no injuries."

4         So that's pretty good authority, from Motorola, that the

5    court can, in fact, determine what the RAND terms are.  And

6    we agree with the court's characterization of the general

7    contract principle that once it's determined that the parties

8    have a binding agreement, if the agreement doesn't provide

9    specifically, with respect to certain terms, and especially

10   where the agreement provides a standard, which in this case

11   is commercially reasonableness, it's quite common for the

12   courts to supply the terms in order to carry out the parties'

13   intent of having a binding agreement.  The court has already

14   ruled there's a binding agreement here and that Microsoft is

15   a third-party beneficiary of it.  And so those cases seem to

16   apply here, as they were apparently thought to apply by

17   Motorola in the *RIM* case.

18            THE COURT:  Let me stop you there.  My friend,

19   Mr. Jenner, was struggling with the fact that it's not a

20   license that Microsoft holds, it's the right to a license.

21   And that that right to a license becomes a license when the

22   terms are agreed to -- putting words in his mouth.  What

23   difference does that make in my analysis of this case?

24            MR. HARRIGAN:  Your Honor, I'm not sure that it makes

25   any difference under the facts of this case, because under

1    the facts of this case Microsoft has unequivocally stated

2    that it will take the license on RAND terms.  And if the

3    court has to determine them, it will take them on those

4    terms.  So the offer has been accepted, regardless of whether

5    you characterize it as Microsoft already having a license, or

6    Microsoft having a right to a license.  Once Microsoft says,

7    "and we'll take it," there's no longer an issue with regard

8    to the obligation or the, frankly, existence of the license.

9    The license exists, it's just a matter of having the court,

10    if necessary, decide what the terms are.

11        THE COURT:  Both sides, in their briefing, make that

12    statement that Microsoft has unambiguously stated that it

13    will take a license.  Where is that in the record?

14        MR. HARRIGAN:  Your Honor, we've handed up a notebook

15    to you, and I'm going to be referring to it periodically.

16    And in tab 3 we have a list of the many statements by

17    Microsoft to this effect, starting with the complaint, which

18    is less than crystal clear.  But as of September 30, 2011,

19    "Microsoft is seeking and remains ready and willing to take a

20    license."

21        And then more recently -- there are numerous statements

22    along those lines -- but in the preliminary injunction motion

23    March 28, 2012, this is over on the second page at the top,

24    "A license that Microsoft is eager to obtain.  A ruling that

25    Motorola is contractually bound to grant a RAND license,

 1   coupled with Microsoft's express commitment to accept the
 2   RAND license, necessarily means that Motorola cannot seek to
 3   enjoin," et cetera.  And there are a number of other
 4   statements in the intervening period.  So that statement is
 5   unequivocal, and if it needs to be any more unequivocal I'll
 6   make it more unequivocal.
 7            THE COURT:  Well, I guess what I'm finding
 8   interesting is -- I mean, your evolving litigation position
 9   seems to be now that you're unequivocally going to take the
10   license.  You also have a motion that they breached the
11   contract, and that would be the contract between Motorola and
12   the IEEE, for one of the two licensing bodies.  If they
13   breached that contract, then that contract doesn't exist.  So
14   how can you take a license under a contract that doesn't
15   exist?
16            MR. HARRIGAN:  Well, Your Honor, I don't think their
17   breach destroys the contract, it just creates a claim for
18   whatever damages flow from the breach.
19        That isn't something that we've spent a lot of time
20   figuring out, because as far as we're concerned what this
21   case is now primarily about is getting the RAND license
22   defined, because that's how it's going to end.  And whether
23   Microsoft has any current or past damages arising from the
24   breach is not the main issue.  But I'm not saying there
25   aren't any.  It could be that all the legal fees expended in

1   Germany and the ITC would be part of that.  But that's a

2   separate issue.  And obviously a party can sue for damages

3   and still get the benefit of the contract, because otherwise

4   then their damages are even worse.

5            THE COURT:  All right.

6            MR. HARRIGAN:  So a second point, Your Honor, relates

7   to the language of the standards which, you know, I think

8   it's clear that it would be an enormously complex task to

9   figure out what the standards said on different subjects at

10  different times.

11       But at tab 2, here's what we have done, hoping that it

12  might be of some use.  We have taken the excerpts from the

13  two standards that each party has quoted.  The ones with

14  yellow highlighting, the yellow highlighting is where

15  Motorola likes it, and the underlining is where Microsoft

16  likes it.  So the parts that were quoted in the briefs by the

17  two parties are distinguished in that way.  And the court

18  noted a few minutes ago the mandatory language from the ITU

19  standard, "will grant a license," and contrasted it with the

20  IEEE language that the court referred to is, "Prepared to

21  grant."

22       The first section of this is the IEEE.  And I would just

23  like to call the court's attention to a few items that help

24  to clarify what the IEEE thinks the rule -- the requirement

25  is, and it's really very parallel to the ITU language.

1          The court noted the statement in the middle of the page,

2    "Is prepared to grant."  That was in 2005.  In 2006 it was

3    changed to, "The Patent Holder will grant a license under

4    reasonable terms."  In 1994 when Motorola submitted an early

5    LOA it said that it, "Agrees to license these patents on a

6    non-discriminatory basis offering fair and commercially

7    reasonable terms," which I think sheds some light on whether

8    the offer is supposed to be RAND, or if it's something that

9    is not RAND, then you bargain toward RAND, because that would

10   not be offering fair and commercially reasonable terms.

11         By the way, in answer to the court's question about the

12   bylaws, we concur with Mr. Jenner's characterization of the

13   situation regarding the bylaws.

14         On the next page, in 2005 the IEEE bylaws said that there

15   has to be a statement that a license will be made available

16   without compensation, or under reasonable rates.  And another

17   point worth noting, Your Honor, is that the commitment as

18   we've highlighted here is irrevocable.  And that runs through

19   these standards, which I believe relates to the question of,

20   you know, can you accept this?  It's an irrevocable

21   commitment.  Do you call it a license or an offer?  The

22   obligation to provide a RAND rate is irrevocable.  And I'm

23   not going to read the rest of it.  But whatever use it is,

24   Your Honor, we've got a collection there of the various

25   phrases used throughout the period, which we think the gist

 1    of all of them is that the Patent Holder is committing to

 2    offer and make a license available on RAND terms.  And there

 3    is no exception for the first offer.

 4         THE COURT:  Is Microsoft in agreement with the

 5    position taken in this matter that all of the patents that

 6    are before the court are standard essential patents, and

 7    therefore the fact that I do not have any definitive chart

 8    listing those patents should not be a concern to me?

 9         MR. HARRIGAN:  Your Honor, if I understand what

10    you're asking, I think the answer is, yes.  All of the

11    patents that are before the court on this breach claim are

12    the ones that are attached to the two letters.  And whether

13    they're standard essential patents or not -- and I take it

14    from Mr. Jenner's comment that he thinks there was one where

15    Motorola didn't submit an LOA, but it was still a standard

16    essential patent, the letters state that they are providing a

17    RAND rate for all of them.  So we believe that they are --

18    even if there are some in there that are not standards

19    essential, and I can't tell you for sure whether that's the

20    case, Motorola was representing in the letter that it was

21    providing a RAND rate for every patent that's attached to

22    either of those two letters.  And, therefore, for purposes of

23    this case we believe that they are all included within the

24    RAND obligation.

25         Now, I'd like to address the comment by Mr. Jenner, a

 1   number of times, that the offers or the letters, or demands

 2   for offers, were just a starting point.  And the royalty

 3   might very well have gone much below 2.25 percent.  This is

 4   contradicted by Motorola's own briefing and by statements in

 5   its declarations that it always gets 2.25 percent at the end

 6   of the day.  The only question is how do they get there?  If

 7   they get some technology coming back the other way, then they

 8   value it in a certain way, then perhaps the royalty rate goes

 9   down, but they're still getting 2.25 percent.

10       In other words, this was a "take it or leave it."  Maybe

11   you get to talk about how you're going to pay the

12   2.25 percent.  But Motorola's response to our summary

13   judgment motion at page 6 says, "Because each licensing

14   situation is unique, negotiated license terms often reflect

15   the 2.25 percent overall value in different ways."  For

16   example, three, a grant-back of license rates.  So the

17   grant-back -- and this is according to Motorola's revisionist

18   version of its own letter, because in fact the letter says,

19   you pay us 2.25 percent, and you grant us back your

20   technology.  And there's no indication that the 2.25 percent

21   is coming down for that reason.  That was the demand in the

22   letter, which I'll get to in a minute.

23       But the fact is in their own brief Motorola says, we're

24   sticking to 2.25 percent, no matter what, the only question

25   is how are we going to get there.

 1      So the suggestion the court made that, tell us whether you

 2   accept within 20 days, sounds like an ultimatum, is

 3   consistent with the fact that Motorola wasn't going to back

 4   off its 2.25 percent, no matter what counteroffers Microsoft

 5   made.

