UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| MICROSOFT CORPORATION,<br><br>Plaintiff,<br><br>v.<br><br>MOTOROLA, INC., et al.,<br><br>Defendants. | CASE NO. C10-1823JLR<br><br>ORDER |
| MOTOROLA MOBILITY, INC., et al.,<br><br>Plaintiffs,<br><br>v.<br><br>MICROSOFT CORPORATION,<br><br>Defendant. | |

ORDER- 1

# I.     INTRODUCTION

This matter is before the court on Plaintiff Microsoft Corporation's ("Microsoft") motion for temporary restraining order and preliminary injunction ("Microsoft's Motion").[1]  (Mot. (Dkt. # 209).)  The court heard the oral argument of counsel on April 11, 2012, and has also considered all pleadings on file, including:  (1) Plaintiff Microsoft Corporation's ("Microsoft") motion for a temporary restraining order and preliminary injunction (Mot. (Dkt. # 209)), along with all exhibits and attachments; (2) Defendants Motorola, Inc., Motorola Mobility, Inc., and General Instrument Corporation's (collectively, "Motorola") response in opposition (Resp. (Dkt. # 248)), along with all exhibits and attachments; and (3) Microsoft's reply (Reply (Dkt. # 257)).  Being fully advised, the court GRANTS Microsoft's motion for a preliminary injunction.[2]

# II.     BACKGROUND

## A.     The IEEE and the ITU as Standard Setting Organizations

Microsoft and Motorola are both members of the Institute of Electrical and Electronics Engineers ("IEEE") and the International Telecommunication Union ("ITU"). The IEEE and the ITU, neither of which are parties to the instant dispute, are

---

[1] While the parties in this action have both filed affirmative claims, because (as explained herein) Microsoft filed the complaint initiating the instant action, for purposes of this order, the court names Microsoft as the "plaintiff."

[2] On April 12, 2012, the court granted Microsoft's motion for a temporary restraining order.  (TRO Order (Dkt. # 261).)  The court's April 12, 2012 order was limited to enjoining Motorola from enforcing any injunctive relief that it may receive from a Germany court with respect to the patents at issue in Microsoft's Motion.  (*Id.* at 2.)  The temporary restraining order was to remain in effect until May 7, 2012.  (*Id.* at 3.)  On May 7, 2012, the court extended the temporary restraining order until the time it issued a ruling on Microsoft's concurrent motion for a preliminary injunction.  (5/7/12 Transcript (Dkt. # 315) at 106.)

international standards setting organizations.  Standards setting organizations play a

significant role in the technology market by allowing companies to agree on common

technological standards so that all compliant products will work together.  Standards

lower costs by increasing product manufacturing volume, and they increase price

competition by eliminating "switching costs" for consumers who desire to switch from

products manufactured by one firm to those manufactured by another.

One complication with standards is that it may be necessary to use patented

technology in order to practice them.  If a patent claims technology selected by a

standards setting organization, the patent is called an "essential patent."  Here, Motorola

is the owner of numerous patents "essential" to certain standards established by the IEEE

and the ITU.  (*See* 10/21/10 Motorola Offer Ltr. (Dkt. # 79-5); 10/29/10 Motorola Offer

Ltr. (Dkt. # 79-6) (see list of attachments).)  In order to reduce the likelihood that owners

of essential patents will abuse their market power, many standards setting organizations,

including the IEEE and the ITU, have adopted rules related to the disclosure and

licensing of essential patents.  The policies often require or encourage members of the

standards setting organization to identify patents that are essential to a proposed standard

and to agree to license their essential patents on reasonable and non-discriminatory

("RAND") terms to anyone who requests a license.  Such rules help to insure that

standards do not allow essential patent owners to extort their competitors or prevent them

from entering the marketplace.

ORDER- 3

**B.      Motorola's Statements to the IEEE and the ITU**

This lawsuit involves two standards—the IEEE 802.11 wireless local area network ("WLAN") Standard ("802.11 Standard) and the ITU H.264 advanced video coding technology standard ("H.264 Standard").[3]  (*See generally* Compl. (Dkt. # 1); Am. Compl. (Dkt. # 53).)  The IEEE's standard setting process is governed by its Intellectual Property Rights Policy (the "IEEE Policy").  (*See generally* IEEE Policy (Dkt. #79-1).)  The IEEE Policy provides that "IEEE standards may be drafted in terms that include the use of Essential Patent Claims."  (*Id.* at 18 (Section 6.2).)  The IEEE Policy defines the term "Essential Patent Claim" as one or more claims in an issued patent (or pending patent application) that are "necessary to create a compliant implementation of either mandatory or optional portions of the normative clauses of the [Proposed] IEEE Standard . . . ."  (*Id.*)  If "Essential Patent Claims" are included in an IEEE standard, the IEEE requires the patent holder to either state that it is not aware of any patents relevant to the IEEE standard or to provide the IEEE with a Letter of Assurance.  (*Id.*)  Any such Letter of Assurance must include either (1) a disclaimer to the effect that the patent holder will not enforce the "Essential Patent Claims," or (2):

> [a] statement that a license for a compliant implementation of the standard will be made available to an unrestricted number of applicants on a worldwide basis without compensation or under reasonable rates, with reasonable terms and conditions that are demonstrably free of any unfair discrimination. . . .

