# EXHIBIT A

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| MICROSOFT CORPORATION, | CASE NO. C10-1823JLR |
| Plaintiff, | ORDER |
| v. | |
| MOTOROLA, INC., et al., | |
| Defendants. | |
| MOTOROLA MOBILITY, INC., et al., | |
| Plaintiffs, | |
| v. | |
| MICROSOFT CORPORATION, | |
| Defendant. | |

6

# I.     INTRODUCTION

This matter is before the court on Plaintiff Microsoft Corporation's ("Microsoft") motion for temporary restraining order and preliminary injunction ("Microsoft's Motion").[1] (Mot. (Dkt. # 209).)  The court heard the oral argument of counsel on April 11, 2012, and has also considered all pleadings on file, including:  (1) Plaintiff Microsoft Corporation's ("Microsoft") motion for a temporary restraining order and preliminary injunction (Mot. (Dkt. # 209)), along with all exhibits and attachments; (2) Defendants Motorola, Inc., Motorola Mobility, Inc., and General Instrument Corporation's (collectively, "Motorola") response in opposition (Resp. (Dkt. # 248)), along with all exhibits and attachments; and (3) Microsoft's reply (Reply (Dkt. # 257)).  Being fully advised, the court GRANTS Microsoft's motion for a preliminary injunction.[2]

# II.     BACKGROUND

## A.     The IEEE and the ITU as Standard Setting Organizations

Microsoft and Motorola are both members of the Institute of Electrical and Electronics Engineers ("IEEE") and the International Telecommunication Union ("ITU"). The IEEE and the ITU, neither of which are parties to the instant dispute, are

---

[1] While the parties in this action have both filed affirmative claims, because (as explained herein) Microsoft filed the complaint initiating the instant action, for purposes of this order, the court names Microsoft as the "plaintiff."

[2] On April 12, 2012, the court granted Microsoft's motion for a temporary restraining order.  (TRO Order (Dkt. # 261).)  The court's April 12, 2012 order was limited to enjoining Motorola from enforcing any injunctive relief that it may receive from a Germany court with respect to the patents at issue in Microsoft's Motion.  (*Id.* at 2.)  The temporary restraining order was to remain in effect until May 7, 2012.  (*Id.* at 3.)  On May 7, 2012, the court extended the temporary restraining order until the time it issued a ruling on Microsoft's concurrent motion for a preliminary injunction.  (5/7/12 Transcript (Dkt. # 315) at 106.)

international standards setting organizations.  Standards setting organizations play a significant role in the technology market by allowing companies to agree on common technological standards so that all compliant products will work together.  Standards lower costs by increasing product manufacturing volume, and they increase price competition by eliminating "switching costs" for consumers who desire to switch from products manufactured by one firm to those manufactured by another.

One complication with standards is that it may be necessary to use patented technology in order to practice them.  If a patent claims technology selected by a standards setting organization, the patent is called an "essential patent."  Here, Motorola is the owner of numerous patents "essential" to certain standards established by the IEEE and the ITU.  (*See* 10/21/10 Motorola Offer Ltr. (Dkt. # 79-5); 10/29/10 Motorola Offer Ltr. (Dkt. # 79-6) (see list of attachments).)  In order to reduce the likelihood that owners of essential patents will abuse their market power, many standards setting organizations, including the IEEE and the ITU, have adopted rules related to the disclosure and licensing of essential patents.  The policies often require or encourage members of the standards setting organization to identify patents that are essential to a proposed standard and to agree to license their essential patents on reasonable and non-discriminatory ("RAND") terms to anyone who requests a license.  Such rules help to insure that standards do not allow essential patent owners to extort their competitors or prevent them from entering the marketplace.

8

**B.    Motorola's Statements to the IEEE and the ITU**

This lawsuit involves two standards—the IEEE 802.11 wireless local area network ("WLAN") Standard ("802.11 Standard) and the ITU H.264 advanced video coding technology standard ("H.264 Standard").[3]  (*See generally* Compl. (Dkt. # 1); Am. Compl. (Dkt. # 53).)  The IEEE's standard setting process is governed by its Intellectual Property Rights Policy (the "IEEE Policy").  (*See generally* IEEE Policy (Dkt. #79-1).)  The IEEE Policy provides that "IEEE standards may be drafted in terms that include the use of Essential Patent Claims."  (*Id.* at 18 (Section 6.2).)  The IEEE Policy defines the term "Essential Patent Claim" as one or more claims in an issued patent (or pending patent application) that are "necessary to create a compliant implementation of either mandatory or optional portions of the normative clauses of the [Proposed] IEEE Standard . . . ."  (*Id.*)  If "Essential Patent Claims" are included in an IEEE standard, the IEEE requires the patent holder to either state that it is not aware of any patents relevant to the IEEE standard or to provide the IEEE with a Letter of Assurance.  (*Id.*)  Any such Letter of Assurance must include either (1) a disclaimer to the effect that the patent holder will not enforce the "Essential Patent Claims," or (2):

> [a] statement that a license for a compliant implementation of the standard will be made available to an unrestricted number of applicants on a worldwide basis without compensation or under reasonable rates, with reasonable terms and conditions that are demonstrably free of any unfair discrimination. . . .

---

[3] The ITU developed the H.264 Standard jointly with two other standard setting organizations—the International Organization for Standardization and the International Electrotechnical Commission.  (Partial S.J. Order (Dkt. #188) at 3.)

(*Id.*)

Motorola has submitted numerous Letters of Assurance to the IEEE in connection

with the 802.11 Standard stating that it "will grant" or "is prepared to grant" a license

under RAND terms for its patents essential to the 802.11 Standard.  (*See generally* IEEE

LOAs (Dkt. # 79-2).)  A typical Motorola Letter of Assurance to the IEEE provides, in

relevant part:

> The Patent Holder will grant [is prepared to grant] a license under
> reasonable rates to an unrestricted number of applicants on a worldwide,
> non-discriminatory basis with reasonable terms and conditions to comply
> with the [Proposed] IEEE Standard.

(*See generally id.*)

Like the IEEE, the ITU has established a policy (the "ITU Policy") with respect to

holders of patents "essential" to implementing a standard.  (*See* ITU Pol. (Dkt. # 79-3).)

Such patent holders must file with the ITU a "Patent Statement and Licensing

Declaration" declaring whether they (1) will grant licenses free of charge on a RAND

basis; (2) will grant licenses on RAND terms; or (3) are not willing to comply with either

of the first two options.  (*See id.* at 9-12.)  Motorola has sent numerous declarations to the

ITU stating that they will grant licenses on RAND terms for its patents essential the

H.264 Standard.  (*See generally* ITU Declarations (Dkt. # 79-4).)  A typical declaration

by Motorola to the ITU provides, in relevant part:

> The Patent Holder will grant a license to an unrestricted number of
> applicants on a worldwide, non-discriminatory basis and on reasonable
> terms and conditions to use the patented material necessary in order to

> manufacture, use, and/or sell implementations of the above ITU-T Recommendation | ISOC/IEC International Standard.[4]

(*E.g.*, *id.* at 2.)

