PUBLIC VERSION

As indicated by Microsoft, the *Qualcomm* case centered on a plaintiff that had not disclosed essential patents to the SSO. There is no such allegation in this case. Rather, as discussed above, Motorola disclosed all of the patents at issue, and it has not been shown that in doing so, Motorola granted an implied license to any of them. As recognized by Microsoft, implied license and waiver, in the manner raised by Microsoft in this investigation, are two sides of the same coin.[97] It has not been shown how Motorola's conduct, especially the fact that it "told the public that it would license its patents for a reasonable royalty," supports a waiver defense.

Accordingly, Microsoft has not prevailed in its waiver defense.

**F.     Analysis and Conclusion As to Microsoft's Equitable Estoppel Defense**

    **1.     Summary of the Parties' Arguments in Equitable Estoppel**

Microsoft indicated that it would present an equitable estoppel defense in section IX(D) of its brief. Ground Rule 12 Filing at 9. Indeed, Microsoft argues that "[e]ven if MMI had not relinquished any right to an exclusion order by virtue of having committed to license its standard-essential patents on RAND terms, MMI should be barred from such relief in this case under the doctrine of equitable estoppel. This is because its license 'offers' to Microsoft were shams specifically designed to set up this and other litigation and breached MMI's RAND assurances on which Microsoft had reasonably relied." Resp. Br. at 254.

---

[97] Microsoft argues, "Implied license and implied waiver of equitable remedies are interchangeable in this forum because money damages are unavailable. But there is a difference between the two, for to the extent MMI impliedly licensed Microsoft's use of the patents, MMI cannot obtain infringement damages—it can only sue for royalties under the license. An implied waiver of equitable remedies still permits infringement liability, although only for money damages." Resp. Br. at 253 n.26.

With respect to its allegation that Motorola disregarded its RAND obligations "to set up this litigation and other litigation with Microsoft," Microsoft details its argument that after Microsoft brought a complaint at the Commission against Motorola, Motorola set its alleged scheme into motion. *Id.* at 254-58. For example, it is argued that "MMI devised a strategy of circumventing its RAND obligations so it could assert its standard-essential patents against Microsoft and gain leverage from the threat of exclusionary relief. [

] *Id.* at 254-55 (citing Dailey Tr. 2621-2622).

It is further argued that [

] "MMI sent two sham license offers in admitted retaliation for Microsoft's Android complaint," knowing that Microsoft could not accept the terms stated therein. *Id.* at 255. The alleged sham letters were briefly discussed above in this section of the Initial Determination, and both proposed a royalty rate of 2.25% on end products.

Microsoft argues that Motorola's "demands" were unreasonable because they were based on the value of the end product, even though Motorola's patents provide little, if any, value to the products. *Id.* at 259-61. Indeed, it is argued, "MMI's standards-essential patents relate not to Xbox's primary uses but to peripheral features whose primary function is to ensure compliance with the standards. MMI's 802.11 patents relate only to security for the 802.11 standard, but Xbox utilizes its own encryption and therefore has no use for MMI's patents apart from their inclusion in the standard." *Id.* at 259 (citing RX-317C (Caruana WS) at Q48-49, Holleman Tr. 1312; Dailey Tr. 2516). Similarly, it is argued, "MMI's H.264 patents relate only to interlaced video, which is not even utilized when Xbox is used for playing games or videos." *Id.* (citing RX-361C

(Rossini WS) at Q20; Holleman Tr. 1312-1313; Murphy Tr. 2061-2062; Teece Tr. 2658-2661).

Further, Microsoft argues that it asked [        ] to obtain a license from Motorola so that there would be a "genuine license" under the 802.11 essential patents. *Id.* at 261-62. Yet, it is argued,  Motorola's response was once again a sham designed to be unacceptable inasmuch as it would require [        ] to pay past and future royalties of 2.25% on the end price of [        ] customers' products, regardless of how inconsequential the [        ] might be in the final product. *Id.* at 262-63. In fact, it is argued, the royalties sought by Motorola exceed any relevant benchmark, such that the royalty Motorola sought for WiFi patents exceeded the price of the [        ] that provides all 802.11 functionality for Xbox. *Id.* at 263-65.  Further, it is argued, if Motorola had followed its own stated policies of licensing end users, it would not have sought from Microsoft "a royalty from Microsoft for all Windows-based computers and smartphones, even though Microsoft sells Windows software, which is only a component of computers and smartphones sold by its customers." *Id.* at 265.

Microsoft argues that Motorola's attempts to justify its unreasonable and discriminatory licensing attempts are unavailing, and instead demonstrate that Motorola was never interested in good-faith negotiations with Microsoft or in offering Microsoft a license on RAND terms. Thus, it is argued, Motorola's infringement claims are barred under equitable estoppel. *Id.* at 266-74.

As indicated above, Motorola opposes Microsoft's defense.  Motorola argues that it has not engaged in misleading conduct, and that its October 2010 letters to Microsoft complied with RAND standards in that they showed that Motorola was willing to enter

into negotiations for RAND licenses.  Compls. Br. at 282-88.  Further, it is argued, there

is no evidence that Microsoft relied on any allegedly misleading conduct, or that

Microsoft would be materially prejudiced by an exclusion order if found to violate

section 337.  Rather, it is argued, Microsoft should not be allowed to infringe another

party's patents with impunity.  *Id.* at 288-89.

### 2.    Application of Legal Standards; Conclusion on Equitable Estoppel

The Federal Circuit's opinion in *A.C. Aukerman Co. v. R.L. Chaides Constr. Co.*,

960 F.2d 1020 (Fed. Cir. 1992) sets forth the standard to be applied with respect to a

defense of equitable estoppel in a patent case.  It is relied upon by both Microsoft and

Motorola.  Resp. Br. at 272; Compls. Br. at 281-82, 289.  In *Aukerman*, the Federal

Circuit held, *inter alia*, that "[e]quitable estoppel is cognizable under 35 U.S.C. § 282 as

an equitable defense to a claim for patent infringement;" that "[w]here an alleged

infringer establishes the defense of equitable estoppel, the patentee's claim may be

entirely barred;" that three elements must be established to bar a patentee's suit by reason

of equitable estoppel; and that "[n]o presumption is applicable to the defense of equitable

estoppel."[98]  960 F.2d at 1028.  The three elements that must be established in an

equitable estoppel case are the following:  (1) "the statements or conduct of the patentee .

. . must communicate something in a misleading way;" (2) "[t] accused infringer must

show that, in fact, it substantially relied on the misleading conduct of the patentee in

connection with taking some action;" and (3) "the accused infringer must establish that it

---

[98] The Federal Circuit, contrasting equitable estoppel with laches (also at issue in the
*Aukerman* appeal) held, "Because the whole suit may be barred, we conclude that the
defendant should carry a burden to establish the defense based on proof, not a
presumption." *Aukerman*, 960 F.2d at 1043.

would be materially prejudiced if the patentee is now permitted to proceed."[99] *Id.* at

1042-43. "Finally, the trial court must, even where the three elements of equitable

estoppel are established, take into consideration any other evidence and facts respecting

the equities of the parties in exercising its discretion and deciding whether to allow the

defense of equitable estoppel to bar the suit.[100] *Id.* at 1043.

*The First Element: Misleading Communication*

As to the first element that must be established in an equitable estoppel case (*i.e*,

"the statements or conduct of the patentee . . . must communicate something in a

misleading way"), the Federal Circuit explained in *Aukerman* that "[t]he 'something'

with which this case, as well as the vast majority of equitable estoppel cases in the patent

field is concerned, is that the accused infringer will not be disturbed by the plaintiff

patentee in the activities in which the former is currently engaged." 960 F.2d at 1042

(footnote omitted).

