# EXHIBIT C



Reference number:
2 O 387/11

- *Official copy*

---



Pronounced on
02 May 2012

Freisinger, Senior
Court Secretary
as Registrar of the
Court

# Mannheim Regional Court

## 2nd Civil Chamber

# In the Name of the People

# Judgment

In the legal dispute

**General Instrument Corporation**

Horsham PA 19044 /USA

- Plaintiff -

Attorneys of Record:
Lawyers quinn emanuel and colleagues, Mannheim, court box 227

**versus**

1. **Microsoft Corporation**
   represented by the  President and Chief Executive Officer of Microsoft Corp.
   Steve Ballmer
   One Microsoft Way, Redmond, I Washington 98052-6399 USA

2. **Microsoft Ireland Operations Limited**
   Blackthorn Road, Sandyford Industrial Estate, Dublin, 181 Ireland
   - Defendant -
   Attorneys of Record for 1 and 2:
   Lawyers Freshfields Bruckhaus Deringer and colleagues, Prannerstr. 10, 80333 Munich

**on the grounds of** patent infringement

following the oral hearing of 07 February 2012, the 2nd Civil Chamber of the Mannheim Regional Court with the participation of

the Presiding Judge at the Regional Court Dr. Kircher
Judge at the Regional Court Dr. Beauer-Gerland
Judge at the Regional Court Wedler
**adjudged** as follows:

I. 1.a)

Defendants are ordered to cease and desist from offering, marketing, using or importing or possessing for said purposes in the territory of the Federal Republic of Germany decoder apparatus (in particular Xbox 360),

if those comprise:

- means for receiving superblocks of adaptively compressed digital video data,

- said superblocks containing individual blocks each compressed using one of a plurality of different compression modes comprising a first compression mode and a second compressing mode,

- said compressed superblocks including selection overhead data identifying the compression mode used for each superblock and/or the blocks contained in each superblock,

- means coupled to said receiving means for retrieving from each received superblock, one of:

    o first overhead data indicative of said first compression mode used to compress all blocks of the superblock, or

    o second overhead data indicative of said second compression mode used to compress all blocks of the superblock, or

    o third overhead data indicating that the individual blocks contained in said superblock were compressed using one compression mode of said plurality of different compression modes;

- means responsive to said retrieved first overhead data for decoding the received superblock using a decompression mode corresponding to said first compression mode;

- means responsive to said retrieved second overhead data for decoding a received superblock using a decompression mode corresponding to said second compression mode; and

- means responsive to said retrieved third overhead data for identifying the compression modes used to compress each individual block in a received superblock and decoding the blocks using a decompression mode for each individual block that corresponds to the compression mode used to compress the block.

(EP 0 615 384 B1, Claim 17, direct infringement).

1.b)   Defendant No. 1 is ordered to cease and desist from offering and/or supplying in the territory of the Federal Republic of Germany computer software (in particular Windows 7 and/or Internet Explorer 9)

if such software is suited to the purpose of building a decoder apparatus on a computer after its installation

if such apparatus comprises:

- means for receiving superblocks of adaptively compressed digital video data,

- said superblocks containing individual blocks each compressed using one of a plurality of different compression modes comprising a first compression mode and a second compressing mode,

- said compressed superblocks including selection overhead data identifying the compression mode used for each superblock and/or the blocks contained in each superblock,

- means coupled to said receiving means for retrieving from each received superblock, one of:

  o first overhead data indicative of said first compression mode used to compress all blocks of the superblock, or

- second overhead data indicative of said second compression mode used to compress all blocks of the superblock, or

- third overhead data indicating that the individual blocks contained in said superblock were compressed using one compression mode of said plurality of different compression modes;

- means responsive to said retrieved first overhead data for decoding the received superblock using a decompression mode corresponding to said first compression mode;

- means responsive to said retrieved second overhead data for decoding a received superblock using a decompression mode corresponding to said second compression mode; and

- means responsive to said retrieved third overhead data for identifying the compression modes used to compress each individual block in a received superblock and decoding the blocks using a decompression mode for each individual block that corresponds to the compression mode used to compress the block.

(EP 0 615 384 B 1, Claim 17, indirect infringement).

1.c)   Defendant 1 is ordered to cease and desist from offering and/or supplying in the territory of the Federal Republic of Germany computer software (in particular Windows Media Player 12)

if such software is suited to the purpose of interacting with a computer software in accordance with section I.1 b) (in particular Windows 7) after its installation on a decoding device in accordance with I.1 b).

(EP 0 615 384 B 1, Claim 17, indirect infringement).

1.d)   For each case of violation against the prohibition in accordance with section I.1.a) and for each case of violation against one of the prohibitions in accordance with section I.1.b) and section I.1.c) Defendant 1 shall face a disciplinary fine of up to EUR 250,000 or alternatively confinement for contempt of court , or up to 6

months confinement for contempt of court, with the confinement to be executed upon the legal representatives of Defendant.

I.2.

Defendants are ordered to render accounts to Plaintiff in writing and in an organized fashion (divided into calendar quarters) indicating to which extent they have committed the actions specified in section I.1.a) since 20 October 2000, and Defendant 1 is ordered to render accounts to Plaintiff in writing and in an organized fashion (divided into calendar quarters) indicating to which extent it has committed the actions specified in section I.1.b) and section 1.1.c) since 20 October 2000, and Defendants are to indicate in each case

a) the individual deliveries (submitting at the same time invoices and/or delivery notes) indicating

aa) delivery quantities, times and prices,
bb) brands of the respective products as well as all identification features such as type designation, item name, serial product number,
cc) names and addresses of the buyers,

b) the individual offers (at the same time submitting offers in writing) indicating
aa) offer quantities, times and prices,

bb) brands of the respective products as well as all identification features such as type designation, item name, serial product number, cc) names and addresses of the commercial offer recipients,

c) the production costs and the generated profit broken down by individual cost factors

d) names and addresses of the manufacturers, suppliers and other previous owners, always including the number of the manufactured, received or ordered products,

e)      advertising made, itemized according to advertising media, circulation figures, period of dissemination and area of dissemination,

whereby the statements made in accordance with a) and d) have to be evidenced through the submission of the order receipts, order confirmations, invoices and delivery and customs documents,

with Defendants having the choice to provide the names and addresses of their non-commercial buyers not to Plaintiff but to a certified public accountant with seat in the Federal Republic of Germany, to be nominated by Plaintiff and sworn to secrecy towards Plaintiff, instead, if Defendants bear the costs of such certified public accountant and authorize and obligate him/her to tell Plaintiff upon its specific inquiry whether or not a specific non-commercial buyer or a specific offer recipient is included in the accounting documents.

I.3.

Defendants are ordered to recall the products described under section I.1.a) in the possession of third parties that are not end customers, which have been brought into the market after 29 April 2006 from the distribution channels by earnestly demanding from such third parties which were granted possession in the products by Defendants or with Defendants' consent under reference to the fact that the chamber decided with the present judgment that the patent in suit was infringed, to return the products to Defendants and that third parties were granted a repayment of the already paid purchase price in case of a return of the products as well as payment of the costs of the return
and
to ultimately remove products described under section I. 1. a) in possession of third parties that are not end customers, which have been brought into the market since 01 September 2008. This shall be done through repossession of the Defendants in the products or their destruction at the respective possessor.

II.   It is determined that Defendants are as joint and several debtors obligated to compensate Plaintiff for all damages Plaintiff incurred through actions of the Defendants pursuant to section I.1.a) since 20 October 2000 and still incurs and that Defendant 1 is obligated to compensate Plaintiff for any damages incurred

through actions of Defendant 1 pursuant to section I.1.b) and section I.1.c) since 20 October 2000 and still incurs   .

III.   The complaint is dismissed in regard to any other claims.

IV.   Defendant 1 shall bear $3/4$ and Defendant 2 $1/4$ of the court costs and the out-of-court costs of Plaintiff.  The Defendants shall each bear their own lout-of-court costs.

V.   The judgment is temporarily enforceable.

1. In regard to Defendant 1 against provision of security in the amount of

- € 120 million regarding section I.1 [cease and desist]
- € 10 million in regard to section I.2. [rendering of accounting]
- € 10 million in regard to section I.3. [recall/removal] whereas the security to be provided in case of isolated enforcement (without enforcement of the cease and desist order according to section I. 1.a) is set to 50 million.
- 120 % of the amount to be enforced in regard to section IV in each case;

2. In regard to Defendant 2 against provision of security in the amount of

- € 40 million regarding section I.1a [cease and desist]
- € 3 million in regard to section I.2. [rendering of accounting]
- € 3 million in regard to section I.3. [recall/removal] whereas the security to be provided in case of isolated enforcement (without enforcement of the cease and desist order according to section I. 1.a) is set to 43 million.
- 120 % of the amount to be enforced in regard to section IV in each case.

# Facts of the Case

Plaintiff is asserting a cease and desist claim as well as claims for rendering of accounts for recall and for removal from the distribution channels against Defendants on the grounds of alleged direct and indirect patent infringement and requests the Court to find that Defendants are obligated to pay damages.

Plaintiff is an American company and a wholly owned subsidiary of Motorola Mobility Inc. The American company Google Inc. is planning to take over Motorola Mobility Inc., thereby also taking over all companies held by Motorola Mobility Inc., including Plaintiff.

Plaintiff is the owner of the European patent EP 0 615 384 B1 concerning the adaptive compression of digital video data, which is in force in Germany (hereinafter "patent in suit"). The patent in suit was filed on 10 March 1994. The application was published on 14 September 1994. The mention of the granting of the patent in suit was published on 20 September 2000. The Federal Republic of Germany is among the designated contracting states. The German translation of the patent in suit was published under the number DE 694 25 919 T2.

In a pleading dated 05 October 2011 (Exhibit FBD 20), a subsidiary of Defendant 1, Microsoft Deutschland GmbH, filed a nullity action before the Federal Patent Court against the German portion of the patent in suit. In a pleading dated 08 February 2012, the Plaintiff in the nullity action and the two third-party intervenors in the nullity action, the Defendants herein, motioned for a stay of the nullity proceedings pursuant to Section 251 of the German Code of Civil Procedure (ZPO) (Exhibit FBD 36).

Plaintiff asserts patent claim 17 of the patent in suit, which, in the language of the case, is worded as follows:

**17.** Decoder apparatus comprising:

means (190, 192) for receiving superblocks
(230) of adaptively compressed digital video
data, said superblocks (230) containing individ-
ual blocks (232) each compressed using one of
a plurality of different compression modes
comprising a first compression mode and a
second compression mode, said compressed
superblocks including selection overhead data
(50, 54, 56) identifying the compression mode
used for each superblock and/or the blocks
contained in each superblock where the com-
pression mode has been determined by first
comparing the amount of overall data for each
block when compressed using the different
compression modes and selecting, for each
block, the compression mode which results in
the least amount of overall data for that block,
and by then comparing the amounts of accu-
mulated data for respective superblocks
formed from (i) blocks compressed by the com-
pression modes selected by the first copmaring
step, (ii) blocks compressed by the first com-
pression mode, and (iii) blocks compressed by
the second compression mode, to provide sup-
berblocks wich are determined to have the
least amount of data for transmission;
means (212) coupled to said receiving means
for retrieving, from each received superblock
(230), one of:
first overhead data indicative of said first com-
pression mode used to compress all blocks of
the superblock,
second overhead data indicative of said sec-
ond compression mode used to compress all
blocks of the superblock (230), and

third overhead data indicating that the individual blocks (232) contained in said superblock (230) were compressed using one compression mode of said plurality of different compression modes;

means (204) responsive to said retrieved first overhead data for decoding the received superblock (230) using a decompression mode corresponding to said first compression mode;

means (194) responsive to said retrieved second overhead data for decoding a received superblock using a decompression mode corresponding to said second compression mode; and

means (194, 204, 206, 222) responsive to said retrieved third overhead data for identifying the compression modes used to compress each individual block in a received superblock (230) and decoding the blocks using a decompression mode for each individual block that corresponds to the compression mode used to compress the block.

