UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| MICROSOFT CORPORATION, | CASE NO. C10-1823JLR |
| Plaintiff, | ORDER |
| v. | |
| MOTOROLA, INC., et al., | |
| Defendants. | |
| MOTOROLA MOBILITY, INC., et al., | |
| Plaintiffs, | |
| v. | |
| MICROSOFT CORPORATION, | |
| Defendant. | |

ORDER- 1

# I.    INTRODUCTION

This matter is before the court on Plaintiff Microsoft Corporation's ("Microsoft") motion for summary judgment ("Microsoft's Motion") for breach of contract (Microsoft Mot. (Dkt. # 236)), and Defendants Motorola, Inc., Motorola Mobility, Inc., and General Instrument Corporation's (collectively, "Motorola") motion for summary judgment ("Motorola's Motion") that Microsoft repudiated its rights to the contract (Motorola Mot. (Dkt. # 231)).[1]  The court heard the oral argument of counsel on May 7, 2012, and has considered all pleadings on file, including:  (1) Microsoft's Motion (Microsoft Mot.) and all attachments thereto; (2) Motorola's response to Microsoft's Motion (Motorola Resp. (Dkt. # 274)) and all attachments thereto; (3) Microsoft's reply in support of its motion (Microsoft Reply (Dkt. # 284)) and all attachments thereto; (4) Motorola's Motion (Motorola Mot.) and all attachments thereto; (5) Microsoft's opposition to Motorola's Motion (Microsoft Resp. (Dkt. # 269)) and all attachments thereto; and (6) Motorola's reply in support of its motion (Motorola Reply (Dkt. # 290)).  Being fully advised, the court DENIES Microsoft's Motion (Dkt. # 236) and DENIES Motorola's Motion (Dkt. # 231).

---

[1] While the parties in this action have both filed affirmative claims, because (as explained herein) Microsoft filed the complaint initiating the instant action, for purposes of this order, the court refers to Microsoft as the "plaintiff."

ORDER- 2

## II.     BACKGROUND

**A.     The IEEE and the ITU as Standard Setting Organizations**

Microsoft and Motorola are both members of the Institute of Electrical and Electronics Engineers ("IEEE") and the International Telecommunication Union ("ITU"). The IEEE and the ITU, neither of which are parties to the instant dispute, are international standards setting organizations.  Standards setting organizations play a significant role in the technology market by allowing companies to agree on common technological standards so that all compliant products will work together.  Standards lower costs by increasing product manufacturing volume, and they increase price competition by eliminating "switching costs" for consumers who desire to switch from products manufactured by one firm to those manufactured by another.

One complication with standards is that it may be necessary to use patented technology in order to practice them.  If a patent claims technology selected by a standards setting organization, the patent is called an "essential patent."  Here, Motorola is the owner of numerous patents "essential" to certain standards established by the IEEE and the ITU.  (*See* 10/21/10 Motorola Offer Ltr. (Dkt. # 79-5); 10/29/10 Motorola Offer Ltr. (Dkt. # 79-6) (see list of attachments).)  In order to reduce the likelihood that owners of essential patents will abuse their market power, many standards setting organizations, including the IEEE and the ITU, have adopted rules related to the disclosure and licensing of essential patents.  The policies often require or encourage members of the standards setting organization to identify patents that are essential to a proposed standard and to agree to license their essential patents on reasonable and non-discriminatory

1  ("RAND") terms to anyone who requests a license.  Such rules help to insure that

2  standards do not allow essential patent owners to extort their competitors or prevent

3  competitors from entering the marketplace.

4  **B.**    **Motorola's Statements to the IEEE and the ITU**

5        This lawsuit involves two standards—the IEEE 802.11 wireless local area network

6  ("WLAN") Standard ("802.11 Standard") and the ITU H.264 advanced video coding

7  technology standard ("H.264 Standard").[2]  (*See generally* Compl. (Dkt. # 1); Am. Compl.

8  (Dkt. # 53).)  The IEEE's standard setting process is governed by its Intellectual Property

9  Rights Policy (the "IEEE Policy").  (*See generally* IEEE Policy (Dkt. # 79-1).)  The IEEE

10 Policy provides that "IEEE standards may be drafted in terms that include the use of

11 Essential Patent Claims."  (*Id.* at 18 (Section 6.2).)  The IEEE Policy defines the term

12 "Essential Patent Claim" as one or more claims in an issued patent (or pending patent

13 application) that are "necessary to create a compliant implementation of either mandatory

14 or optional portions of the normative clauses of the [Proposed] IEEE Standard . . . ."  (*Id.*)

15       If the IEEE learns that an IEEE standard or a proposed IEEE standard may require

16 the use of an essential patent claim, the IEEE requires the patent holder to either state that

17 it is not aware of any patents relevant to the IEEE standard or to provide the IEEE with a

18 Letter of Assurance.  (*Id.*)  Any such Letter of Assurance must include either (1) a

19

20

---

21       [2] The ITU developed the H.264 Standard jointly with two other standard setting
22 organizations—the International Organization for Standardization and the International
   Electrotechnical Commission.  (Partial S.J. Order (Dkt. # 188) at 3.)

disclaimer to the effect that the patent holder will not enforce the "Essential Patent Claims," or (2):

> [a] statement that a license for a compliant implementation of the standard will be made available to an unrestricted number of applicants on a worldwide basis without compensation or under reasonable rates, with reasonable terms and conditions that are demonstrably free of any unfair discrimination. . . .

