```
                  UNITED STATES DISTRICT COURT
            WESTERN DISTRICT OF WASHINGTON AT SEATTLE
_____

MICROSOFT CORPORATION,            )
                                  )
                Plaintiff,        ) CASE NO. C10-1823JLR
                                  )
v.                                ) SEATTLE, WASHINGTON
                                  ) May 30, 2012
MOTOROLA, INC., et al.,           )
                                  ) TUTORIAL PRESENTATION
                Defendant.        )
                                  )
_____

              VERBATIM REPORT OF PROCEEDINGS
         BEFORE THE HONORABLE JAMES L. ROBART
              UNITED STATES DISTRICT JUDGE
_____
```

APPEARANCES:

  For the Plaintiff:    ARTHUR HARRIGAN
                              RICHARD CEDEROTH
                              DAVID GREENFIELD
                              CHRISTOPER WILSON

  For the Defendant:    RALPH PALUMBO
                              PHILIP McCUNE
                              STEVEN PEPE
                              ROB PLUTA

  Reported by:           NANCY L. BAUER, CCR, RPR
                              Federal Court Reporter
                              700 Stewart Street, Suite 17205
                              Seattle, WA 98101
                              (206) 370-8506
                              nancy_bauer@wawd.uscourts.gov

May 30, 2012                                      10:00 a.m.

PROCEEDINGS
_____

THE CLERK:  Case C10-1823, Microsoft v. Motorola.

Counsel, please make your appearances for the record.

MR. HARRIGAN:  Good morning, Your Honor.  Art

Harrigan representing Microsoft.  Mr. Cederoth, next to me

here, will be speaking this morning, and we have David

Greenfield and Chris Wilson, and in the first row back there,

David Cillough and Andy Culbert from Microsoft.

MR. PALUMBO:  Good morning, Your Honor.  Ralph

Palumbo representing Motorola, and we have David McKune from

Ropes and Gray, Rob Pluta from Motorola, Philip McCune from

Summit, and Steve Pepe, and Mr. Pepe will be speaking this

morning.

THE COURT:  Thank you.

Counsel, we are here for your tutorial.  In preparation

for this, I can tell you that I have had the opportunity to

read both patents.  In addition to that, I found very helpful

Exhibit A and Exhibit K out of someone's briefing, which is

the asserted claim language broken out by the terms.  I

appreciate you doing that for me.

I'm not sure who is going first.  Mr. Cederoth?

MR. CEDEROTH:  May I proceed, Your Honor?

THE COURT:  You may.

MR. CEDEROTH:  Your Honor, we could do these in

1    whatever order is most convenient for the court.  At the top
2    of my file is the '780 patent.
3              THE COURT:  That's fine.
4              MR. CEDEROTH:  Your Honor, we've set this up the same
5    way we have with the prior patent, so basically there's a
6    little bit of introduction in terms of background in the
7    prior art, and then a brief overview of the invention, trying
8    to avoid getting into the arguments that are coming next week
9    in the context of the specific claim construction disputes.
10        So the '780 patent is entitled, "Loading status and the
11   hypermedia browser having a limited available display area."
12   This patent was filed roughly 15 years ago, back in the heart
13   of -- at the time of what were the browser wars.
14        At that time -- we've shown as a web page here, on
15   Slide 4, this is what you saw.  These were traditional web
16   browsers.  This was Internet Explorer 3, Version 3, which was
17   introduced in the fall of 1996 and competed directly against
18   what was NetScape 3 at the time.
19        It worked in much the same way browsers work today in the
20   sense of retrieving web pages in various markup languages,
21   primarily HTML or hypertext markup, and displaying the
22   contents, whatever the -- whatever the web page code directed
23   the browser to display.
24        Again -- and we've tied these to some of the quotes from
25   the patent just to bring a little bit more context in terms

1   of what the patent is describing in the text and what you

2   would have seen if you were browsing using Internet Explorer

3   3 or similar browsers at the time.

4       The thing to bear in mind timeframe wise, in 1996, 1997,

5   you don't have, you know, the little computer in your pocket

6   that we carry today in terms of the smartphone.  Handheld

7   devices at the time were just then sort of coming into their

8   own in terms of being a real computer, and they certainly

9   weren't, you know, the convergent-type device that we have

10  today, and most of -- in fact, I don't want to say all, but

11  primarily people browsed the web at home using a traditional

12  desktop PC.  The browsers at the time had a very familiar

13  layout.  They all offered a menu, in addition to other

14  control elements, typically with a ribbon across the front.

