```
1              UNITED STATES DISTRICT COURT

2         WESTERN DISTRICT OF WASHINGTON AT SEATTLE

3    _____

4    MICROSOFT CORPORATION,          )
                                     )
5                   Plaintiff,       )  10-01823-JLR
                                     )
6    v.                              )  SEATTLE, WASHINGTON
                                     )
7    MOTOROLA INC., et al,           )  June 7, 2012
                                     )
8                   Defendant.       )  Markman Hearing
                                     )
9    _____

10             VERBATIM REPORT OF PROCEEDINGS
            BEFORE THE HONORABLE JAMES L. ROBART
11              UNITED STATES DISTRICT JUDGE
     _____ _____

12

13

     APPEARANCES:
14

15


16    For the Plaintiff:      Arthur Harrigan, Richard
                              Cederoth, David Greenfield, Chris
17                            Wilson, David Killough and Andy
                              Culbert
18

19


20
      For the Defendants:    Ralph Palumbo, Steven Pepe,
21                           Philip McCune, Samuel Brenner,
                             Conor McDonough, Daron Greene and
22                           Dane Lacombe

23

24

25
```

1           June 7th, 2012

2           THE CLERK:  Cause number C-10-1823.  Microsoft

3   Corporation versus Motorola Mobility.  Counsel, please make

4   your appearance.

5           MR. HARRIGAN:  Good morning, Your Honor.  Art

6   Harrigan, Danielson Harrigan, representing Microsoft.  And to

7   my left, Rick Cederoth, who will be among those speaking

8   today, from Sidley.  And David Greenfield, from Sidley, who

9   will also be speaking today.  Chris Wilson, from Sidley.  And

10  in their usual locations, David Killough and Andy Culbert.

11          THE COURT:  Thank you.

12          MR. PALUMBO:  Good morning, Your Honor.  Ralph

13  Palumbo for Motorola.  Dane Lacombe and Daron Green.  And I

14  see that Microsoft has taken up your suggestion and let some

15  of our younger lawyers argue.  So, Conor McDonough, from

16  Ropes & Gray, will be doing the argument this morning.

17          THE COURT:  Did they give you "obstruction?"

18          MR. PALUMBO:  I'm sorry?

19          THE COURT:  Did they give you "obstruction?"

20          MR. McDONOUGH:  They gave me "window," Your Honor.

21          MR. PALUMBO:  Sam Brenner, also from Ropes & Gray.

22  Mr. Brenner will also be arguing terms.  And then Mr. McCune,

23  my partner.  And Steve Pepe, who will also be arguing terms.

24  Thank you.

25          MR. HARRIGAN:  Your Honor, I have one quick item.

1          THE COURT:  Yes.

2          MR. HARRIGAN:  Which is, the parties have been

3   discussing some scheduling issues and on which we are working

4   toward reaching agreement.  And we just wanted to --

5   Mr. Palumbo and I talked this morning, and we agreed to ask

6   Your Honor to set aside a little time at the next hearing

7   next week, which is a tutorial I think on Thursday, in the

8   hope that we may have arrived at a proposal for the court.

9   And I'd ask you to set aside a little time to discuss that

10  next week.

11         THE COURT:  What is it we're planning on scheduling?

12         MR. HARRIGAN:  What's already scheduled?

13         THE COURT:  No.

14         MR. HARRIGAN:  The potential -- the issue that's

15  under discussion is a potential stay of the patent part of

16  the case, and perhaps something beyond that.  But that's kind

17  of the area of discussion, without getting into the details

18  of the parties --

19         THE COURT:  I'm happy to do that.  I also intend to

20  talk to you some at the end of today about what we have teed

21  up to do.  So I think it will all correspond.

22         MR. HARRIGAN:  Thank you.

23         MR. PALUMBO:  Your Honor, I think next week we're

24  also talking about a series of interim pre-trial dates before

25  the RAND issues.  And we're working on some mutual dates.

1    And I think that will be another topic we'll want to try to

2    discuss with you next week.

3           THE COURT:  All right.  Counsel, you all got my list

4    of the order that we're taking the terms in, and also some

5    time limits that go with it.  Unlike some of your patents, we

6    actually could understand this one.  So you're getting a

7    little bit less time.  Any request to change that order, or

8    to move time around?  Mr. Cederoth.

9           MR. CEDEROTH:  Your Honor, the order seems fine.  I

10   believe it's the order the parties briefed the terms in, so

11   there's a certain logic to that.  That should work out well.

12   "Graphic element" might squeeze a couple extra minutes.  I

13   think "obstruct" will likely not take the full seven on

14   either side.  I think it's a good plan.  We ought to be able

15   to work within it pretty easily.

16          THE COURT:  Mr. Pepe.

17          MR. PEPE:  I agree that "graphic element" we might

18   need a couple of minutes.  But we'll certainly make it up on

19   the back end with some of the other terms.

20          THE COURT:  All right.  Let's get started, then, on

21   "graphic element."

22      Mr. Cederoth, you and Mr. Pepe should know that "graphic

23   element," to me, I think I can deal with that concept.  You

24   all have an agreed construction of the word "content."  And I

25   guess the court would like to know how wedded you are to

1   that.  Because you all have, seemingly have based your claims

2   construction assuming that that's in use, because you've

3   agreed to it.  And I have concerns that at least some of your

4   constructions are inconsistent with it.  So why don't you

5   assume you're going to spend a minute of your time explaining

6   to me, yes, we really think that's right, we've agreed to it,

7   and we understand the consequences of it.

8           MR. CEDEROTH:  Thank you, Your Honor.

9       Your Honor, I do have slides.  May I approach?

10          THE COURT:  You may approach.

11          MR. CEDEROTH:  Well, Your Honor, let me dive in on

12   graphic element.  And I thought a good place to start, of

13   course, is really just briefly to go back to what we

14   discussed last week in terms of what is the invention.  The

15   court will recall the notion was browsers that were used on

16   desktops being applied then to smaller devices such as like

17   the Palm or the Windows CE devices that were then coming into

18   the market, and the issue with limited display space, and

19   connections which weren't perfect, connections which weren't

20   the super broadband we have today.  And there was, to some

21   extent, the advent of the internet still.

22       Users would surf the pages, with no real expectation of

23   how long it would take for the page to load.  And the patent

24   sought to solve the issue of users becoming frustrated,

25   believing their connection was broken, or the browser was

1   broken, when the page didn't come fully and quickly into

2   view, because the content was still being downloaded and

3   loaded into the browser.

4       So the idea was to take -- rather than devote real estate

5   always to a loading icon, to have this temporary icon which

6   would appear while the content was being loaded, and then

7   disappear.

8       That icon, that image, that indicator is referred to in

9   the claims as a graphic element.  And they're specifically in

10  the three independent claims we've got here.  Motorola urges

11  that it's a discreet image for viewing on a computer screen

12  that is not content, and I could -- whereas from Microsoft's

13  view there is really no construction necessary, or if there

14  is, it's simply a discreet image on the computer screen.

15  Visible image.

16      If I could address the court's question in terms of

17  content.  On our Slide 5 we've got Claim 1.  If you drop to

18  the bottom of that, we've highlighted here, "Wherein content

19  comprises data for presentation which is from a source

20  external to the browser."  I believe that largely mimics the

21  agreed construction where the parties have simply elaborated

22  on the data and referred to it as information for

23  presentation, such as data, graphics, video or audio.

24          THE COURT:  Well, here is my problem.  I view an icon

25  as a graphic.  I don't know what else you can call it.  It's

1    a representation of an image.  And you hold that, "Content,"

2    this is your agreed definition, "such as data, graphics."

3    So, you're telling me that it's an icon representing the

4    content is loading.  And yet by your agreed definition, it's

5    content.  Which puts Motorola into a world of hurt, because

6    their definition includes that it is not content.  So, I

7    don't know if we're in the world of string theory, where

8    things mean differently than we all think.  But it seems to

9    me you've defined this in a manner that renders impossible

10   your proposed constructions.

11          MR. CEDEROTH:  Your Honor, I'm hopeful we can solve

12   this without going fully into the 11th dimension and all of

13   string theory today.

14      Maybe the next step will be to try to get to the core of

15   what the real dispute is between the parties.

16          THE COURT:  Let's stay on my dispute for a moment.

17          MR. CEDEROTH:  Okay.

18          THE COURT:  You used the phrase, and I think it's

19   absolutely accurate, "loading icon."  As I understand the

20   purpose of this invention is to indicate to people, something

21   is happening, and you can tell that something is happening

22   because you've got a little spinning globe, or a rotating

23   question mark, or some kind of representation of something.

24   If that's the case, then it seems to me that it's a discreet

25   image.  I think we're all in agreement on that.  And it's

1    indicating that something is happening, basically that

2    requested content is being loaded.  Why isn't that an

3    adequate definition?

4         MR. CEDEROTH:  For the graphical element?

5         THE COURT:  Yeah.

6         MR. CEDEROTH:  I believe it is.  Whether it has to be

7    not content, we think is a false issue.  The origin of the

8    content was, you know, the prosecution history, the examiner

9    and applicant's attorney went back and forth, over and over,

10   about what is content.  Not content, quote-unquote, but what

11   do you mean is content in the context of the internet?  And

12   in the end, when you get to the reasons for allowance, what

13   the examiner did is he referred to, I believe it is a chart

14   from a Scientific American article.

15       And basically what that showed was, you know, what you

16   would see on a web page.  Sometimes it's data, generically.

17   Sometimes it's hyperlinks.  Sometimes it's pictures.

18   Sometimes it's animations.  Sometimes it's graphics.  And

19   that's what, in the context of the patent, is being referred

20   to broadly as content, what the web page is going to deliver

21   to the enduser.

22       Whether content needed to actually be defined by the

23   parties is probably an open question also, because I think it

24   comes back to, we're talking about a browser.  We're talking

25   about the web page, whether it's served locally, or it's

1   served from off the internet.

2       The whole debate, actually, originated with this Blonder

3   reference that we were talking about last week a little bit.

4           THE COURT:  Counsel, that wet blanket the Federal

5   Circuit keeps telling me that I'm supposed to use words to

6   mean the same thing throughout the patent.  And if that's the

7   case, it seems to me I can't have a different definition for

8   "content" inside your definition of "graphic element" that I

9   can for the remainder of the patent.

