LAW OFFICES
**DANIELSON HARRIGAN LEYH & TOLLEFSON** LLP
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
(206) 623-1700

SHANE P. CRAMER

FACSIMILE: (206) 623-8717
E-MAIL: SHANEC@DHLT.COM

June 25, 2012

**FILED VIA ECF**

The Honorable James L. Robart
United States District Court
Western District of Washington
700 Stewart Street, Suite 14128
Seattle, WA 98101

Re:    *Microsoft Corporation v. Motorola, Inc., et al.* (Civil Case No. 10-cv-1823)

Dear Judge Robart:

We write to request permission to file Judge Posner's Opinion and Order of June 22, 2012 in *Apple, Inc. v. Motorola, Inc.*, Case No. 1:11-cv-08540 (N.D. Ill.), as supplemental authority on Microsoft's Motion for Partial Summary Judgment Dismissing Motorola's Claim for Injunctive Relief (ECF No. 141). We believe the opinion bears directly on Microsoft's motion. *Id.*, at pp. 18-21. A copy of the opinion has been enclosed herewith at Tab A.

Very truly yours,

DANIELSON HARRIGAN LEYH & TOLLEFSON LLP

Shane P. Cramer

SPC:src
Enclosure
cc: All counsel via ECF

# TAB A

IN THE
UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

---

No. 1:11-cv-08540

APPLE, INC. and NeXT SOFTWARE INC.,
(f/k/a NeXT COMPUTER, INC.),

*Plaintiffs,*

v.

MOTOROLA, INC. and MOTOROLA MOBILITY, INC.,

*Defendants.*

---

OPINION and ORDER of June 22, 2012

---

POSNER, *Circuit Judge,* sitting by designation. In my opinion and order of May 22, following the *Daubert* hearing held on the 16th, I ruled that proposed testimony by three of the parties' damages experts (one for Apple and two for Motorola) was inadmissible. *Apple, Inc. v. Motorola, Inc.,* No. 1:11-cv-8540, 2012 WL 1959560 (N.D. Ill. May 22, 2012); see Fed. R. Evid. 702, 703. This ruling precipitated motions by both parties for summary judgment with respect to their opponents' damages claims, followed by motions for summary judgment directed at each other's injunction claims as well. These submissions prompted me to ask the parties to brief the question whether, if all damages and injunctive claims dropped from the case, the case could be

kept alive by Apple's claim for declaratory relief. Motorola had
in its answer to Apple's amended complaint asked for a declara-
tory judgment that each of Apple's patents sought to be en-
forced in this suit was invalid. But unlike Apple it acknowledg-
es that such a request can't keep a case going once all claims for
monetary or injunctive relief are rejected.

   After further briefing, and an oral hearing on June 7, I tenta-
tively concluded that the case would have to be dismissed. And
so I canceled the trials on liability, which had been scheduled to
begin on June 11. I said that an opinion would follow, defini-
tively resolving the question. On June 13, however, I granted
Apple's request, made at the June 7 hearing, for a further hear-
ing on injunctive relief. I said that I had "decided to grant Ap-
ple's request...for 'a hearing at which the parties could attempt
to satisfy the *eBay* factors and do a traditional injunction hear-
ing.'... [At the hearing] each party may argue that it would be
entitled to injunctive relief as to its patent or patents were the
other party found to have infringed. The parties may submit
briefs, if they wish, no later than the close of business on Mon-
day, June 18. The parties should be prepared to address the
possibility of substitution for an injunction of an equitable de-
cree for a reasonable royalty going forward. They should indi-
cate any evidence in the existing record (for it is too late to sup-
plement the record) bearing on the question of injunctive or
other equitable relief. And if Motorola means to argue for in-
junctive relief it should be prepared to address the bearing of
FRAND on the injunction analysis."

   The parties filed briefs and responses and the hearing was
held as scheduled. The question whether the case must be dis-
missed without a determination of liability is now fully ripe for
decision. I begin with the damages claims and then move to the
equitable issues addressed in the recent submissions and hear-
ing and then to declaratory relief.

No. 1:11-cv-08540                                                    3

*Damages.* When the summary judgment motions were filed, my expectation was that the liability trials (one a trial of Apple's claims of infringement, the other of Motorola's claims of infringement) would be followed immediately (if any claims of infringement were upheld in the liability trials) by trials on issues of relief: a jury trial on damages and a bench trial on equitable relief. The trials on relief would have involved five patents—four Apple patents ('002, '263, '647, and '949) and one Motorola patent ('898)—if all were found to have been infringed. Apple concedes that my exclusion of proposed testimony by its damages expert witness Brian W. Napper dooms its claims for damages for infringement of the '002 and '949 patents, and that leaves only the '263 and '647 patents for me to consider in evaluating Motorola's motion for summary judgment on damages.

Regarding the '263 (the realtime patent), I said in my *Daubert* ruling that "Mr. Napper asserts in his expert report that it would cost Motorola $29 to $31 million to add a chip to [each of] its smartphones that would replace the function performed by the invention that is the subject of the '263 patent. The disabling objection [to Napper's proposed testimony] is…[that he] obtained the essential information, namely the identity of the chip that would avoid infringement, from an agent of the party rather than from a disinterested source. The agent in this case is Nathaniel Polish, Apple's principal technical expert." 2012 WL 1959560, at *9.

Apple wants to substitute Dr. Polish, a computer scientist whose competence to testify as an expert witness on liability was not questioned, for Napper as its damages expert for the '263. The expert report by Polish on which Apple relies (Polish filed more than one report) does say that Motorola could have bought a chip (that is, a piece of computer hardware) that would have enabled Motorola to perform the same functions performed by the '263, without infringing. But Polish did not iden-

No. 1:11-cv-08540                                                                4

tify the chip, let alone price it, let alone suggest that he had
searched across all (or at least many, or some, or even a few) of
the chips that Motorola might have bought, or of alternative
ways in which it might have invented around Apple's patent.
(To simplify, I'll generally call all ways of substituting a nonin-
fringing for an infringing invention "inventing around.") All the
report says is that "running without a DSP [digital signal pro-
cessor] would be slower and the CPU would realize a substan-
tially shorter battery life. Thus, *it is likely that instead of pursuing
this approach, a different solution would be purchasing an additional
chip to provide dedicated audio and video decoding capabilities.* Such a
multi-chip solution would not need the codecs currently run-
ning on the DSPs in the Accused Products" (emphasis added).

Napper says that Polish named the chip to him in a private
conversation not mentioned in Polish's report. That was too late
and anyway the mere existence of a chip that would substitute
for the '263 is not enough to establish damages. An expert's re-
port must contain "a *complete* statement of all opinions the wit-
ness will express *and the basis and reasons for them.*" Fed. R. Civ.
P. 26(a)(2)(B)(i) (emphasis added). There is no basis in Polish's
report for a claim that his mystery chip is a feasible, let alone an
economical, substitute for the '263.

Apple has not asked me to allow Polish to supplement his
report. Nor would the needed supplementation be within his
competence as disclosed in his report. There is no suggestion
that he is familiar with the range of chips that might constitute
feasible and economical substitutes for the '263. A competent
damages witness would be one who was involved in the pro-
curement of chips, or who advised as a consultant on the choice
of chips; there is no suggestion that Polish has such experience.
He was, it is true, listed as a damages witness. But his only role
in a damages trial was to be to testify about technical matters
relevant to damages, namely design around. And the only opin-
ion in his expert report that is relevant to design around is his

No. 1:11-cv-08540                                                5

statement about the existence of the chip that he later told Napper about.

The only testimony that I have found in Polish's four expert-witness reports that actually bears on damages is a statement that Motorola's DSP chip (alleged to infringe Apple's '263 patent) is part of a set of chips, and the set costs $14.05. Polish said the DSP function is a substantial part of the overall functionality of the chip set, and so the value of the DSP in the allegedly infringing devices—a value that might be used to estimate the royalty to which Apple would be entitled if the DSP infringes Apple's '263 patent—should be a substantial fraction of the $14.05. But Polish didn't estimate the fraction, and this compelled Napper to acknowledge in his report that since "the DSP within the accused products is integrated with other functionality, and not sold or priced separately, I am unable to determine the portion of the $14.05...that would relate to DSP functionality, though I understand it is a substantial piece." Apple has not tried to base a damages estimate on this chip.

