# EXHIBIT 14

*This article is Part II of a paper originally presented by the author on April 7, 2010, at the 25th Annual Intellectual Property Law Conference of the ABA Section of Intellectual Property Law in Arlington, Virginia. Part I was published in the last issue of* Landslide, *September–October 2010.*

# Negotiating Standards-Related Patent Licenses: How the Deal Is Done part II

## By Michele K. Herman

*Part I ended with a discussion of how the author believes that efforts to "fix" the RAND framework are misguided. Part II further explains her view that, given the realities of licensing negotiations, attempting to define specific terms for RAND licenses for standards-essential patent claims does not optimize the negotiation process.*

### Standards-Related Patent Licenses

Patents with standards-essential patent claims are not licensed differently than any other patent. They are licensed as part of cross-licenses, portfolio licenses, and other business transactions. To the extent that standards-related patents are encumbered by reasonable and nondiscriminatory (RAND) commitments or reasonable, nondiscriminatory, and royalty-free (RAND-RF) commitments, those patents may not be excluded from negotiation. In other words, patentees may not refuse to offer licenses under the essential patent claims contained in such patents to licensees willing to negotiate in good faith. As with any patent license negotiation, patentees and prospective licensees have different and unique goals. Some patentees want to extract the most value possible from their portfolios through licensing while others merely plan to leverage their portfolios defensively to maximize their freedom to operate as to patents of other entities. Other patentees seek to leverage their portfolios to create patent harmony around certain technology, e.g., general-purpose components, while ensuring that they can differentiate their own products and services from their competitors' products and services. Many prospective licensees will have similar goals with regard to their own patent portfolios and respective products and services. Of course, manufacturers and suppliers, especially those with no patent portfolios or weak portfolios of their own, will want to pay as little as possible to a patentee for the rights needed to commercially manufacture or exploit their products and services.

Patent licenses include a multiplicity of interdependent terms and conditions. The trade-offs made among these terms and conditions depend upon the respective goals of the patentee and licensee, as well as the strength of their respective portfolios. There are even more interrelated terms and conditions when a patent license is part of a larger business deal between the parties. As such, the fact that some of the patents may contain essential patent claims subject to RAND or RAND-RF terms rarely comes into play as part of the negotiation in the context of the business deal. In recent years, however, when the patentee and an infringer have been unable to reach an agreement, one or both parties may consider when standardized technology is part of the relevant portfolios. If it is, a patentee may use the fact to argue that its portfolio must be licensed in order for the infringer to participate in the relevant market. Meanwhile the infringer may try to ascertain whether or not any of the patents are or should have been subject to a RAND or RAND-RF license commitment to either argue that the value of the portfolio should be less or that the patentee has violated the relevant patent policy, its licensing commitments, or both, and, consequently, is estopped from asserting such patents under a variety of legal and equitable theories.

Because successfully negotiated license agreements involve significant confidential terms between the parties, such agreements are rarely made public. As a result, it is difficult to show, based on public information, that the vast majority of standards-related patents are indeed incorporated in broader cross-licenses, portfolio licenses, and business deals. Notwithstanding the lack of public agreements, there are examples of agreements that have been litigated or involved in agency enforcement proceedings that may be considered exemplary of the practice to include both essential and nonessential patent claims in bilaterally negotiated patent licenses and business deals.

### *Freedom to Operate*

Manufacturers, distributors, and customers of standardized technologies ("implementers") have a business objective to reduce any risks that may result in litigation expense, payment of patent royalties or damages, or having their products enjoined as a result of patent infringement. Such concerns are not limited to the essential patent claims for standards, but relate to any patent claim that their products may infringe. To

---

**Michele K. Herman** is a partner at Davis Wright Tremaine LLP. Based in the Seattle office, she focuses her practice on open source software, industry standards, and product licensing, and she regularly negotiates complex multiparty agreements. She is formerly associate general counsel and senior director of IP strategy at Microsoft Corp. Ms. Herman would like to thank Joanne van Erp Montague, an attorney at Davis Wright Tremaine, for her significant contribution to the writing of this article. Ms. Herman can be reached at micheleherman@dwt.com.

