# EXHIBIT 18

GSC-E

| DOCUMENT #: | GSC13-IPR-14r1 |
|---|---|
| FOR: | Presentation |
| SOURCE: | TIA |
| AGENDA ITEM: | IPR WG Agenda Item 9 |
| CONTACT(S): | Kent Baker/Dan Bart/Amy Marasco |

# Considerations for Developing or Revising PSO IPR Policies

GSC-13
IPR WG
Agenda Item 9
TIA

Submission Date: July 16, 2008

TRANSFORMING THE NETWORK THROUGH GLOBAL COLLABORATION

MOTM_WASH1823_0402454

Case 2:10-cv-01823-JLR   Document 263-9   Filed 07/18/12   Page 3 of 18
Case 2:10-cv-01823-JLR   Document 230-3   Filed 03/30/12   Page 3 of 18



# Best Practices from GSC

- GSC-12 **IPR Policies** Resolution (12/22), **"Open Standards"** Resolution (12/05); and **Cooperation with Patent and Trademark Offices** Resolution (12/23)
- Taken together support effectiveness of traditional RAND/FRAND-based IPR policies
  - Balance interests of all stakeholders
  - Encourage high technology companies to participate in SDOs and contribution of valuable innovative technology
  - Encourage patent holders to make RAND/FRAND licensing commitments
    - potential licensors have every incentive to negotiate early agreements – *i.e.*, before standard is adopted to gain support for their technology from SDO members
    - Implementers and SDOs recognize innovation and invention are results of significant R&D investments and it is equitable and fair that patent holders receive a reasonable return on that investment
  - Stimulate innovation and dynamic efficiency (both within and around the scope of the standard)

TRANSFORMING THE NETWORK THROUGH GLOBAL COLLABORATION

MOTM_WASH1823_0402455



# Best Practices from GSC

- Disclosure is limited to patent claims that are **likely 'essential'** to the implementation of the standard
- License commitment or Letter of Assurance (LoA) on **RAND/FRAND basis** for claims that end up being essential
- **Actual license** terms are discussed **outside** of the SDO process and negotiated frequently in advance of a final standard on a bi-lateral basis
  - Each negotiation is unique
  - Voluntary "ex ante" disclosure of proposed license terms is generally not a problem, but substantial antitrust or competition law risks if SDOs permit any group discussion of licensing terms during the standards development organization's meetings or activities
  - Implementers or proponents of alternative technologies might unreasonably collude in terms of (a) group discussions of licensing terms or (b) group decisions to avoid a certain technology.

**TRANSFORMING THE NETWORK THROUGH GLOBAL COLLABORATION**

3

MOTM_WASH1823_0402456



## The Reality

- IP laws grant exclusive rights in order to encourage innovation and the undertaking of risky investments; the IPR holders may desire a reasonable return on that investment.

- IP rights should not be viewed as protecting owners *from* competition but as encouraging firms to engage *in* competition; this is also the basis for most competition law enforcement actions, protect competition not competitors

- A licensing commitment or Letter of Assurance (LoA) is an important commitment as IPRs grant the right to exclude, *i.e.*, not to provide a license at all
  – RAND/FRAND commitment, LOA commitment, etc. modifies the right to exclude

- We are seeing enforcement actions targeted at enforcing the LoAs, even when given by a prior owner of the underlying patents containing the essential patent claims (*e.g., FTC vs N-DATA*)

TRANSFORMING THE NETWORK THROUGH GLOBAL COLLABORATION

4

MOTM_WASH1823_0402457



# The Reality

- Today there are more than 16,455 International Standards (with many more in process)
  - Thousands more are adopted by industry associations, consortia, and other SSOs on a global basis
- The number of <u>real disputes</u> brought to the attention of judicial or regulatory bodies over IP-related issues in our sector per year typically is <u>less than 10!</u>
  - Some of the disputes are between or among competitors in a competitive market
  - Some of the disputes are enforcement actions by competition law agencies
  - Most of these involve a patent holder that is accused of intentionally hiding its IP and not disclosing it until after investments are made with regard to implementations – the "<u>bad actor</u>" syndrome
  - Recent cases related to enforcing terms of a LoA given by a prior owner of the underlying patent claims
  - There are <u>so few disputes</u>, most standards folks can recite the names of the cases: 'Dell,' 'Rambus,' 'FTC N-DATA,' etc.
  - The fact there are <u>so few disputes</u> is not evidence the system is broken, but evidence <u>the system works</u> and works in a <u>highly competitive market!</u>

TRANSFORMING THE NETWORK THROUGH GLOBAL COLLABORATION

5

MOTM_WASH1823_0402458



## Ex Ante Debate

- Many companies support disclosure of specific licensing information on a <u>voluntary</u> basis, before approval (*i.e., ex ante*) of the standard, where supported by the standards body membership via the SDO's IPR policy

