# EXHIBIT 6

UNITED STATES INTERNATIONAL TRADE COMMISSION
Washington, D.C.

| | |
|---|---|
| In the Matter of<br><br>**CERTAIN GAMING AND ENTERTAINMENT CONSOLES, RELATED SOFTWARE, AND COMPONENTS THEREOF** | Inv. No. 337-TA-752 |

**STATEMENT REGARDING THE PUBLIC INTEREST BY NON-PARTY INTEL CORPORATION**

Darren B. Bernhard
Director, Antitrust and Commercial
  Litigation
Intel Corporation
1155 F Street, NW
Washington, DC 20004
(202) 626-4380

Joseph Kattan, PC
Thomas G. Hungar
Adam J. Di Vincenzo
John F. Bash
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, NW
Washington, DC 20036-5306
(202) 955-8500
THungar@gibsondunn.com

*Counsel for Intel Corporation*

This case raises an issue of exceptional importance for maintaining the Nation's competitiveness in high-technology industries and enhancing the welfare of U.S. consumers: whether, in light of the governing public interest factors, the Commission should refrain from issuing an Exclusion Order sought by a patentee that has contractually committed to license its "standard-essential patents" ("SEPs") to *all* applicants on reasonable and non-discriminatory ("RAND") terms but has failed to honor that commitment.[1]  The Commission should determine that it would be inappropriate to issue such an order in these circumstances.  An Exclusion Order is unnecessary to protect intellectual-property rights in this case, because Motorola has agreed to license those rights to all comers.  Moreover, an Exclusion Order here would harm the public interest and U.S. consumers by facilitating the unfair exploitation of market power that was created by an industry standard.  This market power, which Motorola agreed to forego in favor of a RAND royalty, would not have existed absent Motorola's RAND commitment because the standard-setting organizations ("SSOs") that promulgated the standards at issue condition the incorporation of a patent into a standard on the receipt of a RAND commitment.

The Commission has broad discretion to refuse an Exclusion Order when such an order would harm the public interest.  19 U.S.C. § 1337(d)(1).  As part of its public-interest analysis, the Commission must evaluate "the effect of such exclusion upon the public health and welfare, competitive conditions in the United States economy, the production of like or directly competitive articles in the United States, and United States consumers."  *Id.*; *see also id.* § 1337(f)(1) (same factors considered in evaluating cease-and-desist order).  In the past, the Commission has refused to enter Exclusion Orders that would cause serious harm to the public interest.

That harm often took the form of depriving the public of products necessary for consumer

---

[1] The same considerations apply to Inv. No. 337-TA-745, *Certain Wireless Communications Devices, Portable Music and Data Processing Devices, Computers, and Components Thereof*.

welfare.  *See*, *e.g.*, *Certain Fluidized Supporting Apparatus & Components Thereof*, Inv. No. 337-TA-182/188, USITC Pub. 1667 (Oct. 5, 1984); *Inclined-Field Acceleration Tubes & Components Thereof*, Inv. No. 337-TA-67, USITC Pub. 1119 (Dec. 29, 1980).  An Exclusion Order in this case would result in a different, but equally severe, public-interest harm: the exploitation of unearned market power to deny producers and consumers the benefits of industry standard-setting, which seeks to avoid creating such power by requiring commitments to accept RAND royalties in lieu of injunctive relief.  An Exclusion Order would likely lead to a windfall settlement that would distort competition, undermine the standard-setting process, and injure consumers—the sort of harm that § 337's public-interest inquiry was designed to prevent.

The Administrative Law Judge ("ALJ") found that four of the five patents at issue in this case are SEPs for the H.264 standard or the 802.11 standard, which are integral to high-definition video and Wi-Fi connections, respectively.  *See* Initial Decision at 284-85.  Each standard was adopted only after participants in the standard-setting process, including Motorola, pledged that they would offer RAND licenses to all parties for any SEPs that they held.  Both the International Telecommunications Union ("ITU"), which adopted the H.264 standard, and the IEEE-SA, which adopted the 802.11 standard, require participants in their standard-setting activities to license any willing licensee to make, sell, and use standard-compliant products.[2]  For example, the ITU's policy provides that "a patent embodied fully or partly in a [standard] must be accessible to everybody without undue constraints."[3]  Before an ITU standard is adopted, each party known to be holding patents essential to the proposed standard must file a statement with the ITU indicating either that it is either willing to negotiate licenses free of charge, "willing to negotiate licenses with other parties on a non-discriminatory basis on reasonable terms and conditions," or

---

[2] *See* www.itu.int/en/ITU-T/ipr/Pages/policy.aspx; www.standards.ieee.org/develop/policies/bylaws/sect6-7.html#6.
[3] *See* www.itu.int/en/ITU-T/ipr/Pages/policy.aspx (Preamble).

