# EXHIBIT 7

# ALSTON&BIRD LLP

One Atlantic Center
1201 West Peachtree Street
Atlanta, GA  30309-3424

404-881-7000
Fax: 404-881-7777
www.alston.com

| | | |
|---|---|---|
| **Patrick J. Flinn** | **Direct Dial: 404-881-7920** | **Email: patrick.flinn@alston.com** |

June 8, 2012

The Honorable Lisa R. Barton
Acting Secretary
U.S. International Trade Commission
500 E Street, S.W.
Washington, DC  20436

      Re:    *In the Matter of Certain Gaming and Entertainment Consoles, Related Software, and Components Thereof,*  Investigation No. 337-TA-752

Dear Secretary Barton:

    On behalf of Nokia Corporation, I write to submit comments on the public interest factors that the Commission must consider, pursuant to 19 U.S.C. §1337(d)(1), in the context of determining whether to issue an Exclusion Order in this investigation.  In particular, I write to express Nokia's view that issuing an Exclusion Order in this instance – where an Administrative Law Judge has found that Motorola breached a binding obligation to license its patents to Microsoft on RAND terms – would harm the public interest by allowing holders of essential IPR to avoid their RAND obligations in their entirety, thereby forcing consumers to pay increased prices for products that practice standards-essential patents.

    In his Initial Determination, ALJ Shaw found that Motorola had committed to license certain patents-in-suit on terms that were reasonable and non-discriminatory ("RAND"), but that Motorola had nonetheless breached its commitment by refusing to offer or grant a RAND license to Microsoft.  In spite of this finding, the ALJ nonetheless recommended entry of an Exclusion Order against Microsoft's continued implementation of the applicable standards because he found they were practicing certain of the patents-in-suit.  If this ruling is allowed to stand, it will irreparably undermine the enforceability of RAND commitments and allow holders of essential patents to repudiate RAND commitments at will when it suits their purpose to utilize the leverage of an ITC action. This is an important occasion for the ITC to take stock of how it is being used – as a high stakes lever to avoid contractual RAND commitments and obtain injunctive relief that would otherwise be unavailable.

    Standard Setting Organizations ("SSOs"), by their very nature, raise anticompetitive concerns. SSOs require industry participants, who are oftentimes competitors, to agree on a single technical solution to a given problem, to the exclusion of competing solutions.  Once a standard is set, and if the standard becomes widely adopted, manufacturers of standards-compliant products may become "locked in," making switching costs prohibitively high.  Consequently, holders of essential patents

may have the unique ability to hold up entire industries by demanding exorbitant royalties for such essential patents, or by refusing to grant a license altogether. In an effort to alleviate these anticompetitive concerns, and working with competition authorities in the United States and Europe, SSOs typically incorporate mechanisms into their IPR policies that ensure that holders of essential patents make commitments to license the patents on RAND terms. These commitments, often given voluntarily, remove the threat of anticompetitive conduct by forcing companies to offer and grant licenses on RAND terms, and to give up – absent exceptional circumstances – their legal right to exclude others from practicing the standard through use of their essential patents.

If this Commission were to issue an Exclusion Order despite a finding by an ALJ that (i) there was a breach of a RAND commitment; and (ii) there was a refusal to grant a license on RAND terms to a willing licensee, the Commission would remove the critical safeguard that protects the entire industry from patent holdup arising from standard-essential patents. Unfettered by any contractual constraints on what they can charge, a holder of essential patents who chooses not to honor the commitments it has made would be free to demand exorbitant royalty rates and other terms from manufacturers, or simply deny licenses to their competitors. Manufacturers, in turn, will invariably pass along any extortionate royalties to consumers, resulting in higher prices for end products. Indeed, absent the RAND safeguard, it is possible that companies will reconsider the value of standardization altogether, since they will risk holdup each and every time they manufacture a standards-compliant product.

The choice presented to the Commission is stark: the RAND commitment is either enforceable, or it is not. If it is enforceable (a conclusion reached by courts around the country and recently supported by the Federal Trade Commission as well), then a ruling by an Administrative Law Judge that a complainant breached its commitment to license on RAND terms *must have consequences*, and an exclusion order cannot issue. If it is not enforceable, then not only will the Commission have taken a position contrary to the prevailing law, but it will force consumers to bear the cost of unchecked royalty demands from holders of essential patents. Under the circumstances here, Nokia submits that the Commission should decline to issue an Exclusion Order and should enforce the RAND commitments made in connection with the patents asserted in this action. Nokia respectfully submits that if the Commission concludes that a patent is valid, infringed by a Respondent practicing a standard, enforceable, and subject to a RAND commitment to such standard (i.e., declared essential), and if the Commission concludes that a Respondent is a willing licensee, then the Commission should take the FRAND commitment into account in fashioning an appropriate remedy, including declining to issue or conditioning any exclusion order in light of the public interest considerations.

