# EXHIBIT 9



Hewlett-Packard Company
3000 Hanover Street
Palo Alto, CA 94304
www.hp.com

June 6, 2012

**By Electronic Filing**

The Honorable Lisa R. Barton
Acting Secretary
U.S. International Trade Commission
500 E Street, S.W.
Washington, DC  20436

Re: *In the Matter of Certain Wireless Communications Devices, Portable Music and Data Processing Devices, Computers, and Components Thereof,* **Investigation No. 337-TA-745, and**

*In the Matter of Certain Gaming and Entertainment Consoles, Related Software, and Components Thereof,* **Investigation No. 337-TA-752**

Dear Secretary Barton:

Hewlett-Packard ("HP") submits these comments in response to the Commission's *Notice of Request for Statements on the Public Interest* in the above-captioned investigations.  Because these investigations share important factors in common on whether an exclusion order would be contrary to the public interest pursuant to 19 U.S.C. §1337(d)(1) ("Section 337(d)(1)"), these comments respond to both Notices.

The Commission should exercise its express statutory authority under Section 337(d)(1) and decline to issue an exclusion order in these investigations.  An injunctive remedy in either investigation would negatively impact competitive conditions in the United States and impose substantial harms on U.S. businesses and consumers.  Thus, a Commission determination to forego a remedy is not only appropriate but compelled by Section 337(d)(1).

While the Commission has viewed enforcing patent rights as important public interest, these investigations involve unique facts that weigh heavily against (and indeed override) the issuance of an exclusion order in these cases.  First, as a participant in a standards-setting body, the complainant previously would have pledged to license the standards-essential patents at issue in these investigations to the respondents on "fair, reasonable, and non-discriminatory" ("FRAND") terms.  Permitting the complainant now to use these patents as a weapon to block the importation of respondents' products into the United States, merely because they implement the standards at issue, would thwart competition, stifle innovation, and result in higher prices for consumers— thereby causing precisely the harms that Congress directed Section 337 should not inflict.

Second, both the wireless communications devices at issue in Investigation 745 and the gaming consoles at issue in Investigation 752 have well-developed ecosystems of companies in the United States that depend on these products as "platforms" to reach consumers.  Because there are no readily available substitutes for these platforms, many companies and workers across the United States would suffer if these products were excluded from the U.S. market.



Accordingly, the issuance of an exclusion order in either investigation would be contrary to the public interest within the meaning of Section 337(d)(1).

### I.   Section 337(d)(1) Requires Consideration Of A Broad Set Of Interests

Section 337(d)(1) authorizes the Commission to exclude articles found to be in violation of the Act from entry into the United States <u>unless</u>:

> after considering the effect of such exclusion upon the public health and welfare, competitive conditions in the United States economy, the production of like or directly competitive articles in the United States, and United States consumers, it finds that such articles should not be excluded from entry.

*Id*.  This statutory language reflects that Congress intended the Commission to undertake a rigorous economic analysis of the effects of an exclusion order on the public interest before issuing such an order.  It also reflects Congress's intent that the Commission look beyond issues of public health and safety and take into account the impact of an exclusion order on the U.S. economy—including on consumer prices, competitive conditions in the United States, and the public welfare.

We recognize that the Commission in past investigations has found a substantial public interest in protecting patent rights.  *See, e.g.*, *Certain Battery-Powered Toy Vehicles*, Inv. No. 337-TA-314, Comm'n Op. at 11 (Apr. 10, 1991).  That interest, however, is not absolute.  Indeed, Section 337(d)(1) expressly identifies other important public interests that Congress expected the Commission, prior to issuing a remedy, would balance against protecting a complainant's private patent monopoly.  By articulating these factors in the express language of the statute and requiring the Commission to consider them in every investigation, Congress signaled its expectation that these public interests could and would override the interest in protecting patent rights in certain cases.  In these investigations, the totality of interests identified in Section 337(d)(1) weigh heavily against the issuance of an exclusion order.

### II.   An Exclusion Order In These Investigations Would Cripple Competition And Harm Hundreds of Companies And Workers

An examination of the public interest in these investigations must take into account the critical role of standards in the IT industry.  Hewlett-Packard speaks with some authority on this, as it is both an American company and global leader in the development and implementation of IT standards: HP participates in and contributes to over 200 standards organizations, such as the ETSI and IEEE Standards Associations, and HP implement hundreds of standards across its products.[1]  By facilitating interoperability, standards promote competition between suppliers, increase choices for consumers, and reduce prices.  They also drive efficiency by leveraging key

---

[1] *See HP leads the way for IT industry standards* (Dec. 8, 2010), available at http://www8.hp.com/us/en/solutions/article_detail.html?compURI=tcm:245-800793.



technologies across industry, allowing companies to focus their energies into inventing truly new technologies instead of "re-inventing" existing ones.[2]

