# EXHIBIT 2

# Microsoft·

June 14, 2011

Federal Trade Commission
Office of the Secretary
Room H-113 (Annex X)
600 Pennsylvania Avenue
Washington, DC  20580

Re:  Patent Standards Workshop, Project No. P11-1204

Dear Commissioners and FTC executive staff:

Microsoft appreciates the opportunity to provide comments in response to the Request for
Comments and Announcement of Workshop on Standards-Setting Issues regarding ―patent hold-
up" in connection with standardization efforts.

At their most fundamental, technical standards are tools that promote efficiency and
innovation by making it easier to create products and services that work together—or
―interoperate"—better.  This is especially true in the information and communications
technology (ICT) environment.  With new ICT solutions and services appearing in the market
almost daily, often connected to one another by the Internet or other networks, interoperability
has become a market imperative.  The development and implementation of standards is one of
the ways in which the technology industry is able to meet consumer demand for interoperability.[1]
By helping to enhance interoperability among products or services within a market, and being
responsive to real marketplace needs, standards can help promote innovation, fuel market
growth, and protect investments in new technologies.

Microsoft plays a dual role in standardization activities.  First, we actively contribute
innovative technology to standardization related to computing hardware, software and associated
devices, the Internet and its infrastructure, consumer electronics devices, and
telecommunications systems.  Second, we are an active implementer of standards.  Microsoft
supports a very large number of standards that are formulated by a broad diversity of standards-
setting organizations (SSOs) in our products.  For example, Microsoft's Windows 7 operating

---

[1] Microsoft's commitment to standardization to help further interoperability is reflected in our
Interoperability Principles, available at http://www.microsoft.com/interop/principles/default.mspx.
Additional information about Microsoft's standards policies and activities can be found at:
http://www.microsoft.com/standards/.

system supports more than sixty industry standards (by a conservative count). [2] Ultimately, both of these roles are deeply informed by the market, and in particular by feedback on the way customers use ICT products and services in their day-to-day lives.

Because of this dual role as contributor and implementer, Microsoft takes a balanced approach to standards development and related intellectual property rights (IPR) issues. We understand the particular needs and concerns of those contributing time, resources, and innovative technologies to the development of standards, but we are equally sensitive to the needs of those who are implementing the resulting standards in their products and services. Patents are of particular concern to Microsoft because Microsoft is perhaps the No. 1 target of patent infringement actions in the ICT industry (given the breadth of its product portfolio and large revenue). Our involvement on both sides of the standards fence frames our perspective that a diverse standards ecosystem that supports multiple technologies is good for the U.S. and global economies.

Our comments in response to the RFC can be summarized as follows:

- Microsoft strongly supports President Obama's focus on technology and the promotion of innovation. In looking at issues relating to the inclusion of IPR (primarily patent rights) in standards, it is critical to preserve and cultivate incentives to innovate. In addition, the United States should promote respect for the value of IPR on a global basis, including the IPR reflected in standards.

- Government should take an inclusive view of SSOs' diverse IPR policies and not promote one approach over the other.

- Concerns about "patent hold-up" should not extend to any bi-lateral business disagreement between two companies regarding proposed licensing terms. These discussions typically pertain to a broader set of questions than just the proposed licensing terms for essential patent claims reading on a standard. In addition, if

---

[2] A typical personal computer running Windows 7 will support more than 200 additional standards, facilitating compatibility among hardware components from various vendors and promoting interoperability between PCs and other computers. These standards were developed by a broad range of SSOs with diverse processes and IPR policy approaches (including those that seek commitments to offer patent licenses on reasonable and non-discriminatory terms and conditions, whether with compensation or on a royalty-free basis).

MOTM_WASH1823_0053366

the Government were to attempt to quasi-regulate RAND licensing terms, then they arguably should review the inter-play among all of the substantive terms (and not just the monetary component) for all aspects of patent licensing terms. Yet that would likely be unworkable.

- Disclosure-based IPR policies help provide useful information as to which patent holders likely will have essential patent claims vis-à-vis the final standard, which enables parties to make an informed decision whether to engage in patent licensing negotiations and the scope of such discussions.

  o However, it is not possible for an SSO technical committee to have full and complete information regarding the patent rights implicated by a draft standard, especially those rights held by non-participants in the process. IPR policies ideally should take a balanced approach that does not unduly burden patent holders and encourages them to participate and contribute innovative technology.

- RAND-based IPR policies provide a flexible framework to help enable customized bi-lateral negotiations for patent licenses that generally are not limited to just the essential patent claims in connection with a standard.

- While almost all of the ICT industry stakeholders support policies that permit the voluntary and unilateral —"ex ante" disclosure of specific licensing terms by a patent holder, proposals for the U.S. Government to promote a mandatory —"ex ante" IPR policy approach or promote the group discussion of proffered licensing terms are not widely supported because such an approach is viewed as:

  o being of little value,

  o creating many practical inefficiencies and possible legal challenges, and

  o something that could be used internationally to undermine the value of patented technology that is included in standards used in other countries.

3

MOTM_WASH1823_0053367

028

**In looking at issues relating to the inclusion of intellectual property in standards, it is critical to ensure that incentives to innovate are preserved**.

We strongly support President Obama and his Administration's focus on technology and the promotion of innovation. Innovation historically has been a catalyst for economic growth and the creation of jobs. The United States, in recognizing the need to preserve incentives for innovation through a healthy patent system and marketplace competition, has been and remains a global technology leader. It is therefore important to ensure that the treatment of patented technology in standards does not undermine incentives to continue to invest in new innovation in standardized technology areas.

As the Antitrust Division of the U.S. Department of Justice has observed:

"The goal of policies involving IP, licensing, and standards should be to promote efficiency, just as it is with antitrust policy. . . . Static efficiency occurs when firms compete within an existing technology to streamline their methods, cut costs, and drive the price of a product embodying that technology down to something close to the cost of unit production. **Static efficiency is a powerful force for increasing consumer welfare, but an even greater driver of consumer welfare is dynamic efficiency, which results from entirely new ways of doing business. Economists now recognize that the gains from dynamic efficiency, also called "leapfrog" competition, can far outstrip the gains from incremental static improvements.** It follows that policymakers should pay particular attention to the impact of laws and enforcement decisions on dynamic efficiency."[3] (Emphasis added.)

In developing policy positions relating to standards, governments should pay special attention to the importance of promoting the dynamic efficiencies that arise from preserving incentives for innovation. Through balanced IPR policies that help make innovative technology available to implementers on reasonable terms, and that do not undercut the value of patented

---

[3] *See* Gerald F. Masoudi, Deputy Assistant Attorney Gen., Antitrust Div., U.S. Dep't of Justice, Address at the High-Level Workshop on Standardization, IP Licensing, and Antitrust, Tilburg Law & Economic Center, Tilburg University: Efficiency in Analysis of Antitrust, Standard Setting, and Intellectual Property 2–3 (Jan. 18, 2007), *available at* http://www.justice.gov/atr/public/speeches/220972.pdf.

4

MOTM_WASH1823_0053368

technology or overly burden patent holders, standards can help to catalyze innovation by
encouraging companies to contribute their innovative technology to collaborative standards-
setting activities and to share their intellectual property with others via the standardization
process.  Standards will not fulfill their salutary purposes if standards policies deter innovators
from contributing patented technologies or investing in further innovation related to standardized
technology.

In addition, the United States Government should continue to advocate for the fair
treatment of patented technology in standards on a global basis.

### Government should take an inclusive view towards SSOs' diverse IPR policies and not promote one approach over another.

