# EXHIBIT 31

# PRICING PATENTS FOR LICENSING IN STANDARD-SETTING ORGANIZATIONS: MAKING SENSE OF FRAND COMMITMENTS

Anne Layne-Farrar
A. Jorge Padilla
Richard Schmalensee*

## I. INTRODUCTION

"Fair," "reasonable," and "non-discriminatory" are an interesting collection of commonly used, but emotion-laden words that become even more emotionally charged when strung together. The acronym, "FRAND," which yokes these words together, turns out to have considerable practical importance, especially in standard-setting situations. A FRAND commitment has serious legal implications: a commitment to offer intellectual property (IP), such as patents, to licensees on fair, reasonable, and non-discriminatory terms and conditions. Unfortunately, even though many are committed to FRAND licensing, there is no universally agreed upon operational definition of that commitment.[1]

---

* Anne Layne-Farrar is a Director at LECG Consulting; A. Jorge Padilla is a Managing Director at LECG Consulting and a Research Fellow at CEMFI Madrid and CEPR London; Richard Schmalensee is the Howard W. Johnson Professor of Economics and Management at Massachusetts Institute of Technology. The authors thank Damien Geradin, Mike Hartogs, Doug Lichtman, Alison Oldale, Trevor Soames, and Richard Taffet for comments and suggestions. We also thank Melissa DiBella and Lubomira Ivanova for invaluable research support. Financial support from Qualcomm is also gratefully acknowledged. The ideas and opinions in this article are exclusively our own.

[1] Daniel Swanson and William J. Baumol note: "It is widely acknowledged that, in fact, there are no generally agreed upon tests to determine whether a particular license does or does not satisfy a RAND commitment." Daniel G. Swanson & William J. Baumol, *Reasonable and Nondiscriminatory (RAND) Royalties, Standards Selection, and Control of Market Power*, 73 Antitrust L.J. 1, 5 (2005). Larry Goldstein and Brian Kearsey echo this: "Unfortunately, [RAND and FRAND] are not well defined. Ambiguity in the definition of 'FRAND' is, in our opinion, one of the core problems in the licensing of rights to patents essential for implementation of a written technical standard." Larry M. Goldstein & Brian N. Kearsey, Technology Patent Licensing: An International Reference on 21st Century Patent Licensing, Patent Pools and Patent Platforms 27 (2004). Likewise, Richard Rapp and Lauren Stiroh state: "The typical [standard setting organization] patent policy mandating that a royalty be 'fair, reasonable and non-discriminatory' gives

671

ANTITRUST LAW JOURNAL [Vol. 74

Intellectual property rights, especially patents, have become a customary feature in standard-setting efforts over the last few decades. For example, the European Telecommunications Standards Institute (ETSI) considers having patented technology in their standards as "inevitable and unavoidable."[2] Along with this patented technology have come rules regarding patent disclosure and licensing. Most standard-setting organizations (SSOs), including ETSI, request that their members make reasonable efforts to identify and disclose any intellectual property that might be relevant for a standard under development.[3] Once IP is disclosed, most SSOs also request that members agree to license their relevant patents on FRAND terms.[4] (In the United States, RAND, which drops "fair," is required instead.) Given the high stakes frequently involved in standard setting,[5] it is no surprise that the definition of FRAND has been the subject of heated debate in recent years.

One school of thought is that FRAND commitments are meant to address a prominent concern in standard setting: the adoption of a technology into a major standard could confer substantial market power, or substantially increased market power, on its owner. Companies with patents that have been selected for a standard—rendering them "essential" since those patents are "required" to meet the standard[6]—may be tempted to opportunistically abuse this market power; for example, by refusing to license or charging excessively high royalty rates.

---

little guidance for royalty determination because 'reasonable' can mean different things to a technology owner and a technology buyer." Richard T. Rapp & Lauren J. Stiroh, Standard Setting and Market Power, Comments Submitted to Joint Hearings of the U.S. Dep't of Justice & Fed. Trade Comm'n, Competition and Intellectual Property Law and Policy in the Knowledge-Based Economy 9 (Apr. 18, 2002), *available at* http://www.ftc.gov/opp/intellect/020418rappstiroh.pdf. For a survey of the debate surrounding FRAND, see Damien Geradin, *Standardization and Technological Innovation: Some Reflections on Ex-ante Licensing, FRAND, and the Proper Means to Reward Innovation* (Tilburg Law and Econ. Ctr., Discussion Paper No. 2006-017), *available at* http://ssrn.com/abstract=909011.

[2] Rudi Bekkers et al., *Intellectual Property Rights and Standardization: The Case of GSM*, 26 TELECOMM. POL'Y 171, 173 (2002).

[3] Firms not making relevant disclosures risk litigation over unfair business practices. *See, e.g.*, Rambus, Inc., FTC Docket No. 9302, 2006 WL 2330119 (Aug. 2, 2006) (Opinion of the Commission), *available at* http://www.ftc.gov/os/adjpro/d9302/index.shtm.

[4] For a discussion of SSO intellectual property rules, see Benjamin Chiao, Josh Lerner & Jean Tirole, *The Rules of Standard Setting Organizations: An Empirical Analysis* (Harvard NOM Research Paper No. 05-05, 2005), *available at* http://ssrn.com/abstract=664643.

[5] *See, e.g.*, Brian DeLacey, Kerry Herman, David Kiron & Josh Lerner, *Strategic Behavior in Standard-Setting Organizations* (Harvard Univ., Working Paper No. 903214, 2006), *available at* http://ssrn.com/abstract=903214.

[6] "Required" may often be too strong a word. *See* Chiao et al., *supra* note 4 (discussing how and why patents get disclosed to SSOs). Moreover, even if a patent is technically essential for implementing a standard, it might be relatively easy to invent around, or it might cover an optional feature of the standard that can be omitted in some applications.

In fact, several recent cases have involved such claims, focusing directly on SSO members' FRAND commitments. Within the United States, in *Qualcomm*, Broadcom alleged that Qualcomm's patent-licensing policies violated its FRAND commitment to ETSI for the mobile telephone 3G standard and violated the Sherman Act in the process.[7] Nokia is also pursuing Qualcomm, although in a different U.S. court in *Nokia*, and without reference to antitrust law.[8] The primary charge in *Nokia* is that a member's FRAND promise to an SSO like ETSI forms an enforceable contract.[9] Thus Nokia is claiming that Qualcomm breached its contract by offering licensing terms that, in its view, are not FRAND. Nor is the United States the only FRAND battlefront. In Europe, the European Commission (EC) has just recently inititated a formal investigation of Qualcomm for abuse of a dominant position.[10] Conflicting definitions of FRAND lie at the heart of all of these cases.

In this article, we discuss ways in which the courts in the United States and Europe might evaluate what behavior is and what is not compliant with SSO members' FRAND commitments. That is, we attempt to give more tangible meaning to the concept of FRAND licensing. To put the FRAND problem into context, Part II briefly reviews the intellectual property and SSO literature, which finds patent values to be highly unequal. Part III discusses two options for giving content to FRAND that emerge from the courts. One option is extending *Georgia-Pacific*, which is the primary case guiding reasonable royalty determination in patent infringement cases in the United States. *Georgia-Pacific* lays out fifteen factors that should be accounted for when calculating reasonable royalty

---

[7] Complaint, Broadcom Corp. v. Qualcomm, Inc., No. 05-3350, 2006 WL 2528545 (D.N.J. filed Aug. 31, 2006). The district court granted Qualcomm's motion to dismiss, but the Third Circuit recently reversed the dismissal of the Sherman Act monopolization and attempted monopolization claims, and affirmed the dismissal of the unlawful monopoly maintenance claim. Broadcom Corp. v. Qualcomm, Inc., No. 05-3350, 2006 WL 2528545 (D.N.J. Aug. 31, 2006), *rev'd in part, aff'd in part*, No. 06-4292, 2007 WL 2475847 (3d Cir. Sept. 4, 2007).

[8] *See* Nokia Corp. v. Qualcomm, Inc., No. 06-509, 2006 WL 2521328 (D. Del. Aug. 29, 2006).

[9] Earlier cases have involved similar claims of contract, but settled prior to a ruling. *See* ESS Tech., Inc. v. PC-Tel, Inc., No. C-99-20292 (N.D. Cal. Feb. 21, 2002) (stipulation and order of dismissal); PC-TEL INC., ANNUAL REPORT 6 (Form 10-K) (Apr. 4, 2001), *available at* http://www.sec.gov/Archives/edgar/data/1057083/000089161802001574/f78706e10-k.txt; *see also* Agere Sys. Guardian Corp. v. Proxim, Inc., No. 01-CV-00339 (D. Del. Sept. 19, 2002) (stipulation and order of dismissal); AGERE SYS. GUARDIAN CORP., ANNUAL REPORT 49 (Form 10-K) (Dec. 5, 2003), *available at* http://www.sec.gov/Archives/edgar/data/1129446/000120677403000880/d13642.htm.

[10] The EC announced the initiation of its formal investigation of Qualcomm on October 1, 2007. European Comm'n, Press Release, http://europa.eu/rapid/pressReleasesAction.do?reference=MEMO/07/389&format=HTML&aged=0&language=EN&guiLanguage=en.

rates, most of which can be easily extended to a standard-setting context.[11] The second option is numeric proportionality, which the complainants to the European Commission have put forth as a definition for FRAND.[12] Under numeric proportionality, each firm contributing patents to a standard would receive a share of the total royalties for the entire standard in proportion to the number of patents it reports as "essential."[13] Of course, the total royalty rate for the standard would still need to be determined, so even under this option *Georgia-Pacific* factors might play a role. Numeric proportionality can lower transaction costs, but generally at the expense of efficiency and equity.

Part IV turns to models in the economics literature that show promise of providing plausible benchmarks for FRAND: the Efficient Component-Pricing Rule (ECPR) and the Shapley value. ECPR was proposed in the late 1970s as a method for ensuring that pricing "bottleneck" facilities, like local electricity or telephone networks, in the face of competition in related services would be consistent with economic efficiency.[14] We first consider ECPR as a possible benchmark for RAND cases in the United States, where economic efficiency concepts tend to be favored. We next consider the Shapley value, based on cooperative game theory, which was proposed by Lloyd Shapley in 1953 as a "fair" method for dividing the rents generated by multiple cooperating participants in any unspecified activity.[15] The Shapley value approach holds promise as a possible benchmark for FRAND cases in the European Union, where economic efficiency is viewed as important but fairness considerations are also given considerable weight.[16] We then compare these two eco-

---

[11] Georgia-Pacific Corp. v. U.S. Plywood Corp., 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970).

[12] Peter Clarke, *Updated: Six Phone Firms Ask EU to Punish Qualcomm*, EETimes, Oct. 28, 2005, http://www.eetimes.com/showArticle.jhtml?articleID=172901195. *See also* Case COMP/C-3/39.247, Texas Instrs. v. Qualcomm (2005); Case COMP/C-3/39.248, Broadcom v. Qualcomm (2006); Case COMP/C-3/39.249, Nokia v. Qualcomm; Case COMP/C-3/39.250, Panasonic v. Qualcomm (2006); Case COMP/C-3/39.251, NEC v. Qualcomm (2005); Case COMP/C-3/39.252, Ericsson v. Qualcomm (2006).

[13] Press Release, Ericsson, Leading Mobile Wireless Technology Companies Call on European Commission to Investigate Qualcomm's Anti-competitive Conduct (Oct. 28, 2005), *available at* http://www.ericsson.com/ericsson/press/releases/20051028-1018618.shtml; Faultline, *Our Patents Are Bigger than Yours, Nokia Tells Qualcomm*, REGISTER, Apr. 6, 2007, http://www.theregister.co.uk/2007/04/06/nokia_qualcomm_patent_spat/.

[14] William J. Baumol, *Some Subtle Pricing Issues in Railroad Regulation*, 10 INT'L. J. TRANSPORT ECON. 341 (1983); Robert D. Willig, *The Theory of Network Access Pricing, in* ISSUES IN PUBLIC UTILITY REGULATION 109 (Harry M. Trebing ed., 1979). For a recent application of ECPR to FRAND, see Swanson & Baumol, *supra* note 1.

[15] Lloyd S. Shapley, *A Value for N-Person Games, in* 2 CONTRIBUTIONS TO THE THEORY OF GAMES 307 (H.W. Kuhn & A.W. Tucker eds., 1953).

[16] *See* Christian Ahlborn & Carsten Grave, *Walter Eucken and Ordoliberalism: An Introduction from a Consumer Welfare Perspective*, 2 COMPETITION POL'Y INT'L 197 (2006); *see also*

nomic approaches, which, remarkably, often lead to the same answer despite their dramatically different philosophical bases.

In particular, whether the evaluation is based on an ECPR or a Shapley value approach, FRAND licensing must consider two key factors: (1) the contribution of the patented invention to the standard, and (2) the existence of any substitute technologies and the general level of competition. Part V summarizes these points and concludes our analysis. Regardless of whether economic efficiency or fairness is the paramount concern, one cannot ignore the contribution a patented technology makes to the value of a standard or the existence of substitute technologies in any sensible, fair distribution of rents. That means numeric proportionality rules will only be applicable under narrow circumstances. While the *Georgia-Pacific* factors may make good guidelines (albeit varyingly applied by the courts) for FRAND licensing evaluations under general circumstances, we argue that the two economic models provide the most solid framework for courts and competition authorities faced with FRAND cases.

## II. LICENSING, PATENT VALUE, AND STANDARD SETTING

Scholars and practitioners have been struggling with how, in general, to value intellectual property for quite some time. The literature on patent licensing, especially the theoretical literature, is vast.[17] No one method for establishing a price emerges from that literature. Of those methods that have been suggested, most have both advantages and disadvantages and must therefore be evaluated in light of the situation at hand.

The more accepted methods for pricing intellectual property are based on traditional financial analysis. These approaches equate the price of a patent to the expected discounted stream of benefits derived from practicing and/or licensing the patent.[18] For example, consider a patent that fully defines a product that can be sold for $5. If costs per unit are $4 and the producers expect to sell 100 units over the lifetime of the product's commercial success, then under traditional financial

---

DAVID J. GERBER, LAW AND COMPETITION IN TWENTIETH CENTURY EUROPE: PROTECTING PROMETHEUS (1998).

[17] For surveys of the theoretical literature, see Morton I. Kamien, *Patent Licensing, in* 1 HANDBOOK OF GAME THEORY WITH ECONOMIC APPLICATIONS 332 (R.J. Aumann & S. Hart eds., 1992); *see also* SUZANNE SCOTCHMER, INNOVATION AND INCENTIVES (2004).

[18] Russell L. Parr & Gordon V. Smith, *Quantitative Methods of Valuing Intellectual Property, in* THE NEW ROLE OF INTELLECTUAL PROPERTY IN COMMERCIAL TRANSACTIONS (Melvin Simensky & Lanning G. Bryer eds., 1994).

636

analysis the patent can be said to generate $100 in profits, which is then discounted to a present value using an acceptable interest rate.

The simple expected earnings approach is not always ideal, however, because the future typically involves choices. To account for the opportunity costs involved in practicing a patent, Pakes suggests a somewhat more general approach relying on option pricing.[19] Under this model a decision tree is developed, with each branch representing an alternative path, including for example licensing a patent, licensing a substitute patent to produce the same product, or opting for some other business altogether not requiring either patent. Each branch is then assigned a probability and an expected payoff (which is then discounted). The branch with the highest expected payoff is the one chosen.

All of these financial approaches link the value of a patent to what we will term its "marginal" or "incremental" contribution. That is, (a) its contribution to the value of the products and/or services that embed its technology, and (b) the existence of current and/or potential alternatives.

In practice these approaches may be hard to implement. Estimating the future stream of revenues "due" to a patent owner for a patent used by a licensee requires estimating how much a particular patent contributes to a good or service, as distinct from other intellectual property embedded in that good or service, plus all of the other contributors to revenues, such as marketing and promotions. Furthermore, calculating the appropriate license revenues also requires estimating the willingness to pay of a third party, in light of its current and likely future alternatives. Potential licensees always have the option of not taking a license if the royalty sought makes some other technology, or some other business entirely, more economically attractive. The option value approach makes this explicit, because substitute technologies and the option of "doing nothing" can be included on the option tree, but a considerable amount of data is required for this method.

Despite the difficulties involved in measuring patent value, it is widely recognized that only a handful of patents are highly valuable—because they influence follow-on innovations and/or cover commercially successful technologies, products, or services for which there are no available substitutes—while the majority of patents hold very little value to

---

[19] Ariel Pakes develops a model in which patents are compared to options. Ariel Pakes, *Patents as Options: Some Estimates of the Value of Holding European Patent Stocks,* 54 Econometrica 755 (1986). For a discussion of the strengths and weaknesses of option value analyses, see Josh Lerner & John Willinge, *A Note on Valuation in Private Equity Settings* 9 (Harvard Bus. Sch., Working Paper No. 9-297-050, 2002).

HeinOnline -- 74 Antitrust L.J. 676 2007

either the original patent holder or anyone else. In other words, the distribution of patent values is highly skewed.[20]

While patent valuation in the standard-setting context has some unique aspects, there is reason to believe that patent values will be uneven here as well. The manner in which patents are disclosed to a standard-setting organization ensures that this will be the case. First, deciding when to disclose a patent as "reading on" a standard (i.e., relevant to it) is a judgment call. Even companies participating in the standard-setting process may not be clear on whether their patents are essential for a standard. As one book on licensing technology explains:

> Today there is substantial confusion about which patents are essential for any technical implementation of a standard. If the standard explicitly incorporates a patent, then of course there is little problem, but that happens only rarely. More commonly, each patent must be evaluated by *someone,* according to *some methodology,* who will determine whether the patent is essential according to that methodology.[21]

Empirical research supports this observation. In interviews, Chiao, Lerner, and Tirole find that the size and complexity of some firms' patent portfolios make it difficult for firms to know which of their patents read on a standard; some respondents likened the task to the search for a needle in a haystack.[22] This can be especially true if the firms send only technical specialists to SSO meetings, without including upper management or strategic decision makers.[23]

Chiao et al. also report that some firms argue that disclosing specific patents reveals valuable information to rivals about future technology

---

[20] Skewness refers to the shape of the distribution curve. In this case, the curve is shifted to the left, with a large peak at very low values and a long "tail" representing a small number of patents with high values. For examples in the literature discussing the skewed distribution of patent value, see F.M. Scherer et al., Patents and the Corporation: A Report on Industrial Technology Under Changing Public Policy (2d ed. 1959); Jean O. Lanjouw et al., *How To Count Patents and Value Intellectual Property: The Uses of Patent Renewal and Application Data,* 46 J. Indus. Econ. 405 (1998); Dietmar Harhoff et al., *Citation Frequency and the Value of Patented Inventions,* 81 Rev. Econ. Stat. 511 (1999); F.M. Scherer & Dietmar Harhoff, *Technology Policy for a World of Skew-Distributed Outcomes,* 29 Res. Pol.'y 559 (2000); Wesley M. Cohen & Stephen A. Merrill, *Introduction, in* Patents in the Knowledge Based Economy 1, 8 (Wesley M. Cohen & Stephen A. Merrill eds., 2003).

[21] Goldstein & Kearsey, *supra* note 1, at 89.

[22] Chiao et al., *supra* note 4, at 5–6.

[23] Including strategic decision makers in the team for standard-setting organization meetings is a relatively new phenomenon. *See, e.g.,* Neil Gandal, Nataly Gantman & David Genesove, *Intellectual Property and Standardization Committee Participation in the U.S. Modem Industry, in* Standards and Public Policy 208 (Shane Greenstein & Victor Stango eds., 2004).

638

strategies.[24] Recognition of these legitimate business concerns is likely one reason that SSOs like ETSI simply request that members use "reasonable endeavours" to identify relevant intellectual property, rather than demand an exhaustive reporting.[25]

Weighing against the incentives not to disclose too much is an incentive to disclose more than is needed. In the United States, the courts have found in several cases that failing to disclose intellectual property to an SSO in a timely fashion constitutes fraudulent or unfair behavior, with remedies typically stripping or at least limiting the offending companies' intellectual property rights.[26] Likewise, the European Commission has shown its determination to prevent "patent ambush." EU Competition Commissioner Neelie Kroes recently stated:

> Standards are of increasing importance, particularly in hi-tech sectors of the economy. It is crucial that standard-setting bodies establish rules which ensure fair, transparent procedures and early disclosure of relevant intellectual property. We will continue to monitor the operation of standard-setting bodies in this regard.[27]

As a result of these factors, the list of disclosed "essential" patents for a given standard is likely to be a mixture of the patents that firms can readily identify, those that firms are not too reluctant to disclose for valid strategic reasons, and those that may or may not be genuinely essential for implementation but are included as insurance against the threat of non-disclosure litigation.

Aside from requesting disclosure of the relevant intellectual property and demanding that the patents disclosed as essential be licensed on FRAND terms, SSOs generally do not venture to define, request, or even advise on any specific licensing terms. In fact, we are not aware of any SSO that explicitly sets out what licensing terms must be to comply with

---

[24] Chiao et al., *supra* note 4, at 6.

[25] European Telecommunications Standards Institute, Intellectual Property Rights Policy, *available at* http://www.etsi.org/legal/documents/ETSI_IPRPolicy.pdf.

[26] *See* Wang Labs., Inc. v. Mitsubishi Elecs. Am. Inc., 103 F.3d 1571 (Fed. Cir. 1997); Qualcomm Inc. v. Broadcom Corp, No. 05-CV-1958-B (BLM), 2007 WL 2296441 (S.D. Cal. Aug. 6, 2007); Stambler v. Diebold, Inc., 11 U.S.P.Q.2d 1709, 1988 WL 95479 (E.D.N.Y. 1988), *aff'd mem.*, 878 F.2d 1445 (Fed. Cir. 1989) (unpublished); Potter Instr. Co. v. Storage Tech. Corp., 207 U.S.P.Q. 763, 1980 U.S. Dist. LEXIS 14348 (E.D. Va. 1980), *aff'd*, 641 F.2d 190 (4th Cir. 1981); Dell Computer Corp., 121 F.T.C. 616, 1996 WL 33412055 (1996) (Statement of the Federal Trade Commission). Of course, other cases brought in U.S. courts have been decided in favor of the defendants, such as Rambus, Inc. v. Infineon Techs. AG, 318 F.3d 1081 (Fed. Cir. 2003).

[27] Press Release, European Commission, Competition: Commission Welcomes Changes in ETSI IPR Rules to Prevent "Patent Ambush" (Dec. 12, 2005), *available at* http://europa.eu.int/rapid/pressReleasesAction.do?reference=IP/05/1565&type=HTML &aged=0&language=EN&guiLanguage=EN.

639

a member's FRAND commitment. This lack of specificity is not surprising. Licensing is, among other things, a pricing matter, and antitrust authorities have traditionally been highly skeptical of organizations where competitors meet to discuss business plans and pricing strategies.

Despite the antitrust tensions, the U.S. Department of Justice recently gave business letter clearance to two SSOs that sought to encourage ex ante (prior to any official vote on a standard) licensing term disclosure as a means of avoiding ex post licensing disputes.[28] VITA has the most stringent new policy, which mandates the disclosure of IP holders' maximum rates and most restrictive terms.[29] IEEE is pursuing a more flexible approach by giving members more opportunities to voluntarily disclose desired licensing terms and conditions.[30]

Regardless of these two isolated efforts—the efficacy of which remains to be seen—the vast majority of IP policies at standard-setting organizations show a considerable lack of definition. The ambiguity is understandable, and perhaps even optimal given the flexibility it enables, but it leaves the courts and competition authorities to their own devices in making FRAND a practicable concept after a standard is defined. In the remainder of the article, we consider the options open to the courts and the competition authorities for giving FRAND specific meaning in any ex post disputes.

### III. COURT-BASED RULES

Two options for defining FRAND emerge from the courts. The first is the framework employed for judging reasonable royalties in patent infringement cases: the *Georgia-Pacific* factors. The second is the proposal that the complainants against Qualcomm to the European Commission have put forth: numeric proportionality. In this Part, we discuss these two potential approaches, pointing out any advantages or disadvantages.

---

[28] Letter from Thomas O. Barnett, Ass't Att'y Gen., U.S. Dep't of Justice, to Michael A. Lindsay, Institute of Electrical and Electronics Engineers (Apr. 30, 2007), *available at* http://www.usdoj.gov/atr/public/busreview/222978.htm; Letter from Thomas O. Barnett, Ass't Att'y Gen., U.S. Dep't of Justice, to Robert A. Skitol, VMEbus Int'l Trade Ass'n (Oct. 30, 2006), *available at* http://www.usdoj.gov/atr/public/busreview/219380.htm.

[29] VMEbus International Trade Association, VITA Patent Policy (Oct. 30, 2006), *available at* http://www.vita.com/disclosure/VITA%20Patent%20Policy%20section%2010%20 draft.pdf.

[30] Press Release, Institute of Electrical and Electronics Engineers, IEEE Enhances Standards Patent Policy to Permit Fuller Disclosure on Licensing (Apr. 30, 2007), *available at* http://standards.ieee.org/announcements/stdspatpol.html.

640

ANTITRUST LAW JOURNAL [Vol. 74

## A. *GEORGIA-PACIFIC*'s FIFTEEN FACTORS

Within the United States, the seminal case for establishing reasonable royalties for patent infringement is *Georgia-Pacific v. United States Plywood*, decided in 1970 in the Southern District of New York.[31] The district court found that United States Plywood infringed Georgia-Pacific's patent for decorative striated plywood panels. The court then enumerated fifteen factors that should be taken into consideration when calculating a reasonable royalty rate for the purposes of determining damages:

1. The royalties received by the patentee for the licensing of the patent in suit, proving or tending to prove an established royalty.

2. The rates paid by the licensee for the use of other patents comparable to the patent in suit.

3. The nature and scope of the license, as exclusive or non-exclusive; or as restricted or non-restricted in terms of territory or with respect to whom the manufactured product may be sold.

4. The licensor's established policy and marketing program to maintain its patent monopoly by not licensing others to use the invention or by granting licenses under special conditions designed to preserve that monopoly.

5. The commercial relationship between the licensor and licensee, such as, whether they are competitors in the same territory in the same line of business; or whether they are inventor and promoter.

6. The effect of selling the patented specialty in promoting sales of other products of the licensee; the existing value of the invention to the licensor as a generator of sales of its non-patented items; and the extent of such derivative or convoyed sales.

7. The duration of the patent and the term of the license.

8. The established profitability of the product made under the patent; its commercial success; and its current popularity.

9. The utility and advantages of the patent property over the old modes or devices, if any, that had been used for working out similar results.

---

[31] Georgia-Pacific Corp. v. U.S. Plywood Corp., 318 F. Supp. 1116 (S.D.N.Y. 1970). Legal scholars appear to agree that the "'*Georgia-Pacific* factors' have served as the standard framework . . . for over thirty years." Roy J. Epstein & Alan J. Marcus, *Economic Analysis of the Reasonable Royalty: Simplification and Extension of the* Georgia-Pacific *Factors*, 85 J. PAT. & TRADEMARK OFF. SOC'Y 555, 555 (2003).

HeinOnline -- 74 Antitrust L.J. 680 2007

10. The nature of the patented invention; the character of the commercial embodiment of it as owned and produced by the licensor; and the benefits to those who have used the invention.

11. The extent to which the infringer has made use of the invention; and any evidence probative of the value of that use.

12. The portion of the profit or of the selling price that may be customary in the particular business or in comparable businesses to allow for the use of the invention or analogous inventions.

13. The portion of the realizable profit that should be credited to the invention as distinguished from non-patented elements, the manufacturing process, business risks, or significant features or improvements added by the infringer.

14. The opinion testimony of qualified experts.

15. The amount that a licensor (such as the patentee) and a licensee (such as the infringer) would have agreed upon (at the time the infringement began) if both had been reasonably and voluntarily trying to reach an agreement; that is, the amount which a prudent licensee—which desired, as a business proposition, to obtain a license to manufacture and sell a particular article embodying the patented invention—would have been willing to pay as a royalty and yet be able to make a reasonable profit and which amount would have been acceptable by a prudent patentee who was willing to grant a license.[32]

The majority of these factors are directly applicable to FRAND evaluations in a standard-setting context, especially for patents with a licensing history prior to their inclusion in a standard. Those factors not already applicable could be easily extended. For instance, Factor 13 could be modified to read, "The portion of the realizable profit that should be credited to the standard component covered by the invention as distinguished from other components, both patented and non-patented . . . ."

Despite the detail and the length of the *Georgia-Pacific* list, the factors do not in fact prescribe the exact method for calculating reasonable royalties. They are instead the guidelines against which specific reasona-

---

[32] *Georgia-Pacific.*, 318 F. Supp. at 1120. This is by necessity a hypothetical exercise, since in each patent infringement case there is no willing licensee and no willing licensor; otherwise there would be no case. This is a point recognized in the *Georgia-Pacific* decision and by subsequent courts, such as the Sixth Circuit in *Panduit. See* Panduit Corp. v. Stahlin Bros. Fibre Works, Inc., 575 F.2d 1152 (6th Cir. 1978). The exercise is worthwhile nonetheless since it casts the reasonable royalty question in the specific circumstances of the firms and patents involved.

