HONORABLE JAMES L. ROBART

1

2

3

4

5

6

7

8

9

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

10

11

| | |
|---|---|
| MICROSOFT CORPORATION, <br><br> Plaintiff, <br><br> v. <br><br> MOTOROLA INC., et al., <br><br> Defendant. | No. C10-1823-JLR <br><br> **REDACTED** <br> MICROSOFT'S RULE 702 MOTION TO PRECLUDE TESTIMONY BY CHARLES R. DONOHOE AND DR. R. SUKUMAR |
| MOTOROLA MOBILITY, INC., et al., <br><br> Plaintiffs, <br><br> v. <br><br> MICROSOFT CORPORATION, <br><br> Defendant. | **Noted: September 10, 2012** <br><br> **ORAL ARGUMENT REQUESTED** |

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

MICROSOFT'S RULE 702 MOTION TO
PRECLUDE TESTIMONY BY CHARLES R.
DONOHOE AND DR. R. SUKUMAR

1

## TABLE OF CONTENTS

2

INTRODUCTION ............................................................................................................. 1

3

LEGAL STANDARD ...................................................................................................... 4

4

ARGUMENT.................................................................................................................... 8

5

I.   CHARLES DONOHOE'S TESTIMONY SHOULD BE EXCLUDED. ............ 8

6

A. Donohoe's 2.25% Conclusion Is Fundamentally Flawed. ................................ 8

7

1.   Motorola's Cellular Telephone Network Patent Licenses Do Not Support
Donohoe's Conclusion Concerning Motorola's 802.11 And H.264 Standard-

8

Essential Patents. ....................................................................................... 8

9

2.   Motorola's Supposed Practice of Demanding 2.25% Cannot Support
Donohoe's Conclusion. ............................................................................ 12

10

11

B. Donohoe Failed To Analyze The Value Of Motorola's Technical Contributions....... 13

12

C. Donohoe's "Modified" *Georgia-Pacific* Analysis Otherwise Captures Hold-Up
Value. ................................................................................................................. 17

13

D. Donohoe's Analysis Violates The Entire Market Value Rule. ........................ 18

14

II.  R. SUKUMAR'S TESTIMONY SHOULD BE EXCLUDED. ........................... 20

15

A. Sukumar's Questionnaire Used Incomprehensible Terminology That Was Never

16

Defined. ............................................................................................................. 20

17

B. Dr. Sukumar Uses A Non-Representative Sample And His Value Calculations

18

Are Biased. ........................................................................................................ 21

C. Dr. Sukumar Provided No Valid Margin Of Error For His Calculations. ....... 22

19

CONCLUSION............................................................................................................... 22

20

21

22

23

24

25

26

MICROSOFT'S RULE 702 MOTION TO
PRECLUDE TESTIMONY BY CHARLES R.
DONOHOE AND DR. R. SUKUMAR - i

LAW OFFICES
CALFO HARRIGAN LEYH & EAKES LLP
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700 FAX, (206) 623-8717

# TABLE OF AUTHORITIES

Page

**Cases**

*1-800 Contacts, Inc. v. Lens.com, Inc.,*
   No. 07-00591, 2010 WL 5186393 (D. Utah Dec. 15, 2010) ................................22

*Apple, Inc. v. Motorola, Inc.,*
   No. 1:11-cv-08540, 2012 WL 2376664 (June 22, 2012)........................................2

*Dataquill, Ltd. v. High Tech Computer Corp.,*
   No. 08cv543–IEG (BGS), 2012 WL 1284381 (S.D. Cal. April 16, 2012)............12

*Daubert v. Merrell Dow Pharmaceuticals, Inc.,*
   509 U.S. 579 (1993)   ..............................................................................4, 5, 7, 18

*ePlus, Inc. v. Lawson Software, Inc.,*
   2011 U.S. Dist. LEXIS 7372 (E.D. Va. Jan. 26, 2011) ...........................................7

*Garretson v. Clark,*
   111 U.S. 120 (1884)   ...............................................................................................16

*General Elec. Co. v. Joiner,*
   522 U.S. 136 (1997)   ...............................................................................................13

*Georgia–Pacific Corp. v. U.S. Plywood Corp.,*
   318 F. Supp. 1116 (S.D.N.Y. 1970) .................................................................*passim*

*Hanson v. Alpine Valley Ski Area, Inc.,*
   718 F.2d 1075 (Fed. Cir. 1983) ..............................................................................11

*Hathaway v. Bazany,*
   507 F.3d 312 (5th Cir. 2007) ..................................................................................13

*IP Innovation, LLC v. Red Hat, Inc.,*
   705 F. Supp. 2d 687 (E.D. Tex. Mar. 2, 2010) ........................................................7

*Kumho Tire Co. v. Carmichael,*
   526 U.S. 137 (1999)   .................................................................................................5

*Lucent Techs. v. Gateway,*
   580 F.3d 1301 (Fed. Cir. 2009) .........................................................5, 6, 9, 12, 18

*Lust v. Merrell Dow Pharmaceuticals, Inc.,*
   89 F.3d 594 (9th Cir. 1996) ................................................................................4, 5

MICROSOFT'S RULE 702 MOTION TO
PRECLUDE TESTIMONY BY CHARLES R.
DONOHOE AND DR. R. SUKUMAR - ii

LAW OFFICES
CALFO HARRIGAN LEYH & EAKES LLP
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL. (206) 623-1700 FAX, (206) 623-8717

*Micro Chem., Inc. v. Lextron, Inc.,*
    317 F.3d 1387 (Fed. Cir. 2003) .................................................................4, 5

*Mirror Worlds, LLC v. Apple, Inc.,*
    784 F. Supp. 2d 703 (E.D. Tex. 2011).....................................................18

*ResQNet.com, Inc. v. Lansa, Inc.,*
    594 F.3d 860 (Fed. Cir. 2010) ....................................................5, 6, 7, 9, 11

*Samuels v. Holland Am. Line-USA, Inc.,*
    656 F.3d 948 (9th Cir. 2011) ....................................................................4, 5

*Sugar Ass'n, Inc. v. McNeil-PPC, Inc.,*
    No. 04-10077, 2008 WL 4755611 (C.D. Cal. Jan. 7, 2008)....................22

*Uniloc USA, Inc. v. Microsoft Corp.,*
    632 F.3d 1292 (Fed. Cir. 2011) ......................................5, 6, 7, 9, 18, 19

*Viterbo v. Dow Chem. Co.,*
    826 F.2d 420 (5th Cir. 1987) ....................................................................13

*Wendler & Ezra, P.C. v. Am. Intern. Group, Inc.,*
    521 F.3d 790 (7th Cir. 2008) ....................................................................13

*Whitserve, LLC v. Computer Packages, Inc.,*
    2012 WL 3573845 (Fed. Cir. Aug. 7, 2012) ...........................6, 7, 13, 18

**Other Authorities**

35 U.S.C. § 284.....................................................................................................5

LAW OFFICES
CALFO HARRIGAN LEYH & EAKES LLP
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700 FAX, (206) 623-8717

1    Pursuant to Fed. R. Evid. 702, Microsoft Corporation hereby moves to exclude the

2 testimony of Charles R. Donohoe, the expert for Motorola defendants (collectively,

3 "Motorola") who offers his opinion as to a RAND royalty for Motorola's 802.11 and H.264

4 standard-essential patents.  Donohoe failed to use a reliable methodology, failed even to try to

5 value the contribution of the Motorola patents as opposed to the value of the entire standard,

6 and failed to follow the entire market value rule that governs all patent value assessments.

7 While purporting to utilize the *Georgia-Pacific* factors often used to justify a reasonable

8 royalty in the context of determining patent infringement damages, he applied those factors in

9 a manner contrary to Federal Circuit law even in that context.

10    Microsoft also moves to exclude the testimony of Dr. R. Sukumar, Motorola's survey

11 expert.  Sukumar's proposed testimony is based on a seriously flawed survey methodology,

12 and his results are unreliable and therefore inadmissible.

