The Honorable James L. Robart

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

MICROSOFT CORPORATION, a Washington corporation,

Plaintiff,

v.

MOTOROLA, INC., MOTOROLA MOBILITY, INC., and GENERAL INSTRUMENT CORPORATION,

Defendants.

CASE NO. C10-1823-JLR

DECLARATION OF DR. R. SUKUMAR IN SUPPORT OF MOTOROLA MOBILITY'S AND GENERAL INSTRUMENT'S OPPOSITION TO MICROSOFT'S RULE 702 MOTION

NOTED ON MOTION CALENDAR: September 10, 2012

DECLARATION OF DR. R. SUKUMAR IN SUPPORT OF
MOTOROLA MOBILITY'S AND GENERAL INSTRUMENT'S
OPPOSITION TO MICROSOFT'S RULE 702 MOTION
CASE NO. C10-1823-JLR

1  I, RAMAMIRTHAM SUKUMAR, declare as follows:

2  1.      I am over 18 years of age.

3  2.      I have been retained by counsel for Motorola Mobility, Inc. and General

4  Instrument, Inc. to serve as an expert for the purposes of conducting survey research and

5  understanding usage and valuation of certain features offered in Microsoft's Xbox 360 console.

6  3.      I have a PhD and M.B.A. from the University of Pittsburgh.  I have published

7  several articles relating to marketing analysis and marketing research.

8  4.      I am the founder and CEO of Optimal Strategix Group, Inc., which is a strategic

9  market research and marketing consulting company, founded in 1998.  I have served as a

10  consultant for many Fortune 500 companies, helping clients focus on understanding the value of

11  the products they offer and the market's value for attribute improvement.  For more than 10 years,

12  I taught core courses in Marketing Management, Market Research and Marketing Strategy,

13  Database Marketing, Data Mining and New Product Development at a number of universities

14  including City University of New York, Baruch College; Rutgers Business School, Sam Garvin

15  International School of Management; Rice University; C.T. Bauer College of Business; and City

16  University of Hong Kong.  [Wion Ex. 4[1], Sukumar Report, pp. 17-21.]

17  5.      Since 1997, I have consulted on marketing and market research issues, including

18  survey design and analysis, for numerous companies and organizations such as Pfizer, Genentech,

19  AstraZeneca, Johnson and Johnson Pharmaceuticals, Abbot Laboratories, Nestle, Kraft Foods,

20  ExxonMobile, Jiffy Lube/Pennzoil, Schlumberger-GeoQuest, Halliburton, Lucas Arts, Qwest

21  Cyber Solutions, Inc., Lubrizol, Shell Oil, Calgary Transit Authority, Diagnostic Systems

22  Laboratories, Columbia/HCA, METRO Transit, Conoco, and St. Luke's Episcopal Hospital.  I am

23  professionally affiliated with the American Marketing Association, American Statistical

24

25  _____
[1]      "Ex. ___" refers to the stated Exhibit to the Declaration of Samuel L. Brenner, submitted on August 27, 2012, (Dkt. No. 392), or Second Declaration of Samuel L. Brenner, submitted concurrently herewith.  "Wion Ex. ___"

26  refers to the stated Exhibit to the Declaration of Christopher Wion, submitted by Microsoft on August 27, 2012 (Dkt. No. 398).

DECLARATION OF DR. R. SUKUMAR IN SUPPORT OF
MOTOROLA MOBILITY'S AND GENERAL INSTRUMENT'S
OPPOSITION TO MICROSOFT'S RULE 702 MOTION - 1
CASE NO. C10-1823-JLR

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone: (206) 676-7000
Fax: (206) 676-7001

1   Association, INFORMS, American Economic Association, American Psychometric Society,

2   American Statistical Association, Econometric Society, and the Product Development and

3   Management Association.  [Wion Ex. 4, Sukumar Report, p. 21.]

4      6.  In the area of intellectual property, I have performed expert and consulting work

5   related to valuation of patented features within the consumer electronics industry.  I have provided

6   a report and testimony regarding conjoint analysis – using the same methodologies I employed in

7   this matter – in *Nomadix, Inc. v. Hewlett-Packard Company et al.*, (C.D. Ca.) and *Apple Inc. v.*

8   *Samsung Electronics Co. Ltd. et al.*, (N.D. Ca.).  Specifically, I recently provided testimony before

9   a jury, on behalf of Samsung Electronics, regarding a conjoint analysis I conducted in regard to

10  that litigation.  [Wion Ex. 4, Sukumar Report, p. 17; Ex. 48, Sukumar Depo. Tr., 13:6-15:19.]

