HONORABLE JAMES L. ROBART

1

2

3

4

5

6

7

8

9

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

10

11

| | |
|---|---|
| MICROSOFT CORPORATION,<br><br>    Plaintiff,<br><br>    v.<br><br>MOTOROLA INC., et al.,<br><br>    Defendant. | No. C10-1823-JLR<br><br>**REDACTED**<br>MICROSOFT'S OPPOSITION TO MOTOROLA'S *DAUBERT* MOTION TO EXCLUDE CERTAIN TESTIMONY OF PLAINTIFF'S EXPERTS DRS. LYNDE, MURPHY, AND SIMCOE |
| MOTOROLA MOBILITY, INC., et al.,<br><br>    Plaintiffs,<br><br>    v.<br><br>MICROSOFT CORPORATION,<br><br>    Defendant. | **Noted: September 10, 2012**<br><br>**ORAL ARGUMENT REQUESTED** |

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

MICROSOFT'S OPPOSITION TO
MOTOROLA'S *DAUBERT* MOTION TO
EXCLUDE CERTAIN TESTIMONY OF
PLAINTIFF'S EXPERTS

LAW OFFICES
CALFO HARRIGAN LEYH & EAKES LLP
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700 FAX, (206) 623-8717

1

## TABLE OF CONTENTS

2   INTRODUCTION ................................................................................................ 1

3   ARGUMENT ...................................................................................................... 3

4   I.   Microsoft's Experts Implement A Sound Methodology For Determining A RAND Royalty
5        For Motorola's 802.11 And H.264 Patents. ........................................................ 3

6        A.   The *Ex Ante* Multilateral Perspective Directly Addresses Risks Inherent In Standard-
             Essential Patent Licensing and Recognized in the Literature. ............................ 3

7        B.   Patent Pools Are An Appropriate Surrogate For *Ex Ante* Multilateral Licenses. .......... 6

8        C.   The *Ex Ante* Multilateral Perspective Conforms With Economic Theory And
9             Academic Publications On RAND ..................................................................... 8

10       D.   Motorola's Own Cited Authorities Endorse *Ex Ante* And Multilateral Approaches To
             RAND Valuation .......................................................................................... 9

11       E.   Microsoft's Experts Use The *Ex Ante* Multilateral Framework As One Of Several
12            Tools That Inform A RAND Determination. .................................................... 12

13  II.  The Fact That Many Standard-Essential Patent Licenses Result From Bilateral
         Negotiations Is Unremarkable And Irrelevant. ..................................................... 13

14  CONCLUSION ................................................................................................. 15

15

16

17

18

19

20

21

22

23

24

25

26

MICROSOFT'S OPPOSITION TO
MOTOROLA'S *DAUBERT* MOTION TO
EXCLUDE CERTAIN TESTIMONY OF
PLAINTIFF'S EXPERTS

LAW OFFICES
CALFO HARRIGAN LEYH & EAKES LLP
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700 FAX, (206) 623-8717

1

2

## <u>TABLE OF AUTHORITIES</u>

3

**Page(s)**

CASES

4

5

*Apple, Inc. v. Motorola, Inc.,*
    No. 1:11-cv-08540, 2012 WL 2376664 (N.D. Ill. June 22, 2012) .............................................9

6

*Boyd v. City and County of San Francisco,*
    576 F.3d 938 (9th Cir. 2009) ..............................................................................................11

7

8

*Feliciano-Hill v. Principi,*
    439 F.3d 18 (1st Cir. 2006)...................................................................................................2

9

*Kumho Tire Co., Ltd. v. Carmichael,*
    526 U.S. 137 (1999)...........................................................................................................11

10

*Micro Chem., Inc. v. Lextron, Inc.,*
    317 F.3d 1387 (Fed. Cir. 2003) ...........................................................................................2

11

12

*United States v. Golb*
    69 F.3d 1417 (9th Cir. 1995) ...............................................................................................2

13

OTHER AUTHORITIES

14

Joseph Farrell et al, "Standard setting, patents, and hold-up", 74 *Antitrust L. J.* 603
    (2007)...........................................................................................................................3, 8, 9

15

16

Federal Trade Commission, *The Evolving IP Marketplace: Aligning Patent Notice and
    Remedies With Competition* (March 2011) (online at
    http://www.ftc.gov/os/2011/03/110307patentreport.pdf) .......................................................8, 9

17

18

Mark A. Lemley and Carl Shapiro, "Patent Holdup and Royalty Stacking," 85 *Texas L.
    Rev.* 1991 (2007).................................................................................................................3, 8

19

Carl Shapiro, "Navigating the Patent Thicket: Cross Licenses, Patent Pools, and
    Standard-Setting," in Adam B. Jaffe *et al., Innovation Policy and the Economy*
    (2001).................................................................................................................................3, 8

20

21

Daniel G. Swanson and William J. Baumol, "Reasonable and Nondiscriminatory
    (RAND) Royalties, Standards Selection, and Control of Market Power", 73
    *Antitrust L. J.* 1 (2005).........................................................................................................3, 8

22

23

24

25

26

MICROSOFT'S OPPOSITION TO
MOTOROLA'S *DAUBERT* MOTION TO
EXCLUDE CERTAIN TESTIMONY OF
PLAINTIFF'S EXPERTS

LAW OFFICES
CALFO HARRIGAN LEYH & EAKES LLP
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700 FAX, (206) 623-8717

## INTRODUCTION

Motorola's *Daubert* motion is premised on the false assumption that there is one and only one way to determine a RAND royalty, and that any other methodology is so far out of bounds that it may not even be heard by the Court. Motorola is wrong. The issue now is simply whether Microsoft has proposed a reliable methodology for determining a RAND royalty, not whether the approach it advocates is more or less preferable than the approach advocated by Motorola. That question will be resolved at trial.

