# EXHIBIT 4

# In The Matter Of:

*MICROSOFT CORPORATION*

*v.*

*MOTOROLA, INC., et al.*

―――――――――――――――――――――

*RICHARD J. HOLLEMAN - Vol. 1*
*August 21, 2012*

―――――――――――――――――――――

**MERRILL CORPORATION**
LegaLink, Inc.

135 Main Street
4th Floor
San Francisco, CA 94105
Phone: 415.357.4300
Fax: 415.357.4301

RICHARD J. HOLLEMAN - 8/21/2012

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WASHINGTON

---------------------------x

MICROSOFT CORPORATION,    )

              Plaintiff,    )  Civil Action File

    v.                     )  Case No. 2:10-cv-01823

MOTOROLA INC., et al.,    )

             Defendants.    )

---------------------------x


VIDEOTAPED DEPOSITION OF RICHARD J. HOLLEMAN

Washington, D.C.

Tuesday, August 21, 2012

8:56 a.m.


Job No.: 2005-445569

Pages 1 - 55

Reported By: Joan V. Cain

Page 2

1  Videotaped Deposition of RICHARD J. HOLLEMAN,
2  held at the law offices of:
3
4       SIDLEY AUSTIN, LLP
5       1501 K Street, Northwest
6       Washington, D.C.  20005
7       (202) 736-8000
8
9  Pursuant to Notice, before Joan V. Cain, Court
10 Reporter and Notary Public in and for the District of
11 Columbia.

Page 3

           APPEARANCES

ON BEHALF OF PLAINTIFF:
   NEIL H. WYLAND, ESQUIRE
   SIDLEY AUSTIN, LLP
   One South Dearborn
   Chicago, Illinois 60603
   Telephone:  (312) 853-7000
   E-mail: nwyland@sidley.com

ON BEHALF OF DEFENDANTS:
   MATTHEW J. RIZZOLO, ESQUIRE
   ROPES & GRAY, LLP
   Suite 900
   700 12th Street, Northwest
   Washington, D.C.  20005-3948
   Telephone:  (202) 508-4600
   E-mail: matthew.rizzolo@ropesgray.com

ALSO PRESENT:
   Terry Michael King

Page 4

                C O N T E N T S

3  EXAMINATION OF RICHARD J. HOLLEMAN      PAGE
4     By Mr. Wyland                          6
5
6           E X H I B I T S
7        (Attached to the Transcript.)
8  PX DEPOSITION EXHIBITS                   PAGE
9  EXHIBIT 213 Rebuttal Expert Report of      7
10     Mr. Holleman, 8/10/12
11 EXHIBIT 214 Letter of Assurance           18
12 EXHIBIT 215 Patent Statement and Licensing 22
13     Declaration Form
14 EXHIBIT 216 IEEE Standards Association    28
15     Patent Policy
16 EXHIBIT 217 Common Patent Policy for the  28
17     ITU-T, ITU-R, ISO, and IEC

Page 5

08:56:33   1           P R O C E E D I N G S
08:56:33   2       THE VIDEOGRAPHER:  Here begins Videotape No.
08:56:35   3  1 in the deposition of Richard Holleman in the matter
08:56:40   4  of Microsoft Corporation versus Motorola,
08:56:43   5  Incorporated, et al., in the U.S. District Court for
08:56:45   6  the Western District of Washington, Case No.
08:56:55   7  2:10-cv-01823.
08:56:55   8       Today's date is August 21st, 2012.  The time
08:56:59   9  on the video monitor is 8:57 a.m.  The video operator
08:57:04  10  today is Terry Michael King of Merrill Legal
08:57:06  11  Solutions.  This video deposition is taking place at
08:57:10  12  Sidley Austin, LLP, 1501 K Street, Northwest,
08:57:15  13  Washington, D.C.
08:57:15  14       Counsel, please voice identify yourselves
08:57:18  15  and state who you represent.
08:57:19  16       MR. WYLAND:  Neil Wyland on behalf of the
08:57:22  17  plaintiff Microsoft Corporation.
08:57:24  18       MR. RIZZOLO:  Matt Rizzolo, Ropes & Gray on
08:57:28  19  behalf of Motorola.
08:57:28  20       THE VIDEOGRAPHER:  The court reporter today
08:57:29  21  is Joan Cain on behalf of Merrill Legal Solutions.
08:57:32  22  Would the reporter please swear in the witness.
08:57:32  23           RICHARD J. HOLLEMAN
08:57:32  24  having been duly sworn, was examined and did testify
08:57:44  25  as follows:

2 (Pages 2 to 5)

Page 6

| Time | # | Text |
|---|---|---|
| 08:57:45 | 1 | EXAMINATION BY COUNSEL FOR PLAINTIFF |
| 08:57:45 | 2 | BY MR. WYLAND: |
| 08:57:45 | 3 | Q   Good morning. |
| 08:57:46 | 4 | A   Good morning. |
| 08:57:46 | 5 | Q   Could you state your full name and address |
| 08:57:48 | 6 | for the record. |
| 08:57:50 | 7 | A   My name is Richard Joseph Holleman.  My |
| 08:57:54 | 8 | address is 2600 Southeast Ocean Boulevard, Apartment N |
| 08:58:01 | 9 | 15, Stuart, Florida. |
| 08:58:03 | 10 | Q   And, Mr. Holleman, you've had your |
| 08:58:06 | 11 | deposition taken several times before, correct? |
| 08:58:09 | 12 | A   Yes, I have. |
| 08:58:10 | 13 | Q   And so you're generally familiar with the |
| 08:58:12 | 14 | procedures? |
| 08:58:12 | 15 | A   Yes, I am. |
| 08:58:12 | 16 | Q   Just a couple of reminders.  One, try to |
| 08:58:15 | 17 | keep our voices up so that the court reporter can take |
| 08:58:18 | 18 | down what we're saying, and if you will wait till I |
| 08:58:22 | 19 | finish the question before answering it, I will try to |
| 08:58:25 | 20 | wait till the end of your answer before I ask another |
| 08:58:28 | 21 | question. |
| 08:58:28 | 22 | A   Agreed. |
| 08:58:28 | 23 | Q   Any other questions before we get started? |
| 08:58:31 | 24 | A   No.  I'm fine. |
| 08:58:32 | 25 | Q   Are you on any medication or under any |

Page 7

| Time | # | Text |
|---|---|---|
| 08:58:35 | 1 | condition that would affect your ability to testify |
| 08:58:37 | 2 | today? |
| 08:58:38 | 3 | A   No, I'm not. |
| 08:58:38 | 4 | Q   I -- I understand you're testifying today as |
| 08:58:40 | 5 | an expert for the defendants in this case, Motorola |
| 08:58:43 | 6 | and related companies? |
| 08:58:44 | 7 | A   Yes, that's correct. |
| 08:58:47 | 8 |     MR. WYLAND:  I'd like to introduce our first |
| 08:58:50 | 9 | exhibit, which has been marked PX 13 -- oh, I'm |
| 08:58:57 | 10 | sorry -- 213. |
| 08:58:59 | 11 |     (PX Deposition Exhibit 213 was marked |
| 08:58:59 | 12 | for identification and was attached to the deposition |
| 08:59:00 | 13 | transcript.) |
| 08:59:07 | 14 | BY MR. WYLAND: |
| 08:59:07 | 15 | Q   Sir, is this the expert report that you've |
| 08:59:09 | 16 | submitted in this case? |
| 08:59:10 | 17 | A   Yes.  It appears to be a copy of my rebuttal |
| 08:59:13 | 18 | expert report. |
| 08:59:14 | 19 | Q   All right.  And that's your signature on the |
| 08:59:15 | 20 | first page? |
| 08:59:16 | 21 | A   Yes, it is. |
| 08:59:18 | 22 | Q   And there are two attachments I believe to |
| 08:59:20 | 23 | this report.  The first, A, what is that? |
| 08:59:28 | 24 | A   That's my summary of my CV. |
| 08:59:34 | 25 | Q   And what is Attachment B? |

Page 8

| Time | # | Text |
|---|---|---|
| 08:59:35 | 1 | A   Attachment B is a list of documents that I |
| 08:59:43 | 2 | have considered in preparation of my report. |
| 08:59:45 | 3 | Q   Does this expert report express your |
| 08:59:47 | 4 | opinions relating to this matter? |
| 08:59:49 | 5 | A   Yes, it does. |
| 08:59:50 | 6 | Q   Is there anything wrong in your report? |
| 08:59:54 | 7 | A   Not that I'm aware of, no. |
| 08:59:56 | 8 | Q   Okay.  So there are no errors that you're |
| 08:59:58 | 9 | aware of in your report? |
| 08:59:59 | 10 | A   None that I would bring forward, no. |
| 09:00:00 | 11 | Q   Okay.  Let's first identify your -- your |
| 09:00:05 | 12 | areas of expertise.  How would you describe your area |
| 09:00:08 | 13 | of expertise? |
| 09:00:12 | 14 | A   I have more than 30 years' experience in |
| 09:00:20 | 15 | industry standards development activities and also as |
| 09:00:26 | 16 | those activities relate to the use of patented |
| 09:00:29 | 17 | material in standards development, primarily through |
| 09:00:34 | 18 | my employment at IBM and subsequently through my |
| 09:00:40 | 19 | consulting activities.  So I would say my expertise is |
| 09:00:44 | 20 | in the area of SSOs so-called, also known as SDOs and |
| 09:00:56 | 21 | their related standards activities and policies |
| 09:00:59 | 22 | relating to the use of patents in standards. |
| 09:01:05 | 23 | Q   Let's define SSO since you used that term |
| 09:01:09 | 24 | and probably will be using that term today.  From your |
| 09:01:13 | 25 | report, I understand that that means standards setting |

