1

2

3

4

5

The Honorable James L. Robart

6

7

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

8

9

MICROSOFT CORPORATION, a Washington corporation,

10

Plaintiff,

11

v.

12

13

MOTOROLA, INC., and MOTOROLA MOBILITY, INC., and GENERAL INSTRUMENT CORPORATION,

14

Defendants.

15

16

17

MOTOROLA MOBILITY, INC., and GENERAL INSTRUMENT CORPORATION,

18

Plaintiffs/Counterclaim Defendant,

19

v.

20

MICROSOFT CORPORATION,

21

Defendant/Counterclaim Plaintiff.

22

CASE NO. C10-1823-JLR

MOTOROLA MOBILITY'S AND GENERAL INSTRUMENT'S REPLY TO MOTOROLA'S *DAUBERT* MOTION

**NOTED ON MOTION CALENDAR:**
**September 10, 2012**

**ORAL ARGUMENT REQUESTED**

**REDACTED**

23

24

25

26

MOTOROLA MOBILITY'S AND GENERAL INSTRUMENT'S
REPLY TO MOTOROLA'S DAUBERT MOTION
CASE NO. C10-1823-JLR

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone: (206) 676-7000
Fax: (206) 676-7001

4828-5319-2977.1

# TABLE OF CONTENTS

I.      INTRODUCTION ........................................................................................... 1

II.     MICROSOFT'S REAL PURPOSE – TO RELY ON THE DEPRESSED RATES
        OF PATENT POOLS –  UNMASKS THE UNRELIABILITY OF ITS
        UNEXPLAINED EX ANTE MULTILATERAL "METHODOLOGY"........................... 3

III.    STRIPPED OF THE FALSE ANALOGY TO PATENT POOLS, MICROSOFT'S
        INVOCATION OF A MULTILATERAL, EX ANTE "METHODOLOGY" IS
        UNJUSTIFIED HERE BECAUSE IT PURPORTS TO ADDRESS
        UNSUBSTANTIATED PROBLEMS ................................................................ 5

IV.     THE ARTICLES CITED BY MOTOROLA DO NOT SUGGEST THAT SSOs
        ENDORSE AN EX ANTE MULTILATERAL METHODOLOGY ................................ 8

V.      THE FACT THAT MOST SEP LICENSES RESULT FROM BILATERAL
        NEGOTIATIONS  IS FURTHER PROOF THAT MICROSOFT'S
        METHODOLOGY IS UNRELIABLE.................................................................. 9

VI.     CONCLUSION.......................................................................................... 10

MOTOROLA MOBILITY'S AND GENERAL INSTRUMENT'S
REPLY  TO MOTOROLA'S DAUBERT MOTION – i
CASE NO. C10-1823-JLR

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

DOCPROPERTY "CUS_DocIDString"

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*Apple, Inc. v. Motorola, Inc.*,
    No. 1:11-cv-08540, -- F.Supp.2d --, 2012 WL 2376664 (N.D. Ill. June 22, 2012)..................6

*Chaffee v. Chaffee*,
    145 P.2d 244 (Wash. 1943)........................................................................................7

*Uniloc USA, Inc. v. Microsoft Corp.*,
    632 F.3d 1292 (Fed. Cir. 2011)..................................................................................8

OTHER AUTHORITIES

Joseph Farrell, John Hayes, Carl Shapiro, & Theresa Sulliva, *Standard Setting, Patents,
    and Hold-Up*, 74 Antitrust L. J. 603 (2007) ........................................................7

Federal Trade Commission, *The Evolving IP Marketplace: Aligning Patent Notice and
    Remedies With Competition* (March 2011) (online at
    http://www.ftc.gov/os/2011/03/110307patentreport.pdf) ........................................6

Damien Geradin, Anne Layne-Farrar, & A. Jorge Padilla, *The Complements Problem
    Within Standard Setting: Assessing the Evidence on Royalty Stacking*, 14 B.U. J. Sci. &
    Tech. L. 144 (2008) ..............................................................................................7, 8

Anne Layne-Farrar, A. Jorge Padilla, & Richard Schmalensee, *Pricing Patents for
    Licensing in Standard-Setting Organizations: Making Sense of Frand Commitments*,
    74 Antitrust L.J. 671 (2007)...................................................................................8, 9

Mark A. Lemley and Carl Shapiro, *Patent Holdup and Royalty Stacking*, 85 Texas L. Rev.
    1991 (2007)...............................................................................................................7

Mario Mariniello, *Fair, Reasonable, and Non-Discriminatory (FRAND) Terms: A
    Challenge for Competition Authorities*, Journal of Competition Law & Economics,
    7(3), 523–41 (2011) ..................................................................................................9

Richard Schmalensee, *Standard-Setting, Innovation Specialists, and Competition Policy*,
    57 J. of Indust. Econ. 526 (2009).........................................................................6, 9

