FILED

**FOR PUBLICATION**

SEP 28 2012

UNITED STATES COURT OF APPEALS

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

FOR THE NINTH CIRCUIT

---

MICROSOFT CORPORATION, a
Washington corporation,

        Plaintiff - Appellee,

v.

MOTOROLA, INC.; MOTOROLA
MOBILITY, INC.; GENERAL
INSTRUMENT CORPORATION,

        Defendants - Appellants.

No. 12-35352

D.C. No. 2:10-cv-01823-JLR

OPINION

---

Appeal from the United States District Court
for the Western District of Washington
James L. Robart, District Judge, Presiding

Argued and Submitted September 11, 2012
San Francisco, California

Before: WALLACE, THOMAS, and BERZON, Circuit Judges.

Opinion by Judge BERZON, Circuit Judge:

In this interlocutory appeal, Motorola appeals from the district court's

preliminary injunction to enjoin Motorola temporarily from enforcing a patent

injunction that it obtained against Microsoft in Germany. We review the district

court's grant of a foreign anti-suit injunction under the deferential abuse-of-discretion standard, and affirm.

## I. BACKGROUND

The parties are involved in ongoing contract and patent litigation before the district court. We recite here only the factual and procedural history most relevant to this interlocutory appeal.

### A.     Standard-setting organizations and intellectual property law

The underlying case before the district court concerns how to interpret and enforce patent-holders' commitments to industry standard-setting organizations ("SSOs"), which establish technical specifications to ensure that products from different manufacturers are compatible with each other. *See generally* Mark A. Lemley, *Intellectual Property Rights and Standard-Setting Organizations*, 90 Calif. L. Rev. 1889 (2002). Specifically, the case involves the H.264 video coding standard set by International Telecommunications Union ("ITU"), and the 802.11 wireless local area network standard set by the Institute of Electrical and Electronics Engineers ("IEEE"). This appeal implicates primarily the H.264 standard.

Standards provide many benefits for technology consumers, including not just interoperability but also lower product costs and increased price competition.

*See Apple, Inc. v. Motorola Mobility, Inc.*, 2011 WL 7324582, at *1 (W.D. Wis. June 7, 2011). The catch with standards "is that it may be necessary to use patented technology in order to practice them." *Id.* As a result, standards threaten to endow holders of standard-essential patents with disproportionate market power. In theory, once a standard has gained such widespread acceptance that compliance is effectively required to compete in a particular market, anyone holding a standard-essential patent could extract unreasonably high royalties from suppliers of standard-compliant products and services. This problem is a form of "patent holdup." *See generally* Mark A. Lemley, *Ten Things to Do About Patent Holdup of Standards (And One Not To)*, 48 B.C. L. Rev. 149 (2007).

Many SSOs try to mitigate the threat of patent holdup by requiring members who hold IP rights in standard-essential patents to agree to license those patents to all comers on terms that are "reasonable and nondiscriminatory," or "RAND." *See* Lemley, *Intellectual Property Rights*, 90 Calif. L. Rev. at 1902, 1906. For example, consider the ITU, whose H.264 standard is implicated in this appeal. The ITU's Common Patent Policy (the "ITU Policy") provides that "a patent embodied fully or partly in a [standard] must be accessible to everybody without undue constraints." Anyone who owns a patent declared essential to an ITU standard must submit a declaration to the ITU stating whether it is willing to "negotiate

licenses with other parties on a non-discriminatory basis on reasonable terms and conditions." If a "patent holder is not willing to comply" with the requirement to negotiate licenses with all seekers, then the standard "shall not include provisions depending on the patent."

Pursuant to these procedural requirements, Motorola has submitted numerous declarations to the ITU stating that it will grant licenses on RAND terms for its H.264-essential patents. A typical such declaration provides:

> The Patent Holder will grant a license to an unrestricted number of applicants on a worldwide, non-discriminatory basis and on reasonable terms and conditions to use the patented material necessary in order to manufacture, use, and/or sell implementations of the above ITU-T Recommendation | ISOC/IEC International Standard.[1]

The ITU Policy does not specify how to determine RAND terms, or how courts should adjudicate disputes between patent-holders and would-be licensors under a RAND commitment. To the contrary, the ITU Policy includes the following disclaimer:

> [Standards] are drawn up by technical and not patent experts; thus, they may not necessarily be very familiar with the complex international legal situation of intellectual property rights such as patents, etc. . . .

---

[1] The ITU's policy documents use the term "recommendation" rather than "standard." "ISOC/IEC" refers to the International Organisation for Standardization and the International Electrotechnical Commission, with which the ITU jointly developed the H.264 standard.

4

> . . . .
>> . . . The detailed arrangements arising from patents (licensing, royalties, etc.) are left to the parties concerned, as these arrangements might differ from case to case.

The ITU Policy also disclaims any role for the organization in negotiating licenses or in "settling disputes on Patents," stating, "this should be left — as in the past — to the parties concerned." Finally, the ITU form that patent-holders use to submit licensing declarations includes the caveat: "This declaration does not represent an actual grant of a license."

Courts and commentators are divided as to how, if at all, RAND licensing disputes should be settled. Relatedly, some commentators have suggested that because of the RAND licensing commitment, injunctive relief is an inappropriate remedy for infringement of standard-essential patents. *See, e.g.*, Lemley, *Ten Things*, 48 B.C. L. Rev. at 167 ("Denying [injunctive] relief is the most powerful way to prevent patent holdup[.]"). Judge Posner, sitting by designation on the U.S. District Court for the Northern District of Illinois, recently held in a different case involving Motorola-owned standard-essential patents for which Motorola had made a RAND commitment that the court would not

> be justified in enjoining Apple [the plaintiff in that case] from infringing [the patent at issue] unless Apple refuses to pay a royalty

5

that meets the FRAND requirement.[2] By committing to license its patents on FRAND terms, Motorola committed to license the [patent] to anyone willing to pay a FRAND royalty and thus implicitly acknowledged that a royalty is adequate compensation for a license to use that patent.

