HONORABLE JAMES L. ROBART

1

2

3

4

5

6

7

8

9

10

11

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| MICROSOFT CORPORATION,<br><br>                Plaintiff,<br><br>        v.<br><br>MOTOROLA INC., et al.,<br><br>                Defendant. | No. C10-1823-JLR<br><br>**REDACTED**<br><br>MICROSOFT'S OPPOSITIONS TO<br>DEFENDANTS' MOTIONS IN LIMINE<br><br>**Noted: October 19, 2012** |
| MOTOROLA MOBILITY, LLC., et al.,<br><br>                Plaintiffs,<br><br>        v.<br><br>MICROSOFT CORPORATION,<br><br>                Defendant. | **ORAL ARGUMENT REQUESTED** |

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

MICROSOFT'S OPPOSITIONS TO
DEFENDANTS' MOTIONS IN LIMINE - 1

1

2

**TABLE OF CONTENTS**

3

I.   Motorola's First Motion in Limine Misrepresents the Scope of Microsoft's Privilege
Objections, and Should Be Denied. ................................................................................. 1

II.  Motorola's Second Motion in Limine Should Be Denied Because Microsoft's Expert's
Critique of Motorola's *Georgia-Pacific* Analysis Was Properly Disclosed in Expert
Reports. ............................................................................................................................. 5

III. Motorola's Third Motion in Limine Is Premised on a Misrepresentation of Microsoft's
Expert's Testimony and Should Be Denied. ................................................................... 7

IV. Motorola's Fourth Motion in Limine Attacking Dr. Peter Rossi's Qualifications Should Be
Denied. ............................................................................................................................. 9

V.  Motorola's Fifth Motion in Limine Should Be Denied Because Valuations of Motorola's
802.11 Patents Conducted on Motorola's Behalf Are Clearly Relevant. ....................... 11

VI. Motorola's Sixth Motion In Limine Provides No Basis for Excluding Evidence of H.264
and 802.11 Patent Pool Licenses and Should Be Denied. ............................................. 14

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

MICROSOFT'S OPPOSITIONS TO
DEFENDANTS' MOTIONS IN LIMINE - i

LAW OFFICES
CALFO HARRIGAN LEYH & EAKES LLP
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700 FAX, (206) 623-8717

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Apple, Inc. v. Motorola, Inc.,*
No. 1:11–cv–08540, 2012 WL 2376664 (N.D. Ill. June 22, 2012) .................................5, 13, 14

*Davis v. Seattle,*
No. C06-1659Z, 2007 U.S. Dist. LEXIS 89856 (W.D. Wash. Nov. 20, 2007).........................3

*Hanson v. Alpine Valley Ski Area, Inc.,*
718 F.2d 1075 (Fed. Cir. 1983) .............................................................................................17

*Lexington Ins. Co. v. Swanson,*
No. C05-1614JP, 2007 U.S. Dist. LEXIS 53509 (W.D. Wash. July 23, 2007).........................3

*Turner v. Univ. of Wash.,*
No. C05-1575RSL, 2007 U.S. Dist. LEXIS 78281 (W.D. Wash. Oct. 10, 2007).....................3

**OTHER AUTHORITIES**

Jorge L. Contreras, "Rethinking RAND: SDO-Based Approaches to Patent Licensing
Commitments," ITU Patent Roundtable Working Paper (Oct. 2012) .......................................8

Joseph Farrell *et al.*, "Standard setting, patents, and hold-up", 74 *Antitrust L. J.* 603
(2007).............................................................................................................14, 15, 17, 18

Federal Trade Commission, *The Evolving IP Marketplace: Aligning Patent Notice and
Remedies With Competition* (March 2011), online at
http://www.ftc.gov/os/2011/03/110307patentreport.pdf .................................................13, 15

Law360.com, "An Interview With Fed. Circ. Chief Judge Rader: Part 1" (Oct. 11,
2012), online at http://www.law360.com/articles/385311/an-interview-with-fed-
circ-chief-judge-rader-part-1. .................................................................................................6

Mark A. Lemley and Carl Shapiro, "Patent Holdup and Royalty Stacking," 85 *Texas L.
Rev.* 1991 (2007)....................................................................................................................14

Jonathan L. Rubin, "Patents, Antitrust, and Rivalry in Standard-Setting," 38 *Rutgers L.
J.* 509 (2007)..........................................................................................................................17

Carl Shapiro, "Navigating the Patent Thicket: Cross Licenses, Patent Pools, and
Standard-Setting," in Adam B. Jaffe *et al.*, *Innovation Policy and the Economy*
(2001)......................................................................................................................................14

LAW OFFICES
**CALFO HARRIGAN LEYH & EAKES LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL. (206) 623-1700 FAX. (206) 623-8717

1

Daniel G. Swanson and William J. Baumol, "Reasonable and Nondiscriminatory (RAND) Royalties, Standards Selection, and Control of Market Power", 73 *Antitrust L. J.* 1 (2005)...........................................................................................13, 15

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

LAW OFFICES
CALFO HARRIGAN LEYH & EAKES LLP
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL. (206) 623-1700 FAX, (206) 623-8717

1

2

I.  **Motorola's First Motion in Limine Misrepresents the Scope of Microsoft's Privilege Objections, and Should Be Denied.**

3

4   In the two depositions Motorola identifies in its motion (Dkt. No. 458, Defendants'

5   Motions in Limine ("MIL") at 1–2), Microsoft witnesses properly limited their responses or

6   declined to answer questions based on clear grounds of privilege, where Motorola's questions

7   expressly sought the content or substance of confidential communications between Microsoft

8   employees and Microsoft lawyers.  Microsoft properly objected to Motorola's attempts to

9   probe these privileged communications, but allowed full discovery into Microsoft's position on

10  Motorola's October 2010 demand letters.  Microsoft agrees that the content of its attorney-

11  client communications should be excluded—and has no intention of offering testimony on such

12  communications in any event.  But Microsoft's privileged objections directed to that specific

13  line of questioning provide no grounds for the broad relief Motorola seeks:  to foreclose

14  Microsoft from offering *any* evidence or testimony on vast and ambiguous categories of

    subject matter related to Motorola's demand letters.  Motorola's motion should be denied.

