# EXHIBIT 12

10/12/12    An Interview With Fed. Circ. Chief Judge Rader: Part 1 - Law360

Case 2:10-cv-01823-JLR   Document 476-5   Filed 10/15/12   Page 2 of 6



**Portfolio Media. Inc.** | 860 Broadway, 6th Floor | New York, NY 10003 | www.law360.com
Phone: +1 646 783 7100 | Fax: +1 646 783 7161 | customerservice@law360.com

# An Interview With Fed. Circ. Chief Judge Rader: Part 1

Law360, New York (October 11, 2012, 4:21 PM ET) -- On July 9, 2012, Stout Risius Ross Inc. managing directors John Bone, David Haas, and David Paris had an opportunity to sit down and discuss various patent damages topics with the chief judge of the United States Court of Appeals for the Federal Circuit, Randall R. Rader. Chief Judge Rader was appointed to this court by President George H.W. Bush in 1990 and took the helm as chief judge in June 2010. In his tenure at the Federal Circuit, as well as instances in which he sat by designation as a district judge, Chief Judge Rader has authored some of the most important opinions dealing with patent damages.

In addition to his judicial duties, Chief Judge Rader also regularly teaches advanced intellectual property courses at George Washington University Law School and various other prestigious law schools. His deep knowledge of the subject matter and his passion and dedication to the field of intellectual property law have earned Chief Judge Rader numerous awards and make him one of the most influential thought leaders in this area. SRR would like to thank Chief Judge Rader for accepting our invitation to participate in this interview.

**SRR: Before we jump into the deep waters of patent litigation and damages, let's start with a couple of questions that will help our readers understand you as a person. So, along those lines, where did you grow up?**

Chief Judge Randall Rader: Portland, Ore. Oregon, in general, if you stretch it to "growing up," because I lived in other parts of the state, such as Grants Pass and Tillamook and then, finally, Portland.

**Q: What would your classmates most remember about you from high school?**

A: I'm not sure that's all printable, but I bet some of them would remember I used to climb the television tower on the weekends, which is against the law, and I was a bit of a fun-loving student, not always as dedicated to my studies as I should have been. Leaving that open, let's talk about my tennis record. I did OK in tennis. I played some tennis in high school, and I still play tennis to this day.

**Q: And we understand you are also a musician?**

A: Well, I am a musician, and I did some of that when I was in high school, too, but that part of my career is still peaking. We still expect to be on the cover of "Rolling Stone" sometime soon.

**Q: When did you decide to take up the practice of law and why?**

A: Well, there are probably two answers to that. I decided mostly when I was living in Finland and gained some greater appreciation for our form of government. The other one

involved me deciding how I would make money as an English major, and that led me to law as well.

**Q: What were you doing in Finland?**

A: I was sent there by my church as a missionary when I was 18. I lived in many cities in Finland and actually became fluent in the language. I did some work as a translator during the three years I was there. It was a pretty important time in my life, as I had to live on my own — those accomplishments were confidence-builders.

**Q: What did you see over there that piqued your interest in law?**

A: Well, they were living — at that time, this is the late '60s, early '70s — and they were living very much in the shadow of the Soviet Union. It reminds me of a time that I accidently crossed the border illegally and got picked up, fortunately, by the Finnish border guards. And all of a sudden I forgot how to speak Finnish. I could speak as well as those guards, but all of a sudden I forgot everything. Luckily for me, they realized that I had just made a mistake and walked in areas I shouldn't have walked.

The overall experience of being so close to the Soviet Union at the height of the Cold War and the Finnish people being very apprehensive of everything Soviet, and yet having to abide by certain requirements that were placed on them by the stronger Russia. I remember coming away with some distinct feelings of joy at our system of government.

**Q: So then you came back, and you went to law school?**

A: Yes, I came back and became enamored with studying the Constitution and our governmental systems, and that brought me here to Washington.

