# EXHIBIT 21

133

ASPEN PUBLISHERS

# DRAFTING LICENSE AGREEMENTS

## Fourth Edition

### Volume 2

Michael A. Epstein
Frank L. Politano
Editors


Wolters Kluwer
Law & Business

2011-2 SUPPLEMENT

134

~~145~~

Case 2:10-cv-01823-JLR   Document 480-3   Filed 10/15/12   Page 3 of 16

Case 2:10-cv-01823-JLR   Document 87-43   Filed 09/23/11   Page 25 of 27

This publication is designed to provide accurate and authoritative information in regard to the subject matter covered. It is sold with the understanding that the publisher and the author(s) are not engaged in rendering legal, accounting, or other professional services. If legal advice or other professional assistance is required, the services of a competent professional should be sought.

—From a *Declaration of Principles* jointly adopted by
a Committee of the American Bar Association and
a Committee of Publishers and Associations

Copyright © 2011, 2010–2003 CCH Incorporated. All Rights Reserved.

Chapter 15 Copyright © 1992–2010 Al Kohn and Bob Kohn

No part of this publication may be reproduced or transmitted in any form or by any means, including electronic, mechanical, photocopying, recording, or utilized by any information storage or retrieval system, without written permission from the publisher. For information about permissions or to request permissions online, visit us at *www.aspenpublishers.com/licensing/default.aspx*, or a written request may be faxed to our permissions department at 212-771-0803.

Published by Wolters Kluwer Law & Business in New York.

Wolters Kluwer Law & Business serves customers worldwide with CCH, Aspen Publishers and Kluwer Law International products.

Printed in the United States of America

1 2 3 4 5 6 7 8 9 0

**Library of Congress Cataloging-in-Publication Data**

Drafting license agreements / Michael A. Epstein, Frank L. Politano, editors. — 4th ed.
   p. cm.
   Includes index.
   ISBN 978-0-7355-3379-2 (set) — ISBN 978-0-7355-3488-8 (v. 1) — ISBN 978-0-7355-3489-6 (v. 2)  1. Intellectual property — United States.  2. License agreements — United States. 3. License agreements — United States — Forms.  I. Epstein, Michael A.  II. Politano, Frank L.

KF2979.D6922
346.7304'8-dc21

                                              2002074782

**2011-2 SUPPLEMENT**

Case 2:10-cv-01823-JLR   Document 420-3   Filed 10/15/12   Page 4 of 16
Case 2:10-cv-01823-JLR   Document 87-4 3   Filed 09/23/11 2   Page 26 of 27

ROYALTY RATES AND VALUATION                                § 20.05

Also, premium pricing and the rate of return must be taken into consideration. In addition, to determine the length of the future income stream, the economic remaining life must be determined.

### [c] Disadvantages

There are disadvantages with this method also. Most notably, it is extremely difficult to predict what benefits will be derived in the future. This is tied to the difficulty in trying to determine the economic life. Another disadvantage is the difficulty inherent in trying to select an accurate discount rate. If the chosen discount rate is too high or too low, the determined value of the property may be noticeably inaccurate.

### [4] Combination of Approaches

There is no one best approach that can be relied upon to provide a single valuation for patented assets. A blend is preferred, but in what proportion? And the presence, absence, and degree of exclusivity associated with intangible intellectual property make valuation even more difficult.[58]

### § 20.05 METHODS OF MEASURING ROYALTY RATES

Once a method of valuation has been determined and applied to the intellectual property, a basis for measuring the royalty rate must also be determined. Typically, the royalty rate is based on a percentage of either the sales or profits of the product that is the subject of the license agreement. In addition, the royalty rate may be determined on a per-unit basis. These methods of measuring the royalty rate are discussed in more detail below.

---

[58] Some useful references include:

G.V. Smith, & R.L. Parr, *Intellectual Property: Valuation, Exploitation and Infringement Damages*, J. Wiley & Sons, New York, 2005.

