# EXHIBIT 36

783

1        IN THE UNITED STATES DISTRICT COURT

2       FOR THE WESTERN DISTRICT OF WASHINGTON

3                    AT SEATTLE

4

5   MICROSOFT CORPORATION, a

6   Washington corporation,

7            Plaintiff,

8   vs.        No. C10-1823-JLR

9   MOTOROLA, INC., MOTOROLA

10  MOBILITY, INC., and GENERAL

11  INSTRUMENT CORPORATION,

12           Defendants.

13  _____

14

15           DEPOSITION OF DAVID A. HEINER

16           Taken on behalf of the Defendants

17                  March 28, 2012

18                     - - -

19  BE IT REMEMBERED THAT, pursuant to the Washington Rules of

20  Civil Procedure, the deposition of DAVID A. HEINER, was

21  taken before Tia B. Reidt, #2798, a Certified Shorthand

22  Reporter, and a Notary Public for the State of Washington,

23  on March 28, 2012, commencing at the hour of 8:48 a.m., the

24  proceedings being reported at 315 5th Avenue South,

25  Suite 1000, Seattle, Washington. TSG Job # 47848.

Page 2

APPEARANCES

Appearing on behalf of the Plaintiff
ARTHUR W. HARRIGAN, JR.
DANIELSON HARRIGAN LEYH & TOLLEFSON
999 3rd Avenue
Seattle, WA 98104

Appearing on behalf of the Defendant
PAUL M. SCHOENHARD
MATTHEW RIZZOLO
ROPES & GRAY
One Metro Center
700 12th Street NW
Washington, DC 20005

Page 3

Appearing on behalf of the Defendant
LYNN ENGEL
SUMMIT LAW GROUP
315 Fifth Avenue South
Seattle, WA 98104

ALSO PRESENT:

Sid Fox,
Videographer

Page 4

EXAMINATION INDEX

EXAMINATION BY                         PAGE
Mr. Schoenhard                          8

EXHIBIT INDEX

| EXHIBIT NO. | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 1 | 10-page Defendant Motorola Mobility, Inc.'s notice of deposition of Microsoft Corporation. | 12 |
| Exhibit 2 | 17-page letter re: Patent Standards Workshop, Project No. P11-1204, dated June 14, 2011. | 27 |
| Exhibit 3 | 1-page Microsoft's Support for Industry Standards document. | 40 |
| Exhibit 4 | 2-page e-mail string re: Microsoft statement. | 42 |
| Exhibit 5 | 3-page Microsoft's Support for Industry Standards document. | 45 |
| Exhibit 6 | 1-page e-mail string re: We just posted a blog. | 46 |
| Exhibit 7 | 2-page e-mail string re: Google Pushing FTC letter now with CNET. | 47 |

Page 5

EXHIBIT INDEX CONTINUED

| EXHIBIT NO. | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 8 | 1-page Google/Motorola Mobility Q1 Questionnaire to competitors. | 49 |
| Exhibit 9 | 22-page 802.11 Patent License dated October 21, 2010. | 53 |
| Exhibit 10 | 24-page H.264 Patent License dated 10/29/2010. | 53 |
| Exhibit 11 | 3-page Interoperability: The other Side of Our Settlement with the European Commission document. | 54 |
| Exhibit 12 | 4-page Frequently Asked Questions about Interoperability document. | 55 |
| Exhibit 13 | 3-page Microsoft Open Specifications document. | 56 |
| Exhibit 14 | 14-page Patent Covenant Agreement, Microsoft Exchange Outlook Protocol. | 58 |
| Exhibit 15 | 21-page Patent Covenant Agreement, Microsoft Sharepoint Protocols. | 60 |
| Exhibit 16 | 27-page Patent Covenant Agreement, Windows Client PC Operating System (Including .net framework) protocols. | 61 |
| Exhibit 17 | 11-page Patent License Microsoft Exchange Server 2010 Protocols. | 62 |

Page 6

1            EXHIBIT INDEX CONTINUED
2
3   EXHIBIT NO.    DESCRIPTION                 PAGE
4   Exhibit 18  2-page e-mail string re: Industry    63
5       understanding of FRAND.
6   Exhibit 19  18-page Google: Please Don't kill    67
7       video on the web document.
8   Exhibit 20  2-page letter from the United       71
9       States Department of Justice dated
10      3/15/21.
11  Exhibit 21  17-page letter re: Standardization  75
12      Feedback for Sub-Committee on
13      Standards dated 3/7/11.
14  Exhibit 22  37-page e-mail and attachment       75
15      Re: Proposed consent decree
16      Microsoft's.
17  Exhibit 23  3-page Microsoft's Proposed         77
18      Consent Decree Principles.

