# EXHIBIT 36

783

Page 1

1      IN THE UNITED STATES DISTRICT COURT
2      FOR THE WESTERN DISTRICT OF WASHINGTON
3                   AT SEATTLE
4
5  MICROSOFT CORPORATION, a
6  Washington corporation,
7           Plaintiff,
8  vs.     No. C10-1823-JLR
9  MOTOROLA, INC., MOTOROLA
10 MOBILITY, INC., and GENERAL
11 INSTRUMENT CORPORATION,
12          Defendants.
13 _____
14
15         DEPOSITION OF DAVID A. HEINER
16         Taken on behalf of the Defendants
17              March 28, 2012
18                 - - -
19 BE IT REMEMBERED THAT, pursuant to the Washington Rules of
20 Civil Procedure, the deposition of DAVID A. HEINER, was
21 taken before Tia B. Reidt, #2798, a Certified Shorthand
22 Reporter, and a Notary Public for the State of Washington,
23 on March 28, 2012, commencing at the hour of 8:48 a.m., the
24 proceedings being reported at 315 5th Avenue South,
25 Suite 1000, Seattle, Washington. TSG Job # 47848.

Page 2

|    | APPEARANCES |
|----|---|
| 1  |  |
| 2  |  |
| 3  | Appearing on behalf of the Plaintiff |
| 4  | ARTHUR W. HARRIGAN, JR. |
| 5  | DANIELSON HARRIGAN LEYH & TOLLEFSON |
| 6  | 999 3rd Avenue |
| 7  | Seattle, WA 98104 |
| 12 | Appearing on behalf of the Defendant |
| 13 | PAUL M. SCHOENHARD |
| 14 | MATTHEW RIZZOLO |
| 15 | ROPES & GRAY |
| 16 | One Metro Center |
| 17 | 700 12th Street NW |
| 18 | Washington, DC 20005 |

Page 3

1 Appearing on behalf of the Defendant
2 LYNN ENGEL
3 SUMMIT LAW GROUP
4 315 Fifth Avenue South
5 Seattle, WA 98104

10 ALSO PRESENT:

12 Sid Fox,
13 Videographer

Page 4

EXAMINATION INDEX

EXAMINATION BY                          PAGE
Mr. Schoenhard                          8

EXHIBIT INDEX

EXHIBIT NO.    DESCRIPTION              PAGE
Exhibit 1   10-page Defendant Motorola Mobility,   12
            Inc.'s notice of deposition of
            Microsoft Corporation.
Exhibit 2   17-page letter re: Patent Standards    27
            Workshop, Project No. P11-1204,
            dated June 14, 2011.
Exhibit 3   1-page Microsoft's Support for         40
            Industry Standards document.
Exhibit 4   2-page e-mail string re:               42
            Microsoft statement.
Exhibit 5   3-page Microsoft's Support for         45
            Industry Standards document.
Exhibit 6   1-page e-mail string re: We just       46
            posted a blog.
Exhibit 7   2-page e-mail string re: Google        47
            Pushing FTC letter now with CNET.

Page 5

EXHIBIT INDEX CONTINUED
EXHIBIT NO.    DESCRIPTION              PAGE
Exhibit 8   1-page Google/Motorola Mobility Q1     49
            Questionnaire to competitors.
Exhibit 9   22-page 802.11 Patent License          53
            dated October 21, 2010.
Exhibit 10  24-page H.264 Patent License dated     53
            10/29/2010.
Exhibit 11  3-page Interoperability: The other     54
            Side of Our Settlement with
            the European Commission document.
Exhibit 12  4-page Frequently Asked Questions      55
            about Interoperability document.
Exhibit 13  3-page Microsoft Open Specifications   56
            document.
Exhibit 14  14-page Patent Covenant Agreement,     58
            Microsoft Exchange Outlook Protocol.
Exhibit 15  21-page Patent Covenant Agreement,     60
            Microsoft Sharepoint Protocols.
Exhibit 16  27-page Patent Covenant Agreement,     61
            Windows Client PC Operating System
            (Including .net framework) protocols.
Exhibit 17  11-page Patent License Microsoft       62
            Exchange Server 2010 Protocols.

