UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| MICROSOFT CORPORATION, | CASE NO. C10-1823JLR |
| Plaintiff, | ORDER |
| v. | |
| MOTOROLA, INC., et al., | |
| Defendants. | |
| MOTOROLA MOBILITY, INC., et al., | |
| Plaintiffs, | |
| v. | |
| MICROSOFT CORPORATION, | |
| Defendant. | |

ORDER- 1

## I.      INTRODUCTION

Microsoft Corporation ("Microsoft") moves to exclude testimony of Charles R. Donohoe and Dr. R. Sukumar.  (Microsoft Mot. (Dkt. # 396).)  Mr. Donohoe is an expert who offers his opinion as to a reasonable and non discriminatory ("RAND") royalty for Defendants Motorola, Inc., Motorola Mobility, Inc., and General Instrument Corporation's (collectively, "Motorola").  Dr. Sukumar conducted a survey on behalf of Motorola regarding "usage and valuation of certain features offered in Microsoft's Xbox 360 console," namely H.264 and 802.11 capability.  Motorola moves to exclude testimony of Microsoft's experts doctors Kevin M. Murphy, Matthew R. Lynde, and Timothy S. Simcoe related to determining RAND terms through the "lens" of an *ex ante*, multilateral (rather than bilateral) negotiation.  (Motorola Mot. (Dkt. # 393).)  Having considered the motions, as well as all papers filed in support and in opposition, and the governing law, and having heard oral argument on October 18, 2012, the court DENIES both Microsoft's and Motorola's motions.

## II.      BACKGROUND

### A.      Standard Setting Organizations

Microsoft and Motorola are both members of the Institute of Electrical and Electronics Engineers ("IEEE") and the International Telecommunication Union ("ITU"). The IEEE and the ITU, neither of which are parties to the instant dispute, are international standards setting organizations.  Standards setting organizations play a significant role in the technology market by allowing companies to agree on common technological standards so that all compliant products will work together.  Standards

1   lower costs by increasing product manufacturing volume, and they increase price

2   competition by eliminating "switching costs" for consumers who desire to switch from

3   products manufactured by one firm to those manufactured by another.

4        One complication with standards is that it may be necessary to use patented

5   technology in order to practice them.  If a patent claims technology selected by a

6   standards setting organization, the patent is called an "essential patent."  Here, Motorola

7   is the owner of numerous patents "essential" to certain standards established by the IEEE

8   and the ITU.  (*See* 10/21/10 Motorola Offer Ltr. (Dkt. # 79-5); 10/29/10 Motorola Offer

9   Ltr. (Dkt. # 79-6) (see list of attachments).)  In order to reduce the likelihood that owners

10  of essential patents will abuse their market power, many standards setting organizations,

11  including the IEEE and the ITU, have adopted rules related to the disclosure and

12  licensing of essential patents.  The policies often require or encourage members of the

13  standards setting organization to identify patents that are essential to a proposed standard

14  and to agree to license their essential patents on RAND terms to anyone who requests a

15  license.  Such rules help to ensure that standards do not allow essential patent owners to

16  extort their competitors or prevent them from entering the marketplace.

17  **B.   Motorola's Statements to the IEEE and the ITU**

18       This lawsuit involves two standards—the IEEE 802.11 wireless local area network

19  ("WLAN") Standard ("802.11 Standard) and the ITU H.264 advanced video coding

20

21

22

1    technology standard ("H.264 Standard").[1]  (*See generally* Compl. (Dkt. # 1); Am. Compl.

2    (Dkt. # 53).)  The IEEE's standard setting process is governed by its Intellectual Property

3    Rights Policy (the "IEEE Policy").  (*See generally* IEEE Policy (Dkt. #79-1).)  The IEEE

4    Policy provides that "IEEE standards may be drafted in terms that include the use of

5    Essential Patent Claims."  (*Id.* at 18 (Section 6.2).)  The IEEE Policy defines the term

6    "Essential Patent Claim" as one or more claims in an issued patent (or pending patent

7    application) that are "necessary to create a compliant implementation of either mandatory

8    or optional portions of the normative clauses of the [Proposed] IEEE Standard . . . ."  (*Id.*)

9           If the IEEE learns that an IEEE standard or a proposed IEEE standard may require

10   the use of an essential patent claim, the IEEE requires the patent holder to either state that

11   it is not aware of any patents relevant to the IEEE standard or to provide the IEEE with a

12   Letter of Assurance.  (*Id.*)  Any such Letter of Assurance must include either (1) a

13   disclaimer to the effect that the patent holder will not enforce the "Essential Patent

14   Claims," or (2):

15          [a] statement that a license for a compliant implementation of the standard
            will be made available to an unrestricted number of applicants on a
16          worldwide basis without compensation or under reasonable rates, with
            reasonable terms and conditions that are demonstrably free of any unfair
17          discrimination. . . .

18   (*Id.*)  If the IEEE cannot obtain a Letter of Assurance, it refers the essential patent to the

19   IEEE Patent Committee.  (*Id.*)

20

21          [1] The ITU developed the H.264 Standard jointly with two other standard setting
     organizations—the International Organization for Standardization and the International
22   Electrotechnical Commission.  (Partial S.J. Order (Dkt. #188) at 3.)

Motorola has submitted numerous Letters of Assurance to the IEEE in connection

with the 802.11 Standard stating that it "will grant" or "is prepared to grant" a license

under RAND terms for its patents essential to the 802.11 Standard.  (*See generally* IEEE

LOAs (Dkt. # 79-2).)  A typical Motorola Letter of Assurance to the IEEE provides, in

relevant part:

> The Patent Holder will grant [or is prepared to grant] a license under
> reasonable rates to an unrestricted number of applicants on a worldwide,
> non-discriminatory basis with reasonable terms and conditions to comply
> with the [Proposed] IEEE Standard.

