```
              UNITED STATES DISTRICT COURT
          WEST DISTRICT OF WASHINGTON AT SEATTLE
```

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT SEATTLE
_____

MICROSOFT CORPORATION,            )
                                  )
                Plaintiff,        ) CASE NO. C10-1823JLR
                                  )
v.                                ) SEATTLE, WASHINGTON
                                  ) October 18, 2012
MOTOROLA, INC., et al.,           )
                                  ) *Daubert* hearing
                Defendant.        )
                                  )
_____

            VERBATIM REPORT OF PROCEEDINGS
        BEFORE THE HONORABLE JAMES L. ROBART
            UNITED STATES DISTRICT JUDGE
_____

APPEARANCES:

  For the Plaintiff:     RICHARD CEDEROTH
                         SHANE CRAMER
                         ANDY CULBERT
                         DAVID GIARDINA
                         ARTHUR HARRIGAN
                         DAVID KILBOUGH
                         DAVID PRITIKIN
                         CHRISTOPHER WION


  For the Defendant:     JAMES BATCHELDER
                         KHUE HOANG
                         JESSE JENNER
                         PHILIP McCUNE
                         RALPH PALUMBO
                         STEVEN PEPE
                         KEVIN POST


  Reported by:           NANCY L. BAUER, CCR, RPR
                         Federal Court Reporter
                         700 Stewart Street, Suite 17205
                         Seattle, WA 98101
                         (206) 370-8506
                         nancy_bauer@wawd.uscourts.gov

```
1   October 18, 2012                          9:00 a.m.
                             PROCEEDINGS
2   _____

3        THE CLERK:  Case C10-1823, Microsoft Corporation v.

4   Motorola.

5     Counsel, please make your appearances for the record.

6        MR. HARRIGAN:  Good morning, Your Honor.  Art

7   Harrigan representing Microsoft, and with me this morning,

8   starting to my left, is Mr. David Pritikin, who, along with

9   me, will be arguing today, from the Sidley firm, and David

10  Giardina also from Sidley; Rick Cederoth; my partner, Chris

11  Wion; and over here we have Andy Culbert from Microsoft; and

12  my partner, Shane Cramer; and David Kilbough.

13       MR. PALUMBO:  Good morning, Your Honor.  Ralph

14  Palumbo for Motorola, and starting at the far end of the

15  table is Mr. Peter Rudling, who is our paralegal in the case,

16  and also Khue Hoang.  Ms. Hoang will be arguing this morning.

17  Jim Batchelder.  Mr. Batchelder will also be arguing.  My

18  partner, Phil McCune.  Mr. Jenner, who you know, who will

19  also be arguing this morning.  And then sitting in the front

20  row, Kevin Post and Steve Pepe from Ropes & Gray.

21       THE COURT:  Counsel, I think by my count I can see

22  three women in this courtroom.  I've never seen so many suits

23  in one place at one time.  I feel like I'm at Brooks

24  Brothers.

25     Let me start with an unrelated matter, which I think you
```

1    will have some keen interest in.

2        You have pending a series of motions to seal, and those

3    motions to seal pertain to, I think, your *Daubert* motions,

4    your in limine motions, and your proposed findings and

5    conclusions.

6        You need to recognize that the Ninth Circuit draws a

7    distinction between dispositive motions and trials in regards

8    to sealing orders and more run-of-the-mill sealing orders.

9    And for those of you who practice in this district, you know

10   that we are not of one mind in regards to the proper approach

11   to sealing orders; that some of my colleagues feel, very

12   acutely, that we seal way too much.

13       So you are all on notice that anything that's going to end

14   up as evidence in this case, be it deposition testimony, be

15   it exhibits, be it trial testimony, will have to meet the

16   Ninth Circuit compelling interest standard, I stress

17   "compelling interest standard," or it will become a matter of

18   public record.

19       We are in the process of talking to some of the other

20   judges who have handled these cases as to how they dealt

21   particularly with the question of exhibits and trial

22   testimony.  There is very, very strong authority for the

23   proposition that, short of the keys to the kingdom, I don't

24   have any ability to exclude people from the courtroom or

25   exclude public knowledge of those exhibits.

1      So when we finish processing your current batch of

2  motions, which I'm going to construe as not falling into that

3  dispositive motion standard, next time around I'm afraid

4  you're going to be entering a much higher level of scrutiny,

5  and you might want to consider that when you consider what it

6  is that you want to put into the court record.

7      Any questions about that, Mr. Harrigan, Mr. Palumbo?

8          MR. HARRIGAN:  No, Your Honor.

9          MR. PALUMBO:  No, Your Honor.  I think we understand

10  the standard that applies at the trial.

11          THE COURT:  All right.  Then let's talk about where

12  we are today.  We're here on Motorola's motion at Docket 393,

13  which is to exclude Murphy, Lynde, and Simcoe testimony, and

14  Microsoft's motion at Docket 396, which is to exclude Donahoe

15  and Sukumar.

16      On the very scientific basis that Motorola filed first,

17  I'll hear the Motorola motion.  Why don't you assume that you

18  have 30 minutes on each side.  Motorola may retain some

19  portion of that time for rebuttal.  And I have some

20  questions, although less than you might think, given that

21  we've had a substantial opportunity to examine this motion,

22  and, secondly, it's a matter that has been teed up not only

23  in this case but in some other cases, so we've had the

24  benefit of various people speaking on that.

25      Any questions about the order today?

1          MR. BATCHELDER:  Your Honor said 30 minutes per side?

2          THE COURT:  Yes.

3          MR. BATCHELDER:  Thank you.

4      My name is James Batchelder from Ropes & Gray on behalf of

5  Motorola.

6      Motorola's motion is based on what we see as four failures

7  of Microsoft's economic opinions.  I'll use this slide as the

8  blueprint as we go through the presentation.

9      The first is, they are based on the wrong hypothetical

10  negotiation; the second is that they're based on a

11  negotiation that Microsoft has not reliably simulated; third,

12  they're based on a discounted patent pool benchmark that is

13  sharply biased and therefore fails the *Lucent/Uniloc* test for

14  comparables; and then fourth, they ignore the most objective

15  and reliable evidence, and they do so without justification.

16      Let's start with the first.  Again, the argument here is

17  that they're based on the wrong hypothetical negotiation,

18  Microsoft's economic expert opinions.  And I think to set the

19  framework, I should say that the parties agree on something

20  here, which is a rare event in this case, and that is the

21  determination of RAND range, and RAND range should be based

22  on a hypothetical negotiation, so we agree on that much, but

23  the parties' positions as to what that negotiation should

24  look like are very starkly different.

25          THE COURT:  Do you agree that it's an ex ante

1  negotiation?  Your motion continues to include the term "ex

2  ante," and yet you seem to accept that as part of that

3  negotiation as you model it, and, hence, I'm a little

4  confused by that.

5       MR. BATCHELDER:  Well, I do think that ex ante could

6  be a useful, theoretical construct, but I think the truth is

7  that both parties, the models that they're putting forward

8  actually, in reality, have an ex post, but ex ante can be a

9  useful construct for analyzing the RANDness of the deal.

10       THE COURT:  What I read in your papers was that your

11  objection here is on the multilateral level, not on the ex

12  ante level; is that accurate?

13       MR. BATCHELDER:  Well, I do think that the patent

14  pool benchmark, the discounted pool benchmark that Microsoft

15  puts forward, they do it under the guise that it looks

16  multilateral and ex ante, when, in fact, it's neither.  So I

17  do think it's important that even the benchmark that they're

18  putting forward doesn't meet their own criteria, and it

19  certainly, most importantly, doesn't identify or assess the

20  value of the patents being licensed.

21       THE COURT:  All right.

22       MR. BATCHELDER:  But back to the point about which

23  hypothetical negotiation makes sense, I do think it's

24  important to go back to how this case came to be.

25       In early October of 2010, Microsoft sued Motorola,

1    alleging patent infringement.  The parties talked.

2    Microsoft -- or Motorola said we've got some patents, too,

3    and Microsoft said, well, let's put those patents on the

4    table, and then we'll have a conversation.

5        So in October -- October 10th and a little bit later,

6    also, Motorola submitted these two offer letters in October,

7    and Microsoft -- the one dealing with 802.11 and one dealing

8    with H.264, and rather than respond or negotiate, Microsoft

9    filed this lawsuit.

10       But the point is that those offer letters arose in the

11   context of a bilateral negotiation.  So Motorola believes and

12   submits that the right hypothetical negotiation to

13   reconstruct here is that bilateral negotiation, that as soon

14   as Microsoft and Motorola sat down at the table and actually

15   hashed out a licensing agreement, taking into account the

16   RAND commitment, what would that look like.

17       Microsoft's position is very different.  What Microsoft

18   says, and I'll show you the verbiage in a moment, what they

19   say is you have to reconstruct a very different negotiation

20   in which, for the given standard like 802.11, every single

21   SEP holder and every would-be licensee, all of them,

22   hundreds, maybe thousands, would sit down together at the

23   bargaining table and they would somehow hash out the deal.

24   It's never happened.  It's pretty difficult to picture what

25   it would look like in practice given that it takes just two

1    parties in a bilateral deal probably a year or more to

2    negotiate.  But anyway, that's Microsoft's position.

3            THE COURT:  Let me stop you, because you're on step

4    two, and I'm still back on step one.

5        It seems to me that what you've described is an accurate

6    model of a bilateral negotiation.  But in terms of setting a

7    royalty rate, I'm not sure that's what I'm asked to do.  So

8    let me start with the basic question.

9        I'm supposed to study a RAND rate or a FRAND rate, both of

10   those use the terminology "RAND."  What case tells me what

11   "reasonable" means?

12           MR. BATCHELDER:  Well, I do think that -- if I could,

13   Your Honor, direct you to the -- invite your attention to the

14   next line.  I think this begins to answer the question,

15   that --

16           THE COURT:  Please answer my question, which is, I'd

17   like the name of the case.

18           MR. BATCHELDER:  What I would say is that what frames

19   what reasonableness is, what the SSOs and Microsoft, and

20   indeed Your Honor and others, have said this is the framework

21   that we would look to.  You know, generally, we have the long

22   line of *Georgia-Pacific* cases that talk about reconstructing

23   hypothetical negotiations between two bargaining entities,

24   and as you know from the motion that Mr. Jenner is going to

25   be arguing about, Mr. Donahoe has taken that framework and

1    modified it to accommodate the fact that he's dealing with a

2    RAND situation.  But that long line of cases essentially

3    assesses how two parties do hash out reasonableness.  But

4    what the SSOs tell us is that RAND negotiations are left to

5    the parties' concern, and it's because they differ from case

6    to case.  That is for a given negotiation, you have to look

7    at the individual licensing entities here, Motorola and

8    Microsoft, and you have to figure out what they would agree

9    to, and that agreement is going to result in the answer to

10   your question, which is that's what reasonableness is and

11   what RAND is.

12           THE COURT:  Well, if each of these is a unique

13   negotiation, what makes it unique?  It seems to me it isn't

14   the fact that Motorola is on one side and Microsoft is on the

15   other.  We're talking about a particular product or standard

16   and a particular patent.  Is that what makes it unique?

17           MR. BATCHELDER:  Well, exactly so.  It's the -- it's

18   the -- the patents that are at issue; that is which ones does

19   Motorola own?  How good are they?  How strong are they in the

20   standard, and how strong are they to what Microsoft actually

21   does?  How many products does Microsoft have that need those

22   patents to operate, and how essential are those to

23   Microsoft's business?  How good of a business partner would

24   Microsoft be to Motorola?  Would they want RAND factor

25   provisions, would they want defense of suspension clauses,

1   all of the kinds of things that typically get hashed out in

2   these type of negotiations.  So reconstructing the

3   hypothetical negotiation, you're going to want to take all

4   that into account.

5           THE COURT:  You used a word that I'm not familiar

6   with.  "How strong," what do you mean by "how strong"?

7           MR. BATCHELDER:  How core they are to both the

8   standard and how core they are to what Microsoft does.

9           THE COURT:  Can I see if I can put some words in your

10  mouth?  In other cases I have seen the language used, "what

11  does the patent contribute to the product or contribute to

12  the standard?"  Do you agree that that's one of the

13  considerations?

14          MR. BATCHELDER:  Yes.

15          THE COURT:  And in the universe of factors, how

16  important of a factor is it?

17          MR. BATCHELDER:  Well, I would submit that in

18  bilateral negotiations, which, again, I believe is the thing

19  that you want to reconstruct, that's as important as

20  anything.

21      How valuable -- if I'm the licensee, how valuable are your

22  patents to what I want to do?  How many of my products

23  practice those things, and how deeply do I need your patents

24  to do it?  Do your patents go to the core of the rate of my

25  products' practice, is it standard, or do they just nibble

1   around some optional stuff around the periphery?  Those are

2   the kinds of things licensing parties take into account all

3   the time.

4           THE COURT:  Then this is helpful for me.  Then what I

5   hear you saying is if the patent contributes 75 percent of

6   the value of the standard, that would be different than if

7   the patent contributes ten percent of the value of the

8   standard?

9           MR. BATCHELDER:  That's certainly true, and also it's

10  not just to the standard, but to the products that are being

11  licensed.

12          THE COURT:  All right.  Thank you, sir.

13          MR. BATCHELDER:  So all of those things, I think,

14  would be relevant.  And that's why, as the SSOs say on this

15  Slide No. 4, what if RAND differs from case to case?  It

16  matters, these varying considerations that are on the

17  licensee, and it's needed for the strength of the

18  intellectual property and license.  It matters very much, and

19  you need to take that into account.

20      And Microsoft had said itself the same thing as reflected

21  on Slide No. 5.  They said that in RAND negotiations, you

22  negotiate on a private, bilateral basis to arrive at a

23  mutually acceptable agreement.  And in the letter they

24  submitted in June to the FTC, June 2011, this formal

25  submission said, "RAND-based IPR policies provide a flexible

1    framework to help enable customized bilateral negotiations."

2    Why customized?  Well, for the rare reason we just talked

3    about; that the SSOs recognize that these licenses differ

4    from case to case.  So you need to take into account in

5    choosing a hypothetical negotiation what's your circumstance

6    here.  And, again, the circumstance here is Microsoft and

7    Motorola in a bilateral negotiation, and we know that because

8    all of this arose in an offer letter from Motorola to

9    Microsoft, not in the context of five entities trying to sit

10   down and cross-license each other.  Conceivably, a RAND

11   assessment can be made if five entities sat down to do that

12   and couldn't agree and thought that one of those entities

13   would take on a reasonable position, but that's not our case,

14   because these assessments differ from case to case.  The

15   right hypothetical negotiation here is a bilateral one

16   between Motorola and Microsoft.

17        And I'd just point out Kevin Murphy, Microsoft's expert,

18   generally agrees that RAND creates this flexible framework to

19   help enable customized, bilateral negotiations.

20             THE COURT:  Do I hear you saying, then, on behalf of

21   Motorola that they think the federal circuit got it right in

22   the *Uniloc v. Microsoft* case?

23             MR. BATCHELDER:  I want to make sure I understand

24   which principle about *Uniloc* you're getting at, Your Honor.

25             THE COURT:  They seem to be endorsing in that case

1   the same concept that you have up in whatever slide this is,

2   Slide 5, where it says you need to specialize it to the

3   details of each of the patents and standards and products.

