HONORABLE JAMES L. ROBART

1

2

3

4

5

6

7

8

9

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

10

11

| | |
|---|---|
| MICROSOFT CORPORATION,<br><br>    Plaintiff,<br><br> v.<br><br>MOTOROLA INC., et al.,<br><br>      Defendant. | No. C10-1823-JLR<br><br>**REDACTED**<br><br>PLAINTIFF MICROSOFT<br>CORPORATION'S TRIAL BRIEF |
| MOTOROLA MOBILITY, LLC., et al.,<br><br>     Plaintiffs,<br><br> v.<br><br>MICROSOFT CORPORATION,<br><br>      Defendant. | |

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

MICROSOFT'S TRIAL BRIEF

# TABLE OF CONTENTS

                                                                              **Page**

INTRODUCTION   ........................................................................................1

ARGUMENT..................................................................................................2

I.     THE PROPER FRAMEWORK FOR DETERMINING RAND
       ROYALTIES REQUIRES AVOIDING HOLD UP AND STACKING
       ERRORS...............................................................................................2

II.    THE MPEG LA POOL PROVIDES THE MOST RELIABLE BENCHMARK
       FOR A RAND ROYALTY FOR MOTOROLA'S H.264 STANDARD-
       ESSENTIAL PATENTS AND AVOIDS HOLD UP AND STACKING
       ERRORS...............................................................................................3

       A.     The MPEG LA Pool Established Royalties For 2,450 Standard-
              Essential Patents Owned by 26 Different Patent Owners, and the
              Pool Patents Have Now Been Licensed By More Than 1,100
              Licensees....................................................................................4

       B.     Motorola's H.264 Standard-Essential Patents Are Not Entitled to
              Anything More Than a Pro Rata Share.........................................5

       C.     Motorola's Parent Company's MPEG LA H.264 Pool License
              Provides a Comparable Measure of RAND...................................7

       D.     The RAND Royalty That Microsoft Should Pay in 2012 for
              Motorola's H.264 Standard-Essential Patents is $474,000...........8

III.   SEVERAL RELEVANT BENCHMARKS EXIST FOR DETERMINING
       A RAND ROYALTY FOR MOTOROLA'S 802.11 ESSENTIAL PATENTS
       THAT AVOID HOLD UP AND STACKING CONCERNS .................8

       A.     The Via Pool Provides a Benchmark.........................................8

       B.     The Market Price for 802.11 Chips, Such as the Marvel Chipset,
              Provides a Benchmark ...............................................................10

       C.     Motorola's Prior Valuations Provide a Benchmark for 802.11
              Valuation.....................................................................................11

       D.     The RAND Royalty That Microsoft Should Pay in 2012 for Motorola's
              802.11 Standard-Essential Patents is $736,231 ...........................12

MICROSOFT'S TRIAL BRIEF

                                                    LAW OFFICES
                                 CALFO HARRIGAN LEYH & EAKES LLP
                                      999 THIRD AVENUE, SUITE 4400
                                        SEATTLE, WASHINGTON 98104
                               TEL, (206) 623-1700 FAX, (206) 623-8717

IV.   THE 2.25% OF WINDOWS SALES AND XBOX SALES THAT
      MOTOROLA NOW DEMANDS IS NOT A RAND ROYALTY ......................13

      A.   Apart From Facilitating Compliance With the Standards (Which
           Is Not Compensable in a RAND Royalty), Motorola's Standard-
           Essential Patents Have Little, If Any, Value in Microsoft's Products ......13

           1.   Motorola's H.264 Patents ...............................................................13

           2.   Motorola's 802.11 Patents ..............................................................16

      B.   By Using Windows Sales and Xbox Sales As the Royalty Base
           For Their 2.25% Royalty, Motorola Violates Principles of
           Apportionment and the Entire Market Value Rule....................................18

      C.   Motorola's Demand Fails to Account for its Rapidly Expiring
           Patents ......................................................................................................21

      D.   Licenses to Motorola's Cellular Telephone Network Standard-
           Essential Patents May Well Reflect Hold-Up and Are Wholly
           Irrelevant, Given That No Apportionment Has Been Performed ..............21

      E.   Motorola's Dismissal of Pool Royalties Has No Basis in Fact .................23

CONCLUSION...........................................................................................................24

MICROSOFT'S TRIAL BRIEF

LAW OFFICES
CALFO HARRIGAN LEYH & EAKES LLP
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700 FAX, (206) 623-8717

# Table of Authorities

Page(s)

CASES

*Apple, Inc. v. Motorola, Inc.*,
  No. 1:11-cv-08540, 2012 WL 2376664 (N.D. Ill. June 22, 2012) ................................1, 13, 14

*Broadcom Corp. v. Qualcomm Inc.*,
  501 F.3d 297 (3d Cir. 2007) .........................................................................................................1

*Cornell Univ. v. Hewlett-Packard Co.*,
  609 F. Supp. 2d 279 (N.D.N.Y. 2009)......................................................................................11

*Dowagiac Mfg. Co. v. Minnesota Moline Plow Co.*,
  235 U.S. 641 (1915)..............................................................................................................1, 19

*Dunkley Co. v. Central California Canneries*,
  7 F.2d 972 (9th Cir. 1925) .........................................................................................................23

*Garretson v. Clark*,
  111 U.S. 120 (1884)....................................................................................................................19

*General Elec. Co. v. Wilkins*,
  2012 WL 3862350 (E.D. Cal., Sept. 5, 2012)...........................................................................21

*Hanson v. Alpine Valley Ski Area, Inc.*,
  718 F.2d 1075 (Fed. Cir. 1983) .................................................................................................23

*LaserDynamics, Inc. v. Quanta Computer, Inc.*,
  694 F.3d 51 (Fed. Cir. 2012) .........................................................................................11, 19, 20

*Lucent Technologies, Inc. v. Gateway, Inc.*,
  580 F.3d 1301 (Fed. Cir. 2009) ...........................................................................................19, 20

*ResQNet.com, Inc. v. Lansa, Inc.*,
  594 F.3d 860 (Fed. Cir. 2010) ...................................................................................................23

*Sheldon v. Metro-Goldwyn Pictures Corp.*,
  309 U.S. 390 (1940).....................................................................................................................19

*Texas Instruments Inc. v. Cypress Semiconductor Corp.*,
  90 F.3d 1558 (Fed. Cir. 1996) ...................................................................................................21

*Uniloc USA, Inc. v. Microsoft Corp.*,
  632 F.3d 1292 (Fed. Cir. 2011) ...........................................................................................19, 20

*Velo-Bind, Inc. v. Minnesota Min. & Mfg. Co.*,
  647 F.2d 965 (9th Cir. 1981) ...............................................................................................1, 20

MICROSOFT'S TRIAL BRIEF

LAW OFFICES
CALFO HARRIGAN LEYH & EAKES, LLP
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700 FAX, (206) 623-8717

1    *Westinghouse Elec. & Mfg. Co. v. Wagner Elec. & Mfg.Co.*,
         225 U.S. 604 (1912)..................................................................................................19

2    **OTHER AUTHORITIES**

3    Christina Bohannan and Herbert Hovenkamp, *Creation without Restraint* (2011) ........................1

4    Joseph Farrell *et al.*, "Standard setting, patents, and hold-up," 74 *Antitrust L. J.* 603,
5        (2007) (Ex. 1014)..............................................................................................1, 6

6    Federal Trade Commission, *The Evolving IP Marketplace: Aligning Patent Notice and
         Remedies With Competition* (March 2011) (Ex. 1034)...............................................1

7    Herbert Hovenkamp, "Competition in Information Technologies: Standards-Essential
8        Patents, Non-Practicing Entities and FRAND Bidding," U. of Iowa Legal Studies
         Research Paper No. 12-32 (Oct. 2012) (Ex. 1647)....................................2, 6, 10, 11

