The Honorable James L. Robart

1
2
3
4
5
6
7

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

8
9

MICROSOFT CORPORATION, a Washington corporation,

CASE NO. C10-1823-JLR

10

                              Plaintiff,

MOTOROLA'S TRIAL BRIEF

11
12

            v.

**[REDACTED]**

13

MOTOROLA, INC., MOTOROLA MOBILITY LLC, and GENERAL INSTRUMENT CORPORATION,

14
15

                              Defendants.

16
17
18
19
20
21
22
23
24
25
26

MOTOROLA'S TRIAL BRIEF
CASE NO. C10-1823-JLR

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ................................................................. 1

II.   How to Determine Rates Commensurate With RAND ...................................... 2

    A.   Reconstructing Hypothetically the Microsoft and Motorola Negotiation ............. 2

    B.   The Via Licensing Pool and MPEG LA Pool Are Not "Comparables" and Reliance on Them Is Not Justified by a Multilateral *Ex Ante* Methodology ......... 5

    C.   Hold Up and Stacking Are Not Proven Problems Here ........................................ 9

    D.   Microsoft's New SEP Licensing Paradigm Has Drastic Policy Implications ...... 10

III.  Motorola's Patents Make Valuable Contributions to the Standards and to Microsoft's Products ........................................................................ 11

    A.   The Parties' 802.11 Portfolios ........................................................... 12

        1.   Motorola's 802.11 Patents are Directed to Core Features ...................... 12

        2.   Microsoft's Products Use Motorola's Patents to Satisfy Consumer Demand ................................................................................ 15

        3.   Microsoft's 802.11 Patents ........................................................... 16

    B.   The Parties' H.264 Portfolios ........................................................... 16

        1.   Motorola's H.264 Essential Patents are Directed to Core Features .......... 16

        2.   Microsoft's Products Use Motorola's Patents to Satisfy Consumer Demand ................................................................................ 19

        3.   There Were No Comparable Alternatives to Motorola's Patents at the Time the H.264 Standard Was Adopted ........................................... 21

        4.   Microsoft's H.264 Patents ........................................................... 21

IV.   Determining a Range of RAND Rates In This Case Based On a Hypothetical Bilateral Negotiation ........................................................................ 22

    A.   Motorola's Licenses and Licensing Practices ........................................ 22

    B.   2.25% Is the Only Logical Starting Point ............................................ 23

MOTOROLA'S TRIAL BRIEF
CASE NO. C10-1823-JLR

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone: (206) 676-7000
Fax: (206) 676-7001

C.      The RAND Rates for the Parties' Portfolios............................................................ 24

V.      CONCLUSION............................................................................................................ 24

MOTOROLA'S TRIAL BRIEF
CASE NO. C10-1823-JLR

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone: (206) 676-7000
Fax: (206) 676-7001

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Lucent Techs., Inc. v. Gateway, Inc.*,
  580 F.3d 1301 (Fed. Cir. 2009)...............................................................................6

*Mondis Tech., Ltd. v. LG Elecs., Inc.*,
  Nos. 2:07–CV–565–TJW–CE and 2:08–CV–478–TJW, 2011 WL 2417367 (E.D. Tex.
  June 14, 2011).........................................................................................................5

*Riles v. Shell Exploration & Prod. Co.*,
  298 F.3d 1302 (Fed. Cir. 2002).................................................................................5

*Studiengesellschaft Kohle, m.b.H. v. Dart Indus., Inc.*,
  862 F.2d 1564 (Fed. Cir. 1988).................................................................................5

*The Boeing Co. v. United States*,
  86 Fed. Cl. 303 (2009) ..............................................................................................5

*Unisplay, S.A. v. Am. Elec. Sign Co.*,
  69 F.3d 512 (Fed. Cir. 1995)...............................................................................5, 11

STATUTES

35 U.S.C. § 284.............................................................................................................3

MOTOROLA'S TRIAL BRIEF
CASE NO. C10-1823-JLR

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone: (206) 676-7000
Fax: (206) 676-7001

I.    **INTRODUCTION**

The Court has recognized that it faces difficult issues of first impression: considering what methodology should be used to determine a RAND royalty rate range, and then using that methodology to determine a range of RAND rates applicable to Motorola's standard essential patents ("SEPs").  (*See, e.g.*, Dkt. No. 490 at 22.)  In doing so, to be as true as possible to what actually happens in the real world, the Court should recreate the licensing negotiation that would have taken place had Microsoft negotiated with Motorola in October 2010.

In reconstructing that bilateral negotiation, the Court should focus on the importance of Motorola's patented technology to Microsoft's products, recognizing that the products broadly implement both the 802.11 and H.264 standards.  In addition to this technical assessment of the patents, the Court should also consider the value and importance of Motorola patents as demonstrated by Motorola's past SEP licenses.  These licenses are negotiated market transactions that reflect how Motorola and a variety of third parties have *actually* valued Motorola's portfolios when negotiating at arm's length under a RAND commitment.  This is the best measure of value of Motorola's patents.  Indeed, these negotiated rates reflect the balance, which Microsoft itself has recognized, between (1) the right of SEP holders not just to recoup their substantial investment in R&D, but to receive fair value for their patents; and (2) the right of implementers to obtain reasonable (but not *de minimis*) rates because they are locked into complying with the standard.

In contrast, Microsoft's "patent pool" approach disrupts this delicate balance by mandating depressed royalty rates that heavily favor implementers.  If a SEP holder is forced to license patents only at "pool rates" it does not believe will provide fair value, it will be unlikely to contribute its valuable patents to the standard.  Companies such as Motorola invest billions of dollars in R&D to develop the best technology.  It makes little business sense to contribute such valuable technology to a standard if the only return will be pennies on a dollar.  The result of Microsoft's approach, apart from imposing a penalty on Motorola that was never envisioned by either Motorola or the standard setting organizations ("SSOs") with which Motorola *actually*

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

1   contracted, is weaker standards that will ultimately have a deleterious impact on consumers.

2   **II.     HOW TO DETERMINE RATES COMMENSURATE WITH RAND**

3        **A.     Reconstructing Hypothetically the Microsoft and Motorola Negotiation**

4        In its *Daubert* Order, the Court observed that it "must employ a methodology which in

5   some way reconstructs the negotiation that would have taken place between Microsoft and

6   Motorola." (Dkt. No. 490 at 22.) Motorola agrees that the Court must try to reconstruct what

7   would have *actually* happened in the real world had Microsoft negotiated with Motorola. As

8   Motorola's expert economist, Professor Richard Schmalensee, will explain, the most appropriate

9   way to reconstruct that negotiation is to employ a modified form of the well-known *Georgia-*

10  *Pacific* hypothetical negotiation, used in patent damages analysis.

11       This is a rational approach. *Georgia-Pacific* is an established, reliable framework for

12  creating a hypothetical negotiation between two parties in damages cases, and provides a helpful

13  analog for RAND licensing. As the Court observed, the Federal Circuit "has consistently

14  sanctioned the use of the *Georgia-Pacific* factors 'to frame the reasonable royalty inquiry.'" (*Id*.

15  at 13.) Similarly, the Court also noted that "other courts have spoken to the applicability of the

16  *Georgia-Pacific* factors in determining a reasonable royalty in the RAND context." (*Id*.)

17  Moreover, as Dr. Schmalensee will explain, there is significant support in the literature for

18  employing a methodology like *Georgia-Pacific* to determine RAND terms.

19       In emulating this real-world negotiation, the Court should start with how companies –

20  including both Motorola and Microsoft – actually *have* negotiated patent licenses in the past.

