The Honorable James L. Robart

1

2

3

4

5

6

7

8

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

9  | MICROSOFT CORPORATION, a Washington corporation,

CASE NO. C10-1823-JLR

10

Plaintiff,

DEFENDANTS' POST-TRIAL BRIEF

11

12  | v.

**REDACTED**

13  | MOTOROLA, INC., MOTOROLA MOBILITY LLC, and GENERAL INSTRUMENT CORPORATION,

14

15

Defendants.

16

17

18

19

20

21

22

23

24

25

26

Summit Law Group pllc
315 Fifth Avenue South, Suite 1000
Seattle, Washington 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ................................................................................................ 1

II.     SSOs AND THE RAND COMMITMENT.................................................... 2

III.    RAND SHOULD BE DETERMINED BY A HYPOTHETICAL BILATERAL
        NEGOTIATION ................................................................................................ 3

IV.     THE PARTIES' HYPOTHETICAL BILATERAL NEGOTIATION .............................. 4

        A.      *Georgia Pacific* Factor 1 -- Licensing Benchmarks ............................. 4

                1.      Motorola's 802.11 and H.264 Licenses Are the Best Benchmark............. 4

                2.      Motorola's 802.11 and H.264 Licenses Are Not Infected With Hold
                        Up And Do Not Contribute To A Stacking Problem................................ 8

                3.      The Via Licensing and MPEG LA Patent Pools Are Poor
                        Comparables ................................................................... 9

                4.      Microsoft's "Confirmatory" Evidence Should be Disregarded ............... 12

        B.      *Georgia-Pacific* Factors 6, 8, 9 and 13 – Motorola's SEPs are Important to
                802.11 and H.264 Standards and to Microsoft's Current and Future
                Products................................................................................................ 14

                1.      Motorola's 802.11 SEPs Are Technologically Valuable ........................ 14

                2.      Motorola's 802.11 SEPs Are Important To Microsoft's Products .......... 17

                3.      Motorola's H.264 SEPs Are Technologically Valuable ........................ 20

                4.      Motorola's H.264 SEPs Are Important to Microsoft's Products............. 22

                5.      The Technical Value of Microsoft's H.264 SEPs................................... 26

        C.      *Georgia-Pacific* Factor 15 -- The Hypothetical Negotiation ............................... 26

V.      CONCLUSION................................................................................................ 31

VI.     MOTOROLA'S OCTOBER LETTERS WERE SENT IN GOOD FAITH.................... 32

DEFENDANTS' POST-TRIAL BRIEF - i
CASE NO. C10-1823-JLR

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

## <u>TABLE OF CITATION ABBREVIATIONS</u>

| | |
|---|---|
| [Witness] Tr. x:y-z | page x, lines y-z of the deposition testimony of the indicated witness |
| 11/aa Tr. x:y-z | page x, lines y-z of the trial transcript of the indicated date |
| Ex. | Trial Exhibit No. |
| *Emphasis* | Unless otherwise indicated, all emphasis is added |

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone: (206) 676-7000
Fax: (206) 676-7001

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Allapattah Serv. v.Exxon Mobil*,
  61 F. Supp. 2d 1308 (S.D. Fla. 1999) ...................................................32

*Badgett v. Security State Bank*,
  116 Wash.2d 563 (1991) .................................................................32

*Boeing Co. v. United States*,
  86 Fed. Cl. 303 (2009) ...................................................................27

*Cellco Partnership v. FCC*,
  No. 11-1135, 2012 U.S. App. LEXIS 24849 (D.C. Cir. Dec. 4, 2012) ...................32

*Cornell Univ. v. Hewlett-Packard Co.*,
  609 F. Supp. 2d 279 (N.D.N.Y. 2008) ................................................13

*Dataquill Ltd v. HTC Corp.*,
  2011 U.S. Dist. LEXIS 138565 (S.D. Cal. 2011) ....................................30

*Dinkins v. Charoen Pokphand USA, Inc.*,
  133 F. Supp. 2d 1237 (M.D. Ala. 2001) ..............................................33

*Edmonson v. Popchoi*,
  155 Wash. App. 376 (Ct. App. Div. 1, 2010) ........................................32

*Harris v. Equilon Enters., LLC*,
  107 F. Supp. 2d 921 (S.D. Ohio 2000) ...............................................32

*J. Marymount, Inc. v. Bayer Healthcare, LLC*,
  No. 09-03110, 2009 U.S. Dist. LEXIS 118882 (N.D. Cal. Nov. 30, 2009) ...........33

*King Instr. Corp. v. Perego*,
  65 F.3d 941 (Fed. Cir. 1995).........................................................27

*Lucent v. Gateway*,
  580 F.3d 1301 (Fed. Cir. 2009).......................................................28

*Marine Polymer Tech., Inc. v. Hemcon, Inc.*,
  672 F.3d 1350, 1360 (Fed. Cir. 2012).................................................30

*Mondis Tech., Ltd. v. LG Elecs., Inc.*,
  Nos. 2:07–CV–565–TJW–CE, 2011 WL 2417367 (E.D. Tex. June 14, 2011)............27

*Multimedia Patent Trust v. Apple*,
  10-CV-2618, 2012 WL 5873711 (S.D. Cal. Nov. 20, 2012)...........................27

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone: (206) 676-7000
Fax: (206) 676-7001

*Procter & Gamble Co. v. Paragon Trade Brands, Inc.*,
   989 F. Supp. 547 (D. Del. 1997) ...........................................................................30

*Qwest Corp. v. Minnesota Public Utilities Comm'n*,
   684 F.3d 721 (8th Cir. 2012) ................................................................................32

*ResQNet v. Lansa*,
   594 F.3d 860 (Fed. Cir. 2010)............................................................................4, 30

*Riles v. Shell Explo. & Prod. Co.*,
   298 F.3d 1302 (Fed. Cir. 2002).............................................................................29

*Studiengesellschaft Kohle, m.b.H. v. Dart Indus., Inc.*,
   862 F.2d 1564 (Fed. Cir. 1988) ............................................................................30

*Transitron Elec. Corp. v. Hughes Aircraft*,
   487 F. Supp. 885 (D. Mass. 1980) .........................................................................34

*Unisplay, S.A. v. Am. Elec. Sign Co., Inc.*,
   69 F.3d 512 (Fed. Cir. 1995)................................................................................29

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone: (206) 676-7000
Fax: (206) 676-7001

## I.     INTRODUCTION

The Court faces difficult issues of first impression: (1) what methodology to use to determine a RAND rate, and (2) how to implement that methodology to determine RAND rates for a license to Microsoft of Motorola's SEPs.  To be as true as possible to what actually happens in the real world, the Court should recreate the licensing negotiation that would have taken place had Microsoft negotiated with Motorola in response to its October 2010 offer letters.

The focus of this bilateral negotiation should be on Motorola's past licenses.  As the Court heard from Motorola's licensing expert, Charles Donohoe, these licenses are negotiated, market transactions that are the best evidence of how Motorola and third parties in the real world have valued Motorola's portfolios when negotiating under a RAND commitment.  These license rates reflect the balance, which Microsoft itself has recognized, between (1) the right of SEP holders not just to recoup their substantial investment in R&D, but to receive fair value for their patents; and (2) the right of implementers to obtain reasonable (but not *de minimis*) rates for use of a standard.

During trial, Motorola's experts demonstrated that the reasonableness of the rates in Motorola's licenses is confirmed by the importance of Motorola's patented technology to the standards, and the value of the standardized technology to Microsoft's products.  As Motorola's experts, Drs. Timothy Williams and Timothy Drabik, explained, Motorola's patents are directed to core, fundamental features of both the 802.11 and H.264 standards.  And as the Court learned from Mr. Michael Dansky, 802.11 and H.264 technology provides functionality in Microsoft's products that consumers demand and that is critical for these products to succeed in the marketplace.

In stark contrast to Motorola's "real-world" approach, Microsoft's experts, inexperienced in licensing, dismiss Motorola's bilaterally negotiated licenses in favor of the sub-market rates of patent pools.  Microsoft's experts justify their reliance on pools as a benchmark by supposed "hold up" and "stacking" problems.   But the evidence shows that "hold up" and "stacking" are not problems with Motorola's licenses or in the 802.11 and H.264 industries.  There is no justification for ignoring the best evidence of value – Motorola's past licenses to these same patents – and

DEFENDANTS' POST-TRIAL BRIEF - 1
CASE NO. C10-1823-JLR

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

forcing Motorola and other SEP holders to license, against their wills, at depressed pool rates.

The impact of forcing SEP holders to license at pool rates would be significant and long-lasting.  These pools feature sub-market rates that heavily favor implementers and distribute royalties based on the number of patents a company has contributed to the pool, rather than on the actual value of a company's patents.  Thus, every patent, whether a fundamental contribution, or a mere "bozo tweak," is rewarded equally.  If an SEP holder with fundamental patents is forced to license its patents at "pool rates," it will be unlikely to contribute them to the standard.  Indeed, if companies like Motorola – which has invested $50 billion dollars over the past 20 years in R&D – are forced to license their SEPs for a fraction of their value, incentives for contributing to standards will be eliminated.  *See, e.g.*, Turner Tr. 75:3-9.  This will result in less collaboration among high technology companies, slower progress in the development of technology, and weaker standards to the detriment of the industry and consumers alike.  11/19 Tr. 146:6-147:11.

## II.   SSOs AND THE RAND COMMITTMENT

Standard Setting Organizations strive to create the best possible standards, which often require inclusion of patented technology.  This creates two issues for SSOs: (1) encouraging patent holders to contribute valuable patented technology to a standard; while (2) ensuring that implementers will have access to that standard, regardless of any patent coverage.  For decades, the RAND commitment established by SSO patent policies has worked successfully to balance the needs of patent holders and implementers in this regard, allowing patent holders to secure a reasonable return on their investment in developing patented technology, while assuring implementers that they will have access to a license on RAND terms.

The result has been broad participation in standards and incentives for innovation, resulting in adoption of robust standards in a variety of industries.  Maintaining this balance is critical to the long-term success of standards.  11/13 Tr. 168:16-169:10.  As Microsoft told the FTC:

> Through **balanced IPR policies** that **help make innovative technology available to implementers on reasonable terms**, and that **do not undercut the value of patented technology or overly burden patent holders**, standards can help to

Summit Law Group pllc
315 Fifth Avenue South, Suite 1000
Seattle, Washington 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

catalyze innovation by encouraging companies to contribute their innovative technology to collaborative standards-setting activities and to share their intellectual property with others via the standardization process. ***Standards will not fulfill their salutary purposes if standards policies deter innovators from contributing patented technologies or investing in further innovation related to standardized technology***. Ex. 2970 at 4-5.

*See also* 11/13 Tr. 167:15-168:8; 11/19 Tr. 136:22-137-138:3, 169:13-170:7.

The RAND commitment provides flexibility to allow SEP holders and implementers to determine RAND terms.  11/19 Tr. 62:19-63:12; 11/16 Tr. 65:15-66:2.  While SSOs do not dictate any particular method of doing so, such terms are typically determined through bilateral negotiation.  Ex. 2970 at 8 n.5, 14-15; 11/16 Tr. 137:21-138:6; 11/19 Tr.142:17-143:10; Heiner Tr. 33:6-8. Microsoft and its experts agree that bilateral negotiations can lead to RAND licenses. Ex 2970 at 7-8, 14-15; 11/13 Tr. 181:12-15; 11/16 Tr. 138:7-18.

