```
 1              UNITED STATES DISTRICT COURT

 2         WESTERN DISTRICT OF WASHINGTON AT SEATTLE

 3    _____

 4    MICROSOFT CORPORATION,          )
                                      )
 5                   Plaintiff,       )  C10-01823-JLR
                                      )
 6    v.                              )  SEATTLE, WASHINGTON
                                      )
 7    MOTOROLA INC., et al,           )  November 13, 2012
                                      )
 8                   Defendant.       )  TRIAL DAY 1
                                      )
 9    _____

10              VERBATIM REPORT OF PROCEEDINGS
          BEFORE THE HONORABLE JAMES L. ROBART
11             UNITED STATES DISTRICT JUDGE
      _____

12

13
      APPEARANCES:
14

15

16    For the Plaintiff:      Arthur Harrigan, Christopher
                              Wion, David Pritikin, Chris Wion,
17                            Rick Cederoth, Ellen Robbins and
                              Andy Culbert
18

19

20
      For the Defendants:    Jesse Jenner, Ralph Palumbo,
21                           Philip McCune, Steve Pepe, Kevin
                             Post and Gabrielle Higgins
22

23

24

25
```

```
 1                      EXAMINATION INDEX

 2

 3    EXAMINATION OF

 4    PAGE

 5      JOHN DEVAAN          DIRECT EXAMINATION              25
                            BY MR. CEDEROTH:
 6                          CROSS EXAMINATION               41
                            BY MS. HIGGINS:
 7                          REDIRECT EXAMINATION            53
                            BY MR. CEDEROTH:
 8                          EXAMINATION                     54
                            BY THE COURT:
 9      GARRETT GLANZ        DIRECT EXAMINATION              58
                            By Mr. Harrigan:
10                          CROSS-EXAMINATION               96
                            By Mr. McCune:
11                          REDIRECT EXAMINATION           120
                            BY MR. HARRIGAN:
12                          EXAMINATION                    123
                            BY THE COURT:
13                          REDIRECT EXAMINATION           130
                            BY MR. HARRIGAN:
14                          RECROSS EXAMINATION            132
                            BY MR. McCUNE:
15                          EXAMINATION                    133
                            BY THE COURT:
16      KEVIN M. MURPHY      DIRECT EXAMINATION             134
                            BY MR. HARRIGAN:
17                          CROSS EXAMINATION              163
                            BY MR. PEPE:
18                          CROSS-EXAMINATION              192
                            By Mr. Harrigan:
19                          FURTHER REDIRECT EXAMINATION   204
                            By Mr. Harrigan:
20      GARY SULLIVAN        DIRECT EXAMINATION             205
                            By Mr. Pritikin:
21

22

23                       EXHIBIT INDEX

24

25    EXHIBITS ADMITTED                                   PAGE
        1408                                               30
```

1  1409                              31
   2042 and 2739                   53
2  1584                             68
   1139                             73
3  1581                             74
   1583                             87
4  1179 & 1643                      91
   1642                             93
5  1625 & 1626                      94
   1141, 1636 & 3087                95
6  2359                            104
    3088                           115
7    3091                          115
     124                           122
8  1125, 1173 & 2832              188
   618                            207
9  424                            217
   424(a)                         217

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    THE COURT:  I don't believe this courtroom has been

2  this full since we were dealing with the constitutionality of

3  a Seattle strip club ordinance.

4    The clerk will please call this matter.

5    THE CLERK:  Case C10-1823 Microsoft Corporation

6  versus Motorola.  Counsel, please make your appearance.

7    MR. HARRIGAN:  Good morning, Your Honor.  Art

8  Harrigan from Calfo Harrigan Leyh & Eakes.  And with me to my

9  left is David Pritikin from Sidley; and Rick Cederoth, also

10  from Sidley; and Andy Culbert from Microsoft; my partner,

11  Chris Wion; and Ellen Robbins from Sidley.  And on the back

12  bench we have my partner, Shane Cramer; and David Giardina

13  from Sidley; and David Killough, down at the end, from

14  Microsoft.

15    THE COURT:  Thank you.

16    MR. JENNER:  Good morning, Your Honor.  Jesse Jenner

17  from Ropes and Gray.  With me at counsel table are Ralph

18  Palumbo from Summit Law Group; Steve Pepe from Ropes and

19  Gray; Kevin Post from Ropes and Gray; Phil McCune from

20  Summit; Gabby Higgins, from Ropes.  Craig Hazelman will be

21  handling the technology for us.  And I think it would be

22  appropriate to introduce Bill Serra and Mike Duffy, who will

23  be introducing documents before the court.

24    Finally, I'd like to introduce Tom Miller, who is the Vice

25  President For Intellectual Property for Motorola Mobility,

1  who the court has seen on the papers, at least.

2      THE COURT:  All right.  Thank you, counsel.  Let's

3  talk about today's schedule.  We're going to begin at

4  9:00 a.m., and we will take our morning break at around

5  10:30, somewhere where it's convenient in terms of the

6  presentation of testimony.  We'll go until noon.  And in the

7  afternoon we will begin at 1 o'clock, as opposed to 1:30, so

8  1 o'clock, and we'll go until 4 o'clock.

9      Unfortunately, the matter that's going to come on at

10  4 o'clock involves a criminal defendant who is in full

11  restraints, so I suspect you all will not want to be here

12  when he arrives.  And you'll need probably to clear off,

13  other than the court's equipment, what's on the counsel

14  table, as he's charged with assaulting both court personnel

15  and Federal Detention Center personnel.  So know that that's

16  a little bit different.  Normally you'll be able to just

17  leave stuff in here.  For that one we'll ask you to at least

18  clear off your side of the courtroom.

19      Tomorrow, so you can have some sense of where we are,

20  we'll begin at 9:00, run until noon, begin at 1:00, and run

21  until 3:00.  The court is going off to talk to the City of

22  Seattle about the addition of 3,800 parking spaces and three

23  Amazon office buildings, which will mean that we will not be

24  able to get in or out of the courthouse.  So I'm part of that

25  delegation.

1      Thursday, 9:00 until noon, and 1:30 -- because Thursday is

2   our customary judge's lunch -- until 4:00 p.m.; and Friday,

3   9:00 a.m. to noon, and 1:30 to 4:30.

4      I've about finished reading your depositions.  Thank you

5   for facilitating that process.  It looks to me like I'm going

6   to take about ten hours to read them.  I have to read the

7   entire deposition, because some of your objections are asked

8   and answered, and such.  So I at least browse through all of

9   that.  Notwithstanding that, I'm prepared to eat part of that

10  time.

11     So we are currently scheduled on Monday from 1:00 p.m.

12  until 4:30; and on Tuesday from 9:00 to noon, and 1:00 p.m.

13  to either 4:00 or 4:30.  I kept Wednesday open in terms of

14  how we're coming in terms of using up time, and if we need to

15  add some additional time to wrap something up.  I can tell

16  you that I think you're all out of here on a hard stop at

17  noon on Wednesday.  So please adjust your plane reservations,

18  as I know many of you have to travel some distance.

19     So, Mr. Harrigan, Mr. Jenner, any questions about

20  scheduling?

21          MR. HARRIGAN:  No, Your Honor.

22          THE COURT:  I'm hopeful that once they've realized

23  how boring this is, that the crowd will thin out, but who

24  knows.  The court has been pestered with calls from Brussels,

25  and Germany, and assorted other places.  So folks must not

1    have anything better to do.

2        So, we'll do what we can to make sure everyone gets a

3    seat.  I'm not sure how we will do that.  We may need to

4    bring in some additional chairs, if we've got room.

5        The court issued, yesterday, an order granting in part and

6    denying in part motions to seal.  Counsel, have you had an

7    opportunity to review that and want to make any comments on

8    it?

9            MR. WION:  Yes, Your Honor, we have.

10           THE COURT:  All right.  Any comments?

11           MR. WION:  We have a few.

12           THE COURT:  All right.

13           MR. WION:  So, Your Honor, yesterday evening the

14   parties exchanged a number of exhibits that one or the other

15   side had expected to introduce at today's session.  There

16   were approximately 50 or so exhibits that were exchanged.

17   And what the parties have done since yesterday evening is

18   attempt to identify which of those documents contained trade

19   secret information for which appropriate sealing or redaction

20   may be necessary.

21       What we have done, on the Microsoft side, is identified

22   five of those documents as appropriate for some treatment

23   along those lines.  Two of the documents we have proposed

24   redactions for, and the other three are exhibits that the

25   court has already determined should be sealed, in yesterday's

1    order.

2         Would Your Honor like to see the five exhibits that we've

3    selected?

4              THE COURT:  Yes.

5              MR. WION:  May I approach?

6              THE COURT:  Yes.

7              MR. WION:  So, Your Honor, if I may start with the

8    two documents that we have provided redactions for, these are

9    Trial Exhibit 1141 and Exhibit 1636.  Both of these documents

10   are H.264 patent pool agreements that disclose the royalty

11   distribution mechanism that was adopted by the pool.  This is

12   the MPEG LA pool, and also discloses the other financial

13   information, including payments and administrative fees of

14   MPEG LA.  MPEG LA has submitted a motion requesting this

15   information be redacted, and on that basis Microsoft has

16   provided those proposed redactions.

17        With respect to the other three documents, I'm happy to

18   discuss them.  They are Exhibit 288, Xbox Technical

19   Publisher's Guide; 2353, Durango Products Specifications; and

20   2727, a document entitled Honing the Living Room.  And each

21   of these documents were sealed, pursuant to yesterday's

22   order, on page 6 for Exhibit 288, and page 10 for the other

23   two exhibits.

24        Our understanding, although subject to the court's

25   clarification, is that at present we have met the relevant

1    standard and that we can proceed with the exhibits as they

2    have been provided to the court.

3        THE COURT:  In terms of when these will come up --

4    what I want to avoid is closing the courtroom, opening the

5    courtroom, closing the courtroom, opening the courtroom.  Are

6    these coming up with one particular witness, or -- in terms

7    of the pure sealed documents?

8        MR. WION:  I would anticipate that these may be

9    introduced in connection with one or possibly two witnesses.

10   The slight difficulty that Microsoft has had in connection

11   with these documents is that two of them, two of the three,

12   have been identified by Motorola.  And so it's not entirely

13   clear how they are intended to be used, or what portions of

14   those documents will be discussed.  Although, we will

15   certainly make every effort to avoid a situation in which the

16   courtroom would need to be closed.  We simply don't have the

17   information right now to know the manner in which Motorola is

18   intending to use those documents.

19       THE COURT:  Well, while it will be awkward,

20   fortunately we have some flexibility because this is a bench

21   trial.  If we clear the courtroom, both sides will do all

22   presentation of their evidence in regards to that particular

23   document at that time.  So we won't do direct, let people

24   back in, finish the direct, take them out for cross, bring

25   them back in for cross.  I mean, we're going to do it once.

1   I'll ask your patience with that.  But it's going to be

2   necessary to expedite this.

3           MR. WION:  Understood, Your Honor.  Thank you very

4   much.

5           THE COURT:  Mr. Jenner, anything from you, sir?

6           MR. JENNER:  Mr. Brenner will speak on our behalf for

7   this.

8           THE COURT:  Mr. Brenner.

9           MR. BRENNER:  Your Honor, last night, as opposing

10  counsel mentioned, we exchanged some redacted documents.  And

11  I believe we sent four documents that contained proposed

12  redactions to opposing counsel.  We are, I think, going to

13  probably use two of those documents today.  May I approach

14  the bench with copies?

15          THE COURT:  Yes.

16          MR. BRENNER:  Just to explain what we've just handed

17  you.  There are two exhibits there.  There's an additional

18  page.  There's Exhibit 13, which is one of the licenses which

19  the court said should be provisionally sealed.  And then

20  there's 1173, which is a table showing various licensing

21  terms.  The version of 1173 that has -- both of these, by the

22  way, show proposed redactions so you can see the information.

23  The version of 1173 that shows proposed redactions was not

24  completely redacted, and we shared with opposing counsel this

25  morning the additional redaction to that front page that we

1    would like at this particular time.

2          THE COURT:  All right.  Which witnesses will these

3    come up with?

4          MR. BRENNER:  During cross examination.

5          THE COURT:  All right.  With Mr. DeVaan?

6          MR. BRENNER:  No, I believe with Mr. Murphy -- Dr.

7    Murphy.  Your Honor, may I ask a couple of clarifying

8    questions about the order from yesterday?

9          THE COURT:  You can try.

10          MR. BRENNER:  Okay.  Thank you.  One question we had,

11    we understand that various licenses and licensing provisions

12    will come in as provisionally redacted, and then if they

13    appear in your final order, that information will be made

14    public.  I think it's not entirely clear to me whether that

15    information, whether that means that that information will

16    become public, or the entire document will, at that point, be

17    revealed in an unredacted form.

18          THE COURT:  It will be only information that is

19    relied upon by the court.  So that if, for example, you have

20    got a royalty rate -- I think our favorite example we've

21    kicked around a couple of times is the RIM royalty rate -- if

22    that is used by the court, it is going to be stated, and the

23    exhibit that it comes from will be available as to that

24    royalty rate, not the entire exhibit in whatever form it was

25    introduced by the court, or by the parties, with that one

1    part unredacted.

2          MR. BRENNER:  So, Your Honor, would it be possible at

3    that point, after your order comes out, for the parties to

4    present versions of these exhibits with just that information

5    publicly revealed?

6          THE COURT:  If you want to do it on 48 hours' notice,

7    yes.

8          MR. BRENNER:  Thank you.

9      One other question is -- well, actually two related

10   questions.  When we come in at 9 o'clock in the morning with

11   proposed redactions for exhibits that we plan to use that

12   day, obviously today we're engaging in cross examination,

13   it's possible that documents might come up during the course

14   of the direct examination that we didn't anticipate using

15   that we might want to use.  Is there a procedure?  Can we

16   submit those on a sealed provisional basis and come in the

17   next morning with proposed redactions at that point?

18         THE COURT:  Mr. Wion, any objection to that?

19         MR. HARRIGAN:  We're pretty much in favor of anything

20   that avoids closing the courtroom.

21         THE COURT:  Let's try that.

22         MR. BRENNER:  The last question is, we've submitted

23   proposed redactions.  I think opposing counsel has mentioned

24   it's not exactly clear what information may come out, what

25   may not.  I think we would just ask that we be allowed to

1    submit revised redactions, or revised proposed redactions

2    after you've had a chance to look at these proposed

3    redactions, or later on in the day.

4            THE COURT:  That's fine.

5            MR. JENNER:  Your Honor --

6            THE COURT:  Yes.

7            MR. JENNER:  I have a supervening issue that arises

8    out of the order on which we'd like guidance from the court,

9    if possible.  The way Your Honor's order handles information,

10   as you've just noted, is that information like royalty rates,

11   that comes into the record, will be made public with respect

12   to the party involved, the third-party licensee, for example,

13   if it appears in the opinion of the court.  And I think Your

14   Honor probably expects that we will be providing royalty

15   information as a part of Motorola's case.

16        The third parties, many of them, received copies of the

17   orders, and as you might be imagining, in many instances

18   third parties have expressed grave concern to the point where

19   at least one party has submitted a letter to us -- and I'd be

20   happy to share that with the court, if it helps -- in which

21   the party is adamantly opposed to having its information, its

22   confidential information appear in the record.  They would

23   consider it to be a breach both of the protective order as

24   well as a breach of the agreement with Motorola.

25        We are sensitive both to the court's ruling as well as the

1   concerns of the third parties.  We are wondering if there is

2   a possibility, in light of the order, of some sort of middle

3   ground that might be possible.  I know in the past, in a

4   hearing, I think the notion came up of providing a code sheet

5   to the court and witnesses, where rather than name a company

6   in relation to a royalty rate, or a confidential provision,

7   there was the prospect of everyone sharing legends like:

8   Company A, Company B, Company C, so that the company could at

9   least have the prospect of having what it considers to be its

10  confidential information remain so.

11      I presume the court has issued its ruling and you're not

12  prepared to entertain -- maybe you are, requests from third

13  parties.  And I should point out that at least one

14  third-party's counsel is here, and would like to be heard, if

15  possible, should its information come up.

16      But would Your Honor either entertain reconsideration with

17  respect to licensing agreements; would you entertain the

18  prospect of using such a code sheet; or would there be some

19  other guidance the court might have on a way in which we

20  could try to be sensitive to the concerns of third parties

21  regarding their licensing information?

22          THE COURT:  The court has spent a lot of time looking

23  at this, and that includes talking to my colleagues both in

24  the Ninth Circuit and outside the Ninth Circuit, about how

25  they've approached this issue in other cases raising some of

1    the same issues.  And I recognize that I am taking probably

2    the most expansive view of the public's right to know.

3        I am not going to reconsider the order.  If someone wants

4    to propose the code sheet suggestion, I'm happy to take a

5    look at that tonight.  That's not one that I thought about.

6    I've tried to do this in a manner that the parties, frankly,

7    can control the release of information in that the witness

8    will have the unredacted document, and counsel and the court

9    will have it.  And your questions don't need to, other than a

10   mutual experience we had recently where a number kind of just

11   popped out, it doesn't need to be disclosed, until we get to

12   the point that if I'm going to issue an order that attempts

13   to explain how I set this royalty rate, at that point it

14   seems to me the public has the right to know what I relied

15   on.

16       So that's my thinking and that's sort of the best I can do

17   to explain it.

18       MR. JENNER:  I understand, Your Honor.  We will

19   certainly give consideration during the course of the day to

20   a code sheet.  I guess it takes us back to the beginning of

21   the case with the decoder rings.  We'll give consideration to

22   whether there is something we think the court might find

23   workable.

24       In respect of the third parties, one counsel asked to be

25   introduced to the court in the event a document were offered

16

1    during testimony.  I don't want to interrupt testimony.

2    Would the court entertain whatever it is that counsel for

3    this party would like to say now, rather than interrupt

4    during a witness's testimony?

5            THE COURT:  When do you expect that document to come

6    up?

7            MR. JENNER:  It could come up today during the course

8    of the Murphy cross.

9            THE COURT:  We'll come back a little bit early and

10   I'll hear him at ten to one, or something.

11           MR. JENNER:  Thank you.  Thank you, Your Honor.

12           THE COURT:  Last two announcements.  One of the sets

13   of pleadings that had been filed was an attack on

14   Mr. Culbert's integrity -- that was intended to be a joke,

15   Mr. Culbert -- since you are now privy to some confidential

16   information.  I haven't gone back and looked at my original

17   order to appoint you and a Motorola person to serve in this

18   role.  I believe I limited it to anything you learned could

19   be used only in connection with this case.  If that's not in

20   there, I will add it at this time.  I suspect you're already

21   operating under that.

22           MR. CULBERT:  I am, Your Honor.  That's my

23   understanding of how that was supposed to work.

24           THE COURT:  All right.  Mr. Jenner, I don't know who

25   Motorola designated?  Sounds like it's Mr. Miller.

1          MR. JENNER:  Mr. Miller is on the rise, Your Honor.

2          MR. MILLER:  I don't think I've seen anything in this

3     area.

4          THE COURT:  All right.  If you do, sir, you'll be

5     under the same restriction.  That needs to be used in

6     connection with this case and not for negotiations with other

7     parties.

8          MR. MILLER:  Absolutely.

9          THE COURT:  Thank you.  Then lastly, counsel, before

10    we get to our first witness, you asked to submit post-trial

11    briefs, which I believe that I have authorized.  At that time

12    I would also like you to submit annotated findings and

13    conclusions.  So take your findings and conclusions and

14    annotate them to the record.  That way you'll be able to have

15    citation to testimony and also to exhibits.  And that's

16    helpful, as we've been working through this.

17       Anything further at this time?

18          MR. JENNER:  Just on that last point, Your Honor, can

19    we set the timing for post-trial briefs and annotated

20    findings at the conclusion of the trial?

21          THE COURT:  It will likely be ten to fourteen days.

22    It won't be the following Monday so that we've ruined your

23    Thanksgiving, but it will be fairly prompt .  But if there's

24    a reason why that time frame is not going to work, then we'll

25    take it up.

1          MR. JENNER:  We'd just like the opportunity to

2     consider it with the court in case there's some unusual

3     problem.

4          THE COURT:  That's fine.  I'm not sure, Mr. Harrigan,

5     are you conducting direct examination today?

6          MR. HARRIGAN:  Your Honor, a preliminary matter.

7     With the court's permission, Microsoft would like to make an

8     opening statement of about ten minutes' duration.

9          THE COURT:  You're welcome to spend your time any way

10    you'd like.

11         MR. HARRIGAN:  Thank you, Your Honor.

12        Your Honor, the issue in this case is how to arrive at a

13    RAND range and a RAND royalty for Motorola's standard

14    essential patents in two portfolios:  H.264 video compression

15    and 802.11 wireless networking.  Microsoft believes that the

16    basic tenets for resolving this issue are two:  First, that

17    the royalties should not include any value that arose by

18    reason of inclusion in, or widespread adoption of the

19    standard, sometimes called the hold-up value.  And secondly,

20    that the royalty should be proportionate in two ways.  First,

21    it should be proportionate to the contribution of the

22    Motorola patents to the standard itself.  That avoids an

23    unreasonable aggregate royalty that could defeat the

24    standard.  Second, the royalty should be proportionate to the

25    contribution of Motorola's patents to the Microsoft products

1    that implement the standard.  Microsoft's witnesses and other

2    evidence will not only support this approach, but the result

3    will be to provide a truly RAND evaluation.

4        Motorola takes an approach that does not lead to a RAND

5    valuation.  Motorola's approach embodies hold-up.  It asks

6    the court to rely on patent licenses that simply do not bear

7    on the issue.  They relate to fundamentally different

8    technology from that involved in the standard essential

9    patents here.  Motorola participated in the standard setting

10   process.  As part of that participation they made RAND

11   commitments, but refused to honor them.  Instead, it insisted

12   on unjustifiable payments for minor and incremental parts of

13   broad technology standards.  If this hold-up strategy is

14   upheld here, it will spread and lead to royalty stacking,

15   dramatically raising consumer costs.

16       Now, in the balance of this statement, Your Honor, I am

17   going to very briefly advise the court of the thrust of the

18   testimony of the live witnesses that Microsoft expects to

19   call, beginning with Mr. Garrett Glanz.  He's not the first

20   witness, but he's the first one I'm going to talk about.  He

21   was Microsoft's representative during the formation of the

22   MPEG LA H.264 pool.  He will testify about the formation of

23   that pool and the effort that took place during its formation

24   to balance two key elements:

25       First, the need for royalties high enough to attract the

1    holders of the standard essential patents; and second, the

2    need for the royalties to be low enough to attract licensees.

3    And he will testify to the express recognition, by the

4    participants, in the MPEG LA formation process.  The failure

5    to achieve this balance could defeat the H.264 standard in

6    favor of other standards.

7        Mr. Glanz will also testify that Motorola actively joined

8    in these formation meetings and argued for lower royalties,

9    argued for annual caps on total payments, and endorsed the

10   final royalties and caps adopted by MPEG LA, rates far lower

11   than those it is now seeking for its H.264 patents here, and

12   even signed off on the final press release before abruptly

13   declining to join the pool in the eleventh hour.

14       Mr. Glanz will testify that the pool discussions involved

15   a distribution of the total royalties on a pro rata basis in

16   proportion to the number of patents held by each company.

17       Mr. Glanz will testify that Motorola never said, during

18   these meetings, that its H.264 patents were more valuable

19   than those of other pool participants and should merit higher

20   royalties.

21       Professor Kevin Murphy is Microsoft's economics expert.

22   He will testify that enforcement of the RAND commitment,

23   where parties are unable to agree, is essential to avoid

24   hold-up.  He will testify that in order to arrive at RAND in

25   this case for the Motorola standard essential patents, the

1    closest analogs and best comparables are two patent pool

2    licenses, including the MPEG LA license I just discussed.

3        He will explain that this is so for several reasons,

4    including the subject matter of the licenses is comparable,

5    the pools address hold-up, they avoid stacking, and they

6    promote widespread adoption of the standard.  And that for

7    these reasons they are reliable indicators of a RAND royalty.

8        Professor Murphy will also testify that the RAND

9    obligation, if enforced, serves to keep total royalties at

10   levels that will enable the standard to succeed.  This impact

11   of the RAND commitment closely parallels the goals and

12   results of the patent pool process.

13       Timothy Simcoe is Microsoft's expert on standards and

14   standard setting organizations and the economics of

15   standards.  He will testify that the intellectual property

16   policies and practices of the standard setting organizations

17   involved in this action, the IEEE and ITU, seek to ensure

18   widespread adoption of the standards that they promulgate.

19       He will testify that the RAND commitments contained in

20   these IP policies, to which Motorola agreed, further these

21   goals.  And he will also explain why RAND should be arrived

22   at from an ex ante perspective, before the industry is locked

23   into the standard by its very success, with an eye toward

24   ensuring that the aggregate royalties for all holders of IP

25   that the standards are reasonable.

1    Matt Lynde is Microsoft's patent valuation expert.  He

2  will provide calculations of the specific royalties that

3  arise from the evidence and from the application of the

4  analytical framework explained by Professors Murphy and

5  Simcoe.

6    This analysis results in per unit RAND royalties of no

7  more than a fraction of a cent for Motorola's H.264 and a few

8  cents for Motorola's 802.11 portfolio.

9    Jennifer Ochs, who is from Marvell, who supplies the

10 802.11 chips in Xbox to Microsoft, will explain how the

11 royalty proposed by Motorola applies to that chip, which is

12 the smallest salable unit.  Ms. Ochs' testimony will show

13 that the terms proposed by Motorola in this case, i.e.,

14 2.25 percent of the end-product price, are both commercially

15 unreasonable and discriminatory.

16    Kirk Dailey is Motorola's Corporate Vice President of

17 Intellectual Property.  He will be examined when he's called

18 by Motorola in its case.  His testimony will demonstrate that

19 the license agreements that Motorola relies on are not

20 reliable comparables in arriving at RAND royalties for

21 Motorola's standard essential patents here.

22    Gary Sullivan is a Microsoft employee who is the chairman

23 of the group that developed the H.264 standard.  That is not

24 a group within Microsoft, but the people who actually

25 developed the standard.  He will testify that the technology

1    that Motorola proposed for inclusion during the formation of

2    the standard was limited to interlaced video, and that it was

3    added to the standard after its goals were already largely

4    achieved.

5        Motorola's H.264 technical expert, Michael Orchard, has

6    analyzed Motorola's H.264 patents in detail, and will confirm

7    that they, in fact, mainly relate to interlaced video coding,

8    which is old and currently unimportant technology.  And that

9    at most, Motorola's contributions to this standard were,

10   first, a very small part of H.264; second, were incremental

11   to longstanding prior art; and third, the equivalent

12   alternative technical solutions were, in fact, available.

13       Microsoft's 802.11 technical expert, Jerry Gibson, will

14   testify that Motorola's 802.11 patents also relate to only a

15   small portion of the standard.  Even in those technical

16   areas, the patents are directed only to a portion of the

17   relevant subject matter, are incremental to longstanding

18   prior art, and that equivalent alternative technical

19   solutions were available.

20       Microsoft will also call fact witnesses to discuss the

21   principal products at issue, and their testimony will show

22   that Motorola patents are tangential to the key functions of

23   the Microsoft products.

24       Leo Del Castillo, Microsoft's General Manager of Xbox

25   hardware, will testify that the core use of the Xbox 360 as a

1  game console does not require either H.264 or 802.11

2  functionality, and that the functionality provided by

3  Motorola's patents is rarely called on in real-world

4  scenarios.  He will testify that the 802.11 functionality in

5  the Xbox is provided by the three-to-four dollar chipset

6  acquired from Marvell.

7      John DeVaan, Motorola's Vice President for Windows, will

8  testify that the Windows operating system provides thousands

9  of important features to end-users and developers, and that

10  support for H.264 is but one among these thousands of

11  features.

12      Finally, Your Honor, the analytical approach taken by

13  Microsoft in this case produces reasonable royalties, free

14  from hold-up.  By contrast, Motorola seeks to use its limited

15  standard essential portfolios to hold up Microsoft and

16  consumers, as one of its prior experts put it, relying on the

17  simple fact that it takes only one bullet, no matter how

18  small, to kill.

19      Thank you, Your Honor.

20      THE COURT:  Thank you.  Mr. Jenner, were you goaded

21  into saying anything in response?

22      MR. JENNER:  Your Honor will be surprised to hear

23  that I am goaded into reserving my opening until such time as

24  we present our case.

25      THE COURT:  All right.  Mr. Harrigan, if Microsoft

```
 1   will call its first witness, please.  Mr. Cederoth.
 2             MR. CEDEROTH:  Microsoft will call John DeVaan.
 3                           JOHN DEVAAN
 4        Having been sworn under oath, testified as follows:
 5             MR. CEDEROTH:  Your Honor, may I approach the
 6   witness?  I have a couple books.
 7             THE COURT:  Yes.
 8             THE CLERK:  Will you state your name for the record
 9   and spell your last name, please.
10             THE WITNESS:  John DeVaan, D-E-V-A-A-N.
11                       DIRECT EXAMINATION
12   BY MR. CEDEROTH:
13   Q   By whom are you employed, Mr. DeVaan?
14   A   Microsoft Corporation.
15   Q   What is your current position with Microsoft?
16   A   I am the Corporate Vice President of Development for the
17   Windows division.
18   Q   What are your responsibilities in that role?
19   A   I oversee the developers that write the program code for
20   the Windows product.
21   Q   And how many people work for you today?
22   A   About 1,200.
23   Q   Let's talk about Windows.  What is Microsoft Windows?
24   A   Windows is an operating system.  And that's the software
25   that provides an abstraction over the hardware, and presents
```

1    an application interface so that a lot of third parties can

2    write programs that run on the computer.

3    Q    Let's break that up just a little bit.  What happens when

4    I hit the power button on my computer.  What does Windows do?

5    A    So when the power button is pressed on the computer, a

6    small amount of software that comes with the actual hardware

7    the computer runs, called the BIOS, or the firmware, and it

8    initializes enough of the hardware that it can read the first

9    parts of the operating system off of the hard disk.  And then

10   Windows goes to work and starts initializing the computer.

11       So if you've ever taken the back off your computer and

12   looked at the circuit board, you see all the different chips,

13   and cables, and things like the disk drive inside.  So

14   Windows starts a process of loading a small amount of

15   software for each of those hardware devices, called drivers,

16   and initializing the devices one by one.  So, the disk drive

17   gets reinitialized for very high thru-put.  The graphics chip

18   that creates the images for this screen gets initialized.

19   The chip that controls the screen gets initialized; the

20   ethernet chip or the WiFi chip, if it has one.

21       And Windows initializes all that hardware, in turn, and

22   then builds up its software abstraction for the applications

23   that run on the system.  So that an application -- it doesn't

24   need to know the specific brand of CPU, or the specific brand

25   of ethernet chip, the application can access that hardware,

1    those hardware resources in a uniform way.

