```
 1                UNITED STATES DISTRICT COURT.

 2           WESTERN DISTRICT OF WASHINGTON AT SEATTLE

 3     _____

 4    MICROSOFT CORPORATION,          )
                                      )
 5                    Plaintiff,      )  C10-01823-JLR
                                      )
 6    v.                              )  SEATTLE, WASHINGTON
                                      )
 7    MOTOROLA INC., et al,           )  November 16, 2012
                                      )
 8                    Defendant.      )  TRIAL DAY 4
                                      )
 9     _____

10               VERBATIM REPORT OF PROCEEDINGS
             BEFORE THE HONORABLE JAMES L. ROBART
11                UNITED STATES DISTRICT JUDGE
       _____

12

13    APPEARANCES:

14

15

16     For the Plaintiff:      Arthur Harrigan, Christopher
                               Wion, David Pritikin, Rick
17                             Cederoth, Ellen Robbins, Andy
                               Culbert, David Giardina, Matt
18                             Love, David Killough, David
                               Howard and Shane Cramer
19

20

21
       For the Defendants:     Jesse Jenner, Ralph Palumbo,
22                             Philip McCune, Kevin Post, Tom
                               Miller, James Batchelder and
23                             Steven Pepe

24

25
```

```
 1
                            EXAMINATION INDEX
 2
      EXAMINATION OF                                         PAGE
 3     TIMOTHY SIMCOE        DIRECT EXAMINATION               13
                            BY MR. PRITIKIN:
 4                          CROSS EXAMINATION                 41
                            BY MR. JENNER:
 5                          REDIRECT EXAMINATION              75
                            BY MR. PRITIKIN:
 6                          RECROSS-EXAMINATION               76
                            BY MR. JENNER:
 7     MATTHEW LYNDE         DIRECT EXAMINATION               78
                            BY MR. PRITIKIN:
 8                          CROSS EXAMINATION                131
                            BY MR. BATCHELDER:
 9     AJAY LUTHRA          DIRECT EXAMINATION               190
                            BY MS. HIGGINS:
10

11

12
                             EXHIBIT INDEX
13     EXHIBITS ADMITTED                                     PAGE
        53                                                    14
14      1575                                                  22
        1568                                                  23
15      1414                                                  24
        1031                                                  25
16      1130                                                  27
        1407                                                  29
17      2839                                                  30
        2838                                                  30
18      1033                                                  32
        1032                                                  41
19      3125                                                  53
        3118                                                  56
20      3114                                                  60
        3010                                                  65
21      3116                                                  75
        54                                                    78
22      1161                                                  83
        1150                                                  87
23      1152                                                  87
        71                                                    94
24      103                                                   95
        1153                                                  98
25      1160, 1161 & 1163                                    104
        1154                                                 105
```

| | |
|---|---|
| 1156 | 106 |
| 1164 | 107 |
| 1158 | 108 |
| 1159 | 109 |
| 1125 | 112 |
| 52 | 112 |
| | 116 |
| 1155, 1165, 1167 | 116 |
| 1190 | 122 |
| 6 | 125 |
| 65 and 66 | 127 |
| 67 | 129 |
| 3013 | 142 |
| 2970 | 143 |
| 1036 and 3194 | 156 |
| 3394 | 177 |
| 2342 | 198 |
| 423 | 199 |
| 610 | 201 |
| 3382 | 203 |
| 2209 | 207 |
| 674 | 208 |
| 2274 | 208 |
| 2227 | 209 |
| 654 | 211 |
| 2216 | 215 |
| 653 & 675 | 216 |
| 710 | 216 |

1           THE COURT:  Please be seated, ladies and gentlemen.

2  We haven't done this for awhile, so let's have the clerk call

3  this matter.

4           THE CLERK:  Case C10-1823, Microsoft versus Motorola.

5  Counsel, please make your appearance.

6           MR. HARRIGAN:  Art Harrigan representing Microsoft.

7  And next to me is Mr. Pritikin from Sidley; and David

8  Giardina from Sidley; and Andy Culbert from Microsoft; and

9  Rick Cederoth from Sidley; and Ellen Robbins from Sidley.

10           MR. JENNER:  Jesse Jenner from Ropes representing

11  Motorola.  And with me, some of our usual cast, Mr. Brenner

12  from Ropes; Mr. Palumbo from Summit; Mr. Pepe from Ropes; Mr.

13  Post from Ropes; Mr. Batchelder from Ropes; Mr. Miller from

14  Motorola.

15           THE COURT:  Mr. Miller, I'm not sure what to draw

16  from the fact that you're getting closer to the court.

17           MR. MILLER:  Stepping up.

18           THE COURT:  Mr. Jenner, I'm in receipt of your

19  letter.  I assume that Microsoft is at this point?

20           MR. JENNER:  Yes, sir.

21           THE COURT:  Let me give you some observations, and

22  then I'll ask you to talk, and you can give me your thoughts

23  on my resolution of this.  And then I'll give Microsoft an

24  opportunity to comment after you.

25       I'm somewhat reminded of the three blind men and the

1    elephant, in that each of us, the two parties and the court,

2    looks at this situation and sees it in a different light.  My

3    light is that Motorola entered into these agreements with

4    various third parties and now wants to, in effect, breach

5    them by using those documents in court, and is asking the

6    court to, in some manner, accommodate that.  And, therefore,

7    I perceive it as your problem.

8        However, I am mindful from your point of view that many

9    courts have chosen to close the courtroom and employ complete

10   confidentiality on existing license agreements, in particular

11   the rates on those.  And I understand the logic for that, and

12   I used to passionately believe in it when I was in private

13   practice.

14       The problem is that they are the central issue in this

15   litigation, and you are properly relying on them as some of

16   the most important evidence that you have, which puts you

17   into the dilemma that you're in right now.  So let me ask

18   you, in your remarks, to kind of address the following four

19   thoughts that I have:  One, I believe from looking at the

20   witness list that this issue doesn't come up today.  I'm not

21   sure about that, but I think that's correct.  Secondly, I'll

22   accept your proposal of new and improved redacted exhibits

23   which somehow camouflage the party that they refer to.

24   Third, in further attempting to ruin your weekend even more,

25   I would like to see briefing on this issue.  I've not had an

1    opportunity to read the cryptology case that you cited.  I

2    guess Mr. Palumbo delivered this at 8:30 this morning.

3         I will continue using the procedure that I outlined

4    originally in terms of it not being disclosed on the public

5    screen, and trusting the lawyers to not disclose the names

6    while they examine the witnesses, but the court having access

7    to the unredacted documents and the parties having access to

8    it.  And I will commit to you that I won't change that

9    arrangement until we get some further resolution of this

10   issue.  And that would include before the trial ends, or

11   before the case ends, or at least this portion of the case.

12        However, I'm going to stay with my belief that the context

13   of the name of the party to the court has significance, if

14   for no other reason than it would make a difference if we

15   were dealing with "Ma and Pa Software Company" which has one

16   product and $10 in sales, versus Motorola negotiating with

17   Microsoft, or IBM, or Google, or whoever.  It seems to me

18   that context is essential to understand the royalty rates

19   that are being discussed in the agreements and being asked to

20   be the basis of the court's decision.

21        My thought is, if we proceed in this manner, if you're

22   unhappy with what I've done, you can go to the Court of

23   Appeals and seek some kind of relief before we publish our

24   findings and conclusions, and therefore trigger this

25   avalanche of information that I assume most people are here

1  watching the trial to see what crumbs fall to the floor from.

2  And that will be helpful guidance for both of us.  But it

3  will also give you -- it should avoid the question of an

4  advisory opinion, because it will give you a fixed mandate

5  from the court, this is what's going to happen otherwise.  So

6  that should ease your path, somewhat, to the circuit.

7      So that would be my suggestion on how we proceed.  And I

8  welcome your comments.

9          MR. JENNER:  Thank you, Your Honor.  I feel a little

10  bit in the lion's den here.  I think I should probably point

11  out --

12          THE COURT:  I'm happy to hear you didn't say the zoo.

13          MR. JENNER:  If it is a zoo, it's all new animals

14  we've never seen before.  I should, in fairness, point out

15  that we're advised, I believe this is correct, that Microsoft

16  does not join in our request.  I imagine that comes as no

17  surprise.

18          THE COURT:  That's why I'm giving them a chance to

19  talk last here.

20          MR. JENNER:  I should point that out.

21      You are correct, we do not have any witnesses today, at

22  least from our perspective, that would need to get into this

23  information, so that we do have the weekend to try to grapple

24  with all these issues and try to figure out how to deal best

25  with it moving forward.

1        And, if I understand, Your Honor is saying that you are

2   accepting the proposal that we submit a new set of numbered

3   but unnamed exhibits, so that as we refer to the number of

4   exhibits, the gallery, at least on the record, won't have any

5   reason to recognize who the exhibit is.  If they put it

6   together, they put it together.  But that's okay to proceed

7   that way?

8             THE COURT:  That's correct.

9             MR. JENNER:  As far as briefing on the issue is

10  concerned, we will certainly do that over the weekend.  Could

11  I ask Your Honor for a little clarification, perhaps on more

12  precisely what the issue is that you want us to address?

13            THE COURT:  Well, I'm trying to give you something

14  that you can use to go up to the circuit.

15            MR. JENNER:  Yes.

16            THE COURT:  So you can say, this is what that

17  crotchety old fool wants to do, and this is why it's wrong.

18  And that's why I'm giving you this fixed target to shoot

19  against, which is that I reserve the right, at the point that

20  they become a matter of significance in my ruling on this

21  issue, to make these license agreements a matter of public

22  record.

23            MR. JENNER:  Right, okay.  I think I understand.

24        Continuing with the procedure that the court has set forth

25  in your order earlier this week, we understand with the

1    overlay that we would be, where necessary, using the numbered

2    exhibits rather than names.  I think we can work with that

3    and hopefully we won't foul it up ourselves by revealing

4    information, as I think has happened at least once.

5         THE COURT:  Well, I find it somewhat ironic that the

6    party whose information did get blurted out needed two law

7    firms to tell us that we got it wrong.

8         MR. JENNER:  I guess in terms of making this process

9    work, I will be the first person to admit probable

10   imperfections in bringing the procedure to pass, but we will

11   do our best to try to make that work.

12     I do believe that we will try to get some sort of -- I'm

13   speaking a little bit without authorization, but I think the

14   plan will be that we will try to seek some sort of an

15   expedited consideration by the circuit, so that we don't have

16   Your Honor in the position of waiting indefinitely for

17   whatever will come out of this.

18     I believe we have been advised informally by some of the

19   third parties that they may seek to do this themselves

20   anyway, so there may actually be more than one avenue sought

21   to try to get that kind of an expedited review.  In fact,

22   maybe if there is more than one, it will garner some more

23   attention by the circuit.  But we understand that Your Honor

24   does not want or does not intend to wait forever to get this

25   resolved, so that we will take it upon ourselves to do what

 1   we think can be done in the most expeditious way possible.

 2          THE COURT:  Mr. Jenner, I think we all recognize when

 3   the trial concludes on Tuesday, this portion of it, you are

 4   not going to get a result by Thanksgiving.  You're likely not

 5   going to get a result by Christmas or New Year's, probably

 6   sometime in the spring.  We have literally, I think we're up

 7   to now 600 pleadings, or something.  We've got several days

 8   of trial testimony.  We've got several depositions.  I think

 9   it was one side or the other had 270 pages of findings and

10   conclusions, and the other side had a brief 185.  It's going

11   to take us awhile.  I'm afraid you outnumber Mr. Fortney and

12   I about 50 to one, and you've taken full advantage of that to

13   generate a lot of paper.  So, I think I'll have some time.

14          MR. JENNER:  Okay.  I understand.

15       The other issue I guess I should address is we had

16   proposed separately in the letter the prospect of a

17   separately sealed portion on Tuesday, so that in the event

18   the circuit does not change its views, it would be at least

19   possible for us to try to avoid breach by withdrawing the

20   information that might go to the public record.  I take it

21   Your Honor is not inclined to head in that direction?

22          THE COURT:  I don't think we need to do that if we

23   employ the approach that I've taken.  As I understand the

24   testimony in this, Mr. Lynde isn't going to mention the

25   stuff.  Maybe Mr. Harrigan can confirm that.

 1        MR. HARRIGAN:  Your Honor, I guess it depends on

 2    whether you're talking about our case or rebuttal.

 3        THE COURT:  We're talking about your case.

 4        MR. HARRIGAN:  I don't think he's going to

 5    affirmatively deal with that during our case.  We don't know

 6    what's going to happen on cross.  But the basic problem with

 7    this, Your Honor, is that the issue here is are these

 8    comparable?  And comparability involves a host of facts about

 9    each one of them.  And I don't think that changing the label

10    on the exhibit is going to solve anything, because the whole

11    point is you have to get into the, you know, who is this

12    licensee?  What is the product?  What is the technology?  So

13    I don't see how we can cross examine anyone who is presenting

14    these licenses without getting into the elements that

15    determine whether they're comparable or not.

16        THE COURT:  All right.  That's what we're going to

17    take up Monday after I get a chance to look at your briefing.

18        MR. JENNER:  All right.  The reason that I mentioned

19    the separate session Tuesday as a possibility is that even if

20    we do what Your Honor is contemplating having us do now, I

21    gather the prospect is still there that if we were successful

22    in keeping the information confidential through the end of

23    the trial, and the circuit does not change its views, then

24    Your Honor would still be in the position of needing to

25    actually go ahead and disclose the information.  So that's

 1  why we propose the separate prospect, so if the circuit says

 2  absolutely no, this is the way it's going to be, we would

 3  still have the option to withdraw that information.

 4          THE COURT:  You always have the option to withdraw

 5  it.  If you need to recall a witness because you limited your

 6  examination and you now have decided to take the plunge,

 7  that's fine.

 8          MR. JENNER:  Strike it?

 9          THE COURT:  It will then be presented -- if you

10  decide that you want to present it, it's going to be

11  presented, and there's no way to then withdraw it.  But it

12  will be presented in the modified form that I've discussed.

13          MR. JENNER:  Yes.

14          THE COURT:  If, on the other hand, you want to omit

15  it, sounds like they're going to take up some of these issues

16  in rebuttal testimony.  And so I'm not sure that there's a

17  way that we can avoid this issue.  And I'm confident the

18  circuit is not going to rule between now and Tuesday.  So I'm

19  afraid I can't let you off the horns of this dilemma.  But at

20  least I can give you a way, if ultimately they tell me I have

21  it wrong, we will have protected your confidentiality, at

22  least tried.  It sounds like Mr. Harrigan just made my

23  remarks somewhat more cogent.  That's exactly what my concern

24  is.

25          MR. JENNER:  Yeah.  Your Honor, could I just have a

 1  moment to confer and see if somebody else has a point that

 2  needs to be made?

 3          THE COURT:  All right.

 4          MR. JENNER:  I think nothing further on the point at

 5  this time, Your Honor.  We will see what we can do with this

 6  over the weekend and get it to Your Honor as expeditiously as

 7  we can.

 8          THE COURT:  That's fine.  Thank you.

 9      I believe we're in Microsoft -- and I'm taking it from the

10  fact that no one has sprung to their feet, that we don't have

11  any blocked exhibits or closed courtroom issues today.

12          MR. PRITIKIN:  We do not, Your Honor.

13          THE COURT:  Let's proceed, then.

14          MR. PRITIKIN:  Microsoft will call as its next

15  witness, Professor Tim Simcoe.

16                      TIMOTHY SIMCOE

17      Having been sworn under oath, testified as follows:

18          THE CLERK:  Will you state your name for the record

19  and spell your last name, please?

20          THE WITNESS:  Timothy Simcoe, S-I-M-C-O-E.

21          THE COURT:  You may inquire.

22                     DIRECT EXAMINATION

23  BY MR. PRITIKIN:

24  Q   Professor Simcoe, could you turn to Tab 53 in your binder?

25  And can you tell us if this is a copy of your CV?

1  A   Yes, it is.

2         MR. PRITIKIN:  Microsoft offers Exhibit 53.

3         MR. JENNER:  No objection.

4         THE COURT:  53 is admitted.

5         (Exhibit No. 53 was admitted into evidence.)

6  Q   Let's go over a couple of the things on it.  Can you tell

7  the court about your educational background?

8  A   I have an undergraduate degree from Harvard in applied

9  math and economics.  And I did my graduate work at the

10 University of California, Berkeley, where I received a

11 master's in economics, and a Ph.D. in business

12 administration.

13 Q   Where do you work now?

14 A   I'm an assistant professor at Boston University School of

15 Management.

16 Q   What do you teach?

17 A   I teach strategy and innovation, and I teach data analysis

18 or statistics.

19 Q   Is your research focused in any particular area?

20 A   The majority of my research is about standards and

21 standards-setting organizations.

22 Q   Have you published articles in that area?

23 A   Yes, I have.

24 Q   Approximately how many?

25 A   At least a dozen different articles and book chapters on

1    that subject.

2    Q    And are you a member of the National Academy of Sciences

3    Committee on Intellectual Property in Standards Setting

4    Processes?

5    A    Yes, I am.

6    Q    What is that?

7    A    The National Academies of Science is an organization that

8    convenes expert panels to work on topics that government

9    policymakers have an interest in.  And so the U.S. Patent and

10   Trademark Office recently sponsored a panel on the

11   intellectual property management policies of

12   standards-setting organizations.  And I'm a member of that

13   panel.

14   Q    What opinions have you reached in this matter?

15   A    I guess we could summarize my opinions as that

16   standards-setting organizations have an interest in seeing

17   the standards that they develop widely diffused and

18   implemented, because fundamentally standards are about

19   interoperability, and without broad implementation, they

20   create little value.

21        In the interests of seeing their standards broadly

22   implemented, they have rules governing the use of

23   intellectual property which may be included in a standard.

24   And those rules are designed, the RAND rule in particular, to

25   address the problem of hold-up or royalty stacking.  And that

1    in the event of a dispute over whether a particular license

2    is consistent, or proposed license is consistent with the

3    RAND principles of no hold-up and no royalty stacking, it is

4    often best to look towards comparables that are available

5    through collective licensing agreements or pools, because

6    pools address the same problem of trying to see that the

7    underlying standard achieves broad diffusion.

8    Q    Now, we heard Professor Murphy earlier in the week discuss

9    hold-up and stacking.  What is the perspective that you bring

10   to these issues, Professor?

11   A    Like Professor Murphy, I'm an economist and I can speak to

12   the underlying economics.  But because my research is

13   primarily focused on standards and standards-setting

14   organizations, I can speak more to the way those

15   organizations are put together and what their objectives are,

16   and how they work.

17   Q    Now, were you in the courtroom at the end of the day

18   yesterday when the court asked Professor Gibson some

19   questions about the standards-setting process, and what it

20   means for a patent to be essential?

21   A    Yes, I was.

22   Q    I want to start with that topic, Professor Simcoe.  Can

23   you tell us a little bit about how standards are developed?

24   A    Standards are developed by engineers who meet in working

25   groups or technical committees.  And those engineers

1   represent the interests of the companies that employ them.

2   And they get together in these technical committees and try

3   to find some agreement on ways to make their products work

4   together.

5   Q   Now, in this process, do the engineers in the room

6   typically know if the technology they're evaluating

7   implicates patents?

8   A   My sense is that they don't.

9   Q   Do all parts of the standard always implicate patents?

10  A   No.  Typically a standard has many different pieces to it,

11  and a great deal of it isn't covered by intellectual property

12  in any way.

13  Q   Now, when some piece of a standard does implicate a patent

14  or patents, is that specified or called out in the standard?

15  A   No, not in the document itself.  And typically the people

16  who are working on it aren't in a position to know whether

17  there's a patent over what they're working on in advance.

18  Q   What does it mean for a patent to be essential to a

19  standard?

20  A   The term "essential" as used by standards-setting

21  organizations means that there's a mandatory or an optional

22  part of the specification that if you were to implement it,

23  you would need to have access to the patent, because the

24  underlying technology that the standard defines is covered by

25  the patent.

1    Q    Now, suppose the patent relates only to an optional

2    portion of a standard.  Is it still considered essential?

3    A    Yes.  Standards-setting organizations define this term

4    "essential" such that a patent is called an essential patent

5    even if it only reads on an optional part of the

6    specification.

7    Q    Is it still subject to a RAND commitment?

8    A    Yes.

9    Q    Are all essential patents important or economically

10   valuable?

11   A    No, not necessarily.  I think the key thing to recognize

12   about this essentiality versus valuable distinction, from an

13   economic point of view, that in order for something to be

14   valuable it has to be both important in the sense of

15   providing value to, say, a user of the standard, but it has

16   to be scarce, it has to be the case that there aren't other

17   equally good ways of accomplishing the same purpose.  And so

18   if there are lots of ways to do something when we're making

19   the choice, and we sort of arbitrarily pick one, and that one

20   happens to be patented, then the essential patent isn't an

21   economically valuable one.

22   Q    Can a patent be essential before the standard is adopted?

23   A    No.  Because before the standard is defined it's

24   impossible to know what's essential or not.  The standard has

25   to exist in order for us to assess whether the mandatory or

1   optional parts that are there that give rise to this concept

2   of essentiality have been defined.

3   Q   Now, during the standard setting process, are participants

4   of the IEEE or the ITU required to conduct a search of their

5   patent portfolios to identify potentially essential patents?

6   A   No, there's no mandatory search rule.  And if there were,

7   participants here are engineers, so they wouldn't do the

8   search in any case.

9   Q   We saw, yesterday, language from an IEEE letter of

10   assurance which a patentholder represented that it held

11   patents or patent applications that may be or may become

12   essential to the standard.  Why is the word "may," used in

13   the letters of assurance?

14   A   Because the standards-setting organizations seek to get

15   these letters of assurance as early in the process as

16   possible, in order to have those RAND commitments even before

17   the standard is defined.

18       And so in that case, as we just heard, we can't figure out

19   whether the patents in question are essential or not, so we

20   have to think of them as maybe becoming essential.

21   Q   Are the parties required to identify their potentially

22   essential patents in the letters of assurance?

23   A   No, you can have a blanket letter of assurance in which

24   they don't list any particular patents or applications.

25   Q   Now, do the standards-setting organizations, like the ITU

1    or the IEEE, do they make a determination of whether patents

2    are essential to the standard?

3    A    No, they do not.

4    Q    And when people in the standards community refer to a

5    "declared" -- have you heard that word, "declared essential

6    patent," what does that mean?

7    A    The term "declared essential patent" is used for a

8    specific patent or patent application that has been

9    identified, typically by its owner, as essential.  But no one

10   else has checked to see whether that's the case.

11   Q    Now, let's switch gears and talk for a few minutes about

12   pools.  If a company wants to join in the pool process, when

13   a pool is getting set up, do the pools usually require that

14   they have at least one essential patent?

15   A    Yes, they do.

16   Q    And do pools, like MPEG LA and Via, make a determination

17   of whether a patent is essential or not?

18   A    Yes.  The pools hire a third-party independent expert

19   typically to evaluate the patents that are submitted and

20   ensure that they're essential.

21   Q    So when we're talking about patents that are in a pool,

22   have all the patents that are licensed out by a patent pool,

23   of the kind we've been discussing in this case, have those

24   been reviewed and determined by a third party to be

25   essential?

1   A   Yes.  Every patent in a pool has gone through a

2   third-party review process.

3   Q   We've heard testimony, I think, that there were over 2,500

4   patents in the MPEG LA pool.  Did someone review all those

5   2,500?

6   A   Yes.

7   Q   Now, one other point of possible confusion.  We've heard a

8   lot in the course of the trial about MPEG and about MPEG LA.

9   Are they related?  Are they the same?  Are they different?

10   A   Those are two different organizations.

11   Q   Can you help us with that?

12   A   MPEG is the Motion Picture Experts Group, which is a group

13   of engineers who develop standards for compression and

14   decompression, and have been doing so for a long period of

15   time.

16      MPEG LA is the MPEG licensing authority, which is a patent

17   pool.  They happen to have the MPEG as the first part of

18   their name because the first pool they set up was for

19   technology developed by the Motion Picture Experts Group.

20   Q   In the course of your work, have you examined how SSOs

21   deal with the incorporation of patented technology in their

22   standards?

23   A   Yes, I've looked at that extensively.

24   Q   Are you familiar with the Intellectual Property Policies

25   in the ITU and the IEEE?

1  A   Yes.

2  Q   Would you turn, please, to Exhibit 1575?  Is this a copy

3  of the current guidelines for implementation for the common

4  patent policy for the ITU?

5  A   I'm sorry, I don't have 1575.

6          MR. JENNER:  We don't have 1575 either.  I'm sorry,

7  here it is.  It's toward the back of the binder, if it's the

8  same as yours, Dr. Simcoe.  It's maybe three from the end.

9  Q   Did you find it there, Professor?

10  A   Yes.

11  Q   All right.  Can you identify this as the guidelines?

12  A   Yes, they are.

13          MR. PRITIKIN:  We move the admission of 1575.

14          MR. JENNER:  No objection.

15          THE COURT:  It is admitted.

16          (Exhibit No. 1575 was admitted into evidence.)

17  Q   And would you turn to page 9 of the annex, that has the

18  stamp number 2815 at the end?

19  A   Yes.

20  Q   Does this policy contain language indicating that it is

21  the "sole objective," of the policy, to ensure that a patent

22  embodied fully or partly in an ITU standard is, "accessible

23  to everybody without undue constraints."

24  A   Yes.

25  Q   Is that your understanding of the policy?

 1    A    Yes.

 2    Q    Would you turn to Exhibit 1568, which I think is behind

 3    that?  And are these the current IEEE standards or bylaws?

 4    A    Yes, they are.

 5    Q    Does this set forth the rules of the IEEE IP policy in

 6    Section 6?

 7    A    Yes.

 8         MR. PRITIKIN:  Microsoft moves admission of 1568.

 9         MR. JENNER:  No objection.

10         THE COURT:  It is admitted.

11         (Exhibit No. 1568 was admitted into evidence.)

12    Q    Let's turn now to Exhibit 1414 in the binder.  I think

13    that's at the very beginning.  Hopefully these are going to

14    be in the order in which we cover them now.  Is this a

15    federal register notice issued by the FTC in 2011, seeking

16    comments on standards-setting organizations and standard

17    essential patents?

18    A    Yes, it is.

19    Q    Can you tell us what this related to?

20    A    At the time -- well, the FTC has a long-standing interest

21    in the potential problem of hold-up and royalty stacking in

22    the context of licensing standard essential patents.  And

23    from time to time they issue a call for comments or convene a

24    conference related to that question, to seek advice on the

25    matter.  And so this is an example of that.

1     MR. PRITIKIN:  Microsoft moves admission of

2  Exhibit 1414.

3     MR. JENNER:  No objection.

4     THE COURT:  It is admitted.

5     (Exhibit No. 1414 was admitted into evidence.)

6  Q  Would you turn to the second page of the exhibit?  And in

7  the column on the far left, about two thirds of the way down,

8  do you see the statement, "The most common mechanism used by

9  SSOs to prevent patent hold-up is the RAND commitment"?

10  A  Yes.

11  Q  And is that consistent with your understanding, based on

12  the review of the IP policies of the organizations?

13  A  Yes, I believe that's correct.

14     MR. JENNER:  Your Honor, I would interpose -- I don't

15  know if it's an objection, or request for clarification, but

16  to the extent it may become important, I believe counsel left

17  out the words, "to attempt," from the quote.

18     MR. PRITIKIN:  I'm sorry if I omitted those.  I

19  didn't intend to.

20     THE COURT:  All right.

21  Q  Is royalty stacking a concern addressed by RAND?

22  A  Yes.

23  Q  Now, in your review of the materials in this case, have

24  you identified any statements by Motorola reflecting a

25  concern with royalty stacking in the standards context?

A    Yes, I have.

Q    Would you turn to Exhibit 1031?  And is this a submission that was made by Motorola with two other companies regarding RAND to ETSI?

A    Yes, it is.

Q    What is ETSI?

A    ETSI is the European Telecommunications Standards Institute.  It's a standards-setting organization that develops standards for cell phones and other kinds of cellular and telecommunication equipment.

MR. PRITIKIN:  Microsoft moves admission of Exhibit 1031.

MR. JENNER:  No objection.

THE COURT:  It is admitted.

(Exhibit No. 1031 was admitted into evidence.)

Q    Would you turn to page two of the document, and in the third paragraph Motorola wrote, "The increasing tendency for multifunction multi-technology products means that there are ever more patents covering the end product, giving rise to the phenomenon of so-called royalty stacking.  Overall, cumulative royalties are perceived to be uncertain and often too high, possibly even prohibitive."  Do you agree with that statement that was made by Motorola?

A    Yes, I do.

Q    Could you turn to page 3?  And I want to direct your

1   attention to the language in Section 6.  How did Motorola

2   propose to address the problem with stacking in connection

3   with standard essential patents?

4   A   Motorola proposed that the FRAND commitment be clarified

5   by articulating two core principles that I think are central

6   to the meeting of FRAND, and those principles are listed here

7   under Section 6.

8   Q   Can you explain, briefly, what those are?

9   A   The first of them is the idea of aggregated reasonable

10  terms.  So I'll read their language.  So they propose, "To

11  clarify the FRAND obligation means essential patentholders

12  agree to grant licenses on terms that are objectively

13  commercially reasonable, taking into account the overall

14  licensing situation, including the cost of obtaining all

15  necessary licenses from other relevant patentholders for all

16  relevant technologies in the end product."

17      And the second principle that they proposed is that of

18  proportionality.  The way they describe that is,

19  "Compensation under FRAND must reflect the patent owner's

20  proportion of all essential patents.  This is not simply a

21  numeric equation, but the compensation must, within

22  reasonable bounds, reflect the contribution."

23  Q   Now, are these statements by Motorola consistent with the

24  approach that you and Professor Murphy advocated?

25  A   Yes, I think they're consistent, almost close to the same

1  thing.

2  Q   Do you understand these statements by Motorola in this

3  document to announce some new principles?

4  A   No.

5  Q   Let's look at page 3 again.  And in the paragraph near the

6  top Motorola wrote that the principles were, "Really in the

7  nature of clarifications of existing FRAND rules and commonly

8  understood goals."  What do you understand that to mean?

9  A   I understand that to mean that they're simply trying to

10  articulate what's a commonly-held view of the meaning of the

11  RAND commitment, consistent with the title of the proposal

12  here, which is minimum change, optimum impact.

13  Q   Let's turn to the next exhibit in the binder,

14  Exhibit 1130.  Is this the 1994 operations manual for the

15  IEEE standards?

16  A   Yes, it is.

17        MR. PRITIKIN:  Microsoft moves admission of

18  Exhibit 1130.

19        MR. JENNER:  No objection.

20        THE COURT:  1130 is admitted.

21        (Exhibit No. 1130 was admitted into evidence.)

22  Q   Would you turn to page 3 of the document?  And do you see

23  the language there that says this is to be used in tandem --

24        MR. JENNER:  I'm sorry, counsel, could you say again

25  where you are?

