

**10-CV-01823-ORD**

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| MICROSOFT CORPORATION, | CASE NO. C10-1823JLR |
| Plaintiff, | FINDINGS OF FACT AND CONCLUSIONS OF LAW |
| v. | |
| MOTOROLA, INC., et al., | |
| Defendants. | |
| MOTOROLA MOBILITY, INC., et al., | |
| Plaintiffs, | |
| v. | |
| MICROSOFT CORPORATION, | |
| Defendant. | |

//

//

ORDER- 1

1    This is a breach of contract case between Microsoft Corporation ("Microsoft") and

2  Motorola, Inc., Motorola Mobility, Inc., and General Instrument Corporation

3  (collectively, "Motorola"). Microsoft claims that Motorola has an obligation to license

4  patents to Microsoft at a reasonable and non-discriminatory ("RAND") rate, and that

5  Motorola breached its RAND obligations through two offer letters. (*See generally* Am.

6  Compl. (Dkt. # 53).)  Microsoft sued Motorola for breach of contract in this court in

7  November, 2010. (*See id.*)

8    At this stage of the case, Microsoft and Motorola are attempting to decipher the

9  meaning of Motorola's RAND licensing obligation.[1]  Without a clear understanding of

10  what RAND means, it would be difficult or impossible to figure out if Motorola breached

11  its obligation to license its patents on RAND terms.  The parties disagree substantially

12  about the meaning of RAND.  Thus, to resolve the dispute, the court held a bench trial

13  from November 13-20, 2012, with the aim of determining a RAND licensing rate and a

14  RAND royalty range for Motorola's patents.

15    These findings of fact and conclusions of law represent the culmination of the

16  court's and the parties' efforts to calculate a RAND rate and range.  To establish a

17  context for these findings and conclusions, the court will briefly outline the details of

18  Motorola's RAND obligation, the patents at issue in this case, and the nature of the

19  dispute between Microsoft and Motorola.

20

21    [1] This matter has a complex procedural history involving several patent infringement
claims as well as claims and counter claims relating to Microsoft's breach of contract claim.  The
court's February, 27, 2012, order provides a more complete procedural history of the case. (*See
22  generally* 2/27/12 Order (Dkt. # 188).)

ORDER- 2

1    Motorola's RAND commitment arises out of its and Microsoft's relationship with

2   two international standard-setting organizations ("SSOs"), the Institute of Electrical

3   Electronics Engineers ("IEEE") and the International Telecommunication Union ("ITU").

4   These organizations create standards for use in designing and manufacturing technology

5   products.  These and other SSOs play a significant role in the technology market by

6   allowing companies to agree on common technological protocols so that products

7   complying with the standards will work together.

8    The standards at issue in this case involve wireless communications, commonly

9   known as "WiFi," and video coding technology.  More specifically, this case involves

10  two standards:  an IEEE wireless local area network ("WLAN") standard called the

11  "802.11 Standard" and an ITU[2] advanced video coding technology standard called the

12  "H.264 Standard."

13    Both of these standards incorporate patented technology.  Thus, in order for a

14  company to practice the standard, it is necessary for that company to utilize technology

15  that is covered by one or more patents.  Patents that are essential to the standard (in that

16  they must be practiced to accomplish the standard) are called standard essential patents,

17  or "SEPs."  The existence of SEPs is a common problem in the world of technology

18  standards.  To deal with this problem, SSOs have devised a solution.  To make it easier

19  for companies to practice their standards, SSOs seek commitments from the owners of

20

21    [2] As detailed below, the ITU developed the H.264 Standard jointly with two other

22  SSOs—the International Organization for Standardization and the International Electrotechnical
    Commission.

1  SEPs to license their patents to standard-users on RAND terms.  Motorola owns patents

2  that are essential to the 802.11 and H.264 Standards and has committed to license them

3  on RAND terms.

4      Microsoft claims that Motorola breached its RAND obligation by making an

5  unreasonable offer in a negotiation to license Motorola's 802.11 and H.264 SEPs.  On

6  October 21, 2010, Motorola sent Microsoft a letter offering to license Motorola's 802.11

7  SEPs.  Motorola offered to license its patents at what it considered the RAND rate of

8  2.25 % of the price of the end product:

> This letter is to confirm Motorola's offer to grant Microsoft a worldwide
> non-exclusive license under Motorola's portfolio of patents and pending
> applications having claims that may be or become Essential Patent Claims
> (as defined in section 6.1 of the IEEE bylaws) for a compliant
> implementation of the IEEE 802.11 Standards. . . . Motorola offers to
> license the patents under reasonable and non-discriminatory terms and
> conditions ("RAND"), including a reasonable royalty of 2.25 % per unit for
> each 802.11 compliant product, subject to a grant back license under the
> 802.11 essential patents of Microsoft.  As per Motorola's standard terms,
> the royalty is calculated based on the price of the end product (e.g, each
> Xbox 360 product) and not on component software (e.g., Windows Mobile
> Software).

(10/21/10 Offer Ltr. (Dkt. # 79-5) at 2.)  On October 29, 2010, Motorola sent a similar

letter offering to license its H.264 SEPs on similar terms.   The letter again offered a

royalty rate of 2.25 % of the end product price:

> Motorola offers to license the patents on a non-discriminatory basis on
> reasonable terms and conditions ("RAND"), including a reasonable royalty,
> of 2.25 % per unit for each H.264 compliant product, subject to a grant
> back license under the H.264 patents of Microsoft, and subject to any
> Motorola commitments made to JVT in connection with an approved H.264
> recommendation.   As per Motorola's standard terms, the royalty is
> calculated based on the price of the end product (e.g., each Xbox 360
> product, each PC/laptop, each smartphone, etc.) and not on component

ORDER- 4

1    software (e.g., Xbox 360 system software, Windows 7 software, Windows
     Phone 7 software, etc.).
2
     (10/29/10 Offer Ltr. (Dkt. # 79-6) at 2.)
3
4        Eleven days later, on November 9, 2010, Microsoft initiated this breach of

5    contract action against Motorola based on Motorola's two offer letters, claiming that the

6    letters breached Motorola's RAND commitments to the IEEE and the ITU. In a previous

7    order, the court held that these RAND commitments create enforceable contracts between

8    Motorola and the respective SSO. (2/27/12 Order (Dkt. # 188).) The court has also held

9    that Microsoft—as a standard-user—can enforce these contracts as a third-party

10   beneficiary. (*See id.*) In a separate prior order, the court interpreted Motorola's

11   commitments to the ITU and IEEE as requiring initial offers by Motorola to license its

12   SEPs to be made in good faith. (6/6/12 Order (Dkt. # 335) at 25.) However, the court

13   has also held that initial offers do not have to be on RAND terms so long as a RAND

14   license eventually issues. (*Id., see also* 10/10/12 Order (Dkt. # 465).)

15       To decide whether Motorola's opening offers were in good faith, a fact-finder

16   must be able to compare them with a reasonable RAND royalty rate and, because more

17   than one rate could conceivably be RAND, a reasonable RAND royalty range. However,

18   as the court ruled on October 10, 2012, the RAND royalty rate is a heavily disputed, fact-

19   sensitive issue that must be resolved by a finder of fact. (10/10/12 Order at 22.)

20   Accordingly, the court held a bench trial to determine: (1) a RAND royalty range for

21   Motorola's SEPs; and (2) a specific RAND royalty rate for Motorola's SEPs. The

22   purpose of this is to enable a fact-finder in a later trial to determine whether Motorola's

ORDER- 5

1    offer letters breached Motorola's RAND obligation to offer a license for its patents in

2    good faith.

3           During the November 13-20, 2012, bench trial, the court heard testimony from

4    eighteen witnesses:  Mr. John Devaan, Mr. Garrett Glanz, Dr. Kevin M. Murphy, Dr.

5    Gary Sullivan, Ms. Jennifer Ochs, Mr. Leonard Del Castillo, Dr. Jerry Gibson, Dr.

6    Timothy Simcoe, Dr. Matthew Lynde, Dr. Ajay Luthra, Dr. Timothy J. Drabik, Dr.

7    Michael Orchard, Dr. Tim Arthur Williams, Dr. Richard Schmalensee, Dr. Ramairtham

8    Sukumar, Mr. Michael J. Dansky, Mr. Kirk Dailey, and Mr. Charles R. Donohoe.

9           Unless stated herein, the court credits the testimony of each of these witnesses.

10   More often than not, the court found that the testimony of the witnesses was not in

11   conflict.  Where conflict exists, the court uses law, reason, and logic to resolve the

12   conflict in an effort to determine a reasonable royalty rate and range for Motorola's

13   802.11 and H.264 SEPs.

14          In these Findings of Fact and Conclusions of Law, the court uses the evidence the

15   parties presented at trial to set forth a methodology for determining a RAND royalty rate

16   and range.  The court then applies this methodology to determine a RAND royalty rate

17   and range between Microsoft and Motorola for Motorola's 802.11 and H.264 SEP

18   portfolios.  The court's methodology is necessarily dictated by the circumstances of this

19   litigation—a dispute between an SEP owner and a standard-user over a reasonable

20   royalty rate.  The court recognizes that real-world negotiations involving patents

21   committed to the RAND obligation might include layers of complexity beyond

22   determining monetary royalty rates.  However, this litigation is limited in scope by the

ORDER- 6

1    pleadings and evidence provided to the court, and the court is therefore likewise

2    constrained to determining what constitutes a reasonable royalty rate for Motorola's SEP

3    portfolio under the RAND obligation.[3] (*See generally* Am. Compl. (Dkt. # 53); Motorola

4    Answer (Dkt. # 68).)

5          The court's analysis proceeds in six parts.  First, the court introduces the parties

6    and their relation to one another.  Second, the court provides background on standards,

7    SSOs, and the RAND commitment.  Third, the court develops a framework for assessing

8    RAND terms.  Specifically, the court adopts a modified version of the *Georgia-Pacific*

9    factors to recreate a hypothetical negotiation between the parties.  *See Georgia-Pacific*

10   *Corp. v. United States Plywood Corp.*, 318 F. Supp. 1116 (S.D.N.Y. 1970).  Importantly,

11   the court determines that the parties in a hypothetical negotiation would set RAND

12   royalty rates by looking at the importance of the SEPs to the standard and the importance

13   of the standard and the SEPs to the products at issue.  These considerations are central to

14   the court's analysis.  Fourth, after establishing a framework for assessing RAND terms,

15   the court introduces the H.264 Standard and Motorola's H.264 SEPs, analyzing each

16   patent in turn and setting out the portfolio's relative importance to the H.264 Standard

17   

18       [3] Regarding the scope of this litigation, Motorola elicited evidence at trial pertaining to
     the value of patents that Microsoft owns.  The pleadings in this case, however, do not implicate
     the value of Microsoft's patents because there is no allegation that Microsoft breached its RAND
19   obligations by failing to license its SEPs on reasonable terms.  Indeed, the allegations in the
     pleadings pertain exclusively to the licensing practices of Motorola. (*See generally* Am. Compl.
20   (Dkt. # 53); Motorola Answer (Dkt. # 68).)  Insofar as Motorola seeks to insert the value of
     Microsoft's patents into the trial to determine the value of Motorola's patents, it is outside the
21   scope of this action.  Accordingly, as explained below, analysis relating to patents owned by
     Microsoft is relevant to this case not for their technological value, but for purposes of
22   analogizing patent pools to find a reasonable rate for Motorola's 802.11 and H.264 SEP
     portfolios.

ORDER- 7

1  and to Microsoft's standard-using products. Fifth, the court introduces the 802.11

2  Standard and Motorola's 802.11 SEPs and analyzes each 802.11 Patent using the same

3  framework.

4      Sixth, the court uses all of the foregoing information, along with comparables

5  suggested by the parties, to determine an appropriate RAND royalty rate for Motorola's

6  SEPs. Based on this analysis, the court sets the royalty rate and range as follows:

7       • The RAND royalty rate for Motorola's H.264 SEP portfolio is 0.555 cents per
          unit; the upper bound of a RAND royalty range for Motorola's H.264 SEP
8         portfolio is 16.389 cents per unit; and the lower bound is 0.555 cents per unit.
          This rate and this range are applicable to both Microsoft Windows and Xbox
9         products. For all other Microsoft products using the H.264 Standard, the
          royalty rate will be the lower bound of 0.555 cents.

10
        • The RAND royalty rate for Motorola's 802.11 SEP portfolio is 3.471 cents per
11        unit; the upper bound of a RAND royalty range for Motorola's 802.11 SEP
          portfolio is 19.5 cents per unit; and the lower bound is 0.8 cents per unit. This
12        rate and range is applicable to Microsoft Xbox products. For all other
          Microsoft products using the 802.11 Standard, the royalty rate will be the low
13        bound of 0.8 cents per unit.

14      Pursuant to Federal Rule of Civil Procedure 52(a), the following constitute the

15  court's Findings of Fact and Conclusions of Law.[4]

16

17

18
        [4] Although the court has not labeled paragraphs specifically as Findings or Conclusions,
19  such labels are not necessary. The nature of the Findings and Conclusions to follow is apparent.
     *See Tri-Tron Int'l. v. A.A. Velto*, 525 F.2d 432, 435-36 (9th Cir. 1975) ("We look at a finding or
20  a conclusion in its true light, regardless of the label that the district court may have placed on
     it. . . . [T]he findings are sufficient if they permit a clear understanding of the basis for the
21  decision of the trial court, irrespective of their mere form or arrangement.") (citations omitted);
     *In re Bubble Up Delaware, Inc.*, 684 F.2d 1259, 1262 (9th Cir. 1982) ("The fact that a court
22  labels determinations 'Findings of Fact' does not make them so if they are in reality conclusions
     of law.").

ORDER- 8

1    **FINDINGS OF FACT AND CONCLUSIONS OF LAW**

2    **I.    THE PARTIES**

3        1.    Microsoft is a Washington corporation having its principal place of

4    business in Redmond, Washington.  (10/24/12 Pretrial Order (Dkt.

5    # 493) at 2.)

6        2.    Motorola, Inc., has changed its corporate name to Motorola Solutions, Inc.

7    ("Motorola Solutions").  Motorola Solutions is a Delaware corporation having its

8    principal place of business in Schaumburg, Illinois.  (10/24/12 Pretrial Order at 3.)

9        3.    Symbol Technologies, Inc. ("Symbol"), which was acquired by Motorola,

10   Inc., in 2007, is now a wholly-owned subsidiary of Motorola Solutions.  (11/20/12 Tr.

11   (Dkt. # 635 (sealed), Dkt. # 636 (redacted)) at 58-59 (Dailey Testimony).)

12       4.    Motorola Mobility, LLC ("Motorola Mobility") is a Delaware limited

13   liability company having its principal place of business in Libertyville, Illinois.  Motorola

14   Mobility's predecessor-in-interest was Motorola Mobility, Inc. ("MMI"), which was a

15   Delaware corporation also having its principal place of business in Libertyville, Illinois.

16   (10/24/12 Pretrial Order at 3.)

17       5.    MMI was an indirect, wholly-owned subsidiary of Motorola, Inc., until it

18   was spun off from Motorola, Inc., on January 4, 2011.  MMI was acquired by Google,

19   Inc. ("Google"), on May 22, 2012.  Motorola Mobility is MMI's successor-in-interest and

20   a wholly-owned subsidiary of Google.  (10/24/12 Pretrial Order at 3.)

21       6.    General Instrument Corporation ("General Instrument") is a Delaware

22   corporation having its principal place of business in Horsham, Pennsylvania.  General

ORDER- 9

1   Instrument was a wholly-owned subsidiary of MMI and is now a direct, wholly-owned

2   subsidiary of Motorola Mobility and an indirect, wholly-owned subsidiary of Google.

3   (10/24/12 Pretrial Order at 3.)

4       7.      Motorola, Inc., Motorola Solutions, Symbol, MMI, Motorola Mobility, and

5   General Instrument are collectively referred to herein as "Motorola."

6       8.      The court has subject matter jurisdiction over this dispute pursuant to 28

7   U.S.C. § 1332 because this is an action between citizens of different states and because

8   the amount in controversy exceeds $75,000.00.

9       9.      Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(a).

10  **II.    STANDARDS & STANDARD-SETTING ORGANIZATIONS**

11  **A.     Background**

12      10.     SSOs are voluntary membership organizations whose participants engage in

13  the development of industry standards, including telecommunication and information

14  technology standards. (*See, e.g.*, 11/16/12 Tr. (Dkt. # 631) at 15:15-20 (Simcoe

15  Testimony).)

16      11.     SSOs "play a significant role in the technology market by allowing

17  companies to agree on common technological standards so that all compliant products

18  will work together." (6/6/12 Order (Dkt. # 335) at 3.)

19      12.     Standards lower costs by increasing product manufacturing volume, and

20  they increase price competition by eliminating switching costs for consumers who want

21  to switch from products manufactured by one firm to those manufactured by another.

22  (6/6/12 Order at 3.)

ORDER- 10

1        13.     SSOs seek to promote widespread adoption of their standards because the

2   interoperability benefits of standards depend on broad implementation.  (11/16/12 Tr. at

3   15:15-20 (Simcoe Testimony); 11/19/12 Tr. (Dkt. # 632) at 136:25-137:3 (Schmalensee

4   Testimony).)

5        14.     SSOs also seek to develop standards that incorporate technology that will

6   make the standard attractive to implementers, while at the same time ensuring a feasible

7   price to those same implementers to promote broad implementation.[5]  (11/13/12 Tr. (Dkt.

8   # 629) at 167 (Murphy Testimony); 11/19/12 Tr. at 137:4-8 (Schmalensee Testimony).)

9        15.     Industry participants in the standard-setting process enjoy significant

10  potential benefits to having their technology incorporated into a standard independent of

11  potential royalty income from licensing patents they own.  These non-income benefits

12  can include increased demand for participants' products, advantages flowing from

13  familiarity with the contributed technology potentially leading to shorter development

14  lead times, and improved compatibility with proprietary products using the standard.

15  (11/16/12 Tr. at 39-40 (Simcoe Testimony).)

16       16.     This case concerns two standards:  the 802.11 Standard and the H.264

17  Standard.  The 802.11 Standard is a wireless communication standard that has been

18  developed over a period of years by the IEEE.  (*See, e.g.,* 11/15/12 Tr. (Dkt. # 633

19  (sealed), Dkt. # 634 (redacted)) at 91:10-12, 92:14-93:11 (Gibson Testimony).)  Two

20  different organizations, the International Organization for Standardization and the

21  ─────────────────

22      [5] For purposes of this order, an implementer is a person or entity who practices all or part
    of a standard.

ORDER- 11

1 International Electrotechnical Commission ("ISO/IEC"), and ITU, jointly developed the

2 H.264 Standard, which relates to video compression. (*See, e.g.*, 11/13/12 Tr. at 210:24-

3 211:21; 213:7-214:1; 214:11-12 (Sullivan Testimony).)

4 **B.     Patented Technology in Standards**

5      17.     The engineers that develop industry standards typically do not know if the

6 use of the technology they are considering implicates a patent or patents. (11/16/12 Tr. at

7 17:5-8 (Simcoe Testimony).)

8      18.     For example, Gary Sullivan, Co-chairman of the Joint Video Team ("JVT")

9 that developed the H.264 video compression standard, did not analyze any particular

10 patents in his work on the standard. (11/14/12 Tr. (Dkt. # 630) at 44:4-21 (Sullivan

11 Testimony).)

12      19.     Similarly, Ajay Luthra, the other Co-chairman of the JVT, did not provide

13 other participants with information about relevant Motorola patents. (11/19/12 Tr. at

14 22:6-12 (Luthra Testimony).)

15      20.     Much of the technology that is incorporated into industry standards is not

16 patented. (11/16/12 Tr. at 17:9-12 (Simcoe Testimony).)

17      21.     For example, many of the core innovations of the H.264 Standard were

18 made by Telenor Group, which did not obtain patents on the technology that it

19 contributed and made its contributions available to all implementers of the standard

20 without patent licensing restrictions. (11/13/12 Tr. at 215:12-18 (Sullivan Testimony);

21 11/14/12 Tr. 114:21-115:5 (Orchard Testimony).)

22

ORDER- 12

1      22.     Likewise, the 802.11 Standard was based in part on a long history of

2 publicly-shared research and development by companies, government agencies, and

3 academic institutions. (11/15/12 Tr. at 96:16-24 (Gibson Testimony).)

4      23.     Nevertheless, using a standard frequently does require use of patented

5 technology. (*See, e.g.*, Ex. 1152 (listing more than 2,400 patents determined to be

6 essential to the H.264 Standard); 11/16/12 Tr. 108:21-109:9 (Lynde Testimony) (stating

7 that there are probably thousands of patents essential to the 802.11 Standard).)

8 **C.     SSO Intellectual Property Policies and the RAND Commitment**

9      24.     As the term is used by SSOs, a patent is "essential" if it is necessary to

10 implement either an optional or mandatory provision of a standard. (11/16/12 Tr. 17:18-

11 25 (Simcoe Testimony); Ex. 1568 at MS-MOTO_1823_00004073096 (IEEE-SA

12 Standards Board Bylaws).)

13      25.     As the court has previously found:

> In order to reduce the likelihood that owners of [standard] essential patents will abuse their market power, many standard setting organizations, including the IEEE and ITU, have adopted rules relating to the disclosure and licensing of essential patents. The policies often require or encourage members of the standards setting organizations to identify patents that are essential to a proposed standard and to agree to license their essential patents on reasonable and non-discriminatory ("RAND") terms to anyone who requests a license. Such rules help to ensure that standards do not allow essential patent owners to extort their competitors or prevent competitors from entering the marketplace.

(6/6/12 Order at 3-4; *see also* Ex. 1414 at 28,036-37 (describing basic elements of SSO intellectual property policies); 11/16/12 Tr. at 19:3-24, 21:24-23:7 (Simcoe Testimony)

1   (same); Exs. 1575 (Guidelines for Implementation of Common Patent Policy of the ITU-

2   T/ITU-R/ISO/IEC) and 1568 (IEEE-SA Standards Board By-Laws).)

3          i.      **The ITU/ISO/IEC Patent Policy**

4          26.     The ITU and ISO/IEC maintain a common patent policy (the

5   "ITU/ISO/IEC Common Patent Policy"), which constitutes the "code of practice"

6   regarding patents covering subject matters of "Recommendations" and "Deliverables" of

7   the respective SSOs. (Ex. 1575 at MOTM_WASH1823_0602815.) The ITU/ISO/IEC

8   Common Patent Policy states that "Recommendations" and "Deliverables" are drawn up

9   by technical (and not patent) experts who may "not be very familiar with the complex

10  international legal situation of intellectual property rights such as patents." (*Id.*)

11         27.     The objective of "Recommendations" and "Deliverables" is to "ensure

12  compatibility of technologies and systems on a worldwide basis." (Ex. 1575 at

13  MOTM_WASH1823_0602815.) To meet this objective, "Recommendations" and

14  "Deliverables" must be accessible to everybody.  It follows then that the "sole objective"

15  of the ITU/ISO/IEC Common Patent Policy is to ensure that "a patent embodied fully or

16  partly in a Recommendation | Deliverable must be accessible to everybody without undue

17  constraints." (*Id.* at MOTM_WASH1823_0602815.)

18         28.     The ITU and ISO/IEC have also published their "Guidelines for

19  Implementation of the Common Patent Policy for ITU-T/ITU-R/ISO/IEC/" ("Guidelines

20  for the Common Patent Policy"). (Ex. 1575 at MOTM_WASH1823_0602808-14.) The

21  Guidelines for the Common Patent Policy encourage disclosure by patentees of

22

ORDER- 14

1   potentially essential patents "as early as possible" in the standards development process.

2   (*Id.* at MOTM_WASH1823_0602808.)

3        29.    Once a patent holder has disclosed a potentially essential patent or has

4   made a blanket disclosure stating that one or more of its patents may be essential to a

5   proposed standard, the ITU will seek a licensing commitment from the patent-holder

6   using a standardized intellectual property rights ("IPR") disclosure form. The ITU refers

7   to such an assurance as a "Patent Statement and Licensing Declaration." (*See, e.g.*, Exs.

8   2838, 2839.) In practice, this assurance is often referred to as a "Letter of Assurance," or

9   an "LOA" for short.

10        30.    The ITU LOA provides three options to the patent holder: (1) the patent

11   holder may commit to license its essential patent(s) on a royalty-free basis; (2) the patent

12   holder may commit to license its essential patent(s) on RAND terms and conditions; or

13   (3) the patent holder may decline to make any licensing commitment. (Ex. 1575 at

14   MOTM_WASH1823_0602815, MOTM_WASH1823_0602818.)

15        31.    If the owner of a declared essential patent declines to make a RAND or

16   royalty-free licensing commitment, the ISO/IEC/ITU policy indicates that the approved

17   standard "shall not include provisions depending on the patent." (Ex. 1575 at

18   MOTM_WASH1823_0602815.)

19        32.    With respect to licensing arrangements for SEPs, the ITU/ISO/IEC

20   Common Patent Policy provides that "[t]he detailed arrangements arising from patents

21   (licensing, royalties, etc.) are left to the parties concerned, as these arrangements might

22   differ from case to case." (Ex. 1575 at MOTM_WASH1823_0602815.) Also, the

ORDER- 15

1   ITU/ISO/IEC Common Patent Policy and its licensing declaration form further state that

2   "negotiations are left to the parties concerned and are performed outside the [ITU]." (*Id.*

3   at MOTM_WASH1823_0602815, MOTM_WASH1823_0602818.)

4       33.    A patent holder willing to make a licensing commitment is given the option

5   of making its commitment conditional on "reciprocity." (Ex. 1575 at

6   MOTM_WASH1823_0602818.) The LOAs further state that "[a]s used herein, the word

7   'reciprocity' means that the Patent Holder shall only be required to license any

8   prospective licensee if such prospective licensee will commit to license its essential

9   patents(s) or essential patent claims for implementation of the same above document free

10  of charge or under reasonable terms and conditions." (*See, e.g.*, Ex. 2838 at

11  MOTM_WASH1823_0000036; *see also id.* at MOTM_WASH1823_0000040, 046, 053,

12  057, 061.)

13      34.    Under the ISO/IEC/ITU policy, when a patent holder has conditioned its

14  licensing commitment on reciprocity, "the Patent Holder shall only be required to license

15  any prospective licensee if such prospective licensee will commit to license its essential

16  patent(s) or essential patent claim(s) for implementation of the same above document free

17  of charge or under reasonable terms and conditions." (Ex. 1575 at

18  MOTM_WASH1823_0602818.)

19      35.    Motorola Mobility, its predecessors, and its wholly-owned subsidiary

20  General Instrument submitted several intellectual property disclosures to the ITU in

21  connection with the development of the H.264 Standard. (Ex. 2838.)

22

ORDER- 16

1       36.     All of Motorola's LOAs indicated that it would "grant to an unrestricted

2   number of applicants on a worldwide, non-discriminatory basis and on reasonable terms

3   and conditions" licenses conditioned on reciprocity.[6] (Ex. 2838 at

4   MOTM_WASH1823_0000036, 039, 046, 053, 057, 061; 11/20/12 Tr. at 33:21-34:12

5   (Dailey Testimony).)

6       ii.     **The IEEE Intellectual Property Rights Policy**

7       37.     The IEEE Standards Association ("IEEE-SA") established the 802.11

8   Standard, which relates to WLAN and is the second of the standards at issue here.

9       38.     The intellectual property policy of the IEEE is set forth in the IEEE-SA

10  Standards Board Bylaws and the IEEE Standards Operations Manual (collectively, the

11  "IEEE IPR Policy"). (11/16/12 Tr. at 27:22-28:9 (Simcoe Testimony); Ex. 1568 at MS-

12  MOTO_1823_00004073082; Ex. 1130 at MS-MOTO_1823_00005246469.)

13      39.     The IEEE-SA Standards Board Bylaws provide that IEEE standards may

14  include "Essential Patent Claims," which it defines as "any Patent Claim the use of which

15  was necessary to create a compliant implementation of either mandatory or optional

16  portions of the normative clauses of the [Proposed] IEEE Standard when, at the time of

17  the [Proposed] IEEE Standard's approval, there was no commercially and technically

18  non-infringing alternative." (Ex. 1568 at MS-MOTO_1823_00004073097 (§ 6.2).)

19      40.     The IEEE-SA Standards Board Bylaws indicate that "[i]f the IEEE receives

20  notice that a [Proposed] IEEE Standard may require the use of a potential Essential Patent

21

22  [6] Although not all of Motorola's LOAs included precisely the quoted language, each
    LOA contained words to that effect.

1 | Claim, the IEEE shall request licensing assurance, on the IEEE Standards Board

2 | approved Letter of Assurance form, from the patent holder or patent applicant." (Ex.

3 | 1568 at MS-MOTO_1823_000040730976 (§ 6.2).) This Letter of Assurance form is the

4 | IEEE version of an LOA.

5 |      41.    The IEEE LOA form allows declared essential patent holders to provide

6 | either "[a] general disclaimer to the effect that the Submitter without conditions will not

7 | enforce any present or future Essential Patent Claims" or "[a] statement that a license for

8 | a compliant implementation of the standard will be made available to an unrestricted

9 | number of applicants on a worldwide basis without compensation or under reasonable

10 | rates, with reasonable terms and conditions that are demonstrably free of any unfair

11 | discrimination." (Ex. 1568 at MS-MOTO_1823_000040730977 (§ 6.2).) The latter

12 | option constitutes the IEEE RAND commitment for "Essential Patent Claims," or SEPs.

13 |      42.    The IEEE LOA form allows, but does not require, the disclosure of specific

14 | patents or pending patent applications that may be or become essential to the standard

15 | under consideration. (11/16/12 Tr. at 19:3:24 (Simcoe Testimony); 11/16/12 Tr. at

16 | 108:21-109:4 (Lynde Testimony).)

17 |      43.    An IEEE LOA from an SEP holder that commits to license unspecified

18 | patents or pending applications for a particular standard is called a "blanket" disclosure.

19 | (11/16/12 Tr. at 19:21-24 (Simcoe Testimony); 11/16/12 Tr. at 108:21-109:4 (Lynde

20 | Testimony).)

21 |      44.    Motorola and Symbol Technologies submitted numerous blanket LOAs to

22 | the IEEE in relation to the 802.11 Standard. (Exs. 1407, 2839.) With these LOAs,

ORDER- 18

1  Motorola and Symbol agreed to grant, on reasonable terms and conditions, licenses to

2  their patents that are essential to the 802.11 Standard on a worldwide and non-

3  discriminatory basis. (11/20/12 Tr. at 32:19-23 (Dailey Testimony).)

4      45.    IEEE-SA Standards Board Bylaws state that "[n]o license is implied by the

5  submission of a Letter of Assurance." (Ex. 1568 at MS-MOTO_1823_00004073098.)

6  The bylaws further state that "[t]he IEEE is not responsible . . . for determining whether

7  any licensing terms or conditions provided in connection with submission of a Letter of

8  Assurance, if any, or in any licensing agreements are reasonable or non-discriminatory."

9  (*Id.*)

10     46.    Symbol and Motorola submitted their first blanket LOAs committing to

11 license their patents essential to the 802.11 Standard in 1993 and 1994, respectively. (Ex.

12 1407 (Symbol Letter of Assurance dated 11/8/1993); Ex. 2839 at

13 MOTM_WASH1823_0000004 (Motorola Letter of Assurance dated 3/1/1994).)

14     47.    The IEEE Operations Manual in place at the time that Motorola and

15 Symbol made their initial 802.11 RAND commitments provided that "[p]atent holders

16 shall submit to the Patent Committee of the IEEE Standards Board, prior to any

17 significant drafting of the standard, a draft of their license that assures that the technology

18 will be made available *at nominal competitive costs* to all who seek to use it for

19 compliance with an incorporated IEEE standard." (Ex. 1130 at MS-

20 MOTO_1823_00005246490 (§ 6.3.2) (emphasis added).)

21

22

ORDER- 19

1    48.    The requirement to license at nominal competitive costs was part of the

2  RAND commitment at the time Motorola and Symbol first committed to license their

3  802.11 SEPs on RAND terms.  (11/16/12 Tr. at 28:10-30:9 (Simcoe Testimony).)

4          **iii.    The ITU and IEEE are Silent as to What Constitutes RAND**

5    49.    The intellectual property rights policies of the IEEE and ITU focus on

6  technical issues and do not describe, explain, or govern RAND licensing terms and

7  conditions.  (*See, e.g.*, Ex. 2838 at MOTM_WASH1823_0000036.)

8    50.    The IEEE and ITU have declined to provide a definition of what constitutes

9  RAND terms and conditions.  Further, the organizations do not attempt to determine what

10  constitutes a reasonable royalty rate or what other terms and conditions are reasonable or

11  nondiscriminatory for any license between interested parties.  (11/16/12 Tr. at 47:12-16;

12  49:9-14, 62:19-22, 73:22-25 (Simcoe Testimony); Ex. 3010 at 8.)

13  **D.    The Purpose of the RAND Commitment**

14    51.    The purpose of the RAND commitment is to encourage widespread

15  adoption of the standard.  (11/13/12 Tr. at 147:19-21 (Murphy Testimony).)

16    52.    When the standard becomes widely used, the holders of SEPs obtain

17  substantial leverage to demand more than the value of their specific patented technology.

18  This is so even if there were equally good alternatives to that technology available when

19  the original standard was adopted.  After the standard is widely implemented, switching

20  to those alternatives is either no longer viable or would be very costly.  (11/13/12 Tr. at

21  140:2-23, 141:18-23 (Murphy Testimony); Ex. 1414 at 28036.)

22

1        53.     A given patent is "essential" to a standard if use of the standard requires

2    infringement of the patent, even if acceptable alternatives of that patent could have been

3    written into the standard. (11/16/12 Tr. at 18:9-21 (Simcoe Testimony); 11/13/12 Tr. at

4    199:11-200:15 (Murphy Testimony).)

5        54.     SSOs define a patent as essential even if the patent only reads onto an

6    optional portion of the standard. (11/16/12 Tr. at 18:1-6 (Simcoe Testimony).)

7        55.     The ability of a holder of an SEP to demand more than the value of its

8    patented technology and to attempt to capture the value of the standard itself is referred to

9    as patent "hold-up." (11/13/12 Tr. at 140:2-23, 141:18-23 (Murphy Testimony); Ex.

10   1414 at 28036; *see also* 11/19/12 Tr. 166:24-167:22 (Schmalensee Testimony)

11   (explaining that the "essence of hold-up" is that while *ex ante* competition constrains

12   what a patent holder can obtain for access to its patent, *ex post*, the technology in the

13   standard does not face that competition).)

14       56.     The threat of hold-up increases as the standard becomes more widely

15   implemented and firms make sunk cost investments that cannot be recovered if they are

16   forced to forego implementation of the standard or the standard is changed. (11/13/12 Tr.

17   at 143:1-18 (Murphy Testimony); 11/16/12 Tr. at 86:20-87:2 (Lynde Testimony).)

18       57.     Hold-up can threaten the diffusion of valuable standards and undermine the

19   standard-setting process. (Ex. 1414 at 28036; 11/13/12 Tr. at 144:25-145:11, 147:22-

20   148:13 (Murphy Testimony).)

21

22

ORDER- 21

1       58.    In addition to harming firms that are forced to pay higher royalties, hold-up

2  also harms consumers to the extent that those excess costs are passed onto them.  (Ex.

3  1414 at 28036; 11/13/12 Tr. at 144:25-145:6, 147:22-148:13 (Murphy Testimony).)

4       59.    Hold-up by one SEP holder also harms other firms that hold SEPs relating

5  to the same standard because it jeopardizes further adoption of the standard and limits the

6  ability of those other holders to obtain appropriate royalties on their technology.

7  (11/13/12 Tr. at 144:25-145:11 (Murphy Testimony).)

8       60.    Indeed, Motorola's expert, Dr. Richard Schmalensee, acknowledged that

9  "the RAND commitment and the whole apparatus exists [sic] to deal with hold-up."

10  (11/19/12 Tr. at 142:13-16, 157:20-23 (Schmalensee Testimony).)

11       61.    Similarly, the Federal Trade Commission ("FTC") has stated that "[t]he

12  most common mechanism used by SSOs to attempt to prevent patent hold-up is the

13  RAND commitment."  (Ex. 1414 at 28037.)

14       62.    Complex industry standards like the H.264 and 802.11 Standards can

15  require the use of hundreds or thousands of SEPs held by dozens of patent holders.  (Exs.

16  1150-54 (listing patents claimed or determined to be essential to the H.264 Standard and

17  patent holders that made blanket disclosures); Exs. 1156, 1158-59, 1164 (listing patents

18  claimed or determined to be essential to the 802.11 Standard and patent holders that made

19  blanket disclosures); 11/16/12 Tr. at 108:21-109:8 (Lynde Testimony) (the number of

20  SEPs related to the 802.11 Standard "generally is acknowledged to be in the

21  thousands").)

22

1      63.    High-tech products can comply with dozens or even hundreds of different

2  standards. For example, a typical personal computer ("PC") implements as many as 90

3  different formal standards and over 100 informal interoperability standards. (11/16/12

4  Tr. at 128:2-10 (Lynde Testimony).)

5      64.    In the context of standards having many SEPs and products that comply

6  with multiple standards, the risk of the use of post-adoption leverage to exact excessive

7  royalties is compounded by the number of potential licensors and can result in cumulative

8  royalty payments that can undermine the standards. (11/13/12 Tr. at 141:24-142:22,

9  145:12-146:14 (Murphy Testimony); 11/16/12 Tr. at 127:23-128:10 (Lynde Testimony).)

10     65.    The payment of excessive royalties to many different holders of SEPs is

11  referred to as "royalty stacking." (11/13/12 Tr. at 141:24-142:22 (Murphy Testimony).)

12     66.    The RAND commitment also addresses royalty stacking and the need to

13  ensure that the aggregate royalties associated with a given standard are reasonable.

14  (11/13/12 Tr. at 146:15-147:2 (Murphy Testimony); 11/16/12 Tr. at 15:14-16:7 (Simcoe

15  Testimony).)

16     67.    Indeed, Motorola emphasized the risk of royalty stacking in the standards

17  context in a submission it made (together with Nokia and Ericsson) to the European

18  Telecommunications Standards Institute ("ETSI") in 2006. (Ex. 1031 at

19  MOTM_WASH1823_0420998 ("cumulative royalties are perceived to be uncertain and

20  often too high, possibly even prohibitive"); 11/16/12 Tr. at 25:16-24 (Simcoe

21  Testimony).) In its ETSI submission, Motorola recited a commonly understood purpose

22  that RAND commitments be interpreted to require patent holders "to grant licenses on

ORDER- 23

1  terms that are objectively commercially reasonable taking into account the overall

2  licensing situation and including the cost of obtaining all necessary licenses from all

3  other relevant patent holders for the technologies in the end product." (Ex. 1031 at

4  MOTM_WASH1823_0420999; 11/16/12 Tr. 25:25-26-22 (Simcoe Testimony) (agreeing

5  with the statements contained in Motorola's ETSI submission).)

6       68.     In the same submission, Motorola also explained a commonly understood

7  principle of proportionality that "[c]ompensation under FRAND[7] must reflect the patent

8  owner's proportion of all essential patents.  This is not simply a numeric equation but the

9  compensation must, within reasonable bounds, reflect the contribution." (Ex. 1031 at

10 MOTM_WASH1823_0420999; 11/16/12 Tr. 25:25-26:22 (Simcoe Testimony) (agreeing

11 with the statements contained in Motorola's ETSI submission).)

12      69.     Motorola sought to "signal to judges in patent litigation that they can and

13 should look at the overall cumulative royalty costs for a given standard and not just

14 assess whether the terms being offered by one particular licensor are fair and reasonable

15 *in vacuo*." (Ex. 1031 at MOTM_WASH1823_042999; 11/16/12 Tr. at 76:2-10 (Simcoe

16 Testimony) (agreeing with statement contained in Motorola's ETSI submission).)

17 //

18 //

19 //

20

_____

21      [7] FRAND, which stands for fair, reasonable, and non-discriminatory, has the same
   meaning as RAND. (*See* 11/16/12 Tr. at 53 (Simcoe Testimony) (using FRAND and RAND
22 interchangeably).)

ORDER- 24

III.    **ECONOMIC GUIDEPOSTS FOR ASSESSING RAND TERMS**

A.    **Basic Principles**

70.    A RAND royalty should be set at a level consistent with the SSOs' goal of promoting widespread adoption of their standards.  (11/13/12 Tr. at 139:17-140:1, 203:14-18 (Murphy Testimony).)

71.    In the context of a dispute concerning whether or not a given royalty is RAND, a proper methodology used to determine a RAND royalty should therefore recognize and seek to mitigate the risk of patent hold-up that RAND commitments are intended to avoid.  (11/16/12 Tr. at 15:14-16:7, 44:10-13, 71:14-25 (Simcoe Testimony); 11/13/12 Tr. at 144:11-24, 203:14-18 (Murphy Testimony).)

72.    Likewise, a proper methodology for determining a RAND royalty should address the risk of royalty stacking by considering the aggregate royalties that would apply if other SEP holders made royalty demands of the implementer.  (11/16/12 Tr. at 15:14-16:7, 44:10-13 (Simcoe Testimony); 11/13/12 Tr. at 203:14-19 (Murphy Testimony).)

73.    At the same time, a RAND royalty should be set with the understanding that SSOs include technology intended to create valuable standards.  (11/19/12 Tr. at 136:24-137:8 (Schmalensee Testimony).)  To induce the creation of valuable standards, the RAND commitment must guarantee that holders of valuable intellectual property will receive reasonable royalties on that property.  (*Id.*)

74.    From an economic perspective, a RAND commitment should be interpreted to limit a patent holder to a reasonable royalty on the economic value of its patented

1 | technology itself, apart from the value associated with incorporation of the patented
2 | technology into the standard. (11/13/12 Tr. at 151:19-153:21 (Murphy Testimony).)
3 | Motorola's expert, Dr. Schmalensee, agreed that if a company makes a RAND
4 | commitment, it is entitled only "to some ill-defined measure [of] return on the value of
5 | the [patented] property, but you are not entitled to the incremental value that you get
6 | because you are part of the standard." (11/19/12 Tr. at 168:21-169:8 (Schmalensee
7 | Testimony).)

8 | **B.      Microsoft's Approach**

9 |     75.      Microsoft contends that the economic value of patented technology isolated
10 | from the value derived from incorporation into the standard would be determined by
11 | calculating the incremental value of the technology compared to the alternatives that
12 | could have been written into the standard. The focus is on the period before the standard
13 | was adopted and implemented (i.e., *ex ante*). (11/13/12 Tr. at 199:9-200:15 (Murphy
14 | Testimony).)

15 |     76.      Although Microsoft's approach suffers from several flaws, *ex ante*
16 | examination of the incremental contribution of the patented technology to the standard
17 | can be helpful in determining a RAND rate in the context of a dispute over a RAND
18 | royalty rate.

19 |     77.      One flaw in Microsoft's approach is its lack of real-world applicability.
20 | Neither the IEEE nor the ITU specifies that RAND terms must be determined using an
21 | incremental value approach. (11/16/12 Tr. at 63:10-12 (Simcoe Testimony).) Moreover,
22 | neither the IEEE nor the ITU require *ex ante* disclosure of RAND terms during the

ORDER- 26

1  standard setting process. In fact, explicit multilateral *ex ante* negotiations cannot be

2  conducted under the auspices of many SSOs, including the IEEE. (*Id.* at 67:11-68:1.)

3      78.    It is possible that SSOs remain generally fearful of the antitrust

4  implications of moving to an *ex ante* policy. (11/16/12 Tr. at 68:2-10 (Simcoe

5  Testimony).) As Dr. Simcoe, Microsoft's standards expert, wrote, "most SSOs prohibit

6  any prospective discussion of licensing terms—generally citing fears of antitrust

7  litigation." (Ex. 3118 at 6.) Dr. Simcoe believes that antitrust concerns have caused

8  SSOs to be scared of engaging in *ex ante* multilateral negotiations. (11/16/12 Tr. at 68:2-

9  10 (Simcoe Testimony).) Dr. Simcoe testified that, among the SSOs, "there are these

10  conversations where they bring up antitrust concerns as a reason to avoid getting into [an]

11  explicit definition of RAND." (*Id.* at 62:16-18.)

12      79.    Another flaw in Microsoft's approach is its impracticability with respect to

13  implementation by courts. In practice, approaches linking the value of a patent to its

14  incremental contribution to a standard are hard to implement. (Ex. 293 at 676.)

15  Calculating incremental value for multi-patent standards "gets very complicated, because

16  when you take one patent out of a standard and put another one in you may make other

17  changes, the performance of the standard is multidimensional, different people value

18  different aspects." (11/19/12 Tr. at 168:3-9 (Schmalensee Testimony).)

19      80.    Nevertheless, a reasonable royalty rate for an SEP committed to a RAND

20  obligation must value the patented technology itself, which necessarily requires

21  considering the importance and contribution of the patent to the standard. If alternatives

22  available to the patented technology would have provided the same or similar technical

ORDER- 27

1  contribution to the standard, the actual value provided by the patented technology is its

2  incremental contribution.  (*See* 11/13/12 Tr. at 152-53 (Murphy Testimony).)  Thus,

3  comparison of the patented technology to the alternatives that the SSO could have written

4  into the standard is a consideration in determining a RAND royalty.

5      81.     Using an example to explain this incremental approach, Dr. Murphy stated:

6      Yeah, that's the goal.  And this is more—this is like in most things in life,
       it's tougher to do than it is to say.  What you'd ideally like to do is sit down
7      and say:  Okay, Kevin, you've contributed this piece of technology.  Bob
       had this alternative piece of technology we could have used instead of
8      yours.  Yours was some increment better than his, that is the value you
       added, because we could have used his rather than yours, so your net
9      contribution was that amount.  And that's what you should get as a
       reasonable royalty.  That's ideally what you do.  That's not an easy exercise
10     always to do.

11  (11/13/12 Tr. at 153:1-11 (Murphy Testimony).)

12      82.     Likewise, Dr. Schmalensee has written that "FRAND licensing must

13  consider two key factors:  (1) contribution of the patented invention to the standard and

14  (2) the existence of any substitute technologies and the general level of competition."

15  (Ex. 293 at 675; *see also* 11/19/12 Tr. at 177:20-178:5 (Schmalensee Testimony).)

16  Dr. Schmalensee has likewise acknowledged that, in the event of a dispute

17  regarding RAND royalties, "[t]he various parties could make their cases in court for the

18  relative values of their IP contributions to the standard, *in the context of other options*

19  *considered during the standard's early developmental phases.*  If a component had

20  multiple alternatives before the standard was settled, its incremental contribution,

21  properly measured, may be close or equal to zero."  (Ex. 293 at 705-06 (emphasis added);

22  11/19/12 Tr. at 165:23-166:6 (Schmalensee Testimony).)

ORDER- 28

1 | C.    **Motorola's Approach**

2 |       83.    Motorola suggests that RAND terms and conditions can be determined by

3 | simulating a hypothetical bilateral negotiation under the RAND obligation. (11/19/12 Tr.

4 | at 149:14-17 (Schmalensee Testimony).) As explained and modified herein, the court

5 | generally agrees with Motorola's approach.

6 |       84.    Support for a hypothetical bilateral negotiation approach is found in real-

7 | world negotiations. Indeed, based on the evidence before the court, RAND license

8 | agreements often consummate through bilateral negotiations between the SEP owner and

9 | the implementer. (11/19/12 Tr. at 149:18-150:3 (Schmalensee Testimony).) Because

10 | bilateral negotiations occur in practice, there exists evidence of the results of such real-

11 | world negotiations that can be used in simulating the hypothetical negotiation. (*Id.*)

12 |       85.    Typically, the SEP owner and the potential licensee determine RAND

13 | terms through good-faith, bilateral negotiations, which take place independent of ITU and

14 | IEEE's activities. (*See, e.g.*, Ex. 2838 at MOTM_WASH1823_0000036, 039, 046, 053;

15 | Ex. 2970 at 14; 11/16/12 Tr. at 137:3-138:18 (Lynde Testimony); see also 11/13/12 Tr. at

16 | 181:12-15 (Murphy Testimony); 11/19/12 Tr. at 142:17-21, 149:18-22 (Schmalensee

17 | Testimony); 11/20/12 Tr. at 45:23-46:3 (Dailey Testimony).) Microsoft's experts agree

18 | that RAND licenses can be determined between parties through private bilateral

19 | negotiations after an SSO adopts a standard. (11/16/12 Tr. at 65:15-66:2 (Simcoe

20 | Testimony); 11/13/12 Tr. at 181:12-15 (Murphy Testimony); 11/16/12 Tr. at 138:7-18

21 | (Lynde Testimony).)

22 |

1          86.     Indeed, Microsoft's statements regarding the RAND commitment show that

2    bilateral negotiations take place in real world settings.  On June 14, 2011, seven months

3    after Microsoft filed its complaint in this case, David Heiner, Microsoft's Vice President

4    and Deputy General Counsel, and Amy Marasco, Microsoft's General Manager for

5    Standards Strategy and Policy, submitted a letter (Ex. 2970) to the FTC on behalf of

6    Microsoft in response to the FTC's May 13, 2011, Request for Comments and

7    Announcement of Workshop on Standards-Setting Issues regarding "patent hold-up" in

8    connection with standardization efforts.  The letter included the following statements:

9          a. "RAND-based IPR policies provide a flexible framework to help enable
             customized bi-lateral negotiations for patent licenses that generally are not
10            limited to just the essential patent claims in connection with a standard."
             (Ex. 2970 at 3.)

11
             b. "RAND is a time-tested and effective approach to licensing
12            commitments.  Like other 'reasonableness' standards, it does not dictate
             specific licensing terms, but it does provide flexibility across a diverse
13            range of situations.  As mentioned above, companies make decisions about
             whether to initiate licensing discussions and, if so, what considerations
14            beyond just the essential claims vis-a-vis the final standard will be
             included.  The negotiation associated with a standards-related patent license
15            typically is no different from any general patent licensing discussion and
             will involve trade-offs on all of the terms and conditions." (Ex. 2970 at
16            12.)

17          87.     Support for a hypothetical bilateral negotiation approach is also found in

18    the experience of the courts.  Courts have long experience in conducting hypothetical

19    bilateral negotiations to frame the reasonable royalty inquiry in patent infringement cases

20    under the *Georgia-Pacific* framework.  *See Georgia-Pacific Corp. v. United States*

21    *Plywood Corp.*, 318 F. Supp. 1116 (S.D.N.Y. 1970).  (11/19/12 Tr. at 149:18-150:3

22    (Schmalensee Testimony); Ex. 293 at 675, 679, 680-82.)

1        88.     Indeed, the Federal Circuit Court of Appeals, the appellate court for patent-

2 related issues, has consistently sanctioned the *Georgia-Pacific* approach.

3 *LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 60 n.2 (Fed. Cir. 2012)

4 ("This court has sanctioned the use of the *Georgia-Pacific* factors to frame the reasonable

5 royalty inquiry. Those factors properly tie the reasonable royalty calculation to the facts

6 of the hypothetical negotiation at issue." (citing *Uniloc USA, Inc. v. Microsoft Corp.*, 632

7 F.3d 1292, 1317 (Fed. Cir. 2011))).

8        89.     Additionally, other courts have spoken to the applicability of the *Georgia-*

9 *Pacific* framework in determining a reasonable royalty in the RAND context. *Broadcom*

10 *Corp. v. Qualcomm Inc.*, 501 F.3d 297, 314-15 n.8 (3d Cir. 2007) ("The reasonableness

11 of royalties is an inquiry that courts routinely undertake using the 15-factor test set forth

12 in *Georgia-Pacific* . . . and some courts have already applied this test in the [RAND]

13 context.").

14        90.     As Anne Layne-Farrar, A. Jorge Padilla, and Richard Schmalensee wrote in

15 2007 in an article in the Antitrust Law Journal entitled *Pricing Patents for Licensing in*

16 *Standard Setting Organizations: Making Sense of FRAND Commitments*, "[o]ne option"

17 for courts seeking to "evaluate what behavior is and what is not compliant with SSO

18 members' FRAND commitments" is "extending *Georgia-Pacific*, which is the primary

19 case guiding reasonable royalty determination in patent infringement cases in the United

20 States." (Ex. 293 at 673.) They add that the "majority of [the *Georgia-Pacific*] factors

21 are directly applicable to FRAND evaluations in a standard-setting context." (Ex. 293 at

22 681.) In using a hypothetical bilateral negotiation, courts should modify the *Georgia-*

1  *Pacific* framework to take the RAND obligation into account.  (11/19/12 Tr. at 150:4-10
2  (Schmalensee Testimony).)

3        91.    Finally, in the context of a dispute over the proper RAND royalty rate,
4  judicial simulation of a hypothetical, bilateral negotiation under the RAND obligation
5  logically will lead to a royalty rate that both parties would have found to be reasonable.

6        92.    However, the hypothetical negotiation under a RAND obligation must be
7  different than the typical *Georgia-Pacific* analysis historically conducted by courts in a
8  patent infringement action.  This is so for at least two reasons.  First, the owner of an SEP
9  is under the obligation to license its patents on RAND terms, whereas the owner of a
10  patent uncommitted to RAND has monopoly power over its patent and may choose to
11  withhold licensing.  Second, the hypothetical negotiation almost certainly will not take
12  place in a vacuum:  the implementer of a standard will understand that it must take a
13  license from many SEP owners, not just one, before it will be in compliance with its
14  licensing obligations and able to fully implement the standard.

15        93.    With respect to methodology, there is one question left to be answered:
16  what factors would an SEP owner and standard-implementer consider during such a
17  hypothetical negotiation?

18  //
19  //
20  //
21  //
22  //

ORDER- 32

1  **D.**     **The Hypothetical Negotiation**

2          In this section, the court sets out the factors that an SEP owner and standard-

3  implementer would consider during a hypothetical negotiation over a reasonable royalty

4  rate to be paid for patents obligated to a RAND commitment.

5          94.     The notion of a reasonable royalty in patents originates in the context of a

6  damages award after a finding of patent infringement.  Title 35, section 284 of the United

7  States Code provides that "[u]pon finding for the claimant the court shall award the

8  claimant damages adequate to compensate for the infringement, but in no event less than

9  a *reasonable royalty* for the use made of the invention by the infringer, together with

10  interest and costs as fixed by the court."  35 U.S.C. § 284 (emphasis added).

11          95.     The Southern District of New York, in its frequently cited opinion in

12  *Georgia-Pacific*, 318 F. Supp. 1116, compiled the following list of fifteen factors

13  relevant to a reasonable royalty calculation in the context of damages in a patent

14  infringement suit:

15          1. The royalties received by the patentee for the licensing of the patent in suit,
            proving or tending to prove an established royalty.

16
            2. The rates paid by the licensee for the use of other patents comparable to the
17          patent in suit.

18          3. The nature and scope of the license.

19          4. The licensor's established policy and marketing program to maintain his patent
            monopoly by not licensing others to use the invention or by granting licenses
20          under special conditions designed to preserve that monopoly.

21          5. The commercial relationship between the licensor and licensee, such as,
            whether they are competitors in the same territory in the same line of business; or
22          whether they are inventor and promoter.

ORDER- 33

6. The effect of selling the patented specialty in promoting sales of other products of the licensee; the existing value of the invention to the licensor as a generator of sales of his non-patented items; and the extent of such derivative or convoyed sales.

7. The duration of the patent and the term of the license.

8. The established profitability of the product made under the patent; its commercial success; and its current popularity.

9. The utility and advantages of the patent property over the old modes or devices, if any, that had been used for working out similar results.

10. The nature of the patented invention; the character of the commercial embodiment of it as owned and produced by the licensor; and the benefits to those who have used the invention.

11. The extent to which the infringer has made use of the invention; and any evidence probative of the value of that use.

12. The portion of the profit or of the selling price that may be customary in the particular business or in comparable businesses to allow for the use of the invention or analogous inventions.

13. The portion of the realizable profit that should be credited to the invention as distinguished from non-patented elements, the manufacturing process, business risks, or significant features or improvements added by the infringer.

14. The opinion testimony of qualified experts.

15. The amount that a licensor and a licensee would have agreed upon (at the time the infringement began) if both had been reasonably and voluntarily trying to reach an agreement.

318 F. Supp. at 1119-20.

96.      The *Georgia-Pacific* factors are widely accepted. *See Minks v. Polaris Indus., Inc.*, 546 F.3d 1364, 1372, (Fed. Cir. 2008) ("A determination of the royalty stemming from a hypothetical negotiation is often made by assessing factors such as

ORDER- 34

1 │ those set forth in *Georgia-Pacific Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116, 1120

2 │ (S.D.N.Y. 1970).").

3 │       97.    The *Georgia-Pacific* case and the factors it propounds are often cited as

4 │ setting forth the guiding principles to determine a reasonable royalty through a

5 │ hypothetical negotiation or the 'willing licensor-willing licensee' approach. This

6 │ approach attempts to ascertain the royalty upon which the parties would have agreed had

7 │ they successfully negotiated an agreement just before infringement began. The

8 │ hypothetical negotiation tries, as best as possible, to recreate the *ex ante* licensing

9 │ negotiation scenario and to describe the resulting agreement. *Lucent Techs., Inc. v.*

10 │ *Gateway, Inc.*, 580 F.3d 1301, 1324-25 (Fed. Cir. 2009); *Unisplay, S.A. v. Am. Elec. Sign*

11 │ *Co., Inc.*, 69 F.3d 512, 517 n.7 (Fed. Cir. 1995).

12 │       98.    Courts have wide discretion to decide which of the *Georgia-Pacific* factors

13 │ are relevant to a given case. *See Minco, Inc. v. Combustion Eng'g, Inc.*, 95 F.3d 1109,

14 │ 1119-20 (Fed. Cir. 1996) (relying on only a few of the *Georgia-Pacific* factors to uphold

15 │ reasonable royalty award of 20 % of the infringer's gross sales).

16 │       99.    The *Georgia-Pacific* factors must be adjusted to account for the purpose of

17 │ the RAND commitment. Specifically, the court concludes that the following *Georgia-*

18 │ *Pacific* factors must be modified.

19 │       100.    Factor 1 examines the royalties received by the patentee for the licensing of

20 │ the patent in suit, proving or tending to prove an established royalty. In the RAND

21 │ context, such licensing royalties for a given patent(s) must be comparable to RAND

22 │ licensing circumstances. In other words, to prove an established royalty rate for an SEP,

ORDER- 35

1  the past royalty rates for a patent must be negotiated under the RAND obligation or a

2  comparable negotiation.  Thus, license agreements where the parties clearly understood

3  the RAND obligation, and as discussed below, patent pools, will be relevant to a

4  hypothetical negotiation for SEPs.

5        101.    Factor 4 considers the licensor's established policy and marketing program

6  to maintain his patent monopoly by not licensing others to use the invention or by

7  granting licenses under special conditions designed to preserve that monopoly.  This

8  factor is inapplicable in the RAND context because the licensor has made a commitment

9  to license on RAND terms and may no longer maintain a patent monopoly by not

10  licensing to others.  In fact, as the court has found in this case, the RAND commitment

11  requires the SEP owner to grant licenses on RAND terms to all implementers of the

12  standard.  (*See* 10/10/12 Order (Dkt. # 465) at 14.)

13        102.    Factor 5 examines the commercial relationship between the licensor and

14  licensee, such as whether they are competitors in the same territory in the same line of

15  business; or whether they are inventor and promoter.  Similar to factor 4, this factor does

16  not apply in the RAND context.  This is because having committed to license on RAND

17  terms, the patentee no longer may discriminate against its competitors in terms of

18  licensing agreements.  Instead, as explained, the patent owner is obligated to license all

19  implementers on reasonable terms.

20        103.    Factors 6 and 8 examine the importance of the patented invention to both

21  the licensor and licensee's sales, as well as to derivative and convoyed sales to the

22  licensee.  Although both of these factors are relevant to a reasonable royalty in the RAND

1  context, it is important to focus the analysis of both of these factors on the value of the

2  patented technology apart from the value associated with incorporation of the patented

3  technology into the standard. (11/13/12 Tr. at 151:19-153:21 (Murphy Testimony).)

4      104.   With respect to Factors 6 and 8, a reasonable royalty would not take into

5  account the value to the licensee created by the existence of the standard itself, but would

6  instead consider the contribution of the patent to the technical capabilities of the standard

7  and also the contribution of those relevant technological capabilities to the implementer

8  and the implementer's products. (*See* 11/13/12 Tr. at 144:12-17 (Murphy Testimony).)

9  This is because there is substantial value in the agreed standard itself apart from any

10  contribution of the patented technology to the standard, and the RAND commitment

11  exists so that SEP patent holders cannot demand more than they contribute. (*See id.* at

12  151:21-152:23 (describing how RAND commitment limits reasonable royalty to that of

13  contribution of patent and not value of the standard itself).)

14      105.   Factor number 7 examines the duration of the patent and the term of the

15  license. The analysis concerning Factor 7 is greatly simplified in the context of a dispute

16  over a reasonable royalty for a RAND-committed patent because the term of the license

17  would equate to the duration of the patent. In many circumstances, this factor will have

18  little influence on what constitutes a reasonable royalty under the RAND commitment.

19      106.   Factor 9 considers the utility and advantages of the patent property over the

20  old modes or devices, if any, that had been used for working out similar results. Through

21  this factor, the parties to a hypothetical negotiation under a RAND commitment would

22  consider alternatives that could have been written into the standard instead of the

ORDER- 37

1 patented technology.  The focus is on the period before the standard was adopted and

2 implemented (i.e., *ex ante*).  (11/13/12 Tr. at 199:9-200:15 (Murphy Testimony).)  Thus,

3 through factor 9, Microsoft's incremental approach to determination of a RAND royalty

4 rate is realized, in part.

5      107.    Factor 10 generally relates to the character of the patented invention and the

6 benefits to those who used the invention.  Similarly, factor 11 examines the extent to

7 which the infringer has made use of the invention and value of that use to the infringer.

8 In the RAND context, both of these factors focus the hypothetical negotiation on the

9 contribution of the patent to the technical capabilities of the standard and also the

10 contribution of those relevant technical capabilities to the implementer and the

11 implementer's products.  Again, in such an analysis, however, it is important to separate

12 the patented technology from the value associated with incorporation of the patented

13 technology into the standard.  Nevertheless, evidence of the benefit and value of the

14 patent to the owner and implementer is relevant to the contribution of the patent to the

15 certain capabilities of the standard, as well as the contribution of the standard's

16 capabilities to the implementer.

17      108.    Factor 12 states, "the portion of the profit or of the selling price that may be

18 customary in the particular business or in comparable businesses to allow for the use of

19 the invention or analogous inventions." *Georgia-Pacific*, 318 F. Supp. at 1120.  This

20 factor must be viewed through the lens of business practices involving RAND

21 commitments.  In other words, licensing fees for non-RAND committed patents

22

ORDER- 38

1 | customary in a business industry cannot form the basis for comparison. Instead, factor 12

2 | must look to customary practices of businesses licensing RAND-committed patents.

3 |      109.   Factor 13 looks at the portion of the realizable profit that should be credited

4 | to the invention as distinguished from non-patented elements, the manufacturing process,

5 | business risks, or significant features or improvements added by the infringer. As with

6 | many of the other factors, in the RAND context, it is critical to consider the contribution

7 | of the patented technology apart from the value of the patent as the result of its

8 | incorporation into the standard, the latter of which would improperly reward the SEP

9 | owner for the value of the standard itself. Rewarding the SEP owner with any of the

10 | value of the standard itself would constitute hold-up value and be contrary to the purpose

11 | behind the RAND commitment. (*See* 11/13/12 Tr. at 152:14-23 (Murphy Testimony).)

12 |      110.   Factor 15 considers the amount that a licensor and a licensee would have

13 | agreed upon (at the time the infringement began) if both had been reasonably and

14 | voluntarily trying to reach an agreement. The SEP owner and the implementer would

15 | consider the RAND commitment and its purposes in their efforts to reach a license

16 | agreement. In trying to reach an agreement, the SEP owner would have been obligated to

17 | license its SEPs on RAND terms which necessarily must abide by the purpose of the

18 | RAND commitment of widespread adoption of the standard through avoidance of hold-

19 | up and stacking.

20 |      111.   With respect to hold-up, the parties would examine a reasonable royalty

21 | rate under the RAND commitment based on the contribution of the patented technology

22 | to the capabilities of the standard, and in turn, the contribution of those capabilities of the

ORDER- 39

1    standard to the implementer and the implementer's products.  Thus, a patent that is

2    extremely important and central to the standard would reasonably command a higher

3    royalty rate than a less important patent.  Importantly, however, because an "essential"

4    patent is one that is necessary to implement either an optional or mandatory provision of

5    a standard, a specific SEP may contribute greatly to an optional portion of a given

6    standard, but if that portion is not used by the implementer, the specific SEP may have

7    little value to the implementer.

8           112.   With respect to stacking concerns, the parties attempting to reach an

9    agreement would consider the overall licensing landscape in existence vis-à-vis the

10   standard and the implementer's products.  In other words, a RAND negotiation would not

11   be conducted in a vacuum.  The parties would instead consider other SEP holders and the

12   royalty rate that each of these patent holders might seek from the implementer based the

13   importance of these other patents to the standard and to the implementer's products.

14          113.   Finally, reasonable parties in search of a reasonable royalty rate under the

15   RAND commitment would consider the fact that, to induce the creation of valuable

16   standards, the RAND commitment must guarantee that holders of valuable intellectual

17   property will receive reasonable royalties on that property.

18          With the aforementioned framework for determining a RAND royalty rate set

19   forth, the court conducts a hypothetical negotiation for Motorola's 802.11 and H.264

20   SEPs.  First, the court examines Motorola's H.264 and 802.11 patent portfolios to

21   determine each portfolio's importance to its respective standard as well as the importance

22   to Microsoft's products.  Second, the court fashions a royalty rate and range for

ORDER- 40

1  Motorola's H.264 and 802.11 patent portfolios based on certain Microsoft products.  In

2  determining a royalty rate and range, the court considers possible comparable licensing

3  agreements and patent pools, which could provide indications of a reasonable royalty rate

4  for Motorola's patent portfolios.  The court also applies the principles behind the RAND

5  commitment in finding the appropriate royalty rate and range.

6  **IV.   THE H.264 STANDARD**

7      Motorola owns a portfolio of patents essential to the H.264 Standard.  To

8  determine a reasonable royalty for Motorola's H.264 SEP portfolio, the court provides

9  background on the H.264 Standard and then examines the importance of Motorola's

10  patent portfolio to the H.264 Standard and to Microsoft products using the standard.

11  **A.   Background on Video Processing**

12      114.   Video compression is the process of transforming video into compressed

13  video that requires less data storage than the original uncompressed video.  (11/14/12 Tr.

14  at 101 (Orchard Testimony).)

15      115.   Video compression is important because modern digital video, particularly

16  high definition video, requires immense amounts of data storage.  (*Id.*)

17      116.   Encoding compresses the original uncompressed video by turning it into a

18  smaller file or stream that requires less storage capacity and less bandwidth to transmit.

19  (*Id.*) Decoding turns an encoded smaller file back into an approximation of the original,

20  uncompressed video.  (*Id.*)

21      117.   Coding tools are individual tools that are used in the process of encoding or

22  decoding.  (*Id.* at 101-02.)  A video compression standard normally defines many

ORDER- 41

1  different coding tools, with different tools used for different purposes.  (*Id.* at 102.)  Each

2  tool contributes a small amount to the compression of video.  (*See id.* at 101-02.)

3  Together, the coding tools provide an aggregate level of compression that varies from

4  standard to standard.  (*Id.*)

5  **B.     Interlaced and Progressive Video**

6         118.    Interlaced video is a compression technology developed around 1940.

7  (11/13/12 Tr. at 214 (Sullivan Testimony); 11/14/12 Tr. at 104 (Orchard Testimony).)

8  The aim of interlaced video is and was to reduce the amount of data being sent in a

9  television broadcast signal by sending only half of a picture at a time.  (11/13/12 Tr. at 37

10  (DeVaan Testimony).)  Modern digital techniques compress video more efficiently than

11  interlaced video.  (11/13/12 Tr. at 214 (Sullivan Testimony); 11/14/12 Tr. at 102, 105

12  (Orchard Testimony).)

13         119.    Interlaced video compression separately captures the even and odd lines of

14  the pictures comprising a video.  (11/14/12 Tr. at 102 (Orchard Testimony); 11/13/12 Tr.

15  at 37 (DeVaan Testimony).)  The odd lines are collectively called a field, and the even

16  lines are another field.  Two consecutive fields, an odd field and the corresponding even

17  field, represent an entire picture and are called a frame.  (11/14/12 Tr. at 103 (Orchard

18  Testimony).)  In old interlaced televisions sets, which showed analog television

19  broadcasts, motion appeared smoother if different halves of the picture (alternating

20  between the even and odd lines) were displayed in quick succession rather than the entire

21  picture being displayed repeatedly at a slower pace.  (*Id.* at 104.)

22

1    120.    Modern flat screen televisions and computer displays do not use interlaced
2    video.  Instead, they rapidly show the entire picture independent of the speed at which
3    television pictures are stored or transmitted.  (11/14/12 Tr. at 104 (Orchard Testimony).)
4    This is called progressive video.  (*Id.*)  Progressive video is a sequence of entire pictures,
5    such as those taken with a still camera.  Each picture (or frame) contains all the lines, not
6    just half of them.  (*Id.* at 102.)

7    121.    Video captured as interlaced video can be converted to progressive form,
8    particularly if it is eventually going to be displayed on a progressive screen.  (11/14/12
9    Tr. at 103 (Orchard Testimony).)  This process is called de-interlacing.  (11/14/12 Tr. at
10   48 (Sullivan Testimony).)  Progressive video is rarely (if ever) converted to interlaced
11   video.  (*Compare* 11/14/12 Tr. at 103 (Orchard Testimony) *with* 11/19/12 Tr. at 43
12   (Drabik Testimony) (stating that interlaced format is used to represent progressive video
13   in a format named "progressive segment frame").)

14   122.    The weight of the evidence before the court demonstrates that interlaced
15   video content is increasingly rare in today's world.  (*See, e.g.,* 11/14/12 Tr. at 102-04
16   (Orchard Testimony).)

17   **C.    Compressing Interlaced Video**

18   123.    Interlaced coding tools increase the efficiency of coding interlaced material.
19   (11/14/12 Tr. at 103, 105 (Orchard Testimony).)  Tools for coding interlaced material
20   were developed for MPEG-2 in 1991 and 1992 and were included in an earlier video
21   coding standard, MPEG-2, that was published in 1995.  (*Id.* at 105; Ex. 1479.)  Tools for
22   coding interlaced material have also been incorporated into other standards, such as

ORDER- 43

1  MPEG-4, another standard that predates H.264. (11/14/12 Tr. at 48-49 (Sullivan

2  Testimony).)

3      124.    Adaptive frame/field coding chooses whether to code a particular piece of

4  interlaced material as a frame or as two separate fields. (11/14/12 Tr. at 118 (Orchard

5  Testimony).) Frame coding processes consecutive lines of the picture together. (*Id.* at

6  103.) Field coding separates odd and even lines and processes each separately.

7      125.    There are two types of adaptive frame/field coding: Picture Adaptive

8  Frame/Field coding ("PICAFF" or "PAFF") and Macroblock Adaptive Frame/Field

9  Coding ("MBAFF"). (11/14/12 Tr. at 27-28 (Sullivan Testimony).) Motorola did not

10  invent or make the seminal contributions to either PICAFF or MBAFF. (*Id.* at 12-13;

11  11/19/12 Tr. at 53 (Drabik Testimony).)

12      126.    PICAFF chooses between field and frame coding for an entire picture so

13  that the picture is entirely coded either as a frame or as two separate fields. (11/14/12 Tr.

14  at 119 (Orchard Testimony).) PICAFF is not used for progressive video. (*Id.* at 103,

15  106; Ex. 424 at MOTM_WASH1823_0336712 (describing PICAFF as a tool used in

16  interlaced coding).)

17      127.    MBAFF chooses between field coding and frame coding for each

18  macroblock, thereby choosing to code a macroblock as a frame or as two separate fields.

19  (11/14/12 Tr. at 119 (Orchard Testimony).) MBAFF is not used for progressive video.

20  (*Id.* at 120; Ex. 424 at MOTM_WASH1823_0336712 (describing MBAFF as a tool used

21  in interlaced coding).)

22

ORDER- 44

1          128.   During the development of the H.264 Standard, Motorola proposed a

2   change to MBAFF where the choice between field or frame coding would be made for

3   two macroblocks at a time, rather than for each macroblock individually.  (11/14/12 Tr.

4   120 (Orchard Testimony).)  To distinguish the two types of MBAFF, MPEG-2's MBAFF

5   is referred to as single macroblock MBAFF, and Motorola's proposal is referred to as

6   paired macroblock MBAFF.  Paired macroblock MBAFF was adopted as a part of the

7   H.264 Standard.  (*Id.*)

8   **D.     Background of the H.264 Standard**

9           **i.     Overview and Development of H.264 Standard**

10          129.   The H.264 Standard is a video coding standard, also known as MPEG-4

11  Part 10, or AVC (Advanced Video Coding).  (Ex. 421; Ex. 424 at 560.)  The first version

12  of the H.264 Standard was adopted in May 2003.  (Ex. 610.)

13          130.   Three core features of the H.264 Standard are coding (described above),

14  prediction, and transform/quantization.  (11/19/12 Tr. at 26:23-27:4 (Drabik Testimony);

15  11/14/12 Tr. at 31:21-32:14 (Sullivan Testimony); 11/14/12 Tr. at 109:10-15 (Orchard

16  Testimony) (prediction, transform, and quantization are "core video coding components

17  of the H.264 standard"); Ex. 424 at 566-71; Ex. 574 at 136-38; Ex. 421 at 4 (0.6.2), 24-25

18  (6.3), 26 (6.4.2), 129-81.)

19          131.   The basic idea of prediction is to eliminate redundancy from picture to

20  picture in order to reduce the number of bits that need to be transmitted or stored.  There

21  are two types of prediction:  intra prediction and inter prediction.  In intra prediction, a

22  prediction is created from spatial extrapolation of neighboring image samples from

ORDER- 45

1   within the same picture frame.  In inter prediction, blocks are predicted using blocks from

2   different pictures, called reference pictures.  Inter prediction is a way to perform motion

3   compensation—that is, to exploit the high correlation between successive pictures of a

4   video stream that represent moving objects.  (Ex. 424 at 568-70; Ex. 574 at 137-38; Ex.

5   421 at 4 (0.6.3).)

6        132.   The basic idea of transform is to convert pixel values into frequency

7   coefficients.  The frequency coefficients are easier to compress than the pixel values.

8   The basic idea of quantization is to reduce the number of bits required to represent each

9   coefficient.  After the frequency coefficients are quantized, they are scanned.  During

10  encoding, a scanning procedure scans the frequency coefficients from locations in two

11  dimensions and repositions them in one dimension for the next coding step.  (Ex. 424 at

12  570-71; Ex. 574 at 138-39; Ex. 421 at 4 (0.6).)

13       133.   H.264 is currently the most widely used video coding format.  (Ex. 2515 at

14  MOTM_WASH1823_0608878 ("[I]n the past four quarters, the H.264 format went from

15  31 percent of all videos to 66 percent, and is now the largest format by far."); Ex. 2747 at

16  MOTM_WASH1823_0610702, 704; 11/20/12 Tr. at 15:16-16:23, 17:15-18:2 (Dansky

17  Testimony).)

18       134.   The ISO/IEC and the ITU, two SSOs, jointly developed the H.264

19  Standard.  (11/13/12 Tr. at 208-09 (Sullivan Testimony).)  The MPEG (Motion Picture

20  Experts Group) video subgroup of ISO/IEC and the VCEG (Video Coding Experts

21  Group) subgroup of ITU develop video compression standards.  (*Id.* at 208.)  VCEG

22  performed the early development of what became the H.264 Standard.  (*Id.* at 210-13.)

ORDER- 46

1    As part of the development of the H.264 Standard, MPEG Video and VCEG created the

2    JVT, a joint organization that finalized the H.264 video standard. (*Id.* at 208-09.)

3         ii.    **Timeline of Development**

4         135.    Between January 1998, and August 2001, VCEG compiled a draft of what

5    would become the H.264 Standard. (11/13/12 Tr. at 211 (Sullivan Testimony).)

6         136.    By the spring of 2001, VCEG estimated its draft provided about 50 percent

7    better compression than had been possible in prior standards. (11/13/12 Tr. at 212-16

8    (Sullivan Testimony).)  In other words, on average VCEG's draft standard required only

9    half the bits to compress video with the same quality as prior standards. (*Id.*)  However,

10   the actual compression achieved varied from video sequence to video sequence. (*See* Ex.

11   424 at MOTM_WASH1823_0336720.)

12        137.    Performance of the standard for interlaced video was not, however,

13   measured by VCEG in the spring of 2001.  Instead, the estimated 50 percent compression

14   improvement was based on a video sequence of resolution lower than standard definition.

15   (11/14/12 Tr. at 28 (Sullivan Testimony); Ex. 424 at MOTM_WASH1823_0336721

16   ("note that Fig. 18 does not show performance for interlaced video").)  As of summer

17   2001, the VCEG design did not include specialized tools for coding interlaced video.

18   (11/13/12 Tr. at 214 (Sullivan Testimony).)

19        138.    In January 2001, MPEG called for proposals for advanced compression

20   technology. (11/13/12 Tr. at 213 (Sullivan Testimony).)  In July 2001, VCEG submitted

21   its draft design to MPEG for evaluation and proposed to join forces with MPEG to

22   finalize the draft standard. (*Id.* at 213.)  After testing VCEG's proposal, MPEG adopted

ORDER- 47

1  it and agreed to join with VCEG to finalize it as a new standard. (*Id.* at 213-14.) In

2  December 2001, VCEG and MPEG formally created the JVT. (*Id.*)

3      139.  After the JVT was formed, the standard underwent six new versions.

4  Testing and development continued through the partnership between MPEG and VCEG

5  and through contributions of other entities. (Ex. 424 at MOTM_WASH1823_0336720.)

6      140.  The JVT finalized the first version of H.264 in May 2003. (11/13/12 Tr. at

7  214 (Sullivan Testimony).) Like the VCEG draft standard from July 2001, it achieved an

8  average of approximately 50 percent improvement in compression over prior standards.

9  (*Id.* at 215; 11/14/12 Tr. at 9-10 (Sullivan Testimony).)

10     141.  Again, performance of the standard for interlaced video was not measured

11 for the final version. (11/14/12 Tr. at 28 (Sullivan Testimony); Ex. 424 at

12 MOTM_WASH1823_0336721 ("note that Fig. 18 does not show performance for

13 interlaced video").) Instead, the estimated 50 percent compression improvement in the

14 final standard was based on a video sequence of resolution lower than standard definition.

15 (11/14/12 Tr. at 28 (Sullivan Testimony); Ex. 424 at MOTM_WASH1823_0336721

16 ("note that Fig. 18 does not show performance for interlaced video").)

17     142.  The final H.264 Standard contained interlaced coding tools, including the

18 Motorola-proposed paired macroblock MBAFF. (11/14/12 Tr. at 119-20 (Orchard

19 Testimony).)

20     **iii.  The Profiles and Levels of the H.264 Standard**

21     143.  The H.264 Standard describes the formatting that is used to implement

22 various compression techniques. Because many techniques are allowed, the standard

ORDER- 48

1   groups these compression techniques into "profiles." (Ex. 574 at 140.) These include the

2   Baseline, Main, High, and Extended profiles. (*Id.*) The standard also defines "levels"

3   ranging from 1 through 5.1 that restrict how the compression techniques allowed by a

4   profile are used. (*Id.*; Ex. 610 at 209.) Compliance with the H.264 Standard is in

5   reference to a profile and a level. (Ex. 610 at 204.)

6       144.   The figure below from the "Marpe" paper illustrates the H.264 profiles:



Ex. 574: Marpe et al., *The H.264/MPEG4 Advanced Video Coding Standard and its Applications,* IEEE Communications Magazine, August 2006 ("Marpe"), at 140 (MOTM_WASH1823_0394434)

13  (Ex. 574 at 140; 11/19/12 Tr. at 36:20-37:4 (Drabik Testimony).)

14      145.   To comply with a particular profile and level of the H.264 Standard, an

15  H.264 video decoder must be able to decompress any video that was encoded using any

16  compression techniques allowed by that profile within the restrictions of that level. (Ex.

17  610 at 204; Ex. 574 at 140.)

18      146.   H.264 does not require an encoder to use any particular compression

19  technique even if that technique is allowed by the profiles and levels with which the

20  encoder complies. (Ex. 610 at 201 (H.264 Standard specifying that "Encoders are not

21  required to make use of any particular subset of features supported in a profile"); Ex. 574

22  at 140.) Instead, an encoder complies with a particular profile and level of the H.264

1  Standard if it produces video that can be decoded by a decoder that complies with that

2  profile and level. (Ex. 574 at 140.)

3      147.    The Constrained Baseline profile (depicted in the "Marpe" paper

4  illustration by the circle within "Baseline") is a package of features that "must be

5  supported by any H.264 decoder." (11/19/12 Tr. at 36:23-24 (Drabik Testimony); Ex.

6  574 at 140.) The Baseline profile is a superset of the Constrained Baseline profile and

7  adds three additional tools for transport efficiency. (Ex. 574 at 140.) "'Baseline' refers

8  to a limited functionality version of the technology that would not support, for example,

9  high definition video." (11/13/12 Tr. at 77:1-3 (Glanz Testimony).)

10      148.    The Baseline profile prohibits the use of interlaced coding tools. (Ex. 574

11  at 140; 11/14/12 Tr. at 19-20 (Sullivan Testimony).)

12      149.    The Main profile and High profile (both depicted in the "Marpe" paper

13  illustration) provide additional coding tools, including field coding, MBAFF, and PAFF.

14  (11/19/12 Tr. at 36:25-37:4 (Drabik Testimony); Ex. 574 at 140.)

15      150.    The Main and High profiles are commonly used for standard definition

16  ("SD") and high definition ("HD") video. (11/19/12 Tr. at 36:25-37:4 (Drabik

17  Testimony); 11/16/12 Tr. at 193:21-23 (Luthra Testimony); Ex. 574 at 141 ("the High

18  profile . . . has overtaken the Main profile for prospective applications of H.264/MPEG4-

19  AVC in typical SD and HD consumer applications"); Ex. 3399 at

20  MOTM_WASH1823_0612357 (the Main profile was "designed with an emphasis on

21  compression coding efficiency capability") (emphasis in original); Ex. 2739 at 17; Ex.

22

1   3345 at 7 ("Main—All features of H.264 except Flexible Macroblock Ordering (FMO).

2   Progressive or interlaced video.  Targets broadcast market.").)

3       151.   Levels below 2.1 and above 4.1 independently prohibit use of interlaced

4   coding tools regardless of the profile used.  Use of interlaced coding tools is allowed by

5   the Main and High profiles for levels 2.1 through 4.1.  (11/19/12 Tr. at 37 (Drabik

6   Testimony).)  Thus, a decoder that conforms to levels 2.1 to 4.1 of the Main or High

7   profiles must support interlace coding.  (Ex. 421 (H.264 Standard, March 2010) at 299

8   (Table A-4, showing "frame_mbs_only_flag" undefined for levels 2.1 to 4.1); 11/14/12

9   Tr. at 19:24-20:1, 20:8-10 (Sullivan Testimony); 11/19/12 Tr. at 37:6-9 (Drabik

10  Testimony).)

11      152.   If one wishes to take advantage of any technique allowed by the Main and

12  High profiles for levels 2.1 through 4.1 that is not allowed in other profiles and levels,

13  one must use decoders that have interlaced coding functionality, regardless of whether

14  that functionality is ever used.  (Ex. 574 at 1.)

15      153.   For example, Google's YouTube specifies the High profile in order to make

16  use of "CABAC" and "B-frame" compression techniques that are allowed by the High

17  profile but not the Baseline profile—but also specifies that video is never interlaced.

18  Therefore, an H.264 compliant decoder that decodes YouTube H.264 video must include

19  the capability to decode interlaced video even if that functionality is not used.  (Ex. 592 at

20  1.)

21  //

22  //

ORDER- 51

1          iv.    **Intellectual Property Relating to the H.264 Standard**

2          154.   The H.264 Standard resulted from the contributions of roughly 170 entities

3    that submitted over 2,300 documents.  (11/14/12 Tr. at 108 (Orchard Testimony).)  H.264

4    is a large and technically complex standard developed with the goal of providing

5    significantly improved compression compared to prior video standards.  (Ex. 610;

6    11/13/12 Tr. at 211 (Sullivan Testimony).)

7          155.   The largest technology contributor to the H.264 Standard was Telenor

8    Group, which contributed many of the core innovations of H.264 and submitted the

9    August 1999 proposal that became the basis of the first draft of the design.  (11/13/12 Tr.

10   at 215 (Sullivan Testimony); 11/14/12 Tr. at 115 (Orchard Testimony).)  Telenor decided

11   not to seek patents on its contributions and notified the JVT of its decision.  (11/14/12 Tr.

12   at 52 (Sullivan Testimony); 11/14/12 Tr. at 115 (Orchard Testimony).)

13         156.   In addition to Telenor's contribution to the standard, there are at least 2,500

14   patents throughout the world that are essential to the H.264 Standard.  (11/14/12 Tr. at

15   110-13 (Orchard Testimony).)  Of those 2,500 patents, over 360 are United States

16   patents.  (*See* Ex. 1544.)

17         157.   Approximately 33 United States companies have enumerated their

18   declared-essential H.264 Patents.  All of these patents are subject to the RAND

19   commitment.  Nineteen additional companies have provided "blanket" LOAs to the ITU

20   obligating their patents to the RAND commitment.  (*See* Ex. 1544.)

21   //

22   //

ORDER- 52

1          v.      **Motorola's Contributions to the Development of the H.264 Standard**

2          158.    Motorola did not contribute to the VCEG draft H.264 design that MPEG

3    evaluated in July 2001. (*See* 11/19/12 Tr. at 22 (Luthra Testimony).)

4          159.    Rather, Motorola became interested in VCEG's work around mid-2001.

5    (11/13/12 Tr. at 215 (Sullivan Testimony); Ex. 420 at 1; 11/19/12 Tr. at 21 (Luthra

6    Testimony).) Motorola made its initial proposal at the first meeting of the JVT in

7    December 2001, after MPEG and VCEG had already joined forces. (11/13/12 Tr. at 216

8    (Sullivan Testimony).) Additionally, Motorola employee Dr. Ajay Luthra began serving

9    as one of the co-chairs of the JVT.[8] (Ex. 424 at MOTM_WASH1823_0336722.)

10         160.    Before Motorola began to participate in the development of the H.264

11   Standard, many other companies and research institutes had already contributed to the

12   development of VCEG's H.264 draft standard, which led eventually to the H.264

13   Standard. (Ex. 420 at 1.) These entities made possible much of the innovation associated

14   with the H.264 Standard. They included Telenor, Nokia, Fraunhofer Heinrich Hertz

15   Institute, and others. (11/13/12 Tr. at 215 (Sullivan Testimony).)

16         161.    The JVT adopted Motorola contributions into the H.264 Standard related to

17   interlaced video. (11/14/12 Tr. at 109 (Orchard Testimony); 11/14/12 Tr. at 12 (Sullivan

18   Testimony); 11/19/12 Tr. at 50-51 (Drabik Testimony).) After the JVT was formed,

19   Motorola submitted 25 proposals, 18 of which related to interlaced video and seven of

20

21   ――――――――――――――――

          [8] The court cannot ascertain at what point in the development of the H.264 Standard Dr.
22   Luthra became involved. It appears Dr. Luthra's involvement began at the time of, or soon after,
     the creation of the JVT. (11/13/12 Tr. at 215 (Sullivan Testimony).)

1 which related to wavelet coding. (11/14/12 Tr. 108-09 (Orchard Testimony).) The JVT

2 did not adopt Motorola's wavelet coding contributions into the H.264 Standard. (*Id.*)

3 The JVT did, however, adopt Motorola's contributions related to interlaced video,

4 including PICAFF and MBAFF. (*Id.* at 119-20.)

5      162.   Accordingly, Motorola's role in H.264 development related almost entirely

6 to interlaced video. (11/14/12 Tr. at 12 (Sullivan Testimony); 11/14/12 Tr. at 12, 109

7 (Orchard Testimony); Ex. 420 at 1.)

8 **E.      Motorola's Patents**

9      163.   There are 16 Motorola U.S. patents, and many foreign counterparts to those

10 patents, that are essential to the practice of the H.264 Standard. These 16 patents are

11 distributed among 6 patent "families." (11/19/12 Tr. at 25:18-19 (Drabik Testimony).)

| Family | U.S. Patent |
|---|---|
| 1. Krause Family | 5,235,419 (Ex. 270) |
| 2. Wu Family | 5,376,968 (Ex. 283) |
| 3. Eifrig Family | 6,005,980 (Ex. 268) |
| 4. MBAFF Family | 6,980,596 (Ex. 271)<br>7,310,374 (Ex. 272)<br>7,310,375 (Ex. 273)<br>7,310,376 (Ex. 274)<br>7,310,377 (Ex. 275)<br>7,421,025 (Ex. 276)<br>7,477,690 (Ex. 277)<br>7,817,718 (Ex. 278) |
| 5. PAFF Family | 7,769,087 (Ex. 281)<br>7,660,353 (Ex. 280)<br>7,839,931 (Ex. 282) |
| 6. Scan Family | 7,162,094 (Ex. 266)<br>6,987,888 (Ex. 265) |

ORDER- 54

164. The six families of Motorola H.264 essential patents are directed to: (a) prediction, (b) adaptive frame/field coding, and (c) transform/quantization. The Krause, Wu, and Eifrig Families are directed to prediction. The MBAFF and PAFF Families are directed to adaptive frame/field coding. The Scan Family is directed to transform/quantization.

i. **The Krause Patent Family**

165. The Krause Family consists of U.S. Patent No. 5,235,419 (the '419 Patent), and foreign counterparts 2079862 (CA), EP0538667 (GB, GER, FR), 2875117 (JP), and 264507(KR). (Ex. 270; Ex. 2 at 17; 11/19/12 Tr. at 26:3-19 (Drabik Testimony).)

166. The '419 patent discloses adaptive video compression using a plurality of motion compensators to more effectively encode video data in which complex movements occur. (*See* Ex. 270 ('419 Patent) at Abstract, FIG. 1.)

167. The Krause Family is "essential" to the H.264 Standard at the Baseline, Main, and High profiles. (11/19/12 Tr. at 26:3-19, 36:18-37:17 (Drabik Testimony).)

168. **Importance to the Standard.** The Krause Family has technical value with respect to the H.264 Standard because it is directed to the core feature of prediction. It allows video encoders to encode video more efficiently by adaptively using the block size that results in the most compression of the video data. (11/19/12 Tr. at 27:22-28:17 (Drabik Testimony).) Likewise, it allows video decoders to retrieve a code word that indicates which block size the encoder used, and then use that code word to recover motion vectors. (*Id.*)

ORDER- 55

1    169.    Motorola presented uncontroverted opinion evidence from Dr. Timothy

2  Drabik that at least one claim of the '419 Patent is practiced by the H.264 Standard.

3  (11/19/12 Tr. at 26:3-19 (Drabik Testimony).)  The court credits this testimony, with one

4  caveat:  none of the terms comprising the claims of the '419 Patent have been construed

5  by a court.  Thus, Dr. Drabik's ultimate opinion requires the assumption that a court of

6  law would construe the claim terms to cover a similar scope as used by Dr. Drabik in his

7  analysis. *See generally Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 372

8  (1996) (placing sole responsibility for construing patent claims on the court); *Cybor*

9  *Corp. v. FAS Tech., Inc.*, 138 F.3d 1448, 1456 (Fed. Cir. 1998) (establishing that the

10  court construes claims purely as a matter of law).

11    170.    Motorola presented undisputed evidence that the '419 Patent contributed to

12  the 50 % coding gain reported for H.264 (progressive scan sequences only).  (11/16/12

13  Tr. at 192:25-193:16 (Luthra Testimony); Ex. 424 at 574-75.)

14    171.    The '419 Patent expired in October 2011, approximately a year after

15  Motorola sent its letter to Microsoft offering to license Motorola's H.264 SEPs.

16  (11/14/12 Tr. at 133 (Orchard Testimony); 11/19/12 Tr. at 56-57 (Drabik Testimony); Ex.

17  270.)  During trial, Microsoft did not present sufficient evidence that, despite the

18  relatively older age of the '419 Patent, it had lost importance to the H.264 Standard.

19    172.    Microsoft did assert that the JVT could have adopted alternatives to the

20  '419 Patent, including similar methods of motion compensation on blocks or sub-blocks

21  described in Exhibits 1477, 633, 462, and 632.  (11/14/12 Tr. at 135 (Orchard

22  Testimony).)  Microsoft did not, however, provide detail, aside from *ipse dixit* expert

1   testimony, as to how these alternatives would have fully replaced the '419 Patent or how

2   they would have affected related aspects of the H.264 Standard.  Moreover, the court

3   concludes, on the evidence before it, that Motorola, through its expert Dr. Drabik, has

4   provided sufficient evidence and explanation as to why the Krause Family of patents are

5   superior in functionality to any of the alternatives set forth by Microsoft.  (*See* 11/19/12

6   Tr. at 25, 44-45 (Drabik Testimony).)

7          173.   The court has examined the specification of the '419 Patent and concludes

8   that it only discloses specific hardware implementations of the means-plus-function

9   elements.  (11/14/12 Tr. at 134-35 (Orchard Testimony).)  According to Microsoft expert

10  Dr. Michael Orchard, at the time the application for the '419 Patent was filed, one of

11  ordinary skill would not understand the '419 Patent to disclose software structures.  (*See*

12  *id.*)  Although Motorola's expert, Dr. Drabik, testified that the '419 Patent specification

13  used the word "algorithm," Motorola did not identify an actual software algorithm

14  disclosed by the specification, and the court can find none.  *See Aristocrat Techs. Austl.*

15  *Pty Ltd. v. Int'l Game Tech.*, 521 F.3d 1328, 1333 (Fed. Cir. 2008) ("[I]n a means-plus-

16  function claim 'in which the disclosed structure is a computer, or microprocessor,

17  programmed to carry out an algorithm, the disclosed structure is not the general purpose

18  computer, but rather the special purpose computer programmed to perform the disclosed

19  algorithm.'" (quoting *WMS Gaming, Inc. v. Int'l Game Tech.*, 184 F.3d 1339, 1349

20  (1999))); (*see* 11/19/12 Tr. at 41 (Drabik Testimony)).  Thus, Motorola presented no

21  evidence that the specification of the '419 Patent discloses software structures or

22  algorithms (or that the disclosed hardware structures would have been viewed by a

ORDER- 57

1    person of ordinary skill as equivalent to software structures or algorithms) corresponding

2    to the means-plus-function claim limitations. Thus, the '419 Patent contributes to the

3    standard, but its contribution is limited to implementation of the standard through

4    hardware.

5         ii.      **The Wu Patent Family**

6         174.    The Wu Family of patents consists of U.S. Patent No. 5,376,968 (the '968

7    Patent) and foreign counterparts 663671(AU), 2118668(CA), EP0615384 (FR, GER, GB,

8    IRE, NETH, ES, SWED), 2945268(JP), 187606(MX), 311960(NOR), 244827(KR), and

9    NI-084114(TAI). (Ex. 283; Ex. 2 at 19; 11/19/12 Tr. at 26:3-19 (Drabik Testimony).)

10        175.    The '968 Patent discloses a system that enables compression of video data

11   by providing adaptive video compression using a plurality of compression modes. (Ex.

12   283 ('968 Patent) at Abstract, Fig. 1; 11/19/12 Tr. at 29:3-13 (Drabik Testimony).)

13   Specifically, the patent discloses that compression can occur on an entire block or

14   indicate with a code that the block should be broken up into sub-blocks. (11/14/12 Tr. at

15   138 (Orchard Testimony).)

16        176.    The Wu Family of patents is "essential" to the H.264 Standard at the

17   Baseline, Main, and High profiles. (11/19/12 Tr. at 26:3-19, 36:18-37:17 (Drabik

18   Testimony).)

19        177.    **Importance to the Standard.** The Wu Family has technical value to the

20   H.264 Standard because it is directed to the core H.264 feature of prediction. The Wu

21   Family patents provide flexibility in adaptively choosing compression modes leading to

22   enhanced coding efficiency. (11/19/12 Tr. at 29:3-13 (Drabik Testimony).) Likewise,

ORDER- 58

1  the Wu Family patents allow video decoders to retrieve overhead data so that they know

2  the compression mode used by the encoder and can perform the appropriate

3  decompression corresponding to that compression mode.  (*Id.*)

4      178.   At trial, Motorola presented uncontested opinion evidence from Dr.

5  Timothy Drabik that at least one claim of the '968 Patent covers adaptive compression as

6  employed by the H.264 Standard.  (11/19/12 Tr. at 26:3-19 (Drabik Testimony).)  Like

7  with the '419 Patent, the court credits this testimony with the caveat that none of the

8  terms comprising the claims of the '968 Patent have been construed by a court.  Thus, Dr.

9  Drabik's ultimate opinion requires the assumption that a court of law would construe the

10  claim terms to cover a similar scope as Dr. Drabik used in his analysis.

11      179.   Motorola presented uncontroverted evidence that the technology claimed in

12  the '968 patent contributed to the 50 % coding gain reported for H.264 (progressive scan

13  sequences only).  (11/16/12 Tr. at 192:25-193:11 (Luthra Testimony); Ex. 424 at 574-75.)

14      180.   The '968 Patent expired March 11, 2013, approximately two and a half

15  years after Motorola sent its letter to Microsoft offering to license Motorola's H.264

16  SEPs.  (*See* 11/14/12 Tr. at 138 (Orchard Testimony); Ex. 283.)  Similar to evidence

17  presented about the '419 Patent, during trial, Microsoft did not provide sufficient

18  evidence that despite the relatively older age of the '968 Patent, it had lost importance to

19  the H.264 Standard.

20      181.   With respect to the '968 Patent, Microsoft asserted that alternatives could

21  have been adopted by the JVT.  Microsoft's suggested alternatives are found in Exhibits

22  462, 632, 633, and 1477.  (11/14/12 Tr. at 135 (Orchard Testimony).)  However,

ORDER- 59

1   Microsoft did not provide detail, aside from *ipse dixit* expert testimony, as to how these

2   alternatives would have fully replaced the '968 Patent or how they would have affected

3   related aspects of the H.264 Standard.  (*See* 11/14/12 Tr. at 138-39 (Orchard Testimony)

4   (opining, without explanation, that Microsoft's alternatives would practice or be

5   equivalent to the '968 Patent).)  Moreover, the court concludes on the evidence before it

6   that Motorola, through its expert Dr. Drabik, has provided sufficient evidence and

7   explanation as to why the Wu Family of patents are superior in functionality to any of the

8   alternatives set forth by Microsoft.  (*See* 11/19/12 Tr. at 45-46 (Drabik Testimony).)

9        182.   As Microsoft points out, the claim of the '968 Patent, as analyzed by Dr.

10  Drabik, covers adaptive compression as described by the H.264 Standard and contains

11  means-plus-function limitations.  (Ex. 283; 11/14/12 Tr. at 139 (Orchard Testimony).)

12  The court has examined the specification of the '968 Patent and concludes that it only

13  discloses specific hardware implementations corresponding to the means-plus-function

14  elements.  (*See* Ex. 283; 11/14/12 Tr. at 134-35 (Orchard Testimony).)  According to

15  Microsoft expert Dr. Orchard, at the time the application for the '968 Patent was filed,

16  one of ordinary skill would not understand the '968 Patent to disclose software structures.

17  (*See* 11/14/12 Tr. at 138 (Orchard Testimony).)  Again, Motorola presented only the

18  expert testimony of Dr. Drabik that the '968 Patent specification used the word

19  "algorithm," but no evidence that the specification of the '968 Patent discloses an actual

20  software structure or algorithm (or that the disclosed hardware structures would have

21  been viewed by a person of ordinary skill as equivalent to software structures or

22  algorithms) corresponding to the means-plus-function claim limitations.

ORDER- 60

1       183.    Unlike the '419 Patent, the '968 Patent includes a claim, claim 16, which

2    does not include means-plus-function limitations.  Thus, on its face, claim 16 is not

3    limited to the hardware structures disclosed in the '968 specification.  Motorola did not,

4    however, provide evidence that claim 16 of the '968 Patent covers the technology of the

5    H.264 Standard.  Nevertheless, the '968 Patent is declared essential to the H.264

6    Standard and thus parties negotiating over this claim may view this patent as applicable

7    to both hardware and software implementation of the H.264 Standard.

8       184.    Thus, the '968 Patent contributes to the coding and prediction efficiency of

9    the H.264 Standard.  It would be a point of contention between the parties to a

10   hypothetical negotiation whether or not the patent's contribution relates only to software

11   implementation or to both software and hardware implementation.

12       **iii.    The Eifrig Patent Family**

13       185.    The Eifrig Family consists of U.S. Patent No. 6,005,980 (the '980 Patent)

14   and foreign counterparts 2230567(CA), 2702769(CA), and 245861(MX).  (Ex. 268; Ex. 2

15   at 1; 11/19/12 Tr. at 26:3-19 (Drabik Testimony).)

16       186.    The '980 Patent is directed to deriving a predictor motion vector ("PMV")

17   for a block based on the motion vectors of that block's three neighboring blocks (left (A),

18   top (B), and top-right (C)), where there is at least one field coded block.  (11/19/12 Tr. at

19   30:6-16 (Drabik Testimony); 11/16/12 Tr. at 200:15-201:10 (Luthra Testimony).)

20       187.    The Eifrig Family is declared "essential" to the H.264 Standard at the Main

21   and High profiles, levels 2.1 to 4.1.  (11/19/12 Tr. at 26:3-12, 37:6-9, 37:14-19 (Drabik

22   Testimony).)

1    188.  **Importance to the Standard.**  The Eifrig Family has technical value to the

2   H.264 Standard because it is directed to the core H.264 feature of prediction.  It improves

3   the coding gain over other choices of blocks for motion vector prediction.  (11/19/12 Tr.

4   at 30:4-23 (Drabik Testimony); 11/16/12 Tr. at 200:21-202:11 (Luthra Testimony).)

5    189.  At trial, Motorola presented uncontested opinion evidence from Dr. Luthra

6   that at least one claim of the '980 Patent covers deriving PMVs as described by the H.264

7   Standard.  (11/16/12 Tr. at 200:15-202:11 (Luthra Testimony).)  Like with the '419

8   Patent and '968 Patent, the court credits this testimony with the caveat that none of the

9   terms comprising the claims of the '980 Patent have been construed by a court.  Thus, Dr.

10  Luthra's ultimate opinion rests on the assumption that a court of law would construe the

11  claim terms to cover a similar scope as used by Dr. Luthra in his analysis.

12   190.  During the development of the H.264 Standard, Motorola proposed to the

13  JVT a technique for calculating a PMV for a block based on neighboring blocks, where

14  the blocks are frame or field coded.  (Ex. 423 (VCEG-O37) at 8; 11/16/12 Tr. at 199:10-

15  200:14 (Luthra Testimony).)

16   191.  Motorola's '980 Patent discloses Motorola's PMV invention: it calculates

17  the PMV for a current block based on the motion vectors of the left, top, and top-right

18  neighboring blocks, where one of the blocks is in field mode.  (Ex. 268; 11/16/12 Tr. at

19  200:15-201:7 (Luthra Testimony).)

20   192.  The JVT adopted Motorola's PMV invention into the H.264 Standard.

21  (*See, e.g.*, Ex. 610 (H.264 Standard, April 2003) at 21 (Fig. 6-9); Ex. 421 (H.264

22

1  Standard, March 2010) at 31 (Fig. 6-14); 11/16/12 Tr. at 200:15-201:24 (Luthra

2  Testimony).)

3       193.    Microsoft and Motorola disagree as to whether the '980 Patent relates to

4  only interlaced video (Microsoft's position) or to both interlaced video and progressive

5  video (Motorola's position). In support of its position, Motorola contends that the '980

6  Patent relates to field coding and mixed frame/field coding, the latter of which would

7  apply to progressive video. (See 11/19/12 Tr. at 54-55 (Drabik Testimony) (asserting that

8  the '980 Patent relates to progressive or interlaced video).)

9       194.    According to Motorola's expert, Dr. Drabik, the limitation of the '980

10  Patent is that one of the blocks must be field coded. (11/19/12 Tr. at 54 (Drabik

11  Testimony).) The evidence before the court demonstrates that field coding is a tool

12  applicable only to interlaced video. (11/14/12 Tr. at 105 (Orchard Testimony) (asserting

13  it would be a mistake to field code progressive video); Ex. 424 (describing adaptive

14  frame/field coding tools as used for interlaced coding).) Indeed, at his deposition, Dr.

15  Drabik stated that the '980 Patent was used for interlaced video. (11/19/12 Tr. at 55

16  (Drabik Testimony).) Accordingly, the court concludes that the '980 Patent applies to

17  only interlaced video, or at the very least would be a less efficient coding tool compared

18  to other tools for coding progressive video.[9]

19

20  ───────────────

21     [9] At trial, Dr. Drabik testified that interlaced coding tools could be invoked to decode
   progressive content and that there may be advantages to doing so. (11/19/12 Tr. at 63-64

22  (Drabik Testimony).) Dr. Drabik, however, did not identify any circumstance where this
   actually occurred. Although the court does not disagree that interlaced coding tools could be

1   195.   Moreover, Microsoft presented convincing evidence that the '980 Patent

2   disclosed prediction of motion using the same three blocks that the prior art used for

3   progressive video. (11/14/12 Tr. at 130-31 (Orchard Testimony).  In particular, the draft

4   H.263 standard from May 1996 showed utilization of the same three blocks as used in the

5   '980 Patent for motion prediction. (*Id.* at 132; Ex. 611.)  Accordingly, the court

6   concludes that it would have been intuitive for a person of ordinary skill to use the same

7   blocks for interlaced video that were already known to work for progressive video.

8   (11/19/12 Tr. at 56 (Drabik Testimony); 11/14/12 Tr. at 131 (Orchard Testimony).)

9   196.   Thus, even if the '980 Patent relates to both interlaced and progressive

10  video, as Motorola argues, the improvements disclosed by the '980 Patent would not

11  apply in the context of progressive video.  Accordingly, the court concludes that the '980

12  Patent provides minimal technical advancements compared to the technology in existence

13  prior to development of the H.264 Standard.

14  **iv.   The MBAFF Patent Family**

15  197.   The MBAFF Family consists of U.S. Patent Nos. 6,980,596 (the '596

16  Patent), 7,310,374 (the '374 Patent), 7,310,375 (the '375 Patent), 7,310,376 (the '376

17  Patent), 7,310,377 (the '377 Patent), 7,421,025 (the '025 Patent), 7,477,690 (the '690

18  Patent), and 7,817,718 (the '718 Patent) and foreign counterparts 2468087(CA),

19  10182726.9(EP), 10182629.5(EP), 10182686.5 (EP), 10182624.6(EP), 10182654.3(EP),

20  2804054.1(EP), 2009-244955(JP), 2008-234061(JP), 244982(MX), 20042544 (NOR),

21

22  used to decode progressive video content, from the trial record, doing so is at the very least
    highly uncommon and not advantageous.

ORDER- 64

1  10-2004-7007762(KR).  (Exs. 271-78; Ex. 2 at 2-17; 11/19/12 Tr. at 26:3-19 (Drabik

2  Testimony).)

3        198.    The '596 Patent is directed to AFF coding on a pair of macroblocks.  (Ex.

4  271 ('596 Patent) at 7:32-8:6, FIG. 7.)  This is referred to as macroblock adaptive

5  frame/field ("MBAFF") coding in the H.264 Standard.  (*See, e.g.*, Ex. 421 (H.264

6  Standard, March 2010) at 13, 29.)  As stated previously, for purposes of this document, to

7  distinguish the two types of MBAFF, pre-H.264 MBAFF technology is referred to as

8  single macroblock MBAFF (11/14/12 Tr. at 120 (Orchard Testimony)), and the

9  technology disclosed by the '596 Patent is referred to as paired macroblock MBAFF

10  (11/14/12 Tr. at 120 (Orchard Testimony)).

11        199.    The '374, '375, '376, '377, '025, '690, and '718 Patents are directed to the

12  fundamental paired macroblock MBAFF technology combined with other prediction

13  techniques that had already been developed such as intra prediction, inter prediction,

14  macroblock skipping, and bi-prediction.  (Ex. 272 ('374 Patent) at 9:9-14:36 (inter); Ex.

15  273 ('375 Patent) at 9:11-17, 14:41-17:2 (intra); Ex. 274 ('376 Patent) at 8:3-20

16  (horizontal or vertical scan path); Ex. 275 ('377 Patent) at 9:11-16:63 (intra and inter);

17  Ex. 276 ('025 Patent) at 7:18-8:36 (smaller portions with a size that is a multiple of a pair

18  of macroblocks); Ex. 277 ('690 Patent) at 12:38-65, 13:58-14:13 (skipped macroblock);

19  Ex. 278 ('718 Patent) at 12:56-13:47 (bi-prediction).)

20        200.    Motorola's MBAFF Patents—the '374, '375, '376, '377, '025, '690, and

21  '718 Patents, along with the '590 Patent—all stem from the same initial patent

22

ORDER- 65

1  application, and they all share the same specification.  (11/14/12 Tr. at 116 (Orchard

2  Testimony); Exs. 271-78.)

3       201.   The MBAFF Family of patents is "essential" to the H.264 Standard at the

4  Main and High profiles, levels 2.1 to 4.1.  (11/19/12 Tr. at 26:3-19, 31:22-32:3, 37:6-19

5  (Drabik Testimony).)

6       202.   **Importance to the Standard.**  The MBAFF Family is technically valuable

7  because it is directed to the core H.264 features of AFF coding and prediction.  It

8  provides coding gain through the use of macroblock pairs, which permit prediction on all

9  seven block sizes in frame and field mode.  (11/19/12 Tr. at 30:24-32:3 (Drabik

10  Testimony); Ex. 424 at 566-68; Ex. 574 (Marpe paper) at 136-37 (describing MBAFF as

11  a "main innovative feature" of H.264); 11/14/12 Tr. at 27:23-28:6, 28:22-29:4, 31:21-

12  32:14 (Sullivan Testimony).)

13       203.   At trial, Motorola presented uncontested opinion evidence from Dr. Luthra

14  and Dr. Drabik that at least one claim of each of the MBAFF Patents covers the MBAFF

15  and prediction techniques described by the H.264 Standard.  (11/19/12 Tr. at 26:3-19

16  (Drabik Testimony); 11/16/12 Tr. at 210:4-11 (Luthra Testimony).)  As before, the court

17  credits this testimony with the caveat that none of the terms comprising the claims in

18  each of the MBAFF Patents have been construed by a court.  Thus, Dr. Luthra's and Dr.

19  Drabik's ultimate opinions rest on the assumption that a court of law would construe the

20  claim terms to cover a similar scope as used by Dr. Luthra and Dr. Drabik in their

21  analyses.

22

1        204.   It is important to make clear, however, that Motorola did not invent

2   MBAFF.  (11/14/12 Tr. at 12 (Sullivan Testimony).)  By the time Motorola filed its

3   patent application for its MBAFF patents, MBAFF technology had been used to

4   compress video in prior video standards, such as the MPEG-2 Standard and the MPEG-4

5   Standard.  (*Id.*)  Microsoft presented evidence that, in terms of functionality and

6   performance, MBAFF in H.264 is essentially the same as MBAFF in MPEG-2.  (*Id.* at

7   50, 56-57, 59.)  Instead, Motorola's MBAFF Family patents relate to paired macroblock

8   MBAFF, and its contribution is determined by the importance of paired macroblock

9   MBAFF to the H.264 Standard.

10       205.   The coding gain achieved by Motorola's paired macroblock MBAFF

11  invention is documented in contribution documents submitted to the JVT by Motorola

12  and third parties during the development of the H.264 Standard.  Motorola submitted its

13  first proposal regarding MBAFF for the January 2002 JVT meeting in Geneva,

14  Switzerland, using the name "Super MB" to discuss paired macroblock MBAFF.  (Ex.

15  2209 (JVT-B106) at 3 ("Super MB is therefore introduced as follows.  Input frame is

16  divided into super MB consisting of 2 MBs of 16x16, as shown in Fig. 4.  A super MB of

17  32x16 can be coded as two frame MBs of 16x16, or one top-field MB of 16x16 and one

18  bottom-field MB of 16x16.  For frame coding, a super MB is coded as two frame MBs

19  and each of two MBs can be further divided into one of seven modes (Fig. 2).  For field

20  coding, a super MB is first split into one top-field MB and one bottom-field MB, as

21  shown in Fig. 5.  The top-field, or the bottom-field, MB is further divided into one of

22  seven block patterns (modes 1a - 7a), as shown in Fig. 5.  The block size in the seven

ORDER- 67

1 | modes can be 16x16, 16x8, 8x16, 8x8, 8x4, 4x8 or 4x4,—the same as for frame MB (Fig.

2 | 2).”); 11/16/12 Tr. at 205:1-207:12 (Luthra Testimony).)

3      206.   At the JVT meeting in Geneva, Motorola presented test results on its paired

4 | macroblock MBAFF invention. The graph in Figure 11 of Motorola's JVT-B106

5 | submission shows a "20 percent improvement with MB pair AFF in comparison to

6 | picture AFF". (Ex. 2209 at 10; 11/16/12 Tr. at 205:1-206:22 (Luthra Testimony).) In

7 | JVT-B106, Motorola compared MBAFF to PAFF because it was "generally comparing to

8 | the current state of the standard." (11/16/12 Tr. at 206:23-207:5, 197:25-198:13 (Luthra

9 | Testimony) ("[G]enerally the benchmark was the current state of the standard at that

10 | stage" because "[a] key goal of the standard was to improve the coding efficiency. And

11 | for the committee to be able to understand whether to adopt a proposal or not, a key

12 | criteria was whether it improves the coding efficien[cy] or not. So that's why generally

13 | we use the current state of the standard, so we could show that a given proposal improved

14 | the coding efficiency in comparison to that.").)

15      207.   Dr. Luthra testified that, "When [Motorola] described our MB pair AFF

16 | proposal the committee liked it very much, and they enthusiastically embraced it."

17 | (11/16/12 Tr. at 207:6-12 (Luthra Testimony).) The JVT concluded that Motorola's

18 | MBAFF proposal "[s]hows good potential for the sequences where the pictures have

19 | mixed motion types." (Ex. 2216 at 28.)

20      208.   In May 2002, Motorola presented additional paired macroblock MBAFF

21 | test results in JVT-C139 for the JVT meeting in Fairfax, Virginia. Consistent with the

22 | B106 results, these test results demonstrated improved coding efficiency by up to 18 %

ORDER- 68

1  over the PAFF technique in the draft standard: "MB/picture level adaptive coding

2  provides the best performance (up to about 18 % savings in the bit rate over current

3  technology in WD2r8 [6])." (Ex. 674 (JVT-C139) at 1; 11/16/12 Tr. at 207:20-208:12

4  (Luthra Testimony); *see also* Ex. 424 at 568 ("During the development of the standard,

5  MBAFF was reported to reduce bit rates in the range of 14 to 16 % over PAFF for ITU-R

6  601 resolution sequences like "Mobile and Calendar" and "MPEG-4 World News.").)

7       209.   Following Motorola's proposals, third-party video coding experts verified

8  the improved efficiency gains provided by Motorola's paired macroblock MBAFF

9  invention and recommended MBAFF for adoption into the H.264 Standard. Sony stated:

10  "We regard this feature [MBAFF] important for developing SDTV/HDTV applications

11  with JVT coding technology. This contribution provides supportive information of MB-

12  level field/frame adaptive coding. We reccomend [sic] the proposal be adopted." (Ex.

13  2274 (JVT-D081) at 1; 11/16/12 Tr. at 208:13-209:11 (Luthra Testimony).) VideoTele

14  stated: "Our simulation results support that macroblock-level frame/field adaptive coding

15  is a useful technique in the JVT standard, giving a bit rate savings of 11 % to 18 % on the

16  two sequences tested." (Ex. 2227 (JVT-E067) at 4; 11/16/12 Tr. at 209:12-210:3 (Luthra

17  Testimony).)

18       210.   The JVT adopted Motorola's proposed paired macroblock MBAFF

19  technique into the H.264 Standard. (*See, e.g.*, Ex. 610 (H.264 Standard, March 2003) at

20  16; Ex. 421 (H.264 Standard, March 2010) at 25; 11/16/12 Tr. at 210:4-8 (Luthra

21  Testimony).)

22

ORDER- 69

1      211.   Despite the preceding evidence that Motorola's paired macroblock MBAFF

2  technique provided technical advancement to the H.264 Standard, Microsoft asserts that

3  an alternative to the paired macroblock MBAFF would have been the single macroblock

4  MBAFF as used in MPEG-2. (11/14/12 Tr. at 120-21 (Orchard Testimony); Exs. 782,

5  785.)

6      212.   Moreover, as Microsoft correctly points out, Motorola provided no

7  evidence that paired macroblock MBAFF performs any better than single macroblock

8  MBAFF. (11/14/12 Tr. at 121 (Orchard Testimony); 11/14/12 Tr. at 51-52 (Sullivan

9  Testimony).) Instead, as shown above, during the development of H.264, Motorola

10  provided the JVT with test results that compared using paired macroblock MBAFF with

11  using no adaptive frame/field technique or using PICAFF.

12      213.   The only evidence relevant to a comparison between single macroblock

13  MBAFF and paired macroblock MBAFF demonstrates that macroblock MBAFF is as

14  efficient as paired macroblock MBAFF. Exhibit 423 reports a Motorola comparison of

15  single macroblock MBAFF to PICAFF (11/16/12 Tr. at 202 (Luthra Testimony)), while

16  Exhibit 2209 reports a Motorola comparison of paired macroblock MBAFF to PICAFF

17  (*id.* at 205). The graphs in those exhibits show the efficiency gain of the MBAFF types

18  over PICAFF. (*Id.* at 206.) One video, "Mobile (IP)", was used in both sets of tests.

19  (Ex. 423 at 16; Ex. 2209 at 9.)

20      214.   In Exhibit 423, the bit rate of single macroblock MBAFF at 31 dB quality

21  is approximately 2804 kb/sec while the bit rate of PICAFF for the same clip and quality

22  is approximately 2569 kb/sec. (Ex. 423 at 16 (Fig. 19).) Thus, the efficiency gain of

ORDER- 70

1  single macroblock MBAFF over PICAFF was approximately 9.1 %: (2804 - 2569)/2569.

2  (Ex. 423 at 16.)

3      215.   In Exhibit 2209, the bit rate of paired macroblock MBAFF for "Mobile

4  (IP)" at 32 dB is approximately 4400 kb/sec while the bit rate of PICAFF for the same

5  clip and quality is approximately 4175 kb/sec. (Ex. 2209 at 9 (Fig. 10).) Thus, for this

6  comparison, the efficiency gain of paired macroblock MBAFF over PICAFF was only

7  approximately 5.3 %: (4400 - 4175)/4175. (Ex. 2209 at 9.) These results—while

8  minimally conclusive without direct comparison between paired macroblock MBAFF

9  and single macroblock MBAFF—suggest that the paired macroblock approach that

10  Motorola advocated was, in fact, inferior to single macroblock MBAFF.

11      216.   Nevertheless, the court credits the inherent value to Motorola's paired

12  macroblock MBAFF invention for two reasons. First, simple logic suggests that

13  Motorola's paired macroblock MBAFF is superior to single macroblock MBAFF in that

14  paired macroblock MBAFF provides greater flexibility in terms of possible macroblock

15  coding options. Second, the JVT was well aware of single macroblock MBAFF due to its

16  use in MPEG-2, but nevertheless chose to incorporate paired macroblock MBAFF into

17  the H.264 Standard.

18      217.   Thus, the court concludes based on the evidence before it that paired

19  macroblock MBAFF has technical value to the H.264 Standard. This technical value is

20  diminished by the alternative of single macroblock MBAFF. It is also diminished by the

21  court's earlier conclusion that such MBAFF technology is directed towards interlaced

22  video as opposed to both interlaced and progressive video. (*See supra* ¶ 127; 11/14/12

ORDER- 71

1  Tr. at 120 (Orchard Testimony); Ex. 424 at MOTM_WASH1823_0336712 (describing

2  MBAFF as a tool used in interlaced coding).)  Parties to a hypothetical negotiation would

3  consider the importance of Motorola's MBAFF patents in this context.

4      218.   Finally, the entirety of Motorola's MBAFF Patent Family—the '374, '375,

5  '376, '377, '025, '690, and '718 Patents, along with the '590 Patent—amounts to a single

6  invention, paired macroblock MBAFF, applied to various coding tools incorporated into

7  the H.264 Standard.  These tools include intra prediction, inter prediction, macroblock

8  skipping, and bi-prediction.  Indeed, all of Motorola's MBAFF patents stem from the

9  same initial patent application and share the same specification.  (11/14/12 Tr. at 116

10  (Orchard Testimony); Exs. 271-78.)  The court concludes that parties to a hypothetical

11  negotiation would value Motorola's MBAFF Patent Family recognizing that,

12  cumulatively, the patent family provides only one core innovative function.

13      **v.**    **The PAFF Patent Family**

14      219.   The PAFF Family consists of U.S. Patent Nos. 7,769,087 (the '087 Patent),

15  7,660,353 (the '353 Patent), and 7,839,931 (the '931 Patent) and foreign counterparts

16  2468086(CA), 200910254137.9(CN), 200910254136.4(CN), 200910254135.X(CN),

17  ZL02827402.4(CN), 200910254134.5(CN), 10182595.8(EP), 10182605.5(EP),

18  10182643.6 (EP), 10183042(EP), 2804044.2(EP), 2003-548552(JP),

19  MX/a/2008/001309(MX), MX/a/2008/001308(MX), MX/a/2008/001311(MX),

20  MX/a/2008/001312(MX), 253886(MX), 20042543(NOR), 10-2010-7006173(KR), and

21  10-2004-7007734(KR).  (Exs. 280-82; Ex. 2 at 20-23; 11/19/12 Tr. at 26:3-19 (Drabik

22  Testimony).)

1   220.   These patents share the same specification and stem from the same original

2   patent application. (*See* 11/14/12 Tr. at 116 (Orchard Testimony); Exs. 280-82).)

3   221.   The '087 patent is directed to deciding, on a picture-by-picture basis,

4   whether to code a bi-predicted picture in a frame mode or in a field mode.  It is used

5   where the picture has two motion vectors, which can both point in the forward or

6   backward direction (i.e., both can refer to earlier or later pictures/fields).  (Ex. 281 ('087

7   Patent) at Abstract, Fig. 11.)

8   222.   The '353 Patent is directed to deciding, on a picture-by-picture basis,

9   whether to code a bi-predicted picture in frame mode or in field mode.  It is used where

10  the picture has two motion vectors, the second of which is encoded as an offset of the

11  first.  (Ex. 280 ('353 Patent) at Abstract, Fig. 11.)

12  223.   The '931 Patent is directed to deciding, on a picture-by-picture basis,

13  whether to code a picture in frame mode or in field mode.  It is used where the reference

14  pictures are indexed.  (Ex. 282 ('931 Patent) at Abstract, Fig. 11.)

15  224.   The PAFF Family is "essential" to the H.264 Standard at the Main and

16  High profiles, levels 2.1 to 4.1.  (11/19/12 Tr. at 26:3-19, 31:22-32:22, 37:6-19 (Drabik

17  Testimony).)

18  225.   **Importance to the Standard.**  The PAFF Family is technically valuable

19  because it is directed to core features of the H.264 Standard—coding and prediction.  It

20  provides coding gain by applying PAFF to "bi-predicted" pictures (pictures having two

21  motion vectors) through flexibility not found in prior PAFF methods.  (11/19/12 Tr. at

22  32:7-22 (Drabik Testimony); 11/16/12 Tr. at 210:12-212:16 (Luthra Testimony).)

ORDER- 73

1        226.   At trial, Motorola presented uncontested opinion evidence from Dr. Luthra

2   and Dr. Drabik that at least one claim of each of the PAFF patents covers the PAFF

3   techniques described by the H.264 Standard. (11/19/12 Tr. at 26:3-19 (Drabik

4   Testimony); 11/16/12 Tr. at 212:17-22 (Luthra Testimony).) As before, the court credits

5   this testimony with the caveat that none of the terms comprising the claims in each of the

6   PAFF Patents have been construed by a court. Thus, Dr. Luthra's and Dr. Drabik's

7   ultimate opinions rest on the assumption that a court of law would construe the claim

8   terms to cover a similar scope as used by Dr. Luthra and Dr. Drabik in their analyses.

9        227.   During the development of the H.264 Standard, Motorola submitted written

10   proposals to the JVT regarding its improved PAFF inventions. (Ex. 654 (JVT-B071) at 5

11   (Fig. 3); 11/16/12 Tr. at 210:12-212:16 (Luthra Testimony).)

12        228.   Motorola's test results demonstrated that PAFF improved coding efficiency

13   by up to 20-30 % over the frame and field coding in the draft standard. (Ex. 654 (JVT-

14   B071) at 1 ("[PAFF] guarantees a performance over frame and field coding"), 5, Fig. 23;

15   11/16/12 Tr. at 210:12-212:5 (Luthra Testimony); Ex. 424 at 567 ("During the

16   development of the H.264/AVC standard, PAFF coding was reported to reduce bit rates

17   in the range of 16 % to 20 % over frame-only coding mode for ITU-R 601 resolution

18   sequences like 'Canoa,' 'Rugby', etc.").)

19        229.   Motorola's PAFF inventions further improved coding efficiency because

20   being able to choose two reference pictures in the future or two reference pictures in the

21   past provided more flexibility than being limited to choosing one reference picture in the

22

1   future and one in the past. (11/16/12 Tr. at 210:12-212:22 (Luthra Testimony); 11/19/12

2   Tr. at 32:4-22 (Drabik Testimony).)

3        230.   The JVT adopted Motorola's proposed PAFF techniques into the H.264

4   Standard. (11/16/12 Tr. at 212:17-19 (Luthra Testimony).)

5        231.   Microsoft contends that Motorola's PAFF patents are unimportant to the

6   H.264 Standard because single macroblock MBAFF was an acceptable alternative.

7   (11/14/12 Tr. at 124 (Orchard Testimony).)

8        232.   Microsoft also contends that Motorola's PAFF Patent Family is

9   unimportant to the H.264 Standard because Motorola's patented PAFF technology was

10  proposed for use in the MPEG-2 standard between 1991 and 1992 and there is no

11  significant difference in the type or performance of PAFF in H.264 as compared with

12  PAFF in the prior standards. (*Id.* at 105, 123; 11/14/12 Tr. at 13, 50 (Sullivan

13  Testimony).)

14       233.   Microsoft, however, provides only *ipse dixit* expert testimony that there

15  was no significant difference between PAFF in the H.264 Standard compared with prior

16  standards. Moreover, the court concludes on the evidence before it that Motorola,

17  through its expert Dr. Luthra, has provided sufficient evidence and explanation as to why

18  the PAFF Family of patents provides superior functionality to that employed by prior

19  standards. For instance, Dr. Luthra testified that PAFF as it existed in MPEG-2 does not

20  disclose a suitable alternative to the '087 Patent because it did not permit the additional

21  flexibility of how motion is estimated and motion vectors are compressed that Motorola's

22

ORDER- 75

1   PAFF inventions provided, and therefore had worse efficiency. (11/16/12 Tr. at 211:4-

2   212:16 (Luthra Testimony).)

3        234.   Additionally, Microsoft contends that single macroblock MBAFF as was

4   employed in MPEG-2 was available to the JVT during development of the H.264

5   Standard and could have been used as an alternative to Motorola's PAFF Patent Family

6   without performance degradation. (11/14/12 Tr. at 124 (Orchard Testimony); Exs. 782,

7   785, 1479.)

8        235.   Microsoft asserts that Motorola's own test results show that PAFF performs

9   worse than single macroblock MBAFF. (11/14/12 Tr. at 124-25 (Orchard Testimony);

10  Ex. 423 at 12-16.) Based on the evidence before it, the court disagrees. As Motorola

11  correctly explains, the test results Microsoft relies on (provided in VCEG-O37) are

12  irrelevant to Motorola's improved PAFF Patent Family because they were based on

13  PAFF found in earlier standards, not Motorola's improved PAFF. (11/16/12 Tr. at 203:7-

14  18 (Luthra Testimony).) The VCEG-O37 contains no test results for single macroblock

15  adaptive frame/field ("AFF") using bi-predicted pictures, which is an element of

16  Motorola's PAFF patent claims. (Ex. 423 at 10-11 (under "Results for I, P and B,"

17  VCEG-O37 states: "Simulations on MB and picture levels are still in progress.").)

18       236.   Moreover, based on the evidence, Microsoft has not shown that the single

19  macroblock AFF technique that was used in MPEG-2 was a comparable alternative.

20  VCEG-N76 discloses the prior art single macroblock AFF technique that had only five

21  block sizes (excluding 16×16 and 8×16) available in field mode. (Ex. 785 at 3.) AFF

22  coding on a single macroblock as in VCEG-N57r2 and VCEG-N76 does not disclose a

ORDER- 76

1   suitable alternative to Motorola's PAFF inventions because the block sizes of 16×16 and

2   8×16 are not available for a single macroblock in field mode, and therefore would result

3   in less efficient compression. (Ex. 785 at 3.)

4        237.   Thus, the court concludes based on the evidence before it that Motorola's

5   PAFF Patent Family has technical value to the H.264 Standard. This technical value,

6   however, is diminished by the court's earlier conclusion that such PAFF technology is

7   directed only towards interlaced video as opposed to both interlaced and progressive

8   video. (*See supra* ¶ 126; 11/14/12 Tr. at 120 (Orchard Testimony); Ex. 424 at

9   MOTM_WASH1823_0336712 (describing PAFF as a tool used in interlaced coding).)

10  Parties to a hypothetical negotiation would consider the importance of Motorola's PAFF

11  patents in this context.

12       238.   Finally, the entirety of Motorola's PAFF Patent Family—the '087, '931,

13  and '353 Patents—amounts to a single invention, PAFF, applied to various coding and

14  prediction tools incorporated into the H.264 Standard. Indeed, like Motorola's MBAFF

15  Patents, Motorola's PAFF Patents stem from the same initial patent application and share

16  the same specification. The court, therefore, concludes that parties to a hypothetical

17  would value Motorola's PAFF Patent Family recognizing that cumulatively the patent

18  family provides one core innovative function.

19       **vi.    The Scan Patent Family**

20       239.   Motorola's Scan Family consists of U.S. Patent Nos. 7,162,094 (the '094

21  Patent) and 6,987,888 (the '888 Patent). (Exs. 265-66; Ex. 2 at 18; 11/19/12 Tr. at 26:3-

22

ORDER- 77

1   19 (Drabik Testimony).)  Motorola's Scan Family patents share the same specification.

2   (11/14/12 Tr. at 116 (Orchard Testimony); Exs. 265-66.)

3        240.   The '094 Patent discloses FIG. 6 as an embodiment of the invention, which

4   shows a preferable scanning pattern for a 4×4 pixel block's frequency coefficient array.

5   (Ex. 266 ('094 Patent) at 8:42-54, 9:12-45, FIG. 6.)

6        241.   The '888 patent discloses FIG. 9 as an embodiment of the invention, which

7   shows a preferable scanning pattern for a 8×8 pixel block's frequency coefficient array.

8   (Ex. 265 ('888 Patent) at 8:44-54, 11:24-12:35, FIG. 9.)

9        242.   The '094 Patent is "essential" to the H.264 Standard at the Main and High

10  profiles, levels 2.1 to 4.1.  (11/19/12 Tr. at 26:3-19, 37:6-19 (Drabik Testimony).)  The

11  '888 Patent is "essential" to the H.264 Standard at the High profile, levels 2.1 to 4.1.  (*Id.*

12  at 26:3-19, 37:6-19; 11/16/12 Tr. at 214:18-25 (Luthra Testimony).)

13       243.   **Importance to the Standard.**  The Scan Family is technically valuable

14  because it is directed to the core features the H.264 Standard of transform and

15  quantization.  (11/19/12 Tr. at 32:23-33:18 (Drabik Testimony).)  The claimed 4×4 and

16  8×8 scan patterns improve coding efficiency.  (*Id.* at 32:23-33:18; 11/16/12 Tr. at 213:14-

17  214:11 (Luthra Testimony).)

18       244.   At trial, Motorola presented uncontested opinion evidence from Dr. Luthra

19  and Dr. Drabik that at least one claim of the '094 patent covers the 4×4 field scan

20  described by the H.264 Standard.  (Ex. 421 (H.264 Standard, March 2010) at 179-80

21  (8.5.6, Fig. 8-8(b), Table 8-13); 11/19/12 Tr. at 26:3-19 (Drabik Testimony); 11/16/12 Tr.

22  at 214:12-25 (Luthra Testimony); Ex. 610 (H.264 Standard, April 2003) at 135.)

1  Likewise, Motorola presented uncontested evidence from the same experts that at least

2  one claim of the '888 patent covers the 8×8 field scan described by the H.264 Standard.

3  (11/19/12 Tr. at 26:3-19 (Drabik Testimony); 11/16/12 Tr. at 214:18-25 (Luthra

4  Testimony); Ex. 421 (H.264 Standard, March 210) at 180-81 (8.5.7, Fig. 8-9(b), Table 8-

5  14).)  Again, the court credits this testimony with the caveat that none of the terms

6  comprising the claims in each of the Scan Family Patents have been construed by a court.

7  Thus, Dr. Luthra's and Dr. Drabik's ultimate opinions rest on the assumption that a court

8  of law would construe the claim terms to cover a similar scope as used by Dr. Luthra and

9  Dr. Drabik in their analyses.

10        245.    During the development of the H.264 Standard, Motorola submitted written

11  proposals to the JVT regarding its 4×4 and 8×8 scans.  (Ex. 675 (JVT-C140); 11/16/12

12  Tr. at 213:2-19 (Luthra Testimony).)

13        246.    Motorola's test results demonstrated that its scans improved coding

14  efficiency by up to 7 % over the zig-zag scan in the draft standard: "Preliminary results

15  with alternate scanning patterns have shown bitrate savings of up to about 7 %."  (Ex.

16  675 (JVT-C140) at 1; see also 11/16/12 Tr. at 213:2-19 (Luthra Testimony).)

17        247.    Third-party video coding experts from Samsung and Sony verified the

18  improved efficiency gains provided by Motorola's 4×4 scan and recommended it for

19  adoption in the H.264 Standard.  Samsung and Sony stated: "The computer simulation

20  carried out using the current JM2.1 codec with CVLC demonstrated that additional bit

21  rate reduction (BDBR) of up to 8.64 % and 6.15 % on average is possible."  (Ex. 2281

22  (JVT-D073) at 5; see also 11/16/12 Tr. at 213:20-214:3 (Luthra Testimony).)  Sony

ORDER- 79

1   stated: "The simulation results show that by employing the proposed method[,] coding

2   efficiency gain by up to 3 % will be obtained." (Ex. 710 (JVT-E118) at 2; *see* also

3   11/16/12 Tr. at 214:4-11 (Luthra Testimony).)

4        248.   The JVT adopted Motorola's proposed scans into the H.264 Standard.

5   (11/16/12 Tr. at 214:12-25 (Luthra Testimony).)

6        249.   Microsoft and Motorola disagree as to whether Motorola's Scan Family

7   Patents relate only to interlaced video (Microsoft's position) or to both interlaced video

8   and progressive video (Motorola's position). (11/14/12 Tr. at 125 (Orchard Testimony

9   (stating Microsoft's position)); 11/19/12 Tr. at 32:23-33:18 (Drabik Testimony (stating

10  Motorola's position)).)

11       250.   At trial, Dr. Drabik testified that Motorola's Scan Family Patents relate to

12  any field-coded material, regardless of whether that material was progressive or

13  interlaced as initially captured. (11/19/12 Tr. at 33 (Drabik Testimony).) The

14  uncontroverted evidence before the court, however, is that field coding is a tool

15  applicable only to interlaced video. (11/14/12 Tr. at 105 (Orchard Testimony) (asserting

16  it would be a mistake to field code progressive video); Ex. 424 (describing adaptive

17  frame/field coding tools as used for interlaced coding).) Accordingly, the court

18  concludes that the Scan Family Patents apply to only interlaced video, or at the very least

19  would be a significantly less efficient coding tool compared to other available tools for

20  coding progressive video.

21       251.   Microsoft contends that the JVT had alternatives to the scan paths in

22  Motorola's patents that could have been used in the H.264 Standard instead. Sony

ORDER- 80

1    proposed its own 4×4 alternate scan and the MPEG-2 8×8 alternate scan for use with

2    interlaced video in H.264.  (11/14/12 Tr. at 126 (Orchard Testimony) (citing Ex. 653);

3    Ex. 653.)

4         252.   Microsoft also contends that the natural and best alternative to Motorola's

5    4×4 scan of Exhibit 266 would have been the 4×4 scan path Sony proposed for the H.264

6    Standard.  (*See* 11/14/12 Tr. at 126, 128 (Orchard Testimony); Ex. 653.)  Microsoft

7    correctly points out that Motorola provided no tests directly comparing Sony's scan path

8    with Motorola's scan path, but both scans were separately shown to perform modestly

9    better than the zigzag scan path for interlaced video.  (11/14/12 Tr. at 127, 128 (Orchard

10   Testimony); Exs. 653, 710, 2281.)  Moreover, Microsoft correctly explains that the

11   average performance of Sony's scan path compared to the zigzag scan path was slightly

12   better than the average performance of the Motorola scan path compared to the zigzag

13   scan path.  (11/14/12 Tr. at 127-30 (Orchard Testimony).)  In fact, Motorola's inventors

14   reported to the JVT that their test results showed that performance of their scans was

15   "consistent" with the performance of the Sony scans, and they initially believed that they

16   had copied a Sony scan.  (Ex. 675 at 2 ("Since our data was also consistent with a 4×4

17   blocksize as described in [Exhibit 653 (Sony alternate-scan proposal)], we used the same

18   4×4 alternate scan as used there.").)

19        253.   With respect to Motorola's 8×8 scan path, Microsoft asserts that the best

20   alternative would have been the MPEG-2 8×8 alternate scan proposed to the JVT by

21   Sony.  (11/14/12 Tr. at 126 (Orchard Testimony) (citing Ex. 653); Ex. 653.)  Again,

22

ORDER- 81

1   Microsoft correctly points out that Motorola provided no test results comparing the

2   Motorola 8×8 scan path to the MPEG-2 alternative.

3          254.    Indeed, the documents Motorola cited in its trial brief as allegedly showing

4   the value of Motorola's alternate scan paths did not compare Motorola's scan paths with

5   the best alternative.  Instead they compared the performance of Motorola's alternate

6   scans with the progressive zigzag scan path on interlaced video. (11/14/12 Tr. at 128-29

7   (Orchard Testimony); Ex. 2281; Ex 710.)  The progressive zigzag scan path was known

8   not to work well with interlaced video. (11/14/12 Tr. at 128 (Orchard Testimony); Exs.

9   2227, 2274.)

10         255.    Here, Motorola does not explain beyond *ipse dixit* expert testimony why its

11  Scan Family of patents would be superior to the alternatives cited by Microsoft. (*See*

12  11/16/12 Tr. at 215:1-14 (Luthra Testimony) (asserting without explanation that "[t]his

13  scan looks a lot more complex to me, compared to Motorola's scan.").)  There is no

14  concrete evidence, such as tests or logical explanation, before the court as to why the

15  suggested alternatives could not have been incorporated into the H.264 Standard without

16  degradation.  Nevertheless, Motorola's Scan Patents were adopted by the JVT, and thus

17  the court credits the judgment of the JVT in doing so.

18         256.    Based on the foregoing, the court concludes that Motorola's Scan Patents

19  provide technical value to the H.264 Standard as directed to a core feature of the

20  standard, but that alternatives were available that may have provided similar technical

21  value.  Thus, parties to a hypothetical negotiation would consider the importance of

22

1  Motorola's Scan patents in this context. Moreover, parties to a hypothetical negotiation

2  would view Motorola's Scan Patents as related to interlaced video only.

3  **F.    Motorola's H.264 Patents and Microsoft's Products**

4      257.    Factors 6, 8, 10, and 15 of the court's RAND-modified *Georgia-Pacific*

5  analysis all require the court to examine the importance of Motorola's H.264 SEPs not

6  only to the H.264 Standard itself, but also with respect to Microsoft's products. Indeed,

7  an implementer would see little to no value in licensing a SEP if that patent did not cover

8  a portion of the standard utilized by the implementer.

9      258.    As an initial matter, although there is clear value to implementers, such as

10  Microsoft, to offer products compliant with the H.264 Standard, this value reflects the

11  value of standard compliance and interoperability, not the value of any individual patents.

12  (11/13/12 Tr. at 34 (DeVaan Testimony); 11/15/12 Tr. at 21 (Del Castillo Testimony).)

13  The court concludes that under a RAND obligation, reasonable parties in a hypothetical

14  negotiation would not consider the value associated with incorporation of the patented

15  technology into the standard. Instead, the negotiating parties would consider only the

16  economic value of the patented technology—based on the technology's contribution to

17  the standard and to the implementer's product itself—apart from the value associated

18  with the standard. (11/13/12 Tr. at 151:19-153:21 (Murphy Testimony).)

19      259.    At trial, Motorola mentioned that the following Microsoft products used the

20  H.264 Standard: Windows, Xbox, Silverlight, Zune, Lync, and Skype. Based on the

21  evidence presented at trial, the court will examine each of these products in turn to

22

ORDER- 83

1  determine the importance of Motorola's H.264 SEPs to the overall functionality of the
2  product.

3      260.    Before doing so, however, having already concluded that 14 of the 16
4  Motorola H.264 SEPs are directed only to interlaced video, the court will discuss the
5  importance of interlaced video to Microsoft's products. Then, on a product-by-product
6  basis, the court will examine the value of all of Motorola's 16 SEPs vis-à-vis Microsoft's
7  products.

8      i.      **Importance of Interlaced Video in the Marketplace**

9      261.    In this section, the court recounts the evidence submitted at trial related to
10  the importance of interlaced video in the marketplace. Based on the evidence, the court
11  concludes that despite ample opportunity to do so at trial, Motorola presented little
12  evidence that users of Microsoft products commonly encounter interlaced H.264 video.
13  The court also concludes that although interlaced video is becoming less prevalent in the
14  market, Motorola demonstrated that support for interlaced video in coding tools is
15  important to Microsoft.

16      262.    First, the evidence at trial demonstrated that Microsoft does not support
17  interlaced H.264 video in many of its products. For example, Microsoft does not support
18  interlaced H.264 video in its Xbox Live service, or its Silverlight, Zune, Lync, or Skype
19  products. (11/15/12 Tr. at 20-21 (Del Castillo Testimony); 11/14/12 Tr. at 150-51
20  (Orchard Testimony).)

21      263.    Motorola offered evidence that some AT&T U-verse content is interlaced
22  and could be received on the Xbox after special software was added. But that software is

ORDER- 84

1   no longer available and was installed by only 10,000 to 11,000 users when it was

2   available. (11/15/12 Tr. at 24, 33 (Del Castillo Testimony).) For purposes of

3   comparison, over 35 million Xbox units have been sold. (*Id.* at 24.)

4       264.    Second, it does not appear that major content providers often use interlaced

5   video. For example, Motorola's parent company, Google, does not support interlaced

6   H.264 video in its products. Although Motorola's expert, Dr. Drabik, did not know the

7   "market reasons" why Google did not support interlaced coding for YouTube, he testified

8   that "it might have something to do with how they [Google] see the future." (11/19/12

9   Tr. at 65 (Drabik Testimony).)

10      265.    As another example, Google's Android operating system also does not

11  support interlaced H.264 video. Instead, Android uses the Baseline profile of H.264 (Ex.

12  2115 at MOTM_WASH1823_0601853), which does not allow use of the interlaced

13  coding tools (Ex. 574 at MS-MOTO_1823_00004052873 (field coding and adaptive

14  frame/field coding excluded from Baseline profile); 11/14/12 Tr. at 19-20 (Sullivan

15  Testimony).)

16      266.    Similarly, the company Hulu has no interlaced video content. (11/14/12 Tr.

17  at 147, 149 (Orchard Testimony).)

18      267.    Motorola expert Michael Dansky offered his opinion as to the importance

19  of interlaced H.264 video, discussing Exhibits 2768, 2249, 2724, and 2342. (11/20/12 Tr.

20  at 18-21 (Dansky Testimony).) The exhibits cited by Mr. Dansky, however, do not relate

21  to interlaced H.264. Exhibit 2768 relates to the Windows Media Video codec, not H.264.

22  (Ex. 2728 at 1.) Exhibit 2249 relates to the VC-1 codec, not H.264. (Ex. 2249 at 1.) The

ORDER- 85

1  CNET report that Dansky cited in Exhibit 2724 did not mention interlaced video and

2  instead referred to "1080p" and "720p," which both indicate progressive video.  (Ex.

3  2724 at 1.)  Exhibit 2342 related to the HEVC codec, not H.264.  (Exhibit 2342 at 1.)

4       268.    Moreover, much of the testimony and evidence presented by Motorola's

5  experts related not to the importance of the technologies allegedly covered by Motorola's

6  H.264 SEPs, but to the general importance of the H.264 Standard to Microsoft's

7  products.  For example, Motorola expert Mr. Dansky did not discuss any particular

8  Motorola patent.  (11/19/12 Tr. at 206:4-219:23 (Dansky Testimony); 11/20/12 Tr. at

9  8:16-23:6 (Dansky Testimony).)  Rather, Mr. Dansky presented testimony solely relating

10  to the importance of the H.264 Standards to Microsoft's products.  (See, e.g., 11/20/12

11  Tr. at 17:15-22 (Dansky Testimony) (discussing that the "H.264 [S]tandard has become

12  the standard, and that there is concern that when products are sold, that they need to be

13  able to decode and code H.264"); 11/20/12 Tr. at 17:23 - 18:2 (Dansky Testimony)

14  (discussing importance of H.264 for tablets and smartphones); Ex. 2724 (discussing

15  importance of H.264 video to the Xbox).)

16       269.    As explained above, Mr. Dansky's approach thus reflects an improper

17  attempt by Motorola to capture the value of the H.264 Standard itself as opposed to a

18  royalty on the actual economic value of Motorola's patented technology.  (11/13/12 Tr. at

19  151-52 (Murphy Testimony) ("A RAND royalty must reflect the economic value of the

20  patented technology itself and not the value attributable to the standard."); 11/19/12 Tr. at

21  168-69 (Schmalensee Testimony) (an SEP holder is "not entitled to the incremental value

22  that you get because you are part of the standard").)

1       270.    Similarly, Motorola expert Dr. Drabik testified that interlaced coding tools

2  could be used to encode progressive video but never explained how that could be done.

3  He made no such claim in his expert report. (11/19/12 Tr. at 57 (Drabik Testimony).) At

4  trial, he testified that he first heard that interlaced coding could be used with progressive

5  video from a Motorola employee whom he encountered in his work on this case. (*Id.* at

6  57-58.)

7       271.    The Motorola employee who suggested to Dr. Drabik that it was possible to

8  use interlaced coding tools with progressive video did not identify anyone who had

9  actually done so and did not refer Drabik to any engineering or scientific publications that

10  discussed using interlaced coding tools with progressive video. (11/19/12 Tr. at 58-60

11  (Drabik Testimony).) Dr. Drabik was not aware of any Microsoft product being used to

12  decode progressively captured content that was compressed using field coding. (*Id.* at

13  60.) Nevertheless, even taking Dr. Drabik's analysis as true, the analysis merely

14  demonstrates that Microsoft products could utilize the interlaced coding tools, but does

15  little to demonstrate that Microsoft products use such tools prevalently or that Microsoft

16  deems such tools important to the overall functionality of its products.

17       272.    Dr. Drabik also pointed to three interlaced H.264 videos that he found on

18  the Internet. The court concludes, however, that these examples do little to demonstrate

19  that interlaced H.264 video is important in the marketplace. (11/19/12 Tr. at 61 (Drabik

20  Testimony).) The first was a pirated video from the Pirate Bay website. (11/14/12 Tr. at

21  148 (Orchard Testimony).) The other two are one- or two-second-long test videos for use

22  by people in developing video software. The court finds that these videos are not

ORDER- 87

1  intended to be viewed by typical users of Microsoft products and therefore do little to

2  show the prevalence of interlaced H.264 video in the marketplace. (*See id.* at 148.)

3       273.   Dr. Drabik also mistakenly pointed to two video samples that were actually

4  not interlaced H.264 video. The first was video of NBC's Olympics coverage, which was

5  provided through YouTube. (11/14/12 Tr. at 148 (Orchard Testimony).) YouTube does

6  not allow interlaced video, so this video is progressive, not interlaced. (*Id.* at 148.) The

7  second contained NASA videos that are available on a NASA website. These videos

8  were not compressed using the H.264 Standard and were not interlaced. (*Id.* at 148.)

9  Drabik knew of no other examples of interlaced H.264 video on the Internet. (11/19/12

10  Tr. at 61-62 (Drabik Testimony).)

11       274.   Motorola offered Exhibit 2342 to suggest that interlaced H.264 video is

12  common. Exhibit 2342 is a submission, presented by a Motorola employee four months

13  before the November 2012 trial in this case, calling for interlaced support to be added to

14  the HEVC standard; Exhibit 2342 does not relate to H.264. The television providers

15  discussed in Exhibit 2342 broadcast in MPEG-2 in the United States, not H.264.

16  (11/14/12 Tr. at 153 (Orchard Testimony).)

17       275.   When that MPEG-2 video is recompressed into H.264, it is almost always

18  converted to progressive if it is interlaced. (11/13/12 Tr. at 214 (Sullivan Testimony)

19  (explaining that the modern techniques in H.264 compress more efficiently than using

20  interlaced video).)

21       276.   Exhibit 2342 provides an example of interlaced television that Dr. Drabik

22  cited in error: coverage of the London Olympics. When coverage of the London

ORDER- 88

1   Olympics was distributed as H.264, that distribution was in progressive form.  (11/14/12

2   Tr. at 148 (Orchard Testimony).)

3          277.    Of broadcast channels listed in Exhibit 2342 discussed at trial, the H.264

4   video distribution over Xbox Live was progressive.  (11/15/12 Tr. at 31 (Del Castillo

5   Testimony) (explaining that, except in three cases, the Xbox Live software did not allow

6   the fifty-five providers listed in Exhibit 2161 (including three also listed in Exhibit 2343)

7   to use interlaced H.264 video, and that two of the exceptions, French and Spanish

8   provider Canal and U.K. provider BSkyB, likely provided only progressive video even

9   without that software restriction).)

10         278.    Motorola did, however, present evidence that support for interlaced video

11  was important to Microsoft.  For instance, as recently as 2009, industry companies

12  requested that interlaced coding tools be included in the Stereo High Profile extension of

13  the H.264 Standard, the first profile of the H.264 Standard designed for multiview

14  coding.  (Ex. 3398 at MOTM_WASH1823_0612350; 11/14/12 Tr. at 20:11-17, 22:7-21

15  (Sullivan Testimony).)  Additionally, Microsoft's Gary Sullivan reported in a technical

16  paper that "[o]ne key restriction imposed in the design of the Multiview High profile was

17  that the pictures could not be coded as individual fields or using macroblock-adaptive

18  frame-field coding."  (Ex. 3398 at MOTM_WASH1823_0612350.)  The restriction

19  referred to as the inability to code pictures as individual fields refers to lack of picture-

20  level frame/field adaptivity, also known as PICAFF or PAFF.  (11/14/12 Tr. at 21:15-

21  22:6 (Sullivan Testimony).)

22

1    279.   Accordingly, the court concludes that (1) interlaced video is becoming less

2  prevalent in the marketplace; (2) little evidence suggests that users of Microsoft products

3  often encounter interlaced video; (3) and Motorola demonstrated that support for

4  interlaced video in coding tools is important to Microsoft so that its products will

5  seamlessly play any video encountered by users.

6    280.   The court now examines each of Microsoft's products that Motorola

7  contends use Motorola's H.264 SEPs.[10]

8    **ii.    Windows**

9    281.   Windows is an operating system that "provides an abstraction over the

10  hardware, and presents an application interface" so that "third parties can write programs

11  that run on the computer." (11/13/12 Tr. at 25-26 (DeVaan Testimony).)  With each

12  version of Windows, Microsoft adds thousands of features which typically build on the

13  capabilities of previous releases. (*Id.* at 28-29.)  For example, the new features of

14  Windows 7 are described in two voluminous books. (Exs. 1408-09.)  Video encoding

15  and decoding is only a tiny part of what the Windows software does and Windows

16  supports many other video compression standards in addition to H.264. (11/13/12 Tr. at

17  34 (DeVaan Testimony).)

18

19  _____

20    [10] During the course of the trial, Motorola and Microsoft referenced additional Microsoft products to those listed in this order, such as the Surface tablet.  Neither party, however,

21  presented any evidence as to the overall functionality of these other products which would be necessary for the court to analyze the importance of Motorola's SEPs to the product.

22  Accordingly, the court declines to provide an analysis or a royalty rate for products for which insufficient evidence was presented.

ORDER- 90

1       282.  Microsoft first included support for H.264 in Windows with Windows 7,

2   which was released in October 2009. (11/13/12 Tr. at 33 (DeVaan Testimony); Ex. 1409

3   at 1.) Microsoft chose to implement H.264 in Windows 7 because it was part of the

4   standard. (11/13/12 Tr. at 34 (DeVaan Testimony).)

5       283.  There is little need for Windows to be able to decode interlaced H.264

6   video content. (11/13/12 Tr. at 38 (DeVaan Testimony); 11/14/12 Tr. at 146 (Orchard

7   Testimony).) Windows users do not commonly encounter interlaced H.264 content.

8   (11/13/12 Tr. at 38 (DeVaan Testimony).) Based on the evidence submitted at trial, the

9   vast majority of video used with Windows comes from Internet websites, where

10  interlaced H.264 video is not commonly found. (11/14/12 Tr. at 147, 149 (Orchard

11  Testimony); Ex. 592.)

12      284.  Most H.264 decoding, in the context of Windows, is not performed by the

13  Windows product. Many computers have non-Microsoft video devices and software that

14  perform any necessary H.264 decoding instead of the built-in Windows decoder.

15  (11/13/12 Tr. at 33-35 (DeVaan Testimony).)

16      285.  Such software includes the VLC Media Player and Flash. (11/13/12 Tr. at

17  36 (DeVaan Testimony).) For example, when a user plays a video from Google, Inc.'s

18  YouTube website on a Windows-based computer, virtually all of the H.264 video content

19  is decoded by non-Microsoft Flash software. (11/13/12 Tr. at 53 (DeVaan Testimony).)

20      286.  Windows is a software product. Thus, it lacks the hardware structures that

21  are required by the means-plus-function elements of the claims of the '419 Patent.

22  Additionally, as explained above, the parties to a hypothetical negotiation would dispute

ORDER- 91

1  whether the claims of the '968 Patent cover software products such as Windows.

2  (11/14/12 Tr. at 135, 139 (Orchard Testimony).)

3      287.   Windows 7 can play DVDs, but DVDs are not H.264 encoded; they use

4  MPEG-2 instead. (11/14/12 Tr. at 147 (Orchard Testimony).) Broadcast television in the

5  United States uses MPEG-2, not H.264. (*Id.* at 153.) Windows 7 cannot play Blu-ray

6  discs. (11/19/12 Tr. at 67 (orchard Testimony).) A Windows computer with a Blu-ray

7  drive must include a third-party application to decode the video on Blu-ray discs.

8  (11/13/12 Tr. at 54 (DeVaan Testimony).)

9      288.   Windows cannot receive H.264 television feeds from satellite providers or

10  encrypted H.264 television feeds from cable providers. (11/19/12 Tr. at 66-67 (Orchard

11  Testimony).)

12      289.   The court concludes, based on this evidence, that Motorola's H.264 SEPs

13  provide only minor importance to the overall functionality of Microsoft's Windows

14  product. Windows is first and foremost an operating system designed to permit various

15  applications to operate vis-à-vis a user. As explained by Microsoft at trial, the Windows

16  operating system has vast functionality completely unrelated to any video playing. Only

17  when a Microsoft Windows user chooses to play interlaced video would Windows

18  employ the functionality of Motorola's H.264 SEPs, which in turn only provide a portion

19  of the coding tools necessary to view the interlaced video. Moreover, the interlaced

20  video would still play without Motorola's H.264 SEPs, it might just be 5-8 % slower.

21

22

1      **iii.    The Xbox**

2      290.    The biggest use of the Xbox is to play single player games.  (11/14/12 Tr.

3  at 144-45 (Orchard Testimony).)  The Xbox can also be used to play multiplayer games

4  using the Xbox Live service.  (11/15/12 Tr. at 11 (Del Castillo Testimony).)  Xbox games

5  never contain H.264 video content, whether played single-player or online via Xbox

6  Live.  (*Id.* at 19-20; 11/14/12 Tr. at 145 (Orchard Testimony).)

7      291.    The Xbox is also used, via Xbox Live, to access video from sources such as

8  Hulu and Netflix.  Xbox Live does not support interlaced video, and many of these third-

9  party sources do not use H.264 and instead use a different video compression standard

10  called VC-1.  (11/15/12 Tr. at 20-21 (Del Castillo Testimony).)

11      292.    The Xbox can be used to play rented or purchased DVDs, but DVDs use

12  MPEG-2 and not H.264.  (11/14/12 Tr. at 145 (Orchard Testimony); 11/13/12 Tr. at

13  209-10 (Sullivan Testimony); 11/15/12 Tr. at 22 (Del Castillo Testimony).)

14      293.    Microsoft recently added a web browser to the Xbox.  (Ex. 3448 at 1.)  This

15  web browser is capable of decoding interlaced video if encountered by an Xbox user.

16  (Ex. 3448 at 1.)

17      294.    Microsoft presented uncontested evidence that the Xbox employs a

18  software decoder and therefore does not include the hardware structures that are required

19  by the means-plus-function claims of the '419 Patent.  (11/14/12 Tr. at 138-39 (Orchard

20  Testimony).)  Additionally, as explained above, the parties to a hypothetical negotiation

21  would dispute whether the claims of the '968 Patent cover software products such as the

22  Xbox.  (*Id.* at 135-39.)

ORDER- 93

1        295.   Motorola presented evidence that Microsoft has continued its efforts to

2 make the Xbox an all-in-one entertainment hub capable of providing television content

3 and video. (11/15/12 Tr. at 54:7-1356:10-15 (Del Castillo Testimony); 11/19/12 Tr. at

4 217:10-218:4 (Dansky Testimony); Ex. 2265, 2688, 2727.)

5        296.   Microsoft CEO Steve Ballmer explained that: "[t]he living room is very

6 important" to Microsoft, "[i]t's a place where there's a high volume of consumption of

7 digital goods and services. So Xbox is very important." (Ex. 2265 at 2; 11/15/12 Tr. at

8 54:23-56:1 (Del Castillo Testimony).)

9        297.   Consumer video consumption has continued to grow on the Xbox. In the

10 spring of 2012, "for the first time, subscribers to Xbox's Live online service in the U.S.

11 spent more time consuming video and music than multiplayer games. Globally, the hours

12 spent on Xbox Live have grown 30 % year-over-year, including gaming and

13 entertainment, while video consumption has risen 140 %." (Ex. 2265 at 2-3; 11/15/12 Tr.

14 at 56:2-57:5 (Del Castillo Testimony).)

15        298.   ███████████████████████████████████

16 ████████████████████████ (11/19/12 Tr. at 67 (Orchard

17 Testimony); 11/15/12 Tr. at 22 (Del Castillo Testimony)), ████████████

18 ████████████████████████████████████████

19 ████████████████ (11/15/12 Tr. at 71:24-72:15 (Del Castillo

20 Testimony); 11/14/12 Tr. at 162:3-8 (Orchard Testimony); Ex. 2353 at 9.)

21        299.   The court concludes, based on this evidence, that Motorola's H.264 SEPs

22 provide only minor importance to the overall functionality of Microsoft's Xbox product.

ORDER- 94

1  Although it is important that the Xbox have the ability to play video, the evidence

2  suggests that much of that video will be in progressive form.   Motorola points to Xbox

3  Live as a source of such video, but Xbox Live does not support interlaced video at this

4  time, and in the past it appears that video over Xbox Live was also in progressive form.

5  (*See* 11/15/12 Tr. at 31 (Del Castillo Testimony).)  Similarly, Motorola offered evidence

6  that some AT&T U-verse content is interlaced and could be received on the Xbox after

7  special software was added, but this software is no longer available and was installed by

8  only 10,000 to 11,000 users out of 35 million Xbox owners.  (*Id.* at 24.)

9       300.   ████████████████████████████████████████████

10  █████████████████████████████████████████████████████████

11  ████████████████████   The court also concludes that video capabilities are becoming

12  more important to Microsoft's Xbox product as Microsoft attempts to provide an all-in-

13  one entertainment device capable of gaming, video, and music entertainment.

14       301.   The court, however, makes clear that the interlaced coding tools covered by

15  Motorola's SEPs are not the inventive patents in interlaced coding and are not central to

16  the main function of the Xbox, which is to play video games.  Like with Windows, only

17  when an Xbox user chooses to play interlaced video will the Xbox employ the

18  functionality of Motorola's H.264 SEPs.  The court concludes that parties to a

19  hypothetical negotiation would consider the importance of Motorola's H.264 SEPs as

20  they apply to the Xbox based on the foregoing analysis.

21

22

ORDER- 95

1        iv.    **Other Microsoft Products**

2        302.    Windows Phone 7 and 7.5 do not include an H.264 decoder.  (11/14/12 Tr.

3    at 150 (Orchard Testimony).)  Windows Phone relies on hardware decoders provided by

4    third parties.  (Ex. 936 at 1-3.)

5        303.    Windows Embedded is an operating system to run on embedded hardware,

6    and it does not support video and does have not a decoder.  (11/14/12 Tr. at 151 (Orchard

7    Testimony).)

8        304.    Silverlight, a framework for dealing with multimedia content, does not

9    support interlaced video.  (11/14/12 Tr. at 150 (Orchard Testimony).)

10       305.    The Zune, a now discontinued portable media player, does not support

11   interlaced video.  (11/14/12 Tr. at 150 (Orchard Testimony).)

12       306.    Lync, a chatting environment, does not support interlaced video.  (11/14/12

13   Tr. at 150 (Orchard Testimony).)

14       307.    Skype, a teleconferencing system, does not support interlaced video.

15   (11/14/12 Tr. at 150-151 (Orchard Testimony).)

16   **V.**    **THE 802.11 STANDARD**

17   **A.**    **The Development of the 802.11 Standard**

18       308.    The 802.11 Standard is a wireless communications standard colloquially

19   known as "Wi-Fi."  (11/15/12 Tr. at 48:3-10 (Del Castillo Testimony).)  The 802.11

20   Standard comprises a set of standards that allow for companies to build products to a set

21   of specifications for wireless local area networking.  It is the *de facto* standard for

22   wireless home networks.  (11/15/12 Tr. at 87-89 (Gibson Testimony).)

309.    Wireless communication is the transfer of information between points not connected by a wire, typically using radio frequencies such as AM/FM radio, satellite communications, and Bluetooth.  (11/15/12 Tr. at 86 (Gibson Testimony).)  Wireless networking is the process of using a wireless link to connect a device such as a laptop—known as a "station" in the 802.11 Standard—with an access point.  When the access point is wired to a modem, the station may access the Internet.  (11/15/12 Tr. at 87 (Gibson Testimony).)

310.    Wireless networks differ from cellular systems, in that each are designed for different purposes.  For example, cellular systems provide connection from many mobile users to base stations over longer ranges.  Wireless networks are designed for low mobility and a range of about 100 feet.  (11/15/12 Tr. at 97 (Gibson Testimony).)

311.    The first wireless packet radio network, ALOHAnet was developed in the 1970s by the University of Hawaii.  ALOHAnet connected to the ARPANET, the predecessor of today's Internet in 1972.  To do so, ALOHAnet used many technologies that were ultimately adopted by the 802.11 Standard.  (11/15/12 Tr. at 90-91 (Gibson Testimony).)

312.    In 1985, the FCC allowed wireless communication technologies in unlicensed bands known as ISM bands.  This decision opened up the possibility of commercial wireless local area networks.  (11/15/12 Tr. at 90-91 (Gibson Testimony).)

313.    Following the FCC decision, in 1990, companies such as Zircom and NCR/AT&T began developing proprietary wireless local area networking products, including the NCR and AT&T product called WaveLAN in 1991.  (11/15/12 Tr. at 90-91

ORDER- 97

1 (Gibson Testimony).)  The proprietary solutions were expensive and forced users to buy

2 all networking components from the same manufacturer.  (*Id.* at 92.)

3      314.   In part to address this problem, the IEEE 802.11 committee established the

4 802.11 Working Group to create a wireless local area network standard.  ALOHAnet and

5 WaveLAN served as a roadmap for the development of the 802.11 Standard.  The

6 systems used data modulation, carriers, multiple access techniques, error control coding,

7 and direct sequence spread spectrum technologies, which all ended up in the 802.11

8 Standard.  (11/15/12 Tr. at 91-92 (Gibson).)

9      315.   The 802.11 Working Group spent seven years developing the first draft of

10 the 802.11 Standard.  (11/15/12 Tr. at 92-93 (Gibson Testimony).)

11      316.   The Working Group issued its first standard, "IEEE 802.11," in 1997

12 (referred to as "802.11-1997").  (11/15/12 Tr. at 92:20-93:11 (Gibson Testimony).)

13 Subsequently, the Working Group issued amendments to the original standard including

14 amendments for higher speeds (802.11a, 802.11b, and 802.11g), improved security

15 (802.11i), quality of service ("QoS") (802.11e), higher throughput (802.11n), and other

16 areas.  (*Id.* at 92:20-94:14; Ex. 520.)

17      317.   The development of the 802.11 Standard involved the participation of many

18 entities:  over 1,000 companies participated in the standard-setting process.  (11/15/12 Tr.

19 at 94-95 (Gibson Testimony); Ex. 514.)  The 802.11 Working Group has met over 130

20 times since its inception and has formed over 30 different task groups to develop

21 amendments to the standard.  (11/15/12 Tr. at 94-95 (Gibson Testimony).)

22

ORDER- 98

1        318.    The 802.11 Standard today is immense and complex; the current version is

2   2,793 pages long.  (Ex. 386A.)

3        319.    Some of the later amendments replace prior technologies in certain areas.

4   For example, in 2009, the Working Group approved the "802.11n" protocol, which

5   provides for higher throughput.  This protocol generally replaced 802.11a, 802.11b, and

6   802.11g, though the 802.11n amendment requires compliant devices to have backward

7   compatibility with 802.11b and 802.11g.  (11/15/12 Tr. at 93-94, 190:3-12, 192:1-7

8   (Gibson Testimony).)

9        320.    There are also many optional portions of the 802.11 Standard.  A device

10  does not need to implement an optional portion of the standard in order to be compliant

11  with the 802.11 Standard.  (11/15/12 Tr. at 97-98 (Gibson Testimony).)

12       321.    The development of the 802.11 Standard dealt primarily with the

13  implementation of well-known technologies rather than innovation.  As such, the

14  majority of the technologies available to and/or adopted by the 802.11 drafters were in

15  the public domain and not covered by patents.  (11/15/12 Tr. at 154-55 (Gibson

16  Testimony).)  Public domain technology that was incorporated into the 802.11 Standard

17  was based on a long history of research and development done by companies,

18  government agencies, and academic institutions.  These prior technologies included the

19  central elements of the 802.11 Standard, such as data modulation, error control coding,

20  multiple access methods, direct sequence spread spectrum and orthogonal frequency

21  division multiplexing.  (11/15/12 Tr. at 96-97 (Gibson Testimony).)

22

ORDER- 99

1    322.   By 2005, the 802.11 Standard was beginning to be used in homes and was

2    increasing in popularity.  (11/15/12 Tr. at 43:4-44:2 (Del Castillo Testimony).)

3    323.   Currently, the 802.11 Standard is the most widely used and universally

4    accepted wireless communications standard for ordinary consumer and business use.

5    (11/15/12 Tr. at 46:4-19, 77:23-78:14 (Del Castillo Testimony); 11/15/12 Tr. at 89:15-18

6    (Gibson Testimony).)  Most homes do not have wired networks, and instead rely on

7    802.11 networks because 802.11 networks do not require the user to place cables all over

8    the home.  (11/15/12 Tr. at 78:1-14 (Del Castillo Testimony).)  For example, Xbox users

9    may connect the device to their network wirelessly.  (*Id.* at 24-25.)

10   **B.      The Relative Technical Value of Different Portions of the 802.11 Standard**

11   324.   When considering the relative technical importance of different sections of

12   the 802.11 Standard, it is important to note that core enabling features are more important

13   than advanced and peripheral features.  (11/19/12 Tr. at 71:6-8, 73:9-74:14 (Williams

14   Testimony).)  The core features are needed to build any 802.11-compliant device.  (*Id.* at

15   73:9-80:3.)  Advanced features are technologies that may be in a particular device.  (*Id.* at

16   74:4-14, 80:2-19.)  Peripheral features are features in technology areas that have not been

17   proven and may or may not have future technological value.  (*Id.* at 102:6-14.)

18   325.   Patents that are essential to optional parts of the standard have a lower

19   value than patents that are essential to the required portions.  (11/19/12 Tr. at 120

20   (Williams Testimony).)

21   326.   **Core Enabling Features.**  Four core enabling features of an 802.11

22   communications network are: (1) network setup, (2) channel access management, (3) data

ORDER- 100

1  modulation, and (4) security and encryption. (11/19/12 Tr. at 84:7-88:19 (Williams

2  Testimony).)

3       327.   Before any communication can occur in 802.11, the user must establish a

4  network connection through a network setup procedure. (11/19/12 Tr. at 85:8-86:2

5  (Williams Testimony).)

6       328.   Once a network connection exists, the network's communication units must

7  gain access to a communication channel before they can send or receive information.

8  (11/19/12 Tr. at 86:3-23 (Williams Testimony).)  This is accomplished by a channel

9  access procedure specified by the 802.11 Standard.  (*Id.*)

10      329.   Further, to send and receive information over the channel, a communication

11 unit's receiver must understand how transmitted information is formatted so that the

12 receiver can interpret the messages it receives from a sender.  In particular, it is necessary

13 to properly synchronize and modulate signals between two communication units.

14 (11/19/12 Tr. at 86:24-87:22 (Williams Testimony).)

15      330.   Another core enabling feature of 802.11 communications is security, which

16 is necessary because wireless communications can be intercepted by third-party

17 eavesdroppers. (11/15/12 Tr. at 178:22-179:19 (Gibson Testimony); 11/19/12 Tr. at

18 87:23-88:19 (Williams Testimony).)  Users can secure transmissions by encrypting the

19 information using an encryption key. (11/19/12 Tr. at 88:8-12 (Williams Testimony).)  In

20 addition, it is important for users to know that a received message was actually sent by an

21 authorized sender rather than by an interloper masquerading as the sender. (11/15/12 Tr.

22 at 113:6-9 (Gibson Testimony); 11/19/12 Tr. at 84:24-85:1, 87:23-88:19 (Williams

ORDER- 101

1    Testimony).)  This requires a process that enables a receiver to confirm that a received

2    message was transmitted by the particular communication device from which the receiver

3    is expecting the message.  (11/15/12 Tr. at 113:6-9 (Gibson Testimony); 11/19/12 Tr. at

4    88:13-19 (Williams Testimony).)

5        331.  **Advanced Features.**  Advanced features in 802.11 are important to some

6    devices, but not all devices.  (11/19/12 Tr. at 80:2-19 (Williams Testimony).)  For

7    example, battery operated devices typically make use of power management patents.  (*Id.*

8    at 80:12-19.)  Other features that fall in this category are features that are not currently

9    mandatory in the 802.11 Standard but may become mandatory in future generations of

10   the standard.  (*Id.* at 80:12-19.)

11       332.  **Peripheral Features.**  Some features of the 802.11 Standard are peripheral

12   and based on technology that has not yet been proven.  Their future value to the standard

13   is questionable.  (11/15/12 Tr. at 102:6-14 (Williams Testimony).)

14   **C.    Many Patents Cover the 802.11 Standard**

15       333.  A patent is deemed "essential" to the 802.11 Standard if any of its claims

16   are essential.  (11/19/12 Tr. at 71:19-72:14 (Williams); Ex. 5 at 14, § 6.1.)  An essential

17   claim is a claim that is "necessary to create a compliant implementation of either

18   mandatory or optional portions of the normative clauses of the [Proposed] IEEE Standard

19   when, at the time of the [Proposed] IEEE Standard's approval, there was no

20   commercially and technically feasible non-infringing alternative."  (11/19/12 Tr. at

21   71:19-72:14 (Williams Testimony); Ex. 5 at 14, § 6.1.)

22

ORDER- 102

334.    There is no formal process for determining whether a patent is essential to the 802.11 Standard. (11/15/12 Tr. at 98-99 (Gibson Testimony).)  However, companies may declare that they have essential patents in an LOA. (11/15/12 Tr. at 98-99 (Gibson Testimony).)

335.    Since 1994, approximately 92 companies have identified—in LOAs—over 350 patents and 30 patent applications as essential to the 802.11 Standard.[11]  (11/15/12 Tr. at 99 (Gibson Testimony); Exs. 7, 1592.)  Companies may also provide "blanket" LOAs to the IEEE, which do not identify specific patents. (*Supra* ¶ 43.)  As stated previously, through "blanket" LOAs, SEP holders commit to license unspecified patents or pending applications for a particular standard. (*Id.*)  At this time, approximately 59

_____

[11] In its proposed findings of fact and conclusions of law, Microsoft asserted that over 100 companies have identified patents in LOAs as essential to the 802.11 Standard.  In support of this assertion, Microsoft cites to portions of Dr. Gibson's testimony and Exhibits 7 and 1592. (Microsoft Pr. FC (Dkt. # 621) ¶ 238.)  Indeed, Dr. Gibson testified that Exhibits 7 and 1592 support a finding that over 100 companies have identified patents essential to 802.11 Standard, but those exhibits demonstrate no such thing. (*See* Exs. 7, 1592.)  Instead, Exhibit 1592 lists 59 companies that have submitted blanket LOAs to the IEEE.  Because the number of companies contributing technology to the 802.11 Standard is relevant to the court's analysis for determining a royalty rate, the court attempted to discern how and in what portions of the record Microsoft and Dr. Gibson came up with their claim that over 100 companies have identified essential patents.  The court concluded that no such evidence exists in the record.  In fact, Microsoft experts Dr. Murphy and Dr. Lynde both asserted that somewhere between 90 and 93 companies had submitted LOAs. (11/16/12 Tr. at 109 (Lynde Testimony); 11/13/12 Tr. at 175 (Murphy Testimony) (Q: "And I believe in one of your demonstratives you indicated there were around 90 SEP holders of 802.11 patents?"  A: "I don't remember the precise number, I think it was 93.").)

Additionally, it is important to note that patents of course expire over time, meaning that at any one time there are less than 350 patents identified as essential to the 802.11 Standard. Although Dr. Gibson's testimony on this point is ambiguous (*see* 11/15/12 Tr. at 99 (Gibson Testimony)), as explained in the section analyzing the Via Licensing 802.11 patent pool, there are currently approximately 250 patents identified as essential to the 802.11 Standard. (*See infra* ¶¶ 567-68.)

ORDER- 103

1   companies have filed these blanket LOAs for the 802.11 Standard, including wireless

2   communication industry leaders such as Atheros, Broadcom, Qualcomm, Research in

3   Motion, and Intel.[12]  (Exs. 7, 1592.)  Thus, according to the expert testimony of Dr.

4   Lynde, there are possibly thousands of essential patents to the 802.11 Standard at any one

5   time.  (*See* 11/16/12 Tr. at 108-109 (Lynde).)

6       336.   Atheros is an example of a company that signed a blanket LOA and which

7   owns patents that are important to the 802.11 Standard.  (11/19/12 Tr. at 118-19

8   (Williams Testimony).)

9       337.   Marvell also has a very valuable 802.11 portfolio and owns a few hundred

10  issued patents essential to the 802.11 Standard.  Marvell's portfolio is particularly

11  important to the newer standards such as 802.11n.  (11/14/12 Tr. at 64 (Ochs

12  Testimony).)

13  **D.      Motorola's 802.11 Patents**

14      338.   The court now determines the importance of Motorola's 802.11 SEPs to

15  both the 802.11 Standard and to Microsoft products.  At trial, Motorola presented scant

16  evidence that its patents are essential to the 802.11 Standard.  Thus, the court concludes

17  that even though parties to a hypothetical negotiation would examine Motorola's patents

18  _____

19      [12] Here, Dr. Gibson, a Microsoft expert, testified that 94 companies had submitted
    blanket LOAs and directed the court to Exhibit 1592 in support of that assertion.  (11/15/12 Tr.
    at 99-100 (Gibson Testimony).)  Exhibit 1592, however, lists only 59 companies that have
20  submitted such blanket LOAs.  (Ex. 1592.)  Likewise, Exhibit 1159 lists 59 companies that have
    submitted blanket LOAs.  (Ex. 1159.)  Further, Dr. Lynde, also a Microsoft expert, testified that
21  59 companies had submitted blanket LOAs.  (11/16/12 Tr. at 109 (Lynde Testimony) ("So there
    are 59 [entities] that have these blanket disclosures that I was able to identify.").)  Despite
22  significant time searching, the court cannot find support for Dr. Gibson's higher number and
    therefore disregards his testimony on this matter.

ORDER- 104

1  for their importance to the 802.11 Standard and to Microsoft's products, their value

2  would be diminished by the lack of evidence regarding their relevance.  With this in mind

3  the court evaluates the importance of Motorola's patents to the 802.11 Standard and to

4  the Xbox—the only product that Motorola alleges uses the patents.

5           i.      **Motorola's Essential Patents**

6           339.    At the time of trial, Motorola contended that 24 of its patents were

7  essential to the 802.11 Standard.  It did not analyze any other patents as essential.

8  (11/15/12 Tr. at 102-05 (Gibson Testimony).)

9           340.    Though Motorola claims 24 of its patents are essential to the 802.11

10 Standard, it did not provide any independent analysis to substantiate this claim.  (*See*

11 *generally* 11/19/12 Tr. at 67-134 (Williams Testimony).)  In other words, Motorola

12 provided no expert or fact testimony that one or more claims of its SEPs do in fact cover

13 portions of the 802.11 Standard.  (*See* 11/19/12 Tr. at 76-77 (Williams Testimony)

14 (admitting, only as a demonstrative, claim charts relating sections of the 802.11 Standard

15 to elements of the claims of the SEPs at issue).)  Instead, Motorola provided only

16 conclusory expert opinion testimony that an 802.11-compliant device would necessarily

17 infringe the SEPs at issue. (*See id.* at 78.)  Even though the court finds Dr. William's

18 testimony conclusory, the court will minimally credit his assertion that Motorola's SEPs

19 are in fact essential to the 802.11 Standard.[13]

20

21 _____

   [13] Motorola's expert did not review any patent file histories before concluding that
22 Motorola's patents were essential to the 802.11 Standard, and he did not articulate a construction
   for any term, but instead assumed that every term of every analyzed patent required only its plain

ORDER- 105

341.    Having failed to provide sufficient explanation as to why any of its SEPs relate to the 802.11 Standard, Motorola relies on attorney submissions that each of the SEPs relate to corresponding portions of the 802.11 Standard in its proposed findings of fact and conclusions.  (Motorola Pr. FC (Dkt. ## 618 (sealed), 624 (redacted) ¶¶ 264-365).)  The court finds the attorney representations insufficient to demonstrate that any of Motorola's alleged 802.11 SEPs are in fact essential to the 802.11 Standard.

342.    Without better evidence that the Motorola patents at issue are essential to the 802.11 Standard, the implementer in a hypothetical negotiation would view Motorola's patents with skepticism.  Nevertheless, because Motorola contends that these patents are essential and used by Microsoft products, parties to a hypothetical negotiation would sit down at the bargaining table and examine these patents for their importance to the 802.11 Standard and to Microsoft's products, although their value would be diminished by the lack of better evidence regarding their true relevance.

343.    The parties in a hypothetical negotiation would also consider the relative importance of Motorola's patents to the 802.11 Standard by examining whether—at the time the standard was developed—there existed viable alternatives to the patents at issue.

and ordinary meaning, a meaning which he did not articulate.  (11/19/12 Tr. at 109 (Williams Testimony).)  Using this approach, Motorola's expert determined that two patents, not subject to this litigation—U.S. Patent Nos. 5,319,712 and 5,636,22—were essential to the standard, yet those two patents were judicially determined to be non-essential based on claim construction.  (*Id.* at 107-09.)  Nevertheless, Microsoft's experts did not dispute that Motorola's 11 SEPs are essential to the 802.11 Standard.  Instead, Microsoft's experts assumed for purposes of their analyses that all of Motorola's declared essential patents were indeed essential to the 802.11 Standard pursuant to the IEEE's definition of "essential."  (*See* Ex. 5 at 14, § 6.1.)

ORDER- 106

1  If viable alternatives existed, the patents are less important to the standard and will be
2  valued accordingly.

3      344.    Here, the parties dispute whether or not technically feasible alternatives
4  existed for Motorola's 802.11 SEPs when the 802.11 Standard was being developed.  The
5  parties also dispute whether adoption of those alternatives would have degraded the
6  performance of the standard.  (11/15/12 Tr. at 114-15, 118-44 (Gibson Testimony).)
7  Microsoft, through its expert Dr. Gibson, asserts that technologically feasible alternatives
8  existed to Motorola's 802.11 SEPs.  Motorola, through its expert Dr. Williams, disagrees.
9  (*Compare* 11/15/12 Tr. at 121-28, 130-35, 138-39, 141-43 (Gibson Testimony) *with*
10  11/19/12 Tr. at 102-06 (Williams Testimony).)

11     345.    The court has carefully examined the relevant portions of the trial
12  testimony and concludes that both Microsoft's and Motorola's experts provide little more
13  than *ipse dixit* testimony regarding such alternatives.  (*Compare* 11/15/12 Tr. at 120-28,
14  130-35, 138-39, 141-43 (Gibson Testimony) *with* 11/19/12 Tr. at 102-06 (Williams
15  Testimony).)  Although Microsoft's expert, Dr. Gibson, lists alternatives to Motorola's
16  802.11 SEPs, he provides little or no explanation as to why these alternatives would
17  adequately replace Motorola's SEPs without degrading the standard.  (*See, e.g.*, 11/15/12
18  Tr. at 120-28 (Gibson Testimony) (declaring without explanation that "[t]he 802.3
19  ethernet standard from 1995, had a version of carrier sense multiple access that could
20  have been used as an alternative to the DCF and the EDCA.").)  For its part, Motorola's
21  expert simply states that he does not believe the alternatives would have been acceptable.
22  He also declines to explain why the alternatives proposed by Microsoft's expert for 23 of

1   the 24 Motorola patents were not feasible.  (11/19/12 Tr. at 102-06 (Williams Testimony)

2   ("My conclusion is that none of Dr. Gibson's proposed alternatives would have been

3   acceptable alternatives in the 802.11 Standard.").)  For the remaining patent, Motorola's

4   expert addressed only two of the four alternatives proposed by Microsoft's expert.

5   (11/19/12 Tr. at 104-06 (Williams Testimony) (discussing only two of the four proposed

6   alternatives to Ex. 148).)  The court is left with these competing expert opinions and little

7   evidence or explanation to resolve the conflict.

8          346.    Accordingly, the court finds that neither party has demonstrated the

9   presence or absence of feasible alternatives to Motorola's SEPs.  The court therefore

10  concludes that in a hypothetical negotiation, the parties simply would disagree as to the

11  technical contribution of Motorola's SEPs to the 802.11 Standard.

12         **ii.     Motorola Agrees that Only the Microsoft Xbox Uses its 802.11 SEPs**

13         347.    Motorola analyzed its patents with respect to only Microsoft's Xbox

14  product, and presented no evidence that other products, such as the Microsoft Surface,

15  used these patents.  (11/19/12 Tr. at 71 (Williams Testimony).)

16         348.    The Xbox is a special purpose computer:  its primary function is to run

17  video games.  (11/15/2012 Tr. at 8-9 (Del Castillo Testimony).)  The original Xbox 360

18  was launched in 2005.  (*Id.* at 13.)  The Xbox contains an optical drive that it uses to load

19  and play video games, but it can also be used to watch DVDs and listen to audio Compact

20  Discs (CDs).  (11/15/12 Tr. at 8-9 (Del Castillo Testimony).)  In 2010, Microsoft

21  introduced the Xbox 360S, which included WiFi capabilities.  (*Id.* at 15.)  The Xbox

22

1  360S uses a WiFi module made by Marvell or Atheros.  (*Id.* at 24, 48-49.)  Microsoft

2  does not build any of the hardware necessary for WiFi connectivity.  (*Id.* at 25.)

3     349. Every Xbox has an Ethernet port, so every Xbox can be connected to the

4  Internet using a wired Ethernet link rather than a wireless connection.  (*Id.* at 25.)  The

5  Xbox can connect to the Internet to download applications and games from the Xbox

6  Live service.  (*Id.* at 8-9.)  Some applications allow for media streaming, such as the

7  Netflix application.  (*Id.*)  Xbox Live allows users to play video games against or with

8  other people over the Internet.  The service also allows a customer to make financial

9  transactions, such as buying additional content for the games that the customer plays.

10  (*Id.* at 11.)

11     350. ██████████████████████████████

12  ████████████████████████  (11/15/12 Tr. at 61:19-62:1 (Del Castillo

13  Testimony).)  ████████████████████  (*Id.* at 72:19-21.)  ███

14  ██████████████████████  (*Id.* at 74:25-75:5.)

15    **iii.**  **The Xbox Does Not Use All of Motorola's 802.11 SEPs**

16     351. Motorola contends that the Xbox uses only 11 of the 24 patents Motorola

17  asserts are essential to the 802.11 Standard.  (11/15/12 Tr. at 102-03 (Gibson

18  Testimony); 11/19/12 Tr. at 107 (Williams Testimony) ("It's my opinion that 11 must be

19  used."); Exs. 148, 151, 156, 157, 161, 164, 169, 170, 171, 177, 180.)  These eleven

20  patents are U.S. Patent Nos. 5,142,533 (the '533 Patent); 5,272,724 (the '724 Patent);

21  5,329,547 (the '547 Patent); 5,357,571 (the '571 Patent); 5,467,398 (the '398 Patent);

22  5,519,730 (the '730 Patent); 5,689,563 (the '563 Patent); 5,822,359 (the '359 Patent);

6,069,896 (the '896 Patent); 6,331,972 (the '972 Patent); 6,473,449 (the '449 Patent). There is no evidence that the Xbox (or any other Microsoft product) uses the other 13 patents that Motorola contends are essential to the 802.11 Standard. (11/15/12 Tr. 102-04 (Gibson Testimony); Exs. 100, 101, 154, 160, 166, 179, 181, 183, 383, 2013, 2014, 2016, 2019.)

352.    The court concludes that in a hypothetical negotiation, Microsoft would not take a license to any of the 13 Motorola SEPs that Motorola does not contend are used by the Xbox, despite the fact that Motorola argues that these 13 patents are "essential" to the 802.11 Standard. Because Motorola admits that Microsoft products do not use these patents in any way, Microsoft would not seek a license to them. Accordingly, the court will analyze only the 11 Motorola 802.11 SEPs that Motorola contends are used by Microsoft's Xbox.

vi.    **The Importance of Motorola's 11 SEPs to the Standard and to the Xbox**

353.    For efficiency purposes, the court will analyze the importance of each SEP to the Xbox as it discusses the relative technical contribution of the SEP to the 802.11 Standard. Motorola argues that the Xbox uses 11 patents covering five technology areas.

| 802.11 Technology Area | U.S. Patent |
|---|---|
| 1. Channel Access Management Patent | 5,142,533 (Ex. 148) |
| 2. Data Modulation (a/g/n) Patents | 5,272,724 (Ex. 151) 5,519,730 (Ex. 164) |
| 3. Network Setup Patents | 6,069,896 (Ex. 171) 6,331,972 (Ex. 177) |
| 4. Data Modulation (b/g) Patents | 5,329,547 (Ex. 156) 6,473,449 (Ex. 180) 5,822,359 (Ex. 170) |

ORDER- 110

| 5. Security Patents | 5,357,571 (Ex. 157) |
| | 5,467,398 (Ex. 161) |
| | 5,689,563 (Ex. 169) |

a.    **Channel Access Management Patent**

354.    Motorola identified one patent, the '533 Patent as essential to enhanced distributed channel access ("EDCA") functionality and to the distributed coordination function ("DCF"), which are methods of accessing a channel within the 802.11 Standard. (11/15/12 Tr. at 106-07 (Gibson Testimony); Ex. 148.)  The '533 Patent expired on March 28, 2011.  (11/19/12 Tr. at 78 (Williams Testimony); Ex. 1589.)  Thus, the '533 Patent would be relevant to the Xbox 360, ███████████████████████████ ███████████████████████████████.

355.    As discussed earlier, Motorola did not elicit testimony regarding the meaning of the '533 claims as they relate to portions of the 802.11 Standard, but now asserts a claims-to-standard relationship through attorney representations in proposed findings of fact and conclusions of law.  (Motorola Pr. FC ¶¶ 272-77.)  Motorola's expert, Dr. Williams, in a conclusory statement, contends that the '533 Patent covers "collision-avoidance" within channel access.  (11/19/12 Tr. at 86 (Williams Testimony) ("So that's called a collision-avoidance system.  And that is covered by the Crisler patent, Exhibit 148.").)

356.    Based on the foregoing, the court finds minimal evidence in the record to demonstrate that the '533 Patent is indeed essential to any portion of the 802.11 Standard, let alone channel access—a core feature of the 802.11 Standard.  Nevertheless, because Microsoft does not contest that the '533 Patent is essential, the court will credit

1    Motorola's scant evidence that the '533 Patent is essential to channel access in the 802.11

2    Standard.

3          357.   Moreover, absolutely no evidence exists in the record explaining the

4    relative importance in relation to other technological contributions of Motorola's '533

5    Patent to channel access or to the 802.11 Standard.[14]  Absent such evidence, the court has

6    no tools with which to evaluate whether the '533 Patent contributes the entirety of the

7    channel access, or provides only a small component.  Microsoft did make clear, however,

8    that Motorola did not invent channel access in wireless networks, and so at minimum the

9    '533 Patent did not provide the inventive functionality of channel access.  (*See* 11/15/12

10   Tr. at 107 (Gibson Testimony).)

11         358.   Because of the limited evidence showing the importance of the '533 Patent

12   to the 802.11 Standard, parties in a hypothetical negotiation would view the '533 Patent

13   as providing very minimal technical contribution to channel access.[15]

14   _____

15        [14] As for each of Motorola's 802.11 "essential" patents, Motorola's expert did not assess

16   the contributions of companies other than Microsoft or Motorola to the 802.11 Standard, nor did
     he evaluate the patents of any company other than Motorola and Microsoft with respect to the

17   802.11 Standard.  (11/19/12 Tr. at 116-17 (Williams Testimony).)  Motorola's expert also did not
     determine the relative importance of Motorola's patents as compared to any third-party patents

18   (including patents in the Via Licensing 802.11 patent pool).  (*Id.* at 117-120.)

19        [15] Lending support for the court's conclusion is the fact that other companies have
     disclosed patents essential to the 802.11 Standard in the area of channel access.  Apple Computer
     identified two U.S. patents related to channel access as essential to the 802.11 Standard:  U.S.

20   Patent Nos. 4,689,786 (using a three-step handshake method wherein periods before attempted
     retransmissions are dynamically adjusted based on recent traffic history) and 4,661,902

21   (handshake method and the retransmission timing after an assumed collision).  (11/15/12 Tr. at
     150 (Gibson Testimony); Exs. 89, 88.)  Proxim, Inc., identified at least one patent, U.S. Patent

22   No. 5,231,634, as essential to the 802.11 Standard relating to a collision avoidance scheme when
     there are multiple agents in the wireless system.  (11/15/12 Tr. at 150-51 (Gibson Testimony);

ORDER- 112

1       359.    Having determined that the '533 Patent provides minimal contribution to

2   the standard, parties to a hypothetical negotiation would next consider whether the '533

3   Patent is nevertheless important to the Xbox's implementation of the standard.

4       360.    For its part, Microsoft asserts that the Xbox does not use the '533 Patent.

5   Microsoft argues that to the extent Motorola relates the '533 Patent to EDCA, EDCA is

6   optional and related to QoS, which is not used by the Xbox.  (11/15/12 Tr. at 106-07

7   (Gibson Testimony); 11/15/2012 Tr. at 28 (Del Castillo Testimony).)  Motorola also

8   relates the '533 Patent to using DCF with RTS/CTS, and according to Microsoft, the

9   Xbox does not use RTS/CTS either.  (11/15/12 Tr. at 106-07 (Gibson Testimony);

10  11/15/2012 Tr. at 28 (Del Castillo Testimony).)

11      361.    In response, Motorola elicited testimony from its expert, Dr. Williams, that

12  the '533 patent is practiced by the general channel access mechanism in the 802.11

13

14

15  Ex. 129.)  Agere Systems, Inc., identified at least one patent and one application that matured
    into a patent as essential to the 802.11 Standard relating to collision avoidance: U.S. Patent No.
16  5,422,887 (providing equitable access using a CDMA-CD scheme) and Application 10/092,295,
    which became U.S. Patent No. 6,707,867 (transmitting signals with timing information related to
17  transmission delays). (11/15/12 Tr. at 150-51 (Gibson Testimony); Exs. 137, 325.)  Spectrix has
    identified at least one patent as related to channel access:  U.S. Patent No. 7,643,509 (multiple
    access/collision avoidance protocol). (11/15/12 Tr. at 150-51 (Gibson Testimony); Ex. 485.)
18  Nokia Corp. sent an LOA to the 802.11 Working Group disclosing U.S. Patent No. 7,006,472 as
    essential to the standard, relating to QoS and selecting the appropriate radio flow for each packet
19  from a selection of predefined flows. (11/15/12 Tr. at 150-51 (Gibson Testimony); Ex. 391.)
    ETRI identified a U.S. patent related to channel access:  7,616,612 (method of guaranteeing QoS
20  for VoIP using priority information). (11/15/12 Tr. at 150-51 (Gibson Testimony); Ex. 484.)
    And, LG identified at least three patents as related to channel access or QoS:  6,469,993
21  (preparing a table of dynamic priority numbers and each terminal); 7,616,592 (communication
    between a mobile station and a base station having header information); and 7,653,025
22  (scheduling packet transmission based on a service identification related to the packet).
    (11/15/12 Tr. at 150-51 (Gibson Testimony); Exs. 476, 483, 486.)

ORDER- 113

1   Standard and the use of RTS/CTS and QoS is not required for infringement.  (11/19/12

2   Tr. at 97:14-98:10 (Williams Testimony).)

3        362.   Albeit conclusory in nature, Dr. Williams' testimony creates a genuine

4   dispute as to whether or not an Xbox would necessarily infringe the '533 Patent through

5   ordinary use of the 802.11 Standard.

6        363.   In sum, the court concludes that parties to a hypothetical negotiation for the

7   '533 Patent would view the patent as providing very little contribution to the 802.11

8   Standard and would disagree over whether the Xbox in fact required a license to the '533

9   Patent in its use of the 802.11 Standard.

10            b.      **Data Modulation (a/g/n) Patents**

11       364.   Motorola identified two patents that relate to data modulation for 802.11a,

12   g, and n, and more specifically to a portion of the orthogonal frequency division

13   multiplexing functionality ("OFDM"), the '724 Patent and the '730 Patent.  (11/15/12 Tr.

14   at 107-08 (Gibson Testimony); Exs. 151, 164.)  The '724 Patent expired on May 3, 2011.

15   (11/19/12 Tr. at 78 (Williams Testimony); Ex. 151; 11/15/12 Tr. at 108-09 (Gibson

16   Testimony).)  Thus, the '724 Patent would be relevant to the Xbox 360, ███████

17   ████████████████████████████████████████████████████████████.  The '730

18   Patent expires on May 21, 2013, and thus, although it is certainly relevant to the Xbox

19   360, █████████████████████████████████████████████████████

20   ████.

21       365.   As with the '533 Patent, Motorola did not elicit testimony regarding the

22   meaning of the '724 Patent's or the '730 Patent's claims as they relate to portions of the

ORDER- 114

1  802.11 Standard, but now asserts a claims-to-standard relationship through attorney

2  representations in proposed findings of fact and conclusions of law. (Motorola Pr. FC ¶¶

3  296-98 ('730 Patent), 301-02 ('724 Patent).) Motorola's expert, Dr. Williams, in a

4  conclusory statement, contends that the '730 and '724 Patents cover OFDM in the

5  802.11a, g, and n modulation schemes. (11/19/12 Tr. at 87 (Williams Testimony) ("Two

6  of those patents relate to a technology called OFDM, which is a high-speed data transport

7  mechanism.").)

8      366.   In response, Microsoft—through its expert, Dr. Gibson—contends that

9  neither the '724 Patent nor the '730 Patent is essential to the 802.11 Standard. According

10  to Microsoft (and apparently Motorola's expert report), Motorola relates claim 14 of the

11  '730 Patent to 802.11 a/g OFDM and asserts that "PLCP preambles" located in subcarrier

12  signals satisfy the first step of this claim. (11/15/12 Tr. at 108 (Gibson Testimony); Ex.

13  164.) Also, according to Microsoft, Motorola analyzed claim 20 of the '724 Patent as

14  essential to synchronizing the timing of data signals, using OFDM and the 802.11

15  Standard under the same analysis as it provided for claim 14 of the '730 Patent.

16  (11/15/12 Tr. at 108-09 (Gibson Testimony); Ex. 151.)

17      367.   Microsoft argues that neither the '724 nor the '730 Patents are essential

18  under Motorola's analysis because the "PLCP preamble" is not intermixed with the

19  information signals in the 802.11 Standard, and therefore the Xbox does not use this

20  patent and it has no value to Microsoft. (11/15/12 Tr. at 108-09 (Gibson Testimony).)

21      368.   Regarding the '730 Patent, Motorola argues that Dr. Gibson failed to

22  explain why the claim limitation at issue is not met by sending the synchronization signal

1  with all subcarriers.  (citing 11/15/12 Tr. at 108:10-21 (Gibson Testimony).)  As Dr.

2  Williams explained, the 802.11 Standard requires information signals to be combined

3  with the PLCP preamble, as Dr. Gibson testified is required by claim 14 of the '730

4  Patent.  (11/19/12 Tr. at 95:5-11 (Williams Testimony).)  Thus, according to Motorola,

5  the '730 Patent is essential to the 802.11 Standard.

6       369.    With respect to the '724 Patent, Motorola argues, with the assistance of Dr.

7  Williams, that the 802.11 Standard requires two synchronization signals to be sent, as

8  claim 20 of the '724 Patent requires.  (11/19/12 Tr. at 94:24-95:3 (Williams Testimony).)

9  Thus, according to Motorola, the '724 Patent is essential.

10      370.    The court finds the record ambiguous regarding whether the '724 and '730

11  Patents are essential to the 802.11 Standard.  Microsoft's explanation as to why these

12  patents are not essential is unsatisfactory to the court.  Microsoft provides no explanation

13  as to what a "PLCP preamble" is, why sending the synchronization signal with all

14  subcarriers is not covered by the claim limitation, and why the 802.11 Standard does not

15  require information signals to be combined with the "PLCP preamble," whatever that

16  may be.  Again, the parties have put the court in the middle of a battle of the experts and

17  have provided no basis for the court to determine a winner.  In other words, the court has

18  insufficient evidence to determine essentiality for the '724 and '730 Patents.

19      371.    With no clear evidence of essentiality, the court is left to credit Dr.

20  Williams' conclusory statement that the '730 and '724 Patents cover OFDM in the

21  802.11a, g, and n modulation schemes and are essential to the 802.11 Standard.

22  (11/19/12 Tr. at 87 (Williams Testimony) ("Two of those patents relate to a technology

ORDER- 116

1  called OFDM, which is a high-speed data transport mechanism.").) Thus, based on the

2  foregoing, the court finds minimal evidence on the record to demonstrate that either the

3  '724 Patent or the '730 Patent is indeed essential to any portion of the 802.11 Standard,

4  let alone data modulation via OFDM—a core feature of the 802.11 Standard.

5       372.  Moreover, absolutely no evidence exists in the record explaining the

6  relative importance in relation to other technological contributions of Motorola's '724

7  and '730 Patents to OFDM. Absent such evidence, the court has no tools with which to

8  evaluate whether the '724 and '730 Patents contribute the entirety of OFDM functionality

9  in the standard or provide only a small component. Microsoft did make clear, however,

10  that Motorola did not invent OFDM. (*See* 11/15/12 Tr. at 108 (Gibson Testimony).)

11       373.  Because of the limited evidence showing the importance of the '724 and

12  '730 Patents to the 802.11 Standard, parties in a hypothetical negotiation would view

13  both patents as providing very minimal technical contribution to data modulation or

14  OFDM.[16]

15

16      [16] Lending support for the court's conclusion is the fact that other companies have
disclosed declared patents essential to the 802.11 Standard in the area of data modulation.

17  Spectrix Corp. identified U.S. Patent No. 5,247,380 as essential to the 802.11 Standard and
related to spread spectrum technology (describing an infrared two-way communication system).

18  (11/15/12 Tr. at 151-52 (Gibson Testimony); Ex. 264.) Nokia Corporation disclosed two
applications and two patents related to spread spectrum technology in the 802.11 Standard: (1)

19  Application No. 20020160769, which became U.S. Patent Nos. 6,675,012 (dynamic frequency
selection that indicates transmission frequency and level of interference) and 6,298,035

20  (estimating separate channel frequencies when using OFDM with two transmitters); and (2)
Application No. 20030050012, which became U.S. Patent Nos. 6,738,599 (dynamic frequency

21  selection in an ad-hoc network) and 6,834,045 (a method for allocating frequencies in a WLAN
operating in the 5 GHz range). (11/15/12 Tr. at 151-52 (Gibson Testimony); Exs. 321, 255, 327,

22  357.) Cisco Systems, Inc., also made contributions in the area of data modulation: U.S. Patent
No. 6,654,921 (receipt of signals from multiple transmission management schemes, time-

1          c.      **Network Setup Patents**

2          374.    Motorola identified two patents as essential to network setup functionality

3    in the 802.11 Standard:  the '896 Patent and the '972 Patent.  (11/15/12 Tr. at 109, 122

4    (Gibson Testimony); Exs. 171 ('896 Patent), 177 ('972 Patent).)

5          375.    According to Microsoft, Motorola relates claim 17 of the '896 Patent and

6    claim 9 of the '972 Patent to the initial association of a station to an access point, in

7    particular transmitting unsolicited probe requests from a station to an access point.

8    (11/15/12 Tr. at 109, 122 (Gibson Testimony); '896 Patent; '972 Patent.)  The '896

9    Patent expires on October 15, 2016, and the '972 Patent expires on February 3, 2017.

10   (*See* '896 Patent; '972 Patent.)  Thus, both are relevant to the Xbox 360 ▆▆▆▆▆▆▆

11   ▆.

12         376.    As with the previous patents, Motorola did not elicit testimony regarding

13   the meaning of the '896 Patent's or the '972 Patent's claims as they relate to portions of

14   the 802.11 Standard, but now asserts a claims-to-standard relationship through attorney

15   representations in proposed findings of fact and conclusions of law.  (Motorola Pr. FC ¶¶

16   264-65.)  Motorola's expert, Dr. Williams, in a conclusory statement, contends that the

17   _____

18   division multiplexing and frequency division multiplexing).  (11/15/12 Tr. at 151-52 (Gibson
     Testimony); Ex. 318.)  AT&T also identified one patent related to data modulation:  U.S. Patent
19   No. 6,430,231 (method for using two or more antennas to receive one more symbol than other
     antennas by using time-division multiplexing in an orthogonal manner).  (11/15/12 Tr. at 151-52
20   (Gibson Testimony); Ex. 260.)  Certain patents in the Via license pool also relate to data
     modulation, including U.S. Patent Nos. 5,307,376 (providing higher quality transmission of a
21   digital signal interlaced in time and infrequency), 6,925,587 (creating an Interleaver design such
     that the same design is near-optimal for all Interleavers within a set of sizes), and 7,526,687
22   (creating an Interleaver design such that the same design is near-optimal for all Interleavers
     within a set of sizes).  (11/15/12 Tr. at 151-152 (Gibson Testimony); Exs. 131, 478, 481.)

1 | '896 and '972 Patents cover initiation of communications between a station and an access
2 | point in the 802.11 Standard. (11/19/12 Tr. at 85 (Williams Testimony) ("The Harris and
3 | Borgstahl patents, Exhibits 177 and 171, deal with the messages that are communicated
4 | back and forth between a station set and an access point, in order to facilitate that
5 | acceptance of the station set onto the access point, and the initiation of
6 | communications.").)

7 |     377.    Based on the foregoing, the court finds minimal evidence in the record to
8 | demonstrate that the '896 and '972 Patents are indeed essential to any portion of the
9 | 802.11 Standard, let alone to network setup functionality—a core feature of the 802.11
10 | Standard. Nevertheless, because Microsoft does not contest the essentiality of the '896
11 | and '972 Patents, the court will credit Motorola's scant evidence that the '896 and '972
12 | Patents are essential to network setup in the 802.11 Standard.

13 |     378.    Moreover, absolutely no evidence exists in the record explaining the
14 | relative importance in relation to other technological contributions of Motorola's '896
15 | and '972 Patents to network setup, initial association of a station to an access point, or
16 | generally to the 802.11 Standard. Absent such evidence, the court has no tools with
17 | which to evaluate whether the '896 and '972 Patents contribute the entirety of these
18 | functions or whether they provide only a small component. Microsoft did make clear,
19 | however, that Motorola did not invent associating stations with access points. (11/15/12
20 | Tr. at 109 (Gibson Testimony).)

21 |     379.    Because of the limited evidence showing the importance of the '896 and
22 | '972 Patents to the 802.11 Standard, the court concludes that parties in a hypothetical

ORDER- 119

1  negotiation would view the '896 and '972 Patents as providing very minimal technical

2  contribution to channel access.

3      380.   Having determined that the '896 and '972 patents provide minimal

4  contribution to the standard, parties to a hypothetical negotiation would next consider

5  whether the patents are important to the Xbox's implementation of the standard.

6      381.   Microsoft contends that the Xbox does not use either the '896 Patent or the

7  '972 Patent.  Microsoft argues that the '896 and '972 Patents do not relate to

8  infrastructure connections such as those between access points and stations (such as

9  between a router/modem and Xbox), but instead relate to communications between peer

10  devices, such as between two stations.  (11/15/12 Tr. at 109-10 (Gibson Testimony).)

11  According to Microsoft, the Xbox does not use the '896 and '972 Patents in normal

12  operations because the Xbox is normally connected to an access point in an infrastructure

13  connection and not to another Xbox in a peer-to-peer connection.  (*Id.* at 110.)

14      382.   In response, Motorola's expert, Dr. Williams, testified that the claims of the

15  '896 and '972 Patents do not contain the term "peer-to-peer" and are not limited to peer-

16  to-peer communications.  (11/19/12 Tr. at 95:14-21, 96:5-8 (Williams Testimony); '896

17  Patent at claim 17; '972 Patent at claim 9; 11/15/12 Tr. at 193:15-16 (Gibson

18  Testimony).)

19      383.   Because the parties dispute the scope of the '896 and '972 Patents, the court

20  examined the specifications of the '896 and '972 Patents and concludes that the

21  specifications discuss the claimed technology in the context of peer-to-peer

22  communications.  (*E.g.*, Ex. 177 at MS-MOTO_1823_00004042238 ("More specifically,

ORDER- 120

1  the present invention relates to peer-to-peer network in which node addressing is

2  dynamically configurable.").)  Although this may lend some credence to Microsoft's

3  argument, nothing in the specifications limits the claims to peer-to-peer communications.

4  Further, even if the claims were so limited, the court does not see why a communication

5  between an Xbox and a router could not constitute a peer-to-peer communication because

6  the patents leave that term undefined.  Thus, the court declines to limit, as a matter of

7  law, the claims of the '896 and '972 Patents so as to exclude Xbox to access point

8  communications.

9       384.   In sum, the court concludes that parties to a hypothetical negotiation for the

10  '896 and '972 Patents would view the patents as providing very little contribution to the

11  802.11 Standard and would disagree over whether licenses to the '896 and '972 Patents

12  are in fact required for the Xbox's use of the 802.11 Standard.

13              **d.    Data Modulation (b/g) Patents**

14       385.   Motorola identifies three patents as related to data modulation for 802.11b

15  and g:  the '547 Patent, the '449 Patent, and the '359 Patent.  (11/15/12 Tr. at 110

16  (Gibson Testimony); Exs. 156 (the '547 Patent), 170 (the '359 Patent), 180 (the '449

17  Patent).)  The '547 Patent expires on March 11, 2013, and thus, although it is relevant to

18  the Xbox 360, ███████████████████████.  The '359 Patent expires on

19  October 13, 2015, and thus, is relevant to both the Xbox 360 ███████████.

20  Similarly, the '449 Patent is relevant to both the Xbox 360 ███████████.

21       386.   Motorola relates the '449 Patent to a method of wirelessly transmitting data

22  using a data modulation technique known as "direct sequence spread spectrum" (DSSS)

ORDER- 121

1 to suppress interference.  (Motorola Pr. FC ¶¶ 286-87 (citing '449 Patent at col. 6, lns.

2 55-67, claim 1).)  Similarly, Motorola identifies the '547 and '359 Patents as relevant to

3 DSSS and, in particular, to sending data signals coherently by inserting "reference

4 symbols" into data to be transmitted.  (Motorola Pr. FC ¶¶ 291-92 (citing '547 Patent at

5 Abstract; '359 Patent at Abstract).)  Because DSSS is relevant to 802.11b and 802.11g,

6 Motorola contends that the '449, '547, and '359 Patents are relevant to those versions of

7 the 802.11 Standard and not to the 802.11n version.  (11/15/12 Tr. at 110:15-111:1

8 (Gibson Testimony).)

9        387.    As with the previous patents, Motorola did not elicit testimony regarding

10 the meaning of the '449, '547, or '359 Patents' claims as they relate to portions of the

11 802.11 Standard, but now asserts a claims-to-standard relationship through attorney

12 representations in  proposed findings of fact and conclusions of law.  (Motorola Pr. FC ¶¶

13 286-87, 291-92.)  Motorola's expert, Dr. Williams, in a conclusory statement, contends

14 that the '449, '547, and '359 Patents cover how to modulate the carrier signal to transmit

15 information in the 802.11 Standard.  (11/19/12 Tr. at 87 (Williams Testimony) ("In the

16 bottom three patents, Exhibits 180, 156, and 170, these deal with the fundamental process

17 of how to change the carrier, how to modulate that carrier in order to convey the

18 information to the other side.").)

19        388.    Based on the foregoing, the court finds minimal evidence on the record to

20 demonstrate that the '449, '547, and '359 Patents are indeed essential to any portion of

21 the 802.11 Standard, let alone to data modulation—a core feature of the 802.11 Standard.

22 Nevertheless, because Microsoft does not contest the essentiality of the '449, '547, and

ORDER- 122

1   '359 Patents, the court will credit Motorola's scant evidence that the '449, '547, and '359

2   Patents are essential to data modulation using the DSSS technique in the 802.11b and

3   802.11g versions of the 802.11 Standard.

4        389.   Moreover, absolutely no evidence exists in the record explaining the

5   relative importance in relation to other technological contributions of Motorola's '449,

6   '547, and '359 Patents to data modulation or DSSS, or generally to the 802.11 Standard.

7   Absent such evidence, the court has no tools with which to evaluate whether the '449,

8   '547, and '359 Patents contribute the entireties of these functions, or provide only a small

9   component.  Microsoft did make clear, however, that Motorola did not invent data

10  modulation or DSSS. (11/15/12 Tr. at 109 (Gibson Testimony).)

11       390.   Because of the limited evidence showing the importance of the '449, '547,

12  and '359 Patents to the 802.11 Standard, parties in a hypothetical negotiation would view

13  the '449, '547, and '359 Patents as providing very minimal technical contribution to data

14  modulation and DSSS.[17]

15       391.   Having determined that the '449, '547, and '359 Patents provide minimal

16  contribution to the standard, parties to a hypothetical negotiation would next consider

17  whether the patents are nevertheless important to the Xbox's implementation of the

18  standard.

19

20

_____

21   [17] As seen with data modulation relevant to 802.11a, 802.11g, and 802.11n, lending

22   support for the court's conclusion is the fact that other companies have disclosed patents
     essential to the 802.11 Standard in the area of data modulation.  (*See supra* note 16.)

ORDER- 123

392.     Through its expert, Dr. Gibson, Microsoft contends that the '449, '547, and '359 Patents are not relevant to the Xbox because these patents relate only to the 802.11b and 802.11g versions of the standard, but not to the 802.11n version, which will be the dominant version going forward. (11/15/12 Tr. at 110:15-112:1 (Gibson Testimony).) In response, Motorola contends that the Xbox supports 802.11b and 802.11g. (11/19/12 Tr. at 81:11-16 (Williams Testimony); Ex. 2329 at MOTM_WASH1823_0606790; Ex. 2329A.) Further, as Dr. Gibson admitted, the availability of 802.11b and 802.11g in the Xbox allows the Xbox to drop back from 802.11n (to 802.11b or 802.11g) when there is too much interference to allow the Xbox to communicate using 802.11n. (11/15/12 Tr. at 192:1-7 (Gibson Testimony); *see also* 11/19/12 Tr. at 96:9-19 (Williams Testimony).) The presence of 802.11b and 802.11g in the Xbox also allows users in homes with older access points to use the Xbox. (11/19/12 Tr. at 96:19-21 (Williams Testimony).)

393.     Based on the foregoing evidence, the court concludes that although 802.11n will be the dominant version going forward, it is important for the Xbox to continue to support and use the 802.11b and 802.11g versions of the 802.11 Standard. Doing so allows the Xbox to function in a greater number of user network setups and therefore adds value to Microsoft.

394.     Accordingly, the court concludes that parties to a hypothetical negotiation for licenses to the '449, '547, and '359 Patents would deem these patents as providing very little contribution to core functionality of the 802.11 Standard. Additionally, the parties would agree that these Patents relate only to the 802.11b and 802.11g versions of the standard, and that those versions are becoming less prevalent. Nevertheless,

1  Motorola is correct that the ability to support and use the 802.11b and 802.11g versions

2  provides value to Microsoft's Xbox product.

3              **e.    Security Patents**

4        395.    Motorola relates the '571 Patent to the four-way handshake used for

5  exchanging secure encryption keys. The "handshake" is a method for exchanging

6  encryption keys used in 802.11 Temporal Key Integrity Protocol ("TKIP") and Counter

7  Mode with Cipher Block Chaining Message Authentication Code Protocol ("CCMP").

8  (11/15/12 Tr. at 112 (Gibson Testimony); Ex. 157 (the '571 Patent).) The '571 Patent

9  expires on July 1, 2013, and thus is relevant to the Xbox 360 ███████████████

10 ████████. (Exs. 157, 1589.)

11       396.    Motorola relates the '398 Patent to the process by which the 802.11

12 encryption protocols calculate a message integrity code ("MIC") to include with data

13 packets. The MIC is a message that is used to verify that the packet is from the correct

14 source. (11/15/12 Tr. at 112-13 (Gibson Testimony); Ex. 161 ('398 Patent).) Similarly,

15 Motorola identifies the '563 Patent as related to using a packet sequence number in the

16 calculation of the MIC. (11/15/12 Tr. at 112-13 (Gibson Testimony); Ex. 169 ('563

17 Patent).) The '398 Patent expires on July 5, 2014, and thus is relevant to both the Xbox

18 360 ███████████. Likewise, the '563 Patent expires on November 18, 2014, and is

19 relevant to both systems.

20       397.    As before, Motorola did not elicit testimony regarding the meaning of the

21 '571, '398, or '563 Patents' claims as they relate to portions of the 802.11 Standard, but

22 now asserts a claims-to-standard relationship through attorney representations in

ORDER- 125

1  proposed findings of fact and conclusions of law.  (Motorola Pr. FC ¶¶ 310-12, 327-28,

2  332-33.)  Motorola's expert, Dr. Williams, in a conclusory statement, contends that the

3  '571 Patent covers the four-way handshake used for exchanging secure encryption keys

4  in the 802.11 Standard.  (11/19/12 Tr. at 88 (Williams Testimony) ("In the ['571 Patent]

5  it discusses a process called in the 802.11 standard as a four-way handshake.  The ['571

6  Patent] covers the first handshake of that four-way handshake, and ultimately ends up in

7  the generation of encryption keys on both sides in order to encrypt the information.").)  In

8  similarly conclusory fashion, Dr. Williams opines that the '398 and '563 Patents relate to

9  encryption, and specifically to the MIC message.  (11/19/12 Tr. at 88 (Williams

10 Testimony) ("The ['398 and '563 Patents] deal with something called the 'message

11 integrity code.'  And this integrity code identifies, specifically to the receiver, that this

12 information was generated by the sender.").)

13        398.    Based on the foregoing, the court finds minimal evidence in the record to

14 demonstrate that the '571, '398 and '563 Patents are indeed essential to any portion of the

15 802.11 Standard, let alone to security and encryption—core features of the 802.11

16 Standard.  Nevertheless, because Microsoft does not contest that the '571, '398 and '563

17 Patents are essential, the court will credit Motorola's scant evidence that the '571, '398

18 and '563 Patents are essential to security and encryption in the 802.11 Standard.

19        399.    Additionally, absolutely no evidence exists in the record explaining the

20 relative importance in relation to other technological contributions of Motorola's '571,

21 '398 and '563 Patents to security or encryption, or generally to the 802.11 Standard.

22 Microsoft, however, presented undisputed evidence that security is a large and complex

ORDER- 126

1  topic in the 802.11 Standard, spanning roughly 150 pages.  (11/15/12 Tr. at 112 (Gibson

2  Testimony); Ex. 386A.)  Also, the record is clear that Motorola did not invent security

3  and encryption in wireless networks.  (11/15/12 Tr. at 110-12 (Gibson Testimony).)

4       400.    Because of the limited evidence showing the importance of the '571, '398

5  and '563 Patents to the 802.11 Standard and strong evidence that other significant

6  technology has been incorporated into security and encryption in the 802.11 Standard, the

7  court concludes that parties in a hypothetical negotiation would view the '571, '398 and

8  '563 Patents as providing very little technical contribution to the overall technology

9  involved in security and encryption in the 802.11 Standard.[18]

10      401.    Microsoft also argues that the Xbox derives little benefit from Motorola's

11 '571, '398 and '563 Patents, aside from compliance with the standard.  (11/15/12 Tr. at

12 114 (Gibson Testimony).)

13      402.    Microsoft presented undisputed evidence explaining that 802.11 encryption

14 only encrypts communications from the Xbox to the router in a user's home and does not

15 protect those communications as they go out onto the Internet.  (11/15/12 Tr. at 114

16 _____

17   [18] Lending support for the court's conclusion is the fact that other companies have
disclosed patents essential to the 802.11 Standard in the area of security.  Nokia disclosed three
18 U.S. patents to the 802.11 Working Group related to encryption of data in communications: U.S.
Patent Nos. 5,987,137; 6,118,775; and 7,120,422.  (11/15/12 Tr. at 148-49 (Gibson Testimony);
19 Exs. 234, 245, 397.)  LG disclosed two U.S. patents related to encryption of data in
communications: U.S. Patent Nos. 6,839,553 (general authentication process between a network
20 and a mobile station) and 6,347,144 (preventing copying of data streams by placing encryption
information inside a header of that stream).  (11/15/12 Tr. at 148-49 (Gibson Testimony); Exs.
21 477, 475.)  Finally, ETRI disclosed one U.S. patent related to encryption of data in
communications: U.S. Patent No. 7,477,746 (dynamically managing a group transient key).
22 (11/15/12 Tr. at 148-49 (Gibson Testimony); Ex. 480.)

1 (Gibson Testimony).) Microsoft also presented uncontested evidence that the Xbox

2 provides its own end-to-end security between the Xbox and another Xbox or between

3 Xbox and Xbox Live servers independent of the technology claimed in the Motorola

4 patents. (*Id.* at 113-14.) Microsoft does not rely on the 802.11 security, and thus, 802.11

5 security and encryption are redundant to the Xbox security, according to Microsoft. (*Id.*)

6      403.   In response, Motorola explained that the Xbox allows a user to use Internet

7 Explorer, a web browser. (11/15/12 Tr. at 22:15-16 (Del Castillo Testimony).)  When an

8 Xbox is used with Internet Explorer, the data transmitted is not encrypted by the Xbox

9 security. (*Id.* at 75:9-20.) Thus, communications using Internet Explorer would be

10 visible to anyone browsing an 802.11 network that is not secured. (*Id.* at 75:15-20.)

11      404.   Motorola also presented evidence that when a user streams videos from

12 Netflix or other content providers over the Internet, they do not use the Xbox security.  In

13 response, Microsoft presented evidence that content providers, such as Netflix, typically

14 protect their content using security that does not implicate 802.11 encryption. (11/15/12

15 Tr. at 26-28 (Del Castillo Testimony); 11/15/12 Tr. at 113 (Gibson Testimony).)

16      405.   Finally, Motorola presented evidence that CCMP and TKIP are commonly

17 used security settings when connecting to the Internet through the Xbox. (11/19/12  Tr.

18 at 191:4-18, 191:25-192:9 (Sukumar Testimony); Ex. 2392; Ex. 3034-A.)  Microsoft does

19 not appear to dispute that CCMP and TKIP are commonly used settings. (11/15/12 Tr. at

20 178:5-8 (Gibson Testimony).)  Accordingly, the court agrees that CCMP and TKIP are

21 commonly used.

22

1      406.   Based on the foregoing, the court concludes that Motorola's '571, '398 and

2  '563 Patents contribute very little technology to the security and encryption portions of

3  the 802.11 Standard.  Moreover, in certain Xbox functionality, such as game playing,

4  Microsoft—not the 802.11 Standard—provides security and encryption.  Nevertheless, in

5  other operations, such as viewing Internet content, the Xbox will use 802.11 security and

6  encryption.  In sum, the court concludes that the '571, '398 and '563 Patents contribute

7  very little to the standard, but what they do contribute will be used by the Xbox in certain

8  circumstances.  Parties to a hypothetical negotiation would consider the '571, '398 and

9  '563 Patents in this light.

10  **VI.    APPROPRIATE RAND ROYALTIES FOR MOTOROLA'S SEPs**

11      The next step in the court's analysis is to determine a RAND rate and range for

12  Motorola's H.264 and 802.11 SEP portfolios.  At trial, with respect to determining a

13  RAND royalty rate for both Motorola's H.264 and 802.11 patent portfolios, the parties

14  submitted evidence of license agreements and patent pools that were allegedly

15  comparable to a RAND royalty rate.  The court examines the parties' proposed, and

16  competing, comparables to determine applicability to the proper RAND royalty rate and

17  range for Motorola's SEP portfolios vis-à-vis Microsoft.  In its analysis, the court

18  considers the RAND-modified *Georgia-Pacific* factors set forth above.  At the conclusion

19  of its analysis, the court provides a RAND royalty rate and range for Motorola's H.264

20  and 802.11 SEPs based on Microsoft's products.

21

22

ORDER- 129

1 | **A.**   **Motorola's Suggested Comparables**

2      Through its licensing expert, Mr. Donohoe, Motorola contends that it is entitled to

3 a royalty rate of 2.25 % of the net selling price of Microsoft's Windows and Xbox

4 products in exchange for a license to its H.264 and 802.11 SEP portfolios.  Motorola

5 seeks this amount as value for its patent portfolios and is indifferent as to whether the

6 value is in the form of monetary payment, a grant-back license, or another form of

7 compensation.  (11/20/12 Tr. at 149-50 (Donohoe Testimony) ("Q: . . . [W]hat you're

8 saying is that Motorola wants 2.25 percent, and doesn't really care whether it's

9 compensated in cash, or in grant-back, but it wants 2.25 percent?  A:  That's correct.").)

10      Specifically, with respect to Motorola's 802.11 SEP portfolio, Mr. Donohoe

11 selected 2.25 % of the end-product price as the applicable rate for Motorola's patents, and

12 using this rate, he calculated the total payments that Microsoft would have made based on

13 annual revenues in the fiscal year 2010 to 2011.  (11/20/12 Tr. at 140:9-141:3 (Donohoe

14 Testimony).)  Mr. Donohoe then picked a royalty rate ranging from 0.25 to 0.5 % for

15 Microsoft's 802.11 SEP portfolio, and using this rate, Mr. Donohoe calculated the total

16 payments that Motorola would have made to Microsoft based on annual revenues of

17 unidentified Motorola products in the fiscal year 2010 to 2011.  (11/20/12 Tr. at 141:4-25

18 (Donohoe Testimony).)  Mr. Donohoe then subtracted the amount Motorola would pay to

19 Microsoft from the amount Microsoft would pay to Motorola and determined that

20 Microsoft would have made a net payment to Motorola of $36 to $54 million in the fiscal

21 year 2010 to 2011.  Applying this amount to the number of Xbox units sold in that time

22 period, Mr. Donohoe calculated a per unit royalty of $3.00 to $4.50 or 1.15 % to 1.73 %

ORDER- 130

1  of average selling price of the Microsoft Xbox. (11/20/12 Tr. at 144:1-19 (Donohoe

2  Testimony).)

3       Similarly, with respect to Motorola's H.264 SEP portfolio, Mr. Donohoe applied a

4  2.25 % end-product price royalty to unidentified Microsoft and Motorola products and

5  determined that a net annual payment (for some unidentified year or years) from

6  Microsoft would have been $137 million. He then capped the payment at $100 to $125

7  million and converted that payment range into a per unit range of $0.50 to $0.63, which

8  he expressed as a rate of 0.68 to 0.84 %. (11/20/12 Tr. at 145:6-146:15 (Donohoe

9  Testimony).)

10       In this case, as previously explained, Motorola has not placed the value of

11  Microsoft's patents at issue, making it impossible for the court to determine the value of

12  any of Microsoft's patents. In any event, regardless of the form of compensation,

13  Motorola's position is that its 802.11 SEP portfolio is worth 2.25 % of the net selling

14  price of Microsoft's products, and that its H.264 SEP portfolio is worth the same rate

15  with yearly payments capped at $100 to $125 million. To support this position, Mr.

16  Donohoe, Motorola's licensing expert, addressed *Georgia-Pacific* Factor 1, which

17  examines the royalties received by the patentee for licensing the patents in suit, proving

18  or tending to prove an established royalty. Mr. Donohoe discussed:  (1) a 2011 license

19  agreement between MMI and VTech Telecommunications Ltd. ("VTech"); (2) a 2010

20  patent cross license agreement between Motorola and Research In Motion Limited

21  ("RIM"); and (3) three agreements entered into by Symbol before it was acquired by

22  Motorola. (11/20/12 Tr. at 138:5-140:23 (Donohoe Testimony); Exs. 13, 36-38, 2833.)

ORDER- 131

1          i.      **The VTech License Agreement**

2          407.   VTech is the world's leading manufacturer and seller of cordless

3    telephones.  (11/20/12 Tr. at 85:24-86:1 (Dailey Testimony).)

4          408.   On November 13, 2007, Motorola brought suit against VTech in the

5    Eastern District of Texas accusing VTech of infringing six Motorola patents.  These

6    patents were not SEPs and they had no RAND licensing requirements.  (11/20/12 Tr. at

7    87:19-88:5 (Dailey Testimony).)

8          409.   Motorola and VTech settled this lawsuit in January 2010 and signed a one-

9    year licensing agreement.  Pursuant to this agreement, Motorola was required to provide

10   written notice of any further infringement after the license expired in January 2011.  If

11   Motorola and VTech could not agree on new licensing terms, then they would arbitrate to

12   settle the dispute.  (11/20/12 Tr. at 88:6-89:16 (Dailey Testimony); Ex. 1680.)

13         410.   On June 17, 2011, Motorola notified VTech that it considered VTech to be

14   infringing a number of Motorola's corded and cordless phone patents.  (11/20/12 Tr. at

15   89:18-22 (Dailey Testimony); Ex. 13 at MOTM_WASH1823_0394368 (second

16   "Whereas" clause).)  Motorola valued this alleged infringement at ▮▮▮▮▮▮ on

17   VTech's past sales, and ▮▮▮▮▮▮ in forward-facing royalties through 2019.  (Ex.

18   1681 at 13; 11/20/12 Tr. at 91:21-23 (Dailey Testimony).)

19         411.   In October 2011, VTech proposed taking a license under Motorola's 802.11

20   and H.264 SEPs "as a part of the agreement we are trying to settle."  (Ex. 2832.)

21         412.   Motorola subsequently settled its infringement claims against VTech and

22   provided VTech with a paid-up license under its cordless and corded phone patents for

ORDER- 132

1    $12 million.  (Ex. 13 at §§ 3.1(a)-(b) and 4.1.)  As a part of the same agreement, VTech

2    agreed to take a license to Motorola's 802.11 and H.264 Patents with a running royalty of

3    2.25 %.  (Ex. 13 § 4.2.)

4          413.   Motorola argues that the VTech's agreement to a 2.25 % license for

5    Motorola's 802.11 and H.264 patent portfolios is distinct from the settlement discussions

6    for the alleged infringement.  (*See generally* Motorola Pr. FC ¶¶ 104-07.)  The court,

7    however, does not reach the same conclusion.

8          414.   The court's conclusion is supported by an October 7, 2011, e-mail VTech

9    sent to Motorola seeking a license to Motorola's 802.11 and H.264 portfolios.  The e-

10   mail provides, in relevant part:

11         We have an interest in licensing your WiFi, 802.11 and MPEG video
           portfolios particularly if it would give us some measure of protection on
12         some future products on our road map.   We see a convergence of
           technologies on future home communication phones/devices that would use
13         some of these technologies.

14         We could enter into a long term license as part of the agreement we are
           trying to settle on the assumption that we would list products using MMI's
15         IP after determining that they qualified.  What we are seeking to learn is the
           areas that they cover and the degree of practical application to our product
16         direction.  Our motivation is to seek a degree of protection by this license.

17   (Ex. 2832.)

18         415.   The language in the October 7, 2011, e-mail makes clear to the court that

19   VTech took a license to Motorola's 802.11 and H.264 portfolios only as a part of a

20   package deal in which it also resolved Motorola's infringement claims.  Under the threat

21   of a potential infringement lawsuit, the court cannot say that the VTech license agreement

22   for Motorola's 802.11 and H.264 SEPs is a reliable indicator of a RAND royalty rate.  As

ORDER- 133

1   stated above, a RAND royalty rate would be the result of a reasonable SEP patentee and a

2   reasonable implementer negotiating towards a reasonable royalty rate.  The threat of a

3   lawsuit, following a history of litigation between the parties, cannot form the basis for

4   such a reasonable negotiation.

5        416.    Dr. Murphy explained this logic: "If you look at the total value of the

6   agreement, clearly it would be dominated by that $12 million.  My understanding is that

7   today, under the 2.25 percent, the amount VTech has paid has been very small, in the

8   thousands, not $12 million range.  And it is pretty clear . . . from the letter that was

9   originally written that the agreement to license at those rates was tied into settling . . . the

10  dispute with Motorola." (11/13/12 Tr. at 192:15-193:21 (Murphy Testimony).)  The

11  court agrees with Dr. Murphy and thus concludes, as Microsoft contends, that VTech

12  would not have agreed to pay 2.25 % in royalties for Motorola's 802.11 and H.264 SEP

13  portfolios independent of the broader licensing agreement.

14       417.    Lending support to the court's conclusion is the fact that Motorola and

15  VTech entered into this agreement during the pendency of the present litigation.  More

16  specifically, Motorola and VTech agreed on the eve of a hearing in the International

17  Trade Commission ("ITC") at which Motorola relied on the agreement as evidence of the

18  reasonableness of its royalty demands on Microsoft.  (11/20/12 Tr. at 94:9-95:14 (Dailey

19  Testimony).)

20       418.    That VTech has paid very little under its license agreement for Motorola's

21  802.11 and H.264 SEPs strongly diminishes the license agreement's relevance as an

22  established royalty rate under Factor 1.  To date, VTech has paid only trivial royalties on

1   its sales of a WiFi-enabled radio product that VTech has discontinued and is phasing out.

2   (Ex. 62 (indicating royalties on VTech's "obsolete" PIMA Internet radio would be ▮▮▮

3   for December 2011, based on U.S. sales for the month of ▮ radios); Ex. 3373

4   (indicating royalties on Internet radio were ▮▮▮ for the third calendar quarter of

5   2012).)  VTech has never paid any royalties on any product compliant with the H.264

6   Standard.  (11/20/12 Tr. at 100:10-13 (Dailey Testimony).)

7       419.   Finally, Motorola contends that VTech recently launched toy tablet

8   products—the Innotab 2 and Innotab 2S—that appear to implement the 802.11 and H.264

9   Standards, and (according to Motorola) are expected to generate significant royalty

10  revenue in the near future.  (Motorola Pr. FC ¶¶ 110-11.)  VTech, however, has not yet

11  paid any royalties on those products, and Mr. Dailey could not predict how many of the

12  toys VTech was going to sell.  (11/20/12 Tr. at 100:14-25, 101:11-13 (Dailey

13  Testimony).)  Again, the court concludes that hypothetical future sales do little  to

14  demonstrate an established royalty rate under Factor 1.

15      420.   In sum, based on the foregoing, the court concludes that the VTech license

16  agreement does not establish a RAND royalty rate and is not an indicator to what is in

17  fact an appropriate RAND royalty rate for Motorola's 802.11 and H.264 patent portfolios

18  in a negotiation with Microsoft.

19      ii.    **The RIM License Agreement**

20      421.   On January 1, 2003, Motorola and RIM entered into a Cellular Essential

21  Properties Cross License Agreement.  (Ex. 2800.)  As a result of the negotiation between

22  RIM and Motorola, the parties reached an agreement that included a cross license to

ORDER- 135

1 | Motorola under RIM's SEPs and a running royalty of ▮▮▮ to be paid by RIM on any

2 | mobile device sold by RIM that was compliant with Narrowband CDMA, Wideband

3 | CDMA and TD/CDMA. (Ex. 2800 at MOTM_WASH1823_0025608 (§ 4.1.2).) RIM

4 | paid a flat lump sum for TDMA-compliant mobile phones. (Ex. 2800 at

5 | MOTM_WASH1823_0025608 (§ 4.1.1).) By its terms, the agreement lasted until

6 | December 31, 2007. (Ex. 2800 at MOTM_WASH1823_0025610.)

7 |     422.   Around the time the 2003 RIM agreement expired, the parties negotiated

8 | for, but were unable to consummate, a new cross license agreement. As a result of this

9 | impasse, the parties engaged in litigation, including litigation regarding certain of

10 | Motorola's 802.11 SEPs. (*See, e.g.*, Ex. 1672.)

11 |     423.   On June 1, 2010, Motorola and RIM entered into a second cross license

12 | agreement for various wireless communications standards, including Wi-Fi (802.11),

13 | certain cellular properties, video coding standards (including H.264), and non-essential

14 | wireless messaging patents. (Ex. 2833; 11/20/12 Tr. at 56:20-57:8 (Dailey Testimony).)

15 | In exchange for this license, RIM granted a license to Motorola under RIM's essential

16 | patents and agreed to pay a lump sum of ▮▮▮ and a running royalty rate of ▮▮▮

17 | of the net selling price of any mobile device sold, regardless of the number of standards

18 | the product used. (11/20/12 Tr. at 56:22-57:24 (Dailey Testimony); Ex. 2833 at

19 | MOTM_WASH1823_0025522.)

20 |     424.   The June 2010 agreement capped royalty payments made by RIM at ▮▮▮

21 | ▮▮▮ annually. (11/20/19 Tr. at 57:25-58:6 (Dailey Testimony).) Motorola and RIM

22 | each exchanged patent "picks" for non-essential patents. (*Id.* at 106:4-8.) The parties

1    also transferred certain patents to one another.  (*Id.* at 56:20-57:1.)  This agreement is

2    effective until May 30, 2020.  (Ex. 2833 at MOTM_WASH1823_0025524.)

3        425.   Motorola contends that the RIM license is comparable to a RAND license

4    agreement with Microsoft for Motorola's H.264 and 802.11 patent portfolios.  In support

5    of its contention, Motorola argues that under the payment provision of the agreement, if

6    RIM were to market a product that used only the 802.11 and H.264 Standards and not the

7    cellular portfolios, RIM would pay ████.  (11/20/12 Tr. at 57:16-20 (Dailey

8    Testimony).)  For the following reasons, the court disagrees that Motorola's RIM license

9    agreement is comparable to a RAND royalty rate between Microsoft and Motorola in this

10   case.

11       426.   First, the RIM agreement is a "fairly broad cross-license" that licenses

12   patents essential to many standards in addition to 802.11 and H.264, including

13   Motorola's cellular patents, as well as other non-standard-essential patents.[19]  (11/20/12

14   Tr. at 56:20-57:8, 105:7-106:11 (Dailey Testimony).)

15       427.   The court concludes that where multiple technologies (including both

16   standard essential and non-essential patents) are licensed within the same agreement, it is

17   necessary to apportion the value of Motorola's 802.11 or H.264 SEPs from the other

18   licensed properties.  (*See, e.g.*, 11/19/12 Tr. at 160:10-18 (Schmalensee Testimony) (if

19   H.264 Patents were licensed together with patents essential to other standards, "one

20

21   _____

22       [19] The RIM license agreement also involves patent transfers going both ways, providing
     mutual benefit to both parties.  (11/20/12 Tr. at 56:20-57:8, 105:7-106:11 (Dailey Testimony).)

ORDER- 137

1 would need to estimate the value of the other patents and subtract it out"); 11/13/12 Tr. at

2 162:7-18 (Murphy Testimony).)

3       428.    Such apportionment would be difficult.  (11/19/12 Tr. at 160:10-19

4 (Schmalensee Testimony) (agreeing it would be a "pretty tough thing to do").)  Here, the

5 challenge in apportionment is made more difficult by Motorola's practice of providing

6 licensees with a license to its 802.11 and H.264 portfolios at no additional charge if a

7 licensee takes a license to its cellular portfolios.  (*See* 11/20/12 Tr. at 74:16-20, 74:25-

8 75:11 (Dailey Testimony) ("It makes it challenging, I suppose.").)

9       429.    At trial, Motorola did not apportion the amount RIM paid between

10 Motorola's 802.11 or H.264 portfolios and the other patents licensed in the RIM license

11 agreement.  Although Mr. Dailey asserted that the RIM license agreement apportioned

12 the royalties payable among the different portfolios (11/20/12 Tr. at 57:9-15 (Dailey

13 Testimony)), the terms of the agreement do no such thing.  To the contrary, the

14 agreement makes clear that royalty payments are to be made on RIM's aggregate sales

15 regardless of the standards its products implement or the patents its products infringe:

16

17

18

19

20 (Ex. 2833 § 5.1.2.)

21       430.    As a result, the court has no way of determining the value of Motorola's

22 802.11 and H.264 patent portfolios as distinct from Motorola's wireless cellphone

1   portfolio and the other patents included in the RIM agreement.  It is also important to the

2   court that the uncontroverted evidence elicited at trial demonstrated that Motorola's

3   wireless cellphone portfolio is extremely strong.  (11/20/12 at Tr. 87:6-8 (Dailey

4   Testimony).)  Accordingly, the court first concludes that an agreement that licenses

5   Motorola's cellphone portfolio as well as other Motorola patents may, in terms of value,

6   be dominated by the cellphone portfolio, as opposed to the other patents included in the

7   agreement.

8         431.   Second, the RIM license agreement provides for a comprehensive

9   settlement of a wide range of litigation between the parties, including litigation in which

10   Motorola was seeking an exclusion order in the ITC to prevent the importation of RIM's

11   flagship BlackBerry products.  (11/20/12 Tr. at 101:22-25, 104:7-13 (Dailey Testimony).)

12   Thus, like the VTech agreement, the RIM agreement resolves a long-lasting dispute and

13   litigation between Motorola and the licensee.  The court agrees with Microsoft that no

14   evidence exists tending to prove that RIM would have agreed to royalties for either

15   802.11 or H.264 Patents alone, apart from this broader agreement that allows RIM to

16   avoid an exclusion order on its BlackBerry products.

17         432.   Third, the RIM licensee agreement caps royalty obligations at ▮▮▮▮▮▮

18   annually.  (Ex. 2833 at §§ 1.7, 5.1.3.)  When the agreement was negotiated, RIM hit the

19   ▮▮▮▮▮▮ cap on the basis of sales of its cellular-compliant BlackBerry products alone

20   (11/20/12 Tr. at 106:21-107:6 (Dailey Testimony)), meaning that it would have paid no

21   incremental royalties for any non-cellular products it might have sold that implemented

22   the 802.11 or H.264 Standards.

ORDER- 139

1      433.    Fourth, under the terms of a prior license (Ex. 2800), RIM paid Motorola

2  the same ███ for patents not including the rights to 802.11 or H.264 implementations.

3  (11/20/12 Tr. at 116:3-8, 117:7-12 (Dailey Testimony).)  The court concludes that to the

4  extent any value can be derived from the RIM agreement for Motorola's H.264 and

5  802.11 Patents, the evidence suggests that the value is very little.

6      434.    Finally, Motorola contends that RIM pays this ███ running royalty on its

7  BlackBerry devices, as well as its PlayBook tablet, the latter of which implements the

8  802.11 and H.264 Standards, but is not cellular capable.  (11/20/20 Tr. at 58:9-23 (Dailey

9  Testimony).)  The evidence before the court, however, is that the PlayBook tablet is not a

10  strong selling item for RIM.  (*See id.* at 107.)  Thus, the court cannot conclude that

11  Motorola has established the RIM license agreement as a comparable royalty pursuant to

12  Factor 1.

13      435.    In sum, based on the foregoing, the court concludes that the RIM license

14  agreement does not establish a RAND royalty rate and is not an indicator to what is in

15  fact an appropriate RAND royalty rate for Motorola's 802.11 and H.264 patent portfolios

16  in a negotiation with Microsoft.

17      **iii.    The Symbol License Agreements**

18      436.    On January 9, 2007, Motorola, Inc., completed its acquisition of Symbol

19  Technologies, Inc. ("Symbol").  (11/20/12 Tr. at 59:2-6 (Dailey Testimony).)

20      437.    U.S. Patent Nos. 5,029,183; 5,479,441; 6,236,674; 6,404,772; and

21  6,473,449 are 802.11 SEPs owned by Symbol at the time of Motorola's acquisition.  Each

22

ORDER- 140

1   of these patents was listed in the Annex attached to Motorola's October 2010 offer to

2   Microsoft.  (Ex. 1; 11/20/12 Tr. at 60:3-9 (Dailey Testimony).)

3       438.   Motorola's licensing expert Mr. Donohoe also identified three license

4   agreements between Symbol and various counterparties that he testified were relevant

5   under Factor 1.  These agreements involved the six 802.11 SEPs listed in the preceding

6   paragraph.  Mr. Donohoe admitted, however, that there are "a lot of differences between

7   the three Symbol agreements and what's being negotiated between Microsoft and

8   Motorola."  (11/20/12 Tr. at 140:1-12 (Donohoe Testimony)); *see also* 11/20/12 Tr. at

9   59:12-61:24 (Dailey Testimony) (discussing Symbol licenses); Exs. 36-38.)

10      439.   The first agreement that Mr. Donohoe referenced was between Symbol and

11  Proxim.  (11/20/12 Tr. at 140:1-7 (Donohoe Testimony); Ex. 36.)  In 2003, a jury

12  awarded Symbol a royalty of 6 % of the average selling price of Proxim's finished

13  products for two of the patents offered to Microsoft in October 2010—U.S. Patent Nos.

14  5,029,183 and 5,479,441.  (11/20/12 Tr. at 59:20-60:2; 81:15-19 (Dailey Testimony); *see*

15  *also* 11/16/12 Tr. at 166:6-13 (Lynde Testimony).)  In settling this dispute, ▮▮▮▮

16  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

17  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

18  ▮▮▮▮▮▮▮▮▮▮▮▮.  (Ex. 36; 11/20/12 Tr. at 59:20-60:9 (Dailey Testimony).)

19  The final agreement indicated that total compensation was valued at no less than a

20  running royalty of ▮▮ of the net product revenue of Proxim's licensed products.  (Ex. 36

21  at MOTM_WASH1823_0398587.)

22

ORDER- 141

440.   For several reasons, the court concludes that the Symbol-Proxim agreement is not a good indicator of a RAND license agreement between Microsoft and Motorola for Motorola's 802.11 and H.264 SEPs.

441.   First, Mr. Dailey, who provided the only substantive testimony regarding the Symbol-Proxim license, did not know whether the jury had been instructed that there were RAND limitations on the royalties that could be awarded.  (11/20/12 Tr. at 81:20-24 (Dailey Testimony).)  Thus, there is no indication that Symbol and Proxim negotiated for the patents at issue (the '441 and '183 Patents) under the RAND obligation.

442.   Second, the Proxim agreement is not probative of the value of Motorola's 802.11 portfolio because the two patents licensed under the Proxim agreement (the '441 and '183 patents) expired before Motorola even sent the October 21, 2010, demand letter to Microsoft.  (Ex. 1589 (summary exhibit identifying that the '441 and '183 patents expired on June 29, 2009); 11/16/12 Tr. at 177:15-22 (Lynde Testimony); Ex. 1.)  Thus, the court concludes that Microsoft and Motorola would not have considered the patents involved in the Proxim agreement during a negotiation for Motorola's 802.11 and H.264 SEPs.

443.   Third, as before, the court declines to find an agreement fashioned under duress of litigation to be indicative of a RAND license agreement.  Accordingly, the court finds that the Symbol-Proxim agreement has no relevance to a proper RAND royalty rate in this case.

444.   The second Symbol agreement Mr. Donohoe referenced was with Hand Held Products ("HHP").  (11/20/12 Tr. at 140:1-7 (Donohoe Testimony); Ex. 36.)  In

ORDER- 142

1  2004, Symbol licensed to HHP three of the 802.11 Patents offered to Microsoft in the

2  October 2010 letter—U.S. Patent Nos. 5,029,183; 5,157,687; and 5,479,441.  (Ex. 38.)

3  Under the agreement, HHP agreed to pay Symbol ███ on products covered by the patents

4  at issue.  This rate was subject to an annual cap of ███████, which could increase by

5  ██████████████████████████████, at which point the license

6  was deemed fully paid-up.  (Ex. 38 at §§ 5.1, 5.2; 11/20/12 Tr. at 84:3-23 (Dailey

7  Testimony).)  Symbol also received grant-back rights under the agreement.  (Ex. 38;

8  11/20/12 Tr. at 60:17-25 (Dailey Testimony).)

9       445.  For the reasons below, the court concludes that the HHP agreement is not a

10  good indicator of RAND in this case.

11       446.  First, like the Symbol agreement with Proxim, the Symbol agreement with

12  HHP was a settlement agreement, and it involved the same now-expired patents involved

13  in the Proxim agreement—the '441 and '183 Patents.  (11/20/12 Tr. at 83:7-21 (Dailey

14  Testimony); Ex. 38 at MOTM_WASH1823_0398559.)  The HHP agreement also

15  included one other patent—the '687 Patent—which the court has determined does not

16  apply to Microsoft.  (*Id.*)  Thus, the court concludes that in a hypothetical negotiation

17  between Microsoft and Motorola, Microsoft would not consider any of the patents

18  involved in the HHP agreement relevant to their products.

19       447.  Second, the royalty payments in the HHP agreement were subject to an

20  annual cap of ████████, far below the total amount of money Motorola is seeking from

21  Microsoft.

22

ORDER- 143

1    448.   Third, like the Proxim agreement, Symbol and HHP reached the agreement

2    as part of a settlement.  As before, the court declines to credit a license agreement

3    brought about by pending litigation as being a good indicator of a RAND royalty rate.

4    449.   Fourth, and finally, there is no indication that the HHP agreement was the

5    result of a negotiation where the parties thereto considered the RAND obligations of

6    Motorola's '441, '183, and '687 Patents.

7    450.   The last Symbol agreement Mr. Donohoe referenced was with Terabeam.

8    In 2006, Symbol licensed to Terabeam three of the 802.11 Patents Motorola offered to

9    Microsoft—U.S. Patent Nos. 5,029,183; 5,479,441; and 6,473,449.  (Ex. 37.)  According

10   to the agreement itself, the consideration paid by Terabeam in lump-sum amounts was

11   valued at ■ of the net selling price of licensed products through expiration of two of

12   the patents and ■ through expiration of the final patent.  (Ex. 37 at

13   MOTM_WASH1823_0398549; 11/20/12 Tr. at 61:15-24 (Dailey Testimony).)

14   451.   For the reasons below, the court concludes that the Terabeam license is a

15   poor indicator of a RAND royalty rate in this case.

16   452.   As stated, two of the three patents involved in the Terabeam license—

17   the '441 and '183 Patents—were expired by the time Motorola sent its October 2010 offer

18   letters to Microsoft and therefore would not have been considered by Microsoft and

19   Motorola during a RAND negotiation.  Moreover, the court has already found that the

20   third patent—U.S. Patent No. 6,473,449—provided very minimal technical contribution

21   to data modulation and DSSS within the 802.11 Standard.

22

1    453.    Additionally, although the Terabeam license listed nominal running royalty

2  rates for the licensed patents (including the expired '441 and '183 Patents), it required

3  Terabeam to make fixed quarterly payments ranging from ███████████████████.

4  (Ex. 37 at MOTM_WASH1823_0398558.) The Terabeam license was fully paid up after

5  the payment of ████████ in royalties. (11/20/12 Tr. at 85:13-19 (Dailey Testimony);

6  Ex. 37 at MOTM_WASH1823_0398558.) This total payment amount is significantly

7  less than the amount Motorola seeks in this case.

8    454.    As a result of the foregoing, the court concludes that the Terabeam license

9  agreement does little to show an established royalty rate commensurate with the amount

10 of royalties Motorola seeks from Microsoft in this matter for the license of its H.264 and

11 802.11 patent portfolios.

12    **iv.    Stacking Issues with the Rates Motorola Seeks**

13    455.    As stated, for its 802.11 SEP portfolio, Motorola seeks a royalty rate of

14 2.25 % of the end-product price. (11/20/12 Tr. at 140:9-141:3 (Donohoe Testimony).)

15 Motorola expert Mr. Donohoe, however, calculated a royalty rate based on the net royalty

16 flow accounting for the exchange of a cross license between Microsoft and Motorola.

17 (*Id.* at 141:4-25.) Mr. Donohoe's calculation resulted in payments from Microsoft to

18 Motorola at a per unit royalty of $3.00 to $4.50 or 1.15 % to 1.73 % of the average

19 selling price of the Microsoft Xbox. (*Id.* at 144:1-19.) In this case, Motorola has not

20 placed the value of Microsoft's patents at issue, and as a result, the court declines to

21 determine the value of Microsoft's patents in determining a royalty rate. Therefore,

22

ORDER- 145

1   because Mr. Donohoe's calculations are offset by payments from Microsoft to Motorola,

2   they are artificially low.

3        456.    Nevertheless, even taking Mr. Donohoe's royalty rates as accurate,

4   Motorola's royalty request for its 802.11 SEP portfolio raises significant stacking

5   concerns. There are at least 92 entities that own 802.11 SEPs. (*Supra* ¶ 335.) If each of

6   these 92 entities sought royalties similar to Motorola's request of 1.15 % to 1.73 % of the

7   end-product price, the aggregate royalty to implement the 802.11 Standard, which is only

8   one feature of the Xbox product, would exceed the total product price. The court

9   concludes that a royalty rate that implicates such clear stacking concerns cannot be a

10  RAND royalty rate because such a royalty rate does not stand up to the central principle

11  of the RAND commitment—widespread adoption of the standard. As Dr. Lynde

12  explained, "[i]f everyone wanted the same deal [as Motorola], it would quickly make the

13  end-product price untenable commercially." (11/16/12 Tr. at 179:1-8 (Lynde

14  Testimony).)

15       457.    Additionally, the court concludes that stacking concerns are heightened in

16  this case because Motorola's 802.11 SEP portfolio provides only minimal contribution to

17  the 802.11 Standard.

18       458.    Similarly, for its H.264 SEP portfolio, Motorola seeks a royalty rate of

19  2.25 % of the end-product price, but with total yearly royalties capped at $100 to $125

20  million. (11/20/12 Tr. at 145:6-146:15 (Donohoe Testimony).) As with Motorola's

21  802.11 SEP portfolio, Mr. Donohoe calculated a royalty rate based on the net royalty

22  flow accounting for the exchange of a cross license between Microsoft and Motorola.

ORDER- 146

1    (*Id.*)  Mr. Donohoe's calculation resulted in payments from Microsoft to Motorola at a

2    per unit rate of $0.50 to $0.63 or 0.68 % to 0.84 % of the average selling price of

3    Microsoft's H.264-compliant products.  (*Id.*)  As stated, Motorola has not placed the

4    value of Microsoft's patents at issue, and as a result, the court declines to determine the

5    value of Microsoft's patents in determining a royalty rate.  Therefore, because Mr.

6    Donohoe's calculations are offset by payments from Microsoft to Motorola, they are

7    artificially low.

8        459.   As with Motorola's 802.11 SEP portfolio, even taking Mr. Donohoe's

9    royalty rates as accurate, Motorola's royalty request for its H.264 SEP portfolio raises

10   significant stacking concerns.  There are at least 52 entities that own H.264 SEPs.  (*Supra*

11   ¶ 157.)  If each of these entities sought royalties similar to Motorola's request of 0.68 to

12   0.84 % of the end-product price, the aggregate royalty to implement the H.264 Standard,

13   which is only one feature of Microsoft's products, would amount to 35.36 % to 43.68 %

14   of the total product price.  The court concludes that this royalty rate, like the aggregate

15   royalty rate requested by Motorola for its 802.11 SEP portfolio, would not promote

16   widespread adoption of the standard and therefore is not commensurate with the RAND

17   commitment.  Additionally, stacking concerns are heightened in the case of Motorola's

18   H.264 SEP portfolio because the court has determined that Motorola's H.264 SEP

19   portfolio relates almost entirely to interlaced video—a functionality not important to

20   Microsoft's H.264-compliant products.

21       460.   Motorola argues that potential royalty stacking concerns have not, to date,

22   impeded widespread adoption of the H.264 and 802.11 Standards.  (*See* 11/13/12 Tr. at

1  177-79 (Murphy Testimony); 11/16/12 Tr. at 139-41 (Lynde Testimony); 11/19/12 Tr. at

2  148 (Schmalensee Testimony).)  This argument is misplaced.  In this litigation, the court

3  is the arbiter to a dispute over whether Motorola has met its RAND obligations.  Whether

4  other SEP holders have complied with their RAND obligations says nothing as to

5  whether Motorola has met its own RAND obligations.  Stated in other words, it would

6  make little sense for the court to decline to enforce Motorola's RAND obligations simply

7  because other SEP owners have complied with their own obligations.  Thus, the court

8  must determine a reasonable royalty rate for Motorola's SEPs based on the principles

9  underlying the RAND commitment, one of which is the concern of royalty stacking.

10        461.    In sum, the court concludes that the royalty rates sought by Motorola for its

11  802.11 and H.264 SEP portfolios do not fall within the range of RAND royalties.

12  **B.    Microsoft's Suggested Comparables**

13        Microsoft's comparables are mostly based on two patent pools—an H.264

14  standard essential patent pool and an 802.11 Standard essential patent pool.  The court

15  begins its analysis with an overview of patent pools generally and then analyzes the

16  patent pool that Microsoft alleges best compares to Motorola's H.264 SEPs (the MPEG

17  LA H.264 patent pool) followed by the patent pool that Microsoft asserts best compares

18  to Motorola's 802.11 SEPs (the Via 802.11 pool).  With respect to Motorola's 802.11

19  SEP portfolio, the court also analyzes other licensing arrangements Microsoft asserts are

20  comparable to a RAND royalty rate.

21  //

22  //

ORDER- 148

1      i.     **Overview of Patent Pools**

2          462.   Generally, patent pools are created by two or more SEP owners or by an

3   administrator of a prospective patent pool who collects SEP owners to act as licensors

4   with the purpose of licensing SEPs to third-party licensees, and usually to the other

5   licensors, in a single licensing package. (*See, e.g.*, Ex. 2345 at MS-

6   MOTO_1823_00002433307-08.)

7          463.   Participation in a patent pool is voluntary. (11/13/12 Tr. at 98:7-12 (Glanz

8   Testimony); 11/13/12 Tr. at 169:12-14 (Murphy Testimony).)  A patent holder can

9   choose to license its SEPs outside of a pool.[20]  (11/16/12 Tr. at 151:10-13 (Lynde

10  Testimony).)

11         464.   Patent pools are also independent from SSOs.  As Microsoft's Gary

12  Sullivan—who was the chairman of the JVT, the organization that finalized the H.264

13  video standard (11/13/12 Tr. at 208:24-209:16 (Sullivan Testimony))—explained,

14  "[o]pen standards (e.g., ITU-T, ISO, IECI) . . . do not force anyone to join any pool and

15  have no relationship whatsoever with any pools that do form." (Ex. 2345 at MS-

16  MOTO_1823_00002433307.)

17         465.   Patent pools generally—as well as the specific pools at issue in this case,

18  MPEG LA H.264 and Via Licensing patent pools—distribute royalties on a per patent

19  basis as part of a patent-counting system. (11/13/12 Tr. at 62:21-63:8, 132:16-24 (Glanz

20  Testimony); 11/13/12 Tr. at 157:23-158:1 (Murphy); 11/16/12 Tr. at 143:3-5 (Lynde

21  _____

22  [20] Microsoft itself preferred and chose to engage in bilateral negotiations for the 802.11 Standard rather than joining a pool. (11/16/12 Tr. at 155:2-15 (Lynde Testimony).)

ORDER- 149

1  Testimony).)  This structure generally provides equal compensation for any given patent

2  in the pool without regard to the technology of each patent, its merit, its importance, or its

3  contribution to the standard.  (11/13/12 Tr. at 62:21-63:8, 124:18-125:21, 132:16-24

4  (Glanz Testimony); 11/13/12 Tr. at 157:23-158:1 (Murphy Testimony); 11/16/12 Tr. at

5  143:7-144:11 (Lynde Testimony).)  "Everyone who joins in the pool agrees to have

6  essentially an equal valuation on a per patent basis." (11/13/12 Tr. at 125:19-21 (Glanz

7  Testimony).)

8       466.    Pools generally set a fee so participants do not need to negotiate with

9  individual prospective licensees.  (11/13/12 Tr. at 170:12-171:3 (Murphy Testimony).)

10  Once the terms of a patent pool are set, a potential licensor cannot go to the pool and

11  renegotiate the deal.  (11/13/12 Tr. at 171:1-3 (Murphy Testimony).)  This results in

12  fundamental or broad patents being given the same value as weak or narrow patents.

13  (11/13/12 Tr. at 148:14-24 (Murphy Testimony); 11/16/12 Tr. at 143:25-144:11 (Lynde

14  Testimony).)

15      **ii.    The MPEG LA H.264 Patent Pool**

16       467.    Using the MPEG LA H.264 patent pool as a comparable, Microsoft

17  contends that the range of RAND royalties for a Microsoft-Motorola license for

18  Motorola's H.264 SEPs would be between 0.065 and 0.204 cents per unit or between

19  $167,000.00 and $502,000.00 per year at current volumes.  (11/16/12 Tr. at 99:3-104:8

20  (Lynde Testimony); 11/20/12 Tr. at 161:7-18 (Lynde Testimony); Exs. 1161, 1163.)

21  According to Microsoft, within that range, the best estimate for a RAND royalty for a

22  license for Microsoft to Motorola's H.264 SEPs is 0.197 cents per unit or an annual

1  royalty of $474,000.00 at current volumes.  (11/16/12 Tr. at 100:3-17 (Lynde

2  Testimony); 11/20/12 Tr. at 159:7-12 (Lynde Testimony).)

3      468.   Microsoft contends that the MPEG LA H.264 patent pool is the closest

4  real-world comparable for the determination of RAND royalties for Motorola's H.264

5  SEPs.  (11/13/12 Tr. at 155:25-158:12 (Murphy Testimony); 11/16/12 Tr. at 80:15-81:2,

6  84:15-86:4 (Lynde Testimony).)

7          **a.    Background Regarding the Formation of the MPEG LA H.264
             Patent Pool**

8      469.   Efforts to form the MPEG LA H.264 pool, which is also known as the

9  MPEG LA AVC pool, began in June 2003, shortly after the H.264 Standard was

10  finalized.  (11/13/12 Tr. at 61:10-15 (Glanz Testimony); 11/16/12 Tr. at 94:25-95:9

11  (Lynde Testimony).)

12      470.   Microsoft, Motorola, and other companies participated in efforts to form

13  the MPEG LA H.264 patent pool.  (Ex. 1584 at MS-MOTO_1823_0002353109 (listing

14  participants); Ex. 1139 (same); 11/13/12 Tr. at 67:10-17 (Glanz Testimony).)

15      471.   Meetings concerning the formation of the MPEG LA H.264 pool occurred

16  before widespread implementation of the H.264 Standard.  Indeed, many potential

17  licensees waited to implement the standard until the MPEG LA pool meetings and the

18  meetings of another pool sponsor, Via Licensing Corporation, concluded.  They wanted

19  to know the respective pool royalty rates and structures before committing to implement

20  the H.264 Standard.  (11/13/12 Tr. at 63:15-67:4, 67:5-68:1, 89:11-90:2 (Glanz

21  Testimony).)

22

ORDER- 151

472.    At the time the MPEG LA H.264 pool was being formed, a number of alternative video compression technologies existed that could have been used instead of the H.264 Standard, including MPEG-4 Visual, Real Video from RealNetworks, and Microsoft's own Windows Media Video. (11/13/12 Tr. at 63:21-64:8 (Glanz Testimony).) With this in mind, the parties involved in the formation of the MPEG LA H.264 pool, including Microsoft and Motorola, tried to strike a balance between setting a royalty high enough to motivate a significant number of patent holders to contribute their patents to the pool and low enough to ensure that licensees would implement the H.264 Standard rather than use an alternative. (11/13/12 Tr. at 74:13-76:5 (Glanz Testimony); Ex. 1642 (email string in which Motorola's representative to MPEG LA, Paul Bawel, noted that Motorola is "in favor of finding the right mix of terms that will result in a successful license for the marketplace").)

473.    The general framework for MPEG LA H.264 pool royalties began to take shape during a two-day meeting on July 31 and August 1, 2003. (Ex. 1581; Ex. 1139; 11/13/12 Tr. at 72:21-73:10 (Glanz Testimony).) At that meeting, Microsoft was represented by Garrett Glanz, and Motorola was represented by Paul Bawel. (11/13/12 Tr. at 62:7-11, 67:10-16 (Glanz Testimony).) The main focus of this two-day meeting was the royalty amount per codec (a combination of an encoder and a decoder) and whether to apply annual caps or some other form of volume discount. (11/13/12 Tr. at 68:23-69:2, 85:20-25 (Glanz Testimony).)

474.    During the meetings, Mr. Glanz took detailed notes of the views expressed by the representatives of the approximately eighteen participating companies, including

ORDER- 152

1   the views expressed by Motorola. (11/13/12 Tr. at 72:21-73:10 (Glanz Testimony); Ex.

2   1139.)

3         475.    On behalf of Motorola, Mr. Bawel criticized elements of one proposal that

4   called for uncapped royalties for codecs that implement the main and extended profiles of

5   H.264 of between $0.20 and $1.50 per unit depending on volume as being "too expensive

6   for mobile" devices and stated that Motorola was strongly in favor of annual caps. (Ex.

7   1139 at MS-MOTO_1823_00003927604-05; 11/13/12 Tr. at 80:8-9, 80:19-81:1 (Glanz

8   Testimony).) Mr. Bawel said that if the proposal with uncapped royalties was adopted, it

9   would lead mobile manufacturers like Motorola to choose to implement video

10   compression technologies other than H.264. (11/13/12 Tr. at 80:19-81:1 (Glanz

11   Testimony).)

12         476.    Mr. Bawel later indicated that, as between two other proposals, Motorola

13   favored a proposal that provided for royalties ranging from $1.00 per unit down to $0.20

14   per unit based on volumes above 50,000 (sales below that would be royalty-free) subject

15   to annual caps of either $2 million per business unit or $8-10 million per enterprise. (Ex.

16   1581 at MS-MOTO_1823_00003927558-62 (slide deck for MPEG LA's presentation at

17   7/31-8/1/03 Meeting of AVC Essential IP Holders); Ex. 1139 at MS-

18   MOTO_1823_00003927611-12 (Glanz's notes from MPEG LA's 7/31-8/1/03 meeting);

19   11/13/12 Tr. at 82:19-84:25, 86:6-10 (Glanz Testimony).)

20         477.    On August 5-6, 2003, both Microsoft and Motorola participated in a

21   separate meeting convened by Via Licensing Corporation ("Via"), a competitor of MPEG

22   LA's that was also trying to establish an H.264 patent pool. At that meeting, Motorola

1 outlined the specific royalty structure it wished to have adopted: $0.25 for manufacture

2 and sale of each codec with annual caps of $2 million. (11/13/12 Tr. at 87:4-88:11

3 (Glanz Testimony); Ex. 1583 (Glanz's notes from 8/4-8/5/03 Via Licensing meeting).)

4 The amounts were a total royalty to be divided among all owners of H.264 SEPs,

5 assuming they could be persuaded to participate in the pool. (*See id.*)

6      478.    The MPEG LA meetings eventually led to a consensus on royalties in the

7 fall of 2003, which was expressed in a November 17, 2003, "News Release." The release

8 was intended to publicize the proposed pool royalties so that potential licensees would

9 proceed to implement H.264 while the MPEG LA pool members worked out detailed

10 agreements and terms. (Ex. 1584 (MPEG LA's November 17, 2003, News Release);

11 11/13/12 Tr. at 88:21-24, 89:11-90:2 (Glanz Testimony).) The News Release announced

12 royalties of $0.20 per codec after the first 100,000 units (which were at no charge) and

13 $0.10 per unit above 5 million units with an annual cap of $3.5 million in year one and

14 scaling up to $5 million over the licensing term. (Ex. 1584 (MPEG LA's November 17,

15 2003, News Release) at 2-3.)

16      479.    Motorola approved the November 2003 "News Release" including these

17 announced royalties and caps. (11/13/12 Tr. at 64:9-66:23(Glanz Testimony) (identifying

18 and describing Ex. 1584 and explaining that Motorola had agreed to the terms reflected in

19 the press release); Ex. 1179 at MS-MOTO_1823_2353356 (email from P. Bawel of

20 Motorola to L. Horne of MPEG LA approving terms of release).)

21      480.    After receiving feedback on the terms announced in November 2003,

22 MPEG LA made changes to the royalty structure relating to the distribution of video

ORDER- 154

1  content.  (11/13/12 Tr. at 91:20-92:7 (Glanz Testimony).)  Motorola agreed with those

2  changes as well, stating that it was "in favor of finding the right mix of terms that will

3  result in a successful license for the marketplace."  (Ex. 1642 at MS-

4  MOTO_1823_00002352332; 11/13/12 Tr. 91:20-92:21 (Glanz Testimony).)

5      481.   MPEG LA issued a final press release on May 18, 2004, confirming the

6  same basic per codec royalty and caps as in the November 17, 2003, News Release.  (Ex.

7  1625 (email string discussing draft of final press release); Ex. 1626 (MPEG LA's May

8  18, 2004, press release); 11/13/12 Tr. at 93:3-94:12 (Glanz Testimony).)  Motorola

9  approved the terms of MPEG LA's May 18, 2004, press release.  (Ex. 1625; Ex. 1626;

10  11/13/12 Tr. at 93:3-94:12 (Glanz Testimony).)

11      482.   It was understood during the formative discussions among the MPEG LA

12  H.264 pool participants that the revenue sharing model would parallel that in MPEG

13  LA's predecessor MPEG-2 and MPEG-4 Visual patent pools.  Each contributing licensor

14  would receive a share of the total pool based on the licensor's number of SEPs relative to

15  the total number of SEPs in the pool for the country in question (e.g., a contributor of one

16  patent in a pool of 100 patents would receive 1 %).  (11/13/12 Tr. at 62:12-63:11, 131:19-

17  132:7 (Glanz Testimony).)

18      483.   Motorola did not object to this allocation method during the formation of

19  the MPEG LA H.264 pool, nor did it state that its patents were more valuable than, or

20  deserved a higher royalty than, the average pool patent.  (11/13/12 Tr. at 95:5-10, 131:25-

21  132:11 (Glanz Testimony).)

22

ORDER- 155

484.    Indeed, Motorola was familiar with the earlier pools on which MPEG LA H.264 was modeled.  Motorola participated as a licensor in the earlier MPEG LA MPEG-4 Visual patent pool, which involved similar video compression technology and involved royalty rates and caps similar to those proposed for the MPEG LA H.264 pool.  (11/16/12 Tr. at 92:10-93:4, 94:6-14, 101:5-17 (Lynde Testimony); 11/13/12 Tr. at 85:13-17 (Glanz Testimony).)  Motorola contributed and licensed through the MPEG LA MPEG-4 Visual pool at least one of the patents that it currently claims is essential to the H.264 Standard.  (11/16/12 Tr. at 93:5-10 (Lynde Testimony).)

485.    In explaining its decision to join the MPEG LA MPEG-4 Visual pool as a licensor, Motorola characterized the royalty rates of the pool as reasonable, observing that participation would provide Motorola with "a simple business solution for most of the patent issues at reasonable rates."  (Ex. 71 at MOTM_WASH1823_0505113; 11/16/12 Tr. at 93:11-94:14 (Lynde Testimony).)  Motorola further observed that participation in the MPEG-4 Visual pool would allow Motorola to "recover a significant portion of the royalties" it would be obligated to pay, while "the cost of negotiating [its] own agreements for all the companies involved [would] cost more than the royalties it could expect to receive."  (Ex. 71 at MOTM_WASH1823_0505113.)

486.    On July 7, 2004, Microsoft formally joined the MPEG LA H.264 pool as both a licensor and a licensee by executing (a) the MPEG LA Agreement Among Licensors Regarding the AVC Standard, which included the royalty structure outlined in the May 18, 2004, press release and the apportionment method described above; (b) the

1 | MPEG LA Licensing Administrator Agreement Regarding the AVC Standard; and (c) the

2 | AVC Patent Portfolio License.  (Exs. 1141, 1636, 3087.)

3 |       487.   On July 14, 2004, Microsoft learned that Motorola had decided not to join

4 | the MPEG LA H.264 pool.  Microsoft received no explanation for this decision beyond

5 | the information contained in an email from MPEG LA's CEO, Larry Horne, stating that

6 | Motorola had sold the patent on which it had predicated its pool membership.  (11/13/12

7 | Tr. at 122:7-1 (Glanz Testimony); Ex. 124.)

8 |       **b.**    **The MPEG LA H.264 Pool Today**

9 |       488.   The MPEG LA H.264 pool currently includes approximately 275 U.S.

10 | SEPs and over 2,400 SEPs worldwide.  (Ex. 1152.)  Those SEPs have been contributed

11 | by twenty-six licensors including leading technology firms such as Apple, Cisco,

12 | Ericsson, Fujitsu, LG, Microsoft, and Sony.  (Ex. 1152; 11/16/12 Tr. at 85:18-21, 90:11-

13 | 91:20 (Lynde Testimony).)

14 |       489.   Over 1,100 licensees participate in the MPEG LA H.264 patent pool.

15 | (11/16/12 Tr. at 85:18-21, 94:22-24 (Lynde Testimony).)

16 |       490.   Pursuant to the form MPEG LA H.264 pool agreement, licensees agree that

17 | if they or their affiliates have H.264 SEPs, they will license them to pool licensors on

18 | RAND terms.  This arrangement is based on the presumption that the licensor's per

19 | patent share of the royalties paid by the licensee represent RAND terms for the licensee's

20 | SEPs.  (Ex. 3087 at § 8.3; 11/16/12 Tr. at 95:25-97:19 (Lynde Testimony).)

21 |       491.   The MPEG LA H.264 patent pool charges royalties to licensees for

22 | products that incorporate an H.264 codec according to the following schedule:

ORDER- 157

1

- the first 100,000 units are royalty-free;
- for unit volumes between 100,000 and 5 million, the royalty is $0.20 per unit;

2

and

- for unit volumes above 5 million, the royalty rate is $0.10 per unit.

3

(Ex. 3087 at § 3.1.1; 11/13/12 Tr. 65:7-17, 95:14-20 (Glanz Testimony); Ex. 1626.)

4

492.    The foregoing per unit royalties were originally subject to the following

5

annual caps:

6

- Sales in 2005 and 2006:  $3.5 million
- Sales in 2007 and 2008:  $4.25 million

7

- Sales in 2009 and 2010:  $5 million

8

(Ex. 3087 at §3.1.1; 11/13/12 Tr. at 65:10-14, 95:14-20 (Glanz Testimony); Ex. 1626.)

9

493.    The annual enterprise cap for products containing an H.264 codec is

10

presently set at $6.5 million.  (Ex. 103 at GGMM 00000327; 11/16/12 Tr. at 102:22-23

11

(Lynde Testimony).)  Computer operating systems sold to OEM computer manufacturers

12

would be subject to a separate annual enterprise cap of an additional $6.5 million, for a

13

total enterprise cap for a firm like Microsoft of $13 million.  (Ex. 3087 § 3.1.6; Ex. 103

14

§ 3.1.6.)

15

494.    The agreement also provides that royalty rates will not increase by more

16

than 10 % upon renewal of the agreement, although increases have not occurred since the

17

agreement commenced.  (Ex. 3087 § 6.1; 11/16/12 Tr. at 100:18-101:4 (Lynde

18

Testimony).)

19

495.    The agreement that MPEG LA has entered into with the licensors

20

participating in the pool obligates MPEG LA to use commercially reasonable best efforts

21

22

1    to maximize the royalties generated by the MPEG LA H.264 patent pool. (Ex. 1636 at §

2    3.9.)

3              c.      **The MPEG LA H.264 Pool as an Indicator of RAND Terms for
                       Motorola's H.264 SEPs**

4

5           496.    Microsoft contends that the MPEG LA H.264 patent pool is the best

6    indicator of a RAND royalty rate for Motorola's H.264 SEPs. According to Microsoft,

7    the timing of its formation (shortly after promulgation of the H.264 Standard and before

8    it had been widely adopted), the number and diversity of the firms that have participated

9    as licensors and licensees in the pool, and the success of the standard, support the

10   conclusion that the MPEG LA H.264 patent pool is the closest real-world comparable for

11   the determination of RAND royalties for Motorola's H.264 SEPs. (11/13/12 Tr. at

12   155:25-158:12 (Murphy Testimony); 11/16/12 Tr. at 80:15-81:2, 84:15-86:4 (Lynde

13   Testimony).)

14          497.    Microsoft also asserts that Motorola's endorsement of the MPEG LA H.264

15   pool royalty structure (including the caps) and its participation as a licensor in MPEG

16   LA's MPEG 4 Visual pool (which has similar royalties for related technology) further

17   confirm that the MPEG LA H.264 pool is an appropriate benchmark in this case.

18   (11/16/12 Tr. at 91:21-94:14 (Lynde Testimony).)

19          498.    For its part, Motorola presented significant evidence that patent pools

20   generally have lower rates than those that can be achieved through bilateral, private

21   negotiations. (Ex. 3013 at 167; 11/16/12 Tr. at 72:6-12 (Simcoe Testimony); 11/19/12

22   Tr. at 137:13-138:3 (Schmalensee Testimony); 11/16/12 Tr. at 141:25-142:13 (Lynde

ORDER- 159

1  Testimony).)  According to Motorola, there are many factors that make patent pools more

2  likely to have rates lower than the rates in bilaterally-negotiated licenses.  The main

3  factors are:  (1) the principal objective of most pools is not to maximize licensing revenue

4  but instead to minimize royalty exposure and maximize freedom of operation for

5  licensees, which drives down the royalty rate (11/19/12 Tr. at 143:23-144:6

6  (Schmalensee Testimony)); (2) pools that allocate revenue based on patent-counting

7  ignore the value of the individual patents being licensed (*see* 11/13/12 Tr. at 125:11-21,

8  134:3-6 (Glanz Testimony); *see also* 11/16/12 Tr. at 143:3-6, 145:11-13, 146:16-20

9  (Lynde Testimony)); (3) due to the non-negotiable nature of patent pool licenses, royalty

10  rates must be low to entice licensees to join (*see, e.g.*, 11/19/12 Tr. at 147:25-148:4

11  (Schmalensee Testimony)); (4) pools have low licensing transaction costs that allow for

12  lower rates (11/16/12 Tr. at 147:11-148:8 (Lynde Testimony)); and (5) concerns over

13  antitrust scrutiny lead to lower rates (*see* 11/16/12 Tr. at 68:2-6 (Simcoe Testimony)).

14  Motorola elicited testimony that because of the typically lower rates found in patent

15  pools, if a patent holder wanted to pursue an "aggressive" licensing strategy, "the pool is

16  not the place to do that."  (11/13/12 Tr. at 134:3-6 (Glanz Testimony).)

17         499.    Based on this extensive testimony, the court agrees as a general matter that

18  patent pools tend to produce lower rates than those that could be achieved through bi-

19  lateral negotiations.  Indeed, the uncontroverted trial evidence is that a rate higher than a

20  pool rate could still be RAND.  (11/16/12 Tr. at 71:14-72:10 (Simcoe Testimony);

21  11/19/12 Tr. at 137:13-17 (Schmalensee Testimony).)

22

ORDER- 160

1      500.   Another problem with using patent pools as the *de facto* RAND royalty rate

2   is that the patent-counting royalty allocation structure of pools does not consider the

3   importance of a particular SEP to the standard or to the implementer's products as the

4   court's hypothetical negotiation requires.  (*See* 11/16/12 Tr. at 143:7-10, 143:24-144:11

5   (Lynde Testimony).)  As explained in the court's RAND-modified *Georgia-Pacific*

6   analysis, it is entirely reasonable for the owner of a patent that is extremely important and

7   central to the standard to seek a higher royalty rate than the owner of a less important

8   patent.  Under a patent-counting pool system, however, "one patent in the pool could be

9   critical to a core feature of the standard and it could be a feature that most standard-

10  compliant products use and rely on heavily.  And another patent could be directed to a

11  feature that's tangential or optional and rarely ever used, and in the pool both would get

12  the identical royalty rate."  (11/16/12 Tr. at 143:25-144:11 (Lynde Testimony).)

13     501.   An additional issue with using patent pools as the *de facto* RAND royalty

14  rate is that patent pools do not use an incremental value approach, an approach that is

15  required in the court's hypothetical negotiation paradigm.  (11/16/12 Tr. at 63:17-19

16  (Simcoe Testimony).)  In other words, patent pools do not try to determine the

17  incremental value of every patent in the pool compared to alternatives that were available

18  prior to defining the standard. (11/16/12 Tr. at 63:19-21 (Simcoe Testimony).)  Patent

19  pools "don't go through the exercise of taking each patent and trying to determine what

20  the alternatives available were at the time the standard was defined."  (11/16/12 Tr. at

21  64:10-13 (Simcoe Testimony).)  Indeed, Dr. Murphy testified that a system in which

22  every patent in a pool is given the same value is not "an exact method" and "is never

ORDER- 161

1   going to give you exactly the right answer." (11/13/12 Tr. at 200:21-23 (Murphy

2   Testimony).)

3       502.    The court also has policy concerns with applying a pool rate as the *de facto*

4   RAND royalty rate for all SEPs relevant to a given standard.  If pool rates were held to be

5   the most appropriate RAND royalty rates, SEP holders with valuable SEPs would be

6   hesitant to participate in standard-setting activities and might instead try to develop

7   proprietary standards.[21]  (11/19/12 Tr. at 146:6-23 (Schmalensee Testimony); 11/13/12

8   Tr. at 168:16-20 (Murphy Testimony).)  Companies and SEP holders might not

9   participate in the standard-setting process or contribute their patents to the standard if

10  they believe that they will not receive full and fair value for their patents.  As a result, the

11  standards might fail to incorporate the best technology available.  (*See* 11/13/12 Tr. at

12  169:2-5 (Murphy Testimony).)  Moreover, since licensing through SSOs under the

13  RAND commitment is, at least for some entities, an important component of profitability,

14  reducing that component would reduce the incentive to innovate and thereby slow the

15  pace of innovation in the economy.  (11/19/12 Tr. at 146:24-147:3 (Schmalensee

16  Testimony).)

17      503.    Finally, the uncontroverted evidence before the court demonstrates that an

18  SEP licensor in a patent pool receives both royalty rates from the pool and value to the

19  _____

20      [21] The trial record supporting the court's policy concern is clear:  Other things remaining
the same, the higher the value of an owner's SEPs and the stronger its licensing program, the
21  lower is its incentive to join a patent pool and the less likely it is to join a pool.  (11/13/12 Tr. at
134:3-6 (Glanz Testimony); *see also* 11/16/12 Tr. at 145:11-13, 146:16-20, 148:9-20 (Lynde
22  Testimony); Ex. 1036 at 295; 11/19/12 Tr. at 146:17-147:3 (Schmalensee Testimony); Ex. 2945
at 174 ("[F]irms with higher value patent portfolios are less likely to join a proportional pool.").)

ORDER- 162

1   SEP holder in terms of unfettered access to the intellectual property of the pool.  Thus,

2   companies that have SEPs for a given standard, but also have products with high

3   potential infringement exposure to others' SEPs for that standard, may decide to join a

4   pool even though they may not obtain as much value for their SEPs.  In a paper entitled

5   "Public Policy Toward Patent Pools," Josh Lerner and Jean Tirole stated that, for the

6   MPEG-2 pool, "[t]he primary motive for certain companies was not to maximize

7   licensing revenues, but rather to accelerate the adoption of the standard."  (Ex. 2945 at

8   175.)

9       504.   Indeed, with respect to the MPEG LA H.264 patent pool, Microsoft's

10  motive in joining the pool was explicitly not to generate a revenue stream from its SEPs.

11  (11/13/12 (Glanz) Tr. at 99:4-100:14; Ex. 3088; Ex. 2840 at

12  MOTM_WASH1823_0392239.)  On May 3, 2010, Dean Hachamovitch, Microsoft's

13  Vice President of Internet Explorer (4/3 Hachamovitch Dep. Tr. at 19:8-14), published a

14  blog posting entitled "Follow Up on HTML5 Video in IE9" on Microsoft's MSDN

15  Blogs, in which he explained that:

16      Microsoft pays into MPEG LA about twice as much as it receives back for
        rights to H.264.  Much of what Microsoft pays in royalties is so that people
17      who buy Windows (on a new PC from an OEM or as a packaged product)
        can just play H.264 video or DVD movies.  Microsoft receives back from
18      MPEG LA less than half the amount for the patent rights that it contributes
        because there are many other companies that provide the licensed
19      functionality in content and products that sell in high volume.  Microsoft
        pledged its patent rights to this neutral organization in order to make its
20      rights broadly available under clear terms, not because it thought this might
        be a good revenue stream. We do not foresee this patent pool ever
21      producing a material revenue stream, and revenue plays no part in our
        decision here.
22

1 (Ex. 2840 at MOTM_WASH1823_0392239.)

2      505.   As Microsoft's intellectual property licensing manager Garrett Glanz

3 explained in an internal email concerning the MPEG LA AVC pool, "Microsoft has

4 consistently argued for low codecs fees with reasonable annual caps in order to promote

5 rapid and broad adoption of the technology . . . . We have taken this approach because

6 H.264/AVC may likely be adopted in important media standards (e.g., ATSC, DVD

7 Forum, 3GPP, DVB, etc.) and hence having the ability to support it in Windows if

8 needed is critical to ensure the flow of content to Windows." (Ex. 2961.) Microsoft saw

9 the setting of low MPEG LA rates as a "business win" for the company. (11/13/12

10 (Glanz) Tr. at 103:7-105:19.)

11      506.   Accordingly, a RAND royalty rate based on a patent pool must consider

12 both royalties received by the pool and the value received by the company through

13 membership in the pool. The value to the company will depend on the circumstances of

14 the individual company.

15      507.   In sum, on the evidence before it, the court concludes that a pool rate itself

16 does not constitute a RAND royalty rate for an SEP holder who is not a member of the

17 pool.

18      508.   Despite the concerns with using a pool rate as the *de facto* RAND royalty

19 rate, the court concludes that under certain circumstances, patent pools can serve as

20 indicators of a royalty rate that falls within the range of royalties consistent with the

21 RAND commitment. Here, the question is whether the MPEG LA H.264 patent pool is

22 an indicator of a RAND royalty rate. The court finds that it is.

ORDER- 164

1          509.    As explained above, a RAND royalty should be set at a level consistent

2     with the SSOs' goal of promoting widespread adoption of their standards. (11/13/12 Tr.

3     at 139:17-140:1, 203:14-18 (Murphy Testimony).)  Here, the evidence before the court is

4     clear:  the MPEG LA H.264 patent pool has achieved widespread adoption of the H.264

5     Standard.  The pool includes approximately 275 U.S. SEPs and over 2400 SEPs

6     worldwide from over 26 licensors including leading technology firms such as Apple,

7     Cisco, Ericsson, Fujitsu, LG, Microsoft and Sony.  (Ex. 1152; 11/16/12 Tr. at 85:18-21,

8     90:11-91:20 (Lynde Testimony).)  Additionally, there are over 1,100 licensees of the

9     MPEG LA H.264 patent pool.  (11/16/12 Tr. at 85:18-21, 94:22-24 (Lynde Testimony).)

10    The court concludes that the MPEG LA H.264 pool royalty rate has been set such that it

11    is consistent with the purpose of the RAND commitment.

12         510.    The evidence also shows that Microsoft, Motorola, and other industry

13    companies, in working to form the MPEG LA H.264 patent pool, tried to strike a balance

14    between setting a royalty high enough to motivate a significant number of patent holders

15    to contribute their patents to the pool and low enough to ensure that licensees would

16    implement the H.264 Standard rather than use alternatives.  (11/13/12 Tr. at 74:13-76:5

17    (Glanz Testimony); Ex. 1642 (email string in which Motorola's representative to MPEG

18    LA, Paul Bawel, noted that Motorola is "in favor of finding the right mix of terms that

19    will result in a successful license for the marketplace").)  This practice nicely aligns with

20    two cornerstones of the RAND obligation:  (1) SSOs seek to include advanced

21    technology to create valuable standards, while at the same time, (2) ensuring widespread

22    adoption.

ORDER- 165

1        511.    Additionally, the trial record demonstrates that the MPEG LA H.264 patent

2   pool contains significant and important technology vis-à-vis the H.264 Standard.

3   Microsoft's technical expert, Dr. Orchard, provides the relevant testimony characterizing

4   the patents in the MPEG LA H.264 pool as "broad, covering all fundamental aspects [of

5   the standard], and rich." (11/14/12 Tr. at 112:21-113:9 (Orchard Testimony).)  The fact

6   the MPEG LA H.264 patent pool contains such important technology alleviates the

7   court's concern that patent pool rates may discourage SEP holders with valuable SEPs

8   from participating.  Because the MPEG LA H.264 patent pool is voluntary, if rates were

9   set too low, SEP holders with valuable SEPs would simply decline to join the pool.

10       512.    The fact that the MPEG LA H.264 patent pool has over 1,100 licensees

11   provides, in the court's view, a real-world indication that any stacking concerns of the

12   licensees are alleviated by the immense and significant technology contained in the pool.

13       513.    Finally, the MPEG LA H.264 patent pool appears to have been set with the

14   understanding that SSOs obtain technology that will create valuable standards, another

15   cornerstone of the RAND commitment.  (11/19/12 Tr. at 136:24-137:8 (Schmalensee

16   Testimony); *see also* 11/13/12 Tr. at 75:5-11 (Glanz Testimony); 11/16/12 Tr. at 90:2-10

17   (Lynde Testimony) (asserting that pools cannot systematically under-compensate

18   licensors because they need to ensure broad and diverse licensor participation in order to

19   make the pool successful).)

20       514.    Because the characteristics of the MPEG LA H.264 pool closely align with

21   all of the purposes of the RAND commitment, the court concludes that the pool rate is a

22   strong indicator of a RAND royalty rate for Motorola's H.264 patent portfolio.

ORDER- 166

1      515.   The rate set by the MPEG LA H.264 patent pool, however, is the low end

2   of the range for a RAND royalty.  As stated, Microsoft saw the low pool rate of MPEG

3   LA H.264 patent pool as a "business win" for the company, which hoped to ensure that

4   H.264 video or DVD movies would seamlessly play on its products.  (11/13/12 Tr. at

5   103:7-105:19 (Glanz Testimony).)  Moreover, from the various rates discussed during

6   formation of the MPEG LA H.264 patent pool, the final rate chosen is on the very low

7   end of those discussed.

8              **d.     Google's Status as an MPEG LA H.264 Patent Pool Licensee**

9      516.   As of May 22, 2012, Google acquired more than 50 % of the shares of

10   Motorola Mobility and General Instrument.  (10/24/12 Pretrial Order (Dkt. # 493) at 3.)

11   That Google, Motorola's parent company, also participates in the MPEG LA H.264

12   patent pool supports the conclusion that this pool provides a logical indicator for the

13   RAND royalty rate at issue in this case.  (Ex. 103.)

14      517.   Google is a licensee of the MPEG LA H.264 patent pool, the same pool in

15   which Microsoft is a Licensor.  Thus, Microsoft is an intended third-party beneficiary of

16   the Google-MPEG LA H.264 patent pool agreement.  (Ex. 103 at § 8.17.)

17      518.   Google is a sophisticated, substantial technology firm.  Google's agreement

18   (as the parent of Motorola Mobility and General Instrument) to the grant-back license

19   provisions in the MPEG LA-Google H.264 patent pool agreement further corroborates

20   that the MPEG LA H.264 pool arrangement is an appropriate benchmark for determining

21   RAND royalties in this case.  (11/16/12 Tr. at 95: 15-24, 97:4-11 (Lynde Testimony).)

22

ORDER- 167

e.   **RAND Royalties for Motorola's H.264 SEPs Based on the MPEG LA H.264 Patent Pool**

Having determined that the MPEG LA H.264 patent pool is an indicator of a RAND royalty rate for Motorola's H.264 SEPs, the court examines the royalties Motorola would receive under that pool.

519.   Based on the licensing rates and reflecting the caps employed by the MPEG LA H.264 pool, Microsoft's economic and valuation expert, Dr. Matthew Lynde, estimated the effective per unit rates and annual royalties at current volumes that Microsoft would be expected to pay under three scenarios: (a) if Motorola received royalties equivalent to what a firm with a like-sized portfolio would receive as a licensor member of the MPEG LA H.264 pool; (b) if Motorola received royalties equivalent to what it would have received if it and the other holders of other readily identifiable H.264 SEPs were all added to the pool with the current pool rate structure; and (c) if Motorola received royalties equivalent to what it would have received if it and the other holders of other readily identifiable H.264 SEPs were all added to the pool at rates increased by the maximum 10 % permitted under the MPEG LA license arrangement. (11/16/12 Tr. at 99:3-101:4 (Lynde Testimony); 11/20/12 Tr. at 158:10-161:18 (Lynde Testimony); Exs. 1161-62.)

520.   Presented with these three scenarios from Dr. Lynde, the court concludes that scenario (b)—if Motorola received royalties equivalent to what it would have received if it and the other holders of other readily identifiable H.264 SEPs were all added to the pool with the current pool rate structure—most closely resembles the desired

ORDER- 168

1  RAND licensing situation.  The court so concludes because, as a general matter, the more

2  relevant patents included in the pool, the more the pool acts to address the stacking

3  concerns implicit in the RAND commitment.  Thus, scenario (b) is better than scenario

4  (a) as an analogy to the RAND commitment.  As for scenario (c), the court finds little

5  reason to increase the rate when that has not been done in the real world.

6      521.    Under scenario (b), Dr. Lynde considered the effect of adding, in addition

7  to Motorola's 63 worldwide H.264 Patents, the 89 other specific H.264 SEPs that have

8  been disclosed by companies submitting LOAs that do not presently participate in the

9  MPEG LA patent pool under the current MPEG LA rate structure.  (11/16/12 Tr. at

10  100:3-17 (Lynde Testimony).)

11      522.    Under this scenario, Microsoft would pay Motorola royalties of 0.185 cents

12  per unit.  (11/16/12 Tr. at 100:3-17 (Lynde Testimony); 11/20/12 Tr. at 160:7-15 (Lynde

13  Testimony); Ex. 1161.)  Although Motorola disputes that the MPEG LA H.264 patent

14  pool is an appropriate comparable, Motorola does not dispute Dr. Lynde's actual

15  calculations under scenario (b).  (*See generally* 11/13-20/12 Tr.)  The court has also

16  examined the actual calculations of Dr. Lynde and finds them accurate.[22] (Ex. 1161.)

17

18

---

[22] The court notes, however, that Dr. Lynde's royalty rate calculations are based on the
19  $13 million cap in royalties provided under the MPEG LA H.264 patent pool royalty share
agreement.  (Ex. 1161.)  Based on Microsoft's current sales volume, Microsoft's royalty
20  payments into the MPEG LA H.264 patent pool meet the $13 million threshold and are therefore
capped.  Using $13 million as Microsoft's total royalty payments, Dr. Lynde calculates
21  Motorola's share of those royalties based the pro rata share of Motorola's 63 H.264 SEPs.  (Ex.
1161.)  Having determined that the MPEG LA H.264 patent pool, including the $13 million
22  royalty cap, is indicative of a RAND royalty rate, the court finds little problem in basing a
RAND royalty on a capped royalty payment.  Indeed, Motorola's licensing expert, Mr. Donohoe,

ORDER- 169

1        523.    As stated above, the royalty rate Motorola would receive under the MPEG

2   LA H.264 patent pool for its SEPs represents only a portion of the value Motorola would

3   receive as a member of the MPEG LA H.264 patent pool.  The remaining portion of the

4   value would be the value to Motorola in having full access to the immense technology

5   included in the MPEG LA H.264 patent pool.  Unfortunately, there is no direct evidence

6   in the trial record for determining the value to Motorola—or more appropriately,

7   Motorola's parent company, Google—in being a member of the MPEG LA H.264 patent

8   pool.  Such evidence would likely consider Google's products and infringement exposure

9   with respect to all known H.264 SEPs.

10       524.    Regarding the value of membership in the MPEG LA H.264 patent pool,

11  the only relevant evidence before the court is that Microsoft pays into the MPEG LA

12  H.264 patent pool about twice as much as it receives back for rights to its H.264 SEPs.

13  (Ex. 2840 at MOTM_WASH1823_0392239.)  Based on this evidence, the court

14  concludes that Microsoft views membership in the MPEG LA H.264 patent pool as

15  providing a value of at least twice as much as it receives in royalty rates.

16       525.    In the absence of any other relevant evidence, the court thereby concludes

17  that Google, like Microsoft, would also view membership in the MPEG LA H.264 patent

18  pool as providing a value of twice the royalty rates it would receive as a licensor in the

19  pool.  This conclusion follows logically from the simple fact that Microsoft and Google

20

21

22  suggests caps on the total lump sum royalty payments.  (11/20/12 Tr. at 145:6-146:15 (Donohoe
    Testimony).)

ORDER- 170

1  are similarly situated as sophisticated, substantial technology firms with vast arrays of

2  technologically complex products.

3      526.   Accordingly, the court concludes that an amount within the RAND royalty

4  range for Motorola's H.264 SEP portfolio is the royalties Motorola would receive under

5  Dr. Lynde's scenario (b) plus twice those royalties, the latter constituting the value in

6  access to the intellectual property in the MPEG LA H.264 patent pool.  This number is

7  0.555 cents per unit (0.185 + 2×0.185).[23]

8

_____

9   [23] This equation represents a dramatic simplification of the calculation actually performed
    by the court. To be rigorous and transparent with the parties, the court will now explain in detail
10  its process for calculating the RAND rate. In essence, the court compares the total value of
    joining a patent pool to the total value of abstaining from a patent pool and then performs simple
11  algebra to calculate the RAND rate.
        The value to a company of joining a patent pool, which the court labels "VP," can be
12  approximated by adding together the value of all benefits of joining the pool and subtracting all
    costs. This means that to calculate the value of joining a pool, the court adds (1) the amount the
13  company receives in royalties from the pool for use of its own patents by others ("$P_+$"); to (2) the
    value to the company of having the intellectual property rights to the pool patents ("IP") (*see
14  supra* ¶ 523); and (3) any external value the company derives from adding its patents to the pool,
    such as promoting participation in the pool and thereby encouraging widespread adoption of the
15  standard ("E") (*see supra* ¶ 485, 503-04); and subtracting (4) the amount the company pays into
    the pool to use patents ("$P_-$"); and (5) the opportunity cost of using the patents in a different way,
16  such as abstaining from the patent pool and licensing patents outside the pool ("OC"). In algebra
    terms, this can be expressed as $VP = P_+ + IP + E - P_- - OC$. By similar methods, the court can
17  calculate the value to a company of abstaining from a patent pool, which the court labels "VA,"
    by adding (1) the amount the company would receive for its patents outside the pool given the
18  RAND commitment (notice that this is, by definition, the RAND rate) ("$A_+$"); to (2) the value to
    the company of having the intellectual property rights to the pool patents ("IP"), which the court
19  assumes a company wishing to practice the standard would obtain by some method; and
    subtracting (3) the amount the company would have to pay to obtain licenses to the pool patents
20  without joining the pool ("$A_-$") and (4) the opportunity cost of not joining the pool. In algebra
    terms, this can be expressed as $VA = A_+ + IP - A_- - OC$.
21      The next step in this calculation is to compare the value of joining a patent pool (VP) to
    the value of abstaining from a patent pool (VA). To begin, both VP and VA include both "IP"
22  and "OC." The value IP will be equivalent both in the pool and outside the pool because a
    company practicing the standard will acquire the same patent licensing rights whether it is inside
    or outside of the pool because it will presumably obtain rights to all of the patents necessary to

ORDER- 171

practice the standard. Thus, the variable IP will have the same value irrespective of pool membership and will not be affected by patent strength relative to the pool. This simplifies the comparison somewhat. Algebraically, the IP values on either side of the comparison will "cancel each other out," resulting in the variable vanishing from the comparison altogether. The situation is not quite as simple with regard to OC, as will be explained below, so OC will not always "cancel out" in quite the same way and must remain in the comparison.

The nature of the comparison between VP and VA varies depending on the value of the company's patents (measured by how important the patents are to the standard and how important they are to actual products the company knows about). For example, a company with very valuable patents relative to the pool or patents that are critical to the standard might be able to command higher royalties by abstaining from the pool (and hence could profit by abstaining). (*See supra* note 21.) On the other hand, a company with patents that are weak relative to the pool or that are unimportant to the standard might have the opposite problem (and hence could profit by joining the pool). (*See id.*) If a court can determine conclusively that, for a given company, joining a patent pool would be substantially more or less valuable than abstaining from it, the court should assign a coefficient to the comparison to reflect that fact, e.g., $C \times (P_+ - P_- - OC) + E = A_+ - A_- - OC$. Note that the coefficient C does not multiply E because the external value represented by E does not vary based on the value of the company's patents or their importance to the standard—assuming as the court does here that all patents in the pool return the same royalty rate. (*See supra* ¶¶ 465-66, 500.) Note also that the equation only applies the comparison coefficient to OC on one side of the equation, thus accounting for the fact that the opportunity cost of joining the pool or abstaining from it will vary proportionately with the relative value of the patents, their importance to the standard, and how important those patents are to actual products the company knows about. As a simple example of how to calculate the comparison coefficient C, if a court determined from the evidence before it that a company could do twice as well monetarily by abstaining from a patent pool than by joining it, the equation would be $2 \times (P_+ - P_- - OC) + E = A_+ - A_- - OC$.

In this case, the court has no evidence demonstrating that Motorola's patents are any more valuable than the average patent in the MPEG LA H.264 pool (*see infra* ¶¶ 528-36) and so assumes that the comparison coefficient C is equal to 1, i.e., that VP = VA. This amounts to assuming that, for Motorola, joining the MPEG LA H.264 patent pool and abstaining from it are roughly equivalent transactions from a monetary perspective. (*See id.*) The court is therefore left with the following equation: $P_+ - P_- - OC + E = A_+ - A_- - OC$. The OC values are equivalent on both sides when C = 1 since joining the patent pool is monetarily equivalent to not joining it, so the OC values "cancel out" algebraically, leaving the court with an equation of: $P_+ - P_- + E = A_+ - A_-$.

Some of these "variables" are actually known quantities. The pool rates, $P_+$ and $P_-$, are known (*see supra* ¶¶ 522, 525-26), and will be known in most cases like this (otherwise there would be no comparison to make in the first place). On the other hand, $A_+$ is not known. This makes sense because $A_+$ is, by definition, the RAND rate—the amount a company would receive for licenses to its patents if it abstained from the pool but adhered to the RAND commitment. As for E, the court has heard testimony that Microsoft derived external value from joining the patent pool because it had a vested interest in widespread adoption of the standard. (*Supra* ¶¶ 503-05.) Specifically, as detailed above, the court heard testimony that Microsoft pays twice as much into

ORDER- 172

1     527.   As explained above, the court also concludes that 0.555 cents per unit

2 represents the low end of the range of a RAND royalty rate for Motorola's H.264 SEP

3 portfolio. Based on the technology represented by Motorola's H.264 SEP portfolio,

4 however, the court can find no reason that a hypothetical negotiation between Microsoft

5 and Motorola would result in an increase to this low bound of RAND.

6     528.   Motorola's technical expert, Timothy Drabik, offered no opinion as to

7 whether Motorola's patents are more or less valuable than the patents in the MPEG LA

8 H.264 pool. (11/19/12 Tr. at 60:16-23 (Drabik Testimony).)

9     529.   Likewise, Kirk Dailey—the current head of patent transactions for Google

10 and the former Corporate Vice President of Intellectual Property for Motorola who

11

12 the MPEG LA H.264 patent pool as it receives back in royalties. (*Id.*) The court has inferred from this evidence that $E = P_+$. In other words, the external value of joining the pool is

13 equivalent to the royalty deficit Microsoft incurs through pool membership. As for $A_-$ the court has heard no testimony whatsoever about how much a company like Motorola would have to pay

14 for the pool's H.264 SEP collection if it abstained from the pool. Faced with this lack of evidence, the court infers that the rate Motorola would have to pay would be higher than the pool

15 rate, but not twice as high because some, if not all, of the companies holding SEPs would be subject to the RAND commitment. Accordingly, the court weighs the evidence before it and

16 finds that the rate outside the pool would be 1.5 times the pool rate. Algebraically, this can be expressed as $A_- = 1.5 \times P_-$.

17     It remains only to substitute all of these values into the operable equation and solve algebraically for the RAND rate, $A_+$. Substituting the known and inferred values into the

18 operable equation yields: $P_+ - P_- + P_+ = A_+ - 1.5 \times P_-$. Simplifying and solving for $A_+$ yields: $A_+ = 2 \times P_+ + .5 \times P_-$. The evidence before the court demonstrates that $2 \times P_+ = P_-$. This is because

19 Microsoft pays twice as much into the MPEG LA H.264 patent pool as it receives back in royalties (*supra* ¶ 504), and the court has already assumed that this equation would also hold true

20 for Motorola since Microsoft is a comparable player in the technology industry to Motorola's parent company Google. (*Supra* ¶ 525.)

21     This allows for further simplification: $A_+ = 2 \times P_+ + .5 \times 2 \times P_+ = 3 \times P_+$. This results in precisely the formula the court used to calculate its RAND rate for Motorola's H.264 SEPs. Translating this back to English, the RAND rate in this case is three times the pool rate, or the

22 pool rate plus twice the pool rate.

1   authored the October 2010 demand letters that gave rise to this dispute—did not know if

2   Motorola's H.264 Patents are more valuable than the average patent in the H.264 pool.

3   (11/20/12 Tr. at 34:25-35:20, 110:11-15 (Dailey Testimony); Exs. 1, 2.)

4        530.   Mr. Dailey did not know if Motorola's portfolio of H.264 SEP portfolio

5   "ranks in the top half or the bottom half of companies contributing patented technology to

6   that standard." (11/20/12 Tr. at 68:6-10 (Dailey Testimony).) Indeed, Motorola never

7   made any claim that its patents were particularly valuable or that it was entitled to greater

8   compensation during the formation of the MPEG LA H.264 patent pool. (11/13/12 Tr. at

9   95:5-10, 131:25-132:11 (Glanz Testimony).)

10       531.   Additionally, the court conducted a comprehensive and detailed

11   examination of the importance of each patent in Motorola's H.264 SEP portfolio to the

12   H.264 Standard or to Microsoft's products. This examination revealed that although

13   some of the patents contributed to the H.264 Standard, others provided only minimal

14   contribution due to the availability of alternative technology. The examination further

15   revealed that, of the patents contributing to the H.264 Standard, Motorola did not provide

16   the inventive technology, but instead built upon already-existing technology.

17       532.   Moreover, all but two of Motorola's H.264 SEPs are directed towards

18   interlaced video, a technology that the court determined was not overly important to

19   either Windows or the Xbox as those products utilized the H.264 Standard. And, as

20   explained by the court above, of the two patents not directed towards interlaced video,

21   only one of those would be used by Microsoft products.

22

ORDER- 174

1       533.    Finally, the court concludes that Motorola's H.264 SEP portfolio only

2   constitutes a sliver of the overall technology incorporated in the H.264 Standard.  Indeed,

3   the largest technology contributor to the H.264 Standard was Telenor Group, which

4   contributed many of the core innovations of H.264 and submitted the August 1999

5   proposal that became the basis of the first draft of the design.  (11/13/12 Tr. at 215

6   (Sullivan Testimony); 11/14/12 Tr. at 115 (Orchard Testimony).)  Telenor decided not to

7   seek patents on its contributions and notified the JVT of its decision.  (11/14/12 Tr. at 52

8   (Sullivan Testimony); 11/14/12 Tr. at 115 (Orchard Testimony).)

9       534.    In addition to Telenor's contribution to the standard, there are at least 2,500

10  patents throughout the world that are essential to the H.264 Standard.  (11/14/12 Tr. at

11  110-13 (Orchard Testimony).)  Of those 2,500 patents, over 360 are United States

12  patents.  (*See* Ex. 1544.)

13      535.    Approximately 33 United States companies have enumerated their

14  declared-essential H.264 Patents.  All of these patents are subject to the RAND

15  commitment.  Nineteen additional companies have provided "blanket" LOAs to the ITU

16  obligating their patents to the RAND commitment.  (*See* Ex. 1544.)

17      536.    In sum, Motorola did not demonstrate that its H.264 SEP portfolio provided

18  significant contribution to the H.264 Standard or would provide significant technological

19  value to Microsoft's products.  As a result, the court concludes that there is no reason to

20  increase the royalty payment with respect to any of Microsoft's products from the rate

21  received by other patents in the MPEG LA H.264 patent pool.

22

ORDER- 175

1   537.   Accordingly, the court holds that the RAND royalty for Motorola's H.264

2   SEP portfolio with respect to all Microsoft products utilizing the H.264 Standard is **0.555**

3   **cents per unit.**[24]

4   538.   The court also determines an upper bound of a RAND royalty rate for

5   Motorola's H.264 SEP portfolio.  As discussed with relation to SSO policy, RAND is

6   informed by two prevailing concerns:  preventing stacking and eliminating hold-up.  The

7   court finds that, among these two goals, the anti-stacking principle is the primary

8   constraint on the upper bound of RAND.

9   539.   The anti-stacking principle constrains RAND because parties in a RAND

10  negotiation would determine a reasonable royalty by considering how much in total

11  license fees the implementer can pay before implementation of the standard becomes

12  cost-prohibitive.  (11/13/12 Tr. at 145-46 (Murphy Testimony).)  This limit will not be

13  construed based only on the cost of licensing one patent in the standard, but rather on the

14  cost of implementing the standard as a whole, which may include the cost of licensing *all*

15  essential patents.  (*Id.*)  In other words, a RAND negotiation would not be conducted in a

16  vacuum, but the parties would instead consider other SEP holders and the royalty rate

17  _____

18  [24] Motorola contends that Microsoft products other than Windows and the Xbox use the
    H.264 Standard.  Motorola lists at least the Windows Phone 7 and 7.5, Windows Embedded,
19  Silverlight, the Zune, Lync, and Skype, as Microsoft products that use the H.264 Standard.
    (Motorola Pr. FC ¶ 535.)  Motorola, however, did not provide sufficient evidence for the court to
20  ascertain the functionality of these products, making it impossible for the court to determine the
    importance of Motorola's H.264 SEPs to these products.  Indeed, the little trial evidence
21  regarding functionality of these additional products demonstrates that Motorola's SEPs would
    have little value to them.  (*See* 11/14/12 Tr. at 150 (Orchard Testimony).)  Without such
22  evidence, the court is left to conclude that the low bound of RAND is the appropriate royalty rate
    for all Microsoft products—Windows, the Xbox, and all others.

ORDER- 176

1  that each of these patent holders might seek from the implementer based the importance

2  of these other patents to the standard and to the implementer's products.

3       540.   To this end, in the course of a hypothetical negotiation with an SEP owner,

4  the implementer must ask herself, as a rational business-person, "What is the most I can

5  pay for a license to this particular SEP or portfolio of SEPs—knowing that I may have to

6  license all SEPs in this entire standard—while still maintaining a viable business?" This

7  query by the implementer will undoubtedly be shaped by examining Factor 12 of the

8  court's RAND-modified *Georgia-Pacific* methodology: customary practices of

9  businesses licensing RAND-committed patents.

10      541.   Thus, the fee that results from a hypothetical RAND negotiation is

11  necessarily informed by the court considering the entire world of known SEPs relevant to

12  a given standard. That ultimate sum must be the aggregate licensing fee of all essential

13  patents calibrated against the principle that license fees should not be stacked in such a

14  way that makes implementation of the standard prohibitively expensive.

15      542.   With this understanding of the upper bound of RAND in mind, the court

16  searches the trial record for the best evidence of the high point of customary practices of

17  businesses licensing RAND-committed patents. The court's search ends with the highest

18  fee discussed during formation of the MPEG LA H.264 patent pool—an uncapped $1.50

19  per unit price. (Ex. 1139 at MS-MOTO_1823_00003927604-05; 11/13/12 Tr. at 80:8-9,

20  80:19-81:1 (Glanz Testimony).)

21      543.   As explained above, the considerations of the licensors during formation of

22  the MPEG LA H.264 patent pool closely align with the purposes underlying the RAND

ORDER- 177

1  commitment.  Thus, the uncapped $1.50 per unit price reflects the highest value in the

2  record considered by industry companies during efforts to reach a royalty rate which the

3  court has found to be an indicator of RAND.

4      544.    Applying the pro rata share of Motorola's H.264 SEP portfolio provided by

5  Dr. Lynde's scenario (b)—3.642 % (Ex. 1160)—the court concludes that Motorola would

6  receive $0.05463 per unit ($1.50×3.642 %) in royalty payments.

7      545.    As before, the court concludes that the value to Motorola under scenario (b)

8  would be not only royalties received, but also access to the intellectual property, which

9  equals an amount of twice the royalties received.  Thus, the upper bound of a RAND

10  royalty for Motorola's H.264 SEP portfolio is **$0.16389 per unit** ($0.05463 +

11  2*$0.05463).

12      546.    The court concludes that this upper bound applies to Microsoft Windows

13  and Xbox products.

14      **iii.    The Via Licensing 802.11 Patent Pool**

15      Having determined the RAND rate for Motorola's H.264 SEP portfolio, the court

16  now turns to determining a rate for Motorola's 802.11 SEP portfolio.

17      547.    Microsoft uses the Via Licensing 802.11 patent pool, along with two other

18  licensing arrangements, to argue that the range of RAND royalties for a Microsoft-

19  Motorola license for Motorola's 802.11 SEP portfolio would be between 3 and 6.5 cents

20  per unit.  (11/16/12 Tr. at 113:3-116:17, 123:25-124:13 (Lynde Testimony).)  Within this

21  range, Microsoft contends that the best estimate of a RAND royalty for Motorola's

22

1  802.11 SEP portfolio is 5 cents per unit. (11/16/12 Tr. at 114:18-115:3 (Lynde

2  Testimony).)

3          a.      **Background of the Via Licensing 802.11 Patent Pool**

4          548.    Via Licensing formed its 802.11-essential patent pool between 2003 and

5  2005: between six years and eight years after the IEEE Working Group issued its first

6  802.11 Standard in 1997. (11/16/12 Tr. at 107:11-13 (Lynde Testimony); 11/15/12 Tr. at

7  92:20-93:11 (Gibson Testimony).)

8          549.    Participation in the pool is substantially lower than other patent pools, such

9  as the MPEG LA H.264 patent pool. Five licensors have joined the Via Licensing 802.11

10  pool: Electronics and Telecommunications Research Institute (ETRI); Japan Radio Co.,

11  Ltd.; Koninklijke Philips Electronics N.V.; LG Electronics, Inc.; and Nippon Telegraph

12  and Telephone Corporation. (11/13/12 Tr. at 174:16-175:3 (Murphy Testimony); Ex.

13  1125.) The Via Licensing 802.11 pool includes 35 worldwide patents essential to the

14  802.11 Standard. (11/16/12 Tr. at 112:9-11 (Lynde Testimony).) Eleven companies are

15  licensees of the Via Licensing 802.11 patent pool: Archos, S.A.; Eastman Kodak;

16  Enfora, L.P.; Fujitsu, Ltd.; Guillemot Corp. S.A.; Imagination Technologies, Ltd.; Japan

17  Radio Co., Ltd.; Koninklijke Philips Electronics N.V.; Koss Corp.; LG Electronics; and

18  Sony Corp. (11/16/12 Tr. at 106:25-107:4 (Lynde Testimony); Ex. 1164.) Current

19  licensees that have not contributed patents to the pool include Eastman Kodak, Fujitsu,

20  LG, Sony, and Koss. (Ex. 1164.)

21          550.    On or about April 15, 2004, while the Via Licensing 802.11 patent pool

22  was being formed, Motorola submitted a patent for evaluation to Via Licensing for

ORDER- 179

1   potential inclusion in the pool. (4/18/12 R. Sonnentag Dep. at 34:13-16, 35:16-25; Ex.

2   45.)

3       551.   Via Licensing's independent evaluator—Robert Sachs of Fenwick &

4   West—determined that the patent Motorola submitted was not essential to the 802.11

5   Standard. (4/18/12 R. Sonnentag Dep. at 45:8-10, 45:17-21, 46:4-8; Ex. 12.) Motorola

6   was therefore unable to participate in the discussions which led to the setting of the Via

7   Licensing 802.11 patent pool royalty rates. (Exs. 43, 44.)

8       552.   The Via Licensing 802.11 pool has rates that vary from $0.05 to $0.55 per

9   unit, depending on volume, pursuant to the following schedule:

| Units/Year | License Fee Per Unit |
|---|---|
| 1 to 500,000 | $0.55 |
| 500,001 to 1,000,000 | $0.50 |
| 1,000,001 to 5,000,000 | $0.45 |
| 5,000,001 to 10,000,000 | $0.30 |
| 10,000,001 to 20,000,000 | $0.20 |
| 20,000,001 to 40,000,000 | $0.10 |
| 40,000,001 or more | $0.05 |

(Ex. 52.)

        553.   As is the case with the MPEG LA H.264 pool, royalties in the Via

Licensing 802.11 pool are shared among licensors according to a Worldwide Revenue

Sharing Algorithm. The algorithm divides revenue between licensors based on the

ORDER- 180

1  relative number of patents each has contributed, adjusted by a country-weight factor.

2  (*See* 11/16/12 Tr. at 112:12-113:2 (Lynde Testimony).)  The Via Licensing 802.11 patent

3  pool thus distributes royalties based upon a patent allocation or proportional royalty

4  structure.  (11/13/12 Tr. at 171:14-18 (Murphy Testimony).)

5          554.    Microsoft is not a licensor or licensee of the Via Licensing 802.11 patent

6  pool.  (11/13/12 Tr. at 173:6-9 (Murphy Testimony).)  Microsoft informed Via Licensing

7  Corporation that Microsoft's objections to taking a license "were the lack of Licensees

8  and critical mass of the program," and that Microsoft "prefers to enter into bi-lateral

9  discussions with the Licensors individually."  (Ex. 3194.)  Dr. Lynde, Microsoft's patent

10  valuation expert, agreed that this strategy "makes sense" for Microsoft.  (11/16/12 Tr. at

11  154:3-155:10 (Lynde Testimony); Ex. 3194.)

12          555.    Like Microsoft, Motorola has not joined the pool.  (11/13/12 Tr. at 173:16-

13  21 (Murphy Testimony).)

14                    b.    **The Via Licensing 802.11 Pool as an Indicator of RAND**
                            **Terms for Motorola's 802.11 SEPs**

15          556.    At the outset, the court notes that the Via Licensing 802.11 patent pool as a

16  *de facto* RAND royalty rate for Motorola's 802.11 SEP portfolio suffers from the same

17  concerns as all patent-counting patent pools in regards to the court's RAND-modified

18  *Georgia-Pacific* methodology.  Namely, the Via Licensing 802.11 pool does not

19  distinguish between patents in the pool on the basis of technical merit, but rather gives

20  the exact same royalty to all patents in the pool.  Also, the pool does not consider the

21  importance of patents to the implementer's products.  Likewise, setting the Via Licensing

22

ORDER- 181

1   802.11 rate as the *de facto* RAND rate would implicate the court's aforementioned policy

2   concerns regarding an SSO's ability to obtain quality technology and the possibility of

3   stifling innovation. (*See supra* ¶ 502.)

4       557.   The Via Licensing 802.11 patent pool has not been very successful in

5   obtaining licensors and licensees. It has been estimated that there are at least 93 holders

6   of 802.11 SEPs. (*See, e.g.,* 11/13/12 Tr. at 175:4-7 (Murphy Testimony).) The vast

7   majority of the firms holding SEPs, including MML and Microsoft, have not joined the

8   Via Licensing 802.11 pool as licensors. (*Id.* at 175:7-10.) Likewise, it has been

9   estimated that there are hundreds of implementers of the 802.11 Standard; a very small

10  percentage of whom have joined the Via Licensing 802.11 pool as licensees. (*Id.* at

11  174:14-175:16.)

12      558.   Thus, unlike the MPEG LA H.264 patent pool, the Via Licensing 802.11

13  patent pool has not been successful in encouraging widespread adoption of the 802.11

14  Standard through buy-in to the pool of licensors and licensees. As stated, the purpose of

15  the RAND commitment is to achieve widespread adoption of the standard. It stands to

16  reason then that the less a patent pool achieves widespread adoption of the standard, the

17  less relevant the pool becomes as an indicator of a RAND royalty rate.

18      559.   Nevertheless, the Via Licensing 802.11 patent pool has certain

19  characteristics that are indicative of a RAND royalty rate.

20      560.   For instance, the Via 802.11 pool is focused exclusively on the standard. It

21  also covers the same kinds of products for the same ultimate purposes as are at issue in

22  the present dispute. (11/13/12 Tr. at 158:22-159:2 (Murphy Testimony).)

ORDER- 182

561. Additionally, the uncontroverted evidence at trial demonstrated that those who participated in the formation of the Via pool designed it to foster widespread adoption of the 802.11 Standard consistent with the intent behind the RAND commitment. (11/13/12 Tr. at 159:20-25 (Murphy Testimony).) Although the pool did not achieve this goal, the royalty rates set by the pool provide a benchmark as to what certain businesses in the industry believed to be a RAND royalty rate. Moreover, Microsoft's expert, Dr. Murphy, opined that the fact that the Via 802.11 pool has not achieved a large level of participation may suggest that rates have been set too high to attract licensees. (11/13/12 Tr. at 159:3-6 (Murphy Testimony); 11/16/12 Tr. at 117:21-23 (Lynde Testimony).) Thus, the Via Licensing 802.11 patent pool may be a conservative indicator of a RAND royalty rate in that the pool rates may be higher than they would be had the pool been formed earlier and/or enjoyed greater licensee participation. (11/16/12 Tr. at 117:15-25 (Lynde Testimony).)

562. Based on this evidence, the court concludes that the Via Licensing 802.11 patent pool is an indicator of a RAND royalty rate for Motorola's 802.11 SEP portfolio, albeit not as strong an indicator as the MPEG LA H.264 patent pool. (11/13/12 Tr. at 159:9-11 (Murphy Testimony) ("I think [the Via Licensing 802.11 patent pool is] probably the best [indicator of RAND] we have.").)

563. The court also concludes that membership in the patent pool would provide value to Motorola of twice the royalties it would receive from the pool. The court bases this conclusion on the same evidence and rationale it employed with respect to the MPEG LA H.264 patent pool. (*See supra* ¶ 524-25.)

ORDER- 183

1

         **c.**    **RAND Royalties Based On The Via 802.11 Pool**

2        564.    Dr. Lynde estimated RAND royalties for Motorola's 802.11 SEPs based on

3  the royalty structure of the Via Licensing 802.11 patent pool. (11/16/12 Tr. at 113:3-

4  116:17 (Lynde Testimony); Exs. 1155, 1165, 1167.) He determined that, because of the

5  relatively low level of participation in the pool, an appropriate analysis of a RAND

6  royalty for Motorola's SEPs using the Via Licensing 802.11 patent pool requires

7  assessing the royalties Motorola might expect to receive from Microsoft if more of the

8  SEPs related to the 802.11 Standard were in the Via Licensing 802.11 pool and Microsoft

9  took a license to the pool. (11/16/12 Tr. at 113:9-24 (Lynde Testimony).) To assess such

10  a scenario, Dr. Lynde adjusted the Via pool to include: (a) the 263 worldwide patents (53

11  of which are U.S. patents) Motorola claimed in its October 21, 2010, letter to be essential

12  to the 802.11 Standard; (b) the 21 worldwide patents that Microsoft originally claimed

13  were essential to the 802.11 Standard; and (c) 186 other 802.11 SEPs that have been

14  specifically disclosed in company submissions to the IEEE. (11/16/12 Tr. at 108:11-15,

15  113:9-24 (Lynde Testimony); Exs. 1155, 1156, 1158.) Under this rubric—but based on

16  existing Via Licensing 802.11 patent pool rates—Microsoft would pay Motorola royalties

17  of approximately 5 cents ($0.05) per unit or approximately $736,000.00 per year at

18  current volumes. (11/16/12 Tr. at 114:7-115:3 (Lynde Testimony); Ex. 1167.)

19        565.    The court finds that Dr. Lynde's analysis is mistaken for the simple reason

20  that by the time of trial Motorola no longer claimed that 263 of its patents were essential

21  to the 802.11 Standard. At trial, Motorola only asserted that 24 (and not 53) of its U.S.

22  patents were essential to the 802.11 Standard and provided no evidence regarding

1    whether any worldwide counterpart patents were essential.  (11/15/12 Tr. at 102-05

2    (Gibson Testimony).)   For its part, at trial, Microsoft only claimed that 7 (and not 21) of

3    its patents were essential to the 802.11 Standard.  (Microsoft Pr. FC ¶ 317.)

4          566.    Accordingly, for the court to determine the appropriate royalties Motorola

5    would receive as a member of the Via Licensing 802.11 pool, it must adjust Dr. Lynde's

6    calculations by inserting the correct number of 802.11 SEPs held by both Microsoft and

7    Motorola.  To accurately adjust Dr. Lynde's calculations, the court follows the working

8    papers underlying Dr. Lynde's calculations for the Via Licensing 802.11 pool found in

9    Exhibits 1155, 1156, 1158, 1165, and 1167.  These working papers set forth the

10   Worldwide Revenue Sharing Algorithm including the country-weight factor.

11         567.    In adjusting Dr. Lynde's calculations, the court takes as accurate Dr.

12   Lynde's uncontested use of the country-weight factor to assign a total weight to the 186

13   802.11 SEPs—not including Microsoft's, Motorola's, and those already in the Via

14   Licensing 802.11 pool—that have been specifically disclosed in company submissions to

15   the IEEE.  (Ex. 1158.)  The total weight of those 186 SEPs is 18,110.66.  The court also

16   takes as accurate Dr. Lynde's calculation of the weight of the 35 patents already in the

17   Via Licensing 802.11 pool.  The total weight of those patents is 2,338.  (*See* Ex. 1165.)

18         568.    As explained above, at trial, Motorola asserted that 24 of its U.S. patents

19   were essential to the 802.11 Standard.  (11/15/12 Tr. at 102-05 (Gibson Testimony).)

20   Each U.S. patent is assigned a country-weight factor of 100.00, meaning that the total

21   weight assigned to Motorola's 24 802.11 SEPs is 2,400.  (*See* Ex. 1158.)  Likewise,

22

ORDER- 185

1  Microsoft asserted that 7 of its patents are essential to the 802.11 Standard.  (Microsoft

2  Pr. FC ¶ 317.)  Accordingly, Microsoft's 802.11 SEPs would have a total weight of 700.

3      569.    The sharing algorithm of the Via Licensing 802.11 patent pool determines

4  royalties based on the proportionate weight of a licensor's patents.  Thus, Motorola's

5  proportion is the weight afforded its 802.11 SEP portfolio divided by the total weight in

6  the pool.  Here, that number is 0.1019 (= 2,400 / (2,400 + 700 + 18,110.66 + 2,338), or

7  10.19 %.  In other words, Motorola's patents, adjusted by country weight, would be

8  10.19 % of the total Via Licensing 802.11 pool.

9      570.    Using this proportional share for Motorola's 802.11 SEP portfolio,

10  Motorola's royalties from Microsoft under the Via Licensing 802.11 pool are easily

11  calculated as 10.19 % of Microsoft's total payments into the pool in a given year.  The

12  uncontested evidence is that Microsoft's 2011 product volume for 802.11 Standard

13  compliant products was 14,263,000.  (Ex. 1167.)  Pursuant to the rate schedule of the Via

14  Licensing 802.11 patent pool, the per unit royalty rate would have been $0.20.  (Ex.

15  1167.)  Accordingly, Microsoft's total payments into the pool for 2011 would have been

16  $2,852,600.00, of which Motorola would have received 10.19 %, or $290,680.00.  Using

17  this total payment and dividing by the number of 802.11-complaint Microsoft products,

18  Motorola would have received $0.02038 per unit (= $290,680.00 / 14,263,000) in 2011.

19      571.    As stated, this per unit value must be increased by the value Motorola

20  would receive through membership in the Via Licensing 802.11 patent pool.  This value

21  is twice the royalty rate.  Accordingly, Motorola's royalty payments from Microsoft for

22

ORDER- 186

1    Motorola's 802.11 SEP portfolio would amount $0.06114 per unit, or <u>6.114 cents per</u>

2    <u>unit</u>.

3         572.    Using this calculated value as an estimate for a RAND royalty rate is

4    conservative and may represent something akin to a ceiling rate for at least two reasons.

5         573.    First, the calculated royalty under the modified Via Licensing 802.11 patent

6    pool does not consider any of the SEPs owned by the 59 802.11-SEP owners who have

7    submitted blanket LOAs to the IEEE.  Among these 59 802.11-SEP owners who

8    submitted blanket LOAs are many of the leading firms in the wireless industry such as

9    Sony, IBM, Atheros, Texas Instruments, Qualcomm, and Marvell.  (Ex. 1159.)

10   Although it is impossible to determine the total number of patents essential to the 802.11

11   Standard, it has been estimated that there may be thousands of 802.11 SEPs.  (11/16/12

12   Tr. at 108:21-109:18, 110:12-15 (Lynde Testimony).)  Indeed, a company named Marvell

13   alone contends that it has "a few hundred" issued U.S. patents that relate "to the latest

14   802.11 standards."  (11/14/12 Tr. at 64:7-16 (Ochs Testimony).)

15        574.    Second, neither Motorola's fact nor its expert witnesses offered any

16   evidence that any of the patents in Motorola's 802.11 SEP portfolio are more valuable

17   than the patents in the Via Licensing 802.11 patent pool.  (11/19/12 Tr. at 119:16-12

18   (Williams Testimony); 11/20/12 Tr. at 110:16-20 (Dailey Testimony).)  Even if these

19   experts had opined that Motorola's patents were more important than others in the Via

20   Licensing 802.11 patent pool, the court likely would have disregarded such testimony as

21   incorrect.  Here, the court conducted a comprehensive and detailed examination of each

22   relevant patent in Motorola's 802.11 SEP portfolio.  This examination revealed, through

1   testimony by Motorola's own experts, that the Xbox uses only 11 of the 24 patents

2   Motorola asserts are essential to the 802.11 Standard. Thus, Microsoft would have no

3   reason in a (hypothetical) negotiation to take a license to any of the 13 Motorola SEPs

4   that the Xbox does not use. In other words, Microsoft has no use for 13 of the 24 patents

5   in Motorola's 802.11 SEP portfolio.

6       575.    Further, in its hypothetical negotiation, the court must consider the

7   importance of the 11 Motorola SEPs that Microsoft does use. Evidence at trial showed

8   that each of the 11 patents provides very minimal technical contribution to the identified

9   portions of the 802.11 Standard. Additionally, the record was clear that Motorola did not

10   provide the inventive technology in any area of the 802.11 Standard, but instead built

11   upon already existing technology.

12       576.    Finally, the court must consider Motorola's contribution in relation to the

13   standard as a whole. The amount of technology involved in the 802.11 Standard is

14   immense. Indeed, the contributions by the University of Hawaii in developing

15   ALOHAnet constitute the basis for the 802.11 Standard. (11/15/12 Tr. at 90-91 (Gibson

16   Testimony).) Additionally, the 802.11 Working Group spent seven years developing the

17   first draft of the 802.11 Standard. (*Id.* at 92-93.) Over 1,000 companies have

18   participated in the development of the 802.11 Standard. (*Id.* at 94-95; Ex. 514.) The

19   802.11 Standard today is large and complex; the current version is 2,793 pages long.

20   (Ex. 386A.) Approximately 92 companies have identified essential patents or submitted

21   blanket LOAs to the IEEE. With this large scale contribution in mind, the court finds that

22

ORDER- 188

1  Motorola's 11 relevant SEPs constitute only a sliver of the overall technology

2  incorporated into the 802.11 Standard.

3      577.   In sum, the court considers the Via Licensing 802.11 patent pool an

4  indicator of a RAND royalty rate for Motorola's SEPs, although not as strong an

5  indicator as the MPEG LA H.264 patent pool.  Nevertheless, pursuant to Factor 9 of the

6  court's RAND-modified *Georgia-Pacific* analysis, parties in a hypothetical negotiation

7  would consider the Via Licensing 802.11 patent pool as practice of one in the business of

8  licensing 802.11 SEPs to fashion a RAND royalty rate.  Moreover, in this case, because

9  Motorola's 11 relevant 802.11 SEPs provide little value to the 802.11 Standard,

10 Microsoft and Motorola acting reasonably during a (hypothetical) negotiation would

11 conclude that <u>6.114 cents per unit</u> is likely higher than an appropriate RAND rate for

12 Motorola's 802.11 SEP portfolio.

13      iv.    **The Marvell Wi-Fi Chip**

14      578.   Microsoft uses, as an additional comparable for a Microsoft-Motorola

15 802.11 RAND rate, the royalty rate that a third-party company, Marvell Semiconductor,

16 Inc. ("Marvell"), pays for the intellectual property in its WiFi chips.  The court agrees

17 that the Marvell rate provides an indicator for 802.11 RAND under Factor 12 of the

18 hypothetical negotiation because the experiences of Marvell, a third-party, tend to

19 establish what is customary in the business of semiconductor licensing.

20          a.    **Background On The Marvell Wi-Fi Chip**

21      579.   Marvell designs and markets semiconductor chipsets that provide 802.11

22 functionality for a variety of products, including the Microsoft Xbox.  (11/19/12 Tr. at

ORDER- 189

1   114:21-25, 115:1-3 (Williams Testimony).)  WiFi chips, such as the Marvell WiFi chips

2   used in the Xbox, are commodity products sold by many different companies.  (*Id.* at

3   115:4-7.)  Marvell manufactures and sells its chips to Microsoft, Motorola, Sony and

4   others, which the companies incorporate into products as diverse as the Sony Playstation

5   and the Audi A8 automobile.  (11/14/12 Tr. at 63:2-10 (Ochs Testimony).)  Though the

6   products are diverse, each company incorporates the Marvell chips into its products for

7   the same reason:  to provide 802.11 functionality.

8          580.    The main purpose of the Marvell WiFi chip is to implement the 802.11

9   Standard:  the chip has no other use than to provide 802.11 functionality to a host

10  product.  (11/14/12 Tr. at 61:16-18 (Ochs Testimony).)  When embedded into a device

11  such as an Xbox, the WiFi chip enables the device to use the 802.11 Standard to transmit

12  and receive information on radio frequency carriers.  Otherwise stated, the WiFi chip

13  uses the 802.11 Standard to enable a host device to communicate wirelessly.  (11/19/12

14  Tr. at 114:10-20 (Williams Testimony).)   The Marvell chip contains the vast majority of

15  what is needed to provide 802.11 functionality in a product like the Xbox.  (11/14/12 Tr.

16  at 61:11-12 (Ochs Testimony).)

17         581.    Microsoft currently pays just under $3.00 per Marvell chip to provide

18  802.11 functionality to the Xbox gaming console.  (11/15/12 Tr. at 25:6-9 (Del Castillo

19  Testimony).)  In the past, Marvell has charged $3.00 to $4.00 per chip for WiFi chips of

20  the kind it sells to Microsoft.  (11/14/12 Tr. at 61:19-21 (Ochs Testimony).)

21         582.    Marvell pays a royalty and licensing fees to ARM Holdings ("ARM")—a

22  software company—on each $3.00-4.00 chip Marvell makes.  ARM Holdings is an

ORDER- 190

1    English company that specializes in creating software and other tools that enable

2    customers to design and make "embedded microprocessors," such as the Marvell WiFi

3    chips. (11/16/12 Tr. at 12:8-13 (Lynde Testimony).) ARM provides Marvell with the

4    patent licenses and "design and know-how" Marvell needs to make its 802.11-compliant

5    chips. In exchange, Marvell pays ARM a royalty of 1 % of the purchase price of the chip

6    (3-4 cents per chip). (11/14/12 Tr. at 71:15-21 (Ochs Testimony).) The ARM license

7    and royalty package includes not only the patents required to build these chips, but also

8    the instructions the customer can use to develop the product. (11/16/12 Tr. at 120:8-13

9    (Lynde Testimony).)

10                    **b.      The ARM Benchmark Rate**

11           583.   According to Jennifer Ochs, Marvell's Director of Intellectual Property

12    Litigation, Marvell considers the 1 % royalty rate it pays to ARM a reasonable "high

13    ceiling" of what a semiconductor company should pay for an intellectual property

14    royalty. (11/14/12 Tr. at 70:24-25, 71:1 (Ochs Testimony).)

15           584.   This "high ceiling" determination is based partially on the fact that ARM

16    licenses not only patents, but also directions on how to design necessary elements of the

17    chip. (11/14/12 Tr. at 71:5-8 (Ochs Testimony); *see also* 11/16/12 Tr. at 120:8-13

18    (Lynde Testimony).) Ms. Ochs's testimony suggested that a company should pay less

19    than a 1 % royalty rate for a patent-only license agreement—one that does not contain

20    ARM's additional intellectual property. (*See* 11/14/12 Tr. at 70:24-25, 71:1 (Ochs

21    Testimony).)

22

ORDER- 191

1      585.   Marvell also considers the ARM rate an appropriate benchmark because the

2   rate is based on the selling price of the chip, not the sale price of the end-user product

3   into which the chip is embedded.  According to Ms. Ochs, the denominator in the royalty

4   calculation must be the price of the chip rather than the price of the user end-product

5   because even a low royalty rate applied to an expensive end-product would quickly

6   outstrip Marvell's profit margins on its chips. (*See* 11/14/12 Tr. at 68, 69:1-3 (Ochs

7   Testimony).)  For example, a 1 % royalty on a chip placed in an $80,000.00 Audi A8

8   would be $800.00, or about 267 times the retail price of the chip. (*See id.* at 69:1-3.)  Ms.

9   Ochs further testified that, not only would a royalty rate based on the consumer end

10  product often be cost-prohibitive, it would also be impractical because when Marvell

11  sells the chips it usually does not know their intended end use. (11/14/12 Tr. at 68:5-25,

12  69:15-16 (Ochs Testimony).)  Finally, the chips provide the same functionality in each

13  host device regardless of the end cost of the device, so it is logical that the royalty rate be

14  the same across all devices. (*See id.* at 62:17-20.)  Likely because of these reasons, Ms.

15  Ochs testified that she had never heard of a chip maker paying a running royalty on the

16  end-product price of its consumers' products. (*Id.* at 70:7-10.)

17     586.   Ms. Ochs finally testified that, because the risk of "royalty stacking"

18  inflates the impact of any royalty on a company's bottom line, even a 1 % royalty is a

19  "high ceiling" benchmark. This is because the profit margin on semiconductor chips is

20  narrow, and several royalty payments can quickly subsume a company's expected profits.

21  (*See* 11/14/12 Tr. at 70:1-6 (Ochs Testimony).)   Indeed, "you can't pay too many

22  royalties before you just run out of profit." (*Id.* at 70:2-3.)

ORDER- 192

1        587.    Thus, the court concludes that Marvell's experience with the ARM rate

2   shows that the 1 % rate represents a reasonable "high ceiling" royalty rate in

3   semiconductor intellectual property licensing.

4               c.       The ARM Benchmark Rate as an Industry Indicator

5        588.    In light of the foregoing, the court holds that the ARM rate is a reference

6   point in the present RAND hypothetical negotiation.   More specifically, the court looks

7   to the ARM rate to inform its consideration of Factor 12 of the modified *Georgia-Pacific*

8   factors.

9        589.    Under Factor 12, the court should consider, in a hypothetical negotiation,

10  "[t]he portion of the profit or of the selling price that may be customary in the particular

11  business or in comparable businesses to allow for the use of the invention or analogous

12  inventions." *Georgia-Pacific*, 318 F. Supp. at 1120.

13       590.    Marvell's experience with the ARM royalty rate provides the court with a

14  royalty rate "that may be customary in the particular business." *Id.*  So, the court

15  considers a royalty rate of 1 % per 802.11-enabling chip, between 3 and 4 cents per chip

16  (depending on the chip's final sale price) an indicator of a RAND rate for Motorola's

17  802.11 SEP portfolio.[25]

18

19  _____

20  [25] The court is aware that the 1% royalty rate paid by Marvell constitutes the entirety of
    the royalty rates paid by Marvell for its 802.11 Wi-Fi chip. Motorola, on the other hand, only
    owns a portion of the intellectual property comprising the 802.11 Standard. Here, the court notes
21  that it is not privy to financial and licensing considerations, beyond the 1% royalty to ARM, of
    Marvell and other third-party 802.11 SEP owners. The minimal evidence before the court
22  suggests that other considerations exist that justify the court in employing the 1% rate as a
    comparable. Marvell owns significant patents relevant to the 802.11 Standard, and Marvell and

ORDER- 193

1    **v.    The InteCap Analysis**

2         As a third possible indicator of a RAND royalty rate for Motorola's 802.11 SEP

3    portfolio, the court examines an analysis by a consulting firm called InteCap, Inc.

4    ("InteCap"), which developed a patent licensing valuation model for Motorola's 802.11

5    SEPs in 2003.

6         **a.    Background of the InteCap Analysis**

7         591.    In 2003, InteCap specialized in valuing patent portfolios. In particular,

8    InteCap was in the business of evaluating patent portfolios for the purpose of maximizing

9    the royalty income that could be obtained through monetization of patents. (11/16/12 Tr.

10   at 126:12-20 (Lynde Testimony).)

11        592.    InteCap evaluated Motorola's 802.11 SEP portfolio in 2003 and proposed a

12   licensing model that segmented licensing markets and target companies into three

13   categories or "Links":

14   •    Link-1 comprised companies that made 802.11 chipsets;

15   •    Link-2 comprised companies that made 802.11-dedicated
          devices like routers and access points; and

16
     •    Link-3 comprised companies that made 802.11-enabled
17        consumer products like laptops, PCs, and gaming consoles.

18   (Ex. 65 at CRA_001290 (identifying addressable markets for potential 802.11 licensing).)

19

20   Motorola have engaged in cross licensing discussions. (11/14/12 Tr. at 64-68 (Ochs Testimony);
     Exs. 16, 1608.) Without a full understanding of the considerations of Marvell and other third-
21   party 802.11 SEP owners, the court is left to consider the 1% ARM royalty, equating to 3-4 cents
     per chip, only as an indicator of a reasonable royalty rate in the semiconductor intellectual
22   property licensing industry.

ORDER- 194

593.   According to InteCap's report, when considering licensing in the 802.11 context, "[i]ndustry royalty stacking issues must be addressed/recognized." (Ex. 65 at CRA_001289; 11/16/12 Tr. at 127:7-22 (Lynde Testimony).)  InteCap's valuation model therefore recognized that the following factors must be accounted for in setting a royalty:

- "802.11 feature factor," which InteCap defined as the "Value of 802.11 functionality related to [the] total product functionality"; and

- "Royalty stacking adjustment factor," which InteCap defined as the "Factor to address [the] portion of total 802.11 functionality enabled by Motorola IP."

(Ex. 65 at CRA_001290, CRA_001314 (describing InteCap's 802.11 Valuation Model Framework); 7/12/12 D. Curtis Dep. at 46:2-12.)

594.   For Link-3 companies—802.11-enabled products like PCs, laptops, and game consoles—the "feature factor" employed by InteCap was 10 % of the product's end price.  The application of this factor had the effect of reducing the base to which any royalty was applied by 90 % before any other adjustments were made.  (Ex. 65 at CRA_001315 ("802.11 feature factor-percent of sales [=] 0.10"); 7/12/12 D. Curtis Dep. at 42:2-20.)

595.   InteCap's valuation model assumed a 25 % stacking factor based on the assumption that Motorola held 25 % of all 802.11 SEPs.  The record here shows that this assumption clearly overemphasizes the relative size and importance of Motorola's 802.11 SEP portfolio at issue in this litigation.  (11/16/12 Tr. at 129:3-15 (Lynde Testimony); *see also id.* at 108:21-109:9 (Lynde Testimony) (stating there are thousands of patents essential to the 802.11 Standard); 11/14/12 Tr. at 64:7-9 (Ochs Testimony) (Marvell has a

ORDER- 195

1  few hundred issued U.S. 802.11 Patents); Ex. 65 at CRA_001288 (InteCap's analysis

2  assumed Motorola owned 14 802.11 technically or commercially essential patents).)

3     596.   When accounting for the feature and stacking adjustment factors, InteCap's

4  model resulted in an effective royalty of 0.1 % on the price of the products of Link-3

5  companies.  This royalty would have been applied to products embedded with 802.11

6  functionality, including PCs, laptops, and game consoles, such as the Xbox.  (7/12/12 D.

7  Curtis Dep. at 56:8-14 (Q:  . . . "[T]he final royalty rate that is produced in the model is

8  0.1 percent of the laptop selling price, correct?  A.  Correct . . . ."); Ex. 6, at MOTO-MS-

9  000237738 ("Assumptions:  Net Royalty Rates 0.1 % of sales . . . ."); Ex. 65, at

10 CRA_001291 (applying Valuation Model); Ex. 66, at CRA_001708 (same).)

11    597.   InteCap's model resulted in a royalty rate of 0.5 % of the price of 802.11

12 WiFi chips ("Link-1"), such as those sold by Marvell and Atheros.  Specifically, InteCap

13 proposed an "802.11 feature factor" of the 802.11 chips of 100 %; an aggregate

14 reasonable royalty for all industry-wide 802.11 SEPs of 2 %, and a "Royalty stacking

15 adjustment factor" to isolate Motorola's portion of that aggregate royalty of 25 % (i.e.,

16 25 % of 2 % equals 0.5 % for Motorola's 802.11 SEPs).  (Ex. 65 at CRA_001291

17 (applying InteCap model); Ex. 66, at CRA_001708 (same).)

        **b.**    **The InteCap Evaluation As An Indicator of a RAND Royalty**

19    598.   The court concludes that the InteCap rate would serve as a RAND indicator

20 in a hypothetical negotiation.

21    599.   Motorola makes several arguments against using the InteCap rate; the court

22 will address these arguments in turn.

600.   Motorola first contends that the InteCap evaluation considered only five Motorola 802.11 SEPs, whereas the Motorola 802.11 SEP portfolio at issue in this case contains many more patents. (Motorola Pr. FC ¶ 200 (citing 7/12/12 D. Curtis Dep. at 164:8-10).) The evidence before the court suggests otherwise. InteCap performed an evaluation of certain Motorola 802.11 SEPs to provide Motorola with a licensing recommendation for all of Motorola's 802.11 SEPs. (Ex. 65 at CRA_001288 (InteCap's analysis assumed Motorola owned 14 802.11 technically or commercially essential patents).) The InteCap rate is relevant because InteCap evaluated five Motorola patents as a representative sample for Motorola's entire 802.11 SEP portfolio in existence in 2003. The rate that InteCap developed based on these patents was designed to represent a reasonable rate for the entire portfolio. Because the InteCap evaluation valued Motorola's entire 802.11 SEP portfolio as of 2003, the rate can serve as an indicator in the present case.

601.   Second, Motorola contends that the patents evaluated by InteCap are different from the patents in its current 802.11 SEP portfolio, particularly with respect to their relevant strength. Otherwise stated, Motorola contends that there is no way to assess the relative strength of the patents that InteCap considered compared to patents in Motorola's 802.11 SEP portfolio at issue in this litigation. (Motorola Pr. FC ¶ 200.) Motorola correctly explains that, of all the 802.11 SEPs in Motorola's portfolio at issue in

1    this case, only one (U.S. Patent No. 5,560,021) was considered by InteCap.[26]   (Ex. 1; Ex.

2    6 at MOTO-MS-000237726.)   Based on this fact, Motorola tries to diminish the

3    relevance of the InteCap evaluation to seek a significantly higher royalty rate.

4        602.   Motorola's argument is misplaced for two reasons.  First, the argument is

5    undercut by the court's earlier finding that Motorola's 802.11 SEP portfolio provides

6    very minimal contribution to the 802.11 Standard.  InteCap valued Motorola's patents as

7    providing 25 % of the functionality of the 802.11 Standard.  The court concludes that

8    Motorola's 802.11 SEP portfolio as it exists today provides nowhere near 25 % of the

9    overall functionality of the 802.11 Standard.  Thus, if anything, the 802.11 SEPs

10   Motorola owned in 2003 were more valuable than the 802.11 SEPs it owns today.

11   Second, the question with respect to the InteCap analysis is not whether it provides a

12   precise RAND royalty rate for Motorola's 802.11 SEP portfolio, but whether it is an

13   indicator of an appropriate RAND royalty rate.

14       603.   For the following reasons, the court concludes that the InteCap evaluation

15   is an indicator of an appropriate RAND royalty rate for Motorola's 802.11 SEP portfolio.

16       604.   The methodology of the InteCap evaluation exhibits characteristics

17   consistent with the principles underlying the RAND commitment.  For instance, the

18   evaluation considered the value of the functionality of the 802.11 Standard in relation to

19   the total product functionality.  This consideration is very similar to the consideration

20

21   _____

     [26] Although the court generally agrees that different SEP portfolios typically lead to
22   different RAND royalty rates vis-à-vis the same implementer, that logic is case specific and does
     not apply here.

ORDER- 198

1  under Factor 15 of the court's RAND-modified *Georgia-Pacific* analysis which examines

2  the importance of the SEP to the implementer's product.

3      605.    The InteCap evaluation also accounted for stacking issues—an important

4  principle of the RAND commitment—by considering the portion of the total 802.11

5  Standard enabled by Motorola's intellectual property. Again, this precise consideration is

6  found in the court's hypothetical negotiation, which examines the importance of the SEP

7  to the standard.

8      606.    Additionally, in 2003, InteCap was in the business of evaluating patent

9  portfolios for the purpose of licensing patents—and, in the case, evaluating Motorola's

10  802.11 SEP portfolio. The evidence supports the conclusion that InteCap attempted to

11  provide Motorola with a licensing recommendation that would comport with Motorola's

12  RAND obligation. Thus, pursuant to Factor 12 of the court's RAND-modified *Georgia-*

13  *Pacific* analysis, the court concludes that parties in a hypothetical negotiation would

14  consider the InteCap evaluation as an effort by a company in the business of licensing

15  (RAND) patents to fashion a RAND royalty rate. Because of the minimal contribution of

16  Motorola's patents, reasonable parties to a hypothetical negotiation would recognize that

17  Motorola's 802.11 SEP portfolio is not worth more than the portfolio that InteCap

18  evaluated in 2003.

19      607.    In sum, the methodology of the InteCap evaluation exhibits certain

20  characteristics of a RAND royalty rate, making the evaluation an appropriate indicator of

21  RAND. The strength of the InteCap evaluation as an indicator is, however, diminished

22  by the evaluation's over-exaggeration of the relative importance of Motorola's 802.11

ORDER- 199

1  SEP portfolio to the 802.11 Standard.  The court has attempted to adjust for this

2  overestimation, but without concrete evidence to accurately make such adjustments, the

3  accuracy of the InteCap indicator is placed into question.  Accordingly, the court

4  concludes that parties to a negotiation would view the InteCap evaluation as an indicator

5  of a RAND royalty rate, but would consider it less important than the Via Licensing Pool

6  or the Marvell Wi-Fi chip.

7                c.     **RAND Royalties Based on the InteCap Analysis**

8        608.   The InteCap evaluation suggested a 0.1 % royalty on Link 3 products, such

9  PCs, laptops, and game consoles.  Link 3 products would naturally include the Xbox

10  game console, which typically sold for between $200.00 and $400.00.  (11/15/12 Tr. at

11  13 (Del Castillo Testimony).)

12        609.   Thus, a RAND royalty rate based on InteCap as an indicator would be

13  between 20 and 40 cents per unit.

14        610.   However, the court concludes that InteCap overestimated the importance of

15  Motorola's 802.11 SEP portfolio to the 802.11 Standard by assigning the portfolio a

16  value of 25 % of the entire 802.11 Standard.  Having carefully examined the importance

17  of Motorola's 802.11 SEP portfolio with respect to Microsoft, the court concludes that

18  the InteCap evaluation applied to Motorola's current 802.11 SEP portfolio overstates its

19  importance by at least a factor of 25.  The testimony of Dr. Gibson corroborates this

20  conclusion.  Dr. Gibson estimated that Motorola's 802.11 SEP portfolio is less than 1 %

21  of the overall technology in the 802.11 Standard.  (11/15/12 Tr. at 154 (Gibson

22  Testimony).)

1     611.    The court concludes that Microsoft and Motorola acting reasonably in a

2  hypothetical negotiation would view the importance of Motorola's 802.11 SEP portfolio

3  as vastly inferior to InteCap's estimate and would accordingly adjust the royalty rate

4  produced by the InteCap evaluation downward by a factor of 25.  The adjusted InteCap

5  evaluation produces a royalty rate of between 0.8 and 1.6 cents per unit.

6     612.    In sum, the court concludes that during the course of a hypothetical

7  negotiation, Microsoft and Motorola would reasonably consider the InteCap evaluation as

8  an indicator of a RAND royalty rate for Motorola's 802.11 SEP portfolio.  The court

9  further concludes that the parties would significantly adjust the InteCap indicator

10  downward to compensate for overestimation by InteCap of the value of Motorola's

11  802.11 SEP portfolio to the 802.11 Standard.  Thus, the adjusted rate the parties would

12  look to is between 0.8 and 1.6 cents per unit.

13  **C.    A Reasonable Royalty Rate for Motorola's 802.11 SEP Portfolio**

14     613.    Pursuant to Factor 12 of the court's RAND-modified *Georgia-Pacific*

15  analysis, Microsoft and Motorola would consider the Via Licensing 802.11 patent pool,

16  Marvell Wi-Fi chip, and the InteCap evaluation as indicators of a RAND royalty rate for

17  Motorola's 802.11 SEP portfolio.  Microsoft and Motorola, acting reasonably in the

18  course of their negotiation, would view the aforementioned indicators in light of the

19  importance of Motorola's 802.11 SEP portfolio to the 802.11 Standard.  More

20  specifically, in the case of the Via Licensing 802.11 patent pool and the InteCap

21  evaluation, the indicator would be adjusted downward due to the lack of importance of

22  Motorola's 802.11 SEP portfolio to the standard, as explained extensively herein.

ORDER- 201

1    614.    The three indicators produced the following estimates of a RAND royalty

2 rate:  (1) The Via Licensing 802.11 patent pool implied a royalty rate of <u>6.114 cents per</u>

3 <u>unit</u>; (2) the ARM rate for the Marvell Wi-Fi chip suggested a royalty rate between <u>3 and</u>

4 <u>4 cents per unit</u>; and (3) the InteCap evaluation theorized a royalty rate between <u>0.8 and</u>

5 <u>1.6 cents per unit</u>.

6    615.    In relation to the amount Motorola seeks in this litigation—$6.00-8.00 per

7 Xbox unit—these three indicators are very close to one another.  The fact that three

8 independent indicators of a RAND royalty rate produced such similar results strongly

9 suggests that the ballpark of a RAND royalty rate for Motorola's 802.11 SEPs falls

10 within the range of the indicative rates.

11    616.    Placing itself into the hypothetical negotiation between Microsoft and

12 Motorola, the court concludes that one reasonable path for the parties in pinpointing a

13 royalty rate based on the above indicators would be to average the three.  The court notes

14 that the process of averaging is common in business negotiations, so the court will

15 employ that process here.

16    617.    In its calculation, the court averages the low point from the InteCap

17 evaluation—0.8 cents per unit—in large part because the InteCap evaluation based

18 royalties on the end-price of products.  As the court's RAND-modified *Georgia-Pacific*

19 methodology explains, a patent's royalty rate should be based on the importance of the

20 patent to the standard and to the implementer's product.  Under this analysis, this royalty

21 rate would fluctuate little, if at all, based on the end selling price of the product.

22 Accordingly, if 0.8 cents per unit is a reasonable royalty rate for a $200.00 Xbox, then it

1    should be a reasonable royalty rate for an Xbox selling for $400.00 that uses the patented

2    technology in the same manner.

3        618.    With respect to the indicative range of the Marvell Wi-Fi chip, the court

4    concludes that reasonable parties would split the range, such that a rate of 3.5 cents per

5    unit would be used in the average.

6        619.    Thus, the average of the three indicators is 3.471 cents per unit (= (0.8 + 3.5

7    + 6.114) / 3).

8        620.    Reasonable parties in the hypothetical negotiation would check the 3.471

9    cents per unit rate for its reliability.  Here, the Motorola and Microsoft would see that the

10   rate falls almost perfectly in between the range of rates provided by the Marvell Wi-Fi

11   chip indicator.  Additionally, the rate of 3.471 is slightly below the rate indicated by the

12   Via Licensing 802.11 patent pool.  Microsoft and Motorola would view this as an

13   accurate assessment, because the rate of the Via Licensing pool was likely too high for

14   the reasons explained above.  Finally, the parties would view 3.471 cents per unit as

15   "within the ballpark" vis-à-vis the rate from the InteCap indicator.  As stated, the InteCap

16   evaluation is not a strong indicator because the court's efforts to modify the

17   overestimation by InteCap of the value of Motorola's 802.11 SEP portfolio was

18   imprecise at best.  Thus, based on the foregoing, the court concludes that the parties

19   would agree that a rate of 3.471 cents per unit not only falls in the range of the three

20   indicators, but also makes logical sense and is in accord with the totality of the evidence

21   before the court.

22

1      621.    Accordingly, the court adopts the rate of **3.471 cents per unit** as the rate

2   Microsoft and Motorola would agree to for a license to Motorola's 802.11 SEP portfolio

3   acting reasonably in a hypothetical negotiation in light of the RAND commitment.[27]

4      622.    Next, the court determines an upper and lower bound of a RAND royalty

5   range for Motorola's 802.11 SEP portfolio.  As explained previously in relation to the

6   MPEG LA H.264 patent pool, stacking concerns from the perspective of the implementer

7   govern the upper bound of RAND.  Keeping stacking in mind, the court searches the trial

8   record for an indication of what this upper bound may be.  The court's search ends on the

9   high point of the royalty range offered by Microsoft at trial:  6.5 cents per unit.

10   (Microsoft Pr. FC ¶ 429.)  This rate was proposed by Microsoft expert Dr. Lynde based

11   on his efforts to ascertain a royalty rate based on the Via Licensing 802.11 patent pool.

12   (Microsoft Pr. FC ¶ 429.)  As discussed above, the court ultimately concluded that Dr.

13   Lynde used incorrect figures for Motorola's and Microsoft's 802.11 SEPs in calculating

14   royalties based on the Via Licensing 802.11 patent pool.  Dr. Lynde used the number of

15   patents claimed to be essential by Motorola in Motorola's October 21, 2010, offer letter

16   to Microsoft.  Similarly, Dr. Lynde used the number of patents claimed by Microsoft as

17   essential at an earlier stage in the litigation.  By the time of trial, both Motorola and

18   Microsoft had significantly reduced the number of patents each claimed as essential to

19   _____

20   [27] Although Motorola may contend that Microsoft products other than the Xbox use the
     802.11 Standard, Motorola did not make such an assertion at trial.  Thus, the court is unable to
21   ascertain the functionality of any other Microsoft products that Motorola may contend use the
     802.11 Standard, making it impossible for the court to determine the importance of Motorola's
22   802.11 SEPs to these products.  Accordingly, the court is left to conclude that the RAND rate for
     Motorola's 802.11 SEP portfolio applies only to Microsoft's Xbox products.

ORDER- 204

1    the 802.11 Standard.  Accordingly, the court recalculated the royalties from the Via

2    Licensing 802.11 patent pool based on an accurate count of patents.  (*Supra* ¶ 565-71.)

3         623.    One might wonder why the court would use Dr. Lynde's royalty rate as an

4    indicator of an upper RAND bound after it determined that Dr. Lynde used the incorrect

5    number of patents.  Microsoft, at the time of trial, knew that Dr. Lynde's calculations

6    regarding the Via Licensing 802.11 pool included an incorrect counting of Motorola's

7    and Microsoft's respective essential patents, but nevertheless came into the court room

8    and suggested a rate of 6.5 cents per unit.  In part, the court views the trial as simulating a

9    hypothetical negotiation.  In many ways, Microsoft's 6.5 cents per unit royalty suggestion

10   is not dissimilar to an offer in a hypothetical negotiation.  Here, Microsoft offered a 6.5

11   cents per unit royalty rate based on its own calculations relating to the Via Licensing

12   802.11 patent pool, which the court has determined to be an indicator of a RAND royalty

13   rate.  The fact that Microsoft used—in the eyes of the court—inaccurate numbers, says

14   little about whether Microsoft was unreasonable in making this offer.  Indeed, Microsoft

15   was offering to pay more for Motorola's 802.11 SEP portfolio than it would pay had

16   accurate numbers been used.

17        624.    Microsoft based its 6.5 cents per unit offer on the Via Licensing 802.11

18   patent pool with the assumption that Motorola had joined the pool as a licensor.  As the

19   court has explained, such patent pools provide licensors value beyond mere royalties

20   received.  The court has determined this additional value to be twice the royalties

21   received.  In offering the 6.5 cents per unit rate, Microsoft failed to consider this

22   additional value.  In consideration of these benefits, the court increases the rate to **19.5**

ORDER- 205

1   **cents per unit** (= 6.5 + 2×6.5) and holds that this rate is the upper bound of a RAND

2   royalty between Microsoft and Motorola for Motorola's 802.11 SEP portfolio.

3        625.   Finally, the court determines a lower bound of the RAND royalty rate. The

4   lower bound assumes both that the SEP owner is acting reasonably and that she is

5   seeking a royalty return for her patents. Needless to say, without an assumption that the

6   SEP owner desires return on her patents, the RAND royalty rate would fall to zero. Here,

7   the court will (safely) assume that in a hypothetical negotiation between Microsoft and

8   Motorola, Motorola would seek a return on its 802.11 SEP portfolio.

9        626.   The lower bound of RAND will logically be constrained by the value of the

10   SEP owner's portfolio. In the RAND context, an SEP owner is entitled "to some ill-

11   defined measure [of] return on the value of the [patented] property, but [not] to the

12   incremental value that you get because you are part of the standard." (11/19/12 Tr. at

13   168:21-169:8 (Schmalensee Testimony).) Thus, the question becomes what is the lowest

14   value that an SEP owner would agree to after examining the value of the relevant patents

15   to the 802.11 Standard and to the implementer's product.

16        627.   Unfortunately, there is little evidence in the record to assist the court in

17   determining a lower bound. The court must, however, provide a lower bound based on

18   the evidence before it. Accordingly, the court chooses **0.8 cents per unit** as the lower

19   bound of RAND. This value represents the low royalty rate based on the adjusted

20

21

22

ORDER- 206

1   InteCap evaluation as an indicator of RAND. It also represents the lowest royalty rate on

2   the record based on a methodology the court has found to be an indicator of RAND.[28]

3   **VII.   CONCLUSION**

4        In conclusion and as explained herein, the court concludes as follows:

5   •   The RAND royalty rate for Motorola's H.264 SEP portfolio is 0.555 cents
         per unit; the upper bound of a RAND royalty for Motorola's H.264 SEP
6        portfolio is 16.389 cents per unit; and the lower bound is 0.555 cents per
         unit. This rate and range are applicable to both Microsoft Windows and
7        Xbox products. For all other Microsoft products using the H.264 Standard,
         the royalty rate will be the lower bound of 0.555 cents.
8
     •   The RAND royalty rate for Motorola's 802.11 SEP portfolio is 3.471 cents
9        per unit; the upper bound of a RAND royalty for Motorola's 802.11 SEP
         portfolio is 19.5 cents per unit; and the lower bound is 0.8 cents per unit.
10       This rate and range are applicable to Microsoft Xbox products. For all
         other Microsoft products using the 802.11 Standard, the royalty rate will be
11       the low bound of 0.8 cents per unit.

12   IT IS SO ORDERED.

13   Dated this 25th day of April, 2013.

14

15                                    Jam R. Rlat

16                                    _____
                                      JAMES L. ROBART
17                                    United States District Judge

18

19

20   _____

21   [28] As stated, Motorola did not assert at trial that any Microsoft products other the Xbox
     used Motorola's 802.11 SEP portfolio. The court therefore could not apply the determined
22   RAND royalty rate to any other Microsoft products. As a result, the court applies the low bound
     of the RAND range to all Microsoft products, other than the Xbox, using the 802.11 Standard.