# EXHIBIT 1

9

CONFIDENTIAL

Page 1

1            IN THE UNITED STATES DISTRICT COURT

2          FOR THE WESTERN DISTRICT OF WASHINGTON

3

4                        AT SEATTLE

5

6

7

8     MICROSOFT CORPORATION, a            )

9     Washington corporation,             )

10                                         )

11                    Plaintiff,           )

12                                         ) No. 2-10-cv-

13               vs.                       )   01823-JLR

14                                         )

15     MOTOROLA, INC., and MOTOROLA        )

16     MOBILITY, INC.,                     )

17                                         )

18                    Defendants.          )

19

20

21      VIDEOTAPED 30(b)(6) DEPOSITION OF

22

23                            May 9, 2013

24     Job No. CS1663256

25                        Seattle, Washington

CONFIDENTIAL

Page 2

```
 1                    APPEARANCES
 2
 3          For the Plaintiff:
 4
                        Christopher T. Wion
 5                      Calfo Harrigan Leyh & Eakes
                        999 Third Avenue
 6                      Suite 4400
                        Seattle, WA 98104
 7                      206.623.1700
                        206.623.8717 Fax
 8                      chrisw@calfoharrigan.com
 9
10          For the Defendants:
11
                        Andrea Pallios Roberts
12                      Elanor A. Mangin
                        Quinn Emanuel
13                      555 Twin Dolphin Drive
                        Fifth Floor
14                      Redwood Shores, CA 94065
                        650.801.5000
15                      650.801.5100 Fax
                        andreaproberts@quinnemanuel.com
16                      elanormangin@quinnemanuel.com
17
18
            Also present: Cody Malone, Videographer
19
20
21
22
23
24
25
```

CONFIDENTIAL

Page 3

1                          EXAMINATION INDEX
2        EXAMINATION BY:                           PAGE NO.
3        MS. ROBERTS                                  7
4
5
6
7                            EXHIBIT INDEX
8          EXHIBIT NO.      DESCRIPTION              PAGE NO.
9
10       Exhibit No. 1     Motorola's Second Notice of      16
                           Deposition to Microsoft
11                         Corporation Pursuant to
                           Federal Rule of Civil
12                         Procedure 30(B)(6).
13       Exhibit No. 2     EMEA Operating Region Request    79
                           for DTV; Cost Indication
14                         Implementation & Operation.
                           Nos. MS-MOTO_1823_00004082856
15                         to 4082893
16       Exhibit No. 3     Email string RE: Progress        93
                           Update (Next 24/48 hours)
17                         dated 2/9/2012.
                           No. MS-MOTO_1823_00004082148
18
         Exhibit No. 4     Letter to Hans Peter from        101
19                         Theresa Daly dated 2/13/2012.
                           Nos. MS-MOTO_1823_00004082542
20                         to 4081543
21       Exhibit No. 5     Email string re: CEVA            106
                           proposal.
22                         Nos. MS-MOTO_1823_00004082146
                           to 4082147
23
         Exhibit No. 6     Email string re: MSCIS - EMEA    110
24                         Supplier 2012-02-28 v14.pptx.
                           Nos. MS-MOTO_1823_00004082591
25                         to 4082614

CONFIDENTIAL

Page 4

1                     EXHIBIT INDEX (Continuing)
2        EXHIBIT NO.       DESCRIPTION                    PAGE NO.
3
         Exhibit No. 7     Email to Owen Roberts from        115
4                          Jeff Davidson dated 4/6/2012.
                           Nos. MS-MOTO_1823_00004082501
5                          to 4082503
6        Exhibit No. 8     Email string re: Europe DTV       122
                           decision.
7                          Nos. MS-MOTO_1823_00004082126
                           to 4082128
8
         Exhibit No. 9     Email string re: Europe DTV       135
9                          decision.
                           Nos. MS-MOTO_1823_00004082077
10                         to 4082080
11       Exhibit No. 10    Email string re: Arvato           140
                           update.
12                         Nos. MS-MOTO_1823_00004082679
                           to 4082680
13
         Exhibit No. 11    Email to Owen Roberts from        142
14                         Jeff Davidson dated
                           5/30/2012.
15                         Nos. MS-MOTO_1823_00004082288
16       Exhibit No. 12    Email string re: European         144
                           Distribution Centre update
17                         Friday 29th.
                           Nos. MS-MOTO_1823_00004081840
18                         to 4081844
19       Exhibit No. 13    German Relocation Damages         180
                           Figures - Final Schedule.
20                         Nos. MS-MOTO_1823_00004081525
                           to 4081526
21
         Exhibit No. 14    CEVA DTV Implementation           181
22                         Project Costs.
                           Nos. MS-MOTO_1823_00004082685
23                         to 4081526
24
25

CONFIDENTIAL

Page 5

1                        EXHIBIT INDEX (Continuing)
2        EXHIBIT NO.        DESCRIPTION                    PAGE NO.
3
    Exhibit No. 15    Microsoft Corporation's April    186
4                     12, 2013 Supplemental
                      Disclosures Pursuant to
5                     Federal Rule of Civil
                      Procedure 26(a)(1)(A)(i) and
6                     (iii).
7    Exhibit No. 16    Fixed Costs chart.               198
                       No. MS-MOTO_1823_00004081521
8
    Exhibit No. 17    Exhibit H Venray Distribution    208
9                     and Warehouse Services
                      Start-up and Run Services
10                    Pricing Agreement.
                      Nos. MS-MOTO_1823_00004081413
11                    to 4081418
12    Exhibit No. 18    Arvato Invoice to Microsoft      211
                        Ireland Operations Limited.
13                      Nos. MS-MOTO_1823_00004082702
                        to 4082703
14
    Exhibit No. 19    Email string re: Master Plan     213
15                    .xlsx.
                      Nos. MS-MOTO_1823_00004082073
16                    to 4082076
17
18
19
20
21
22
23
24
25

CONFIDENTIAL

Page 6

1              BE IT REMEMBERED that on Thursday,

2     May 9, 2013, at 315 Fifth Avenue South, Suite 1000,

3     Seattle, Washington, at 8:59 a.m., before Karmen M.

4     Knudson, CCR, RPR, CRR, Notary Public in and for the

5     State of Washington, appeared JAMES JEFF DAVIDSON,

6     the witness herein;

7                   WHEREUPON, the following

8     proceedings were had, to wit:

9

10                 <<<<<< >>>>>>

11

12              THE VIDEOGRAPHER:  Good morning.

13    My name is Cody Malone of Veritext.  The date today

14    is the 9th day of May 2013.  The time on the video

15    monitor is approximately 8:59 a.m.

16       This deposition is being held at the Summit Law

17    Group, 315 Fifth Avenue South in Seattle, Washington.

18    The caption of the case is Microsoft Corporation

19    versus Motorola, in the United States District Court,

20    Western District of Washington at Seattle.  The cause

21    number is 2-10-CV-01823-JLR.  The name of the witness

22    today is Jeff Davidson.

23       We'd ask, at this time, would the attorneys

24    present please voice-identify themselves and the

25    parties they represent.

CONFIDENTIAL

Page 7

1         MS. ROBERTS:  Andrea Pallios

2   Roberts of Quinn Emanuel, representing defendant

3   Motorola.

4         MS. MANGIN:  Elanor Mangin of Quinn

5   Emanuel, representing Motorola.

6         MR. WION:  Chris Wion from Calfo

7   Harrigan, representing Microsoft and the witness.

8         THE VIDEOGRAPHER:  Thank you.

9      At this time, we'd ask the court reporter, Karmen

10   Knudson of Veritext, to please swear in the witness

11   and proceed with the deposition.

12   JAMES JEFF DAVIDSON,   having been first duly sworn

13                         by the Notary, deposed and

14                         testified as follows:

15

16

17               EXAMINATION

18   BY MS. ROBERTS:

19   Q   Good morning, Mr. Davidson.

20   A   Good morning.

21   Q   As you heard, my name is Andrea Roberts and I'm going

22       to be taking your deposition taken today.

23         Have you ever been deposed before?

24   A   Never.

25   Q   Okay.  Well, I'm going to go over some of the ground

CONFIDENTIAL

Page 9

```
 1          If you don't ask for clarification, I'm going to
 2      assume that you understood the question.
 3  A   Okay.
 4  Q   Your counsel may object from time to time.  Unless he
 5      instructs you not to answer, you should answer my
 6      question if you understand it.
 7          Do you understand that?
 8  A   I do.
 9  Q   If you need a break at any time, just let me know.
10      We'll take periodic breaks throughout the day, but if
11      you need one, I'll be happy to take one.
12          Is there any reason why you can't give complete
13      and truthful testimony here today?
14  A   No.
15  Q   Let's start with a little bit of your background.
16          What is your position -- or where do you work?
17  A   I work at Microsoft; a general manager there --
18  Q   Okay.
19  A   -- responsible for supply chain operations globally.
20          THE REPORTER:  I couldn't hear --
21  A   General manager in supply chain, responsible for
22      supply chain operations globally.
23          That includes distribution and logistics, which
24      happens to be the topic here.
25  Q   (By Ms. Roberts)  Okay.  And are you based here in --
```

CONFIDENTIAL

1      The person whose name I don't know how to

2      pronounce -- "Aay-fa"?  Is that what you said?

3  A   "Ee-fa."

4  Q   "Ee-fa"?  Where is -- is that male or female?

5  A   Male -- sorry, female.

6  Q   Where is she --

7  A   She is based in Dublin.

8  Q   Dublin?  Okay.

9      And what about Bert lane?

10  A   Bert Lane.

11  Q   I'm sorry.  Where is Bert Lane based?

12  A   He lives in Germany.  Works in the Netherlands

13      distribution center in Venray.

14  Q   Where is Jana Shull?

15  A   Redmond.

16  Q   Theresa Daly, is she in --

17  A   Dublin.

18  Q   -- Ireland?

19      And Shelley McKinley, where is she based?

20  A   Redmond.

21  Q   Redmond?

22      And you said Ms. McKinley is in legal?

23  A   Legal, yes.

24  Q   Is she an attorney, or do you know what her role is

25      in legal?

CONFIDENTIAL

Page 28

1   A   I am not completely clear.  I'm pretty sure she is an

2       attorney.

3   Q   Okay.  And what was -- what was her role?

4   A   Actually, I believe she's a senior attorney.

5           She held a call with me --

6                       MR. WION:  I want to caution the

7       witness, if you can answer the question without

8       disclosing privileged information, that's fine, but

9       if there were privileged communications with

10      Ms. McKinley, then that's not something that you

11      should be disclosing here today.

12                      THE WITNESS:  Okay.

13  A   She basically alerted me to the case and triggered

14      more discussion between Owen, myself, and Fergus.

15      That was, for the most part, the extent.

16          And then drew me in to connections with other

17      people at Microsoft to understand what was going on.

18  Q   (By Ms. Roberts)  And who were the other people at

19      Microsoft?

20  A   I can't even recall the names.  I had never -- there

21      was several of them, and I had never worked with them

22      before.  They were just different parts of the

23      business around Windows and -- some of them in IEB,

24      Entertainment and -- Interactive Entertainment

25      Business -- that I just never worked with.  And to be

CONFIDENTIAL

Page 34

1      the move elsewhere.  Is that correct?

2  A   I don't believe I did.

3  Q   Okay.  And do you know where others on the team

4      stored documents relating to the move?

5  A   I -- I don't.

6  Q   Is there -- I don't know how Microsoft's setup is for

7      storage of documents, but are there, like, shared

8      drives or folders where people store documents?

9  A   I do know we set up a SharePoint for -- once we put a

10     project manager in place, decided we're going to go

11     make this move, to drive the implementation, we put

12     a -- a SharePoint there.  So there would be documents

13     relating to the execution of the project.

14 Q   And you said you did that once you put a project

15     manager in place?

16 A   Yes.

17 Q   When was that?

18 A   It would have been shortly after we decided -- and

19     I'm -- I'm not completely positive, but I think I'm

20     being accurate here; is -- I think we decided March

21     8th of 2012, and then somewhere within a week, that

22     week, we assigned a project manager.  And somewhere

23     within a few weeks after that, there was -- a couple

24     weeks, there was probably a SharePoint up.

25 Q   Okay.  And when you say "we decided March 8th of

CONFIDENTIAL

Page 35

1     2012," what was decided on that date?

2  A  That we would award business to CEVA and relocate

3     from Germany to the Netherlands.

4  Q  Okay.  Do you know the -- well, let me start over.

5        You stated you personally didn't search your

6     emails to -- for collection for documents produced in

7     this case.  Is that right?

8  A  I'm sorry?

9  Q  Did you -- you didn't personally search your emails

10    for documents to collect in this case?

11 A  No.

12 Q  Counsel or somebody else did?

13 A  No.

14 Q  Okay.  So you don't know the -- the date range of --

15    of emails that were searched, do you?

16 A  No.

17 Q  And do you know what specific categories of documents

18    Microsoft looked for to collect to produce in this

19    case relating to the relocation?

20 A  No.

21 Q  Do you know whether documents exist -- well, let's --

22    let's talk a little bit more about players.

23       So as background, we're talking about relocation

24    of the EMEA -- do you say "ah-mee-ah"?

25 A  "Ah-mee-ah."

CONFIDENTIAL

Page 56

1                    EXAMINATION (Continuing)

2      BY MS. ROBERTS:

3   Q   Mr. Davidson, I'd like to kind of get a sense of

4       the timeline of the move from the Düren, Germany

5       facilities to -- to Venray.

6           So, first of all, when did Microsoft decide to

7       relocate the EMEA facilities?

8   A   It was that first week of March where -- when we

9       decided to do it.  But -- somewhere in there.  It was

10      early March.  Somewhere -- I mentioned March 8th

11      earlier.  I know that was an award date.

12          I think -- it was right within that same time

13      period.  It was just a -- a flurry of decisions and

14      activity.

15  Q   And when you say "March," you mean March 2012; right?

16  A   Yes, March of 2012.  Sorry.

17  Q   When did Microsoft start considering whether it

18      should move the EMEA facilities?

19  A   Mid-January of 2012.

20  Q   And who -- who ultimately made the decision to move

21      the facilities?

22  A   It would have been me; Owen Roberts, my boss; and his

23      boss, Brian Tobey.

24  Q   Brian Tobey?

25  A   Yes.

CONFIDENTIAL

Page 57

1    Q    And he was Owen Roberts' boss?

2    A    It was Owen's boss, yes.   So Owen and I conferred.

3         Brian heard it.   "Whatever you guys think is best."

4    Q    And so prior to mid-January 2012, was -- was

5         Microsoft considering relocating the EMEA facilities?

6    A    I'm sorry; would you repeat that?

7    Q    Right.

8              Well, I think you stated that it was in mid-

9         January 2012 that Microsoft started considering

10        moving the EMEA facilities.   Is that right?

11   A    That's correct.

12   Q    Okay.   I've seen some documents dated January 1st,

13        2012.

14             Does that -- and I can show them to you, but --

15   A    Yeah.

16   Q    -- does that affect your recollection of what the

17        timeline was?

18   A    No.   I mean, it was January 2012.

19   Q    Okay.

20   A    We were alerted to the legal situation right -- right

21        in there, early to mid-January.   And that's when it

22        started.

23             We had not considered relocating prior to being

24        alerted.

25   Q    Okay.   And who -- who alerted -- alerted you to the

CONFIDENTIAL

1    legal situation?   Was that Shelley McKinley --

2  A  Shelley.

3  Q  -- or somebody else?

4  A  Yeah, Shelley.

5  Q  And what did you understand the legal situation to

6    be?

7  A  I understood, at that stage, basically what was

8    public.

9       It was a patent infringement case.   There was a

10   risk of an injunction, where we would not be able to

11   distribute our product to or from Germany.

12       That's basically what I understood the case to

13   be.   The rest of it was legal.   And -- and, frankly,

14   we've got plenty of legal experts.   And my job was

15   basically to hear risk; we should start considering

16   mitigations.   And that was my understanding.

17  Q  Okay.  So tell me about your discussions with --

18     well, I guess, in making the decision, was that

19     primarily discussions between you and Owen Roberts?

20  A  In making decisions?

21  Q  Right.

22  A  My -- yes, myself and Owen, primarily.

23       Shelley would be -- she'd be aware of -- of what

24     those were; sometimes consulted.

25       And then Fergus was a key input, because he was

CONFIDENTIAL

Page 60

1    continuity of supply.

2        And it isn't just -- I remember the discussion

3    wasn't -- it isn't just about, you know, if you

4    couldn't ship for X period of time, and if just that

5    X period of time was impacted, as those retailers

6    need to go fill those shelves with someone's product,

7    and it won't be ours if we're not supplying it.

8        So that risk and potential disruption far

9    outweighed the cost of -- of moving.

10   Q   Could other distribution facilities have sort of

11       filled in to prevent that period of disruption in the

12       event that an injunction had actually issued?

13   A   Not to the -- we did evaluate that, but nowhere near

14       the volume or scale we would require.  And the cost

15       to actually do it would pretty quickly stack up to

16       the cost equivalent to the move.

17       We did consider that, though.

18   Q   Did you have any discussions with anyone other than

19       Owen Roberts about whether to relocate the

20       facilities?

21                       MR. WION:   And in answering that,

22       you can answer "yes" or "no," but again, I need to

23       caution you not to disclose any privileged

24       communications you may have had on the subject.

25   A   Could you repeat the question?

CONFIDENTIAL

1   Q   (By Ms. Roberts)  Sure.
2           Is there -- did you have discussions with anyone
3       other than Owen Roberts about whether to relocate the
4       facilities?
5   A   There were privileged conversations with legal.  No
6       one else that I could recall.
7   Q   And when you say "legal," are you referring to
8       Ms. McKinley, or anyone else?
9   A   Ms. -- yes, Ms. McKinley.
10  Q   Okay.  Anybody else from the legal department?
11  A   Not that I can recall.
12  Q   Did -- did you and Mr. Roberts make presentations to
13      anyone about whether or not the facility should be
14      relocated?
15  A   We talked -- we did speak with Brian, actually.
16          I don't think any presentations -- I mean, we did
17      present information to Brian, but I wouldn't call it
18      a presentation.  We met with Brian, shared the
19      information that we were looking at.
20  Q   So I guess when I say "presentation," was there any
21      documentation that was provided to Brian --
22  A   Yes.
23  Q   -- regarding whether to move?
24  A   Yes.  We -- discussions was move and move with who.
25  Q   And do you know -- can you recall approximately when

CONFIDENTIAL

Page 63

```
 1        investigating?  No.

 2   Q    Who -- is there somebody at Microsoft that had to

 3        sort of ultimately give the rubber stamp of approval

 4        to move the facilities out of Düren?

 5   A    I'm sure -- I'm sure Owen would have spoken with

 6        Brian.

 7   Q    Okay.

 8   A    Yeah, I mean, we wouldn't -- we wouldn't have gone

 9        and just done it without Brian being onboard.

10            So I'm sure Owen had a discussion with Brian.  I

11        wouldn't have been part of it.

12   Q    Okay.  And so does the -- would the buck stop with

13        Brian, or would somebody above Brian have needed to

14        approve the move?

15   A    I don't know.

16   Q    Okay.  And there were conversations between Owen and

17        Brian about the decision to move, that you weren't a

18        part of?

19   A    Correct.

20   Q    Okay.  And you don't know what was said in those

21        discussions?

22   A    Between the two of them?

23   Q    Right.

24   A    No; other than we continued evaluating, evaluating,

25        evaluating, and then we decided.
```

CONFIDENTIAL

Page 64

1  Q  And in preparing for today, you didn't speak with

2     Mr. Roberts or Mr. Tobey to determine what they

3     discussed that you weren't privy to; is that right?

4  A  I did not.

5  Q  Okay.  Were there multiple discussions with -- excuse

6     me.

7        Were there multiple discussions with Ms. McKinley

8     regarding whether to relocate the EMEA facilities?

9  A  Yes.

10 Q  Approximately how many?

11 A  I -- I couldn't put a number on it.

12 Q  Was it sort of -- were there ongoing discussions with

13    Ms. McKinley on a regular basis about the decision on

14    whether to relocate?

15 A  There were -- yes, there were -- there were

16    ongoing -- I don't know -- by "ongoing," you mean

17    were there multiple, or --

18 Q  Well, let me -- did you speak with her on a weekly

19    basis during this process?

20 A  Probably every -- yeah, about once a week at least.

21 Q  Did you speak with her on a daily basis during this

22    process?

23 A  No, not on a daily basis.

24 Q  So closer to once a week?

25 A  Yeah, once a week, every couple weeks.

CONFIDENTIAL

```
 1        this is the first large scale, I guess, can you
 2        explain to me how you're differentiating there?
 3   A    Yeah.  I'll give you an example.
 4            Düren was, I think -- I think it was a forty --
 5        450,000-square-foot facility and we --
 6                        THE REPORTER:  Can you repeat that?
 7   A    Düren was a 450,000-square-foot facility and we
 8        occupied a portion of it, because other tenants
 9        occupied the rest.
10            You know, we moved from one site in Australia, as
11        an example, to another site in Australia, but the
12        size of the facility would have been something like
13        maybe 40,000 square feet, 20,000 square feet.  Small
14        moves, can do them in a day or two, you're done.  You
15        know, and so nothing that I would consider even
16        remotely close to -- to this scale.
17            We started other distribution centers, but not
18        had to move to other ones of this size and scale.
19   Q    In your tenure at Microsoft, have you ever previously
20        considered whether to move a distribution facility
21        because of a potential injunction in a legal case?
22   A    No.
23   Q    So focusing on Germany, do you know whether Microsoft
24        has ever faced a potential injunction to -- that
25        would have precluded the sale within or from Germany
```

CONFIDENTIAL

Page 77

1      of any of its products?

2   A   Not --

3                    MR. WION:  Objection.  Vague.

4   Q   (By Ms. Roberts)  Sorry.  Was your answer "no"?

5   A   Not to my knowledge.

6   Q   Okay.  Nobody has ever come to you in your role -- or

7      let me start over.

8           Nobody has ever previously come to you in your

9      roles, being involved in operations and logistics,

10     and asked you to analyze whether or not to move a

11     distribution facility because there was a potential

12     for an injunction in a legal matter?

13                   MR. WION:  And you're asking --

14  Q   (By Ms. Roberts)  Is that right?

15                   MR. WION:  -- in his individual

16     capacity?

17                   MS. ROBERTS:  Well, I think it

18     would fall within the 30(b)(6) topics.

19  Q   (By Ms. Roberts)  But if you don't know from

20     Microsoft's perspective, then we can ask in your

21     personal capacity.

22  A   I am not aware.

23  Q   You're personally not aware.

24  A   Correct.

25  Q   Is that right?

CONFIDENTIAL

Page 78

1          And is that something that you --

2     A    No.

3     Q    -- looked into at all --

4     A    Or I personally don't recall.

5     Q    Is that something that you looked into at all in

6          preparing for your deposition today?

7     A    Is it -- repeat the question.

8     Q    In preparation for your deposition today, did you

9          look into whether Microsoft has previously considered

10         whether to relocate a distribution facility because

11         of a potential for an injunction in a legal matter?

12    A    No, that was not part of my preparation.

13    Q    And in your role in operations and logistics, if

14         Microsoft had previously considered relocating a

15         distribution facility for any reason, would that be

16         something that you would be in the loop on?

17    A    I would expect so, at the right point in time, yes.

18    Q    When you say "at the right point in time," what does

19         that mean?

20    A    Meaning if -- if consulting on whether to -- to

21         relocate or move, start up, close, I would be

22         consulted at a point in time where that was something

23         that needed to be considered, I would think.  But I

24         can't control --

25    Q    You would hope?

CONFIDENTIAL

Page 89

1    Q    Okay.  If I can turn your attention to the page that

2         ends in numbers 2862.

