LAW OFFICES
**CALFO HARRIGAN LEYH & EAKES** LLP
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON  98104
(206) 623-1700

ARTHUR W. HARRIGAN, JR.

FACSIMILE:  (206) 623-8717
E-MAIL:  ARTHURH@CALFOHARRIGAN.COM

June 20, 2013

The Honorable James L. Robart
United States District Court
Western District of Washington
700 Stewart Street, Suite 14128
Seattle, WA  98101-9906

     Re:    *Microsoft Corp. v. Motorola, Inc.*, et al., No. 10-cv-1823-JLR

Dear Judge Robart:

## I.    Introductory Statement.

    Motorola's June 18, 2013 letter brief (hereafter "Brief") is its second attempt to dispose of Microsoft's claim for German relocation damages via a manufactured discovery dispute.  The Court's comments on Motorola's first attempt apply equally here:

> At issue, as I understand it, is a request that the court preclude Microsoft from relying on or introducing evidence related to four damage theories.  So, in effect, this is somewhat like a motion in limine, although it really is more in the order of a disguised motion for summary judgment.[1]

    Microsoft has fully complied with its discovery obligations and provided an informed witness, Jeff Davidson (General Manager, Global Supply Chain, Operations) to testify with respect to Topic 8 of Motorola's Rule 30(b)(6) notice.  Davidson oversaw Microsoft's efforts to relocate its Europe, Middle East, and Africa ("EMEA") distribution facility to avoid the impact of a potential German injunction that could have prevented Microsoft from distributing Xboxes and copies of Windows software to or from Germany.  Davidson, along with his supervisor, Owen Roberts (General Manager, Global Supply Chain), considered relocation as a potential response to the risk of an injunction created by Motorola's prosecution of its litigation in Germany, participated in evaluating other options, and was involved in the final decision to relocate the EMEA facilities to The Netherlands.  Davidson testified appropriately, and Motorola has no basis to re-open the 30(b)(6) deposition with another witness.

    Motorola also deposed two Microsoft witnesses in their individual capacities, Roberts and Theresa Daly, relating to the same subjects.  In total, Motorola examined the three witnesses for approximately 12 hours over three days.

---

[1] May 7, 2013 Hearing Tr. at 2-3.

As with its May 1, 2013 discovery motion on this topic (Dkt. #682), Motorola delayed filing this motion until well after it had the information it has advanced to support it. Motorola's motion comes almost one month after the close of fact discovery (May 20), and more than two weeks after its last fact deposition (Daly, on May 30). There is no basis to reopen fact discovery.

## II.     Factual Background and Procedural History.

Microsoft seeks to recover the costs it incurred to relocate its German distribution facility in the spring of 2012. At the time, Motorola's infringement action was pending in Germany and the German court had already held a hearing on, and set a date for a decision on the merits of, Motorola's infringement case. The injunction sought by Motorola – on its RAND-committed patents – would have prevented Microsoft from importing, selling, or distributing its Xbox 360s and Windows software to or from Germany. Had Motorola made a RAND license to its H.264 SEPs available, the predicate for the German infringement action would have been absent. An important consequence of the threatened injunction was to put at risk Microsoft's ability to supply its customers in large portions of EMEA from its primary distribution facility in Duren, Germany. Microsoft is entitled to recover the costs of mitigating the losses that would have arisen from such an injunction.

On April 3, 2013, Microsoft served a supplemental interrogatory response articulating the basis for its recovery of these costs. Ex. A, at p. 27. Motorola served its 30(b)(6) notice two days later. Motorola deposed Microsoft's witness designated for Topic 8 (Davidson) on May 9. On May 15, Motorola raised the same alleged deficiencies that now form the basis for its motion. On May 16, Microsoft explicitly disclaimed "any obligation to offer an additional 30(b)(6) witness to provide further testimony regarding Topic 8."[2]

Instead of filing the motion in mid-May, Motorola waited until after the close of fact discovery (May 20), after exchange of opening expert reports (on May 29), and after exchange of rebuttal reports (on June 10). Motorola's motion is untimely under Local Civil Rule 16(f), which requires that any motion to compel discovery be filed and served before the close of discovery. Fact discovery closed on May 20. Motorola has provided no justification for its delay.[3]

## III.     Microsoft Properly Responded to Examination Regarding 30(b)(6) Topic 8.

Motorola's 30(b)(6) notice on damage issues includes ten separate topics, filling four pages of text. Microsoft designated, and Motorola deposed, a total of four 30(b)(6) witnesses: David Killough, Jon DeVaan, David Treadwell, and Jeff Davidson.

