# EXHIBIT A

THE HONORABLE JAMES L. ROBART

1

2

3

4

5

6

7

8

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

9

10   MICROSOFT CORPORATION,

                          Plaintiff,

11         vs.

12   MOTOROLA, INC.,  et al.,

13                          Defendants.
      _____
14   MOTOROLA MOBILITY LLC, et al.,

15                          Plaintiffs,

16         vs.

17   MICROSOFT CORPORATION,

18                          Defendants.

Case No. C10-1823-JLR

DEFENDANT MOTOROLA
MOBILITY, INC.'S FIRST SET OF
INTERROGATORIES AND
REQUESTS FOR PRODUCTION TO
PLAINTIFF MICROSOFT
CORPORATION **AND
MICROSOFT CORPORATION'S**
*APRIL 3, 2013 SUPPLEMENTAL*
**OBJECTIONS, ANSWERS, AND
RESPONSES THERETO**

19

20      **MICROSOFT CORPORATION'S** *APRIL 3, 2013 SUPPLEMENTAL* **OBJECTIONS,
        ANSWERS, AND RESPONSES TO MOTOROLA MOBILITY, INC.'S
        FIRST SET OF INTERROGATORIES AND REQUESTS FOR PRODUCTION**

21

22              Pursuant to Fed. R. Civ. P. 26, 33, and 34 and all applicable Local Rules, Microsoft

23   Corporation ("Microsoft") hereby submits the following answers, responses,  and objections to

24   Motorola Mobility, Inc.'s ("Defendant's" or "Motorola's") First Set of Interrogatories and

25   Requests for Production ("Discovery Requests").

MICROSOFT CORPORATION'S *APRIL 3,
2013 SUPPLEMENTAL* OBJECTIONS,
ANSWERS, AND RESPONSES - 1

LAW OFFICES
**CALFO HARRIGAN LEYH & EAKES LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700   FAX, (206) 623-8717

**GENERAL OBJECTIONS**

Microsoft makes the following General Objections to the Discovery Requests.  These General Objections are incorporated into the specific objections to each Request.  The assertion of the same or additional objections to any individual Discovery Request does not waive other General Objections that are not specifically repeated in the specific objections.  The objections set forth below are based on information presently available to Microsoft.  Microsoft reserves the right to supplement or amend these objections based on information later obtained through investigation, discovery, or otherwise.

1.       Microsoft objects to the Discovery Requests because, as more specifically stated below, they are overbroad and/or call for the production of documents and information that are neither relevant to the issues raised in this action nor reasonably calculated to lead to the discovery of relevant or admissible evidence.

2.       Microsoft objects to the Discovery Requests, including the "Definitions" and "Instructions" set forth therein, because, and to the extent that, they seek to impose on Microsoft obligations different from or greater than those imposed by federal statute, the Federal Rules of Civil Procedure, or the Local Rules.

3.       Microsoft objects to any discovery directed at information or documentation protected by the attorney-client privilege, the work product doctrine, and/or any other applicable privilege and/or immunity.  To the extent any document protected by the attorney-client privilege, the work product doctrine, and/or any other applicable privilege is produced inadvertently, Microsoft has not authorized such production, and no waiver of any privilege shall be inferred from such inadvertent production.  Unless otherwise agreed by the parties and subject to a contemporaneous exchange of privilege logs or as otherwise ordered by the Court, Microsoft will endeavor to deliver its privilege log to Motorola within 30 days after completing its final production of documents pursuant to Motorola's document requests.

MICROSOFT CORPORATION'S *APRIL 3, 2013 SUPPLEMENTAL* OBJECTIONS, ANSWERS, AND RESPONSES - 2

LAW OFFICES
**CALFO HARRIGAN LEYH & EAKES LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700    FAX, (206) 623-8717

4.      Microsoft responds to the Discovery Requests as it interprets and understands each Request set forth therein.  If Motorola subsequently asserts an interpretation of any request or sub-part thereof that differs from Microsoft's understanding of that request or sub-part thereof, Microsoft reserves the right to supplement its objections and/or responses.

5.      Microsoft objects to any Request to the extent it requires Microsoft to draw a legal conclusion in order to ascertain its scope.

6.      Microsoft objects to each Request as overly broad, not relevant to the claims and defenses at issue, and not reasonably calculated to lead to the discovery of admissible evidence to the extent it is not limited in time and seeks information for periods of time that are not relevant to any claim or defense.

7.      Microsoft objects to each Request to the extent it calls for premature disclosure of expert opinions or contentions on legal issues or otherwise.

8.      Microsoft objects to the Requests as cumulative, and will deem any production of materials responsive to any particular request to be sufficient production with respect to any other Request seeking similar materials.

9.      Microsoft objects to any Request to the extent it is vague, ambiguous, irrelevant, overbroad, unduly burdensome, or to the extent it seeks information that is: not reasonably calculated to lead to the discovery of relevant or admissible evidence; unreasonably cumulative or duplicative, or obtainable from some other source that is more convenient, less burdensome or less expensive; of the kind that Motorola had ample opportunity to obtain from other sources.

10.     Microsoft objects to document requests that seek production of "All Documents" as vague, ambiguous, overbroad, unduly burdensome, irrelevant and not reasonably calculated to lead to the discovery of relevant or admissible evidence.  Microsoft

**MICROSOFT CORPORATION'S *APRIL 3, 2013 SUPPLEMENTAL* OBJECTIONS, ANSWERS, AND RESPONSES - 3**

LAW OFFICES
**CALFO HARRIGAN LEYH & EAKES LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700   FAX, (206) 623-8717

1    will comply with its obligations under the Federal Rules to search for and produce responsive

2    documents, including searches of custodians likely to have responsive documents.

3         11.    Microsoft objects to Motorola's Discovery Requests, and the definitions and

4    instructions that accompany Motorola's Discovery Requests, to the extent they mischaracterize

5    or misstate facts, circumstances, events and/or obligations.

6         12.     Microsoft objects to Item No. 2 of Motorola's "Definitions," wherein Motorola

7    sets forth the definition of "Motorola Mobility," as overly vague.  Microsoft does not and

8    cannot know all of Motorola's "predecessors or successors (merged, acquired, or otherwise),

9    parents, divisions, subsidiaries, and affiliates thereof, and all officers, agents, employees,

10   counsel and other persons acting on its behalf, or any other person or entity subject to Motorola

11   Mobility's control, or which controls Motorola Mobility."

12        13.    Microsoft objects to Item No. 12 of Motorola's "Definitions," wherein Motorola

13   sets forth the definition of "Electronically stored information," because, and to the extent, this

14   definition seeks to impose on Microsoft obligations different from or greater than those

15   imposed by federal statute, the Federal Rules of Civil Procedure, or the Local Rules.

16        14.    Microsoft objects to Item No. 13 of Motorola's "Definitions," wherein Motorola

17   sets forth the definition of "Communications," to the extent it purports to include a request for

18   oral communications, such as voice recordings.  The burden and expense of reviewing and

19   producing any such communications or recordings, if it is even possible to review and produce

20   them, would outweigh their possible relevance and are not likely to lead to the discovery of

21   relevant or admissible evidence.  Production of such communications or recordings would also

22   be unreasonably cumulative and duplicative because the information that might be obtained

23   from such recordings is also being sought and is obtainable, to the extent it exists, by other

24   means or from other sources that are more convenient, less burdensome, or less expensive.

25

**MICROSOFT CORPORATION'S *APRIL 3, 2013 SUPPLEMENTAL* OBJECTIONS, ANSWERS, AND RESPONSES - 4**

LAW OFFICES
**CALFO HARRIGAN LEYH & EAKES LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700   FAX, (206) 623-8717

15.     Microsoft objects to Motorola's Discovery Requests to the extent the information requested is not reasonably accessible by Microsoft for all purposes, not just for this litigation.  Information not reasonably accessible by Microsoft includes, but is not limited to, deleted documents, wherever located, and documents available on any backup or archival tapes or other media.  The burden and expense of accessing, reviewing, and producing this information outweigh its possible relevance and are not likely to lead to the discovery of relevant or admissible evidence.  Production of this information would also be unreasonably cumulative and duplicative because the information that might be obtained from this inaccessible data is also being sought and is obtainable, to the extent it exists, by other means or from other sources that are more convenient, less burdensome, or less expensive.

16.     Microsoft objects to the Discovery Requests, including the "Definitions" and "Instructions" set forth therein, because and to the extent such requests, definitions, or instructions reserve the right to call for the production of documents in "native format" and/or "meta data."  Such requests are overbroad, unduly burdensome and not reasonably calculated to lead to the discovery of relevant or admissible evidence.  First, production in native format would make it very difficult for the parties to manage or maintain control over the materials, especially in cases involving large productions, since native formats are generally designed for easy editing compared to the fixed document formats like TIFF that are more suitable for production and evidentiary purposes.  Second, due to the editable nature of most native formats, production in native format would make it impossible to ensure that confidentiality designations are consistently associated with particular documents, and therefore observed.  It is not possible to apply either document production numbers or confidentiality designations at the page level when a document is produced in its native format.  Although it is possible to number or make confidentiality designations at the file level, once the document is printed out it loses any connection to such numbering or designation.  An individual reading a hard-copy

MICROSOFT CORPORATION'S *APRIL 3, 2013 SUPPLEMENTAL* OBJECTIONS, ANSWERS, AND RESPONSES - 5

LAW OFFICES
**CALFO HARRIGAN LEYH & EAKES LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700   FAX, (206) 623-8717

printout of a protected document would have no indication that it is designated as containing "confidential business information" and/or as confidential source code.  Third, native files are capable of being modified or altered, and production in native format may raise authenticity issues that can be avoided when the information is produced in a static form.  Fourth, production in native format imposes an undue burden and expense, since it would require Microsoft to search every document for hidden text that could be privileged.  Accordingly, Microsoft will not produce responsive electronically stored information in native format.  Instead, Microsoft will produce documents in a TIFF or pdf format, with a load file indicating document breaks, and with any agreed upon metadata fields.  Microsoft also agrees that in appropriate limited circumstances, and where there is a specific need that cannot otherwise be met, it will also produce the native version of the document.  In the event responsive electronically stored information does not lend itself to image file production, Microsoft will confer with Motorola regarding possible native form production, with appropriate protections to be separately negotiated and mutually agreed upon by the parties in advance of such production.

17.     Microsoft objects to Motorola's Discovery Requests to the extent they seek discovery of electronically stored information from sources that are not reasonably accessible in light of the burdens or costs required to locate, restore, review, and produce whatever responsive information may be found.  Microsoft has attempted to identify below all known difficult-to-access sources that may contain responsive information, but it is not able to retrieve the information – or even to confirm with certainty whether any responsive information in fact exists on the sources – without incurring substantial burden or cost.  *See* Fed. R. Civ. Pro. 26(b)(2)(B) and FRCP 26(b)(2)(C).  More easily accessed sources – such as active servers, hard drives and other direct access storage media containing active data and records that are responsive to Motorola's requests – are likely to yield all the information that is reasonably

MICROSOFT CORPORATION'S *APRIL 3, 2013 SUPPLEMENTAL* OBJECTIONS, ANSWERS, AND RESPONSES - 6

LAW OFFICES
**CALFO HARRIGAN LEYH & EAKES LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700    FAX, (206) 623-8717

useful for this action.  Further, production of information from some of the listed inaccessible sources may also be unreasonably cumulative and duplicative because information that might be obtained is also obtainable, to the extent it exists, from other sources that are more convenient, less burdensome, or less expensive.  The sources that may contain potentially responsive information which Microsoft is neither searching nor producing because they are not reasonably accessible fall under the categories set out below.  Microsoft has attempted to provide as much detail as is reasonably possible regarding these sources, in an effort to enable Motorola to intelligently evaluate the burdens and costs of providing discovery from these sources, and the likelihood of finding responsive and relevant information on the identified sources.

Centrally Managed Exchange Email Servers:  Microsoft's Exchange Servers are used by employees for their email.  Exchange Servers are replicated for disaster recovery and business continuity purposes only.  Exchange mailbox data is replicated across multiple servers after which time the replicated data is recycled within 30 days.  Microsoft has not suspended the replication rotation of this disaster recovery and business continuity process because the vast majority of data on the disaster recovery systems is an additional copy of data more readily available on the active systems.  Microsoft is not searching or producing documents from these disaster recovery media.

Centrally Managed File Servers:  Prior to 2008, file servers located in the Microsoft IT managed datacenters, as well as certain servers located outside of the datacenters but whose backup services are managed by Microsoft IT, were backed up in full on a weekly basis, with daily differential backups.  Weekly tapes were maintained for 21 days; monthly tapes are kept for 90 days.  After 90 days the tapes were recycled.  Since 2008, each protected resource (e.g. data volume, file share, etc.) receives a recovery point each day.  File servers are retained on disk for 28 days, with only a monthly backup tape created and retained for 90 days.  After 90

**MICROSOFT CORPORATION'S *APRIL 3, 2013 SUPPLEMENTAL* OBJECTIONS, ANSWERS, AND RESPONSES - 7**

LAW OFFICES
**CALFO HARRIGAN LEYH & EAKES LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700   FAX, (206) 623-8717

days, the tapes are recycled.  Microsoft has not suspended the backup rotation of this disaster

recovery system.  Microsoft is not searching or producing electronically stored information

from this disaster recovery media.

Other File Servers Located Outside the Microsoft IT Datacenters:  In addition to its

significant centralized information systems managed by Microsoft's IT group, Microsoft

business units maintain many other, decentralized information systems that are used by

different business units and functional groups as required by the business needs of such units

and groups, often for software development and testing.  The business units and functional

groups may call on Microsoft IT to perform their disaster recovery services, or they may

provide their own disaster recovery services.  Each decentralized group establishes and

manages its own disaster recovery process, and such processes may vary from group to group.

Many of these groups follow the same protocol for file server backups as followed by

Microsoft's IT group.  Microsoft has not suspended the backup rotation of the disaster

recovery systems used for these decentralized information systems.  Microsoft is not searching

or producing electronically stored information from these disaster recovery media.  At this

juncture, investigation as to the existence of any relevant and reasonably accessible

information is conducted on a case-by-case basis and predicated on its investigation thus far,

Microsoft has no reason to believe that any such data exists for this case.

Obsolete Backup Media:  As with many large organizations, Microsoft's disaster

recovery policies have evolved with changing technology and business needs over time.  As to

some of the file servers currently or historically managed by Microsoft's centralized IT group,

obsolete backup media may exist.  Such media is not used for disaster recovery, nor is it used

for any business purpose.  For a majority of the obsolete media, Microsoft has no record of

what data was written to an individual tape or reel due to the loss or retirement of obsolete tape

databases and the  and the labels on the individual housings of the tapes and reels, or on the

MICROSOFT CORPORATION'S *APRIL 3,
2013 SUPPLEMENTAL* OBJECTIONS,
ANSWERS, AND RESPONSES - 8

LAW OFFICES
**CALFO HARRIGAN LEYH & EAKES LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700   FAX, (206) 623-8717

1   bins are not informative as to content.  When inventory or labeling information is available it is

2   usually limited to include some of the following data points:  the name of the server, the media

3   type, an ID or tracking number for the media, the date of the creation of the media, and the

4   drives backed up.  Microsoft has no records identifying the business units or individuals who

5   stored documents on a particular server, and therefore has no record of whose or what

6   documents might be stored on any of the obsolete tapes.  In many instances, the drives needed

7   to restore obsolete media are no longer available at Microsoft, and may not be available

8   commercially or otherwise.  The cost and burden of restoring these obsolete media would be

9   excessive, even assuming that the hardware, software and trained staff to restore the media

10  could be located.  Microsoft is not searching or producing documents from this obsolete media.