 6           THE COURT:  How do you know that?

 7           MR. HARRIGAN:  Because they say so, in their brief.

 8   They say they always get 2.25 percent.

 9           THE COURT:  You didn't know that at the time.

10           MR. HARRIGAN:  Well, what Microsoft knew at the time,

11   Your Honor, was the demand was 2.25 percent for the standard

12   essential patents on the price of a laptop, among other

13   things -- which is kind of important, which I'll also get to

14   in a second -- and you give us your standard essential

15   patents also.  That was what Microsoft knew.

16      And what Microsoft didn't know, I presume they didn't know

17   this, was that Motorola was never backing off the

18   2.25 percent.  But what matters for this case is, was the

19   letter a breach?  Because the breach has to be measured based

20   upon what Motorola was saying when it said it, not what it

21   says now about what it really meant.

22           THE COURT:  Well, this takes me to one of my favorite

23   aspects of this case, which is how am I going to determine if

24   it was unreasonable until I know what RAND terms are?  And

25   I'm not going to know what RAND terms are until November 26th

1    when the jury comes back.

2         MR. HARRIGAN:  Well, Your Honor, I think that -- if

3    we take the example of the laptop, I believe that as a matter

4    of law it's unreasonable.  And that's apart from some of the

5    other evidence with regard to the total amount of royalties

6    and how they relate to essentially being 20 percent of

7    Microsoft's annual profits for a tiny little piece of the

8    operating system.

9         The fact is that Motorola's technology that contributes to

10   the operating system is a tiny little part of Microsoft's

11   operating system.  And as a matter of law, the only way that

12   Motorola could get a percentage of the price of the operating

13   system, would be to demonstrate that its little contribution

14   to that operating system is the basis for customer demand for

15   the operating system.  But it's not asking for a percentage

16   of the operating system, it's asking for a percentage of the

17   laptop price.

18        There is no way that Motorola's standards essential

19   patents on this, for the operating system, are on the basis

20   of customer demand for it, much less the customer demand for

21   the laptop, which is the requirement under the entire Market

22   Value Rule, if you are going to get a royalty based on a

23   percent of the product price.  And under those cases the

24   burden is on the Patent Holder to demonstrate that its

25   technology is the basis of customer demand.

1      And failure to do that, there are a lot of *Daubert* motions

2  granted on the basis of excluding evidence using that royalty

3  approach, because as a matter of law first the Patent Holder

4  has to sustain the burden of showing that its technology is

5  the basis for customer demand.  There has been absolutely no

6  effort made by Motorola to even try to do that here.  And it

7  obviously can't, as to the laptop.

8      And so, Your Honor, on that basis we believe as a matter

9  of law, it is clear that at least with respect to the laptop,

10  which is kind of an important piece of this case, the demand

11  was unreasonable as a matter of law.  And the other thing is,

12  Your Honor, these letters don't invite anybody to negotiate

13  about individual products.  It lists the products that the

14  demand relates to very specifically.  And there's no

15  suggestion that you could have different rates for different

16  ones, or, oh, we'll talk about this, or whatever.  They're

17  listed there in each of the two letters.

18      So the court raised the question about valuing the

19  patents.  And, Your Honor, you cited to an article which we

20  believe, based on what you said about it, states the law

21  correctly, which is that you value the contribution of the

22  patented technology to the accused product.  And that's

23  really what I was just talking about.  That is a general

24  proposition for how you determine patent damages and how you

25  measure them.

1    In the case of asking for a percentage of the product, you

2  have to show that your technology is the basis of customer

3  demand, which is a version of this general proposition,

4  because that is how you measure the contribution of the

5  technology to the product.  And there is no way that that is

6  -- I won't repeat myself -- but that burden has not been met

7  here.  But the court's statement is correct with regard to

8  what the overall rule is.

9    And here, not only is Motorola using the laptop product of

10  which Microsoft's product is a piece, to charge the royalty,

11  which violates the general principle because it's not even

12  applying it to the right product, but in addition we have

13  cited -- and I'll get to it if I ever arrive at my outline --

14  we have cited statements by Motorola folks who came up with

15  these letters and determined what was going to be sought.

16    To the effect that in the case of the Xbox, what they were

17  valuing was the contribution of the standard to the Xbox.

18  They thought that the standard had high value to the Xbox,

19  which is exactly what you do not get to do in a RAND context.

20  That is the holdup value.  You don't get the value of the

21  standard.  You get the value -- you get the proportionate

22  contribution of your technology to the standard.  And that

23  has to then relate to its contribution to the product.  And,

24  in fact, Motorola's deposition testimony admits that what

25  they considered was the value of the standard.

 1          Would you take a look, please, at tab 4 in the notebook.

 2    I just want to call the court's attention to, in a little bit

 3    more context, what Judge Shaw said, which is at tab 4.   The

 4    first quote is the one that Mr. Jenner read that the royalty

 5    rate of 2.25 percent could not possibly have been accepted by

 6    Microsoft.  He then said, "Indeed there is no evidence that

 7    any company would agree to the offer that Motorola sent to

 8    Microsoft."  Then he said, and this is significant in that it

 9    shows how he was reading the RAND obligation, "The offers

10    made to Microsoft show that although Motorola assured the

11    SSOs and the public that it would provide reasonable and

12    non-discriminatory licenses for the patents essential to

13    certain standards, those communications were misleading."

14    ie: These letters show that the commitments had been

15    misleading.

16          And then finally, "The evidence supports Microsoft's

17    conclusion that Motorola was not interested in good-faith

18    negotiations and in extending a RAND license to it."

19          We concur that the court is not bound in any way by those

20    observations.  They're worth whatever the comments of an

21    independent third party about this situation are worth.

22          The court asked what happened in Germany.  And at tab 10

23    there is a quote from the -- one of the translations.  This

24    is Motorola's translation of the May 2nd order.  And I am

25    merely calling the court's attention to the fact that the

1   German court does not recognize third-party beneficiary

2   rights.  And there was a communication glitch here.  And

3   there is one other statement we wanted to call to the court's

4   attention from the German case, and that is, "In the opinion

5   of the court, this consideration may be restricted to the

6   question whether the offer constitutes a blatant violation of

7   antitrust law."

8       And what the court is talking about there is that

9   Microsoft had made its Orange Book offer, Motorola did not

10  accept it, and the question was, what is the significance of

11  that in terms of the failure to accept a reasonable proposed

12  royalty?  And the court's answer was that the criteria for

13  determining that is whether the failure to accept that Orange

14  Book offer was a blatant violation of antitrust law, not just

15  a violation of antitrust law.

16      So the court's determination that this case is going to go

17  forward with an injunction, in spite of Microsoft's Orange

18  Book offer, was predicated on the fact that by turning it

19  down Motorola was not committing a blatant violation of

20  antitrust law.  And that's the only determination of

21  reasonable royalties the court made or will make.  So that

22  case is clearly inconsistent with RAND.  And the fact that it

23  doesn't even recognize that Microsoft has contract right as a

24  third-party beneficiary, would suggest that the probability

25  of inconsistent outcomes and the motivation to do the end-run

1    are clear.

2         THE COURT:  Well, let's stop on that question.  It is

3    a standard feature of judicial training that we are taught to

4    avoid conflicting judicial declarations, for the reasons that

5    they leave the parties in precisely the predicament that

6    we're in right now.  How do I harmonize these two positions?

7    I mean, I was very careful not to enjoin the German legal

8    system and the German court.  On the other hand, Motorola at

9    this point has a lawful opinion in Germany.  How is it that

10   the court here can pretend like that doesn't exist without

11   depriving Motorola of its rights?

12        MR. HARRIGAN:  Well, Your Honor, the anti-suit case

13   law provides the answer.  And that is that this was an

14   end-run, it was an effort to create a situation where there

15   is a high likelihood of inconsistent outcomes, one in which

16   Motorola can get the leverage of an injunction that it would

17   not get under the jurisprudence in this country or in this

18   court.

19        And so it is a classic end-run around a court that was

20   first seized with jurisdiction of this matter, and is in the

21   process of determining whether Microsoft has a license --

22   actually determining simply what the terms are of the license

23   that Microsoft will get.  Because the stage is set, Microsoft

24   has committed to take a license, it has already been ruled by

25   the court that it has a right to such a license, and the

1 court can determine the terms.  So there is no basis for

2 getting an injunction in this case, which I guess we'll be

3 talking about in a few minutes.

4   But this is a classic anti-suit situation, and the

5 decisions -- the decision of the German court simply

6 underscores the fact that in addition to the reasons that we

7 advanced earlier, now the injunction is imminent, which is

8 the basis for -- which was the motivation for the motion.

9 And it's clearly demonstrated that the legal system in

10 Germany is more antithetical to the RAND scheme of things

11 than we even suggested in the motion.  We were hesitant to

12 say German law doesn't recognize third-party beneficiary

13 rights, but there seemed to be some confusion about it, but

14 there isn't any in the mind of the judge who made the

15 decision.

16   Your Honor, in the interests of time, I'm going to address

17 the -- let me make sure I don't have anything left here.  Oh,

18 I'm going to address the repudiation issue as briefly as I

19 can.  The original argument by Motorola was that when

20 Microsoft filed the lawsuit, it repudiated the contract.  And

21 the court seemed to look askance at that proposition.  And in

22 the current motion the ground has shifted and Motorola is now

23 arguing that there are -- arguing for two conditions

24 precedent that added together seem to amount to repudiation.