---

[3] The ITU developed the H.264 Standard jointly with two other standard setting organizations—the International Organization for Standardization and the International Electrotechnical Commission.  (Partial S.J. Order (Dkt. #188) at 3.)

(*Id.*)

Motorola has submitted numerous Letters of Assurance to the IEEE in connection with the 802.11 Standard stating that it "will grant" or "is prepared to grant" a license under RAND terms for its patents essential to the 802.11 Standard. (*See generally* IEEE LOAs (Dkt. # 79-2).)  A typical Motorola Letter of Assurance to the IEEE provides, in relevant part:

> The Patent Holder will grant [is prepared to grant] a license under reasonable rates to an unrestricted number of applicants on a worldwide, non-discriminatory basis with reasonable terms and conditions to comply with the [Proposed] IEEE Standard.

(*See generally id.*)

Like the IEEE, the ITU has established a policy (the "ITU Policy") with respect to holders of patents "essential" to implementing a standard. (*See* ITU Pol. (Dkt. # 79-3).) Such patent holders must file with the ITU a "Patent Statement and Licensing Declaration" declaring whether they (1) will grant licenses free of charge on a RAND basis; (2) will grant licenses on RAND terms; or (3) are not willing to comply with either of the first two options. (*See id.* at 9-12.)  Motorola has sent numerous declarations to the ITU stating that they will grant licenses on RAND terms for its patents essential the H.264 Standard. (*See generally* ITU Declarations (Dkt. # 79-4).)  A typical declaration by Motorola to the ITU provides, in relevant part:

> The Patent Holder will grant a license to an unrestricted number of applicants on a worldwide, non-discriminatory basis and on reasonable terms and conditions to use the patented material necessary in order to

ORDER- 5

manufacture, use, and/or sell implementations of the above ITU-T Recommendation | ISOC/IEC International Standard.[4]

(*E.g.*, *id.* at 2.)

The court ruled that Motorola's Letters of Assurance to the IEEE and Motorola's declarations to the ITU creates an enforceable contract between Motorola and the respective standard setting organization.  (Partial S.J. Order at 10.)  Additionally, as a member of the IEEE and the ITU and a prospective user of both the H.264 Standard and the 802.11 Standard, Microsoft was found to be a third-party beneficiary of the contract. (*Id.*)

**B.     The Present Action**

**i.     Microsoft's Breach of Contract Claim**

On October 21, 2010, Motorola sent Microsoft a letter (the "October 21 Letter") that read in pertinent part:

> This letter is to confirm Motorola's offer to grant Microsoft a worldwide non-exclusive license under Motorola's portfolio of patents and pending applications having claims that may be or become Essential Patent Claims (as defined in section 6.1 of the IEEE bylaws) for a compliant implementation of the IEEE 802.11 Standards. . . .  Motorola offers to license the patents under reasonable and non-discriminatory terms and conditions ("RAND"), including a reasonable royalty of 2.25% per unit for each 802.11 compliant product, subject to a grant back license under the 802.11 essential patents of Microsoft.  As per Motorola's standard terms, the royalty is calculated based on the price of the end product (e.g, each Xbox 360 product) and not on component software (e.g., Windows Mobile Software).

_____

[4] The declaration to the ITU also states that "negotiations of licenses are left to the parties concerned and are performed outside the ITU-T | ISO/IEC.  (ITU Declarations at 2.)

(10/21/10 Offer Ltr. at 2.)  Then, on October 29, 2010, Motorola sent a similar letter (the

"October 29 Letter") regarding the H.264 related patents, stating:

> Motorola offers to license the patents on a non-discriminatory basis on reasonable terms and conditions ("RAND"), including a reasonable royalty, of 2.25% per unit for each H.264 compliant product, subject to a grant back license under the H.264 patents of Microsoft, and subject to any Motorola commitments made to JVT in connection with an approved H.264 recommendation.  As per Motorola's standard terms, the royalty is calculated based on the price of the end product (e.g., each Xbox 360 product, each PC/laptop, each smartphone, etc.) and not on component software (e.g., Xbox 360 system software, Windows 7 software, Windows Phone 7 software, etc.)

(10/29/10 Offer Ltr. at 2.)  Motorola attached to its October 29 Letter a non-exhaustive

list of patents it offered to license to Microsoft.  (*See id.*)

Microsoft filed its complaint initiating this action on November 9, 2010 and its

amended complaint on February 23, 2011.  (Compl.; Am. Compl.)  Microsoft's contends

that the October 21 and October 29 Letters seek unreasonable royalty rates and therefore

breach Motorola's obligations to the IEEE and the ITU to grant licenses on RAND terms.

(Am. Compl. at 21, 22.)  Microsoft alleges claims against Motorola for breach of contract

and promissory estoppel.[5]  (*Id.*)  In its prayer for relief, Microsoft seeks, *inter alia*, a

declaration that it is entitled to a license on RAND terms from Motorola for all patents

subject to Motorola's commitments to the IEEE (through Letters of Assurance) and to the

ITU (through declarations).  (*Id.* at 25 ¶¶ G, H (Prayer for Relief).)