The court ruled that Motorola's Letters of Assurance to the IEEE and Motorola's declarations to the ITU creates an enforceable contract between Motorola and the respective standard setting organization. (Partial S.J. Order at 10.) Additionally, as a member of the IEEE and the ITU and a prospective user of both the H.264 Standard and the 802.11 Standard, Microsoft was found to be a third-party beneficiary of the contract. (*Id.*)

## B.    The Present Action

### i.    Microsoft's Breach of Contract Claim

On October 21, 2010, Motorola sent Microsoft a letter (the "October 21 Letter") that read in pertinent part:

> This letter is to confirm Motorola's offer to grant Microsoft a worldwide non-exclusive license under Motorola's portfolio of patents and pending applications having claims that may be or become Essential Patent Claims (as defined in section 6.1 of the IEEE bylaws) for a compliant implementation of the IEEE 802.11 Standards. . . . Motorola offers to license the patents under reasonable and non-discriminatory terms and conditions ("RAND"), including a reasonable royalty of 2.25% per unit for each 802.11 compliant product, subject to a grant back license under the 802.11 essential patents of Microsoft. As per Motorola's standard terms, the royalty is calculated based on the price of the end product (e.g, each Xbox 360 product) and not on component software (e.g., Windows Mobile Software).

---

[4] The declaration to the ITU also states that "negotiations of licenses are left to the parties concerned and are performed outside the ITU-T | ISO/IEC. (ITU Declarations at 2.)

11

(10/21/10 Offer Ltr. at 2.)  Then, on October 29, 2010, Motorola sent a similar letter (the

"October 29 Letter") regarding the H.264 related patents, stating:

> Motorola offers to license the patents on a non-discriminatory basis on
> reasonable terms and conditions ("RAND"), including a reasonable royalty,
> of 2.25% per unit for each H.264 compliant product, subject to a grant back
> license under the H.264 patents of Microsoft, and subject to any Motorola
> commitments made to JVT in connection with an approved H.264
> recommendation.  As per Motorola's standard terms, the royalty is
> calculated based on the price of the end product (e.g., each Xbox 360
> product, each PC/laptop, each smartphone, etc.) and not on component
> software (e.g., Xbox 360 system software, Windows 7 software, Windows
> Phone 7 software, etc.)

(10/29/10 Offer Ltr. at 2.)  Motorola attached to its October 29 Letter a non-exhaustive

list of patents it offered to license to Microsoft.  (*See id.*)

Microsoft filed its complaint initiating this action on November 9, 2010 and its

amended complaint on February 23, 2011.  (Compl.; Am. Compl.)  Microsoft's contends

that the October 21 and October 29 Letters seek unreasonable royalty rates and therefore

breach Motorola's obligations to the IEEE and the ITU to grant licenses on RAND terms.

(Am. Compl. at 21, 22.)  Microsoft alleges claims against Motorola for breach of contract

and promissory estoppel.[5]  (*Id.*)  In its prayer for relief, Microsoft seeks, *inter alia*, a

declaration that it is entitled to a license on RAND terms from Motorola for all patents

subject to Motorola's commitments to the IEEE (through Letters of Assurance) and to the

ITU (through declarations).  (*Id.* at 25 ¶¶ G, H (Prayer for Relief).)

---

[5] Microsoft's action against Motorola also included claims for waiver and declaratory
judgment, but the court's June 1, 2011 order dismissed both of those claims, leaving only the
breach of contract and promissory estoppel claims.  (Dkt. # 66 at 12.)

In response, Motorola asserted affirmative defenses and counterclaims.  (*See* Motorola Answer (Dkt. # 68).)  Motorola's counterclaims, which are relevant to the instant motion for preliminary injunction, seek a declaratory judgment that (1) it has not breached any RAND obligations, and (2) Microsoft repudiated and/or rejected the benefits of Motorola's RAND obligations, and therefore Microsoft is not entitled to a license to Motorola's patents related to the H.264 and 802.11 Standards.  (*Id.* ¶¶ 61-75 (Counterclaims).)

      **b.**      **The Parties' Patent Infringement Claims**

On June 1, 2011, under cause No. C10-1823JLR, the court consolidated the action initiated by Microsoft's November 9, 2010 complaint with an action initiated by Motorola in the Western District of Wisconsin, subsequently transferred to this district as C11-0343JLR, where Motorola alleges that Microsoft infringed Motorola-owned U.S. Patent Nos. 7,310,374; 7,310,375; and 7,310,376 (the "Motorola Patents").  (Order (Dkt. # 66 at 12) (consolidating the actions); Motorola Compl. (C11-0343JLR, Dkt. # 29) ¶¶ 14-40 (Motorola's claims for patent infringement).)  The Motorola Patents relate to the H.264 video compression technology.  (*See* Motorola Compl. ¶¶ 17, 26, 35.)  Microsoft answered and asserted affirmative defenses, as well as a counterclaim for patent infringement as to Microsoft-owned U.S. Patent Nos. 6,339,780 and 7,411,582 (the "Microsoft Patents.[6]  (C11-0343JLR, Dkt. # 37 ¶¶ 11-20.)  In turn, Motorola answered

---

[6] Microsoft's answer also included claims for breach of contract and promissory estoppel which are substantially (if not precisely) the same as the claims in the action initiated by

Microsoft's counterclaims, asserted 14 affirmative defenses, and brought a declaratory judgment counterclaim that it did not infringe the Microsoft Patents and that the Microsoft Patents are invalid.[7] (Dkt. # 67 ¶¶ 9-20 (Counterclaims).)

## C.  German Action

On July 6, 2011, over six months after Microsoft filed its initial complaint in this court, Defendant General Instrument Corporation initiated a separate lawsuit in Germany (the "German action") alleging Plaintiff Microsoft infringed two Motorola-owned European issued patents—European Patent Nos. 0615384 and 0538667 (the "European Patents").[8] (Chrocziel Decl. (Dkt. # 212) at 2 ¶ 4; Grosch Decl. (Dkt. # 249) at 6 ¶ 14.) In the German Action, General Instrument Corporation sought, *inter alia*, injunctive relief prohibiting Microsoft from offering decoder apparatus and computer software in Germany that infringe the two European Patents. (Grosch Decl. at 6 ¶ 14.) Both European Patents are essential to the H.264 Standard. (*Id.* at 6 ¶ 15.) And, Motorola declared to the ITU that it would license both European Patents on RAND terms to all

Microsoft's November 9, 2010 complaint. (*Compare* C11-0343JLR, Dkt. # 37 ¶¶ 102-116 *with* Dkt. # 53 ¶¶ 80-94.)

[7] Motorola's answer also included declaratory judgment claims that (1) it met its RAND obligations, and (2) Microsoft repudiated any rights associated with Motorola's RAND statements. (Dkt. # 67 ¶¶ 21-90 (Counterclaims).) These two counterclaims are substantially (if not precisely) the same, and seek the same relief, as the counterclaims set forth by Motorola in the action initiated by Microsoft's November 9, 2010 complaint. (*Compare* Dkt. # 67 ¶¶ 21-90 *with* Dkt. # 68 ¶¶ 61-75.)

[8] In the German Action, the plaintiff General Instrument (the defendant in this action) is part of the Motorola Group. (Grosch Decl. at 6 ¶ 14.) The defendants in the German Action are Microsoft Corporation (the Plaintiff in this action), Microsoft Deutschland GmbH, and Microsoft Ireland Operations Ltd. (*Id.*)

14

applicants on a worldwide basis.  (*See* 10/29/10 Motorola Offer Ltr. at 19, 21.)

Moreover, both European Patents were included on the list of patents Motorola provided

to Microsoft in its October 29 Letter offering to license all of Motorola's essential patents

at 2.25%.  (*See id.* at 2, 19, 21.)

## D.        Microsoft's Motion for Preliminary Injunction

The German Action was litigated in the Mannheim Court, which indicated that it

would issue a decision with respect to Defendant General Instrument Corporation's

patent infringement claim and request for injunctive relief on April 17, 2012.  (Chrocziel

Decl. at 5-6 ¶ 21; Grosch Decl. at 9 ¶ 25.)  On March 28, 2012, Microsoft filed its motion

for a temporary restraining order and preliminary injunction with this court.  (See Mot.)