There is no evidence of anything that could be construed as direct communication

between Motorola and Microsoft concerning Motorola's willingness to license the patents

at issue, or willingness not to disturb Microsoft's conduct with respect to the accused

devices, until shortly before Motorola sent the two October 2010 offer letters at issue.

The record, which is discussed above, shows that the parties [

---

[99] "As with laches, the prejudice may be a change of economic position or loss of evidence." *Aukerman*, 960 F.2d at 1043.

[100] The Federal Circuit also held that "since no special considerations are implicated by the defense of equitable estoppel as we have defined it herein, we adopt the preponderance of evidence standard in connection with the proof of equitable estoppel factors, absent special circumstances, such as fraud or intentional misconduct." *Aukerman*, 960 F.2d at 1046.

] the ensuing October 2010 letters from Motorola to Microsoft, with their licensing offers, are in evidence.  Moreover, the documents that Motorola had already sent to the SSOs concerning RAND licensing, and the obligations it thereby undertook, were designed to provide assurances to the SSOs and their members that Motorola would provide RAND licenses to patents essential to the specified standards.  Thus, Motorola has "communicated something," as required by the first element of equitable estoppel, when Motorola sent its letters and assurance to the SSOs.  Yet, to address fully the requirement of the first element of equitable estoppel, it must be determined whether or not those communications were in fact misleading.  As discussed immediately below, Motorola's statements and conduct toward Microsoft, and also toward [

], show that Motorola's statements to the SSOs were misleading.

The evidence shows that the royalty rate offered by Motorola of 2.25%, both as to its amount and the products covered, could not possibly have been accepted by Microsoft.  The evidence shows that Motorola has entered into licenses with at least [    ] companies for Motorola essential patents at a rate that is at or near 2.25%.  In each license, [                                        ] was included in that grant.  CX-778C (Dailey RWS) at 3-23; CX-62C to 66C; CX-70C; CX-73C; CX-74C; 75C; CX-77C; CX-83C; CX-91C; CX-92C; CX-93C; CX-94C, CX-96C to 101C, CX-104C, CX-105C, CX-582C, CX-681C, CX-782C.  For [    ] of the negotiations preceding the licenses, Motorola identified correspondence that showed an opening offer at or around 2.25%.  CX-778C (Dailey RWS) at 3-4.  Yet, there are likely differences between the products covered by

those licenses and the products at issue in this investigation because, as Motorola admits, some of the licenses were for Motorola's cellular essential portfolios, and thus "not necessarily the 802.11 or H.264 portfolios." Compls. Br. at 272-73.  Indeed, Motorola

[

] Dailey Tr. 2639-2640.

Use of the functionality related to the H.264 standard, which is covered by a plain reading of the Motorola offer, is likely to be encountered only by a user of interlaced video, and its use is thus far from universal in the accused Xbox devices.  None of the normal uses of the Xbox console – playing games or DVDs or viewing most Internet content – use this functionality.  RX-361C (Rossini WS) at Q20; Holleman Tr. 1312-13, Murphy Tr. 2061-62, Teece Tr. 2658-2661.  In addition, on the face of the Motorola offer, the 2.25% royalty covers the end price of all products containing Windows or Windows Phone software.  Even if the royalty were based only on the value of Windows software, rather than the entire value of computers and smartphones that incorporate Windows, it would amount to $400 million per year, or [

] *See* Dailey Tr.

2547-2549; CX-15.  Motorola's own corporate vice president of intellectual property was

[

] Dailey Tr. 2529,

2531.  Indeed, there is no evidence that any company would agree to the offer that Motorola sent to Microsoft.

Motorla's offer to [          ] covered past and future royalties of 2.25% on the end price of [          ] customers' products, regardless of how [

301

].  The royalty on even the least expensive of end products

incorporating [                    ] would likely exceed the price of [                    ], which

[                                        ].  *See* RRX-97C (Murphy) at Q6; Ochs Tr. 1941,

1958-1960.  For example, the royalty applied to a gaming console that wholesales for

$200 would be $4.50, or more than the price of [                    ].  Ochs Tr. 1942-1943,

1961-1962; Dailey Tr. 2524-2525, 2525.  In addition to such a high rate, Motorola's offer

specifically excluded any [


].  RRX-88C at § 3.5 and Annex C; Ochs Tr. 1943-1943, 1958-1960.

The offers made to Microsoft show that although Motorola assured the SSOs and

the public that it would provide reasonable and non-discriminatory licenses for the

patents essential to certain standards, those communications were misleading.  This fact

is only made more apparent by Motorola's dealings with [        ].  While Motorola's

offers need not be the same as the terms that might eventually be contained in a RAND

license, Motorola admits that it is bound to negotiate in good faith.  Compls. Br. at 263-

63, 279-82 (citing, *inter alia*, CX-758C (Holleman WS) at 8-13; CX-759C (Teece WS) at

6, 11, 16; Holleman Tr. 1323-1325, 1328-1329).  Motorola's answer to the evidence

concerning the terms that it actually offered is that through negotiations Microsoft could

have explained the nature of its business, and eventually (perhaps over the course of

lengthy negotiations lasting months or years, based on past negotiations) Motorola would

have provided a reasonable and non-discriminatory license.  *See* Dailey Tr. 2496-2497,

2634-2635; Compls. Br. at 284-89.  Yet, in view of the terms offered, there is nothing in

302

the record to suggest that even that scenario is likely. As discussed above, the evidence supports Microsoft's conclusion that Motorola was not interested in good faith negotiations and in extending a RAND license to it.[101]

Microsoft argues that the letters it received from Motorola made "take it or leave it" offers, based largely on the closing of each letter, which stated that the offer was open for only 20 days, and would Microsoft please confirm. *See* Resp. Br. 270, CX-597C; CX-598C. That provision of Motorola's letters is described in more detail above, and does not weigh heavily in the determination that Motorola made misleading communications, as required under *Aukerman*. Especially if Motorola were otherwise engaged in an attempt at good-faith negotiations toward a RAND license, that statement by Motorola would not necessarily indicate a "take it or leave it" demand, but only that if one delayed in negotiations, after 20 days one would have to begin on a different, and possibly less advantageous, footing. In the actual circumstances presented, Microsoft had no interest in using Motorola's offer as a starting point for negotiations.

Consequently, the first element to be considered with respect to an equitable estoppel defense has been established.

*The Second Element: Reliance*

As to the second element that must be established in an equitable estoppel case (*i.e,* "[t]he accused infringer must show that, in fact, it substantially relied on the misleading conduct of the patentee in connection with taking some action"), the Federal

---

[101] Indeed, Motorola claims that before writing to Microsoft, Motorola [

] *See* Dailey Tr. 2519, 2543-2545.

Circuit explained in *Aukerman* that "[r]eliance is not the same as prejudice or harm, although frequently confused. An infringer can build a plant being entirely unaware of the patent. As a result of infringement, the infringer may be unable to use the facility. Although harmed, the infringer could not show reliance on the patentee's conduct. To show reliance, the infringer must have had a relationship or communication with the plaintiff which lulls the infringer into a sense of security in going ahead with building the plant." 960 F.2d at 1043.