With regard to the further content of the patent in suit, and in particular with regard to the description and the associated figures, we refer to the patent specification (Exhibit KP2-K2) and the German translation thereof (Exhibit KP2-K2).

Defendant 2 is the group parent company of the Microsoft group of companies. It offers the Xbox 360 video game console and the computer software Windows 7, Windows Media Player Version 22 and Microsoft Internet Explorer Version 9 (hereinafter "challenged embodiments") in the Federal Republic of Germany via its German-language websites. Defendant 2 is an Irish affiliate that sells the challenged embodiment Xbox 360 on the German market.

The challenged embodiments support the video compression standard H.264, which is published under the identifier MPEG-4/AVC *(Advanced Video Coding)* as the tenth part of the MPEG standard (MPEG-4/Part 10, ISO/IEC 24496-10) (hereinafter "Standard"). The challenged embodiment Xbox 360 makes it possible to play H.264 video files. If Windows 7 as well as Windows Internet Explorer Version 9 are installed on a computer, this computer is able to play H.264 video files. This is also true for Windows Media Player Version 12, which uses the decoder module of Windows 7.

The H.264 standard regulates, among other things, the decompression of a standard-compatible compressed digital video signal and also defines the compression format to be decoded for a digital video signal. The standard was developed by the International Telecommunication Union (ITU) in cooperation with MPEG *(Moving Pictures Experts Group)* and published in the document ITU-T H.264 (03/2010) (Exhibit KPI- K4). The predecessor of Plaintiff's parent company, Motorola Inc., had participated in the H.264/MPEG4/AVC standard setting process in 2002 and 2003.

Plaintiff and also Motorola Inc. had issued several licensing declarations over the course of the standard setting process to ITU, which contain a commitment to license any patents that it believes are essential to the standard at non-discriminating, fair, and reasonable terms to anyone requesting a license (Set of Exhibits FBD 8).

Some of the commitments that were made read as follows (translation):

> "2. *The owner of the patent will grant an unlimited number of applicants, on a worldwide, non-discriminatory basis and on reasonable terms, a license to use the patented material [...]. Check_ here* [Chamber comment: this item was checked in each case] *if the patent owner's willingness to license the patent is subject to a condition of reciprocity for the above-mentioned ITU-T recommendations / the ISO/IEC International Standard.*
>
> *The licensing negotiations are left to the respective parties and take place outside of the ITU-T/ISO/IEC."*

Defendant 1 is one of those companies that, in its capacity as licensor, introduced all patents considered essential for the H.264 standard in the MPEG LA H.264/AVC patent pool (hereinafter "MPEG LA Pool"). In this pool, 171 patent families declared as essential to the standard are administered and jointly licensed by MPEG LA, L.L.C. This is the purpose of of the MPEG LA H.264/AVC patent pool licensing agreement (hereinafter "MPEG LA Pool Agreement", Exhibit FBD-12). This agreement provides for a tiered licensing fee system with fixed amounts for each device. Products using the standard-relevant technology (such as decoder products) are classified in so-called units. Up to 100,000 units per year are free for any company *("legal entity")* . For the following units, a licensing fee per unit in the amount of $0.20 applies. For the 5,000,001st unit and up, the licensing fee decreases to $0.10 per unit. The MPEG LA Pool Agreement also provides a maximum amount for licensees and their affiliates (2005-2006: max. $3.5 million / year; 2007-2008: max. $4.25 million / year; 2009-2010: max. $5 million / year; 2011-2015: max. $6.5 million / year).

The companies Terayon Communications Systems, Inc. (hereinafter "Terayon") and Tut Systems, Inc. (hereinafter: "Tut Systems") were licensees of the MPEG LA Pool Agreement. The predecessor of Plaintiff's group parent Motorola, Inc. merged with Terayon and Tut Systems in 2007 (FBD 29). After the Motorola Group was divided into Motorola Solutions, Inc. and Motorola Holdings, Inc., Terayon and Tut Systems were assigned to Motorola Mobility Inc. (a subsidiary of Motorola Mobility Holdings, Inc.), the Plaintiff's group parent. In 2011, Terayon and Tut Systems became part of Plaintiff by way of takeover *("Berger merging Tut Systems [or Terayon] with and into General Instrument Corporation"*- FBD 31)

The company planning to take over Plaintiff's parent company, Google Inc., is also a licensee of the MPEG LA patent pool (Exhibit FBD-18).

Section 8.3 of the MPEG LA Pool Agreement is worded as follows:

> ***"Licensor Grant.*** *Upon full execution of this Agreement, Licensor agrors to grant a worldwide, non-exclusive license and/or sublicense (commensurate to this scope of the licences which Licensor has selected hereunder) under any and all AVC Essential Patent(s) that Licensor and its Affiliates, if any, have the right to* licence *and / or sublicense, to any Licensor or any sublicensor of the*

> *Licensing Administrator desiring such a* licence *and/or sublicense on fair and reasonable terms and conditions. [...]"*

Section 8.I.2 states:

> *"This Agreement may not be assigned by the Licensor under any circumstances. This Agreement shall terminate upon the Sale by Licensor of all or substantially all of its assets, or capital shares (or similar indicia of ownership), or upon a similar transaction."*

Pursuant to Section 6.6.4, the obligation as per Section 8.3 survives the expiration or termination of the license agreement.

In a letter dated 29 October 2010 (Exhibit FBD 9), Plaintiff's parent company provided Defendant 1 with an offer, valid for 20 days and characterized as RAND (reasonable and non-discriminatory), to enter into an agreement regarding a worldwide, non-exclusive license for the Motorola portfolio of patents essential to the H.264 standard for a licensing fee of 2.25% of the sales prices of the end products compatible with the standard (e.g. Xbox 360, PC, laptop, smartphone etc.). Furthermore, the offer provided for a grant-back license for Microsoft's patents that are essential to the standard, on the same terms and conditions. Finally, the letter stated a willingness to also enter into potential negotiations regarding a license for only individual patents from the Motorola portfolio. Defendant 1 did not accept this offer.

In a letter from its attorneys dated 23 December 2011, Defendant 1 provided Plaintiff with an unconditional offer, also applicable to its subsidiaries, to enter into a license agreement with regard to the German portion of the patent in suit herein (also the subject of the parallel proceedings 2 O 376/11) and the German portion of European patent EP 0 615 384 BI, which is the subject of the parallel proceedings 2 O 373/11 and 2 O 387/11 (Exhibit FBD-21 (English original version and German translation)).

The subject of this fully drafted offer to enter into a license agreement is a non-exclusive, non-transferable right on the part of Defendant 1 and its subsidiaries to produce a product that includes an AVC decoder or AVC codec according to the

patent, and moreover the rights to import to Germany, as well as the use and possession of such products within Germany.

Section 3.I of the offer provides for a quota license per *"computing device containing an AVC Decoder or AVC Codec"* (= unit) in the amount of €0.02 for each unit for the first ten million units per year (= max. €200,000.00) and €0.01 for each unit per year in excess thereof.

Defendant 1 calculated the license fees offered largely as follows:

The 270 patent families declared essential to the standard were attributable to 36 patent owners in all. If, it said, one were to compare how many of these patent families were attributable to the individual patent owners out of the total of 36 patent owners, the portfolio held by Plaintiff and its parent company would be seen to be the fifth largest of all individual portfolios. If, it said, this portfolio were compared on the one hand with the overall number of patent families included in the MPEG LA Pool and on the other with the patent families held by third parties, the portfolio held by Plaintiff and its parent company would account for 6.3% (17 patent families, including the patent in suit), while the patent pool held a total of 63.6% of the patents essential to the standard and an additional 30.1% was held by third parties.

Defendant determined the alleged technical value of the patents held by Plaintiff and its parent company by way of something it calls a "citation analysis," whose validity Plaintiff disputes. In this method, the rate at which a certain patent is cited as relevant prior art for later inventions is supposed to permit conclusions to be drawn with regard to the importance of that invention and its technical value (p. 356 et seq.). According to this so-called citation analysis, the patent portfolio of Plaintiff and its group parent company is supposedly ranked eleventh among patent owners. Several of the ten patent owners who hold portfolios with higher citation values have, it is claimed, included their patents in the MPEG LA Pool. Compared against the overall number of patents essential to the standard that are held in the MPEG LA Pool, it is claimed that the result is that after all necessary corrections have been made, these patents account for 72.7% of the total citation value, while those held by third parties (including Plaintiff and its group parent company) account for 27.3%. All of the patents held by

Plaintiff and its group parent company are claimed to represent just 3.8% of the total citation value of all patents essential to the standard.

To calculate the license rates, Defendant 1 drew on license rates for patent pools or licensing programs that also concern the H.264/AVC technology or similar technologies.  It is claimed that the first market that enters into consideration for comparison purposes is the market for patents that are part of the MPEG LA Pool. This pool encompasses 171 patent families held by 28 patent owners. The license fees for the worldwide manufacture or sale of standard-compatible decoders are graduated in the MPEG LA Pool as discussed above (also see Exhibit FBD-12, Art. 3.I.I). The license fees for the pool are distributed in proportion to the number of patents held by the licensors, i.e. a licensor receives, at the highest license fee of $0.2, €0.00082 per patent family for each unit sold. By that measure, the patent holder with the largest number of patent families in the pool would receive € 0.0159 per unit.

Furthermore, Defendant refers to a licensing program operated by the company AT&T, in which patents essential to the H.264/AVC standard are licensed outside a patent pool (p. 268 et seq.; AT&T licensing terms: Exhibit FBD-25). According to this, AT&T demands, for the worldwide licensing of its portfolio of patents essential to the H.264/AVC standard, a quota license of $0.18 [€0.1375[1]] for up to 5 million units, with the fee reduced to $0.10 [€0.0764] for all further units and a limit of $5 million per calendar year applying. In Defendant's opinion, it is to be presumed that the relevant portfolio held by AT&T is approximately equivalent to the portfolio held by Plaintiff and its parent company, even exceeding the value of the latter. It is claimed that AT&T currently has nine licensees.

Finally, Defendant refers to licensing terms that are supposedly customary on the market for other standards that are technologically comparable to the H.264/AVC standard (p. 269 et seq.):

- VC-I standard (pool license): $0.20 per unit for more than 100,000 and up to 5 million units, $0.10 for more than 5 million units, limit $5 million.

---

[1] Currency rate as at 18 April 2012

- MPEG-4 visual standard (pool license): $0.25 per unit for more than 50,000 units, limit $1.25 million.
- Pool licenses for less similar technologies: less than $1.00 per unit to just $0.10 per unit.

If Plaintiff and its group parent company had added their patent portfolio to the MPEG LA Pool, they would be entitled for their entire portfolio, applying the arithmetic calculation customary within the pool, to just (proportional share of fees per patent family, assuming the maximum rate between 100,000 and 5 million units 7⁻) €0.00082 x (patent families held by Plaintiff and its group parent company =) 17 = €0.01394 per unit. If one considers the two patents in suit as two patent families, the license rate for the two patents, at 2 x €0.00082, would equal €0.00165. If the pool was based on a calculation of the value (the citation value), Plaintiff and its group parent company would be entitled to an even lower fee.