(*Id.*)  If the IEEE cannot obtain a Letter of Assurance, it refers the essential patent to the IEEE Patent Committee.  (*Id.*)

Motorola has submitted numerous Letters of Assurance to the IEEE in connection with the 802.11 Standard stating that it "will grant" or "is prepared to grant" a license under RAND terms for its patents essential to the 802.11 Standard.  (*See generally* IEEE LOAs (Dkt. # 79-2).)  A typical Motorola Letter of Assurance to the IEEE provides, in relevant part:

> The Patent Holder will grant [or is prepared to grant] a license under reasonable rates to an unrestricted number of applicants on a worldwide, non-discriminatory basis with reasonable terms and conditions to comply with the [Proposed] IEEE Standard.

(*See generally id.*)  Such Letters of Assurance are irrevocable once submitted and accepted by the IEEE and apply from the date the standard is approved until the date the standard is withdrawn.  (IEEE Policy at 19.)

Like the IEEE, the ITU has established a policy (the "ITU Policy") with respect to holders of patents "essential" to implementing a standard.  (*See* ITU Policy (Dkt. # 79-3).)  Such patent holders must file with the ITU a "Patent Statement and Licensing Declaration" declaring whether they (1) will grant licenses free of charge on a RAND

1   basis; (2) will grant licenses on RAND terms; or (3) are not willing to comply with either

2   of the first two options.  (*See id.* at 9-12.)  If a patent holder is not willing to comply with

3   either of the first two options, the ITU standard will not include provisions that depend on

4   the patent.  (*Id.* at 9.)

5         Motorola has sent numerous declarations to the ITU stating that it will grant

6   licenses on RAND terms for its patents essential the H.264 Standard.  (*See generally* ITU

7   Declarations (Dkt. # 79-4).)  A typical declaration by Motorola to the ITU provides, in

8   relevant part:

9          The Patent Holder will grant a license to an unrestricted number of
       applicants on a worldwide, non-discriminatory basis and on reasonable

10         terms and conditions to use the patented material necessary in order to
       manufacture, use, and/or sell implementations of the above ITU-T

11         Recommendation | ISOC/IEC International Standard.[3]

12  (*E.g.*, *id.* at 2.)

13        In a February 27, 2012 order, the court ruled that Motorola's Letters of Assurance

14  to the IEEE and Motorola's declarations to the ITU create enforceable contracts between

15  Motorola and the respective standard setting organization.  (Partial S.J. Order at 10.)

16  Additionally, the court found that as a member of the IEEE and the ITU and as a

17  prospective user of both the H.264 Standard and the 802.11 Standard, Microsoft is a

18  third-party beneficiary of those contracts.  (*Id.*)

19

20

21  _____

22     [3] Motorola's declaration to the ITU also states that "negotiations of licenses are left to the
parties concerned and are performed outside the ITU-T | ISO/IEC."  (ITU Declarations at 2.)

ORDER- 6

1  **C.    Motorola's Offer Letters to Microsoft**

2      On October 21, 2010, Motorola sent Microsoft a letter (the "October 21 Letter")

3  that read in pertinent part:

4      This letter is to confirm Motorola's offer to grant Microsoft a worldwide
       non-exclusive license under Motorola's portfolio of patents and pending
5      applications having claims that may be or become Essential Patent Claims
       (as defined in section 6.1 of the IEEE bylaws) for a compliant
6      implementation of the IEEE 802.11 Standards. . . .  Motorola offers to
       license the patents under reasonable and non-discriminatory terms and
7      conditions ("RAND"), including a reasonable royalty of 2.25% per unit for
       each 802.11 compliant product, subject to a grant back license under the
8      802.11 essential patents of Microsoft.  As per Motorola's standard terms,
       the royalty is calculated based on the price of the end product (e.g., each
9      Xbox 360 product) and not on component software (e.g., Windows Mobile
       Software).

10

11 (10/21/10 Offer Ltr. at 2.)  Then, on October 29, 2010, Motorola sent a similar letter (the

   "October 29 Letter") regarding the H.264 related patents, stating:
12

13     Motorola offers to license the patents on a non-discriminatory basis on
       reasonable terms and conditions ("RAND"), including a reasonable royalty,
14     of 2.25% per unit for each H.264 compliant product, subject to a grant back
       license under the H.264 patents of Microsoft, and subject to any Motorola
15     commitments made to JVT in connection with an approved H.264
       recommendation.   As per Motorola's standard terms, the royalty is
16     calculated based on the price of the end product (e.g., each Xbox 360
       product, each PC/laptop, each smartphone, etc.) and not on component
17     software (e.g., Xbox 360 system software, Windows 7 software, Windows
       Phone 7 software, etc.)

18 (10/29/10 Offer Ltr. at 2.)  Motorola attached to its October 29 Letter a non-exhaustive

19 list of patents it offered to license to Microsoft.  (*See id.*)

20      Microsoft filed its complaint initiating this action on November 9, 2010 and its

21 amended complaint on February 23, 2011.  (Compl. (Dkt. # 1); Am. Compl. (Dkt. # 53).)

22 Microsoft contends that the October 21 and October 29 Letters seek unreasonable royalty

ORDER- 7

1   rates and therefore breach Motorola's obligations to the IEEE and the ITU to grant

2   licenses on RAND terms.  (Am. Compl. at 21 & 22 ¶¶ 80-87.)  Microsoft alleges claims

3   against Motorola for breach of contract and promissory estoppel.[4]  (*Id.*)  In its prayer for

4   relief, Microsoft seeks, *inter alia*, a declaration that it is entitled to a license on RAND

5   terms from Motorola for all patents subject to Motorola's commitments to the IEEE

6   (through Letters of Assurance) and to the ITU (through declarations).  (*Id.* at 25 ¶¶ G, H

7   (Prayer for Relief).)

8       In response, Motorola asserted affirmative defenses and counterclaims.  (*See*

9   Motorola Answer (Dkt. # 68).)  Motorola's counterclaims seek a declaratory judgment

10  that (1) it has not breached any RAND obligations, and (2) Microsoft repudiated and/or

11  rejected the benefits of Motorola's RAND obligations, and therefore Microsoft is not

12  entitled to a license to Motorola's patents related to the H.264 and 802.11 Standards.  (*Id.*

13  ¶¶ 61-75 (Counterclaims).)