15  At some point there were efforts to customize that and allow

16  you to move the ribbon to the side or the bottom or whatever,

17  or shrink the ribbon altogether, but generally this is what

18  browsers looked like.

19      In addition to the fundamental control elements in terms

20  of the menu, they also included the status displays.  Because

21  if you think back to that time in particular, the connections

22  that most people had to the Internet were not particularly

23  fast, and so web pages would load at varying speeds, highly

24  dependent upon the quality of your connection and the

25  complexity of the content in the web page, whether it was

1   images or just text.  And also there was a lot of art in

2   terms of constructing the web page so it would load quickly.

3       As noted in the patent, this is something which I can

4   still recall, I suspect everyone can:  User frustration.  The

5   page would load, and honestly you wouldn't know whether the

6   page was done loading.  Particularly, you know, at that time,

7   you go to a new page -- and to some extent it really was kind

8   of the age of discovery for a lot of people with respect to

9   the web, and the age of discovery for web developers in terms

10  of the content they were putting up on their website.

11      So you'd go to a new page, and -- you know, at one time

12  you really didn't know whether it all loaded.  So the -- all

13  the browsers went pretty quickly to use of the status

14  displays or status indicators.

15      Here, the Internet Explorer actually had two.  One was the

16  stylistic "e" in the upper right-hand corner.  The other was

17  the bar across the bottom, which could be used to show

18  loading in sort of a bar graph form, going from far left to

19  far right as the content is fully loaded.

20      On Slide 11, we actually have an animation and we have a

21  CD that we provided to the court and counsel, which capture

22  this animation.

23      What this is was a screen capture run over the top of an

24  Internet Explorer from that vintage on a Windows 95 computer

25  loading a web page which was archived also from that

1    timeframe.  And let's -- we'll run back to the beginning.

2        So if you'd navigate to this web page, which was the

3    University of Illinois National Center of Supercomputing

4    Applications, the address is in the address bar, we load to a

5    new page, and we wait.  The logo, the stylized "e" begins to

6    animate as it begins to enter, and while the web browser is

7    loading the content that it's retrieving from the website,

8    from the web server, and it continues to, in this case,

9    animate -- in other words, this spinning globe -- as the

10   content is continued to be -- I don't want to say necessarily

11   "downloaded," but loaded from the website.

12       The way browsers work is they retrieve the page.  They

13   load it into their own memory construct from which they then

14   display it.

15       This vintage of web browser in the 1995, '96, '97

16   timeframe, added a feature that the '780 patent assumes to be

17   in the prior art, and it certainly was.  And that's where

18   the -- the pages would load as best they could on the fly --

19   or they -- sorry -- they would display as best they could on

20   the fly.  As they got sufficient content, they would put it

21   up.

22       If you think back to that timeframe, there's often -- and

23   the animation actually shows it -- where a higher density or

24   larger content such as an image was going to be displayed,

25   often the browser would first display a textual indicator,

1    because that was easy to put up fast.  And what that did to

2    the user is it provided this digital affirmation that the

3    browser was working, that their web page hadn't stalled or

4    they hadn't lost their connection, and then adds enough of

5    that content for the image.  Here we've got a couple of

6    paragraphs from folks from the NCSA, and as they were loaded

7    and able to be displayed, they would be displayed.  So the

8    page would build sort of sequentially.

9        And while this was going on in the background, while the

10   content was being loaded, the display icons would animate or

11   otherwise indicate to the user that the content was still

12   being loaded.

13       So that is the status display that sort of brings us to

14   where the patent dives in.

15       The patent starts with the idea that this is the time

16   where smaller, handheld devices are beginning to be adopted,

17   and this Windows CE was sort of the first, really,

18   computer-like operating system for small handheld devices.

19   Again, sort of thinking back to that time, you know, sort of

20   specialty devices like the Palm, but they really weren't

21   computer-like in the way that your desktop was or like your

22   laptop might be, or certainly like today's convergent devices

23   are.