10      So, that's what my dilemma is here.  I think we know how

11  to define the term.  And I think I just put words in your

12  mouth that you agreed to it, and we'll see how I put words in

13  Mr. Pepe's mouth next.

14          MR. CEDEROTH:  If I could skip ahead just a couple

15  slides.  This is our Slide 6, fully loaded, which is taken

16  from Motorola's non-infringing contentions.  On the right is

17  an image from our infringement contentions.  And we're

18  pointing to this loading animation here in the center of the

19  screen.  And Motorola is saying that this cannot be the

20  graphic element, because it's from a source external to the

21  browser, and therefore content.  Flipping that around,

22  they're saying that you know that, in effect, this loading

23  icon, the graphic element has to come from the browser onto

24  the claims.

25      And we think there's nothing in this patent which says

1    that the graphic element has to be from the browser.  The

2    browser could get it from some other file.  It could get it

3    from the operating system.  You know, I think conceptually

4    the browser could even go to the web page and, you know, grab

5    a piece of the web page and put it into some sort of spinning

6    animation to provide the indication to the user that, hey,

7    the browser is loading the rest of the content of this web

8    page.  That's really the nub of this dispute.

9        I have a slide on the logical fallacy involved, which I'll

10   leave for the court's amusement -- bemusement later.

11       Really, we would be fine with the court's proposed

12   construction.  And it's worth noting that that is not content

13   aspect of this.  You know, that is expressly referred to in

14   some of the claims.  It is not in others.  And so we think --

15   the court knows the law, it would be error to read it into

16   the claims it's not present in.  In the claims it is present

17   in, that is an aspect of the claim we have to prove on

18   infringement.

19           THE COURT:  All right.

20           MR. CEDEROTH:  Lots of prosecution arguments from

21   Motorola here.  They do gloss over, as we show on Slide 9,

22   the second aspect of this reference to the core concept.  And

23   we've highlighted it.  Motorola seizes on the prior sentence

24   which begins, "The core concept is a non-content graphic

25   element."  Well, the applicant had more to say and

1    immediately qualified the statement.

2        And if you move on in this same -- this is taken from

3    Exhibit D of Docket 224, which is Mr. Wilson's declaration,

4    and attachments that were submitted with our opening brief.

5    If you flip ahead in that document to page 23 where the

6    applicant begins to discuss some of the new claims, the

7    applicant expressly told the examiner that, hey, these new

8    claims are different.  They claim the invention using

9    different limitations, and elements.  And we think there's no

10   basis to apply this as a clear disavowal under the Federal

11   Circuit law, and the court is well familiar.

12       With respect to Blonder, we don't need to belabor this

13   either, but when you get to the punch line on Blonder, is

14   really found in the examiner's reasons for allowance, where

15   he says, "The graphic element is not additional content,"

16   leaving open the possibility that for some of the claims it

17   could be some piece of the content.

18       What it isn't, and certainly what was disclaimed in this

19   prosecution history, is that it is not what Blonder does.

20   And what Blonder did was to put up a replacement page.  I

21   don't want to say fake, but essentially fake content, not the

22   content that the user was trying to obtain, but padding,

23   while the loading process endured.

24       And that's -- I think that closes it.  Any further

25   questions on content I can answer?

1          THE COURT:  No.

2          MR. CEDEROTH:  Thank you, Your Honor.

3          MR. PEPE:  Your Honor, we have some binders to hand

4     up.

5          THE COURT:  You may approach.

6      You may proceed.

7          MR. PEPE:  Starting with the initial question you

8     asked, what exactly is content?  That issue was heavily

9     discussed and debated during prosecution.  The applicants and

10    the examiner went back and forth, and ultimately they agreed

11    to a definition which is very similar to the one that the

12    parties have agreed to.  And I understand your issue

13    wrestling with, well, how can a graphic element not be

14    content when the definition of content would include a

15    graphic element?  And I think the simple answer to that

16    question is, the answer lies in the prosecution history, and

17    the answer lies in the fact that content -- it's the source

18    of the content.

19      When we're talking about content, we're talking about

20    information, data that is external to the browser.  That's

21    how it's defined.  So certainly the graphic element can be --

22    the content can include graphics, because it's from a source

23    external to the browser.  And you really get this

24    understanding by diving into the prosecution history.  The

25    prosecution history is at the core of this issue.

1    THE COURT:  What's the Federal Circuit telling me

2    about prosecution history at this point, in the ever evolving

3    theory of patent interpretation offered by the Federal

4    Circuit?

5    MR. PEPE:  Well, the prosecution history, as you

6    know, is part of the intrinsic evidence.  And the Doctrine of

7    Prosecution Disclaimer is still alive and well.  You recently

8    cited it in your Deep9 case.  And the law set forth in that

9    case is still the law that exists today.

10   THE COURT:  That assumes there was a disavowal here.

11   And I'm waiting to hear you explain that one to me, which you

12   will in a bit, I'm sure.

13   MR. PEPE:  To us this is a classic case of

14   prosecution disclaimer.  And if I could direct your attention

15   to Slide 8 of the binder.  Right there during prosecution

16   Microsoft told the examiner that a core concept -- it's not

17   just a concept, it's not just an important concept, but it's

18   a core concept.  A core concept is a non-content graphic

19   element.  That language is clear.  It is unmistakable.  It is

20   unambiguous.  The graphic element is not content .

21   THE COURT:  That strikes me as an explanation.

22   That's not a disavowal.

23   MR. PEPE:  Well, it's part of the prosecution history

24   and it's part of the story.  And when we get to the Blonder

25   reference you'll see how this story develops, and develops,

1    and develops.  And it's not just that they said this once,

2    Your Honor, they said it three times during the prosecution.

3    The core concept is a non-content graphic element.

4        And if you turn to Slide 10.  Let's talk about Blonder a

5    little bit, because it puts this in context.  Blonder was a

6    very important reference during the prosecution.  He claims

7    to be rejected five times over Blonder.  And if you slip over

8    to Slide 11, Blonder was really addressing a similar problem

9    that the '780 patent was trying to address.  Content would be

10   downloaded very slowly over the internet, during the mid-90s.

11             THE COURT:  I wouldn't limit it to the mid-90s.

12             MR. PEPE:  Well, that's true.  It depends on your

13   service provider, I guess.  So, Blonder says, while you're

14   waiting for the content from the source external to the

15   browser to get downloaded, what we're going to do is we're

16   going to display padding.  Padding is preloaded --

17             THE COURT:  I understand Blonder, so you don't need

18   to explain it to me.  I'll go far outside the record and ask

19   you a question.  It's my understanding of Blonder's padding

20   that it is internal to the machine, it's not being imported

21   from an outside source.  Is that correct?

22             MR. PEPE:  That's correct.  The padding is stored

23   locally on the device.  So that while content is being

24   loaded, you can quickly display that content, and the user

25   has something to do.

1          THE COURT:  So let me give you my famous -- or not

2    famous, perhaps infamous, inside-chambers question.  Let's

3    assume that I'm asking the search to be for geranium.  And

4    there is nothing in my computer that I have previously

5    downloaded that speaks to flowers, or geranium.  As I

6    understand Blonder, Blonder will look and go, geranium,

7    flower, flowers, you know, and pull up some preloaded bit of

8    trivia about the Rose Bowl.

9          MR. PEPE:  I think that's one way Blonder is

10   implemented.  The important thing about Blonder is that it

11   has this preloaded content to occupy the user.

12         THE COURT:  I understand.

13         MR. PEPE:  So the examiner said, well, these claims

14   are objectionable because your claims, Microsoft, require a

15   graphic element.  We have a graphic element in Blonder, it's

16   the padding.  And if you can turn to Slide 13.  Microsoft

17   came back and said, not so fast.  The padding in Blonder is

18   content, it's stuff that you would display on the screen that

19   would typically be downloaded from the internet.  The graphic

20   element is not content.  So they were distinguishing

21   Blonder's padding, which is content, from the graphic

22   element, which is not.

23      And this is what led to the debate between the examiner

24   and the applicants about what exactly is content.  And

25   ultimately they agreed to a definition of content to get the

1    claims allowed.  So between the core concept statement that

2    was repeated three times, over, and over, and over again, and

3    the statements here that are made to distinguish Blonder's

4    padding, which is content, from the graphic element, which is

5    not, it becomes clear that the graphic element can't be

6    content as the parties defined it.

7         The graphic element can't be from a source external to the

8    browser.  It's an indicator.  It's not content.  It's not

9    meant to convey anything to the user that relates to the

10   requested web page, other than the fact that the content is

11   being loaded.

12        Your Honor, they went even further in the prosecution

13   history.  So we have the core concept.  We have the

14   distinction over Blonder, by the argument.  And then if you

15   turn to Slide 14, they went even further and they said,

16   patent office, we're going to put the word "over" in the

17   claim.  We're going to say that the graphic element is over

18   the content viewing area.

19        And if you look on Slide 14, in that second blowout, they

20   said, "The use of 'over' in the claim language emphasizes

21   that the graphic element is not part of the content."  They

22   were drawing a distinction between content and the graphic

23   element.  So that was the third instance during the

24   prosecution.  This all arises, this is all part of the story

25   about the graphic element not being content.

1    And when you get to the notice of allowability on Slide

2    15, the whole sentence reads, "As noted during the file

3    history, the claimed invention is directed to covering a part

4    of the content viewing area with a graphic element.  This

5    graphic element is not additional content."  It's not

6    additional content to what's being downloaded from the

7    internet.  It is something different.  It is not from a

8    source external to the browser.  It's coming from within the

9    browser to indicate a delay in the downloading of the content

10   from the internet.

11   So, these three elements, these three statements, the

12   repeated core concept statements; the amendment to the claim

13   language to put in the word "over," to indicate that over the

14   content viewing area means that the graphic element is not

15   content; and the repeated arguments during the prosecution,

16   these all weave together and tell a story.  The examiner even

17   acknowledged it.  The graphic element is not content.

18   Now, Microsoft really doesn't have an answer for the

19   prosecution history.  And the parties talked about content

20   and we agreed to that construction, because that's what the

21   prosecution history says, that's what was needed to get the

22   claims allowed.  And what they're doing, Your Honor, and you

23   see it in their slides, they're focusing you on Motorola's

24   non-infringement contentions.  And in doing so, they're

25   citing the *Wilson* case.

1    And if I could ask you to please flip to Slide 19.  Now,

2 Microsoft is taking *Wilson* way too far in arguing that the

3 court should look at Motorola's non-infringement contentions.