Apple argues that to establish a prima facie case it need only show that there is one chip, however costly, somewhere in the world of computer hardware, that Motorola could have substituted for the '263. It argues that the cost of that chip is a sufficiently accurate estimate of Apple's damages to shift the burden of production to Motorola to prove the existence of cheaper chips. Such an allocation of burdens of production might make sense if knowledge of those alternatives to Apple's proposed mode of avoiding infringement were uniquely within Motorola's knowledge and difficult for Apple to access even with all the tools of modern discovery. *Campbell v. United States,* 365 U.S. 85, 96 (1961) ("the ordinary rule, based on considerations of fairness, does not place the burden upon a litigant of establishing facts peculiarly within the knowledge of his adversary"); cf. *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973); *Ybarra v. Spangard,* 154 P.2d 687 (Cal. 1944); *Duncan v. Duck-*

No. 1:11-cv-08540                                          6

*worth,* 644 F.2d 653, 656 (7th Cir. 1981). That is not argued, how-
ever, and would not be credible. The parties—both leading
manufacturers of cell phones—have equal access to information
about computer hardware for such devices.

Other than in a case of unequal access by one side of the law-
suit (rare given modern discovery, at least when the opposing
parties are roughly equal in resources and sophistication, as
Apple and Motorola are), a plaintiff to withstand summary
judgment must present enough evidence to make a prima facie
case—that is, enough evidence to justify a trier of fact in finding
in favor of the plaintiff if the defendant presents no contrary ev-
idence. *Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133,
142–43 (2000); *Texas Department of Community Affairs v. Burdine,*
450 U.S. 248, 252–55 (1981). Even if Motorola presented no evi-
dence concerning other chips, the mere fact that there is *a* chip
that might substitute for the alleged infringing invention would
not enable the trier of fact to infer that the cost of *that* chip ap-
proximates the cost that Motorola avoided by (allegedly) in-
fringing, and hence the royalty it might have had to pay Apple
for a license to use Apple's patented chip.

At the June 7 hearing, Apple's counsel remarked—about re-
quiring a patentee to "identify or be able to opine that that is the
absolute lowest cost best design-around, so it is the best meas-
ure of damages"—"I am not aware of any law to that effect."
True, but Apple still must show that the chip that it suggested
that Motorola could have purchased was a commercially rea-
sonable design-around. As I said (not very articulately, I'm
afraid) at that hearing, "Apple didn't have to show that the chip
identified by Dr. Polish was the very best design-around. Obvi-
ously, there are limits to how much of a burden you place on
[the plaintiff. If] Dr. Polish said...this is the standard thing, this
is what other people use[, t]hat might well be enough, but—of
course, that's not in his report, and I don't think a computer sci-
entist really is...the only expert you need on damages. You

No. 1:11-cv-08540                                                        7

need someone who is involved more in a financial part of the company or the selling part, the marketing, the procurement [part]."

I also agree with what Apple's counsel said next: "our belief is [that] the law is that as long as your expert puts forth a cognizable, *proper measure of damages*, one that if by itself were presented to a jury, it would be *sustainable as proper evidence*, that that is sufficient to bear the burden of proof by that party at that time" (emphasis added). I take it by "sustainable as proper evidence" counsel did not mean admissible, which goes without saying, but that the evidence establishes a prima facie case. Polish's testimony about the chip does not establish a prima facie case. It invites guesswork. That won't do.

The '647, to which I now turn, is an Apple patent on what is called "structure detection and linking." The term refers to a cell phone's ability to recognize patterns such as phone numbers, web addresses, and dates in text and then present the user with a menu of possible responses, such as calling the phone number or creating a calendar entry. I rejected Napper's attempt to use sales of an iPhone application called "Clipboard Manager" to estimate the value of the functions performed by the '647. No rational iPhone owner would knowingly purchase Clipboard Manager for its structure detection and linking capabilities, because the capabilities built into the iPhone for doing these things are already superior to the Clipboard Manager's method of structure detection and linking.

Apple argues that there is an alternative basis for assessing damages for the alleged infringement—Napper's proposed testimony (which I was not asked to exclude at the *Daubert* hearing) about the cost of duplicating the functions performed by the '647 without infringing. That estimate, intended to make Napper's proposed damages figure (the one based on Clipboard Manager that I disallowed) seem conservative, was based on the time it took another cell phone manufacturer, HTC, to design

No. 1:11-cv-08540                                    8

around the '647 patent after the International Trade Commission, finding that HTC cell phones infringed the '647, threatened to forbid their importation to the United States. *In re Certain Personal Data & Mobile Communications Devices & Related Software,* Inv. No. 337-TA-710 (Dec. 19, 2011), http://info.usitc.gov/ouii/public/337inv.nsf/RemOrd/710/$File/337-ta-710.pdf (visited June 22, 2012). An infringer enjoined from using a patented invention has to stop selling the infringing product until it purges the infringement, as by an invent-around. The cost (including lost sales) of having to invent around is therefore one method of estimating the reasonable royalty for a license.

The estimate of Apple's damages based on HTC's experience was an afterthought; it occupies only two pages in Napper's report and says nothing about HTC the company, or about HTC's cell phones, or about the engineering resources that HTC devoted to modifying its phones in response to the International Trade Commission's exclusion order, which permitted HTC to import the offending phones for four more months before it had to prove that it had successfully designed around the '647. Napper's report also doesn't mention that the International Trade Commission's construction of the patent's claims differs from my construction of the same claims. So while at the June 7 hearing Apple's counsel was literally correct in saying that HTC was "faced with the exact same patent," the statement was misleading because as construed the claims were different and that means that the cost of designing around may have been different, an issue that responsible expert testimony would have to address but that Napper's report ignores.

Apple argues last-minute that *any* act of infringement, even if it gives rise to no measurable damages, is an injury entitling it to a judgment. It points to a distinction between a breach of contract and a tort. A breach of contract is a wrong, so even if the victim of the breach (the other party to the contract) fails to

prove that he was injured by it he is entitled to judgment and
the symbolic award of nominal damages. *Mindgames, Inc. v.
Western Publishing Co.*, 218 F.3d 652, 654 (7th Cir. 2000); E. Allan
Farnsworth, *Contracts* § 12.8, p. 784 (3d ed. 1999). In contrast, a
tort does not come into existence until there is an injury, without
which negligence or recklessness or other tortious behavior, in
the sense of behavior that *if* it causes an injury gives rise to a
tort, is not a basis for relief. *Chang v. Baxter Healthcare Corp.*, 599
F.3d 728, 733–34 (7th Cir. 2010); W. Page Keeton et al., *Prosser &
Keeton on the Law of Torts* § 30, pp. 164–65 (5th ed. 1984); cf. *Re-
statement (Second) of Torts* § 899, comment c (1977).

To this as to most legal generalizations there is an exception:
intentional trespass to land is a tort actionable even if no dam-
age results. *Restatement (Second) of Torts, supra*, § 163. The reason
is to prevent the trespasser from acquiring title by adverse pos-
session. *Chang v. Baxter Healthcare Corp., supra*, 599 F.3d at 733. A
suit for "harmless" trespass is analogous to a suit to quiet title,
though the latter proceeding is *in rem* and thus if successful es-
tablishes title good against the world rather than just against a
single trespasser.

More fundamentally, exclusion is *the* fundamental right that
ownership of property confers and it is not limited (as tort rights
are) to intrusions that cause palpable injury. It would be ridicu-
lous to think that to get an injunction against people picnicking
on your front lawn you'd have to prove they weren't cleaning
up after themselves or were sitting in your favorite picnic spot.

A patent is property too, and a suit to establish the validity
or scope of a patent by means of a suit against an alleged in-
fringer would be analogous to a "harmless trespass" suit, see
*Lindemann Maschinenfabrik GmbH v. American Hoist & Derrick
Co.*, 895 F.2d 1403, 1406 (Fed. Cir. 1990), and could therefore jus-
tify an award of nominal damages if no injury were proved.
*Dobson v. Dornan*, 118 U.S. 10, 17 (1886); *Nike, Inc. v. Wal-Mart
Stores, Inc.*, 138 F.3d 1437, 1441 (Fed. Cir. 1998). Nominal dam-

No. 1:11-cv-08540                                        10

ages are awarded in other types of case as well, for example
cases in which a violation of procedural due process is proved
even if no actual injury is shown. E.g., *Farrar v. Hobby*, 506 U.S.
103, 112 (1992). *Why* nominal damages are ever awarded is a
separate question, for which I doubt there is a satisfactory an-
swer. Nominal damages "may be little better than a fossil rem-
nant of an earlier legal system, when it was thought that to say
such things as that 'from my earliest reading, I have considered
it laid up among the very elements of the common law, that,
wherever there is a wrong, there is a remedy to redress it; and
that every injury imports damage in the nature of it; and, if no
other damage is established, the party injured is entitled to a
verdict for nominal damages,' *Webb v. Portland Mfg. Co.*, 29 Fed.
Cases 506, 507 (Cir. Ct. Me. 1838) (Story, J.), was to say some-
thing, rather than to talk in a circle." *Habitat Education Center v.
United States Forest Service*, 607 F.3d 453, 460 (7th Cir. 2010).