Published in *Landslide* Volume 3, Number 2, November/December 2010. © 2010 by the American Bar Association. Reproduced with permission. All rights reserved. This information or any portion thereof may not be copied or disseminated in any form or by any means or stored in an electronic database or retrieval system without the express written consent of the American Bar Association.

MOTM_WASH1823_0402432

the extent that such implementers have patent portfolios of their own, they are likely to leverage those patent portfolios in connection with standardized technologies to reduce the risk that other implementers will enforce patents against them, i.e., the implementer desires "freedom to operate."

There are at least two common ways that implementers leverage their portfolios to achieve greater freedom to operate. In the first approach, an implementer may enter into a RAND-RF license or patent nonassertion (covenant not to sue (CNS)) to its essential claims, but only as long as the prospective licensee does not sue the implementer. This is known as defensive termination or defensive suspension. A similar approach is to license patent claims, both essential and nonessential, for standardized technologies on the condition that the prospective licensee grants a reciprocal license to the implementer. This is known as reciprocity. While defensive termination and reciprocity are common terms in patent licenses, the scope of what may trigger a defensive termination and the scope of the reciprocal grant are often subject to significant disagreement and negotiation.

An example of defensive termination can be readily seen in Cisco's patent statement to the Internet Engineering Task Force (IETF).[1] The relevant portion of Cisco's statement provides:

> If this standard is adopted, Cisco will not assert any patents owned or controlled by Cisco against any party for making, using, selling, importing or offering for sale a product that implements the standard, provided, however that Cisco retains the right to assert its patents (including the right to claim past royalties) against any party that asserts a patent it owns or controls (either directly or indirectly) against Cisco or any of Cisco's affiliates or successors in title or against any products of Cisco or any products of any of Cisco's affiliates either alone or in combination with other products; and Cisco retains the right to assert its patents against any product or portion thereof that is not necessary for compliance with the standard.[2]

In this particular example, the standard is an Internet draft entitled "Distribution of diverse BGP paths." Note that Cisco appears to offer a CNS for any patent claims that would be infringed by a "product that implements the standard," not just claims essential for the implementation of the standard. Notwithstanding this CNS, Cisco reserves the right to assert its patents against "any product or portion thereof that is not necessary for compliance," thereby effectively limiting the CNS to essential claims. The CNS also does not apply to anyone who asserts a patent against Cisco, its affiliates, or, importantly, against any party regarding a Cisco product, even if the patent infringement is unrelated to the standard. In effect, Cisco is offering implementers freedom to operate with respect to only those portions of products that are necessary for compliance with the standard as long as the beneficiaries of that CNS do not sue Cisco, its affiliates, their distributors, customers, or partners for any patent infringement. Consequently, Cisco is leveraging its essential claims to obtain a greater freedom to operate for all of its products in connection with all of its distribution channels.

Not all parties agree that the breadth of this defensive termination provision is consistent with a commitment to license essential patent claims on terms that are reasonable and nondiscriminatory. Without legal precedent for guidance as to whether broad defensive termination provisions are indeed RAND, some implementers, like Cisco has done in this case, have offered to alternatively license their essential patent claims on royalty-bearing terms presumably with a much narrower defensive termination provision, i.e., limited to the licensee bringing suit against Cisco under the licensee's essential patent claims.

Reciprocity is in some ways similar to defensive termination except that an implementer does not obtain an actual license from its licensees under a defensive termination provision; the implementer can merely terminate the license it granted if the licensee sues. In practice this can be an important distinction. If an implementer is sued by its licensee for patent infringement and the implementer had obtained a reciprocal license, then the implementer has a defense to the patent infringement claim because the implementer is licensed. If, instead, the implementer is sued by its licensee for patent infringement and the implementer may only rely on its defensive termination provision, then the implementer may countersue on its own patents but does not have a defense to the patent infringement claim because the implementer is not licensed. Like defensive termination, parties may argue that the reciprocity terms are not RAND if the implementer demands grant backs of greater scope than the scope of the license the implementer offers. In many RAND negotiations, however, the parties each may want reciprocal licenses but to different products or services; e.g., one company wants a grant for hardware and the other for software. As a result, it is not uncommon to see the scope of the grants differ in negotiations involving standards-essential patent claims.