- The debate sharpens regarding:
  - <u>Mandatory *ex ante* approaches</u>
  - <u>Group discussion of licensing terms</u>

- Those SDOs who consider the *ex ante* issue and with competent legal counsel about the risks for the <u>SDO and participants in the SDO</u>, generally conclude that they will **NOT permit** any group discussion of specific licensing terms during the standards development organization's meetings or activities
  - The GSC Resolution on effective IPR Polices should be revised to make this point more explicit

TRANSFORMING THE NETWORK THROUGH GLOBAL COLLABORATION

MOTM_WASH1823_0402459



## Ex Ante Debate

- Mandatory *ex ante* approaches
    - May imply necessity of <u>patent searches</u>, which are very expensive and not conclusive
    - Adding such expensive process steps <u>discourages</u> innovative <u>companies</u>, particularly those with large patent portfolios, from <u>participating</u> in that SDO's standardization activities

- Group discussion of licensing terms
    - Proponents' objective is to facilitate the group discussions or negotiations of licensing terms by technical committees at an SSO
        - Potential for anti-competitive conduct and thus <u>legal risk</u> for participants and the SDOs
        - Disincentives for innovation in and around standardized technology areas
        - Increased <u>costs, burdens, and risks</u> on the standards-setting process
        - Technical committees are populated by <u>technical personnel</u> and not attorneys or those charged by their companies with license negotiations
        - Many more technical committees than company personnel with licensing responsibilities
        - Slows adoption of new technologies to the detriment of consumers
        - <u>Favors</u> certain company business models over other business models

- Many companies challenge whether a "solution" is needed or properly scoped to address the <u>perceived</u> "problems"
    - Inefficiency trade-offs (static vs. dynamic)

TRANSFORMING THE NETWORK THROUGH GLOBAL COLLABORATION

MOTM_WASH1823_0402460



## Impact of Business Models

- Many of the companies participating in the SDOs engaged on <u>both</u> sides of the debates are <u>patent holders</u>, but not all
- Participants in the discussions are mostly <u>for-profit</u> companies
- Viewpoints are colored by <u>business strategy</u>, <u>scope of patent portfolios and relevant business models</u>
- From the SDO's perspective, developing IPR policies that <u>include all business models and favor none</u> is key.
- Successful SDOs and successful standards processes are 'company neutral' and 'technology neutral'
  - Competition should occur in the marketplace, <u>NOT</u> in the SDO or standards process

TRANSFORMING THE NETWORK THROUGH GLOBAL COLLABORATION

MOTM_WASH1823_0402461



# Business Models Drive IPR Policy Debates

- Different standards activities or policies impact different business models and IP portfolios differently:
  - *Licensing model* – seeking <u>reasonable return</u> on R&D investments
  - *Product model* – monetize IP through <u>products</u>
    - Often <u>defensive</u> approach in standards
      - Do not actively seek licenses from implementers
    - May want to pay lower royalties to reduce costs
    - May want to raise rivals' costs
  - *Service providers* – use <u>loss-leader</u> business model (*e.g.*, subsidized handsets) to drive monetization of services
  - *Consulting model* – seeking to transfer value quotient from product/licensed IP to consulting services (and possibly up-sell to proprietary offerings)

TRANSFORMING THE NETWORK THROUGH GLOBAL COLLABORATION

MOTM_WASH1823_0402462



# Why do SDOs generally not allow licensing discussions?

- Most SDOs in our sector have prohibitions against discussion of licensing terms in technical meetings of the SDO
  - Whether a standard is widely adopted depends on its <u>technical</u> content, viable commercial environment and timely responsiveness to market needs
  - Collaborative efforts are best focused on the <u>technical content</u>
    - Participants make their own informed decisions about <u>commercial/market issues</u> from their own company's perspective
      - Voting member might determine how to vote based upon his/her company position
    - Discussion of commercial issues raises both <u>legal and practical</u> hurdles, for SDOs and participants
- Also a "<u>myth</u>" that lower IP costs for a standard or technology guarantees market success
  - For example, a <u>RAND/FRAND</u> memory card can cost less and gain larger market acceptance based on <u>technical merits</u> than an alternative royalty-free design

MOTM_WASH1823_0402463

## What RAND/FRAND Really Means

- Patent holder agrees to make licenses available for those patent claims covered by RAND/FRAND commitment: gives up right to refuse to license on reasonable terms and conditions (*i.e.*, keep patented technology for own sole use or limited licensing to selected licensees)

- Patent holder agrees it is prepared to make licenses available under "[fair and] reasonable ... terms and conditions" including:
  - financial terms (*e.g.*, up-front fees and/or running royalties) and
  - other non-financial "terms and conditions" (*e.g.*, cross-licences, scope of use, non-sublicenability, reciprocity)

- Patent holder agrees to make licenses available to all interested parties; gives up the right (often exercised in non-standards situations) to grant exclusive licenses or "pick and choose" who to license