"not willing to comply with" either of those options—in which case the standard "shall not include provisions depending on the patent."[4] The IEEE-SA requires materially similar pledges.

In accordance with these requirements, Motorola "submitted licensing declarations and letters of assurance relating to the H.264 standard and various portions of the 802.11 standard" stating that "it was prepared to grant licenses for patents essential to the relevant standards to an unrestricted number of applications on RAND terms and conditions." Initial Decision at 285. In so doing, Motorola accepted that RAND royalties would sufficiently compensate it for the use of its SEPs by *any* implementer of the standards. In other words, to get its technologies included in the standards, Motorola agreed not to seek injunctive relief from parties willing and able to pay RAND royalties. Here, the ALJ found that Motorola's offer to Microsoft was unreasonable and that Motorola did not engage in good faith negotiations. *Id.* at 303.

Because Motorola's RAND commitments constitute promises to license the SEPs to all parties that incorporate the H.264 and 802.11 standards into their products, they effectively modified the scope of Motorola's patent rights. A patent confers "a property right," *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 535 U.S. 722, 730 (2002), that ordinarily entitles the holder to obtain an Exclusion Order if it is able to meet the statutory requirements of the Tariff Act. But "[a]s with other property rights, patent-related rights can be contracted away." *Deprenyl Animal Health, Inc. v. Univ. of Toronto Innov. Found.*, 297 F.3d 1343, 1357 (Fed. Cir. 2002). Once the patentee agrees to license SEPs, the scope of its property right is modified and it may no longer seek an injunctive order against willing licensees. *Cf. Tessera, Inc. v. ITC*, 646 F.3d 1357, 1369–71 (Fed. Cir. 2011). Motorola's contractual promises to accept compensation from *all* users of the standards leave no room for barring parties willing and able to pay RAND royalties from selling standard-compliant products. It follows that the Commission's ordinary

---

[4] *See* www.itu.int/en/ITU-T/ipr/Pages/policy.aspx (Sections 2 and 3).

3

presumption in favor of an Exclusion Order should not apply in a case, like this one, in which the patentee has made a RAND commitment.

That is especially true given the central role that RAND commitments play in protecting the public from potentially anticompetitive consequences of standard-setting.  The adoption of a standard enables the SEP holder to exert leverage over the entire industry by demanding excessive royalties and threatening to enjoin the sale of standard-compliant products.  Unlike with ordinary patents—which an infringer can often design around to produce a materially similar product—it is commercially infeasible for an individual manufacturer to decline to incorporate a commercially accepted standard (and hence the SEPs) into a new product.  Indeed, the very purpose of interoperability standards is to incorporate identical standard-compliant features into products so that different manufacturers' products will work together.  Failing to adopt the H.264 standard would make Microsoft's products unable to process the large volume of video content using that standard, and failing to adopt the 802.11 standard would make its products unable to communicate with the large installed base of Wi-Fi routers in both private and public places.

This commercial reality means that, after a standard is adopted, SEP holders can "hold up" other companies through threats of injunctive relief in order to "capture not just the value of the inventive contribution that [the SEP holders] have made . . . but also some greater amount of money than their invention is worth."  Mark A. Lemley, *Ten Things To Do About Patent Holdup of Standards (And One Not To)*, 48 B.C. L. Rev. 149, 152 (2007).  That is precisely why SSOs require participants to agree to grant licenses to all applicants on RAND terms *before* the standard is adopted.  As the IEEE and other SSOs have explained, "[a]voiding hold-up outcomes (with their exorbitant and exclusionary license demands) is critical to ensuring that a standard will be genuinely 'open' to implementation by all interested parties."  *Amicus Curiae* Br. of the

4

IEEE et al., at 27, *Broadcom Corp. v. Qualcomm Inc.* (3d Cir. filed Dec. 19, 2006).