    A.    The RAND Commitment Is Binding And Enforceable.

Courts around the country agree that a RAND commitment creates a binding and enforceable undertaking for the benefit of third parties. For example, in the parallel district court action between Microsoft and Motorola, the United States District Court for the Western District of Washington has now twice held that "through Motorola's letters to both the IEEE and ITU, Motorola has entered into binding contractual commitments to license its essential patents on RAND terms." *Microsoft Corp. v. Motorola, Inc.*, 10-cv-1823, Order No. 188 at 10 (W.D. Wash. Feb. 27, 2012); *see also* Order No. 335 at 13 ("Accordingly, the court reaffirms its prior decision that Motorola's statements to the IEEE and ITR constitute a binding agreement to license its essential patents on RAND terms.").

June 8, 2012
Page 3

      Likewise, the United States District Court for the Western District of Wisconsin ruled that, in the context of denying a motion to dismiss, "[t]he combination of the [ETSI IPR Policy] and Motorola's assurances to the Institute that it would grant fair, reasonable and non-discriminatory licenses to the [patents in suit] constitute a contractual agreement between Motorola and the European Telecommunications Standards Institute." *Apple Inc. v. Motorola Mobility, Inc*., 11-cv-178, Order at 19 (W.D. Wisc. June 7, 2011).

      Indeed, SSO licensing obligations are also recognized as binding commitments by the Federal Trade Commission, and disregarding such an obligation can constitute a violation of the FTC Act. *See* FTC Release, *FTC Challenges Patent Holder's Refusal to Meet Commitment to License* (noting that the FTC had filed a complaint alleging violation of Section 5 of the FTC Act and had accepted a consent order based upon the refusal to comply with a binding SSO licensing obligation). Accordingly, RAND commitments are binding and enforceable, and must be treated as such by the Commission.

      **B.**      **A RAND Commitment Precludes A Party From Seeking an Exclusion Order Against Willing Licensees.**

      The nature of the commitment is clear as well. ALJ Shaw concluded that by virtue of its declarations to IEEE and ITU, Motorola promised to "provide reasonable and non-discriminatory licenses" to Microsoft. By virtue of this commitment, Motorola necessarily relinquished its right to seek injunctive relief for the alleged infringement of these same patents against a willing licensee.[1] A company cannot simply withdraw its RAND commitment against a willing licensee once it has satisfied itself that it has made an offer, or once it has obtained an exclusion order.

      This Investigation presents a very basic question: can a party (i) after it has entered into a binding commitment to license certain patents on RAND terms; (ii) breach that promise; and (iii) nonetheless obtain an Exclusion Order for infringement of those patents against a willing licensee? Any answer other than "no" would inflict fatal injury on the admitted RAND obligation and indeed on the policy behind and the rational for SSOs in general.[2]

---

[1]     Nokia owns thousands of patents that have been declared essential to various industry standards. Yet in spite of the fact that Nokia has participated in several International Trade Commission investigations as both complainant and respondent, Nokia has never sought an exclusionary order before this Commission based on the infringement of a declared-essential patent. In Nokia's view, the RAND commitment would not require the relinquishment of the right to seek or enforce an injunction in exceptional circumstances such as the total refusal to negotiate with the holder of an essential patent or the complete refusal to fulfill, or even acknowledge the existence of, a party's FRAND payment obligations on patents that are valid, essential, and infringed.

[2]     Because it is an enforceable commitment to grant a license, the presence of a RAND commitment is sufficient grounds on which to terminate an Investigation against a willing licensee. Under 19 U.S.C. § 1337(c), an ITC Investigation may be terminated prior to the determination of whether there has been a violation of the Tariff Act of 1930 "on the basis of an agreement between the private parties to the investigation." Where a party bears a contractual obligation which, if enforced by a defendant that is fulfilling its part of such contract, would be inconsistent with a suit for injunctive

### C. An Exclusion Order Would Undermine RAND Commitments and Would Raise Prices on Consumers.

Vitiating the RAND regime threatens to hurt consumers in two ways. First, it directly eliminates an important check on the royalty rates that essential IPR holders can charge for their patents. It is well-established that RAND restrictions directly benefit consumers by ensuring that they are not saddled with the cost of unreasonable royalty rates charged to manufacturers:

> RAND policies seek to provide a level of assurance to implementers with respect to the availability of essential patent claims that may be held by participants in the standards process. RAND also ensures that the licensing terms will be reasonable. In this way, RAND licensing promotes the rapid adoption of standards and new technologies, and encourages entry by the greatest number of new producers. This results in comprehensive standards, better products, and lower prices for consumers.