In the collaborative process that necessarily preceded the setting of the technical standards at issue in these investigations, numerous companies would have committed to disclose any patents they owned that were essential to practice the standard.  To ensure that owners of these standards-essential patents ("SEPs") are not able to use them to block products implementing the standards from the marketplace, companies that owned such patents—including the complainant—irrevocably pledge to license these SEPs to companies like the respondents and other standards implementers on FRAND terms.  *Cf. Broadcom Corp. v. Qualcomm, Inc.*, 501 F.3d 297, 313 (3d Cir. 2007) ("To guard against anticompetitive patent hold-up, most SDOs require firms supplying essential technologies for inclusion in a prospective standard to commit to licensing their technologies on FRAND terms.").  Just as HP regularly does when implementing standards into its own products, it assumes that the respondents in these investigations implemented the standards at issue in reasonable reliance on such a pledge.

To now permit the complainant to block respondents' standards-compliant products from access to the U.S. market, through an ITC exclusion order or other means, would be disastrous for both competition and consumers, not only in the context of these two investigations, but for all future efforts to bring standardization to particular fields of technology.  The availability of an ITC exclusion order will give the complainant both the incentive and ability to use the threat of blocked market access to charge companies supracompetitive prices for use of the standard— <u>after</u> these companies have invested huge sums to implement these standards into their products and therefore are "locked in" to using the standard.  This will severely injure competitive conditions in the United States across a range of products.  It also will harm consumer welfare by forcing companies to charge higher prices for products that implement these standards and will stifle innovation.

Moreover, if exclusion orders were generally available to owners of SEPs subject to FRAND, these owners would have strong incentives to exploit this leverage and to demand exorbitant royalties for use of the standards.  Companies selling standard-compliant products across a wide range of products and industries would then be forced to pay artificially high prices to these SEP owners in order to "purchase" protection against an exclusion order.  If this were to occur, standards would become a means to impede, rather than promote, innovation and market competition.

The end results would also be higher prices and frustration for consumers.  Fragmentation of a technical segment into multiple competing standards can result in higher prices, wasted investment (if a technical solution later becomes obsolete), and even disincentives for consumers to enter the market segment at all, lest they purchase products that are discontinued or are incompatible with others.  Such lack of standardization also results in increased costs for producers, as investments in developing technical solutions are defrayed across fewer companies.

---

[2] For a collection of studies on the economic and consumer benefits of standards, see *ISO / IEC Inventory of Studies on the Economic and Social Benefits of Standardization*, available at http://www.standardsinfo.net/info/benefits/benefits.html.



Similarly, as any consumer who has a drawer full of power supplies (whether for their cellular phones, portable DVD players, or digital cameras) can likely attest, the failure to standardize in a given technical segment can lead to inefficiency, waste, and increased cost. Having to throw out a functioning power supply for an older cellular phone because it fits no other devices, or being unable to use a device while waiting for a new power supply to ship from the manufacturer because it is not readily available in a store, are common and potentially expensive frustrations of modern life resulting in part from a lack of standardization across products. Standards, by contrast, foster a robust marketplace of competitive but interoperable products for the benefit of all consumers.

Precisely these concerns have led U.S. antitrust enforcement agencies to express strong reservations about the ability of holders of SEPs to obtain exclusion orders or similar remedies. As the Federal Trade Commission (FTC) noted in a recent report,

> Hold-up in the standard setting context can be particularly acute. Standards are often adopted to make products compatible and interoperable with other products in the industry. . . In addition to higher prices and other economic harms, hold-up in standards-based industries may discourage standard setting activities and collaboration, which can harm innovation.[3]

In this regard, the FTC report specifically noted that the language of Section 337(d)(1)

> should allow consideration of whether an exclusion order based on a minor patented component of a complex product can unduly harm consumers by causing hold-up, distorting competition, raising prices and deterring innovation. <u>These concerns can be especially powerful when a patentee asserts a patent in the ITC that is subject to a RAND commitment against standardized technology. . . . The FTC . . . recommends that the ITC incorporate concerns about patent hold-up, especially of standards, into the decision of whether to grant an exclusion order in accordance with the public interest elements of Section 337.</u>[4]

The Department of Justice has voiced similar concerns; indeed, it recently did so with respect to the particular complainant involved in these investigations. *See Statement of Dept. of Justice Antitrust Division on Decision to Close Investigations of Google Inc.'s Acquisition of Motorola Mobility* (noting that the Division "continues to have concerns about the potential inappropriate use of SEPs [standard-essential patents] in the wireless device industry") (Feb. 2012); *see also* Tom Krazit, *FTC "enormously concerned" about some mobile patent tactics*, Gigaom.com (May 31, 2012) (quoting FTC Chairman Jon Leibowitz as saying that the use of standards-essential patents to exclude products from the market is "an area that the Commission is enormously concerned about"). That the United States' two leading antitrust enforcement agencies, after extensive investigations, have each expressed these concerns strongly supports the conclusion that the issuance of an exclusion order in these investigations would negatively impact

---

[3] Federal Trade Commission, *The Evolving IP Marketplace: Aligning Patent Notice and Remedies with Competition* (March 2011), at 28.
[4] *Id.* at 30 (emphasis added).