Most SSOs have an IPR (or patent) policy that seeks to balance the rights and interests of
their stakeholders by seeking commitments from participating patent holders that they will offer
patent licenses for their essential patent claims on reasonable and non-discriminatory (RAND)
terms and conditions.  Currently there is significant diversity with regard to how, and the detail
with which, these policies are articulated by various SSOs.  This diversity is healthy and should
be encouraged, and any articulation by the government of one or more preferred approaches
should be avoided.  This diversity and breadth of SSOs has emerged as a result of market forces
in response to varying business needs, and provides for flexibility, competition and choice.  No
one SSO or standardization process necessarily produces —better" standards; the test of success
and relevance of a standard is the extent to which it ultimately gets used in the marketplace.  This
view is widely supported by the ICT industry.[4]

The FTC should encourage SSOs to ensure that their IPR policies are clearly worded,
publicly available, and easy to find.  Although many SSOs make their IPR policies easily
available to the public on their websites, others make them difficult to find or available only to
their members.  In addition, we support FTC efforts to encourage SSOs to make any patent

[4] *See, e.g.*, Comments submitted by the Information Technology Industry Council in response to a recent
NIST Request for Information (—ITI encourages the US Government to embrace a variety of ICT
standards and standards-setting processes, and avoid policy decisions that might discourage a broad
diversity of approaches to ICT standardization. This diversity provides for choice, competition and
flexibility that further enable the ICT sector to respond to a rapidly changing marketplace with new,
innovative solutions.") (http://standards.gov/standards_gov/mastercomments030711.cfm).

5

declarations, letters of assurance, or other licensing information they receive from patent holders easily available to the public on their websites. The information contained in IPR policies, and, if applicable, patent declarations, letters of assurance, or other licensing information is important to all stakeholders in the ICT industry, including current and potential SSO participants and standards implementers.

**The concept of "patent hold-up" should map to marketplace realities.**

The notion that "patent hold-up" is a substantial problem that should be addressed by government action seems to stem from a largely theoretical analysis of the situation. If a patent holder can charge implementers more than a reasonable royalty because those implementers are (perhaps) "locked into" the standard, then is it not likely that it would take advantage of this opportunity?

We believe that this reasoning greatly over-simplifies—and obscures—the realities of standards-related patent licensing. How any individual company will approach patent licensing will depend on many factors, such as:

- What is the company's primary business model implicated by the relevant standard? Is it likely that the company will proactively seek patent licenses (either as a licensor, a licensee or both)?
- Who are the likely companies holding essential patent claims, and what are their business models, products and patent portfolios?
- What licensing or other agreements are already in place between the parties?
- If the parties decide to enter into an agreement, then what are all of the issues (including all of the IPR-related issues) that likely will be negotiated?
- Are there trade-offs that may be made with regard to royalty payments or other financial terms?
  - For example, there are companies who sometimes are willing to offer their essential patent claims to a particular standard free of charge, but they also include a defensive suspension clause that causes the free license in connection with these patent claims to terminate if the licensee commences litigation against the licensor on any grounds whatsoever.

6

As a result, we respectfully suggest that a simplified and theoretical approach to defining ―patent hold-up‖ may not sufficiently map to complex marketplace realities.  It may pull in what are essentially routine business negotiations between two parties.  These negotiations almost always include considerations beyond the proposed licensing terms for just the essential claims in a standard (and just the royalty element of any such terms).  Many companies question whether these types of business negotiations should be labeled as ―patent hold-up‖ and scrutinized by regulators.  We believe that there is an important difference between intentional or deceptive conduct in connection with patents that read on standards and routine bilateral disagreements over licensing terms for the use of patented technology.

In the former context, there seems to be a dearth of examples of actual patent hold-up with regard to the essential patent claims reading on a standard.  Microsoft has never been accused of patent hold-up in this regard, nor has it accused any other company of such behavior.  This is not to say that Microsoft has never been a party to litigation where the parties disagree whether proffered licensing terms were consistent with the relevant patent licensing commitment (such as RAND).  When companies have such bilateral disagreements, it may make sense for them to seek resolution in the courts.  But such litigation is rarely limited to the proposed licensing terms for just the essential claims reading on a standard; typically such litigation is addressing other patent-related issues or even other business terms that the parties have been unable to reach agreement on.

Depending on their applicable business model, many companies largely use their patents vis-à-vis standards defensively.  Far from seeking to "hold up" implementers, these firms will not seek patent royalties at all in the ordinary course of business.  Rather, they will seek a patent license from an implementer only when that implementer has first challenged them on other patent infringement issues.

In addition, it is important to consider the healthy competition among different business models and how that influences debates regarding ―patent hold-up‖ and whether there is a need to impose further restrictions on patent holders.  Some companies are largely innovators who predictably will seek a return on their investments in innovation through licensing their patents.  Some product-based companies take a more nuanced position, often using their patents vis-à-vis standards defensively (as described above).  Still others have a significant consulting or

7

integration services focus, and they may benefit from having access to others' innovative technology in standards at a reduced cost if not for free.  The current RAND-based structure balances these different interests.  Proponents seeking to tilt that balance may largely be seeking reduced licensing costs and a related competitive advantage as opposed to solving a documented and widespread problem.[5]

## Disclosure-based IPR policies provide useful information regarding likely holders of essential patent claims.

There are hundreds of different SSO IPR policies and they vary significantly.  As a general matter, the IPR policies of most formal SSOs and many consortia are "disclosure-based". Under these types of IPR policies, participating companies generally are required (or encouraged) to disclose either (a) patents they hold that are likely to contain patent claims that will be essential to implementing the final standard, or (b) the fact that they likely hold such patents (but without identifying specific patents). The disclosing participant is then typically requested to declare its intention with regard to licensing such essential claims (such as RAND, RAND without a royalty, or "will not agree to offer RAND licenses").  If specific patents were

---

[5]  See remarks by Keith Mallinson (a long-standing research analyst and consultant in the telecommunications industry) at http://ipfinance.blogspot.com/2011/05/fruits-of-labour-not-windfall-gains-in.html:  "Regulatory price-setting in the arena of innovative technologies neither reflects the market reality of commercial negotiation nor is it related to the costs, efforts and technical or commercial risks involved in developing those technologies. Defining (F)RAND [fair, reasonable and non-discriminatory] according to an imposed pricing structure would severely limit the ability of licensors and licensees to negotiate bilateral commercial terms that reflect their respective positions and needs....

Further, minimizing the cost of licensed technologies may not result in a minimum cost solution.  In addition to providing higher performance and improved features, incorporating patented IP into a standard may actually reduce the cost of implementing the standard.  For example, patented IP might reduce the total cost of ownership to the end consumer of a product such as a mobile phone – including phone acquisition costs (with costs of design, development, bill of materials and assembly) and network service charges (reflecting costs of bandwidth acquisition, network equipment, operations, and maintenance). The impact of such cost reductions may far exceed any additional costs in licensing fees. Market forces are best at determining the value to be attributed to any input component in such a system, including technology licences. Regulators should be careful to avoid favouring particular business models or making decisions on which part of the value chain deserves to make the greater profit, especially where dynamic innovation is concerned....

The principle of (F)RAND licensing has been broadly adopted to ensure that patent owners who contribute technology to standards agree to make licences available to their standards-essential IP to all comers on terms that are reasonable and free from unfair discrimination, while maintaining the ability to achieve adequate reward for their innovations.  There will at times be significant contention between the patent owner and implementer about what constitutes reasonable licensing terms, but this is to be expected as with commercial negotiation on any input cost component and has, for the most part, been readily resolved through bilateral negotiations.  In the rare instances where such negotiations have not been successful, contract law is applicable to the (F)RAND commitment and the courts are able to deal with such disputes...."