642

ble royalty approaches are generally judged. In infringement suits, both sides typically present their own calculations and the presiding judge rules on which of the two is more reasonable under the circumstances at hand, or throws both proposals out and offers his or her own calculation. The judge has considerable discretion over the particulars, including the choice of an accounting method.[33] This discretion can be viewed as a cost, however, since it can lead to considerable uncertainty over the terms that will prevail in a judgment.

If uncertainty is deemed an acceptable cost for standard setting, a similar process might work in FRAND disputes as well. FRAND would be left as a largely undefined but enforceable promise with an SSO. In the event of a dispute, such as the cases currently underway in the United States and Europe, the disputing parties would put forth their best arguments in support of specific licensing terms. The judge would either choose one of those proposals or justify a third, which the parties would then have to implement.

## B. Numeric Proportionality

The complainants against Qualcomm in Europe argue that all patents that are "essential" to a standard should be regarded as equally valuable and treated symmetrically, since they all afford patent holders the same market power (or hold-up power) ex post.[34] Extending this line of thought, the complainants propose that royalties satisfying the FRAND promise are those that are proportional to the number of essential patents that contributed to the standard. If 100 patents are found to be essential, and firm A holds ten of them, firm A should receive 10 percent of the total royalty the standard commands. On the face of it, this proposal may appear quite egalitarian and, thus, at least likely to satisfy the "fair" part of FRAND.

Numeric proportionality rules are used today in some licensing settings. For instance, several recently formed patent pools, all of which grew out of standard-setting efforts, use numeric proportionality formulae to distribute the pool's royalty earnings among participants.[35] The primary motivation for adopting numeric rules is lower transaction

---

[33] *See, e.g.,* Smithkline Diagnostics, Inc. v. Helena Labs. Corp., 926 F.2d 1161, 1164 n.2 (Fed. Cir. 1991).

[34] Faultline, *supra* note 13.

[35] Anne Layne-Farrar & Josh Lerner, *To Join or Not to Join: Examining Patent Pool Participation and Rent Sharing Rules* (Working Paper Nov. 11, 2006), *available at* http://ssrn.com/abstract=945189.

643

costs. Simple numeric formulae make royalties easy to calculate and administer and easy for patent holders to verify.

The advantage of lower transaction costs, however, is offset by a number of disadvantages. The first is a practical concern. Numeric rules only make sense when the group of patents defining the licensing universe is boiled down to those patents that are truly essential for the standard. The patents that participants declare as "essential" for a standard may or may not be either technically or commercially essential. As discussed above, the circumstances under which patents are identified as "essential" may lead to less than perfect disclosure for a number of reasons. Nor do SSOs typically evaluate submissions to determine essentiality.[36] As a result, mere self-reporting is not enough to establish whether a patent is genuinely needed for a standard. A rule compensating companies holding patents of questionable relevance, but which are nonetheless declared essential on the same terms as those companies holding truly essential patents, would not satisfy either the "fair" or the "reasonable" aspects of FRAND.

In order to implement a numeric proportionality rule, then, all licensors would have to agree on a definition of essentiality and then submit their patents for independent review to determine which met that definition. Defining essentiality entails a number of strategic decisions, such as whether or not to cover required technical elements for the core product only, or whether to cover optional features as well. The definition might also include commercially essential patents, where the patent may not be required to get a standard to work but is required to make it palatable to consumers. After essentiality had been clearly defined, licensors would need to agree on who would conduct the evaluations for essentiality. As patent review is a subjective art, the choice of an independent reviewer could be contentious.[37] These steps are, in fact, the steps that the patent pools choosing numeric proportionality rules have followed.[38] While the process is clearly feasible, the fact that such steps are required to implement a numeric proportionality rule shows that such rules are not as simple or as straightforward as they might first appear.

If independent essentiality determinations were not made, a numeric proportionality rule would create harmful incentives for patenting behavior and would therefore have detrimental effects on intellectual

---

[36] See GOLDSTEIN & KEARSEY, *supra* note 1, at 88–135.

[37] Patents are complex legal and technical documents. The reviewer would need to be well-versed in both patent law and the technology at hand.

[38] See GOLDSTEIN & KEARSEY, *supra* note 1, at 88–135.

property rights and standard setting. Consider a world in which such a rule exists and is understood to exist by all SSO participants. Each company participating in standard setting would have a strong incentive to file for as many patents as it can. The larger its portfolio, regardless of the technological contributions of the patents comprising that portfolio or the nature of their next-best alternatives, the larger its share of the royalties for the standard would be. If an invention can be separated into two distinct patents rather than merely adding to the number of claims for one patent, a rational firm would make that separation. Companies would attempt to patent even relatively minor incremental innovations, all in the hopes of building the largest portfolio of "essential" patents as possible. Companies would then report as many patents as possible to the SSO as being essential to a standard, knowing that the SSO would not evaluate the patents to determine whether they are, in fact, essential.[39] In short, a poorly implemented numeric proportionality rule would not only fail to satisfy FRAND principles,[40] it would also encourage a proliferation of patenting of minor innovations.[41]

More troubling, however, is the potential for disproportionate payments even with well-designed numerically proportionate royalty rules. This seemingly contradictory statement follows from the fact that not all patents are born equal. The intellectual property literature has made it clear that patents differ in terms of their technological contributions, the value of the products that embed those contributions, and the nature of the next-best alternatives.[42] The available evidence shows that patent values as a general matter do reflect those differences and, consequently, vary enormously. If a technology is easy to invent around or has a ready supply of close substitutes, it is likely to receive a relatively lower

---

[39] Participants may be unwilling to review competitors' claims of essentiality. *See* Chiao et al., *supra* note 4, at 6 n.3 ("In fact, U.S. legal rules mandating trebled damages for willful infringement lead firms to discourage their engineers from even examining the patent portfolios of their competitors.").

[40] That is, it would be both unfair and unreasonable since companies with large portfolios of relatively unimportant patents would capture the most royalty earnings, while firms with a smaller number of critical patents would receive less.

[41] It would thus exacerbate any worries over patent proliferation and patent thickets, already hotly debated in the academic literature and popular press. For influential papers on patent thickets, see Carl Shapiro, *Navigating the Patent Thicket: Cross Licenses, Patent Pools, and Standard-Setting* (Competition Pol'y Ctr., Paper CPC00-011, 2001), *available at* http://repositories.cdlib.org/iber/cpc/CPC00-011/, *reprinted in* 1 INNOVATION POLICY AND THE ECONOMY (Adam Jaffe, Joshua Lerner & Scott Stern eds., 2001); Michael Heller & Rebecca Eisenberg, *Can Patents Deter Innovation? The Anticommons in Biomedical Research*, 280 SCI. 698 (1998); *see also* Danny Bradbury, *Canadian Innovation Choked by U.S. Laws*, NAT'L POST, Nov. 17, 2003, at FE1.

[42] *See* Parr & Smith, *supra* note 18; Richard S. Toikka, *Patent Licensing Under Competitive and Non-Competitive Conditions*, 82 J. PAT. & TRADEMARK OFF. SOC'Y 279 (2000).

**645**

compensation than others. There is no reason to impose different valuation principles for technologies in a standard-setting context. Common sense suggests that it cannot be "fair," "reasonable," or "non-discriminatory" to offer the holder of easily substitutable patents the same compensation as the holder of a critical, irreplaceable patented technology supporting the same standard.

As a consequence of the diversity in patent value, numeric proportionality rules will only make sense in a limited set of circumstances. For instance, when SSO members' IP contributions are roughly symmetric in value, numeric proportionality rules will not sacrifice economic efficiency or fairness, which dictate that a firm's share should equal its marginal contribution to the standard. Proportionality may also be appropriate in the rare event that members' numeric shares correlate highly with their contribution shares of the standard's value. In this case, numeric proportionality rules mimic value proportionality rules. Correlation of this type can occur in patent pool settings as a result of self-selection into the pool, but we would not expect this condition to hold generally within SSOs.[43]

## IV. ECONOMIC RULES

We turn now from rules proposed in litigation settings to those proposed in the economic literature. We first discuss a recent paper by Swanson and Baumol that suggests a strategy for making FRAND operational in a standard-setting environment.[44] Their proposal is rooted in the concept of economic efficiency. For the second economic approach we apply a cooperative game theory model to FRAND. This second option might hold appeal for European audiences. We close the section by comparing the two models.

### A. A MARKET/EFFICIENCY-BASED APPROACH

Swanson and Baumol develop a market/efficiency-based framework for evaluating RAND royalties by considering intellectual property competition before and during the standard-setting process. In essence, their approach relies on the fact that while a standard is developing, multiple technologies supported by rival firms may compete for inclusion in the standard. This ex ante competition can be harnessed to provide a benchmark for what is fair, reasonable, and non-discriminatory ex post, after the standard has been set and competition among technologies has thereby been diminished. We begin by summarizing their

---

[43] Layne-Farrar & Lerner, *supra* note 35.
[44] Swanson & Baumol, *supra* note 1.

646

model. We then extend their ex ante competition analysis to account for
multiple components and contributors to a standard.

### 1. *The Swanson-Baumol Model*

Swanson and Baumol consider the case in which a standard involves
choice of a single technology to produce a given downstream product.
They suppose an SSO holds an auction over competing technologies
during the development phase, with the winner of the auction becom-
ing the standard. During the auction, intellectual property holders
would need to submit offers for a license fee per unit of output to down-
stream users of the standard, who would then choose which patent
should be embodied in a standard. The outcome of such an auction
would, Swanson and Baumol argue, provide a basis for what constitutes
"reasonable" license fees, because it would fully reflect the state of com-
petition among potential IP providers existing prior to the selection of a
standard. This reasonable level of royalty rates would of course be con-
strained by the price of the final product in the downstream market. If a
proposed royalty rate were too high, then the license fee would result in
downstream manufacturers producing at a loss and they would there-
fore veto the IP technology during the auction.

Under some simplifying assumptions, discussed in greater detail be-
low, Swanson and Baumol show that the auction will be won by the
"best" IP option—under their assumptions, the option that permits pro-
duction of the downstream product at the lowest cost.[45] This IP will be
licensed at a fee equal to the recurring costs of licensing, plus the differ-
ence in value between the best and next-best IP alternatives. This hypo-
thetical auction is the foundation for the "fair" and "reasonable" aspects
of the licensing rule that Swanson and Baumol propose.

They then adapt the "efficient component pricing rule" to satisfy the
"non-discriminatory" component of FRAND[46]: a competitively neutral li-
cense fee should compensate the IP owner both for the incremental
costs of licensing IP and the opportunity cost of licensing the technol-

---

[45] While Swanson and Baumol define options in terms of cost, the analysis is un-
changed if we instead hold cost constant and maximize the quality or performance of the
technology. *Id.* at 19.

[46] *Id.* at 32–33. Compliance with ECPR is necessary for a license fee to satisfy the non-
discriminatory component of FRAND when the licensor also participates in the down-
stream market. As noted above, the ECPR was developed in the context of pricing the
services of public utility bottlenecks, like local telephone networks, when the owner of the
bottleneck is in competition (in long-distance services, for instance) with a rival to which
it sells the bottleneck's services.

647

ogy. Faced with such a fee, the IP holder will be indifferent between licensing the technology to rivals and producing the product itself.

Consider a vertically integrated IP holder which considers the fee per unit of downstream output, $P_i$, at which it could license its technology on non-discriminatory terms. Let $P_{f,i}$ denote the price of the final product using the technology owned and licensed by company $i$, and assume that the final products of the IP owner and licensees are perfect substitutes.[47] The efficient component pricing rule requires that the royalty rate fee charged by company $i$ satisfies:

$$(1) \qquad\qquad P_i = P_{f,i} - IC_{r,i}.$$

According to equation (1), the non-discriminatory license fee $P_i$ is equal to the implicit price firm $i$ charges itself for the technology: the final product price, $P_{f,i}$, less the licensor's incremental costs of remaining inputs, $IC_{r,i}$, such as capital and labor. Thus, the per-unit value of the IP is defined by the marginal contribution of the technology to the value of the final good. Efficiency requires that, holding other inputs constant, an increase in the price of the final good be matched by an increase in the license fee charged to third parties. The license fee set by equation (1) makes the licensor indifferent between producing a unit of the final product itself and allowing downstream competitors to produce that unit licensing its IP. Note that when the IP technology is used as an input in different final products, the implicit price the licensor charges itself will generally differ and, thus, so will the non-discriminatory license fee charged to third parties.

Swanson and Baumol show that ECPR is a necessary and sufficient condition for a licensing fee to be non-discriminatory.[48] Finally, they demonstrate that the ECPR license fee obtained from equation (1) above will be the same as the "reasonable" royalty rate resulting from the auction-like process described above so long as "downstream barriers to entry are low *regardless of competitive conditions in the technology licensing market.*"[49] If the license fee is too low it will attract new entrants, pushing the final product price down until equation (1) matches the fee. Alternatively, if the license fee is higher than that defined by equation (1), downstream producers will reject it since at that level they would produce at a loss.

---

[47] *Id.* at 32. For simplicity, we set the recurring cost of licensing IP equal to zero. Adding licensing costs does not alter the conclusions of the model at all, but does make for more complicated equations.

[48] *Id.* at 33. This result is denoted as the "'Level-Playing-Field' Theorem."

[49] *Id.* at 39.

## 2. *Extending the Model*

While Swanson and Baumol's ex ante auction approach provides an elegant solution to determining whether a license price meets FRAND terms, their analysis rests on some strong simplifying assumptions. Most importantly, the standard they consider requires only one patented technology, which is then used as an input in the production of the final good: one patent held by one firm becomes one standard, which defines one product.

Standards rarely, if ever, consist of just one patent, however. To the contrary, most standards, especially those defining complex products and services, include many IP contributions covering complementary aspects of the product, and are proffered by many different IP developers. For example, the mobile phone Universal Mobile Telecommunications System (UMTS) standard at issue in the FRAND cases listed earlier covers radio access networks (the Wideband Code Division Multiple Access, or WCDMA, an interface for the mobile phone-to-base station leg of a call), core networks (for handling the call after it reaches a base station), system architecture features (such as coding and encryption methods), plus several other backward compatibility and feature-driven components. All told, the essential IP declared to ETSI for the WCDMA/UMTS standard includes over 4,000 patents held by over forty-five companies as of early 2006.[50]

The contribution of multiple parties to a standard significantly complicates the FRAND question. What defines FRAND licensing commitments for individual parties? How will royalty payments compare or be distributed among participants? The Swanson-Baumol analysis does not address these concerns. While applying their model to competing multi-patent standards may define a reasonable overall level of royalties, it does not provide a means for dividing those royalties among participants in the winning standard. Moreover, the Swanson-Baumol non-discriminatory royalty benchmark—the implicit price the IP owner charges itself (which equals the opportunity cost of a lost sale)—cannot be applied when multiple complementary patents contribute to a standard. To manufacture the final product, each IP owner needs cross-licenses for the components of the standard for which it does not hold intellec-

---

[50] As measured by declared essential patents, issued worldwide, posted on ETSI's Web site for UMTS and other 3G projects. *See* ETSI IPR Database, http://webapp.etsi.org/ipr/. Note that while many more thousands of patents are listed for these projects on the Web site, as of March 20, 2006, a great many of these are duplicate entries. After duplicate patent numbers are eliminated, about 4,650 patents remain, covering patents issued across the globe.

tual property rights. Therefore, the opportunity costs cannot be expressed in terms of lost sales in the downstream market since the firm cannot manufacture the final good without additional intellectual property.

With these issues in mind, we start our model extension. Assume that a standard consists of two complementary components, $a$ and $b$, each developed by distinct companies and each protected by a patent.[51] In what follows, $a$ and $b$ refer to a component-patent-company combination. By assuming two technologies that must be used together to obtain a single product, we can capture the essence of the multi-patent issues within standard setting without too much complexity. The value of the standard per unit of final output, which following Swanson-Baumol one can think of as the difference between the competitive price of the final product and the incremental cost of other inputs, is given by $W_{ab}$. The standard only has value when both components are present; both components are strict complements; both add value. All components included in the standard are, at least to some degree, important and necessary for the standard to function properly. The cumulative royalty rate for the standard is given by the sum of the royalty rates for the two components, i.e., $P_{cum} = P_a + P_b \le W_{ab} = P_{final\_good} - Costs$. This equation is analogous to the Swanson-Baumol setup, and is just expanded to recognize that two parties can lay claim to the profits generated by the product. By adding the second party, though, we also introduce ambiguity over what each patent holder should receive.

In order to fix prices for the two patent holders, we assume that the SSO determines the reasonable level of royalties by holding two simultaneous auctions: one for each of the complementary components. The auction mechanism works in two stages. In the first stage, patent holders quote their royalty rates non-cooperatively. Each of them sets its rate so that (a) it is not undercut by competing technologies and (b) it is consistent with the royalty rate paid for the complementary component. In a second stage, each licensor decides whether or not to be part of the standard, given the resulting royalty rates. We solve this game by backward induction looking for subgame perfect Nash equilibria (SPNE).[52]

---

[51] This is a simplifying assumption that does not change the main results. The results still hold true in the general case, with $n$ IP components produced by the same company, or $n$ IP components produced by $z$ companies.

[52] A Nash equilibrium, named after the mathematician who proposed it—John Forbes Nash of *A Beautiful Mind* fame—is a game theory concept. A Nash equilibrium is a solution to a game involving two or more players in which no player has anything to gain by changing only his or her own strategy unilaterally. In other words, if I take your possible actions into account and pick my best strategy, and you do the same, neither one of us has any incentive to change our strategies unless something else changes, like new informa-

The solution to the second stage is trivial: each patent holder licenses its patent if and only if its royalty rate exceeds the incremental cost of licensing its technology, which, as above, is assumed to be zero for simplicity; that is, $P_i \geq 0$ for $i = a,b$. For the first stage of the auction process, we consider the following five alternative ex ante scenarios: (1) perfect competition among rival technologies for both components; (2) perfect competition for one of the components and no competition for the other; (3) perfect competition for one of the components and imperfect competition for the other—i.e., there exists a close, but not perfect, substitute; (4) no competition for either of the two components; and (5) no competition for one component and imperfect competition for the other. These five scenarios capture the competition possibilities facing technologies within standard setting. Sometimes a technology will be unique and face no competition; sometimes competition will exist but represent a second-best outcome; and at other times competition will be fierce among easily interchangeable options. Under the five different scenarios the outcome of the auction and the resulting FRAND rates will be different.

### Case 1: Perfect competition ex ante in the market for both of the IP components.

With perfect competition ex ante for both IP components necessary for a given standard, the equilibrium royalty rate of each component of the standard is given by the incremental cost of licensing that component, which is assumed to be zero without loss of generality. This equilibrium is unique. When ex ante perfect substitutes to a technology exist, an IP owner cannot extract any positive profits since it has no market power in the auction. In the battle to be included in the standard, the license fee is bid down to the point where it is just enough to cover the incremental costs of licensing. Thus, licensors cover their costs only, while licensees (or end-users of the product) appropriate all of the rents from the standard.

### Case 2: Perfect competition ex ante for one of the components; no competition for the other.

With perfect competition for component $b$, no provider of the corresponding IP can extract any profit from licensing. On the other hand,

---

tion. John Nash, *Equilibrium Points in n-Person Games*, 36 PROC. NAT'L ACAD. SCI. 48 (1950). An equilibrium is subgame perfect if it represents a Nash equilibrium of every subgame the original game can be divided into. Since our purpose is to lay out the possible tools that courts and competition authorities can use to define FRAND, we do not go into detail on the derivation of any equilibria.

651

the patent holder without a substitute (the company delivering component $a$) can do so. In the unique equilibrium of the simultaneous auction game, the IP holder facing no competition captures the full value of the standard:

$$(2) \qquad P_a = P = W_{ab}; \; P_b = 0.$$

### Case 3: Perfect competition ex ante for one of the components; imperfect competition ex ante for the other.

Assume there is still perfect competition for component $b$, but component $a$ now faces competition from component $c$. Component $c$ is a close, but not perfect, substitute for component $a$ and is produced by a third company. Now two standards are possible, with values $W_{ab}$ and $W_{bc}$, where $W_{ab} > W_{bc}$. In equilibrium, $P_b = 0$, as before. But the royalty rate charged for component $a$ in this case is limited to the incremental value of the corresponding IP over the next-best alternative. If the holder of $a$ tried to capture the full value as in Case 2, it would lose the auction to $c$. Because the $(a,b)$ standard is superior to the $(c,b)$ standard though, company $a$ can win the auction by setting a license fee such that the net value of the $(a,b)$ standard to all licensors, $W_{ab} - P = W_{ab} - P_a$, is slightly higher than the net value of the $(c,b)$ standard with a royalty rate of zero. Thus, in the unique SPNE of this auction game,[53] component $a$'s IP owner captures the full incremental value:

$$(3) \qquad P_a = P = W_{ab} - W_{bc}; \; P_b = 0.$$

### Case 4: No competition ex ante for either of the two components.

It can be the case that neither of the necessary components faces competition. In this case, there is a single supplier of the IP necessary to produce $a$ and a single supplier of the IP necessary to produce $b$. Since both $a$ and $b$ are required for the product, though, the rents must be shared even though each IP holder is a "monopolist" in some sense. Since the value of neither $a$ nor $b$ is limited by any close substitutes, any pair of royalty rates $(P_a, P_b)$ meeting the following two conditions will constitute a SPNE of the auction game. First, $P_i \geq 0$ for $i = a,b$ to ensure that both $a$ and $b$ are contributed to the product (i.e., their holders will only participate in the standard if the reward is positive). Second, $P_a + P_b = W_{ab}$, otherwise no one would implement the standard since the aggregate price would exceed the value of the product. Note that for any

---

[53] We assume for simplicity that in case of a tie in the royalty rates quoted by the owners of components $a$ and $c$, the SSO selects the component with a greater absolute contribution to the standard: component $a$.

value of $P_a < W_{ab}$, the best response of the owner of patent $b$ is to set $P_b = W_{ab} - P_a$, which implies the second condition above. Patent holder $b$ cannot be better off by deviating from this strategy. Setting a lower royalty rate will only benefit licensees. Setting a higher rate would cause the total royalty rate to exceed $W_{ab}$ and would result in market collapse, since the value of the standard $W_{ab}$ is defined as the difference between the price of the final good and the cost of all other inputs.

### Case 5: No competition ex ante for one of the components; imperfect competition ex ante for the other.

In the last of the five scenarios we consider, there is a single supplier of component $b$, and component $a$ faces competition from component $c$ exactly as in Case 3, above. As in Case 3, the royalty rate charged for component $a$ here is limited by the incremental value of the IP over the next-best alternative: $P_a \leq W_{ab} - W_{bc}$. If company $a$ tried to set a higher rate, it would be successfully undercut by company $c$. Furthermore, as in Case 4, the royalty rate charged for component $a$ is also limited by the royalty rate charged for the complementary component $b$: $P_a + P_b = W_{ab}$. Therefore, following the same logic as in the previous scenario, we can show that any pair $(P_a, P_b)$, such that (1) $P_i \geq 0$ for $i = a$, $b$, (2) $P_a \leq W_{ab} - W_{bc}$ and (3) $P_a + P_b = W_{ab}$, constitutes a SPNE of the auction game. As before, condition (1) ensures it is in the interest of each IP holder to participate. Condition (2) reflects the fact that IP holder $a$ cannot be too aggressive or it risks losing the auction to IP holder $c$. And condition (3) captures the fact that licensees will pay no more in the aggregate than the worth of the product. Although there may be equilibria in which component $a$ may generate a higher royalty than component $b$, even when the former faces competition and the latter does not, the maximum royalty rate that can be charged for $a$, $W_{ab} - W_{bc}$, is below the maximum royalty rate that can be charged for $b$, $W_{ab}$.

In conclusion, at equilibrium we find four important results. First, the royalty rates charged for components $a$ and $b$ are additive. That is, the aggregate rate matters since licensees are constrained in the downstream market. Second, the royalty rates are non-decreasing in the value of the standard (which in turn is defined by the value of the final good less other costs), and strictly increasing in the value of the standard in the absence of perfect competition. In other words, if the value of the standard increases—either because the price of the final good rises (say, due to a demand shock) or the non-IP costs to produce it fall—the royalty rates might increase, depending on the level of competition in the technology market, but certainly will not decrease. When the IP components do not face substitutes, then any rise in the value of the standard

653

translates into a rise in royalty rates with certainty. Third, when a component faces imperfect competition, its royalty rate equals its incremental contribution to the value of the standard. Fourth and finally, the equilibrium royalty rate for a component to the standard is lower when it faces competition from other components and is minimal when competition is perfect.

## B. A Cooperative-Game Theoretic Approach to FRAND

Some might argue that efficiency-based rules, which treat competitive market outcomes—even monopolistic ones—as optimal and ignore issues of equity, cannot be counted on to produce outcomes that are fair or reasonable. In Europe, concepts of fairness are generally more important than they are in the United States, where economic efficiency is typically the foremost concern.[54] An alternative approach to defining FRAND incorporates a normative interpretation and is based on cooperative game theory.[55]

A simple model proposed by Shapley defines a means for dividing rents among participants of any cooperative group, such as an SSO that has the owners of complementary patents as its members.[56] The model has a number of attractive features in relation to the notions of fairness and reasonableness. It divides rents (or costs) among players belonging to a group according to their average marginal or incremental contribution to alternative combinations of the members of the cooperative group. (What is meant by "average" here is made precise below.) The Shapley value, thus, "to some extent is a synonym for the principle of marginal contribution—a time-honored principle in economic theory."[57] It abstracts away from market competition in defining a "just" benchmark for a distribution of payments. As Young stated: "[T]he idea that rewards should be in proportion to contributions has a considerable ethical appeal in itself, and appears to reflect widely held views about

---

[54] *See* Ahlborn & Grave, *supra* note 16; *see also* GERBER, *supra* note 16.

[55] "Cooperative game theory does not set out to describe the way individuals behave. Rather, it recommends reasonable rules of allocation, or proposes indices to measure power." Eyal Winter, *The Shapley Value, in* 3 HANDBOOK OF GAME THEORY WITH ECONOMIC APPLICATIONS 2025, 2049 (Robert Aumann & Sergiu Hart eds., 2002).

[56] *See* Shapley, *supra* note 15.

[57] Winter, *supra* note 55, at 2033. For useful expositions and discussions of the Shapley value, see R. DUNCAN LUCE & HOWARD RAIFFA, GAMES AND DECISIONS (1957); MARTIN SHUBIK, GAME THEORY IN THE SOCIAL SCIENCES: CONCEPTS AND SOLUTIONS (1983); and GUILLERMO OWEN, GAME THEORY (2d ed. 1982).

what constitutes 'just compensation' without any reference to the theory of perfect competition."[58]

Shapley's assumptions and solution are quite general, but they can easily be restated in the standard-setting context. Suppose there are several patents (or other pieces of intellectual property) that might be used in a particular standard. Let $N$ denote the set of all these patents, let $S$ be any subset of $N$, and let $v(S)$ be the total (not per-unit) economic value, net of licensing costs, of the best standard that can be devised using the patents in $S$. If the patents in set $S$ cannot support a workable standard at all, then $v(S) = 0$ (i.e., the standard defined by the group of patents $S$ has no value). This might occur if $S$ represented an incomplete set, say, needing one more component before a viable product was defined. With all patents included in the standard (the full set $N$), value is equal to $v(N)$, which is taken to be the best possible standard and assumed to be adopted by the SSO. Let $P_i(v)$ be the value received by the owner of patent $i$, for any patent $i$ in the larger set $N$ ($i \in N$). Shapley argued that any fair and reasonable method of dividing a standard's total value among the relevant patent holders should satisfy four basic conditions:

- *Efficiency*: The total value of the standard is distributed among all patents; nothing is left over:

$$\sum_{i \in N} P_i(v) = v(N).^{59}$$

- *Anonymity*: The value received by any patent is independent of who owns it and when it is considered for incorporation into the standard in relation to other patents. In particular, if patents $i$ and $j$ are symmetric, in the sense that they each contribute the same amount to the standard, their payoffs should be equal as well: $P_i(v) = P_j(v)$.

- *Dummy*: If a patent does not contribute anything to any possible standard, it is a dummy, and it receives a payoff of zero. That is, if

---

[58] H.P. Young, *Individual Contribution and Just Compensation, in* THE SHAPLEY VALUE: ESSAYS IN HONOR OF LLOYD S. SHAPLEY 267 (Alvin E. Roth ed., 2005) [hereinafter THE SHAPLEY VALUE].