13                                    **INTRODUCTION**

14    As this Court has recognized, standardization may confer market power on holders of

15 essential patents, and this power is ripe for abuse by patent holders who could demand that

16 implementers pay them hold-up value—that is, the value of practicing the standard itself.

17 (Dkt. No. 335 at 3.)  One of Motorola's experts, MIT economics professor Richard

18 Schmalensee, agreed that being included in a standard enhances the market power of a patent.

19 Wion Decl. Ex. 1, Deposition of Richard Schmalensee ("Schmalensee Dep.") 13:11–13.

20 RAND commitments exist to "help to insure that standards do not allow essential patent

21 owners to extort their competitors," and prevent hold-up (Dkt. No. 335 at 4)—and again,

22 Professor Schmalensee agreed:  in his words, "RAND commitments exist to address hold-up."

23 Ex. 1 (Schmalensee Dep.) 12:7–13:4.  But Charles Donohoe, a retired lawyer who is

24 Motorola's RAND royalty expert, ignored Schmalensee's guidance, and centered his analysis

25 on capturing the hold-up value of Motorola's patents.  Estimating the hold-up value is not a

26

MICROSOFT'S RULE 702 MOTION TO
PRECLUDE TESTIMONY BY CHARLES R.
DONOHOE AND DR. R. SUKUMAR - 1

LAW OFFICES
CALFO HARRIGAN LEYH & EAKES, LLP
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL. (206) 623-1700 FAX. (206) 623-8717

1   reliable methodology for determining a RAND royalty.  In fact, it is entirely inconsistent with

2   the RAND commitment.

3        Motorola should have been well aware of this.  In its assertion of other standard-

4   essential patents against Apple, Inc., Motorola also submitted damages expert reports seeking

5   to recover the hold-up value of its asserted standard-essential patent.  *See Apple, Inc. v.*

6   *Motorola, Inc.*, No. 1:11-cv-08540, 2012 WL 2376664, at *11 (June 22, 2012) ("Motorola

7   claims to be entitled to a minimum royalty of 2.25% for a license for the patents in the

8   portfolio that contains the [asserted standard-essential patent].").  Judge Richard Posner, sitting

9   by designation as a District Judge, excluded Motorola's expert's testimony, and explained in

10  no uncertain terms that Motorola's "reasonable royalty" theory for its standard-essential patent

11  was entirely unsound because it captured hold-up value.  *See id.* at *11.

12        Motorola presents the same faulty analytical approach here that it did in *Apple* (using

13  Donohoe instead of its prior RAND royalty expert, Carla Mulhern, whose testimony was

14  excluded by Judge Posner under *Daubert*).  Donohoe asserts that Motorola is entitled to the

15  2.25% royalty it wants, simply because its patents have been incorporated into the 802.11 and

16  H.264 standards, and (in Motorola's view) being able to use the standards is worth at least that

17  much to Microsoft..  Donohoe concludes that the appropriate model for a RAND royalty is a

18  "negotiation" in November 2010, long after Microsoft had incorporated the standards into its

19  products.  In Donohoe's view, that "negotiation" would begin and end with Motorola's "2.25%

20  in value" demand.  *See* Wion Decl. Ex. 2, July 24, 2012 Expert Report of Charles R. Donohoe

21  ("Donohoe Rpt.") ¶¶ 164. 168, 176, 179.  Donohoe's analysis rests on prior Motorola licenses

22  that included patents essential to cellular telephone network standards.  As Professor

23  Schmalensee admitted, any consideration of those licenses to estimate a RAND royalty for

24  802.11 and H.264 patents alone would need to account for the relative value of the different

25

26

LAW OFFICES
CALFO HARRIGAN LEYH & EAKES, LLP
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700 FAX, (206) 623-8717

1    standards. Ex. 1 (Schmalensee Dep.) 195:6–24, 193:12–19.  Donohoe did nothing to account

2    for those differences.

3         A further fallacy in Donohoe's approach is that he did not even try to isolate the value

4    of Motorola's H.264 and 802.11 standard-essential patents separate and apart from being

5    incorporated into the standards as a whole.  Professor Schmalensee confirmed at his deposition

6    that Donohoe's approach is wrong: "any sort of hypothetical negotiation that didn't consider

7    the patents and didn't consider their importance would be off the mark."  Ex. 1 (Schmalensee

8    Dep.) 79:8–11.  For that reason, Professor Schmalensee was apparently not even asked to

9    review and critique what Donohoe had done.  *Id.* at 10:15–18.

10        Donohoe believed he could avoid making any attempt to value Motorola's patents

11   because (in his view) a RAND royalty is simply any amount two parties would agree to,

12   regardless of circumstances.  *See* Wion Decl. Ex. 3, August 24, 2012 Deposition of Charles R.

13   Donohoe ("Donohoe Dep.") 76:3–5.  But given the outsized leverage conferred by the

14   standards once Microsoft had made and sold standard-compliant products, that cannot possibly

15   be the correct legal test.  Far from isolating the value of the relevant patents from the value of

16   the standard, Donohoe's approach estimates what the holder of a standard-essential patent

17   could extract in a hold-up, based on the value to an implementer of being able to continue to

18   use the standard.  Because Donohoe's proposed RAND royalty estimate is really an estimate of

19   hold-up value, it is fundamentally unreliable, and should be excluded.

20        Independent of this RAND-specific problem, Donohoe's conclusions are unreliable

21   because they are based on a "modified Georgia-Pacific analysis" that violates established

22   principles of Federal Circuit law governing the determination of reasonable royalties, even in

23   the context of patent damages. In particular, Donohoe's analysis violates the Federal Circuit's

24   entire market value rule.  His proposed RAND royalty is based on the prices of complex,

25   multifaceted products that allegedly incorporate Motorola's patents as part of the H.264 and

26

MICROSOFT'S RULE 702 MOTION TO
PRECLUDE TESTIMONY BY CHARLES R.
DONOHOE AND DR. R. SUKUMAR - 3

LAW OFFICES
CALFO HARRIGAN LEYH & EAKES, LLP
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700 FAX, (206) 623-8717

1  802.11 standards. Donohoe does not even claim that the *standards* are the basis for customer

2  demand for Microsoft's products, much less that Motorola's *specific patented technology* is

3  itself the basis for customer demand—but that is what the entire market value rule requires.

4  Federal Circuit law would not permit Motorola to recover Donohoe's proposed royalty even if

5  Motorola's patents were not the subject of RAND commitments. This testimony, like his

6  RAND hold-up testimony, is fundamentally unreliable and Donohoe should be barred from

7  testifying at trial.[1]

8          R. Sukumar, Motorola's survey expert, offers testimony concerning a seriously flawed

9  survey he conducted regarding the "usage and valuation" of standard-compliant features of

10  Microsoft's Xbox. Sukumar's survey methodology resulted in a biased and non-representative

11  panel of respondents, who were presented with flawed questions that used incomprehensible

12  terminology. Sukumar provided no valid margin of error for his calculations, and his results

13  are unreliable and therefore inadmissible. Sukumar should also be barred from testifying at

14  trial.

15                                    **LEGAL STANDARD**

16          Federal Rule of Evidence 702 requires expert testimony to be (1) based on sufficient

17  facts or data; (2) the product of reliable principles and methods; and (3) the result of applying

18  the principles and methods reliably to the facts of the case. *Daubert v. Merrell Dow*

19  *Pharmaceuticals, Inc.*, 509 U.S. 579 , 591–92 (1993); *see also Samuels v. Holland Am. Line-*

20  *USA, Inc.*, 656 F.3d 948, 952 (9th Cir. 2011); *Micro Chem., Inc. v. Lextron, Inc.*, 317 F.3d

21  1387, 1391–92 (Fed. Cir. 2003). *Daubert* established four illustrative "reliability-related

22  factors," including "a theory's testability, whether it 'has been a subject of peer review or

23  publication,' the 'known or potential rate of error,' and the 'degree of acceptance ... within the

24  ───────────────

[1] To the extent that Motorola's other experts (in particular Michael J. Dansky) present testimony in violation of
the entire market value rule, or that otherwise violates Federal Circuit law governing the admissibility of evidence
25  as probative of a reasonable royalty, Microsoft reserves the right to object to that testimony in future motions in
limine or at trial.