11     7.  I have reviewed Dr. Peter Rossi's August 10, 2012 Rebuttal Report to my Expert

12  Report of July 24, 2012, his Declaration in Support of Microsoft's Rule 702 Motion to preclude

13  my testimony, and the transcript of Dr. Rossi's August 29, 2012 deposition.  I disagree with the

14  vast majority of Dr. Rossi's opinions, including his allegations that I have failed to provide

15  sufficient underlying documentation, that I have employed the wrong methodology to calculate

16  confidence levels, that online, compensated surveys are inherently unreliable, and that the use of

17  certain technical terminology in my surveys renders the results useless.  Dr. Rossi's criticisms lack

18  factual and scientific basis.  It appears that he is either not sufficiently experienced with or

19  misunderstands the methodologies I employed, all of which have been well known and accepted

20  by the surveying field for many years.

21     8.  My July 24, 2012 expert report provided information relating to my methodologies

22  and results for two surveys relating to the usage and desirability of certain features within an Xbox

23  360 console.  Specifically, the surveys and accompanying analyses related to the inclusion of

24  H.264 (referred to herein as the "H.264 survey") and Wi-Fi (referred to herein as the "802.11

25  survey") in Xbox consoles.  [Wion Ex. 4, Sukumar Report, p. 3.]  My report details the relevant

26  steps I took in constructing and carrying out the surveys as well my analysis of the data obtained.

DECLARATION OF DR. R. SUKUMAR IN SUPPORT OF
MOTOROLA MOBILITY'S AND GENERAL INSTRUMENT'S
OPPOSITION TO MICROSOFT'S RULE 702 MOTION - 2
CASE NO. C10-1823-JLR

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone: (206) 676-7000
Fax: (206) 676-7001

1   Included with my report were exhibits and data files that plainly showed the questions asked of

2   each respondent, the responses given by each respondent, and the calculations used for the

3   advanced analysis.  The data was provided in three file formats, all of which are well known and

4   widely used within the fields of statistics and market research.  Specifically, the data were

5   provided in (1) either Comma-Separated Value (.csv) and Excel (.xls) file types which are easily

6   opened by the Microsoft Excel program; and (2) a file type (.sav) that is used by IBM's SPSS

7   software for data analysis.  [MOTM_WASH1823_603524-MOTM_WASH1823_603549.]

8          9.    I designed and implemented two surveys designed to identify usage and valuation

9   of H.264 decoding and WiFi in Microsoft's Xbox console.  I was not asked to, and did not, render

10  an opinion on Microsoft's alleged infringement of Motorola's patent portfolio.  I was not provided

11  with the numbers of the patents at issue, nor did I need to know them to conduct the surveys.  [Ex.

12  48, Sukumar Depo. Tr., 129:3-130:5.]  I also was not asked to, and did not, render an opinion as to

13  whether Motorola's asserted patents in the above-captioned action are necessary to practice the

14  standard or what the incremental value of any individual patent (or specific portfolio of patents)

15  would be to a user in the marketplace.  [Ex. 48, Sukumar Depo. Tr., 125:25-128:3.]

16          a.    At my direction, a field team, led by Lia Pasternack, the Director of Field

17  Services for OSG, contracted with a facility at a local mall to perform qualitative interviews with

18  mall shoppers.  [*Id.*, 25:20-26:6.]  Ms. Pasternack joined OSG in 2009 and has over 10 years of

19  experience in quantitative and qualitative research data collection.  Qualitative interviews are, by

20  their nature, exploratory and are used to determine a threshold understanding of how certain

21  consumers talk about or reference certain products.  [Wion Ex. 4, Sukumar Report, pp. 5-6; Ex.

22  48, Sukumar Depo. Tr. 66:13-24.]  The field team screened potential respondents based in part on

23  whether they owned an Xbox console and whether they were responsible for or involved in the

24  decision to purchase the Xbox console.  [*Id.*, 28:25-31:5.]