The methodology proposed by Microsoft's experts easily meets the threshold requirements for being considered a reliable approach. The relevant scholarly literature recognizes unique risks presented in the licensing of standard essential patents: after the standard has been adopted, a would-be implementer is largely at the mercy of the holder of an essential patent, and that bargaining disparity increases as the standard is more widely adopted. In addition, because standards like H.264 and 802.11 are the product of contributions from so many participants, and because a large number of patents are essential to these standards, a seemingly modest royalty paid for each patent can pyramid into an unreasonable burden.

To address these concerns, Microsoft's experts proposed a methodology that would assess the *ex ante* value of the standard essential patents—*i.e.,* the value of their contribution before the standard was adopted or widely implemented. They also sought a methodology that would avoid the hold-up value of the standard itself, that would not reward the patent holder for the value of the standard rather than their patents, and that would address the stacking problem. Based on the literature and sound principles of economics, Microsoft's experts have opined that a multilateral *ex ante* framework—one that considers the value of the patents before the widespread adoption of the standard and that does so in recognition of the large number of patents needed to practice a standard—is part of a reasonable route to a RAND royalty. Microsoft's experts use real-world 802.11 and H.264 multilateral patent pool license

1   agreements as analogues to the terms emerging from such a framework.  Additionally,

2   Microsoft's experts use other inputs to inform the appropriate RAND valuation, including the

3   entire market value rule and smallest saleable unit analysis (principles of Federal Circuit

4   reasonable royalty law), ██████████████████████████████████████████████

5   ███████████████████████████████████████

6          Microsoft believes that after trial, the Court will conclude that this is a far better way to

7   set a RAND royalty than the approach urged by Motorola—an approach that looks to *ex post*

8   hypothetical bilateral negotiations that inherently maximize the risk of holdup, that focuses on

9   the value of the standard and not the patents, and that relies heavily on non-comparable *ex post*

10  licenses of patents essential to cellular standards, not the standards at issue here.  But the Court

11  need not reach that conclusion in order to deny the Motorola's motion.  *See United States v.*

12  *Golb* 69 F.3d 1417, 1428 (9th Cir. 1995) (where parties' experts reached different results from

13  performing different experiments, "it was within the [fact finder's] province to resolve these

14  competing opinions"); *Micro Chem., Inc. v. Lextron, Inc.*, 317 F.3d 1387, 1394 (Fed. Cir.

15  2003) (where case involved "a classic example of competing experts," outcome properly

16  depended on "which expert's analysis" the fact finder believed).  *See also Feliciano-Hill v.*

17  *Principi*, 439 F.3d 18, 25 (1st Cir. 2006) ("The mere fact that two experts disagree is not

18  grounds for excluding one's testimony.").  All that the Court needs to decide is whether the

19  methodology proposed by Microsoft is one way of legitimately addressing the economic and

20  valuation issues underlying the RAND requirement.  It clearly meets that test.

21

22

23

24

25

26

## ARGUMENT

I. **Microsoft's Experts Implement A Sound Methodology For Determining A RAND Royalty For Motorola's 802.11 And H.264 Patents.**

A. **The *Ex Ante* Multilateral Perspective Directly Addresses Risks Inherent In Standard-Essential Patent Licensing and Recognized in the Literature.**

RAND commitments mitigate three key risks presented by the licensing of standard-essential patents:  capture of the value of the standard once it has been implemented; hold-up of implementers who have far less bargaining power than the holders of essential patents; and the stacking of royalties by many holders of essential patents, resulting in unreasonable royalty burdens. All of these are well recognized in the economic literature. *See, e.g.*, Joseph Farrell *et al.*, "Standard setting, patents, and hold-up", 74 *Antitrust L. J.* 603, 608 (2007) (Wion Decl. Ex. 12); Mark A. Lemley and Carl Shapiro, "Patent Holdup and Royalty Stacking," 85 *Texas L. Rev.* 1991, 2027 (2007) (Wion Decl. Ex. 13); Daniel G. Swanson and William J. Baumol, "Reasonable and Nondiscriminatory (RAND) Royalties, Standards Selection, and Control of Market Power", 73 *Antitrust L. J.* 1, 57 (2005) (Wion Decl. Ex. 14); Carl Shapiro, "Navigating the Patent Thicket: Cross Licenses, Patent Pools, and Standard-Setting," in Adam B. Jaffe *et al.*, *Innovation Policy and the Economy* (2001) 128, 136 (Wion Decl. Ex. 15); Sections I.C & I.D, *infra*. Microsoft's experts propose a methodology for RAND valuation that addresses these risks by considering the terms that would result from an *ex ante* multilateral framework, in which the patents of significant numbers of standard-essential patent holders are made available to prospective implementers. This approach values standard-essential patents on an *ex ante* basis so that their value is captured (not the value of the standard), and takes away the outsized bargaining power of patent holders that arises after the standard is widely implemented. The multilateral framework also provides a mechanism to establish a reasonable, manageable royalty burden across the entirety of the patents needed to implement the standard, with a fair allocation of royalties to all standard-essential patent holders. In a

MICROSOFT'S OPPOSITION TO
MOTOROLA'S *DAUBERT* MOTION TO
EXCLUDE CERTAIN TESTIMONY OF
PLAINTIFF'S EXPERTS - 3

LAW OFFICES
CALFO HARRIGAN LEYH & EAKES, LLP
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700 FAX, (206) 623-8717

1    multilateral framework, all licensors appreciate the potential impact of their individual

2    licensing positions, and recognize that the aggregate royalties sought must be sufficiently

3    reasonable as to allow the widespread implementation of the standard.