Page 9

| Time | # | Text |
|---|---|---|
| 09:01:16 | 1 | organizations? |
| 09:01:18 | 2 | A   Yes, standard setting organizations, and I |
| 09:01:21 | 3 | think, as I said, also often referred to as SDOs, |
| 09:01:25 | 4 | standards developing organizations. |
| 09:01:27 | 5 | Q   And so if we use either of those terms |
| 09:01:30 | 6 | today, can we understand that they can be used |
| 09:01:32 | 7 | interchangeably? |
| 09:01:33 | 8 | A   Yes, we can. |
| 09:01:34 | 9 | Q   Do you have a preference for using one term |
| 09:01:36 | 10 | over the other? |
| 09:01:37 | 11 | A   My personal preference is SDO, but almost |
| 09:01:42 | 12 | all of the documents are now using SSO. |
| 09:01:46 | 13 | Q   And another term that we see in your expert |
| 09:01:54 | 14 | report and perhaps elsewhere is a term called LOA, and |
| 09:01:59 | 15 | what is that? |
| 09:01:59 | 16 | A   LOA is a term, acronym for Letter of |
| 09:02:09 | 17 | Assurance.  This came primarily from the IEEE |
| 09:02:14 | 18 | standards organization, which is a letter that is |
| 09:02:22 | 19 | requested relative to patents that may be essential to |
| 09:02:25 | 20 | a standard.  Generally, it is used in here also in the |
| 09:02:31 | 21 | context of the ITU, International Telecommunications |
| 09:02:37 | 22 | Union.  While they do not specifically call it an LOA, |
| 09:02:41 | 23 | they refer to it as a statement, licensing statement. |
| 09:02:48 | 24 | It's, in effect, the same kind of document.  So for |
| 09:02:54 | 25 | convenience, I've referred to it here as LOA. |

Page 10

```
09:02:58   1      Q   Okay.  And so the ITU, since you've
09:03:00   2    identified that, that is a standards setting
09:03:04   3    organization that has -- has promulgated the H.264
09:03:12   4    standard; is that correct?
09:03:13   5      A   Yes, through one of their suborganizations,
09:03:18   6    that's the ITU-T.  This whole activity is fraught with
09:03:22   7    acronyms.  So that would be the telecommunications
09:03:28   8    sector of the ITU.  There's also a radio
09:03:31   9    communications sector that develops radio
09:03:34  10    communication standards, and there is an ITUD, which
09:03:39  11    is for developing countries that are interested in
09:03:42  12    telecom.  The ITU is a specialized agency of the U.N.
09:03:51  13      Q   And since you identified it, the IEEE, what
09:03:53  14    is that?
09:03:54  15      A   That's the Institute of Electrical and
09:03:57  16    Electronic Engineers.  It's a professional association
09:04:03  17    of more than I guess close to 500,000 engineers in
09:04:09  18    related fields throughout the world.  One of their
09:04:14  19    many activities is standards development through the
09:04:17  20    IEEE-SA, which SA is standards association.  That
09:04:27  21    develops and promulgates IEEE standards.
09:04:31  22      Q   And the IEEE standard that is at issue in
09:04:35  23    this case is what, to your understanding?
09:04:36  24      A   802.11, which is a local area network
09:04:40  25    standard.
```

Page 11

```
09:04:43   1      Q   And you summarized, I think, some of your
09:04:51   2    relevant experience in your report, correct?
09:04:53   3      A   Yes.
09:04:54   4      Q   And that's accurate as far as you know,
09:04:56   5    right?
09:04:56   6      A   Yes, it is.
09:04:57   7      Q   Okay.  You are not a lawyer, are you?
09:04:59   8      A   No, I'm not.  I've been accused of lawyering
09:05:03   9    a number of times, but, no, I'm not a lawyer.
09:05:05  10      Q   Okay.  But you're not claiming any expertise
09:05:08  11    regarding legal obligations, are you?
09:05:10  12      A   No, I'm not.
09:05:10  13      Q   Okay.  And, as I understand it, you haven't
09:05:13  14    provided any opinions about legal obligations?
09:05:15  15      A   No, I have not.
09:05:18  16      Q   And in that regard, it's my understanding
09:05:21  17    from your report that you have not claimed any
09:05:23  18    expertise concerning the legal effect of the standard
09:05:28  19    setting organizations policies; is that correct?
09:05:30  20      A   That is correct.
09:05:36  21      Q   And you're not claiming any expertise
09:05:39  22    regarding the legal effect of the Letters of
09:05:41  23    Assurances, are you?
09:05:42  24      A   No, I'm not.
09:05:42  25      Q   And you're not providing any opinions
```

Page 12

```
09:05:45   1    regarding the legal effects of the Letters of
09:05:48   2    Assurances?
09:05:48   3      A   That's correct.
09:05:56   4      Q   Just so we're clear, you said that you use
09:05:59   5    the term letters of assurance interchangeably for the
09:06:02   6    IEEE form and the ITU form, and if we use letters of
09:06:08   7    assurance or LOA here today, we can understand that
09:06:12   8    that's just regarding those declaration forms or
09:06:17   9    assurance forms generally, correct?
09:06:18  10      A   Yes, that's correct.
09:06:25  11      Q   Do you have any personal experience in
09:06:27  12    licensing?
09:06:32  13      A   At IBM my organization was part of the
09:06:40  14    intellectual property and licensing function at
09:06:43  15    corporate headquarters.  We came under that
09:06:45  16    organization, and so we interacted with the licensing
09:06:56  17    representatives, with the patent attorneys.  My only
09:07:02  18    direct activity would be when I was asked to provide
09:07:07  19    comments or positions in connection with the licensing
09:07:13  20    activities that they were engaged in because there was
09:07:17  21    a standards related matter, but I was not involved in
09:07:24  22    conducting any licensing negotiations per se.
09:07:30  23          While I sat in on a few meetings from time
09:07:33  24    to time because of a potential standards related
09:07:36  25    issue, I was not personally more my people personally
```

Page 13

```
09:07:42   1    involved in being responsible for licensing
09:07:45   2    negotiations.
09:07:45   3      Q   Okay.  So you're not claiming any expertise
09:07:48   4    in terms of licensing negotiations?
09:07:50   5      A   No.  I have, certainly because of the
09:07:53   6    organization, familiarity with the practice, the
09:07:57   7    procedures, and what's entailed, but do not have any
09:08:03   8    direct experience.
09:08:07   9      Q   Okay.  And that would include general patent
09:08:09  10    licensing outside of the standards context too?
09:08:13  11      A   Yes.
09:08:13  12      Q   All right.  And as long as we're talking
09:08:16  13    about the standard context here, there's a term that
09:08:20  14    we'll be using RAND, and it's your understanding that
09:08:23  15    that means reasonable and nondiscriminatory?
09:08:26  16      A   Reasonable and nondiscriminatory terms and
09:08:31  17    conditions, RAND.
09:08:32  18      Q   Okay.
09:08:32  19      A   Often also referred to as FRAND because of
09:08:36  20    the European context, but basically fair, reasonable
09:08:40  21    and nondiscriminatory, the terms are pretty much used
09:08:47  22    interchangeably.
09:08:48  23      Q   And I take it from your prior testimony that
09:08:50  24    you have never personally participated in the
09:08:53  25    negotiation of a patent licensing on RAND terms?
```

4 (Pages 10 to 13)

Page 14

```
09:08:57   1    A   Correct.
09:08:58   2    Q   Have you ever been directly involved in
09:09:02   3  negotiating any type of license?
09:09:06   4    A   No.
09:09:10   5    Q   And so you are not providing any opinions
09:09:12   6  about licensing per se, are you?
09:09:13   7    A   No.  My opinions are in relationship to the
09:09:17   8  SSOs.  They are patent policies and related activities
09:09:23   9  only.
09:09:23  10    Q   And you have no previous personal experience
09:09:32  11  in evaluating what would be a reasonable royalty rate?
09:09:35  12    A   No.
09:09:37  13    Q   Have you had any personal experience
09:09:40  14  evaluating any RAND term in a license before?
09:09:47  15    A   Yes.
09:09:47  16    Q   And what would that be?
09:09:48  17    A   Reciprocity, terms of grant-backs.
09:09:55  18    Q   And in what context did you evaluate that?
09:10:02  19    A   I was the chair of the ITU-T ad hoc group
09:10:06  20  that developed their first statement.  In fact, I was
09:10:12  21  looking in my footnote to give the right name of that
09:10:20  22  document patent licensing guideline.  I wanted to give
09:10:27  23  the -- this is conveniently --
09:10:29  24         MR. RIZZOLO:  It's page 8.
09:10:31  25         THE WITNESS:  -- referred to as the LOA,
```