Carl Shapiro, "Navigating the Patent Thicket: Cross Licenses, Patent Pools, and Standard-
    Setting," in Adam B. Jaffe et al., Innovation Policy and the Economy (2001) ........6

MOTOROLA MOBILITY'S AND GENERAL INSTRUMENT'S
REPLY TO MOTOROLA'S DAUBERT MOTION – ii
CASE NO. C10-1823-JLR

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

DOCPROPERTY "CUS_DocIDString"

Daniel G. Swanson and William J. Baumol, *Reasonable and Nondiscriminatory (RAND) Royalties, Standards Selection, and Control of Market Power*, 73 Antitrust L.J. 1 (2005) ................................................................................................................6

MOTOROLA MOBILITY'S AND GENERAL INSTRUMENT'S
REPLY  TO MOTOROLA'S DAUBERT MOTION – iii
CASE NO. C10-1823-JLR

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

DOCPROPERTY "CUS_DocIDString"

1    Defendants (collectively "Motorola") respectfully submit this Reply in response to

2    Microsoft's Opposition to Motorola's *Daubert* Motion.[1]

3    **I.    INTRODUCTION**

4          Microsoft concedes that, in the real world, many – if not most – SEP licenses result from

5    bilateral negotiations, and that bilateral *ex post* agreements are "commonplace" and "clearly

6    contemplated" by SSOs.  (Dkt. No. 410 at 13-14.)  Despite this, Microsoft's experts (none of

7    whom has negotiated a license) opined in their reports that RAND terms should be determined

8    through some undefined multilateral, *ex ante* "methodology" that lacks a real-world analog.  (*See,*

9    *e.g.*, Ex. 7 at 2, 17; Ex. 5 at 7, 27; Ex. 6 at 2, 3.)  Notably, Microsoft's experts did not perform

10   their multilateral, *ex ante* analysis, nor did they explain how the Court should do so.  This is not

11   surprising.  Microsoft's multilateral, *ex ante* methodology is a purely theoretical construct that

12   cannot be practically implemented in the real world.

13   ████████████████████████████████████████████████████████████████

14   ████████████████████████████████████████████████████████████████

15   ███████████████████████████████████████████████████    Consistent with

16   this concession, Microsoft in its brief now retreats to arguing that RAND should be viewed from

17   an equally vague multilateral, *ex ante* "perspective." (*See, e.g.*, Dkt. No. 410 at 5, 13.)  This

18   positions Microsoft even further from the real-world realities of RAND licensing negotiations.  No

19   matter what Microsoft calls it, its multilateral, *ex ante* approach has no counterpart in the real

20   world.  Trying to determine RAND terms through the "lens" or "perspective" of Microsoft's

21   approach is meaningless and will not lead to reliable results.

22         Microsoft tries to justify its undefined "methodology" by arguing that its multilateral, *ex*

23   *ante* "perspective" would address certain theoretical licensing "risks" identified by its economic

---

[1] "Ex. ___" refers to the stated Exhibit to the Declaration of Samuel L. Brenner, submitted on August 27, 2012, (Dkt. No. 392), or Second Declaration of Samuel L. Brenner, submitted on September 5, 2010 (Dkt. No. 406).  "Wion Ex. ___" refers to the stated Exhibit to the Declaration of Christopher Wion, submitted by Microsoft on August 27, 2012 (Dkt. No. 398).  "Wion II Ex. ___" refers to the stated Exhibit to the Declaration of Christopher Wion, submitted by Microsoft on September 5, 2012 (Dkt. No. 408).  All emphasis is added unless otherwise indicated.

MOTOROLA MOBILITY'S AND GENERAL INSTRUMENT'S
REPLY  TO MOTOROLA'S DAUBERT MOTION – 1
CASE NO. C10-1823-JLR

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

non-licensing experts.  (*See id.* at 3.)  But Microsoft in its Opposition and its experts in deposition point to no evidence that these "risks" have resulted in actual problems in the real world or, more specifically, in Motorola's extensive group of standard essential patent ("SEP") licenses.  Nor do Microsoft or its experts point to an example of Motorola (or, for that matter, anyone else) actually having licensed SEPs through Microsoft's undefined multilateral, *ex ante* negotiation process.  If those theoretical risks had been a real-world concern, one would expect that Microsoft's multilateral, *ex ante* negotiation – and not a bilateral negotiation – would have become the predominant manner in which RAND terms are determined, and that SSOs long ago would have called for Microsoft's multilateral, *ex ante* negotiations (and not bilateral negotiations, which, as the Court has noted, the SSOs "contemplate" or "envision" (*see* Dkt. No. 335 at 24, 18)).