*Apple, Inc. v. Motorola, Inc.*, — F. Supp. 2d —, 2012 WL 2376664 (N.D. Ill. June 22, 2012), at *12 (Posner, J.). More generally, Justice Kennedy has suggested that injunctions against patent infringement "may not serve the public interest" in cases where "the patented invention is but a small component of the product the companies seek to produce and the threat of an injunction is employed simply for undue leverage in negotiations." *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 396-97 (2006) (Kennedy, J., concurring).

**B.     The U.S. contract litigation**

In October 2010, Motorola sent Microsoft two letters offering to license certain of its standard-essential patents. Of relevance to this appeal is the H.264 letter, sent on October 29, 2010. The letter proposed a royalty of "2.25% per unit" for each standard-compliant product, "subject to a grant back license" of Microsoft's standard-essential patents, "based on the price of the end product (e.g., each Xbox 360 product, each PC/laptop, each smartphone, etc.) and not on

---

[2] Instead of RAND, some courts and commentators use the alternative, legally equivalent abbreviation "FRAND," for "fair, reasonable, and non-discriminatory rates."

component software (e.g., Xbox 360 system software, Windows 7 software, Windows Phone 7 software, etc.)." It noted in closing: "Motorola will leave this offer open for 20 days. Please confirm whether Microsoft accepts the offer."

Appended to the letter was a "non-exhaustive list" of the U.S. and international patents that Motorola declares that it owns and that are essential to the H.264 standard, and that would be "included in the license" being offered. The list comprised not just U.S. patents but also numerous patents granted or filed in foreign jurisdictions, including Australia, Canada, China, the European Patent Convention,[3] France, Germany, Great Britain, Ireland, Japan, Korea, Mexico, the Netherlands, Norway, South Korea, Sweden, and Taiwan. Among these were German patents numbered EP0538667 ("'667") and EP0615384 ("'384"), and U.S. patents 7,310,374 ("'374"); 7,310,375 ("'375"); and 7,310,376 ("'376").[4]

---

[3] The European Patent Convention allows applicants to file patent applications with the European Patent Office ("EPO"), designating for which contracting states the patent is sought. If the EPO grants a European patent, the grant does not result in a single, transnational patent, but rather creates an independent, nationally-enforceable patent within each of the designated states, with "the effect of and . . . subject to the same conditions as a national patent granted by that State, unless this Convention provides otherwise." European Patent Convention art. 2, Oct. 5, 1973. Infringement claims, for instance, must be litigated independently within each country under each country's patent law. *See id.* art. 64(3).

[4] The prefix "EP" denotes that these are European patents.

On November 9, 2010, Microsoft filed a breach-of-contract suit against

Motorola in the U.S. District Court for the Western District of Washington, under

Washington state contract law.[5] Microsoft's theory of liability is that Motorola's

proposed royalty terms were unreasonable, and that Motorola's letters therefore

breached its contractual RAND obligations to the IEEE and the ITU, to which

Microsoft is a third-party beneficiary. The next day, Motorola filed a patent suit

against Microsoft in the U.S. District Court for the Western District of Wisconsin,

alleging infringement of U.S. patents '374, '375, and '376. The Western District of

Wisconsin transferred the patent case to the Western District of Washington,

where, in June 2011, the district court ruled that Motorola's patent claims were not

compulsory counterclaims to Microsoft's contract claims. Nevertheless, the court

consolidated the two cases in the interest of judicial economy.

In February 2012, the district court granted partial summary judgment for

Microsoft on its contract claims, finding that:

> (1) Motorola entered into binding contractual commitments with the
> IEEE and the ITU, committing to license its declared-essential patents
> on RAND terms and conditions; and (2) that Microsoft is a third-party
> beneficiary of Motorola's commitments to the IEEE and the ITU.

---

[5] Microsoft's amended complaint of February 23, 2011, is the currently
operative complaint.

The district court noted that, at a status conference earlier in February 2012, "Motorola stated on the record that it did not dispute that it entered into the aforementioned binding contractual commitments with the IEEE and the ITU and that Microsoft is a third-party beneficiary of these commitments."[6]

The district court denied Microsoft's motion for summary judgment as to whether Motorola must offer RAND terms in its initial offer letters (or whether only the ultimate license must be RAND, which is Motorola's position), and as to

_____

[6] The transcript of the status conference states, in relevant part:

> THE COURT: Is the first part of that sentence also accurate, that you entered into binding contractual commitments with IEEE and ITU, committing those to that RAND process?
>
> [COUNSEL]: Well, yeah, that is really what the issue is, your Honor, in terms of what the assurance is. The assurance is that we would — that Motorola agreed to license those standard essential patents on RAND terms.
>
> THE COURT: All I am asking is — I think you just agreed with me. I am not asking you if you did it or not, I am just asking you if that's what you are supposed to do. I think the answer to that is yes.
>
> [COUNSEL]: Yes. Enter into a license on RAND terms, that's right.
>
> THE COURT: The second point that Microsoft asked the court to declare is, and I will quote, "Microsoft is a third-party beneficiary of Motorola's commitments to the SSOs." Once again, let's stay away from the precise terms that were offered and asked as a conceptual matter. I think there is also no disagreement on that. [Counsel], am I correct on that?
>
> [COUNSEL]: Your Honor, that is correct, we would agree that Microsoft can fairly claim to be the third-party beneficiary of the assurance.

whether Motorola's letters offering to license its H.264 and 802.11 standard-essential patents breached Motorola's RAND obligations. These remaining two issues are scheduled to be tried to the bench in November 2012.