15      At the deposition of Microsoft employee Amy Marasco, Motorola asked a series of

16  questions concerning internal legal discussions related to Motorola's October 2010 demand

17  letters.  Ms. Marasco testified that she had no personal experience in evaluating specific terms

18  to determine whether they comply with RAND requirements and that any information that she

19  possessed about Motorola's demand letters or related Microsoft positions came from her

20  communications with Microsoft lawyers.  *See* 10/15/12 Declaration of Christopher Wion

21  ("Wion Decl.") Ex. 1 (Marasco Dep.) at 144:17–20; Dkt. No. 459 Ex. 11 (Marasco Dep.) at

22  87:23–90:15.  Microsoft's privilege-based limiting instructions and objections to Motorola's

23  questioning of Ms. Marasco arose only after Motorola continued to probe the content of those

24  privileged communications.  *See, e.g.*, Dkt. No. 459 Ex. 11 (Marasco Dep.) at 88:11–90:9.

25      As is plain from Microsoft's objections to that line of questioning, Microsoft has no

26  intention of offering Ms. Marasco as a witness concerning Microsoft's internal evaluation of

MICROSOFT'S OPPOSITIONS TO
DEFENDANTS' MOTIONS IN LIMINE - 1

1   Motorola's letters, because any knowledge she has on those aspects came through privileged

2   conversations.  But Microsoft's limited privilege objections as to those specific questions

3   provide no basis for what Motorola seeks through its motion—precluding Microsoft from

4   offering *any* "evidence and testimony relating to the . . . subject matter" it identifies concerning

5   Microsoft's analysis and response to Motorola's demand letters.  That Ms. Marasco's personal

6   knowledge of some aspects of those broad subjects came from conversations with Microsoft's

7   lawyers provides no basis to exclude evidence or testimony on Microsoft's positions.

8          In his deposition, Microsoft's Horacio Gutierrez

9

10

11

12

13

14

15

16

17          Motorola's demand letters are central evidence to at least the breach portion

18   of this case, and

19                                                                                  .  Instead, the identified

20   objections were specifically targeted at Motorola's questions that sought the *content* of

21   privileged communications

22          .  Even in the passages Motorola complains of, Mr. Gutierrez made every effort to

23   provide as complete a response as he could without divulging privileged communications.  *See,*

24   *e.g., id.* at 46:16–47:25.

25

26   MICROSOFT'S OPPOSITIONS TO
     DEFENDANTS' MOTIONS IN LIMINE - 2

1    There was nothing inappropriate about Microsoft's privilege objections; rather, the line

2    drawn and testimony provided fully comport with governing precedent.

> A fact is one thing and a communication concerning that fact is an entirely
> different thing. The client cannot be compelled to answer the question, "What
> did you say or write to the attorney," but may not refuse to disclose any relevant
> fact within his knowledge merely because he incorporated a statement of such
> fact into his communication to his attorney.

6    *Davis v. Seattle*, No. C06-1659Z, 2007 U.S. Dist. LEXIS 89856 at *10 (W.D. Wash. Nov. 20,

7    2007) (quotation marks and citations omitted).  Microsoft's witness provided full disclosure of

8    the facts underlying Microsoft's positions, but only refused to provide the content of

9    Microsoft's legal communications.

10    The relief Motorola seeks is wildly disproportionate to the privilege objections and

11    limiting instructions that were actually made in Mr. Gutierrez's deposition.  Motorola seeks to

12    bar Microsoft from offering *any* "evidence and testimony relating to the . . . subject matter" it

13    identifies concerning Microsoft's analysis and response to Motorola's demand letters.  (MIL at

14    2.)  Motorola's motion provides no basis for such a request.  The objections and limiting

15    instructions made in both depositions were made only to protect privileged communications on

16    those subjects and by no means generally foreclosed inquiry on Microsoft's position or related

17    facts, which Mr. Gutierrez fully provided.  Motorola's feigned concerns about "trial by

18    ambush" (MIL at 2) are wholly unfounded.  Microsoft's limited privilege assertions provide no

19    basis for the subject matter waiver Motorola seeks.[1]

20    Motorola's motion in limine stands in stark contrast to first motion in limine filed by

21    Microsoft.  (*See* Dkt. No. 450 at 1–4.)  In that motion, Microsoft sought to preclude testimony

---

[1] The cases Motorola cites by no means suggest otherwise.  In *Lexington Ins. Co. v. Swanson*, No. C05-1614JP, 2007 U.S. Dist. LEXIS 53509 (W.D. Wash. July 23, 2007), the court held that a litigant would waive attorney-client privilege if it attempted to put into evidence its reliance on the advice of counsel.  *Id.* at *13.  At no point has Microsoft ever suggested that its reliance on advice of counsel would ever be part of the evidence in this case.  In *Turner v. Univ. of Wash.*, No. C05-1575RSL, 2007 U.S. Dist. LEXIS 78281 (W.D. Wash. Oct. 10, 2007), the court declined to grant a motion in limine that—like Motorola's motion here—sought to exclude "any evidence regarding issues" for which a party claimed attorney-client privilege, because the movant failed to identify the specific material sought to be excluded.  *Id.* at *3–4.

MICROSOFT'S OPPOSITIONS TO
DEFENDANTS' MOTIONS IN LIMINE - 3

1    from Motorola's experts based on private conversations with Motorola employees, where

2    depositions of the same employees on the same topics was obstructed on privilege grounds.