**Q: Thank you for sharing a little of your background with us. You've been deeply involved in trying to push damages quantification in patent litigation toward more analytically sound methodologies and eliminating those that are flawed, like the 25-percent rule. In your review of reasonable royalty cases and damages testimony over the years, have most of the analyses for those reasonable royalty determinations been based on an analysis of the Georgia-Pacific factors?**

A: Whenever I hear "Georgia-Pacific" I bristle a little bit because the Georgia-Pacific factors are really just a laundry list of various things to be considered. The Georgia-Pacific factors were never meant to be a test or a formula for resolving damages issues. They are merely a list of things to consider. And somehow it gets blown out of context — I see it time after time after time. I can tell you exactly how it gets blown out of context.

The expert — I trust this is not you gentlemen — is sitting on the stand and he or she will testify: Well, there are 15 Georgia-Pacific factors and six of them favor us and the other nine are neutral. Well, that is an attempt to convert this laundry list into some kind of methodology. However, many of those 15 factors may be overlapping or irrelevant to a particular case. Yet some will try to make their case seem more reasonable by stacking up so many Georgia-Pacific factors in their favor and the rest are against their opponent or neutral. And that's not what the Georgia-Pacific case was ever about and it's a flawed methodology. Those factors were not meant to be counted up the way you count up balls and strikes during a baseball game.

**Q: Is there a more methodologically sound way to address the reasonable royalty issue?**

A: Yes, I think so. While every case is going to be different, you have to look at the relevant economic evidence in each case. I like to use an analogy which people understand quite

readily; and that is, you go to a realtor and you ask a realtor what enhancement to the value of their home will they get if they add a second garage or if they change the countertops in their kitchen or if they put a bathroom in the basement. And realtors can tell you with great confidence, magnificent accuracy, and some dependable uniformity within a thousand dollars or so what each of those components of the larger saleable unit, the house, is worth.

And that's often what we are doing in our intellectual property cases. We are trying to decide what this claimed invention, which is a tiny component or maybe a larger component, but it's a component of a larger device or process, what is the value of that component? Well, that's like, is it a countertop or is it a second-car garage? The realtors can do it. Why can't we? I know part of the answer, of course. You know, a real estate market has 20, 30, 40 comparables on the same block.

And you are going to have a market to analyze and assess. But I do think that's where our emphasis ought to be, not on counting Georgia-Pacific factors, but on locating the best market we can come up with. That's usually going to be licenses, and, of course, that gets you into the difficult task of deciding how comparable those licenses are, and how much value to give to divergent clauses and services provided in each license. But that's where our emphasis has to be in analyzing the market occupied by the claimed invention, not counting Georgia-Pacific factors.

**Q: And certainly within the context of transactions, you would look at market development and how the market reacted to the addition of that particular invention?**

A: Exactly, absolutely. And I think there is more of this — well, I know there is more of this going on than appears in your average patent trial. I mean the companies are in constant negotiation with each other, there is constant licensing going on of saleable factors, bundled together perhaps with other factors, but of course the difficulty becomes the regression analysis and stripping away the other factors so that you can analyze the claimed invention in its proper market context. But that's what has to happen, and not a counting of Georgia-Pacific factors.

**Q: Zeroing in on the question of comparable license agreements, because there have been a number of opinions that have related to those as well.**

A: You are going to yell at me about ResQNet, aren't you?

**Q: No, no. I'll stick with asking questions. We have seen some courts preclude experts from relying on certain license agreements because they're not comparable, as if there's some sort of litmus test between what's comparable and what's not. Whereas other courts have said there are degrees of comparability, recognizing that there's information that you can pull out of these agreements. So where do you fall on that spectrum?**

A: Well, I should have started with my caveat here. It's not my job to tell district judges how to decide cases. And I'm talking to you much as I'd talk to my class over at George Washington University. Each judge will apply his or her judgment as the case requires. But if they are actually working to find the comparability of licenses, they are focused on the right question. And I'm not really too concerned about where they draw the line. I would hope they would draw the line to make the market broader because the broader your market sample, the more reliable it will be.