R. Goldscheider, *Licensing and the Art of Technology Management*, West Publishing, New York, 2007.

P.B. Bell, & J. Simon, *The Law And Business of Licensing*, Clark, Boardman, Callaghan, New York, 1997.

M.B. Finnegan, & R. Goldscheider, *The Law And Business of Licensing*, Clark Boardman Company, New York, 1980.

136

~~147~~

### [A] Gross or Net Sales

To reiterate the comparison provided in Section 1, gross sales are the total of all sales at invoice prices, whereas net sales are gross sales minus returns, allowances, rebates, and discounts. Net sales can also exclude sales taxes, installation, freight and packing expenses, and other expenses.[59]

Gross sales and net sales are favored by licensors because they are relatively easy to measure, relatively hard to manipulate, and account for increases due to inflation. Licensees also prefer basing the royalty rate on gross or net sales because it allows proper accounting to the licensor without having to disclose profit information. For these reasons, the majority of licenses use sales as the royalty rate base, with net sales predominating because they allow deductions for certain expenses that are not related to the protected technology.

One method that uses net sales as the basis for measuring royalty rates is the "5% of Sales Method." As is obvious from its name, the "5% of Sales Method" bases the royalty rate on 5% of the net sales. The major disadvantage of the "5% of Sales Method" is that it does not take into account other financial considerations, the scope of the license grant, the risk associated with licensing the intellectual property, the capital investment necessary to implement the intellectual property, profits, manufacturing expenses, and operating expenses. Therefore, although this method may be used as a baseline, most negotiated royalty rates actually fall between 1% and 5% of the net sales.

### [B] Profits

Another method of measuring the royalty rate is to use the profits resulting from the sale of the licensed product. Gross profit is determined by subtracting from gross sales the cost of the goods sold, which generally includes directly allocable expenses, such as manufacturing expenses, raw material costs, direct labor costs, utility expenses, and depreciation expenses for the manufacturing facility.[60]

One problem with the gross profits method is that operating expenses are not considered. Typical operating expenses include sales expenses, advertising, administrative costs, rent, basic utilities, and other expenses needed to keep the business running but that are not directly

---

[59] *See* 1 Harold Einhorn, Patent Licensing Transactions § 3.04[3] (1997).

[60] Russell L. Parr & Gregory J. Battersby, 1999 Licensing Update, Aspen Publishers, Inc., *Chapter 8: Royalty Rate Trends*, p. 224 (1999).

137

~~148~~

# EXHIBIT 22

138

Case 2:10-cv-01823-JLR Document 482-3 Filed 10/15/12 Page 2 of 16
Case 2:10-cv-01823-JLR Document 087-3 Filed 09/25/12 Page 7 of 56

# DRAFTING PATENT LICENSE AGREEMENTS

## Fifth Edition

Brian G. Brunsvold
Dennis P. O'Reilley

*Partners: Finnegan, Henderson, Farabow, Garrett & Dunner, L.L.P.*
Washington, D.C.



The Bureau of National Affairs, Inc., Washington, D.C.

139

~~150~~

Copyright © 1971, 1984, 1991, 1998, 2004

The Bureau of National Affairs, Inc.
Washington, D.C. 20037

**Library of Congress Cataloging-in-Publication Data**

Brunsvold, Brian G., 1938-
   Drafting patent license agreements / Brian G. Brunsvold, Dennis P. O'Reilley. -- 5th ed.
     p. cm.
   Includes index.
   ISBN 1-57018-424-0
   1. Patent licenses--United States. 2. Trade secrets--United States.  I. O'Reilley, Dennis P., 1943- II. Title.

KF3145.M35 2004
346.7304'86--dc22

                                2004058597

All rights reserved. Photocopying any portion of this publication is strictly prohibited unless express written authorization is first obtained from BNA Books, 1231 25th St., N.W., Washington, D.C. 20037, www.bnabooks.com. Authorization to photocopy items for internal or personal use, or the internal or personal use of specific clients, is granted by BNA Books for libraries and other users registered with the Copyright Clearance Center (CCC) Transactional Reporting Service, provided that $1.00 per page is paid directly to CCC, 222 Rosewood Dr., Danvers, MA 01923, www.copyright.com, Telephone: 978-750-8400, Fax: 978-646-8600.