Page 7

1                 DAVID A. HEINER
2            DEPOSITION OF DAVID A. HEINER
3             Wednesday, March 28, 2012
4                    8:48 a.m.
5
6       THE VIDEOGRAPHER:  This is the start of videotape
7   labeled No. 1 of the videotape deposition of David Heiner in
8   the matter of Microsoft Corporation verses Motorola Inc.,
9   et. al, in the United States District Court for the Western
10  District of Washington at Seattle, Civil Action
11  No. C10-1823-JLR.
12      This deposition is being held at Summit Law Group,
13  315 5th Avenue South, Suite 1000, Seattle, Washington, 98104
14  on March 28th, 2012, at approximately 8:45 a.m.
15      My name is Sid Fox from TSG Reporting, Inc., and
16  I'm the legal video specialist.  The court reporter is Tia
17  Reidt in association with TSG Reporting.
18      Will counsel please introduce yourselves.
19      MR. SCHOENHARD:  Good morning.  My name is Paul
20  Schoenhard.  I'm an attorney with Ropes & Gray, LLP.  I'm
21  here today representing the Motorola entities, the
22  defendants.
23      With me today are Matt Rizzolo, also with Ropes &
24  Gray, and Lynn Engel with the Summit Law Group.
25      MR. HARRIGAN:  Art Harrigan, Danielson Harrigan,

Page 8

1                 DAVID A. HEINER
2   representing Microsoft and the witness.
3       THE VIDEOGRAPHER:  Will the court reporter please
4   swear the witness in.
5   DAVID A. HEINER, having been first duly sworn, was
6   examined and testified as follows:
7
8   EXAMINATION
9   BY MR. SCHOENHARD:
10      Q.  Good morning, Mr. Heiner.
11      A.  Good morning.
12      Q.  Please state your full name and home address for
13  the record.
14      A.  David A. Heiner, 14314 227th Avenue Northeast,
15  Woodinville, Washington, 98077.
16      Q.  And do you understand that you're testifying under
17  oath here today?
18      A.  I do.
19      Q.  Is there any reason you won't be able to provide
20  honest testimony today?
21      A.  No.
22      Q.  You are currently employed by Microsoft?
23      A.  Yes.
24      Q.  What is your current title?
25      A.  Vice president and deputy general counsel.

Page 9

1                 DAVID A. HEINER
2       Q.  What are your responsibilities as vice president
3   and deputy general counsel?
4       A.  I'm responsible for two organizations within the
5   Microsoft law department.  One is our antitrust group, and
6   the other is the corporate standards group.
7       Q.  Do I understand correctly, based on your answer,
8   that the antitrust group and the corporate standards groups
9   are treated as two separate groups?
10      A.  They're often treated as one group, so it's --
11  there's no real answer.  It could be one or two.
12      Q.  But you have general responsibility for both?
13      A.  I do.
14      Q.  Could you please explain briefly what your
15  standards -- what your responsibilities are with respect to
16  the standards group?
17      A.  Well, I oversee the group.  The corporate
18  standards group is an organization that provides services to
19  the rest of Microsoft.  Those services include legal advice
20  in connection with participation in standards bodies,
21  standards policy work, and also includes people who
22  participate directly in standards-setting organizations, so
23  these are nonlawyers whose job function is to represent
24  Microsoft at standards bodies.
25      There are other people within Microsoft who are not