Page 6

1  EXHIBIT INDEX CONTINUED
2
3  EXHIBIT NO.     DESCRIPTION                         PAGE
4  Exhibit 18  2-page e-mail string re: Industry        63
5              understanding of FRAND.
6  Exhibit 19  18-page Google: Please Don't kill        67
7              video on the web document.
8  Exhibit 20  2-page letter from the United            71
9              States Department of Justice dated
10             3/15/21.
11 Exhibit 21  17-page letter re: Standardization       75
12             Feedback for Sub-Committee on
13             Standards dated 3/7/11.
14 Exhibit 22  37-page e-mail and attachment            75
15             Re: Proposed consent decree
16             Microsoft's.
17 Exhibit 23  3-page Microsoft's Proposed              77
18             Consent Decree Principles.

Page 7

1              DAVID A. HEINER
2         DEPOSITION OF DAVID A. HEINER
3            Wednesday, March 28, 2012
4                  8:48 a.m.
5
6        THE VIDEOGRAPHER:  This is the start of videotape
7  labeled No. 1 of the videotape deposition of David Heiner in
8  the matter of Microsoft Corporation verses Motorola Inc.,
9  et. al, in the United States District Court for the Western
10 District of Washington at Seattle, Civil Action
11 No. C10-1823-JLR.
12       This deposition is being held at Summit Law Group,
13 315 5th Avenue South, Suite 1000, Seattle, Washington, 98104
14 on March 28th, 2012, at approximately 8:45 a.m.
15       My name is Sid Fox from TSG Reporting, Inc., and
16 I'm the legal video specialist.  The court reporter is Tia
17 Reidt in association with TSG Reporting.
18       Will counsel please introduce yourselves.
19       MR. SCHOENHARD:  Good morning.  My name is Paul
20 Schoenhard.  I'm an attorney with Ropes & Gray, LLP.  I'm
21 here today representing the Motorola entities, the
22 defendants.
23       With me today are Matt Rizzolo, also with Ropes &
24 Gray, and Lynn Engel with the Summit Law Group.
25       MR. HARRIGAN:  Art Harrigan, Danielson Harrigan,

Page 8

1              DAVID A. HEINER
2  representing Microsoft and the witness.
3        THE VIDEOGRAPHER:  Will the court reporter please
4  swear the witness in.
5  DAVID A. HEINER, having been first duly sworn, was
6  examined and testified as follows:
7
8  EXAMINATION
9  BY MR. SCHOENHARD:
10    Q.   Good morning, Mr. Heiner.
11    A.   Good morning.
12    Q.   Please state your full name and home address for
13 the record.
14    A.   David A. Heiner, 14314 227th Avenue Northeast,
15 Woodinville, Washington, 98077.
16    Q.   And do you understand that you're testifying under
17 oath here today?
18    A.   I do.
19    Q.   Is there any reason you won't be able to provide
20 honest testimony today?
21    A.   No.
22    Q.   You are currently employed by Microsoft?
23    A.   Yes.
24    Q.   What is your current title?
25    A.   Vice president and deputy general counsel.

Page 9

1              DAVID A. HEINER
2     Q.   What are your responsibilities as vice president
3  and deputy general counsel?
4     A.   I'm responsible for two organizations within the
5  Microsoft law department.  One is our antitrust group, and
6  the other is the corporate standards group.
7     Q.   Do I understand correctly, based on your answer,
8  that the antitrust group and the corporate standards groups
9  are treated as two separate groups?
10    A.   They're often treated as one group, so it's --
11 there's no real answer.  It could be one or two.
12    Q.   But you have general responsibility for both?
13    A.   I do.
14    Q.   Could you please explain briefly what your
15 standards -- what your responsibilities are with respect to
16 the standards group?
17    A.   Well, I oversee the group.  The corporate
18 standards group is an organization that provides services to
19 the rest of Microsoft.  Those services include legal advice
20 in connection with participation in standards bodies,
21 standards policy work, and also includes people who
22 participate directly in standards-setting organizations, so
23 these are nonlawyers whose job function is to represent
24 Microsoft at standards bodies.
25       There are other people within Microsoft who are not