(*See generally id.*)  Such Letters of Assurance are irrevocable once submitted and

accepted by the IEEE and apply from the date the standard is approved until the date the

standard is withdrawn.  (IEEE Policy at 19.)

Like the IEEE, the ITU has established a policy (the "ITU Policy") with respect to

holders of patents "essential" to implementing a standard.  (*See* ITU Policy (Dkt. # 79-

3).)  Such patent holders must file with the ITU a "Patent Statement and Licensing

Declaration" declaring whether they (1) will grant licenses free of charge on a RAND

basis; (2) will grant licenses on RAND terms; or (3) are not willing to comply with either

of the first two options.  (*See id.* at 9-12.)  If a patent holder is not willing to comply with

either of the first two options, the ITU standard will not depend on that patent(s).

(*Id.* at 9.)

Motorola has sent numerous declarations to the ITU stating that they will grant

licenses on RAND terms for its patents essential the H.264 Standard.  (*See generally* ITU

1    Declarations (Dkt. # 79-4).)  A typical declaration by Motorola to the ITU provides, in

2    relevant part:

> The Patent Holder will grant a license to an unrestricted number of applicants on a worldwide, non-discriminatory basis and on reasonable terms and conditions to use the patented material necessary in order to manufacture, use, and/or sell implementations of the above ITU-T Recommendation | ISOC/IEC International Standard.[2]

6    (*E.g.*, *id.* at 2.)

7    **C.    Motorola's Offer Letters to Microsoft**

8    On October 21, 2010, Motorola sent Microsoft a letter (the "October 21 Letter")

9    that read in pertinent part:

> This letter is to confirm Motorola's offer to grant Microsoft a worldwide non-exclusive license under Motorola's portfolio of patents and pending applications having claims that may be or become Essential Patent Claims (as defined in section 6.1 of the IEEE bylaws) for a compliant implementation of the IEEE 802.11 Standards. . . .  Motorola offers to license the patents under reasonable and non-discriminatory terms and conditions ("RAND"), including a reasonable royalty of 2.25% per unit for each 802.11 compliant product, subject to a grant back license under the 802.11 essential patents of Microsoft.  As per Motorola's standard terms, the royalty is calculated based on the price of the end product (e,g, each Xbox 360 product) and not on component software (e.g., Windows Mobile Software).

17   (10/21/10 Offer Ltr. at 2.)  Then, on October 29, 2010, Motorola sent a similar letter (the

     "October 29 Letter") regarding the H.264-related patents, stating:

> Motorola offers to license the patents on a non-discriminatory basis on reasonable terms and conditions ("RAND"), including a reasonable royalty, of 2.25% per unit for each H.264 compliant product, subject to a grant back license under the H.264 patents of Microsoft, and subject to any Motorola

---

21

22   [2] The declaration to the ITU also states that "negotiations of licenses are left to the parties concerned and are performed outside the ITU-T | ISO/IEC."  (ITU Declarations at 2.)

ORDER- 6

commitments made to JVT in connection with an approved H.264 recommendation. As per Motorola's standard terms, the royalty is calculated based on the price of the end product (e.g., each Xbox 360 product, each PC/laptop, each smartphone, etc.) and not on component software (e.g., Xbox 360 system software, Windows 7 software, Windows Phone 7 software, etc.)

(10/29/10 Offer Ltr. at 2.) Motorola attached to its October 29 Letter a non-exhaustive list of patents it offered to license to Microsoft. (*See id.*)

On November 9, 2010, Microsoft filed its complaint initiating this action, and on February 23, 2011, Microsoft filed an amended complaint. (Compl. (Dkt. # 1); Am. Compl. (Dkt. # 53).) Microsoft contends that the October 21 and October 29 Letters seek unreasonable royalty rates and therefore breach Motorola's obligations to the IEEE and the ITU to grant licenses on RAND terms. (Am. Compl. at 21, 22.) Microsoft alleges claims against Motorola for breach of contract and promissory estoppel.[3] (*Id.*) In its prayer for relief, Microsoft seeks, *inter alia*, (1) a declaration that it is entitled to a license on RAND terms from Motorola for all patents subject to Motorola's commitments to the IEEE (through Letters of Assurance) and to the ITU (through declarations), and (2) a judicial accounting of a RAND royalty rate for Motorola's patents subject to these commitments. (*Id.* at 25 (Prayer for Relief).)

In response, Motorola asserted affirmative defenses and counterclaims. (*See* Motorola Answer (Dkt. # 68).) Motorola's counterclaims, which are relevant to the

---

[3] Microsoft's action against Motorola also included claims for waiver and declaratory judgment, but the court's June 1, 2011 order dismissed both of those claims, leaving only the breach of contract and promissory estoppel claims. (Dkt. # 66 at 12.)

ORDER- 7

1  instant motion for preliminary injunction, seek a declaratory judgment that (1) Motorola

2  has not breached any RAND obligations, and (2) Microsoft repudiated and/or rejected the

3  benefits of Motorola's RAND obligations, and therefore Microsoft is not entitled to a

4  license to Motorola's patents related to the H.264 and 802.11 Standards.  (*Id.* ¶¶ 61-75

5  (Counterclaims).)