4          MR. BATCHELDER:  Well, I would submit that for a

5   bilateral negotiation, if you're going to reconstruct that --

6   and using a *Georgia-Pacific*-like analysis, you do want to

7   take into account patent value, and one way to do that is to

8   look at past licenses of the licensing entity here.

9      As you know, Motorola's *Georgia-Pacific* analysis tries to

10  reconstruct, through *Georgia-Pacific* Factor 15, that

11  hypothetical negotiation, and it recognizes that both the

12  courts and industry have long recognized that the most

13  reliable and the most objective evidence of the value of a

14  given set of patents and the reasonableness of the royalty is

15  the past licensing history of a licensor.

16         THE COURT:  But I want to make sure I understand

17  that.  You would agree, though, that that depends in part on

18  the end product?  That's one of the considerations in that?

19         MR. BATCHELDER:  The end product of the licensee?

20         THE COURT:  Yes.

21         MR. BATCHELDER:  Yes.

22         THE COURT:  Okay.

23         MR. BATCHELDER:  I want to point out Slide 6, Your

24  Honor's summary judgment order.  As you say here, Motorola

25  correctly asserts that the IEEE and ITU policies contemplate

1    that RAND licenses will be negotiated between the

2    patentholder and the implementer of the standard.  I think

3    that's entirely consistent with what Microsoft said in the

4    prior slide and what the SSOs have said on the slide before

5    that.  It's a customized negotiation.  Here, it's taking

6    place between the patentholder and the implementer.  That is

7    Motorola and Microsoft, not some cast of thousands'

8    hypothetical negotiation in which everybody involved as a

9    licensor and licensee potentially for the standard would step

10   forward and try to negotiate in a melee.

11        Microsoft acknowledges on Slide 7 in its *Daubert*

12   opposition that many, even most, standard essential patent

13   licenses are the product of bilateral negotiations.  They say

14   that's unremarkable and irrelevant.  I believe it's highly

15   relevant in part because in reconstructing the bilateral

16   negotiation that we believe is the right one to reconstruct,

17   we have real-world examples.  You have hundreds if not

18   thousands of templates that you can borrow from.  This has

19   been done by thousands of licensing entities and has been

20   handled by courts for decades using the *Georgia-Pacific*

21   analysis.

22             THE COURT:  Do you know of any RAND rate that has

23   been set using the multilateral approach?

24             MR. BATCHELDER:  No, sir, I don't.  In fact, I don't

25   feel that that negotiation that they hold out, a multilateral

1    ex ante negotiation with full participation has ever been

2    done, and their experts can't point to one.

3        All right.  So here I just -- I point to Dr. Murphy and

4    Dr. Simcoe, their two experts that, again, make these various

5    points that we're trying to rely on here; that bilaterally

6    between the parties is the way to handle this kind of an

7    assessment.  And, in fact, that quote from Professor Simcoe

8    at the bottom, "Hypothetical negotiation between a willing

9    licensor and a willing licensee," that's the right

10   hypothetical negotiation.  When you're talking about these

11   two parties, where the dispute here arose through one party

12   offering another a license, the right hypothetical

13   negotiation to reconstruct is between the willing licensor

14   and willing licensee, not the cast of thousands they put

15   forward in their brief, and not the cast of thousands that

16   these expert opinions are all predicated on.  And for that

17   reason alone, I think we need default.

18       In the interest of time, Your Honor, I'm not going to take

19   you through chapter and verse of these two quotes from

20   Dr. Lynde, but I will say that I think they help to

21   illustrate the absurdity, ultimately, of the perspective of

22   Microsoft's experts.

23       I did asked Dr. Lynde here, "Let me ask you to assume a

24   hypothetical where I, as the licensor, seek out a licensee,

25   and we agreed.  We see eye-to-eye on the fact that my SEPs

1   are more valuable than the other SEPs for a given standard.

2   If we agree on that, is there anything unRAND about the

3   agreement that that licensee is going to pay me more because

4   he agrees with me that my SEPs are more valuable?"  And

5   Dr. Lynde said that would violate RAND.  That would violate

6   RAND because two parties can't sit down and agree.  They need

7   to back up and imagine some, again, cast of thousands sitting

8   down to negotiate a license agreement, and they need to

9   imagine what that would have looked like and they need to

10  compare that to the deal they wanted to do.  And only once

11  they did that can they sit down in good faith and agree on a

12  license and be comfortable that it's RAND.

13          THE COURT:  Well, counsel, the trouble that I have

14  with this theme, which is rampant in your pleadings, is that,

15  while it may be accurate in an essential patent negotiation,

16  that's not what happened here.  Mr. Jenner makes the point

17  every time he gets the chance that, Oh, you know, that is

18  this entity.  You know, their patents and our patents and

19  this is going to be very complex and we're going to need a

20  hundred-page agreement.  Yes, if you were sitting down doing

21  this as normal business people, I agree that would be

22  accurate, but you've demonstrated to the court that you're

23  not, that you're both pursuing another agenda, and therefore

24  I'm not talking about what are Microsoft's patents worth.

25  I'm talking about what is the royalty that goes with

1   Motorola's patent.

2        So this whole line of discussion that you keep pushing on

3   the court, while you need to consider the relative patent

4   strength of everyone's patent, I don't think has anything to

5   do with the question I'm being asked.

6            MR. BATCHELDER:  Your Honor, if I could, that's

7   Microsoft's position; that is, that you need to take into

8   account all the would-be licensors and all the would-be

9   licensees for the entire standard, and imagine what that

10  negotiation would look like.

11       All I'm saying here is -- and you can forget about a

12  cross-license -- but if I'm a licensor and I go to a licensee

13  and I say, "I think my SEPs here are more valuable than

14  others in the industry," and the licensee says, "You know

15  what?  I agree with you.  I've looked at your patents.  I

16  think they're more valuable, too, so I'm willing to pay you

17  more," and we enter into a deal having seen eye-to-eye on

18  that point -- Dr. Lynde here, Microsoft's expert, is saying

19  that's not RAND because you haven't imagined this melee

20  negotiation with the thousands of entities all negotiating at

21  once, even though that's never happened and it's really hard

22  to picture, that's not RAND.

23       And I would just submit that, as a practical matter, two

24  parties have to be able to negotiate like that and see eye to

25  eye.

1    Now, I grant you here that negotiation hasn't reached

2    fruition, but that happens all the time in *Georgia-Pacific*,

3    too.  The parties don't agree and submit to the court, and

4    the courts reconstruct what a reasonable deal would look

5    like.  And that's all we're saying here is the right

6    hypothetical negotiation of reconstruct is that bilateral

7    negotiation, even though the parties have not been able to do

8    it themselves.  That's all I'm saying.

9    I would say, also, in Slide 10, when I asked Dr. Lynde

10   here was he acknowledging there had been thousands of lines

11   of SEP licensing agreements over time, and I asked him, "Can

12   you name one that's RAND?"  And what he said was, "No, I

13   can't."  I said, "You can't name one?"  And he said, "No.

14   That would require a detailed investigation."  And I said,

15   "Well, what would that look like?"  And he said, "Well, that

16   could take hundreds of hours to again reconstruct this cast

17   of thousands negotiation."

18   So what are the ramifications of that position?  This

19   graphic on Slide 11 is designed to illustrate these two

20   parties on the left who happily reach a deal, they both are

21   delighted with it because the licensee believes he's getting

22   patents of extraordinarily high value, and he's willing to

23   pay for that.  They reach their deal, they sign it, and

24   Dr. Lynde and Microsoft's other experts over on the right

25   say, "Hold the phone.  You can't take that deal because it

might be on RAND.  We have to send this team of Sherlock

Holmes guys with magnifying glasses to look through the

multilateral full participation lens, and until we do that

for hundreds of hours and pay the economists to do it, you're

probably going to be in violation of RAND."  That can't be

the right standard.

And I would submit it doesn't just put this one deal in

jeopardy, but it's like, well, this is designed to

illustrate -- it will call into question and cast a shadow of

doubt on the licensing agreements that have been entered into

under SSOs for the last 30 years.  Again, that can't be the

right way.

And so, again, our first point is simply that the right

hypothetical negotiation here is a bilateral one, because

that's what the offer was.  It was a one-way communication

from Motorola to Microsoft.  It was not submitted in a pool

or a group, and so the negotiation they were relying upon is

not the right one.

Moving to the second very closely related point, as Your

Honor has already touched on.  Their negotiation, they've not

reliably simulated, because it's never happened, to Your

Honor's earlier question.  There never has been a

multilateral and standing negotiation with full

participation.

And here's Dr. Lynde's standard.  This is what you need to

1    have, he says.  You need to consider a multilevel, ex ante

2    negotiation with full participation, and full participation

3    is important, he explains.  And I asked him in his

4    deposition, "Well, has that ever happened for a given

5    standard?"  His answer:  "Not to my knowledge."  And none of

6    their experts have come forward with any example of this ever

7    happening, and I would submit that as a result of that, it's

8    a fundamentally unreliable exercise; and not only it hasn't

9    happened, but as we lay out in Slide 16, it couldn't happen.

10   It's forbidden by the SSOs, and, in fact, it's forbidden, as

11   Dr. Simcoe acknowledges, for antitrust reasons, because there

12   could be a group boycott if that kind of thing happens.  But

13   not only has it not happened, it would likely be illegal if

14   it did happen.  That renders it a fundamentally unreliable

15   pretext, and yet that is the pretext and the basic premise of

16   all of Microsoft's economic experts.

17       So moving on to the third point, they do a bit of

18   bait-and-switch.  They hold up this Latin-clad standard, ex

19   ante, multilateral, full participation negotiations never

20   happened, and then they say because of all that Latin and all

21   that fancy phraseology, we're going to rely on the

22   patentholder.  So they don't do the hard work to reconstruct

23   what this ex ante, multilateral, full participation

24   negotiations thing would really looked like.  They say,

25   "Well, we'll look at patent pools, because we think they kind

1   of resemble that," and for a lot of reasons that fails.  And,

2   again, both *Lucent* and *Uniloc* say if you're going to hold up

3   something as the plaintiff in a case and say this is my

4   comparable, you have to prove it is comparable, and they

5   can't possibly carry that burden of proof here because, in

6   fact, patent pools are sharply discounted and therefore it is

7   an extremely biased attempt at a benchmark.

8        THE COURT:  Well, what would be the standard that I

9   should hold them to in terms of -- you say if you're

10  proposing a rate, what is it that you need to convince me of?

11       MR. BATCHELDER:  Well, as the *Uniloc* case says here,

12  there must be a basis in fact to associate the royalties

13  rates use and prior licenses to the particular hypothetical

14  negotiation, and as *Lucent* said, "The plaintiff has the

15  burden of proof that the licenses were sufficiently

16  comparable to support the damage award."  So, for example,

17  they would need to show that the royalty rate associated with

18  these patent pools, Via and MPEG LA, are not discount-house

19  royalty rates.  They're royalty rates that were designed to

20  capture the fair market value of the intellectual property

21  being licensed, and here they simply cannot meet that

22  standard.  And I'd like to walk you through a couple of

23  slides to help illustrate that point.  I realize I'm short on

24  time, so I'll skip through some slides.

25       But I will say, just very quickly, they say multilateral

1   is important.  Well, full participation multilaterally was

2   not met here.  Via doesn't meet it, and they only had five

3   licensors participate in the Via pool.  In the MPEG LA pool,

4   they only had 20 companies out of a thousand set the royalty

5   rate.  So their multilateral, full participation criteria

6   hasn't been met.

7        Your Honor asked earlier about ex ante.  The MPEG LA pool

8   was not ex ante to the formation of the standard.  It came

9   six months later.  And the Via pool came ten years later.

10  Clearly not ex ante.  So their own criteria aren't being met.

11       And then most fundamentally they say here on Slide 22,

12  "Patent pool rates, in particular, are discounted."  Here is

13  an economist, Damien Geradin, who says here, "Under a pool,

14  as part of the arrangement, members often get a discounted

15  cross-license to one another's patents."

16       So why are they discounted?  Well, we list here on the

17  bottom why that is.  That is, essentially these pools are

18  focusing on cheap implementation.  That is, they want to

19  promulgate broad dissemination of the standardized

20  technology, and they draw licensees in with cheap rates in

21  order to get them to adopt it and adopt it broadly.

22       Why would the licensors agree to that?  Because most of

23  them are implementers themselves, and Microsoft is the

24  classic example of that.  They kick in their patents, MPEG

25  LA, for example, and the reason they do it is because they

want Windows and their other implementing products, which are essentially ubiquitous in the marketplace, they're the lowest cost structure possible.

This next bullet is very important.  Patent counting ignores value.  These patent pools fundamentally do not do what Microsoft says you have to do, and that is, analyze the value of the patents.  These patent pools allocate royalties not by value but just by how many you've got.  So if I have five and someone else has ten, they get twice as much royalty as I do, and if I say, wait a minute, my five patents are really core to the standard and they're core to these licensees' needs, my patents do exactly what their products do, they're really valuable, and that guy who has ten, a lot of his patents actually are nibbling around the periphery of the standard, they're not what these products do.  Most of them look like they may be invalid anyway.  The pools say we don't care about that.  He gets ten, you get five.  That's all we care about.  He gets twice as much as you.

Antitrust scrutiny is another reason that the royalty rates are low for pools, and the transaction costs are almost nothing, and as a result of that, they can charge cheap royalties.

So here is Dr. Lynde admitting -- and, again, in the interest of time, I'm not going to read all the Q and A, but if you have a strong licensing program, other things remain

1   the same.  You're deterred from joining the patent pool.

2       And over here, even more importantly, perhaps, if you have

3   valuable patents, if you have good patents in this pool, core

4   patents, you're likely not going to want to join, because

5   it's just a patent-counting arrangement, it doesn't assess

6   value.

7       And what does that mean?  If the people with the strongest

8   patents are deterred from joining, and the people with the

9   strongest length in programs are deterred from joining, the

10  ones that do join are weak.  It's a discount house for cheap

11  patents for people that haven't invested in a licensing

12  program.  It is not the kind of comparable that *Lucent* and

13  *Uniloc* rely upon.  Microsoft cannot carry its burden here.

14      Slide 24 is about transaction costs, and again I asked

15  Dr. Lynde, "Do you agree that royalty rates can be set lower

16  in patent pools because of the reduced transaction costs?"

17  He says, essentially, yes, yes, that can happen.

18      And there's nothing on RAND, he acknowledges to the right,

19  in recovering in a bilateral negotiation the real transaction

20  costs you anticipate.  So for this reason alone, these

21  discountable patent pools can't be a fair comparable for the

22  hypothetical negotiations here, which would be a bilateral

23  one.

24      Slide 25 points out that Dr. Lynde testified once in a

25  prior case about SEPs that happened to involve the 802.11

1   patent.  He represented the plaintiff, and he opined about

2   the reasonable royalty there, and lo and behold, his opinion

3   was, "It was higher than the royalty rate."  I asked him by

4   how much.  He said he couldn't remember.  I asked him if it

5   could be more than 500 percent.  He couldn't remember.

6       But it's kind of ironic now that that's the rate that

7   Microsoft is trying to shove down the throat of Motorola,

8   with their own expert in a prior case saying it was below the

9   rate that was reasonable.