9    Mark A. Lemley and Carl Shapiro, "Patent Hold-up and Royalty Stacking," 85 *Texas L.
10       Rev.* 1991 (2007) (Ex. 1030)................................................................................2

11   Fiona M. Scott Morton, "Patent Portfolio Acquisitions: An Economic Analysis" (Sept.
12       21, 2012) at 2 (Ex. 1646.) ....................................................................................22

13   Carl Shapiro, "Navigating the Patent Thicket: Cross Licenses, Patent Pools, and
         Standard-Setting," in Adam B. Jaffe *et al.*, *Innovation Policy and the Economy*
14       (2001) (Ex. 1012)................................................................................................2

15   Daniel J. Swanson & William J. Baumol, "Reasonable and Non-discriminatory (RAND)
         Royalties, Standard Selection, and Control of Market Power," 73 *Antitrust L.J.* 1
16       (2005) (Ex. 1013)............................................................................................1, 2

17

18

19

20

21

22

23

24

25

26

MICROSOFT'S TRIAL BRIEF

LAW OFFICES
CALFO HARRIGAN LEYH & EAKES, LLP
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700 FAX, (206) 623-8717

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

## INTRODUCTION

The purpose of this phase of the breach of contract trial is to determine a RAND royalty, both a range and specific royalty, for the Motorola Defendants' patents that they have declared essential to the 802.11 and H.264 standards.[1]  RAND royalties rest on two key principles that derive from the fundamental requirement of apportionment that holds a patent owner is not entitled to a royalty for the value contributed to a product by the patented and unpatented contributions of others. *Velo-Bind, Inc. v. Minnesota Min. & Mfg. Co.*, 647 F.2d 965, 973 (9th Cir. 1981) ("where the patent creates only part of the profits, damages are limited to that part of the profits, which must be apportioned as between those created by the patent and those not so created."); *see also, Dowagiac Mfg. Company v. Minnesota Moline Plow Company*, 235 U.S. 641, 646 (1915).

First, the main purpose of the RAND requirement "is to confine the patentee's royalty demand to the value conferred by the patent itself as distinct from the additional value—the hold-up value—conferred by the patent's being designated as standard-essential." *Apple, Inc. v. Motorola, Inc.*, No. 1:11-cv-08540, 2012 WL 2376664, at *11 (N.D. Ill. June 22, 2012).  *See Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297, 313-14 (3d Cir. 2007); Bohannan and Hovenkamp, *Creation without Restraint* (2011) at 358–62; Federal Trade Commission, *The Evolving IP Marketplace: Aligning Patent Notice and Remedies With Competition* (March 2011) at 192 (Ex. 1034); Farrell *et al.*, "Standard setting, patents, and hold-up", 74 *Antitrust L. J.* 603, 608 (2007) (Ex. 1014); Swanson & Baumol, "Reasonable and Non-discriminatory (RAND) Royalties, Standard Selection, and Control of Market Power," 73 *Antitrust L. J.* 1, 7–11 (2005) (Ex. 1013).  The prohibition on recovering hold-up value from standard implementers arises from a party's willing participation in the standard-setting process (which subjects the patent owner to the patent disclosure and commitment policies of the standard organization) and is an integral part of the RAND commitment.

---

[1] Because Motorola and third parties have motions to seal currently pending before the Court (*see, e.g.,* Dkt. Nos. 495, 504, 508), Microsoft is filing its Trial Brief under seal, with a redacted version filed in the public record.

MICROSOFT'S TRIAL BRIEF - 1

LAW OFFICES
CALFO HARRIGAN LEYH & EAKES, LLP
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700 FAX, (206) 623-8717

1    Second, in the context of complex standards involving contributions from many parties

2  and the existence of many standard essential patents, principles of apportionment mean that an

3  individual patent holder is not entitled to more than its legitimate share and that the aggregate

4  royalty for all patents essential to practice the standard must be reasonable.  The determination of

5  a RAND royalty therefore must also assure that the standard will still be economically viable if

6  the other holders of standard-essential patents receive similar amounts.  Put another way, a

7  cumulative royalty for all patents essential to a standard that is so high that the standard cannot

8  succeed in the market would fail the "R" in the RAND test, as it would not be a "reasonable"

9  royalty.  This latter aspect is the so-called "stacking" problem.  *See, e.g.*, Lemley & Shapiro,

10  "Patent Hold-up and Royalty Stacking," 85 *Texas L. Rev.* 1991, 2015–16, 2026–28 (2007) (Ex.

11  1030); Swanson & Baumol, 73 *Antitrust L. J.* at 57; Shapiro, "Navigating the Patent Thicket:

12  Cross Licenses, Patent Pools, and Standard-Setting," in Jaffe *et al.*, *Innovation Policy and the*

13  *Economy* (2001) at 6–8 (Ex. 1012).  *See also* Hovenkamp, "Competition in Information

14  Technologies: Standards-Essential Patents, Non-Practicing Entities and FRAND Bidding," U. of

15  Iowa Legal Studies Research Paper No. 12-32 (Oct. 2012) at 9–10 (Ex. 1647).

16    The Court should be guided by sound, comparable, market-based evidence that addresses

17  both the "hold up" and reasonable aggregate royalty/stacking problems and that therefore

18  provides a reliable foundation for determination of a RAND royalty.  Microsoft's evidence will

19  do so.  In contrast, Motorola's position—that a RAND royalty for its H.264 and 802.11 standard-

20  essential patents is 2.25% of Windows and Xbox sales—rests entirely on incomparable licenses,

21  and amounts to a hold-up royalty that bears no relationship to any proper apportionment of the

22  value of Motorola's patents.

## ARGUMENT

## I.    THE PROPER FRAMEWORK FOR DETERMINING RAND ROYALTIES REQUIRES AVOIDING HOLD UP AND STACKING ERRORS

Microsoft urges the Court to adhere closely to a RAND valuation framework that avoids

hold up and applies proper principles of apportionment to prevent the risk of undue royalty

MICROSOFT'S TRIAL BRIEF - 2

stacking.  An *ex ante* multilateral framework  addresses both concerns.   An ex ante perspective addresses hold up because it values standard essential patents in light of the alternatives that existed before the standard was finalized and, more critically, before the industry had made irreversible investments in implementation and became locked into the standard.  A "multilateral" perspective ensures that apportionment principles are properly applied by considering the contributions and claims of all potentially interested parties and the aggregate royalty burden that would potentially result in stacking multiples of the RAND royalty sought by any given patent holder.  As set forth below, evidence concerning pools and other objective benchmarks establish reliable data for determining the relevant RAND values in keeping with these principles here.

## II.   THE MPEG LA POOL PROVIDES THE MOST RELIABLE BENCHMARK FOR A RAND ROYALTY FOR MOTOROLA'S H.264 STANDARD-ESSENTIAL PATENTS AND AVOIDS HOLD UP AND STACKING ERRORS.

For the H.264 standard, a large number (26) of patent owners (other than the Motorola Defendants) have formed a patent pool to license their respective standard-essential patents.  A large number (over 1,100) of licensees—including Defendant Motorola Mobility, Inc.'s own parent company, Google, Inc. ("Google")—have licensed the pool patents.  The pool royalties are RAND royalties for at least two key reasons: First, the pool royalties were set before the standard in question was widely adopted, mitigating the danger of "patent hold-up" because prospective licensees had lower sunk costs in standard-compliant products.  In at least this way, the pool provides a real world approximation of the "ex ante" economic framework, effectively separating the value of the patents from the value created by their inclusion in the standard.  The pool rate is set on the assumption that substantially all holders of standard essential patents will join and, thus, represents the estimated value of all patents on the standard.  As such, the pool royalty represents the aggregation of the incremental value of each essential patent as an approximation of the process of individually analyzing each patent against available alternatives.  This excludes hold up, because if the licensors had attempted to set their royalties at the "patent

MICROSOFT'S TRIAL BRIEF - 3

hold-up" level (capturing the value of standard compliance), prospective licensees could have chosen a competing standard or other alternative technology instead, or pushed the SSO to modify the standard. Second, because pool set the total royalties that would be charged for the patents in the pool as a group, each pool patent owner had to consider the royalties it would charge and receive in the broader context of the royalties that others would charge and receive, in a multi-lateral context.