21  Motorola's experts, Dr. Schmalensee and Mr. Donohoe, and Kirk Dailey, formerly the Corporate

22  Vice President of Intellectual Property at Motorola, will explain that, in the real world, RAND

23  licenses are complex agreements that require the exchange of sensitive business information and

24  extensive negotiation to account for unique circumstances of each licensing situation. Given that it

25  is industry practice to cross-license SEPs on a portfolio basis, taking into account respective market

26  positions, industry conditions and other commercial considerations, the parties typically discuss and

MOTOROLA'S TRIAL BRIEF - 2
CASE NO. C10-1823-JLR

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone: (206) 676-7000
Fax: (206) 676-7001

evaluate the scope, use, and importance of patents in each party's portfolios, to arrive at a final
RAND rate for that license.  Mr. Dailey will testify that the foregoing is what Motorola has done –
and continues to do – in patent license negotiations.  Indeed, as Judge Crabb recently observed:

> [T]here are all these things that enter into [a SEP license] such as the value of
> each party's portfolio and cross-licensing.  I mean those are just the major
> questions.  Then you get into anybody that's negotiating a license has a multitude
> of things to consider: How often the payments are made; what currency the
> payments are made in; what's the geographical scope; what things are excluded. .
> . . All of those things are just – if you thought about it, they would take weeks and
> weeks and weeks to think about. . . . I mean this is what people – these are the
> kinds of contracts that people negotiate who are experienced, who spent years in
> the business, who have backgrounds in finance and economics.

(Nov. 1, 2012 Hr'g Tr., Case No. 11-CV-178-BBC (W.D. Wis.), at 8-9.)[1]

Motorola has identified 58 licenses that include at least one of the SEPs at issue.  All of
these licenses "provide at least some indicia of the appropriate initial royalty rate" in this case.
(Dkt. No. 490 at 14.)   More than that, these licenses provide evidence regarding Motorola's
licensing practices.  ██████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████
████████   These real-world licenses are arms'-length market transactions that reflect the value of
Motorola's patents and are the best evidence for modeling the hypothetical negotiation here.

Motorola appreciates the Court's concern regarding whether it should apply the Entire
Market Value Rule ("EMVR"), which is used in a "reasonable royalty" damages analysis under 35
U.S.C. § 284, to the hypothetical RAND licensing negotiation context.  But if the Court wishes to
recreate the *actual* real-world negotiation between the parties, the EMVR should not be a constraint
in that analysis.[2] ██████████████████████████████████████████████████████████

---

[1] The transcript of this hearing in *Apple, Inc. v. Motorola Mobility, Inc.*, was provided to the Court by separate
letter.  All emphasis is added unless otherwise indicated.

[2] This "Rule" springs from the Federal Circuit's 35 U.S.C. § 284 damages jurisprudence, and there is no reason why
it should be applied in the RAND licensing context, which takes place between private parties on a bilateral contract
basis.

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

1      ████████  Indeed, Mr. Donohoe will testify that royalty rates in real-world SEP patent licenses are

2   commonly stated as a percentage of sales or final product price.  *See, e.g.*, Ex. 2863 at § 20.05.[3]  He

3   will explain that there are several reasons for this, including ease of accounting and efficiency, and

4   because the royalty will adjust automatically as the price adjusts.  Even the current IEEE LOA form

5   *expressly permits* royalties to be based on a final product price.  *See, e.g.,* Ex. 214.

6          Both Motorola's and Microsoft's own licenses confirm this real-world licensing practice.

7   ████████████████████████████████████████████████████████████████████████████

8   ████████████████████████████████████████████████████████████████████████████

9   ████████████████████████████████  And several of Microsoft's interoperability protocol

10  patent licenses, which purport to license on "reasonable and non-discriminatory terms," include a

11  royalty based on the product sold by the licensee.  *See*, *e.g.*, Exs. 3043-3046.

12         There are additional reasons the EMVR is an inappropriate constraint in a private licensing

13  context.  Because parties to SEP licenses typically seek broad coverage and protection, SEP

14  licenses almost always cover future unknown products that cannot be accounted for in an EMVR

15  analysis.  This case is a real-world example demonstrating why this is the case.  For example, in

16  October 2010, Microsoft's Xbox was the only Microsoft Wi-Fi product with significant sales.  But

17  on October 26 of this year, Microsoft introduced its Surface Tablet – a product that Microsoft has

18  been heavily advertising[4] – that relies entirely on Wi-Fi to connect to the internet.  And Microsoft

19  apparently is working on its own smartphone, which undoubtedly will have Wi-Fi capabilities.[5]

20         The EMVR is a damages analysis applied to specific products after infringement has been

21  found.  It is inappropriate to apply this damages constraint in a licensing context that deals with

22  future, unknown products, which may use the standardized technology in new and unanticipated

23  ways.  That is why the EMVR is not applied in real-world bilateral licensing.  Similarly, SEP

---

[3] "Ex. __" refers to the identified proposed trial exhibit number.  A courtesy copy of each cited exhibit will be provided to the Court in electronic and paper form by the parties on Thursday, November 8, 2012.

[4] As just one example, the home page at www.microsoft.com now features the Surface tablet.

[5] *See* http://blogs.wsj.com/digits/2012/11/02/why-microsoft-might-want-to-build-its-own-smartphone/.

MOTOROLA'S TRIAL BRIEF - 4
CASE NO. C10-1823-JLR

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone: (206) 676-7000
Fax: (206) 676-7001

licenses are almost always worldwide in scope; applying the EMVR in this context would have the effect of imposing a U.S. litigation constraint to arms'-length licensing around the world.

Even if the Court believes the EMVR might have some applicability to licensing, whether the EMVR applies here should be informed by Motorola's past licensing practices. *See, e.g.*, *Riles v. Shell Exploration & Prod. Co.*, 298 F.3d 1302, 1313 (Fed. Cir. 2002) (finding expert's damages models improperly "ignored [patent holder's] established licensing practice" when considering appropriate royalty rate); *Unisplay, S.A. v. Am. Elec. Sign Co., Inc.*, 69 F.3d 512, 519 (Fed. Cir. 1995); *Studiengesellschaft Kohle, m.b.H. v. Dart Indus., Inc.*, 862 F.2d 1564, 1568 (Fed. Cir. 1988) ("[T]he patentee's usual licensing approach should be considered in assessing a reasonable royalty.").

The industry practice – endorsed by SSOs – of using net selling price of the end product, along with Motorola's history of doing so, necessarily informs what the royalty base would be in this negotiation, because that base is predicated on the royalty base in prior real-world negotiation involving the parties. *See, e.g.*, *The Boeing Co. v. United States*, 86 Fed. Cl. 303, 319-20 (2009); *Mondis Tech., Ltd. v. LG Elecs., Inc.*, Nos. 2:07–CV–565–TJW–CE and 2:08–CV–478–TJW, 2011 WL 2417367, at *3 (E.D. Tex. June 14, 2011).