## III.   RAND SHOULD BE DETERMINED BY A HYPOTHETICAL BILATERAL NEGOTIATION

In its *Daubert* Order, the Court observed that it "must employ a methodology which in some way reconstructs the negotiation that would have taken place between Microsoft and Motorola." Dkt. No. 490 at 22.  As Motorola's economist, Dr. Richard Schmalensee, explained, the most appropriate way to reconstruct that negotiation is to use a modified form of the well-known *Georgia-Pacific* hypothetical negotiation.  11/19 Tr. 149:16-150:17, 177:7-179:19.

*Georgia-Pacific* provides an established, reliable framework for simulating a real-world negotiation in damages cases – a helpful analog for RAND licensing.  Moreover, as the Court observed, the Federal Circuit "has consistently sanctioned the use of the *Georgia-Pacific* factors 'to frame the reasonable royalty inquiry.'" Dkt. No. 490 at 13.  The Court also noted that "other courts have spoken to the applicability of the *Georgia-Pacific* factors in determining a reasonable royalty in the RAND context." *Id.*  Indeed, there is significant support in the literature for employing a methodology like *Georgia-Pacific* to determine RAND terms. Dkt. No. 409 at 3, n5.

Microsoft, in contrast, advocates determining RAND terms using a theoretical multilateral *ex ante* framework.  But the fundamental flaw with this approach is that it is premised on the

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

existence of two problems – "hold up" and "stacking" – that, as explained below, are not problems in the 802.11 or H.264 industries, or for the parties in this case.   Microsoft's theoretical multilateral *ex ante* "negotiations," moreover, do not occur in the real world and, in fact, cannot be conducted under the auspices of many SSO policies, including those of the IEEE.   11/16 Tr. 67:11-68:10. [1]   Compounding this problem, an *ex ante* approach to valuing SEPs is impractical and inadvisable and would be completely infeasible in this case.   11/19 Tr. 139:4-142:7, 168:3-20.

## IV.   THE PARTIES' HYPOTHETICAL BILATERAL NEGOTIATION

### A.   *Georgia Pacific* Factor 1 -- Licensing Benchmarks

As explained below, Motorola's licenses (1) are arms-length, marketplace transactions negotiated in good faith under a RAND commitment with sophisticated licensees, (2) include the patents at issue in this litigation, (3) were not the product of hold up, (4) have not contributed to a stacking problem, and (5) are presumed reasonable.   As such, these licenses are the best evidence of the RAND rate and range for a license between Motorola and Microsoft.   11/19 Tr. 150:11-17; *ResQNet v. Lansa,* 594 F.3d 860, 869-70 (Fed. Cir. 2010).

Professor Hovenkamp's recent article endorses use of Motorola's licenses to determine RAND. [2]   Although he concedes that "computing FRAND royalties . . . is not easy," he agrees that it is "much easier" when "the FRAND-encumbered patent has been licensed to others, thus creating a 'yardstick' for measuring future royalties."   *Id*. at 8.   Thus, Prof. Hovenkamp agrees that, where licenses are available, they should be the foundation for determining a RAND rate.

#### 1.   Motorola's 802.11 and H.264 Licenses Are the Best Benchmark

Motorola's substantial historical investment in R&D has resulted in significant portfolios of important and valuable essential and non-essential patents.   To recoup that investment,

---

[1]   In response to questions from the Court, Microsoft's Dr. Lynde defined "*ex ante*" as before the effective adoption of the standard and "*ex post*" as after the standard.   11/16 Tr. 86:5-15.

[2]   Herbert J. Hovenkamp, *Competition in Information Technologies: Standards-Essential Patents, Non-Practicing Entities and FRAND Bidding*, No. 12-32, University of Iowa Legal Studies Research Paper (Nov. 2012), available at http://papers.ssrn.com/sol3/papers.cfm?abstract_id=2154203.

DEFENDANTS' POST-TRIAL BRIEF - 4
CASE NO. C10-1823-JLR

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone: (206) 676-7000
Fax: (206) 676-7001

Motorola has a long history of licensing its core SEP portfolios, including cellular, 802.11 and H.264, at its "standard offer" of 2.25% of the end product price. 11/20 Tr. 30:4-20, 36:18-20. As explained by Kirk Dailey, the former head of Motorola's licensing group, that "standard offer" resulted from Motorola's experience licensing its cellular portfolios in the early 1990s. Originally a fixed per-unit fee of $9, Motorola's rate was converted to a 2.25% royalty at the request of licensees, who were concerned that falling cell phone prices had pushed the effective rate for Motorola's patents higher than intended. *Id*. 36:23–37:8. Based on that experience, Motorola has continued to offer and enter into dozens of license agreements at or near this rate, including licenses for its 802.11 and H.264 technology.

Motorola's RAND licenses are complex agreements resulting from the exchange of sensitive business information during extensive good-faith negotiations. 11/20 Tr. 45-47, 119-121. Through the negotiation process, Motorola and its licensees are able to determine which way any balancing payments should flow, whether any caps should apply, how other non-monetary compensation will be paid, and whether additional portfolios will be selected under Motorola's "no stacking policy." 11/20 Tr. 136:15-137:4; PFF 33-37.

As is typical in the industry, Motorola requires a cross license under its licensee's SEPs to protect its own product business. 11/20 Tr. 34:14-24. This requirement is compliant with RAND. In fact, Motorola's LOAs with the ITU ***explicitly condition*** Motorola's RAND obligation on a grant back license. 11/20 Tr. 33:12-34:17; Ex. 2838 at 2. Without a grant-back, Motorola does not owe a RAND obligation to a prospective licensee.

During negotiations, VTech requested a license under Motorola's 802.11 and H.264 portfolios to "give

DEFENDANTS' POST-TRIAL BRIEF - 5
CASE NO. C10-1823-JLR

[VTech] some measure of protection on some future products on our road map" and proposed tiered royalty rates ranging from 0.5% to 2.5%. Ex. 2832; ███████████, ███████████

████████████████████████████████████████████████████████████

███████████████████████████████████ Microsoft's expert, Dr. Murphy, admitted that this agreement *was not the product of hold up*. 11/13 Tr. 184:5-10. Recently, VTech has launched two new tablets (the InnoTab 2 and 2S), both of which practice H.264 and 802.11 and are expected to generate significant royalty revenue in the near future. 11/20 Tr. 55:1-7; 3200; 3396.[3]

Mr. Donohoe testified that the Symbol licenses confirm his conclusions regarding the range of RAND rates for Motorola's SEPs. In 2007, Motorola acquired Symbol Technologies.

[3] ████████████████████████████████████████████████████████████

DEFENDANTS' POST-TRIAL BRIEF - 6
CASE NO. C10-1823-JLR

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone: (206) 676-7000
Fax: (206) 676-7001

1   11/20 Tr. 59:2-6. 

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18   Microsoft's experts argued that the ▮▮▮ and ▮▮▮ licenses are not appropriate

19   benchmarks because, under Motorola's "no stacking" policy, it is difficult to apportion the

20   royalties among the various licensed portfolios.  But a closer examination of these agreements

21   refutes that position.

22

23

24

25

26

DEFENDANTS' POST-TRIAL BRIEF - 7
CASE NO. C10-1823-JLR

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone: (206) 676-7000
Fax: (206) 676-7001

1

2

3      **2.      Motorola's 802.11 and H.264 Licenses Are Not Infected With Hold Up
               And Do Not Contribute To A Stacking Problem**

4      Microsoft's experts dismissed Motorola's licenses because of supposed hold up and

5   stacking concerns, but have no evidence that these are actual problems with Motorola's licenses.

6   Dr. Murphy, for example, testified that Motorola's licenses "could have hold up" and that *ex post*

7   licenses had the "potential" for hold up, but ultimately admitted that "hold-up has not necessarily

8   been a problem."  11/13 Tr. 162, 179-80, 201-02.  Dr. Simcoe admitted he has ***no evidence*** of hold

9   up in any Motorola's license – or, for that matter, in ***any*** license from ***any*** company, or even ***in***

10  ***this very case***.  11/16 Tr. 66:24-67:10.  And Dr. Lynde admitted he has no specific evidence of

11  hold up with Motorola's licenses.  11/16 Tr. 138:19-139:7; 11/19 Tr. 150:18-25.  Thus, their

12  testimony is fully consistent with Microsoft's statement to the FTC that hold up "occurs rarely"

13  and there is "little evidence" it is a "real problem."  Ex. 2970 at 6, 14-16.

14      Microsoft similarly presented no specific evidence of a stacking problem in the 802.11 or

15  H.264 industries generally.  11/13 Tr. 177:14-179:14; 11/16 Tr. 66:3-23, 139:10-141:15.[4]  As Dr.

16  Schmalensee explained, while the economic literature recognizes royalty stacking as a theoretical

17  concern, no actual stacking problem has been observed because, for example: (1) many SEP

18  holders retain their patents for defensive purposes and do not license them; (2) stacking is taken

19  into consideration during negotiations; and (3) parties tend to be reasonable because of the

20  repeated and reciprocal nature of licensing.  *Id.* at 148:8-18, 173:13-175:10; *see also* 11/19 Tr.

21

22  _____

      [4]      Microsoft's experts testified that stacking could become a problem if the Court adopts Motorola's proposed
23  rates.  11/16 Tr. 179:1-7.  But these opinions are nothing more that unsupported speculation.  For example, Dr.
      Murphy presented a demonstrative (Ex. 4006) that purported to show that a stacking problem would exist if the Court
24  found a RAND rate of 2.25% for Motorola's patents.  But Dr. Murphy admitted that his "simple" demonstrative was
      merely "illustrative"; it (1) assumed all potential licensors would try to license their patents (which has not been the
25  case), (2) assumed all would seek – and obtain – 2.25% for their patents (which does not conform to actual practice),
      (3) did not account for reductions in rate due to cross-licensing (which industry practice confirms is often the case),
26  and (4) did not account for potential differences in size, value, strength and importance between Motorola's portfolios
      and the portfolios of others (which must be considered in any negotiation).  11/13 Tr. 175:12-177:10.

DEFENDANTS' POST-TRIAL BRIEF - 8               SUMMIT LAW GROUP PLLC
CASE NO. C10-1823-JLR

176:3-177:2 ("I license you, you license me; if I am unreasonable to you, you are going to be unreasonable to me tomorrow.").  Moreover, most SEP licenses are cross-licenses that yield lower "net" rates, which further alleviates any stacking problem.  11/13 Tr. 176:17-20.  And there is little likelihood of Microsoft ever facing a stacking problem, as Microsoft ███████████████████████ ███████████████████████████████████████████████████████████████████.

Microsoft relies on two 2006 proposals submitted by Motorola and others to an unrelated standards body (ETSI) for an unrelated technology (cellular) to try to substantiate its purported stacking concern.  Exs.1031, 1033.  The first proposal suggested "introduce[ing] the principles of aggregated reasonable terms and proportionality into the [ETSI] FRAND definition."  Ex. 1031 at § 6; 11/16 Tr. 77:12-20.  This proposed revision was rejected.  11/16 Tr. 68-70.  Motorola's second proposal, which related to a proposed cellular patent pool, was also rejected.  Notably, even without these changes being implemented, a cellular stacking problem has not materialized and cellular technology has enjoyed widespread, worldwide success.  PFF 129-30.  If anything, the history of these proposals confirms that the concepts of aggregate reasonable terms/proportionality and patent pooling are not necessary to prevent stacking problems.

### 3.    The Via Licensing and MPEG LA Patent Pools Are Poor Comparables

Because a multilateral *ex ante* negotiation has never happened in the real world and is impossible to model accurately, Microsoft resorts to the MPEG LA H.264 and Via Licensing 802.11 patent pools (and their depressed rates) as supposed proxies for such a negotiation.  But these are poor comparables for a bilaterally negotiated license between Motorola and Microsoft.