2    Q    So the computer is now ready for the user to use it?

3    A    Right.

4    Q    I captured a screen shot from Windows 7 that's been marked

5    as Exhibit 4000 as a demonstrative.  Can we put that up,

6    please?

7    A    Yes.

8    Q    Can you explain to the court what this shows and what the

9    use of it is?

10   A    What you're seeing on the screen here is the Windows

11   control panel.  And it lists some small applications which

12   are available on the computer for the user to control the

13   fine-grain settings of either pieces of the hardware or the

14   programming installed on the computer.

15   Q    We've expanded one of these, if I could put up

16   Exhibit 4001 as a demonstrative.  This is the device manager

17   setting.  Could you explain to the court what this does and

18   what it provides to the user?

19   A    The device manager provides a means that enumerates all of

20   those internals of the computer that I was talking about

21   before, and gives the user very fine-grained and very

22   technical access to the features and capabilities of that

23   hardware.

24   Q    What is the role of Windows for the hardware components?

25   A    So, Windows provides an interface to the hardware that

1   allows those software programs to run.  And the software

2   programs can be written once, and work on a wide variety of

3   computers.  You know, not every computer has the exact same

4   set of parts, let alone parts of the exact same brand.

5   Q   Let's consider applications for a moment.  What does

6   Windows do for a software application such as Microsoft Word?

7   A   So an application goes through a process similar to what I

8   described for Windows, but at that higher level.  So the

9   application is going to ask for access to resources on the

10  computer.  So it will ask for a portion of the RAM inside the

11  computer.  It will ask for a portion of the screen.  So if

12  you're looking at the windows on the display from the last

13  exhibit, you see the device manager has a region of the

14  display and the control panel has a region of the display.

15       So Word, a program like Word is going to go through asking

16  the operating system for access to these resources.  And the

17  operating system will balance the requests from all the

18  applications, so that the applications get what they want at

19  the right time.  If the resource needs to be taken away and

20  given to another program at some point, the operating system

21  can do that.

22  Q   Let's take a step back.  How many features are there in

23  any given version of Windows?  For example, Windows 7?

24  A   So, for each version of Windows we'll add thousands of

25  features.  And those features typically build on the

1    thousands of features from the previous release, and the

2    previous release before that.

3    Q    Mr. DeVaan, do you know Ed Bott?

4    A    I do.

5    Q    On the podium there you should have a copy of 1408, which

6    is a Windows Inside Out book that Mr. Bott is one of the

7    principal editors for.  And if you flip to Roman numeral 23

8    in there, you can see you're acknowledged as a contributor

9    and supporter of this book.  What does this book describe?

10   A    So a book like Windows 7 Inside Out is a book -- it

11   describes the basic function of Windows, and with an emphasis

12   on the things which were new in a current Windows version.

13   So there would be a book like this for Windows Vista, for

14   example.  So it does cover much of the basic use that's been

15   constant, but basically focuses on what's new and different

16   in Windows 7.

17   Q    And Microsoft facilitates the flow of information to Mr.

18   Bott to help prepare this book?

19   A    Yes, we do.

20   Q    If you could flip, then, to page Roman 7, beginning of the

21   table of contents.  This goes on for about 13 pages.  How

22   does that list of features and functionalities compare to the

23   work that your team did in building Windows 7?

24   A    It gives an overview of many of the new features that we

25   did in Windows 7, along with some amount of the basic usage

1    of Windows itself.

2             MR. CEDEROTH:  Microsoft would offer 1408, Your

3    Honor.

4             THE COURT:  Any objection?

5             MS. HIGGINS:  No objection, Your Honor.

6             THE COURT:  It is admitted.  It may be published.

7             (Exhibit No. 1408 was admitted into evidence.)

8    Q    You also have on the podium there Exhibit 1409, which is a

9    book, Windows Internals.  Windows Internals by Mark

10   Russinovich and David Solomon?

11   A    Russinovich.

12   Q    I was hoping I could do it.  Do you know the authors?

13   A    I do.

14   Q    And in what capacity?

15   A    Mark worked for me while Windows 7 was being developed.

16   And David does not work at Microsoft, but I know him in

17   conjunction with the book.

18   Q    Are you familiar with this book?

19   A    I am.

20   Q    And what's the purpose of this book?

21   A    Similar to what we just talked about with the Ed Bott

22   book, I'd say the Ed Bott book is focused on things that a

23   person sitting in front of the computer can see.  And this

24   book is really for technical people working with the

25   internals of Windows.

1        So if I'm an IT pro supporting Windows, or I'm a

2   programmer writing the device drivers I talked about that

3   come in during the initialization of Windows, you would look

4   to Windows Internals for information for how Windows worked

5   and what was new in Windows 7.

6   Q   Again, if you could flip to page Roman 7.  And, again,

7   this begins with the table of contents, and in this book goes

8   on for ten pages.  How does that list of features and

9   functionalities compare to the work that your team did in

10  building Windows 7?

11  A   It's going to highlight, again, the things which are

12  consistent in Windows and how Windows works, with an emphasis

13  on what's new and different for Windows 7.

14  Q   Did Microsoft support writing this book?

15  A   Yes, we did.

16           MR. CEDEROTH:  Microsoft would offer 1409.

17           MS. HIGGINS:  No objection, Your Honor.

18           THE COURT:  1409 is admitted.

19       (Exhibit No. 1409 was admitted into evidence.)

20  Q   Let's take a step back now.  How does Microsoft go about

21  developing a new version of Windows?

22  A   We break the work on a new version of Windows into three

23  core phases.  The first phase is what we call the design

24  phase.  And we take in information from all kinds of parts of

25  the market, customer research, and other factors, business

1    needs, and we do a highly iterative process to come up with

2    what we call the vision and specification for that version of

3    Windows, which then we use, through the development phase,

4    which is the second major phase, where we actually write and

5    test the program code to make the new capabilities

6    functional.

7        And then the third phase the world gets to see, it's a

8    broad public testing phase, with the release of a preview

9    release or a beta, and up to when we create the final what we

10   call "release to manufacturer version" which then PC makers

11   take and build PCs with.

12   Q   When it comes down to an individual feature, how does

13   Microsoft decide whether to include a feature or not in any

14   particular version of Windows?

15   A   So it's a very iterative process.  We start with the

16   information that I was talking about before.  And there are a

17   lot of perspectives on that information that we try to

18   resolve.

19       So there's the kind of top-level business and strategic

20   needs from executive management, there are the domain experts

21   which tend to be in what we call the "feature teams" broadly

22   across the 1,200 programmers, and the other engineers that

23   work with them.  And so we iterate bringing this top-down

24   perspective and this bottom-up perspective into the final

25   vision for the release.

1   Q    Just by way of example, the features and operations

2   described in 1408 and 1409, those were arrived at through

3   that process?

4   A    Yes.

5   Q    You mention a number of other employees that were

6   involved.  In rough numbers, how many Microsoft employees

7   were involved in building Windows 7?

8   A    In the Windows division proper, there are about 5,000

9   engineers, and there are also significant contributions from

10  other groups at Microsoft.

11  Q    And, again, just in rough numbers, what did it cost to

12  develop and build Windows 7?

13  A    So, they don't really tell the engineering managers, but a

14  lot.  You know, the 5,000 times six-figure salaries is a lot

15  for three years.

16  Q    Something north of a billion dollars?

17  A    Certainly.

18  Q    Mr. DeVaan, are you familiar with video-coding technology

19  known as H.264?

20  A    I am.

21  Q    And does Microsoft now include support for H.264 in

22  Windows 7?

23  A    Yes.

24  Q    What does it mean for Windows 7 to support H.264?

25  A    Well, the technical basis is that when a user encounters a

1   video encoded with H.264, Windows is able to either use a

2   chip, one of the hardware devices on the computer, or if

3   that's not available through software, play the video on the

4   screen.

5   Q    Is H.264 the only video format supported in Windows 7?

6   A    No.

7   Q    Does Windows 7 support all the popular codecs today?

8   A    We try to support all the popular formats so that people

9   using the computer get the results they expect, which is

10  click on the video and it plays.

11  Q    When Microsoft decided to include H.264 support in

12  Windows, how did you build and add that function?

13  A    We built that starting with the technology that comes from

14  the standards body, and then used our own engineers to create

15  the process for either offloading to hardware or decoding

16  directly in software.

17  Q    Are you familiar that H.264 is articulated as a standard?

18  A    Yes.  That was an important part of the reason why we

19  chose to do it.

20  Q    How did the standard figure in to how Microsoft went about

21  building and creating its version of H.264 in Windows?

22  A    So this is in 2006 or thereabouts, and so two things were

23  happening.  High definition camcorders were coming to the

24  market, and streaming of video on the internet was popular.

25  And then streaming high definition content was starting to

1    emerge.  And what we were interested in is finding and

2    picking the right standard formats to implement, to achieve

3    the philosophy that I was talking about earlier, that when a

4    person using a computer is just on the internet or connects

5    up their camcorder, it works as they expect, the video plays.

6    Q    Are you familiar with hardware decoders?

7    A    I am.

8    Q    What is a hardware decoder?

9    A    There are two primary kinds.  Sometimes the decoders are a

10   separate chip, so if you look at that circuit board in your

11   computer, you could point to a chip.  Often it is a feature

12   of the GPU, which is another chip which controls the graphics

13   display in the computer.  And both ways are used to provide

14   hardware decoding support for H.264.

15   Q    Does Windows interact with the hardware decoders when it

16   encounters an H.264 file?

17   A    It does.

18   Q    How so?

19   A    Very early on in the video playback process, the hardware

20   is interrogated to see if it has a hardware decoder.  And if

21   it does, that hardware decoder is used to play back the

22   video.

23   Q    So the hardware decoder is used instead of the Windows

24   code?

25   A    Yes.

1  Q    Does Microsoft provide computer makers with hardware

2  decoders?

3  A    Not that I'm aware of.

4  Q    Are you familiar with any other third-party software

5  programs that decode H.264 content?

6  A    Yes.

7  Q    Can you give me some examples?

8  A    So there's a popular download called VLC Media Player, is

9  one example.  And I believe Flash also decodes H.264.

10  Q    Who provides the codecs for those programs?  Does

11  Microsoft?

12  A    Microsoft does not.  I don't know who does.

13  Q    In the course of your work in deciding what features were

14  to be included in Windows 7, what considerations apply to

15  including the H.264 capability?

16  A    So, our first concern is the prediction of how popular or

17  how many people are going to want to use a particular

18  capability.  And then when it's a situation like video, where

19  it's a very broad world with a lot of people participating,

20  having a standard which we believe will be the most popular,

21  at least over time, is an important asset for us, because

22  then the computer will work for what people want to

23  accomplish for a minimum of work across the ecosystem to try

24  to get things to happen.

25  Q    Is it important to Windows to include the H.264

1  standardized technology?

2  A   In the way that we try not to do anything unimportant, you

3  know, as I was saying before about the thousands of features

4  that we do, we think all of them are important, and H.264

5  fits there.

6  Q   Are you familiar with the term interlaced video?

7  A   I am.

8  Q   And what's your understanding of interlaced?

9  A   So if you think back to grade school when you first

10  learned about images being a collection of dots, you think of

11  the dots are arranged in rows on the screen.  And interlaced

12  is a process where alternating sets of rows of dots get

13  played one at a time.  And it's a mechanism that goes way,

14  way, way back to the earliest broadcast TV, to basically make

15  the amount of data you're sending at any instant in time be

16  less than sending the whole picture at that instant in time.

17  Q   The different lines of that picture are interwoven in the

18  final result?

19  A   In the blink of the TV monitor you'll get one set of

20  lines, then the next set of lines, alternating.

21  Q   And is the display on my Windows 7 laptop, is that an

22  interlaced display?

23  A   No, it is not.

24  Q   Do you know whether computers, in general, use interlaced

25  displays?

1  A   Interlaced displays are going by the wayside.  Pretty

2  much, if you have an LCD display, it's called a progressive

3  display, not interlaced.

4  Q   In deciding what features and capabilities to include in

5  Windows, did your teams develop any understanding of the

6  nature of the video content available on the web today?

7  A   Yes, we did.

8  Q   And based on that understanding, how important is it for

9  Windows to be able to decode interlaced content?

10  A   Not very important.

11  Q   Why is that?

12  A   There isn't a lot of content that uses interlaced format.

13  If you think of -- when someone is sitting down to compress a

14  video for distribution, there are a lot of tactics that they

15  can use for compression.  Interlaced is one of them.  And it

16  just doesn't get used very often.

17  Q   Then why does Microsoft support interlaced video in its

18  H.264 technology within Windows?

19  A   Well, it's part of the standard.  And going back to that

20  philosophy of a video file, click on the video file, that it

21  should play, it's important for us to support the standard.

22  Q   Are you familiar with a technology known as 802.11?

23  A   I am.

24  Q   And does Microsoft's Windows 7 product provide any sort of

25  support for 802.11?

1  A    It does.

2  Q    In what way?

3  A    Going back to what I was talking about when the computer

4  starts up, the 802.11 functionality is provided by a WiFi

5  card or WiFi chip in the computer, if it has one.  And in

6  that same process of initializing the hardware, Windows will

7  load the driver for the WiFi chip, and then that will provide

8  an abstraction for applications to do its networking over

9  WiFi through the chip.

10 Q    So Windows provides the user interface?

11 A    Yes.

12 Q    In the absence of the WiFi chip you mentioned, does

13 Windows provide any 802.11 functionality?

14 A    There is some very narrow aspects of wired networking

15 that's called 802.11.  But in general, no.

16 Q    But no over-the-air wireless broadband?

17 A    Correct.  Correct.

18 Q    Is it important for Microsoft that Windows support 802.11?

19 A    I would say the same way -- we were just talking about

20 H.264.  It's clearly a standard, and people expect Windows to

21 operate in conjunction with the standard.

22 Q    How does the value of support for 802.11 in Windows

23 compare to the value of the other features that are described

24 in the books?

25 A    It's really hard to give a specific value on any one of

1    the features over the other.  It is going to depend on what

2    people want to do.  For a desktop computer there's very

3    little value to 802.11 WiFi.  So it's going to vary a lot.

4    So it's hard to write one over the other.

5    Q   A couple questions on a new product, just a few.  Are you

6    familiar with the new Microsoft product called Surface?

7    A   I am.

8    Q   What is that product?

9    A   It's a computer, in a tablet form factor, that runs a

10   version of Windows called Windows RT.  And it's designed to

11   be a great tablet, in the tablet form factor.  And the unique

12   things that Microsoft brings to this part of the market is

13   it's not just a tablet, it is a computer.  You can click up

14   the kickstand and lower the cover and there's a keyboard

15   there.  So you might have enjoyed reading your e-mail on the

16   tablet, but it's time to open a Word document and actually do

17   some work.  And that's a unique take on the tablet that the

18   Surface brings.

19   Q   Does that also include touchscreen technology?

20   A   It does.

21   Q   Is that an important aspect of the Surface experience?

22   A   Yes, it is.

23   Q   Does Surface support H.264?

24   A   Yes, it does.

25   Q   Is it important for Microsoft that the Surface support

1    H.264?

2    A    On the basis we've been talking, you know, as one of the

3    capabilities that it has, yes.

4    Q    Okay.  Is that in relation to the standard?

5    A    Well, it's important that -- the standard is what makes

6    H.264 important.  That means there will be content in the

7    world, and people will expect the content to play when they

8    use the Surface.

9    Q    Does the Surface include 802.11 functionality?

10   A    It does.

11   Q    How does it provide the 802.11 functionality?

12   A    It's a computer, so it's exactly as I've described before,

13   Windows RT loads the driver for the WiFi chip and provides

14   WiFi functionality that way.

15   Q    So it relies upon the presence of the WiFi chip?

16   A    Yes.

17   Q    Okay.  Is it important for Microsoft that the Surface

18   include 802.11 functionality?

19   A    In the notion that 802.11 and WiFi are standards for

20   connectivity, yes.

21            MR. CEDEROTH:  Pass the witness, Your Honor.

22                      CROSS EXAMINATION

23   BY MS. HIGGINS:

24   Q    Good morning, Mr. DeVaan.

25   A    Good morning.

1  Q   So you testified that Windows does support H.264, correct?

2  A   Yes.

3  Q   And that goes for both Windows 7 and Windows 8?

4  A   Yes.

5  Q   And, in fact, that's also true with respect to newer

6  versions of Windows Vista, correct?

7  A   Newer versions of Windows Vista, I'm not familiar that

8  that's true.

9  Q   Okay.  Now, media foundation, you know what that is,

10  correct?

11  A   Yes.

12  Q   That's an area of the Windows code that has to do with

13  media processing and display, correct?

14  A   Yes.

15  Q   Media foundation is included in both Windows 7 and

16  Windows 8, correct?

17  A   Yes.

18  Q   And, in fact, media foundation includes both an H.264

19  decoder and an H.264 encoder, correct?

20  A   Yes.

21  Q   Now, the media foundation H.264 decoder supports the

22  Baseline, Main and High profiles of the H.264 standard up to

23  level 5.1, correct?

24  A   I'm not going to be expert enough to answer with that

25  level of precision.  So I don't know.

1    Q   Can we bring up Exhibit 2042, please?  I believe there's a

2    binder up there, sir, if you would also like to look in your

3    binder at Exhibit 2042.  And it's also published on the

4    screen.  Let me know when you're ready.

5    A   I have it in front of me.

6    Q   This is a document titled H.264 decoding.  Do you see

7    that?

8    A   Yes.

9    Q   This is a document from Microsoft's Windows MSDN website,

10   down at the bottom?

11   A   I'm sorry, I didn't bring my glasses.  But,

12   msdn.microsoft.com, yes.

13   Q   At the top of the document it states that, "The media

14   foundation H.264 video decoder is a media foundation

15   transform that supports the decoding of Baseline, Main, and

16   High profiles up to level 5.1."  Do you see that?

17   A   I do, and it does say that.

18   Q   Do you believe that's the case, sir?

19   A   My firsthand knowledge is hard, but I would believe if

20   MSDN says it, it's true.

21   Q   Okay.  Then Internet Explorer 9, that's a Microsoft

22   browser, correct?

23   A   Yes.

24   Q   And if Internet Explorer 9 uses the media foundation API,

25   that's an application programming interface, in Windows to

1   decode H.264, correct?

2   A   Yes.

3   Q   And within Windows 7 there's also Windows 7 Media Player,

4   correct?

5   A   Yes.

6   Q   And the Windows 7 Media Player uses the media foundation

7   API in Windows to decode H.264, correct?

8   A   There are some differences, but basically, yes.

9   Q   Now, if you would, I believe that you still have a copy up

10  there of 1408.  Could you pick up that book?  It's the

11  Windows 7 Inside Out book.  Yes, sir.

12       Now, if you would, Mr. Cederoth had directed you to the

13  table of contents.  And I'd ask you to turn to table of

14  contents part 3, which is titled "digital media"?

15  A   Okay.

16  Q   You see that there?

17  A   Yes.

18  Q   And there's three chapters there, chapters 12, 13 and 14,

19  that are devoted to digital media, correct?

20  A   Yes.

21  Q   Now, turn if you would to page 408.

22  A   Okay.

23  Q   There's a section there that discusses which file formats

24  and codecs are supported in Windows 7, correct?

25  A   Yes.

1  Q    And on the next page there's a table labeled, "File

2  formats newly supported in Windows Media Player 12."  You see

3  that?

4  A    Yes.

5  Q    Then underneath there there's two file types, AVC HD

6  video, correct?

7  A    Yes.

8  Q    And that's a file type that you're familiar with, sir,

9  correct?

10  A    Yes.

11  Q    Camcorders use that?

12  A    Yes.

13  Q    And there's also another one, MP4 video.  Do you see

14  that?

15  A    Yes.

16  Q    And both of those file types state that these container

17  formats are typically used -- typically use the H.264 video

18  compression codec, correct?

19  A    Correct.

20  Q    Let's turn to the next page, the next page, 410, at the

21  top, has a first paragraph that discusses adding an updated

22  codec.  Do you see that?

23  A    Yes.

24  Q    There was some of your testimony was talking about

25  hardware or third-party codecs versus the native H.264

1    decoder, correct?

2    A   I'd say it a little differently.  There's the hardware

3    decoder, and then the Windows native software decoder for

4    H.264.

5    Q   Okay.  Now, would you agree that the first paragraph here

6    is discouraging Windows 7 users from downloading and

7    installing third-party codecs?

8    A   Give me a moment to read it.

9    Q   Sure.

10   A   It describes some downsides to installing your own codecs.

11   Q   It warns users who install third-party codecs that, "You

12   do so at your own risk.  A buggy codec can cause the player

13   to crash, freeze, or suffer reduced performance."  Correct?

14   A   Yes.

15   Q   Now, let's turn to your two demonstratives that you used

16   during your direct testimony.  Now, demonstrative 4000, you

17   labeled sample Windows 7 control panel, correct?

18   A   I don't see a label "sample."

19   Q   Right up at the top of the screen, sir.

20   A   At the top.  I'm looking only at the screen.

21   Q   Okay.  Now, in your sample Windows 7 control panel, there

22   are applications that aren't part of Windows 7, correct?

23   A   Correct.

24   Q   And, in fact, none of the Accumine -- they're highlighted

25   here -- Flash Player, Adobe version Cue CS4, iCloud, Java and

1    Quicktime.

2    A    Can you go through your list again, please?

3    Q    Sure.  Accumine, Flash Player, Adobe version Cue, iCloud,

4    Java and Quicktime.

5    A    Those are not Windows components.

6    Q    Let's turn to the blowout demonstrative 4001, please.

7         And I'll direct your attention to where it says, device

8    manager.

9    A    Yes.

10   Q    Then over on the left it refers to display adapter.  Do

11   you see that?

12   A    Yes, I do.

13   Q    It says VMware SVGA 3D?  Do you see that?

14   A    Yes, I do.

15   Q    There is no hardware accelerator listed on the display

16   adapter, correct?

17   A    In this case, no.

18        Can I think about that just for a second?  I don't know

19   the details of what VMware does in their video display

20   driver, so it might or might not have direct hardware in the

21   host operating system backing it.

22   Q    But it doesn't list a hardware accelerator there, correct?

23   A    It does not.

24   Q    Windows 7 was the first version of Windows to support

25   H.264 natively, correct?

1    A    Yes.

2    Q    And prior to Windows 7, support was provided only by these

3    third-party codecs, correct?

4    A    Correct.

5    Q    And third party add-on is an additional program that

6    somebody is going to install, correct?

7    A    Yes.

8    Q    And third party add-ons you found during that first phase

9    that you discussed during your direct testimony was not

10   delivering the quality, safety, and seamlessness that the

11   end-user really expected, correct?

12   A    I don't think I said that in my opening testimony.  But I

13   think it's correct, yes.

14   Q    Okay.  End-users desire the content they want to just work

15   and not have the technical hassles to do what they want to

16   do, correct?

17   A    Correct.

18   Q    And during that first phase that you were discussing,

19   Microsoft's view was that customers needed to be able to rely

20   on playing high definition video reliably, correct?

21   A    Correct.

22   Q    In fact, Microsoft put native support for H.264 in

23   Windows 7 because it wanted to include it as a standard for

24   playing high definition content and to relieve the end-user

25   from having to go to the hassle and risk of installing H.264

1    from a third party, correct?

2    A   I would say because it is a standard; and correct

3    otherwise.

4    Q   Okay.  During your direct testimony I believe you referred

5    to the design phase, and you talked about a vision and

6    specification for that version of Windows that you were

7    working on, correct?

8    A   Correct.

9    Q   Now, internally within Microsoft, Microsoft has something

10   that it refers to as pillars of Windows 7, correct?

11   A   Yes.

12   Q   And these are sort of top-level themes for that vision for

13   the product, correct?

14   A   Correct.

15   Q   And one of the key pillars of the Windows 7 vision was to

16   enable Microsoft to provide customers with an inbox solution

17   to view both the playback of broadcast video content, as well

18   as live video content, correct?

19   A   I'm not remembering that that was a pillar.  I'd have to

20   refer to the vision document to review that.

21   Q   Let's bring up Exhibit 2739, please.  Can you look at it

22   on the screen or binder, sir?

23   A   Which was the number?

24   Q   2739.

25   A   Okay.

1    Q    And first of all, this is a functional specification for

2    Windows 7, correct?

3    A    Yes.

4    Q    Okay.  And I'll direct your attention to page 942600.

5    A    In the lawyer numbers?

6    Q    In the lawyer numbers.

7    A    942 -- mine are all 944.

8    Q    944 -- I'm sorry.  944788.  Sorry, sir.

9    A    That's the first page.

10   Q    Okay.  And so this is the functional specification for

11   Windows 7, correct?

12   A    Um, I believe so, yes.

13   Q    Let's turn to page 944791.  And I direct your attention to

14   right underneath the "Value Prop and Business Rationale," it

15   states there, "This feature will implement one of the key

16   pillars of the Windows 7 vision of enabling Microsoft to

17   provide customers an inbox solution to view both the playback

18   of broadcast video content, as well as live broadcast video

19   content."  Do you see that, sir?

20   A    I see that.

21   Q    This was, indeed, one of the Windows 7 visions during the

22   design and development of Windows 7, correct?

23   A    So we implemented it, and I'm not sure that the language

24   in the spec, which is the very detailed feature team

25   document, did necessarily get reflected as a pillar in and of

1    itself.  But all the features roll up to a pillar of the

2    vision.

3    Q    That's what the program managers wrote there though,

4    correct, sir?

5    A    It is.

6    Q    And, in fact, under key success metrics for this feature,

7    one of the key success metrics that is listed is playback of

8    new file types, including H.264, correct?

9    A    Yes.

10   Q    Okay.  While we're in the specification, let's turn to

11   944792.

12   A    Okay.

13   Q    And I direct your attention to the top of the page.

14   There's some information there on broadcast and H.264.  Do

15   you see that?

16   A    Yes.

17   Q    And this document reports that DirecTV, all DirecTV local

18   HD content will be broadcast in H.264, do you see that?

19   A    Yes.

20   Q    And in fact it says, for BSkyB, all BSkyB HD content will

21   be broadcast in H.264, correct?

22   A    Yes.

23   Q    And Canal-plus, all Canal-plus HD content is in H.264, it

24   says that as well, correct?

25   A    Yes.

1  Q   There was some direct testimony about hardware and

2  hardware acceleration, correct?

3  A   Yes.

4  Q   It's true, sir, when media foundation cannot locate a

5  hardware accelerator, it will use the software decoding,

6  correct?

7  A   That's correct.

8  Q   And, in fact, for H.264, that hardware acceleration could

9  be enabled or disabled, correct?

10 A   Yes.

11 Q   I want to turn to your testimony regarding the Surface

12 tablet.

13 A   Okay.

14 Q   With respect to the Surface tablet, the only internet

15 connection for the Surface is 802.11, correct?

16 A   The only built-in, yes.

17 Q   And there's no ethernet port, correct?

18 A   There is no ethernet port.

19         MS. HIGGINS:  Pass the witness.

20    Your Honor, I offer for evidence Exhibit 402 and 2739.

21         THE COURT:  Any objection?

22         MR. CEDEROTH:  Not on 2739, Your Honor.

23         MS. HIGGINS:  2042 and 2739.

24         MR. CEDEROTH:  And not on 2042.

25         THE COURT:  They're admitted.

1        (Exhibit No. 2042 and 2739 were admitted into evidence.)

2                        REDIRECT EXAMINATION

3    BY MR. CEDEROTH:

4    Q    Mr. DeVaan, counsel went through a list of software

5    decoders, including Flash, I think, that were displayed on

6    the control panel?

7    A    Yes.

8    Q    Do you have an understanding as to whether these are

9    widely used on Windows-based PCs or laptops?

10   A    Which exactly, the Flash, you're asking?

11   Q    For example, Flash.

12   A    Flash is very broadly used.

13   Q    And when they are present, what is normally used for

14   decoding H.264 content?  Is it Flash?  Is it hardware on the

15   computer?  Is it Windows or some other option?

16   A    It's going to depend upon how the user accessed the

17   content.  So I would say the most popular way through a web

18   browser to a site like YouTube would typically use Flash.

19   It's beginning to use H.264, but I think most people who

20   navigate there would use Flash.

21   Q    And is Flash one of the buggy third-party codecs counsel

22   was referring to?

23   A    No.

24           MR. CEDEROTH:  No further questions, Your Honor.

25           MS. HIGGINS:  No questions, Your Honor.

1    THE COURT:  I have some for you.

2    THE WITNESS:  Okay.

3                              EXAMINATION

4  BY THE COURT:

5  Q   Now that you've taken us through high school, we'll go

6  back to elementary.

7        Did I understand that if you have an -- what I'll call

8  an application, let's say Blu-ray, it would incorporate the

9  H.264 standard and a user could access the standard through

10  that application; is that correct?

11  A   That's correct.  So usually when you get a computer with a

12  Blu-ray drive, it will include an application like CyberLink

13  or Total Media Center, which is -- those are third-party

14  programs that use their own codecs to play back the Blu-ray.

15  Q   So the responsibility, then, of the creator of that

16  application would be to obtain access to the H.264 standard?

17  A   They do.  In theory, you could write so that it would just

18  use the Windows, but they all seem to bring their own.

19  Q   And what is the advantage or disadvantage of doing it one

20  way or the other?

21  A   I think it's the ability to make sure on the very, very

22  broadest number of PCs, because these programs are trying to

23  support not just Windows 7, but Windows Vista, and Windows XP

24  where Windows doesn't have the support.  So it's just easier

25  for them from a product-support standpoint to include it

1    themselves.

2    Q    All right.  And what is Microsoft's view -- you've

3    described that as an add-on.  Would that be discouraged

4    because of potential user problems?

5    A    Coming from a reputable source like these application

6    vendors, we wouldn't discourage it.  It's the "Type-in the

7    search box on the internet and find a place that's

8    advertising codecs," that we wouldn't recommend.

9    Q    Just so my notes are complete, does Windows Media Player

10   support H.264?

11   A    On Windows 7 and Windows 8, yes.

12   Q    At one point you talked about the significance of H.264 to

13   the Microsoft products, generally.  And you've described it

14   as equivalent to all the other features.  Would you explain

15   that answer for me?

16   A    So, when we're going through the design phase for a

17   version of Windows, we only have so many people to do the

18   work.  And so we're going to trade and pick the things which

19   are most valuable to do, that we think are most valuable for

20   the people that are going to use Windows.

21        And so in that standpoint we do make decisions about, you

22   know, should we have these people do H.264, or should we have

23   them do memory size reductions, or other things that might

24   benefit people in other ways.

25   Q    Is that prioritization recorded somewhere, or is that just

1    in terms of assignments that you're giving to your software

2    writers?

3    A   At the high level it's the vision document that we talked

4    about.  So counsel was talking about pillars, which is the

5    very top-level outline of what we're going to do.  Then the

6    outline eventually becomes completely expanded in the

7    specification, like was given in one of the exhibits.

8    Q   Final area.  I think I understand interlaced and

9    progressive.  Does H.264 encode progressive also?