1          MR. PRITIKIN:  Page 3.

2    Q    Do you see the language there that says this is to be used

3    in tandem with the IEEE standards board bylaws?  The scope of

4    these two documents are the rules that govern standards

5    development, bylaws, and the required procedures to implement

6    those rules and operations.  How do you understand these

7    documents to relate to each other?

8    A    That collectively they form the intellectual property

9    policy of the IEEE.

10   Q    Now, let's turn to Section 6.3.2 on page 19 of the

11   document.  And first, can you tell us what this section is

12   addressing?

13   A    This section describes a requirement that patentholders

14   submit to the patent committee of the IEEE, a draft license,

15   prior to incorporating any patented technology into the

16   standard.

17   Q    Now, does it say anything about the terms that are

18   supposed to be in that license?

19   A    Yes.

20   Q    What does it say?

21   A    It says here that a draft or their license that assures

22   that the technology will be made available at nominal

23   competitive costs to all who seek to use it for compliance

24   with an incorporated IEEE standard.

25   Q    Now, how does the requirement that a license at nominal

1    competitive cost relate to the RAND commitment?

2    A   It's part of the RAND commitment.

3    Q   Let's turn to Exhibit 1407.  And is this a blanket letter

4    of assurance that was submitted by Symbol Technologies with

5    respect to the 802.11 standard?

6    A   Yes.

7    Q   And do you understand that Symbol was later acquired by

8    Motorola?

9    A   Yes.

10   Q   And that's where some of these patents came from?

11   A   Yes, sir.

12   Q   When was this submitted?

13   A   This was submitted in November, 1993.

14          MR. PRITIKIN:  Microsoft moves the admission of

15   Exhibit 1407.

16          MR. JENNER:  No objection.

17          THE COURT:  It is admitted may be published.

18          (Exhibit No. 1407 was admitted into evidence.)

19   Q   We're going to look at one more letter of assurance.

20   Would you turn to 2839?  Is this a collection of letters of

21   assurance submitted by Motorola and Symbol with respect to

22   the 802.11 standard?  It's the one that ends with 1823.  It

23   ends in a "4."  Do you have that?  It is a little hard to

24   read.

25   A   I have it.

1  Q   Is this a blanket letter of assurance submitted by

2  Motorola in 1994?

3  A   Yes.

4  Q   Now, going back to what we talked about just a few minutes

5  ago, at the time that Symbol and Motorola submitted these

6  blanket letters of assurance on 802.11, was the provision of

7  the operations manual requiring licensing at nominal

8  competitive costs in place?

9  A   Yes, it was.

10        MR. PRITIKIN:  If I had not done so, Your Honor, I do

11  want to move admission of 2839.  Perhaps I already did.

12        THE COURT:  I believe you did.  Any objection?

13        MR. JENNER:  No objection.

14        THE COURT:  It is admitted.

15        (Exhibit No. 2839 was admitted into evidence.)

16  Q   Let's turn to Exhibit 2838, which is in the back.  And are

17  these copies of letters of assurance submitted by Motorola

18  and its affiliates to the ITU?

19  A   Yes, they are.

20        MR. PRITIKIN:  Microsoft moves admission of

21  Exhibit 2838.

22        MR. JENNER:  No objection.

23        THE COURT:  2838 is admitted.

24        (Exhibit No. 2838 was admitted into evidence.)

25  Q   Professor Simcoe, I want to turn now to the subject of

1  patent pools.  Are these sometimes referred to as collective

2  licensing agreements or arrangements?

3  A   Yes.  Pools and collective licensing agreements are

4  synonyms.

5  Q   Are collective licensing agreements sometimes abbreviated

6  CLA?

7  A   Yes.

8  Q   Do you agree with Professor Murphy that, in the standards

9  context, pools, where they're available, will often be the

10  best comparables for a RAND royalty?

11  A   Yes, I do.

12  Q   Now, in supporting the use of pools as a comparable, are

13  you suggesting that pool participation should be or somehow

14  is mandatory?

15  A   Not at all, no.

16  Q   What are you saying?

17  A   We're saying that in the event of a dispute over the terms

18  and conditions of a license that is being offered subject to

19  a RAND commitment, you often have to find a way to try and

20  value the patents.  And you're looking for a comparable.  And

21  that often the pools, for a number of reasons, are the best

22  available comparables.

23  Q   In the course of your work on this case, have you reviewed

24  documents in which Motorola discussed the use of collective

25  licensing agreements?

1  A   Yes, I have.

2  Q   Would you turn in your binder, please, to Exhibit 1033?

3          MR. JENNER:  Did you say 1033, counsel?

4          MR. PRITIKIN:  Yes.

5  Q   Is this another submission Motorola made to the same

6  working group at ETSI?

7  A   Yes, it is.

8  Q   It was in connection with the minimum-change,

9  optimum-impact proposal we talked about earlier?

10 A   Yes.

11         MR. PRITIKIN:  Microsoft moves admission of

12 Exhibit 1033.

13         MR. JENNER:  No objection.

14         THE COURT:  1033 is admitted.

15         (Exhibit No. 1033 was admitted into evidence.)

16 Q   In connection with the investigation and work that was

17 ongoing at ETSI, had other companies proposed the use of

18 collective licensing agreements for the licensing of standard

19 essential patents?

20 A   Yes.  Several of the other companies who are authors on

21 this proposal had put forward a collective licensing

22 agreement.

23 Q   And in Exhibit 1033, did Motorola comment on these

24 proposals?

25 A   Yes.

1    Q    Now, let's look at the first page of the document,

2    Exhibit 1033.  And there are certain key features of

3    collective licensing arrangements that are discussed there.

4    How do these compare to the features of patent pools that

5    you've been describing?

6    A    Um, they're the same.  I suppose it's worth highlighting

7    what you think are those key features here.  So, in Section 2

8    under "discussion" it talks about the idea that in collective

9    licensing agreements the essentiality of a patent is

10   evaluated by an independent expert, that the terms and

11   conditions of a license are determined by the members of the

12   collective licensing agreement, and that the fact that

13   members are potential licensees implies reasonable terms,

14   that those terms are public information, and that it provides

15   the benefit of being a one-stop shop, making it easy for

16   licensees to access large numbers of essential property

17   rights for a particular standard.  And those are all features

18   of patent pools that help to make them excellent comparables.

19   Q    Now, let's look at the last two paragraphs on the first

20   page.  What did Motorola say about how collective licensing

21   arrangement proposals related to its proposal to deal with

22   the stacking problem that we talked about earlier?

23   A    At the bottom of this page Motorola says that, "These

24   kinds of voluntary collective licensing models are all

25   compatible with and complementary to the minimum-change,

1    optimum-impact approach jointly proposed by Ericsson,

2    Motorola and Nokia.  They fit together comfortably and

3    synergistically.  So I read that as saying their principles

4    of aggregated reasonable terms and proportionality are met by

5    the pools.

6    Q   Was Motorola saying that pools help solve the problem of

7    royalty stacking?

8    A   Yes, that's how I read this.

9    Q   And they're saying that they find them compatible with and

10   complementary to its approach?

11   A   Yes.

12   Q   Are you aware in this case Motorola's experts have

13   characterized pools as discount shops that are biased in

14   favor of low rates?  Have you heard that?

15   A   Yes, I'm aware of that.

16   Q   Is that what Motorola said in this document?

17   A   No.

18   Q   Let's look at the next page.  And I want to direct your

19   attention to the second paragraph, Professor.  You see

20   Motorola wrote, "According to the CLA," -- that's collective

21   license agreement arrangement -- "proposal, the licensing

22   terms of the CLA will be reasonable due to the dual role of

23   most of the members, IPR owners, and future licensees, and

24   made public."  What does the dual role of the parties forming

25   the pool -- why does that suggest terms should be reasonable?

1  A   By dual role here they mean that many of the licensors in

2  the pool will also be licensees to the patents owned by other

3  pool members.  And the fact that they're pointing to a link

4  between that dual role of licensor and licensee, and

5  reasonableness of the terms, reflects the idea that pools

6  have to strike a balance between setting rates and other

7  terms and conditions that attract a large number of licensees

8  to make the pool attractive to the licensors.  And the pool

9  has to attract a large number of licensors so that the

10 licensee's view it is an attractive one-stop shop.

11 Q   Now, are you also aware that Motorola and its experts have

12 suggested in this case that pools are not a good benchmark

13 for RAND?  Have you heard that?

14 A   Yes, I have.

15 Q   Is that consistent with what Motorola told ETSI before it

16 got involved in this litigation with Microsoft?

17 A   No.

18 Q   Let's look at that paragraph, again, that you were

19 discussing a minute ago.  And in the last sentence of the

20 paragraph Motorola wrote, "This will provide a benchmark for

21 the level of aggregated reasonable terms, and the

22 proportionality in the public domain, which will increase

23 transparency."  What do you understand that to mean?

24 A   I believe that they're saying pools are good comparables.

25 They provide a benchmark for RAND terms and conditions.

1   Q   Now, you also understand in this case that Motorola and

2   its experts have criticized pools for supposedly keeping

3   rates low because of antitrust concerns?

4   A   Yes.

5   Q   And are there, in fact, antitrust guidelines that address

6   patent pools?

7   A   Yes.

8   Q   Would you look at Exhibit 1032 in your binder?  And are

9   these guidelines for licensing of intellectual property

10  issued by the Department of Justice and FTC in the mid-1990s?

11  A   Yes, they are.

12  Q   Are they still in place?

13  A   Yes.

14  Q   Would you turn, please, to page 28.  And let's look at the

15  paragraph at the top of the page.  It's talking about

16  cross-licensing and pooling arrangements.  And it says that

17  they may provide pro-competitive benefits by integrating

18  complementary technologies, reducing transaction costs,

19  clearing blocking positions, and avoiding costly infringement

20  litigation."  Do you agree with that?

21  A   Yes, I do.

22  Q   And have the antitrust agencies reviewed any of the modern

23  patent pools?

24  A   Yes, they have.

25  Q   Which ones have they -- have they issued letters with

1    respect to the MPEG LA AVC pool?

2    A    Yes.

3    Q    Was that pool approved by the Department of Justice?

4    A    Yes, it was.

5    Q    Are there features or policies of modern patent pools that

6    help to address antitrust concerns?

7    A    Yes.

8    Q    And at a high level, can you tell us what those are?

9    A    At a high level, the features of pools that economists

10   think of as alleviating antitrust concerns are that we have

11   this third-party independent review process that we talked

12   about earlier.  So by ensuring that each of the patents

13   licensed in the pool is actually essential to the standard,

14   it assures that these patents are what are called

15   "complementary inputs" by economists.  And there are many

16   reasons to think that joint licensing of complementary inputs

17   is pro-competitive.

18       And the second feature is that the licensors in a pool are

19   free to license their patents independently of the pool.  So

20   they're not obligated to only license these patents through

21   the pool.

22   Q    I'm sorry, I may have misspoken on one of my earlier

23   questions.  Had the Department of Justice approved the MPEG-2

24   pool?  Is that the pool that was approved?

25   A    Yes.  I think you were referring to the two business

1  review letters issued in the mid-1990s, one for the original

2  MPEG pool, and the other for the DVD pool.

3  Q    All right.  Do antitrust rules require that pools charge

4  low rates?

5  A    No.

6  Q    Have you reviewed royalty information across a wide range

7  of patent pools?

8  A    Yes, I have.

9  Q    For standard essential patents?

10  A    Yes.  Pools covering standard essential patents.

11  Q    What form of royalty is most common in standards-based

12  pools for consumer products?

13  A    For consumer products, the structure of royalties is

14  typically a fixed price, cents per unit of a licensed

15  product.  Although then you often have volume discounts and

16  caps, and other features of the pricing structure.

17  Q    From an economic perspective, why do you believe that

18  fixed per-unit rates are common in these standards-based

19  pools?

20  A    Well, I think fundamentally it gets you away from the

21  problem where if it's just a running percent royalty, and the

22  base that you're talking about is a cruise ship, as we heard

23  the other day, or a Boeing jetliner, that percentage of sales

24  ends up capturing all kinds of value associated with other

25  parts of the product that have nothing to do with the

1   standard, or the even smaller contribution of the patented

2   technology that's a small piece of the standard.

3   Q   Do pools sometimes vary the fixed amount to some extent,

4   by field of use of the license device?

5   A   Yes.  Pools often have different prices for different,

6   what they call, fields of use, what economists might just

7   call a market.

8   Q   If a particular pool does not have a field of use

9   distinction, what do you conclude?

10  A   If a pool does not have a field of use distinction?  Oh,

11  that they're just licensing in one market, I guess.

12  Q   Does the MPEG LA H.264 have different rate structures for

13  different fields of use?

14  A   Yes, it does.

15  Q   Can you explain that?

16  A   The MPEG H.264 has one rate structure that seems to be set

17  up for high-volume consumer products; and it has a second

18  rate structure that seems to be title-by-title video

19  licensing.

20  Q   Now, a patentholder can benefit by getting royalties on

21  standard essential patents, correct?

22  A   Yes.

23  Q   How can a patentholder benefit from the incorporation of

24  its technology into a standard apart from collecting

25  royalties on patents that it may own?

1    A    There are lots of ways that firms can benefit from

2    incorporating patented technologies into standards, even if

3    they don't expect to collect any royalty whatsoever.  So,

4    probably the most important example is just that firms make

5    profits in complementary markets.  So a firm that

6    manufacturers cell phones, or something, computers, benefits

7    from the diffusion of the standard, because the standard can

8    increase demand for cell phones or computers and they make a

9    profit in those other markets.

10        When participating in a standards-setting organization,

11   firms also can derive a number of benefits from having their

12   technology included in the standard, as opposed to some

13   other.  So those benefits include things like lower costs in

14   implementing your own technology, or faster time to market

15   because you're familiar with it, and that familiarity lets

16   you develop products that reach the markets sooner than your

17   competitors.

18        And I guess probably the other big example is you may have

19   a large installed base of product, and you want the standard

20   to work well with the product that your existing customers

21   are already using, and by incorporating your own technology

22   into the standard, you're better able to make the industry

23   standard operate with your installed base of products.

24        So, all of those are examples of ways in which a firm

25   benefits before they collect a royalty.  And it helps explain

1    the fact that large numbers of firms make a RAND commitment

2    and never seek to license their patents or commit to license

3    their patents on royalty-free terms.

4    Q   To ask the question a different way, Professor, are there

5    motivations that companies have, besides collecting money on

6    royalties, for contributing their patents and technology to a

7    standard?

8    A   Yes, absolutely.  So those are all examples of motivations

9    to contribute technology to standards that are independent of

10   any licensing.

11   Q   Now, if a company chooses not to participate in a pool,

12   but to license its patents outside the pool, does that imply

13   that it has higher-value patents?

14   A   No.

15   Q   Are those patents still subject to a RAND commitment?

16   A   Yes.

17            MR. PRITIKIN:  No further questions, Your Honor.

18            THE COURT:  Okay.

19            MR. PRITIKIN:  Your Honor, I'm informed I neglected

20   to move admission of 1032.  I'll do so now.

21            THE COURT:  Any objection, Mr. Jenner?

22            MR. JENNER:  The antitrust guidelines?  No objection.

23            THE COURT:  It is admitted.

24            (Exhibit No. 1032 was admitted into evidence.)

25                       CROSS EXAMINATION

1  BY MR. JENNER:

2  Q   Dr. Simcoe, you have a copy of the binder in front of you?

3  A   Yes.

4  Q   Dr. Simcoe, if you would just note that in the back of

5  your binder there is a copy of your deposition transcript

6  from August 29, 2012.  Do you see that that's there?

7  A   Yes.

8  Q   Okay.  Thank you.

9      Now, Dr. Simcoe, just to establish some yes's and no's.

10  You're here as an expert on economics and standards-setting

11  organizations, correct?

12  A   Yes, that's correct.

13  Q   So you're here testifying as an economist?

14  A   I'm here testifying as an expert in economics and

15  standards-setting organizations.

16  Q   You've never been an employee of a standards-setting

17  organization, correct?

18  A   No, I have not.

19  Q   You've never been a consultant to a standards-setting

20  organization?

21  A   I've spoken with people who manage standards-setting

22  organizations on issues, but I've never been a paid

23  consultant on a standards-setting organization.

24  Q   You've never negotiated a RAND license?

25  A   No, I have not.

1  Q   You've never participated in the negotiation of a RAND

2  license?

3  A   No.  That's something I've studied, but never done it.

4  Q   Is it the case that you've never participated in the

5  negotiation of any kind of patent license?

6  A   No.  I've never been a participant in negotiating a patent

7  license.

8  Q   You've never testified in a patent infringement case about

9  what a reasonable royalty might be?

10 A   This is the first case I've ever testified in.

11 Q   So the answer is, you've never testified --

12 A   No, I've never testified, no.

13 Q   And you've never testified, therefore, about how to apply

14 the methodology of the *Georgia Pacific* case in patent

15 litigation?

16 A   No, I have not.

17 Q   And you're not offering any opinion about how *Georgia*

18 *Pacific* might be applied in this case, should the court need

19 to go there, correct?

20 A   I guess my opinion is that as long as whatever

21 modifications to make *Georgia Pacific* consistent with the

22 notion of no hold-up and no royalty stacking are applied,

23 then that modified approach could be fine.

24 Q   Well, you're -- I'm just referring to the *Georgia Pacific*

25 case itself.  You're not offering any opinion on how the

1   so-called factors of the *Georgia Pacific* case ought to be

2   applied in this case, if they are applied?

3   A    Well, I guess I have to go back and say my opinion is that

4   the RAND commitment is a commitment to seek terms and

5   conditions that are consistent with the principles of no

6   hold-up and royalty stacking, the principles we saw in that

7   ETSI document.  And so, whatever you apply, if you call them

8   *Georgia Pacific*, as long as they're consistent with those

9   principles, that's okay.

10  Q    So, is it your understanding, then, that the RAND

11  commitment requires application of no hold-up, no royalty

12  stacking?

13  A    Yes.

14  Q    Now, you're here offering an opinion about how a court

15  should approach the problem of determining a RAND price in

16  the event of a dispute?

17  A    Yes.

18  Q    And you say that your opinions relate to the principles

19  that one should use to adjudicate a dispute over whether a

20  particular license or proposed license is RAND?

21  A    Yes.

22  Q    And this is based on your academic research, not based on

23  actual SSO experience or licensing experience, correct?

24  A    This is based on my experience and research on

25  standards-setting organizations, which I've been doing for

1    maybe the last decade.

2    Q    But not participation with standards organizations or in

3    licensing negotiations, correct?

4    A    Not as a standards developer or as a participant in

5    licensing negotiations, that's correct.

6    Q    Now, you understand, sir, that the letters of assurance

7    that you referred to were between Motorola and the IEEE on

8    one hand, and Motorola and the ITU on the other hand?

9    A    Yes.  I understand that those letters were submitted to

10    the IEEE and the ITU.

11    Q    Your opinions here are not based on the views of anyone

12    connected with the IEEE or the ITU, correct?

13    A    I don't think that's quite correct.  I don't -- well, I

14    suppose I can't -- I've talked to many people who are IEEE

15    and ITU participants, and that informs my opinion, through

16    forums like this National Academies panel that I serve on,

17    and conferences that I've organized on intellectual property

18    licenses, and, again, standards-setting organizations.  So

19    all that background informs my opinions.  But I'm not going

20    to be able to pull out a quote from somebody at the ITU and

21    offer it right now in support of my opinions.

22    Q    So the answer to my question is that your opinion is not

23    based on the views of anyone connected with the IEEE or the

24    ITU?

25    A    It's based on my experience, which includes plenty of

1  interaction with people who participate in the IEEE and the

2  ITU.

3  Q   Would you just look at your deposition, sir, in the back

4  of the binder?  Turn to page 124.  Tell me when you have

5  that.

6  A   Yes.

7  Q   Starting at line 7, you stated:

8       "Question:  And those views, number one, they're your

9  views personally?

10       "Answer:  Yes.

11       "Question:  They're informed by views of others?

12       "Answer:  Yes.

13       "Question:  But they're not informed, I take it, by the

14  views of anybody connected with the IEEE or ITU?

15       "Answer:  They're informed by a reading of the IEEE and

16  ITU intellectual property policies.

17       "Question.  We'll come to that.  But just in terms of

18  other persons, not informed by any other person who has

19  written on the subject at IEEE or ITU; is that correct?

20       "Answer:  I can't think of specific writings by

21  individuals."

22       Did you give those answers to those questions?

23  A   Yes, I did.

24  Q   Okay.  Now, you haven't offered any specific opinions

25  about the IEEE intellectual property rights policies

1  themselves, correct?

2  A    Aside from my opinions about the proper interpretation of

3  the RAND commitment, which is contained in those policies.

4  Q    And you haven't offered any specific opinions about the

5  ITU intellectual property policy, correct?

6  A    Aside from my opinions about the proper interpretation of

7  the RAND commitment, which is part of those policies.

8  Q    So your opinions about the IEEE and the ITU policies are

9  limited to your understanding of what the RAND commitments

10  mean?

11  A    I think that's accurate.

12  Q    You're not offering an opinion on how, for example, the

13  IEEE would define RAND, or the IEEE's actual definition of

14  RAND, are you?

15  A    My understanding is that they don't provide an explicit

16  definition of RAND inside those policies.

17       But may I go back and make one small amendment to my

18  answer to the previous question?  It's that, I do opine on

19  the notion that standards-setting organizations desire to see

20  their standards widely implemented, or broadly diffused, and

21  that you can find support for that inside the language of the

22  intellectual property policies of the IEEE and ITU.

23  Q    That's your interpretation, but it's not based on anything

24  that the IEEE or the ITU has said, correct?

25  A    Oh, actually it's based on language in the policy, such as

1   the notion that the sole objective of this policy is to allow

2   implementers to implement the standards without undue

3   constraint.

4   Q   Well, go back to my earlier question.  You're not offering

5   an opinion on how the IEEE would define RAND; is that

6   correct?

7   A   I'm offering an opinion on the proper interpretation of

8   the RAND commitment in the event of a dispute.  I don't have

9   an opinion on the definition of RAND in the intellectual

10  property policy.

11  Q   Would you turn to your deposition, again, please, at 118?

12  Tell me when you have that.

13  A   Yes.

14  Q   I'll call your attention to the following testimony.

15  Starting with the question at line 3.  The question was:

16        "According to who?  According to economists, or

17  according to the SSOs themselves?

18        "Answer:  I don't think there's necessarily a conflict

19  between the two, but I'm trying to clarify that I'm not

20  offering an opinion on how, for instance, the IEEE would

21  define RAND, because I think the IEEE leaves parts of RAND

22  less defined than one might need.  Yeah.  I'm not offering an

23  opinion on the IEEE's definition of RAND .  I'm offering an

24  opinion on how you should approach the problem of determining

25  a reasonable and non-discriminatory price in the event of a

1  dispute over a RAND commitment.

2      "Question:  I want to be a little bit precise about

3  what we're talking about, how you should approach it, meaning

4  how an economist would approach it.

5      "Answer:  How a court should approach it."

6      Were you asked those questions and did you give those

7  answers?

8  A   Yes.

9  Q   And when you talked about the notion of RAND being less

10 defined than one might need, that's because you think that

11 RAND -- that the IEEE leaves parts of RAND less defined than

12 one might need, correct?  That's what you said in that

13 answer?

14 A   That's what I said, yes.

15 Q   You haven't been asked to apply the Via pool to this case,

16 or done the work that would have allowed you to answer the

17 question of how to apply the Via pool in this case, correct?

18 A   That's correct.

19 Q   In fact, you have no opinion on whether or not the Via

20 licensing pool is an appropriate benchmark for evaluating

21 proposed RAND terms for 802.11, correct?

22 A   My opinion is that patent pools have a number of desirable

23 features that often make them the best available comparables.

24 But I haven't done the work that would be required for me to

25 opine on whether the Via pool is the best available pool in

1   this case.

2   Q   So you have no opinion, in answer to my question, of

3   whether or not the Via pool is an appropriate benchmark for

4   evaluating proposed RAND terms for 802.11?

5   A   Yes, I haven't done that work.

6   Q   And as for the MPEG LA pool, you can't opine on the

7   specifics of the H.264, correct?

8   A   Um, I'm not sure what you mean by "opine on the

9   specifics."

10  Q   You're not making a recommendation to the court one way or

11  the other as to whether MPEG LA would or would not be a good

12  benchmark for determining RAND terms for H.264, correct?

13  A   For the same reasons I articulated a moment ago, yes, I

14  believe pools are often the best available comparables, but I

15  haven't done the work to ascertain whether this specific pool

16  is the best available comparable in this case.

17  Q   To be clear, while you've made a general statement in your

18  direct testimony, you are not taking a position as to whether

19  or not either of the specific pools in this case is an

20  appropriate benchmark, because you haven't done that work?

21  A   That's correct.

22  Q   You haven't made a detailed factual review of Motorola's

23  prior licenses?

24  A   No, I haven't.

25  Q   So you don't have an opinion as to whether Motorola's

1  licenses include hold-up, do you?

2  A   I haven't done a review that would allow me to make a

3  detailed finding as to whether Motorola's licenses include

4  hold-up.  Though there's reason to believe that licenses that

5  are entered into long after the standard is widely adopted by

6  the entire industry are going to have hold-up value in them,

7  because economists just assume that a licensor who has that

8  kind of leverage will try to exercise it.

9  Q   But you haven't done the work to figure out whether or not

10  Motorola's licenses include hold-up, and therefore you don't

11  have any opinion about that?

12  A   Yes.  I have not done a detailed review of Motorola's

13  licenses.

14  Q   You were never asked to work out any particular

15  methodology that the court could use consistent with your

16  principles, correct?

17  A   That's correct.

18  Q   So you're not giving an opinion to the court on how to

19  implement any of the particular possible ways in which one

20  could go about determining RAND?

21  A   The key thing is that however one implements, that

22  implementation has to be consistent with these principles of

23  a RAND commitment constraining a licensor not to capture

24  hold-up value or charge aggregated unreasonable terms and

25  conditions, you know, royalty stacking.  And so any

1  methodology that's consistent with those principles would be

2  fine.

3  Q   So generally speaking, you're here explaining your

4  opinions about what you think RAND should mean and how the

5  court should apply it?

6  A   I'm here articulating what I think are broadly-held

7  consensus views of the meaning of RAND that should be applied

8  in the event when there's a dispute over whether the terms

9  and conditions in a prospective license, when they're subject

10  to a RAND commitment.

11  Q   But you don't know what the legal definition of RAND is,

12  correct?

13  A   Yes.  I can't offer any legal opinions.

14  Q   Isn't it true that you don't actually know what fair and

15  reasonable in FRAND means?

16  A   I think that there is a consensus that incorporates these

17  ideas of no hold-up and no royalty stacking.

18  Q   Well, you're here giving your opinion to the court.  I'm

19  asking you, isn't it true that you, sir, don't actually know

20  what fair and reasonable in FRAND means?

21  A   I think my opinion that the reasonable component of fair

22  and reasonable -- so let's start with fair and reasonable.

23  FRAND and RAND, I think we agreed when my deposition was

24  taken, are synonyms.  They mean the same thing.

25  Q   Yes.  They can be used interchangeably, we agreed on that.

1    A    So the fair and reasonable part, my opinion is that

2    there's a consensus among standard setters and economists who

3    study standard setting, and others who examine standard

4    setting, that the RAND commitment, or FRAND commitment, is

5    meant to prevent patentholders from capturing hold-up value,

6    or charging aggregated unreasonable terms and conditions.

7    Q    Sir, I don't think you're answering my question.  So let

8    me show you a document.  Could you turn in your binder to

9    Exhibit 3125, please?  Do you have that?

10   A    Yes, I do.

11   Q    3125 is a paper that you prepared on or about September 2,

12   2009, correct?

13   A    This is sort of a short document that's part of a blog

14   called talkstandards.com.

15   Q    And you prepared it?

16   A    Yes, I did.  The first part, not all of the comments in

17   the discussion thread.

18          MR. JENNER:  Your Honor, I offer 3125.

19          MR. PRITIKIN:  No objection.

20          THE COURT:  3125 is admitted.

21          (Exhibit No. 3125 was admitted into evidence.)

22   Q    Would you turn, please, to the third page of 3125?

23   A    Yes.

24   Q    And do you see that in the middle of the page, of the

25   fourth bullet, there's a comment that you provided to the

1  dialogue where it says, "Timothy Simcoe says:"  The fourth

2  bullet.  Do you have that?

3  A   Yes.

4  Q   Under the fourth bullet, the fourth paragraph you began by

5  stating, "However, no one knows what the FR in FRAND really

6  means.  I do not think that adding FR to FRAND helps to solve

7  the hold-up problem at all.  Rather, it provides grounds for

8  ex post litigation over licensing terms when firms adopted a

9  standard in full knowledge that the patents existed.  It also

10 invites the courts to try and come up with a definition of

11 FR."

12      Do you see that, sir?

13 A   Yes.

14 Q   You wrote that at that time, didn't you?

15 A   I did.  And I think it's important to understand the

16 context in which I wrote it.  So, as you see in the following

17 line it says, "My comment was meant to be provocative."  So,

18 here I was asked to comment on this EU white paper and try

19 and stimulate a discussion among people who work on these

20 issues.  And I did that by pointing out something that I

21 think of as a problem, which is that the RAND commitment can

22 be abused.  Firms can seek hold-up value when a standard has

23 been widely implemented under the RAND commitment by arguing

24 that the commitment is nothing more than a commitment to

25 start a negotiation.  And so that's consistent with what I

1  wrote.

2  Q   Are you saying when you wrote the words, "However, no one

3  knows what the FR in FRAND really means," you didn't mean

4  that?  Is that your testimony?

5  A   No.  I wrote these terms.

6  Q   You did mean that?

7  A   And so I'm saying that what I was trying to do was provoke

8  a discussion on this.

9  Q   You provoked more discussion.  Would you turn to the prior

10 page?

11         THE COURT:  Prior, meaning which direction?

12         MR. JENNER:  Page 2 of the exhibit.

13 Q   And under the second bullet Timothy Simcoe says, in the

14 fifth paragraph, "I would argue that the FR part of FRAND is

15 no different from the lack of a commitment.  A more cynical

16 take is that the purpose of FR is to absolve the SSO of

17 antitrust liability in any ex post litigation over

18 licensing."  Do you see that?

19 A   Yes.

20 Q   So, did you also not really mean that statement, sir?  Or

21 were you stating in this article that the FR part of FRAND is

22 no different from a lack of commitment?

23 A   I'm stating here that the FR part of FRAND is no different

24 than the lack of a commitment in the sense that RAND can be

25 abused by people that treat the commitment as nothing more

1  than a promise to negotiate.

2  Q   Sir, would you turn to Exhibit 3118.  This is a paper that

3  you authored in November of 2007, correct?

4  A   Yes.

5  Q   This is not a blog, this is a published paper?

6  A   Yes.

7       MR. JENNER:  Your Honor, I offer 3118.

8       MR. PRITIKIN:  No objection.

9       THE COURT:  3118 is admitted.

10      (Exhibit No. 3118 was admitted into evidence.)