3              The bottom right-hand corner of that chart,

4         there's a go-live date of April 2nd, 2012.

5    A    Yes.

6    Q    Was that consistent with the timeline that you were

7         discussing earlier in terms of trying to be up and

8         running --

9    A    That would be consistent with that timeline.

10   Q    Okay.  And did that date change?

11   A    The date -- did -- on paper, or did the actual date

12        change?

13   Q    Did the actual timeline of having a go-live date

14        change from April 2nd, 2012, to some later date?

15   A    Yes.  It changed to June 1st.

16   Q    Okay.  What was the reason for that change?

17   A    We -- we -- there was no -- we wouldn't be ready to

18        operate at the scale we needed to operate any sooner.

19   Q    And it did ultimately go live on June 1st; right?

20   A    Yes.

21   Q    Okay.  Were there considerations of the impact of

22        potential injunction in connection with changing the

23        go live date to June 1st, 2012?

24   A    I think we -- there were considerations, but there

25        weren't any other real options, because we were

CONFIDENTIAL

Page 172

1   A   We wouldn't really org- -- Microsoft would not
2       organize it.  Arvato would -- would make that work.
3   Q   Okay.  Now, are you aware that Motorola filed its
4       patent infringement lawsuit against Microsoft in
5       Germany in July of 2011?
6   A   I'm not aware of the dates.
7   Q   Okay.  So is it fair to say, then, you don't know why
8       Microsoft didn't start considering moving the German
9       facilities to the Netherlands earlier than January of
10      2012?
11  A   I'm -- I'm not aware of anything that occurred before
12      my involvement.  Yeah.
13  Q   You've testified today about sort of -- kind of a --
14      what a rushed process it was to meet the deadlines.
15          Would the process have cost less to move the
16      facilities if it were stretched over a larger period
17      of time; you know, a few more months, perhaps?
18  A   It probably would have, yes.
19  Q   Would have saved cost?
20          Are you familiar with what -- what we've called
21      the anti-suit injunction in the Washington
22      litigation?
23  A   No, I'm not.
24  Q   Okay.  Are you aware that Microsoft filed a motion
25      in -- here in Washington, asking the Court to

CONFIDENTIAL

Page 173

1       preclude Motorola from enforcing an injunction in

2       Germany?

3                       MR. WION:  I just want to clarify

4       that these questions are asked of Mr. Davidson in his

5       individual capacity, by definition.

6                       MS. ROBERTS:  Well --

7                       MR. WION:  If you have a different

8       understanding, let me know.

9                       MS. ROBERTS:  Well, let me be more

10      clear.

11  Q   (By Ms. Roberts)  Microsoft filed an anti-suit motion

12      in Washington; is that correct?

13  A   I don't know.

14  Q   And it didn't file that motion until March 28th,

15      2012; is that correct?

16  A   I don't know.

17  Q   Okay.  Do you know why Microsoft did not ask the

18      Court, the Washington court, earlier to preclude

19      Motorola from enforcing an injunction in Germany?

20  A   I don't -- I don't know.  I'm not aware.

21  Q   Is it --

22  A   Or don't remember.  But -- yeah.

23  Q   And was the timeline of filing any motions in

24      Washington discussed with you in connection with

25      deciding whether and when to move the Düren

CONFIDENTIAL

Page 174

1    facilities?

2  A  I -- I do remember discussions about filings.

3     I don't remember sequence, I don't recall the

4     dates.  And those were privileged conversations.

5  Q  Did the dates of those filings impact Microsoft's

6     decision on whether and when to move the Düren

7     facilities?

8  A  As I mentioned earlier, the -- the train left the

9     station once we decided, in terms of terminations,

10    financial commitments, making the changes, getting

11    systems changes in place.

12 Q  So are you aware that the Washington court -- or

13    Microsoft is aware that the Washington court did

14    issue an injunction precluding Motorola from

15    enforcing an injunction in Germany; right?

16              MR. WION:  I'm going to object.

17    This line of questioning does not seem to be within

18    the scope of the topic on which Mr. Davidson is here

19    to testify.

20     But if you are interested in asking him of his

21    personal knowledge, you may do so, to the extent he

22    knows.

23              MS. ROBERTS:  Well, I disagree,

24    because I think it goes to mitigation of damages.

25     So if he doesn't know the answer his, that's

CONFIDENTIAL

Page 175

1    fine, and we can fight about that later.

2                          MR. WION:   The objection still

3    stands.   We can figure it out later.

4  Q  (By Ms. Roberts)   So my question was:   Are you aware

5    that the Washington court issued an injunction

6    precluding Motorola from enforcing an injunction in

7    Germany?

8                          MR. WION:   And can we just have a

9    standing objection to that on the same basis that I

10   just articulated?

11                         MS. ROBERTS:   No.   You can keep

12   objecting.

13                         MR. WION:   Oh.

14        Same objection.

15        You can answer if you know.

16  A  I would need you to explain the question in long

17   legal terms.

18  Q  (By Ms. Roberts)   Okay.   Did Microsoft consider

19   changing its plans -- well...

20        What did Microsoft do to avoid having to move

21   from Germany?

22  A  I cannot comment on the legal proceedings.

23        We evaluated options.   We evaluated could we set

24   up a bonded warehouse within Germany, which would be

25   not considered -- product not being considered as

CONFIDENTIAL

1  Q   Okay.  What, if anything, did Microsoft do to avoid

2      litigation with Motorola in Germany altogether?

3                      MR. WION:  Objection.  Outside the

4      scope of the deposition topic for which Mr. Davidson

5      has been designated.

6          You can ask in his individual capacity.

7          And you can answer if you know.

8  A   I don't know.

9  Q   (By Ms. Roberts)  Do you have any information as

10     to -- regarding Microsoft's negotiations with

11     Motorola over a license to patents in Germany?

12                     MR. WION:  Same objection.

13 A   I don't know.

14 Q   (By Ms. Roberts)  And have you heard the term "Orange

15     Book Procedure"?

16 A   No.

17 Q   So you don't have any familiarity with whether or not

18     Microsoft followed a particular -- the Orange Book

19     Procedure in its litigation in Germany?

20                     MR. WION:  Same objection.

21 A   I'm not aware.

22 Q   (By Ms. Roberts)  Mr. Davidson, are you aware that

23     Microsoft is alleging that the costs incurred in

24     connection with relocating the EMEA facility to

25     Venray was $11.6 million?

CONFIDENTIAL

Page 216

1   Q   Right.  That was long before the move?

2   A   Correct.

3   Q   Okay.  Do you have any knowledge of any of the

4       negotiations between Microsoft and Motorola over

5       patent licensing?

6                   MR. WION:  Objection.  Outside the

7       scope of Topic 8.

8           To the extent that you're asking it in

9       Mr. Davidson's individual capacity, he can answer if

10      he knows.

11  A   I don't.

12  Q   (By Ms. Roberts)  Do you know what contract Motorola

13      breached that allegedly required Microsoft to

14      relocate its EMEA distribution facilities to the

15      Netherlands?

16                  MR. WION:  Same objection.

17  A   I'm not.  Not sure.

18  Q   (By Ms. Roberts)  I want to circle back to sort of

19      the initial timeline on making the decision to move.

20          Who is it exactly that told you about the

21      potential for an injunction?

22  A   It was Shelley McKinley.

23  Q   Okay.  And then do you know if Ms. McKinley told

24      Mr. Roberts as well, or if you told him?

25  A   She told him as well.

1   Q   Okay.  Do you have any knowledge of the analysis --

2   A   Excuse me.

3   Q   Sorry.

4   A   Let me clarify.

5   Q   Yeah.

6   A   I know she spoke with Owen.  I don't know if that's

7       how Owen found out.

8   Q   Okay.

9   A   I can't -- I can't speak for them.

10  Q   He might have found out --

11  A   Right.

12  Q   -- through other means?

13  A   Right.

14  Q   Do you know what analysis Microsoft performed

15      regarding the potential need to relocate the EMEA

16      distribution facilities before you were informed of

17      that potential need?

18  A   I don't recall.

19  Q   Do you know whether any such analysis was conducted

20      outside of the legal department prior to you being

21      informed of the potential need to relocate the EMEA

22      distribution facilities?

23  A   I -- I don't know.

24  Q   I kind of want to get a sense of what you were

25      actually informed.

CONFIDENTIAL

Page 218

1        So were you told there's a threat of an
2    injunction that would limit the ability to distribute
3    products to and from Germany, figure out a solution
4    to that problem; or were you told, more specifically,
5    you need to consider relocating the EMEA distribution
6    facilities as the result for a potential for
7    injunction?
8                    MR. WION:  And just as a reminder,
9    counsel is not asking for you to disclose any
10   privileged information that you might have learned on
11   those subjects.
12   A   All those discussions were under privilege.
13   Q   (By Ms. Roberts)  Had Microsoft ever considered
14   moving from the Düren, Germany facilities prior to
15   January of 2012?
16   A   No, not consid- -- not considered in earnest.  We
17   didn't have a reason.
18   Q   So you mentioned that Arvato was starting to request
19   increased costs for -- did you or anyone on your team
20   contemplate looking for another vendor as a result of
21   that?
22                   MR. WION:  Objection.  Vague.
23   Unclear as to time.
24   Q   (By Ms. Roberts)  Can you answer the question?
25   A   Can you clarify?

CONFIDENTIAL

1       I just want to be clear.  Are you unable to

2    testify about what occurred in the litigation based

3    on privilege?

4       I just want to make sure I understand the scope

5    of what the objection was.

6                    MR. WION:  There's also an

7    objection that it's beyond the scope of the topic for

8    which he's been designated.

9       To the extent that you can answer the question in

10   your individual capacity, feel free.

11  A   Repeat it.

12  Q   (By Ms. Roberts)  Okay.  Well, then I'll ask more

13   specifically.

14       Do you understand that Microsoft filed a motion

15   to preclude Motorola from enforcing an injunction in

16   Germany?

17                    MR. WION:   Same objection.

18       You can answer if you know.

19  A   I recall knowing.

20  Q   (By Ms. Roberts)  You recall knowing?

21  A   I don't know the content.  I don't recall the dates.

22  Q   Do you recall knowing that Microsoft filed that

23   motion before the move occurred?

24  A   I don't recall.

25  Q   Okay.  Do you recall knowing that Microsoft did not

CONFIDENTIAL

Page 229

1     file that motion before January 2012?
2  A  I did not know that.
3  Q  Did you have any discussions with counsel -- and
4     we'll start by -- I'll ask a yes-or-no question.
5        Did you have any discussions with counsel about
6     whether there were ways to avoid the injunction while
7     you were working on the move?
8                    MR. WION:  I'm going to object
9     and -- first, on the basis that it's beyond the topic
10    for which Mr. Davidson has been designated, and also
11    caution Mr. Davidson not to disclose any privileged
12    communications in connection with any response to
13    that question.
14       Subject to those objections, you can answer if
15    you can.
16 A  That's a lot to navigate there.
17       Honestly, my -- my recollection of the legal
18    discussions, they're very limited.
19 Q  (By Ms. Roberts)  Okay.  I guess I'm just -- I'm
20    trying to get a sense of whether --
21 A  This is --
22 Q  -- you can't recall, or whether you recall but there
23    is information that you can't tell me because it's
24    privileged.
25 A  We hit a -- we hit a point where it actually couldn't

CONFIDENTIAL

Page 234

```
1      STATE OF WASHINGTON )    I, Karmen M. Knudson, CCR, RPR, CRR,
                           ) ss a certified court reporter in
2      County of Pierce    )    the State of Washington, do hereby
                                certify:

3

4

               That the foregoing deposition of JAMES JEFF
5      DAVIDSON was taken before me and completed on May 9, 2013,
       and thereafter was transcribed under my direction; that the
6      deposition is a full, true and complete transcript of the
       testimony of said witness, including all questions, answers,
7      objections, motions and exceptions;
8              That the witness, before examination, was by me
       duly sworn to testify the truth, the whole truth, and
9      nothing but the truth, and that the witness reserved the
       right of signature;

10

               That I am not a relative, employee, attorney or
11     counsel of any party to this action or relative or employee
       of any such attorney or counsel and that I am not
12     financially interested in the said action or the outcome
       thereof;

13

               That I am herewith securely sealing the said
14     deposition and promptly delivering the same to
       Attorney Andrea Pallios Roberts.

15

               IN WITNESS WHEREOF, I have hereunto set my
16     signature on May 13, 2013.

17

18

19

20

21

22            _____

               , CCR, RPR, CRR
23             Certified Court Reporter No. 1935.

24

25
```

# EXHIBIT 2

**From:** Theresa Daly
**To:** EMEA RSM Leadership Team; EMEA Distribution Sales Managers; EMEA RSM Country Leads, Burak Cokmen, Marc Jakbert, Neil Thompson, Oliver Kistner, Sergusz Witos, Simon Arratie, Tomasz Bochenik
**CC:** MSDS SC EMEA; WSDS Leadership Team Dublin
**Sent:** 6/1/2012 2:11:40 AM
**Subject:** European Distribution Centre

Hi Everyone,

As a follow up to my email below I wanted to share with you an update on the change to our main distribution centre in Europe. Per my previous note we will transition our main European distribution centre from Germany to the Netherlands. The last day of operations from our facility in Germany was yesterday 31st May. From today, Friday the 01st June, all our operations will be supported from our new distribution centre located in the Netherlands.

The decision to move our main distribution centre in Europe was made with a vision for the future. To support the growth in our business over the years ahead we need to significantly scale our distribution footprint and capabilities in EMEA. A transition of this scale is not easy and has taken significant effort and resources to plan and execute. As with any project of this magnitude, our EMEA Distribution & Logistics team have worked to ensure a successful transition plus a seamless arrival to our customers. However, I would ask you to be extra vigilant to any customer feedback from June 1st and feedback through our EMEA Channel Operations team in order to swiftly rectify any issues.

If there is any specific feedback or questions relating to the transition I would appreciate that you contact our transition team.
Below are some interesting facts, figures and photo's to help you understand the scale of the change and how it will position us for future success.

| Facts and Figures | Current German Facility | New Netherlands Facility |
|---|---|---|
| Dedicated facility footprint | 22k square metres | 42k square metres |
| Pallet storage space | 21k pallet locations | 40k pallet locations |
| Production lines | 10 dedicated lines | 20 dedicated lines |
| Loading bays / doors | 14 bays | 38 bays |

**New Facility Photos**



CONFIDENTIAL BUSINESS INFORMATION,
SUBJECT TO PROTECTIVE ORDER

MS-MOTO_1823_00004083255

45

MS-MOTO_1823_00004083256



CONFIDENTIAL BUSINESS INFORMATION,
SUBJECT TO PROTECTIVE ORDER

Regards , Theresa
GM WW Channel Operations

From: Theresa Daly
Sent: 16 May 2012 16:55
To: EMEA RSM Leadership Team: EMEA Distribution Sales Managers; EMEA RSM Country Leads
Cc: Abigail Corey; Jason Hutchinson; Joanne Lawrance; Jonathan Ewan Lowe; Jose Carlos Macias Itaki; Martina Ebles; Myriam Bedreddine (TT Alliance); Nico Schwarz; Richard Harper; Ronan Dervin; Anthony Hardin; Paul Longstaff; Brit Nutter; Deleine Rusic; Teresa Stapleton; Fiona Canney
Subject: European Distribution Centre

Dear Microsoft Subsidiary ,

Please be advised of the following changes to Microsoft Distribution Centre operations in Europe.

From Friday 1st June 2012 the Microsoft European Distribution Centre will operate from a new location in Europe (The Netherlands). The Distribution Centre will be run by our outsourced partner CEVA Logistics.

Until the transition date of June 1st our existing distribution operations will continue to run as normal from our German facility operated by Arvato Bertelsmann. From June 1st we will no longer operate out of our Distribution Centre in Duren, Germany.

Changes for customers:
• Shipping paperwork will only be available in English language initially

• VAT reg. numbers will change from DE to NL – customers may need to update their systems internally.

We will be communicating this change to impacted customers next Monday 21st May.

Please note that there is no impact to our existing center network as part of this change and there are no changes to our Distribution Centre in Birmingham UK and operations will continue from there as normal.

There is no change to the Commercial programs operating from Hertzbrook in Germany.

If you have any questions or would like further details regarding this transition please email . Richard Harper  richerh @ Microsoft.com

Yours Sincerely ,

Theresa Daly
GM WW Channel Operations

CONFIDENTIAL BUSINESS INFORMATION,
SUBJECT TO PROTECTIVE ORDER

MS-MOTO_1823_00004083257

# EXHIBIT 3

Page 1

1

2           IN THE UNITED STATES DISTRICT COURT

3             WESTERN DISTRICT OF WASHINGTON

4                      AT SEATTLE

5                        oOo

6

   MICROSOFT CORPORATION,

7

                   Plaintiff,

8                                CASE NO. C10-1823-JLR

      vs.

9

   MOTOROLA, INC., et al.,

10

                   Defendant.

11  _____

   MOTOROLA MOBILITY LLC,

12  et al.,

13          Plaintiff,

14  vs.

15  MICROSOFT CORPORATION,

16          Defendant.          /

17

18              VIDEOTAPED DEPOSITION OF

19                  OWEN ROBERTS

20             Wednesday, May 22, 2013

21                  Reno, Nevada

22

23

   Job No. CS1671951

24

                REPORTED BY:  MICHELLE BLAZER

25              CCR #469 (NV) - CSR #3361 (CA)

Page 2

```
1                         oOo
2                     APPEARANCES
3                   FOR MICROSOFT:
           CALFO HARRIGAN LEYH & EAKES
4                  Attorneys at Law
           999 Third Avenue, Suite 4400
5            Seattle, Washington 98104
           By:  Christopher T. Wion, Esq.
6
                        -and-
7
              David E. Killough, Esq.
8            Assistant General Counsel
              MICROSOFT CORPORATION
9               One Microsoft Way
                Redmond, WA 98052
10
11
12                  FOR MOTOROLA:
         QUINN EMANUEL URQUHART & SULLIVAN
13                 Attorneys at Law
              555 Twin Dolphin Drive
14         Redwood Shores, California 94065
           By:  Andrea Pallios Roberts, Esq.
15
16
17                  ALSO PRESENT:
18           David Corrao, Videographer
19                      oOo
20
21
22
23
24
25
```

Page 3

```
 1                          I N D E X
 2    EXAMINATION                                         PAGE
 3     BY MS. ROBERTS:                                      7
 4
 5                          EXHIBITS
 6    NUMBER                 DESCRIPTION                   PAGE
 7     1            Germany High Level                       45
                    Plan/Scope/Status dated 21/02/12
 8
       2            PERF110-Arvato Heat Map Report           52
 9                  Period FY13 - Mar
10     3            Arvato CLCA Executive Summary            56
                    Report Period: FY12 - Mar
11
       4            Letter dated April 17, 2012              83
12
       5            FMV Scorecard - May 11th 2012 KPI        85
13                  Dashboard Summary
14     6            Email chain dated 20 January 2012        90
15     7            Email string dated 08 February 2012      92
16     8            Email string dated March 8, 2012         95
17     9            Network Optimisation: Network           101
                    Design Greenfield Analysis
18                  16/05/2013
19    10            Email chain dated 3/8/2012              104
20    11            Email dated 3/22/2012                   105
21    12            Email dated 6/12/2012 with attached     106
                    DTV Move Metrics
22
      13            SC Transition Proposal February         107
23                  23rd, Dublin
24    14            Email string dated June 1, 2012         111
25    15            Email string dated 1/19/2012 and        118
                    1/20/2012
```

Page 4

1

EXHIBITS, (continued)

2

NUMBER                    DESCRIPTION                    PG

3

4

5      16              Email string dated 1/27/2012 and        122
                       2/1/2012

6

       17              Email string dated 11 April 2012        124

7

       18              Email string dated 5/7/2012             128

8

9    PREVIOUS EXHIBITS REFERENCED                              PAGE

10   DAVIDSON EXHIBIT 4                                          60

11   DAVIDSON EXHIBIT 9                                          77

12   DAVIDSON EXHIBIT 16                                        117

13

14

                              o0o

15

16

17

18

19

20

21

22

23

24

25

Page 5

1                    ATTORNEY'S NOTES/CORRECTIONS

2       PAGE      LINE

3       _____     _____    _____

4       _____     _____    _____

5       _____     _____    _____

6       _____     _____    _____

7       _____     _____    _____

8       _____     _____    _____

9       _____     _____    _____

10      _____     _____    _____

11      _____     _____    _____

12      _____     _____    _____

13      _____     _____    _____

14      _____     _____    _____

15      _____     _____    _____

16      _____     _____    _____

17      _____     _____    _____

18      _____     _____    _____

19      _____     _____    _____

20      _____     _____    _____

21      _____     _____    _____

22      _____     _____    _____

23      _____     _____    _____

24      _____     _____    _____

25      _____     _____    _____

Page 6

1          Reno, Nevada, Wednesday, May 22, 2013

2                  1:00 o'clock, p.m.

3                       oOo

4          PURSUANT TO NOTICE, and on Wednesday, the 22nd

5     day of May 2013, at the hour of 1:00 p.m. of said day, at

6     the offices of Microsoft, Reno, Nevada, before Michelle

7     Blazer, a Certified Court Reporter, personally appeared

8     OWEN ROBERTS.

9                       o0o

10          THE VIDEOGRAPHER:  We are on record.  The date

11     is Wednesday May 22nd, 2013, and the monitor time is

12     approximately 1:03 p.m.

13          This is the video deposition of Owen Roberts in

14     the matter of Microsoft, plaintiff, versus Motorola, the

15     defendant.  The case number is C-10-1823-JLR as filed in

16     the United States District Court for the Western District

17     of Washington at Seattle.

18          This deposition is being held at Microsoft

19     Conference Room C-1, 6840 Sierra Center Parkway, Reno

20     Nevada.

21          The court reporter is Michelle Blazer of Bonanza

22     Reporting.  I am a Certified Court Videographer, my name

23     is David Correo of A. Correo Video.  My address is 5375

24     Kietzke Lane, Reno, Nevada.

25          Please note that the audio and video will

Page 7

1  continue to record unless all parties have agreed to go

2  off line -- correction, go off the record.

3          The microphones are sensitive and will pick up

4  whispers and private conversations.

5          Counsel will now introduce themselves, the name

6  of their firm and who they represent, counsel for the

7  plaintiff first, please.

8          MR. WION:  Chris Wion, Calfo Harrigan for

9  Microsoft and the witness.

10          MR. KILLOUGH:  David Killough for Microsoft.

11          MS. ROBERTS:  Andrea Pallios Roberts of Quinn

12  Emanuel for defendant, Motorola.

13          THE VIDEOGRAPHER:  Will the court reporter

14  please swear in the witness.