---

[2] The parties' respective letters, including those omitted by Motorola, are collected at Exhibits B-E hereto.

[3] Motorola did not need to depose Daly before bringing this motion. As Microsoft informed Motorola, Daly had no substantive involvement in the relocation effort. *See* Ex. F (collection of correspondence relating to Daly's deposition). Motorola now writes that Daly "could [not] provide additional detail on the history of and factors in the decision to relocate or Microsoft's efforts to mitigate through its litigation strategy," precisely as Microsoft had forewarned. Brief at 4. Microsoft also offered to make Daly available in Redmond for two hours (before her flight to Dublin) on May 17 while she was there on other business but Motorola declined this offer, opting to take her deposition in Dublin on the next available date, May 30. *See Id.*

Motorola's motion relates only to Topic 8, which contains eight discrete sub-parts (*see* Appendix A). Motorola claims Davidson failed to answer questions relating to parts 2, 3, and 7, and requests an order requiring Microsoft to produce a fifth 30(b)(6) witness "to testify fully regarding Microsoft's [2] decision to relocate and [3] all of the factors considered in that decision, as well as [7] the reasons why Microsoft did not mitigate damages." Brief at 1. Motorola's request lacks merit. No basis exists to re-open discovery on these subjects.

A.  Part 2:  "the history of the decision to relocate the EMEA distribution center"

Davidson's and Roberts' deposition testimony demonstrates that there is nothing of consequence remaining to discover. They made the decision to relocate. It was not a mandate handed down from Microsoft's legal department, as Motorola implies. They began to evaluate relocation among the possible means of mitigating the risk created by Motorola's German action in mid-January 2012, chose a new site and vendor in March 2012, and then executed, bringing the new EMEA facility on-line in The Netherlands in June 2012.

In January 2012, Microsoft in-house counsel, Shelley McKinley alerted the business unit responsible for managing the EMEA distribution facility – *i.e.*, Davidson and Roberts – that Microsoft might not be able to continue distributing its products to or from Germany based on the "legal situation" in Germany:

A:  We were alerted to the legal situation right -- right in there, early to mid-January. And that's when it started. We had not considered relocating prior to being alerted.
Q:  Okay. And who -- who alerted -- alerted you to the legal situation? Was that Shelley McKinley – ...
A:  Yeah, Shelley.
Q:  And what did you understand the legal situation to be?
A:  I understood, at that stage, basically what was public. It was a patent infringement case. There was a risk of an injunction, where we would not be able to distribute our product to or from Germany.[4] That's basically what I understood the case to be. The rest of it was legal. And -- and, frankly, we've got plenty of legal experts. And my job was basically to hear risk; we should start considering mitigations.

Ex. G at 57:20-58:16.[5]  Thereafter, Davidson evaluated the possibility of relocating the EMEA facilities and, ultimately, he and Roberts made the decision, along with the support of Roberts' supervisor, Brian Tobey (Corporate VP for Manufacturing and Operations):

Q:  When did Microsoft start considering whether it should move the EMEA facilities?
A:  Mid-January of 2012.
Q:  And who -- who ultimately made the decision to move the facilities?

---

[4]  Motorola's suggestion that Davidson could not connect this risk with the ongoing litigation between Microsoft and Motorola over SEP's (Brief at 3) is belied by his actual testimony. *See* Ex. G at 69:25-70:7 ("Q: ...Who were the parties to the proceedings? A: Motorola and Microsoft. My understanding were -- was, there were hearings, and we understood the risk of injunction in Germany. I know that the -- the hearings, I believe, were in Seattle.")
[5]  Relevant excerpts from the deposition of Jeff Davidson are attached hereto as "Exhibit G".

A:  It would have been me; Owen Roberts, my boss; and his boss, Brian Tobey.[6]

*Id.* at 56:17-23.  Davidson also testified that Microsoft chose a location and vendor for the new facility in early March.  *Id.* 56:6-16.  Roberts similarly testified that the decision to relocate the EMEA facility was a business decision, <u>not</u> a decision made by Microsoft's in-house counsel:

> Q: Okay. And I just want to make sure I am understanding your testimony correctly. I believe you testified earlier today that you and your team decided between going with Arvato versus CEVA, whereas the legal team was – was the group that – that made the decision whether or not to move; is that correct?
> A: No, that is not correct.
> Q: Okay.
> A: **No. The legal team is there to give us advice.  We own the business and we make the business decision based on the risks that are presented to us.  And so the legal team had presented a case that said we had a very strong risk of our business being materially impacted if we lost the litigation in Germany, and then it was a decision by the business to say how to [sic] we mitigate for that risk and at what stage do we mitigate for that risk.  It's not a legal decision.**
> Q: So when I asked you who made the decision to relocate the distribution facility out of Germany, who was that?
> A: That was my decision with Brian Tobey as my support as far as for that.  But when I presented it to Brian, where we were, the business risks associated with it, Brian agreed with my proposal.