11      Legacy Systems:  Microsoft was incorporated in 1981 and began operations a few years

12  before that.  As of March 2010 Microsoft had over 88,000 employees working in over 650

13  buildings located in 41of the United States and over 100 countries around the world.  Over the

14  years Microsoft has replaced, changed, and/or upgraded the hardware and software used by

15  individual employees and for its shared information systems.  As such, it is possible that legacy

16  data remaining from obsolete systems is located in various storage media which may be

17  incompatible with and unintelligible on the successor systems.  To the extent such legacy data

18  exists, it is possible that current employees are not aware of its existence or location.

19  Microsoft is not searching its legacy systems because it believes they are not reasonably

20  accessible because of undue burden or cost.

21      Sources Requiring Computer Forensics to Access:  Microsoft is not searching or

22  producing information from any source that is capable of being accessed or viewed only

23  through forensic or other extraordinary means.  Many of these data types are created by the

24  operating system or an application to assist in memory management or enhance the efficient

25  functioning of the application or operating system.  Operating systems and applications

**MICROSOFT CORPORATION'S** *APRIL 3,*
*2013 SUPPLEMENTAL* **OBJECTIONS,**
**ANSWERS, AND RESPONSES - 9**

generally create and overwrite such data without the intent or specific knowledge of users. Although it is not possible to provide all the particulars of the information that might be mined through such extraordinary processes without actually performing them, examples of the types of materials that, in general, may be forensically retrieved include the following:  (a) Residual, Latent or Ambient Data – Residual data, which is sometimes also called "latent" data or "ambient" data, refers to data that is not active on a computer system which is inaccessible without specialized forensic tools and techniques.  "Until overwritten, these data reside on media such as a hard drive in unused space and other areas available for data storage."  The Sedona Conference Glossary (May 2005), p. 26 (*Latent Data*).  This category includes "data that is not active on a computer system, including (1) data found on media free space; (2) data found in file slack space; and (3) data within files that has functionally been deleted in that it is not visible using the application with which the file was created, without use of un-delete or special data recovery techniques.  May contain copies of deleted files, Internet files and file fragments."  The Sedona Conference Glossary (May 2005), p. 37 (*Residual Data*).  Residual, latent or ambient data may also include such items as fragments of instant messaging chats that were not saved by the chat participants but that the operating system placed temporarily on the hard drive for memory management purposes without the knowledge of the user. (b) Temporary Files – These are "files stored on a computer for temporary use only, and are often created by Internet browsers.  These temp files store information about Web sites that a user has visited, and allow for more rapid display of the Web page when the user revisits the site.  Forensic techniques can be used to track the history of a computer's Internet usage through the examination of these temporary files.  Temp files are also created by common office applications, such as word processing or spreadsheet applications."  The Sedona Conference Glossary (May 2005), p. 42.  (c) Cached Storage – Cache is "a dedicated, high speed storage location which can be used for the temporary storage of frequently used data.  As data may be

**MICROSOFT CORPORATION'S** *APRIL 3, 2013 SUPPLEMENTAL* **OBJECTIONS, ANSWERS, AND RESPONSES -** 10

LAW OFFICES
**CALFO HARRIGAN LEYH & EAKES LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700    FAX, (206) 623-8717

retrieved more quickly from cache than the original storage location, cache allows applications to run more quickly.  Web site contents often reside in cached storage locations on a hard drive."  The Sedona Conference Glossary (May 2005), p. 6.  (d) Swap Files or Page Files – A swap file is a "file used to temporarily store code and data for programs that are currently running.  This information is left in the swap file after the programs are terminated, and may be retrieved using forensic techniques.  Also referred to as a page file or paging file."  The Sedona Conference Glossary (May 2005), p. 41.

Databases:  To the extent Motorola's Requests seek different data or data in configurations different from those for which such databases are configured, Microsoft is not searching or attempting to produce information from such databases because it believes they are not reasonably accessible because of undue burden or cost.

Source Code not Stored in Microsoft's Central Source Repositories:  Microsoft objects to Motorola's Requests to the extent they seek the production of all source code for a particular product.  Source code for a large software product often contains tens of millions of lines of code that hundreds or even thousands of individuals in different parts of the company have helped create over a number of years.  Microsoft manages the process using a database tool called Source Depot, also called the "source tree."  At any one time, the Source Depot for a product or major part contains the most current version of the source code for that product as well as source code relating to various past versions.  Collecting source code from the Source Depot is relatively straightforward.  However, not all source code for a product or major part is stored in its source tree.  For example, Microsoft Office contains parts built by groups within Microsoft outside the Office group (e.g., the division that creates tools used by software developers) and by third-party vendors.  The source code for such "partner parts" is created and stored by the partner group elsewhere in Microsoft or by the third-party vendor, which provides only already-compiled binary code – not source code – to the Office source tree.  The

MICROSOFT CORPORATION'S *APRIL 3,*
*2013 SUPPLEMENTAL* OBJECTIONS,
ANSWERS, AND RESPONSES - 11

LAW OFFICES
**CALFO HARRIGAN LEYH & EAKES LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700   FAX, (206) 623-8717

process to identify, locate and collect all of the source code not stored in a product's source tree is extraordinarily difficult, time-consuming, and not always fruitful.  There is no single comprehensive list of all the source code for the parts that were contributed by partner groups. This is because, in the ordinary course of business, and after a product is released, Microsoft has no need to identify or collect all the source code for it.  When a product such as Office is released, the source code in the source tree is "compiled" into "binary" (i.e., a series of zeros and ones, a/k/a "object code") code and combined with binary code provided by any partner groups to "build" the version that is released to licensees.  Thereafter, it may be necessary to locate certain portions of source code used to build the product in order to fix bugs, but the full set of source code is not needed.  In order to be certain that it has assembled the complete set of source code for a product released several years ago, Microsoft would have to work backward from the final product.  This would require first determining which binary code in the final product is or is not associated with what versions and parts of source code in the (more readily accessible) source tree.  Then, Microsoft developers would need to figure out which partner group produced that binary code, and then attempt to obtain the code from that group.  Many developers in these groups will have changed jobs, moved to other groups within Microsoft, or may have left the company, and may no longer be able to provide that group's portion of source code.

Other Sources that are not Reasonably Accessible:  In addition, it is possible that Microsoft's information systems may retain information on other sources that are accessible only by incurring substantial burdens or costs.  Microsoft's identification of sources that are not reasonably accessible is based upon information currently known.  Microsoft reserves the right to supplement its response as additional information about other potentially responsive information from other sources that are not reasonably accessible becomes known.

**MICROSOFT CORPORATION'S *APRIL 3, 2013 SUPPLEMENTAL* OBJECTIONS, ANSWERS, AND RESPONSES - 12**

LAW OFFICES
**CALFO HARRIGAN LEYH & EAKES LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700   FAX, (206) 623-8717

1       As set forth in more detail in its responses to Motorola's individual requests, Microsoft

2 is producing electronically stored information that is responsive, not privileged, and reasonably

3 accessible.  Microsoft believes that Motorola should review and evaluate the information from

4 such sources before requesting that Microsoft search for and produce information contained on

5 sources that are not reasonably accessible.  If, after such review and evaluation, Motorola

6 continues to seek discovery of information from sources that have been identified as not

7 reasonably accessible, Microsoft requests that the parties schedule a meet and confer to

8 discuss, among other things, the particular type(s) of information sought by Motorola and its

9 relevance to the parties' respective claims and defenses, the burdens and costs of accessing,

10 retrieving and reviewing such information, the needs that may establish "good cause" for

11 requiring all or part of the requested discovery notwithstanding its inaccessibility, and

12 conditions on obtaining and producing the information that may be appropriate, including

13 whether Motorola is willing to pay the costs associated with such discovery.

14       18.    Microsoft objects to Motorola's requests for production to the extent they seek

15 to impose an obligation on Microsoft to create and maintain wholly new documents, through

16 recording communications that have not otherwise been recorded in the ordinary course of

17 business, solely for the purpose of discovery in the litigation.

18       19.    Microsoft objects to the Discovery Requests on the grounds that they seek the

19 production of documents containing confidential, nonpublic business documents, financial

20 data, proprietary knowledge or trade secret information of Microsoft and third parties

21 ("Confidential Information").  Microsoft will produce responsive, non-privileged Confidential

22 Information subject to entry of a stipulated protective order signed by the Court.

23       20.    Microsoft objects to the Discovery Requests to the extent that they would

24 require Microsoft to search for documents from custodians from whom Microsoft has already

25 searched for documents responsive to Motorola's discovery requests in other actions because

MICROSOFT CORPORATION'S *APRIL 3,*
*2013 SUPPLEMENTAL* OBJECTIONS,
ANSWERS, AND RESPONSES - 13

LAW OFFICES
**CALFO HARRIGAN LEYH & EAKES LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700     FAX, (206) 623-8717

such a requirement is burdensome and inefficient.  If, after Motorola reviews the documents produced in response to its discovery requests in the other actions, Motorola believes that additional responsive documents exist, Microsoft is willing to meet and confer regarding the scope of such additional discovery.

21.     No incidental or implied admissions are intended by the objections herein.  The assertion of any objection to the Discovery Requests is not intended to mean, and shall not be construed as acknowledging or suggesting, that any responsive documents were in fact created or exist or that Microsoft has possession, custody, or control of such documents.  Nor shall the fact that Microsoft has objected to any Discovery Request be taken as an admission that Microsoft accepts or admits the existence of any facts set forth or assumed by such Discovery Request.

22.     As used herein, the term "Motorola Patent Actions" refers to the actions filed by Motorola Mobility, Inc. and General Instrument Corporation in the Federal District Court for the Western District of Wisconsin (Case Nos. 3:10-CV-699, 3:10-CV-700, and 3:10-CV-826); the Southern District of Florida (Case No. 1:10-cv-24063); and before the International Trade Commission (ITC Case No. 337-TA-752).

23.     Microsoft's failure to object to a Discovery Request on a particular ground shall not be construed as a waiver of its right to object on that ground or any additional ground at any time.

24.     All documents that Microsoft produces in response to these Discovery Requests will be produced at times and places to be agreed upon by counsel.

**MICROSOFT CORPORATION'S** *APRIL 3,*
*2013 SUPPLEMENTAL* **OBJECTIONS,**
**ANSWERS, AND RESPONSES -** 14

**INTERROGATORY NO. 3**:   State the factual basis for any contention underlying Microsoft's claim that Motorola's October 21, 2010 and October 29, 2010 Letter constituted a breach or other violation of a commitment to license patents on reasonable and non-discriminatory terms.

**ANSWER:** Microsoft incorporates by reference each of its General Objections as though set forth herein.  Microsoft further objects that this is a premature contention interrogatory.  Microsoft is not obligated to respond to premature contention interrogatories until the parties have substantially completed discovery.

Subject to and without waiving these objections, Microsoft answers that, in willful disregard of the commitments Motorola made to IEEE and the ITU-T, Motorola has refused to extend to Microsoft a license consistent with Motorola's promises for any of Motorola's allegedly "essential" patents.  Instead, Motorola is demanding royalty payments that are wholly disproportionate to the royalty that its patents should command under any reasonable calculus. Motorola has discriminatorily chosen Microsoft's Xbox product line and other multi-function, many-featured products and software, such as Windows 7 and Windows Phone 7 and products incorporating Microsoft software, for the purpose of extracting unreasonable royalties from Microsoft that are inconsistent with Motorola's obligation to offer licenses for the relevant patents on RAND terms and conditions.

In further response, Microsoft states as follows:

Motorola's October 21, 2010 Letter

By letter to Microsoft, dated October 21, 2010, Kirk Dailey, Motorola's Corporate Vice President Intellectual Property, offered to license "Motorola's portfolio of patents and pending applications having claims that may be or become Essential Patent Claims (as defined in section 6.1 of the IEEE bylaws) for a compliant implementation of the IEEE 802.11 Standards."  Motorola offered to license the relevant patents under terms and conditions that

**MICROSOFT CORPORATION'S** *APRIL 3,*
*2013 SUPPLEMENTAL* **OBJECTIONS,**
**ANSWERS, AND RESPONSES -** 15

LAW OFFICES
**CALFO HARRIGAN LEYH & EAKES LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700   FAX, (206) 623-8717

1   included a "royalty of 2.25% per unit for each 802.11 complaint product[.]"  Motorola stated

2   that the royalty "is calculated based on the price of the end product (e.g., each Xbox 360

3   product) and not on component software."

4          The cost of the chips and associated components that provide wireless connectivity for

5   Xbox 360 consoles is a small fraction of the overall cost of the device.  Moreover, Microsoft

6   sells its Xbox 360 consoles at a number of prices.  Each console includes approximately the

7   same chips and associated components for wireless connectivity, providing the same level of

8   relevant functionality.  Motorola thus seeks a royalty on components of Xbox 360 that is

9   disproportionate to the value and contribution of its purportedly "essential" patents and has

10  declined to offer a license to its purported "essential" patents unless it receives exorbitant and

11  discriminatory royalty payments to which it is not entitled.  On information and belief,

12  Motorola has not previously entered into a license agreement for its purported "essential"

13  patents that is comparable to the demand made of Microsoft.  Motorola has thereby refused to

14  offer to license the patents at a reasonable rate, with reasonable terms, under conditions that are

15  demonstrably free of any unfair discrimination.

16         The royalty demanded by Motorola falls well outside the boundaries of a reasonable

17  and non-discriminatory royalty and therefore violates the commitment Motorola made to the

18  IEEE and its members.

19         Participants in IEEE-SA standards setting efforts, including those directed to WLAN

20  technology, were subject to the IEEE-SA Standard Board Bylaws concerning the submission

21  of Letters of Assurance related to patent claims deemed "essential" by a submitting party.

22  Clause 6 of those Bylaws (which was revised slightly over the years) generally provides in

23  pertinent part:

24         A Letter of Assurance shall be either:

25

**MICROSOFT CORPORATION'S *APRIL 3,***
***2013 SUPPLEMENTAL* OBJECTIONS,**
**ANSWERS, AND RESPONSES - 16**

a) A general disclaimer to the effect that the submitter without conditions will not enforce any present or future Essential Patent Claims against any person or entity making, using, selling, offering to sell, importing, distributing, or implementing a compliant implementation of the standard; or

b) A statement that a license for a compliant implementation of the standard will be made available to an unrestricted number of applicants on a worldwide basis without compensation or under reasonable rates, with reasonable terms and conditions that are demonstrably free of any unfair discrimination.

Motorola openly and publicly submitted Letters of Assurance pursuant to Clause 6 of the IEEE-SA Standards Board Bylaws that it would offer to license any of its patents essential to the applicable WLAN standard(s) to any entity under reasonable rates on a non-discriminatory basis. IEEE-SA and its participants and affiliates relied on Motorola's promises in developing, adopting and implementing IEEE-SA technical standards. These standards are now implemented worldwide in a variety of electronic devices that have become commonplace.

Microsoft invested substantial resources in developing and marketing products in compliance with these standards, relying on the assurances of participating patent holders – including Motorola – that any essential patents held by such patent holders would be available for licensing by implementers of the standards on such terms.

By way of non-limiting example, each Xbox device includes substantial software and many computer chips and modules that perform various functions, including enabling Xbox's core functionality as a video gaming machine. Of those, the Xbox console includes one – an interface provided to Microsoft by third-parties – that allows consumers optionally to connect an Xbox to the Internet using a WLAN connection.

The third-party WLAN interface does not enable any of Xbox's core video gaming functionality. In addition, Microsoft allows consumers an alternative, wired method to connect to the Internet. This alternative method does not require use of any WLAN technology.