25 And so I will just address first the issue of conditions.

 1          The first condition is that Microsoft must negotiate.   In

 2    other words, Motorola's duty to make a RAND offer is subject

 3    to a condition precedent that Microsoft has to negotiate when

 4    it gets the offer.   And that just doesn't make any sense.   In

 5    terms of sequence, you can't have a condition precedent that

 6    doesn't even -- where the occasion for the condition doesn't

 7    even arise until after the other party has taken its action.

 8          The duty that Motorola has under the contract that it says

 9    Microsoft repudiated, obviously exists at the time that it

10    makes the offer.   And it can't be subject to a condition that

11    -- a precondition that can't happen until after the demand

12    was delivered.   And there is no --

13               THE COURT:   Let me stop you, because I'm not sure I

14    understand the legal underpinnings for this argument.   Do you

15    disagree with the statement of one of the witnesses here that

16    you need to look at the conduct of both the patent owner as

17    well as the implementer, they both need to be willing to

18    negotiate in good faith, and there is an obligation on both

19    parties' parts to negotiate in good faith?   Is that in

20    disagreement to Microsoft's position?

21               MR. HARRIGAN:   I think, Your Honor, that the RAND

22    contract does not contain any such duty.

23               THE COURT:   Well, that's your senior director of

24    intellectual property talking in this context.

25               MR. HARRIGAN:   Well, I think that the witness was

1  stating a belief with regard to how this should work.  I

2  don't believe the witness was attempting to render a legal

3  opinion on what the RAND contract requires.

4          THE COURT:  Well, his words speak for themselves.  It

5  seems to me you're ignoring the second half of that sentence.

6          MR. HARRIGAN:  No, Your Honor.

7          THE COURT:  You know, what good faith is there in

8  saying:  You know what?  We don't want to play in your

9  sandbox, we're going to go sue you.

10          MR. HARRIGAN:  Your Honor, first of all, that is

11  subject to the proposition that the first party has acted in

12  good faith to begin with.

13      But the court, if I can quote a higher authority on what

14  the contract means as opposed to how people should behave

15  themselves, has said, "Motorola has failed to provide any

16  legal authority that requires negotiation as a precondition

17  to a breach of contract claim based on RAND licensing

18  commitments."  Or, and another statement, "Motorola attempts

19  to insert a requirement that Microsoft negotiated the license

20  terms prior to filing suit for breach of contract.  The IEEE

21  and ITU guidelines provide no such requirement."  And if you

22  look through the tab where we put all of this in there, and

23  you look at all the ones with yellow on them, you will not

24  find a word that says that the recipient of a RAND demand has

25  a duty to negotiate.

1    The fact is that if the recipient of the RAND demand, as
2    Microsoft did, looks at this offer and says, no one in its
3    right mind can ever accept this, this is not RAND, they've
4    breached their agreement.  You have a right to file a lawsuit
5    to enforce the contract, that is exactly what we did.  It
6    wasn't a repudiation.
7            THE COURT:  Well, counsel, you know, I have two
8    questions about that.  First, you apparently had been, you
9    Microsoft, had been disregarding Motorola's patent rights for
10   18 months.  And then you accuse them of somehow improper
11   conduct when they write you an offer saying you have been
12   using our patents for 18 months, here are the terms for
13   licensing them.  Isn't that inequitable?
14           MR. HARRIGAN:  I think not, Your Honor.  And, in
15   fact, I'll quote Motorola on that point, from one of their
16   motions for summary judgment on this issue at page 5,
17   "Companies sometimes choose not to engage each other in
18   licensing discussions, despite the fact that each is getting
19   value from the other side's patented technology.  For years
20   that was the case with Motorola and Microsoft."
21       So companies, for whatever reason, think it might be
22   better to not bother with this, and we'll just proceed.  And
23   the whole point of the RAND scheme is that if someone does
24   decide that they want to collect something for the standards
25   essential technology, you can be comfortable that it's not

1  going to cost you any more than a reasonable amount to take

2  care of that problem.

3      And presumably if you're a company like Microsoft you're

4  going to get something in return for your own standards

5  essential patents.  And so it's all going to kind of come out

6  in the wash.  And therefore maybe it's not worth bothering

7  with.

8      What happened here, we believe, is that Motorola decided

9  to point a gun at Microsoft for various reasons, and it sent

10  them a letter that it had no intention of ever having

11  accepted, or didn't regard as being -- didn't actually regard

12  as being reasonable.

13      So it's completely outside the normal behavior of the

14  parties in this situation.

15          THE COURT:  You know, counsel, you both have filed so

16  much stuff under seal, I'm hesitant to try and sort through

17  it, because your knowledge of that is better than mine.  But

18  Motorola offered a compelling case that there had been prior

19  discussions, and negotiations, and business arrangements,

20  that had postponed this resolution.  Pointing a gun at your

21  head seems to me to be the worst of hyperbole.

22          MR. HARRIGAN:  The gun didn't get pointed until the

23  letters were delivered.  The letters were completely outside

24  the context of any of those discussions.  And, Your Honor, I

25  confess, I am not an expert in the content of those

1    discussions either.  But I don't think anybody has suggested

2    that they were about the list of patents that were attached

3    to those two letters.  They were about a variety of things.

4         THE COURT:  Well, let me take your argument to a

5    slightly more extreme position.  What I hear you saying is

6    that arrangements like the IEEE or the ITU, one side has a

7    good faith -- Patent Holder, has a good faith obligation to

8    propose a term.  And every one of those is going to imply the

9    question of, is it RAND, because we don't know until it's

10   ultimately resolved.

11        And then the implementer, as the language is used, is free

12   to immediately run to court and say, we don't like the terms,

13   court, you resolve them.  That doesn't seem to me to give

14   rise to a commercially reasonable context for these essential

15   patents use.

16        MR. HARRIGAN:  Well, Your Honor, if the predicate is

17   that a RAND offer was made, then running to court would not

18   be appropriate.  But you can run to court, as long as you

19   satisfy Rule 11, if you have a reasonable basis for believing

20   that you have a cause of action for breach of contract.  And

21   the RAND scheme does not denigrate that right, nor does a

22   lawsuit to enforce the contract constitute repudiation.

23        And I'll just mention one other thing about that lawsuit,

24   which is that Microsoft did not merely sue for breach of

25   contract.  Microsoft also asked for a decree that Microsoft

 1    is entitled to license from Motorola any and all patents, et

 2    cetera.  In other words, the declaratory judgment action.

 3            THE COURT:  Well, you were doing better when you were

 4    attempting to persuade the court that that wasn't the most

 5    precise use of language.  You need to take a long walk off a

 6    very short pier to get to the position that you're arguing

 7    here.  That complaint does not ask for a license, only by

 8    implication.

 9            MR. HARRIGAN:  Well, it asks for the court to rule

10    that Microsoft is entitled to a license.  And it asks for the

11    court to determine that there are binding and enforceable

12    contractual obligations.  Now, the court dismissed that

13    declaratory judgment action based on procedural grounds that

14    I'm not here to argue about.  The question is what did

15    Microsoft say in its pleading that would be a repudiation?

16    And what I'm saying is that Microsoft didn't just say, you

17    breached.  It also said, enforce this agreement.  Declare

18    that Microsoft is entitled to a license, and that there is a

19    binding and enforceable agreement, which is the opposite of

20    repudiation.  And under the repudiation standard, repudiation

21    will be found only where there is an unequivocal indication

22    that the repudiating party will not perform.  Asking to

23    enforce a contract can not possibly meet that standard.

24            THE COURT:  Well, wouldn't a less arrogant position

25    have been to say, Microsoft wishes to take a license under

 1  this.  Court, set the terms.

 2          MR. HARRIGAN:  Could have done that.  Did do that

 3  later.

 4          THE COURT:  The evolving litigation position.

 5          MR. HARRIGAN:  The evolving litigation position.  I

 6  think it's fair to say the position of Microsoft specifically

 7  asking the court to grant -- to see to it that it was granted

 8  a license and that it would take one, arose in September of

 9  2011.

10          THE COURT:  All right.  Please continue.

11          MR. HARRIGAN:  So, Your Honor, I think it might help

12  at this point to turn to the actual letters for a second,

13  which are --

14          MR. WION:  Tab 6.

15          MR. HARRIGAN:  These have the attachments and some

16  yellow highlighting on them.  I'd like to turn to the second

17  one in that tab, which is Exhibit 13, and just run down what

18  these letters actually say.  And, Your Honor, the breach

19  claim that we are making should be measured by the actual

20  terms of the letters, because that's when we believe the

21  breach took place, and should not be read in light of

22  subsequent revisionist history about what we really meant and

23  what we normally do.