---

[5] Microsoft's action against Motorola also included claims for waiver and declaratory judgment, but the court's June 1, 2011 order dismissed both of those claims, leaving only the breach of contract and promissory estoppel claims.  (Dkt. # 66 at 12.)

1    In response, Motorola asserted affirmative defenses and counterclaims.  (*See*

2    Motorola Answer (Dkt. # 68).)  Motorola's counterclaims, which are relevant to the

3    instant motion for preliminary injunction, seek a declaratory judgment that (1) it has not

4    breached any RAND obligations, and (2) Microsoft repudiated and/or rejected the

5    benefits of Motorola's RAND obligations, and therefore Microsoft is not entitled to a

6    license to Motorola's patents related to the H.264 and 802.11 Standards.  (*Id.* ¶¶ 61-75

7    (Counterclaims).)

8        **b.    The Parties' Patent Infringement Claims**

9        On June 1, 2011, under cause No. C10-1823JLR, the court consolidated the action

10   initiated by Microsoft's November 9, 2010 complaint with an action initiated by

11   Motorola in the Western District of Wisconsin, subsequently transferred to this district as

12   C11-0343JLR, where Motorola alleges that Microsoft infringed Motorola-owned U.S.

13   Patent Nos. 7,310,374; 7,310,375; and 7,310,376 (the "Motorola Patents").  (Order (Dkt.

14   # 66 at 12) (consolidating the actions); Motorola Compl. (C11-0343JLR, Dkt. # 29) ¶¶

15   14-40 (Motorola's claims for patent infringement).)  The Motorola Patents relate to the

16   H.264 video compression technology.  (*See* Motorola Compl. ¶¶ 17, 26, 35.)  Microsoft

17   answered and asserted affirmative defenses, as well as a counterclaim for patent

18   infringement as to Microsoft-owned U.S. Patent Nos. 6,339,780 and 7,411,582 (the

19   "Microsoft Patents.[6]  (C11-0343JLR, Dkt. # 37 ¶¶ 11-20.)  In turn, Motorola answered

20

21   _____

22   [6] Microsoft's answer also included claims for breach of contract and promissory estoppel which are substantially (if not precisely) the same as the claims in the action initiated by

1   Microsoft's counterclaims, asserted 14 affirmative defenses, and brought a declaratory

2   judgment counterclaim that it did not infringe the Microsoft Patents and that the

3   Microsoft Patents are invalid.[7]  (Dkt. # 67 ¶¶ 9-20 (Counterclaims).)

4   **C.    German Action**

5          On July 6, 2011, over six months after Microsoft filed its initial complaint in this

6   court, Defendant General Instrument Corporation initiated a separate lawsuit in Germany

7   (the "German action") alleging Plaintiff Microsoft infringed two Motorola-owned

8   European issued patents—European Patent Nos. 0615384 and 0538667 (the "European

9   Patents").[8]  (Chrocziel Decl. (Dkt. # 212) at 2 ¶ 4; Grosch Decl. (Dkt. # 249) at 6 ¶ 14.)

10  In the German Action, General Instrument Corporation sought, *inter alia*, injunctive

11  relief prohibiting Microsoft from offering decoder apparatus and computer software in

12  Germany that infringe the two European Patents.  (Grosch Decl. at 6 ¶ 14.)  Both

13  European Patents are essential to the H.264 Standard.  (*Id.* at 6 ¶ 15.)  And, Motorola

14  declared to the ITU that it would license both European Patents on RAND terms to all

15

16  Microsoft's November 9, 2010 complaint.  (*Compare* C11-0343JLR, Dkt. # 37 ¶¶ 102-116 *with*
    Dkt. # 53 ¶¶ 80-94.)

17

18      [7] Motorola's answer also included declaratory judgment claims that (1) it met its RAND
    obligations, and (2) Microsoft repudiated any rights associated with Motorola's RAND

19  statements.  (Dkt. # 67 ¶¶ 21-90 (Counterclaims).)  These two counterclaims are substantially (if
    not precisely) the same, and seek the same relief, as the counterclaims set forth by Motorola in
    the action initiated by Microsoft's November 9, 2010 complaint.  (*Compare* Dkt. # 67 ¶¶ 21-90

20  *with* Dkt. # 68 ¶¶ 61-75.)

21      [8] In the German Action, the plaintiff General Instrument (the defendant in this action) is
    part of the Motorola Group.  (Grosch Decl. at 6 ¶ 14.)  The defendants in the German Action are

22  Microsoft Corporation (the Plaintiff in this action), Microsoft Deutschland GmbH, and Microsoft
    Ireland Operations Ltd.  (*Id.*)

1  applicants on a worldwide basis.  (*See* 10/29/10 Motorola Offer Ltr. at 19, 21.)

2  Moreover, both European Patents were included on the list of patents Motorola provided

3  to Microsoft in its October 29 Letter offering to license all of Motorola's essential patents

4  at 2.25%.  (*See id.* at 2, 19, 21.)

5  **D.   Microsoft's Motion for Preliminary Injunction**

6         The German Action was litigated in the Mannheim Court, which indicated that it

7  would issue a decision with respect to Defendant General Instrument Corporation's

8  patent infringement claim and request for injunctive relief on April 17, 2012.  (Chrocziel

9  Decl. at 5-6 ¶ 21; Grosch Decl. at 9 ¶ 25.)  On March 28, 2012, Microsoft filed its motion

10  for a temporary restraining order and preliminary injunction with this court.  (See Mot.)