Microsoft's motion sought an anti-suit injunction against Motorola restraining and

enjoining Motorola from enforcing any injunctive relief that it may receive in the German

Action.

On April 11, 2012, upon review of the parties' written filings and after oral

argument, this court found that an anti-suit injunction was appropriate and granted

Microsoft's motion for a temporary restraining order restraining Motorola from enforcing

any injunctive relief it may receive in the German Action related to the declared-essential

European Patents.  (TRO Order at 2.)  Additionally, the court required Microsoft to post a

$100,000,000 bond as collateral for any damages to Motorola as a result of the court's

restraining order.  (*Id.*)  The court's temporary restraining order remained in effect until

May 7, 2012, and the court extended the restraining order at a May 7, 2012 hearing in the

presence of the parties.  (*Id.* at 3; 5/7/12 Transcript at 106.)

15

## III.    DISCUSSION

The court now turns to Microsoft's motion for a preliminary anti-suit injunction. Microsoft's motion for an anti-suit injunction relates only to enjoining Motorola from enforcing any injunctive relief it may receive in the German Action with respect to the European Patents at issue therein.  As stated, the European Patents are essential to the H.264 Standard, but not the 802.11 Standard.  Therefore, in its analysis, the court focuses on Motorola's declarations to the ITU related to its patents essential to the H.264 Standard and Motorola's October 29 Letter to Microsoft offering to license Motorola's patent portfolio related to the H.264 Standard.

### A.    Legal Standard

To obtain preliminary injunctive relief, a party ordinarily must demonstrate (1) that she is likely to succeed on the merits, (2) that she is likely to suffer irreparable harm in the absence of preliminary relief, (3) that the balance of equities tips in her favor, and (4) that an injunction is in the public interest.  *Winter v. Natural Res. Defense Council, Inc.*, 555 U.S. 7, 20 (2008).  The Ninth Circuit has developed a corollary to this test:  a preliminary injunction may be appropriate if there are "serious questions going to the merits" and the balance of the hardships tips sharply in the applicant's favor, so long as the applicant also shows, as *Winter* requires, that the injunction is in the public interest and that irreparable injury is likely.  *Alliance for the Wild Rockies v. Cottrell*, 622 F.3d 1045, 1052 (9th Cir. 2010).  This approach allows for preservation of the status quo where complex legal questions require further inspection or deliberation.

Where the injunction sought would prevent a party from litigating similar claims in a foreign court, the standard is different.  To obtain an anti-suit injunction, the applicant is not required to show a likelihood of success on the merits of the underlying claim.  Rather, it need only demonstrate that the factors specific to an anti-suit injunction weigh in its favor.  *E. & J. Gallo Winery v. Andina Licores S.A.*, 446 F.3d 984, 991 (9th Cir. 2006).  Those factors are:  (1) whether or not the parties and the issues are the same, and whether or not the first action is dispositive of the action to be enjoined; (2) whether the foreign litigation would frustrate a policy of the forum issuing the injunction;[9] and (3) whether the impact on comity would be tolerable.  *Applied Med. Distribution Corp. v. Surgical Co. BV*, 587 F.3d 909, 913 (9th Cir. 2009) (citing *Gallo*, 446 F.3d at 991, 994).[10]

---

[9]  The *Gallo* court indicated that a showing of the second factor could be replaced by any of the other three rationales anticipated by *In re Unterweser Reederei Gmbh*, 428 F.2d 888, 896 (5th Cir. 1970), *aff'd on reh'g en banc*, 446 F.2d 907 (1971).  *Gallo*, 446 F.3d at 990, 991.  That is, a showing that the foreign litigation frustrates a policy of the forum issuing the injunction could be replaced by a showing that the foreign litigation would be vexatious or oppressive, would threaten the issuing court's *in rem* or *quasi in rem* jurisdiction, or where the proceedings prejudice other equitable considerations.  *Id.* (citing *Seattle Totems Hockey Club, Inc. v. NHL*, 652 F.2d 852, 855 (9th Cir. 1981)).

[10]  It is arguably unclear from Ninth Circuit case law whether the three anti-suit injunction factors replace all four *Winter* preliminary injunction factors, or whether they replace only the requirement that the movant show a likelihood of success on the merits of the underlying claim.  *See Gallo*, 446 F.3d at 991 ("[Movant] need not meet the usual test of a likelihood of success on the merits of the underlying claim to obtain an anti-suit injunction . . . .  Rather, [movant] need only demonstrate that the factors specific to an anti-suit injunction weigh in favor of granting the injunction.").  Under a literal reading of *Gallo*, a showing of irreparable harm, balance of equities, and public interest might still be required to obtain an anti-suit injunction.  But the absence of any mention of the *Winter* factors by the *Applied Medical Distribution* court suggests otherwise.  The Third Circuit expressly supports the replacement of all four *Winter* factors.  *See Stonington Partners, Inc. v. Lernout & Hauspie Speech Products N.V.*, 310 F.3d 118, 128-29 (3d Cir. 2002).  For completeness, the court will analyze the three anti-suit injunction factors as well as the three possibly remaining preliminary injunction factors.

17

To determine proper resolution of Microsoft's motion for an anti-suit injunction, the court begins its analysis with the three anti-suit injunction factors and then turns to the three preliminary injunction factors (*see supra* footnote 10 for discussion as to the applicability of the *Winter* preliminary injunction factors).

## B.    Anti-Suit Injunction Factors

### i.    Affect of the U.S. Action on the German Action

"Whether or not the parties and the issues are the same, and whether or not the first action is dispositive of the action to be enjoined" is a threshold question in the anti-suit injunction analysis. *Applied Med. Distribution*, 587 F.3d at 918; *Gallo*, 446 F.3d at 991.

### a.    Whether the Parties are the Same in the U.S. and German Actions

Perfect identity of parties is not required for an anti-suit injunction. Rather, it suffices that the parties be affiliated in such a way that their interests coincide. *See, e.g.*, *Int'l Equity Invs., Inc. v. Opportunity Equity Partners Ltd.*, 441 F.Supp.2d 552, 562 (S.D.N.Y.2006).

Here, the parties admit that for purposes of an anti-suit injunction the parties are the same. (4/11/12 Transcript (Dkt. # 276) at 21.) Indeed, the action before this court involves Microsoft as a plaintiff and Motorola, Motorola Mobility Inc., and General Instrument Corporation as defendants; whereas, the German Action involves General Instrument Corporation, an affiliate of Motorola, as the plaintiff and Microsoft and two of

18

its European affiliates as defendants. Accordingly, the court finds that the parties in this action and the German Action are the same.

> ### b. Whether the Issues are the Same in the U.S. and German Actions

Anti-suit injunctions are only appropriate when the domestic action is capable of disposing of all the issues in the foreign action. *Applied Med. Distribution*, 587 F.3d at 915. As is the case here, when the parties in the two actions are the same, the two questions of whether "the issues are the same" and whether "the domestic action is dispositive of the foreign action" collapse into one. *Id.* (recognizing that "issues are functionally the same if one action is dispositive of the other."). The issues need not be precisely identical, but instead the inquiry is whether the issues in the domestic action are dispositive of the issues in the foreign action. (*Id.*)

Generally, in the action before this court, Microsoft seeks adjudication of the duties and obligations of Motorola and Microsoft under Motorola's commitments to the ITU to license H.264 Standard-essential patents on RAND terms. (*See generally* Am. Compl.) Specifically, Microsoft asks the court to rule that Motorola's declarations to the ITU create binding, enforceable contracts between Motorola and the ITU, whereby Motorola commits to grant RAND licenses for its H.264 Standard-essential patents to all applicants on a worldwide basis. Additionally, Microsoft asks the court to declare that it is a third-party beneficiary to this contract and that it has a right to obtain a license for Motorola's H.264 Standard-essential patents on RAND terms on a worldwide basis. The court has already determined that Motorola's declarations to the ITU created an

enforceable contract requiring Motorola to license its H.264 Standard-essential patents on RAND terms, with Microsoft as a third-party beneficiary to that contract. (Partial S.J. Order at 10.)