Microsoft argues that it "reasonably relied on the promise of a RAND license when it made investments implementing the H.264 and 802.11 standards in its products, including its Xbox gaming consoles. Microsoft had no reason to doubt that MMI would honor its Letters of Assurance, for MMI itself participated in and benefited from the standard-setting process—a process which depends on reliable and enforceable RAND assurances." Resp. Br. at 273 (citing a text from the year 2000, but no evidence of record). In its reply, Microsoft argues that "MMI asserts that there is no evidence Microsoft relied on its RAND promises, but the evidence demonstrates Microsoft made investments implementing the 802.11 and H.264 standards, which are now sunk costs." Resp Reply at 92-93. Microsoft, however, never explains what those costs were or, more importantly, that it undertook them in consideration of Motorola's communications with the SSOs in which it assumed RAND obligations. Motorola's communications to the SSOs may have been misleading, as betrayed by Motorola's subsequent conduct toward Microsoft [          ] which is discussed above, but there is no evidence that Microsoft relied on any statement by Motorola to embark on, or to continue in, any course of conduct.

Consequently, the second element to be considered with respect to an equitable estoppel defense has not been established.

### *The Third Element: Material Prejudice*

As to the third element that must be established in an equitable estoppel case (*i.e*, "the accused infringer must establish that it would be materially prejudiced if the patentee is now permitted to proceed"), the Federal Circuit explained in *Aukerman* that "the prejudice may be a change of economic position or loss of evidence." 960 F.2d at 1043.

There is no dispute that if Motorola obtains an exclusion order, Microsoft would be prohibited from importing its profitable Xbox console, and possibly controllers or other products used with the consoles. As is evident from the discussion above in connection with the revenues to be gained merely from royalties on the accused products, the loss of revenues to Microsoft resulting from an exclusion order would be large, at least until such time as the products could be redesigned (and there is no estimate in the record of how long that would take).

Motorola argues that "one who chooses to infringe should not be heard to complain that he has to pay the penalty for his infringement." Compls. Br. at 289 (citing *Robert Bosch LLC v. Pylon Mfg. Corp.*, 659 F.3d 1142, 1156 (Fed. Cir. 2011)). Motorola, however, misses the point. If equitable estoppel were to be found, then Microsoft's infringement would have occurred in reliance on Motorola's misleading statements.[102] In that case, Microsoft would have good reason to complain of the economic or other injury it would suffer.

---

[102] When a patent holder made misleading statements to the infringer who relied on those statements, the application of equitable estoppel would not run contrary to the *Bosch*

305

Consequently, the third element to be considered with respect to an equitable estoppel defense has been established.

*Conclusion on Equitable Estoppel*

The test set forth in *Aukerman* would require a trial court, even where the three elements of equitable estoppel are established, to consider any other evidence and facts respecting the equities of the parties in exercising its discretion and deciding whether to allow the defense of equitable estoppel to bar the suit. 960 F.3d at 1043. As discussed above, all three elements have not been established because it has not been shown that there was the requisite reliance. All "three elements must be established to bar a patentee's suit by reason of equitable estoppel." 960 F.2d at 1028.

Accordingly, it is not found that equitable estoppel bars Motorola's request for a remedy.

## XI. Economic Prong; Determinations on Domestic Industry

As indicated above in section IV.D., in order for a section 337 violation to be found as to any of the five asserted patents, Motorola must establish that the domestic industry requirement has been satisfied as to that individual patent.[103] Thus, for each

---

opinion, cited by Motorola. In *Bosch*, the Federal Circuit was concerned with the equitable factors relative to the granting of a permanent injunction. The court held, "A party cannot escape an injunction simply because it is smaller than the patentee or because its primary product is an infringing one." 659 F.3d at 1156. Nevertheless, it was determined in *Bosch* that the hardships balanced in favor of granting the injunction. Moreover, the Federal Circuit's *Aukerman* opinion is specifically concerned with an infringer that seeks the application of estoppel against the patent holder.

[103] The statute allows the domestic industry requirement to be satisfied in some instances when a domestic industry is in the process if being established. Further, the statute does not restrict the definition of a domestic industry to only the domestic investments or other activities of the complainant. *See* 19 U.S.C. § 1337(a)(2)-(3). Nevertheless, Motorola is

**PUBLIC VERSION**

patent, Motorola must show that is satisfies section 337(a)(3)(A), (B) or (C) (*i.e.*, that with respect to each individual patent, it has significant investment in plant and equipment; significant employment of labor or capital; or substantial investment in exploitation of the patent, such as through engineering, research and development ("R&D"), or licensing).

Motorola argues that as to each patent, it has satisfied the domestic industry requirement under section 337(a)(3)(A), (B) and (C). Compls. Br. at 262. First, in reverse order to the way that the definition of a domestic industry is presented in the statute, Motorola argues that under section 337(a)(3)(C), its investments in licensing, as well as engineering and R&D, satisfies the definition of a domestic industry, and thus the domestic industry requirement, with respect to each patent. *See Id.* at 244-61. Second, Motorola argues that under section 337(a)(3)(A) and (B), it has satisfied both the technical and economic prongs with respect to each patent. Motorola's arguments with respect to its investments and activities relative to section 337(a)(3)(A) and (B) refer back to its previous arguments concerning section 337(a)(3)(C). *See Id.* at 244, 261-62.

Motorola's domestic industry case is discussed below generally in the order argued by Motorola (section 337(a)(3)(C), followed by section 337(a)(3)(A) and (B)). Finally, the conclusion on domestic industry is provided for each patent. As to each patent, a statement is made as to whether or not the domestic industry requirement is satisfied through licensing, engineering or R&D (*i.e.*, investment in exploitation as defined by section 337(a)(3)(C)), and then a statement is made as to whether or not a

---

relying on domestic industries alleged to be already in existence as to each asserted patent; and further, Motorola relies only on it own investments or other activities. *See* Compls. Br. at 244.

domestic industry exists as defined in section 337(a)(3)(A) or (B).  With respect to the latter, the technical prong conclusion as to each patent (set forth in earlier sections of this Initial Determination) is combined with the economic prong analysis contained below.

### A.  Section 337(a)(3)(C)

#### 1.   Licensing

##### a.   The Legal Standard Applied to Licensing

Section IV.D. of this Initial Determination contains an overview of the domestic industry requirement, and shows that, in certain circumstances, a complaint can show that the requirement is satisfied by relying on section 337(a)(3)(C), and particularly, upon substantial investments made to license an asserted patent.  In its opinion in *Navigation Devices*, initially cited in section I.D., the Commission summarized and highlighted statutory provisions and case precedent to shed light on the steps that a complainant must could take, and in some cases might take, in order to arrive at a successful showing of domestic industry based on licensing.

Each complainant seeking to satisfy the domestic industry requirement by its investment in patent licensing must establish that its asserted investment activities satisfy three requirements of section 337(a)(3)(C).  First, the investment must relate to exploitation of the asserted patent.  Second, the investment relate to "licensing."  Third, any alleged investment must be domestic, *i.e.*, it must occur in the United States.  After determining the extent to which a complainant's investments fall within these statutory parameters, *i.e.*, the required nexus to the asserted patent, nexus to licensing and nexus to the United States, one can evaluate whether a complainant's qualifying investments are "substantial," as required by the statute.  *Navigation Devices*, Comm'n Op. at 4.

**PUBLIC VERSION**

"Because the statute requires that investments satisfy all three of these requirements, the absence of a nexus to any one of them will defeat complainant's attempt to satisfy the domestic industry requirement." *Id.* at 7 n.12.

*Nexus to the Asserted Patent*

If a complainant's activity is only partially related to licensing the asserted patent in the United States, the Commission examines the strength of the nexus between the activity and licensing the asserted patent in the United States. *Id.* at 4.  A complainant may be able to establish the strength of the nexus between the asserted patent and its licensing activities through evidence showing that its licensing activities are particularly focused on the asserted patent among the group of patents in the portfolio, or through other evidence that demonstrates the relative importance or value of the asserted patent within the portfolio. *Id.* at 5 (citing *Certain Coaxial Cable Connectors and Components Thereof and Products Containing Same*, Inv. No. 337-TA-650, Comm'n Op. at 44-51 (Apr. 14, 2010) (evidence clearly showed that one patent was more important and more valuable than the other)).