Defendant claims that it is multiplying the amount of €0.01394 to which Plaintiff and its group parent company would be entitled for their entire portfolio if they were, theoretically, members of the pool by a factor of ten, to €0.14 per unit for up to 5 million products, and by a factor of five, to €0.075 per unit for all units in excess thereof. Thus, according to Defendant, the fee is approximately equivalent to the licensing fee demanded by the independent provider AT&T for its portfolio (which, Defendant alleges, is more valuable).

For the two patents in suit (the patent in suit herein and the German portion of European patent EP 0 538 667 BI, which is the subject of parallel proceedings 2 0 240111 and 2 0 376/11), Plaintiff charges a quota license of €0.0165 for the first 5 million units per year and €0.0083 for all additional units per year. This fee corresponds to 2/17 of the fee calculated for the entire portfolio of 17 patent families held by Plaintiff and/or its group parent company.

Defendant rounds the aforementioned licensing fees up to full euro cents (rounding €0.0165 to €0.02 and €0.0083 to € 0.01), extends the higher entry-level fee to the first 10 million units, and does not apply a limit.

Alternatively, Defendant 1 offered, in the letter dated 23 December 2012, to enter into a reciprocal license agreement for Germany with the parent company of Plaintiff, Motorola Mobility Inc., for the entire portfolio of the patents essential to the H.264 standard held by Defendant 1 and its subsidiaries as the parties of the first part and Motorola Mobility Inc. and its subsidiaries as the parties of the second part. In its pleading dated 03 February 2012, Defendant 1 offered to enter into a reciprocal *worldwide* portfolio license. In the oral negotiations held on 07 February 2012, Defendant's representative clarified that this cross-license did not constitute an independent license offer, but was rather a supplementary component concerning the specified license offer. What was being offered, the representative claimed, was not a free cross-license, but rather a fee-based cross-license at the calculated license rates of €0.02 per unit or €0.01 per unit, as the case may be. In its pleading dated 02 March 2012, which was not allowed in this regard, Defendants ultimately stated their willingness to grant Plaintiff a worldwide cross-license *free of charge* with regard to their portfolio of patents essential to the standard, and to do so in addition to their license offer limited to the two patents in suit that had been granted in Germany (p. 382 et seq.).

Another part of Defendants' offer is an acknowledgment of a duty to render damages on the merits for the use of the licensed patents in the past and a commitment to retract the nullity action against the licensed patent in suit within ten days after acceptance of the license offer by Plaintiff. In a pleading dated 03 February 2012 (cf. 2 0 373, p. 364 et seq.), Defendant extended the license offer to include a right of termination on Plaintiff's part in the event that Defendant, after retracting the nullity actions against the two patents claimed in these proceedings and in the parallel proceedings should file a new nullity action against one or both patents in suit. In the oral negotiations, Defendant's representative specified in this regard that according to Defendant's offer, Plaintiff was supposed to be granted a right of extraordinary termination even if a nullity action were filed in the future by a party benefiting under the license agreement.

The offer made by Defendant 1 was supposed to remain in force until it was accepted by Plaintiff or until a final and legally binding decision was rendered to the effect that the products of Microsoft Corp. that are compatible with the H.264/AVC standard do

not infringe the two patents in suit claimed herein, or the patents were declared null and void on a final and legally binding basis or the complaints were rejected on a final and legally binding basis for other reasons.

Defendant 1 also rendered accounts with regard to the licensing fees due pursuant to the license agreement that had been offered for the alleged use of the patent in suit by Defendants as well as Microsoft Deutschland GmbH in the past, up to September 2011 (Set of Exhibits FBD-34). Defendant 1 deposited the licensing fees calculated according to the license agreement offer, plus default interest, with the deposit office of the Amtsgericht [Local Court] of Mannheim (certification of deposit: Exhibit FBD-35), waiving the right to retract such deposit (most recently clarified in a letter from the Defendants' representative dated 08 February 2012 to the Local Court of Mannheim, p. 360).

In a pleading dated 30 March 2012, Defendants provided notice that Defendant 1 had calculated the licensing fee payments, including interest, that were due and still outstanding since the first issuance of an invoice pursuant to its license agreement offer. Defendant 1 deposited the further sum calculated on 30 March 2012, also with the deposit office of the Local Court of Mannheim and waiving the right to retract such deposit (Exhibit FBD-40).

**Plaintiff** argues that the invention claimed in the patent in suit is implemented in the standard as a necessary requirement, and that the patent in suit is therefore essential to the standard.

Since the challenged embodiment Xbox 360 is able to play standard-compatible compressed video formats, Plaintiff claims that this embodiment is a decoder device that directly embodies claim 17 of the patent in suit. The challenged embodiments Windows 7 and Windows Internet Explorer 9 indirectly infringe the patent in suit, since after one of these programs, which include the corresponding H.264 codecs (software modules), is installed on a computer, the computer is configured as a decoder device. Windows Media Player 12, Plaintiff claims, also indirectly infringes the patent in suit since this software program is appropriate for working with, and intended to work with,

an essential element of the invention by accessing, as intended, the decoder function provided by Windows 7.

Plaintiff alleges that claim 17 is therefore literally embodied by the challenged embodiments working in accordance with the standard.

Plaintiff believes that the question of whether an encoder in accordance with the standard or the encoders of Defendants embody the coding-related features of claim 17 is immaterial because claim 17 does not disclose a system comprising an encoder and decoder. Plaintiff claims that it is sufficient that – and this is undisputed – the challenged embodiments can decode signals from a coding device in accordance with claim 1. Moreover, Plaintiff alleges, Defendants' encoder does, however, in fact embody the coding-related features of claim 17. Plaintiff is also of the opinion that it is not necessary for the overhead data according to the patent to be signaled through a single piece of information, and in particular that the term "overhead data" cannot be reduced to the syntax element mb_type. This, it says, is compatible neither with the wording nor with the description of the patent in suit.

Plaintiff believes Defendants are not entitled to a right of use, either based on the willingness to grant a license stated by Plaintiff or its previous group parent company vis-à-vis ITU or based on the MPEG LA Pool Agreement. Plaintiff furthermore submits that the MPEG LA pool agreements, which do not refer to the patent in suit in any case, were terminated by the takeover of the companies Terayon and Tut Systems by Motorola, Inc. in 2007.
Furthermore, Plaintiff claims, the statement of willingness to grant a license and the MPEG LA Pool Agreement also do not establish any dolo petit objection on the part of Defendants.

Plaintiff also claims Defendants cannot counter Plaintiff's cease-and-desist claim with an objection concerning a compulsory license under antitrust law.

Such an objection by Defendants is precluded, Plaintiff alleges, since they did not present their license agreement offer until 23 December 2011, and thus long after the deadline for the statement of defense. Furthermore, Plaintiff claims that Plaintiff is also

not obligated to accept the license agreement offer of Defendant 1 dated 23 December 2011.

The licensing fee offered by Defendant 1, Plaintiff claims, is entirely inappropriate and disproportionately low. Plaintiff would never license patents as important as the patents in suit herein for the sum offered. Plaintiff continues that if one were to calculate the quota license offered as a percentage of the sales revenue of the challenged embodiments, the result would be a licensing fee of between 0.00145% and 0.004% of the sales revenue, while license rates of over 4% of sales typically apply in the electronics/IT and/or computer sectors. Plaintiff argues that it is neither in accordance with typical practice nor economically reasonable to scale down the value of a patent that is essential to a standard according to a linear model merely based on the numerical percentage of all patents essential to the standard that the patent in question represents. A patent that is essential to a standard does not become worth less because the patent owner holds additional patents essential to the standard and, to avoid charging unreasonably high license rates for the overall portfolio, does not take an aggregate rate rising according to a linear model as the basis for licensing of all patents.

The value of the Motorola patents, Plaintiff asserts, is evidenced, inter alia, by a cross-license with the company Nokia, which holds the largest portfolio of patents declared essential to the H.264 standard.

Furthermore, Plaintiff says, it should be taken into consideration that Plaintiff and/or its parent company are offering their entire patent portfolio of mobile radio patents that are essential to the standard, which includes several portions of various technologies essential to the standard, for a licensing fee of 2.25% of sales, with this fee falling due when any one technology – such as H.264 – or any one patent, as the case may be, is utilized. The rate of 2.25% is thus, Plaintiff claims, not a total amount that can be apportioned to all licensed patents; there is, as a basic principle, no linear connection between the number of patents and the license rate.

Unlike Defendants, Plaintiff considers the calculation of the FRAND license rate on the basis of the fees for the MPEG LA patent pool to be inadmissible, since a patent pool

by nature does not represent a suitable benchmark for comparison. Moreover, Plaintiff claims, there is no numerical proportionality that applies to license rates for a portfolio of patents that are essential to a standard; such proportionality would place companies at a disadvantage due to the mere fact of their holding a very large number of patents essential to the standard. From an economic perspective, Plaintiff continues, individual patents are actually the valuable thing.

Methodologically speaking, there is no basis for Defendants' assumption that the value of a patent can be determined, inter alia, by the relative frequency of citations thereof in other patents.

Plaintiff asserts that the court is not obliged to grant Defendants a period of use of existing inventory since doing so would ultimately erode the cease-and-desist claim to which Plaintiff is entitled without limitation. Furthermore, Plaintiff asserts that it is not evident that adjusting the challenged embodiments with regard to the cessation of use of the patent in suit as pursued by Plaintiff herein would lead to disruptions among users of the programs.

Ordering protection from enforcement pursuant to Section 712 of the German Civil Code (ZPO) does not enter into consideration, Plaintiff asserts, because loss of sales by Defendants – which, from Plaintiff's perspective, has not been shown in any case – is not sufficient for this. Plaintiff alleges that Defendants have not furnished evidence of a serious risk to their financial existence.

Plaintiff **petitions**

– I.1.a) – I.1.d) as found in the judgment;
– I.2. as found in the judgment, except for the provisons regarding the services of an auditor;
– I.3.
  Defendants are ordered to recall from the distribution channels the products described under A.I.1.a) that are in the possession of third parties and that have been brought into circulation after 29 April 2006, by issuing a serious request to such third parties as have been granted possession of the products by or with the approval of Defendants – with a reference to

the fact that the Chamber, in its judgment in the matter at hand, has found the patent in suit to have been infringed – to return the products to Defendants and promising such third parties that any purchase prices already paid will be reimbursed and that the costs incurred in connection with the return will be borne by Defendants if the products are returned

and

to remove such products on a final basis, either by recalling such products or by occasioning the destruction thereof by the relevant parties who have possession thereof.

– II. as found in the judgment.

Defendants **petition**

that the complaint be denied.

alternatively:
that a stay of the legal dispute be ordered until such time as the relevant antitrust authorities have decided as to the admissibility of the announced takeover of Plaintiff's group parent company by Google Inc.;

alternatively:
that a stay of the legal dispute be ordered in accordance with Section 148 of the German Civil Code (ZPO) until such time as a final and legally binding judgment has been rendered in the nullity action concerning the German portion of European patent EP 0 615 384 BI / DE 694 25 919 T2;

and as a secondary alternative:
that Defendants be granted a reasonable period of use of existing inventory;

and as a secondary alternative:

that with regard to petition 1.I.2 of the complaint, Defendants be sentenced merely to provide information, subject to a proviso on the services of an auditor;

and as a secondary alternative:
that Defendants be allowed to avoid enforcement by furnishing security, which can also be provided in the form of a bank or Sparkasse guarantee, regardless of whether any security is furnished by Plaintiff (Section 712 ZPO);

and as a secondary alternative:
that the security to be furnished by Plaintiff within the scope of preliminary enforceability be set at not less than €236,000,000.00.