14              **III.   DISCUSSION**

15      In its motion, Motorola argues that Microsoft repudiated its rights as a third-party

16  beneficiary to the contracts between Motorola and the IEEE and the ITU.  Microsoft

17  responds that it did not repudiate its contractual rights, and in its own motion, Microsoft

18  argues that Motorola breached its contractual duties to Microsoft through the October 21

19  and October 29 Letters.  To fully analyze Microsoft's Motion and Motorola's Motion, the

20

21  _____

22      [4] Microsoft's action against Motorola also included claims for waiver and declaratory
    judgment, but the court's June 1, 2011 order dismissed both of those claims, leaving only the
    breach of contract and promissory estoppel claims.  (Dkt. # 66 at 12.)

1    court must determine the rights and obligations under the contracts.  As a starting point,

2    the court examines the formation of the contracts between Motorola and the IEEE and the

3    ITU, and then determines whether Microsoft repudiated any of its rights as a third-party

4    beneficiary to those contracts and whether either of Motorola's letters breached its

5    contractual obligations.

6    **A.    Summary Judgment Standard**

7           Summary judgment is appropriate if the evidence, when viewed in the light most

8    favorable to the non-moving party, demonstrates "that there is no genuine dispute as to

9    any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ.

10   P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Galen v. Cnty. of L.A.*,

11   477 F.3d 652, 658 (9th Cir. 2007).  The moving party bears the initial burden of showing

12   there is no genuine issue of material fact and that he or she is entitled to prevail as a

13   matter of law.  *Celotex*, 477 U.S. at 323.  If the moving party meets his or her burden,

14   then the non-moving party "must make a showing sufficient to establish a genuine

15   dispute of material fact regarding the existence of the essential elements of his case that

16   he must prove at trial" in order to withstand summary judgment.  *Galen*, 477 F.3d at 658.

17   Here, cross-motions for summary judgment are at issue.  The court "evaluate[s] each

18   motion separately, giving the nonmoving party in each instance the benefit of all

19   reasonable inferences."  *ACLU of Nev. v. City of Las Vegas*, 466 F.3d 784, 790-91 (9th

20   Cir. 2006) (citations omitted); *see also Friends of Columbia Gorge, Inc. v. Schafer*, 624

21   F. Supp. 2d 1253, 1263 (D. Or. 2008).

22

1    **B.      Motorola's Contracts with the IEEE and the ITU**

2            In its February 27, 2012 order, this court held that (1) Motorola's declarations to

3    the IEEE and the ITU constituted "binding contractual commitments to license its

4    essential patents on RAND terms"; and (2) that Microsoft is a third-party beneficiary of

5    Motorola's commitments.  (Partial S.J. Order at 9-11.)  Nevertheless, for the first time at

6    the May 7, 2012 oral argument for Microsoft's and Motorola's Motions, Motorola argued

7    that its commitments to the IEEE and ITU were in fact unilateral offers to grant licenses

8    on RAND terms.[5]  Motorola's counsel argued:

9    _____

10          [5] Prior to the May 7, 2012 oral argument, Motorola had agreed that its commitments to
     the IEEE and ITU constituted binding contracts to license its essential patents on RAND terms
11   and that Microsoft was a third-party beneficiary.  For instance, the following discussion
     transpired during a February 13, 2012 status conference with the court:
12
          THE COURT:  Is the first part of that sentence also accurate, that you entered into
13        binding contractual commitments with IEEE and ITU, committing those to that
          RAND process?
14
          MR. JENNER (counsel for Motorola):  Well, yeah, that is really what the issue is,
15        your Honor, in terms of what the assurance is.  The assurance is that we would—
          that Motorola agreed to license those standard essential patents on RAND terms.
16
          THE COURT:  All I am asking is—I think you just agreed with me.  I am not
17        asking you if you did it or not, I am just asking you if that's what you are
          supposed to do.  I think the answer to that is yes.
18
          MR. JENNER:  Yes.  Enter into a license on RAND terms, that's right.
19
          THE COURT:  The second point that Microsoft asked the court to declare is, and
20        I will quote, "Microsoft is a third-party beneficiary of Motorola's commitment to
          the SSOs."  Once again, let's stay away from the precise terms that were offered
21        and asked as a conceptual matter.  I think there is also no disagreement on that.
          Mr. Jenner, am I correct on that?
22
          MR. JENNER:  Your Honor, that is correct, we would agree that Microsoft can
          fairly claim to be the third-party beneficiary of the assurance.

> We believe at this point that the Letters of Assurance are unilateral offers made by Motorola that it will grant licenses on reasonable terms, and that offerees, like Microsoft, if they satisfy the conditions to apply for a license in some form and negotiate, are entitled to the license.
>
> So the offer is—there's never a signed piece of paper constituting the contract. The offer is unilaterally made by Motorola. It's like, I'll give a reward of $500 to somebody who brings my cat. Show up with the cat, then you've accepted and you get the reward. You didn't have to sign a piece of paper. If you apply for a license and negotiate with me, then you have formed a contract under the Letter of Assurance.

(5/9/12 Transcript (Dkt. # 315) at 21.)  The court disagrees with Motorola's analysis of contract formation and reaffirms its holding from its February 27, 2012 order.