24       Flashing back to what the browser looked like on your

25   desktop, you had the address bar, you've got the display, the

1   status display.  Then in the smaller devices, and, actually,

2   the device that the patent uses in its illustrations, I

3   think, was actually a device that HP brought out in that

4   timeframe specifically for Windows CE devices.  And you can

5   see that there's no permanent address bar, there's no status

6   display icon.  And the reason for that is the -- is the

7   smaller screens' geography.  There's simply less space to be

8   used for, other than content that the user is looking to

9   display and access.

10      So the problem posed by the patent is both, well, where do

11  you put the display -- the status display icon, because the

12  handheld devices had the same issues in terms of access to

13  the Internet, in terms of their own connections and how

14  quickly they could download any particular web page.  If

15  anything, they had a bigger problem with it because this is

16  the time, again, when wireless was also in its infancy, at

17  least in comparison to how we know it today.

18      We've included in here some slides on the prior art, two

19  pieces of prior art that I'm going to skip over pretty

20  quickly, but they are the Blonder reference and the Knowlton

21  reference.  These will come up next week in the claim

22  construction hearing, they figured in the briefing, they

23  figured in the prosecution history for the '780 patent.  The

24  important takeaway for today in terms of -- specifically in

25  terms of Blonder is that Blonder did consider this -- and in

particular, Figure 13 of the Blonder patent shows -- did

consider this specific problem in the sense that a user would

be navigating from page to page, and it's not clear how they

determined it, but they do have this test they show in Box

136 in the Figure 13 flowchart where they actually make this

test, is the time to load this page greater than some time

threshold?  If no, we go right to displaying the page, and

that would have happened consistent with the state-of-the-art

browsers that we discussed a few minutes ago consequentially

as the content was available.  Maybe not the whole page at

once, but on the flow.

But if the time to load exceeds the threshold, then

Blonder's solution to that, to this sort of presenting the

user with what appears to be a hung-up display, is to dump in

a web page padding that is alternate content.  It's not the

content that the user was trying to access.  It wasn't the

next page in their little hypermedia path.  It's something

different in the patent, and Blonder describes it, and then

that page -- that padding, that alternate content stays on

the screen and entertains the user -- the patent describes it

being related, you know, a specific example is that if you

were traversing through a particular set of pages, you might

have one pre-stored that relates to that topic.  So you put

it up, and the user is still engaged.

Once the page the user is actually trying to get to is

1   ready to load, then you can see the flowchart shows, you put

2   that on the page and display it.  So that loading time is

3   spent with padding.  And then this was discussed in the

4   prosecution history, and we'll come back to that next week.

5       Knowlton is, really, a completely different set of

6   technologies.  It's intended to extract an image from -- an

7   actual image.  These are not web pages, and they're not

8   displayed one on top of the other in the manner --

9   particularly in the manner described in the '780.

10      Let's talk briefly about the '780 patent and what does it

11  propose to add to the art and add to the user experience.

12      Fundamentally, we're talking about a temporary status icon

13  that appears over a content area, and that it's indicative of

14  the present condition where content is being loaded into the

15  content area so that it can be displayed.

16      Going back to the screen, real estate, the patent has an

17  area 56.  This is the area that's available to display the

18  web page, display the area the user was trying to access.  It

19  does include -- at least in this embodiment, it does include

20  some of the usual control elements.  You've got menus and

21  file menus so that the typical navigation operations that a

22  user would use consistently are shown by buttons in a

23  traditional way.  But there's no address bar, there's no

24  status icon to provide the indication that users would have

25  been familiar with that the page was loading.

1     Looking at the content, it's made -- the content would be

2     very similar, if not exactly the same you can see on your

3     home PC.  You've got images, you've got hyperlinks, you've

4     got text.  If we'd gone back to the NCSA page, we would have

5     had pictures of the NCSA principals that were displayed, but

6     you don't have the status bar.

7     So what the patent proposes is to take a status icon, a

8     status indicator, and superimpose it, overlay it over the

9     content area on a temporary basis so that the user would have

10    this visual indication that their browser is working; that in

11    the background it is continuing to load the information which

12    is going to be displayed as the content.  And while that

13    loading is going on, the indicator is there somewhere

14    overlaying the content.  Again, specifically it requires it

15    to be over a portion of the content-viewing area.

16    Then once the content is loaded and all that remains to be

17    done is the display, then the icon disappears.  It's designed

18    to move off screen and not be visible to the user.  And the

19    user can then scroll through this page.  One of the typical

20    experiences is in these smaller devices, you only had part of

21    the page, whereas on your home PC with a full-sized monitor,

22    you might have the whole page or substantially all the page.