4 What *Wilson Sporting Goods* says is that the court can look at

5 the accused product for content, to understand the product.

6 What Microsoft is asking you to do is asking you to

7 effectively conflate the two steps of the Markman process,

8 that is, construing the claims and determining whether or not

9 there's infringement into one.

10    And the Fed. Circuit made it very clear, and you can see

11 on this first blowout, "This court, of course, repeats its

12 rule that claims may not be construed with reference to the

13 accused device."

14    And district courts, since *Wilson*, have followed that.

15 And you can see that in the case below.  "*Wilson*, however,

16 did not allow infringement issues to be raised or decided

17 during claim construction."  That's precisely what they're

18 doing, and that's inappropriate at this stage of the

19 proceedings.

20    THE COURT:  All right.  Thank you.  Mr. Cederoth, you

21 get one minute.

22    MR. CEDEROTH:  Thank you, Your Honor.  Just briefly

23 in response to Mr. Pepe's remarks and the court's question

24 about Federal Circuit law.  I think the court's recent

25 decision in terms of how to treat the prosecution history are

1  consistent with the Federal Circuit law.  That's not a

2  guarantee that those decisions won't be reversed.

3      The core concept statement that was pointed out three

4  times in the prosecution history, each time it was

5  accompanied by the additional sentence we talked about

6  before.

7      Blonder provides padding, provides replacement content.

8  Blonder provides no indication to the user that something

9  different is being loaded.  That's the essence of the dispute

10  there.  And certainly Microsoft has disclaimed ever covering

11  that.

12      The punch line, you saw it again in the examiner's reasons

13  for allowance.  The graphic element is not additional

14  content.  It's not the replacement page or replacement

15  content that Blonder offered.

16      And as far as the contentions go, Your Honor, I think

17  those simply -- we're not asking the court to rule on those

18  in any way, we're simply using them to illustrate the essence

19  of the dispute here, which came up sort of on the side of

20  Mr. Pepe's remarks, where he says that the graphic element

21  has to be from within the browser.  That's not what the

22  claims say.

23          THE COURT:  Okay.  Thank you.

24          MR. PEPE:  Sir, may I have 15 seconds to just address

25  one point that was raised?

1          THE COURT:  All right.

2          MR. PEPE:  I'll do it right from here.

3      In our book on Slide 35 we cite two cases, *Norian* and

4  *Atofina*.  Those stand for the proposition that the applicant

5  needs to be held to what they said during prosecution.  And

6  if they could have said less to get around Blonder, then they

7  should have.  The fact that they went broader and they said,

8  the graphic element is not content, the public is entitled to

9  rely upon that representation, and they need to be stuck to

10  the full scope of that statement.  I'll just direct your

11  attention to that slide, Your Honor.

12          THE COURT:  All right.

13      Mr. Cederoth, during times when the browser is loading

14  visible content, and as part of your remarks in this, as a

15  frequently frustrated computer user, I certainly have periods

16  of time when the loading icon is being displayed when there

17  is nothing on my screen.  And I guess I would like both of

18  you to address the question of does visible content as it's

19  used in the claim mean visible during loading, or visible

20  after it has been downloaded?

21          MR. CEDEROTH:  Let me start with that, Your Honor.

22      I think, first, visible content is not used in every

23  claim.  Often it's just phrased "content."  And sometimes

24  there are -- I mean, there's a variety of claims, some of

25  them actually have two discreet steps.  So loading and

1   displaying.

2       We believe that when visible content is used, it's

3   referring to a class of contents.  And if you go back to the

4   agreed construction on content, it's possible that some of

5   that is not, in fact, ever going to be visible to the user.

6   For example, an audio file.  You know, there might be an icon

7   for the audio file.  But the audio file itself won't be

8   visible.

9       In requiring visible content, where those claims do, it's

10  referring to content that would exclude, for example, the

11  audio content.

12      In terms of the court's experience with a web page, and

13  loading, and the icon spinning and nothing being visible, I

14  think that goes really to how browsers work, and particularly

15  the way browsers worked at the time that the invention was

16  first advanced in the patent office.

17      And the browser would seek to download the page.  You

18  know, the web pages come in HTML, or now other markup

19  languages.  But back at the time, predominantly HTML and

20  various flavors of them.  That was code that the browser

21  application had to decipher.  And sometimes it had -- that

22  code included links off to an image file, or off to some

23  other server for more data to be -- or graphic, or animation,

24  or image to be downloaded.  The browser is grinding away in

25  the background, assembling all of this into what will be

1    displayed, what you will see.

2        In one of the advances at the time, not what the patent is

3    about, but one of the advances at the time was this idea that

4    browsers would build the pages as best they could, on the

5    fly.  So once they had an image, they would put it up rather

6    than waiting for all the images on the page to be put up.  We

7    discussed that last week a little bit about, you know, the

8    page may not all fit in the display area of your device.  So

9    there's a scrolling aspect that might be involved in terms of

10   viewing the entire page you're trying to access.  That's the

11   explanation for the experience you've had, and I think not

12   uncommonly, and also where and what visible content refers

13   to.

14       As to whether the -- I do think what Motorola is trying to

15   do here is to conflate loading and displaying.  In the patent

16   we've called out some aspects of this in the -- in our slides

17   in terms of the claims and the specification.  The patent

18   clearly refers to two steps.  The first step of loading.  The

19   second step of displaying.  The claims sometimes refer to

20   them separately.  Sometimes they don't refer to the separate

21   displaying.  They refer to the icon, though.  We call that

22   out.

23       For example, Claim 12, wherein it indicates the browser is

24   loading content.  Claim 19 refers to displaying the icon

25   during the loading step.  Claim 19 also has the displaying

1    step, and further references that the displaying and the

2    loading occur, in part, concurrently.

3         These are all indications that loading and displaying are

4    not the same thing.  And the content -- some claims require

5    it.  Others don't.  But there may or may not actually be

6    visible content on the screen from the content you're trying

7    to access, while the loading icon is in place.

8         Once it's loaded, then the browser moves fully onto the

9    displaying step, and those steps may or may not occur, in

10   part, concurrently.

11              THE COURT:  All right.

12              MR. PEPE:  So as Mr. Cederoth pointed out, Your

13   Honor, some of the claims say "loading content," some of the

14   claims say, "loading visible content."  So there has to be a

15   difference between the two.  And, frankly, common sense and

16   the plainer language of the phrase "loading visible content"

17   gives you the answer.  Loading visible content means that the

18   content is visible as to content that's being loaded.  And

19   this is answered definitively in the prosecution history.

20        And if I could direct your attention, Your Honor, to Slide

21   22.  And you could see in Slide 22, that first highlighted

22   portion, "While the content is being loaded, the content is

23   visible to the user."  So it has to be visible to the user in

24   the browser while it's being loaded.

25        Again, clear language.  Unmistakable language.

1    Unambiguous language.  It could not be any clearer.  That is

2    a definitive statement.  And if there was any ambiguity, at

3    the end in this blowout they say, "These changes are made to

4    clarify that the loading content is visible."  Very clear.

5        They went a little further, Your Honor.  Let's talk about,

6    when we look at Slide 23, why they added "loading visible

7    content" to the claims.  And the reason is, it was another

8    way to get around Blonder.  Blonder was a problem for them.

9    What Blonder taught was, display the padding, finish

10   downloading, and when you finish the downloading, take the

11   padding off, and put the downloaded content on.  So there was

12   no simultaneous display of the padding, and of the content.

13       And when you look at Slide 23, they said that as much.

14   "These claims are allowable because none of the cited

15   references disclose a browser that displays a temporary

16   graphic element over the content viewing area during times

17   when the browser is loading visible content."

18       Now, if there was any ambiguity, two sentences later they

19   say, "Blonder never suggests a technique or desire for

20   currently displaying the delayed content and the padding in

21   the content viewing area."  What they were saying is that

22   Blonder did not simultaneously show the padding and the

23   downloaded content.  And we're different.  We're different

24   because we're going to display visible content to you on the

25   screen while the graphic element is still there.

 1          So, between the express statement that I had showed you in

 2     Slide 22, and the statement here on 23, it can't be any

 3     clearer.  The visible content is -- the content is visible as

 4     it's being loaded.

 5          Now, Microsoft makes this argument about conflating

 6     loading and displaying, and that certain claims have separate

 7     loading and displaying steps.  And they're right.  There are

 8     certain claims that have separate loading and displaying

 9     steps.  But those claims do not include loading visible

10     content.  And that is critical.  In those claims, the loading

11     step is separate from a displaying step.  In Claims 2 and 12,

12     they say, "loading visible content," which means that those

13     steps are happening at the same time.  And that is shown

14     there on Slide 25.

15          And, unless Your Honor has any questions, I'm going to

16     take a seat.

17               THE COURT:  Explain to me what Motorola believes is

18     the test the court should apply to distinguish between a

19     disavowal and an explanation.

20               MR. PEPE:  Did the applicant -- well, did the

21     applicant give up claim scope by making arguments or

22     amendments to the claims?  And I submit that's exactly what

23     happened here.

24               THE COURT:  Okay.

25               MR. PEPE:  But I will also add that even if it was

1    not a disclaimer, you can still use the prosecution history

2    for context, and to get an understanding as to what the

3    applicant understood as the invention.  And that's cited in

4    the *Phillips* case at page 317, stands for that proposition.

5    You can look at the prosecution history to have an

6    understanding of what the applicant understood as his or her

7    invention.

8        THE COURT:  My reading of *Phillips*, is prosecution is

9    useful for disavowal, and that I really need to look to the

10    specifications.  And I think you're in agreement with that

11    interpretation.  But you currently are arguing for greater

12    emphasis on prosecution history.

13        MR. PEPE:  What *Phillips* says is that the spec -- and

14    *Vitronics* says the spec is the single best guide.  And I

15    certainly agree with that.  And *Phillips* does say the

16    prosecution history, because it's a back and forth between

17    the patent office and the examiner, it doesn't have the same

18    clarity as the specification would.  But that doesn't mean

19    you don't consider it.  It means that you have to understand

20    the context of what the prosecution history is all about.

21    But it certainly can be used, even in a non-disclaimer

22    setting, to understand what the claim terms mean.  And,

23    again, that's at 317 in the *Phillips* case.