But without questioning the propriety of an award of nomi-
nal damages in patent-infringement as in other classes of case, I
strongly doubt (despite a contrary intimation in *Morrow v. Mi-
crosoft Corp.*, 499 F.3d 1332, 1339 (Fed. Cir. 2007)) that a patentee
can *sue* for nominal damages, at least not in a federal court given
the meaning that the Supreme Court has given to the terms
"Cases" and "Controversies" in Article III of the Constitution.
Without an actual or prospective tangible injury, a federal court
has no subject-matter jurisdiction. In *Farrar v. Hobby, supra*, the
plaintiffs sued for $17 million but were awarded nominal dam-
ages because they failed to prove actual damages. They had not
sued for nominal damages. What rational person would?

It's not as if nominal damages were compensation for a nom-
inal harm. They are a symbolic recognition of a wrong that pro-
duced no harm, though it may have infringed a right. You can't
go into federal court and say you had a contract with X and X
broke it and you're really annoyed even though you sustained
no injury of any sort (in fact you made money because you re-

No. 1:11-cv-08540                                                    11

contracted at a higher price) so please give me a judgment for $1
that I can pin on my wall. No more can Apple be permitted to
force a trial in federal court the sole outcome of which would be
an award of $1. Which anyway it doesn't want to do. When
Motorola filed a motion for summary judgment contending that
Apple cannot establish "any amount of damages arising from
alleged infringement of" its patents, Apple did not respond that
summary judgment should be denied because Apple could ob-
tain nominal damages if it proved infringement; it responded
that Motorola was wrong to think Apple couldn't establish sub-
stantial damages.

   But I must consider the possible bearing of 35 U.S.C. § 284,
a provision of the Patent Act that provides in relevant part that
"upon finding for the claimant *the court shall award the claimant
damages* adequate to compensate for the infringement, *but in no
event less than a reasonable royalty* for the use made of the inven-
tion by the infringer, together with interest and costs as fixed by
the court" (emphasis added). This conceivably could be read to
entitle a patentee to a royalty if it proves infringement even if it
presents no evidence at all of harm; and presumably the royalty
that the court would award wouldn't be a nominal royalty. Nei-
ther party is seeking such relief here—a substantial royalty
predicated on no showing of harm. But for completeness I want
to dispel any impression that such relief—substantial "compen-
satory" damages for no tangible injury—would be proper even
apart from constitutional limitations on the jurisdiction of the
federal courts.

   A reasonable royalty is a form of damages when awarded
in the damages phase of an infringement litigation, though it
usually is a form of equitable relief, as we'll see, when it is im-
posed, in lieu of an injunction, to prevent future harm to the pa-
tentee. The difference between conventional damages and a
royalty is that often a royalty is actually a form of restitution—a
way of transferring to the patentee the infringer's profit, or,

what amounts to the same thing, the infringer's cost savings from practicing the patented invention without authorization. Although the Federal Circuit in *Dow Chemical Co. v. Mee Industries, Inc.*, 341 F.3d 1370, 1382 (Fed. Cir. 2003), spoke of "the presumption of damages when infringement is proven," it quickly added: "But, the district court's obligation to award some amount of damages 'does not mean that a patentee who puts on little or no satisfactory evidence of a reasonable royalty can successfully appeal on the ground that the amount awarded by the court is not 'reasonable' and therefore contravenes section 284.'" *Id.*

The quotation is from *Lindemann Maschinenfabrik GmbH v. American Hoist & Derrick Co., supra*, 895 F.2d at 1407, so we go to that opinion and learn (*id.*) that "'one who fails to submit evidence in support of a position cannot be heard on appeal to complain that the trial court failed to find facts upholding that position,'" quoting *Railroad Dynamics, Inc. v. A. Stucki Co.*, 727 F.2d 1506, 1519 (Fed. Cir. 1984). *Lindemann* cites *Devex Corp. v. General Motors Corp.*, 667 F.2d 347, 363 (3d Cir. 1981), affirmed on other grounds, 461 U.S. 648 (1983), which had "affirm[ed an] award of zero damages for lack of evidence" and in doing so had said that "the statute [35 U.S.C. § 284] requires the award of a reasonable royalty, but to argue that this requirement exists even in the absence of any evidence from which a court may derive a reasonable royalty goes beyond the possible meaning of the statute." Not even nominal damages could be awarded.

Any intimation that proof of infringement is alone enough to warrant a remedial order (as when *Dow* posits an "obligation to award some amount of damages" if infringement is proved) was scotched by the Supreme Court in *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391–92 (2006). And with specific reference to calculating a royalty, *Dow* itself instructs district courts not pull the royalty out of a hat but instead "to consider the so-called *Georgia-Pacific* factors in detail, and award such

No. 1:11-cv-08540                                          13

reasonable royalties as the record evidence will support." 341
F.3d at 1382 (citation omitted); see also *Lucent Technologies, Inc.
v. Gateway, Inc.*, 580 F.3d 1301 (Fed. Cir. 2009); *Parental Guide of
Texas, Inc. v. Thomson, Inc.*, 446 F.3d 1265, 1270 (Fed. Cir. 2006).

So let's take a look at those factors (*Georgia-Pacific Corp. v.
United States Plywood Corp.*, 318 F. Supp. 1116, 1120 (S.D.N.Y.
1970)):

> A comprehensive list of evidentiary facts relevant, in gen-
> eral, to the determination of the amount of a reasonable
> royalty for a patent license may be drawn from a conspec-
> tus of the leading cases. The following are some of the fac-
> tors *mutatis mutandis* seemingly more pertinent to the is-
> sue herein:
> 1. The royalties received by the patentee for the licensing
> of the patent in suit, proving or tending to prove an estab-
> lished royalty.
> 2. The rates paid by the licensee for the use of other pa-
> tents comparable to the patent in suit.
> 3. The nature and scope of the license, as exclusive or non-
> exclusive; or as restricted or non-restricted in terms of ter-
> ritory or with respect to whom the manufactured product
> may be sold.
> 4. The licensor's established policy and marketing pro-
> gram to maintain his patent monopoly by not licensing
> others to use the invention or by granting licenses under
> special conditions designed to preserve that monopoly.
> 5. The commercial relationship between the licensor and
> licensee, such as, whether they are competitors in the
> same territory in the same line of business; or whether
> they are inventor and promoter.
> 6. The effect of selling the patented specialty in promoting
> sales of other products of the licensee; the existing value
> of the invention to the licensor as a generator of sales of
> his non-patented items; and the extent of such derivative
> or convoyed sales.
> 7. The duration of the patent and the term of the license.
> 8. The established profitability of the product made under
> the patent; its commercial success; and its current popu-
> larity.
> 9. The utility and advantages of the patent property over
> the old modes or devices, if any, that had been used for
> working out similar results.

No. 1:11-cv-08540                                                    14

10. The nature of the patented invention; the character of the commercial embodiment of it as owned and produced by the licensor; and the benefits to those who have used the invention.

11. The extent to which the infringer has made use of the invention; and any evidence probative of the value of that use.

12. The portion of the profit or of the selling price that may be customary in the particular business or in comparable businesses to allow for the use of the invention or analogous inventions.

13. The portion of the realizable profit that should be credited to the invention as distinguished from non-patented elements, the manufacturing process, business risks, or significant features or improvements added by the infringer.

14. The opinion testimony of qualified experts.

15. The amount that a licensor (such as the patentee) and a licensee (such as the infringer) would have agreed upon (at the time the infringement began) if both had been reasonably and voluntarily trying to reach an agreement; that is, the amount which a prudent licensee—who desired, as a business proposition, to obtain a license to manufacture and sell a particular article embodying the patented invention—would have been willing to pay as a royalty and yet be able to make a reasonable profit and which amount would have been acceptable by a prudent patentee who was willing to grant a license.

This is a formidable list. The "some" in the second sentence is particularly rich—how many additional factors may be lurking somewhere? And could a judge or a jury really balance 15 or more factors and come up with anything resembling an objective assessment? We needn't try to answer these questions. Apple has not presented admissible evidence that the *Georgia-Pacific* factors support its damages claim.