In a recent case, Nokia brought a patent infringement lawsuit against Apple for infringing a number of standards-related patents that Nokia has claimed are essential to various ETSI and IEEE standards.[3] Apple answered the complaint claiming that Nokia reneged, among other things, on its F/RAND statements by requiring Apple to grant Nokia patent licenses to Apple's smartphone technologies, which allegedly are not part of the ETSI and IEEE standards for which Nokia is licensing its essential patent claims.[4] Apple's answer states:

> 79. Throughout the negotiations, Apple made clear to Nokia that, except for one specific family of patents, Apple would not agree to cross-license to Nokia any of its patents (in particular those relating to iPhone technology) that were not essential to relevant industry standards, such as GSM, GPRS, EDGE, UMTS, and WLAN.
>
> 80. Apple has no obligation, under any law or otherwise, to license these non-standards-essential patents to Nokia. Thus, Nokia is seeking unlawfully and unfairly to leverage the monopoly power it obtained from its false F/RAND commitments to SSOs to obtain licenses to Apple's proprietary technology (to which Nokia is not entitled) that would enable Nokia to try to develop products with features now unique to the iPhone. Nokia's demand for license terms that are unfair, unreasonable, and discriminatory constitutes a breach of Nokia's F/RAND commitments.[5]

The resolution of this case will be interesting if it, among other things, provides guidance as to the scope of grant backs that can be demanded as part of a RAND license. However,

Published in Landslide Volume 3, Number 2, November/December 2010. © 2010 by the American Bar Association. Reproduced with permission. All rights reserved. This information or any portion thereof may not be copied or disseminated in any form or by any means or stored in an electronic database or retrieval system without the express written consent of the American Bar Association.

MOTM_WASH1823_0402433

such resolution, if forthcoming, will almost certainly be limited to the facts of this particular case. As discussed above, there are many trade-offs within a patent license, many of which could affect the scope of the grant back, such as what other rights the implementer is granting, the field of use of the license, whether the licensee can sublicense or transfer the rights, etc.

These examples highlight the desire for implementers to obtain patent rights or freedom to operate beyond what is essential for compliance with a particular standard. It is therefore common for negotiations to move quickly away from a license for essential patent claims to broader negotiations concerning portfolios of essential and nonessential claims through package licenses or cross-licenses. In the end, standards-essential patents are licensed in most cases as part of broader agreements.

*Maximizing Returns*

Patent holders generally want the largest return on their research and development investments, and, accordingly, will want to maximize the value of their patent portfolios. Value may be measured in terms of licensing revenue generated. Innovators may maximize licensing revenue by maximizing the amount they receive per license, by maximizing the number of paying licensees, or through a combination of the two.

Some innovators maximize the amount they can obtain per license by combining the nonessential and essential patent rights into a single portfolio. The idea behind this strategy from the patentee's perspective is that the more patents licensed, the more the licensee should pay for the package. Licensees, however, may negotiate agreements that include improvement patents and patents covering new versions of their products without increasing rates. Of course, when nonessential and essential patent claims are licensed together, qualitative factors associated with the various claims also must be considered when valuing the portfolio. In other words, the value of the portfolio is not simply based on the number of patents being licensed. In addition, an innovator may license patents as part of a broader technology license that includes know-how and other valuable intellectual property rights. In such cases, the innovator may benefit from the widest commercial implementation of its licensed technology and the licensee may benefit by being able to achieve an earlier time to market with a smaller investment in development activities. Standards-essential patent claims may help to serve both goals—attracting large numbers of licensees and ensuring that the patented technology is widely adopted—but the standards-essential patent claims are just a part of the broader agreement.