- Patent holder agrees to make licenses available on terms and conditions that are "non-discriminatory"

TRANSFORMING THE NETWORK THROUGH GLOBAL COLLABORATION

11

MOTM_WASH1823_0402464



## What RAND/FRAND Really Means

- RAND/FRAND means licensor is prepared to negotiate in good faith to determine licensing terms provided that counterparty also demonstrates good faith
- "It takes two to make a license agreement":
  - All a patent owner can do is make genuine *bona fide* licensing offer
- Terms and conditions of <u>any</u> license subject to RAND/FRAND result from normal commercial negotiations between licensor and licensee, outside the SDO processes
- RAND/FRAND does not mandate a specific royalty level:
  - What is RAND/FRAND in one situation may not be RAND/FRAND in another
- There are important elements of 'consideration' other than royalties
  - *i.e.*, pass through rights, etc.

TRANSFORMING THE NETWORK THROUGH GLOBAL COLLABORATION

12

MOTM_WASH1823_0402465



# Does including IP in a standard give a company market power?

- Once technology is standardized are the market, competitors, service providers, and users "locked in" to one company or a small group of IP holders?

- Holders of essential IP face significant competitive constraints even after IP is included in a standard:

  - **Horizontal constraints**: prices commanded by complementary patents within standard <u>and</u> by competing standards within same field

  - **Vertical constraints**: patent holders without any downstream operations constrained by elasticity of consumer demand for product:
    - Vertically integrated licensor has stronger bargaining position because it has alternative of capturing profits through its own product sales
    - Vertically integrated firms have incentives to raise rival downstream firms' costs through licensing terms, while remaining open to cross-licensing agreements with other integrated companies

  - **Dynamic constraints**: the formal standard-setting process is a repeat game and essential IP holder committing abuses could find their reputations so damaged as to affect their effectiveness in discussions of subsequent standards etc.



## Confusion over 'Open Source' and 'Open Standards'

- As covered earlier at GSC-13 IPRWG, there continues to be confusion over **"Open Source"** Software (OSS) and **"Open Standards"**
- Policies within SDOs and public policy debates or initiatives need to clearly distinguish the two
  - OSS typically is one way to implement at standard, but it is not itself a standard
  - With convergence, standards often can be implemented in hardware, software (OSS and/or proprietary), or a combination thereof
  - **There are many OSS implementations of RAND-based standards**
  - Special rules for OSS are not necessary
- TIA is generating a Open Standards White Paper to help with this education effort

TRANSFORMING THE NETWORK THROUGH GLOBAL COLLABORATION

14

MOTM_WASH1823_0402467

# Conclusion: RAND/FRAND Works and Works Well!



- RAND/FRAND regime has allowed successful development of innovative technologies (*e.g.*, mobile telephony, Internet, Wi-Fi®, DSL, etc.) and fostered competition
- Abuses of RAND/FRAND are rare:
  - Very little actual case-law
  - Involve intentional failures to disclose patents or non-member patent ambush, not failures to disclose licensing terms
  - Have been and are being dealt with by private litigation or government enforcement actions
  - **BUT** lots of academic discussions currently taking place to understand the complexity of IPR issues in a standardization context and such education is good
- More tools being generated to help in understanding SDO IPR policies and how to interpret them, (*e.g.*, ABA book mentioned at GSC-12)

TRANSFORMING THE NETWORK THROUGH GLOBAL COLLABORATION

15

MOTM_WASH1823_0402468

695



# Conclusion: RAND/FRAND Works!

- Criticisms made against the RAND/FRAND regime fail to convince those who take the time to understand the issues
  - Efforts to move away from RAND/FRAND or to re-interpret it are essentially motivated by a desire to reduce prices paid for patented technology or get access to IPR

- Confiscatory SDO IPR policies drive IP holders and their innovative technologies out of the SDO
  - Balanced IPR policies encourage participation in the SDO
  - Without participation by 'high-tech' innovative and risk-taking companies, you produce low-tech or 'no-tech' standards that are not likely to be widely deployed or commercially successful
  - Balancing of interests based on a membership-wide consensus is what has worked well over time at ANSI, ETSI, TIA, ITU, ISO, IEC, etc.
    - Recently – ITU/ISO/IEC Common Patent Policy

TRANSFORMING THE NETWORK THROUGH GLOBAL COLLABORATION

MOTM_WASH1823_0402469

## Conclusion: GSC IPRWG Resolutions should be re-affirmed and revised

- TIA believes the GSC IPRWG Resolutions from GSC-12 have served the industry and stakeholders in GSC very well and should be re-affirmed at GSC-13

- TIA has offered a small revision to the effective IPR Policies Resolution to explicitly capture what is in fact the practice at most PSOs. **See Contribution No. 11**

TRANSFORMING THE NETWORK THROUGH GLOBAL COLLABORATION

17

MOTM_WASH1823_0402470

697