Given the crucial role of RAND commitments in preserving competition, straightforward application of § 337's public-interest factors shows that an Exclusion Order would be inappropriate here. Most obviously, enforcement of RAND commitments improves the "competitive conditions in the United States economy" and enhances the welfare of "United States consumers" by mitigating the hold-up problem. 19 U.S.C. § 1337(d)(1). Because of the commercial infeasibility of designing around standards, allowing an SEP holder to obtain an injunction against a party willing to pay RAND royalties would empower SEP holders to extract a disproportionate share of the value of accused products, making an unreasonably high settlement the only plausible outcome, and thereby raising prices to consumers. An Exclusion Order would force Microsoft to choose between withdrawing products from the market or paying far more than a RAND royalty. Competition and consumers would be harmed in either event.

Even more troubling, issuance of an Exclusion Order in the face of binding RAND commitments would undermine the standard-setting process that is so vital to U.S. innovation, economic growth, and consumer welfare. The creation and adoption of standards greatly benefit U.S. consumers by "facilitat[ing] the sharing of information among purchasers of products from competing manufacturers." *Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297, 308 (3d Cir. 2007). But companies will become reluctant to agree on standards and to incorporate them into their products if SEP holders can unfairly exploit the resulting standard-derived market power through Exclusion Orders, as Motorola seeks to do here. That will ultimately hurt consumers, who have benefited tremendously from the interoperability of high-technology products.

For the foregoing reasons, the Commission should refrain from issuing any remedial orders against Microsoft based on Motorola's standard-essential patents.

| | |
|---|---|
| June 8, 2012 | Respectfully submitted, |
| | /s/ Thomas G. Hungar |
| Darren B. Bernhard | Joseph Kattan, PC |
| Director, Antitrust and Commercial　Litigation | Thomas G. Hungar |
| | Adam J. Di Vincenzo |
| Intel Corporation | John F. Bash |
| 1155 F Street, NW | GIBSON, DUNN & CRUTCHER LLP |
| Washington, DC 20004 | 1050 Connecticut Avenue, NW |
| (202) 626-4380 | Washington, DC 20036 |
| | (202) 955-8500 |
| | THungar@gibsondunn.com |

*Counsel for Intel Corporation*

| Certain Gaming and Entertainment Consoles, Related Software, and Components Thereof | Inv. No. 337-TA-752 |

# CERTIFICATE OF SERIVCE

I, Thomas G. Hungar, certify that on June 8, 2012, copies of the foregoing STATEMENT REGARDING THE PUBLIC INTEREST were delivered, pursuant to Commission regulations, to the following interested parties as indicated:

| | |
|---|---|
| The Honorable Lisa Barton<br>Acting Secretary to the Commission<br>U.S. International Trade Commission<br>500 E Street, SW, Room 112A<br>Washington, DC 20436 | Via EDIS and 8 Copies Via Hand Delivery |
| Jia Chen<br>Office of General Counsel<br>U.S. International Trade Commission<br>500 E Street, SW Washington, DC 20436 | Via E-mail<br><br>jia.chen@usitc.gov |
| The Honorable David P. Shaw<br>Administrative Law Judge<br>U.S. International Trade Commission<br>500 E Street, SW, Suite 317<br>Washington, DC 20436 | Via Hand Delivery |
| Pyong Yoon<br>Attorney-Advisor<br>U.S. International Trade Commission<br>500 E Street, SW, Suite 317<br>Washington, DC 20436 | Via E-mail<br><br>Pyong.yoon@usitc.gov |
| Stephen Rosenman<br>Ropes & Gray LLP<br>One Metro Center<br>700 12th Street, N.W., Suite 900<br>Washington, DC 20005<br><br>Charles F. Schill<br>Steptoe & Johnson LLP<br>1330 Connecticut Avenue, NW<br>Washington, DC 20036<br><br>*Counsel for Complainants Motorola Mobility, Inc. and General Instrument Corporation* | Via E-mail<br><br>RopesITC752@ropesgray.com<br><br>S&JMotorola752@steptoe.com |

Certain Gaming and Entertainment Consoles,                    Inv. No. 337-TA-752
Related Software, and Components Thereof

| Brian R. Nester, Esq.<br>Sidley Austin LLP<br>1501 K Street NW<br>Washington, DC 20005<br><br>*Counsel for Respondent Microsoft Corp.* | Via E-mail<br><br>Project-MS_Moto_ITC_752@sidley.com |

/s/ Thomas G. Hungar
Thomas G. Hungar
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, NW
Washington, DC 20036-5306
(202) 955-8500

*Counsel for Intel Corporation*

CERTIFICATE OF SERVICE PAGE 2 OF 2