Nicos L. Tsilas, "The Threat to Innovation, Interoperability, and Government Procurement Options From Recently Proposed Definitions of 'Open Standards,'" 10 Int'l J. Comm. L. & Pol'y 8 (Autumn 2005). Because manufacturers of standards-essential products are locked in to a technology, switching costs are generally unreasonably high, meaning that manufacturers could be forced to simply pay exorbitant royalties (and pass the costs to consumers) rather than switch technologies:

> Hold-up may have especially severe consequences for innovation and competition in the context of standardized technology…Once a technology is incorporated into a standard, a firm with a patent reading on the technology can demand a royalty that reflects not only the value of the technology compared to alternatives, but also the value associated with investments made to implement the standard. Switching costs may be prohibitively high when an industry becomes locked into using standardized

---

relief, that party is barred from seeking relief before the International Trade Commission, and any investigations flowing from the breach of such obligations are subject to termination. *See In the Matter of Certain Dynamic Random Access Memories, Components Thereof, and Products Containing Same*, Inv. No. 337-TA-242, 1987 ITC LEXIS 95 (May 21, 1987). There, the Administrative Law Judge determined that:

> TI has remained in breach of its promises to Hitachi that, if enforced, would be inconsistent with a suit against Hitachi for an injunction. This course of conduct bars TI from recourse to the equity power of the Commission…Hitachi's immunity from suit for an injunction under the patents in suit is a complete defense to an action under 19 U.S.C. § 1337 and is sufficient to warrant termination of the investigation with respect to Hitachi.

*Id.* at *31-32. Here, the declarations, letters of assurance, and SSO policies work in concert to constitute binding agreements to license the patents-in-suit on RAND terms.

June 8, 2012
Page 5

      technology.  Were patentees able to obtain the hold-up value, this overcompensation could raise prices for consumers while undermining efficient choices made among technologies competing for inclusion in a standard.

Federal Trade Commission, *The Evolving IP Marketplace: Aligning Patent Notice and Remedies With Competition* at 22 (Mar. 2011).  Moreover, if the RAND commitment is toothless, there always exists the risk that industry participants will collude to exclude disfavored companies from the industry altogether.  If the Commission enters an Exclusion Order despite a clear finding that RAND obligations have been breached, there will be little left to restrain essential patent holders from seeking unreasonable royalties and other terms, and manufacturers will be forced to pay such inflated rates and agree to other onerous terms, or face complete exclusion from the U.S. market.  All to the detriment of consumers.

      Second, eliminating the RAND framework threatens to undermine the very value of standardization.  SSOs exist to develop and promote widespread use of industry standards.  Although standards eliminate competition between industry participants on alternative technologies, they benefit consumers by making products from different manufacturers interoperable.  ABA Section of Antitrust Law, Handbook on Antitrust Aspects of Standard Setting, 97 (2d. Ed. 2011).  Standards thus create economies of scale, since large quantities of products using the same technologies are being manufactured rather than smaller quantities of products using a multitude of splintered proprietary technologies.  *See id.* at 11-12.  If the Commission refuses to enforce RAND commitments, it is likely that companies will question the basic utility of standardization altogether.  Standardization without RAND would expose companies to the very real threat of holdup each and every time they manufacture a standards-compliant product.  A flight from standardization, in turn, would reduce network effects and economies of scale, necessarily resulting in higher prices and less interoperability.

      Nokia respectfully submits that if the Commission concludes that a patent is valid, infringed by a Respondent practicing a standard, enforceable, and subject to a RAND commitment to such standard (i.e., declared essential), and if the Commission concludes that a Respondent is a willing licensee, then the Commission should take the FRAND commitment into account in fashioning an appropriate remedy, including declining to issue or conditioning any exclusion order in light of the public interest considerations.

                                                Sincerely,

                                                */S/ Patrick J. Flinn*

                                                Patrick J. Flinn