"competitive conditions in the United States" and "United States consumers" within the meaning of Section 337(d)(1).

Given the standards-essential patents at issue, the only dispute at this stage should be whether the royalties demanded by the complainant are "fair, reasonable, and non-discriminatory." That dispute, however, should be resolved in the federal courts, not the ITC, as the federal courts have the authority to fashion a monetary remedy that adequately compensates the complainant. The ITC, by contrast, has no such authority. Nothing suggests Congress promulgated Section 337 to permit patent holders to convert claims for FRAND royalties from SEP licensees into the power to exclude such licensees from access to the U.S. market. To the contrary, Section 337(d)(1) by its terms indicates Congress's intent that, where the effect of an exclusion order would on balance negatively impact that public interest—as is the case here—the Commission should not issue a remedy at all.

An exclusion order would be against the public interest for the further reason that it would harm thousands of companies and workers across the IT industry, beyond the thousands who are directly employed by the named respondents in the United States. Excluding these devices from the U.S. market would result in direct harm to companies that are not parties to the dispute, adversely affecting their ability to compete and succeed, thereby harming the U.S. economy more broadly.

* * * * *

HP owns a large portfolio of patents and keenly understands the strong public interest in protecting patent rights. It has been a frequent party to investigations at the Commission, as both a complainant and a respondent, and values the remedy Section 337 can offer where imported products are competing unfairly and can be excluded in a manner consistent with the Commission's statutory mission of protecting U.S. industry and consumers. The unique facts in these investigations, however, weigh strongly against the issuance of an exclusion order because exclusion would be contrary to the interests of the U.S. industry and consumers the Commission is charged to protect. The appropriate remedy for any underpayment of royalties is an award of FRAND royalties. While the Commission cannot award such a remedy, the complainant can obtain this relief in federal district court. To grant the complainant the power to exclude the products at issue from the U.S. market, after respondents relied on complainant's pledge to license these patents for implementers of the standards at issue, would be directly contrary to the public interest and would frustrate, rather than advance, the goals of Section 337.

Respectfully submitted,

Vaishali Udupa
IP Litigation Manager
Hewlett-Packard

James R. Bell, PhD.
Director of the Industry Standards Program Office
Hewlett-Packard

| Certain Gaming and Entertainment Consoles, Related Software, and Components Thereof | Inv. No. 337-TA-752 |

## CERTIFICATE OF SERVICE

I, Vaishali Udupa, hereby certify that on June 6, 2012, copies of the foregoing **SUBMISSION ON PUBLIC INTEREST** was delivered, pursuant to Commission regulations, to the following interested parties as indicated:

| | |
|---|---|
| The Honorable Lisa Barton<br>Acting Secretary to the Commission<br>U.S. International Trade Commission<br>500 E Street, SW, Room 112<br>Washington, DC  20436 | Via EDIS and 8 copies via overnight delivery |
| Jia Chen<br>Office of General Counsel<br>U.S. International Trade Commission<br>500 E Street, SW Washington, DC  20436 | Via E-mail<br><br>jia.chen@usitc.gov |
| The Honorable David P. Shaw<br>Administrative Law Judge<br>U.S. International Trade Commission<br>500 E Street, SW, Suite 317<br>Washington, DC  20436 | Via hand delivery |
| Pyong Yoon<br>Attorney-Advisor<br>U.S. International Trade Commission<br>500 E Street, SW, Suite 317<br>Washington, DC  20436 | Via E-mail<br><br>Pyong.yoon@usitc.gov |
| Stephen Rosenman<br>Ropes & Gray LLP<br>One Metro Center<br>700 12th Street, N.W., Suite 900<br>Washington, DC 20005<br><br>Charles F. Schill<br>Steptoe & Johnson LLP<br>1330 Connecticut Avenue, NW<br>Washington, DC 20036<br><br>*Counsel for Complainants Motorola Mobility, Inc. and General Instrument  Corporation* | Via E-mail<br><br>S&JMotorola752@steptoe.com<br>RopesITC752@ropesgray.com |

Certain Gaming and Entertainment Consoles, Inv. No. 337-TA-752
Related Software, and Components Thereof

| Brian R. Nester, Esq.<br>Sidley Austin LLP<br>1501 K Street NW<br>Washington, DC 20005<br><br>*Counsel for Respondent Microsoft Corp.* | Via E-mail<br><br>Project-MS_Moto_ITC_752@sidley.com |

_____
Vaishali Udupa | IP Litigation Counsel
Hewlett-Packard Company
13600 EDS Drive
Herndon, VA 20171
+1 703 456 5014 | Tel