MOTM_WASH1823_0053372

disclosed, then the licensing commitment will apply only to any claims in the identified patents that end up being essential vis-à-vis the final version of the standard. In the case of a patent holder disclosing more generally that it likely will have essential claims, the licensing commitment generally will apply to any and all essential claims the patent holder has vis-à-vis the final standard.

A large number of SSOs, including ISO/IEC/ITU, CEN/CENELEC, ETSI, AFNOR, Ecma International, OMG (Object Management Group), PWG (Printer Working Group), TTA (Telecommunications Technology Association of Korea), TTC (Telecommunication Technology Committee in Japan) and ANSI-accredited SSOs (such as the IEEE, TIA, ATIS and ASTM), have some form of disclosure-based IPR policy.

Some SSOs have adopted ―participation-based" IPR policies. Under this type of IPR policy, a participating company undertakes a RAND (with or without a royalty) licensing commitment for any essential claims it may have vis-à-vis the final standard just by joining the SSO or by joining a technical committee of the SSO. Standardization efforts under a participation-based IPR policy typically are scoped very narrowly. They also often include safeguards for participants to opt out or exclude certain essential claims by disclosing the patents containing those essential claims and stating that the automatic commitment will not apply to them. This provides some protection to participating patent holders in the event a competitor contributes their technology to the standardization effort, either inadvertently or in an effort to obtain access to such technology under the relevant IPR policy framework.

With ―participation-based" IPR policies, sometimes the automatic commitments are RAND-RF (free of charge but with other RAND terms), as was the case with the popular USB standard and the W3C standards. Some examples of SSOs that use a participation-based approach are Bluetooth SIG, GS1, BIAN (Banking Industry Architecture Network), DVB, Infiniband Association, MIPI Alliance, SD Card Association, Serial ATA International Organization, SIGIS, WiFi Alliance, WiMAX Forum and the W3C.

Typically, because SSOs want to encourage disclosures as early as possible during the development of a standard, disclosure is not limited to just known essential claims because those claims can only be accurately identified when the standard is almost final and the draft text is stable. So there often is a trade-off in terms of getting more information early on in the process

9

(recognizing that some portion of it likely will end up not being relevant), as opposed to having most (if not all) of the disclosed information be accurate and directly applicable to the final standard.

In some ways, the value of a disclosure-based policy is finding out which patent holders likely will have essential patent claims vis-à-vis the final standard.  Companies then typically consider that information in the context of its affected product(s) and make decisions, including whether to approach any of those patent holders to discuss licensing terms.  What they decide to do depends on a number of different factors, such as whether the parties have existing agreements that may be applicable, the patent portfolio positioning between the parties (which is not a consideration based on just the total number of patents but more likely focused on whether they have patents that read on the other's products, and which products), the companies' applicable business models (which may suggest whether or not the patent holder will proactively seek a license from implementers) and past experiences with each other.  In addition, these considerations will of necessity include patents that go beyond just the essential patent claims relating to a standard.  If an implementer is going to enter into a license agreement with the disclosing patent holder, such implementer will want to protect its entire product(s) and will need to consider a broader (and perhaps cross-) licensing arrangement.

The RFC also seeks feedback with regard to the fact that most disclosure-based policies do not require participating patent holders to conduct patent searches, nor do they bind non-participants.

As a practical matter, a requirement to conduct patent searches would be a strong disincentive for patent holders to participate in standards-setting activities and contribute their technology so that it can be used by others.  Many U.S.-based firms have hundreds of employees participating in hundreds of different SSO engagements, and thousands of patents in their portfolios.  The cost and resources needed to conduct multiple patent searches vis-à-vis a developing standard spread across a significant number of standards engagements would be very significant.[6]

---

[6] Assessing whether a single patent reads on a particular version of a draft standard could cost tens of thousands of dollars.  If patent searches were required in order for patent holders to make definitive disclosures, then there would be a need to conduct several such searches in connection with a single draft standard as it evolves.  Multiply that by hundreds of potential standards and the ongoing costs becomes prohibitive.

10

This is why the ICT industry sought clarification from the FTC in connection with the *Dell* consent decree.[7]  The FTC clarified that the consent decree was not intended to support a "disclose it or lose it" approach to patent disclosures in the standards context and that Dell's failure to disclose was "not inadvertent".  Similarly, back in the early 1990's the European Telecommunications Standards Institute (ETSI) proposed an IPR policy pursuant to which a patent holder's failure to make timely and complete disclosures would result in arguably compulsory licensing on ETSI-sanctioned terms (which were perceived to permit very low royalties).  Working with U.S.-based trade associations, the U.S. Government intervened and the ETSI policy was modified to be more consistent with other disclosure-based SSO policies.

It is difficult to envision how an SSO IPR policy would apply to non-participants.  It is estimated that there are at least 1,000 ICT SSOs around the world.  Any absolute disclosure policy would create a huge burden on ICT companies to police all of those developing standards, conduct interminable patent searches, and make definitive disclosures or risk losing valuable patent rights.  When the Standardization Administration of China (SAC) released its draft *Interim Provisions on Formulation and Revision of Patent-related National Standards* for public comment on November 2, 2009, a number of U.S.-based trade associations provided comments seeking clarification that the proposed IPR policy would only cover those patent holders who were participating in the development of the relevant Chinese National Standard (and, for example, not patent holders who may have made a licensing commitment in connection with an ISO/IEC-related standard being modified during the Chinese standardization process).

There rarely will be a complete and accurate portrait of the patents that contain essential claims with regard to a particular draft standard.  This is not surprising.  Standards are often lengthy technical documents.  Many of the essential patents are not included as the result of a formal contribution or a technology "bake off" pursuant to which the technical committee makes a decision among competing patented technologies.  Engineers create a technical document that, not surprisingly, affects a range of patented technology.  That said, there still seems to be only limited patent infringement litigation based solely on essential patent claims vis-à-vis a standard where the essential patents were unknown to the participants at the time the participants selected among competing proposals to include in the standard.  And those cases, although very limited in

---

[7] *In re Dell Computer Corp.*, 121 F.T.C. 616 (May 20, 1996).

MOTM_WASH1823_0053375

number, typically have involved allegations that the patent owner intentionally failed to disclose its patents in violation of the applicable SSO IPR policy.

**RAND licensing commitments provide a balanced and flexible approach to patent licensing.**

RAND is a time-tested and effective approach to licensing commitments. Like other –reasonableness" standards, it does not dictate specific licensing terms, but it does provide flexibility across a diverse range of situations. As mentioned above, companies make decisions about whether to initiate licensing discussions and, if so, what considerations beyond just the essential claims vis-à-vis the final standard will be included. The negotiation associated with a standards-related patent license typically is no different from any general patent licensing discussion and will involve trade-offs on all of the terms and conditions.

While there is no exhaustive list of traditional RAND licensing terms, in addition to a possible compensation element, such terms may include a field-of-use restriction, reciprocity, non-sublicenseability, defensive suspension and other common patent licensing considerations. Whether specific articulations of these types of terms are RAND can be a matter of some debate. For example, if a standard acquires market power (most don't), a patent owner who requires broad grant backs in the form of reciprocity or broad defensive termination provisions in exchange for its license of essential patent claims to implement such standard arguably may not be offering a RAND license. With regard to defensive termination, if the standard has market power and if the –trigger" for suspension is much broader than the actual license grant, it is not clear that the term is RAND. For example, if the defensive suspension is triggered by the implementer asserting any type of IPR against the patent holder (or even any litigation claim on any topic), then arguably the patent holder is receiving a free-of-charge cross-license to the implementer's entire IPR portfolio in exchange for a license to just the patent holder's essential claims vis-à-vis a standard. As with other –reasonableness" tests, these and other questions can be resolved through litigation in the relatively rare circumstances where business discussions fail (and the risks for each side inherent in such litigation of course inform the business discussions).