[59] In a standard-setting context, this condition implicitly assumes that while patent holders need to be given incentives to develop their IP, this is not so for downstream manufacturers. Moreover, unlike the analysis of the previous section, it is assumed here that the total value captured by IP owners in aggregate is independent of the extent and nature of IP competition ex ante. Relaxing this assumption would not alter our conclusions regarding the relative compensations of patent holders with different average marginal contributions to the standard.

655

$v(S \cup i) - v(S) = 0$ for every $S \subset N$, then $P_i(v) = 0$.[60] In other words, worthless patents get no rents.

- *Additivity.* Suppose that a single set of patents can support a second standard that is unrelated commercially to the one considered so far. That is, the value of either standard depends only on the patents on which it is based, not on the value of patents involved in the other standard. Let $w(S)$ be the value of the best second standard that can be supported with the set of patents $S$. The assumption is that in this case payoffs to individual patents will be the same whether the two standards are analyzed separately, as two cooperative games, or together, as a single cooperative game: $P_i(v+w) = P_i(v) + P_i(w)$, for all $i \in N$.

Remarkably, Shapley demonstrated that one and only one method of dividing value satisfies all four of these axioms:

$$(4) \qquad P_i(v) = \sum_{i \in S \subseteq N} \frac{|S|!(n-|S|-1)!}{n!} (v(S \cup \{i\}) - v(S)),$$

where $|S|$ is the number of patents in set $S$ and $n!$ ($n$ factorial) equals $n \times (n-1) \times \ldots \times 3 \times 2 \times 1$.[61]

This forbidding formula has a simple and intuitive interpretation, which is also useful in computation.[62] Suppose that there are $n$ patent-owners, one for each patent involved. (Because of the anonymity assumption, nothing would be affected if groups of "patent owners" were in fact employees of a small number of firms that actually owned the patents.) Suppose the patent owners arrive at the SSO in random order each with her patent in her pocket, with all possible arrival sequences equally likely. Now suppose that in each sequence, each patent owner receives the amount by which her patent increases the value of the best standard that can be built from the patents that are already at the SSO when she arrives. That is, if the set of patents $S$ is at the SSO when patent $j$ arrives, $j$'s owner receives the incremental value $v(S \cup j) - v(S)$. The Shapley value gives $j$ the average of such contributions over all possible arrival sequences—each patent thus receives the average (over arrival sequences) of its marginal contribution.

One surprising result from this model is that, in general, as we illustrate in a particular case below, patents that are not part of the ultimate

---

[60] $S \cup i$ denotes the set of all patents in $S$ plus patent $i$.

[61] THE SHAPLEY VALUE, *supra* note 58, at 4–7.

[62] LUCE & RAIFFA, *supra* note 57, at 250; SHUBIK, *supra* note 57, at 181; OWEN, *supra* note 57, at 197.

656

standard will, if they are not dummies (valueless as defined above), receive non-zero value. While this might strike some as unfair since even though the contribution is not included in the final standard, if it is a viable alternative that could have been chosen, it still receives a payout. This finding is clearly at odds with the ECPR, where only those patents that are included in a standard can receive any payout at all. It does, however, match certain notions of fairness in that everyone who participates in a meaningful way is compensated. It also captures the ex ante presence of alternatives.

To illustrate how the Shapley value works, let us consider the two-component case analyzed in Part IV.[63] Suppose only one patent for component $a$ is available, while a number of firms have patents for component $b$, denoted as $b_1, b_2, b_3, \ldots b_n$. Suppose for simplicity that the value of a standard involving $a$ and *any* patent of component $b$ is equal to 1. How do the "fair and reasonable" returns to the firms vary with the number of holders of patents on component $b$? Analysis of two special cases will illuminate the path to the general answer.

### Case A: n = 1; one holder of a patent on component $a$ and one holder of a patent on component $b$.

There are two possible orderings for the arrival of the two patent-owners: (1) $a$ arrives first and $b$ arrives second, or (2) $b$ is first and $a$ is second. In the first case, $a$ receives nothing since a standard supported only by a patent on one component has no value by assumption. Therefore, the last to arrive $b$ receives 1, the value of a workable standard. In the second case, $a$ receives 1 and $b$ receives zero. Thus, the value player $i$ contributes, $v_i(\{i,j\})$, in arrival ordering $\{i,j\}$ is denoted by:

$$v_a(\{a,b\}) = 0; \ v_b(\{a,b\}) = 1; \ v_a(\{a,b\}) = 1; \ \text{and} \ v_b(\{a,b\}) = 0.$$

The average contribution of player $i, z_i$ is therefore equal to:

$$z_a = \frac{1+0}{2} = \frac{1}{2} \ \text{and} \ z_b = \frac{1+0}{2} = \frac{1}{2}.$$

Whereas the ECPR allowed for any division of rent between the two unique component providers (within the bounds of the two conditions that ensured participation and licensee viability), the Shapley value has just one division of rents. Because the Shapley approach divides rents according to average contributions (e.g., $P_i = z_i$), in this case the Shapley solution divides total value evenly between the holders of the two pat-

---

[63] *See infra* Part IV.A.2.

ents. Note that this case corresponds to Case 4 in Part IV. The royalty rates derived under the Shapley approach constitute one SPNE of the auction game analyzed in Part IV, athough there are many other equilibria which cannot be justified in Shapley value terms.

**Case B:** $n = 2$: two $b$'s and one $a$.

This case is analogous to Case 2 above, where one component faced no competition while the other faced perfect competition. With one $a$ and two $b$'s, $b_1$ and $b_2$, there are six possible orderings for the arrival of the patent-owners:

$\{a,b_1,b_2\}$, $\{a,b_2,b_1\}$, $\{b_1,a,b_2\}$, $\{b_1,b_2,a\}$, $\{b_2,a,b_1\}$, and $\{b_2,b_1,a\}$.

$a$'s marginal contribution in each of the possible orderings is:

$v_a (\{a,b_1,b_2\}) = v_a (\{a,b_b,b_1\}) = 0$, and

$v_a (\{b_1,a,b_2\}) = v_a (\{b_2,a,b_1\}) = v_a (\{b_1,b_2,a\}) = v_a (\{b_2,b_1,a\}) = 1$

$b_1$'s marginal contributions are given by:

$v_{b_1} (\{b_1,a,b_2\}) = v_{b_1} (\{b_1,b_2,a\}) = v_{b_1} (\{a,b_2,b_1\}) = v_{b_1} (\{b_2,a,b_1\}) = v_{b_1} (\{b_2,b_1,a\}) = 0$

$v_{b_1} (\{a,b_1,b_2\}) = 1$

And by symmetry, $b_2$'s marginal contributions are:

$v_{b_2} (\{b_1,a,b_2\}) = v_{b_2} (\{b_1,b_2,a\}) = v_{b_2} (\{a,b_1,b_2\}) = v_{b_2} (\{b_2,a,b_1\}) = v_{b_2} (\{b_2,b_1,a\}) = 0$

$v_{b_2} (\{a,b_2,b_1\}) = 1$.

Thus, the average marginal contributions of $a$, $b_1$, and $b_2$ are equal to:

$$z_a = \frac{4}{6} \text{ and } z_{b_1} = z_{b_2} = \frac{1}{6}.$$

Here, even though it might make technical sense for the standard to be based on only one of the two component $b$ patents, both $b_1$ and $b_2$ are entitled to royalties according to the Shapley value. In contrast, under the efficiency-based approach of the previous section, company $a$ would obtain all rents, $z_a = 1$, since it faced no competition, while companies $b_1$ and $b_2$ would obtain zero since perfect competition would drive their auction bids to that level. The Shapley value is still affected by competition, but less drastically. Certainly each $b$ component receives less than $a$ because one is a perfect substitute for the other, but since the potential contribution to the standard is positive for each $b$, so is each $b$'s payout.

658

**Case C: The general case, $n-1$ $b$'s and one $a$.**

This case is also analogous to Case 2 above, where $a$ faces no competition at all and $b$ faces perfect substitutes, but here we move from the limited 2-substitute model to the more general $n$-substitute model, of which $n=2$ is a special case. As before, if $a$ arrives first, its marginal contribution is zero. The probability of this happening is now

$$\frac{1}{n}.$$

In all other arrival sequences, which have total probability

$$\frac{n-1}{n},$$

$a$'s marginal contribution is 1. Hence, $a$'s expected (or average) marginal contribution is equal to the probability of $a$ arriving first multiplied by the value of arriving first plus the probability of $a$ arriving second or later multiplied by the value of arriving second or later:

$z_a$ = Pr ($a$ arriving first) $\cdot v_a$ (when $a$ arrives first) +
          Pr ($a$ not arriving first) $\cdot v_a$ (when $a$ does not arrive first).
Or in notational form,

(5)                     $$z_a = \frac{1}{n} \cdot 0 + \frac{n-1}{n} \cdot 1 = 1 - \frac{1}{n}.$$

As all $b$'s are identical and receive in total

$$\frac{1}{n},$$

the amount $a$ does not receive, each $b_i$'s expected marginal contribution is given by an equal share of that residual amount:

(6)                     $$z_{b_i} = \frac{1}{n-1} \left( 1 - \left( 1 - \frac{1}{n} \right) \right) = \frac{1}{n(n-1)}.$$

Note that as the number of holders of economically interchangeable patents on component $b$, $n-1$, approaches infinity, the players' average contributions become:

$$\lim_{n \to \infty} z_a = \lim_{n \to \infty} \left( 1 - \frac{1}{n} \right) = 1 \text{ and } \lim_{n \to \infty} z_{b_i} = \lim_{n \to \infty} \frac{1}{n(n-1)} = 0.$$

In words, as the number of $b$'s—economically interchangeable patents on one of the standard's necessary components—increases, the holder of the unique patent for the other component, $a$, receives the entire

659

value of the standard and each $b$'s average marginal contribution becomes zero. More generally, as the number of IP owners competing to contribute the same component increases, the average marginal contribution of each individual party decreases and their total Shapley value return falls to zero, assuming their IP is interchangeable.

As already noted, Cases B and C are related to Case 2 in Part IV: there is no competition for component $a$ but component $b$ faces perfect competition. Note that the Shapley value only coincides with the equilibrium outcome of the auction game in the limit, i.e., when the number of alternatives for component $b$, $n$, goes to infinity. (See Part V below.) For finite $n$ the Shapley value implies a lower (higher) compensation for component $a$ (respectively, component $b$). This follows because the Shapley value rewards participation and therefore assesses a lower penalty for components with competition.

### Case D: The $b_i$ patents are not perfect substitutes.

This case is analogous to Case 3 in Part IV, in which there is imperfect competition for one component, no competition for the other. Suppose there are two $b$ offerings, so $N = 2$. The standard is again based on both $a$ and one $b$, but assume $b_2$ is less valuable than $b_1$. The standard defined by $b_2$, $(a, b_2)$, has value 1 as before, but the standard based on $b_1$, $(a, b_1)$, has value $1+\delta$. Under these assumptions, $b_1$ will contribute $1+\delta$ if it arrives second after $a$ (1 sequence), $\delta$ if it arrives third after both $a$ and $b_2$ (2 sequences), and nothing otherwise. $a$ will contribute 1 if it arrives second after $b_2$ (1 sequence), $1+\delta$ if it arrives after $b_1$ (3 sequences), and nothing otherwise. $b_2$ gets 1 only when it arrives second after $a$ (one sequence) and nothing otherwise.

Averaging over arrival sequences as before, $a$ gets

$$\frac{4}{6}+\frac{\delta}{2}, \quad b_1 \text{ gets } \frac{1}{6}+\frac{\delta}{2}, \text{ and } b_2 \text{ gets } \frac{1}{6}.$$

The final (most valuable) standard is clearly $(a, b_1)$, but $b_2$ nonetheless receives royalties. One can think of this as the sum of two standards, the one for which $b_1$ and $b_2$ are perfect substitutes with value 1, and one for which $a$ and $b_1$ are essential and that has total value $\delta$. Under the additivity condition, the total value is the sum of these two standards.

It is straightforward, but somewhat tedious, to extend this analysis to the general case with multiple $b$'s in competition, where the value of the $(a, b_1)$ standard is $1+\delta$ and the value of an $(a, b_i)$ standard is 1, for any of the other $b$'s, $i = 2, \ldots, n-1$. In this case $a$ receives

660

ANTITRUST LAW JOURNAL [Vol. 74

$\left(1-\dfrac{1}{n}\right)+\dfrac{\delta}{2}$ , $b_1$ receives $\dfrac{1}{n(n-1)}+\dfrac{\delta}{2}$ , and the other $b_i$ receive $\dfrac{1}{n(n-1)}$

each. In the limit as $n$ becomes large, $a$ receives 1, the entire value of the basic standard, and splits $\delta$, the value of the improvement for which $b_1$ is also essential, with $b_1$. This is conceptually consistent with the cases A through C above: components always get their average contribution value; competition for a specific component lowers its reward; if multiple components face no competition, they share in the total value equally.

Case D is also related to the ECPR Case 5, where one component faces no competition and there is imperfect competition for the other. Recall that multiple equilibria were possible for Case 5, as long as they satisfy the conditions for participation (non-zero payoff) and viability (payoff does not exceed value of product). The Shapley outcome would constitute one equilibrium of the many possible in the auction game. For example, under the ECPR approach component $a$ could receive in equilibrium $1 + \delta$ (more than under the Shapley approach) or just 1 (less than under Shapley). We close this Part by exploring in greater detail the relationship between the two economic approaches and their robust policy implications.

## C. RECONCILING THE TWO ECONOMIC APPROACHES

The two approaches developed above are based on very different fundamental assumptions. The driving force behind the auction approach is market competition and efficient pricing—non-cooperative, winner-take-all principles. The Shapley value approach, in contrast, is based on fairness principles: it compensates parties on the basis of their average marginal contributions in a cooperative game regardless of efficiency or market conditions. Despite their very different starting points, however, we have shown that these two approaches have the same basic implications and agree completely on a number of important properties that any defensible definition of FRAND must satisfy.

First, both approaches imply that a critical factor affecting patent holders' compensation is the presence of close substitutes. In the Swanson-Baumol analysis, the presence of perfect substitutes drives economic profits down to zero, while the absence of competition rewards a pioneer fully for its IP innovation. The Shapley value method for allocating payments implies that the more substitutes any patent has, the lower its "fair and reasonable" share of value.[64]

---

[64] The analysis of Case D in Part V above shows that even imperfect substitutes decrease Shapley value returns: the smaller is $\delta$ or the larger is $n$, the lower the share of $b_1$,

Second, the level of competition is a key determinant of the value of the patent. As the number of competitors for a component in a standard increases, the lower the ex ante market power possessed by any of them, and thus the lower the returns under the Swanson-Baumol approach. Similarly, the more competitors a given patent-owner faces under the Shapley value approach, the fewer the number of arrival sequences in which it has a significant marginal contribution. (In Case C above, for instance, any individual $b$ had a non-zero marginal contribution only if $a$ arrived first and $b$ arrived second.) Put another way, when the fraction of coalitions to which an IP owner has a large marginal contribution decreases, its IP value measured by the average marginal contribution falls as well. With the market-based approach, a lack of substitute technologies confers ex ante market power to the IP owner during the auction phase, while the presence of alternative technologies reduces that power. In both approaches, the fiercer the competition for any component, the lower the effective level of any individual-related IP contribution and, therefore, the lower the value of the corresponding payout.

Third, and perhaps most important for their applicability to FRAND litigation, both approaches to dividing rents ignore any market power that being included in a standard might bestow. This is clearly true by explicit assumption for the Swanson-Baumol method, which relies on ex ante auction prices to determine ex post payouts. The Shapley value method of distributing rents bases payoffs on ex ante marginal contributions, so even IP that is not part of the "winning" standard receives some payoff, as long as its average marginal contribution to some collections of patents is positive.

Finally, as the number of close substitutes for a component increases and approaches infinity, our extension of the auction approach and the Shapley value approach lead to identical allocations of royalty payments. The following two properties indicate the equivalence of the two approaches in the limit and, we would argue, should be satisfied by any reasonable FRAND definition.

> ***Property 1.*** *As the number of perfect substitutes for a piece of intellectual property approaches infinity, the IP holder's royalty payments defined by the Shapley value (average marginal contribution) approaches the licensee payments defined by the ex ante auction model.*

---

even though its patent has no perfect substitutes. Case 3 in Part IV indicates that a similar property is satisfied by the Swanson-Baumol ex ante auction approach.

662

*Proof.* Assume the set-up from Case 2 above: a standard consists of two complementary components, $a$ and $b$, with $n-1$ perfect substitutes for component $b$. The value of the standard is given by $W(v_a,v_b)$, again defined as the difference between the final product price and the cost of other inputs. Both components are essential, i.e., the standard is worth nothing if either component is missing from the standard. From equations (8) and (9) it follows that the average marginal contributions of components $a$ and $b$ are equal to:

$$P_a = z_a = W(v_a,v_b) - \frac{1}{n} \text{ and } P_b = z_b = \frac{1}{n(n-1)}.$$

In the limit, as the number of perfect substitutes to component $b$, i.e., $n-1$, grows to infinity, the components' average marginal contributions to the value of the standard become:

$$\lim_{n\to\infty} P_a = \lim_{n\to\infty} \left[ W(v_a,v_b) - \frac{1}{n} \right] = W(v_a,v_b) \text{ and}$$

$$\lim_{n\to\infty} P_b = \lim_{n\to\infty} \left( \frac{1}{n(n-1)} \right) = 0.$$

In words, in the limiting case all the value of the standard, $W(v_a,v_b)$, is derived from the contribution of component $a$. Thus, the company contributing $a$ appropriates all rents from the standard while the companies contributing $b$'s get nothing.[65] Thus, as the number of perfect substitutes of component $b$ grows, the royalty payments proportional to the components' Shapley values approach the royalty payments derived from an ex ante auction in equation (7).[66]

*Property 2. More valuable intellectual properties receive more rent.*

We have seen above that when patents or other IP have perfect substitutes, they are less valuable to the standard and they receive less in either ECPR or Shapley value payouts. Let us now consider a slightly more complex situation that extends Case C. Instead of two competing standards, here there are three possible standards: one using components $a$ and $b$ with value $W(v_a,v_b)$, one using components $b$ and $c$ with value $W(v_b,v_c)$, and one using all three components with value $W^*$. All these

---

[65] The royalty payments do need to be incentive-compatible for IP owners to license their technology, so $b$'s license fees should cover the incremental costs of licensing, which we have neglected for simplicity.

[66] Note that under the ECPR an IP owner will get reimbursed for his incremental costs irrespective of how small the marginal contribution of his technology is, as long as it is sufficient to cover those costs. Likewise, under the Shapley value, owners whose marginal contributions are positive on any arrival sequence receive royalty payments.

663

values are computed assuming that only one standard will be offered to the market. Suppose $W^*>W(v_a,v_b)>W(v_b,v_c)$, so that the standard with all three components is clearly the best. One might expect $a$ to receive a larger share of $W^*$ than $c$ as the second of these inequalities shows it to be more valuable.

Let us first consider the Shapley value. There are, as before, six arrival sequences. In all of them the first arrival makes zero marginal contribution, but the second and third arrivals make positive marginal contributions. Enumerating and averaging we obtain:

$$P_a = z_a = \frac{1}{6}\left[\,W(v_a,v_b) + 2\,\left(W^* - W(v_b,v_c)\right)\,\right],$$

$$P_b = z_b = \frac{1}{6}\left[\,2W^* + W(v_a,v_b) + W(v_b,v_c)\,\right], \text{ and}$$

$$P_c = z_c = \frac{1}{6}\left[\,W(v_b,v_c) + 2\,\left(W^* - W(v_a,v_b)\right)\,\right].$$

It is easy to show that $P_b > P_a > P_c$. A little reflection shows that $b$'s ability to form a workable standard with $a$ or $c$ makes it the most valuable of the three.

Now suppose there are $n{-}2$ perfect substitutes for $b$. As $n$ increases, we know that the total royalties of all of $b$'s go to zero. What about $a$ and $c$? In a fraction

$$\frac{1}{n}$$

of the arrival sequences $a$ arrives first and has no marginal contribution, and the same is true for $c$. In the limit, as $n$ increases, these sequences have zero effect on average marginal contributions, and only sequences in which a perfect substitute for $b$ arrives first matter. In half of these, $a$ arrives before $c$, and their marginal contributions are $W(v_a,v_b)$ and $[\,W^* - W(v_a,v_b)\,]$ respectively. In the other half of the relevant sequences, $c$ arrives before $a$, and their marginal contributions are $W(v_b,v_c)$ and $[\,W^* - W(v_b,v_c)\,]$, respectively. Thus, in the limit, the three payouts are:

$$\lim_{n\to\infty} P_a = \frac{1}{2}\,\left[\,W(v_a,v_b)+\left(W^*- W(v_b,v_c)\right)\,\right],$$

$$\lim_{n\to\infty} P_b = 0, \text{ and}$$

664

ANTITRUST LAW JOURNAL                    [Vol. 74

$$\lim_{n \to \infty} P_c = \frac{1}{2} \left[ W(v_b, v_c) + (W^* - W(v_a, v_b)) \right].$$

As expected, $P_a > P_c > P_b$ in the limit.

Now let us consider the ex ante auction. The process of ex ante competition is necessarily more complex with multiple components, and Swanson and Baumol do not deal with this case. In Case 3, only the $(a,b)$ and $(b,c)$ standards were feasible and we showed that $(a,b)$ would emerge under our assumptions, with $a$ receiving $P_a = [W(v_a,v_b) - W(v_b,v_c)]$, and both $b$ and $c$ receiving zero. In comparison with the Shapley value analysis—where the full standard value is divided by the SSO members every time—with ex ante competition, the total profit realized by the IP holders is reduced.

Suppose the $(a,b,c)$ standard is invented, and there are multiple substitutes for $b$. Component $a$'s owner can block this standard by refusing to participate (or perhaps vote against it within the SSO), so $a$ will need to receive at least its payoff from the $(a,b)$ standard, $P_a = [W(v_a,v_b) - W(v_b,v_c)]$, in order to support the $(a,b,c)$ standard. Prior to the $(a,b,c)$ invention, none of the $b$'s received anything, and none can block the new standard, so none will receive anything here either. Component $c$'s owner can also block the new standard by refusing to participate, so it will presumably receive positive rent, but at what level?

We extend the model as follows. Suppose that companies $a$ and $c$ demand royalty payments sequentially. Suppose further that $a$ and $c$ move first with equal probability. The alternative standards, $(a,b)$ and $(b,c)$, provide threat points for the negotiations over the standard $(a,b,c)$ and thus should inform the payoff outcome. Which threat point proves relevant depends on the sequence of moves: the standard $(a,b)$ constitutes the threat point when $c$ moves first, and $(b,c)$ when $a$ moves first. Consider first the outcome of the sequential royalty-setting game when $a$ moves first. It is straightforward to show that there is a unique equilibrium where $a$ receives $W^*$ and $c$ receives zero. Instead, when $c$ moves first, the unique equilibrium involves $a$ receiving its minimum payoff to avoid blocking, $[W(v_a,v_b) - W(v_b,v_c)]$, and $c$ appropriating the residual, $W^* - [W(v_a,v_b) - W(v_b,v_c)]$. Consequently, the expected payoffs, averaging over the two possible sequences, of companies $a$ and $c$ equal respectively:

$$\frac{1}{2} \left( W^* + [W(v_a,v_b) - W(v_b,v_c)] \right), \text{ and}$$

$$\frac{1}{2} \left( W^* - [W(v_a,v_b) - W(v_b,v_c)] \right).$$

665

Clearly the royalty payments received by $a$ exceed those received by $c$, just as in the Shapley analysis. These results would extend to other game forms under some regularity assumptions, so in general we would expect that the payout ordering follows the contribution ordering noted above, namely $P_a \geq P_c \geq P_b = 0$.

## V. CONCLUSION

We have presented four possible methods that the courts and competition authorities might use as benchmarks for FRAND evaluations. The first two are based on methods used in court cases. The fifteen factors in *Georgia-Pacific* that guide reasonable royalty determinations for patent infringement cases are the most obvious starting point for FRAND, and they appear to be readily applicable to reasonable royalties within SSOs. That said, the factors leave the specific method of royalty determination an open question and thus allow for considerable uncertainty in outcomes. The numeric proportionality rule suggested by the complainants in Europe is more problematic. While it can lower the transaction costs involved in determining FRAND royalties, it is only appropriate in a narrow set of circumstances. If applied outside of those circumstances, numeric proportionality would result in non-FRAND rates.

The other two methods we have considered are based on existing economic models which, when extended to standard-setting contexts, have strong implications for determining FRAND royalties. One starts from market solutions, while the other is rooted in cooperative game theory. Despite their contrasting origins, both the ECPR and the Shapley value analyses come to qualitatively similar solutions: FRAND terms are only satisfied when standard participants whose patents make greater incremental contributions to the value of the standard receive higher royalty payments than other participants. The ECPR and Shapley value models developed in this article, while they do not fully capture the complexities of real-world intellectual property licensing within standard setting, do satisfy all three criteria encompassed in the acronym FRAND.

The two economic model methods are similar to the *Georgia-Pacific* factors in that they could guide ex post evaluations even though they do not provide an explicit formula. We do not argue that license fees should actually be set by either the ECPR or Shapley value approach, as it would be difficult, time consuming, and generally contentious to determine the incremental contributions of the many patents that are reported as essential to most standards. When ex post litigation occurs, however, these two approaches could be employed to assess the royalty rates that parties have set through bilateral negotiations. Consistent with reasonable royalty calculations in the context of patent infringement,

666

the models here could provide structure for a court review. The various parties could make their cases in court for the relative values of their IP contributions to the standard, in the context of other options considered during the standard's early developmental phases. If a component had multiple alternatives before the standard was settled, its incremental contribution, properly measured, may be close or equal to zero. Precise marginal contributions to the standard are not really necessary, just relative contributions. License terms meeting a fair, reasonable, and nondiscriminatory benchmark must allow companies with pivotal contributions to a standard to benefit from relatively better licensing terms.

667

# EXHIBIT 32

*Journal of Competition Law & Economics, 7(3), 523–541*
doi:10.1093/joclec/nhr010
Advance Access publication 2 August 2011

# FAIR, REASONABLE AND NON-DISCRIMINATORY (FRAND) TERMS: A CHALLENGE FOR COMPETITION AUTHORITIES

## *Mario Mariniello* [*]

Downloaded from http://jcle.oxfordjournals.org/ at Virginia Polytechnic Institute and State University on July 2, 2012

ABSTRACT

Standards contribute to increase welfare to the extent that they reduce production costs and increase products' value to consumers. The adoption of a standard can, however, raise competition concerns. After the adoption of the standard, the chosen technology may lack effective substitutes. The owner of an intellectual property (IP) right essential to the technology may indeed use the additional market power that may be gained through standardization (competitors being absent ex-post) to charge higher prices to "locked-in" licensees. To mitigate such a hold-up risk, standard setting organizations usually require patent holders to disclose their relevant IP rights ex-ante and/or to commit to license IP on fair, reasonable and non-discriminatory (FRAND) terms. This article suggests a methodology to assess whether FRAND commitments are violated, from a competition perspective. The proposed methodology extends the framework proposed by Cecilio Madero and Nicholas Banasevic by outlining four necessary conditions for an ex-post licensing behavior to be considered anticompetitive, in violation of FRAND commitments.

*JEL*: K21; L40; L43

## I. INTRODUCTION

The European Commission has recently investigated a number of high-profile cases in the field of standardization, emphasizing the increasing relevance that competition authorities attribute to this subject.[1] Standardization can

---

[*] Chief Economist Team, DG Competition, European Commission. Email: mario.mariniello@ ec.europa.eu. The views expressed in this article are those of the author and do not necessarily reflect those of DG Competition or the European Commission. The author also wishes to thank Miguel De la Mano, Damien Gerardin, Cyril Hariton, Joachim Klein, Anne Layne-Farrar, Damien Neven, Georges Siotis, and Sarah Jane Wheatley for their helpful comments and advice. The usual disclaimer applies.

[1] Particularly relevant are the *Rambus* and the *Qualcomm* cases. In the *Rambus* case, following a complaint set forth by a number of DRAM manufacturers, the European Commission accused Rambus of infringing competition rules by deceptively lying or withholding information about its patents in the context of the JEDEC standard setting process. In December 2009, the European Commission accepted Rambus' proposed commitments, which were considered adequate to address its competition concerns. *See* Commission Decision of 9.12.2009

---

© The Author (2011). Published by Oxford University Press. All rights reserved.
For Permissions, please email: journals.permissions@oup.com

produce a number of advantages by substantially reducing transaction costs to firms and enhancing the value of products for consumers. Standard setting organizations play an important role in coordinating the choice of a particular standard. After the adoption of the standard, however, the chosen technology may lack effective substitutes. The owner of a patented technology may thus have additional market power (competing technologies being effectively absent ex-post) vis-à-vis "locked-in" licensees.