26  MICROSOFT'S RULE 702 MOTION TO
PRECLUDE TESTIMONY BY CHARLES R.
DONOHOE AND DR. R. SUKUMAR - 4

LAW OFFICES
CALFO HARRIGAN LEYH & EAKES, LLP
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700 FAX, (206) 623-8717

1   relevant scientific community.'" *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 145, 151

2   (1999). In applying these principles, the district court must act as a "gatekeeper" to exclude

3   expert testimony that "is irrelevant or does not result from the application of reliable

4   methodologies or theories to the facts of the case." *Micro Chem.*, 317 F.3d. at 1391; *see also*

5   *Samuels*, 656 F.3d at 952 (affirming district court's exercise of its "gatekeeper role" under

6   *Daubert* excluding scientifically unreliable evidence and expert testimony). The burden is on

7   the party submitting expert opinion evidence to demonstrate compliance with these

8   requirements and to prove admissibility. *See Lust v. Merrell Dow Pharmaceuticals, Inc.*, 89

9   F.3d 594, 598 (9th Cir. 1996).

10          In patent cases, reasonable-royalty damages estimates based on a hypothetical

11   negotiation are common.[2] *See* 35 U.S.C. § 284. However, *Uniloc USA, Inc. v. Microsoft*

12   *Corp.*, 632 F.3d 1292 (Fed. Cir. 2011), along with *ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d

13   860 (Fed. Cir. 2010), and *Lucent Techs. v. Gateway*, 580 F.3d 1301 (Fed. Cir. 2009), demand

14   that reasonable royalty calculations be based on sound economic principles and reliable data,

15   and an expert's damages calculation is inadmissible if any part of the calculation is

16   unsupported or contrary to law. *Uniloc*, 632 F.3d at 1317 ("Beginning from a fundamentally

17   flawed premise and adjusting it based on legitimate considerations specific to the facts of the

18   case nevertheless results in a fundamentally flawed conclusion."). When a hypothetical

19   negotiation analysis is used, it *must* take into account factors that would have affected a real-

20   world negotiation, including the potential alternatives to taking a license to the patents in suit.

21

22   [2] Microsoft disputes that a bare hypothetical negotiation provides the correct analytical framework for
     determining a RAND royalty for standard-essential patents, but the Court need not resolve that issue to bar

23   Donohoe's flawed opinions. In the patent damages context, courts rationally proceed on the assumption that the
     patents are valid, enforceable and infringed, and an important element of the negotiation is consideration of

24   alternatives that the accused infringer could employ. By contrast, once a patent is written into a standard that the
     market adopts, there is little to "negotiate" because the alternative at that point of selling non-compliant products
     is not realistic. In addition, because there are so many essential patents in complex standards, a RAND royalty

25   must reflect that there is some uncertainty as to whether the patents are, in fact, essential, valid and enforceable.
     In the hypothetical negotiation in patent damages cases, that consideration is said to be barred and the patents are
     assumed to be infringed, valid and enforceable.

26   MICROSOFT'S RULE 702 MOTION TO
     PRECLUDE TESTIMONY BY CHARLES R.
     DONOHOE AND DR. R. SUKUMAR - 5

LAW OFFICES
CALFO HARRIGAN LEYH & EAKES, LLP
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL. (206) 623-1700 FAX. (206) 623-8717

1    *Id.* at 1313 (quoting with approval criticism of reasonable royalty damages theory that "takes

2    no account of the importance of the patent to the profits of the product sold, the potential

3    availability of close substitutes or equally noninfringing alternatives, or any of the other

4    idiosyncrasies of the patent at issue that would have affected a real-world negotiation")

5    (citation omitted).

6        The *Georgia-Pacific* factors, originating from a district court opinion from 1970,

7    *Georgia–Pacific Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116 (S.D.N.Y. 1970), are an

8    open-ended, unweighted list of considerations often used by expert witnesses in evaluating

9    reasonable royalty damages in patent cases.  The Federal Circuit approves the use of *Georgia-*

10    *Pacific* factors only to the extent that "evidence purporting to apply to these, and any other

11    factors, must be tied to the relevant facts and circumstances of the particular case at issue and

12    the hypothetical negotiations that would have taken place in light of those facts and

13    circumstances at the relevant time."  *Uniloc*, 632 F.3d at 1318.  Further, the Federal Circuit has

14    recently cautioned that undisciplined *Georgia-Pacific* analysis leads to "purely speculative"

15    reasonable royalty awards:  if experts "chose to use" the *Georgia-Pacific* factors,

16
17
18
19
20
21
> reciting each factor and making a conclusory remark about its impact on the
> damages calculation before moving on does no more than tell the jury what
> factors a damages analysis could take into consideration. *See Lucent*, 580 F.3d
> at 1329 (explaining that a "damages award cannot stand solely on evidence
> which amounts to little more than a recitation of royalty numbers" and jurors
> cannot rely on "superficial testimony" with "no analysis").  Expert witnesses
> should concentrate on *fully* analyzing the *applicable* factors, not cursorily
> reciting all fifteen.  And, while mathematical precision is not required, some
> explanation of both why and generally to what extent the particular factor
> impacts the royalty calculation is needed.

21    *Whitserve, LLC v. Computer Packages, Inc.*, 2012 WL 3573845, at *14 (Fed. Cir. Aug. 7,

22    2012) (emphasis in original).

23        Accordingly, any evidence considered in a reasonable royalty analysis (as part of a

24    *Georgia-Pacific* factor or otherwise) must be tied to both the invention and the reasonable

25    royalty calculation in order to be admissible.  *See ResQNet.com*, 594 F.3d at 869 ("Any

26

1   evidence unrelated to the claimed invention does not support compensation for infringement

2   but punishes beyond the reach of the statute."); *Uniloc*, 632 F.3d at 1315 ("If the patentee fails

3   to tie the theory to the facts of the case, the testimony must be excluded.").  Specifically, prior

4   license agreements can only be used to estimate a reasonable royalty where those licenses are

5   comparable to the hypothetical license to the patent-in-suit.  *See ResQNet.com*, 594 F.3d at 873

6   (vacating damages award where no factual findings accounted for the economic differences

7   between prior licenses and proposed damages award).  And under the "entire market value

8   rule," total product revenue cannot be used as a royalty base without showing that the patented

9   feature is the basis for customer demand for the entire product.  *Uniloc*, 632 F.3d at 1318.

10        Theories that ignore these predicates and stray beyond sound economic principles and

11   reliable data are not admissible evidence of a reasonable royalty.  *E.g.*, *Whitserve*, 2012 WL

12   3573845, at *15 ("[T]he royalty rate suggested by [plaintiff's expert] does not support the

13   verdict because his testimony is conclusory, speculative and, frankly, out of line with economic

14   reality."); *ePlus, Inc. v. Lawson Software, Inc.*, 2011 U.S. Dist. LEXIS 7372, at *23–25 (E.D.

15   Va. Jan. 26, 2011) (excluding reasonable royalty analysis based on a "dubious royalty base" as

16   permitting such "*ipse dixit* opinion testimony" would amount to "abdicat[ing] the gatekeeping

17   duty imposed by *Daubert* and its progeny"); *IP Innovation, LLC v. Red Hat, Inc.*, 705 F. Supp.

18   2d 687, 691 (E.D. Tex. Mar. 2, 2010) (Rader, C.J., sitting by designation) (expert opinion

19   "improperly inflates both the royalty base and the royalty rate by relying on irrelevant or

20   unreliable evidence and by failing to account for the economic realities of th[e] claimed

21   component as part of a larger system").