25          b.    The field team interviewed a total of 30 respondents.  [Wion Ex. 4,

26  Sukumar Report, p. 4.]  This is an acceptable number of respondents, and is within the guidelines

DECLARATION OF DR. R. SUKUMAR IN SUPPORT OF
MOTOROLA MOBILITY'S AND GENERAL INSTRUMENT'S
OPPOSITION TO MICROSOFT'S RULE 702 MOTION - 3
CASE NO. C10-1823-JLR

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

1   suggested in the Reference Manual on Scientific Evidence (2nd Ed. 2000), which is identified in

2   the References section of my report.  [Wion Ex. 4, Sukumar Report, p. 22.].  It is my standard

3   practice to receive verbal debriefings from a field team after such qualitative interviews, and to

4   work with them to design a survey based on the results.  I do not require or encourage field teams

5   to take notes during these interviews, because in my experience, doing so hinders the flow of

6   conversation and may ultimately defeat the purpose of an interview.  [Ex. 48, Sukumar Depo. Tr.,

7   32:18-33:1.]  Ms. Pasternack provided me with a verbal debrief of the findings from the

8   qualitative interviews, and we worked together to design the surveys.  [Wion Ex. 4, Sukumar

9   Report, pp. 5-6.]

10          c.      These surveys were then pre-tested by a field team, again led by Ms.

11   Pasternack.  [Ex. 48, Sukumar Depo. Tr., 37:7-18.]  The pre-tests were conducted in person with

12   screened respondents.  [Ex. 48, Sukumar Depo. Tr., 57:16-58:13.]  It is my understanding from

13   speaking with Ms. Pasternack that the respondents were given instructions on completing the

14   computer-based survey and were directly observed at all times during the pre-test process by the

15   proctors and Ms. Pasternack, who served as moderator.  [*Id.*]  The purpose of a pre-test is to

16   determine whether any of the questions are confusing or could be better stated.  [*Id.*]  For example,

17   it is my understanding that from this pre-test, Ms. Pasternack and her team determined that

18   respondents had difficulty remembering what Month and Year they purchased their Xbox, but

19   could better recall how long ago they purchased it.  [*Id.*, 50:23-51:7.]  These refinements were

20   made by Ms. Pasternack's team to the surveys during the pre-test.  [*Id.*, 51:8-20.]  Ms. Pasternack

21   and her team also learned that respondents were more comfortable using increments of $100 for

22   the conjoint portion of the survey instead of the $50 increments we initially programmed, so we

23   changed that as well.  [*Id.*, 49:7-50:9.]

24          d.      I understand that the respondents were also provided with a two-page

25   document.  The front page had a question asking each respondent to identify whether any of the

26   test questions were confusing.  The second page contained a list of Xbox features.  The

DECLARATION OF DR. R. SUKUMAR IN SUPPORT OF
MOTOROLA MOBILITY'S AND GENERAL INSTRUMENT'S
OPPOSITION TO MICROSOFT'S RULE 702 MOTION - 4
CASE NO. C10-1823-JLR

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone: (206) 676-7000
Fax: (206) 676-7001

1   respondents were asked to write their name at the top of the questionnaire page and to circle the

2   top 5 features from the second page that were most important to them.  [*Id*., 48:1-49:6; Ex. 59,

3   Pre-Test Questionnaire.]  I did not review these papers prior to finalizing the surveys because, as I

4   have noted, the purpose of pre-testing is to refine questions to minimize confusion.  [Ex. 48,

5   Sukumar Depo. Tr., 47:11-23.]  These refinements were made by the field team during the pre-test

6   process, and later approved by me, after I was verbally debriefed by Ms. Pasternack.  It is my

7   customary practice not to review the papers or other documentation from the pre-test because there

8   is no need to do so.  [*Id.*]  I have seen these papers since I finalized my expert report, and as

9   expected, they do not contain any information that would cause me to change any portion of my

10  report.

11          e.      I understand that Dr. Rossi believes that respondents were "telephoned …

12  AFTER they completed the questionnaire on line" (emphasis is his).  Dr. Rossi cites no evidence

13  for this supposition, and it is untrue.  Respondents were observed by Ms. Pasternack during the

14  pre-testing and she answered questions and made adjustments to the surveys, as she saw fit, based

15  on feedback from the respondents.  [*Id*., 49:7-51:20.]