4          As Microsoft's experts explained, these risks are magnified in the context of one-off

5    bilateral negotiations between the holder of truly essential patents and individual implementers

6    whose choice is to knuckle under or remove product features:

7          In unconstrained bilateral *ex post* negotiations, licensors have the incentive and
           ability to demand royalties that exceed the *ex ante* economic value of their
8          proprietary technology. In particular, an opportunistic licensor can use the
           switching costs created by widespread adoption of a standard to extract value
9          that would otherwise accrue to implementers and their customers.

10   Wion Decl. Ex. 3 (Simcoe Rpt.) ¶ 107; *see also id.* ¶¶ 87–91, 108; Wion Decl. Ex. 1 (Murphy

11   Rpt.) ¶ 46; Wion Decl. Ex. 2 (Lynde Rpt.) at 15–17.  Motorola does not argue that Microsoft's

12   experts' methodologies are unreliable because they inadequately address the problems of

13   patent stacking and hold-up, nor does Motorola argue that royalty demands that create hold-up

14   or stacking problems are nonetheless RAND.  Motorola's brief simply ignores the underlying

15   problems inherent with standard-essential patent licensing or, indeed, the rationale for

16   requiring reasonable and non-discriminatory royalties in the first place.



23   Motorola's expert, Professor Richard Schmalensee, also acknowledged the stacking problem—

24   agreeing that information concerning licenses involving patent owners other than Motorola

25   "would be useful" in assessing whether Motorola's demands were RAND—and agreed that

26

1  "RAND commitments exist to address hold-up." Dkt. No. 398 Ex. 1 (Schmalensee Dep.)

2  113:14–18, 12:7–13:4.

3       Microsoft's experts' consideration of an *ex ante*, multilateral perspective is entirely

4  consistent with SSO policies. That SSOs mention parties engaging in bilateral negotiations

5  does not mean that the SSOs believed that only bilateral negotiations could produce RAND

6  royalties. To the contrary, as Motorola has repeatedly emphasized, and as Motorola's own

7  experts acknowledge, the ITU and IEEE do not specify what is or is not RAND. Wion Decl.

8  Ex. 4 (Holleman Dep.) 17:9–25; Dkt. No. 362 at 4, 8; Dkt. No. 398 Ex. 1 (Schmalensee Dep.)

9  175:8–10. Critically, the SSOs do not say that pool rates—like those established by the 802.11

10  and H.264 pools cited by Microsoft's experts—are not RAND. (Dkt. No. 398 Ex. 1

11  (Schmalensee Dep.) 175:4–10.)

12       Moreover, nothing in the SSO patent policies prohibits a multilateral framework.

13  Statements that indicate that negotiations "are left to the parties concerned" (Dkt. No. 393,

14  Motorola Mobility's and General Instrument's Daubert Mot. To Exclude Certain Testimony Of

15  Pl.'s Experts Drs. Lynde, Murphy, And Simcoe ("Br.") 4) plainly do not require any particular

16  negotiations framework at all—bilateral or multilateral. A large group of licensors and

17  licensees is certainly composed of "parties concerned," and if that group generates royalty

18  agreements out of a patent pool or other multilateral framework outside the confines of the

19  SSO itself, the SSO statements Motorola cites contain no objection to those practices.

20  Contrary to Motorola's contentions (Br. 5), many SSOs promote pools, and other SSOs do not

21  take a position that patent pools are inappropriate. *See* Wion Decl. Ex. 4 (Holleman Dep.)

22  44:8–18; Dkt. No. 398 Ex. 1 (Schmalensee Dep.) 175:12–176:9; Wion Decl. Ex. 5 (IEEE Press

23  Release) at MS-MOTO_1823_00005245695 ("The IEEE 802.11 Patent Pool Exploratory

24  Forum is designed to promote the fair, reasonable, and non-discriminatory availability of

25  licenses essential to IEEE 802.11 through patent pools."). And nothing in the patent policies

26
MICROSOFT'S OPPOSITION TO
MOTOROLA'S *DAUBERT* MOTION TO
EXCLUDE CERTAIN TESTIMONY OF
PLAINTIFF'S EXPERTS - 5

LAW OFFICES
CALFO HARRIGAN LEYH & EAKES, LLP
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700 FAX, (206) 623-8717

prohibits *ex ante* negotiations—and in fact the IEEE now expressly permits such negotiations. Wion Decl. Ex. 4 (Holleman Dep.) 44:19–23; Wion Decl. Ex. 5 (IEEE Press Release) at MS-MOTO_1823_00005245695 (stating that through the IEEE 802.11 Patent Pool Exploratory Forum, "owners of patents essential to IEEE 802.11 standards will discuss licensing practices . . . related to launching a patent pool for IEEE 802.11-2012 *and appropriate extensions to the standard.*") (emphasis added).