Page 15

```
09:10:34   1  Patent Statement and Licensing Declaration, okay, is
09:10:38   2  what the ITU calls it, and I chaired the ad hoc that
09:10:44   3  developed the first version of that, and one of the
09:10:47   4  considerations was whether or not a reciprocal
09:10:57   5  grant-back should be included in that statement, and
09:10:59   6  actually, that's a RAND term in the pure sense.  So
09:11:08   7  that's why I said I was involved in that.
09:11:10   8  BY MR. WYLAND:
09:11:10   9    Q   And what did you conclude in that process?
09:11:12  10    A   The group concluded that there would be a
09:11:17  11  requirement for a grant-back, and in the same way when
09:11:24  12  I was chairman of the IEEE patent committee, we had
09:11:29  13  some discussions on the matter and also that RAND term
09:11:35  14  was included.
09:11:48  15    Q   Have you been involved in any -- or did you
09:11:55  16  have personal involvement with evaluating any other
09:11:58  17  RAND terms for contracts or licenses I should say?
09:12:02  18    A   Any other RAND terms?  No.
09:12:18  19    Q   Have you done anything for your testimony
09:12:35  20  today to educate yourself about reasonable royalty
09:12:37  21  rates in the standards setting organization context?
09:12:43  22    A   No, I have not.
09:12:47  23    Q   Have you performed any independent research
09:12:49  24  concerning RAND terms in standards -- in licenses
09:12:56  25  covering essential patents for standards setting
```

Page 16

```
09:12:58   1  organizations?
09:12:59   2    A   No research.  I have knowledge based on
09:13:03   3  reading documents and expert reports and testimony in
09:13:10   4  terms of what has been said, but that's knowledge I've
09:13:13   5  gained from that experience, not from doing any
09:13:18   6  research.
09:13:32   7    Q   You are not providing an opinion on what a
09:13:34   8  reasonable royalty rate is for this case, are you?
09:13:39   9    A   No, I'm not.
09:13:40  10    Q   Okay.  And you're not providing an opinion
09:13:42  11  concerning what any particular RAND term for a license
09:13:44  12  is in connection with this case?
09:13:46  13    A   No, I'm not.
09:13:52  14    Q   I think we already established that this
09:13:54  15  case involves two standards, correct?
09:13:56  16    A   Yes.
09:13:57  17    Q   The H.264 standard and the 802.11 standard?
09:14:02  18    A   Yes.
09:14:03  19    Q   Okay.  And I think you said that your
09:14:16  20  opinions relate primarily to the patent policies of
09:14:20  21  the two standards setting organizations at issue?
09:14:24  22    A   That's correct, yes.
09:14:25  23    Q   And the patent policies of standards setting
09:14:32  24  organizations govern the conduct of the persons or
09:14:38  25  companies who are participating in those
```

Page 17

```
09:14:39   1  organizations, correct?
09:14:40   2    A   Yes.
09:15:11   3    Q   One of the things that the patent policies
09:15:12   4  of the IEEE and ITU provide for is the submission of a
09:15:16   5  Letter of Assurance in connection with essential
09:15:19   6  patents that are identified during the standard
09:15:21   7  process?
09:15:22   8    A   Yes, it does.
09:15:26   9    Q   And it's my understanding from your report
09:15:30  10  that neither the IEEE nor the ITU take any position on
09:15:39  11  what is considered RAND in terms of terms for a
09:15:42  12  license; is that correct?
09:15:44  13    A   Correct.
09:15:47  14    Q   And neither of those define what is
09:15:50  15  reasonable?
09:15:50  16    A   Correct.
09:15:57  17    Q   And neither of those SSOs define what is
09:16:00  18  considered nondiscriminatory, do they?
09:16:02  19    A   Correct.
09:16:03  20    Q   So would you agree that the definition of
09:16:05  21  what is or is not RAND, for purposes of a license,
09:16:13  22  under the patent policies of the IEEE and ITU is
09:16:16  23  outside the scope of the IEEE and I -- ITU's patent
09:16:22  24  policies?
09:16:22  25    A   Yes.  It's left to the parties involved to
```

5 (Pages 14 to 17)

Page 18

```
09:16:27   1   determine the RAND conditions.
09:16:32   2       Q  And the IEEE and ITU patent policies don't
09:16:37   3   say anything about what factors may assist, say, a
09:16:41   4   court in determining what a reasonable royalty rate
09:16:43   5   is?
09:16:44   6       A  Correct.
09:16:53   7       Q  In terms of what other terms in a license
09:16:56   8   might be considered RAND, the patent policies of the
09:17:05   9   IEEE and ITU do not provide any assistance to, say, a
09:17:09  10   court in determining what would be considered RAND?
09:17:12  11       A  That's correct.
09:17:20  12       Q  Would you say it's fair to characterize what
09:17:24  13   the IEEE and ITU have done is to say that they have
09:17:33  14   purposely stayed completely out of the negotiations of
09:17:36  15   parties of what a RAND license would be?
09:17:38  16       A  Yes.  In fact, the ITU explicitly says
09:17:44  17   negotiations are conducted outside of the ITU, and the
09:17:51  18   same is the intent of the IEEE.
09:18:13  19          MR. WYLAND:  Let's mark this.
09:18:14  20          (PX Deposition Exhibit 214 was marked
09:18:14  21   for identification and was attached to the deposition
09:18:26  22   transcript.)
09:18:26  23          THE WITNESS:  Thank you.
09:19:26  24   BY MR. WYLAND:
09:19:26  25       Q  All right.  You've been handed PX Exhibit
```

Page 19

```
09:19:33   1   214.  Can you identify what this document is for me?
09:19:35   2       A  It's a Letter of Assurance form for
09:19:37   3   essential patent claims from January 2008.
09:19:45   4       Q  And is this form Letter of Assurance
09:19:47   5   something you relied upon in your -- in preparing your
09:19:51   6   report?
09:19:52   7       A  Yes, it is.
09:20:07   8       Q  All right.  If you will look at under
09:20:09   9   Section D, submitter's position regarding license of
09:20:13  10   essential patent claims, and there's number 1, and
09:20:17  11   underneath that on the second page is B with a box
09:20:22  12   next to it.  And B states, "The Submitter will grant a
09:20:30  13   license under reasonable rates to an unrestricted
09:20:34  14   number of applicants on a worldwide basis with
09:20:38  15   reasonable terms and conditions that are demonstrably
09:20:44  16   free of unfair discrimination."
09:20:46  17          Is that correct?
09:20:46  18       A  Yes.
09:20:49  19       Q  And this is the Letter of Assurance election
09:20:57  20   that relates to Motorola's 802.11 standard essential
09:21:05  21   patents; is that correct?
09:21:06  22       A  A form of this letter, yes.  There have been
09:21:09  23   a number of versions of this over the years.
09:21:12  24       Q  Okay.
09:21:12  25       A  This I believe may be the most current.
```

Page 20

```
09:21:18   1       Q  And in terms of what your opinions are, do
09:21:21   2   the differences among those different forms that
09:21:23   3   Motorola has signed make any difference to the
09:21:28   4   opinions that you've given in this case?
09:21:30   5       A  No.  The basic B, C, and D are the -- what
09:21:37   6   is included in the sentence in B, in C, and D are the
09:21:42   7   basic policy of the IEEE.  The other items were not
09:21:52   8   there in previous versions.
09:21:54   9       Q  Okay.  And is it your understanding, at
09:21:59  10   least on all of the Letter of Assurance forms that you
09:22:02  11   have seen for -- for Motorola in connection with the
09:22:06  12   IEEE, that they have elected -- they've taken this B
09:22:11  13   election under the Letter of Assurance?
09:22:13  14       A  Yes, a willingness to grant licenses under
09:22:16  15   RAND, RAND terms and conditions, yes.
09:22:23  16       Q  All right.  And by the terms of the Letter
09:22:25  17   of Assurance here, the license granted has to be under
09:22:28  18   reasonable rates, correct?
09:22:29  19       A  Yes.
09:22:31  20       Q  And it has to be to an unrestricted number
09:22:34  21   of applicants?
09:22:35  22       A  That's right.  If anybody comes forward and
09:22:39  23   requests a license, they cannot be refused the
09:22:42  24   opportunity to negotiate for a license.
09:22:45  25       Q  And it has to be on -- the license has to be
```

Page 21

```
09:22:48   1   on a worldwide basis?
09:23:02   2       A  I would say generally yes, that's right.
09:23:04   3   That's correct.
09:23:05   4       Q  And then finally it has to be with
09:23:07   5   reasonable terms and conditions that are demonstrably
09:23:11   6   free of unfair discrimination, correct?
09:23:14   7       A  Correct.
09:23:15   8       Q  Okay.  And so does that mean that the terms
09:23:18   9   and conditions other than royalties also must be
09:23:21  10   reasonable?
09:23:26  11       A  Yes.
09:23:28  12       Q  And it has to be demonstrably free of unfair
09:23:33  13   discrimination?
09:23:33  14       A  Yes.  I've always had difficulty with that
09:23:36  15   term, frankly, because I'm not sure what fair
09:23:39  16   discrimination is.  So free of unfair discrimination
09:23:42  17   sort of implies, if you had fair discrimination it
09:23:45  18   would be okay but --
09:23:49  19       Q  So I take it that you're not -- you're not
09:23:51  20   quite sure what unfair discrimination means in that
09:23:53  21   context?
09:23:54  22       A  Yes, I am sure.  Based on my experience and
09:23:58  23   being involved in this for many years, the unfair
09:24:00  24   discrimination means that, as we already said, you
09:24:10  25   will be willing to grant licenses to whomever may
```

6 (Pages 18 to 21)