In the end, Microsoft never had any intention of actually using its newly minted multilateral, *ex ante* "perspective."  Rather, the true purpose of Microsoft's "perspective" is to justify the unsupported theory it has advanced from the very start of this case – that RAND terms in this case should be defined by the artificially low pool rates of MPEG LA and Via Licensing.  But these pools are not reliably what Microsoft calls "surrogates" for such a negotiation.  These patent pools are not *ex ante* because they were entered into after the standard was adopted and prospective implementers had sunk costs into standard compliance.  They are also not "multilateral" because they do not reflect full participation by all licensors and potential licensees ██████████████████████████████████████.

Microsoft's experts did not explain what Microsoft's multilateral *ex ante* negotiation should be, nor did they attempt to analyze or implement it in this case.  Accordingly, Microsoft's attempt to declare that patent pool rates, and nothing else, are RAND by analogizing them to its multilateral, *ex ante* negotiation should be rejected and expert testimony on this unreliable, unexplained and unimplemented "methodology" should be excluded.

MOTOROLA MOBILITY'S AND GENERAL INSTRUMENT'S
REPLY  TO MOTOROLA'S DAUBERT MOTION – 2
CASE NO. C10-1823-JLR

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

4828-5319-2977.1

## II.    MICROSOFT'S REAL PURPOSE – TO RELY ON THE DEPRESSED RATES OF PATENT POOLS –  UNMASKS THE UNRELIABILITY OF ITS UNEXPLAINED *EX ANTE* MULTILATERAL "METHODOLOGY"

Microsoft's experts in their reports (1) do not explain what Microsoft's multilateral, *ex ante* negotiation would actually look like, (2) do not point to any instance of Microsoft's envisioned negotiation ever having taken place in the real world, and (3) do not even attempt to perform such an analysis.  None of this comes as a surprise.  Microsoft's multilateral, *ex ante* methodology is a figment of its economic experts' imaginations and cannot be practically implemented in the real world.  If Microsoft's experts believe that RAND terms should be determined using Microsoft's multilateral, *ex ante* methodology, Microsoft's experts should have applied that methodology.  They did not, and this failure alone should preclude them from introducing any testimony regarding implementation or consideration of that "methodology."

Rather than apply its multilateral *ex ante* "methodology," Microsoft self-servingly uses this elusive "methodology" as a springboard to coyly introduce the MPEG LA and Via Licensing patent pools (and their depressed royalty rates) as "surrogates" for an *ex ante* multilateral "perspective."  Make no mistake – Microsoft's transparent litigation goal is to persuade the Court to adopt these low pool rates.  But the pools are not reliable "surrogates" because they are neither "multilateral" nor "*ex ante*" as defined by Microsoft.

As Motorola explained in its opening brief (and as Microsoft did not contest in its Opposition), Microsoft's experts appear to require that RAND terms be the result of a multilateral negotiation ████████████████████████████████████████████████████ ████████████████████████████████████████████  Indeed, Microsoft confirmed in its Opposition that its multilateral negotiation ████████████████████████████ ████████████████████████████  But nowhere do Microsoft's experts explain how to do this, or attempt to do it for the Court.  Instead, they simply leap to the conclusion that pools are such negotiations, and pool rates therefore should be adopted as RAND.

But the MPEG LA and Via Licensing pools are not "multilateral" as Microsoft has defined

MOTOROLA MOBILITY'S AND GENERAL INSTRUMENT'S
REPLY  TO MOTOROLA'S DAUBERT MOTION – 3
CASE NO. C10-1823-JLR

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:   (206) 676-7001

4828-5319-2977.1

1   it.  For example, the Via Licensing patent pool, which neither Motorola nor Microsoft has joined

2   (and which lacks participation from a meaningful percentage of the industry), only has 5 licensors.

3   This is a far cry from the hundreds of holders of SEPs essential to the 802.11 standard and the

4   thousands of companies that are implementers of the standard.  (*See* Ex. 5 at 15.)  Such a small

5   participation cannot provide the multilateral "perspective" – whatever that is – that Microsoft's

6   experts believe is necessary.

7         As for the MPEG LA patent pool, Microsoft notes that it **currently** has over 1,000

8   licensees and licensors (Dkt. No. 410 at 6-7), but Microsoft's experts presented no evidence that

9   all (or even many) of these companies were involved in a "multilateral" negotiation of the terms

10  for the MPEG LA agreement.  To the contrary, it appears that only $20^2$ of these companies were

11  involved in establishing the terms of the agreement, and that all others have had to accede to these

12  terms without an opportunity to negotiate.  Again, such a small participation cannot justify the

13  "multilateral" benchmark that Microsoft's experts proclaim is necessary.

14        Microsoft also requires that RAND terms be set *ex ante* – i.e., before the 802.11 and H.264

15  standards were adopted or widely implemented.  (*Id*. at 1.)  But neither of these pools is the result

16  of an *ex ante* process.  In the case of Via Licensing, that pool agreement was established in 2005,

17  over ten years after the original 802.11 standard was adopted in 1994.[3]  In the case of MPEG LA,

18  the H.264 standard was adopted in May 2003 and the terms for the MPEG LA H.264 pool were

19  agreed upon six months later in November 2003.