### C.   The German patent litigation

In July 2011, several months into the above-described domestic litigation, Motorola sued Microsoft in the Landgericht Mannheim, or Mannheim Regional Court, alleging infringement of the German '667 and '384 patents.[7] In the German suit, Motorola sought, among other relief, an injunction prohibiting Microsoft from selling allegedly infringing products in Germany, including the Microsoft Xbox gaming system and certain Microsoft Windows software.

On May 2, 2012, the Mannheim Court issued its ruling. First, the court held that Microsoft did not have a license to use Motorola's patents. Second, it rejected the argument that Motorola's RAND commitment to the ITU created a contract enforceable by Microsoft, because German law does not recognize third-party contractual rights. Finally, the German court held that Microsoft had infringed the '667 and '384 patents, and enjoined Microsoft from "offering, marketing, using or

---

[7] The plaintiff in the German suit is General Instrument Corporation, a defendant in this case and a subsidiary of the Motorola Group. The defendants in the German suit are Microsoft Corporation, the plaintiff in this case, as well as Microsoft Deutschland GmbH and Microsoft Ireland Operations Ltd.

importing or possessing . . . in the territory of the Federal Republic of Germany decoder apparatus (in particular Xbox 360)"; from "offering and/or supplying in the territory of the Federal Republic of Germany computer software (in particular Windows 7 and/or Internet Explorer 9)"; and "from offering and/or supplying in the territory of the Federal Republic of Germany computer software (in particular Windows Media Player 12)." The German court rejected the argument that a RAND commitment operates as a "waiver of claims for injunctive relief."[8]

The German injunction is not self-enforcing. According to an expert declaration on German law submitted by Motorola to the district court, to enforce the German patent injunction, Motorola would have to post a security bond covering potential damages to Microsoft should the infringement ruling be reversed on appeal. Microsoft could then file a motion with the German appellate court to stay the injunction, which motion "would be granted if there is a reasonable likelihood of success for the appeal and if enforcement pending appeal would cause significant harm."

---

[8] We quote from the preliminary translations of the German court order provided by the parties to the district court. Although each party submitted its own translation, they do not differ substantially. This quote comes from the translation provided by Microsoft.

According to the same expert, Microsoft could alternatively avoid enforcement of the injunction pending appeal by following what is known in German law as "the *Orange Book* procedure," after the German Supreme Court opinion that introduced it. Under this procedure, Microsoft would have to make "an unconditional offer to conclude a license agreement" with Motorola. Microsoft could include in its offer either a specific proposed royalty rate, or "a provision according to which the patent holder shall determine the appropriate royalty rate at its fair discretion," subject to German judicial review.

## D.     The anti-suit injunction

While the parties were awaiting the German court's decision, Microsoft asked Motorola (through an email exchange between their lawyers) to "agree that it would not seek enforcement of a German injunction pending a ruling on the RAND related issues by Judge Robart," and "offered to post a bond of $300 million" against any possible injury to Motorola. Absent such an agreement, Microsoft said, it would ask the district court to enjoin Motorola from enforcing any German injunction that it might obtain. Motorola responded with "surprise[]" that Microsoft would ask a United States District Court to rule on the propriety of a remedy in Germany," particularly given the availability of the *Orange Book* procedure.

On March 28, 2012, Microsoft moved the district court for a temporary restraining order ("TRO") and preliminary injunction to enjoin Motorola from enforcing any German injunctive relief it might obtain. On April 12, 2012, after oral argument on the motion, the district court granted Microsoft's motion for a TRO, requiring Microsoft to post a $100 million security bond as collateral for any damages to Motorola. It was after that, on May 2, that the Mannheim Court issued its ruling.

On May 14, 2012, the district court converted the TRO into the preliminary injunction at issue in this interlocutory appeal. The preliminary injunction bars Motorola from "enforcing any injunctive relief it may receive in the German Action with respect to the European Patents at issue therein," and "shall remain in effect until [the district court] is able to determine whether injunctive relief is an appropriate remedy for Motorola to seek with respect to Microsoft's alleged infringement of Motorola's standard essential patents."

The district court explained its rationale for granting the injunction as follows. First, the district court concluded that the pending *contract* action before it would be dispositive of the German *patent* action, "because the European Patents at issue in the German Action were included in Motorola's October 29 Letter offering a worldwide license for Motorola's H.264 Standard-essential patents, and

13

because Motorola contracted with the ITU to license the European Patents on

RAND terms to all applicants on a worldwide basis." Second, the court determined

that the German action raised "concerns against inconsistent judgments," and that

"the timing of the filing of the German Action raises concerns of forum shopping

and duplicative and vexatious litigation," particularly since "Motorola's

commitments to the ITU involved approximately 100 Motorola-owned patents, yet

Motorola invoked the German Action implicating only two . . . of these patents and

sought injunctive relief in Germany before [the district court] could adjudicate that

precise issue." "In sum," the district court concluded, "Motorola's actions have

frustrated [the district court's] ability to adjudicate issues properly before it," i.e.,

the propriety of injunctive relief in the RAND context.