3    Unlike Microsoft, Motorola intends to use affirmatively information that was the subject of

4    privilege objections.  For example, four of Motorola's experts rely on the factual proposition

5    that ███████████████████████████████████████████████

6    ██████████████████████████████████████████████████

7    ██████████████████████████████████████████████████

8    ██████████████████████████████  (*Id.* at 1.)  And Motorola's

9    corporate parent, Google, Inc. ("Google"), invoked privilege to block Microsoft's inquiry into

10   any factual bases for withholding from Microsoft the license to Motorola's H.264 standard

11   essential patents that Google, as an MPEG LA H.264 pool licensee, is obligated to grant.  (*Id.*

12   at 2–3.)  Google also invoked privilege to block Microsoft's inquiry to any factual basis for

13   any Motorola assertion that its H.264 standard essential patents are worth more than the rate

14   presumed reasonable under Google's MPEG LA license.  (*Id.*)

15        Microsoft does not intend to call either Ms. Marasco or Mr. Gutierrez at the upcoming

16   RAND royalty trial.[2]  Microsoft's experts have explained at length in their reports and

17   depositions why the royalty that Motorola seeks is not RAND, and Motorola clearly

18   understands the positions and evidence to be offered. ██████████████████

19   ██████████████████████████████████████████████████

20   ████████████████████████████████████  In contrast,

21   Motorola's and Google's assertions of privilege barred inquiry into a central disputed factual

22   issue for the RAND trial—████████████████████████████████

23   ████████████████████████.  Microsoft's assertions of

24   privilege only arose when responses to Motorola's questions would have directly involved

25

[2] This fact alone renders Motorola's motion abstract at this time.

26
MICROSOFT'S OPPOSITIONS TO
DEFENDANTS' MOTIONS IN LIMINE - 4

LAW OFFICES
CALFO HARRIGAN LEYH & EAKES, LLP
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL. (206) 623-1700 FAX, (206) 623-8717

1  Microsoft's witnesses' communications with Microsoft lawyers, and Microsoft has no

2  intention of offering testimony from Mr. Gutierrez or any other witness concerning those

3  communications.  Motorola's motion should be denied.

II.  **Motorola's Second Motion in Limine Should Be Denied Because Microsoft's Expert's Critique of Motorola's *Georgia-Pacific* Analysis Was Properly Disclosed in Expert Reports.**

6  Motorola's motion directed at Microsoft expert Matthew Lynde is ostensibly premised

7  on the unremarkable proposition that expert testimony should be limited to matters disclosed in

8  expert reports.  (MIL at 3.)  But Motorola identifies no suggestion anywhere in Dr. Lynde's

9  deposition testimony, or in Microsoft's filings or disclosures in this case, that Microsoft might

10  seek to offer improper testimony beyond the scope of Dr. Lynde's expert disclosures.  Instead,

11  Motorola's motion appears to be an attempt to hinder Dr. Lynde's ability to criticize

12  Motorola's expert Charles Donohoe at trial, and to prevent Dr. Lynde from offering his own,

13  properly-disclosed, analysis of an appropriate RAND royalty.  Motorola's motion should be

14  denied.

15  Criticism of Donohoe's "modified *Georgia-Pacific* analysis" is central to Dr. Lynde's

16  rebuttal report, as Motorola admits.  (MIL at 3.)  Dr. Lynde's rebuttal report includes forty-four

17  pages of analysis of Donohoe's unreliable *Georgia-Pacific* "methodology," including detailed

18  criticisms of Donohoe's use of each of the fifteen factors.  (Dkt. No. 457 Ex. 1 (Lynde Reb.

19  Rpt.) at 12–54.)  Motorola's motion identifies no ground for precluding Microsoft from

20  offering properly-disclosed testimony criticizing Donohoe's analysis.

21  Further, *Georgia-Pacific* and its progeny do not describe an economic "methodology"

22  at all—the *Georgia-Pacific* factors are simply a non-exhaustive, unweighted list of things

23  parties might consider in a hypothetical negotiation over a patent license.  *See Apple, Inc. v.*

24  *Motorola, Inc.*, No. 1:11–cv–08540, 2012 WL 2376664, at *9 (N.D. Ill. June 22, 2012).  As

25  Chief Judge Randall Rader of the Federal Circuit explained in a recent interview, "the

26

MICROSOFT'S OPPOSITIONS TO
DEFENDANTS' MOTIONS IN LIMINE - 5

LAW OFFICES
CALFO HARRIGAN LEYH & EAKES, LLP
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL. (206) 623-1700 FAX, (206) 623-8717

1  *Georgia-Pacific* factors are really just a laundry list of various things to be considered.  The

2  *Georgia-Pacific* factors were never meant to be a test or a formula for resolving damages

3  issues.  They are merely a list of things to consider." Wion Decl. Ex. 11, Law360.com, "An

4  Interview With Fed. Circ. Chief Judge Rader: Part 1" (Oct. 11, 2012), online at

5  http://www.law360.com/articles/385311/an-interview-with-fed-circ-chief-judge-rader-part-1.

6  Dr. Lynde did not perform a "Georgia-Pacific analysis" in the sense that he marched through

7  each of those factors and based his conclusion exclusively on such an analysis.  He explained

8  at length why he considered that inappropriate.  (Dkt. No. 457 Ex. 1 (Lynde Reb. Rpt.) at 41.)

9  But to the extent that the Court chooses to look to any of the *Georgia-Pacific* factors, Dr.

10  Lynde has offered opinions within the ambit of some of those factors.  Given their breadth,

11  much of the evidence Dr. Lynde considered in his properly-disclosed analysis of an appropriate

12  RAND royalty in this case fits within one or more of the *Georgia-Pacific* factors.  For

13  example, Dr. Lynde has opined that patent pool licenses for broad portfolios of 802.11 and

14  H.264 patents provide the best benchmark for a RAND royalty for Motorola's patents.

15  Motorola provides no basis for foreclosing opinions of this type disclosed in Microsoft's expert

16  reports.