So your economists will tell you: Give me wide comparability and then we'll discuss the discounting or enhancement of each individual sample according to how comparable it is. I think that's a sounder economic approach. But as long as they are focused on the comparability to the claimed invention, I think the eye is on the right ball and they'll make

contact more often than not.

**Q: That's, in large part, how we've approached complex license agreements, because there may be relevant information that can be garnered from certain agreements, while other agreements should be discounted altogether because they are so different.**

A: Yes, they are just completely off limits. Well, and you have to know your judge. Those judges will draw that comparability line and you have to deal with the line that's drawn. But I would argue if you were the expert sitting there, "Well, Your Honor, if you'll let me use this, I will discount it for areas that it has no applicability and I will enhance it where it really is right on point and I think you'll see, even though it's a bit on the periphery, it has relevance." And the judge will come back and say, "Well, but this could be prejudicial, and you have to promise that you can deal with that."

**Q: Courts have paid a lot of attention to damages in recent cases like Lucent, i4i, Cornell, ResQNet, Uniloc, cases that you're intimately familiar with.**

A: But I'm going to bristle a little bit because those are recent cases, and I would argue quite persuasively that our court has been sending this same message in the Grain Processing era, in Riles v. Shell, Crystal Semiconductor. Oiness was another case. We mentioned the BIC case. I think going all the way back to Rite-Hite, we started looking at it in the early '90s, and I think we've given a pretty constant drumbeat on the need for sound economic evidence and a focus on the scope of the claimed invention. But the recent cases have brought that more closely into focus. And so, now that I've bristled, let's go on to the question.

**Q: Well, the question is: Do you think the lessons from these cases have been absorbed by lawyers, damages experts and the district courts?**

A: Well, in general, yes. I think that they are getting the idea that we need sound economic analysis. That's the central point here. My favorite example of the ugly argument is, say Microsoft makes $60 billion a year, and I'm just asking for one small percentage of that. Of course the $60 billion, if that's the right number, I'm making that up by the way, whatever they make is irrelevant, it has nothing to do with the market impact of the claimed invention. It's prejudicial to be before the jury, and we need to keep our eye on the right ball.

**Q: At a recent conference, you spoke about the need for early case assessments. Are there specific things that you would suggest that district courts do differently for a billion-dollar case as opposed to, let's say, a million-dollar case from a practical standpoint?**

A: Here, once again, I need to start with my clear recognition that each judge is entrusted with the proper procedure to which I give strict deference here on the appellate level. Looking at adjudication itself as a market, however, if we don't exercise proper efficiencies, we can end up investing a vast amount of resources in an enterprise that doesn't justify that investment. And if we do that often enough, we will find ourselves with no time for the areas that need significant investments and we'll lose to our competitors. Those competitors can be foreign adjudicatory systems, they can be rival areas where these cases can be resolved such as mediation, arbitration. But it's just very clear that you've got to marshal your resources intelligently.

Now, what would I do differently if I were sitting as a district judge and I recognized that that case has marginal impact on the market? Well, I'd be very quick to narrow the issues to one claim and one patent or two claims and two patents or whatever. I would entertain summary judgment motions quite enthusiastically. I would set time limits. I would put witness limits on. I would make sure that this question for which the parties have a right to an

answer, gets an answer, but I'd get them their answer in days, not weeks.

**Q: That's very helpful. I'm going to move on to another topic – the "entire market value rule."**

The rest of our interview with Chief Judge Rader will be published next week.

--By John R. Bone, David A. Haas and David N. Paris, Stout Risius Ross Inc.

*John Bone, CPA, CFF, and David Haas, CLP, are managing directors in SRR's Chicago office. David Paris is a managing director in the firm's Washington, D.C., office.*

*The opinions expressed are those of the authors and do not necessarily reflect the views of the firm, its clients, or Portfolio Media Inc., or any of its or their respective affiliates. This article is for general information purposes and is not intended to be and should not be taken as legal advice.*

All Content © 2003-2012, Portfolio Media, Inc.