Published by BNA Books
1231 25th St., N.W., Washington, D.C. 20037
*http://www.bnabooks.com*

International Standard Book Number 1-57018-424-0
*Printed in the United States of America*

Case 2:10-cv-01823-JLR Document 487-3 Filed 10/15/12 Page 9 of 16
Case 2:10-cv-01823-JLR Document 487-3 Filed 10/15/12 Page 9 of 16

may be negotiable. In some markets where risk and reward are high, such as pharmaceuticals, royalty rates of 10% to 30%, along with substantial milestone payments, may be tolerated. In a very few instances, as where the use of the invention (perhaps a new and important catalyst) contributes extremely large added value to the products in which it is used, royalties as high as 50 percent (measured on the selling price of the catalyst or similar value-adding constituent) can be justified and will be found acceptable.

## 10.01 Selection and Definition of the Royalty Base

Contract drafting in respect to royalty payments divides itself rather naturally into (1) the problem of defining the base on which royalties are to be computed and (2) the procedures under which royalties payable are to be calculated, reported, and accounted for. It ordinarily works well to treat these two matters separately, focusing one part of the agreement on each. Accordingly, the following sections will outline an approach suitable to this course.

### A. *Selecting the Royalty Base*

Selection of the royalty base is the first step in negotiating license consideration. Varying the royalty rate to achieve a desired total consideration is relatively easy once the royalty base is determined. The ideal royalty base should have two fundamental characteristics: it should relate directly to the licensee's use of the licensed rights and it should be amenable to reliable accounting and auditing.

The first desired characteristic of a royalty base, relation to use of the licensed technology, reflects a logical connection between the benefit given to the licensee and the amount paid by the licensee.

The second desired characteristic is more practical than logical. Payment of royalties generally requires reliance on the licensee to determine, in accordance with the terms of the license, what royalties are payable. This determination is considerably easier, and more likely to be correctly calculated, if the royalty base is something already counted or recorded in the ordinary course of business of the licensee. A licensee normally uses and retains invoices that show the sales price of products or normally counts the number of products made or sold. A licensee, on the other hand, may not normally count the number of cycles of a machine, for example. Selection of an unusual royalty base, even though it may be directly related to use of the licensed technology, can lead to errors in royalty calculation by the licensee and to increased costs to the licensee in creating a separate record and to the licensor in auditing records that may deviate from accepted accounting principles.

Mention of accounting principles suggests another factor to consider in selecting a royalty base. A licensee's profit on a licensed product or the licensee's cost of the licensed product are both tempting bases, since each has some direct relation to the licensee's use of the licensed technology. Before selecting such a base, however, the licensor should consider the variable definitions for profit and cost under generally accepted accounting principles, and the licensee should consider whether it wishes to disclose to the licensor its profit or cost figures. If such a royalty base is to be used, care should be taken to define, to the extent reasonable and possible given principles of accounting, exactly what profit or cost the parties contemplate.

Where the licensed technology involves a product or process that uses or consumes a raw material, an attractive royalty base is the cost of that raw material. Such a base is directly related to the licensee's use of the technology, and such costs are ordinarily kept by the licensee in the ordinary course of business. Before selecting such a base, however, the parties should consider potential fluctuations of the price for the raw material that may have nothing to do with the market for the licensed product. Licensees who agreed in the early 1970s to pay royalties on the cost of oil input to licensed refining processes were unpleasantly surprised when OPEC caused dramatic increases in the price of oil.

The most common royalty bases are the sales price (net or gross) of the licensed product or a fixed amount for each licensed product sold or manufactured.

### B. Defining the Royalty Base

Inadequate or ambiguous definition of the royalty base has, over the years, engendered much litigation. In the litigated cases, there appear to be two principal sources of controversy: (1) vagueness as to the general subject matter intended to bear royalties and (2) uncertainty concerning intended peripheral metes and bounds of royalty-bearing subject matter otherwise reasonably identified.