Page 30

1    DAVID A. HEINER
2  the second paragraph on Page 12 of Exhibit 2.
3    A.   Okay. (Witness peruses document.)
4        Okay.
5    Q.   Is it fair to say that Microsoft believes that
6  while there is no exhaustive list of traditional RAND
7  licensing terms, in addition to a possible compensation
8  element, such terms may include a field of use restriction,
9  reciprocity, non sublicensability, defensive suspension, and
10 other common patent licensing considerations?
11   A.   Yeah. Generally I think that's correct.
12       As I think about one of the earlier questions you
13 asked, though, maybe I should clarify one aspect. This is
14 my letter to the Federal Trade Commission, and it was my
15 view at the time. I am responsible for this function at
16 Microsoft. But to go all the way to say that, you know,
17 does Microsoft believe X, Y and Z is perhaps a bit of a
18 stretch, since it's a corporate entity and there's not
19 necessarily any one belief of such an entity.
20       But having said that, I am responsible for the
21 subject matter generally, and so...
22   Q.   And you do agree that Exhibit 2, the June 2011
23 letter, was submitted to the Federal Trade Commission on
24 behalf of Microsoft, the corporate entity?
25   A.   Yes.

Page 31

1    DAVID A. HEINER
2    Q.   Can you explain what you understand the term
3  "field of use restriction" to mean?
4    A.   I'm sorry. Can you repeat the question?
5    Q.   Can you explain to me what you understand the term
6  "field of use restriction" to mean.
7    A.   I understand the term "field of use restriction"
8  to mean that a particular, say, patent might be licensed for
9  one use and not another.
10   Q.   Can you explain to me what you understand the term
11 "reciprocity" to mean?
12   A.   Let's see. I understand that term to mean that in
13 a patent license, there might be a reciprocal grant of
14 patent rights back to the licensor.
15   Q.   Would that also be referred to as a grant-back?
16   A.   I think so. I'm not sure if the terms are, you
17 know, completely synonymous or not, but yes.
18   Q.   What do you understand the term "defensive
19 suspension" to mean?
20   A.   I understand that to refer to the concept where a
21 patent holder might grant a patent license to a licensee but
22 have a provision that says that if the licensee engages in
23 some specified act such as a lawsuit back against the
24 licensor, then the license grant terminates.
25   Q.   And what might other common patent licensing

Page 32

1    DAVID A. HEINER
2  considerations include?
3    A.   I don't know offhand.
4    Q.   Would licensing nonessential patents as part of
5  the same transaction be a common patent licensing
6  consideration?
7    A.   Can you repeat the question?
8    Q.   Would including as part of license discussion
9  nonessential patents also be another common patent licensing
10 consideration?
11   A.   Yes. I think that happens.
12   Q.   Would considerations of license term and
13 termination also be common patent license considerations?
14   A.   Yes.
15   Q.   And each of these considerations would typically
16 be fleshed out as part of bilateral negotiations between the
17 perspective licensor and perspective licensee, correct?
18   A.   Yes.
19   Q.   Would you agree that whether terms are reasonable
20 can be a matter of some debate?
21   A.   Yes.
22   Q.   And whether terms are reasonable can be resolved
23 through litigation in the relatively rare circumstances
24 where business discussions fail, correct?
25   A.   I think that's right.

Page 33

1    DAVID A. HEINER
2    Q.   You would typically expect for there to be
3  business discussions prior to legal action, however,
4  correct?
5    A.   I don't know about that.
6    Q.   You agree that RAND license terms are typically
7  arrived at through bilateral negotiation, correct?
8    A.   Typically, yes.
9    Q.   Are there circumstances in which bilateral
10 negotiation would not be involved?
11       MR. HARRIGAN: Object to the form of the question.
12       You can answer.
13       THE WITNESS: I think one important aspect of the
14 standards system is that a firm that makes a RAND commitment
15 when it initiates patent licensing discussions, that it do
16 so in good faith and that any offer it makes that it
17 believes that offer is RAND, recognizing that people may
18 differ on that point.
19       And so if a firm were to come forward and put on
20 the table an offer that is manifestly not RAND, that likely
21 would not provide the basis for good-faith negotiations to
22 proceed.
23 BY MR. SCHOENHARD:
24   Q.   How might you determine if an offer is manifestly
25 not RAND?