Page 30

DAVID A. HEINER

1  the second paragraph on Page 12 of Exhibit 2.
2  A.  Okay. (Witness peruses document.)
3      Okay.
4  Q.  Is it fair to say that Microsoft believes that
5  while there is no exhaustive list of traditional RAND
6  licensing terms, in addition to a possible compensation
7  element, such terms may include a field of use restriction,
8  reciprocity, non sublicensability, defensive suspension, and
9  other common patent licensing considerations?
10 A.  Yeah. Generally I think that's correct.
11     As I think about one of the earlier questions you
12 asked, though, maybe I should clarify one aspect. This is
13 my letter to the Federal Trade Commission, and it was my
14 view at the time. I am responsible for this function at
15 Microsoft. But to go all the way to say that, you know,
16 does Microsoft believe X, Y and Z is perhaps a bit of a
17 stretch, since it's a corporate entity and there's not
18 necessarily any one belief of such an entity.
19     But having said that, I am responsible for the
20 subject matter generally, and so...
21 Q.  And you do agree that Exhibit 2, the June 2011
22 letter, was submitted to the Federal Trade Commission on
23 behalf of Microsoft, the corporate entity?
24 A.  Yes.

Page 31

DAVID A. HEINER

1  Q.  Can you explain what you understand the term
2  "field of use restriction" to mean?
3  A.  I'm sorry. Can you repeat the question?
4  Q.  Can you explain to me what you understand the term
5  "field of use restriction" to mean.
6  A.  I understand the term "field of use restriction"
7  to mean that a particular, say, patent might be licensed for
8  one use and not another.
9  Q.  Can you explain to me what you understand the term
10 "reciprocity" to mean?
11 A.  Let's see. I understand that term to mean that in
12 a patent license, there might be a reciprocal grant of
13 patent rights back to the licensor.
14 Q.  Would that also be referred to as a grant-back?
15 A.  I think so. I'm not sure if the terms are, you
16 know, completely synonymous or not, but yes.
17 Q.  What do you understand the term "defensive
18 suspension" to mean?
19 A.  I understand that to refer to the concept where a
20 patent holder might grant a patent license to a licensee but
21 have a provision that says that if the licensee engages in
22 some specified act such as a lawsuit back against the
23 licensor, then the license grant terminates.
24 Q.  And what might other common patent licensing

Page 32

DAVID A. HEINER

1  considerations include?
2  A.  I don't know offhand.
3  Q.  Would licensing nonessential patents as part of
4  the same transaction be a common patent licensing
5  consideration?
6  A.  Can you repeat the question?
7  Q.  Would including as part of license discussion
8  nonessential patents also be another common patent licensing
9  consideration?
10 A.  Yes. I think that happens.
11 Q.  Would considerations of license term and
12 termination also be common patent license considerations?
13 A.  Yes.
14 Q.  And each of these considerations would typically
15 be fleshed out as part of bilateral negotiations between the
16 perspective licensor and perspective licensee, correct?
17 A.  Yes.
18 Q.  Would you agree that whether terms are reasonable
19 can be a matter of some debate?
20 A.  Yes.
21 Q.  And whether terms are reasonable can be resolved
22 through litigation in the relatively rare circumstances
23 where business discussions fail, correct?
24 A.  I think that's right.