6  **D.     The November 13, 2012 Trial**

7           In three prior orders,[4] the court ruled that Motorola's Letters of Assurance to the

8  IEEE and Motorola's declarations to the ITU create enforceable contracts between

9  Motorola and the respective standard setting organization to license its essential patents

10 on RAND terms.  Additionally, the court found that as a member of the IEEE and the

11 ITU and a prospective user of both the H.264 Standard and the 802.11 Standard,

12 Microsoft is a third-party beneficiary of the contract.  (*Id.*)

13          With the parties' input, the court adopted a two-part approach to adjudicate

14 Microsoft's breach of contract claim.[5]  The court will first determine a RAND royalty

15 rate (or RAND royalty range) at the November 13, 2012 trial, and second, with this

16 determination as guidance, a jury will hear Microsoft's breach of contract claim.  In

17 advance of the November 13, 2012 trial, the parties each submitted *Daubert* motions

18 regarding expert testimony related to the proper methodology for adjudication of a

19

20          [4] *See* 2/27/12 Order (Dkt. # 188) at 10; 6/6/12 Order (Dkt. # 335) at 13; 10/10/12 Order
   (Dkt. # 465).

21          [5] This case has a complex procedural history, and while the court will not recite it in this
22 order, the procedural background of this case can be found in the court's October 10, 2012 order
   on Motorola's motion for partial summary judgment (10/10/12 Order at 8-11).

1    RAND royalty rate.  The court now addresses the issues raised by the parties' respective

2    *Daubert* motions.

3                              **III.    LEGAL STANDARD**

4            Federal Rule of Evidence 702 allows admission of "scientific, technical, or other

5    specialized knowledge" by a qualified expert if it will "help the trier of fact to understand

6    the evidence or to determine a fact in issue."  Expert testimony is admissible pursuant to

7    Rule 702 if it is both relevant and reliable.  *Daubert v. Merrell Dow Pharms., Inc.*, 509

8    U.S. 579, 589 (1993).  When considering expert testimony offered pursuant to Federal

9    Rule of Evidence 702, the trial court acts as a "gatekeeper" by "making a preliminary

10   determination that the expert's testimony is reliable."  *Elsayed Mukhtar v. Cal. State

11   Univ., Hayward*, 299 F.3d 1053, 1063 (9th Cir. 2002).  *See also Kumho Tire Co. v.

12   Carmichael*, 526 U.S. 137, 147-48 (1999); *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 142

13   (1997); *Daubert*, 509 U.S. at 589-90.  An expert witness may provide opinion testimony

14   if:  (1) the expert's scientific, technical, or other specialized knowledge will help the trier

15   of fact to understand the evidence or to determine a fact in issue, (2) the testimony is

16   based upon sufficient facts or data, (3) the testimony is the product of reliable principles

17   and methods, and (4) the expert has reliably applied the principles and methods to the

18   facts of the case.  Fed. R. Evid. 702; *see Sundance, Inc. v. DeMonte Fabricating Ltd.*, 550

19   F.3d 1356, 1360 (Fed. Cir. 2008).  In *Daubert* the Supreme Court set forth a non-

20   exclusive list of factors to determine whether scientific testimony is sufficiently reliable:

21   (1) whether a theory or technique can be (and has been) tested; (2) whether the theory or

22   technique has been subjected to peer review and publication; (3) the known or potential

1    rate of error; and (4) whether it is generally accepted in the scientific community.

2    *Wagner v. Cnty. of Maricopa*, 673 F.3d 977, 989 (9th Cir. 2012) (quoting *Daubert*, 509

3    U.S. at 593-94).

4          "[T]he test under *Daubert* is not the correctness of the expert's conclusions but the

5    soundness of his methodology." *Primiano v. Cook*, 598 F.3d 558, 564 (9th Cir. 2010)

6    (citing *Daubert*, 509 U.S. at 594, 596).  The inquiry into admissibility of expert opinion is

7    a "flexible one," where "[s]haky but admissible evidence is to be attacked by cross

8    examination, contrary evidence, and attention to the burden of proof, not exclusion."  *Id.*

9    Therefore, trial courts can and should consider other factors not specifically mentioned

10   by the United States Supreme Court in *Daubert*.  *Daubert*, 509 U.S. at 594. "Under

11   *Daubert*, the district judge is 'a gatekeeper, not a fact finder.'  When an expert meets the

12   threshold established by Rule 702 as explained in *Daubert*, the expert may testify and the

13   jury decides how much weight to give that testimony." *Id.* (quoting *United States v.*

14   *Sandoval-Mendoza*, 472 F.3d 645, 654 (9th Cir. 2006)).

15         "Trial courts must exercise reasonable discretion in evaluating and in determining

16   how to evaluate the relevance and reliability of expert opinion testimony." *United States*

17   *v. Alatorre*, 22 F.3d 1098, 1102-03 (9th Cir. 2000). A trial judge has "considerable

18   leeway" in deciding not only "how to go about determining whether particular expert

19   testimony is reliable," but also in deciding whether the testimony is reliable. *Kumho*

20   *Tire*, 509 U.S. at 153.