10      I needed to redact Slide 26 because Microsoft sealed that

11  document, but it reflects why Microsoft itself refused to

12  join the very Via pool whose royalty rate, again, it is

13  trying to shove down the throat of Motorola here, it

14  preferred bilateral negotiations.

15      And, again, for the MPEG LA, Microsoft participated there

16  and intentionally sought to suppress the royalty rate.  Why?

17  Because it was very concerned with making sure that Windows

18  could be disseminated cheaply, and as they said in the bottom

19  here, "We do not foresee this patent pool ever producing a

20  material revenue stream.  Revenue plays no part in our

21  decision to join the MPEG LA," and yet they're holding this

22  up as a benchmark for the fair market value reasonable

23  royalty rate when they know, they acknowledge internally that

24  it doesn't get that great of a return.  It's a discount

25  house.  It's not a fair benchmark.  It doesn't mean the pools

are bad.  It just means the pools are not benchmarks for a fair market value.

And, finally, Your Honor, the last of the four independent points as to why these economic expert opinions fail, they ignore the most objectionable and reliable evidence out there.

These cases, I'm not going to take a lot of time to walk through them, and I'm sure Your Honor knows the case law over the years has recognized what the industry has recognized, and that is the best and most reliable evidence for the value of a given set of patents is the licensing history of the licensor, particularly if any of those licenses involve the patents in suit, and, here, that's exactly what Motorola's *Georgia-Pacific* type of analysis has started and stopped with.

And the *Riles* case, at the top, in the federal circuit, reversed because the district court abused its discretion in failing to exclude the defendant's expert's damages model, which ignored the plaintiff's established prices and practice regarding royal rate, and that legal principle published in the cases has been recognized by *Chisum*, as shown on the bottom there.

And Microsoft's excuses for ignoring the reliable evidence are, well, theoretically there could be a distinct holdup. Theoretically there might be a stacking problem because

1    academic articles say that you have to think about those

2    things.  And I don't disagree that you have to think about

3    them, but the question here is, do they apply in this case?

4    Is there a holdup here?  Is there stacking here?  And

5    definitively the answer under the evidence here in this case

6    is no.

7        We showed Dr. Lynde the statement in Microsoft's FTC

8    letter, "There is little evidence that patent holdup in the

9    standard context is a real problem," and keep in mind

10   Microsoft wrote that letter to the FTC about eight months

11   after receiving Motorola's offer letters.  So we asked Dr.

12   Lynde, "Do you agree with that?"  And he said, "Yeah, I have

13   no basis from the economic evidence to conclude whether or

14   not patent holdup is a real problem."  And we asked him about

15   802.11 and H.264 in particular at the bottom there, and he

16   said, "Yeah, I haven't looked into whether there's holdup in

17   those industries."  Well, those are the ones that matter.

18       Microsoft also says to the FTC, "Concerns about patent

19   holdup should not extend to any bilateral business agreements

20   between two companies regarding those licensing terms."  Like

21   the issue here, I said, "Do you agree with that?"  He said,

22   "I don't necessarily disagree with that.  I don't have any

23   particular bases to disagree with it."

24       Most important -- this might be the most important slide

25   in the presentation and the most important evidence in this

 1    case.  We asked all three of Microsoft's economic experts,

 2    "Is there evidence that any of Motorola's past licenses, one

 3    that Mr. Donahoe relies upon, that any of them have been

 4    affected with holdup?"  And all three of them said, "We're

 5    not aware of anything like that."  So they waved their hands

 6    and said, well, academic holdup might be a problem.  Of

 7    course it might be.  You always have to ask.  But here we did

 8    ask, and their expert said, "We've got no evidence that any

 9    of the Motorola licenses were affected with holdup."  And so

10    what are we talking about here?  Why would it be unreasonable

11    for Mr. Donahoe to look to those under *Georgia-Pacific*?

12              THE COURT:  You have five minutes.

13              MR. BATCHELDER:  Thank you.

14        What about stacking?  If there's no evidence of holdup,

15    what about stacking?  Well, we asked him that, too.  Sure,

16    you have to ask whether stacking is present.  The question

17    is, is it present here?  And we asked Dr. Murphy, Dr. Lynde,

18    and Dr. Simcoe, and all of them said, "You know what?  I

19    don't think it is present here."

20        "I don't see it in Wi-Fi or 3G," Dr. Murphy says.  And

21    802.11, I asked Dr. Lynde, he said, "Not that I'm aware of.

22    It doesn't seem to be a problem in the aggregate."  "What

23    about for H.264?"  "I'm not aware of any studies or empirical

24    evidence about stacking there."  And Dr. Simcoe:  "I don't

25    have any evidence in connection with 802.11 or H.264."  No

1    evidence of stacking.

2        I asked Dr. Lynde in particular, "Well, let's look at

3    these 89 patents that are SEPs for H.264 that aren't in the

4    MPEG LA pool.  Why haven't those holders come to Microsoft

5    and demanded a license?"  He said, "Well, I don't have any

6    information about that, but they're probably trying to create

7    implied cross-license, and that creates a de facto world free

8    license, and that could go toward solving the stacking

9    issue."

10       You would think after all this talk of stacking between

11   these two industries, Microsoft might have entered into,

12   what, a hundred licensing agreements if stacking were to be

13   an issue, at least dozens of them.  The truth is, Your Honor,

14   for each of these industries, 802.11 and H.264, Microsoft has

15   entered into the grand total of one licensing agreement.  So

16   MPEG LA, a grand total of one.  And with Via the story is

17   even better.  That is for 802.11, there are thousands of SEPs

18   outside of the Via Licensing pool.  Microsoft refused to join

19   the pool, and again, it has only taken the grand total of one

20   license.

21       There is no stacking problem here with respect to these

22   industries, as their exerts admit, or with respect to

23   Microsoft.

24       And then, finally, you know, we asked these experts,

25   Microsoft has publically articulated its positions and its

1   understanding from its own experience about RAND and holdup

2   and stacking.  It's told the FTC what it really thinks, that

3   stacking is really more of a theoretical problem and holdup

4   is really more of a theoretical problem, and we haven't seen

5   it manifest itself in real life in these industries, and we

6   asked each of them, "Have you talked to Microsoft?  Have you

7   asked them whether the opinions that you're testifying to in

8   this case square with their real life experience and their

9   opinions about these things?"  And to a person, every one of

10  them said, "No."  In fact, Dr. Lynde said, "I didn't even

11  know about these people.  I didn't even know about the FTC

12  letter."  They didn't bother to check whether these

13  theoretical handwritten opinions were grounded in the reality

14  that Microsoft has experienced.

15      Thank you.

16          THE COURT:  You have reserved, at this point, two

17  minutes for rebuttal.

18          MR. BATCHELDER:  Thank you.

19          MR. HARRIGAN:  Your Honor, good morning.

20      Your Honor, it might actually make sense to use, as a

21  jumping-off point, the slide that counsel held up relating to

22  the Lynde testimony that he quoted, and the parts that are

23  not yellow highlighted on that slide address what we believe

24  this case is in large part about.

25      Dr. Lynde responded to the --

1        THE COURT:  Which slide are we looking at, counsel?

2        MR. HARRIGAN:  No. 9.

3    So what Dr. Lynde was saying about the bilateral

4    negotiations that he was being asked to address is that is

5    exactly the problem of doing ex post bilateral sequential

6    negotiations, is there are components of holdup and stacking

7    issues which are going to present a problem, and that is the

8    consistent view of not only Microsoft's experts but of many

9    other authorities and courts, and, in fact, has been

10   enunciated by Motorola itself in this case.

11       And what the -- the basic approach that Microsoft's

12   experts have taken is to identify the correct hypothetical

13   negotiation that should be used for a court to arrive at a

14   RAND rate in a standards essential patent situation, and that

15   is, first of all, it has to be ex ante, because otherwise the

16   negotiation will involve holdup, or at least there is every

17   reason to believe it will, because if you can extract more,

18   you -- generally speaking, humans figure out a way to do it,

19   and secondly, that it has to be whatever you want to call it,

20   the multilateral/bilateral decision is just semantics.

21   Multilateral, as used by the experts here, simply means that

22   you have an aggregation of licensors and licensees so that

23   you end up with a rate that doesn't -- that -- you escape the

24   problem of ending up with individual negotiations that create

25   a collection of rates that exceed the value of the

1    technology, in which case the standard doesn't work.  So

2    whether you call it aggregation, multilateral, or multiparty,

3    that is the characteristic of the hypothetical negotiation

4    that our experts identify.

5        And counsel has suggested that holdup is not a problem,

6    but if you look, Your Honor, now in our notebook, at Tab 2,

7    the heading for which is "Holdup and stacking are recognized

8    concerns," the first excerpt is from Motorola's proposed

9    findings of fact.

10       "RAND commitments are designed to ensure that a standard,

11   essential patentholder will not engage in holdup.  Royalty

12   stacking is another potential issue with standard patent

13   licensing."  So obviously they're not imaginary concerns.

14   Motorola has proposed that the court find that they are real.

15       Their expert, Professor Schmalensee says, "RAND

16   commitments exist to address holdup.  That's why they have

17   RAND.  RAND is a legal requirement that's a matter of

18   contract."  It's imposed in order to prevent holdup, and the

19   only way it's going to work is if, when the parties can't

20   agree on what RAND is, the court decides the issue.  That

21   makes the contract meaningful and enforceable, and if the

22   court adopts the wrong approach, the one that Motorola is

23   proposing, and uses ex-post bilateral negotiation by a party

24   that is not a part or member of the patent pool, there is no

25   way to -- and now I'm going to allude to the statements about

1    the experts saying there's no evidence of holdup in

2    Motorola's negotiations.  In fact, what Dr. Murphy said and

3    the others said, but Dr. Murphy specifically, I happen to

4    know clearly, said, that given human nature, you have to

5    assume that holdup is involved in that transaction because

6    Motorola has the capacity to extract that value because it's

7    not -- unless the court imposes a different result.

8         So the -- as Dr. Lynde said, the ex-post bilateral

9    negotiation cannot be assumed to yield a result that doesn't

10   have holdup in it.  The hypothetical ex ante negotiation that

11   our experts are identifying as the goal you want to get to

12   assures both no holdup, and because of the aggregating

13   effect, that there isn't stacking.

14        And I'm going to now address another subject that the

15   court raised, which is, what kind of legal authority do we

16   have out there that says what RAND is?  And let me start by

17   asking you to look at Tab 3 in our book, which contains two

18   quotations from the *Apple v. Motorola* case, the ones in

19   the -- the second one and the third one on the first page of

20   that tab.

21        Once a patent becomes essential, the patentee's bargaining

22   power surges, as we all know, and, secondly, the purpose of

23   the RAND requirement, and the validity of which Motorola does

24   not question, is to confine the patentee's royalty demand for

25   the value incurred by the patent itself as distinct from the

1   additional value, the holdup value conferred by the patents

2   being designated as standards and standards essential.

3       And then, Your Honor, the final quote, which I'm just

4   going to read because it's not in the book from Judge

5   Posner's decision, is, "The proper method of computing a RAND

6   royalty starts with what the cost of a licensing would have

7   been of obtaining just before the patent and invention was

8   declared essential to the compliance with the industry

9   standard, a license for the function performed by the patent,

10  that cost would be a measure of the value of the patent qua

11  patent."  That's essentially -- he doesn't use the words "ex

12  ante," but that's what essentially that is.

13          THE COURT:  Mr. Harrigan, let me stop you at that

14  point.  It seems to me that any time I start to question

15  Judge Posner, I'm treading on dangerous ground.  But let's

16  take your most recent statement.

17      What Judge Posner appears to be saying is that if I look

18  at a snapshot of time before it's declared an essential

19  patent, that that's my starting point.  But at that point,

20  then, that patent is the unique property of the patentee, and

21  therefore it has a value that is attributed to the fact that

22  it is a monopoly and the patentee can exclude anyone else

23  from using it.

24      After it's declared an industry essential patent, it then

25  becomes subject to a reasonable and nondiscriminatory rate,

1  but it is available to everyone.

2      So it seems to me that, with all due respect to Judge

3  Posner, I'm not sure I agree with his view, because I'm

4  supposed to set this rate as a RAND rate and not a monopoly

5  patent rate.  How do you respond to that?

6          MR. HARRIGAN:  Your Honor, I agree with you, and, in

7  fact, the purpose for my quoting Judge Posner on the claim is

8  simply that it recognizes a judicial recognition of the need

9  for a so-called -- what is called an ex ante rate if you're

10  going to arrive at RAND.

11      However, he got it wrong when he picked the time, because

12  actually the time is after the standard has been adopted but

13  before it has achieved widespread adoption, because -- in

14  fact, and as our witnesses, including our fact witnesses,

15  will testify in this case, at the time, for example, that

16  H.264 had just been adopted, and the MPEG LA pool was in the

17  process of being formed, there were alternatives to H.264

18  that potentially would have won out had the patent pool not

19  gotten it right and produced a rate that was acceptable to

20  the wide swath of licensees.

21      But, Your Honor, those discussions, the fact the H.264 was

22  adopted in early '03, and the MPEG LA rates were formed in

23  the fall of '03, so that -- and, in fact, a lot of licensees,

24  as Mr. Lance [phonetic] will testify, were sitting out there

25  in the wings trying to see which way to jump and waiting to

1   see what that patent pool would do.

2       So we're going to have a substantial amount of testimony,

3   Your Honor, that the MPEG LA patent pool is the closest

4   comparable there is to the Holy Grail, which, obviously,

5   hasn't happened, but it's a hypothetical negotiation that

6   gives you a guide to where you're trying to get to.  All of

7   the licensors and licensees get together at the time the

8   standard is being formed and in some fashion determine what

9   rate is the right rate for the licensors and the right rate

10  for the licensees, and they come up with a compromise that

11  reflects everybody's interests.  You avoid stacking, which

12  all happens at once, and that's called multilateral, and that

13  is how you solve the problem.

14      And from the court's standpoint, the hypothetical

15  negotiation is just there to say, okay, this is what we're

16  trying to get to.  I don't have one that somebody can put in

17  front of me, because if we did, there wouldn't be anything to

18  talk about, but now I'm going to look for a comparable that's

19  as close to that as there is.

20          THE COURT:  It seems to me that -- first of all, I'm

21  delighting that the headline is going to be, "Microsoft says

22  Judge Posner, you're wrong," as opposed to, "Idiot judge

23  criticizes esteemed colleague," but let me go back to my

24  question, which is, in Judge Posner's analysis in *Apple*, was

25  he assuming a multilateral or a bilateral negotiation?

1          MR. HARRIGAN:  Well, in his discussion, Your Honor,

2    he was assuming an ex ante negotiation, and obviously you can

3    have a bilateral --

4          THE COURT:  Are you telling me we don't know which of

5    those two?

6          MR. HARRIGAN:  Well, Your Honor, first of all, we're

7    talking about how the court is going to get to RAND.

8    Obviously, in the case, the parties didn't get to RAND.  In

9    most cases, I believe it is correct that a bilateral

10   negotiation can take place and end up with RAND, as long as

11   the parties believe that if they don't get there, a court is

12   going to impose it.