The pool royalties therefore address both the "patent hold-up" and the royalty stacking issues. They provide a baseline, market-based measure of what standard-essential patents are actually worth in the RAND context. Further, the licensors identified where products potentially differ in terms of their benefit from the standard, and provided product categories to accommodate different royalty pricing as necessary. The pool royalties define specific per unit royalties with volume discounts for each product category, with annual caps that are adjusted upward over time in a rational, market based compromise between the licensors and would-be standard implementers that effectively encourages both to participate. The royalties also take into account the expiration of patents and utilize a formula calibrated annually based on current patent holdings of each licensor. The pool royalties therefore provide the best available measure for the RAND royalty to which Motorola is entitled. There is no evidence that the patents in Motorola's H.264 portfolio are worth more than the average pool patent.

A. **The MPEG LA Pool Established Royalties For 2,450 Standard-Essential Patents Owned By 26 Different Patent Owners, and the Pool Patents Have Now Been Licensed By More Than 1,100 Licensees.**

The MPEG LA pool was set up between 2003 and 2004, shortly after the initial adoption of the H.264 standard, but prior to its widespread implementation. A patent owner that wishes to participate in the pool as a licensor must first submit its patents to an independent evaluator who assesses whether the patents are genuinely essential. A total of 2,450 patents have been found by the evaluator to be essential to the H.264 standard and included in the pool. These patents are

MICROSOFT'S TRIAL BRIEF - 4

owned by 26 different patent owners, including Microsoft.  The H.264 pool patents have now been licensed by over 1,100 licensees.

Pool royalty rates were established at the outset with the hope that substantially all H.264 standard-essential patents would eventually be included in the pool, thereby establishing a market-based price for all of the patented intellectual property included in the standard. Motorola, Inc. participated in the pool royalty-setting process.  As a pre-requisite to participation, Motorola submitted one of its H.264 patents for a determination of essentiality by MPEG LA's independent expert, an evaluation intended to ensure that only essential patents would be included in the pool.  Motorola, Inc. actively engaged in the royalty-setting negotiations and approved the H.264 pool royalty rates, but withdrew from the process at the eleventh hour, after many other participants, including Microsoft, had executed the pool agreements.  Ultimately, Motorola neither contributed patents to the pool nor licensed the pool patents of the remaining participants.  During discovery, Microsoft tried to probe whether Motorola rejected the MPEG LA pool to preserve its ability to use its standard-essential patents to "hold up" implementers of the H.264 standard.  Motorola claimed privilege as to its aims. The Court has ruled that Motorola may not offer evidence at trial concerning its reasons for not joining the MPEG LA pool.

The pool royalties collected are divided among the licensors based upon a formula that considers, by country, the royalties received on sales in that country, and the number and type of unexpired pool patents in that country that a particular licensor has contributed.

**B.  Motorola's H.264 Standard-Essential Patents Are Not Entitled to Anything More Than a Pro Rata Share.**

The H.264 standard relates to techniques for compressing a video signal so that it can be efficiently transmitted or stored using a minimum of bandwidth.  Dozens of companies were involved in the creation of the standard, and by any objective measure over 2,500 patents worldwide have been identified as essential to the standard.  There is ample economic support for the default rule in contexts such as this that a holder of RAND-committed standard-essential

LAW OFFICES
CALFO HARRIGAN LEYH & EAKES, LLP
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700 FAX, (206) 623-8717

1  patents should receive no more than its *pro rata* share based on the number of patents essential to

2  the standard absent some demonstration that it is entitled to greater compensation. *See, e.g.*,

3  Hovenkamp, "Competition in Information Technologies" at 8–9 ("FRAND obligations tend to

4  'level' the value of patents in the sense that they apply a uniform royalty measure to patent that

5  are declared essential … [F]irms know all this in advance, so if they wish to assert later that a

6  particular patent within their standards-adaptable portfolio is unusually valuable, they can always

7  say so and leave the SSO to decide whether or not to adopt it.  Absent that, there does not seem

8  to be any good reason for not treating all patents alike, and the cost of determining individual

9  value would very likely swamp the system."); Farrell *et al.*, 74 *Antitrust L. J.* at 643 ("Without

10  reliable information about the relative importance of various patents, a natural if imperfect

11  default for a SSO to adopt for standards covered by large number of patents is to divide up the

12  aggregate royalty by the number of essential patents.  While this proportionality rule could in

theory be highly imperfect, it is voluntarily used by a number of patent pools.").[2]

13        In valuing Motorola's H.264 standard-essential patents, the broader context is important.

14  Much of H.264 was built on video coding technology that is now in the public domain.  For the

15  still-patented aspects of H.264, Motorola's patents are but a sliver (and as explained in detail

16  below, even that sliver is of little relevance to modern video).  Over 50 companies have declared

17  to the ITU that they have patents potentially essential to the H.264 standard, and the MPEG LA

18  pool alone contains 2,450 patents that have been determined to be essential.  Whatever the value

19  of the H.264 standard, the patented technology used in that standard comes from many, many

20  sources, and Motorola is entitled to no more than its *pro rata* contribution of patented technology

21  after having taken account of the contributions of others.

22        There is no contrary evidence.  Motorola's expert never even attempts to show that

23  Motorola's H.264 patents are even of average value in relation to other's H.264 patents.  Simply

24  declaring that some patent relates to core technology in a standard cannot be enough to justify an

25

26  [2] ████████████████████████ ████████ Exh. 284.

MICROSOFT'S TRIAL BRIEF - 6

LAW OFFICES
CALFO HARRIGAN LEYH & EAKES, LLP
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700 FAX, (206) 623-8717

1   outsized royalty, as the standard in the end comprises the sum of all its many pieces—especially

2   in the case of a complex standard like H.264.  Therefore, the question here is not just whether a

3   given royalty is reasonable for Motorola to receive, but also whether some considerable multiple

4   of that royalty would be reasonable for all of the H.264 standard-essential patents.  RAND must

5   be assessed in that light.

## C. Motorola's Parent Company's MPEG LA H.264 Pool License Provides a Comparable Measure of RAND.

7        Google, the parent company of Motorola, has licensed the patents in the MPEG LA

8   H.264 patent pool.  The license agreement Google signed obliges it to license to the pool

9   licensors (including Microsoft), as well as to other pool licensees, any H.264 standard-essential

10  patents owned by Google or Google affiliates, including Motorola.  The operative language in

11  the license agreement reads:



    In fact, the royalty that Microsoft has urged

represents an overestimate of that royalty for the Motorola patents.

     Microsoft does not here seek enforcement of its contractual right to Motorola's H.264

standard-essential patents at the MPEG LA pool royalty.  Rather, this shows that a sophisticated

company like Google agreed that                             , and the

MICROSOFT'S TRIAL BRIEF - 7

LAW OFFICES
CALFO HARRIGAN LEYH & EAKES, LLP
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700 FAX, (206) 623-8717

rights to be licensed for those royalties include the very patents at issue here. This makes the Google MPEG LA license a powerful comparable.