## B. The Via Licensing Pool and MPEG LA Pool Are Not "Comparables" and Reliance on Them Is Not Justified by a Multilateral *Ex Ante* Methodology

The nub of Microsoft's case is that the Court should adopt the rates of the Via Licensing pool for 802.11 and the MPEG LA pool for H.264. But patent pools are voluntary organizations and, unlike with the IEEE and ITU, Motorola has no contractual obligation to these pools. Motorola has not joined these pools. As Mr. Dailey will explain, Motorola invests nearly $1.5 billion annually in R&D. Motorola – like other high-technology companies – is entitled to recover a fair return on this investment through patent licensing, if it chooses. Certain companies will not join pools as licensors because low pool royalty rates do not permit a fair return on R&D investment. ██████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

MOTOROLA'S TRIAL BRIEF - 5
CASE NO. C10-1823-JLR

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone: (206) 676-7000
Fax: (206) 676-7001

1  ████████████████████████████████████████████████

2        As a plaintiff relying on these pools, Microsoft necessarily bears the burden of showing

3  that they are "comparable" to the real-world negotiation between Microsoft and Motorola.[6]  *See,*

4  *e.g.*, *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1329 (Fed. Cir. 2009).  Microsoft,

5  however, cannot meet this burden.  As the Court recognized during the *Daubert* hearing (Oct. 18,

6  2012 Hr'g Tr. at 39) and as Mr. Roger Smith, Motorola's patent pool expert, will explain, patent

7  pools are fundamentally different from, and typically have much lower rates than, private arms'-

8  length negotiated licenses.  There are many reasons for this, including: (1) the principal objective

9  of these pools is to minimize royalty exposure and maximize freedom of operation for licensees;

10  (2) pools that allocate revenue based on patent-counting ignore the value of the patents, which

11  deters holders of high-value SEPs from joining as licensors; (3) due to the non-negotiable nature

12  of pool patent licenses, royalty rates must be low to entice licensees to join; (4) pools have low

13  licensing transaction costs that allow for lower rates; and (5) concerns over antitrust scrutiny deter

14  higher rates.  Generally, as recognized by Microsoft's expert, Dr. Lynde, the higher the value of an

15  owner's SEPs and the stronger its licensing program, the lower the incentive to join a pool.  Lynde

16  Depo. Tr. at 182:20-183:3.  Indeed, such an owner will see a greater return on its investment by

17  negotiating licenses with potential licensees.  For example, of the top eight firms holding SEPs for

18  H.264, three (Nokia, Motorola, and IBM) declined to join MPEG LA's H.264 pool.

19        As the Court recognized, "[t]he motivation of someone joining the pool and setting a pool

20  rate is not the same as Motorola's motivation, which is to maximize its return."  (Oct. 18, 2012

21  Hr'g Tr. at 40.)  Indeed, Microsoft did not join the MPEG LA pool to generate a licensing revenue

22  stream from its H.264 SEPs.  Dean Hachamovitch, Microsoft's Vice President in Charge of

23  Internet Explorer, explained in a blog that "revenue plays no part in our decision" to join the

24  MPEG LA pool.  Ex. 2840.  Rather, Microsoft sought to maximize its return by selling as many

25
26   [6] Microsoft's reliance on patent pools also belies its assertions about the EMVR.  The two pools relied on by
Microsoft as "comparables" include a fixed per unit rate, regardless of the product's price or whether the 802.11 or
H.264 functionality is the basis for customer demand.

MOTOROLA'S TRIAL BRIEF - 6
CASE NO. C10-1823-JLR

Summit Law Group pllc
315 Fifth Avenue South, Suite 1000
Seattle, Washington 98104-2682
Telephone: (206) 676-7000
Fax: (206) 676-7001

1   H.264 products as possible that were clear of infringement claims. █████████████

2   █████████████████████████████████████████████████████████████████████████

3   ████████████████████

4          Compelling evidence of the inappropriateness of using patent pools as comparables comes

5   from an email sent by Gary Sullivan, the Microsoft employee who served as chairman of the

6   committee that developed the H.264/AVC standard.  Ex. 2345.  ████████████████████

7   ███████████████████████████████████████████████████████████████████████████

8   ██████████████████████████████████████████████████████

9          ████████████████████████████████████████

10         ████████████████████████████████████████

11         ████████████████████████████████████████

12         ██████████████████████████

13   ███████  ████████████████████████████████████████████████████████████████

14   ███████████████████████████████████████████████████████████████████████████

15   ███████████████████████████████████████████████████████████████████████████

16   ███████████████████████████████████████████████████████████████████████████

17   ███████████████████████████████████████████████████████████████████████████

18   ████████████████████████████████████████████████████████████████████

19         Ignoring the general differences between pools and bilateral licenses and the fact that

20   Motorola has not joined these pools, Microsoft's experts have concocted a "multilateral *ex ante*"

21   approach to justify reliance on pool rates.  But neither the Via Licensing nor MPEG LA pool is

22   "multilateral" or "*ex ante*" – and indeed Microsoft has not pointed to *any* real-world negotiation

23   that was both "multilateral" and "*ex ante*" within its own definitions.  Dr. Lynde defines a

24   "multilateral" negotiation as requiring "full participation" of all patent holders and prospective

25   licensees.  Neither Via Licensing nor MPEG LA was negotiated with "full participation."  While

26   the 802.11 standard has (in Dr. Lynde's words) "in the hundreds or thousands" of SEPs and SEP

MOTOROLA'S TRIAL BRIEF - 7
CASE NO. C10-1823-JLR

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone: (206) 676-7000
Fax: (206) 676-7001

holders, the pool itself has only five licensors.  As for MPEG LA, it appears that fewer than two dozen[7] companies (out of over 1,100 licensees and licensors) were involved in establishing the terms of the agreement.  In recognition of this, during the October 18 oral argument, Microsoft's counsel conceded that MPEG LA is "not fully multilateral," and that the Via Licensing pool "is not as strong a comparable as the MPEG LA pool."  (Oct. 18, 2012 Hr'g Tr. at 44.)

Microsoft would also require that RAND terms be set *ex ante* – i.e., before the 802.11 and H.264 standards were adopted or widely implemented.  But Microsoft has not demonstrated that either of these pools is the result of an *ex ante* process.  In the case of Via Licensing, that pool agreement was established in 2005, nearly seven years after the original 802.11 standard was adopted in 1997.  And in the case of MPEG LA, the H.264 standard was adopted in May 2003 and the terms for the MPEG LA H.264 pool were agreed upon six months later in November 2003.

Microsoft's reliance on pools also contradicts the economic theory it has advanced throughout this litigation – that the value of a SEP should be the incremental value of that SEP over available alternatives.  Patent pools do not value patents in this way.  Indeed, the two pools Microsoft proposes as "comparables" do the *opposite* – these pools treat all patents (both weak and strong) as if they are equally valuable (or equally unimportant) and distribute royalties on an equal, per-patent basis.  This "patent counting" approach ignores the technology of the patent, its importance, its contribution to the standard, and its use.  This not only deters high-value SEP holders from joining these pools, but also means that the pool rates reveal nothing about the incremental value of any particular patent or portfolio in the pool.  And such patent counting directly contradicts what Microsoft's own Gary Sullivan said ██████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████  Ex. 2345.  Indeed, Judge Crabb expressed

---

[7] *See* http://www.mpegla.com/Lists/MPEG%20LA%20News%20List/Attachments/138/n_03-09-11_avc.html.

MOTOROLA'S TRIAL BRIEF - 8
CASE NO. C10-1823-JLR

skepticism that this was "an appropriate way" to proceed when Apple suggested that she adopt a similar patent-counting method.  (Nov. 5, 2012 Tr., Case No. 11-CV-178-BBC (W.D. Wis.), at 28.)

### C.   Hold Up and Stacking Are Not Proven Problems Here

Critically, Microsoft's theoretical "multilateral *ex ante*" approach is not necessary to address hold up and stacking.  For example, as Microsoft conceded in its proposed findings of fact, "[a]dopting a multilateral perspective means considering the aggregate royalty burden potentially imposed by all SEP holders; it does not require or imply that the actual negotiation of RAND license agreements should necessarily be conducted multilaterally.  Rather, ***it provides a larger contextual framework for private parties to use in evaluating proposed RAND terms in bilateral negotiations*** or for a court to consider in evaluating proposed RAND terms in the event of a dispute."  (Dkt. No. 454 ¶ 89.)  As the Court observed, "[e]very possibility exists that Microsoft's stacking concern could be addressed through a bilateral negotiation."  (Dkt. No. 490 at 26.)