***The characteristics of these pools make them poor comparables***.  Pool licenses are fundamentally different from and serve a different purpose than SSOs and bilaterally negotiated licenses.  PFF 143-46.  Microsoft's experts tried to justify reliance on these pools by attempting to find similarities between SSOs and patent pools.  But Microsoft's own Gary Sullivan, who helped lead the development of the H.264/AVC standard, refutes this false comparison:

DEFENDANTS' POST-TRIAL BRIEF - 9
CASE NO. C10-1823-JLR

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

> Do not mix up the notion of patent pools and open standards organizations. **They have NOTHING to do with each other**. Open standards organizations (e.g., ITU-T, ISO, IEC) have NO OPINION whatsoever on specific licensing terms and they do not force anyone to join any pool and **have no relationship whatsoever with any pools that do form**. Ex. 2345; 11/14 Tr. 37:4-40:2.[5]

Indeed, Motorola's economic expert, Dr. Richard Schmalensee, explained that while pools and SSOs both seek broad adoption of the standard, their motivations quickly diverge, making Microsoft's comparison inaccurate. 11/19 Tr. 147:12-148:7.

Here, the Court is determining a RAND rate for a bilaterally negotiated license to Motorola's patents based on the unique circumstances of Motorola and Microsoft. In contrast, the MPEG LA and Via Licensing pools do not include Motorola's patents and were negotiated by multiple parties based on their collective circumstances (and the desire for low rates to stimulate pool membership). Moreover, Microsoft is relying on these pools as proxies for its proposed multilateral *ex ante* negotiation, but these pools are neither fully multilateral nor *ex ante*. PFF 164-172. The Via Licensing pool has been unable over seven years to attract a meaningful number of licensors or licensees and is effectively a failure. PFF 179-84. Indeed, Microsoft told Via Licensing that it did not want to join because it preferred to license bilaterally, outside of the pool – exactly Motorola's position. 11/18 Tr. 152:5-155:19; Ex. 3194. And Dr. Lynde testified in a prior engagement for Fujitsu that a reasonable royalty for an 802.11 SEP would be higher than the Via Licensing pool rate – **_as much as 500% or more higher_**. 11/16 Tr. 175:13-176:17.[6]

**Microsoft's pools ignore patent value**. These pools also are poor comparables because they ignore the actual value and technical merit of patents and, instead, value all patents equally. This contradicts directly Microsoft's economic theories advanced at trial that "a RAND royalty must reflect the economic value of the patented technology" (11/13 Tr. 151:24-25, 153:1-10) and

---

[5]     And while Mr. Sullivan tried to distance himself from these statements during trial, his email clearly states that "anyone studying the situation would reach the same conclusions [as in his email] and say roughly the same thing. *There's no major insight here. I don't really understand how a different impression can persist.*" Ex. 2345.

[6]     While Microsoft argues self-servingly that the Via Licensing pool has been a failure because its rates are too high to attract licensees (*see, e.g.*,11/18 Tr. 117:18-23), an equally plausible explanation is that the rates were set too low to attract licensors. Regardless, the abject failure of the pool makes it completely inappropriate as a benchmark.

DEFENDANTS' POST-TRIAL BRIEF - 10
CASE NO. C10-1823-JLR

that a "reasonable royalty should be tied to the technical merit of the patent" (*id.* at 171:20-24). These pools do precisely the opposite – they distribute royalties on a per-patent basis and treat all patents (both weak and strong) as if they are equally valuable (or equally unimportant). PFF 157-63. This "patent counting" approach (1) is not used in bilateral licensing; (2) ignores the technology of the patent, its contribution to the standard and its use by licensed products; and (3) contradicts the irrefutable logic of Microsoft's Gary Sullivan, who observed that a company can charge more for "fundamentally-important IPR" than for a "Bozo tweak." Ex. 2345.[7]

*Microsoft's pools were not designed to maximize return*. As the Court recognized, "[t]he motivation of someone joining the pool and setting a pool rate is not the same as Motorola's motivation, which is to maximize its return." 10/18/12 Hr'g Tr. at 40. Indeed, the sub-market rates of the MPEG LA pool were motivated by a desire to limit royalty exposure for implementers, not to maximize return. Garrett Glanz, a Microsoft in-house attorney, confirmed that Microsoft lobbied actively for low rates and annual caps to protect its OEM customers and to limit the cost to Microsoft of integrating H.264 into PCs. 11/13 Tr. 97:6-99:16; Ex. 2961.[8] When these efforts were successful, it was lauded as a "business win." Ex. 2359 at 5; 11/13 Tr. 99:4-16, 104:12-105:19. Microsoft's Dean Hachamovitch, a Vice President, confirmed that "revenue play[ed] no part in our decision" to join the pool. Ex. 2840 at 2. Instead, Microsoft sought to maximize its profits by selling as many H.264 products as possible that were clear of infringement claims.

*Patent pools are voluntary organizations that companies should not be forced to join*. It is not unRAND for a company to reject a pool and seek "higher reasonable rates" outside of the pool. 11/13 Tr. 101:11-18; *id.* at 98:7-12; 11/16 Tr. 139:18-22, 151:7-13. As recognized by Dr. Lynde, the higher the value of a patent owner's SEPs and the more capable its licensing program,

---

[7]     Judge Crabb also expressed skepticism that patent counting was "an appropriate way" to determine a RAND rate. (Nov. 5, 2012 Tr., Case No. 11-CV-178-BBC (W.D. Wis.), at 28.)

[8]     Microsoft was not alone in lobbying for low rates and caps. Many of the companies with the largest potential exposure advocated for low rates and annual caps, including Sony, Fujitsu, Mitsubishi, Motorola, Samsung, and Nokia. 11/13 Tr. 78:8-17, 86:11-14; 97:6-13; Ex. 1139.

DEFENDANTS' POST-TRIAL BRIEF - 11
CASE NO. C10-1823-JLR

the lower its incentive to join a pool.  11/16 Tr. 145:21-146:3, 146:23-147:3.  Consistent with this, Mr. Glanz conceded that Motorola did not join MPEG LA because it believed "it was advantageous for them not to license through the MPEG LA pool."  *Id.* at 102:6-18.[9]  Indeed, Motorola has invested $50 billion in R&D over the last twenty years and its decision is in complete harmony with Mr. Sullivan's testimony that a patent holder is entitled to an "amount that *fairly compensates for the value of their IPR*."  Ex. 2345; 11/13 Tr. 169:11-20; 11/14 Tr. 14:16-15:1, 32:20-33:15; 11/16 Tr. 151:7-13; Ex. 3399.[10]  The effect of Microsoft's use of patent pool licenses as a comparable is to improperly force Motorola to join these pools against its will.

### 4.   Microsoft's "Confirmatory" Evidence Should be Disregarded

In an attempt to justify its patent-counting-based RAND rate, Microsoft relies on: (1) the ARM Holdings licensing program (11/16 Tr. 120:5-124:16); (2) a 2003 InteCap analysis (11/16 Tr. 124:17-22); and (3) Marvell's 802.11 chip price (11/16 Tr. 119:5-120:4).  None provides a reliable benchmark for determining a RAND rate and range applicable to Motorola's SEPs.

*Royalties Earned by ARM Holdings Are Not Reflective of a RAND Royalty for Motorola's 802.11 SEPs*.  Although Microsoft's Dr. Lynde purportedly relied on ARM's licensing program as a benchmark, he never read the license agreement that ARM uses in that program (11/16 Tr. 160:20-161:14), never familiarized himself with the agreement's restrictions on the scope of license (*id*. at 161:15-22), and presented no evidence regarding the number or nature of any patents covered by the agreement.  He similarly did not know whether the license covers only ASICs made with ARM tools, and admitted that if so, the license could be "quite a bit less valuable" than an unrestricted patent license.  Finally, Dr. Lynde conceded that the ARM license "is not a comparable to a multilateral *ex ante* negotiation…." 11/16 Tr. 160:13-15.

---

[9]     Even though Motorola was involved in the discussions that set the terms of the MPEG LA H.264 license, Motorola's decision not to join the pool was not unusual.  Indeed, Apple, Nokia, IBM, and Thompson all were involved in discussions with MPEG LA and none joined the pool at that time.  11/13 Tr. 117:2-119:2; 11/16 Tr. 150:5-152:4.  Similarly, Microsoft has not joined the 802.11 Via Licensing pool because "Microsoft prefers to enter into bi- lateral discussions with the Licensor's [*sic*] individually."  Ex. 3194; 11/16 Tr. 153:19-155:19.

[10]     Dr. Simcoe admitted that a RAND rate can be above a pool rate.  11/13 Tr. 119:3-190; 11/16 Tr. 72:6-10.

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

*The 2003 InteCap Analysis is Not Informative of a RAND Rate for Motorola's Current Portfolio of 802.11 SEPs*.   The InteCap study did not generate useful data applicable to Motorola's licensing efforts.   Indeed, as Dr. Lynde confirmed, the 2003 InteCap exercise considered only 5 Motorola 802.11 SEPs – only *one* of those was listed in the Annex of 802.11 patents offered to Microsoft in October 2010.   *Id*. at 164:8-23.   InteCap did not consider the strength of the later-acquired Symbol patents or the royalties they were awarded following successful litigation.   *Id*. at 166:3-19.   Dr. Lynde also did "nothing to assess the relative strength of the patents that InteCap considered, as compared to the patents at issue in this litigation owned by Motorola."   *Id*. at 165:14-21.   InteCap also did not account for changing circumstances regarding the use of 802.11 in the marketplace (*id*. at 163:18-23); and utilized "projections [that] fell short of reality" (*id*. at 164:3-7).   Ultimately, the InteCap analysis was viewed by Motorola only to determine whether there was "viability in proceeding."   Curtis Tr. 35:7.   Motorola wanted to do "a worst case assessment of what a minimal opportunity might be" – it was *not* an exercise in profit maximization, as Dr. Lynde suggested.   *Compare id*. at 38:7-8 *with* 11/16 Tr. 126:14-20.

*Marvell's 802.11 Chipset Is Not the Smallest Saleable Unit and Does Not Constrain a RAND Royalty for Motorola's 802.11 Patents*.   Dr. Lynde testified that application of Motorola's 2.25% rate to the price of the Marvell chipset would produce a royalty rate that corroborates the RAND rate that he calculated for Motorola's patents.   *Id*. at 119:20-120:4.   As explained below (*see* Section IV.B.2, *infra*), the economic value of Motorola's 802.11 technology is best measured by the value it provides to the user – not by the price of the Marvell chip.   Moreover, it is incorrect that Marvell's chipset, operating alone, practices each and every claim of the Motorola 802.11 patents.   *Id*. at 158:3-10; *see, e.g.*, *Cornell Univ. v. Hewlett-Packard Co.*, 609 F. Supp. 2d 279, 283, 288 (N.D.N.Y. 2008) (describing the "smallest salable unit" as the "patent-practicing unit," the "infringing unit," and the "unit incorporating [the patented] invention").   In fact, exactly the opposite was established by both Motorola's Dr. Williams (11/19 Tr. 71:12-13, 132:13-133:5) and Microsoft's Mr. Del Castillo (11/15 Tr. 25:15-19, ███).   According to a Microsoft engineer,

DEFENDANTS' POST-TRIAL BRIEF - 13
CASE NO. C10-1823-JLR

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone: (206) 676-7000
Fax: (206) 676-7001

components of the Xbox outside of the Marvell chip are used to perform significant parts of the 802.11 functionality. Ex. 502 at ¶ 54. For example, the Xbox implements the 802.11 Standard's highest level of security in order to be certified compliant by the Wi-Fi Alliance, and Motorola's Banwart patent includes claim limitations that read on security functions carried out in the processor and memory of the Xbox, not in the Marvell chip. 11/19 Tr. 98:15-100:13.[11]

## B. *Georgia-Pacific* Factors 6, 8, 9 and 13 – Motorola's SEPs are Important to 802.11 and H.264 Standards and to Microsoft's Current and Future Products

*Georgia-Pacific* Factors 6, 8, 9, and 13 relate to the importance and use of the patented technology and its implementation in the products that utilize it. In the context of a cross-license to a portfolio of SEPs, this suggests a two-step inquiry. The fact finder should consider (1) the value, benefit and importance of the patented technology in the context of the standards at issue and (2) the value and importance of that patented technology to the products at issue by considering, for example, sales revenue, market acceptance, profit, convoyed sales, and technical operation. As set forth below, the analysis for Factors 6, 8, 9 and 13 demonstrates that Motorola's 802.11 and H.264 patents are valuable and confirms the rate in Motorola's executed licenses.