10   A   Yes.

11   Q   Why, then, if the standard does both, is it important to

12   draw this distinction that everyone seems to think is

13   important?

14   A   Between progressive and interlaced?

15   Q   Yes.

16   A   So, I think that the ability of progressive to deliver a

17   superior picture is an important consideration, because there

18   are times where in the interlacing the picture can start to

19   look flickery, depending upon the monitor quality and other

20   things.  And you don't get that with progressive.

21   Q   But if the standard which you now are using allows both,

22   why does it make a difference that either one is used over

23   the other?

24   A   Well, the objective is for the end-user to not know

25   anything about it.  And in that case it doesn't matter at all

1    to the end-user.

2        But if you're the network operator, we're talking about

3    DirecTV, and they care because they want to deliver

4    high-quality picture that people see, and use the smallest

5    amount of data size so that they can have capacity for more

6    channels.  And the tradeoff in the world is pretty much

7    overwhelmingly progressive for picture quality.

8    Q    Your ability to access progressive is still based on an

9    access to the H.264 standard?

10   A    Yes.  There are other video formats that have progressive

11   also, but most H.264 files are progressive.

12   Q    In terms of the Motorola patents that are part of the

13   H.264 standard, do they go to both progressive and

14   interlaced, or solely to interlaced?

15   A    Somebody else can answer that better for you than I can.

16   But my understanding is interlaced only.  But I don't know

17   for sure.

18        THE COURT:  All right.  Mr. Cederoth, any further

19   questions?

20        MR. CEDEROTH:  Your Honor, as tempted as I am to

21   cross examine the witness after your direct, we have no

22   further questions.

23        THE COURT:  Counsel?

24        MS. HIGGINS:  No further questions, Your Honor.

25        THE COURT:  You may step down.  Thank you very much,

```
 1   sir.
 2       Counsel, why don't we take our break at this time and
 3   we'll start at twenty minutes to eleven with a fresh witness.
 4   And that will be who?
 5           MR. HARRIGAN:  Mr. Glanz, Your Honor.
 6                       (Court recessed.)
 7
 8           THE COURT:  Mr. Harrigan, your next witness, please.
 9           MR. HARRIGAN:  Microsoft calls Mr. Garrett Glanz.
10   Whereupon,
11                       GARRETT GLANZ
12   called as a witness, having been first duly sworn, was
13   examined and testified as follows:
14           THE CLERK:  Will you state your name for the record
15   and spell your last name?
16           THE WITNESS:  Garrett Glanz, spelled G-L-A-N-Z.
17                   DIRECT EXAMINATION
18   By Mr. Harrigan:
19   Q   Mr. Glanz, are you employed by Microsoft?
20   A   I am.
21   Q   What is your current position?
22   A   I am a general manager of licensing in the intellectual
23   property group.
24   Q   Licensing of what?
25   A   Licensing of Microsoft's patents, in particular.
```

1    Q    Any particular category of patents, or just all patents?

2    A    All patents.

3    Q    And how long have you been in that position?

4    A    I have been in that role just over two years.

5    Q    And how long have you been at Microsoft?

6    A    I have been at Microsoft for just over twelve years.

7    Q    Could you --  So you started in 2000, approximately?

8    A    That's correct.

9    Q    And would you give the court just a brief synopsis of your

10   positions and responsibilities at Microsoft from 2000 until

11   you assumed your current job in 2010?

12   A    When I joined in 2000, I was a business development

13   manager in the Windows Digital Media division.  And in that

14   role I was responsible for both inbound licensing of various

15   technologies and metadata, as well as the outbound licensing

16   of the Windows Media technologies.  As well in that time, I

17   was Microsoft's representative to the MPEG LA patents pool

18   meetings.

19   Q    Is that the only patent pool you had involvement with --

20   that you had involvement with during that time?

21   A    I was involved with both the MPEG-4 visual patent pool,

22   the H.264 patent pool and the AVC-1 patent pool that

23   followed.

24   Q    And the first two you mentioned are both MPEG LA pools?

25   A    That's correct.

1          MR. HARRIGAN:  Your Honor, we have a demonstrative

2   exhibit, which is number 4002, which is in the notebook that

3   you should have in front of you there somewhere, in I think

4   the first tab, which is a timeline.

5   By Mr. Harrigan:

6   Q   Mr. Glanz, could you tell the court briefly what this

7   timeline depicts?

8          THE COURT:  Mr. Jenner, who will be doing your cross?

9          MR. McCUNE:  I will be, your Honor.

10          THE COURT:  Do you have a copy of this?

11          MR. JENNER:  I do.

12          THE WITNESS:  This timeline shows, starting at the

13   formation of the MPEG LA visual pool through the

14   standardization of H.264, the initial meetings of the MPEG LA

15   H.264 patent pool, all the way through the subsequent press

16   releases announcing the terms of the pool, and finally ends

17   with Microsoft's signature on the pool agreements, and then

18   when we learned about Motorola's decision not to join the

19   pool.

20   By Mr. Harrigan:

21   Q   Okay.  So just briefly, the first thing here is MPEG-4

22   patent, November 2002.  What is the relationship between the

23   technology dealt with by MPEG-4 and the technology dealt with

24   by MPEG LA H.264, if any?

25   A   MPEG-4 visual was an earlier video codec technology, that

1    had been standardized, and ultimately a pool formed around it

2    just subsequent to 264.  264 was the successor technology, if

3    you will, to the MPEG-4 visual.

4    Q   So the first meeting of the MPEG LA H.264 pool occurred in

5    the same year as the formation of the -- the completion of

6    the MPEG-4 pool?

7    A   According to this timeline, the MPEG-4 pool ended the end

8    of November 2002, and the first meeting of the H.264 pool was

9    June of 2003.

10   Q   Thanks.  And this timeline indicates that H.264 was

11   adopted -- was actually adopted when?

12   A   It was adopted as a standard in May of 2003.

13   Q   And then the first MPEG LA meeting with respect to that

14   pool occurred a short time later, July --

15   A   Actually, June 23rd.

16   Q   June 23rd, thank you.  Could you describe for the court

17   what the general process was for the formation of the MPEG LA

18   H.264 pool?  In other words, what was the procedure by which

19   various people got together and discussed the things they

20   needed to discuss in order to arrive at a patent pool around

21   that standard?

22   A   Typically around the time that a standard was finalized,

23   MPEG LA would put out a call for patents, indicating that any

24   company which held essential patents was invited to

25   participate in pool licensing discussions.  So they did that.

1    And then subsequently, an initial meeting would be called.

2    And MPEG LA would facilitate then the negotiations among the

3    essential patent holders, and ultimately drive consensus

4    towards a licensing model and agreements, and then launch a

5    licensing program based on the terms that the pool had agreed

6    to.

7    Q    Okay.  So were there a series of meetings then in the

8    spring, summer and fall of 2003, among all of these people?

9    A    Yes.

10   Q    And did you attend those meetings?

11   A    I did.

12   Q    Then, even though it is a little bit --  Once the

13   licensing system and the royalties and so forth are all

14   agreed on, could you just describe for the court what

15   MPEG LA's role is at that point, once their licensees are

16   signed up and the royalties have been determined?

17   A    Sure.  Once the pool launches and licensees begin to sign

18   up, MPEG LA will then collect the royalties reported by the

19   different licensees and distribute the royalties amongst the

20   different licensors.

21   Q    And is there a set system for distributing the royalties?

22   A    Yes, there is.

23   Q    Without going into the nitty-gritty details, basically how

24   does that work?

25   A    So the royalty distribution is based on a formula, taking

1   into account the revenues generated and the total number of

2   patents contributed to the pool, and basically splitting up

3   the royalties per licensor based on the number of patents

4   they had contributed.

5   Q   So it is just an arithmetic proportion based on the total

6   number of patents in the pool and the number of patents held

7   by individual companies?

8   A   That's correct.

9   Q   With no doubt some other qualifications, but that's the

10  basic idea?

11  A   Yes.

12  Q   And when you attended these meetings, were you doing so as

13  Microsoft's representative?

14  A   Yes, I was.

15  Q   At the time of the initial MPEG LA H.264 meeting, how

16  widespread was the implementation of H.264?

17  A   H.264 was still in a very early stage of adoption and

18  deployment.  Companies were in many cases working on their

19  implementations, but there were not a large scale -- a large

20  number of commercial products out in the market at that time.

21  Q   And at the time that the MPEG LA H.264 pool was starting

22  to coalesce in roughly the spring of '03, were there

23  competing technologies performing functions similar to that

24  the H.264 was set up to perform?

25  A   Yes, there were a number of competing video codec

1    technologies, including MPEG-4 visual, which was the

2    precursor standard, as well as some proprietary technologies,

3    such as real video from RealNetworks, as well as Windows

4    Media video, which was Microsoft's proprietary solution.

5    Q    What did Microsoft's proprietary solution do?

6    A    Similar to H.264, it compressed video streams for

7    distribution over the internet, for example, to PCs and other

8    types of devices.

9    Q    Would you turn in your notebook to Exhibit 1584, which

10   should be the next one in the book after the timeline?

11        This exhibit is entitled "News Release."  It is dated

12   November 17, 2003 at the beginning of the text.  What is this

13   exhibit?

14   A    This is a press release by MPEG LA, announcing that the

15   H.264 patent pool had met and had agreed on licensing terms

16   for the technology.

17   Q    So this was kind of the announcement that the people who

18   had been attending all these meetings that we are about to

19   get into in more detail had reached consensus on what?

20   A    On the specific licensing terms for the H.264 technology.

21   Q    And the second line here says, "The essential H.264 MPEG-4

22   AVC patent and patent application holders have reached

23   agreement on the terms of a joint patent license for

24   implementation and use," et cetera.

25        Is that an accurate statement based on your attendance

1   at the meetings?

2   A   Yes.

3   Q   And does this exhibit accurately set forth in the second

4   page what the royalties were that had been agreed upon at

5   this point in time for decoders and encoders?

6   A   Yes, it does.

7   Q   Would you recap for the court briefly -- run through and

8   tell the court basically what this first part of Page 2 is

9   telling us regarding decoder and encoder royalties?

10  A   So the essential patentholders agreed that for H.264

11  codecs the royalty rate would start at 20¢ per unit after the

12  first 100,000 units, meaning the first 100,000 units were at

13  no charge.   And above 5 million units the per codec rate

14  would drop to 10¢ per unit.   Furthermore, there was agreement

15  that there would be an annual cap on the royalties paid,

16  starting at $3.5 million, and scaling up to $5 million over

17  the term of the license agreement.

18  Q   And then the third paragraph is rather long.  Can you just

19  tell us briefly -- give us a paraphrase of what that is

20  about?

21  A   So the third paragraph describes the annual caps available

22  to companies who would be paying on behalf of PC OEMs.  For

23  example, to the extent that Apple, let's say --  Actually,

24  Apple is not a good example.  To the extent that Microsoft

25  puts an H.264 codec into Windows, this cap would allow

1  Microsoft to pay and not pass a royalty liability down to PC

2  OEMs.

3  Q    And then the last paragraph deals with the grace period?

4  A    That's right.  MPEG LA --  The patentholders agree to

5  allow MPEG LA to offer a royalty-free grace period for

6  companies that signed up before a certain point in time.

7  Q    And then we don't need to discuss it, but just tell the

8  court basically what is covered under the next section,

9  "Participation Fees."  What is that about?

10 A    Participation fees were royalties due for the distribution

11 of content in the H.264 technology.  So it was for websites,

12 for DVD distributors that might use the technology.

13 Q    And does this exhibit also indicate the identity of the

14 companies who had cooperated in arriving at these terms?  And

15 I'm referring to the first full -- first paragraph after the

16 bullets on Page 3.

17 A    Yes, the press release lists the companies that had agreed

18 to these terms.

19 Q    And is Motorola included in that list?

20 A    Yes, it is.

21 Q    And had Motorola agreed to these terms, based on your

22 attendance at the meetings?

23 A    Yes.

24 Q    Was there another organization at the same time, that is,

25 back in the spring and summer of '03 -- was there another

1    organization besides MPEG LA that was working on an H.264

2    patent pool?

3    A   Yes, Via Licensing had also made a call for patents and

4    was attempting to form a patent pool for H.264.

5    Q   And did you participate in the Via Licensing meetings

6    also?

7    A   Yes, I did.

8    Q   Did Motorola participate in the Via Licensing meetings?

9    A   Yes.

10   Q   Who was Motorola --  I don't know if I specifically asked

11   you, but Motorola participated in the MPEG LA H.264 meetings

12   also, right?

13   A   Yes.

14   Q   Who was Motorola's representative in those two

15   organizations?

16   A   Paul Bawel.

17   Q   That's B-A-W-E-L?

18   A   That's correct.

19   Q   Why did you participate in both potential patent pools?

20   A   At the time it wasn't clear which of those pools would

21   ultimately be successful to bring a license to market.  So

22   from Microsoft's perspective, because we felt that it was

23   important to have a functioning patent pool for the

24   technology, we thought it was useful to participate in both

25   to understand and ultimately join the pool that was

1    successful.

2    Q    And so Via was more or less a competitor of MPEG LA?

3    A    Yes.

4         MR. HARRIGAN:  We will offer 1584.

5         MR. McCUNE:  No objection.

6         THE COURT:  It will be admitted and may be published.

7         (1584 admitted.)

8    By Mr. Harrigan:

9    Q    Would you describe for the court what the process was at

10   MPEG LA for seeking to arrive at agreed royalty rates and

11   other elements of the royalty structure?  How was it run?

12   How did they organize arriving at a consensus?

13   A    MPEG LA would convene the meetings, and would drive the

14   agenda, which was typically comprised of a strawman licensing

15   proposal that MPEG LA would put on the table to drive

16   discussion among the patentholders, and ultimately tried to

17   achieve consensus on the key terms.  As part of those

18   discussions, MPEG LA would go around the room and ask each

19   company to state specifically its position on the strawman,

20   including any adjustments that those companies would choose

21   to make to that strawman.

22   Q    What were the main topics of discussion?

23   A    The primary topics for the H.264 pool discussions revolved

24   around the relative level of the per codec royalties, whether

25   there should be annual caps applied to those, and as well

1    whether use fees or participation fees were a key component

2    of the overall licensing structure.

3    Q    How did a company get to be one of the outfits

4    participating or represented at these meetings?

5    A    In order to participate in the discussions, a company

6    would either need to have an issued patent or an application

7    that was deemed essential to the H.264 standard.

8    Q    Who decided whether something that was submitted as the

9    entry ticket was essential or not?

10   A    MPEG LA designated an external expert to do the

11   evaluations of the patents and applications submitted.

12   Q    And was it sufficient to have one patent or one

13   application that was deemed to be essential in order -- as

14   your ticket to entry?

15   A    That's correct.  Most companies only submitted a single

16   patent or application in order to participate.

17   Q    Even if they may have had others?

18   A    Right.

19   Q    So all of the participants were potential licensors of the

20   H.264 technology?

21   A    That's correct.

22   Q    And how about licensees, were any licensees at the

23   meetings?

24   A    In fact, many of the companies holding essential patents

25   as licensors would also be licensees of the technology.

1    Q    For example, who?

2    A    For example Microsoft, Sony, Motorola.

3    Q    And why were they --  It is probably obvious, but why were

4    they both potential licensors and licensees?

5    A    Those companies I just cited all had products which

6    ultimately would benefit from the H.264.

7    Q    And also happened to have phones, and at least one SEP?

8    A    Correct.

9    Q    What were the Motorola products that made it a potential

10   licensee?

11   A    Motorola both distributed -- built and distributed mobile

12   phones, as well as set-top boxes.

13   Q    And how about Microsoft?

14   A    Microsoft had Windows, which of course could integrate

15   H.264, as well as other products like Xbox.

16   Q    So I think you said that a strawman would be put up, and

17   then -- it may be slightly repetitious, but did people

18   immediately express their views on that, or was it preceded

19   by some other discussion, or how did that work?

20   A    Typically a strawman was put on the table by MPEG LA,

21   there would be a period of ad hoc conversation where

22   companies maybe provided some initial reaction, threw out

23   some ideas on how to refine it, but then there was usually a

24   more formal portion where MPEG LA again went around the room

25   and asked each company specifically what their view on the

1    proposal was.

2    Q    And with respect to the part of the meeting where they

3    went around and asked each company their specific views on a

4    strawman, did you take notes of those events?

5    A    Yes, I did.

6    Q    And was it a standard business practice of yours to do

7    that?

8    A    Yes.

9    Q    Did you do it in the ordinary course of performing your

10   Microsoft duties?

11   A    Yes, I did.

12   Q    Did you accurately record what was stated by these

13   participants?

14   A    Yes.

15   Q    How thoroughly did you record that information?

16   A    I took very detailed notes of the proceedings.

17   Q    And what use did you actually make of these notes, in

18   terms of your Microsoft work, besides simply recording what

19   happened?

20   A    I took those notes so that I could then go back and inform

21   and update our executives on how the discussions were

22   progressing, and also then drive sort of our internal

23   decision process around our participation in the pool.

24   Q    To whom did you -- who were the people that you

25   immediately dealt with, with respect to these topics?

1    A    At Microsoft?

2    Q    Yeah.

3    A    At the time I was dealing directly with my manager Bill

4    Spencer, as well as the head of the Windows Client Group,

5    Will Poole.

6    Q    What was the mechanical method by which you took the

7    notes?

8    A    I had a tablet PC that had a pen input, so I was able it

9    handwrite notes on my PC screen which were then captured

10   digitally.

11   Q    Where did you maintain the notes once you had taken them

12   and made whatever use of them you made with respect to

13   management activities?

14   A    I saved them on the hard drive of my laptop.

15   Q    And you have already said that Motorola was at these

16   meetings.  Did you record Motorola's observations and

17   comments on the various strawmen in these notes?

18   A    Yes.

19   Q    And the other companies' as well?

20   A    Absolutely.

21   Q    Please turn to Exhibit 1139, which should be the next one.

22   Can you tell us what Exhibit 1139 is?

23   A    That exhibit is my notes from the first day of the MPEG LA

24   meeting on July 31st, 2003.

25   Q    Okay.  And do they continue on to a second day?

```
 1    A    Yes, they do.

 2    Q    So these cover July 31 and August 1?

 3    A    That's correct.

 4    Q    Are all the responses you just gave to me with regard to

 5    how these notes were generated true with this document?

 6    A    Yes.

 7    Q    And does it include Motorola -- among other things,

 8    Motorola's observations and comments about various strawmen

 9    proposals?

10    A    Yes.

11         MR. HARRIGAN:  We will offer 1139.

12         MR. McCUNE:  No objection, your Honor.

13         THE COURT:  1139 is admitted and may be published.

14         (1139 admitted.)

15    By Mr. Harrigan:

16    Q    Then would you please take a look at Exhibit 1581, which

17    is the next one?  What is Exhibit 1581?

18    A    These are the slides that MPEG LA presented at that

19    meeting, starting on July 31st, 2003.

20    Q    These slides contained, among other things, the strawmen

21    that were being put up to be discussed?

22    A    Correct.

23         MR. HARRIGAN:  We will offer 1581.

24         MR. McCUNE:  No objection, your Honor.

25         THE COURT:  1581 is admitted.
```

1          (1581 admitted.)

2          MR. HARRIGAN:  In an attempt to simplify this, which

3   I hope is successful, we have the next tab, which should be

4   Demonstrative Exhibit 4003.  If you page in about four pages

5   you will see that we have the -- we have some of the slides

6   on one side and some of Mr. Glanz -- and we have Mr. Glanz's

7   notes on the other side.

8      I am holding it up so you can see what I am -- where you

9   should be looking.  So we are going to go back and forth

10  between these two documents and try to relate your notes to

11  what was under discussion as reflected in the slides.

12  By Mr. Harrigan:

13  Q   Just by way of a little more background before we dive

14  into this, did you express views on behalf of Microsoft at

15  the MPEG LA meetings about what you believed or Microsoft

16  believed should be the basic approach to setting royalties?

17  A   Yes, I did.

18  Q   And what did you say in that regard?

19  A   Microsoft's view was that the exercise of establishing the

20  licensing terms for H.264 had to strike the right balance

21  between achieving sufficient revenue for the patentholders so

22  as to motivate enough patentholders to join the effort, as

23  well as to establish a royalty rate that was supportable and

24  acceptable to a wide variety of companies that might

25  ultimately choose to implement the technology into their

1    products.

2    Q    And did you express that -- Microsoft's support for that

3    approach to the other people at the meetings?

4    A    Yes.

5    Q    Were there discussions during the meetings about the risk

6    that might exist if rates were set too low?

7    A    Yes, there was.  If rates were set too low, the risk was

8    that the revenues would not be significant enough to motivate

9    patentholders to actually contribute their patents to the

10   joint license, and therefore the license would not represent

11   a one-stop shop for potential licensees.

12   Q    And were there discussions about the risks if the rates

13   were set too high?

14   A    Yes, there were.

15   Q    And what -- generally, what was the conversation about

16   that?

17   A    If the rates were set too high, licensees would likely

18   consider the technology economically unsupportable and would

19   ultimately decide to implement competing or alternative video

20   codec technologies.

21   Q    And were there discussions about -- if this balance was

22   not reached, if an appropriate balance was not reached, such

23   as you just described, whether that entailed any risk to the

24   success of the standard, was that a conversation --

25   A    Yes.

1  Q   And what was the risk?

2  A   Again, the risk was that if the rates were too high,

3  potential implementers would use alternative video coding

4  technologies, and H.264 would not be broadly adopted across

5  the market.

6  Q   So let's go and take a look at your notes here.  Now, this

7  was not the first meeting, correct?

8  A   No.  I recall this was the second meeting.

9  Q   Take a look initially at the -- at what is numbered

10 Slide 14 of the slide deck, which is opposite the first page

11 of your notes here.  It says, "The license working session of

12 strawman."  Is this the strawman that was put forward on the

13 first day?

14 A   Yes, it is.

15 Q   The date at the top of your notes on the right-hand side

16 of this says July 31, '03.  Are those the notes with respect

17 to the discussion of the strawman that we are looking at

18 here?

19 A   Yes, they are.

20 Q   Just tell the court briefly what the two component -- the

21 main two components of the strawman are here as reflected in

22 the first two pages, that is Slides 14 and 15 of the slide

23 deck?

24 A   Sure.  MPEG LA's initial proposal was to establish

25 separate royalty rates for either AVC or H.264 baseline

1    products, and main or extended products.  "Baseline" refers

2    to a limited functionality version of the technology that

3    would not support, for example, high definition video.

4    "Main" and "extended" are the more capable versions of the

5    technology.

6         And MPEG LA was proposing that a lower rate be established

7    for baseline products of 50¢ per codec, with $1 million --

8    actually $2 million per codec caps.  And in the case of main

9    and extended, MPEG LA had a proposal that the codec --

10   Q    Before we get too --  Extended is on the next page?

11   A    Yes.

12   Q    Slide 15.  Go ahead with extended.

13   A    So the extended proposal was for a per codec rate starting

14   at $1.50 per unit for the first 10 million units; scaling

15   down to $1 per codec from 10 to 20 million; and then scaling

16   down to 50¢ from 20 to 50; and then for any units over 50

17   million, 20¢ per codec.

18   Q    The does the first section of your notes deal with the

19   discussion about those two -- basically those two pages,

20   primarily?

21   A    Yes.

22   Q    Let's just take a look then.  We have the date.  About

23   three lines down you say, "Strawman is presented to start

24   discussions."  And that is the strawman we just went through,

25   correct?

1  A   Correct.

2  Q   And then I see you have France Telecom written down here

3  at the bottom.  Is that the first comment?

4  A   Yes.

5  Q   And the next several pages contain what, generally?

6  A   The next several pages contain the notes based on what

7  each company said in response to the strawman proposal.

8  Q   So at the top of the next page, which is 27603 in the

9  lawyer number, you have Sony.  So this is Sony's comments?

10  A   Correct.

11  Q   And you have a circle around the word "cap."  What does

12  that signify?

13  A   I was noting that Sony and many other companies, as you

14  will see in the notes, were supportive of having an annual

15  cap applied to the royalties paid by any given company.

16  Q   So every time we see "cap" circled under a name, they were

17  for some kind of a cap?

18  A   Correct.

19  Q   And over on the next page I see that you have, under

20  Samsung, second line, "Same royalty for all profiles"?

21  A   Um-hum.

22  Q   And also under ETRI, and also under MEI.  What does that

23  signify?

24  A   As I indicated in the strawman, MPEG LA was initially

25  proposing a different royalty rate for baseline versus the

1    main and extended.  It was quickly agreed to among the group

2    that there shouldn't be separation in royalty rates for the

3    different profiles.

4    Q    And then at the bottom of Page 27604 we have your notes on

5    Motorola's comments on this strawman?

6    A    That's correct.

7    Q    I may interrupt here and there to ask you a clarification.

8    But would you just go through that and tell the court what

9    Motorola had to say about this proposal?

10   A    Sure.  So Motorola indicated -- said that the grace period

11   proposed by MPEG LA was a good idea, but that it may need to

12   be even longer than what MPEG LA proposed initially.

13   Q    And I am going to interrupt you right there, and just tell

14   the court that Slide 19, which is also in this collection in

15   this section, says, "Grace period during 2004 for licensees

16   who sign up within six months of license start up."  So no

17   cost if you sign up within six months, right?

18   A    No cost for that period of time.

19   Q    Right.  So Motorola liked the grace period, but thought it

20   should be perhaps longer?

21   A    That's correct.

22   Q    Go ahead.  Continue explaining -- telling us what

23   Motorola --

24   A    Motorola said that there should be a minimum threshold,

25   meaning that some number of initial units should be royalty

1    free.

2    Q    And we just looked at the November press release.  In

3    fact, that was ultimately adopted, was it not?

4    A    That's correct.

5    Q    The first how many?

6    A    100,000.

7    Q    Go ahead.

8    A    Motorola noted -- said that it was in strong favor of a

9    cap -- an annual royalty cap.

10   Q    Okay.

11   A    Motorola pointed out that in some of the revenue

12   projections presented by MPEG LA that mobile devices were not

13   actually included as a category, and that projections at the

14   time back in 2003 indicated that 50 percent of mobile phones

15   would support video by the year 2010.  So Motorola stated

16   that they felt -- they believed that mobile would be a

17   significant contributor to the revenue stream going forward.

18   Q    Okay.

19   A    Further, Motorola said the rates proposed by MPEG LA and

20   the strawman were too expensive for mobile devices,

21   especially given the low price points that many of those

22   devices sell at, and will ultimately -- would ultimately lead

23   mobile OEMs like Motorola to choose alternative video coding

24   technologies.

25   Q    Alternative to what?

1    A    To H.264.

2    Q    And then what is the last point here?

3    A    The last point again refers to the revenue projections

4    presented by MPEG LA.  Motorola said that the encoder

5    projections seemed to be significantly higher than the

6    decoder projections in question, and whether that made

7    logical sense.

8    Q    So then I see that your notes continue with various

9    comments by other companies.  And then we get to Page 27609,

10   which starts "Larry's summary."  Who is Larry?

11   A    Larry Horne is the CEO of MPEG LA, and was essentially the

12   facilitator of these meetings.

13   Q    And explain what he said in his summary here.

14   A    So once he heard each of the companies' reactions to the

15   strawman proposal, he summarized by indicating that -- by

16   saying that he heard the group clearly say that all H.264

17   profiles should be treated the same, in terms of how the

18   license would apply and the rates would apply.  He said that

19   he heard the group state that caps -- annual caps were a

20   necessary component of the ultimate license structure, and

21   that there was some question about whether use fees, or

22   participation fees as they were later called in the press

23   release, were the right thing to do.

24   Q    And then do you then record the comments of various people

25   about the use fees?

1    A    That's right.

2    Q    And over on the next page, what was Motorola's comment

3    about that?

4    A    Motorola said that it did not support use fees because it

5    was concerned that content distributors would try to pass the

6    fees up to suppliers or vendors of the H.264-capable devices.

7    So, for example, the Motorola set-top boxes that were sold to

8    cable companies like Comcast.

9    Q    Now, we have the second demonstrative, which works the

10   same way as the one we just went through with the slides on

11   the left and the notes on the right.  And these are taken out

12   of the other original exhibits.  And this is called 4004.

13          Just to get oriented here --  First of all, do the

14   slides here represent some strawmen who were put forward on

15   August 1?

16   A    Yes.

17   Q    And your notes about -- comments about them?

18   A    Correct.

19   Q    I see that the first page, Slide 27, says, "Strawman II

20   all profiles."  Now we are just talking about one profile?

21   A    Well, single rate for all the different profiles.

22   Q    Would you tell the court what is depicted here for

23   Strawman II?  And then I see that Strawman No. III starts

24   three pages -- on Slide 30.  If you can just do this, go

25   through the two of them and explain what they proposed and

1    what the main differences are?

2    A    So on the second day of the meeting, MPEG LA came in with

3    two new strawman proposals based on what they had heard the

4    day before.  And specifically they presented this to the

5    group and asked each company to comment on which of the two

6    strawman proposals, No. II or No. III, each company

7    preferred.

8    Q    So let me interrupt.  Were they saying what would you like

9    to do, or are they saying which one of these two do you

10   prefer?

11   A    The specific question was which of these two do you

12   prefer.

13   Q    Go ahead.

14   A    So Strawman II establishes or proposes a per codec rate

15   of -- so there is a threshold for the first -- royalty free

16   threshold for the first 50,000 units, after which it

17   establishes a per codec rate of $1 for the units between

18   50,000 and 5 million, 50¢ per codec between 5 million and 10

19   million units, and 20¢ per codec for any units above 10

20   million.

21        And in the proposal MPEG LA suggested that there would be

22   a prepayment option available, an up-front prepayment, for

23   companies that expected to ship in high volume.  So this was

24   in lieu of a cap.

25   Q    So just another way of arriving at some of the same

1    objectives as the cap?

2    A   It is a way of lowering the per unit rate for high volume

3    producers.

4    Q   Right.  Go ahead then, if you would, since I think the

5    rest of this refers to things related to other parts of the

6    technology.  How about Strawman No. III, how did that differ

7    with respect to the codec part of this?

8    A   Strawman No. III also had a royalty-free threshold of

9    50,000 units.  The initial $1 per codec rate only applied up

10   to 2.5 million units, and the rate would go down at 2.5 to

11   50¢ through 10 million, and above 10 million units it was 20¢

12   per codec.

13       Additionally, MPEG LA proposed that there would be annual

14   up-front caps available of $8 million for each of the five

15   categories of H.264-capable products that they proposed.

16   Q   Then turning to your notes, just so we get the terminology

17   here right.  The first page of your notes says, "Day two,"

18   and it lays out a set of proposals.  Which strawman are you

19   writing down here?

20   A   This is day two.  The first page of the notes refers to

21   Strawman II.

22   Q   And the next page you have "Proposal No. 2."  What does

23   that refer to?

24   A   That refers to the second proposal of the second day,

25   which is actually Strawman No. III.