11  Q   Turn to page 6, sir.  Do you have that?

12  A   Yes.

13  Q   And then the second full paragraph you began by stating,

14  "In practice, the meaning of RAND and its European equivalent

15  FRAND, fair reasonable and non-discriminatory, is unclear."

16  Do you see that?

17  A   Yes.

18  Q   Was that an accurate statement when you made it in this

19  published paper?

20  A   Yes, I think it was.

21  Q   But you didn't testify in your direct that you thought the

22  meaning of RAND and FRAND was unclear, did you?

23  A   I think unclear here is consistent with the idea that the

24  RAND commitment can be abused, by arguing that it's nothing

25  more than a commitment to enter into a licensing negotiation,

1  as opposed to a commitment not to seek hold-up value.

2  Q   That's what unclear means to you?

3  A   Yes.  Unclear means that we have disputes over which of

4  those two options is the proper interpretation of RAND.

5  Q   You've written that RAND licensing commitments are not a

6  workable solution to SSOs intellectual property problems,

7  haven't you?

8  A   Could you show me the context in which I wrote that?

9  Q   Turn to Exhibit 3114.  Do you have that, sir?

10  A   Yes.

11  Q   And this is a piece that you wrote in June of 2007,

12  correct?

13  A   Yes.

14  Q   And it says that it's a peer-reviewed journal on the

15  internet, correct?

16  A   Yes, I guess so.

17  Q   What does peer review mean?

18  A   So peer review typically means that you submit your

19  article to a journal editor, who then sends it out to some

20  other group of people to read and provide feedback.  And if

21  they provide feedback, you incorporate that into your paper,

22  and then you resubmit it.  And after a few rounds of that

23  kind of interaction, they may accept it for publication.

24  That wasn't at all the process here.  But that's okay.  It's

25  -- it's something -- I was invited to submit this.

1    Q    It was considered by professional colleagues?

2    A    I don't know.  I never got any feedback on it other than

3    it got published.

4    Q    All right, sir.  Would you look at the fourth paragraph,

5    the last paragraph on the page.  And you began by stating,

6    "The second half of the paper argues that RAND licensing

7    commitments are not a workable solution to SSOs intellectual

8    property problems."  Do you see that, sir?

9    A    Yes.

10   Q    You believed that at the time you wrote it?

11   A    Yes.  I think so.  It was followed by, "This problem with

12   RAND is that it's difficult to define, let alone measure or

13   adjudicate reasonable prices."

14   Q    So you've written in your papers that RAND is unclear,

15   that people don't know what it means, and that it's not a

16   workable solution.  But in your direct testimony you

17   testified to the court what RAND means and how the court

18   should apply it, correct?

19   A    In my direct testimony I believe I testified that there's

20   a broad consensus on what RAND means, not unanimity, and the

21   lack of unanimity is where we have this potential for abuse.

22   And I think that's something that you'll find in all of my

23   writings.

24   Q    In the context of you yourself not knowing what RAND

25   means.  You stated that in one of your articles.

1   A   I guess if you say that knowing what it means requires

2   knowing that there's a unanimous consent, or a unanimous

3   position among everyone you could possibly ask what the

4   proper interpretation of RAND is, I don't know, and no one

5   does yet, because we have these disputes.

6   Q   Right.  We have a dispute, sir, in which the court -- I

7   don't presume to state what it is the court will do or should

8   do, but one view of this is that the court is looking to

9   adjudicate the meaning of an existing contract and perhaps

10  not what people might want to think in the future.  And if

11  we're here to adjudicate the meaning of an existing contract,

12  you don't know what RAND means in the existing contracts

13  between Motorola and the standards organizations, do you?

14  A   I can't speak to contracts at all because that's a legal

15  issue.  But what I can speak to is this sort of consensus

16  interpretation of RAND that exists in the community of people

17  who study the issue.

18  Q   Turn to page 4 of this article, sir.  And then the fourth

19  full paragraph you stated, "Ironically the problem with RAND

20  is that it is not a standard.  The concept of reasonable

21  pricing has no clear meaning.  Is RAND a commitment not to

22  seek an injunction against the use of a technology?  Is it a

23  commitment to accept a certain percentage of the final goods'

24  price, or a commitment that all patents incorporated in the

25  product will split a certain percentage?  How should a RAND

1   price be set?"  Did you write that in this article, sir?

2   A   Yes, I did.

3   Q   And yet even having written that information in this

4   article, you're still comfortable that you're telling the

5   court what RAND means in your opinion?

6   A   I'm very comfortable with this sentence.  The point I've

7   been trying to communicate here, I guess, is that -- is right

8   here in this sentence that says, "In some cases it seems that

9   IP holders make RAND pricing commitments with the belief that

10  the commitment is so vague and ill defined that it is, in

11  fact, vacuous."  And I think that belief that one can simply

12  treat it as a vacuous commitment is where there is some

13  issues with RAND.  And that's inconsistent with the view of

14  the majority of people who work on this issue.  But that's my

15  view.

16  Q   Would you turn to Exhibit 3010 in the front of your

17  binder.  Tell me when you have that.

18  A   Yes.

19          MR. JENNER:  First, Your Honor, I'm not sure if I

20  offered 3114.  If I didn't, I offer 3114.

21          MR. PRITIKIN:  No objection.

22          THE COURT:  There was no objection and it is being

23  admitted.

24          (Exhibit No. 3114 was admitted into evidence.)

25  Q   3110, sir, is some comments that you made in connection

1   with comments to the Federal Trade Commission, correct?

2   A   Do you mean 3010?

3   Q   3010.  3010.  Yes.  Would you turn to page 8?  On page 8

4   in the second full paragraph at the end of the paragraph you

5   told the Federal Trade Commission, "It is not clear that a

6   RAND promise places any restrictions on prospective prices or

7   licensing terms, aside from a ban from exclusivity."  You see

8   that?

9   A   Yes.

10  Q   You told that to the Federal Trade Commission?

11  A   Yes.

12  Q   You were also asked some questions about whether or not

13  there is any concern about antitrust activity with respect to

14  SSOs or pools.  You testified about that in your direct?

15  A   Yes.

16  Q   And in the first part of this paragraph you stated,

17  "Whether because of antitrust fears or concerns that they

18  will upset certain members, SSOs typically shy away from

19  providing an explicit definition of RAND, leaving the matter

20  to individual firms, and ultimately courts."  Do you see

21  that?

22  A   Yes.

23  Q   So in this article you acknowledge that it is possible

24  that the SSOs do, indeed, fear possible antitrust

25  implications of discussions amongst the members?

1    A    SSO attorneys certainly talk about antitrust issues,

2    though my view is that the antitrust authorities have

3    recently gone out of their way to be accommodating and

4    encouraging towards collective licensing, ex ante disclosure

5    of most restrictive terms and conditions, and other kinds of

6    practices that would facilitate ex ante negotiations to

7    prevent hold-up, and other kinds of approaches that would

8    avoid the problem with royalty stacking.

9    Q    Yes.  There are recent discussions.  But you also have

10   acknowledged that for years SSOs have been afraid of the

11   potential consequences of discussions about rates, correct?

12   A    Well, I think it's hard for me to sort of impute what --

13   whether these fears that get talked about are actually what's

14   going on, or if it's the concerns of specific members, or

15   exactly what they're thinking when they design the policies.

16   But there are these conversations where they bring up

17   antitrust concerns as a reason to avoid getting into explicit

18   definition of RAND, as I say here.

19   Q    You have stated that a RAND commitment leaves SSO

20   participants with considerable flexibility to pursue

21   aggressive licensing strategies, correct?

22   A    Yes.

23   Q    And that's in Exhibit 3118, if you would turn to that.  Do

24   you have 3118?

25   A    Yes.

1    Q    If you'd look at page 6.  Well, I guess I've got the wrong

2    exhibit, so I'll stand by your testimony.

3         You've also agreed that any price that avoids royalty

4    stacking and hold-up can be consistent with RAND?

5    A    Yes.

6    Q    And that RAND does not require a specific royalty rate?

7    A    As in a particular number?

8    Q    Yes.

9    A    Yes.

10   Q    The SSOs contemplate many ways of getting to what they

11   think of as RAND, correct?

12   A    Yes, they do.

13   Q    Neither the IEEE nor the ITU specifies that you need to

14   use an incremental value approach to determine RAND terms,

15   correct?

16   A    That's correct.

17   Q    And, in fact, patent pools don't use an incremental value

18   approach, do they?

19   A    No.  Patent pools do not try to determine the incremental

20   value of every patent in the pool, compared to alternatives

21   that were available prior to defining the standard.

22   Q    So to the extent that Professor Posner or others have

23   suggested an incremental-value approach, one would not

24   achieve an incremental-value approach by resorting --

25             THE COURT:  Are you distinguishing between Professor

1   Posner and Judge Posner?

2          MR. JENNER:  Did I say Professor Posner?  My

3   inclinations betray me.   Judge Posner.

4   Q   To the extent that Judge Posner suggested an incremental

5   value approach, patent pools do not provide an incremental

6   value approach, do they?

7   A   I think Judge Posner was using the incremental-value idea

8   as a way of getting to a working definition of what hold-up

9   would mean, as opposed to proposing a methodology for valuing

10   any set of patents.  But patent pools, as you said, don't go

11   through the exercise of taking each patent and trying to

12   determine what were the alternatives available at the time

13   the standard was defined.

14   Q   Right.

15   A   Working out the design around costs, and then taking

16   each -- somehow aggregating that up into a price.  There's

17   thousands of patents in the pool, that would be difficult.

18          THE COURT:  Mr. Jenner, until the Xbox version of

19   federal court comes out, I'm not sure I can compete with

20   Judge Posner.  But we're going to take our morning break at

21   this time.

22          MR. HARRIGAN:  Your Honor, I have one item, if I may,

23   which is to correct my abject failure to mention all the

24   Microsoft lawyers who are present at today's hearing.  They

25   also include my partners Mr. Wion and Mr. Cramer who are back

```
 1  there, and Mr. Nathaniel Love from Sidley, and David Killough
 2  and David Howard from Microsoft.
 3            THE COURT:  Thank you.
 4            MR. JENNER:  Your Honor, before we break can I
 5  complete this segment by offering Exhibit 3010?
 6            THE COURT:  Any objection?
 7            MR. PRITIKIN:  No objection.
 8            THE COURT:  3010 is admitted.
 9            (Exhibit No. 3010 was admitted into evidence.)
10                   (Court recessed.)
11
12            THE COURT:  Please continue, Mr. Jenner.
13            MR. JENNER:  Thank you, your Honor.
14  By Mr. Jenner:
15  Q   Sir, you have agreed that it is left entirely to the
16  parties to determine the terms of a standards-essential
17  license by whatever methodology they deem appropriate,
18  correct?
19  A   Subject to the caveat that there is a RAND commitment,
20  which I believe is a commitment which is enforceable.  In the
21  event that there is a dispute over the commitment, there has
22  to be some enforcement mechanism.  But, yes, RAND licenses
23  can be negotiated between parties.
24  Q   In a variety of ways?
25  A   Yes.
```

1    Q    And one of those is private bilateral negotiations?

2    A    Yes.

3    Q    As far as stacking is concerned, you have acknowledged

4    that you don't have any evidence that royalty stacking was an

5    actual problem for a company seeking licenses for any

6    essential patents, correct?

7    A    As I recall, my evidence of royalty stacking is largely

8    the existence of patent pools which offer a solution to the

9    royalty stacking problem.  And the comments of companies like

10   Motorola in their ETSI submission, where they say, we need to

11   articulate a principle of aggregated reasonable terms and

12   conditions to avoid the royalty stacking problem.  But I

13   haven't looked at the total cumulative royalty burden in any

14   particular industry to establish this, because the licenses

15   are secret, and so it is hard to know what the size of the

16   stack would be.

17   Q    So you don't have any example of an industry in which

18   there is actual evidence that royalty stacking has been a

19   problem, right?

20   A    The best example I have is the evidence in this paper by

21   Lemley and Shapiro on royalty stacking.  I haven't looked at

22   any particular industry to figure out what the size of the

23   stack would be, that's correct.

24   Q    As far as hold-up is concerned, you have no evidence that

25   there is any hold-up in any of Motorola's prior licenses,

1  correct?

2  A   Yes, I haven't done the work that would let me figure that

3  out.

4  Q   In fact, you stated that you have no evidence that the

5  dispute between Motorola and Microsoft in this case is in

6  fact based on hold-up; isn't that right?

7  A   Yes.

8  Q   And you can't nail down any particular license from any

9  company as an example of hold-up, correct?

10 A   Yes, I haven't attempted to do that.

11 Q   You agree, would you, that the IEEE has expressly

12 prohibited its members from discussing in IEEE meetings

13 anything having to do with specific license terms?

14 A   Yes, inside the meetings.  Although they are allowed to

15 make a commitment to the most restrictive terms and

16 conditions to a license using the voluntary ex ante

17 disclosure policy that the IEEE has in place.

18 Q   Right, individually, but not by virtue of an IEEE meeting?

19 A   No, they are not allowed to discuss prospective licensing

20 terms in the meetings.  It is typically engineers in the

21 meetings who wouldn't be discussing that in any case.

22 Q   And you noted that in your expert report, right, that

23 explicit multilateral ex ante negotiations cannot be

24 conducted under the auspices of many traditional SSOs like

25 the IEEE and the ITU, correct?

1    A    Correct.

2    Q    And you have written that it is a possibility that

3    standard-setting organizations remain generally fearful of

4    the antitrust implications of moving to an ex ante policy,

5    correct?

6    A    That's correct.

7    Q    You think that antitrust concerns historically have caused

8    SSOs to be scared of engaging in ex ante multilateral

9    discussions, correct?

10   A    Yes, I guess that's correct.

11   Q    Now, you were shown the ETSI proposal by Motorola and some

12   other folks in your direct testimony?

13   A    Yes.

14   Q    And if you have it, that is Exhibit 1031 in the white

15   binder that you used on your direct testimony.

16   A    Yes.

17   Q    Turn to the page with what we now finally call "the lawyer

18   numbers," 0999 in the lower right-hand corner.  It is about

19   the third or fourth page in.  It has Section 6 in the middle

20   of the paper.  Do you have that?

21   A    Yes.

22   Q    Now, first, let's be very clear about a couple of things.

23   This was a proposal made to ETSI?

24   A    Yes.

25   Q    Which is not the IEEE and it is not the ITU, correct?

1   A   That's correct.

2   Q   This proposal, first of all, has nothing to do with 802.11

3   or H.264, correct?

4   A   It has to do with clarifying the FRAND concept, which is

5   commonly held to mean the same thing across the

6   standard-setting organizations.

7   Q   But it was made to ETSI, and it had nothing to do with

8   802.11 or H.264, correct?

9   A   It was made to ETSI, who doesn't develop either of those

10  standards, yes.

11  Q   Now, if you look down under 6.1, "Clarification of FRAND"

12  is the proposal?  Clarification?

13  A   Yes.

14  Q   So that presumes, in common parlance, that something needs

15  to be clarified?

16  A   It does.

17  Q   It says, "It is proposed to revise the ETSI IPR policy."

18  Do you see that?

19  A   Yes.

20  Q   That presumes that something needs to be revised, in

21  common parlance?

22  A   Yes.

23  Q   And it goes on to use the words "to clarify the meaning of

24  FRAND," correct?

25  A   Correct.

1    Q    So somebody thought the meaning of FRAND needed

2    clarification, correct?

3    A    Yes.

4    Q    And in Item 1, "aggravated reasonable terms," the first

5    thing it says there, again, is to clarify what the FRAND

6    obligation means, correct?

7    A    Yes.

8    Q    So clearly somebody thought that clarification and

9    revision was needed, because that's what was proposed?

10   A    Yes, Motorola thought that these clarifications would be a

11   good idea.

12   Q    Even some other people thought that.

13   A    Yes.

14   Q    And at the end of the day, the organization rejected this,

15   correct?

16   A    ETSI didn't adopt these clarifications formally in its IPR

17   policy.

18   Q    So they were rejected?

19   A    I don't know, because I don't know if they came to a vote.

20   But, yes --  I mean, in the sense was this language adopted

21   in the ETSI IPR policy?  No, it was not.

22   Q    It was not.  And so despite anybody's suggestions, these

23   ideas never became part of any policy, correct?

24   A    That's correct.

25   Q    You talked a little bit about pools.  You have agreed that

1  when there are fewer essential patentholders that have joined

2  a pool, it is less relevant as a benchmark, haven't you?

3  A    All else equal, I think pools that have a large fraction

4  of the potential licensees and licensors in them are likely

5  to provide a better comparable benchmark.

6  Q    So that a pool like Via that has very few essential

7  patentholders is more likely to be a less meaningful

8  benchmark?

9  A    I haven't done the work that would let me assess the

10  quality of Via as a benchmark.

11  Q    And you can't assess the quality of MPEG LA as a benchmark

12  either, for the same reason?

13  A    Yes.

14  Q    But you have agreed that it is possible that a price above

15  a pool price is consistent with RAND terms and conditions,

16  haven't you?

17  A    My position is that RAND terms and conditions mean that

18  the price can't incorporate hold-up value or incorporate the

19  costs of switching that accumulate through industry-wide

20  adoption of the technology, and can't be aggregate

21  unreasonable, which is the clarification that we were just

22  looking at in the ETSI policy -- or the proposed policy.  To

23  the extent that whatever price you are telling me above the

24  pool, below the pool is consistent with those principles,

25  that's fine.

1   Q    So the answer to my question --

2   A    The reason pools provide an attractive benchmark is that

3   they face the same problem that the standard-setting

4   organization does, in terms of balancing the interests of the

5   licensees and licensors.

6   Q    I don't want to interrupt you, sir.  I am desperate to get

7   an answer to my question.  You would agree and have agreed

8   that a price higher than a pool rate could be RAND, yes or

9   no, sir?

10  A    Yes, the number could be higher than the number charged by

11  a pool.  As long as it is consistent with no royalty stacking

12  and no hold-up, it would be RAND.

13  Q    Your testimony really is about no royalty stacking and

14  hold-up?  That's essentially what you are here to tell the

15  court?

16  A    I think my testimony, to go all the way back to what were

17  my opinions, has to do with the objectives of the SSOs, in

18  terms of promoting the diffusion of the standard, the use of

19  the RAND commitment in particular in the context of the IPR

20  policy in promoting diffusion, the interpretation of the RAND

21  standard as no hold-up and no stacking, and the fact that

22  pools are often the best available comparables when we have

23  this problem of valuing the terms and conditions of a RAND

24  license in the event of a dispute.

25  Q    Pools are often the best comparables, you say.  Pools do

1    patent counting, we have already established that.  But you

2    haven't done enough work to determine what the overall

3    reliability of patent counting is, have you?

4    A    I'm not sure what you mean.

5    Q    You have not done enough work to determine what the

6    overall reliability of patent counting is, have you?

7    A    Yes, I guess that's right.

8    Q    And you don't know of any situation in the real world

9    outside of patent pool organizations where actual licensing

10   has utilized patent counting, do you?

11   A    I know of papers that talk about cross-licensing

12   negotiations, where the size of the stack matters.  But I

13   haven't observed this personally.  My view is that pools use

14   patent counting as a pragmatic solution to a valuation

15   problem.  Outside of pools, I don't have any opinion about

16   patent counting.

17   Q    The answer to my question is, indeed, you don't know of

18   any situation in the real world, outside of patent pool

19   organizations, where actual licensing has utilized patent

20   counting, do you?

21   A    No.

22   Q    Now, you broadly agree that standard-setting organizations

23   don't make any determination about the reasonableness of a

24   license, correct?

25   A    That's correct.

1    Q    But you have recognized that standard-setting

2    organizations go so far as to presume that if a license is

3    granted, it is reasonable; isn't that true?

4    A    No.

5    Q    It is not?

6    A    Standard-setting organizations stay out of determination

7    of whether a license is reasonable or not.

8    Q    Would you turn, sir, to Exhibit 3116 in your binder?  Do

9    you have that?

10   A    Yes.

11   Q    This is another paper that you wrote in 2005, correct?

12   A    Yes, this was subsequently published as a book chapter.

13   Q    As a book chapter.  Would you turn to Page 30?  Tell me

14   when you are there.

15   A    Yes.

16   Q    And if you will follow with me, starting in the middle of

17   the -- the top line on the page.  You stated in your paper,

18   which later became a book chapter, quote, "The most popular

19   by far is the RAND or reasonable and nondiscriminatory

20   licensing requirement.  In practice this requirement is

21   fairly vague.  While it is clear that a RAND rule implies

22   that IPR holders cannot refuse to grant a license, it leaves

23   them with fairly wide latitude to set prices that can even

24   vary by licensee.  Moreover, most SSOs do not actually make

25   any determination about the reasonableness of a license, but

```
 1   rather presume that this criteria has been met as long as a
 2   license has been granted."  Did you write that, sir, in your
 3   article which later became a book chapter?
 4   A   Yes, I did.
 5           MR. JENNER:  Thank you.  No further questions.
 6           MR. PRITIKIN:  Just a couple of questions, your
 7   Honor.
 8           MR. JENNER:  Your Honor, I constantly am reminded
 9   about my failings to offer exhibits.  I would offer
10   Exhibit 3116.
11           THE COURT:  Any objection?
12           MR. PRITIKIN:  No.
13           THE COURT:  3116 is admitted.
14           (3116 admitted.)
15                    REDIRECT EXAMINATION
16   BY MR. PRITIKIN:
17   Q   Professor Simcoe, could you go back to Exhibit 1031?
18   A   Yes.
19   Q   And would you turn over to Page 3 of the document?  I want
20   to direct your attention to the second sentence in the first
21   paragraph.  These proposed changes are really in the nature
22   of clarification of existing FRAND rules and commonly
23   understood goals.  Do you believe that the approach that was
24   being urged by Motorola here in this document reflected
25   commonly held views of RAND?
```

1  A   Yes, I do.

2  Q   And let's look down to the bottom of the page.  And I want

3  to direct your attention to the last paragraph, the last two

4  sentences, where Motorola said that one of their objectives

5  here was to "signal to judges in patent litigation that they

6  can and should look at the overall cumulative royalty costs

7  for a given standard, and not just assess whether the terms

8  being offered by one particular licensor are fair and

9  reasonable in vacuo."  Do you agree with that approach?

10 A   Yes.

11       MR. PRITIKIN:  Nothing further.

12                  RECROSS-EXAMINATION

13 BY MR. JENNER:

14 Q   As long as we are on that article, sir, would you just

15 look at the two sections that counsel pointed out to you,

16 where there was a proposed signal to judges as to what they

17 might want to think.  Will you again confirm for me, sir,

18 that that signal was not adopted by ETSI?  It did not send

19 the signal, did it?

20 A   ETSI did not incorporate this language into their IPR

21 policy.

22 Q   And, therefore, didn't send the signal, did it?

23 A   The signal wasn't the adopting of the language.  The

24 signal here, I believe, was meant to be the idea that --

25 Hold on a second.  Let me look at it.

77

```
 1    Q    I think this is clear.

 2    A    You're right.

 3              THE COURT:  I think he is still answering your

 4    question.

 5              THE WITNESS:  Yes, this language did not make its way

 6    into the ETSI policy.

 7    By Mr. Jenner:

 8    Q    Did not.  And the other thing I would ask you to take a

 9    look at is, under the section where the 6.1 clarification

10    appears, mid-page --  Do you see that?

11    A    Yes.

12    Q    The second paragraph begins with a sentence that I did not

13    ask you about.  It says, "The two proposed changes would

14    introduce the principles of aggregated reasonable terms and

15    proportionality into the FRAND definition."  Do you see that?

16    A    Yes.

17    Q    And would you agree with me that if they are to be

18    introduced, they are logically not already there?

19    A    I believe that the proposal spells out the idea that --

20    their clarification of commonly understood goals.

21              MR. JENNER:  Okay.  That's fine.  No further

22    questions, your Honor.

23              THE COURT:  Thank you.

24              MR. PRITIKIN:  Nothing further.

25              THE COURT:  You may step down, sir.  Thank you.
```

1      Microsoft will call its next witness.

2           MR. PRITIKIN:  Microsoft's next witness, your Honor,

3    is Dr. Matthew Lynde.

4    Whereupon,

5                          MATTHEW LYNDE

6    called as a witness, having been first duly sworn, was

7    examined and testified as follows:

8           THE CLERK:  Will you please state your full name and

9    spell your last name?

10          THE WITNESS:  My name is Matthew Lynde.  The last

11   name is spelled L-Y-N-D-E.

12                      DIRECT EXAMINATION

13   BY MR. PRITIKIN:

14   Q   Dr. Lynde, could you turn to Exhibit 54 in your binder?

15   Is this a copy of your CV?

16   A   Yes, it is.

17          MR. PRITIKIN:  Microsoft moves the admission of 54.

18          MR. BATCHELDER:  James Batchelder.  No objection.

19          THE COURT:  The exhibit is admitted.

20          (54 admitted.)

21   By Mr. Pritikin:

22   Q   Could you describe your educational background?

23   A   I have a Ph.D. in economics from the University of

24   California at Berkeley.  I also have an undergraduate degree

25   in economics from the same institution, although as an

1    undergraduate I studied a great deal of electrical

2    engineering and French.

3    Q    Where do you currently work?

4    A    I work at Cornerstone Research.

5    Q    And can you explain what that company is?

6    A    Cornerstone Research is an economic consulting firm with

7    six offices across the nation, and we specialize, mostly as

8    ex-professors, in studying economic issues in regulatory and

9    dispute arenas, usually having to do with antitrust and

10   securities laws.  My particular specialty is intellectual

11   property disputes.

12   Q    Are you one of those ex-professors?

13   A    I am afraid I am.

14   Q    Before joining Cornerstone, where did you work?

15   A    I was a partner at PricewaterhouseCoopers.  Prior to that

16   -- prior to the merger at Pricewaterhouse, both in New York

17   and later in San Francisco, where I headed up

18   Pricewaterhouse's intellectual property practice.

19   Q    Have you been accepted as an expert and testified in court

20   as an expert on IP valuation and patent damages issues?

21   A    Yes, I have.

22   Q    In your consulting work, what experience have you had in

23   IP licensing?

24   A    In my consulting work, both at Pricewaterhouse and at

25   Cornerstone Research, I have consulted with clients who are

1    interested in assessing the value of their IP portfolios,

2    particularly patents.  And they want some guidelines, from an

3    economist anyway, about thoughts in terms of approaches to

4    value.

5    Q    Are you a member of any advisory boards relating to

6    intellectual property?

7    A    I have been a sponsor on the advisory board for the

8    Berkeley Center for Law and Technology in the past.  I am

9    currently on the advisory board for the LST Group at Stanford

10   Law, and the original sponsor of the Intellectual Property

11   Litigation Clearinghouse.

12   Q    Have you prepared a demonstrative exhibit summarizing the

13   conclusions that you have reached in this matter?

14   A    Yes, I have.

15   Q    Could we put up Exhibit 4073?  Can you explain to us what

16   conclusions you have reached regarding a RAND royalty for

17   Microsoft's H.264 standard-essential patents?

18   A    Yes.  With respect to the H.264 standard, my conclusion

19   from the evidence I have reviewed is the current RAND royalty

20   indicated by the objective evidence is approximately

21   two-tenths of a cent per unit that Microsoft would sell.

22   Q    What is that based on?

23   A    That is based on the best available comparable, the

24   objective evidence provided by the actual negotiated terms

25   and conditions of the MPEG LA patent pool that is

1    specifically addressing the H.264 standard and nothing else.

2    And that is its basis.

3    Q    And what conclusions have you reached regarding a RAND

4    royalty for Motorola's 802.11 standard-essential patents?

5    A    With respect to the 802.11, otherwise known as the WiFi

6    standard, set by the IEEE, the best evidence I have reviewed

7    in this case would indicate that the current RAND royalty of

8    approximately 5 to 6¢, no higher than 5 to 6¢, per unit of

9    Microsoft sales payable to Motorola.

10       And the basis of that opinion, once again, is principally

11   on the best available evidence from a pool arrangement, in

12   this case the only pool I am aware of that has achieved some

13   level of success, and that is the Via Licensing pool for

14   802.11.

15       But given the relatively limited participation in that

16   pool, I look to other corroborative evidence, including chip

17   prices and royalties on chips that would implement an 802.11

18   functionality.

19   Q    Why have you denominated the royalty in a cents per unit

20   form rather than a percentage royalty?

21   A    Well, principally because the evidence available to the

22   economist is the actually negotiating parties who are making

23   pool arrangements, have determined uniformly, as far as I

24   know with respect to consumer electronics products, certainly

25   in these two pools, and many others that I am aware of, that

1    in that situation a cents per unit form of royalty is the

2    most appropriate royalty form.

3    Q    And what would be the problem with a percentage royalty?

4    A    Well, as Professor Simcoe indicated, the problem with

5    licensing on a percentage basis raises the risk that you have

6    the participation of the patentholder and payment of

7    royalties on subject matter which is completely divorced and

8    separate and apart from the patent subject matter, number

9    one, let alone the standard.  And so that is the problem and

10   danger, especially with consumer electronics, multicomponent

11   sorts of end products.

12       And this is particularly exacerbated by Motorola's policy

13   of licensing downstream, as close to the consumer as possible

14   with the highest possible price.  That makes the hold-up

15   problem all the worse.

16   Q    Now, let's focus on how you applied your approach in the

17   H.264 context.  Have you prepared a summary of the Motorola

18   patents that you understood that at least Motorola claimed

19   were essential to H.264?

20   A    Yes, I have.

21   Q    And would you turn to Exhibit 1151?  Is this a list of the

22   patents, at least that Motorola said were essential?

23   A    Yes, that was the intent of this list.  I believe I got

24   this from Motorola's own submissions in this case.

25            MR. PRITIKIN:  Microsoft moves the admission of

1    Exhibit 1161.

2              MR. BATCHELDER:  No objection.

3              THE COURT:  It is admitted.

4              (1161 admitted.)

5    By Mr. Pritikin:

6    Q    How many worldwide patents are listed?

7    A    Sixty-three worldwide patents were disclosed as

8    potentially essential by Motorola.

9    Q    And how many U.S. patents have they said they have that

10   are essential?

11   A    Sixteen.

12   Q    And are these the numbers that you used in your analysis?

13   A    They are indeed.

14   Q    Does Microsoft also have patents it claims are essential

15   to H.264?

16   A    Yes, it does, indeed.  As we heard, Dr. Sullivan actually

17   chaired the group that came up with the standard, eventually.

18   Q    Would you turn to Exhibit 1150?  Is this a list that you

19   prepared of the Microsoft H.264 essential patents?

20   A    It is indeed.  On a worldwide basis Microsoft has almost

21   three times as many patents as Motorola in this area, 172

22   patents.

23   Q    And how many U.S. patents?

24   A    It has 40 U.S. patents.

25   Q    And has someone determined that these are essential to the

1  H.264 standard?

2  A   In the case of Microsoft, yes, because once you submit

3  your patents to a pool, and Microsoft does participate in the

4  pool, there is an independent assessment made of the

5  essentiality of those patents.