15                          OWEN ROBERTS,

16              called as a witness in said case,

17                    having been duly sworn,

18              was examined and testified as follows:

19                          EXAMINATION

20  BY MS. ROBERTS:

21      Q    Good afternoon, Mr. Roberts.

22      A    Hi.

23      Q    As you just heard, my name is Andrea Roberts and

24  I will be taking your deposition today.

25          Will you please state your full name for the

```
1        Q    Okay.  So the Xbox would be distributed from
2    this facility?
3        A    Correct.
4        Q    But the facility would not be limited to the
5    Xbox; correct?
6        A    No.  No, ma'am.
7        Q    Okay.  So do you know what analysis Microsoft
8    had performed prior to Ms. McKinley informing you
9    about -- about the potential need for a move?
10            Let me --
11       A    I don't understand the question.
12       Q    That was a bad question.
13            Prior to you being informed that there was a
14   potential need to relocate the facility out of Germany,
15   do you know what analysis Microsoft had performed to
16   determine that there was that potential need?
17       A    No, I don't.
18       Q    Do you know if Ms. McKinley was working with
19   anybody else at Microsoft to determine whether there was
20   a potential need to relocate?
21       A    I don't think I understand the question.
22       Q    I guess I'm -- I'm trying to get -- get at who,
23   if anyone, Ms. McKinley was working with on this
24   particular issue, if you know.
25       A    Which issue?
```

```
 1        in deciding between Arvato's selection and CEVA's

 2        selection; is that right?

 3            A    Correct.

 4            Q    Okay.  So taking a step back to the decision to

 5        actually relocate the German facility, were you involved

 6        in that decision?

 7            A    I want to clarify the question.

 8            Q    Sure.

 9            A    I thought I had already covered the fact that I

10        said back in January we were informed that we were -- we

11        were being -- we had a court litigation pending against

12        us which -- which would probably require us to move our

13        facility in order to keep doing business in Europe.

14                 If you are asking that question, no, I wasn't

15        part of that decision, that was a legal --

16            Q    Okay.

17            A    -- decision.

18            Q    Okay.

19            A    Once the -- once we had been -- we were told

20        then to go and look for alternatives whilst the

21        litigation continued.

22            Q    Okay.  So in terms of evaluating if there were

23        any options to Microsoft other than relocating the German

24        facility that would comply with what was going on in the

25        litigation, did -- did you evaluate any other options?
```

1    they believed our last drop dead date would be the 1st of

2    June and therefore I made a decision to tell the teams to

3    shoot for the first of June.

4              As a backup plan, if April the 17th had happened

5    we had a separate backup plan which basically meant we

6    were going to shut down the facility in Germany and make

7    best effort out of Venray at that date.

8        Q    And when you say you went back to the legal team

9    to let them know that the April 17th date was not

10   achievable, who did you go back to?

11       A    To Shelley McKinley.

12       Q    Going back to the actual decisions that

13   Microsoft had to make, the decision between choosing

14   Arvato or CEVA, who had sort of the final say in making

15   that decision; was that you or Mr. Tobey or somebody

16   else?

17       A    That decision ultimately rested with me.

18       Q    Okay.  And then the decision to relocate the

19   facility out of Germany, do you know who ultimately had

20   signoff authority on that decision?

21       A    That was -- I would rephrase the point to say it

22   wasn't a decision to move it, we were told, based on the

23   litigation, we had to move the facility.

24       Q    Okay.  So I guess just to clarify, I understand

25   your team, your team did not make the decision --

Page 41

1      A     Correct.

2      Q     -- to relocate out of Germany?

3      A     No.  We were not planning to move warehouses in

4  Europe.

5      Q     Okay.  That was a decision that your team was

6  informed by legal counsel?

7      A     Correct.

8      Q     Okay, and do you know who on the legal team --

9  or do you know who made the decision to move, which was

10  then conveyed to you by legal counsel?

11      A     Shelley McKinley was my contact.

12      Q     Okay.  But do you know whether she is the one

13  that made the decision to move?

14      A     I don't know that.

15      Q     Okay.  All right.  So then going back to the

16  go-live date, it was initially April 17th of 2012, it was

17  moved to June 1st, 2012; correct?

18      A     Correct.

19      Q     In sort of -- in the time period between January

20  and June 1st of 2012, were you in communication with the

21  legal team to determine what was going on in the

22  litigation and whether the need to move diminished or

23  went away?

24      A     No, I wasn't.

25      Q     Okay.  Do you know if anybody on your team was?

1          Do you see that?

2      A    I see that.

3      Q    Focusing first on the significant increase in

4  their current pricing that Arvato was demanding, is that

5  in reference to the bid that they submitted for the new

6  facility or were they demanding an increase in their

7  pricing at the Duren facility prior to the move?

8      A    No, ma'am.  This is all to do with the new

9  facility.

10      Q    Okay.  And then what does it mean when you

11  reference a scale that they, Arvato, cannot match in

12  Europe?

13      A    This was a reference to help -- This was an

14  informed e-mail, so, to Mary Ellen Smith, to help her

15  understand that she probably didn't know of CEVA

16  Logistics and I was trying to position the fact that CEVA

17  Logistics were a big player and, in fact, a significantly

18  bigger player in the logistics field than Arvato was.

19          Just to give her some comfort in -- that we

20  weren't selecting a small supplier with no, no

21  background.

22      Q    Okay, and what is Ms. Smith's role?

23      A    Ms. Smith's role is the V.P. of Worldwide

24  Operations which handles all, I want to call it

25  commercially related business.  MSCIS, the division I

1    products to avoid a finding of infringement in Germany?

2         A    I don't know if they did or not.  And if they

3    were -- if they did, I wasn't privy to that discussion.

4    It wasn't relevant for my job.

5         Q    Do you know what, if anything, Microsoft did to

6    avoid litigation in Germany in general?

7         A    No.

8         Q    Okay.  So do you have any information about the

9    licensing offers that Microsoft made to Motorola?

10        A    No, I don't.

11        Q    Do you have any information about the German law

12   procedures that were or were not followed by Microsoft or

13   Motorola?

14        A    No, I don't.

15        Q    I believe you testified earlier that you are not

16   aware of the date on which Motorola filed its lawsuit in

17   Germany against Microsoft; correct?

18        A    That is correct.

19        Q    Okay, and so is it fair to say you don't know

20   why Microsoft didn't start -- or let me start over.

21             Is it fair to say you don't know why you weren't

22   informed of the litigation prior to January of 2012?

23        A    No idea.

24        Q    Do you know whether Brian Tobey knew of the

25   litigation prior to your meeting with Ms. McKinley in

Page 133

1    January 2012?

2        A    I have no idea.

3        Q    Do you recall at that meeting -- you said it was

4    an in-person meeting; correct?

5        A    Yeah.

6        Q    Do you recall if at that meeting if he seemed

7    like he was learning something new?

8        A    I can't recall.  I think we were both slightly

9    dumbfounded, so he may have been hearing it for the first

10   time as well.

11       Q    Okay.

12       A    But that was my recollection.  It's not

13   something you are told every day.

14       Q    Right.  And you're not -- you weren't aware of

15   the filings that Microsoft filed in the Seattle case

16   with -- that relate to the injunction -- potential for an

17   injunction in Germany; correct?

18       A    No.  Not part of that team.

19       Q    So you have no information as to why those

20   motions were filed on a particular date and not any

21   earlier; correct?

22       A    None at all.

23       Q    In terms of when Microsoft started the process

24   for relocating the distribution facility, from your point

25   of view what, what date would that be?  Would that be

1    January of 2012 or early March when the decision was made

2    to go with CEVA?

3        A    Can you clarify the question?  I thought I had

4    already testified that the first I heard about this was

5    in mid to late January.

6        Q    Right.  I'm trying to get an idea from your

7    perspective when you are thinking about when the move

8    process started, do you go back to the January date or

9    once you selected a vendor and were, you know, moving

10   forward with that vendor?

11       A    No.  As far as my recollection is concerned, and

12   we had not made a decision to move the facility in that

13   January date.  We had the potential risk of a move and

14   that's why we were being prudent and starting the work of

15   due diligence.  And it was at some later stage, some date

16   between that date and March the 8th when we finally

17   awarded the business that we had decided that we were

18   going that way.  And I think that was closer to the March

19   time frame than the January time frame.

20       Q    Okay.  And I just want to make sure I am

21   understanding your testimony correctly.

22            I believe you testified earlier today that you

23   and your team decided between going with Arvato versus

24   CEVA, whereas the legal team was -- was the group that --

25   that made the decision whether or not to move; is that

1   correct?

2        A    No, that is not correct.

3        Q    Okay.

4        A    No.  The legal team is there to give us advice.

5   We own the business and we make the business decision

6   based on the risks that are presented to us.  And so the

7   legal team had presented a case that said we had a very

8   strong risk of our business being materially impacted if

9   we lost the litigation in Germany, and then it was a

10  decision by the business to say how to we mitigate for

11  that risk and at what stage do we mitigate for that risk.

12  It's not a legal decision.

13       Q    So when I asked you who made the decision to

14  relocate the distribution facility out of Germany, who

15  was that?

16       A    That was my decision with Brian Tobey as my

17  support as far as for that.  But when I presented it to

18  Brian, where we were, the business risks associated with

19  it, Brian agreed with my proposal.

20       Q    Okay.  Can you then explain to me, I guess, what

21  information was provided to you by legal to advise you of

22  the risk?

23       A    As I stated earlier, Shelley had told us that

24  there was this litigation pending and it didn't appear

25  that -- and as a result of that we would be -- materially

Page 150

```
 1    STATE OF NEVADA      )

 2                         )    ss.

 3    COUNTY OF WASHOE     )

 4

 5            I, MICHELLE BLAZER, a Certified Court Reporter

 6    in and for the State of Nevada, do hereby certify:

 7            That I was personally present for the purpose of

 8    acting as Certified Court Reporter in the matter entitled

 9    herein;  that the witness was by me duly sworn; that

10    before the proceedings completion, the reading and

11    signing of the deposition has not been requested by the

12    deponent or party;

13            That the foregoing transcript is a true and

14    correct transcript of the stenographic notes of testimony

15    taken by me in the above-captioned matter to the best of

16    my knowledge, skill and ability.

17            I further certify that I am not an attorney or

18    counsel for any of the parties, nor a relative or

19    employee of any attorney or counsel connected with the

20    action, nor financially interested in the action.

21

22    _____

23    MICHELLE BLAZER, CCR #469 (NV) CSR #3361 (CA)

24              BONANZA REPORTING - RENO

25
```

# EXHIBIT 4

The Honorable James L. Robart

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

MICROSOFT CORPORATION, a
Washington corporation,

        Plaintiff,

    vs.

MOTOROLA, INC., MOTOROLA
MOBILITY LLC, and GENERAL
INSTRUMENT CORPORATION,

       Defendants.

CASE NO. C10-1823-JLR

**MOTOROLA'S SECOND NOTICE OF DEPOSITION TO MICROSOFT CORPORATION PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 30(B)(6)**

PLEASE TAKE NOTICE that, pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure, Defendant Motorola Mobility LLC ("Motorola") will depose Plaintiff Microsoft Corporation ("Microsoft") on Monday, April 15, 2013, beginning at 9:00 AM and continuing from day-to-day thereafter, excluding Saturdays, Sundays, and holidays, until completed.  The deposition shall take place at Summit Law Group, 315 Fifth Avenue South, Suite 1000, Seattle, Washington 98104-2682, or according to alternate arrangements upon which counsel jointly agree. The deposition shall be recorded by videotape, audiotape, and stenographic recording.

Microsoft shall designate one or more of its officers, directors, managing agents, or other persons who consent to testify on Microsoft's behalf as to all matters known or reasonably available to Microsoft with respect to the Topics of Examination set forth below.  For each person designated, Microsoft shall advise counsel for Motorola of the identity of that person and the topic(s) on which that person shall testify at least seven days in advance of the deposition. Microsoft shall also produce all relevant documents in that person's possession at least seven days in advance of the deposition.

## DEFINITIONS

For the purposes of this Notice of Deposition, the following words and phrases have the following meaning:

1.      "MOTOROLA" refers to Defendant Motorola Mobility, LLC.

2.      "PLAINTIFF" or "MICROSOFT" refers collectively and individually to Microsoft Corporation, and all its predecessors or successors (merged, acquired, or otherwise), parents, divisions, subsidiaries, and affiliates thereof, and all officers, agents, employees, counsel and other persons acting on its behalf, or any other person or entity subject to Microsoft's control, or which controls Microsoft.

3.      The term "STANDARDS DEVELOPING ORGANIZATION" and "SDO" shall mean any standards setting organization, standards developing organization, or standards setting body, or other standards organization, including but not limited to the Institute of Electrical and Electronics Engineers ("IEEE"), the IEEE Standards Association ("IEEE-SA"), the International

Telecommunication Union ("ITU"), and the ITU's Telecommunication Standardization Sector ("ITU-T").

## TOPICS OF EXAMINATION

**TOPIC NO. 1:**

Facts relating to any and all damage MICROSOFT claims to have suffered as a result of any breach by MOTOROLA of its obligations or commitments to any SDO, including but not limited to the factual bases for MICROSOFT'S contention, if it so contends, that said alleged damage resulted from MOTOROLA'S alleged breach of its obligations or commitments to an SDO, any efforts by MICROSOFT to mitigate the damages claimed, the persons with knowledge of such facts, and documents relating to such facts.

**TOPIC NO. 2:**

The attorneys' fees and other litigation costs (including the dollar amount) MICROSOFT has incurred relating to this dispute and to the actions filed by Motorola Mobility, Inc. and General Instrument Corporation in the Federal District Court for the Western District of Wisconsin (Case Nos. 3:10-CV-699, 3:10-CV-700, and 3:10-CV-826); the Southern District of Florida (Case No. 1:10-cv-24063); and before the International Trade Commission (ITC Case No. 337-TA-752), including but not limited to, the factual basis for MICROSOFT'S contention, if it so contends, that said attorneys' fees and other litigation costs were incurred as a result of MOTOROLA'S alleged breach of its obligations or commitments to an SDO, other reasons why such attorneys' fees and other litigation costs were incurred, any efforts by MICROSOFT to mitigate the damages claimed, the persons with knowledge of such facts, and documents relating to such facts.

**TOPIC NO. 3**

Any costs or expenses (including the dollar amount) other than attorneys' fees and other litigation costs, including without limitation lost employee time and loss of productivity, that MICROSOFT has incurred relating to this dispute and to the actions filed by Motorola Mobility, Inc. and General Instrument Corporation in the Federal District Court for the Western District of Wisconsin (Case Nos. 3:10-CV-699, 3:10-CV-700, and 3:10-CV-826); the Southern District of

Florida (Case No. 1:10-cv-24063); and before the International Trade Commission (ITC Case No. 337-TA-752), including but not limited to, the factual basis for MICROSOFT'S contention, if it so contends, that said costs or expenses were incurred as a result of MOTOROLA'S alleged breach of its obligations or commitments to an SDO, other reasons why such costs or expenses were incurred, any efforts by MICROSOFT to mitigate the damages claimed, the persons with knowledge of such facts, and the documents relating to such facts.

**TOPIC NO. 4**

The attorneys' fees and other litigation costs (including the dollar amount) MICROSOFT has incurred relating to the actions filed by Motorola on July 6 and 7, 2011, in Germany, asserting that Microsoft infringes Motorola patents essential to the H.264 standard, including but not limited to, the factual basis for MICROSOFT'S contention, if it so contends, that said attorneys' fees and other litigation costs were incurred as a result of MOTOROLA'S alleged breach of its obligations or commitments to an SDO, other reasons why such fees or expenses were incurred, any efforts by MICROSOFT to mitigate the damages claimed, the persons with knowledge of such facts, and the documents relating to such facts.

**TOPIC NO. 5**

Any costs or expenses (including the dollar amount) other than attorneys' fees and litigation costs, including without limitation lost employee time and loss of productivity, that MICROSOFT has incurred relating to the actions filed by Motorola on July 6 and 7, 2011, in Germany, asserting that Microsoft infringes Motorola patents essential to the H.264 standard, including but not limited to, the factual basis for MICROSOFT'S contention that said costs and expenses were incurred as a result of MOTOROLA'S alleged breach of its obligations or commitments to an SDO, other reasons why such costs or expenses were incurred, any efforts by MICROSOFT to mitigate the damages claimed, the persons with knowledge of such facts, and the documents relating to such facts.

**TOPIC NO. 6**

The attorneys' fees and other litigation costs and expenses (including the dollar amount) MICROSOFT has incurred in connection with defending itself in any action in which

MOTOROLA sought to enjoin or exclude MICROSOFT from practicing, or importing products that practice, the 802.11 and H.264 standards, including without limitation those actions filed in the International Trade Commission, in the U.S. district courts, and in Germany, including but not limited to, the factual basis for MICROSOFT'S contention that said attorneys' fees and other litigation costs were incurred as a result of MOTOROLA'S alleged breach of its obligations or commitments to an SDO, other reasons why such fees and costs were incurred, any efforts by MICROSOFT to mitigate the damages claimed, the persons with knowledge of such facts, and the documents relating to such facts.

**TOPIC NO. 7**

Any actual or imminent loss of profits (including the dollar amount), loss of customers and potential customers, and loss of goodwill and product image suffered by MICROSOFT as a result of any claimed breach of contract by MOTOROLA, including but not limited to the identities of customers lost or potentially lost, the factual basis for MICROSOFT'S contention, if it so contends, that said losses were a result of MOTOROLA'S alleged breach of its obligations or commitments to an SDO, other possible causes of said losses, any efforts by MICROSOFT to mitigate the damages claimed, the persons with knowledge of such facts, and the documents relating to such facts.

**TOPIC NO. 8**

The costs (including the dollar amount) incurred by MICROSOFT in preparation for a potential injunction requiring MICROSOFT to withdraw its H.264-compliant products from the German market and the actions taken in preparation for the potential injunction, including without limitation costs relating to MICROSOFT's relocation of its EMEA distribution center to the Netherlands and increased costs associated with operating the EMEA distribution center out of the Netherlands instead of Germany, the history of the decision to relocate the EMEA distribution center, all other factors considered by MICROSOFT in connection with relocating the EMEA distribution center, the basis for MICROSOFT'S contention, if it so contends that said relocation and costs associated therewith was a result of MOTOROLA'S alleged breach of its obligations or commitments to an SDO, all other lawsuits against MICROSOFT pending in Germany prior to the

1  relocation of its EMEA distribution center in which MICROSOFT faced the risk of injunction,

2  destruction of devices, or other remedies, relating to its distribution center in Germany or the

3  distribution of its products in Germany, other options MICROSOFT considered taking to prepare

4  for the potential injunction in Germany and the costs of such options, any efforts by MICROSOFT

5  to mitigate the damages claimed, all communications with any third parties regarding relocating

6  the EMEA distribution center to the Netherlands, the persons with knowledge of such facts, and

7  the documents relating to such facts.

8  **TOPIC NO. 9**

9      The costs (including the dollar amount) incurred by MICROSOFT in preparation for a

10  potential injunction requiring MICROSOFT to withdraw its Xbox products from the U.S. market

11  and the actions taken in preparation for the potential injunction, all other factors considered with

12  respect to those actions, the factual basis for MICROSOFT'S contention, if it so contends, that

13  said costs were incurred as a result of MOTOROLA'S alleged breach of its obligations or

14  commitments to an SDO, all other lawsuits against MICROSOFT pending in the United States in

15  which MICROSOFT faced the risk of injunction, destruction of devices, or other remedies,

16  relating to its manufacturing or distribution of its products in the United States, other options

17  MICROSOFT considered taking to prepare for the potential injunction in the United States and the

18  costs of such options, any efforts by MICROSOFT to mitigate the damages claimed, the persons

19  with knowledge of such facts, and the documents relating to such facts.

20  **TOPIC NO. 10**

21      Facts relating to any irreparable harm or other harm not adequately compensable at law

22  that MICROSOFT claims it has suffered or will suffer as a result of any breach by MOTOROLA

23  of its obligations or commitments to any SDO, persons with knowledge of such facts, and the

24  documents relating to such facts.

25

26

27

28

1    DATED this 5th day of April, 2013.

2

3

4                                         SUMMIT LAW GROUP PLLC

5                                         By /s/ Ralph H. Palumbo
                                              Ralph H. Palumbo, WSBA #04751
6                                             Philip S. McCune, WSBA #21081
                                              Lynn M. Engel, WSBA #21934
7                                             ralphp@summitlaw.com
                                              philm@summitlaw.com
8                                             lynne@summitlaw.com

9
                                          By /s/ Thomas V. Miller
10                                            Thomas V. Miller
                                              MOTOROLA MOBILITY LLC
11                                            600 North U.S. Highway 45
                                              Libertyville, IL 60048-1286
12                                            (847) 523-2162

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

2

QUINN EMANUEL URQUHART &
SULLIVAN, LLP

3

By /s/ Kathleen M. Sullivan

4

Kathleen M. Sullivan, NY #1804624
51 Madison Ave., 22nd Floor
New York, NY 10010
(212) 849-7000
kathleensullivan@quinnemanuel.com

5

6

7

By /s/ Brian C. Cannon

8

Brian C. Cannon, CA #193071
555 Twin Dolphin Drive, 5th Floor
Redwood Shores, CA 94065
(650) 801-5000
briancannon@quinnemanuel.com

9

10

11

By /s/ William C. Price

12

William C. Price, CA #108542
865 S. Figueroa Street, 10th Floor
Los Angeles, CA 90017
(213) 443-3000
williamprice@quinnemanuel.com

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## PROOF OF SERVICE

I am employed in the County of San Mateo, State of California.  I am over the age of eighteen years and not a party to the within action; my business address is 555 Twin Dolphin Drive, 5th Floor, Redwood Shores, California  94065-2139.

On April 5, 2013, I served true copies of the following document(s) described as **MOTOROLA'S SECOND NOTICE OF DEPOSITION TO MICROSOFT CORPORATION PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 30(B)(6)** on the interested parties in this action as follows:

microsoft-motorola@calfoharrigan.com

Project-MS_Moto_WDWA_343_1823@sidley.com

rcederoth@sidley.com

**BY ELECTRONIC MAIL TRANSMISSION:**  By electronic mail transmission from meghanbordonaro@quinnemanuel.com on April 5, 2013, by transmitting a PDF format copy of such document(s) to each such person at the e mail address listed below their address(es).  The document(s) was/were transmitted by electronic transmission and such transmission was reported as complete and without error.

I declare that I am employed in the office of a member of the bar of this Court at whose direction the service was made.

Executed on April 5, 2013, at Redwood Shores, California.


s/Meghan E. Bordonaro_____
Meghan E. Bordonaro

# EXHIBIT 5

**Elanor Mangin**

| | |
|---|---|
| **From:** | Andrea P Roberts |
| **Sent:** | Wednesday, May 01, 2013 3:04 PM |
| **To:** | Microsoft v Moto Breach of RAND Case |
| **Subject:** | FW: 30(b)(6) Deposition Notices |

**From:** Chris Wion [mailto:chrisw@calfoharrigan.com]
**Sent:** Wednesday, May 01, 2013 2:04 PM
**To:** Ralph Palumbo; Art Harrigan
**Cc:** Andrea P Roberts; Brian Cannon; Phil McCune; Marcia Ripley; Cheryl McCrum; MSFT-Motorola; Project-MS_Moto_WDWA_343_1823@Sidley.com
**Subject:** RE: 30(b)(6) Deposition Notices

Ralph,

As we discussed during out meet and confer on Monday, subject to Microsoft's stated objections, Microsoft has designated David Killough, Jeff Davidson, and John DeVaan to address topics 2, 4, 6, 8 and 10 of Motorola's Second 30(b)(6) Deposition Notice.  Microsoft also is designating David Treadwell to address aspects of Topic 10 that relate to the Xbox; Mr. DeVaan will address that topic only as it relates to Windows.

As we stated on Monday, Mr. Killough is available on May 6 and Mr. DeVaan is available on May 7 (from 12 – 4).   In addition, we can confirm that Mr. Davidson is available on May 9 and Mr. Treadwell is available on May 17 (from 12 – 5).  Please let us know if Motorola plans to go forward with these depositions on this schedule.

To reiterate Microsoft's position on how depositions will be counted, if this multi-part 30(b)(6) deposition is concluded in 7 hours or less, Motorola will have used only 1 of its 4  damage depositions.  Anything over 7 hours would be treated as a second deposition.  In addition, if Motorola spends an excessive amount of time questioning any 30(b)(6) designee in his personal capacity, Microsoft reserves the right to treat each such instance as a separate deposition.