Ex. H at 134:20-135:19 (emphasis added). [7]

As the decision-makers, Davidson and Roberts were the Microsoft witnesses in the best position to address the basis for and history of that decision.  Both testified that they learned about a risk to Microsoft's continued business in Germany from McKinley, but that how to address that risk was a business matter handled by the business group, not by the legal department.

    B.  <u>Part 3:  "all other factors considered by Microsoft in connection with relocating the EMEA distribution center."</u>

Motorola repeatedly claims that Davidson failed to testify fully regarding "all of the factors considered" in the decision to relocate.  Brief at 1, 3.  Motorola does not cite any questions posed to Davidson on this subject that he was unable to address.  In fact, Motorola acknowledges that he testified:

> regarding the work that he and his team did to analyze potential locations for a new facility, the potential for a new vendor, and actually implementing the move, after having been advised of the situation in January.  He explained that Microsoft decided to work

---

[6] Davidson also confirmed that Microsoft "had not considered relocating prior to being alerted" of the legal situation by McKinley in mid-January. *Id.*, 57:20-22.
[7] Relevant excerpts from the deposition of Owen Roberts are attached hereto as "Exhibit H."

with a vendor called CEVA and relocate to a new facility in Venray, The Netherlands, on or about March 8, 2012, and the new facility went "live" on June 1, 2012.

Brief at 3.[8] Motorola has not explained the possible relevance of factors that were <u>not</u> considered by those making the decision. Those factors, logically, did not influence the decision.

     C. <u>Part 7: "any efforts by Microsoft to mitigate the damages claimed".</u>

     Motorola argues Microsoft's witnesses have not adequately described Microsoft's mitigation efforts. Motorola is wrong and it has misconstrued the nature of Microsoft's claim. Because of the German location of Microsoft's EMEA distribution center, Motorola stood poised to exact tremendous damage on Microsoft's business outside of Germany with its two German H.264 patents. As Davidson described in detail, the relocation was, itself, an effort to mitigate the hundreds of millions of dollars in damages that Microsoft would have incurred had it been enjoined from distributing Xboxes and copies of Windows both within Germany and throughout the EMEA region from its German distribution facility before it could relocate:

> [The] consideration was really risk. We didn't know with any certainty what would happen one way or the other, but obviously cost was a key consideration, against the risk of not – not being able to do business in Germany.
>
> And, you know, it didn't – at that time, it was – I think it's pretty simple to look at it and say, well, it's Xbox and we couldn't ship to or from Germany, that's potentially hundreds of millions of dollars, but potentially more, depending on how long it would take us to actually respond – Windows, likewise – compared to ten, twelve million dollars in relocation.
>
> And, you know, also, the customer impact in that risk. And so from a customer's perspective, they rely on Microsoft to do their business. They rely on us to have continuity of supply. So my charter is to satisfy that demand and make sure that there's continuity of supply....So that risk an potential disruption far outweighed the cost of – of moving.

Ex. G at 59:8-60:9.

     "The doctrine of mitigation of damages, or avoidable consequences, prevents an injured party from recovering damages that the injured party could have avoided if it had taken reasonable efforts after the wrong was committed. A person who has been injured by another's wrongdoing is given wide latitude and is only required to act reasonably in mitigating her damages." *Transalta Centralia Generation LLC v. Sicklesteel Cranes, Inc.*, 134 Wn. App. 819, 825-26, 142 P.3d 209 (2006) (internal citations omitted). "The obvious corollary to this rule is that an injured party is generally entitled to all legitimate and reasonable expenses an injured party is generally entitled to all legitimate and reasonable expenses necessarily incurred by him in an honest and good faith effort to reduce the damages from or following the wrongful act." *Kubista v. Romaine*, 14 Wn. App. 58, 64, 538 P.2d 812 (1975). As the court noted in *Kubista*:

---

[8] *See, e.g.*, Ex. G at 59-60; 73-74; 83-84 (describing factors considered in the decision-making process).