**MICROSOFT CORPORATION'S *APRIL 3, 2013 SUPPLEMENTAL* OBJECTIONS, ANSWERS, AND RESPONSES - 17**

LAW OFFICES
**CALFO HARRIGAN LEYH & EAKES LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700   FAX, (206) 623-8717

On information and belief, Motorola obtained rights to several of the WLAN patents it has represented as "essential" through its recent acquisition of Symbol Technologies, Inc. ("Symbol").

Prior to the releases of the 802.11 protocols, Motorola and Symbol submitted Letters of Assurance to the IEEE pursuant to Clause 6 of the IEEE-SA Standards Board Bylaws with respect to those protocols, guaranteeing that any "essential" patents would be licensed under reasonable and non-discriminatory terms and conditions.  Both Motorola's and Symbol's Letters of Assurance apply to any "essential" patents they then held as well as any other "essential" patents they subsequently obtained.

In reliance on these letters of assurance, IEEE released the 802.11 standard and various amendments to that standard that Motorola asserts incorporated Motorola's and Symbol's patented technology.  On information and belief, once Motorola and Symbol disclosed that they likely held essential patents, absent a licensing commitment from them to the effect that they would offer licenses to "essential" patents on reasonable and non-discriminatory terms and conditions, the relevant IEEE working groups would have either revised the standards, employing alternative technologies instead, stopped working on the protocols or taken other actions.

In submitting its Letter of Assurance pursuant to the applicable IEEE IPR policy, Motorola entered into an actual or implied contract with IEEE, for the benefit of IEEE members and any entity that implements the 802.11 standard.  Motorola is bound by its agreements to offer licenses consistent with the referenced IEEE bylaws.

Similarly, Symbol, in submitting its Letter of Assurance pursuant to the applicable IEEE IPR policy, entered into an actual or implied contract with IEEE, for the benefit of IEEE members and any other entity that implements the 802.11 standard, and Motorola is bound by that commitment.

**MICROSOFT CORPORATION'S** *APRIL 3,*
*2013 SUPPLEMENTAL* **OBJECTIONS,**
**ANSWERS, AND RESPONSES -** 18

1    Motorola broke its promise to IEEE-SA and its members and affiliates by refusing to

2    offer to Microsoft a license that is consistent with Motorola's Letter(s) of Assurance and

3    Clause 6 of the IEEE-SA Standards Board Bylaws, instead demanding royalties that are

4    excessive and discriminatory.

5    Motorola's October 29, 2010 Letter

6        By letter to Microsoft, dated October 29, 2010, Kirk Dailey, Motorola's Corporate Vice

7    President Intellectual Property, offered to license "Motorola's portfolio of patents and pending

8    applications covering the subject matter of ITU-T Recommendation H.264[.]"  Motorola

9    offered to license the relevant patents under terms and conditions that included a "royalty of

10   2.25% per unit for each H.264 complaint product[.]"  Motorola stated that the royalty "is

11   calculated based on the price of the end product (e.g., each Xbox 360 product, each PC/laptop,

12   each smartphone, etc.) and not on component software (e.g., Xbox 360 system software,

13   Windows 7 software, Windows Phone 7 software, etc.)."

14       The cost of such component software and any inter-related hardware is a small fraction

15   of the overall cost of the listed devices.  Moreover, Microsoft sells products having H.264

16   related capabilities at a wide range of prices, without regard to the significance of such H.264

17   related capabilities to the primary or expected use of the products.  Motorola thus seeks a

18   royalty on software and hardware components of Xbox 360 and other devices that are

19   unrelated to its identified patents and has declined to offer a license unless it receives

20   exorbitant royalty payments to which it is not entitled.  On information and belief, Motorola

21   has not previously entered into a license agreement for its identified patents that is comparable

22   to the demand made of Microsoft.  Motorola has thereby refused to offer to license the patents

23   at a reasonable rate, with reasonable terms, on a non-discriminatory basis.

24

25

**MICROSOFT CORPORATION'S** *APRIL 3,*
*2013 SUPPLEMENTAL* **OBJECTIONS,**
**ANSWERS, AND RESPONSES - 19**

LAW OFFICES
**CALFO HARRIGAN LEYH & EAKES LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700   FAX, (206) 623-8717

The royalty demanded by Motorola falls well outside the boundaries of a reasonable and non-discriminatory royalty and therefore violates the commitment Motorola made to the ITU and its members.

Participants in ITU-T standards setting efforts, including those directed to H.264 technology, were subject to the ITU-T Common Patent Policy concerning the submission of Patent Statement and Licensing Declarations related to patents identified by a submitting party. The ITU-T Common Patent Policy generally provides, in pertinent part, that a patent holder's statement may declare that:

(2.1) The patent holder is willing to negotiate licenses free of charge with other parties on a non-discriminatory basis on reasonable terms and conditions.

(2.2) The patent holder is willing to negotiate licenses with other parties on a non-discriminatory basis on reasonable terms and conditions.

Motorola openly and publicly submitted Patent Statement and Licensing Declarations pursuant to the ITU-T's Common Patent Policy that it would offer to license any of its patents essential for the relevant H.264 Recommendation(s) to any entity under reasonable rates on a non-discriminatory basis.  The ITU-T and its participants and affiliates relied on Motorola's promises in developing, adopting and implementing the ITU-T H.264 Recommendations (or standards).  These standards are now implemented worldwide in a variety of electronic devices and software that have become commonplace.  Microsoft invested substantial resources in developing and marketing products in compliance with these standards, relying on the assurances of participating patent holders – including Motorola – that any "essential" patents held by such patent holders would be available for licensing by implementers of the standards on such terms.

In submitting its Patent Statement and Licensing Declarations pursuant to the applicable ITU-T policy, Motorola entered into an actual or implied contract with the ITU-T,

**MICROSOFT CORPORATION'S *APRIL 3, 2013 SUPPLEMENTAL* OBJECTIONS, ANSWERS, AND RESPONSES - 20**

LAW OFFICES
**CALFO HARRIGAN LEYH & EAKES LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700   FAX, (206) 623-8717

for the benefit of ITU-T members and any entity that implements the H.264 technologies. Motorola is bound by its agreements to offer licenses consistent with the referenced ITU-T Common Patent Policy.

Microsoft has participated in the development of the 802.11 and H.264 standards. Microsoft and other companies participating in the development of these standards relied on Motorola's commitments to ensure that the royalties Motorola would seek would conform to the promises made by Motorola.

In reliance on the integrity of the SDO process and the commitments made by Motorola and others regarding 802.11 patents they deem "essential," Microsoft began providing its Xbox video game consoles with WLAN connectivity.  By way of example, Microsoft purchased and incorporated into its Xbox 360 video game consoles third-party-manufactured interfaces that provide Xbox 360 devices with WLAN connectivity.  Microsoft made its decision to provide its Xbox video game consoles with WLAN connectivity in reliance on, and under the assumption that, it and/or any third party supplier could avoid patent litigation and take a license to "essential" patents that Motorola, or any other company submitting a Letter of Assurance, holds with regard to the WLAN standard under IEEE's well publicized IPR policy.

Microsoft and other manufacturers of WLAN-compliant devices necessarily relied on the assurances of participating patent holders – including Motorola – that any "essential" patents held by such patent holders would be available for licensing by implementers of the standards on such terms.

Correspondingly, in reliance on the integrity of the SDO process and specifically the commitments made by Motorola and others regarding patents related to H.264 technologies, Microsoft began providing its H.264 technology capability in its Xbox video game consoles. Microsoft made its decision to provide its Xbox video game consoles with H.264 technology in reliance on, and under the assumption that, it and/or any third party supplier could avoid patent

MICROSOFT CORPORATION'S *APRIL 3, 2013 SUPPLEMENTAL* OBJECTIONS, ANSWERS, AND RESPONSES - 21

LAW OFFICES
**CALFO HARRIGAN LEYH & EAKES LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700   FAX, (206) 623-8717

litigation and take a license to any "essential" patents held by Motorola, or any other company submitting a Patent Statement and Licensing Declaration, under the ITU-T's well-publicized IPR policy.

Microsoft made similar investments in other fields, including Windows 7 and Windows Phone 7, based upon Motorola's representations in relation to the H.264 technology standards. Microsoft and other manufacturers and suppliers of H.264 compliant technology necessarily relied on the commitments of Motorola and others to license their "essential" patents under these terms.

By way of non-limiting example, each personal computer running Windows 7 includes substantial software and many computer chips and modules that perform various functions, including those related to the general operation of a computing device.  Of those, each personal computer includes just a portion directed to H.264 technologies.

By way of further non-limiting example, each smartphone running Windows Phone 7 includes substantial software and many computer chips and modules that perform various functions, including those related to the general and particularized operation of a smartphone independent of H.264 technology.  Of those, each smartphone includes just a portion directed to H.264 technologies.

Motorola broke its promise to the ITU-T and its members and affiliates by refusing to offer to Microsoft a license that is consistent with Motorola's Patent Statement and Licensing Declaration(s) and the Common Patent Policy of the ITU-T, instead demanding royalties that are excessive and discriminatory.

## SUPPLEMENTAL RESPONSE OF APRIL 3, 2013:

Motorola committed to license its standard essential patents on RAND terms.  This meant that Motorola had to make a license available to any implementer of the standards.

**MICROSOFT CORPORATION'S** *APRIL 3,*
*2013 SUPPLEMENTAL* **OBJECTIONS,**
**ANSWERS, AND RESPONSES -** 22

LAW OFFICES
**CALFO HARRIGAN LEYH & EAKES LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700   FAX, (206) 623-8717

1    Offers made to prospective licensees had to be commercially reasonable.  Motorola could not

2    seek injunctive relief instead of entering into a license on RAND terms, especially in

3    circumstances where its license offers were not commercially reasonable.  In addition,

4    Motorola was subject to a duty of good faith and fair dealing in licensing and offering to

5    license its standard essential patents.

6           As a consequence of these contractual obligations undertaken by Motorola, Motorola

7    breached its RAND commitments in at least the following respects.  Motorola's breach is not

8    limited to the October 2010 demand letters.

9    - Motorola's October 2010 demand letters did not offer licenses to Microsoft on
10     RAND terms, and, to the contrary, were commercially unreasonable and
       facially outrageous; Motorola improperly sought the holdup value of its patents
11     rather than their RAND value and improperly sought a royalty on the entire
       market value of products, which included many components and features for
12     which Motorola was not entitled to any compensation.

13   - Motorola improperly sought injunctive relief in the ITC, the district courts and
       Germany instead of honoring its commitment to make licenses available on
14     RAND terms.  Repeated judicial and administrative rulings specific to Motorola
       have confirmed that its pursuit of injunctive relief was improper, including
15     Judge Posner's June 22, 2012 determination that Motorola could not obtain
       injunctive relief on its 802.11 standard-essential patents; the Court's November
16     29, 2012 order enjoining Motorola from seeking injunctive relief against
       Microsoft with respect to Motorola's H.264 and 802.11 standard essential patent
17     portfolios; and the January 3, 2013 FTC consent order prohibiting Google and
       Motorola from obtaining or enforcing injunctive relief on standard-essential
18     patents during the pendency of district court's resolution of a request for a
       RAND determination.  As the FTC explained, the consent order barring
19     Motorola from pursuing injunctive relief targeted "breaches by Google and its
       subsidiary [Motorola] of Motorola's commitments to license standard-essential
20     patents ('SEPs') on terms that are fair, reasonable and non-discriminatory
       ('FRAND')."  Statement of the Federal Trade Commission, *In the Matter of*
21     *Google Inc.,* FTC File No. 121-0120 (Jan. 3, 2013).
22

23   - Motorola declined to offer a license to Microsoft's chip supplier Marvell (which
       requested a license for the specific benefit of Microsoft) on RAND terms that
24     would cover product shipped to Microsoft and acted in a way that was both
       unreasonable and discriminatory.

25

**MICROSOFT CORPORATION'S** *APRIL 3,*
*2013 SUPPLEMENTAL* **OBJECTIONS,**
**ANSWERS, AND RESPONSES** - 23

- Once Motorola was acquired by Google and Microsoft had a right to a license to Motorola's H.264 standard essential patents by virtue of Google's participation in the MPEG-LA AVC pool, Motorola refused to grant a license on those terms, which would have complied with the RAND commitment.

- Motorola violated the covenant of good faith and fair dealing by reason of all of the actions recited above, whether considered separately or collectively, on an objective standard.

- Motorola also violated the covenant of good faith and fair dealing because it knew it was acting, and intended to act, inconsistently with the covenant of good faith and fair dealing by virtue of the actions recited above and the following additional indicia of intent:

  o Motorola's objective from the beginning was to secure crippling injunctive relief in some forum so that Microsoft would be deterred from seeking compensation for Motorola's infringement of Microsoft's non standard essential patents in Motorola's Android phones.  Motorola's demand letters in October 2010 were intended to set forth offers that it knew no reasonable company would accept.

  o In furtherance of the pursuit of injunctive relief, Motorola stated that the offers in the demand letters would remain open for only 20 days.

  o At the time that the demand letters were sent, Motorola had never entered into a license with anyone for its H.264 or 802.11 standard essential patents that was remotely comparable to the terms of the demand letter

  o Motorola understood the financial implications of the demand letter, including that it would be compensated for components and features as to which it had no patents.

  o Motorola sought injunctions knowing that the terms in its October 2010 demand letters would be unacceptable to Microsoft and would not be accepted.

  o Motorola demanded that Marvell pay royalties on the end product sales of its downstream customers even though no one had ever agreed to pay royalties to Motorola on this basis.

  o Motorola discriminated against Marvell and Microsoft by excluding chips sold to Microsoft from the license offered to Marvell.

**MICROSOFT CORPORATION'S** *APRIL 3,*
*2013 SUPPLEMENTAL* **OBJECTIONS,**
**ANSWERS, AND RESPONSES -** 24

LAW OFFICES
**CALFO HARRIGAN LEYH & EAKES LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700   FAX, (206) 623-8717

1    o   Motorola in league with its parent company Google evaded the
         requirements of the MPEG-LA AVC pool agreement.

2    **INTERROGATORY NO. 4:**  State the factual basis for any contention that Microsoft

3    suffered damage to its business or property, or was irreparably injured, by reason of the

4    October 21, 2010 Letter and/or October 29, 2010 Letter.

5        **ANSWER:**  Microsoft incorporates by reference each of its General Objections as

6    though set forth herein.  Microsoft further objects that this is a premature contention

7    interrogatory.  Microsoft is not obligated to respond to premature contention interrogatories

8    until the parties have substantially completed discovery.

9        Subject to and without waiving the foregoing objections, Microsoft answers that it has

10   suffered damage because, and to the extent that, Microsoft and its employees have been forced

11   to expend a significant amount of time, money and resources on issues relating to this dispute

12   and the Motorola Patent Actions.  But for Motorola's failure to offer Microsoft licenses to

13   those patents Motorola alleges are "essential" to implementation of the H.264 and 802.11

14   standards on RAND terms and conditions, Microsoft would not have incurred these costs,

15   expenses or losses of productivity.  It will be difficult, if not impossible, for Microsoft to

16   recoup this lost time and productivity, and Microsoft's losses will continue until Motorola

17   complies with the contractual commitments it made to the IEEE, ITU, and their members.

18   Microsoft has also been damaged as a result of having to defend the Motorola Patent Actions,

19   in which Motorola seeks to enjoin or exclude Microsoft from practicing, or importing products

20   that practice, the 802.11 and H.264 standards.  Further, Microsoft may also suffer imminent

21   loss of profits, loss of customers and potential customers, and loss of goodwill and product

22   image as a result of Motorola's refusal to offer licenses to the relevant technologies on fair and

23   reasonable terms.