24      The October 29th, Exhibit 14 letter, is for a worldwide

25  non-exclusive license for H.264.  Motorola represents in the

1   letter that this offer is RAND.  And that's highlighted.  It

2   includes a royalty, a reasonable royalty of 2.25 percent,

3   subject to a grant-back license under the H.264 patents of

4   Microsoft.  And that means you pay 2.25 percent, and we get a

5   grant-back license.  It does not mean you get 2.25 percent

6   and we'll talk about reducing this if you give us a

7   grant-back license.  The offer is made subject to the receipt

8   of a grant-back license.

9       The next sentence says that, "As per Motorola's standard

10  terms, the royalty is based on the price of the end product,

11  e.g., among other things, each PC/laptop, and not on

12  component software, e.g., Windows 7 software."  I've already

13  covered why we believe that is a breach.  It's very clear

14  that that is what's going on here.  And those are stated to

15  be Motorola's standard terms.  And their brief, which I

16  quoted from earlier, confirms that their standard term is

17  that they get 2.25 percent somehow.

18      So you can either -- what the letter actually says is we

19  get 2.25 percent, and we get the grant-back.  But even if you

20  buy the revisionist history, Motorola says, we always get

21  2.25 percent somehow, taking into account what we might get

22  back.

23      And finally, as the court already noted, "This offer is

24  open for 20 days.  Confirm whether Microsoft accepts it."  So

25  it is an ultimatum.  It contains terms that we believe are

 1    clearly not reasonable.  And, therefore, it is a breach, if

 2    the court determines that there is an obligation to make a

 3    RAND offer.  And I'm not going to go back through the

 4    highlighted standards.  The court has already read about them

 5    numerous times.  They're in the notebook.

 6       We have underlined a number of statements by each of the

 7    two organizations stating you either make it available, or

 8    you offer -- you either make RAND terms available or you

 9    offer RAND terms.  And those provisions cannot logically be

10    that, well, at some point down the road you will finally get

11    to making a RAND offer.  They state what the obligation is of

12    the Patent Holder with respect to an offer.  And they say you

13    will make a RAND offer, or you will make your technology

14    available on RAND terms.  It's not available on RAND terms if

15    your offer isn't RAND.  You're making it unavailable RAND

16    terms.

17            THE COURT:  Go back to diagraming the sentence in the

18    October 29th letter.  It says, "Including a reasonable

19    royalty of 2.25 percent per unit, subject to a grant-back

20    license."  It seems to me -- I don't know what that sentence

21    means.  Does that mean 2.25, less the value of the grant-back

22    license?  It doesn't say 2.25 and a grant-back license, which

23    is how you choose to read it.

24            MR. HARRIGAN:  Well, Your Honor, the way I would read

25    it is this:  We're starting out with the second word of the

 1   sentence.  "Motorola offers" -- offers to license.  So here's

 2   the offer:  "Offers to license on a non-discriminatory basis

 3   on reasonable terms and conditions, RAND, including a

 4   reasonable royalty of 2.25 percent, subject to a grant-back

 5   license."  So what's subject to the grant-back license is the

 6   offer.  This offer is subject to a grant-back license.  In

 7   other words, we are offering you 2.25 percent.  But the offer

 8   of 2.25 percent is subject to a grant-back license.  It

 9   doesn't say the 2.25 percent is modified by a grant-back

10   license.

11           THE COURT:  You know, there was a wonderful Latin

12   phrase that attaches to construction of these terms, which I

13   think in more dignified language than I would use says that

14   the subject relates to the clause before it, not modifying

15   the entire sentence.  Do you want to reconsider that, or are

16   you sticking to that position?

17           MR. HARRIGAN:  Well, Your Honor, I hate to be

18   stubborn, and it's been awhile since I diagrammed a sentence.

19   However, I think -- and I'll be short here -- I already am

20   short.  "Motorola offers to license."  Then we go to the

21   comma, and it says, "Including a reasonable royalty,"

22   et cetera, comma, "subject to a grant-back license."  I

23   believe with those two commas around that phrase, the

24   "subject to" is modifying the fact that Motorola offers, for

25   what it's worth.

1     So, why is this offer -- it is inherently unreasonable for

2  two main reasons:  One, I've already stated and I don't have

3  time to repeat it, and that is that there's -- but very

4  briefly -- there's been no demonstration particularly in the

5  case of the laptop, Motorola can sustain the burden under the

6  rule requiring that it show that it was the basis of customer

7  demand.

8     Secondly, and more intuitively obvious than the legal

9  analysis of patent courts, is what is the -- how is it

10  possible for a royalty based upon Motorola's contribution of

11  a small part of a standard, that is a small part of an

12  operating system, how is it consistent with the general

13  requirement of proportionality for the royalty on -- for that

14  to depend upon the price of a device, the laptop that the

15  operating system is a small part of, when the price of the

16  laptop varies depending on how big its screen is, whether

17  it's got a titanium case, what kind of a keyboard it has, how

18  fast it is, how much memory it has.  None of those things

19  have anything remotely to do with the contribution of

20  Motorola's technology.

21     So, apart from the intricacies of patent law, just as a

22  matter of common sense, it doesn't make any sense for the

23  royalty that Motorola gets to be increased by ten times

24  because somebody buys a $4,000 laptop, instead of a $400

25  laptop.  Maybe there isn't a $4,000 laptop.  But maybe a

1    $3,000 instead of a $300.  Because there's been no

2    demonstration of proportionality between those numbers and

3    Motorola's contribution.

4         THE COURT:  Mr. Harrigan, shouldn't you be addressing

5    the jury?  I mean, this is your opening statement.

6         MR. HARRIGAN:  Well, Your Honor, the facts that I

7    just stated I don't believe are disputable.  The fact is that

8    we know why people pay more for certain laptops.  And there's

9    been -- Motorola would have to come forward with some

10   evidence that those variations are connected to its

11   technology somehow, or else it's simply inherently

12   unreasonable.  So that's how we believe that that should be

13   viewed.

14       And if the concern is that it's a factual issue, I will

15   revert to the entire Market Value Rule, which says you can't

16   do it this way unless you sustain the burden of proving that

17   your technology is the basis for customer demand.  And we

18   submit that Motorola hasn't even started to or attempted to

19   sustain that burden.  So, on that basis as a matter of law it

20   is unreasonable.  And that would be outside the RAND context.

21   Even if you didn't have the constraints of RAND, that rule

22   would apply.

23       I've already covered the ITC comments.  With regard to the

24   various license agreements that Motorola has cited, they have

25   not come forward with any licensing agreement, where they did

1   what they're doing here in the case of the laptop.  Whatever

2   else is wrong with their comparisons, and we've provided some

3   detailed comments on that in the briefs, they have produced

4   no comparable situation where the product of which they're

5   seeking a percentage royalty is not the product of the person

6   from whom they're getting the royalty.  And for the reasons

7   I've already said, that is a grotesque situation which is

8   part and parcel of the letter, because you can't accept it

9   piecemeal.  And that is, that the product of which they would

10  have -- the product that Microsoft is producing, the

11  operating system, is not the product that is the subject of

12  the royalty.

13      I'm a little confused about where I am on time.

14          THE COURT:  You have about eight minutes left.

15          MR. HARRIGAN:  Does that include the injunction

16  issue?

17          THE COURT:  No.

18          MR. HARRIGAN:  Okay.  Thank you.

19          THE COURT:  It doesn't mean you have to use all of

20  it.

21          MR. HARRIGAN:  I understand.

22      Another aspect of these letters that needs to be measured,

23  Your Honor, is the fact that Motorola is now claiming that it

24  was only seeking a total of 2.25 percent.  And if we're -- I

25  believe that it is a valid basis for summary judgment on

1    breach that, in fact, there is no way to get there by reading

2    those two letters.  They asked for 2.2 -- there were two

3    standards.  They sent two letters.  They asked for

4    2.25 percent in each letter.  They listed the products they

5    wanted it on.  If you read those two letters you would

6    immediately conclude that you're paying four and a half

7    percent total; or at least that they were separate royalties

8    for 2.25 percent, for each standard.

9        And Motorola has come forward with no evidence to suggest

10   that that level of royalty would be reasonable.  And so if

11   we're going to measure their conduct in those letters it

12   should be measured in the way that -- it should be measured

13   according to the way that the letters were written.  And you

14   just can't get to the position that they now say is their

15   normal approach.

16       Let me just see if I have left off anything terribly

17   important.  Oh, one other thought I did want to express, Your

18   Honor, you alluded to the jury setting the RAND rate, or

19   determining the terms.  And we believe the court can decide

20   that without a jury.  We're not here to debate that today.

21   But I just want to let you know that that's something that

22   would probably be debated when the appropriate time comes.

23   Thank you.

24       MR. JENNER:  Your Honor, at the risk of wearing out

25   my welcome, will you take four points in reply?

1          THE COURT:  I think you had your time, Mr. Jenner.

2          MR. JENNER:  Okay.  Thank you.

3          THE COURT:  Mr. Harrigan, I think it is -- we're

4    going to do injunctive relief.  And do you want to do your

5    injunctive relief speech now, or are you delegating that to

6    someone else?

7          MR. HARRIGAN:  I'm doing it.

8          THE COURT:  All right.  Then I'll hear from you.

9          MR. HARRIGAN:  All right.

10         THE COURT:  Mr. Palumbo, you will get the last word

11   today.