11  Microsoft's motion sought an anti-suit injunction against Motorola restraining and

12  enjoining Motorola from enforcing any injunctive relief that it may receive in the German

13  Action.

14         On April 11, 2012, upon review of the parties' written filings and after oral

15  argument, this court found that an anti-suit injunction was appropriate and granted

16  Microsoft's motion for a temporary restraining order restraining Motorola from enforcing

17  any injunctive relief it may receive in the German Action related to the declared-essential

18  European Patents.  (TRO Order at 2.)  Additionally, the court required Microsoft to post a

19  $100,000,000 bond as collateral for any damages to Motorola as a result of the court's

20  restraining order.  (*Id.*)  The court's temporary restraining order remained in effect until

21  May 7, 2012, and the court extended the restraining order at a May 7, 2012 hearing in the

22  presence of the parties.  (*Id.* at 3; 5/7/12 Transcript at 106.)

# III.   DISCUSSION

The court now turns to Microsoft's motion for a preliminary anti-suit injunction. Microsoft's motion for an anti-suit injunction relates only to enjoining Motorola from enforcing any injunctive relief it may receive in the German Action with respect to the European Patents at issue therein.  As stated, the European Patents are essential to the H.264 Standard, but not the 802.11 Standard.  Therefore, in its analysis, the court focuses on Motorola's declarations to the ITU related to its patents essential to the H.264 Standard and Motorola's October 29 Letter to Microsoft offering to license Motorola's patent portfolio related to the H.264 Standard.

## A.   Legal Standard

To obtain preliminary injunctive relief, a party ordinarily must demonstrate (1) that she is likely to succeed on the merits, (2) that she is likely to suffer irreparable harm in the absence of preliminary relief, (3) that the balance of equities tips in her favor, and (4) that an injunction is in the public interest.  *Winter v. Natural Res. Defense Council, Inc.*, 555 U.S. 7, 20 (2008).  The Ninth Circuit has developed a corollary to this test:  a preliminary injunction may be appropriate if there are "serious questions going to the merits" and the balance of the hardships tips sharply in the applicant's favor, so long as the applicant also shows, as *Winter* requires, that the injunction is in the public interest and that irreparable injury is likely.  *Alliance for the Wild Rockies v. Cottrell*, 622 F.3d 1045, 1052 (9th Cir. 2010).  This approach allows for preservation of the status quo where complex legal questions require further inspection or deliberation.

1    Where the injunction sought would prevent a party from litigating similar claims

2    in a foreign court, the standard is different.  To obtain an anti-suit injunction, the

3    applicant is not required to show a likelihood of success on the merits of the underlying

4    claim.  Rather, it need only demonstrate that the factors specific to an anti-suit injunction

5    weigh in its favor.  *E. & J. Gallo Winery v. Andina Licores S.A.*, 446 F.3d 984, 991 (9th

6    Cir. 2006).  Those factors are:  (1) whether or not the parties and the issues are the same,

7    and whether or not the first action is dispositive of the action to be enjoined; (2) whether

8    the foreign litigation would frustrate a policy of the forum issuing the injunction;[9] and (3)

9    whether the impact on comity would be tolerable.  *Applied Med. Distribution Corp. v.*

10   *Surgical Co. BV*, 587 F.3d 909, 913 (9th Cir. 2009) (citing *Gallo*, 446 F.3d at 991, 994).[10]

11   _____

12        [9]  The *Gallo* court indicated that a showing of the second factor could be replaced by any
     of the other three rationales anticipated by *In re Unterweser Reederei Gmbh*, 428 F.2d 888, 896

13   (5th Cir. 1970), *aff'd on reh'g en banc*, 446 F.2d 907 (1971).  *Gallo*, 446 F.3d at 990, 991.  That
     is, a showing that the foreign litigation frustrates a policy of the forum issuing the injunction

14   could be replaced by a showing that the foreign litigation would be vexatious or oppressive,
     would threaten the issuing court's *in rem* or *quasi in rem* jurisdiction, or where the proceedings

15   prejudice other equitable considerations.  *Id.* (citing *Seattle Totems Hockey Club, Inc. v. NHL*,
     652 F.2d 852, 855 (9th Cir. 1981)).

16        [10]  It is arguably unclear from Ninth Circuit case law whether the three anti-suit injunction
     factors replace all four *Winter* preliminary injunction factors, or whether they replace only the

17   requirement that the movant show a likelihood of success on the merits of the underlying claim.
     *See Gallo*, 446 F.3d at 991 ("[Movant] need not meet the usual test of a likelihood of success on

18   the merits of the underlying claim to obtain an anti-suit injunction . . . .  Rather, [movant] need
     only demonstrate that the factors specific to an anti-suit injunction weigh in favor of granting the

19   injunction.").  Under a literal reading of *Gallo*, a showing of irreparable harm, balance of
     equities, and public interest might still be required to obtain an anti-suit injunction.  But the

20   absence of any mention of the *Winter* factors by the *Applied Medical Distribution* court suggests
     otherwise.  The Third Circuit expressly supports the replacement of all four *Winter* factors.  *See*

21   *Stonington Partners, Inc. v. Lernout & Hauspie Speech Products N.V.*, 310 F.3d 118, 128-29 (3d
     Cir. 2002).  For completeness, the court will analyze the three anti-suit injunction factors as well

22   as the three possibly remaining preliminary injunction factors.