Having made these determinations, the court is now left to adjudicate (1) whether Microsoft repudiated, by the filing of this lawsuit, its right to a RAND license for Motorola's H.264 Standard-essential patents, and (2) in the event that Microsoft did not repudiate its rights to a license, whether Motorola's October 29 Letter sought an unreasonably high royalty rate for a license to Motorola's H.264 Standard-essential patents, and thus, breached Motorola's obligation to grant licenses on RAND terms. The parties have filed cross motions for summary judgment on these related issues, and the court heard oral argument on both motions on May 7, 2012. (*See* Dkt. ## 231, 236, 313.)

Additionally, Microsoft has brought a separate motion for summary judgment seeking to dismiss Motorola's request for injunctive relief with respect to any of its patents essential to the 802.11 and H.264 Standards that were offered to Microsoft through the October 21 and October 29 Letters.[11] (*See generally* Partial S.J. Mot. re Inj. Relief (Dkt. # 152).) In this motion, Microsoft argues injunctive relief is inappropriate because (1) Motorola's October 21 and October 29 Letters sought monetary payments for a worldwide license to Motorola's patents related to the 802.11 and H.264 Standards demonstrating that monetary relief would suffice as an alternative remedy to an injunction, and (2) Microsoft seeks to obtain a license for Motorola's patents, is entitled

---

[11] The court heard oral argument on Microsoft's motion on May 7, 2012. (Dkt. # 313.)

20

to a RAND license as a third-party beneficiary, and such a RAND licensing arrangement will eventually take place between the parties either through negotiation or by the court setting the terms.[12] (*See generally id.*) Thus, through this motion—because the European Patents at issue in the German Action were included in Motorola's October 29 Letter offering a worldwide license for Motorola's H.264 Standard-essential patents, and because Motorola contracted with the ITU to license the European Patents on RAND terms to all applicants on a worldwide basis—Microsoft has squarely placed before this court the issue of whether injunctive relief is an appropriate remedy for infringement of Motorola's H.264 Standard-essential patents, including the European Patents.

Finally, before the court is a determination of RAND terms and conditions with respect to a license Motorola may be obligated to provide Microsoft for its standard-essential patents. Thus, in the event the court finds that Microsoft has not repudiated its rights to a RAND license for Motorola's standard-essential patents and that the parties continue to disagree as to the RAND terms of such a license, the court will conduct a trial to determine such terms, including a determination of a RAND royalty rate. The trial date has been set for November 19, 2012.

Thus, at the conclusion of this matter, the court will have determined (1) whether Microsoft is entitled to a worldwide RAND license for Motorola's standard essential

---

[12] Although an express statement that Microsoft seeks a license for Motorola's standard essential patents is missing from its complaint (*see generally* Am. Compl.), in its recent papers to the court, Microsoft has affirmatively stated that it is ready and willing to take a license to such patents on RAND terms. (*See, e.g.*, Mot. Partial S.J. re Inj. Relief at 5 ("The indisputable evidence is that Microsoft is seeking a license on RAND terms—in this very action.").)

patents, including the European Patents, (2) whether Microsoft has repudiated its rights to such a license, (3) whether Motorola may seek injunctive relief against Microsoft with respect to its standard essential patents, and (4) in the event Microsoft is entitled to such a license, what the RAND terms are for such a license.

Based on the issues before it, the court finds that this action is dispositive of whether a German court may issue an injunction against Microsoft for infringement of the European Patents.  Issuance of injunctive relief with respect to the European Patents is an issue squarely before this court.  Here, the court stresses that its April 11, 2012 temporary restraining order was limited to enjoining Motorola from enforcing any injunctive relief that it may receive in the German Action with respect to the European Patents.  Importantly, the order in no way enjoined Motorola from pursuing the German Action and receiving monetary damages (or any other non-injunctive relief), and in no way prohibited further proceedings in Germany.  Thus, the court's restraining order was limited to the issue directly before it—whether injunctive relief was permissible.  Thus, the court finds that for the limited purpose of determining whether an anti-suit injunction enjoining Motorola from enforcing any injunctive relief it may receive in the German Action is appropriate, the issues before it are dispositive of the German Action.

### ii.    Frustrate a Policy of the Forum Issuing the Injunction

"The second step in deciding if an anti-suit injunction is appropriate is determining if the continuation of the foreign litigation would frustrate a policy of the forum issuing the injunction."  *Applied Med. Distribution*, 587 F.3d at 918 (internal quotation marks omitted).  Courts have found that court policies against avoiding inconsistent judgments,

forum shopping and engaging in duplicative and vexatious litigation sufficient to satisfy this step. *See id.* at 918.

The court finds that this factor favors granting an anti-suit injunction. First, as the issue of injunctive relief is before both this court and the court in Germany, this court has concerns against inconsistent judgments. Indeed, this court may find that Motorola may not seek injunctive relief against Microsoft with respect to its standard essential patents, which include the European Patents; whereas to the contrary, the German court may grant Motorola the injunctive relief it seeks in the German Action with respect to the same European Patents.[13] Second, the court finds that the timing of the filing of the German Action raises concerns of forum shopping and duplicative and vexatious litigation. In this action, Microsoft filed its initial complaint in November 2010 invoking this court's jurisdiction to determine the worldwide rights and obligations of Motorola's commitments to the ITU and IEEE with respect to all Motorola's standard essential patents, including the two European Patents. It was not until June 2011, over six months after Microsoft initiated its action, that Motorola initiated the German Action seeking injunctive relief for Microsoft's alleged infringement of the European Patents. The court's concerns over forum shopping and duplicative and vexatious litigation are heightened by the fact that Motorola's commitments to the ITU involved approximately 100 Motorola-owned patents, yet Motorola invoked the German Action implicating only

---

[13] In fact, it is the court's understanding that on May 2, 2012, the German court issued its final order finding in favor of Motorola on the issue of patent infringement and granting Motorola injunctive relief. (5/7/12 Transcript at 43.)

23

two (the European Patents) of these patents and sought injunctive relief in Germany before this court could adjudicate that precise issue.

In sum, Motorola's actions have frustrated this court's ability to adjudicate issues properly before it. Without the issuance of an anti-suit injunction, the integrity of the action before this court will be lessened.

### iii.     Whether the impact on comity would be tolerable

"The third step in deciding if an anti-suit injunction is appropriate is determining whether the impact on comity would be tolerable." *Applied Med. Distribution*, 587 F.3d at 919. "[T]he extent to which the United States, or any state, honors the judicial decrees of foreign nations is a matter of choice, governed by the comity of nations" and the "[e]xtension of comity to a foreign judgment is neither a matter of absolute obligation, on the one hand, nor of mere courtesy and good will, upon the other." *Asvesta v. Petroutsas*, 580 F.3d 1000, 1010-11 (9th Cir. 2009) (internal quotations and citations omitted). Recognizing that anti-suit injunctions may implicate comity concerns, the Ninth Circuit has urged that they be issued sparingly. *Gallo*, 446 F.3d at 989.