When a large patent portfolio is at issue, a potentially important consideration is whether the licensee's efforts relate to "an article protected by" the asserted patent under section 337(a)(2)-(3).  For example, if a licensee's product is an "article protected by" the patent, then the license at issue is connected to that patent.[104]  *Id.* at 5.  In general, the

---

[104] "Evidence that the patent-at-issue is practiced or infringed in the United States may also be relevant to the value of the patent and may suggest a high value relative to that of the other patents in the portfolio.  Conversely, evidence that a patent is not practiced or infringed may indicate relatively less value." *Navigation Devices*, Comm'n Op. at 6.

Commission may also consider other factors, including, but not limited to: (1) the number of patents in the portfolio;

(2) the relative value contributed by the asserted patent to the portfolio; (3) the prominence of the asserted patent in licensing discussions, negotiations and any resulting license agreement; and (4) the scope of technology covered by the portfolio compared to the scope of the asserted patent. *Id.*

"Evidence demonstrating the relative value and/or importance of an asserted patent in a portfolio may indicate the focus of complainant's investment and, in turn, may reflect the strength of the nexus between these activities and the asserted patent." *Id.* The Commission has stated, by way of example, that "the asserted patent may be shown to be particularly important or valuable within the portfolio where there is evidence that (1) it was discussed during the licensing negotiation process, (2) it has been successfully litigated before by complainant, (3) it relates to a technology industry standard, (4) it is a base patent or a pioneering patent, (5) it is infringed or practiced in the United States, or (6) the market recognizes its value in some other way." *Id.* Yet, the Commission recognizes that "certain facts pertaining to the importance or value of a particular patent in a portfolio may, in some instances, be difficult to establish as a result of the varying perspectives of the complainant, potential licensees, and third parties." *Id.* Indeed, "a patent may be important to the patentee or the potential licensee for different reasons. Frequently, there is no evidence as to what motivated the licensee to agree to take a license. Nevertheless, this type of evidence, when present in the record, is useful in determining the focus of complainant's licensing activity. A showing that the asserted patent is relatively important within the portfolio is not required to show a nexus between

310

**PUBLIC VERSION**

that patent and the licensing activities . . . but may be one indication of the strength of the nexus." *Id.*

"All things being equal, the nexus between licensing activities and an asserted patent may be stronger when the asserted patent is among a relatively small group of licensed patents. The scope of the technology covered by the license and the congruence of the patents contained in the portfolio may also indicate the strength of the nexus to a particular patent." *Id.* (citing *Certain Dynamic Sequential Gradient Compression Devices and Component Parts Thereof*, Inv. No. 337-TA-335, Final ID, USITC Pub. 2575 at 63 (Nov. 1992) ("To include activities which are in the same field of technology but which do not have the requisite nexus to the patent would be contrary to the statute.") (footnote omitted)). Consequently, "[e]vidence showing how the asserted patents fit together congruently with other patents in the portfolio covering a specific technology may demonstrate a stronger nexus to the licensing activity than evidence indicating that the patents cover a wide variety of technologies bearing only a limited relationship to one another."[105] *Id.*

*Nexus to Licensing*

A complainant's activities relied upon to show investment in licensing may be solely related to licensing. Yet, when activities serve multiple purposes, a complainant cannot rely on all related expenditures to prove domestic industry. *Id.* "For example, the evidence may show that analyzing another company's product for infringement may

---

[105] "The burden is on complainant to show that there is a nexus between its alleged licensing activities and an asserted patent. A complainant cannot establish that the asserted patent is more valuable than the remainder of the patents in a portfolio merely by filing a section 337 action alleging infringement of that patent." *Navigation Devices*, Comm'n Op. at 6.

**PUBLIC VERSION**

relate to licensing, but it may also occur with an eye toward litigation seeking injunctive relief against that company." *Id.*     Indeed, the Court of Appeals for the Federal Circuit has held that "expenditures on patent litigation do not automatically constitute evidence of the existence of an industry in the United States established by substantial investment in the exploitation of a patent." *Mezzalingua v. Int'l Trade Comm'n*, 660 F.3d 1322, 1328 (Fed. Cir. 2011). "The fact that litigation adversaries eventually enter into a license agreement does not . . . mean that all of the prior litigation expenses must be attributed to the licensing effort." *Id.* at 1329. Rather, a nexus must be shown between litigation expenses and licensing. *Id.* at 1328.

*Nexus to the United States*

"The most obvious requirement of section 337(a)(3) is that the investment occur in the United States." *Id.* (citing 19 U.S.C. § 1337(a)(3)). When a complainant's licensing activity is performed and directed within the United States, the facts weighs in favor of a strong nexus between the activities and the United States. *Id.* "The Commission's analysis is a fact-focused and case-specific inquiry that takes into account the extent to which the complainant conducts its licensing operations in the United States, including the employment of U.S. personnel and utilization of U.S. resources in its licensing activities." *Id.* (footnote omitted).

*Whether the Investment Is "Substantial"*

Once it has been shown that a complainant's investment is in licensing the asserted patent in the United States, the next inquiry is whether the investment is substantial, as that term is used in the statute. *See Id.* As indicated in section I.D. of this Initial Determination, in the general discussion of section 337(a)(3)(c), this inquiry is a

**PUBLIC VERSION**

fact-dependent inquiry for which the complainant bears the burden of proof. *Stringed*

*Musical Instruments*, Comm'n Op. at 8.

There is no minimum monetary expenditure that a complainant must demonstrate

to qualify as a domestic industry under the "substantial investment" requirement; nor is

there a need to define or quantify an industry in absolute mathematical terms. Rather,

"the requirement for showing the existence of a domestic industry will depend on the

industry in question, and the complainant's relative size. *Id*. at 14. Indeed, as explained

in the *Navigation Devices* opinion, the Commission "has adopted a flexible approach

whereby a complainant whose showing on one or more of the three section 337(a)(3)(C)

requirements is relatively weak may nevertheless establish that its investment is

"substantial" by demonstrating that its activities and/or expenses are of a large

magnitude." *Navigation Devices*, Comm'n Op. at 7 (footnote omitted). The type of

efforts that are considered a "substantial investment" under section 337(a)(3)(C) will vary

depending on the nature of the industry and the resources of the complainant." *Id*.

Thus, the Commission has stated that:

> Other factors that might be relevant in determining whether a
> complainant's investment is substantial are (1) the existence of other types
> of "exploitation" of the asserted patent such as research, development, or
> engineering, (2) the existence of license-related ancillary activities such as
> ensuring compliance with license agreements and providing training or
> technical support to its licensees, (3) whether complainant's licensing
> activities are continuing, and (4) whether complainant's licensing
> activities are those that are referenced favorably in the legislative history
> of section 337(a)(3)(C). The complainant's return on its licensing
> investment (or lack thereof) may also be circumstantial evidence of the
> complainant's investment.

*Id*. at 7.