Plaintiff contests the motions to stay the proceedings and the motion for protection from enforcement.

**Defendants** are of the opinion that the challenged embodiments cannot infringe the patent in suit because their own encoders and all encoders in accordance with the standard do not perform any compression as required in claim 17. Encoders that are in accordance with the standard, Defendants assert, do not engage in any selection of compression modes on the basis of the quantity of data compressed, so it is not possible for infringement to have taken place. Namely, Defendants assert, claim 17 protects not only a decoder, but a system consisting of an encoder that functions in the manner described in features 3 through 5 of claim 17 and a decoder. In particular, fulfillment of feature 5 presupposes that the data received have been determined by the encoder in the specific manner described in feature 5a) – 5c). Defendants assert that this is not the case with decoders in accordance with the standard.

Furthermore, Defendants claim, the types of overhead data presupposed in feature 6 are not compatible with the specifications of the standard. They continue that in the standard, there are no first and second overhead data within the meaning of sub-features 6.a.) and 6.b) that display the use of a compression mode. The syntax element mb_type, Defendants assert, does not indicate a partition size for all

submacroblocks in a macroblock, e.g. mb_type=1$^2$_8x8 merely shows that four submacroblocks are present, but not how they are partitioned. The partitioning of all submacroblocks within a specific macroblock is not shown until a second information part is added, namely the syntax element sub_mb_type. Defendants claim that this is not, however, compatible with feature 6, according to which overhead data can only consist of a single information part. For this reason, Defendants assert, the standard also does not include any third overhead data within the meaning of sub-feature 6.c.), because in the event of 8x8 partitioning, four sub_mb_type syntax elements would be required in each case along with the syntax element mb_type. Furthermore, third overhead data in accordance with the patent would, Defendants allege, have to have a different data structure from the first and second overhead data. The latter only have to indicate in each case a single compression mode for the superblock, while the former have to indicate the compression mode – additional information – separately for each block in the superblock. By contrast, they state that the alleged first, second, and third overhead data always have the same structure in the standard: mb_type in combination with sub_mb_type.

Defendants are moreover of the opinion that they have a right to use the patent in suit pursuant to Art. 8.3 in conjunction with 6.6.4 of the MPEG LA Pool Agreement. Art. 8.3 of the MPEG LA Pool Agreement, they claim, is not merely a statement of willingness to grant a license at a potential licensee's request. Rather, the license agreement establishes an obligation on the part of the MPEG LA licensee to offer a license, on its own initiative, to every user of the standard who is either a licensor or a licensee in the MPEG LA patent pool, or the companies affiliated with such licensors and licensees, on the conditions outlined in Art. 3 of the MPEG LA Pool Agreement. Plaintiff, as a company affiliated with Terayon and Tut Systems, two licensees or former licensees, as the case may be, of the MPEG LA Pool Agreement, or as their overall legal successor, is therefore obligated under Art. 8.3 in conjunction with 6.6.4 and 1.l of the MPEG LA Pool Agreement to grant Defendant 1, as one of the licensors in the license pool, or Defendant 2, as a company affiliated with such licensor, a license to use the patents of Plaintiff that are essential to the standard.

Furthermore, Defendants assert a right of use based on the statement of willingness to grant a license made by Plaintiff to ITU with regard to licensing on FRAND (Fair,

Reasonable And Non-Discriminatory) conditions. The statement of willingness to grant a license is a contract for the benefit of a third party as defined in Section 328 of the German Civil Code (*Bürgerliches Gesetzbuch* – BGB), namely all users of the H.264 standard who are willing to agree to a license. Defendants assert, first, that a binding offer to enter into a license agreement follows from this statement. Second, Plaintiff has waived the right to assert rights of exclusivity pursuant to Sections 139 et seq. of the German Patent Act (*Patentgesetz* – PatG) and, with regard to the patent that is supposedly essential to the standard, is limited from the outset to claims for payment of a reasonable licensing fee.

As a secondary alternative, Defendants claim Plaintiff's statement of willingness to grant a license as a dolo petit objection pursuant to Section 242 BGB. By asserting the cease-and-desist claims, Defendants assert, Plaintiff finds itself irreconcilably at odds with such statement, because based on the statement of willingness, it has to surrender its right to forbid the use of the patent immediately by granting a right of use.

Ultimately, Defendants assert, Plaintiff cannot refuse the offer to enter into a license agreement made to it by Defendant 1 on 23 December 2011 without violating antitrust law. Defendants claim that this offer meets all requirements for a FRAND licensing offer pursuant to the *Orange Book Standard* decision rendered by the Federal Court of Justice. The licensing offer contains contractual terms and conditions customary within the industry, and both the license rate and the basis for the license are in accordance with fair, non-obstructing and non-discriminatory conditions. The licensing fee offered is far in excess of the license rates calculated by Defendants as customary for the market and thus also far exceeds the amount to be considered a FRAND licensing fee. This, Defendants assert, is evident, inter alia, from a private expert opinion obtained by Defendants (Exhibit FBD-22). The free cross-license that Defendant 1 offered for those of the Parties' patents that are essential to the standard is, Defendants allege, advantageous to Plaintiff in light of the size of the portfolio of patents essential to the standard that are held by Defendant 1 and its subsidiaries.

A quota license fee is also customary in this technological field. Defendants assert that a value-based license rate, on the other hand, would not yield a reasonable result

because the value of the end product could vary widely, regardless of the functionality of the standard-compatible decoder, which is always the same.

The quota license offered, Defendants claim, is substantially in excess of the license rates customary on the market and is thus considerably above what the Plaintiff should actually be able to demand.

To calculate a reasonable license that is customary on the market, Defendants claim that they rightly drew on license rates for patent pools or licensing programs that also concern the H.264 technology or similar technologies.

Defendants argue that ultimately, Defendant 1 also took all fulfillment actions required pursuant to the *Orange Book Standard* decision.

Furthermore, Defendants are of the opinion that in the event of approval of the takeover of Plaintiff's parent company by Google Inc., they are entitled to a *dolo petit* objection (Section 242 BGB) against the claims that have been asserted, because Google Inc. is obligated under the MPEG LA License Agreement to license to Defendants the patents essential to H.264 to which Google Inc. is entitled. Against this background, Defendants assert that the proceedings, as petitioned for as an alternative, should be suspended until such time as the antitrust authorities issue a decision as to the admissibility of the takeover.

Finally, Defendants are of the opinion that the patent in suit lacks legal validity; the subsidiary of Defendant 1, Microsoft Deutschland GmbH, has, however, petitioned for a stay of the nullity proceedings in connection with the *Orange Book Standard* offer made by Defendant 1.

In the event that the Court finds in Plaintiff's favor, Defendants assert that they should, at any rate, be granted a reasonable period of use of existing inventory, since the immediate and unlimited enforcement of the cease-and-desist claim is associated with disproportionate disadvantages for Defendants and their customers and Plaintiff can reasonably be expected to tolerate a certain limitation in this regard. Defendants claim that in light of the complexity and worldwide use of the challenged embodiments, it is

not possible for them to respond immediately to a possible cease-and-desist order by shifting their products. An immediately effective cease-and-desist claim could have serious consequences, not only for the Defendants themselves, but also for their customers and the users of the challenged products. Furthermore, the allegedly patent-infringing decoders make up only a small portion of the functions of the challenged embodiments.

Regardless of any security to be furnished by Plaintiff, the preliminary enforcement of a judgment worded according to the petitions would cause Defendants to suffer an irremediable disadvantage, one not countered by any prevailing interest of Plaintiff in the preliminary enforceability of the judgment; for this reason, Defendants assert that in the event that the Court finds in Plaintiff's favor, the Court is obliged to grant them protection from enforcement pursuant to Section 712 para. 1 clause 1 ZPO regardless of any security furnished by Plaintiff. Removing the H.264 decoder from their products, Defendants assert, poses logistical challenges for Defendants and their customers with regard to the interoperability of the H.264 decoder with other functions of the product and other products. In addition to serious financial losses, Defendants claim that they face a loss of market share in the event of preliminary enforcement, along with irreparable damage to their image and brand. Countless other products based on the challenged embodiments would be affected if sales of the latter were discontinued, although these products do not use the patent in suit at all. By contrast, Plaintiff – which, Defendants assert, is not a direct competitor of Defendants – would merely face easily calculated financial losses if preliminary enforceability were suspended.

With regard to the further facts of the matter and status of the dispute, we refer to the content of the pleadings and the exhibits along with the record of the session.

# Reasons for the decision

The admissible complaint is for the most part unsubstantiated.

The challenged embodiments use Claim 17 of the patent in suit (A.). Defendants are not authorized to use the patent in suit (B.), and Plaintiff is also not hindered in enforcing its cease and desist claim for antitrust law reasons (C.). Therefore, Plaintiff is for the most part entitled to the asserted claims (D.). A stay of the proceedings is also not indicated (E.)

## A.

Defendants infringe the patent in suit pursuant to Art. 64 para. 1 EPC in connection with Sec. 9 c. 2 no. 1 and Sec. 10 para. 1 PatG (Patent Act), since the challenged embodiments make literal use of Claim 17 of the patent in suit directly, (Xbox 360, both Defendants) and indirectly (Windows 7, Windows Internet Explorer 9, Windows Media Player 12, Defendant 1).

The patent in suit relates to the compression of digital video signals.

1. Since digital image transmission would generate very large data volumes if each individual image would be transfered individually, video data are usually coded with a combination of technologies to compress the image data as efficiently as possible. The prior art already knew video compression techniques using the spatial correlation between adjacent pixels in an individual image ("frame") (intra frame coding), and also compression systems using similarities between temporarily adjacent frames to densify the data more. In the latter so-called inter frame coding the difference coding was known, in which only the difference between a current frame and the prediction of the current frame is transmitted.  In addition, inter-frame video compression systems, which use motion compensation were also already known in the prior

art. In the motion compensation it is sufficient to transfer a motion vector describing the shift of an unchanged image area compared to the reference image.  The patent in suit, for example, names the publication by Ninomiya and Ohtsuka „A Motion-Compensated Interframe Coding System for Television Pictures", IEEE Transactions an Communications, volume COM-30, no. 1, January 1982. According to it, a motion vector is determined for each block (image section) by matching a block in the previous frame, which is most similar to the determined block. The entire current frame can then be reconstructed at a decoder by sending the difference between the corresponding block pairs, together with the motion vectors that are required to identify the corresponding pairs [0007].

If the motion compensation functions well, the difference image - divided into blocks - can be coded more efficiently than the original image blocks.  The coded difference image and the information regarding the (coded) motion vectors are then transmitted together to the decoder device.

The performance of the block-matching method is dependent on how well the movement from one frame to the next can be modeled as a simple translation. Thus, often movements may involve zooming, rotation, and many other complex distortions that cannot be accurately modeled as a simple translation [0009]. The efficiency of block-based motion estimation algorithms can therefore depend on the size of the block used to adjust the current frame to the previous frame.  A large block size will function well in areas in which the image is still or is translated uniformly, since less overhead data is necessary to transmit the data linked to the image blocks. In other cases in which motion takes place from one frame to the other, a smaller block size can achieve better performance.  Against this background the static decision for a certain block size has the disadvantage of efficiency losses.

To address this problem, the prior art knew systems for adaptive compression of digital video data. For example, from US Patent 5.068.724 a method was known providing the opportunity to code data blocks either with or without motion compensation in each case selecting the type of compression which

used the least overall number of bits for a block [0010]. From US Patent 5.235.419 it was known to use a plurality of motion compensators using different block sizes for the compression of digital video data, always transmitting the data block which needed the least amount of compressed data from each motion compensator resulting from the motion [0011].