Forming a contract requires an offer, its acceptance, and consideration. *Veith v. Xterra Wetsuits, LLC*, 183 P.3d 334, 337 (Wash. 2008) (citation omitted).  An offer consists of a promise to render a stated performance in exchange for a return promise being given. *Pacific Cascade Corp. v. Nimmer*, 608 P.2d 266, 268 (Wash. Ct. App. 1980) (citing Restatement of Contracts § 24 (1932)).  Acceptance is an expression (communicated by word, sign, or writing to the person making the offer) of the intention to be bound by the offer's terms. *Veith*, 183 P.3d at 337.  Consideration is "any act, forbearance, creation, modification or destruction of a legal relationship, or return promise given in exchange." *King v. Riveland*, 886 P.2d 160, 164 (Wash. 1994).  Put another way, consideration is a bargained-for exchange of promises. *Williams Fruit Co. v. Hanover Ins. Co.*, 474 P.2d 577, 581 (Wash. 1970).

(2/13/2012 Transcript (Dkt. # 242) at 4-5.)

1    Here, a contract is formed through Motorola's (or any essential patent holder's)

2    commitment to the IEEE or the ITU to license patents on RAND terms.  When the IEEE

3    or the ITU learns that one of its standards or recommendations (as referred to by the ITU)

4    may cover a private patent, both standard setting organizations ask the patent holder to

5    state its intentions with respect its standard essential patents.  Specifically, in the case of

6    the IEEE, it requires a Letter of Assurance from the patent holder asking the patent holder

7    to state (1) that it agrees not enforce its essential patents, or (2) that it will license its

8    patents on RAND terms to all applicants.  (IEEE Policy at 18.)  Similarly, the ITU asks

9    the patent holder to indicate on a form whether it (1) will grant a license free of charge;

10   (2) will grant a license on RAND terms; or (3) is unwilling to grant licenses on either of

11   the two prior options.  (ITU Policy at 9-12.)

12      The court concludes that these requests by the IEEE and the ITU constitute offers

13   to the patent holder to indicate their intentions with regard to essential patents so that the

14   IEEE and the ITU may choose whether to incorporate the patented technology into a

15   standard.  Indeed, if the IEEE cannot obtain such a Letter of Assurance from the patent

16   holder, it will refer the situation to the IEEE Patent Committee.  Historically, the IEEE

17   has not included technology into a standard unless it could obtain a Letter of Assurance.

18   Likewise, the ITU will not incorporate patented technology into a standard unless it can

19   obtain a declaration from the patent holder agreeing to either license free of charge or on

20   RAND terms.

21      The court also concludes that Motorola's Letters of Assurance to the IEEE and

22   declarations to the ITU constitute acceptances for purposes of contract formation.

ORDER- 12

1  Motorola has indicated repeatedly and on numerous occasions to both standard setting

2  organizations that it will grant licenses to all applicants on RAND terms.  By checking

3  the box on both the IEEE and ITU forms that it is willing to grant licenses on RAND

4  terms, Motorola unequivocally indicated its intention to be bound by the respective

5  standard setting organization's terms.

6        Finally, regarding consideration, each standard setting organization promised to

7  include, or at least consider including, the patent holder's technology in its standard in

8  exchange for Motorola's promise to license its essential patents on RAND terms.  Thus,

9  the requisite consideration exists for contract formation.  Accordingly, the court reaffirms

10  its prior decision that Motorola's statements to the IEEE and ITU constituted a binding

11  agreement to license its essential patents on RAND terms.[6]

12        Additionally, the court reaffirms its prior decision that Microsoft, as a potential

13  user of the 802.11 Standard and the H.264 Standard, is a third-party beneficiary to the

14  agreements between Motorola and the IEEE and Motorola and the ITU.  A third party

15  beneficiary is one who, though not a party to a contract, will nevertheless receive direct

16  benefits therefrom.  *Wolfe v. Morgan*, 524 P.2d 927, 930 (Wash. Ct. App. 1974);

17  *McDonald Constr. Co. v. Murray*, 485 P.2d 626, 27-28 (Wash. Ct. App. 1971).  The right

18  of a third party beneficiary to sue upon a contract depends, as a rule, upon whether the

19

20       [6] The parties agree that the operative contract language includes the language of

21  Motorola's statements to the IEEE and the ITU, as well as the relevant language in the IEEE and
ITU Policies.  (Motorola Mot. at 18-19; 5/7/12 Transcript (Dkt. # 315) at 53 ("By the way, in

22  answer to the court's question about the bylaws, we concur with Mr. Jenner's characterization of
the situation regarding the bylaws.").)

1   contract is for his or her direct benefit or whether his or her benefit under it is merely

2   incidental, indirect or consequential. *Lonsdale v. Chesterfield*, 573 P.2d 822, 825 (Wash.

3   Ct. App. 1978). A third party for whose direct benefit a contract was entered into may

4   sue for breach thereof. *Id.* (citing 17 Am. Jur. 2d Contracts § 305 (1964)).

5        Motorola's commitments to the IEEE and the ITU are for the direct benefit

6   Motorola's potential licensees, including Microsoft. Motorola has committed to the

7   IEEE and the ITU to license its essential patents on RAND terms to an unrestricted

8   number of applicants. These commitments are clearly designed to benefit potential

9   licensees of Motorola's standard essential patent by ensuring that such patents are readily

10  accessible to everybody at reasonable rates. (*See, e.g.*, ITU Policy at 9 (stating that the

11  objective of the policy "is to ensure compatibility of technologies and systems on a

12  worldwide basis. To meet this objective, which is in the common interest of all those

13  participating, it must be insured that [the standardized technologies] . . . are accessible to

14  everybody"). Accordingly, Microsoft is a third-party beneficiary to Motorola's

15  agreements with the IEEE and the ITU to license its standard essential patents on RAND

16  terms, and therefore, Microsoft may sue for breach of that agreement.