23    In the smaller devices, you really didn't.  So you might have

24    to scroll down, and as you scroll, the additional information

25    from the page would be displayed as you come to it.  But once

 1    the icon has disappeared or gone off screen, then you know

 2    the page is loaded.

 3        That is -- that brings us to the end.  The idea is to

 4    provide to the web user of these small devices, not even

 5    necessarily small devices, but anywhere where you're trying

 6    to maximize the viewing area and minimize the space of the

 7    device, that which is used for control indication that have a

 8    temporary nature.

 9        The '780 teaches to provide the loading indicator over the

10    viewing area, and then remove it.

11        I'm happy to answer any questions, Your Honor.

12            THE COURT:  I understand.

13            MR. PEPE:  Good morning, Your Honor.  May I proceed?

14            THE COURT:  Yes.

15            MR. PEPE:  I don't have a tremendous amount to add to

16    Mr. Cederoth's presentation.

17        If you scroll through our slides, starting on Slide 15, in

18    many ways it tracks and is duplicative of Mr. Cederoth's

19    presentation, and rather than give the court a similar

20    presentation, I'm just going to focus on two points.

21        The first point is on Slide 20.  It's in the summary of

22    the invention description.

23        Now, as Mr. Cederoth explained, the concept here is to

24    take a temporary graphic element and put it in the

25    content-viewing area while content is being loaded.  What the

1   summary invention says to do with this temporary graphic

2   element is to put it in the corner of the content-viewing

3   area, and the reason is simple.

4        The temporary graphic element is going to obstruct the

5   underlying content, so the patent explains that if you put it

6   in the corner of the web page, the corner of the

7   content-viewing area, there's typically not content there, so

8   you're not going to be obstructing anything of significance.

9        So the summary of the invention instructs that if you're

10  going to use this concept, to put the temporary graphic

11  element out of the way so you don't obstruct any underlying

12  content.

13       And then if we could flip over to Slide 21, Mr. Cederoth

14  had used Internet Explorer 3.  In our presentation, we use

15  Internet Explorer 1.  And just to kind of summarize about

16  what this patent is all about, it basically takes that

17  loading status icon, which Mr. Cederoth explained is in this

18  toolbar area, which is outside the content-viewing area, and

19  what it simply does is it takes this animated icon, which is

20  in the content-viewing area, and rather than keep it in the

21  toolbar, it just puts it in this content-viewing area such

22  that when content is being loaded, you see that icon there,

23  and then once content is completely loaded -- if we can flip

24  over to 22 -- that icon will then disappear.  That is

25  fundamentally the concept of the '780 patent.

1    Unless the court has any questions, I will sit down, and

2  we can move on to the '582.

3        THE COURT:  All right.  I think I understand.  Thank

4  you.

5        MR. PEPE:  Thank you, Your Honor.

6        MR. CEDEROTH:  Your Honor, I'll start with -- and I

7  apologize for not handing out the slides on the '780, but

8  I'll correct that with the slides I have on the '582.  If I

9  may approach?

10        THE COURT:  Yes.  You may proceed.

11        MR. CEDEROTH:  Thank you, Your Honor.  The '582

12  patent -- and I'll follow the same format as before.  I'll

13  give you introduction to the prior art and then a little bit

14  of background on the '582.

15    The advance here, again, focuses on portable devices,

16  small devices, and specifically in advance in terms of

17  virtual keyboards.  Historically, as the patent describes,

18  there have been separate applications -- separate keyboards

19  for separate applications or device-specific keyboards.  And

20  the patent tries to move beyond that.  And as the title tells

21  us, it's the soft input panel system and method.  Maybe not

22  as descriptive as the drawings can be.

23    Starting with the -- on Slide 4, what we've shown is,

24  basically, a generic device, the idea that portable devices

25  typically had two mechanisms for accepting user input.  The

1    first was what I mentioned, that each application might have

2    its own virtual keyboard.  And as we've shown here, you've

3    got a word processor and a spreadsheet application.  Each of

4    them has a keyboard which is displayed on the screen when

5    that particular program is being run, and the user, then, is

6    limited to using that keyboard, that input for accessing the

7    functionality of a particular program, whether it's a word

8    processor or it's a spreadsheet program.