24        THE COURT:  All right.

25        MR. CEDEROTH:  Your Honor, may I ask for 20

1   additional seconds on the "during?"  And it just goes to

2   Blonder.  I don't think there's a big divergence between

3   Mr. Pepe and myself in terms of the import of, as a matter of

4   law, the prosecution history.  It can be informing.  But when

5   you look at this prosecution history, you see the applicant

6   and the examiner were talking past each other for a long time

7   about Blonder.  And in the end they reached a meeting of the

8   minds as to the claims would not cover Blonder.  Blonder does

9   not provide any indication to the user that content is being

10  loaded.  It simply puts up alternate content, which frankly

11  could be confusing to the user.  It's not the content the

12  user was looking for.  It's padding.  And eventually it will

13  go away if the other content is successful in loading.

14      I think eventually the examiner and the applicants reached

15  a meeting of the minds on that, that the graphic element is

16  not this additional content, and the graphic element is

17  displayed during loading, provides the feedback to the user,

18  so the user doesn't get frustrated, turn off the browser,

19  navigate away to a new page.

20          THE COURT:  All right.

21          MR. CEDEROTH:  On --

22          THE COURT:  It seems to me only appropriate that you

23  and Mr. Pepe argue "obstructing."  But I'm not sure who's

24  going to speak on behalf of Microsoft.

25          MR. CEDEROTH:  I've drawn the straw on obstructing.

1    And hopefully we'll move in a helpful path on this one.

2        The real dispute here is obstructing.  Is it opaque?  Is

3    the graphic element opaque?

4            THE COURT:  Would you define translucent and opaque

5    for me?

6            MR. CEDEROTH:  Well, I have a slide, Your Honor, in

7    terms of obstructing.  I was thinking about this,

8    particularly in terms of -- I mean, if you wake up in the

9    morning and you've got a lovely view of Mount Rainier out

10   your window, you know, not every day it's unobstructed, but

11   when it is, it's a sight to behold.  You know, a tree could

12   -- a maple tree could grow, or branch could grow across your

13   window.  And to some extent it obstructs your view of

14   Rainier.  But you can still see it.  You can still see the

15   content.

16       I don't think that's translucent.  I think the little

17   pieces of the tree are opaque.  But I think the winter scene

18   on the slide clearly falls within any acceptable notion of

19   obstructed.  As the leaves grow on the tree, the obstruction

20   increases.  And I think each of the winter, spring and summer

21   illustrations on the slide fall within obstructed.

22       As to translucent and opaque, I was sitting in

23   Mr. Harrigan's office yesterday and enjoying his view across

24   the Sound to the Olympics.  But as the afternoon came on and

25   the sun peeked through the clouds, a very helpful

1  administrator came in and pulled shades in the conference

2  room to keep the sun from beating in.  I could still see

3  through them.  I could still see the ferries crossing the

4  Sound.  I could still see the Olympics in the background and

5  the snow on the peaks, and the clouds, then, eventually

6  blotting out the sun.  But there was clearly an obstruction

7  to the view.  It wasn't crystal clear anymore.  But you could

8  see it.

9       Alternatively, you think about either the slide, or what

10  Mr. Harrigan's administrator could have done, you pull a

11  classic window shade, which -- you know, a blackout shade

12  that completely blacks out whatever you're trying to see,

13  whatever would otherwise be visible through the window.  Put

14  that in the context of this patent, and what you're talking

15  about is something on the screen, a graphical element, that's

16  visible to the user.  It's not hidden in the content, and

17  provides the indication that loading is going on.

18       I think that is what -- and the claims address this from

19  various different angles in terms of obstructing only part of

20  the view.  And the dispute is, is it opaque, or is it

21  translucent?  It certainly serves the complete purpose of the

22  invention, as long as it is visible to the user.

23            THE COURT:  All right.

24            MR. BRENNER:  Counsel, may it please the court,

25  Samuel Brenner.  I liked Mr. Cederoth's image of the trees

1    obstructing the view.  And I think it actually captures the

2    concept of obstructing.  If you're looking behind the trunk,

3    you're not seeing behind the trunk.  I think that is

4    obstructing.  I think that it is blocking entirely.  If we

5    look at Slide 28, as opposing counsel pointed out, our

6    principal dispute is whether obstruct means interfere with,

7    as well as block.

8        I think in understanding what the patentees were getting

9    at when they used the term "obstruct," it's useful to think

10   about what the point of this invention was.  This notion was

11   there were smaller screens on personal handheld devices, and

12   so they moved the loading status indicator down into the

13   content viewing area.  And they did a couple things.  They

14   made it temporary, so they removed it as soon as the content

15   was finished loading, so you have as little obstruction as

16   possible.  And they also instructed again and again in the

17   specifications -- they stated again and again in the

18   specifications, that this graphic element should be located

19   in a corner.  Again, to obstruct as little content as

20   possible.

21       I think Microsoft wants to broaden its patent to cover

22   translucent indicators.  And we talked about, in our opening

23   brief, what their motivation is.  There are some of these

24   asserted devices where there are translucent indicators,

25   indicators you can see through.  But I think nothing in the

1    claims, or the specifications, or the prosecution history,

2    says that this graphic element can be translucent.  That

3    seems to be an important change from any of the prior art

4    that's discussed in the specification.

5        We don't see that.  What we see, instead, in the claims in

6    the specification, is that there are geographic limitations

7    to where the graphic element is located.

8            THE COURT:  When you say a geographic location,

9    you've also interchangeably used the phrase "corner."  Where

10    do you get "corner" from?

11           MR. BRENNER:  Your Honor, if we look at Slide 29, in

12    the specification, in the summary of the invention, they talk

13    about this being, "A temporary, animated graphic element is

14    presented in the corner of the content viewing area during

15    times when the browser is loading content."  And they state

16    later on in the second blowout, that the temporary graphic

17    element is preferably located in a corner.  And they even say

18    a blank corner, the upper right-hand corner.  And I think the

19    context there makes it clear that that's because the graphic

20    element is obscuring the content that's behind it.  And

21    they're trying to limit the extent of that obstruction.

22           THE COURT:  If I go back to the claim language it

23    says, "Obstruct only part of the content."  That's in 1.  And

24    in 12 it says, "Positioned over a portion of the content."

25    That's in 12.  Which do I look at, the summary of the

1    invention or the actual language?

2            MR. BRENNER:  Your Honor, I think you can look at

3    both.  I think that they agree with each other.  I think the

4    claim language when taking about obstructing part of the

5    content, is talking about what happens in a particular area.

6    The patentees, in looking for this invention, in seeking to

7    get this invention, were dealing with a problem where if they

8    had the graphic element there, it was going to block the

9    content.  That's why they're focusing on the corner.  That's

10   why they're focusing on the blank corner.

11        And if we can see Slide 29, again, I'm sure you're

12   familiar with Figure 3, we've shown it to you a number of

13   times.  That's this picture, with the temporary graphic

14   element in the upper right-hand corner, where it's not going

15   to get in the way, where it's not going to obscure other

16   content.

17        If we could turn to Slide 30.  Your Honor, in their brief

18   Microsoft makes much of the word "or," and suggests that here

19   as used in the specification, "or" makes obstruct and

20   interfere interchangeable.  And we address that.  They cite a

21   case, the *Edwards Lifesciences* case, which I think stands for

22   the reasonable proposition when a word is used

23   interchangeably in the specification, that's akin to a

24   definition.

25        I think the *Edwards Lifesciences* case is not relevant to

1   this consideration.  In that case the court was dealing with

2   a prosecution history and a specification where the words

3   "graft," and "intraluminal graft" were repeatedly used

4   interchangeably in I think the specification and the

5   prosecution history.  I don't think they were ever separated

6   by the word "or."  There was a long history in those patents

7   where I think the modifier was taken out and put in in

8   various places.

9        That's not this case.  This is plain language.  What here

10   the specification is worried about in the prior art, I

11   believe, is that the browser controls not obstruct the

12   viewing area, and not interfere with the viewing area.  Those

13   are two separate concepts.

14        THE COURT:  Well, would you agree with me that if we

15   had a graphic element that acts to gray out the underlying

16   content, that that would obstruct the underlying content?

17        MR. BRENNER:  Your Honor, I think in the context of

18   this patent, as the word obstruct is used, if you can see

19   through it, it's not obstructing.  Obstruct means block

20   completely.  And I don't want to circle around to make a

21   circular argument in this regard.  But, that's why.  And I'm

22   going to harp on the corner again.  That's why it's got to be

23   placed in a corner.  It's got to be in a portion.  If it was

24   translucent, if it was just graying out the content, and it's

25   removed after the content is completely loaded, there would

1    be no reason to place it in the corner, if you could see

2    through it.  Because it's going to be gone as soon as the

3    content is completely loaded.  The problem is that it's

4    blocking something entirely.

5              THE COURT:  All right.

6              MR. BRENNER:  Thank you, Your Honor.

7              THE COURT:  Thank you, Mr. Brenner.

8              MR. CEDEROTH:  Five seconds, if I may.

9              THE COURT:  Yes, sir.

10             MR. CEDEROTH:  I want to point out that Claim 6

11   actually recites that the graphic element appears in the

12   corner.

13             THE COURT:  All right.  "Icon," Mr. Cederoth.

14             MR. CEDEROTH:  Mr. Greenfield.

15             THE COURT:  Mr. Greenfield.  So did you or

16   Mr. Brenner get the better term to construe here?

17             MR. GREENFIELD:  I have this and "window," so I'm not

18   sure which one would end up better.  If I may approach the

19   court, Your Honor, I have slide handouts.

20             THE COURT:  Thank you.  Let me give you some

21   guidance.  My concerns in the '582 patent, use of the term

22   icon, is first, you make -- Microsoft makes a big point out

23   of Motorola's proposed construction excludes text.  And I'd

24   like to know where that comes from .

25        And secondly, since the purpose of this icon in this

1   patent seems to be that it's used by the user, what's wrong

2   with importing the "manipulated by the user" language?

3           MR. GREENFIELD:  Your Honor, I'll start with text.

4   Motorola made it clear in their non-infringement contentions

5   that any icon that contains text is not an icon, according to

6   this patent.  I think that's their non-infringement argument

7   that we're going with, which is why we felt the term icon

8   needed to be construed.  We don't understand why -- an icon

9   can contain text.

10          THE COURT:  Well, for those of us who may not be very

11  visual, I'll use the example recycle bin.  That's in the

12  pleadings.  I mean, it's got what I guess I'm supposed to

13  construe as a garbage can filled with something.  I thought

14  it was popcorn for the longest time.  But underneath it, it

15  says "recycle bin."  Well, dummy, now I get it.  So, it seems

16  to me that the use of text in connection with an icon is a

17  recognized use here.