The remaining patent for which damages are sought is Motorola's '898, part of a portfolio of patents for enabling communication between cell phones and cell towers (called "cellular base stations" in the patent). The '898 and '559 (a Motorola patent for which I granted Apple's motion for summary judg-

No. 1:11-cv-08540                                                    15

ment of noninfringement) have both been declared by Motorola
to be "standards essential" patents. These are patents that cell
phone makers *must* use to communicate over specified tele-
communications networks and therefore that the patentee
(Motorola) has committed to licensing to anyone on fair, rea-
sonable, and nondiscriminatory (acronym "FRAND," or some-
times "RAND"—the word "fair" adds nothing to "reasonable"
and "nondiscriminatory") terms, as required by the standards-
setting organizations as a condition of the patented technolo-
gy's being deemed essential to compliance with the standard.

My summary judgment order of June 5, finding that Apple
had not infringed Motorola's '559 patent, may seem incon-
sistent with the proposition that Apple's 3G ("third genera-
tion") mobile devices, which are governed by the Universal
Mobile Telecommunications Standard (UMTS), must therefore
use patents declared essential to that standard, such as the '559.
But there is no inconsistency. Motorola's standards-essential
patents (including the '898 still at issue in this case) are merely
*claimed* to be standards-essential. The European Telecommuni-
cations Standards Institute collects declarations by companies
that claim to own patents essential to compliance with the
UMTS standard, but the Institute does not determine whether
they really are essential. See "ETSI IPR Database FAQ,"
www.etsi.org/website/aboutetsi/iprsinetsi/IPRdb_FAQ.aspx
(visited June 22, 2012); *Apple Inc. v. Samsung Electronics Inc.*, No.
11-CV-01846, 2012 WL 1672493 (N.D. Cal. May 14, 2012). Apple
showed that although its cell phones generate the preamble se-
quences (the subject of Motorola's '559 patent) required by the
3G UMTS standard, they do not do so in the manner claimed by
'559, and so the '559 isn't essential.

With its principal damages witness for the '898, Carla S. Mul-
hern, excluded as a result of my *Daubert* ruling, Motorola has
fallen back on another of its expert damages witnesses, Charles
R. Donohoe, who was not excluded. Mr. Donohoe is qualified to

No. 1:11-cv-08540                                                    16

opine on the licensing of standards-essential patents, but the
bottom line of his 8-page declaration (he did not submit a formal
report, as Rule 26 requires, Fed. R. Civ. P. 26(a)(2)(B); *Meyers v.
National R.R. Passenger Corp.*, 619 F.3d 729, 734 (7th Cir. 2010);
*Gay v. Stonebridge Life Ins. Co.*, 660 F.3d 58, 62 (1st Cir. 2011)) is
that if Apple had wanted to license any of the patents in
Motorola's standards-essential portfolio, the license fee would
have exceeded the product of the percentage of the portfolio
represented by the patent and the value of the entire portfolio.
Suppose the portfolio contained 100 patents and they would
command a reasonable royalty of $700 million to a firm that li-
censed all 100. One patent is 1 percent of 100 patents and 1 per-
cent of $700 million is $7 million. But according to Donohoe's
declaration, the license fee for that single patent, if licensed on
its own rather than as part of a package deal that comprised the
entire portfolio, would be "up to" 40 to 50 percent of the royalty
for the entire portfolio—that is, up to $350 million.

That "up to" covers a lot of ground. Even a royalty of only
$14 million would be mathematically disproportionate
(Donohoe's term is "nonlinear") for using a single patent in a
portfolio of 100 patents worth in the aggregate a $700 million
royalty, because $14 million is 2 percent of $700 million rather
than 1 percent (1 out of 100 patents). How to pick the right non-
linear royalty? Donohoe's declaration does not answer that es-
sential question, and there is no suggestion that any other wit-
ness can answer it. In his deposition Donohoe tried to retract the
"up to" of his declaration by testifying that the royalty for a sin-
gle patent in the portfolio "should be *at least* 40 to 50 percent of
overall rate is my experience" (emphasis added)—still open-
ended, though now on the upside. He gave no reason for his
change of mind, no estimate of the shape of the nonlinear royal-
ty function, no basis, in short, for his estimate of "at least 40 to
50 percent" of a reasonable royalty for the entire portfolio. And
he admitted that he knows nothing about the portfolio that in-

No. 1:11-cv-08540                                                    17

cludes the '898 patent; his 40-to-50 percent figure is a statement
about portfolios of standards-essential telecommunications pa-
tents in general.

It might seem that at a minimum Motorola could argue for
the linear price—in my example, 1 percent of the value of the
portfolio. But it does not make that fallback argument; it's going
for broke. Moreover, if the proper pricing is nonlinear, Motorola
would need evidence that the '898 patent is not *less* valuable
than the average patent in the portfolio, for in that case it would
merit less than a linear proportion of the portfolio's value. It
hasn't presented any such evidence.

"Going for broke" is the inescapable characterization of
Motorola's damages claim. Motorola claims to be entitled to a
minimum royalty of 2.25 percent for a license for the patents in
the portfolio that contains the '898. Though it's the only patent
in the portfolio that remains in this suit, Motorola claims to be
entitled to damages equal to (or "up to," or "at least"—it seems
not to have made up its mind) 40 to 50 percent of 2.25 percent,
which would be 0.9 to 1.125 percent of sales of Apple devices
that infringe the '898.

At the June 7 hearing Motorola's lawyer said that in future
litigation it would prove that Apple had infringed the other pa-
tents in the portfolio as well and so Motorola would prove its
entitlement to 2.25 percent of all sales. In his words: "Apple is
infringing *all* the standards-essential patents [this was said be-
fore I granted Apple summary judgment regarding its alleged
infringement of Motorola's '559 patent] that Motorola owns by
selling its cell phones that communicate on these wireless net-
works. As...a practical reality, we cannot sue on a hundred pa-
tents in one case, or 75.... There are other cases pending, and
there are cases in various stages of development at the Interna-
tional Trade Commission. But the ultimate result would have to
be, as a result of all the litigations, that Apple would pay
Motorola whatever the standards-essential license negotiated

No. 1:11-cv-08540                                    18

fee would be. We say it's 2.25 percent, *but I'm not going to be able to prove to you that that's the right number today*" (emphasis added). And now it's too late.

There is another decisive objection to Motorola's damages claim. The proper method of computing a FRAND royalty starts with what the cost to the licensee would have been of obtaining, just before the patented invention was declared essential to compliance with the industry standard, a license for the function performed by the patent. That cost would be a measure of the value of the patent qua patent. But once a patent becomes essential to a standard, the patentee's bargaining power surges because a prospective licensee has no alternative to licensing the patent; he is at the patentee's mercy. The purpose of the FRAND requirements, the validity of which Motorola doesn't question, is to confine the patentee's royalty demand to the value conferred by the patent itself as distinct from the additional value—the hold-up value—conferred by the patent's being designated as standard-essential. *Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297, 313–14 (3d Cir. 2007); Daniel G. Swanson & William J. Baumol, "Reasonable and Nondiscriminatory (RAND) Royalties, Standards Selection, and Control of Market Power," 73 *Antitrust L.J.* 1, 7–11 (2005). Motorola has provided no evidence for calculating a reasonable royalty that would be consistent with this point.

So damages are out for both parties. But a patentee can also seek injunctive relief for infringement, and both parties seek such relief, as I have already noted with respect to Apple.

*Injunctive Relief.* To begin with Motorola's injunctive claim, I don't see how, given FRAND, I would be justified in enjoining Apple from infringing the '898 unless Apple refuses to pay a royalty that meets the FRAND requirement. By committing to license its patents on FRAND terms, Motorola committed to license the '898 to anyone willing to pay a FRAND royalty and thus implicitly acknowledged that a royalty is adequate com-

No. 1:11-cv-08540                                             19

pensation for a license to use that patent. How could it do oth-
erwise? How could it be permitted to enjoin Apple from using
an invention that it contends Apple *must* use if it wants to make
a cell phone with UMTS telecommunications capability—
without which it would not be a cell *phone*.