As mentioned above, the specific terms of few patent cross-licenses or package licenses are made publicly available. Thus, it is not a simple matter to show that it is a common practice to license many standards-essential patent claims along with nonessential claims. However, there are a number of recent cases that illustrate that both essential and nonessential claims are typically part of package licenses and cross-licenses.

For example, Research in Motion (RIM) entered into a cross-license agreement with Motorola in 2003.[6] Motorola granted RIM a nonexclusive, worldwide license to practice patents Motorola claimed were essential to several standards, along with a license to practice several nonessential Motorola patents, for five years.[7] RIM attempted to renegotiate the license terms and conditions for both the essential and nonessential patents, but then brought an action alleging that Motorola had proposed terms that were unfair, unreasonable, and discriminatory, and breached the cross-license agreement section requiring Motorola to negotiate an extension or new license in good faith.[8]

In another example, Samsung and Ericsson entered into a cross-licensing agreement that expired in 2005.[9] The parties were unable to agree on renewal terms resulting in patent infringement litigation.[10] The cross-licensing agreement included both essential and nonessential patent claims for WCDMA cellular technology, although the dispute focused on each party's alleged breach of its obligations to license its essential patent claims to the other party under fair, reasonable, and nondiscriminatory terms.[11]

Although the lawsuit between Nokia and Apple mentioned above is largely based on standards-essential patent claims, the dispute is not focused solely on standards-essential patent claims. Indeed, both parties have brought ITC complaints against one another seeking exclusion on account of nonessential patents:

> The Asserted Patents are sometimes referred to as "implementation patents" (as opposed to "essential patents"). Implementation patents are not essential to any relevant wireless communication standards, and, therefore, do not implicate contractual licensing obligations required by membership in many wireless communication standard setting organizations. Nokia's implementation patents—including the Asserted Patents—are particularly important to Nokia's success because they permit Nokia to differentiate its products from those of its competitors.[12]

It should be clear from these examples that both standards-essential claims and nonessential claims are often licensed together in a cross-license negotiated on a bilateral basis. The same is true for package licenses. After settling a complaint by the European Commission, Rambus Inc. now includes a sample patent license on its website.[13] The sample patent license includes patents that are essential and nonessential to several JEDEC[14] standards.[15] The licensed patents are defined in terms of the Dynamic Random Access Memories (DRAMs) that comply with certain JEDEC-published specifications.[16] If the license had been tailored to standards-essential claims, it would have presumably defined the subject patents as those patent claims that are necessarily infringed by implementing the JEDEC published specifications. Instead, the licensed products and the patents subject to the agreement extend to the entire memory, not just those portions that comply with the JEDEC-published specifications.[17] Consequently, the sample license agreement offered by Rambus and approved by the EU includes both standards-essential patent claims and nonessential patent claims.

Another fairly common practice among innovators is to license technology that includes patents, know-how, and other intellectual property. In offering such technology licenses, the innovator is often pressed to grant certain representations and warranties of noninfringement or provide indemnification

Published in *Landslide* Volume 3, Number 2, November/December 2010. © 2010 by the American Bar Association. Reproduced with permission. All rights reserved. This information or any portion thereof may not be copied or disseminated in any form or by any means or stored in an electronic database or retrieval system without the express written consent of the American Bar Association.

MOTM_WASH1823_0402434

for patent infringement, or both. When the innovator's licensees are large in number and often competitors, making such representations and warranties or providing indemnities for patent infringement may be very risky for the innovator licensing the technology. Not only might the innovator have to step in and defend against patent infringement claims, pay damages based on them, and redesign the technology, but the infringement claims in and of themselves may chill the commercialization of the technology. Any chilling effect could also significantly reduce the innovator's licensing revenues. As a result, many innovators attempt to create a royalty-free zone around their technology by only licensing the technology, including standards-essential patent claims and other patent claims, on the condition that their licensees agree not to assert any of their own patents against the technology or specific products they license from the innovator. The nonassertion of patents extends not only to the innovator, but also to all of the innovator's licensees.