Proposals to somehow reduce –RAND" to some uniform formula could undermine the value of current practices and restrict some of the flexibility that helps to enable current licensing practices and protect the defensive value of contributed patent technology. There are many

12

existing patent licenses that include access to essential patent claims vis-à-vis one or more standards that reflect a customized solution between the two parties that takes into consideration all of the licensing terms (and not just the financial component).

In addition, the existence of a RAND commitment to offer patent licenses should not preclude a patent holder from seeking preliminary injunctive relief or commencing an action in the International Trade Commission just because the patent holder has made a licensing commitment to offer RAND-based licenses in connection with a standard. Whether such relief is available should be assessed under the current legal framework in the applicable jurisdiction, which often is premised substantially on the specific facts and circumstances at issue. Any uniform declaration that such relief would not be available if the patent holder has made a commitment to offer a RAND license for its essential patent claims in connection with a standard may reduce any incentives that implementers might have to engage in good faith negotiations with the patent holder.

With regard to the issue whether the licensing commitment should be binding on the successor-in-interest of the implicated patent rights, we believe that there is a fairly broad consensus that this outcome would be ideal. The issue is how to effectuate this in practice. If a patent holder makes a specific patent disclosure to a SSO, then it should be able to track that commitment and bind the transferee as part of the transfer agreement.

This becomes more challenging when the patent holder has made a more general licensing commitment that it will license any essential claims that it has (and when the patent holder has made such general commitments to many SSOs). In order to bind a transferee, such patent holder would have to conduct patent searches to determine what patent claims were implicated by the commitment(s). Many patent holders that use their patents largely for defensive purposes vis-à-vis standards do not want to undertake this significant expense. This is especially true when the patent holder has made a commitment to license on RAND terms on a royalty-free (or compensation-free) basis. If such patent holders are required to conduct patent searches to determine what they are giving away for free, then they may be less willing to agree to a RAND-RF licensing commitment. We believe that SSOs should seek to help address this issue in their IPR policy, but it is not realistic to expect that they alone can fully solve this issue.

13

**Proposals for the U.S. Government to promote a mandatory "ex ante" IPR policy approach are not supported by the broader ICT industry because such an approach is viewed as (a) being of little value, (b) creating many practical inefficiencies and possible legal challenges, and (c) something that could be used internationally to possibly undermine the value of patented technology that is included in standards.**

Almost all disclosure-based IPR policies address (a) the extent to which patent holders have to disclose whether they have any patent claims that likely will be essential to implement the standard under development and/or (b) the choices such patent holders have with regard to the licensing commitment they can make vis-à-vis those claims (such as a commitment to license under RAND terms and conditions).

If a patent holder makes a disclosure about its essential patent claims, potential implementers can decide when (or even whether) to contact the patent holder to obtain information about actual license terms. Depending on when the patent holder makes such a patent disclosure, this may occur *ex ante* (before the standard is finalized). Any negotiations typically are conducted bilaterally and outside the SSO.

"Ex ante" IPR policies typically refers to those disclosure-based policies that either permit or require patent holders to disclose specific licensing terms, including royalty rates, to the standards body before the standard is finalized. While almost all ICT industry stakeholders (including Microsoft) support policies that permit the voluntary and unilateral "ex ante" disclosure of specific licensing terms by a patent holder, there are differing views with regard to proposed IPR policies that would mandate the "ex ante" disclosure of specific licensing terms and/or permit group discussions of those terms. Advocates of mandatory "ex ante" IPR policies argue that this is necessary to prevent patent holders from "holding up" implementers and extracting onerous terms after the standard is completed and everyone is attempting to implement the standard as written. Opponents highlight that "patent hold-up" occurs rarely when viewed across thousands of ICT standards, and such policies would unduly burden the standardization process and create many unnecessary practical inefficiencies and potential legal problems.

14

There are literally thousands of ICT standards in existence today.  Hundreds of these standards have been referenced in eGovernment Interoperability Frameworks,[8] with no apparent documented problems relating to IPR issues.[9]  There have been a relatively small number of noteworthy litigations that have been commenced when two parties have been unable to agree on whether proffered licensing terms were RAND and/or otherwise met the requirements of the applicable SSO's IPR policy.  These are very much the exception, not the rule.  Most SSOs review and regularly update their IPR policy to address broad issues, but they often are reluctant to add substantial burdens to the process to address relatively rare, potential –one-off" disputes that are fact-specific and can be litigated if the two parties cannot come to an agreement.

The debate over mandatory –ex ante" IPR policies has been underway for more than a decade.  During this time, many ICT SSOs and their members with disclosure-based IPR policy approaches have thoughtfully considered whether to adopt such a policy, and with the exception of the VITA standards body, they largely have rejected adopting such an approach.  The principle reasons typically include the following considerations:

- A mandatory –ex ante" IPR policy would require patent holders to disclose proposed licensing terms for their essential patent claims.  Most stakeholders have observed that, for various reasons, such a disclosure is of little practical value.  When a patent holder discloses to a SSO that it likely holds essential patent claims, a prospective implementer makes a decision whether to approach this patent holder to discuss possible licensing terms (and that decision is dependent on a number of factors).  Any implementer actually deciding to negotiate a license will rarely, if ever, want a license for just the patent holder's essential patent claims in connection with that standard.  An implementer seeking a license likely will want to negotiate a bi-lateral, customized agreement that will include other IPR (including related patent claims that it may be infringing) that impact its entire product or at least those product features that relate to and utilize the standard.  The license also likely will reflect a range of possible trade-offs between the two parties based on their respective IPR portfolios and other business

---

[8]  *See* —Government Interoperability:  A comparative analysis of 30 countries" by CSTransform at http://www.cstransform.com/white_papers/InteropAnalysisV2.0.pdf.

[9]  The existence of competing standards also can help reduce the threat of possible patent –hold up".

MOTM_WASH1823_0053379

opportunities. So adding a requirement to an SSO IPR policy to the effect that disclosing patent holders must prepare and submit licensing terms for just its essential patent claims creates an obligation and burden on patent holders that arguably adds little or no value to the standardization process.

- Standards technical committees make hundreds of technical decisions and, as has been much noted, the process is often lengthy. Experienced stakeholders have noted that injecting licensing terms into the standardization process will inevitably delay the process further still without improving the technical value of the standard.

- Some patent holders make RAND licensing commitments largely for defensive purposes to further their own freedom of action, such as seeking to protect their products that implement standards from patent infringement claims asserted by others. As a result, quite often they will not proactively seek to obtain licenses from implementers. It has been observed during stakeholder debates on the –ex ante" issue that requiring these patent holders to prepare patent licensing terms unnecessarily creates burdens and complications for them without adding value to the standardization effort.

- There is little evidence that –patent hold-up" in the standards context is a real problem. Most patent holders also are implementers, whether with regard to the same standard or in terms of the broader ICT standards landscape, and thus share an interest in maintaining reasonable royalty rates. This ecosystem generates few IPR-related disputes as a result.

- Under a mandatory –ex ante" IPR policy, there is a substantial risk—even a likelihood—of buyer cartel or group boycott behavior. An SSO obviously is a forum for participants to discuss the development of technical standards. Those discussions are likely to extend to price if price terms are disclosed in connection with the offer of technology to a standard-setting effort. The technical committee members may explicitly or implicitly pressure a disclosing patent holder to modify its proposed licensing terms or risk not having its technology included in the standard. This is especially true if the IPR policy permits the group discussion of proposed licensing terms as part of the standardization process. For this reason, mandatory –ex ante" IPR

16

policy approaches also may discourage key patent holders from participating in the process and contributing their valuable patented technology. They also could create disincentives to invest further in innovation in that technology area.