To reduce the risk of such "hold-up," standard setting organizations (SSOs) usually request patent holders to disclose their relevant intellectual property (IP) rights ex-ante (that is, before the adoption of the standard) and/or to commit to license IP rights which they consider to be essential to the standard on fair, reasonable and non-discriminatory (FRAND) terms. The primary purpose of FRAND is to ensure that a licensor would forgo its right not to license its IP rights or to license only on terms that would appropriate all the rents that can be generated by the standard. However, a FRAND commitment should not prevent the patent holder from extracting rents which derive from the advantages that the chosen standard offers over the next best competing standard. The patent holder should thus be able to obtain the incremental rent that arises from standardization with respect to the next best alternative, or in other words the rent that it would be able to obtain while being in competition with those alternatives.[2] A more severe constraint on returns would risk hampering innovation, as patent holders would have reduced opportunities to recover their up-front research investment. The magnitude of such returns can be instrumental to encourage innovation, as returns on successful innovations need to compensate, not only for the cost of developing the innovation itself, but also for the cost of developing other projects which ultimately fail. It may be tempting to think that in order to solve the hold up problem, an IP holder should be compelled to commit to particular royalty rates. However, patent holders have little incentive to commit ex-ante to specific royalty rates, and forcing IP holders to do so would, likewise, be inefficient. In fact, ex-ante the IP right holder may know little about the value of its innovation at the time at which

Downloaded from http://jcle.oxfordjournals.org/ at Virginia Polytechnic Institute and State University on July 2, 2012

---

(Case COMP/38.636 Rambus), http://ec.europa.eu/competition/antitrust/cases/dec_docs/38636/38636_1203_1.pdf. In the *Qualcomm* case, the European Commission investigated the claims of a number of mobile phone producers (Nokia, Sony/Ericsson, NEC, Panasonic, Broadcom and Texas Instruments) accusing the research company Qualcomm of charging excessive, non-FRAND royalty rates to access its essential IP rights in W-CDMA, the technology selected as 3G standard in Europe. After 4 years of investigation, the complaints were withdrawn and the case was closed. *See* Press Release, Eur. Comm'n, European Commission's Announcement to Close Formal Proceedings Against Qualcomm (Case COMP/39.247), http://europa.eu/rapid/pressReleasesAction.do?reference=MEMO/09/516.

[2] The proposed approach thus implies an "ex-post" analysis, where the incremental value is defined as the difference between the value of the technologies that are competing to enter the standard.

the standard is set. Before the adoption of the standard, the market to which the IP rights are related is just a potential market—little is known about how the market will develop in the future, what the success of the technology among consumers will be, and what profits licensees should reasonably expect.

If the licensor was forced to commit to a particular royalty rate ex-ante, it may prove inefficient ex-post and may thus lead to inefficient choices of standards ex-ante (unduly affected by poorly informed expectations about market developments). Standard setting organizations thus recognize that taking into account new information is preferable, and FRAND commitments can thus be seen as a necessarily imprecise norm for the adoption of licensing terms as new information becomes available.

Accordingly, FRAND commitments involve an incomplete contract between licensors and licensees, and the precise implementation of FRAND commitments will naturally be controversial. Courts, within the context of companies' private litigations, appear to be the natural setting where FRAND issues could be dealt with. That was the case a number of times in the United States.[3] However, to the extent that a violation of a FRAND commitment involves an exploitation of market power in excess of what ex-ante competition would have allowed, the matter has also been considered by competition authorities. They might also be called upon to assess whether patent holders do not abuse their dominant position by charging a price higher than they would have been willing to commit to ex-ante, conditional on the standard being adopted. It is unclear, though, how competition authorities should assess alleged violations of FRAND commitment. As explained below, there is no commonly accepted method in the economic literature, and the case law does not provide much guidance either.

From the perspective of antitrust policy, the built-in ambiguity in the definition of FRAND makes it difficult to identify the counter-factual for "reasonable" licensing terms which is needed to establish a FRAND violation. However, FRAND may become an empty shell if it is not seen to impose any constraints on parties in the standard setting process. At the very least, certain obligations from the FRAND commitment derive directly from the above interpretation that patent holders which had committed to FRAND should not appropriate all the rents which can be generated by a standard.

First, the FRAND commitment waives the patent holder's right to refuse to license its IP rights to anybody seeking such a license. Conversely, a potential licensee must be viewed as having an equal obligation to engage in

---

[3] *See, e.g.*, Commonwealth Scientific Indus. Research Org. v. Buffalo Tech. (USA), Inc., No. 2:05-CV-53, 2006 WL 1233122 (E.D. Tex. May 8, 2006); Broadcom Corp. v. Qualcomm Inc., 501 F.3d 297 (3d Cir 2007).

Downloaded from http://jcle.oxfordjournals.org/ at Virginia Polytechnic Institute and State University on July 2, 2012

good faith negotiations and not abuse a FRAND commitment to gain unfair advantage or simply infringe a licensor's IP right. This reflects the view that the bargaining is not entirely shifted to either party ex-post.

Second, the licensing terms offered after the adoption of the standard (ex-post) should not be worse than those which the patent holder would have committed to ex-ante in the context of a standard setting contest conditional on the information that is available ex-post.

The first obligation emphasizes that the primary role of FRAND is to ensure that, ex-post, the potential licensor and licensee negotiate the terms of an agreement at arm's length. Testing for its infringement requires, first of all, verifying whether an agreement was ultimately concluded, but it might also require a more in-depth analysis of the negotiation process, which includes inspecting internal communication intended to lay down negotiation strategies. This type of evidence is normally available to competition authorities, and verification that players abide by such an obligation can be relatively easy.

The second obligation makes it explicit that the evaluation of FRAND commitments involves a comparison between ex-post conditions and those that would have been negotiated ex-ante. But it also highlights the difficulty of the exercise, as the relevant counterfactual ex-ante is contingent both on the context of the standard setting contest and on the information available ex-post. This is the intrinsic limit faced in testing a FRAND violation based on the comparison between ex-ante and ex-post royalty rates. The comparison of ex-ante and ex-post royalty rates can be a useful indicator as to whether ex-post royalties are excessive, because it identifies the difference between prices which are charged when competition amongst technology exists (ex-ante) and when it does not (ex-post). However, ex-post royalty rates higher than ex-ante royalty rates do not necessarily imply a violation of a FRAND commitment. As the account of the negotiations between players sometimes shows, the bargaining power of players may evolve over time independently of the adoption of the standard—for example, because their business structure or their financial needs change over time. In addition, ex-ante, significant uncertainty often remains regarding future competitive circumstances—for example, the level of demand, the implementation and diffusion of the standard, or the strength of the IP right, including the ability to invent around the IP right. Hence, ex-post royalty rates which are higher than ex-ante royalty rates cannot *per se* identify a FRAND violation.[4]

Downloaded from http://jcle.oxfordjournals.org/ at Virginia Polytechnic Institute and State University on July 2, 2012

[4] One could also argue that, theoretically, ex-post royalty rates that are lower than ex-ante rates do not necessarily imply that a FRAND violation did not occur. This would happen, for example, if the ex-post value of an IP right turns out to be lower than what was expected ex-ante. In this article, I take the view that a competition authority should normally consider ex-post rates lower than ex-ante rates not to violate FRAND (condition 3 of the "check list," as explained below). However, a competition authority may take into account such possibility when the evidence collected during the investigation suggests unequivocally that the reason

*Fair, Reasonable and Non-Discriminatory (FRAND) Terms*   527

On the other hand, the limits of the criteria based on the comparison between the price charged by the patent holder and the intrinsic value of the technology appear to be more severe. Establishing an objective economic value for IP rights incorporated into a standard is hardly feasible, as their value is contingent upon the value of the other IP rights that form part of the standard, the value of the standard itself (which is determined by market forces), the rate of diffusion, and the expected product life cycle. In addition, innovating firms need to spread risk over many activities. The price of a successful innovation should also cover the risk of failed research attempts. It is difficult to imagine how all of this could be taken directly into account by a competition authority attempting to establish the FRAND value of a certain technology.

The aim of this article is to develop a simple framework and a practical methodology that could be implemented by competition authorities to establish whether a FRAND violation has occurred, building on the approach proposed by Cecilio Madero and Nicholas Banasevic.[5] These authors suggest that antitrust scrutiny may be required if standardization has conferred market power on a company. That would depend mainly on two factors: (1) whether it is commercially indispensable to comply with a particular standard and (2) whether there is lock-in to the standard. Furthermore, they stress the importance of the ex-ante competitive situation as a benchmark for the alleged abuse of the patent holder. If ex-ante competition is already absent, "the price that the patent holder can charge is the same ex-ante and ex-post, and hence there is no incremental power conferred by the standard." From their perspective, the presence of ex-ante competition is thus a necessary condition for a violation of FRAND commitment to take place.[6] In what follows, we will pursue this approach further and outline a number of other conditions necessary for a violation to occur.

The methodology developed in this article can thus be seen as screening test. It is meant to identify cases in which there is, in all likelihood, no violation of FRAND commitments and does not offer much guidance for those

---

for ex-ante rates higher than ex-post is to be attributed to the deceptive behavior of the patent holder, which intentionally induced a licensee to revise its ex-ante expectations upwards without a legitimate justification.

[5] Cecilio V. Madero & Nicholas Banasevic, *Standards and Market Power*, 5 ANTITRUST CHRON. 1 (2008), https://www.competitionpolicyinternational.com/file/view/5330.

[6] Anne Layne-Farrar and A. Jorge Padilla explore empirically the relationship between patent value (measured as number of forward citations) and inclusion in a standard. They find that inclusion in a standard need not have any affect at all on patent value; this is especially true for more valuable patents, for which the incremental effect on value due to inclusion in the standard is arguably lower. *See* Anne Layne-Farrar, A. Jorge Padilla, *Assessing the Link Between Standard Setting and Patent Holder Market Power*, 9 INT'L J. IT STANDARDS AND STANDARDIZATION RES. (forthcoming 2011).

Downloaded from http://jcle.oxfordjournals.org/ at Virginia Polytechnic Institute and State University on July 2, 2012

cases in which FRAND commitments cannot be excluded. The initial
screening test relies on the observation that a FRAND violation could only
be possible if there is a significant difference between what the patent holder
could potentially charge ex-ante and what it charges ex-post. If just one of
the conditions fails, then either the adoption of the standard did not deter-
mine any significant increment in market power, or that additional market
power was not abused by the patent holder—then a FRAND violation could
not have occurred. The test is attractive as it provides four concrete dimen-
sions along which the evidence gathered during the investigation can be
tested. As such, it should make the investigation of a potential FRAND vio-
lation more tractable.[7]

The four conditions and the suggested methodology are defined and
explained extensively in Part III. The rest of the article is organized as
follows: in the next part, I describe the relevant economic literature, and
Part IV concludes.

## II. THE LITERATURE

Considerable research efforts on patent licensing and its value have been
made. Economic literature, however, has not yet provided much help on
how a competition authority should ascertain a FRAND violation. Most
importantly, there is no consensus in the literature on what the right tool to
enforce FRAND commitments in the context of competition policy should
be. One important contribution is by Daniel Swanson and William
Baumol,[8] who suggest a methodology to determine reasonable-non discrimi-
natory (RAND) royalty rates.[9] Swanson and Baumol propose the use of an
auction-like mechanism for the selection of the best technology which
should take place before the adoption of the standard.[10] If competition at
pre-selection stage is effective—that is, a reasonable amount of information
is available to those involved in the selection process and participants are
effectively bound by the commitment to license on RAND terms—then the
outcome of the ex-ante auction would prevent the acquisition and exercise
of monopoly power by those companies holding IP rights essential to the
technology selected as a standard. Swanson and Baumol show that, under
certain conditions, the outcome of the auction-like process would be

Downloaded from http://jcle.oxfordjournals.org/ at Virginia Polytechnic Institute and State University on July 2, 2012

---

[7]  It should be noted that the proposed methodology focuses on the "fair and reasonable" part
of FRAND—the non-discriminatory part is not discussed.

[8]  Daniel G. Swanson & William J. Baumol, *Reasonable and Nondiscriminatory (RAND)
Royalties, Standards Selection, and Control of Market Power*, 73 ANTITRUST L.J. 1, 51-56
(2005).

[9]  In the United States, the equivalent concept to FRAND is RAND (the "fairness" element is
absent).

[10] Auction design has been widely explored in the literature. For an overview, see THE
ECONOMIC THEORY OF AUCTIONS (Paul Klemperer ed., Edward Elgar 2000).

equivalent to the one following the application of the efficiency component pricing rule (ECPR), which would also imply non-discriminatory royalty rates in the downstream market.

The main insight of Swanson's and Baumol's analysis is that a reasonable royalty rate should approximate the outcome of an auction-like process taking place before the adoption of the standard. This is the rationale behind the so called ex-ante/ex-post test on which this article is focused. However, this is also the intrinsic limit of Swanson and Baumol's analysis—their article does not seem to recognize that negotiations are more relevant than auctions in the standard setting process. Moreover, a natural corollary of their analysis is that it would be optimal to commit to a certain royalty rate ex-ante. This, however, could be true only under the (unrealistic) assumption of perfect information ex-ante.[11]

More recently, the debate on how to benchmark FRAND royalty rates has been fostered by the emergence of antitrust issues which triggered the interest of a number of scholars from both sides of the Atlantic. Anne Layne-Farrar, A. Jorge Padilla, and Richard Schmalensee[12] extend the framework developed by Swanson and Baumol to multiple patents and patent holders; then they consider applying the "Shapley value" as a potential alternative tool to determine FRAND royalty rates. This article focuses on the allocation of rents among complements, as the Shapley model allows for identification of a "reasonable" rate in a setting where more than one patent holder owns a patent essential to the standard. According to this rule, a fair royalty rate should be correlated to the patent holder's average marginal or incremental contribution to alternative combinations of the members of a cooperative group consisting of the coalition of patent holders of the technology chosen as standard. This rule provides a benchmark in the case of multiple-patent holders but, unfortunately, its direct application to a real antitrust case would hardly be feasible. Indeed, it appears extremely difficult to estimate what the value of the marginal contribution of each patent holder is to the coalition of patent holders of the adopted technology. Joseph Farrell, John Hayes, Carl Shapiro, and Theresa Sullivan[13] endorse the ex-ante/ex-post approach by suggesting that "courts should interpret the fair and reasonable prong of FRAND as the royalties that would have been

---

[11] The model of Swanson and Baumol features a number of additional simplifications (in particular, that each competing technology has only one patent held by one company), which further question the general validity of its results. For an analysis, see Damien Gerardin, Anne Layne-Farrar & A. Jorge Padilla, *Competing Away Market Power? An Economic Assessment of Ex Ante Auctions in Standard Setting*, 4 EUR. COMPETITION J. 443 (2008).

[12] Anne Layne-Farrar, A. Jorge Padilla & Richard Schmalensee, *Pricing Patents for Licensing in Standard Setting Organizations: Making Sense of FRAND Commitments*, 74 ANTITRUST L.J. 671 (2007).

[13] Joseph Farrell, John Hayes, Carl Shapiro & Theresa Sullivan, *Standard Setting, Patents and Hold-Up*, 74 ANTITRUST L.J. 603, 637 (2007).

Downloaded from http://jcle.oxfordjournals.org/ at Virginia Polytechnic Institute and State University on July 2, 2012

voluntarily negotiated before users became committed to using the patented
technology . . . .[T]his is typically *not* the same as the level of royalties that
would be voluntarily negotiated ex post." They suggest that an antitrust
authority should screen and compare the ex-ante and ex-post patent
holders' market power by comparing ex-ante switching cost with ex-post
switching cost.

In parallel with the economic literature, the issue of the antitrust enforce-
ment of the FRAND commitment has been discussed in terms of both
economic and legal aspects. For instance, Roy Epstein and Alan Marcus[14]
suggest an analytical framework which extends the fifteen principles for the
definition of a reasonable royalty rate developed in the seminal case *Georgia
Pacific v. U.S. Plywood*.[15] Epstein and Marcus group the fifteen principles
into four categories: factors based on comparable royalties, factors based on
profitability of the patented invention, factors based on potential loss of
sales by the patent holder, and expert opinion and the hypothetical nego-
tiation. They then propose a discounted cash flow analysis which would
incorporate the key insights from the *Georgia-Pacific* factors. The proposed
rule hinges on the difference in profits between the project which exploits
the patented technology and an alternative project. It thus suggests a
measure of reasonableness of royalty rates, but it leaves the hold-up question
open. More recently, Philippe Chappatte discusses the benefits and the risk
of standard setting, stressing the importance of the distinction between
"hold-up" and "royalty stacking" issues.[16] Chappatte explores some of the
benchmarks that have been proposed for FRAND royalty rates. Namely,
benchmarks relative to the ex-ante competitive rates, to industry experience
and expectation, and to the principle of the patent holder's contribution to
the technology. Particularly for this last type of benchmark, Chappatte
motivates the use of reasonable aggregate rates and proportionality (that is,
the direct correlation between the number of filed patents and the share of
the aggregate royalty rate to which the patent holder would be entitled of
under FRAND terms), as these are standard reference points in the indus-
try, particularly at the start of negotiation processes. This methodology,
however, appears to have little support in terms of economic principles, as
there is no particular reason as to why the number of filed patents should
reflect the degree of bargaining power of a patent holder independently from
the adoption of the standard which is supposed to be the source of market
power. A patent holder's bargaining power depends mostly, instead, on a
patent's economic value—that is, on the likelihood that a credible substitute

Downloaded from http://jcle.oxfordjournals.org/ at Virginia Polytechnic Institute and State University on July 2, 2012

[14] Roy J. Epstein &Alan J. Marcus, *Economic Analysis of the Reasonable Royalty: Simplification and Extension of the* Georgia-Pacific *Factors*, 85 J. PAT. & TRADEMARK OFF. SOC'Y 555 (2003).
[15] Georgia-Pacific Corp. v. U.S. Plywood Corp., 318 F. Supp. 1116 (S.D.N.Y. 1970).
[16] Philippe Chappatte, *FRAND Commitments—The Case for Antitrust Intervention*, 5 EUR. COMPETITION J. 319 (2009).

for that patent exists. Furthermore, establishing a proportionality principle for the assessment of royalties' "fairness" would increase a firm's incentive to file non-valuable patents, thereby inefficiently reducing access to the technology (a patent thicket issue).

Finally, in April 2007, the U.S. Department of Justice and the Federal Trade Commission published a report on antitrust enforcement and IP rights.[17] Among other issues, this report discusses the scope of a FRAND commitment. The agencies consider that unilateral, ex-ante announcements of licensing terms by IP holders cannot be abusive conduct and therefore do not violate antitrust rules. Similarly, joint announcements by industry players of their intended (or maximum) licensing terms could be considered. This confirms that making unilateral, ex-ante commitments (which form the basis for a comparison with ex-post behavior) is lawful conduct. A similar approach was recently undertaken by the European Commission with the adoption of the new Guidelines for cooperation agreements in December 2010. At paragraph 299, the Guidelines state: "standard-setting agreements providing for ex ante disclosures of most restrictive licensing terms, will not, in principle, restrict competition within the meaning of Article 101(1) . . . .Therefore, should a standard-setting organisation's IP right policy choose to provide for IP right holders to individually disclose their most restrictive licensing terms, including the maximum royalty rates they would charge, prior to the adoption of the standard, this will normally not lead to a restriction of competition within the meaning of Article 101(1)123."[18]

### III. IMPLEMENTING FRAND: A METHODOLOGY

As discussed above, while it is difficult to assess whether a FRAND commitment has been breached, assessing whether a FRAND commitment has not been infringed can be easier. In the first case the competition authority would have to explain why a patent holder requires specific terms and conditions for accessing its patents. In particular, it would be required to show the existence of a difference between what is charged by the patent holder after the adoption of the standard and what would have been asked if

---

[17] U.S. Dep't of Justice & Fed. Trade Comm'n, Antitrust Enforcement and Intellectual Property Rights: Promoting Innovation and Competition (2007), *available at* http://www.justice.gov/atr/public/hearings/ip/222655.pdf.

[18] *Guidelines on the Applicability of Article 101 of the Treaty on the Functioning of the European Union to Horizontal Co-Operation Agreements*, 2011 O.J. (C 11) 1. Note that there is no contradiction between paragraph 299 of the Guidelines and what was stated in the introduction as regards potential inefficiencies due to ex-ante disclosure of maximum royalty rates. Indeed, such disclosure can be inefficient only if the patent holder is obliged to disclose its maximum terms ex-ante. On the other hand, to prevent other types of inefficiencies, a patent holder must be able to unilaterally disclose its maximum terms ex-ante, if it wishes to do so, without infringing the European Treaty.

Downloaded from http://jcle.oxfordjournals.org/ at Virginia Polytechnic Institute and State University on July 2, 2012

competition amongst technologies still existed ex-post. In the second case, instead, one starts with asking whether the facts gathered during the investigation support the conclusion that the FRAND commitment has not been infringed. If even just one necessary element is not present, then we can conclude that a FRAND commitment, most likely, has not been infringed. Instead, if all the necessary conditions are satisfied, or could not be tested because the necessary evidence does not exist, an infringement of the FRAND commitment cannot be excluded. Only at that stage, should one proceed with a quantitative assessment of the level of FRAND terms and conditions.

Before going into the details of each condition, though, it is important to make one remark. There is no consensus in the literature as to whether FRAND should imply a uniform royalty level for all licensees (which would be the natural outcome of a multilateral ex-ante negotiation between the licensor and the perspective licensees) or if it should rather imply different royalties depending on each player's bargaining power or business features. The first approach raises concerns in terms of competition enforcement, as it implicitly legitimises coalitions of buyers aimed at extracting rent from patent holders, thereby reducing ex-ante incentives to innovate. Hence, in this article, I take the view that FRAND is the outcome of a bilateral hypothetical negotiation between the licensor and the licensee, which would take place ex-ante (when competition amongst technologies may still be present), conditional on the information which is available ex-post.[19] Thus, FRAND naturally varies amongst players.

For that reason, the conditions listed below have to be weighed against each agreement. In other words, the agreement between a patent holder and Licensee *A* may infringe FRAND if all four conditions are satisfied from the perspective of Licensee *A*. It is indeed possible that a certain condition is satisfied for one agreement but not satisfied for another, depending on the relative features of each single player and the player's role in the standardization process.

## A.  Condition 1: Ex-Ante, a Credible Alternative to the Adopted Technology Exists

If there is no incremental increase in market power due to the adoption of the standard because no credible competing technology existed before the adoption, no FRAND infringement can take place. It is important to note that this condition does not only imply that an alternative technology to the selected one exists ex-ante; the technology must also be a "credible" alternative. That is, to satisfy this condition it must be shown that the industry

---

Downloaded from http://jcle.oxfordjournals.org/ at Virginia Polytechnic Institute and State University on July 2, 2012

[19] This approach comports well with the "hypothetical negotiation" for reasonable royalty determination defined in the U.S. case *Georgia-Pacific*, 318 F. Supp. 1116.

could have selected that technology as standard if ex-ante prospective licensees could have reasonably anticipated the price that they would face ex-post.

When working toward a particular standard, the participating industry will take into account a number of factors, such as technical performance, their own patent portfolio, and the commercial viability of a particular technology. The latter criterion comprises a number of aspects, such as whether a particular standard can become a global one (which increases the overall market size), whether it is compatible with an existing standard in which the company has a stake, the company's expectations about royalties that would have to be paid or that they may receive, and whether the technology is compatible with existing networks. Each player will have to make trade-offs. For instance, a particular technology may be supported in spite of high expected royalty rates if it is also likely to generate higher revenues. In such a case the higher royalty rate does not result from an abuse of market power, but from the technological or commercial advantages of the particular standard.

Condition 1 thus begs the following question: assuming that the industry could reasonably expect the price that is now charged ex-post by the patent holder, would the licensee have had (1) the incentive and (2) the ability to switch to an alternative standard?

Testing condition 1 requires, first of all, a close look at the standardization process. A competition authority should thus interview market players, inspect the minutes of all the meetings between industry players affecting the choice of the standard, and observe market players' behavior during the different phases of standardization. Ultimately, the competition authority should have a clear picture of the support that the selected technology received at the moment of the adoption of the standard. For example, one could check whether the licensee strongly supported that technology and its motivation for doing so (which could be due to previous investments in that technology that the perspective licensee had already made before the adoption of the standard, for example); it could be checked whether other technologies were taken into account during the preliminary voting process; it could also be checked how industry players reacted to stall-periods (if any) when the adoption of the technology became uncertain and, in particular, whether other solutions were put forward by the industry. If those tests are negative, then condition 1 most likely is not met. Thus, the adoption of the standard did not increase the patent holder's market power, and FRAND could not have been violated.

## B. Condition 2: Ex-Ante, Prospective Licensees Cannot Reasonably Anticipate Licensor's Ex-Post Requests

If an industry could reasonably anticipate a patent holder's licensing conditions ex-ante and nevertheless selected its technology as the standard, a

Downloaded from http://jcle.oxfordjournals.org/ at Virginia Polytechnic Institute and State University on July 2, 2012

FRAND infringement is unlikely to occur. In that case, expensive licensing terms may reflect only the value of that particular technology to the licensees, who reveal their preference for the technology via the standard setting process. This logic is consistent with the general view that ex-ante statements concerning the maximum rate that the patent holder will charge after the adoption of the standard may mitigate the hold-up problem.

To satisfy this condition it is not necessary that, ex-ante, the licensee cannot reasonably anticipate the ex-post royalty rate; however, it is necessary for a sufficiently large number of players participating in the standard setting process, such that they could trigger the adoption of a different technology. Similarly, if the licensee had a pivotal role in the standard setting process (for example, because it was the main supporter of the adopted technology or because it is a major industry player), this condition would not be satisfied if the licensee could have reasonably anticipated the ex-post licensing terms before the adoption of the standard.

To test this condition, a competition authority should find out what was publicly known ex-ante about the patent holder's likely ex-post behavior, what was privately known by the single licensee, and what its role was during the standard setting process. Useful sources of information in that respect are minutes of the meetings between industry players relevant to the selection of the standard (for example, relevant workgroup members), contemporaneous expert analysis or statements by market players reported in specialized press, companies' press releases, internal communications, and business plans or presentations to the board of directors reporting expectations of future development in the market. It would also be useful to inspect any negotiation that could have taken place between the licensee and the licensor before the adoption of the standard—there is indeed a certain likelihood that during the negotiation, the licensee had developed knowledge of the patent holder's request for accessing its IP rights.

It should be noted that, even if the exact ex-post price was not known at the time of the adoption and if the possibility that the patent holder was going to charge high rates after the adoption of the standard was a source of concern amongst industry players, it would already be a signal that condition 2 might not be satisfied. In addition, to the extent that concerns were expressed ex-ante, it does not matter whether they were expressed before or after the patent holder had committed to FRAND. Indeed, if the commitment by each patent holder is a necessary condition imposed by the SSO for the adoption of the standard, the fact that the patent holder commits to charge FRAND royalty rates ex-post cannot have any impact on the licensees' expectation of the ex-post royalty rate; even before the commitment, prospective licensees would anticipate that if there was a market for the patent holder's technology, the patent holder would commit to FRAND beforehand.

Downloaded from http://jcle.oxfordjournals.org/ at Virginia Polytechnic Institute and State University on July 2, 2012

## C. Condition 3: Ex-Post, the Licensor Requests Worse Licensing Conditions Than Ex-Ante

Condition 3 is the direct application of the ex-ante/ex-post comparison principle: if agreements concluded when technology competition is absent (that is, ex-post) entail equally or less onerous conditions for the licensees than those concluded when competition is present (that is, ex-ante), the patent holder has not violated FRAND.

As indicated above in Part I, the main limitation of methodologies based on the ex-ante/ex-post comparison derives from the fact that ex-post royalty rates higher than ex-ante royalty rates do not necessarily imply that the patent holder has violated its FRAND commitment. A number of reasons that are not related to the increase in market power due to the adoption of the standard may indeed explain such a difference.[20] However, it is in principle fair to assume that the value of the technology immediately after the adoption of the standard is not lower than what was before the adoption. If that is the case, when the ex-post licensing conditions are not worse than those offered ex-ante, one could infer that most likely the patent holder did not exploit any additional market power acquired due to the adoption of the standard and hence did not violate its FRAND commitment.

To be able to test this condition, it is necessary that: (1) at least one agreement between the patent holder and a licensee was concluded before the adoption of the standard; (2) it is possible to disentangle the price that the licensee is paying to access the patent holder's IP rights from the other components of the agreement (if any); and (3) the licensee which concluded the agreement ex-ante is in a comparable position to the licensee which concluded the agreement ex-post. It should be stressed that if this condition cannot be verified because the necessary evidence does not exist (because, for example, no agreement was concluded ex-ante), condition 3 cannot be tested. In that case, a FRAND violation cannot be excluded. So, for the purpose of the screening test proposed in this article, condition 3 should be assumed to be satisfied in those circumstances.