MICROSOFT'S RULE 702 MOTION TO
PRECLUDE TESTIMONY BY CHARLES R.
DONOHOE AND DR. R. SUKUMAR - 7

LAW OFFICES
CALFO HARRIGAN LEYH & EAKES, LLP
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700 FAX, (206) 623-8717

1

## ARGUMENT

2

### I.   CHARLES DONOHOE'S TESTIMONY SHOULD BE EXCLUDED.

3

#### A. Donohoe's 2.25% Conclusion Is Fundamentally Flawed.

4      Donohoe's analysis begins with the ungrounded conclusion that there is an established

5    royalty of 2.25% for Motorola's H.264 and 802.11 standard-essential patents, which Donohoe

6    uses as his starting point.  He then engages in a "modified" *Georgia-Pacific* analysis, but after

7    doing this analysis, leaves the 2.25% unchanged as his conclusion.  He then applies the 2.25%

8    to Xbox and to Windows software.  Donohoe reduces the final amount owed by Microsoft by

9    setting an annual cap on Windows royalties slightly below the amount otherwise due, and

10   giving Microsoft an offset for royalties that he says Motorola would owe Microsoft.

11   Donohoe's entire analysis thus collapses if his 2.25% starting point—also his effective

12   conclusion—is rejected.

13         **1.  Motorola's Cellular Telephone Network Patent Licenses Do Not
              Support Donohoe's Conclusion Concerning Motorola's 802.11 And**
14            **H.264 Standard-Essential Patents.**

15      Donohoe based his 2.25% starting point on past Motorola license agreements, virtually

16   all of which involved licenses to Motorola's cellular telephone network standard-essential

17   patents.  *See* Ex. 3 (Donohoe Dep.) 59:5–15; Ex. 2 (Donohoe Rpt.) ¶¶ 58–87.  In negotiations

18   with prospective licensees, Motorola described its cellular telephone network standard-

19   essential patent portfolio as the "industry leading patent portfolio," Ex. 3 (Donohoe Dep.)

20   99:23–101:13, ███████████████████████.  *Id.* at 98:17–99:2. ███████

21   ███████████████████████████████████████████████████

22   ███████████████████████████████████████████████████

23   ███████████████████████████████████████████████

24   ███.  *Id.* at 103:2–10.  Donohoe simply assumed that Motorola's past licenses for its

25   cellular telephone network standard-essential patents provided evidence of a RAND royalty for

26   
MICROSOFT'S RULE 702 MOTION TO
PRECLUDE TESTIMONY BY CHARLES R.
DONOHOE AND DR. R. SUKUMAR - 8

LAW OFFICES
CALFO HARRIGAN LEYH & EAKES, LLP
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL. (206) 623-1700 FAX. (206) 623-8717

1   its 802.11 and H.264 standard-essential patents.  This assumption was completely unwarranted,

2   and these licenses cannot support Donohoe's conclusion.

3        Microsoft is not seeking a license to practice Motorola's standard-essential cellular

4   telephone network patents to make and sell cell phones, *see* Ex. 3 (Donohoe Dep.) 162:16–23,

5   and those patent rights are thus irrelevant to a RAND royalty in this case.  *See Uniloc*, 632

6   F.3d at 1318 (expert's royalty "starting point . . . had no relation to the facts of the case, and as

7   such, was arbitrary, unreliable, and irrelevant").  ████████████████████████████████████

8   ██████████████████████████████████████████████████████████

9        Ex. 2 (Donohoe Rpt.) ¶¶ 35–42.  Donohoe considered these licenses under *Georgia-*

10  *Pacific* factor one in his "modified" analysis, Ex. 3 (Donohoe Dep.) 64:5–15, but that factor,

11  by its plain terms, does not apply, because it concerns "royalties received by the patentee for

12  the licensing of the *patent in suit*, proving or tending to prove an established royalty."

13  *ResQNet.com*, 594 F.3d at 869 (quotation marks omitted, emphasis in original).

14       Although Motorola claims that a few of the patents in the two sets of standards overlap,

15  the inclusion of other Motorola cellular telephone network patents renders the licenses

16  incomparable.  Donohoe's justification for considering these agreements—"I have relied on

17  those agreements in which one of the 'overlap' patents is licensed," Ex. 2 (Donohoe Rpt.)

18  ¶ 59—is inconsistent with Federal Circuit law.  It is more than "doubtful that the technology of

19  those license agreements is in any way similar to the technology being litigated here," *Lucent*,

20  580 F.3d at 1329, it is *certain*.  This case concerns Motorola's 802.11 and H.264 patents,

21  Xbox, and Windows; not cell phone network patents licensed by cell phone manufacturers.

22       In using the 2.25% royalty for the cellular telephone network standard-essential patent

23  portfolio to value the H.264 and 802.11 standard-essential patent portfolios, Donohoe

24  essentially assumed that the benefit of a cell phone being able to connect with a cellular

25  network was the same as the benefit of an Xbox having Wi-Fi connectivity.  But he had no

26

MICROSOFT'S RULE 702 MOTION TO
PRECLUDE TESTIMONY BY CHARLES R.
DONOHOE AND DR. R. SUKUMAR - 9

LAW OFFICES
CALFO HARRIGAN LEYH & EAKES, LLP
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700 FAX, (206) 623-8717

1   basis for this assumption, and he admitted as much at his deposition, testifying that being

2   unable to use an Xbox console with a wireless connection was "not as grave" a problem as

3   being unable to connect a cell phone with a cellular telephone network.  Ex. 3 (Donohoe Dep.)

4   158:2–17.



8   *Id.* at 109:25–110:22.  As

9   Motorola's Professor Schmalensee explained, evaluating "two different patent portfolios with

10   different patents that related to different standards" requires "making judgments about patent

11   breadth, patent strength, importance of functions, and so forth, and value of standards."  Ex. 1

12   (Schmalensee Dep.) 194:18–195:24.  Donohoe never even attempted this analysis.  Instead, he

13   claimed "that's just not done in the business," Ex. 3 (Donohoe Dep.) 14:24–15:1,

14   and simply declared 2.25% was the "standard" rate for

15   802.11 and H.264.  Ex. 2 (Donohoe Rpt.) ¶ 63.

16   Even before using one set of essential patents for one standard as a benchmark for the

17   value of a different set of essential patents for a different standard, considerable analytical

18   work would have been necessary.  Although Donohoe believed that Motorola's cellular

19   telephone network standard-essential patent portfolio was extraordinarily valuable, *id.* at

20   98:17–99:2, he never evaluated the strength of Motorola's H.264 and 802.11 standard-essential

21   patents.  He admitted that he did not even know if the respective Motorola portfolios ranked in

22   the top half or the bottom half of company portfolios in terms of the value of the technological

23   contribution.  *Id.* at 160:15–23 (802.11), 163:1–6 (H.264).  A strong patent portfolio,

24   obviously, is worth more than a weak patent portfolio.  Ex. 1 (Schmalensee Dep.) 59:11–60:7.

25

26

MICROSOFT'S RULE 702 MOTION TO
PRECLUDE TESTIMONY BY CHARLES R.
DONOHOE AND DR. R. SUKUMAR - 10

LAW OFFICES
CALFO HARRIGAN LEYH & EAKES, LLP
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700 FAX, (206) 623-8717

1   Donohoe offers no basis for comparing Motorola's H.264 or 802.11 portfolios to its cellular

2   telephone network portfolios, and there is no reason to think they have the same value.



10                                                                                    because "a single

11   licensing agreement does not generally demonstrate uniformity nor acquiescence in the

12   reasonableness of the royalty rate." *Hanson v. Alpine Valley Ski Area, Inc.*, 718 F.2d 1075,

13   1078 (Fed. Cir. 1983); *see ResQNet.com*, 594 F.3d at 869 (*Georgia-Pacific* factor 1 concerns

14   royalties actually "received" that "tend[ ] to prove an established royalty").