16          10.     I used Authentic Response to recruit respondents and conduct the surveys online.

17  Authentic Response is well-known and well-regarded within the industry for providing

18  representative samples across the United States and across consumer industry groups.  [Wion Ex.

19  4, Sukumar Report, p. 7.]   I and Ms. Pasternack reviewed Authentic Response's panel

20  management features prior to engaging them and have worked with them on numerous projects.

21  [Ex. 48, Sukumar Depo. Tr., 232:3-13.]

22          11.     Providing compensation or "gifts" to survey respondents is standard procedure in

23  the industry and ensures a minimum level of consumer participation.  [Ex. 48, Sukumar Depo. Tr.,

24  219:25-222:4.]   In my 16 years of performing market surveys, I have found that providing

25  appropriate compensation does not measurably impact or bias the results of the survey.  I

26

DECLARATION OF DR. R. SUKUMAR IN SUPPORT OF
MOTOROLA MOBILITY'S AND GENERAL INSTRUMENT'S
OPPOSITION TO MICROSOFT'S RULE 702 MOTION - 5
CASE NO. C10-1823-JLR

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone: (206) 676-7000
Fax: (206) 676-7001

1    understand from Dr. Rossi's testimony that he has compensated survey respondents as well.  [Ex.

2    47, Rossi Depo. Tr., 25:11-13].

3         12.    My surveys included terms like "WiFi," "H.264," "progressive video," "interlaced

4    video" and "MBAFF."   [Wion Ex. 4, Sukumar Report, Ex. A2, H.264 Questionnaire.]   The

5    inclusion of these terms does not inherently affect the results of the surveys.  [Ex. 48, Sukumar

6    Depo. Tr., 76:4-78:12.]  Instead, one must look to the purpose of the questions and the information

7    it seeks to elicit.  In the case of the one question in the H.264 survey that included the use of

8    "MBAFF," for example, any respondent unsure of its meaning or unsure of the "right" response

9    had the option to choose "Not Sure" as the response.  [Wion Ex. 4, Sukumar Report, Exs. A2,

10   p. 15 and F2, QH5A1-A2.]





DECLARATION OF DR. R. SUKUMAR IN SUPPORT OF
MOTOROLA MOBILITY'S AND GENERAL INSTRUMENT'S
OPPOSITION TO MICROSOFT'S RULE 702 MOTION - 6
CASE NO. C10-1823-JLR

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

Because a respondent had to first identify that he or she had viewed "interlaced" video content on their Xbox console in QH5A1 in order to reveal question QH5A2, more than 50% of respondents never even saw "MBAFF" because they had already answered "Not Sure" in QH5A1.  [Ex. 48, Sukumar Depo. Tr., 230:15-231:7.]

      a.    I relied on the methodologies set forth in the *Reference Manual on Scientific Evidence* (2nd Ed. 2000) ("Reference Manual"), which was identified in the References section of my report.  The Reference Manual notes that including a "not sure" or "I don't know" selection will minimize a respondent's need to guess, if he or she does not have sufficient knowledge to answer a question.  [*See* Ex. 52, p. 250 ("By signaling to the respondent that it is appropriate not to have an opinion, the question reduces the demand for an answer and, as a result, the inclination to hazard a guess just to comply.)"]

      b.    Based on my experience, questions as straightforward and uncomplicated as QH5A1 and QH5A2 do not necessarily need to be pre-tested.  [*Id.*]  Either a respondent has the knowledge to identify the particular types of video encoding that he or she has viewed on their Xbox, or they can "opt-out" by responding "Not sure."  These questions, as posed, provide a reliable means by which to obtain the desired information.

      c.    I note that Dr. Rossi states that the number of respondents selecting "Not sure" in response to QH5A1 should have been "closer to 100%," but he provides no underlying facts to substantiate his personal guess.  [Rossi Decl.,[2] ¶ 23.]  All the numbers I provide in my report are based on actual data obtained by surveying respondents.

    13.    Similarly, Dr. Rossi opines that "B/G" and "B/G/N" are "non-standard terms" and are, therefore, confusing to respondents.  Again, Dr. Rossi provides no support for this view.  In fact, the terminology I used was consistent with how it is used on the internet—including Microsoft's own Xbox website.  [Ex. 48, Sukumar Depo. Tr., 87:11-21; Ex. 51, printout from

---

[2]    "Rossi Decl." refers to the Declaration of Peter E. Rossi In Support Of Microsoft Corporation's Rule 702 Motion To Preclude Testimony By Charles R. Donohoe And Dr. R. Sukumar, filed August 27, 2012.