### B. Patent Pools Are An Appropriate Surrogate For *Ex Ante* Multilateral Licenses.

Patent pools like the MPEG-LA and Via pools (for H.264 and 802.11, respectively) reflect a market-based, real-world form of multilateral licensing, in the sense that multiple licensors and multiple licensees agree on terms that limit the "stack" for the licensed portfolio. Participants in the formation of the pool had to "confront the royalty stacking problem" and "negotiate aggregate[ ] rates with many different licensors with different patent portfolios." Wion Decl. Ex. 1 (Murphy Rpt.) ¶¶ 59(b), 61; *see* Wion Decl. Ex. 3 (Simcoe Rpt.) ¶¶ 130–143. Motorola's own experts concede that patent pool royalties—which are not set by bilateral negotiations—may well be RAND. (Dkt. No. 398 Ex. 3 (Donohoe Dep.) 17:3–17; Dkt. No. 398 Ex. 1 (Schmalensee Dep.) 168:15–169:10.)

Motorola complains that Microsoft's experts focus on only two patent pools, in contrast to Motorola's experts' consideration of 50 bilateral licenses. (Br. 13.) This comparison—Motorola's experts have more data points than do Microsoft's—is not the basis of an argument about methodology, but a claim about the weight of evidence.

Even if counting data points here were a measure of reliability, the MPEG-LA pool considered by Microsoft's experts reflects the agreement of 29 licensors and more than 1,100 licensees for RAND royalties for 2,339 standard-essential patents, a

MICROSOFT'S OPPOSITION TO
MOTOROLA'S *DAUBERT* MOTION TO
EXCLUDE CERTAIN TESTIMONY OF
PLAINTIFF'S EXPERTS - 6

LAW OFFICES
CALFO HARRIGAN LEYH & EAKES, LLP
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700 FAX, (206) 623-8717

1  combination which dwarfs the 50 agreements Motorola claims to have considered.  *See* Dkt.

2  No. 236 at 1; Wion Decl. Ex. 9 (list of MPEG-LA H.264 licensees) at MS-

3  MOTO_1823_00004073189.

4      Motorola also claims that rates emerging from pools and multilateral negotiations are

5  somehow unreliable because participants "with broad product exposure would advocate for

6  rates on the *low end of RAND*," and participants who "prefer[ ] broad adoption of the standard

7  . . . may also push for rates on the *low end of RAND*."  (Br. 13, emphasis added).  But Motorola

8  acknowledges that even if these participants and their preferences drove the final royalties

9  emerging from the pool or multilateral negotiation, *the result would still be RAND*, because

10  even if RAND is a range, "the low end of RAND" is still RAND.  Moreover,

11  

12

13

14

15  Wion Decl. Ex. 11 (Smith Rpt.) ¶ 30.  At his deposition, Mr. Smith also expressly

16  acknowledged "the possibility that pools could charge rates for the collective license that

17  would be within the range of a RAND rate."  Wion Decl. Ex. 17 (Smith Dep.) at 94:21-24.  If

18  pools and a multilateral framework produce RAND royalties, as Motorola and its experts

19  admits they may, then Microsoft's experts' use of that evidence and those models to inform a

20  RAND royalty determination here is an entirely appropriate and reliable methodology.[1]

21

22

23

24  _____

[1] Even further, Motorola's expert Richard Schmalensee admitted that the same business interests (advocated by
25  those with broad product exposure, and/or prefer broad adoption of a standard) would lead to lower rates
emerging from bilateral negotiations, just as they would in pools.  (*See* Dkt. No. 398 Ex. 1 (Schmalensee Dep.)
179:2–22.)

26  MICROSOFT'S OPPOSITION TO
MOTOROLA'S *DAUBERT* MOTION TO
EXCLUDE CERTAIN TESTIMONY OF
PLAINTIFF'S EXPERTS - 7

LAW OFFICES
CALFO HARRIGAN LEYH & EAKES, LLP
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL. (206) 623-1700 FAX. (206) 623-8717

## C. The *Ex Ante* Multilateral Perspective Conforms With Economic Theory And Academic Publications On RAND.

The three major problems in standard-essential patent licenses identified by Microsoft's experts—hold-up, patent stacking, and capture of the value of standardization—are well-recognized in academic literature on RAND.  Standardization confers market power on standard-essential patent holders, which can enable extraction of royalties that do not reflect the value of the underlying patented technology, raising consumer prices for standard-compliant products without providing any benefit to consumers.  *See* Federal Trade Commission, *The Evolving IP Marketplace: Aligning Patent Notice and Remedies With Competition* (March 2011) 192 (online at http://www.ftc.gov/os/2011/03/110307patentreport.pdf) (Wion Decl. Ex. 16); Farrell et al., 74 *Antitrust L. J.* at 608 (Wion Decl. Ex. 12).  That market power can lead to hold-up and the capture of the value of standardization, with a patent holder demanding, for example, unreasonably high royalties, or licenses to an implementer's *non*-standard-essential patents, before allowing the implementer access to the standard.  *See* Shapiro, "Navigating the Patent Thicket: Cross Licenses, Patent Pools, and Standard-Setting," at 128, 136 (Wion Decl. Ex. 15). When hundreds or thousands of patents are possibly essential to a standard, these problems may become severe, as royalty demands from multiple patent holders "stack" to until the overall royalty burden threatens adoption of the standard.  *See* Lemley and Shapiro, 85 *Texas L. Rev.* at 2027 (Wion Decl. Ex. 13).