Page 22

```
09:24:13   1   desire one, and it does not necessarily mean that you
09:24:21   2   show discrimination because different licenses have
09:24:27   3   different royalty rates.
09:24:28   4         Some people interpret unfair discrimination
09:24:31   5   to mean that every license has the same royalty rate,
09:24:39   6   otherwise it's unfair discrimination, which is not an
09:24:43   7   opinion that -- that I would share based on my
09:24:44   8   background and experience.
09:24:45   9      Q   The IEEE does not define what unfair
09:24:53  10   discrimination means, though, does it?
09:24:55  11      A   No, it does not.
09:24:56  12      Q   And when you talk about your experience, you
09:24:59  13   haven't had any experience negotiating any RAND
09:25:04  14   licenses, right?
09:25:04  15      A   No.  But I've had experience in issues that
09:25:07  16   have brought -- been brought before, say, the Patent
09:25:09  17   Committee at the IEEE concerning terms and conditions
09:25:13  18   that patent holders were prepared to offer relative to
09:25:17  19   their licenses.
09:25:41  20      Q   Let's look at the ITU's form.
09:25:51  21         (PX Deposition Exhibit 215 was marked
09:25:51  22   for identification and was attached to the deposition
09:26:20  23   transcript.)
09:26:20  24   BY MR. WYLAND:
09:26:21  25      Q   All right.  You've been handed PX Exhibit
```

Page 23

```
09:26:25   1   215, and will you identify this document for me?
09:26:27   2      A   It's a copy of the patent statement
09:26:31   3   licensing declaration that would be used for both
09:26:34   4   ITU-T and ITU-R recommendations.  In the ITU the
09:26:41   5   standards are referred to as recommendations.
09:26:51   6      Q   All right.  And this is also a form Letter
09:26:54   7   of Assurance that you relied on in preparing your
09:26:58   8   report?
09:26:58   9      A   Yes.
09:27:04  10      Q   And let's look at the -- again, the
09:27:06  11   licensing declaration language.  I'll focus your
09:27:10  12   attention.  This is the second page under 2.  This
09:27:19  13   says, "The Patent Holder is prepared to grant a
09:27:21  14   license to an unrestricted number of applicants on a
09:27:24  15   worldwide, non-discriminatory basis and on reasonable
09:27:29  16   terms and conditions to make, use and sell
09:27:35  17   implementations of the above document."  Then it goes
09:27:43  18   on to say, "Negotiations are left to the parties
09:27:46  19   concerned and are performed outside the ITU-T, ITU-R,
09:27:51  20   ISO, or IEC;"  is that correct?
09:27:55  21      A   Yes.
09:27:55  22      Q   Okay.  And to your understanding, this is
09:28:06  23   the Letter of Assurance election that relates to
09:28:11  24   Motorola's H.264 standard essential patents; is that
09:28:16  25   correct?
```

Page 24

```
09:28:16   1      A   Yes.
09:28:17   2      Q   And, again, as with -- as you discussed with
09:28:22   3   respect to the IEEE, Motorola signed a version, or
09:28:33   4   probably several versions of this form, correct?
09:28:35   5      A   Yes.
09:28:35   6      Q   But, to your understanding, its obligations
09:28:38   7   are the same under all of those forms, right?
09:28:40   8      A   Yes.
09:28:45   9      Q   And by the terms of this Letter of
09:28:50  10   Assurance, it says that the patent holder is prepared
09:28:52  11   to grant a license to an unrestricted number of
09:28:56  12   applicants, right, and that means the same thing that
09:28:58  13   we discussed with respect to the IEEE form?
09:29:04  14      A   Yes.
09:29:06  15      Q   And, again, this one says it's on a
09:29:08  16   worldwide basis, so -- so the scope of the license
09:29:12  17   would have to be worldwide?
09:29:13  18      A   Yes.
09:29:20  19      Q   And, again, this Letter of Assurance
09:29:22  20   specifies that the license should be
09:29:24  21   nondiscriminatory?
09:29:25  22      A   Yes, it does.
09:29:26  23      Q   And the ITU also does not define what
09:29:28  24   nondiscriminatory means, correct?
09:29:30  25      A   Correct.
```

Page 25

```
09:29:30   1      Q   And it must be on reasonable terms and
09:29:32   2   conditions, right?
09:29:33   3      A   Yes.
09:29:33   4      Q   And the ITU does not define what reasonable
09:29:36   5   terms and conditions mean?
09:29:42   6      A   Generally, no, but in -- both in this
09:29:47   7   document and also the IEEE document, you had asked me
09:29:53   8   about the SSOs, including any RAND terms and
09:30:04   9   conditions in their policies, and while these
09:30:07  10   documents are not, quote, the policy, one could say
09:30:19  11   there is a RAND condition included if you select Item
09:30:22  12   1 free of charge, and you're basically saying that you
09:30:26  13   are not going to charge a royalty rate.
09:30:30  14         So it does provide a condition where it
09:30:37  15   includes, as an option, a RAND condition, and -- and
09:30:42  16   the same with the IEEE.  It has a similar provision
09:30:48  17   which one could say is a RAND term which is I'm not
09:30:53  18   going to charge, you know, a royalty.  The IEEE
09:31:00  19   document even under the item B grant includes two
09:31:07  20   options which are -- generally result from the ex ante
09:31:15  21   process which allows, on an optional basis, if the
09:31:20  22   patent holder wishes to choose to put a rates will not
09:31:27  23   exceed provision, percent of product, flat fee, per
09:31:30  24   unit, or sample license.
09:31:32  25         So those are, as it says, optional.  They're
```

Page 26

```
09:31:36   1   not part of the policy, but they are guidance that is
09:31:40   2   recognized if one wishes to -- to take advantage of
09:31:44   3   it.
09:31:44   4       Q   Okay.  You were looking at, for the last
09:31:47   5   part of your question, on the IEEE, you were looking
09:31:50   6   back to PX Exhibit 214, correct?
09:31:53   7       A   Yes, I was.
09:31:54   8       Q   And so I take it from what you just told me,
09:31:57   9   you could consider in the option 1 where the patent
09:32:01  10   holder declares that they are going to -- or prepared
09:32:05  11   to grant a license free of charge, that the free of
09:32:07  12   charge term could be considered a RAND term, right?
09:32:10  13       A   Yes, in the purest sense --
09:32:12  14       Q   Okay.
09:32:13  15       A   -- you could consider that a RAND term.
09:32:15  16       Q   Yeah.  And so then if we look at Exhibit
09:32:20  17   214, the latter part of your statement was relating to
09:32:22  18   options under B.  There are two additional boxes
09:32:25  19   there, right?
09:32:25  20       A   Yes.
09:32:25  21       Q   And that now allows a patent holder to
09:32:30  22   either declare a specific rate that they will not
09:32:33  23   exceed under the first box, right?
09:32:34  24       A   Yes, and it says for example, percent of a
09:32:38  25   product price, a flat fee, a per -unit fee, and I
```

Page 27

```
09:32:43   1   guess you could say et cetera, but it gives some
09:32:45   2   examples.
09:32:45   3       Q   Sure.  And then the second one is they can
09:32:48   4   provide a sample license, right?
09:32:49   5       A   Yes.
09:32:50   6       Q   Which would obviously contain more terms
09:32:52   7   than just the royalty?
09:32:53   8       A   Yes.
09:32:54   9       Q   Okay.  Now, if we look at the first page of
09:32:56  10   Exhibit 214, under Section D there's some italicized
09:33:06  11   text in the note there, right, or that's titled
09:33:12  12   "Note"?
09:33:13  13       A   Yes, there is.
09:33:13  14       Q   All right.  And here in the second sentence
09:33:20  15   it says, the IEEE takes no position with respect to
09:33:24  16   the validity or essentiality of patent claims or the
09:33:28  17   reasonableness of rates, terms, and conditions
09:33:31  18   provided in connection with submission of a Letter of
09:33:35  19   Assurance, if any, or in any License Agreements
09:33:37  20   offered by the submitter.
09:33:39  21           Do you see that sentence?
09:33:40  22       A   Yes, I do.
09:33:44  23       Q   Okay.  So here even though they have those
09:33:47  24   two options under -- under 2 to provide a not to
09:33:50  25   exceed royalty or provide a license, the IEEE is still
```

Page 28

```
09:33:55   1   taking no positions with respect to the reasonableness
09:33:58   2   of any terms that the patent holder provides under
09:34:03   3   those options, correct?
09:34:07   4       A   That's correct.
09:34:32   5       Q   And if we go back to PX Exhibit 215, which
09:34:36   6   is the ITU form of the Letter of Assurance, I think
09:34:39   7   you've mentioned this before, but that -- that second
09:34:43   8   sentence about negotiations are left to the parties --
09:34:48   9       A   Yes.
09:34:48  10       Q   -- okay, and that is what you were relying
09:34:53  11   on when you indicated that the ITU is essentially
09:34:56  12   staying out of the parties' negotiations, right?
09:34:58  13       A   Yes, and the same thing is true of the IEEE.
09:36:02  14           MR. WYLAND:  Let's mark a couple of other
09:36:05  15   exhibits.  Oh, wrong one.
09:36:16  16           Let's mark these two as the next ones.
09:36:19  17           (PX Deposition Exhibits 216 and 217
09:36:19  18   were marked for identification and were attached to
09:36:38  19   the deposition transcript.)
09:36:38  20           THE WITNESS:  Thank you.
09:36:54  21           MR. RIZZOLO:  Counsel, do you have a copy
09:36:55  22   for me?
09:36:56  23           MR. WYLAND:  Oh, I'm sorry.
09:36:57  24           MR. RIZZOLO:  No problem.
09:36:58  25           MR. WYLAND:  I do have copies.  All right.
```