20        That the MPEG LA and VIA Licensing patent pools are not actually multilateral or *ex ante*

21  negates these pools as any kind of "surrogate."  Accordingly, the opinions of Microsoft's experts

22  based on these pools are unreliable.  In fact, even if these pools were the results of multilateral, *ex*

23  *ante* negotiations, they would still not be relevant in mirroring the real-world license negotiations

24

25        [2] *See* http://www.mpegla.com/Lists/MPEG%20LA%20News%20List/Attachments/138/n_03-09-11_avc.html.

26        [3] Microsoft's reliance on the IEEE 802.11 Patent Pool Exploratory Forum is misplaced.  This exploratory forum is
      just that – exploratory.  And even in the future a pool emerges, the rates of such a pool would be set 20 years after the

MOTOROLA MOBILITY'S AND GENERAL INSTRUMENT'S
REPLY TO MOTOROLA'S DAUBERT MOTION – 4
CASE NO. C10-1823-JLR

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:   (206) 676-7001

1   envisioned or contemplated by Motorola's LOAs  As Motorola has previously explained, the

2   formation of a patent pool is different from an arms-length bilateral negotiation, and the incentives

3   and motivations for entering into a pool are very different from the incentives and motivations for

4   entering into a bilateral license.  (*See, e.g.*, Dkt. No. 393 at 12-13; ███████████████.)

5   **III.    STRIPPED OF THE FALSE ANALOGY TO PATENT POOLS, MICROSOFT'S
          INVOCATION OF A MULTILATERAL, *EX ANTE* "METHODOLOGY" IS
6          UNJUSTIFIED    HERE    BECAUSE    IT    PURPORTS    TO    ADDRESS
          UNSUBSTANTIATED PROBLEMS**

7           Instead of explaining how to implement its multilateral, *ex ante* negotiation and how such

8   an implemented negotiation should be analyzed by the Court, Microsoft instead resorts to

9   economic theory.  In particular, it argues that its theoretical multilateral, *ex ante* "methodology"

10  addresses hold-up and stacking risks associated with SEP licensing.  (Dkt. No. 410 at 3-4.)

11  However, while avoiding hold up and stacking is desirable, Microsoft has presented no evidence

12  that these are more than theoretical risks identified in academic literature.  It is also plain that

13  Motorola's IEEE and ITU RAND commitments do not require contracting parties to resort to

14  Microsoft's undefined "methodology."   If the SSOs do not require this methodology, it is

15  unreasonable to impose it on Motorola, even if some academics think it might be a good idea to

16  investigate in the future.

17          Microsoft's experts admitted during deposition that they have no evidence of a hold up or

18  stacking problem in the real world.  ████████████████████████████

19  ████████████████████████████████████████████████

20  ████████████████████████████████████████████████

21  ████████████████████████████████████████████████

22  ████████████████████████████████████████████████

23  ████████████████████████████████████████████████

24  ████████████████████████████████████████████████

25

26  standard had been adopted and, therefore, would not be *ex ante*.  And unless there is "full participation" of all
    potential 802.11 licensors and licensees (and there is no reason to assume there will be), it will not be multilateral.

MOTOROLA MOBILITY'S AND GENERAL INSTRUMENT'S
REPLY TO MOTOROLA'S DAUBERT MOTION – 5
CASE NO. C10-1823-JLR

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

4828-5319-2977.1

1 ███████████████████████████████████████████████████

2 ███████████████████████████████████████████████████

3 ███████████████████████████████████████████████████

4 ███████████████████████████████████████████████████

5 ████████████████████████████████████████[4]

6   Thus, there is no evidence to support Microsoft's arguments that hold up and stacking risks

7 are "magnified" in the context of bilateral negotiations (Dkt. No. 410 at 4).  Indeed, the lack of

8 evidence of hold up and stacking confirms that (1) existing RAND commitments prevent the

9 manifestation in the real world of these theoretical concerns and (2) bilateral negotiation works in

10 the real world and is a reliable and true methodology for determining RAND.

11   The writings Microsoft cites (Dkt. No. 410 at 8, 9) to support its *ex ante* multilateral

12 "perspective" are inapposite, in that they merely recognize the theoretical problems, but they do

13 not suggest that existing SSO policies require Microsoft's *ex ante* multilateral "methodology."

14 • While the 2011 FTC report Microsoft cites (Wion II Ex. 16) discusses the theory of hold
   up and urges using the incremental value of patents in determining RAND, the Report also
15   endorses Motorola's conclusion that "Courts should apply the hypothetical negotiation
   framework to determine reasonable royalty damages for a patent subject to a RAND
16   commitment."  (*Id.* at 23.)  And even if an incremental value approach is useful, none of
   Microsoft's experts actually determines the incremental value of Motorola's H.264 and
17   802.11 patents.  (*See* Dkt. No. 409 at 16.)