Finally, the district court reasoned that the injunction's "impact on comity

would be tolerable," *Applied Med. Distrib. Corp. v. Surgical Co.*, 587 F.3d 909,

919 (9th Cir. 2009) (internal quotation marks and citation omitted), because the

German action was filed after the U.S. action; the "anti-suit injunction is limited in

scope to enjoining Motorola from enforcing any injunctive relief that it may

receive in the German Action," but does not otherwise affect Motorola's ability to

pursue its German patent claims against Microsoft; and "[the district court] has [a]

strong interest in adjudicating the claims before it," as both parties are U.S.

corporations and the facts at issue in the contract dispute took place within the United States.

On May 16, 2012, Motorola filed a timely notice of appeal from the preliminary injunction in this court.

## II. JURISDICTION

"Not all cases involving a patent-law claim fall within the Federal Circuit's jurisdiction." *Holmes Group, Inc. v. Vornado Air Circulation Sys., Inc.*, 535 U.S. 826, 834 (2002). The Federal Circuit has jurisdiction over an interlocutory appeal only if it would have jurisdiction over a final appeal in the case under 28 U.S.C. § 1295. 28 U.S.C. § 1292(c)(1). Microsoft's complaint sounds in contract and invokes the district court's diversity jurisdiction under 28 U.S.C. § 1332. We therefore have jurisdiction over this interlocutory appeal under 28 U.S.C. § 1292(a)(1).

## III. STANDARD OF REVIEW

We review a district court's foreign anti-suit injunction for abuse of discretion. *See Applied Med.*, 587 F.3d at 913. We review the district court's factual findings in connection with the injunction for clear error, and its legal interpretations de novo. *See id.* "When a district court makes an error of law, it is an abuse of discretion." *Id.*

15

Abuse-of-discretion review is highly deferential to the district court. *See*
*United States v. Hinkson*, 585 F.3d 1247, 1261-62 (9th Cir. 2009) (en banc). Under
this standard of review, we must "uphold a district court determination that falls
within a broad range of permissible conclusions in the absence of an erroneous
application of law." *Grant v. City of Long Beach*, 315 F.3d 1081, 1091 (9th Cir.
2002), *amended by* 334 F.3d 795 (9th Cir. 2003) (order). We reverse "only when"
we are "convinced firmly that the reviewed decision lies beyond the pale of
reasonable justification under the circumstances." *Harman v. Apfel*, 211 F.3d 1172,
1175 (9th Cir. 2000).

## IV. ANALYSIS

"'A federal district court with jurisdiction over the parties has the power to
enjoin them from proceeding with an action in the courts of a foreign country,
although the power should be used sparingly.'" *E. & J. Gallo Winery v. Andina*
*Licores S.A.*, 446 F.3d 984, 989 (9th Cir. 2006) (quoting *Seattle Totems Hockey*
*Club, Inc. v. Nat'l Hockey League*, 652 F.2d 852, 855 (9th Cir. 1981)).

We clarified our framework for evaluating a foreign anti-suit injunction in
*Gallo*, 446 F.3d 984, and elaborated upon that framework in *Applied Medical*, 587
F.3d 909. Together, these cases establish a three-part inquiry for assessing the
propriety of such an injunction. First, we determine "whether or not the parties and

the issues are the same" in both the domestic and foreign actions, "and whether or not the first action is dispositive of the action to be enjoined." *Gallo*, 446 F.3d at 991 (citations omitted). Second, we determine whether at least one of the so-called "*Unterweser* factors" applies. *See id.* Finally, we assess whether the injunction's "impact on comity is tolerable." *Id.*

The *Unterweser* factors are a disjunctive list of considerations that may justify a foreign anti-suit injunction, first articulated by the Fifth Circuit in *In re Unterweser Reederei GMBH*, 428 F.2d 888, 896 (5th Cir. 1970), *aff'd on reh'g*, 446 F.2d 907 (5th Cir. 1971) (en banc) (per curiam), *rev'd on other grounds sub nom. M/S Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1 (1972), and adopted by this court as instructive in *Seattle Totems*, 652 F.2d at 855. The full list of *Unterweser* factors is as follows:

> [whether the] foreign litigation . . . would (1) frustrate a policy of the forum issuing the injunction; (2) be vexatious or oppressive; (3) threaten the issuing court's *in rem* or *quasi in rem* jurisdiction; or (4) where the proceedings prejudice other equitable considerations.

*Gallo*, 446 F.3d at 990 (quoting *Seattle Totems*, 652 F.2d at 855).[9]

---

[9] In *Applied Medical*, we more narrowly described the second *Gallo* step as an inquiry into "whether the foreign litigation would 'frustrate a policy of the forum issuing the injunction,'" 587 F.3d at 913 (quoting *Gallo*, 446 F.3d at 991); in other words, we referenced solely the first of the *Unterweser* factors. But there is no indication that *Applied Medical* meant, in so doing, to narrow the *Gallo* inquiry.

(continued...)

In determining whether to issue Microsoft's requested anti-suit injunction, the district court applied the three-step *Gallo* framework, and therefore "identified the correct legal standard for decision of the issue before it." *Hinkson*, 585 F.3d at 1251. Under the abuse-of-discretion standard of review, we next consider whether, in applying that framework, "the district court's findings of fact, and its application of those findings of fact to the correct legal standard, were illogical, implausible, or without support in inferences that may be drawn from facts in the record." *Id.*

## A.     The parties and issues are the same in both actions

The threshold consideration for a foreign anti-suit injunction is "whether or not the parties and the issues are the same" in both the domestic and foreign actions, "and whether or not the first action is dispositive of the action to be enjoined." *Gallo*, 446 F.3d at 991 (citations omitted); *accord Quaak v. Klynveld Peat Marwick Goerdeler Bedrijfsrevisoren*, 361 F.3d 11, 18 (1st Cir. 2004) ("The gatekeeping inquiry is, of course, whether parallel suits involve the same parties

---

[9](...continued)
Rather, in both *Gallo* and *Applied Medical*, such a focus made sense because the contracts at issue included forum-selection clauses, and the specific rationale for the anti-suit injunction in each case was to protect the strong U.S. public policy of enforcing forum-selection clauses. Still, *Gallo* itself is clear that the list of *Unterweser* factors is disjunctive, and that "*any* of the *Unterweser* factors" may justify a foreign anti-suit injunction, not just the first. 446 F.3d at 991 (emphasis added).

and issues."); *Paramedics Electromedicina Comercial, Ltda. v. GE Med. Sys. Info. Tech., Inc.*, 369 F.3d 645, 652 (2d Cir. 2004).