17      Motorola's motion lacks any foundation, and can only be understood as an attempt to

18  impede Microsoft's ability to offer testimony constituting specific, targeted criticisms of

19  Donohoe's flawed analysis, or to interfere with Dr. Lynde's ability offer his own views on

20  considerations that may fall under the *Georgia-Pacific* list, by arguing that such testimony

21  improperly amounts to Dr. Lynde's own opinion of how to perform a *Georgia-Pacific* analysis

22  in the first instance.  All such opinions were properly disclosed in Dr. Lynde's reports, and

23  Motorola's motion should be denied.

MICROSOFT'S OPPOSITIONS TO
DEFENDANTS' MOTIONS IN LIMINE - 6

LAW OFFICES
CALFO HARRIGAN LEYH & EAKES, LLP
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700 FAX, (206) 623-8717

III.   **Motorola's Third Motion in Limine Is Premised on a Misrepresentation of Microsoft's Expert's Testimony and Should Be Denied.**

The premise of Motorola's third motion in limine is a straw man constructed from a blatant misrepresentation of the deposition testimony of Microsoft's expert Kevin Murphy. Motorola suggests that Microsoft intends to introduce evidence or offer testimony concerning a "royalty-free license" to Motorola's 802.11 and H.264 patents. (MIL at 4.) Motorola uses the quoted phrase "royalty-free license" six times in its motion (MIL at 4–6), leaving the false impression that the words in the quotation marks come from Dr. Murphy. They do not. Motorola is not quoting Dr. Murphy—it is quoting its own counsel, who attempted to recharacterize Dr. Murphy's opinions in an effort to undermine his testimony.

At Dr. Murphy's deposition, Motorola's counsel recast Dr. Murphy's opinion as stating that widespread, unlicensed use of Motorola's patents should be considered a "royalty-free license"—and Dr. Murphy squarely rejected that characterization:

> Q. In fact, you have the opinion that they have a royalty free license?
>
> A. No, I wouldn't say -- that would be a legal conclusion.  I don't have a legal conclusion.  I said as an economic matter they are operating without a -- without a royalty -- there is no royalties being charged.  And it's not just Motorola.  I mean, there are lots of standard essential patent holders, most of which are not currently licensing the users of the 802.11 technology.

(Dkt. No. 457 Ex. 4 (Murphy Dep.) at 89:14–24; *see also id.* at 118:22–119:1 ("Q.  Okay.  So your opinion is more the economic reality that they are not paying royalties as opposed to any sort of royalty free license that might result from that use?  A.  Yes.").)  Motorola's claim that Dr. Murphy "retreated" from any assertion about "royalty-free licenses" (MIL at 5) is baseless—Dr. Murphy at no point made any such assertion.  He merely pointed out that many, if not most, of the firms that implement the 802.11 standard do not pay royalties for that use.

The evidence introduced at trial will show that of the hundreds, if not thousands, of patents that are possibly essential to 802.11, very few are the subject of individual or 802.11 portfolio licenses granted by their holders, because all of them constitute minor, incremental

LAW OFFICES
CALFO HARRIGAN LEYH & EAKES, LLP
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700 FAX, (206) 623-8717

1  portions of a large, complex standard.[3] This widespread, unlicensed use of 802.11 patents

2  suggests broad adoption by many patent holders of the view that these patents have little

3  licensing value, making it simply not worth the time, effort, and overhead cost to attempt to

4  license them.  Instead, participants in the standard-setting process who hold standard-essential

5  patents get significant value from simply having 802.11 technology widely used and adopted,

6  through gains in interoperability and an increased market for their products.

7

8  . *See*

9  Dkt. No. 423 at 5–7.  In short, the market evidence reflects a low value of individual 802.11

10  portfolio licensing, and Motorola's own 802.11 licensing history only confirms this.

11      The relevance of the market evidence concerning the lack of licensing of 802.11 patents

12  (                         ) is fully disclosed in Dr. Murphy's report (*see* Wion

13  Decl. Ex. 3 (Murphy Reb. Rpt.) ¶¶ 4, 28–30), and Motorola's motion provides no basis for

14  excluding this entirely proper expert testimony.  Motorola's citations to the law of implied

15  licenses and equitable estoppel (MIL at 4–5) have nothing to do with Dr. Murphy's actual

16  disclosed testimony and are simply irrelevant.  Motorola's motion is premised on words its

17  own counsel used and that Dr. Murphy never said or adopted.  The motion is baseless and

18  should be denied.

19

20

21

22  [3] Motorola provides no explanation of what it means by stating that this "widespread unlicensed use" is "unsupported (and unsupportable)" (MIL at 5–6)—Motorola's own proposed findings of fact

23

24  (Dkt. No. 452
Ex. 9 (Donohoe Rpt.) ¶¶ 103, 148.) *See also* Wion Decl. Ex. 13, Jorge L. Contreras, "Rethinking RAND: SDO-

25  Based Approaches to Patent Licensing Commitments," ITU Patent Roundtable Working Paper (Oct. 2012) at 9 ("[M]any patent holders engaged in standards development do not actively seek to license or enforce their SEPs.").

26

MICROSOFT'S OPPOSITIONS TO
DEFENDANTS' MOTIONS IN LIMINE - 8

LAW OFFICES
CALFO HARRIGAN LEYH & EAKES, LLP
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700 FAX, (206) 623-8717

1

### IV.  Motorola's Fourth Motion in Limine Attacking Dr. Peter Rossi's Qualifications Should Be Denied.

2      Microsoft's survey expert Dr. Peter Rossi provides detailed analysis of the

3  insufficiencies of Motorola expert Dr. R. Sumukar's survey and accompanying expert report.