#### 1. Vagueness as to Subject Matter

The problem of vagueness is well illustrated by *Heath v. A.B. Dick Co.*[10] and *Muth v. J.W. Speaker Corp.*[11]

In the *Heath* case, the commitment was to pay royalties of "ten cents (10¢) per pound of the film material used in the stencilization of stencil sheets *under this license.*"[12] This followed an agreement

---

[10] 253 F.2d 30, 116 USPQ 358 (7th Cir. 1958).
[11] 151 F. Supp. 188, 114 USPQ 327 (D. Wis. 1957).
[12] 253 F.2d at 32, 116 USPQ at 359 (emphasis added).

**FILED UNDER SEAL:
OUTSIDE ATTORNEYS' EYES ONLY
SUBJECT TO PROTECTIVE ORDER**

**EXHIBIT 15**

143

154

# EXHIBIT 23

# LETTER OF ASSURANCE FOR ESSENTIAL PATENT CLAIMS

| | |
|---|---|
| Please return via mail, e-mail (as a PDF), or fax: | PatCom Administrator, IEEE-SA Standards Board Patent Committee<br>Institute of Electrical and Electronics Engineers, Inc.<br>445 Hoes Lane<br>Piscataway, NJ   08854   USA<br>FAX (+1 732-875-0524)   e-mail: patcom@ieee.org |

*No license is implied by submission of this Letter of Assurance*

## A. SUBMITTER:

Legal Name:                                                                                                                                ("Submitter")

## B. SUBMITTER'S CONTACT INFORMATION (for the purpose of licensing information):

Contact Name/Title:
Department:
Address:

Telephone:                                   Fax:                                   E-mail:
URL:

*Note: The IEEE does not endorse the content, or confirm the accuracy or consistency of any contact information or web site listed above.*

## C. IEEE STANDARD OR PROJECT (e.g., AMENDMENT, CORRIGENDA, OR REVISION):

In accordance with Clause 6.3.5 of the *IEEE-SA Standards Board Operations Manual*, this licensing position is limited to the following:

Standard/Project Number:
Title:

## D. SUBMITTER'S POSITION REGARDING LICENSING OF ESSENTIAL PATENT CLAIMS:

In accordance with Clause 6 of the *IEEE-SA Standards Board Bylaws*, the Submitter hereby declares the following **(Check box 1 or box 2 below)**:

*Note: Nothing in this Letter of Assurance shall be interpreted as giving rise to a duty to conduct a patent search. The IEEE takes no position with respect to the validity or essentiality of Patent Claims or the reasonableness of rates, terms, and conditions provided in connection with submission of a Letter of Assurance, if any, or in any license agreements offered by the Submitter. To the extent there are inconsistencies between the Letter of Assurance Form and any sample licenses, material licensing terms, or not to exceed rates provided in connection with 1.a. or 1.b. below, the terms of the Letter of Assurance Form shall control.*

☐ 1. The Submitter may own, control, or have the ability to license Patent Claims that might be or become Essential Patent Claims. With respect to such Essential Patent Claims, the Submitter's licensing position is as follows **(must check a, b, c, or d and any applicable subordinate boxes)**:

   ☐ a. The Submitter will grant a license without compensation to an unrestricted number of applicants on a worldwide basis with reasonable terms and conditions that are demonstrably free of unfair discrimination.

      ☐ (Optional) A sample of such a license (or material licensing terms) that is substantially similar to what the Submitter would offer is attached.

Copyright © 2012 IEEE                January 2012
145

☐ b. The Submitter will grant a license under reasonable rates to an unrestricted number of applicants on a worldwide basis with reasonable terms and conditions that are demonstrably free of unfair discrimination.

☐ (Optional) These reasonable rates will not exceed _____ (e.g., percent of product price, flat fee, per unit).

☐ (Optional) A sample of such a license (or material licensing terms) that is substantially similar to what the Submitter would offer is attached.