Page 34

1     DAVID A. HEINER
2  A.  If it had the characteristics that Microsoft
3  identified in an interrogatory response, I think in this
4  case but I'm not sure, where we listed a number of aspects
5  of what, is in our view, not RAND.
6  Q.  In such a circumstance, you believe that rather
7  than going back and saying this doesn't look quite right in
8  the general standards-setting context, it makes sense to go
9  ahead with a legal action?
10 A.  I think that's fair to say.
11 Q.  Please direct your attention to Page 13 of
12 Exhibit 2, the June 2011 letter.
13 A.  Okay.
14 Q.  Please feel free to read to yourself the first
15 full paragraph on this page.
16     MR. HARRIGAN: I'm sorry. I was typing and missed
17 it. Where are we reading?
18     MR. SCHOENHARD: Page 13, the first full paragraph.
19     MR. HARRIGAN: Thanks.
20     THE WITNESS: (Witness peruses document.)
21 Okay.
22 BY MR. SCHOENHARD:
23 Q.  Is it fair to say that as of June 2011, the time
24 this letter was submitted to the Federal Trade Commission,
25 you believed that the existence of a RAND commitment to

Page 35

1     DAVID A. HEINER
2  offer patent licences should not preclude a patent holder
3  from seeking a preliminary injunctive relief or commencing
4  an action in the International Trade Commission just because
5  the patent holder has made a licensing commitment to offer
6  RAND-based licenses in connection with the standard?
7  A.  Yes.
8  Q.  And would you agree that any uniform declaration
9  that such relief would not be available if the patent holder
10 has made a commitment to offer a RAND license for its
11 essential patent claims in connection with the standard may
12 reduce any incentives that implementers might have to engage
13 in good-faith negotiations with the patent holder?
14 A.  Yes. I mean, generally I believe that, and I
15 think it's a commonplace notion, that anytime there's any
16 limit whatsoever on the scope of intellectual property
17 rights, that logically tends to reduce incentives to attain
18 those rights.
19     And on the other hand, if what's happening is that
20 there's greater sharing of those rights, then in the near
21 term there's the possibility of greater enervation by others
22 using those rights, and that's kind of a balancing and
23 tradeoff that has to be made.
24 Q.  Please direct your attention to Page 8 of
25 Exhibit 2, the June 2011 letter to the Federal Trade

Page 36

1     DAVID A. HEINER
2  Commission.
3  A.  (Witness complies.)
4  Q.  In Footnote 5 on Page 8 of Exhibit 2, do you see
5  reference to a Mr. Keith Mallinson, M-A-L-L-I-N-S-O-N?
6  A.  Yes.
7  Q.  Who is Mr. Keith Mallinson?
8  A.  I don't know beyond what is said in the
9  parenthetical.
10 Q.  The parenthetical to which you're referring reads,
11 "A longstanding research analyst and consultant in the
12 telecommunications industry"?
13 A.  Yes.
14 Q.  Do you believe that statement regarding
15 Mr. Mallinson to be correct?
16 A.  Let me take a minute and read this. We're talking
17 about the statement that's the second sentence of the
18 footnote, or after the colon?
19 Q.  I was referring to the statement in the
20 parenthetical referring to who Mr. Mallinson is.
21 A.  Oh. I assume that's correct. I don't know
22 personally.
23 Q.  Please take a moment to read to yourself the final
24 paragraph of Footnote 5 on Page 8 of Exhibit 2.
25 A.  Okay. (Witness complies.)

Page 37

1     DAVID A. HEINER
2     MR. HARRIGAN: When you say "the final paragraph,"
3  you're talking about the one that starts, "The principal"?
4     MR. SCHOENHARD: Correct.
5     MR. HARRIGAN: Feel free to read the rest of that
6  footnote.
7     THE WITNESS: (Witness peruses document.)
8  Okay.
9  BY MR. SCHOENHARD:
10 Q.  Do you agree with Mr. Mallinson's statement that
11 there will at times be significant contention between the
12 patent owner and implementer about what constitutes
13 reasonable licensing terms, but this is to be expected, as
14 with commercial negotiation on any input cost component, and
15 has for the most part been readily resolved through
16 bilateral negotiations?
17 A.  Yes.
18 Q.  Would you agree, then, that even in situations
19 where there may be significant contention between parties as
20 to what would ultimately be reasonable terms, bilateral
21 negotiation is an appropriate course?
22 A.  In general, yes. This particular case I think of
23 as an outlier.
24 Q.  If a potential implementer of a standard is aware
25 that another entity owns a portfolio of potentially