Page 33

DAVID A. HEINER

1  Q.  You would typically expect for there to be
2  business discussions prior to legal action, however,
3  correct?
4  A.  I don't know about that.
5  Q.  You agree that RAND license terms are typically
6  arrived at through bilateral negotiation, correct?
7  A.  Typically, yes.
8  Q.  Are there circumstances in which bilateral
9  negotiation would not be involved?
10     MR. HARRIGAN: Object to the form of the question.
11     You can answer.
12     THE WITNESS: I think one important aspect of the
13 standards system is that a firm that makes a RAND commitment
14 when it initiates patent licensing discussions, that it do
15 so in good faith and that any offer it makes that it
16 believes that offer is RAND, recognizing that people may
17 differ on that point.
18     And so if a firm were to come forward and put on
19 the table an offer that is manifestly not RAND, that likely
20 would not provide the basis for good-faith negotiations to
21 proceed.
22 BY MR. SCHOENHARD:
23 Q.  How might you determine if an offer is manifestly
24 not RAND?

Page 34

DAVID A. HEINER

A. If it had the characteristics that Microsoft identified in an interrogatory response, I think in this case but I'm not sure, where we listed a number of aspects of what, is in our view, not RAND.

Q. In such a circumstance, you believe that rather than going back and saying this doesn't look quite right in the general standards-setting context, it makes sense to go ahead with a legal action?

A. I think that's fair to say.

Q. Please direct your attention to Page 13 of Exhibit 2, the June 2011 letter.

A. Okay.

Q. Please feel free to read to yourself the first full paragraph on this page.

MR. HARRIGAN: I'm sorry. I was typing and missed it. Where are we reading?

MR. SCHOENHARD: Page 13, the first full paragraph.

MR. HARRIGAN: Thanks.

THE WITNESS: (Witness peruses document.) Okay.

BY MR. SCHOENHARD:

Q. Is it fair to say that as of June 2011, the time this letter was submitted to the Federal Trade Commission, you believed that the existence of a RAND commitment to

Page 35

DAVID A. HEINER

offer patent licences should not preclude a patent holder from seeking a preliminary injunctive relief or commencing an action in the International Trade Commission just because the patent holder has made a licensing commitment to offer RAND-based licenses in connection with the standard?

A. Yes.

Q. And would you agree that any uniform declaration that such relief would not be available if the patent holder has made a commitment to offer a RAND license for its essential patent claims in connection with the standard may reduce any incentives that implementers might have to engage in good-faith negotiations with the patent holder?

A. Yes. I mean, generally I believe that, and I think it's a commonplace notion, that anytime there's any limit whatsoever on the scope of intellectual property rights, that logically tends to reduce incentives to attain those rights.

And on the other hand, if what's happening is that there's greater sharing of those rights, then in the near term there's the possibility of greater enervation by others using those rights, and that's kind of a balancing and tradeoff that has to be made.

Q. Please direct your attention to Page 8 of Exhibit 2, the June 2011 letter to the Federal Trade

Page 36

DAVID A. HEINER

Commission.

A. (Witness complies.)

Q. In Footnote 5 on Page 8 of Exhibit 2, do you see reference to a Mr. Keith Mallinson, M-A-L-L-I-N-S-O-N?

A. Yes.

Q. Who is Mr. Keith Mallinson?

A. I don't know beyond what is said in the parenthetical.

Q. The parenthetical to which you're referring reads, "A longstanding research analyst and consultant in the telecommunications industry"?

A. Yes.

Q. Do you believe that statement regarding Mr. Mallinson to be correct?

A. Let me take a minute and read this. We're talking about the statement that's the second sentence of the footnote, or after the colon?

Q. I was referring to the statement in the parenthetical referring to who Mr. Mallinson is.

A. Oh. I assume that's correct. I don't know personally.

Q. Please take a moment to read to yourself the final paragraph of Footnote 5 on Page 8 of Exhibit 2.

A. Okay. (Witness complies.)

Page 37

DAVID A. HEINER

MR. HARRIGAN: When you say "the final paragraph," you're talking about the one that starts, "The principal"?

MR. SCHOENHARD: Correct.

MR. HARRIGAN: Feel free to read the rest of that footnote.

THE WITNESS: (Witness peruses document.) Okay.

BY MR. SCHOENHARD:

Q. Do you agree with Mr. Mallinson's statement that there will at times be significant contention between the patent owner and implementer about what constitutes reasonable licensing terms, but this is to be expected, as with commercial negotiation on any input cost component, and has for the most part been readily resolved through bilateral negotiations?