21   //

22

ORDER- 10

# IV.   ANALYSIS

## A.   Microsoft's *Daubert* Motion

### 1.   Charles R. Donohoe

Microsoft moves to exclude the expert testimony of Charles Donohoe, Motorola's expert who opines as to the proper method for determining a RAND royalty rate. (Microsoft Mot. at 12.)   Mr. Donohoe determined a RAND royalty range by using a modified *Georgia-Pacific* methodology:   Mr. Donohoe's approach began with a 2.25% royalty of Microsoft's end product price, and then adjusted this royalty up or down based on Mr. Donohoe's analysis of each of the 15 *Georgia-Pacific* factors.   (*See generally* Donohoe Decl. (Dkt. # 399-2).)   The *Georgia-Pacific* methodology—also known as the "the 'willing licensor-willing licensee' approach"—is a common approach to determining a reasonable royalty in the context of patent infringement.   *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1324 (Fed. Cir. 2009) (quoting *Georgia-Pacific Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970)).   This approach determines a reasonable royalty "on the basis of a hypothetical negotiation, occurring between the parties at the time that infringement began" using the 15 *Georgia-Pacific* factors to guide that hypothetical negotiation.   *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1312 (Fed. Cir. 2011).   The first of the *Georgia-Pacific* factors is:   The royalties received by the patentee for the licensing of the patent in suit, proving or tending to prove an established royalty.   *Georgia-Pacific*, 318 F. Supp. at 1120.   Mr. Donohoe claims that his initial 2.25% royalty rate is based on existing Motorola license agreements involving (1) licenses to Motorola's entire 802.11 and/or H.264 standard

1   essential patent portfolios in addition to Motorola's cellular portfolios; (2) licenses to

2   Motorola's cellular portfolio that include one or more 802.11 standard essential patents;

3   and (3) licenses that include a grant to only Motorola's 802.11 and H.264 standard

4   essential patent portfolios.  (Donohoe Decl. ¶¶ 64-91.)  In other words, Mr. Donohoe

5   looked to past/existing Motorola license agreements involving some or all of Motorola's

6   802.11 and H.264 standard essential patents in an effort to determine an established

7   royalty rate and then analyzed the remaining *Georgia-Pacific* factors to modify the initial

8   rate.

9          Microsoft does not challenge Mr. Donohoe's use of the *Georgia-Pacific* factors.

10  Instead, Microsoft moves to exclude Mr. Donohoe's testimony because he (1) selected an

11  inappropriate beginning royalty rate by relying on non-comparable Motorola license

12  agreements, and (2) failed to properly account for the value of Motorola's 802.11 and

13  H.264 standard essential patents.  Microsoft also argues that Mr. Donohoe's RAND

14  royalty analysis is unreliable because it does not account for the entire market value rule,

15  and is therefore contrary to law.  (*See generally* Microsoft Mot.)  For the reasons set forth

16  below, the court finds that Microsoft's first two arguments go to the weight of Mr.

17  Donohoe's testimony, as opposed to its admissibility; and, with respect to Microsoft's

18  assertion that the entire market value rule ("EMVR") precludes Mr. Donohoe's

19  testimony, the court, while skeptical of Motorola's position, declines to make such a

20  determination at this time.

21         As an initial matter, the court finds that Mr. Donohoe's methodology of beginning

22  with an initial royalty rate and then analyzing the *Georgia-Pacific* to reconstruct a

1   hypothetical negotiation has thoroughly "been subjected to peer review and publication."

2   The Federal Circuit, as the appellate court for patent-related issues, has consistently

3   sanctioned the use of the *Georgia-Pacific* factors "to frame the reasonable royalty

4   inquiry." *LaserDynamics, Inc. v. Quanta Computer, Inc.*, Nos. 2011-1440, 2011-1470,

5   2012 WL 3758093, at *4 n.2 (Fed. Cir. Aug. 30, 2012).  Moreover, other courts have

6   spoken to the applicability of the *Georgia-Pacific* factors in determining a reasonable

7   royalty in the RAND context. *See Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297,

8   314-15 n.8 (3d Cir. 2007) ("The reasonableness of royalties is an inquiry that courts

9   routinely undertake using the 15-factor test set forth in *Georgia-Pacific . . . and some*

10  *courts have already applied this test in the [RAND] context*.") (emphasis added).

11  Consistent with legal opinions, scholarly publications also speak to the extension of the

12  *Georgia-Pacific* factors to the determination of a RAND royalty rate in the context of

13  licensing standard essential patents.  (Brenner Decl. (Dkt. # 406) Ex. 55 (Anne Layne-

14  Farrar, *Be My FRAND:  Standard Setting and Fair, Reasonable and Non-discriminatory*

15  *Terms*) at 5 ("One obvious option for providing context to [RAND] within [standard

16  setting organizations] would be to extend the *Georgia-Pacific* fifteen factors to standard

17  setting.  In fact, the majority of these factors are already directly applicable to [RAND]

18  evaluations in a standard setting context.").)  Thus, the court finds that Mr. Donohoe's

19  methodology is reliable under *Daubert* because it has been subjected to peer review and

20  publication and cited approvingly.

21       Nevertheless, citing *Uniloc*, Microsoft asserts that Mr. Donohoe's initial 2.25%

22  royalty rate is untethered from the facts of this case.  *Uniloc*, 632 F.3d at 1315 ("If the

1    patentee fails to tie the theory to the facts of the case, the testimony must be excluded.").