13       But if the court uses bilateral negotiations that are

14   effected with holdup as the basis to get to RAND, then the

15   whole system is going to fall apart, because all those people

16   who were behaving inappropriately will have an incentive not

17   to do so.

18       So I don't know if I've completely answered your question,

19   but if you look at the MPEG LA situation, it has the

20   following characteristics.  What I'm saying here, Your Honor,

21   is, this is not about some in-the-sky, nonexistent event.

22   This is about, in the case of MPEG LA, a very closely

23   analogous situation to that pie-in-the-sky event, and one

24   that has many other features that make it comparable enough

25   to use to arrive at a RAND royalty in this case.

1     First of all, as I said, it happened before broad adoption

2   but after the standard was adopted.  Secondly, there were 20

3   licensor participants, many of whom were also licensees, that

4   included Microsoft and Motorola, both of them were both

5   licensors and licensees.  When the rates were tentatively

6   published, the licensees responded and changes were made to

7   the royalties; that is, the perspective licensees who were

8   not at the table for the formation.

9     The system for MPEG LA uses a proportional allocation of

10  the total royalty among the participant licensors in the

11  pool, and that is an arithmetic fraction of the total.  And,

12  Your Honor, the evidence in the case will be that neither

13  Mr. Dailey nor Motorola's expert, Taylor, can say that

14  Motorola's H.264 patents are any better than the average

15  patent.

16    So a slice of the pool that represents their arithmetic

17  share is a fair allocation for them.  Obviously it's

18  comparable because we're talking about the very same

19  standard, so it's not like we're going out and looking for

20  some different set of technology.  We're talking about H.264,

21  we're talking about Motorola's patent, which their own people

22  can't say are any better than the rest of the patents in the

23  H.264 standard.

24          THE COURT:  It seems to me you never address what

25  seems to be the biggest distinction here, which is a pool, by

1    its very nature, is a voluntary agreement to join an

2    organization.

3              MR. HARRIGAN:  Yes.

4              THE COURT:  Motorola has stated it doesn't want to be

5    in the pool.  It wants to go it alone and it wants to

6    negotiate based on that position.

7         So, I mean, how can I take something which is a

8    fundamentally different character and say it controls a

9    completely different situation?

10             MR. HARRIGAN:  Well, Your Honor, there are a couple

11   of ways -- there are a number of reasons why that works.

12   First of all, it's certainly true that Motorola was under no

13   obligation to join the pool.  But the court needs to find a

14   closely comparable situation to arrive at a rate, and a rate

15   where the situation has the characteristics of, at least if

16   not completely ex ante, at least as close as we're going to

17   get, because it's before widespread adoption.

18        And so the rates that those parties agreed to in the pool

19   are very likely to be in the right order and magnitude,

20   subject to adjustment; for example, if Motorola came forward,

21   which it can't, and said that its patents were more valuable

22   than the rest.  But the fact is, they aren't, and what we're

23   talking about here is a standard and what is -- in effect,

24   what is Motorola's proper share of a reasonable total royalty

25   for that standard?

1      THE COURT:  Well, but -- go back to the fundamental

2  question here.

3      The motivation of someone joining the pool and setting a

4  pool rate is not the same as Motorola's motivation, which is

5  to maximize its return.

6      MR. HARRIGAN:  Well, Your Honor, the motivation of

7  the licensors in the pool is to make the standard work, and

8  the way to do that is to come up with a rate that is high

9  enough to give the licensors a return that they believe is

10  fair and adequate without going so high as to deter the many

11  licensees that you want to have sign up from signing up.

12      And, Your Honor, this particular example is

13  particularly -- is especially compelling, because what

14  actually happened is that Motorola participated throughout

15  the formation of the MPEG LA pool.  It argued for lower rates

16  than were initially discussed, it argued for lower caps than

17  initially discussed, and it entered to and agreed to and

18  signed off on two press releases from MPEG LA stating these

19  are our rates, and then right before the pool was formed,

20  Motorola decided to drop out.

21      But you'll have unequivocal and undisputable evidence that

22  it agreed with the ultimate rates.  And, in fact, part of the

23  reason they were what they were is because Motorola argued

24  that they should be lower than those initially discussed.

25      The other point, Your Honor, that I think is important is,

1  if you look at Tab 5 of the notebook, the notion which

2  Motorola has repeated several times in its argument this

3  morning, that the pool rates are super cheap, is refuted by

4  their own expert, Mr. Smith, who, at Tab 5, said, "This is

5  not to say that patent pools seek to promote downstream

6  manufacturing through low royalty rates at the expense of the

7  patentholder or licensors.  Rather, the pool royalty rates

8  must be set to balance the desire to attract licensees with

9  the need to attract other potential licensors.  If the rates

10 are too low, not enough licensors will join the pool."

11     So, Your Honor, I'm not saying that this is the perfect

12 comparable, but it is a very compelling comparable, and it's

13 a landmark the court can use to arrive at a rate, and we

14 believe that the rate will be in the same neighborhood as the

15 pool arrived at, because, Your Honor, that pool replicates

16 the ex ante situation that we want to get to, and it

17 replicates the situation where you do not have, a, after the

18 fact, a bilateral series of negotiations, each of which

19 extracts holdup so that the total cost of implementing the

20 standard is a higher cost than two reasonable sets of people

21 would ever have agreed to when it was in the process of being

22 put together.

23     And when you're dealing with standards, that has to be the

24 goal, is to get to the rate that -- if you had a bilateral

25 negotiation of all the licensors and all the licensees, you

1  would get a rate that was in the middle of what it took to

2  attract both of them and avoided making the standard too

3  expensive for the licensees.  That's what you would get.

4          THE COURT:  Has there before been such a multilateral

5  negotiation?

6          MR. HARRIGAN:  Your Honor, I don't think -- we cannot

7  cite that to you, but that very subject --

8          THE COURT:  I take it that was a "no."

9          MR. HARRIGAN:  Right.  But it's important to qualify

10  that by saying that the IEEE and other standards

11  organizations are currently discussing doing that very thing.

12  But, Your Honor, here's the problem.  I mean, I -- but right

13  now we don't have that system.  Obviously if we had that

14  system, there wouldn't be any need for judicial intervention

15  because all the rates would be set by contractors in advance

16  for everybody.

17      Here we have a system that depends on the parties agreeing

18  to a RAND rate, and the licensor is offering a RAND rate

19  whether they're in a pool or not in a pool, and the court's

20  problem, of course, is, how do I figure out what that is when

21  the parties can't agree?  And all I'm saying is that a pool

22  that is formed with a large number of licensors involved and

23  is accepted by a large number of licensees and occurs close

24  to the time when the standard was adopted, before there was a

25  holdup potential, is a very good comparable.

1    And, of course, Your Honor, this is a *Daubert* motion.

2  There doesn't have to be a perfect comparable.  That's a

3  question of how much weight the court chooses to give it.

4  But it is a piece of evidence that our experts are relying

5  on, and they should be entitled to rely on it.

6    Let me go back to where we -- you know, kind of a legal

7  issue here.

8    Motorola basically makes two arguments; one is the

9  standards organizations require bilateral negotiations, and

10  I'm not going to read through this, but if you look at Tab 1

11  of our notebook, we have put there all the quotes in

12  Motorola's brief from the standards organizations on this

13  issue that they -- on pages 4 and 5 of their brief, and you

14  will not find a single statement in here that even requires

15  the parties to engage in bilateral negotiations, much less

16  when to tell the court how to go about setting a RAND rate.

17    So we are not operating under some mandate for the

18  standard-setting organizations here to use only bilateral

19  comparables.  In fact, the whole notion of bilateral versus

20  multilaterals, as I said, is just semantics, because you can

21  have a bilateral negotiation with three licensors on one side

22  and three licensees on the other side, and lateral means

23  side, it doesn't mean how many people are on each side.  So

24  there is nothing here in the -- the standard-setting

25  organizations are not controlling this situation.

1          THE COURT:  Well, since we're on this topic, can you

2    point me to any RAND rate that has been set by a court, using

3    your proposed multilateral negotiation model?

4          MR. HARRIGAN:  I don't think there is a RAND rate

5    that's been set by a court, Your Honor.  I think that's the

6    reason that this is a very important case, because this case

7    is going to determine how that's done.

8          THE COURT:  All right.  So the answer to that one was

9    no.  Then let me take you to part two, which is, can you

10   point me to any rate that's been set using this multilateral

11   negotiation?

12         MR. HARRIGAN:  Yes, the MPEG LA rates for H.264.

13         THE COURT:  That's the one you would -- I hate to say

14   "hang your hat on," but --

15         MR. HARRIGAN:  Yes, Your Honor.  And, in fact, the

16   Via pool on 802.11 is not as strong a comparable as the MPEG

17   LA pool, but, in fact, the Via pool was formed at or before

18   802.11 became very widely adopted.  And so it's -- it is a

19   data point that should be considered here along with other

20   data points in arriving at a RAND rate there.

21      So -- but I think that the answer to your question is the

22   MPEG LA pool is very close to -- it is -- it is ex ante.

23   What it isn't is, it's not fully multilateral, but it's very

24   substantially -- it includes a large number of the people

25   involved.

1        And, you know, Your Honor, so the only prong of Motorola's

2   argument besides the invalid one that the standard-setting

3   organizations forbid nonbilateral activity is that the

4   economic theory doesn't stack up in this way.  And the fact

5   is that Motorola itself has advocated this very thing.

6        If you look at Tab 4, this is a submission in 2006 by

7   Motorola to ETSI, which is a telephone standard-setting

8   organization in Europe.  And Motorola -- the second page,

9   actually, should be the first page.  If you look at the

10  second page of this tab, Motorola was worrying about

11  cumulative royalties, which were often uncertain, possibly

12  too high, and, at worst, prohibited.  And multitechnology

13  purpose devices complicate the picture.  And, finally,

14  licensors could push royalties up in an unlimited way.  That

15  was what Motorola was worried about, and its solution was to

16  use what it calls the aggregated reasonable terms approach.

17  Essentially, patent owners agree to grant licenses on terms

18  that are objectively and commercially reasonable, taking into

19  account the overall licensing situation, including the cost

20  of obtaining all necessary licenses from other relevant

21  patentholders for all relevant technologies in the end

22  product.

23       And then as far as distributing the royalties, they

24  advocated proportionality, and they said these proposed

25  changes are really in the nature of clarifications of

1    existing RAND rules and commonly understood goals.

2       So Motorola agrees that stacking is a problem, Motorola

3    agrees that holdup is a problem, and they advocated something

4    that sounds an awful lot like an ex ante multilateral

5    negotiation to solve those problems.

6       And opposite this, we have put Mr. Simcoe's statements,

7    which you'll see bears a close resemblance to what Motorola

8    was advocating in 2006.

9       In addition --

10       THE COURT:  Mr. Harrigan, before you run out of time,

11    one of the tests that I'm obligated to apply is the

12    reliability standard under *Daubert*.  Given that this has

13    never happened, how can I find that it's reliable?

14       MR. HARRIGAN:  Well, Your Honor, the hypothetical

15    negotiation that *Georgia-Pacific* calls for has never

16    happened, either.  That's a hypothetical negotiation that

17    includes a bunch of legal requirements, such as the entire

18    market rule, that the parties -- bilateral negotiating

19    parties are not bound by it, but it is a hypothetical

20    situation that exists as a way of measuring patent damages.

21       So the fact that it's never happened is -- Your Honor,

22    we're not asking the court to make believe something happened

23    and then adopt it.  We're saying if you're looking for what

24    the RAND royalty needs to be, you look at a hypothetical

25    situation just like the *Georgia-Pacific* hypothetical

situation, and it has certain characteristics.  Then you look
for a comparable real-world situation that closely
approximates the ideal.  But as an economic theory matter, it
makes sense to first posit what the ideal is.  And, in fact,
Motorola's own experts have said that that is a good way to
get there.

THE COURT:  Mr. Harrigan, I think you fundamentally
misunderstand the relationship between the district court and
the courts of appeal, and in particular the federal circuit.
They validated the *Georgia-Pacific* approach hundreds of
times.  You know, this court employs it regularly in patent
cases.  I mean, it's been found reliable, producing reliable
results.

What you're telling me is, this is the best approximation
there is out there, but it's never been used, so you should
consider it, but, you know, we can't really vouch for the
accuracy of it.

MR. HARRIGAN:  Well, Your Honor, what we can vouch
for the accuracy of is the proper comparables.  The evidence
of Motorola's, in effect, admission that the MPEG LA rates
are appropriate.  And, Your Honor, this is the first time a
court is going to set a RAND rate, so I think it's not any
mystery that this court is going to have to determine how
that is done, and that may be the RAND version of the
*Georgia-Pacific* case.  But there isn't an appellate court

 1   that's ever said how you do this, because it hasn't happened

 2   before.

 3          THE COURT:  Well, in my chambers it's very easy.  We

 4   refer to it as the Fortney doctrine.  That's an inside joke

 5   for those of you who know my law clerk.

 6          MR. HARRIGAN:  Your Honor, I would just call your

 7   attention to the fact that Mr. Schmalensee, who is one of

 8   Motorola's experts in this case, has written a paper, which

 9   we've cited in our papers, in 2007, in which he advocates

10   figuring out a RAND rate by using a hypothetical series of

11   auctions, in effect in which the licensors bid for the amount

12   that they would take for their technology to be included, and

13   that that is part of the process of determining whose

14   technology gets included, but the net result is you end up

15   with the best technology and for a reasonable sum that

16   represents the actual value of that technology because of the

17   auction.  And that auction approach is essentially the same

18   thing as the multilateral, hypothetical negotiation.  It's a

19   hypothetical auction, which is a form of negotiation, and

20   it's certainly not bilateral because it involves licensees

21   and licensors negotiating.

22          THE COURT:  The academy, the last refuge of desperate

23   people.

24     Why don't you go ahead and wrap up, counsel.

25          MR. HARRIGAN:  So, finally, Your Honor, I guess the

other part of this, given this is a *Daubert* motion, is, we can't figure out what Motorola is trying to exclude.  I guess they don't want the experts to say "multilateral."  I don't think they can, with a straight face, say they can't say ex ante, because it's clear it has to be ex ante to avoid holdup.  So if our experts aren't allowed to use "multilateral," we can live with that, but their analysis is an accepted and recognized economic framework for arriving at RAND, and we have abundant evidence of comparable situations in the real world that enable the court to figure out approximately what that hypothetical ex ante negotiation would have produced.  And that, we believe, is the correct way to arrive at RAND, and that using after the fact bilateral negotiation, which inevitably involves the holdup potential, it is the wrong way to proceed, because it will result in higher rates, stacking, and holdup, if that approach is endorsed by the court, because there will be an incentive for people to charge -- to do what Motorola has done.

The other -- and, finally, Your Honor, the best evidence here of, I guess, holdup in Motorola's behavior is that its approach has been in this case to ask for and demand a very high royalty, and then when the other party doesn't accept it, go to Germany to get an injunction in order to give them an incentive to give in, and that's another element of

1    behavior that needs to be deterred and in which a RAND rate

2    setting process that arrives at the ex ante value will

3    prevent.

4        Thank you, Your Honor.

5            THE COURT:  Thank you.

6        Mr. Batchelder, Mr. Harrigan gave you a launching pad for

7    one of the court's questions.