### D. The RAND Royalty That Microsoft Should Pay in 2012 for Motorola's H.264 Standard-Essential Patents Is $474,000.

Around the world, Motorola has a total of 63 patents that it claims are essential to the H.264 standard. For 2012, Microsoft has paid $13 million in royalties to the MPEG LA H.264 pool. If Motorola were a licensor in the MPEG LA H.264 pool, Motorola's share of the 2012 pool royalties paid by Microsoft would have been $474,000.[3] This is the RAND royalty that Microsoft should pay for Motorola's H.264 standard-essential patents in 2012. The royalty for other years can readily be calculated based on the number of unexpired Motorola patents remaining in those years.

### III. SEVERAL RELEVANT BENCHMARKS EXIST FOR DETERMINING A RAND ROYALTY FOR MOTOROLA'S 802.11 ESSENTIAL PATENTS THAT AVOID HOLD UP AND STACKING CONCERNS

As with H.264, 802.11 results from the contributions of dozens of parties and involves hundreds and hundreds of essential patents. Again, the default rule in contexts such as this is that a holder of RAND-committed standard-essential patents should receive no more than its *pro rata* share based on the number of patents essential to the standard absent some demonstration that it is entitled to greater compensation. *See supra*. Consistent with this principle and the framework set forth above, several objective benchmarks point to a RAND royalty for Motorola's declared-essential 802.11 patents at around five cents per unit.

### A. The Via Pool Provides a Benchmark.

A patent pool organized by Via Licensing Corporation ("Via") was formed between 2003 and 2005, several years after the first version of the 802.11 standard was adopted, but contemporaneous with widespread implementation of the standard. As such, its pricing model is

---

[3] In addition to Motorola's 63 patents, this figure is based on an analysis that assumes the addition to the pool of the 89 other patents that have been specifically declared essential to the H.264 standard but are not in the pool now. If only Motorola's patents are added, the annual royalty would be $502,000.

MICROSOFT'S TRIAL BRIEF - 8

LAW OFFICES
CALFO HARRIGAN LEYH & EAKES, LLP
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700 FAX, (206) 623-8717

1  unlikely to include substantial hold-up value. As it did when the MPEG LA H.264 pool was

2  formed, Motorola tried to participate in the Via pool. However, the supposedly essential patent

3  that Motorola submitted to Via was rejected by the independent evaluator, who concluded that

4  the Motorola patent was not, in fact, essential to the 802.11 standard.

5       The Via pool eventually came to include 38 standard-essential patents worldwide from

6  five different patent owners: Electronics and Telecommunications Research Institute, Japan

7  Radio Co., Ltd., Koninklijke Philips Electronics N.V., LG Electronics, Inc., and Nippon

8  Telegraph and Telephone Corporation. There are six additional licensees. The royalties that are

9  collected by the Via 802.11 pool are divided among the licensors based upon a formula that

10  considers, by country, the royalties received on sales in that country and the number of unexpired

11  pool patents for the relevant period in that country that a particular licensor has contributed.

12  And, as with the MPEG LA pool, the pricing contemplated that eventually all standard-essential

13  patents for 802.11 would be included.[4]

14       As in the case of H.264, Motorola's 802.11 standard-essential patents represent a sliver

15  of the technology encompassed in the 802.11 standard. The original standard issued in 1997,

16  prepared by a group within the Institute of Electrical and Electronics Engineers ("IEEE") called

17  the 802.11 Working Group. Beginning in 2002, 802.11 expanded more broadly into mainstream

18  consumer applications. Amendments to the standard (containing enhanced features) have been

19  issued since then, and are assigned letters of the alphabet (802.11b, 802.11c, 802.11d, etc.).

20  Much of the 802.11 technology was based on earlier wireless and networking technology not

21  subject to any patent rights. To the extent the technology is covered by patents, there are dozens

22  of companies that made significant contributions to 802.11 and that hold patents that are

23  essential to the standard. U.S. patents identified in letters of assurance to the IEEE total 150, but

24  the actual number is almost certainly several multiples of that because most companies do not

25  specifically identify their patents when they submit letters of assurance to the IEEE, including

---

[4] The Via pool included a provision for a modest increase in its pricing as more licensors and patents were included; Microsoft's experts applied this increased pricing in their assessment of the Via pool comparability.

MICROSOFT'S TRIAL BRIEF - 9

pioneers in WiFi, such as Qualcomm, Broadcom, Atheros, Lucent, Intel, IBM, Novell, NEC, Marvell, and Ericsson. No basis exists for concluding that Motorola had any outsized contribution to 802.11 or holds more valuable patents than these other companies. Rather, although Motorola participated in the 802.11 Working Group at various times, its participation was limited, and the contributions of its patents are nominal and are not linked to any proposals adopted by the group. Moreover, many other companies contributed to these same areas of the standard as Motorola. Motorola's experts' mere incantation that Motorola's patents touch on fundamental technology for 802.11(such as network setup) is simply beside the point. Once enacted, all of the patented technology incorporated into the standard is by definition fundamental to the standard (that is why the patents are called "standard-essential"). *See* Hovenkamp, "Competition in Information Technologies," at 8–9. There simply is no evidence to support Motorola's claims that its patents are worth more than the average 802.11 standard-essential patent.

Again, in assessing the importance of Motorola's 802.11 standard-essential patents to Microsoft, the broader context is important. At least 90 entities have submitted Letters of Assurance to the IEEE with respect to the 802.11 standard or have been found to hold essential patents in connection with their participation in the Via pool. Whatever the value of the 802.11 standard, the patented technology that is used in that standard comes from many, many sources, and Motorola is only entitled to its *pro rata* contribution of the patented technology after having taken account of the contribution of others.

## B. The Market Price for 802.11 Chips, such as the Marvel Chipset, Provides a Benchmark.

Where multi-featured end products are accused, the smallest saleable unit substantially embodying the invention typically supplies an upper bound for the royalty base. *LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 67–68 (Fed. Cir. 2012); *see Cornell Univ. v. Hewlett-Packard Co.*, 609 F. Supp. 2d 279, 283, 287–88 (N.D.N.Y. 2009) ("[C]ounsel would have wisely abandoned a royalty base claim encompassing a product with significant non-

LAW OFFICES
CALFO HARRIGAN LEYH & EAKES, LLP
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700 FAX, (206) 623-8717

infringing components.  The logical and readily available alternative was the smallest salable infringing unit with close relation to the claimed invention—namely the processor itself"); Hovenkamp, "Competition in Information Technologies," at 11 (endorsing the use of the smallest saleable unit in assessing RAND royalties).  In the Xbox (the only Microsoft product analyzed by Motorola's experts for purposes of its 802.11 patents) the 802.11 functionality is provided by a $3–$4 chipset purchased from Marvell Technology Group Ltd. ("Marvell").[5] Royalties for substantial technologies incorporated in such chipsets are normally just cents per chipset.

### C. Motorola's Prior Valuations Provide a Benchmark for 802.11 Valuation.

An internal valuation of the Motorola 802.11 essential patents undertaken by Motorola itself in 2003 provides another benchmark.  At the time, the 802.11 standard was just starting to be implemented, so "hold-up" was far more difficult than it is today, when companies like Microsoft are selling millions of dollars of products that comply with the 802.11 standard.

Motorola was planning to initiate a licensing campaign and wanted to know how much it might be able to obtain.  The valuation was performed by outside consultants, selected by Motorola, who worked at InteCap, Inc. ("InteCap").



---

[5] Marvell has sought but has not received a license from Motorola for its chipset—a license that would exhaust the Motorola patent rights in connection with any end product incorporating such chipset, including Microsoft's Xbox.

[6] In addition, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮  No licenses resulted, suggesting strongly that Motorola had over-priced its portfolio even then.