Microsoft's experts admit they have *no specific evidence* that any of Motorola's successfully-negotiated SEP licenses has led to a stacking problem.  Indeed, given that Microsoft has taken just one 802.11 license and one H.264 license, it demonstrably does *not* have a stacking problem.  And Microsoft ignores that while stacking is a theoretical risk, Microsoft has not presented any credible evidence that it is a real-world problem for 802.11 or H.264.  This is because (1) many SEP holders do not license their patents, electing instead to save their patents for defensive purposes and (2) most SEP licenses are cross-licenses that yield lower "net" rates.

Regarding hold up, Microsoft's experts again admit that they have no specific evidence that Motorola has held up licensees.  Microsoft also ignores that nearly all of Motorola's licenses are cross-licenses.  In a cross licensing situation, there is minimal risk of hold up because both parties have portfolios to be licensed, subject to their RAND commitments.  If Motorola sought hold up, its licensee would most certainly either complain or seek hold up as well.  And given Microsoft's failure to identify any evidence of hold up, it is not surprising that, as the Court will hear, Microsoft's experts admit RAND terms can be reached through private bilateral negotiation.

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone: (206) 676-7000
Fax: (206) 676-7001

1

**D.      Microsoft's New SEP Licensing Paradigm Has Drastic Policy Implications**

2

Microsoft's "multilateral *ex ante*" "lens" or "perspective" flies in the face of industry and

3

SSO practice and is inconsistent with Microsoft's own public statements to the government even

4

after this case was filed.  On June 14, 2011, David Heiner, Microsoft's Vice President and Deputy

5

General Counsel, and Amy Marasco, Microsoft's General Manager, Standards Strategy and

6

Policy, sent a joint letter on behalf of Microsoft to the Federal Trade Commission, in which they

7

laid out a very different understanding of RAND than Microsoft now propounds to this Court.  *See*

8

Ex. 2970.  The reasonable positions in that letter highlight the policy implications of the Court

9

adopting or endorsing Microsoft's academic and unrealistic litigation paradigm.

10

As Microsoft stated in its FTC letter, the RAND commitment balances rights:

11

> Through ***balanced IPR policies*** that help make innovative technology available to
12

> implementers on reasonable terms, and that ***do not undercut the value of patented***
13

> ***technology or overly burden patent holders***, standards can help to catalyze
> innovation by encouraging companies to contribute their innovative technology to
14

> collaborative standards-setting activities and to share their intellectual property with
> others via the standardization process.  ***Standards will not fulfill their salutary***
15

> ***purposes if standards policies deter innovators from contributing patented***
> ***technologies or investing in further innovation related to standardized technology***.

16

*Id*.  By advocating a depressed patent pool rate in the guise of a "multilateral *ex ante*"

17

"perspective," Microsoft disrupts this balance by substantially favoring licensees at the expense of

18

patent holders.  As Microsoft itself recognized, this reduces the chance that SEP holders will

19

contribute to a new standard in the future.  Ironically, while Microsoft maintains that its paradigm

20

enables the ready adoption of strong standards, this paradigm would actually result in *weaker*

21

standards, because patent holders who invest billions of dollars in R&D will withhold their "crown

22

jewel" patents if they believe they will be forced to license their patents for pennies.

23

Microsoft's paradigm also would lead to unsettling results.  If Microsoft were correct that

24

RAND rates should be assessed through a multilateral *ex ante* "lens" and should approximate pool

25

rates, nearly all existing SEP licenses would potentially be viewed as non-compliant with RAND.

26

MOTOROLA'S TRIAL BRIEF - 10
CASE NO. C10-1823-JLR

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone: (206) 676-7000
Fax: (206) 676-7001

This would open the floodgates of litigation, and courts would be inundated with lawsuits by licensees trying to use the judicial system to re-negotiate their licenses. Such a result in no way comports with Microsoft's acknowledgement that RAND licenses are typically negotiated bilaterally after the standard is adopted or with Microsoft's FTC statement that "[p]roposals to somehow reduce 'RAND' to some uniform formula could undermine the value of current practices and restrict some of the flexibility that helps to enable current licensing practices and protect the defensive value of contributed patent technology." *Id*.

## III.    MOTOROLA'S PATENTS MAKE VALUABLE CONTRIBUTIONS TO THE STANDARDS AND TO MICROSOFT'S PRODUCTS

At trial, Motorola will offer evidence regarding (1) the nature, strength and importance of Motorola's essential patents to the 802.11 and H.264 Standards and Microsoft's products and (2) the rates of Motorola's previous SEP licenses, negotiated successfully under RAND commitments. *See, e.g.*, *Unisplay*, 69 F.3d at 519 (The patentee's prior license agreements "should carry considerable weight in calculating a reasonable royalty rate."); Chisum on Patents, Vol. VII, § 20.07[2][a], p. 20-1243 ("The theory underlying giving weight to [actual prior and existing] licenses is that the actual results reached by persons with conflicting economic interests constitute direct and reliable evidence of the fair market value of a license under the patent (i.e., the sum that a willing buyer and willing seller would have agreed to in hypothetical negotiations prior to commencement of infringement by the defendant).").

In particular, Mr. Donohoe will testify that in arriving at final royalty numbers he employed the kind of modified *Georgia-Pacific* approach recommended by Professor Schmalensee to emulate a hypothetical bilateral negotiation between the parties. He will testify that, in conducting his analysis, he considered information regarding Motorola's extensive licensing history for SEPs and numerous SEP licenses, information about the strength and scope of the parties' 802.11 and H.264 portfolios as provided by Motorola technical experts Dr. Timothy

MOTOROLA'S TRIAL BRIEF - 11
CASE NO. C10-1823-JLR

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone: (206) 676-7000
Fax: (206) 676-7001

1  Williams and Dr. Timothy Drabik respectively, as well as information provided by Motorola

2  expert Michael Dansky regarding the value of the parties' 802.11 and H.264 portfolios and the

3  importance of the standards and the parties' patents to the parties' respective product lines.

4  **A.      The Parties' 802.11 Portfolios**

5        The 802.11 Standard is a wireless communications standard colloquially known as "Wi-

6  Fi," and is the most widely used and universally accepted wireless communications standard for

7  ordinary consumer and business use.  In recent years, there has been a steadily predominant trend

8  to provide 802.11-compatible Wi-Fi in personal computers, laptops, video game consoles, cellular

9  telephones, smartphones, and many other consumer and business products.

10       The IEEE 802.11 working group issued its first Standard in 1997.  Subsequently, the

11 802.11 working group issued various amendments to the original Standard including amendments

12 for different communications protocols (802.11a, (b) (g)), improved security (802.11i), quality of

13 service (QoS) (802.11e), and higher throughput (802.11n).  Periodically, the various 802.11

14 amendments were consolidated into a single document – of particular relevance here is IEEE

15 802.11-2007 (in 2007) (Ex. 427), and IEEE 802.11-2012 (in 2012) (Ex. 386A).

16       Each communication protocol is capable of certain data rates.  In 1999, the "802.11a" and

17 "802.11b" protocols were approved.  802.11a devices can communicate at data rates up to 54

18 megabits/sec.  802.11b is slower (11 megabits/sec), but has a greater range than 802.11a.  In 2003,

19 the "802.11g" protocol was approved, which had the range of 802.11b and the data rate of

20 802.11a.  In 2009, the "802.11n" protocol was approved.  It specifies new technology including

21 the use of multiple antennas and data streams, to increase the data rate to 600 megabits/sec.