### 1. Motorola's 802.11 SEPs Are Technologically Valuable

As of October 2010, Motorola's 802.11 portfolio comprised at least 23 patent families with at least 48 U.S. patents and hundreds of foreign counterparts. Ex. 1. Motorola's expert, Dr. Tim Williams, selected 24 patents (one from each of 22 families, and two from a 23rd family), analyzed the patents and file histories, selected and analyzed a representative claim from each, and prepared a claim chart correlating each to the 802.11 Standard. Dr. Williams thus verified that each claim was essential. 11/19 Tr. 70:10-71:5, 72:20-73:2, 74:18-22, 76:11-77:19, 109:15-25.[12]

---

[11]     Moreover, Marvell does not sell chips that include license fees embodied in that price. 11/19 Tr. 157:18-19. As Dr. Schmalensee testified, "[i]t is certainly not uncommon for the price of a product to vastly exceed the cost or price of the hardware involved because of intellectual property." *Id.* at 156:8-10.

[12]     For the most part, Microsoft does not dispute that Motorola's 802.11 patents are essential – Microsoft's expert, Dr. Jerry Gibson, simply assumed Motorola's patents were essential (indeed, were it otherwise, there would be no RAND obligation on Motorola's part, and this litigation would be moot as to the 802.11 Standard). 11/15 Tr. 156:21-157:18.  At trial, he attempted to modify this general assumption by raising some questions as to Dr.

DEFENDANTS' POST-TRIAL BRIEF - 14
CASE NO. C10-1823-JLR

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone: (206) 676-7000
Fax:  (206) 676-7001

Dr. Williams testified that Motorola's 802.11 SEPs are technologically valuable because they cover fundamental and core features of the Standard.   11/19 Tr. 71:6-8, 128:21-130:12, 133:14-134:2.  He considered eleven patent families covering various aspects of four core features of the Standard, and explained why the inventions of these patents *must* be used by any device certified as 802.11 compliant by the Wi-Fi alliance. *Id.* 73:12-22, 78:7-20, 79:10-16, 84:7-18:[13]

- **Network Setup:** 6,069,896 (Borgstahl, Ex. 171) and 6,331,972 (Harris, Ex. 177).  In 802.11, wireless connections must first be established by a predetermined exchange of control information between a wireless "station" (*e.g.*, smartphone or Xbox) and an "access point" (*e.g.*, a Wi-Fi router connected to the Internet) before any further communication can occur. 11/19 Tr. 84:19-20, 85:2-86:2.

- **Channel Access Management**: 5,142,533 (Crisler, Ex. 148) covers the situations where more than one 802.11 station has established a connection to an access point.   802.11 communication is such that only one station may communicate at any one point in time.  To determine when an 802.11-compliant device should transmit, Crisler implements a "listen before you talk" process.  This technique enables multiple 802.11 devices to share the channel efficiently. 11/19 Tr. 84:21-23, 86:3-23, 105:11-13.

- **Data Modulation Techniques**:  Five patents – 6,473,449 (Cafarella, Ex. 180); 5,329,547 (Ling, Ex. 156); 5,822,359 (Bruckert. Ex. 170); 5,519,730 (Jasper. Ex. 164); and 5,272,724 (Solomon, Ex. 151) – relate to basic aspects of the sophisticated modulation techniques used in 802.11.  Different combinations of these patents are used depending on whether the 802.11a, 802.11b, 802.11g, or 802.11n version of the standard is being used.  11/19 Tr. 84:23-24, 86:24-87:22.

- **Security and Encryption**: 5,357,571 (Banwart, Ex. 157), 5,467,398 (Pierce, Ex. 161), and 5,689,563 (Brown, Ex. 169).  Any practical implementation of 802.11 must provide compliant security for the communication to prevent eavesdropping and ensure authentic communication.  11/19 Tr. 84:24-85:1, 87:23-88:19.

Three additional families cover core features that certain types of 802.11 devices must use, 11/19 Tr. 73:23-74:9, 79:17-80:1:

- 6,404,772 (Beach, Ex. 179), required by access point devices, is directed to core aspects of channel access management.  11/19 Tr. 79:23-24.

- 6,038,263 (Kotzin, Ex. 383) covers MIMO technology used in 802.11n devices, and is rapidly increasing in importance and value.  11/19 Tr. 79:5-9, 24-25.

- 5,412,722 (Sherly, Ex. 160) covers important aspects of group key encryption. 11/19 Tr. 80:1.

---

Williams' essentiality analysis of two of the Motorola patents, but Dr. Williams refuted these assertions.  11/15 Tr. 108:22-109:7; 11/19 Tr. 94:19-95:3; 11/15 Tr. 107:22-108:21; 11/19 Tr. 95:5-11.

[13]    The "Wi-Fi Alliance" has established a certification program whereby companies submit products for testing to verify compliance with the Standard.  Certified products are permitted to display the Wi-Fi Alliance logo.  11/19 Tr. 80:20-81:24; Ex. 2329 at 31; Ex. 2329A.

DEFENDANTS' POST-TRIAL BRIEF - 15
CASE NO. C10-1823-JLR

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone: (206) 676-7000
Fax:  (206) 676-7001

Motorola's nine remaining families are required for important advanced features that may or may not be used in a particular 802.11 device, 11/19 Tr. 74:10-17, 80:2-19:

- **Power Management**:  U.S. Patent Nos. 5,029,183 (Tymes, Ex. 2013) and 5,479,441 (Kramer, Ex. 2014) (members of the same family); 5,560,021 (Vook, Ex. 166); and 6,236,674 (Morelli, Ex. 2016), concerning power management, are important for battery-powered portable devices.  11/19 Tr. 80:6-15.

- **Low Density Parity Check Codes**:  7,143,333 and 7,165,205 (Blankenship, Exs. 181, 183) and 7,493,548 (Nimbalker, Ex. 2019) relate to "LDPC" codes. LDPC codes correct communication errors caused by noise or interference, and are expected to be mandatory in the near future.  11/19 Tr. 80:15-17.

- **Data Fragmentation, Fast Transitions, Networking**:  5,311,516 (Kuznicki, Ex. 154) (Data Fragmentation); 7,236,477 (Emeott, Ex. 101) (Fast Transitions); and 7,197,016 (Belcea, Ex. 100) (Mesh Networking).  11/19 Tr. 80:6-19.

Some of the patents that Dr. Williams considered have expired, and so would pertain only to past damages.  But the Motorola 802.11 portfolio is a dynamic asset, and as some patents expire other recently issued patents join the portfolio.  11/19 Tr. 78:21-79:9, 80:15-17.  What Microsoft does not use today (e.g., in Xbox) it might use tomorrow (e.g., in Surface tablets).  This is precisely why parties seek portfolio licenses when licensing SEPs.[14]

Significantly, none of Microsoft's purported alternatives to the 802.11 technologies covered by the Motorola's essential patents were, in fact, credible, acceptable alternatives.  None were shown to have been actually considered for implementation by the IEEE.  Nor was it shown how any purported alternative would or could have been implemented in the Standard and, if implemented, how the Standard would have had to be further amended or rewritten, and what technological or commercial advantages or disadvantages would have resulted.  Nor was it shown that any alleged alternative actually would have fallen outside the scope of the Motorola patent that it purports to replace.  11/19 Tr. 71:17-19, 102:17-106:4.  Indeed, Dr. Gibson admitted that he was wrong as to at least one alleged alternative.  11/15 Tr. 169:14-175:12.  Another alternative was based on his undergraduate textbook, whereas the technology of the standard requires far

---

[14]    Microsoft owns seven patents that it says are essential to the 802.11 Standard.  At least five, however, are in fact not essential.  And the two remaining patents that arguably may be essential relate to subject matter that is peripheral to the normal use of 802.11 and has not been widely adopted in actual commercial use.  Neither arguably essential patent is used in any Motorola 802.11-compliant product.  11/19Tr. 71:14-16; 100:24-102:16.

DEFENDANTS' POST-TRIAL BRIEF - 16
CASE NO. C10-1823-JLR

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

more complex approaches.  11/19 Tr. 105:17-106:4.  His attempts to justify his analysis as to the other alternatives were neither rigorous nor credible.  11/15 Tr. 164:23-169:13.

The testimony of Marvell's Jennifer Ochs confirms Dr. Williams' opinion that Motorola's 802.11 patents are valuable.  She testified that Marvell has a "very valuable" 802.11 portfolio of "a few hundred patents" and yet offered to enter into a ***zero-zero cross-license*** with Motorola for its 802.11 patents.  11/14 Tr. 64, 76-77.

### 2.    Motorola's 802.11 SEPs Are Important To Microsoft's Products

Based on Microsoft's statements that the Xbox and Surface comply with the 802.11 Standard and bear the Wi-Fi logo, those products necessarily use at least the above-discussed eleven core patent families that must be implemented by any Wi-Fi-certified device.  11/19 Tr. 71:9-11, 80:20-83:12; 11/13 Tr. 40:5-10, 41:9-20, 52:11-18; Exs. 2329 at 0606790, 2329A, 3145.

Dr. Gibson attempted to discount the value of Borgstahl and Harris by asserting that those patents relate only to "peer-to-peer" devices, and that therefore the Xbox products do not use those patents.  11/15 Tr. 109:11-110:14.  But Dr. Gibson admitted on cross that the asserted claims do not include any "peer-to-peer" language, and Dr. Williams pointed out that Dr. Gibson was attempting to improperly import an illustrative embodiment disclosed in those patents into claims that impose no peer-to-peer limitation.[15]  11/15 Tr. 192:11-193:19; 11/19 Tr. 95:12-21.  Dr. Gibson also deemed as "not relevant" Ling, Cafarella and Bruckert because they relate to the 802.11b and 802.11g modulation schemes, which he characterized as slower "legacy" modes of operation.  11/15 Tr. 110:15-112:1.  Dr. Williams refuted this, too, pointing out that the 802.11 Standard requires these modes to be supported.  This support allows for 802.11n devices to be backward compatible with 802.11b and 802.11g devices, allowing newer 802.11 devices to work with older ones, and for all devices in a network to "fall back" to the b- or g- modes when

---

[15]    Microsoft's expert also argued that 5,142,533 (Crisler), prior to its expiration in March 2011, was not used by the Xbox.  11/15 Tr. 106:21-107:21.  Dr. Williams refuted this, explaining that his original essentiality analysis cited the use of the RTS/CTS signal, and Quality of Service (QoS) features, in the standard as an ***example*** of how Crisler read on the standard, but that Crisler did not require use of RTS/CTS, or QoS, and its claims did in fact read on the Xbox operation.  11/19 Tr. 97:14-98:10.