1    Q    So these two pages are you basically writing down what the

2    proposals were?

3    A    Correct.

4    Q    Then we get to "FT OK."  What does that mean?

5    A    That means France Telecom was agreeable to these

6    proposals.

7    Q    And then it says --  What does the next line say?

8    A    Sony's comment was that it preferred rather than

9    Strawman II or III to revisit the structure that was agreed

10   to for MPEG LA visual.

11   Q    So they weren't answering the question?

12   A    Correct.

13   Q    Do you know what the MPEG-4 structure was that they were

14   saying they preferred, approximately, generally?

15   A    Yes.  The MPEG LA license structure established a 50¢ per

16   codec rate, 25¢ for decoders, 25¢ for encoders with annual

17   caps of $1 million each for encoders and decoders.

18            THE COURT:  Mr. Harrigan, let me stop you.  When you

19   say "50¢ per codec," what does that mean?

20            THE WITNESS:  So a codec is basically the combination

21   of an encoder, which is able to create the content in a

22   compressed format, and a decoder, which is able to play back

23   the content in a compressed format.  Many devices implement

24   both encode and decode functions, and therefore would have a

25   codec.

1    By Mr. Harrigan:

2    Q    Paging through here to Page 27614.  Did you record what

3    Motorola had to say about these strawman?

4    A    Yes, I did.

5    Q    And what did they say?

6    A    Motorola said that of these two strawmen proposals

7    presented by MPEG LA on the second day, it preferred Proposal

8    No. 1; however, it would want to see a cap applied to it of

9    either $2 million per year per business unit or somewhere

10   between 8- to $10 million per year per enterprise.

11   Q    And what did Nokia have to say about these strawman?

12   A    Nokia basically agreed with Motorola's comment that the

13   $8 million cap -- enterprise cap at that level was

14   appropriate.

15   Q    MS refers to what you had to say; is that right?

16   A    That is Microsoft, yes.

17   Q    What did you have to say?

18   A    Microsoft stated that we, like Sony, preferred the MPEG

19   visual that had been agreed to some months before.

20   Q    MPEG-4, I take it, was fresh in the participants' minds?

21   A    Most of the participants in the H.264 meetings had

22   previously participated in the MPEG-4 visual discussions, and

23   really all of the same issues around caps and royalty rates

24   came up in that context.

25   Q    And skipping down here to IBM, what was their comment

1    regarding the codec royalties?

2    A    IBM stated that they also preferred low cost per codec,

3    low royalties on a codec basis.

4    Q    So turning to the next tab, was there a licensing patent

5    pool meeting a few days later?

6    A    Yes.

7    Q    And are these your notes on that patent pool --

8    A    Yes.

9    Q    -- dated August 5, '03?

10   A    Yes.

11   Q    And were they taken, maintained and used for the same

12   purposes as the ones that we have just been reviewing for

13   MPEG LA?

14   A    Yes.

15            MR. HARRIGAN:  We will offer 1583.

16            THE COURT:  Any objection?

17            MR. McCUNE:  No objection, your Honor.

18            THE COURT:  It is admitted and may be published.

19            (1583 admitted.)

20   By Mr. Harrigan:

21   Q    We are not going to go through these in any detail.  Do

22   they reflect that Mr. Bawel was there for Motorola?

23   A    Yes, I believe the meetings actually took place at the

24   Motorola campus.

25   Q    And would you turn all the way to Page 27627?  There is a

1  reference there to a Motorola proposal.  Do these notes

2  reflect a proposal Motorola was making at the Via Licensing

3  meeting?

4  A   Yes, they do.

5  Q   What was it?

6  A   At the time, Motorola proposed that the per codec royalty

7  be 25¢ for the manufacture and sale of the codec, with an

8  additional 5¢ per codec for the use, and that there would

9  also then be annual caps of $2 million for the manufacture

10  and sale, and $500,000 for the use, for a total of

11  $2.5 million maximum per entity.

12  Q   And was this inconsistent with what it had said a few days

13  earlier, as you understood it, at the MPEG LA meeting?

14  A   No, this was consistent with the statements Motorola made

15  in that meeting.

16  Q   These are different rates, though, aren't they?

17  A   They are different rates than the strawman, but that's

18  because MPEG LA proposed the strawman proposals.

19  Q   After this July/August period, did the meetings continue?

20  A   Yes, they did.

21  Q   When was a consensus reached on the royalty structure for

22  MPEG LA?

23  A   I recall that consensus was reached in the fall time

24  frame, likely October.

25  Q   Would you take a look at Exhibit 1643?  First of all, tell

1    us what the e-mail discussion is about, and then what the

2    attachment to the e-mail is.  Generally what is it about and

3    tell us what the attachment is?

4    A   This was an e-mail sent by Larry Horne to the AVC group,

5    which was the e-mail list that included all of the

6    participants in the H.264 licensing discussions, including

7    Microsoft, including Motorola.  And this was initially sent

8    as a proposed press release that MPEG LA would make to the

9    marketplace, announcing the terms that the group had agreed

10   upon.

11   Q   Why did MPEG LA issue press releases?  Why did the group

12   issue press releases?

13   A   As noted on the timeline, the standard had been approved

14   back in May, and the market was very interested to understand

15   what the licensing terms would be, so that companies could

16   make decisions about whether or not to implement the

17   technology in their products.

18   Q   Why not wait until you were all done with the contracts

19   and so forth?

20   A   There was agreement in this time frame on what the basic

21   financial terms of the license would be.  However, there were

22   a lot of legal documents that needed to be created amongst

23   the group, and so it was important to let the market know as

24   soon as possible what the rates would be, so that they would

25   have certainty in their product plans while the group

1    continued to work through the process of developing legal

2    documents and actually launching the licensing program.

3    Q    Is there a draft press release attached to this e-mail

4    string?

5    A    Yes, there is.

6    Q    The first two lines of it say, "The essential H.264 MPEG-4

7    AVC patent and patent application holders have reached

8    agreement on the terms of a joint patent license," correct?

9    A    Correct.

10   Q    Is that true?

11   A    Yes, it was.

12   Q    And the first page of Exhibit 1643 contains an e-mail from

13   Paul Bawel at 2:21 p.m. on November 7, '03 to Larry Horne and

14   the AVC group, indicating it has some clarifications it wants

15   on the press release?

16   A    That's correct.

17   Q    Finally, the press release on Page 3 lists the companies

18   that are described in the first sentence as having reached

19   agreement.  And is Motorola included there?

20   A    Yes.

21   Q    And then the next exhibit is 1179, which is also a

22   November 7, '03 e-mail.  In this case it starts out with

23   Mr. Bawel saying, "Okay, Motorola agrees with the terms of

24   the press release.  Thanks for all of the hard work,

25   everybody."

1          MR. HARRIGAN:  We will offer 1179.

2          THE COURT:  Any objection?

3          MR. McCUNE:  No objection, your Honor.

4          THE COURT:  1179.

5          MR. HARRIGAN:  1643.

6          MR. McCUNE:  Also no objection.

7          THE COURT:  1643 is admitted.

8          (1179 & 1643 admitted.)

9   By Mr. Harrigan:

10  Q    Did everyone who participated in these meetings agree

11  ultimately to these terms at this point in time?

12  A    No.

13  Q    Can you recall those who didn't?

14  A    Several companies ultimately chose to withhold their name

15  from the press release, and in some cases did not sign up for

16  the licensing program.  Those included Apple, NTT, IBM, and a

17  few others.

18  Q    Did any of them eventually join the pool?

19  A    Apple eventually joined the pool.

20  Q    Would you take a look at Exhibit 1642, and tell us what

21  that is?  Let me ask you a preliminary question.  After the

22  press release went back, did you get any feedback?

23  A    MPEG LA received comments and feedback from a number of

24  different potential implementers of the H.264 technology.

25  Q    What was the general nature of those comments?

1    A    I recall that the feedback was primarily about the

2    participation fees and how they would apply to content

3    distribution businesses.

4    Q    And did those -- did that feedback give rise to any

5    changes in the royalty structure?

6    A    Yes, there were a few modifications to the structure that

7    was announced on November 7th.

8    Q    And then we are just looking at Exhibit 1642.  Does that

9    have something to do with these changes?

10   A    Yes.  This is an e-mail from Larry Horne to the AVC group

11   e-mail list, describing some of the feedback received, as

12   well as some of the proposed changes to address that

13   feedback.

14   Q    And then there is an e-mail from Mr. Bawel from Motorola

15   here, expressing agreement in principle with the changes.  In

16   the second paragraph he says, "We are also interested in

17   learning how the changes to title by title terms will affect

18   the license, but are in favor of finding the right mix of

19   terms that will result in a successful license for the

20   marketplace," correct?

21   A    Correct.

22           MR. HARRIGAN:  We will offer 1642.

23           THE COURT:  Any objection?

24           MR. McCUNE:  No, your Honor, no objection.

25           THE COURT:  1642 is admitted.

1              (1642 admitted.)

2    By Mr. Harrigan:

3    Q    Please take a look at 1626.  Before we go into that, take

4    a look at the next one, 1625.  So 1625 starts with an e-mail

5    of May 17, '04, from you to Larry Horne.  And before we get

6    to that one, let's look at the last e-mail in this exhibit,

7    which is from Mr. Horne to the AVC group.  Are you with me?

8    7:34 p.m. on the second page of Exhibit 1625.

9              The second to last sentence of his e-mail says,

10   "Attached for your information is the final press release.

11   We plan to issue it tomorrow, Friday."  And this is sent to

12   the AVC group.  That included you?

13   A    Yes.

14   Q    And Mr. Bawel?

15   A    Yes.

16   Q    And is it your understanding that Motorola approved the

17   press release?

18   A    Yes.

19   Q    And how did you get that understanding?

20   A    I received that -- I developed that understanding based on

21   both this e-mail chain where Larry Horne specifically

22   mentions that Motorola has approved the release, as well as

23   the fact that the final release that was issued included

24   Motorola's name.

25   Q    Is Exhibit 1626 the press release that is under

1  discussion, that was mentioned in Exhibit 1625?

2  A   Yes, it is.

3  Q   The first sentence of Exhibit 1626 says, "MPEG LA today

4  announced that AVC's essential patentholders have agreed on

5  final terms of license to be included," et cetera.  And on

6  the second page, in the next to the last paragraph, it says,

7  "Owners of substantial patents that expect to participate in

8  the AVC patent portfolio license include," and then there is

9  a list which in the third line says, "General Instrument

10 Corporation, dba, Motorola Broadband Communications Sector."

11 Correct?

12 A   Yes.

13         MR. HARRIGAN:  We will offer 1626 and 1625.

14         THE COURT:  Any objection to 1625?

15         MR. McCUNE:  No objection, your Honor.

16         THE COURT:  1626?

17         MR. McCUNE:  No objection.

18         THE COURT:  Both are admitted.

19         (1625 & 1626 admitted.)

20 By Mr. Harrigan:

21 Q   Then, Mr. Glanz, if you would be so kind as to look at the

22 next three exhibits in your notebook.  1141, tell us what

23 that is.

24 A   1141 is the agreement among licensors for the H.264 pool,

25 and describes a number of different things that the licensors

1   agreed to, including -- I believe it talks about the royalty

2   sharing formula.

3   Q   Okay.  And that's the one you generally described earlier?

4   A   Correct.

5   Q   During the discussion of the royalty structure, including

6   the royalty sharing method, at the MPEG LA meetings that we

7   have been talking about, did Motorola ever raise its hand and

8   say, by the way, our patents are worth more than the rest of

9   your patents so we should get higher royalties?

10  A   No, Motorola never stated that.

11  Q   Okay, what is Exhibit 1636?

12  A   1636 is the licensing administrator agreement between

13  MPEG LA and the various patentholders.

14  Q   And Exhibit 3087 is what?

15  A   That is the actual patent portfolio license between the

16  pool and various licensees.

17  Q   They are all basically in this format; is that right?

18  A   That's correct.

19  Q   This one is with Microsoft?

20  A   Correct.

21          MR. HARRIGAN:  We will offer 1141, 1636 and 3087.

22          MR. McCUNE:  No objection to any of those.

23          THE COURT:  They are admitted and may be published.

24          (1141, 1636 & 3087 admitted.)

25  By Mr. Harrigan:

1  Q   Did you eventually hear that Motorola was not going to

2  join the pool?

3  A   Yes, we did.

4  Q   And prior to learning that they were not going to join the

5  pool, had anyone from Motorola told you that they objected to

6  the royalties?

7  A   No.

8       MR. HARRIGAN:  No further questions.

9                     CROSS-EXAMINATION

10 By Mr. McCune:

11 Q   Good morning, Mr. Glanz.

12 A   Good morning.

13 Q   Do you have the cross witness notebook in front of you?

14 A   I do.

15 Q   Mr. Glanz, my name is Phil McCune, and I represent

16 Motorola in this case.

17      Mr. Glanz, Microsoft participated in the MPEG LA H.264

18 pool because it was a proponent of the technology, correct?

19 A   That's correct.

20 Q   Microsoft participated in the pool because it wanted H.264

21 to become a broadly adopted standard, correct?

22 A   Correct.

23 Q   Also, Microsoft participated in the pool because, whether

24 Microsoft wanted H.264 to become a standard or not, it was

25 likely to become an important standard, correct?

1    A    If the licensing rates were set appropriately, yes.

2    Q    Your deposition is in the back of your binder, sir.  Would

3    you take a look at Page 67 of your deposition, starting at

4    Line 23?  Let me know when you're there.

5    A    67, Line 3?

6    Q    Line 23.  Question:  "Would you agree that Microsoft

7    argued for low codec fees with reasonable annual caps and

8    opposed use fees, at least in part, because H.264 was

9    considered likely to be adopted, and an important media

10   standard, and hence having the ability to support it in

11   Windows was consider critical to insure the flow of content

12   to Windows?"  Answer:  "Yes, I would agree with that

13   statement."

14   A    I am not seeing that on Page 67, Line 3 of what I am

15   looking at here.

16   Q    Line 23, sir.

17   A    23.  I'm sorry.  Would you repeat the question?

18   Q    That statement -- the text I just read to you from Line 23

19   on Page 67 to Line 5 on Page 68, that was a correct

20   statement?

21   A    Yes.

22   Q    And you still agree with that statement, correct?

23   A    I do.

24   Q    Microsoft wanted low codec fees and annual caps on those

25   license fees for the MPEG LA H.264 pool, correct?

1    A    Low in comparison to MPEG-2, correct.

2    Q    This was in an effort to control part of the licensing

3    costs as part of Microsoft's business strategy, correct?

4    A    That wasn't the only reason.

5    Q    That was an important reason?

6    A    That was a reason.

7    Q    Microsoft wasn't obligated to participate in any of the

8    MPEG LA H.264 pool or the Via H.264 pool, was it?

9    A    No.

10   Q    In fact, no standard essential patentholder was obligated

11   to participate in any pool, was it?

12   A    Correct.

13   Q    And Microsoft advocated an H.264 licensing model where

14   Microsoft's royalty covered OEMs using the Windows operating

15   system, correct?

16   A    Correct.

17   Q    That licensing structure fit Microsoft's goal of

18   incorporating the H.264 standard into Microsoft's PC

19   operating system, correct?

20   A    Correct.

21   Q    In fact, Microsoft obtained from MPEG LA separate

22   licensing caps for PC operating systems software that used

23   the H.264 standard, right?

24   A    Correct.

25   Q    You mentioned that briefly with Mr. Harrigan earlier.

1    These caps limited the cost of H.264 integration for

2    Microsoft's OEM customers, correct?

3    A    Correct.

4    Q    Your group considered getting that structure into the

5    MPEG LA H.264 pool a win, didn't they?

6    A    Yes, we did.

7    Q    It was a win because H.264 licensing terms were low enough

8    that Microsoft could make a business case to ship the codecs

9    in Windows and not create royalty liability for its OEMs?

10   A    It was a win because it allowed us to insure the broad

11   support of H.264 in a high volume product like Windows.

12   Q    And to insure that could be there, Microsoft needed to

13   have royalty rates that justified its putting it in there and

14   not creating too much of a cost structure, correct?

15   A    We didn't want to create a significant liability for our

16   OEMs if we were able to bear the cost ourselves.

17   Q    Let's take a look at Trial Exhibit 3088.  It is the second

18   tab in your notebook that has many tabs, not all of which we

19   will be talking about today.

20        Do you have the exhibit in front of you, sir?

21   A    3088?

22   Q    3088, correct.

23   A    Yes, I do.

24   Q    And you identified this document in your deposition as a

25   July 2004 slide presentation for Microsoft's executive

1  internal review prior to signing the MPEG LA H.264 patent

2  pool agreements; is that correct?

3  A   Correct.

4  Q   And if you look at Page 5 of this agreement -- excuse me,

5  of this presentation, Page 5 of a five-page presentation,

6  that's a full page discussing the costs to Microsoft of

7  licensing into the H.264 patent pool, correct?

8  A   Correct.

9  Q   At this time Microsoft had a good idea of the licensors

10 for the pool, right?

11 A   Yes, we did.

12 Q   And there is no analysis here of the revenues to Microsoft

13 from that pool, correct?

14 A   Correct.

15 Q   And there is no evidence from this executive presentation

16 that pool revenues were a driving factor for Microsoft in its

17 analysis of whether to join the MPEG LA H.264 pool, correct?

18 A   Pool revenues were very difficult to calculate, and

19 therefore we did not attempt to do that in this presentation.

20         MR. McCUNE:  Move to strike, your Honor, and request

21 that the witness be instructed to answer the question.

22         THE COURT:  Overruled.

23 By Mr. McCune:

24 Q   Sir, is there any presentation in this Exhibit 3088 that

25 discusses revenues from Microsoft's licenses that were in the

1  pool -- that would be in the pool?

2  A   No.

3  Q   Was that something that was discussed with the Microsoft

4  executives that were present for this presentation when they

5  considered joining the H.264 MPEG LA pool?

6  A   I don't recall.

7  Q   Now, there are many reasons, Mr. Glanz, why an H.264

8  standard-essential patentholder might choose not to join the

9  MPEG LA H.264 pool, correct?

10 A   Correct.

11 Q   One reason would be that a patentholder may choose not to

12 join the pool in order to hold back its patents to use

13 defensively in litigation, correct?

14 A   Correct.

15 Q   A patentholder -- standard-essential patentholder might

16 also want to seek higher reasonable rates than those that

17 were being charged by a pool, correct?

18 A   Correct.

19 Q   I read in your deposition -- you stated that your

20 understanding was -- the reason that Motorola had decided not

21 to join the H.264 MPEG LA pool was that --

22        MR. HARRIGAN:  Your Honor, I think we are getting

23 into an area that the court has precluded at this point.  The

24 previous questions were generic.  This one is now about why

25 Motorola might not have joined the pool.

1       MR. McCUNE:  I only have one question, your Honor,

2   directed to what this witness's understanding was of why

3   Motorola did not join the pool.

4       THE COURT:  I will permit the question.

5   By Mr. McCune:

6   Q   Was it your understanding, sir, that Motorola had decided

7   for various reasons that it was advantageous to them not to

8   license to the MPEG LA pool?

9   A   I recall that we learned from Larry Horne that Motorola

10  had sold the patent that it had initially submitted for its

11  participation in the pool.

12  Q   Will you take a look at your deposition at Page 27, sir?

13  Starting at Line 19 of Page 27 of your deposition.  Question:

14  "Do you have any understanding of why Motorola dropped out?"

15  Answer:  "I do not have a detailed understanding.  As I

16  recall, they decided for various reasons to, you know -- that

17  it was advantageous for them not to license through the

18  MPEG LA pool."

19      MR. HARRIGAN:  Objection.  Lack of foundation.

20      THE COURT:  Overruled.

21  By Mr. Harrigan:

22  Q   Is that a correct statement, sir?

23  A   That is what I said during my deposition.  At the time I

24  think that is what I understood.

25  Q   And then at Line 25 on Page 27.  Question:  "You were in

1  direct communication with individuals at Motorola during the

2  MPEG LA H.264 discussion process?"  Answer:  "Yes, I had in

3  the previous MPEG LA visual pool developed a relationship

4  with Paul Bawel, who was at Motorola."  Is that a true

5  statement, sir.

6  A    That is true.

7  Q    Let's move on, Mr. Glanz, to Exhibit 2359.  That is the

8  third tab in your binder, sir.  Do you have that in front of

9  you?

10 A    I do.

11 Q    This is an e-mail string produced by Microsoft to Motorola

12 in this litigation.  Did you review this exhibit in preparing

13 for your testimony today, sir?

14 A    I did see this, yes.

15 Q    So you would agree with me, wouldn't you, that this is an

16 e-mail string that discusses the development of a slide deck

17 for a presentation at the Standards Summit at Microsoft in

18 about April of 2006; is that correct?

19 A    Yes.

20 Q    Does this e-mail string --  Do you recall this string,

21 sir, after having reviewed it?

22 A    I do.

23 Q    Was it created in the ordinary course of business?

24 A    It was.

25 Q    Were you the -- were you involved in the way that it is

1    indicated, in the to/from lines throughout this string, sir?

2    A   Yes.

3    Q   Does it accurately reflect your interaction with others at

4    Microsoft with respect to the Standards Summit?

5    A   Yes, it does.

6           MR. McCUNE:  Your Honor I would move Exhibit 2359

7    into evidence.

8           MR. HARRIGAN:  No objection.

9           THE COURT:  It is admitted.

10          (2359 admitted.)

11   By Mr. McCune:

12   Q   Mr. Glanz, let's start at Bates number ending with 618 on

13   the exhibit.  If you can take a look down at the -- it looks

14   like an Excel spreadsheet, that discussed the notes from 2:00

15   to 2:45 p.m. time slot.  Do you see that there?

16   A   Yes, I do.

17   Q   It says there will be a case study, correct?

18   A   Um-hum.

19   Q   Presented by Pat Griffis, correct?

20   A   Correct.

21   Q   And the subject will be "Business win," correct?

22   A   Could you repeat the question?

23   Q   One of the subjects of that case study will be a business

24   win, correct?

25   A   Yes.

1  Q   And the other bullet says, "Success of VC-1 into SMPTE and

2  H.264 royalty avoidance."  Did I read that correctly?

3  A   That's what it says.

4  Q   The case study was going to discuss how Microsoft had

5  avoided H.264 royalties, correct?

6  A   I don't know.  I was not involved in setting the agenda

7  for this session.

8  Q   Were you ultimately involved in the slide deck that became

9  part of this presentation?

10  A   As indicated in this e-mail thread, it was sent to me, but

11  I did not have a chance to review it.  I did see the notes

12  that Mr. Ribas had included in his comments.

13  Q   You had an understanding, sir, though, because of your

14  involvement with the MPEG LA H.264 pool that Microsoft

15  considered it to be a business win to have obtained the

16  royalty structure that it did in that pool, versus other

17  potentially higher royalty structures, correct?

18  A   Yes.  We felt that the royalty structure was supportable

19  in the marketplace.

20  Q   If we turn to page Bates numbered last three digits 615,

21  the second page of the exhibit, sir.  Gary Sullivan at the

22  bottom e-mail here, the last e-mail, Monday May 8th, is

23  writing to you and several others about the slide deck that

24  is being put together, correct?

25  A   Yes, it looks like that is correct.

1    Q    And Gary says, "Regarding slide number 3, I believe that

2    for many years MPEG-2 was even more expensive than $2.50 a

3    unit."  Is that a correct statement?

4    A    I believe that is true.

5    Q    And above that Pat Griffis writes back to Gary, you and

6    others, "I will comment on the initial $4 device MPEG-2

7    pricing in comments.  It was 2.50 at the time we started the

8    new pool."  Was that a correct statement by Pat Griffis at

9    that time?

10   A    I believe so.

11   Q    Moving to the first page of Exhibit 2359.  If we look --

12   not your e-mail at the top, but the next e-mail down, this is

13   an e-mail from Jordi Ribas to you, dated May 12th, 2006;

14   correct?

15   A    Correct.

16   Q    And Jordi is asking you whether you have reviewed and

17   blessed the deck that has been discussed throughout this

18   e-mail, correct?

19   A    Yes.

20   Q    Jordi asks you to take a look at Jordi's comments on the

21   deck, and correct -- can approve or disapprove her comments

22   as to whether her comments correcting the deck are

23   appropriate; is that right?

24   A    That's correct.

25   Q    Jordi writes, "I found incorrect, sensitive or misleading

1   statements in this deck," correct?

2   A   Yes.

3   Q   I'm sorry?

4   A   Correct.

5   Q   And she says -- or he says, "I highly recommend revising

6   it giving the following," and has a list of five points,

7   correct?

8   A   Correct.

9   Q   And point number five, Jordi quotes the deck as saying,

10  "Microsoft has a strong position in the H.264 patent pool and

11  helped establish the pool's licensing terms.  Much more

12  reasonable for Microsoft than MPEG-2."  Jordi was quoting the

13  deck at that time; is that right?

14  A   Yes.

15  Q   And Jordi wrote in response to that deck statement,

16  "Misleading.  The patent that allowed us to participate in

17  the H.264 patent pool initially was an old patent filed years

18  before we contributed to H.264."

19          And then Jordi writes further, "In this case MPEG LA

20  allowed those with 'patent applications' later on to

21  participate.  But this was unprecedented so we couldn't count

22  on it for future reference."  That's what Jordi wrote to you,

23  correct?

24  A   Correct.

25  Q   And you wrote in response, "I agree with your points

```
 1    below," correct?

 2    A    Correct.

 3    Q    You and Mr. Harrigan discussed another licensing pool,

 4    Via, that was formed at the same time the MPEG LA pool,

 5    correct?

 6    A    Correct?

 7    Q    Microsoft participated in Via meetings, right?

 8    A    That's right.

 9    Q    But Microsoft decided not to join Via?

10    A    Correct.

11    Q    And Via did offer a pool license ultimately, correct?

12    A    For a period of time, yes.

13    Q    Microsoft was not a member of that pool?

14    A    No.

15    Q    There are patent pools other than Via that Microsoft has

16    explored and decided not to joint, such as the MPEG LA DRM

17    pool, correct?

18    A    That's correct.  That was not a standards-based pool.

19    Q    Look at Exhibit 1581 that Mr. Harrigan discussed.  You

20    also have it in this folder.  It is in the middle of all

21    these tabs, 1, 2, 3, 4, 5 up from the back?

22         THE COURT:  Counsel, is this a good time to stop?

23         MR. McCUNE:  Yes, it is, your Honor.

24         THE COURT:  We will be in recess.  Mr. Jenner, did

25    you want to do something at five minutes to 1:00?
```

1          MR. JENNER:  I'm sorry, your Honor?

2          THE COURT:  Do you still want to take up some matter

3     at five minutes to 1:00?

4          MR. JENNER:  If it is acceptable to your Honor, it

5     would be a prudent time to consider that.

6          THE COURT:  We will be back out at five minutes to

7     1:00.  We will be in recess.  Thank you, counsel.

8     (Recess.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                      AFTERNOON SESSION
2          THE COURT:  Mr. Jenner.
3          MR. JENNER:  Your Honor, thank you.  Following up on
4   a discussion from earlier this morning, Your Honor, what we
5   would propose to do, which we hope we can make workable if
6   it's acceptable to Your Honor, is to create a code sheet that
7   will have a correspondence between license agreement
8   companies to which we think we need to refer, and a code.
9   Company A, B, C, D, E, and so on.  We would provide that to
10  the court, to the witness, to counsel.  We will, to the
11  extent it's feasible, mark the cover page of exhibits with a
12  code name so that it will be hopefully easier for the witness
13  or the lawyer, like me, not to forget that we're using the
14  code name, and try as much as possible to refer to the codes
15  as a way of keeping the identification of licensed parties
16  out of the record as much as possible, if that's acceptable
17  to the court.
18         THE COURT:  Why don't you give me some authority
19  where this has been used and I will get back to you.  It
20  seems to me that it's violative of what I understand to be
21  the Ninth Circuit's fundamental rule, which is that the
22  public is entitled to know -- I'm still looking for the right
23  term -- non-creative business-related materials.  But I'm
24  happy to think about that.  I'll take it under advisement.
25         MR. JENNER:  All right, sir, we'll see what we can
```

```
 1    find after the break today and give you what we can in the

 2    morning.

 3              THE COURT:  That would be fine.

 4              MR. JENNER:  In connection with this, there was one

 5    this morning, we're multiplying -- there are now two counsel

 6    who, with the court's permission, would like to address the

 7    court about their specific situation and issues.  One is

 8    Mr. Denkenberger of Christensen O'Connor, who would like to

 9    be heard on behalf of RIM, and Mr. Paul Zeineddin, of his

10    firm, who would like to be heard on behalf of Samsung, if

11    Your Honor would entertain that.

12              THE COURT:  In regards to RIM, they filed a pleading

13    already.  I'll hear it, but let's not have a repeat.  I don't

14    think I've seen anything from Samsung.

15              MR. JENNER:  Your Honor, I'm not the proponent of

16    this.  So I would turn this over to counsel if Your Honor

17    will hear from them.

18              MR. HARRIGAN:  Your Honor, may I supply about

19    30 seconds of food for thought on counsel's earlier proposal?