6  Q   Now, how do the relative patents of Microsoft and Motorola

7  figure into your analysis?

8  A   Well, I simply observe that both parties have portfolios

9  in this area, and that they are sizable portfolios.  And that

10  considering that there -- many parties have patents that may

11  or are deemed essential in this area, there is an economic

12  problem of coordination, how all of that would be

13  coordinated, so the world consumers can benefit from an

14  agreed-upon standard.

15  Q   Now, you said that you considered the MPEG LA H.264 pool

16  as the best comparable.  Have you prepared a demonstrative

17  exhibit explaining why?

18  A   Yes, I have.

19  Q   Let's take a look at Exhibit 4074, that demonstrative.

20  A   Yes, it is.

21  Q   Using the demonstrative, can you explain to us or give us

22  an overview of why you think the MPEG LA H.264 pool is the

23  best benchmark?

24  A   Yes.  Of the evidence I have reviewed, and in conjunction

25  with a broad consensus amongst economists who have studied

1    this issue, and we have heard two very significant, prominent

2    economists this week on the problem of hold-up and stacking

3    and standards organizations, the benchmark of a pool

4    fundamentally is the right approach, because it is something

5    that approximates an ex ante multilateral negotiation.  And

6    that is the kind of free negotiation of parties which would

7    result, if we observe it, in a royalty which fully addresses

8    the issue of stacking and hold-up.

9         So, in particular, when we look at the evidence in this

10   case, the MPEG LA H.264 pool is specifically tied to the

11   standard in question.  That is its only purpose.  It is

12   exactly the right technology.

13        And it was established just after the ITU came up with the

14   standard.  And the industry is essentially waiting to see if

15   reasonable terms would be offered by the pool.  And

16   relatively quickly they were.  And this was before the

17   widespread adoption of H.264.

18        It has been a very successful pool.  There are 26

19   licensors, major licensors, large blue chip companies with

20   significant portfolios, over 2,400 patents, as we have heard,

21   on a worldwide basis, and now over 1100 licensees.  So both

22   on the licensor and licensee side, and given the widespread

23   adoption of the standard that almost all of us around the

24   world are benefiting from now, this is a very successful

25   pool.

1    So for all these reasons, this was the best available

2  objective evidence of the right comparable in order to answer

3  the question of what would be something consistent with a

4  RAND commitment.

5         THE COURT:  Mr. Pritikin, before you begin, we are

6  going to have other people look at this transcript.  You have

7  used this phrase "ex ante," and other people used the phrase

8  "ex post."  Would you define those so we have a common

9  definition?

10         THE WITNESS:  Yes, sir.  Without being a Latin

11  scholar, what economists mean by it is, ex ante is before

12  something and ex post is after something.  The criteria

13  economists are concerned with is either before or after the

14  effective adoption of the standard.  Because before the

15  standard --

16         THE COURT:  I don't need an explanation.  I just need

17  a definition.

18         THE WITNESS:  Yes, sir.

19  By Mr. Pritikin:

20  Q    Now, do you limit the term "ex ante" to before the date

21  the standard is adopted, or do you use it in connection with

22  the widespread implementation of the standard?

23  A    As far as economists are concerned, there is a gradual

24  transition there.  But effectively, in terms of economics, it

25  is before widespread adoption, so the implementers have not

 1  yet sunk costs that they can't recover should there be any

 2  change in the standard.

 3           MR. PRITIKIN:  Your Honor, I neglected to move the

 4  admission of Exhibit 1150, and would do so now.

 5           MR. BATCHELDER:  No objection.

 6           THE COURT:  It is admitted.

 7           (1150 admitted.)

 8  By Mr. Pritikin:

 9  Q   Would you turn to Exhibit 1152?  Is this a summary that

10  you prepared of the patentholders and the unexpired patents

11  in the H.264 MPEG LA pool?

12  A   Yes, it is.

13           MR. PRITIKIN:  Microsoft moves the admission of 1152.

14           MR. BATCHELDER:  No objection.

15           THE COURT:  1152 is admitted.

16           (1152 admitted.)

17  By Mr. Pritikin:

18  Q   Dr. Lynde, are you aware that Motorola's experts in this

19  case have claimed that the MPEG LA pool is not a good

20  comparable, because it supposedly does not include licensors

21  that generate a return on their R&D investments through

22  licensing rather than through product sales?

23  A   Yes, I am aware of that.

24  Q   Now, are there in fact licensors in the H.264 pool that

25  you understand derive most or all of their relevant revenue

1    from licensing, as opposed to making and selling products?

2    A   Yes, there are, of course.

3    Q   Let me ask you about a few of them on the list that is in

4    Exhibit 1152.  Dolby Laboratories, what is your understanding

5    of what Dolby Laboratories does?

6    A   Well, Dolby Lab's -- License Corporation anyway, gets all

7    of its revenue, as far as I understand, from royalties from

8    licensing its intellectual property.

9    Q   And what about the Electronics and Telecommunications

10   Institute on Page 2?

11   A   Once again, ETRI, to the best of my knowledge, receives

12   substantially all of its income from licensing its

13   intellectual property.

14   Q   Another on Page 2 is the Fraunhofer-Gesellschaft.  Is

15   another name for that the Heinrich Hertz Institut that

16   Dr. Sullivan mentioned?

17   A   That is my understanding.  Actually, the HHR, as we

18   English speakers say, or the Fraunhofer-Gesellschaft, is a

19   major licensor of intellectual property.  And we also heard

20   from Dr. Sullivan it is a major contributor to the standard.

21   And to the best of my knowledge, it receives substantially

22   all of its income from licensing intellectual property.

23   Q   If you look at Page 62, another of the members of the

24   MPEG LA pool is something called the Trustees of Columbia

25   University.  Do they make and sell products?

1    A    I think they are in the education business.  But they also

2    have research professors that provide intellectual property,

3    the university trustees, like many university trustees of

4    universities receive income from royalties.

5    Q    Does the MPEG LA pool include licensors that derive their

6    revenue from the licensing of their patents?

7    A    To the best of my knowledge, certainly.

8    Q    Motorola's experts also claim that pool rates are set low

9    in order to encourage the adoption of the standard rather

10   than to compensate patentholders for their intellectual

11   property.  Do you agree with that criticism?

12   A    No, I completely disagree with that.

13   Q    Why not?

14   A    Because a successful pool that economists would envisage

15   to happen to address both the stacking and the hold-up

16   problem consists both of licensors and licensees.  So it has

17   a balance of all interested parties.  And they come to a

18   collective licensing agreement, balancing the needs of

19   providing adequate compensation to all of the contributors of

20   intellectual property, not just one or a few, but all, and at

21   the same time providing a total royalty burden at the end of

22   the process for producers of products that is commercially

23   feasible, that provides consumers with a sustainable value,

24   and products for them to enjoy the benefits of the standard.

25   So that balance is exactly what economists are looking for

1    for the proper benchmark.

2    Q    For a large pool like MPEG LA, do the rates need to be set

3    high enough to attract licensors?

4    A    Certainly.  There has to be the attraction of a high

5    enough price to attract licensors.  It should be borne in

6    mind, of course, that if there is no standard, there is no

7    revenue.  So, once again, the interests of the licensor is to

8    balance with other licensors, and to balance the objective of

9    having a widely-adopted standard so that all licensors can

10   benefit from revenues.

11   Q    Now, Motorola's experts also claim that because pools

12   frequently divide royalties based on patent numbers, they

13   attract only firms with low-value patents.  What is your

14   response to that?

15   A    My response is that is simply not what we observe, even if

16   it might be theoretically possible.  What we observe in these

17   pools, especially with regard to interoperability standards,

18   as was pointed out by both previous economists, the question

19   isn't so much a matter of having a standard that is

20   innovation driven as it is having a standard where everybody

21   agrees that the language all of the equipment is using talks

22   with each other.  Everybody has to agree on that.  That is

23   the point of the standard.

24        And we observe that major corporations, such as Microsoft,

25   and Ericsson, and LG, and many of the major corporations are

1    participating, for example, in the H.264 pool.

2    Q    Let me ask you about some of the members of the MPEG LA

3    pool.  I am going to ask you whether you regard them as

4    leading technology firms.  Apple?

5    A    Absolutely.  Perhaps the leading technology firm.

6    Q    Well, I'm not sure my client would agree.  But is Apple a

7    member of the MPEG LA pool?

8    A    It is.

9    Q    And is Cisco a member of that pool?

10   A    It is.

11   Q    Fujitsu?

12   A    Yes.

13   Q    You mentioned LG.  What about Sony?  Is Sony a member of

14   the pool?

15   A    It is.  And, of course, it is a very major electronics

16   company.

17   Q    Ericsson?

18   A    Yes.

19   Q    Toshiba?

20   A    Yes.

21   Q    Were you here when Mr. Glanz testified about Motorola's

22   participation in the formation of the MPEG LA H.264 pool?

23   A    Yes, I was.

24   Q    And what bearing does Motorola's participation in the

25   formation of that pool have on your opinion on the use of it

1   as a benchmark?

2   A   Well, I think it further corroborates the usefulness of

3   this benchmark.  Because, as we heard from Mr. Glanz,

4   Motorola was very heavily involved in the whole process, all

5   the way up to the last press release involved in not

6   proposing higher rates, but potentially lower rates, as

7   licenses, and also never proposed that their particular

8   patents were more valuable than average, more valuable than

9   others'.

10   Q   Has Motorola participated in other MPEG LA pools relating

11   to video compression?

12   A   Indeed it has.

13   Q   Which one?

14   A   It also participated in negotiations for and eventually

15   joined the MPEG-4 visual pool.

16   Q   And can you tell us at a high level what that technology

17   related to?

18   A   It is very similar to codec technology for compression of

19   video signals.  It was actually a competing standard that had

20   been proposed.

21   Q   And what conclusions do you draw from the fact that

22   Motorola participated in a pool around that video compression

23   standard?

24   A   The terms that were eventually agreed on by that pool were

25   very similar to the MPEG LA H.264 pool, in terms of structure

1  and in terms of rate, in terms of caps.  So it seems to me

2  that from that participation, in joining the pool, Motorola

3  clearly indicates that they see that as a reasonable and

4  viable business model.

5  Q   And in fact, is one of the patents that Motorola in this

6  case says is essential to H.264 also said to be essential to

7  that standard and included in that pool?

8  A   Yes, there is one overlap patent.

9  Q   Is that the '980 patent?

10 A   I believe that's correct.

11 Q   Now, could you turn to Exhibit 71 in your binder?  Can you

12 tell us what this document is?

13 A   Yes.  This is an internal Motorola document.  It appears

14 to be a document by Motorola Stamp Group, which specializes

15 in licensing, as far as I understand.

16 Q   And what does this relate to?

17 A   This in particular relates to their evaluation, their

18 participation, in the pool we were just talking about, the

19 MPEG-4 visual pool.

20 Q   And if you look at the first page of it, there is a

21 statement made that signing the license or joining the pool

22 provides a simple business solution for most of the patent

23 issues at reasonable rates.  Do you see that?

24 A   Yes, I do.  And that is exactly what an economist would

25 expect.  There are tremendous efficiencies of using a pool

1    arrangement in terms of avoiding negotiating costs,

2    transaction costs in joining the pool.

3    Q    So does the Motorola document identify the rates of that

4    pool as reasonable?

5    A    It does indeed.

6    Q    How do those rates compare to the rates of the MPEG LA

7    H.264 pool?

8    A    They are very similar.  They are about 25¢ a unit for

9    rights to the entire pool, not one licensor, compared to 10,

10   20¢ for the -- 0 to 10 to 20¢ for the MPEG LA pool.

11   Q    The 25¢ is not what one company would get, that's what

12   everybody would get and divide up; is that correct?

13   A    That would be what everybody that contributes to the pool

14   would divide up.

15   Q    Now, is Google --

16        MR. PRITIKIN:  Your Honor, I will move the admission

17   of Exhibit 71.

18        MR. BATCHELDER:  No objection.

19        THE COURT:  71 is admitted.

20        (71 admitted.)

21   By Mr. Pritikin:

22   Q    Is Google, Motorola's parent company, a licensee of the

23   MPEG LA H.264 pool?

24   A    Yes, that's my understanding.

25   Q    Would you turn to Exhibit 103, please?  And is this

1    Google's license agreement with the MPEG LA H.264 pool?

2    A    Yes, it is.  It is called the AVC patent portfolio

3    license.  AVC, it is my understanding, being another name for

4    the H.264 standard.

5    Q    Is the MPEG LA pool sometimes called the H.264 pool and

6    sometimes called the AVC pool?

7    A    Yes, it is.  That is my understanding.

8    Q    The same thing?

9    A    That is my understanding, yes.

10            MR. PRITIKIN:  Microsoft moves the admission of 103.

11            MR. BATCHELDER:  No objection.

12            THE COURT:  It is admitted.

13            (103 admitted.)

14   By Mr. Pritikin:

15   Q    Now, do you consider this Google agreement with the pool

16   to be a relevant comparable for purposes of the valuation

17   exercise in this case?

18   A    Yes, certainly this is an example of a large and

19   sophisticated technology company which has taken a license

20   from the MPEG LA pool arrangement on standard terms and

21   conditions as proposed by the pool.

22   Q    Do you believe that this corroborates your selection of

23   the pool as a comparable?

24   A    Yes, I do, indeed.

25   Q    What, if any, commitments to MPEG LA licensees, like

1  Google, do they make with respect to their own H.264

2  essential patents?

3  A   Well, my economist understanding anyway is that the

4  standard agreements involve the requirement of a grant back

5  of rights from the licensee for patents that are in the exact

6  same standards area, which seems reasonable.

7  Q   And does the commitment extend to the affiliates of the

8  licensee?

9  A   That is my understanding.  It is also my understanding

10  that that would presumably include affiliates such as

11  Motorola Mobility, which has been purchased by Google.

12  Q   Would you turn to Section 8.3 of the agreement at pages 26

13  to 27?  And is this the provision you are referring to?

14  A   Yes, that is what I was thinking of in Section 8.3 here.

15  And the language says what it says.  That was my

16  understanding.  First of all, there is a presumption that the

17  terms and conditions are fair and reasonable, that is a fair

18  and reasonable royalty, and that there is grant back by the

19  licensee.

20  Q   Now, I want to pause on that for just a moment, Dr. Lynde,

21  and make sure we understand what this says.  The patents that

22  are being licensed back are the patents of Google and its

23  affiliates, like Motorola; is that correct?

24  A   That is my understanding.

25  Q   And Google is saying in this document that the pool rates

1  are presumed to be a fair and reasonable royalty rate?

2  A   That is my understanding from this agreement signed by

3  Google.

4  Q   And what does that tell you about whether the pool royalty

5  rates in this case are a good comparable for the Motorola

6  H.264 patents?

7  A   Well, I think that provides further corroboration that

8  this is an appropriate benchmark for a RAND-compliant rate.

9  Q   Was this an arm's length transaction between Google and

10  the pool?

11  A   Certainly.  The pool is independent.

12  Q   Now, does the H.264 pool include all of the patents that

13  are essential to the H.264 standard?

14  A   No, it does not.  No pool I know includes absolutely all

15  patents that might exist in the world that might be relevant.

16  Q   And so have you been able to determine the total number of

17  patents worldwide that are essential to the H.264 standards

18  that are not in the pool, besides, for example, Motorola's?

19  A   I am afraid that is not possible for anyone to do, because

20  many of the disclosures of potentially essential patents made

21  by parties are made under what we have heard described as

22  blanket disclosures, that is to say a patentholder discloses

23  that they have some intellectual property patents in this

24  area, but they don't enumerate the patents specifically.

25  Q   Could you turn to Exhibits 1153 and 1154?  First, is

1  Exhibit 1153 a list that you prepared of specific patents

2  that you identified as potentially essential by firms and

3  letters of assurance submitted to the ITU that are not part

4  of the pool?

5  A   Yes.  That's right.  What I did was, I went to the ITU and

6  I found whatever disclosures I could about specific patents,

7  that is, not the blanket disclosures, but specific patent

8  numbers that had been submitted in LOAs, and I made a list of

9  those.  And there are 89 of them.

10         MR. PRITIKIN:  Microsoft moves the admission of 1153.

11         MR. BATCHELDER:  No objection.

12         THE COURT:  1153 is admitted.

13         (1153 admitted.)

14  By Mr. Pritikin:

15  Q   Let's turn to 1154.  Is this a list you prepared of

16  companies and organizations that submitted blanket letters of

17  assurance and that did not identify the patents individually?

18  A   Yes, that's right.  On the same source I was able to see

19  that the following companies had submitted blanket

20  disclosures, indicating that they had at least one, if not

21  many, patents that would be applicable under this standard.

22  Q   Now, some of the companies that submitted blanket letters

23  of assurance and didn't list their patents, would you

24  consider them significant companies?

25  A   Oh, indeed.  Such little-known entities as AT&T, Broadcom,

1  Intel, Lucent, Matsushita, Phillips, Qualcomm, Thompson.

2  These are very, very major technology companies.

3  Q   Now, have you analyzed the royalties that Microsoft would

4  pay to Motorola for a license to Motorola's portfolio of

5  H.264 patents under various scenarios based on the MPEG LA

6  pool rate structure?

7  A   Yes, I have.

8  Q   And have you prepared a demonstrative summarizing your

9  conclusions?

10  A   I have.

11  Q   Let's look at Exhibit 4077.  I want to take you through

12  each of these.  Can you explain what the first line shows?

13  A   Yes.  The first line is using the MPEG LA H.264 pool as a

14  benchmark, and adjusting that benchmark as if Motorola's

15  claimed essential patents were a part of that pool.  So this

16  is a number which is easy to calculate, using the pool's

17  arrangement for sharing the revenues that would come in from

18  the royalties.  And I have made that calculation.  It turns

19  out that the per-unit royalty, that is, the amount payable by

20  Microsoft on a per-unit basis to Motorola under this

21  structure would be just under two-tenths of a cent per unit.

22  Q   And, again, using just the current year as an example,

23  what would be the total amount of royalties if this were used

24  as the RAND royalty that Microsoft would owe Motorola?

25  A   For the current information it had in terms of the number

1    of units sold by Microsoft, that would amount to $502,000 per

2    year.

3    Q    Now, if we look down to the next line, what assumptions

4    did you make here?

5    A    This was where I considered all the other 89 disclosed and

6    enumerated claimed essential patents in the same calculation,

7    as if they were in the pool, which of course they are not.

8    Providing a benchmark is the purpose of the exercise.

9    Q    Let me pause on that for a moment.  By assuming additional

10   patents were in the pool, does that lower Motorola's overall

11   share?

12   A    Exactly.  And everybody else's, too.  But there are a lot

13   of players who are providing technology in this space.  That

14   is part of the issue.  So with that calculation, you will see

15   the result is similar.  It is about .19 cents per unit; or

16   aggregated on an annual basis, given Microsoft's current

17   volume of products which use H.264, $474,000 per year.

18   Q    Now, in the next line you say rates are increased by ten

19   percent.  What does that refer to?

20   A    The pool contract contemplates that the participants may

21   elect to increase the pool rates up to a maximum of ten

22   percent should they deem that useful and appropriate, for

23   example, if there were more patents in the pool.  And in that

24   case the calculation would go up a little bit to just over

25   two-tenths of a cent per unit, for an aggregate annual

1    payment for Microsoft's shipping units using H.264 of

2    $521,000.

3    Q    Now, have the MPEG LA rates actually increased over time?

4    A    No, they have not.

5    Q    By the way, we talked earlier about the other pool that

6    Motorola was a member of, the H.264 -- excuse me, the other

7    MPEG-4 pool.  Do you recall that?

8    A    The MPEG-4 visual pool, correct.

9    Q    How do the royalties in that pool compare to the royalties

10   in the MPEG LA pool for H.264?

11   A    Well, they are very similar.  There is a little bit of a

12   different structure in terms of volume discounting.  They are

13   about 25¢ a unit.  Whereas for the MPEG LA pool, it starts

14   off for the first 100,000 units as royalty free, and then

15   $100,000 per unit (sic), up to a limit, and then it goes back

16   down to 10¢ a unit.  They are pretty much in the same

17   ballpark, and have similar caps as well.

18   Q    Let's look at the last line.  You say there that these are

19   the rates based on the Google grant-back provision?

20        THE COURT:  Counsel, I'm sorry.  Did the witness just

21   say "$100,000 per unit up to a limit"?

22        THE WITNESS:  No, that is not what I said.  If I did,

23   I misspoke.

24        THE COURT:  That is what the reporter wrote down, and

25   that's what I heard.

1    THE WITNESS:  Let me correct what I said then.  The

2  royalty structure for MPEG LA H.264 is royalty free up to

3  100,000 units.  And then from 100,000 to a certain limit it

4  is 20¢ per unit.

5    THE COURT:  Okay.

6    THE WITNESS:  And beyond that it is 10¢ per unit.  I

7  apologize.

8  By Mr. Pritikin:

9  Q   Let's turn to the last line on Exhibit 4077, Dr. Lynde.

10  You say -- you show here rates based on the Google grant-back

11  provision.  What is that?

12  A   That is a calculation I was able to do using the same

13  distribution formulas.  And that would be how much would be

14  payable by Microsoft to Google for rights to the H.264 pool

15  under the grant-back provision that is in the Google license

16  agreement with the pool itself.  And that would be .06 cents

17  per unit.

18  Q   How much would it have been for the past year?

19  A   That would be $167,000 per unit (sic).  I should say, that

20  is assuming that Google would hit one of the caps in the

21  royalty arrangement.  Given Google's size, I think that is a

22  reasonable assumption.  There are two other caps they could

23  also hit, each as six and a half million.  If it does hit

24  those caps, it turns out the grant-back rate would be just

25  about two tenths of a cent per unit.

 1          THE COURT:  Counsel, you need to define what a

 2   grant-back provision is.

 3          MR. PRITIKIN:  I was going there, your Honor.

 4   By Mr. Pritikin:

 5   Q    Now, we talked earlier about the Google license with the

 6   MPEG LA pool.  What do you mean by a grant-back provision?

 7   A    There is a condition in that Google license where the

 8   licensee, Google, agrees to grant back rights to the pool for

 9   its H.264-specific standard-essential patents.  That's what

10   this calculation does.

11   Q    And has Google clarified this also, agreed to grant back

12   the rights to the Motorola patents as an affiliate?

13          MR. BATCHELDER:  Your Honor, I need to interpose an

14   objection here.  This witness is here to testify as an

15   economist, not as a lawyer interpreting the meaning of

16   contracts.

17          THE COURT:  I will sustain the objection.

18   By Mr. Pritikin:

19   Q    Now, is the amount that you show in the last line the

20   amount that is presumed to be fair and reasonable under the

21   Google-MPEG LA agreement?

22   A    Speaking as an economist, I think we looked at that term

23   in the agreement where a licensee does agree that the rates

24   they are paying are fair and reasonable.

25   Q    And, again, just to clarify, I think you may have

1    misspoken on the $167,000 and described that as per unit.

2    What is the $167,000 figure?

3    A    That would be the aggregate annual amount payable at the

4    rate of .065 cents per unit.

5    Q    Now, could you turn to Exhibits 1160, 1161 and 1163.  Can

6    you tell us what these documents are?

7    A    Yes.  These are the detailed calculations for the summary

8    figures that I just discussed.

9              MR. PRITIKIN:  Microsoft moves the admission of 1160,

10   1161 and 1163.

11             MR. BATCHELDER:  No objection.

12             THE COURT:  They are admitted.

13             (1160, 1161 & 1163 admitted.)

14   By Mr. Pritikin:

15   Q    Let's go back to the Demonstrative 4074 for just a minute.

16   Now, under the approach that you have proposed under the pool

17   as a comparable, would this calculation then be done afresh

18   each year?

19   A    Yes, that is the pool arrangement.  And that would make

20   sense, since it depends on geographically differentiated

21   patent accounts.  The patents that are not expired yet or

22   patents that might be issued would be put into the

23   calculation and revised each year.

24   Q    And does this approach then account for patent expirations

25   as they occur?

1    A   Yes, exactly.

2    Q   Now, there has been testimony that Motorola's patents

3    relate almost entirely to something called interlaced video,

4    and that that is not important to Microsoft's products.  Have

5    you reduced the level of royalties that Motorola would get to

6    reflect that?

7    A   No.  No, I have not.  I have simply observed what the

8    actual real-world pool negotiation resulted in.

9            MR. PRITIKIN:  Your Honor, I would offer

10   Exhibit 1154.  I may have skipped over that when we talked

11   about it.

12           MR. BATCHELDER:  No objection.

13           THE COURT:  1154 is admitted.

14           (1154 admitted.)

15   By Mr. Pritikin:

16   Q   Now, Dr. Lynde, let's shift gears and talk about 802.11.

17   Could you turn to Exhibit 1156?  Is this a summary that you

18   prepared of the Motorola patents that Motorola has said are

19   essential to 802.11?

20   A   Yes, that's correct, just like with the other standard, I

21   made a list of the patents that Motorola in this case has put

22   forward and has claimed essential.

23           MR. PRITIKIN:  Microsoft moves 1156.

24           MR. BATCHELDER:  No objection.

25           THE COURT:  1156 is admitted.

```
 1              (1156 admitted.)

 2   By Mr. Pritikin:

 3   Q    How many patents worldwide are on the list?

 4   A    There are 263.

 5   Q    And of that, how many are U.S. patents?

 6   A    Fifty-four.

 7   Q    Now, what is your understanding of the number of those

 8   U.S. patents that Motorola has claimed are allegedly used in

 9   the Xbox?

10   A    My understanding is, given the nature of the Xbox product,

11   that Motorola has put forward eleven out of the 54 as being

12   used by the Xbox, although I think I understood that one

13   might be expired by now.

14   Q    Now, you testified earlier that the first benchmark that

15   you look to in connection with the 802.11 RAND royalty was

16   the Via Licensing pool.  Can we turn to Exhibit 1125?  Now,

17   the Via pool is much smaller than the MPEG LA pool; is that

18   correct?

19   A    It is a much smaller pool, yes.

20   Q    And how many licensors participate in the Via pool?

21   A    There are currently five licensors.

22   Q    And which companies are those?

23   A    They are ETRI, Japan Radio, Phillips, LG and Nippon

24   Telegraph.

25   Q    Let's turn to Exhibit 1164.  Is this a list you prepared
```

1   of the licensees of the Via 802.11 pool?

2   A   Yes, that's right.  These are, as far as I know right now,

3   the licensees.  And there are eleven of them, five of whom

4   are also licensors or have been licensors.

5          MR. PRITIKIN:  And Microsoft moves the admission of

6   1164.

7          MR. BATCHELDER:  No objection.

8          THE COURT:  1164 is admitted.

9          (1164 admitted.)

10  By Mr. Pritikin:

11  Q   Now, approximately when was the Via 802.11 pool formed?

12  A   It was formed, as I understand it, in the 2003 to 2005

13  time frame.

14  Q   And how does that timeline figure into your analysis here?

15  A   Well, this pool is not as ideal as the H.264 pool, first

16  of all, because it has a lower participation rate, but also

17  because it was formed really at about the same time when

18  802.11, also known as WiFi, had become really quite widely

19  adopted by approximately that time frame.  So it wasn't as

20  much of an ex ante arrangement as an economist would prefer,

21  in terms of looking at an ideal comparable.

22  Q   And what does that do to the rates?  Does it push them up

23  or down?

24  A   That would tend to push the rates up, because it would

25  be -- it would contain some potential for the value to be

1    raised, because the investments had already been made, and

2    therefore licensors would have more leverage when they went

3    to get licenses.

4    Q    Now, as you did in the case of H.264, did you attempt to

5    compile a list of patents that were specifically identified

6    as potentially essential to the 802.11 standard in letters of

7    assurance submitted to the IEEE?

8    A    Yes.  Similarly with the ITU standard, I looked at

9    disclosures for claimed essential patents under the 802.11

10   standard.

11   Q    And would you turn to Exhibit 1158?  Is this a summary you

12   prepared of the patents that are specifically identified in

13   the letters of assurance, other than Microsoft, Motorola and

14   the Via licensors?

15   A    Yes, that's right.  That's what this is in this schedule.

16         MR. PRITIKIN:  Microsoft moves the admission of 1158.

17         MR. BATCHELDER:  No objection.

18         THE COURT:  1158 is admitted.

19         (1158 admitted.)

20   By Mr. Pritikin:

21   Q    Beyond those patents that were declared essential, were

22   you -- how many additional patents were you able to identify

23   through letters of assurance?

24   A    Well, once again, we have the problem that it is possible

25   under this SSO's rules to submit blanket disclosures.  So

1  many parties submitted disclosures saying they had some

2  intellectual property in the area of 802.11 networking, but

3  we don't know -- nobody knows what the aggregate total might

4  be.  It is probably in the thousands.

5  Q   Is it acknowledged to be in the thousands widely?

6  A   It generally is acknowledged to be in the thousands.  And

7  given that there are 90-odd entities that have submitted

8  technology under that standard, that is likely to be the

9  case.

10 Q   Let's turn to Exhibit 1159.  Is this a summary you have

11 prepared of the various companies and organizations that had

12 submitted blanket letters of assurance?

13 A   Yes, that's right, that's what this list is.

14 Q   And how many are on this list?

15 A   We've got --  I believe it is -- the total is 90,

16 including the ones that have specific disclosures.  So there

17 are 59 that have these blanket disclosures that I was able to

18 identify.

19         MR. PRITIKIN:  Microsoft moves the admission of 1159.

20         MR. BATCHELDER:  No objection.

21         THE COURT:  It is admitted.

22         (1159 admitted.)

23 By Mr. Pritikin:

24 Q   Have you prepared a demonstrative summarizing this

25 information?

1    A    I have.

2    Q    Let's look at Exhibit 4078.  What is shown here?

3    A    This is graphically, I guess, a depiction of the declared

4    essential-patent situation under 802.11.  And you will see

5    sort of going off into the indefinite top of the bar chart,

6    nobody actually knows the total number of patents that might

7    be deemed or actually essential to the standard.  But you

8    also see in this chart that Via has 14; Motorola, who was

9    apart from this case and did not disclose specific patents,

10   has 54 in this case.  And then I was able to find 150 more

11   specific patent disclosures.

12       But you will see there are very major intellectual

13   property-owning companies that have declared that they have

14   some essential patents in this area, companies such as Sony,

15   IBM, Atheros, TI, Qualcomm, and also Marvell.  And I would

16   note that we heard from a Ms. Ochs from Marvell earlier this

17   week, that while they have blanket disclosures, she told us

18   here that they actually have hundreds of U.S. patents in this

19   area.  So you can see that if Marvell has hundreds, and there

20   are these other major technologies, the likely total would be

21   very large.

22       THE COURT:  Counsel, let me ask.  Would you go back

23   to Exhibit 1156, please?  In the far right-hand side it says

24   "hypothetical Via pool weight," and then you have two

25   columns.  What is that calculation?