-Chris

**From:** Ralph Palumbo [mailto:ralphp@SummitLaw.com]
**Sent:** Tuesday, April 30, 2013 4:31 PM
**To:** Chris Wion; 'Art Harrigan'
**Cc:** 'Andrea P Roberts'; 'Brian Cannon'; Phil McCune; Marcia Ripley; Cheryl McCrum
**Subject:** RE: 30(b)(6) Deposition Notices

Art and Chris,

        Disregard my email below.  I misunderstood and have now clarified our position with the rest of our team.  We plan to treat each 30(b)(6) deposition notice as a separate deposition for purposes of Judge Robart's limits on the number of depositions that are permitted.  A second notice is forthcoming.  It's our position that the 30(b)(6) deposition should not be limited to 7 hours, especially in light of the multiple witnesses that apparently will be provided for each notice.

1

Ralph

---

**From:** Ralph Palumbo
**Sent:** Tuesday, April 30, 2013 3:57 PM
**To:** 'Chris Wion'; 'Art Harrigan'
**Cc:** Andrea P Roberts; Brian Cannon; Phil McCune; Marcia Ripley; Cheryl McCrum
**Subject:** 30(b)(6) Deposition Notices

Chris and Art,

        This is to confirm our agreement that the 30(b)(6) deposition on multiple topics will be treated as a single deposition of up to 7 hours for purposes of Judge Robart's four deposition limit on damages, even though the topics will be covered by multiple Microsoft witnesses and we are serving multiple 30(b)(6) notices on distinct topics.  If we exceed 7 hours, the additional hours will be counted as a 2nd deposition, if we exceed 14 hours the additional hours will be counted as a third deposition, etc.

Ralph

-------------------------- Summit Law Group --------------------------
The information contained in this e-mail message may be privileged, confidential and protected from disclosure. If you are not the intended recipient, any dissemination, distribution or copying is strictly prohibited. If you think that you have received this e-mail message in error, please e-mail the sender at the above e-mail address.

Circular 230 Notice: To comply with IRS regulations, please note that any discussion of Federal tax issues in this email (and in any attachments) is not intended or written to be used, and cannot be used, by any taxpayer for the purpose of (a) avoiding any penalties imposed under the Internal Revenue Code or (b) promoting, marketing or recommending to another party any transaction or matter addressed herein.

# EXHIBIT 6

CONFIDENTIAL

Page 1

1            UNITED STATES DISTRICT COURT
          FOR THE WESTERN DISTRICT OF WASHINGTON
2                      AT SEATTLE
3
   -----------------------------------------------
4   MICROSOFT CORPORATION, a
   Washington corporation
5
                      Plaintiff
6        Vs
7
   MOTOROLA, INC., MOTOROLA
8   MOBILITY LLC, and GENERAL
   INSTRUMENT CORPORATION
9
10                    Defendants
11
   Case No: C10-1823-JLR
12  -----------------------------------------------
13
                     CONFIDENTIAL
14
15         Videotaped Deposition of Theresa Daly
16
                    At: 9:12 a.m.
17
                 Thursday, 30th May 2013
18
19
                  At the offices of:
20
21                     Regus
                  Alexandra House
22               The Sweepstakes
              Ballsbridge, Dublin, Ireland
23
24
25     Job No. CS1674023

CONFIDENTIAL

Page 2

```
 1                      APPEARANCES
 2
 3   For the Plaintiffs Microsoft:
 4
 5           Ms. Erin Kelly, Esq.
 6           SIDLEY AUSTIN
             One South Dearborn
 7           Chicago, IL 60603
             Tel: (312) 853-7272
 8           ekelly@sidley.com
 9
10
11   For the Defendants Motorola, et al.:
12
13           Mr. Willaim C. Price, Esq.
             Ms. Elanor A. Mangin, Esq.
14
             QUINN EMANUEL URQUHART & SULLIVAN
15           555 Twin Dolphin Drive
             5th Floor
16           Redwood Shores, California 94065
             Tel: (650) 801-5000
17           williamprice@quinnemanuel.com
     elanormangin@quinnemanuel.com
18
19
20
21   Also Present:
22           Kay Hendrick - Court Reporter
23           David Ross-Elliott - Videographer
24
25
```

CONFIDENTIAL

Page 3

1                           I N D E X

2    WITNESS:

     THERESA DALY (Sworn)                              6

3

     Examination by Mr. Price                          6

4

     Cross-examination by Ms. Kelly               173

5

     Re-examination by Mr. Price                  175

6

7    Exhibit 1   ... ... ... ... ... ... ... ... ... ... 37

8

9    Exhibit 2   ... ... ... ... ... ... ... ... ... ... 87

10

11   Exhibit 3   ... ... ... ... ... ... ... ... ... ... 99

12

13   Exhibit 4   ... ... ... ... ... ... ... ... ... ...114

14

15   Exhibit 5   ... ... ... ... ... ... ... ... ... ...128

16

17   Exhibit 6   ... ... ... ... ... ... ... ... ... ...155

18

19   Exhibit 7   ... ... ... ... ... ... ... ... ... ...156

20

21

22

23

24

25

CONFIDENTIAL

Page 4

1              PREVIOUSLY MARKED EXHIBITS

2

3

4   Exhibit Davidson 4    ...    ...    ...         10

5

6   Exhibit Davidson 7    ...    ...    ...         28

7

8   Exhibit Roberts 2     ...    ...    ...         72

9

10  Exhibit Roberts 9     ...    ...    ...         75

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CONFIDENTIAL

1                    Thursday, 30th May 2013

2

3          THE VIDEOGRAPHER:  Good morning.  This

4    is the beginning of Tape One, Volume One in the

5    video deposition of Miss Theresa Daly.  This is

6    being held at the Regus Offices at Alexandra

7    House, The Sweepstakes in Ballsbridge, Dublin

8    Ireland.  This is being taken on 30th May 2013 at

9    12 minutes past 9 a.m.  This deposition is being

10   taken in the matter of Microsoft Corporation, a

11   Washington Corporation, the Plaintiff, versus

12   Motorola Inc., Motorola Mobility LLC and General

13   Instrument Corporation, the defendants.  The case

14   number is C10-1823-JLR.  This is being heard

15   before the United States District Court for the

16   Western District of Washington, Seattle.

17          The Court Reporter here today is Kay

18   Hendrick of Veritext National Deposition and

19   Litigation Services and I am the videographer.  My

20   name is David Ross Elliott also of Veritext

21   National Deposition and Litigation Services.

22          Would all of counsel introduce

23   themselves please for the record and whom they

24   represent?

25          MR PRICE:  Bill Price representing

CONFIDENTIAL

Page 6

```
 1   Motorola.
 2          MS MANGIN:  Elanor Mangin also of
 3   Motorola.
 4          MS KELLY:  Erin Kelly representing
 5   Microsoft.
 6
 7                  THERESA DALY
 8            having been duly affirmed,
 9              testified as follows:
10   Examination by Mr Price:
11          Q.  Can you tell us your name?
12          A.  Yes, Theresa Daly.
13          Q.  Mrs Daly, where do you work?
14          A.  I work with Microsoft Dublin.
15          Q.  How long have you worked with
16   Microsoft Dublin?
17          A.  I have worked almost six years.
18          Q.  And what is your current position?
19          A.  My current position I am the General
20   Manager of the supply chain for MSCIS Division.
21          Q.  Could you tell us first what MSCIS
22   stands for?
23          A.  It is the manufacturing -- I have to
24   remember myself.  It is the Manufacturing Supply
25   Chain and Information Services.
```

CONFIDENTIAL

1          Q.   So why did you glance at it?

2          A.   So that, I mean, as in terms of

3    signing I obviously, what is the correspondence,

4    what is the name of the company, so Arvato

5    I recognize Arvato.  I know it is one of our key

6    vendors so that is really it to confirm that.

7          Q.   So as the senior person in charge of

8    this difference when you reviewed this letter to

9    sign it the reason you reviewed it was to make

10   sure it was to Arvato?

11         A.   Yes.

12         Q.   Is there any other reason why you as

13   the senior person in the division before signing

14   off on this letter would review this letter other

15   than just to make sure that it was going to the

16   right person?

17         MS KELLY:  Object to the form.

18         MR PRICE:  Is there any other reason

19   that you glanced at this letter other than to make

20   sure it was going to Arvato?

21         A.   No.

22         Q.   So you didn't actually read any of

23   the substance of the letter?

24         A.   No.

25         Q.   You didn't know anything about any

CONFIDENTIAL

Page 19

1    of the contents of letter before you signed it?

2           A.   I would have had a heads up as to

3    what was happening but at the time I was not

4    involved in the discussions.   I was not involved

5    in any of the decision making.   It was not within

6    my responsibility.

7           Q.   Did you ever receive anything back

8    from Arvato to the effect of, Ms Daly, I don't

9    know why we are receiving this from you because

10   you don't know anything about this?

11          MS KELLY:   Object to the form.

12          A.   No.

13          MR PRICE:   You understood that the

14   person receiving this letter would think that the

15   letter was, in fact, from you.

16          MS KELLY:   Object to the form.   Calls

17   for speculation.

18          A.   I mean I don't understand the

19   question.

20          MR PRICE:   Did you have an understanding

21   that whoever received this letter would have the

22   impression that this letter was a letter which

23   came from you?

24          A.   It came as a signature, so my

25   signature as the only authorized person to sign

1           A.   Yes, it was in the corridor, just a

2    few minutes.

3           Q.   Earlier you said that the decision

4    to move out of Germany that Legal was involved,

5    correct?

6           A.   That's what Owen said at the time.

7           Q.   Again anything you know about why

8    the move took place is what you heard from

9    Mr Roberts?

10          A.   Yes.

11          Q.   So when Mr Roberts told you Legal

12   was involved in a decision to move the

13   distribution center out of Germany, did he tell

14   you if he had any role himself in making that

15   decision?

16          MS KELLY:   It's been asked and answered.

17          A.   No, he didn't tell me directly but

18   he was the global supply chain manager so he was

19   clearly involved in the process, but I do not know

20   as to what meetings he was in.  I do not know

21   specifically what decisions he would have made.

22   That I don't know.

23          MR PRICE:  So Mr Roberts told you -- I

24   am trying to get clear what he told you as to what

25   you assumed, do you understand?

CONFIDENTIAL

1          A.  I just read what's -- what I am

2     informed of here.

3          MR PRICE:  Okay.  That is all I am

4     saying, you did read this --

5          A.  I did read it, yes.

6          Q.  We are talking over each other.  You

7     did read Exhibit 4, Daly Exhibit 4?

8          A.  Yes.

9          Q.  Around April 2002 and you were

10    informed there had been a German court decision

11    that found Microsoft had infringed on Motorola's

12    patents, right?

13         A.  Right, this is what the document

14    says.  Yes.

15         Q.  Did you hear anything more about

16    that after receiving this e-mail?

17         A.  No.  I may have received another

18    e-mail from PR, but I just don't recall if I did

19    or didn't right now.

20         Q.  Do you recall in the April 2012

21    timeframe -- make it simple here.  At any time in

22    2012 did you have any understanding about

23    decisions in courts about injunctions in

24    connection with any litigation between Motorola

25    and Microsoft?

CONFIDENTIAL

Page 120

1   in a patent case between Motorola and Microsoft?

2          A.   Yes, Owen gave me a heads up at the

3   end of January which we talked about earlier.

4          Q.   But this particular e-mail seems to

5   refer to a decision that was just made, do you see

6   on the first page where this talks about "In

7   response to the Motorola versus Microsoft decision

8   in Mannheim which we received within the past

9   hour."?

10         A.   Then if they received it within the

11  past hour this is the first notice I would have

12  had of whatever the decision was made, and I

13  basically followed the guidelines which is

14  basically that if we needed to use a statement,

15  this is the statement.  If there was any other

16  mails or questions go directly to Tom Baumgartner

17  immediately.

18         Q.   On the second page here in the sub

19  headline it says:

20              "German court finds that Microsoft has

21  infringed on Motorola's patent in this case."

22              At the time that you received this

23  e-mail, at that time you read this and understood

24  there had been a decision in the case, right?

25              MS KELLY:  Object to the form.

1    mean, I don't follow the PR side of it.  I don't

2    manage it.  Basically we get guidance from PR and

3    we follow the guidance.  So they gave us clear

4    guidance here.

5            Q.  Would you have been concerned if

6    there had been something in the media that

7    reflected negatively on Microsoft's ability to

8    fulfill its commitments to its customers?

9            A.  It's a kind of speculative question,

10   but if there was a statement in the newspapers

11   saying we could not fulfill cord orders of course

12   I would have been concerned.

13           Q.  Do you know what they mean by the

14   "high media interest"?

15           A.  No, they said we expect high media

16   interest in this decision.  If there was high

17   media interest in the decision that I can't

18   confirm.

19           Q.  Why was it expected?

20           MS KELLY:  Object to the form.

21           A.  I didn't write this.  This is what

22   PR are writing, so I can't comment on what PR were

23   working on at the time.

24           MR PRICE:  At the time in April when you

25   received this did you even know about a decision

CONFIDENTIAL

Page 118

1            Q.   And then what's this information on
2     the embargo?
3            A.   On the embargo and digital, I don't
4     have the details behind that.
5            Q.   Do you see it says:
6            "We expect high media interest in this
7     decision.  Please provide the statement below
8     reactively and forward any additional questions
9     that PR needs outlined below."
10           Do you see that?
11           A.   Yes.
12           Q.   Now, is it correct that there was
13     high media interest in the decision of the
14     Mannheim court --
15           MS KELLY:  Object to form.
16           MR PRICE:  -- in May 2012?
17           MS KELLY:  Object to the form.
18           A.   I can't comment on that.
19           MR PRICE:  Were you aware of there being
20     news reports or anything else in the media about a
21     decision in the case between Motorola and
22     Microsoft that was in Mannheim in Germany?
23           A.   I don't believe it was in the Irish
24     newspapers, but it could have been in the German
25     newspapers.  It could have been in the French.  I

CONFIDENTIAL

Page 117

1    Motorola versus Microsoft case?

2              MS KELLY:  Object to the form.

3              A.  I can't comment if it was sent out

4    externally.  This was an internal communication.

5              MR PRICE:  Do you see Mr Cuddy had said:

6    "This is our statement and contact information for

7    inquiries."?

8              A.  Yes, so in this case if I had a

9    query or if I had received a query from a

10   customer, partner, colleague then I would contact

11   Thomas Baumgartner, and this is the guy so

12   I wouldn't respond to anything.  I would just

13   refer everything to this person.

14             Q.  On the second page there you see

15   under:

16             "Subsidiary PR guidance, including

17   information on embargo and digital PR."  Do you

18   see that?

19             A.  Yes.

20             Q.  First of all do you know what this

21   means "Subsidiary PR guidance including

22   information on embargo and digital PR."?

23             A.  I understand what the subsidiary

24   refers to, so the subsidiary is the sale of the

25   subsidiary.

CONFIDENTIAL

Page 116

1   Motorola Microsoft litigation other than the one

2   that is attached to Daly Exhibit 4?

3           A.   To be honest there may have been but

4   I just can't recall exactly now as to how many

5   mails came from this particular alias.

6           Q.   And do you see that Mr Cuddy says:

7           "Attached please find the PR advisory

8   with our statement and contact information for

9   inquiries in response to the Motorola versus

10  Microsoft decision in Mannheim which we received

11  within the past hour."?

12          A.   Yes.

13          Q.   What is the decision in Mannheim

14  that is referred to here?

15          A.   I am assuming it's what is written

16  here.

17          Q.   On the third and fourth pages?

18          A.   Yes.

19          Q.   If you look on the second page then

20  you see there is a section there that says:

21  "Worldwide PR field advisory", and it goes down,

22  do you see a title sub headline etc?  Looking at

23  this is it your understanding that a statement was

24  sent out externally from Microsoft regarding a

25  decision that had been made in Mannheim on the

CONFIDENTIAL

Page 115

```
 1   have sent it to Jeff.  I would have sent it to
 2   Jeff really so that he was completely aware of the
 3   situation in EMEA and that he also had the
 4   official PR advisory communication.
 5              Q.  Well, the e-mail below yours is from
 6   Dave Cuddy to GPH Communications update
 7   notification, do you see that?
 8              A.  Yes.
 9              Q.  First could you tell me who Dave
10   Cuddy is?
11              A.  I don't remember who he is.
12              Q.  Were you part of the e-mail group
13   GPH Comms update notification?
14              A.  Yes, I must have been.
15              Q.  What was that e-mail group?
16              A.  There was -- there was a group of
17   people that PR would have communicated to in terms
18   of updates they felt were necessary on the case.
19              Q.  By "the case" you are talking about
20   the litigation between Motorola and Microsoft?
21              A.  Yes.
22              Q.  What does GPH stand for?
23              A.  I can't remember.
24              Q.  Had you received -- strike that.
25   Did you receive other updates concerning the
```

CONFIDENTIAL

Page 114

1    record at 12.11 p.m.

2              MR PRICE:  Miss Daly, I am going to put

3    before you a document we are going to mark as Daly

4    Exhibit 4 and it appears to be an e-mail from you

5    to Jeff Davidson dated May 2nd, 2012.

6              (Exhibit 4 marked for identification)

7              Miss Daly, do you have Daly Exhibit 4

8    before you?

9              A.  Yes.

10             Q.  If you look it over so that I can

11   ask you some questions about it.  If you look at

12   the first page you see it appears to be an e-mail

13   from you to Mr Davidson dated May 2nd, 2012,

14   correct?

15             A.  Correct.

16             Q.  On your part of the e-mail here it

17   says "Comms on ruling", which I assume means

18   "comments on ruling"?

19             A.  "Communication".

20             Q.  Communication?

21             A.  Yes.

22             Q.  So can you tell me what led you to

23   send this e-mail to Mr Davidson?

24             A.  I can't remember exactly why I would

25   have sent it.  I am trying to think why I would

CONFIDENTIAL

Page 113

1            Q.   Why did the timeline change from

2       April 17th, to June?

3            A.   That I can't tell you.

4            Q.   Did Mr Davidson say anything to you

5       about anything happening in the litigation between

6       Motorola and Microsoft that caused the timeline to

7       change?

8            A.   No, not that I recall.   No.

9            Q.   Did Mr Davidson ever relate anything

10      to you that Legal had said about the timeline?

11           A.   No.   I mean the only discussions

12      that I had with Jeff were around my concerns in

13      terms of doing this transition when it was hitting

14      year end.   It is a critical time in the Company

15      and I certainly wouldn't have chosen to do a

16      transition at that time of year.   But that wasn't

17      my choice, that was my view.

18           MR PRICE:   We have been going for an

19      hour and five minutes I have been told.   So let's

20      take a break?

21           A.   Okay.

22           THE VIDEOGRAPHER:   Going off-the-record

23      at 11.47 am as indicated on the video screen.

24                     (Short Recess)

25           THE VIDEOGRAPHER:   We are back on the

CONFIDENTIAL

Page 112

1    was anything in connection with the litigation

2    that dictated that time period?

3              A.  No, he didn't.

4              Q.  When did you have these discussions

5    about your timing concerns?

6              A.  This would have been around the time

7    that I was made aware that there was going to be a

8    transition and that the transition was going to be

9    to a new vendor in Europe.

10             Q.  So that would have been some time in

11   March or April?

12             A.  It must have been some time in March

13   or April, yes.

14             Q.  We have looked at the correspondence

15   that went out with your signature to Arvato

16   talking about a termination date in April, and

17   then one talking about a termination date in June,

18   do you recall that?

19             A.  Yes.

20             Q.  So at some point the timelines

21   changed, correct?

22             A.  Correct.

23             Q.  When did the timeline change?

24             A.  That I don't recall.  I wasn't

25   involved in the decision to change timelines.

CONFIDENTIAL

Page 111

1          A.  He said we didn't really have a

2   choice in the timing, that this was mitigating a

3   risk and this was the plan they were going ahead

4   with.

5          Q.  Did he say why they didn't have a

6   choice, what was going on in the litigation --

7          A.  He didn't go through the details.

8   He just said we were mitigating a potential risk

9   to our business.

10          Q.  Did he say why the process had not

11   started until January 2012?

12          A.  No, he didn't.  No.

13          Q.  Did he say or identify anything in

14   the context of the litigation that had happened

15   which caused him to think there was some sort of

16   rush in doing the transition?

17          A.  I don't have the details behind it,

18   but I was under the impression that we had to

19   complete the transition within a specific time

20   period.

21          Q.  Did he say what time period that

22   was?

23          A.  Yes, it was really it had to be done

24   by the end of May, June.

25          Q.  Did he say anything about why there

CONFIDENTIAL

Page 110

1   said:  Look I'm concerned about that?

2          A.  Yeah, I mean, he told me clearly

3   they would have training programmes put in place.

4   They would do everything within their remit to

5   ensure the transition was smooth, that we would

6   have the service level.

7          Q.  By Jeff you are referring to --

8          A.  Jeff Davidson.

9          Q.  Did Mr Davidson say anything to you

10  as to why Microsoft decided not to continue to use

11  Arvato as a vendor at a different location?

12         A.  I didn't go through the reasons as

13  to why they went with CEVA.

14         Q.  Did you ever recommend staying with

15  Arvato to manage the distribution center?

16         A.  No, I didn't have a view on which

17  vendor.  I did have a view on the timing.

18         Q.  What was your view on the timing?

19         A.  My view on the timing is this was

20  hitting our year end, and year end for the sales

21  organization is absolutely critical in terms of

22  meeting their budget targets, and I knew this was

23  going to cause concern for my sales colleagues.

24         Q.  What did Mr Davidson say about that,

25  when you said about your concerns of the timing?

CONFIDENTIAL

Page 109

1           MS KELLY:  Object to the form.

2           MR PRICE:  Go ahead.

3           A.   Sorry, I just got distracted.  So I

4    got you up to the point that you were saying --

5    perhaps it is better for you to repeat the

6    question again.  I do apologize, this is the

7    second time.

8           MR PRICE:  So you knew that the

9    knowledge, the expertise and the competence of the

10   people at CEVA running the distribution center

11   could have an impact on whether or not you as your

12   manager would meet your targets, your expectations

13   for customer satisfaction, yes?

14          A.   Yes.

15          Q.   So at the time internally when

16   Microsoft was discussing changing the vendor from

17   Arvato to CEVA did you voice any concerns about

18   changing the management team basically, I mean

19   changing who was managing the distribution center?

20          A.   To Jeff I would have.  My primary

21   concern is that we were going to maintain the

22   service level, we were going to maintain the

23   credibility and the level of confidence we had

24   with the partners.

25          Q.   So what was his response when you

CONFIDENTIAL

Page 108

1    someone who was concerned about meeting targets,

2    did you have a view as to whether or not it would

3    have been better to have the distribution center

4    run by people who had the expertise and the

5    experience and the competence that you say Arvato

6    had?

7              MS KELLY:  Object to the form.

8              A.  Sorry, I lost you there.  Do you

9    mind repeating?

10             MR PRICE:  Sure.  At the time you were

11   told; hey, we were going to move this out of

12   Germany into somewhere else.

13             A.  Yes, correct.

14             MR PRICE:  And then you were told we are

15   switching from Arvato to CEVA?

16             A.  Yes.

17             MR PRICE:  And you certainly knew as the

18   manager of Channel Operations that the competence

19   and knowledge and expertise of the people running

20   the distribution facility might impact customer

21   satisfaction?

22             A.  Yes.

23             MR PRICE:  And might impact whether or

24   not Microsoft would meet its targets with respect

25   to that?

CONFIDENTIAL

Page 107

1   the transition is completed when the service level

2   is meeting targets.

3            Q.   So was that completed in May?

4            A.   Absolutely not.

5            Q.   When was that completed?

6            A.   That was completed I would say

7   probably January/February this year.