> A wide latitude of discretion must be allowed to the person who by another's wrong has been forced into a predicament where he is faced with a probability of injury or loss. Only the conduct of a reasonable man is required of him. If a choice of two reasonable courses presents itself, the person whose wrong forced the choice cannot complain that one rather than the other is chosen.

*Id., citing Hogland v. Klein*, 49 Wn.2d 216, 221, 298 P.2d 1099 (1956).

Davidson testified at length regarding Microsoft's efforts to avoid having to move its primary EMEA distribution facility from Germany. Among other things, these efforts included exploring the possibility of distributing products from other existing facilities in the UK and Dubai or converting the German facility into a "bonded" warehouse that theoretically could continue to operate within Germany despite the injunction. *See, e.g.*, Ex. G at 175:20-177:4. Roberts provided similar testimony. Ex. H at 32-34,131. Both Davidson and Roberts also testified regarding Microsoft's efforts to reduce the costs of relocation, analyzing, for example, the most practical geographic location and physical structure to house the new distribution facility and selecting a new distribution vendor (CEVA) whose operating costs would be lower than the incumbent's (Arvato). *See* Ex. G, at 79-80, 125, 205; Ex. H, at 137. Additional detail regarding the comparative costs of these two vendors is included in the May 29, 2013, report of Microsoft's damages expert, Todd Menenberg – deposed earlier today (June 20).

Motorola's main complaint is that Davidson could not articulate the various legal steps that Microsoft took (or could have taken) both in this case and in the German action, which Motorola claims could have avoided the need to relocate. Those questions are outside the scope of Topic 8. In any case, facts pertaining to the legal proceedings, and the actions taken by Motorola and Microsoft in those proceedings, are a matter of record. The parties have exchanged expert reports on the German "*Orange Book*" process as a legal alternative. While Motorola asserts that Microsoft could have employed the "*Orange Book*" process to avoid an injunction, this Court already ruled that Microsoft should not be forced to subject itself to that procedure under threat of an injunction (Dkt. #318, at 24), and the Ninth Circuit agreed. *See Microsoft Corp. v. Motorola, Inc.* 696 F.3d 872, 886 (9th Cir. 2012). Fact testimony to recount the proceedings to which Motorola was a party is both unnecessary and improper.

Motorola also apparently wants to examine someone in Microsoft's legal department about Microsoft's strategy in this case and in Germany. As Davidson testified, this was a business decision. It was made *before* this Court's April 12, 2012 temporary restraining order on Microsoft's anti-suit motion. The risk of an injunction in Germany was a fact. The move was a business response to that fact. It is Microsoft's knowledge at the time it decided to relocate (by early March 2012) that is relevant. *Brown v. State Farm Fire & Casualty Co.*, 66 Wn. App. 273, 282, 831 P.2d 1122 (1992) (reasonableness of expenses is analyzed at time expenses were incurred, not in hindsight). By the time the Court entered its order, the decision to relocate could not be undone. Microsoft had terminated its contract in Germany and begun transitioning to the Netherlands; many of the costs had already been incurred and old and new legal relationships had been irrevocably changed because these steps had to be taken in time to avoid a disruptive injunction. Ex. G at 70-72, 174; Ex. H at 85-86.

6

Moreover, the Court's anti-suit preliminary injunction did not irrevocably remove the risk to Microsoft's operations in Germany. Motorola appealed the ruling. The preliminary injunction did not become final until the Court's November 30, 2012 Order (Dkt. #607).

Motorola speculates that perhaps the decision to relocate was unrelated to Motorola's German action and was due to purported benefits of the Dutch facility. Motorola has had ample opportunity to explore this issue with the most knowledgeable witness, Davidson, who testified:

> Germany is the best place for us to have a distribution center in mainland Europe. That would be the primary factor. Well, actually, that would be one factor. The disruption to our team, potential disruption to our business, in a different way than a break in continuity supply; just meaning, anytime you move, when you move into something new and it's that sizable -- I mean, this is a facility that's -- I want to say ten plus -- it's ten plus football fields. This is not a small feat, and the fact that we had many other things going on. During this period, we were planning for -- we were launching 84 products this year -- that year. We -- my team was opening 44 Microsoft retail stores. We were already opening -- because we were expanding our online presence globally, we ended up expanding into 22 countries. I had already started work in Japan, Australia, and Shanghai, to make sure that we were ready for all those expansions, as well as India. And Europe was just another thing on top of everything else. And so from my perspective, it was look for every possible way not to move. And we couldn't find it within those time frames, or at least couldn't find it in an optimal way. And so the move was definitely the hardest possible choice.