24

25

**MICROSOFT CORPORATION'S *APRIL 3,***
***2013 SUPPLEMENTAL* OBJECTIONS,**
**ANSWERS, AND RESPONSES - 25**

LAW OFFICES
**CALFO HARRIGAN LEYH & EAKES LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700   FAX, (206) 623-8717

**SUPPLEMENTAL RESPONSE OF APRIL 3, 2013:**

Motorola's breach is not limited to its October 2010 demand letters.  In addition to suffering damage to its business or property and irreparable injury as a consequence of the October 2010 demand letters, Microsoft has also suffered damage to its business or property and irreparable injury as a consequence of other actions taken by Motorola (or its failure to act) in breach of its contractual commitments.

On November 22, 2010, Motorola filed an ITC action seeking exclusion of Xbox consoles based on three patents alleged to be essential to H.264 and one patent alleged to be essential to 802.11.  Motorola also filed district court cases asserting patents alleged to be essential to H.264 or 802.11.

On July 6 and 7, 2011, Motorola filed two patent infringement suits in Germany, asserting patents claimed to be essential to the H.264 standard.  Motorola sought an injunction that would exclude Microsoft products (including the Windows operating system and the Xbox video game console) from the German market.  Microsoft incorporates by reference its previous response describing harm flowing from the Motorola Patent Action, as analogous harms have been caused by Motorola's German suits, including the costs of defending against Motorola's improper pursuit of injunctions.  Microsoft also incorporates by reference all filings made in support of its Motion for TRO and Preliminary Injunction, including Dkt. Nos. 209–217.

Motorola's failure to grant Microsoft a RAND license to its H.264 and 802.11 patents, and its pursuit of injunctions has imposed significant costs on Microsoft.  But for the breach of the RAND obligations, this injury would not have been incurred.  Thus damages attributable to the breach include Microsoft's legal expenses incurred in defending the ITC and district court cases, insofar as they were based on standard essential patents and legal expenses incurred in defending the German actions based on H.264 patents.

MICROSOFT CORPORATION'S *APRIL 3,*
*2013 SUPPLEMENTAL* OBJECTIONS,
ANSWERS, AND RESPONSES - 26

LAW OFFICES
**CALFO HARRIGAN LEYH & EAKES LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700   FAX, (206) 623-8717

1    Motorola's actions forced Microsoft to implement costly measures in preparation for a

2    potential injunctive relief that Motorola was seeking requiring Microsoft to withdraw its

3    H.264-compliant products—including Windows and Xbox—from the German market, and

4    Xbox from the U.S. Market.  Microsoft took these measures in order to mitigate the greater

5    damages it would have suffered from the injunctive relief Motorola was seeking obtained in

6    breach of Motorola's RAND commitments.  Microsoft's main logistics and products/software

7    distribution center for the European, Middle Eastern and African ("EMEA") market was

8    located in Germany.  The injunction Motorola sought through its German actions would have

9    not only removed Microsoft's products from Germany, but threatened Microsoft's entire

10   EMEA distribution network for its products.

11   As a result of Motorola's actions, and in an effort to mitigate the enormous financial

12   and non-economic damages that Microsoft would have suffered had it been excluded from the

13   German market as a result of Motorola's breach, Microsoft was forced to relocate its EMEA

14   distribution center to the Netherlands in spring 2012.  The costs incurred by Microsoft in

15   connection with these relocation efforts were approximately $11.6 million.  Further, the annual

16   cost of operating its distribution center out of the Netherlands is approximately $5,000,000

17   greater than the cost of continuing to operate the distribution center in Germany would have

18   been in the period after the move, a cost increase which is continuing.  Invoices and other

19   substantiating documentation for certain of these costs, identified as Bates range MS-

20   MOTO_1823_00004081413 - MS-MOTO_1823_00004081432, are being produced today.

21   Should Microsoft become aware of additional information or documentation bearing on these

22   damages, Microsoft will supplement its response, as contemplated by Rule 26(e).

23   On July 18, 2011, Marvell sought a license to Motorola's 802.11 patents so that the wifi

24   chipsets it sold to Microsoft and products in which they were used would be licensed.  If the

25

**MICROSOFT CORPORATION'S *APRIL 3, 2013 SUPPLEMENTAL* OBJECTIONS, ANSWERS, AND RESPONSES -** 27

LAW OFFICES
**CALFO HARRIGAN LEYH & EAKES LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700   FAX, (206) 623-8717

1  license had been available at that time, Microsoft would not have incurred any further damage

2  by failure of Motorola to make available a license on RAND terms for its 802.11 patents.

3     On May 22, 2012, Motorola was acquired by Google, and Microsoft was entitled to a

4  license to Motorola's H.264 patents under the terms of Google's license agreement with

5  MPEG-LA on terms set forth in the pool license.  Motorola failed to make available a license

6  on those terms.  If the license had been available at that time, Microsoft would not have

7  incurred any further damage by failure of Motorola to make available a license on RAND

8  terms for its H.264 patents.

9     SUPPLEMENTAL OBJECTIONS, ANSWERS, AND RESPONSES DATED this 3rd

10  day of April, 2013.

11     DATED this 3rd day of April, 2012.

12         CALFO HARRIGAN LEYH & EAKES LLP

13

14       By  s/ Christopher Wion

15         Arthur W. Harrigan, Jr., WSBA #1751
       Christopher Wion, WSBA #33207

16         Shane P. Cramer, WSBA #35099
       999 Third Avenue, Suite 4400

17         Seattle, WA  98104
       Phone:  206-623-1700

18         arthurh@calfoharrigan.com
       chrisw@calfoharrigan.com

19         shanec@calfoharrigan.com

20         T. Andrew Culbert
       David E. Killough

21         MICROSOFT CORPORATION
       1 Microsoft Way

22         Redmond, WA  98052
       Phone:  425-882-8080

23         Fax:  425-869-1327

24

25

**MICROSOFT CORPORATION'S** *APRIL 3,*
*2013 SUPPLEMENTAL* **OBJECTIONS,**
**ANSWERS, AND RESPONSES -** 28

LAW OFFICES
**CALFO HARRIGAN LEYH & EAKES LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700   FAX, (206) 623-8717

David T. Pritikin
Richard A. Cederoth
Constantine L. Trela, Jr.
William H. Baumgartner, Jr.
Ellen S. Robbins
Douglas I. Lewis
David C. Giardina
John W. McBride
David Greenfield

SIDLEY AUSTIN LLP
One South Dearborn
Chicago, IL  60603
Phone:  312-853-7000
Fax:  312-853-7036


Carter G. Phillips
Brian R. Nester

SIDLEY AUSTIN LLP
1501 K Street NW
Washington, DC  20005
Telephone:  202-736-8000
Fax:  202-736-8711

Counsel for Microsoft Corp.

**MICROSOFT CORPORATION'S** *APRIL 3,*
*2013 SUPPLEMENTAL* **OBJECTIONS,**
**ANSWERS, AND RESPONSES -** 29

LAW OFFICES
**CALFO HARRIGAN LEYH & EAKES LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700   FAX, (206) 623-8717

## CERTIFICATE OF SERVICE

I, Linda Bledsoe, swear under penalty of perjury under the laws of the State of Washington to the following:

1.     I am over the age of 21 and not a party to this action.

2.     On the 3rd day of April, 2013, I caused the preceding document to be served on counsel of record in the following manner:

**Attorneys for Motorola Solutions, Inc., and Motorola Mobility, Inc.:**

Ralph Palumbo, WSBA #04751
Philip S. McCune, WSBA #21081                        _____  Messenger
Summit Law Group                                              _____  US Mail
315 Fifth Ave. South, Suite 1000                          _____  Facsimile
Seattle, WA  98104-2682                                      ___X___  Email
Telephone:  206-676-7000
Email:  Summit1823@summitlaw.com


Steven Pepe (*pro hac vice*)                               _____  Messenger
Jesse J. Jenner (*pro hac vice*)                           _____  US Mail
Ropes & Gray LLP                                              _____  Facsimile
1211 Avenue of the Americas                             ___X___  Email
New York, NY  10036-8704
Telephone:  (212) 596-9046
Email:  steven.pepe@ropesgray.com
Email:  jesse.jenner@ropesgray.com


Norman H. Beamer (*pro hac vice*)                    _____  Messenger
Ropes & Gray LLP                                              _____  US Mail
1900 University Avenue, 6th Floor                       _____  Facsimile
East Palo Alto, CA  94303-2284                           ___X___  Email
Telephone:  (650) 617-4030
Email:  norman.beamer@ropesgray.com

**MICROSOFT CORPORATION'S *APRIL 3, 2013 SUPPLEMENTAL* OBJECTIONS, ANSWERS, AND RESPONSES -** 30

LAW OFFICES
**CALFO HARRIGAN LEYH & EAKES LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700   FAX, (206) 623-8717

1

Paul M. Schoenhard (*pro hac vice*)              _____ Messenger
Ropes & Gray LLP                                 _____ US Mail
One Metro Center                                 _____ Facsimile
700 12th Street NW, Suite 900                    ___X___ Email
Washington, DC  20005-3948
Telephone:  (202) 508-4693
Email: Paul.schoenhard@ropesgray.com

2

3

4

5

William Price (*pro hac vice*)                   _____ Messenger
Brian Cannon (*pro hac vice*)                    _____ US Mail
Andrea Pallios Roberts (*pro hac vice*)          _____ Facsimile
Quinn Emanuel                                    ___X___ Email
555 Twin Dolphin Drive, 5th Floor
Redwood Shores, CA  94065-2139
williamprice@quinnemanuel.com
briancannon@quinnemanuel.com
andreaproberts@quinnemanuel.com

6

7

8

9

10

11

        DATED this 3rd day of April, 2013.

12

13

                              s/ Linda Bledsoe
                              LINDA BLEDSOE

14

15

16

17

18

19

20

21

22

23

24

25

**MICROSOFT CORPORATION'S *APRIL 3,***
***2013 SUPPLEMENTAL* OBJECTIONS,**
**ANSWERS, AND RESPONSES -** 31

# EXHIBIT B

**quinn emanuel** trial lawyers | silicon valley

555 Twin Dolphin Drive, 5th Floor, Redwood Shores, California  94065-2139 | TEL: (650) 801-5000  FAX: (650) 801-5100

May 15, 2013

V<small>IA</small> E-M<small>AIL</small>

Chris Wion
Calfo Harrigan Leyh & Eakes LLP
999 Third Avenue, Suite 4400
Seattle, WA 98104

Re:     Microsoft Corp. v. Motorola Mobility, Case No. C10-1823-JLR

Dear Chris:

I write regarding the May 9, 2013 deposition of Jeff Davidson.  In addition to the many document production deficiencies identified in Mr. Davidson's deposition, which are set forth in detail in our May 10 letter, Mr. Davidson was unprepared to testify on several issues which fall squarely within Topic 8 of Motorola's Second Rule 30(b)(6) Deposition Notice, on which he was designated to testify.  Specifically, Mr. Davidson was not prepared to testify on the following issues:

- what, if any, analysis Microsoft performed with respect to the necessity of relocating the EMEA distribution facilities before Mr. Davidson was involved, or that he was not personally involved in (Davidson Rough Tr., 68:21-25, 213:10-19);
- who at Microsoft had to ultimately approve the move (*id.*, 61:17-62:15);
- whether Microsoft ever previously considered moving distribution facilities in response to a possible injunction (*id.*, 75:18-76:21);
- who in the legal department Shelly McKinley was working with in connection with the possible injunction and relocation (*id.*, 63:21-25);
- what Microsoft did to avoid litigation in Germany (*id.*, 175:7-176:2);

quinn emanuel urquhart & sullivan, llp
LOS ANGELES | 865 South Figueroa Street, 10th Floor, Los Angeles, California  90017-2543 | TEL (213) 443-3000  FAX (213) 443-3100
NEW YORK | 51 Madison Avenue, 22nd Floor, New York, New York  10010-1601 | TEL (212) 849-7000  FAX (212) 849-7100
SAN FRANCISCO | 50 California Street, 22nd Floor, San Francisco, California  94111-4788 | TEL (415) 875-6600  FAX (415) 875-6700
CHICAGO | 500 W. Madison Street, Suite 2450, Chicago, Illinois  60661-2510 | TEL (312) 705-7400  FAX (312) 705-7401
LONDON | 16 Old Bailey, London EC4M 7EG, United Kingdom | TEL +44(0) 20 7653 2000  FAX +44(0) 20 7653 2100
TOKYO | NBF Hibiya Bldg., 25F, 1-1-7, Uchisaiwai-cho, Chiyoda-ku, Tokyo 100-0011, Japan | TEL +81 3 5510 1711  FAX +81 3 5510 1712
MANNHEIM | Erzbergerstraße 5, 68165 Mannheim, Germany | TEL +49(0) 621 43298 6000  FAX +49(0) 621 43298 6100

May 15, 2013

- Microsoft's motion for an anti-suit injunction and the timing thereof (*id.*, 169:21-170:5, 173:3-5, 224:5-18);
- why Microsoft did not consider relocating the EMEA distribution facility prior to January 2012 (*id.*, 168:17-22);
- how quickly Arvato found a new tenant for the Dueren facility (*id.*, 128:20-25);
- the differences between the Dueren and Venray facilities in terms of products stored, products distributed, revenue generated, etc.  (*id.*, 158:15-161:9); and
- how the numbers in Exhibit 16 were generated (*id.*, 206:4-8).

The above issues relate to Microsoft's decision to relocate the EMEA distribution center, other factors considered by Microsoft in connection with relocating the EMEA distribution center, the costs associated with the relocation, and Microsoft's efforts, if any, to mitigate damages, all of which are expressly covered by Topic 8.  Yet, Mr. Davidson could not answer questions on these issues.  By Thursday, May 16 at 5 pm Pacific, please provide date(s) on which a witness or witnesses will be made available to testify on these issues.

Very truly yours,

Andrea Pallios Roberts

CC: All counsel

APR

01980.62689/5275798.2

01980.62689/5275798.2

# EXHIBIT C

LAW OFFICES
**CALFO HARRIGAN LEYH & EAKES** LLP
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
(206) 623-1700

CHRIS WION

E-MAIL: CHRISW@CALFOHARRIGAN.COM
FACSIMILE: (206) 623-8717

May 16, 2013

**VIA EMAIL**

Andrea Pallios Roberts
Quinn Emanuel Urquhart & Sullivan, LLP
555 Twin Dolphin Drive, 5th Floor
Redwood Shores, CA  94065-2139

      Re:    *Microsoft Corp. v. Motorola Mobility, et al.*  Case No. 10-1823-JLR

Dear Andrea:

      We write in response to your letter of May 15, in which you request an additional 30(b)(6) designee to supplement the testimony provided by Jeff Davidson on May 9.

      Mr. Davidson was adequately prepared to address Topic 8 of Motorola's April 5, 2013, 30(b)(6) deposition notice.  That topic sought a witness to testify regarding:

> The costs (including the dollar amount) incurred by MICROSOFT in preparation for a potential injunction requiring MICROSOFT to withdraw its H.264-compliant products from the German market and the actions taken in preparation for the potential injunction, including without limitation costs relating to MICROSOFT's relocation of its EMEA distribution center to the Netherlands and increased costs associated with operating the EMEA distribution center out of the Netherlands instead of Germany, the history of the decision to relocate the EMEA distribution center, all other factors considered by MICROSOFT in connection with relocating the EMEA distribution center, the basis for MICROSOFT'S contention, if it so contends that said relocation and costs associated therewith was a result of MOTOROLA'S alleged breach of its obligations or commitments to an SDO, all other lawsuits against MICROSOFT pending in Germany prior to the relocation of its EMEA distribution center in which MICROSOFT faced the risk of injunction, destruction of devices, or other remedies, relating to its distribution center in Germany or the distribution of its products in Germany, other options MICROSOFT considered taking to prepare for the potential injunction in Germany and the costs of such options, any efforts by MICROSOFT to mitigate the damages claimed, all communications with any third parties regarding relocating the EMEA distribution center to the Netherlands, the persons with knowledge of such facts, and the documents relating to such facts.