12         MR. PALUMBO:  Thank you, Your Honor.

13         MR. HARRIGAN:  As usual I have too much paper, so

14   I've got to find it.

15      So, Your Honor, we believe there are three reasons that

16   the court should dismiss the claim for injunctive relief.

17   The first I've just talked about, which is that if, in fact,

18   the letters were a breach, it remains for Motorola to even

19   make a RAND offer.

20      Second, we believe it's clear that Microsoft is going to

21   get a license in this case.  It is entitled to one.  It's

22   committed to take one.  And it's asking the court to

23   determine the terms.  And therefore at the end of the day

24   there will be -- not only at the end of the day, but at this

25   point in time, in light of those commitments and that

1    program, there will be no basis for injunctive relief.

2       And third, the lack of irreparable harm.  And since I've

3    already talked about the first two, I will focus on the last.

4           THE COURT:  Well, please do so in the context of the

5    *eBay* case, because it seems to me that's the controlling

6    authority that I'm to follow.

7           MR. HARRIGAN:  I agree.  Let me turn to the *eBay* case

8    then, right off the bat.

9           THE COURT:  And also as part of that, I thought

10   Motorola made a strong argument in regards to, how do I know

11   what is irreparable harm in this context?  Both of you have

12   cited things that the court would not normally think of as

13   irreparable harm, because it's not in this business.  So I'd

14   like you to cover that also.

15          MR. HARRIGAN:  So first of all, Your Honor, under

16   *eBay*, basic equitable principles of it relating to the

17   availability of injunctive relief are viable in patent cases.

18   And the factors that the court has identified that have to be

19   shown are not -- they're not balancing factors, they are four

20   independent factors, each of which has to be demonstrated.

21   The first one is that the party has suffered an irreparable

22   injury.  The second is that remedies available at law, such

23   as monetary damages, are inadequate to compensate for that

24   injury.  Then the court balances hardships and looks at the

25   public interest.

1    The first two items, as well as the other two, are

2    requirements for getting injunctive relief.  The court

3    doesn't balance the probability of irreparable injury against

4    some other thing in order to make a decision, it determines

5    if there has been irreparable injury, and if monetary damages

6    are inadequate.

7    So we believe that the best evidence that monetary damages

8    are not inadequate is that Motorola has written two letters

9    stating that it will take what we think is an astronomical

10   amount of money, but nonetheless money, in exchange for a

11   worldwide license to these patents.  And therefore it must

12   believe that it can be adequately compensated in money.  It

13   is essentially an admission.

14   In fact, we had a similar statement recently which is at

15   tab 9 of your notebook, in describing the German -- outcome

16   of the German litigation Motorola said -- after stating it

17   was pleased -- it said, "Fair compensation is all that we

18   have been seeking for our intellectual property."

19   It has not been suggested -- Motorola has not come forward

20   with anything indicating that they have irreparable harm.

21   And, in fact, the two letters and their statement in Germany

22   strongly indicate that they do not.

23   Now, the question of whether there's been a breach by

24   Microsoft, or repudiation by Microsoft, doesn't bear on this

25   issue, because the whole notion of when do you get injunctive

1    relief, and do you have to show irreparable harm, presumes

2    that there's been in this case an infringement or there's

3    been some breach.  The issue is, what's the remedy?  And here

4    the remedy is money, and it will be decided in this case in a

5    RAND context pursuant to Microsoft's commitment to take a

6    license.  And so, the end game here in this case will

7    inevitably result in Motorola receiving reasonable

8    compensation, and that removes any basis for injunctive

9    relief.

10          THE COURT:  Well let me take you back to your

11   anti-suit briefing, in which you argued that Microsoft would

12   suffer irreparable injury if there was not an injunction

13   entered against Motorola, among other reasons that potential

14   customers wouldn't buy the product because of uncertainty,

15   that it was a damage to Microsoft's reputation for

16   reliability, all of those arguments which you were forcefully

17   making at the time.

18       If Mr. Jenner or Mr. Palumbo were to stand up, they would

19   say the same thing.  So why were you right then, and they're

20   wrong now?

21          MR. HARRIGAN:  Well, Your Honor, in fact Motorola

22   does not say the same thing.  It has done nothing to identify

23   irreparable harm.  Microsoft's irreparable harm actually

24   began before we even came into the court.  And that is that

25   it had to move its distribution center to the Netherlands

1   because it wouldn't have time to make the change after an

2   injunction was entered.  There were hundreds of people

3   dismantling its German operations.  There was concern about

4   all kinds of partner relationships being dismembered, because

5   the German operation is huge and complicated, and there was

6   no way to comply with an injunction without making the

7   preparations.

8       And that irreparable harm was already happening.  Motorola

9   has come forward with nothing comparable to that at all.

10          THE COURT:  That just seems to me that Microsoft made

11  a bad legal decision.  German law was the same when it set

12  this up as it is now.  And they chose to go into a large and

13  very lucrative market in the face of law which was known to

14  them.  So, that argument doesn't have much traction with me.

15          MR. HARRIGAN:  Well, Your Honor, I'm not trying to

16  debate the wisdom or the merits of the German legal system.

17  But the question was, wasn't Microsoft arguing it would

18  suffer irreparable harm from a German injunction?  And the

19  answer is yes.  And it really was irreparable harm.  I'm

20  saying, if you look at Motorola's evidence, they just talk

21  about, well, there are these cases that say that this might

22  happen or that might happen.  But there is no evidence that

23  it is happening or it actually would happen.

24          THE COURT:  All right.

25          MR. HARRIGAN:  For example, some of the cases say you

1   might lose market share, and that might be irreparable harm;

2   or, your litigation expenses are robbing you of the money to

3   do research.  And Motorola cites those cases and mentions

4   those potential irreparable harm factors.  But there is not a

5   declaration that says that Motorola is running out of

6   research money because of the lack of this licensing revenue,

7   or that it's lost market share as a result of this problem.

8      Motorola and Microsoft are not competitors.  So the fact

9   is that it's up to Motorola, under the *eBay* case, to come

10  forward with something that at least creates an issue of fact

11  as to whether it has suffered irreparable harm.

12      THE COURT:  Mr. Harrigan, I think the court could

13  take judicial notice of the fact that the legal fees in this

14  matter would finance a small country.  Why don't you go ahead

15  and wrap up.

16      MR. HARRIGAN:  All right.  I will just briefly

17  address two things:  One is, Motorola also argues that this

18  motion is coming too soon because, "The factual record has

19  not yet been developed to allow for adequate consideration of

20  these issues."  And we suggest, Your Honor, that that is no

21  longer -- if that were ever the case, that is no longer the

22  case since there's been ample opportunity for discovery, and

23  that that work has not produced any evidence of irreparable

24  harm that would justify denying this motion.

25      Finally, Your Honor, I just want to mention the fact that

 1   I believe the court's temporary restraining order, by its

 2   terms, will expire upon the court's rendering a decision with

 3   regard to the issues that we've been debating this morning.

 4   And Microsoft is here requesting that there not be a hiatus,

 5   and that when the court does rule, and thus potentially

 6   satisfies that termination condition of the temporary

 7   restraining order, that the court determine and act on

 8   whether that order should be extended.

 9        Thank you, Your Honor.

10        MR. JENNER:  And, Your Honor, just for the record, if

11   Your Honor decides to entertain it, we would of course like

12   to be heard in opposition to that.  No surprise, I'm sure.

13        THE COURT:  No surprise.  Mr. Jenner, given the

14   timing, you may get your four points here.  Looks like we're

15   going to have some time.  But have Mr. Palumbo go first.

16        MR. JENNER:  I just would like -- four points I would

17   make in response to counsel's argument.  Could you bring up

18   Dave's slide 46?

19        This goes to what I take to be the overriding, "they ask

20   too much" argument, $4 billion.  And I would emphasize we

21   didn't ask $4 billion, we asked the standard rate of

22   2.25 percent applied to products.  And nobody came back and

23   said, if you do that, it's going to be too big.  Any time

24   anyone has ever come in negotiations, and we always have

25   negotiations, there have been caps, there have been

1    discounts, there have been royalty-free cross licenses.

2    Negotiations allow customization and remove this magnitudinal

3    problem that Microsoft brings up.

4        So I do not want to leave this notion that total money is

5    a demonstration of reasonability.  And at the bottom of the

6    slide, as Judge Posner said, "If you think it's too much,

7    negotiate, just tell them they're charging too much."

8        Could you pull up slide 40.  Slide 40 goes to the issue of

9    no way that you should be charging for the end product in the

10   first place.  And we just want to call to Your Honor's

11   attention that the law, in particular the *Lucent v. Gateway*

12   case, in the middle of the page, recognizes that

13   sophisticated parties -- I don't want to say always,

14   routinely enter into license agreements that are based on the

15   end value of commercial products.  Because that's the

16   convenient way, the foolproof check way, where you're not

17   speculating about somebody's profits or anything else.  The

18   end product has a price, and you can work with it.  Of course

19   you can negotiate that away.  But it's recognized as a common

20   point.