To determine proper resolution of Microsoft's motion for an anti-suit injunction, the court begins its analysis with the three anti-suit injunction factors and then turns to the three preliminary injunction factors (*see supra* footnote 10 for discussion as to the applicability of the *Winter* preliminary injunction factors).

**B.   Anti-Suit Injunction Factors**

### i.     Affect of the U.S. Action on the German Action

"Whether or not the parties and the issues are the same, and whether or not the first action is dispositive of the action to be enjoined" is a threshold question in the anti-suit injunction analysis. *Applied Med. Distribution*, 587 F.3d at 918; *Gallo*, 446 F.3d at 991.

### a.     Whether the Parties are the Same in the U.S. and German Actions

Perfect identity of parties is not required for an anti-suit injunction. Rather, it suffices that the parties be affiliated in such a way that their interests coincide. *See, e.g.*, *Int'l Equity Invs., Inc. v. Opportunity Equity Partners Ltd.*, 441 F.Supp.2d 552, 562 (S.D.N.Y.2006).

Here, the parties admit that for purposes of an anti-suit injunction the parties are the same. (4/11/12 Transcript (Dkt. # 276) at 21.) Indeed, the action before this court involves Microsoft as a plaintiff and Motorola, Motorola Mobility Inc., and General Instrument Corporation as defendants; whereas, the German Action involves General Instrument Corporation, an affiliate of Motorola, as the plaintiff and Microsoft and two of

1    its European affiliates as defendants.  Accordingly, the court finds that the parties in this

2    action and the German Action are the same.

3        **b.    Whether the Issues are the Same in the U.S. and German
               Actions**

4

5    Anti-suit injunctions are only appropriate when the domestic action is capable of

     disposing of all the issues in the foreign action.  *Applied Med. Distribution*, 587 F.3d at

6    915.  As is the case here, when the parties in the two actions are the same, the two

7    questions of whether "the issues are the same" and whether "the domestic action is

8    dispositive of the foreign action" collapse into one.  *Id.* (recognizing that "issues are

9    functionally the same if one action is dispositive of the other.").  The issues need not be

10   precisely identical, but instead the inquiry is whether the issues in the domestic action are

11   dispositive of the issues in the foreign action.  (*Id.*)

12   Generally, in the action before this court, Microsoft seeks adjudication of the

13   duties and obligations of Motorola and Microsoft under Motorola's commitments to the

14   ITU to license H.264 Standard-essential patents on RAND terms.  (*See generally* Am.

15   Compl.)  Specifically, Microsoft asks the court to rule that Motorola's declarations to the

16   ITU create binding, enforceable contracts between Motorola and the ITU, whereby

17   Motorola commits to grant RAND licenses for its H.264 Standard-essential patents to all

18   applicants on a worldwide basis.  Additionally, Microsoft asks the court to declare that it

19   is a third-party beneficiary to this contract and that it has a right to obtain a license for

20   Motorola's H.264 Standard-essential patents on RAND terms on a worldwide basis.  The

21   court has already determined that Motorola's declarations to the ITU created an

22

ORDER- 14

1  enforceable contract requiring Motorola to license its H.264 Standard-essential patents on

2  RAND terms, with Microsoft as a third-party beneficiary to that contract.  (Partial S.J.

3  Order at 10.)

4      Having made these determinations, the court is now left to adjudicate (1) whether

5  Microsoft repudiated, by the filing of this lawsuit, its right to a RAND license for

6  Motorola's H.264 Standard-essential patents, and (2) in the event that Microsoft did not

7  repudiate its rights to a license, whether Motorola's October 29 Letter sought an

8  unreasonably high royalty rate for a license to Motorola's H.264 Standard-essential

9  patents, and thus, breached Motorola's obligation to grant licenses on RAND terms.  The

10 parties have filed cross motions for summary judgment on these related issues, and the

11 court heard oral argument on both motions on May 7, 2012.  (*See* Dkt. ## 231, 236, 313.)

12     Additionally, Microsoft has brought a separate motion for summary judgment

13 seeking to dismiss Motorola's request for injunctive relief with respect to any of its

14 patents essential to the 802.11 and H.264 Standards that were offered to Microsoft

15 through the October 21 and October 29 Letters.[11]  (*See generally* Partial S.J. Mot. re Inj.

16 Relief (Dkt. # 152).)  In this motion, Microsoft argues injunctive relief is inappropriate

17 because (1) Motorola's October 21 and October 29 Letters sought monetary payments for

18 a worldwide license to Motorola's patents related to the 802.11 and H.264 Standards

19 demonstrating that monetary relief would suffice as an alternative remedy to an

20 injunction, and (2) Microsoft seeks to obtain a license for Motorola's patents, is entitled

21

22     [11] The court heard oral argument on Microsoft's motion on May 7, 2012.  (Dkt. # 313.)