Although the court is keenly aware of the importance of comity, under the issues and facts before it, an anti-suit injunction would not have an intolerable impact on comity. Importantly, the court finds the concerns of comity alleviated because, here, a foreign court has been belatedly asked by Motorola to decide an issue already placed before this court. As stated, Microsoft initiated the action in this court in November 2010 placing directly at issue whether it is entitled to a license for Motorola's standard essential patents, including the European Patents. Then, over six months later, Motorola

24

seeks to litigate that precise issue with respect to the European Patents in the German Action denying this court the opportunity to administer the prior filed action. *See Laker Airways Ltd. V. Sabena Belgian World Airlines*, 731 F.2d 909, 939 (D.C. Cir. 1984).

Further reducing the court's concern of comity is that an anti-suit injunction is limited in scope to enjoining Motorola from enforcing any injunctive relief that it may receive in the German Action with respect to the European Patents. Thus, an anti-suit injunction implicates comity only so far as necessary to preserve this court's ability to adjudicate the duplicative dispute over the propriety of injunctive relief. Moreover, upon adjudication of the duplicative issue, this court will remove the anti-suit injunction and the parties will follow the court's determination of the parties' rights and obligations under Motorola's contract with the ITU regarding its standard essential patents.

Finally, the court notes that this court has strong interest in adjudicating the claims before it. The lawsuit was initiated by an American company (Microsoft) against another American company (Motorola). Central to the lawsuit are the October 21 and October 29 Letters—sent by Motorola from its Libertyville, Illinois office to Microsoft at its Redmond, Washington office—which Microsoft alleges breached Motorola's commitments to the IEEE and ITU to grant licenses for all of its patents, both domestic and foreign, on RAND terms to all applicants on a worldwide basis. Accordingly, this court is fully capable of adjudicating the issues before it. To the contrary, the lawsuit lacks international issues and foreign government involvement. *Applied Med. Distribution*, 587 F.3d at 921 (holding "that where there is no public international issue raised, a foreign government is not involved in the litigation, and the litigation involves

25

private parties concerning disputes arising out of a contract, not only would an anti-suit injunction not have an intolerable impact on comity, but allowing foreign suits to proceed in such circumstances would seriously *harm* international comity") (international quotations omitted).

Thus, based on the foregoing, the court finds that the three anti-suit injunction factors favor granting the injunction. Having made this finding, the court now turns to the three *Winter* preliminary injunction factors.

## C.    Preliminary Injunction Factors

To obtain preliminary injunctive relief, a party ordinarily must demonstrate (1) that she is likely to succeed on the merits, (2) that she is likely to suffer irreparable harm in the absence of preliminary relief, (3) that the balance of equities tips in her favor, and (4) that an injunction is in the public interest. *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008). As explained in footnote 10 (*infra*), the first factor—that she is likely to succeed on the merits—has clearly been replaced by the anti-suit injunction factors. Thus, the court examines the remaining three preliminary injunction factors below.

### i.    Irreparable Harm

In the German Action, Motorola seeks injunctive relief to exclude Microsoft products utilizing the H.264 Standard. (Mot. at 14; Grosch Decl. at 6 ¶ 15.) In particular, Microsoft asserts that it may be forced to withdraw from the German market its Xbox game console and software products such as Windows 7, Internet Explorer 9, and Windows Media Player 12. (Mot. at 14; Grosch Decl. at 6 ¶ 15.)    To describe the

adverse impact a German injunction would have with respect to the Xbox, Microsoft submitted the declaration of Josh Hutto, who is responsible for Microsoft's global marketing strategy for the Xbox.  (Hutto Decl. (Dkt. # 216).)   Mr. Hutto explains that removal of the Xbox from the German market will cause Microsoft to lose sales, recent momentum, and market share.  (*Id.* at 2 ¶ 7.)  Mr. Hutto further states that regaining any lost market share will be difficult because (1) shelf space in retail stores is often hard to recapture and (2) third-party publishers or makers of games compatible with Microsoft's Xbox console will be compelled to cease production for the Xbox, instead favoring other game console providers such as Nintendo or Sony.  (*Id.* at 3 ¶¶ 8, 9.)  As a result, Mr. Hutto believes that the Xbox will see diminished brand loyalty and brand affinity.  (*Id.* at 4 ¶ 13.)

As to the adverse affect of a German injunction on Microsoft's software products (such as Windows) related to the H.264 technology, Microsoft submitted the declaration of Marcelo Prieto, Senior Director, Volume Licensing Programs at Microsoft, who is responsible for the management of Microsoft's global portfolio of volume licensing agreements.  (Prieto Decl. (Dkt. # 214) at 1-2 ¶ 2.)  Mr. Prieto explains that Microsoft's software licensing agreements often involve multinational companies, with German presences, who seek large scale licensing arrangements.  (*Id.* at 2 ¶ 5 & 4 ¶ 14.)  A German injunction would force Microsoft to alter its business relationships with such multinational companies, providing software licenses to offices outside of Germany and ceasing support to offices within Germany.  (*Id.* at 3-4 ¶ 13.)  For a multinational company seeking a unified information technology environment across all corporate

27

offices, such an arrangement will be undesirable. (*Id.* at 4 ¶ 14.) According to Microsoft, this arrangement will damage its reputation for providing broad information technology solutions that successfully operate across international borders. (Mot. at 15.)

Based on the evidence before it, the court finds that Microsoft has shown that a German injunction enjoining the sale of Microsoft Software and the Microsoft Xbox in the country of Germany will result irreparable harm. Microsoft has provided this court with convincing evidence that it will lose market share, which will be difficult to regain, and suffer harm to its business reputation. *Conceptus, Inc. v. Hologic, Inc.*, No. C 09-02280 WHA, 2012 WL 44064, at *2 (N.D. Cal. Jan. 9, 2012) (loss of market share, customers, and access to potential customers demonstrated irreparable harm); *Rent-a-Center,Inc. v. Canyon Television & Appliance Rental, Inc.*, 944 F.2d 597, 603 (9th Cir. 1991) (damage to reputation or goodwill, because it is difficult to quantify qualifies as irreparable harm). Thus, this factor favors granting a preliminary injunction and hence an anti-suit injunction.[14]

### ii. Balance of Equities

The court finds the balance of equities weighs in favor of an injunction. Were Microsoft enjoined from selling products covered by the H.264 technology in Germany, it appears to the court that Microsoft has two options. First, it could cease the sale of its

---

[14] Moreover, at this point, Microsoft's irreparable harm is in no way speculative. Indeed, as stated above, it appears to the court that the German Action concluded on May 2, 2012, with a finding of infringement in Motorola's favor and the issuance of an injunction. (5/7/12 Transcript at 43.)

Xbox and software products in Germany, thereby incurring the harm described above (*supra* § III.C.i).  Or, second, it could attempt to negotiate a license for Motorola's H.264 Standard-essential patents with the threat of an injunction looming over the negotiation table.  It would seem clear that a negotiation where one party (Microsoft) must either come to an agreement or cease its sales throughout the country of Germany fundamentally places that party at a disadvantage.  Moreover, if it is shown later that injunctive relief was indeed improper, any licensing arrangement resulting from such negotiations may not easily be undone.  Thus, under either option, the court finds that Microsoft faces significant harm without the issuance of an anti-suit injunction.

To the contrary, Motorola faces little injury by an anti-suit injunction.  By issuance of an anti-suit injunction, this court is in no way stating that Motorola will not at some later date receive injunctive relief, but only that it must wait until this court has had the opportunity to adjudicate that issue.  In the meantime, the court has required Microsoft to post a $100 million bond to compensate Motorola for its losses in the event that this injunction is reversed or vacated.  Further, because Motorola's October 21 and 29 Letters seek a monetary royalty payment for the license of Motorola's standard essential patents, Motorola implicitly admits that it may be made whole through monetary damages.  Thus, the court finds that the balance of hardships tips in Microsoft's favor and in favor of granting an anti-suit injunction.