313

b.      **Summary of the Arguments of the Parties**

Motorola argues that it (and its predecessor) have made, and continue to make, substantial investments in licensing the asserted patents.  Motorola argues that it has developed "a robust intellectual property management and licensing business concerning its extensive portfolio of patents."  Compls. Br. at 245-46.  It is argued that although Motorola has more than 24,000 patents and patent applications worldwide, covering inventions in numerous industries, it traditionally enters into licenses covering [

        ]  It is further argued that from 2000 through February 2011, Motorola has received approximately [              ] in licensing revenue, and that cumulative royalties under licenses involving the asserted patents range from [              ] to [

    ]  Motorola argues that its licensing group directly employs [  ] people, [ ] of whom are located in the Untied States; and that in 2010, the combined salaries of [   ] people employed in the United States, who are involved in patent licensing activities, approximated [             ]  It is argued that [                  ] have also been spent in litigation and negotiations that have expanded Motorola's licensing.  *Id.* at 244-50; Compls. Reply at 93-95.  Further, it is argued that the evidence shows that Motorola's investments have the required nexus to licensing, the required nexus to the patents, and are substantial, in satisfaction of the domestic industry requirement.  Compls. Br. at 250-55.

Microsoft argues that Motorola's licensing activities fail to establish a domestic industry.  It is argued that few of Motorola's licenses identify specific patents, and fewer identify the asserted patents.  Further, it is argued that Motorola has made no effort to allocate revenues and costs to specific asserted patents.  Indeed, it is argued that most of

**PUBLIC VERSION**

the licenses relied upon by Motorola were signed before 2007, while the alleged

investment information is from a period of time after 2007.  Microsoft argues that while

Motorola's expenditures may be substantial in an absolute sense, they are not significant

when viewed in terms of the asserted patents.  Resp. Br. at 276-279; Resp. Reply at 94-

96.  Indeed, Microsoft argues, Motorola's evidence fails to show that the asserted patents

were sufficiently important to Motorola's licensing activities, and fails to show that

Motorola's litigation activity constitutes a domestic industry.  Resp. Br. at 276-281.

### c.   Analysis and Conclusion on Licensing

An examination of the required nexus to the asserted patent, the nexus to

licensing, and the and nexus to the United States must precede an evaluation of whether

Motorola's investments are "substantial." *See Navigation Devices*, Comm'n Op. at 4.

*Nexus to the Patents*

Motorola has shown that there is a nexus between its licensing investments and

each of the asserted patents.

Although not specifically called out in each license agreement, the '712 patent has

been licensed at least [    ] times since 2000.  CX-544C.  Motorola's licensing activities

with respect to the '712 patent are currently ongoing.   Motorola recently concluded a

license with [        ] that expressly includes the '712 patent.  CX-778C (Dailey RWS) at

and 23; CX-782C at 29.  [

                                                   ].  CX-789C.  Other licensing discussions

involving the '712 patent are taking place with [              ] and [    ].  CX-715C

(Dailey WS) at 17-19, 21; CX-714C (Leonard WS) at 15-16.

315

The importance of the '712 patent is further demonstrated by the fact that it has been incorporated into many wireless communication protocols. It is and/or has been declared essential to at least the 3G, 3GPP LTE, UMTS, 802.16 WiMax Profile Annex and WLAN 802.11 standards. CX-586C; CX-715C (Dailey WS) at 19; CX-714C (Leonard WS) at 11. The '712 patent is one of relative few patents that [

] CX-715C (Dailey WS) at 22.

Motorola also has identified the '571 and '896 patents as essential to the 802.11 standard. CX-715C (Dailey WS) at 19; CX-714C (Leonard WS) at 11. Both of these patents are also among the relatively few that Motorola [

] CX-715C (Dailey WS) at 22. The technology in the '896 patent was also incorporated into the widely-used Bluetooth wireless protocol. CX-712C (Madisetti) 3-4; Leeper Tr. 138-139. The '571 and '896 patents have been licensed approximately [   ] times each as part of Motorola's 802.11-essential patent portfolio. CX-714C (Leonard WS) at 13-14. In fact, [                    ] of Motorola's executed license agreements and license negotiations since 2007 have included the '571 and '896 patents as essential patents in the 802.11 portfolio. Dailey Tr. 2570.

Motorola is currently in negotiations with handset makers [                  ], and [   ] regarding a license to the '571 and '896 patents. CX-715C (Dailey WS) at 17-19, 21; CX-714C (Leonard WS) at 15-16. [

]. CX-789C. [   ] also obtained a license in [   ] to Motorola's 802.11 patents (expressly including the '571 and

**PUBLIC VERSION**

'896 patents), stating it intended to create 802.11-compliant [                    ]. Dailey Tr. 65-67; CX-782C at 30. [        ] currently is making other 802.11-compliant products, including a [             ]. *See, e.g.*, CX-844; Dailey Tr. 2589.[106]

Motorola has declared and licensed the '596 and '094 patents as essential to the H.264 video coding standard. CX-715C (Dailey WS) 19; CX-714C (Leonard WS) 11. Both of these patents are among the relative few that Motorola [

                                          ] CX-715C (Dailey WS) at 22. The '596 and '094 patents have been licensed approximately [    ] times each. CX-544C. [                    ] of Motorola's executed license agreements and license negotiations since 2007 have involved the '596 and '094 patents as part of the H.264 and video coding patent portfolios, including agreements reached with major handset manufacturers such as [    ] and [      ]. *See* Dailey Tr. 62, 2570. Motorola is currently in negotiations with handset makers [                ], and [      ] regarding a license to the '596 and '094 patents. CX-715C (Dailey WS) at 17-19, 21. Furthermore, [            ] licensing request and subsequent agreement explicitly referenced Motorola's H.264 patents (including the '596 and '094 patents) for use in future products. Dailey Tr. 65-67; CX-782C at 22.

*Nexus to Licensing*

The investments relied upon by Motorola overwhelmingly pertain to licensing. There is little dispute as to that fact. Motorola does, however, include litigation within its licensing argument. Specifically, Motorola references litigation against RIM and Apple

---

[106] This "production-driven" licensing activity connected with the [      ] agreement is precisely the type that Congress intended to encourage. *See Navigation Devices*, Comm'n Op. at 12.

in litigation, and in particular the fact that the RIM litigation led to a license of

Motorola's entire [                              ].  Compls. Br. at 251.  Motorola has not,

however, made a connection between specific litigation expenses and licensing.  Rather,

it appears that the license in question may have arisen simply as an outcome of litigation.

*See Mezzalingua*, 660 F.3d at 1328-29.

> *Nexus to the United States*

It has not been disputed that Motorola's licensing investments have been made

almost entirely in the United States.  The record evidence supports such a nexus.  *See,*

*e.g.*, CX-715C (Dailey WS) at 9-10; CX-542; CX-555C; CX-714C (Leonard WS) 6-8.

> *Whether the Investments Are Substantial*

Motorola argues that "the magnitude of its licensing investments is sufficiently

large as to overcome any possible concerns about the strength of the nexus."  Compls. Br.

at 253 (relying on *Navigation Devices*).  While the legal principle cited by Motorola is

correct, *see Navigation Devices*, Comm'n Op. at 7, as indicated above, the evidence also

shows a strong nexus between Motorola licenses and the asserted patents.  Although the

asserted patents are only five of many patents owned and licensed by Motorola, they play

an important part in Motorola's licensing business.  In any event, Motorola's investments

in licensing are quite large.  The investments are so large, that even when one considers

only investments made since 2007, as argued by respondent, the evidence shows that the

investments are substantial.