2. Based on this, it is the object of the patent in suit to provide a more efficient system for adaptively compressing digital video data [0012].

To solve this object the patent in suit teaches a coding apparatus, a method for adaptively compressing digital video data and a decoder apparatus for such adaptively compressing digital video data [0012 et seq.]. To optimize the (as small as possible) data amounts to be transmitted, the encoder first selects in two selection modes from a plurality of different compression modes that compression mode which can compress the individual blocks of a so-called superblock in each case most efficiently. From the individual blocks compressed in this manner one constructs a version of the superblock and compares its data amount in a second step with the data amounts which result from the compression of all blocks of this superblock through a first compression mode and through a second compression mode. The version of the superblock containing the least amount of data to be transmitted for the superblock is released for transmission [0018]. The selected compression mode is disclosed through so-called overhead data.

According to the description of the patent in suit in a preferred embodiment the superblocks consists of blocks of 16x16 pixels, divided into 8x8 large blocks [0034].

On the receiver side the patent in suit proposes in Claim 17 a decoder device, whose features can be structured as follows. The chamber has based this on the feature structure submitted by Plaintiff as Exhibit KP2-K4. The feature structure submitted by Defendants as Exhibit FBD 5 only deviates from this feature structure insofar as a different way of counting and partially different paragraphs are shown and for the english word "compression mode(s)" the

translation "KompressionsModus(i)" and not "Kompressions-Mode(n)" is used. However, these differences have no relevance.

1.   *Decoder apparatus comprising:*

2.   *means for receiving superblocks of adaptively compressed digital video data,*

3.   *said superblocks containing individual blocks each compressed using one of a plurality of different compression modes comprising a first compression mode and a second compressing mode,*

4.   *said compressed superblocks including selection overhead data identifying the compression mode used for each superblock and/or the blocks contained in each superblock,*

5.   *a.) where the compression mode has been determined by first comparing the amount of overall data for each block when compressed using the different compression modes and*

   *b.) selecting for each block the compression mode which results in the least amount of overall data for that bloc, and then*

   *c.) comparing the amounts of accumulated data for respective superblocks formed from:*

   *(i)   blocks compressed by the compression modes selected by the first comparing step,*

   *(ii)  blocks compressed by the first compression mode, and*

   *(iii) blocks compressed by the second compression mode, and*

   *to provide supberblocks wich are determined to have the least amount of data for transmission;*

6. *means coupled to said receiving means for retrieving from each received superblock, one of:* •

   a.   *first overhead data indicative of said first compression mode used to compress all blocks of the superblock, or*

   b.   *second overhead data indicative of said second compression mode used to compress all blocks of the superblock, or*

   c.   *third overhead data indicating that the individual blocks contained in said superblock were compressed using one compression mode of said plurality of different compression modes;*

7. *means responsive to said retrieved first overhead data for decoding the received superblock using a decompression mode corresponding to said first compression mode;*

8. *means responsive to said retrieved second overhead data for decoding a received superblock using a decompression mode corresponding to said second compression mode; and*

9. *means responsive to said retrieved third overhead data for identifying the compression modes used to compress each individual block in a received superblock and decoding the blocks using a decompression mode for each individual block that corresponds to the compression mode used to compress the block.*

II.

The challenged embodiments literally use Claim 17 of the patent in suit (A.).

The necessary interpretation of the patent in suit according to the understanding of the average person skilled in the art has to focus on the wording of the claim (Art. 69 para. 1 c. 1 EPC, Sec. 14 para. 1 c. 1 PatG (Patent Act); BGH GRUR 2004, 1023 et seq. -

*bodenseitige Vereinzelungsvorrichtung),* the content of the description and of the drawings are to be used in addition for the interpretation (Art. 69 para. 1 c. 2 EPC, Sec. 14 para. 1 c. 2 PatG (Patent Act)). As far as the description is used to interpret the patent specification, the technical sense of the words and terms is decisive and not their pure philological or logical-scientific meaning (BGHZ 150, 149, 156 - *Schneidmesser I,* BGH GRUR 1999, 909 - *Spannschraube).*

In an interpretation of Claim 17 oriented in these principles the challenged embodiments use all of its features.

The indirect prove of the infringement of the patent in suit basing it on the characteristics of the standard is admissible since the challenged embodiments undisputedly support the H.264 standard. A comparison of the applicable provisions of the standard with the patent in suit shows that a decoder device pursuant to the standard realizes all features of Claim 17.

Due to correct patent law considerations, this is undisputed between the parties in regard to Features 7, 8 and 9.

1. Decoder devices pursuant to the standard (Feature I) however also comprise "means for receiving superblocks of adaptively compressed digital video data" (Feature 2), which also fulfills Features 3, 4 and 5.

   Pursuant to Feature 2 the claimed decoder device has to be able to receive adaptively compress superblocks of digital video data compressed from a plurality of compression modes (Feature 3), and to decode these and finally to reestablish the video sequence.

   Claim 17 contains a comprehensive description of encoder processes leading to the data which a decoder pursuant to the patent is established to decode. Features 3, 4 and 5 are part of the determination of the objective of the decoder device pursuant to the patent *("for receiving superblocks..."* ) beginning with Feature 2 . This objective defines the protected decoder device more closely in such a way that it has to fulfill not only the spatial-physical features explictly

formulated by the patent claim, but also has to be formed in such a way that it can fulfill the function mentioned in the patent claim (cf. BGH, GRUR 2009, 837 - *Bauschalungsstütze).* Within this definition of the objective <u>Feature 5</u> teaches the comparative and selection decisions, which have to be at first made by a coding device pursuant to the patent on the block level and then at the superblock level, and<u>Feature 4</u> determines that the compressed superblocks include selection overhead data identifying the compression mode pursuant to Feature 5. All these features included in the definition of the objective are features originally on the decoder side, which do not characterize the decoder beyond its suitability for decoding of such data.

The standard provides for decoder devices able to receive a data stream of digital video data. According to the requirements of the standard, adaptively compressed digital video data are decoded in form of macro-blocks consisting of 16 x 16 pixels (Exhibit KPI-K2, section 6.2. (p. 24), section 3.77).  The macro-blocks themselves contain sub-macro-blocks with 8 x 8 pixels each (section 3.148 (p. 12)). Thus, macro-blocks correspond to superblocks in terms fo the patent in suit [0034] and sub-macro-blocks correspond to blocks in terms of the patent in suit [0034]. Macro blocks and sub-macro-blocks can be subdivided into different partitions for the purpose of inter-coding.  The subsequently displayed figure 6-9 (section 6.4.2, p. 26) shows the partitionings for macro-blocks and sub-macro-blocks possible according to the standard:



Figure 6-9 – Macroblock partitions, sub-macroblock partitions, macroblock partition scans, and sub-macroblock partition scans

With this, the standard stipulates a compression format for digital video data and a decompression procedure for video data compressed according to this format. In the context of the *predictive* inter-coding there are several compression modes in the standard which result from the selection of certain partitions by the individual sub-macro blocks (=blocks) of a macro-block. From the here relevant perspective of the decoder pursuant to the standard it is here not decisive in which way the macro-blocks

(superblocks), which contain the lowest amount of data, were ultimately generated by the encoder (e.g. through comparison of the concrete determined amounts with the correct amount of the overall data or estimation of the coding costs).   This corresponds to the fact that the standard leaves the video coding process, namely the selection of compression modes, in the scope of the *predictive intercoding,* open (cf. section 0.6.1 (p. 3)).

Decoders pursuant to the standard are undisputedly (also) able to receive superblocks from adaptively compressing digital video data which went through the comparison and selection steps described in <u>Feature 5</u>.

Data coded pursuant to the standard also contain selection overhead data in terms of <u>Feature 4,</u> i.e. information at the syntax level identifying the compression mode used in coding a partition (section 7.4.5, S. 97, regarding macro-block level; section 7.4.5.2, S. 105, regarding sub-macro-block level),

Relevant is that the decoder device pursuant to the standard thus at least has means to receive macro-blocks (superblocks) coded in the manner described in Features 3-5.  This finding will not change should encoders pursuant to the standard actually make their comparison and selection decision based on a manner that does not realize Claim 1 or Feature 5 of Claim 17.  Contrary to Defendants' opinion, Claim 17 does not require a system which contains an encoder compressing data with the method shown in Claim 17 and a decoder. Already according to its wording, Claim 17 is not a system claim, but a (decoding) device claim. The description of the processes on the encoder side in Claim 17 is restricted to the information about the purpose according to which the decoder device has to be suitable to receive superblocks which were selected and generated in the described manner. The encoder itself is the object of Claim 1 which is not the subject matter of the patent in suit.

2. Pursuant to <u>Feature 6 </u>the decoder devices according to the standard also contain means coupled to said receiving means for retrieving from each received superblock, one of:

a.   first overhead data indicative of said first compression mode used to compress all blocks of the superblock, or

b.   second overhead data indicative of said second compression mode used to compress all blocks of the superblock, or

c.   third overhead data indicating that the individual blocks contained in said superblock were compressed using one compression mode of said plurality of different compression modes;

In the standard the coded data for a macro-block contain a syntax element mb_type indicating the macro-block type for each coded macro-block.  For a *predictive* macro-block type (P) the mb_type shows both type "P" and also the partition size which was used for the motion compensation (table 7-13, p. 100). In the context of the motion compensation a macro-block can be divided into a 16x16 partition (mb_type = P_LO_16x16), two 16x8 partitions (mb_type = P_LO_LO_16x8), two 8x16 partitions (mb_type

P LO LO 8x16) or in four 8x8 partitions (mb_type = P_8x8).

In case of a P-macro-block-partitioning of 8x8 the standard provides for a (sub) partitioning at sub-macro-block level signaled by another syntax element sub_mb_type. A sub-macro-block can be partitioned into one 8x8 partition, two 8x4 partitions, two 4x8 partitions or four 4x4 partitions. These different partitionings of the individual sub-macro-blocks and also the associated syntax elements can be found in table 7-17 (p. 105 of the standard) copied below:

**Table 7-17 – Sub-macroblock types in P macroblocks**

| sub_mb_type[ mbPartIdx ] | Name of sub_mb_type[ mbPartIdx ] | NumSubMbPart ( sub_mb_type[ mbPartIdx ] ) | SubMbPredMode ( sub_mb_type[ mbPartIdx ] ) | SubMbPartWidth ( sub_mb_type[ mbPartIdx ] ) | SubMbPartHeight ( sub_mb_type[ mbPartIdx ] ) |
|---|---|---|---|---|---|
| inferred | na | na | na | na | na |
| 0 | P_L0_8x8 | 1 | Pred_L0 | 8 | 8 |
| 1 | P_L0_8x4 | 2 | Pred_L0 | 8 | 4 |
| 2 | P_L0_4x8 | 2 | Pred_L0 | 4 | 8 |
| 3 | P_L0_4x4 | 4 | Pred_L0 | 4 | 4 |

The compression at sub-macro-block level can be done uniformly for all four 8x8 sub-macro-blocks or non-uniformly for the four 8x8 sub-macro-blocks with different codings.

In this way, the compression at sub macro-block level can also be done

a)   uniformly for all four 8x8 sub-macro-blocks with a first coding, e.g. 4x8 (mb_type=P_8x8; sub_mb_type for all 8x8 sub-macro-blocks uniformly 4x8);

b)   uniformly for all four 8x8 sub-macro-blocks with a second coding, e.g. 8x4 (mb_type=P_8x8; sub_mb_type for all 8x8 sub-macro-blocks uniformly 8x4);

c)   for the four 8x8 sub-macro-blocks non-uniformly with different codings, e.g. 4x8 for two of the four 8x8 sub-macro-blocks (mb_type=P_8x8; sub_mb_type for these two blocks 4x8) and with one coding of 8x4 for the two remaining of the four 8x8 sub-macro-blocks (mb_type=P_8x8; sub_mb_type for these two blocks 8x4).