17  **C.    The Parties' Cross Claims**

18       Motorola contends that Microsoft's rights as a third-party beneficiary are

19  conditioned on Microsoft first applying for a license to Motorola's standard essential

20  patents and second negotiating for a RAND license to those patents. (Motorola Mot. at

21  19-23.) According to Motorola, because Microsoft failed to perform either of these

22  conditions, it has repudiated its rights to a RAND license for Motorola's standard

1  essential patents.  (*Id.* at 23-27.)  In its motion, Microsoft asserts that Motorola's October

2  21 and October 29 Letters offering to license its 802.11 Standard essential patents and its

3  H.264 Standard essential patents, respectively, sought such an unreasonable royalty rate

4  they breached Motorola's obligation to offer its licenses on RAND terms.

5       To resolve the parties' cross-motions, the court must first determine the parties'

6  rights and obligations under Motorola's contracts with the IEEE and the ITU.  "The

7  cardinal rule with which all interpretation begins is that its purpose is to ascertain the

8  intention of the parties."  *Berg v. Hudesman*, 801 P.2d 222, 226 (Wash. 1990).

9  Washington courts generally give words in a contract their ordinary, usual, and popular

10  meaning unless the entirety of the agreement clearly demonstrates a contrary intent.

11  *Hearst Commc'ns, Inc. v. Seattle Times Co.*, 115 P.3d 262, 267 (Wash. 2005).  Under

12  Washington law, contracts are interpreted in accordance with the context rule.  *Wash.*

13  *State Republican Party v. Wash. State Grange*, 676 F.3d 784, 796 (9th Cir. 2012)

14  (citation omitted).

15      Under the context rule, extrinsic evidence is admissible to assist the court in
        ascertaining the parties['] intent and in interpreting the contract.  The court

16      may consider (1) the subject matter and objective of the contract, (2) the
        circumstances surrounding the making of the contract, (3) the subsequent

17      conduct of the parties to the contract, (4) the reasonableness of the parties'
        respective interpretations, (5) statements made by the parties in preliminary

18      negotiations, (6) usages of trade, and (7) the course of dealing between the
        parties.  Such evidence is admissible regardless of whether the contract

19      language is deemed ambiguous.  Extrinsic evidence cannot be considered:
        (a) to show a party's unilateral or subjective intent as to the meaning of a

20      contract word or term; (b) to show an intention independent of the
        instrument; or (c) to vary, contradict, or modify the written word.

21

22

1   *Spectrum Glass Co. v. Pub. Util. Dist. No. 1*, 119 P.3d 854, 858 (Wash. Ct. App. 2005)

2   (citations omitted).  With that legal framework in mind, the court turns to the parties'

3   respective motions.

   **1.      Motorola's Repudiation Motion**

5          Motorola argues that despite its RAND commitments to the IEEE and the ITU, it

6   does not have any obligations towards Microsoft because Microsoft (1) has failed to

7   satisfy conditions precedent and (2) by failing to satisfy those conditions has repudiated

8   any rights to a RAND license.  (Motorola Mot. at 23, 25.)  Specifically, Motorola

9   contends that its RAND obligations to Microsoft are conditioned on Microsoft applying

10  for a license to its standard essential patents and negotiating that license in good faith.

11  (*Id.* at 19-23.)

12         "Conditions precedent" are "those facts and events, occurring subsequently to the

13  making of a valid contract, that must exist or occur before there is a right to immediate

14  performance, before there is a breach of contract duty, before the usual judicial remedies

15  are available."  *Ross v. Harding*, 391 P.2d 526, 530 (Wash. 1964).  By contrast, a breach

16  of a contractual obligation subjects the promisor to liability for damages, but it does not

17  necessarily discharge the other party's duty of performance.  *Id.*  But the nonoccurrence

18  of a condition precedent prevents the promisor from acquiring a right or deprives it of

19  one, but it does not subject the promisor to liability.  *Id.*

20         Whether a contract provision is a condition precedent or a contractual obligation

21  depends on the intent of the parties, and courts determine this intent from a fair and

22  reasonable construction of the language used, taking into account all the surrounding

ORDER- 16

circumstances.  *See Koller v. Flerchinger*, 441 P.2d 126, 128 (Wash. 1968).  Importantly, where it is doubtful whether words create a promise (i.e., contractual obligation) or an express condition, courts shall interpret them as creating a promise.  *Ross*, 391 P.2d at 531.  Words such as "provided that," "on condition," "when," "so that," "while," "as soon as," and "after" suggest a conditional intent, not a promise.  *Jones Assoc. v. Eastside Prop.*, 704 P.2d 681, 685 (Wash. App. Ct. 1985) (citing *Vogt v. Hovander*, 616 P.2d 660, 666 (Wash. App. Ct. 1979)).

After examining Motorola's commitments to both the IEEE and the ITU, as well as the extrinsic evidence presented by the parties to this litigation, the court determines that it was not the intent of the contracting parties (Motorola and the IEEE/ITU) to require that implementer of a standard first apply for a license and then negotiate for a license in good faith before Motorola's RAND obligations are triggered.  As an initial matter, no words that would indicate the parties' conditional intent—such as those articulated by the court in *Jones*, 704 P.2d 685—are found in Motorola's Letters of Assurance to the IEEE and declarations to the ITU.  Without any such words, the court is disinclined to find that either applying for a license or negotiating in good faith are conditions precedent.

Furthermore, Motorola's commitments to grant licenses to implementers on RAND terms cannot turn on whether or not the implementer first applies for a license.  If that were the case, Motorola could demand exorbitant licensing fees from implementers of the standards who had not yet applied for a license.  Such a result is contrary to the purpose of Motorola's commitments to the IEEE and ITU, which is to ensure that

1    standard essential patents are available to all implementers on RAND terms.  (*See, e.g.*,

2    ITU Policy at 9 ("It follows, therefore, that a patent embodied fully or partly in a

3    Recommendation | Deliverable must be accessible to everybody without undue

4    constraints.  To meet this requirement in general is the sole objective of the code of

5    practice.").)  Indeed, Motorola's own standard essential expert testified in a related matter

6    that a patent owner's RAND obligations are not conditioned on whether the patentee or

7    the implementer makes the first contact.  (Microsoft Resp. at 9-10; Holleman Tr. (Dkt. #

8    270-4) at 1-4 ("Q:  Okay.  And it would be fair to say that you don't think a patent

9    owner's RAND obligations turn on the question of whether the patent owner or the

10   prospective licensee makes the first contact?  A:  No, I do not.").  Thus, Motorola

11   committed to the IEEE and ITU to grant RAND licenses to an unrestricted number of

12   applicants, and Motorola cannot avoid this commitment simply by contacting the

13   implementer before the implementer applies for a license.