9        The second solution that I alluded to was that basically

10   the device itself would have a virtual keyboard.  And while

11   what we've shown here is actually relatively simple for a

12   device keyboard, what you'd find is that you're talking about

13   a keyboard which has to be sort of all things to all

14   programs, then.  So at least the complexity of these much

15   smaller key size potentially leads to confusion in terms of

16   providing a useful interface to specific applications.

17       So confronted with this -- and virtual keyboards were

18   certainly well known at the time of the '582 patent.  What

19   the patent tries to do is provide a -- you know, what's

20   describe as an efficient and flexible solution or method for

21   providing users with options on the keyboards on a per

22   application basis.  I sort of think of it as allowing many

23   keyboards to many applications mapping, whereas in the prior

24   art you had an application to keyboard-specific mapping or

25   device-to-keyboard-specific mapping.

1      And the way the patent goes about doing this is, when an
2   application -- when you come first to the application, the
3   user is presented with an icon, which is shown in the bottom
4   of the screen here, it's No. 52, which is basically a button,
5   and it allows the user to press that button via the stylus or
6   the touchscreen, and that pops up a list, a list of potential
7   input methods from which the user can choose.
8      In Figure 6 of the patent, which is shown here on the
9   left, the list includes the keyboard, handwriting tool, or
10   misspelled graffiti, which was a play on some software that
11   Palm provided at the time.  It's shown as kind of a spray
12   can, a drawing tool.
13      And then in Figure 7, you see what the user has chosen.
14   For this particular instance, it's the keyboard, basically a
15   virtual QWERTY keyboard that can be used to enter text and
16   other information.  Alternatively, the user could have chosen
17   a numerical keypad, as shown in Slide 10.  After tapping the
18   button, this icon for virtual keyboards, this provides, then,
19   a -- many to many, if you will, or many to each mapping for
20   the applications so that if you're in a word processor -- I,
21   actually, have a series of slides here that will give you an
22   example of how a user might choose to toggle between these.
23      So the patent describes first including some sort of
24   interface component or technology which allows the
25   application then running on the device to receive the virtual

1   input from the various different virtual keyboards as if the

2   user was basically going around and plugging in these

3   different physical keyboards, physical input devices.

4       So you start with the user making a selection of a QWERTY

5   keyboard.  So the user types on the QWERTY keyboard, and the

6   text elements then appear on the screen.  "My number is."

7   Okay?

8       Now the user has moved to a new keyboard, using the

9   numeric keyboard like you might use with a word processing

10  application, and type in a number.

11      And then the next one, the same thing could be done, then,

12  in terms of drawing.  So the user could start with the

13  drawing keyboard and draw this really handsome sketch of a

14  flower, choose the QWERTY keyboard to insert the text for

15  "flower," and then use the numeric keypad to insert the

16  numeric information about it.

17      The advantage here is that -- again, we're talking about

18  relatively limited screen size.  Is all the -- the -- all the

19  input buttons, either text or line drawing tools or numbers,

20  could have been crammed onto a single keypad as the prior art

21  did and had that for the device itself to be used with any

22  application on the device, or each of these could have been a

23  separate application.

24      But what the '582 attempts to do is provide these options

25  to the user so they can select them on the fly for whatever

1    is most convenient.

2        The ones listed in the patent are the keyboard, the

3    drawing pallet, and graffiti.  The patent also teaches that

4    the great thing about this is you're not then limited.  The

5    user can download and install or otherwise install their own

6    customized keypads, again, able to use them and select them

7    on the fly with each application.

8        That is -- that is the simple version of it, but that

9    concludes it.

10            THE COURT:  Thank you.

11            MR. PEPE:  May I, Your Honor?

12            THE COURT:  Yes.

13            MR. PEPE:  So, again, I'm not going to try to retread

14   any ground that Mr. Cederoth covered, so I'm going to start

15   with Slide 8 and provide a clarification and, I think, a

16   potential misstatement by Mr. Cederoth.

17       Looking at Figure 6, I believe he stated that you would

18   press 52 to pop up that pop-up menu.  I believe the patent

19   explains, and you can see this on the blow-out on Slide 8,

20   the first blow-out.  I believe it's the triangular button

21   "70" that you would press that would pop up this menu of

22   potential soft input methods.  Button 52 is actually used to

23   either hide or display the software input method that's been

24   selected.