18          MR. GREENFIELD:  Your Honor, we agree.  We believe

19  that an icon can be or can contain text.  And we think it's

20  clear even in Motorola's own brief they cite to, as you

21  mention, the recycle bin, that contains text underneath.

22  Motorola tries to distinguish that text and say it's just a

23  textual label.  But you can click on the text recycle bin and

24  open up the recycle bin.

25          Similarly, in their brief they refer to Microsoft Word's

1    "W" icon, and say that's stylized text, so it doesn't really

2    count as text.  I think that just sort of begs the question

3    of what other distinctions does Motorola envision can't be

4    text?  I mean, is it not text because it's blue?

5        The applicant did state in the file history a reference,

6    as you see in Figure 3 on the left there, referenced an icon

7    40a.  And that has text in it, too.  And referred to that as

8    text, referred to that as an icon with text.

9            THE COURT:  Let me ask you my zinger question to ruin

10   your whole day.  Why don't I use just use your own dictionary

11   definition of icon?

12           MR. GREENFIELD:  Your Honor, we actually -- turning

13   to that.  I will say just as a side note that the dictionary

14   definition, you know, the dictionary is extrinsic evidence,

15   even though it is the Microsoft dictionary.

16           THE COURT:  Of your client, prepared by your client,

17   for your client, and used by your client.

18           MR. GREENFIELD:  Correct.  But not by the inventor of

19   this patent.  He did not create the icon definition.

20       You know, we don't have too much objection with the

21   dictionary definition.  We just think that it should be

22   clarified that an icon can be or can contain text.  That's

23   clear from the intrinsic evidence.

24           THE COURT:  All right.  Continue on if you want to

25   say anything else.  I didn't mean to cut you off.

1          MR. GREENE:  My only other comment, Your Honor, I

2     think there's not much point in continuing with this.  But

3     Motorola insists that an icon can be manipulated as far as

4     construction.  And Claim 1 requires an actuatable icon to the

5     extent that --

6          THE COURT:  Claim 1 requires --

7          MR. GREENFIELD:  An actuatable icon.  I have problems

8     pronouncing that word, sorry.

9          THE COURT:  That might be why it's not in the

10    dictionary, at least any dictionary that we can find.

11         MR. GREENFIELD:  It's an icon that can be actuated.

12    The parties have agreed on a construction that means

13    activated, essentially.

14         THE COURT:  Okay.

15         MR. GREENFIELD:  But to the extent that Motorola is

16    adding in the limitation that an icon must be manipulated, we

17    think it's superfluous.  Thank you.

18         THE COURT:  Thank you.  Mr. Pepe.

19         MR. PEPE:  We have additional binders, Your Honor.

20         THE COURT:  You may proceed.

21         MR. PEPE:  If I could direct your attention to

22    Slide 5 of the new slide dec.  The issue here is really

23    whether icons are limited to images.  And Motorola agrees

24    with Your Honor's suggestion that the Microsoft dictionary

25    provides an acceptable definition for icons.  It's the one

1   that we have proposed here for icon.

2       If you could turn to Slide 6.  The patent doesn't provide

3   an awful lot of guidance as to what icons are.  But the

4   little guidance it does provide supports Motorola's position

5   that an icon is an image.  As seen on Slide 6, "The patent

6   equates icons with displayable bitmaps."  A bitmap is an

7   image.  And the few times the patent identifies or discusses

8   icons, it identifies images.  For example, the keyboard, 52.

9   They say that is the icon.  Now, because there's admittedly

10  not a lot of evidence in the intrinsic record, both parties,

11  both parties turn to dictionaries.

12      And as Your Honor noted, Motorola relies upon Microsoft's

13  computer dictionary.  And Microsoft's computer dictionary

14  defines icon as an image.  And, yes, the thing of popcorn is

15  at the bottom.  But the recycle bin text, that's a textual

16  label.  That's not part of the icon.  That's something that's

17  separate.  You could actually right click on recycle bin, and

18  you could change the textual label.  It's not part of the

19  image.

20      And that's really the key here.  The key is that an icon

21  is an image, it is not text.  And when you look at the

22  dictionary definitions on Slide 8 that Microsoft relies on --

23  they don't rely on their own, they rely on others -- but

24  you've got to take a closer look at what these dictionary

25  definitions say.  The first one says an icon is a symbol, and

1    a tiny picture.  Those are images.  You don't see those words

2    in their construction.

3        The second one says, "A small pictorial on-screen

4    representation."  They conveniently take that part out, "the

5    small pictorial."  And they just go with, "on-screen

6    representation."  So not only do they ignore their own

7    dictionary, they selectively cite the dictionaries that they

8    do rely upon.

9        Now, turning to Slide 9, they do rely upon a cited

10   reference in the Berman 773 patent, which happens to be a

11   Microsoft patent, and it provides this whole list of images,

12   and calls these icons.  And Microsoft focuses on 40a.  And if

13   you could flip over to Slide 10.  40a includes the

14   letter "a."  That's not text.  That's part of the image.

15   It's part of the picture.  Motorola's construction allows for

16   characters to be part of the image.  It would allow for text

17   or textual characters as part of the image.  The key is, is

18   that an icon is an image.  It's not text.

19       Now, when I was preparing for this hearing --

20           THE COURT:  Excuse me, explain to me again how a

21   small image displayed on a screen includes a text -- or, what

22   did you just call it?  A letter?

23           MR. PEPE:  I'm sorry, Your Honor?

24           THE COURT:  Your proposed definition is a small image

25   displayed on a screen.  But I thought I just heard you say,

1    but it's okay to put a letter in your small image?

2         MR. PEPE:  My point being an image can include

3    characters.  For example, when you're looking on Slide 10,

4    Microsoft Word has a "W" as part of the image.  You could

5    have a picture that has a character as part of the image.

6    It's still an image.  It doesn't convert the image to text.

7    So there's a distinction.  Text is something that you write

8    into an e-mail.  Text is something you write into a Word

9    document.  Text is something that you fill into a cell of an

10   Excel spreadsheet.  A character within a picture, a character

11   within an image, that's not text.

12      And Microsoft itself makes this clear.  When you look at

13   their 773 patent, and I'm on Slide 11, right there in their

14   patent, they say, "Present day computer systems often employ

15   object-oriented displays with icons, pictures, and text."  So

16   there Microsoft itself is distinguishing between icons and

17   text.

18      But there's even more on Slide 11.  Microsoft goes on to

19   say, in their own patent, "Object-oriented display systems

20   often utilize small graphical items or objects called icons,

21   which symbolically indicate a type of operation."  So,

22   there's that manipulation by the user.  It's a type of

23   operation.  And this notion of small graphical items and

24   symbols, supports Motorola's notion that an icon has to be an

25   image.

1    And, finally, Your Honor, on Slide 12, the fundamental

2    problem with Microsoft's construction, an on-screen

3    representation of something, it basically reaches an absurd

4    result.  Everything on the screen represents something.  So

5    under their construction, arguably everything would be an

6    icon.  And that's just not appropriate or right.

7         Thank you, Your Honor.

8              THE COURT:  All right.

9              MR. GREENFIELD:  Your Honor, may I have a minute to

10   respond?

11             THE COURT:  Yes.

12             MR. GREENFIELD:  Your Honor, as a first note,

13   Motorola just referenced the 773 patent as identifying and

14   defining icon.  It's a different patent.  It's not relevant

15   here what an applicant might have said in that patent.

16        As another issue, the '582 patent repeatedly refers to

17   icons as buttons, a note to the fact that they're

18   interchangeable.  So when you go down here, and again the 52,

19   this keyboard, is the only specific example of an icon that's

20   identified in the patent.  But element 70, which is that up

21   arrow, in the claims is the actuatable icon that it refers

22   to.

23        Under Motorola's construction, evidently from what they

24   just said, if instead of that up arrow we had a letter "a"

25   there, that would still be an icon.  But if we had, say,

1    "input method," or, "select input method" there, that

2    wouldn't be an icon, because that's text, not just a single

3    character.

4        Microsoft's position is not that any text can be an icon.

5    We're not talking about a Word document where you can select

6    two words at random and say, here's an icon.  An icon still

7    has to be, according to the claim, representative of an input

8    method.  We wanted to make that clear, we're not talking

9    about any random words.

10       And, finally, just from the art at the time, under

11   Motorola's proposed construction, none of these buttons or

12   icons would actually be icons, because they contain text.

13   They contain more than just a single letter.

14            THE COURT:  Okay.  Thank you, sir.

15            MR. GREENFIELD:  Thank you, Your Honor.

16            THE COURT:  Counsel, I believe we were going to do

17   "invoking a selected input method," and then take our break.

18            MR. CEDEROTH:  Your Honor, I'll try to make up some

19   time.  Let me limit my comments with respect to "invoking."

20            THE COURT:  We're doing fine on time.  This is a

21   troublesome patent for the court.  If I literally take your

22   proposed construction, it seems to me you don't have an

23   invention, because the SIP manager has to do something.  I

24   mean, it was my understanding that the gravamen of this

25   invention was that input went into the SIP manager, which in

1    some manner converted it into instructions that any

2    application could understand, without disclosing the source

3    of the input.

4        If that's the case, taking your construction here, I don't

5    see what this -- there's no invention in this invention.

6            MR. CEDEROTH:  Let me address that, Your Honor.

7        The claims actually come at this from two ways.  There are

8    claims which specifically required a SIP manager or a

9    management component.  Then there are claims that are silent

10   as to that.  It's the claims that are silent as to the

11   management component where this issue arises in terms of the

12   dispute, vis-a-vis invoking.

13       What those claims allow is that the applications, that in

14   effect this translation capability, or functionality of a SIP

15   manager, can be distributed to the applications.  And I think

16   it still fits within the confines of the invention as we

17   discussed last week, which was the idea of breaking away from

18   having dedicated keyboards, or dedicated input methods, for

19   particular applications.  Or dedicated input methods for a

20   particular device.

21       What this still would allow, if you distribute the -- I'm

22   shorthanding this -- but the translation capability, if you

23   distribute that among the applications so that they can

24   recognize the input, the input is translated, you're still

25   within the broad notion of the invention.  And I think that

1    the claims, as agreed with the examiner, reflect this

2    dichotomy that some are specific to the management component.