The Federal Trade Commission recently issued a policy
statement which implies that injunctive relief is indeed unavail-
able for infringement of a patent governed by FRAND. "Third
Party United States Federal Trade Commission's Statement on
the Public Interest," filed on June 6, 2012, in *In re Certain Wireless
Communication Devices, Portable Music & Data Processing Devices,
Computers & Components Thereof,* Inv. No. 337-TA-745,
www.ftc.gov/os/2012/06/1206ftcwirelesscom.pdf (visited June
22, 2012). This was said in the context of an exclusion order by
the International Trade Commission, but its logic embraces any
claim to enjoin the sale of an infringing product. For the FTC
says it's "explaining the potential economic and competitive
impact of injunctive relief on disputes involving SEPs [standard-
essential patents]." *Id.* at 2. It goes on to note that

> a royalty negotiation that occurs under threat of an exclu-
> sion order may be weighted heavily in favor of the patent-
> ee in a way that is in tension with the RAND commitment.
> High switching costs combined with the threat of an ex-
> clusion order could allow a patentee to obtain unreasona-
> ble licensing terms despite its RAND commitment, not be-
> cause its invention is valuable, but because implementers
> are locked in to practicing the standard. The resulting im-
> balance between the value of patented technology and the
> rewards for innovation may be especially acute where the
> exclusion order is based on a patent covering a small com-
> ponent of a complex multicomponent product. In these
> ways, the threat of an exclusion order may allow the hold-
> er of a RAND-encumbered SEP to realize royalty rates that
> reflect patent hold-up, rather than the value of the patent
> relative to alternatives.

No. 1:11-cv-08540                                                     20

*Id.* at 3–4; see also (besides the *Broadcom* case and the Swanson &
Baumol article) Douglas Lichtman, "Understanding the RAND
Commitment," 47 *Houston L. Rev.* 1023, 1039–43 (2010); Mark A.
Lemley, "Intellectual Property Rights and Standard-Setting Or-
ganizations," 90 *Cal. L. Rev.* 1889, 1916 (2002).

Motorola counters that Apple's refusal to negotiate with it af-
ter rejecting its initial offer of a 2.25 percent royalty warrants in-
junctive relief; by opting not to take a license ex ante, it argues,
Apple should lose the FRAND safe harbor. But Apple's refusal
to negotiate for a license (if it did refuse—the parties offer com-
peting accounts, unnecessary for me to resolve, of why negotia-
tions broke down) was not a defense to a claim by Motorola for
a FRAND royalty. If Apple said no to 2.25 percent, it ran the risk
of being ordered by a court to pay an equal or even higher roy-
alty rate, but that is not the same thing as Motorola's being ex-
cused from no longer having to comply with its FRAND obliga-
tions. Motorola agreed to license its standards-essential patents
on FRAND terms as a *quid pro quo* for their being declared es-
sential to the standard. FTC Statement on the Public Interest, *su-
pra*, at 2. It does not claim to have conditioned agreement on
prospective licensees' making counteroffers in license negotia-
tions.

Motorola argues further that deprived of the possibility of in-
junctive relief, it will not be able to extract a reasonable royalty
from Apple. Suppose, hypothetically, that the maximum rea-
sonable FRAND royalty would be $10 million. If Motorola
therefore demanded such a royalty, Apple, knowing that litiga-
tion is costly, would refuse, and Motorola would accept a lesser
amount. Of course litigation would also be costly for Apple, and
this might induce it to pay the $10 million rather than fight. But
the deeper objection to Motorola's argument is that the "Ameri-
can rule," which with immaterial exceptions makes the winning
party in a litigation bear his litigation costs rather than being
able to shift them to the loser, does not deem damages an inad-

No. 1:11-cv-08540                                          21

equate remedy just because, unless backed by a threat of injunc-
tion, it may induce a settlement for less than the damages right-
ly sought by the plaintiff. You can't obtain an injunction for a
simple breach of contract on the ground that you need the in-
junction to pressure the defendant to settle your damages claim
on terms more advantageous to you than if there were no such
pressure.

A further objection to Motorola's claim for injunctive relief
applies to Apple's claim for such relief as well. The grant of an
injunction is not an automatic or even a presumptive conse-
quence of a finding of liability, either generally or in a patent
case—in fact the Supreme Court has held that the standard for
deciding whether to grant such relief in patent cases is the nor-
mal equity standard. *eBay Inc. v. MercExchange, L.L.C., supra*, 547
U.S. at 391–92; see also *Ecolab, Inc. v. FMC Corp.*, 569 F.3d 1335,
1351–52 (Fed. Cir. 2009). And that means, with immaterial ex-
ceptions, that the alternative of monetary relief must be inade-
quate. "[T]he inadequacy of one's damages remedy is normally
a prerequisite to injunctive relief." *Hoard v. Reddy*, 175 F.3d 531,
533 (7th Cir. 1999); see also *Walgreen Co. v. Sara Creek Property
Co.*, 966 F.2d 273, 274 (7th Cir. 1992). "[A] plaintiff seeking an
injunction is quite often successful precisely because he cannot
calculate the damages he suffers." *Pelletier v. Stuart-James Co.*,
863 F.2d 1550, 1558 n. 15 (11th Cir. 1989). A FRAND royalty
would provide all the relief to which Motorola would be enti-
tled if it proved infringement of the '898 patent, and thus it is
not entitled to an injunction.

In fact neither party is entitled to an injunction. Neither has
shown that damages would not be an adequate remedy. True,
neither has presented sufficient evidence of damages to with-
stand summary judgment—but that is not because damages are
impossible to calculate with reasonable certainty and are there-
fore an inadequate remedy; it's because the parties have failed
to present enough evidence to create a triable issue. They had an

No. 1:11-cv-08540                                              22

adequate legal remedy but failed to make a prima facie case of
how much money, by way of such remedy, they are entitled to.
That was a simple failure of proof.

The monetary remedy in patent cases is measured as I have
already noted either by the patentee's loss or by the value of the
infringement to the infringer. The premise of the alternative
measure—value to the infringer—is that had the infringer nego-
tiated for a license rather than infringing, that value would have
been transmuted into a license fee paid to the patentee, and the
loss of that fee constitutes damages suffered by the patentee.
"Restitution measured by the market value of an unauthorized
use appeared at an early date as a remedy for patent infringe-
ment, in cases where the patentee was unable to prove either his
own damages or the infringer's profits. (Although such an
award has always been denominated 'damages' in the context of
patent infringement, it is more accurately described as a species
of restitution for the value of a benefit wrongly obtained.) Un-
like the accounting for the infringer's profits, restitution meas-
ured by use value survives in the current Patent Act." *Restate-
ment (Third) of Restitution and Unjust Enrichment* § 42, comments
c and f (2011); see also George E. Palmer, *The Law of Restitution* §
2.7, pp. 93–94 (1978); Roger D. Blair & Thomas F. Cotter, "An
Economic Analysis of Damages Rules in Intellectual Property
Law," 39 *William & Mary L. Rev.* 1585, 1650 (1998).

There is no question of collectability in this case, a common
reason why a damages remedy is inadequate. Both parties have
deep pockets. And neither has acknowledged that damages for
the infringement of its patents could not be estimated with tol-
erable certainty. On the contrary, each insists not only that dam-
ages are calculable but that it has calculated them. The problem
is not that damages cannot be calculated, but that on the eve of
trial, with the record closed, it became apparent that the parties
had failed to make a responsible calculation.

No. 1:11-cv-08540                                          23

Apple claims that Motorola profited from infringement by in-
corporating the desirable features of Apple's patented technolo-
gy into its own devices without either paying a royalty for a li-
cense to use the patents or incurring the cost of inventing
around them. Apple has never contended that these benefits to
Motorola of infringement cannot be quantified. It merely has
failed, despite its vast resources and superb legal team, to do so
in a minimally acceptable manner—failed whether because of
mistakes in trial preparation (which even the best lawyers can
make), or because too many cooks spoil the stew (Apple is rep-
resented by three law firms in this litigation), or maybe because
the infringements did not deprive Apple of any profits (I'll come
back to this counterintuitive point).

Apple also contends that it's losing market share (which
could happen though its sales were growing—as they have
been—because a competitor, namely Motorola, was growing
faster) to Motorola, and also losing future customers to
Motorola because of infringement, and requests an injunction to
limit Motorola's penetration of the market and preserve Apple's
own customer base. But it has not laid a foundation for such re-
lief.