For example, at one time Microsoft licensed its Windows products under a model where its OEMs were requested to agree not to assert patents against Microsoft or Microsoft's other OEM licensees. It was believed by some that everyone would benefit if an ecosystem could be built around a platform that all OEMs supported. In exchange for the patent nonassertion agreement, many OEMs requested that Microsoft make representations or warranties of noninfringement with regard to its other licensees, or that Microsoft offer to indemnify its OEMs if another OEM licensee sued for patent infringement. The patent nonassertion provisions covered both standards-essential and nonessential patent claims. As Microsoft began to enter into more cross-licenses, it determined that it no longer needed the nonassertion of patents provisions in its OEM license agreements and discontinued the use of that provision.[18]

Similarly, Qualcomm licenses its patent portfolios that include both standards-essential claims and nonessential claims. Qualcomm requests that its licensees grant royalty-free cross-licenses to Qualcomm, and offers to include in their licensing agreements a covenant not to assert provision (CNTA) relating only to standards-essential patent claims whereby licensees agree not to assert their standards-essential patent claims against other Qualcomm licensees who make the same agreement. Qualcomm negotiates the scope of its cross-licenses and does not require inclusion of the CNTA. The Japanese Federal Trade Commission (JFTC) nevertheless ordered Qualcomm to remove such provisions with respect to Japanese licensees.[19] Qualcomm explains:

> Qualcomm naturally disputes the notion that any provisions in our license agreements with Japanese companies were forced upon them. These licenses were agreed to voluntarily by the Japanese licensees many years ago, after extensive arms-length negotiations. Indeed, the non-assert provision was rejected by several Japanese companies, and is not even a provision in those agreements. In addition, these cross-license and non-assert provisions, common elements of many license agreements, provide enormous benefits to our customers and licensees. Qualcomm believes that requiring revisions of long-standing contracts is neither justified by the facts nor supported by the law.[20]

The JFTC's cease and desist order has been stayed by the Tokyo High Court pending a final decision by the JFTC after a full evidentiary hearing.[21] Irrespective of the merits of the JFTC's action against Qualcomm, it should be apparent that licensing technology in a way that promotes a royalty-free zone for the licensed technology (including standards-essential patent claims) is not an uncommon practice and may indeed be viewed by many licensees as quite beneficial.

*Business Transactions*

Many standards-essential patent claims are licensed as part of commercial product transactions. Again, because most business agreements are negotiated on a confidential and bilateral basis, the terms of such agreements are typically not made public. However, there are a number of product licenses that are made partially public, especially for software that can be downloaded from a vendor's website. For example, IBM licenses its WebSphere products under a license agreement that it makes publicly available.[22] Although the Websphere license agreement does not include a specific-patent license, it does provide a specific-use license to its licensees:

> Except as provided below, each valid Proof of Entitlement to the Program authorizes you to install and use the Program, or any part of the Program on a machine with a single processor (or a machine with multiple processors, if you acquire a Proof of Entitlement for the Program for each processor in such machine). You must acquire a Proof of Entitlement for each processor on which the Program, or any part of the Program is installed and used. For example, an additional testing server, staging server or review server requires the use of a separate copy of the Program, so it requires an additional Proof of Entitlement.
>
> These Proofs of Entitlement may be obtained separately for each of these Programs or as multiple Proofs of Entitlement for this Program.[23]

Even though there is no express patent license for standards-essential patent claims, it should be reasonably understood that IBM has at least impliedly licensed the patents needed to exercise the grant of the license IBM has made.[24]

Similarly, Adobe licenses its Adobe Acrobat products with the following provision:

> ... Adobe grants Licensee a non-exclusive license to install and use the Server Components delivered hereunder according to the terms and conditions of this Agreement and the applicable License Metrics and for the purposes described in the Documentation.[25]

Again, a licensee would arguably be minimally licensed under Adobe's patents needed to exercise this license grant.[26] Both IBM's Websphere and Adobe's Acrobat products implement and support numerous industry standards. The implied patent licenses granted in these product licenses are not limited to standards-essential patent claims, but rather to all patent claims that would be needed by the licensee to exercise the license granted.