Most of the SSOs and their stakeholders that have considered these proposals over the years have determined that there are only a limited number of situations where ―patent hold-up" takes place in the context of standards-setting. The industry has determined that those situations generally are best addressed through bi-lateral negotiation (and, in rare cases, litigation) as opposed to modifying the SSO's IPR policy and arguably unnecessarily burdening the standardization process for the many ICT standards that are being widely implemented in the marketplace with no apparent IPR-related challenges.

Accordingly, we support the majority of ICT companies who believe that SSOs should develop their IPR policies based on a consensus of their stakeholders, and that governments should not promote one approach over another, including a mandatory ―ex ante" IPR policy regime and the group discussion of proposed licensing terms.

In conclusion, we thank you for the opportunity to provide comments in response to the RFC.

Respectfully submitted,
Microsoft Corporation

David Heiner
Vice President and Deputy General Counsel

Amy Marasco
General Manager, Standards Strategy and Policy

MOTM_WASH1823_0053381

042

EXHIBIT 3

**FILED UNDER SEAL**

EXHIBIT 4

**FILED UNDER SEAL**

# EXHIBIT 5

# FILED UNDER SEAL

# EXHIBIT 6

# FILED UNDER SEAL

# EXHIBIT 7

# **FILED UNDER SEAL**

# EXHIBIT 8

# **FILED UNDER SEAL**

080

EXHIBIT 9

Page 1

1                    IN THE UNITED STATES DISTRICT COURT

2                   FOR THE WESTERN DISTRICT OF WASHINGTON

3                              AT SEATTLE

4

5    MICROSOFT CORPORATION, a

6    Washington corporation,

7              Plaintiff,

8    vs.          No. C10-1823-JLR

9    MOTOROLA, INC., MOTOROLA

10   MOBILITY, INC., and GENERAL

11   INSTRUMENT CORPORATION,

12             Defendants.

13   _____

14

15              DEPOSITION OF DAVID A. HEINER

16             Taken on behalf of the Defendants

17                    March 28, 2012

18                       -  -  -

19   BE IT REMEMBERED THAT, pursuant to the Washington Rules of

20   Civil Procedure, the deposition of DAVID A. HEINER, was

21   taken before Tia B. Reidt, #2798, a Certified Shorthand

22   Reporter, and a Notary Public for the State of Washington,

23   on March 28, 2012, commencing at the hour of 8:48 a.m., the

24   proceedings being reported at 315 5th Avenue South,

25   Suite 1000, Seattle, Washington. TSG Job # 47848.

Page 2

APPEARANCES

1
2
3  Appearing on behalf of the Plaintiff
4  ARTHUR W. HARRIGAN, JR.
5  DANIELSON HARRIGAN LEYH & TOLLEFSON
6  999 3rd Avenue
7  Seattle, WA 98104
8
9
10
11
12  Appearing on behalf of the Defendant
13  PAUL M. SCHOENHARD
14  MATTHEW RIZZOLO
15  ROPES & GRAY
16  One Metro Center
17  700 12th Street NW
18  Washington, DC 20005
19
20
21
22
23
24
25

Page 3

1  Appearing on behalf of the Defendant
2  LYNN ENGEL
3  SUMMIT LAW GROUP
4  315 Fifth Avenue South
5  Seattle, WA 98104
6
7
8
9
10  ALSO PRESENT:
11
12  Sid Fox,
13  Videographer
14
15
16
17
18
19
20
21
22
23
24
25

Page 4

1           EXAMINATION INDEX
2
3  EXAMINATION BY               PAGE
4  Mr. Schoenhard              8
5
6           EXHIBIT INDEX
7
8  EXHIBIT NO.    DESCRIPTION      PAGE
9  Exhibit 1  10-page Defendant Motorola Mobility,    12
10      Inc.'s notice of deposition of
11      Microsoft Corporation.
12  Exhibit 2  17-page letter re: Patent Standards    27
13      Workshop, Project No. P11-1204,
14      dated June 14, 2011.
15  Exhibit 3  1-page Microsoft's Support for    40
16      Industry Standards document.
17  Exhibit 4  2-page e-mail string re:    42
18      Microsoft statement.
19  Exhibit 5  3-page Microsoft's Support for    45
20      Industry Standards document.
21  Exhibit 6  1-page e-mail string re: We just    46
22      posted a blog.
23  Exhibit 7  2-page e-mail string re: Google    47
24      Pushing FTC letter now with CNET.
25

Page 5

1        EXHIBIT INDEX CONTINUED
2  EXHIBIT NO.    DESCRIPTION      PAGE
3  Exhibit 8  1-page Google/Motorola Mobility Q1    49
4      Questionnaire to competitors.
5  Exhibit 9  22-page 802.11 Patent License    53
6      dated October 21, 2010.
7  Exhibit 10  24-page H.264 Patent License dated    53
8      10/29/2010.
9  Exhibit 11  3-page Interoperability: The other    54
10      Side of Our Settlement with
11      the European Commission document.
12  Exhibit 12  4-page Frequently Asked Questions    55
13      about Interoperability document.
14  Exhibit 13  3-page Microsoft Open Specifications    56
15      document.
16  Exhibit 14  14-page Patent Covenant Agreement,    58
17      Microsoft Exchange Outlook Protocol.
18  Exhibit 15  21-page Patent Covenant Agreement,    60
19      Microsoft Sharepoint Protocols.
20  Exhibit 16  27-page Patent Covenant Agreement,    61
21      Windows Client PC Operating System
22      (Including .net framework) protocols.
23  Exhibit 17  11-page Patent License Microsoft    62
24      Exchange Server 2010 Protocols.
25

| | Page 6 |
|---|---|

EXHIBIT INDEX CONTINUED

| EXHIBIT NO. | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 18 | 2-page e-mail string re: Industry understanding of FRAND. | 63 |
| Exhibit 19 | 18-page Google: Please Don't kill video on the web document. | 67 |
| Exhibit 20 | 2-page letter from the United States Department of Justice dated 3/15/21. | 71 |
| Exhibit 21 | 17-page letter re: Standardization Feedback for Sub-Committee on Standards dated 3/7/11. | 75 |
| Exhibit 22 | 37-page e-mail and attachment Re: Proposed consent decree Microsoft's. | 75 |
| Exhibit 23 | 3-page Microsoft's Proposed Consent Decree Principles. | 77 |

| | Page 7 |
|---|---|

DAVID A. HEINER

DEPOSITION OF DAVID A. HEINER

Wednesday, March 28, 2012

8:48 a.m.

THE VIDEOGRAPHER: This is the start of videotape labeled No. 1 of the videotape deposition of David Heiner in the matter of Microsoft Corporation verses Motorola Inc., et. al, in the United States District Court for the Western District of Washington at Seattle, Civil Action No. C10-1823-JLR.

This deposition is being held at Summit Law Group, 315 5th Avenue South, Suite 1000, Seattle, Washington, 98104 on March 28th, 2012, at approximately 8:45 a.m.

My name is Sid Fox from TSG Reporting, Inc., and I'm the legal video specialist. The court reporter is Tia Reidt in association with TSG Reporting.

Will counsel please introduce yourselves.

MR. SCHOENHARD: Good morning. My name is Paul Schoenhard. I'm an attorney with Ropes & Gray, LLP. I'm here today representing the Motorola entities, the defendants.

With me today are Matt Rizzolo, also with Ropes & Gray, and Lynn Engel with the Summit Law Group.

MR. HARRIGAN: Art Harrigan, Danielson Harrigan,

| | Page 8 |
|---|---|

DAVID A. HEINER

representing Microsoft and the witness.

THE VIDEOGRAPHER: Will the court reporter please swear the witness in.