Regarding (1), to qualify as a benchmark, an agreement must have been finalized ex-ante—that is, before the standard is adopted. Agreements which were negotiated but not finalized ex-ante cannot qualify as benchmarks. In other words, proposals or counter-proposals between the licensee and the licensor taking place before the adoption of the standard cannot be used as counterfactuals for ex-post agreements, although they may reveal relevant information about the level of ex-ante knowledge about the patent holder's charging policy. Alternatively, if proposals were used as counterfactuals, this would significantly interfere within the negotiation process between market players. Market players would indeed be bound by their proposal for an

---

[20] *See supra*, Part I.

Downloaded from http://jcle.oxfordjournals.org/ at Virginia Polytechnic Institute and State University on July 2, 2012

indeterminate amount of time, as any ex-post agreement would be tested against the counterfactual of their ex-ante proposal. From the perspective of competition policy, this would also have the perverse effect of reducing the incentive for market players to negotiate the terms of the licensing agreements before the adoption of a standard, thereby rendering the issue of the potential for abuse of the standard setting process by patent holders more acute.

Regarding (2), it should be noted that, particularly in the context of IP rights, agreements may entail a number of components that have an economic value to the parties that can be very difficult to quantify. For example, agreements may entail royalty rates, lump sum payments, deductions on the royalty rates contingent on the type of product sold, compensation for cross-licensing of patent portfolios, settlements of ongoing patent disputes, transactions of related businesses, commitments to reciprocal support for the parties' technologies in other markets, sub-license rights, different geographical scopes, accessory clauses such as most favored nation clauses, and non-assertion clauses towards third parties, among other provisions. If these components are negotiated altogether and included in the same agreement, disentangling the price that the licensee is effectively paying for accessing the patent holder's IP rights risks becoming an unfeasible task.[21] Indeed, the royalty rate that would have been negotiated on a stand-alone basis would undoubtedly significantly differ from the one defined by such a comprehensive agreement.

On the other hand, if the agreement is relatively simple and the main price components can be easily quantified, a methodology aimed at summarizing the price for accessing the IP rights can be implemented. For example, if the agreement entails only a royalty rate and a lump sum payment, plus a number of ancillary components of minor relevance, an "effective royalty rate" can be calculated in order to allow comparison between different agreements. Such an effective rate could be calculated following these two steps. First, one should compute the net present cost for the licensee at time $t = 0$, when the contract is signed. That is:

$$E_0(C) = \sum_{t=0}^{\infty} \delta^t \times \left( F_t + R_t \times E_{0,t}(V_t \times B_t) + \eta_t \right)$$

where: $E_0(C)$ is the licensee's total expected cost for accessing the licensor's patents in net present value at time $t = 0$; $\delta$ is the licensee's discount factor; $F_t$ is a lump sum payment due at time $t$; $R_t$ is a running royalty rate due at

---

[21] Empirical research shows that certain relationships exist. For example, lump sum/upfront payments vary inversely with running royalty rates, and increased restrictions (scope or geography) lower running royalty rates. For an empirical analysis of the contract terms of licencing agreements, see Inés Macho-Stadler, Xavier Martinez-Giralt & J. David Pérez-Castrillo, *The Role of Information in Licensing Contract Design*, 25 RESEARCH POL'Y 43, 47-48 (1996).

Downloaded from http://jcle.oxfordjournals.org/ at Virginia Polytechnic Institute and State University on July 2, 2012

*Fair, Reasonable and Non-Discriminatory (FRAND) Terms*   537

time $t$; $V_t$ is the volume of products sold at time $t$; $B_t$ is the per-unit sale price at time $t$; $E_{0,t}(V_t \times B_t)$ is the revenue to be yielded at time $t$ that is expected at time 0; and $\eta_t$ is a cost component of unknown size and unknown sign, including all the other implicit or explicit valuable transactions that are not easily quantifiable.

If $\eta_t$ can be assumed to be negligible, $E_0(C)$ can normally be computed with the information available to the competition authority. $F_t$ and $R_t$ are described in the licensing agreement. $\delta$ can be deduced by the company's contemporary internal documentation concerning its financial strategies and its ability to access credit. Finally, $E_{0,t}(V_t \times B_t)$ can be calculated by analyzing the companies' internal business plans; usually, before concluding an agreement, the board of directors of a company has an overview of how the company will perform in the market in case of agreement. Hence, information about $V_t$ and $B_t$ are normally reported to the board of directors at the time of the agreement. In the second step, an effective rate $\lambda_0$ is then calculated as:

$$\lambda_0 = \frac{E_0(C)}{E_0(V)}$$

where $E_0(V)$ is the stream of volumes sold by the licensee expected at time 0. Computing $\lambda_0$ for different agreements would allow the competition authority to compare them and establish whether one agreement is more onerous than another.

Finally, regarding (3), it must be possible to use the ex-ante agreement as a counterfactual for the ex-post agreement against which condition 3 is tested. If the licensees have completely different characteristics (for example if the licensee of the ex-ante agreement is a major industry player with a relevant portfolio to cross-license while the licensee of the ex-post agreement is a small entrant with no IP rights), the two agreements may not be comparable. Indeed, in the example just mentioned, in an industry where network externalities are prominent, the patent holder might have an incentive to charge a low price to a major industry player (in the form of low royalty rates) to foster the development of the market, whereas the patent holder might not have the same incentive with smaller players. In that case, it would be difficult to infer anything from the comparison between the two agreements unless the differences between the licensees' structural features are properly taken into account.

More generally, the ex-ante/ex-post comparison requires the definition of an ex-ante benchmark for the ex-post agreement. Most of the time, such a benchmark would need to be inferred from agreements concluded by the patent holder with other licensees.[22] This means that there are two relevant

---

[22] This can also not be the case—a licensee may well conclude an agreement ex-ante and an agreement ex-post (for example, if the ex-ante agreement has limited time duration).

Downloaded from http://jcle.oxfordjournals.org/ at Virginia Polytechnic Institute and State University on July 2, 2012

dimensions of the counterfactual: the first one derives from considering ex-post what would have been negotiated ex-ante; the second one derives from considering what would have been negotiated by a certain player, who is different from the player that ultimately concluded the agreement. For that reason, this exercise may become too speculative if at least one of these dimensions cannot be dealt with in a straightforward manner. Hence, only ex-ante agreements of comparable licensees should be used as benchmarks.

If, after checking (1), (2), and (3), it is concluded that no agreement was finalized ex-ante or that none of the ex-ante agreements can be used as counterfactuals, condition 3 cannot be tested. In that case, the ex-ante/ex-post comparison principle cannot be directly implemented. However, it is still relevant to check the other conditions—if none of them fails, one cannot exclude that the FRAND commitment has been violated, and other criteria should be implemented to ascertain whether it has been.[23]

### D.  Condition 4: Ex-Post, the Licensee Is Locked into the Technology

FRAND commitments prevent patent holders from exploiting the removal of competition in the technology market due to the adoption of the standard. If licensees are not locked in the technology (that is, they can still switch to an alternative technology at zero or very low cost if the price charged by the patent holder is too high), any hold-up effect would be minimal, if not zero. In such a case, no FRAND violation is likely to occur.

Condition 4 thus requires the competition authority to inspect whether and when the patent holder became a monopolist vis-à-vis the licensee.[24] Defining a precise cut-off date that separates ex-ante from ex-post periods can be inappropriate, though. Usually, lock-in happens gradually—market players normally make their sunk investments over time, so that a specific date separating ex-ante from ex-post cannot be picked up. However, by inspecting the evidence concerning the level of investments made by the licensee, the degree of flexibility of the standard setting process, and the ability that the industry would still have to converge to an alternative standard, it is possible to ascertain whether a specific agreement should be considered ex-ante or ex-post. Any agreement concluded by a licensee that has not yet made relevant sunk investment in the technology and when the industry could still revert to an alternative technology should be considered ex-ante. Any agreement concluded when the licensee has already

---

[23] *See infra* Part III.E.

[24] In the context of IP rights, competition authorities usually identify as many markets as the number of patents essential to the implementation of a certain technology. An essential patent is defined as a patent which cannot be circumvented by licensees in order to implement a certain technology—that is, the patent holder is an "unavoidable partner." In this article, it is assumed that the patent holder that is alleged to violate FRAND owns at least one essential patent to the technology selected as standard.

Downloaded from http://jcle.oxfordjournals.org/ at Virginia Polytechnic Institute and State University on July 2, 2012

significantly invested in the technology or when the industry cannot revert to an alternative technology anymore should instead be considered ex-post.

Obviously, only ex-post agreements can violate FRAND. However, a licensee might lock itself into the technology long before the patent holder commits to FRAND—for example, because it has relevant stakes in the patent holder's technology (the licensee could also own patents essential to that technology). In that case, even if the licensing agreement were considered ex-post, it could hardly violate FRAND, since, technically speaking, there is no link between the adoption of the standard and the increase in the patent holder's market power vis-à-vis the licensee.[25]

It should also be noted that, even if licensees are locked-in, that does not necessarily imply that patent holders face no constraint in setting the price for accessing their IP rights (that is, they can act in a manner which is substantially independent of competitors and consumers). Even if a company is a monopolist in the market defined as the patent essential to a certain technology, depending on the market and on the players' business structure, it may still face a highly elastic demand. For example, the patent holder may have an interest in not hampering competition downstream in such a way that the development of the market for the products that implement its technology would slow down or halt. This is particularly true if the patent holder is active only upstream in the technology market—it thus has nothing to gain from a reduction of competition in the downstream market, which could be caused by an excessive price charged to downstream producers.[26] On the other hand, vertically integrated companies might have an incentive to increase their royalty rates in order to gain a competitive advantage in the downstream market.[27] At the same time, patent holders may also take into account the competitive pressure that is exerted by products that implement technologies different from their own and limit their royalty requests to favor the expansion of products implementing their own technology amongst final customers.

### E. The Next Steps

As mentioned above, the four conditions act as a screening test. If, on the basis of the evidence provided, the competition authority concludes that none of the four conditions fails, one should conclude that the patent holder

Downloaded from http://jcle.oxfordjournals.org/ at Virginia Polytechnic Institute and State University on July 2, 2012

---

[25] In that sense, condition 4 may overlap with condition 1.
[26] This phenomenon is known in the literature as "raising rivals' costs." *See, e.g.*, Steven C. Salop & David T. Scheffman, *Raising Rivals' Costs*, 73 AM. ECON.REV. 267 (1983).
[27] For a theoretical model, see Klaus M. Schmidt, *Complementary Patents and Market Structure* (Centre for Econ. Policy Research, Discussion Paper No. DP7005, 2008).

540     *Journal of Competition Law & Economics*

could have violated FRAND vis-à-vis the licensee, and the matter should be investigated further.[28]

At that stage, the competition authority would have to establish whether the ex-post rates indeed do violate FRAND and which remedies should then be imposed. A number of criteria could be used for that purpose; namely, criteria aimed at identifying a discrepancy between what the patent holder charges ex-post and what it is believed it could charge if there were still competition in the technology market. These criteria include testing whether there exists a significant difference between ex-ante and ex-post royalty rates that cannot be explained by an increase in the bargaining power of the patent holder that is independent of the adoption of the standard or the new information on demand; whether there exist significant differences between the price paid for the technology and the price paid by comparable licensees for comparable technologies in different markets; and whether the technology is overpriced according to qualified experts' opinion and independent market players, having taken into account its value to the market and risk entailed by innovators to develop it.

The implementation of these types of criteria (which would resemble the criteria suggested in *Georgia-Pacific Corp. v. U.S. Plywood Corp.*[29]) would necessarily lead to a decision as to whether FRAND has been violated. If an infringement is identified, a fine should be imposed and remedies (for example, lower royalty rates) should be discussed. Possibly, the definition of the new terms and conditions could be left to the parties, who would restart their negotiation process and, in that case, use private litigation as a tool to solve any upcoming issue.

IV. CONCLUSION

FRAND commitments are often imposed on patent holders by standard setting organizations to prevent patent holders from abusing the additional market power they gain through the adoption of the standard. The built-in ambiguity of FRAND, however, makes its enforcement fraught with difficulties—a competition authority that was called to ascertain whether a FRAND violation occurred would be confronted with the ambitious task of defining a proper counterfactual for "fair and reasonable" royalty rates.

In this article, I propose a methodology that aims to structure a competition authority's approach to cases of alleged violation of FRAND. The methodology involves a screening test to assess whether a violation of FRAND could have occurred in the case at hand, in the first place. That would be the case if four necessary conditions are satisfied: (1) ex-ante, a

---

[28] As specified above, if a condition cannot be tested for objective lack of evidence, it should be assumed that the condition is satisfied.

[29] 318 F. Supp. 1116 (S.D.N.Y. 1970).

Downloaded from http://jcle.oxfordjournals.org/ at Virginia Polytechnic Institute and State University on July 2, 2012

credible alternative to the adopted technology exists; (2) ex-ante, prospective licensees cannot reasonably anticipate the licensor's ex-post requests; (3) ex-post, the licensor requests worse licensing conditions than ex-ante; and (4) ex-post, the licensee is locked into the technology.

If that is not the case (that is, if at least one the four conditions is not satisfied), there is no need for the competition authority to define the proper counterfactual for FRAND royalty rates. Conversely, if, according to the suggested methodology, a FRAND violation could have occurred, then the competition authority would need to enter the somewhat judgmental process of deciding whether the terms and conditions offered by the defendant are FRAND. That process would entail an objective valuation of the royalty rate that the patent holder would have been able to charge if the standard did not increase its market power, subject to the broader context of the license contract. At that stage, however, one may wonder whether it should not be for the defendant, instead, to provide convincing evidence that the terms and condition it offers are FRAND vis-à-vis the plaintiff.

Downloaded from http://jcle.oxfordjournals.org/ at Virginia Polytechnic Institute and State University on July 2, 2012

# EXHIBIT 33

# **FILED UNDER SEAL**

# EXHIBIT 34

692

# Follow Up on HTML5 Video in IE9

Published Monday, May 3, 2010 3:02 AM

Our recent post generated many comments and questions. The discussion of intellectual property rights is complex and invites many different points of view. This is a good opportunity to talk through the certainty and uncertainty relative to our goals for IE9 from Microsoft's point of view.

Developers have consistently conveyed that they want certainty and predictability in the underlying browser platform. We want to deliver a great HTML5 experience in IE9 with great certainty. The goal of certainty informs a lot of choices, such as which of the many standards still under construction we'll pursue. Browser developers have to make decisions like this all the time.

For many reasons, H.264 video offers a more certain path than other video formats and does so in a way that delivers a great HTML5 experience for developers and end-users. First and most important, we think it is the best available video codec today for HTML5 for our customers. Relative to alternatives, H.264 maintains strong hardware support in PCs and mobile devices as well as a breadth of implementation in consumer electronics devices around the world, excellent video quality, scale of existing usage, availability of tools and content authoring systems, and overall industry momentum – each an important factor that contributes to our point of view.

H.264 also provides the best certainty and clarity with respect to legal rights from the many companies that have patents in this area. The rights for implementations of the H.264 standard (see this Wikipedia article about the standardization process) are managed by MPEG-LA as part of a program that has been in place for many years. This long-standing licensing program for a codec that is in broad usage today in the industry provides a stable system from which we can support our customers. As experts will note, there is never complete certainty in an area like this one.

Some comments asked for examples to support the statement in the previous post about "The rights to other codecs are often less clear, as has been described in the press." One comment linked to a Streaming Media article; other examples are easy to find.

Intellectual property is a complex topic. As it's not an engineering topic and this is an engineering blog, the remarks here are by definition limited. On the topic of whether one person's codec does or doesn't use someone else's intellectual property, the only opinion that ultimately matters is a court's. Many people seem to assume that availability of source code under an open source license implies that there are no additional costs, or that the code has properly secured necessary intellectual property rights from all rightful owners. Our experience and the experience of others indicate otherwise, and the web standards groups have discussed this issue as well. For other codecs, it's not clear today how the rights will be determined for commercial scenarios and what the costs will be. By virtue of existing commercial use in a wide variety of products implemented by a large number of companies, H.264 minimizes uncertainty for consumers and developers.

Several comments speculated about Microsoft's financial interest in the codec. (Microsoft participates in MPEG-LA with many other companies.) *Microsoft pays into MPEG-LA about twice as much as it receives back for rights to H.264.* Much of what Microsoft pays in royalties is so that people who buy Windows (on a new PC from an OEM or as a packaged product) can just play H.264 video or DVD movies. Microsoft receives back from MPEG-LA less than half the amount for the patent rights that it contributes because there are many other companies that provide the licensed functionality in content and products that sell in high volume. Microsoft pledged its patent rights to this neutral organization in order to make its rights broadly available under clear terms, not because it thought this might be a good revenue stream. We do not foresee this patent pool ever producing a material revenue stream, and revenue plays no part in our decision here.

There were many questions about royalties, and a lot of speculation in the comments about licenses and payments. The majority of H.264 video content on the web today is royalty-free. MPEG has said that individuals

693

can create video files in the H.264 format and distribute them and play them over the internet for non-commercial purposes without further obligation on licensed platforms like Windows. We are aware that this commitment is set to expire in 2016, but fully expect to commit to supporting the extension of this license and associated terms beyond that date. In general, distributing encoders or decoders or offering sophisticated pay-for-video requires a license from MPEG-LA.  Third-party applications that simply make calls to the H.264 code in Windows (and which do not incorporate any H.264 code directly) are covered by Microsoft's license of H.264.

Some comments pointed to language in our Windows EULA that comes directly from MPEG-LA and reinforces many of these terms. As with all licensing programs, there are limitations and issues, which people have pointed out.  The functionality we provide is technology we license and we follow the terms of that license.

Several comments asked about Microsoft's support for plug-ins (like Flash and Silverlight). Of course, IE9 will continue to support Flash and other plug-ins. Developers who want to use the same markup today across different browsers rely on plug-ins. Plug-ins are also important for delivering innovation and functionality ahead of the standards process; mainstream video on the web today works primarily because of plug-ins.  We're committed to plug-in support because developer choice and opportunity in authoring web pages are very important; ISVs on a platform are what make it great. We fully expect to support plug-ins (of all types, including video) along with HTML5.  There were also some comments asking about our work with Adobe on Flash and this report offers a recent discussion.

We've read some follow up discussion about support for more than the H.264 codec in IE9's HTML5 video tag. To be clear, users can install other codecs for use in Windows Media Player and Windows Media Center.  For web browsers, developers can continue to offer plug-ins (using NPAPI or ActiveX; they are effectively equivalent in this scenario) so that webpages can play video using these codecs on Windows. For example, webpages will still be able to play VC-1 (Microsoft WMV) files in IE9.  A key motivator for improving the codec support in Windows 7 was to reduce the need that end-users might have to download additional codecs.  The security risks regarding downloadable codecs and associated malware are documented and significant. By building on H.264 for HTML5 video functionality, we provide a higher level of certainty regarding the security of this aspect of browsing and our web platform.

The biggest obstacle to supporting more than H.264 today is the uncertainty. When there's industry consensus and confidence that the uncertainties are resolved, we'll be open to considering other codecs. Until then, we'll continue with our current plans to deliver great HTML5 video in IE9 with certainty for consumers and developers.

Dean Hachamovitch

List of articles referenced

AVC/H.264 Licensors

Fake codecs that drop widely spread malware

Google may face legal challenges if it open-sources VP8 codec

H.264 Already Won—Makes Up 66 Percent Of Web Videos

H.264 licensing body won't charge royalties for HTML5, other Web streams

IE Blog: HTML5 Video

JPEG patent case steams forward

Mac OS X malware posing as fake video codec discovered

Malware Posing As Youtube Codec

Media Streaming with Windows 7

694

*Microsoft Security Intelligence Report Volume 8*

*Microsoft Sued Over JPEG Patent*

*MPEG LA's AVC License Will Continue Not to Charge Royalties for Internet Video that is Free to End Users*

*NPAPI*

*Open letter to Steve Jobs: Thoughts on Flash*

*Re: Codecs for <video> and <audio> from Silvia Pfeiffer on 2009-07-29 (public-html@w3.org from July 2009)*

# Comments




**Jones111**
3 May 2010 12:34 AM
#

I hoped that you'll at least support wmv/vc-1 and hope that we'll be able to choose which codecs we'll use in IE9. So far the idea of using H.264 is great - I think that this and other HTML 5 extensions'll change the web as we know it.

However, you should not drop plugins yet, as these have some important features, that are not covered in HTML.

We hope to see more inventions and samples with the next build of IE9.




**Damian**
3 May 2010 12:50 AM
#

The least you could do is name the major competing codec and what it's pros and cons are. You just come off as legally afraid to do anything else.

Well at least I hope that's it and not that you are supporting this codec to make it hard for new multi-platform independent browsers to start up.




**hAl**
3 May 2010 1:05 AM
#

This post does not make it clear why VC-1 was not added as well. It is also a standard with industry momentum that has a lot of hardware support and has near identical licensing as h.264.

It also has a lot of advantages in using a lot less computing power to decode video essentially making it a greener codec than h.264 and much easier for mobile devices batteries.




**anonymous**
3 May 2010 1:57 AM
#

"At the end of the day, we're building a browser for the Windows customer. Listening to that customer, in whatever form that takes, is not just important, it defines what we're here to do." LIARS. WINDOWS CUSTOMERS WANT XP SUPPORT FOR IE9 WHICH YOU ARE NOT DOING. DID YOU NOT READ THOSE HUNDREDS OF COMMENTS ASKING FOR XP SUPPORT WHEN IE9 WAS UNVEILED?

695

Case 2:10-cv-01823-JLR Document 392-8 Filed 08/27/12 Page 63 of 106
FOLLOW UP ON HTML5 VIDEO IN IE9 - IESTERNET EXPLORER TEAM BLOG - SITE HOME - MSDN BLOGS



**Jonas**
3 May 2010 1:58 AM
#

The reason is enforced format lock-in, a widely used method with Microsoft products.

It has nothing to do with developer convenience, especially for open source based development which this decision will have a direct negative effect, due to the complications related to H.264 licensing.

And, considering convenience; it is the opposite of what you would call the situation when your video content is in a different format than the one enforced by the browser. Plugin-based video content is, and this is obvious, not the convenient solution.

Except for these reasons, it shows MSIE unwillingness to cooperate with open standards, as H.264 should not be the defacto standard, which it would be, if MSIE exclusively supports only this format. It should only be one of the options.



**Leo Davidson**
3 May 2010 2:13 AM
#

"For other codecs, it's not clear today how the rights will be determined for commercial scenarios and what the costs will be."

It's not clear today what the costs for H.264 will be, either.

All we know is that MPEG-LA reserve the right to charge for just about everything (even *hosting* the files, it seems) but have promised not to charge for most things for a few years. That just makes them sound like crack dealers giving the first hit free, to me.



**Leo Davidson**
3 May 2010 2:46 AM
#

Just adding to my previous reply:

MPEG-LA could solve the trust issue by legally promising to continue to only charge reasonable prices for reasonable things forever, instead of only for a few years.

(Obviously "reasonable" would have to be defined, but if the licence cost was linked to inflation + some maximum percent, or whatever, that'd work.)

If the MPEG-LA did that then they'd stop looking like crack dealers giving out the first hit for free.

It reminds me of (UK) politicians bringing in draconian laws and verbally promising that they won't abuse the laws, yet refusing to make those promises part of the conditions of the laws.

If they really plan to be reasonable (and they may well do) then they should have no problem putting that in the contract.

If they did that then most of the problems would go away.



**Scott**
3 May 2010 2:47 AM
#

Why not support Theora (.ogv)? It is an open-source video format whose codec can be included in a browser or any other programs at no costs. This is clearly stated in its website (http://www.theora.org/benefits/).

In my opinion, Microsoft should support a variety of multimedia formats so that developers will not have

**696**

to spend more time making things work. Should Microsoft limits its support for new web standards, Internet Explorer will lose market share, as we have seen, to other browsers as a consequence.



**Florian**
3 May 2010 3:13 AM
#

"Until then, we'll continue with our current plans to deliver great HTML5 video in IE9 with certainty for consumers and developers."

You act as if H.264 was some kind of certainty. It is most definitely not. H.264 is the most uncertain of choices because:

- The commercial clause as put forth by MPEG-LA is very vaguely defined, thus exposing anybody who touches it to a huge risk.

- Pricing for royalties are not quoted, and it is practically certain that they would put anybody out of business except big media conglomerates, thus representing an unquantifiable infinite risk.

- Royalty free usage for personal use might end 2015, by which time an unspecified number of users and possibly businesses would be exposed to an unlimited amount of risk.

- H.264 and its lock-in of video codecs might be found to be illegal under antitrust and price-fixing laws, therefore exposing anybody who touches it to an infinite risk of this technology being prohibited, limited, crippled or stagnated.

- H.264 is put forth by a large committee, virtually guaranteeing that it will change little, and therefore exposing users and businesses to the infinite risk of being locked into yet another stagnant technology.

H.264 is the next GIF, and personally I don't fancy another 20 years in which some strangulating monopolistic standard cripples the web, the effects of which still reverberate in todays image support in browsers. Trying to make H.264 the standard for video is guaranteeing a GIFicationof web video and another 20 years or more of stagnation in the field of web video.



**Leo (not Davidson)**
3 May 2010 3:15 AM
#

Too much emotion in this debate for firm decisions so early on to be purely in the public interest.

Members of the working group really need to stop making statements and using language that is clearly chosen in an attempt to influence a draft specification that is still years from candidacy.

There is no doubt H.264 is the current obvious choice (in 2010), but it is also no reason why the rendering conduit cannot be wide open for publisher choice into the future and render the debate a non-issue.

This would be about as absurd as delivering user agents today that will only natively render GIF images out of the box.

Show the global community some respect; the internet would not exist as it is today (for our own profiteering) if not for the open development and resistance to railroading.



**SomeDude**
3 May 2010 3:51 AM
#

Great post, can't wait for IE9!


**Florian**

697

FOLLOW-UP ON HTML5 VIDEO IN IE9 - IEBLOG - SITE HOME - MSDN BLOGS


3 May 2010 3:57 AM

\#

H.264 may be represented by 60% of web video offers, but right now it is only represented by 25% of the market share of web video capable installed browsers. Whereas ogg-theora is represented by 75% of web video capable installed browsers.

The two H.264 proponent browsers are Safari and IE9. In order to fill the ogg-theora/H.264 gap, both Safari and IE9 would need to grow by over 25% in browser market share as opposed to IE6/7/8/Firefox. This is unlikely to happen within the next 18 months as Safari doesn't grow that fast, and Microsoft has shown that is incapable of replacing older versions of its browser in a timely manner.

Therefore the particular decision of IE9 *NOT* to support ogg-theora makes life especially much more difficult and uncertain for both consumers and developers. The decision will delay and hinder the arrival of web-video for another 2 to 3 years, because for users and developers there's no single sure way of supporting video in 100% of web video capable browsers regardless of other risks and uncertainties either H.264 or ogg-theora represents and regardless of their technical merits or drawbacks.


Cox
3 May 2010 5:15 AM

\#

The real question is: I agree that theora is not clear as of its patents, but if google publishes a new format, with the right licence to use it, would you implement it right away ?

I mean, would we have to wait till IE 10. Is your decision set in stone for ie9 or are you allowing it to evolve ?

I'd appreciate a clear answer, such as "whatever happens, we will stick to h264 ONLY", or "if a decent format with correct licence is made public, we will consider it".

Thanks in advance


alex
3 May 2010 5:17 AM

\#

again, wich audio codecs will ie9 support. video without an audio-stream is a little bit boring. will ie9 support the audio-element?


Jean-Philippe Martin
3 May 2010 5:42 AM

\#

First, thanks for this new post. This explain clearly your choice and your position and answer a lot of questions.

I only have the impression that you are taking a shortcut to implement html5 video tag and you do not give any options for the future.

Maybe that's not your team goal but the focus should be on fixing the html5 specs to define a clear, royalty-free codec.

MPEG LA objectives are commercials = to make as much money as possible : http://www.mpegla.com/main/Pages/PoolBenefits.aspx

So implementing this codec only in your next browser and believing that everything will be ok in the future is naive to say the least.

I think that your aiming only for the passing grade instead of giving a thoughtful and viable solution for

698

the longterm.



**Manny Maozinhas**
3 May 2010 5:46 AM

#

Thanks for this informative post, Dean. Can't wait for IE9!

BTW, the guys that are claiming for ogg support should check this Ed Bott post first: http://blogs.zdnet.com/Bott/?p=2086.

You also could go out and sayd the same stuff to Steve Jobs here: http://www.apple.com/hotnews/thoughts-on-flash/. Oh, wait, you can't - because unlike Microsoft, Apple don't like to open their posts to comments!!! After all, everything they do is for the benefit of the consumers, right...? (not).