15          There is no connection between Motorola's licensing of cellular telephone network

16   standard-essential patents to cell phone companies and the 802.11 and H.264 patents at issue

17   here. The standards are different, the patents are different, and the strength of the Motorola

18   patent portfolios are different. All of Donohoe's testimony concerning Motorola's irrelevant

19   licenses is unreliable, inconsistent with the law, and must be excluded. *See ResQNet.com*, 594

20   F.3d at 869 ("This court has long required district courts performing reasonable royalty

21   calculations to exercise vigilance when considering past licenses to technologies other than the

22   patent in suit."); *id.* at 872 ("[Courts] must consider licenses that are commensurate with what

23   the defendant has appropriated. If not, a prevailing plaintiff would be free to inflate the

24

25   _____

      [3]

26

PRECLUDE TESTIMONY BY CHARLES R.
DONOHOE AND DR. R. SUKUMAR - 11

                                    LAW OFFICES
                      CALFO HARRIGAN LEYH & EAKES, LLP
                            999 THIRD AVENUE, SUITE 4400
                              SEATTLE, WASHINGTON 98104
                        TEL. (206) 623-1700 FAX, (206) 623-8717

1   reasonable royalty analysis with conveniently selected licenses without an economic or other

2   link to the technology in question."); *Lucent*, 580 F.3d at 1329 (damages verdict "cannot stand

3   solely on evidence which amounts to little more than a recitation of royalty numbers, one of

4   which is arguably in the ballpark of the jury's award, particularly when it is doubtful that the

5   technology of those license agreements is in any way similar to the technology being litigated

6   here"); *Dataquill, Ltd. v. High Tech Computer Corp.*, No. 08cv543–IEG (BGS), 2012 WL

7   1284381, at *5 (S.D. Cal. April 16, 2012) (excluding expert testimony relying on non-

8   comparable licenses). Because Donohoe's *Georgia-Pacific* analysis begins and ends with

9   these incomparable licenses—*see* Ex. 2 (Donohoe Rpt.) ¶ 168 (Motorola's 802.11 patents

10  "would be given a value of 2.25%"), ¶ 179 (Motorola's H.264 patents should be given a

11  royalty rate of "2.25% of the relevant end product")—his conclusions are wholly unreliable,

12  and can be excluded on this basis alone.

> **2.  Motorola's Supposed Practice of Demanding 2.25% Cannot Support Donohoe's Conclusion.**

13

14

15       Donohoe also characterized 2.25% as Motorola's "established, standard practice of

16  commencing a negotiation" and claimed that "[a]ny license consummated with Microsoft

17  would be consistent with these principles," meaning that "Motorola would have sought value at

18  or around 2.25% for its 802.11 and H.264 portfolios." Ex. 2 (Donohoe Rpt.) ¶ 99(a), (f). [4]  As

19  the Federal Circuit has observed, opening licensing demands are of questionable relevance to

20  determining a reasonable royalty:

21           [P]roposed licenses may have some value for determining a reasonable royalty
             in certain situations.  Their evidentiary value is limited, however, by, *inter alia*,
22           the fact that patentees could artificially inflate the royalty rate by making
             outrageous offers.

23

24

25  ⁴ Donohoe appeared to abandon this position at his deposition, instead stating that his 2.25% starting point was
    based only on the license agreements themselves. *See* Ex. 3 (Donohoe Dep.) 59:5–15.

26  MICROSOFT'S RULE 702 MOTION TO
    PRECLUDE TESTIMONY BY CHARLES R.
    DONOHOE AND DR. R. SUKUMAR - 12

LAW OFFICES
CALFO HARRIGAN LEYH & EAKES, LLP
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL. (206) 623-1700 FAX, (206) 623-8717

1    *Whitserve*, 2012 WL 3573845, at *12. As to 802.11 and H.264, Donohoe's analysis is even

2    more suspect, as it is actually based on Motorola's apparent practice of using 2.25% as its

3    opening demand for its cellular telephone network patents. Donohoe opines that in his

4    hypothetical negotiation Motorola would simply copy its "template RAND license agreement

5    for its cellular portfolios," with its "2.25% running royalty rate" and use it "to draft a RAND

6    license for its 802.11 and H.264 portfolios." *Id.* ¶ 154.

7            Donohoe's conversion of Motorola's opening licensing demand into the parties'

8    conclusion in a hypothetical negotiation over the value of the Motorola patents is unreliable as

9    a matter of law. Donohoe's conclusion that Motorola simply gets what it wants is precisely the

10   form of expert testimony the Supreme Court has made clear should not be allowed: testimony

11   "connected to existing data only by the *ipse dixit* of the expert." *General Elec. Co. v. Joiner*,

12   522 U.S. 136, 146 (1997); *see Wendler & Ezra, P.C. v. Am. Intern. Group, Inc.*, 521 F.3d 790,

13   791 (7th Cir. 2008) (per curiam) ("We have said over and over that an expert's ipse dixit is

14   inadmissible. An expert who supplies nothing but a bottom line supplies nothing of value to

15   the judicial process.") (quotation marks omitted); *Hathaway v. Bazany*, 507 F.3d 312, 318 (5th

16   Cir. 2007) ("[W]ithout more than credentials and a subjective opinion, an expert's testimony

17   that 'it is so' is not admissible."), *quoting Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 424 (5th

18   Cir. 1987). Donohoe's *ipse dixit* is in turn nothing but an adoption of the *ipse dixit* of Motorola

19   itself.

20           **B. Donohoe Failed To Analyze The Value Of Motorola's Technical**
                **Contributions.**
21
             Focusing on the incremental value (if any) of Motorola's standard-essential patents
22
     themselves, prior to market implementation or adoption of the standard, is essential to
23
     determining a RAND royalty. One way of doing this is to compare the Motorola patents to
24
     alternatives that could have been written into the standard instead, because that would ensure
25
     that the valuation does not capture the hold-up value of standardization itself. In *Apple*, Judge
26

MICROSOFT'S RULE 702 MOTION TO
PRECLUDE TESTIMONY BY CHARLES R.
DONOHOE AND DR. R. SUKUMAR - 13

LAW OFFICES
CALFO HARRIGAN LEYH & EAKES, LLP
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL. (206) 623-1700 FAX (206) 623-8717

1  Posner rejected Motorola's theory that it was entitled to 2.25% royalties for its standard-

2  essential patents, and explained that Motorola's analytical approach was fundamentally

3  unsound because it captured hold-up value:

> There is another decisive objection to Motorola's damages claim. The proper
> method of computing a FRAND royalty starts with what the cost to the licensee
> would have been of obtaining, just before the patented invention was declared
> essential to compliance with the industry standard, a license for the function
> performed by the patent. That cost would be a measure of the value of the
> patent qua patent. But once a patent becomes essential to a standard, the
> patentee's bargaining power surges because a prospective licensee has no
> alternative to licensing the patent; he is at the patentee's mercy. *The purpose of
> the FRAND requirements, the validity of which Motorola doesn't question, is to
> confine the patentee's royalty demand to the value conferred by the patent itself
> as distinct from the additional value—the hold-up value—conferred by the
> patent's being designated as standard-essential.* Motorola has provided no
> evidence for calculating a reasonable royalty that would be consistent with this
> point.

11  2012 WL 2376664, at *11 (emphasis added, internal citations omitted).

12      Motorola's economic expert, Professor Schmalensee, stated that in the "modified"

13  *Georgia-Pacific* approach he recommended to Donohoe, "one would want to consider not just

14  the existence of potential substitutes [to the patents in the standard,] but their properties." Ex.

15  1 (Schmalensee Dep.) 47:8–10. Ignoring both Judge Posner and Professor Schmalensee,

16  Donohoe made no effort compare the value of Motorola's contributions to the standard with

17  any alternatives that could have been used in the standard instead. Ex. 3 (Donohoe Dep.)

18  61:14–62:23. Instead, Donohoe looked only at the value of the entire standard, concluding that

19  "802.11 technology had clear advantages and utility over wired networks and cellular

20  technologies," and claiming this fact "supports Motorola's offer of 2.25% for its 802.11

21  portfolio." Ex. 2 (Donohoe Rpt.) ¶ 134. Similarly, for Motorola's H.264 standard-essential

22  patents, Donohoe claimed that "H.264 technology has clear advantages and utility over other

23  video compression technologies," and suggested that this "favors Motorola slightly" in his

24  analysis. *Id.* ¶ 143.