DECLARATION OF DR. R. SUKUMAR IN SUPPORT OF
MOTOROLA MOBILITY'S AND GENERAL INSTRUMENT'S
OPPOSITION TO MICROSOFT'S RULE 702 MOTION - 7
CASE NO. C10-1823-JLR

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone: (206) 676-7000
Fax: (206) 676-7001

1    Amazon.com website showing product information for an Xbox 360 Wireless Network Adapter

2    ("With increased speed, range and wireless security features*, the Xbox 260 Wireless 'N'

3    Networking Adapter offers the fastest and most convenient connection to Xbox LIVE.  You can

4    seamlessly download or stream HD movies, TV episodes, and games from Xbox LIVE

5    marketplace in full 1080p and 5.1 surround sound from anywhere in the house.** *Compatible with*

6    *A/B/G/N networks*, . . . ") (emphasis added).]

7            14.     Dr. Rossi opines – again without any support – that the average amount of time it

8    took for a respondent to complete a survey (slightly over 4 minutes) somehow "suggests strongly

9    that the reported values are unreliable."   [Rossi Decl., ¶ 35.]   First, Dr. Rossi misstates the

10   meaning of the Elapsed Time column.  As I explained during my deposition, "Elapsed Time"

11   refers to the amount of time a respondent took to complete the conjoint exercise (which consists of

12   15 nearly identical questions), *not* the time it took to complete the entire survey.  [Ex. 48, Sukumar

13   Depo. Tr., 103:15-23.]   Based on my experience in conducting hundreds of surveys, it is not

14   surprising that an average respondent was able to complete a 15 question survey in less than 5

15   minutes, where the questions were short, uncomplicated, and nearly identical.  Certainly, there is

16   no basis on this fact alone to assume that respondents who were able to complete a survey in this

17   time somehow "did not devote substantial effort to completing the survey," as Dr. Rossi suggests.

18   [Rossi Decl., ¶ 32].  In fact, nothing I have ever seen compels me to exclude an entire class of

19   respondents based simply on the time to complete the survey.  [*Id*., 72:19-74:2.]

20           15.     Each survey was broken into two distinct sections.  The first section asked direct

21   questions about usage and preferences for the Xbox console.  The results of the first section are

22   calculated by tallying the number of weighted responses and calculating a percentage from the

23   sample size.  The second section presents what is known as a conjoint analysis.  Conjoint analysis

24   has been used extensively in understanding how the market values improvements in a given

25   feature.  The term "conjoint analysis" (also commonly referred to as "tradeoff analysis"), was

26   coined from the words "consider jointly."  It has been used in a number of legal cases to assess the

DECLARATION OF DR. R. SUKUMAR IN SUPPORT OF
MOTOROLA MOBILITY'S AND GENERAL INSTRUMENT'S
OPPOSITION TO MICROSOFT'S RULE 702 MOTION - 8
CASE NO. C10-1823-JLR

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone: (206) 676-7000
Fax: (206) 676-7001

importance a given feature (or attribute) has in a customer's decision to buy a product having that feature.  The methodology has been used in patent litigations to determine the market's value of improvements resulting from inclusion of a patented feature.  (The market's value for the improvement of a feature is sometimes referred to as "MVAI".)

16.    Conjoint analysis is used to determine what value a customer places on a particular feature of a product by measuring the partial value ("partworth" utility) of multiple individual features of the product.  The data is used to isolate the utility of one particular feature to the customer.  I used mathematical formulations, developed over a decade ago by Drs. Ofek and Srinivasan and published in MARKETING SCIENCE, a well-respected journal, to calculate a Willingness To Pay (WTP) value that represents what a respondent will pay for the addition of a given feature.  In this case, I then took the WTP values for each individual user across each tested feature and presented the Mean (or average) WTP for each tested feature.  I note that although Dr. Rossi critiques the Ofek/Srinivasan methodology, he acknowledges that the publication in which it was presented is peer-reviewed, thus confirming it as an eminently reliable article.  [Ex. 47, Rossi Depo Tr., 224:25-225:7.]