Economists recognize that RAND licensing terms should be informed by *ex ante* valuation of the patented technology, to avoid capture of the value of standardization.  *See* Swanson and Baumol, 73 *Antitrust L. J.* at 57 ("We have suggested that a royalty be deemed 'reasonable' for RAND purposes when it is or approximates the outcome of an auction-like process appropriately designed to take lawful advantage of the state of competition existing *ex ante* (i.e., in advance of standard selection) between and among available IP options.") (Wion

1   Decl. Ex. 14); Farrell et al., 74 *Antitrust L. J.* at 637 ("[C]ourts should interpret the fair and

2   reasonable prong of FRAND as the royalties that would have been voluntarily negotiated

3   before users became committed to using the patented technology.") (Wion Decl. Ex. 12);

4   Federal Trade Commission, *The Evolving IP Marketplace* at 194 ("Courts should cap the

5   royalty [for a RAND-committed patent] at the incremental value of the patented technology

6   over alternatives available at the time the standard was defined.") (Wion Decl. Ex. 16).  *See*

7   *also Apple, Inc. v. Motorola, Inc.*, No. 1:11-cv-08540, 2012 WL 2376664, at *11 (N.D. Ill.

8   June 22, 2012) ("The proper method of computing a FRAND royalty starts with what the cost

9   to the licensee would have been of obtaining, just before the patented invention was declared

10  essential to compliance with the industry standard, a license for the function performed by the

11  patent.").

**D. Motorola's Own Cited Authorities Endorse *Ex Ante* And Multilateral Approaches To RAND Valuation.**

The industry and academic sources Motorola provides in its brief—supposedly

endorsing its position that bilateral negotiations are the only acceptable method of licensing

standard-essential patents—themselves recognize patent stacking and hold-up as problems, and

discuss alternatives to bilateral negotiations, *including multilateral and/or* ex ante *negotiations*,

as solutions.  Nokia's statement to the Federal Trade Commission cited by Motorola (Br. 6)

reflects the same concern about stacking that Microsoft's experts identify:  "[W]hen a lot of

individual rates are aggregated, the cumulative figure can turn out to be extremely high and

appear anything but commercially viable."  (Dkt. No. 392 Ex. 26 at 6.)  Nokia proposed that all

licensors provide *ex ante* disclosure of their view of the maximum expected aggregate royalty

rate, so that potential implementers of the standard "better understand the likely market-entry

costs attributable to patents."  (*Id.* at 7.)  Nokia explained that *only then* could royalties "be

1    negotiated bilaterally in the normal way,"[2] because that negotiation would occur with full

2    knowledge of the anticipated overall royalty burden in implementing the standard.  (*Id.*)[3]  This

3    achieves the same goal that Microsoft's experts accomplish through consideration of terms that

4    would arise out of a multilateral framework.

5         Motorola's reliance on the Federal Trade Commission's statements (Br. 6) is also

6    misplaced.  The FTC, like Microsoft's experts and Motorola's Richard Schmalensee,

7    acknowledged that RAND commitments are intended "to prevent patent hold-up."  (Dkt. No.

8    392 Ex. 27 at 28037.)  The FTC noted that some SSOs require *ex ante* disclosures of specific

9    licensing terms (*id.*), noted concerns that "leaving the negotiation of licensing terms until after

10   the standard has been implemented gives the patent holder excessive leverage that can lead to

11   patent hold-up" (*id.*), and solicited comments on topics including "How frequently do ex ante

12   multilateral negotiations of licensing terms occur?  How are such negotiations conducted?" (*id.*

13   at 28038).

14        The academic articles Motorola cites also support Microsoft's experts' consideration of

15   *ex ante* and multilateral license terms in a RAND valuation.  Motorola cites authors Geradin,

16   Layne-Farrar, and Padilla (Br. 7), who consider *alternatives* to bilateral negotiation:

17            Taking ex ante licensing disclosure even further, another proposal suggests that
             antitrust authorities should take a lenient approach toward joint negotiations of
18           licensing terms within SSOs before a standard is adopted.  While joint price
             setting is usually anathema in antitrust, the idea here is that collective
19           bargaining would exert pressure on licensing prices that the current SSO system
             of confidential bilateral negotiations does not.

20

21

22        [2] Motorola's selective quotation of this passage (Br. 6) to suggest that Nokia supports Motorola's position is
     misleading.  Nokia was proposing that bilateral negotiations ("the normal way") could only occur *after* licensors
23   had made an *ex ante* disclosure of the anticipated aggregate royalty burden.  (Dkt. No. 392 Ex. 27 at 7.)  Nokia's
     position was that absent such disclosures, "the normal way" could lead to patent stacking.  (*Id.* at 6–7.)  Nokia's
24   position in this regard was consistent with the submission that it and Motorola jointly made (together with
     Ericsson) to ETSI.  *See* Section I.A, *supra*; Wion Decl. Ex. 10.

25        [3] An additional article Motorola attempts to use to support its position also acknowledges that an *ex ante*
     approach may ameliorate stacking concerns: "*[E]x ante* public prices would allow standard-setting participants to
26   account for cost when comparing different suggested technical approaches."  (Dkt. No. 392 Ex. 18 at 1046 n. 65.)

MICROSOFT'S OPPOSITION TO
MOTOROLA'S *DAUBERT* MOTION TO
EXCLUDE CERTAIN TESTIMONY OF
PLAINTIFF'S EXPERTS - 10

LAW OFFICES
CALFO HARRIGAN LEYH & EAKES, LLP
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700 FAX, (206) 623-8717

1  (Dkt. No. 392 Ex. 29 at 148.)  Motorola relies on another, overlapping set of authors that

2  includes its expert, Richard Schmalensee (Br. 7), but that article actually endorses an *ex ante*,

3  multilateral framework as a possible model for court determination of a RAND rate, in which

4  "various parties could make their cases in court for the relative values of their IP contributions

5  to the standard, in the context of other options considered during the standard's early

6  developmental phases." (Dkt. No. 392 Ex. 31 at 705–06.)  Even the academic Motorola cites

7  as taking "the view that FRAND is the outcome of a hypothetical negotiation between the

8  licensor and licensee" (Br. 7) does not support Motorola's position.  In its brief, Motorola cuts

9  off the quote after the word "licensee," because the next clause specifies that such a negotiation

10 "would take place ex-ante (when competition amongst technologies may still be present)."