Page 29

```
09:37:00   1   I think this is -- was the first one Exhibit 215?
09:37:08   2           THE WITNESS:  Standards association was
09:37:10   3   Exhibit 216.
09:37:11   4           MR. WYLAND:  Okay.  That's Exhibit 216.
09:37:15   5           THE WITNESS:  ITU is Exhibit 217.
09:37:18   6           MR. RIZZOLO:  Thanks.
09:37:35   7   BY MR. WYLAND:
09:37:35   8       Q   You have been handed Plaintiff's Exhibits
09:37:40   9   216 and 217, and let's just first establish what these
09:37:44  10   are.  PX Exhibit 216 is the patent policy for the
09:37:50  11   IEEE; is that correct?
09:37:51  12       A   It's the section out of the standards board
09:37:56  13   bylaws on patents, yes, Section 6.
09:37:59  14       Q   Okay.  Would you have a preference to look
09:38:04  15   at the bylaws in total as opposed --
09:38:06  16       A   No.
09:38:06  17       Q   -- to this, or does it --
09:38:09  18       A   This is fine.  This is where the patent
09:38:11  19   policy is contained.
09:38:11  20       Q   Okay.  And PX Exhibit 217 is the common
09:38:16  21   patent policy for the ITU-T, ITU-R, ISO, and IEC?
09:38:22  22       A   Yes, that's correct.
09:38:23  23       Q   Okay.  And this is the -- in case it wasn't
09:38:27  24   clear from the title, this is the patent policy for
09:38:29  25   the ITU-T, correct?
```

8 (Pages 26 to 29)

Page 30

```
09:38:31   1     A   Yes.
09:38:31   2     Q   Okay.  Now it's -- as I understand it, in
09:38:40   3   your report it's your opinion that the patent policies
09:38:44   4   only require the patent holder to be willing to
09:38:47   5   negotiate a license in good faith; is that correct?
09:38:51   6     A   Yes, to enter into good faith negotiations
09:39:00   7   to any applicants who are interested in obtaining a
09:39:04   8   license.
09:39:04   9     Q   And can you point me to what in particular
09:39:07  10   in the patent policies you base that opinion on?
09:39:14  11     A   The --
09:39:15  12     Q   And just so we're clear, when you're
09:39:17  13   pointing to a document, could you tell us which one?
09:39:20  14     A   Right.
09:39:20  15     Q   Sorry.
09:39:22  16     A   The -- the good faith language per se is --
09:39:31  17   is not contained in the policy itself in either the
09:39:41  18   IEEE or the ITU, and the term has been used for many
09:39:50  19   years, by myself and others involved in standards, to
09:39:58  20   indicate that the patent holder who has made -- given
09:40:04  21   the RAND assurance, okay, will engage in negotiations
09:40:14  22   for the intent of coming up with a RAND license using
09:40:30  23   good basic principles of negotiation with the other
09:40:33  24   party to try to reach an agreement on a license.  And
09:40:41  25   so that's basically where that comes from.
```

Page 31

```
09:40:46   1       Since negotiations are left outside of the
09:40:52   2   IEEE and the ITU, I believe that's why you will not
09:40:57   3   see any great amount of specific language relating to
09:41:03   4   the activity itself.
09:41:10   5     Q   Okay.  Following up on that last point, so
09:41:15   6   I've -- I've read the IEEE patent policy, which is
09:41:19   7   Exhibit 216, and I couldn't find the word "negotiate"
09:41:21   8   or its derivatives in the policy itself.
09:41:24   9     A   That's correct.  Unlike the ITU-T, but, as I
09:41:31  10   say, the -- the policy of the ITU-T even before they
09:41:38  11   were merged, the ISO and the IEC -- the ISO and IEC
09:41:48  12   are separate organization, ISO, International
09:41:52  13   Organization for Standardization, and the IEC, the
09:41:58  14   International Electrotechnical Commission, are two
09:42:05  15   separate international standards bodies.  Before there
09:42:09  16   was a common policy, they each had their own patent
09:42:18  17   policy, and those of us who were involved in standards
09:42:26  18   and patent-related activities, basically, there was a
09:42:28  19   common understanding of the intent and of the
09:42:33  20   practices involved.
09:42:37  21       The ITU-T was the one that most specifically
09:42:41  22   mentioned negotiations outside of the ITU-T, but when
09:42:50  23   you read the patent policy of the IEEE and, as you
09:42:58  24   pointed out, the italics, that they take no position,
09:43:05  25   I think there's a pretty clear indication that those
```

Page 32

```
09:43:07   1   activities would have to be someplace other than the
09:43:09   2   SSO.
09:43:09   3     Q   And outside of -- yeah, sorry.  Strike that.
09:43:17   4       So I take it that you're -- in terms of the
09:43:23   5   IEEE, you're not aware of any statement that the IEEE
09:43:30   6   has made that says that a patent holder fulfills its
09:43:33   7   obligations under an accepted letter of assurance by
09:43:40   8   only negotiating?
09:43:41   9     A   No, I do not believe there is such a
09:43:43  10   statement.
09:43:50  11     Q   And are you aware of any statement by the
09:43:53  12   ITU that says that a patent holder fulfills its
09:43:56  13   obligations under an accepted Letter of Assurance by
09:44:00  14   only negotiating?
09:44:01  15     A   The concern I have with your question is the
09:44:03  16   use of the word "only."  Certainly, both policies
09:44:13  17   specify and include in their wording the fact that the
09:44:18  18   patent holder who makes the RAND declaration is
09:44:23  19   willing to offer licenses, and so that's the extent of
09:44:30  20   the statement from the SSO.  It doesn't include any
09:44:38  21   statement relevant to only or not only.
09:44:57  22     Q   Now, you said that -- and we can look at it.
09:44:59  23   Let's look at PX Exhibit 217, which is the patent
09:45:03  24   policy for the ITU-T, correct?
09:45:10  25       I think you mentioned that this in -- in the
```

Page 33

```
09:45:15   1   Section 2 does use the word "negotiate," correct?
09:45:23   2     A   Exhibit 217, right?
09:45:28   3     Q   Exhibit 217, yeah.
09:45:29   4     A   I thought you said Exhibit 216.
09:45:31   5     Q   I'm sorry if I did.  So Exhibit 217 is
09:45:33   6   the -- is the patent policy governing the ITU-T,
09:45:37   7   right?
09:45:37   8     A   Yes, it is.  They call it a code of
09:45:40   9   practice, but referred to it as the patent policy,
09:45:42  10   yes.
09:45:42  11     Q   Okay.  Yeah.
09:45:44  12     A   And 2.1 --
09:45:46  13     Q   Yeah.
09:45:46  14     A   -- such negotiations are left to the parties
09:45:50  15   concerned and are performed outside the ITU-T,
09:45:53  16   correct.
09:45:54  17     Q   Yes.  All right.  Let's look at this common
09:45:57  18   patent policy, and I think you just mentioned that
09:45:59  19   they refer to it as a code of practice, and that's
09:46:02  20   stated in the first line, correct?
09:46:04  21     A   Yes.
09:46:04  22     Q   All right.  And then if you look at the
09:46:10  23   second paragraph, it starts recommended -- I'm
09:46:12  24   sorry -- recommendations/deliverables, and what are
09:46:18  25   recommendations and deliverables?
```

Page 34

```
09:46:21   1    A   If a recommendation -- which is the ITU's
09:46:27   2    title for a standard, in IEEE it would be called a
09:46:35   3    standard.  In the ITU it's called a recommendation.
09:46:39   4    Slash, that's not really a slash, but slash
09:46:42   5    deliverable.  It may be a preferred practice or
09:46:50   6    something that doesn't carry the title of standard.
09:46:53   7    That's why they use the term "deliverable."
09:46:55   8        Q   Okay.  Let's look up above, where they --
09:47:00   9    they talk about recommendations are and deliverables.
09:47:03  10    It says, in the first paragraph in the parenthetical,
09:47:07  11    "For purposes of this document, ITU-T and ITU-R
09:47:11  12    Recommendations are referred to as 'recommendations',"
09:47:14  13    correct?
09:47:15  14        A   Yes.
09:47:15  15        Q   So ITU-T and ITU-R recommendations are, as
09:47:19  16    you said, those are the standard, right?
09:47:23  17        A   Yes.
09:47:23  18        Q   So the H.264 standard is a recommendation?
09:47:26  19        A   Yes.
09:47:27  20        Q   And then it says that ISO deliverables and
09:47:30  21    IEC deliverables are referred to as deliverables.  So
09:47:33  22    is the -- is the ISO and IEC terms for standards, they
09:47:39  23    call them deliverables?
09:47:40  24        A   I don't, but it appears they now do.
09:47:48  25        Q   Okay.
```

Page 35

```
09:47:49   1    A   At some point they've changed the
09:47:51   2    terminology to deliverables.  I do not know why, but
09:47:55   3    they are standards.  The ITU-T and R may have
09:48:02   4    deliverables, but in this context it does appear that
09:48:07   5    the initial cap D on deliverables is referring to ISO
09:48:14   6    and IEC, which based on my experience, are the
09:48:18   7    standards developed by those organizations.
09:48:24   8        Q   And so because this is a common patent
09:48:27   9    policy for four different organizations, two of which
09:48:31  10    use one term "recommendations," two of which use
09:48:36  11    deliverables, they -- in the patent policy they use
09:48:38  12    both, right?
09:48:38  13        A   Yes.
09:48:39  14        Q   And so where we see recommendations, and I
09:48:43  15    used it -- I said slash, which you're right, it's not
09:48:45  16    really a slash.  It's a straight up and down bar
09:48:48  17    deliverables.  To me this means that if we're
09:48:52  18    referring to this in terms of the ITU, we use the term
09:48:56  19    "recommendations," right?
09:48:58  20        A   Yes.
09:48:58  21        Q   That's the operative term in the sentence?
09:49:02  22        A   Yes, it is.
09:49:04  23        Q   Yeah, okay.  So if -- if we -- if we use
09:49:06  24    that and we take out the word "deliverables," that
09:49:09  25    second paragraph would read, "Recommendations...are
```