18 • Both the Swanson & Baumol article (Wion II Ex. 14) and Judge Posner's decision in the
   *Apple v. Motorola* case embrace a purely theoretical approach that Microsoft has *not*
19   followed.  (*See* Dkt. No. 409 at 5-6.)  And as Motorola's expert, Dr. Schmalensee, points
   out, such a theoretical approach is not practical in a setting in which there are many patents
20   and patent holders.  (*See* Ex. 49 at 547; Wion Ex. 1 at 32:9-11 ("But I've said – then and
   elsewhere – that you really can't use that approach in practice.").)

21 • In his article on the so-called "patent thicket" (Wion II Ex. 15), Shapiro is writing about
   what he believes are theoretical problems with the current patent system, rather than the
22   meaning of current RAND commitments to the IEEE or ITU.  While he discusses various

23 ───────────────────────────
   [4] The fact that Microsoft's experts could not point to any evidence of a stacking or hold up problem is not
24 unexpected.  As Motorola's licensing experts explained, stacking is not an actual problem in this case because ██

███████████████████████████████████████████████████

25 ███████████████████████████████████████████████████

███████████████████████████████████████████████████

26 ████████████████████████████████████████████ Notably, no
Motorola licensee has complained of hold up.

MOTOROLA MOBILITY'S AND GENERAL INSTRUMENT'S
REPLY  TO MOTOROLA'S DAUBERT MOTION – 6
CASE NO. C10-1823-JLR

Summit Law Group pllc
315 Fifth Avenue South, Suite 1000
Seattle, Washington 98104-2682
Telephone:  (206) 676-7000
Fax:   (206) 676-7001

4828-5319-2977.1

*ex ante* considerations, he presents no empirical data purporting to show that hold up or stacking have been real-world concerns.

- The article by Lemley and Shapiro (Wion II Ex. 13) does opine (without real empirical evidence) that royalty stacking is a problem in the RAND context, but does ***not*** contend that the RAND commitment was intended to address stacking, or that RAND must or should be addressed through a multilateral *ex ante* "perspective."[55]

- The Farrell et al. article (Wion II Ex. 12), which discusses theoretical "economic issues raised by" licensing of SEPs (*id*. at 607), presents an academic theory (*see id*. at 638) about how RAND could be interpreted, but does not assert that this theory is in fact what the RAND commitment binds parties to do.  Indeed, the article acknowledges the difficulties and limitations of ex ante and collective negotiations. (*See. e.g.*, *id*. at 630-31 ("[E]x ante negotiations appear to be relatively difficult and rare."); *id*. at 634 ("[I]dentifying the limits on permissible collective negotiations is difficult . . . ."); *id*. at 634-35 (discussing different possible approaches to allowing for collective negotiations); *id*. at 643 (discussing "a natural if imperfect" rule that SSOs could adopt to account for royalty stacking).)

Nothing Microsoft has cited proves that its multilateral *ex ante* approach is reliable or acceptable, or that Microsoft's approach was incorporated into the actual assurances that Motorola provided to the IEEE and ITU and that should be imposed on Motorola now.[6]  And until such time as Microsoft's theoretical approaches become an accepted method for determining RAND, they are just unsubstantiated, unreliable, undefined theories, which should not be used after-the-fact to impose new contractual commitments on parties which never agreed to them.  *See, e.g.*, *Chaffee v. Chaffee*, 145 P.2d 244, 252 (Wash. 1943) ("Neither abstract justice nor the rule of liberal construction justifies the creation of a contract for the parties which they did not make themselves or the imposition upon one party to a contract of an obligation not assumed.").

---

[5] While the Lemley and Shapiro article purports to provide "empirical evidence" of royalty stacking (Wion II Ex. 13 at 1994), the only "proof" the article offers is that that there are many essential patents reading on various standards (*see id*. at 2025-29), and that "far from perfect" data (*id*. at 2035) suggests that there might be a problem.  As Lemley and Shapiro themselves admit, "[i]t is not clear what the total cost of these stacked royalties [in the WCDMA context] is."  (*Id*. at 2026.)  As Geradin, Layne-Farrar, and Padilla note, Lemley and Shapiro "do not present any *data* on royalty rates."  (Ex. 29 at 160; *see also id*. at 161-62 ("We find [Lemley and Shapiro's case study about Wi-Fi] too speculative to establish evidence of a significant complements problem in Wi-Fi.").)