Conducting this threshold inquiry in *Applied Medical* with reference to a contract containing a forum-selection clause, we clarified that

> whether the issues are the same and the first action dispositive of the action to be enjoined are interrelated requirements; that is, to the extent the domestic action is capable of disposing of all the issues in the foreign action and all the issues in the foreign action fall under the forum selection clause, the issues are meaningfully "the same."

587 F.3d at 915. Although the contract at issue in this case does not contain a forum-selection clause, we are nevertheless informed by *Applied Medical*'s emphasis on the functional character of the threshold similarity-of-issues inquiry. We ask "whether the issues are the same" not in a technical or formal sense, but "in the sense that all the issues in the foreign action . . . can be resolved in the local action." *Id.* The issues need not be "precisely and verbally identical," as "the verbal form of laws in different countries will inevitably differ." *Id.*

Here, all agree that the parties are the same in both the U.S. and German actions. As to whether the issues are the same in the sense that all the issues in the German patent action can be resolved in the U.S. contract action, Motorola argues that the U.S. action cannot resolve the German action, because patent law is uniquely territorial and patents have no extraterritorial effect.

19

To be sure, if the district court had based its injunction in an expectation that U.S. *patent* claims could dispose of German patent claims, then it would have erred. *See Stein Assocs., Inc. v. Heat & Control, Inc.*, 748 F.2d 653, 658 (Fed. Cir. 1984) (upholding denial of foreign anti-suit injunction against enforcement of British patents corresponding to U.S. patents-in-suit, holding that "resolution of the domestic action will not dispose of the British action" because "[o]nly a British court, applying British law, can determine validity and infringement of British patents"); *Canadian Filters (Harwich) Ltd. v. Lear-Siegler, Inc.*, 412 F.2d 577, 579 (1st Cir. 1969) (vacating injunction of Canadian patent proceedings and finding that none of the exceptions to comity that might justify a foreign anti-suit injunction applied "where the subject matter of the foreign suit is a separate, independent foreign patent right"); *cf. Sperry Rand Corp. v. Sunbeam Corp.*, 285 F.2d 542, 544-45 (7th Cir. 1961) (rejecting argument that district court could enjoin German trademark litigation).

But the district court did not base its injunction on the pendency of parallel patent proceedings. Rather, it is Microsoft's Washington state *contract* claims that the district court determined could resolve the German patent claims. Specifically, the district court concluded that the pending domestic contract action could resolve the issues in the German patent action "because the European Patents at issue in

20

the German Action were included in Motorola's October 29 Letter offering a

worldwide license for Motorola's H.264 Standard-essential patents, and because

Motorola contracted with the ITU to license the European Patents on RAND terms

to all applicants on a worldwide basis."

The contractual umbrella over the patent claims in this case brings it in line

with *Medtronic, Inc. v. Catalyst Research Corp.*, 518 F. Supp. 946 (D. Minn.

1981), *aff'd*, 664 F.2d 660 (8th Cir. 1981). There, as here, the district court

enjoined a party from enforcing injunctive relief in foreign patent-infringement

actions, although unlike here, none of the foreign fora had yet issued an injunction.

The district court in *Medtronic* correctly observed that "[w]here patents are the

issue, the subject matter is not the same" for foreign anti-suit injunction purposes.

*Id.* at 955 (citing *Western Elec. Co., Inc. v. Milgo Elec. Corp.*, 450 F. Supp. 835,

838 (S.D. Fla. 1978)). But the court concluded that it could issue an anti-suit

injunction against the enforcement of foreign patents where the precise issue

before the U.S. court was not the patents themselves, but "a contract between the

parties" not to enforce the patents. *Id.* In other words, the party was "not seeking to

enjoin [a party from litigating in] a foreign court on the basis of a patent validity or

infringement finding by a United States court" but on the basis of a contract

interpretation by a U.S. court. *Id.*

21

Ordinarily, we do not assess at all the likelihood of success on the merits in a case like this, because when a preliminary injunction is also a foreign anti-suit injunction, the likelihood-of-success aspect of the traditional preliminary injunction test is replaced by the *Gallo* test. *See Gallo*, 446 F.3d at 990 ("To the extent the traditional preliminary injunction test is appropriate, we only need address whether [the injunction seeker] showed a significant likelihood of success on the merits. The merits in this case, however, are about whether [the injunction seeker] has demonstrated that the factors specific to an anti-suit injunction weigh in favor of granting that injunction here." (alterations in original) (internal quotation marks, ellipses, and citation omitted)). So in this case, a ballpark, tentative assessment of the merits of the contract dispute is intrinsically bound up with the threshold anti-suit injunction inquiry: If we concluded that the district court's interpretation of the RAND commitment as a contract enforceable by Microsoft was fundamentally legally erroneous, then we would have to conclude that it was an abuse of discretion for the district court to rule that the U.S. contract action might dispose of the German patent action. Here, however, Motorola does not dispute that its RAND commitments created a contract that Microsoft can enforce as a third-party beneficiary, even if it disagrees with Microsoft over how to interpret the terms of that contract.