4  If Microsoft's *Daubert* motion challenging the reliability of Dr. Sukumar's survey is denied,

5  and instead the Court determines that the criticism of Dr. Sukumar's survey simply goes to the

6  weight of the evidence, Dr. Rossi is amply qualified to provide the analysis needed to

7  understand the problems with Dr. Sukumar's survey design and the conclusions he draws.  If

8  Microsoft's *Daubert* motion as to Dr. Sukumar is granted, there is obviously no need for Dr.

9  Rossi to testify.

10     Motorola claims that Dr. Rossi's opinions are "unsupportable" because of a "complete

11  lack of factual underpinnings" for his opinions.  (MIL at 6.)  But Dr. Rossi's criticisms go to

12  the predicates for structuring and conducting a reliable survey, and the burden for establishing

13  the proper predicates rested with Motorola and Dr. Sukumar, not Dr. Rossi.  The Rule 702

14  basis for Dr. Rossi's criticisms is his unchallenged expertise as a survey expert.  Dr. Rossi

15  simply explains that Dr. Sukumar didn't craft a reliable survey, and the fact that Dr. Rossi

16  didn't himself do the work that would have been needed for a reliable survey is irrelevant.  Dr.

17  Rossi is not the proponent of this survey:  Dr. Sukumar is.

18     Moreover, if those missing "factual underpinnings" disqualify Dr. Rossi, Motorola has

19  disqualified its own expert.  Dr. Sukumar himself disclaimed any technical expertise with

20  respect to the H.264 technologies—interlaced and progressive video, MBAFF ("Macroblock

21  Adaptive Frame/Field")—that were the subject of his survey.  Wion Decl. Ex. 4 (Sukumar

22  Dep.) at 54:7–55:1.  In pilot testing his own survey, Dr. Sukumar did not attempt to ascertain

23  "the average consumer's familiarity" with "terminology related to Xboxes"—Dr. Sukumar

24  does not know whether the pilot test participants were asked if they knew what 802.11 or

25  H.264 was, and confirmed participants certainly weren't asked if they knew what MBAFF

26

MICROSOFT'S OPPOSITIONS TO
DEFENDANTS' MOTIONS IN LIMINE - 9

LAW OFFICES
CALFO HARRIGAN LEYH & EAKES, LLP
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700 FAX, (206) 623-8717

1  meant. *Id.* at 65:22–66:7. Dr. Sukumar did not even pilot test the questions himself (*id.* at

2  24:15–25:7) or meet with or interview any of the pilot test respondents. And Dr. Sukumar

3  conducted the full survey online through the use of a third party (Wion Decl. Ex. 5 (Sukumar

4  Rpt.) at 7–8), so just like Dr. Rossi, he "did not speak to or otherwise have contact with any of

5  the participants" in the survey either (*see* MIL at 6).

6       As explained in Microsoft's *Daubert* motion, one of the most glaring problems with Dr.

7  Sukumar's survey is the entirely implausible set of responses to the survey's incomprehensible

8  questions concerning the usage of H.264 on Microsoft's Xbox. (*See* Dkt. No. 396 at 20–21;

9  Dkt. No. 423 at 10–12.) Dr. Sukumar asked respondents what types of video they had watched

10  on their Xbox, including options like "Progressive" and "MBAFF (Macroblock Adaptive

11  Frame/Field)," but these terms were never defined for participants, never pilot tested, and Dr.

12  Sukumar himself admitted at his deposition he had no basis to believe any respondent had any

13  idea what these terms meant. *See* Wion Decl. Ex. 4 (Sukumar Dep.) at 80:13–81:16, 151:9–

14  152:13 ("Q. . . . [W]as there any research done to determine if respondents understood what

15  that [MBAFF] was? A. There was no research done. There was no pilot test done."). The

16  survey results on these deeply flawed questions show that 125 respondents purported to: (1)

17  know what MBAFF means, and (2) know whether they had viewed MBAFF content. (*See*

18  Dkt. No. 423 at 11; Dkt. No. 397 (Rossi Decl.) ¶ 24.) But even Motorola's technical expert on

19  H.264, Timothy Drabik, could not determine what type of video he was watching without

20  copying the files to a separate computer and analyzing them. (*See* Dkt. No. 398 Ex. 5 (Drabik

21  Dep.) 133:9–135:14). The presumption that these were meaningful responses reflecting the

22  usage of H.264 video or Motorola's patents on the Xbox—as opposed to guesses—is

23  unfounded, as Dr. Rossi explains. (Dkt. No. 457 Ex. 5 at ¶¶ 34–38.)

24       In a poorly-disguised end-run around this problem with its survey, Motorola's motion

25  attempts to bar Microsoft from criticizing these glaring deficiencies at trial, by suggesting that

26

MICROSOFT'S OPPOSITIONS TO
DEFENDANTS' MOTIONS IN LIMINE - 10

LAW OFFICES
CALFO HARRIGAN LEYH & EAKES, LLP
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL. (206) 623-1700 FAX. (206) 623-8717

1    only a technical expert in H.264, performing a survey of Xbox users' understanding of these

2    terms, could be permitted to opine on the subject.  Simultaneously, Motorola seeks to offer its

3    own witness to present the results of this survey—but Dr. Sukumar had no technical

4    understanding of these terms, failed to pilot test these questions (which were added after the

5    pilot at the urging of Motorola's counsel), failed to define the terms for participants, and

6    admitted he had no idea what those participants understood about the terms.  It is Dr. Sukumar

7    that has "no personal or professional knowledge of the subject matter" (MIL at 7)—yet he

8    designed, conducted, and seeks to offer the survey as evidence in this case.  If Dr. Sukumar is

9    permitted to present survey results suggesting that consumers understand what these terms

10   mean, or that they are aware of whether they watch progressive, interlaced, or MBAFF-

11   encoded video on an Xbox, Dr. Rossi must be permitted to explain why that suggestion is

12   implausible and wholly unfounded.  Motorola's motion should be denied.

**V.    Motorola's Fifth Motion in Limine Should Be Denied Because Valuations of Motorola's 802.11 Patents Conducted on Motorola's Behalf Are Clearly Relevant.**

In 2003,



*See* Wion Decl. Ex. 6 (Lynde Rep.) at 24.

LAW OFFICES
CALFO HARRIGAN LEYH & EAKES, LLP
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL. (206) 623-1700 FAX. (206) 623-8717



1

2         *See* Wion Decl. Ex. 7 (Curtis Dep.) at 64:13–65:8.