☐ c. The Submitter without conditions will not enforce any present or future Essential Patent Claims against any person or entity making, using, selling, offering to sell, importing, distributing, or implementing such a compliant implementation.

☐ d. The Submitter is unwilling or unable to grant licenses according to the provisions of either a or b above or to agree that it will not enforce its Essential Patent Claims as described in c above.

☐ 2. After a Reasonable and Good Faith Inquiry, the Submitter is not aware of any Patent Claims that the Submitter may own, control, or have the ability to license that might be or become Essential Patent Claims.

**E. SCOPE OF ASSURANCE:**

*Note: The Submitter must complete this section if box 1 in part D above is checked.*

The Submitter may, but is not required to, identify one or more of its Patent Claims that it believes might be or become Essential Patent Claims. ***(Submitter must check box 1 or box 2 below)***

☐ 1. When checked, this Letter of Assurance only applies to the Patent Claims identified below that are or become Essential Patent Claims. (If no Patent Claim is identified below, then this Letter of Assurance applies to all Essential Patent Claims supported by the disclosure in the patent or patent applications listed below.)

Patent/Application/Docket Number:
Description/Title (optional):

Claim (optional):

Patent/Application/Docket Number:
Description/Title (optional):

Claim (optional):

Patent/Application/Docket Number:
Description/Title (optional):

Claim (optional):

*For additional patents, use additional pages as necessary.*

☐ 2. When checked, this Letter of Assurance is a Blanket Letter of Assurance. As such, all Essential Patent Claims that the Submitter may currently or in the future have the ability to license shall be available under the terms as indicated above in part D.1; however, a Blanket Assurance shall not supersede any pre-existing or simultaneously submitted specific assurance identifying potential Essential Patent Claims.

Copyright © 2012 IEEE            January 2012

## F. APPLICATION TO AFFILIATES:

With respect to any Essential Patent Claims that an Affiliate has the ability to license, the Submitter agrees that (i) the licensing positions described in parts C and D above apply to any Essential Patent Claims within the scope of the assurance described in part E; and (ii) the terms of this assurance are binding on each such Affiliate; provided, however, that such representations and commitments shall not apply to Affiliates identified below:

_____    _____
Organization's Name                Organization's Name


Address                            Address


Contact person                     Contact person


*For additional Affiliates, use additional pages as necessary.*

## G. SIGNATURE:

By signing this Letter of Assurance, you represent that you have the authority to bind the Submitter and all Affiliates (other than those Affiliates excluded above) to the representations and commitments provided in this LOA and acknowledge that users and implementers of the [Proposed] IEEE Standard identified in part C above are relying or will rely upon and may seek enforcement of the terms of this LOA. The Submitter and all Affiliates (other than those Affiliates excluded above) agree not to sell or otherwise transfer any rights in any Essential Patent Claims that they hold, control, or have the ability to license with the intent of circumventing or negating any of the representations and commitments made in this LOA.

The Submitter agrees (a) to provide notice of a Letter of Assurance either through a Statement of Encumbrance or by binding any assignee or transferee to the terms of such Letter of Assurance; and (b) to require its assignee or transferee to (i) agree to similarly provide such notice and (ii) to bind its assignees or transferees to agree to provide such notice as described in (a) and (b).

If, as described in Clause 6 of the *IEEE-SA Standards Board Bylaws*, the Submitter becomes aware of additional Patent Claims not already covered by an existing Letter of Assurance that are owned, controlled, or licensable by the Submitter that may be or become Essential Patent Claims with respect to the standard identified in C above, the Submitter agrees to submit a Letter of Assurance stating its position regarding enforcement or licensing of such Patent Claims.