Page 38

1  DAVID A. HEINER
2  standard-essential patents, do you believe that the
3  implementer has an obligation to seek a license to those
4  patents?
5  A.  I don't know about that.  The current practice in
6  the industry is often that no such license is sought and so
7  no such license is put in place, but rather firms simply
8  implement standards and rely on the fact that if they needed
9  a license - in other words, if the patent holder came
10 knocking - there's a RAND commitment.
11     And so I think often in the industry, firms simply
12 implement and don't actually obtain licences from everyone
13 who might have IP that reads on implementation.
14 Q.  Does that practice create free-rider issues?
15 A.  What do you mean?
16 Q.  Doesn't that type of practice encourage
17 implementers to effectively operate in an unlicensed
18 capacity with respect to existing IP rights in the hopes
19 that never shall a license need to be paid?
20 A.  I don't know.  I'm just commenting on what I think
21 happens in the industry.
22 Q.  When a patent holder comes knocking on the
23 implementer's door, what do you believe to be the common
24 practice?
25 A.  The common practice is that the patent holder, if

Page 39

1  DAVID A. HEINER
2  he's knocking on someone's door, apparently is seeking
3  licensing fees and then is obliged to offer a license that
4  is compliant with RAND.
5  Q.  How do you determine if the license that's offered
6  is compliant with RAND?
7  A.  Well, that's a very big question, and people go to
8  conferences and have debates about what is RAND and the
9  like, so there's no definitive answer to that.
10 Q.  In large part, the parties collectively and
11 bilaterally determine what is RAND in their specific
12 contexts through negotiations, correct?
13 A.  Typically.
14     MR. SCHOENHARD:  I think I've had you on the record
15 for approximately an hour.  Why don't we go ahead and take
16 our first break, and then we'll resume in a few moments.
17     THE VIDEOGRAPHER:  The time is approximately
18 9:35 a.m.  We are off the record.
19     (Pause in the proceedings.)
20     THE VIDEOGRAPHER:  We are back on the record.  The
21 time is approximately 9:54 a.m.
22 BY MR. SCHOENHARD:
23 Q.  Mr. Heiner, do you understand that you've been
24 designated to testify today additionally with respect to
25 Topic 36 in Motorola's Notice of Deposition --

Page 40

1  DAVID A. HEINER
2  A.  Yes.
3  Q.  -- relating to a February 8th, 2012 statement,
4  "Microsoft Support for Industry Standards"?
5  A.  Yes.
6  Q.  Do you believe that you are prepared today to
7  speak with respect to that topic?
8  A.  Yes.
9     (Whereupon, a 1-page Microsoft's Support for
10 Industry Standards document was marked Exhibit 3 for
11 identification.)
12    THE COURT REPORTER:  Exhibit 3.
13 BY MR. SCHOENHARD:
14 Q.  Mr. Heiner, you have been handed a document that
15 has been marked as Heiner Exhibit 3, bearing Production No.
16 MS-MOTO_1823_00005196256.
17     Please take a moment to review this document and
18 tell me whether you recognize it.
19 A.  Yes, I recognize this document.
20 Q.  What is this document, Heiner Exhibit 3?
21 A.  This document is a printout of a web page where
22 Microsoft made a statement regarding its support for
23 industry standards.
24 Q.  As part of this February 8th, 2012 statement,
25 Microsoft stated, under the No. 2, "This means that