A. Yes.

Q. Would you agree, then, that even in situations where there may be significant contention between parties as to what would ultimately be reasonable terms, bilateral negotiation is an appropriate course?

A. In general, yes. This particular case I think of as an outlier.

Q. If a potential implementer of a standard is aware that another entity owns a portfolio of potentially

Page 38

1  DAVID A. HEINER
2  standard-essential patents, do you believe that the
3  implementer has an obligation to seek a license to those
4  patents?
5     A.   I don't know about that.  The current practice in
6  the industry is often that no such license is sought and so
7  no such license is put in place, but rather firms simply
8  implement standards and rely on the fact that if they needed
9  a license - in other words, if the patent holder came
10 knocking - there's a RAND commitment.
11       And so I think often in the industry, firms simply
12 implement and don't actually obtain licences from everyone
13 who might have IP that reads on implementation.
14    Q.   Does that practice create free-rider issues?
15    A.   What do you mean?
16    Q.   Doesn't that type of practice encourage
17 implementers to effectively operate in an unlicensed
18 capacity with respect to existing IP rights in the hopes
19 that never shall a license need to be paid?
20    A.   I don't know.  I'm just commenting on what I think
21 happens in the industry.
22    Q.   When a patent holder comes knocking on the
23 implementer's door, what do you believe to be the common
24 practice?
25    A.   The common practice is that the patent holder, if

Page 39

1  DAVID A. HEINER
2  he's knocking on someone's door, apparently is seeking
3  licensing fees and then is obliged to offer a license that
4  is compliant with RAND.
5     Q.   How do you determine if the license that's offered
6  is compliant with RAND?
7     A.   Well, that's a very big question, and people go to
8  conferences and have debates about what is RAND and the
9  like, so there's no definitive answer to that.
10    Q.   In large part, the parties collectively and
11 bilaterally determine what is RAND in their specific
12 contexts through negotiations, correct?
13    A.   Typically.
14       MR. SCHOENHARD:  I think I've had you on the record
15 for approximately an hour.  Why don't we go ahead and take
16 our first break, and then we'll resume in a few moments.
17       THE VIDEOGRAPHER:  The time is approximately
18 9:35 a.m.  We are off the record.
19       (Pause in the proceedings.)
20       THE VIDEOGRAPHER:  We are back on the record.  The
21 time is approximately 9:54 a.m.
22 BY MR. SCHOENHARD:
23    Q.   Mr. Heiner, do you understand that you've been
24 designated to testify today additionally with respect to
25 Topic 36 in Motorola's Notice of Deposition --

Page 40

1  DAVID A. HEINER
2     A.   Yes.
3     Q.   -- relating to a February 8th, 2012 statement,
4  "Microsoft Support for Industry Standards"?
5     A.   Yes.
6     Q.   Do you believe that you are prepared today to
7  speak with respect to that topic?
8     A.   Yes.
9        (Whereupon, a 1-page Microsoft's Support for
10 Industry Standards document was marked Exhibit 3 for
11 identification.)
12       THE COURT REPORTER:  Exhibit 3.
13 BY MR. SCHOENHARD:
14    Q.   Mr. Heiner, you have been handed a document that
15 has been marked as Heiner Exhibit 3, bearing Production No.
16 MS-MOTO_1823_00005196256.
17       Please take a moment to review this document and
18 tell me whether you recognize it.
19    A.   Yes, I recognize this document.
20    Q.   What is this document, Heiner Exhibit 3?
21    A.   This document is a printout of a web page where
22 Microsoft made a statement regarding its support for
23 industry standards.
24    Q.   As part of this February 8th, 2012 statement,
25 Microsoft stated, under the No. 2, "This means that