2    Additionally, Microsoft argues that basing a 2.25% starting point on past Motorola

3    license agreements involving Motorola's standard essential patents for cellular telephone

4    networks does not support a 2.25% starting point in this case because entirely different

5    standards are at issue here, namely the H.264 and 802.11 standards.  (Microsoft Mot. at

6    12-13.)  For purposes of the *Daubert* motion, the court disagrees.  Certainly, the

7    applicability of Motorola's license agreements, which Mr. Donohoe examines in

8    determining the initial royalty rate of 2.25%, should be subject to vigorous cross

9    examination with respect to their comparability to the present case.  But each license

10   agreement cited by Mr. Donohoe involves at least one of Motorola's 802.11 or H.264

11   standard essential patents, and two of those involve only Motorola's 802.11 and H.264

12   standard essential patent portfolios.  Further, in at least one instance, Motorola has

13   received a royalty rate similar to the 2.25% starting rate for a license to its H.264 and

14   802.11 standard essential patent portfolio.  Thus, the cited license agreements provide at

15   least some indicia of the appropriate initial royalty rate such that the court cannot say the

16   initial rate is so divorced from the facts of this case as to render Mr. Donohoe's testimony

17   inadmissible.  *See Inventio AG v. Otis Elevator Co.*, No. 06 Civ. 5377, 2011 WL

18   3359705, at *3 (S.D.N.Y. June 22, 2011) (finding that expert's starting point, selected

19   because it was the rate patentee at one time licensed its intellectual property, was not

20   untied to the facts of the case so as to warrant exclusion, but instead the propriety of the

21   starting point went to the weight as opposed to admissibility).  Accordingly, the court

22

1   declines to exclude Mr. Donohoe's otherwise admissible testimony on the grounds that it

2   is contrary to *Uniloc*.

3          Next, Microsoft argues that Mr. Donohoe's analysis impermissibly focuses on the

4   value of 802.11 and H.264 standards and not on the value of Motorola's own standard

5   essential patents.  Thus, according to Microsoft, Mr. Donohoe's analysis captures the

6   hold-up value—the value that exists after patents have been declared essential to a

7   standard.  (Microsoft Mot. at 17-22 (citing *Apple, Inc. v. Motorola, Inc.*, 2012 WL

8   2376664, at *11 (N.D. Ill. June 22, 2012)).)  Microsoft contends that capturing such hold-

9   up value is contrary to the law.  (*Id.*)  Again, for purposes of the *Daubert* motion, the

10  court disagrees, and finds that Microsoft's criticism of Mr. Donohoe's analysis go to

11  weight as opposed to admissibility.  Contrary to Microsoft's assertion, in his report, Mr.

12  Donohoe expressly considered the opinions of technical professionals in assessing the

13  value of Motorola's 802.11 and H.264 patents to the standards themselves.  (Donohoe

14  Decl. ¶¶ 132, 138.)  From these technical professionals, Mr. Donohoe understood

15  Motorola's standards to include core aspects of both the 802.11 and H.264 standards.

16  (*Id.*)  Thus, to the extent that Mr. Donohoe discusses the importance of the standards in

17  his *Georgia-Pacific* analysis, such discussion implicitly considers the importance of

18  Motorola's standard essential patent portfolios.  Here, it appears Microsoft's dispute is

19  with the opinions of Motorola's technical professionals who found Motorola's 802.11

20

21

22

ORDER- 15

1    and H.264 patent portfolios fundamental to the respective standards.  Such a dispute is

2    factual in nature and will not act to exclude admissible expert testimony.[6]

3         Finally, Microsoft asserts that Mr. Donohoe's testimony fails to account for the

4    entire market value rule.  (Microsoft Mot. at 22-23.)  In the context of patent

5    infringement, the entire market value rule allows a patentee to assess damages based on

6    the entire market value of the accused product only where the patented feature creates the

7    "basis for customer demand" or "substantially create[s] the value of the component

8    parts." *Lucent Techs.*, 580 F.3d at 1336; *Rite-Hite Corp. v. Kelley Co.*, 56 F.3d 1538,

9    1549-50 (Fed. Cir. 1995).  Accordingly, Microsoft contends that Mr. Donohoe's

10   application of the 2.25% royalty to the entire market value of Microsoft's products is

11   contrary to law because Mr. Donohue does not attempt to satisfy the predicate that

12   Motorola's standard essential patents create the basis for customer demand of Microsoft's

13   products.  (Microsoft Mot. at 23.)

14        On the face of the rule, it would be appear Mr. Donohoe has improperly applied

15   the 2.25% royalty rate to Microsoft's end product price without first demonstrating that

16   Motorola's standard essential patents create the basis for the customer demand of

17   Microsoft's products.  But, in *Lucent Technologies, Inc. v. Gateway, Inc.*, the Federal

18   Circuit examined the entire market value rule and found that it did not act as a *per se* bar

19

20

_____

21     [6] Indeed, Microsoft's *Daubert* motion does not seek to exclude or attack the
     appropriateness of Motorola's technical professionals, and therefore no basis exists to exclude

22   their opinions (upon which Mr. Donohoe relied).

to application of a royalty rate to end product price without showing that the patent

creates the basis for the customer demand:

> Although our law states certain mandatory conditions for applying the entire market value rule, courts must nevertheless be cognizant of a fundamental relationship between the entire market value rule and the calculation of a running royalty damages award.  Simply put, *the base used in a running royalty calculation can always be the value of the entire commercial embodiment, as long as the magnitude of the rate is within an acceptable range (as determined by the evidence).*  Indeed, [a]ll running royalties have at least two variables:  the royalty base and the royalty rate.

> *****

> *There is nothing inherently wrong with using the market value of the entire product, especially when there is no established market value for the infringing component or feature*, so long as the multiplier accounts for the proportion of the base represented by the infringing component or feature.