8        It seems to me that many of your slides go to what's wrong

9    with this expert's testimony, and that's the question that

10   arises in the *Daubert* motion.  But, you know, I guess I'm

11   still at a loss to understand.  Is Motorola also contending

12   that patent pools are a bad comparable, or is just the

13   testimony of these experts in regards to a specific patent

14   pool improper?

15           MR. BATCHELDER:  The latter, Your Honor.  That is,

16   the line here on these two patentees, they have not carried

17   their burden of demonstrating that they are comparables as

18   the federal circuit requires, the showing of proving a

19   comparable under the *Uniloc* and *Lucent* standards.

20       I don't mean to say that no pool anywhere, no matter how

21   it gets royalties, could ever be thought of as a comparable

22   for any other kind of license.  But here, given it's a

23   bilateral, hypothetical negotiation that you need to

24   construct, Your Honor put your finger on exactly the problem.

25   These pools are, as Your Honor said, a fundamentally

 1    different character; that a one-on-one negotiating license

 2    agreement, as Your Honor correctly pointed out, the

 3    motivations of the people that join pools are fundamentally

 4    different than the motivations of someone licensing in the

 5    real world who wants to sit down and get fair market value

 6    for their patents.  They cannot meet that standard.

 7        Mr. Harrigan said, well, what the court needs to do is to

 8    find a closely comparable situation.  Well, that's exactly

 9    what Mr. Donahoe has done.

10        The close comparable in the *Georgia-Pacific* case, he

11    turned to the licensor and said, "Do you have a licensing

12    program that's well established?  Do you have patents" --

13    excuse me -- "do you have licenses that cover these patents

14    in suit?"  If so, that's the first place you go to.

15            THE COURT:  You're getting into, I think,

16    Mr. Jenner's defense here in a moment, so let's stay on path.

17            MR. BATCHELDER:  Okay.  So coming back to patent

18    rules, I think as I've gone through, Your Honor, there's

19    abundance evidence here that they are essentially discount

20    houses, that their -- it's to broadly disseminate the

21    standardized technology, which is great, that serves a useful

22    function.  But one function these patent pools can't serve is

23    the fair comparable for fair market value of the given set of

24    patents.  That they don't do in a bilateral negotiation.

25            THE COURT:  Why is your comparable analysis only in

1    your rely brief?

2          MR. BATCHELDER:  I believe that we touched on it in

3    our motion, too, Your Honor.  I'd be happy to fetch it and

4    find the passages I think are relevant to that.  But I think

5    it straddles both parts.  The point of -- essentially we made

6    the argument on the multilateral ex ante motion, and they

7    came back and said, well, there could be holdup, and you

8    should look to pools, and in response to that we said, well,

9    you haven't proven all of the pools, and the pools you're

10   pointing to are not good comparables, so it kind of comes in

11   that logical progression.

12        The other fundamental point that you made, and you put

13   your finger on exactly the problem:  *Daubert* and 702 are

14   about reliability, and their economic construct, all of their

15   opinions are predicated on, are based on a negotiation that

16   has never occurred, and therefore cannot reliably

17   reconstruct.  Whereas in contrast, *Georgia-Pacific*, for

18   decades, as Your Honor pointed out, has been reconstructing

19   hypothetical negotiations between two licensing entities, and

20   here we have a great body, and the fact those kind of

21   license -- like Motorola and other sophisticated licensees

22   like Nokia and like RIM and like Datech that establish a good

23   baseline.

24        I do just want to point out, Mr. Harrigan did question

25   whether Microsoft's experts really did say that there was no

1   evidence of holdup.  And just as one example, I have

2   Dr. Lynde's deposition here, and I just want to read to you

3   from page 34, line 1 through line 6.  I handed him Exhibit C

4   to Donahoe's report, which is 50-plus licensing agreements

5   that Motorola has entered into that he was turning to for his

6   *Georgia-Pacific* comparables, and that was Exhibit 13 to the

7   Lynde deposition.  I said -- I'm just reading from the

8   transcript.  It's not a separate slide.

9        "Looking at Exhibit 13, my question is, are there any

10  agreements on this exhibit as to which you have any specific

11  evidence that holdup was involved."

12  "ANSWER:  With respect to these agreements, I do not have

13  specific evidence."

14       So Microsoft's experts, they had these agreements, they've

15  been able to take discovery, they're heavily incented to find

16  evidence of holdup associated with them, they have nothing,

17  they have nothing at all, and it's not good enough to come in

18  here and say holdup is an economic possibility.  You have to

19  show that holdup matters in this case on these facts, and

20  they've got the facts and they've got the licenses, and they

21  haven't been able to point to any.  Neither have they been

22  able to point to any evidence of stacking, because, again, in

23  each of these industries, Microsoft has taken a grand total

24  of one license.  There cannot possibly be any stacking.

25            THE COURT:  Counsel, we'll take our morning break at

 1   this time.  We'll be back at a quarter to 11:00, and we'll be

 2   taking up Microsoft's motion at that time.  We'll be in

 3   recess.

 4                        (A RECESS WAS TAKEN.)

 5            THE COURT:  Who is going to be speaking for

 6   Microsoft?

 7            MR. PRITIKIN:  I will, Your Honor.

 8            THE COURT:  All right.

 9            MR. PRITIKIN:  We talked to Motorola's counsel, and

10   we suggested it might make sense for us to break out the

11   Donahoe and Sukumar portions of this, argue Donahoe through,

12   and then Sukumar, we have different lawyers doing the

13   arguments, and we anticipate the Sukumar argument will be

14   quite short anyway.

15            THE COURT:  All right.  Is that acceptable,

16   Mr. Jenner?

17            MR. JENNER:  Yes.

18            THE COURT:  All right.

19            MR. PRITIKIN:  As Your Honor is aware, Mr. Donahoe

20   purported to employ what he called a modified *Georgia-Pacific*

21   analysis.  What he did not do is to say how he modified

22   *Georgia-Pacific*, why he modified it, where he found some

23   precedent for the authority for the modifications that he

24   proposed to make.  And, in fact, if one looks at the

25   testimony of their economist, Schmalensee, and contrasts that

1  with the testimony of Mr. Donahoe, that they're basically

2  crossing each other where neither comes up with some kind of

3  economic rationale, some logic for the modifications that

4  have supposedly been made.

5      Now, we know that no court has ever, ever used a modified

6  *Georgia-Pacific* analysis to determine a RAND royalty or, for

7  that matter, any other kind of royalty.

8      Beyond that, I think the place to start is what is

9  *Georgia-Pacific* anyway?  And there is a misunderstanding, a

10  misconception about what it really is.

11      *Georgia-Pacific* is not a test, it is not an analytical

12  framework, it is a non-exhaustive list of factors that can be

13  considered in patent damages.

14      Now, I have a handout, and let me -- may I hand up a

15  couple of copies of this, Your Honor?

16          THE COURT:  Yes.

17          MR. PRITIKIN:  What I've done here, Your Honor, is

18  primarily quotations, and I've numbered the paragraphs so

19  that we can refer to them as we proceed through the argument.

20      The first paragraph that we have is a statement by Chief

21  Judge Rader from the federal circuit, who was talking

22  recently about *Georgia-Pacific*, and what he said is, he often

23  bristles when he hears people talk about the *Georgia-Pacific*

24  analysis, because he says it's really just a laundry list of

25  various things to be considered.  The factors were never

1   meant to be a test or a formula for resolving damages issues.

2   They're merely a list for things to consider, and that's

3   clear from reading the *Georgia-Pacific* case itself.

4        What experts often do in patent damages cases is come up

5   with some number, a royalty rate, walk through the

6   *Georgia-Pacific* factors, and then have a thumbs up or a

7   thumbs down on each factor, this would put it up, this would

8   push it down, this one is neutral, and that was the way a

9   number of people approached this.

10       But in the recent federal circuit decision of *Whitserve*,

11  the federal circuit made clear that is not an acceptable

12  approach to using the *Georgia-Pacific* factors.  It is a list

13  of things that may be considered, but what is required is

14  real economic analysis and not simply a cursory or conclusory

15  recitation of whether a factor will move a rate up or down or

16  leave it neutral.

17       I'll come back to this a little later, but that's really

18  one of the flaws, a methodological flaw that permeates what

19  Donahoe has done here.

20            THE COURT:  Did the Western District of Washington

21  move to the federal circuit?

22            MR. PRITIKIN:  No, sir.

23            THE COURT:  Then why do I care what they say?

24            MR. PRITIKIN:  Because the federal circuit case law

25  on patent damages provides useful information in connection

1   with the RAND determination.

2          THE COURT:  Can you cite me to a Ninth Circuit judge

3   that said that?

4          MR. PRITIKIN:  I can't, Your Honor.  There was a

5   time, of course, where the appeals went to the regional

6   circuits in patent cases, and it may be possible, I suppose,

7   to canvass the whole Ninth Circuit law on it.

8      But what the court is tasked with here is determining what

9   a RAND royalty is.  I mean, that really is what we're up to

10  here.

11         THE COURT:  We all agree upon that.  But due to the

12  unique procedural posture of this case, and we all learned

13  the other day, it goes to the Ninth Circuit, and the last

14  time I checked, the Ninth Circuit was not saying we blindly

15  follow the federal circuit.  And so, therefore, I'd ask both

16  sides to concentrate on what the Ninth Circuit law is,

17  although I'm the first to tell you that it's sparse, and it's

18  going to be particularly sparse in regards to RAND rates

19  because that's not what they normally do.  But they are very

20  experienced in a lot of other areas, and they have

21  *Georgia-Pacific* cases.

22         MR. PRITIKIN:  Correct.

23      And, Your Honor, I think to the extent we're going to be

24  looking to federal circuit law, we're going to look to it as

25  I think the Ninth Circuit would look to it, which is that

1    there is a large body of law there that deals with the

2    question of reasonable royalty in the context of patent

3    damages, and it may be helpful, it may be persuasive, it may

4    be illuminating, you're correct, Your Honor, it would not be

5    binding on the Ninth Circuit.  We're to look to that simply

6    for the persuasive value that those cases are going to

7    provide.

8        Now, returning to what it is that Donahoe did, he did

9    purport to follow at least some form of federal circuit

10   damages law with *Georgia-Pacific*, but modified it in some

11   way, and as I said, there's no precedent for determining RAND

12   royalty the way he did it.

13       But there are at least four methodological flaws in what

14   it is that Donahoe did.  The first is that in selecting the

15   two-and-a-quarter-percent royalty that he used, and that was

16   both his beginning and his ending point of the analysis, he

17   did not apply a reliable methodology in picking that number.

18   He purported to base it on what he called "comparable

19   licenses," but he didn't do that, and all you have to do is

20   look at his report to see he didn't do that.

21       The second problem is, that to the extent that he

22   purported to apply *Georgia-Pacific* and that he used that to

23   validate the framework in which he was using, he recited

24   those factors without any analysis or economic explanation or

25   quantification of how they influenced what he considered to

1   be a reasonable royalty.

2        Third, he applied a percentage royalty to the entire value

3   of the products, like Xbox and Windows, without any

4   apportionment.  And, again, the entire market value rule is

5   something that has been developed in the context of patent

6   damages for determining a reasonable royalty.  We think it is

7   highly persuasive because the fundamental principle

8   underlying it is that it is designed to prevent the patentee

9   from getting a windfall on things that he did not invent.

10       And, fourth, Donahoe failed to follow an accepted

11  methodology, because the way he designed this modified

12  *Georgia-Pacific* approach, he set out to capture the holdup

13  value and not the value of the Motorola patents.

14       Now, I want to talk about each of these in a little more

15  detail.

16       Let me start with the two and a quarter percent that he

17  used both as his starting point and his ending point in his

18  analysis, and the threshold reliability of the entire

19  analysis that he did is going to turn on whether or not he

20  had a proper starting point, because that was both the

21  beginning and the end of the analysis.

22       He based the two and a quarter percent primarily on past

23  licenses to Motorola's cellular telephone network patent

24  portfolio.  Now, we heard earlier this morning talk about how

25  they had used comparables.  These were different portfolios.

1   Motorola had patents that they said were essential to various

2   cellular standards, the standards that are used when you make

3   cell phones.

4       There has been no demonstration at all, by Donahoe or by

5   any of the other experts, they didn't even attempt to show

6   it, that there was any comparability between the patents that

7   are essential to a cellular standard and those that are at

8   issue here.

9       Now, many of these involve licenses just to the cellular

10  portfolio, and there are over 100 Motorola patents that they

11  had said are essential to the cellular portfolio and licenses

12  for those implementations.

13      Now, how is it, then, that Donahoe said it was all right

14  to rely on these licenses to the cellular patents?  The

15  rationale that he has come up with is that there are some

16  patents that are in common or overlap between the cellular

17  portfolio and the 802.11 wireless portfolio.  There's no

18  argument that the H.264 patent, that we have any commonality

19  there, just the wireless.  And you'll often see when you read

20  through the papers that they filed, the patents are licensed

21  in both, plural.  But we can cut through all that and really

22  focus on what the facts are here.

23      And if you turn, for example, Your Honor, to paragraph 5

24  in the handout that I provided to the court, these are

25  excerpts from Motorola's proposed findings of fact that was

1    filed with the court, and what Motorola has said, if you look

2    at paragraph 210 of the findings, that there are -- I believe

3    there are nine patents listed there that they say are used by

4    Xbox.  That's the product they pointed to using the 802.11

5    standard.  So whittling this universe down, there really is

6    only these patents.  This is what their case is based on.

7         And then if you look further back in their proposed

8    findings, 436 to 439, you can see their discussion of the

9    other license agreements, those agreements that involve the

10   licenses to the cellular portfolios, and what you see when

11   you compare these is that there are two 802.11 patents, just

12   two that they say are always licensed for use in a cellular

13   implementation.  Now, that is two patents out of over 100 in

14   the cellular portfolio.

15        Donahoe is pointing to those cellular licenses and saying

16   they somehow inform what a royalty would be for the 802.11

17   patents, but a point in fact, when you actually look at what

18   Motorola is contending here, the overlap is vanishingly

19   small, it is two patents, there's never been an apportionment

20   of those two, and those two patents that they pointed to are

21   licensed for use in a cellular implementation, not for use in

22   an 802.11 implementation.

23        And so the argument that somehow because there is some

24   commonality of one patent or two patents, that that would

25   justify looking at the cellular portfolio as a comparable,

1    simply disappears.

2        If we look at paragraph 6 in the handout I provided, you

3    can see that Donahoe hasn't even attempted to make the kind

4    of apportionment that would be necessary.

5        So when you actually look at all of the Motorola licenses

6    that they're relying on, that they try to use to say that

7    there is something comparable here that would justify using

8    the two and a quarter percent that they started with, in the

9    end it really comes down to one license.  And it talked

10   about, in paragraph 7, Motorola has designated all of this as

11   confidential, so I don't want to say it on the public record,

12   but as you can see, the amounts are so small that they

13   plainly would not satisfy anybody's requirement or showing

14   that there's any kind of an established rate here.

15       Now, there are further problems in the attempts that

16   Motorola has made to try to use these licenses to establish

17   some kind of comparability.  We know that they involve

18   different patents, different standards, but they also involve

19   different licensed products for different purposes.  Common

20   sense tells you that in order to have a cell phone, you're

21   clearly going to need to have the ability to have cellular

22   communications sent.  And yet that is completely different

23   from the situation we have with the products that are

24   involved in this case, the Xbox console and Windows, where

25   the functionality is vast, far beyond any of the standards

1    that are alleged and at issue here.