MICROSOFT'S TRIAL BRIEF - 11

LAW OFFICES
CALFO HARRIGAN LEYH & EAKES, LLP
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700 FAX, (206) 623-8717

1    The favorable assumptions which underlie the InteCap analysis suggest that its ██████

2    recommendation is considerably higher than an appropriate RAND royalty.  Indeed, Motorola's

3    30(b)(6) witness testified that ████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

7    A ██████ royalty applied to a $200 Xbox console would yield a ████████████

8   ██.  Given the assumptions favorable to Motorola, this supports a RAND royalty in the

9    neighborhood of five cents and certainly caps a RAND royalty.

**D. The RAND Royalty That Microsoft Should Pay in 2012 for Motorola's 802.11 Standard-Essential Patents Is $736,231.**

A RAND royalty for Motorola's 802.11 patents can be determined by following the Via

royalty calculation and distribution model, but adjusting royalties upwards to reflect the

conceptional inclusion of *all* unexpired standard-essential patents on 802.11.  This inclusive pool

mitigates stacking concerns, and results in Microsoft paying a royalty for Motorola's 802.11

patents of 5 cents per unit; at current volumes, this would constitute an annual payment of

$736,271.  The royalty for other years can readily be calculated based on the number of

unexpired Motorola patents remaining in those years.  This analysis assumes that the pool

royalty would stay constant upon addition of other patents to the pool, as did the Via pool's

model, and accommodates royalty stacking concerns.[7]

---

[7] If the Via pool rates were increased by the maximum 25% permitted under the pool agreements upon the inclusion of additional patents in the pool, Microsoft would pay to Motorola $920,338 per year based on current volumes for a license to its 802.11 essential patents.

MICROSOFT'S TRIAL BRIEF - 12

LAW OFFICES
CALFO HARRIGAN LEYH & EAKES, LLP
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL. (206) 623-1700 FAX. (206) 623-8717

## IV. THE 2.25% OF WINDOWS SALES AND XBOX SALES THAT MOTOROLA NOW DEMANDS IS NOT A RAND ROYALTY.

Motorola's position is that a RAND royalty for its H.264 and 802.11 standard-essential patents is 2.25% of Windows sales and Xbox sales.[8]  But its 2.25% demand is a hold-up royalty that bears no relationship to the value of Motorola's patents to Microsoft's products, is based on incomparable licenses, and fails to apportion the value of Motorola's patents.  Motorola's demand of 2.25% of the price of a $200 Xbox (or $4.50/unit) is more than 22 times the maximum per unit rate Microsoft would pay for a license to the 2,450 patents contained in the MPEG LA H.264 pool ($0.20/unit).  Moreover, to decide that Motorola is entitled to a royalty of 2.25% from Microsoft for Motorola's standard-essential patents, requires the conclusion that all the other patent owners, on average, are also entitled to a minimum of 2.25%.

### A. Apart From Facilitating Compliance With the Standards (Which Is Not Compensable in a RAND Royalty), Motorola's Standard-Essential Patents Have Little, If Any, Value in Microsoft's Products.

As noted above, the purpose of RAND commitment "is to confine the patentee's royalty demand to the value conferred by the patent itself as distinct from the additional value—the hold-up value—conferred by the patent's being designated as standard-essential." *Apple*, 2012 WL 2376664, at *11.  That Motorola's 2.25% royalty demand is not RAND is demonstrated beyond doubt as it plainly seeks amounts greater than Motorola could have obtained in a traditional infringement suit on Microsoft's products, because there is no evidence that the Motorola patents drive consumer demand for the Microsoft products.

### 1. Motorola's H.264 Patents

Motorola claims to have 16 U.S. patents (some with foreign counterparts) that are essential to the H.264 standard.  Of the 16, 14 relate to interlaced video.  Computers display video in progressive format, meaning that the entire picture is created line by line.  Progressive content is encoded by processing a picture's even and odd lines together ("frame coding").  An

---

[8] Motorola's experts purport to offer per unit royalties for Windows and Xbox, but these are calculated by assuming a grant-back and valuation of Microsoft's patents and applying various caps.  The underlying and fundamental basis for the Motorola proposed royalty is 2.25% applied to Windows software and to Xbox.

LAW OFFICES
CALFO HARRIGAN LEYH & EAKES, LLP
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700 FAX, (206) 623-8717

1    alternative format is "interlaced video," which involves encoding odd and even lines separately

2    ("field coding"). Interlaced video is a relic of analog over-the-air broadcast television, where

3    there were advantages in capturing and displaying the even and odd lines of the picture

4    separately. Interlaced video is rarely transmitted over the Internet, but in order to be fully

5    compliant with certain profiles and levels of H.264, a product must support both progressive and

6    interlaced video.

7         Microsoft products, such as Windows and Xbox, support interlaced video solely in order

8    to be compliant with H.264, but rarely encounter this type of video and there was never any

9    effort to take advantage of any specific technology covered by Motorola's patents. A RAND

10    royalty is supposed to measure "the value of the patent qua patent," *Apple*, 2012 WL 2376664, at

11    *11. Motorola's interlaced video patents had little or no value because they represent minor

12    improvements on preexisting interlaced technology. Alternative technologies were available that

13    could have been written into the standard instead if the SSO had known that Motorola would

     later attempt to hold up implementers with these patents.

14         Only two of Motorola's asserted H.264 patents—U.S. Patent Nos. 5,235,419 (Ex. 270)

15    and 5,376,968 (Ex. 283)—are not limited to interlaced video, but one of them (the '419 patent)

16    has already expired, and the other expires in four months. Like the interlaced patents, these

17    patents simply involve choices (of encoding block sizes and compression modes) for which

18    alternatives existed that could have been implemented in the standard instead. Further, the

19    means-plus-function claim limit these patents to their disclosed hardware (i.e., not software).

20    They therefore do not apply to Microsoft's Windows or Xbox products.

21           **a) Microsoft Windows**

22         Microsoft Windows provides underlying operating system software for PCs, laptops, and

23    smartphones. Windows facilitates the basic operation of these computing devices, including

24    managing software applications, mediating between hardware and software, and policing the

25

26

MICROSOFT'S TRIAL BRIEF - 14

security and stability of the computer system.  Windows also provides numerous user-facing features, including accessory applications such as control panels and basic word processors.

Windows is compliant with the H.264 standard and is therefore capable of decoding such video, but computers running Windows generally contain third-party software that can also decode H.264 video.  Many software applications—for example, Adobe Systems' Flash Player—contain their own decoder.  Where third-party software is available, Windows typically relies on the third-party product to complete any H.264 decoding.  Further, as discussed above, the narrow form of H.264-encoded content which is mainly addressed by Motorola's patents—interlaced video—is a rarity on the Internet.  Modern computer screens never display video in interlaced format; any interlaced content is converted to a different format (progressive format) for display.  Windows Phone 7 does not provide any software H.264 decoders, leaving decoding on that platform entirely to third-party hardware not sold by Microsoft.

Motorola and its experts have gone to great length to try to find examples of interlaced video content, such as from pirate web sites and obscure test clips, that Windows can play.  But their difficulty in finding such examples underscores how trivial the Motorola patents really are to Windows.  Motorola is left to argue the importance of compliance with the overall H.264 standard, but that simply shows that Motorola seeks hold-up, not the RAND value of its patents.  There will be no evidence at trial that shows or even suggests that the basis for customer demand for Windows is its use of the H.264 standard, let alone the Motorola H.264 standard-essential patents.

### b)  Microsoft's Xbox 360

Microsoft's Xbox 360 game console is also compliant with the H.264 standard, but the Motorola patents offer little value to that product either.  The Xbox is primarily used for playing video games, and video games (whether played standalone or online) do not use H.264.  Microsoft's Xbox Live, an online service for Xbox users, does not support interlaced format.