22       **1.      Motorola's 802.11 Patents are Directed to Core Features**

23       As of October 2010, when Motorola's offer was made and the negotiation would have

24 taken place, there were at least 23 patent families in Motorola's 802.11 portfolio.  Those patent

25 families include at least 48 Motorola U.S. patents, and in addition many foreign counterparts to

26 those patents.  A summary list of Motorola's 802.11 SEPs is marked as Exhibit 3320.  As

MOTOROLA'S TRIAL BRIEF - 12
CASE NO. C10-1823-JLR

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

1    Motorola's expert Dr. Tim Williams will testify, Motorola's essential patents[8] are predominantly

2    directed to important core aspects of the Standard that are necessarily and widely used by devices

3    that are compliant with the 802.11 Standard.  The 23 Motorola 802.11 patent families can be

4    grouped into 9 general categories:  (A) network setup; (B) channel access management; (C) data

5    modulation techniques; (D) security and encryption; (E) power management; (F) low density

6    parity check codes; (G) data fragmentation; (H) fast transitions; and (I) mesh networking.  Some

7    of these groups are discussed in more detail below.

8            Of the 23 Motorola families of 802.11 essential patents, at least 11 families claim subject

9    matter that is used in Microsoft's Xbox products, based on the fact that Microsoft states that its

10   Xbox products are certified by the Wi-Fi Alliance to comply with the 802.11 Standard.   In

11   addition, a hypothetical negotiation would need to account for the likely use of Motorola 802.11

12   SEPs in future products (*e.g.*, Microsoft's recently released Surface tablet product).  Exs. 3379-80.

13           Significantly, there are no acceptable alternative approaches to the 802.11 technologies

14   covered by the Motorola essential patents that have been shown to have been actually considered

15   for implementation by the 802.11 IEEE Standards Organization.  Nor has it been shown how any

16   purported alternative would or could have been implemented in the Standard and, if implemented,

17   how the Standard would have been amended or rewritten, and what technological or commercial

18   advantages or disadvantages would have resulted.  Inadequacies of the approaches that Microsoft

19   argues as alternatives to Motorola's 802.11 patents are summarized in Ex. 3317.

20           **Some examples of Motorola's essential patent coverage of core 802.11 technologies:**

21           **(A) and (B) Network Setup and Channel Access Management:**  For the wireless 802.11

22   Standard, communication connections must be established over the airwaves before any further

23   communication can occur.  This is done by a predetermined exchange of control information

24

25   _____
     [8] A patent claim is essential to the 802.11 Standard if it is "necessary to create a compliant implementation of either
26   mandatory or optional portions of the normative clauses of the [Proposed] IEEE Standard when, at the time of the
     [Proposed] IEEE Standard's approval, there was no commercially and technically feasible non-infringing alternative."
     Ex. 5 at 14.  Motorola expert Dr. Williams compared a representative claim from the "parent" patent of each of the 23

MOTOROLA'S TRIAL BRIEF - 13
CASE NO. C10-1823-JLR

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone: (206) 676-7000
Fax: (206) 676-7001

between a wireless "station" (*e.g.*, a computer, smartphone or an Xbox console) and an "access point" (*e.g.*, a Wi-Fi router connected to Comcast cable or a Verizon phone line). If this exchange proceeds correctly, a wireless connection is established between the wireless station and access point. Because the access point is connected to the Internet, the wireless stations can communicate, via the router, over the Internet. If more than one station has established a connection to an access point, the nature of Wi-Fi communication is such that only one station can communicate at any one point in time. The 802.11 Standard provides for various "channel access management" techniques to enable multiple devices to efficiently share the channel.

Motorola's essential patent portfolio includes four families that cover key aspects of network setup and channel access management:    U.S. Patent Nos. 6,069,896 (Borgstahl); 6,331,972 (Harris); 5,142,533 (Crisler); and 6,404,772 (Beach).

**(C) Data Modulation Techniques:** Once a communication connection between a station and an access point is established, data can be communicated back and forth between the devices. In the 802.11 Standard, depending on whether the devices are using the 802.11a, 802.11b, 802.11g or 802.11n versions, various modulation techniques are specified by the Standard. Generally, "modulation" refers to the manner in which the basic "carrier wave" of the wireless transmission is varied over time in order to encode the data that is being transmitted. For example, AM radio uses amplitude modulation, where the amplitude of the carrier wave is varied to transmit voice, music and other information. The modulation techniques specified by the 802.11 standard are considerably more sophisticated. Motorola's six standards-essential data modulation patent families are directed to important aspects of these modulation techniques. Those families are: U.S. Patent Nos. 6,473,449 (Cafarella); 5,329,547 (Ling); 5,822,359 (Bruckert); 5,519,730 (Jasper); 5,272,724 (Solomon); and 6,038,263 (Kotzin).

**(D) Security and Encryption:** Any commercially practical implementation of the 802.11

---

Motorola 802.11 essential patent families to the 802.11 Standard to verify essentiality under the IEEE's definition. The claim charts reflecting this analysis are marked as Exs. 3293-3316.

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone: (206) 676-7000
Fax: (206) 676-7001

Standard must provide security for the communication in order to prevent eavesdropping and ensure authentic communication.   Motorola has four patent families that are essential to the security provisions of the 802.11 Standard: U.S. Patent Nos. 5,357,571 (Banwart); 5,467,398 (Pierce); 5,689,563 (Brown); and 5,412,722 (Sherly).

**(E) Power Management:**  Power management is important when wireless capability is provided in portable, battery-powered devices.   Motorola patents that are essential to this key aspect of the Standard are U.S. Patent Nos. 5,029,183 (Tymes) and 5,479,441 (Kramer) (members of the same family); 5,560,021 (Vook); and 6,236,674 (Morelli).

**(F) Low Density Parity Check Codes ("LDPC"):** Motorola has three families relating to LDPC – U.S. Patent Nos. 7,143,333 (Blankenship); 7,165,205 (Blankenship); and 7,493,544 (Nimbalker).  These patents are effective for correcting communication errors caused by noise or poor transmission conditions, and are expected to be important for future Wi-Fi applications.

**(G), (H), and (I):** The remaining Motorola patent families – U.S. Patent Nos. 5,311,516 (Kuznicki) (Data Fragmentation); 7,236,477 (Emeott) (Fast Transitions); and 7,197,016 (Belcea) (Mesh Networking) – are more peripheral to the 802.11 Standard, and would have less significance in a hypothetical negotiation, but nonetheless should be accorded reasonable value.