DEFENDANTS' POST-TRIAL BRIEF - 17
CASE NO. C10-1823-JLR

operating conditions do not allow reliable n-mode operation.  11/19 Tr. 96:9-21; *also* 11/15 Tr. 189:13-190:9,  191:19-192:10.  ████████████████████████████████████

████████████████████████████████████████████████████

Microsoft's expert also attempted to dismiss Motorola's security SEPs, arguing that the Xbox's own end-to-end security rendered the security provisions of the standard not relevant to the Xbox.  11/15 Tr. 112:2-114:14.  But this end-to-end security is limited to communications between two Xboxes or between an Xbox and an Xbox Live service.  It does not encrypt and secure other communications, such as when using Internet Explorer to surf the Internet on the Xbox.  *Id.* 181:6-185:15, 26:16-22, 27:16-28:1, ██████.  Further, Wi-Fi certification is critical to the marketability of the Xbox, and certification is conditioned on compliance with the security provisions of the 802.11 Standard, which in turn requires use of Motorola's patents.  If an Xbox is being used with a Wi-Fi access point that is set for 802.11 security, the Xbox must be set to function at that same level of security.  *Id.* 175:23-177:20, 180:10-13; 11/19 Tr. 96:23-97:8.  This is a common occurrence in the ordinary home environment in which the Xbox is used.[16]

There is no doubt that the ability to communicate via the 802.11 Wi-Fi Standard and obtaining Wi-Fi certification are crucial to the marketability of the Xbox.  There has been a steady trend in recent years to provide Wi-Fi in consumer and business products, and it has become a customer expectation.  11/15/12 Tr. 46:13-19, ██████, 86:3-89:20, 92:9-93:11.  Microsoft's Xbox is no exception to this trend.  As stated by a Microsoft engineer, Wi-Fi certification "is a key and very important marketing lever we have with our competition and not having the 802.11b/g/n Wi-Fi logo is not an option."  Ex. 3145 at 1.  Prior to integrating Wi-Fi in the Xbox 360 console, Microsoft acknowledged its concerns that the Xbox 360 would "appear dated" when compared to the competing consoles from Sony and Nintendo, which included integrated Wi-Fi, and that this

████████████████████████████████████████████  11/15 Tr. 42:18-44:22:████████████

---

[16]    Survey results show that 19.6% of users of the Xbox 360 use 802.11 CCMP security and 12.6% of users of the Xbox 360 use 802.11 TKIP security when connecting to the Internet through Wi-Fi.  11/19 Tr. 191:4-18, 191:25-192:9, Ex. 2392, Ex. 3034-A, PFF 706-707.

Summit Law Group pllc
315 Fifth Avenue South, Suite 1000
Seattle, Washington 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

Indeed, without integrated Wi-Fi, the Xbox 360's market share plummeted to less than 30% from a dominant 69% after launch.  11/14/12 Tr. 214:16-24; Ex. 2451.  Product reviews lamented Microsoft's continued failure to include Wi-Fi in the Xbox 360.  Ex. 2684 at 4 ("[T]he older Xbox was limited to a wired network connection.  Sadly, that hasn't changed on the [new Xbox model]").   Realizing that "wireless connectivity using wifi was becoming a customer expectation," 11/15/12 Tr. 46:16-17, 50:7-8, Microsoft planned to beat Nintendo and Sony to the market with the first console to have integrated 802.11n wireless connectivity in the Xbox 360 S.  Microsoft touted this feature as a "key product differentiator," where Nintendo and Sony only "have 802.11b/g included in [the console]."  11/15 Tr. 46:1-19; ▮▮▮▮▮▮▮; ▮▮▮▮▮▮▮

In addition, Microsoft understood the importance of providing 802.11n connectivity to existing Xbox 360 owners, and in parallel developed the "Omni N" wireless adapter for sale as an add-on accessory.  ▮▮▮▮▮▮   Microsoft sold its wireless adapter, which was directed solely to providing improved wireless functionality for $99.99, despite its cost of goods sold of less than $15.  11/15 Tr. 25:20-25, 50:12-17, 51:7-25, 53:3-14; ▮▮▮▮▮▮▮

Following launch in 2010 of the Xbox 360 S (with its now-integrated Wi-Fi) and the Omni N adapter, Microsoft regained the top market share, where it remains today.  11/15/12 Tr. 214:25-215:5; Ex. 2451.  Microsoft has admitted that "most homes do not have wired networks today.  When you go into a home, if they have a connection, it's going to be WiFi, because it's the easiest to set up."  11/15/12 Tr. 78:2-4.  Indeed, without 802.11, it "would probably be difficult" to sell the Xbox 360 today.  Penello Depo Tr. 71:10-14; *see also* ▮▮▮▮▮▮▮

Recently, Microsoft has focused on a strategy to "own the living room" by positioning the Xbox as a digital multimedia hub at the center of home entertainment.  11/15/12 Tr. 54:7-13, 56:10-15; 11/19/12 Tr. 217:10-218:4; Exs. 2265 at 2-4, ▮▮▮▮▮▮▮.  Wi-Fi is a critical part of this strategy, as it "opens up the world for all the other features that you can get to," such as multiplayer video games, and bandwidth-intensive content like HD video available, for example, through Xbox LIVE subscriptions.  11/15/12 Tr. 46:20-25; ▮▮▮ ▮▮▮▮▮▮,

DEFENDANTS' POST-TRIAL BRIEF - 19
CASE NO. C10-1823-JLR

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone: (206) 676-7000
Fax: (206) 676-7001

███   Wi-Fi will be "vital" to the overall user experience in Microsoft's next-generation Xbox. 11/15 Tr. 218:20-219:19; ████████ ████████ ███████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████ ██████████████████████████████████████████

Microsoft's new Surface tablet uses only 802.11, instead of cellular or wired connections, to connect to the Internet. 11/13 Tr. 41:9-20, 52:11-18. Critically, without 802.11 capability, the Surface tablet would be unable to compete in the market, because consumers purchase tablets with the intention of accessing online content frequently. Ex. 2718 at 1.

### 3. Motorola's H.264 SEPs Are Technologically Valuable

Motorola has 16 U.S. patents in 6 families and 55 foreign counterparts that are essential, technically valuable to, and directed to core features of, H.264 (11/19 Tr. 25-27; PFF 443-500):

- **Krause and Wu Patent Families**: 5,235,419 (Krause, Ex. 270) is technically valuable because it relates to a fundamental prediction technique that compares a plurality of motion compensators to find the one that results in the most compression. 11/19 Tr. 27:22-28:17; PFF 450-52. 5,376,968 (Wu, Ex.283) is technically valuable because it relates to a fundamental prediction technique that provides greater flexibility in adaptively choosing compression modes, which leads to greater efficiency. 11/19 Tr. 29:2-22; PFF 457-59.

- **Eifrig Patent Family**: 6,005,980 (Ex. 268) is technically valuable because it generates a predictor motion vector, which significantly improves coding gain over other choices of blocks for motion vector prediction. 11/19 Tr. 30; 11/16 Tr. 200:2-202:11; PFF 464-67.

- **MBAFF Patent Family**: 6,980,596, 7,310,374, 7,310,375, 7,310,376, 7,310,377, 7,421,025, 7,477,690, and 7,817,718 (Exs. 271-278) are directed to a "main innovative feature" of H.264 – macroblock adaptive frame/field ("MBAFF") coding – that is technically valuable because it provides substantial coding gain through the use of macroblock pairs, which permit prediction on all seven block sizes in frame and field mode. 11/19 Tr. 30:24-32:3; Ex. 574 at 136-37. The JVT adopted MBAFF after third party coding experts confirmed that it outperformed the alternative in the draft Standard by "up to about 18%." 11/16 Tr. 205-10; Exs. 674 at 1, 2209, 2274, 2227; PFF 473-79.

- **PAFF Patent Family**: 7,769,087, 7,660,353, and 7,839,931 (Exs. 280-82) are directed to improving a technique called "PAFF" – coding on a picture-by-picture basis. They are technically valuable because they provide substantial coding gain by applying PAFF to "bi-predicted" pictures (*i.e.*, pictures having 2 motion vectors), through flexibility not found in prior PAFF methods. 11/16 Tr. 210-212; 11/19 Tr. 32; Ex. 654 at 5; PFF 486-90.

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone: (206) 676-7000
Fax: (206) 676-7001

- **Scan Patent Family**: 7,162,094 and 6,987,888 (Exs. 265-66) are technically valuable because they relate to 4x4 and 8x8 scans, which were adopted into the Standard after the JVT confirmed they outperformed alternatives by "up to about 7%."  11/16 Tr. 213-15; 11/19 Tr. 33; Exs. 675 at 1, 2281 at 4-5, 710; PFF 496-500.

The Krause and Wu Families contributed to the 50% coding efficiency gain reported for H.264 progressive-scan video. 11/16 Tr. 192:25-193:16; Ex. 424 at 574.  They are essential to the H.264 Standard at every level of the Baseline, Main, and High profiles.  11/19 Tr. 36-37.  Every encoder and decoder that processes H.264 video uses these patents.  11/19 Tr. 28-29.  The Eifrig, MBAFF, PAFF and '094 (Scan) patents are essential at the Main and High profiles, levels 2.1 to 4.1; and the '888 (Scan) patent is essential at the High profile, levels 2.1 to 4.1.  These profiles/levels are important because they are commonly used for standard definition and high definition video.  11/19 Tr. 31-32, 36-37.  PFF 437, 440, 448-52, 455-59, 462, 471, 484, 494.

Microsoft discounts the value of Motorola's patents by asserting that "comparable" technologies were available.  Many of these technologies, however, were considered during the development of the Standard and did not provide the efficiency gains that the JVT experts sought to achieve.  For example, Microsoft points to scans submitted by Sony as alleged alternatives to Motorola's Scan Family.  But the JVT determined that Sony "[n]eed[ed] to demonstrate larger gain for acceptance."  Ex. 2216 at 28; 11/16 Tr. 215-16.  Ultimately, Sony itself, and others, actually recommended the adoption of Motorola's scans.  Exs. 710, 2281 at 1; 11/16 Tr. 213-16.  Similarly, the alleged alternative to Motorola's MBAFF and PAFF Families – applying AFF to single macroblocks – was characterized as "need[ing] more work" and was abandoned.  Ex. 3382 at 7; 11/16 Tr. 203-07.  Likewise, for the Eifrig Family, the JVT adopted Motorola's solution as the default for calculating predictor motion vectors, because other choices did not give as good performance.  11/16 Tr. 200-02.  Finally, for the Krause and Wu Families, Microsoft has not shown that any alleged alternative was considered, or how it could have been implemented in the Standard.  And, even if they had been considered, each of the purported alternatives would have

DEFENDANTS' POST-TRIAL BRIEF - 21
CASE NO. C10-1823-JLR

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone: (206) 676-7000
Fax: (206) 676-7001

1  performed worse than do Krause and Wu.  11/19 Tr. 44:15-46:5; PFF 506-33.[17]

2          **4.      Motorola's H.264 SEPs Are Important to Microsoft's Products**

3          ***Microsoft's H.264-Compliant Products Use Motorola's H.264 SEPs***.  Microsoft sells and

4  has sold numerous products that are compliant with the H.264 Standard, including the Xbox

5  products, Windows 7, Window 8, Windows Vista, Windows Embedded, Zune for Windows

6  Expression, Windows Phone, and the new Surface tablet.  Each of these products supports profiles

7  and levels covered by Motorola's H.264 patents.  11/19 Tr. 33-38; 11/13 Tr. 40:5-41:8, 42-43;

8  Exs. ▮▮▮ 937 at 2, 2042 at 3, 1489, 640 at 2-3, 936 at 2-3, 641 at 6, 2176 at 8, 15, and 2174 at 2;

9  PFF 534-557.  As explained above, Motorola's patents span the Baseline, Main and High profiles,

10 and in particular the profiles and levels commonly used for SD and HD video.  Because a

11 compliant decoder operating at these profiles/levels must implement all tools for that profile and

12 level, Microsoft's products use the technologies claimed in Motorola's H.264 patents.  11/19 Tr. at

13 25:21-23, 33-38; PFF 433-442, 534-557.[18]  Indeed, a German Court found that the Xbox 360,

14 Windows 7, Internet Explorer 9 and Windows Media Player 12 infringe certain claims of

15 Motorola's Krause (EP 0538667) and Wu (EP 0615384) patents; and the ALJ in ITC Inv. No.

16 337-TA-752 determined that the Xbox 360 infringes certain claims of Motorola's '596 (MBAFF)

17 and '094 (Scan) patents.  PFF 540-41, 545.