20              THE COURT:  Yes.

21              MR. HARRIGAN:  We think that process might be fine,

22    if the only issue is who is this.  But if the issue is what

23    are the facts and elements of this agreement that bear on

24    whatever purpose it's being offered for, and you start

25    talking about their products, and the other things involved
```

 1    in the contract, there's no way to avoid somebody figuring it

 2    out.  So we think it's probably impractical.

 3              THE COURT:  That's why I'd like to think about it.

 4    But I'm sure Mr. Jenner is going to suggest some creative

 5    ways to get around that.

 6              MR. JENNER:  We're always trying, Your Honor.

 7        So I would turn the floor over to counsel.

 8              MR. ZEINEDDIN:  Good afternoon, Your Honor, and thank

 9    you very much.  Samsung did submit a motion to seal, however,

10    the specific exhibits that are at issue were not included in

11    either party's motion, so they were not part of the order.

12    And with Your Honor's permission, I'd like to cite the

13    specific number of these exhibits, because they're very

14    sensitive, and so that both parties are on notice, they

15    should be sealed per Your Honor's opinion.  And also to the

16    extent that these exhibits would be introduced, we would like

17    a heads-up to actually be able to take a look at any proposed

18    redactions by the parties.

19              THE COURT:  You'll need to reach that arrangement

20    with them.  But give me the exhibit numbers.

21              MR. ZEINEDDIN:  Thank you, Your Honor.  They're

22    Exhibits 2769, 3163, 3191, 3238, 3264, and 3137.

23              THE COURT:  Thank you, sir.  And to all counsel for

24    third parties who are here, after you've read the order, if

25    you want to identify specific exhibits for us to look at,

1   certainly in regards to your clients, feel free to submit

2   that and I'll accept it in, again, a fairly informal form,

3   since we're trying to keep this moving along.

4       And the esteemed delegate for the Christensen O'Connor

5   firm is acknowledged.

6           MR. DENKENBERGER:  John Denkenberger on behalf of

7   Research in Motion.  I'm not sure if I heard you correctly.

8   RIM is asking the court for the additional 48 hours to review

9   the court's order, as well as the trial transcript, prior to

10  it becoming public.  I wasn't sure if that was the earlier

11  question presented by the counsel that was just here.  But

12  Research is asking that we be allowed to participate in that

13  review, Your Honor.

14          THE COURT:  You're free to submit specific exhibits

15  that you believe are sealed or entitled to different

16  treatment under my order.  I can't give you 48 hours, so

17  let's get it by 9 o'clock tomorrow morning.  I'm not going to

18  allow third parties to hold individual hearings in regard to

19  exhibits.  We'll take a look at it, then we'll rule.  And

20  that will be publicly announced so everyone will know what it

21  is.

22          MR. DENKENBERGER:  Secondly, and I only have two more

23  issues.  Secondly, we request that the proposed coding would

24  be extended to the patents themselves, because the patents

25  typically have the assignee's name on it, in this case it's

1    Research in Motion.  If the court does adopt this coding

2    procedure, if the patents themselves are not coded, then

3    outside parties -- so we would ask the court to please

4    include that if the court is so inclined.

5              THE COURT:  I'm sure Mr. Jenner will welcome your

6    suggestions to include it in his proposal.  I understand the

7    concern, if it's Code X and it's a RIM patent, you might draw

8    the logical conclusion.

9              MR. DENKENBERGER:  From the court's orders of

10   yesterday, we note that Exhibit 2800 is missing from those

11   documents that should be sealed.  And we'd ask that

12   Exhibit 2800 be added to those listing of documents under

13   seal.  And it was part of our motion, Docket No. 502.

14             THE COURT:  We'll look at 2800.

15             MR. DENKENBERGER:  Thank you for your time.

16             THE COURT:  Mr. McCune.

17                  CROSS EXAMINATION (Cont.)

18   By MR. McCUNE:

19   Q   Mr. Glanz, I'm sorry we couldn't get you out of here

20   before lunch.  It won't be too much more time for us here.

21   First of all, if I could direct you, Mr. Glanz and

22   Mr. Harrigan, to an exhibit we discussed previously,

23   Exhibit 3088.  I neglected to move that exhibit into evidence

24   through your examination I'd like to do so now.

25             THE COURT:  Any objection?

1       MR. HARRIGAN:  No objection.

2       THE COURT:  It is admitted and may be published.

3       (Exhibit No. 3088 was admitted into evidence.)

4   Q   Mr. Glanz, if you would turn to Exhibit 3091 in your

5   exhibit binder, it's the fourth up from the back.

6       THE COURT:  Your binder?

7       MR. McCUNE:  Yes, Your Honor, in the cross

8   examination binder.

9   Q   Do you have it, Mr. Glanz?

10  A   I do.

11  Q   Mr. Glanz, this is a two-page exhibit, the top of which is

12  an e-mail from you to Xavier Pouyat, I'm not sure if I have

13  that name right.

14  A   Right.

15  Q   This is an e-mail that was communicated in the ordinary

16  course of business at Microsoft, correct?

17  A   Correct.

18  Q   And you recognize this e-mail as an accurate

19  representation of your communication, correct?

20  A   I do.

21      MR. McCUNE:  I'd like to move 3091 into evidence.

22      THE COURT:  Any objection?

23      MR. HARRIGAN:  No objection.

24      THE COURT:  It is admitted.

25      (Exhibit No. 3091 was admitted into evidence.)

1    Q   In this e-mail, Mr. Glanz, you're suggesting updates to a

2    slide that has been put together by Mr. Pouyat, correct?

3    A   Yes, correct.

4    Q   It says at the top, "I suggest a few updates to slide 7."

5    And one of the updates is with respect to H.264 AVC, correct?

6    A   Correct.

7    Q   The first bullet point says, "The MPEG patent pool license

8    available with patents from 18 companies."  Right?

9    A   Correct.

10   Q   The second bullet says, "Via licensing pool license

11   available with patents from five companies."  Right?

12   A   Correct.

13   Q   The next bullet says, "Some companies joining neither

14   patent."  Correct?

15   A   Correct.

16   Q   And the last bullet says, "100-plus companies jointly

17   developed H.264 AVC."  Correct?

18   A   Correct.

19   Q   So at this time on October 31st, 2005 of about 100

20   companies that had developed the technology for H.264, 18 of

21   those companies that had standard essential patents were in

22   the MPEG LA patent pool, correct?

23   A   That's correct.

24   Q   And only five of those companies that had standard

25   essential patents were in the Via licensing pool, correct?

1    A    That's correct.

2    Q    In October 2005, at the time of this e-mail, you knew that

3    some companies with standard essential patents to H.264

4    technology, were not in either the MPEG LA or Via pools,

5    right?

6    A    Yes.

7    Q    Some of those companies were Apple, correct?

8    A    (Nods head.)

9    Q    Nokia, right?

10   A    (Nods head.)

11   Q    I need a verbal answer, sir.

12   A    Yes.  Apple, Nokia, correct.

13   Q    IBM, correct?

14   A    Yes.

15   Q    Motorola, of course?

16   A    Yes.

17   Q    Thompson, right?

18   A    Correct.

19   Q    And each of those companies that we've just mentioned had

20   participated in the MPEG LA pool discussions, right?

21   A    That's right.

22   Q    And each of those companies participated in the Via pool

23   discussions also, right?

24   A    I don't recall if each had been in both, but they

25   certainly had been in one or the other.

1    Q    IBM in the MPEG LA discussions the been opposed to caps,

2    right?

3    A    I don't recall, specifically.

4    Q    Let's turn to page 45 of your deposition, please, at

5    line 17.  Let me know when you're there.

6    A    I'm there.

7    Q    "Question:  What comments by IBM do you recall?  Answer:

8    I recall that they were not in favor of annual caps, that

9    they preferred running royalties."  Is that an accurate

10   statement?

11   A    That is.

12   Q    Do you recall that Thompson had also wanted higher

13   royalties that were uncapped?

14   A    I seem to recall that, yes.

15   Q    Have you taken a look recently to apprise yourself of who

16   is a member of the MPEG LA pools and Via pools?

17   A    I haven't looked at that for quite awhile.

18   Q    The last time you did that was about 2010; is that right?

19   A    That may be right, yes.

20   Q    By 2010 IBM hadn't joined the MPEG LA pool, had it?

21   A    I believe that's true.

22   Q    Thompson had not joined the MPEG LA pool either, had it?

23   A    I think that's right.

24   Q    Nokia hadn't joined the MPEG LA pool, right?

25   A    I think that's right.

1    Q    Motorola hadn't, of course.

2    A    Correct.

3    Q    Thompson hadn't.  And I think that's it for my list.  The

4    MPEG LA pool and Via pool each set a RAND rate, right?

5    A    They set rates that were determined by the licensors in

6    that pool, and those licensors felt were market-acceptable

7    rates.

8    Q    Those licensors felt that those rates were reasonable and

9    non-discriminatory also, correct?

10   A    I can't speculate on what they thought about that.

11   Q    The Via rate structure and MPEG LA rate structure were

12   different, correct?

13   A    That's right.

14   Q    We talked earlier about how you knew Paul Bawel from

15   Motorola, who you met during the discussions about MPEG LA,

16   right?

17   A    That's right.

18   Q    Paul Bawel came to Microsoft to work, didn't he?

19   A    Yes, he did.

20   Q    In about mid-2006?

21   A    I don't remember specifically.  That sounds right.

22   Q    He joined the Microsoft standards program?

23   A    I believe he joined the IP group in Microsoft.

24   Q    And you've had contact with Mr. Bawel since he came to

25   Microsoft?

1    A    That's correct.

2            MR. McCUNE:  No further questions.  Thank you,

3    Mr. Glanz.

4            THE COURT:  Counsel.

5                         REDIRECT EXAMINATION

6    BY MR. HARRIGAN:

7    Q    Is Mr. Bawel currently employed at Microsoft?

8    A    No, he is not.

9    Q    When did he leave?

10   A    I believe he left two months ago, or maybe a month ago.

11   Fairly recently.

12   Q    In answer to questions about Exhibit 3088 regarding the

13   absence of projected revenues from the MPEG LA, do you recall

14   that?

15   A    Yes.

16   Q    You said something like, they were hard to figure out?

17   A    That's correct.

18   Q    Why was that?

19   A    At the time it was unclear both how many patents would be

20   part of or contributed to the pool.  It was unclear how

21   broadly H.264 would be adopted, and so therefore it was very

22   difficult, based on the lack of data for those two factors,

23   to understand what Microsoft's revenue share might be from

24   the pool.

25   Q    And you were asked some questions about MPEG-2.  When was

1    MPEG-2 formed, approximately?

2    A    I don't know exactly, but I believe it was in order of the

3    mid-to-late 1990s.

4    Q    Okay.  And what kind of products were the primary market

5    for the technology that was represented by MPEG-2?

6    A    When MPEG-2 was first developed, the primary application

7    was for DVD, disks and players.  And so that's really, I

8    think, what the standard was focused on and what the

9    licensing program was therefore focused on.

10   Q    We've had some discussions here about the importance of

11   technologies to the functioning of products or whether

12   they're central or tangential.  How important was the MPEG-2

13   technology to the hardware DVD players, and so forth, you

14   just described?

15   A    MPEG-2 really was the enabler of the primary functionality

16   for a DVD player, which was to play back video content.

17   Q    How did that compare, for example, to Microsoft's need for

18   MPEG-2?

19   A    In the case for a product like Windows, video playback is

20   one of hundreds if not thousands of different functions

21   accommodated by the platform and the software.

22   Q    You were asked some questions about the rate, the royalty

23   rate at MPEG-2 being $2.50.  That would be for the entire

24   pool, correct?

25   A    That was the royalty rate set by the pool for use of the

1    codec in a device.

2    Q   How successful was the Via licensing H.264 pool?

3    A   It was not successful.  I don't recall exactly how many

4    licensees they ultimately had, but they eventually wound the

5    pool down and many of those patentholders ended up joining

6    the MPEG LA pool.

7             MR. HARRIGAN:  I have one exhibit, Your Honor, that

8    I'd like to offer now, in light of the questions on cross,

9    which is the last exhibit in our notebook, and it's

10   Exhibit 124.  And to save everybody the trouble, maybe we

11   could put that up on the screen.

12   Q   This is an e-mail of July 14, 2004.  Is this the document

13   that you, from which you learned that Motorola had not joined

14   the pool?

15   A   Yes, it is.

16            MR. HARRIGAN:  No further questions.  Excuse me, I'll

17   offer 124.

18            THE COURT:  Any objection?

19            MR. McCUNE:  No objection.

20            THE COURT:  124 is admitted.

21        (Exhibit No. 124 was admitted into evidence.).

22            THE COURT:  Any recross?

23            MR. McCUNE:  No, Your Honor.

24            THE COURT:  All right.  I have some questions.

25

1

2                         EXAMINATION

3    BY THE COURT:

4    Q    I'm not sure that I yet understand how pools work.  Some

5    pools are more successful than others, I gather?

6    A    That's correct.

7    Q    What differentiates, or what factors make a pool

8    successful?

9    A    So, using perhaps the MPEG LA H.264 pool and the Via pool

10   as an example.  MPEG LA was able to get 18 different

11   patentholders to join and accept the terms, and offer their

12   patents to the marketplace.  By contrast, Via I believe only

13   had five patentholders that participated.  As a licensee or

14   potential licensee of the technology, your hope is to go to,

15   ideally a single place, to get everything that you need from

16   an IPR perspective in order to, then, get a license and ship

17   your product, that incorporates the technology.  So, really,

18   MPEG LA's pool had a lot more value to offer those licensees

19   than Via's pool did.

20   Q    We'll come back to that in a moment.  Are there different

21   organizations that try and organize these pools, then?

22   A    (Nods head.)

23   Q    Are they private companies?  What are they?

24   A    They are, yes.  There's a number of other organizations,

25   including Via, MPEG LA, there's a company called Sisvel, it's

1    based in Europe, and often they will, at the early stage

2    compete.  They'll both try, or multiple patent pool companies

3    will try to attract licensors and reach a critical mass to

4    then bring a license to the marketplace.

5    Q   And am I correct that someone who holds a standard

6    essential patent, or a company that does not hold a standard

7    essential patent to a particular standard, both may join a

8    patent pool?

9    A   Only companies that have patents that are deemed to be

10   essential, usually by an outside expert, are allowed to

11   participate in the discussions and ultimately join the pool.

12   Q   You've already anticipated my question.  Is it then the

13   pool that appoints someone to evaluate if a patent is a

14   standard essential patent?

15   A   Yes, they'll usually appoint an outside technical expert

16   who can review the spec of the standard against the patent

17   and make a determination of whether it's truly essential.

18   Q   Earlier in your testimony you were talking about how

19   royalty rates are determined.  Did I understand you to say if

20   we had one hundred patents in a pool, and I held one of them,

21   my royalty rate would be based on that one patent that I

22   contributed versus the total number of patents?

23   A   Roughly speaking there are some additional details behind

24   it, but that's basically how it works.

25   Q   How, if at all then, is the contribution of a patent to

1   the standard, assigned some value?

2   A   The hope of all the companies that choose to participate

3   in the standard is that over time not only will participating

4   companies contribute more patents into the pool, but that

5   additional companies will ultimately join and raise the value

6   of that pool offering.  And so the expectation is that over

7   time as more patents issue, as more patents are contributed,

8   as more companies join, the per-patent value, if you will,

9   for each licensor will go down, because there's more patents

10  in the pool.

11  Q   As a general rule, though, wouldn't it seem that the more

12  contribution your patent makes to a standard, the less likely

13  it would be that you would join the pool?

14  A   So, every patent in the pool is essential, meaning that

15  you cannot implement the standard without infringing that

16  patent.  And while each individual patent owner likely feels

17  that their patents are the best, and that they should get

18  more than their fair share of the credit, the truth is

19  they're all essential, and everyone who joins in the pool

20  agrees to have essentially an equal valuation on a per-patent

21  basis.

22  Q   When you say, "each is essential to the standard," as a

23  hypothetical let's assume I have a patent that addresses only

24  interlaced compression.

25  A   Um-hum.

1    Q    And there is another patent that addresses only

2    progressive.

3    A    (Nods head.)

4    Q    Would both of those be essential to the standard?

5    A    They could be essential to the standard, but they may not

6    be implemented in all of the products in the marketplace.  A

7    lot of standards have optional aspects to them.

8    Q    So if I were going to use only interlaced and I had no

9    interest in progressive, would I still have to, if I were in

10   this pool, sign up for all of the patents that are in the

11   pool?

12   A    So, licensors agree to license all of their essential

13   patents, and licensees are taking a license to all of the

14   patents contributed by members or participants in the pool.

15   Q    So the significance, then, if any, of use of a particular

16   technology, would not be to the rate, but it could be to the

17   contribution or the use that your particular product makes of

18   a portion of that standard?

19   A    These video pools have chosen not to distinguish the

20   different sort of sub profiles or categories of the

21   technology.  That was kind of what we talked about as far as

22   the baseline versus the main and extended.  For simplicity

23   sake, the patentholders in those pools decided that, again,

24   all essential patents, all functionality embodied by the

25   standard would be licensed effectively at a single rate, and

1    that, you know, revenue would then be divided up based on

2    just the raw number of patents contributed, not necessarily

3    any determination of relative value or relative use in the

4    market.

5    Q    Okay.  I interrupted you earlier to talk about codecs.

6    I'm still a little uncertain.  Would an encoding codec and a

7    decoding codec count as one codec in terms of the rate that's

8    paid?

9    A    Yes.  There was earlier discussion where there was a

10   thought of separating the two, because that had been done in

11   MPEG-4, a separate rate for decoders and a separate rate for

12   encoders.  But the ultimate decision by both pools was to

13   have a single rate for the codec.  So regardless of whether

14   or not you implement just decoding or just encoding, or both,

15   it's the same rate on a per-unit basis.

16   Q    When you use the phrase "per unit" what do you mean?

17   A    Per device, for example, or per software application.

18   Q    I'm still somewhat confused.  Let's assume I have a

19   software program, and it has an encoding codec and it has a

20   decoding codec.  Do I pay for two codecs, or only one because

21   it's one unit?

22   A    Under the terms that were set in the MPEG LA H.264 pool,

23   you'd pay a single fee regardless of whether you implemented

24   decode, encode, or both.  It was a single rate, and did not

25   differentiate on which of those sides of the technology, if

1    you will, are implemented.

2    Q   Microsoft signed up for the MPEG LA pool, it didn't sign

3    up for the Via licensing pool.  In summary terms, why would

4    it be interested in one, not in the other?

5    A   So we ended up choosing and going with MPEG LA pool

6    because there were 18 companies, or 17 other companies that,

7    you know, were moving forward with that pool at the time.

8    And we felt that that was the best chance at creating the

9    critical mass that the market would need in order to take

10   that license and make that program work.

11        On the other hand, the Via pool was a smaller set of

12   companies that ultimately went forward.  And it was, frankly,

13   impractical to participate in both, because to the extent

14   that a company or licensee decided to take a license from

15   both, they would be getting two licenses, effectively, to

16   Microsoft's patents, and we would ultimately have to refund

17   them some amount of money, you know, so that we weren't

18   double licensing.

19   Q   Should I draw any implication as to the usefulness of the

20   802.11 standard, and the fact you chose not to participate in

21   that patent pool?

22   A   This was all related to H.264 and was not, you know, tied

23   to anything with 802.11.

24   Q   When did Microsoft's involvement with the MPEG LA pool

25   begin on your timeline, if you could --

1    A    So, our first experience with MPEG LA all-up was in the

2    MPEG-4 pool, which according to the timeline was effectively

3    launched at the end of 2002.  So, we, for some months before

4    that, had been participating in that process.  The beginning

5    of the H.264 pool with MPEG LA was, I think the timeline said

6    June of 2003.

7    Q    Is it the creation of the pool or the status of your

8    products that causes you to become interested in

9    participation?

10   A    It was is a combination of things.  Number one, H.264 was

11   considered a very strong video coding technology at the time.

12   Gary Sullivan, who is a Microsoft employee, was the chair

13   person of that standardization group.  So Microsoft had good

14   knowledge of what capability the technology had.  So we saw

15   real value for it in products.

16        On the other hand, we had a number of patents in the video

17   coding space, and based on our experience with MPEG-4 visual,

18   saw the benefit and value of participating in a patent pool.

19        So it was really the combination of understanding that the

20   patent pool process was valuable, that the technology could

21   be valuable if priced correctly, that led us to choose to

22   participate in MPEG LA and also in Via.

23   Q    Well, there seems to be three points of view in this room

24   as to when a hypothetical negotiation should have commenced.

25   Is it correct, then, that in terms of the interest in the

1    H.264 standard that Microsoft was interested in, it would

2    have been at the creation of the MPEG LA pool?

3    A    Like I said, part of the reason we chose to participate is

4    we did have interest in the technology and wanted to see a

5    licensing structure that would work in the marketplace and

6    make it successful as a technology.

7              THE COURT:  Thank you.  Mr. Harrigan, any follow-up?

8              MR. HARRIGAN:  Just a couple things, Your Honor.

9              THE COURT:  Mr. Jenner, am I going to lure you into

10   this one also?

11             MR. JENNER:  It's Mr. McCune's --

12             THE COURT:  I know it is Mr. McCune's witness.

13                      REDIRECT EXAMINATION

14   BY MR. HARRIGAN:

15   Q    Just to make sure we're talking about the same thing here

16   with regard to the Via licensing pool.  The Via licensing

17   pool you were talking about is related to what standard?

18   A    The one I was talking about was related to H.264.

19   Q    Does Via also have a pool relating to 802.11?

20   A    I understand they do.  I have not participated in that

21   one.

22   Q    In your earlier testimony you said that Via and MPEG LA

23   were in competition with each other to be the pool for the

24   H.264 standard.

25   A    That's correct.

1   Q    So what happened?

2   A    So at the end of the day MPEG LA was successful in getting

3   a significantly larger number of patentholders to support its

4   pool.  Via had a very small number of patentholders.  And

5   ultimately they both launched the program, but over time Via

6   was not successful in getting companies to license, and

7   eventually wound down the pool.  And I think most, if not all

8   of the companies in the Via pool, ultimately joined the MPEG

9   LA pool.

10  Q    And you testified earlier about the importance of having

11  rates that attract patentholders, and the importance of

12  having rates that attract licensees, and getting a balance.

13  So who did the better job?

14  A    I think it was clear, based on the number of companies who

15  offered their patents through it, and the number of companies

16  that took licenses, that MPEG LA was far more successful in

17  finding both the right balance and creating a one-stop shop

18  for the marketplace.

19  Q    And, finally, the example that the court gave you where

20  you have one hundred patents in a standard, or in the pool,

21  and you own one, so under that scenario, except for some

22  refinements, you get one-hundredth of the total royalties, is

23  that how that works?

24  A    That's correct.

25  Q    During the course of the MPEG LA meetings that you've

1  discussed, did anybody question that that was going to be the

2  system?

3  A   No.  That was a well-established distribution model that

4  MPEG LA had used both for the MPEG-4 visual, as well as, I

5  believe, although I'm not certain about this since we didn't

6  participate, but I believe a similar formula was used in

7  MPEG-2.

8  Q   And during the course of those meetings did Motorola ever

9  say:  Hey, this doesn't work for us because our patents are

10  worth more?

11  A   No.

12         MR. McCUNE:  If I could accept Mr. Jenner's

13  invitation, Your Honor.

14                   RECROSS EXAMINATION

15  BY MR. McCUNE:

16  Q   Mr. Glanz, you just established that essentially one of

17  the ways we've talked about the revenues coming from the

18  patent pool is patent counting, correct?  If there are ten

19  patents in a pool, and there's ten dollars worth of revenues,

20  Microsoft gets one dollar, correct?  If Microsoft has one of

21  those ten patents?

22  A   That's how the calculation would work, yes.

23  Q   If Microsoft had two of ten, it would get two dollars?

24  A   Correct.

25  Q   Is it your contention --

1      THE COURT:  Now you're doing math on my level,

2  counsel.

3      MR. McCUNE:  That's about as far as I go, Your Honor.

4  Q   Is it your contention, Mr. Glanz, that every patent in the

5  MPEG LA H.264 patent pool has equal value in implementing the

6  standard?

7  A   My contention is every patent in the pool is essential to

8  the standard, and that the patentholders participating in the

9  pool choose to distribute the revenue from the pool in the

10 manner we just described.

11 Q   Is it your contention, Mr. Glanz, that the patents of

12 patentholders that do not participate in the MPEG LA pool,

13 has the same value to implementing the standards as the

14 patents owned by the companies that do choose to participate

15 in the pool?

16 A   I couldn't determine that.

17     THE COURT:  You're never going to get to leave.

18                        EXAMINATION

19 BY THE COURT:

20 Q   Assuming that in the pool, then, that we're in this

21 revenue or payment model of number of patents versus total in

22 the pool, why would anyone who had a particularly successful

23 or essential patent choose to participate in a pool, unless

24 they have some advantage from the cross licensing?

25 A   So I think the motivation for participating in the pool is

1  to both ensure the success of the standard to generate a

2  reasonable revenue stream from your patents to fulfill your

3  RAND commitment to the standards organization.  I think

4  you're right that if someone really wanted to be aggressive

5  with their patents in this particular space, that the pool is

6  not the place to do that.

7          THE COURT:  All right.  Thank you, sir.  Any further

8  questions, counsel?

9          MR. McCUNE:  No, Your Honor.

10          MR. HARRIGAN:  No, Your Honor.

11          THE COURT:  All right.  You may step down.  Thank

12  you.

13      Microsoft will call its next witness, please.

14          MR. HARRIGAN:  Microsoft will call Professor Kevin

15  Murphy.

16                    KEVIN M. MURPHY

17      Having been sworn under oath, testified as follows:

18          THE CLERK:  Will you state your name for the record

19  and spell your last name, please?

20          THE WITNESS:  Kevin M. Murphy, M-U-R-P-H-Y.

21          THE COURT:  You may proceed.

22          MR. HARRIGAN:  Thank you, Your Honor.

23                    DIRECT EXAMINATION

24  BY MR. HARRIGAN:

25  Q   Professor Murphy, you've been asked by Microsoft to do

1    some analysis or render some opinions in this case.  Could

2    you begin by giving us a -- giving the court a rundown of

3    your current positions, and the length of time you've held

4    them, and what your areas of expertise are?

5              MR. HARRIGAN:  I'll just mention, Your Honor, there's

6    a CV, we're not going to wade through it, but it's

7    Exhibit 108 which I'll offer at this time.  And I want

8    Professor Murphy to highlight some items.

9    A    I'm an economist by training.  I have a Ph.D. in Economics

10   from the University of Chicago, which I received in 1986.  I

11   also have a BA in Economics from UCLA that I obtained in

12   1981.  I have been teaching at the University of Chicago

13   since 1983.  I currently am a professor, the George J.

14   Stigler Distinguished Service Professor of Economics in the

15   economics department, and the graduate school of business,

16   now called the Booth School of Business, at the University of

17   Chicago.  I teach economics courses for both MBA students and

18   Ph.D. students.  And that's pretty much what I've done since

19   I've been there.

20   Q    And have you received any academic or other awards related

21   to your profession?

22   A    Yes.  In, I believe it was 1997, I was awarded the John

23   Bates Clark medal, which is given to -- what at that time was

24   given every other year to an outstanding American economist

25   under the age of 40.  It's now given every year, I think, for

1  the last few years.  I've received other awards for various

2  papers that I've written in terms of -- one, the Kenneth

3  Arrow Award, the Garfield Award.  I was awarded a MacArthur

4  grant about seven years ago, or so, which gives you five

5  years of support for your research.

6  Q   Is that the so-called "genius grant" or something like

7  that?

8  A   I guess.

9  Q   And do you do some work for Navigant Economics?

10  A   Yes, I do.  I'm managing director at Navigant Economics.

11  It's a firm that specializes in economics and other business

12  consulting.  Prior to that I was a principal at Chicago

13  Partners, a similar firm that was acquired by Navigant

14  Economics.

15  Q   Is your work in this case on behalf of Navigant?

16  A   Yes, I work on behalf of Navigant and do this kind of

17  work, in addition to my work at the University of Chicago.

18  Q   And have you personally done, personally or through

19  Navigant, done prior work for Microsoft?

20  A   Yes, I have.  I've worked on a number of matters over the

21  years for Microsoft.

22  Q   And were you involved in their antitrust, some of their

23  antitrust matters?

24  A   Yes, I was.  I was involved in a remedies phase of the

25  Explorer trial, or however you want to refer to that.  I

1    worked for them in the issues involving Sun Microsystems, and

2    several other matters for Microsoft over the years.

3    Q   And have you published articles in the economics field,

4    and if so, give us a rough idea of the scope.

5    A   Yeah.  I've written 65, 70 articles or so on economics in

6    a pretty wide-range of areas from antitrust, to growth, to

7    labor economics, inequality, health, just a whole bunch of

8    different areas of economics over the years.

9    Q   And prior to this case, have you had any experience with

10   the economics of intellectual property matters?

11   A   Yes, I have.  I've worked on a number of consulting

12   matters in terms of determining reasonable royalties for

13   software, medical products.  I've also worked for ASCAP,

14   which is a copyright -- issues licenses for performance

15   rights to various entities including television, radio, live

16   performance, and the like.  For them I've done mostly

17   consulting work in terms of helping them figure out what

18   rates to charge.  They're under a reasonable royalty,

19   reasonable rate setting consent decree from the court.  So I

20   work with them to determine what reasonable rates would be.

21       In addition to that I teach about intellectual property in

22   three of the courses that I have taught over time.  My Ph.D.

23   course in economics; my public policy course to business

24   students; and my advanced microeconomics course in the Ph.D.

25   program.

1    Q    Last but not least, have you done expert or consulting

2    work relating to the economics of the patent system?

3    A    Yes, I have.  The patent system is one of the topics I

4    like to talk about, it's part of the more general issue of

5    property rights and contracting that is an area of my

6    interest, and an area of great interest to economists, more

7    generally.  So it's something we cover in each of the courses

8    I've talked about.

9    Q    Okay.  What were you asked to do in this case?

10   A    I was really asked to do a couple of things.  First I was

11   asked to present or analyze what would be an economic

12   framework for arriving at a RAND royalty in this case.  That

13   is, from an economic standpoint what are the factors that

14   need to be considered and what frameworks are useful for

15   understanding what would constitute a RAND royalty.  I was

16   then asked to evaluate various potential benchmarks for

17   determining a RAND royalty in this case, including patent

18   pools, as well as other licensing agreements put forward by

19   Motorola.

20   Q    Okay.  And briefly would you tell the court what you did

21   in order to form your opinions on those subjects.

22   A    Well, we read the various filings and court documents.  We

23   looked at deposition testimony.  We looked at the various

24   documents from the case, looked at a lot of licensing

25   agreements over time.  We researched various patent pools,

1    not just the pools at issue in this case, but other patent

2    pools for similar type products that emerged in the IT

3    industry.  We read the literature in economics.  There's a

4    very large literature of people talking about patent issues,

5    and in particular RAND issues, and they talk about issues of

6    hold-up, and patent hold-up, and patent stacking.  So it was

7    a matter of putting all those together, and then putting them

8    together with our, you know, economic analysis to come up

9    with conclusions.

10   Q    Okay.

11        We have a demonstrative which is simply a blowup of the

12   three opinions that Professor Murphy has reached in this

13   case, which we would like to put up now.  That's 4005.  And

14   I'm going to ask you, Professor Murphy, to tell us what your

15   opinions are, but why don't we do them one at a time, and

16   start with this one.

17   A    Okay.  Opinion No. 1 is that RAND commitments encourage

18   adoption in widespread use of standards by preventing

19   hold-up.  The basic idea here is that we've talked about --

20   it was talked about just a bit ago, widespread adoption and

21   use depends on getting participation of both licensees and

22   licensors in the system.  And just like when you talk about