 1          THE WITNESS:  That, sir, is part of the calculation

 2    that I used to calculate what the benchmark pool license

 3    payment would be if this were a benchmark for a RAND royalty.

 4          THE COURT:  What is the "weight," as you have used

 5    that term?

 6          THE WITNESS:  The pool arrangement, like most pool

 7    arrangements, is a patent-count-based distribution, but it is

 8    weighted by geography.  If you have more patents in important

 9    geographies like the United States you get more weight in the

10    distribution of royalties to you.

11          THE COURT:  Is this a good time to take a break?

12          MR. PRITIKIN:  Sure, your Honor.

13          THE COURT:  All right.  Counsel, we will be in recess

14    until 1:30.  When we come back, the doctor will be back on

15    the stand.  Any matters that we need to take up between now

16    and then?

17          MR. HARRIGAN:  One question, your Honor.  We were

18    both talking, when would you like the weekend homework

19    briefing delivered?

20          THE COURT:  9:00 Sunday morning it would be nice if

21    it was filed.  That will give me some time to look at it.  In

22    fact, let's make it noon on Sunday.  That would work.

23          MR. PRITIKIN:  I am told I did not move the admission

24    of 1125.  I am not very good at this.  I will do so now.

25          MR. BATCHELDER:  What is that?

1     MR. PRITIKIN:  Just the list of the 802.11 licensors.

2     MR. BATCHELDER:  No objection.

3     THE COURT:  1125 is admitted.

4     (1125 admitted.)

5     THE COURT:  We will be in recess.

6  (Recess.)

7     THE COURT:  Please be seated.  Counsel, you may

8  resume.

9  Q    Now, Dr. Lynde, before we broke for lunch did you tell us

10  that there were 35 patents worldwide in the Via pool?

11  A    Yes, I think that's the right number.

12  Q    Could you turn to Exhibit 52 in the binder.

13     Does this document show the rate structure for the

14  802.11 pool?

15  A    Yes, it does.

16     MR. PRITIKIN:  Microsoft moves the admission of

17  Exhibit 52.

18     MR. BATCHELDER:  No objection.

19     THE COURT:  It's admitted.

20     (Exhibit No. 52 was admitted into evidence.)

21  Q    Can you explain, in general terms, how royalties are

22  divided among the licensors?

23  A    Yes.  For the Via pool, the license fees collected by the

24  licensing pool are redistributed to the contributors to the

25  pool, based generally on a patent-count basis.  But the

1    patent counts are weighted by geography, that is, a

2    geographic distribution of where the patent rights exist.

3    Q    Did you analyze the royalties that Motorola would have

4    received from Microsoft for a license to its 802.11 essential

5    patents based on the Via pool structure?

6    A    Using this structure as a benchmark, I have made an

7    estimate of what a RAND-compliant payment from Microsoft to

8    Motorola would be under a similar kind of arrangement.

9    Q    Have you prepared a demonstrative that summarizes the

10   results?

11   A    I have.

12   Q    Would you turn to Exhibit 4079.  Now, in conducting this

13   analysis, what, if any, adjustments did you make in order to

14   account for the fact that the Via pool has relatively low

15   participation?

16   A    In order to make this a better comp, comparable, what I

17   did was to calculate the rate as if the other identified

18   claimed essential patents that were available to me were in

19   the pool.  So, for example, through the course of this matter

20   I'm aware of the claimed essential patents from Motorola, but

21   there are also some other claimed essential patents.  So

22   putting these in through the calculation, I've made an

23   estimate of what the equivalent per-unit royalty would be

24   from Microsoft back to Motorola with this benchmark.

25   Q    Now, given the universe of the number of 802.11 essential

1   patents you used, what percentage of the total did you

2   allocate to Motorola?

3   A   Well, because we have got all of the claimed essential

4   Motorola patents, and a great number are not visible to me,

5   that calculation is done with about 26 percent of the

6   patents, not weighted by geography, belonging to Motorola.

7   Q   Do you believe that Motorola, in fact, owns 26 percent of

8   all the patents essential to the 802.11 standard?

9   A   Oh, no, not by any stretch of the imagination, because

10  it's just the fact that we're here in the discovery process

11  that we have more access to their patents.  A great many

12  patents are disclosed under blanket terms, therefore we don't

13  know the number, although it's certainly in the thousands.

14  Q   And so is this assumption, the 26-percent assumption you

15  made, is that favorable or unfavorable to Motorola?

16  A   Well, it's highly favorable to Motorola in the calculation

17  that I do.  That is a higher implied royalty rate.

18  Q   Now, turning back to Exhibit 4079, can you explain what is

19  shown in the row labeled "current rates?"

20  A   Yes.  At the current rates and the current claimed

21  essential patent counts, the estimate would be for about

22  $0.05 per unit that Microsoft would pay to Motorola for each

23  unit that Motorola shipped that had a WiFi capability.

24  Q   Or Microsoft shipped?

25  A   I'm sorry, Microsoft shipped.

1    Q    And you show a $736,000 number.  What is that?

2    A    That would be the volume of Microsoft shipments, times the

3    rate.

4    Q    Now, you call these current rates.  What do you mean by

5    current?

6    A    This pool, like the MPEG LA pool, has mechanisms for

7    adjusting the patent-count allocation, depending on the

8    expiration of certain parties' patents, or new patents coming

9    on board.

10   Q    So as patents expired they would drop out?

11   A    Yes, they would.

12   Q    Does your proposal contemplate using your calculations

13   afresh each year, then?

14   A    Yes, I believe that's approximately the mechanism that the

15   Via pool advocates.

16   Q    In particular, if we focus on the Motorola 802.11 patents,

17   do you have an understanding as to whether a number of those

18   are rapidly expiring?

19   A    I have seen expiration dates.  I believe that several of

20   them are expiring next year and several more in 2014.

21   Q    What does the row labeled "Rates increased by 25 percent"

22   show?

23   A    This pool collective agreement, like the MPEG LA

24   collective agreement, contemplates that the parties might

25   wish to increase the royalty rate should, for example, the

1    participation and contribution of patents increase.  So, I've

2    provided here the maximum increase contemplated in that

3    collective agreement, which would be a 25 percent increase in

4    the royalty rates.

5    Q   And on that basis what would the current per-unit royalty

6    be?

7    A   In that case the current per-unit royalty would rise to

8    about 6.5 cents per unit, and would accumulate, in the most

9    recent year data that's available for Microsoft units, to

10   $920,000 per year.

11   Q   Did you prepare schedules or summaries that show the

12   calculations and the basis for the numbers that you have come

13   up with?

14   A   Yes, I did.

15   Q   Could you look at Exhibits 1155, 1165 and 1167.  And are

16   these the work papers showing the calculations?

17   A   Yes.  Yes, they are.

18        MR. PRITIKIN:  Microsoft moves the admission of 1155,

19   1165 and 1167.

20        MR. BATCHELDER:  No objection.

21        THE COURT:  They are admitted and may be published.

22    (Exhibit Nos. 1155, 1165, 1167 were admitted into evidence.)

23   Q   When you performed this analysis, was it your

24   understanding that a company called France Telecom was still

25   part of the Via pool?

1    A    At that time it was my understanding, yes.

2    Q    And since that time, have you seen information that shows

3    that company has since withdrawn from the pool?

4    A    As I currently look at the Via information, it does appear

5    that France Telecom may have dropped out of the pool, at

6    least as a contributor.

7    Q    And if you redid the calculations reflecting that, would

8    that alter your calculations in any meaningful way?

9    A    No, it would not.  First of all, it's not terribly

10   material.  But, secondly, the method for calculating a

11   benchmark uses as many identified patents that are claimed

12   essential, in order to calibrate the benchmark.  So it

13   wouldn't make any difference in the essential part of my

14   calculation.

15   Q    When you presented your summary of conclusions earlier,

16   you noted that you viewed the royalties derived from the Via

17   pool to represent a ceiling.  What did you mean by that?

18   A    Well, the Via pool is not as ideal, for example, as the

19   MPEG LA pool.  It's not done in advance, all of the

20   significant investment that the industry made in the

21   standards technology.  And it hasn't been able to achieve a

22   large level of participation, perhaps because the rates are

23   too high and it didn't attract enough licensees.

24        But for that, for both those reasons, it's my belief that

25   it would be a higher rate than it would otherwise incur.  And

1  in addition, because of the way the evidence has been

2  presented to me, I've got a relatively high count of Motorola

3  claimed essential patents, so that gives an artificially high

4  proportion of the distributed royalty to Motorola.

5  Q   Now, in addition to using the Via pool, have you looked at

6  other benchmarks to confirm your conclusions?

7  A   Yes.  Given the fact that the pool had these limitations,

8  I did try to look to other corroborating evidence to make

9  sure that this estimate of a high-level RAND compliant rate

10 was reasonable.

11 Q   Are you familiar with the terminology, "Smallest saleable

12 unit," in the context of royalties?

13 A   Yes, I am.

14 Q   What does that refer to?

15 A   My understanding is that the notion is that in calculating

16 a reasonable royalty for patent damages, that the law is

17 taking cognizance of the fact that it's difficult to

18 calibrate the apportioned value of a small component of a

19 complex device, on the entire market value of that complex

20 device, like a consumer electronics device.

21     So, it is now recommended, and I believe economically

22 advisable, to look at the smallest saleable unit when

23 thinking about a reasonable royalty.  That way you are

24 looking at a royalty rate not on the thousands of others'

25 contributed technologies that are complementary in producing,

1    say, a PC or some other complex consumer device; but you

2    really focus on what's appropriate just for the technology in

3    question.   In this case that would be 802.11 compliant WiFi

4    communications capability.

5    Q    And what is your understanding of what Marvell charges

6    Microsoft for the chip that provides the WiFi functionality

7    in the Xbox?

8    A    As I recalled the testimony from Ms. Ochs earlier this

9    week, it was $3 to $4.   I understand Microsoft's view of the

10   cost of goods sold currently might be at the lower end of

11   that range.

12   Q    Now, you understand that Motorola has urged a royalty rate

13   of two-and-a-quarter percent for its 802.11 standard

14   essential patents in this case?

15   A    Yes, I do.

16   Q    I take it, do you agree that that's a reasonable

17   percentage royalty?

18   A    I do not agree that it is anywhere near RAND-compliant in

19   structure or level of royalty.

20   Q    If you applied Motorola's proposed two-and-a-quarter

21   percent to the price of the chip, as opposed to the entire

22   Xbox, what royalty ratings would you obtain?

23   A    Two-and-a-quarter percent multiplied times a $3 or $4

24   chip, would be approximately $0.07 to $0.09 per unit.

25   Q    How does that factor in at all to the numbers you

1  proposed?

2  A   I think it provides some corroboration that the

3  approximately $0.05 to $0.06 range for a RAND-compliant rate

4  is approximately correct.

5  Q   Now, another corroborating benchmark you referred to

6  earlier was the royalties earned by ARM Holdings.  And what

7  technology is involved there?

8  A   ARM Holdings is an English company that has specialized in

9  creating software and other tools for designing what are

10  called embedded microprocessors.  It's the most widely-used

11  technology for doing that these days.  And it really is the

12  essence of building an ASIC these days, once you license

13  those tools, and know how from ARM.

14       MR. BATCHELDER:  Your Honor, I'll object on

15  foundation grounds.

16       THE COURT:  Would you explain what an ASIC is.

17       THE WITNESS:  That's an application specific

18  integrated circuit, Your Honor.

19       THE COURT:  Of course.

20       MR. BATCHELDER:  My objection is lack of foundation

21  about this witness's knowledge about ARM and the ASIC market

22  and all the rest.

23       THE COURT:  Why don't you lay some foundation.

24       MR. PRITIKIN:  Sure.

25  Q   Dr. Lynde, did you, in the course of the work you did on

1  this case, did you undertake some investigation to learn what

2  the ARM Holdings license policies are?

3  A   I did.

4  Q   And where did you gain that information?

5  A   From their annual report.

6       MR. PRITIKIN:  Your Honor, I think that's a

7  sufficient basis.

8       THE COURT:  Do you wish to renew your objection,

9  counsel?

10       MR. BATCHELDER:  I renew the objection.

11       THE COURT:  It's overruled.

12  Q   Now, does the technology licensed by ARM include both

13  patents and know-how?

14  A   Yes, it does.  And all the tools needed to design an

15  application specific integrated circuit.

16  Q   Is that, in your opinion, more valuable than just the

17  patents?

18  A   Well, I am cognizant that Ms. Ochs said that in terms of

19  her licensing practices she believes that this, in terms of a

20  chip like an 802.11-capable chip, that this would be the

21  ceiling of what value might be for the intellectual property,

22  because this is the IP that actually builds the chip, and

23  that was, according to her testimony, one percent.

24  Q   Can you tell us, again, why did you select this as a

25  reference point?

1    A    Because it is a ceiling represented by a third party,

2    Ms. Ochs, as a high level, a maximum level of a reasonable

3    royalty for IP in creating a chip.

4    Q    Did you attach any importance to the fact that Marvell

5    uses this as a benchmark?

6    A    Indeed I did, because Marvell, I understand, is the chip

7    manufacturer that provides the 802.11-capable chip to

8    Microsoft, for example.

9    Q    Now, are the royalties that are charged by ARM limited by

10   RAND commitments?

11   A    No, they are not.

12   Q    Were you able to find publicly-available information on

13   the royalty revenues received by ARM Holdings?

14   A    Yes.  In their annual report ARM does report both the

15   royalty and license fee revenues for their licensing of their

16   chip design tools.

17   Q    Would you turn, please, to Exhibit 1190.  And is this the

18   ARM Holdings annual report for 2011?

19   A    Yes, it is.

20        MR. PRITIKIN:  Microsoft moves the admission, Your

21   Honor.

22        MR. BATCHELDER:  No objection.

23        THE COURT:  It is admitted.

24        (Exhibit No. 1190 was admitted into evidence.)

25   Q    From the information in this annual report, were you able

1   to calculate the royalties received by ARM Holdings in 2011

2   on a per-unit basis?

3   A   Yes, because that is exactly the way that you can report

4   that from the data they provide on aggregate terms.  On

5   average, in this year, ARM was charging between $0.05 and

6   $0.06 per unit.  I'm sorry, about $0.05 for the royalty

7   component, and about another $0.04 for the license fee.  So

8   in a range between $0.05 and $0.09 per chip.

9   Q   Now, if you applied the one percent royalty ceiling or

10  benchmark Ms. Ochs referred to, and you apply that to the $3

11  to $4 WiFi chip sold by Marvell to Microsoft, what range of

12  royalties does that give you?

13  A   That would give you $0.03 to $0.04, of course.

14  Q   How does all of this bear on your analysis as to what a

15  RAND royalty would be for the Motorola 802.11 patents?

16  A   This to me provides further corroboration that the range

17  of $0.05 to $0.06 would be an upper limit of what a

18  RAND-compliant royalty rate would be.

19  Q   Have you prepared a demonstrative that summarizes your

20  conclusions regarding the level of royalties that would be

21  RAND for Motorola's 802.11 portfolio?

22  A   Yes, I have.

23  Q   Let's take a look at Exhibit 4080.  And is this such a

24  demonstrative?

25  A   It is.

1    Q    Would you explain what you have put down here?

2    A    Briefly, to recapitulate, in my view the RAND-compliant

3    royalty for rights to Motorola's 802.11 patents would be no

4    more than approximately $0.05 to $0.06 per unit.  And that is

5    based on the best available comparable of a multilateral

6    ex ante negotiation from the Via pool arrangement.  And I

7    further corroborated the reasonableness of that by looking at

8    the ARM Holdings license for critical IP in designing a chip.

9    And also looking at a royalty rate applied to the value of

10   the smallest saleable unit, that is a chip.

11   Q    And the ARM Holdings gets you to $0.05 to $0.09 per unit?

12   A    Yes, between $0.05 and $0.09 depending on whether or not

13   you include the license fee.

14   Q    And Motorola's two-and-a-quarter percent applied to the

15   smallest available unit is between $0.07 and $0.09?

16   A    That's correct.

17   Q    So let's turn to another source of corroboration.  Did you

18   consider evidence of Motorola's own internal assessments of

19   the royalties it could receive for licensing its 802.11

20   patents?

21   A    Yes.  That was one other piece of corroborative evidence I

22   had available to me.

23   Q    Would you turn to Exhibit 6, please?

24   A    (Witness complies.)

25   Q    And is this a Motorola stamp-board presentation regarding

1    802.11 licensing?

2    A   This is the same stamp board we saw before, internal

3    Motorola licensing organization.

4    Q   A stamp board, is it your understanding that is the board

5    that signs off on these licenses at Motorola?

6    A   I don't know in detail its responsibilities, but generally

7    I understand that's the area.

8           MR. PRITIKIN:  Microsoft moves admission of

9    Exhibit 6.

10          MR. BATCHELDER:  No objection.

11          THE COURT:  If 6 has not previously been admitted it

12   is admitted now.

13          (Exhibit No. 6 was admitted into evidence.)

14   Q   When was this analysis done?

15   A   At least this document was dated September 18, 2003.

16   Q   Was that around the time that WiFi was beginning to take

17   off?

18   A   Yes, indeed.  I think that's the general consensus.

19   2002/2003 it was really taking off.

20   Q   Let's turn to the page with the last three digits, 738.

21   You understand this to be a valuation summary for the PC

22   segment?

23   A   Yes.  As I read the document this is an estimate of what

24   really the lifetime royalties Motorola was hoping it might

25   get from licensing this technology to PC OEMs.

1    Q    If you look down in the lower right corner, what is the

2    royalty rate that Motorola hoped to get from laptop computer

3    makers for a license to its 802.11 patents?

4    A    This model, it was based on an assumption of obtaining as

5    much as one-tenth of one percent of the sales value.

6    Q    That would be of the end-sales price?

7    A    That would be of the end-sales price.

8    Q    Do you have an understanding, from your review of the work

9    papers, how Motorola came up with that assumption?

10   A    Well, the work papers also include an external analysis

11   from the consultancy, which apparently Motorola retained.

12   Q    Who did they retain to help them with this?

13   A    They retained a company called InteCap.

14   Q    Can you tell us a little bit about InteCap?  What is it?

15   A    InteCap has been acquired by CRA, but it was an

16   independent consultancy that specialized in looking at and

17   valuing patent portfolios.  They, in particular, to my

18   personal knowledge, they were involved in evaluating patent

19   portfolios for the purpose of monetization, for maximizing

20   the royalty income that could be obtained.

21   Q    Let's look at Exhibits 65 and 66.  And are these the

22   InteCap documents that supported the consideration we looked

23   at before?

24   A    Well, it would appear to me, because of the InteCap

25   heading, that at least part of this was initially an InteCap

1    evaluation.

2            MR. PRITIKIN:  Microsoft moves admission of

3    Exhibit 65 and 66.

4            MR. BATCHELDER:  No objection.

5            THE COURT:  They are admitted and may be published.

6        (Exhibit Nos. 65 and 66 were admitted into evidence.)

7    Q   Let's start with Exhibit 65 and take a closer look at

8    that.  Now, did InteCap advise Motorola that it needed to

9    consider the risk of royalty stacking in connection with

10   802.11?

11   A   Yes, this document does discuss the need to consider

12   stacking, and it actually involves an adjustment for

13   stacking.

14   Q   Let's turn to the page with the last three digits, 289.

15   And I'll direct your attention to the top.  There's a

16   discussion of competing 802.11 IP.  What do you understand

17   that to be?

18   A   My understanding is, is that was InteCap putting out that

19   there were at least 50 other companies who had declared

20   essential patents in the 802.11 area, actually there are 90

21   by now, and that this royalty stacking issue had to be

22   addressed and recognized in consideration of a royalty.

23   Q   Now, when thinking about the problem of stacking more

24   generally, to what extent is it necessary to take into

25   account that products, like laptops or the Xbox, need to

1    comply with standards other than just 802.11?

2    A    Well, the stacking problem exists within a standard,

3    certainly when there are as many as 90 contributors to the

4    technology.  But when thinking about certainly downstream

5    licensing, it's very important to think about stacking when

6    you have a number of standards.  I understand that the

7    typical PC has as many as 80 or 90 different formal

8    standards, at least a couple hundred informal standards,

9    interoperability standards.  So that would need to be taken

10   into account.

11   Q    Have you seen any indication that Motorola actually used

12   InteCap's analysis in its business planning activities?

13   A    Well, I'm aware of at least one communication where a

14   proposed rate structure such as this was discussed by

15   Motorola personnel in terms of a proposal to an OEM.

16   Q    Would you turn to Exhibit 67?  What do you understand this

17   to be?

18   A    I understand this to be an e-mail from a Motorola person

19   Mr. Curtis Dave, about a proposed licensing arrangement for

20   802.11.  And as you can see, what he is proposing,

21   Mr. Curtis, is a final royalty that would be one-tenth of one

22   percent of their price.

23            MR. PRITIKIN:  Microsoft moves admission of

24   Exhibit 67.

25            MR. BATCHELDER:  No objection.

1      THE COURT:  67 is admitted.

2      (Exhibit No. 67 was admitted into evidence.)

3   Q   Let me ask you a couple of questions about what InteCap

4   did to adjust for royalty stacking.  What adjustment to the

5   aggregate royalty for all 802.11 IP did InteCap make for

6   stacking?

7   A   They applied an adjustment factor of 25 percent.

8   Q   And did this imply that Motorola held a quarter of the

9   patents essential to 802.11?

10  A   It did imply that Motorola would be entitled to 25 percent

11  of all the value of the entire standard.

12  Q   And what's your reaction to that?

13  A   I think that would be gravely exaggerated of the likely

14  extent and importance of the Motorola patent portfolio in the

15  standard.

16  Q   Do you believe that the .1 percent is too high?

17  A   Yes, both in form and level.

18  Q   Do you have an understanding whether when InteCap did this

19  analysis back in 2003, it reflected the fact that Motorola

20  had made RAND commitments?

21  A   My understanding is this was not put forward with any

22  specific adjustment or contemplation of meeting a RAND

23  commitment.

24  Q   Now, one of Motorola's experts has said that the InteCap

25  royalty rates are too low because 802.11 has become more

1   widely used over the years.  What is your reaction to that?

2   A   My reaction to that is that that means that there is more

3   and more danger of hold-up value.  As the value of the

4   standard becomes greater, there's a greater and greater

5   danger that an ex post facto negotiated license will include

6   more and more hold-up, especially if it's negotiated

7   downstream closer and closer to the consumer at a fixed

8   percentage of higher and higher end-product values.

9   Q   Now, have you been present in the courtroom and heard

10  testimony about how H.264 and 802.11 are becoming

11  increasingly important for consumer products?

12  A   I have.

13  Q   What implications does that have for hold-up?

14  A   Well, once again, that exacerbates the potential problem

15  for hold-up, because ex post facto, that is after the fact,

16  that the standards have been promulgated and agreed upon by

17  many parties, and major investments have been made by many

18  other parties in terms of implementing the standards, so that

19  they become very widespread and universally expected by the

20  consuming public, then an essential patent becomes, even one

21  essential patent becomes, like Dr. Teece an expert for

22  Motorola in other similar actions put forward, like a bullet.

23  And you only need one bullet to kill.

24  Q   How many essential patents does it take to hold someone

25  up?

1    A    Just one.

2         MR. PRITIKIN:  I have no further questions, Your

3    Honor.

4         THE COURT:  Counsel, I can only say the Dr. Seuss

5    character that is the defender of the trees, it's a good

6    thing that's fictional, otherwise they'd be very angry at

7    you.

8         MR. BATCHELDER:  I apologize to the Lorax.

9         THE COURT:  You may proceed, counsel.

10                        CROSS EXAMINATION

11   BY MR. BATCHELDER:

12   Q    Dr. Lynde, you should have three binders.  Do you have a

13   velo-bind that has your deposition transcript?

14   A    Yes, I do.

15   Q    And you should have a smaller binder that has trial

16   exhibits, and a larger binder with expert reports and a few

17   other things.  Do you have those three?

18   A    Seems I do.

19   Q    Thank you, sir.  Let's begin by talking about what you are

20   and are not an expert in.  You are not an expert in

21   standards-setting organizations, correct?

22   A    No.

23   Q    You have no direct experience with standards-setting

24   organizations?

25   A    I do not.

1    Q    How many times have you testified in litigation?

2    A    Um, at deposition as well as trial, two or three dozen

3    times, I guess.

4    Q    But other than this litigation you've never once testified

5    on the subject of standards-setting organizations, correct?

6    A    Not specifically on the subject of SSOs, no.

7    Q    Other than this litigation, you've never written on that

8    subject, correct?

9    A    That's correct.

10   Q    Let's talk about patent pools.  You've never advised a

11   client on the subject of patent pools, have you, sir?

12   A    Not specifically, no.

13   Q    You've never written any economic literature on the

14   subject of patent pools, correct?

15   A    No.

16   Q    And you've never been invited to give a talk on that

17   subject, correct?

18   A    No.

19   Q    You also addressed RAND in your direct testimony, didn't

20   you?

21   A    Yes.

22   Q    You've never negotiated a RAND license, have you?

23   A    I have not.

24   Q    In fact, you've never negotiated any patent license, have

25   you, sir?

1  A    Well, I'm not a lawyer, I'm an economist.

2  Q    The answer is you have not?

3  A    I have not.  Although I've advised lawyers who are

4  negotiating contracts.

5  Q    Let's talk about that.  Of your hundreds of client

6  consultations, you provided consulting services in connection

7  with a grand total of six or seven licenses, correct?

8  A    I think that's approximately right.

9  Q    And not one of them involved a standard essential patent,

10  correct?

11  A    Not to the best of my recollection, no.

12  Q    Now, when you were formulating your opinions in this

13  matter, you never discussed with Microsoft whether its

14  experience with RAND licensing are consistent with the

15  opinions that you're rendering in this matter, fair?

16  A    I did not.

17  Q    Can we put up 2970, please?  You've seen this letter

18  before, haven't you, sir?

19  A    Yes, I have.

20  Q    This is a 17-page letter on standards setting and RAND

21  issues sent by Microsoft to the FTC in June of 2011, correct?

22  A    Yes, that's my understanding.

23  Q    If you turn to the final page you'll see it lists two

24  Microsoft representatives, there's a David Heiner, who is

25  Microsoft's vice president and deputy general counsel; and

1    then there is Amy Marasco, Microsoft's general manager of

2    standards strategy and policy, correct?

3    A    I do see that, yes.

4    Q    Now, in formulating your opinions in this matter, you did

5    not speak with Mr. Heiner or Ms. Marasco, correct?

6    A    No, I did not.

7    Q    In fact, you didn't even know of their existence or even

8    the existence of this Microsoft FTC letter when you

9    formulated your opinions, correct?

10   A    Um, that's correct, I hadn't personally reviewed it at

11   that time.

12   Q    I'd like to take a look at what Microsoft told the FTC in

13   this letter about patent hold-up.  But before I do I want to

14   put it in the context of timing.  This letter was sent to the

15   FTC in June 2011, and that was seven months after Microsoft

16   filed this lawsuit; isn't that right?

17   A    I don't know the full sequence of this lawsuit, but I take

18   that as a given.

19   Q    You take my word for it?

20   A    Sure.

21   Q    Thanks.

22        Keeping that in mind, let's turn to page 16, the third

23   bullet, and you'll see it begins with a sentence, "There is

24   little evidence that patent hold-up in the standard context

25   is a real problem."  You see that, correct, sir?

1   A   Yes, I do.

2   Q   I want the record to be very clear on this point.  You

3   have no basis to disagree with that statement, because you

4   have no basis, from economic evidence, to conclude whether or

5   not patent hold-up is a real problem, true?

6   A   Well, like Professor Simcoe and Professor Murphy, I am

7   familiar with the economic literature and the writings on

8   this as a policy matter, and the potential for this to be a

9   very grave problem, indeed.

10  Q   Could we put up, please, in Dr. Lynde's deposition, page

11  137, line 23, through 138, line 9.

12       I asked you in your deposition about this very passage,

13  starting on line 23:

14       "Question.  The third bullet point on page 16 of

15  Exhibit 5" -- which is the FTC letter, begins with this

16  sentence --

17       MR. PRITIKIN:  Excuse me, could we get a copy of the

18  deposition?

19  Q   "Question:  The third bullet point on page 16 of Exhibit 5

20  begins with this sentence.  'There is little evidence that

21  patent hold-up in the standards context is a real problem.'

22  Do you see that?

23       "Answer:  I do.

24       "Question:  Do you agree?

25       "Answer:  I have no basis from economic evidence to

1    conclude whether or not patent hold-up is a real problem.

2    But I have no basis to disagree with the statement as

3    Microsoft has put forward."

4         Have I read correctly, sir?

5    A   Yes, that's right.

6    Q   If we could turn to page 2 of the same document,

7    Exhibit 2970, the last bullet point there.  I'd like to

8    invite your attention to the first two sentences "Concerns

9    about patent hold-up should not extend to any bilateral

10   business disagreement between two companies regarding

11   proposed licensing terms.  These discussions typically

12   pertain to a broader set of questions than just the proposed

13   licensing terms for essential patent claims reading on a

14   standard."  Do you see that, sir?

15   A   Yes, I do.

16   Q   You don't have any particular basis to disagree with that

17   statement either, do you?

18   A   Well, that's simply Microsoft's view about bilateral

19   negotiations.

20   Q   My question is, you don't have any particular basis to

21   disagree with that view, do you?

22   A   I don't know why I would, that's their view as expressed

23   in this letter.

24   Q   Thank you, sir.

25        If you could turn to page 14 in the same document,

1    second paragraph.  You see at the top it refers to, if a

2    patentholder makes a disclosure about its essential patent

3    claims, then the last sentence says, "Any negotiations

4    typically are conducted bilaterally and outside the SSO."  Do

5    you see that?

6    A    Yes, I do.

7    Q    You agree with that statement too, don't you?

8    A    Well, that is, as the letter states, pursuant to the

9    specific circumstances of Microsoft, I presume.

10   Q    You agree that such negotiations are conducted bilaterally

11   and outside the SSO, typically?

12   A    I don't know what "such," refers to.  Many people license

13   through the pool, that's an efficient way to proceed.  Other

14   negotiations are bilateral.

15   Q    Sir, you agree that negotiations over SEP licensing are

16   typically conducted bilaterally, true?

17   A    I don't have any basis to quantify one way or the other.

18   But economists know it's very efficient to have efficient

19   contracting through a pool.  That saves a lot of bilateral

20   negotiating costs.

21   Q    Let's pull up Dr. Lynde's deposition, page 136, lines 10

22   through 17.  Directing your attention to that same passage we

23   were just looking at and the FTC letter.

24          "Question:  The final sentence of that paragraph says

25   any negotiations typically are conducted bilaterally and

1    outside the SSO.  Do you see that?

2         "Answer:  I do.

3         "Question:  Do you agree with that?

4         "Answer:  That's -- in my experience, that's generally

5    correct."  Have I read correctly, sir?

6    A    Yes, that's true, in my experience.

7    Q    A RAND SEP license can result from an ex post bilateral

8    negotiation, can't it, sir?