8            Q.   Did you ever ask anyone -- let me

9   step back.  Why did it take so long for the

10   service level to meet targets?

11            A.   A number of issues from my

12   perspective.  Number 1, we were -- we set up a new

13   warehouse with a completely new workforce so the

14   level of competence, level of knowledge, level of

15   expertise was not what we were accustomed to.

16   There was a complete changeover in systems which

17   caused a lot of difficulties.

18            Q.   Let me ask you first about the

19   competence and knowledge and expertise.  You are

20   referring to the people who ran the distribution

21   center?

22            A.   Yes.

23            Q.   And in particular CEVA?

24            A.   Yes.

25            Q.   Now prior to the transition, as

CONFIDENTIAL

Page 106

1          Q.  So you talked to him about a

2     timeline?

3          A.  Yes, the transition was planned to

4     be completed by the end of May, so that was a

5     pretty short timeline to try and leverage best

6     practice across all the regions.

7          Q.  Did you ever put anything in writing

8     in response to this e-mail that you were not as

9     optimistic as he was about the opportunities to

10    create these efficiencies by updating the

11    processes and aligning them globally?

12         A.  No, not in writing.  No.

13         Q.  Do you know if anyone else at

14    Microsoft said that they thought that Mr Longstaff

15    was mistaken that the transition from Germany to

16    the Netherlands would be an opportunity to create

17    these efficiencies by updating processes and

18    aligning globally?

19         A.  Not that I am aware of.

20         Q.  Was the transition completed in May?

21         A.  No, it wasn't -- oh, it depends on

22    what you mean by completed.

23         Q.  Well, it is your definition

24    completed?

25         A.  My definition of completed is that

CONFIDENTIAL

Page 105

1          Q.  So what would have been the
2     advantages of that, that is of having this
3     opportunity to synchronise and align the processes
4     globally as opposed to regionally, what would have
5     been the advantage of that?
6          A.  It makes it more productivity would
7     be higher so it is really looking do they have
8     best practice in North America that we are not
9     implementing in EMEA.  Is the best practice to
10    implement in Singapore.  So it is really around
11    best practice so you come up with a more efficient
12    management of the order book.
13         Q.  Now we see at the top of this e-mail
14    chain you did send an e-mail to Mr Longstaff about
15    his e-mail correct?
16         A.  Yes.
17         Q.  Did you ever send him anything in
18    writing where you said that you disagreed that the
19    transition provided a great opportunity to update
20    the processes and to align globally?
21         A.  No, I didn't.
22         Q.  Did you ever tell him that verbally?
23         A.  I didn't tell him I disagreed.  I
24    told him I was not as optimistic as he was that we
25    would achieve this within the timeline.

CONFIDENTIAL

Page 104

```
1              A.   He reported to me, yes.

2              Q.   Did you disagree with him as to

3    whether or not this transition was an opportunity

4    to update the processes?

5              A.   I wasn't as optimistic that we would

6    have -- that within the timelines we would have

7    the opportunity.

8              Q.   And what would be the advantage of

9    updating your processes to align globally, what

10   would have been the advantage of that?

11             A.   We always tried to make sure,

12   because the outsourced vendor Accenture manages

13   our business in Singapore, in North America --

14   Accenture is the outsource partner that manages

15   our order management globally, right.  So they

16   have centers in Buenos Aries.  They have a center

17   in Redmond, a center in Dublin and a center in

18   Singapore, and prior to this we were a regional

19   organisations.  We only moved to a global

20   organization in the beginning, or at least -- when

21   was it -- the end of November 2011.  Prior to that

22   we were regional organisations.  So we would have

23   managed the processes in each of the regions

24   slightly different and this was an opportunity to

25   synchronise and to align.
```

CONFIDENTIAL

Page 103

1   update our processes and to align globally."

2          What was your understanding as to what

3   this was referring to?

4          MS KELLY:  Object to form.

5          A.  Sorry, could you perhaps expand the

6   question for me, I am unclear on what you are

7   looking for?

8          MR PRICE:  I am asking what was your

9   understanding as to what the word "this" referred

10  to?

11         A.  I mean Paul wrote the e-mail and he

12  was referring to, I am assuming he is referring to

13  the transition.

14         Q.  The transition from Germany to the

15  Netherlands --

16         A.  From Germany to the Netherlands.

17         Q.  So what you are telling us is at the

18  time your view was that this would be an

19  opportunity to update processes to align globally?

20         A.  At the time it was Paul's view that

21  this would be an opportunity.

22         Q.  Did you disagree with him?

23         A.  I mean, he sent the e-mail out.  He

24  didn't consult me prior to sending the e-mail.

25         Q.  Mr Longstaff reported to you?

CONFIDENTIAL

Page 102

1    paragraph:

2           "Overall this is a great opportunity to

3    update many of our processes and to align globally

4    and we thank you for your support during the

5    transition."

6           Do you see that?

7           A.  Yes.

8           Q.  What's being referred to when the

9    e-mail says:

10          "This move is a great opportunity to

11   update many of our processes and to align

12   globally."?

13          MS KELLY:  Object to the form.

14          A.  At the time I was a responsible

15   Global Channel Operations which also means I was

16   responsible for Global Order Management, and at

17   the time we thought we would have an opportunity

18   to align some of the processes and how we manage

19   the order book with North America and with

20   Singapore and with Dublin, but as it transpired we

21   actually didn't have any time to do it.

22          Q.  So let's go back at the time then,

23   April 1st 2012.  First of all in the e-mail where

24   it says:

25          "Overall this is a great opportunity to

CONFIDENTIAL

Page 101

1          Q.   Now you are referring to the April

2    1st 2012 e-mail that Mr Longstaff sent?

3          A.   Yes.

4          Q.   And you are copied on that?

5          A.   Yes.

6          Q.   And on the CC who are the rest of

7    these folks copied?

8          A.   Brid Harte also reported directly

9    into me.  And Danielle reports into me, and Niamh

10   reports into Danielle.

11         Q.   And were these folks, did they have

12   the same sorts of responsibilities?

13         A.   Similar, I mean Danielle manages our

14   rebates programme.  Niamh at the time, she's no

15   longer with us, she would have been a process

16   subject matter expert.  Brid managed Western

17   Europe and CE.  So they were my team members.

18         Q.   And one of the topics of this e-mail

19   was the move of the distribution center from Duren

20   to Venray, correct?

21         A.   Yes.

22         Q.   And also concerned the change of

23   vendors from Arvato to CEVA?

24         A.   Yes.

25         Q.   And if you look at the last

CONFIDENTIAL

Page 100

1        Q.   Who was Mr Longstaff, what is his
2    job?
3            A.   Mr Longstaff at the time reported to
4    me and he was the Channel Operations Manager for
5    UK, France, Germany and the EMEA region.
6        Q.   So you say:  "Hi, in the future you
7    should DRM such communication ensuring the message
8    cannot be printed or sent to additional persons.
9    Regards Theresa."
10           What are you referring to?
11           A.   I am referring to, if you look
12   further down the e-mail on the "to" line you see
13   "center of Dublin own team".  So we outsource the
14   transactional management of the order book to
15   Accenture, it is probably a group of about 60
16   people sitting in Dublin, and any information of
17   this sensitivity we would DRM it, which means that
18   it cannot be printed, it cannot be forwarded, that
19   the owner of the information is Paul.  That's what
20   DRM means.  Paul Longstaff, so he would have been
21   the owner of that e-mail and because it's
22   sensitive I did not want one of the colleagues in
23   the outsourced department sending it to somebody
24   who shouldn't be aware of it, or doesn't need to
25   be involved.

CONFIDENTIAL

Page 99

1   2, which refers to the great relationship with

2   Arvato, do you see that?

3           A.  Umm hmm.  Yes.

4           Q.  After Arvato refused to extend the

5   termination dates because Microsoft and Arvato had

6   not reached agreement, after that point did

7   Microsoft have great relationships with Arvato?

8           A.  I can only comment on my

9   perspective, and from my perspective in terms of

10  fulfilling orders on time in full with the right

11  documentation I had no issues with their service

12  level.

13          Q.  But in terms of Arvato's willingness

14  to provide services or the cost of services did

15  you have any knowledge of that?

16          A.  I had no knowledge.

17          Q.  If you look now at what we will mark

18  as Daly Exhibit 3.

19              (Exhibit 3 marked for identification)

20          Do you see the top e-mail there is from

21  you to Paul Longstaff?

22          A.  Yes.

23          Q.  Dated April 1st 2012.  This is an

24  e-mail that you sent to Mr Longstaff?

25          A.  Yes.

CONFIDENTIAL

Page 98

1          "In that letter Microsoft stated that

2     the termination date for those services would be

3     April 17, 2012."

4               And then in the next sentence it says:

5               "This letter is to notify you we have

6     separate termination dates for termination of the

7     services and operations which are as follows."

8               Do you see that first bullet point?

9               "June 4th, 2012 termination of

10    distribution Turnkey services in Germany."

11              Do you see that?

12              A.   Yes.

13              Q.   Then if you look at the second page,

14    the response from Arvato, and in the second

15    paragraph it says:

16              "Although upon your request we were

17    willing to enter into discussions about extension

18    of certain services we unfortunately have not

19    reached any agreement so far and therefore we need

20    to expressly object to your new termination dates

21    set out in your letter dated March 30th, 2012."

22              Do you see that?

23              A.   Yes.

24              Q.   And these communications took place

25    prior to the April 2nd, 2012 e-mail, Daly Exhibit

1              A.   Because that is what they were

2     informed.  This would have been the information

3     that went out to all my team members and the

4     indirect team members that were sitting in Dublin.

5              MR PRICE:  So the MSCIS operations that

6     is the 110 --

7              A.   That is about 110, yes.

8              MR PRICE:  As of April 2, 2012 was

9     Microsoft's relationship with Arvato "great"?

10             MS KELLY:  Object to the form.

11             A.   I can just comment on from my

12    perspective running the Channel, and from the

13    perspective of the performance I would say from my

14    perspective yes.

15             MR PRICE:  Let me ask you if you recall

16    that in March 2012 you signed communications with

17    Arvato asking that the termination date change, do

18    you recall that?

19             A.   No, I don't recall asking to change

20    the termination date.

21             Q.   Look at Davidson Exhibit 7, and in

22    the third page of that and the letter that you

23    signed in the first paragraph it refers to the

24    February 18th, 2012 letter and in the second

25    sentence it says:

CONFIDENTIAL

Page 96

1    European distribution center out of Germany?

2            MS KELLY:  Object to the form.

3            A.  Sorry, could you just say that

4    again, please?

5            MR PRICE:  Sure.  Around this timeframe,

6    April 2012?

7            A.  Yes.

8            Q.  Had Microsoft represented publicly

9    that it was having to move its distribution center

10   out of Germany because of the risk from the

11   Motorola patent litigation in Germany?

12           A.  That I can't recall.

13           Q.  When you say this was distributed,

14   that is referring to Daly 2, within Microsoft was

15   it your understanding that the employees who

16   worked for you had the understanding that

17   Microsoft was moving the distribution center from

18   Germany because of risks from the Motorola patent

19   litigation?

20           MS KELLY:  Object to the form.

21           A.  Yes, the understanding in my

22   employees is that we were mitigating a potential

23   risk by moving the warehouse from Duren to Venray.

24           MR PRICE:  And how would your employees

25   have had that understanding?

1          A.  Yes, I know Jeff and Owen would have

2     been involved.

3          Q.  Anyone else?

4          A.  I am sure Brian Tobey was involved.

5     Brian Tobey was our corporate Vice President, he

6     would have had to have been involved.  I am

7     guessing now who was involved.  There would have

8     been more on Jeff's team involved in the

9     evaluation.

10          Q.  At the time of the April 2nd, 2012

11    e-mail, Daly Exhibit 2, who did you know was

12    involved in an evaluation of the risks of

13    Motorola's patent litigation against Microsoft?

14          A.  I knew Jeff and Owen were involved.

15          Q.  And the Legal Department?

16          A.  Well Shelley was there as Owen's

17    advisor but I can't tell you if she was present in

18    those meetings or not, I have no idea.

19          Q.  Was this PR statement released?

20          A.  It was shared internally.  I don't

21    recall if it was shared externally or not.

22          Q.  Do you have any memory or

23    understanding that externally Microsoft was taking

24    the position that because of Motorola's patent

25    case that Microsoft was wanting to move the

CONFIDENTIAL

Page 94

1              A.   It was subsequent to Seattle.

2              MR PRICE:   And what did Mr Roberts tell

3       you about his view about the risk of disruption

4       from Motorola's patent litigation?

5              MS KELLY:   Object to the form.

6              A.   He didn't tell me what his personal

7       view was.   He told me that there was a risk to our

8       business.

9              MR PRICE:   And did he tell you why he

10      thought there was a risk to the business?

11             A.   Because if we couldn't sell our

12      products in mainland Europe then it was a clear

13      revenue risk.

14             Q.   Did Mr Roberts say that he himself

15      had done a risk analysis of Microsoft's business

16      as a result of the Motorola litigation?

17             A.   He didn't -- he didn't directly tell

18      me but it was clear that there was an evaluation

19      done as to what could be a potential impact to the

20      business.

21             Q.   And you said it was clear that an

22      evaluation had been done, do you have any direct

23      knowledge as to who did any evaluation about the

24      risk of disruption of Microsoft's business as a

25      result of Motorola's patent litigation?

CONFIDENTIAL

Page 93

1          Q.  And when?

2          A.  It would have been around this

3    period, you know from the first conversation was

4    the end of January, so it could have been March.

5    I couldn't tell you exactly which month, but it

6    was in that timeframe because my first

7    conversation, very first conversation, my very

8    first knowledge of this is when Owen gave me a

9    heads up in our face-to-face meeting in Seattle,

10   and that was in January.

11         Q.  And we talked about the face-to-face

12   meeting in Seattle in January?

13         A.  Yes.

14         Q.  And at that point you were told by

15   Mr Roberts that this was something that was being

16   looked into whether or not the distribution center

17   would change, correct?

18         A.  Correct, yes.

19         MS KELLY:  Object to the form.

20         MR PRICE:  So when is the first time

21   that Mr Roberts told you that there was a risk of

22   disruption as a result of Motorola's patent

23   litigation?

24         A.  I can't tell you exactly.

25         MR PRICE:  It was after --

1    Legal.  Exactly who wrote it I couldn't say.  It

2    is normally a collaboration between PR and Legal.

3              MR PRICE:  Do you see the last section

4    says:

5              "The risk of disruption from Motorola's

6    patent litigation is simply too high."

7              A.  Umm hmm.

8              Q.  What risks is that referring to?

9              A.  The risk I understood was that there

10   was a risk of losing the case and if we did we

11   would not be able to sell Xbox 360 outside of

12   Germany.

13             Q.  How did you have the understanding

14   that is the risk this was referring to?

15             A.  That is what Owen told me.

16             Q.  When did he tell you that was a risk

17   as a result of litigation?

18             A.  It must have been around this time.

19             Q.  Around the time of April 2012 --

20             A.  Yes.

21             Q.  Before this timeframe of April 2012

22   had anyone told you there was risk of disruption

23   of Microsoft's business as a result of litigation

24   filed by Motorola?

25             A.  Yes, Owen told me.

CONFIDENTIAL

Page 91

```
 1  before I finish because it is such --
 2          A.  Okay sorry.
 3          Q.  -- so just try to do your best?
 4          A.  Okay.
 5          Q.  But at the end of day you are still
 6  not going to be able too master this?
 7          A.  I will try.
 8          Q.  And why is it your assumption that
 9  Ms McKinley, who was the legal advisor, is the one
10  who drafted this?
11          A.  Because all PR communication has to
12  go via Legal prior to it being signed off.  It is
13  standard policy in the company.
14          Q.  So Legal had to sign off on any PR
15  statement?
16          A.  Any of this nature, yes, we would
17  always go to the PR Department, they work with the
18  Legal Department.  That would be the practice.
19          Q.  Is there a reason why in particular
20  that you think that Legal wrote this statement as
21  opposed to just signing off on it?
22          MS KELLY:  Object to the form.
23          A.  Sorry, I made an assumption, it
24  could have been PR that wrote this statement.  It
25  would have been a collaboration between PR and
```

1  different -- beginning with "we", a different type

2  set to the rest of the e-mail, do you see that?

3          A.  Yes, I do.  Yes.

4          Q.  It says:

5          "We have a great relationship with

6  Arvato and we are pleased with the quality of

7  their services.  But Motorola's refusal to live up

8  to its patent promises has left us no choice.  We

9  would have preferred to keep our European

10  distribution center with Arvato in Germany as it

11  has been for many years, but unfortunately the

12  risk of disruption from Motorola's patent

13  litigation is simply too high."

14          Did you see that?

15          A.  Umm hmm.

16          Q.  Did you write those words?

17          A.  No, I didn't.

18          Q.  Who did?

19          A.  I can't tell you exactly but my

20  assumption at the time is it would have come from

21  Shelley McKinley.

22          Q.  And Shelley McKinley is the lawyer

23  that was the key advisor to Mr Roberts --

24          A.  Yes.  Yes.

25          Q.  You are answering the question

CONFIDENTIAL

Page 89

1          A.   Because it had hit the media at that

2     stage.  As far as I recall that there was a case

3     pending with Motorola and people started to ask

4     questions so therefore I would defer back to Owen

5     how should we handle this internally, and Shelley

6     would have been the main advisor on how we should

7     handle communications.

8          Q.   What hit the media as of April 2nd,

9     2012 that resulted in this e-mail being created?

10          A.   I don't recall exactly but it was

11     public at the time.  As far as I recall it was

12     public.

13          Q.   When you say it was public, tell me

14     everything you recall?

15          A.   The only thing I recall is that

16     there was a patent issue and there was a dispute

17     between Motorola and Microsoft over the patent.

18          Q.   Do you recall it being public

19     information at the time that there was -- that

20     Motorola was seeking an injunction against

21     Microsoft?

22          A.   No, I can't remember the exact

23     details at the time.

24          Q.   If you look at the e-mail and if you

25     look down there is a section in quotes, it is in a

CONFIDENTIAL

Page 88

1    around April 2012, is that right?

2              A.  Yes, it states it here.  Yes.

3              Q.  First can you tell me if there is a

4    general to section there MSCIS Operations, EMEA

5    (FTE)?

6              A.  Yes.

7              Q.  What is that referring to?

8              A.  That refers to the team we were just

9    talking about, the roughly about 110 people.  They

10   would all report into the MSCIS division, and FTE

11   means they are full-time employees.

12             Q.  We have got copies here, Shelley

13   McKinley, who is that?

14             A.  Shelley McKinley was from the Legal

15   Department and she was Owen's key lead contact

16   advisor.

17             Q.  How do you know that she was

18   Mr Roberts key lead contact advisor?

19             A.  Because he said she was.

20             Q.  Then Owen Roberts and Jeff Davidson?

21             A.  Yes.

22             Q.  So the advisory rate of the

23   distribution center.  Now first let me ask you how

24   did this e-mail come to be, that is what was the

25   reason for sending this e-mail?

CONFIDENTIAL

Page 87

1   team is 50 people.  My direct reports would have

2   been about eight people at the time.

3           Q.  Okay?

4           A.  Then there is a whole bunch of

5   activities from packaging to localisation, IT

6   services that are all within the division and they

7   would all have a dotted line to me from a people

8   management perspective, talent management creating

9   the community, moral, key events we were planning,

10   from that perspective I would manage the wider

11   group of people.

12           Q.  Yes.  Let me now put before you what

13   we will mark as Daly 2.  We will mark as Daly 2 an

14   e-mail chain beginning with the April 2, 2012 from

15   Theresa Daly to Brendan Kelly.

16               (Exhibit 2 marked for identification)

17           If you look at Daly 2, do you see at the

18   top it appears to be a e-mail from you to Brendan

19   Kelly dated April 2, 2012, do you see that?

20           A.  Yes.

21           Q.  And if you go to the bottom of that

22   chain, do you see there is an e-mail from you to

23   MSCIS Operations EMEA and others, correct?

24           A.  Correct, yes.

25           Q.  And this is an e-mail you sent out

CONFIDENTIAL

Page 86

1          Q.  So the people who reported to you

2      from North America, were those managers?

3          A.  Yes, they were managers.  Yes.

4          Q.  So did their subordinates report

5      indirectly to you?

6          A.  Sorry, I don't understand now.

7          Q.  You had managers in North America

8      reporting directly into you --

9          A.  Directly into me, yes.

10          Q.  And they had subordinates?

11          A.  Yes, they had team members.  Yes.

12          Q.  And so those team members basically

13      reported to someone who reported to you?

14          A.  Yes, correct.  Yes.

15          Q.  So if you include those folks as

16      indirect reporting because they reported through a

17      manager?

18          A.  Yes.

19          Q.  That is how many --

20          A.  50, that is the complete team.

21          Q.  Okay.  I thought you said they were

22      all in Dublin?

23          A.  Okay, you asked me two questions.

24      So one was the Channel team, so that is the direct

25      team that I am responsible for, and that whole

CONFIDENTIAL

Page 85

1  Distribution and Logistics.  The Distribution and

2  Logistics team in Dublin reported directly into

3  Jeff as did the Distribution and Logistics team in

4  North America and Asia Pacific.

5              Q.  And who reported to you?

6              A.  To me reported the Channel

7  Operations team in North America, in Asia Pacific

8  and in Dublin.

9              Q.  As of February 2012 do you have any

10  estimate as to how many people reported directly

11  to you?

12              A.  Around 50 would be a fair estimate.

13              Q.  And this is both North America --

14              A.  And Dublin and Singapore.

15              Q.  And do you have any idea how many

16  people reported to you indirectly, that is how

17  many employees Microsoft had that were ultimately

18  under your umbrella?

19              A.  The indirect employees at the time

20  would have been about 110, all based in Dublin.

21  So they would be dotted line from a people

22  management perspective, talent management

23  perspective, creating supply chain identity, the

24  community spirit.  From those perspectives they

25  would have been dotted line into me.

CONFIDENTIAL

Page 84

1          A.   Well, because this was confidential

2   because I was given a clear remit that I was to

3   focus on Channel and not on this area, I know the

4   letters would have been reviewed by Owen Roberts,

5   Jeff Davidson, and I am sure they would have had

6   Legal validation as well.

7          MR PRICE:   Who gave you the letter to

8   sign?

9          A.   It can only be one of two people.  I

10  can't remember exactly which person gave me this

11  letter, it would either have been Jeff Davidson or

12  Fergus Rigley.  Fergus Rigley, he reports directly

13  to Jeff.

14         Q.   Why do you think it would have had

15  to have been one of those people?

16         A.   Because Jeff was the most senior

17  person involved in this and he was overseeing all

18  of this and Fergus reports to him in Dublin.

19         Q.   At the time in February 2012 when

20  you were the General Manager of MSCIS what were

21  the reporting lines between you and Mr Roberts and

22  Mr Davidson?

23         A.   Okay, so I reported directly to Owen

24  Roberts responsible for Channel.  Jeff reported

25  directly into Owen Roberts responsible for

CONFIDENTIAL

Page 83

1   an adverse outcome in current litigation, do you

2   see that?

3              A.   Sorry.   I beg your pardon, do you

4   mind repeating that?

5              Q.   Yes.   Do you see in the second

6   sentence of that letter refers to a reason that

7   Microsoft is making a change from Arvato as being

8   the possibility of disruption to the business

9   because of an adverse outcome in litigation, do

10  you see that?

11             A.   Yes, I do.   Yes.

12             Q.   Do you have any understanding as to

13  why in this notice Microsoft was telling Arvato

14  the reason Microsoft was terminating the contract

15  with Arvato?