Ex. G, at 73:1-74:7.[9]

Finally, to the extent that Motorola expected Davidson to "testify regarding various legal alternatives Microsoft *could have* employed" (Brief at 3) or "certain efforts Microsoft *might have made* to mitigate the damages" (*id.* at 6), these subjects do not properly fall within Topic 8. Neither Mr. Davidson – nor any other 30(b)(6) designee on facts – would be required to speculate on these legal theories.

## IV.   Motorola's Privilege Arguments Lack Merit.

Motorola alternatively argues that the 30(b)(6) deposition should be re-opened because Davidson (1) disclosed *privileged* information and/or (2) refused to disclose *non-privileged* information. Mot. Brief at 7. Both arguments are baseless.

Motorola claims Davidson's testimony about facts learned from McKinley should result in a broad privilege waiver. But Motorola has failed to identify any privileged information that was disclosed. See Ex. G, at 58:7-11 ("I understood, at that stage, basically what was public. It was a patent infringement case. There was a risk of injunction, where we would not be able to distribute our product to or from Germany.") That Davidson learned certain facts from an

---

[9] Motorola's suggestion that Microsoft relocated its EMEA distribution facility to "add[] a second damages theory" (Mot. Brief, at 6) simply is not grounded in reality.

attorney does not alter the character of the information.  Disclosure of non-privileged information does not waive the attorney-client privilege.

Motorola also claims that Microsoft improperly refused to disclose certain *non-privileged* information.  Motorola does not cite any specific instance where Davidson refused to answer a question at the instruction of counsel.  Instead, Motorola's argument is based on Davidson's own comments that certain communications might be privileged.  *See, e.g.*, Ex. G at 61:5-6; 174:3-4; 218:12.  Davidson never "refused" to answer a question, and it was incumbent upon Motorola's examining counsel to test Davidson's lay understanding of privilege rather than simply skip to the next question, hoping to lay the groundwork for a discovery motion.  *See, e.g., Novartis Pharmaceuticals Corp. v. Abbott Laboratories*, 203 F.R.D. 159, 166 (D. Del. 2001) (agreeing with Abbott's position that "Novartis should have asked further questions about the [allegedly privileged] telephone conversation at Dr. Norton's deposition so that Abbott could have decided whether or not to allow Dr. Norton to answer the questions.").

**V.    Conclusion.**

For the reasons set forth herein, Microsoft respectfully requests that the Court deny Motorola's motion.  Motorola's motion is untimely and no valid reason exists that would warrant permitting Motorola to take another deposition relating to Topic 8.  Finally, Microsoft requests that Motorola be precluded from seeking to exclude Microsoft's relocation damage claims either in a dispositive motion or in a *motion in limine*, as Motorola has now twice sought such relief and Microsoft should not be required to address these issues a third or fourth time.

Very truly yours,

CALFO HARRIGAN LEYH EAKES LLP

Arthur W. Harrigan, Jr.

cc:    All Counsel (via ECF)

8

**APPENDIX A:  MOTOROLA 30(B)(6) TOPIC 8**
(Motorola 6/18/13 Letter Brief at Ex. 4)

[1]  The costs (including the dollar amount) incurred by MICROSOFT in preparation for a potential injunction requiring MICROSOFT to withdraw its H.264-compliant products from the German market and the actions taken in preparation for the potential injunction, including without limitation costs relating to MICROSOFT's relocation of its EMEA distribution center to the Netherlands and increased costs associated with operating the EMEA distribution center out of the Netherlands instead of Germany, [2] the history of the decision to relocate the EMEA distribution center, [3] all other factors considered by MICROSOFT in connection with relocating the EMEA distribution center, [4] the basis for MICROSOFT'S contention, if it so contends that said relocation and costs associated therewith was a result of MOTOROLA'S alleged breach of its obligations or commitments to an SDO, [5] all other lawsuits against MICROSOFT pending in Germany prior to the relocation of its EMEA distribution center in which MICROSOFT faced the risk of injunction, destruction of devices, or other remedies, relating to its distribution center in Germany or the distribution of its products in Germany, [6] other options MICROSOFT considered taking to prepare for the potential injunction in Germany and the costs of such options, [7] any efforts by MICROSOFT to mitigate the damages claimed,
[8] all communications with any third parties regarding relocating the EMEA distribution center to the Netherlands, the persons with knowledge of such facts, and the documents relating to such facts.