Andrea Pallios Roberts
May 16, 2013
Page 2

Your letter includes a bullet-point list of 10 items that Motorola claims "fall squarely within Topic 8" and for which Mr. Davidson was not adequately prepared. We do not agree that Mr. Davidson was required to testify regarding each of the specific items listed in your letter. We also disagree with your characterization of Mr. Davidson's testimony as to these items, and instead rely on the deposition transcript itself.[1] Mr. Davidson was prepared to, and did, properly address the issues set forth in Topic 8.

Moreover, as you know, we are making Mr. Davidson's manager at the time of the relocation, Owen Roberts, available for deposition on May 22. If Motorola decides to go forward with Mr. Roberts' deposition, and to the extent he has relevant and non-privileged knowledge bearing on the specific follow-up items in your letter, Motorola will have an opportunity to ask its questions.

Accordingly, we do not agree that Microsoft has any obligation to offer an additional 30(b)(6) witness to provide further testimony regarding Topic 8.

Very truly yours,

CALFO HARRIGAN LEYH & EAKES LLP

Chris Wion

CTW:lb

---

[1] We also note that the relationship between the items on your list and the corresponding citations to the transcript is, at times, somewhat unclear.

# EXHIBIT D

**quinn emanuel** trial lawyers | silicon valley

555 Twin Dolphin Drive, 5th Floor, Redwood Shores, California  94065-2139 | TEL: (650) 801-5000  FAX: (650) 801-5100

May 30, 2013

<u>VIA E-MAIL</u>

Chris Wion
Calfo Harrigan Leyh & Eakes LLP
999 Third Avenue, Suite 4400
Seattle, WA 98104

Re:     <u>Microsoft Corp. v. Motorola Mobility, Case No. C10-1823-JLR</u>

Dear Chris:

I write regarding various discovery issues relating to Microsoft's claim that it relocated its EMEA distribution facilities as a result of Motorola's alleged breach of contract.

**30(b)(6) Deposition**

First, as explained in my May 15 letter, Mr. Davidson, Microsoft's 30(b)(6) witness on Topic 8 of Motorola's Second Rule 30(b)(6) Deposition Notice, was not prepared to testify on issues that fall within that topic:

• what, if any, analysis Microsoft performed with respect to the necessity of relocating the EMEA distribution facilities before Mr. Davidson was involved, or that he was not personally involved in (Davidson Tr., 217:14-23)[1];

---

[1]     My May 15 letter cited to the rough deposition transcript, as that was all that was available at the time.  The citations herein are to the final deposition transcript.

**quinn emanuel urquhart & sullivan, llp**

LOS ANGELES | 865 South Figueroa Street, 10th Floor, Los Angeles, California  90017-2543 | TEL (213) 443-3000  FAX (213) 443-3100
NEW YORK | 51 Madison Avenue, 22nd Floor, New York, New York  10010-1601 | TEL (212) 849-7000  FAX (212) 849-7100
SAN FRANCISCO | 50 California Street, 22nd Floor, San Francisco, California  94111-4788 | TEL (415) 875-6600  FAX (415) 875-6700
CHICAGO | 500 W. Madison Street, Suite 2450, Chicago, Illinois  60661-2510 | TEL (312) 705-7400  FAX (312) 705-7401
LONDON | 16 Old Bailey, London EC4M 7EG, United Kingdom | TEL +44(0) 20 7653 2000  FAX +44(0) 20 7653 2100
TOKYO | NBF Hibiya Bldg., 25F, 1-1-7, Uchisaiwai-cho, Chiyoda-ku, Tokyo 100-0011, Japan | TEL +81 3 5510 1711  FAX +81 3 5510 1712
MANNHEIM | Erzbergerstraße 5, 68165 Mannheim, Germany | TEL +49(0) 621 43298 6000  FAX +49(0) 621 43298 6100

May 30, 2013

- who at Microsoft had to ultimately approve the move (*id.*, 63:12-15);
- whether Microsoft ever previously considered moving distribution facilities in response to a possible injunction (*id.*, 76:23-78:12);
- who in the legal department Shelly McKinley was working with in connection with the possible injunction and relocation (*id.*, 65:6-10);
- what Microsoft did to avoid litigation in Germany (*id.*, 179:1-21);
- Microsoft's motion for an anti-suit injunction and the timing thereof (*id.*, 172:20-173:22);
- why Microsoft did not consider relocating the EMEA distribution facility prior to January 2012 (*id.*, 172:7-12);
- how quickly Arvato found a new tenant for the Dueren facility (*id.*, 131:21-25);
- the differences between the Dueren and Venray facilities in terms of products stored, products distributed, revenue generated, etc. (*id.*, 161:24-164:21); and
- how the numbers in Exhibit 16 were generated (*id.*, 210:6-14).

We maintain that Mr. Davidson did not have answers to questions directed at these issues, and this is clear from the deposition transcript. In your May 16 letter in response, you did not address the substance of any of these issues. For example, you do not cite to where in the transcript Mr. Davidson answered these questions. Nor do you explain how these issues do not fall within Topic 8.

In any event, we deposed Mr. Roberts, to whom Mr. Davidson reported, and hoped that he could testify on some or all of these issues. He could not testify as to several of them. Rather, according to Mr. Roberts, the decision to relocate the EMEA distribution facility was a legal decision. (Roberts Tr., 32:4-21) ("I said back in January we were informed that we were – we were being -- we had a court litigation pending against us which -- which would probably require us to move our facility in order to keep doing business in Europe. If you are asking that question, no, I wasn't part of that decision, that was a legal decision.") Mr. Roberts also did not know what, if anything, Microsoft did to avoid litigation in Germany, the licensing offers made by Microsoft, the German law procedures that were or were not followed by Microsoft, the briefs Microsoft filed in the Washington case and while they were not filed earlier, or why he was not informed of the need to move earlier than January 2012. (*Id.*, 132:5-14, 132:21-23, 106:9-17,133:14-22.) Ms. Daly similarly could not testify on these issues. These issues bear directly on the proximate cause of the move and Microsoft's efforts, if any, to mitigate damages. Motorola is entitled to this information. If it is someone in the legal department that knows this information, then we need to depose that person. If Microsoft is refusing to provide discovery on these issues based on privilege, then it needs to clearly state as much. It cannot hide the ball by failing to properly educate a 30(b)(6) witness.

Accordingly, by Monday, June 3, please let us know if Microsoft will produce a witness who is appropriately educated to testify on the decisions and actions taken by the Microsoft legal

May 30, 2013

department as they relate to the decision to relocate the EMEA distribution facility, and any efforts to mitigate the alleged damages.

## Documents

The following categories of documents that we previously requested still do not appear to be included in Microsoft's supplemental document products:

- Microsoft "Network Analysis" reports related to the Duren facility from 2010 through June 2012;
- Communications between Microsoft and Arvato regarding "open book" procedures from 2010 through June 2012
- Arvato's operative lease for the Duren facility for the period from January 2012-June 2012;
- Documents sufficient to show the percentage of the Duren facility Microsoft shared with other tenants and apportionment for how the facility was shared; and
- Communications with Arvato, following the termination of services, indicating that Arvato had a new tenant for the Duren space.

Are these documents still forthcoming? Further, when does Microsoft expect its document production to be complete?

Additionally, in Ms. Mangin's May 15 letter to you, we asked Microsoft to let us know "which custodians' files were previously searched to identify documents relating to Microsoft's claim that it relocated its EMEA distribution facility to the Netherlands." We have not received a response. Please provide one.

## Privilege Log

Microsoft's privilege log relating to its claim that it relocated its EMEA distribution facility to the Netherlands appears to be limited to Mr. Davidson's files. Is the privilege log being updated to reflect documents withheld from Mr. Roberts and Ms. Daly's files? Further, given Mr. Roberts' testimony that the decision to move was made by the legal department, it seems likely that there are many additional documents being withheld on the basis of privilege. Please

May 30, 2013

confirm that this is the case.

Please provide a response to the issues raised in this letter by June 6.

Very truly yours,

Andrea Pallios Roberts

CC: All counsel

APR

01980.62689/5332159.1

01980.62689/5332159.1

# EXHIBIT E

LAW OFFICES
## CALFO HARRIGAN LEYH & EAKES LLP
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON  98104
(206) 623-1700

CHRISTOPHER WION

E-MAIL:  CHRISW@CALFOHARRIGAN.COM
FACSIMILE:  (206) 623-8717

June 6, 2013

**SENT VIA EMAIL**

Andrea Pallios Roberts
Quinn Emanuel
555 Twin Dolphin Drive, 5th Floor
Redwood Shores, CA  94065-2139

      Re:    *Microsoft Corp. v. Motorola Mobility, et al.*  Case No. 10-1823-JLR

Dear Andrea:

      We write in response to your letter of May 30, 2013.

      **Motorola's 30(b)(6) Damages Deposition; Topic 8**

      We continue to disagree with your characterization of both the proper scope of Topic 8 as well as Jeff Davidson's testimony on that Topic.  Mr. Davidson was prepared to address Topic 8 and we object to Motorola's effort to expand the scope of Topic 8 beyond its terms.  Also, as your letter acknowledges, at his May 22 deposition, Owen Roberts answered some of the questions Motorola claims fall within Topic 8.  However, your letter neither identifies the questions you contend remain outstanding nor why you contend those remaining questions properly fall within the scope of Topic 8.  Your letter does not provide any additional information that would alter our earlier response to your May 15 letter on this same subject.

      Your May 30 letter also mischaracterizes Mr. Roberts' deposition testimony regarding Microsoft's decision to relocate the EMEA distribution facilities from Germany to the Netherlands.  Mr. Roberts did not testify that this was a decision made by the Microsoft legal department.  Immediately following the deposition excerpt selectively quoted in your letter (but omitted from your letter), Mr. Roberts explained that after becoming aware of the risk associated with a German injunction in January 2013 he evaluated (among other things) the option of setting up a bonded facility in Germany as an alternative to relocation.  Roberts Tr. 32:22-34:24; *see also* 123:7-25.  The decision to relocate was not made until after potential alternatives were explored.  Mr. Roberts repeatedly explained that the decision to relocate the EMEA facilities was a business decision based on the "risk that we would not be able to do business out of our

Andrea Pallios Roberts
June 6, 2013
Page 2

German facility" (Roberts Tr. 15:19-21) and was not a decision made by Microsoft's legal
department.  *See, e.g.*, Roberts Tr. 15:18-16:16; 17:13-18:4; 134:6-136:11.

Motorola's request for an additional deposition relating to the "decisions and actions
taken by the Microsoft legal department as they relate to the decision to relocate the EMEA
distribution facility, and any efforts to mitigate the alleged damages" reflects a fundamental
misunderstanding of Mr. Roberts' deposition testimony.  At his deposition, and pursuant to your
request for confirmation, Mr. Roberts expressly corrected your stated understanding of his
testimony on this issue:

> Q:    Okay.  And I just want to make sure I am understanding your testimony
>        correctly.  I believe you testified earlier today that you and your team
>        decided between going with Arvato versus CEVA, whereas the legal team
>        was – was the group that – that made the decision whether or not to move;
>        is that correct?
>
> A:    No, that is not correct.
>
> Q:    Okay.
>
> A:    No.  The legal team is there to give us advice.  We own the business and
>        we make the business decision based on the risks that are presented to us.
>        And so the legal team had presented a case that said we had a very strong
>        risk of our business being materially impacted if we lost the litigation in
>        Germany, and then it was a decision by the business to say how to [sic] we
>        mitigate for that risk and at what stage do we mitigate for that risk.  It's
>        not a legal decision.
>
> Q:    So when I asked you who made the decision to relocate the distribution
>        facility out of Germany, who was that?
>
> A:    That was my decision with Brian Tobey as my support as far as for that.
>        But when I presented it to Brian, where we were, the business risks
>        associated with it, Brian agreed with my proposal.

Roberts Tr. 134:20-135:19.

Motorola has no basis to demand that Microsoft offer another fact witness to testify
regarding the "decisions and actions taken by the Microsoft legal department[.]"

Andrea Pallios Roberts
June 6, 2013
Page 3

**<u>Documents</u>**

Microsoft has engaged in a document collection and production process based on a reasonable and diligent search for documents relevant to the relocation of its EMEA distribution facilities from Germany to the Netherlands.  As we previously have explained, Microsoft has not been withholding documents based on whether or not they are supportive of Microsoft's positions in this case.  We have collected relevant documents from the following custodians, each of whom already has been deposed by Motorola in this action:  Jeff Davidson (on May 9), Owen Roberts (on May 22), and Theresa Daly (May 30).  As we stated in our May 14 letter, we disagree with Motorola that Microsoft is obligated to perform additional custodial collections for the other eight individuals listed in Ms. Mangin's May 10 letter.

However, in addition to the collections from Mr. Davidson, Mr. Roberts, and Ms. Daly, Microsoft has engaged in a reasonable process of identifying, gathering and producing relevant documentation with the assistance of other Microsoft personnel in the relocation, including Aoife Muldoon, Paul Benzie, Fergus Rigley, and Jana Shull.  This process has included numerous targeted searches, including with regard to the 20 categories of documents listed in Ms. Mangin's May 10 letter, one of which broadly sought relevant documents stored on the "Sharepoint" site for the project, established around March 2012.  *See* Davidson Tr. 34:9-13 ("I do know we set up a SharePoint for -- once we put a project manager in place, decided we're going to go make this move, to drive the implementation, we put a -- a SharePoint there.  So there would be documents relating to the execution of the project.")  In your May 30 letter, you inquired about the status of documents from five of these categories, to which we respond as follows:

- The "Network optimization: Network design" document prepared by Arvato was produced on May 16, 2013, as Bates No. MS-MOTO_1823_00004083069 – 74.

- Based on our investigation, there appear to have been no written communications between Microsoft and Arvato regarding "open book" procedures from 2010 through June 2012.

- Microsoft does not have a copy of Arvato's operative lease for the Duren facility for the period from January 2012 - June 2012.

- The "Duren Warehouse (Germany)" schematic showing how the Duren facility was shared with other tenants was produced on May 19, 2013, as Bates No. MS-MOTO_1823_00004083317.[1]

- Based on our investigation, there appear to have been no written communications between Microsoft and Arvato, following the termination of services, indicating that Arvato had a new tenant for the Duren space.

---

[1] We expect to produce a color copy of this document later today.

Andrea Pallios Roberts
June 6, 2013
Page 4

**<u>Supplementation of Privilege Log</u>**

We expect to serve an updated privilege log by Monday, June 10.

                                         Very truly yours,

                                         CALFO HARRIGAN LEYH & EAKES LLP

                                         /s/ Christopher Wion

                                         Christopher Wion

EXHIBIT F

LAW OFFICES
**CALFO HARRIGAN LEYH & EAKES LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
(206) 623-1700

CHRISTOPHER WION

E-MAIL: CHRISW@CALFOHARRIGAN.COM
FACSIMILE (206) 623-8717

May 14, 2013

**VIA EMAIL**

Elanor Mangin
Quinn Emanuel Urquhart & Sullivan, LLP
555 Twin Dolphin Drive, 5th Floor
Redwood Shores, CA 94065-2139

   Re: *Microsoft Corp. v. Motorola Mobility, et al.* Case No. 10-1823-JLR

Dear Elanor:

   We write in response to your letter of May 10 and related follow-up communications with Andrea Roberts.

   First, this confirms that Microsoft will not be calling Marcello Prieto or Josh Hutto to testify at trial. Microsoft's experts also will not be relying on conversations with, or the testimony of, Mr. Prieto or Mr. Hutto. Based on these representations, we understand that Motorola does not plan to go forward with these depositions.