21       And at the bottom of the slide Your Honor will even see

22   the IEEE's Letter of Assurance even provides using the end

23   price of the product as a permissible option.  So to say

24   using the end product price is improper is wrong.

25             THE COURT:  Did you check that box?

1           MR. JENNER:  I'm sorry?

2           THE COURT:  Did you check that box on the IEEE?

3           MR. JENNER:  Didn't have to.

4           THE COURT:  You selected another option on the RAND

5      terms.

6           MR. JENNER:  It's in the context of saying that the

7      price won't exceed a certain price.  And we didn't agree the

8      price wouldn't exceed a certain price.

9           THE COURT:  Counsel, the argument that you just made

10     to me was we selected a different basis for RAND terms, and

11     now we're proposing RAND terms that include the rejected

12     basis.  That doesn't strike me as a particular powerful

13     argument.

14          MR. JENNER:  All I'm trying to say the IEEE

15     understands that parties will, on occasion, use the end price

16     as a basis for pricing.  It recognizes that that's possible.

17         The third point that I would like to make goes to this

18     question about "subject to."  It's tab 6 of Microsoft's

19     binder where they showed you Exhibit 14, the ITU RAND letter.

20     And they take the position that it was appropriate to

21     interpret "subject to" as something that would come along for

22     free.

23         What I would ask Your Honor to consider is a line further

24     down.  At the end of line 3 of the second paragraph there's

25     another clause where it also says, "And subject to any

1    Motorola commitments made to JVT in connection with an

2    approved H.264 recommendation."  That shows that there was

3    going to have to be a reduction in recognition of JVT.

4    Nobody could possibly suggest that Motorola used "subject to"

5    in that context to mean that Microsoft was supposed to pay

6    Motorola for obligations Motorola had to JVT.  So clearly the

7    second "subject to" shows that it was going to be a decrease

8    in what was owed.

9        The last thing I would point out, Your Honor, is on slide

10   18.  If you could bring up slide 18.  The notion of Microsoft

11   saying that Motorola only had a duty to negotiate in good

12   faith.  And that is not a duty that should be imposed upon

13   Microsoft.  The middle box shows that Washington State law

14   imposes on both parties a good-faith negotiation obligation.

15   I just wanted to call that to the court's attention.

16            THE COURT:  All right.  Thank you.

17       Mr. Palumbo, other than me, you get the last word of the

18   day.

19            MR. PALUMBO:  I also have a bench book, Your Honor.

20   And I guess since you and I are going to have a conversation,

21   that makes it impossible for me to get through my bench book,

22   so I want to set this into context.

23       First, if you grant our repudiation motion, we're done,

24   since Microsoft's motion to dismiss our injunctive relief

25   claim is based on their right to a RAND license.  So I'm

1  going to explain why you should not dismiss the injunctive

2  relief claim at this time, even if you deny our repudiation

3  motion.  And as I'm sure you understand, the injunction

4  motion and the other motions you heard this morning, are

5  inner-related.

6      So I don't want to be flippant, but let me start with a

7  very simple and perhaps silly example.  You fall in love with

8  a house.  More importantly, your wife falls in love with a

9  house, and she tells you to go buy it.  Your real estate

10  broker tells you that the seller wants $1 million, won't take

11  a dollar less, you've got 20 days to accept.  What do you do?

12  You tell the broker, yeah, yeah, go offer them $800,000.

13  That's exactly what happened in this.  And we can't tell you

14  the substance of those negotiations, but there have been

15  negotiations, and they have been significant.

16      So let me first explain to you what I think Mr. Jenner was

17  saying, and make it crystal clear about how we think this

18  case should proceed.  If you determine that Microsoft has not

19  repudiated its right to a RAND license, we submit that you

20  should find the contract imposes a duty of good faith

21  negotiations on both parties, a mutual duty, and that that

22  duty is continuing.

23      We submit that that holding is consistent with the terms

24  of the contract where the parties clearly anticipate the RAND

25  terms will be set by negotiations and that that is a good

1   policy for the federal court.

2       In other words, federal courts should permit and even

3   encourage the parties to continue negotiations in good faith

4   until it's clear that both have negotiated in good faith, and

5   they have a genuine good-faith disagreement on the RAND

6   terms, and the dispute will not be resolved without the

7   court's intervention to resolve the dispute.  Proceeding in

8   that manner does not require any change in the case schedule

9   in this case.  Motorola and Microsoft have something less

10  than seven months between now and November 19th to reach an

11  agreement on all the RAND terms.

12      So what are the possibilities?  First possibility, you

13  could determine on November 19th that one or the other party

14  had not negotiated in good faith, and you could think about

15  remedies for that.  Second possibility, the parties could

16  reach an agreement on some but not all RAND license terms.

17  And if the court then determined that it was going to submit

18  those terms to the court's determination, you'd have less to

19  deal with.  Or, the parties could agree upon all terms.  And

20  proceeding in that manner is, we think, consistent with the

21  law, we think it's good policy for the federal court, and we

22  think it makes a great deal of sense.

23          THE COURT:  Does that mean you're joining Microsoft

24  in taking this issue away from the jury?

25          MR. PALUMBO:  We have to think about that, Your

1   Honor.  We certainly considered whether this is simply a

2   matter of equity that would be for your determination only.

3   But I'd like to talk with the clients and talk with the other

4   lawyers before we weigh in.  But if there is a disagreement

5   between us and Microsoft on that point, I'm sure you're going

6   to hear about it and the basis for it.

7        So the issues before the court are the two issues that I

8   have on the screen.  Do the RAND Letters of Assurance and our

9   offer to Microsoft categorically bar Motorola for seeking

10  injunctive relief for the three H.264 patents?  It's only the

11  H.264 patents that are at issue in this motion.  And the

12  second issue is whether you should refrain from determining

13  whether Motorola could meet its burden of proving the

14  four-part test.

15       This motion comes to you in a manner that is somewhat

16  unprecedented.  In all the cases cited in both the parties'

17  briefs, the Patent Holder makes a motion for injunctive

18  relief, supported by evidence that the Patent Holder has

19  offered to satisfy the four-part test for granting injunctive

20  relief.  Some of those cases are preliminary injunction

21  cases, some are permanent injunction cases where there had

22  been a finding at trial of patent validity and infringement.

23  Motorola has not made and does not intend to make a

24  preliminary injunction motion.

25       If Motorola's patents are judged valid and Microsoft's

1    products are judged to infringe, whether Motorola makes a

2    motion for permanent injunction will depend on facts which

3    are yet to be determined, including future developments in

4    the markets in which Motorola and Microsoft's products

5    compete.  The competing products right now are Windows 7,

6    which is offered on PCs, and on the Nokia phone.  Microsoft

7    will release Windows 8, that will be a cross-platform license

8    that operates on PCs and all mobile devices, in direct

9    competition for Motorola's project.

10        So it remains to be seen, even to us, whether we would

11   make a motion for preliminary injunction.  If we decided that

12   there was a basis to do it, we would offer the evidence in

13   support of the four-part test at trial and make the motion at

14   the conclusion of trial.  And the evidence in that motion

15   will be undoubtedly different than the evidence we offer

16   today.

17        Now, Microsoft argues in its reply that it is not arguing

18   that the RAND commitment is a categorical bar to injunctive

19   relief.  But if you look at the third slide, Your Honor, if

20   you look at what they say consistently in their opening

21   motion, they are arguing precisely that the RAND commitment

22   is a per se or categorical bar.  And I have shown you several

23   quotes out of Microsoft's briefs.  And if you can look at

24   just the last one on slide 4.  It's clear what they're

25   saying, they're saying that because we have made a RAND

1    commitment, that's an adequate remedy of law for use of the

2    patented technology and we have no right to injunctive

3    relief.

4          So what Microsoft's contending is that the RAND commitment

5    is an admission that a compulsory license is an adequate

6    remedy.  And if that contention were true, if the RAND

7    commitment was a per se bar to injunctive relief, then there

8    would be a basis to grant this motion.  But Microsoft's

9    contention is contrary to law.

10         Federal cases uniformly hold that a Patent Holder's

11   willingness to license its patent, including by making a RAND

12   commitment, does not bar injunctive relief.  Rather, the

13   availability of injunctive relief is decided in each case

14   based upon the traditional four-factor test, and the specific

15   facts in that case.  And we have *eBay*, the language which I'm

16   sure you're familiar with, Your Honor, where the district

17   court found that the willingness to license would be

18   sufficient to show that the Patent Holder would not suffer

19   irreparable harm.  And Justice Thomas said, "But traditional

20   equitable principles do not permit such broad

21   classifications."  And this is the language in *eBay,* that the

22   lower courts cite every time they're confronted with this

23   question.

24         The *CSIRO* case is a RAND case.  And the court found that

25   CSIRO's only intent was to derive license revenue, and CSIRO

 1   made a RAND assurance to the IEEE.  And in the face of both

 2   of those, the district court granted a permanent injunction,

 3   finding that a compulsory license will not adequately

 4   compensate CSIRO for the infringement.