ORDER- 15

1  to a RAND license as a third-party beneficiary, and such a RAND licensing arrangement

2  will eventually take place between the parties either through negotiation or by the court

3  setting the terms.[12]  (*See generally id.*)  Thus, through this motion—because the

4  European Patents at issue in the German Action were included in Motorola's October 29

5  Letter offering a worldwide license for Motorola's H.264 Standard-essential patents, and

6  because Motorola contracted with the ITU to license the European Patents on RAND

7  terms to all applicants on a worldwide basis—Microsoft has squarely placed before this

8  court the issue of whether injunctive relief is an appropriate remedy for infringement of

9  Motorola's H.264 Standard-essential patents, including the European Patents.

10        Finally, before the court is a determination of RAND terms and conditions with

11  respect to a license Motorola may be obligated to provide Microsoft for its standard-

12  essential patents.  Thus, in the event the court finds that Microsoft has not repudiated its

13  rights to a RAND license for Motorola's standard-essential patents and that the parties

14  continue to disagree as to the RAND terms of such a license, the court will conduct a trial

15  to determine such terms, including a determination of a RAND royalty rate.  The trial

16  date has been set for November 19, 2012.

17        Thus, at the conclusion of this matter, the court will have determined (1) whether

18  Microsoft is entitled to a worldwide RAND license for Motorola's standard essential

19

20        [12] Although an express statement that Microsoft seeks a license for Motorola's standard
21  essential patents is missing from its complaint (*see generally* Am. Compl.), in its recent papers
     to the court, Microsoft has affirmatively stated that it is ready and willing to take a license to such
22  patents on RAND terms.  (*See, e.g.*, Mot. Partial S.J. re Inj. Relief at 5 ("The indisputable
     evidence is that Microsoft is seeking a license on RAND terms—in this very action.").)

1  patents, including the European Patents, (2) whether Microsoft has repudiated its rights to

2  such a license, (3) whether Motorola may seek injunctive relief against Microsoft with

3  respect to its standard essential patents, and (4) in the event Microsoft is entitled to such a

4  license, what the RAND terms are for such a license.

5       Based on the issues before it, the court finds that this action is dispositive of

6  whether a German court may issue an injunction against Microsoft for infringement of

7  the European Patents.  Issuance of injunctive relief with respect to the European Patents

8  is an issue squarely before this court.  Here, the court stresses that its April 11, 2012

9  temporary restraining order was limited to enjoining Motorola from enforcing any

10 injunctive relief that it may receive in the German Action with respect to the European

11 Patents.  Importantly, the order in no way enjoined Motorola from pursuing the German

12 Action and receiving monetary damages (or any other non-injunctive relief), and in no

13 way prohibited further proceedings in Germany.  Thus, the court's restraining order was

14 limited to the issue directly before it—whether injunctive relief was permissible.  Thus,

15 the court finds that for the limited purpose of determining whether an anti-suit injunction

16 enjoining Motorola from enforcing any injunctive relief it may receive in the German

17 Action is appropriate, the issues before it are dispositive of the German Action.

18     **ii.    Frustrate a Policy of the Forum Issuing the Injunction**

19          "The second step in deciding if an anti-suit injunction is appropriate is determining

20 if the continuation of the foreign litigation would frustrate a policy of the forum issuing

21 the injunction." *Applied Med. Distribution*, 587 F.3d at 918 (internal quotation marks

22 omitted).  Courts have found that court policies against avoiding inconsistent judgments,

1  forum shopping and engaging in duplicative and vexatious litigation sufficient to satisfy

2  this step.  *See id.* at 918.

3        The court finds that this factor favors granting an anti-suit injunction.  First, as the

4  issue of injunctive relief is before both this court and the court in Germany, this court has

5  concerns against inconsistent judgments.  Indeed, this court may find that Motorola may

6  not seek injunctive relief against Microsoft with respect to its standard essential patents,

7  which include the European Patents; whereas to the contrary, the German court may grant

8  Motorola the injunctive relief it seeks in the German Action with respect to the same

9  European Patents.[13]  Second, the court finds that the timing of the filing of the German

10 Action raises concerns of forum shopping and duplicative and vexatious litigation.  In

11 this action, Microsoft filed its initial complaint in November 2010 invoking this court's

12 jurisdiction to determine the worldwide rights and obligations of Motorola's

13 commitments to the ITU and IEEE with respect to all Motorola's standard essential

14 patents, including the two European Patents.  It was not until June 2011, over six months

15 after Microsoft initiated its action, that Motorola initiated the German Action seeking

16 injunctive relief for Microsoft's alleged infringement of the European Patents.  The

17 court's concerns over forum shopping and duplicative and vexatious litigation are

18 heightened by the fact that Motorola's commitments to the ITU involved approximately

19 100 Motorola-owned patents, yet Motorola invoked the German Action implicating only

20

21      [13] In fact, it is the court's understanding that on May 2, 2012, the German court issued its

22 final order finding in favor of Motorola on the issue of patent infringement and granting
   Motorola injunctive relief.  (5/7/12 Transcript at 43.)

two (the European Patents) of these patents and sought injunctive relief in Germany before this court could adjudicate that precise issue.

In sum, Motorola's actions have frustrated this court's ability to adjudicate issues properly before it. Without the issuance of an anti-suit injunction, the integrity of the action before this court will be lessened.