### iii.    Public Interest

The court finds that the public interest is served by issuing an anti-suit injunction and permitting Microsoft to continue its business operations without interruption until

29

this court has had the opportunity to adjudicate the injunctive relief issue before it.  Such a finding serves the public interest by (1) having disputes properly before a United States court resolved here as opposed to a foreign court; (2) ensuring standard essential patents are accessible to all comers under RAND terms; and (3) permitting Microsoft's customers, who rely on Microsoft's information technology services, to conduct business uninterrupted.  Thus, the court finds that the public interest factor favors granting an anti-suit injunction.

## IV.   CONCLUSION

Based on the foregoing, the court GRANTS Microsoft's motion for a preliminary injunction (Dkt. ## 209 (sealed motion), 210 (redacted motion)) and CONVERTS the court's April 11, 2012 temporary restraining order (Dkt. # 261) into a preliminary injunction.  This preliminary injunction shall remain in effect until this court is able to determine whether injunctive relief is an appropriate remedy for Motorola to seek with respect to Microsoft's alleged infringement of Motorola's standard essential patents.

Dated this 14th day of May, 2012.

The Honorable James L. Robart
U.S.  District Court Judge

30

# EXHIBIT B

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| MICROSOFT CORPORATION,<br><br>               Plaintiff,<br><br>    v.<br><br>MOTOROLA, INC., et al.,<br><br>               Defendants. | CASE NO. C10-1823JLR<br><br>ORDER |
| MOTOROLA MOBILITY, INC., et al.,<br><br>               Plaintiffs,<br><br>    v.<br><br>MICROSOFT CORPORATION,<br><br>               Defendant. | |

This matter is before the court on Plaintiff Microsoft Corporation's ("Microsoft")

motion for temporary restraining order and preliminary injunction ("Microsoft's

32

Motion").  (Mot. (Dkt. # 209).)  The court heard the oral argument of counsel on April 11, 2012, and has also considered all pleadings on file, including:

(1)  Plaintiff Microsoft Corporation's ("Microsoft") motion for a temporary restraining order and preliminary injunction (Dkt. # 209), along with all exhibits and attachments;

(2)  Defendants Motorola, Inc., Motorola Mobility, Inc., and General Instrument Corporation's (collectively, "Motorola") response in opposition (Dkt. # 248), along with all exhibits and attachments; and

(3)  Microsoft's reply (Dkt. # 257).

The court is authorized to issue this temporary restraining order by Rule 65(b). Fed. R. Civ. P. 65(b).  Having stated its findings of fact and conclusions of law on the record at the April 11, 2012 hearing, and having found that the factors for an anti-suit injunction set forth in *E. & J. Gallo Winery v. Andina Licores S.A.*, 446 F.3d 984, 989 (9th Cir. 2006) have been met, the court hereby GRANTS Plaintiffs' motion for a temporary restraining order (Dkt. # 209).  The court ORDERS that, without prior leave of this court, Motorola is enjoined from enforcing any injunctive relief it may receive in the German court system relating to the patents at issue in Microsoft's Motion.  The court further ORDERS that Microsoft shall post a security bond in the amount of $100 million USD in connection with this motion.

33

This temporary restraining order shall be binding as provided in Federal Rule of

Civil Procedure 65(d) and shall remain in effect until the court's ruling on Docket No.

236, for which a hearing is scheduled on May 7, 2012.[1]

Dated this 12th day of April, 2012.

_____
The Honorable James L. Robart
U.S. District Court Judge

---

[1] Pursuant to Federal Rule of Civil Procedure 65(b)(2), the court finds good cause for extending this temporary restraining order beyond the fourteen day limit ordinarily imposed by Rule 65(b)(2) because the purpose of this anti-suit injunction is to provide this court the opportunity to adjudicate issues properly presented in this jurisdiction as opposed to permitting a foreign court to adjudicate those issues. The court intends to commence adjudication of the issues requiring this anti-suit injunction on May 7, 2012 or as soon as possible thereafter.

# EXHIBIT C

```
 1                  UNITED STATES DISTRICT COURT

 2            WESTERN DISTRICT OF WASHINGTON AT SEATTLE

 3    ------------------------------------------------------------

 4    MICROSOFT CORPORATION,          )
                                      )
 5                     Plaintiff,     ) 10-01823-JLR
                                      )
 6    v.                              ) SEATTLE, WASHINGTON
                                      )
 7    MOTOROLA INC., et al,           ) April 11, 2012
                                      )
 8                     Defendants.    ) Court's Ruling
                                      )
 9    ------------------------------------------------------------

10                VERBATIM REPORT OF PROCEEDINGS
            BEFORE THE HONORABLE JAMES L. ROBART
11               UNITED STATES DISTRICT JUDGE

12    ------------------------------------------------------------

13

      APPEARANCES:
14


15


16    For the Plaintiff:      Arthur Harrigan, Christopher
                              Wion, David Pritikin and Andy
17                            Culbert


18


19


20    For the Defendants:     Jesse Jenner, Ralph Palumbo, Mark
                              Rowland, Philip McCune and Neill
21                            Taylor


22


23


24


25
```

1    THE COURT:  As we've had an intervening break, I'll

2    ask the clerk to please call roll.

3    THE CLERK:  C-10-1823, Microsoft versus Motorola.

4    Counsel, please make your appearance.

5    MR. HARRIGAN:  Art Harrigan, Your Honor, representing

6    Microsoft; and David Pritikin to my left, from Sidley; Andy

7    Culbert; and my partner, Bruce Wion.

8    MR. PALUMBO:  Ralph Palumbo for Motorola, with Jesse

9    Jenner, Phillip McCune and Neill Taylor.

10    THE COURT:  Thank you.  Counsel, thank you for

11    indulging the court, giving us a chance to go back and review

12    the files in this matter, and having had the advantage of

13    your argument this morning.

14    As a preliminary matter I should advise you that I have

15    granted docket 208, which is Microsoft's motion to file

16    documents under seal; and docket 247, Motorola's motion to

17    file documents under seal.  Both of those contain information

18    that is appropriately commercial secrets and not generally

19    available to the public.

20    That leaves docket 209, which is the sealed version of the

21    motion for temporary restraining order; and 210, which is a

22    slightly redacted version of the motion for preliminary

23    injunction and temporary restraining order, and the court's

24    ruling will be in regards to those entries.

25    I must say I enjoyed this morning in that Mr. Jenner's

1   description of this as a "murky area" is a bit of an

2   understatement.  There is not a lot of law on the Anti-Suit

3   Act.

4       I will begin by offering a perhaps more universal

5   observation, which is the limited number of cases that there

6   are seem to be guided in substantial part by some special

7   interest or special significance of the aspects of the

8   dispute which are in the United States.

9       The cases that deny relief under the Anti-Suit Act tend to

10  involve situations where each country has an interest of

11  roughly similar proportion in the particular dispute.  And

12  while none of the cases attempts to set out a bright line

13  differentiating where that dichotomy breaks, it seems to me

14  that it is very evident.