As argued by Motorola, its licensing group currently employs [     ] people, [     ] of

whom are located in the United States.  CX-715C (Dailey WS) at 9; CX-555C; CX-714C

(Leonard WS) 6-7.  When one includes employees in other Motorola departments (such

as the legal department) who perform at least some activities in support of licensing, the total is [   ] employees, who earned [               ] in salary in 2010.[107]   CX-685C; CX-715C (Dailey WS) 9-10; CX-542C; CX-714C (Leonard WS) at 6-8.  The result of Motorola's licensing investments is [               ] every year in royalties paid under licenses that cover the each of the asserted patents, with cumulative royalty revenues in the decade before the complaint was filed that ranged from [               ] (attributed to the [   ] licenses that cover the '596 and '094 patents) to [       ] (attributed to the '712 patent, which is covered by [       ] licenses relied upon by Motorola's expert).  *See* CX-682C; CX-683C; CX-715C (Dailey WS) at 12; CX-544C; CX-714C (Leonard WS) at 13-14.

Accordingly, it is found that Motorola's investments in licensing are substantial, including the licensing of each asserted patent.  Thus, Motorola has satisfied the domestic industry requirement as to each asserted patent by exploiting that patent through licensing.

### 2.    Engineering and R&D

#### a.    The Legal Standard Applied to Engineering and R&D

Section 337(a)(3)(C) lists engineering and R&D, along with licensing, as areas in which substantial investment may satisfy the domestic industry requirement.  As indicated above in the discussion of licensing, the Commission "has adopted a flexible approach whereby a complainant whose showing on one or more of the three section

---

[107] Notwithstanding the litigation against RIM, at least [   ] Motorola employees were directly or indirectly involved in the negotiations with RIM, which began in mid-2007 and culminated in the aforementioned license agreement.  *See* CX-715C (Dailey WS) at 15; CX-714C (Leonard WS) at 20-21.

337(a)(3)(C) requirements is relatively weak may nevertheless establish that its investment is 'substantial' by demonstrating that its activities and/or expenses are of a large magnitude." *Navigation Devices*, Comm'n Op. at 7 (footnote omitted). "The type of efforts that are considered a 'substantial investment' under section 337(a)(3)(C) will vary depending on the nature of the industry and the resources of the complainant." *Id.*

For example, in some cases, the Commission has considered work performed by contractors when assessing the strength of a complainant's case. *See Certain GPS Chips, Associated Software and Systems, and Products Containing Same*, Inv. No. 337-TA-596, Order No. 37 (Initial Determination), 2008 WL 838257, at 2 (Feb. 27, 2008) (and cases cited therein) (recognizing work performed by contractors as sufficient to support a domestic industry), Notice of Comm'n Decision Not to Review (Mar. 20, 2008). In other circumstances, the Commission has found that domestic R&D expenditures directed to products that incorporate the patented technologies at issue are sufficient to satisfy the economic prong of the domestic industry requirement under 337(a)(3)(C). *See, e.g.*, *Certain NOR and NAND Flash Memory Devices and Products Containing Same*, Inv. No. 337-TA-560, Order No. 37 at 6 (Nov. 17, 2006), Notice of Comm'n Decision Not to Review (Dec. 8, 2006).

b.     **Summary of the Arguments of the Parties**

Motorola argues that it "commits substantial resources to engineering and [R&D] efforts to create new products and improve current products that practice the Asserted Patents." Compls. Br. at 255. It is argued that "Motorola's substantial investment in product-specific engineering and R&D related to its Droid 2 and Droid X products in the United States satisfies the economic prong of the domestic industry products with regard

320

to the '712, '571, and '896 patents." *Id.* at 256. With respect to the '596 and '094 patents, Motorola relies on R&D related to VIP12XX series set-top boxes. *Id.* at 260; Compls. Reply at 96.

Microsoft argues that Motorola cannot establish that a domestic industry exists based on non-licensing activities. Resp. Br. at 281 (combining all non-licensing arguments in one section). It is argued that Motorola failed to allocate its activities and expenditures properly to the specific products alleged to practice the asserted patents, and failed to show substantial non-licensing investment in the exploitation of the patents under section 337(a)(3)(C). *Id.* at 282; Resp. Reply at 96-97.

        c.        **Analysis and Conclusions on Engineering and R&D**

*Engineering and R&D Related to Droid X and Droid 2 Products*

The initial step in the manufacturing process of the Droid X and Droid 2 is the [                              ]. Although some [                    ] are made in [            ], a significant proportion of [                        ] prototypes are developed and made in the United States during the R&D stage, in Motorola's facilities in [                         ]. CX-716C (Deardorff WS) at 5; CX-714C (Leonard WS) 24. Motorola has incurred equipment and materials costs (excluding personnel costs) of [                ] associated with the domestic development of [                  ] for its Droid 2 and Droid X products. CX-716C (Deardorff WS) at 5; CX-690C at 1, 3-5; CX-714C (Leonard WS) at 24.

Additionally, Motorola conducts the majority of its product-specific R&D for the Droid X and Droid 2 in the United States. For example, from 2009 through February 2011, U.S. employees accounted for [          ] of the total time spent on R&D related to

321

**PUBLIC VERSION**

these products. CX-716C (Deardorff WS) at 4; CPX-19C; CX-549C; CX-714C (Leonard

WS) 27-28.  During that time, Motorola employees worked approximately [          ] hours

in the United States on product-specific R&D related to the Droid X and Droid 2

products (without regard to the earlier handsets, which may have provided a foundation

for the Droid X and Droid 2 projects).  CX-716C (Deardorff WS) at 4; CPX-19C; CX-

550C; CX-714C (Leonard WS) 25-26.

      In 2010, at least [     ] Motorola employees performed these R&D activities in at

least [     ] facilities across the United States, including facilities in [

                                                    ].  CX-716C (Deardorff WS) at 3-

4; CPX-19C; CX-546C; CX-714C (Leonard WS) 27-29.  Motorola spent approximately

[               ] on employee expenses for the aforementioned domestic R&D related to the

Droid X and Droid 2.  CX-716C (Deardorff WS) at 4; CPX-19C; CX-551C; CX-714C

(Leonard WS) 25-26.

      Post-assembly engineering, programming and testing related to the Droid X and

Droid 2 also take place in the United States.  While the physical assembly of all Motorola

handsets for commercial sale occurs in [     ], the handsets are not usable by carriers and

consumers until the post-assembly loading of vendor-specific software and testing has

taken place.  CX-716C (Deardorff WS) at 6; CX-714C (Leonard WS) 29-30.  These post-

assembly activities occur for all handsets sold in the United States at a facility owned by

a Motorola contractor, [          ], in [                    ].  CX-716C (Deardorff WS) at 6;

CX-714C (Leonard WS) 29.  After software installation, the handsets undergo 30 to 45

minutes of [                          ] testing at the [            ] facility.  CX-716C

(Deardorff WS) at 6.  After the software is loaded, and testing is complete, [          ]

packages the handsets individually and distributes them to carriers and consumers from

the [                    ] facility.  CX-716C (Deardorff WS) at 6; CX-714C (Leonard WS)

29.

      In 2010, Motorola incurred [                    ] in total expenses associated with

activities in [                    ], including expenses for [    ] Motorola personnel involved

in managing and supporting these activities.  CX-716C (Deardorff WS) at 6-7; CX-691C

at 1-3; CX-553C; CX-714C (Leonard WS) 30, 32.  While these expenses relate to

production and distribution operations for all handsets sold in the United States over this

period, Droid 2 and Droid X collectively account for [          ] of such sales.  CX-716C

(Deardorff WS) at 7; CX-715C (Dailey WS) 6; CX-553C; CX-714C (Leonard WS) 30,

32.  Thus, during this period, Motorola incurred over [          ] in final production,

testing, packaging and distribution activities in the U.S. associated with Droid X and

Droid 2.  *See* CX-716C (Deardorff WS) at 7; CX-553C; CX-714C (Leonard WS) 30.