In this constellation the overhead data regarding lit. a) (mb_type=P_8x8; sub_mb_type for all 8x8 sub-macro-blocks uniformly 4x8) indicate the first compression mode, which was used to compress all blocks of the superblock (=macro-block) (sub Feature 6.a.), the overhead data regarding lit.
b) (mb_type=P_9x8; sub_mb_type for all 8x8 sub-macro-blocks uniformly 8x4) indicate the second compression mode, which was used to compress all blocks of the superblock (=macro-block) (sub Feature 6.b.), and the overhead data regarding lit.
c) (mb_type=P_8x8; sub_mb_type for two blocks 4x8 and mb_type=P_8x8; sub_mb_type for the two additional blocks 8x4) indicate that the individual blocks contained in the superblock (=macro-block) were compressed using a compression mode from a plurality of different compression modes (sub Feature 6.c.).

As far as Defendant objects that the description of the coding at sub macro-block level is allegedly not done by the syntax element mb_type, but by an additional indication in form of syntax element sub_mb_type, while in Feature 6 with "overhead data" only *an* information part is said to teach, we have to object to that at first with the wording of the claim which uses the plural ("overhead data" (singular) / "overhead data" (plural)). On the other side, the description of the patent in suit in case of an overhead of two different code words also speaks for the superblock on one hand and the individual blocks of "overhead data" [0043] on the other hand.

According to all this it should be stated that in the standard at least in case of a P-macro-block partitioning 8x8 overhead data can be sent which realize the sub Features 6.a.) - 6.c.). That is why a decoder pursuant to the standard must have means to retrieve these data. As far as Feature 6 teaches a "means to retrieve from each received superblock" it is necessary, but also necessary that the decoder device is *suitable* to retrieve the first, second and third overhead data from each received superblock. This suitability is not questioned by the assumption that received superblocks possibly do not contain first, second and third overhead data according

to sub features 6.a.) - 6.c.). Already the declaration that the standard decoding devices can regain the first, second and third overhead data according to subfeatures 6.a.) - 6.c.) shows the realization of the intended purpose described in Feature 6 through the means comprised by the standard decoding apparatus. Thus, this does not depends on the further question whether the patent in suit actually requires the coding to be carried out blockwise even in the case of of a superblock with 16xl6, 8xl6 or16x8 partitions or whether a uniform coding of the submacroblocks as a result of a uniform coding at the macroblock level.

B.

Defendants may not rely on the right to use the patent in suit.

I.

The parties do not dispute that no license agreement has been concluded.

II.

The Defendants are also not entitled to any right to use the patent in suit based on the licensing declarations *("Patent Statement and Licencing Declaration Form",Plaintiff's and its Group parent"s* set of Exhibits FBD-8) to the standard setting organization International Telecommunication Union (ITU).

Contrary to the view of the Defendants, neither the Plaintiff's general ITU declaration of willingness to license of December 2002 nor the specific ITU declaration of willingness to license of Motorola Inc., predecessor of the Plaintiff's parent company constitute a contract for the benefit of third parties (here: the Defendants) for the patent in suit of October 8, 2007 or a waiver of prohibition.

The assessment of any entitlement to use the patent in suit from the licensing declaration to the ITU is subject to German substantive law. The question about what legal system should be applied to assess the grant of a right to use intellectual property rights must be answered according to the the laws of the country for for whose territory protection is sought (cf. Mannheim Regional Court, InstGE 13, 65 -

*UBTS capable mobile telephone II,* mar. no. 161 with further proofs, cit. no. juris; Kühnen, Hdb. Patent infringement, 5. edition, mar. no. 1298).

Based on the classification of the simple license as a right in rem, which the court considered to apply ( Karlsruhe Higher Regional Court, GRUR Int 1987, 788 et seq. *Offenendspinnmaschine;* in detail Mannheim Local Court loc. cit., mar. no. 166, with further proofs; BGH, GRUR 2009, 946, mar. no.20, cit. no. juris - *Reifen Progressiv* (on copyright law); a.A. (only claim under the law of obligations:) BGHZ 83, 251 - *Verankerungsteil;* a.A. (reified obligation): McGuire, Die Lizenz, zugl. Habil. Osnabrück 2009) an entitlement to use the patent in suit by the Defendants might at best be considered if one were already to see a contract for the benefit of third parties in the making of the licensing declaration to the standard setting organization ITU and its acceptance. Such a grant of license with an operative character through a contract for the benefit of third parties is excluded by the fact that German law does not acknowledge an in rem contract for the benefit of third parties. Sections 328 et seq. BGB are neither directly or by analogy applicable to in rem contracts (cf. Mannheim Regional Court, loc. cit., mar. no. 167 with further proofs).

The licensing declaration also does not contain a waiver of claims for injunctive relief with the effect that the Plaintiff would be restricted to making or accepting a FRAND offer and demanding payment of license fees in the FRAND amount, where necessary by means of a claim for damages. Such a waiver of the power of exclusivity from the patent could at best have a purely in personam character, but would not be an operative act having an effect on the continued existence of the patent right, which directly restricts the Plaintiff's rights as patent holder. The latter would not even be legally possible considering the in rem nature of the claim for injunctive relief inseparably associated with the property right as such (cf. Mannheim Local Court, InstGE 11, 9, mar. no. 99 et seq. - *UBTS capable mobile telephone,* cit. no. Juris; Kühnen, loc. cit., mar. no. 1298).

The Plaintiff's or rather its former parent company's licensing declaration to the ITU can however also not be understood as a binding licensing offer to a large number of third parties still unknown to the Plaintiff, which only requires acceptance by a third party but as an invitation to parties concerned for their part to make a FRAND offer (cf. also section 2 at the end: *"Negotiations of licences are left to the parties*

*concerned and are performed outside the ITU-TASO/IEC").* The license declaration thus merely comprises a declarative specification of the obligation to contract existing anyway under antitrust law (cf. Kühnen, loc. cit.., mar. no. 1298). With the promise to grant a license to third parties under FRAND conditions it only creates a basis for a claim, for which the party concerned must formulate a specific request fleshing out the basis of the claim (Karlsruhe Higher Regional Court, InstGE 12, 220 - *BP3-Standard).*

Finally, an offer of an in personam *"pactum de non petendo"* ("negative license") and thus the patent holder's waiver of the form of pressure of the claim for injunctive relief for enforcing its patent law claims against a large number of potential patent infringers unknown to it (sec. 2 :"an *unrestricted number of applicants")*  is improbable. The patent holder declaring its willingness to license merely offers to cause the downfall of the exclusivity rights under the patent by concluding a license agreement - and precisely not unconditionally (Kühnen, loc. cit., mar. no. 1298).

In the light of the foregoing, with regard to the Plaintiff's ITU licensing declaration, the Defendants can rely neither on a positive right of use granted to it nor on a waiver of prohibition.

III.

The Defendants are not entitled to any right to use the parent in suit under the MPEG LA Pooling Agreement (cf. Exhibit FBD 12).

The assessment of the alleged grant of right of use in the MPEG LA Pooling Agreement is again in accordance with the laws of the country for for whose territory protection is sought (cf. above at sec. 11.). According to German substantive law do be applied accordingly, Terayon and Tut Systems could not validly dispose of the patent in suit belonging to them. It is neither submitted nor otherwise evident where the MPEG LA Pool licensees Terayon and Tut Systems' corresponding power of disposal of the patent in suit is supposed to have come from. Understood as grant of a license to the patent in suit, Art. 8.3 of the MPEG LA Pooling Agreement would constitute a disposal for the benefit of third parties, the Plaintiff. As such, the alleged license is invalid.

Against this background, it does not matter whether a license would apply to the patent in suit and to the Defendant no. 2 as subsidiary of the licensor Microsoft Corporation at all.

C.

The Defendants cannot successfully defend themselves with the objection that the Plaintiff would have to grant it a license for the patent in suit immediately, which is why the request for injunctive relief was an abuse of law. The Defendants are not entitled to a do/o-petit objection either due to their offer of a license agreement of December 23, 2012 (I.) or in connection with the licensing declaration to the ITU (II.) or due to the MPEG LA Pooling Agreement (III.).

**I.**

The Plaintiff is not hindered under antitrust law from enforcing its claim for injunctive relief against the Defendants resulting from the infringement of the patent in suit. The Defendants cannot exclude any claim for the grant of a license under section 33 para. 1 of the German Restrictive Practices Act [Gesetz gegen Wettbewerbsbeschränkungen(GWB) in conjunction with Art. 102 TFEU or sections 19, 20 GWB from the claim for injunctive relief.

1. The Plaintiff is the relevant addressee of Art. 102 AEUV or sections 19, 20 GWB, since according to its own submission, anyone who manufactures, offers, sells and distributes H.264 decoding apparatus must comply with the H.264 standard and this necessarily also makes use of the patent in suit. The grant of licenses to the patent in suit thus objectively forms a market of its own, which the Plaintiff controls as the only supplier.

2. The license offer to the Plaintiff made by Defendant no. 1 also with effect for Defendant no. 2 (hereinafter referred to as: Defendants' license offer) does not meet all requirements that the Federal Supreme Court have listed in its decision *Orange-Book-Standard* (judgment of May 6, 2009, KZR 39/09, GRUR 2009, 694 et seq.).

Accordingly, the Defendant against which a claim is brought under a patent may raise as an objection against the patent holder bringing an action that it would be abusing a market dominance if it were to refuse to conclude a patent licensing agreement under non-discriminatory and non-restrictive conditions with the Defendant (BGH, loc. cit.., 1st guiding principle, cit. no. juris). However, the patent holder, which asserts a claim for injunctive relief under its patent, although the Defendant is entitled to a claim for the grant of a license to the patent in suit, only abuses its market dominance and only acts contrary to principles of good faith if two requirements are met: on the one hand, the party requesting the license must have made it an unconditional offer to conclude a license agreement, which the patent holder may not reject, without unduly restricting the party requesting the license or contravening the prohibition of discrimination, and consider itself bound by this offer. On the other hand, if it has already used the object of the patent before the patent holder has accepted its offer, the party requesting the license must comply with the obligations that the licensing agreement to be concluded links to the use of the licensed object. This especially means that the party requesting the license must pay or guarantee the payment of the license fees resulting from the agreement (BGH, loc. cit., mar. no. 29).

3.  Even if the *Orange-Book-Standard* decision had correlated a de facto standard, the criteria listed there are likewise applicable to standards which have been elaborated by standard setting organizations (here: ITU) in a standardizing process (cf. Mannheim Regional Court, InstGE 13, 65, mar. no.176, cit.no.juris).

4.  The Plaintiff should reject the Defendant's offer to conclude a license agreement without thereby having unduly restricted or discriminated against the Defendant •

    a. While the foregoing unconditional offer essentially conforms to usual contract terms and shows a sufficient degree of regulation taking into account the amendments made [..] The offer in its amended wording among other things especially includes a right of termination by the patent

holder in the event of future attacks against the legality of the patent in suit (cf. Karlsruhe Higher Regional Court, January 23, 2012, p. 6), and the Defendant also acknowledges in connection with its offer an obligation to pay damages for use actions in the past based on the merits of the case(cf. Mannheim Regional Court, judgment of December 9, 2011, 7 O 122/11).

b.  The Defendant's offer of a licensing agreement is nevertheless not an offer, which the Plaintiff may not reject, without being in violation of antitrust law. The patent holder is namely not required to accept an offer at licensing rates that are below what it could demand without being in violation of antitrust law.