14        Likewise, a finding that negotiating in good faith is condition precedent to

15   Motorola's RAND obligations to the implementer would run contrary to the purpose of

16   Motorola's commitments to the IEEE and the ITU.  Although Motorola correctly asserts

17   that the IEEE and ITU Policies contemplate that RAND licenses will be negotiated

18   between the patent holder and the implementer of the standard, it does not follow that

19   negotiating in good faith is a condition precedent to Motorola's promise to grant licenses

20   on RAND terms.  (*See* Motorola Mot. at 20-21; ITU Declarations at 2 ("Negotiations of

21   licenses are left to the parties concerned and are performed outside the ITU-T |

22   ISO/IEC.").)  Again, under Motorola's interpretation of its commitments to the IEEE and

ITU, Motorola could preemptively request exorbitant compensation for its standard essential technology, and the implementer would be compelled to negotiate in good faith in response to the exorbitant demand.  This cannot be the result envisioned by the IEEE and the ITU with respect to Motorola's commitments to them to grant licenses on RAND terms.  *See Eurick v. Pemco Ins. Co.*, 738 P.2d 251, 252 (Wash. 1987) (contract interpretation should not produce an absurd result).  In sum, the court concludes that Motorola's contracts with the IEEE and the ITU do not condition Motorola's RAND obligations on the implementer first applying for a license and then negotiating in good faith.

Motorola's also contends that Microsoft repudiated its rights to a RAND license by bringing this lawsuit.  (Motorola Mot. at 25-28.)  As a consequence of Microsoft's alleged repudiation, Motorola insists that it may enforce its essential patents through all available remedies.  (*Id.* at 25.)  Specifically, Motorola states:

> Any reasonable interpretation of Motorola's RAND obligations must allow for enforcement of its essential patent rights in circumstances where, as here, an implementer of a standard fails (for years) to apply for a license, claims that it does not need a license, is unwilling to engage in good faith license negotiations, and instead sues the patentee.

(*Id.*)

Here, as explained above, the court has determined that neither applying for a license nor negotiating good faith for a license are conditions precedent to Motorola's obligations to grant licenses on RAND terms.  Additionally, Microsoft has stated to this court that not only does it believe that it needs a license, it is ready and willing to accept a license on RAND terms.  (*See, e.g.*, Microsoft Reply to Mot. Dismissing Inj. Relief (Dkt.

1  # 152) at 9 ("The indisputable evidence is that Microsoft is seeking a license on RAND

2  terms—in this very action.").).)[7]  Thus, the entire basis for Motorola's assertion that

3  Microsoft has repudiated its rights to a RAND license is unwarranted.

4        Moreover, although Motorola cites no legal standard for repudiation, repudiation

5  is closely related with the doctrine of anticipatory breach.  An anticipatory breach occurs

6  when one of the parties to a bilateral contract either expressly or impliedly repudiates the

7  contract prior to the time for performance.  *Lovric v. Dunatov*, 567 P.2d 678, 683 (Wash.

8  App. Ct. 1977).  A party's intent not to perform his or her contractual obligations,

9  however, may not be implied from "doubtful and indefinite statements that the

10  performance may or may not take place," or from "a negative attitude" alone.  *Id.*;

11  *Palmiero v. Spada Distrib. Co.*, 217 F.2d 561, 565 (9th Cir. 1954).  The law requires a

12  positive statement or action by the promisor indicating distinctly and unequivocally that

13  he or she either will not or cannot substantially perform any of his contractual

14  obligations.  *Lovric*, 567 P.2d at 683.

15        Here, Motorola points to no positive statement or action by Microsoft indicating

16  that Microsoft will not perform its end of the bargain.  Indeed, as stated above, Microsoft

17  has affirmatively represented that it will take a RAND license from Motorola for the

18  standard essential patents.  Moreover, the court will not find that Microsoft has

19  repudiated its rights to a RAND license by simply seeking court relief in attempting to

20  _____

21        [7] The court takes Microsoft's assertion at its word and will hold Microsoft to that
statement throughout the course of this litigation.  Indeed, at the November 19, 2012 trial on the
RAND contract issues, the finder-of-fact will determine a RAND royalty rate for Motorola's
22  relevant standard essential patent portfolios.

1   enforce the terms of Motorola's commitments to the IEEE and ITU.  Motorola has

2   committed to license its standard essential patents on RAND terms, and, if a third-party

3   beneficiary to that commitment does not believe Motorola is meeting its obligations

4   thereto, the courthouse may be the only place to resolve the differences.  In sum,

5   Microsoft has not repudiated its rights as a third-party beneficiary to Motorola's

6   agreements with the IEEE and the ITU to grant licenses to its standard essential patents

7   on RAND terms.  Accordingly, the court denies Motorola's motion for partial summary

8   judgment (Dkt. # 236).

9        **2.      Microsoft's Breach of Contract Motion**

10        Having determined that Microsoft continues to have a right to a RAND license,

11  the court now examines whether Motorola's October 21 and 29 Letters offering to license

12  its standard essential patents to Microsoft breached its RAND obligations.  Microsoft

13  contends that by sending its October 21 and 29 Letters, Motorola breached its

14  commitments to the IEEE and the ITU because the requested royalty rate (1) resulted in

15  "blatantly unreasonable" cash payments, and (2) applied to a "blatantly unreasonable"

16  base—the sale price of Xboxes and computers running Windows.  (Microsoft Mot. at 18-

17  22.)