25       If we can turn back a slide to Slide 7, Mr. Cederoth

1   explained about this use of the interface, and I'd like to do

2   a deeper dive into what the interface actually is.  And what

3   we've reproduced here is Figure 2 on the right.  And the

4   patent discloses what's called the SIP manager, SIP stands

5   for Soft Input Panel.

6        Now, this SIP manager is really the heart of what's going

7   on in the '582 patent.  It's called a "manager" because what

8   it's doing is it's managing these input methods.  As the

9   patent explains, the SIP manager is connected to the

10   graphical window environment.  That's like the Windows

11   operating system.  It's also interfaced with the input method

12   64.  That would be the display of a keyboard, the handwriting

13   recognition, the graffiti that was misspelled that was

14   mentioned earlier.

15        And what the SIP manager does is, it kind of directs

16   traffic.  What it does, if we could flip to Slide 10, for

17   example.  This shows what happens when a user is pressing a

18   key on a displayable keyboard.  The SIP manager will receive

19   that input from -- through the interface that was mentioned

20   earlier.

21        And if you flip over to the next slide, the SIP manager

22   will then direct that input over to the graphical window

23   environment.  So we start out with the user in the input

24   method, the display and keyboard, typing in the input.  That

25   gets sent to the SIP manager.  The SIP manager will then

1    redirect it to the graphical window environment.  And then

2    flipping over to Slide 12, that graphical window environment

3    will then send it to another application being used, be it a

4    processor, be it a spreadsheet, be it an email program.

5         Now, I wanted to focus for a minute on this Figure 2, and

6    in particular the boxes in the upper right-hand corner.

7    Those are the hardware keyboard 36 and the keyboard driver

8    62.

9         The hardware keyboard is a physical keyboard that you

10   would use with a typical PC, and a keyboard driver is simply

11   just software which would allow the keyboard to communicate

12   with the operating system.

13        Now, most applications are designed to receive input from

14   a physical hardware device such as a keyboard, and because of

15   that, the SIP manager, which sends the user input over to the

16   graphical window environment, will put it in a form such that

17   it looks like it came from a hardware device.

18        And you can see Slide 12 in those two blow-outs -- the

19   second two blow-outs on the slide, in particular reading from

20   the abstract, it explains that the manager component --

21   that's the SIP manager -- communicates the user data to the

22   graphical window environment as a message, whereby an

23   application program receives the message as if the message

24   was generated on a hardware input device.

25        So this is an issue that's going to come up next week, so

1    I'm not going to go deeper into it, but as the patent
2    explains, the application is going to receive this input, not
3    as if it was generated on a soft panel, but as if it was
4    generated on a hardware device such as a keyboard.
5        Other than those few points, I think Mr. Cederoth covered
6    it all.  Unless Your Honor has questions, I'll take a seat.
7            THE COURT:  No, thank you.
8            MR. PEPE:  Thank you, Your Honor.
9            THE COURT:  Mr. Cederoth, do you want to respond as
10   to which button you push?
11           MR. CEDEROTH:  I believe Mr. Pepe has that right,
12   Your Honor.  I think the patent is pretty clear about it.  I
13   was not intending to rewrite the patent on the fly.
14           THE COURT:  All right.  Anything else that you would
15   like to present today, gentlemen?
16           MR. CEDEROTH:  Your Honor, we do have a CD that has
17   the animations, and we'll --
18           THE COURT:  You can make them available.
19           MR. CEDEROTH:  We'll submit it to the court and to
20   counsel.
21           THE COURT:  Mr. Pepe, anything further?
22           MR. PALUMBO:  Nothing, Your Honor.  Thank you.
23           THE COURT:  Counsel, we'll be in recess, being better
24   informed than when we came.  Thank you very much.
                        (PROCEEDINGS CONCLUDED.)

C E R T I F I C A T E


I, Nancy L. Bauer, CCR, RPR, Court Reporter for
the United States District Court in the Western District of
Washington at Seattle, do hereby certify that I was present
in court during the foregoing matter and reported said
proceedings stenographically.

I further certify that thereafter, I have caused
said stenographic notes to be transcribed under my direction
and that the foregoing pages are a true and accurate
transcription to the best of my ability.



Dated this 12 day of June 2012.


/S/  Nancy L. Bauer

Nancy L. Bauer, CCR, RPR
Official Court Reporter