3         Claims 19 and those that follow, they claim the management

4    component and what it does.  And they would require it to do

5    the invoking.

6         THE COURT:  Well, if you have distributed the

7    translation function to the application, where does that

8    translation function come from?  I mean, if I understood you,

9    you just told me that you send it out to the various

10   applications.  Where did it come from?

11        MR. CEDEROTH:  If I could grab the patent for a

12   moment.

13        I think to start at the very literal level in terms of the

14   diagrams shown in Figure 2, it would reach the applications

15   through the graphical -- the input would reach the

16   applications through the graphical window environment.  You

17   would simply not have the SIP manager interposed between the

18   input method and the graphical windowing environment.

19        But the application, and in the, I don't want to say "real

20   world," but in a development environment, the way this would

21   happen, is the API, or the application program interface,

22   could be published in a way that the application developers

23   can include the basic handshaking requirements that would be

24   needed to allow it to accept the generic input.  So that as

25   you wrote a new application for a device, instead of

 1    dedicating a particular input method to it, such as the

 2    patent describes, you know, whether it's a QWERTY keyboard,

 3    or a numeric keyboard, or other options, what you would do is

 4    you would include, in effect, the API that the SIP manager

 5    provides, and it would reside with the applications.

 6        Or it could be included in the graphical window

 7    environment.  It basically defines an API which can be

 8    present anywhere on the device and still provide the benefit

 9    that the invention seeks to provide.  And I think that is the

10    scheme that's represented in the claims.

11        I think the other point that I wanted to make, Your Honor,

12    is with respect to this reference in the prosecution history

13    where the applicants' refer to invoking, for example, through

14    the use of the management -- provide the management

15    component, or the SIP manager.

16        And for that Motorola equates that as a definition.  And

17    they cite to the *Sinorgchem* case from the Federal Circuit.

18    Two important distinctions there.  One, the "for example"

19    reference.  I think it was up to -- for example, up to about

20    four percent, was the phrase in the *Sinorgchem* patent.  That

21    was found in the specification.  And the Federal Circuit

22    found that, in fact, the applicants there had acted as their

23    own lexicographer.  Here we're talking about something that

24    is an attempt to explain in the prosecution history.

25        And more importantly, though, when you looked at the

1   bottom line, what the actual construction was in the

2   *Sinorgchem* case, the Federal Circuit found that it is, "An

3   amount up to, for example, up to about four percent."  They

4   included the e.g. in the example, or in the construction.

5          So, if we were to take Motorola's construction here on

6   "invoking" and say, for example, by management component we

7   would be being true to that case.  And I think there would be

8   no particular problem with that.

9          But the claims in 15 and 17 are simply silent about what

10  does invoke mean.

11              THE COURT:  Thank you.

12              MR. PEPE:  Your Honor, since Figure 2 is such an

13  important part of this, we decided to make a board, a big

14  board so we could all see it.  And if I could ask you to take

15  a look at Slide 15 in the book.  And to echo your comments

16  earlier, this patent is all about the SIP manager and the

17  management component here.  If there is an invention here,

18  it's the management component.  When you look at Figure 2,

19  input methods were known, applications were known, the

20  graphical window environment was obviously known.  And so

21  were the keyboards.

22          What is potentially new here is the SIP manager.  And you

23  need to keep in mind what they were trying to do with this

24  patent.  What they say in the patent is that in the prior art

25  each application had its own soft input panel.  So you would

1   have a word processor, a spreadsheet, an e-mail program, all

2   with their own soft input panel, and it was inefficient.  And

3   what they tried to do was have a separate place for these

4   input methods, these soft input methods, so that these

5   various applications could share the input methods.

6       And the only way to do that is with this SIP manager, this

7   management component, to be a traffic cop, to interface

8   between the input methods and the applications.  And when you

9   -- flipping over to Slide 16, when you look at the objects of

10  the invention they talk about this -- Microsoft talks about

11  this in their responsive briefs, that the objects of the

12  inventions don't talk about SIP managers or management

13  components.

14      But when you look at what they're talking about here in

15  the objects, they're all performed by the management

16  component.  For example, the fourth object enables a

17  plurality of applications to receive user input from a common

18  input method.  That is achieved by and with the management

19  component.  And that would hold true to all six of these.

20      And when you -- flipping over to Slide 18, when we focus

21  in on this invoking action, the management component, the SIP

22  manager, is the only component disclosed in the entire patent

23  as performing this invoking action.  And it says it right

24  there, "SIP manager 58 loads and calls the selected input

25  method."

1     Now, if the management component didn't perform this step,

2   it would need to be performed by either the application or

3   the graphical window environment, which is precisely what the

4   patent is trying to avoid.  That was in the prior art.  They

5   did not want to have the invoking step done by the

6   application, or by the graphical window environment.  They

7   wanted to have the input method separate.  In order to keep

8   it separate, and independent, you needed to have the

9   management component and the SIP manager to act as a traffic

10  cop.

11     And they explained that during prosecution.  They said,

12  "The selected input is then invoked, e.g. loaded and called

13  by a management component."  And then they go on to say, in

14  another portion of the prosecution history, "The input method

15  that is loaded by a communication manager."

16     So it's clear, there's one embodiment disclosed, there's

17  one thing that is identified as performing the invoking, and

18  that is the management component.

19     To briefly address Motorola's argument about the

20  *Sinorgchem* case.  To be clear, we're not saying every time

21  you see "e.g." it's an express definition.  And I thought

22  this was an important enough point that I wanted to quote our

23  brief.  What we say, and you can see that on Slide 19, "In

24  this circumstance, where the patent discloses a single

25  structure as performing the invoking step, the use of e.g.

1    amounts to an express definition."  And we cited to

2    *Sinorgchem* simply to indicate that the Fed. Circuit has

3    looked at "e.g." before, and said that it doesn't mean, "for

4    example."  So I just wanted to be clear, maybe we could have

5    been clearer in our language, but we're not saying every time

6    we use "e.g." it amounts to an express definition.

7         Now, Microsoft raises in its brief and raised during the

8    argument, the fact that certain claims, including "manager

9    component," and they're making what amounts to a claim

10   differentiation argument.  "Manager component" is in certain

11   claims.  It's not in the ones that include "invoking."  And

12   claim differentiation is not a hard and fast rule.  That's

13   what the Fed Circuit has said.  And in situations as is here

14   where the only structure that's disclosed as performing

15   "invoking" is a management component.

16        And the very purpose of the patent is to use the

17   management component to act as an interface between the input

18   methods and the applications.  And given the statements in

19   the prosecution history, it is entirely appropriate to say

20   that the invoking step is performed by the management

21   component.  Because otherwise it would be performed, as I

22   said, by the applications or the graphical window

23   environment, which was done in the prior art.  Thank you.

24             THE COURT:  Thank you.  Brief rebuttal, Mr. Cederoth.

25             MR. CEDEROTH:  First, we are talking about an

1   explanation given in the prosecution history.  It's not in

2   the specification.  Counsel makes the point that this is the

3   only embodiment shown in the patent.  That's not unusual in

4   the patent context, and patent law.  And when you go to the

5   specification, they don't point to any words of exclusion in

6   reference to the only embodiment, or reference to this as

7   being the invention.  Only counsel refer to it that way.  The

8   patent doesn't.

9       And in terms of the dichotomy in the claims -- and we're

10  not able to pull it up immediately -- but the reasons for

11  allowance from the examiner in the notice of allowability,

12  which I'll find the cite for or otherwise provide to the

13  court, it refers expressly to Claim 15 as the list of claims.

14  And it makes no reference to the management component.  So,

15  if it is the invention, you would think it might have had

16  some play in the reasons for allowance.  Thank you, Your

17  Honor.

18          THE COURT:  Counsel, we'll take our morning break at

19  this time and come back out at 20 minutes to 11, at which

20  time we will take up "distinct from" language, which we

21  marked as six for this morning's agenda.  We'll be in recess.

22              (The proceedings recessed.)

23          THE COURT:  Mr. Cederoth, I believe we left off on,

24  "distinct from."

25          MR. CEDEROTH:  Thank you, Your Honor.  If I could

1    backtrack.  I promised a cite on the reasons for allowance

2    right before we left.  And that's docket 226 at Exhibit EE.

3              THE COURT:  All right.

4              MR. CEDEROTH:  The current term is "distinct from

5    computer/applications/programs."  The latter terms being used

6    in Claims 1, 11, 15 and 19.  "Distinct from" seems to be

7    really the core of the dispute here.

8              THE COURT:  Let me suggest the following:

9              MR. CEDEROTH:  Sure.

10             THE COURT:  We're going to do this one a little bit

11   differently.  Tell me what is wrong with Motorola's

12   construction.  And when Mr. Pepe gets up I'm going to ask him

13   what's wrong with Microsoft's construction.

14             MR. CEDEROTH:  Okay.  Our principal dispute with

15   Motorola's construction is the insertion of the word

16   "independent."  We're not sure what it means.  We don't think

17   it comports with the description of the inner operation

18   between the input methods and the applications that use them

19   as described in the patent.  And we don't find it anywhere in

20   the claims.

21        In fact, the claims talk about input method components

22   that plug into the applications.  They're components.

23   They're not -- they can't be completely independent, because

24   then they're not -- you know, of course it depends on what

25   independent means.  And that is going to be the next dispute

1    if that's included.  We could live with the separate from --

2    the input methods are separate from the computer programs and

3    applications.

4        The second piece where they go on to define computer

5    programs and applications are self-contained executable

6    software.  In general I think that's, you know, not horribly

7    objectionable.  It's taken not surprisingly from a Microsoft

8    computer dictionary.  But I think the court encountered what

9    is a computer program in another case recently, and I think

10   there decided it's really an identifiable set of instructions

11   or words to that effect.  I think that would work fine here

12   also.

13       I think computer program, at bottom, probably really

14   doesn't need to be defined to get to the essence of the

15   dispute here.  Which, to be honest, Your Honor, eludes us.

16   We believe it's somehow embedded in the "independent and"

17   piece.

18           THE COURT:  All right.  Thank you.  Mr. Pepe.

19           MR. PEPE:  Well, not surprisingly Motorola's issue

20   with Microsoft's construction is that it doesn't include the

21   term "independent."  And that's really the fundamental

22   dispute between the parties.