To begin with, as far as the record shows, an injunction
would not avert such losses, because of the ease of designing
around the patent claims at issue. The costs of designing around
the '647 patent (structure detection and linking) would be simi-
lar to the costs of designing around the '002 (unblockable
taskbar); both invent-arounds would just require reprogram-
ming Motorola's smartphones to avoid at least one claim limita-
tion. (A claim is not infringed if at least one "limitation" (ele-
ment) of the claim is not present in the allegedly infringing de-
vice. *Catalina Marketing Int'l, Inc. v. Coolsavings.com, Inc.*, 289 F.3d
801, 812 (Fed. Cir. 2002); *Lemelson v. United States*, 752 F.2d 1538,
1551 (Fed. Cir. 1985).) Given my claims construction of the '647
patent, Motorola could design around simply by creating copies

No. 1:11-cv-08540                                                24

of the code that performs structure detection and linking for
each particular program rather than by using a common-code
module for all programs; for without a common code there is no
"analyzer *server*," as required by the patent claim. Motorola
could similarly include programs that occasionally block the
taskbar to avoid '002. As far as the '263 patent (realtime) is con-
cerned, there is no evidence of the cost of inventing around the
surviving claims in it, and for all the records shows the cost may
be slight. And finally I noted in my May 22 opinion how easy
and cheap it would be for Motorola to avoid infringing the fin-
ger-gesture claim in the '949 patent.

If, then, Apple couldn't exclude Motorola from the market
with an injunction because of the ease of inventing around, the
only thing Apple lost as a result of the alleged infringements
was royalties capped at the minimum design-around cost. Its
alleged loss of market share because Motorola's smartphones do
the same thing (either via license or design-around) would have
occurred with or without an injunction, and so doesn't establish
the inadequacy of damages.

Thus, while difficulty of quantifying loss of goodwill or of
market share might justify injunctive relief in some cases, in this
case an injunction would in all likelihood be ineffectual in pre-
venting such loss. (No damages are sought for past such loss.)
Unsurprisingly, there's no evidence of loss of market share or
customer goodwill by Apple, and no basis for expecting such
loss in the future. The price differences between the iPhone,
which is Apple's smartphone, and Motorola smartphones sug-
gest that the markets for the two classes of product are not per-
fectly overlapping, and so a small improvement in a Motorola
smartphone attributable to infringement may not take signifi-
cant sales from Apple. And while the patents themselves (or
some of them at least) may well have considerable value, after
the claims constructions by Judge Crabb and myself and after
my grants of partial summary judgment only a handful of the

No. 1:11-cv-08540                                                    25

original patent claims remain in the case; infringement of that
handful may not be a source of significant injury past, present,
or future. For a variety of reasons patents in the field of infor-
mation technology often have little if any value except defen-
sively. See Alan Devlin, "Systemic Bias in Patent Law," 61 De-
Paul L. Rev. 57, 77–80 (2011), and references cited there.

A related reason for withholding injunctive relief in this
case is that it would be likely to impose costs on the alleged in-
fringer disproportionate both to the benefits to it of having in-
fringed and to the harm to the victim of infringement, and
would thus be a windfall to the patentee and a form of punitive
rather than compensatory damages imposed on the infringer.
Not only is there no evidence of gain to Motorola or loss to Ap-
ple even though if there were gain or loss Apple should have
been able to quantify it, but in addition an injunction could force
Motorola to remove lucrative products from the market for as
long as it took to remove the infringing features—minor fea-
tures in complex devices most features of which are not alleged
to infringe—from its products, or to invent around the infring-
ing features.

This point about potential harm to the infringer from an in-
junction may seem to imply that had Motorola refrained from
infringing Apple's patents (supposing it did infringe, an unan-
swered question, obviously), it would have had to pay a very
large license fee to Apple as the alternative to a costly invent
around. And such an implication might seem inconsistent with
my determination that Apple has failed to show that Motorola
derived significant benefits from the alleged infringements; for
if there are no big benefits from infringing, there would be no
big license fee for being allowed to continue to use the patents
infringed on. But this ignores the fact that the market for
smartphones (the kind of advanced cell phones sold by Apple
and Motorola) has grown rapidly since Motorola's alleged in-
fringements began three years ago. Sales of smartphones grew

by almost two-thirds last year alone. An injunction issued today might do much greater harm to Motorola than the license fee that Apple would have charged had Motorola sought one when the alleged infringements began.

Apple could have sought, in lieu of an injunction against the sale of Motorola's devices, an order that Motorola pay a reasonable royalty for continued use of the inventions covered by the Apple patents. Such an order would impose a compulsory license on Apple in exchange for its receiving a perpetual royalty. (The Federal Circuit prefers the term "ongoing royalty," *Paice LLC v. Toyota Motor Corp.*, 504 F.3d 1293, 1313 n. 13 (Fed. Cir. 2007).) It would be an equitable remedy imposed as a substitute for an injunction against infringement. *Bard Peripheral Vascular, Inc. v. W.L. Gore & Associates, Inc.*, 670 F.3d 1171, 1192 (Fed. Cir. 2012), vacated in part on other grounds, 2012 WL 2149764 (Fed. Cir. June 14, 2012). (Equitable remedies, contrary to the familiar dichotomy between monetary and equitable relief, are often monetary. E.g., *McReynolds v. Merrill Lynch*, 672 F.3d 482, 483 (7th Cir. 2012); *Hoelzer v. City of Stamford*, 972 F.2d 495, 498 (2d Cir. 1992).)

A compulsory license with ongoing royalty is likely to be a superior remedy in a case like this because of the frequent disproportion between harm to the patentee from infringement and harm to the infringer and to the public from an injunction, a factor emphasized in Justice Kennedy's concurring opinion in *eBay Inc. v. MercExchange, L.L.C., supra*, 547 U.S. at 396–97, in which he pointed out that "when the patented invention is but a small component of the product the companies seek to produce and the threat of an injunction is employed simply for undue leverage in negotiations, legal damages may well be sufficient to compensate for the infringement and an injunction may not serve the public interest." He could have been describing this case. Three Justices joined his opinion, and no Justice expressed disagreement with it.

No. 1:11-cv-08540                                                    27

The ongoing royalty will usually be the reasonable royalty
as of the time of first infringement. If the infringement occurred
in 1999, say, the royalty would be a percentage of the sale price
of the infringing product and would continue as long as the li-
censee continued to sell the product, as in *Shatterproof Glass
Corp. v. Libbey-Owens Ford Co.*, 758 F.2d 613, 628 (Fed. Cir. 1985).
Ms. Mulhern, the Motorola damages expert whom I excluded,
thought that Apple should have paid Motorola $298 million for
the right to use the '898. That would not have been for a per-
petual license. It was simply the product of multiplying Apple's
sales revenues, during the period from the beginning of the al-
leged infringement to the present, from devices allegedly in-
fringing the '898, by a percentage (we haven't been able to fig-
ure out precisely what percentage) in Donohoe's 40 to 50 per-
cent range (actually, since his range actually was "up to 40 to 50
percent," the lower end was not 40 percent but zero percent) of
2.25 percent. The reasonable royalty going forward would be
the product of multiplying by the same percentage the estimat-
ed future sales by Apple of infringing devices. The failure to
justify the percentage leaves Motorola without a basis for calcu-
lating a going-forward royalty, as it has proposed no alternative
to the method just suggested.

Apple's damages case consisted of an attempt to calculate
the reasonable royalty for the period up to trial—the money that
Motorola owed it for past infringement. Had Apple been able to
prove its damages case (as well as establish liability for in-
fringement of its patents), those damages (that is, the reasonable
royalty, looking backwards) would have been the basis for fix-
ing a reasonable royalty to be paid for each future sale in lieu of
an injunction, that is, the per-unit royalty going forward, or as it
is sometimes called the "running royalty." Damages are de-
signed to place the patentee in the position it would have occu-
pied had the patent not been infringed; had the patent not been
infringed the royalty would have been an estimate of the future

No. 1:11-cv-08540                                                            28

as well as the present value of being allowed to practice the pa-
tent. An alternative to the running royalty would be a lump-
sum royalty representing the present value of the expected fu-
ture royalties, by analogy to a lump-sum damages award for
lost future earnings in a tort case.

An award of damages could have given Apple damages in
the form both of restitution of any past gains by Motorola from
the infringements and of the present value of a reasonable royal-
ty for future use by Motorola of the patented inventions. Alt-
hough an order to pay a royalty in the future certainly sounds
like an equitable order (a mandatory injunction) and can be one
as we noted earlier, the Federal Circuit in *Telcordia Technologies,
Inc. v. Cisco Systems, Inc.*, 612 F.3d 1365, 1378–79 (Fed. Cir. 2010),
indicated that alternatively it could be part of a jury's verdict on
damages. If past damages are awarded along with future dam-
ages either calculated as a lump sum or as a nonequity running-
royalty order, there would be no occasion to order equitable re-
lief.