Neither IBM nor Adobe provides representations or warranties of noninfringement or offers indemnification for patent infringement in their respective public licenses. Consequently, the implied licenses are granted only with regard to the patents they own or control. It should be

Published in *Landslide* Volume 3, Number 2, November/December 2010. © 2010 by the American Bar Association. Reproduced with permission. All rights reserved. This information or any portion thereof may not be copied or disseminated in any form or by any means or stored in an electronic database or retrieval system without the express written consent of the American Bar Association.

MOTM_WASH1823_0402435

understood, however, that the nonpublic agreements that are negotiated between the parties that spell out, among other things, the specific fees paid by individual licensees may also include other negotiated terms, such as appropriate representation and warranties for noninfringement as well as indemnification for patent-related legal claims. When a product license includes such representations, warranties, or indemnities, the licensee is also protected within the scope of those provisions from damages resulting from third-party patent infringement claims, including those based on standards-essential patent claims. As a result, specific licenses for standards-essential patent claims are often viewed as unnecessary by product licensees.

## Conclusion

There are multiple ways that a party may obtain licenses to standards-essential patent claims, but in virtually every case the standards-essential patent claims are not licensed in isolation. Attempting to define specific terms for a RAND license for standards-essential patent claims, consequently, would not be useful in practice. Patent licensing works best when patentees and prospective licensees can negotiate terms that are well-suited to meet their unique objectives and incorporate the patent rights each party needs to support its own business model.

Patent disputes are relatively rare when considering the number of patents granted and the extent to which patented technology has been commercialized on a global basis. The same is true concerning standards-essential patent claims. The number of disputes concerning such claims is also quite small given the large number of adopted standards and patents declared essential to such standards. Balanced patent policies that encourage early disclosure of patents with potentially essential claims and seek assurances that licenses will be made available on RAND terms help to avoid some holdup problems. Holdup problems would, however, not be reduced if standards-essential patent claims were licensed for free since there are many other patent claims that would need to be licensed as part of the deal. Similarly, other proposals to address feared holdup problems would not only have unintended negative consequences as discussed above, but would be impractical given the manner is which standards-essential patent claims are licensed. Accordingly, any standards-related patent policy should be based on how patents are licensed in practice, not how they might be licensed in theoretical isolation. ■