DAVID A. HEINER, having been first duly sworn, was examined and testified as follows:

EXAMINATION

BY MR. SCHOENHARD:

Q. Good morning, Mr. Heiner.

A. Good morning.

Q. Please state your full name and home address for the record.

A. David A. Heiner, 14314 227th Avenue Northeast, Woodinville, Washington, 98077.

Q. And do you understand that you're testifying under oath here today?

A. I do.

Q. Is there any reason you won't be able to provide honest testimony today?

A. No.

Q. You are currently employed by Microsoft?

A. Yes.

Q. What is your current title?

A. Vice president and deputy general counsel.

| | Page 9 |
|---|---|

DAVID A. HEINER

Q. What are your responsibilities as vice president and deputy general counsel?

A. I'm responsible for two organizations within the Microsoft law department. One is our antitrust group, and the other is the corporate standards group.

Q. Do I understand correctly, based on your answer, that the antitrust group and the corporate standards groups are treated as two separate groups?

A. They're often treated as one group, so it's -- there's no real answer. It could be one or two.

Q. But you have general responsibility for both?

A. I do.

Q. Could you please explain briefly what your standards -- what your responsibilities are with respect to the standards group?

A. Well, I oversee the group. The corporate standards group is an organization that provides services to the rest of Microsoft. Those services include legal advice in connection with participation in standards bodies, standards policy work, and also includes people who participate directly in standards-setting organizations, so these are nonlawyers whose job function is to represent Microsoft at standards bodies.

There are other people within Microsoft who are not

| Page 30 | Page 31 |
|---|---|
| DAVID A. HEINER | DAVID A. HEINER |
| 1 | 1 |
| 2 the second paragraph on Page 12 of Exhibit 2. | 2 Q. Can you explain what you understand the term |
| 3 A. Okay. (Witness peruses document.) | 3 "field of use restriction" to mean? |
| 4 Okay. | 4 A. I'm sorry. Can you repeat the question? |
| 5 Q. Is it fair to say that Microsoft believes that | 5 Q. Can you explain to me what you understand the term |
| 6 while there is no exhaustive list of traditional RAND | 6 "field of use restriction" to mean. |
| 7 licensing terms, in addition to a possible compensation | 7 A. I understand the term "field of use restriction" |
| 8 element, such terms may include a field of use restriction, | 8 to mean that a particular, say, patent might be licensed for |
| 9 reciprocity, non sublicensability, defensive suspension, and | 9 one use and not another. |
| 10 other common patent licensing considerations? | 10 Q. Can you explain to me what you understand the term |
| 11 A. Yeah. Generally I think that's correct. | 11 "reciprocity" to mean? |
| 12 As I think about one of the earlier questions you | 12 A. Let's see. I understand that term to mean that in |
| 13 asked, though, maybe I should clarify one aspect. This is | 13 a patent license, there might be a reciprocal grant of |
| 14 my letter to the Federal Trade Commission, and it was my | 14 patent rights back to the licensor. |
| 15 view at the time. I am responsible for this function at | 15 Q. Would that also be referred to as a grant-back? |
| 16 Microsoft. But to go all the way to say that, you know, | 16 A. I think so. I'm not sure if the terms are, you |
| 17 does Microsoft believe X, Y and Z is perhaps a bit of a | 17 know, completely synonymous or not, but yes. |
| 18 stretch, since it's a corporate entity and there's not | 18 Q. What do you understand the term "defensive |
| 19 necessarily any one belief of such an entity. | 19 suspension" to mean? |
| 20 But having said that, I am responsible for the | 20 A. I understand that to refer to the concept where a |
| 21 subject matter generally, and so... | 21 patent holder might grant a patent license to a licensee but |
| 22 Q. And you do agree that Exhibit 2, the June 2011 | 22 have a provision that says that if the licensee engages in |
| 23 letter, was submitted to the Federal Trade Commission on | 23 some specified act such as a lawsuit back against the |
| 24 behalf of Microsoft, the corporate entity? | 24 licensor, then the license grant terminates. |
| 25 A. Yes. | 25 Q. And what might other common patent licensing |

| Page 32 | Page 33 |
|---|---|
| DAVID A. HEINER | DAVID A. HEINER |
| 1 | 1 |
| 2 considerations include? | 2 Q. You would typically expect for there to be |
| 3 A. I don't know offhand. | 3 business discussions prior to legal action, however, |
| 4 Q. Would licensing nonessential patents as part of | 4 correct? |
| 5 the same transaction be a common patent licensing | 5 A. I don't know about that. |
| 6 consideration? | 6 Q. You agree that RAND license terms are typically |
| 7 A. Can you repeat the question? | 7 arrived at through bilateral negotiation, correct? |
| 8 Q. Would including as part of license discussion | 8 A. Typically, yes. |
| 9 nonessential patents also be another common patent licensing | 9 Q. Are there circumstances in which bilateral |
| 10 consideration? | 10 negotiation would not be involved? |
| 11 A. Yes. I think that happens. | 11 MR. HARRIGAN: Object to the form of the question. |
| 12 Q. Would considerations of license term and | 12 You can answer. |
| 13 termination also be common patent license considerations? | 13 THE WITNESS: I think one important aspect of the |
| 14 A. Yes. | 14 standards system is that a firm that makes a RAND commitment |
| 15 Q. And each of these considerations would typically | 15 when it initiates patent licensing discussions, that it do |
| 16 be fleshed out as part of bilateral negotiations between the | 16 so in good faith and that any offer it makes that it |
| 17 perspective licensor and perspective licensee, correct? | 17 believes that offer is RAND, recognizing that people may |
| 18 A. Yes. | 18 differ on that point. |
| 19 Q. Would you agree that whether terms are reasonable | 19 And so if a firm were to come forward and put on |
| 20 can be a matter of some debate? | 20 the table an offer that is manifestly not RAND, that likely |
| 21 A. Yes. | 21 would not provide the basis for good-faith negotiations to |
| 22 Q. And whether terms are reasonable can be resolved | 22 proceed. |
| 23 through litigation in the relatively rare circumstances | 23 BY MR. SCHOENHARD: |
| 24 where business discussions fail, correct? | 24 Q. How might you determine if an offer is manifestly |
| 25 A. I think that's right. | 25 not RAND? |

| Page 34 | Page 35 |
|---|---|
| DAVID A. HEINER | DAVID A. HEINER |

**Page 34**

DAVID A. HEINER

1
2    A.    If it had the characteristics that Microsoft
3  identified in an interrogatory response, I think in this
4  case but I'm not sure, where we listed a number of aspects
5  of what, is in our view, not RAND.
6    Q.    In such a circumstance, you believe that rather
7  than going back and saying this doesn't look quite right in
8  the general standards-setting context, it makes sense to go
9  ahead with a legal action?
10    A.    I think that's fair to say.
11    Q.    Please direct your attention to Page 13 of
12  Exhibit 2, the June 2011 letter.
13    A.    Okay.
14    Q.    Please feel free to read to yourself the first
15  full paragraph on this page.
16        MR. HARRIGAN:  I'm sorry.  I was typing and missed
17  it.  Where are we reading?
18        MR. SCHOENHARD:  Page 13, the first full paragraph.
19        MR. HARRIGAN:  Thanks.
20        THE WITNESS:  (Witness peruses document.)
21        Okay.
22  BY MR. SCHOENHARD:
23    Q.    Is it fair to say that as of June 2011, the time
24  this letter was submitted to the Federal Trade Commission,
25  you believed that the existence of a RAND commitment to