**Jones111**
3 May 2010 5:53 AM
#

Apple seems to have the same Problems:

http://hugoroy.eu/jobs-os.php

A browser without codecs is bad, a browser without fast codecs is bad but open source-browsers that uses codecs that are based on illegal copyright violating sources sould be banned. - Well, maybe I just don't like the Mozilla HackFox browser.

Even if we have to run wmp, it would be better than no support at all. Just integrate the UAC for that pupose in an easy way, and we're all much happier.



**Brian LePore**
3 May 2010 6:26 AM
#

Wait, I am a bit confused. We can only run the other codecs when using a plug-in? Why can't the video tag also play any other codec that is installed on the user's computer, and have IE9 specifically make sure that H.264 comes bundled? Security? If that is the case why allow it in WMP/WMC?

Don't get me wrong, I think H.264 is a better format than OGG, and I do understand why other browsers support just OGG. I am in the camp of someone that wants it to just work. Right now I will output both formats for my users and would love to be able to cut that down in the future. I just don't understand why the video tag can't be made to work with everything the user has.

And can we please get a comment on the audio tag? Will it be supported? What format will that support? If it's something beyond mp3, wave, or ogg I would really like to know as I have code I would need to update.



**Rod Mac**
3 May 2010 6:46 AM
#

Video aside, why isn't IE9's focus Silverlight? Isn't HTML5 just playing into the hands of Google?



**Charbax**
3 May 2010 7:18 AM

#

699

Dear Microsoft, I want to hear you mention Ogg Theora. And I want you to talk about On2 VP8 which rumors are Google will unveil in a couple of weeks and free up licence free as HTML5 video codec.

You, Microsoft, if you want to sound like you are playing nice to the FOSS crowd, simply need to state that you WOULD be interested in supporting On2 VP8, and that you would even be interested in supporting Google in proving to the industry that that specific open source and free codec would in fact be usable and not be in conflict with the Mpeg LA patents.

You need to state that you would find it good for the industry that there were to be an open source and free video codec which also performs well compared to Mpeg LA patented codecs.

Especially if adding Ogg Theora 2.0 support in IE9 only requires few megabytes of codec code, then you should state that you will not have a problem supporting that.



Jimmy Jazz
3 May 2010 7:38 AM
#

@tz. Yeah, MS is evil. And the fact that you can post that in a MS blog, no less (but not anywhere in an Apple one, for that matter) is very telling indeed...



Rob
3 May 2010 7:45 AM
#

Current H.264 patent litigation

http://bit.ly/9vNGZW



Armando Ortiz
3 May 2010 8:06 AM
#

I don't think any amount of explaining is going to quell the cry for true interoperability with other codecs.

How Microsoft and Apple could make such an absurd assumption that one single codec can rule them all is beyond me.  Lord of the Rings, anyone?

The other thing that got me was this:

"Developers have consistently conveyed that they want certainty and predictability in the underlying browser platform."

If we're talking about IE, then that's an alternate universe that this statement has even begun to manifest.  I think it's more applicable to say that developers have consistently conveyed that they want IE to follow standards, which, by definition, provides certainty and predictability.

MY WEBWARE SHOULD WORK THE SAME ACROSS ALL BROWSERS THAT ADHERE TO STANDARDS!

The entire IE family of products is a perfect example of how NOT to provide "certainty and predictability" except where security (or lack thereof) is concerned.  I can't say it has done anything for page rendering because...and not to put too fine a point on it...it's simply not happening with all these hacks I have to put in place.

So Microsoft won't support Theora.  Then I choose not to support IE and I most certainly will not support H.264.  I'm a webware developer, Microsoft.  I want standards and I want something open that I can readily use and not have to pay huge amounts of cash for in the future.

"We are aware that this commitment is set to expire in 2016, but fully expect to commit to supporting the extension of this license and associated terms beyond that date."

That doesn't spell "certainty" to me...sounds more like the parable of the scorpion and the fox...

700

8/24/12
Case 2:10-cv-01823-JLR Document 392-8 Filed 08/27/12 Page 68 of 106
Follow-up on HTML5 Video in IE9 - IEBlog - Site Home - MSDN Blogs



**Aethec**
3 May 2010 8:07 AM


#

I wonder how many of the "MS is evil, Theora is good" comments come from people who actually read what this blog says.



**Jones111**
3 May 2010 8:10 AM


#

Steve Jobs mailed:

"A patent pool is being assembled to go after Theora and other "open source" codecs now."

http://hugoroy.eu/jobs-os.php



**Jadd**
3 May 2010 8:41 AM


#

Why not support both H.264 and Ogg Vorbis?



**Matt**
3 May 2010 8:43 AM


#

Rob, your (spam?) link says nothing about h264.



**Rob**
3 May 2010 8:45 AM


#

This is great news. Very logical roadmap. Thanks.



**Will**
3 May 2010 8:47 AM


#

Florian, you've clearly conveyed that you don't know anything about "antitrust and price-fixing laws" so why would anyone believe anything you say?

Jadd, please be polite and actually read before commenting. Thanks.

**Parrotlover77**
3 May 2010 8:49 AM


#

"We're committed to plug-in support because developer choice and opportunity in authoring web pages are very important; ISVs on a platform are what make it great."

You guys need to have a talk with the Windows Phone 7 team about developer choice, since there isn't any in WP7.

That aside, I like the direction IE9 is going.  H.264 is the best choice IMHO if you were to choose only a single codec for HTML5 video.  I'm glad to see you are open to other codecs, should other browsers

make a different choice. I'm hoping they don't because I think a single codec and a single standard for this will make video support a lot easier for web developers in the long run.

Has the IE team communicated with Mozilla/Apple/Opera about using H.264 exclusively? If there's buy-in from the other browser vendors, I think a lot of fears will be eased.



Ruthsarian
3 May 2010 8:50 AM

#

Come January 1, 2011, MPEG-LA could drastically increase its license fees on H.264. It could start charging companies like YouTube (Google) a per-stream fee. If there is no alternative, patent-unencumbered codec available then web video will be all but dead.

The arguments against Theora aren't really there. Every argument speaks of patent problems, but fail to specify one. It's just a lot of "maybe" and "possibly".

Why not invest a bit of effort, if Microsoft is unsure of Theora's patent issues, into research them for yourselves? Xiph.org already has, but if you're unwilling to take their word for it then invest some effort to educate yourselves.

Steve Jobs speaking of "a patent pool being assembled" is nothing more than fearmongering. The simple fact of the matter is that there is no patent pool. Such weak threats have been thrown out there since before it was published in 2004.

That's six years Theora has been available. And the number of lawsuits so far? Zero.

And there never will be. It would be a devastating blow to MPEG-LA if it were proven in a court of law that Theora was patent unencumbered. Why pay a license fee for MPEG when there's a free codec that provides just as good quality?

Which is why you will always hear of these vague claims of "patent pools" and some "major lawsuit" is waiting in the wings, ready to pounce upon Xiph.

Well they better move fast as a lot of those MPEG-LA patents will be up in a few years.



Will
3 May 2010 8:59 AM

#

Ruthsarian, you're plainly confused. MPEG-LA *is* a patent pool, no "assembly" required.



Ruthsarian
3 May 2010 9:00 AM

#

http://lists.xiph.org/pipermail/theora/2010-April/003769.html

There you go. Straight from Xiph. The statements from MPEG-LA about all video codecs being patent encumbered are simply not true. It's just a bunch of FUD to keep big corporations (Hello Microsoft) from finding suitable free alternatives and MPEG-LA losing out on another revenue stream.

Again. Microsoft, you need to educate yourselves before you make such important changes in what technology you implement. Your rash decisions affect millions of people.



Will
3 May 2010 9:08 AM

#

ROFL... yeah, xiph is a credible source. Unfortunately, the legal system isn't really based on asking the

defendent "Did you break the law?" and acquitting them if they say "no."




**Laurent**
3 May 2010 9:08 AM
#

I agree with Ruthsarian; it's just not a fair race. Free stuff starts off with so many walls dressed up.




**Ben Trafford**
3 May 2010 9:19 AM
#

The same FUD being spread about Theora is almost identical to the FUD that was spread about Linux. "We are analyzing our legal options. Linux obviously infringes on patents. We're going to do stuff to people who use it."

If Apple, Microsoft et. al. are so certain that Theora is breaking patents, then show your cards. Otherwise, don't try to pretend that implementing H.264 over Theora is anything other than a money grab by the usual gang of monopolists.



**Charlie**
3 May 2010 9:27 AM
#

"This post does not make it clear why VC-1 was not added as well."

VC-1, despite its origins, is a codec also governed by the MPEG-LA. Its licensing is pretty much identical to that of H.264, so supporting VC-1 in IE9 doesn't really buy anybody anything. Microsoft also (ironically) pays MPEG-LA for the right to include VC-1 support in Windows.

"MY WEBWARE SHOULD WORK THE SAME ACROSS ALL BROWSERS THAT ADHERE TO STANDARDS"

Then you should lobby W3C to actually explicitly add Ogg Vorbis/Theora support to HTML5 as it's currently not a part of the standard. Why get mad at Microsoft for not implementing something that's not a part of the standard? Microsoft is 100% following the HTML5 spec.

"it shows MSIE unwillingness to cooperate with open standards"

Which open standards? Ogg? Theora? These formats and codecs are open SOURCE, but they're not standards. In order for something to be considered a standard it must be ratified by an industry group or standards committee like SMPTE or ISO.



**Andrew**
3 May 2010 9:27 AM
#

As a web developer who watched Real destroy their market lock through greed, it is disappointing to see patent trolls continue to hobble innovation in web technology.

Dean, the moment you make the statement that you're an engineer, not a lawyer, your blog post becomes irrelevant. Any argument about the performance or legality of one codec against others must be backed with evidence, and Microsoft's track record on supposed IP violations in Linux makes it virtually impossible to take statements of this ilk as anything other than FUD. If you plan to speak for your corporation, understand that you have debts to pay.

FWIW I think HTML5 is for the most part a terrible idea. On the surface it comes across as a convenience for developers, but in practice it cannot be implemented fully by a browser vendor without licensing; I suspect it won't be long before the geolocation feature is hit by a submarine patent. To an end user, this smacks of oligopolistic practices which have no place in a document renderer. You'd be entitled to call

blogs.msdn.com/b/ie/archive/2010/05/03/follow-up-on-html5-video-in-ie9.aspx

this comment paranoia, but remember your employer had to settle out of court with Eolas and will probably have to do the same with i4i.



**Martin**
3 May 2010 9:29 AM

#

Quote:

"For web browsers, developers can continue to offer plug-ins (using NPAPI or ActiveX; they are effectively equivalent in this scenario) so that webpages can play video using these codecs on Windows."

What does this mean? Does it mean that someone can make a plugin which allow the video tag to play any kind of Video which the plugin can decode? Or will we again end up with a situation where we have to make special html to explorer 9, to trigger the correct plugin even if the user have it installed?



**timw4mail**
3 May 2010 9:34 AM

#

EXPLOITATION. IE is and has always been exploitation of the web for none but Microsoft's gain. This is not changing. The more I see things like this in IE, the less I see progress, because with every one step forward, there are two steps back.

There's a reason that everybody else (Except Apple) supports Ogg Theora/Vorbis for the video tag. Mozilla supports it because it's patent free. Mozilla can't afford to license H.264. Opera refuses to pay a license for H.264. Google supports it because they "aren't evil". Microsoft doesn't support it and Apple doesn't support it. WHY? Because they are members of the H.264 patent pool. They have royalties to gain.

This is completely inexcusable. Without actual standards, the web is fragmented. With only support of H.264, when the HTML5 video tag reaches primetime, IE 9 becomes another IE 6.

Microsoft, quit the browser market, or actually work with an existing rendering engine. Obviously there isn't enough competence at Microsoft to realize that an open web is more important than lock-in or profit.



**Paul**
3 May 2010 9:39 AM

#

andrew it's soooo cute that you think Dean will actually ever read these comments!

martin a plugin to render other codecs would require special html (an object tag) like Flash does in order to be invoked. they're explicitly not making the codec in the video tag itself pluggable.



**Matt**
3 May 2010 9:41 AM

#

tim: I think you need to understand what a "corporation" is legally required to do

(answer: generate profit for shareholders).



**FUD**
3 May 2010 9:55 AM

#

704

The following statement is instructive:

..."H.264 minimizes uncertainty for consumers and developers."

IOW:  The reason to choose H.264 in IE, exclusive to truly free codecs, is pure and simple FUD.

This is why IE is loosing market share hand over fist versus others.  MS is not listening to their technical base that wants free and open standards, and we are choosing to not take what is being force-fed to us any more.

If you do not support Ogg/Theora -- you loose, because we just say, "Oh, so, you can't play our movie??? -- Hmm, well, here... here's a better, faster, more secure alternative browser for you.  It's crunchy, you'll love it!"  -- and, they will.



Another
3 May 2010 9:59 AM

#

As long as you can still download Firefox and Linux .iso, IE 9 looks like a fully functional release to me...

Oh, and why bother writing blog entries about H264.  The reason that you don't support Theora is not technical or Legal - it's because you haven't been kicked in the arse by the EU and US Anti-trust regulators enough :)



T
3 May 2010 9:59 AM
#

Microsoft are yet to present any form of web browser to the public which follows any single w3c specification correctly.

Achieve that first and then try to support draft specifications.

Users are already voting with their feet on IE and it's time Microsoft had a serious re-think about the browser because by the time html 5 is final, IE will be irrelevant as a direct result of not supporting web standards correctly.

Now that Microsoft's position is clear and IE's market share is rapidly falling, developers can start to exclude IE from accessing content it is incapable of supporting.

Internet explorer needs the web. The web does not need Internet explorer.

There is a very deep hatred for IE amongst the professional web development community and developers are now so sick of needing to price support for IE separately, that many developers have started to add features turned off or missing when IE is used to visit the site.

Microsoft needs to try to win back the trust of web developers by supporting standards correctly.

This announcement goes nowhere towards doing so.

Way to go to provide your customers with a slow, irrelevant and featureless web experience.

Not a single usable version of Internet explorer released to date and yet still no lessons learned.

Every other browser software distributor tries to provide as much choice as they can for their users, while Microsoft is insistent on focusing on what choices it's users and developers should not have.

Wake up and start putting your customers first.

The web is about standards and choice. Not about what your abysmal web browsing software will not do.

Andraz

705



3 May 2010 10:06 AM

\#

There are perfectly good reasons to support h264 for Microsoft - you have all the patent mess sorted out, you have wested interest in media-serving space to continue to be locked down.

But that does not make you a good player in web space. For your strategic purposes of trying to keep barrier to entry for free software high, you are spreading Fear, Uncertainty and Doubt about Theora and OGG.

Either you know about possible exact patents that are being violated and in this case as a good player in web space you would need to disclose them, or you are on the other side helping to gather them and being quiet because of that (in which case you are a hypocrite).

Now there is the third option too. You neither know about patents Theora might violate neither are you trying to find them. I find that third option the most believable - You are basing decisions on your strategic interests and not on technical or legal merits.

How many lawsuits are there about Theora? Zero. Until any of them materialize, the talk about uncertainty is FUD. A well known tactics that should stop.

If this is engineering blog, act like engineers,  put out a concrete data about what you know about Theora. Give us the facts, not FUD.



Anders
3 May 2010 10:45 AM

\#

Why dont you do what micrsooft allways does best. Give the community an api that we can use to add theora  to ie 9 html 5 video tag. Then we could choice of a free webformat or a more closed one. The security issue could always be solved in one way or another ( by digitally signing or only allow codec download from certain vendor site).

Best Regards Anders



Steve
3 May 2010 10:50 AM

\#

If Microsoft implemented OGG and then got sued would you foot the legal bills? Would you hire the people who got fired or had their careers ended for making that decision.

Of course there are no lawsuits against ogg...The guys with deep pockets don't use it. If there are patents that can be used against it then they won't be shown until there is someone with deep pockets shipping ogg. The patent guys don't care about preventing you from watching videos, they care about taking money from Apple.

Working for a large technology company (not Microsoft or Apple) I can tell you that many decisions are made about technology on a legal basis for legal certainty. No one with hundreds of millions to lose really wants to see if ogg is unencumbered.



John Drinkwater
3 May 2010 10:53 AM

\#

Seriously, you'll point to blog comments made *within the same week* you made your post to back up your argument about rights issues?

Mike


3 May 2010 10:54 AM



You talk about "certainty and predictability", from my point of view as a developer, that would be if each browser uses the same codec. Right now Apple and Microsoft chose H.264, but I'm not sure if Google, Opera and Mozilla will do the same. If they don't, then there is no "certainty and predictability", because then we have to encode in multiple formats to support each browser.

I'm ok with H.264, whatever works you know, it's just that I'm disappointed that in of you (all browser-vendors) for not being able to agree on one standard.


Florian
3 May 2010 10:59 AM



@Will

Why should anybody believe what you say?

Now I'll explain to you the term "monopoly". Monopoly is when one company or conglomerate controls one particular market by having their product being the predominant one.

Monopolies happen, luckily H.264 is not (yet) a monopoly in Browsers, however it pretty much is the predominant product in the recording/editing/distribution sector.

Now I'll explain to you anti trust. This happens when a company that does have a Monopoly (like MPEG-LA already has it on recording/editing/distribution for for video codecs) missuses their strong position to shut out competition of that market.

You might ask, well, what's bad about a market without competition, and I leave that to you as an enlightening exercise (hint, you may use wikipedia).


virtualblackfox
3 May 2010 11:11 AM



Are you really explaining to us that choosing the exact opposite as what the other big web browser (firefox) already does is a good choice for web developers ???

No web developer is stupid: the html5/video tag is doomed, the install base of flash will never be beaten without ie and firefox implementing the same codec, so we are stuck with flash as the only cross browser video player (if mobile phone are ignored as their screen size require a separate encoding anyway).


StandardsGuy
3 May 2010 11:17 AM



@Leo (not Davidson)
>Members of the working group really need to stop
>making statements and using language that is
>clearly chosen in an attempt to influence a draft
>specification that is still years from candidacy.

That's all a part of being in the working group. You get to influence the specification. The working group is not just some magic impartial council that carves standards into stone tablets without regard for what its members want.

Microsoft, along with the other members, is invited to comment on how the standards should be

707

molded.



### Steve Watkins
3 May 2010 11:20 AM



@Ruthsarian: You are out of date with your claim that H.264 fees could start as soon as January 2011. Earlier this year MPEG LA announced that there will be no royalties on internet video that is fre to end-users until Jan 1st 2016, and this post by Microsoft suggests that it may well continue past that date too.

For the first time in my life I feel sorry for Microsoft.

The voice that seems to be largely missing from these debates is that of all the different companies that provide video services on the web.



### Mike
3 May 2010 11:20 AM



Serious question: what would Microsoft do if Google decided to encode all YouTube video in a different codec (not H.264)?



### Aaron
3 May 2010 11:30 AM



I'm disappointed that Theora will not be implemented in IE9. This seems like a step backwards. Once we hit year 2014 a lot a bloggers and sites will not be able to finance the large royalty fees set out by the MPEG-LA.

The optimal solution would be to support Theora and H264. At least this would allow everyone to use HTML5 video.



### Steve Watkins
3 May 2010 11:38 AM



@ Aaron: Its not 2014, its 2016, and even then they may not start charing. Do you really think they would try to charge people who cant afford to pay? Generally people only come after their slice of the pie if there is actually a pie worth sharing there. Where video is not monetized I very much doubt they will bother.



### Theo
3 May 2010 11:46 AM



A lot of people are glossing over what might end being more important: The lack of a Canvas tag in MS' IE9 Implementation.



### Romeo Placia
3 May 2010 12:02 PM



Theora is better because it's open. EOD

**708**



ravewulf
3 May 2010 12:04 PM

#

Audio - obviously going to be AAC (AAC and h.264 go together in the .mp4 container)

h.264 - clear on legal end (and MS is already paying for it, why not use it?), excellent compression/quality, hardware acceleration, large mobile device support, large support in terms of software editors/encoders/players, large supply in content

VC-1 - similar/same as h.264, except not quite as much much mobile device support and very little supply in content

ogg - somewhat murky legal end (some person who helped develop could jump in with claims and cause a mess), compression not as good as h.264, little to no hardware acceleration, very little mobile device support, smaller support in software/encoders, very little content uses it

This could all change in the FUTURE, but this is how things are NOW



EricLaw [MSFT]
3 May 2010 12:08 PM

#

@ravewulf: As mentioned previously, IE9's AUDIO element will support MP3 and AAC.



ravewulf
3 May 2010 12:17 PM

#

@Mike I doubt Google will go with something that doesn't have broad support. They want as many people as possible to be able to use their products, regardless of browser or OS. As W3C adds more codecs in the future, browsers and content will adapt to it.

@EricLaw [MSFT] Thanks for clarifying (I hadn't checked, just went with what most use with h.264 video) :)



Steve Watkins
3 May 2010 12:20 PM

#

@ravewulf: Regarding theora murky legals, I dont think it even needs to be someone who helped develop it, its about patents that cover any of the concepts used to make the compression & format work.

For there to be a totally safe codec from a legal point of view, someone would need to come up with a method of compression that was completely new, not covered by any of the existing patents out there, then they would need to be recognised as the owner of this intellectual property, and then declare that they were giving it to the world for free forever.

Either that or wait for all the existing aptents that cover things like H.264 to expire, which will be a very long time away.



Jack
3 May 2010 12:27 PM

#

@ravewulf

"ogg - somewhat murky legal end (some person who helped develop could jump in with claims and cause a mess)"

709

It's sad that people have to resort to lies. But shows also fear. The question then is why? Why does this CODEC (ogg theora) that according to them is so bad, has so much legal uncertainty, has so little support causes them so much fear that they have to lie to justify their words and actions?



**Steve Watkins**
3 May 2010 12:33 PM
   #

@Jack If you want to believe that legal uncertainty surrounding Theora does not exist then thats your choice, but please dont call people liars on this issue unless you would like to personally cover us all for any legal hassles if it does turn out that any of theoras methods are covered by someone elses patent.

It may well be true that there are other reasons why some would be interested in spreading FUD about Theora, but that does not mean that patent woes for Theora are impossible. I have a feeling we will find out before too long.



**Jack**
3 May 2010 12:46 PM
   #

1) Microsoft takes their legal decisions based on news sources without credibility.

2) Microsoft uses insinuations and innuendos but not facts to exclude other CODECs

3) Their decision is not based on monetary reasons because they don't receive enough money from the MPEG Cartel

4) Non-commercial use is useless for the web. Most of the web runs on advertising, this excludes 99% of the people that wants to put video on the web

6) Most of the hardware and software sold in prosumer market don't include an H264 license to allow commercial use anyway!

5) This puts newcomers, startups and small business at great financial disadvantage

6) The standards for the web have always been royalty-free! Video should too!

7) It's that the MPEG and their members, including Microsoft and Apple, want to eliminate competition at any cost and impose a extortion scheme

8) Lack of competition will be bad for consumers and bad for technological innovation!

9) Microsoft's hypocrisy is immense: at the time of OOXML standardization Microsoft claimed that having more than ONE file format was good for consumers. Now that's no longer the case.

10) It's just another step to the end of a FREE and OPEN internet. Big corporations will always subvert these organizations. Microsoft, Apple, Google, Nokia...



**Jack**
3 May 2010 12:50 PM
   #

@Steve Watkins

"If you want to believe that legal uncertainty surrounding Theora does not exist then thats your choice, but please dont call people liars on this issue unless you would like to personally cover us all for any legal hassles if it does turn out that any of theoras methods are covered by someone elses patent."

You're seeing things upside down! It's you that have to provide PROOF that Theora infringes. Until then I will do the right thing. Call liars LIARS!

If people fear patent suits for using Theora, then they will also fear patents suits for using H264. Both are

710

FOLLOW-UP ON HTML5 VIDEO IN IE9 – IEBLOG – SITE HOME – MSDN BLOGS

the same position.



**Sir Gallantmon (ニール・ゴンバ)**
3 May 2010 12:56 PM

#

@EricLaw [MSFT]

Why not support the Vorbis format with <audio> tag? Nobody has been arguing against it, it just seems to get lost in the hubbub about Theora and <video>... And Microsoft ALREADY USES Vorbis in the Xbox consoles, so they obviously feel it a good codec.

As for <video>, supposedly, Dirac is going to be VC-2. It's not confirmed, but we'll see. As for H.264, nobody seems to notice that the "free" license for H.264 and AAC only apply if you are making ZERO revenue. This means, no advertisements, no "donations", no monetary "subscriptions", etc.

Because of this, it is legally infeasible to use H.264/AAC for most sites aiming to use <video> that don't already pay for the H.264/AAC license. Rather, I'd use either Dirac/FLAC, Dirac/Vorbis, Theora/FLAC, or Theora/Vorbis. Most likely Theora/Vorbis since that has the most support in the HTML 5 browser space, with Chrome, Firefox, and Opera supporting it.

I realize that Theora is terrible for HD quality video, which I believe Dirac excels at. So technically both bases should be covered. I'm also aware that Firefox's HTML5 backend does include support code for Dirac, it just is disabled currently.

Obviously, Chrome's HTML5 backend supports it, since it uses ffmpeg, which supports a smörgåsbord of codecs.

Opera can have Dirac plugged into it since it uses GStreamer for its HTML 5 engine.

So, Microsoft, when will you be implementing Ogg support for HTML 5? ;)



**JoeJaz**
3 May 2010 1:01 PM

#

My vote is for VP8.  Understanding that this is not yet "open", if it is opened, it would seem to make a lot of lives easier and just make sense.  I wish MS would consider this option but I'm not optimistic.



**Fredrik Wendt**
3 May 2010 1:14 PM

#

A free and open format (that doesn't require you to pay a license fee for development) would be far better than H.264. Ogg is a very good option that is well supported in many modern operating systems.

This is a real chance for MSFT to show they do want to participate, instead of EEE.



**Ray**
3 May 2010 1:21 PM

#

When Microsoft if making a decision, they should stand on a Microsoft side.

From Microsoft point of view, whenever they add a codec into IE, it will aldo be included in Windows. Microsoft must be made sure that they do not need to pay layalty later on for the codec.

Otherwise, considering the number of Windows/IE copy on the market, it will be very difficult for Microsoft to manage.

711

This is also the reason that Microsoft did not include Codec for DVD play in Windows XP.




**Matt**
3 May 2010 1:25 PM
#

JoeJaz, any announcement from Google that they're making VP8 "open" is worthless *unless* they provide developers who implement it a warranty of indemnification (as Microsoft does for their major products) saying that Google's legal team will defend implementors from lawsuits, and Google's assets will be at risk, not the implementors. It would be a huge win for the internet, but I'm not holding my breath. Instead, expect to see Google make a meaningless announcement that gets lots of press but ultimately means little.




**Fiery Kitsune**
3 May 2010 1:39 PM
#

Hey Microsoft, are you so proud that you can't even be bothered to mention Vorbis or Theora by name?




**Paul Eccles**
3 May 2010 1:43 PM
#

To the people who are suggesting all the obscure formats, VC-1, Dirac, VP8, Ogg etc etc:

H.264 can be decoded in hardware by most portable devices, including the Zune, iPod and many (most) video-capable cellphones. The future is mobile.



**Aaron**
3 May 2010 2:04 PM
#

@Paul Eccles

Those formats are not obscure. Ogg Vorbis, for example is used in games quite a lot. VC-1 is used in Blu-ray Discs. (I'll give you Dirac).

There is no logical reason to artificially limit IE9.

Microsoft may as well go back to IE6.



**Bob**
3 May 2010 2:09 PM
#

"# re: Follow Up on HTML5 Video in IE9

Monday, May 03, 2010 8:10 AM by Jones111

Steve Jobs mailed:

"A patent pool is being assembled to go after Theora and other "open source" codecs now."

http://hugoroy.eu/jobs-os.php"

Interestingly enough, the patent troll/pool Jobs was talking about has just filed... against Apple! Not Ogg (Which Mozilla, Google and Opera all contain.) H.264 appears to be risky.

Looks like no codec is safe.

712

Case 2:10-cv-01823-JLR FOLLOW UP ON HTML5 VIDEO IN IE9 - IEBLOG - SITE HOME - MSDN Blogs



**PG**
3 May 2010 2:13 PM
#

Matt:

Microsoft provides indemnification for h.264? Or does MPEG-LA?

Neither does? I thought so.

They can't indemnify against patents, just like Xiph.org or Google can't: If the patent holder denies a license, that's their right. And with patents there's no need to be "reasonable and non-discrimatory".

If in 2 weeks ACME Corp. comes up with a patent that h.264 necessarily infringes on and doesn't want to license it to Microsoft at all, IE9 will ship without h.264.

And there's nothing that MPEG-LA or Microsoft could do about it.