25

26  MICROSOFT'S RULE 702 MOTION TO
PRECLUDE TESTIMONY BY CHARLES R.
DONOHOE AND DR. R. SUKUMAR - 14

1    While Donohoe asserted in passing that "Motorola's patented technology represents a

2    substantial improvement over alternatives that were being considered for the H.264 standard,"

3    *id.* ¶ 140, Donohoe did not focus on the value of the improvement as the key driver of a RAND

4    royalty, nor did he attribute that improvement in the standard to Motorola's patented

5    technology.  Donohoe confirmed that he only analyzed whether "the 802.11 and H.264

6    standards were better than alternative standards."  Ex. 3 (Donohoe Dep.) 239:11–22.

7    Tellingly, Donohoe did not know whether the advantages of the 802.11 and H.264 standards he

8    cited in his report even required making use of Motorola's patents.  *Id.* at 240:1–5.

9        Donohoe's focus on the value of the standards alone is apparent from how he applied

10   *Georgia-Pacific* factors to decide whether his 2.25% starting point should be adjusted:  his

11   analysis turned on the value to an implementer of complying with the 802.11 and H.264

12   standards.  For example, under *Georgia-Pacific* factor 6 ("the effect of selling the patented

13   specialty in promoting the sales of other products of the licensee"), Donohoe asserted that "Wi-

14   Fi functionality has become pervasive" and "devices can not be competitive" without it, and

15   that "H.264 functionality is an important feature of both Windows and Xbox."  Ex. 2 (Donohoe

16   Rpt.) ¶¶ 113, 118.  Donohoe's conclusion was that factor 6 would lead to "a somewhat higher

17   RAND royalty rate . . . because of the convoyed and derivative sales achieved by the inclusion

18   of [Motorola's] technology in Microsoft's products."  *Id.* ¶ 120.  Donohoe admitted his factor 6

19   analysis lacked any connection to Motorola's patents and only addressesed the value of

20   compliance with the standard.  Ex. 3 (Donohoe Dep.) 224:9–13 ("[Q]: In your analysis of

21   Factor 6, did you try to separate out the value of Motorola's standard-essential patents from the

22   value of the standard as a whole?  A: No.").

23       Under *Georgia-Pacific* factor 9 ("the utility and advantages of the patent"), Donohoe

24   described benefits of the standards, not of Motorola's patents—*e.g.*, "[a] wireless connection

25   has certain advantages over wired connections"; "H.264 [ ] functionality has certain

26   MICROSOFT'S RULE 702 MOTION TO
     PRECLUDE TESTIMONY BY CHARLES R.
     DONOHOE AND DR. R. SUKUMAR - 15

1   advantages over other video compression formatting standards." Ex. 2 (Donohoe Rpt) ¶¶ 129,

2   137. Donohoe then equated his proposed royalty with hold-up value, concluding that "802.11

3   technology had clear advantages and utility over wired networks and cellular technology" and

4   that "this factor supports Motorola's offer of 2.25% for its 802.11" patents. *Id.* ¶ 134.

5       *Georgia-Pacific* factor 13 concerns apportionment—separating out and independently

6   assessing the value of the patented feature itself: "When a patent is for an improvement . . .

7   [the patentee] must separate its results distinctly from those of the other parts, so that the

8   benefits derived from it may be distinctly seen and appreciated." *Garretson v. Clark*, 111 U.S.

9   120, 121 (1884); *see also Uniloc*, 632 F.3d at 1318 (if the patentee cannot "show that 'the

10  entire value of the whole machine, as a marketable article, is properly and legally attributable

11  to the patented feature[,]'" the patentee must provide evidence to apportion damages "between

12  the patented feature and the unpatented features, and such evidence must be reliable and

13  tangible, and not conjectural or speculative'") (quoting *Garretson*, 111 U.S. at 121).

14  Consistent with Federal Circuit law, Professor Schmalensee stated that under factor 13, "the

15  ultimate question, if you're interested in RAND royalties on a patent or a patent portfolio, is

16  how valuable are those patents or that portfolio." Ex. 1 (Schmalensee Dep.) 102:2–9; *see id.* at

17  101:24–102:1 (factor 13 concerns "the portion attributable to the patent or patents at issue"). .

18  But Donohoe confirmed that in his factor 13 analysis, he *did not* try to apportion out the value

19  of the Motorola standard-essential patents from the value of compliance with the standard as a

20  whole. Ex. 3 (Donohoe Dep.) 248:9–17. Not surprisingly, Donohoe never talked to Professor

21  Schmalensee about what was required for a reliable analysis under *Georgia-Pacific* factor 13.

22  *Id.* at 248:18–21. Donohoe's failure to apportion the value (if any) of Motorola's patents, apart

23  from the value of the standard, is unreliable in light of Federal Circuit law and even in the

24  opinion of Motorola's other expert.

25

26

LAW OFFICES
CALFO HARRIGAN LEYH & EAKES, LLP
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700 FAX, (206) 623-8717

1    Donohoe's embrace of hold-up was at its most brazen in his conclusion on *Georgia-*

2    *Pacific* factor 8:  "Microsoft's substantial profits would permit it to pay a higher royalty in

3    order to maintain its products on the market with all existing functionality." Ex. 2 (Donohoe

4    Rpt.) ¶ 126.  In other words, Donohoe envisioned a negotiation in which Microsoft faced

5    removal of its standard-compliant products from the market, and Motorola could extract

6    substantial value because of Microsoft's substantial profits for those products.  Donohoe

7    openly admitted that his factor 8 analysis focused on the value of practicing the standard.  Ex.

8    3 (Donohoe Dep.) 236:24–237:17.  Donohoe's conclusion—what he embraces as a proper

9    consideration enhancing Motorola's royalty—is exactly the hold-up scenario Judge Posner

10   explained is barred:  "[O]nce a patent becomes essential to a standard, the patentee's

11   bargaining power surges because a prospective licensee has no alternative to licensing the

12   patent; he is at the patentee's mercy." *Apple*, 2012 WL 2376664, at *11.

### C. Donohoe's "Modified" *Georgia-Pacific* Analysis Otherwise Captures Hold-Up Value.

15   Donohoe applied a "modified" *Georgia-Pacific* analysis to estimate a royalty for

16   Motorola's H.264 and 802.11 standard-essential patents. Ex. 2 (Donohoe Rpt.) ¶¶ 54, 48 & n.

17   9.  As discussed above, Donohoe claimed a 2.25% royalty as the starting point, then looked to

18   "modified" *Georgia-Pacific* factors to assess whether the 2.25% should be increased or

19   decreased.  Donohoe's recitation of the *Georgia-Pacific* factors are accompanied by imprecise

20   pronouncements like "this factor either favors Motorola slightly or is neutral" (Ex. 2 (Donohoe

21   Rpt.) ¶ 143), or "this factor would tend to push the royalty rate higher" (*Id.* ¶ 151).  While

22   Donohoe opined that *Georgia-Pacific* factors 6, 8, 9, and 13 would increase the royalty rate

23   (*Id.* ¶¶ 120, 128, 143, 151), he admitted he was unable to specify the amount of increase for

24   any one of those four factors. Ex. 3 (Donohoe Dep.) 206:17–207:15.  Donohoe's analysis is

25   exactly the sort of "superficial" *Georgia-Pacific* expert testimony found unreliable by the

26   Federal Circuit, as it lacks a substantive "explanation of both why and generally to what extent

MICROSOFT'S RULE 702 MOTION TO
PRECLUDE TESTIMONY BY CHARLES R.
DONOHOE AND DR. R. SUKUMAR - 17

LAW OFFICES
CALFO HARRIGAN LEYH & EAKES, LLP
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700 FAX, (206) 623-8717

1   the particular factor impacts the royalty calculation." *Whitserve*, 2012 WL 3573845, at *14.

2   Moreover, as with the expert criticized in *Whitserve*, in Donohoe's suspect opinion,

3   consideration of each *Georgia-Pacific* factor either increases the royalty rate or is "neutral,"

4   and "none justified a decreased rate." 2012 WL 3573845, at *14.