17.    My report details the steps taken to calculate WTP and includes citations to the supporting references that validate the procedures used in this study.  I also provided Microsoft with detailed spreadsheets containing all the calculations performed to derive the Mean WTP. [MOTM_WASH1823_603549.]  I also included ".sav" files which are used in IBM's SPSS program—a commonly used statistical analysis tool.    [MOTM_WASH1823_603539; MOTM_WASH1823_603545]  I identified in my report the programs used for data collection and analysis—specifically, Sawtooth Software's CBC programs.  [Wion Ex. 4, Sukumar Report, pp. 3-4.]  Thus, the file names for these programs included my team's internal project name for the two surveys (5007A and 5007H, respectively) and descriptive phrases such as "802.11 - All CBC Data" which clearly means that it contains all the CBC data for the 802.l1 portion of the survey. Similarly, I included an excel spreadsheet called "WTP Calculation" which contained all my

DECLARATION OF DR. R. SUKUMAR IN SUPPORT OF
MOTOROLA MOBILITY'S AND GENERAL INSTRUMENT'S
OPPOSITION TO MICROSOFT'S RULE 702 MOTION - 9
CASE NO. C10-1823-JLR

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

1    calculations for the WTP values.  [MOTM_WASH1823_603549.]  I note that Dr. Rossi included

2    as part of his report calculations performed by Tim Savage, who clearly was able to access and

3    analyze the data contained in the produced SPSS files.  [Ex. 60, Rossi Report, Appendix G.]

4         18.    As stated in my report, I used the term WTP interchangeably with MVAI (market

5    value for an attribute improvement), which I also refer to as "market value for the improvement of

6    a feature" in my report.  [Wion Ex. 4, Sukumar Report, p. 8.]  The WTP/MVAI calculation is not

7    calculated on an individual basis and does not correspond to the actual price a manufacturer would

8    charge for a product as this would necessarily depend on other factors.  I did not have the data to

9    make such a calculation, nor was I asked to do so.  The WTP/MVAI calculation in my report is

10   representative of the maximum price that the market, as represented by a group of consumers, is

11   willing to pay for a particular feature.  [Ex. 48, Sukumar Depo. Tr., 147:24-148:8.]

12        19.    I did not use Bayesian methods to compute the WTP/MVAI values, nor was it

13   necessary for me to do so.  Instead, as noted above and in my report, I used the Ofek/Srinivasan

14   method, which is a well accepted alternative means of calculation.  [Wion Ex. 4, Sukumar Report,

15   p. 3; Ex. 48, Sukumar Depo. Tr., 216:14-217:24.]

16        20.    I calculated and reported margins of error for the WTP values using classic

17   statistical method, also known as the "delta" theorem.  [Ex. 48, Sukumar Depo. Tr., 214:12-

18   216:25.]  The equations used to derive these percentages appear in the most fundamental statistics

19   references and textbooks, including "Introduction to the Theory of Statistics" (3d. edition) by

20   Mood, Graybill and Boes.  [*Id.*]  Dr. Rossi's assumption that it is necessary to use Bayesian

21   methods to calculate error margins ignores the fact that the delta theorem, and the resulting

22   confidence intervals generated by the theorem, is a well known and accepted alternative.  [*Id.*]

23        21.    The MVAI estimates I calculated for the Wi-Fi feature differed between the 802.11

24   survey and the H.264 survey based, in part, on the fact that the H.264 survey also included 802.11

25   as an attribute.  Because the H.264 survey included additional attributes that the respondents

26   valued, they were then willing to place more emphasis on those features.  [*Id.*, 144:12-146:22.]

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone: (206) 676-7000
Fax: (206) 676-7001

1    Dr. Rossi claims that the calculated margins of error are too small, but he provides no basis as to

2    why and has not performed any calculations of his own to support his claim.  [Ex. 47, Rossi Depo.

3    Tr., 244:15-22.]  My calculations are based on the raw data provided and are readily reproducible.

4         22.    In order to forestall the possibility of illogical results, I imposed certain constraints

5    when analyzing the CBC data using the CBC program.  This is common practice and is discussed

6    in "The CBC/HB System for Hierarchical Bayes Estimation" paper at page 15.  This paper is

7    identified in my report in the References Section.  [Wion Ex. 4, Sukumar Report, Ex. E.]