11 *Compare* Br. 7 *with* Dkt No. 392 Ex. 32 at 532.  That same author acknowledges that "[t]here

12 is no consensus in the literature as to whether FRAND should imply a uniform royalty level for

13 all licensees (which would be the natural outcome of a multilateral ex-ante negotiation between

14 the licensor and prospective licensees)." (Dkt. No. 392 Ex. 32 at 532.)

15      The academics Motorola attempts to rely on—including its own expert—acknowledge

16 that court intervention may be necessary, and that a court's RAND valuation may involve

17 consideration of multilateral and *ex ante* issues.  Microsoft's experts endorse this same process.

18 *See* Wion Decl. Ex. 1 (Murphy Rpt.) ¶ 46; Wion Decl. Ex. 2 (Lynde Rpt.) at 15–17; Wion

19 Decl. Ex. 3 (Simcoe Rpt.) ¶¶ 87–91, 107–08.  Motorola's claimed "consensus among industry

20 participants and academics" (Br. 8) rejecting *ex ante* or multilateral considerations in RAND

21 valuation does not exist.  To the contrary, the literature establishes that Microsoft's experts'

22 consideration of an *ex ante*, multilateral framework as part of RAND valuation is accepted

23 within the relevant scientific community. *See Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S.

24 137, 150 (1999); *Boyd v. City and County of San Francisco*, 576 F.3d 938, 946 (9th Cir. 2009)

25 (affirming admission of expert testimony where opposing parties "present[ed] no evidence,

26

MICROSOFT'S OPPOSITION TO
MOTOROLA'S *DAUBERT* MOTION TO
EXCLUDE CERTAIN TESTIMONY OF
PLAINTIFF'S EXPERTS - 11

LAW OFFICES
CALFO HARRIGAN LEYH & EAKES, LLP
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700 FAX, (206) 623-8717

1   outside of their own assertions, that the theory is unreliable, nor do they dispute the existence

2   of multiple peer-reviewed articles in support of the theory.").

3       **E. Microsoft's Experts Use The *Ex Ante* Multilateral Framework As One Of Several Tools That Inform A RAND Determination.**

4

5       Motorola inaccurately asserts, without a quotation or citation, that Microsoft's experts

6   claim "that RAND terms *must* be based on such a multilateral negotiation." (Br. 2, emphasis

7   added.) But Microsoft's experts do not claim that only the use of a multilateral framework—

8   and no other process—could ever result in a RAND license. Microsoft's experts use the lens

9   of an *ex ante* multilateral framework as a valuation tool that tests whether the royalty charged

10   by one licensor is truly RAND, in that it does not lead to patent stacking, hold-up, or the

11   capture of the value of the standard. Wion Decl. Ex. 3 (Simcoe Rpt.) ¶¶ 95, 99–106. *See also*

12   Wion Decl. Ex. 2 (Lynde Rpt.) at 17, 26. Microsoft's experts do not claim that an *ex ante*

13   multilateral lens is a prescription for how things must be done in practice—it is simply an

14   exercise in valuation to guide resolution of disputes like the one before the Court. Wion Decl.

15   Ex. 7 (Simcoe Dep.) 196:14–197:1; Wion Decl. Ex. 8 (Lynde Dep.) 50:20–51:15; Wion Decl.

16   Ex. 6 (Murphy Tr.) 151:6–155:25.

17       Further, the *ex ante*, multilateral framework and its patent pool analogues are only part

18   of the analytical tools and evidence that inform Microsoft's experts' RAND determination.

19   Both the entire market value rule and smallest saleable unit analysis—emerging from the

20   Federal Circuit's cases on assessing reasonable royalties—provide a "ceiling" for a RAND

21   license to Motorola's H.264 and 802.11 patents, because neither the 802.11 or H.264 standards

22   nor Motorola's particular patents "drive[ ] consumer demand for Microsoft's multi-function,

23   complex products." *E.g.*, Wion Decl. Ex. 2 (Lynde Rpt.) 9, 22, 34, 22. Microsoft's experts

24   also consider, among other things,

25

26       And Microsoft's experts consider

MICROSOFT'S OPPOSITION TO
MOTOROLA'S *DAUBERT* MOTION TO
EXCLUDE CERTAIN TESTIMONY OF
PLAINTIFF'S EXPERTS - 12

LAW OFFICES
CALFO HARRIGAN LEYH & EAKES, LLP
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700 FAX, (206) 623-8717

1

2

3

4                                                          In sum, Microsoft's experts used these collected analyses

5   together to reach their conclusions on RAND value.

6   **II.     The Fact That Many Standard-Essential Patent Licenses Result From Bilateral
7            Negotiations Is Unremarkable And Irrelevant.**

8            In arguing that consideration of multilateral license terms is a fundamentally unreliable

9   methodology for RAND valuation, Motorola claims that *only* the process of a bilateral

10  negotiation can produce a RAND royalty, and that whatever Microsoft's experts propose,

11  unless they exclusively utilize a bilateral negotiation process, the result cannot be RAND:

12          [A] methodology based on a multilateral, rather than a bilateral negotiation, is
            simply wishful thinking by Microsoft as to how it might like RAND
13          negotiations to work. Because that methodology does *not*, in fact, reflect how
            RAND negotiations *actually* work, it is not reliable, and will not produce
14          reliable results.