Page 36

```
09:49:11   1    non-binding; their objective is to ensure
09:49:14   2    compatibility of technologies and systems on a
09:49:17   3    worldwide basis.  To meet this objective, which is in
09:49:21   4    the common interests of all those participating, it
09:49:24   5    must be ensured that recommendations, their
09:49:27   6    applications," uses -- I'm sorry -- "use, et cetera,
09:49:32   7    are accessible to everybody."
09:49:34   8        Did I read that correctly?
09:49:36   9        A   Without undue constraints.
09:49:40  10        Q   I'm sorry.  I left something out.  Oh, I was
09:49:51  11    reading the second paragraph, not the third paragraph.
09:49:54  12        A   Okay.  Let me -- yes.
09:50:02  13        Q   Let's -- okay.
09:50:05  14        A   The next paragraph --
09:50:06  15        Q   Yeah, we'll talk about that in just a sec.
09:50:14  16        A   Yes, that's what it says.
09:50:15  17        Q   Okay.  So then -- then we'll go to the next
09:50:17  18    paragraph, right?  And that paragraph says, again
09:50:23  19    taking out the word "deliverables" because we'll be
09:50:26  20    discussing about ITU, "It follows, therefore, that a
09:50:29  21    patent embodied fully or partly in a Recommendation...
09:50:35  22    must be accessible to everybody without undue
09:50:38  23    constraints.  To meet this requirement in general is
09:50:44  24    the sole objective of the code of practice.  The
09:50:52  25    detailed arrangements arising from patents (licensing,
```

Page 37

```
09:50:57   1    royalties, etc.) are left to the parties concerned, as
09:51:04   2    these arrangements might differ from case to case;" is
09:51:08   3    that correct?
09:51:08   4        A   Yes, that's what it says.
09:51:20   5        Q   So the first sentence of the -- the third
09:51:23   6    paragraph where it says that recommendations must be
09:51:26   7    accessible to everybody without undue constraints, so
09:51:35   8    under the policy, any patent that is fully or partly
09:51:38   9    embodied in a recommendation such as H.264, the policy
09:51:42  10    is saying that that must be accessible to everybody
09:51:47  11    without undue constraint, right?
09:51:49  12        A   Yes.
09:51:50  13        Q   Okay.  And then the next sentence says, "To
09:51:54  14    meet this requirement in general is the sole objective
09:51:57  15    of the code of practice."  And so that means that the
09:52:01  16    sole objective of the policy is to meet the
09:52:03  17    requirements that patents embodied fully or partly in
09:52:10  18    a recommendation must be accessible to everybody
09:52:12  19    without undue constraints, right?
09:52:14  20        A   Yes, which is why the policy 2.1 says that
09:52:17  21    the patent holder is willing to negotiate licenses
09:52:21  22    with other parties on a nondiscriminatory and
09:52:24  23    reasonable basis, which is what makes them available
09:52:27  24    to everyone without undue constraints.
09:52:30  25        Q   Okay.  And then the preface to those
```

10 (Pages 34 to 37)

Page 38

```
09:52:32   1   numbered paragraphs says, "This code of practice may
09:52:35   2   be summarized as follows," right?
09:52:39   3       A   Yes.
09:52:39   4       Q   So -- so these three paragraphs summarize
09:52:41   5   what is the patent policy of the ITU-T, right?
09:52:43   6       A   I'm sorry.  Could you repeat that?
09:52:45   7       Q   I'm sorry.  So these three numbered
09:52:46   8   paragraphs 1, 2, 3 here are essentially summarizing or
09:52:52   9   setting forth the patent policy of the ITU?
09:52:58  10       A   Actually, I think the -- the whole document
09:53:01  11   sets forth the Code of Practice even though after the
09:53:07  12   first three paragraphs it says the practice may be
09:53:13  13   summarized as follows.  I believe the whole document
09:53:17  14   covers the Code of Practice.  I don't think it's just
09:53:20  15   the first three paragraphs.
09:53:22  16       Q   Fair enough.  Let's look at the three
09:53:28  17   numbered paragraphs, though.  The first paragraph,
09:53:30  18   this sets forth the disclosure requirement, correct?
09:53:42  19       A   Yes.
09:53:44  20       Q   And to summarize it, it's essentially saying
09:53:47  21   that any party participating in the work developing a
09:53:50  22   standard should disclose any patents that are known to
09:54:00  23   affect the standard?
09:54:01  24       A   Generally, yes, that's what it says.
09:54:03  25       Q   Yeah.  And if you look at the second
```

Page 39

```
09:54:13   1   paragraph here, this is the paragraph that in your
09:54:18   2   report you've based your opinions about obligations to
09:54:21   3   negotiate, right?
09:54:21   4       A   Correct.
09:54:27   5       Q   And this paragraph is identifying three
09:54:30   6   different situations that might arise when a
09:54:34   7   disclosure is made pursuant to the first paragraph; is
09:54:37   8   that right?
09:54:37   9       A   Yes, it does.
09:54:42  10       Q   And --
09:54:43  11       A   Actually, it doesn't describe three
09:54:45  12   different.
09:54:47  13       Q   It doesn't describe three different, what do
09:54:52  14   you mean by that?
09:54:53  15       A   Yes, yes, yes, it does.  It describes three
09:54:55  16   different -- three different possibilities for the
09:54:58  17   patent holder.  I'm sorry.
09:54:59  18       Q   Okay.
09:55:00  19       A   Yes.
09:55:00  20       Q   So -- so the first sentence reads, again
09:55:03  21   taking out the word "deliverable," "If a
09:55:05  22   recommendation...is developed and such information as
09:55:08  23   referred to in paragraph 1 has been disclosed, three
09:55:12  24   different situations may arise:" --
09:55:14  25       A   Correct.
```

Page 40

```
09:55:14   1       Q   -- correct?  And the information referred to
09:55:17   2   in paragraph 1 there is a disclosure that a
09:55:23   3   participating party would make if they have knowledge
09:55:26   4   of a patent that either -- that either -- that either
09:55:32   5   does or may impact a standard under development,
09:55:35   6   right?
09:55:35   7       A   Yes.
09:55:37   8       Q   And so then it goes on to say that there are
09:55:41   9   three different situations might arise when a
09:55:43  10   disclosure is made, right?
09:55:45  11       A   Yes.
09:55:46  12       Q   And the first situation is that the patent
09:55:48  13   holder is willing to negotiation -- negotiate a
09:55:50  14   license free of charge, and it goes on, right?
09:55:53  15       A   Correct.
09:55:57  16       Q   So that -- that's the situation that --
09:55:58  17   that -- well, strike that.
09:55:59  18           The second is that the patent holder is
09:56:03  19   willing to negotiate licenses with other parties on a
09:56:08  20   nondiscriminatory basis on reasonable terms and
09:56:11  21   conditions, right?
09:56:12  22       A   Correct.
09:56:12  23       Q   And the third situation that might arise is
09:56:15  24   that the patent holder is not willing to comply with
09:56:18  25   either paragraphs 2.1 or 2.2, right?
```

Page 41

```
09:56:22   1       A   Yes.
09:56:28   2       Q   So paragraph 2 here does not address the
09:56:30   3   Letter of Assurance issue, does it?
09:56:34   4       A   I'm sorry?
09:56:35   5           MR. RIZZOLO:  Objection, vague.
09:56:36   6   BY MR. WYLAND:
09:56:37   7       Q   Okay.  Paragraph 2 here by its terms does
09:56:42   8   not discuss the Letter of Assurance requirement,
09:56:47   9   right?
09:56:48  10       A   In the case of the ITU, you mean the Patent
09:56:52  11   Statement and Licensing Declaration, right?
09:56:53  12       Q   Yes.  Yes.
09:56:55  13       A   No, there's no mention of it here.
09:56:57  14       Q   Okay.  Paragraph 3, however, does relate to
09:57:03  15   the -- what we're calling the Letter of Assurance for
09:57:05  16   a patent declaration and licensing statement, right?
09:57:09  17       A   Yes, it does.
09:57:10  18       Q   So paragraph 3 says, whatever case applies,
09:57:14  19   2.1, 2.2, or 2.3 -- and that's referring back to what
09:57:19  20   we just discussed in paragraph 2, right?
09:57:22  21       A   Yes.
09:57:22  22       Q   Okay.  It then goes on to say, "The patent
09:57:25  23   holder has to provide a written statement to be filed
09:57:28  24   at the ITU-TSB, ITU-BR, or the offices of the CEOs of
09:57:38  25   ISO or IEC, respectively."  That -- that's referring
```

11 (Pages 38 to 41)

Page 42

```
09:57:44   1    to -- well, let me continue.
09:57:47   2        It then goes on to say, using the
09:57:50   3    appropriate 'Patent Statement and Licensing
09:57:52   4    Declaration' form."  So this paragraph 3 in the first
09:57:57   5    sentence is providing the requirement that a party who
09:58:05   6    has been identified as having a patent that does or
09:58:07   7    may impact a standard under development is required to
09:58:13   8    file a Patent Statement and Licensing Declaration
09:58:16   9    form, right?
09:58:17  10    A   Correct.
09:58:28  11    Q   And then it says, "This statement must not
09:58:31  12    include additional provisions, conditions, or any
09:58:34  13    other exclusion clauses in excess of what is provided
09:58:38  14    for each case in the corresponding boxes of the form."
09:58:41  15    And that means that a patent holder can't vary the
09:58:44  16    form when they turn it in, right?
09:58:46  17    A   Yes.
09:58:46  18    Q   They can't change the language that has been
09:58:49  19    developed for use in the Patent Statement and
09:58:55  20    Licensing Declaration form, right?
09:58:56  21    A   Correct.
09:59:04  22    Q   And the language on the -- no, strike that.
09:59:28  23        And you agree that the patent holder's RAND
09:59:31  24    obligation stems from the Letters of Assurance that
09:59:36  25    are submitted to the SSOs, right?
```