[6] While the IEEE and ITU patent policies do not explicitly prohibit an *ex ante* multilateral negotiation, (or, indeed, anything else that would lead to RAND), it does not logically follow that the policies therefore demand use of Microsoft's "methodology" or that hypothesizing such a methodology is reliable.  Moreover, Motorola's ETSI submission is inapposite.  (Dkt. No. 410 at 4.)  First, that proposal was directed to ETSI, rather than the IEEE or the ITU, the parties to the binding contracts in this case.  Second, it was directed to the ***cumulative*** royalties that would be paid for ***all*** standards used by a product – not the single standard stacking "problem" discussed by Microsoft in its brief.  Most importantly, the proposal was rejected by ETSI.  The only possible conclusion is that no SSO – not even ETSI – has accepted the premises of that submission.

MOTOROLA MOBILITY'S AND GENERAL INSTRUMENT'S
REPLY  TO MOTOROLA'S DAUBERT MOTION – 7
CASE NO. C10-1823-JLR

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

Microsoft's Opposition fails to show that its proposed multilateral, *ex ante* "methodology" is reliable. How can it be? It is a "perspective" without any real-world underpinning, contrived for the sole purpose of addressing problems that its own experts agree have not been demonstrated to exist, and it is entirely untethered to the policies underlying the actual contracts at issue in this case. *See, e.g., Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1313, 1318 (Fed. Cir. 2011).[7]

## IV. THE ARTICLES CITED BY MOTOROLA DO NOT SUGGEST THAT SSOs ENDORSE AN *EX ANTE* MULTILATERAL METHODOLOGY

Contrary to Microsoft's suggestion (Dkt. No. 410 at 9), the industry and academic sources cited in Motorola's opening brief (Dkt. No. 393 at 6-7) do not suggest that the SSOs require determination of RAND terms through Microsoft's "multilateral *ex ante*" methodology. Indeed, as Microsoft's own careful wording demonstrates, these sources "discuss alternatives to bilateral negotiations," (Dkt. No. 410 at 9) insofar as some of the authors wish to see future changes in how the SSOs craft standards and RAND assurances. None of these sources suggests that Motorola's RAND commitments in any way require, or even envision, the prospective sorts of multilateral *ex ante* changes that Microsoft's experts opine SSOs should adopt in the future. For example:

- As demonstrated by the very section of the Geradin, Layne-Farrar, and Padilla article Microsoft cites (*id.* at 10-11), these authors discuss "proposals" and "policy recommendations" that have been put forward to address "the ***perceived*** complements problem within standard setting," (Ex. 29 at 147), but certainly do not suggest that these "proposals" are in fact required by existing RAND commitments. Indeed, these authors reach a telling conclusion: "considering both the scant evidence that royalty stacking and other complementary issues are widespread and recurring problems, along with the availability of several countervailing market responses, we find that were society to implement several of these policy recommendations it would risk setting a course for Scylla in the absence of any evidence of danger from Charybdis." (*Id.* at 176.)

- In their 2007 article (Ex. 31), Layne-Farrar, Padilla, and Schmalensee do consider theoretical extensions of the Swanson & Baumol model of *ex ante* auction, but ultimately

---

[7] The Entire Market Value Rule ("EMVR") and the 2003 InteCap analysis discussed in Microsoft's brief are irrelevant. As explained in Motorola's Opposition to Microsoft's *Daubert* motion, the EMVR has no applicability to licensing. (Dkt. No. 409 at 17-20.) And, the 2003 InteCap analysis is flawed because, among other reasons, (1) the current Motorola 802.11 patent portfolio is significantly larger than and substantively different from the short list upon which the InteCap analysis was based, (2) it was based on flawed market assumptions, and (3) it is inconsistent with Motorola's executed 802.11 licenses. (*See, e.g.*, Ex. 50 at 29-31.)

MOTOROLA MOBILITY'S AND GENERAL INSTRUMENT'S
REPLY TO MOTOROLA'S DAUBERT MOTION – 8
CASE NO. C10-1823-JLR

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone: (206) 676-7000
Fax: (206) 676-7001

4828-5319-2977.1

"do not argue that license fees should actually be set by either [of the theoretical approaches discussed] as it would be difficult, time consuming, and generally contentious to determine the incremental contributions of the many patents that are reported as essential to most standards." (*Id.* at 705.)  In a 2009 follow-up article, moreover, Dr. Schmalensee reaffirmed that the Swanson & Baumol model was not something that could be implemented in the real world.  (*See* Ex. 49 at 547 (noting that "formal ex ante competition among potential licensors" is an approach that "is unlikely to be workable in practice.").  Microsoft expert Dr. Simcoe expressly denied that he was suggesting an *ex ante* auction should even be used in this case.  (Ex. 37 at 220:11-221:2.)

- In his 2011 article (Ex. 32), Mariniello, who believes that FRAND "is the outcome of a bilateral hypothetical negotiation between the licensor and the licensee," (*id.* at 532), similarly explains that his proposed bilateral hypothetical negotiation "would take place *ex ante*" but would be "conditional on the information which is available *ex post*." (*Id.*)  This approach, moreover "comports well with the 'hypothetical negotiation' for reasonable royalty determination defined in the U.S. case *Georgia-Pacific*." (*Id.* at 532 n.19.)