22

We emphasize that we do not (indeed, we may not) decide whether the district court's partial summary judgment, or its determination that it would adjudicate a RAND rate, was proper — if an appellate court is to review those determinations, it will have to do so on a final, not an interlocutory, appeal. But we do hold this much: The district court's conclusions that Motorola's RAND declarations to the ITU created a contract enforceable by Microsoft as a third-party beneficiary (which Motorola concedes), and that this contract governs in some way what actions Motorola may take to enforce its ITU standard-essential patents (including the patents at issue in the German suit), were not legally erroneous. Motorola, in its declarations to the ITU, promised to "grant a license to an unrestricted number of applicants on a worldwide, non-discriminatory basis and on reasonable terms and conditions to use the patented material necessary" to practice the ITU standards. This language admits of no limitations as to who or how many applicants could receive a license ("unrestricted number of applicants") or as to which country's patents would be included ("worldwide," "the patented material necessary"). Implicit in such a sweeping promise is, at least arguably, a guarantee that the patent-holder will not take steps to keep would-be users from using the patented material, such as seeking an injunction, but will instead proffer licenses consistent with the commitment made. *See Apple*, 2012 WL 2376664 at *12.

In particular, the face of the contract makes clear that it encompasses not just U.S. patents, but all of Motorola's standard-essential patents worldwide. When that contract is enforced by a U.S. court, the U.S. court is not enforcing German patent law but, rather, the private law of the contract between the parties. Although patents themselves are not extraterritorial, there is no reason a party may not freely agree to reservations or limitations on rights that it would have under foreign patent law (or any other rights that it may have under foreign law) in a contract enforceable in U.S. courts. By way of comparison, whenever a party agrees to a forum-selection clause, it relinquishes any benefits that it might receive from statutory rights or favorable canons of contractual interpretation only available in other forums. That is the party's choice, and "[t]here are compelling reasons why a freely negotiated private international agreement, unaffected by fraud, undue influence, or overweening bargaining power, . . . should be given full effect." *M/S Bremen*, 407 U.S. at 12-13.

Here, there is no forum-selection clause, but the broader principle applies: Courts should give effect to freely made contractual agreements. Motorola made promises to the ITU to license its standard-essential patents worldwide to all comers. In exchange, it received the benefit of having its patents implicated in the

24

standards. Motorola could have withheld the promise at the price of having the ITU avoid its patents when setting standards, but chose not to.

In sum, whether or not the district court ultimately determines that Motorola breached its contract with the ITU (it may or may not have), it is clear that there *is* a contract, that it is enforceable by Microsoft, and that it encompasses not just U.S. patents but also the patents at issue in the German suit. Moreover, even if Motorola did not breach its contract, then, *however* the RAND rate is to be determined under the ITU standards, injunctive relief against infringement is arguably a remedy inconsistent with the licensing commitment. That the licensing agreement is not itself a license according to the ITU Policy does not detract from this conclusion. The question is how the commitment to license is to be enforced, not whether the commitment itself is a license.

Motorola maintains that it is improper for the district court to determine the prospective RAND rate (or retrospective royalties consistent with the RAND rate), at least before good-faith bargaining between the patentee and the prospective licensee has failed to produce a rate. We do not at this juncture decide whether that is true or not. *Cf. Apple*, 2012 WL 2376664 at *11 (Posner, J.) (suggesting that district court could determine RAND royalty by "start[ing] with what the cost to the licensee would have been of obtaining, just before the patented invention was

25

declared essential to compliance with the industry standard, a license for the function performed by the patent"); *id.* at *12 ("Motorola agreed to license its standards-essential patents on FRAND terms as a *quid pro quo* for their being declared essential to the standard. It does not claim to have conditioned agreement on prospective licensees' making counteroffers in license negotiations." (citation omitted)). Whatever the appropriate method of determining the RAND licensing rate, it could well be that retrospective payment at the rate ultimately determined and a determination of the future rate, not an injunction banning sales while that rate is determined, is the only remedy consistent with the contractual commitment to license users of ITU standard-essential patents.

We conclude that the district court did not abuse its discretion in determining that Microsoft's contract-based claims, including its claim that the RAND commitment precludes injunctive relief, would, if decided in favor of Microsoft, determine the propriety of the enforcement by Motorola of the injunctive relief obtained in Germany.

### B.    At least two *Unterweser* factors apply

At the second *Gallo* step, we look to "whether the foreign litigation would 'frustrate a policy of the forum issuing the injunction,'" *Applied Med.*, 587 F.3d at

913 (quoting *Gallo*, 446 F.3d at 991), or whether any of the other *Unterweser*

factors apply. *See Gallo*, 446 F.3d at 991.

In explaining its rationale for the injunction, the district court made findings

sufficient to establish at least two of the *Unterweser* factors: that the foreign

litigation is "'vexatious or oppressive,'" and that the foreign litigation

"'prejudice[s] . . . equitable considerations.'" *Gallo*, 446 F.3d at 990 (quoting

*Seattle Totems*, 652 F.2d at 855); *cf. id.* at 989 ("Courts derive the ability to enter

an anti-suit injunction from their equitable powers."). Based on its interactions

with the parties, the district court found that "the timing of the filing of the German

Action raises concerns of forum shopping and duplicative and vexatious

litigation," particularly since "Motorola's commitments to the ITU involved

approximately 100 Motorola-owned patents, yet Motorola invoked the German

Action implicating only two . . . of these patents and sought injunctive relief in

Germany before this court could adjudicate that precise issue," i.e., the propriety of

injunctive relief for infringement of standard-essential patents. In other words, in

the district court's view, Motorola's German litigation was "vexatious or

oppressive" to Microsoft and interfered with "equitable considerations" by

compromising the court's ability to reach a just result in the case before it free of

external pressure on Microsoft to enter into a "holdup" settlement before the litigation is complete.