3

4

5

6

7

8

9

10

11

12

13

14

15     The licensing rates recommended by Motorola's own consultants for its 802.11 patents

16 are undoubtedly relevant to the determination of a RAND royalty for those patents,

17

18      . Motorola's protests to the contrary—

19                                       —only reveal the deep-

20 seeded embrace of patent hold-up that runs throughout Motorola's misguided RAND theory in

21 this case.  Specifically, Motorola claims that

22

23

24

25

26

LAW OFFICES
CALFO HARRIGAN LEYH & EAKES, LLP
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700 FAX, (206) 623-8717

1    ████████████████████████████████████████████████████████████████

2    █████████████████████████████████████████████████████. But

3    even further, the statement lays bare Motorola's attempt, consistent from its demand letters

4    through the course of this case, to capture the value of standardization through holdup.

5    ████████████████████████████████████████████████████████████████

6    ████████████████████████████████████████████████████████████████

7    ████████████████████████████████████████████████████████████████

8    █████████████████████████████████ Consistent with the *ex ante* approach endorsed by Judge

9    Posner, the Federal Trade Commission, and academic commentators, InteCap's 2003 valuation

10   is in fact much more likely to indicate a RAND royalty than is Motorola's October 2010 view

11   of the value of its 802.11 portfolio, because the 2003 valuation could not capture the value of

12   standardization that had not yet accrued. *See Apple*, 2012 WL 2376664, at *11; Dkt. No. 407

13   Ex. 16, Federal Trade Commission, *The Evolving IP Marketplace: Aligning Patent Notice and*

14   *Remedies With Competition* (March 2011) at 194; Dkt. No. 407 Ex. 14, Daniel G. Swanson and

15   William J. Baumol, "Reasonable and Nondiscriminatory (RAND) Royalties, Standards

16   Selection, and Control of Market Power", 73 *Antitrust L. J.* 1, 57 (2005).

17        The view of independent consultants hired by Motorola as the value of and appropriate

18   licensing rates for Motorola's 802.11 patents is plainly relevant evidence in this case, no matter

19   how inconvenient Motorola finds it now.  Dr. Lynde's consideration of that evidence

20   appropriately acknowledges the different setting in which the analysis was made, and the

21   conclusions he draws—████████████████████████████████████████████

22   ████████████████████████████████████████████—are entirely proper.

23   Motorola's motion should be denied.

24

25

26

## VI.   Motorola's Sixth Motion In Limine Provides No Basis for Excluding Evidence of H.264 and 802.11 Patent Pool Licenses and Should Be Denied.

Motorola already filed a *Daubert* challenge to Microsoft's experts, relying on the same straw man argument advanced here:  that Microsoft's experts believed only "multilateral *ex ante* negotiations" could inform a RAND royalty, and that such testimony was unreliable. Motorola now urges exclusion of "all evidence and testimony suggesting that these patent pools are proxies for a multilateral *ex ante* negotiation." (MIL at 10.)

As Microsoft has previously explained, *see* Dkt. No. 410 (*Daubert* Opp.), Microsoft's experts' economic framework aims to address problems well-known in the academic literature—hold-up and royalty stacking—from an accepted perspective.  Microsoft's experts and academic commentators recognize that standard-essential patent holders may demand royalties from implementers reflecting the value of the standard rather than the value of the patented technology in the absence of a standard.  (*See* Dkt. No. 407 Ex. 12, Joseph Farrell *et al.*, "Standard setting, patents, and hold-up", 74 *Antitrust L. J.* 603, 616–18 (2007) (discussing particularly significant risks of hold-up in the context of technical standards); Dkt. No. 407 Ex. 13, Mark A. Lemley and Carl Shapiro, "Patent Holdup and Royalty Stacking," 85 *Texas L. Rev.* 1991 (2007).)  And as Microsoft's experts and commentators observe, the RAND commitment is meant to combat such exploitation.  *See* Dkt. No. 407 Ex. 15, Carl Shapiro, "Navigating the Patent Thicket: Cross Licenses, Patent Pools, and Standard-Setting," in Adam B. Jaffe *et al.*, *Innovation Policy and the Economy* (2001), at 10 (noting that RAND commitments "are explicitly intended to reduce or eliminate any 'hold-up' problems"); *Apple*, 2012 WL 2376664, at *11.

The approach taken by Microsoft's experts aims to address these risks inherent in standard-essential patent licensing.  Isolating the value of the patented technology helps ensure that patent holders do not hold up implementation by demanding royalties that far exceed their technological contribution, and one method of such isolation considered by Microsoft's

LAW OFFICES
CALFO HARRIGAN LEYH & EAKES, LLP
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700 FAX, (206) 623-8717

experts—the *ex ante* perspective—finds strong support in the academic literature and from the

Federal Trade Commission. (*See* Dkt. No. 407 Ex. 14, Swanson and Baumol, 73 *Antitrust L. J.*

at 57 (RAND "is or approximates the outcome of an auction-like process appropriately

designed to take lawful advantage of the state of competition existing *ex ante* (i.e., in advance

of standard selection) between and among available IP options."); Dkt. No. 407 Ex. 12, Farrell

*et al.*, 74 *Antitrust L. J.* at 637 ("[C]ourts should interpret the fair and reasonable prong of

FRAND as the royalties that would have been voluntarily negotiated before users became

committed to using the patented technology."); Dkt. No. 407 Ex. 16, Federal Trade

Commission, *The Evolving IP Marketplace* at 194 ("Courts should cap the royalty [for a

RAND-committed patent] at the incremental value of the patented technology over alternatives

available at the time the standard was defined.").)