Print name of authorized person: _____

Title of authorized person:

Signature of authorized person: _____  Date:

Address:

Phone:                             E-mail:

*Note: This assurance applies from the date of the standard's approval to the date of the standard's transfer to inactive status and is irrevocable upon acceptance by the IEEE-SA.*

---

*The IEEE Patent Policy and the procedures used to execute that policy are documented in the IEEE-SA Standards Board Bylaws and the IEEE-SA Standards Board Operations Manual, available at http://standards.ieee.org/develop/policies/. The terms and definitions set forth in the IEEE Patent Policy, IEEE-SA Standards Board Bylaws, and IEEE-SA Standards Board Operations Manual in effect as of the date of this Letter of Assurance are incorporated herein.*

# DEFINITIONS

The following terms, when capitalized, have the following meanings:

*"Accepted Letter of Assurance"* and *"Accepted LOA"* shall mean a Letter of Assurance that the IEEE-SA has determined is complete in all material respects and has been posted to the IEEE-SA web site.

*"Affiliate"* shall mean an entity that directly or indirectly, through one or more intermediaries, controls the Submitter, is controlled by the Submitter, or is under common control with the Submitter. For the purposes of this definition, the term "control" and its derivatives, with respect to for-profit entities, means the legal, beneficial or equitable ownership, directly or indirectly, of more than fifty percent (50%) of the capital stock (or other ownership interest, if not a corporation) of an entity ordinarily having voting rights. "Control" and its derivatives, with respect to nonprofit entities, means the power to elect or appoint more than fifty percent (50%) of the Board of Directors of an entity.

*"Blanket Letter of Assurance"* shall mean a Letter of Assurance that applies to all Essential Patent Claims for which a Submitter may currently or in the future (except as otherwise provided for in these Bylaws and in the *IEEE-SA Standards Board Operations Manual)* have the ability to license.

*"Enabling Technology"* shall mean any technology that may be necessary to make or use any product or portion thereof that complies with the [Proposed] IEEE Standard but is neither explicitly required by nor expressly set forth in the [Proposed] IEEE Standard (e.g., semiconductor manufacturing technology, compiler technology, object-oriented technology, basic operating system technology, and the like).

*"Essential Patent Claim"* shall mean any Patent Claim the use of which was necessary to create a compliant implementation of either mandatory or optional portions of the normative clauses of the [Proposed] IEEE Standard when, at the time of the [Proposed] IEEE Standard's approval, there was no commercially and technically feasible non-infringing alternative. An Essential Patent Claim does not include any Patent Claim that was essential only for Enabling Technology or any claim other than that set forth above even if contained in the same patent as the Essential Patent Claim.

*"Letter of Assurance"* and *"LOA"* shall mean a document, including any attachments, stating the Submitter's position regarding ownership, enforcement, or licensing of Essential Patent Claims for a specifically referenced IEEE Standard, submitted in a form acceptable to the IEEE-SA.

*"Patent Claim(s)"* shall mean one or more claims in issued patent(s) or pending patent application(s).

*"Reasonable and Good Faith Inquiry"* includes, but is not limited to, a Submitter using reasonable efforts to identify and contact those individuals who are from, employed by, or otherwise represent the Submitter and who are known to the Submitter to be current or past participants in the development process of the [Proposed] IEEE Standard identified in a Letter of Assurance, including, but not limited to, participation in a Sponsor Ballot or Working Group. If the Submitter did not or does not have any participants, then a Reasonable and Good Faith Inquiry may include, but is not limited to, the Submitter using reasonable efforts to contact individuals who are from, employed by, or represent the Submitter and who the Submitter believes are most likely to have knowledge about the technology covered by the [Proposed] IEEE Standard.

*"Statement of Encumbrance"* shall mean a specific reference to an Accepted LOA or a general statement in the transfer or assignment agreement that the Patent Claim(s) being transferred or assigned are subject to any encumbrances that may exist as of the effective date of such agreement. An Accepted LOA is an encumbrance.

*"Submitter"* when used in reference to a Letter of Assurance shall mean an individual or an organization that provides a completed Letter of Assurance. A Submitter may or may not hold Essential Patent Claims.

*Should any discrepancy exist between the definitions above and the definitions in the IEEE-SA Standards Board Bylaws clause 6.1, the definitions contained in the Bylaws shall control.*