Page 41

1  DAVID A. HEINER
2  Microsoft will not seek an injunction or exclusion order
3  against any firm on the basis of those essential patents,"
4  correct?
5  A.  Correct.
6  Q.  As of today, is that Microsoft's official
7  position?
8  A.  Yes.
9  Q.  As of today, is it Microsoft's position that it is
10 inappropriate for standards-essential patent holders to seek
11 injunctive-style relief?
12 A.  Yes.
13 Q.  That position is directly contrary to the position
14 taken at Page 13 of the June 2011 Federal Trade Commission
15 letter we discussed a moment ago, correct?
16 A.  Our position changed from June 14th to more
17 recently, yes.
18 Q.  Why did Microsoft's position change?
19 A.  Based on experience since then, based on thinking
20 about the subject more deeply, and based on discussions with
21 the US Department of Justice.
22 Q.  When you say "based or our experience since then,"
23 are you referring to your experience as, for example, a
24 defendant against the Motorola entities?
25 A.  Yes.

```
                                    Page 54
 1              DAVID A. HEINER
 2    Q.   Do you recall whether you have seen these
 3　documents before?
 4    A.   I don't think I have.  I'm not certain.
 5    Q.   You can set them aside.
 6    A.   Okay.
 7         (Whereupon, a 3-page Interoperability: The other
 8　Side of Our Settlement with the European Commission document
 9　was marked Exhibit 11 for identification.)
10         THE COURT REPORTER:  Exhibit 11.
11　BY MR. SCHOENHARD:
12    Q.   Mr. Heiner, you've been handed a document that has
13　been marked as Heiner Exhibit 11.
14         Please take a moment to review this document and
15　tell me whether you recognize it.
16    A.   (Witness peruses document.)
17         Okay.
18    Q.   Do you recognize this document?
19    A.   Yes.
20    Q.   What is Heiner Exhibit 11?
21    A.   It appears to be a printout of a blog post that I
22　did apparently on December 18th of 2009.
23    Q.   To what does the blog post marked as Heiner
24　Exhibit 11 relate?
25    A.   It relates to a settlement of inquiries made by
```

```
                                    Page 55
 1              DAVID A. HEINER
 2　the European Commission regarding interoperability.
 3    Q.   What is interoperability?
 4    A.   That's another one of those $64,000 questions.
 5　But generally it's the ability of two products to -- at
 6　least in the computer context, two products to exchange
 7　information and interact with one another.
 8    Q.   And in connection with the European Commission's
 9　investigation, were there concerns about the availability of
10　interoperability with Microsoft products?
11    A.   Yes.
12    Q.   As part of this and other investigations,
13　Microsoft created a set of principles regarding
14　interoperability that it intends to follow, correct?  Do you
15　have any responsibility for the principles of
16　interoperability at Microsoft?
17    A.   Yes.
18    Q.   What is that responsibility?
19    A.   The responsibility is counseling clients with
20　respect to living up to those principles.
21    Q.   And when you say "counseling clients," you're
22　referring to clients within Microsoft, correct?
23    A.   Yes.
24         (Whereupon, a 4-page Frequently Asked Questions
25　about Interoperability document was marked Exhibit 12 for
```

```
                                    Page 56
 1              DAVID A. HEINER
 2　identification.)
 3         THE COURT REPORTER:  Exhibit 12.
 4　BY MR. SCHOENHARD:
 5    Q.   Mr. Heiner, you've been handed a document that has
 6　been marked as Heiner Exhibit 12, bearing Production Nos.
 7　MOTOM_WASH1823_0394353 through 356.  Please take a moment to
 8　review this document and tell me whether you recognize it.
 9    A.   (Witness peruses document.)
10         I see it appears to be a printout of a Microsoft
11　website relating to the interoperability principles we
12　announced.  I don't specifically recall the document.
13         (Whereupon, a 3-page Microsoft Open Specifications
14　document was marked Exhibit 13 for identification.)
15　BY MR. SCHOENHARD:
16    Q.   Mr. Heiner, you've been handed a document marked
17　as Heiner Exhibit 13 which bears Production Nos.
18　MOTM_WASH1823_0394414 through 416.
19         Please take a moment to review this document and
20　tell me whether you recognize it.
21    A.   Yes.  I recognize this document to be a printout
22　from the Microsoft website of the interoperability