Page 41

1  DAVID A. HEINER
2  Microsoft will not seek an injunction or exclusion order
3  against any firm on the basis of those essential patents,"
4  correct?
5     A.   Correct.
6     Q.   As of today, is that Microsoft's official
7  position?
8     A.   Yes.
9     Q.   As of today, is it Microsoft's position that it is
10 inappropriate for standards-essential patent holders to seek
11 injunctive-style relief?
12    A.   Yes.
13    Q.   That position is directly contrary to the position
14 taken at Page 13 of the June 2011 Federal Trade Commission
15 letter we discussed a moment ago, correct?
16    A.   Our position changed from June 14th to more
17 recently, yes.
18    Q.   Why did Microsoft's position change?
19    A.   Based on experience since then, based on thinking
20 about the subject more deeply, and based on discussions with
21 the US Department of Justice.
22    Q.   When you say "based or our experience since then,"
23 are you referring to your experience as, for example, a
24 defendant against the Motorola entities?
25    A.   Yes.

Page 54

1       DAVID A. HEINER
2   Q. Do you recall whether you have seen these
3   documents before?
4   A. I don't think I have. I'm not certain.
5   Q. You can set them aside.
6   A. Okay.
7       (Whereupon, a 3-page Interoperability: The other
8   Side of Our Settlement with the European Commission document
9   was marked Exhibit 11 for identification.)
10      THE COURT REPORTER: Exhibit 11.
11  BY MR. SCHOENHARD:
12  Q. Mr. Heiner, you've been handed a document that has
13  been marked as Heiner Exhibit 11.
14      Please take a moment to review this document and
15  tell me whether you recognize it.
16  A. (Witness peruses document.)
17      Okay.
18  Q. Do you recognize this document?
19  A. Yes.
20  Q. What is Heiner Exhibit 11?
21  A. It appears to be a printout of a blog post that I
22  did apparently on December 18th of 2009.
23  Q. To what does the blog post marked as Heiner
24  Exhibit 11 relate?
25  A. It relates to a settlement of inquiries made by

Page 55

1       DAVID A. HEINER
2   the European Commission regarding interoperability.
3   Q. What is interoperability?
4   A. That's another one of those $64,000 questions.
5   But generally it's the ability of two products to -- at
6   least in the computer context, two products to exchange
7   information and interact with one another.
8   Q. And in connection with the European Commission's
9   investigation, were there concerns about the availability of
10  interoperability with Microsoft products?
11  A. Yes.
12  Q. As part of this and other investigations,
13  Microsoft created a set of principles regarding
14  interoperability that it intends to follow, correct? Do you
15  have any responsibility for the principles of
16  interoperability at Microsoft?
17  A. Yes.
18  Q. What is that responsibility?
19  A. The responsibility is counseling clients with
20  respect to living up to those principles.
21  Q. And when you say "counseling clients," you're
22  referring to clients within Microsoft, correct?
23  A. Yes.
24      (Whereupon, a 4-page Frequently Asked Questions
25  about Interoperability document was marked Exhibit 12 for

Page 56

1       DAVID A. HEINER
2   identification.)
3       THE COURT REPORTER: Exhibit 12.
4   BY MR. SCHOENHARD:
5   Q. Mr. Heiner, you've been handed a document that has
6   been marked as Heiner Exhibit 12, bearing Production Nos.
7   MOTOM_WASH1823_0394353 through 356. Please take a moment to
8   review this document and tell me whether you recognize it.
9   A. (Witness peruses document.)
10      I see it appears to be a printout of a Microsoft
11  website relating to the interoperability principles we
12  announced. I don't specifically recall the document.
13      (Whereupon, a 3-page Microsoft Open Specifications
14  document was marked Exhibit 13 for identification.)
15  BY MR. SCHOENHARD:
16  Q. Mr. Heiner, you've been handed a document marked
17  as Heiner Exhibit 13 which bears Production Nos.
18  MOTM_WASH1823_0394414 through 416.
19      Please take a moment to review this document and
20  tell me whether you recognize it.
21  A. Yes. I recognize this document to be a printout
22  from the Microsoft website of the interoperability
23  principles that Microsoft articulated.
24  Q. Are you familiar with the set of interoperability
25  principles reflected in Exhibit 13?