580 F.3d 1301, 1338-39 (Fed. Cir. 2009) (emphases added) (internal quotations omitted).

In other words, the royalty rate and the base are simply variables to be determined based

on the evidence presented and in accord with proper apportionment regarding the value

of the patented feature.  Consistent with the statements in *Gateway*, district courts have

permitted license agreements based on the entire product value as evidence of a

reasonable royalty rate despite a lack of showing that the patented feature formed the

"basis for customer demand."  *See, e.g.*, *The Boeing Co. v. United States*, 86 Fed. Cl. 303,

319-20 (2009); *Mondis Tech., Ltd. v. LG Elecs., Inc.*, 2011 WL 2417367, at *3 (E.D. Tex.

June 14, 2011).  Thus, the court declines to adopt a *per se* rule that a royalty rate may

never be applied to the entire product price without satisfaction of the entire market value

rule.

1    With that said, the court has already expressed skepticism that an appropriate

2  RAND royalty rate for Motorola's standard essential patents should be based on the end

3  product price of Microsoft's products.  By their very nature, Motorola's standard

4  essential patents only relate to the 802.11 and H.264 capabilities, which in turn only

5  constitute a portion of Microsoft's end products.  It would thus seem illogical to turn

6  around and base a RAND royalty on the end product price.  Nevertheless, as the court

7  cannot say Mr. Donohoe's testimony violates the entire market value rule, the court will

8  not currently exclude Mr. Donohoe's testimony, which is otherwise based on a reliable

9  methodology.

10       **2.    Dr. Sukumar**

11       Microsoft moves to exclude Dr. R. Sukumar's survey, which Dr. Sukumar

12  conducted on behalf of Motorola with the purpose of understanding usage and valuation

13  of certain features offered in Microsoft's Xbox 360 console.  (Sukumar Rpt. (Dkt. # 398-

14  1) at 4.)  Specifically, Dr. Sukumar's survey focused on the H.264 video decoding and

15  the 802.11 Wi-Fi capabilities of the Xbox 360.  (*Id.*)  Dr. Sukumar's survey employed a

16  "conjoint analysis," which is described below:

17       In conjoint analysis, we determine what value a customer places on a
         particular feature of a product by measuring the partial value ("partworth"
18       utility) of multiple individual features of the product.  For example, we
         measure the value to the customer of the product offered in several
19       combinations, some of which might contain feature 1 (but perhaps not
         feature 2), some of which might contain feature 2 (but perhaps not feature
20       1), and some of which might contain both features 1 and 2.  We can use the
         data we collect to isolate the value to the customer of one particular feature.

21  (*Id.* ¶ 2.)

22

ORDER- 18

1   Microsoft seeks to exclude Dr. Sukumar's survey on the grounds that (1) it is

2   unreliable because the questionnaire used incomprehensible terminology, such as asking

3   respondents to "select the types of video content [he or she] has viewed on his or her

4   Xbox console and providing options of "MBAFF (Macroblock Adaptive Frame/Field),"

5   "Progressive," and "not sure," and (2) it used a non-representative sample of the relevant

6   universe, that is, Xbox owners, users, or individuals likely to purchase an Xbox.

7   (Microsoft Mot. at 24-25.)  Additionally, Microsoft asserts that Dr. Sukumar's survey is

8   unreliable because it failed to provide a margin of error for his calculations.

9   Microsoft's criticisms of Mr. Sukumar's survey "go to 'issues of methodology,

10  survey design, reliability, . . . [and] critique of conclusions,' and therefore 'go to the

11  weight of the survey rather than its admissibility.'"  *Fortune Dynamic*, 618 F.3d at 1038

12  (quoting *Clicks Billiards, Inc. v. Sixshooters, Inc.*, 251 F.3d 1252, 1263 (9th Cir. 2001)).

13  "[T]echnical inadequacies in a survey, including the format of the questions or the

14  manner in which it was taken, bear on the weight of the evidence, not its admissibility."

15  *Id.* (internal quotation marks omitted).  First, Microsoft's assertion that Dr. Sukumar used

16  a non-representative sample does not appear well-founded.  Microsoft suggests that the

17  relevant universe is Xbox owners, users, or individuals likely to purchase an Xbox.  Dr.

18  Sukumar's survey only surveyed Xbox owners.  But, any argument as to

19  underinclusiveness of the survey goes to weight, as opposed to admissibility.  *Id.*

20  Second, although Microsoft may dispute the clarity of Dr. Sukumar's questionnaire, the

21  disputed questionnaire terms were themselves defined in the survey and given to

22  respondents who owned an Xbox, and were arguably more likely to understand technical

1    terms.  Thus, the clarity of the survey questionnaire is a question of fact, best resolved at

2    trial through cross examination.  Third, contrary to Microsoft's assertion, Dr. Sukumar's

3    survey did in fact contain a margin for error calculation .  (Sukumar Rpt. at 8 ("Statistical

4    confidence intervals can be expected to be within a range of 3.5% - 5.2% at a 95%

5    confidence level.").)

6           Here, Dr. Sukumar's survey sought to solicit data on the impact on consumer

7    demand of the H.264 and 802.11 capabilities in Microsoft's Xbox console.  The H.264

8    and 802.11 capabilities implicate Motorola's standard essential patents at issue in this

9    litigation for which the court is attempting to determine a RAND royalty rate.  Thus, Dr.

10   Sukumar's survey is admissible as relevant under FRE 401 and 402 and is sufficiently

11   reliable under FRE 702 and *Daubert*.  Accordingly, Microsoft's motion to exclude Dr.

12   Sukumar's testimony is denied.

13   **B.     Motorola's *Daubert* Motion**

14          Motorola moves to exclude certain testimony of three of Microsoft's expert

15   witnesses—doctors Kevin M. Murphy, Matthew R. Lynde, and Timothy S. Simcoe—on

16   the grounds that their opinions are not based on a reliable methodology.  (Motorola Mot.