2         Their own economist, Schmalensee, if you look at

3    paragraphs 2 and 3 on the handout, has agreed that you can't

4    replace this with other portfolios without assessing the

5    strengths of the products, the functions, and many other

6    things, and Donahoe admitted that he had not done that.

7         The final point with respect to the two and a quarter

8    percent, Your Honor, is, again, one, he purported to derive

9    this from Factor 1 in *Georgia-Pacific*, and to the extent one

10   is going to look to that for any kind of legal guidance, what

11   Factor 1 of *Georgia-Pacific* says is, "an established

12   royalty," and it's based on the royalties that have been

13   received, and it really puts the law to the argument that is

14   being advanced here, because no one, no one on the Motorola

15   side, not Donahoe and not the other experts, have come

16   forward and said there is an established two and a quarter

17   percent royalty for the 802.11 patents or the H.264 patents.

18        So the starting point isn't there, and that taints the

19   entire analysis that he did.  It is not a reliable

20   methodology.

21        Now, the second fundamental problem with what Donahoe did

22   turns on the way in which he purported to utilize the various

23   *Georgia-Pacific*-specific factors.  And, again, to the extent

24   one is going to rely on *Georgia-Pacific*, on the use of those

25   factors, not binding necessarily, but he's the one who

1    invoked it, he took us down that road, and he's got to follow

2    the rules if he's going to do that.  But instead, what he did

3    was this sort of thumbs up, thumbs down, not look at this

4    factor -- actually, if you look through the factors, they

5    were all neutral or increased the royalty a little bit.

6         But what the *Whitserve* case says, and it is their sound

7    logic in that case, the *Whitserve* case says you can't do it

8    that way.  You can't have a superficial recitation of the

9    factors.  What the federal circuit said in that case was,

10   while mathematical precision is not required, some

11   explanation of both why and generally to what extent the

12   particular factor impacts the royalty calculation is needed.

13   That is a logical result, it is a sound result consistent

14   with the law that has been developed in that area, and I

15   certainly have every reason to believe that the Ninth Circuit

16   would follow up with a similar rule with respect to, if you

17   choose to use the *Georgia-Pacific* factor, you've got to do it

18   the right way.

19        Now, the third fundamental layer of what he did and why it

20   is not a reliable methodology is because he applied a

21   percentage royalty to the entirety of Windows and the

22   entirety of Xbox without any showing -- without any showing

23   that the Motorola patents drive demand, drive consumer demand

24   for those products.

25        Now, this gets into the entire market value rule, and,

1    again, you know, we're not going to find -- I don't think

2    we're going to find a discussion of the entire market value

3    rule in the law of the Ninth Circuit, but it is a bedrock

4    principle that has been established by the federal circuit in

5    all cases involving patent damages.  And, again, I think it

6    would provide very good guidance to the Ninth Circuit in

7    trying to elucidate how one applies a royalty, what the base

8    is.

9        The logic behind the entire market rule is unassailable,

10   and that is if you have a patent, you get rewarded and you

11   get compensated for the value of your patent, but not things

12   you didn't contribute to and not things you didn't invent and

13   not other things that are in the product.

14       In this case what we know Donahoe did was simply to take

15   his two and a quarter percent and multiply it times the end

16   price of Windows and the end product price of the Xbox

17   console.

18       So how did he try to defend this?  Well, if you look at

19   paragraph 10 in the handout, the argument he advanced is,

20   well, these things are important, they're important.  Xbox

21   wouldn't remain competitive without them.  But that is not

22   the same as being the basis for customer demand.  Those two

23   things are fundamentally different.

24       And we don't have to look any further than -- again, I'm

25   citing this as persuasive precedent, the *Laser Dynamic* case

1    from the federal circuit.  If you look at Slide 11, precisely

2    the same argument was advanced there.  All of these that are

3    covered by these patents are important, and you wouldn't buy

4    a computer without them.  But that was knocked down by the

5    Court of Appeals.  And they explained here that, to name a

6    few, a high-resolution screen, responsive keyboard, fast

7    wireless network receiver, all of these things are important,

8    that consumers would be unlikely to select laptop computers

9    without them.  But as they point out, proof that consumers

10   would not want a laptop computer without such features is not

11   tantamount to proof that any one of those features alone

12   drives the market for laptop computers, and that is precisely

13   what Donahoe did here.

14       One can read his expert report, one can read the reports

15   he relied on, you will not find in those reports -- you will

16   not find in those reports any basis for an assertion that the

17   Motorola patents that are allegedly essential to these

18   standards provide the basis for consumer demand of those

19   products.  It's implausible, and that's probably in part the

20   reason that argument was not advanced.

21       But this notion of necessary apportionment finds support

22   not just in federal circuit case law, it finds it in the

23   Supreme Court law as well, Your Honor, that necessary

24   apportionment is required.  *Aro Manufacturing*, 377 U.S. 476.

25       Now, a second argument that Donahoe advances is, well,

1   fine, maybe I've got the wrong base.  You know, maybe it

2   isn't contributing to the demand for the entire Xbox or all

3   of Windows, but I'll fix that with a low rate.  We can jigger

4   the two, and we'll come out just fine.

5       But if we look at paragraph 12, what we've done in

6   paragraph 12 is to contrast what Donahoe said about jiggering

7   the rate and fixing it that way with the same argument

8   presented in *Laser Dynamics* squarely rejected by the court,

9   and, again, a perfectly logical and sound decision of the

10  federal circuit on this.

11          THE COURT:  Counsel, you've used 20 of your 30

12  minutes at this time.

13          MR. PRITIKIN:  All right.  I'll wind up quickly, Your

14  Honor.

15      Two other reasons why -- let me just -- actually, I'll go

16  to the final reason, Your Honor, as to why this is not an

17  accepted methodology, and that is because what Donahoe did

18  was to set up and capture the holdup value of the standard

19  instead of what would be a RAND royalty for the small number

20  of Motorola patents.  The court is familiar with the concept

21  of holdup.  I don't need to review that again.

22      What Donahoe did was to design an analysis that would

23  maximize holdup.  I mean, that's really what he did.  And how

24  do we know that?

25      Well, first he used 2010 as the date of his hypothetical

1    negotiation.  Now, again, he invoked *Georgia-Pacific*.  But if

2    you go down that road, what *Georgia-Pacific* says is you do it

3    at the time the infringement begins.  But he selected 2010.

4         By 2010, Microsoft has lots of sound cause and the

5    standards have been widely implemented.  So it's not ex ante,

6    as Judge Posner had suggested at something earlier in time

7    around the adoption of the standard.  It's not at the time

8    you use with *Georgia-Pacific*.  It's at a time when they get

9    the greatest chokehold on Microsoft.  That's holdup.  And

10   there's no explanation, no rational explanation for doing

11   that, other than to maximize the holdup value.

12        Second, he valued the standard and not the patents.  And

13   I've included a series of slides here, 13, 14, and 15, and

14   one can read through the language that he used there, where

15   what he's talking about in valuing these is the value of the

16   standard.  802.11 is important, H.264 is important, but what

17   he doesn't talk about is the value of the patents, which

18   would be relevant.  To value the standard and the importance

19   of that, again, is holdup.

20        Now, he admitted that he didn't separate out the value of

21   the patent.  He said it was too hard.  Of course, again,

22   looking at the federal circuit as persuasive authority on

23   this.  Then he said you don't get excused because things are

24   hard.  You've got to do the hard work.  And in paragraph 16

25   of the handout, we've pointed at some testimony from

1    Professor Schmalensee, their economist, who said that if you

2    do this kind of analysis where you're pointing to the

3    standard instead of the specific patents, the words he used

4    is, "it is off the mark."  Well, that's exactly what it is

5    that Donahoe did here.

6        Let me see if I can pull this together, Your Honor.

7    There's a bit of a strong argument that Motorola has set up

8    that we're criticizing because of *Georgia-Pacific* and can't

9    use it.  That is not the basis of our motion.  That is not

10   the basis.  As I said at the beginning, the *Georgia-Pacific*

11   factors is a non-exhaustive list of things that may be

12   considered.  A good part of what we heard from Harrigan and

13   experts on the Microsoft side will offer will fit within one

14   or more of those *Georgia-Pacific* factors, and the court needs

15   to take those into account.

16       The problem with what they did is methodological.  There

17   are fundamental methodological flaws in what he did, and it's

18   the four things that I've identified in the course of this

19   argument.

20       Once he decided that he was going to use *Georgia-Pacific*,

21   that those factors were going to provide the template in the

22   hypothetical negotiation, if you wanted to modify it, it was

23   incumbent on him or on the economist somewhere in the report

24   to say these are the modifications I made, this is the

25   economic logic behind doing them.  We're off -- in many

 1   respects, we're off in uncharted waters here in determining

 2   what the RAND royalty is, but that's why you need a coherent

 3   economic explanation for it.

 4        The only way you can define how to modify the

 5   *Georgia-Pacific* factors is to kind of read through the report

 6   and see what he did along the way.  There's really no

 7   explanation for why it's done.  At the end of the day, what

 8   he did was go down this *Georgia-Pacific* road, take the pieces

 9   of it that he thought were favorable and would generate a

10   high royalty rate, apply it to an improper base, and then he

11   just threw overboard pieces of *Georgia-Pacific* that were

12   inconvenient or that would work against him.  So he discarded

13   the requirement that the licenses really have to be

14   comparable, and he's going into cell phone licenses.  I mean,

15   that's one of the modifications.  I don't know.  There's no

16   justification for it.

17        He discarded the entire market value rule.  As I said,

18   finds precedent even in the rulings of the Supreme Court

19   concept of apportionment, no basis for that.  He failed to

20   apply the *Georgia-Pacific* factors in a meaningful and

21   economic way is this *Whitserve* case would require.  And what

22   you're left with when you're done looking at what Donahoe did

23   is what I would call picking and choosing.  Well, picking and

24   choosing is the antithesis of a reliable scientific

25   methodology, and for that reason we would ask the court to

1    exclude the testimony and opinions they plan to offer.

2          THE COURT:  Thank you.

3          MR. JENNER:  Your Honor, the first thing I would note

4    is, as happened with prior proceedings, these slides include

5    confidential information.  Your book, Your Honor, includes

6    the confidential information.  What will be on the screen

7    will be masked, just so that it's clear that we're proceeding

8    in that way.

9       This is *Daubert*, and I'll try to confine myself as much as

10   possible to *Daubert*.  So let me start first by saying we have

11   a witness here, Mr. Donahoe, who is a 25-year veteran of

12   licensing, including standards essential licensing patents,

13   including working in that field for Samsung.  He is probably

14   one of the most experienced licensing executives in the

15   country.  His credentials, as far as I can see, are

16   unchallenged.  Nobody questions that, and he has, in fact,

17   been held qualified to testify on this basis and other

18   proceedings, including the *Apple* case.

19      So this is not about his credentials.  It's about

20   methodology or the application of methodology.  Depending

21   upon which one of those it is, the result, I submit, is very

22   different under Ninth Circuit law.

23      As far as methodology is concerned, his methodology, which

24   I will refer to more accurately as a hypothetical bilateral

25   negotiation of which *Georgia-Pacific* applies an application,

1    mirrors the real world, unlike Microsoft's methodology.

2    Bilateral licensing in general and in standards patents has

3    been what has gone on in the real world for decades.  And the

4    bilateral hypothetical negotiation in this case is intended,

5    like *Georgia-Pacific* in a damages case, to implement what

6    happens in the real world in a way that Your Honor can hope

7    to apply in establishing RAND licensing rates.

8        This kind of high-technology bilateral licensing is

9    conducted by sophisticated parties with competent counsel.

10   It considers the strength and value of the parties' competing

11   patent portfolios, it looks at the product exposure and the

12   result of risk that allows the parties bilaterally to account

13   for other considerations, including, in the RAND context,

14   whatever they want to say to each other about holdup and

15   stacking, and they ultimately craft an agreement that suits

16   their particular business needs.

17       So Mr. Donahoe's analysis uses a hypothetical recreation

18   of the real world kinds of negotiations that go on.  That's

19   the real basis for this that makes it sound in a way that is

20   similar to *Georgia-Pacific*, and that's why we called it

21   modified.  We, the lawyers, call it modified because this

22   isn't *Georgia-Pacific*.  This is not a damages case.  We are

23   not going back to the eve the infringement began.  We are not

24   calculating damages in a specific case.  We are licensing a

25   whole portfolio.  We are licensing not only present but

1    future products.  It simply isn't the same as *Georgia-Pacific*

2    applied in the damages case.  That's why we, the lawyers,

3    call it modified *Georgia-Pacific*.

4        But you don't have to call it modified *Georgia-Pacific*.

5    Just call it a hypothetical bilateral negotiation in a RAND

6    context in order to achieve the goals of RAND licensing.

7        So this modified *Georgia-Pacific* --

8            THE COURT:  Let me stop you there.  You went back to

9    it again today.  The strength of each party's patent

10   portfolios.

11           MR. JENNER:  Yes.

12           THE COURT:  Do you think that has anything to do with

13   the question that I have to answer starting on November 13th?

14           MR. JENNER:  I believe that the strength of the two

15   parties negotiating the portfolios is what will ultimately be

16   the result in the royalty rate.  It will go down as to

17   Motorola if Microsoft's offsetting portfolio is strong.  It

18   will go up if Microsoft's portfolio is weak.  So I think that

19   in the real world, and, therefore, I think what Your Honor

20   should consider is, this is not -- this is the discussion the

21   parties will bring to the negotiation table.  They're not

22   going to talk about the thousand portfolios in MPEG LA.  They

23   never would do that in a real negotiation.  But they're

24   confronting each other, and they will look at what each other

25   brings to the table in order to determine what the offsets

1    are that results in the final royalty rate.

2         THE COURT:  Counsel, we just have a fundamental

3    difference of opinion on this.  You know, you entered

4    yourself into a contract which provides the court to set a

5    royalty rate in regards to Motorola's patents.  It makes no

6    difference to me if Microsoft has zero patents or it has

7    150,000 patents in setting the royalty rate for Motorola's

8    patents.  Why am I wrong on that, and why do you keep raising

9    this issue?

10        MR. JENNER:  Well, Your Honor, I guess I'm swimming

11   upstream here, but I believe in a notion where both parties

12   have RAND commitments, Motorola is going to go into a

13   negotiation, and it's going to be negotiating to protect

14   itself as well.  It is not going to want to give away its

15   patent rights in a real-world negotiation and be confronted

16   the next day by the adversary patents coming back at it.

17   That's not what people do in negotiations.  If Your Honor is

18   going to mirror what happens in the real world, you need to

19   consider the dynamics and the facts between two parties.  I

20   submit you need to consider what each party brings to the

21   table, or you're not approximating what happens in the real

22   world.

23        THE COURT:  So let me ask you a very simple question.

24   Did Motorola ask me to value Microsoft's patents in these two

25   standards?

1      MR. JENNER:  I guess you mean in the letters that

2  were written?

3      THE COURT:  Well, in your pleadings.

4      MR. JENNER:  It's not in our pleadings.  We didn't

5  bring this up.  Microsoft did.