MICROSOFT'S TRIAL BRIEF - 15

LAW OFFICES
CALFO HARRIGAN LEYH & EAKES, LLP
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL. (206) 623-1700 FAX. (206) 623-8717

1  Although the Xbox 360 can play DVDs, DVDs do not use the H.264 format.[9]  As in the case of

2  Windows, Motorola and its experts have gone to great lengths to try to find some examples of

3  interlaced video content played on Xbox.  For example, they argue that AT&T's U-verse

4  television service was available as a software add-on to Microsoft's Xbox.  But only a tiny

5  percentage of Xbox users ever obtained the software for U-verse.  Again, there will be no

6  evidence at trial that shows or even suggests that, for any Xbox-related product, the basis for

7  customer demand is its support for H.264 video, let alone the use of the Motorola H.264

8  standard-essential patents.

9           **2.  Motorola's 802.11 Patents.**

10         Earlier in the course of this litigation, Motorola identified as many as 58 U.S. patents

11  (many with foreign counterparts) that it claimed were essential to the 802.11 standard.  However,

12  Motorola now asserts that only 24 of those patents are actually essential and points to only 11 of

13  the 24 that it contends are actually used in Xbox.  However, even the larger group of 24 contains

14  no patent that has much value, as there were available alternatives that the drafters of the 802.11

15  standard could have adopted instead of these patents.  Moreover, these patents are either not used

16  by Microsoft's Xbox or are not relevant to its normal operation.

17         The Xbox console is the only Microsoft 802.11 standard compliant product analyzed by

18  Motorola's experts.  Between 2001 and 2010, Microsoft's Xbox console was sold with only a

19  wired Ethernet adapter for network connectivity.  Starting in 2004, Microsoft began selling an

20  adapter that could be attached to the Xbox console to permit wireless Internet connection

21  through a local area network.  The adapter was compliant with the 802.11 standard.  In June

22  2010, Microsoft launched a redesigned Xbox console which included the 802.11 wireless

23  capability via a Marvell chipset integrated into the console itself, without any price bump.

24  Wireless connectivity, though, is certainly not the basis for customer demand for the Xbox

25  _____

26  [9] While Blu-ray discs do contain H.264 content, Xbox has no support for viewing Blu-ray discs.  In any event, most Blue-ray video content is not in the interlaced video form that is addressed in the majority of Motorola's H.264 standard-essential patents.

MICROSOFT'S TRIAL BRIEF - 16

LAW OFFICES
CALFO HARRIGAN LEYH & EAKES, LLP
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700 FAX, (206) 623-8717

1    product.  While a wireless signal can be used to communicate between the Xbox console and a

2    user's home wireless router, a wired connection will work as well, as with prior versions of the

3    product.  Many users continue to connect in that way.

4         The parties agree that thirteen of the 24 patents that Motorola claims are essential to the

5    802.11 standard are not used by the Xbox.  Motorola's 6,404,772 patent (Ex. 381) concerns

6    802.11 Quality of Service capabilities that Xbox does not use.  Motorola's power-saving patents,

7    5,560,021 (Ex. 166), 6,236,674 (Ex. 178), 5,029,183 (Ex. 147), and 5,479,441 (Ex. 162), are not

8    used by the Xbox because it is not a battery-operated device, and does not support 802.11 power-

9    saving functionality.  Motorola's 7,197,016 (Ex. 100) patent relates to a mesh network routing

10   protocol that the Xbox does not support (the Xbox does not support mesh networks).  The Xbox

11   does not offer support for low-density parity check (LDPC) codes (one way to reduce errors

12   when transmitting a signal over a noisy transmission medium) and therefore does not use

13   Motorola's LDPC code patents—the 7,143,333 (Ex. 181), 7,165,205 (Ex. 183), or 7,493,548

14   (Ex. 182) patents.  Motorola's 7,236,477 patent (Ex. 101) concerns fast transitions by wireless

15   device moving between different wireless access points; that functionality is not supported by the

16   Xbox, because it is stationary when used and must be unplugged in order to move it.  Motorola's

17   5,412,722 patent (Ex. 160) requires steps to be performed by an access point, but the Xbox is not

18   an access point and, thus, does not practice this patent.  Motorola's 6,038,263 patent (Ex. 383)

19   requires transmitting signals via spatially separate antennas, but the wireless adapter in the Xbox

20   does not make such transmissions.  And the default 802.11 settings on consumer devices, and the

21   hard-coded setting on the Xbox itself, do not result in splitting up ("fragmenting") 802.11

22   packets, so the Xbox does not practice Motorola's 5,311,516 patent (Ex. 154) (which expired in

     May of 2012).

23        The remaining 11 patents that Motorola contends are practiced by the Xbox, provide, at

24   best, minimal value to the Xbox.  Two of these patents, the 5,142,533 (Ex. 148) and 5,272,724

25   (Ex. 151) patents, have already expired.  In any event, the '533 patent required the use of either

26

MICROSOFT'S TRIAL BRIEF - 17

RTS/CTS or QoS—functionality that the Xbox does not support. Motorola's 6,069,896 (Ex. 171) and 6,331,972 (Ex. 177) patents relate to peer-to-peer communication in 802.11, which is not used in normal operation when an Xbox connects to a wireless access point. Motorola's 6,473,449 (Ex. 180), 5,329,547 (Ex. 156), and 5,822,359 (Ex. 170) patents relate to older amendments of the 802.11 standard that offer significantly slower communication speeds than the "n" amendment currently supported by the Xbox console. While legacy devices may exist that operate based on the older amendments, the current Xbox console is compliant with 802.11n, and patents related to the "b" and "g" amendments are of little value. Motorola has only a single unexpired patent allegedly covering the use of 802.11n, the 5,519,730 patent (Ex. 164), and that patent expires in May of next year.

The other three patents – U.S. Patent Nos. 5,357,571 (Ex. 157), 5,467,398 (Ex. 161), and 5,689,563 (Ex. 169) – that Motorola claims are used by the Xbox relate to security. But, Xbox implements its own end-to-end encryption of any sensitive data, independent of any security provided by the 802.11 standard. As a result, Xbox data is always encrypted before the data are sent over a connection (whether wired or wireless) between a console and a router (or the Internet). To the extent that Motorola's patents actually cover some portion of 802.11 encryption, these patents provide redundant technology to Xbox's proprietary end-to-end encryption that is entirely unnecessary for the security of Xbox data and is of little value to Microsoft.

B. **By Using Windows Sales and Xbox Sales As the Royalty Base For Their 2.25% Royalty, Motorola Violates Principles of Apportionment and the Entire Market Value Rule.**

In the context of determining reasonable royalties, the "entire market value rule" bars the use of sales revenues of an accused product as a royalty base where a patent covers a single feature of a complicated, multi-faceted product, unless the patentee proves that the patent-related feature is the basis for customer demand. *See LaserDynamics*, 694 F.3d at 67. The law has long required the patentee to apportion the value of the patented technology in relation to other

MICROSOFT'S TRIAL BRIEF - 18

1   technologies, both patented and unpatented, that make up a product. *See, e.g., Sheldon v. Metro-*
2   *Goldwyn Pictures Corp.*, 309 U.S. 390, 402 (1940); *Dowagiac Mfg. Co. v. Minnesota Moline*
3   *Plow Co.*, 235 U.S. 641, 645–51 (1915); *Westinghouse Elec. & Mfg. Co. v. Wagner Elec. &*
4   *Mfg.Co.*, 225 U.S. 604, 614–15 (1912); *Garretson v. Clark,* 111 U.S. 120, 121 (1884).  It is
5   irrelevant to this inquiry that certain features may be of general importance to any given product,
6   or necessary for its commercial viability: "proof that consumers would not want a [product]
7   without such features is not tantamount to proof that any one of those features alone drives the
8   market" for the product, and "[i]t is this latter and higher degree of proof that must exist to
9   support an entire market value rule theory." *LaserDynamics*, 694 F.3d at 68.