## 2. Microsoft's Products Use Motorola's Patents to Satisfy Consumer Demand

Based on the fact that Microsoft states that its Xbox products comply with the 802.11 Standard and bear the Wi-Fi logo (*e.g.*, Exs. 562, 2040, 2236, 2329), those products use at least the following 11 Motorola 802.11 essential U.S. patents:   6,069,896 (Borgstahl); 6,331,972 (Harris);6,473,449 (Cafarella); 5,329,547 (Ling); 5,822,359 (Bruckert); 5,519,730 (Jasper); 5,272,724 (Solomon); 5,142,533 (Crisler); 5,357,571 (Banwart); 5,467,398 (Pierce); and 5,689,563 (Brown).   Consumer demand for the Xbox is in part driven by the portions of the 802.11 Standard (e.g., network setup and channel access) on which Motorola's patents read.[9]

---

[9] For example, until the Xbox included 802.11 capability, Xbox 360 sales were generally stagnant from 2007-2009. Microsoft's witness Albert Penello confirmed that it would be "difficult to sell an Xbox console if it did not have the

MOTOROLA'S TRIAL BRIEF - 15
CASE NO. C10-1823-JLR

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone: (206) 676-7000
Fax: (206) 676-7001

The Xbox is the smallest saleable unit sold by Microsoft that provides complete 802.11 functionality.  The Xbox uses an integrated circuit chip that provides some, ***but not all***, of the Wi-Fi capabilities of the Xbox.  According to internal Microsoft documents, the Xbox itself, not the Wi-Fi chip, is used to perform at least some 802.11 functionality.  Exs. 2029-2030.  Moreover, without other circuitry and software provided by Xbox, the Wi-Fi chip, by itself, cannot communicate or otherwise function with even those aspects of the 802.11 Standard that are implemented in circuitry within the chip.  For example, the Xbox implements the 802.11 Standard's highest level of security in order to be certified compliant by the Wi-Fi Alliance, and Motorola's Banwart patent includes claim limitations that read on security functions carried out in the processor and memory of the Xbox, not in the Wi-Fi chip.

Microsoft's new Surface tablet will use only 802.11, instead of cellular or wired connections, to connect to the internet.  Exs. 3379-3380.  Without 802.11 capability, the Surface tablet would be unable to compete in the market, because consumers can readily select tablet devices other than the Surface that have 802.11 capability.

### 3.    Microsoft's 802.11 Patents

Microsoft owns 6 families of patents that it has claimed are essential to the 802.11 Standard.  At least four of the Microsoft patent families, however, are in fact not essential.  Moreover, the two remaining patent families that arguably are essential relate to aspects of the Standard that are peripheral to the normal use of the Standard, and relate to 802.11 technology that has not been widely adopted in actual commercial use.  Neither of these two arguably essential Microsoft patents is used in any Motorola 802.11-compliant product.

## B.    The Parties' H.264 Portfolios

### 1.    Motorola's H.264 Essential Patents are Directed to Core Features

Motorola has 16 U.S. patents, and many foreign counterparts, that are essential – as

---

ability to connect wirelessly to the internet."  Ex. 2817.  With embedded 802.11 capability, such sales are now projected to reach nearly $30 billion by 2017.  Ex. 2467.

MOTOROLA'S TRIAL BRIEF - 16
CASE NO. C10-1823-JLR

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

defined by ITU/ISO/IEC – to the practice of the H.264 Standard.[10]  These 16 essential patents fall within 6 families, all directed to core aspects of the H.264 Standard.

U.S. Patent No. 5,235,419 ("The Krause Family").  The Krause Family is directed to compressing effectively certain types of video data.  The data is first compressed using different block sizes. The encoder then transmits the compressed block data and a code word for the block size that results in the most compression.  The Krause Family also describes a decoder that receives the compressed block data and the code word, and uses the code word to recover a motion vector.  Having the motion vector, the block data can then be decompressed.  The adaptive compression technology claimed in the Krause Family is important to the H.264 Standard because it is directed to a fundamental prediction technique that improves coding efficiency.  The Krause Family is essential to the H.264 Standard at every Level of the Baseline, Main, and High Profiles.

U.S. Patent No. 5,376,968 ("The Wu Family").  The Wu Family is also directed to compressing video data effectively.  Here, blocks of a "superblock" (i.e. macroblock) are compressed using different compression modes.  An encoder selects the most efficient mode for compressing the blocks, and then transmits the compressed macroblock and data indicating which compression mode was used.  The Wu Family further describes a decoder that performs the reverse process.  Like the Krause Family, the technology claimed in the Wu Family is important to the H.264 Standard because it is fundamental to prediction, the core feature of H.264 that is responsible for much of H.264's coding gain.  The Wu Family is essential to the H.264 Standard at every Level of the Baseline, Main, and High Profiles.

U.S. Patent No. 6,005,980 ("The Eifrig Family").  The Eifrig Family is directed to compressing efficiently video data that includes a field coded block.  A prediction motion vector ("PMV") is derived for a block based on the motion vectors of a particular set of three neighboring blocks.  The technology claimed in the Eifrig Family is important to the H.264 Standard because it

---

[10] Motorola has one additional U.S. Patent 6,836,514 directed to error correction, an optional feature provided in Annex B3 of the H.264 Standard.

MOTOROLA'S TRIAL BRIEF - 17
CASE NO. C10-1823-JLR

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone: (206) 676-7000
Fax: (206) 676-7001

provides a more efficient motion compensation technique.  Specifically, it provides greater coding gain by using the three neighboring blocks – left, top, and top-right – to calculate the PMV.  The Eifrig Family is essential to the H.264 Standard at the Main and High Profiles, Levels 2.1 to 4.1.

U.S. Patent Nos. 6,980,596, 7,310,374, 7,310,375, 7,310,376, 7,310,377, 7,421,025, 7,477,690, 7,817,718 (collectively, "The MBAFF Family").  The MBAFF Family is directed to adaptive frame/field ("AFF") coding on a group of neighboring macroblocks, e.g., a pair of macroblocks.  Coding macroblocks in pairs is referred to as macroblock adaptive frame/field ("MBAFF") coding in the H.264 Standard.  As disclosed in the '596 patent, it is preferable in some applications to be able to divide macroblocks coded in field mode into the same 7 block sizes as macroblocks coded in frame mode ($16\times16$ pixels, $16\times8$ pixels, $8\times16$ pixels, $8\times8$ pixels, $8\times4$ pixels, $4\times8$ pixels, and $4\times4$ pixels).  This can be achieved by performing AFF coding on macroblock pairs instead of on single macroblocks.

MBAFF is an innovative feature of H.264, which greatly enhanced coding efficiency. Motorola's MBAFF invention was adopted after experts from Sony and VideoTele confirmed Motorola's findings that MBAFF outperformed available alternatives by up to 18%.  Sony stated that: "We regard this feature [MBAFF] important for developing SDTV/HDTV applications with JVT [Joint Video Team] coding technology."  Ex. 2274 at 1.  Similarly VideoTele reported that: "Our simulation results support that macroblock-level frame/field adaptive coding is a useful technique . . . giving a bit rate savings of 11% to 18% on the two sequences tested."  Ex. 2227 at 4.  The MBAFF Family is essential to the H.264 Standard at the Main and High Profiles, Levels 2.1 to 4.1.

U.S. Patent Nos. 7,769,087, 7,660,353, and 7,839,931 (collectively, "The PAFF Family"). The PAFF Family is directed to improving a coding technique called "PAFF," which involves deciding, on a picture-by-picture basis, whether to code a picture in a frame mode or in a field mode (as opposed to making such decisions separately for each pair of macroblocks in a picture (MBAFF)).  The PAFF Family improved the efficiency of applying PAFF to "bi-predicted" pictures, which are pictures having two motion vectors, and provide for greater reduction in bit

Summit Law Group pllc
315 Fifth Avenue South, Suite 1000
Seattle, Washington 98104-2682
Telephone: (206) 676-7000
Fax: (206) 676-7001

rates through flexibility not found in prior PAFF methods.  The PAFF Family is essential to the H.264 Standard at the Main and High Profiles, Levels 2.1 to 4.1.

U.S. Patent Nos. 7,162,094 and 6,987,888 (collectively, "The Scan Family").  The '094 and '888 patents are directed to scan paths optimized for interlaced video.  The '094 patent discloses a scanning pattern for a 4×4 pixel block's frequency coefficient array.  The '888 patent discloses a scanning pattern for an 8×8 pixel block's frequency coefficient array.  The inventions disclosed in the Scan Family are important because they improve coding efficiency.  Specifically, the 4×4 and 8×8 scan patterns result in significantly more compression than the traditional zigzag pattern in many applications, including interlaced video coding.