18          ***Microsoft's Products Play Progressive and Interlaced H.264 Video***.  Microsoft's H.264-

19

20 ---

[17]      Microsoft's assertions that Motorola's patents are invalid over prior art are flawed, because it has not shown
21 that any of the alleged references discloses each and every element of the claims of Motorola's patents.  PFF 636-59.
Microsoft's assertion that the Krause and Wu patents do not cover software decoders is equally flawed, because one of
22 ordinary skill reading the specifications (including the references to algorithms) would understand that the "decoder
apparatus" could be implemented in hardware or software.  11/19 Tr. 41:20-42:2; PFF 633-34.

23 [18]      Microsoft asserts that Motorola's Eifrig, MBAFF, PAFF and Scan patents are limited to "interlaced" video.
However, none of Motorola's patents has claim limitations to "interlaced."  And, as Microsoft's Dr. Sullivan
24 explained, "whether the video is interlaced or progressive is outside the scope of the standard."  11/14 Tr. 27:11-22;
Ex. 424 at 6 ("The coding representation in H.264/AVC is primarily agnostic with respect to this video characteristic,
25 i.e., the underlying interlaced or progressive timing of the original captured pictures.").  Microsoft ignores that the
Eifrig, MBAFF, PAFF and Scan patents are directed to frame and field coding, and the Main and High profiles of the
26 H.264 Standard cover frame and field coding.  *Id.*  These Motorola patents are optimized for interlaced video, but can
*also* be used advantageously on progressive video.  11/19 Tr. 63:12-64:21, 43:4-44:13.

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone: (206) 676-7000
Fax: (206) 676-7001

compliant products use Motorola's H.264 SEPs to play H.264 video.[19]  For example, the Xbox H.264 decoder plays progressive and interlaced H.264 video from a variety of sources: the Xbox's Internet Explorer browser plays H.264 content from the Internet; the Xbox as an extender to Windows Media Center plays recorded TV/video; the Xbox plays H.264 video from AT&T U-verse; and the Xbox's USB ports are used to play H.264 video.  11/15 Tr. 40-42; 11/14 Tr. 157:20-160:8; Exs. 2738, 2161 at 2-3.  Dr. Drabik confirmed through testing that the Xbox H.264 decoder decodes progressive and interlaced H.264 video in these ways.  11/19 Tr. 40:6-41:19.  Dr. Sukumar confirmed that surveyed Xbox users use their consoles to watch video, including 30.3% who watch interlaced video. 11/19 Tr. 186-87; Exs. 2399, 3034 at Ex. A2 at 15.

Originally, Microsoft's General Manager of Xbox, Leonardo Del Castillo, testified that Xbox's Internet Explorer did not support interlaced H.264 video.  11/15 Tr. 22:23-23:4.  But Microsoft recanted Mr. Del Castillo's statement in a letter to the Court:

> After Dr. Drabik's testimony to the contrary, we went back to Mr. Del Castillo, and he checked with internal Microsoft resources and tried the search Dr. Drabik identified.  *Mr. Del Castillo determined that he had been misinformed.  **Xbox's Internet Explorer browser will play interlaced-coded H.264 video from the Internet if it encounters such content**.  Microsoft wanted to inform the Court and correct the record*." Ex. 3448.

Similarly, Microsoft's expert, Prof. Orchard, asserted that "no interlace is supported by Xbox Live." 11/14 Tr. 145:7-10.  But, Microsoft's Del Castillo contradicted his own expert, admitting that for Xbox Live "there may be interlaced content."  11/15 Tr. 32:3-32:15; PFF 559-70.

The Windows H.264 decoder plays progressive and interlaced H.264 content from a variety of sources, including the Internet, TV and camcorders.  Exs. ███████, 2738; 1408 at 409, 412; 11/14 Tr. 153:2-154:2, 159:15-23.  Microsoft's V.P. for Windows, Jon DeVaan, testified that Windows Media Player and Internet Explorer use the Windows H.264 decoder to decode

---

[19]  The smallest saleable unit for the H.264 functionality in Microsoft's products is the Xbox and Windows 7. Microsoft does not sell the Xbox H.264 decoder or the Windows 7 H.264 codec separately. ███████████████████████████████████████████████████████████████ Likewise, the Windows H.264 codec functions are carried out in the CPU and memory of the PC and may also use a hardware accelerator. 11/13 Tr. 35:6-14; Ex. 591 at 5.

DEFENDANTS' POST-TRIAL BRIEF - 23
CASE NO. C10-1823-JLR

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone: (206) 676-7000
Fax: (206) 676-7001

H.264 video.  11/13 Tr. 43:21-44:8.[20]  Microsoft's "Windows 7 Inside Out" states that Windows Media Player 12 "now directly supports the most common high-definition formats, especially those that use the H.264 video compression codec."  Ex. 1408 at 408-09; 11/13 Tr. 44:21-45:19.  Microsoft admits that Windows Media Center can be used to "[w]atch, pause, and record HDTV," and that "when you use Windows Media Center to . . . watch a video, Windows Media Player is actually doing the work in the background."  Exs.  2738, 1408 at 413.[21]  Major network operators broadcast HDTV in H.264.  Exs. 2739 at 3-5, 2342; 11/13 Tr. 51:17-25.  Dr. Drabik verified that the Windows H.264 decoder plays progressive and interlaced H.264 video.  For example, Dr. Drabik downloaded a Katy Perry BBC video from the Internet, confirmed that it was H.264 interlaced (MBAFF), and played it with Windows 7.  11/19 Tr. 38:10-40:5; Ex. 2183; PFF 571-80.

***Microsoft Added H.264 Support in Response to Consumer Demand***.  Mr. Del Castillo admitted that Microsoft markets the Xbox as the "all-in-one entertainment hub," and that "the living room is very important" to the Xbox, where "there's a high volume of consumption of digital goods and services."  11/15 Tr. 54:23-56:1; Exs. 2265 at 2-3, 2161.  Before the Xbox supported H.264, it was criticized as having "crippled" video playback.  Ex. 2572 at 3.  ███████

████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████  11/15 Tr. 34.[22]  When Microsoft added H.264 support, it was applauded as putting Microsoft "at the head of the pack."  Ex. 2724.  H.264 support, including for interlaced, continues to be important to Microsoft.  ████

████████████████████████████████████████████████████████████████████████

███████████████████████████████████████████  11/14 Tr. 162:5-8.  PFF 585-601.

---

[20]    Microsoft discourages consumers from using third party codecs, because they "can cause the player to crash, freeze or suffer reduced performance."  Ex. 1408 at 410; 11/13 Tr. 46-48; PFF 581.

[21]    Prof. Orchard failed to consider several functions in Windows Media Center.  11/14 Tr. 156-7; PFF 584.

[22]    This HD DVD player provides a powerful indication of the value of H.264 in the Xbox.  The Xbox 360 HD DVD player's function is to play high definition video, including H.264.  Ex. █████████.  The Xbox 360 HD DVD player had a retail price of $199, reflecting the market value Microsoft placed on being able to play high-definition H.264 video on the Xbox 360.  Exs. █████, 3347 at 4 ("The Xbox HD DVD player is the best high-definition movie experience and value on the market."); 11/15 Tr. 35:15-22, 37:1-15, 38:10-23.

Summit Law Group pllc
315 Fifth Avenue South, Suite 1000
Seattle, Washington 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

Mr. DeVaan testified that Microsoft included support for H.264 in Windows 7 because third party codecs were "not delivering the quality, safety, and seamlessness that the end-user really expected" and Microsoft "wanted to relieve the end-user from having to go to the hassle and risk of installing H.264 from a third party."  11/13 Tr. 47:23-49:3.  "One of the key pillars of the Windows 7 vision" was "enabling Microsoft to provide customers an **in box solution** to view both the playback and broadcast video content as well as live broadcast video content."  Ex. 2739 at 4-5; 11/13 Tr. 49:9-51:9.  A "key success metric" for this pillar was "[p]layback of new file types (…H.264)."  *Id*.  Another "pillar" for Windows is to be "Optimized for Entertainment."  Ex. 2373 at 18.  Microsoft's Windows 7 specification states that "[f]or Windows 7 to be a success in media playback, it is essential that a strategic subset of popular non-Windows Media codecs are provided in the box."  *Id*.  Mr. DeVaan testified that this subset includes H.264.  DeVaan Dep. Tr. 59:7-16.  Without including H.264 capability, Microsoft would have difficulty selling its products, because these devices would be unable to play a significant and growing proportion of H.264 video content.  Microsoft has clearly recognized consumer demand for H.264 content by incorporating H.264 capabilities into its products.  11/20 Tr. 14-17, 20-21; Exs. 2572 at 3, 2515; PFF 602-619.

*Interlaced Video Is Ubiquitous and Important to Microsoft's Products*.  Microsoft's assertions that interlaced video "is very rare" and "not very important" in H.264 are contradicted by the record.  In 2001-2002, third parties stated that "it is important to make sure that H.26L [draft of H.264] has adequate syntax to support the interlace needs for video."  Exs. 782 at 1, 653 at 1.  And, as recently as July 2012, seven companies (NBC, HBO, CBS, CBC, MMI, Comcast and Cable Labs) submitted to MPEG that "interlaced scan formats remain ubiquitous" and "in order to achieve commercial success, new compression standards should continue to efficiently support interlaced formats for the foreseeable future."  Ex. 2342; 11/20 Tr. 20:6-21:5.  Microsoft's own documents admit the importance of interlaced.  The Windows support website states that "interlaced" is a feature "of increasing importance, as support for Windows Media-based content spreads to DVD players, set-top boxes, and other home electronics."  Ex. 2768.  Microsoft also

1   acknowledges that "interlaced video content is widely used in television broadcasting."  Ex. 2249.

2          **5.     The Technical Value of Microsoft's H.264 SEPs**

3          Microsoft's claim of 40 essential patents is exaggerated because at least 17 are not

4   essential:  15 are directed to optional features in the Annexes of the Standard, and at least 2 have

5   claim limitations that are not in the Standard.  11/19 Tr. 46-47.  At least 7 more had alternatives

6   available at the time of the adoption of the Standard that offered comparable performance.  For

7   example, the JVT found for the FastVDO transform that there "was not significant difference" in

8   complexity and "no difference demonstrated" in quality.  Ex. 2216 at 21.  At least 5 more patents

9   are directed to minor aspects.  11/19 Tr. 47:9-11.  And, at least 2 more relate only to the Extended

10  profile, which is little used.  11/19 Tr. 47:6-13.  Thus, Motorola's H.264 portfolio is as valuable,

11  or slightly more valuable, as a technical matter, than Microsoft's portfolio.  11/19 Tr. 25:24-26:2.

12  ██████████████████████████████████████████████████████████████████████

13  ███████████████████████████████████████████████   PFF 660-686.

14      **C.     *Georgia-Pacific* Factor 15 -- The Hypothetical Negotiation[23]**

15          Mr. Donohoe relied upon the evidence adduced at trial and the opinions of the experts on

16  his "negotiating team" to simulate a bilateral negotiation and opine on a range of RAND rates for

17  Motorola's patents.   Notably, Microsoft's experts, who collectively lack any meaningful

18  negotiating experience of their own, failed to present their own affirmative evidence regarding the

19  outcome of a hypothetical bilateral negotiation and presented no opinion as to the nature of the

20  rate that would result from the consideration of relevant *Georgia-Pacific* factors.