23   what is there for a patent pool and what a patent pool tries

24   to do, a RAND commitment is much the same way, it's trying to

25   say how do we come up with a set of royalties that are going

1    to allow the standard to get wide adoption.

2         And the major concern here is that, particularly with

3    interoperability standards, once the standard is adopted, the

4    playing field changes quite a bit and opens up the

5    possibility of hold-up.

6         And I'll give you a simple example.  If you sort of

7    thought about just a very simple system of designing a plug

8    that you were going to plug in the wall, and before you've

9    come up with the plug and how far out the prongs should be,

10   and what shape it should be, you really could choose -- a lot

11   of alternatives would be just about as good as one another.

12        But if we decided to settle on a particular plug to which

13   I had the patent rights, after mine was the plug that was

14   chosen, I would then have, potentially, particularly once it

15   became widely adopted and consumers put those plugs in all

16   their houses, and people built devices that used that same

17   plug, I would find myself in a very enviable position, and

18   would be able to charge a lot more than what the ultimate

19   contribution I made was, which was very little, given there

20   was a lot of interchangeability beforehand.

21        So that's the kind of -- that's the sort of straw man, if

22   you want, the prototypical hold-up problem.  And it's more

23   complicated than that in practice, but the idea is similar.

24             THE COURT:  Mr. Harrigan, you have this shown as not

25   published on my screen.

1    MR. HARRIGAN:  I don't understand why it says that.

2    THE COURT:  I think you're in control of the --

3    MR. HARRIGAN:  Your Honor, I don't know if you follow

4 this method, but I'm going to tender Professor Murphy as an

5 expert in economics at this point.

6    THE COURT:  That is not necessary in federal court.

7 But do you have any objection, whoever is handling the cross?

8    MR. PEPE:  No objection, Your Honor.

9    THE COURT:  You failed to ask Dr. Murphy, though,

10 what his opinion is of Judge Posner, his colleague.

11    THE WITNESS:  Well, I -- Dick is a good friend of

12 mine.  We, for years, did a panel together at the management

13 conference every year.  And let's say Dick is creative.

14    THE COURT:  Decisive also.

15    THE WITNESS:  Confident.

16 Q   So the plug you were just talking about, that would be

17 with somebody with a patent on a plug, right?

18 A   Yes.  If somebody said there were 27 different patented

19 plugs, and we're going to choose one of them to be the

20 standard, beforehand the value of any one plug over another

21 might be close to zero, they all might be equally good.  But

22 once we've chosen it, that person would have substantially

23 more leverage, and that's the root of the hold-up issue.

24 Q   We're talking here about a standard that involves many,

25 many patents, or two standards that involve many, many

1  patents.  How does that type -- what are the economic

2  characteristics of standards of that kind that relate to your

3  first opinion?

4  A   Well, it complicates it even further, because if it was

5  just a matter of switching the plug you might say, well, all

6  I need is an adapter if I want to switch the plug.  Just do

7  like I do when I travel, and I take that little adapter, and

8  I go to England and I have to plug it in.  But if you're

9  talking one that has hundreds or thousands of components,

10  switching to -- once you have the standard in place,

11  switching individual components, or switching a number of

12  components is much, much more complicated.  So the hold-up

13  problem becomes multiplied.

14      And it also brings up a second important issue, which is

15  often called the patent stacking problem, that it's one thing

16  to have the owner of one patent hold up the standard, that is

17  demand value ex post that was not inherent in the technology

18  itself, but was rather created by the standard.  It's another

19  thing if you have a hundred people try to do that.  And

20  having a large number of people doing that creates an

21  additional problem, which we call the patent stacking

22  problem.  And we'll talk about that more later.

23  Q   Let's say we've got a standard like H.264, can't

24  implementers who need this type of technology find an

25  alternate?

1    A    Well, first off it can often be difficult for even an

2    individual to find an alternate, once they've already set

3    their technology in place.  That is, before they made the

4    technological choice to say, before something became the

5    standard, you might have had lots of options available.  But

6    once you've decided on the methodology, written the computer

7    code, created the products that use it, switching becomes

8    tougher.

9         Now, think about a world where there's not a single user,

10   but rather hundreds or thousands of users.  And remember the

11   whole crux of the standard here is an interoperability

12   standard.  It's a standard that says, I want my device to

13   work with yours.  So I can't by myself decide to switch,

14   otherwise I'll break that compatibility.  So what it would

15   take with hundreds of thousands of users would be them all to

16   simultaneously switch out the old component and put in the

17   new one.  Well, it's difficult, for one.  It's much, much

18   more difficult for many people.

19        And that's something that really, I think, we have to

20   focus on here is when you're talking about a compatibility

21   standard or communication standard, much of the value of the

22   standard is agreeing on how we're going to do it.  In fact,

23   the reason you need a standard is often there are many ways

24   to proverbially skin a cat.  There's many ways to accomplish

25   a given end.

1    But in order to have interoperability, we all have to

2  settle on one, we all have to choose the same plug.  We have

3  to choose the same way of communicating with each other.  It

4  doesn't do any good if I learn English and you learn Chinese.

5  Both perfectly good languages.  But we're not going to

6  communicate very well if we choose different ones.

7    So the value is created by everybody settling on one, and

8  that's why we have standard setting committees, and that's

9  why the value is set on the standard, and that additional

10  value is subject to what you call hold-up.

11  Q    Then where does the RAND commitment fit into this problem?

12  A    Well, the RAND commitment says, look, I know by making you

13  a part of the standard you're going to be put into a position

14  to not just collect the value of what you've contributed, but

15  some of the value created by the standard.  And, moreover,

16  with lots of contributors, if each one of you tries to

17  collect that value, that's going to cause the standard to

18  fail.  It's going to be too expensive.  It's going to be too

19  much risk for people who want to join the standard.  And

20  people want to use it.

21    So, in order to prevent that hold-up, people have to

22  commit to say, I will charge a reasonable royalty, something

23  that will be low enough that allows the standard to be

24  successful.

25    And it's important to realize, it's not just the licensors

1   -- sorry, the licensees who lose out if there's hold-up.

2   When hold-up occurs, it hurts the other licensors, because

3   the standard is not going to be as widely adopted as it was,

4   and it hurts the ultimate consumers, who are either going to

5   pay more, or not get the product, or get a standard that's

6   less widely adopted.

7       So hold-up is not just a problem for the licensees, it's a

8   problem for the whole system, which is why SSOs go the RAND

9   direction.  They say, look, it's in our interests to get the

10  standard adopted and get widespread use, make a big pie, so

11  we all can share in that to avoid that hold-up.

12  Q   You referred to stacking, and we have a demonstrative on

13  that.  Would you like to take a look at that and explain what

14  it demonstrates?  That's No. 4006.

15  A   Well, 4006 is just a really simple demonstrative intended

16  to make a very simple point.  It says, look, there are in

17  this case Motorola, and there's 91 other standard essential

18  patentholders.

19  Q   This is now for 802.11?

20  A   This is 802.11.  So we illustrate it with the Xbox.  And

21  Xbox is one of the products that implements 802.11.  And we

22  show here Motorola's demand for 2.25 percent of the selling

23  price of the Xbox 360.  Well, if each of the other 91

24  standard essential patentholders was also asked for

25  two-and-a-quarter percent, that total royalty demand would be

1    204.75 percent.  That would be there's, plus Motorola's 2.25,

2    would give a total demand of 207 percent.  Obviously if I'm a

3    product producer, I can't afford to pay royalties for 802.11

4    for 207 percent of the product price.

5        But also remember, 802.11 is only a small part of the

6    functionality of the Xbox.  The Xbox is primarily a gaming

7    system, not a communication system.  So the idea that you

8    would pay more than double the total price of the gaming

9    system just for the 802.11 communication protocol obviously

10   doesn't fit.  That's the stacking problem.  You can't just

11   look at one person's rate in isolation and say, is that

12   reasonable?  Does that help the system succeed?  Well, the

13   system ain't going to succeed if you're charging that kind of

14   rate.  And that's what you have to worry about.

15   Q   So RAND addresses hold-up and stacking, is that correct,

16   or it attempts to?

17   A   Yeah, I think those are two of the things.  More generally

18   I think RAND is designed to find a set of rates that are

19   going to allow the standard to succeed.  It's going to allow

20   the widespread adoption.  And it's that widespread adoption

21   that ultimately is going to benefit all the parties that

22   participate.  The sellers are going to be well off because

23   there's lots of use.  The buyer is going to be well off

24   because they get to use it.  And the sellers of the product

25   are going to be well off because there's, again, a big

1    market.  That's the whole idea.

2    Q   Where do patent pools fit into the picture of solving

3    these problems?

4    A   Well, patent pools have much the same goal.  Like a RAND

5    commitment, which is trying to keep rates at a level that

6    will encourage widespread adoption.  Patent pools themselves

7    have that same goal.  How do we make the standard successful?

8    How do we get widespread adoption?  Which means, I have to

9    have rates that are high enough to get participation by the

10   sellers, the patentholders, the holders of the intellectual

11   property rights; and I have to have rates low enough to get

12   the end customers on board.

13        And the key to making it a success for everybody is

14   getting widespread adoption.  That's the key.  Right?  How do

15   I make both buyers and sellers happy?  Well, they seldom

16   agree on a price for a big-sized pie.  Because I want lower

17   prices as a buyer, you want higher prices as a seller.  But

18   we all can agree on a bigger pie, is what helps everybody.

19        And that's what the patent pools are about.  That's what

20   the RAND commitment is about.  It's about encouraging

21   widespread adoption by avoiding hold-up.

22   Q   And I think you alluded to this, but if you don't solve

23   the hold-up and stacking problem, does this impact -- it

24   obviously impacts the licensors and licensees.  Does it

25   impact the public?

1  A   Absolutely it impacts the public, in two ways.  One, if

2  you don't solve those problems, and rates for intellectual

3  property become too high, that's going to increase prices.

4  And higher prices are bad for customers.  But secondly,

5  you're not going to get the widespread adoption.  And the

6  ultimate biggest goal that people get from a product is

7  making it useful and popular so people can get the advantage

8  of using it, particularly when it comes to communication

9  technologies.  Those are technologies where I benefit by

10  communicating with other people, and communicating with other

11  devices.

12      So, widespread adoption is a very natural goal that

13  benefits all parties, including consumers.

14  Q   So there was, just before you got on the stand, we were

15  having a conversation about the royalty allocation method of

16  the MPEG LA pool, which does it on a pro rata basis.  In your

17  view, are there circumstances where it would make sense for

18  one standard essential patentholder to get a higher royalty

19  than a bunch of other standard essential patentholders in the

20  same standard?

21  A   From an economic standpoint you could see why that would

22  occur.  If the one set of patents adds substantially more

23  value than others to the system, that certainly is something

24  you could see happening.

25  Q   Does that change once the standard is adopted?

1    A    Well, once the standard is adopted I think it's hard to

2    implement, because once the standard is adopted the amount a

3    patentholder can demand is going -- it's adopted in

4    widespread use, I really want to say that it's really made

5    its way into the marketplace.  But once we're in that

6    situation, the demand a patentholder can make is dependent

7    not on the value they brought to the table at the beginning,

8    but really on the value of the standard.

9        Because if I can go to a user and say, look, you can't use

10   the standard, if you don't license my part of it, maybe mine

11   is a trivial part, but if you don't license my part you can't

12   use the standard, then what I'm able to collect on is not my

13   contribution, but the total contribution of all the people

14   put in, plus all the investments that those people made.  I

15   built my product.  I designed my product, my customers are

16   depending on this product.  And you have the right to deny me

17   not just the value of your patent, but the value of the

18   entire standard.  And that's the hold-up problem.

19       So, after the fact it's very hard to let that process play

20   out.  If it was going to play out, it really needs to be

21   played out early, before the widespread adoption.

22   Q    So this so-called ex ante period?

23   A    Yes.  That would be the natural time at which one could

24   use market forces to determine who brought more to the table.

25   After the fact, it's not who brought more to the table, it's

 1   who has the greatest ability to hold people up.  And that's

 2   the problem.

 3   Q   And have you found any indication or information in this

 4   case to suggest that Motorola's patents in either the 802.11

 5   or H.264 standard are more valuable than others?

 6   A   My understanding is that Motorola's patent experts were

 7   not able to say whether their patents were more or less

 8   valuable than the average.

 9   Q   Would it affect your concerns about the risks of hold-up

10   and stacking if there were indications that with respect to a

11   particular standard, they actually had not been a problem, or

12   not a significant problem?  Would that matter to you?

13   A   No.  I think, you know, that's hopefully where we can end

14   up in most markets.  There are potential problems that we

15   solve.  And if you look at the literature, and if you look at

16   discussions of patent stacking in the standards case, and you

17   look at discussions of hold-up in the standards case, the

18   RAND commitment plays a very central role in most analyses of

19   saying why we've been able to mitigate that problem.  That

20   is, if you have the RAND commitment, and people are held to

21   that RAND commitment, and that's the important part, if you

22   have the RAND commitment and people are held to it, that they

23   have to charge reasonable royalties, then one can solve both

24   of those problems.  But it requires that people be held to

25   those RAND commitments.

1    Q   Okay.  And does your demonstrative No. 4006 shed any light

2    on whether its, in fact, true that hold-up and stacking has

3    not been a problem in this case, in the 802.11 situation?

4    A   Well, I think this more speaks to what potentially could

5    happen.  The reason why you can't say it hasn't been a

6    problem up until now, to say it won't be a problem later.  I

7    mean, that's true of most contracts.  This is what you teach

8    in class.  The whole idea of contracting is that we have a

9    contract, and we depend on the courts to enforce that

10   contract.  But 99 percent of the time, or more, people reach

11   the deal and abide by the contract without ever setting foot

12   in court.

13       What's important to make the contracts work, without the

14   court, is that when you end up in the court those contracts

15   are enforced.  And that's what we rely on.  And the RAND

16   commitment and enforcing the RAND commitment, to me, is

17   central to making that system work and preserving a state

18   where, in fact, those problems won't materialize.

19   Q   Why don't we move to your second opinion.  And why don't

20   you just tell the court what that is, and the basis for it.

21   A   Okay.  I'm going to wait for it to come up on the screen

22   so everybody can see it.  This is the second opinion, I'll

23   read it, then talk a little about it.

24       "A RAND royalty must reflect the economic value of the

25   patented technology itself and not the value attributable to

1    the standard."  And that's a really key point.  The basic

2    idea is this.  Why do we need a standard?  Well, usually we

3    need a standard precisely because there are many ways to do

4    it.  And the important thing is that we agree on one of them,

5    right?  That's the case where the standard is most in need,

6    when there's many different ways we could communicate.  We

7    could all agree to speak Chinese.  We could all agree to

8    speak English.  We could all agree to write from right to

9    left.  We could agree to write from left to right.  In

10   principle, it doesn't really matter.  But if we're all going

11   to communicate with each other, we need to decide on one or

12   the other.  That's the situation where standard is the most

13   valuable.

14        But also the case is where the difference between the

15   value of the contributions and the value that can be

16   extracted ex post is the largest.  Because the value is

17   largely created by the agreement, the agreement on the

18   standard.  And when you have a lot of the value agreed on by

19   the standard, that's the part that people can hold-up the

20   standard for, and can demand more than they contribute.

21   Q    So, in -- you're saying in order to arrive at RAND, you

22   have to figure out how to arrive at the economic value of the

23   technology itself?

24   A    That's --

25   Q    So basically that's the goal, right?

1    A    Yeah, that's the goal.  And this is more -- this is like

2    in most things in life, it's tougher to do than it is to say.

3    What you'd ideally like to do is sit down and say:  Okay,

4    Kevin, you contributed this piece of technology.  Bob had

5    this alternative piece of technology we could have used

6    instead of yours.  Yours was some increment better than his,

7    that is the value you added, because we could have used his

8    rather than yours, so your net contribution was that amount.

9    And that's what you should get as a reasonable royalty.

10   That's ideally what you do.

11       That's not an easy exercise always to do.  So what we

12   often do in economics, what we usually do is we try to say,

13   well, is there anybody else out there going through that same

14   exercise?  Is there any other transaction I can look at where

15   I can learn something about what the answer to that question

16   would be?  That is, what can go out there and ask this

17   ex ante versus ex post value?  What is going to give me a

18   rate that serves that goal of preventing royalty stacking and

19   preventing hold-up?  And that's where we're led to the patent

20   pools, because those are people that are solving the same

21   problem.

22   Q    We're about to arrive at opinion 3, but I have one

23   question for you before we get there, which is, what about

24   just requiring the parties to negotiate under a RAND

25   obligation?  From an economic standpoint, what does that

1   accomplish?

2   A   I would say from an economic standpoint it accomplishes

3   nothing.  There's an old saying that:  The definition of

4   crazy is doing the same thing and expecting a different

5   result.  And that's kind of what we're talking about here.

6   Because if you said, look, I'm just going to let people

7   negotiate to whatever deal they can get.  And you say, okay,

8   well let me do that in a world that doesn't have a RAND

9   commitment.  You get some outcome.  Now you say, I've got a

10  RAND commitment, but the only thing I'm going really try to

11  do is negotiate until you reach a deal.  Well, you're going

12  to get the same outcome.  There is no reason that outcome is

13  going to be any different if you haven't done something to

14  change the bargaining dynamic.  You have to put some

15  constraint on the system to make it so you're going to get a

16  different outcome with a RAND commitment than you would

17  without it.

18      And it's absolutely essential that we get a different

19  outcome, because by definition the deal that would be reached

20  by bargaining between the parties after the standard has been

21  adopted, and after it's in widespread use, would include the

22  hold-up.  The hold-up by its very nature is in there.

23      So, in order to exclude the hold-up, to get us back to

24  this ex ante value, you have to have a constraint on the

25  bargaining system.  And the constraint that people have

1   adopted is the RAND commitment.

2       But what is the teeth behind the RAND commitment?  The

3   teeth behind the RAND commitment is if the guy doesn't give

4   me a deal that is RAND, there is somebody out there who is

5   going to enforce the commitment, like it is in any contract.

6   And that's why you need to have ultimately the right to go

7   and say, hey, this guy has not abided by his RAND commitment

8   and he needs to be required to do so.

9   Q   Okay.  So then what's your -- tell us about your third

10  opinion.

11  A   Yeah.  My third opinion is really that when you look for

12  comparables, and because RAND is so central in the standard

13  context, and I think that's really where we're starting from,

14  that the idea of abiding by the RAND commitment is central.

15  And remember the core of the RAND commitment is finding that

16  balance of rates that encourages widespread adoption.

17  Because that's the goal of the RAND commitment is to make the

18  standard successful.

19      That leads us to say, well, what transactions in the

20  marketplace proxy most closely for that RAND commitment?  And

21  I think what we looked at is we said, well, the patent pools

22  kind of have that same objective.  They're trying to get

23  widespread success, just like the RAND commitment is.  So

24  we're led to the patent pools as a natural place to look.

25  Q   Okay.  So why don't we focus on H.264 and tell the court

1    what your view is regarding patent pools as a comparable for

2    that standard and a royalty for that standard?

3    A    Okay.  Well, I think the H.264 patent pool has a lot of

4    things going for it.

5    Q    You're talking about MPEG LA?

6    A    MPEG LA's H.264, yes.  Not the failed patent pool that we

7    talked about earlier, somebody had talked about in the last

8    testimony.

9         A number of things make it nice.  One, as mentioned

10   earlier today, the negotiations started as soon as the

11   standard was adopted.  Right after the standard was adopted

12   they started saying, how are we going to get a patent pool?

13   Clearly the objective of the patent pool was getting

14   widespread adoption and success.  That was a major, it had

15   both participation of -- it was licensors, but many of those

16   licensors were also licensees, which you've got to get both

17   sides on board to make the standard successful.  It's a

18   two-way street.  Okay?

19        They were successful in getting a relatively large number

20   of licensors on board and a reasonable number of licensees at

21   the same time.  So those are some of the major features going

22   for them, and what makes the pool attractive.  And I think by

23   both accounts they have been successful in getting widespread

24   adoption in making the standard quite successful.

25   Q    And what about the subject matter of the pools?  How does

1    that assist us with this analysis?

2    A    Absolutely.  It's the same subject matter of what we're

3    interested in here.  I sort of took that for granted.  That

4    is, the H.264 pools that we're looking at cover patents for

5    the same technology.  And in particular, it covered patents

6    for the same standard.  And, therefore, the same objectives

7    and same impediments or circumstances that would lead to

8    either widespread adoption, or the failure to achieve

9    widespread adoption.  So, it's a very common ground in some

10   sense.

11        We also have the fact that MPEG LA H.264 pool uses the

12   numerical allocation.  And in this case where Motorola has

13   said it's patents aren't necessarily more valuable or less

14   valuable, numeric allocation seems to fit pretty well.  I

15   would also like to say one thing about numeric allocation

16   while I'm there.  As an economist when you first look at it

17   you say, well, numeric allocation, how does that work?  Some

18   patents are more valuable than others.  I'd be worried about

19   that, potentially.

20        But there's an even more important principle that we use

21   in economics, which is, how do we know whether something is

22   reasonable?  Well, we look to see whether parties in the

23   marketplace adopt that, voluntarily.  And we do see that

24   patent pools tend to adopt this numeric allocation.  And I

25   think as an economist you say, well, what does that tell me?

1   It tells me, yeah, it's not going to be perfect.  But it's a

2   tradeoff between something that's simple, easy to implement,

3   avoids a lot of trouble, and fighting, and other things; and

4   at the same time is good enough to make the product

5   successful.

6        And even though some people, under that system, get a

7   little more or a little less than they might under some other

8   system, if that's what it takes to get the standard going and

9   to get widespread adoption, then everybody can be better off

10  than they would in the alternative, because a bigger pie

11  doesn't have to be cut up nearly as exactly to give everybody

12  what they need.

13  Q   Okay.  Any other comments you want to make about the

14  comparability of the MPEG LA H.264 pool, or do you think

15  we've exhausted that topic?

16  A   I think we've covered most of it, yeah.

17  Q   Then why don't you take us on to your approach to valuing

18  the 802.11 royalty.

19  A   Okay.  Now, 802.11, that pool, it has a couple of things.

20  One is --

21  Q   You're talking about the Via pool?

22  A   The Via licensing 802.11 pool.  It certainly covers the

23  same standard.  So that is a very good thing, if we're

24  thinking about what are other patents that are essential to

25  that same standard, how might they be valued, because that

1    means they're used in the same set of products, and for the

2    same ultimate purposes.  So that helps.

3        You know, that pool hasn't been as successful.  And they

4    particularly haven't been successful to get licensees to sign

5    on, which may say something that rates may be too high, that

6    maybe they haven't got licenses on.

7        So that to me says H.264 has lots of things.  802.11,

8    that's the downside to the 802.11 pool.  I think we have to

9    say that.  I think it's probably the best thing we have.  But

10   the fact that it's been less successful I think makes it less

11   of a good thing than we found for the H.264.

12   Q   Is this a problem that frequently arises or often arises

13   in the case of using comparables?

14   A   Oh, yes, the idea that you usually don't have a perfect

15   comparable.  And, for example, if I was valuing a house, I

16   may be able to find some houses that are similar, but it's a

17   relatively unique house, and I may have to settle for things

18   that aren't as close as I could in another situation.

19   Q   Okay.

20   A   So it's not unusual.  But it's still -- remember, the key

21   features, it was still designed to foster widespread

22   adoption, like the RAND commitment was.  And it was still,

23   for the same end-uses.  So those features are very important

24   parts that I still think make the 802.11 the best thing we

25   have.

1   Q   Okay.  Do you have any information about the extent to

2   which 802.11 standard essential patents are actually licensed

3   in the market?

4   A   Well, I think one of the striking things you see when you

5   look at the market is there's very little licensing of 802.11

6   patents, generally.  Even the people who are not in the pool,

7   and even Motorola has not widely licensed these patents.

8   And, therefore, there's not that many to look at within the

9   standard.  That tells you one thing.  It tells you, you might

10  say in some sense if you're looking for the most common rate

11  out there, the most common rate is actually zero, that most

12  people are actually collecting.  That is certainly the

13  dominant rate that occurs in the marketplace in the 802.11

14  space.

15  Q   I think you've also looked at Motorola's approach to

16  arriving at a RAND rate in this case.  And would you tell us

17  what your views are with regard to its reliability as

18  compared to the reliability of the method you've just

19  outlined?

20  A   Yes.  So Motorola experts put forward a number of patents

21  as comparables.  And the biggest problem I see is the vast

22  majority of them are cell phone patents, and in particular,

23  patents for cell phone devices, for cellular devices.  And if

24  you think about, well, what determines the value of a patent?

25  Well, one of the key things is how central is it to the

1    product?  Particularly you think about it as a percentage

2    royalty of the product price.

3        And to me when you think about it as an economist, you

4    say, well, I know something about the fees people charge for

5    cell phone patents for cell phones, how is that a reliable

6    comparison for the H.264 patents for the Windows operating

7    system?  I mean, a cell phone patent is so much more central

8    to the operation of the cell phone.  Like, it's hard to have

9    a cell phone that will do much good if it can't communicate

10   as a phone.  Whereas, an operating system, like the Windows

11   operating system, H.264 functionality, in particular the

12   component of H.264 functionality contributed by Motorola's

13   technology, relative to the next best way of achieving that

14   same component of the H.264 technology, relative to the

15   Windows operating system, is just like night and day.  I

16   don't know how you could use the rates for one to say what

17   the rates for the other ought to be.  Because you have a

18   technology that's central to the function of one product, and

19   a very small part in terms of overall functionality of the

20   Windows operating system.

21       Even if you go to the Xbox and say, I want to look at

22   802.11, and the slice of 802.11 that's due to the Motorola

23   patents, and you compare that, again, to the functionality of

24   a cell phone with a cell phone patent, it's just -- they're

25   just not in the same comparison.  I don't see how one really

1  helps me to know the other.

2      Knowing what a piece of technology that is central to the

3  function of one device tells me about how much a different

4  piece of technology is worth, that's not central really to

5  the function of a different device, is really something from

6  an economic standpoint seems incredibly hard to justify.

7  Q   Don't some of the comparables Motorola relies on include

8  some of the standard essential patents in the standards?

9  A   They do.  But they include other things.  So, for example,

10  if I'm licensing somebody who produces a cellular device,

11  cell phone patents, and 802.11 patents, or H.264 patents, I

12  can't extract from the value of that license the value of the

13  802.11 patents, or the H.264 patents, particularly because

14  you would think that the majority of the value is being

15  contributed by the cellular technology.  So those mixed

16  licenses, to me, for the same reason that the standalone cell

17  licenses, aren't very useful for coming up with what's the

18  market value of those things.

19      Now, also there's another issue, which is many of these

20  licenses were negotiated well after the standards were

21  adopted.  And so those also could have an element of hold-up

22  in them.  But even if they didn't have the hold-up in them,

23  you still have this comparability problem, that cell phone

24  patents are much more central to a cell phone than are the

25  patent at issue in this case, and the device that's at issue

 1   in this case.  It seems to me it's hard to go from one to the

 2   other.

 3              MR. HARRIGAN:  May I have just a moment here, Your

 4   Honor?  No further questions.

 5                          CROSS EXAMINATION

 6   BY MR. PEPE:

 7   Q   I'll introduce myself, Dr. Murphy.  My name is Steve Pepe,

 8   and I'll be asking you a few questions this afternoon.  One

 9   of the subjects you addressed in your direct examination is

10   patent licenses.  In fact, you just finished with those.

11   Now, you've never negotiated a RAND patent license; is that

12   right?

13   A   I have not negotiated patent licenses.  I do help

14   negotiate licenses for other things that are subject to a

15   reasonable fee criteria, particularly the work I do for

16   ASCAP.

17   Q   But no RAND patent licenses, correct?

18   A   No, not patent.  Those would be for performance rights.

19   Q   You're not an expert in patent licensing or patent

20   licensing negotiations, correct?

21   A   I would say I'm an economist, so I can talk about the

22   economic aspect of those things.  But, no, I wouldn't

23   consider that's my area of expertise.  I'm an economist by

24   training.

25   Q   Thank you.  In your direct testimony you reference

 1  Standards Setting Organization, and I'm going to use the

 2  abbreviation SSO for short.  Prior to this case you haven't

 3  had any specific dealings with the SSOs that are at issue in

 4  this case, the ITU and the IEEE; isn't that right?

 5  A   No, I don't think I've had any dealings with those.  I've

 6  had dealings with measurement standard organizations, but not

 7  these.

 8  Q   You've never been employed by or been a consultant to the

 9  ITU or IEEE?

10  A   No, I have not.

11  Q   You have never been qualified as an expert in SSOs or how

12  they operate, correct?

13  A   Not in particular.  Again, I'm an economist.

14  Q   Thank you.  In your direct testimony you talked about the

15  term RAND, correct?

16  A   Yes, I did.

17  Q   And you also mentioned that you have about 65 or 70

18  articles that canvas a broad range of topics, right?

19  A   Yes.

20  Q   But prior to this case, you had never published any

21  articles about RAND, correct?

22  A   No, I don't think I have, no.

23  Q   Thank you.  And prior to getting involved with this case,

24  you had not given any expert testimony on RAND obligations or

25  RAND commitments, correct?

1    A    Well, I did testify before the ITC.

2    Q    When I say, "this case," I mean this global dispute

3    between the parties.

4    A    I just wanted to be clear, I think that would technically

5    be a different case, but it's the same matter.

6    Q    Same matter.

7    A    That was the first time I've testified about RAND.

8    Although, again, I've done a lot of work on what constitutes

9    a reasonable royalty.

10   Q    Thank you, Dr. Murphy.  And in your direct testimony you

11   also addressed the subject of patent pools, correct?

12   A    Yes, I did.

13   Q    And you've never been qualified as an expert in patent

14   pools, correct?

15   A    Well, I'm an economist.