9    A    It might, yes.

10   Q    And, in fact, you agree that RAND license terms are

11   typically arrived at through bilateral negotiations, correct?

12   A    Assuming that the RAND commitment is binding, that is

13   possible.

14   Q    My question, sir, is do you agree that RAND license terms

15   are typically arrived at through bilateral negotiations?

16   A    Parties that have bilateral negotiations and reach an

17   agreement for SEPs, reach an agreement sometimes on

18   RAND-compliant rates.

19   Q    When you formulated your opinions in this matter, there

20   was no Motorola license involving its 802.11 or H.264

21   patents, as to which you had any specific evidence that

22   hold-up was involved, correct?

23   A    Um, well, yes, that's correct.  Because it's a very

24   fact-intensive investigation.

25   Q    And that's an investigation you did not undertake?

1   A    Well, I did undertake it for the circumstances of this

2   case with respect to two standards in the Motorola patent

3   portfolios.

4   Q    Just so the record is clear, sir, when you formulated your

5   opinions, there was no Motorola license involving its 802.11

6   or H.264 patents, that you had any specific evidence that

7   hold-up was involved, correct?

8   A    Of specific license agreements, no.  I was analyzing the

9   proposal.

10  Q    Let's move on to the subject of royalty stacking.  The

11  economic analysis of royalty stacking is a subject in the

12  professional literature that you're familiar with and

13  consider yourself an expert in, true?

14  A    Yes.

15  Q    And the WiFi 802.11 industry is about 13 years old,

16  correct?

17  A    Approximately.

18  Q    All right.  Now, when you were deposed in this matter just

19  a few months ago, and all that time in the WiFi industry in

20  the aggregate, royalty stacking had never been a problem,

21  right?

22  A    Well, there's some debate in the professional literature

23  about whether it is or how much potential problem it could

24  be.  There are a vast number of claimed essential patents out

25  there.  Nobody knows the number.  And for the moment, as

1   Professor Murphy pointed out, for almost all those, the

2   current royalty is zero.  It's royalty free.  There is

3   forbearance.  But that doesn't mean this could not be a very

4   significant policy problem currently, and in the future.

5   Q   Will you pull up Dr. Lynde's deposition, page 211, lines

6   11 through 23.

7        "Question:  Is royalty stacking a problem for the WiFi

8   industry?

9        "Answer:  Once again, I'm not aware of economic

10  literature analyzing the difficulties presented by stacking.

11  What I am aware of is that there are a large number of 802.11

12  related patents, many of which have not been asserted or

13  licensed, but are effectively not earning any royalty, and

14  that the 802.11 standard has been very widely implemented

15  around the world.  So by that criteria, in the aggregate, it

16  has not been a problem."  Did I read correctly, sir?

17  A   I think that's what I just said.

18  Q   Did I read correctly?

19  A   You did.

20  Q   Thank you.  Turning to H.264, that industry is more than

21  nine years old, correct?

22  A   Approximately.

23  Q   And in the H.264 industry, when you were deposed in this

24  matter, you were not aware of any literature to the effect

25  that implementers of the H.264 standard are suffering from a

1   stacking problem, correct?

2   A   Well, largely thanks to the pool.  It's a very successful

3   pool.

4   Q   Is that a yes, sir?

5          THE COURT:  Don't interrupt, counsel.

6          MR. BATCHELDER:  I apologize.  I didn't mean to

7   interrupt.  I thought you were done.

8   A   Yes, I'm not aware of professional literature reviewing an

9   assessment of any problem in that area.  It's a very

10  successful pool.  Those outside the pool, for the most part,

11  have forborne from charging royalties.

12  Q   There is no literature that you know of to the effect that

13  implementers of the H.264 standard are suffering from a

14  stacking problem, correct?

15  A   As I said, I'm not aware of any such literature right now.

16  Q   And let's move on to the subject of patent pools.  Can we

17  put up 3013, please?

18          Now, this is an article entitled, "The Complements

19  Problem Within Standard Setting:  Assessing the Evidence on

20  Royalty Stacking."  And the lead author is Damien Geradin.

21  You've seen this before, haven't you, sir?

22  A   Yes.

23  Q   And you've considered it?

24  A   Yes.

25  Q   Could we turn to page 167, please.  And the first

1    paragraph, and if I could read starting with that second

2    sentence there.  "Under a pool, owners of patents deemed

3    essential to a standard, opt to form a joint license in order

4    to bundle at least some subset of the essential IPRs into a

5    single package.  The participating firms agree on an

6    aggregate royalty rate for the package, and on a method of

7    dividing the royalty earnings amongst themselves.  As part of

8    the arrangement, members often get a discounted cross-license

9    to one another's patents."  You see that, sir?

10   A   I do.

11   Q   And you have no basis to disagree with that statement that

12   I just read to you?

13   A   I have no basis.  I am not aware of any particular

14   instances of discounted cross-licensing, though.

15   Q   Particularly you have no basis to disagree that pool

16   members often get a discounted cross-license to one another's

17   patents, correct?

18   A   I have no knowledge of that particular assertion.

19           MR. BATCHELDER:  Motorola offers 3013.

20           MR. PRITIKIN:  No objection.

21           THE COURT:  It is entered.

22           (Exhibit No. 3013 was admitted into evidence.)

23           MR. BATCHELDER:  I also need to offer 2970, the FTC

24   letter.

25           MR. PRITIKIN:  No objection.

1    THE COURT:  It is admitted.

2        (Exhibit No. 2970 was admitted into evidence.)

3    Q    Both the MPEG LA and Via patent pools divide royalties

4    based upon a patent-counting approach?

5    A    Basically it's a little more refined, but that's the basic

6    idea.

7    Q    Neither the MPEG LA pool nor the Via pool does anything to

8    assess the relative value of given participant's SEP

9    contributions, correct?

10   A    Well, that's correct, and for a very good reason.  This

11   whole dispute shows how difficult it would be if the parties

12   started squabbling about, you know, "My patents are better

13   than your patent," and the like.  And the whole point of

14   these standards is just to agree on a standard.  That's the

15   point, rather than arguing about relative values.  To the

16   extent that there are any relative value differences, they

17   are assumed to be reasonably dealt with.  And this is what we

18   observe empirically.  This is not made up out of theory.

19   Empirically, what do parties do in these pools?  They say,

20   let's not disagree about relative values, let's distribute on

21   the basic patent-count method, without all the huge

22   transactions costs of disputing over relative value.

23   Q    Is that a yes?

24   A    Yes, sir.

25   Q    So one patent in the pool could be critical to a core

1  feature of the standard and it could be a feature that most

2  standard-compliant products use and rely on heavily.  And

3  another patent could be directed to a feature that's

4  tangential or optional and rarely ever used, and in the pool

5  both would get the identical royalty rate, correct?

6  A   In the aggregate and on the average that's the way these

7  pools have come together and have formed an agreement.

8  That's what we simply observe empirically from the parties

9  that know the relative values and the meaning of that best.

10  Q   Is that a yes, sir?

11  A   Yes.

12  Q   In this case Motorola is not relying on patent pools as

13  comparables, but you are, correct?

14  A   In terms of assessing what a RAND-compliant rate would be?

15  Q   As a comparable, yes.

16  A   Well, yes.

17  Q   And you have not evaluated whether the average value of

18  Motorola's 802.11 SEPs is higher or lower than the average

19  value of the Via 802.11 patents, have you, sir?

20  A   I have not, to the extent that there is technical

21  testimony from technical experts about whether there are

22  easily available ex ante alternatives, that would bear on the

23  economic question of value.  But I have not made any

24  technical assessment, knowing that the parties aren't

25  contesting those issues.

1    Q    You have also not evaluated whether the average value of

2    Motorola's H.264 SEPs is higher or lower than the average

3    value of the MPEG LA patents?

4    A    I have not, nor is it necessary if one relies on the

5    real-world multilateral negotiation, the parties most

6    knowledgeable, who entered freely into a multilateral

7    negotiation, and agreed upon a structure, which went on a

8    patent-count allocation method.

9    Q    You didn't do that analysis, right, sir?

10   A    As I said, it was not necessary.

11   Q    Patent-counting pools are sometimes referred to as

12   numeric-proportional pools, correct?

13   A    Sometimes, yes.

14   Q    If I could have 1036, please.

15        And this is a paper, with the cute name "To Join Or Not

16   to Join.  Examining Patent Pool Participation and Rent

17   Sharing Rules."  Principal author Anne Layne Farrar, correct?

18   A    Yes.  One of the authors of the previous papers as well.

19   Q    You've seen this before, haven't you?

20   A    Yes, I have.

21   Q    If we could turn to page 295, it's also the Bates number

22   ending in 92902.  If we could pull up line 7.  This paper

23   says that, "Firms with higher value patent portfolios are

24   less likely to join a numeric proportional pool."  Do you see

25   that, sir?

1    A    Yes, I do.

2    Q    And you agree with that statement, don't you?

3    A    As an economic analysis, that's a possibility, yes.

4    Q    So the stronger my patents, the less likely I am to join

5    the pool.

6            THE COURT:  Counsel, someone has got their cell phone

7    close to a microphone.

8    Q    The stronger my patents, the less likely I am to join a

9    pool?

10   A    Well, not necessarily.  We see a lot of blue-chip patents

11   joining the H.264 pool, because there are many other reasons

12   to join the pool, apart from just exploitation through

13   maximizing royalties.

14       And so there's a balance that needs to be considered in

15   that regard.

16   Q    My question wasn't about what is necessary, sir, my

17   question is about likelihood.  And the stronger my patents

18   the less likely I am to join a pool, right?

19   A    Well, everything else equal, from a matter of economic

20   theory, yes.  But the empirical observation is that a very

21   large number of blue-chip companies contributed major

22   patents, 2,500 patents to the H.264 pool, for example.

23   Q    We'll get to that in a minute, and we'll get to who

24   decided not to join.  You agree, though, that the

25   patent-counting method favors parties that have large numbers

1    of low-value patents, correct?

2    A   Well, not necessarily.  But everything else equal, as a

3    point of economic analysis, that might be possible.

4    Q   All right.  Let's talk about transaction costs.  The

5    bilateral negotiation can take a long time and be expensive,

6    correct?

7    A   Indeed they can.

8    Q   Often involve many months, even sometimes multiple years,

9    correct?

10   A   That's my general understanding.

11   Q   And you agree that royalty rates can be set lower in

12   patent pools because of the reduced transaction costs,

13   correct?

14   A   A more efficient process could certainly benefit all

15   parties, both providers of technology and users of

16   technology.  That's one reasons economists feel so strongly

17   that pools are pro-competitive and benefit the public.

18   Q   Coming back to my question, sir, you agree royalty rates

19   can be set lower in patent pools because of the reduced

20   transaction costs, correct?

21   A   Might be lower, it depends.  But it might be lower, it

22   depends, but it might be lower if there are reduced

23   transaction costs.  All parties can win in that situation.

24   Q   Can we see Dr. Lynde's deposition page 166, lines 10

25   through 14.

1     "Question:  Do you agree that royalty rates can be set

2  lower in patent pools because of the reduced transaction

3  costs?

4     "Answer:  Other thing equal, that could result because

5  the transaction costs have been saved."  Have I read

6  correctly, sir?

7  A   I hope I said "other things equal" but what you read was

8  correct and that's what I just said also.

9  Q   I'm going to read you a statement, sir.  "Some firms

10  become patent pool licensors because they place a higher

11  value on ease of licensing than on maximizing licensing

12  revenue."  And you agree with that statement?

13  A   That's certainly possible.

14  Q   The better established a company's licensing program, the

15  less likely it is to join a pool, correct?

16  A   I have no basis to know whether or not that's true.

17  Q   Certainly an economic possibility, isn't it, sir?

18  A   Many things are.

19  Q   Including that one, sir?

20  A   It's economically possible, yes.

21  Q   There's nothing un-RAND about securing, in a

22  bilaterally-negotiated license agreement, the transaction

23  costs incurred in connection with those negotiations, true?

24  A   If it's just with respect to the transactions cost, no, as

25  long as the bargain that is reached is compliant with the

1   licensor's RAND promise.

2   Q    Sir, doesn't that mean that that fact alone biases your

3   analysis?  Because you're imposing a royalty rate from a very

4   low transaction cost in patent pools on to a bilateral

5   negotiation that has a higher transaction cost.  That's an

6   apples to oranges biased comparison.

7   A    No, I don't think so.  Because the transactions

8   cost-benefit could be equally shared between the licensor and

9   the licensee.  As I said, all parties would gain from lower

10  transactions costs.

11  Q    That's not the question.  You're imposing a royalty rate

12  from a low-transaction cost environment on to a different

13  environment, a bilateral environment between Motorola and

14  Microsoft, and that has high transaction costs, correct?

15  A    Yes.  Then the question comes under the RAND obligation,

16  whose burden is it to pay that transaction cost?  It could be

17  both parties.

18  Q    Yes or no, sir.  Is maximizing profits contrary to RAND?

19  A    Well, maximizing profits for an economist always involves

20  the constraints of technology and the law, and promises.  So

21  maximizing profit under the constraints of the law and of

22  promise is consistent with economic theory.

23  Q    Sir, are you unable to answer that question yes or no?

24  A    I thought I answered it accurately.

25  Q    Let me see Dr. Lynde's deposition, please, page 150 lines

1    10 through 12.

2            "Question:  Is maximizing profits contrary to RAND?

3            "Answer:  No."  Have I read correctly, sir?

4    A    Yes.  And that's what I just said.

5    Q    Let's talk about, and I mentioned a moment ago I would, a

6    few examples of companies that decided not to join the

7    MPEG LA patent pool.  Motorola, IBM, and Nokia, among others,

8    all chose not to join MPEG LA pool, correct?

9    A    That's my understanding, yes.

10   Q    Even though each of those entities has a significant

11   portfolio of H.264 essential patents, correct?

12   A    Well, they're blanket disclosures, but probably fair to

13   say they have large portfolios.

14   Q    It's fair to say they have significant portfolios,

15   correct, sir?

16   A    Nobody knows, but I would agree that's likely to be the

17   case.

18   Q    Could we put up Dr. Lynde's deposition, page 158, lines 5

19   through 10.

20           "Question:  Motorola didn't join.  IBM didn't join.

21   Nokia didn't join.  Correct?

22           "Answer:  That's my understanding.

23           "Question:  Each of those entities has a significant

24   portfolio of H.264 essential patents, correct?

25           "Answer:  That's also my understanding."  Correct, sir?

1    A    But isn't that what I just said?

2    Q    That is your understanding.  You just said nobody knows.

3    But it is your understanding that each of those entities,

4    including Motorola, has a significant H.264 patent portfolio,

5    correct?

6    A    That's my understanding.

7    Q    Thank you.  Now, they shouldn't be forced to join the

8    MPEG LA pool, those three entities, should they?

9    A    No one should be forced to join a pool, no.

10   Q    There's nothing wrong with those entities choosing to

11   license their SEPs outside the pool, correct?

12   A    No, nothing wrong, as long as they comply with the RAND

13   obligations.

14   Q    Let's focus on IBM and Nokia for a moment.  In formulating

15   your opinions in this matter, you didn't uncover any evidence

16   that any of the licensees who have licensed H.264 patents

17   from IBM or Nokia, have complained that those licenses are

18   non-RAND or the subject of hold-up or stacking, correct.

19   A    I'm not aware of any evidence that there are any such

20   licenses, let alone that they aren't royalty-free.

21   Q    You just don't know one way or the other?

22   A    I'm not aware, no.

23   Q    You didn't look?

24   A    Well, I know that Microsoft does not have any licenses to

25   any of the other ones that are outside the pool, and the only

1    issue right now is with Motorola.

2    Q    Beyond that did you look into Nokia or IBM, sir?

3    A    Well, their licenses are not in evidence.  All I know is

4    that it's not a problem for Microsoft.

5    Q    Let's move to the 802.11 pools, sir.  Speaking of

6    Microsoft, Microsoft itself chose not to join that pool,

7    correct?

8    A    For the Via licensing?  Yes, that's correct.

9    Q    I take it in formulating your opinions in this matter you

10   went to Microsoft and you asked, why.  Didn't you?

11   A    I don't recall doing that.

12   Q    So you never asked?

13   A    Not that I recall.

14   Q    And you don't have a reason for not asking, do you?

15   A    It wasn't necessary for my -- the method I was applying.

16   Q    Are you now saying you have a reason, sir?

17   A    It wasn't necessary.

18   Q    Can we put up Dr. Lynde's deposition, please, 155 lines,

19   19, through 156, 6.

20        "Question:  The Via pool does not include all 802.11

21   SEP owners, correct?

22        "Answer:  That's correct.

23        "Question:  Does not include Microsoft, correct?

24        "Answer:  Correct.

25        "Question:  Why didn't Microsoft join the Via pool?

1       "Answer:  I don't know.

2       "Question:  Have you asked?

3       "Answer:  I did not.

4       "Question:  Why not?

5       "Answer:  I did not ask.

6       "Question:  The question is, why didn't you ask?

7       "Answer:  I don't know."  Have I read correctly, sir?

8  A   You have.

9          MR. PRITIKIN:  I think we should read into the record

10  the next question and answer.

11     "If Microsoft had decided not to join the Via pool because

12  it believed the royalty rate associated with Via was below

13  what it should be, would that be relevant to you in your

14  opinions?

15     "Answer:  No, I don't believe so.  Because I was looking

16  for the best available evidence for a multilateral

17  negotiation, not with respect to any one party's view of how

18  the multilateral and hold-up problem was to be solved."

19  Q   Dr. Lynde, let's talk specifically about Microsoft's

20  reasons.  Can we put up 3194, please?  Have you seen this

21  document before?

22  A   I'm sorry, it's kind of hard to read on the screen here.

23  Q   Let's blow up the first passage, make it as large as you

24  need.  Can you read it now?

25  A   I can.  Thank you.

1    Q    Have you seen this before, sir?

2    A    I don't recall at the moment.

3    Q    I'm going to then ask you to make some assumptions in

4    connection with this document.  Let me start with the back

5    page, the signature block.  Read there, the name Peter

6    Derania, licensing business manager, Via Licensing

7    Corporation.  Do you see that?

8    A    Yes, I do.

9    Q    Let's go back up to the top to that first e-mail.  You'll

10   see it's from Peter Derania, correct?

11   A    Correct.

12   Q    And the first line it says, "I did discuss the 802.11

13   program with Paul Bawel yesterday."  Do you see that?

14   A    Yes, I do.

15   Q    You were here for Mr. Glanz's testimony when he explained

16   Paul Bawel had come to Microsoft by this time?

17   A    I did hear that he was a Microsoft employee for a period

18   of time, although apparently not currently.

19   Q    But he was a Microsoft employee as of this time, correct,

20   sir?

21   A    I don't know the exact timing of his employment.

22   Q    In the fourth line you'll see he says that Microsoft -- he

23   said that, "Microsoft prefers to enter into bilateral

24   discussions with the licensors individually.  And actually

25   before that he says, Paul's objections to taking a license

1  last year were the lack of licensees and critical mass of the

2  program.  He said that Microsoft prefers to enter into

3  bilateral discussions with the licensors individually."  Do

4  you see that?

5  A   With respect to that pool, which had relatively few

6  patents in it, I do understand that.

7  Q   And you don't have any reason to dispute that this was

8  Microsoft's reason for not joining the Via pool, do you?

9  A   I do not.  If that's one of the stated reasons, it makes

10 sense.

11 Q   All right.  Well assume that was the reason, sir.

12 Microsoft simply preferred bilateral negotiations over pool

13 licensing for 802.11.  Microsoft would have been perfectly

14 entitled to make that choice, correct?

15 A   Of course.

16 Q   And Motorola made the same choice, right?  Just like

17 Microsoft, it chose not to join the Via pool and instead to

18 negotiate its 802.11 patents bilaterally, correct?

19 A   Apparently, yes.

20 Q   All right.  Let's pull up 4080, which is one of the

21 demonstratives that you just presented.

22     MR. BATCHELDER:  Before we get there, Your Honor, I'm

23 told I need to offer in 1036, 3194 and 4080.

24     MR. PRITIKIN:  What was the second exhibit?

25     MR. BATCHELDER:  3194.  Strike the 4080, I think

1    that's just demonstrative.

2         MR. PRITIKIN:  We have no objection to 1036 or 3194.

3         THE COURT:  Then they are admitted.

4    (Exhibit Nos. 1036 and 3194 were admitted into evidence.)

5    Q   Dr. Lynde, just to demonstrate to the court that I did, in

6    fact, attend the court's technology tutorial, I've circled on

7    4080, the phrase "smallest saleable unit" from your graphic.

8    Do you see that there?

9    A   Yes, I do.  Well done.

10   Q   Thank you, sir.  Let's see if I can remove it at the end.

11   I take it you're referring there to the Marvell chip?

12   A   I am, indeed.

13   Q   Now, for a given patent claim, that term "smallest

14   saleable unit" refers to the smallest saleable unit that

15   alone practices every element of that patent claim, correct?

16   A   Well, sir, it sounds like a legal conclusion.  My general

17   economic understanding of smallest saleable unit is the item

18   is in commerce for which we can observe an arms-length

19   transaction for a component or part that embodies essentially

20   the functionality of the patent.

21   Q   I'm just going to repeat my question to make sure we have

22   a clear record as to whether or not you know the answer.  For

23   a given patent claim, the term smallest saleable unit refers

24   to the smallest saleable unit that alone practices every

25   element of that claim, correct?

1  A   Well, once again, sir, that sounds like you want me to

2  reach a legal conclusion, from what I take from your

3  precision of your legal language.  And I'm not offering a

4  legal opinion.

5  Q   Okay.  So you just don't know what the legal standard is,

6  is that fair?

7  A   Not as a lawyer.  I think I heard it earlier this week,

8  just as an economist.

9  Q   Using the Xbox as an example, for many of the patent

10 claims in Motorola's 802.11 portfolio, the Marvell chip alone

11 does not practice all elements of the claim, and instead

12 other components of the Xbox are needed to practice those

13 elements, correct?

14 A   I have no personal knowledge whether or not that's true.

15 Q   Didn't Dr. Williams explain that in his rebuttal expert

16 report that you read, sir?

17 A   I believe I recall that.  But once again, I have no

18 personal knowledge of that.

19 Q   So you just don't know?

20 A   It sounds to me like you're asking a very precise legal

21 question.  I'm only observing the economic problem of

22 apportionment.  And the Fed Circuit has clearly made that

23 view, if you look at the smallest saleable unit you're likely

24 to get closer to the value of the patent as opposed to the

25 EMVR problem, the Entire Market Value Rule problem, of

1   charging royalties on an entire collection of various

2   technologies, such as would be included in a PC.

3   Q   Just to make sure the record is clear, sir, you do or you

4   don't know one way or the other whether or not for many of

5   the patent claims in Motorola's 802.11 portfolio, the Marvell

6   chip alone does not practice all elements of the claim, and

7   instead other components of the Xbox are needed to practice

8   those elements?

9   A   I don't believe I have the expertise to offer an opinion

10  on that.

11  Q   And you heard Mr. Del Castillo testify yesterday?

12  A   Only in part.

13  Q   You left for part of his testimony?

14  A   I hate to say this, but I came in a little late.

15  Q   You're aware, though, I take it, that he testified

16  yesterday that Xbox software provides some of the Xbox's

17  802.11 functionality, correct?

18  A   I believe I did hear, at least part of that testimony,

19  yes.

20  Q   So, when you used this phrase "smallest saleable unit" in

21  your demonstrative, and in your testimony to His Honor, you

22  didn't mean to suggest that the Marvell chip was sufficient

23  to practice the 802.11 functionality in the Xbox, correct?

24  A   I did not mean to imply that.  My understanding from

25  Ms. Ochs' testimony is that that chip has full 802.11

1    functionality.  And I'm not aware of any other component that

2    has an arms-length price which could even approximate the

3    smallest saleable unit, which is what the economist is

4    looking for in terms of determining a component value.

5    Q    To be clear, you didn't mean to suggest that the chip

6    itself was sufficient to practice all the 802.11

7    functionality in the Xbox, did you, sir?

8    A    Gosh, sir, that seems like that same question has been

9    asked a bunch of times.  I'm not sure that I understand the

10   nuance of this latest version.  I'm not offering a legal

11   opinion about claims, or what's practiced, or for what part.

12   To an economist, it's obvious that chip is the smallest

13   saleable unit.

14   Q    Sir, as to any Microsoft product, the Xbox, the Surface,

15   anything, you don't mean to suggest to the court that the

16   chip alone is sufficient to practice all the 802.11

17   functionality in the product, correct?  Yes or no.

18   A    My understanding is that the chip does provide all

19   necessary 802.11 functionality.

20   Q    Even though Dr. Williams has rendered opinions in his

21   report to the contrary, and even though Mr. Del Castillo

22   testified yesterday that the Xbox software provides some of

23   the Xbox 802.11 functionality?

24   A    Once again, just from the testimony I've heard in terms of

25   smallest saleable unit, this is the only thing that could

1    reasonably be construed in that way, irrespective of what

2    these technical or legal differences might be.

3    Q    Look at that, I eliminated my circle.

4    A    Congratulations.

5    Q    I'm going to draw another one.  Let's move on to ARM.  You

6    refer there to ARM Holdings.  And I take it you're telling

7    His Honor that the ARM license agreement is a comparable that

8    he should rely on in this matter; is that correct?

9    A    No, I don't think I said that.  I said this was

10   corroborative information about what chip licensing maximums

11   could be.

12   Q    Is it a comparable, sir?

13   A    It is not a comparable to an ex ante multilateral

14   negotiation, that would be the pool rate indicated by the Via

15   arrangement.

16   Q    Now, this reference to ARM Holdings that I circled, it's

17   actually a reference to a publicly-available chip license,

18   correct?

19   A    That's correct.

20   Q    But you formulated your opinions about ARM, having never

21   seen the ARM license itself, correct?

22   A    Um, I don't think I've seen the ARM license itself.  I

23   don't manufacture application specific integrated circuits.

24   Q    In connection with your work on this case, you didn't

25   actually look at the ARM license itself, did you?

1    A    No, I did not.  I looked at the annual report where it is

2    possible to calculate what the average per-unit royalty

3    received from their arrangement is.

4    Q    You did not attach the ARM license agreement to your

5    expert report, did you?

6    A    I did not.

7    Q    It's not in evidence in this case, is it, sir?

8    A    I do not know.

9    Q    Did you ask that it be in evidence?

10   A    I did not.

11   Q    It's not on Microsoft's exhibit list, is it?

12   A    I do not know.

13   Q    Did you ask it be put on Microsoft's exhibit list?

14   A    I did not.

15   Q    In formulating your opinions in this matter, you did not

16   learn what specific restrictions the license imposes on the

17   use of ARM's patents, did you, sir?

18   A    I have not reviewed the agreement.  I'm sure it's a

19   lengthy one.

20   Q    And you did not learn what specific restrictions the

21   license imposes on the use of ARM's patents, did you?

22   A    I did not.

23   Q    In formulating your opinions in this matter, you did not

24   determine whether the ARM license would cover a licensee

25   making its own chip without using ARM's tools, did you?

1    A    I did not.

2    Q    And if the license is restricted to chips designed with

3    ARM's tools, then it would be less valuable than an

4    unrestricted patent license, possibly quite a bit less

5    valuable; is that correct?

6    A    I don't think I understand that question.  The whole

7    purpose is to use ARM's proprietary technologies to design

8    ASICs.

9    Q    I'm going to repeat it, sir, and see if you can get it.

10   If the license is restricted to chips designed with ARM

11   tools, then it would be less valuable than an unrestricted

12   patent license, possibly quite a bit less valuable; is that

13   fair?

14   A    No, I don't agree with that.

15   Q    Can we put up Dr. Lynde's deposition, page 236, line 13,

16   through 237, line 6.  Can you blow up 236 line 13, please?

17        "Question:  If I took a license to the ARM license that

18   you've seen described on the website, and I didn't use the

19   ARM tools to create a chip, but I made my own chip in my own

20   way, would my chip be licensed under the ARM patents?

21        "Answer:  I don't know.  If you didn't use the tools or

22   the reference design or anything else having to do with ARM,

23   I don't see how it would have a relationship to ARM.

24        "Question:  Wouldn't that make it a less valuable

25   license than a straight-up patent license that would allow me

1   to sell whatever chips might practice a given patent?

2        "Answer:  With respect to an unrestricted license to

3   the ARM patent portfolio, with respect to that comparison,

4   yes, it might be somewhat less valuable.

5        "Question:  Quite a bit less valuable, right?

6        "Answer:  Possibly."  Have I read correctly, sir?

7   A   Yes.

8   Q   And, sir --

9        MR. PRITIKIN:  I think we should read at least the

10  rest of the answer.

11  Q   All right.  "Possibly.  But the point of taking the

12  license from ARM is to design ASICs."  Have I read that

13  correctly, sir?

14  A   Yes.

15  Q   And the ARM license doesn't involve standard essential

16  patents, does it?

17  A   No, indeed, it's a proprietary standard.

18  Q   Let's turn briefly to InteCap.  When the InteCap study was

19  undertaken in 2003, there was significant near-term

20  uncertainty, as to the competitive landscape of the value

21  achieved, is that fair?

22  A   Well, earlier on in the implementation of the technology

23  that's generally true.

24  Q   Motorola has not relied on the InteCap study in any way

25  since the early 2000's, approximately the time frame that the

1   study was completed, correct?

2   A   I'm not aware of any evidence whether they have or not.

3   Q   One reason that Motorola has not relied in any way on the

4   InteCap study for the last nine years, is because the study

5   was based on projections, and those projections fell short of

6   reality, correct?

7   A   I believe there's some testimony to that effect.

8   Q   InteCap studied only five Motorola SEPs for 802.11,

9   correct, sir?

10  A   I believe that was their assumption in that analysis.

11  Q   It's not something you mentioned on your direct, is it?

12  A   I don't recall.

13  Q   The Motorola 802.11 portfolio here contains many more

14  patents, correct?

15  A   Yes, it does.

16  Q   There were 35 patents attached to Motorola's offer letter

17  here, correct?

18  A   I believe that's correct, yes.

19  Q   And it's true that only one of the 802.11 patents at issue

20  in this matter was considered by InteCap in 2003, correct?

21  A   I have not made that calculation.

22  Q   You don't dispute it, do you?

23  A   I do not have a basis to dispute it, no.

24  Q   That's not something you looked into when you were doing

25  your analysis?

1   A   I did not.

2   Q   In formulating your opinions, you did nothing to assess

3   the relative strength of the patents that InteCap considered,

4   as compared to the patents at issue in this litigation, owned

5   by Motorola, covering 802.11, correct?

6   A   I did not.  I did notice that there's only 11, and now 10,

7   being asserted against the Xbox, so it didn't strike me as a

8   huge difference.

9   Q   You're engaging in patent-counting again, sir, are you?

10  A   Well, in the absence of any particular information, of

11  particular value of interoperability patents, that's not an

12  unreasonable thing to do, and that's what we observe in the

13  real world in all kinds of these pool arrangements.