16             A.   No, I don't.   I mean, I didn't write

17  this letter so I have no understanding of why a

18  particular sentence was phrased or there was

19  particular information being shared with Arvato.

20  I don't have the background.

21             Q.   Who wrote the letter?

22             A.   I don't know who wrote the letter.

23             Q.   Do you have any belief as to who

24  wrote the letter?

25             MS KELLY:   Object to the form.

CONFIDENTIAL

Page 82

1            A.   I mean we started the project back

2    in, I think it was February, February or March the

3    transition project was started.

4            Q.   Okay.

5            A.   So the termination must have been

6    somewhere in that period.

7            Q.   Okay.   Your understanding is there

8    was some contract or contracts between Arvato and

9    Microsoft for Arvato to basically run a

10   distribution facility in Duren Germany?

11           A.   Yes, correct.   Yes.

12           Q.   Do you have any idea as to when by

13   its own terms that contract was going to end?

14           A.   Oh, no, I had no idea.

15           Q.   Do you have any idea as to whether

16   that contract was a year to year contract or a two

17   year contract or a three year contract?

18           A.   No, I don't.

19           Q.   In the letter that was sent out

20   under your signature to Arvato in February 2002,

21   if you want to look at that, that is Davidson

22   Exhibit 4, February 13th, 2002 (sic) letter.

23   I point out to you that the sentence in the letter

24   which purports to say why Microsoft is making a

25   change, where it says in the event they experience

CONFIDENTIAL

1          Q.  -- that Microsoft was looking at

2     changing the location of the distribution center

3     and that Legal was somehow involved, correct?

4          A.  Yes.

5          Q.  Did anyone tell you how long it took

6     for those, the examination of moving the

7     distribution center and how long that took from

8     the filing of the patent lawsuit in Germany?

9          A.  No.  Owen basically was very clear

10    that it was a need to know basis.  He was very

11    clear that my focus had to be on maintaining the

12    Channel Operations end of the business, and he

13    would inform me on a need to know basis.

14         Q.  Did it appear to you that when their

15    decision had been made to move the distribution

16    center out of Germany that there was some kind of

17    rush in doing that, some urgency?

18         A.  Yes, that was my perception.

19         Q.  And did you ever talk to anyone as

20    to why didn't we start this process earlier?

21         A.  No, I didn't.

22         Q.  When did Arvato Services contract

23    with Microsoft end by its own terms?

24         A.  I can't tell you exactly.

25         Q.  Do you have some general idea?

CONFIDENTIAL

Page 80

1           Q.   I mean do you have an estimate, can

2      you say between 10 kilometers and 20 or, even

3      better, if you can say miles?

4           A.   I haven't a clue really.  I assume

5      it is 50 to 60 kilometers but to be honest it is

6      just a guess.

7           Q.   Earlier you said that you had been

8      told by Mr Roberts that there was some sort of

9      patent litigation, correct?

10          A.   Yes.

11          Q.   Did you ever come to understand that

12     that patent litigation was filed against Microsoft

13     in Germany in like around July 2011?

14          A.   July 2011?

15          Q.   Yes?

16          A.   No, that I don't recall.  I don't

17     recall when it was filed.

18          Q.   Did you ever have any understanding

19     as to the timing as to when the patent litigation

20     against Microsoft was filed in Germany?

21          A.   No, no, not exactly.  No.

22          Q.   Were you ever involved in

23     conversations as to -- strike that.  You were told

24     sometime in January 2012 that --

25          A.   Yes.

CONFIDENTIAL

Page 79

```
 1              Q.  Now I may have already asked you
 2    this I just don't recall, have you ever seen a
 3    report like Roberts Exhibit 9 which seems to
 4    discuss where is the best place to have
 5    distribution centers and evaluating the costs?
 6              A.  No, I haven't.  I haven't got
 7    involved in any of those types of discussions.
 8              Q.  On page 4 where it does refer to the
 9    business to the inbound port, do you know what
10    that's referring to, what the inbound port is?
11              A.  Yes, the inbound port is where we
12    get our deliveries from -- primarily from Asia,
13    and they come in by container freight and they
14    dock in the port.
15              Q.  Do you know what port that is?
16              A.  No, I can't tell you specifically.
17    I know it is in the Netherlands but I can't tell
18    you specifically which one.
19              Q.  Do you know whether -- which of the
20    two Venray or Duren is closest to the port?
21              A.  No, I don't know.
22              Q.  Do you know how close Venray is to
23    the port in the Netherlands?
24              A.  No, I mean -- no, I would be
25    guessing.
```

CONFIDENTIAL

Page 78

1    have a hub in Dubai that supports some of the

2    Middle Eastern European markets.

3              Q.   So the model Microsoft uses, at

4    least right now, does not have a single

5    distribution center covering the UK and EMEA

6    market?

7              A.   Correct, yes.

8              Q.   So let me ask you, since you have

9    been at Microsoft have there always been multiple

10   distribution centres covering EMEA market and UK?

11             A.   Yes, there has always been a

12   distribution center for the UK market, it services

13   the UK market specifically and it has always been

14   one distribution center covering EMEA since I

15   started.

16             Q.   Do you know why there are two

17   distribution centers instead of just one?

18             A.   I mean the UK would be about 40% of

19   our market from a revenue perspective, so I think

20   logically the market then would then need its own

21   distribution center to support that revenue.

22             Q.   Have you ever been involved in

23   discussions within Microsoft about going to a

24   single distribution model?

25             A.   No, that never.  No.

CONFIDENTIAL

Page 77

1          Q.  So were you involved in any

2     discussions in Microsoft concerning how close to

3     an inbound port would be best for a distribution

4     center?

5               A.  No, I have not been involved.  No.

6               Q.  Did you have any understanding that

7     the distance from the distribution center to an

8     inbound port was of any significance?

9               A.  No.  No.

10              Q.  Let me ask you about your

11    understanding as to the kind of the model for

12    distribution centres that Microsoft uses.  Do you

13    see in this document it has scenario 1 on page 4

14    where it has one distribution center and then page

15    5 it has best continental distribution center and

16    best British distribution center, do you see that?

17              A.  Page 5.  Sorry -- oh, yes, at the

18    very top.

19              Q.  Yes, at the top?

20              A.  I see that, yes.

21              Q.  So does Microsoft have a single

22    distribution center that covers Britain, EMEA?

23              A.  It would be a distribution center

24    that covers the UK and only the UK market.  Then

25    Duren supports primarily the EMEA market and we

CONFIDENTIAL

Page 76

1    heard the phrase used.

2              Q.   And in what context?

3              A.   I can't recall exactly.  I mean, it

4    would be just a term that is used sometimes if we

5    are talking about where is the central hub of an

6    activity.

7              Q.   Have you heard the phrase used in

8    connection with where a distribution center should

9    be located?

10             A.   No, I haven't.

11             Q.   Let me ask you if you have heard

12   about discussions about some of the topics on

13   this.  If you look at the fourth page it says

14   "Scenario 1", where it says:  "Best EMEA DC

15   Heinsburg area."  And first let me ask you have

16   you seen documents where distribution center is

17   abbreviated to DC?

18             A.   Yes, I have.  Yes.

19             Q.   You have told us about what EMEA is.

20   It says:  "Best EMEA DC," distribution center

21   "Heinsburg area."  If you go down on that first

22   bullet point where it talks about EMEA warehouse

23   with a lower distance to the inbound port.  Do you

24   see that?

25             A.   Yes, I do.  Yes.

CONFIDENTIAL

Page 75

1          A.  No, I have just heard it used

2     primarily by the sales organization.

3          Q.  Let me put before you what we will

4     mark as Roberts 9.

5               (Previously Marked Roberts Exhibit 9)

6               Roberts 9 appears to be a presentation

7     entitled Network Optimization Network Design

8     Greenfield Analysis by Arvato Services

9     Bertelsmann.  My first question is have you seen

10    this?

11         A.  No, I've not seen this.

12         Q.  Have you seen any documents like

13    this where there seems to be analysis as to where

14    is the best place to have a distribution center?

15         A.  No, I haven't.

16         Q.  Have you heard of a phrase called

17    centre of gravity?

18         A.  It is a very generic question.  I

19    have heard of centre of gravity.

20         Q.  Other than high school?

21         A.  In this context no, I haven't, I am

22    not familiar with exactly what the phrase means.

23         Q.  So in Microsoft have you heard the

24    phrase centre of gravity used?

25         A.  Yes, I would have to say I have

CONFIDENTIAL

Page 74

1   map.  It is not something we have used here in

2   Dublin or Europe.

3          Q.  So what have you understood heat map

4   to mean back in the colonies?

5          A.  I am not really sure what it is.

6          Q.  You said you have heard the phrase?

7          A.  I've heard the phrase heat map which

8   is used very much by my colleagues in the States

9   but I think heat map, I have never worked with

10  one.

11         Q.  Sure.  But when they said heat map

12  did you pretend to know what they were talking

13  about just to be polite or did you actually have

14  some kind of idea --

15         A.  No, I just heard the term used.  I

16  know the sales organization use a heat map when

17  they are talking about the competitors, but I have

18  no background in heat mapping or I don't use the

19  concept.

20         Q.  I am not asking whether you have

21  actually used it but in the context where you have

22  heard it used?

23         A.  I have heard the word used.

24         Q.  And did you understand the context

25  in what it seemed they were referring to?

CONFIDENTIAL

1   report like this about another vendor or in some

2   other context?

3           A.   No, this is the first time I have

4   ever seen anything like this.

5           Q.   So I guess my question is do you

6   have the slightest idea what these numbers mean?

7           A.   No, I haven't a clue.

8           Q.   Maybe you can at least tell us what

9   some of the columns are.  Do you see in the left

10  column there seems to be, it says book of

11  business, then it says Arvato CS SPA global

12  English and I guess there is like a list of, do

13  you see it is in blue type?

14          A.   Sorry, I have no idea what this is.

15          Q.   In connection with on-going review

16  of distribution centers, cost performance,

17  location, had you ever heard of something called

18  the heat map before?

19          A.   No, I mean heat map is a term we use

20  in Microsoft but I have never personally used or

21  seen a heat map like this.

22          Q.   What does the heat map term refer to

23  as you know it?

24          A.   I mean it is really -- it is the

25  teams in the States I have heard use the term heat

1          Q.   Today I mean, now you have as a

2    General Manager more responsibilities than you did

3    back in 2012, early 2012?

4          A.   Correct, yes.

5          Q.   Now do you get involved -- let me

6    finish, in discussions about whether or not a

7    particular location is the best location for a

8    distribution center and how much is it costing and

9    what the performance is?

10          A.   Jeff is still responsible for the

11   global strategy for distribution logistics and

12   continues that role, so I would be involved in

13   some discussions but I would always fall back on

14   Jeff and his team expertise.  My role is to come

15   in with what I believe the requirements are from

16   the customer and sales perspective.

17          Q.   Let me show you what we will have

18   marked in this deposition I guess as -- let's give

19   what was previously marked Roberts 2.

20          (Previously Marked Roberts Exhibit 2)

21          I have put before you Roberts 2, Arvato

22   Heat Map Report.  My first question is is this

23   something that you have ever seen?

24          A.   No, I have never seen this.

25          Q.   Have you ever seen any kind of

1   location etc, that would be true with respect to

2   the Duren distribution center as well, correct?

3           A.  It would be more -- the discussions

4   are usually more focused on cost and performance

5   as opposed to the exact location.

6           Q.  And costs and performance, as you

7   understand, can be affected by where your location

8   is?

9           A.  They can be, yes.

10          MS KELLY:  Object to form.  Calls for

11  speculation.

12          MR PRICE:  How can cost and performance

13  be related to location?

14          A.  Sorry, you are asking me with

15  respect to what?

16          MR PRICE:  How can location affect a

17  distribution center's cost and performance?

18          MS KELLY:  Object to the form.  Calls

19  for speculation.

20          A.  I can't answer the question, I am

21  really not an expert in this area.

22          MR PRICE:  Who were the experts in the

23  area?

24          A.  Jeff Davidson is the absolute expert

25  and he has a team of experts reporting into him.

CONFIDENTIAL

Page 70

```
 1    center?
 2              A.   Of course I had thoughts but there
 3    again they are speculative, they are not fact.
 4              Q.   Well, hopefully your thoughts would
 5    be based upon fact?
 6              A.   Well, I am not an expert in the
 7    area, so ...
 8              Q.   So let me ask you whether you have
 9    shared any thoughts.  Did you ever share your
10    thoughts with anyone in Microsoft as to what would
11    be the best location for the EMEA distribution
12    center?
13              A.   Now you are talking about
14    specifically Duren?
15              Q.   Yes --
16              A.   Because we obviously have more
17    warehouses.
18              Q.   Yes, for the Duren?
19              A.   For the Duren one, no.  It was a
20    really good location for us, so there was no
21    particular discussions with respect to Duren.
22    There were clearly discussions with respect to
23    other parts of EMEA.
24              Q.   Well, you said that there would be
25    yearly on-going discussion as to performance,
```

CONFIDENTIAL

1          A.   On performance, yes I would be.

2          Q.   Were there discussions about whether

3    or not the location of the distribution facility

4    should be changed, was that discussed on a regular

5    basis?

6          A.   Every year the team would evaluate

7    location network optimization.   It is a constant

8    on-going discussion.

9          Q.   Were you involved in these yearly

10   on-going discussions about where would be best to

11   say locate the distribution center?

12         A.   No, not in relation to Arvato in

13   Germany.   No.

14         Q.   Why wouldn't you be involved if

15   that -- let me step back.   The location of the

16   distribution center could effect the performance,

17   correct?

18         A.   I mean, I would be speculating to

19   answer that question.

20         Q.   Were you ever asked your opinion as

21   to what would be the best location for a

22   distribution center for EMEA?

23         A.   No.   No.

24         Q.   Did you have any thoughts on what

25   would be the best location for a distribution

CONFIDENTIAL

1   then there would be discussion with my

2   distribution colleagues as to how they would

3   deliver that service for the partner.  So those

4   types of operational service level discussions.

5           Q.  Prior to 2012 did you have any

6   discussions with anyone within Microsoft about

7   changing the vendor?

8           A.  We would have, as part of the

9   business every single year we would have

10  discussions around -- as part of our budgeting

11  process there would be a normal part of

12  discussions evaluating vendors.  On the freight

13  side of the business the team goes out every year

14  to market to make sure that we have got the right

15  rates.  So as a normal part of the business there

16  would be discussions happening, yes.

17          Q.  As a normal part of business would

18  there be yearly discussions about evaluating

19  Arvato's costs and performance?

20          A.  Yes, there were discussions.

21  I wasn't part of the discussion but that is part

22  of the business.

23          Q.  Were you at least part of the

24  discussions in connection with the performance

25  aspect of Arvato?

CONFIDENTIAL

Page 67

```
 1    would pay attention to the costs of Arvato's

 2    Services?

 3              A.   No, I had no involvement whatsoever

 4    in the cost.  I would have more involvement on

 5    whether the deliveries were on time, if the

 6    deliveries were of the right quality.  If the

 7    invoicing was correct of the deliveries, etc, but

 8    that would have been my operation of involvement.

 9              Q.   So your involvement was more

10    concerned with the results and not how much it was

11    costing --

12              A.   Yes.

13              Q.   -- Microsoft to get those results?

14              A.   Yes, I was completely focused on the

15    results and on meetings our customer expectations

16    and meeting the sales organisations and meeting

17    their expectations.

18              Q.   Did you have any discussions within

19    Microsoft as to how Arvato could improve

20    performance?

21              A.   Going back the years, yes.

22              Q.   What kind of discussions?

23              A.   There would have been discussions,

24    for instance, I would come in with request for a

25    value added service for some of our partners, and
```

CONFIDENTIAL

Page 66

 1            THE VIDEOGRAPHER:  It's gone.

 2            MR PRICE:  So between the time -- let me

 3    step back.  During the time that Arvato was the

 4    vendor and the distribution center was in Duren in

 5    Germany.

 6            A.   Umm hmm.

 7            Q.   During that time were you as manager

 8    of Channel Operations concerned with the

 9    performance of that distribution center in

10    Germany?

11            A.   Of Arvato, no.  We had actually a

12    really good performance delivered by the

13    distribution center in Germany, Arvato.

14            Q.   So were you involved in any review

15    of Arvato's performance in the distribution center

16    in Germany?

17            A.   No, I wasn't involved directly in

18    any of the reviews.

19            Q.   Were you involved indirectly in any

20    reviews of Arvato's performance?

21            A.    Indirectly no.  I mean, we had a

22    really good performance level at the time so there

23    was no major issues to be discussed.

24            Q.   So when you say a good performance

25    level did you have any -- were you the person who

CONFIDENTIAL

Page 65

1    I involved in discussions?

2              MR PRICE:  Yes, were you involved in

3    discussions -- let's step back then?

4              A.  Yes.

5              Q.  So you told us that some time at the

6    beginning of 2012 that you were told by Mr Roberts

7    that Microsoft was looking into moving the

8    distribution facility from Germany, correct?

9              A.  It was up for discussion, yes.

10             Q.  Now between that and the time that

11   you learned that a decision had been made to move

12   out of Germany, so between those two times did you

13   have any discussions about the effect of a move

14   out of Germany on Channel Operations?

15             A.  No.

16             Q.  So prior to the move out of Germany

17   when Arvato was the vendor and the distribution

18   center was in Duren Germany, were you concerned

19   about the performance of Arvato and the

20   distribution center?

21             THE VIDEOGRAPHER:  Sorry, there is a

22   mobile phone on right next to a microphone that

23   blocked out the question.

24             MR PRICE:  It is within a few feet of a

25   microphone.  Is that better?

CONFIDENTIAL

Page 64

1

2              THE VIDEOGRAPHER:  This is the beginning

3    of tape two, volume one of the video deposition of

4    Ms Theresa Daly.  We are on the record again at

5    10.39 am as indicated on the video screen.

6              MR PRICE:  Ms Daly, we were talking

7    earlier about your position as being in charge of

8    Channel Operations?

9              A.  Yes.

10             Q.  So the distribution facility and how

11   well it perform would effect, you have told us,

12   Channel Operations?

13             A.  Yes, that is correct.

14             Q.  If they were performing well you

15   would hear from your sales people or the

16   customers, right?

17             A.  Right, correct.

18             Q.  So was -- in deciding whether or not

19   to move from Germany to somewhere else, did anyone

20   talk to you about what you thought the effect

21   would be on Channel Operations, that is on

22   customer service, on how your sales people could

23   perform or anything of that nature?

24             MS KELLY:  Object to the form.

25             A.  Can I ask you to clarify as in was

Page 63

1   I often forget, so that you remain refreshed and

2   the Court Reporter can remain refreshed?

3           A.   That is good, I appreciate that.

4   Thank you.

5           Q.   Okay.  We have not been going an

6   hour, or have we?  No, we haven't --

7           MS KELLY:  It is close to an hour.

8           THE VIDEOGRAPHER:  An hour and 11

9   minutes.

10          MR PRICE:  Somebody who knows.  Would

11  you like to take a break now?

12          A.   I am actually okay at the moment.

13          MR PRICE:  Would you like a break?

14          THE COURT REPORTER:  Yes, I would

15  please.

16          MR PRICE:  The senior person here.

17          A.   Absolutely.

18          MR PRICE:  Why don't we take a 10 minute

19  break?

20          THE VIDEOGRAPHER:  This is the end of

21  tape one, volume one of the video deposition of

22  Theresa Daly.  Going off the record at 10.23 as

23  indicated on the video screen.

24

25                  (Short Recess)

CONFIDENTIAL

Page 62

1    those conversations if Owen felt he needed to

2    update me on anything that is when he would do it.

3            Q.   In the conversations that you had

4    with Mr Roberts about changing from Arvato to CEVA

5    did he make any comments about Arvato, its

6    strengths, its weaknesses?

7            A.   Not specifically, no.

8            Q.   Did he say why he thought CEVA was a

9    better choice than Arvato?

10           A.   I mean he didn't say precisely what

11   the reasons were and why they made that decision.

12           Q.   Did you have any input at all as to

13   whether or not Microsoft should switch from Arvato

14   to CEVA?

15           A.   No, I had no input whatsoever.

16           Q.   Let me give you another heads up on

17   deposition practice here just so you know.

18   This -- we are going to be here for a while today

19   and it is a kind of small room?

20           A.   Yes.

21           Q.   So if you need to take a break just

22   say so.

23           A.   Okay, thank you.

24           Q.   We will try to take breaks every

25   hour or so and you guys can remind me because

CONFIDENTIAL

Page 61

1    to deal with the distribution was changed

2    eventually from Arvato to CEVA?

3              A.  Yes.

4              Q.  Did you ever learn why Microsoft

5    made a decision to change the vendor in charge of

6    the distribution facility from Arvato to CEVA?

7              A.  I was given an update from Owen

8    Roberts.  Basically he said we went with CEVA

9    because given the timescale -- I am trying to

10   remember now -- it was to do because CEVA support

11   us in North America so they are a global operator,

12   and he said -- I remember he was saying -- I am

13   trying to recall.  He informed me that we were

14   going with CEVA, that we had worked with them in

15   North America.  They were a global operator, that

16   they had a depth of experience in this particular

17   area, but other than that I didn't have any

18   detailed conversations.

19             Q.  Do you remember was this one

20   conversation or more than one conversation?

21             A.  This would be part of -- with Owen I

22   would have had a telephone conversation with him

23   weekly as part of how we do business.  Primarily

24   the purpose of the phone calls is updating him on

25   what happens in Channel Operations.  So as part of

CONFIDENTIAL

1          Q.  In 2012?

2          A.  So there was a long process in 2012

3     from January right through to year end in June, so

4     if it came to when we were in the middle of

5     transitioning the project then I would have a

6     conversation with the sales organization to

7     explain to them that we are moving the

8     distribution center.

9          Q.  I just didn't hear what you said,

10    you would have had conversations with whom?

11         A.  The sales organization.

12         Q.  So my question is a little bit more

13    direct?  Did you have any conversation with anyone

14    other than Mr Roberts as to why Microsoft had made

15    the decision to move from Germany to somewhere

16    else?

17         A.  No, not that I recall.  No.

18         Q.  You talked about being given a heads

19    up on Microsoft looking into moving from Germany,

20    did you ever have any discussions with anyone as

21    to Microsoft changing the vendor from Arvato to

22    someone else?

23         A.  No, not that I recall.  No.

24         Q.  You understand that the vendor, that

25    is the company that, you know, was sort of hired

CONFIDENTIAL

Page 59

1           MS KELLY:  Object to the form.

2           MR PRICE:  Do you understand the

3    question?

4           A.  Yes, I understand the question.  No,

5    he didn't share any information with me.

6           Q.  So did Mr Roberts ever tell you who

7    made that decision, the decision to move the

8    distribution centre from Germany to somewhere

9    else?

10          A.  No, he didn't tell me who made the

11   decision.  He just said the decision has been

12   made.

13          Q.  Now when you had your discussion --

14   let me step back.  Did you have any discussions

15   with anyone other than Mr Roberts as to why

16   Microsoft would move its distribution center from

17   Germany to somewhere else?

18          MS KELLY:  Sorry, can you repeat the

19   question?

20          MR PRICE:  Sure.  Did you have any

21   discussions with anyone other than Mr Roberts as

22   to why Microsoft would move its distribution

23   center from Germany to somewhere else?

24          A.  Could you help clarify what time

25   period you are talking about?

CONFIDENTIAL

Page 58

1              A.  Yes, he did.  Yes.

2              Q.  Did he tell you -- and this is just

3    a yes or no -- did he tell you at that time

4    whether Legal had made a recommendation?

5              A.  No, he didn't tell me.

6              Q.  Did he tell you anything at all

7    about his conversations with Legal?