   Second, we have been working to ascertain dates of availability for both Owen Roberts and Theresa Daly. Mr. Roberts is on vacation until May 21 and his calendar appears to be full for that week. However, we will do what we can to find time for his deposition. If he can be available that week, the deposition will need to take place in Reno, Nevada, and likely will need to be limited in duration. Ms. Daly is in Redmond this week, also with a full schedule before she returns to Dublin on Friday afternoon. We can confirm that Ms. Daly was not involved in the decision-making process relating to the German relocation, was not involved in the decision to change vendors, was not involved in any decisions relating to communications with either Arvato or CEVA relating to the move, did not communicate directly with Arvato or CEVA during the relocation process (beyond simply signing certain written communications prepared by others), and did not deal directly with Microsoft's customers. As Jeff Davidson testified on May 9, Ms. Daly was primarily focused on channel management, including interfacing with Microsoft's sales and marketing teams. In light of this information and the additional documents we will be producing (described below), we ask that you reconsider whether there is a legitimate need for Ms. Daly's deposition to go forward.

   Third, regarding your request for additional documents, we are working diligently to identify, gather and review the documents specifically listed in your letter. We are also collecting relevant documents of Ms. Daly and Mr. Roberts that may not be captured in either this, or Microsoft's prior, collection. We will produce these documents as soon as possible,

Elanor Mangin
May 14, 2013
Page 2

which we currently expect to be early next week (depending on volume). We believe that these steps are reasonable under the circumstances and do not agree that further custodial collections are necessary or appropriate.

Finally, although we disagree with your characterization of the privilege assertions at Jeff Davidson's deposition on May 9, we are willing to provide a log identifying any documents relating to the German relocation that have been withheld on the basis of privilege.

Very truly yours,

CALFO HARRIGAN LEYH & EAKES LLP

Christopher T. Wion

CTW:lb

**quinn emanuel** trial lawyers | silicon valley

555 Twin Dolphin Drive, 5th Floor, Redwood Shores, California  94065-2139 | TEL (650) 801-5000 FAX (650) 801-5100

May 15, 2013

<span style="text-decoration: underline">VIA E-MAIL</span>

Chris Wion
Calfo Harrigan Leyh & Eakes, LLP
999 Third Ave., Ste. 4400
Seattle, WA 98104

Re:   <span style="text-decoration: underline">Microsoft Corp. v. Motorola Mobility, et al.  Case No. 10-1823-JLR</span>

Dear Chris:

We write in response to your letter of May 14, 2013.

Based on your representations that Microsoft will not be calling Marcello Prieto or Josh Hutto to testify at trial, and that Microsoft's experts will not rely on conversations with, or the testimony of, Mr. Prieto or Mr. Hutto, Motorola withdraws its request to depose these witnesses.

With regard to the additional documents requested in our letter of May 10, we appreciate your efforts to identify, gather, and review those documents as soon as possible, as well as including Theresa Daly and Owen Roberts as custodians from whom additional documents will potentially be produced early next week.  Your letter, however, states that Microsoft does not agree that "further custodial collections are necessary or appropriate."  To better assess Microsoft's position, please let us know which custodians' files were previously searched to identify documents relating to Microsoft's claim that it relocated its EMEA distribution facility to the Netherlands.  As for the privilege log regarding documents relating to the relocation of the EMEA distribution facilities as privileged, we ask that it be produced in the same time frame as the other documents.

Finally, we disagree with Microsoft's position that Ms. Daly is not a relevant witness.  She was the author of three exhibits to Mr. Davidson's deposition (Exs. 4, 7, and 12)—Microsoft's February 2012 notification to Arvato regarding the termination of services, Microsoft's March 2012 notification to Arvato that the date of transition had changed, and her May 2012

announcement to Microsoft sales teams regarding the opening of the Venray facility—and Mr. Davidson did not discuss the content or context of these communications with her in advance of his deposition (Davidson Depo. Rough Tr. 146:22-147:8).  Each of these documents bears upon the basis for Microsoft's decision to relocate its EMEA distribution facilities.  Thus, Ms. Daly's deposition is reasonably calculated to lead to the discovery of admissible evidence relating to the relocation.  Accordingly, Motorola still wishes to depose her.  Please provide a date on which she is available for deposition in the United States.  Please produce any documents collected from her files no later than  48 hours prior to her deposition.


Very truly yours,


*/s/ Elanor A. Mangin*

Elanor A. Mangin

LAW OFFICES
**CALFO HARRIGAN LEYH & EAKES** LLP
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON  98104
(206) 623-1700

CHRISTOPHER WION

E-MAIL:  CHRISW@CALFOHARRIGAN.COM
FACSIMILE:  (206) 623-8717

May 16, 2013

**VIA EMAIL**

Elanor Mangin
Quinn Emanuel Urquhart & Sullivan, LLP
555 Twin Dolphin Drive, 5th Floor
Redwood Shores, CA 94065-2139

  Re: *Microsoft Corp. v. Motorola Mobility, et al.* Case No. 10-1823-JLR

Dear Elanor:

  We write in response to your letter of May 15, received last night at 10:09 p.m. Pacific.

  In your letter, you state that Theresa Daly was the author of three documents introduced as exhibits at Jeff Davidson's May 9 deposition. This is not correct. As we explained in our May 14 letter, Ms. Daly did not communicate directly with Arvato during the relocation process other than simply signing certain written communications prepared by others. This is true with respect to both of the notices to Arvato referenced in your letter (Davidson Exs. 4 and 7). With respect to Ms. Daly's emails included in Ex. 12, Mr. Davidson testified at length regarding the substance of those emails (Davidson 144:20-160:22). Although you suggest that Ms. Daly's "May 2012 announcement to Microsoft sales team regarding the opening of the Venray facility … bears upon the basis for Microsoft's decision to relocate its EMEA distribution facilities," as we explained in our May 14 letter, Ms. Daly was not involved in the decision-making process relating to the relocation and we disagree that her comments months later have any material bearing on the issue.

  As we stated on Tuesday, Ms. Daly has been in Redmond this week and will be returning to Dublin tomorrow. Although we do not see any reasonable basis to disrupt her very busy schedule this week, she can be available for a deposition in Seattle starting at 2:00 p.m., with a hard stop of 4:00 p.m. It is unlikely that we will be able to produce any of her custodial documents by that time. Please let us know by no later than <u>noon</u> today whether Motorola wishes to go forward with this deposition tomorrow.

    Very truly yours,

    CALFO HARRIGAN LEYH & EAKES LLP

     /s/
    Christopher T. Wion

**quinn emanuel** trial lawyers | silicon valley

555 Twin Dolphin Drive, 5th Floor, Redwood Shores, California 94065-2139 | TEL (650) 801-5000 FAX (650) 801-5100

May 16, 2013

<u>Via E-Mail</u>

Chris Wion
Calfo Harrigan Leyh & Eakes LLP
999 Third Ave., Ste. 4400
Seattle, WA 98104

Re:    <u>Microsoft Corp. v. Motorola Mobility, et al.  Case No. 10-1823-JLR</u>

Dear Chris:

We write in response to your letter of May 16, 2013 demanding a response by noon today.  As we have previously explained, Ms. Daly's deposition is reasonably calculated to lead to the discovery of admissible evidence.  That she did not author Exhibits 4 and 7 does not mean that she does not have information about those documents, which she signed.  And, that Mr. Davidson testified about Exhibit 12 does not mean that Ms. Daly does not have unique information that Mr. Davidson did not have.  Indeed, he testified that he had not discussed the content or the context of those communications with her in advance of his deposition, and therefore could not testify as to the source of the information contained therein.

While we understand that Ms. Daly is currently in the United States and that Microsoft would like to accommodate her schedule for the deposition, we cannot proceed with the deposition tomorrow, May 17, for only two hours.  There is no reason why Ms. Daly's deposition should not be subject to the ordinary guidelines set forth in Fed. Rule Civ. P. 30(d)(1).  Moreover, Microsoft has agreed to search Ms. Daly's files—which it apparently failed to do previously—but will not complete that production prior to tomorrow.  We need those documents prior to her deposition.  Accordingly, please provide a date on which Ms. Daly is available for a deposition, in the United States, no earlier than 48 hours following Microsoft's production of documents from her files.

quinn emanuel urquhart & sullivan, llp
LOS ANGELES | NEW YORK | SAN FRANCISCO | CHICAGO | WASHINGTON, DC | LONDON | TOKYO | MANNHEIM | MOSCOW | HAMBURG | PARIS

Very truly yours,

*/s/ Elanor A. Mangin*

Elanor A. Mangin

01980.62689/5319161.1

LAW OFFICES
**CALFO HARRIGAN LEYH & EAKES** LLP
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
(206) 623-1700

CHRISTOPHER WION

E-MAIL:  CHRISW@CALFOHARRIGAN.COM
FACSIMILE  (206) 623-8717

May 16, 2013

**VIA EMAIL**

Elanor Mangin
Quinn Emanuel Urquhart & Sullivan, LLP
555 Twin Dolphin Drive, 5th Floor
Redwood Shores, CA  94065-2139

      Re:    *Microsoft Corp. v. Motorola Mobility, et al.*  Case No. 10-1823-JLR

Dear Elanor:

      We write in response to your letter of May 16.

      This confirms that Motorola has declined our offer to make Ms. Daly available for deposition in Seattle tomorrow afternoon before her return flight to Dublin.  Ms. Daly plans to be in the United States on other business during the week of June 24 and could be available for deposition on June 25.  Please let us know if you would like us to reserve that date. Alternatively, she could be available for deposition in Dublin later this month, in person or by telephone or video conference.

      Very truly yours,

      CALFO HARRIGAN LEYH & EAKES LLP

      Christopher T. Wion

CTW:lb

# EXHIBIT G

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WASHINGTON


AT SEATTLE



MICROSOFT CORPORATION, a          )

Washington corporation,           )

                                  )

                Plaintiff,         )

                                  ) No. 2-10-cv-01823-JLR

            vs.                    )

                                  )

MOTOROLA, INC., and MOTOROLA      )

MOBILITY, INC.,                   )

                                  )

                Defendants.        )



VIDEOTAPED 30(b)(6) DEPOSITION OF JAMES JEFF DAVIDSON


May 9, 2013


Seattle, Washington

1  A   I am not completely clear.  I'm pretty sure she is an

2      attorney.

3  Q   Okay.  And what was -- what was her role?

4  A   Actually, I believe she's a senior attorney.

5          She held a call with me --

6                    MR. WION:  I want to caution the

7      witness, if you can answer the question without

8      disclosing privileged information, that's fine, but

9      if there were privileged communications with

10     Ms. McKinley, then that's not something that you

11     should be disclosing here today.

12                    THE WITNESS:  Okay.

13 A   She basically alerted me to the case and triggered

14     more discussion between Owen, myself, and Fergus.

15     That was, for the most part, the extent.

16         And then drew me in to connections with other

17     people at Microsoft to understand what was going on.

18 Q   (By Ms. Roberts)  And who were the other people at

19     Microsoft?

20 A   I can't even recall the names.  I had never -- there

21     was several of them, and I had never worked with them

22     before.  They were just different parts of the

23     business around Windows and -- some of them in IEB,

24     Entertainment and -- Interactive Entertainment

25     Business -- that I just never worked with.  And to be

56

1                        EXAMINATION (Continuing)

2       BY MS. ROBERTS:

3    Q   Mr. Davidson, I'd like to kind of get a sense of

4        the timeline of the move from the Düren, Germany

5        facilities to -- to Venray.

6            So, first of all, when did Microsoft decide to

7        relocate the EMEA facilities?

8    A   It was that first week of March where -- when we

9        decided to do it.  But -- somewhere in there.  It was

10       early March.  Somewhere -- I mentioned March 8th

11       earlier.  I know that was an award date.

12           I think -- it was right within that same time

13       period.  It was just a -- a flurry of decisions and

14       activity.

15   Q   And when you say "March," you mean March 2012; right?

16   A   Yes, March of 2012.  Sorry.

17   Q   When did Microsoft start considering whether it

18       should move the EMEA facilities?

19   A   Mid-January of 2012.

20   Q   And who -- who ultimately made the decision to move

21       the facilities?

22   A   It would have been me; Owen Roberts, my boss; and his

23       boss, Brian Tobey.

24   Q   Brian Tobey?

25   A   Yes.

57

```
 1  Q   And he was Owen Roberts' boss?

 2  A   It was Owen's boss, yes.  So Owen and I conferred.

 3      Brian heard it.  "Whatever you guys think is best."

 4  Q   And so prior to mid-January 2012, was -- was

 5      Microsoft considering relocating the EMEA facilities?

 6  A   I'm sorry; would you repeat that?

 7  Q   Right.

 8          Well, I think you stated that it was in mid-

 9      January 2012 that Microsoft started considering

10      moving the EMEA facilities.  Is that right?

11  A   That's correct.

12  Q   Okay.  I've seen some documents dated January 1st,

13      2012.

14          Does that -- and I can show them to you, but --

15  A   Yeah.

16  Q   -- does that affect your recollection of what the

17      timeline was?

18  A   No.  I mean, it was January 2012.

19  Q   Okay.

20  A   We were alerted to the legal situation right -- right

21      in there, early to mid-January.  And that's when it

22      started.

23          We had not considered relocating prior to being

24      alerted.

25  Q   Okay.  And who -- who alerted -- alerted you to the
```

```
 1       legal situation?  Was that Shelley McKinley --
 2  A    Shelley.
 3  Q    -- or somebody else?
 4  A    Yeah, Shelley.
 5  Q    And what did you understand the legal situation to
 6       be?
 7  A    I understood, at that stage, basically what was
 8       public.
 9            It was a patent infringement case.  There was a
10       risk of an injunction, where we would not be able to
11       distribute our product to or from Germany.
12            That's basically what I understood the case to
13       be.  The rest of it was legal.  And -- and, frankly,
14       we've got plenty of legal experts.  And my job was
15       basically to hear risk; we should start considering
16       mitigations.  And that was my understanding.
17  Q    Okay.  So tell me about your discussions with --
18       well, I guess, in making the decision, was that
19       primarily discussions between you and Owen Roberts?
20  A    In making decisions?
21  Q    Right.
22  A    My -- yes, myself and Owen, primarily.
23            Shelley would be -- she'd be aware of -- of what
24       those were; sometimes consulted.
25            And then Fergus was a key input, because he was
```

59

1       the eyes on the ground and kind of -- he could see

2       different sites and those types of things.

3   Q   And so what factors did Microsoft consider in

4       deciding whether or not to relocate the EMEA facility

5       outside of Germany?

6   A   Specifically whether to relocate or not?

7   Q   Right.

8   A   Consideration was really risk.  We didn't know with

9       any certainty what would happen one way or the other,

10      but obviously cost was a key consideration, against

11      the risk of not -- not being able to do business in

12      Germany.

13          And, you know, it didn't -- at that time, it

14      was -- I think it's pretty simple to look at it and

15      say, well, it's Xbox and we couldn't ship to or from

16      Germany, that's potentially hundreds of millions of

17      dollars, but potentially more, depending on how long

18      it would take us to actually respond -- Windows,

19      likewise -- compared to ten, twelve million dollars

20      in relocation.