 5       Courts have not distinguished between a willingness to

 6   license evidenced by a RAND commitment, and a willingness to

 7   license evidenced by the fact that the Patent Holder has

 8   licensed to other parties, or even stated its willingness to

 9   license to the infringer at issue.

10       So, we don't have many RAND cases.  We do have a large

11   number of cases where the court considers evidence of a

12   Patent Holder's willingness to license, rejects that that is

13   a basis, per se, to deny it.  And in each case they follow

14   the Supreme Court's decision in *eBay*.

15       So I'm going to go through very, very quickly, Your Honor,

16   a whole series of cases.  Here is *Transocean*.  And in this

17   case, *Transocean*, the evidence was that Transocean was

18   willing to consider licensing its invention to GSF, the

19   defendant in the case, and even in the face of that the court

20   granted a permanent injunction.

21       Then you have *ActiveVideo*, same ruling; *Callaway Golf,*

22   same ruling.  Willingness to license does not forego the

23   ability to get injunctive relief, rather injunctive relief is

24   judged by the four-part test.  And willingness to license is

25   a factor the court considers, but it is not a dispositive

1    factor.

2        And then here's a whole series of cases, again none of

3    these are RAND cases, Your Honor, but as I said, the courts

4    do not distinguish between a willingness to license,

5    evidenced by other evidence, and a RAND willingness to

6    license.

7        So let me turn to what ALJ Shaw says, and this is

8    consistent with our research, and Microsoft cites no cases to

9    the contrary.  What he says in denying Microsoft's RAND

10   defense is, "Microsoft was not able to cite one case in which

11   an exclusion order was foreclosed, due to the existence of

12   RAND obligations."  And I submit, Your Honor, there is no

13   case that holds that a RAND commitment, standing alone, in

14   and of itself, bars injunctive relief.

15       So then Microsoft takes the position that if the court

16   establishes the terms of a RAND license, injunctive relief

17   cannot be granted, since Microsoft will have a license to

18   Microsoft's H.264 patents.  And that proposition is contrary

19   to the district court's decisions in *CSIRO* and *Transocean*.

20       So here is the language from *CSIRO*, which was a RAND case.

21   And the court says, "Further, such royalty payment, a royalty

22   payment under compulsory license, does not necessarily

23   include the other non-monetary license terms that are as

24   important as monetary terms to a licensor such as CSIRO."

25   And Mr. Jenner has told you at some length that a RAND

1    license, and I'll show you some specific language, would

2    include not only a royalty rate, but many other material

3    terms.

4        So at least the *CSIRO* district court determined that even

5    though they could grant a compulsory license, that license

6    would not include all the essential terms that a Patent

7    Holder was entitled to for the infringement in this case on

8    the specific facts of the *CSIRO* case, and an injunction

9    issued, in the face of a RAND obligation.

10       *Transocean,* as I said before, was not a RAND case.  But

11   the court said the same thing.  "The court's persuaded that

12   if it does not enter a permanent injunction, it will force a

13   compulsory license on Transocean, that will not contain any

14   of the commercial business terms typically used by a Patent

15   Holder."

16       And I promised that I would show you specific language

17   about the fact that a RAND license is going to be and have

18   more like the 80-page license that Mr. Jenner held up.  What

19   the ITU policy says -- this is a policy that applies where

20   the Patent Holder checks the box that they're not going to

21   charge a royalty, and what the ITU says is, even in that case

22   where there's no royalty, the Patent Holder is still entitled

23   to require that the implementer sign a license agreement that

24   contains other reasonable terms and conditions such as those,

25   and it goes on.

1    So if you find yourself in a position where either you or

2  the jury has to determine the terms of a RAND license, you

3  will be doing much more, we submit, than simply determining a

4  royalty rate.  You'll be looking at cross licenses, how the

5  cross licenses for Microsoft products impact the royalty

6  rate, and many other material terms.

7    So let me turn to now --

8         THE COURT:  Before you leave that, in our research on

9  this, we could not find a RAND case in this context.  The

10 RAND cases, including the ones that you're mentioning, are

11 all situations where the infringing party refuses to take a

12 RAND license.  That seems to me to just wipe that whole line

13 of authority out.  Because it is a dramatically different

14 situation.  I would concede to you that it's appropriate to

15 have injunctive relief then, because you need to stop the

16 inequitable conduct.

17        MR. PALUMBO:  No question.

18        THE COURT:  So, tell me why you then carry that over

19 into the RAND context.

20        MR. PALUMBO:  I'm not sure I understand your

21 question.  But let me try to answer it, and then you can

22 correct me.  If you were to determine that both parties had

23 negotiated in good faith, we would still have the opportunity

24 to offer evidence to meet our burden of proof under the

25 four-part test that a compulsory license would not be

1  sufficient to protect our patent rights.  And the courts go

2  on and they cite Justice Robert's concurring opinion where he

3  says, yes, that's the law that's in the majority opinion, but

4  we have a long history of honoring Patent Holder's rights to

5  exclude others from practicing their inventions, and that

6  history has to be honored.  It's not dispositive as it was

7  before *eBay,* but it has to be honored.

8      Now, Your Honor, the burden of proof that we would have to

9  meet in that circumstance would be very substantial.  And as

10  I said, we can't sit here today, because facts are yet to be

11  developed, and tell you that we could meet the burden of

12  proof.  I'm prepared to tell you, we're not in a position

13  where we could even decide that we were going to seek a

14  permanent injunction.  That decision will be made prior to

15  trial based on the evidence we believe we can offer at trial.

16  So where there is a RAND commitment, there's no question that

17  there's a balancing between the Patent Holder's right to

18  exclude, and the RAND commitment, and the burden for us to

19  show and meet the burden that CSIRO was able to meet in its

20  case is very substantial.  And if you've read that case,

21  there are facts in that case which support it.  And they are

22  different than the facts that we would be able to offer you.

23  So I'm not saying we would be entitled to it in the face of a

24  RAND commitment, I'm saying that is an issue that has yet to

25  be determined.

1      But I want to turn to another subject, Your Honor.

2   Microsoft seems to suggest that there's something wrong and

3   unfair about requiring it to negotiate a RAND license, unless

4   the potential for injunctive relief is removed by this court.

5   But the clear intent of the parties to the contract is that

6   RAND license terms would be established by negotiations

7   between the parties.  And we submit this court should stay

8   its hands until those negotiations have failed.

9      Since court intervention at the inception of negotiation

10  is unprecedented, as far as we can determine, I can find no

11  case, every infringer seeking a RAND license does so with the

12  potential that unsuccessful negotiations could result in an

13  injunction.

14     The potential for an injunction, the potential, Your

15  Honor, not the injunction, but the potential is an incentive

16  for the infringer to engage in good faith negotiations, and

17  the countervailing incentive for Motorola as the Patent

18  Holder to engage in good faith negotiations, is the potential

19  such as this seeking to have the court set a compulsory

20  license.  So there are equal and offsetting incentives.  And

21  what we suggest is it would be a mistake for the court at

22  this point to remove the potential for an injunction.

23     And let me just show you a few slides on that issue.

24  These basically say what you've just said, Your Honor.

25  Members of the industry and the ABA standards clearly say if

1    you have a RAND commitment but you can't successfully

2    negotiate in good faith a RAND license offer, the Patent

3    Holder isn't precluded from getting an injunction.  And if

4    you note in each of these, the underlying assumption is the

5    potential for injunction is out there as you negotiate.

6        Let me show you what Microsoft's two executives who are

7    responsible for standards have said in a June letter to the

8    ITC, and I'm not going to read you the whole thing, but look

9    at the bolded language at the bottom, "Any uniform

10   declaration that such relief" -- preliminary injunction --

11   "would not be available if the Patent Holder has made a

12   commitment to offer a RAND license for its essential patent

13   claims in connection with a standard may reduce any

14   incentives that implementers might have to engage in good

15   faith negotiations with the Patent Holder."

16       So that's a letter submission to the Federal Trade

17   Commission by Microsoft, and it says precisely that.  This is

18   an incentive.  It's out there.  There's no guarantee that

19   there will be injunctive relief if there is no RAND license.

20   But it is an incentive.  And I said, there are equal and

21   offsetting incentives for good-faith negotiations that weigh

22   upon Motorola, just as the potential for an injunction weighs

23   upon Microsoft.

24       I'll show you a couple slides.  Ericsson is, as you know,

25   a very large cellular company.  And Ericsson basically says

1   the same thing, "The availability of injunctive relief for

2   standards essential patents indeed has depended on the

3   behavior of the parties to the proceedings and, in

4   particular, on their conduct in bilateral negotiations."  So

5   Ericsson is recognizing the fact that courts do grant

6   injunctions even in the face of a RAND license, and resolving

7   that that is a good thing for the benefit of those

8   negotiations.

9       And then here is *Transocean* where the court says

10  effectively the same thing, recognizing the benefit of a

11  potential injunction on the commercial negotiating power in

12  a licensing negotiation.  And because this is not a RAND

13  license, what the court in *Transocean* says is, "If

14  GlobalSantaFe can continue to infringe with a court-issued

15  compulsory license, then others would be encouraged to

16  infringe, and Transocean loses part of its commercial

17  negotiating power in license negotiations."