### iii.    Whether the impact on comity would be tolerable

"The third step in deciding if an anti-suit injunction is appropriate is determining whether the impact on comity would be tolerable." *Applied Med. Distribution*, 587 F.3d at 919. "[T]he extent to which the United States, or any state, honors the judicial decrees of foreign nations is a matter of choice, governed by the comity of nations" and the "[e]xtension of comity to a foreign judgment is neither a matter of absolute obligation, on the one hand, nor of mere courtesy and good will, upon the other." *Asvesta v. Petroutsas*, 580 F.3d 1000, 1010-11 (9th Cir. 2009) (internal quotations and citations omitted). Recognizing that anti-suit injunctions may implicate comity concerns, the Ninth Circuit has urged that they be issued sparingly. *Gallo*, 446 F.3d at 989.

Although the court is keenly aware of the importance of comity, under the issues and facts before it, an anti-suit injunction would not have an intolerable impact on comity. Importantly, the court finds the concerns of comity alleviated because, here, a foreign court has been belatedly asked by Motorola to decide an issue already placed before this court. As stated, Microsoft initiated the action in this court in November 2010 placing directly at issue whether it is entitled to a license for Motorola's standard essential patents, including the European Patents. Then, over six months later, Motorola

seeks to litigate that precise issue with respect to the European Patents in the German

Action denying this court the opportunity to administer the prior filed action.  *See Laker*

*Airways Ltd. V. Sabena Belgian World Airlines*, 731 F.2d 909, 939 (D.C. Cir. 1984).

Further reducing the court's concern of comity is that an anti-suit injunction is

limited in scope to enjoining Motorola from enforcing any injunctive relief that it may

receive in the German Action with respect to the European Patents.  Thus, an anti-suit

injunction implicates comity only so far as necessary to preserve this court's ability to

adjudicate the duplicative dispute over the propriety of injunctive relief.  Moreover, upon

adjudication of the duplicative issue, this court will remove the anti-suit injunction and

the parties will follow the court's determination of the parties' rights and obligations

under Motorola's contract with the ITU regarding its standard essential patents.

Finally, the court notes that this court has strong interest in adjudicating the claims

before it.  The lawsuit was initiated by an American company (Microsoft) against another

American company (Motorola).  Central to the lawsuit are the October 21 and October 29

Letters—sent by Motorola from its Libertyville, Illinois office to Microsoft at its

Redmond, Washington office—which Microsoft alleges breached Motorola's

commitments to the IEEE and ITU to grant licenses for all of its patents, both domestic

and foreign, on RAND terms to all applicants on a worldwide basis.  Accordingly, this

court is fully capable of adjudicating the issues before it.  To the contrary, the lawsuit

lacks international issues and foreign government involvement.  *Applied Med.*

*Distribution*, 587 F.3d at 921 (holding "that where there is no public international issue

raised, a foreign government is not involved in the litigation, and the litigation involves

private parties concerning disputes arising out of a contract, not only would an anti-suit injunction not have an intolerable impact on comity, but allowing foreign suits to proceed in such circumstances would seriously *harm* international comity") (international quotations omitted).

Thus, based on the foregoing, the court finds that the three anti-suit injunction factors favor granting the injunction. Having made this finding, the court now turns to the three *Winter* preliminary injunction factors.

## C.    Preliminary Injunction Factors

To obtain preliminary injunctive relief, a party ordinarily must demonstrate (1) that she is likely to succeed on the merits, (2) that she is likely to suffer irreparable harm in the absence of preliminary relief, (3) that the balance of equities tips in her favor, and (4) that an injunction is in the public interest. *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008). As explained in footnote 10 (*infra*), the first factor—that she is likely to succeed on the merits—has clearly been replaced by the anti-suit injunction factors. Thus, the court examines the remaining three preliminary injunction factors below.

### i.    Irreparable Harm

In the German Action, Motorola seeks injunctive relief to exclude Microsoft products utilizing the H.264 Standard. (Mot. at 14; Grosch Decl. at 6 ¶ 15.) In particular, Microsoft asserts that it may be forced to withdraw from the German market its Xbox game console and software products such as Windows 7, Internet Explorer 9, and Windows Media Player 12. (Mot. at 14; Grosch Decl. at 6 ¶ 15.)    To describe the

ORDER- 21

1   adverse impact a German injunction would have with respect to the Xbox, Microsoft

2   submitted the declaration of Josh Hutto, who is responsible for Microsoft's global

3   marketing strategy for the Xbox.  (Hutto Decl. (Dkt. # 216).)   Mr. Hutto explains that

4   removal of the Xbox from the German market will cause Microsoft to lose sales, recent

5   momentum, and market share.  (*Id.* at 2 ¶ 7.)  Mr. Hutto further states that regaining any

6   lost market share will be difficult because (1) shelf space in retail stores is often hard to

7   recapture and (2) third-party publishers or makers of games compatible with Microsoft's

8   Xbox console will be compelled to cease production for the Xbox, instead favoring other

9   game console providers such as Nintendo or Sony.  (*Id.* at 3 ¶¶ 8, 9.)  As a result, Mr.

10  Hutto believes that the Xbox will see diminished brand loyalty and brand affinity.  (*Id.* at

11  4 ¶ 13.)