15      I have had the advantage of reviewing Microsoft's motion

16  for a temporary restraining order, found in the docket at

17  209; Motorola's response in opposition, found in the docket

18  at 248; Microsoft's reply, found in the docket at 257.  Each

19  and every one of those pleadings has been abundantly

20  supported by declarations and attachments, and I've had the

21  opportunity to review those.  And finally, I've heard oral

22  argument today.  And the following will constitute the

23  court's findings and conclusions:

24      Beginning with, what is the anti-suit standard?  In

25  considering an anti-suit motion the Ninth Circuit directs the

1    district courts to consider:  No. 1, whether or not the

2    parties and the issues are the same, and whether or not the

3    first action is dispositive of the action to be enjoined;

4    No. 2, whether the foreign litigation would frustrate a

5    policy of the forum issuing the injunction; and No. 3,

6    whether the impact on comity would be tolerable.

7         That comes out of the *Applied Medical Distribution

8    Corporation* case, 587 F3d 909, and specifically at 913,

9    issued by the Ninth Circuit in 2009, and basically applying

10   the law that is found in the *Gallo* case, 446 F3d at 991 and

11   994.

12        The *Gallo* court indicated that a showing on the second

13   factor could be replaced by any of three other rationales

14   anticipated by *In Re: Unterweiser,* U-N-T-E-R-W-E-I-S-E-R,

15   428 F.2d 888 and 896 (the Fifth Circuit in 1970 affirmed on

16   rehearing en banc at 446 F.2d 907 in 1971).

17        In our reading, that case shows that a foreign litigation

18   frustrates the policy of the forum issuing the injunction in

19   the circumstances where the foreign litigation is either

20   vexatious or oppressive, would threaten the issuing courts in

21   rem or quasi in rem jurisdiction, or where the proceedings

22   prejudice other equitable considerations.  Microsoft has also

23   argued, including this morning, that other considerations set

24   forth in the *Seattle Totems Club* are applicable to the second

25   anti-suit factor.

5

1    I think that we are all in agreement that Ninth Circuit

2    law is unclear whether the three anti-suit injunction factors

3    replace all four of the *Winter* -- W-I-N-T-E-R -- standard

4    preliminary injunction factors, or whether they replace only

5    the requirement that the movant show a likelihood of success

6    on the merits in the underlying claim.  *Gallo* at 446 F.3d

7    991.  Quoting, "Movant need not meet the usual test of

8    likelihood of success on the merits of the underlying claim

9    to obtain an anti-suit injunction.  Rather, movant need only

10   demonstrate that the specific factors to the anti-suit

11   injunction weigh in favor of granting the injunction."

12   Under a literal reading of *Gallo*, a showing of irreparable

13   harm, balance of equities, and public interests, might still

14   be required to obtain an anti-suit injunction.  However, the

15   absence of any mention of the *Winter* factors in the *Applied*

16   *Medical Distribution* court decision suggests otherwise.

17   Simply to make my ruling as complete as possible, I will

18   go through the *Winter* factors, the three *Winter* factors of

19   irreparable harm, balance of equities, and public interest,

20   in that they may arguably still be part of an anti-suit

21   motion.  But the parties should be aware that it's my belief

22   that the crux of the anti-suit motion are the three-part

23   tests set forth in *Gallo*.

24   So, beginning with irreparable harm, one of the *Winter*

25   factors.  Microsoft alleges, through the deposition of

1    Mr. Prito -- P-R-I-T-O -- that its contracts with its vendors

2    for Windows and Xbox will be severely affected by an

3    injunction issued by the German court.  Motorola responds

4    that Microsoft may take advantage of the "orange book"

5    procedure under German law, to defend against an injunction

6    should one ever come into effect.

7        It is the court's view, however, that even if this is

8    true, it would place Microsoft at the position of a

9    negotiation in Germany with the threat of an immediate

10   injunction hanging over its head.  And that's something that

11   seems to me to be a matter of some substantial harm.

12       And finally, Motorola argued for the first time today that

13   were the German court to set a royalty rate too high, this

14   court could still remedy that at a later date by requiring

15   Motorola to pay the difference between the royalty rate set

16   by Germany, and the rate set by this court.  The court is not

17   persuaded by this argument.  Were the court to issue an

18   injunction against Motorola enforcing a German injunction, it

19   would not affect the German court's ability to award monetary

20   damages in a patent infringement action then pending.  So on

21   balance, I think that the irreparable harm standard goes

22   somewhat to Microsoft's favor.

23       The balance of hardships test, the second *Winter* factor.

24   The first thing that is of notice to the court is that if I

25   do nothing, Microsoft may need to begin removing Windows and

1    Internet Explorer products from the market, or face the

2    negotiation under threat, which I mentioned earlier; while

3    Motorola will simply be required to keep the status quo, if I

4    grant the temporary restraining order, until this court can

5    adjudicate the RAND issues before it.  On that evaluation of

6    the situation before me, I find that the balanced hardship

7    tips in Microsoft's favor.

8         The third and final question under *Winter* is that of the

9    public interest.  And case law provides that the public

10   interest in having disputes properly before an American court

11   resolved in the United States as opposed to a foreign court

12   is a legitimate matter of public interest.  And secondly,

13   that the public interest is in having standard essential

14   patents being accessible to all comers under fair and just

15   considerations.  So I would find that the public interest

16   would favor granting the temporary restraining order.

17        Having done that more out of caution than anything else,

18   I'll then move on to the anti-suit injunction factors, which

19   are in the mind of the court really the crux of this matter.

20   The first of those is whether -- well, the test is whether or

21   not the parties and the issues are the same, and whether or

22   not the first action is dispositive of the foreign action to

23   be enjoined.  That's in the literature referred to most often

24   as the "first step."

25        In this instance, in regards to that first step, the

1   parties are in agreement that more or less the same United

2   States and German actions -- the same parties are the same in

3   the United States and German actions.

4       That takes us then to really the battleground in this,

5   which is whether the United States action, or resolution of

6   it, would be dispositive of the foreign action to be

7   enjoined.  And I will add, for the edification of the Court

8   of Appeals so it knows where I'm coming from, that I consider

9   the preservation of my ability to resolve this dispute to be

10  something that needs to be carefully guarded, otherwise we

11  run into the possibilities of conflicting resolutions,

12  duplicative litigation, and unfortunate results that don't

13  follow appropriate law.

14      As has been correctly noted by Motorola and acknowledged

15  by Microsoft, anti-suit injunctions are only appropriate when

16  the domestic action is capable of disposing of all of the

17  issues in the foreign action.  And that's language that comes

18  out of *Applied Medical Distribution*.  That is a bright letter

19  law principle that is more obeyed in theory than in practice,

20  as the cases that are before me, many of them involve less

21  than complete disposition of the foreign action but a

22  substantial impact and an ability to preserve the authority

23  of the United States court.

24      Therefore, I turn my analysis to the question that I asked

25  in my order yesterday, in which the parties were kind enough

1    to discuss extensively during oral argument, which is what

2    parts of this case would affect or dispose of some if not all

3    of the action in Germany?

4        Microsoft contends that Motorola has submitted numerous

5    patents to the International Telecommunications Union, known

6    to the parties as the ITU as, "Declared essential patents to

7    the H.264 video compression standards."  In the submissions,

8    which Mr. Jenner and I talked about this morning, Motorola

9    declares to license its patents to, "An unrestricted number

10   of applicants on a worldwide, non-discriminatory basis, and

11   on reasonable terms and conditions."

12       It is important to the court to note that the patents at

13   issue in the German action are expressly subject to the ITU

14   agreement at Motorola's inclusion.  Motorola contends --

15   excuse me, Microsoft contends that Motorola's letter to

16   Microsoft, found in the record, offering to grant Microsoft a

17   worldwide license for Motorola's portfolio of declared

18   essential patents relating to the ITU H.264 standard,

19   violated Motorola's agreement with the ITU.