      Furthermore, Motorola invests [                    ] in other domestic activities

related to engineering for Droid 2 and Droid X, such as post-sale customer service,

technical support, and warranty repair services.  CX-716C (Deardorff WS) at 7-12; CX-

714C (Leonard WS) 32-37.  These expenses include costs for Motorola engineers as well

as third-party contractors.  CX-716C (Deardorff WS) at 10-12; CX-714C (Leonard WS)

35-38.  Employees in Motorola's warranty operations and post-sales support departments

provide input during the product development process on design features and assembly

procedures, and monitor product quality throughout the product's lifecycle to help

improve product performance and customer satisfaction.  CX-716C (Deardorff WS) at

13; CX-714C (Leonard WS) 40.

**PUBLIC VERSION**

Motorola's domestic investments in engineering and R&D related to the Droid 2 and Droid X are substantial, both in terms of the amount of expenditures that Motorola has made, and in terms of the value added, to the amount devices alleged to practice three of the asserted patent. Without Motorola's domestic engineering and R&D, the final manufactured Droid 2 and Droid X products would not function properly. Without the aforementioned investments, if the Droid 2 and Droid X products existed, their existence would have been due to substantial expenditures made overseas rather in the United States. Due to its substantial investment in engineering and R&D, Motorola has satisfied the economic prong of the domestic industry requirement for the '712, '571, and '896 patents.

*R&D Related to VIP12XX Set-Top Boxes*

The current circumstances relevant to Motorola's VIP12XX set-top boxes in many ways stand in contrast to those of the vibrant economic circumstances surrounding the Motorola Droid products, discussed above. Motorola admits in its brief that the VIP12XX set-tops boxes represent a "mature" product line.[108] Compls. Br. at 260 n.118 (quoting Richards Tr. 96, 99). Respondent favors the use of other quotes by Motorola personnel at the hearing to the effect that the VIP12XX is [

        ] is in a [                    ] that [

            ] and that there is [                    ] with respect to these set-top boxes.

Resp. Br. at 283-84 (quoting Richards Tr. 86, 96).

---

[108] There is no dispute that the VIP12XX set-top boxes are made in [        ]. Richards Tr. 98.

**PUBLIC VERSION**

Motorola urges that the Commission to look not only at Motorola's current investments with respect to the VIP12XX, but also to its R&D investments in the past, and to vaguely described "next generation" set-top boxes that "employ the H.264 technology at issue." Motorola conspicuously does not rely on both engineering and R&D, as it does in relation to the Droid products, but rather expressly relies only on R&D.[109] Motorola Br. at 261-62. Yet, Motorola reaches back as far as 2005 to gather together expenditures in support of its arguments, without explaining why there should be an economic continuity between R&D that may have taken place seven years ago and a product that is nearing its end. Motorola also fails to explain the connection of the current VIP12XX set-top boxes to next generation products. In its post-hearing brief, Motorola provides no technical argument relating to next generation products; and based on the vague description of such products, it appears that respondent correctly argues that next generation products were excluded from Motorola's pre-hearing brief. Consequently, the question presented is not whether an industry relating to the VIP12XX set-top boxes is in decline, or whether an industry is in the making with respect to a new generation of set-top boxes. Rather, the question is whether there still is a domestic industry based on R&D relating to the products relied upon by Motorola, which are the VIP12XX set-top boxes.

The evidence reveals that little, if any, R&D (or any other type of engineering) is taking place in the United States with respect to the VI12XX set-top boxes. It is hard to discern any R&D expenditures that are currently taking place, or that took place

---

[109] In particular, Mr. Richards, Motorola's economic witness on the '094 and '596 patents testified that in his analysis, he did not rely on repairs. *See* Richards Tr. 78.

approximately at the time that the complaint was filed. Even in its reply, when faced

with Microsoft's challenge to a current domestic industry, Motorola aggregates any

current R&D expenditures with past years and the development of future products.

Compls. Reply at 65-96. Yet, what is clear from the record is that, with respect to the

VIP12XX set-top boxes,[          ] individuals are currently assigned to what may be

term R&D. Further, requests for technical assistance regarding the VIP12XX products

have dwindled to, at best, [                    ] each month. *See* Richards Tr. 94-98.

Accordingly, it has not been shown that, based on investments in R&D, the

economic prong of the domestic industry requirement is satisfied with respect to the '596

and '094 patents.

> **B.      Section 337(a)(3)(A) and (B)**
>
> > **1.      The Legal Standard Applied to section 337(a)(3)(A) and (B)**

As indicated in section I.D. of this Initial Determination, to determine whether a

complainant's investments are "significant" under section 337(a)(3)(A) and (B), the

Commission examines the facts in each investigation, the article of commerce, and the

realities of the marketplace, as well as the nature of the investment and/or employment

activities in the industry in question, and the complainant's relative size. *Printing and

Imaging Devices*, Comm'n Op. at 27.

In determining whether a complainant's activities are significant with respect to

the articles protected by the intellectual property right concerned, the Commission has

considered, among other things, the value added to the article in the United States by the

domestic activities; the relative domestic contribution to the protected article by

comparing complainant's product-related domestic activities to its product-related foreign

326

activities; and the nature of complainant's activities to determine whether they are directed to the practice of one or more claims of the asserted patent. *Id.* at 27-28.

### 2.      Summary of the Arguments of the Parties

Motorola devotes only two paragraphs of its main brief to the question of whether it has satisfied the requirements of section 337(a)(3)(A) and (B) as to each asserted patents, and relies primarily on the showings it made relative to section 337(a)(3)(C). Motorola argues that its "aforementioned activities, in combination with other evidence introduced by Motorola, also show that Motorola satisfies the economic domestic industry requirement for each of the Asserted Patents under prongs (A) and (B). Motorola's domestic activities constitute significant investments in plant and equipment and significant employment of labor and capital relating to the Droid 2, Droid X, and VIP12XX products that are protected by the asserted patents." Compls. Br. at 261-62 (citing CX-716C (Deardorff WS) at 7-14; CX-717C (Richards WS) at 3-6; and CX-714C (Leonard WS) 28-29, 44-46)). It is argued that "[t]he sophisticated domestic activities undertaken by Motorola employees and contractors add significant value to Droid 2, Droid X, and VIP12XX products as compared to the assembly work done overseas concerning those products, *e.g.,* developing and designing the products, rendering the products operational by loading and testing software, as well as other high-value activities." *Id.* Motorola provides few specific arguments in its reply. *See* Compls. Reply at 96-97.

Microsoft argues that Motorola failed to establish a domestic industry based on non-licensing activities. Although Microsoft combines a discussion of section 337(a)(3)(A) and (B) with non-licensing activities under section 337(a)(3)(C), with

**PUBLIC VERSION**

respect to the former statutory provisions, Microsoft clearly faults Motorola's reliance on the VP 12XX set-top boxes because those products are at their end of life cycle, and few employees work with the products in the United States; and Microsoft faults Motorola for failing to correlate the employees and facilities specifically to the Droid X and Droid 2 products. Resp. Br. at 281-285. Microsoft objects to any reliance by Motorola on "next generation" set-top boxes or repair services (discussed above with respect to engineering and R&D), arguing that such products were raised only after pre-hearing briefs were filed. Resp. Reply at 96-97.

### 3. Analysis and Conclusion under section 337(a)(3)(A) and (B)

Motorola has not focused its arguments under section 337(a)(3)(C) to show with specificity how large an investment it has made in plant and equipment, or provided details about the employment of labor or capital. [110] Moreover, Motorola's briefing does not show how economic evidence presented in the context of section 337(a)(3)(C) translates to the requirements of section 337(a)(3)(A) or (B), or how the evidence breaks down by patent.