The Defendant, which considers the Plaintiff's claim for a license (2.25 % of the revenue) to be excessive and an abuse of law, has not made any use of the possibility exisiting in such cases to leave the amount of the license fee according to section 315 BGB to the patent holder's fair discretion (BGH, loc. cit., mar. no. 39). After the Defendant rather committed itself to a specific calculation basis (quota license) and a specific licensing rate (2 €-Cents or 1 € cent per unit), it had to be considered whether the rejection of this offer by the Plaintiff on the grounds that the license fees offered were too low is in violation of antitrust law.

In the opinion of the Court, this consideration may be restricted to the question whether the offer constitutes a *blatant* violation of antitrust law. As the Federal Supreme Court makes clear in the *Orange-BookStandard* decision, the infringement proceedings is to be relieved to an avoidable extent from the difficult and time-consuming task of determining the precise amount of a non-restrictive or discriminatory license fee (BGH, loc. cit. mar. no. 39). In the case of an offer of a license in accordance with section 315 BGB, the infringement court is therefore to be able to be satisfied that the patent holder is obliged to accept the offer of a licensing agreement and determine according to its fair discretion when the party requesting the license has deposited an amount sufficient in any case and the other requirements of the "compulsory license plea" are also met (BGH, loc. cit. mar. no. 40). In connection with the question whether the deposited amount

(in any casel) is certainly sufficient, a summary consideration by the Court will be sufficient (cf. Kühnen, loc. cit.., mar. no. 1296). Inasmuch, the party requesting a license also does not incur any disadvantage, since in subsequent proceedings on the amount of the compensation the burden of production and the burden of proof for the reasonableness of the amount of the license fee agreed lie with the patent holder.

If, one the other hand, the party requesting the license offers a specific license fee which it considers to be reasonable, which the patent holder rejects as too low, the question is raised what significance is given to the party requesting the license's assertion that the license fee offered is reasonable and whether in the end the party requesting the license can force a costly and time-consuming hearing of evidence with each offer, which in the view of the Federal Supreme Court must particularly be avoided in infringement proceedings.

Since only a clearly excessive price is unreasonable within the meaning of Art. 102 TFEU, the rejection of the offer by the patent holder due to allegedly to low license fees is only in violation of antitrust law if the party requesting the license offers such a high license price that any change compared with this for the benefit of the patent holder would be unreasonable.

If, on the other hand, the conditions in the offer by the party requesting a license are (only) unreasonable, but Art. 102 TFEU, sections 19, 20 GWB allow a deviation for the benefit of the patent holder, the patent holder's refusal to grant a license under there conditions does not establish the objection of an abuse of law. An obligation to contract only exists under conditions which are reasonable *and* in respect of which any change for the benefit of the party with market dominance is unreasonable in such a way that the insistence on these conditions must be regarded as an abuse of law by a party with market dominance (Karlsruhe Higher Regional Court, 6 U 174/02, GRUR-RR 2007, 177 et seq., mar. no. 56, cit. no. juris). As long as the patent holder can rely on there still being maneuvering room for its benefit within what is reasonable, it is not in violation of antitrust law. That this "upper limit" of the party not yet in violation of antitrust law is also not

automatically ascertainable for the party requesting the license does not unduly encumber it, for it basically bears the burden of production and proof for the requirements of the licensing claim under antitrust law anyway (cf. BGH, loc. cit, mar. no. 37 et seq.) and as shown, the solution is left up to it section 315 BGB.

If, upon a summary consideration, this means that the license fees offered by the party requesting a license are in any case not certainly sufficient (so that each deviation upwards would be clearly unreasonable), the rejection by the patent holder is not blatantly in violation of antitrust law. A hearing of evidence on the question whether the offer (in any case) is reasonable is not required therefore.

c.  The Defendant's offer does not stand up to a review oriented to these principles. It cannot be established that the license fees offered would be sufficient in any case.

The *Orange-Book-Standard* decision did not have to consider the question about what standards the amount sufficient in any case (there in accordance with section 315 BGB) have to be determined by )e.g. general comparable market, license pools, patent holder's licensing practice etc.)

In the present case, there is not need to consider whether a patent pool considered by itself can be a convincing point of departure and relevant benchmark. Inasmuch, in the opinion of the Court, there are at least some concerns. On the one hand, the patent holder's interests in introducing its standard-setting essential patents into a pool is not automatically comparable with the patent holder which waives these. Thus, at least for producing members of a patent pool, this should often depend on obtaining the maximum amount of licensing revenues from the patents introduced than on the possibility of being able to use the patents of other pool members as economically favorably as possible. The suitability of the licensing rates of a patent pool as a relevant benchmark may also not be restricted by - as in the case of the MPEG LA Pool - several of the largest patent holders not having joined the pool.

Also if these basic concerns regarding the Defendant's calculation method are disregarded, the court can in any case not determine that the license fees offered certainly move in such an amount that a deviation upwards would lead to clearly excessive fees.

d.  This is especially true against the background of the numerical downward calculation of the fee for both patents in suit calculated for the Plaintiff's (17) standard-setting essential patents (2/17). As a result, the linear billing method of the MPEG LA patent pool is transferred one to one, although the Plaintiff has precisely not joined this pool. Namely, it does not make any difference whether the € 0.082 cent share of the license granted in the pool per patent family and unit is directly increased tenfold (€ 0.82 cent) and is then doubled to € l.64 cent (two patents whose licensing is requested) or whether first of all the total amount of (€ 0.082 cent x 17 patent families =) € 1,394 theoretically granted for the portfolio in the pool is increased tenfold (€ 13.94 cent) and then calculated numerically downward to the number of the patents in suit (l/17 or 2/17 for both patents in suit = € 0.82 cent or € 1.64 cent).

The Court does not deny that the Defendant has taken into account that a standard-setting essential patent can generally be had relatively more economically favorably as part of a patent pool than through an individual license by increasing the share of the pool license theoretically accruing for the Plaintiff's portfolio tenfold.

But it is not recognizable that the Defendant thereby reaches an amount of licenses in which any further deviation upwards would be unreasonable. On the other hand, it is already apparent in the opinion of the Court that the thus determined portfolio license corresponds to the license fees that AT&T receives from at least 9 licensees for its more or less comparable portfolio. That AT&T inasmuch would have enforced a license fee equally against 9 licensees, which is not only usual in the market, but moves at its upper limit, which precisely can be regarded as reasonable and not restrictive or discriminating, does not appear obvious.

It also does not at all appear certain to the Court that the maximum amount of licenses for both patents in suit is to lie exactly at 2/17 of the amount of licenses determined for the Plaintiff's and its Group parent's portfolio. This would not only require the at least questionable application of the license calculation method for parts of pool licenses to individual license fees, but also the certainty that both patents in suit taken by themselves are actually not - as appropriate also only minimally - more valuable than the other 15 patents of the Plaintiff's and its Group parent's portfolio.

e.  Also a comparison with the patent pool for a predecessor technology for video compression, the H.262 (MPEG 2) standard gives rise to doubts that the licensing rates offered by the Defendant move in an amount in which a deviation upwards would lead to clearly excessive fees. The H.262 pool initially provided for license fees of US-$ 4 per device (without cap limit), after reductions, currently still US-$ 2 per item is requested. These license fees lie clearly above those of the MPEG LA patent pool ( US-$ 0.2 or US-$ 0.1), which Defendant took as a basis for its calculations, without the Court having any evidence for the fees of the H.262 pool for their part being (having been) unreasonable, restrictive or discriminating. sAlso taking into account the Defendant's submission according to which the MPEG 2 pool had been formed in the year 1997 and thus at a time in which the products working with compressed data were relatively expensive and worked with less implemented standards, at least the even currently clearly higher license fee of the MPEG 2 pool raises doubts that the € 2 cents or € 1 cent per item offered by the Defendant are actually at the upper limit of what is reasonable.

f.  A more detailed analysis of the controversial methodology and the validity of the so-called analysis of citations referred to by the Defendant is not required, since the Defendant has ultimately not oriented the licensing rates offered by it to the alleged citation value. Inasmuch, the Defendant has also only stated the alleged citation value of the portfolio (3.8 % of the total citation value; expert opinion by Bekker, Exhibit FBD-22, S. 31), but not of both of the patent in suit. Against this background, notwithstanding the disputed value of the citation method it is in any case not discernible

that the licensing rates offered moved at the upper limit of what would be reasonable for patents with a corresponding "citation value".

5. If the Defendants have stated clearly in the oral proceedings that their offer included as additional components a remunerated cross license regarding the licensing rates determined by them, this too does not lead to a different assessment of the offer.

From the fact alone that the party requesting a license would be satisfied with a certain licensing rate it cannot be inferred that this licensing rate would also have to be accepted for the patent holder's patents.

On the one hand, the interests regarding the respective patents on the party requesting the licenses' side may be completely different than on the patent holder's side. This is especially true if both sides manufacture and / or sell and distribute completely different quantities. Thus, the party which sells higher quantities will generally prefer a lower reciprocal licensing rate and the party with lower own quantities will generally prefer a higher reciprocal licensing rate.

The present case also shows the Plaintiff's minimal interest in the Defendant's standard-setting essential patents in the fact that the Plaintiff did not take any license for the MPEG LA pool, in which Defendant introduced its own standard-setting essential patents in the past.

On the other hand, it would otherwise have been obvious to the party requesting a license to force the patent holder to a licensing through an offer of a cross license under the same conditions, during which the amount of licenses could precisely not be oriented to the requested patents, but to the party requesting a license's own patents - and their possibly lower value. That a remunerated cross license does not per se have to be in accordance with their interests for both parties, is in other respects also shown by the Defendant's themselves when for their part they reject the remunerated cross license offered by the Plaintiff under its conditions (2.25 % of the revenues) as being unreasonably high.

That the party requesting a license is prepared to license its own patents under a remunerated cross license under the same conditions that it offers for the patents requested by it therefore does not automatically militate in favor of the fee rates offered in any case being so high that the patent holder could only reject the offer in violation of antitrust law. In view of the fact that the licensing rates offered taken by themselves are not obviously sufficient in any case (cf. above), the additional worldwide cross license could only lead to Plaintiff being able to reject the offer without being in violation of antitrust law if Defendant's portfolio had at least the same value for Plaintiff (i.e. not only objectively, in which case also the latter is disputed between the parties) as the Plaintiff's portfolio for the Defendant, which could be measured for example by the necessity of using the patents, and the quantity of products according to the patent manufactured or sold or the turnover thereby generated.

6.  If the Defendants finally declared in the pleading of 2 March 2012 (sheet. 489 et seq., 498 et seq.) their willingness to grant the Plaintiff a worldwide, non-remunerated cross license to its portfolio of H.264 standard-setting essential patents in addition to the patients in suit granted in Germany, the aforementioned considerations on the remunerated cross license applies accordingly. Inasmuch, it makes no difference whether the party requesting a license wishes to license the respective patents at a licensing rate not sufficient in any case, in any case regarding the patent holder's patents or equally reciprocally free of charge. A cross license free of charge is not without remuneration; the latter is granted by the grant of the licenses to the patents to which the licensee is entitled and may consequently likewise be too low. Also in the case of the cross license free of charge, for the reasons stated above (cf. section 5), the Court can consequently not determine that the Plaintiff could only reject the offer in violation of antitrust law.