18        With respect to the cash payment, Microsoft asserts that Motorola's requested

19  royalty rate (2.25% for each of Motorola's 802.11 and H.264 portfolio of standard

20  essential patents) as applied to the sale price of end products (Xbox in the case of 802.11

21  Standard essential patents, and personal computers running Microsoft Windows in the

22  case of H.264 Standard essential patents) would result in approximately $4 billion per

year in licensing fees.  (Microsoft Mot. at 18-19.)  According to Microsoft, when compared to Microsoft's profits and Motorola's royalty revenue from other licensees, a payment of $4 billion per year in licensing fees is "blatantly unreasonable."  (*Id.*)

Regarding the base for the royalty, Microsoft asserts that it is "blatantly unreasonable" for the royalty rate to apply to the sale price of Xboxes and computers running Windows.  (*Id.* at 20-21.)  According to Microsoft, the 802.11 and H.264 Standards are but one small part of Microsoft's end products, and Motorola's standard essential patents are but one small part of the 802.11 and H.264 Standards.  (*Id.* at 8-9.)  Thus, Microsoft believes that the "relevant royalty base for assessing a 'reasonable' royalty is not the selling price of a laptop computer or an Xbox 360 game console, but rather is—at most—the value of the specific component or feature that incorporates the patented invention."  (*Id.* at 8.)

Motorola responds that its commitments to the IEEE and the ITU do not require Motorola to make unsolicited offers on RAND terms, but instead only requires Motorola to grant licenses, after a negotiation, on RAND terms.  (Motorola Resp. at 14-16.)  Thus, according to Motorola, because its October 21 and 29 Letters were merely offers to license its standard essential patents, those letters could not have breached its commitments to the IEEE and ITU.  (*Id.*)  Moreover, Motorola contends that even if it were required to offer on RAND terms, its October 21 and 29 Letters were in fact reasonable.  (*Id.* at 16-20.)  In support of this contention, Motorola asserts that its offered royalty rate of 2.25% of the end product is both its standard offer given to other implementers of its 802.11 and H.264 patents and similar to the rates of fully-negotiated

1  licenses that include one or more of Motorola's 802.11 and H.264 patents.  (*Id.* at 16-17.)

2  Motorola has provided the court with a spreadsheet of more than 50 completed licenses

3  that include one or more of the patents in Motorola's 802.11 and H.264 portfolios.  (*Id.* at

4  17.)

5           In short, the central dispute between the parties is whether Motorola's

6  commitments to the IEEE and the ITU require it to offer its standard essential patents on

7  RAND terms.  Microsoft asserts that Motorola's Letters of Assurance and declarations

8  require RAND offers.  (Microsoft Mot. at 12-17.)  Motorola disagrees and argues that

9  because RAND terms are both complex and specific to the parties involved, the patent

10 holder (Motorola, in this case) does not, at the time it makes an initial offer, have

11 sufficient information to be expected to offer on RAND terms.  (Motorola Resp. at 9.)

12 Thus, according to Motorola, it is incumbent on the parties to negotiate towards a RAND

13 license.  (*Id.* at 9-13.)

14          Motorola's Letters of Assurance to the IEEE and declarations to the ITU state that

15 it "will grant" or "is prepared to grant" licenses on RAND terms to all applicants.  The

16 language of Motorola's agreements focuses on the resulting RAND license between the

17 patent holder and the implementer, not on the opening offer.  The words of the agreement

18 must be given their ordinary meaning.  *Hearst Commc'ns*, 115 P.3d at 267.

19 Additionally, Motorola's declarations to the ITU state that "[n]egotiations are left to the

20 parties concerned and are performed outside [the ITU]."  (ITU Policy at 12.)  Similarly,

21 the IEEE Policy recites that the IEEE is not responsible "for determining whether any

22 licensing terms or conditions provided in connection with submission of a Letter of

ORDER- 23

1    Assurance, if any, or in any licensing agreements are reasonable and non-discriminatory."

2    (IEEE Policy at 19.)  Thus, the language of Motorola's agreements with the IEEE and the

3    ITU envisions a negotiation between the parties towards a resulting RAND license.  This

4    give-and-take understanding of the RAND licensing process is buttressed by testimony of

5    Michele Herman, Microsoft's former Associate General Counsel and Senior Director of

6    Intellectual Property, who stated that the negotiation process was critical to the process of

7    determining a RAND license.  (Post Decl. Ex. 21 (Dkt. # 230-5) at 23-25 (Herman Tr.);

8    Post Decl. Ex. 22 (Dkt. # 230-5) at 28 (Herman Article).)

9           Because the IEEE and the ITU agreements anticipate that the parties will negotiate

10   towards a RAND license, it logically does not follow that initial offers must be on RAND

11   terms.  Here, critical to the court is the observation that RAND terms cannot be

12   determined until after a negotiation by the parties (or, in this case, after a court

13   determines RAND terms because the parties cannot agree).  Indeed, Microsoft's expert in

14   a related matter stated that "RAND does not dictate specific licensing terms, but provides

15   flexibility with respect to specific deals."  (Berneman Rpt. (Dkt. # 275-1) at 4.)  As stated

16   above, the purpose behind the IEEE and the ITU agreements is to ensure widespread

17   access to standard essential patents.  Thus, a requirement that the standard essential

18   patent holder (here, Motorola) make unsolicited offers on RAND terms would frustrate

19   this purpose by discouraging the standard essential patent holder to make initial contact

20   with implementers for fear that it will later be sued for making an initial offer that is later

21   determined as not RAND.  Accordingly, the court concludes that under Motorola's

22

1    agreements with the IEEE and the ITU, Motorola need not make initial offers on RAND

2    terms.