23       Now, what's interesting is that the word "distinct" does

24   not appear anywhere in the specification of the patent.  The

25   term "distinct" was added during prosecution.  And that's

 1   where we need to go.  We need to go to the prosecution to see

 2   exactly what was meant by "distinct."

 3       And just to kind of follow up on an earlier point, what

 4   *Phillips* does say at page 317 is that, "Like the

 5   specification, the prosecution history provides evidence of

 6   how the PTO and the inventor understood the patent."  And

 7   that's why we need to go to the prosecution history.

 8       And if I could ask you to flip to Slide 24, the

 9   distinction between --

10           THE COURT:  Let me stop you before we go to 24.

11           MR. PEPE:  Yes.

12           THE COURT:  I think what I heard you implicitly just

13   say, if we're arguing about the presence or absence of the

14   word "independent," which seems to be the dispute between the

15   parties, is you want to clarify that the input method is a

16   separate piece of software from the program application.  Is

17   there more in that dispute?

18           MR. PEPE:  Yes.  It's not just separate.  Separate

19   means that it's stored in separate parts of the system.

20   Independent means that it functions independently.  And you

21   need to have that in order to get around the Stucka

22   reference.  And Slide 24 shows Stucka and the patent

23   side-by-side.  And the reason for the independence becomes

24   clear when you compare the two systems.

25       Now, in Stucka there was this display object store, that

1    basically is a storage place for user interface elements.

2    And what would happen is the Applications A, B and Z, all the

3    various applications, could pull parts or information from

4    the object store.  And those applications themselves would

5    build the input methods or the user interface.

6         So even though they were stored separately, the display

7    object store and the applications, even though they were

8    separate, what would happen here is the applications would

9    pull in those user interface elements and the applications

10   themselves would build the user interface.

11        The '582 patent is different.  And you've got to remember

12   what we were trying to do here was to have applications be

13   able to be changed while the input method stays the same, and

14   vice versa.  You want to have this independence.  And unlike

15   Stucka, the claim input methods control their own appearance

16   and their own operation.  And I think Your Honor alluded to

17   that earlier where the applications don't know where this

18   information is coming from.  And that's because these input

19   methods function independently.

20        And when you look at Slide 25, that's precisely what they

21   told the patent office.  They said, "In contrast to the

22   present invention, Stucka is directed towards providing

23   applications with the ability to dynamically construct their

24   own user interfaces using display components selected from a

25   server."  What these applications do is they pull this

1    information from this separately stored area and they build

2    their own user interfaces.

3         They go on to say, "Stucka's teachings are thus directly

4    opposite the fundamental concept of the input as defined and

5    claimed in the claims of the present invention.  For one,

6    input methods of the present invention are not built and

7    output by the application program, but are independent

8    software entities, that among other things essentially draw

9    themselves."  Then it goes on to note that the claims include

10   the word "distinct."

11        That is where we get guided in the prosecution history as

12   to what "distinct" means.  What they're saying here is unlike

13   Stucka, where the applications actually themselves draw the

14   user interface, in our patent it's going to be different.

15   This is what the applicants were saying.  In our patent the

16   input methods will control themselves.  They will be

17   independent.  They will function independently from the

18   applications.

19        And when you flip over to Slide 26, there's other

20   statements in the patent and the prosecution history that

21   support this notion of independence.  And the appeal brief

22   during prosecution, the applicant said:  Each input method

23   runs its own executable code.  Each input method draws its

24   own input panel.  Each input method calls a function of the

25   management component.

1    And they even call the input method application.  You have

2   an application, which is an input method, and it's

3   communicating with another application.  This is this notion

4   of independence.  Without this notion of independence, you

5   wind up back at the prior art.  The problem they were trying

6   to solve, what they were trying to do, the fundamental

7   purpose for this patent, was to have these input methods, not

8   just be separate, but to be independently functioning from

9   the applications.

10    Now, one of the things that came up during the argument

11   and in their briefs, if you look at Slide 27, they criticize

12   this notion of independence because they're saying the input

13   methods and applications will prevent them from merging or

14   combining at run time.  Well, what I did was I grabbed one of

15   their slides from Microsoft's tutorial.  And plainly you can

16   see the soft input methods are on the left, the applications

17   are on the right.  They're separate.  They're independent.

18   And they're communicating through an interface.  If they were

19   going to merge or combine, there would be no need for that

20   interface.  They're separate.

21    The fundamental problem -- and again if you can look at

22   the bottom of 27, what they said during prosecution, or

23   actually in the patent, is that the input method can stay the

24   same as the user switches between applications.  This is

25   further proof that there isn't a merging at run time.  What

1    the patent is saying is that you could keep your soft input

2    panel up on the screen and then switch from Application A, to

3    Application B, to Application C.  All the time that soft

4    input method is going to stay up on the screen.  That's this

5    notion of independence.

6        And if you can look at Slide 28, the fundamental problem

7    with not including independence is that you wind up back at

8    Stucka.  Stucka had a separate object store where you had the

9    user interface elements, and separate applications.  And

10   Microsoft's construction would read on that.  It's only by

11   including the requirement that they be independent and

12   function independently that gets you around the Stucka

13   reference.

14            THE COURT:  All right.  Mr. Cederoth.

15            MR. CEDEROTH:  Thank you, Your Honor.  Again the term

16   "independent" is -- I'm still not sure what it would mean if

17   we import it into the construction here.  Notably the reasons

18   for allowance over the Stucka reference, again that's docket

19   226 at Exhibit EE, make no reference to this independence.

20   The examiner was fine with the "distinct from."  The slide

21   that counsel put up shows that the input methods are, in

22   fact, separate.  You know, that was the point of this, that

23   they could make it come to the device, come to the

24   application.  New ones could be created and they weren't

25   limited either by the device or the application.  They're

1    certainly separate.  We're fine with that.

2        But this notion that the boundaries are like the Berlin

3    Wall, never to be crossed, I think is not -- particularly in

4    terms of the run-time execution, I mean, it's not clear to me

5    whether counsel is saying that the input methods are -- would

6    they be dot EXE files, dot DLL files?  Are they precluding

7    libraries?  Do they have to be an application that you could

8    buy and run on your own computer?  What "independent" means

9    is not being clarified here.

10        And the reference to the interface from the tutorial.

11    Interfaces, that is how code talks to each other.  That is,

12    you know, whether it's an application programming interface,

13    or in the COM world, that the patent describes, the interface

14    is the way one piece of code talks to another piece of code.

15    It doesn't say anything about what sort of boundaries those

16    pieces of code have themselves.  And, in fact, one could be

17    running in the same process phase and essentially merged into

18    at one time.

19            THE COURT:  All right.  The term is "window."

20            MR. GREENFIELD:  Your Honor, the term "window,"

21    Microsoft does not believe it needs to be construed.  It's a

22    very easily understood term.  The patent doesn't attempt to

23    redefine window in any way, either in the intrinsic evidence

24    and the specification file history.  Motorola's adding

25    additional limitations on to a window that are not supported

1   by the specifications.

2      Motorola is requiring that window must be hidable,

3   dockable, movable and resizable.  There's no support for

4   this.  There's no requirement that a window must contain any

5   of these.

6          THE COURT:  Wouldn't you agree with me that the

7   specifications consistently use those four traits in

8   connection with window?

9          MR. GREENFIELD:  The specification does state the

10  windows can be, it does provide examples where windows are

11  hidden, docked, moved and resizable.  But it doesn't require

12  that any window must be able to do those.

13     To that extent, Claims 8 and 9 -- Claim 8 requires that a

14  window be hidden, Claim 9 requires that a window be docked.

15  These are requirements of claim terms, too.  So to the extent

16  that they're written into the construction of window, it

17  would be superfluous to have them.  This is one aspect of

18  Microsoft's burden to prove infringement, is to prove that

19  these windows are hidden and docked.

20     Motorola bases its construction on the same piece of

21  extrinsic evidence that Microsoft does.  And that's the

22  Microsoft dictionary.  The Microsoft dictionary defines, in

23  part, window, "In applications and graphical interfaces, a

24  portion of the screen that can contain its own document or

25  message."  Microsoft believes this is a more than adequate

1    description of a window.  If the court wants to continue with

2    and import the entire definition from the dictionary,

3    Microsoft would not object to that.

4        Motorola argues in its brief that Microsoft's construction

5    is incorrect because it's based on extrinsic evidence.  As I

6    just showed you, Motorola's definition is based on the exact

7    same piece of extrinsic evidence.  They're identical, other

8    than the additional limitations.

9        Motorola further argues in its brief that Microsoft's

10   definition is incorrect because it excludes a requirement

11   that each window has its own boundaries.  Motorola's

12   construction doesn't have that requirement either.  So I'm

13   not sure what their point is.  They have the same issue

14   they're alleging that Microsoft has.

15           THE COURT:  All right.  Thank you.

16           MR. GREENFIELD:  Thank you, Your Honor.

17           MR. McDONOUGH:  I'm Conor McDonough for Motorola.

18   Counsel for Microsoft noted that they take the position that

19   "window" need not be construed, and the term "window" has a

20   plain and ordinarily meaning.  Motorola unsurprisingly

21   disagrees and submits that there's a genuine dispute as to

22   the scope of the term "window."  And the scope of the term

23   "window" has, in fact, been defined in the specification.  As

24   Your Honor noted, the specification repeatedly uses the terms

25   dockable, hidable, movable and resizable, in connection with

1   the term "window."

2       And, therefore, that dispute is likely to persist until

3   trial, absent a construction, and lead to jury confusion

4   about the proper scope of the term.  So Motorola certainly

5   argues that construction is a necessary action to take, and

6   then certainly Motorola's construction is proper.

7       Turning to the substantive basis of the argument.  I was

8   somewhat surprised by Microsoft's assertion that the

9   specification doesn't support Motorola's construction.  When,

10  in fact, there are no less than 22 points in the

11  specification, again as Your Honor noted, that describe in

12  the context of the window, that it be hidden or shown, that

13  it be movable, resizable, dockable.  These are all

14  substantive elements that fully support Motorola's

15  construction.  In contrast, Microsoft has not pointed to a

16  single point in the specification for support for its

17  construction of "window."  And further, has relied upon

18  extrinsic evidence from which it has very selectively picked

19  a very broad definition that would cover virtually any

20  element on the screen.

21      I would note that in contrast to Microsoft, Motorola has

22  applied certain limitations that are based in the

23  specifications to its selection from the Microsoft computer

24  dictionary.  And further, that an idea that a window has its

25  own boundaries, is implicit in the notion of being hidable,

1    dockable, movable and resizable.  And for those reasons, Your

2    Honor, we believe Motorola's construction is proper and

3    should be adopted by the court.