I am mindful that *Amado v. Microsoft Corp.*, 517 F.3d 1353,
1361–62 (Fed. Cir. 2008), holds that the retrospective reasonable
royalty (damages "going backward") should be lower than the
prospective royalty ("going forward") to reflect the parties'
greater certainty in the latter case—infringement having been
determined by a court and not merely claimed by the patentee—
that the device really does infringe a valid patent. See also *Bard
Peripheral Vascular, Inc. v. W.L. Gore & Associates, Inc.*, *supra*, 670
F.3d at 1193. This is consistent with the proposition that the
forward royalty is an injunction substitute, so not really damag-
es, so not really based on what the parties might have negotiat-
ed years earlier. Fair enough. But nothing in the record of this
case—a record now closed—enables me to calculate the adjust-
ment necessary to determine either a running royalty or a lump-
sum royalty.

No. 1:11-cv-08540                                                    29

Although both parties asked for injunctive relief, neither named an expert witness who would testify about such relief—either about an injunction or about the equitable substitute of a compulsory license at a reasonable royalty were an injunction denied. Neither party suggested that any of its damages experts had an opinion about such a royalty, except that one of them, Professor Dennis Carlton, properly challenged Motorola's claim to be entitled to what in effect would be a hold-up royalty for standards-essential patents.

The reports of the damages experts no more provide a rational basis for computing royalties going forward than for computing royalties going backward, even if they are different rates. Damages experts in a patent case would be expected to estimate running royalties as well as past damages, but none has done so in this case.

But all this is an aside because in the brief Apple filed on June 18 in response to my order of June 13 it states that it cannot compute a prospective royalty (either a running or a lump-sum royalty) because that computation would depend on expert evidence that I struck. Instead it argues that it is entitled to an injunction because it has no adequate damages remedy for future losses attributable to continuing infringement by Motorola.

A patentee cannot base a claim to an injunction on a self-inflicted wound, such as sponsoring a damages expert who prepares a demonstrably inadequate report. What is true, but a different point, is that the fact that a patentee seeks and even obtains damages for past harm from infringement does not disable it from obtaining injunctive relief. *Acumed LLC v. Stryker Corp.*, 551 F.3d 1323, 1328 (Fed. Cir. 2008). It might have been able to quantify only a small part of the harm that it had incurred, and similarly might be able to quantify only a small part of the future harm it would incur if the infringement continued. And then it might well be entitled to an injunction, as well as to (only partially adequate) damages for past infringement.

Apple in conjuring loss of consumer goodwill and of market
share tries to make the kind of case for an injunction that was
made successfully by the plaintiff in *i4i Ltd. Partnership v. Mi-
crosoft Corp.*, 598 F.3d 831, 862 (Fed. Cir. 2010), where the court
concluded that "a small company was practicing its patent, only
to suffer a loss of market share, brand recognition, and customer
goodwill as the result of the defendant's infringing acts. Such
losses may frequently defy attempts at valuation, particularly
when the infringing acts significantly change the relevant mar-
ket, as occurred here." Apple is not a "small company"; its mar-
ket capitalization exceeds that of Google and Microsoft com-
bined. To suggest that it has suffered loss of market share, brand
recognition, or customer goodwill as a result of Motorola's al-
leged infringement of the patent claims still in play in this case
is wild conjecture. And until about a week ago Apple had not
suggested in this litigation that the losses it allegedly suffered or
will suffer from the alleged infringement "defy attempts at val-
uation."

In its latest written and oral submissions Apple attempts
what I told its legal team at a pretrial conference I would not let
it do in the liability trials then envisaged: turn the case into an
Apple versus Motorola popularity contest. Apple wanted me to
allow into evidence media reports attesting to what a terrific
product the iPhone is. I said I would not permit this because the
quality of the iPhone (and of related Apple products, primarily
the iPad) and consumers' regard for it have, so far as the record
shows, nothing to do with the handful of patent claims that I
had ruled presented triable issues of infringement. Apple's "feel
good" theory does not indicate that infringement of *these* claims
(if they were infringed) reduced Apple's sales or market share,
or impaired consumer goodwill toward Apple products. Typical
is the statement in Apple's brief of June 18 that "an Apple sur-
vey identified watching streaming videos from YouTube among
the top ten planned activities for consumers using iPads in the

United States." The '263 patent in issue in this litigation is not a claim to a monopoly of streaming video!

Apple is complaining that Motorola's phones *as a whole* ripped off the iPhone *as a whole*. But Motorola's desire to sell products that compete with the iPhone is a separate harm—and a perfectly legal one—from any harm caused by patent infringement.

Because there are such substantial grounds for skepticism concerning the harm that Apple is likely to incur from continued infringement, cf. *Lucent Technologies, Inc. v. Gateway, Inc.*, *supra*, 580 F.3d at 1333, it would not be proper even to consider ordering an injunction without evidence that would enable me to compare the costs and benefits of an injunction with the costs and benefits of the substitute equitable remedy of a compulsory license with a reasonable royalty, that is, a running (ongoing) royalty. Apple, as noted earlier, has acknowledged that it can't estimate a royalty substitute for an injunction—not because such an estimate is inherently infeasible but because I struck the proposed testimony of its indispensable damages witness, Mr. Napper. While such a royalty may perhaps, as held or assumed in the *Telcordia* case, be part of a damages remedy (the remedy "at law" as distinct from an equitable remedy), it certainly can be a substitute equitable remedy for an injunction. This possibility is germane to the "balance of hardships" component of *eBay*'s test for whether to grant an injunction in a patent case. 547 U.S. at 391.

Apple tries to elide the issue of a royalty substitute for an injunction by trivializing the costs of an injunction to Motorola. It says it has no objection to delaying the effective date of the injunction for a period of three months to allow Motorola to try to invent around the Apple patents. If Motorola succeeded during that period in inventing around—that is, in duplicating the functionality of Apple's patents without infringing them—the cost of the injunction to Motorola would be no greater than if

No. 1:11-cv-08540                                              32

Motorola had invented around in the first place rather than in-
fringing.

I am not persuaded by Apple's soothing reassurance that a
tailored injunction would avert significant hardship to
Motorola. Apple ignores the following possibilities: that a non-
infringing invent-around cannot be completed, installed, and
tested within three months (Motorola might therefore return to
court seeking a modification of the injunction); that the cost to
Motorola of retooling its production lines to make the rede-
signed devices would be considerable and a further source of
delay in completing the invent-around in three months; that
Motorola might have to destroy (if it is not feasible to rebuild)
the smartphones that are in its inventory or in the inventories of
distributors and can be refitted with the invent-around only at a
cost so stiff as to make the devices unsalable at a competitive
price; and, perhaps most ominous, that Apple will sue Motorola
alleging that the redesigned phones still infringe its patents, just
as it is challenging HTC's design-around of the '647 in current
proceedings before the International Trade Commission.

Also ignored are the harm that an injunction might cause to
consumers who can no longer buy preferred products because
their sales have been enjoined, and the cost to the judiciary as
well as to the parties of administering an injunction—which un-
der the rubric of "public interest" is another factor that *eBay* re-
quires me to weigh in deciding whether to grant injunctive re-
lief. 547 U.S. at 391. The danger that Apple's goal in obtaining
an injunction is harassment of its bitter rival, requiring particu-
larly watchful supervision by the court should it issue the in-
junction, is suggested by the fact that while a delayed injunction
would in principle render no benefit to Apple besides harming
its competitor by forcing it to waste time and money finding a
new way of performing the functions now performed in an al-
legedly infringing manner, an ongoing royalty would yield sig-

No. 1:11-cv-08540                                                    33

nificant income to Apple—yet which it wants to forgo in favor
of imposing costs and litigation burdens on its adversary.

Because of the potential costs to Motorola and the federal
judiciary I could not responsibly order injunctive relief in favor
of Apple without knowing whether the lower cost of a compul-
sory license at a reasonable royalty would produce a better bal-
ance of hardships. I note, amplifying earlier points, the absence
of evidence that if Motorola is infringing the patent claims at is-
sue, it is imposing a significant cost on Apple. Consider the '002,
which Apple charges is infringed by Motorola's preventing par-
tial obstruction of its smartphones' notification windows. There
is no evidence, and it seems more than unlikely, that occasional
partial obstruction would appreciably reduce the value of
Motorola's smartphones to consumers—Apple didn't even
bother to install a notification window on its devices until last
year. Consider next the '949, which Apple contends is infringed
by Motorola's enabling customers who buy a Motorola
smartphone with a Kindle reader pre-installed to turn pages by
tapping on the screen rather than by swiping a finger across it
(which actually is more like turning pages than tapping is).
Consider the '263, the realtime patent, alleged to be infringed by
Motorola's adopting a method for avoiding glitches in "real
time" communications (such as movies) that has not been
shown to provide a superior experience to consumers than al-
ternative, noninfringing realtime software or hardware or oth-
erwise drive consumer demand for the iPhone. And consider
the '647 (structural linking and detection), which also provides
unproved consumer benefits.