## Endnotes

1. IETF, Cisco's Statement of IPR relating to draft-raszuk-diverse-bgp-path-dist-00 (Feb. 12, 2010), https://datatracker.ietf.org/ipr/1267/.
2. Submission by Rachel Albright, Cisco Systems, Cisco's Statement of IPR relating to draft-raszuk-diverse-bgp-path-dist-00 (Feb. 12, 2010), http://www.ietf.org/ietf-ftp/IPR/cisco-ipr-draft-raszuk-diverse-bgp-path-dist-00.txt.
3. Complaint at 1, Nokia Corp. v. Apple Inc., C.A. No. 1:09-cv-00791 (D.C. Del. Oct. 22, 2009).
4. Answer at 40, Nokia Corp. v. Apple Inc., C.A. No. 1:09-cv-00791 (D.C. Del. Dec. 11, 2009) [hereinafter Apple Answer]. An amended answer has been filed by Apple. First Amended Answer, Nokia Corp. v. Apple Inc., C.A. No. 1:09-cv-00791 (D.C. Del. Feb 19, 2010).
5. Apple Answer, *supra* note 4, at 40.
6. Complaint at 24–25, Research in Motion Ltd v. Motorola, Inc., No. 3:08-cv-0284 (N.D. Tex Feb. 16, 2008).
7. *Id.* at 25.
8. *Id.* at 27. The companies entered into a settlement agreement, ending all outstanding litigation, which includes cross-licenses of "patent rights relating to certain industry standards and certain technologies, such as 2G, 3G, 4G, 802.11 and wireless email." Press Release, Motorola, Motorola and Research in Motion Announce Settlement and License Agreement (June 11, 2010), http://mediacenter.motorola.com/Press-Releases/Motorola-and-Research-In-Motion-Announce-Settlement-and-License-Agreement-327a.aspx.
9. *Samsung, Ericsson Settle Two-Year Patent Dispute*, FIERCE WIRELESS, July 2, 2007, http://www.fiercewireless.com/story/samsung-ericsson-settle-two-year-patent-dispute/2007-07-09.
10. Ericsson Inc v. Samsung Elecs. Co., No. 2:06-CV-63, 2007 U.S. Dist. LEXIS 29257, at *2 (E.D. Tex. Apr. 20, 2007).
11. *Id.* at *2–3.
12. Complaint at 6, *In re* Certain Elec. Devices, Including Mobile Phones, Portable Music Players, and Computers, USITC Inv. No. 337-TA-701 (Dec. 29, 2009).
13. Rambus, Licensing Options, http://www.rambus.com/us/about/Licensing/index.html (last visited Oct. 20, 2010).licensing_options.html (last visited Oct. 10, 2010).
14. JEDEC, http://www.jedec.org/ (last visited Mar. 3, 2010).
15. RAMBUS, DRAM PATENT LICENSE AGREEMENT BETWEEN RAMBUS INC. AND [NAME OF COMPANY] 6, *available at* http://www.rambus.com/assets/documents/patents/ec_dram_license_agreement.pdf.
16. *Id.* at 4–5.
17. *Id.* at 4. The term "Licensee Product" is defined as "any Current JEDEC DRAM." *Id.*
18. Press Release, Microsoft, Statement by Microsoft Corporation on Japanese Fair Trade Commission Recommendation (July 13, 2004), http://www.microsoft.com/presspass/press/2004/jul04/07-13JFTCStatementPR.mspx.
19. Cease and Desist Order Against Qualcomm Inc., Japan Fair Trade Comm'n (Sept. 30, 2009), *available at* http://www.jftc.go.jp/e-page/pressreleases/2009/September/090930.pdf.
20. Press Release, Qualcomm, Qualcomm Provides Update on JFTC Investigation (Aug. 13, 2009), http://www.qualcomm.com/news/releases/2009/08/13/qualcomm-provides-update-jftc-investigation.
21. Press Release, Qualcomm, Tokyo High Court Grants Stay of JFTC Order (Feb. 11, 2010), http://www.qualcomm.com/news/releases/2010/02/11/tokyo-high-court-grants-stay-jftc-order.
22. IBM, IBM LICENSE INFORMATION DOCUMENT, *available at* http://www-03.ibm.com/software/sla/sladb.nsf/lilookup/4255D7D60E4F65110025716C0060235F?opendocument&amp;li_select=CD19F494034770A40025716C00602338
23. *Id.*
24. *See* TransCore LP v. Elec. Transaction Consultants Corp., 563 F.3d 1271, 1279 (Fed. Cir. 2009) (holding that TransCore was legally estopped from asserting its later-issued patent against its licensee because authorizations granted for other patents created an implied license to the later-issued patent).
25. ADOBE, ADOBE ACROBAT CONNECT PRO SOFTWARE LICENSE AGREEMENT § 2.1, *available at* http://www.adobe.com/products/eulas/pdfs/acrobat_connect_pro_7.pdf.
26. *Id.*

Published in *Landslide* Volume 3, Number 2, November/December 2010. © 2010 by the American Bar Association. Reproduced with permission. All rights reserved. This information or any portion thereof may not be copied or disseminated in any form or by any means or stored in an electronic database or retrieval system without the express written consent of the American Bar Association.

MOTM_WASH1823_0402436