**Page 35**

DAVID A. HEINER

1
2  offer patent licences should not preclude a patent holder
3  from seeking a preliminary injunctive relief or commencing
4  an action in the International Trade Commission just because
5  the patent holder has made a licensing commitment to offer
6  RAND-based licenses in connection with the standard?
7    A.    Yes.
8    Q.    And would you agree that any uniform declaration
9  that such relief would not be available if the patent holder
10  has made a commitment to offer a RAND license for its
11  essential patent claims in connection with the standard may
12  reduce any incentives that implementers might have to engage
13  in good-faith negotiations with the patent holder?
14    A.    Yes.  I mean, generally I believe that, and I
15  think it's a commonplace notion, that anytime there's any
16  limit whatsoever on the scope of intellectual property
17  rights, that logically tends to reduce incentives to attain
18  those rights.
19        And on the other hand, if what's happening is that
20  there's greater sharing of those rights, then in the near
21  term there's the possibility of greater enervation by others
22  using those rights, and that's kind of a balancing and
23  tradeoff that has to be made.
24    Q.    Please direct your attention to Page 8 of
25  Exhibit 2, the June 2011 letter to the Federal Trade

**Page 36**

DAVID A. HEINER

1  Commission.
2    A.    (Witness complies.)
3    Q.    In Footnote 5 on Page 8 of Exhibit 2, do you see
4  reference to a Mr. Keith Mallinson, M-A-L-L-I-N-S-O-N?
5    A.    Yes.
6    Q.    Who is Mr. Keith Mallinson?
7    A.    I don't know beyond what is said in the
8  parenthetical.
9    Q.    The parenthetical to which you're referring reads,
10  "A longstanding research analyst and consultant in the
11  telecommunications industry"?
12    A.    Yes.
13    Q.    Do you believe that statement regarding
14  Mr. Mallinson to be correct?
15    A.    Let me take a minute and read this.  We're talking
16  about the statement that's the second sentence of the
17  footnote, or after the colon?
18    Q.    I was referring to the statement in the
19  parenthetical referring to who Mr. Mallinson is.
20    A.    Oh.  I assume that's correct.  I don't know
21  personally.
22    Q.    Please take a moment to read to yourself the final
23  paragraph of Footnote 5 on Page 8 of Exhibit 2.
24    A.    Okay.  (Witness complies.)

**Page 37**

DAVID A. HEINER

1
2        MR. HARRIGAN:  When you say "the final paragraph,"
3  you're talking about the one that starts, "The principal"?
4        MR. SCHOENHARD:  Correct.
5        MR. HARRIGAN:  Feel free to read the rest of that
6  footnote.
7        THE WITNESS:  (Witness peruses document.)
8        Okay.
9  BY MR. SCHOENHARD:
10    Q.    Do you agree with Mr. Mallinson's statement that
11  there will at times be significant contention between the
12  patent owner and implementer about what constitutes
13  reasonable licensing terms, but this is to be expected, as
14  with commercial negotiation on any input cost component, and
15  has for the most part been readily resolved through
16  bilateral negotiations?
17    A.    Yes.
18    Q.    Would you agree, then, that even in situations
19  where there may be significant contention between parties as
20  to what would ultimately be reasonable terms, bilateral
21  negotiation is an appropriate course?
22    A.    In general, yes.  This particular case I think of
23  as an outlier.
24    Q.    If a potential implementer of a standard is aware
25  that another entity owns a portfolio of potentially

TSG Reporting - Worldwide     877-702-9580

093

| Page 38 | Page 39 |
|---|---|
| DAVID A. HEINER | DAVID A. HEINER |
| 1 | 1 |
| 2 standard-essential patents, do you believe that the | 2 he's knocking on someone's door, apparently is seeking |
| 3 implementer has an obligation to seek a license to those | 3 licensing fees and then is obliged to offer a license that |
| 4 patents? | 4 is compliant with RAND. |
| 5    A.  I don't know about that. The current practice in | 5    Q.  How do you determine if the license that's offered |
| 6 the industry is often that no such license is sought and so | 6 is compliant with RAND? |
| 7 no such license is put in place, but rather firms simply | 7    A.  Well, that's a very big question, and people go to |
| 8 implement standards and rely on the fact that if they needed | 8 conferences and have debates about what is RAND and the |
| 9 a license - in other words, if the patent holder came | 9 like, so there's no definitive answer to that. |
| 10 knocking - there's a RAND commitment. | 10    Q.  In large part, the parties collectively and |
| 11    And so I think often in the industry, firms simply | 11 bilaterally determine what is RAND in their specific |
| 12 implement and don't actually obtain licences from everyone | 12 contexts through negotiations, correct? |
| 13 who might have IP that reads on implementation. | 13    A.  Typically. |
| 14    Q.  Does that practice create free-rider issues? | 14    MR. SCHOENHARD: I think I've had you on the record |
| 15    A.  What do you mean? | 15 for approximately an hour. Why don't we go ahead and take |
| 16    Q.  Doesn't that type of practice encourage | 16 our first break, and then we'll resume in a few moments. |
| 17 implementers to effectively operate in an unlicensed | 17    THE VIDEOGRAPHER: The time is approximately |
| 18 capacity with respect to existing IP rights in the hopes | 18 9:35 a.m. We are off the record. |
| 19 that never shall a license need to be paid? | 19    (Pause in the proceedings.) |
| 20    A.  I don't know. I'm just commenting on what I think | 20    THE VIDEOGRAPHER: We are back on the record. The |
| 21 happens in the industry. | 21 time is approximately 9:54 a.m. |
| 22    Q.  When a patent holder comes knocking on the | 22 BY MR. SCHOENHARD: |
| 23 implementer's door, what do you believe to be the common | 23    Q.  Mr. Heiner, do you understand that you've been |
| 24 practice? | 24 designated to testify today additionally with respect to |
| 25    A.  The common practice is that the patent holder, if | 25 Topic 36 in Motorola's Notice of Deposition -- |

| Page 40 | Page 41 |
|---|---|
| DAVID A. HEINER | DAVID A. HEINER |
| 1 | 1 |
| 2    A.  Yes. | 2 Microsoft will not seek an injunction or exclusion order |
| 3    Q.  -- relating to a February 8th, 2012 statement, | 3 against any firm on the basis of those essential patents," |
| 4 "Microsoft Support for Industry Standards"? | 4 correct? |
| 5    A.  Yes. | 5    A.  Correct. |
| 6    Q.  Do you believe that you are prepared today to | 6    Q.  As of today, is that Microsoft's official |
| 7 speak with respect to that topic? | 7 position? |
| 8    A.  Yes. | 8    A.  Yes. |
| 9    (Whereupon, a 1-page Microsoft's Support for | 9    Q.  As of today, is it Microsoft's position that it is |
| 10 Industry Standards document was marked Exhibit 3 for | 10 inappropriate for standards-essential patent holders to seek |
| 11 identification.) | 11 injunctive-style relief? |
| 12    THE COURT REPORTER: Exhibit 3. | 12    A.  Yes. |
| 13 BY MR. SCHOENHARD: | 13    Q.  That position is directly contrary to the position |
| 14    Q.  Mr. Heiner, you have been handed a document that | 14 taken at Page 13 of the June 2011 Federal Trade Commission |
| 15 has been marked as Heiner Exhibit 3, bearing Production No. | 15 letter we discussed a moment ago, correct? |
| 16 MS-MOTO_1823_00005196256. | 16    A.  Our position changed from June 14th to more |
| 17    Please take a moment to review this document and | 17 recently, yes. |
| 18 tell me whether you recognize it. | 18    Q.  Why did Microsoft's position change? |
| 19    A.  Yes, I recognize this document. | 19    A.  Based on experience since then, based on thinking |
| 20    Q.  What is this document, Heiner Exhibit 3? | 20 about the subject more deeply, and based on discussions with |
| 21    A.  This document is a printout of a web page where | 21 the US Department of Justice. |
| 22 Microsoft made a statement regarding its support for | 22    Q.  When you say "based or our experience since then," |
| 23 industry standards. | 23 are you referring to your experience as, for example, a |
| 24    Q.  As part of this February 8th, 2012 statement, | 24 defendant against the Motorola entities? |
| 25 Microsoft stated, under the No. 2, "This means that | 25    A.  Yes. |

094

| | |
|---|---|
| **Page 54** | **Page 55** |

### Page 54

DAVID A. HEINER

2    Q.   Do you recall whether you have seen these

3  documents before?