For real-world examples of this, look at any tech trade fair: Devices are taken from display by customs because of MP3, not for Vorbis. It doesn't matter if those devices and their vendors have proper licensing with Thomson/mp3licensing.com: Sisvel prefers to stay independent with their patent.

How is h.264 safer from that than any other codec?



**PG**
3 May 2010 2:21 PM
#

@Paul Eccles:

"H.264 can be decoded in hardware"

Nice try, still wrong: H.264 can be decoded by codec functions in hardware that are driven by firmware.

h.264 is too complex to be handled in hardware completely. The accelerated functions will be generic enough to be adaptable to other codecs as well, and those codec functions usually support other codecs besides h.264, such as VC-1, MPEG-4, RealVideo.

Support for Theora would be a matter of a firmware update.

Also, those h.264 decoders usually only provide baseline support. To be able to decode more advanced h.264 profiles, the devices have to fall back to software-only again, until the firmware is similarly enhanced.

When comparing h.264 with Theora for mobile devices with similarly optimized codecs, h.264 will suffer from its higher decoder complexity (yay for committee based designs that needlessly bloat the feature set), so should Theora take off and be supported by the firmware, it will actually be a better choice.



**anon**
3 May 2010 2:29 PM
#

What this article says: "We're considering the VIDEO tag to mean ONLY H.264"

You might as well come out and implement a <H264> tag yourself. I mean, why listen to other people?



**anon**
3 May 2010 2:31 PM
#

What if <IMG> only supported JPEG? Can you see the issues that might arise from that?

713



**Jon**
3 May 2010 2:35 PM
#

This was posted earlier in this thread, but it deserves repeating:

http://lists.xiph.org/pipermail/theora/2010-April/003769.html

Video codecs are NOT any more of a patent minefield than any other area of software development, it is just that codecs produced through industry groups like MPEG-LA are overly encumbered with trivial patents due to the distorted fashion in which they are produced.

Do you see Microsoft refusing to implement SVG because of a 'submarine patent risk'? Or Canvas? Or CSS3? No, but implementing these is no less or more risky than implementing a royalty-free video codec such as Ogg Theora. The difference is that Microsoft is invested in the MPEG standards group and while it may not currently profit from the patents it holds for H.264, it still helps to prevent competition from non-members, as they have to pay royalties and cannot cross-licence patents like the members can.



motercalo1
3 May 2010 2:42 PM
 #

I think it's gonna really be great.



**Bored**
3 May 2010 2:43 PM
#

The IEBlog is pretty boring these days. Microsoft announces what they're going to do. Most developers and users read it and think "oh, that's interesting" and move on with their day. And then the trolls and zealots appear and fill the comments with the usual load of FUD and spam, none of which will make any difference at all. Rinse. Repeat. It's all so boring. I wish that MS would get back to talking about technical things so that the trolls and crazies get bored and go away.



**WarpKat**
3 May 2010 3:22 PM
#

@Bored:  You're so boring... :P



**Ken Kinder**
3 May 2010 3:43 PM
#

This fiasco reminds me of the bad old days of Embrace, Extend, Extinguish. As usual, IE is the last browser to implement the HTML5 standard, and as usual, they're looking to kill open standards in the process.

There's nothing open or free about H.264. It's a patent-encumbered format, with Microsoft holding the lionshare of the patents in the H.264 pool. By *only* supporting this anti-standard, Microsoft is intentionally trying to swing its patent weight around and distinguish competition from open source browsers like Firefox.

Shame on Microsoft. H.264 is anti-open, anti-free, and anti-competitive. It has no place on the web and Microsoft knows it.

Alex

714

FOLLOW UP ON HTML5 VIDEO IN IE9 - IEBLOG - SITE HOME - MSDN BLOGS



3 May 2010 3:46 PM

#

@PG:

"h.264 is too complex to be handled in hardware completely."

That's incorrect. Video cards which support DXVA decoding for H.264 (that's most Nvidia and AMD cards) support full GPU decoding of the compressed bitstream. It's called Profile D or VLD Profile, look it up: http://download.microsoft.com/download/5/f/c/5fc4ec5c-bd8c-4624-8034-319c1bab7671/DXVA_H264.pdf

The codecs currently supporting DXVA decoding in Windows are MPEG-2, H.264 and VC-1. The support is a combination of decoder hooks, driver APIs and GPU hardware support.



Alex
3 May 2010 3:51 PM

#

Here's a suggestion:

Anybody referring to Ogg as a "codec" should henceforth have their comments and opinions entirely disregarded. If you don't know the difference between a file format and a codec, you're probably not qualified to contribute to this discussion so please stop trolling.



Waldo
3 May 2010 3:54 PM

#

Okay, let's say Microsoft implements Theora and Vorbis support, then it becomes clear that one of these or both codecs infringe patents in the MPEG-LA patent pools: Would it matter for Microsoft? I don't think so, because MS has these patents already licensed, unlike Mozilla. So the only risk for MS would be if Theora or Vorbis infringe a patent MS has not licensed, wouldn't it?



clive boulton
3 May 2010 4:00 PM

#

Microsoft is listening. Excellent steps.



rugu
3 May 2010 4:18 PM

#

« When there's industry consensus and confidence that the uncertainties are resolved, we'll be open to considering other codecs. »

So we have to await the final battle against Theora/Vorbis?

Is this what Steve Jobs was talking about in his email?



Ray Stantz
3 May 2010 4:34 PM

#

I was pleased to note that this blog entry links to a Wikipedia article. It serves to underscore the relevance and value that Wikipedia has for a great many people. It is, therefore, extremely disheartening to know that Internet Explorer 9 will be incapable of native support for all of Wikipedia's content.

Mozilla, Opera Software and Google support both Ogg Theora and Ogg Vorbis in their browser software. Activision Blizzard uses Ogg Vorbis audio in World of Warcraft. Bungie's Halo, published by Microsoft Game Studios, uses Ogg Vorbis audio on Windows and OS X. It is clear that in these cases the risk of using open media formats was found to be acceptable.

Internet Explorer 9 has the opportunity to make a significant contribution to the open web through the support of open media formats. I encourage Microsoft to take that opportunity.



Herodotus
3 May 2010 5:04 PM

#

I am estatic that Microsoft is adopting HTML5 and h.264. This is truly great news for consumers! The move to open standards is much appeciated.

My only requests are that you provide a version of ie9 with no activex support compiled in to improve security  and that you fully support HTML5's canvas feature.



ombarg
3 May 2010 5:22 PM

#

@IEteam, i would like to ask something to you, guys, this has been said lot of times here, but i would like to put again on the table this issue:

Please *consider* the possibility of a radical migration of IE engine.  Choose Webkit, choose Gecko , what you like, but please do something to boost standards support in the *short* term.

Google did it ( Chrome Frame ), why don't you?

I.e:

"Virtually all of Chrome's April expansion came at the expense of Microsoft Corp.'s Internet Explorer, which dropped 0.7 percentage points to finish the month at 59.95%, the first time that IE has fallen under the 60% mark." (*)

Thanks for listening.

(*) http://www.computerworld.com/s/article/9176240/Chrome_again_beats_Firefox_in_browser_gain_race

(retrieved 2010/05/03 )



Giving up
3 May 2010 5:26 PM

#

A wise decision. This will have the effect of further marginalizing Internet Explorer, and give you guys more of an opportunity to finally lay this beast to rest. I also recommend supporting only AAC audio, and only the WMV container, and possibly finding other ways to shoot yourselves in the foot with views that are polar opposite to Mozilla and just as extremist.



Matt
3 May 2010 5:42 PM

#

ombarg sez "Six out of ten browser users use IE. You're clearly not successful since you've only got 50% more marketshare than all of your competitors combined (including those that run on platforms you don't). So you should adopt the rendering engine used by your weaker competitors."

Errr. yeah. That makes sense.

blogs.msdn.com/b/ie/archive/2010/05/03/follow-up-on-html5-video-in-ie9.aspx

Case 2:10-cv-01823-JLR Document 392-8 Filed 08/27/12 Page 84 of 106

 

**Wurst**

3 May 2010 5:57 PM

#

"And really, now that we see multiple large companies with experienced legal teams and non-trivial exposure committed to shipping Theora I think we're kidding ourselves when we attempt to analyze this as a legal issue. It's not. It's a business/political decision. The market is now going to battle it out.  Enjoy the show."

http://lists.whatwg.org/pipermail/whatwg-whatwg.org/2009-May/020015.html

 

**matthewv**

3 May 2010 6:27 PM

#

Well this makes it easy then: we can just encode all our videos in Ogg Theora, and blame Microsoft (as always) whey they don't work in IE. Nobody would be surprised: IE hasn't supported anything resembling an up-to-date standard in years, so why would anyone expect IE9 to? (Note: I'm not saying Ogg Theora is more modern or up-to-date than H.264, just that not many would be surprised if IE didn't support something most other browsers do.)

 

**Mac**

3 May 2010 6:28 PM

#

I don't see how the choice of H.264 would be anticompetitive against Mozilla, as someone claimed. According to the post:

"Third-party applications that simply make calls to the H.264 code in Windows (and which do not incorporate any H.264 code directly) are covered by Microsoft's license of H.264"

so there is no reason why Firefox would have to pay to implement H.264 on Windows (which is the only platform where IE competes against it).

As for the whole patents/fees issue: discussing what might happen in 5+ years in this industry is bound to be inaccurate and/or irrelevant. For the time being, H.264 seems the most reasonable choice. And if it turned out to be wrong, there is plenty of time to fix it.

 

**Matt**

3 May 2010 6:38 PM

#

Mac: You should read the discussion in https://bugzilla.mozilla.org/show_bug.cgi?id=435339

 

**Jamie**

3 May 2010 6:38 PM

#

I also can't wait for IE9, and think you guys are doing great things! As a Web Developer I've backed IE since version 4 (however in fairness I was absent for IE6 fiasco).

What gets me is that Apple is basically saying the same thing about H.264 but I'll bet no one is sending them nasty comments... oh yeah that's right you can't leave comments (Not that they would be bothered to read them anyway, apple's far too busy prosecuting its consumers these days) And with all the I-products backing it I would go with h.264 too. Though I would personally like to see the clout those products cary deminish.

717

I would like to request that IE9 be made a mandatory update for windows

I would also like to see IE add the ability to provide Windows IE9 feature updates for things like this. If (for example) some new technology came out that replaced h.264, you'd be able to impliment an update changing IE9's support. I think the ability to add new features as they come along, instead of having to wait 2 version later would have a drastic impact on IE's market share. Just a thought.

Keep up the good work!



**Hamranhansenhansen**
3 May 2010 7:17 PM
 #

I applaud Microsoft for following the ISO standard for consumer audio video.

H.264 is the successor to the DVD. When you argue against H.264, that is like arguing against the DVD. Both DVD and H.264 enable consumers to choose any device from any manufacturer and still see video content. It enables publishers to publish one video product and be playable on any device from any manufacturer. This is good for everybody involved.

There is no need to support any codec other than H.264 in the video tag. If you're not using ISO standard video, you don't need W3C standard markup. If you are going to be nonstandard, you are choosing to be seen by just a small fraction of the Web. In that case, you might as well use a plug-in.



**Jordan**
3 May 2010 8:21 PM
 #

Seriously. Can supporting both codecs (H.264 *and* Ogg Theora.. is "Ogg Theora" in MS's list of banned words on blogs or something? Not mentioned once by name!) really be that horrible of a nightmare? Sounds like they're playing their same old game. Ho, hum.



**person**
3 May 2010 8:41 PM
#

@Jordan: Perhaps they are not as short sided as you? There are more codecs than h.264 and Theora. Do they need to list every single codec that exists each post make the whiners happy? What they are are talking about applies not only to Theora but to VP8 (which is even listed in the title of one of their links) and others.



**Karthik**
3 May 2010 10:38 PM
 #

I don't see why Microsoft should follow through MPEGLA's lead.

Clearly, Microsoft hasn't learnt a lesson after the MP3 licensing ambush.



**Leonardo**
3 May 2010 10:43 PM
 #

I understand and agree with Microsoft's arguments that H.264 is a great codec and that its legal story is more predictable than that of other codecs.

However, I also understand the arguments of others who worry mostly about the fact that they may

**718**

eventually be required to pay royalties for H.264.

How about going one step further, Microsoft? Use your leverage as a leading software company and the fact that you are one of the licensors of MPEG LA to lead an effort that attempts to make MPEG's H.264 baseline profile royalty-free, similar to what JPEG did with its own baseline profile. Notice that this would need to be done only to the baseline profile, and more advanced profiles could continue to be royalty-bearing. This way, we can have the best of both worlds, and other browser makers would have no reasons not to support H.264.




Robert O'Callahan
3 May 2010 11:03 PM

#

Dean, you say "Third-party applications that simply make calls to the H.264 code in Windows (and which do not incorporate any H.264 code directly) are covered by Microsoft's license of H.264." ... and then "As with all licensing programs, there are limitations and issues, which people have pointed out."

This is quite subtle. So all third party apps are "covered" in the sense that Microsoft's license applies to them, but they must still respect the limits of that license, right? In particular, third party apps that wish to use the codec for "commercial use" (whatever that is; a lot of developers will need lawyers, I guess) are actually not "covered" in the normal sense of the word.

In light of that, I still think your declaration that "Third-party applications that simply make calls to the H.264 code in Windows ... are covered by Microsoft's license of H.264" is potentially very misleading. A large number of apps that do just that could find themselves paying royalties or on the receiving end of a lawsuit from the MPEG-LA.




Andrew
3 May 2010 11:21 PM

#

Ogg Theora was the *original* recommendation for the <video> tag... but then Microsoft decided to use H.264.

Why!? Do web developers now have to provide two versions of every video, one for IE and one for other browsers? Is this not what happened with stylesheets, and Microsoft's hasLayout "feature"?

I originally had high hopes for IE9, but I am very disappointed. Thanks a lot Microsoft.




hAl
4 May 2010 12:24 AM

#

<blockquote>MPEG-LA could solve the trust issue by legally promising to continue to only charge reasonable prices for reasonable things forever, instead of only for a few years.</blockquote>

MPEG-LA does not determine the licenses. That is up to the licensees. And those have already committed to charge reasonable prices as participant in the standardization proces of h.264 or as a participant of the blu ray association. Also the patent pool will get smaller over the next 5 years as some patent overrun the 20 years making the share for other patent holder bigger even without a price rise.

So your suggested doom scenario of a steep price rise is not on the cards. The parties involved in the patent pool have every reason to keep prices reasonable.




Richard
4 May 2010 1:09 AM

#

719

I'm confused about these points:

"For web browsers, developers can continue to offer plug-ins (using NPAPI or ActiveX; they are effectively equivalent in this scenario) so that webpages can play video using these codecs on Windows. For example, webpages will still be able to play VC-1 (Microsoft WMV) files in IE9."

1) You say that developers can offer plug-ins using NPAPI, but your hyperlink for NPAPI goes to a Wikipedia article that states that IE no longer supports NPAPI plug-ins!

2) Does this mean that a plug-in will be required in order to play VC-1? Will the plug-in be provided with IE and installed by default, or will it be a separate download?



PG
4 May 2010 1:25 AM
#

@Alex: "GPU hardware support."

What does this GPU hardware support consist of? Most likely (from looking at implementations of the codec acceleration with GPUs on other platforms) by pushing some shader _program_ into the GPU.

So while this program is designed for the special purpose features of a GPU, these features are still relatively generic.

Case in point: AMD released a new video driver that provides support for additional h.264 profiles for some of their chips. Were GPU video decoding "entirely in hardware", this wouldn't be possible.

So yes, this is software, Theora support can be added (on the OMAP platform they do this already), and Theora on GPU will likely require less resources than h.264 on GPU.



Martin
4 May 2010 5:00 AM
#

Can we get any comment on why Microsoft don't allow 3 party components/developers to add support for additional codecs in the video tag?

And on an additional note: Why don't you re-use the existing Windows (player) codec system. That would make the entire problem go away, because then users could play $FORMAT video if they had the codec installed. (And there is already codec support for Theora).

And on an additional note: What about audio support? (Both in the video itself, and the <audio> tag?



Leo Davidson
4 May 2010 5:03 AM
#

@hAl, come on, let's not have a stupid argument of semantics. Pretend I said "the members of MPEG-LA" rather than "MPEG-LA" if you must.

If you are so certain that all members have all agreed to be reasonable until all their patents expire, where is that in writing, please?

If they are all really going to do that and really mean it then it will be no problem for them to make it legally binding, instead of the current vague promises not to charge anyone for certain uses for a few years, after which all bets are off.

If it is in writing somewhere then my idea was already done before I suggested it and all is well, but AFAIK there is no such legal promise.

**720**

FOLLOW-UP ON HTML5 VIDEO IN IE9 - IEBLOG - SITE HOME - MSDN BLOGS



### Leo Davidson
4 May 2010 5:10 AM

#

Switching sides of the debate for a moment, I'd defend Microsoft's decision not to open up the <video> tag to all codecs installed on people's machines.

For whatever reason, video codecs & demuxers tend to be the most bug-ridden, crash-prone, unstable, security-flawed software on the planet.

(I guess it's caused by the same phenomenon which makes almost all media playback UIs completely non-standard. :) )

It gets even worse when you have a soup of different codecs and demuxers on machines (as many people do), as well as so many differnet versions and builds of different codecs/demuxers, etc. There are also added complexities with 64-bit (since the 32- and 64-bit worlds see different codecs).

If you want to produce a stable, secure and predictable web browser (or video plugin) then you need to have control over the code which deals with video. That doesn't mean it has to be baked into the browser but it does mean you don't want to open the browser up to running any old codec/demuxer.



### Leo Davidson
4 May 2010 5:20 AM

#

Clarification: When I say "have control over the code which deals with video", I don't mean you must necessarily own that code, but that it must be vetted and whitelisted as "okay".

Whether that vetting & whitelist process is open to modification by third party developers and/or end users is another discussion.

The one thing you really, really do not want to do is have web browsers automatically passing untrusted data from the web to the existing video codec free-for-all that makes so many desktop video apps crash today.



### hAl
4 May 2010 5:29 AM

#

@Leo Davidson

From the MPEG-LA FAQ

"Q: What is the Term of the AVC Patent Portfolio License?

A: The initial term runs through December 31, 2010. The License is renewable for successive five year periods for the useful life of any Portfolio patent on reasonable terms and conditions.

Q: Is there a limitation on the amount that royalty rates may increase at each renewal?

A: If royalty rates were to increase, they will not increase by more than 10% at each renewal for specific license grants (except Internet Broadcast AVC Video, which is provided for in Section 3.1.5 of the License)."

So yes, patent licensors in the mepg-la patent pool have committed to reasonable terms and conditions and to limited lisense prices on renewals. The scenarios of steep price rises on renewals are just made up stories by open source fans who feel the need to spread FUD on the h.264 licensing.

There is no basis to support such stories as that would be against the interests of patent pools which are mainly created to support broad support for a technology with one stop licensing.

Martin



4 May 2010 5:37 AM

\#

To Leo Davidson:

Really? Is the Windows codec system so bad? But it's Microsofts own system, so it should be easy to run the decoder in its own process. Then you can simply restart it if it crashes. (Extra bonus if you resume the video where it crashed). But I must admit I have never seen a windows user complain about codecs crashing.

But even if it is that bad, that's not an argument because anyone can still make a 3 party codec which decode video in IE9 they just can't use the video tag to do it. So we once again have to make special html to IE9 -(

What will most likely happend is that someone make a plugin, which use the windows codecs to decode video, and then we end up with this situation anyway.



Responsible Adult
4 May 2010 6:03 AM

\#

Soundtrack for reading these comments: http://www.youtube.com/watch?v=OYws8biwOYc

People whose major achievement is using Mom's WiFi are giving advice to an engineering team -- I love this country.



ieblog
4 May 2010 6:22 AM

\#

@Richard: Dean's point is that ALL browsers support more codecs via plug-ins/addons-- in IE, that's using ActiveX while in other browsers, the mechanism is NPAPI. IE itself doesn't ship any plugins, but virtually all installs of Windows include Windows Media player, which supports VC-1.

@Martin: As mentioned a few times, IE9 will support MP3 and AAC for audio.



Martin
4 May 2010 6:42 AM

\#

But the problem with IE9's codec plugin support, is that it require non standard ie9 only html to use.

And why no vorbis audio support for <audio>

Do you fear patents for that too(And if you do, remember to inform Microsofts game section, which does use vorbis).



Leo Davidson
4 May 2010 7:17 AM

\#

@hAl,

Thank you for the reply. If that is accurate & binding, and there are no hidden caveats, then it seems reasonable and was (more or less) what I was suggesting.

@Martin,

It's not really the Windows codec system that's at fault. The problem is that people writing codecs/demuxers tend to do a poor job of checking for unexpected inputs and produce code that crashes (or has security flaws or whatever) when faced with them.

722

You can move all your video rendering out-of-process and sandbox it for a bit more security (assuming the codecs are well-written enough to run in the sandbox; and even then sandboxes usually only protect from writes, not reads (data theft)).

Even then, though, you'd still be asking your users to put up with unpredictable video performance and stability.

If videos randomly crash or do not work in a web browser then it's better than taking out the entire web browser -- for sure -- but it's not exactly a great user experience.

We don't really need a hundred different video codecs anyway. A handful of good codes with known-good quality implementations is much better than a free-for-all.

I mean, there are a million and one different image formats but the web gets by pretty well with just PNG, JPEG, GIF and SVG.

I'm not saying there should only be one codec (though it'd be nice if everyone could agree on one which they all support) but there's no need for ten, either.



Leo Davidson
4 May 2010 7:24 AM
#

@hAl, Another thought:

Given that the rate for non-commercial use is currently 0, according to that FAQ it can never be non-zero. :)



Martin
4 May 2010 7:38 AM
#

[quote]It's not really the Windows codec system that's at fault. The problem is that people writing codecs/demuxers tend to do a poor job of checking for unexpected inputs and produce code that crashes (or has security flaws or whatever) when faced with them.[/quote]

What? If you do the decoding in its own process, that process should not have any read/write access to any other user data.

And remember the alternative to the possibility of bad codecs are a blank screen, because the browser can't decode the video at all. I know what i prefer.

I assume that Microsoft have written their own H.264 windows codec, so we know that just using the codec system will at least work for MPG4.

So as i see it, the alternatives for non H.264 are between no video, and possible bad video.

But I really don't think that there are that many problems with the existing windows codecs.

And I agree we don't need support for any insane format(Flv anyone?) but the problem with the current solution is that it's H.264 only and there is no way for third parties to fix that.

Using windows codecs would atleast allow users the possibility to view the videos at wikipedia.org and other places which use other formats.



Martin
4 May 2010 7:40 AM
#

"(except Internet Broadcast AVC Video, which is provided for in Section 3.1.5 of the License).").
This is the problematic section. So i think they plan to ask money for all H.264 streams 1 jan 2016.

723



Peter Olejnik

4 May 2010 7:59 AM

#

As new media artists and professionals, what we all simply want to ensure is that Apple and Microsoft won't start using MPEG-LA to sue content "professionals" for adopting the H.264 standard under the guy of HTML5.

If Microsoft, Apple, including the entire MPEG LA community are willing to waive their royalties rights for the better of the web new media experience, AND guarantee that content producers—including "professionals"—along with viewers, will both, not be harassed or sued, then sure—HTML5.

However, till then, Adobe Flash video all the way.

 

Leo Davidson

4 May 2010 8:08 AM

#

@Martin,

"What? If you do the decoding in its own process, that process should not have any read/write access to any other user data."

Sorry but by saying that you appear to be ignorant of not just how Windows works by how the security model in every desktop OS works. (Including desktop flavours, and most other flavours for that matter, of Linux/Unix.)

If a process is running under an account then, in general, it has (read, and often write) access to that account's files.

You could run it under another account, or even a virtual machine, and marshal all the data back and forth to that account but doing that is easier said than done, both from a software engineering perspective and from a sysadmin perspective. (Even more so when we are talking about third party code where you have no control over its requirements and assumptions.)

Certainly, and in general, it would be wonderful if code was restricted from "doing things it shouldn't do," but it would be a full-time job defining (and then vetting) the lists of what each piece of code may do. Instead, at least for now, all desktop OS use accounts (and a few other things like the Low Integrity stuff) which paint with a much broader brush.

All of which is largely off-topic and beside-the-point anyway. Even if you have perfect sandboxing and security around the code doing the video decoding, if it still crashes then the user still gets annoyed and the people trying to host videos still can't feel certain that their content will actually work.

I don't think anyone really wants anything other than H.264 or Theora (or both), possibly with Google's On2 codec thrown into the mix if they end up sorting it out. (And chances are if Google do then the Theora advocates will switch to that instead, since it seems to tick all their boxes and then some.)

Let me stress again that I'm not saying browsers should be completely closed to supporting new codecs in <video> tags; I am just saying that doing it by feeding untrusted data into whatever random codecs happen to be installed is a really, really bad idea.

I mean, if you advocate doing that then you are advocating a design where web browsers auto-run locally installed code on arbitrary web data. Think about that for a second...

If you still can't see what a nightmare that would be, replace the phrase "video codec" with "ActiveX control."

The two types of components are virtually identical, in terms of how they plug into other apps. You certainly would not want any website you visited to be able to invoke any installed ActiveX DLL with the data/arguments of its choice. Ditto with video codecs.

724



**hAl**
4 May 2010 8:24 AM
#

@martin

No that is not a problematic section because the licensing fee for Internet Broadcast AVC Video is zero till 2016 and after that will be maximum the fee of free TV broadcasting which is currently 10,000 dollars per broadcaster(site).

I guess people spreadig the FUD forgot to mention that little detail...

From the MPEG-LA license summery I have (which is not updated to 2016 yet)

**********

"For (b) (2) where remuneration is from other sources, in the case of free television (television broadcasting which is sent by an over-the-air, satellite and/or cable Transmission, and which is not paid for by an End User), the licensee (broadcaster which is identified as providing free television AVC video) may pay (beginning January 1, 2006) according to one of two royalty options: (i) a one-time payment of $2,500 per AVC transmission encoder (applies to each AVC encoder which is used by or on behalf of a Licensee in transmitting AVC video to the End User) or (ii) annual fee per Broadcast Market12 starting at $2,500 per calendar year per Broadcast Markets of at least 100,000 but no more than 499,999 television households, $5,000 per calendar year per Broadcast Market which includes at least 500,000 but no more than 999,999 television households, and $10,000 per calendar year per Broadcast Market which includes 1,000,000 or more television households.13 In the case of Internet broadcast (AVC video that is delivered via the Worldwide Internet to an end user for which the End User does not pay remuneration for the right to receive or view, i.e., neither title-by-title nor subscription), there will be no royalty during the first term of the License (ending December 31, 2010), and after the first term the royalty shall be no more than the economic equivalent of royalties payable during the same time for free television."



**hAl**
4 May 2010 8:25 AM
#

In addition to the above license text video broadcast of less that 12 minuten are licensed for free anyways.

So as I can see it a internet video broadcaster that plays h.264 video longer than 12 minuten and has a marketshare of more than 1 million people (I asume that would be unique visitors to the video) would pay

- nothing untill 2016 and then a maximum of 10,000 dollars.

A site with video less than 12 minuten would pay:

- nothing

A site with videos that have less than 100,000 visitors would pay:

- nothing.



**hAl**
4 May 2010 8:36 AM


And I am inclined to expect that MPEG-LA leaves the fee at nothing even after 2016 anyways as it hardly worth it to collect those fees from the few sites that regularly have long video's that get more than a million viewers.

**725**

FOLLOW-UP ON HTML5 VIDEO IN IE9 - DEAN HACHAMOVITCH'S BLOG - SITE HOME - MSDN BLOGS

What is at least evident that there is a lot of FUD being spread about the h.264 licensing fees that could have been avoided with some simple surfing tto the MPEG-LA website and doing some minor fact checking.



hAl

4 May 2010 8:42 AM


#

Some links for the readers

AVC/h.264 licensing FAQ:

http://www.mpegla.com/main/programs/AVC/Pages/FAQ.aspx

AVC/h.264 license summary:

http://www.mpegla.com/main/programs/AVC/Documents/AVC_TermsSummary.pdf



8675309

4 May 2010 9:22 AM


#

1 thing that gets me is what about the low powered video proccsors that cant do high qualty flash video properly?



Charlie

4 May 2010 11:06 AM

#

@PG:

"Theora support can be added (on the OMAP platform they do this already), and Theora on GPU will likely require less resources than h.264 on GPU."

You're arguing semantics. When people talk about "hardware accelerated" decoding on PCs, it's implied that the acceleration is done by the GPU. Whether you call that "software" or "hardware" support, the fact remains that the GPU vendor still needs to implement that support one way or another. Also, the GPU functions that comprise DXVA are only generic to a certain extent: for example, you can't take an old Nvidia GeForce 4000 series card and make it support H.264 VLD profile decoding. Take a look at http://www.nvidia.com/docs/CP/11036/PureVideo_Product_Comparison.pdf and you'll notice that not every video card supports every codec for DXVA.