5        Further, Donohoe considered a hypothetical negotiation taking place after Microsoft

6   had designed and deployed its products complying with the 802.11 and H.264 standards.

7   Donohoe then ignored the actual value of Motorola's patents, instead focusing on the

8   importance of standards to the standard-compliant Microsoft products. Because his

9   hypothetical negotiation took place after Microsoft has already adopted the standards, Donohoe

10  effectively presented Microsoft with a Hobson's choice:  pay the 2.25% royalty or stop selling

11  standard-compliant products.

12       **D. Donohoe's Analysis Violates The Entire Market Value Rule.**

13       Donohoe's testimony should also be excluded under *Daubert* for an additional reason

14  involving the royalty base to which he applied his unreliable 2.25% royalty. Donohoe's use of

15  the entire market value of Microsoft's products as a base for his "RAND" royalty is

16  impermissible under Federal Circuit law, because it contravenes a key principle of patent

17  damages law called the "entire market value rule."  The entire market value rule prohibits a

18  patentee from using total sales of the accused product as a royalty base where the asserted

19  patent claims cover a single feature of a complicated, multi-faceted product, unless the

20  patentee proves "that the patent-related feature is the basis for customer demand." *Lucent*, 580

21  F.3d at 1336. The point of the rule is to ensure that a patentee does not recover the value of

22  unpatented features as part of a royalty award; rather, a royalty award must be strictly tied to

23  the value of the invention. *See Uniloc*, 632 F.3d at 1318; *Mirror Worlds, LLC v. Apple, Inc.*,

24  784 F. Supp. 2d 703,724–27 (E.D. Tex. 2011) (granting judgment as a matter of law vacating

25  jury's damages award where patentee presented "a fatally flawed reasonable royalty analysis"

26

MICROSOFT'S RULE 702 MOTION TO
PRECLUDE TESTIMONY BY CHARLES R.
DONOHOE AND DR. R. SUKUMAR - 18

LAW OFFICES
CALFO HARRIGAN LEYH & EAKES, LLP
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700 FAX, (206) 623-8717

1    that lacked "a legally sound justification for its royalty base" and violated the entire market

2    value rule).

3          Donohoe applied his 2.25% royalty to a royalty base of the entire market value of

4    Microsoft's products, but never even attempted to satisfy the predicate for doing so under the

5    entire market value rule.  Donohoe simply declared that Motorola "would be seeking a royalty

6    on Microsoft's Xbox console under both its 802.11 and H.264 portfolios" and that "the agreed-

7    to royalty base for Microsoft's H.264 products would be the net selling price of the Windows

8    software."  Ex. 2 (Donohoe Rpt.) ¶¶ 169, 181.  Donohoe claimed he could ignore the entire

9    market value rule because that is "how it's done in the real world," where companies "tend to

10   look at the value of the end product as the royalty base."  Ex. 3 (Donohoe Dep.) 195:1–196:18.

11   Donohoe did not claim that Motorola's patents or even the standards at issue were the basis for

12   customer demand for Microsoft's Windows and Xbox products.  *See, e.g, id.* at 199:8–11.  He

13   could not give even a single example in which an Xbox user would use H.264 video.  *Id.* at

14   228:12–17.  Donohoe's proposed royalty base thus violates the entire market value rule, and

15   his testimony would never be permitted under Federal Circuit law as indicative of a reasonable

16   royalty even for patent damages purposes.

17         Donohoe cannot avoid the entire market value rule simply by claiming that other

18   Motorola license agreements, for other products and under other patents, use end product sales

19   as a royalty base.  Donohoe believes that some patents are licensed this way "because it's

20   convenient," and that "the less important a patent is to a product, the lower the royalty rate

21   would be even though you keep the royalty base, the end product."  Ex. 3 (Donohoe Dep.)

22   195:18–19, 196:15–18.  The law forecloses exactly what Donohoe proposes: "The Supreme

23   Court and this court's precedents do not allow consideration of the entire market value of

24   accused products for minor patent improvements simply by asserting a low enough royalty

25   rate."  *Uniloc*, 632 F.3d at 1320.  Donohoe's RAND royalty conclusion is premised on a

26
MICROSOFT'S RULE 702 MOTION TO
PRECLUDE TESTIMONY BY CHARLES R.
DONOHOE AND DR. R. SUKUMAR - 19

LAW OFFICES
CALFO HARRIGAN LEYH & EAKES, LLP
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL. (206) 623-1700 FAX. (206) 623-8717

1   legally-impermissible royalty base, and his testimony should be excluded in its entirety as

2   unreliable.

3   **II.    R. SUKUMAR'S TESTIMONY SHOULD BE EXCLUDED.**

4           Motorola retained Dr. R. Sukumar to conduct a survey and provide opinions regarding

5   "usage and valuation of certain features offered in Microsoft's Xbox 360 console," namely,

6   "H.264 decoding capability" and "802.11 (Wi-Fi) capability."  Wion Decl. Ex. 4, July 24, 2012

7   Expert Report of Dr. R. Sukumar ("Sukumar Rpt.") I.3–4.  Sukumar used an internet provider

8   to invite thousands of individuals to take part in an on-line survey for payment.  He obtained

9   about 500 qualified respondents for each of two questionnaires, which asked the respondents to

10  compare hypothetical Xbox products with different features and prices, and to choose the

11  preferred set of features.  Ex. 4 (Sukumar Rpt.) Exs. F1, F2.  This "conjoint" survey attempted

12  to determine how much the respondents would be willing to pay for Wi-Fi or decoding H.264-

13  encoded videos, and also elicited information about their usage.  Sukumar's proposed

14  testimony should be excluded in its entirety because the survey is based on such seriously

15  flawed methodologies that the results are unreliable.

16  **A. Sukumar's Questionnaire Used Incomprehensible Terminology That Was**
    **Never Defined.**

17

18          Sukumar's survey questionnaire used incomprehensible terminology that was never

19  defined.  Declaration of Peter E. Rossi ("Rossi Decl.") ¶ 22.  As only one example, Sukumar

20  asked respondents to "select the types of video content you have viewed on your Xbox

21  Console" and provided the leading options "MBAFF (Macroblock Adaptive Frame/Field),"

22  "Progressive," and "not sure."  Ex. 4 (Sukumar Rpt.) Ex. A2 at 15.  Most consumers would

23  have no idea what these terms mean, and no explanation was provided.  Rossi Decl. ¶¶ 22–24.

24  Even Motorola's technical expert Timothy Drabik could only determine the encoding of videos

25  he viewed on an Xbox by copying the video files to a different computer, then using software

26  MICROSOFT'S RULE 702 MOTION TO
    PRECLUDE TESTIMONY BY CHARLES R.
    DONOHOE AND DR. R. SUKUMAR - 20

1 | tools to examine the encoding.  Wion Decl. Ex. 5, August 21, 2012 Deposition of Timothy

2 | John Drabik, at 132:16–135:14.

3 |   The unreliable nature of the survey results is further demonstrated by the fact that 75%

4 | of Sukumar's respondents in one survey took less than five minutes to answer a survey

5 | consisting of 15 separate "choice" tasks, each involving a screen with multiple lines of text and

6 | esoteric engineering specifications—this is less time than most would require just to read the

7 | text. Rossi Decl. ¶¶ 32, 35.  The only reasonable conclusion is that the survey was completed

8 | by seasoned online survey respondents to get paid, not to provide reliable information. *Id.*

9 | ¶ 32.

10 | **B. Dr. Sukumar Uses A Non-Representative Sample And His Value Calculations Are Biased.**

11 |   Because the Sukumar survey drew a sample from an Internet panel, it was incumbent

12 | on Dr. Sukumar to prove that the sample was representative of the relevant universe, *i.e.*, Xbox

13 | owners, users, or individuals likely to purchase an Xbox.  He has not done so.  In fact, the

14 | Internet panel consisted of U.S. residents who were willing to take surveys for compensation,

15 | and thus was skewed toward older and middle-income individuals with more disposable

16 | income. Rossi Decl. ¶ 30, 32.  Such a panel is not representative of the younger population to

17 | which the Xbox console appeals. *Id.* ¶ 30.  In addition, more than 46,000 invitations allegedly

18 | were sent, but only 16% of the recipients even responded. Ex. 4 (Sukumar Rpt.) IV.3.  This

19 | low response rate further undermines any conceivable correspondence between the panel

20 | demographics and the relevant demographics, an issue Sukumar does not address. *Id.* ¶ 30.