8         a.    Page 15 of this paper explains that "[c]onjoint studies frequently include

9    product attributes for which almost everyone would be expected to prefer one level to another.

10   However, estimated part worths sometimes turn out not to have those expected orders.  This can

11   be a problem, since part worths with the wrong slopes, or coefficients with the wrong signs, are

12   likely to yield nonsense results and can undermine users' confidence."  Thus, using constraints

13   maintains the credibility of the calculations.  Constraints are appropriate for attributes that have

14   "unambiguous a-priori preference orders, such as quality, speed, price, etc."  Those are precisely

15   the types of constraints I used to ensure that the results are not nonsensical.  [Ex. 48, Sukumar

16   Depo. Tr., 114:7-116:20.]

17        b.    Dr. Rossi mischaracterizes how the CBC software treats the constraints.  As

18   is clear from the data provided, constraints do not predetermine a user's utility function for a given

19   attribute to be higher than it otherwise would be without constraints.  For example, if a user does

20   not value Wi-Fi, then the part-worths utility for that feature will remain at or close to zero,

21   regardless of the constraints.  [*Id.*]

22

23

24

25

26

DECLARATION OF DR. R. SUKUMAR IN SUPPORT OF
MOTOROLA MOBILITY'S AND GENERAL INSTRUMENT'S
OPPOSITION TO MICROSOFT'S RULE 702 MOTION - 11
CASE NO. C10-1823-JLR

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

1         I declare under penalty of perjury of the laws of the United States and the State of

2    Washington that the foregoing is true and correct.

3

4         DATED this 5th day of September, 2012.

5

6

7

8                                        _____

9                                             Dr. R. Sukumar

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

DECLARATION OF DR. R. SUKUMAR IN SUPPORT OF
MOTOROLA MOBILITY'S AND GENERAL INSTRUMENT'S
OPPOSITION TO MICROSOFT'S RULE 702 MOTION - 12
CASE NO. C10-1823-JLR

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone: (206) 676-7000
Fax: (206) 676-7001

1

## CERTIFICATE OF SERVICE

2       I hereby certify that on this day I electronically filed the foregoing with the Clerk of the

3  Court using the CM/ECF system which will send notification of such filing to the following:

4               Arthur W. Harrigan, Jr., Esq.
                Christopher T. Wion, Esq.
5               Shane P. Cramer, Esq.
                Calfo Danielson, Harrigan, Leyh & Eakes LLP
6               *arthurh@calfoharrigan.com*
                *chrisw@calfoharrigan.com*
7               *shanec@calfoharrigan.com*

8               Richard A. Cederoth, Esq.
                Brian R. Nester, Esq.
9               David T. Pritikin, Esq.
                Douglas I. Lewis, Esq.
10              John W. McBride, Esq.
                David Greenfield, Esq.
11              William H. Baumgartner, Jr., Esq.
                David C. Giardina, Esq.
12              Carter G. Phillips, Esq.
                Constantine L. Trela, Jr., Esq.
13              Ellen S. Robbins, Esq.
                Nathaniel C. Love, Esq.
14              Sidley Austin LLP
                *rcederoth@sidley.com*
15              *bnester@sidley.com*
                *dpritikin@sidley.com*
16              *dilewis@sidley.com*
                *jwmcbride@sidley.com*
17              *david.greenfield@sidley.com*
                *wbaumgartner@sidley.com*
18              *dgiardina@sidley.com*
                *cphillips@sidley.com*
19              *ctrela@sidley.com*
                *erobbins@sidley.com*
20              *nlove@sidley.com*

21
                T. Andrew Culbert, Esq.
22              David E. Killough, Esq.
                Microsoft Corp.
23              *andycu@microsoft.com*
                *davkill@microsoft.com*
24

25      DATED this 5th day of September, 2012.

26                                        _____
                                          /s/ *Marcia A. Ripley*
                                          Marcia A. Ripley

DECLARATION OF DR. R. SUKUMAR IN SUPPORT OF
MOTOROLA MOBILITY'S AND GENERAL INSTRUMENT'S
OPPOSITION TO MICROSOFT'S RULE 702 MOTION - 13
CASE NO. C10-1823-JLR

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone: (206) 676-7000
Fax: (206) 676-7001