15  (Br. 3.) Motorola is wrong. The *ex ante*, multilateral perspective provides a framework to

16  avoid hold-up, patent stacking, and the capture of the value of standardization, and to arrive at

17  RAND terms. Motorola offers no explanation *why* addressing these risks would make

18  Microsoft's experts' analysis unreliable, instead simply insisting that Microsoft's experts

19  should have considered bilateral negotiations only.

20          Motorola scatters quotations throughout its brief indicating that licenses to standard-

21  essential patents are "generally nego[t]iated on a bilateral basis" (Br. 4) or "typically arrived at

22  through bilateral negotiation" (Br. 8), that bilateral negotiations are the "practice" (Br. 6),

23  "generally occur[ ]" (Br. 6), or have been used "for the most part" (Br. 9) in licensing standard-

24  essential patents. These statements stand for nothing more than the proposition that many

25  standard-essential patents subject to RAND commitments have been licensed following a

26  bilateral negotiation. That many—even most—standard-essential patent licenses are the

MICROSOFT'S OPPOSITION TO
MOTOROLA'S *DAUBERT* MOTION TO
EXCLUDE CERTAIN TESTIMONY OF
PLAINTIFF'S EXPERTS - 13

product of bilateral negotiations is both unremarkable and irrelevant as to whether the terms of any individual license *actually reflect RAND terms*. If, as here, one party demands a royalty that reflects the hold-up value of the standard, and seeks to use injunctions to force acquiescence to its demands, bilateral negotiations would fail to reach a RAND royalty. That is why the Court is being called upon to set the RAND royalty—and doing so requires a methodology that produces a correct valuation and avoids a holdup.

As Microsoft's expert Kevin Murphy explained, if someone or something is enforcing the reasonability requirement, bilateral negotiations may well result in RAND royalties:

> People can bilaterally negotiate. The question is what do we do to enforce the reasonability requirement, and what do we need to do in order to cause those negotiations to ultimately result in a reasonable rate. And the answer is you have to do something that eliminates the hold-up.

Wion Decl. Ex. 6 (Murphy Dep.) 38:25–39:6. Microsoft's expert Timothy Simcoe also acknowledges that bilateral agreements are commonplace. Wion Decl. Ex. 3 (Simcoe Rpt.) ¶ 95 (stating that while "[m]any SSO intellectual property policies clearly contemplate bilateral negotiation of RAND terms and conditions," parties to such a negotiation "must be aware of hold up and royalty stacking"); *see also* Wion Decl. Ex. 8 (Lynde Dep.) 110:20–26 (result of bilateral negotiations "must be compliant with the patent holder's RAND obligation"). That bilateral negotiations *may* result in RAND license terms says nothing as to whether bilateral negotiations are *necessary* for determination of RAND terms. Motorola's experts go even further, claiming that the process of bilateral negotiation is somehow a *sufficient* condition for RAND—that *any* bilateral negotiation *always* results in a RAND royalty. (Dkt. No. 398 Ex. 3 (Donohoe Dep.) 76:3–5.) Microsoft disputes that position[4], and as the Court recognized in its ruling on Microsoft's motion for a preliminary injunction, bilateral negotiations conducted

---

[4] Motorola mischaracterizes the entire history of this case by claiming that "Microsoft has never challenged" the methodology that Motorola proposes (a hypothetical bilateral negotiation). Microsoft has consistently opposed Motorola's theory that its RAND commitments mean no more than an obligation to negotiate, and that such a negotiation can occur under threat of an injunction. (*E.g.*, Dkt. No. 374 at 8–12.) The rejection of that theory is central to Microsoft's claims in this case. (*See* Dkt. No. 53 (Amended Complaint) ¶¶ 79, 83–85.)

MICROSOFT'S OPPOSITION TO
MOTOROLA'S *DAUBERT* MOTION TO
EXCLUDE CERTAIN TESTIMONY OF
PLAINTIFF'S EXPERTS - 14

LAW OFFICES
CALFO HARRIGAN LEYH & EAKES, LLP
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700 FAX, (206) 623-8717

1  under threat of an injunction are highly unlikely to produce RAND terms.  (Dkt. No. 318,

2  Order on Preliminary Injunction 24 ("It would seem clear that a negotiation where one party

3  (Microsoft) must either come to an agreement or cease its sales throughout the country of

4  Germany fundamentally places that party at a disadvantage.").)

5      Motorola's claim that *only* the process of a bilateral negotiation can produce a RAND

6  royalty makes no sense.  "Reasonable and non-discriminatory" are economic attributes of the

7  royalty charged for use of the standard-essential patents.  They are not attributes of a process

8  for determining a royalty.  If a flat $1,000 annual payment is a reasonable and non-

9  discriminatory royalty for the use of a set of RAND-committed, standard-essential patents,

10  $1,000 is RAND regardless of whether it arose from a pool rate, from a multilateral negotiation

11  involving multiple licensors and licensees, or from a bilateral negotiation between the patent

12  holder and a single licensee.