Page 43

```
09:59:38   1    A   Correct.
09:59:38   2        MR. RIZZOLO:  Objection, vague.
09:59:44   3    BY MR. WYLAND:
09:59:44   4    Q   Well, to address the potential objection, if
09:59:47   5    you'll pull out your report, which is PX Exhibit 213.
10:00:29   6    Paragraph 24.
10:00:31   7    A   Okay.
10:00:32   8    Q   And here the second sentence you say, "The
10:00:36   9    RAND obligation stems from the Letters of Assurance
10:00:38  10    that are submitted to SSOs in accordance with SSO
10:00:43  11    patent policies and procedures," right?
10:00:45  12    A   Correct.
10:00:46  13    Q   Okay.  And that's your understanding?
10:00:48  14    A   Yes, it is.
10:01:02  15    Q   And I should say if you need a break at any
10:01:05  16    time --
10:01:05  17    A   Yeah, it's from drinking all the water.
10:01:07  18    Q   Would you like a break?
10:01:08  19    A   Is that all right.
10:01:09  20    Q   It's fine with me.  I don't know how long
10:01:10  21    we've been going.  An hour, yeah.
10:01:12  22    A   An hour.
10:01:13  23        THE VIDEOGRAPHER:  We're going off the
10:01:14  24    record.  The time is now 10:01 a.m.
10:01:17  25        (Recess.)
```

Page 44

```
10:08:12   1        THE VIDEOGRAPHER:  We're back on the record.
10:08:14   2    The time is 10:08 a.m.
10:08:17   3    BY MR. WYLAND:
10:08:17   4    Q   Okay.  Throughout your report you say, you
10:08:29   5    give your opinion that RAND terms and conditions are
10:08:33   6    determined through bilateral negotiations, correct?
10:08:35   7    A   Yes.
10:08:35   8    Q   Okay.  There's nothing in the SSO policies
10:08:39   9    that prohibits multilateral negotiations, is there?
10:08:43  10    A   No, there is not.
10:08:50  11    Q   And, in fact, don't some SSOs encourage or
10:08:54  12    have encouraged the development of patent pools
10:08:57  13    relating to licensing for standards?
10:09:01  14    A   I would say some have used patent pools,
10:09:04  15    yes.
10:09:06  16    Q   And the SSOs don't take a position that
10:09:08  17    that's inappropriate, do they?
10:09:09  18    A   No.
10:09:15  19    Q   And there's nothing in the standards setting
10:09:17  20    organization policies that prohibits ex ante
10:09:20  21    negotiations, is there?
10:09:26  22    A   Nothing that prohibits.  IEEE has that
10:09:35  23    possibility.  Some organizations do; some don't.
10:09:41  24    Q   And is it fair to say that -- that since the
10:09:48  25    SSOs through their policies stay out of the
```

Page 45

```
10:09:51   1    negotiations among interested parties, that they don't
10:09:56   2    take a position one way or the other that negotiations
10:10:00   3    have to follow any particular form or arrangement?
10:10:06   4    A   That's correct.  Many different alternatives
10:10:08   5    could be used.
10:10:50   6    Q   Take a look at your report, paragraph 53.
10:10:53   7    This is Plaintiff's Exhibit 213.  Here you give an
10:11:19   8    opinion about what a reasonable royalty should be
10:11:22   9    viewed in terms of, return on investment and other
10:11:29  10    considerations --
10:11:30  11    A   Yes.
10:11:30  12    Q   -- is that correct?  Your opinion there is
10:11:34  13    not based upon any requirement of the standards
10:11:38  14    setting organization patent policies or guidelines, is
10:11:41  15    it?
10:11:41  16    A   My opinion is based on my involvement with
10:11:46  17    the policies and the implementation of the policies
10:11:48  18    through the SSOs, in terms of my comments about
10:11:55  19    balancing the interest of, in this 53, of patent
10:12:00  20    holders and implementers.  I think often there's a
10:12:04  21    view that the RAND activity is primarily viewed as a
10:12:18  22    benefit to the potential licensee, and often the --
10:12:20  23    what's overlooked is that it's intended to be a
10:12:25  24    balance to the patent holder's interest as well so
10:12:29  25    that the SSO, in terms of its primary goal, which is
```

Page 46

```
10:12:34   1   promulgation of the standard, they want to see the
10:12:39   2   standard implemented either in products or services
10:12:44   3   and recognize that to do that there needs to be a
10:12:47   4   balance.
10:12:47   5       So I think often the -- the view of
10:12:52   6   reasonableness is considered more from the licensee
10:12:59   7   side and not so much from the reasonableness for the
10:13:04   8   patent holder, which is why I commented on the balance
10:13:06   9   there.
10:13:06  10     Q   But the SSOs, as we've seen, have expressly
10:13:15  11   said that they don't give an opinion on what is
10:13:17  12   reasonable, right?
10:13:18  13     A   That's right.
10:13:19  14     Q   And they stay out of the negotiation
10:13:23  15   process, correct?
10:13:23  16     A   Yes, they do.
10:13:24  17     Q   So there's nothing from the SSO patent
10:13:28  18   policy perspective that says that any of these items
10:13:30  19   here that you have listed should be considered in
10:13:34  20   terms of determining what a reasonable royalty is,
10:13:36  21   correct?
10:13:38  22     A   That's correct.
10:13:48  23     Q   And in paragraph 55 on page 23, this
10:13:56  24   paragraph is -- provides some of your opinions
10:13:59  25   regarding Dr. Lynde's expert report, correct?
```

Page 47

```
10:14:03   1     A   Yes.
10:14:12   2     Q   And in the second sentence I believe you
10:14:13   3   state, "This is in direct conflict with the ITU
10:14:17   4   policy, which expressly recognizes that RAND terms and
10:14:20   5   conditions will vary case by case depending on the
10:14:24   6   unique circumstances of the parties."
10:14:27   7     A   Yes.
10:14:27   8     Q   But that's -- the ITU policy doesn't state
10:14:31   9   that conditions will vary case by case, does it?
10:14:38  10     A   It says these arrangements might differ from
10:14:42  11   case to case.
10:14:42  12     Q   Will is different than might, right?
10:14:46  13     A   Yes.
10:14:47  14     Q   Okay.  And in stating that they might
10:14:54  15   differ, the ITU is also expressly saying that they're
10:14:58  16   staying out of those negotiations, right?
10:15:01  17     A   Yes.  It's an interesting statement in that
10:15:08  18   while stating -- staying out of the negotiations, they
10:15:11  19   do include a statement that one could view as a
10:15:16  20   comment on the negotiations.  So neither of these
10:15:23  21   policies I would say is -- is perfect from the
10:15:26  22   complete extent of what each organization may intend
10:15:32  23   because there is some carryover in a number of
10:15:35  24   different ways, and in the ITU this is an example of
10:15:40  25   where I think it's -- the ITU felt strongly enough
```

Page 48

```
10:15:48   1   about this that they did include a sentence, and that
10:15:51   2   sentence could be viewed as a possible consideration
10:15:55   3   in negotiations.
10:16:00   4     Q   So given, though, that the ITU doesn't
10:16:03   5   define what a reasonable royalty rate is and that
10:16:07   6   they've expressly stated that they're going to stay
10:16:10   7   out of parties' negotiations, anything that Dr. Lynde
10:16:17   8   said can't really directly conflict with the ITU
10:16:20   9   policy, can it?
10:16:21  10       MR. RIZZOLO:  Objection, form.
10:16:22  11       THE WITNESS:  Well, no, I -- I would --
10:16:24  12   would not agree because the ITU, in those two -- in
10:16:30  13   that -- those two sentences -- actually, the last one,
10:16:37  14   it mentions detail arrangements.  I'm referring to
10:16:40  15   Exhibit 217, the third paragraph.  And it says,
10:16:48  16   Detailed arrangements arising from patents," and it
10:16:51  17   mentions arrangements, licensing, royalties, et
10:16:56  18   cetera, are left outside, and then it says, as you've
10:17:00  19   said, these might or, if you will, may differ from
10:17:03  20   case to case.
10:17:11  21       So when I commented on Dr. Lynde's report,
10:17:16  22   all right, which implied that the conditions for an
10:17:26  23   appropriate royalty rate as he did, okay, and
10:17:32  24   specifically applying that to RAND is I think not in
10:17:44  25   concert with this ITU statement.
```