- The FTC's Request For Comment ("RFC") (Ex. 27) demonstrates that the FTC was considering ways to address some perceived problems in the SEP licensing process.  The RFC thus – while recognizing that "[s]etting specific terms of [RAND] patent license[s] generally occurs in bilateral negotiations between the patent holder and individual standards users after the standard-setting process is completed," (Ex. 27 at 28037) – asked questions about whether *ex ante* negotiations even or ever take place, and further asks "[w]hy are *ex ante* disclosures of licensing terms not required or made?" (*Id.* at 28038.)  It follows that *ex ante* pricing models that the FTC was considering are ***not*** part of existing RAND commitments.  Nokia's comment (Ex. 26) in response to the RFC similarly discussed a proposal for changing the current RAND system, and did not purport to describe a feature of existing RAND contractual commitments.  (*See id.* at 7.)

The materials cited by Motorola in its *Daubert* Motion (Dkt. No. 393 at 6-7) both demonstrate that the consensus in academia and industry is that RAND licenses are typically the product of bilateral *ex post* negotiation, and reflect the fact that, while academics have considered various theoretical problems and prospective solutions, there is simply no academic consensus that RAND commitments, as they actually exist, bind the contracting parties to terms that must or should be viewed through some sort of non-existent "multilateral *ex ante* lens" or "perspective."

## V.   THE FACT THAT MOST SEP LICENSES RESULT FROM BILATERAL NEGOTIATIONS  IS FURTHER PROOF THAT MICROSOFT'S METHODOLOGY IS UNRELIABLE

In its Opposition, Microsoft admits that:

- "[M]any – even most – standard-essential patent licenses are the product of bilateral negotiations." (Dkt. No. 410 13-14.)

- "[B]ilateral agreements are commonplace." (*Id.*)

MOTOROLA MOBILITY'S AND GENERAL INSTRUMENT'S
REPLY  TO MOTOROLA'S DAUBERT MOTION – 9
CASE NO. C10-1823-JLR

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:   (206) 676-7001

- ""[M]any SSO intellectual property policies clearly contemplate bilateral negotiations of RAND terms and conditions.""  (*Id.* (*quoting* Dr. Simcoe's opening report, Ex. 7 at ¶ 95).))

Microsoft's experts have similarly observed that:

- "[B]ilateral negotiations are one way to reach a license on RAND terms and conditions. ***It's often used***."  (Ex. 37 at 159:24-160:2.)
- "[T]he fact" is "that we are going to rely mostly on bilateral negotiations to ultimately get you there [to RAND terms]" under "the backstop provided by the court . . . ."  (Ex. 39 at 34:13-17; *see also* Ex. 10 at 2040:25-2041:6 (agreeing that "negotiations should be undertaken bilaterally between parties where standards are involved.").)
- "The fair market value [of a portfolio of SEPs] is usually defined as a market transaction between a buyer and a seller . . . ."  (Ex. 38 at 41:18-20.)

Contrary to Microsoft's arguments (Dkt. No. 410 at 13-14), these admissions and statements ***are*** remarkable and relevant.  They demonstrate that, in the real world, it is well accepted by SSOs and industry that RAND terms are determined through bilateral negotiations, not through some kind of unknown and undefined multilateral *ex ante* negotiation.  And they confirm that the industry-validated, well-established, and accepted practice of reaching RAND agreements for Motorola's SEPs through bilateral arrangements is a reliable and, indeed, the correct approach.

## VI.   CONCLUSION

Unlike the modified *Georgia-Pacific* analysis employed by Motorola's experts, which mirrors the real-world approach to RAND licensing, Microsoft's multilateral, *ex ante* "perspective" is no more than a theoretical, unexplained construct premised on supposed problems that have not been shown to be actual problems in the real world.  Confirming the unreliability of Microsoft's approach, Microsoft's experts do not point to any agreement that resulted from Microsoft's actual multilateral, *ex ante* negotiation process, and they do not even attempt to analyze what Microsoft's multilateral *ex ante* negotiation would have looked like ***in this case***.  And, fatal to Microsoft's expert opinions, none of Microsoft's experts purports to explain reliably what Microsoft's multilateral *ex ante* negotiation is or how it is to be implemented by the Court.  There is no such analysis or reliable methodology that would justify expert testimony at trial.

In reality, Microsoft's unexplained multilateral, *ex ante* "perspective" is nothing more than

MOTOROLA MOBILITY'S AND GENERAL INSTRUMENT'S
REPLY  TO MOTOROLA'S DAUBERT MOTION – 10
CASE NO. C10-1823-JLR

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:   (206) 676-7001

4828-5319-2977.1

1  a stalking horse that Microsoft uses in attempting to bootstrap to patent pools, to rely on their

2  depressed royalty rates.   But this approach, too, is unreliable because patent pools are neither

3  multilateral nor *ex ante*, and pools serve a different purpose than do arms-length licensing

4  negotiations.   Microsoft's multilateral, *ex ante* "methodology" has no real-world underpinning,

5  and its experts' assertion of this unexplained and unapplied "methodology" should be excluded.