Motorola contends that the German litigation cannot be described as "vexatious" because the German court ruled in Motorola's favor. But litigation may have some merit and still be "vexatious," which is defined as "without reasonable or probable cause or excuse; harassing; annoying." *Black's Law Dictionary* 1701 (9th ed. 2009). In the midst of litigation over Motorola's obligations under Washington state contract law with respect to a portfolio of patents that includes the two German patents, Motorola initiated separate proceedings in Germany to enforce those two patents directly. The district court interpreted this step as a procedural maneuver designed to harass Microsoft with the threat of an injunction removing its products from a significant European market and so to interfere with the court's ability to decide the contractual questions already properly before it. Although the district court's interpretation of Motorola's litigation decisions may not be the only possible interpretation, it is not "illogical, implausible, or without support from inferences that may be drawn from facts in the record." *Hinkson*, 585 F.3d at 1251. We therefore cannot hold that the district court abused its discretion at this stage of the *Gallo* analysis.

   **C.    The injunction's impact on comity is tolerable**

28

Finally, we assess whether the injunction's "impact on comity is tolerable." *Gallo*, 446 F.3d at 991.

The particular phrasing is instructive. *Gallo* requires not that we calculate the precise quantum of the injunction's interference with comity, but only that we estimate whether any such interference is so great as to be intolerable. Such a flexible, fact- and context-specific inquiry accords both with the posture of deference to the district court that abuse-of-discretion review requires generally, and with the resistance of comity in particular to precise measurement. After all, comity, as many courts have recognized, is "a complex and elusive concept." *Laker Airways Ltd. v. Sabena, Belgian World Airlines*, 731 F.2d 909, 937 (D.C. Cir. 1984) (quoted in *Gallo*, 446 F.3d at 995); *see also Quaak*, 361 F.3d at 18 ("[C]omity is an elusive concept."). It "is neither a matter of absolute obligation, on the one hand, nor of mere courtesy and good will, upon the other." *Hilton v. Guyot*, 159 U.S. 113, 163-64 (1895).

Nevertheless, our cases, along with instructive authority from other circuits, do provide some objective guidance as to factors that may inform our comity inquiry in the anti-suit injunction context. For instance, comity is less likely to be threatened in the context of a private contractual dispute than in a dispute implicating public international law or government litigants. *See Gallo*, 446 F.3d at

29

994; *Applied Med.*, 587 F.3d at 921. At one pole, where two parties have made a prior contractual commitment to litigate disputes in a particular forum, upholding that commitment by enjoining litigation in some other forum is unlikely to implicate comity concerns at all. *See Applied Med.*, 587 F.3d at 921. At the other pole, if (hypothetically speaking) the State Department represented to the court that "the issuance of an injunction really would throw a monkey wrench, however small, into the foreign relations of the United States," *Allendale Mut. Ins. Co. v. Bull Data Sys., Inc.*, 10 F.3d 425, 431 (7th Cir. 1993) (Posner, J.), then comity would presumably weigh quite heavily against an anti-suit injunction. Between these two poles, courts must in their discretion evaluate whether and to what extent international comity would be impinged upon by an anti-suit injunction under the particular circumstances. The order in which the domestic and foreign suits were filed, although not dispositive, may be relevant to this determination depending on the particular circumstances. *Compare Applied Med.*, 587 F.3d at 921 (where "subsequent filing" of foreign action "raises the concern that [party] is attempting to evade the rightful authority of the district court," enjoining foreign action would not "intolerably impact comity"), *with Gallo*, 446 F.3d at 994 (when parties have forum-selection clause, "one party's filing first in a different forum would not implicate comity at all").

The scope of the anti-suit injunction is another factor relevant to the comity inquiry. In *Laker Airways*, which we have recognized as a "seminal case[] on anti-suit injunctions," *Gallo*, 446 F.3d at 994, the D.C. Circuit explained: "Comity teaches that the sweep of the injunction should be no broader than necessary to avoid the harm on which the injunction is predicated." *Laker Airways*, 731 F.2d at 933 n.81. A useful illustration of this teaching is provided by the Second Circuit's opinion in *Ibeto Petrochemical Indus. Ltd. v. M/T Beffen*, 475 F.3d 56 (2d Cir. 2007). In that case, the receiver of an allegedly contaminated oil shipment from New Jersey to Nigeria sued the shipper in Nigerian court, subsequently demanded arbitration in London, and then filed an additional suit against the shipper in U.S. district court. *Id.* at 59. The U.S. district court found that the parties had an enforceable contractual agreement to arbitrate any disputes in London, and accordingly compelled arbitration, stayed the U.S. action pending completion of the arbitration, and permanently enjoined the litigation in Nigeria. *Id.* at 60-61. The Second Circuit concluded that an anti-suit injunction was appropriate but that the district court's generally worded, seemingly permanent injunction "cut[] much too broadly." *Id.* at 65. Noting that "principles of international comity and reciprocity require a delicate touch in the issuance of anti-foreign suit injunctions," the Second Circuit remanded to the district court with instructions to modify the injunction

31

Case 2:10-cv-01823-JLR   Document 446   Filed 10/01/12   Page 32 of 37

into a more tailored order "directed specifically to the parties" and limited in time. *Id.*

Applying these precepts to our case, we cannot conclude that the district court abused its discretion in determining that a foreign anti-suit injunction could issue. At bottom, this case is a private dispute under Washington state contract law, between two U.S. corporations; it does not raise any "public international issue." *Gallo*, 446 F.3d at 994. Motorola only initiated the German litigation after Microsoft filed suit in the United States. Moreover, the anti-suit injunction sweeps "no broader than necessary," *Laker Airways*, 731 F.2d at 933 n.81; it bars Motorola not from pursuing its German patent claims against Microsoft altogether, but only from posting the bond required to enforce the German injunction. Even that bar could expire as soon as the district court has had an opportunity to adjudicate the contractual issues before it.