Microsoft's experts also consider the aggregate reasonable royalties applicable to a

standard, aiming to combat the patent stacking problem by ensuring that the sum of all licenses

does not exceed the value of the technology. This perspective finds support not only in the

literature, but in Motorola's own SSO submissions concerning the stacking problem. In a prior

joint submission to ETSI (an SSO involved in cellular technology), Motorola suggested that

(Dkt. No. 407 Ex. 10 (ETSI Proposal Slides) at

MOTM_WASH1823_0421008 (emphasis in original) (sealed by Order dated 9/13/12, Dkt. No.

433).) Swanson and Baumol describe an *ex ante* auction-like process among available

intellectual property options, in which implementers band together to consider competing

technologies at prices offered by each intellectual property holder, in a many-sided negotiation.

(*See* Dkt. No. 407 Ex. 14, Swanson and Baumol, 73 *Antitrust L. J.* at 10–25). And Motorola's

MICROSOFT'S OPPOSITIONS TO
DEFENDANTS' MOTIONS IN LIMINE - 15

LAW OFFICES
CALFO HARRIGAN LEYH & EAKES, LLP
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700 FAX, (206) 623-8717

1  own expert Richard Schmalensee co-authored an article suggesting a possible model in which

2  "various parties could make their cases in court for the relative values of their IP contributions

3  to the standard, in the context of other options considered during the standard's early

4  developmental phases." (Dkt. No. 392 Ex. 31 at 705–06.)

5      The perspective discussed by Microsoft's experts, which includes both *ex ante* and

6  multilateral considerations, serves as a description of how to avoid the hold-up and stacking

7  problems—but Microsoft's experts never state that actual multilateral, *ex ante* negotiations

8  must have taken place to produce RAND licenses.  Instead, Microsoft's experts explain how

9  patent pools, including the MPEG-LA and Via Licensing pools for the H.264 and 802.11

10 standards, respectively, provide evidence of what is reasonable in the standard-setting context,

11 because of how the pools adequately address the hold-up and stacking problems in a manner

12 and setting comparable to what would take place in *ex ante*, multilateral negotiations.

13 Motorola protests that neither pool represents "full participation" by every standard-essential

14 patent holder (MIL at 11)—but Microsoft's experts never opined that "full participation" was

15 required in order for a license to be a *relevant* comparable to a RAND royalty determination,

16 only that the participation of multiple patent holders lessened the risk of stacking problems,

17 making such licenses better candidates as relevant comparables. (*See* Dkt. No. 407 Ex. 7

18 (Simcoe Dep.) at 196:14–197:1; Dkt. No. 407 Ex. 8 (Lynde Dep.) at 50:20–51:15; Dkt. No.

19 407 Ex. 6 (Murphy Dep.) at 151:6–155:25.)

20      As to the timing in the formation of the pools, the academic literature recognizes that

21 with respect to prevention of hold-up, the *ex ante* concept is not limited to pre-standardization,

22 but can relate more generally to the period before widespread implementation of the standard:

23      We start from the principle that FRAND rules should be interpreted as a
        mechanism by which standard setting organization participants address the
24      problem of patent hold-up when *ex ante* negotiation was absent or inconclusive,
        and by which they make efficient timing of negotiation possible without
25      inviting hold-up.  This implies that courts should interpret the fair and

26

LAW OFFICES
CALFO HARRIGAN LEYH & EAKES, LLP
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700 FAX, (206) 623-8717

1

reasonable prong of FRAND as the royalties that would have been voluntarily negotiated *before users became committed to using the patented technology.*

2

(Dkt. No. 407 Ex. 12, Farrell *et al.,* 74 *Antitrust L. J.* at 637 (emphasis added).)  *See also* Wion

3

Decl. Ex. 8, Jonathan L. Rubin, "Patents, Antitrust, and Rivalry in Standard-Setting," 38

4

*Rutgers L. J.* 509, 518 (2007) ("A hold-up problem can occur . . . as long as a substantial

5

investment has been made in adopting or implementing the standard so that the selection of the

6

standard is economically irreversible.").  Further, Motorola only identifies a six-month gap in

7

2003 between adoption of the H.264 standard and the MPEG LA pool formation (MIL at 11)—

8

hardly a significant delay in which patent holders could expect to capture significant growth in

9

the standard.  Motorola also notes that the Via pool was formed in 2005, eight years after

10

adoption of the original 802.11 standard (MIL at 11)—

11

12

13

14

15

Wion Decl. Ex. 11 (Dansky Rpt.) at 20.  In the

16

end, Motorola's arguments about the pools prove too much.  According to Motorola, the pools

17

are not "multilateral" enough, or are not sufficiently "*ex ante*"—but if true, that would only

18

mean that the pool rates are *higher* than a RAND royalty, because the participants could have

19

engaged in stacking or tried to capture hold-up value.

20

The pool rates plainly represent what a large group of standard-essential patent holders

21

consider a reasonable royalty for a license to their 802.11 or H.264 patents.  The large numbers

22

of licensee and licensors—especially in the MPEG LA pool—reflect significant acquiescence

23

to the reasonableness of the pool rates for patented technology necessary to implement the

24

H.264 standard.  *Cf. Hanson v. Alpine Valley Ski Area, Inc.,* 718 F.2d 1075, 1078 (Fed. Cir.

25

1983) (noting that "a single licensing agreement does not generally demonstrate uniformity nor

26

MICROSOFT'S OPPOSITIONS TO
DEFENDANTS' MOTIONS IN LIMINE - 17

LAW OFFICES
CALFO HARRIGAN LEYH & EAKES, LLP
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL. (206) 623-1700 FAX. (206) 623-8717

1   acquiescence in the reasonableness of the royalty rate"). While Motorola protests that it does

2   not license its patents in these pools (MIL at 10)[4], that does not render the pools irrelevant—

3   ███████████████████████████████████████████████████████████████████

4   ███████████████████████. (*See* Dkt. No 284 at 7; Dkt. No. 286 Exs. 5–6 (sealed by

5   Order dated 6-6-12, Dkt. No. 337)). To the contrary, there is no reason to believe Motorola's

6   standard-essential patents have any greater economic value to a prospective implementer of

7   either the 802.11 or H.264 standard than do those essential patents in the pools—all are simply

8   necessary to implement the standard. (*See* Dkt. No. 407 Ex. 12, Farrell *et al.*, 74 *Antitrust L. J.*

9   at 643 (endorsing the use of pool rates as a "default method of apportioning royalties," while

10  noting that individual patent owners would always be free to try to show that their patents were

11  worth more than the average pool patents).) Here, ██████████████████████████

12  ███████████████████████████████████████████████████████████████████

13  █████████████████████████████—meaning that the default pool

14  rate should apply. *See* Wion Decl. Ex. 9 (Donohoe Dep.) at 183:5–12; Wion Decl. Ex. 10

15  (Schmalensee Dep.) at 164:21–165:24.