23　principles that Microsoft articulated.
24    Q.   Are you familiar with the set of interoperability
25　principles reflected in Exhibit 13?
```

```
                                    Page 57
 1              DAVID A. HEINER
 2    A.   Yes.
 3    Q.   One of the interoperability principles is
 4　identified with the numeral 4 at the bottom of the page
 5　carrying over to the second page of the bottom, "RAND Patent
 6　Terms."
 7         Do you see that?
 8    A.   Yes.
 9    Q.   As one of Microsoft's interoperability principles,
10　Microsoft has committed to provide licenses to certain of
11　its patents covering Microsoft open protocols on reasonable
12　and nondiscriminatory terms, correct?
13    A.   Yes.
14    Q.   Is the term "RAND" with respect to reasonable and
15　nondiscriminatory licensing terms, as used in the context of
16　Microsoft's interoperability principles, substantially the
17　same, in your view, as RAND is understood in these standards
18　context?
19    A.   I'm not sure about that.  You know, here we're
20　talking about making available proprietary technologies.
21　And in the standard-setting context, you know, we're talking
22　about firms coming together to contribute technology which
23　may come from many different places into one standard and
24　then that standard being one of many that gets implemented
25　in products.
```

```
                                              Page 82
 1             DAVID A. HEINER
 2   BY MR. SCHOENHARD:
 3     Q.   Mr. Heiner, are you aware of any time prior to the
 4   fall of 2011 at which Microsoft took the position that
 5   injunctive relief should not be available to standard-
 6   essential patent holders?
 7         MR. HARRIGAN:  Object to the form of the question.
 8         THE WITNESS:  No.
 9         MR. SCHOENHARD:  Mr. Heiner, I don't believe I have
10   anything further.  I thank you very much for your time this
11   morning.
12         THE WITNESS:  Okay.  Thank you.
13         THE COURT REPORTER:  Any questions?
14         MR. HARRIGAN:  Nope.
15         THE VIDEOGRAPHER:  Here marks the end of videotape
16   labeled No. 2 in the deposition of David Heiner.
17         The time is approximately 11:56 a.m.  We are off
18   the record.
19         THE COURT REPORTER:  And before I go off the
20   record, would you like the standing order?
21         MR. SCHOENHARD:  Please.
22         THE COURT REPORTER:  And would you like a copy,
23   standing order?
24   //
25   CONTINUED ON THE NEXT PAGE TO INCLUDE JURAT.
```

```
                                              Page 83
 1             DAVID A. HEINER
 2         MR. HARRIGAN:  Yeah.
 3         THE COURT REPORTER:  Thank you.
 4         (Whereupon, the deposition was concluded at
 5   11:59 a.m.)
 6
 7         (Signature waived.)
```

```
                                              Page 84
 1             CERTIFICATE
 2
 3     I, Tia B. Reidt, do hereby certify that
 4   pursuant to the Rules of Civil Procedure, the witness
 5   named herein appeared before me at the time and place
 6   set forth in the caption herein; that at the said time
 7   and place, I reported in stenotype all testimony
 8   adduced and other oral proceedings had in the
 9   foregoing matter; and that the foregoing transcript
10   pages constitute a full, true and correct record of
11   such testimony adduced and oral proceeding had and
12   of the whole thereof.
13
14      IN WITNESS HEREOF, I have hereunto set my hand
15   this 9th day of April, 2012.
16
17
18
19
     _____
20     Tia B. Reidt
21
22   Commission Expiration: June 3, 2014
23
24
25
```

```
                                              Page 85
 1             CORRECTION SHEET
 2   Deposition of: David Heiner      Date: 03/28/12
 3   Regarding:    Microsoft Vs. Motorola
 4   Reporter:     Tia Reidt
 5   _____
 6   Please make all corrections, changes or clarifications
 7   to your testimony on this sheet, showing page and line
 8   number.  If there are no changes, write "none" across
 9   the page.  Sign this sheet on the line provided.
10   Page   Line   Reason for Change
11   ____  ____  _____
12   ____  ____  _____
13   ____  ____  _____
14   ____  ____  _____
15   ____  ____  _____
16   ____  ____  _____
17   ____  ____  _____
18   ____  ____  _____
19   ____  ____  _____
20   ____  ____  _____
21   ____  ____  _____
22   ____  ____  _____
23   ____  ____  _____
24       Signature_____
25          David Heiner
```