Page 57

1       DAVID A. HEINER
2   A. Yes.
3   Q. One of the interoperability principles is
4   identified with the numeral 4 at the bottom of the page
5   carrying over to the second page of the bottom, "RAND Patent
6   Terms."
7       Do you see that?
8   A. Yes.
9   Q. As one of Microsoft's interoperability principles,
10  Microsoft has committed to provide licenses to certain of
11  its patents covering Microsoft open protocols on reasonable
12  and nondiscriminatory terms, correct?
13  A. Yes.
14  Q. Is the term "RAND" with respect to reasonable and
15  nondiscriminatory licensing terms, as used in the context of
16  Microsoft's interoperability principles, substantially the
17  same, in your view, as RAND is understood in these standards
18  context?
19  A. I'm not sure about that. You know, here we're
20  talking about making available proprietary technologies.
21  And in the standard-setting context, you know, we're talking
22  about firms coming together to contribute technology which
23  may come from many different places into one standard and
24  then that standard being one of many that gets implemented
25  in products.

Page 82

1  DAVID A. HEINER
2  BY MR. SCHOENHARD:
3   Q.  Mr. Heiner, are you aware of any time prior to the
4  fall of 2011 at which Microsoft took the position that
5  injunctive relief should not be available to standard-
6  essential patent holders?
7      MR. HARRIGAN:  Object to the form of the question.
8      THE WITNESS:  No.
9      MR. SCHOENHARD:  Mr. Heiner, I don't believe I have
10 anything further.  I thank you very much for your time this
11 morning.
12     THE WITNESS:  Okay.  Thank you.
13     THE COURT REPORTER:  Any questions?
14     MR. HARRIGAN:  Nope.
15     THE VIDEOGRAPHER:  Here marks the end of videotape
16 labeled No. 2 in the deposition of David Heiner.
17     The time is approximately 11:56 a.m.  We are off
18 the record.
19     THE COURT REPORTER:  And before I go off the
20 record, would you like the standing order?
21     MR. SCHOENHARD:  Please.
22     THE COURT REPORTER:  And would you like a copy,
23 standing order?
24 //
25 CONTINUED ON THE NEXT PAGE TO INCLUDE JURAT.

Page 83

1  DAVID A. HEINER
2      MR. HARRIGAN:  Yeah.
3      THE COURT REPORTER:  Thank you.
4      (Whereupon, the deposition was concluded at
5  11:59 a.m.)
6
7      (Signature waived.)

Page 84

1                CERTIFICATE
2
3    I, Tia B. Reidt, do hereby certify that
4  pursuant to the Rules of Civil Procedure, the witness
5  named herein appeared before me at the time and place
6  set forth in the caption herein; that at the said time
7  and place, I reported in stenotype all testimony
8  adduced and other oral proceedings had in the
9  foregoing matter; and that the foregoing transcript
10 pages constitute a full, true and correct record of
11 such testimony adduced and oral proceeding had and
12 of the whole thereof.
13
14    IN WITNESS HEREOF, I have hereunto set my hand
15 this 9th day of April, 2012.
16
17
18
19
    _____
20   Tia B. Reidt
21
22 Commission Expiration: June 3, 2014
23
24
25

Page 85

1              CORRECTION SHEET
2  Deposition of: David Heiner    Date: 03/28/12
3  Regarding:    Microsoft Vs. Motorola
4  Reporter:     Tia Reidt
5  _____
6  Please make all corrections, changes or clarifications
7  to your testimony on this sheet, showing page and line
8  number.  If there are no changes, write "none" across
9  the page.  Sign this sheet on the line provided.
10 Page  Line  Reason for Change
11 ____  ____  _____
12 ____  ____  _____
13 ____  ____  _____
14 ____  ____  _____
15 ____  ____  _____
16 ____  ____  _____
17 ____  ____  _____
18 ____  ____  _____
19 ____  ____  _____
20 ____  ____  _____
21 ____  ____  _____
22 ____  ____  _____
23 ____  ____  _____
24       Signature_____
25          David Heiner