17   at 5.)  Doctors Murphy, Lynde, and Simcoe opine that the proper framework to determine

18   a RAND royalty rate between Motorola and Microsoft is that of an *ex ante*, multilateral

19   negotiation involving full participation of standard essential patent holders and potential

20   standards implementers.  (*See generally* Murphy Decl. (Dkt. # 408-1); Lynde Decl. (Dkt.

21   # 408-2); Simcoe Decl. (Dkt. # 408-3).)  Thus, Microsoft's proposed hypothetical

22   negotiation includes two requirements:  (1) that it occur *ex ante* to adoption of the

1   standard, and (2) that it include multiple patent holders and implementers.  Motorola

2   argues that there is no support for the idea that RAND terms are determined through

3   multilateral negotiations, but instead asserts that such terms are determined based on

4   bilateral negotiations between the patentee and implementer.[7]  (Motorola Mot. at 6.)

5          In support of its argument, Motorola contends that the language of Motorola's

6   agreements with IEEE and ITU make clear that negotiations for RAND license

7   agreements are bilateral in nature, such that they occur between only the patentee and the

8   implementer.  Motorola directs the court to statements of the ITU's Legal Officer and

9   statements in the IEEE and ITU policies regarding the expectation of bilateral

10  negotiations towards a RAND license.  (Motorola Mot. at 7-10.)  Motorola also asserts

11  that industry participants and academics understand that a RAND license is the product

12  of bilateral negotiations between the patentee and implementer and directs the court to a

13  litany of literature to support thereof.  (*Id.* at 10-12.)  Finally, Motorola asserts that

14  Microsoft's own experts have previously testified that RAND terms are the result of

15  bilateral negotiations.  (*Id.* at 13-14.)

16         Microsoft responds that its *ex ante*, multilateral "lens" for determining a RAND

17  royalty rate properly addresses two key risks presented by licensing of standard essential

18  patents:  (1) "improper capture of the "hold-up" value of the standard as the result of the

19  patentee's ability to leverage its monopoly over implementers of the standard; and (2)

20  stacking of royalties by many holders of essential patents, resulting in unreasonable

21

22         [7] Motorola does not appear to dispute that opinion testimony related to *ex ante* negotiations is admissible under *Daubert*.  (See generally Motorola Mot.)

1   royalty burdens on the implementer.  (Microsoft Resp. (Dkt. # 410) at 6.)  Microsoft

2   asserts that its proposed framework for determining a RAND rate provides the proper

3   parameters where all licensors appreciate the potential impact of their individual

4   licensing positions and recognize that the aggregate royalties must be sufficiently

5   reasonable as to allow widespread implementation of the standard.  (*Id.* at 6-7.)

6   Analogizing determination of a RAND rate in the present case to patent pools for the

7   H.264 and 802.11 standards, namely the MPEG LA (H.264) and Via (802.11) pools,

8   Microsoft contends that such pools reflect real-world form of multilateral licensing which

9   alleviate the aforementioned concerns by addressing all interested parties.

10         At the upcoming November 13 trial, the court will determine a RAND royalty rate

11  and range.  In determining this rate and range, the court must employ a methodology

12  which in some way reconstructs the negotiation that would have taken place between

13  Microsoft and Motorola.  From its review of prior case law, the court can find no instance

14  where a prior court has been called upon to make a determination of a reasonable royalty

15  rate for a block of standard essential patents held out by the patent holder for licensing on

16  RAND terms.  Moreover, while much publication and scholarly writings has dealt with

17  the notion of RAND and its importance to industry standards, limited publication exists

18  on the methodology a court should employ to determine a RAND royalty rate when

19  negotiations between the patent holder and implementer break down.  With this in mind,

20  the court examines the reliability of Microsoft's proposed *ex ante*, multilateral

21  framework.

22

1    The court notes at the outset that the typical manner for establishing the reliability

2    of expert testimony is not met in this case with respect to the "multilateral" prong of

3    Microsoft's proposed framework.  The testimony relating to a multilateral negotiation for

4    determining a RAND royalty rate has not "been subjected to peer review and

5    publication."  *See Clausen v. M/V NEW CARISSA*, 339 F.3d 1049, 1057 (9th Cir. 2003)

6    (stating that whether expert testimony has "been subjected to normal scientific scrutiny

7    through peer review and publication" is one of the primary criteria for establishing

8    reliability).  This does not mean, however, that this testimony is inadmissible under

9    *Daubert*.  Indeed, the *Clausen* court stated, "[t]here may well be good reasons why a

10    scientific study has not been published.  For example, it may be too recent or of

11    insufficiently broad interest."  *Id.* (citing *Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d

12    1311, 1318 n.9 (9th Cir. 1995)).  Where peer review and publication are absent, "the

13    experts must explain precisely how they went about reaching their conclusions and point

14    to some objective source—a learned treatise, the policy statement of a professional

15    association, a published article in a reputable scientific journal or the like—to show that

16    they have followed the scientific evidence method, as it is practiced by (at least) a

17    recognized minority of scientists in their field."  *Id.*

18    Here, Microsoft's framework for reconstructing a hypothetical negotiation under

19    the circumstances unique to this case seeks to address two well-founded concerns:  hold-

20    up and stacking.  Both hold-up and stacking are widely recognized concerns in the

21    context of standard essential patent licensing.  (*See, e.g.*, Simcoe Decl. ¶¶ 81, 91.)  The

22    risk of hold-up exists because each standard essential patent holder has monopoly power

1   of the implementers of the standard and may "hold up" an implementer after adoption of

2   a standard while demanding unreasonably high royalty rates for a license to standard

3   essential patents.  (*Id.* ¶ 80; Murphy Decl. ¶ 44.)  In this hold-up situation, the

4   implementer is compelled to pay a higher rate to gain the benefits of interoperability with

5   complementary products and recoup investments in designing and producing products

6   made in reliance on the industry standard.  (Murphy Decl. ¶ 45.)  Microsoft's proposed

7   framework seeks to address this concern by contemplating a negotiation (for determining

8   a RAND rate) at a time just prior to adoption of the standard, thereby eliminating excess

9   value added to the patents through the adoption of the standard.  (Simcoe Decl. ¶ 62.)