6      THE COURT:  You're telling me today, as you have on

7  multiple occasions, "Judge, this is a big mess.  It's an 80-

8  or a 100-page document.  You've got to consider all of these

9  factors."  That is not what's in this case, counsel, and I

10  don't know why you keep doing this.

11      MR. JENNER:  Well, I'll just try one more time, Your

12  Honor.  The letters that form the predicate of Microsoft's

13  complaint are letters in which Motorola offered RAND

14  licenses, subject to cross-licenses, that was always the

15  predicate for the RAND implementation.  The cross-licenses

16  were part of the bargain.  There is no way on earth there

17  would have been a licensing agreement without the

18  cross-license.  It never would have happened.  It doesn't

19  happen in the real world, and I submit Your Honor should not

20  exclude that.  You'd be going down the wrong path if you

21  exclude that.  It will get you to a final rate, because in

22  considering this, we submit, and we submit that the testimony

23  and the evidence show how these factors are considered in the

24  hypothetical negotiation and result in a RAND range and a

25  RAND rate, which, in fact, are different from the starting

1    point.  But you can't get there without considering both.

2         THE COURT:  Counsel, I appreciate your confidence in

3    the court's Solomon-like wisdom, but that's not the issue

4    that's before me.  You may have, in your responsive letter,

5    asked for a more inclusive negotiation, but your obligation

6    under those conventions is to license the Motorola patent on

7    RAND rates, and that's what's here, and if you wanted

8    something more than that, then you needed to ask me to do

9    something more than that.

10       I see the bullpen is busy handing you notes.

11        MR. JENNER:  Well, they want me to make the point,

12   Your Honor, that at least the ITU letter of agreement

13   expressly is subject to reciprocity.  It's right in the

14   letter of agreement for the ITU.  That one is just plain

15   unambiguous as to what it is the parties would be agreeing to

16   as to RAND limitation.

17       But, Your Honor, I know we disagree on this.  I don't want

18   this to be an entirety of the *Daubert*.

19        THE COURT:  So why don't you move on.

20        MR. JENNER:  Okay.  Turning to Slide 3, this is some

21   of the law that we submit, unlike multilateral negotiations,

22   the courts have considered the possibility of implementing

23   FRAND under a framework, and the framework they talk about

24   in the *Broadcom* case, it's *Georgia-Pacific*, and in the *ESS*

25   district court case it was *Georgia-Pacific*.  Nobody had to go

1    all the way and determine RAND licensing rates, but both of

2    these courts recognized that this was the framework that made

3    sense to consider.

4        Likewise on Slide 5, to the extent people pay attention to

5    the commentators, the commentators have said that

6    *Georgia-Pacific* is a sensible framework and provides a useful

7    starting point and factors that would be directly applicable

8    to FRAND.

9        On page 5, which I just overshot -- on Slide 5, Your

10   Honor, we list some of the case-bound papers on this.  You

11   heard earlier about Microsoft's June 11 letter to the FTC.

12   After the litigation began, Microsoft acknowledged to the FTC

13   that RAND policies help enable bilateral negotiations.

14   Microsoft's *Daubert* surreply in a different litigation

15   recognized *Broadcom* and *ESS Technologies* and pointed out that

16   they point to a relationship between RAND and

17   *Georgia-Pacific*.  And the experts Simcoe and Lynde in this

18   case both recognized that applying the factors of

19   *Georgia-Pacific* could get you to RAND.  So I submit the

20   methodology, Your Honor, is well recognized by courts,

21   commentators, and Microsoft itself.  It's the right

22   methodology so that the question we're coming to under

23   *Daubert* is whether the application of the methodology is so

24   flawed and so off the mark that Your Honor shouldn't hear it

25   subject to cross-examination, then I submit the answer is no.

You have a question?

THE COURT:  I was going to direct you to -- because you're going to use your time.  Let's not argue about the applicability of *Georgia-Pacific*.  That's a legal issue that I think the court is bound on where it goes on that.

Let's talk about Mr. Donahoe, because I have some very serious concerns, starting with his assumption of the 2.25 percent royalty.  So I'd like you to use your time wisely here.

MR. JENNER:  Okay.  Let's look at that.  There's a little bit of that on Slide 5 under the point of his reliance on substantial evidence.

He relies on a lot of licensing agreements as a way to get there.  Counsel is wrong in the way his expert reports X that out.  And if you look at page -- for the record, page 35 and following in his expert report, what you're going to see is that Donahoe actually relies on a subset of about seven licensing agreements in order to look at what the starting point should be.  The other agreements are more of a general guide for how the negotiations are conducted by Motorola, what kinds of other things Your Honor might consider, like carve-outs and caps and suspension clauses and that sort of thing.

But the fundamental seven agreements are ones which don't pull out single patents.  They license the entirety of the

802.11, H.264 portfolio, or both, and two of those agreements

clearly are the best comparables.  They're right on the

money.  One of them is the VTech agreement in which nothing

is licensed for essential patents except 802.11 and H.264.

And in that agreement, it is the licensee who approached

Motorola looking for the license proposing rates, which I'll

show you on another slide, which were substantial rates and

ultimately wound up being negotiated to the rate that

Motorola seeks.

There's another licensee, which I guess I'm not supposed

to name.  It's one of the same seven which also negotiated a

license where they had substantial value to give back to

Motorola in the form of patents.  The royalty rate was

somewhat lower.  But they have products that are only

utilized in the 802.11 and H.264 portfolios.  In those

products where they're paying the full royalty, they're right

on the money, they are comparables.  There are lots of cases

that looked at only one or two comparables as the basis to

find the starting point, in contrast to Microsoft, which has

no starting point at all.

THE COURT:  Well, your starting point is deeply

troublesome to me, because what I got out of the report,

starting on page 34, it says, "The information establishes

that Motorola typically opens negotiations by offering rates

between 1.7 and 2.25."

1    You know, that's an assumption.  That's, you know, someone

2    told him this, you know, this is where to start, and it

3    impacts his entire analysis.

4         MR. JENNER:  Well, somebody told him where to start.

5    Your Honor, those are the facts that he looked at and

6    concluded that it was fair to start there.

7         THE COURT:  What you just told me is he looked --

8    first off, I assume that you agree with Mr. Batchelder, who

9    threw all your cellular licenses under the bus this morning;

10   that it was a different industry, a different set of patents,

11   different convention.  They're gone.

12       So let's talk about the specific question that we're

13   looking at, which is the 802.11 and the H.264, and you're

14   telling me now you've got two licenses that cover those.

15        MR. JENNER:  Two licenses that are squarely on point.

16        THE COURT:  And one of those is on page --

17        MR. JENNER:  If Your Honor would turn to Slide 16.

18        THE COURT:  I'm actually in his report.

19        MR. JENNER:  Oh.  Sorry.

20        THE COURT:  It would be paragraph 82, the VTech

21   Communications.  That's one of your two that we're looking

22   at.

23        MR. JENNER:  Yes, it is.

24        THE COURT:  Okay.  And by paragraph, since you don't

25   want to mention the name, what is the other one he refers to?

1    MR. JENNER:  Um --

2    THE COURT:  Counsel, where I'm going with this -- you

3  have to read and listen at the same time.  Where I'm going

4  with this is, it strikes me that what you're proposing is

5  basically what the federal circuits tossed, which is, Hey, we

6  all start at 25 percent, that's our royalty.  Whatever -- it

7  doesn't matter what the patent is, it doesn't matter what the

8  price is, it doesn't matter what the contribution is, we

9  start at 25 percent.  The federal circuit rang the bell on

10  that.

11    MR. JENNER:  Absolutely not the same thing, Your

12  Honor.  It's not the same thing at all.

13    You're talking about the so-called rule of thumb, where in

14  the *Uniloc* case and in some cases that follow that, there's

15  an unpublished decision in the *Oracle* litigation that looked

16  at another rule of thumb that had a fancy name.

17    The court looked at a situation that had nothing to do

18  with being tethered to real-world licensing agreements.  The

19  experts came in and said, "Oh, today is a sunny day.  We're

20  going to take 25 percent of profit and use that as a starting

21  point."  Untethered to licensing agreements, untethered to

22  Factor 1 of *Georgia-Pacific*.  These licensing agreements are

23  completely tethered to *Georgia-Pacific*, and they are the

24  closest comparables in the case.  They're necessarily the

25  best starting point for Your Honor to use in trying to figure

1    out what RAND would be.

2            THE COURT:  Well, I mean, I think the response to

3    that -- I'm enjoying the discussion -- is that it's

4    untethered to reality, because, you know, you've taken it and

5    you're now applying it to a different situation and saying

6    it's the same.  The contribution of the Motorola patent to

7    the product seems untouched by your analysis.

8            MR. JENNER:  The contribution of the patents to the

9    products is discussed elsewhere in other factors by Donahoe.

10   He considered some of those factors -- and by the way, I want

11   to point out this is very different from --

12           THE COURT:  Do you have that paragraph?

13           MR. JENNER:  It starts at paragraph 68.  I want to

14   point out, first of all, that the product -- the patent

15   application to the products is discussed over a number of the

16   factors on pages and pages by Mr. Donahoe, where he either

17   finds no effect or he finds in some cases it would have a

18   tendency to drive the royalty upward.  That is specifically

19   criticized by counsel in the *Whitserve* case, and I don't want

20   to leave that untouched, because in the *Whitserve* case, what

21   really happened, if you look at Footnote 15 in *Whitserve*,

22   which is at page 35 of the slip opinion, you'll find out what

23   the expert in that case did was to discuss and analyze

24   nothing.  There was one question and answer given as an

25   example where the witness was questioned about two of the

1  factors, 9 and 13, and then he answered, "Well, here's a

2  chart that shows advantages.  I find they would support a

3  higher royalty rate."

4      What the *Whitserve* court was criticizing is not that you

5  can have factors driven up or down, but rather that you have

6  to have some explanation of why you reached the conclusion.

7      There are cases that we cite in these slides, which I may

8  or may not be able to come to, where you'll see federal

9  district courts have, in fact, done this as a matter of

10  routine.  Why?  There's no other way to do it.  We're looking

11  at lots of factors where you're trying to talk about whether

12  or not a patent is valuable.  Does Microsoft really want you

13  to think there is some algorithm that you type that into, and

14  the algorithm tells you, okay, increase the royalty rate by

15  .2?  You can't have that kind of precision.

16          THE COURT:  Don't set up the straw man.  Stay with

17  your expert --

18          MR. JENNER:  Okay -- look at --

19          THE COURT:  Don't interrupt me, sir.  I don't

20  interrupt you.

21      What I got out of Mr. Donahoe was he said, "I rely on the

22  opinions of technical witnesses who have discussed the

23  importance of Motorola's standard essential patents to the

24  standard."

25      Where in my paragraph is that?

1      MR. JENNER:  I'm going to need some help with that.
2  It's in the following factors where he essentially discusses
3  some of the factors between Factors 3 and 13.  It occurs
4  between pages, roughly, 40 and page, I'm going to say, 75 of
5  the report, where he is discussing the patents, the scope of
6  the patents, how the patents compare to the standard.  I'm
7  sorry to say, but also how the parties' patents compare with
8  each other.  And he gets all of that information from the
9  technical witnesses who will provide that background.  So he
10 is not the technologist.  He doesn't purport to be a person
11 who is able to look at these complicated patents, but he is
12 relying on the output of the other experts as input for him
13 as the negotiator, and that's what happens in the real world.
14 That's what teams do.
15      THE COURT:  Will you agree with me, then, that if I
16 find that he is relying on opinions in regards to the value
17 of the standards as opposed to the value of the
18 industry-essential patent, that I should disregard his
19 report?
20      MR. JENNER:  No, I can't rely on that entirely, but I
21 can think of at least two ways in which that wouldn't be
22 fair, and I think he probably does this in two ways.  One is,
23 where there are so many patents involved, that it is
24 unrealistic and impractical to evaluate 40 individual
25 patents.  He likely relies on the standard as a proxy for

what the patents cover, and I don't think there's anything
unfair about that at all.

If he then goes on and takes the standard and tells you
you should increase the royalty rate because of the standard,
that could be a problem, but he doesn't do that, either.  He
looks at the standard as a proxy for what the patents cover,
and I think in three or four places he says that would tend
to move the royalty upward, but, in fact, he doesn't do that.
He doesn't do that.  There is no increase for the value of
the standard in his calculations.  There's no possibility of
holdup having been built into what counsel refers to because
he said he didn't increase the royalty rate for any of that.

THE COURT:  He found lots of things that increased
the royalty rate --

MR. JENNER:  But he didn't bump the royalty rate up.
He said, "I'm not going higher because Motorola doesn't go
higher," and he didn't.  He stayed true to his word.

THE COURT:  All right.  Point me to where in his
analysis did he explain how a portion -- which components of
Microsoft's products were patented and which portions were
unpatented.

MR. JENNER:  The closest I think I can come to that
is I think it's in the expert reports of Williams and Drabik,
because they are technologists who do that.  They provide
that information.  There's no motion against them because

1   they, in fact, do an extremely thorough, probably 100-page

2   job of marching through the patents and exploring the

3   analysis.  They go through what the patents are, patent by

4   patent, what they cover, they talk about alternatives to the

5   extent you can talk about alternatives.  That's the job of

6   the technical experts, and they're the ones who do that.

7   That isn't the role of Donahoe.

8          THE COURT:  Fine, but he then has to say, "I relied

9   on their reports in some manner to adjust as a consideration

10  under the *Georgia-Pacific* factors."  Where did he do that?

11         MR. JENNER:  I'll give one example at page 58,

12  paragraph 113, he expressly relies on Dansky.  On page 60 he

13  expressly relies on input from Dansky.  All I can do here is

14  turn pages to try and find examples.  My co-counsel was

15  trying to pass me some examples, which I'll hurriedly try to

16  find.  There's another example, Your Honor.  Paragraph 134,

17  he expressly relies on his review of the Williams and Dansky

18  reports.  Paragraph 142, he expressly relies on Drabik.  141,

19  he expressly relies on Drabik and Dansky.  Paragraph 143,

20  expressly on Drabik and Dansky.  His report relies throughout

21  on the input of the other experts who are competent to render

22  expert opinions in their fields.  He is the licensing expert.

23  He's taking their inputs.  And that's the way it ought to be.

24         THE COURT:  You're going to run out of time, so let

25  me waste some more of it.

1    You've got what seems to be an inconsistency or a

2    contradiction.  You're urging on the court a *Georgia-Pacific*

3    analysis modified, however you wanted to describe it.

4    However, you then say, "Judge, pay no attention to the entire

5    market value rule because it's inapplicable."  How can you

6    reconcile because of the acceptance of the entire market

7    value of *Georgia-Pacific*?  How can you reconcile that?

8         MR. JENNER:  I'll go through quickly.  You wanted

9    important input on what the Ninth Circuit has to say, and I

10   wanted to point out on Slide 8 that all of these four attacks

11   by counsel go to the application of methodology to the

12   evidence, and the Ninth Circuit at the bottom of Slide 8 has

13   said, in *Kennedy v. Collagen Corporation*, that faults, if

14   there are faults, in the use of a particular methodology, go

15   to weight.  So I'll give you my conclusion now just so I

16   don't run out of time.  That all of the attacks that counsel

17   chooses to apply to the methodologies implemented by

18   Mr. Donahoe should go to weight, if anything, and Your Honor

19   should deny the motion for that reason.