10          In its opposition to Microsoft's *Daubert* motion, Motorola relied on *Lucent Technologies,*
11  *Inc. v. Gateway, Inc.,* 580 F.3d 1301, 1338-39 (Fed. Cir. 2009), for the proposition that the entire
12  market value rule does not require a showing that the patent created the basis for the customer
13  demand, "as long as the magnitude of the rate is within an acceptable range (as determined by
14  the evidence)."  Although that approach was followed by some district courts in the aftermath of
15  *Lucent*, the Federal Circuit has clarified that the *Lucent* opinion in no way alters the fundamental
16  standard requiring proper apportionment; instead, the entire market value rule acts as a *per se* bar
17  to application of a royalty rate to end product price without a showing that the patent creates the
18  basis for the customer demand, and the use of the broad royalty base is not permissible simply
19  because the royalty rate has been made small enough. *See e.g., Uniloc USA, Inc. v. Microsoft*
20  *Corp.*, 632 F.3d 1292, 1302 (Fed. Cir. 2011) ("The Supreme Court and this court's precedents do
21  not allow consideration of the entire market value of accused products for minor patent
22  improvements simply by asserting a low enough royalty rate.").  In the most recent ruling,
23  *LaserDynamics*, the Federal Circuit emphasized that "the requirement to prove that the patented
24  feature drives demand for the entire product may not be avoided by the use of a very small
25  royalty rate," explaining that:

                We recently rejected such a contention, raised again in this case by
                LaserDynamics, and clarified that "[t]he Supreme Court and this court's

26

MICROSOFT'S TRIAL BRIEF - 19

precedents do not allow consideration of the entire market value of accused products for minor patent improvements simply by asserting a low enough royalty rate." *Uniloc*, 632 F.3d at 1319–20 (explaining that statements in *Lucent* suggesting otherwise were taken out of context).

*LaserDynamics*, 694 F.3d at 67. While Federal Circuit law is persuasive authority in this action, Ninth Circuit law on apportionment predating the formation of the Federal Circuit is in accord. *See Velo-Bind*, 647 F.2d at 973 (9th Cir. 1981) ("[A]lthough courts have applied the entire market value rule in certain limited circumstances, this rule is itself an exception to the more general rule that, where the patent creates only part of the profits, damages are limited to that part of the profits, which must be apportioned as between those created by the patent and those not so created.").

Even if it were permissible to use total sales as the royalty base by adjusting to a lower royalty rate, Motorola simply applies the same 2.25% to every Microsoft product regardless of overall feature sets or prices (Windows, all packages of the Xbox, the standalone Xbox wireless adapter)—and even the disavowed passage in *Lucent* stated that the patentee must use a royalty rate that "accounts for the proportion of the base represented by the infringing component or feature." 580 F.3d at 1339. A percentage royalty, as urged by Motorola, cannot be ascertained without apportioning the use of the patents in particular implementations and devices. Otherwise, it inherently captures value for which Motorola is not entitled to compensation, especially in the RAND context.

Apportionment, whether enforced via the entire market value rule or otherwise, is an essential restraint in preventing overreaching and windfall recovery in every patent valuation context. No *reasonable* valuation, in a patent infringement action or any other context involving multi-component, multi-featured products, can be had without proper apportionment. Yet, no Motorola expert has even asserted, much less attempted to show, that the Motorola H.264 or 802.11 essential patents form the basis for consumer demand for Microsoft's complex products. Therefore, Motorola's use of Windows and Xbox sales as a royalty base is both contrary to law and impermissible.

LAW OFFICES
CALFO HARRIGAN LEYH & EAKES, LLP
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700 FAX, (206) 623-8717

**C. Motorola's Demand Fails to Account for its Rapidly Expiring Patents.**

A further problem with Motorola's proposed 2.25% royalty is that it fails to take into account the expiration of Motorola's patents.[10]  Its 802.11 patents are rapidly expiring – in fact, Motorola recently abandoned the portion of its ITC case against the Xbox on the only two 802.11 patents that have been litigated because the patents will soon expire.  Likewise, the only H.264 patents not solely applicable to interlaced video are also about to expire.  Motorola's continuing and unvarying 2.25% royalty is plainly not RAND.  By contrast, the royalty proposed by Microsoft, utilizing the pool formulas, takes into account patent expirations.

**D. Licenses to Motorola's Cellular Telephone Network Standard-Essential Patents May Well Reflect Hold-Up and Are Wholly Irrelevant, Given That No Apportionment Has Been Performed.**

The evidence that Motorola offers to support its 2.25% royalty demand may well reflect hold-up.  With few exceptions, these licenses to Motorola's portfolios of patents essential to various cellular telephone network standards were entered into by makers of cell phones and cellular telephone network equipment that had already made and sold standard-compliant products.  If they did not pay Motorola for its cellular telephone network standard-essential patents, they risked injunctions or exclusion orders that would have removed their products from the marketplace.  For example,

The U.S. antitrust authorities have recognized that "the threat of injunctions and exclusions" means that "[t]he prices achieved by negotiation between a

---

[10] The parties remain engaged in litigation in other fora related to certain of the patents at issue here, for example, ITC Investigation 337-TA-752 and cases in Germany.  The decisions from the ITC action are not given collateral estoppel effect in the district courts.  *General Elec. Co. v. Wilkins*, 2012 WL 3862350 at *1 n.1 (E.D. Cal., Sept. 5, 2012) ("The ITC decisions are not binding on this court"); *Texas Instruments Inc. v. Cypress Semiconductor Corp.*, 90 F.3d 1558, 1569 (Fed. Cir. 1996) ("ITC decisions are not binding on district courts in subsequent cases brought before them"), and in any event the ITC does not involve valuing the asserted patents.  In the German action, neither the value nor the validity of the asserted patents was considered.

MICROSOFT'S TRIAL BRIEF - 21

1   buyer and an IP supplier in this environment will [ ] tend *not* to reflect the value of the patent

2   before it was incorporated into the product or standard." Scott Morton, "Patent Portfolio

3   Acquisitions:  An Economic Analysis" (Sept. 21, 2012) at 2 (Ex. 1646.)

4          But Motorola's agreements are not appropriate comparables for even more fundamental

5   reasons:  they concern different patents, different standards, and different products.  The primary

6   purpose of a cell phone is to connect to a cellular network, but an Xbox console that cannot use a

7   WiFi connection is still a useful product:  tens of millions of them were sold by Microsoft.  By

8   the same token, Motorola told prospective licensees that ███████████████████████████

9   ██████████████████████████████████ (Ex. 1117 at 21337; Taylor Dep. at

10  201–03, 208–09.)  But neither Kirk Dailey, Motorola's head of licensing, nor K. McNeill Taylor,

11  Jr., Motorola's chief IP counsel, ████████████████████████████████████████

12  ████████████████████████████████████ (Taylor Dep. 5, 73–74,

13  212–13.)

14         The vast majority of Motorola's licenses include only its portfolio of cellular telephone

15  network standard-essential patents.  Importantly, these licenses provide rights only for building

16  standard-compliant implementations; the licensed patents cannot be used in any other way, and

17  no other aspect of the product is licensed.  Yet, Motorola argues that they are relevant because

18  they include so-called "overlap" patents—patents declared essential to both the cellular and

19  802.11 standards.  There are two fallacies in this argument.  First, the overlap is miniscule:  there

20  are just one or two 802.11 patents in the hundreds of patents included in the cellular licenses, and

21  those are not even licensed for 802.11 implementations.  Second, Motorola made no attempt to

22  apportion the value of the royalties paid for these one or two patents versus the rest of the

23  licensed patents.