The inventions of Motorola's Scan Family were adopted into the standard after experts from Samsung and Sony confirmed Motorola's findings that the inventions outperformed available alternatives.  Samsung stated that: "The computer simulation carried out using the current JM2.1 codec with CVLC demonstrated that additional bit rate reduction (BDBR) of up to 8.64% and 6.15% on average is possible."  Ex. 2281 at 5.  Sony stated that: "The simulation results show that by employing the proposed method coding efficiency gain by up to 3% will be obtained."  Ex. 710 at 2.  The '094 patent is essential to the standard at the Main and High Profiles, Levels 2.1 to 4.1, and the '888 patent is essential at the High Profile, Levels 2.1 to 4.1.[11]

### 2.   Microsoft's Products Use Motorola's Patents to Satisfy Consumer Demand

Microsoft sells and has sold numerous products that are compliant with the H.264 Standard, including the Xbox, Windows 7, Window 8, Windows Vista, Windows Embedded, Zune for Windows Expression, Windows Phone 7, and now the new Surface tablet.  Each of these products supports Profiles and Levels covered by Motorola's H.264 patents.  As explained above,

---

[11] Microsoft's assertions that Motorola's patents are invalid over prior art is flawed, because the alleged prior art identified by Microsoft's expert lacks elements disclosed in the claims of Motorola's patents.  Microsoft's assertion that the Krause and Wu patents do not cover software decoders is equally flawed, because one of ordinary skill reading the specifications (including the references to algorithms) would understand that the "decoder apparatus" could be implemented in hardware or software.  In any event, this is a hypothetical license negotiation, not a patent trial.  The parties will not have resolved individual patent disputes in such a negotiation.

MOTOROLA'S TRIAL BRIEF - 19
CASE NO. C10-1823-JLR

1  Motorola's patents span the Baseline, Main and High Profiles, and in particular Profiles and

2  Levels used for High Definition ("HD") video.  Because a compliant decoder operating at these

3  Profiles/Levels must implement all tools for that Profile and Level, Microsoft's products use the

4  technologies claimed in Motorola's H.264 patents.  Dr. Drabik confirmed, for example, that the

5  Xbox, and Windows 7 running on a laptop computer, both play H.264 progressive and interlaced

6  video, including MBAFF-encoded video.  Additionally, Dr. Sukumar confirmed that Xbox users

7  use their consoles to watch video, including interlaced video and MBAFF-encoded video.[12]

8  Microsoft's products use Motorola's patented H.264 technologies to satisfy consumer

9  demand for devices that play a wide range of digital video content.  For example, during

10  development of Windows 7, Microsoft's consumer research found that consumers highly valued

11  HD video playback.  Ex. 2377 at 30; DeVaan Depo. Tr. 80:12-25, 82:8-19. ████████████

12  ███████████████████████████████████████████████████████████████ DeVaan

13  Depo. Tr. at 84:10-11. ████████████████████████████████████████████

14  █████████████████████ *Id*. at 42:19-22. ██████████████████████████

15  █████████████████████ *Id*. at 42:12-14. ██████████████████████

16  ████████████████████████████████████████████████████████████████

17  ████████████████████████████████████████████████████████████████

18  ████████████████████████████████████████████████████ Ex. 2373.

19  ████████████████████████████████████████████████████████████████

20  ████████████████████ *Id.* at 58:17-19.

21  Because consumers were installing H.264 codecs, Microsoft decided to support H.264. █

22  ████████████████████████████████████████████████████████████████

23  ████████████████████████████████████████████████████████████████

24  █████████████████████ *Id.* at 49:16-23. ███████████████████████

25

26

[12] To the extent it matters, Microsoft's Xbox product has been found by an ITC judge to infringe the '596 MBAFF and '094 scan patents (Ex. 428); the Xbox and Windows 7 products have been found to infringe the German counterparts to the '419 Krause and Wu '968 patents (Exs. 2206, 2239).

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone: (206) 676-7000
Fax:  (206) 676-7001

1 ███████████████████████████████████████████████████████

2 ███████████████████████████████████     Ex. 2373; DeVaan Depo. Tr. 59:7-16.

3      Similarly, Microsoft recognized consumer demand to play video using the Xbox.  In 2006,

4  Microsoft sold an HD DVD accessory to allow customers to play HD video, including H.264

5  video.  Then, in 2007, Microsoft put native H.264 support in the Xbox.  Now, Microsoft touts the

6  Xbox as the "all-in-one entertainment center" and reports that users are watching 30 hours of

7  video per month on the Xbox.  Ex. 3375.

8      Without H.264 capability, Microsoft would have difficulty selling its products, because its

9  products would be unable to play a significant and growing proportion of H.264 video content.

10           **3.      There Were No Comparable Alternatives to Motorola's Patents at the
                        Time the H.264 Standard Was Adopted**

11

12      Motorola's inventions were adopted into the H.264 Standard because they achieved better

13  coding efficiency than other technologies proposed at the time by experts involved in the JVT,

14  which included Microsoft.   The technologies to which Microsoft now points as allegedly

15  comparable to Motorola's inventions are, in most cases, technologies that were not recognized as

16  viable alternatives during development of the H.264 Standard.  In the cases in which Microsoft

17  points to alternative technologies that were considered in connection with H.264, the allegedly

18  comparable alternative was not shown to provide the efficiency the JVT experts sought to achieve.

19  For example, Microsoft points to scans submitted by Sony as alleged alternatives to Motorola's

20  Scan Family.   The JVT determined that Sony "[n]eed[ed] to demonstrate larger gain for

21  acceptance."  Ex. 2216 at 28.  Ultimately, Sony itself and others recommended the adoption of

22  Motorola's submission.   Similarly, the technology alleged by Microsoft as an alternative to

23  Motorola's MBAFF and PAFF Families – applying AFF to single macroblocks – was

24  characterized as "need[ing] more work" and abandoned.  Ex. 3382 at 7.

25           **4.      Microsoft's H.264 Patents**

26      Microsoft's claim of 40 essential patents is exaggerated because at least 17 are not

   essential:  15 are directed to optional features in Annexes B.3, C, D and E of the H.264 Standard

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone: (206) 676-7000
Fax:  (206) 676-7001

and at least 2 have narrow claim limitations that do not read on the H.264 Standard.  For the remaining 23 Microsoft patents, there were alternatives available at the time of the adoption of the H.264 Standard that offered comparable performance.  Some of these alternatives were presented to the JVT and demonstrated to meet or exceed Microsoft's patents.  For example, alternatives to Microsoft's transform patents were proposed by others and found by the JVT to perform equally well or better than Microsoft's patents.  Ex. 2217 at 1; Ex. 2216 at 18.

## IV.    DETERMINING A RANGE OF RAND RATES IN THIS CASE BASED ON A HYPOTHETICAL BILATERAL NEGOTIATION

Mr. Donohoe will testify, based on his long experience in licensing negotiations, that, in recreating the hypothetical negotiation between Microsoft and Motorola, he relied on the technical assessment of Drs. Williams and Drabik described above, as well as on 58 Motorola licenses that include patents in the H.264 and 802.11 portfolios.  Of these 58 licenses, he principally relied upon seven (notably including running royalty licenses to Option NV in 2004, RIM in 2010, and VTech in 2011) in determining a range of RAND royalty rates.  *See, e.g.*, Exs. 13, 2805, 2833.