21          ***Net Selling Price Is The Most Appropriate Royalty Base***.  Motorola's standard offer and

22  nearly all of its SEP licenses with a running royalty have used the net selling price of licensed end

23  _____

24  [23]    *Georgia Pacific* Factor 14 relates to reliance on qualified expert testimony.  A typical licensing negotiation
team commonly includes technical, financial, marketing and legal team members.  In this case, Motorola's experts –
25  Drs. Schmalensee, Drabik, and Williams and  Mr. Dansky – are qualified experts who have examined and evaluated
evidence in the same way.  Their testimony informs the analysis of Factors 6, 8, 9, and 13, as well as the hypothetical
bilateral negotiation that follows.  Motorola submits that, in light of the RAND commitment and based on the
26  evidence introduced during trial, *Georgia-Pacific* Factors 2-5, 7, and 10-12 are neutral or have no effect.

DEFENDANTS' POST-TRIAL BRIEF - 26
CASE NO. C10-1823-JLR

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

1   products as the royalty base.  11/20 Tr. 36:16-37:8; 11/19 Tr. 152:1-9.  Motorola has agreed to pay

2   others using net selling price as a royalty base.  *Id.*  Using net selling price is not unique to

3   Motorola – as Mr. Dailey testified, it is common industry practice.  11/20 Tr. 37:20-38:13.  The

4   Federal Circuit and licensing treatises confirm this.  11/16 Tr. 173:8-175:12; 11/19 Tr. at 152:10-

5   14; 154:20-8; Ex. 2922 at 4; Dkt. 409 at 18-19.  And the current IEEE LOA form expressly

6   permits royalties to be based on a product price.  Ex. 3394; 11/19 Tr. 174:22-175:12.

7       Motorola's practice – endorsed by SSOs and by industry practice – of using net selling

8   price necessarily informs what the royalty base would be in the hypothetical negotiation, because

9   this is what has been done in prior real-world negotiations involving Motorola's patents.  *See, e.g.*,

10  *Multimedia Patent Trust v. Apple*, 10-CV-2618, 2012 WL 5873711, at *6 (S.D. Cal. Nov. 20,

11  2012) ("[T]he use of the accused products' entire market value as a royalty base can be

12  economically justified where sophisticated parties have entered into agreements that base the value

13  of the patented invention as a percentage of the commercial products' sale price."); *see also*

14  *Boeing Co. v. United States*, 86 Fed. Cl. 303, 319-20 (2009); *Mondis Tech., Ltd. v. LG Elecs., Inc.*,

15  Nos. 2:07–CV–565–TJW–CE, 2011 WL 2417367, at *3 (E.D. Tex. June 14, 2011).

16      Microsoft's experts argue that net selling price is inappropriate as a royalty base because,

17  for example, the royalty for 802.11 would exceed the price of the chip that contributes much of the

18  802.11 functionality in the Xbox.  But the Federal Circuit has recognized that "the economic value

19  of a patent may be greater than the value of the sales of the patented part alone."  *King Instr. Corp.*

20  *v. Perego*, 65 F.3d 941, 950 n.4 (Fed. Cir. 1995).  That is precisely the case here – the value of

21  Wi-Fi to the Xbox cannot be measured by the price of the Marvell chip.  Rather, its economic

22  value is based on the value of the functionality it provides to the end user.  As explained above,

23  Wi-Fi functionality is a critical feature in the Xbox that imparts significant value to the end user.

24      Microsoft's experts next urge that a per-unit royalty must be used because net selling price

25  may capture the value of non-patented components.  *See, e.g.*, 11/16 Tr. 82:3-11.  But the Court

26  has previously stated that it "does not agree with Microsoft that it is always facially unreasonable

DEFENDANTS' POST-TRIAL BRIEF - 27
CASE NO. C10-1823-JLR

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

for a proposed royalty rate to result in a larger royalty payment for products that have higher end prices." Dkt. 188 at 16 (citing Dkt. 183); *see also Lucent v. Gateway*, 580 F.3d 1301, 1339 (Fed. Cir. 2009) (stating that even though a patented invention is part of a multicomponent product, awarding a reasonable royalty based on the sale price can be "economically justified").  As Dr. Schmalensee explained, such a royalty structure may be reasonable here.  11/19 Tr. 155:14-156:3.

This is best demonstrated by an example.  Assuming a 2.25% royalty, Microsoft would owe a royalty of $4.50 on a $200 Xbox with a 4 GB hard drive and $9.00 on a $400 Xbox with a 256 GB hard drive even though both have the same Wi-Fi functionality.  But the user of the $200 Xbox will quickly fill his 4 GB hard drive.  In contrast, the user of the Xbox with the 256 GB hard drive has more storage space and can more fully utilize the Xbox, for example, by wirelessly downloading additional games and videos.  Thus, the 802.11 functionality provides more value to the end user of the $400 Xbox and justifies a higher royalty.[24]

The use of net selling price of the Xbox is an appropriate royalty when considering that Microsoft realizes significant additional revenue streams through the use of 802.11 and H.264 by the Xbox that is not subject to a royalty payment.  Many users download and play games and access Xbox LIVE through a Wi-Fi connection.  Thus, the Xbox's Wi-Fi capability unlocks this additional content for users (and thus additional revenue for Microsoft that is not subject to a royalty).

***The Entire Market Value Rule ("EMVR") Is Not Relevant to RAND Negotiations***.  Microsoft argues that the EMVR precludes the use of net selling price as a licensing royalty base.  But the EMVR is a rule used in determining patent infringement damages.  While Microsoft has repeatedly advocated that the EMVR should be extended to licensing, Microsoft has presented no

---

[24]    Simple math demonstrates that using a per-unit royalty in situations in which products vary by price has its own problems.  As the Court noted, a licensee would pay the same royalty (e.g., $0.20) for the same technology regardless of whether the product is being sold for $125 or $1.  11/13 Tr. 198:14-199:8.  For the $125 product, the effective royalty rate is 0.16%.  For the $1 product, the effective royalty rate is 20%.

DEFENDANTS' POST-TRIAL BRIEF - 28
CASE NO. C10-1823-JLR

legal authority to support this extension.  And Microsoft presented no evidence that parties in a real-world licensing negotiation ever use the EMVR.  There are compelling reasons for this.  Because parties to SEP licenses typically seek broad coverage and protection, SEP licenses almost always cover future unknown products that may use the standardized technology in new and unanticipated ways and, thus, cannot be considered adequately in an EMVR analysis.

This case is a real-world example demonstrating why:  In October 2010, the Xbox was the only Microsoft Wi-Fi product with significant sales.  But recently, Microsoft introduced its Surface Tablet, which relies on 802.11 as its sole means to connect to the Internet.  And apparently, Microsoft is now working on its own smartphone, which will undoubtedly have Wi-Fi.  A RAND rate set using the EMVR in the context of the Xbox alone would not be appropriate for the Surface and other future products.  Indeed, as Dr. Lynde admitted, a royalty rate can be RAND even if not calculated pursuant to the EMVR.  11/16 Tr. 169: 6-8, 173:21-174:5.[25]

Even if the Court believes the EMVR might have some applicability in the licensing context, using net selling price as the royalty base is appropriate in this case based on Motorola's prior licensing practice.  Indeed, this Court has found that there is no "*per se* rule that a royalty rate may never be applied to the entire product price without satisfaction of the entire market value rule" and "[c]onsistent with the statements in *Gateway*, district courts have permitted license agreements based on the entire product value as evidence of a reasonable royalty rate despite a lack of showing that the patented feature formed the 'basis for customer demand.'"  Dkt. 490 at 17.  Here, Motorola's established licensing practice of using net selling price dictates that the EMVR should not be applied in determining RAND in this case.  *See Riles v. Shell Explo. & Prod. Co.*, 298 F.3d 1302, 1313 (Fed. Cir. 2002) (finding expert improperly "ignored [patentee's] established licensing practice" when considering royalty rate); *Unisplay, S.A. v. Am. Elec. Sign*

---

[25]   There are other reasons why the EMVR is inapplicable in private contracts.  The EMVR is a constraint on *U.S.* patent infringement damages.  Motorola's 802.11 and H.264 patent portfolios include patents from numerous foreign countries.  Exs. 1, 2.  Blindly applying the EMVR to *non-U.S.* patents in setting a worldwide royalty rate would have the effect of imposing a U.S. litigation constraint to arms'-length licensing around the world.

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

*Co., Inc.*, 69 F.3d 512, 519 (Fed. Cir. 1995); *Studiengesellschaft Kohle, m.b.H. v. Dart Indus., Inc.*, 862 F.2d 1564, 1568 (Fed. Cir. 1988) ("[T]he patentee's usual licensing approach should be considered in assessing a reasonable royalty."); *see also* page 27, *supra*.

Moreover, Motorola submits that the EMVR has been satisfied at least with respect to the Xbox's and Surface's use of 802.11. As explained in detail above, Wi-Fi in the Xbox is expected by customers and is key to its competitive positioning. Similarly, Wi-Fi is vital to the Surface because it has no other way of connecting to the Internet. *See, e.g.*, *Dataquill Ltd v. HTC Corp.*, 2011 U.S. Dist. LEXIS 138565, at *78-80 (S.D. Cal. 2011) (stating that a reasonable jury could find the EMVR satisfied because the patented technology was "vital" to the defendant's "competitive position in the marketplace"); *see also Marine Polymer Tech., Inc. v. Hemcon, Inc.*, 672 F.3d 1350, 1360 (Fed. Cir. 2012) (finding EMVR satisfied because of the importance of the patented technology to the infringing product and its significance on market demand).

***The RAND Rate and Range for a License Between the Parties***. With respect to Motorola's 802.11 SEPs, consistent with industry practice, SSO policy, Motorola's own licenses, and Motorola's offers in this case, Mr. Donohoe concluded that the parties would have negotiated a cross-license and, as part of that, would calculate a balancing payment based on the relative strength of one another's portfolio as compared to their respective exposures. 11/20 Tr. 133:23-134:14, 136:15-137:4, 142:5-22. ██████████████████████████████████████,[26] the technical testimony of Dr. Williams and the valuation analysis conducted by Mr. Dansky, Mr. Donohoe concluded that Motorola's portfolio would be valued at 2.25% of the end product price. Microsoft's 802.11 portfolio, which was significantly smaller and is directed to ancillary features in the standard (and Motorola's products), would be conservatively valued at between 0.25% and 0.5%. Using these values and the relative exposures of one another's 802.11-compliant products,

---

[26]    Courts have endorsed determining a royalty rate based on one or two licenses. *ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860, 870, 872-73 (Fed. Cir. 2010) (remanding to determine a royalty based on two licenses); *Procter & Gamble Co. v. Paragon Trade Brands, Inc.*, 989 F. Supp. 547, 614 (D. Del. 1997) ("The Court also finds the Confab license to be probative of the rate to which P & G and Paragon would have agreed at the time of infringement.").

DEFENDANTS' POST-TRIAL BRIEF - 30
CASE NO. C10-1823-JLR

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone: (206) 676-7000
Fax: (206) 676-7001

1    Mr. Donohoe calculated a balancing payment favoring Motorola and concluded that the RAND

2    rate for Motorola's patents would be between "1.15 percent to 1.73 percent, which would be the

3    RAND royalty amount paid based upon the sales of the Xbox 360."  11/20 Tr. 144:18-19.

4          With respect to Motorola's H.264 SEPs, Mr. Donohoe similarly concluded that the parties

5    would negotiate bilaterally for a cross-license to one another's H.264 SEPs.  ███████████████

6    ███████████████████████████████, the testimony of Dr. Drabik and the valuation

7    analysis conducted by Mr. Dansky, Mr. Donohoe concluded that Motorola's portfolio would be

8    valued at 2.25% of Windows 7.  Based on the relative strength of Microsoft's H.264 portfolio, Mr.