16   Q    You've been an expert for Microsoft in about ten cases

17   during the last ten years; isn't that right?

18   A    I would say that's roughly right, yes.

19   Q    During that time period, roughly about a quarter of your

20   consulting fees have come from Microsoft; is that correct?

21   A    Probably not.  I think that might have been true at one

22   time.

23   Q    Is it higher?

24   A    Less.  It's less today.  Substantially less.

25   Q    Now, you talked about the technical strength of Motorola's

1    802.11 and H.264 patents very briefly, said you didn't see

2    any evidence of the relative strength of Motorola's patents.

3    Now, you haven't done an assessment or evaluation of the

4    technical strengths of Motorola's 802.11 and H.264 patents;

5    isn't that right?

6    A   I think you mischaracterized my testimony there.  I don't

7    think I said what you just said I did.

8        I can answer your question, but your preamble I think

9    misstated my testimony.

10   Q   You did not consider the expert reports of Motorola's

11   technical witnesses in reaching your opinions, correct?

12   A   I did not particularly, no.  I think that's not my area of

13   expertise.  My understanding is that, and presumably they'll

14   speak for themselves, my understanding that when asked

15   whether their patents would rank in the top half or bottom

16   half, they were unable to say which way they went.

17   Q   My question, sir, was the technical expert reports in this

18   case, you did not rely upon those opinions and conclusions in

19   those expert reports, correct?

20   A   No, I did not.

21   Q   Thank you sir.  Thank you.

22       Now, during your testimony you talked about how the

23   RAND commitments and standards need to attract both licensees

24   and licensors, correct?

25   A   I think that's right.  What you need to do is you need to

1  be able to get widespread adoption.

2  Q   Yes.

3  A   Let me just finish.

4  Q   I asked a very simple straightforward --

5       THE COURT:  Mr. Pepe, we have a rule around here.

6  You talk, then he talks.  Don't cut him off.

7       MR. PEPE:  Yes, sir.

8  A   I'm just saying, you want to make the standard attractive,

9  so you have to get people to contribute technology.  And you

10  have to have the technology and the standard that's going to

11  make it attractive.  But then it has to be priced in a way

12  that makes buyers want to use it.  Because the value of

13  something, particularly a communication technology, depends

14  on widespread adoption.

15  Q   You would agree that the patent policies in the RAND

16  commitment seeks to balance the rights and interests of the

17  patentholders and of the implementers; is that right?

18  A   Yes.  Although I would definitely add that the RAND

19  commitment is intrinsically tied up in preventing the hold-up

20  I talked about before.  As an economist, and if you read the

21  literature in economics on RAND commitments, hold-up is

22  central to the whole discussion.

23  Q   We'll get to the RAND commitment shortly.

24       You agree the SSO patent policies should take a

25  balanced approach that does not unduly burden patentholders

1    but encourages them to contribute innovative technology to

2    the standards.  Correct?

3    A   I would say as a general matter you do want to get

4    innovative technology.  You want to produce a good standard

5    that's going to be widely used.

6    Q   You would agree that the patent policy should not undercut

7    the value of patented technologies that contribute to the

8    standard, right?

9    A   Well, you've got to be careful on what you mean by value.

10   If you're talking about the ex ante value, the value

11   contributed by the patent, not the value contributed by the

12   standard, I would agree with that.  But if you're going to

13   start talking about the value that somebody could extract

14   after the fact, which by definition would include the

15   hold-up, then I would not agree.

16   Q   You would agree when the standard is being formed, that if

17   patentholders do not believe they're going to get fair value

18   for their patents from licensing, they may not contribute

19   their patents to the standard; isn't that correct?

20   A   Yes.  But you've got to be careful, because if they think

21   that people are going to be able to hold -- other people are

22   going to be able to hold other people up after the fact,

23   they're not going to get fair value either.  In order to make

24   it successful, you have to prevent the hold-up.  And the

25   hold-up -- preventing a hold-up is not just in the interests

1   of licensees, it's in the interest of licensors as well.

2   Q   If you don't have the best technology in the standard,

3   that puts the standard at risk, and it may not be successful,

4   correct?

5   A   Yeah.  I think in general you want better technology.  As

6   with everything in life, you've got to trade off costs and

7   benefits.  So you don't always want to say, I want the best

8   of everything.  I don't go out when I buy a car and I say, I

9   want the best car money can buy.  I want the car that makes

10  the most sense.

11  Q   Let's turn to the patent pools, one other topic you

12  discussed during your direct.  Now, patent pools are

13  voluntary organizations, correct?

14  A   Joining a patent pool, yes, would be a voluntary activity.

15  Q   That would be the case here with both the MPEG LA H.264

16  and the Via licensing 802.11 pools, right?

17  A   Yes.  They would be voluntary organizations that one could

18  join.

19  Q   And a company shouldn't be forced to join a pool, correct?

20  A   No, I would say they shouldn't be forced.  No.

21  Q   Thank you, sir.  Thank you.

22        And as we heard Mr. Glanz testify about earlier, there

23  may be lots of reasons why companies would decide not to join

24  a pool.  You have no quarrel with that statement, correct?

25  A   I don't have a quarrel with that statement that there are

1    reasons why people don't join.

2    Q    Thank you.  And you agree that the licensing terms of a

3    pool agreement are a, "take-it-or-leave-it" proposition,

4    correct?

5    A    Well, I'm not sure that's right in terms of how they were

6    arrived at.  I think after the fact the pools generally set a

7    fee and they don't negotiate.  But the setting of the fee

8    itself, as we heard earlier today, involves a back and forth

9    in terms of this balancing act between getting the two sides

10   on board.  So it's negotiated ex ante, not negotiated ex

11   post.

12   Q    Once the terms are set and the pool is formed, those

13   agreements are basically a, "Take it or leave it"

14   proposition.  The licensees either take it or they leave it,

15   correct?

16   A    But every agreement is that after you've agreed -- I mean,

17   I don't understand your distinction.  Once we've agreed, it's

18   take it or leave it.  The way we got there was negotiation.

19   And we got there in negotiation here between the people that

20   were sitting there negotiating over setting the patent pool

21   rates.  And there is --

22   Q    I don't mean to cut you off.  Let me try a different

23   question, because I'm trying to get to a different point

24   here.  Once the terms of the agreement are set, if a licensee

25   doesn't like -- potential licensee doesn't like the terms,

1    they can't go to the pool and say, "I want to renegotiate

2    this deal."  They can't do that, correct?

3    A   No, not generally, no.  But that's true of lots of

4    transactions in the world.

5    Q   Thank you.  The same would hold for potential licensors.

6    Once the terms are set, a potential licensor can't go to the

7    pool and say, "I want to renegotiate this deal," correct?

8    A   No, not quite.  Because there is scope for changing the

9    rates within the pool over time, as things change.  I mean,

10   for example, as other people are added, and I believe both of

11   these pools had provisions for some adjustment to the rates,

12   usually it's capped and usually there's a bound, but there

13   often is scope for some adjustment to the rates.

14   Q   Now, you heard Mr. Glanz testify, and I believe you also

15   testified, that the MPEG LA and Via licensing pools, they

16   distribute royalties based upon a patent allocation or

17   proportional royalty structure; is that correct?

18   A   Yes.  I believe that's not just common for them, but many

19   pools use that structure.

20   Q   Now, you testified at your deposition that a reasonable

21   royalty for a patent should be tied to the technical merit of

22   the patent.  Do you still agree with that?

23   A   I think that would be the ideal, yes, that's what you'd

24   like to shoot for.

25   Q   You would agree with me that in the Via pool, the Via

1  licensing pool, and the MPEG LA H.264 pool, there's not an

2  individual assessment of the technical merit of a patent in

3  deciding how much of the royalties that patent should get,

4  correct?

5  A   I think they've decided that the costs of actually going

6  through that exercise outweigh the benefits.  And I think

7  that's an important piece of economic evidence that people --

8  Q   I'm sorry.

9  A   That that was a voluntarily chosen system that emerged in

10 the market, and survived, and has been successful.

11 Q   Just to be clear, sir.  Once a patent is in a pool, the

12 Via and MPEG LA pools don't look at patent A and patent B,

13 and say, well, A is more valuable so it gets a higher

14 royalty, and B is not as valuable so it's going to get a

15 lower royalty.  Those two patents will get the same exact

16 royalty, correct?

17 A   They do.  But we have to think about how we got to that

18 outcome.  Remember --

19 Q   I was just asking, sir, about whether or not there's an

20 individual assessment of these patents.

21 A   I am trying to understand.  I think we're ultimately

22 trying to figure out why they do that, and whether that makes

23 sense.

24 Q   What I'm trying to get at, sir, is how the royalties are

25 allocated.

1    A    Yeah, that's how they're allocated.

2              THE COURT:  I get to interrupt you.  It's time for

3    the afternoon break, counsel.  We'll be back at 2:45.

4                    (The proceedings recessed.)

5    By Mr. Pepe:

6    Q    Dr. Murphy, let's turn to the Via Licensing 802.11 pool.

7    Now, Microsoft decided not to join the Via 802.11 pool as

8    either a licensor or licensee, correct?

9    A    That's correct.

10   Q    And that was perfectly reasonable for them not to join the

11   pool, would you agree?

12   A    I would agree that is perfectly reasonable.

13   Q    And Microsoft shouldn't be forced to join the pool,

14   correct?

15   A    No, they should not be forced as a licensee or licensor.

16   Q    And like Microsoft, Motorola is not a licensor or a

17   licensee of the Via Licensing 802.11 pool, correct?

18   A    That's correct, they are not either.

19   Q    So Motorola made the decision to keep its patents out of

20   the pool, correct?

21   A    Yes, they did.

22   Q    So the rates paid by licensees don't include rights to

23   Motorola's patents or technology; isn't that correct?

24   A    They are not in the pool, so it wouldn't be included, no.

25   Q    Thank you.  Now, let's pull up Exhibit 1173.  That is one

1   of the confidential exhibits.  And you should have a binder

2   in front of you with that exhibit.  It is kind of small.

3           Now, in this chart which you prepared, you are using an

4   ex ante/ex post dividing line for 802.11 of September 16th,

5   1999; is that correct?

6   A   That's correct.

7   Q   Now, the Via Licensing pool formed in 2005?

8   A   Yes, it was.

9   Q   Using your ex ante/ex post dividing line, the Via

10  licensing pool was six years ex post, correct?

11  A   That is correct.  I did discuss that in my report.

12  Q   Now, you also testified the Via Licensing 802.11 pool was

13  not successful in attracting licensees, correct?

14  A   Yes, it wasn't very successful.  It has some, but not very

15  many.

16  Q   Well, let's take a look at how successful they were at

17  attracting licensors.  Can we pull up Exhibit 1125.  That is

18  also in your binder.  This is a printout from a web page from

19  Via Licensing's website.  You can see at the bottom it is

20  dated September 5th, 2012.  Do you see that at the bottom

21  right?

22  A   Yes.

23  Q   And do you see in the upper left-hand corner it says

24  802.11 A through J licensors?

25  A   Yes.

1  Q    And it lists just five licensors as of September 5th,

2  2012, correct?

3  A    That's correct.

4  Q    And I believe in one of your demonstratives you indicated

5  there were around 90 SEP holders of 802.11 patents?

6  A    I don't remember the precise number, I think it was 93 --

7  Q    91, 92.  You would agree only about five percent of

8  potential licensors have joined the Via Licensing Group,

9  correct?

10 A    Yes.  I would think the licensee side as well.  They

11 haven't been very successful.

12 Q    They haven't been very successful.  Now, let's actually

13 take a look at your demonstrative 406.  I think you called

14 this a simple demonstrative of what, quote, potentially could

15 happen in the industry, correct?

16 A    I think it is more illustrative, yeah.  I wasn't saying

17 this is what would happen.  It is just to make the point of

18 -- you know, sort of what could happen under the stacking.

19 Q    Now, this demonstrative assumes that all 91 licensors

20 would go out and seek to license their patents, correct?

21 A    In order to get that full amount, that's what you would

22 need, yes.

23 Q    Now, not only does it assume that they would go out and

24 try to license, but they will actually get two and a quarter

25 percent for each of their portfolios for 802.11, correct?

1    A    That's what it would take to get the 207.  To get

2    multiplication of what any one person gets, you don't need

3    all that.  Yes, to get the 207 percent, that's what you would

4    need.

5    Q    You agree that most standard-essential patent licenses are

6    cross licenses, right?

7    A    Yeah, there would tend to be cross licenses in there, but

8    that doesn't mean there wouldn't be royalties.  There are

9    royalties even in cross licenses.

10   Q    You reviewed around 60 Motorola standard-essential patent

11   licenses, roughly?

12   A    Yes.

13   Q    And were all 60 of them cross licenses?

14   A    I don't know if all 60 were.  I think probably pretty

15   close to that.  That doesn't mean they didn't have

16   substantial royalties in them.

17   Q    Right.  When you have a cross license there tends to be

18   royalty rates flowing both ways, so there is a net lower

19   rate, correct?

20   A    Right.  There is many ways you could do it.  You could

21   have two rates, and net them, or you could net a rate, you

22   could do lots of different things.

23   Q    Now, your demonstrative 4006 doesn't take into

24   consideration that there would be or may be cross licensing

25   which would push down that net rate, correct?

1  A    Yeah, that's true, it could.  You are starting from a

2  really high number here.

3  Q    Well, your demonstrative makes no attempt to account for

4  potential differences in size, value, strength and importance

5  between the patents of the other 91 SEP holders and

6  Motorola's, correct?

7  A    Yeah, that's why it is a demonstrative, not a prediction.

8  Q    There is a lot of assumptions built into this

9  demonstrative?

10  A    Yeah, it is illustrative.

11  Q    Now, focusing on the 802.11 standard, it was released

12  about 13 years ago, correct?

13  A    Yeah, I think that would correspond.  802.11 --

14  Q    You agree that as of the date you formulated your opinions

15  in this case there was no 802.11 stacking problem in the

16  industry, correct?

17  A    You know, there has been a debate on that.  I think

18  Farrell, Shapiro and Lemley hinted there might be.  I think

19  other people have taken issue with that.  I certainly haven't

20  reached the opinion that that historically has been a

21  problem.  My testimony was more that if you allow people to

22  engage in the kind of hold-up that I would characterize as

23  going on, that certainly is a potential problem.

24  Q    Yes or no, Dr. Murphy, currently is there an 802.11

25  stacking problem in the industry?

1  A   I think the economic literature is in debate on that.  I

2  am just telling you what the literature says.

3  Q   Can we pull up Dr. Murphy's deposition transcript,

4  Page 83, Line 16 to 25.  I think there is a binder there that

5  might have that in there.  Question:  "So you agree that in

6  the approximately 13 years since the standard was first

7  adopted, commentators -- many people believe there is not a

8  stacking problem related to 802.11?"  Answer:  "I don't

9  think, one, that's materialized itself.  I think there is a

10 potential stacking problem.  I don't think it's really

11 materialized per se.  I don't think it is really materialized

12 as, you know, lots of people charging substantial license

13 fees to date.  It's one of the reasons it's important to get

14 this case right."

15      Sir, were you asked that question and did you provide

16 that answer?

17 A   Yeah, and I would agree with that answer today.  I think

18 your question was prefaced with "many people" there.  I agree

19 there are many people who believe that.  I am saying there

20 are some people that would disagree.

21 Q   You would agree there is no stacking problem that has

22 materialized?

23 A   I would say it hasn't.  In my opinion, based on the

24 evidence I have seen, I don't think it is there to date.  As

25 I stated in my answer here, I think there still is a

1    potential problem, and particularly, if you allow hold-up to

2    occur, it is much more likely to be a problem.

3    Q    And the H.264 standard has been around for about a decade,

4    right?

5    A    Yeah.

6    Q    Around a decade, maybe a little less?

7    A    A little less.  A little less.  Close.  Coming up on that

8    anniversary, I guess.

9    Q    And you certainly agree that as of the date you formulated

10   your opinions in this case there was no H.264 royalty

11   stacking problem in the industry, correct?

12   A    I don't think there has been yet.  I think patent pools,

13   in particular the H.264 pool, has helped, as have RAND

14   commitments, more generally.

15   Q    Now, let's talk about licensing.  Over the past several

16   decades there have been hundreds of standard-essential

17   licenses that have been negotiated across all different types

18   of standards, would you agree with that?

19   A    I'm sorry.  License -- standard-essential licenses?  You

20   mean licenses for standard-essential patents?

21   Q    Yes.

22   A    Yes, there have been licenses negotiated for

23   standard-essential patents.

24   Q    And you would agree that many of these licenses have been

25   negotiated ex post?

1    A    Yes, there have been many negotiated ex post.

2    Q    Is it your opinion that licenses that are negotiated ex

3    post are in effect hold-up simply because they were

4    negotiated ex post?

5    A    I think there is that potential.  I think we live in an

6    environment right now, and up until now, where the RAND

7    commitment hasn't been fully litigated through.  I think in

8    that world, whether or not it includes hold-up is an open

9    question and likely to vary across different licenses,

10   because it is not clear exactly what the RAND commitment is.

11   I think that's the reality we live in.  And that I think is

12   one of the reasons why this case is in some sense very

13   important.

14   Q    So if Microsoft was a licensor in a standard-essential

15   patent license that was negotiated ex post, you think there

16   would be the potential there that Microsoft held up the

17   licensing?

18   A    There certainly --  Without knowing any more, you would

19   say you would have to leave that open as a possibility,

20   because the negotiations took place in an environment in

21   which hold-up was possible.  Whether they did or not, you

22   know, we would have to get further into the details.

23   Q    But you would agree that ex post bilateral negotiations

24   can lead to a RAND license, right?

25   A    If they are done in the right context.  And that doesn't

1    mean they always do.  I think it would be a lot clearer if it

2    was resolved exactly what RAND entitles people to.

3    Q    So the answer to my question was, yes, ex post bilateral

4    negotiations can lead to a RAND license?

5    A    If they were subject to the right external pressure.  If

6    they are not subject to the right external pressure, then

7    they wouldn't as a matter of economics.  If it is just the

8    negotiation is going to be, negotiate for whatever you can

9    get, and whatever you get is what RAND is determined to be,

10   then I would say no, that is just not consistent with getting

11   a RAND rate.

12   Q    Let me try to come back to my question one more time.

13   Dr. Murphy, do you agree that ex post bilateral negotiations

14   can lead to a RAND license, yes or no?

15   A    Yes, under the right external conditions.

16   Q    Thank you.

17   A    Under the wrong external conditions, no.

18   Q    Let's talk in particular about Motorola's licenses.  Now,

19   you reviewed about 60 of them, correct?

20   A    Somewhere in that neighborhood, yes.

21   Q    And all of these were negotiated under a RAND commitment,

22   correct?

23   A    I can't say every last one, but I think the vast majority

24   were, yes.

25   Q    Now, during direct you testified that an important

1    principle that we use in economics, which is, how do we know

2    whether something is reasonable?  Well, we look to see

3    whether the parties in the marketplace adopt that

4    voluntarily.  Do you recall that testimony?

5    A    Yes.

6    Q    And do you stand by that testimony?

7    A    Yes, I do.

8    Q    Now, sir, all 58 or 59 of those Motorola licenses, they

9    are all market transactions, correct?

10   A    They are, and they are all engaged in an ex post

11   environment.  So you are going to get whatever that ex post

12   environment produces.

13   Q    Sir, do you have any specific evidence that any of

14   Motorola's licenses were the product of hold-up?

15   A    Again, I know we are not supposed to mention names.  There

16   is one where there was -- there was an injunction sought.  An

17   injunction in an ex post environment by its very nature

18   involves an element of hold-up, because an injunction would

19   deny you the right not just to the patent in question but to

20   the standard.  Things that involve injunctions inherently

21   bring hold-up into the equation.

22   Q    You are aware that that company that we are talking about

23   had an earlier license from 2003, correct?

24   A    Yes.  But once you are in an ex post environment there is

25   definitely the possibility of hold-up.

1  Q   Now, that 2003 license, you have no opinion -- you

2  testified at your deposition that you had no opinion as to

3  whether or not that license was effectively a hold-up?

4         MR. HARRIGAN:  Your Honor, I think we are kind of

5  highlighting the problem here, because we don't know --  How

6  can we do redirect on this with our hands tied behind our

7  back with regard to --

8         MR. PEPE:  What I will do is I will move on --

9         THE COURT:  Mr. Pepe, I am going to strike that whole

10  line of testimony.  It seems to me that is a fair comment.

11  If you want to raise the name of the company and have it out

12  on the record, then that's fine.

13         MR. PEPE:  I am going to try this a little

14  differently then.

15         THE COURT:  So I am striking the testimony?

16         MR. PEPE:  Yes.

17         THE COURT:  All right.

18  By Mr. Pepe:

19  Q   Sir, I believe you testified on direct that these 59

20  license -- 58 licenses could have hold-up, correct?

21  A   Yes.  I don't remember my exact testimony, but I would

22  agree with that, that because they were negotiated after the

23  fact they could have hold-up.

24  Q   They could have hold-up?

25  A   Yes.

1  Q   Let's talk about comparables for a moment.  You mentioned

2  a lot of the licenses on that list were to cell phone

3  companies that involved cell phone patents, right?

4  A   Yes, a very large number were.

5  Q   Well, there is at least one company on there that doesn't

6  sell cell phones, right?  That's Vtech?

7  A   Yes.  That license has substantial other issues with it,

8  but not that other one.

9  Q   Was that Vtech license the product of hold-up?

10  A   No.  I would say that was a different form of the kind of

11  problems that make interpreting licenses difficult.

12  Q   Let's pull up Exhibit 2832, please.  Now, this is an

13  e-mail from Nick Delaney at Vtech to Kirk Dailey at Motorola,

14  correct?

15  A   Yes.

16  Q   And this is dated October 7th, 2011?

17  A   Yes.

18  Q   And the first paragraph says, "Kirk, we have an interest

19  in licensing your WiFi 802.11 and MPEG video portfolios,

20  particularly if it would give us some measure of protection

21  on some future products on our roadmap.  We see a convergence

22  of technologies on future home communication phones/devices

23  that would use some of these technologies."  Do you see that?

24  A   Yes, I do.

25  Q   So this was Vtech coming to Motorola saying, hey, we are

1    interested in a license to 802.11 and H.264, you would agree?

2    A    Yes.   But they were also interested in what they mentioned

3    in the second paragraph, which was settling their existing

4    dispute, where Motorola contended -- I think at the time,

5    that they owed Motorola $50 million for things having to do

6    with their cordless phone.   And they negotiated --  And he

7    clearly states here that he wants to do this as part of that

8    agreement.   And as an economist I can tell you, when you see

9    something like that, where you have terms that were

10   negotiated together, you can't interpret the deal you got on

11   one independent of the other one.   I mean, it is a package

12   deal, as the guy is making clear here.   Just read the second

13   paragraph.

14   Q    Sir, my question was pretty focused.   It was simply Vtech

15   came to Motorola and said we are interested in a license to

16   802.11 and H.264, yes or no?

17   A    I would say that is not the message they sent.   They say

18   we are interested in that as part of settling the

19   agreement -- this dispute.   That is a correct statement of

20   what they were saying.

21   Q    And they wanted a license for future products, right?

22   A    Yes, as part of settling this other dispute.   And I think

23   you just want to say what it is.

24   Q    Let's take a look at what Vtech actually offered to

25   Motorola.   You can see there is a table there.   And they

1    offered a rate that ranged between 0.5 percent and

2    2.5 percent, depending upon the price of the end product,

3    correct?

4    A    Yes, that's what is in the table.

5    Q    Now, you testified about the Vtech agreement at the ITC

6    hearing between the parties?

7    A    Yes.

8    Q    And do you recall that the royalty rate was 2.25 percent

9    for Motorola's 802.11 and H.264 portfolios?

10   A    I believe that's correct, that's what is in the Vtech

11   license that was reached as part of the settlement of this

12   other dispute.

13   Q    Now, sir, basic math, the 2.25 percent is less than the

14   highest royalty rate that Vtech offered, which was

15   2.5 percent in this letter -- in this e-mail, correct?

16   A    Yeah, but it is a flat royalty.  You don't want to compare

17   the highest to the flat one.  That is like --

18   Q    Just looking at the simple numbers, two and quarter is

19   less than two and a half?

20   A    And is bigger than 0.5.

21   Q    And 0.5 is well higher than any of the Via -- the Via

22   Licensing 802.11, correct?

23   A    Yeah.  I really think on this one you really need to take

24   into consideration the fact that the $12 million settlement

25   that was ultimately reached as part of the same agreement for

1    other patent issues that were between the parties.

2    Q   Well, this e-mail refers, as we discussed, future

3    products, right?

4    A   I agree.  But I would be remiss as an economist if I

5    didn't point out when you have multiple parts of an agreement

6    you can't just pull each one out and look at each one

7    independently.

8    Q   Sir, I am not talking about the agreement, I am just

9    talking about the e-mail that refers to future products.  It

10   is a simple question.

11   A   It does refer to future products, but it also refers to

12   doing this as part of settling their past dispute.

13   Q   I am focusing on the language about future products.  I

14   would ask you to turn in your binder to Exhibit 3396.  Now,

15   sir, this is a user manual for Innotab2S.  Do you see that?

16   A   Yes, I do.

17   Q   Do you see in the upper left-hand corner it indicates it

18   is a Vtech property?

19        THE COURT:  Let me stop you.  Are you moving the

20   admission of 2832?

21        MR. PEPE:  I will offer 2832.

22        THE COURT:  You need to do it as you go along.  You

23   don't wait until you get done with everything and go back.

24   Any objection to 2832?

25        MR. HARRIGAN:  Your Honor, we don't have any

1    objection, subject to reviewing what may or may not be in the

2    redaction.

3              THE COURT:  All right.

4              MR. PEPE:  While we are at it, can I also offer 1173,

5    1125, 2832?

6              THE COURT:  Slow down.  Your first one?

7              MR. PEPE:  1173.

8              THE COURT:  Mr. Harrigan, any objection?

9              MR. HARRIGAN:  No objection.

10             MR. PEPE:  1125.

11             THE COURT:  He needs to comment.

12             MR. PEPE:  I think he did.

13             MR. HARRIGAN:  No objection.

14             THE COURT:  Then it is admitted.

15             MR. HARRIGAN:  The same for 1125.

16             THE COURT:  Then 1125 is admitted.

17             MR. PEPE:  2832.

18             MR. HARRIGAN:  I have to find it.

19             THE COURT:  2832 is the one we were just looking at.

20             MR. HARRIGAN:  No objection, subject to finding out

21    what's in the redaction.

22             THE COURT:  All right.  Provisionally admitted.

23             (1125, 1173 & 2832 admitted.)

24    By Mr. Pepe:

25    Q   Turning back to 3396, are you aware that Vtech recently

1    introduced a new tablet product?

2    A    Yeah.  It is a toy tablet, yes.

3    Q    And in this manual, if I could ask you to turn to Page 2

4    -- or Page 1, which is the introduction.  You see that it

5    says, "Thank you for purchasing Vtech Innotab2S the WiFi

6    anywhere tablet."  Do you see that?

7    A    Yes.

8    Q    This indicates that this product is WiFi compliant or has

9    WiFi technology, correct?

10   A    My understanding is they have a WiFi version, yes.

11   Q    Could I ask you to please turn to Page 22 of the manual.

12   The first sentence reads, "Innotab2S supports Jpeg and

13   MJpeg/H.264 baseline profile formatted video playback."  Do

14   you see that?

15   A    I didn't find it yet.  Yes, I do.

16   Q    So this indicates that the Innotab2S is compliant with

17   H.264, correct?

18   A    I believe it is.

19   Q    Now, I actually happen to have an Innotab2S with me.  You

20   probably can't see it from there, but it says WiFi here, WiFi

21   here, WiFi here, WiFi here, WiFi here, and WiFi here.  Six

22   times on the packaging on the front cover it indicates that

23   it is WiFi compliant?

24         THE COURT:  Counsel, is this an exhibit?

25         MR. PEPE:  Just a demonstrative.

1      THE COURT:  Don't parade things around that are not

2  an exhibit or not disclosed as a demonstrative.

3      MR. PEPE:  Okay.

4  By Mr. Pepe:

5  Q   Now, we heard testimony earlier today that Microsoft

6  introduced its own tablet product, right, the Surface?

7  A   Was I supposed to answer that question?  I thought you

8  were --

9      THE COURT:  I think he was testifying in his own

10  right.  That's why we are going to move on.

11  By Mr. Pepe:

12  Q   I was going to point out that somebody in the marketing

13  department thought it was important to put WiFi compliant --

14      MR. HARRIGAN:  I thought you said we weren't going to

15  do that.

16      THE COURT:  The objection is sustained.

17  By Mr. Pepe:

18  Q   So we heard from Mr. De Vann earlier today, he talked

19  about the Surface tablet?

20  A   Yes.

21  Q   And he indicated that the Surface supports H.264, correct?

22  A   Yes.

23  Q   And it supports 802.11?

24  A   Yes, it does.

25  Q   And it is a noncellular product?

1  A   Yes, it does.

2  Q   And I will represent to you that the Innotab2S is also a

3  noncellular product.

4  A   Yes, it is, I believe.

5  Q   So you would agree with me that if Vtech was selling the

6  Surface tablet it would be paying 2.25 percent of the net

7  selling price for the use of Motorola's H.264 and 802.11

8  portfolios, correct?

9  A   I don't think you can conclude that, because I don't think

10 the prospect of them selling that tablet was there when that

11 license was negotiated.  I am going to negotiate a license

12 based on the prospect of what I am going to sell.

13 Q   If Vtech was selling the Surface tablet, sir, under the

14 terms of the Vtech agreement, it would be paying 2.25 percent

15 of the net selling price, correct?

16 A   It would, under the agreement.  But I don't know what

17 logic you use to hold the agreement constant as you change

18 products and companies.  I mean, if they were selling a

19 cruise ship with built-in WiFi, I assume they wouldn't be

20 paying 2.25 percent of the cruise ship.  I am just pointing

21 out you can't just move products across licenses and

22 companies and assume that the same negotiations would have

23 taken place.  I would also point out that everything we are

24 talking about here is about the value of the standard.  Never

25 mind.

1  Q   Sir, Vtech agreed to 2.25 percent for Motorola's 802.11

2  and H.264 portfolios, correct?

3  A   They did as part of settling that broader agreement.  I

4  think you need to take that into account.

5  Q   And they are selling a tablet that is WiFi compliant,

6  H.264 compliant and is noncellular, correct?

7  A   It is a tablet, but it is a toy.  That is an important, I

8  would think, distinction.

9  Q   Well, sir, the Surface is 802.11 compliant, H.264

10 compliant and not cellular, right?

11 A   Yeah, but it is not a toy.

12        MR. PEPE:  Thank you.  No further questions.

13                   REDIRECT-EXAMINATION

14 By Mr. Harrigan:

15 Q   In this book that you have been looking at there is an

16 Exhibit 13, I think.  It is the first one in the notebook.

17 A   Yes.

18 Q   And it is a patent license agreement between Motorola and

19 Vtech?

20 A   Yes.

21 Q   Is this the one that has been under discussion?

22 A   Yes, I believe it is.

23 Q   And would you turn --  I believe you said that you thought

24 that Motorola had a patent infringement claim against Vtech

25 of about $50 million relating to cordless telephones?

1   A    Yes.

2   Q    And would you turn to Page 6 of Exhibit 13?

3   A    Yes, I am there.

4   Q    And Paragraph 4.1, what does that tell you about the

5   nature of the consideration exchanged here that included the

6   2.25 percent deal?

7   A    Vtech at the same time agreed to pay a $12 million payment

8   to Motorola to help settle that open issue regarding the

9   cordless phones.

10  Q    And from an economic analysis standpoint, what does

11  that -- how do you -- how do you use the 2.25 percent as a

12  comparable under these circumstances?

13  A    Well, if you look --  I don't think there is very much you

14  can.  If you look at the total value of the agreement,

15  clearly it would be dominated by that $12 million.  My

16  understanding is that today, under the 2.25 percent, the

17  amount that Vtech has paid has been very small, in the

18  thousands, not $12 million range.  And it is pretty clear,

19  you know, from the letter that was originally written that

20  the agreement to license at those rates was tied into

21  settling the agreement or the dispute with Motorola.

22  Q    You were asked about whether people should be forced to

23  join patent pools, and you said no.  Is there anything about

24  your suggestion that patent pools form a valid comparable in

25  this case for determining RAND that is equivalent to forcing

1  people to join patent pools?

2  A   No.  In fact, here is a good analogy.  Let's say you