14  Q   And, sir, just to be clear, you did nothing to assess the

15  relative strength of the patents that InteCap considered, as

16  compared to the patents at issue in this litigation owned by

17  Motorola, correct?

18  A   I did not.

19  Q   You didn't even look for evidence reflecting that

20  comparative value, did you?

21  A   I'm not aware of any.

22  Q   Well, as an example, none of the five 802.11 patents

23  considered by InteCap in 2003 had been asserted in

24  litigation, correct?

25  A   I have no personal knowledge of that.

1  Q   You didn't look into that?

2  A   I did not.

3  Q   Two of the 802.11 patents in Motorola's current portfolio

4  have been successfully asserted in litigation, haven't they?

5  A   I do not know.

6  Q   You don't know about the two Symbol patents that were

7  found valid and infringed?

8  A   The Symbol patents, yes, I was aware of that.

9  Q   You were aware they were found valid and infringed?

10  A   Yes.

11  Q   And that the reasonable royalty rate in that case was

12  6 percent of the net selling price?

13  A   I'm aware of that, yes.

14  Q   Of those two patents?

15  A   I'm aware of that litigation.

16  Q   Neither of those two patents was in the Motorola portfolio

17  at the time of the 2003 InteCap study, over nine years ago,

18  correct, sir?

19  A   No.  They were acquired in the Symbol acquisition.

20  Q   And let's shift gears and talk about RAND rates and

21  ranges.  For a given set of SEPs, there is not a particular

22  dollars and cents amount that you believe is RAND, but rather

23  there's a range of rates that would be compliant with a RAND

24  obligation, right?

25  A   I think that's fair to say.

1   Q   And the appropriate range is within the same order of

2   magnitude as the point estimate, correct?

3   A   Well, in my view the method of using a benchmark of a

4   pool, because no pool is absolutely perfect, it involves some

5   range either up or down from the central values --

6           THE COURT:  Counsel, you used the phrase "point

7   range", I don't know what that is.

8   Q   Let me repeat my question, Your Honor, and make sure my

9   record is clear.  My question was, the appropriate range is

10  within the same order of magnitude as the point estimate?

11          THE COURT:  By "point estimate" you mean what?

12          MR. BATCHELDER:  If you pick out a given dollar and

13  cents estimate.

14  Q   Sir, let me repeat the question, so we have a clear

15  record.  The appropriate range is within the same order of

16  magnitude as the point estimate, correct?

17  A   Yes.  And what I meant, as I clarified, was that for

18  example, the range around two-tenths of a cent for a

19  RAND-compliant royalty for the H.264 standard patents would

20  be a couple of tenths of a cent above or below that.  And

21  similarly within the range of the five-cent indicated

22  RAND-compliant royalty for 802.11, it could be a few cents

23  above or below.

24  Q   That's assuming that your point estimate was the right

25  one, correct?

1    A   Well, given that my estimate indicates on a range like

2    that, I believe that's the correct indication of a

3    RAND-compliant range.

4    Q   You've been a patent damages exert many, many times,

5    correct?

6    A   A fairly large number of times, yes.

7    Q   And you agree that the assessment of RAND is not any

8    direct part of damages case law, correct?

9    A   I'm not aware in general patent damages case law of

10   particular cases that read on that.

11   Q   And you agree that, "The Entire Market Value Rule is part

12   of damages case law, and the assessment of RAND is not part

13   of any damages case law."  Correct?

14   A   Once again, I'm only speaking as an economist, not as a

15   lawyer.  But I'm typically asked to assess patent damages,

16   not in a RAND context, just what would be the amount to

17   compensate the patentholder for infringement.

18   Q   Is that a yes?

19   A   Maybe you could repeat the question.  I thought it was an

20   accurate response.

21   Q   I was asking whether you agree with this statement, sir.

22   "The Entire Market Value Rule is part of damages, patent

23   damages case law, and the assessment of RAND is not any

24   direct part of damages case law."

25   A   Once again, I'm not speaking as a lawyer, but the EMVR I'm

1    familiar with as a damages expert, at least, I've been asked

2    to make certain assumptions by attorneys, knowledgeable in

3    that area.  And with respect to RAND I'm not aware of

4    particular case law instructions about taking that RAND

5    obligation into account.

6    Q    True or false, sir.  A royalty rate can be RAND even if

7    not calculated pursuant to the Entire Market Value Rule?

8    A    It could be, sure.

9    Q    Now, in the real world it can be expensive to audit

10   compliance license agreements, correct?

11   A    In the real world, yes, it generally is.

12   Q    For both the licensor and licensee, correct?

13   A    Correct.

14   Q    And to reduce those costs, SEP licensing parties often

15   choose a royalty base that's relatively inexpensive to

16   measure, correct?

17   A    That can sometimes be a business consideration for that

18   choice, yes.

19   Q    And a per-unit royalty is sometimes chosen for that

20   reason, correct?

21   A    It is particularly simple, yes.

22   Q    And the SEP license is sometimes set for unit royalties,

23   even though the licensed patents may add significant value to

24   some units, but far less value to others, correct?

25   A    We observe empirically that unit pricing for complex

1    consumer electronics components is almost always the way it's

2    chosen to go.

3    Q    But that's a reasonable thing to do in the real world

4    because businesses need to deal with transaction costs,

5    correct?

6    A    That is part of the consideration, certainly.

7    Q    And it's reasonable even though the per-unit royalty

8    structure is not consistent with how a "reasonable royalty,"

9    would be calculated, using the apportionment requirements

10   with the Entire Market Value Rule of patent damages case law,

11   correct?

12   A    I'm sorry, sir.  Could you repeat that question?

13   Q    It's reasonable to use a per-unit royalty structure, even

14   though such a structure is not consistent with how a

15   reasonable royalty would be calculated using the

16   apportionment requirements with the Entire Market Value Rule

17   of patent damages case law, correct?

18   A    Would it be possible to structure a royalty that way even

19   if there were some other different determination of a

20   reasonable royalty rate, apart from transactions costs?  Am I

21   understanding you correctly?

22   Q    Let me withdraw the question and I'll move on.  The

23   per-unit royalty structure is reasonable, even though it

24   "Doesn't have anything to do with patent damages case law and

25   the Entire Market Value Rule."  Do you agree with that?

1    A    That's possible, yes.

2    Q    And your royalty rate calculation here, based on patent

3    pools, your calculated rate does not take into account the

4    extent to which Microsoft's products use Motorola's 802.11

5    and H.264 standard essential patents, correct?

6    A    Well, I'm simply observing what the contributors of

7    technology freely agreed to in the pool arrangements in terms

8    of the way they offered to license their property.  They

9    considered it to be fair and reasonable.  Google has deemed

10   it to be fair and reasonable.  That's what we observe in the

11   world, without anybody else's judgment.

12   Q    Is that a yes?

13   A    I think it was an accurate answer.

14   Q    I want to make sure we have a clear record, sir.  Your

15   royalty rate calculation here, based on patent pools, does

16   not take into account the extent to which Microsoft's

17   products use Motorola's 802.11 and H.264 standard essential

18   patents correct?

19   A    Not correct.

20   Q    If we could put up Dr. Lynde's deposition, page 83, line

21   18, through 84, line 5.

22        "Question:  Did you consider, in your analysis, the

23   extent to which Microsoft uses the 802.11 and H.264

24   technologies in its products?

25        "Answer:  As I believe I mentioned earlier, I was aware

1    from my discussions with at least the technical experts

2    retained by Microsoft, of which Microsoft products use the

3    Motorola -- used the standards that are in question here, and

4    which portion of those might have used the technologies

5    described in the Motorola patents.  But as I also said, I did

6    not use that as a particular component of my economic

7    conclusion about a RAND rate."  Have I read correctly, sir?

8    A    Yes, that's true.  That's correct.  And that's consistent

9    with what I've said.

10   Q    We were just talking about per-unit royalties.  But some

11   SEP licensing parties also use net selling price as a royalty

12   base, because that too is relatively inexpensive to audit,

13   correct?

14   A    It is more expensive to audit, but/for licensing complex

15   consumer devices, they're almost all per-unit royalties, as

16   far as I know, to avoid the danger of applying a royalty to

17   other components which have nothing to do with the patent, or

18   standard-related subject matter.

19   Q    Was your answer just now about pools?

20   A    No.

21   Q    Okay.  I just want to make sure I have a clear record on

22   this.  Licensing agreements often base the royalty on the

23   sales or profits of the licensed products, correct, sir?

24   A    In my experience for -- well, let me see if I understand

25   the context of your question.  Just generally, any license

1  for anything?

2  Q   Licensing generally.

3  A   Well, it depends entirely on the circumstances.  But if

4  it's a complex consumer device that has many components and

5  there is a danger of the royalty to be applied to subject

6  matter that has nothing to do with the patent in question,

7  that is not generally the way it's done, in my experience.

8  Q   Let's do it this way, sir.  Let me read you a quote from

9  the famous *Lucent* case.  You've read that case, *Lucent v.*

10 *Gateway* from the Federal Circuit?

11 A   I've read portions of it, certainly.

12 Q   Let me read you a quote:  "Sophisticated parties routinely

13 enter into license agreements that base the value of the

14 patented inventions as a percentage of the commercial

15 product's sales price."  And you agree with that, right?

16 A   It happens, certainly.

17 Q   This opinion used the word "routinely."  Is that a fair

18 description?

19 A   I don't have any empirical basis to know how routine that

20 is.

21 Q   It's possible to structure a RAND license agreement where

22 the royalty is tied to the selling price of a product, rather

23 than a per-unit basis, or some other basis, correct, sir?

24 A   It's possible .  But the further downstream you go in

25 terms of charging a percentage royalty, the more danger there

1    is for charging royalty inappropriately on subject matter

2    which has nothing to do with the patent, or the standard

3    that's being licensed.  And, therefore, it is not what would

4    commonly be done.  You try to go to the smallest saleable

5    unit.

6    Q   Sir, isn't it true SSOs themselves endorse making RAND

7    commitments based on product price of the royalty base?

8    A   Not generally for the complex consumer, for the very

9    reasons I just said.  There's too much danger of charging a

10   royalty inappropriately on non-patent, or --

11   Q   And -- I'm sorry, sir.

12   A   It is possible for certain fields of use, like content, to

13   charge a percentage value on the content.  Because, of

14   course, the content of a TV show or music clip is that whole

15   clip.

16           THE COURT:  How much longer will you be?

17           MR. BATCHELDER:  Probably another five minutes, Your

18   Honor.

19           THE COURT:  If you promise, then we'll run right

20   through.

21           MR. BATCHELDER:  I'll do my very best.

22   Q   Could we put up 3394, please?  If we put up the page, the

23   next page.  Could you blow up the top, please?  And you'll

24   see, sir, at the top here -- by the way, let's go back to the

25   first page .  You recognize this document as an IEEE form

1    LOA, sir?

2    A    Yes, I've seen these before.

3    Q    Now, let's go back to that second page.  Can we blow up

4    the top, please?  You'll see there it says, "The submitter

5    will grant a license under reasonable rates to an

6    unrestricted number of applicants on a worldwide basis with

7    reasonable terms and conditions that are demonstrably free of

8    unfair discrimination."  And one of the bases that is

9    specified in this IEEE LOA, is percent of product price.

10   Correct, sir?

11   A    That is what it says, yes.

12   Q    All right, sir.

13        Now, before this litigation you've testified on patent

14   pools and SEPs only once before, when you were working on

15   behalf of Fujitsu, correct?

16   A    Yes.

17   Q    And Fujitsu's patent at issue there was an SEP for the

18   802.11 standard, wasn't it?

19   A    That was my understanding, yes.

20   Q    Fujitsu was the plaintiff, correct?

21   A    It was.

22   Q    Fujitsu joined the 802.11 patent pool, correct?

23   A    It had.

24   Q    But your testimony on behalf of Fujitsu, as a plaintiff,

25   was that the reasonable royalty owed to Fujitsu for

1  infringement in that matter exceeded the royalty rate

2  associated with the Via 802.11 patent pool, correct, sir?

3  A   That's right, because it was not constrained by the RAND

4  commitment, which was embodied in the pool participation.

5  Fujitsu was part of the pool.

6  Q   So the reasonable royalty is higher than the pool royalty

7  in your opinion that you conveyed to the jury in that matter,

8  right, sir?

9  A   For a straight patent infringement matter, unencumbered by

10  RAND, that's what an economist would expect.

11  Q   How much higher was it, sir?

12  A   I don't recall exactly.  It was cents per unit, but I

13  don't recall.

14  Q   Could it have been 100 percent greater?

15  A   I don't recall the percentage difference.

16  Q   Could it have been 500 percent greater?

17  A   I don't recall.

18       MR. BATCHELDER:  No further questions, Your Honor.

19  Thank you.

20       THE COURT:  Thank you, counsel.  Sit down.  We're

21  taking our break.  Ladies and gentlemen, we'll be in recess

22  until 3:20.

23             (The proceedings recessed.)

24

25       MR. BATCHELDER:  Your Honor, I apologize.  But the

1   last document that I raised with the witness was

2   Exhibit 3394, that was the IEEE letter of assurance.  I

3   neglected to move that into evidence.  I will do that now.

4            THE COURT:  Any objection?

5            MR. PRITIKIN:  No.

6            THE COURT:  It is admitted.

7            (3394 admitted.)

8   By Mr. Pritikin:

9   Q   Dr. Lynde, I just have a couple of questions for you.

10  Let's start with InteCap.  You were asked some questions

11  about the Motorola patents that were considered by InteCap in

12  its analysis.  Do you recall those questions?

13  A   Yes, I do.

14  Q   And do you recall some questions about how InteCap did not

15  consider two patents that were later acquired through Symbol,

16  and that were the subject of some jury verdict?

17  A   I do remember that question.

18  Q   Now, by the time that Motorola sent its letter to

19  Microsoft in October of 2010, had those two Symbol patents

20  expired?

21  A   I'm afraid I am relying on memory, but I believe that is

22  the case.

23  Q   Now, you told us that InteCap had assumed that Motorola

24  had 25 percent of all the 802.11 patents; is that right?

25  A   That was implicit in the method they applied.  It was

1  really just an arbitrary figure they put in for an

2  adjustment, which they acknowledge something needed to be

3  done.

4  Q  Now, regardless of whether Motorola had a handful of

5  additional patents besides those considered by InteCap, do

6  you think with that 25 percent implicit assumption, InteCap

7  shortchanged Motorola?

8  A  No, on the contrary, it greatly exaggerates any likely

9  effect from the size of the portfolio, then or now.

10  Q  Let's talk about transaction costs.  Do you recall you

11  were asked a number of questions about that?

12  A  I do.

13  Q  Now, just suppose that a company in bilateral negotiations

14  insists on an unreasonable royalty, and runs up the

15  transaction costs, is that something you think they should be

16  compensated for?

17  A  Gosh.  I want to offer an opinion as an economist.  That

18  ability to impose a cost through something which doesn't

19  comply with, say, a promise to be reasonable seems to me

20  shouldn't be borne by the other party.

21  Q  And could legitimate transaction costs explain the

22  difference between your proposed RAND royalty and the two and

23  a quarter percent of the end product that has been suggested

24  by Motorola?

25  A  No, not by any stretch of the imagination.

1  Q   One last topic, royalty stacking.  Now, if other companies

2  having standard-essential patents charged what Motorola is

3  asking for in this case, two and a quarter percent of the

4  end-product price, would there, in your opinion, be a serious

5  stacking problem?

6  A   Absolutely.  If everyone wanted that same deal, it would

7  quickly make the end-product price untenable commercially.

8  Q   And based on your analysis in this case, do you believe

9  that Motorola is engaged in hold-up?

10  A   I do.

11       MR. PRITIKIN:  Nothing further, your Honor.

12       MR. BATCHELDER:  No questions, your Honor.

13       THE COURT:  You may step down.  Thank you.  Motorola

14  will call its next witness -- excuse me.  It is still

15  Microsoft.

16       MS. HIGGINS:  Your Honor, Motorola would call as --

17       THE COURT:  I need to get Microsoft to say they are

18  done.  Mr. Harrigan.

19       MR. HARRIGAN:  Yes, your Honor.  Except for finishing

20  up the Orchard testimony, and calling Mr. Dailey when he

21  appears on behalf of Motorola as part of our case, we have

22  completed our witnesses.  And that raises a question, because

23  where we stand right now, as we understand it, is that

24  Motorola has twelve remaining witnesses, not counting the two

25  that we are going to be dealing with this afternoon, I guess.

1    And I want the court to know that we are planning to curtail

2    our cross so that we end up with an hour and a half for

3    rebuttal.  When you look at the two days that we have next

4    week, and subtract an hour and a half for rebuttal, we were

5    wondering whether Motorola is really going to be able to get

6    through twelve witnesses.  If not, we would love to know

7    which ones they are going to eliminate.

8              THE COURT:  Mr. Jenner, do you want to address that

9    as opposed to passing that one off to someone else?

10             MR. JENNER:  The honest answer to your question, your

11   Honor, is no, but I will.  We certainly appreciate that we

12   are under some time pressure, and we are going to have to

13   conjure with that over the weekend.  Mr. Pepe has already

14   provided what we think is the tentative list for Monday.  I

15   will make no bones about the fact that we may be having to

16   curtail witnesses.  They have the tentative list for Monday.

17      In accordance with the schedule the court has required, we

18   will give them, no later than Sunday 4:00, the final list for

19   Monday.  We will continue to comply with that rule.  But I am

20   not in a position to tell him who, if at all, we will be

21   unable to call.  I just can't do that at this point.

22             MR. HARRIGAN:  Your Honor, my intent was not to ask

23   for the answer this instant.  But I do think that if four or

24   five witnesses are going to be eliminated, there should be a

25   deadline by which we know who they are.

1    THE COURT:  Let's assume you all take the night off

2    and you reconsider this all tomorrow.  Let's say by 4:30 on

3    Saturday you will talk to them and advise them which

4    witnesses you will be calling on a more final basis for

5    Monday, just for Monday.

6    MR. JENNER:  For Monday.  Your Honor, I should point

7    out we have had people traveling because of deaths in the

8    family, people are coming back, Mr. Dailey we expected to be

9    here.  We have had lawyers and witnesses that have had

10   unexpected health problems, including death in the family.

11   We are going to have to factor that in as well.  We will

12   advise them by 4:30 Saturday afternoon what the order is for

13   Monday.

14   THE COURT:  That would be fine.

15   MR. HARRIGAN:  May I ask for one other piece of

16   information perhaps on Sunday?  And that is, I would assume

17   that by Sunday they will know if there are some witnesses

18   that are not going to show up, be testifying at all, on

19   Monday or Tuesday.  If that is true, then I would request

20   that we find out who they are on Sunday sometime, so that we

21   are not trying to --  Because we obviously have to prepare to

22   cross-examine twelve witnesses in two days.  And I don't

23   think that is going to happen.

24   MR. JENNER:  Part of the game, your Honor, is we are

25   going to be trying to evaluate, including when we see what

1   happens Monday, what it is we can accomplish on Tuesday.  I

2   am well aware of the reports in the newspapers about, I guess

3   it was a Samsung/Apple trial before Judge Koh, where they

4   found themselves with 70 witnesses and four and a half

5   minutes or something like that, and people were running

6   around like chickens with their heads cut off.  We will be

7   evaluating Monday.  We will tell them what we can tell them

8   as soon as we can tell them.

9          THE COURT:  Let's use our time wisely.  I would

10  expect if you know at some point that someone is out, it will

11  be communicated without any games played.

12         MR. JENNER:  Yes.

13         THE COURT:  You are all very professional lawyers.  I

14  truly believe in the American College Standards of

15  Professionalism.  That's how you guys behave, and I

16  appreciate that.  And I'm sure as part of that, when you know

17  they will know.  Let's leave it at that, other than the 4:30

18  on Saturday who you are going to have on Monday.

19         MR. JENNER:  Good.

20         MR. HARRIGAN:  Thank you, your Honor.  You can call

21  your first witness.

22         MR. JENNER:  Your Honor, I would like to interject.

23  I did reserve the opportunity to deliver a very brief opening

24  on behalf of Motorola.  I would like to take a few minutes to

25  do that now.  Not that your Honor is unaware of what this

1   case is about.

2        Nevertheless, while it may not seem like it, we are

3   halfway through this process of determining what a RAND rate

4   or range of rates should be for a license to Microsoft under

5   Motorola's standards-essential patents.

6        Plainly, I would submit, Motorola and Microsoft are a

7   couple of ships passing in the night.  The evidence shows

8   Microsoft wants, in our submission, the low rates of patent

9   pools rather than the rates that the parties would have

10  agreed to had Microsoft been willing to negotiate.

11       In order to justify the low pool rates, Microsoft's

12  evidence promotes a so-called multilateral ex ante approach

13  to RAND licensing, in which many patentholders and

14  implementers supposedly participate in a negotiation.  Of

15  course, no such multilateral ex ante negotiation happens in

16  the real world.  But, nevertheless, Microsoft's witnesses

17  consider this to be a proxy for relying on pools.  And that's

18  what the evidence is showing.

19       The fact remains that the pools are neither fully

20  multilateral, nor ex ante, and they don't accomplish the

21  purpose of identifying ex ante incremental patent value, much

22  less what would happen in the real world negotiation that we

23  submit our evidence will show.

24       Patent pools are voluntary organizations that generally

25  divide royalties equally among the companies that choose to

1    join on a patent counting basis.  And one of our witnesses

2    will address that.

3        Patent pools make no attempts to determine the value of

4    the individual patents contributed to the pool.  Every

5    patent, whether a fundamental contribution, or the well-known

6    Bozo tweak, gets the same rate, deterring those who believe

7    they have strong patents from joining the pool.

8        If pool rates were used to impose artificially low rates

9    on all standards-essential patents, regardless of whether the

10   patentholders wanted to join a pool, this would inevitably

11   discourage patentholders from making substantial technology

12   investments, from joining and contributing to the standards

13   of the future.  This, in turn, would weaken standards of the

14   future to the detriment of every sector in these industries,

15   including consumers.  That, the evidence will show, is an

16   important policy consideration that we submit the court

17   should take into account.

18       Indeed, the evidence here shows that important patentees,

19   like IBM, Nokia and Thompson, and Motorola for that matter,

20   did indeed reject the MPEG LA patent pool for H.264, and

21   many, many more patentholders, including Microsoft itself,

22   avoided the Via pool.

23       So establishing a method of determining RAND rates based

24   on patent pools would call into question the validity and

25   stability of many RAND licenses entered into in recent years

1    in reliance on good-faith bilateral negotiations rather than

2    low pool rates.  So there is a backward effect as well as a

3    forward effect at stake here.

4        Motorola, in contrast, will apply the expectation of the

5    standards organizations that RAND rates would typically be

6    determined by good-faith bilateral negotiations between a

7    patentholder and an implementer who wants a license.  The

8    evidence will show that this is how the real world works, and

9    even Microsoft witnesses have already conceded that RAND

10   license terms are typically arrived at through bilateral

11   negotiations.

12       Motorola, therefore, seeks to simulate a negotiation that

13   would have taken place in the real world in October 2010 if

14   Microsoft had negotiated with Motorola instead of commencing

15   litigation first.

16       That negotiation, we submit, would be similar to the

17   well-known hypothetical negotiation like that of the Georgia

18   Pacific case.

19       During such a bilateral negotiation Motorola and Microsoft

20   would have considered all applicable factors, including the

21   relative value of the patents that each has to offer to the

22   other in order to arrive at RAND terms.

23       Motorola's witnesses will provide the basis for the court

24   to consider this hypothetical bilateral negotiation.

25       Dr. Richard Holleman, a former long-term executive of the

1    IEEE, will provide relevant background regarding the meaning

2    of the RAND commitment and the expectation of SSOs.  He will

3    confirm that the standards organizations have no

4    predetermined meaning of RAND, and leave the RAND negotiation

5    to the involved parties.

6        Dr. Richard Schmalensee, who is an economist from MIT,

7    will explain the proper framework for the RAND negotiation,

8    noting the theoretical but impractical concepts discussed in

9    the academic literature, and then confirming that the

10   hypothetical bilateral negotiation that would have taken

11   place between the parties is the logical way to reach a

12   practical real world solution.

13       Roger Smith, former head of licensing at IBM, another

14   great technology company, will explain why patent pools are

15   not a fair or useful tool for determining a RAND rate for a

16   bilateral licensing negotiation between two companies.

17       As to the technical contributions the parties bring to the

18   table, Motorola's Ajay Luthra, who participated in the

19   development of the H.264 standard, and is connected with many

20   Motorola patents covering the standard, will testify

21   regarding Motorola's patent contributions to the H.264

22   standard.

23       Motorola's patent experts will then describe the value

24   provided by Motorola's patents, as well as the comparative

25   value of patents that Microsoft would have brought to the

1   bilateral negotiating table.

2       Dr. Tim Williams will testify as to the breadth and

3   strength of Motorola's coverage of the 802.11 standard,

4   compared with Microsoft's few patents.

5       Dr. Tim Drabik will explain the coverage of Motorola's

6   H.264 patents, compared with the coverage of Microsoft's

7   patents.

8       Mr. Michael Dansky, an expert in technology valuation,

9   will then explain the importance of Motorola's patents to

10  Microsoft's product line, showing why Microsoft would have

11  been willing to pay a realistic royalty for access to

12  Motorola's standard-essential portfolios.

13      Similarly, Dr. Ramanathan Sukumar will describe a survey

14  of relevant users that demonstrates the value of features

15  covered by Motorola's patents.  And I apologize to him for my

16  perpetual inability to pronounce his name properly.

17      Kirk Dailey, former vice-president of intellectual

18  property at Motorola Mobility, and responsible for years of

19  standards-essential patent licensing negotiations will

20  explain Motorola's long history of licensing and describe

21  relevant Motorola patent licenses for this technology and

22  these patents.

23      And Motorola's licensing expert, Charles Donohoe, who

24  spent 20 years as head of licensing at Samsung, another

25  considerable technology company, and negotiated many RAND

1    licenses, will explain how a hypothetical bilateral

2    negotiation would have been conducted arriving at proposed

3    RAND rates for the Motorola standards-essential patents

4    portfolios.

5         This array of witnesses, in large part mirroring a

6    licensing team that we submit would be the real world,

7    simulates what happens in licensing negotiations contemplated

8    by SSOs, and embraced by industry, as opposed to the narrow

9    realm and applicability of patent pools that set depressed

10   rates.  These witnesses will explain what happens in

11   negotiations in the real world, rather than in the realm of

12   economic theory.

13        A licensing team like this includes professionals who

14   evaluate the patented technology, and financial professionals

15   who value the technology as applied to the adversaries'

16   products.  Lead negotiators then bargain for months with

17   their adversaries to arrive at a solution acceptable to both

18   sides.

19        Motorola will explain these relevant aspects of the

20   simulated bilateral negotiation to arrive at a meaningful

21   license rate, fair to both sides, but consistent with

22   Motorola's other licenses for these technologies, and what

23   would have happened in the real world.

24        With that, your Honor, I would like to -- unless you have

25   any questions, I would like to proceed with our first

1   witness.

2           THE COURT:  The only question I would have is more

3   something that I would be interested in.  And that is how --

4   I understand how as part of bilateral negotiations there

5   would be cross licensing.  But given that we are not in

6   bilateral negotiations, we are in hypothetical bilateral

7   negotiations, what authority do I have to assume that

8   Microsoft would have cross licensed?  So as your witnesses

9   are presenting their testimony, they might keep that in mind.

10          MR. JENNER:  All right.  Fine.  Thank you.

11          THE COURT:  Thank you.

12          MR. JENNER:  With that, Ms. Higgins, who is known to

13  the court, will now for real call our first witness.

14          MS. HIGGINS:  Your Honor, Motorola calls Dr. Ajay

15  Luthra.

16          MR. JENNER:  I should add, your Honor, just because

17  of these exigencies we have all been speaking about, I have

18  tried to characterize the witnesses in a progression having

19  to do with negotiations.  We are unable to do that here in

20  the courtroom.  We will call them when we can.

21  Whereupon,

22                      AJAY LUTHRA

23  called as a witness, having been first duly sworn, was

24  examined and testified as follows:

25          THE CLERK:  Will you state your full name for the

1    record and spell your last name, please?

2          THE WITNESS:  Ajay Luthra, L-U-T-H-R-A.

3          THE COURT:  You may inquire.

4                      DIRECT EXAMINATION

5    BY MS. HIGGINS:

6    Q    Good afternoon, Dr. Luthra.

7    A    Good afternoon.

8    Q    Would you please tell us briefly about your education?

9    A    I have bachelor's in engineering from BITS, India,

10   master's in electrical engineering from New Delhi, and Ph.D.

11   in systems engineering from University of Pennsylvania,

12   Philadelphia.

13   Q    And who do you currently work for?

14   A    Motorola Mobility.

15   Q    How long have you worked at Motorola?

16   A    If you count the years I worked with GI, which was

17   acquired by Motorola, about 17 years.

18   Q    And what is your current position at Motorola?

19   A    I am vice-president and Motorola fellow.

20   Q    And what are your duties in those positions?

21   A    I manage a group of engineers in advanced technology.

22   Their activities are involving digital video processing,

23   digital video compression, next generation system

24   architecture design.

25   Q    Have you been involved in standards development?

1    A    Yes, I have been involved in MPEG-2, MPEG-4 part two,

2    H.264, and more recently HEVC, the next generation video

3    coding standard.  I have been one of the co-chairs of H.264.

4    Q    Dr. Luthra, I'm not sure if your mic is on.

5              THE COURT:  Maybe I could suggest that you get closer

6    to the mic.

7    By Ms. Higgins:

8    Q    Please show Exhibit 5000.  Dr. Luthra, do you recognize

9    this as a list of Motorola's U.S. patents that relate to the

10   H.264 standard?

11   A    Yes.

12   Q    And there are a number of patent families there.  Are you

13   familiar with those?

14   A    Yes, the Krause, Wu, Eifrig, MBAFF and PAFF and scan

15   family.

16   Q    For the record, I am just going to quickly read in those

17   patent numbers.  Those are Exhibit 270, Exhibit 283,

18   Exhibit 268.  And then for the MBAFF family, Exhibits 271

19   through 78; the PAFF family, Exhibits 280 through 282; and

20   the scan family, Exhibits 265 through 266.  Do you see all of

21   those?

22   A    Yes.

23             MS. HIGGINS:  Motorola offers Exhibit 5000.

24             MR. CEDEROTH:  Your Honor, it is a demonstrative.

25             MS. HIGGINS:  That's fine, your Honor.  I offer it as

1    a demonstrative.

2              MR. CEDEROTH:  No objection as a demonstrative.

3              THE COURT:  As a demonstrative.  We have not been

4    admitting demonstrative exhibits, counsel.

5              MS. HIGGINS:  Okay.

6    By Ms. Higgins:

7    Q    Please identify the patents on which you are a named

8    inventor?

9    A    I am one of the inventors on the MBAFF family, Eifrig

10   family, PAFF family and scan family.