8              A.  No, he didn't.

9              Q.  Did he tell you anything at all

10   about his personal opinion as to whether or not

11   the distribution centre should be moved from

12   Germany to somewhere else?

13             A.  No, he didn't.

14             Q.  Did he ever tell you his personal

15   view as to whether or not Microsoft should have

16   moved its distribution center, the EMEA

17   distribution centre from Germany to somewhere

18   else?

19             A.  No, he never shared a personal view

20   with me.

21             Q.  Did he ever tell you what anyone

22   else in Microsoft's view what that move was, that

23   someone's else opinion was that the distribution

24   center should have been moved from Germany to

25   somewhere else?

CONFIDENTIAL

Page 57

1    being told about a decision being made to move out

2    of Germany, first to be clear, your testimony is

3    that you were not involved in any such decision in

4    terms of making a decision or giving advice about

5    the decision; is that right?

6              A.  Yes, that is correct.

7              Q.  And when Mr Roberts told you that a

8    decision had been made to move did he tell you

9    what his recommendation had been as to whether or

10   not the EMEA distribution centre should have been

11   moved out of Germany?

12             A.  My main recollection with Owen

13   Roberts was the face-to-face meeting in Seattle

14   where he informed me that there was a situation.

15   He informed me there was a possibility that we

16   would have to move warehouse, but I wasn't

17   involved in any of the decision making process and

18   at some stage in the process Owen would have told

19   me that we have made a decision and we are moving

20   to Venray.

21             Q.  When Mr Roberts told you that

22   Microsoft was looking into whether or not

23   Microsoft should move from its distribution center

24   from Germany I think you told us already that he

25   said Legal was involved?

CONFIDENTIAL

Page 56

```
1              Q.   So we have got to make sure we have

2        a clear record otherwise if you look at the

3        transcript it is going to look like half a

4        question and answer --

5              A.   Okay, no problem.

6              Q.   Like that, but it is a hard habit to

7        break so I will call it out, but try to be a

8        little patient, it also gives you a chance --

9              A.   Okay, I will wait.

10             Q.   -- or not.  It also gives you a

11       chance to think about the question --

12             A.   Yes.

13             Q.   And gives your attorney a chance to

14       object for the record because if she thinks there

15       is something wrong with the question --

16             A.   Perfect.

17             Q.   -- and every now and then you say

18       "umm hmm" or "ah ha" when you mean to say "yes" or

19       "no", so need to say yes or no because the Court

20       Reporter can't take down --

21             A.   Okay.

22             Q.   -- grunts.  You have interrupted me

23       about four times while you told me you were not

24       going to.  It is a habit that is hard to break

25       because it is so natural.  So talking about you
```

CONFIDENTIAL

Page 55

```
 1              Q.   I am asking you something a little
 2     bit different, I am asking you about when did you
 3     learn that there had been a decision to move
 4     outside of Germany?
 5              A.   And I can't recall exactly when I
 6     was told that decision.
 7              Q.   So my question is though, do you
 8     recall how you were told, where you were, who was
 9     there, do you have a recollection of an events
10     where you were told there was a decision?
11              A.   I don't have a recollection of the
12     specific event.
13              Q.   Now, going back very quickly to how
14     depositions work.  In normal conversation it is
15     really easy to anticipate a question so if you saw
16     a transcript of someone having a normal
17     conversation you would have half a question,
18     answer, and then the rest of the question may be,
19     probably not even the rest of the question because
20     that is just how people communicate.  Here it is
21     important that you wait for your response until
22     the question is finished even though you know what
23     the rest of the question is going to be.  That is
24     because she has to take down everything?
25              A.   Okay.
```

CONFIDENTIAL

Page 54

1    asking in chronology?

2              A.  It would have been somewhere between

3    February and I don't know, April/May, but I just

4    don't recall exactly when.

5              Q.  Well, when you were told by -- by

6    Mr Roberts?

7              A.  Yes, Mr Roberts.  Yes.

8              Q.  So let me get back to specifically

9    what he told you about the reason that there was

10   going to be a move and whenever he told you, okay?

11   In fact, first let me ask you do you actually

12   recall the time that he told you, I don't mean the

13   date, but do you have a memory whether it was on

14   the phone or, you know, sitting in a lobby, do you

15   have any specific memory as to the event?

16             A.  Yes, as I have already said it was a

17   face-to-face meeting.

18             Q.  This is the one in Seattle?

19             A.  Yes, in Seattle and it was towards

20   the end of January.

21             Q.  I am trying to distinguish, I

22   thought you made a distinction, the face-to-face

23   meetings I think you said they were looking into

24   making a move?

25             A.  Yes, that's right.

CONFIDENTIAL

Page 53

1   asking you as a chronology not as a specific date,

2   did you have an understanding that Microsoft had

3   made a decision to move the distribution center to

4   Germany before this letter was sent out with your

5   signature?

6           MS KELLY:  Object to the form.  Lack of

7   foundation.  Vague.  Asked and answered.

8           A.  I can't recall exactly.

9           MR PRICE:  Well, if you look, we showed

10  you Davidson Exhibit 7, and that included a

11  March 30th, 2012 letter sent out under your

12  signature to Arvato asking that the termination

13  date be changed and also included a response from

14  Arvato dated April 3, 2012, we were just looking

15  at that?

16          A.  Umm hmm.  Yes.

17          MR PRICE:  So can you tell us before

18  these exchanges whether or not you had been

19  informed that Microsoft had made a decision to

20  move the EMEA distribution center outside of

21  Germany?

22          MS KELLY:  Object to the form.

23          A.  I can't recall exactly when I was

24  told by phone.

25          Q.  Again I am not asking exactly, I am

CONFIDENTIAL

Page 52

```
 1    Germany, you may not know the exact date but you

 2    may know when you learned it in relation to other

 3    events, right?

 4              A.   Right.

 5              Q.   So one event that I pointed out to

 6    you that you have looked at is this February 13th,

 7    2012 termination notice that was sent to Arvato

 8    under your signature?

 9              A.   Umm hmm.

10              Q.   You have seen that, correct?

11              A.   Correct.

12              Q.   So my question is; is it your best

13    recollection that you learned that Microsoft had

14    made a decision to move the distribution center

15    out of Germany before the date of this letter?

16              MS KELLY:   Object to the form.

17              A.   I cannot recall exactly when I was

18    informed.

19              Q.   And that's not what I am asking

20    because sometimes people can't recall exactly when

21    they were informed.  I am asking if you can give

22    me a chronology in relation to a document that is

23    right in front of you right now, that is the

24    February 13th, 2012 termination notice that you

25    signed and was sent to Arvato.  So I am just
```

CONFIDENTIAL

Page 51

1    me something you know nothing about, I am entitled

2    to your best recollection and your best estimate.

3    An estimate might be for example, how big is this

4    table, how far are you sitting from me.  You have

5    actual knowledge of that because you are sitting

6    across the table from me.  If I asked you how far

7    I was sitting across from my wife two nights ago

8    you would have no idea about that, you would be

9    speculating.  I don't want you to guess on things,

10   okay?

11            A.  Okay.

12            Q.  Now, in terms of dates it is

13   sometimes difficult to remember exact dates from

14   something that happened years ago, and of course

15   that is one of the reasons that you have

16   documentation, right?

17            A.  Yes.

18            Q.  And, in fact, that is one of the

19   reasons Microsoft keeps documentation so it can go

20   back to its files and say this is when something

21   happened, right?

22            A.  Right.

23            Q.  So what I was asking you in terms of

24   when you first heard about a decision by Microsoft

25   to move the EMEA distribution center outside of

CONFIDENTIAL

Page 50

1         A.  Yes, I do.

2         Q.  And do you know what that means?

3         A.  Not -- I have a vague understanding

4    of it, but exactly what it means no, I don't.

5         Q.  You have a vague understanding that

6    there is a criminal penalty if you intentionally

7    gave untruthful testimony?

8         A.  Yes, that I would know.  Yes.

9         Q.  Now, in terms of a procedure you

10   understand that your attorney has the right to

11   make objections?

12        A.  Yes.

13        Q.  Now if she makes objections and does

14   not instruct you not to answer then you are

15   required to give me an answer unless you don't

16   understand the question, okay, do you understand

17   that?

18        A.  Yes.

19        Q.  And the answer may be "I don't know"

20   or "I don't recall"?

21        A.  Okay.

22        Q.  If, of course, that is a truthful

23   answer.  Now sometimes you will be asked to give

24   estimates or your best recollection, and although

25   we don't want you to speculate, for example, tell

CONFIDENTIAL

Page 49

1   the decision to do that, to terminate the
2   relationship?
3          MS KELLY:   Object to the form.   Lack of
4   foundation.   You are putting words in her mouth at
5   this point.
6          MR PRICE:   That is called a legal
7   question you are allowed to ask.
8          MS KELLY:   No, not if it is wrong.
9   Object to form.   Lack of foundation.   Calls for
10  speculation.   She has answered the question in
11  terms of memory of dates.   Why don't you repeat
12  the question and Miss Daly can answer?
13         MR PRICE:   Miss Daly, a couple of
14  things.   Is this the first time you have had your
15  deposition taken?
16         A.   Yes.
17         Q.   Congratulations.   Have you had a
18  chance to talk with your counsel about the basic
19  ground rules?
20         A.   Yes.
21         Q.   Of course one of the ground rules is
22  you are supposed to tell the truth, right?
23         A.   Of course.
24         Q.   And that you are testifying under
25  penalty of perjury, do you understand that?

CONFIDENTIAL

1    say that we are terminating the contract and we

2    are moving to Venray, but I don't remember exactly

3    which month or which week that was.

4            Q.   Sure.   If you look at Davidson

5    Exhibit 4 which I showed you, that is the

6    February 13th, 2012 termination notice that you

7    signed and was sent to Arvato.   So is it your best

8    recollection then that prior to that date, prior

9    to sending out the termination notice that you had

10   somehow learned that Microsoft had made the

11   decision to move the distribution center from

12   Germany to somewhere else?

13           A.   Yes, I would have learned from Owen

14   Roberts.

15           Q.   Before that date?

16           MS KELLY:   Objection to form.

17           A.   Before that date, I am assuming it

18   was before the date.   I don't recall the date.

19   But Owen would have rung me and given me a heads

20   up to say what was happening.

21           MR PRICE:   You might not remember the

22   exact dates but you have some memory of the

23   chronology, correct, that before you sent the

24   termination letter to Arvato, before you did that

25   you were given a heads up that Microsoft had made

CONFIDENTIAL

1          A.  Yes.

2          Q.  And when it was that?

3          A.  I don't remember.

4          Q.  You recall earlier I showed you a

5  February 13th, 2012 letter you sent to Arvato?

6          A.  Yes.

7          Q.  Terminating their relationship with

8  Arvato?

9          MS KELLY:  Object to the form.

10         MR PRICE:  Were you told before then

11  that a decision had been made to move the

12  distribution center?

13         A.  I have no recollection of the exact

14  dates but ...

15         Q.  Ms Daly, it is a while ago so some

16  times you can't remember exact dates so that is

17  why we try and say you can't remember an exact

18  date but you can say whether it was before or

19  after something else happened --

20         A.  Yes.

21         Q.  -- that you do know the date on?

22         A.  Owen was my main point of contact

23  for this because he made it very clear that is how

24  he wanted to handle the process, so Owen would

25  have given me in a telephone call a heads up to

CONFIDENTIAL

Page 46

1          A.  Yes.

2          Q.  So Mr Roberts specifically told you

3     that Legal was involved in the decision to move

4     the distribution center from Germany, correct?

5          A.  Yes, he didn't say -- he gave me a

6     heads up there wasn't a decision made to move,

7     this was back in January.  So he told me there was

8     a situation, there was discussions on-going.  He

9     did tell me it was due to a patent issue.  He

10    didn't give me any details, but his main message

11    to me was that my responsibility and I had to

12    focus on the channel operations, I was not to get

13    distracted and that Jeff Davidson would be the key

14    person he would work with in this situation.

15         Q.  Okay.  I think we may have a

16    clarification and I want to make sure that the

17    record shows.  As of the first conversation that

18    you had with Mr Roberts in January 2012 he told

19    you there were discussions about moving from

20    Germany but a decision had not been made?

21         A.  All he said to me was there was

22    discussions happening.

23         Q.  Did there come a time when you were

24    told a decision had been made to move the EMEA

25    distribution center from Germany?

CONFIDENTIAL

1           A.  Yes, it was in the corridor, just a

2   few minutes.

3           Q.  Earlier you said that the decision

4   to move out of Germany that Legal was involved,

5   correct?

6           A.  That's what Owen said at the time.

7           Q.  Again anything you know about why

8   the move took place is what you heard from

9   Mr Roberts?

10          A.  Yes.

11          Q.  So when Mr Roberts told you Legal

12  was involved in a decision to move the

13  distribution center out of Germany, did he tell

14  you if he had any role himself in making that

15  decision?

16          MS KELLY:  It's been asked and answered.

17          A.  No, he didn't tell me directly but

18  he was the global supply chain manager so he was

19  clearly involved in the process, but I do not know

20  as to what meetings he was in.  I do not know

21  specifically what decisions he would have made.

22  That I don't know.

23          MR PRICE:  So Mr Roberts told you -- I

24  am trying to get clear what he told you as to what

25  you assumed, do you understand?

CONFIDENTIAL

Page 44

1          Q.   So the e-mail seems to indicate that

2     it was Fergus Rigley who decided you needed to

3     know and gave you some information?

4          A.   That is incorrect.  It was Owen

5     Roberts decided I needed to know and gave me the

6     information prior to this e-mail.

7          Q.   Did you have any conversation with

8     Fergus Rigley concerning the topic --

9          A.   Yes --

10         Q.   -- let me finish -- that the topic

11    of moving the distribution center from Germany to

12    somewhere else?

13         A.   Yes, Fergus mentioned to me that he

14    knew that there was discussions happening and I

15    just said to Fergus I am aware of it but it is

16    confidential and I am not involved in the process.

17         Q.   So let me go back to the

18    conversation that you say you had with Mr Roberts,

19    and I think you said you were in Seattle?

20         A.   In Seattle, yes.

21         Q.   The conversation that you had with

22    him was that face-to-face or by phone?

23         A.   Face-to-face.

24         Q.   You said it was just like a few

25    minutes?

CONFIDENTIAL

Page 43

1  pending case that he didn't know what the decision

2  was going to be, but it may impact the

3  distribution centre.  It was confidential.  I was

4  not going to be involved in the discussions in the

5  process, it was going to be handled by Jeff

6  Davidson and that was my instruction and that's

7  what I agreed with Owen.

8          Q.  So is it your best recollection then

9  that when you received Davidson Exhibit 1 that

10  when you read that first e-mail there that you

11  knew what Mr Roberts was referring to?

12          A.  I knew what he was referring to yes,

13  because he had told me, he had given me a heads

14  up.  He told me it was confidential and that I

15  would not be involved in the process.

16          Q.  So you just don't recall one way or

17  another whether or not you looked at the other

18  e-mails that were attached to this e-mail?

19          A.  No, I don't.  No, I don't.

20          Q.  You mentioned that you said you

21  thought that Owen Roberts briefed you, if you look

22  at the e-mail to you it says:  "Fergus decided you

23  needed to know and I have to tell you both no one

24  else needs to know."  Do you see that?

25          A.  Yes, I do.  Yes.

CONFIDENTIAL

```
 1    he said "no one else needs to know", right?
 2              MS KELLY:  Object to the form.  This has
 3    been asked and answered.
 4              MR PRICE:  Correct?
 5              A.  Sorry, I feel I am repeating myself
 6    all the time.
 7              MR PRICE:  You may be but don't worry
 8    about it --
 9              A.  So Owen --
10              MR PRICE:  Wait I am not sure you have
11    the question.  So my question is when you received
12    this and you read just the top part there, do you
13    see just the top part addressed to you?
14              A.  Yes.
15              Q.  It talks about:  "I have to tell you
16    both no one else needs to know", do you see that?
17              A.  Yes.
18              Q.  Is it fair to say when you read that
19    you wanted to have some understanding as to what
20    he was talking about, need to know what, okay?
21              A.  Okay.
22              Q.  Is that fair?
23              A.  Owen -- towards the end of January I
24    was in Seattle, Owen told me in about three or
25    four minutes, gave me a heads up that there was a
```

CONFIDENTIAL

Page 41

1    recollection of this e-mail thread.

2              MR PRICE:  Would you sometimes get

3    e-mails from people that contained e-mails to

4    which you were not originally party?

5              A.  Yes.  Yeah.

6              MR PRICE:  And would it have been your

7    practice when that happened, when you got e-mails

8    such as this which contained an entire chain,

9    would it have been your practice to look over the

10   chain to see what people were talking about?

11             MS KELLY:  Object to form.

12             A.  Only if it was necessary.

13             MR PRICE:  So when you say only if it

14   was necessary, do you see at the top of the e-mail

15   chain which is the only one -- only e-mail

16   addressed to you says:

17             "Not sure how my  message last week

18   about 'need to know' was misinterpreted, so now

19   Fergus decided you needed to know, I have to tell

20   you both no one else needs to know."  Do you see

21   that?

22             A.  Yes.

23             Q.  And would it be fair to say that

24   when you received this you wanted to have some

25   idea as to what Mr Roberts was referring to when

CONFIDENTIAL

Page 40

1  confidential and a small number of people were

2  involved in this process and he told me at the

3  time that I was not to be involved in this process

4  until I got further notice from him.

5           Q.  Let me get back to my question?

6           A.  Yes.

7           Q.  You were being given a heads up as

8  to what was happening, correct?

9           A.  Yes.

10          Q.  And to be given a heads up you had

11 to have some information, be told some information

12 about what was happening?

13          A.  Yes.

14          Q.  And you received this e-mail which

15 included a chain which discussed, among other

16 things, what was happening, correct?

17          A.  Correct.

18          MS KELLY:  Object to the form.

19          MR PRICE:  So is it your belief that one

20 of the things that you did as getting a heads up

21 as to what was happening was read the e-mail

22 chain?

23          MS KELLY:  Asked and answered.

24          A.  I don't remember if I read the

25 e-mail chain.  Right now I honestly have no

CONFIDENTIAL

Page 39

1          Q.   First of all this is an e-mail that
2     you received from Mr Roberts?
3          A.   Yes.
4          Q.   And if you look at this does this
5     refresh your recollection that it was around
6     January 20th, 2012 that you were told about
7     discussions about moving the distribution center
8     from Germany to somewhere else?
9          A.   Yes, I knew it was sometime earlier
10    in the year.  So yeah, the end of January
11    beginning of February.
12         Q.   So when you received the e-mail from
13    Mr Roberts you see there is a chain here and you
14    are not on the rest of the e-mails?
15         A.   No, I am not.  No.
16         Q.   When you read this e-mail from Mr
17    Robert where he said:  "None else needs to know
18    about this"?
19         A.   Yes.
20         Q.   Did you read the chain to find out
21    what he was talking about?
22         A.   I can't recall whether I read this
23    exact chain.  It doesn't look familiar to me right
24    now, but clearly Owen gave me a heads up as what
25    was happening.  He clearly called out it was

CONFIDENTIAL

Page 38

1    Davidson dated January 20th, 2012, do you see

2    that?

3             A.  Yes.

4             MS KELLY:  Before you go on, if she

5    needs time to review the whole chain can you give

6    her time to do that?

7             MR PRICE:  If you need time to review

8    the whole chain go ahead.  First let me ask you

9    Ma'am, have you seen this before, Daly Exhibit 1.

10            A.  I don't recall.

11            MR PRICE:  Is this one of the documents

12   that you saw yesterday?

13            MS KELLY:  I am going to object and

14   instruct not to answer.  And work product.

15            A.  Okay.

16            MR PRICE:  Have you had a chance now to

17   review Daly Exhibit 1?

18            A.  Yes.

19            Q.  Do you see at the top of Daly

20   Exhibit of this e-mail chain there is an e-mail

21   from Owen Roberts to you and Noel Moore, Jeff

22   Davidson copied, dated January 20th, 2012?

23            A.  Umm hmm.

24            Q.  Is that a yes?

25            A.  Yes.

CONFIDENTIAL

1          A.  Well he would have said that

2     Microsoft has made a decision, and that he also

3     told me that it was -- that it was reformed --

4     that he was informed by Legal or legal

5     representatives, and my understanding at the time

6     was that we were -- that there was a patent case

7     and there was a risk that we wouldn't be able to

8     do business in Europe and to mitigate the risk we

9     were moving the warehouse to Venray to enable us

10    to continue selling Xbox.  That was my general

11    understanding that Owen would have informed me.

12          Q.  Let's break that down.  First let's

13    focus on when you think you were informed that a

14    move was going to be made out of Germany.  If we

15    can put before you what is going to be marked as

16    Daly Exhibit 1.

17          (Exhibit 1 marked for identification)

18          Do you have in front of you what we have

19    marked as Daly Exhibit 1?

20          A.  Umm hmm.

21          Q.  Do you see at the top -- first you

22    see this looks like an e-mail chain?

23          A.  Yes.

24          Q.  And at the top it is an e-mail from

25    Owen Roberts to Theresa Daly, Noel Moore and Jeff

CONFIDENTIAL

1   January.  It was early in the year when he gave me

2   a heads up.  He told me my remit was to focus on

3   Channel operations to make sure that part of the

4   business was running smoothly and Jeff Davidson

5   would be the person dealing with the process that

6   was at hand.  And then he would have informed me

7   intermittently by telephone as to what was

8   happening, but I don't recall exactly when those

9   dates were.

10          Q.  Did Mr Roberts tell you what his

11   role was in connection with any move by the

12   distribution center out of Germany?

13          A.  What do you mean by his role?

14          Q.  Let me rephrase.  Did Mr Roberts

15   tell you anything about his role in any decision

16   about moving the distribution center out of

17   Germany, did he say:  I made the decision?  Did he

18   say:  I was told to do that.  Did he say:  I don't

19   know how this happened.  Anything about whether he

20   was involved in making the decision to move

21   Microsoft's EMEA distribution center out of

22   Germany?

23          A.  No, he didn't tell me directly.

24          Q.  Did he tell you indirectly how he

25   was involved?

CONFIDENTIAL

1          Q.  Let me ask, would changing the EMEA

2   distribution services vendor have any impact on

3   Channel Operations?

4          A.  Yes, it would.  Yes.

5          Q.  What impact would it have on Channel

6   operations?

7          A.  Because I deal directly with our

8   sales organization customers, if there was any

9   change in service level as in delayed orders, or

10  missed orders or incorrect paperwork, that

11  escalation would come via myself and my team from

12  the sales organization and from our customers.

13         Q.  Did there come a time when you were

14  informed by someone that Microsoft was going to

15  change its distribution center location from

16  Germany to some place else?

17         A.  Yes, I was informed by Owen Roberts.

18         Q.  And when were you informed?

19         A.  I don't remember.  I mean, I

20  remember he gave me a heads up as of the situation

21  in February.

22         Q.  2012?

23         A.  As far as I recall.

24         Q.  Of 2012?

25         A.  Or it may have been the end of

CONFIDENTIAL

Page 34

1   Microsoft making a change in its distributor or

2   moving from Germany because of any litigation

3   between Microsoft and Motorola?

4           MS KELLY:  Object to the form.  Can you

5   clarify when you say first-hand knowledge?

6           MR PRICE:  You have answered a few times

7   questions concerning first-hand knowledge, what

8   did you understand that to mean?

9           A.  When you say first-hand knowledge I

10  understand that I was directly involved in the

11  discussion, that I directly had discussions and

12  met with partners in Arvato, that is what I

13  understand.  So with that understanding my answer

14  is no, I was not involved in any discussions.  I

15  did not have first-hand knowledge.  If you want to

16  call it second hand knowledge from Owen Roberts as

17  a heads up as to what was happening, yes.