21          And, you know, also, the customer impact in that

22      risk.  And so from a customer's perspective, they

23      rely on Microsoft to do their business.  They rely on

24      us to have continuity of supply.  So my charter is to

25      satisfy that demand and make sure that there's

```
 1        continuity of supply.
 2            And it isn't just -- I remember the discussion
 3        wasn't -- it isn't just about, you know, if you
 4        couldn't ship for X period of time, and if just that
 5        X period of time was impacted, as those retailers
 6        need to go fill those shelves with someone's product,
 7        and it won't be ours if we're not supplying it.
 8            So that risk and potential disruption far
 9        outweighed the cost of -- of moving.
10   Q    Could other distribution facilities have sort of
11        filled in to prevent that period of disruption in the
12        event that an injunction had actually issued?
13   A    Not to the -- we did evaluate that, but nowhere near
14        the volume or scale we would require.  And the cost
15        to actually do it would pretty quickly stack up to
16        the cost equivalent to the move.
17            We did consider that, though.
18   Q    Did you have any discussions with anyone other than
19        Owen Roberts about whether to relocate the
20        facilities?
21                        MR. WION:  And in answering that,
22        you can answer "yes" or "no," but again, I need to
23        caution you not to disclose any privileged
24        communications you may have had on the subject.
25   A    Could you repeat the question?
```

61

1   Q   (By Ms. Roberts)  Sure.

2         Is there -- did you have discussions with anyone

3       other than Owen Roberts about whether to relocate the

4       facilities?

5   A   There were privileged conversations with legal.  No

6       one else that I could recall.

7   Q   And when you say "legal," are you referring to

8       Ms. McKinley, or anyone else?

9   A   Ms. -- yes, Ms. McKinley.

10  Q   Okay.  Anybody else from the legal department?

11  A   Not that I can recall.

12  Q   Did -- did you and Mr. Roberts make presentations to

13      anyone about whether or not the facility should be

14      relocated?

15  A   We talked -- we did speak with Brian, actually.

16        I don't think any presentations -- I mean, we did

17      present information to Brian, but I wouldn't call it

18      a presentation.  We met with Brian, shared the

19      information that we were looking at.

20  Q   So I guess when I say "presentation," was there any

21      documentation that was provided to Brian --

22  A   Yes.

23  Q   -- regarding whether to move?

24  A   Yes.  We -- discussions was move and move with who.

25  Q   And do you know -- can you recall approximately when

```
 1        really aren't documents relating to the -- the

 2        decision of whether or not to relocate.

 3             So I'm wondering if that's because they did not

 4        exist, or if they weren't collected, or withheld for

 5        some reason.

 6   A    I --

 7   Q    Do you know?

 8   A    I never saw a document, to my knowledge, that --

 9        where we discussed whether or not to move.  It was

10        verbal.

11   Q    So you and Mr. Roberts did not email at all about

12        whether to move?  That was all verbal?

13   A    Yeah.  To the best I recall, yes.

14   Q    And do you know whether Mr. Roberts emailed with

15        Mr. Tobey or anyone else about whether or not to

16        move?

17   A    I don't know.

18   Q    In connection -- in connection with this decision-

19        making process, were you aware of what was going on

20        in the ongoing legal proceedings between -- or the --

21        well, let me take a step back.

22             I think you referenced that there were legal

23        proceedings, and you deferred to the lawyers on the

24        legal part of it.  But what is your understanding of

25        what the legal proceedings were?  Who were the
```

70

1    parties to the proceedings?

2  A  Motorola and Microsoft.

3       My understanding were -- was, there were

4    hearings, and we understood the risk of injunction in

5    Germany.

6       I know that the -- the hearings, I believe, were

7    in Seattle.

8       Our risk initially that we needed to solve for

9    was -- we had a very definitive date to solve for,

10   which was March 31st.  And so all of our decisions

11   were around targeting that period of time; meaning,

12   if you're going to move, you need to find a way to

13   have continuity of supply by April 1st and on.  You

14   need to figure out how to have continuity of supply.

15      And I did realize after that March 31st date or

16   even sometime -- sometimes March, dates were moving

17   out.  However, when we make the decisions, there's a

18   lot that goes into motion that is just difficult and

19   impossible or highly expensive to -- to change.

20  Q  Now, you said that there was a definitive date to

21   solve for, and that was March 31st.

22  A  Mm-hm.

23  Q  I guess, what was it that needed to be done by March

24   31st, and why?

25  A  I understood that the risk of -- that there could be

71

 1    a potential injunction, where we wouldn't be able to

 2    sell or distribute, within or out of Germany, Xbox

 3    products, Windows products, and the date that that

 4    would -- could potentially go into effect would have

 5    been March 31st or April 1st, right there somewhere.

 6         And so when I say the date to solve for, make

 7    sure we have a solution so we can continue to sell.

 8    That would have been the -- the date to solve for.

 9 Q  And then obviously there's this ongoing litigation

10    while you're making the decision.

11         Did you take into consideration in the decision-

12    making process the different events that were

13    occurring in parallel in the litigation at the time?

14                    MR. WION:  Objection.  Vague.

15 Q  (By Ms. Roberts)  Did you understand the question?

16 A  Could you clarify?

17 Q  Sure.

18         In -- while you were deciding whether or not to

19    relocate, did you take into consideration any of the

20    legal developments occurring in the case at the time?

21 A  Could you -- would you give me an example of a legal

22    development?

23 Q  Well, you know, briefs being filed or orders from the

24    court.  Did you -- were you aware of those and did

25    they affect your decision?

72

1  A    I was aware of them.  It made us evaluate,

2       consistently evaluate, what we were doing or not

3       doing.

4            Once we made the decision -- and this would

5       have -- this was prior to knowing any other

6       additional information.  We had a financial

7       commitment to CEVA.  We had exit notice already to

8       Arvato.

9            Arvato was already searching for another -- and

10      secured it, actually, pretty quickly -- another

11      client to occupy the Düren facility.

12           We evaluated options to bridge a period of time

13      between when we could be ready and March 31st,

14      because it was clear March 31st would not be a

15      feasible date.

16           And they would have been scaled down, definitely

17      not scaleable solutions whatsoever, and costly.

18           There were a number of scenarios that we did, but

19      I would say that we were in the middle of a risk

20      sandwich.

21           You know, we had the legal proceedings, we had

22      financial commitments, we had solid termination

23      periods, and we had to make sure that we would be

24      ready for any one of those scenarios.  But we were

25      definitely in the middle of a risk sandwich.

73

1    Q    Can you explain to me, in -- in your analysis -- or

2         let me be clear -- in Microsoft's analysis of whether

3         or not to relocate to -- relocate from the Düren,

4         Germany facility, what factors weighed in favor of

5         staying in Germany?

6    A    Germany is the best place for us to have a

7         distribution center in mainland Europe.  That would

8         be the primary factor.

9              Well, actually, that would be one factor.

10             The disruption to our team, potential disruption

11        to our business, in a different way than a break in

12        continuity supply; just meaning, anytime you move,

13        when you move into something new and it's that

14        sizable -- I mean, this is a facility that's -- I

15        want to say ten plus -- it's ten plus football

16        fields.  This is not a small feat, and the fact that

17        we had many other things going on.

18             During this period, we were planning for -- we

19        were launching 84 products this year -- that year.

20        We -- my team was opening 44 Microsoft retail stores.

21        We were already opening -- because we were expanding

22        our online presence globally, we ended up expanding

23        into 22 countries.

24             I had already started work in Japan, Australia,

25        and Shanghai, to make sure that we were ready for all

74

1    those expansions, as well as India.  And Europe was

2    just another thing on top of everything else.

3        And so from my perspective, it was look for every

4    possible way not to move.  And we couldn't find it

5    within those time frames, or at least couldn't find

6    it in an optimal way.  And so the move was definitely

7    the hardest possible choice.

8  Q   In terms of timing -- because in connection with the

9      move, Microsoft also switched from having Arvato run

10     the Düren facility to having CEVA run the Venray

11     facility; right?

12 A   Mm-hm.

13 Q   Which decision came first:  the decision to move out

14     of Germany or the decision to switch from Arvato to

15     CEVA?  Or was it all one decision?

16 A   Hm.  I don't recall.  That's a completely logical

17     question.  Honestly, I just -- I don't recall.

18     It was a really compressed time.  But I think the

19     decision sequentially to move would have been first,

20     because I had no reason to change Arvato out.  And

21     that would prompt the other.

22     You know, the -- because the first thing we

23     started to evaluate was whether we move or not and

24     what our options were; whether it was move, options

25     around moving, and then potential sites to move.

79

1  A   I can't control everybody else.  So in my role, I

2      would expect so.

3  Q   Okay.  I'm going to hand you what we will mark as

4      Davidson Exhibit 2, which is a document which has the

5      Bates number MS-MOTO_1823_00004082856.

6                             (Exhibit No. 2 marked

7                               for identification.)

8

9  Q   (By Ms. Roberts)  And I'll give you a minute to look

10     through it.  Let me know when you're ready.

11         So, first of all, I'll direct your attention to

12     the -- well, have you seen this document before?

13 A   I have seen this document before.

14 Q   And what do you understand this document to be?

15 A   This was a proposal from CEVA -- or investigation

16     "slash" proposal from CEVA as they investigated

17     potential sites.

18 Q   And it's dated January 26, 2012?

19 A   That is correct.

20 Q   Is that correct?  Okay.

21         So if I can turn your attention to the second

22     page.

23 A   Mm-hm.

24 Q   And there's a list of countries -- Netherlands,

25     Belgium, UK and France -- in this chart.

80

1       Do you see that?

2  A  Yes, I do.

3  Q  Were those locations that CEVA was investigating for

4     potential locations to relocate to?

5  A  These were some of them, yes.

6  Q  What other locations were considered?

7  A  Belgium, UK, France -- there would be other locations

8     that we talked about.  Poland, Czech Republic.

9       Those are some that I recall.

10  Q  Okay.  And as you may recall, I asked you a few

11    moments ago sort of which came first; the decision to

12    move or the decision to relocate.

13  A  Mm-hm.

14  Q  And I believe you testified earlier that the ultimate

15    decision to move wasn't made until March of 2012.

16     This document, looking at other facilities, is

17    dated January 2012.

18     Does that refresh your recollection as to the

19    timeline as to when -- when Microsoft analyzed each

20    of those issues, whether to move and where to move

21    to?

22  A  Our decision to move was in March.  Our evaluation,

23    it was earlier.

24  Q  And was there any evaluation done prior to January of

25    2012?

83

1           And we said minimal location we would consider

2       would be 40 -- 350,000.

3   Q   Okay.  Now, there's reference -- in the left-hand

4       column, in the Netherlands column, it says "Place:

5       Venlo"?

6   A   Yes.

7   Q   Venlo is a different location than Venray; is that

8       correct?

9   A   They're close together, yes.

10  Q   Okay.  So at this time period, was CEVA analyzing a

11      location different than the one that Microsoft

12      ultimately chose to move to?

13  A   At this point in time, yes.

14  Q   Okay.  And then the grand totals at the very bottom

15      of this chart, is it correct that the entry for

16      Belgium was the least expensive at the time?

17  A   For their estimates on a distribution center, without

18      considering logistics costs, taxes, labor, risk of

19      strike, holidays, working hour restrictions.  You

20      name it.

21  Q   Okay.  And so all of those other factors that you

22      just -- just listed, were those part of the overall

23      consideration of where to --

24  A   Those --

25  Q   -- to move?

84

1   A   Those would be a few, yes.

2   Q   Okay.

3   A   As well as site readiness.

4   Q   What do you mean by "site readiness"?

5   A   For example, Belgium, if I recall correctly, while

6       the footprint of the facility was this size

7       referenced here, there was some other tenants in the

8       facility.  And so we wouldn't actually be able to

9       occupy it completely.

10  Q   If you turn to the next page of Davidson Exhibit 2,

11      there's a bullet point list and it's entitled

12      "Highlights of the Analysis."

13  A   Mm-hm.

14  Q   And the first bullet point starts out "In light" --

15      "In the light of the current timeline"?

16  A   Mm-hm.

17  Q   What was the current timeline as of January of 2012?

18  A   I believe in that March 31st/April 1st.  Yeah.

19  Q   And so was -- basically, was -- was Microsoft looking

20      to be up and running at a different location by March

21      31st?

22  A   The scenario we provided to the suppliers was, we

23      need to find a suitable site.  We're evaluating -- we

24      need to evaluate the site, so we need to evaluate the

25      feasibility of being live by that point in time.  We

125

1  compliance issues we needed to make sure of.

2      More in -- in terms of the evaluation, several

3  groups across Microsoft.

4  Q  So I just want to make sure I am understanding you

5  correctly.

6      In terms of deciding whether or not to move from

7  Düren, Germany, the tax group was involved in that

8  analysis, the trade group was involved in that

9  analysis, and then perhaps other groups within

10  Microsoft?

11  A  Let me clarify something.

12      The decision, no.

13  Q  Okay.

14  A  The inputs into the decision, yes.

15      For example, we evaluated other scenarios; you

16  know, would there be a tax implication if we went

17  into Belgium.

18      Yes, there would be a tax implication.  You

19  should think about a 24 percent or some other tax

20  associated with labor.

21      What if we moved to this location in France?

22      Yep, taxes.

23      We had other scenarios that we evaluated:  What

24  if we did a bonded warehouse?

25      We brought in tax to evaluate that.

174

1      facilities?

2  A   I -- I do remember discussions about filings.

3          I don't remember sequence, I don't recall the

4      dates.   And those were privileged conversations.

5  Q   Did the dates of those filings impact Microsoft's

6      decision on whether and when to move the Düren

7      facilities?

8  A   As I mentioned earlier, the -- the train left the

9      station once we decided, in terms of terminations,

10     financial commitments, making the changes, getting

11     systems changes in place.

12 Q   So are you aware that the Washington court -- or

13     Microsoft is aware that the Washington court did

14     issue an injunction precluding Motorola from

15     enforcing an injunction in Germany; right?

16                     MR. WION:  I'm going to object.

17     This line of questioning does not seem to be within

18     the scope of the topic on which Mr. Davidson is here

19     to testify.

20         But if you are interested in asking him of his

21     personal knowledge, you may do so, to the extent he

22     knows.

23                     MS. ROBERTS:  Well, I disagree,

24     because I think it goes to mitigation of damages.

25         So if he doesn't know the answer his, that's

175

1        fine, and we can fight about that later.

2                        MR. WION:  The objection still

3        stands.  We can figure it out later.

4     Q   (By Ms. Roberts)  So my question was:  Are you aware

5        that the Washington court issued an injunction

6        precluding Motorola from enforcing an injunction in

7        Germany?

8                        MR. WION:  And can we just have a

9        standing objection to that on the same basis that I

10       just articulated?

11                       MS. ROBERTS:  No.  You can keep

12       objecting.

13                       MR. WION:  Oh.

14          Same objection.

15          You can answer if you know.

16    A   I would need you to explain the question in long

17       legal terms.

18    Q   (By Ms. Roberts)  Okay.  Did Microsoft consider

19       changing its plans -- well...

20          What did Microsoft do to avoid having to move

21       from Germany?

22    A   I cannot comment on the legal proceedings.

23          We evaluated options.  We evaluated could we set

24       up a bonded warehouse within Germany, which would be

25       not considered -- product not being considered as

176

1    imported into the EU until it had to be imported in

2    its final country of sale.

3          We evaluated -- do you mean with respect to

4    moving the entire facility?

5  Q  Well, I guess, any alternatives that were considered.

6  A  We evaluated potentially moving consoles and Windows

7    products to the UK warehouse.

8          Dubai was never an option.

9          The UK actually ended up not being an option,

10   because they couldn't scale to the level we needed.

11         Those would be the -- the primary.  Yeah.

12 Q  Now, can you explain to me what you mean by "a bonded

13   warehouse in Germany"?

14 A  Yes.

15         So we investigated could we either convert or set

16   up a warehouse within Germany that would be -- I'm

17   going to use the term loosely "a free trade zone."

18   So we could get product on land into Germany.  It

19   wouldn't be considered as imported into Germany.