18      So what this is saying is if somebody gets a compulsory

19  license from Motorola, and then the risk of an injunctive

20  relief is removed, then that is diminishing the power to

21  successfully achieve future successful negotiations over a

22  RAND license.

23      And here is the German court.  And the German court says

24  the same thing in the certified transcript.  And I think

25  Mr. Harrigan has contended there is just no relationship

1   between RAND and this antitrust thing, yet he cited

2   absolutely no authority to you whatsoever for that

3   proposition, Your Honor.  And you were troubled in the motion

4   we had the last time we were here about the impact that the

5   potential for an injunction would have on Microsoft.  And you

6   were concerned about a disparate ruling by the German court.

7        But just in terms of negotiation, in the German court if

8   Microsoft -- if Microsoft's offer is deemed to be not

9   reasonable, not meeting the German court standard, we get an

10  injunction.

11       If Microsoft makes an offer and the German court

12  determines that our denial or rejection of that offer is

13  unreasonable, then we can't enforce our patent rights.  So we

14  don't have that here.  But we do have a similar situation

15  where there are equal and offsetting incentives to both

16  parties to engage in good-faith negotiations, and you should

17  not grant a motion to dismiss the injunctive relief claim

18  because it hasn't even been posed properly and would be

19  contrary to law; but also because it removes one of the

20  critical incentives that may get the parties to agree upon

21  the terms of a RAND license without you ever having to do

22  anything in this case.

23       And then I have a whole series of slides, but I want to

24  conclude pretty quickly.  And these slides just go on to

25  demonstrate why it is Mr. Harrigan said that -- well, they

1    say that we've got the burden of coming forward with all of

2    our proof.  And yet here is the cite from their own case

3    which confirms what I've told you, which is this motion is

4    based solely on the RAND commitment as evidence that there

5    can't be irreparable harm.  Motorola says because --

6    Microsoft says, "Because Motorola cannot show irreparable

7    harm and because monetary relief would provide an adequate

8    remedy, it is not necessary for the court to consider any of

9    the other *eBay* factors in rejecting Motorola's claim for

10   injunctive relief."

11       So the other factors and our proof in this motion of the

12   four-part test, wasn't even put on the table by Microsoft's

13   motion.  Microsoft says, well, we're not direct competitors

14   and so you can't give an injunction, because we're not direct

15   competitors.

16       If a motion for permanent injunction is made, you're going

17   to look at that issue, and you're going to look at it very

18   closely.  The fact is, as I've said, Windows 7 is a platform

19   for mobile phones, Windows 8 is a platform for smart phones

20   and tablets, that will compete directly with Motorola's

21   mobile devices.  And the *ActiveVideo* court says, "The court

22   is not aware of any precedent which requires direct

23   competition in any form before an injunction is made."

24       Microsoft also argues in its briefs that we could never

25   get an injunction because H.264 is not a core aspect of our

1    business.  In fact, Motorola has been a leader in video

2    compression for 20 years.  H.264 is a core functionality, and

3    Motorola and Microsoft were co-chairs of the joint video team

4    responsible for H.264 development.  So to say this is a

5    non-core functionality for Motorola simply is not true

6    factually.

7         And moreover, here's the *Bosch* court, which says, "The

8    federal court granted a permanent injunction based on

9    indirect evidence of lost market share."  And it says

10   further, "Injuries that affect a non-core aspect of a

11   patentee's business are equally capable of being irreparable

12   as ones that affect more significant operations."  Even if it

13   were non-core, and it is core, that alone would not be a

14   basis.

15        Then I'm just swinging through --

16             THE COURT:  You should go ahead and wrap up.

17             MR. PALUMBO:  So Microsoft argues that the fact of a

18   RAND commitment standing alone means that a compulsory

19   license is an adequate remedy of law, and as a matter of law

20   we can't get injunctive relief.  We've demonstrated that the

21   Supreme Court's decision in *eBay* and every single decision of

22   the federal courts following *eBay*, is contrary to Microsoft's

23   position.  And we submit that you should refrain from

24   determining whether Motorola can meet its burden to prove the

25   four-factor test for permanent injunctive relief, unless and

1  until we seek such relief and offer evidence at trial.  Thank

2  you, Your Honor.  That's all I have.

3         THE COURT:  Thank you.  Mr. Harrigan, do you want to

4  take two minutes?

5         MR. HARRIGAN:  I would.  Thank you, Your Honor.  I

6  was going to suggest the same amount of time.

7      Your Honor, this motion is really primarily predicated on

8  two things:  The first one is that Microsoft, for all

9  practical purposes, has a license at this point.  And the

10  only issue is what are the terms going to be?  And they're

11  going to be set by the court.  If that proposition accords

12  with the court's view of the matter, then there will never be

13  any need for a basis for injunctive relief because Microsoft

14  will have a license to the two standards and that will be the

15  end of it.  And that is what was proposed in Motorola's

16  letters, but on unacceptable terms.  That's the first

17  proposition.

18      The second proposition is that the lack of irreparable

19  harm is not based on the fact that this is a RAND situation.

20  At page three of our reply brief, among other places, we

21  indicate that the key basis for this motion is that Motorola

22  offered to license its H.264 patent portfolio to Microsoft at

23  a 2.25 percent royalty rate.

24      In other words, this is not a case where Motorola

25  expressed a willingness to do this to some other party, or

1    even just expressed a general willingness to Microsoft.  It

2    gave a specific amount of specific royalty that it would take

3    in return for a worldwide license for these patents with this

4    party.  And that is a unique situation, and it means that,

5    especially in light of Microsoft's agreement to accept the

6    license at whatever rates the court sets, there isn't going

7    to be any basis for injunctive relief.  But it's also an

8    admission by Motorola that at least payment of that much

9    money is acceptable, an acceptable outcome, and is all of the

10   relief that they are seeking in the letters.

11       Basically, Your Honor, Motorola is entitled to RAND rates,

12   and it's going to get them as a result of this lawsuit, if

13   not in some other way.  Thank you.

14           THE COURT:  Counsel, as I indicated at the start, I'm

15   taking these matters under advisement and will file a written

16   opinion.  I'm reserving my ruling, in part, because I need

17   time to consider the material that you've given us today.

18   I'm not sure that there is a tree left standing in the

19   forest, given the volume that's been submitted.  And I also

20   want to think about some of the arguments that you've made

21   today.

22       However, I will tell you that it is at least my

23   preliminary -- and I stress "preliminary" -- view that

24   Microsoft's motion for breach of contract is going to be

25   denied and that Motorola's motion for repudiation is going to

1    be denied.

2       Regarding Microsoft's motion to dismiss the injunctive

3    relief claim, Mr. Palumbo acknowledged what's been troubling

4    the court, which is there is not much legal authority

5    regarding RAND cases.  And the authority which we've been

6    given by both sides has to do with infringers who decline to

7    take a license.  That complicates that particular motion.

8       Secondly, the parties are well ahead of the court in what

9    a trial in this matter might look like.  I need to go back

10   and try and determine from your pleadings, as opposed to your

11   argument, what issues are in and what are out in order to

12   evaluate the availability of injunctive relief.  So that one

13   is reserved for further consideration.

14      In response to Mr. Jenner, I am acutely aware that I have

15   outstanding a temporary restraining order, and we may convert

16   it into a preliminary injunction, if that is in accordance

17   with our consideration of your motions.  And I'm not inclined

18   to have another argument in doing so.  You've had your

19   opportunity to present what you wanted to the court.  And I

20   think you've done a good job of doing so.

21      I'm going to close with the following observation, which

22   I've thought about a fair amount, and which hopefully will

23   offer you some guidance in the court's view of this matter.

24   The court is well aware that it is being played as a pawn in

25   a global, industry-wide business negotiation.  The conduct of

1  both Motorola and Microsoft has been driven by an attempt to

2  secure commercial advantage.  And to an outsider looking in

3  at it, the conduct has been arbitrary, it has been arrogant,

4  and frankly it appears to be based on hubris.

5      When I use the word "hubris" I am reminded of Sophocles'

6  *Antigone*, when Creon refuses to even bury Polynices; or, for

7  those of you who want to be more highbrow, Icarus for flying

8  too close to the sun.

9      These days hubris is usually defined as extreme pride or

10 arrogance, often associated with the loss of contact with

11 reality, and an overestimation of one's own competence or

12 capabilities.  In this case, it is an indictment of the

13 character of the parties.

14     So, returning to the court's self-described role as a pawn

15 in this chess game, I leave you with one of my favorite

16 traditional Irish sayings:  When the chess game is over, the

17 pawn and the king go back to the same box.

18     You should think about that.  We will be in recess.  Thank

19 you, counsel.

20                  (The proceedings recessed.)

21                   C E R T I F I C A T E

22     I certify that the foregoing is a correct transcript

23 from the record of proceedings in the above-entitled matter.

24 /s/ *Debbie Zurn*                      May 8, 2012

25 Debbie Zurn, Court Reporter