12      As to the adverse affect of a German injunction on Microsoft's software products

13  (such as Windows) related to the H.264 technology, Microsoft submitted the declaration

14  of Marcelo Prieto, Senior Director, Volume Licensing Programs at Microsoft, who is

15  responsible for the management of Microsoft's global portfolio of volume licensing

16  agreements.  (Prieto Decl. (Dkt. # 214) at 1-2 ¶ 2.)  Mr. Prieto explains that Microsoft's

17  software licensing agreements often involve multinational companies, with German

18  presences, who seek large scale licensing arrangements.  (*Id.* at 2 ¶ 5 & 4 ¶ 14.)  A

19  German injunction would force Microsoft to alter its business relationships with such

20  multinational companies, providing software licenses to offices outside of Germany and

21  ceasing support to offices within Germany.  (*Id.* at 3-4 ¶ 13.)  For a multinational

22  company seeking a unified information technology environment across all corporate

1    offices, such an arrangement will be undesirable.  (*Id.* at 4 ¶ 14.)  According to Microsoft,

2    this arrangement will damage its reputation for providing broad information technology

3    solutions that successfully operate across international borders.  (Mot. at 15.)

4         Based on the evidence before it, the court finds that Microsoft has shown that a

5    German injunction enjoining the sale of Microsoft Software and the Microsoft Xbox in

6    the country of Germany will result irreparable harm.  Microsoft has provided this court

7    with convincing evidence that it will lose market share, which will be difficult to regain,

8    and suffer harm to its business reputation.  *Conceptus, Inc. v. Hologic, Inc.*, No. C 09-

9    02280 WHA, 2012 WL 44064, at *2 (N.D. Cal. Jan. 9, 2012) (loss of market share,

10   customers, and access to potential customers demonstrated irreparable harm); *Rent-a-*

11   *Center,Inc. v. Canyon Television & Appliance Rental, Inc.*, 944 F.2d 597, 603 (9th Cir.

12   1991) (damage to reputation or goodwill, because it is difficult to quantify qualifies as

13   irreparable harm).  Thus, this factor favors granting a preliminary injunction and hence an

14   anti-suit injunction.[14]

15        ii.    **Balance of Equities**

16        The court finds the balance of equities weighs in favor of an injunction.  Were

17   Microsoft enjoined from selling products covered by the H.264 technology in Germany,

18   it appears to the court that Microsoft has two options.  First, it could cease the sale of its

19

_____

20        [14] Moreover, at this point, Microsoft's irreparable harm is in no way speculative.  Indeed,

21   as stated above, it appears to the court that the German Action concluded on May 2, 2012, with a
     finding of infringement in Motorola's favor and the issuance of an injunction.  (5/7/12 Transcript

22   at 43.)

ORDER- 23

Xbox and software products in Germany, thereby incurring the harm described above (*supra* § III.C.i).  Or, second, it could attempt to negotiate a license for Motorola's H.264 Standard-essential patents with the threat of an injunction looming over the negotiation table.  It would seem clear that a negotiation where one party (Microsoft) must either come to an agreement or cease its sales throughout the country of Germany fundamentally places that party at a disadvantage.  Moreover, if it is shown later that injunctive relief was indeed improper, any licensing arrangement resulting from such negotiations may not easily be undone.  Thus, under either option, the court finds that Microsoft faces significant harm without the issuance of an anti-suit injunction.

To the contrary, Motorola faces little injury by an anti-suit injunction.  By issuance of an anti-suit injunction, this court is in no way stating that Motorola will not at some later date receive injunctive relief, but only that it must wait until this court has had the opportunity to adjudicate that issue.  In the meantime, the court has required Microsoft to post a $100 million bond to compensate Motorola for its losses in the event that this injunction is reversed or vacated.  Further, because Motorola's October 21 and 29 Letters seek a monetary royalty payment for the license of Motorola's standard essential patents, Motorola implicitly admits that it may be made whole through monetary damages.  Thus, the court finds that the balance of hardships tips in Microsoft's favor and in favor of granting an anti-suit injunction.

### iii.    Public Interest

The court finds that the public interest is served by issuing an anti-suit injunction and permitting Microsoft to continue its business operations without interruption until

1  this court has had the opportunity to adjudicate the injunctive relief issue before it.  Such

2  a finding serves the public interest by (1) having disputes properly before a United States

3  court resolved here as opposed to a foreign court; (2) ensuring standard essential patents

4  are accessible to all comers under RAND terms; and (3) permitting Microsoft's

5  customers, who rely on Microsoft's information technology services, to conduct business

6  uninterrupted.  Thus, the court finds that the public interest factor favors granting an anti-

7  suit injunction.

8                              IV.    CONCLUSION

9          Based on the foregoing, the court GRANTS Microsoft's motion for a preliminary

10  injunction (Dkt. ## 209 (sealed motion), 210 (redacted motion)) and CONVERTS the

11  court's April 11, 2012 temporary restraining order (Dkt. # 261) into a preliminary

12  injunction.  This preliminary injunction shall remain in effect until this court is able to

13  determine whether injunctive relief is an appropriate remedy for Motorola to seek with

14  respect to Microsoft's alleged infringement of Motorola's standard essential patents.

15          Dated this 14th day of May, 2012.

16

17  _____

18  The Honorable James L. Robart
    U.S.  District Court Judge

19

20

21

22

ORDER- 25