20       What I think is important in there, for reasons of this

21   decision, is that Motorola offered both covered United States

22   patents and non-U.S. patents in Motorola's portfolio,

23   including the patents at issue in the German action.  I find

24   that to be inconsistent with the position taken by Motorola

25   in this court.

1    It has been important to me to remember the following

2  things about the lawsuit:  First, it is between two American

3  companies; secondly, it involves an ITU agreement with no

4  apparent choice of law provision.  I will acknowledge that

5  some of the cases attach great significance to the presence

6  of a choice of law provision, but we don't have one here.

7  That, however, could go either direction and really leaves

8  open the court to make this judgment regarding, does the

9  United States have an interest in this matter?

10    Next, the offer letter from Motorola sent to Microsoft in

11  the United States covers both the U.S. and foreign patents,

12  and it is this offer letter which Microsoft alleges breaches

13  the ITU agreement.  Under these facts before the court, in my

14  understanding, is the question of a determination of the

15  worldwide RAND -- shorthand for what we've been talking about

16  -- the RAND rate for Motorola's standard essential patents

17  subject to the ITU agreement.

18    Motorola argues that Microsoft has not properly alleged

19  this issue.  However, having presided over this dispute now

20  for several months, it has been widely discussed, and in fact

21  the court has set up a framework for resolution of precisely

22  that question, which has been set in the timeframe that

23  Motorola argued that it needed.  And therefore, I believe

24  that it is properly alleged.

25    And finally I would note in regards to this, if Motorola

1   did not want its foreign patent subject to this court's

2   jurisdiction, then it would not have provided them as part of

3   the offer letter to Microsoft.

4       This particular issue is part of a larger dispute before

5   the court that includes the issues of whether Motorola must

6   offer licenses to the H.264 standard essential patents,

7   subject to the ITU agreement on RAND terms.  Next, whether

8   Motorola's offers in its letters breached any such

9   obligations.  Third, whether Motorola may seek an injunction

10  for any standard essential patents.

11      In this instance were the German court to issue an

12  injunction, it would sharply usurp the ability of this court

13  to determine whether or not an injunction is appropriate.

14  And conversely, were this court to determine that an

15  injunction for any standard essential patent was improper, it

16  would dispose of the issue in the German action with respect

17  to the issuance of an injunction, the subject of Microsoft's

18  present motion.

19      And lastly, this court has before it and has had before it

20  now for an extended period of time, and a great deal of legal

21  work, the question whether Microsoft is entitled to a RAND

22  license and subsequently determining the RAND rate.  Such

23  adjudication of these issues is inappropriate to a German

24  court injunction.  Indeed, there is no reason the German

25  court cannot go forward with its application of German patent

 1   infringement law and damages without usurping this court's

 2   ability to make such adjudications.

 3       That is the first step in the anti-suit injunction

 4   standard.  The second is whether the foreign litigation would

 5   frustrate a policy of the forum issuing the injunction.  As

 6   set forth in *Applied Medical,* the second step in deciding if

 7   an anti-suit injunction is appropriate is determining if the

 8   continuation of the foreign litigation would frustrate a

 9   policy of the forum issuing the injunction.

10       Courts have found that the court's policies against

11   avoiding inconsistent judgments, forum shopping, and engaging

12   in duplicative and vexatious litigation is sufficient to

13   satisfy this step.  Here this prong has been met because this

14   court's policy against inconsistent judgments, the German

15   court issuing an injunction while this court finding no

16   injunction justified is a possibility, and the forum

17   shopping, vexatious litigation, an end-run around the

18   litigation here in order to achieve the injunction goal in

19   Germany, are certainly possible.

20       The court frankly has concerns that Motorola pulled two

21   patents out of the list of patents that are around 100,

22   offered in the letter to Microsoft, which is the crux of this

23   litigation, and it sued on them in Germany, before a court

24   with a different legal standard, and before this court could

25   adjudicate those issues.

13

1       The final and third step under the anti-suit test is, "The

2   third step in deciding if an anti-suit injunction is

3   appropriate is determining whether the impact on comity would

4   be tolerable."  Once again citing *Allied Medical*

5   *Distributors*, 587 F3d at 919.  As I mentioned, this is the

6   final step in determining the appropriateness of the

7   anti-suit injunction.

8       Typically courts have said that comity concerns are

9   alleviated through the parties' agreement to litigation in a

10  certain jurisdiction, ie: a choice of law provision in a

11  contract.  We do not have that here.  Despite the lack of

12  choice of law provision, the concerns of comity are

13  alleviated in this instance because of the concern on the

14  part of this court that a foreign court is being asked to

15  limit this court's ability to adjudicate the issues properly

16  before it.  The support for that statement can be found in

17  the *Laker Airways* case, 731 F.2d 909 from the DC Circuit in

18  1984.

19      For the reasons discussed when I talked about why the

20  United States has a special interest in this matter, I find

21  that it is something of special interest to the United States

22  court system, given that the parties have initiated this

23  litigation here on a more inclusive basis.

24      In this instance, the need of the court to maintain the

25  integrity of this action is as important or more important

Debbie Zurn - RPR, CRR - Federal Court Reporter - 700 Stewart Street - Suite 17205 - Seattle WA  98101

1  than accommodation of the substantially more limited German

2  interests.  The *Laker* case also stands authority for this

3  proposition.

4      Therefore, I find that under the three tests set forth in

5  the anti-suit matrix, that each of them favors the issuance

6  of an injunction in this matter.  Therefore, the court grants

7  the motion for temporary restraining order.  It will issue a

8  short one-page order setting forth the actual terms of it.

9  They will incorporate the following:

10     The court, applying the factors in *Gallo* for an anti-suit

11  injunction, grants Microsoft's motion for a temporary

12  restraining order found in the docket at 209.  The injunction

13  is limited -- I stress -- is limited to enjoining Motorola

14  from enforcing any injunctive relief it may receive in the

15  German actions that were the subject of Microsoft's motion,

16  without further leave of this court.  Therefore, you're not

17  rid of me.

18     This temporary restraining order shall remain in effect

19  until the court's ruling on docket 236, which is subject to a

20  hearing scheduled for, I believe it's May 7, 2012.  It seems

21  to me that the outcome of that particular motion for partial

22  summary judgment could have an impact on where we go next.

23     Finally, given the relatively limited duration and the

24  argument that I heard this morning, I find that Microsoft

25  shall post a security bond in the amount of $100 million US

1  dollars in connection with this motion.

2      As I said, that portion of the order will come out in

3  written form to satisfy the provisions of Civil Rule 65.  The

4  court's oral opinion will justify -- will have the effect of

5  being the reasons why I'm issuing the TRO at this time.

6  Mr. Harrigan, anything further on behalf of Microsoft?

7          MR. HARRIGAN:  No, Your Honor.

8          THE COURT:  All right.  Mr. Jenner?

9          MR. JENNER:  Nothing here, Your Honor.

10         THE COURT:  All right.  Gentlemen, thank you very

11  much.  It's been an interesting pursuit, not one that I would

12  have predicted where it turned out, because it's decided on

13  much different grounds than we started off on.  We will be in

14  recess.  Thank you, counsel.

15              (The proceedings recessed.)

16

17

18

19

20

21

22

23

24

25

# C E R T I F I C A T E

I, Debbie K. Zurn, RPR, CRR, Court Reporter for the United States District Court in the Western District of Washington at Seattle, do hereby certify that I was present in court during the foregoing matter and reported said proceedings stenographically.

I further certify that thereafter, I have caused said stenographic notes to be transcribed under my direction and that the foregoing pages are a true and accurate transcription to the best of my ability.

Dated this 11th day of April, 2012.

/s/ *Debbie Zurn*

Debbie Zurn