Accordingly, it has not been shown by a preponderance of the evidence that the economic prong of the domestic industry requirement, as set forth in section 337(a)(3)(A) or (B), is satisfied.

---

[110] In response to Microsoft's brief, Motorola admits that most of the VIP12XX set-top boxes are shipped directly from [      ] to customers in the United States, such as AT&T, while others are shipped through a facility in [              ]. Yet, Motorola erroneously argues that this disparity between foreign and domestic operations is of little importance, and does not provide details about the [      ] facility. *See* Compls. Reply at 96.

### C.      Conclusions on Domestic Industry

Accordingly, for the reasons set forth above, the following domestic industry findings are made.

With respect to the '896 patent, it has been shown that a domestic industry exists under section 337(a)(3)(C) based on licensing, and based on engineering and R&D. The technical prong of the domestic industry requirement has been satisfied, but it has not been shown that the economic prong has been satisfied with respect to section 337(a)(3)(A) or (B).

With respect to the '094 patent, it has been shown that a domestic industry exists under section 337(a)(3)(C) based on licensing, but not based on R&D. The technical prong of the domestic industry requirement has been satisfied, but it has not been shown that the economic prong has been satisfied with respect to section 337(a)(3)(A) or (B).

With respect to the '596 patent, it has been shown that a domestic industry exists under section 337(a)(3)(C) based on licensing, but not based on R&D. The technical prong of the domestic industry requirement has been satisfied, but it has not been shown that the economic prong has been satisfied with respect to section 337(a)(3)(A) or (B).

With respect to the '571 patent, it has been shown that a domestic industry exists under section 337(a)(3)(C) based on licensing, and based on engineering & R&D.  The technical prong of the domestic industry requirement has been satisfied, but it has not been shown that the economic prong has been satisfied with respect to section 337(a)(3)(A) or (B).

With respect to the '712 patent, it has been shown that a domestic industry exists under section 337(a)(3)(C) based on licensing, and engineering and R&D.  The technical

prong of the domestic industry requirement has not been satisfied, and it has not been shown that the economic prong has been satisfied with respect to section 337(a)(3)(A) or (B).

## XII.    Conclusions of Law

1.      The Commission has subject matter, personal, and *in rem* jurisdiction in this investigation.

2.      The importation requirement is satisfied.

3.      Respondent's accused products infringe asserted claims 1 and 12 of the '896 patent.

4.      Respondent's accused products infringe asserted claims 7, 8, and 10 of the '094 patent.

5.      Respondent's accused products infringe asserted claims 1 and 2 of the '596 patent.

6.      Respondent's accused products infringe asserted claims 12 and 13 of the '571 patent.

7.      Respondent's accused products do not infringe asserted claims 6, 8, and 17 of the '712 patent.

8.      It has not been shown by clear and convincing evidence that any asserted claim of the '896, '094, '571, or the '712 patents is invalid.

9.      It has been shown by clear and convincing evidence that asserted claim 1 of the '596 patent is invalid as anticipated.  It has not been shown by clear and convincing evidence that asserted claim 2 is invalid as anticipated.

<u>PUBLIC VERSION</u>

10.     The domestic industry requirement is satisfied with respect to all asserted patents.

11.     Respondent has not prevailed on any equitable or RAND defense.

**XIII.   Initial Determination and Order**

Accordingly, it is the INITIAL DETERMINATION of the undersigned that a violation of section 337 (19 U.S.C. § 1337) has occurred in the importation into the United States, the sale for importation, or the sale within the United States after importation of certain gaming and entertainment consoles, related software, and components thereof, with respect to asserted claims 1 and 12 of U.S. Patent No. 6,069,896; asserted claims 7, 8, and 10 of U.S. Patent No. 7,162,094; claim 2 of U.S. Patent No. 6,980,596; and asserted claims 12 and 13 of U.S. Patent No. 5,357,571.  A violation of section 337 has not occurred with respect to asserted claim 1 of U.S. Patent No. 6,980,596, or asserted claims 6, 8, or 17 of U.S. Patent No. 5,319,712.

Further, this Initial Determination, together with the record of the hearing in this investigation consisting of (1) the transcript of the hearing, with appropriate corrections as may hereafter be ordered, and (2) the exhibits received into evidence in this investigation, is CERTIFIED to the Commission.

In accordance with 19 C.F.R. § 210.39(c), all material found to be confidential by the undersigned under 19 C.F.R. § 210.5 is to be given *in camera* treatment.

The Secretary shall serve a public version of this ID upon all parties of record and the confidential version upon counsel who are signatories to the Protective Order, as amended, issued in this investigation.

## PUBLIC VERSION

To expedite service of the public version, each party is hereby ORDERED to file with the Commission Secretary by no later than May 7, 2012, a copy of this Initial Determination with brackets that show any portion considered by the party (or its suppliers of information) to be confidential, accompanied by a list indicating each page on which such a bracket is to be found.  At least one copy of such a filing shall be served upon the office of the undersigned, and the brackets shall be marked in red.  If a party (and its suppliers of information) considers nothing in the Initial Determination to be confidential, and thus makes no request that any portion be redacted from the public version, then a statement to that effect shall be filed.

Pursuant to 19 C.F.R. § 210.42(h), this Initial Determination shall become the determination of the Commission unless a party files a petition for review pursuant to § 210.43(a) or the Commission, pursuant to § 210.44, orders on its own motion a review of the ID or certain issues herein.


David P. Shaw
Administrative Law Judge


Issued:  April 23, 2012

332

**CERTAIN GAMING AND ENTERTAINMENT CONSOLES, RELATED SOFTWARE, AND COMPONENTS THEREOF**                                    337-TA-752

## PUBLIC  CERTIFICATE OF SERVICE

I, Lisa R. Barton, hereby certify that the attached **INITIAL DETERMINATION ON VIOLATION** has been served upon the following parties as indicated, on

May 11, 2012                              .

Lisa R. Barton, Acting Secretary
U.S. International Trade Commission
500 E Street SW, Room 112A
Washington, D.C.  20436

**FOR COMPLAINANT MOTOROLA MOBILITY, INC. AND GENERAL INSTRUMENT CORPORATION:**

Stephen J. Rosenman, Esq.              ( ) Via Hand Delivery
**ROPES & GRAY LLP**                   (X) Via Overnight Mail
One Metro Center                       ( ) Via First Class Mail
700 12th St., N.W., Suite 900          ( ) Other: _____
Washington, D.C.  20005

**FOR RESPONDENT MICROSOFT CORPORATION:**

Brian R. Nester, Esq.                  ( ) Via Hand Delivery
**SIDLEY AUSTIN LLP**                  (X) Via Overnight Mail
1501 K Street, N.W.                    ( ) Via First Class Mail
Washington, D.C. 20005                 ( ) Other: _____

**CERTAIN GAMING AND ENTERTAINMENT CONSOLES, RELATED SOFTWARE,**
**AND COMPONENTS THEREOF**                                **337-TA-752**

<u>PUBLIC MAILING LIST</u>

Heather Hall                                ( )Via Hand Delivery
**LEXIS - NEXIS**                           ( )Via Overnight Mail
9443 Springboro Pike                        (X)Via First Class Mail
Miamisburg, OH   45342                      ( )Other:_____

Kenneth Clair                               ( )Via Hand Delivery
**THOMSON WEST**                            ( )Via Overnight Mail
1100 – 13th Street NW, Suite 200            (X)Via First Class Mail
Washington, DC 20005                        ( )Other:_____