It therefore does not depend on the question whether the *Orange-Book-Standard* offer of 23 December 2011 pursuant to section 296 para. 1 ZPO and the offer of an additional further cross license free of charge pursuant to section 296a ZPO first made in the pleading of 2 March 2012, which no

extension was granted in this regard, after the end of the oral proceedings are precluded in any case.

In accordance with the aforesaid, the Plaintiff did not violate antitrust law by not accepting Defendant's offer of a licensing agreement made in various forms, which is why the Defendants cannot cite the *dolo-petit* objection (section 242 BGB in conjunction with Art. 102 TFEU or sections 19, 20 GWB) against the Plaintiff's claim for injunctive relief.

## II.

The Defendants cannot successfully defend themselves with the objection that the Plaintiff would have to grant it a license for the patent in suit immediately, which is why the request for injunctive relief was an abuse of law (do/o-petit objection, section 242 BGB). In the case of the licensing declaration, the rules on the necessity of an offer of a license by the party requesting a license set forth under section 1 apply in the same way. If the party requesting a license could successfully fend off the patent holder's claims for injunctive relief with the argument that the patent holder would in the end in any case be obliged to deliver it a license - voluntarily if one were to hand over the patent holder to any dishonest licensee for which there would no longer be any incentive to commence licensing negotiations (cf. Kühnen, loc. cit., mar. no. 1298).

The licensing declaration finally no longer includes a declaratory specification of the obligation to contract existing in any case under antitrust law, whereby it suspends from the review under antitrust law whether the patent holder has a market dominating position as a result of the obligations to license free from discrimination and abuse (cfl. Kühnen, mar. no. 1298 et seq.).

## III.

A justified do/o-petit objection also does not result from the MPEG LA pooling agreement because a contractual obligation by the Plaintiff, to make the Defendants an offer under the conditions outlined in the MPEG LA pooling agreement does not exist.

According to section 8.3 of the agreement, the licensees Terayon and Tut Systems were obliged to grant licenses for own standard-setting eessential patents and those of their *"Affiliates"* . *"Affiliates"* are according to section 1.I of the agreement also undertakings that are held by a common parent company *("...or is under common control with Licensor").* While Terayon and Tut Systems should have been held by the same parent company (Motorola, Inc., later Motorola Mobility, Inc.) as the Plaintiff from 2007 (up until its merger with the Plainjtff) (the start of the affiliation with the Group is not submitted). Based on this circumstance, however, at best obligations of the licensees Terayon and Tut Systems, but not Plaintiff, which was not a contractual party to the MPEG LA pooling agreement, could have resulted. But also the Plaintiff's merger with Terayon und Tut Systems in the year 2011 could not establish any licensing obligation of Plaintiff under the MPEG LA pooling agreement (by way of the alleged universal succession): the MPEG LA pooling agreement was namely pursuant to section 8.I.2 already terminated through the takeover of the licensees Terayon and Tut Systems by Motorola, Inc. in the year 2007. While section 6.6.4 of the MPEG LA pooling agreement provides that the licensee's obligation under section 8.3 outlasts the termination of the agreement. But such an obligation of the licensees Terayon and Tut Systems to license Plaintiff's patents outlasting the termination of the agreement did not exist at the time of the termination of the agreement, i.e. the takeover of Terayon and Tut Systems by Motorola, Inc. in the year 2007, because the Plaintiff was not an *"Affiliate"* of both licensees at the time.

It can be thus left open whether an obligation to grant a license would even apply to the patent in suit and against the Defendant no. 2 as subsidiary of the licensee, Defendant no. 1.

## D.

The Plaintiff's claims for the thus established infringement of the patent in suit are determined pursuant to Art. 64 EPC in accordance with the regulations of the German Patent Act [Patentgesetz].

1. Since the Defendants have used the subject matter of the patent in suit in violation of section 9 no. 1 PatG (Xbox 360, both Defendants) and section 10

PatG (Windows 7, Media Player 12 and Internet Explorer 9, Defendant no. I), they obliged to the Plaintiff to forbear from this, section 139 para. 1 PatG in conjunction with Art 64 EPC. The danger of repetition results from the already occurring infringing acts through the sale and distribution of the challenged embodiments.

The obligation of forbearance had to be expressed without any restriction because a non-infringing use of the apparatus of the challenged embodiments for decoding H.264 video data is not recognizable. The other functions of the challenged embodiments are not dependent on decoding apparatus in accordance with the invention, which is why Defendant does not have any recognizable interest in continuing to offer, sell and distribute the challenged embodiments in a design enabling the use of the patent in suit.

Defendants did not have to be granted a grace period. Inasmuch, there is an insuffiicient specification of the serious consequences of an immediately applicable obligation of forbearance alleged by the Defendant.

Defendants were ordered to forbear, under section 890 ZPO, at the Plaintiff's request, they must be threatened with the legal consequences of a contravention of the obligation of forbearance.

2. The promised claim for furnishing information and presentation of invoices results from § 140b PatG und § 242 BGB in conjunction with Art. 64 EPC. If no reservation of auditor was provided at the Plaintiff's request, this had to be amended (cf. Kühnen, loc. cit, WL 1045 et seq. with further proofs) and to dismiss the further action to this extent.

3. The claim for recall and removal asserted for the products which have reached the marketing channels since September 9, 2008 results from section 140a para..3 s. 1 PatG new version in conjunction with  Art. 64 EPC. For the products which reached the marketing channels before September 9, 2008, there is merely a claim for recall from the marketing channels to an extent

corresponding to section 140a para. 3 s. 1 PatG new version, but not for the removal from the marketing channels.

The contractual relationship already resulting from (culpable) infringing acts before the entry into force of the German Act on the Improvement of the Enforcement of Intellectual Property Rights [Gesetz zur Verbesserung der Durchsetzung von Rechten des geistigen Eigentums] (BGBl. 2008 I, p. 1191) on September 01, 2008 - in the absence of express statutory transitional provisions regarding its content and its effects - solely subject to the right which applied at the time of its coming into existence, i.e. by September 1, 2008 (cf. BGH, GRUR 2009, 515, 517 - *Botorradreiniger).* The claim for recall already results under earlier legislation - without this depending on an interpretation in accordance with guidelines - pursuant to sections 139 para. 2 PatG, 249 para. 1 BGB as damages by means of specific performance or as a claim for a remedy independent of fault pursuant to section 1004 para. 1 p. 1 BGB by analogy (Mannheim Regional Court, judgment of November 13, 2009, 7 O 92/08 - not published). Such a claim for the removal of a danger with the same content aimed at recall under section 140a para. 3 s. 1 PatG new version in accordance with earlier legislation does not require a power of disposal of the infringer of the objects to be recalled in the sense of a legal handling of the intermediate customer in the marketing channel (otherwise on the simple recall indeed also BGH, GRUR 1974, 666, 669 - Reparaturversicherung, with further proofs). This does not apply regarding the removal from the marketing channels. Since the removal from the marketing channels by the infringer beyond the appeal to a voluntary surrender (recall) requires the outcome of the "final removal" itself , under earlier legislation it is in principle required that the infringer has power of disposal of the objects to be recalled in the sense of a legal handling of the intermediate customer in the marketing channel (cf. BGH, GRUR 1974, 666, 669 - Reparaturversicherung, with further proofs). Plaintiff has not set forth such a power of disposal of the Defendant and this is otherwise not evident. A different application of the law as a result of the delayed implementation of the so-called Enforcement Guideline may not be considered. The Guideline does not bring about a direct horizontal effect between the parties and to this

extent a guideline-conforming legislative continuation of the general claims for removal of the consequences is not possible since the Court to this extent would replace the legislator (Mannheim Regional Court, InstGE 12, 200 mar. no. 42 - *Stickstoffmonoxyd-Nachweis;* loc. cit. Düsseldorf Higher Regional Court, InstGE 13, 15 - *Faktor VIII-Konzentrat).*

According to the wording of the statute (considering "marketing channels") it still had to be clarified that objects that are held by private or commercial final consumers are not covered by the operative provisions of the judgment (cf. Mannheim Regional Court, InstGE 12, 200, 208-210 — subparagraph 45 et seq. *Stickstoffmonoxyd-Nachweis;* a.A. Kühnen, loc. cit., mar. no. 1082).

4. The Defendants must bear at least the charge of negligence regarding the declared patent infringement from October 20, 2000, one month after publication of the reference to the grant of the patent in suit, which is why they are also obliged to pay damages to the Plaintiff from this date pursuant to section 139 para. 2 PatG in conjunction with Art. 64 EPC. Plaintiff is currently unable to put a figure ofn its claim for damages; this justifies the petition for a determination of the location, section 256 ZPO.

## E.

A stay of the proceedings pursuant to section 148 ZPO is not indicated.

## I.

The legal dispute did not have to be stayed until the decision on the action for nullity brought against the patent in suit. While the decision on the action for nullity is

has precedence within the meaning of section 148 ZPO. The Court has however exercised the discretion granted to it by this regulation to ensure than a stay of the infringement proceedings is refrained from. After the Plaintiff in an action for nullity applied for the suspension of the nullity proceedings and declared that it would refrain from filing a further petition to the court in the nullity proceedings as long as it and the

Defendants considered themselves bound by their offer of a licensing agreement, it is unlikely for the time being that there will be a destruction of the patent in suit.

II.

A stay pursuant to section 148 ZPO may also not be considered regarding the review of the admissibility of the takeover of the Plaintiff's parent company by Google Inc. by the antitrust authority, because the decision by the antitrust authority does not have precedence. Any future changes in the legal situation do not have precedence over the decision to be taken based on the current legal situation (cfl. Zöller/Greger, ZPO, 29. edl., § 148, mar. no. 6a).

F.

The decision on costs results from sections 92 para. 2 no. I, 100 para. 1 ZPO.

The decision on the provisional enforceability is based on section 709 s. 1 and s. 2 ZPO.

In the determination of the provision of security regarding the obligation to recall and remove the products described under section I.I.a) (Xbox 360) the Court takes into account that the isolated enforcement of these obligations serving to remove the patent-infringing state of affairs virtually corresponds to the enforcement of the claim for injunctive relief.

Defendant's application for a stay of execution pursuant to section 712 ZPO shall remain unsuccessful. Defendant's submission that it is threatened by financial losses, the loss of market shares and harm to its image is not sufficient to substantiate the requirements of section 712 para. 1 s. 1 ZPO.

The enforcement of claims for injunctive relief under technical property rights regularly results in the discontinuation of business activities in connection with the patent-infringing products and therefore does not per se open the scope of application of section 712 para. 1 s. 1 ZPO (Düsseldorf Higher Regional Court, InstGE 8, 117, 121 - Fahrbare Betonpumpe). That the Defendant's economic existence also taking account the Plaintiff's fault-free liability pursuant to section 717 para. 2 sentence 1 ZPO would be threatened, has not been set forth or submitted as prima facie evidence. Regarding

the possible disadvantages for the user of the challenged embodiments (undertakings, public administration) submitted by the Defendant, these are not irredeemable disadvantages threatening the Defendant itself. However, section 712 ZPO does not serve to protect third parties.


Dr. Kircher                      Dr. Bauer-Gerland                 Wedler
Presiding Judge at the           Judge at the Regional Court       Judge at the Regional Court
Regional Court


Executed:

as registrar of the court registry

In my capacity as a certified and sworn translator for the English language, duly commissioned and sworn in by the President of Regional Court of Munich II, I hereby certify that the foregoing is a true and complete English translation of the document in the German language submitted to me.

Ramona Felder
Kärntner Platz 3
80686 Munich
Germany

Munich, 4 May 2012

(Ramona Felder)