3            This conclusion, however, does not mean that Motorola, as the owner of standard

4    essential patents subject to RAND licensing agreements with the IEEE and ITU, may

5    make blatantly unreasonable offers to implementers.  Such behavior would frustrate the

6    purpose behind the agreements by allowing the standard essential patent owner to abuse

7    its power as a standard essential patent holder and extract higher than reasonable royalty

8    rates (or, at a minimum, royalty rates consistently on the high range of RAND terms).

9    Thus, although the language of Motorola's agreements do not require it to make offers on

10   RAND terms, any offer by Motorola (be it an initial offer or an offer during a back-and-

11   forth negotiation) must comport with the implied duty of good faith and fair dealing

12   inherent in every contract.[8]  *Badgett v. Sec. State Bank*, 807 P.2d 356, 360 (Wash. 1991).

13           In its motion, Microsoft asserts that Motorola's October 21 and 29 Letters offering

14   licenses to Motorola's standard essential patents did so on blatantly unreasonable terms.

15   The conundrum for the court is that before it can determine whether Motorola breached

16   its duty to make good faith offers by its October 21 and 29 Letters, the court must first

17   determine the RAND terms of an agreement between Motorola and Microsoft for

18   Motorola's relevant portfolios of standard essential patents.  In other words, to determine

19   whether Motorola's offers were so blatantly unreasonable as to breach its duty of good

20   faith, it is necessary in this instance to compare the offer against a true RAND royalty

21   ───────────────

22   [8] Indeed, Motorola agrees that any offer on its part to license its standard essential patents
     must comport with its duty of good faith and fair dealing.  (Motorola Reply at 14.)

1  rate.  Thus, it would be improper based on the facts and argument presented to the court

2  in Microsoft's motion for summary judgment for the court to determine that as a matter

3  of law Motorola's offers were so unreasonable as to breach its duty of good faith and fair

4  dealing.  Such a finding is heavily fact intensive and is appropriately placed in the hands

5  of a finder-of-fact that knows what in fact constitutes a RAND agreement between the

6  parties.

7         Microsoft attempts to avoid this conclusion by suggesting that Motorola's offers

8  were *prima facie* blatantly unreasonable such that no reasonable person could find that

9  the offers were RAND.  (*See generally* Microsoft Mot.)  Although the court can envision

10  a situation where an offer is so exorbitant and unjustified that it breaches the patentee's

11  duty to offer in good faith without needing to weigh it against a true RAND agreement,

12  this is not that situation.  Here, Motorola has presented the court with numerous licensing

13  agreements suggesting that it has received comparable royalty rates to those offered to

14  Microsoft from other licensees for some, if not most, of its patents essential to the 802.11

15  Standard and the H.264 Standard.  (Motorola Resp. at 17-20.)  Although Microsoft

16  asserts that these license agreements are not relevant (and not admissible evidence) with

17  respect to any RAND obligations Motorola has with respect to Microsoft, the court

18  concludes that a determination of the relevance of Motorola's prior license agreements is

19  inherently fact intensive, more appropriate as a motion in limine, and cannot be decided

20  at this time.  To make such a determination, the court must engage in a factual

21  comparison between the circumstances of each prior agreement and the circumstances

22  that exist between the parties to this litigation with the benefit of complete briefing as to

1  the law of relevance and admissibility in the context of applicability of prior licenses for

2  patent damages.

3         Additionally, at the summary judgment stage, the court finds unpersuasive

4  Microsoft's assertion that Motorola's 802.11 and H.264 Standard essential patent

5  portfolios cover only a minimal part of the technology involved in the 802.11 and H.264

6  Standards.  Microsoft has provided the court no evidence to support this assertion (*see*

7  *generally* Microsoft Mot.), and thus, has not met its burden of demonstrating that no

8  genuine issue material fact exists with respect to the importance of Motorola's standard

9  essential patents.

10        Finally, Microsoft has made no showing that Motorola's October 21 and 29

11  Letters were sent in bad faith.  Good faith has been defined as "honesty in fact in the

12  conduct or transaction concerned."  *Heinrich v. Titus-Will Sales, Inc.*, 868 P.2d 169, 174

13  (Wash. App. Ct. 1994).  While the court will not at this time set forth a legal standard

14  with respect to Motorola's duty to offer its patents in good faith, it is likely that any

15  analysis of Motorola's duty will involve, at least in part, an examination of the intent

16  behind Motorola's offers.  Microsoft has only offered testimony tending to show that

17  Motorola understood the financial impact of its offers.  (Wion Decl. Ex. 12 (Dkt. # 238-

18  12) at 27-28 (Dailey Tr.).)  This showing, on its own, however, does not establish that

19  Motorola was acting dishonestly.  Motorola very well could have intended the offers in

20  its October 21 and 29 Letters as initial contacts with a potential licensee of its patents.

21  Indeed, Motorola offered on its standard terms.

22

1     Based on the foregoing, Microsoft has failed to carry its burden of demonstrating

2   to the court that no issues of material fact exist with respect to its breach of contract

3   claim.  The court, therefore, denies Microsoft's motion for summary judgment for breach

4   of contract (Dkt. # 236).

5                                    **IV.     CONCLUSION**

6     Based on the foregoing, the court DENIES Microsoft's motion for summary

7   judgment for breach of contract (Dkt. ## 236 (sealed motion) & 237 (redacted motion))

8   without prejudice.  The court also DENIES Motorola's motion for partial summary

9   judgment regarding repudiation (Dkt. # 228 (redacted motion) & 231 (sealed motion))

10  with prejudice.

11    Dated this 6th day of June, 2012.

12

13  _____
    The Honorable James L. Robart
14  U.S.  District Court Judge

15

16

17

18

19

20

21

22