4           THE COURT:  All right.  Thank you.  Counsel, I

5    believe that we are turning next to, "as if."  Mr. Cederoth.

6           MR. CEDEROTH:  Could we argue over "icon" again, Your

7    Honor?

8        This is one, Your Honor, where if I can take a cue from

9    the last time I was here.  Our problem with Motorola's

10   construction is the insertion of the term "originated" into

11   the phrasing of the claim, which isn't there.  Frankly, we're

12   not sure what that means.  If we're looking forward to

13   mischief that might be forthcoming, you know, perhaps it's an

14   argument that it's not "as if," originated from a keyboard,

15   unless the messaging that is supplied to the application,

16   matches the messaging of the particular keyboard for that

17   device.

18       That is, I think, is completely foreign to the notion of

19   the '582 patent, for two reasons:  One, the patent

20   presupposes and expressly contemplates that there may not be

21   a hardware keyboard.  This may be a virtual input device

22   only, where some keyboard has to be displayed.

23       In that instance, how would you -- how is the application

24   ever going to sort out whether and how the information

25   originated from the keyboard, which it knows nothing about?

1    A physical keyboard.

2        Secondly, I think the patent contradicts that notion

3    because it's all about improving virtual keyboards, and

4    improving the options for the particular applications so they

5    don't have to be wedded to a particular virtual keyboard, or

6    a hardware keyboard.

7            THE COURT:  Would I be correct in understanding that

8    at the time this patent was under discussion, that either a

9    hard keyboard, or a mouse, would have been the two

10   predominant methods of input?

11           MR. CEDEROTH:  I think predominant, but not

12   exclusive.  There were a range of devices.  If we go back to

13   that time frame, I don't have all of them at my fingertips

14   right now, but if I think back to -- remember the stylus

15   devices, Your Honor, where you didn't necessarily have a

16   keyboard, but you had a stylus that you could poke?  The

17   whole graffiti, that was how the graffiti-input worked.  I

18   think it was the Palm device, or the Palm predecessor at the

19   time.  But I do think predominance, probably even today, or

20   at least until the dawn of the iPhone, the predominant

21   devices predominantly had some physical keyboard.

22       And just to note, Your Honor, on our Slide 33, the patent

23   does -- it's pretty clear that these messages from the input

24   method, are provided without the application being provided

25   with information as to the source.  And that they would not

1    ordinarily recognize whether the data received originated at

2    a hardware input device, or from one of the virtual input

3    methods.  Unless the court has further questions.

4            THE COURT:  I'm fine.  Thank you.

5            MR. PEPE:  Can we get Slide 36 up?  Slide 36 has the

6    express claim language of the five claims that include this

7    limitation.  In Motorola's view this dispute can be resolved

8    just based upon the plain language of these claims.  The

9    claims all provide that input is given to a computer program

10   as if the information was received via using input received

11   from a hardware input device.

12      What this is saying is that the input needs to look like

13   it was received from a user using a hardware device.  And

14   that makes sense.  Applications in this time frame were

15   written to be used with a hardware device, a physical

16   keyboard, or maps.  So it would make sense to feed the

17   information from the soft input panel to the applications as

18   if it was actually entered on a hardware device.  Otherwise

19   you would have to rewrite the applications.  You would have

20   to allow for multiple types of input.  And for simplicity

21   purposes, it would make sense to have the applications just

22   look for hardware input.

23      And it's not just the express claim language that gets you

24   there.  When you look at the summary of the invention on

25   Slide 37, it says right there, "An application program

1    receives messages, such as corresponding to a keystroke."

2    Corresponding to a keystroke, meaning corresponding to a

3    message, as if it was entered on a keyboard, "as if the

4    message was generated on a hardware keyboard."  That's the

5    summary of the invention.

6         The abstract.  Same language.  And if that wasn't good

7    enough, they said it not once, but twice in the patent.  They

8    said, "As if the user had entered those digits on a physical

9    keyboard."  And they also went on to say, "In the form of

10   that keystroke, mouse or other message placed in the message

11   queue of the application's window."  And during prosecution

12   they went even further and said, "The input method and

13   management component can simulate the standard hardware input

14   device."

15        Between the express claim language, the teachings of the

16   spec, and the statement in prosecution history, it's clear

17   the input needs to look like it came from a hardware device.

18        Now, Microsoft relies -- well, let's first turn to Slide

19   38.  The examiner had that same understanding.  In the

20   reasons for allowance, he said, "None of the cited art

21   teaches or suggests providing the input as if the information

22   was received via user input received from a hardware device

23   as Claims 1, 11, 15 and 19."  So, the examiner clearly

24   understood it based upon the express language, the summary of

25   the invention, the abstract, and the statements in the spec.

1    Now, turning to Slide 39, Microsoft does focus on one

2    particular passage in the spec.  And this is a single

3    incident in the spec.  And it's frankly ambiguous.  The

4    passage says, "Applications do not ordinarily recognize

5    whether data received thereby originated at a hardware input

6    device or via user activity within the soft input panel."

7    You could read that two ways.  You could read it as if they

8    don't recognize where it came from, because it all looks like

9    hardware input, so it doesn't know if it's a soft input

10   method.  Or you could read it the way Microsoft is reading

11   it, which is this means that the applications don't need to

12   know if it's hardware, or software, or whatever.

13       But even under their interpretation, the law is clear, and

14   we cite the *TIP* case in our brief, that the claims don't have

15   to cover everything in the spec.  So if there is an

16   alternative embodiment or separate way of looking at things

17   in the patent, that doesn't necessarily need to be claimed.

18   And when you look at the express language of the claims here,

19   it clearly doesn't cover this situation where the application

20   doesn't need to recognize whether it's software or hardware.

21   Thank you, Your Honor.

22       THE COURT:  Thank you.

23       MR. CEDEROTH:  Your Honor, the only point I have is

24   the proposition being advanced today is not new.  The

25   applicants told the examiner this exact thing as we call out

1   on Slide 32.  And in terms of ultimately the examiner's

2   reasons for allowance, you know, the examiner simply uses the

3   claim language.  The examiner does not adopt Motorola's

4   phrasing and assertion of the term "originated."

5           THE COURT:  All right.  Mr. Pepe, can I get you back

6   up?

7           MR. PEPE:  Sure.

8           THE COURT:  Why do we need the word "originated?"

9   Why can't we just say, "As if the information was received

10  from hardware input device."

11          MR. PEPE:  I think it provides clarity to the jury,

12  will provide clarity to the jury what is meant by that

13  phrase.  Because obviously the parties dispute what that

14  means.  And the term "originated" is added to the claim

15  language to make it clear that it needs to appear as if it

16  was generated on or originated from a hardware input device.

17  And the fact that Microsoft doesn't agree to that shows that

18  we have a bona fide dispute as to whether or not that's the

19  true meaning of the claim.

20          THE COURT:  Okay.  Thank you.  I believe, counsel,

21  that we've reached the end of our terms.  Is that correct,

22  Mr. Cederoth?

23          MR. CEDEROTH:  That is correct, Your Honor.

24          THE COURT:  All right.  Then let me give you some

25  hopefully helpful guidance on where we're going next, that

1  will assist you in your work to come up with a schedule.

2  Most likely the next project that the court will turn to is

3  your invalidity motion.  I think the parties should have a

4  pretty clear idea where the court is going with that one,

5  since I railed away when you were here.  So that's queued up

6  for us.

7      Injunctive relief is also pending.  And that's a very

8  interesting motion, and one that will take us awhile to get

9  to, or through.  But know that it's out there.  We've set a

10  November 19th trial date in this.  At that trial, in the

11  court's mind, we will be dealing with establishing the RAND

12  terms for Microsoft's use of the Motorola patent library.

13  And secondly, the question of Motorola's potential bad faith

14  in its initial offer.  And since I'm sure you've spent all of

15  your time reading my order of yesterday, you understand why I

16  say that.

17      That trial will not cover the infringement claims that are

18  in the 1823 litigation.  For your information, in terms of

19  coming up with a schedule you can live with, I want you to

20  know that I am doing my best to completely ruin your summers.

21      It is the court's standard procedure to have cases ready

22  for you to prepare 30 days before trial.  So that means that

23  by October 20th the decks are cleared of all pending motions.

24  You have your opportunity to prepare, knowing what that trial

25  looks like.  I was never fond when I was in private practice

1    of judges the first day of trial announcing their decisions

2    on motions in limine, or summary judgment motions, because

3    many times it wasted a lot of time, and a lot of effort.  And

4    it frankly shaped your trial presentations in a different

5    manner.

6        In order to have the decks cleared by October 20th, or so,

7    it means that your motions and issues need to be ripe, ie:

8    ready for decision, 45 days before that.  Largely due to you,

9    we have a lot of pending cases, and a lot of pending work

10   right now.  And we need 45 days to get through everything

11   that you have.

12       So that means in terms of your planning, you need to back

13   up your motions and issues in a manner that you'll have them

14   ripe by around the 10th of September.  I have no idea what it

15   is that you would consider filing, but know that the local

16   rules provide some different noting schedules depending on

17   where we are.  So that would be my target date.

18       Once again I note that those motions and issues should

19   pertain to RAND terms and bad faith, because that's what

20   we're going to be trying in November.

21       You should not expect a ruling on today's Markman hearing

22   in the immediate future, because you're basically going to be

23   at the bottom of the barrel in terms of things we're going to

24   work on in this case, and in other cases that involve similar

25   issues.

1      So, with that bit of hopeful guidance, Mr. Harrigan, I

2   guess I'll call on you first.  Anything you'd like to say on

3   behalf of Microsoft?

4           MR. HARRIGAN:  No, Your Honor.

5           THE COURT:  Mr. Palumbo?

6           MR. PALUMBO:  Nothing from me.  Thank you, Your

7   Honor.

8           THE COURT:  We'll be in recess.  Thank you for your

9   presentation this morning.  As always, it's interesting.

10  We'll be in recess.

11                  (The proceedings recessed.)

12

13                  C E R T I F I C A T E

14

15

16      I certify that the foregoing is a correct transcript from

17   the record of proceedings in the above-entitled matter.

18

19

20   /s/ Debbie Zurn                June 12, 2012

21   Debbie Zurn, Court Reporter          Dated

22

23

24

25