The notion that these minor-seeming infringements have
cost Apple market share and consumer goodwill is implausible,
has virtually no support in the record, and so fails to indicate
that the benefits to Apple from an injunction would exceed the
costs to Motorola. An injunction that imposes greater costs on
the defendant than it confers benefits on the plaintiff reduces net

No. 1:11-cv-08540                                                    34

social welfare. That is the insight behind the "balance of hard-
ships" component of the *eBay* standard for injunctive relief in
patent cases.

   And I must not lose sight of the basic principle that injunc-
tive relief is available only when the remedy at law is inade-
quate—that is, only when damages would not provide complete
relief. As noted in *Stickle v. Heublein, Inc.*, 716 F.2d 1550, 1563
(Fed. Cir. 1983)—though the point is too obvious to require a
citation—a patentee can't obtain an injunction (and, by parity of
reasoning, an ongoing royalty in lieu of an injunction) if either
damages or an equitable substitute such as a running royalty
would provide complete relief. Ordinarily a running royalty,
combined with the damages remedy for past sales, should pro-
vide full compensation to the patentee, thus obviating injunctive
relief.

   Apple could have sought such a remedy, but did not. It ba-
ses its claim for injunctive relief on future harms that it claims
cannot be quantified for purposes of a monetary remedy, name-
ly loss of consumer goodwill and of market share. In fact such
losses are conventional items of damages. But assume they can't
be quantified in this case. An injunction would not prevent the-
se losses, as I have explained, given the feasibility of avoiding
the effect of the injunction by either doing without a functionali-
ty that may be worth very little (such as the functionality that
prevents application programs from ever partially, though not
entirely blocking, a notification window, in the '002, or that ena-
bles pages in a Kindle application to be turned by tapping rather
than swiping, in the '949), or by inventing around, such as in-
venting around the '263, which, because of the deficiencies of
Napper's expert report, I cannot conclude would be expensive,
or inventing around the '647 patent by reprogramming
Motorola's smartphones to avoid at least one claim limitation,
for example by simply creating copies of the code that performs
structure detection and linking for each particular program ra-

ther than using a common code module for all programs, be-
cause if there is no common code there is no "analyzer *server*,"
as required by the patent claim.

By failing to present a minimally adequate damages case,
Apple has disabled itself from arguing that damages would not
provide a complete remedy, going forward in the form of run-
ning royalties, as well as backward. It harps on loss of consumer
goodwill and market share, as a ground for an injunction, but
not only has no real evidence of such loss, but, given the nature
of the patent claims, it is not a loss that an injunction would
avert. Apple's case for injunctive relief flunks the irreparable in-
jury, balance of hardships, and public interest standards of *eBay*.

The deadline for discovery was April 23, 2012, and for ex-
pert reports March 20, and supplementation of expert reports
continued through late April. The expert and the other witness-
es have been deposed. The parties do not claim to have been
rushed unduly by Judge Crabb (who presided over the litigation
before the case was assigned to me) or by me. They are proud,
as they should be, of their ability to provide superb service to
their clients under time pressure that would crush less skilled
and resourced firms and clients. There is no question of sur-
prise, or haste in ruling on the issues of relief. The parties have
had a full opportunity to present all evidence germane to sum-
mary judgment proceedings on relief. Apple describes the brief
that it filed on June 18 as its offer of the evidence it would pre-
sent at a full evidentiary hearing on relief, and does not evince a
desire, or claim a right, to present additional evidence. It turns
out that despite the parties' best efforts, they do not have evi-
dence to withstand summary judgment on damages and injunc-
tive relief.

*Declaratory Relief.* The parties seek declaratory judgments of
invalidity and noninfringement of their opponents' patents.
Motorola concedes, as I said at the outset of this opinion, that
once damages and injunctive relief drop out, it has no basis for

No. 1:11-cv-08540                                                    36

seeking declaratory relief. Apple, however, argues (or argued, for it may have dropped its request for declaratory relief) that with the case ready for trial after an extensive and very costly pretrial period (it made this argument at the June 7 hearing, held just four days before the trials had been scheduled to begin), it is a waste of resources to abort the trials. It is true that any continued sale of Motorola products, including the products involved in this case that are alleged to violate Apple's patents would be a fresh act of alleged infringement and Apple could bring a new suit just like this one, though it would have to contend with a possible defense of collateral estoppel to some or many of its claims and contentions. But as Motorola points out, if a plaintiff fails to establish any basis for an award of relief, the defendant is entitled to a judgment dismissing the case with prejudice even if a future lawsuit between the parties, continuing their dispute, can be anticipated. "[A]n actual controversy cannot be based on a fear of litigation over future products." *Amana Refrigeration, Inc. v. Quadlux, Inc.*, 172 F.3d 852, 855–56 (Fed. Cir. 1999); cf. *ATA Airlines, Inc. v. Federal Express Corp.*, 665 F.3d 882, 896 (7th Cir. 2011).

A party may sue for declaratory relief in federal court only if either it or its opponent could bring a federal suit for injunctive or monetary relief. See *Franchise Tax Board v. Construction Laborers Vacation Trust*, 463 U.S. 1, 19 and n. 19 (1983); *Skelly Oil Co. v. Phillips Petroleum Co.*, 339 U.S. 667, 671–74 (1950). An insurance company that denies coverage can seek a declaratory judgment against its insured, because the insured could sue the company for having broken the insurance contract by denying coverage. And a firm alleged to have infringed a patent can seek a declaratory judgment of noninfringement against the patentee because the latter could sue the former for infringement. But when the court has determined that neither party could obtain monetary or injunctive relief against the other, as in this case, a declaratory judgment in favor of either party would confer no

No. 1:11-cv-08540                                    37

tangible benefit on the victor and so there would be no federal
subject-matter jurisdiction. *Jordan v. Sosa*, 654 F.3d 1012, 1026–27
(10th Cir. 2011); *Hickman v. State of Missouri*, 144 F.3d 1141, 1142
(8th Cir. 1998).

In any event the decision whether to grant declaratory relief
is discretionary, 28 U.S.C. § 2201(a) (courts "may"—not
"must"—issue declaratory judgments); *MedImmune, Inc. v.
Genentech, Inc.*, 549 U.S. 118, 136 (2007); *Wilton v. Seven Falls Co.*,
515 U.S. 277, 286–89 (1995), and Apple concedes that "[t]here is
no controlling case law that prevents that exercise of discretion
[over whether to exercise declaratory judgment authority] in
this case." Even if I could grant a declaratory judgment in this
case, I would not do so, because the issuance of such a judgment
would have no practical effect.

*Form of Dismissal.* It remains only to consider the appropri-
ate form of the judgment of dismissal (actually dismissals, be-
cause there are two suits—Apple's and Motorola's—which were
consolidated for the sake of judicial economy). It might seem
that the case has become moot, because the parties cannot obtain
any benefit from further proceedings. But that is not correct.
They can't obtain any benefit from further proceedings in this
case but they can appeal its dismissal. And even if no appeal
were planned, the case would not be moot, because a failure of
proof, whether with respect to liability or to remedy, while it
ends a case does not make the case moot. A dismissal for moot-
ness ordinarily (though with exceptions, for example because of
voluntary cessation by the defendant of his alleged misconduct,
or because the case is capable of repetition but evades review) is
without prejudice. Fed. R. Civ. P. 41(b); *University of Pittsburgh v.
Varian Medical Systems, Inc.*, 569 F.3d 1328, 1332–33 (Fed. Cir.
2009); *Brereton v. Bountiful City Corp.*, 434 F.3d 1213, 1216–17
(10th Cir. 2006). And when a suit is dismissed without preju-
dice, so that the dismissal is not res judicata, the loser can (again
with exceptions) refile it. *In re IFC Credit Corp.*, 663 F.3d 315, 320

No. 1:11-cv-08540                                    38

(7th Cir. 2011); *Robinson v. Sherrod*, 631 F.3d 839, 843 (7th Cir. 2011). It would be ridiculous to dismiss a suit for failure to prove damages and allow the plaintiff to refile the suit so that he could have a second chance to prove damages. This case is therefore dismissed with prejudice; a separate order to that effect is being entered today.