4    A.   I don't think I have.  I'm not certain.

5    Q.   You can set them aside.

6    A.   Okay.

7         (Whereupon, a 3-page Interoperability: The other

8  Side of Our Settlement with the European Commission document

9  was marked Exhibit 11 for identification.)

10       THE COURT REPORTER:  Exhibit 11.

11  BY MR. SCHOENHARD:

12    Q.   Mr. Heiner, you've been handed a document that has

13  been marked as Heiner Exhibit 11.

14         Please take a moment to review this document and

15  tell me whether you recognize it.

16    A.   (Witness peruses document.)

17         Okay.

18    Q.   Do you recognize this document?

19    A.   Yes.

20    Q.   What is Heiner Exhibit 11?

21    A.   It appears to be a printout of a blog post that I

22  did apparently on December 18th of 2009.

23    Q.   To what does the blog post marked as Heiner

24  Exhibit 11 relate?

25    A.   It relates to a settlement of inquiries made by

### Page 55

DAVID A. HEINER

2  the European Commission regarding interoperability.

3    Q.   What is interoperability?

4    A.   That's another one of those $64,000 questions.

5  But generally it's the ability of two products to -- at

6  least in the computer context, two products to exchange

7  information and interact with one another.

8    Q.   And in connection with the European Commission's

9  investigation, were there concerns about the availability of

10  interoperability with Microsoft products?

11    A.   Yes.

12    Q.   As part of this and other investigations,

13  Microsoft created a set of principles regarding

14  interoperability that it intends to follow, correct?  Do you

15  have any responsibility for the principles of

16  interoperability at Microsoft?

17    A.   Yes.

18    Q.   What is that responsibility?

19    A.   The responsibility is counseling clients with

20  respect to living up to those principles.

21    Q.   And when you say "counseling clients," you're

22  referring to clients within Microsoft, correct?

23    A.   Yes.

24         (Whereupon, a 4-page Frequently Asked Questions

25  about Interoperability document was marked Exhibit 12 for

### Page 56

DAVID A. HEINER

2  identification.)

3       THE COURT REPORTER:  Exhibit 12.

4  BY MR. SCHOENHARD:

5    Q.   Mr. Heiner, you've been handed a document that has

6  been marked as Heiner Exhibit 12, bearing Production Nos.

7  MOTOM_WASH1823_0394353 through 356.  Please take a moment to

8  review this document and tell me whether you recognize it.

9    A.   (Witness peruses document.)

10         I see it appears to be a printout of a Microsoft

11  website relating to the interoperability principles we

12  announced.  I don't specifically recall the document.

13         (Whereupon, a 3-page Microsoft Open Specifications

14  document was marked Exhibit 13 for identification.)

15  BY MR. SCHOENHARD:

16    Q.   Mr. Heiner, you've been handed a document marked

17  as Heiner Exhibit 13 which bears Production Nos.

18  MOTOM_WASH1823_0394414 through 416.

19         Please take a moment to review this document and

20  tell me whether you recognize it.

21    A.   Yes.  I recognize this document to be a printout

22  from the Microsoft website of the interoperability

23  principles that Microsoft articulated.

24    Q.   Are you familiar with the set of interoperability

25  principles reflected in Exhibit 13?

### Page 57

DAVID A. HEINER

2    A.   Yes.

3    Q.   One of the interoperability principles is

4  identified with the numeral 4 at the bottom of the page

5  carrying over to the second page of the bottom, "RAND Patent

6  Terms."

7         Do you see that?

8    A.   Yes.

9    Q.   As one of Microsoft's interoperability principles,

10  Microsoft has committed to provide licenses to certain of

11  its patents covering Microsoft open protocols on reasonable

12  and nondiscriminatory terms, correct?

13    A.   Yes.

14    Q.   Is the term "RAND" with respect to reasonable and

15  nondiscriminatory licensing terms, as used in the context of

16  Microsoft's interoperability principles, substantially the

17  same, in your view, as RAND is understood in these standards

18  context?

19    A.   I'm not sure about that.  You know, here we're

20  talking about making available proprietary technologies.

21  And in the standard-setting context, you know, we're talking

22  about firms coming together to contribute technology which

23  may come from many different places into one standard and

24  then that standard being one of many that gets implemented

25  in products.

Page 82

DAVID A. HEINER
1
2  BY MR. SCHOENHARD:
3      Q.   Mr. Heiner, are you aware of any time prior to the
4  fall of 2011 at which Microsoft took the position that
5  injunctive relief should not be available to standard-
6  essential patent holders?
7          MR. HARRIGAN:  Object to the form of the question.
8          THE WITNESS:  No.
9          MR. SCHOENHARD:  Mr. Heiner, I don't believe I have
10  anything further.  I thank you very much for your time this
11  morning.
12          THE WITNESS:  Okay.  Thank you.
13          THE COURT REPORTER:  Any questions?
14          MR. HARRIGAN:  Nope.
15          THE VIDEOGRAPHER:  Here marks the end of videotape
16  labeled No. 2 in the deposition of David Heiner.
17          The time is approximately 11:56 a.m.  We are off
18  the record.
19          THE COURT REPORTER:  And before I go off the
20  record, would you like the standing order?
21          MR. SCHOENHARD:  Please.
22          THE COURT REPORTER:  And would you like a copy,
23  standing order?
24  //
25  CONTINUED ON THE NEXT PAGE TO INCLUDE JURAT.

Page 83

DAVID A. HEINER
1
2          MR. HARRIGAN:  Yeah.
3          THE COURT REPORTER:  Thank you.
4          (Whereupon, the deposition was concluded at
5  11:59 a.m.)
6
7          (Signature waived.)

Page 84

CERTIFICATE
1
2
3      I, Tia B. Reidt, do hereby certify that
4  pursuant to the Rules of Civil Procedure, the witness
5  named herein appeared before me at the time and place
6  set forth in the caption herein; that at the said time
7  and place, I reported in stenotype all testimony
8  adduced and other oral proceedings had in the
9  foregoing matter; and that the foregoing transcript
10  pages constitute a full, true and correct record of
11  such testimony adduced and oral proceeding had and
12  of the whole thereof.
13
14      IN WITNESS HEREOF, I have hereunto set my hand
15  this 9th day of April, 2012.
16
17
18
19
    _____
20   Tia B. Reidt
21
22  Commission Expiration: June 3, 2014
23
24
25

Page 85

CORRECTION SHEET
1
2  Deposition of: David Heiner      Date: 03/28/12
3  Regarding:     Microsoft  Vs.  Motorola
4  Reporter:    Tia Reidt
5  _____
6  Please make all corrections, changes or clarifications
7  to your testimony on this sheet, showing page and line
8  number.  If there are no changes, write "none" across
9  the page.  Sign this sheet on the line provided.
10  Page  Line  Reason for Change
11  _____ _____ _____
12  _____ _____ _____
13  _____ _____ _____
14  _____ _____ _____
15  _____ _____ _____
16  _____ _____ _____
17  _____ _____ _____
18  _____ _____ _____
19  _____ _____ _____
20  _____ _____ _____
21  _____ _____ _____
22  _____ _____ _____
23  _____ _____ _____
24      Signature_____
25           David Heiner