But more importantly than can Theora support be done, the bigger question is WILL it be done. Please provide me a link to a news source that shows that Nvidia, AMD and Intel have committed to adding Theora DXVA support. Where's Apple's API support for Theora decode acceleration?



Charlie

4 May 2010 11:16 AM


#

To all those saying Microsoft is ignoring standards by choosing not to support Theora and Vorbis:

1. HTML5 specification doesn't actually require either of those codecs. To be fair, it doesn't require H.264/AAC support either.

2. HTML5 specification is still in draft stages which means no browser's HTML5 implementation is "more" complete than others because the specification isn't done yet.

3. Neither Theora nor Vorbis are standards because they haven't been ratified by any industry or standards organization (such as SMTPE or ISO). Open source != standard

So to suggest that Microsoft is somehow ignoring web standards for video is completely ridiculous. How can they ignore something that doesn't even exist?!? One could just as easily make the argument then that Firefox and Chrome are ignoring standards too!



PG
4 May 2010 11:38 AM
#

@Charlie:

Semantics? I talk about the difference between necessarily having to buy a new device for any other codec support, or installing a driver update should that come out. That is, the difference between a possible update and an impossible one.

The other aspect is that with the GPGPU APIs it should be feasible for third parties to provide GPU-accelerated video decoding. Probably not as efficient as the vendors (that can natively access device functions), but still an improvement. As written, that happens on OMAP.

Indeed the question is, if it will be done. Simple answer: It will be supported when there's a business case. Should Theora become common on the Web, it will be supported. Microsoft (and others) seems to be very interested in making sure that this won't ever happen.

For "Vorbis and Theora aren't standards", a standard is a standard once it's set in stone by _some_ governing body that declares it stable. For Vorbis and Theora, this standard body is Xiph.org - simple as that.

Following your argument that only SMTPE and ISO are supposed to declare standards, HTML should be universally ignored (That's W3C, not ISO),SMTP should be ignored (that's IETF, not ISO).

ISO gave us (in cooperation with ITU-T) OSI networking. We're on IP now, surely something must have gone wrong?

I think I'll stick to standards that are actually out there (Theora for nearly 6 years by now)



Amtiskaw
4 May 2010 11:56 AM
#

@hAl

The 12 minute limit you mention only applies to video services where the user pays for individual videos, so ad-supported services such as YouTube would not benefit from this.

Your figures around the royalties for internet broadcasters do not correspond to the language in the summary. You talk about 'unique viewers', but the summary makes no mention of actual viewers, only to the size of the 'Broadcast Markets' in which people COULD receive the content. This map: http://www.dishuser.org/TVMarkets/ should give you some idea of the number of 'Broadcast Markets' in the USA alone. Now, imagine you post a video on the internet, people COULD watch it in every one of those areas (and the rest of the world!), and theoretically the 'economic equivalent' royalties promised by the summary could be millions upon millions of dollars.

Interestingly, the licence summary has a footnote that indicates the royalty equivalence between internet broadcasters and free television is expanded on in section 3.1.5 of the full AVC Patent Portfolio License, but for some reason they don't actually make the full license available online: http://www.mpegla.com/main/programs/AVC/Pages/Agreement.aspx

Quite apart from broadcaster royalties, there is also the issues of royalties for distributing decoders. Browser vendors such as Mozilla and Opera would have to pay several million dollars per year to distribute versions of their browsers that included a h.264 decoder, or drop support for HTML5 video. This would be a tremendous strain on their finances, particularly for a non-profit foundation like Mozilla.

727

It would effectively mean only rich companies could make web browsers that could browse the entire web and show HTML5 video.



**Charlie**
4 May 2010 12:03 PM

#

@PG:

You're interpreting my example of ISO and SMPTE literally. I listed them as examples of industry and standards organization, but the list certainly isn't limited to them. 3GPP, IETF, ITU, DECE... These are all valid examples. But Xiph.org isn't, I'm sorry to say. Xiph is a non-profit corporation, not a governing body or an organization of industry professionals. If you follow that logic, than RealVideo is also a standard.

Let's repeat that again for everyone to hear: Vorbis and Theora are not standards.



**FactChecker**
4 May 2010 12:27 PM

#

<<<Browser vendors such as Mozilla and Opera would have to pay several million dollars per year to distribute versions of their browsers that included a h.264 decoder>>>

And where exactly did you pull this per-year figure from?

(FWIW, Mozilla likely spends more per year on Firefox than Microsoft and Apple spend on IE and Safari-- they can afford to, because Google plays them almost $100M/year).



**Charlie**
4 May 2010 12:29 PM

#

@Amtiskaw:

"Browser vendors such as Mozilla and Opera would have to pay several million dollars per year to distribute versions of their browsers that included a h.264 decoder, or drop support for HTML5 video."

To be fair, this is not an issue on Windows 7 and Vista because access to the native H.264 decoder is open to any DirectShow or Media Foundation based application. It's exactly how players such as PowerDVD work, so there's no reason why Firefox or Chrome couldn't take advantage of the same decoder.

—



**Peter Olejnik**
4 May 2010 12:33 PM

#

@Charlie,

That's nonsense! They do own the content in an indirect form.

If an internet broadcaster wishes to sell rights to their content that's been encoded via h.264 through a professional third party software suite—Adobe Flash, or Final Cut Pro—why should they then need to dish out additional costs to do so, especially since they've already paid with the intent to monatize via the price of the third party "professional suite"? That's usury, not to mention evasive!

Charlie – also don't know if you know this, but the majority of individuals who broadcast through the web are not just huge media firms, but average people – YouTube, Vimeo.

Evermore, with Google's recent announcement regarding the possbility of users renting out their content

-- will that mean everyone who's gone viral, and now wishes to sell access to their YouTube videos using HTML5 will also payout MPEG-LA millions too? That's absurd!

 tom
4 May 2010 1:44 PM
  #

The security "risks" with downloading codecs is directly related to the way in which Windows Media player works.

Windows Media Player can prompt a user to download a codec, or a licence for any video and accepting such, opens the whole media player up to scripting access where all kinds of malware comes alive.

The media player should *never* have allowed browser windows (in particular IE windows when IE wasn't the default browser (due to already known security issues)) to be popped up.

Users attempting to download a video for the latest Footy match, not knowing/caring that the video content wasn't 100% legit would find them self faced with never ending popups for p-o-r-n, e-n-h-a-n-c-e-m-e-n-t drugs, fake-anti-virus software galore.

Often times the only way to rid oneself of the popups is to CTRL+ALT+DEL and kill WMP.

I realize the debate over video formats is intense and heated - but we are all very concerned because it is both important, and using *existing* stats to make a long term choice is a massive failure.  SVG never took off with great numbers BECAUSE IE didn't support it. CSS3 isn't mainstream yet BECAUSE IE didn't support any of it (even with vendor prefixes). XHTML didn't take off BECAUSE IE didn't support it. HTML5 is slow to take off BECAUSE IE6/IE7 don't support it, and IE8 only supports some stuff.

The Browser needs to take an advanced position and support new technologies BEFORE they fully penetrate the market as they DETERMINE where the market goes... and thus when MSFT says that IE9 will ONLY support H.264 natively, MSFT, and IE are in turn FORCING the community to give up supporting other formats.

Don't be surprised in the slightest that developers are upset about this - and don't be surprised when they are vocal about it, or alter their supported browsers in their web apps as a result.

 Amtiskaw
4 May 2010 3:07 PM
  #

@FactChecker

I 'pulled it' it from the blog of Mike Shaver, chief evangelist for the Mozilla Corporation:

of http://shaver.off.net/diary/2010/01/23/html5-video-and-codecs/

To quote:

"Mozilla has decided differently, in part because there is no apparent means for us to license H.264 under terms that would cover other users of our technology, such as Linux distributors, or people in affiliated projects like Wikimedia or the Participatory Culture Foundation. Even if we were to pay the $5,000,000 annual licensing cost for H.264, and we were to not care about the spectre of license fees for internet distribution of encoded content, or about content and tool creators, downstream projects would be no better off."

 Leo Davidson
4 May 2010 3:25 PM
  #

@Charlie:

729

"Let's repeat that again for everyone to hear: Vorbis and Theora are not standards."

You say that like you expect it to mean a great deal to people.

Whatever your definition of "standards," when people say they want "standards support" very few of them care exactly who defined those standards (or file formats or whatever you want to call them).

What people want is for web browsers (etc.) to implement well-defined specification s(may I use that word?) in ways which are compatible and consistent with other browsers (and other software in general). Clearly the spec has to be a good spec or it won't be that useful (or it'll be too difficult to for different teams to implement consistently, a bit like HTML4).

From what I've seen of the Ogg and Vorbis formats (I can't speak about Theora as I have not written code against it), they are well defined, well documented and well conceived. They have been well maintained over the years, with regard for quality, sensible ideas/changes and backward compatibility. They have several good example implementations and libraries. They have been used in lots of software and hardware projects, including many commercial ones. There are many tools which will input and output data in the Ogg Vorbis format in a consistent way.

What more do you want from a format before it's as good as a "standard?"

If you think there is something specifically wrong with Ogg, Vorbis or Theora then by all means state your objection (like anything else, they are not perfect), but the fact that the body which designed them doesn't meet your standards* doesn't seem like a valid objection. Judge the format, not the size of the companies who sat on the committee which rubber-stamped it.

(* Uh, I mean, "criteria" since you don't quality as a standards body and thus cannot define a standard, by your own definition. :-))

There are plenty of other formats which aren't "standards" by your definition and yet which we all use every day more than happily.

It's like insisting on having a THX logo on your audio hardware: It might indicate some level of quality but it doesn't indicate it absolutely. There are some fairly poor THX-approved sound systems as well as the awesome ones. There are many awesome ones that don't bother getting THX approval because it costs a lot of money and people who know about audio equipment know that THX is largely meaningless.

Similarly, some international standards are an absolute crock (like the MS Office XML standards which zero people, including MS themselves, have managed to implement so far) while some international standards are great, and some great formats aren't "standards," and so on...



Amtiskaw
4 May 2010 3:36 PM
    #

@Charlie

Sure, and I believe they considered doing just that, but decided against it because such a strategy would undermine the cross-platform nature of the Firefox browser, and the web itself.

As FactChecker pointed out, Mozilla certainly have the cash to license H.264, and probably any other codec they like, but they're making a stand based on the principles open web. The open web is about more than just following standards, it's also about open participation. The great strength of the web has always been that anyone can make a website or develop a browser. Adopting H.264 for web video undermines that principle, so Mozilla have taken a stand against it. Not because it's easier, or because it's cheaper, but because it's the right thing to do.



hAl
4 May 2010 3:41 PM
    #

**730**

This test in 2010 show that to achieve similar quality a Theora file would have to be twice the size of a h.264 file.

http://keyj.s2000.ws/?p=356



Amtiskaw
4 May 2010 4:03 PM
#

@hAl

So given that user bandwidth increases by 50% each year:

http://www.useit.com/alertbox/980405.html

We could just stick with Flash for a couple of years then switch to Theora and it would be exactly the same as if we'd switched to H.264 now!

Problem solved! Everyone meet back in in 2012! :-)



wambo
4 May 2010 8:48 PM
#

@Charlie: Did you consider PNG a standard at the time it was implemented by IE 4.0 and 32-bit Netscape 4.04? That was when it was merely described in a RFC, years before being standardised by the ISO.

@Amtiskaw: The end of 2012 is also when all patents relevant to MP3 decoding should be expired, then Firefox might implement native MP3 support for the audio tag so we have at least some sort of common denominator for native implementations.



hAl
4 May 2010 11:37 PM
#

<blockquote>We could just stick with Flash for a couple of years then switch to Theora and it would be exactly the same as if we'd switched to H.264 now!</blockquote>

Unlikely because the amount of video on the internet will also increase and with Theora the increase would be much faster.

Basically using a mediocre codec like Theora would increase the cost of internet traffic for datacentres, transit and service providers with hunderds of millions of dollars. The prices of internet for consumers and sites would be higher than nescesary.



hAl
4 May 2010 11:43 PM
#

@Amtiskaw

In a broadcast the video is send to all people in an area.

On a site a html video is only send on a pageview to one person.

So looking at unique visitors to a webpage containing a html video is a good measure for the number of people a video was broadcasted to.



Amtiskaw
5 May 2010 12:55 AM

#

@hAl

That's certainly a reasonable view, but the point is it's YOUR opinion, not what's actually written in the licensing summary. The summary itself is ambiguous. If they've nothing to hide, then MPEG-LA should publish exactly how internet broadcasting royalties would be calculated, so we could have a properly informed discussion.



Druss
5 May 2010 5:40 AM
#

When a company starts choosing to avoid risks and sits on its own success, well I think it's a sign of decadence.

I believe a company like Microsoft should look a little bit further and pursue not only its own interests (money) but also oversee -whenever possible- the interests of the entire community.

Imho copyright as it's today is only about a way to make money regardles it is right or not.

Please rethink your decision and add native support for the Ogg Theora technology in IE9.

Kind regards,

druss



sam's sung
5 May 2010 8:17 AM
#

"When a company starts choosing to avoid risks and sits on its own success, well I think it's a sign of decadence."

They're paying for it as IE's market share continues it's inevitable downward slide. I believe we've passed MS' tipping point.



Dan
5 May 2010 9:04 AM
#

The HTML5 standard doesn't specify a codec so let the user install whatever DirectShow codec they want to use instead of breaking the spec and stopping non-H.264 codecs from playing.

Until now Microsoft hasn't assumed the responsibility for whether or not codecs need a licence in the country that Windows is being used in, they've just set up the DirectShow framework and let users install whatever codecs they want, so why should it start now?

Or would it be something to do with Microsoft using IE as a tool to help cash in the future on the H.264 patents that they own?



Matt
5 May 2010 9:13 AM
#

Dan, it's both foolish and impolite to ask questions when their answers are contained in the original posting.

PG
732



5 May 2010 9:39 AM

#

@Charlie:

The difference between RealVideo and Theora is that there's a specification (versioned, stable for 6 years, open to implement for third parties) for Theora. There isn't such a thing for RealVideo.

Were Real to release a specification with such characteristics, RealVideo would be standardized, yes.

The only question for standards is if they're properly managed: That is, clear specifications, stable release engineering, open access for third parties. Xiph.org has shown to be able to provide that.

If someone wants to provide their own video standard, they're free to do so. And prove over time that they're doing a good job managing a standard.

But that's probably a matter of belief, similar to the difference between "big government" (ISO and their ilk) and "individual reponsibility" (lots of standards by whoever cares enough to manage them).

Given the track record of ISO, I'll stick to the Xiph.org model.



Anonymous

5 May 2010 11:28 AM

#

Here's all anyone needs to know about MPEG-LA: they write one thing and say another.



hAl

5 May 2010 2:15 PM

#

@PG

Theora is not a standard an it takes nearly twice the bitrate to deliver the same quality video as the h.264 which is an actual standard.

Worthless as an option for internet video.



Noname

5 May 2010 2:41 PM

#

I think one big thing that people would like to hear is using plugins, can you extend what the video tag supports?

The post says you can use plugins to use codecs, but nothing mentions extending what the video tag supports.

So could there be an outright yes or no answer for this? (This should help keep the theora people quiet knowing that IE isn't limited to just h264 if you can extend the video tag.)



hAl

5 May 2010 2:54 PM

#

@Noname

Microsoft themself will not make such a plugin but anybody else could.

Noname

**733**


5 May 2010 3:02 PM
#

I know that, but the whole point of my post was to have at least a semi-official yes or no on the video tag can be extended to support additional video types.

With who writes the plugin, I don't care, in the end I know that support in a lot of cases means "if you can do it, good for you, but don't come crying to us if it breaks." All I care about is whether you can do it.


Leo Davidson
5 May 2010 5:04 PM
#

@hAl, AFAIK MS have not specified which kinds of plugins they mean, which I think is what Noname is getting at.

If people can only write the current styles of plugins then there is no way to extend which video tags IE supports (at least as I understand the plugin APIs).

They would not be able to make it so that a web author could simply specify a Theora (or whatever) file as the target of a video tag. Instead, the cumbersome embed/object tags would have to be used (just like with Flash today) and all of the browser's native video UI would be lost or have to be reproduced (again, just like Flash today). Such a video plugin would have little to offer over what Flash gives us today, other than the codec itself.

OTOH, if IE9 has an API for supplying video codec plugins then that's different.

PS: Not sure what you mean when you say one format isn't a standard because it isn't as high quality as some other format. Since when has that been the case? By that logic, MP3, MPEG2, JPEG, GIF, XML and a whole heap of things would not be standards as for each of them there exists something which is technically better.


Alex
5 May 2010 7:07 PM
#

FYI, here's an excellent overview of H.264 licensing:

http://www.engadget.com/2010/05/04/know-your-rights-h-264-patent-licensing-and-you/


Charlie
5 May 2010 7:28 PM
#

One thing I still don't understand: why are people pissed at *Microsoft* for not including Theora/Vorbis/Ogg support in IE9? Shouldn't you all be mad at W3C for not specifying mandatory video/audio codecs in the HTML5 specification to start with? Microsoft is no more right or wrong in choosing H.264 than Mozilla is right or wrong in choosing Theora - both choices are compliant with the current spec draft! If you want Theora/Vorbis/Ogg to be supported in every browser, then W3C should explicitly say so in the HTML5 spec! Being mad at a company for not doing what they were never required to do in the first place just seems kind of passive aggressive to me.

Imagine I was throwing a party tonight and I invited you. You ask me what food you should bring to the party and I say, "Whatever you want". You show up at the party with a cheese platter. Can I really be mad at you because you didn't bring chips too? I don't think so. After all, I did say "bring anything"!

Sorry if I'm oversimplifying the issue, but it just seems to me that all this time and effort spent venting at Microsoft would be much better spent venting at W3C and pressuring them to be clearer in the HTML5 video specification. If Microsoft truly is committed to fully supporting the HTML5 spec, then you stand a

better chance getting Theora/Vorbis support in IE9 (or IE10) if those codecs are in the spec to start with.



**Noname**
5 May 2010 7:52 PM
#

One thing I should make clear then. I'm not annoyed at Microsoft choosing h264. They have the right to choose what format they use and to be honest, I don't care too much about theora or vorbis.

The whole purpose of what I'm doing is to hopefully stop those people whining on and on. In both posts on the video tag supporting h264 the wording of the posts didn't help too much and it has been left implied that the video tag is limited to just a certain set of Microsoft chosen formats and you are left using plugins to get other formats to play, but it will be like flash to use.

If you think about it, if someone comes back and says, "Yes it is possible" then all of those people whining on will be silenced. This means that it won't be directly supported by Microsoft themselves but someone can go out and add Theora support to the Video tag. (Although there are bound to be a few die hard complainers who will continue saying that Microsoft should be writing the codecs.) On the other hand, if someone says "No it isn't possible" then I won't really care either way. It just means my quest to silence the moaners failed.

I like places like the IEBlog, yes there is always some glossing over of how things are going but that is expected. I just want to find a way to make a lot of these very annoying comments to go away. I also thought that having one fairly constructive question on the topic rather than lots and lots of people bashing while there is still no complete information on the topic.



**nobodyInParticular**
5 May 2010 9:03 PM
#

Every so called advantage of H.264 mentioned would be equally true of a true open and royalty free industry standard.  Clinging to these proprietary formats harms the public.  They are covered by patents of dubious quality forcing people to purchase licenses directly or indirectly as a form of tax on everything. All evidence that these proprietary formats are a greater benefit than a harm to the public is purely subjective.  People believe or disbelieve these things as they suit their agendas.

As an engineer, I do not believe that any patent on a file format is legitimate.  Encoding video into a file is not patentable in and of itself since the need for it makes the innovation obvious.  And just what is innovative by a compression technique?  These have been known for decades.  Nothing new there either.



**hAl**
6 May 2010 12:32 AM
#

<blockquote>Every so called advantage of H.264 mentioned would be equally true of a true open and royalty free industry standard</blockquote>

Then name us which true open and royalty free standard:

* Is an ISO/IEC standard

* Combines the same quality/compression ratio

* Is a current Blu ray standard

* Is a codec used for digital TV broadcasting

* Has hardware support in hundreds of millions of devices

* Is widely supported in video en entertainment software

735

Possibly if a codec provides all of the above advantage and also is open and royalty free there could be reason for complaints about the descision to use h.264 as the codec for the video tag in IE9.

 **Dan**
6 May 2010 1:12 AM

    #

@Matt:

"Dan, it's both foolish and impolite to ask questions when their answers are contained in the original posting."

It doesn't say why Microsoft have suddenly decided to worry about codec patents in IE when every other program of theirs uses DirectShow and works with whatever codec the user wishes to install.

It doesn't say why Microsoft have decided that using user-installed codecs to access video on the Internet can be dangerous in IE when Media Player does exactly that already.

It doesn't say why Microsoft have decided to block everything that isn't H.264 on quality grounds when they're happy to have Media Center play anything.

The answers are not contained in the original psot.

 **Leo Davidson**
6 May 2010 3:03 AM

    #

@Charlie,

Some people *are* angry with the W3C for not mandating a codec. However, if you read up on the issue you'll find that the W3C wanted to specify a codec in the standard but the participants could not agree on one.

Apple *refused* to support Theora.

Mozilla *refused* to support H.264.

Google were happy to support either or both.

Microsoft, meanwhile (AFAIK anyway), had not weighed in on the issue until now. So it's not that (different groups of) people have not been angry with the other players; it's just that the anger with Microsoft is fresher.

The W3C decided that there was no point specifying things in a standard which they knew implementers would actively ignore. I'm not sure that was the right thing to do but I can see their reasoning. A big goal of HTML5 seems to be to create a spec which really is (eventually) implemented in its entirety, unlike HTML4.

For better or worse, standards don't actually mean much when they conflict with business (etc.) interests and the W3C has no power to dictate anything to anyone.

Leaving the codec out of the spec. punted the responsibility for choosing a common codec over to the browser makers. Those browser makers have failed to agree on a common codec. Every player (except maybe Google) has attracted some anger from some people over the matter.

 **Will**
6 May 2010 7:18 AM

    #

nobodyinparticular sez <<<Encoding video into a file is not patentable in and of itself since the need for it makes the innovation obvious>>>

**736**

eeeeeeeeee
eeeeeeeeee

eeeeeeeeee

eeeeeeeeee

Your remark makes your complete lack of understanding of patent law obvious. If you're going to play fake-lawyer, you need to do at least a little bit of research.



**PG**
6 May 2010 8:54 AM
#

@hAl:

Whether Theora is a standard depends on the definition of a standard. It definitely fits mine (stable, properly specified, accessible to third parties).

For quality, the specification doesn't say anything about quality. See the improvements between the libtheora 1.0 and 1.1 implementations, and those that happened after 1.1. It's catching up, and it definitely has a need to do, but it has more room for improvement than h.264. All those improvements happen within the standard.

Your list of devices that use h.264 (Bluray, digital broadcasting and all those devices) is actually an example of the issues h.264 faces: Thanks to the complexity of "design by committee", where everyone tried to get their own pet feature in, to improve leverage in the licensing business, h.264 is segmented into various profiles.

So you have a valid h.264 data stream on Bluray but can't play that stream on the iPhone (and most other portable devices) as only the baseline profile is supported on the latter. digital broadcasting uses another set of h.264 features, as does the encoding in studio workflows.

For the web, this means that only h.264 baseline will be universally used (to support the growing segment of mobile internet). So any quality comparison between codecs in the context of web-video must be with h.264 baseline to be meaningful.

When you get your hands on a h.264 stream you'll have to look first if the used features are all supported by your codec (ever had those spurious defects in mpeg4 video? Those might have come from different support for specified features).

Theora will just work.



**Gabe**
6 May 2010 10:05 AM
#

No reason to artificially limit IE9 users to a single codec, other than 'business strategy'.

You people are so unbelievably selfish. Can't you just make a decent browser that supports as many codecs as possible? It costs you nothing but development time, and your bank account is full.

And stop pretending your decisions are in the customer's interest. The only decisions you make support your bottom line, and we all know it. So very predictable.



**Alex**
6 May 2010 12:37 PM
#

@Dan:

Your original question of "Or would it be something to do with Microsoft using IE as a tool to help cash in in the future on the H.264 patents that they own?" WAS in fact addressed in the original post. It's been pointed out that Microsoft pays more to MPEG-LA to license H.264 than it actually gets back from it in royalties. BTW, anybody who thinks that codec royalties amount to some significant amount of cash - you're mistaken. We're talking about pennies per unit. For a company the size of Microsoft the amount of money it gets from codec royalties is a drop in the bucket - certainly not enough to be worth changing

entire IE strategies for.

@PG:

"Theora will just work."

Really? A mobile phone will decode 1080p Theora video without a hitch? I sincerely doubt that.

Your point about H.264 profiles and their fragmented support is valid, but you're missing the real point: not all playback devices have the same processing power so profiles were defined in order to create conformance guidelines. In other words, profiles are not what make H.264 support fragmented. Even if you took the profiles out of the spec, you'd still need some way to say "this device will play H.264 video but only up to 720x576 25 fps progressive with 4:2:0 subsampling because it doesn't have the CPU power to handle anything more". If all decoders could handle 1080p 60 fps 4:4:4 video, there'd be no need for profiles.



Dam
6 May 2010 2:40 PM
    #

@Alex:

This is true, until the licence is changed in 2015 and Microsoft can decide how that licence is changed as they form a part of MPEG-LA.

I'm sure they're willing to invest in corning the market by making something free for the consumer before reaping the rewards later on, it's not as if it's the first time it's happened. The decisions taken now seem to point to that end, if it were otherwise they would use DirectShow like any other piece of Windows software to allow the user the freedom to view whatever website they want.



ANAND
7 May 2010 2:00 AM
    #

What is the top speed at which browsers can run SunSpider? I guess the answer is going to be ZERO SECONDS.

I just ran this test on my 2 yr laptop on Chrome 5.0.396 dev channel build and 10/26 of the tests are actually running in 0 seconds (See the Chrome reults here at http://tinyurl.com/25eeswh)

Come-on IE, catch up. It should not be hard to do all the work in no time ... !!!



Ryan Smyth
9 May 2010 10:12 PM
    #

Wow. People. Seriously. Read the post. The number of comments above that show complete ignorance of the original article is staggering.

Read it again with perhaps a bit more of an open mind and maybe some more education on the actual issues involved.

Open source codecs are not a solution to the problem that H.264 addresses for Microsoft. Those codecs may be "open", but that does not mean that they have been legally vetted against patent infringement.

etc. etc. etc.

It's all there in the post as to why Microsoft isn't supporting other codecs out of the box. If you really want them, then install them. Nobody is stopping you. IE9 supports the plug-in architecture needed for other codecs.

Stop whining.



**Wurst**
10 May 2010 6:00 AM
 #

@Ryan Smyth:

« but that does not mean that they have been legally vetted against patent infringement »

Theora is basically just an improved version of a former proprietary codecs older than 10 years. The original was very likely carefully avoiding any patents and so did the contributers to the open source project. The chances for patent infringement are low, the chances for infringement of patents Microsoft has not already licensed are even lower. Really, how can anybody believe that patents are the issue here. Google had no problem including Theora/Vorbis support, why does Microsoft.



**Matt**
10 May 2010 6:33 AM
 #

<<<The original was very likely carefully avoiding any patents and so did the contributers to the open source project.>>>

Your overwhelming naivete would be quaint were it not so dangerous. Please leave the lawyering to those who have a legal education.



**Alex**
12 May 2010 6:16 PM
 #

@Dam:

Microsoft does not form part of MPEG-LA - you should check your facts. MPEG-LA is an independent firm that governs the licensing of certain codecs. Some of those codecs have patent pools, but the companies in the patent pools don't control MPEG-LA. MPEG-LA doesn't actually own the patents, it's just a service provider.

I can't tell if you're just uninformed or if you enjoy making wild speculations, but either way, your theory about Microsoft's world domination by way of surprise H.264 royalties doesn't add up due to the fact that it goes against both facts and common business sense.

@Wurst:

I agree with Matt - you're being very naive. Theora (VP3) is a DCT-based codec just like every other MPEG codec (including H.264) and VC-1, and considering that nearly every step of the traditional DCT compression process is patented, it's virtually impossible to construct a DCT-based codec without accidentally stomping on somebody's patent. While I think it's completely asinine that basic math operations can be patented, the fact still remains that they are and no amount of pretending they're not is going to make those patents go away.

The only reason Theora hasn't been sued for patent infringement yet is because nobody has bothered to do it yet. The financial benefit of sueing a non-profit organization is dubious at best. But does that make Theora "patent free"? No. Just because some 40-yr old Ford Pinto hasn't been in a car accident for 40 years doesn't make it safe either.

Anybody who doesn't understand why codecs are a patent minefield should do a simple patent search: http://www.google.com/patents?q=discrete+cosine+transform

**739**