21 |   Equally impermissibly, Sukumar arbitrarily and incorrectly biased his computerized

22 | analysis of respondent data toward higher valuations for Wi-Fi or H.264-encoded videos as

23 | Xbox features.  Specifically, in his analysis Sukumar imposed constraints that ensured that an

24 | Xbox with H.264 and 802.11 features would always be valued higher than an Xbox without

25 | those features, essentially precluding the possibility that the features add no additional value

26 | 

MICROSOFT'S RULE 702 MOTION TO
PRECLUDE TESTIMONY BY CHARLES R.
DONOHOE AND DR. R. SUKUMAR - 21

1    for consumers. *Id.* ¶ 18.  Absent evidence that the sample is both representative of the relevant

2    universe and unbiased, it would be error to assume that the survey results are reliable or to

3    permit Sukumar to testify about the survey. *See Sugar Ass'n, Inc. v. McNeil-PPC, Inc.*, No.

4    04-10077, 2008 WL 4755611, at *3–4 (C.D. Cal. Jan. 7, 2008) (excluding survey because "no

5    specific universe of respondents was chosen for this survey." (internal citation omitted)); *see*

6    *also 1-800 Contacts, Inc. v. Lens.com, Inc.*, No. 07-00591, 2010 WL 5186393, at *7 (D. Utah

7    Dec. 15, 2010) (granting the motion to strike the confusion survey and expert report that

8    related to the survey).

9        **C. Dr. Sukumar Provided No Valid Margin Of Error For His Calculations.**

10       Statistical estimates, such as those contained in the Sukumar Report, are meaningless

11   without an indication of the degree of error present in them, e.g., a margin of error or

12   confidence interval. Rossi Decl. ¶¶ 9, 36–43.  Dr. Sukumar, however, did not provide any

13   confidence intervals or margins of error for most of his calculations. *Id.*¶¶ 38–39.  This alone

14   justifies precluding his testimony.  Moreover, while Dr. Sukumar claims to have produced

15   confidence intervals for some of his calculations (*see* Sukumar Rpt. Tables 11 and 15), the

16   methodology he used was inappropriate for a Bayesian conjoint study and his results are

17   inconsistent. *Id.* ¶¶ 40–41.  In fact, the true margin of error in his calculations must be much

18   larger than anything indicated in Sukumar's piecemeal disclosure of margins of error. *Id.* ¶ 41.

19   The absence of any valid margin of error for Dr. Sukumar's statistics renders them unreliable

20   and inadmissible under Rule 702.

21                                **CONCLUSION**

22       Charles Donohoe offers an unreliable RAND royalty conclusion based on a flawed

23   *Georgia-Pacific* analysis and evidence barred by Federal Circuit law.  Donohoe openly seeks

24   to recover the hold-up value of the 802.11 and H.264 standards—a legally-erroneous and

25   fundamentally unreliable methodology for determining a RAND royalty.  Donohoe's

26

MICROSOFT'S RULE 702 MOTION TO
PRECLUDE TESTIMONY BY CHARLES R.
DONOHOE AND DR. R. SUKUMAR - 22

LAW OFFICES
CALFO HARRIGAN LEYH & EAKES, LLP
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL. (206) 623-1700 FAX, (206) 623-8717

1   conclusions are unreliable and his testimony inadmissible, and he should be barred from

2   testifying at trial.  Dr. R. Sukumar's offered survey evidence is fundamentally unreliable and

3   should also be excluded.

4        DATED this 27th day of August, 2012.

5                    CALFO HARRIGAN LEYH & EAKES LLP

6                By    s/ Arthur W. Harrigan, Jr.
7                      Arthur W. Harrigan, Jr., WSBA #1751
                       Christopher Wion, WSBA #33207
8                      Shane P. Cramer, WSBA #35099

9                By    s/ T. Andrew Culbert
                       T. Andrew Culbert
10                     David E. Killough
                       MICROSOFT CORPORATION
11                     1 Microsoft Way
                       Redmond, WA  98052
12                     Phone:  425-882-8080

13
                       David T. Pritikin
14                     Richard A. Cederoth
                       Constantine L. Trela, Jr.
15                     William H. Baumgartner, Jr.
                       Ellen S. Robbins
16                     Douglas I. Lewis
                       David C. Giardina
17                     John W. McBride
                       David Greenfield
18                     SIDLEY AUSTIN LLP
                       One South Dearborn
19                     Chicago, IL  60603
                       Phone: 312-853-7000
20                     Fax:  312-853-7036

21
                       Carter G. Phillips
22                     Brian R. Nester
                       SIDLEY AUSTIN LLP
23                     1501 K Street NW
                       Washington, DC  20005
24                     Telephone: 202-736-8000
25                     Counsel for Microsoft Corp.

26
MICROSOFT'S RULE 702 MOTION TO
PRECLUDE TESTIMONY BY CHARLES R.
DONOHOE AND DR. R. SUKUMAR - 23

LAW OFFICES
CALFO HARRIGAN LEYH & EAKES, LLP
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700 FAX, (206) 623-8717

# CERTIFICATE OF SERVICE

I, Linda Bledsoe, swear under penalty of perjury under the laws of the State of Washington to the following:

1.   I am over the age of 21 and not a party to this action.

2.   On the 27th day of August, 2012, I caused the preceding document to be served on counsel of record in the following manner:

**Attorneys for Motorola Solutions, Inc., and Motorola Mobility, Inc.:**

| | |
|---|---|
| Ralph Palumbo, WSBA #04751 | _____ Messenger |
| Philip S. McCune, WSBA #21081 | _____ US Mail |
| Lynn M. Engel, WSBA #21934 | _____ Facsimile |
| Summit Law Group | __X__ ECF |
| 315 Fifth Ave. South, Suite 1000 | |
| Seattle, WA 98104-2682 | |
| Telephone: 206-676-7000 | |
| Email: Summit1823@summitlaw.com | |

| | |
|---|---|
| Steven Pepe (*pro hac vice*) | _____ Messenger |
| Jesse J. Jenner (*pro hac vice*) | _____ US Mail |
| Ropes & Gray LLP | _____ Facsimile |
| 1211 Avenue of the Americas | __X__ ECF |
| New York, NY 10036-8704 | |
| Telephone: (212) 596-9046 | |
| Email: steven.pepe@ropesgray.com | |
| Email: jesse.jenner@ropesgray.com | |

| | |
|---|---|
| Norman H. Beamer (*pro hac vice*) | _____ Messenger |
| Ropes & Gray LLP | _____ US Mail |
| 1900 University Avenue, 6th Floor | _____ Facsimile |
| East Palo Alto, CA 94303-2284 | __X__ ECF |
| Telephone: (650) 617-4030 | |
| Email: norman.beamer@ropesgray.com | |

MICROSOFT'S RULE 702 MOTION TO
PRECLUDE TESTIMONY BY CHARLES R.
DONOHOE AND DR. R. SUKUMAR - 24

1    Paul M. Schoenhard (*pro hac vice*)
     Ropes & Gray LLP
2    One Metro Center
     700 12th Street NW, Suite 900
3    Washington, DC  20005-3948
     Telephone:  (202) 508-4693
4    Email: Paul.schoenhard@ropesgray.com

5        DATED this 27th day of August, 2012.

6

7                                    s/ Linda Bledsoe
                                     _____
8                                    LINDA BLEDSOE

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

|  | Messenger |
|---|---|
|  | US Mail |
|  | Facsimile |
| X | ECF |

MICROSOFT'S RULE 702 MOTION TO
PRECLUDE TESTIMONY BY CHARLES R.
DONOHOE AND DR. R. SUKUMAR - 25