13      In the end, Motorola's central criticism is that Microsoft's experts acknowledged the

14  risks inherent in standard-essential patent licensing, and attempted to address them.  It cannot

15  possibly be correct that confronting the problems of hold-up, stacking, and capture of

16  standardization renders a RAND determination unreliable.  Motorola's insistence that bilateral

17  negotiations are common is entirely irrelevant to the question of whether consideration of the

18  *ex ante*, multilateral framework is reliable and will assist the Court in RAND valuation.

19                                    **CONCLUSION**

20      Microsoft's experts' consideration of the terms of *ex ante*, multilateral licenses to

21  Motorola's 802.11 and H.264 patents form part of a reliable methodology for determining a

22  RAND royalty for those patents.  Motorola's motion should be denied.

23

24

25

26  MICROSOFT'S OPPOSITION TO
    MOTOROLA'S *DAUBERT* MOTION TO
    EXCLUDE CERTAIN TESTIMONY OF
    PLAINTIFF'S EXPERTS - 15

1    DATED this 5th day of September, 2012.

2                       CALFO HARRIGAN LEYH & EAKES LLP

3                   By   s/ Arthur W. Harrigan, Jr.

4                         Arthur W. Harrigan, Jr., WSBA #1751
                          Christopher Wion, WSBA #33207

5                          Shane P. Cramer, WSBA #35099

6                 By   s/ T. Andrew Culbert

7                         T. Andrew Culbert, WSBA #35925
                         David E. Killough, WSBA #40185

8                         MICROSOFT CORPORATION
                         1 Microsoft Way

9                         Redmond, WA 98052
                         Phone: 425-882-8080

10                       Fax: 425-869-1327

11                       David T. Pritikin, *Pro Hac Vice*
                         Richard A. Cederoth, *Pro Hac Vice*

12                       Constantine L. Trela, Jr., *Pro Hac Vice*
                         Douglas I. Lewis, *Pro Hac Vice*

13                       John W. McBride, *Pro Hac Vice*
                         Nathaniel C. Love, *Pro Hac Vice*

14                       SIDLEY AUSTIN LLP
                         One South Dearborn

15                       Chicago, IL 60603
                         Phone: 312-853-7000

16                       Fax: 312-853-7036

17                       Carter G. Phillips, *Pro Hac Vice*

18                       SIDLEY AUSTIN LLP
                         1501 K Street, N.W.

19                       Washington, D.C. 20005
                         Phone: 202-736-8000

20                       Fax: 202-736-8711

21                       Counsel for Microsoft Corporation

22

23

24

25

26

MICROSOFT'S OPPOSITION TO
MOTOROLA'S *DAUBERT* MOTION TO
EXCLUDE CERTAIN TESTIMONY OF
PLAINTIFF'S EXPERTS - 16

LAW OFFICES
CALFO HARRIGAN LEYH & EAKES, LLP
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700 FAX, (206) 623-8717

## CERTIFICATE OF SERVICE

I, Linda Bledsoe, swear under penalty of perjury under the laws of the State of Washington to the following:

1.    I am over the age of 21 and not a party to this action.

2.    On the 5th day of September, 2012, I caused the preceding document to be served on counsel of record in the following manner:

**Attorneys for Motorola Solutions, Inc., and Motorola Mobility, Inc.:**

Ralph Palumbo, WSBA #04751  
Philip S. McCune, WSBA #21081          _____ Messenger  
Lynn M. Engel, WSBA #21934            _____ US Mail  
Summit Law Group                     _____ Facsimile  
315 Fifth Ave. South, Suite 1000       X     ECF  
Seattle, WA  98104-2682  
Telephone:  206-676-7000  
Email:  Summit1823@summitlaw.com  


Steven Pepe (*pro hac vice*)           _____ Messenger  
Jesse J. Jenner (*pro hac vice*)        _____ US Mail  
Ropes & Gray LLP                     _____ Facsimile  
1211 Avenue of the Americas            X     ECF  
New York, NY  10036-8704  
Telephone:  (212) 596-9046  
Email:  steven.pepe@ropesgray.com  
Email:  jesse.jenner@ropesgray.com  


Norman H. Beamer (*pro hac vice*)       _____ Messenger  
Ropes & Gray LLP                     _____ US Mail  
1900 University Avenue, 6th Floor     _____ Facsimile  
East Palo Alto, CA  94303-2284         X     ECF  
Telephone:  (650) 617-4030  
Email:  norman.beamer@ropesgray.com  

MICROSOFT'S OPPOSITION TO
MOTOROLA'S *DAUBERT* MOTION TO
EXCLUDE CERTAIN TESTIMONY OF
PLAINTIFF'S EXPERTS - 17

LAW OFFICES
CALFO HARRIGAN LEYH & EAKES, LLP
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700 FAX, (206) 623-8717

1

Paul M. Schoenhard (*pro hac vice*)
Ropes & Gray LLP
One Metro Center
700 12th Street NW, Suite 900
Washington, DC  20005-3948
Telephone:  (202) 508-4693
Email: Paul.schoenhard@ropesgray.com

_____ Messenger
_____ US Mail
_____ Facsimile
___X___ ECF

2

3

4

5        DATED this 5th day of September, 2012.

6

7                                          s/ Linda Bledsoe_____
                                           LINDA BLEDSOE
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

MICROSOFT'S OPPOSITION TO
MOTOROLA'S *DAUBERT* MOTION TO
EXCLUDE CERTAIN TESTIMONY OF
PLAINTIFF'S EXPERTS - 18

LAW OFFICES
CALFO HARRIGAN LEYH & EAKES, LLP
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL. (206) 623-1700 FAX. (206) 623-8717