Page 49

```
10:17:47   1   BY MR. WYLAND:
10:18:05   2     Q   But you do agree that where the ITU
10:18:07   3   expresses in its policy that the detail arrangements
10:18:10   4   from the patents, licensing, royalties, et cetera, are
10:18:13   5   left to the parties concerned, I think we've already
10:18:17   6   established that means that the negotiations
10:18:18   7   themselves are outside the scope of the ITU, right?
10:18:21   8     A   Yes.
10:18:26   9     Q   And that the ITU policy doesn't require or
10:18:28  10   prohibit any particular form of negotiation, does it?
10:18:31  11     A   That's correct.
10:19:11  12     Q   And if we look at your paragraph 58, the
10:19:22  13   second sentence you say, "As described above, the SSOs
10:19:25  14   do not concern themselves with the particular terms
10:19:27  15   and conditions of a RAND license, nor do they
10:19:30  16   prescribe or forbid any specific terms, royalty
10:19:34  17   format, or royalty base," correct?
10:19:36  18     A   Yes, correct.
10:19:37  19     Q   Okay.  And -- and that's essentially what we
10:19:40  20   just talked about, that -- that neither the IEE --
10:19:46  21     A   IEEE.
10:19:47  22     Q   -- IEEE --
10:19:49  23     A   Yes.
10:19:49  24     Q   -- or the ITU concerned themselves with the
10:19:53  25   specific terms of negotiations or with the definition
```

13 (Pages 46 to 49)

Page 50

| | | |
|---|---|---|
| 10:19:58 | 1 | of what reasonable terms and conditions are, right? |
| 10:20:01 | 2 | A   Correct. |
| 10:20:22 | 3 | Q   Now, in paragraphs 66 to 70 of your |
| 10:20:26 | 4 | opinion -- of your report, you provide certain |
| 10:20:29 | 5 | opinions regarding patent hold up; is that correct? |
| 10:20:37 | 6 | A   Yes, I do. |
| 10:20:38 | 7 | Q   There's nothing in the SSO policies that |
| 10:20:40 | 8 | discuss the concept of patent hold up, is there? |
| 10:20:44 | 9 | A   Not in the policies, no. |
| 10:20:52 | 10 | Q   And are you basing your opinions there on |
| 10:20:54 | 11 | any particular statements from the SSOs concerning |
| 10:20:56 | 12 | patent hold up? |
| 10:20:57 | 13 | A   I'm basing it on my opinions after having |
| 10:21:03 | 14 | read Microsoft's expert reports, and, as I said, that |
| 10:21:16 | 15 | the SSOs, while concerned about promulgation of the |
| 10:21:20 | 16 | standard, the term "patent hold up" is often used in |
| 10:21:26 | 17 | the context of the possibility of a patent holder |
| 10:21:34 | 18 | being unwilling to license an essential patent, which |
| 10:21:39 | 19 | would therefore hold up the standard from being |
| 10:21:41 | 20 | implemented.  So it's a term that is often used in |
| 10:21:49 | 21 | discussion about standards and patents. |
| 10:21:51 | 22 | Q   But your opinions there are not drawn from |
| 10:21:59 | 23 | the patent policies, per se; is that correct? |
| 10:22:02 | 24 | A   No, drawn from my experience and the |
| 10:22:07 | 25 | implementation of the patent policy, having been |

Page 51

| | | |
|---|---|---|
| 10:22:12 | 1 | chairman of the Patent Committee of IEEE-SA, having |
| 10:22:18 | 2 | been a member for the U.S. on the ad hoc ITU committee |
| 10:22:24 | 3 | for patent policy, and numerous other involvements in |
| 10:22:29 | 4 | implementation of the patent policies, and that's |
| 10:22:32 | 5 | where my opinions are formed. |
| 10:22:48 | 6 | Q   How are you being compensated for your work |
| 10:22:50 | 7 | on this matter? |
| 10:22:53 | 8 | A   I'm being compensated at my normal hourly |
| 10:22:57 | 9 | rate of $600 an hour. |
| 10:23:01 | 10 | Q   How many hours have you worked on this |
| 10:23:03 | 11 | matter for so far? |
| 10:23:04 | 12 | A   I thought last night you might ask me that, |
| 10:23:07 | 13 | and I'm -- I'm not quite sure.  It's certainly less |
| 10:23:10 | 14 | than a hundred, maybe it's 50 or -- or less.  I'm not |
| 10:23:16 | 15 | quite sure.  I haven't billed for this activity.  I |
| 10:23:21 | 16 | will in September. |
| 10:23:25 | 17 | Q   Okay.  When did you start working on this |
| 10:23:27 | 18 | activity? |
| 10:23:27 | 19 | A   About 3 weeks ago.  On this particular |
| 10:23:34 | 20 | activity, about 3, 3, 4 weeks ago. |
| 10:23:39 | 21 | Q   And how many other matters for Motorola have |
| 10:23:42 | 22 | you been employed as an expert? |
| 10:23:43 | 23 | A   ITC matter Motorola and Microsoft, and then |
| 10:23:53 | 24 | Motorola and Apple, which I've done reports for -- |
| 10:23:59 | 25 | Q   Do you recall -- |

Page 52

| | | |
|---|---|---|
| 10:23:59 | 1 | A   And given depositions. |
| 10:24:01 | 2 | Q   Do you recall approximately how many reports |
| 10:24:03 | 3 | you have given for the Motorola/Apple matters? |
| 10:24:09 | 4 | A   Two or three. |
| 10:24:10 | 5 | Q   And how many depositions? |
| 10:24:11 | 6 | A   Two I believe. |
| 10:24:19 | 7 | Q   And have you testified at a trial or hearing |
| 10:24:21 | 8 | in the Motorola/Apple matter? |
| 10:24:22 | 9 | A   No, I have not. |
| 10:24:36 | 10 | Q   And approximately how many other expert |
| 10:24:37 | 11 | retentions have you had since 2006? |
| 10:24:50 | 12 | A   I don't have that information in front of |
| 10:24:51 | 13 | me.  I've done work for -- oh, how many you said. |
| 10:24:54 | 14 | Q   Yeah. |
| 10:24:54 | 15 | A   Maybe four or five. |
| 10:24:59 | 16 | Q   Okay.  And it's my understanding that the |
| 10:25:01 | 17 | Apple/Motorola matters involved RAND issues, if we can |
| 10:25:05 | 18 | just use that term generally. |
| 10:25:06 | 19 | A   Yes. |
| 10:25:07 | 20 | Q   Have other of your representations involved |
| 10:25:10 | 21 | RAND issues? |
| 10:25:10 | 22 | A   Yes, they have. |
| 10:25:11 | 23 | Q   Okay.  How many of those? |
| 10:25:16 | 24 | A   I would say all except a couple. |
| 10:25:23 | 25 | Q   Okay.  In terms of the cases that you've |

Page 53

| | | |
|---|---|---|
| 10:25:25 | 1 | worked on that have involved RAND issues, have you |
| 10:25:28 | 2 | always represented the patent holder? |
| 10:25:30 | 3 | A   Yes, I have. |
| 10:25:37 | 4 | Q   And have you ever testified in a case that a |
| 10:25:39 | 5 | patent holder has not compiled fully with its |
| 10:25:43 | 6 | obligations under the applicable patent policies of |
| 10:25:46 | 7 | the standards setting organization? |
| 10:25:48 | 8 | A   Not for any of the activities I've been |
| 10:25:50 | 9 | involved in. |
| 10:25:54 | 10 | MR. WYLAND:  All right.  Can we go off for a |
| 10:25:55 | 11 | minute. |
| 10:25:59 | 12 | THE WITNESS:  Sure. |
| 10:25:59 | 13 | THE VIDEOGRAPHER:  We're going off the |
| 10:26:00 | 14 | record.  The time is 10:25 a.m. |
| 10:26:03 | 15 | (Recess.) |
| 10:30:56 | 16 | THE VIDEOGRAPHER:  We're back on the record. |
| 10:30:57 | 17 | Here marks the beginning of Videotape No. 2 in the |
| 10:31:01 | 18 | deposition of Richard Holleman.  The time is now 10:31 |
| 10:31:06 | 19 | a.m. |
| 10:31:08 | 20 | BY MR. WYLAND: |
| 10:31:09 | 21 | Q   I am done subject to any further questions I |
| 10:31:11 | 22 | might have if you have any redirect.  No? |
| 10:31:14 | 23 | MR. RIZZOLO:  No questions. |
| 10:31:15 | 24 | THE VIDEOGRAPHER:  Here marks the end of |
| 10:31:17 | 25 | Videotape No. 2 in the deposition of Richard Holleman. |

14 (Pages 50 to 53)

RICHARD J. HOLLEMAN - 8/21/2012

Page 54

| | | |
|---|---|---|
| 10:31:20 | 1 | We're going off the record and the time is 10:31 a.m. |
| 10:31:23 | 2 | (Signature having not been discussed, |
| 10:31:23 | 3 | the deposition of Richard J. Holleman was concluded at |
| 10:31:48 | 4 | 10:31 a.m.) |
| | 5 | (The following Acknowledgement of |
| | 6 | Deponent Page is included in the event at the |
| | 7 | conclusion of Richard J. Holleman's deposition he |
| | 8 | elects to read and sign his deposition transcript.) |

Page 55

1  CERTIFICATE OF SHORTHAND REPORTER-NOTARY PUBLIC
2      I, Joan V. Cain, Court Reporter, the officer
3  before whom the foregoing deposition was taken, do
4  hereby certify that the foregoing transcript is a true
5  and correct record of the testimony given; that said
6  testimony was taken by me stenographically and
7  thereafter reduced to typewriting under my direction
8  and that I am neither counsel for, related to, nor
9  employed by any of the parties to this case and have
10 no interest, financial or otherwise, in its outcome.
11     IN WITNESS WHEREOF, I have hereunto set my
12 hand and affixed my notarial seal this 21st day of
13 August 2012.
14
15 My commission expires:
16 June 14, 2014
17 _____
18 NOTARY PUBLIC IN AND FOR THE
19 DISTRICT OF COLUMBIA

15 (Pages 54 to 55)