6       DATED this 10th day of September, 2012.

7                      Respectfully submitted,

8                      SUMMIT LAW GROUP PLLC

9                      By */s/ Ralph H. Palumbo*

10                         Ralph H. Palumbo, WSBA #04751

11                         Philip S. McCune, WSBA #21081

Lynn M. Engel, WSBA #21934
*ralphp@summitlaw.com*
*philm@summitlaw.com*
*lynne@summitlaw.com*

13 By */s/ Thomas V. Miller*

Thomas V. Miller
MOTOROLA MOBILITY, INC.
600 North U.S. Highway 45
Libertyville, IL  60048-1286
(847) 523-2162

17 And by

18 Jesse J. Jenner (*pro hac vice*)
Steven Pepe (*pro hac vice*)
Kevin J. Post (*pro hac vice*)
Ropes & Gray LLP
1211 Avenue of the Americas
New York, NY  10036-8704
(212) 596-9046
*jesse.jenner@ropesgray.com*
*steven.pepe@ropesgray.com*
*kevin.post@ropesgray.com*

MOTOROLA MOBILITY'S AND GENERAL INSTRUMENT'S
REPLY  TO MOTOROLA'S DAUBERT MOTION – 11
CASE NO. C10-1823-JLR

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:   (206) 676-7001

4828-5319-2977.1

James R. Batchelder (*pro hac vice*)
Norman H. Beamer (*pro hac vice* )
Ropes & Gray LLP
1900 University Avenue, 6th Floor
East Palo Alto, CA  94303-2284
(650) 617-4030
*james.batchelder@ropesgray.com*
*norman.beamer@ropesgray.com*

Paul M. Schoenhard (*pro hac vice*
Ropes & Gray LLP
One Metro Center
700 12th Street NW, Suite 900
Washington, DC  20005-3948
(202) 508-4693
*paul.schoenhard.@ropesgray.com*

***Attorneys for Motorola Solutions, Inc., Motorola
Mobility, Inc., and General Instrument Corp.***

MOTOROLA MOBILITY'S AND GENERAL INSTRUMENT'S
REPLY  TO MOTOROLA'S DAUBERT MOTION – 12
CASE NO. C10-1823-JLR

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:   (206) 676-7001

4828-5319-2977.1

1

**CERTIFICATE OF SERVICE**

2

        I hereby certify that on this day I electronically filed the foregoing with the Clerk of the
Court using the CM/ECF system which will send notification of such filing to the following:

3

4

                        Arthur W. Harrigan, Jr., Esq.
                        Christopher T. Wion, Esq.

5

                        Shane P. Cramer, Esq.
                        Danielson, Harrigan, Leyh & Tollefson LLP

6

                        *arthurh@dhlt.com*
                        *chrisw@dhlt.com*

7

                        *shanec@dhlt.com*

8

                        Richard A. Cederoth, Esq.
                        Brian R. Nester, Esq.

9

                        David T. Pritikin, Esq.
                        Douglas I. Lewis, Esq.

10

                        John W. McBride, Esq.
                        David Greenfield, Esq.

11

                        William H. Baumgartner, Jr., Esq.
                        David C. Giardina, Esq.

12

                        Carter G. Phillips, Esq.
                        Constantine L. Trela, Jr., Esq.

13

                        Ellen S. Robbins, Esq.
                        Nathaniel C. Love, Esq.

14

                        Sidley Austin LLP

15

                        *rcederoth@sidley.com*
                        *bnester@sidley.com*

16

                        *dpritikin@sidley.com*
                        *dilewis@sidley.com*

17

                        *jwmcbride@sidley.com*
                        *david.greenfield@sidley.com*

18

                        *wbaumgartner@sidley.com*
                        *dgiardina@sidley.com*

19

                        *cphillips@sidley.com*
                        *ctrela@sidley.com*

20

                        *erobbins@sidley.com*
                        *nlove@sidley.com*

21

22

                        T. Andrew Culbert, Esq.
                        David E. Killough, Esq.

23

                        Microsoft Corp.
                        *andycu@microsoft.com*

24

                        *davkill@microsoft.com*

25

        DATED this 10th day of September, 2012.

26

                                        /s/ *Marcia A. Ripley*
                                        Marcia A. Ripley

MOTOROLA MOBILITY'S AND GENERAL INSTRUMENT'S
REPLY  TO MOTOROLA'S DAUBERT MOTION – 13
CASE NO. C10-1823-JLR

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:   (206) 676-7001

4828-5319-2977.1