Motorola argues that the anti-suit injunction offends comity intolerably because its German patent claims have merit under German law, as evidenced by the Mannheim Court's ruling in Motorola's favor and injunction against the sale of Microsoft products, and because German courts, unlike some U.S. courts and commentators, do not interpret the RAND commitment to create a contract enforceable by third parties or to foreclose injunctive relief. If Motorola is right

32

that the two German patents are essential to implementing the H.264 industry standard, then it is hardly surprising that the German court found that Microsoft was using those patents in its H.264-compliant products.

German and U.S. courts may differ as to what legal conclusions follow from that finding. But the mere fact that different jurisdictions answer the same legal question differently does not, without more, generate an intolerable comity problem. If that were the case, then there could virtually never be a foreign anti-suit injunction: Parallel proceedings in different jurisdictions would have to be permitted to proceed any time the two jurisdictions had different rules of law, which is almost always the case.

Again our forum-selection cases prove instructive on this point, even though this case does not involve a forum-selection clause. In those cases, we have emphasized that an anti-suit injunction in the service of "enforcing a contract" between private parties does not "breach[] norms of comity," even if, absent that contract, one party might have enjoyed different procedural or substantive advantages under another country's law. *Gallo*, 446 F.3d at 994; *see also, e.g.*, *Paramedics*, 369 F.3d at 649-55 (upholding foreign anti-suit injunction against Brazilian litigation commenced after U.S. court had ruled the parties' dispute was subject to their arbitration agreement and compelled arbitration, even though the

33

Brazilian suit alleged "a tort claim unique to Brazilian law" that the party argued could not be arbitrated).

In any event, we have never suggested that the propriety of an anti-suit injunction turns upon the merits of the foreign suit under foreign law. In *Applied Medical*, the object of a foreign anti-suit injunction made a similar argument that its Belgian action could not be enjoined consistent with comity, because the action was initiated "in good faith and [was] founded on legitimate Belgian law." 587 F.3d at 921. We rejected this argument. To be sure, in *Gallo*, we suggested that an anti-suit injunction may be especially warranted to restrain a party from "potentially fraudulent" foreign litigation. 446 F.3d at 993. But "we made clear in *Gallo* that demonstration of such extreme facts was not necessary to conclude that an injunction would not have an intolerable impact on comity." *Applied Med.*, 587 F.3d at 921 (construing *Gallo*).

Motorola further urges that the anti-suit injunction must be overturned because it has disabled Motorola from enforcing its German patents in the only forum in which they can be enforced. This argument exaggerates the scope of the injunction, which leaves Motorola free to continue litigating its German patent claims against Microsoft as to damages or other non-injunctive remedies to which it may be entitled. Indeed, depending on the outcome of the district court litigation,

Motorola may well ultimately be able to enforce the German injunction too. It was Motorola that offered to license the German patents to Microsoft in its October 29, 2010, letter, confirming that those patents are implicated in its RAND contractual agreement. If Motorola wishes to challenge the district court's interpretation of that agreement, it will have to do so on final appeal, after this case is fully resolved. In the meantime, we cannot say that the district court's limited anti-suit injunction to protect its ability to reach that final resolution enacts any intolerable incursion into Germany's sovereignty.

However elusive it may be, comity is not, of course, to be contemplated lightly. Foreign anti-suit injunctions should not be issued routinely. But the record makes clear that the district court gave thoughtful consideration to the importance of international comity and nevertheless determined that under the unique circumstances of this case, an anti-suit injunction was proper. Reviewing that determination for an abuse of discretion, we cannot say that it rested upon an erroneous view of the law or a clearly erroneous view of the facts. "At most, there are competing comity concerns, so it cannot fairly be said" that the district court's preliminary injunction "would have an intolerable impact on comity." *Applied Med.*, 587 F.3d at 921.

## V. CONCLUSION

35

Case 2:10-cv-01823-JLR   Document 446   Filed 10/01/12   Page 36 of 37

Under the unique circumstances of this case, the district court's narrowly tailored preliminary injunction was not an abuse of discretion. We **AFFIRM**.

## Counsel

Derek L. Shaffer, Quinn Emanuel Urquhart & Sullivan, LLP, Washington D.C.; Kathleen M. Sullivan, Quinn Emanuel Urquhart & Sullivan, LLP, New York, NY, attorneys for Appellants.

Arthur W. Harrigan, Jr., Christopher Wion, Shane P. Cramer, Danielson Harrigan Leyh & Tollefson LLP, Seattle, WA; David T. Pritikin, Constantine L. Treta, Jr., Richard A. Cederoth, Robert N. Hochman, Nathaniel C. Love, Sidley Austin LLP, Chicago, IL; Carter G. Phillips, Sidley Austin LLP, Washington, D.C.; T. Andrew Culbert, David E. Killough, Microsoft Corporation, Redmond, WA, attorneys for Appellee.