16      In the end, ████████████████████████████████████████████████

17  ██████████████████████████████████████████████████████████████████.

18  Wion Decl. Ex. 9 (Donohoe Dep.) at 17:3–17; Wion Decl. Ex. 10 (Schmalensee Dep.) at

19  168:15–169:10. By that admission alone, the pool licenses are relevant evidence in this case,

20  and Microsoft's experts' consideration of them entirely appropriate. Motorola's motion should

21  be denied.

22

23

24  [4] Motorola's claim can hardly be taken seriously, given its insistence that its expert Charles Donohoe is free to copy the royalty rate from a license agreement that includes only a single Motorola patent declared essential to

25  802.11—licensed among hundreds of other patents essential to other standards. (*See* Dkt. No. 462 (Defendants' Proposed Findings of Fact and Conclusions of Law) at ¶ 501 ("For a patent license to be a valid benchmark for a RAND rate for a patent portfolio, the patent license must include at least one of the patents in the portfolio.").)

26

MICROSOFT'S OPPOSITIONS TO
DEFENDANTS' MOTIONS IN LIMINE - 18

1

DATED this 15th day of October, 2012.

2

CALFO HARRIGAN LEYH & EAKES LLP

3

4

By  s/ Arthur W. Harrigan, Jr.
       Arthur W. Harrigan, Jr., WSBA #1751

5
       Christopher Wion, WSBA #33207
       Shane P. Cramer, WSBA #35099

6

7

By  s/ T. Andrew Culbert
       T. Andrew Culbert

8
       David E. Killough
       MICROSOFT CORPORATION

9
       1 Microsoft Way
       Redmond, WA  98052

10
       Phone: 425-882-8080
       Fax: 425-869-1327

11

12
       David T. Pritikin
       Richard A. Cederoth

13
       Constantine L. Trela, Jr.
       William H. Baumgartner, Jr.

14
       Ellen S. Robbins
       Douglas I. Lewis

15
       David C. Giardina
       John W. McBride

16
       David Greenfield
       Nathaniel C. Love

17

18
       SIDLEY AUSTIN LLP
       One South Dearborn

19
       Chicago, IL  60603
       Phone: 312-853-7000

20
       Fax: 312-853-7036

21
       Carter G. Phillips
       Brian R. Nester

22

23
       SIDLEY AUSTIN LLP
       1501 K Street NW

24
       Washington, DC  20005
       Telephone: 202-736-8000

25
       Fax: 202-736-8711

26
       Counsel for Microsoft Corp.

MICROSOFT'S OPPOSITIONS TO
DEFENDANTS' MOTIONS IN LIMINE - 19

## CERTIFICATE OF SERVICE

I, Linda Bledsoe, swear under penalty of perjury under the laws of the State of Washington to the following:

1.     I am over the age of 21 and not a party to this action.

2.     On the 15th day of October, 2012, I caused the preceding document to be served on counsel of record in the following manner:

**Attorneys for Motorola Solutions, Inc., and Motorola Mobility, Inc.:**

| | |
|---|---|
| Ralph Palumbo, WSBA #04751 | |
| Philip S. McCune, WSBA #21081 | _____ Messenger |
| Lynn M. Engel, WSBA #21934 | _____ US Mail |
| Summit Law Group | _____ Facsimile |
| 315 Fifth Ave. South, Suite 1000 | __X__ ECF |
| Seattle, WA 98104-2682 | |
| Telephone: 206-676-7000 | |
| Email: Summit1823@summitlaw.com | |

| | |
|---|---|
| Steven Pepe (*pro hac vice*) | _____ Messenger |
| Jesse J. Jenner (*pro hac vice*) | _____ US Mail |
| Ropes & Gray LLP | _____ Facsimile |
| 1211 Avenue of the Americas | __X__ ECF |
| New York, NY 10036-8704 | |
| Telephone: (212) 596-9046 | |
| Email: steven.pepe@ropesgray.com | |
| Email: jesse.jenner@ropesgray.com | |

| | |
|---|---|
| Norman H. Beamer (*pro hac vice*) | _____ Messenger |
| Ropes & Gray LLP | _____ US Mail |
| 1900 University Avenue, 6th Floor | _____ Facsimile |
| East Palo Alto, CA 94303-2284 | __X__ ECF |
| Telephone: (650) 617-4030 | |
| Email: norman.beamer@ropesgray.com | |

LAW OFFICES
CALFO HARRIGAN LEYH & EAKES, LLP
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL. (206) 623-1700 FAX, (206) 623-8717

1   Paul M. Schoenhard (*pro hac vice*)                  _____ Messenger
    Ropes & Gray LLP                                     _____ US Mail
2   One Metro Center                                     _____ Facsimile
    700 12th Street NW, Suite 900                        ___X___ ECF
3   Washington, DC  20005-3948
    Telephone:  (202) 508-4693
4   Email: Paul.schoenhard@ropesgray.com

5        DATED this 15th day of October, 2012.

6

7                                          s/ Linda Bledsoe
                                           _____
8                                          LINDA BLEDSOE

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

MICROSOFT'S OPPOSITIONS TO
DEFENDANTS' MOTIONS IN LIMINE - 21