10  Indeed, this *ex ante* interpretation of a RAND royalty rate has been endorsed by

11  numerous publications and the Federal Trade Commission.  (*Id.* ¶ 62, 99-108 (listing

12  various publications endorsing *ex ante* negotiations in RAND context).)

13          Similarly, the concern of stacking is widely understood as a practical concern

14  when licensing standard essential patents.  (Simcoe Decl. ¶ 91.)  The stacking concern

15  arises because numerous patent holders lay claim to standard essential patents requiring

16  an implementer in theory to take numerous licenses before utilizing a standard.  (*Id.* ¶

17  89.)  Here, there are almost 100 organizations that have submitted letters of assurance to

18  the IEEE for the 802.11 standard and roughly 230 organizations with declared essential

19  patents for the H.264 standard.  (Lynde Decl. at 25.)  Accordingly, an implementer may

20  be subjected to cumulative demands for licenses to essential patents, which could lead to

21  economically unsustainable royalty payments.  (Simcoe Decl. ¶ 89.)  To address this

22  concern, Microsoft's proposed framework envisions a hypothetical negotiation between

1    multiple patent holders and multiple implementers so that, among other things, stacking

2    concerns of the implementer can be addressed during the negotiation.  To this point, in

3    real world application, owners of standard essential patents use patent pools or other

4    collective licensing agreements to license their intellectual property.  (Murphy Decl. ¶

5    22.)  Such patent pools serve as a "one-stop shop," allowing parties interested in a

6    standard to gather many (or all) of the patents necessary to implement the technology

7    rather than obtaining patent licenses from each patent holder individually.  (Id.)  One

8    such patent pool is the "MPEG LA," which licenses patents the H.264 standard.  (*Id.* ¶

9    23.)

10          Based on the foregoing, the court concludes that, for purposes of a *Daubert*

11   challenge, Microsoft's proposed framework reasonably relies upon and logically

12   addresses widely acknowledged and published concerns of hold-up and stacking found in

13   licensing standard essential patents.  The fact that multilateral license agreements for

14   standard essential patents, including the H.264 patents, do indeed occur in practice adds

15   to the reliability of Microsoft's proposed framework.  Motorola has only challenged

16   Microsoft's stated stacking and hold-up concerns insofar as they apply to the case at

17   hand.  But, the court's duty at this time is to develop a methodology for reconstructing a

18   hypothetical negotiation between Microsoft and Motorola in a general sense and then

19   apply that methodology to the specific circumstances of the case at hand.

20          Although without hearing evidence of competing experts, the court cannot with

21   certainty set forth the proper parameters for a hypothetical negotiation, any such

22   hypothetical negotiation may indeed address the widely acknowledged concerns of hold-

1  up and stacking implicit in a RAND licensing negotiation for standard essential patents.

2  *Primiano*, 598 F.3d at 565-66 ("Lack of certainty is not, for a qualified expert, the same

3  thing as guesswork."); *Sandoval-Mendoza*, 472 F.3d at 655-56 (lack of certainty does not

4  preclude introduction of medical expert opinion testimony where medical knowledge

5  "permits the assertion of a reasonable opinion"); *Obrey v. Johnson*, 400 F.3d 691, 696

6  (9th Cir. 2005) (evidence is admissible if the evidence is relevant and the expert's

7  methods are sound).  Certainly, Microsoft's proposed framework is subject to criticism.

8  Every possibility exists that Microsoft's stacking concern could be addressed through a

9  bilateral negotiation, as opposed to Microsoft's proposed multilateral negotiation.

10  Additionally, as Microsoft's counsel admitted at oral argument, an *ex ante* negotiation

11  may not fully, or at all, address Motorola's *ex post* promise that it license its standard

12  essential patents on RAND terms.  Such discrepancies between the methodology and the

13  circumstances of the present case can be addressed at trial through cross examination.

14  *Bergen v. F/V St. Patrick*, 816 F.2d 1345, 1352 n.5 (9th Cir. 1987) ("[t]he weakness in

15  the underpinnings of [expert] opinions may be developed upon cross-examination," as

16  "such weakness goes to the weight and credibility of the testimony" as opposed to its

17  admissibility").

18  //

19  //

20  //

21  //

22  //

ORDER- 26

1

## V.     CONCLUSION

2        Based on the foregoing, the court DENIES Motorola's motion (Dkt. # 393) to

3    exclude testimony related to *ex ante*, multilateral negotiations to determine a RAND

4    royalty rate.  The court also DENIES Microsoft's motion (Dkt. # 396) to exclude

5    testimony of Charles Donohoe and survey evidence of Dr. Sukumar.

6        Dated this 22nd day of October, 2012.

7

8

9                                          _____

10                                         JAMES L. ROBART
                                           United States District Judge

11

12

13

14

15

16

17

18

19

20

21

22

ORDER- 27