20       But let me go to the entire market value rule.  The entire

21   market value rule, as much as counsel won't want to accept

22   it, is and always has been a tool implemented in damages

23   analyses.  Counsel placed heavy reliance on the *Laser*

24   *Dynamics* case, and he had a picture he put up from *Laser*

25   *Dynamics,* which is his paragraph 11.  It starts out by

1   saying, "We reaffirm that in any case involving

2   multicomponent products, patentees may not calculate damages

3   based on sales of the end product."  Well, why is that

4   different?  The entire market value rule is applied in the

5   determination of the value of an injury in a patent

6   infringement case.  It doesn't exist in the real world, and

7   it never has.

8      Your Honor is being asked to throw out hundreds of years

9   of licensing negotiations, where parties license their

10   patents on the basis of end products.

11      If you look at Slide 21, for starters, Slide 21 shows,

12   first of all, that industry, now and forever, has always used

13   end product prices as a royalty base.  Why?  Because it's

14   easily observable, it's calculable, you can make royalty

15   reports, it makes it's easier to account for how you're going

16   to pay for future products.

17      They don't have that in *Laser Dynamics*.  They're not

18   litigating damages on future products.  They've got a product

19   in front of them, they're figuring out it infringed, and

20   they're calculating what the damage should be for it.

21      It's different from standard licensing negotiations that

22   parties conduct in the real world.  Agreements often do this

23   in order to provide a patent piece for entire present and

24   future product lines, it enables royalty rates to adjust down

25   the road as prices change for products where you're not

1   fighting about those products.

2       Motorola has always done this.  I mentioned 28 out of 33

3   licenses are based on net product price.  Microsoft does it

4   on its own licenses.  Once of the standards here at the

5   bottom of Slide 21, the IEEE expressly provides for using

6   percent of product price as the basis for the RAND agreement.

7       So everybody out there does this in the normal course in

8   the real world.

9       Slide 22, a reputable licensing treatise recognizes that

10  it is quite common, if not the most common, for royalties in

11  license negotiations to be predicated on the end product and

12  the end product price.

13      In the *Lucent v. Gateway* case, even though they were

14  calculating damages and had to do what they had to do,

15  including the entire market value rule, the court

16  acknowledged that sophisticated parties routinely enter into

17  licensing agreements that base the value of the inventions as

18  a percentage of the commercial product sale price.

19      And then other district courts have gone even farther.  In

20  damages cases themselves where the parties have a history of

21  having crafted licensing agreements based on the end product

22  price, the courts say even that's different from the entire

23  market value rule, because here the parties have a practice

24  of licensing on the basis of the end product price, just like

25  Motorola and Microsoft do.

1    And in the *Boeing*, *Mondis*, and *Riles* cases, they said

2  never mind the entire market value rule.  The product prices

3  apply because that's what the parties' licensing history has

4  been.

5    So I submit, Your Honor, the only fair way to look at this

6  on Slide 25 is that the entire fair market rule is a creature

7  that the federal circuit fairly applies -- one can squabble

8  with that, I suppose -- but fairly apply in calculating

9  damages, which is simply a different thing from the ordinary

10  arm's length licensing negotiations that go on every day,

11  where parties can and should be entitled to contract on

12  whatever basis they want, and if they find it convenient as a

13  matter of accounting to contract on the basis of the end

14  product price, that doesn't violate the entire market value

15  rule.  And Microsoft's own expert on valuation here,

16  Dr. Lynde, agreed that the royalty can be RAND if it's not

17  calculated on the entire market value rule.

18    Your Honor needs to draw, I submit, a distinction between

19  damages --

20        THE COURT:  Let me stop you.  If you keep talking,

21  you're not going to have any time to talk about your survey

22  expert.

23        MR. JENNER:  All right.  Your Honor, I'm done, then,

24  unless you have any questions.

25    I submit that on the basis of the Ninth Circuit's own law,

1    these are criticisms of which I can rebut every single one of

2    them.  They're unfair and unfounded as to Donahoe, but, in

3    fact, they go to the application of his methodology.  They

4    are not a basis in the Ninth Circuit or I think any place

5    else for excluding a witness.  At most, they go to weight,

6    and Your Honor ought to hear the witness.

7            THE COURT:  Other than in Judge Posner's courtroom.

8            MR. JENNER:  Well, Judge Posner, he got it wrong,

9    too, when he thinks that incremental value should be

10   calculated in multi-patent cases.  It's one thing in a

11   damages case like he had to talk about incremental value for

12   one patent and then throw the damages out.  It's another

13   thing where you, Your Honor, have 40, 50, 60 patents that are

14   10 or 20 years old, how are you going to calculate

15   incremental value?  Even Microsoft didn't try to do that.  He

16   got it wrong when he says you can apply that in a case like

17   this.  It just doesn't work, and nobody in the real world

18   does it.

19       I'm done.

20           THE COURT:  I'm delighted to say Microsoft and

21   Motorola --

22           MR. JENNER:  I'm happy to be quoted on that, Your

23   Honor.  Thank you.

24           THE COURT:  Mr. Pritikin?

25           MR. PRITIKIN:  Yes, sir.  I'd like to respond to just

1  a couple of points very briefly.

2          THE COURT:  All right.  You're going to exhaust your

3  time on survey.

4          MR. PRITIKIN:  I thought I reserved time.

5          THE COURT:  You have four minutes.  You can use

6  two/two.

7          MR. PRITIKIN:  I'll try to use a minute, if I can,

8  Your Honor, with respect to the licensing.

9          THE COURT:  I'll tell you, by the way, survey is not

10  that critical to me.  I think I understand that issue.  I get

11  it frequently.  I wouldn't spend a lot of time on it.

12          MR. PRITIKIN:  All right.  With respect to the

13  licensing agreements, if you look at Slide 12 that Mr. Jenner

14  used, we're down now to six of them, and I would direct the

15  court specifically to the expert report of Mr. Donahoe where

16  he talks about those, and I want to keep the names -- I'll

17  try to protect the confidentiality of this.

18      But the Option NV is in paragraph 78, the Samsung is in

19  79, Kodak is in 80, Ericsson was in 81, RIM is in 68, and

20  Nokia is in paragraph 64 and the ones that follow.

21      What you'll see if you actually go back and look at those

22  is that for a number of those, Donahoe says specifically he's

23  not placing reliance on those agreements.  That is in black

24  and white in the Donahoe report, and I would invite the court

25  to go back and look at those paragraphs to see what he

1    actually said about it.

2       With respect to the paragraph 68 company, there are really

3    two of them left that they're relying on, I would invite the

4    court to take a look at paragraphs 22 and 23 of the Lynde

5    report, in which Motorola attached as Exhibit 46 in their

6    opposition, and that has additional facts relating to that

7    agreement that make it abundantly clear that it is not and

8    cannot be a comparable.  Pages, excuse me, 22 to 23 of the

9    Lynde report.

10      Just a couple of other quick points, Your Honor.  You

11   asked Mr. Jenner whether or not they were valuing the

12   standard or the patents.  Again, I invite the court to look

13   at the handout that I provided.

14      There's text there from the Donahoe report, and all you

15   have to do is read paragraphs 113 through 120 of the Donahoe

16   report where he's kind of pulling it together on 802.11 and

17   H.264, and he talks again and again about the standard and

18   why the standard is important in the Microsoft patents.

19      Now, we heard a new argument a few minutes ago, and the

20   reason that it's okay to do that is to look at the standard.

21   You asked Mr. Jenner the question, he said there was so many

22   patents.  Well, that isn't true, either.  All you have to do

23   is look at their findings of fact, and we're down to just

24   nine 802.11 patents that are supposedly implicated by Xbox.

25   And in H.2064, I think it's some 15 patents, but eight of

1     those are all of the same specification, essentially the same

2     thing that's in those patents.  So that argument just doesn't

3     hold water, that there are too many patents for them to do

4     the hard work that they needed to do.

5         The last point on the entire market value rule, Your

6     Honor, we ought to stand back and look at this argument

7     that's being advanced here.  They're turning it on its head.

8     The entire market value rule was developed as a protection,

9     as a safeguard to be sure the patent owner isn't overclaiming

10    and getting things that he didn't deserve, and that's why the

11    bedrock principle has been established in damages.

12        What Motorola is telling us is that in the case of a

13    standard central patent, where you're under an obligation to

14    license it in reasonable and nondiscriminatory terms, all

15    bets are off, you get more.  You can do things once you've

16    declared your central patent is RAND and undertaken the

17    solemn commitment, now you're free of all the shackles that

18    would otherwise be imposed on you to protect you from

19    overclaiming.  It's backwards.  It makes no sense.

20        The entire market value rule finds its authority in

21    Supreme Court precedent, in the *Garretson v. Clark* case and

22    in the *Aro* case that I cited before.

23        Unless the court has questions, I'm going to give

24    Mr. Harrigan a couple of minutes to talk about survey.

25             THE COURT:  Okay.

1          MR. HARRIGAN:  I'll be very quick, Your Honor.

2      Your Honor, the notebook is going to get there in time for

3  you to use it.

4      Here's the bottom line:  There's a lot of pieces of paper

5  in here, but they boil down to and they highlight some things

6  that are not highlighted in the brief.

7      The point is that this survey was used to determine how

8  important these two technologies are.  Among the defects in

9  the survey, the key one is that the people who did -- who did

10  not connect to the Internet, who owned an Xbox but did not

11  connect to the Internet with it, were kicked out of the

12  survey.  If they checked the box that they didn't connect to

13  the Internet, they weren't included in the sample.  So the

14  measuring of connecting to the Internet by excluding the

15  people who don't connect to the Internet, and then the

16  conclusion is, for example, Mr. Dansky says about 45 percent

17  of the Xbox customers have used the 802.11 adapter to connect

18  to the Internet, that excludes the people who didn't connect

19  to the Internet.  So the common denominator in the fraction

20  is way too low, it's way too small, and the percentage goes

21  way up.

22      And those rates -- and there are several examples of how

23  that affects that -- those rates are the basis for part of

24  Mr. Donahoe's testimony and a good part of Mr. Dansky's

25  evaluation.

1    The other -- and you can see this is all laid out in these

2    slides for your perusal.  The other basic problem is that

3    people were asked to whether -- to what extent they'd watch

4    MBAFF video.  They had no idea what it meant.  And like

5    Motorola's own witnesses agree, there's no way to tell unless

6    you get out a machine that measures it, and presumably none

7    of these people did that.

8        Thank you, Your Honor.

9        THE COURT:  Ms. Hoang, you have about the same amount

10   of time.

11       MS. HOANG:  Okay.  Thank you, Your Honor.

12   I guess it's worth noting right off the bat that the first

13   argument that Mr. Harrigan made was a new one.  It was not in

14   any of their briefings or in their 28-page expert declaration

15   to this court of the *Daubert* motion, the discussion about

16   exclusion of Xbox users who were not connected to the

17   Internet.

18       What I would say to that, Your Honor, is that the surveys

19   were designed to measure usage by Xbox owners and Xbox users

20   and were designed to measure the valuation or the relative

21   valuation by these Xbox owners and Xbox users of particular

22   features.

23       Dr. Sukumar's methodology used closely to the

24   fundamentally accepted principles for survey research and

25   survey conducting.  He references and adheres to the

*Reference Guide on Survey Research*, which is maintained by the Federal Judicial Center.  That is recognized by Microsoft's experts as well.  The sample set that he used, we would submit, Your Honor, is reliable because it, as I mentioned, adheres to all these various principles, and I'm hoping that our opposition to their *Daubert* papers lays that out pretty well.

I will touch on the MBAFF situation in just one moment. Your Honor, they're overlaying an impossible and really irrelevant standard to MBAFF.  Technical experts dealing with infringement issues must uphold a much, much more rigorous standard.  They have to do claim construction, they have to apply claims, and they have to map them, and, of course, they need software tools and other things to understand whether MBAFF, as it is set forth in a particular patent claim, exists.

This is a survey that simply asks Xbox users and Xbox owners, do you know what you're watching?  If you don't click, the third button that says "I'm not sure."  If you do, then presumably you will click the button that says "MBAFF." That's all it's meant to do.  It doesn't say you must know technically what MBAFF is, you must be able to define it, you must be able to measure it using a software tool.  This is nothing more than a simple question that says do you have -- are you aware of what you're watching in terms of videos on

1    your Xbox console?

2              THE COURT:  Would you read me the actual question?

3              MS. HOANG:  Yes.  It's the very first slide in my

4    deck.  It's Slide No. 2.  The question says, "Please select

5    the types of video content you have used on your Xbox console

6    connected to your TV."  There's only three choices.  One is

7    "MBAFF," and the acronym is spelled out, one is

8    "progressive," and one is "not sure."  There's nothing

9    implied in the question that would force someone to answer

10   "MBAFF" if they didn't understand what it was.  It is not a

11   complicated question.  It's not long.  There aren't very many

12   choices to make.  And there's a clear and clean opt-out that,

13   according to the survey principles, vastly reduces any

14   potential confusion or false positives, and that's present

15   and available for any survey respondent to select, and as it

16   so happens, 84 percent of the survey respondents did not pick

17   MBAFF.  A very small percentage of people were able to

18   identify it and select it, and that's all it was designed to

19   measure.  That's it.

20             THE COURT:  Counsel, was there a question in there

21   about how much they had to drink during the football game

22   before answering this question?

23             MS. HOANG:  I'm constantly surprised about what

24   gamers know and don't know about video technology, if that's

25   where their interest lies.

1          THE COURT:  Counsel, thank you.

2          MS. HOANG:  Thank you.

3          THE COURT:  We'll take this matter under advisement.

4   I thank you for a spirited and informative session today.  I

5   believe I see you next on the 29th for the pretrial

6   conference, and we'll look forward to that.

7          MR. PALUMBO:  Your Honor, we have a lot of boxes to

8   pick up.  Will the courtroom be open after the noon hour so

9   we can have someone come and get it?

10         THE COURT:  Yes.

11         MR. PALUMBO:  And with respect to issue of closing

12  the courtroom during trial, if there's any information we

13  believe that meets the Ninth Circuit's compelling interest

14  standard, we'll file the appropriate motion with respect to

15  our information.

16      The question I have is, there may be third parties who

17  seem to protect their licensing information.  Is it the

18  court's preference that those third parties simply file a

19  motion, or seek the court's permission before filing a

20  motion?

21         THE COURT:  They can file a motion.

22         MR. PALUMBO:  Thank you, Your Honor.

23         THE COURT:  Anything further?  Then we'll be in

24  recess.  Thank you, counsel.

                    (THE PROCEEDINGS CONCLUDED.)

C E R T I F I C A T E


I, Nancy L. Bauer, CCR, RPR, Court Reporter for the United States District Court in the Western District of Washington at Seattle, do hereby certify that I was present in court during the foregoing matter and reported said proceedings stenographically.

I further certify that thereafter, I have caused said stenographic notes to be transcribed under my direction and that the foregoing pages are a true and accurate transcription to the best of my ability.


Dated this 23rd day of October 2012.


/S/   Nancy L. Bauer

Nancy L. Bauer, CCR, RPR
Official Court Reporter