24         Only a small number of Motorola license agreements actually include (together with

25  other things) licenses to Motorola's portfolios of 802.11 essential patents or H.264 essential

26

MICROSOFT'S TRIAL BRIEF - 22

patents.  But these, too, provide no assistance in determining a RAND royalty for the 802.11 or H.264 portfolios.  All of them include patents in addition to Motorola's portfolios of 802.11 and H.264 standard-essential patents, and many involved only lump-sum payments (some of which flowed from Motorola to the counter-party) or were royalty-free cross-licenses.  Neither Motorola nor its experts has made any effort to apportion the royalties in these agreements between the 802.11 and H.264 patents and the other patents included the agreements, typically those in Motorola's cellular essential portfolios.  Thus, these agreements do not support Motorola's claim that there is an established royalty of 2.25% applicable to Motorola's 802.11 and H.264 portfolios. ███████████████████████████████████████

███████████████████████████████████████████████████████████████

███—and that single agreement is insufficient to provide an established royalty, especially where only *de minimis* royalties were paid ████████████.[11]  *See See ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860, 869, 872 (Fed. Cir. 2010); *Hanson v. Alpine Valley Ski Area, Inc.*, 718 F.2d 1075, 1078 (Fed. Cir. 1983).  Moreover, the agreement was conveniently negotiated by Motorola after this litigation commenced, in return for an agreement by Motorola to lower a separate arbitration demand.  *See Dunkley Co. v. Central California Canneries*, 7 F.2d 972 (9th Cir. 1925) (rejecting later-arising license agreements as evidence of a reasonable royalty).

### E.  Motorola's Dismissal of Pool Royalties Has No Basis in Fact.

Motorola dismisses pool royalties as irrelevant, saying that the licensor-participants intend to profit from the sale of standard-compliant products and set the pool royalties at an unreasonably low level to lower their own costs.  The evidence is to the contrary.

---

[11] Although Motorola's ████████████████████████████████████████████
████████████████████████████████████ Moreover, ████ sales of smartphones incorporating the licensed cellular standards would alone have been sufficient to reach the annual royalty caps in the agreement—and any use of other licensed standards in those products did not create any additional royalty obligation. Given that, ████ would have had little interest in bargaining over the royalties nominally applicable to the 802.11 or H.264 standards.

MICROSOFT'S TRIAL BRIEF - 23

LAW OFFICES
CALFO HARRIGAN LEYH & EAKES, LLP
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700 FAX, (206) 623-8717

1  First, both the MPEG LA and the Via pool contain licensors, such as Columbia

2  University and the Electronics and Telecommunications Research Institute, that do not sell

3  standard-compliant products. They have no incentive to low-ball the pool royalties to reduce

4  their product costs because they have no standard-compliant products, but instead would be seek

5  the maximum viable royalty. Pools seek to promote the success of the standard by balancing the

6  need to attract a critical mass of licensors against the essential goal of the standard: widespread

7  adoption by licensors--a goal that can be achieved only by enforcing the RAND obligation.

8  Second, as noted above, Motorola's own parent company, Google, contractually

9  agreed—on Motorola's behalf—that ████████████████████████████████████

10 ████████████████████████████████████████████████████████████████████

11 ████████████████████████████████████████████████████████████████████

   Google evidently did not view the pool royalties as unreasonably low.

12 Finally, Motorola asserts that SSOs envision that RAND royalties will always be

13 negotiated one-on-one between a single licensor and a single licensee. But even policies at the

14 SSOs, including those that promulgated the H.264 and 802.11 standards, do not support that

15 conclusion. To the contrary, for example, IEEE set up an "802.11 Patent Pool Exploratory

16 Forum" to "promote the fair, reasonable and non-discriminatory availability of licenses essential

17 to IEEE 802.11 through patent pools." (Ex. 297.) Likewise, in joint submissions to ETSI,

18 Motorola itself ████████████████████████████████████████████████

19 ████████████████████████████████████████████████ (Ex. 1033 at

20 MOTM_WASH1823_0421107; Ex. 1606 at MOTM_WASH1823_0421101.)

21                              **CONCLUSION**

22 Microsoft's proposed royalties are RAND and Motorola's proposed royalties are not.

23

24

25

26

MICROSOFT'S TRIAL BRIEF - 24

DATED this 7th day of November, 2012.

CALFO HARRIGAN LEYH & EAKES LLP

By  s/ Arthur W. Harrigan, Jr.
       Arthur W. Harrigan, Jr., WSBA #1751
       Christopher Wion, WSBA #33207
       Shane P. Cramer, WSBA #35099

By  s/ T. Andrew Culbert
       T. Andrew Culbert
       David E. Killough
       MICROSOFT CORPORATION
       1 Microsoft Way
       Redmond, WA  98052
       Phone:  425-882-8080
       Fax:  425-869-1327

       David T. Pritikin
       Richard A. Cederoth
       Constantine L. Trela, Jr.
       William H. Baumgartner, Jr.
       Ellen S. Robbins
       Douglas I. Lewis
       David C. Giardina
       John W. McBride
       David Greenfield
       Nathaniel C. Love

       SIDLEY AUSTIN LLP
       One South Dearborn
       Chicago, IL  60603
       Phone:  312-853-7000
       Fax:  312-853-7036

       Carter G. Phillips
       Brian R. Nester

       SIDLEY AUSTIN LLP
       1501 K Street NW
       Washington, DC  20005
       Telephone:  202-736-8000
       Fax:  202-736-8711

       Counsel for Microsoft Corp.

LAW OFFICES
CALFO HARRIGAN LEYH & EAKES, LLP
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700 FAX, (206) 623-8717

# CERTIFICATE OF SERVICE

I, Linda Bledsoe, swear under penalty of perjury under the laws of the State of Washington to the following:

1.   I am over the age of 21 and not a party to this action.

2.   On the 7th day of November, 2012, I caused the preceding document to be served on counsel of record in the following manner:

**Attorneys for Motorola Solutions, Inc., and Motorola Mobility, Inc.:**

| | |
|---|---|
| Ralph Palumbo, WSBA #04751 | |
| Philip S. McCune, WSBA #21081 | _____ Messenger |
| Lynn M. Engel, WSBA #21934 | _____ US Mail |
| Summit Law Group | _____ Facsimile |
| 315 Fifth Ave. South, Suite 1000 | __X__ ECF |
| Seattle, WA 98104-2682 | |
| Telephone: 206-676-7000 | |
| Email: Summit1823@summitlaw.com | |

| | |
|---|---|
| Steven Pepe (*pro hac vice*) | _____ Messenger |
| Jesse J. Jenner (*pro hac vice*) | _____ US Mail |
| Ropes & Gray LLP | _____ Facsimile |
| 1211 Avenue of the Americas | __X__ ECF |
| New York, NY 10036-8704 | |
| Telephone: (212) 596-9046 | |
| Email: steven.pepe@ropesgray.com | |
| Email: jesse.jenner@ropesgray.com | |

| | |
|---|---|
| Norman H. Beamer (*pro hac vice*) | _____ Messenger |
| Ropes & Gray LLP | _____ US Mail |
| 1900 University Avenue, 6th Floor | _____ Facsimile |
| East Palo Alto, CA 94303-2284 | __X__ ECF |
| Telephone: (650) 617-4030 | |
| Email: norman.beamer@ropesgray.com | |

LAW OFFICES
CALFO HARRIGAN LEYH & EAKES, LLP
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700 FAX, (206) 623-8717

1

Paul M. Schoenhard (*pro hac vice*)

Ropes & Gray LLP

2

One Metro Center

700 12th Street NW, Suite 900

3

Washington, DC  20005-3948

Telephone:  (202) 508-4693

4

Email: Paul.schoenhard@ropesgray.com

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

DATED this 7th day of November, 2012.

|        | Messenger |
| ------ | --------- |
|        | US Mail   |
|        | Facsimile |
|   X    | ECF       |

s/ Linda Bledsoe
LINDA BLEDSOE

MICROSOFT'S TRIAL BRIEF - 27