### A.    Motorola's Licenses and Licensing Practices

Motorola's Mr. Dailey will testify regarding Motorola's long and successful history of engaging in bilateral negotiations that have led to RAND licenses.  He will explain that many of these agreements are for Motorola's cellular portfolios, which include certain patents that are also found in Motorola's 802.11 portfolio.  He will also explain that in recent negotiations, 802.11 and H.264 technology has become increasingly important to Motorola's competitors.

Mr. Donohoe will testify regarding his view of these agreements, including his reliance on seven specific licenses that include Motorola's 802.11 and H.264 portfolios in their entireties.  He will testify that several of these licenses, ███████████████████████████████████ █████████████████████████████████████████████████████████ █████████████████████████████████████████████████████████ █████████████████████████████████████████████████████████ ████████████████████████████ lead directly to some of his conclusions in this case.

MOTOROLA'S TRIAL BRIEF - 22
CASE NO. C10-1823-JLR

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

He will describe licenses entered into by Motorola's subsidiary, Symbol Technologies, which

██████████████████████████████████████████████████████████████████████████████

████████████████████████████ Exs. 36-39; *see also* Ex. 2944.  Finally, he will explain that

products covered by Motorola's licenses, including VTech's InnoTab 2 and RIM's PlayBook

tablets, utilize Motorola's portfolios in the same way that Microsoft would.  *See, e.g.*, Ex. 2801.

Microsoft criticizes Motorola for failing to apportion the royalty between the cellular and

non-cellular portfolios in certain licenses, but this ignores that conducting such an apportionment

would necessarily be arbitrary and contrary to how parties conduct real-world negotiations.

Indeed, the license parties themselves have not apportioned the value of these portfolios in the

agreements. █████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████

██████████████████████████████████

**B.      2.25% Is the Only Logical Starting Point**

As Mr. Donohoe will explain, these licenses demonstrate that there was no more logical

starting point for Motorola's opening offer, or for recreating the negotiation between the parties, than

2.25% of net selling price.[13] █████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████

---

[13] In the interest of recreating as closely as possible the actual negotiation that would have taken place between Microsoft and Motorola, it is at least relevant that, *in actuality*, Motorola's opening offer was 2.25%.  Motorola's numerous other licenses merely confirm that this is Motorola's standard, well-understood negotiating practice.

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone: (206) 676-7000
Fax: (206) 676-7001

1 ████████████████████████████████████████████

2   In this case, the 2.25% starting point was based on Motorola's standard offer for core SEP

3 portfolios, the actual opening offers to Microsoft for licenses to the 802.11 and H.264 portfolios,

4 ███████████████████████████████████████████████████████████

5 ███████████████████████████████████████████████████████████

6 ███████████████████████████████████████████████████████████

7 ████████████████████████████████████████████████████

8 **C.   The RAND Rates for the Parties' Portfolios**

9   Mr. Donohoe will testify that, using the *Georgia-Pacific* factors as a framework in

10 emulating a hypothetical bilateral negotiation, and relying on the technical opinions of Dr.

11 Williams and Dr. Drabik regarding the importance of the parties' patents to the respective

12 standards, and the financial opinions of Mr. Dansky regarding the importance of the standard (and

13 thus these patents) to the parties' products, he determined the following RAND rates:

| Portfolio | Net Payment to Motorola | Per Unit Range (Low/High) | | Running Royalty Range (Low/High) | |
|---|---|---|---|---|---|
| ████ | ████ | ████ | ████ | ████ | ████ |
| | | ████ | ████ | ████ | ████ |

18 **V.   CONCLUSION**

19   In determining a RAND range, the Court should construct the hypothetical negotiation that

20 would have taken place between the parties in October of 2010 had Microsoft engaged in

21 negotiations at that time.  In simulating this negotiation, the Court should disregard Microsoft's

22 attempt to force Motorola into accepting low pool rates from two pools that Motorola has declined

23 to join and that are neither "multilateral" nor "*ex ante*" by Microsoft's own definitions.  Instead,

24 the Court should use the best evidence of what this licensing negotiation would have looked like:

25 the licenses that Motorola has successfully negotiated for these SEPs.

26

MOTOROLA'S TRIAL BRIEF - 24
CASE NO. C10-1823-JLR

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone: (206) 676-7000
Fax: (206) 676-7001

DATED this 7th day of November, 2012.

Respectfully submitted,

SUMMIT LAW GROUP PLLC

By */s/ Ralph H. Palumbo*
    Ralph H. Palumbo, WSBA #04751
    Philip S. McCune, WSBA #21081
    Lynn M. Engel, WSBA #21934
    *ralphp@summitlaw.com*
    *philm@summitlaw.com*
    *lynne@summitlaw.com*

By */s/ Thomas V. Miller*
    Thomas V. Miller
    MOTOROLA MOBILITY LLC
    600 North U.S. Highway 45
    Libertyville, IL  60048-1286
    (847) 523-2162

And by

    Jesse J. Jenner (*pro hac vice* )
    Steven Pepe (*pro hac vice* )
    Kevin J. Post (*pro hac vice* )
    Ropes & Gray LLP
    1211 Avenue of the Americas
    New York, NY  10036-8704
    (212) 596-9046
    *jesse.jenner@ropesgray.com*
    *steven.pepe@ropesgray.com*
    *kevin.post@ropesgray.com*

    James R. Batchelder (*pro hac vice*)
    Norman H. Beamer (*pro hac vice* )
    Ropes & Gray LLP
    1900 University Avenue, 6th Floor
    East Palo Alto, CA  94303-2284
    (650) 617-4030
    *james.batchelder@ropesgray.com*
    *norman.beamer@ropesgray.com*

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

Paul M. Schoenhard (*pro hac vice*
Ropes & Gray LLP
One Metro Center
700 12th Street NW, Suite 900
Washington, DC  20005-3948
(202) 508-4693
*paul.schoenhard.@ropesgray.com*

**Attorneys for Motorola Solutions, Inc.,
Motorola Mobility LLC and General
Instrument Corp.**

MOTOROLA'S TRIAL BRIEF - 26
CASE NO. C10-1823-JLR

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

**CERTIFICATE OF SERVICE**

I hereby certify that on this day I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Arthur W. Harrigan, Jr., Esq.
Christopher T. Wion, Esq.
Shane P. Cramer, Esq.
Calfo Harrigan Leyh & Eakes LLP
*arthurh@calfoharrigan.com*
*chrisw@calfoharrigan.com*
*shanec@calfoharrigan.com*

Richard A. Cederoth, Esq.
Brian R. Nester, Esq.
David T. Pritikin, Esq.
Douglas I. Lewis, Esq.
John W. McBride, Esq.
David Greenfield, Esq.
William H. Baumgartner, Jr., Esq.
David C. Giardina, Esq.
Carter G. Phillips, Esq.
Constantine L. Trela, Jr., Esq.
Ellen S. Robbins, Esq.
Nathaniel C. Love, Esq.
Sidley Austin LLP
*rcederoth@sidley.com*
*bnester@sidley.com*
*dpritikin@sidley.com*
*dilewis@sidley.com*
*jwmcbride@sidley.com*
*david.greenfield@sidley.com*
*wbaumgartner@sidley.com*
*dgiardina@sidley.com*
*cphillips@sidley.com*
*ctrela@sidley.com*
*erobbins@sidley.com*
*nlove@sidley.com*

T. Andrew Culbert, Esq.
David E. Killough, Esq.
Microsoft Corp.
*andycu@microsoft.com*
*davkill@microsoft.com*

DATED this 7th day of November, 2012.

/s/ *Marcia A. Ripley*
Marcia A. Ripley

MOTOROLA'S TRIAL BRIEF - 27
CASE NO. C10-1823-JLR

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001