9    Donohoe concluded that Microsoft would also be credited with 2.25% for its own portfolio.  After

10   computing a balancing payment, he concluded that Motorola would be willing to cap annual

11   Microsoft payments at between $100 and $125 million, ██████████████████████████

12   ████████████████████████  After converting this to a running royalty, the RAND

13   rate for Motorola's H.264 essential patents would be about $0.50 to $0.63 per-unit.  11/20 Tr.

14   146:9-10.  If left as a per unit percentage, this would equate to "a rate of 0.68 percent to 0.84

15   percent as the royalty rate on the … Windows 7 product."  *Id*. 146:11-13.

16   **V.     CONCLUSION**

17          Messrs. Dailey's and Donohoe's testimony establishes that, had Microsoft responded to

18   Motorola's October 2010 initial offer letters by negotiating in good faith, the parties would have

19   agreed to the foregoing percentage royalty rates and annual caps, which are within the RAND

20   range for these portfolios. Motorola's standard offer and licensing history confirm that the RAND

21   range for Motorola's 802.11 and H.264 portfolios – before adjustments for a particular licensing

22   negotiation as here – extends up to 2.25% of the end product price.  This conclusion is dictated by

23   Motorola's history of making this offer for these portfolios ██████████████████████████

24   █████████  and its conclusion of licenses – ██████████████████████████ – in which Motorola

25   adjusted its standard rate in light of the licensee's portfolio in the ultimate cross-license.

26                              *      *      *

DEFENDANTS' POST-TRIAL BRIEF - 31
CASE NO. C10-1823-JLR

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone: (206) 676-7000
Fax: (206) 676-7001

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

## VI.   MOTOROLA'S OCTOBER LETTERS WERE SENT IN GOOD FAITH

At the conclusion of trial, the Court requested that the parties address the "legal basis for a high and a low range in a good faith contract negotiation." 11/20 Tr. 169:21-23.  Specifically, the Court was interested in "what constitutes a good-faith range" and "is the high in a good faith range a multiple of three times the final number?  Or is it not so unreasonably . . . unrelated to reality that it shocks the conscience." *Id.* 171:8-11.Motorola has been unable to identify cases in this Circuit (or elsewhere) that address these questions directly.  However, Motorola has identified authority that informs whether an offer is reasonable.

Washington law recognizes in nearly every contract an implied duty of good faith and fair dealing. *Edmonson v. Popchoi*, 155 Wash. App. 376, 386 (Ct. App. Div. 1 2010), *aff'd*, 172 Wash. 2d 272 (2011); *Badgett v. Security State Bank*, 116 Wash.2d 563, 569 (1991). The duty of good faith generally requires contractual parties to cooperate in view of their agreed common purpose and each other's justified expectations. *See Edmonson v. Popchoi*, 155 Wash. App. at 783–86 (noting duty requires "mutual cooperation so that each party may enjoy the full benefit of performance").  There is no "free-floating duty of good faith unattached to the underlying legal document." *Badgett*, 166 Wash.2d at 570. Thus, Washington courts therefore look to the terms of the contract to determine whether the duty of good faith has been breached.

The reasonableness of an offer cannot be determined based on a bright-line test.  *See, e.g.*, *Cellco Partnership v. FCC*, No. 11-1135, 2012 U.S. App. LEXIS 24849, at *34-35 (D.C. Cir. Dec. 4, 2012) (stating that the 16 factors provided by the "data roaming rule" to evaluate whether a rate is commercially reasonable provides "considerable flexibility" and "largely leaves the terms . . . up for negotiation.").[27]  Rather than imposing specific numerical constraints when evaluating the

---

[27]     The reasonableness of an offer often arises in the context of the UCC or by operation of statute.  *See, e.g.*, *Qwest Corp. v. Minn. Pub. Utilities Comm'n*, 684 F.3d 721, 728 (8th Cir. 2012) (finding that whether a price under 47 U.S.C. §271 is "just, reasonable and non unreasonably discriminatory" is a "fact-specific inquiry" that can be shown by demonstrating that the offered rate is either at or below the rate offered to similarly-situated companies or in arms-length agreements with such companies); *Harris v. Equilon Enters.*, LLC, 107 F. Supp. 2d 921, 930-931 (S.D. Ohio 2000) ("'It is settled law that a bona fide offer under the PMPA [Petroleum Marketing Practices Act] is measured by an objective market standard.' An objectively reasonable offer is one that approaches fair market value."); *Allapattah*

DEFENDANTS' POST-TRIAL BRIEF - 32
CASE NO. C10-1823-JLR

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone: (206) 676-7000
Fax: (206) 676-7001

reasonableness of an offer, courts have recognized that offers must be viewed objectively in the context of a negotiation.  In practice, parties typically open with a "high" offer because there is an expectation that parties must leave room for bargaining and compromise during negotiations.

> Even if the court accepted CP's position that EEOC's initial proposal was somewhat excessive, the court would not find in CP's favor.  EEOC needs never present an initial offer that is acceptable to an employer.  ***A well-recognized negotiations tactic is to 'open high' and leave room for integrative solutions***. [n18 'Every litigator knows that few cases can be settled with a single offer, because even if the first offer is reasonable the offeree seldom believes that the opening offer is the final offer. ***In fact, litigators are expressly advised to start with an inflated demand or a stingy offer in order to leave room for further bargaining***.'] During the bargaining process, positions give way to interests; assertions of power and rights dissolve into searches for common ground.

*Dinkins v. Charoen Pokphand USA, Inc.*, 133 F. Supp. 2d 1237, 1244 (M.D. Ala. 2001); *see also J. Marymount, Inc. v. Bayer Healthcare, LLC*, No. 09-03110, 2009 U.S. Dist. LEXIS 118882, at *9 (N.D. Cal. Nov. 30, 2009) ("[T]ypically initial offers are used 'to anchor the negotiations in [a party's] favor by starting the process with a high number.'").

The inapplicability of a bright-line rule is even more apparent in the context of RAND licensing.  Unlike straight-forward commercial contracts, such as purchase agreements, which may involve only the payment of money, RAND licenses are often complex, involving numerous material terms, such as scope, field of use, grant backs, defensive suspension, patent transfer, releases, and covenants.  Moreover, at the time an initial offer is made, the licensor is typically unaware of the particular business needs, desires and considerations of the licensee.  Only through negotiation can this information be known.  Accordingly, licensors typically present an opening offer that allows the licensor sufficient room for compromise and bargaining.

Thus, whether Motorola's offers were reasonable should be judged in the context of typical negotiating practices, where the reasonableness of an offer does not turn on any multiplier.  In particular, Motorola did not deviate from its standard licensing practice with Microsoft – it treated Microsoft like any other potential licensee and offered its standard rate, just as it has done dozens

---

*Serv. v. Exxon Mobil*, 61 F. Supp. 2d 1308, 1323 (S.D. Fla. 1999) (stating that under the UCC, a departure from customary usage and commercial practice "strongly indicate" that a price is not commercially reasonable).

DEFENDANTS' POST-TRIAL BRIEF - 33
CASE NO. C10-1823-JLR

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

of times before.  *See, e.g.*, *Transitron Elec. Corp. v. Hughes Aircraft*, 487 F. Supp. 885, 903 (D. Mass. 1980) (noting that a 1% royalty rate was not excessive, where it was a standard offer made to all licensees and imposed no unreasonable restrictions).  Moreover, Motorola's executed licenses are consistent with this standard rate (and, in fact, these very rates were agreed to by VTech in its license).  And as the Court has recognized, parties do not have information when an initial offer is made to know what is and is not RAND.  Dkt. No. 335 at 23-25.  That can only be determined through negotiations, which should have occurred here.  For these reasons, Motorola's offer was not unreasonable or a violation of its obligation of good faith and fair dealing.

DATED this 14th day of December, 2012.

**RESPECTFULLY SUBMITTED,**

SUMMIT LAW GROUP PLLC

By */s/ Ralph H. Palumbo*
    Ralph H. Palumbo, WSBA #04751
    Philip S. McCune, WSBA #21081
    Lynn M. Engel, WSBA #21934
    *ralphp@summitlaw.com*
    *philm@summitlaw.com*
    *lynne@summitlaw.com*

By */s/ Thomas V.  Miller*
    Thomas V. Miller
    MOTOROLA MOBILITY LLC
    600 North U.S. Highway 45
    Libertyville, IL  60048-1286
    (847) 523-2162

DEFENDANTS' POST-TRIAL BRIEF - 34
CASE NO. C10-1823-JLR

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

And by

Jesse J. Jenner (*pro hac vice* )
Steven Pepe (*pro hac vice* )
Kevin J. Post (*pro hac vice*)
Ropes & Gray LLP
1211 Avenue of the Americas
New York, NY  10036-8704
(212) 596-9046
*jesse.jenner@ropesgray.com*
*steven.pepe@ropesgray.com*
*kevin.post@ropesgray.com*

James R. Batchelder (*pro hac vice*)
Norman H. Beamer (*pro hac vice* )
Ropes & Gray LLP
1900 University Avenue, 6th Floor
East Palo Alto, CA  94303-2284
(650) 617-4030
*james.batchelder@ropesgray.com*
*norman.beamer@ropesgray.com*

Paul M. Schoenhard (*pro hac vice*
Ropes & Gray LLP
One Metro Center
700 12th Street NW, Suite 900
Washington, DC  20005-3948
(202) 508-4693
*paul.schoenhard.@ropesgray.com*

**Attorneys for Motorola Solutions, Inc.,
Motorola Mobility LLC and General
Instrument Corp.**

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

**CERTIFICATE OF SERVICE**

I hereby certify that on this day I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Arthur W. Harrigan, Jr., Esq.
Christopher T. Wion, Esq.
Shane P. Cramer, Esq.
Calfo Harrigan Leyh & Eakes LLP
*arthurh@calfoharrigan.com*
*chrisw@calfoharrigan.com*
*shanec@calfoharrigan.com*

Richard A. Cederoth, Esq.
Brian R. Nester, Esq.
David T. Pritikin, Esq.
Douglas I. Lewis, Esq.
John W. McBride, Esq.
David Greenfield, Esq.
William H. Baumgartner, Jr., Esq.
David C. Giardina, Esq.
Carter G. Phillips, Esq.
Constantine L. Trela, Jr., Esq.
Ellen S. Robbins, Esq.
Nathaniel C. Love, Esq.
Sidley Austin LLP
*rcederoth@sidley.com*
*bnester@sidley.com*
*dpritikin@sidley.com*
*dilewis@sidley.com*
*jwmcbride@sidley.com*
*david.greenfield@sidley.com*
*wbaumgartner@sidley.com*
*dgiardina@sidley.com*
*cphillips@sidley.com*
*ctrela@sidley.com*
*erobbins@sidley.com*
*nlove@sidley.com*

T. Andrew Culbert, Esq.
David E. Killough, Esq.
Microsoft Corp.
*andycu@microsoft.com*
*davkill@microsoft.com*

DATED this 17th day of December, 2012.

*/s/ Marcia A. Ripley*
Marcia A. Ripley

DEFENDANTS' POST-TRIAL BRIEF - 36
CASE NO. C10-1823-JLR

Summit Law Group pllc
315 Fifth Avenue South, Suite 1000
Seattle, Washington 98104-2682
Telephone: (206) 676-7000
Fax: (206) 676-7001