3  wanted to value my house, and I didn't want to sell my house,

4  but I needed to transfer it for some tax reasons or something

5  else.  I would look at other people who sold houses.  I chose

6  not to sell my house.  And I had every right to choose not to

7  sell my house.  But that doesn't mean the price somebody else

8  sold it for isn't a valid comparable.  The fact that I

9  decided not to sell doesn't tell me a comparable from

10 somebody else who did decide to sell is inappropriate.

11 Q   We had some testimony from Mr. Glanz this morning that the

12 Via folks and the MPEG LA folks were competitors in this

13 situation relating to being the successful pool for H.264.

14 What relevance is there to the fact that there is competition

15 among patent pools to whether pro rata royalties as a method

16 of distribution is a valid or accepted method?

17 A   Well, I mean, again, these patent pool providers, they

18 have incentive to get people to use their pool rather than

19 somebody else's pool.  And if distributing royalties in

20 another way, for example trying to ascertain the precise

21 value of each of the component patents was a superior system,

22 and a system that did better at attracting people to the

23 patent pool, we would think they would have every incentive

24 to do that, because that would give them a leg up on the

25 other patent pool provider who used an inferior method.  What

1   that tells me as an economist is that there is value to doing

2   it this way.  That is, the benefits of doing it on a pro rata

3   basis exceed the cost.

4   Q   The other Via pool on 802.11 that you discussed, it was

5   pointed out that pool was formed six years after the standard

6   was adopted.  How does that relate to its validity as a

7   comparable as an ex ante event?

8   A   I think that would mean there would be some greater

9   potential for hold-up there.  Now, the fact that it is a pool

10  would mitigate against that to some extent.  But, if

11  anything, the potential for it to include some hold-up would

12  push the rates to be higher than you would expect in a true

13  ex ante negotiation.  That would make the rates, if anything,

14  too high.

15  Q   And what was the sort of continuum of the spread of 802.11

16  between the time of adoption and the time of the Via pool and

17  today?  Are you aware to what extent there had been

18  widespread adoption at the time of the pool?

19  A   802.11 had become reasonably well adopted by the time we

20  got -- I think it was 2005 when the Via Licensing pool came

21  into existence.  It wasn't as widespread as it is today, so

22  it has continued to evolve and expand.  It certainly was well

23  off the ground by that time.

24          MR. HARRIGAN:  No further questions.

25          THE COURT:  Mr. Pepe?

1        MR. PEPE:  No questions.

2        THE COURT:  Dr. Murphy, I have some.  You're an

3    economist, you said that several times, and not a specialist

4    in essential patents.  But in a patent pool, is that limited

5    to a particular area of commerce?  If I had a patent that was

6    applicable to DVDs or to cellular phones, I have a joined a

7    pool, am I able to use it in both?

8        THE WITNESS:  It would depend on the rules the pool

9    set up.  I think generally they try to keep it simple.  I

10   think that helps join the technology.  You know, in this

11   case, both the pools in question here set per unit royalties,

12   which if you think -- is one way to do it.  That accommodates

13   it being put into a wide range of products.

14   So like my kind of fun example was the cruise ship.  You

15   certainly wouldn't want to take -- say, if you had a

16   WiFi-enabled cruise ship, you owe me 2.25 percent of the

17   selling price of the cruise ship.  That would be an enormous

18   number.  You would more likely say how many devices do you

19   have on the cruise ship, and you pay those.  And if somebody

20   had an office building, it would be the same way.

21   I think one of the things that helps them do it over a

22   wide range of products is having that per unit royalty.

23        THE COURT:  Let's talk about the per unit royalty for

24   a bit.  Are you aware of patent pools that base the royalty

25   on the value of the end product?

1          THE WITNESS:  I haven't studied them all in detail.

2    Most of the ones I know of do it on a unit basis, although

3    there probably are some out there who have done it the other

4    way.  I think you tend to do it the other way when there

5    is --  It depends on the nature of the product.  The 802.11,

6    for example, for the Xbox, the proportionate royalty is

7    really problematic.  And I pointed this out in my report,

8    because, for example --  Microsoft used to sell the 802.11

9    adapter separately, and so they sold it for like $70 or

10   whatever.  And they sold it with the Xbox for a couple of

11   hundred dollars.  And so when they -- the people who bought

12   the 802.11 separately obviously are the people who valued it

13   the most.  Under this 2.25 percent royalty the patent

14   licensor would collect 2.25 percent of the $70 for the

15   fraction of people that bought it.

16       When you integrate it into the system in a later version

17   of the Xbox, the value per unit obviously went down because

18   you weren't just selling to the most highly valued users, you

19   are now getting to collect on every unit sold.  But a

20   proportionate royalty would actually entitle you to collect

21   now instead of 2.25 percent of $70, 2.25 percent of several

22   hundred dollars.  So that was a good example where this

23   proportionate royalty didn't make any sense.  In a case where

24   we know the royalty should be going one way, the

25   proportionate royalty was actually pushing it in the opposite

1    direction.  That was the one I focused on for purposes of my

2    analysis, because it was the example that was applicable to

3    this particular case.

4         THE COURT:  So that our record is clear, when you say

5    that in the patent pool it is based on the sale of a unit,

6    what do you mean by that?

7         THE WITNESS:  You talked earlier about the software.

8    So you have it in a piece of software.  So for every copy of

9    that software I sell I am going to pay a certain amount.  So

10   if it is a 20¢ per unit royalty, I sell a copy of the

11   software, I have to pay 20¢ to the pool.  Or if I sell -- if

12   it is on a physical device, for every device I sell I pay

13   20¢.

14        THE COURT:  Let's take your example then.  You've got

15   operating system software selling for $125 that's using an

16   industry standard, and it is paying 20¢ per unit or per

17   software copy.  The same industry standard is in a $1 -- what

18   we keep calling a toy, the same remuneration, 20¢.  As an

19   economist, how do you explain that?

20        THE WITNESS:  What matters is whether the value that

21   is being added is the same amount to the two products.  That

22   is, is it providing the same dollar amount of increment to

23   functionality?  Is the ability to connect, for example, to

24   the network worth the same for those two products?

25        You can come up with examples where per unit does really

1   well, like in this case where you were talking about whether

2   it is a stand-alone adapter that I plug into my box, or

3   whether it is built into the computer, I should pay the same

4   amount because I end up with exactly the same product,

5   whether I buy them together or buy them separately.

6       I think in your example you would say a per unit royalty

7   maybe isn't going to be the perfect royalty in that case.  It

8   depends on the particular example you are looking at.

9           THE COURT:  Before a pool is created you have a

10  patent which is an industry essential patent.  It has a

11  value.  And what I understand you are saying is that value

12  would depend on its contribution to the usefulness of the

13  standard; is that correct?

14          THE WITNESS:  You have to be careful, because it is

15  contribution relative to the next best alternative, right.

16  It is like a jar of water.  You might say, well, that is

17  incredibly useful; if I don't have water I'm going to die.

18  But the value of the water in the marketplace is determined

19  by how valuable is that water compared -- I can get water

20  somewhere else, so that limits its value.  And that is very

21  important to remember.

22      The value of what a patent adds to the standard is not

23  what you would lose if you did without that functionality, it

24  is if you had to put the next best alternative in there.

25      So if Apple and IBM both come to the standard setting

1    organization, and Apple's patent would add 21¢ per unit sold

2    to the value, and IBM's would add 20¢, the net value added by

3    Apple's technology is a penny.  Because if they hadn't put

4    Apple's technology in there they could have put IBM's

5    technology in there.  That is the economic value added of the

6    technology.

7              THE COURT:  You are embracing Judge Posner's

8    design-around recent opinion that embraces the concept of

9    design around in measuring damages?

10             THE WITNESS:  I think that is kind of where you go,

11   because that's what economics tells what happened.  That's

12   what determines the value of things.  If I was going out

13   there trying to decide what patent I am going to use, I would

14   be -- there would be competition between Apple and IBM in my

15   example to contribute their technology.

16             THE COURT:  Let me take you to the next step.  Once

17   we are inside the pool, what I have heard you say is that

18   patent has the same value as every other patent.  And is

19   there any justification for that other than broadening the

20   market by setting up an industry standard?

21             THE WITNESS:  I would say as an exact method, no.  I

22   think it is hard to say why that is going to give --  It is

23   never going to give you exactly the right answer.  I think

24   the flaw is that the key notion is the value created by that

25   standard -- the expansion in value that people are going to

1  get, that one penny of value added is going to get multiplied

2  by a big number if we make this patent successful.  And using

3  that numerical apportionment is a good way to get lots of

4  people on board to get the standard moving.

5     I say --  Am I convinced as a theoretical matter that it

6  should work?  No.  As a theoretical matter it may or may not

7  work well.  What tells me it seems to work pretty well is

8  that's what pools do.  There is competition among these

9  pools.  If it was better to do it a different way --

10  Remember, Via lost out in the H.264 space.  Their pool lost

11  out to the MPEG LA pool.  If the way to get the best patents

12  was to do it this other way, you would think they would have

13  every incentive in the world do it.  The problem is, it is

14  costly.  It is a hard process already to get everybody on

15  board to produce a standard.

16     If you start getting into the game of how are we apportion

17  these things, it is not going to be so easy.

18          THE COURT:  I think it was Justice Potter Stewart who

19  was famously quoted as saying he couldn't very well define

20  it, but he recognized pornography when he saw it.  What I've

21  heard from your testimony today is, you can't quantify it,

22  but you recognize stacking and hold-up when you see it.  How

23  do I quantify stacking and hold-up?

24          THE WITNESS:  I would say hold-up --  It is not that

25  we can't see hold-up.  It is that hold-up has not necessarily

1   been a problem.  But the reason hold-up has tended to not be

2   a problem is because we have a RAND commitment.  The RAND

3   commitment is there precisely to avoid that hold-up.  And we

4   have been in a situation where people have, I think, by and

5   large abided by the RAND commitment.  If people don't abide

6   by the RAND commitment, then hold-up becomes a problem, and

7   stacking becomes a problem at the same time.

8       The perpetuation of that situation in which people abide

9   by the RAND commitment and set reasonable royalties I think

10  depends on ultimately, when it is litigated, that we come up

11  with a reasonable --

12      We enforce the idea that you can't hold people up.  That's

13  what prevents people from holding up in the first place.  It

14  is not unlike every other piece of enforcement that we have

15  out there.  You never want to be in a situation where the

16  court or anybody else has to adjudicate every single

17  transaction.  But we know in order to get transactions to

18  solve their -- transactors to resolve their own disputes, we

19  have to at the end of the day enforce the rules required to

20  make it work.  And the RAND commitment, and the commitment

21  that I'm going to have to charge a reasonable royalty even

22  though I could hold people up --  Because once they have

23  adopted that standard, they have very little option, they

24  have very few places to go.  If I want to communicate with

25  other people via WiFi, I have to use the same standard as

 1    everybody else, because if I switch I can't communicate with

 2    everybody.

 3              THE COURT:  That raises an issue with me, though,

 4    because one of the things I am asked to do here is to

 5    construct a hypothetical negotiation at a point in time.  If

 6    the point in time is before the adoption of the standard,

 7    then I won't have the difficulty of saying it is now a

 8    standard and there is value in it having become a standard.

 9    If I do it after it has become a standard, then I have to

10    somehow account for the fact it now has that monopoly

11    standard power.  How do I address that?

12              THE WITNESS:  That's why we suggested the patent

13    pools.  They are trying to solve that same problem that the

14    RAND commitment is.  The whole issue of the RAND commitment

15    is keeping that rate at an appropriate, reasonable level that

16    will allow the standard to grow.  That's why you have a RAND

17    commitment.  People said if I don't have RAND I will get

18    hold-up, I will get stacking and all these other things, and

19    the standard won't be as successful as it should be.

20         Patent pools have that same objective.  And that's really

21    fortunate for us because we can then say, look, I don't have

22    to do this hypothetical exercise, which is by its very nature

23    what we love to do, but is very hard.  So what you do when

24    you can't perform a hypothetical exercise, you look for some

25    transaction that proxies that hypothetical exercise.  And

1    that is the story I would say for the patent pools.  It is

2    like they are doing what we are trying to do, and their

3    outcome gives us guidance.

4        And I don't want to oversell it.  I don't want to say this

5    is going to give you the exact answer, but it is going to

6    point you in the right direction, because the very concerns

7    that they have, preventing hold-up, preventing stacking,

8    getting widespread adoption is the same objective that the

9    RAND commitment has.  And that's why they are very, very

10   helpful.

11            THE COURT:  All right.  Mr. Harrigan, follow up.

12            MR. HARRIGAN:  One question.

13                       REDIRECT EXAMINATION

14   By Mr. Harrigan:

15   Q   Professor, with reference to the MPEG LA H.264 pool, what

16   is it about the circumstances under which it was formed from

17   a timing standpoint that relates to whether it is a proxy for

18   ex ante royalties?

19   A   Well, it was ex ante in two senses, I would say.  One, the

20   negotiations took place right after the standard was adopted,

21   which is before it had widespread adoption.  But it is also

22   my understanding that at the time there was competition from

23   other standards, and therefore it hadn't been the only choice

24   at the time.  So the hold-up potential was limited for that

25   reason as well.  So the timing is helpful, as is the

1  existence of potential alternatives.

2          MR. HARRIGAN:  No further questions.

3          THE COURT:  Mr. Pepe?

4          MR. PEPE:  No questions, your Honor.

5          THE COURT:  You may step down.  Thank you, sir.

6  Microsoft may call its next witness.

7          MR. HARRIGAN:  Mr. Pritikin will be examining.

8          MR. PRITIKIN:  Your Honor, we are calling Gary

9  Sullivan as our next witness.

10  Whereupon,

11                      GARY SULLIVAN

12  called as a witness, having been first duly sworn, was

13  examined and testified as follows:

14          THE CLERK:  Will you state your full name for the

15  record and spell your last name, please?

16          THE WITNESS:  Gary Sullivan, S-U-L-L-I-V-A-N.

17          THE COURT:  You may inquire.

18                   DIRECT EXAMINATION

19  By Mr. Pritikin:

20  Q   Dr. Sullivan, by whom are you employed?

21  A   Microsoft.

22  Q   What is your current position?

23  A   Internally I am classified as a principal software

24  development engineer.  My business cards and external

25  communication identify me as video and image technology

1   architect.

2   Q   Could you describe your education for us?

3   A   I have a bachelor's and master's degree from the

4   University of Louisville in Kentucky, and an engineer's

5   degree and Ph.D. from UCLA.  All of those are in electrical

6   engineering.

7   Q   Now, you have a witness binder in front of you,

8   Dr. Sullivan.  Could you turn, please, to Exhibit 618?  Is

9   this a copy of your Ph.D. thesis?

10  A   Yes, it is.

11  Q   Can you tell us, generally, what the subject was of the

12  thesis?

13  A   Well, it was on video coding, or coding of moving images,

14  using vector quantization, motion compensation and quadtree

15  decomposition.

16  Q   When was the thesis submitted?

17  A   In late August or early September of 1991.

18  Q   And did you distribute copies to others at that time?

19  A   Yes, I personally made 20 or 30 copies, and gave them to

20  various friends and associates.

21  Q   And was it also placed in the library at UCLA?

22  A   Yes.

23          MR. PRITIKIN:  Your Honor, Microsoft offers

24  Exhibit 618.

25          MR. ROWLAND:  No objection, your Honor.  Mark

1    Rowland.

2            THE COURT:  Thank you, Mr. Rowland.

3            (618 admitted.)

4    By Mr. Harrigan:

5    Q    Doctor, what did you do after you received your Ph.D.?

6    A    Shortly after that I went to work for a company named

7    PictureTel in the Boston, Massachusetts area.  I started

8    there in late October or early November of 1991.

9    Q    And what was the business of PictureTel?

10   A    They were a leading video conferencing company at the

11   time.

12   Q    How long did you stay at PictureTel?

13   A    Seven or eight years.

14   Q    Did you then join Microsoft?

15   A    Yes.

16   Q    And approximately when was that?

17   A    In the spring of 1999.

18   Q    Can you tell us what your principal areas of

19   responsibility have been at Microsoft?

20   A    The first thing that I was hired to do at Microsoft was to

21   develop what became known as DirectX video acceleration,

22   which is a way to play video on a PC through the Windows

23   operating system using hardware acceleration built into

24   graphic accelerators.  Later, I became more and more involved

25   in standardization, which I was already doing when I joined

1  the company.  It eventually became the vast majority of my

2  job.

3  Q   Would you turn to exhibit -- demonstrative Exhibit 4008 in

4  the booklet.  Have you prepared a demonstrative showing the

5  primary standards organizations in the video field?

6  A   Yes.

7  Q   Dr. Sullivan, this is a real alphabet soup.  I wonder if

8  using Exhibit 4008 you could explain to us briefly what are

9  the principal organizations and the letter schemes of the

10  standards?

11  A   The two organizations that have made the most predominant

12  video coding standards have been the MPEG Video Activity,

13  which is part of the ISO/IEC organization, internationally,

14  and the VCEG organization, which is part of the ITU, the

15  Internation Telecommunications Union.

16  Q   What do they stand for, MPEG and VCEG?

17  A   MPEG is the Moving Pictures Experts Group in the ISO/IEC

18  community.  And VCEG is the Video Coding Experts Group.  The

19  standards that they produce are generally -- in the MPEG

20  world the standard is generally called MPEG something, like

21  MPEG-1 or MPEG-2, or something of that sort.  The standards

22  produced in the ITU for video are called H.26 something, like

23  H.261, 2, 3, 4.

24  Q   Now, you also have something called JVT, Joint Video Team.

25  What is that?

1  A   Yes.  These two organizations, MPEG video and VCEG, joined

2  up together to create the Joint Video Team.  That was a joint

3  organization of the two video-coding standard bodies.

4  Q   Is that the group then that finalized the H.264 video

5  standard?

6  A   Yes.

7  Q   Now, looking at these three organizations, have you had

8  leadership positions in any of these organizations?

9  A   Yes, I have, in all three.

10  Q   And would you tell us what those positions have been?

11  A   Well, I have been the chairman -- what's called the

12  rapporteur of the video-coding expert's group in the ITU

13  since 1997.  I was the chair of its primary activity in the

14  ITU for sometime before that, starting in '96.  I have been

15  chair of MPEG video off and on since 2001.  And I was the

16  chair of the JVT.

17  Q   Are you currently the chair of the MPEG video group and

18  the VCEG group?

19  A   Yes.

20  Q   Now, at the time that work began on the H.264 standard,

21  what was the predominant video standard?

22  A   That would be MPEG-2, also known as H.262 in the ITU.

23  Q   Was that standard widely implemented?

24  A   Yes, it was widely implemented.

25  Q   Is it still used today?

1    A    Yes, it is.

2    Q    And can you give us examples of where it would be used

3    today?

4    A    It is used for DVD movies.  It is used for broadcast

5    television in the United States, and I think it is used on

6    some cable television systems.

7    Q    Now let's turn specifically to H.264.  Have you prepared a

8    timeline showing the development of the H.264 standard?

9    A    Yes.

10   Q    And is that on the board behind you?

11   A    Yes.

12   Q    And perhaps we could put it on the screen as well.

13        I don't know if your Honor can see that.  Is that in a

14   good position?

15        THE COURT:  It's fine.

16   By Mr. Pritikin:

17   Q    Dr. Sullivan, looking at this, you have a blue line and a

18   red line.  Can you tell us what the blue line is?

19   A    The blue line is the project work going on in the ITU VCEG

20   organization.

21   Q    What is the red line?

22   A    Or orange line, I guess.  Oh, it is red over there.  That

23   is the project activity in the MPEG video.

24   Q    Let's talk first about the events on the blue line.  What

25   happened in January of 1998?

1   A   VCEG issued a call for proposals for a new technology to

2   become a new standard far superior in compression to existing

3   standards at the time.

4   Q   And who was the chairman of VCEG at that time?

5   A   I was.

6   Q   What were the goals at VCEG for the H.264 standard at the

7   outset?

8   A   Well, the primary goal was significantly improved

9   compression capability relative to prior standards.  There

10  were some other goals, but that was the primary goal.

11  Q   What happened in August of 1999?

12  A   That's when VCEG adopted its first draft of the new

13  standard.

14  Q   Now, you have drawn a bracket spanning the period from

15  August 1999 into the spring of 2001.  What happened during

16  that period?

17  A   During that period VCEG met about every three months in

18  various places, and continued to improve the draft design

19  that we had at first adopted in August of '99.  At each

20  meeting we would add features and capabilities to the draft

21  standard and improve it.

22  Q   Now, typically how many companies or individuals submitted

23  documentary proposals during this period?

24  A   Well, we would have about 40 or 50 people at each meeting,

25  roughly speaking, and numbers of documents in the range of

1  maybe 30 to 60 at each meeting.  Perhaps half of those would

2  be proposals or analysis documents regarding the draft

3  standard that we were preparing.

4  Q   One of the terms that is used, and it may be a little

5  confusing, is contribution or contribution document.  What

6  did you consider to be a contribution document?

7  A   Any document that was submitted to the committee.  It

8  could be a proposal for a technical change to the draft

9  standard, it could be a study of the performance of the

10 draft, or a study of some related technology, a communication

11 message, some sort of information relative to the work of the

12 committee.

13 Q   So a contribution or contribution document would not

14 necessarily be a proposal?

15 A   That's correct.

16 Q   Now, did the number of people attending these meetings

17 grow over time?

18 A   Yes.  At the beginning of this process, starting in, say,

19 late '98, or '99, we would have maybe 40 or 50 people coming

20 to the meetings.  As the work progressed, it became well

21 known in the community that we were really achieving

22 something substantial.  And so around the end of 2000, 2001

23 we had a significant increase in the number of attendees, and

24 in the number of contribution documents.

25 Q   You also made a note there of test verification of about

1   50 percent improvement.  By the spring of 2001, how much

2   improvement had you achieved over the prior standards?

3   A   Well, we estimated that the average would be about a

4   50 percent bit rate savings for the same video quality.  So

5   cutting in half the number of bits that you would need to

6   code video with a certain level of video quality, on average.

7   Q   Now, let's go to the red line or brown line on the screen

8   and talk about what the MPEG group was doing.  What happened

9   in January of 2001?

10  A   MPEG issued its own call for proposals for significant

11  advanced technology for compression capability.

12  Q   And what happened in July of 2001?

13  A   There was a test conducted where people could submit

14  proposals in response to this call that had been issued in

15  January.  And in particular the VCEG organization submitted

16  its draft design in July 2001 for its evaluation by MPEG, and

17  proposed to join forces with MPEG to finalize the draft

18  standard.

19  Q   At this point were you chair of both the MPEG video group

20  and VCEG?

21  A   Yes, I was at that point.  Yes.

22  Q   Did MPEG adopt the VCEG design in July of 2001?

23  A   Yes, it did.  MPEG adopted the VCEG design and

24  communicated positively in response to the VCEG proposal

25  proposing to join together for the future work to finalize

1    the standard together.

2    Q    And then if we jump ahead to December of 2001, you show

3    the JVT being formed.  Were you designated as chairman of the

4    JVT?

5    A    Yes, I was the chair of the JVT.

6    Q    Were their vice-chairs?

7    A    Yes.

8    Q    Who were they?

9    A    There was Thomas Wiegan from the Fraunhofer Heinrich Hertz

10   Institute in Germany and Ajay Luthra of Motorola.

11   Q    When was the first release of the final version of H.264?

12   A    That was in May of 2003.

13   Q    Now, I want to go back and focus for a moment on the VCEG

14   proposal from the summer of 2001.  Did that proposal include

15   any coding tools for interlaced video?

16   A    No, it did not.

17   Q    So it was simply progressive video?

18   A    Yes.

19   Q    Why not?

20   A    Well, interlaced video scanning is sort of a primitive

21   compression technology from around 1940.  Since then, people

22   felt like the modern digital compression technologies were

23   superior to that, and that interlaced video would be waning

24   in importance.  So at the time we did not include any

25   particular support for interlaced video in the design.

1  Q   Now, let's talk about the version that you had by July

2  of 2001.  You said it had a 50 percent improvement.  How did

3  that compare to the results of the first release of the final

4  version of H.264 in 2003?

5  A   I would say it was very similar in its capabilities.  VCEG

6  had done a lot of work leading up to this test done in July

7  of 2001.  The vast majority of the advance in compression was

8  already well in place by that time.

9  Q   Now, as you think back on the work that led to that 2001

10  VCEG submission, which companies or organizations stand out

11  as having made some of the most important contributions?

12  A   Well, there were lots of companies that participated.  As

13  I said, we might have 40 or so people at every meeting from

14  various companies around the world.  However, if you ask

15  which companies stand out in my mind as significant

16  contributors, one would be Telenor.  Telenor submitted the

17  proposal that became the basis of the first draft of the

18  design in August of 1999.

19      Another was Fraunhofer Heinrich Hertz Institute of

20  Germany.  They made quite a few contributions.

21      Another was Nokia.  They were also very active in the

22  work.

23  Q   Now, when did Motorola become interested in the work of

24  VCEG?

25  A   I believe that was around mid-2001.

1   Q   And did it become public at that time that you were making

2   good progress?

3   A   Oh, yes, by then it was very well known that we were

4   making substantial progress.

5   Q   And when did Motorola make its first proposal?

6   A   A proposal I believe was submitted to the first meeting of

7   the JVT in December of 2001, after the groups joined forces.

8   Q   So during this entire three-year period, when VCEG

9   achieved a 50 percent compression improvement, that you said

10  was close to the compression improvement in the final

11  standard, was Motorola responsible for any of that?

12  A   No, they did not make any proposals during that process.

13  Q   Now, could you turn to Exhibit 424 in your exhibit binder?

14  Can you identify this, Dr. Sullivan, as an article published

15  in the IEEE transactions on circuits and systems for video

16  technology in July of 2003?

17  A   Yes.

18  Q   Did you co-author this with Doctors Wiegan, Bjontegaard

19  and Luthra?

20  A   Yes, I did.

21  Q   And has this article been referenced over the years in

22  publications dealing with H.264?

23  A   Yes.  This is by far the most well-known publication about

24  the standard.  It has been referenced many times in many

25  academic works.

1          MR. PRITIKIN:  Microsoft offers Exhibit 424, your

2     Honor.

3          MR. ROWLAND:  No objection.

4          THE COURT:  It is admitted.

5          (424 admitted.)

6     By Mr. Rowland:

7     Q   Dr. Sullivan, attached to it is 424(a), which is a blown

8     up and easier to read version of the top graph from figure 18

9     on Page 574.  Do you have a copy of that in your booklet as

10    well?

11    A   Yes, I do.

12         MR. PRITIKIN:  Your Honor, Microsoft offers 424 (a)

13    as well.

14         MR. ROWLAND:  No objection.

15         THE COURT:  424(a) is admitted.

16         (424(a) admitted.)

17    By Mr. Pritikin:

18    Q   Let's look at 424(a), because it is a bit easier to read.

19    Can you tell us first, generally, what is shown on this

20    graph?

21    A   This shows a number of curves, each of which represent the

22    compression performance of a draft of the standard as we were

23    developing it.

24    Q   And what is on the vertical axis?

25    A   That is PSNR.  That is the measure of video quality.  In

1   quality measurement, higher is better for PSNR.

2   Q   So if we are looking at the graph, we go up, higher means

3   it has better quality?

4   A   Yes, that's better quality.

5   Q   And what is shown on the horizontal axis?

6   A   That is bit rate and kilobits per second.  That is the

7   amount of bits that is needed to achieve the level of

8   quality.

9   Q   I will ask you the question, which is better, going left

10  or right?

11  A   Going left is better, because that is a savings in bit

12  rate.

13  Q   Now, what is represented by the various curves that are

14  shown here?

15  A   Each one is the performance of a draft of the standard

16  known as H.264 MPEG-4 AVC.  There are various versions of the

17  draft that are tested here.  There are also two curves

18  included for reference that are the performance of prior

19  standards.

20  Q   Let's go through the legend very quickly.  What does TML

21  refer to?

22  A   TML means test model long-term.  That is the vergence of

23  the standard that -- as they were being developed in VCEG,

24  before the two organizations jointly began working on the

25  project together.

1   Q    And what does JM refer to?

2   A    JM means joint model, and the different versions of the JM

3   are versions of the draft standard after the two groups

4   joined together.

5   Q    And finally, I think you said there were two older

6   reference standards.  What are those?

7   A    We have H.263 plus.  That is the second version of the ITU

8   H.263 standard, and the other is MPEG-4 advanced simple

9   profile.  Again, these are both older standards that have

10  been developed before the H.264 or AVC standard.

11  Q    Now, if we want to compare one version to another, how do

12  we determine from looking at this graph whether a particular

13  standard achieves better compression than another standard?

14  A    Well, a better curve would be a curve that is farther to

15  the left, or higher on the chart.

16  Q    And what is the last TML version shown?

17  A    That's TML-9.

18  Q    And what is the date of that?

19  A    TML-9 would be from September of 2001, the last version

20  produced by VCEG before the groups joined together as a joint

21  project.

22  Q    Had Motorola made any proposals embodied in TML-9?

23  A    No.

24         THE COURT:  At that point we are going to stop,

25  counsel.  We will resume tomorrow morning.  Mr. Harrigan, who

1  will Microsoft be calling for witnesses tomorrow?

2          MR. HARRIGAN:  I will turn to someone that has the

3  list.

4          MS. ROBBINS:  Your Honor, Ellen Robbins on behalf of

5  Microsoft.  Tomorrow we will be starting with Leo

6  Del Castillo.  We will finish, obviously, with Mr. Sullivan.

7  Del Castillo, Orchard, Jennifer Ochs and Jerry Gibson.  I

8  believe that should take us through the end of the day at

9  3:00.

10          THE COURT:  All right.  Counsel, any matters we

11  should take up before we adjourn for the day?

12          MR. PRITIKIN:  Not for us.

13          MR. JENNER:  Nothing from Motorola, your Honor.

14          THE COURT:  Subject to my mathematics being correct,

15  Microsoft used three hours and 35 minutes today, and Motorola

16  used one hour and 55 minutes.  You can guide yourselves

17  accordingly.

18          MR. JENNER:  Your Honor, do you have or do you know

19  when you will have readings on the deposition designations?

20          THE COURT:  I know that I am going to eat whatever

21  time I take in excess.  You will have through noon on

22  Wednesday if you need it as available time.

23          MR. JENNER:  Thank you.

24          THE COURT:  I would be delighted if you are finished

25  by the close of business on Tuesday, but I don't want to rush

1    you guys either.

2            MR. JENNER:  We just have in mind the allocations you

3    had mentioned.  We are counting minutes as carefully as we

4    can.  We don't want to run afoul of the court's schedule.

5            THE COURT:  You are in good shape.  All right.

6    Counsel, I am sorry that we are going to cause you to clear

7    off your tabs, but that's one of the things that will happen

8    today.  We will be in recess until 9:00 tomorrow morning.

                        (Adjourned.)

C E R T I F I C A T E


we, Debbie K. Zurn and Barry Fanning, Court Reporters for the United States District Court in the Western District of Washington at Seattle, do hereby certify that we were present in court during the foregoing matter and reported said proceedings stenographically.

We further certify that thereafter, we have caused said stenographic notes to be transcribed under our direction and that the foregoing pages are a true and accurate transcription to the best of our ability.


Dated this 18th day of December, 2012.


/s/ *Debbie Zurn, Barry Fanning*

*DEBBIE ZURN/BARRY FANNING*
*OFFICIAL COURT REPORTERS*