11   Q    Now, turn to Exhibit 424 in your binder.  Let me know when

12   you have that in front of you, sir.

13   A    Which number, please?

14   Q    424.

15   A    Yes, I am there.

16   Q    And it is also on your screen, too, so you can look there

17   as well.  Is this a paper relating to H.264 that you

18   co-authored?

19   A    Yes.

20   Q    And if you would, please turn to Figure 18 on Page 574.

21   A    Okay.  I'm there.

22   Q    What does Figure 18 show?

23   A    It shows the performance of the reference code for H.264

24   for low resolution sequences, CIF and QCIF resolutions.

25   Q    Now, one of Microsoft's witnesses testified that most of

1   the coding efficiency gain of H.264 was in place as of TML-9.

2   Do you agree with that statement?

3   A    No, that is not the full story.

4   Q    Why?

5   A    It does not show the performance for high resolution

6   interlaced format video, which is a key format for standard

7   definition and high definition TVs.

8   Q    Now, does Motorola have any patented technology that is

9   reflected in these graphs?

10  A    Yes.  I believe it has our older items, the Krause and Wu

11  family.  The technology described in there is in here.

12  Q    Now, does Motorola have any patented H.264 technology that

13  is not reflected in these graphs?

14  A    Yes, our interlaced coding tools associated technology,

15  the Eifrig family, the MBAFF family, PAFF family and scan

16  family.  The technology described there is not in here.

17  Q    There has been a lot of testimony about interlaced video,

18  so I want to ask you about that.  Why did Motorola work to

19  improve coding efficiency for interlaced video?

20  A    One of the key business of Motorola is to distribute video

21  associated with H.264 television applications.  In digital

22  television, for both standard definition and high definition,

23  interlaced video format is a key format.  And to be able to

24  distribute those content very efficiently, our products and

25  technology has to recognize the fact that the video is

1  captured in interlaced format.

2  Q   Now, on your screen the next exhibit is Exhibit 2342.  Do

3  you recognize this as an MPEG submission numbered M26274, and

4  dated July 2012?

5  A   Yes, I do.

6  Q   And what is the source of this document?

7  A   This document was provided by the representatives from NBC

8  Universal, HBO, CBS Corporation, Canadian Broadcasting

9  Corporation, Motorola Mobility, Comcast and Cable Labs.

10  Q   It says here, "To be presented by Ajay Luthra."  Did you

11  present this at the MPEG meeting in July 2012?

12  A   Yes, I did.

13  Q   And what did you present?

14  A   I presented that this document describes the interlaced

15  scan formats remain ubiquitous in the worldwide television

16  ecosystem.  Therefore, it is very important for a video

17  coding system to design the technology that is very efficient

18  in compressing interlaced video.

19  Q   Now, let's turn to Page 2 of Exhibit 2342.  In the last

20  paragraph it states, "That in order to achieve commercial

21  success, new compression standards should continue to

22  efficiently support interlaced formats for the foreseeable

23  future."  Do you see that, Dr. Luthra?

24  A   Yes, I do.

25  Q   Why is support for interlaced formats necessary to achieve

1  commercial success?

2  A   If you look further up in the document it states, "In

3  current cable, satellite and telco distribution systems,

4  1080i, 480i and 576i formats are in widespread use around the

5  world."

6  Q   Is there any benefit to distributing video in interlaced

7  format?

8  A   Yes, if the video is captured in interlaced format then it

9  is more efficient to compress it in the native format using

10 H.264.

11 Q   Can problems arise if you convert interlaced video into

12 progressive video before it is encoded?

13 A   Yes, several problems and issues arise.  The first one is

14 that when you are converting from interlaced to progressive,

15 you don't have the information associated with the lines that

16 are present in progressive format.  So you are estimating or

17 guessing what those information is.  In the process, if the

18 distortion gets added, it will result in lowering coding

19 efficiency.

20     Other issues that arise is that when you go from

21 interlaced to progressive, for example going from 1080i to

22 1080p, you double the pixel rate, so the entire processing

23 system and everything has to work at twice the rate.

24     The third issue arises, that when you go from 1080i to

25 1080p, for example, your bitrate is doubled.  So now you have

1    to have two times the coding efficiency just to get back

2    where you started from.

3    Q    Just to be clear, 1080i, that is 1080 interlaced?

4    A    1080i is interlaced, 1080p is progressive.

5    Q    Please refer to Exhibit 4007, which is a timeline that was

6    presented by one of Microsoft's witnesses.

7    A    I'm there.

8    Q    Now, do you have a personal understanding of the

9    development timeline of H.264?

10   A    I do.

11   Q    I am going to ask you to turn to the middle section of the

12   timeline, where it states, "Test verification of about

13   50 percent improvement."  Do you see that?

14   A    Yes, I do.

15   Q    Did any of that improvement apply to interlaced video or

16   Motorola's interlaced patents?

17   A    No, that was done only for smaller resolution and

18   progressive scan video only.

19   Q    Now, there is also a third section of the timeline that

20   begins in July 2001, and goes to the first few weeks of the

21   standard in May 2003.  Did the performance of the H.264

22   standard improve during that time frame?

23   A    Yes, it improved significantly for high resolution

24   interlaced video formats.

25   Q    And did Motorola contribute to those substantial

1  improvements?

2  A   Yes, we actively participated in the committee, and we

3  also submitted many documents, and our inventions are also

4  described in the patent family that I talked about earlier.

5  Q   Please show Exhibit 5001.  What does this timeline show,

6  Dr. Luthra?

7  A   This timeline shows the significant improvement in coding

8  efficiency for interlaced video.  It shows that in July 2001

9  Motorola identifies weakness in H.26L, for it to be not

10  efficient for interlaced video.

11     Next, it shows in December 2001 Motorola submitted the

12  proposal with a prediction motion vector.

13     Next, was Motorola MBAFF and PAFF, and after that a

14  Motorola scan proposal in May of 2002.

15  Q   Now, can you explain briefly how Motorola developed the

16  technology in these proposals?

17  A   Yes.  First of all, we worked very long and hard.  We had

18  lots of discussions, and based upon that we developed some

19  ideas.  Then we simulated that in the software, looked at the

20  tests, analyzed them thoroughly.  Based upon that we had

21  further discussion, and decided if we need to have some other

22  ideas also implemented.  If they work, we did that.  And once

23  we were satisfied, we provided the description of our

24  proposals to JVT and the results of our simulation.

25  Q   Now, at the end there, the results of your simulations,

 1   those tests, what was the benchmark against which you were

 2   comparing?

 3   A   Generally the benchmark was the current state of the

 4   standard at that stage.

 5   Q   And why did you use the existing standard as the

 6   benchmark?

 7   A   A key goal of the standard was to improve the coding

 8   efficiency.  And for the committee to be able to understand

 9   whether to adopt a proposal or not, a key criteria was

10   whether it improves the coding efficient or not.  So that's

11   why generally we use the current state of the standard, so we

12   could show that a given proposal improved the coding

13   efficiency in comparison to that.

14        MS. HIGGINS:  Before I move on to the next subject, I

15   would like to offer Exhibit 2342, which is an MPEG

16   submission.

17        MR. CEDEROTH:  No objection.

18        THE COURT:  It is admitted.

19        (2342 admitted.)

20   By Ms. Higgins:

21   Q   Please refer to Exhibit 2271, which is an MPEG submission

22   numbered M7227, entitled "Performance of MPEG-4 Profiles Used

23   for Streaming Video and Comparison with H.26L."  Are you a

24   co-author on this document, dated July 2001?

25   A   Yes, I am.

1    Q    Can you explain briefly what you discussed in this paper?

2    A    In this paper we are comparing the performance of the

3    various video coding standards.  And one of the key

4    conclusions here was that the performance of H.26L was not

5    any better than the existing standard, MPEG-4 part two.  And

6    we also concluded it showed evidence that if new tools are

7    added which are designed to improve the coding efficiency for

8    interlaced format, then it can improve the performance of

9    H.26L.

10   Q    Now, please refer to Exhibit 423, which is Motorola's

11   VCEG-037 submission.

12   A    Okay.

13   Q    Are you a co-author of this document?

14   A    Yes, I am.

15          MS. HIGGINS:  Motorola offers Exhibit 423.

16          MR. CEDEROTH:  No objection.

17   By Ms. Higgins:

18   Q    What is discussed --

19          THE COURT:  Counsel, you need to wait until I admit

20   it.  It is admitted.

21          MS. HIGGINS:  Thank you.

22          (423 admitted.)

23   By Ms. Higgins:

24   Q    What is discussed in this document, Dr. Luthra?

25   A    It describes interlaced coding tools that can be added to

1    H.26L video coding as proposed by Motorola.

2    Q   Please turn to Figure 9 on the bottom of Page 8 of

3    Exhibit 423.

4    A   Figure --

5    Q   Figure 9 on the bottom of Page 8.

6    A   Okay.  I am there.

7    Q   Please explain what this figure shows.

8    A   It shows that there is a current regional pixel denoted by

9    E, and it has four neighboring regions, denoted by A, B, C

10   and D.  And for compressing the current region E one can use

11   the neighboring regions A, B, C and D to do the video

12   compression, and do, for example, motion vector prediction,

13   PMV.  And these regions or these blocks could be field or

14   frame.

15   Q   Was Motorola granted any patents that relate to prediction

16   motion vector technology?

17   A   Yes.  That technology is described in the Eifrig patent.

18   Q   Please turn to Figure 7 of the Eifrig patent, which is

19   Exhibit 268.

20   A   Okay.

21   Q   Please explain what is shown in Figure 7 of the Eifrig

22   patent?

23   A   It shows that the current block number 700 is being

24   compressed.  It has three neighboring blocks, 712, 722, 732.

25   They are used to calculate the prediction motion vector.  The

1  current block 700 is a field mode.

2  Q   Now, is there any benefit to using these three neighboring

3  blocks, MV1, MV2 and MV3?

4  A   Yes, they provide the widest range of information about

5  neighborhood, and it allows you to compress 700 block video,

6  which is MV1, MV2, by having (inaudible) characteristics

7  about neighboring area.

8  Q   Was Motorola's patented PMV technology adopted into the

9  H.264 standard?

10  A   Yes, it was.

11  Q   Please turn to Exhibit 610.  What is Exhibit 610?

12  A   It is an H.264 standard as of May 2003.

13          MS. HIGGINS:  Motorola offers Exhibit 610.

14          THE COURT:  Any objection?

15          MR. CEDEROTH:  No objection.

16          THE COURT:  The exhibit is admitted.

17          (610 admitted.)

18  By Ms. Higgins:

19  Q   Please turn to 610 at Page 21.  What is shown in

20  Figure 6-9 at the top of the page?

21  A   It shows that there is a current macroblock or partition

22  or block being compressed.  Its neighboring blocks are A, B,

23  C and D.  Those blocks can be used to do various video

24  processing, for example, prediction of motion vector.

25  Q   Is there a reason for using blocks A, B, C instead of

1  blocks A, B, D?

2  A   Yes.  A, B, C gives better information about the

3  surrounding area, and it covers all the neighborhood.  If you

4  do A, B, D, you are constrained only to the -- more off to

5  the left side.

6  Q   Does that have any effect on the coding efficiency?

7  A   Yes.  The better information you have about surrounding

8  area, the better possibility you have of predicting motion

9  vector, which means you are required less number of bits to

10  compress the motion vector.  And that will improve the coding

11  efficiency.

12  Q   Let's turn back to Exhibit 423, which is VCEG037.  I would

13  like to direct you to a different part of this contribution,

14  Page 9 of Exhibit 423.  It refers there to testing.  What is

15  Motorola testing there?

16  A   Motorola is testing various different coding tools

17  designed for compressing interlaced video.

18  Q   Did the tests that were conducted here include tests on

19  single macroblock adaptive frame/field coding?

20  A   Yes, they did.

21  Q   Please turn to Exhibit 3382, which is JVT-B002D2.

22  A   Okay.

23  Q   Who authored this document?

24  A   This is co-authored by Gary Sullivan, Thomas Wiegan and

25  myself.

1          MS. HIGGINS:  Motorola offers Exhibit 3382.

2          MR. CEDEROTH:  I am trying to see what it is, your

3    Honor.  No objection, your Honor.

4          THE COURT:  It is admitted.

5          (3382 admitted.)

6    By Ms. Higgins:

7    Q   Page 7 of the exhibit references VCEG-037.  Let me know

8    when you have that in front of you.

9    A   I do.

10   Q   What did the JVT conclude regarding Motorola's single

11   macroblock AFF test results in VCEG-037?

12   A   They were not satisfied with the performance, and they

13   noticed MB adaptive, which is for single macroblock, needs

14   more work.

15   Q   Now, after Motorola performed this testing on single

16   macroblock AFF, what further work did Motorola do?

17   A   We worked in two areas.  We first improved the performance

18   of picture AFF.  But we were also surprised by the

19   performance of single MBAFF was not very good.  So after much

20   review and thinking, we realized that the key reason the

21   performance of MBAFF for single macroblock was not efficient

22   was because when you split them into two regions you lose the

23   capability to do 16-by-16 and 8-by-16 base processing, which

24   is very important when you are compressing high resolution

25   video that you see in standard definition and high

```
 1   definition.  So it was very important to have the capability
 2   where you can include those regions as well.  Otherwise, you
 3   are kind of tying the hands behind the back for field coding.
 4   To solve that problem we invented new approach in which we
 5   did the AFF at macroblock pair level.
 6           MS. HIGGINS:  Your Honor, may I have permission to
 7   put up a board?
 8           THE COURT:  Yes.
 9           MS. HIGGINS:  It is also Exhibit 3277 in the binder.
10   By Ms. Higgins:
11   Q    Dr. Luthra, you had mentioned macroblock pair adaptive
12   frame/field coding and picture level adaptive frame/field
13   coding.  Let's discuss macroblock pair adaptive frame/field
14   coding first.  Now, does Exhibit 3277 contain information
15   from the Joint Video Team submissions made by Motorola
16   relating to macroblock pair AFF?
17   A    Yes, it does.
18           MR. CEDEROTH:  Your Honor, I'm not sure we are
19   talking about the right exhibit or we are all talking about
20   the same exhibit.  This is 3277?
21           MS. HIGGINS:  Yes, it is.
22           MR. CEDEROTH:  Not 3276?
23           MS. HIGGINS:  It is 3277.
24           MR. CEDEROTH:  Thank you, your Honor.
25   By Ms. Higgins:
```

1   Q    Now, the first entry on the timeline refers to

2   Exhibit 2209, which is Motorola's JVT-B106 submission.  Did

3   you co-author that document?

4   A    Yes, I did.

5   Q    And what did Motorola propose in Exhibit 2209?

6   A    In this proposal we were proposing to break the picture

7   into a collection of super MBs, which was two macroblocks.

8   That nomenclature was later changed to be called MB pair,

9   macroblock pair.  We have too many acronyms, I guess.

10  Q    Now, both in the document and on the timeline, is there a

11  picture of the macroblock pair, which is Figure 4 of the

12  document?

13  A    Figure 4 of the document, yes.

14  Q    Now, please turn to Figure 4 on Page 10 of Exhibit 2209 --

15  excuse me, Figure 11.

16  A    Okay.

17  Q    What does Figure 11 show?

18  A    Figure 11 compares, among other things, the performance of

19  picture level AFF versus MB pair level AFF.

20  Q    Now, these graphs can be hard to read to a lot of us in

21  the room.  So I was wondering if you can explain, where is

22  the macroblock pair AFF curve in the graph?

23  A    The macroblock pair AFF is the black line with the X marks

24  on it.  That is the top most curve.  Picture level AFF is the

25  yellow line with the triangles on it.

1   Q   Which is better, being on the top or being on the bottom

2   of those curves?

3   A   Being on the top of the graph means you have lesser amount

4   of compression noise, and that's better.  Being on the left

5   means you are requiring less number of bits to have certain

6   amount of compression noise.  Being on the left means you are

7   requiring less number of bits, which is better because that

8   means you have higher coding efficiency.

9   Q   Can you tell us what the graph shows with respect to

10  coding efficiency when you are comparing your macroblock pair

11  AFF to picture level AFF?

12  A   So if you take an example where you roughly draw a line

13  for the same visual quality, let us say around number 32,

14  which is 32 dB here, then you see that you achieve that kind

15  of quality for a lot less bitrate in comparison to the code

16  corresponding to picture level AFF, which is the yellow

17  curve.  If you drop down on the Xs, that will show roughly of

18  the order of 20 percent improvement with MB pair AFF in

19  comparison to picture AFF.

20  Q   So there, MB pair AFF is 20 percent greater in efficiency

21  than picture level AFF, correct?

22  A   Yes, it is.

23  Q   Now, in Figure 11, why did you compare macroblock pair AFF

24  to picture level AFF, for instance, instead of single

25  macroblock AFF?

1    A    As I mentioned earlier, we were generally comparing the

2    performance to the current state of the standard.  Picture

3    level AFF was the accepted -- a generally accepted concept to

4    be included in the standard.  So we were comparing the

5    performance in relation to the picture level AFF.

6    Q    Now, in the prior submission Motorola had been testing

7    single macroblock AFF.  What happened to that proposal?

8    A    When we described our MB pair AFF proposal the committee

9    liked it very much, and they enthusiastically embraced it.

10   They also understand the logic behind using MB pair instead

11   of single macroblock.  So they dropped the concept of single

12   MBAFF.

13         MS. HIGGINS:  I don't believe I have offered

14   Exhibit 2209.  I hereby offer it, which is the JVT-B106 that

15   we are discussing.

16         MR. CEDEROTH:  No objection, your Honor.

17         THE COURT:  It is admitted.

18         (2209 admitted.)

19   By Ms. Higgins:

20   Q    Now, let's return back to the timeline.  The second entry

21   on the timeline refers to Exhibit 674, which is Motorola's

22   C-139 submission.  Did you co-author JVT-C139?

23   A    Yes, I did.

24         MS. HIGGINS:  Motorola offers Exhibit 674.

25         MR. CEDEROTH:  It is the JVT?

1          MS. HIGGINS:  Yes.

2          MR. CEDEROTH:  No objection.

3          THE COURT:  It is admitted.

4          (674 admitted.)

5    By Ms. Higgins:

6    Q   The timeline shows Tables 3 and 4 from Page 6 of

7    Exhibit 674.  What bitrate do these tabs from 674 show?

8    A   You can blow up that portion of the screen, please?  I

9    can't read it.  Table 3 shows that bitrate savings by using

10   MB pair adaptive coding over picture level adaptive coding.

11   It shows that MB pair adaptive coding can save as much as

12   18 percent of the bitrate.

13   Q   Now, the third entry on the timeline refers to

14   Exhibit 2274, which is a JVT-DO81 submission.  Do you

15   recognize that submission?

16   A   Yes, I do.

17   Q   And that's a submission by Sony?

18   A   Yes, it is.

19   Q   And did you review that at the time it was submitted to

20   the JVT?

21   A   Yes, I did.

22          MS. HIGGINS:  Motorola offers Exhibit 2274.

23          MR. CEDEROTH:  No objection.

24          THE COURT:  It is admitted.

25          (2274 admitted.)

1  By Ms. Higgins:

2  Q    What is discussed in this document?

3  A    Could you remind me of the number for this document?

4  Q    Yes, sir.  Exhibit 2227.

5  A    For this display.

6  Q    So it is 2274, the submission by Sony.

7  A    I was asking for the display.  I have to look here.  This

8  shows that Sony recommends MBAFF, which means MB pair AFF.

9  They say this contribution provides supportive information of

10 MB level field/frame adaptive coding.  "We recommend the

11 proposal be adopted."

12 Q    Now, the fourth entry on the timeline refers to

13 Exhibit 2227, which is JVT-E067, which is a submission by

14 VideoTele.com.  Did you review this document at the time it

15 was submitted to the JVT?

16 A    Yes, I did.

17         MS. HIGGINS:  Motorola offers Exhibit 2227.

18         MR. CEDEROTH:  No objection.

19         THE COURT:  It is admitted.

20         (2227 admitted.)

21 By Ms. Higgins:

22 Q    In Exhibit 2227 did VideoTele test Motorola's macroblock

23 pair proposal?

24 A    Yes, they did.  They concluded our simulation results

25 support that macroblock level frame/field adaptive coding is

1   a useful technique in the JVT standard, giving a bitrate

2   saving of 11 percent to 18 percent on the two sequences

3   tested.

4   Q   Now, the final entry on the timeline refers to the H.264

5   standard at Page 16.  Was Motorola's MB pair AFF proposal

6   adopted into the H.264 standard?

7   A   Yes.  Figure 6.4 shows that a frame or a picture can be

8   broken down into a collection of macroblock pair.

9   Q   Was Motorola granted any patents on its MB pair AFF

10  invention?

11  A   Yes, it was.  That is under the name of MBAFF family.

12  Q   Now, let's turn to Motorola's PAFF proposal.  If you would

13  turn in your binder to Exhibit 674, which is JVT-B071

14  submitted by Motorola.

15  A   Tell me the number again.

16  Q   674.

17  A   That is JVT-C139?

18  Q   Excuse me, 654, which is JVT-B071.

19  A   I'm there.

20  Q   Are you a co-author on this document?

21  A   Yes, I am.

22          MS. HIGGINS:  Motorola offers Exhibit 654.

23          MR. CEDEROTH:  This is JVT-B071?

24          MS. HIGGINS:  Correct.

25          MR. CEDEROTH:  No objection.

1          THE COURT:  It is admitted.

2          (654 admitted.)

3   By Ms. Higgins:

4   Q   What did Motorola propose in B071?

5   A   Motorola is proposing new technology associated with

6   picture AFF and improvements to picture AFF for H.264

7   standard.

8   Q   Please turn to Figure 3 on Page 5 of Exhibit 654.  At the

9   top of the page in Figure 3, what is shown there?

10  A   It shows one of the Motorola's invention associated with

11  improving the performance of picture AFF.  It shows that the

12  current field can be predicted based upon the motion vector

13  can be derived from the fields in the future, and their

14  values can be obtained from what we call here MV2, the motion

15  vector in field 2.

16  Q   Let's turn to one of those curves.  Please turn to

17  Figure 23 on Page 18 of Exhibit 654.

18  A   Okay.

19  Q   That is the one on the bottom of the page.

20  A   I'm there.

21  Q   What does Figure 23 show?

22  A   Again, it compares the performance of adaptive picture AFF

23  in comparison to frame only coding and field only coding.  It

24  shows if you follow the same process, where we draw a

25  horizontal line corresponding to certain visual quality, let

1   us say 33 dB.  And then you see how many bits are required to

2   achieve roughly that kind of quality.  Then it shows that

3   adaptive picture AFF can save in the order of 20 to

4   30 percent bitrate, which means it is significantly more

5   efficient for the sequence.

6   Q   Now, the motion vectors that you were explaining in the

7   previous document, did they help provide any additional

8   performance --

9   A   Yes, that --

10  Q   -- in connection with picture AFF?

11  A   Yes, that provided additional flexibility of how the

12  motion is estimated and how the motion vectors are

13  compressed.  And it helped improve the performance further by

14  lowering the bitrate.

15  Q   And how does that affect coding efficiency?

16  A   In lowering the bitrate you have better coding efficiency.

17  Q   Did the JVT adopt Motorola's improved picture level AFF

18  technology into the H.264 standard?

19  A   Yes, it did.

20  Q   Was Motorola granted any patents for its improved PAFF

21  technology?

22  A   Yes, it was.  That is what I refer to as PAFF family.

23          MS. HIGGINS:  May we approach one more time, your

24  Honor, for one more board?

25          THE COURT:  Yes.

213

1    By Ms. Higgins:

2    Q    Now, let's turn up to a timeline on the Motorola scan

3    family of patents.   Did Motorola make submissions with

4    respect to this patent family?

5    A    Yes, it did.

6    Q    The first entry on the timeline refers to Exhibit 675,

7    Motorola's JVT-C140 proposal?

8    A    Yes.

9    Q    And in that proposal you were proposing new scans, a

10   four-by-four scan and an eight-by-eight scan?

11   A    Yes, we did.

12   Q    Now, the first entry on the timeline shows a figure from

13   Page 2 of Exhibit 675.   What is shown in that figure?

14   A    It shows Motorola's four-by-four scan pattern.

15   Q    And in this submission to the JVT, did Motorola present

16   test results for its new scans?

17   A    Yes, as stated here, "Preliminary results with alternate

18   scanning patterns have shown bitrate savings of up to about

19   seven percent."

20   Q    Now, the next entry on the timeline is JVT-D073, a

21   submission by Samsung.

22   A    Yes.

23   Q    In this submission, did Motorola test -- excuse me, did

24   Samsung test Motorola's four-by-four scan?

25   A    Yes.   And they stated, "The computer simulation

1    demonstrated that additional bitrate reduction of up to

2    8.64 percent and 6.15 percent on average is possible.  We

3    would like to adopt the alternate scan in JVT."

4    Q    Turning to the third entry on the timeline, JVT-E118, a

5    submission by Sony.

6    A    Yes.

7    Q    What is discussed in this document?

8    A    This is also providing the simulation results associated

9    with alternate scans.  And they conclude, "The simulation

10   results show that by employing the proposed method a coding

11   efficiency gain by up to three percent will be obtained."

12   Q    Now, the final entry on the timeline refers to the H.264

13   at Page 135.  Does this show Motorola's four-by-four scan?

14   A    Yes, it does.

15   Q    Was Motorola's four-by-four scan adopted into the

16   standard?

17   A    Yes, it was.

18   Q    And did Motorola also propose an eight-by-eight scan?

19   A    Yes, it did.

20   Q    And that scan was adopted into the standard?

21   A    That scan was adopted in what we call Phase II, which was

22   about a year after the first phase in 2004.

23   Q    And Motorola has two patents on its scanned inventions,

24   one for the four-by-four and one for the eight-by-eight scan?

25   A    That's correct.

1    Q    Now, had anyone, other than Motorola, proposed an

2    alternate scan during the JVT submission process?

3    A    Yes.  The one that comes to mind was from Sony.

4    Q    Please turn to Exhibit 653 in your binder.

5    A    Okay.

6    Q    Which is a submission B068 from Sony.

7    A    Yes, it is.

8    Q    Please turn to Page 3 of Exhibit 653.

9    A    Okay.

10   Q    Sony is proposing an alternate four-by-four scan there?

11   A    Yes, it is.

12   Q    How did Motorola's scan compare to Sony's scan?

13   A    This scan looks a lot more complex to me, compared to

14   Motorola's scan.

15   Q    Please turn to Exhibit 2216, which is JVT-B001d5, which is

16   an output document approved by the JVT.

17   A    Yes, I'm there.

18   Q    Are you a co-author on this document, sir?

19   A    Yes, I am.

20        MS. HIGGINS:  Motorola offers 2216.

21        MR. CEDEROTH:  No objection.

22        THE COURT:  Thank you.  It is admitted.

23        (2216 admitted.)

24        THE COURT:  Counsel, did you move on 653?

25        MS. HIGGINS:  I don't believe so.  I also need to

1    offer 675.

2              THE COURT:  Let's do 653, and then we will do the

3    next one.

4              MR. CEDEROTH:  No objection.

5              THE COURT:  And your next one is?

6              MS. HIGGINS:  The next one is 675, which is a JVT

7    submission, C140.

8              MR. CEDEROTH:  Got it.  No objection.

9              THE COURT:  675 is also admitted.

10             (653 & 675 admitted.)

11             MS. HIGGINS:  One more, Exhibit 710.

12             MR. CEDEROTH:  Sure.  No objection.

13             THE COURT:  710 is admitted.

14             (710 admitted.)

15   By Ms. Higgins:

16   Q   Getting back to this report in February 2002.  Please turn

17   to Page 28 of this report, where there is a discussion

18   regarding Sony's B68 submission.

19   A   I am there.

20   Q   What did the JVT conclude regarding B68?

21   A   As stated here, it says, "Small coding gain.  Need to

22   demonstrate larger gain for acceptance."

23             MS. HIGGINS:  Pass the witness, your Honor.

24             THE COURT:  Actually, you won't, because we are going

25   to stop for the day.

1          MR. JENNER:  Your Honor, if I may, in my sometimes

2     role of John Alden speaking for Miles Standish, I have been

3     asked by the third parties if I would bring to your Honor's

4     attention again, that if your Honor will have a minute, the

5     third-party licensees would like to be heard briefly as a

6     result of your rulings earlier today about the briefing

7     schedule.  Mr. Zinedin would like to speak on behalf of

8     Samsung, and perhaps some of the other third parties.

9          THE COURT:  Counsel, go ahead and sit down.  I am

10     going to finish up today, and then I will touch on what you

11     just said, Mr. Jenner.  You can go ahead and step down, sir.

12        The schedule for Monday is --  We will talk about that in

13     a moment.  The trial schedule will be 9:00 a.m. to noon and

14     1:00 p.m. to 4:00.

15        The time used today was Microsoft, two hours; Motorola,

16     three hours and 30 minutes.  And that means that Microsoft

17     has remaining four hours and 40 minutes, and Motorola has

18     remaining five hours and 35 minutes.

19        I will reiterate that I would like witnesses disclosed --

20     Monday's witnesses disclosed by 4:30 on Saturday.  If someone

21     would be kind enough to call Mr. Fortney's number and tell us

22     also so we can also prepare, that would be appreciated.

23        Counsel, at 8:45 on Monday, at which point I will have

24     read the material in regards to the sealing question, I will

25     hear argument, and try and save you some time off of your

1    trial day.  And at that time I will be happy to hear from the

2    third parties also.  That will be the disposition of it,

3    unless you are aware of something, Mr. Jenner, that makes

4    that not functional.

5              MR. JENNER:  I think there is a question of whether

6    its third parties might have the opportunity to submit,

7    either jointly or otherwise, a brief on behalf of themselves.

8              THE COURT:  They are always welcome.

9              MR. JENNER:  Sorry?

10             THE COURT:  They are always welcome.  Anything

11   further, Mr. Harrigan?

12             MR. HARRIGAN:  No, your Honor.

13             THE COURT:  Mr. Jenner?

14             MR. JENNER:  Nothing here, your Honor.

15             THE COURT:  Have a nice weekend.  I'm sure none of

16   you have anything to do.

17                     (Adjourned for the day.)

18

19

20

21

22

23

24

25

```
1                    C E R T I F I C A T E

2


3


4          we, Debbie K. Zurn and Barry Fanning, Court

5   Reporters for the United States District Court in the Western

6   District of Washington at Seattle, do hereby certify that we

7   were present in court during the foregoing matter and

8   reported said proceedings stenographically.

9          We further certify that thereafter, we have caused

10  said stenographic notes to be transcribed under our direction

11  and that the foregoing pages are a true and accurate

12  transcription to the best of our ability.

13


14


15         Dated this 18th day of December, 2012.

16


17                         /s/ Debbie Zurn, Barry Fanning

18                         DEBBIE ZURN/BARRY FANNING
                           OFFICIAL COURT REPORTERS
19


20


21


22


23


24


25
```