18          Q.  So anything that you know about the

19  reason that Microsoft moved its EMEA distribution

20  center from Germany to the Netherlands, anything

21  you know you learned from someone else?

22          A.  From Owen Roberts primarily.  He was

23  the person who managed this process and he was the

24  person who would have updated me when he felt it

25  was necessary.

CONFIDENTIAL

1          "As discussed Microsoft is making this

2     change to avoid any potential disruption to our

3     business in the event we experience an adverse

4     outcome in current litigation between Microsoft

5     and Motorola Mobility in Germany."

6          Do you see that?

7          A.   Yes.

8          Q.   To begin with you told us at the

9     time you signed this letter on behalf of Microsoft

10    and MSCIS in particular that you had not read it,

11    correct?

12         A.   Correct, yes.

13         Q.   You told us you don't have

14    first-hand knowledge of the contents of the

15    letter, correct?

16         A.   Correct, yes.

17         Q.   Is it correct, did you have -- is it

18    correct that you did not have first-hand knowledge

19    of discussions between Microsoft and Arvato about

20    potential business disruption as a result of any

21    litigation between Microsoft and Motorola?

22         A.   That is correct, I was not involved

23    in any discussions.

24         Q.   Is it correct that to this day you

25    don't have any first-hand knowledge about

CONFIDENTIAL

1    straight to Jeff.

2            Q.  When is the first time that you ever

3    read the contents of the letter dated April 3,

4    2012 from Arvato addressed to you, when was the

5    first time you ever read it?

6            A.  I think you showed it to me

7    yesterday.

8            Q.  By "you", the video captioned your

9    head, you don't mean me?

10           A.  No, not you, the Microsoft team

11   yesterday would have shown me the letter.

12           Q.  So that's the first time you ever

13   read the letter?

14           A.  Yes, I don't recall reading it

15   beforehand prior to yesterday.

16           Q.  So do you have any first-hand

17   knowledge at all about the contents of your

18   communications, Theresa Daly?

19           A.  Yes.

20           Q.  With Dr Hans Peter Heulskotter?

21           A.  No, I don't.

22           Q.  So, for example, the first exhibit I

23   saw here which is Davidson 4?

24           A.  Yes.

25           Q.  The second sentence says:

CONFIDENTIAL

Page 31

1    MSCIS in Microsoft Ireland, the first time was

2    May 29th, 2013?

3            A.  Yes.

4            Q.  Do you recall getting a response

5    from this letter from Arvato?

6            A.  To be honest I wouldn't have.  I

7    don't particularly recall the exact response to

8    the letter.

9            Q.  If you look at the second page of

10   the Exhibit?

11           A.  Yes.

12           Q.  Still on Davidson Exhibit 7, do you

13   see there looks like a copy of the letter from Dr

14   Hans Peter Heulskotter at Arvato to Theresa Daly?

15           A.  Yes.

16           Q.  Microsoft Ireland that begins:

17   "Dear Theresa", do you see that?

18           A.  Yes.

19           Q.  Did you, in fact, receive this

20   letter from Arvato, Dr Hans Peter Heulskotter to

21   you?

22           A.  Yes, I am sure I did.

23           Q.  When you received the letter did you

24   read it?

25           A.  No, I would have forwarded it

CONFIDENTIAL

Page 30

1    you signed it?

2          A.   Okay, I repeat again I was the

3    General Manager with responsibility for Channel

4    Operations globally.  Jeff Davidson was

5    responsible for Distribution and Logistics

6    Globally.  So this would have been, this letter

7    and all the contents, the details would have been

8    discussed and validated by Jeff and Owen Roberts.

9          Q.   So the answer to my question is no?

10         A.   No.

11         Q.   A double negative.  So let me ask it

12   again then.  Did you believe that in your position

13   as General Manager that you should have read this

14   before signing it, yes or no?

15         A.   No.

16         Q.   The letter itself, have you read

17   this letter before, we are siting here at a

18   deposition now, apparently you didn't read it at

19   the time you signed it, has there ever come a time

20   when you did read the letter?

21         A.   Yesterday at our meeting with the

22   team I was shown the letter.

23         Q.   Okay.  So your testimony was the

24   first time you actually read this March 30th, 2012

25   letter to Arvato that you signed on behalf of

CONFIDENTIAL

Page 29

```
1    this appears to be a letter that is signed by you
2    Theresa Daly, correct?
3              A.  Correct.
4              Q.  And you were signing on for and on
5    behalf of Microsoft Ireland Operations Limited?
6              A.  Yes, correct.
7              Q.  So and that is your signature on the
8    letter?
9              A.  Yes, it is.  Yes.
10             Q.  So before signing this letter did
11   you have any knowledge of the substance of the
12   letter?
13             MS KELLY:  Object to the form.
14             A.  When you say knowledge do you mean
15   was I aware or was I involved?
16             MR PRICE:  Let me take a step back.
17   Before signing this letter as the General Manager
18   of MSCIS and for and on behalf of Microsoft
19   Ireland did you read the letter?
20             A.  No, I wouldn't have read the details
21   of the letter.
22             Q.  And were you -- did you think that
23   as someone signing for and on behalf of Microsoft
24   Ireland Operations and as the General Manager that
25   you should have read the letter to Arvato before
```

CONFIDENTIAL

Page 28

1    terms of Microsoft policy and in terms of

2    authorized signatures we would have responded --

3    the letter would have come to me and I would have

4    passed it directly to Jeff Davidson.  It was a

5    figure head position for the region in terms of

6    seniority.  It was no more than that.

7            Q.  So sometimes Microsoft -- let me

8    repeat that.  Let me see if your testimony is the

9    same about some subsequent communications between

10   Arvato and Microsoft that appear to involve you?

11           A.  Okay.

12           Q.  If you would look at what we have

13   before you.

14           (Previously Marked Davidson Exhibit 7)

15           Miss Daly, you will see previously

16   marked Davidson 7 which begins with an e-mail on

17   April 6th, 2012 between Mr Davidson and

18   Mr Roberts, and then there appear to be

19   attachments to that, do you see that?

20           A.  Umm hmm.  Yes.

21           Q.  If we can go in chronological order

22   here, we will start at the last page, the third

23   page of the exhibit do you see there is a letter

24   dated March 30th, 2012 to Dr Hans Peter

25   Heulskotter at Arvato and, again at the bottom

CONFIDENTIAL

Page 27

1           A.   Maybe I am not making myself clear.

2    The person responsible in this case instance for

3    global distribution and logistics was Jeff

4    Davidson who reported to Owen Roberts, and Jeff

5    and Owen were the responsibles within Microsoft

6    for all correspondence and communication with

7    Arvato.

8           MR PRICE:  So why in your understanding

9    if Hans Peter at Arvato had a response to the

10   termination letter why would he have responded to

11   you instead of responding to the people at

12   Microsoft who were responsible?

13          MS KELLY:  Object to the form.  The

14   response is vague.  Lack of foundation.

15          A.   Could you repeat the question

16   please?

17          MR PRICE:  You told us that the

18   discussions with Arvato didn't involve you, that

19   you had no involvement.

20          A.   That is correct.

21          Q.   So you have also told us that you

22   believe that Dr Heulskotter, who we refer to as

23   Hans Peter, responded to you after receiving the

24   notice of termination?

25          A.   So in terms of formality and in

CONFIDENTIAL

Page 26

1    part of any meetings.  I was not part of any

2    telephone calls with Arvato.  It just wasn't my

3    role.  I wasn't involved in that process.

4           Q.  Well, did Hans Peter respond to the

5    February 13th, 2012 termination letter?

6           A.  I am sure he did.

7           Q.  Did he respond to you?

8           A.  He would have responded to me as the

9    signature on the letter.

10          Q.  If he wanted -- your understanding

11   if he wanted to make sure Microsoft knew what his

12   position was --

13          A.  Yes.

14          MS KELLY:  Wait.

15          MR PRICE:  Who was your understanding he

16   would have responded to?

17          A.  He would have responded -- his

18   discussion would have been with Owen Roberts and

19   Jeff Davidson, not with me.

20          Q.  So there would have been no reason

21   for him to respond to you because if he wanted to

22   deliver a message to Microsoft he could have

23   talked to someone else?

24          MS KELLY:  Object to form.  Lack of

25   foundation.

CONFIDENTIAL

Page 25

```
 1              Q.  Well, you didn't send this letter to
 2       somebody at Microsoft, you sent this outside of
 3       Microsoft?
 4              A.  Yes, Arvato.
 5              Q.  Is it your testimony that your
 6       belief is that -- started with that, that Arvato
 7       would not have the impression that you wrote the
 8       letter?
 9              A.  Yes.
10              Q.  And that you did sign it?
11              A.  Absolutely, yes.
12              Q.  Did you have any discussions with
13       Hans Peter, the person to whom the letter is
14       written about that?
15              A.  No.
16              Q.  You had further communications with
17       Arvato and Hans Peter, correct?
18              A.  There was letters I signed.  I
19       didn't have communication with them.
20              Q.  After this letter was signed
21       February 14th, 2012 you had subsequent
22       correspondence with Arvato, correct?
23              A.  There were subsequent letters which
24       I signed but I did not have any direct
25       communication, verbal communication.  I was not
```

CONFIDENTIAL

Page 24

1    in fact, you were the person who wrote the letter?

2            MS KELLY:  Object to the form.

3            A.  I don't understand that question.

4            MR PRICE:  Well, do you agree that if

5    someone looked at this letter and saw your

6    signature at the bottom that it might give the

7    appearance that you, in fact, Miss Daly, are the

8    one who wrote the letter.

9            MS KELLY:  Object to the form.  Calls

10   for speculation.

11           A.  Who is the someone, who are you

12   referring to?

13           MR PRICE:  I am saying if someone saw

14   this letter, say someone outside of Microsoft,

15   someone saw this letter signed by you, do you

16   agree that that might give that person the

17   impression that you wrote the letter?

18           MS KELLY:  Object to the form.  Calls

19   for speculation.  Lack of foundation.

20           A.  I just think we have a very clear

21   structure and organization in Microsoft so the

22   parties we work with are very aware of that

23   structure.  So for me this doesn't cause any

24   confusion for Arvato to whom the letter was

25   directed.

CONFIDENTIAL

Page 23

1    of it, but as I said again, I was not involved in

2    any of these discussions in any of the meetings.

3    I was purely a signature on the letter.

4              Q.   And being the signatory on the

5    letter as the senior person in the division did

6    you do anything to try to educate yourself about

7    what was going on?

8              A.   No, I was specifically told not to

9    get involved by my manager at the time.

10             Q.   So who was it who told you not to

11   get involved in the substance that is described in

12   the letter that bears your signature, Davidson

13   Exhibit 4?

14             A.   Owen Roberts.

15             Q.   And at the time did you say anything

16   to them such as:  Hey, if I am going to sign this

17   letter I need to know what's going on?

18             A.   Yes, I had a discussion with him to

19   talk about responsibilities.  He made it very

20   clear that Jeff Davidson was the responsible

21   general manager in this particular case and I

22   trusted Jeff.

23             Q.   Did you have any understanding

24   whether or not Microsoft wanted to give the

25   impression to whoever would see this letter that,

CONFIDENTIAL

Page 22

1          Q.   Okay.   So if we look at this letter

2     then, let's stay with the second sentence:

3          "As discussed Microsoft is -- strike

4     that.  Did you have an understanding that this

5     February 13th, 2012 letter was meant to give

6     notice of termination to Arvato for services

7     Arvato had been providing to Microsoft?

8          A.   Yes, I had been given a heads up by

9     my manager Owen Roberts that this process was

10    happening.  He also made it clear that it was not

11    within my remit.  My remit was to focus on my key

12    job which was Channel Operations.  There was

13    another part of the team dealing with this.

14         Q.   So you didn't have an understanding

15    by signing the February 13th, 2012 letter, which

16    is Davidson Exhibit 4, that you were sending

17    Arvato a document which gave them official notice

18    that their services were terminated, correct?

19         A.   Yes.

20         MS KELLY:   Object to form.

21         MR PRICE:   And did you know that in that

22    same letter you were also asking Arvato to make a

23    formal business and cost proposal for services, do

24    you have an understanding of that?

25         A.   I would have a vague understanding

CONFIDENTIAL

Page 176

1                    CERTIFICATE OF DEPONENT

2

3    I, Theresa Daly, hereby certify that I have read

4    the foregoing pages of my deposition of testimony

5    taken in these proceedings Thursday, 30th May 2013

6    and, with the exception of the changes listed on

7    the next page and/or corrections, if any, find

8    them to be a true and accurate transcription

9    thereof.

10

11

12

13

14   Signed:  ........................

15   Name:  Theresa Daly

16

17

18

19

20

21

22

23

24

25

# EXHIBIT 7

**quinn emanuel** trial lawyers | silicon valley

555 Twin Dolphin Drive, 5th Floor, Redwood Shores, California  94065-2139 | TEL: (650) 801-5000  FAX: (650) 801-5100

May 15, 2013

VIA E-MAIL

Chris Wion
Calfo Harrigan Leyh & Eakes LLP
999 Third Avenue, Suite 4400
Seattle, WA 98104

Re:    Microsoft Corp. v. Motorola Mobility, Case No. C10-1823-JLR

Dear Chris:

I write regarding the May 9, 2013 deposition of Jeff Davidson.  In addition to the many document production deficiencies identified in Mr. Davidson's deposition, which are set forth in detail in our May 10 letter, Mr. Davidson was unprepared to testify on several issues which fall squarely within Topic 8 of Motorola's Second Rule 30(b)(6) Deposition Notice, on which he was designated to testify.  Specifically, Mr. Davidson was not prepared to testify on the following issues:

- what, if any, analysis Microsoft performed with respect to the necessity of relocating the EMEA distribution facilities before Mr. Davidson was involved, or that he was not personally involved in (Davidson Rough Tr., 68:21-25, 213:10-19);
- who at Microsoft had to ultimately approve the move (*id.*, 61:17-62:15);
- whether Microsoft ever previously considered moving distribution facilities in response to a possible injunction (*id.*, 75:18-76:21);
- who in the legal department Shelly McKinley was working with in connection with the possible injunction and relocation (*id.*, 63:21-25);
- what Microsoft did to avoid litigation in Germany (*id.*, 175:7-176:2);

quinn emanuel urquhart & sullivan, llp

LOS ANGELES | 865 South Figueroa Street, 10th Floor, Los Angeles, California  90017-2543 | TEL (213) 443-3000  FAX (213) 443-3100
NEW YORK | 51 Madison Avenue, 22nd Floor, New York, New York  10010-1601 | TEL (212) 849-7000  FAX (212) 849-7100
SAN FRANCISCO | 50 California Street, 22nd Floor, San Francisco, California  94111-4788 | TEL (415) 875-6600  FAX (415) 875-6700
CHICAGO | 500 W. Madison Street, Suite 2450, Chicago, Illinois  60661-2510 | TEL (312) 705-7400  FAX (312) 705-7401
LONDON | 16 Old Bailey, London EC4M 7EG, United Kingdom | TEL +44(0) 20 7653 2000  FAX +44(0) 20 7653 2100
TOKYO | NBF Hibiya Bldg., 25F, 1-1-7, Uchisaiwai-cho, Chiyoda-ku, Tokyo 100-0011, Japan | TEL +81 3 5510 1711  FAX +81 3 5510 1712
MANNHEIM | Erzbergerstraße 5, 68165 Mannheim, Germany | TEL +49(0) 621 43298 6000  FAX +49(0) 621 43298 6100

01980.62689/5375798.2

May 15, 2013

- Microsoft's motion for an anti-suit injunction and the timing thereof (*id.*, 169:21-170:5, 173:3-5, 224:5-18);
- why Microsoft did not consider relocating the EMEA distribution facility prior to January 2012 (*id.*, 168:17-22);
- how quickly Arvato found a new tenant for the Dueren facility (*id.*, 128:20-25);
- the differences between the Dueren and Venray facilities in terms of products stored, products distributed, revenue generated, etc.  (*id.*, 158:15-161:9); and
- how the numbers in Exhibit 16 were generated (*id.*, 206:4-8).

The above issues relate to Microsoft's decision to relocate the EMEA distribution center, other factors considered by Microsoft in connection with relocating the EMEA distribution center, the costs associated with the relocation, and Microsoft's efforts, if any, to mitigate damages, all of which are expressly covered by Topic 8.  Yet, Mr. Davidson could not answer questions on these issues.  By Thursday, May 16 at 5 pm Pacific, please provide date(s) on which a witness or witnesses will be made available to testify on these issues.

Very truly yours,

*Andrea Pallios Roberts*

Andrea Pallios Roberts

CC: All counsel

APR

01980.62689/5275798.2

01980.62689/5275798.2

01980.62689/5275798.2

# EXHIBIT 8

**quinn emanuel** trial lawyers | silicon valley

555 Twin Dolphin Drive, 5th Floor, Redwood Shores, California  94065-2139 | TEL: (650) 801-5000 FAX: (650) 801-5100

May 30, 2013

V<small>IA</small> E-M<small>AIL</small>

Chris Wion
Calfo Harrigan Leyh & Eakes LLP
999 Third Avenue, Suite 4400
Seattle, WA 98104

Re:    Microsoft Corp. v. Motorola Mobility, Case No. C10-1823-JLR

Dear Chris:

I write regarding various discovery issues relating to Microsoft's claim that it relocated its EMEA distribution facilities as a result of Motorola's alleged breach of contract.

**30(b)(6) Deposition**

First, as explained in my May 15 letter, Mr. Davidson, Microsoft's 30(b)(6) witness on Topic 8 of Motorola's Second Rule 30(b)(6) Deposition Notice, was not prepared to testify on issues that fall within that topic:

- what, if any, analysis Microsoft performed with respect to the necessity of relocating the EMEA distribution facilities before Mr. Davidson was involved, or that he was not personally involved in (Davidson Tr., 217:14-23)[1];

---

[1]    My May 15 letter cited to the rough deposition transcript, as that was all that was available at the time.  The citations herein are to the final deposition transcript.

quinn emanuel urquhart & sullivan, llp

LOS ANGELES | 865 South Figueroa Street, 10th Floor, Los Angeles, California  90017-2543 | TEL (213) 443-3000  FAX (213) 443-3100
NEW YORK | 51 Madison Avenue, 22nd Floor, New York, New York  10010-1601 | TEL (212) 849-7000  FAX (212) 849-7100
SAN FRANCISCO | 50 California Street, 22nd Floor, San Francisco, California  94111-4788 | TEL (415) 875-6600  FAX (415) 875-6700
CHICAGO | 500 W. Madison Street, Suite 2450, Chicago, Illinois  60661-2510 | TEL (312) 705-7400  FAX (312) 705-7401
LONDON | 16 Old Bailey, London EC4M 7EG, United Kingdom | TEL +44(0) 20 7653 2000  FAX +44(0) 20 7653 2100
TOKYO | NBF Hibiya Bldg., 25F, 1-1-7, Uchisaiwai-cho, Chiyoda-ku, Tokyo 100-0011, Japan | TEL +81 3 5510 1711  FAX +81 3 5510 1712
MANNHEIM | Erzbergerstraße 5, 68165 Mannheim, Germany | TEL +49(0) 621 43298 6000  FAX +49(0) 621 43298 6100

01980.62689/5332159.1

May 30, 2013

- who at Microsoft had to ultimately approve the move (*id.*, 63:12-15);
- whether Microsoft ever previously considered moving distribution facilities in response to a possible injunction (*id.*, 76:23-78:12);
- who in the legal department Shelly McKinley was working with in connection with the possible injunction and relocation (*id.*, 65:6-10);
- what Microsoft did to avoid litigation in Germany (*id.*, 179:1-21);
- Microsoft's motion for an anti-suit injunction and the timing thereof (*id.*, 172:20-173:22);
- why Microsoft did not consider relocating the EMEA distribution facility prior to January 2012 (*id.*, 172:7-12);
- how quickly Arvato found a new tenant for the Dueren facility (*id.*, 131:21-25);
- the differences between the Dueren and Venray facilities in terms of products stored, products distributed, revenue generated, etc. (*id.*, 161:24-164:21); and
- how the numbers in Exhibit 16 were generated (*id.*, 210:6-14).

We maintain that Mr. Davidson did not have answers to questions directed at these issues, and this is clear from the deposition transcript. In your May 16 letter in response, you did not address the substance of any of these issues. For example, you do not cite to where in the transcript Mr. Davidson answered these questions. Nor do you explain how these issues do not fall within Topic 8.

In any event, we deposed Mr. Roberts, to whom Mr. Davidson reported, and hoped that he could testify on some or all of these issues. He could not testify as to several of them. Rather, according to Mr. Roberts, the decision to relocate the EMEA distribution facility was a legal decision. (Roberts Tr., 32:4-21) ("I said back in January we were informed that we were – we were being -- we had a court litigation pending against us which -- which would probably require us to move our facility in order to keep doing business in Europe. If you are asking that question, no, I wasn't part of that decision, that was a legal decision.") Mr. Roberts also did not know what, if anything, Microsoft did to avoid litigation in Germany, the licensing offers made by Microsoft, the German law procedures that were or were not followed by Microsoft, the briefs Microsoft filed in the Washington case and while they were not filed earlier, or why he was not informed of the need to move earlier than January 2012. (*Id.*, 132:5-14, 132:21-23, 106:9-17,133:14-22.) Ms. Daly similarly could not testify on these issues. These issues bear directly on the proximate cause of the move and Microsoft's efforts, if any, to mitigate damages. Motorola is entitled to this information. If it is someone in the legal department that knows this information, then we need to depose that person. If Microsoft is refusing to provide discovery on these issues based on privilege, then it needs to clearly state as much. It cannot hide the ball by failing to properly educate a 30(b)(6) witness.

Accordingly, by Monday, June 3, please let us know if Microsoft will produce a witness who is appropriately educated to testify on the decisions and actions taken by the Microsoft legal

May 30, 2013

department as they relate to the decision to relocate the EMEA distribution facility, and any efforts to mitigate the alleged damages.

## Documents

The following categories of documents that we previously requested still do not appear to be included in Microsoft's supplemental document products:

- Microsoft "Network Analysis" reports related to the Duren facility from 2010 through June 2012;
- Communications between Microsoft and Arvato regarding  "open book" procedures from 2010 through June 2012
- Arvato's operative lease for the Duren facility for the period from January 2012-June 2012;
- Documents sufficient to show the percentage of the Duren facility Microsoft shared with other tenants and apportionment for how the facility was shared; and
- Communications with Arvato, following the termination of services, indicating that Arvato had a new tenant for the Duren space.

Are these documents still forthcoming?  Further, when does Microsoft expect its document production to be complete?

Additionally, in Ms. Mangin's May 15 letter to you, we asked Microsoft to let us know "which custodians' files were previously searched to identify documents relating to Microsoft's claim that it relocated its EMEA distribution facility to the Netherlands."  We have not received a response.  Please provide one.

## Privilege Log

Microsoft's privilege log relating to its claim that it relocated its EMEA distribution facility to the Netherlands appears to be limited to Mr. Davidson's files.  Is the privilege log being updated to reflect documents withheld from Mr. Roberts and Ms. Daly's files?  Further, given Mr. Roberts' testimony that the decision to move was made by the legal department, it seems likely that there are many additional documents being withheld on the basis of privilege.  Please

May 30, 2013

confirm that this is the case.

Please provide a response to the issues raised in this letter by June 6.


Very truly yours,

Andrea Pallios Roberts

CC: All counsel

APR

01980.62689/5332159.1

01980.62689/5332159.1

01980.62689/5332159.1

4

197