20         We could ship from there to any country; however,

21   at the point it was shipped to any country within the

22   EU, it would need to be imported into that country.

23   And it would be that treatment that we would take

24   into consideration.

25         We consulted our tax team if it was clear within

1    the timelines we needed to execute.

2         We ruled that option out, because it would

3    introduce extreme complexity in the way we transacted

4    with our customers.

5  Q   And under what timeline would going with the bonded

6     warehouse have worked, if any?

7  A   Probably -- I'm trying to recall these discussions.

8         Longer than six months.  A year.

9         But even then, it wasn't optimal because of the

10    sheer number of transactions that would need to be

11    executed.  It wouldn't be an optimal model.  It would

12    be costly; more costly than not being bonded, without

13    a doubt.  And the number of transactions would just

14    be very, very complex.

15  Q   Now, you said a moment ago, you were thinking about

16    some discussions about the bonded warehouse.  Who

17    were those discussions with?

18  A   Our tax team.  I don't -- I don't recall -- tax and

19    trade teams.  I don't recall specifically who.

20  Q   And was it you personally with the tax and trade

21    teams, or was there anybody else involved?

22  A   Fergus was involved.  I think they did a read-out

23    with me.  And I don't recall who else was in that

24    discussion.

25  Q   If -- if you had the time to go with the bonded

205

```
 1        seeing.  I saw tables that had Germany as the base,
 2        and we compared real estate, labor -- primarily real
 3        estate and labor.  And we compared Germany.  I
 4        believe I saw Poland, France, Netherlands.  I think
 5        Czech Republic.
 6            I remember saying this.  Yes, we did look at it.
 7        I don't remember -- I don't recall specifically the
 8        numbers, but I do recall Netherlands being higher
 9        than Germany in each of the indices.
10   Q    And when you say that's something that we looked at,
11        is that something that Microsoft did or something
12        that CEVA or Arvato did as a part of their proposals?
13   A    All of the above.
14   Q    Okay.  So there was some internal Microsoft work --
15   A    Yes.
16   Q    -- analyzing that?
17   A    Yes.
18   Q    Okay.  And was that documented in some way?
19   A    I -- I did see a document with a table on it.  I
20        recall seeing it.
21   Q    Okay.
22   A    I don't know the name of the document.  I don't
23        know -- I don't recall where it -- from where it
24        came, but I do remember seeing it.
25   Q    If you could turn to -- turn to Davidson Exhibit 15.
```

```
 1        So were you told there's a threat of an

 2     injunction that would limit the ability to distribute

 3     products to and from Germany, figure out a solution

 4     to that problem; or were you told, more specifically,

 5     you need to consider relocating the EMEA distribution

 6     facilities as the result for a potential for

 7     injunction?

 8                    MR. WION:  And just as a reminder,

 9     counsel is not asking for you to disclose any

10     privileged information that you might have learned on

11     those subjects.

12  A  All those discussions were under privilege.

13  Q  (By Ms. Roberts)  Had Microsoft ever considered

14     moving from the Düren, Germany facilities prior to

15     January of 2012?

16  A  No, not consid- -- not considered in earnest.  We

17     didn't have a reason.

18  Q  So you mentioned that Arvato was starting to request

19     increased costs for -- did you or anyone on your team

20     contemplate looking for another vendor as a result of

21     that?

22                    MR. WION:  Objection.  Vague.

23     Unclear as to time.

24  Q  (By Ms. Roberts)  Can you answer the question?

25  A  Can you clarify?
```

1    STATE OF WASHINGTON )    I, Karmen M. Knudson, CCR, RPR, CRR,
                       ) ss a certified court reporter in
2    County of Pierce    )    the State of Washington, do hereby
                           certify:

3

4

5          That the foregoing deposition of JAMES JEFF
    DAVIDSON was taken before me and completed on May 9, 2013,
    and thereafter was transcribed under my direction; that the
6    deposition is a full, true and complete transcript of the
    testimony of said witness, including all questions, answers,
7    objections, motions and exceptions;

8          That the witness, before examination, was by me
    duly sworn to testify the truth, the whole truth, and
9    nothing but the truth, and that the witness reserved the
    right of signature;
10

11         That I am not a relative, employee, attorney or
    counsel of any party to this action or relative or employee
    of any such attorney or counsel and that I am not
12    financially interested in the said action or the outcome
    thereof;
13

14         That I am herewith securely sealing the said
    deposition and promptly delivering the same to
    Attorney Andrea Pallios Roberts.
15

16         IN WITNESS WHEREOF, I have hereunto set my
    signature on May 13, 2013.

17

18

19

20

21

22                 _____
                 Karmen M. Knudson, CCR, RPR, CRR
23                 Certified Court Reporter No. 1935.

24

25

# EXHIBIT H

CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

1

1

2             IN THE UNITED STATES DISTRICT COURT

3               WESTERN DISTRICT OF WASHINGTON

4                        AT SEATTLE

5                          oOo

6
MICROSOFT CORPORATION,

7
             Plaintiff,

8                              CASE NO. C10-1823-JLR
     vs.

9
MOTOROLA, INC., et al.,

10
             Defendant.

11  _____
MOTOROLA MOBILITY LLC,

12  et al.,

13          Plaintiff,

14  vs.

15  MICROSOFT CORPORATION,

16          Defendant.         /

17

18              VIDEOTAPED DEPOSITION OF

19                  OWEN ROBERTS

20              Wednesday, May 22, 2013

21                  Reno, Nevada

22

23
Job No. CS1671951

24
             REPORTED BY:  MICHELLE BLAZER

25             CCR #469 (NV) - CSR #3361 (CA)

CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

32

1    in deciding between Arvato's selection and CEVA's

2    selection; is that right?

3        A    Correct.

4        Q    Okay.  So taking a step back to the decision to

5    actually relocate the German facility, were you involved

6    in that decision?

7        A    I want to clarify the question.

8        Q    Sure.

9        A    I thought I had already covered the fact that I

10   said back in January we were informed that we were -- we

11   were being -- we had a court litigation pending against

12   us which -- which would probably require us to move our

13   facility in order to keep doing business in Europe.

14            If you are asking that question, no, I wasn't

15   part of that decision, that was a legal --

16       Q    Okay.

17       A    -- decision.

18       Q    Okay.

19       A    Once the -- once we had been -- we were told

20   then to go and look for alternatives whilst the

21   litigation continued.

22       Q    Okay.  So in terms of evaluating if there were

23   any options to Microsoft other than relocating the German

24   facility that would comply with what was going on in the

25   litigation, did -- did you evaluate any other options?

CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

33

1      A      I evaluated one other option.

2      Q      And what was that?

3      A      That was to set up a bonded facility in the

4   current German warehouse.

5      Q      And can you explain what you mean by a bonded

6   facility?

7      A      So moving into the German warehouse there is

8   what I am going to call German discreet product for the

9   German market.  Let's just say for argument's sake, these

10   are not the exact numbers, but let's just say for

11   argument's sake that it was ten percent of everything

12   that moved into that warehouse.

13            90 percent of the volume would be leaving

14   Germany to go to other markets, and therefore, we

15   evaluated whether there was a potential of creating a

16   bonded solution that that product that wasn't actually

17   physically located as a trade designation, that product

18   could move in, it's still designated in a free zone, not

19   within a country, and that we could move it out of that

20   free zone as well into those countries when orders came

21   in.

22      Q      Okay, and I take it Microsoft did not go with

23   the option of creating a bonded warehouse?

24      A      No.

25      Q      And do you recall why not?

CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

34

1      A     The risks of us being able to execute that

2   flawlessly and perfectly, if indeed we had been found

3   against in Germany, the risks were too high.  I could not

4   guarantee to my boss or to the legal team that we would

5   be flawless in that, and that we may be, if we were found

6   to be in breach of whatever we were litigating against, I

7   couldn't guarantee that we would be perfect in that and

8   the risk was deemed to be too high.

9      Q     And can you explain what the risks were in a

10   little bit more detail?

11      A     The risks would be that we had not ever set up a

12   bonded facility, and it's a very complex trade, tax and

13   systems implementation to do that perfectly.  And we did

14   not have, number one, the time, or we didn't believe we

15   had the processes to do that perfectly.  And it would

16   have caused a terrific disruption for a number of our

17   customers as well as outside of Germany because it

18   changes the way in which we invoice them as well.

19      Q     Okay.  How long would it have taken to set up a

20   bonded warehouse?

21      A     To do it perfectly, I'm -- I'm going to guess.

22   There is no -- it depends.  It depends, let me put it

23   that way.  It could take, you know, a minimum of a year,

24   it could take a couple of years to do it.

25      Q     So in -- in evaluating whether setting up a

CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

85

1    Q    Not a minute longer?

2    A    Not a minute longer.

3    Q    Are you aware that prior to April 17th, 2012

4  Microsoft had filed a motion with the Federal Court in

5  Washington asking for an order precluding Motorola from

6  enforcing any injunction in Germany?

7    A    No, I am not.

8    Q    Okay, and so is it fair to say you are not aware

9  that the judge had already ruled on that motion in

10  Microsoft's favor?

11    A    No, I was not.

12    Q    And so as of April 17th, 2012 when this letter

13  was -- is dated, you are not aware that, in fact, the

14  threat of an injunction had lessened based on the Court's

15  orders?

16    A    No.

17    Q    Going to hand you what we will mark as Roberts

18  Exhibit 5, which bears the Bates number

19  MS-MOTO_1823_00004083774.

20         (Whereupon Robert's Exhibit 5

21          was marked for identification.)

22         THE WITNESS:  May I just add to my answer of the

23  previous question?

24  BY MS. ROBERTS:

25    Q    Of course.

CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

86

1     A    All I would say is it was irrelevant at that

2  date anyway, because we had -- we had awarded the

3  business and we were in movement, we were in progress of

4  moving it.  So it would have been an irrelevant piece of

5  information at that stage.  The ship had sailed.

6     Q    If it wanted to could Microsoft have extended

7  the period of time to complete the move if the risk of an

8  injunction had decreased?

9     A    We had already allowed until the June the 1st

10  period, so we had already increased it from that

11  April 17th date.  That decision had been made long

12  before.

13     Q    Right, but if -- if -- if you were aware that

14  the threat of an injunction had decreased, could you have

15  changed the go-live date to July, say July 1st of 2012

16  and sort of --

17     A    No, ma'am.

18         From a business continuity perspective, July

19  onwards is a rampant of our incredibly busy season in

20  Europe, and therefore if we were going to move we had to

21  be established, set up and have a facility operating

22  before we hit the start of peak, which would have been

23  late July.

24     Q    Okay.  So to some extent, the timing of when the

25  move had to be completed was influenced by Microsoft's

CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

131

1      A     No, ma'am.  Not his style.

2      Q     Okay.  The next sentence says, "Still lots of

3   balls in the air and this does not definitely help in ITC

4   which is the big issue - they are not governed by this

5   court it turns out."

6            Do you know what he's describing there?

7      A     I do not know what that means at all.

8      Q     Okay.  Who were the other individuals on this

9   e-mail?

10     A     These are Jerry Knoben, Nino, and Kevin Adams

11  are direct reports of -- some of Brian Tobey direct

12  reports.

13     Q     Okay.  What areas of the business do they work

14  in?

15     A     Manufacturing, sourcing and planning.

16     Q     In terms of what Microsoft did to avoid having

17  to move out of Germany we discussed the three options it

18  considered.  Actually moving, a bonded warehouse in

19  Germany, and distributing Xbox consoles from the United

20  Kingdom; correct?

21     A     Correct.

22     Q     And there were no other alternatives considered;

23  correct?

24     A     No, ma'am.

25     Q     Did Microsoft consider changing any of its

CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

134

1  January of 2012 or early March when the decision was made

2  to go with CEVA?

3      A    Can you clarify the question?  I thought I had

4  already testified that the first I heard about this was

5  in mid to late January.

6      Q    Right.  I'm trying to get an idea from your

7  perspective when you are thinking about when the move

8  process started, do you go back to the January date or

9  once you selected a vendor and were, you know, moving

10  forward with that vendor?

11      A    No.  As far as my recollection is concerned, and

12  we had not made a decision to move the facility in that

13  January date.  We had the potential risk of a move and

14  that's why we were being prudent and starting the work of

15  due diligence.  And it was at some later stage, some date

16  between that date and March the 8th when we finally

17  awarded the business that we had decided that we were

18  going that way.  And I think that was closer to the March

19  time frame than the January time frame.

20      Q    Okay.  And I just want to make sure I am

21  understanding your testimony correctly.

22           I believe you testified earlier today that you

23  and your team decided between going with Arvato versus

24  CEVA, whereas the legal team was -- was the group that --

25  that made the decision whether or not to move; is that

CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

135

1   correct?

2       A      No, that is not correct.

3       Q      Okay.

4       A      No.   The legal team is there to give us advice.

5   We own the business and we make the business decision

6   based on the risks that are presented to us.   And so the

7   legal team had presented a case that said we had a very

8   strong risk of our business being materially impacted if

9   we lost the litigation in Germany, and then it was a

10  decision by the business to say how to we mitigate for

11  that risk and at what stage do we mitigate for that risk.

12  It's not a legal decision.

13      Q      So when I asked you who made the decision to

14  relocate the distribution facility out of Germany, who

15  was that?

16      A      That was my decision with Brian Tobey as my

17  support as far as for that.   But when I presented it to

18  Brian, where we were, the business risks associated with

19  it, Brian agreed with my proposal.

20      Q      Okay.  Can you then explain to me, I guess, what

21  information was provided to you by legal to advise you of

22  the risk?

23      A      As I stated earlier, Shelley had told us that

24  there was this litigation pending and it didn't appear

25  that -- and as a result of that we would be -- materially

CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

137

1        MR. WION:  Objection, calls for disclosure of

2   privileged communications.

3        THE WITNESS:  No, ma'am.

4   BY MS. ROBERTS:

5    Q    What, if anything, did Microsoft do to keep the

6   costs of the move from Germany to the Netherlands down?

7    A    We approached the move like we approach all of

8   our business transactions, which is -- and one of our key

9   pillars of our organization is to aggressively manage

10  costs.  It's been a stated strategy of our group for the

11  last seven years.  And therefore, we knew that this was

12  not an open -- this was a cost to the business that we

13  would have to absorb elsewhere.  So we were minimizing

14  costs everywhere we could.  There was no such thing as a

15  blank check.

16   Q    And were there particular steps taken?

17   A    Well, that's why we had the RFP process, the

18  requests for pricing process, and we spent that very

19  short time period with the both teams trying to get the

20  costs back down to a reasonable point.

21   Q    And it's correct that Arvato's bid was higher

22  than CEVA's bid; correct?

23   A    Yes, that is correct.

24   Q    CEVA eventually, though, went above the amount

25  it bid; correct?

CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

150

```
 1  STATE OF NEVADA      )

 2                       )     ss.

 3  COUNTY OF WASHOE     )

 4

 5           I, MICHELLE BLAZER, a Certified Court Reporter

 6  in and for the State of Nevada, do hereby certify:

 7           That I was personally present for the purpose of

 8  acting as Certified Court Reporter in the matter entitled

 9  herein;  that the witness was by me duly sworn; that

10  before the proceedings completion, the reading and

11  signing of the deposition has not been requested by the

12  deponent or party;

13           That the foregoing transcript is a true and

14  correct transcript of the stenographic notes of testimony

15  taken by me in the above-captioned matter to the best of

16  my knowledge, skill and ability.

17           I further certify that I am not an attorney or

18  counsel for any of the parties, nor a relative or

19  employee of any attorney or counsel connected with the

20  action, nor financially interested in the action.

21

22        _____

23        MICHELLE BLAZER, CCR #469 (NV) CSR #3361 (CA)

24                BONANZA REPORTING - RENO

25
```