THE HONORABLE JAMES L. ROBART

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

MICROSOFT CORPORATION,

                    Plaintiff,

      vs.

MOTOROLA, INC.,  et al.,

                    Defendants.

_____

MOTOROLA MOBILITY LLC, et al.,

                    Plaintiffs,

      vs.

MICROSOFT CORPORATION,

                    Defendants.

Case No. C10-1823-JLR

DECLARATION OF CHRISTOPHER
WION IN SUPPORT OF MICROSOFT
CORPORATION'S BRIEF
REGARDING THE DUTY OF GOOD
FAITH AND FAIR DEALING IN THE
CONTEXT OF RAND LICENSING

I, Christopher Wion, hereby declare as follows:

1.      I am an attorney at the law firm of Calfo Harrigan Leyh & Eakes LLP, one of the

law firms representing Microsoft Corporation ("Microsoft") in the above-captioned matter, and

have personal knowledge of the facts stated herein.

---

**DECLARATION OF CHRISTOPHER WION
IN SUPPORT OF MICROSOFT'S BRIEF
REGARDING DUTY OF GOOD FAITH AND
FAIR DEALING** - 1
CAUSE NO. C10-1823-JLR

LAW OFFICES
**CALFO HARRIGAN LEYH & EAKES LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700   FAX, (206) 623-8717

2.      Attached hereto as Exhibit 1 is a true and correct copy of Plaintiff's Amended Complaint, Dkt. No. 431, filed October 1, 2012, from In re Innovation IP Ventures, LLC, Case No. 1:11-cv-9308, currently pending in the Northern District of Illinois.

3.      Attached hereto as Exhibit 2 is a true and correct copy of selected chapters from the book Contractual Good Faith: Formation, Performance, Breach, Enforcement, authored by Steven J. Burton & Eric G. Andersen and published by Little, Brown & Company in 1995.

4.      Attached hereto as Exhibit 3 is a true and correct copy Breach of Contract and the Common Law Duty to Perform in Good Faith, authored by Steven J. Burton and published in the Harvard Law Review in 1980 as 94 Harv. L. Rev. 369 (1980).

5.      Attached hereto as Exhibit 4 is a true and correct copy of Washington Pattern Jury Instruction (6th Ed.) 302.11, available at

http://government.westlaw.com/linkedslice/default.asp?SP=wciji-1000.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

DATED this 1st day of July, 2013 in Seattle, Washington.

CHRISTOPHER WION

DECLARATION OF CHRISTOPHER WION
IN SUPPORT OF MICROSOFT'S BRIEF
REGARDING DUTY OF GOOD FAITH AND
FAIR DEALING - 2
CAUSE NO. C10-1823-JLR

1

## CERTIFICATE OF SERVICE

2

       I, Emma Aubrey, swear under penalty of perjury under the laws of the State of

Washington to the following:

3

     1.      I am over the age of 21 and not a party to this action.

4

     2.      On the 1st day of July, 2013, I caused the preceding document to be served on

5

counsel of record in the following manner:

6

7

**<u>Attorneys for Motorola Solutions, Inc., and Motorola Mobility, Inc.:</u>**

8

Ralph Palumbo, WSBA #04751
Philip S. McCune, WSBA #21081            _____  Messenger

9

Lynn M. Engel, WSBA #21934            _____  US Mail
Summit Law Group                        _____  Facsimile

10

315 Fifth Ave. South, Suite 1000         ___X___  ECF
Seattle, WA  98104-2682

11

Telephone:  206-676-7000
Email:  Summit1823@summitlaw.com

12

13

Steven Pepe (*pro hac vice*)              _____  Messenger

14

Jesse J. Jenner (*pro hac vice*)          _____  US Mail
Ropes & Gray LLP                        _____  Facsimile

15

1211 Avenue of the Americas            ___X___  ECF
New York, NY  10036-8704

16

Telephone:  (212) 596-9046
Email:  steven.pepe@ropesgray.com

17

Email:  jesse.jenner@ropesgray.com

18

19

Norman H. Beamer (*pro hac vice*)      _____  Messenger
Ropes & Gray LLP                        _____  US Mail

20

1900 University Avenue, 6th Floor     _____  Facsimile
East Palo Alto, CA  94303-2284      ___X___  ECF

21

Telephone:  (650) 617-4030
Email:  norman.beamer@ropesgray.com

22

23

24

25

**DECLARATION OF CHRISTOPHER WION**
**IN SUPPORT OF MICROSOFT'S BRIEF**
**REGARDING DUTY OF GOOD FAITH AND**
**FAIR DEALING** - 3
CAUSE NO. C10-1823-JLR

1  Paul M. Schoenhard (*pro hac vice*)          _____ Messenger
   Ropes & Gray LLP                              _____ US Mail
2  One Metro Center                              _____ Facsimile
   700 12th Street NW, Suite 900                 ___X___ ECF
3  Washington, DC  20005-3948
   Telephone:  (202) 508-4693
4  Email: Paul.schoenhard@ropesgray.com

5       DATED this 1st day of July, 2013.

6

7                              /s/ Emma Aubrey
                               EMMA AUBREY
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**DECLARATION OF CHRISTOPHER WION
IN SUPPORT OF MICROSOFT'S BRIEF
REGARDING DUTY OF GOOD FAITH AND
FAIR DEALING** - 4
CAUSE NO. C10-1823-JLR

LAW OFFICES
**CALFO HARRIGAN LEYH & EAKES LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700   FAX, (206) 623-8717

# Exhibit 1

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| In re Innovatio IP Ventures, LLC, Patent Litigation | Case No. 1:11-cv-09308 |
| This Document Relates To: | Judge James F. Holderman<br>Magistrate Judge Sidney Schenkier |
| *Cisco Systems, Inc., and Motorola Solutions, Inc., v. Innovatio IP Ventures, LLC*, Case No. 1:11-cv-09309 (originally 1:11-cv-00425 (D. Del.))<br><br>and<br><br>*NETGEAR, INC. v. Innovatio IP Ventures, LLC*, Case No. 1:12-cv-00427 (originally 1:11-cv-01139 (D. Del.)) | **[PUBLIC REDACTED VERSION]** |

## PLAINTIFFS' AMENDED COMPLAINT

Plaintiffs Cisco Systems, Inc. ("Cisco"), Motorola Solutions, Inc. ("Motorola"), and NETGEAR, Inc. ("NETGEAR") (collectively, "Plaintiffs"), for their amended complaint against Defendants Innovatio IP Ventures, LLC, Innovatio Management, LLC, and Noel B. Whitley, hereby allege as follows:

### <u>NATURE OF THIS ACTION</u>

1.     This is a civil action brought under federal and state laws against Defendants for declaratory judgment of non-infringement and invalidity of twenty-three United States patents pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202, and United States Patent Law, 35 U.S.C. § 100 *et seq.*, as well as for violation of the Federal Racketeering Influenced and Corrupt Organizations Act ("RICO"), violation of Cal. Bus. & Prof. Code § 17200, civil

conspiracy, breach of contract, promissory estoppel, intentional interference with prospective economic advantage, unclean hands, and for such other relief as the Court deems just and proper.

## THE PARTIES

2.     Plaintiff Cisco is a corporation organized and existing under the laws of the State of California with its principal place of business located at 170 West Tasman Drive, San Jose, California 95134.

3.     Plaintiff Motorola is a corporation organized and existing under the laws of the State of Delaware with its principal place of business at 1303 East Algonquin Road, Schaumburg, Illinois 60196.

4.     Plaintiff NETGEAR is a corporation organized and existing under the laws of the State of Delaware with its principal place of business at 350 East Plumeria Drive, San Jose, California 95134.

5.     Plaintiffs Cisco, Motorola, and NETGEAR are in the business of making and selling, among other things, wireless local area network ("WLAN") products.  Such products include, for example, wireless access points having components within them which provide wireless connectivity pursuant to recognized standards such as IEEE 802.11, also known as "Wi-Fi."  Plaintiffs are well known participants in the market for WLAN products.

6.     On information and belief, Defendant Innovatio IP Ventures, LLC ("Innovatio") is a limited liability company organized and existing under the laws of the State of Delaware, and indicates that its principal place of business is at 22 West Washington Street, Suite 1500, Chicago, Illinois 60602.

7.     Innovatio is a holding company purportedly focused on the licensing of patents allegedly acquired from Broadcom Corporation ("Broadcom").  Despite this, Innovatio employs

dozens of attorneys and agents that assist in the pattern and practice of illegal conduct as alleged herein.

8.      Innovatio is also registered with the State of California to transact business in California.

9.      On information and belief, Defendant Innovatio Management, LLC ("IM") is a limited liability company organized and existing under the laws of Delaware with a place of business at 6 Clawson Street, Ladera Ranch, California 92694.

10.      IM is registered with the State of California to transact intrastate business in California.

11.      On information and belief, Defendant Noel B. Whitley resides at 6 Clawson Street, Ladera Ranch, California 92694.  Mr. Whitley and his agents are referred to herein as "Whitley."  Innovatio, IM and Whitley are referred to herein, alone or in combination, as "Defendants."

12.      On information and belief, Whitley conducts and directs the affairs of Innovatio through a pattern of improper acts as alleged herein, including within Illinois, causing concrete financial harm to Plaintiffs and others.

13.      On information and belief, IM conducts and directs the affairs of Innovatio through a pattern of improper acts as alleged herein, including within Illinois, causing concrete financial harm to Plaintiffs and others.

## JURISDICTION AND VENUE

14.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1332, 1338(a), 2201, and 2202, and the Patent Laws of the United States, 35 U.S.C. § 1, *et seq.*  This Court further has subject matter jurisdiction over Plaintiffs' claim for violations of the RICO Act

pursuant to 28 U.S.C. §§ 1331 and the RICO Act, 18 U.S.C. § 1961 *et seq.* This Court further has supplemental jurisdiction over Plaintiffs' other claims pursuant to 28 U.S.C. §1367, including over Plaintiffs' claims under California Business and Professional Code Section 17200 pursuant to 28 U.S.C. §§ 1338(b) and 1367(a).

15.     This Court further has personal jurisdiction over Innovatio, IM, and Whitley, including pursuant to 18 U.S.C. § 1965(b). Jurisdiction is further proper over Innovatio, IM, and Whitley, including under the Illinois Code of Civil Procedure, 735 ILCS 5/2-209, for at least the reason that Defendants have transacted business, committed tortious conduct, caused harm, and made or performed contracts (███████████████████████████████████████ ████████████████) within the State of Illinois as described herein.

16.     Venue is proper in this judicial district under 28 U.S.C. § 1391 and 18 U.S.C. § 1965(a). At a minimum, Innovatio purports to have a principal place of business in Illinois. Defendants further have multiple agents, and conduct their affairs, including the conduct complained of herein, within the state of Illinois.

17.     Plaintiffs Cisco, Motorola, and NETGEAR manufacture and sell products that are the subject of the consolidated actions in *In re Innovatio IP Ventures, LLC, Patent Litigation* (Case No. 1:11-cv-09308), and/or Defendants' accusations and threats against Plaintiffs' customers. Cisco, Motorola, and NETGEAR each supply or have supplied products that are the subject of Innovatio's patent allegations in the matters consolidated in *In re Innovatio IP Ventures, LLC, Patent Litigation* (Case No. 1:11-cv-09308). Cisco, Motorola, and NETGEAR further each supply or have supplied one or more of the defendants that are the subject of Innovatio's infringement allegations in the matters consolidated in *In re Innovatio IP Ventures, LLC, Patent Litigation* (Case No. 1:11-cv-09308) with accused products.

18.     Cisco, Motorola, and NETGEAR each have received demands from certain parties subject to Innovatio's allegations in the cases consolidated in *In re Innovatio IP Ventures, LLC, Patent Litigation* (Case No. 1:11-cv-09308) and others for indemnity against Innovatio's patent infringement claims, and/or Defendants' threats in connection with their licensing efforts, outside the context of litigation.

19.     Cisco, Motorola, and NETGEAR and their products have not infringed and do not infringe, either directly or indirectly, any valid and enforceable claim of any of the Patents-In-Suit, either literally or under the doctrine of equivalents.   A substantial controversy exists between the parties which is of sufficient immediacy and reality to warrant declaratory relief.

### THE ORIGINAL PATENTS-IN-SUIT

20.     U.S. Patent No. 6,714,559 ("the '559 patent") is entitled "Redundant Radio Frequency Network Having A Roaming Terminal Communication Protocol" and bears an issuance date of March 30, 2004.  A copy of the '559 patent is attached hereto as Exhibit 1.

21.     U.S. Patent No. 7,386,002 ("the '002 patent") is entitled "Redundant Radio Frequency Network Having A Roaming Terminal Communication Protocol" and bears an issuance date of June 10, 2008.  A copy of the '002 patent is attached hereto as Exhibit 2.

22.     U.S. Patent No. 7,535,921 ("the '921 patent") is entitled "Redundant Radio Frequency Network Having A Roaming Terminal Communication Protocol" and bears an issuance date of May 19, 2009.  A copy of the '921 patent is attached hereto as Exhibit 3.

23.     U.S. Patent No. 7,548,553 ("the '553 patent") is entitled "Redundant Radio Frequency Network Having A Roaming Terminal Communication Protocol" and bears an issuance date of June 19, 2009.  A copy of the '553 patent is attached hereto as Exhibit 4.

24.     U.S. Patent No. 5,740,366 ("the '366 patent") is entitled "Communication Network Having A Plurality Of Bridging Nodes Which Transmit A Beacon To Terminal Nodes In Power Saving State That It Has Messages Awaiting Delivery" and bears an issuance date of April 14, 1998.  A copy of the '366 patent is attached hereto as <u>Exhibit 5.</u>

25.     U.S. Patent No. 5,940,771 ("the '771 patent") is entitled "Network Supporting Roaming, Sleeping Terminals" and bears an issuance date of August 17, 1999.  A copy of the '771 patent is attached hereto as <u>Exhibit 6.</u>

26.     U.S. Patent No. 6,374,311 ("the '311 patent") is entitled "Communication Network Having A Plurality Of Bridging Nodes Which Transmit A Beacon To Terminal Nodes In Power Saving State That It Has Messages Awaiting Delivery" and bears an issuance date of April 16, 2002.  A copy of the '311 patent is attached hereto as <u>Exhibit 7.</u>

27.     U.S. Patent No. 7,457,646 ("the '646 patent") is entitled "Radio Frequency Local Area Network" and bears an issuance date of November 25, 2008.  A copy of the '646 patent is attached hereto as <u>Exhibit 8.</u>

28.     U.S. Patent No. 5,546,397 ("the '397 patent") is entitled "High Reliability Access Point For Wireless Local Area Network" and bears an issuance date of August 13, 1996.  A copy of the '397 patent is attached hereto as <u>Exhibit 9.</u>

29.     U.S. Patent No. 5,844,893 ("the '893 patent") is entitled "System For Coupling Host Computer Means With Base Transceiver Units On A Local Area Network" and bears an issuance date of December 1, 1998.  A copy of the '893 patent is attached hereto as <u>Exhibit 10.</u>

30.     U.S. Patent No. 6,665,536 ("the '536 patent") is entitled "Local Area Network Having Multiple Channel Wireless Access" and bears an issuance date of December 16, 2003.  A copy of the '536 patent is attached hereto as <u>Exhibit 11.</u>

6

31.     U.S. Patent No. 6,697,415 ("the '415 patent") is entitled "Spread Spectrum Transceiver Module Utilizing Multiple Mode Transmission" and bears an issuance date of February 24, 2004.  A copy of the '415 patent is attached hereto as <u>Exhibit 12.</u>

32.     U.S. Patent No. 7,013,138 ("the '138 patent") is entitled "Local Area Network Having Multiple Channel Wireless Access" and bears an issuance date of March 14, 2006.  A copy of the '138 patent is attached hereto as <u>Exhibit 13.</u>

33.     U.S. Patent No. 7,710,907 ("the '907 patent") is entitled "Local Area Network Having Multiple Channel Wireless Access" and bears an issuance date of May 4, 2010.  A copy of the '907 patent is attached hereto as <u>Exhibit 14.</u>

34.     U.S. Patent No. 7,916,747 ("the '747 patent") is entitled "Redundant Radio Frequency Network Having A Roaming Terminal Communication Protocol" and bears an issuance date of March 29, 2011.  A copy of the '747 patent is attached hereto as <u>Exhibit 15.</u>

35.     U.S. Patent No. 7,873,343 ("the '343 patent") is entitled "Communication Network Terminal With Sleep Capability" and bears an issuance date of January 18, 2011.  A copy of the '343 patent is attached hereto as <u>Exhibit 16.</u>

36.     U.S. Patent No. 7,536,167 ("the '167 patent") is entitled "Network Supporting Roaming, Sleeping Terminals" and bears an issuance date of May 19, 2009.  A copy of the '167 patent is attached hereto as <u>Exhibit 17.</u>

## **THE ADDITIONAL PATENTS-IN-SUIT**

37.     On July 10, 2012, Innovatio filed its Answer to Complaint for Declaratory Judgment, Counterclaims and Cross-Claims in the Cisco Declaratory Judgment Action and the NETGEAR Declaratory Judgment Action.  In its Counterclaims and Cross-Claims, Innovatio accuses Cisco, Motorola, and NETGEAR of infringing and continuing to infringe the seventeen

Original Patents-In-Suit and an additional six Innovatio Patents – U.S. Patent Nos. 5,295,154, 5,428,636, 5,504,746, 6,826,165, 7,107,052, and 7,710,935 (the "Additional Patents-In-Suit") – by, *inter alia*, "their manufacture . . . of their WLAN and/or mesh network products and/or systems," and "making available to Network Operators WLAN and/or mesh products and/or systems." The Original Patents-In-Suit and the Additional Patents-In-Suit are collectively referred to herein as the "Patents-In-Suit."

38.     U.S. Patent No. 5,295,154 ("the '154 patent") is entitled "Radio Frequency Local Area Network" and bears an issuance date of March 15, 1994. A copy of the '154 patent is attached hereto as <u>Exhibit 18</u>.

39.     U.S. Patent No. 5,428,636 ("the '636 patent") is entitled "Radio Frequency Local Area Network" and bears an issuance date of June 27, 1995. A copy of the '636 patent is attached hereto as <u>Exhibit 19</u>.

40.     U.S. Patent No. 5,504,746 ("the '746 patent") is entitled "Radio Frequency Local Area Network" and bears an issuance date of April 2, 1996. A copy of the '746 patent is attached hereto as <u>Exhibit 20</u>.

41.     U.S. Patent No. 6,826,165 ("the '165 patent") is entitled "Radio Frequency Local Area Network" and bears an issuance date of November 30, 2004. A copy of the '165 patent is attached hereto as <u>Exhibit 21</u>.

42.     U.S. Patent No. 7,107,052 ("the '052 patent") is entitled "Local Area Network Having Multiple Channel Wireless Access" and bears an issuance date of September 12, 2006. A copy of the '052 patent is attached hereto as <u>Exhibit 22</u>.

43.     U.S. Patent No. 7,710,935 ("the '935 patent") is entitled "Local Area Network Having Multiple Channel Wireless Access" and bears an issuance date of May 4, 2010.  A copy of the '935 patent is attached hereto as Exhibit 23.[1]

## PRELIMINARY STATEMENT OF FACTS

### A.     Introduction

44.     Defendants, on their own and through their attorneys and other agents, are engaged in a nationwide pattern and scheme to indiscriminately and improperly threaten, defraud, and extort money to which Defendants are not entitled from thousands of businesses, both small and large, that use standardized Wi-Fi (802.11) technology.  These businesses include Plaintiffs' customers.  Rather than approach companies like Cisco, Motorola, and NETGEAR that develop and supply devices that provide accused Wi-Fi technology, Defendants instead target retirement homes, cafés, restaurants, convenience stores, health-care providers, and many other businesses that neither develop nor supply the accused technologies.

45.     As set forth below, Defendants are conducting this pattern and scheme through, among other things, fraud, deceit, misrepresentation, and other forms of unfair and unlawful conduct.  For instance, as alleged herein, Defendants hide from the recipients of their licensing demands the fact that thousands of the accused products are subject to existing licenses, and therefore are beyond the reach of Innovatio's infringement claims.  Adding to their unlawful conduct, Defendants fail to disclose, disregard, and repeatedly breach obligations to license Innovatio's allegedly standards-essential patents on reasonable and non-discriminatory

---

[1]    The patents identified in paragraphs 20–36 are collectively referred to herein as the "Original Patents-In-Suit."  The '154 patent, the '636 patent, the '746 patent, the '165 patent, the '052 patent, and the '935 patent are collectively referred to herein as the "Additional Patents-In-Suit."

("RAND") terms, something Innovatio is contractually committed to do as the alleged owner of these patents.

46. Defendants perpetuate their unlawful acts by capitalizing on the *in terrorem* impact of improper threats of patent infringement lawsuits and huge legal expenses to investigate Innovatio's alleged "31 patents" and "1,454 patent claims," in order to dissuade Defendants' licensing targets from investigating Defendants' claims. Unlike suppliers of the accused technologies, many of Innovatio's licensing targets are small businesses that do not possess the resources or experience to investigate and challenge Defendants' illegal licensing activities as alleged herein. Faced with the prospects of exorbitant expenses, some of Plaintiffs' customers have succumbed to these threats and paid money that Defendants had no right to receive — indeed, for reasons explained herein, money that Defendants are legally prohibited from taking.

47. Without limitation, Defendants' unlawful conduct includes:

a) demanding that end users of IEEE 802.11 equipment, including Cisco's, Motorola's, and/or NETGEAR's customers, agree to pay thousands of dollars to use components that already are licensed in an effort to circumvent existing licenses to the Patents-In-Suit, in breach of contractual obligations not to do so and while hiding the existence of those licenses from the recipients of its demands;

b) demanding that end users of IEEE 802.11 equipment, including Cisco's, Motorola's, and/or NETGEAR's customers, agree to pay thousands of dollars for patents that they do not use or which have expired;

c) extorting unreasonable fees from end users of IEEE 802.11 equipment, including Cisco's, Motorola's, and/or NETGEAR's customers, in an effort to circumvent obligations that any patent license would be on fair, reasonable and non-discriminatory

terms, while simultaneously hiding the existence of those obligations from the recipients of its demands; and

d)       failing to license its patents to Cisco, Motorola, and NETGEAR or other Wi-Fi product manufacturers/suppliers for reasonable royalties and other fair, reasonable and non-discriminatory terms.

In pursuing this pattern and practice of improper and illegal licensing activities, Defendants have demanded that end users, including Cisco's, Motorola's, and NETGEAR's customers, pay thousands ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ of dollars in fees to use Wi-Fi in their business regardless of whether the allegedly infringing products are already licensed, the number or percentage of patents used/implemented, the remaining term of the patents or the number of its patents that are now expired, or the fact that the exorbitant fees demanded by Defendants are significantly more than the cost of the products and the customers' Wi-Fi computer networking setup.  Defendants have used and continue to use, among other things, unlawful licensing and sham tactics in pursuit of their goals.

**B.       The Development Of The Accused IEEE 802.11 Wi-Fi Technologies**

48.       Cisco, together with numerous other companies, were and are members and participants in standards-setting organizations related to a variety of technologies, such as the Institute of Electrical and Electronics Engineers ("IEEE").

49.       The IEEE is a professional association and leading developer of technical standards.  IEEE members include engineers, scientists and allied professionals whose technical interests relate to electrical and computer sciences, engineering and related disciplines.  Members may participate in the standards-setting process in working groups and/or subgroups called task groups.

11

50. To protect against unscrupulous conduct by any patent holder who seeks to benefit unfairly from, or to manipulate to its advantage, the IEEE's standard-setting process, and to enable the IEEE and its members to develop standards free from potentially blocking patents, the IEEE instituted policies and rules regarding the disclosure and licensing of patents.

51. At all relevant times alleged herein, the IEEE's rules and policies required fairness and candor with respect to intellectual property. By way of example only, the IEEE required its members and patent holders to submit letters of assurance including either a general disclaimer to the effect that the patentee will not enforce any of its present or future patents whose use would be required to implement the proposed IEEE standard against any person or entity using the patents incident to practice of the standard or a statement that a license will be made available to all applicants without compensation or under reasonable rates, with reasonable terms and conditions that are demonstrably free of any unfair discrimination ("RAND terms"). For example, the IEEE's Standards Board Bylaws stated at relevant times that "IEEE standards may include the known use of essential patents and patent applications provided the IEEE receives assurance from the patent holder or applicant with respect to patents whose infringement is, or in the case of patent applications, potential future infringement the applicant asserts will be, unavoidable in a compliant implementation of either mandatory or optional portions of the standard [essential patents]." Additionally, the IEEE's Standards Board Bylaws further state that "[t]his assurance shall be either a) A general disclaimer to the effect that the patentee will not enforce any of its present or future patent(s) whose use would be required to implement either mandatory or optional portions of the proposed IEEE standard against any person or entity complying with the standard; or b) A statement that a license for such implementation will be made available without compensation or under reasonable rates, with

reasonable terms and conditions that are demonstrably free of any unfair discrimination," and "[t]his assurance is irrevocable once submitted and accepted and shall apply, at a minimum, from the date of the standard's approval to the date of the standard's withdrawal."

52.    The IEEE formed the 802.11 working group in 1990.  The IEEE 802.11 standards are entitled "Wireless LAN Media Access Control (MAC) and Physical Layer (PHY) Specifications" and concerns wireless local area networking ("wireless LAN").  In 1997, the IEEE formed two task groups: the 802.11a and 802.11b.  In 2000, the IEEE formed the 802.11g task group and 802.11e task group.  In 2003, the IEEE formed the 802.11n task group.

53.    Wireless standards like IEEE 802.11 play an important role by ensuring interoperability between products that operate in accordance with such standards, facilitating the adoption and advancement of these technologies.

54.    Cisco, Motorola, and NETGEAR, together with other companies involved in communications and wireless technologies, worked for years to develop and deploy various wireless technologies, including standardized technologies such as IEEE 802.11, more commonly known as "Wi-Fi."

55.    Cisco, Motorola, and NETGEAR have sold and sell Wi-Fi products that include components operating in accordance with various 802.11 standards, and are beneficiaries of the IEEE and 802.11 standards-setting process.  Cisco's, Motorola's, and NETGEAR's customers purchase Wi-Fi products and are also beneficiaries of the IEEE and 802.11 standards-setting process.

56.    Cisco's, Motorola's, and NETGEAR's Wi-Fi products sold to customers are used, for example, as access points in networks, which facilitate wireless access to the Internet.

**C.    Innovatio And The Alleged Acquisition Of Its Patent Portfolio**

57.     Defendant Whitley was a former Intellectual Property executive at Broadcom Corporation ("Broadcom") who, after leaving Broadcom, formed Innovatio and IM in February 2011.

58.     Innovatio holds itself out as the owner by assignment from Broadcom of the following 31 patents, U.S. Patent 5,295,154, U.S. Patent 5,428,636, U.S. Patent 5,504,746, U.S. Patent 5,546,397, U.S. Patent 5,673,031, U.S. Patent 5,740,366, U.S. Patent 5,844,893, U.S. Patent 5,940,771, U.S. Patent 6,046,992, U.S. Patent 6,374,311, U.S. Patent 6,665,536, U.S. Patent 6,697,415, U.S. Patent 6,714,559, U.S. Patent 6,826,165, U.S. Patent 7,013,138, U.S. Patent 7,107,052, U.S. Patent 7,386,002, U.S. Patent 7,457,646, U.S. Patent 7,483,397, U.S. Patent 7,535,921, U.S. Patent 7,536,167, U.S. Patent 7,548,553, U.S. Patent 7,552,246, U.S. Patent 7,558,557, U.S. Patent 7,710,907, U.S. Patent 7,710,935, U.S. Patent 7,826,818, U.S. Patent 7,856,003, U.S. Patent 7,873,343, U.S. Patent 7,916,747, and U.S. Patent 7,917,145 (collectively, the "Innovatio Patents").

59.     Innovatio allegedly acquired its rights, title, and interest in the Innovatio Patents from Broadcom by an assignment agreement dated February 28, 2011, two weeks after Whitley formed Innovatio.  Innovatio granted back to Broadcom a license to the Innovatio Patents and

██████████████████████████████████████████████████████

████████████████████████████████ .

### D.     The Innovatio Patents Are Subject To RAND Commitments By Innovatio's Predecessors

60.     Various other companies allegedly held rights, title, and/or interest in certain of the Patents-In-Suit (or then pending or nascent applications for those patents) prior to their alleged acquisition by Broadcom, including, in order, Intermec IP Corporation, Intermec

Technologies Corporation (subsidiary of UNOVA), and Norand Corporation, which had previously obtained its alleged rights, title, and interest from the named inventors on the patents. Collectively, Norand Corporation, Intermec Technologies Corporation, Intermec IP Corporation and Broadcom Corporation are referred to herein as "Innovatio's Predecessors."

61.     Innovatio's Predecessors subjected the Innovatio Patents to a number of obligations concerning any licensing or enforcement of such patents, including by virtue of their participation in standards-setting bodies.  For example, the Innovatio Patents are subject to the IEEE's policies on patents and, in particular, the Innovatio Patents are subject to RAND commitments undertaken by Innovatio's Predecessors before the IEEE.

62.     On or about June 20, 1997, Norand submitted a letter of assurance to the IEEE relating to 802.11, stating "[i]n the event the proposed IEEE standard is adopted, and the standard cannot be practiced without the use of one or more patents which are now or hereafter owned by Norand, Norand would upon request be willing to negotiate a non-transferable, non-exclusive sole and personal license, under the relevant claims of such patent or patents, on a non-discriminatory basis on reasonable terms and conditions."   Norand merged with Intermec Corporation in or around December 1997.

63.     On or about October 26, 1995, before Norand and Intermec Corporation merged, Intermec Corporation submitted a letter of assurance to the IEEE relating to 802.11, stating "[i]n the event that patents issue to, or are acquired by, Intermec in the future which Intermec believes will read on devices operating under the proposed IEEE 802.11 Standard, Intermec will (upon written request from any third party) grant a nonexclusive, nontransferable sole and personal license under any such issued patent on nondiscriminatory basis, on terms and conditions which Intermec deems reasonable."

15

64.     On or about September 6, 2002, Broadcom submitted a letter of assurance to the IEEE relating to 802.11, stating "Broadcom Corporation will license any patents that have or may issue to Broadcom Corporation that relate to a submission to Task Group E entitled 'Analysis of Dual Pre-coding for FEC,' IEEE 802.11/02-414r0, if such submission is adopted in its entirety and made a part of the IEEE 802.11e standard."   On information and belief, submission to Task Group E entitled Analysis of Dual Pre-coding for FEC, IEEE 802.11/02-414r0 was adopted and made a part of the IEEE 802.11e standard.  The letter of assurance further stated that licenses from Broadcom would be granted "royalty-free and granted on reasonable and non-discriminatory terms and conditions."

65.     On or about September 6, 2002, Broadcom submitted another letter of assurance to the IEEE relating to 802.11, stating "Broadcom Corporation will license any patents that have or may issue to Broadcom Corporation that relate to a submission to Task Group G entitled 'IBSS Non-ERP Coexistence,' IEEE 802.11/02-235r2, if such submission is adopted in its entirety and made a part of the IEEE 802.11g standard."  The letter of assurance further stated that licenses from Broadcom would be granted "royalty-free and granted on reasonable and non-discriminatory terms and conditions."

66.     On or about October 17, 2006 Broadcom submitted another letter of assurance to the IEEE for 802.11n.  The letter of assurance states that Broadcom "will grant a license under reasonable rates to an unrestricted number of applicants on a worldwide, non-discriminatory basis with reasonable terms and conditions to comply with the [802.11n] IEEE standard."  The letter further states that "[t]his assurance applies from the date of the standard's approval to the date of the standard's withdrawal and is irrevocable upon acceptance by the IEEE-SA Standards Board Patent Committee."

67.     Innovatio's Predecessors' conduct and promises, including, without limitation, its letters of assurance offering licenses on RAND terms, created express and/or implied contracts with the IEEE and its members, or alternatively between Innovatio's Predecessors and the IEEE, to which IEEE members and other third-parties such as suppliers and users of 802.11 products are third-party beneficiaries.

68.     As the assignee to the Innovatio Patents, which Innovatio claims are standards-based and fundamental to IEEE 802.11 Wi-Fi, Innovatio is bound by the agreements, licenses, covenants, obligations, and promises relating to those patents entered into by Innovatio's Predecessors, including without limitation the RAND obligations undertaken by Innovatio's Predecessors.

**E.      The Innovatio Patents Are Subject To Prior Licenses, Including Licenses To 802.11 Chip Suppliers**

69.     On information and belief, the Innovatio Patents are subject to licenses and exhaustion, including licenses to suppliers of 802.11 components.  For example, as described above, on or around February 28, 2011, Innovatio granted Broadcom a license



.  Innovatio's rights, title, and interest in the Innovatio Patents are subject to license and exhaustion, including with respect to the licenses

.  Broadcom manufactures, sells, and supplies IEEE 802.11 components, such as chips or chipsets that are certified as "Wi-Fi" products and that operate in accordance with aspects of the 802.11 standards.  Based on public market studies, Broadcom is a substantial supplier of 802.11 components; for example, according to one such study, in 2011,

17

Broadcom supplied nearly a quarter of all 802.11 components. These components are incorporated by others into devices such as routers, laptops, tablets, and handsets, including but not limited to products manufactured and/or sold by Plaintiffs, thereby providing those devices with 802.11-standardized capability by virtue of the Broadcom 802.11 components contained inside.

70. On information and belief, the Innovatio Patents are also subject to additional licenses, including without limitation ████████████████████████████████ ███████████████████ at least some of which supply components that are incorporated by others into devices such as access points, laptops, tablets, and handsets, including but not limited to products manufactured and/or sold by Plaintiffs.

    **F.**    **Upon Acquiring the Innovatio Patents, Defendants Immediately Began An Improper Campaign To Extract Licensing Fees To Which They Are Not Entitled**

71. Defendants are engaging and have engaged in a nationwide pattern and practice of unlawful activities designed to extract unjustified and unlawful fees from targets of Innovatio's "licensing" campaign. In furtherance of this campaign and in an effort to enrich Innovatio and those associated with Innovatio, Defendants have engaged and are engaged, among other things, in an ongoing campaign of making false and misleading statements and baseless threats and allegations, while hiding material facts regarding the Innovatio Patents, intended to illegally circumvent licensing obligations on the patents and extort monies to which Innovatio is not entitled.

72. Defendants were aware and intended that these acts would threaten suppliers and users of accused wireless equipment, thereby decreasing and/or harming competition in those markets and causing Plaintiffs and others participating in or wishing to enter markets for that

equipment to undertake substantial expenses to investigate and defend against Defendants' unlawful pattern and practices.

73.     Innovatio's licensing campaign is largely directed at end users of Wi-Fi technology, such as bakeries, restaurants, cafés, hotels, and other small businesses that do not make or sell devices that provide the accused Wi-Fi functionality and therefore do not have substantial technical knowledge about the products or standards necessary to defend against Innovatio's allegations, nor the resources to do so.  On information and belief, Defendants are targeting this class of users as part of their campaign to obtain fees that bear no reasonable relation to the value, if any, of the Innovatio Patents, or their scope, and to avoid the license- and standards-related encumbrances on the patents.  This unlawful conduct is systemic and ongoing and is being committed by and under the direction and control of at least Defendants.

74.     Innovatio has sent more than 8,000 threatening letters to licensing targets in all 50 states.  On information and belief, these letters are signed and sent by Defendants including Whitley, and others acting on behalf of Defendants, including without limitation Innovatio's counsel, as well as Robert Berman of IP Dispute Resolution Corporation ("IPDR"), Samik Bhattacharyya, Jennifer Lim, and Eric Ogawa of VICIS Consulting LLC ("VICIS"), and Anthony Dowell of Dowell Baker ("Dowell").  Additionally, to enhance the credibility of its threats, Innovatio has filed twenty-three lawsuits in jurisdictions of four different states against the end-users of WLAN products (the "End-User Actions") – claiming to own, and alleging infringement of, seventeen of the Innovatio Patents – U.S. Patent Nos. 6,714,559, 7,386,002, 7,535,921, 7,548,553, 5,740,366, 5,940,771, 6,374,311, 7,457,646, 5,546,397, 5,844,893, 6,665,536, 6,697,415, 7,013,138, 7,710,907, 7,916,747, 7,873,343, and 7,536,167 (the "Original Patents-In-Suit").

75.     The purpose of Defendants' pattern and practice of illegal conduct is not legitimate enforcement of its alleged patent rights, but rather the avoidance of numerous obligations on the patents, allowing Defendants to unlawfully tax the successful 802.11 Wi-Fi standards by attempting to license and licensing products that are already licensed, at rates that have no reasonable relation to the value of the patents being asserted, in contravention of at least the licenses and RAND commitments to which the patents are subject.  To accomplish this, Defendants prey upon end users that are not involved in the development or supply of the accused technologies, demanding exorbitant licensing amounts that breach numerous obligations on the patents and greatly exceed any notion of reasonableness.  In furtherance of their plan, Defendants threaten protracted negotiations with onerous burdens on end users, and offer supposed "discounts" for promptly paying Innovatio without engaging in such negotiations, while making it clear that Innovatio will initiate costly litigation with anyone that does not acquiesce (something it cannot realistically do given the 8000-plus letters sent throughout the U.S.).  Under these circumstances, Innovatio circumvents its obligations and illegally obtains and seeks to obtain licensing fees to which it is not entitled, at great detriment to the Plaintiffs in this action, their customers, and the public generally.

76.     For example, the Innovatio Patents are subject to RAND obligations, prohibiting Innovatio from licensing those patents to any user or implementer of Wi-Fi on terms that are anything other than fair, reasonable, and non-discriminatory.  In breach of those obligations, Defendants demand licenses costing many times more than the entire price of the allegedly infringing Wi-Fi components.  Defendants attempt to circumvent Innovatio's RAND obligations by pursuing these licenses from thousands of end users while hiding those obligations from the end users, knowing that such end users would need to spend much more in costs to investigate or

20

challenge Innovatio's claims (something Defendants and their agents readily cite in correspondence to end users), let alone negotiate a RAND royalty, and issuing *in terrorem* threats that discourage users from investigating or challenging Innovatio's claims.

77.    As another example, Innovatio granted licenses under the Innovatio Patents to Wi-Fi component suppliers, including Broadcom. The Broadcom license . Broadcom is a large supplier of such chips in Wi-Fi products used throughout the U.S., including in routers, handsets, laptops and other devices. At least Broadcom's license prohibits Innovatio from claiming infringement or collecting fees based on licensed Broadcom products. . Defendants unlawfully and intentionally seek to circumvent this and other licenses, by hiding these licenses from targets of Innovatio's conduct, pursuing licenses from end users, issuing threats concerning the patents and their histories and promising that any investigation into the patents or the accused products will cost far more than the amounts demanded by Defendants, even though the amounts sought by Defendants are not due or legally recoverable. For example, on or about April 27, 2011,

██████████████████████████████████████████████████████████████

███████████████████████████        ████████████████████████████

██████████████████████████████████████████████████████████████

█████████████████████████████████████.  Defendants' threats directed at

products with, or users of, licensed 802.11 components are barred, at minimum, pursuant to such

licenses and/or the doctrine of exhaustion, and are therefore, objectively baseless for at least

those reasons.  Defendants compound this improper conduct by ignoring requests by end users

for information concerning the prior licensing of the patents and hiding information about such

licensing—including, by way of example only, hiding the Broadcom license in letters to

████████████.

     78.     Additionally, Innovatio, without justification or adequate investigation, has filed

sham lawsuits against businesses that use licensed products as part of its campaign to intimidate

its other licensing targets to accept its unlawful demands for fear of suit.  Indeed, ███████████

is a target of Defendants' unlawful licensing campaign, and is presently defending against

Innovatio's infringement allegations based on ████████████ use of wireless networking

products that rely on Broadcom chips for the accused 802.11 Wi-Fi capabilities.

     79.     As another example, ██████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

████████████████████████.

80.     Defendants' scheme and campaign is furthered through additional material misrepresentations and omissions regarding the patents.  For example, although Defendants' correspondence to licensing targets demand licensing fees, not one of the threat letters indicates that Innovatio's Predecessors, from whom Innovatio allegedly acquired rights in the Innovatio Patents, agreed to provide RAND licenses, or that Innovatio is obligated to provide a license on RAND terms.  The letters to the ████████████████████████████████████████████████ ████████████ discussed below are illustrative of Defendants' tactics and omissions in this and other respects.  (*See, e.g.*, Ex. 24, May 9, 2012 Letter to ████████████████████, signed by Noel Whitley; Ex. 25, June 19, 2012 Letter to ████████████.)  Likewise, Defendants affirmatively misrepresent and/or hide from their licensing targets the fact that the Innovatio Patents are subject to existing licenses to suppliers of Wi-Fi products/components, such that no licensing fee may be due, as described above.  Defendants also affirmatively misrepresent and/or hide ██████████████████████████████████████████████████████████ ████████.  Defendants further their duplicitous conduct in the actual licensing of its patents to those that have acquiesced to their threats.  For example, Innovatio has warranted and represented to certain licensees that ████████████████████████████████████████████ ████████████████████████████████████████████████████████ ██████████████████████████████████ (*See, e.g.*, Ex. 26, ████████████████ ████████████████████████████████████████████████.) ████████████ ████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████, Innovatio's representation is misleading, fraudulent, and unlawful. This and other misconduct is deceptive, and constitutes fraud and misrepresentation in the conduct of Innovatio's licensing program, on which customers, including Plaintiff's customers have relied to their legal and pecuniary detriment, causing them and also Plaintiffs pecuniary harm that was directly and proximately caused by Defendants' misdeeds.

81.     Defendants' pattern and practice also includes baseless threats of infringement of patents that have expired. To date, at least ten of the Innovatio Patents have expired, yet those patents continue to be highlighted in Defendants' threat letters in furtherance of their licensing campaign. Yet Innovatio states to its licensing targets that "Innovatio proposes granting [the licensing target] an upfront, paid-up license for its use under all of 31 of the issued Innovatio Patents," when those targets have no liability on and therefore no need of such a license to expired patents. For example, on May 9, 2012, almost one year after the '771 patent expired and almost six months after the '311 patent expired, Innovatio sent a demand letter to ████ ████████████████. (*See* Ex. 24.) Innovatio did not provide notice of these or its other patents to ███████████████ before expiration. Notwithstanding the expiration of these patents and other patents, Innovatio's May 9, 2012 demand letter stated "[t]he operation and use of any [WLANs that use the IEEE 802.11 communication protocols] by ████ ████████████ constitutes infringement of at least the following Innovatio Patents: . . . U.S. Patent No. 5,940,771 . . . [and] U.S. Patent No. 6,374,311." (Ex. 24.) Yet circumstances here including a failure to comply with 35 U.S.C. §287, confirms that Innovatio cannot assert infringement or recover damages on at least these expired patent claims. On information and belief, Innovatio never disclosed that these patents had expired, or that its remedies were limited,

and the purpose behind inclusion of these patents is to inflate the size of Innovatio's portfolio, instill fear, increase fees and costs to investigate, and force its targets to capitulate promptly to Innovatio's unlawful demands.

82.     Additionally, Defendants, their counsel and their agents have stated hundreds of times, in correspondence to third party licensing targets and publicly over the past year, that the Innovatio Patents are "essential" and anyone practicing the IEEE 802.11 standards or Wi-Fi is infringing and must pay for its "31 patents" and "1454 patent claims."  (*See e.g.*, in Innovatio's demand letters, Defendants assert that the Innovatio Patents "are controlling patents in the area of WLAN (e.g. Wi-Fi) and mesh networking technologies," and that their licensing targets infringe the patents by operating "WLANs deployed in any corporate office, manufacturing, distribution, retail, inventory management, warehousing, industrial monitoring or control, or 'smart energy' environments."; Ex. 25, June 19, 2012 letter to ███████████ ("the WLAN Patents cover the manner in which access points and terminal devices communicate with each other, including 802.11, Zigbee, and many other short distance communication protocols.")). However, in connection with litigation, in contrast to what Defendants tell their licensing targets, Defendants have stated that "a majority of [the] asserted claims cover optional features and/or WLAN implementations."  (*See* Ex. 27.)  A few weeks later, Innovatio told this Court that only "36 of the 348 asserted claims (in seven of the 17 asserted patents) cover mandatory features of the 802.11 standard, while 333 of the 348 asserted claims (in 14 of the 17 asserted patents) cover: (1) portions of the standard that are 'optional' for a device to support; (2) portions of the standard that, even if supported by the device, are 'optional' for the user to utilize; or (3) device or network implementations that are not defined by the standard and that may be different for each manufacturer or user.  Put another way, **more than 95% of the asserted claims cover**

**'optional' or implementation features that are not defined by the standard.**" (*See* Ex. 28 (emphasis in original).) Innovatio made these and other similar statements in opposing (and on those bases, overcoming) motions to stay its claims against end users, in favor of Plaintiffs, the suppliers of the accused products. This was a necessary and yet unlawful measure, as a stay of Innovatio's claims against the end users would greatly hinder Defendants' ability to leverage threats of protracted and costly litigation in their licensing campaign against end users. Moreover, Defendants do not tell third parties from whom Innovatio seeks licenses that it is Innovatio's position in court that more than 95% of the asserted patents claims are based on "optional" or "implementation" features. To the contrary, Defendants tell third parties that the Innovatio patents cover the standard and demand that those third parties take licenses to all of the Innovatio patents, regardless of whether those third parties do or do not use what Innovatio describes as "optional" or "implementation" features. This conduct is deceitful and used to perpetrate fraud and extortion on targets of Defendants' licensing campaign.

83. Defendants have further perpetrated a number of additional falsehoods, half-truths, and misrepresentations in order to extract monies to which Innovatio is not entitled in the conduct of its licensing campaign. These acts include, without limitation: (a) stating that the named inventors on the asserted patents are "widely considered to be the Fathers of Radio Frequency Local Area Networking Technology—commonly referred to as wireless local area networking ('WLAN') or 'Wi-Fi';" this is, in fact, false; (b) grossly misrepresenting the number of entities that have taken licenses as part of the Innovatio licensing campaign; (c) misrepresenting in its threat letters the "confirmed . . . validity" of certain Innovatio Patents through re-exam at the U.S. Patent Office, and in the International Trade Commission—only one patent (the now expired '311) was ever the subject of a re-examination at the U.S. Patent Office,

26

and was only allowed following significant amendment to its claims by the then-owner Broadcom; and (d) misrepresenting the value of licenses and settlements related to the Innovatio Patents—numerous letters state that the Innovatio Patents have "generat[ed] in excess of $1 Billion in settlements and license fees," most of which would appears to be based on the $891 million that Qualcomm was publicly reported to have paid Broadcom as part of a broad settlement unrelated to Innovatio's licensing program and which involved numerous other patents and myriad other legal issues such as alleged antitrust abuses in U.S., Europe, and Asia court or regulatory proceedings.

84.     As alleged herein, in furtherance of its unlawful campaign, Defendants intimidate their targets into acceding to Innovatio's improper and illegal licensing demands by threatening substantial harm to their targets' businesses.  For example, Defendants state to businesses such as ██████████████████████████████████████████████████, that Innovatio's "WLAN Patents consist of 1,454 patent claims covering access points, terminal devices, the wireless local area network as a whole, and the manner in which these devices communicate with each other," and that ████████████ "has been identified by Innovatio as an infringing party to be added to a future round of infringement litigation."   To encourage immediate payment without investigation, Defendants threaten financial harm to ████████████, stating "[p]atent litigation is an extremely expensive and time-consuming method of resolving disputes."   To discourage any meaningful or informed negotiation, much less challenge to its patents, Defendants further threaten ████████████ with a burdensome process that includes, without limitation, expensive collection of facts and the review by ████████████ counsel of "tens of thousands of pages of materials," knowing that the cost of an unlawful license is far less than the cost of investigation or litigation, but far more than any amount that Innovatio could obtain

27

Case: 1:11-cv-09308 Document #: 431 Filed: 10/01/12 Page 28 of 61 PageID #:13308

without violating obligations owed on the patents. Notably, nowhere in Defendants' letters, communications, or process do Defendants disclose to their targets, such as ███████████, the existing limitations on its patent rights, such as the Broadcom or other Wi-Fi supplier licenses, or its RAND commitments. And Defendants' threats of high litigation costs are intended to force the recipients of Innovatio's licensing demands to take an exorbitant and unnecessary license to Innovatio's patents, rather than to engage in a material investigation of the facts or litigation, where the true facts about the limitations on Innovatio's patent rights would likely be discovered. (*See, e.g.*, Ex. 29, September 17, 2012 Email from VICIS to ███████ ████████████████████████████████████████████████████████████ ██████████████████.) To further Innovatio's unlawful licensing scheme, Defendants threaten immediate harm in the event that licensing targets seek indemnity from their suppliers including Cisco.

85. As set forth herein the unlawful conduct alleged herein is a part of an ongoing pattern of misconduct, and was and continues to be committed with knowledge and with the intent to defraud and extort illegal fees from Defendants' licensing targets, causing direct financial harm to those targets and to Plaintiffs, who supply products to may of those targets, including in the form of legal fees. Defendants have perpetrated these falsehoods, misrepresentation, omissions, and other deceitful conduct to force their targets to immediately give in and pay fees that Innovatio has no right to obtain.

### COUNT I - DECLARATION OF NON-INFRINGEMENT OF U.S. PATENT NO. 6,714,559

86. Plaintiffs repeat and reallege the allegations in paragraphs 1-85 as though fully set forth herein.

28

87.     The accused mesh networking and WLAN products, networks and/or systems have not infringed and do not infringe, directly or indirectly, any valid and enforceable claim of the '559 patent, either literally or under the doctrine of equivalents.

88.     As a result of the acts described in the foregoing paragraphs, there exists a substantial controversy of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

89.     A judicial declaration is necessary and appropriate so that Plaintiffs may ascertain their rights regarding the '559 patent.

## COUNT II - DECLARATION OF INVALIDITY OF U.S. PATENT NO. 6,714,559

90.     Plaintiffs repeat and reallege the allegations in paragraphs 1-89 as though fully set forth herein.

91.     The '559 patent is invalid for failure to meet the conditions of patentability and/or otherwise comply with one or more of 35 U.S.C. §§ 100 *et seq.*, 101, 102, 103, and 112.

92.     As a result of the acts described in the foregoing paragraphs, there exists a substantial controversy of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

93.     A judicial declaration is necessary and appropriate so that Plaintiffs may ascertain their rights with respect to the '559 patent.

## COUNT III - DECLARATION OF NON-INFRINGEMENT OF U.S. PATENT NO. 7,386,002

94.     Plaintiffs repeat and reallege the allegations in paragraphs 1-93 as though fully set forth herein.

29

95.     The accused mesh networking and WLAN products, networks and/or systems have not infringed and do not infringe, directly or indirectly, any valid and enforceable claim of the '002 patent, either literally or under the doctrine of equivalents.

96.     As a result of the acts described in the foregoing paragraphs, there exists a substantial controversy of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

97.     A judicial declaration is necessary and appropriate so that Plaintiffs may ascertain their rights regarding the '002 patent.

## COUNT IV - DECLARATION OF INVALIDITY OF U.S. PATENT NO. 7,386,002

98.     Plaintiffs repeat and reallege the allegations in paragraphs 1-97 as though fully set forth herein.

99.     The '002 patent is invalid for failure to meet the conditions of patentability and/or otherwise comply with one or more of 35 U.S.C. §§ 100 *et seq.*, 101, 102, 103, and 112.

100.    As a result of the acts described in the foregoing paragraphs, there exists a substantial controversy of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

101.    A judicial declaration is necessary and appropriate so that Plaintiffs may ascertain their rights with respect to the '002 patent.

## COUNT V - DECLARATION OF NON-INFRINGEMENT OF U.S. PATENT NO. 7,535,921

102.    Plaintiffs repeat and reallege the allegations in paragraphs 1-101 as though fully set forth herein.

30

103.     The accused mesh networking and WLAN products, networks and/or systems have not infringed and do not infringe, directly or indirectly, any valid and enforceable claim of the '921 patent, either literally or under the doctrine of equivalents.

104.     As a result of the acts described in the foregoing paragraphs, there exists a substantial controversy of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

105.     A judicial declaration is necessary and appropriate so that Plaintiffs may ascertain their rights regarding the '921 patent.

### COUNT VI - DECLARATION OF INVALIDITY OF U.S. PATENT NO. 7,535,921

106.     Plaintiffs repeat and reallege the allegations in paragraphs 1-105 as though fully set forth herein.

107.     The '921 patent is invalid for failure to meet the conditions of patentability and/or otherwise comply with one or more of 35 U.S.C. §§ 100 *et seq.*, 101, 102, 103, and 112.

108.     As a result of the acts described in the foregoing paragraphs, there exists a substantial controversy of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

109.     A judicial declaration is necessary and appropriate so that Plaintiffs may ascertain their rights with respect to the '921 patent.

### COUNT VII - DECLARATION OF NON-INFRINGEMENT OF U.S. PATENT NO. 7,548,553

110.     Plaintiffs repeat and reallege the allegations in paragraphs 1-109 as though fully set forth herein.

111.     The accused mesh networking and WLAN products, networks and/or systems have not infringed and do not infringe, directly or indirectly, any valid and enforceable claim of the '553 patent, either literally or under the doctrine of equivalents.

112.     As a result of the acts described in the foregoing paragraphs, there exists a substantial controversy of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

113.     A judicial declaration is necessary and appropriate so that Plaintiffs may ascertain their rights regarding the '553 patent.

### COUNT VIII - DECLARATION OF INVALIDITY OF U.S. PATENT NO. 7,548,553

114.     Plaintiffs repeat and reallege the allegations in paragraphs 1-113 as though fully set forth herein.

115.     The '553 patent is invalid for failure to meet the conditions of patentability and/or otherwise comply with one or more of 35 U.S.C. §§ 100 *et seq.*, 101, 102, 103, and 112.

116.     As a result of the acts described in the foregoing paragraphs, there exists a substantial controversy of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

117.     A judicial declaration is necessary and appropriate so that Plaintiffs may ascertain their rights with respect to the '553 patent.

### COUNT IX - DECLARATION OF NON-INFRINGEMENT OF U.S. PATENT NO. 5,740,366

118.     Plaintiffs repeat and reallege the allegations in paragraphs 1-117 as though fully set forth herein.

119.    The accused mesh networking and WLAN products, networks and/or systems have not infringed and do not infringe, directly or indirectly, any valid and enforceable claim of the '366 patent, either literally or under the doctrine of equivalents.

120.    As a result of the acts described in the foregoing paragraphs, there exists a substantial controversy of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

121.    A judicial declaration is necessary and appropriate so that Plaintiffs may ascertain their rights regarding the '366 patent.

## COUNT X - DECLARATION OF INVALIDITY OF U.S. PATENT NO. 5,740,366

122.    Plaintiffs repeat and reallege the allegations in paragraphs 1-121 as though fully set forth herein.

123.    The '366 patent is invalid for failure to meet the conditions of patentability and/or otherwise comply with one or more of 35 U.S.C. §§ 100 *et seq.*, 101, 102, 103, and 112.

124.    As a result of the acts described in the foregoing paragraphs, there exists a substantial controversy of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

125.    A judicial declaration is necessary and appropriate so that Plaintiffs may ascertain their rights with respect to the '366 patent.

## COUNT XI - DECLARATION OF NON-INFRINGEMENT OF U.S. PATENT NO. 5,940,771

126.    Plaintiffs repeat and reallege the allegations in paragraphs 1-125 as though fully set forth herein.

127. The accused mesh networking and WLAN products, networks and/or systems have not infringed and do not infringe, directly or indirectly, any valid and enforceable claim of the '771 patent, either literally or under the doctrine of equivalents.

128. As a result of the acts described in the foregoing paragraphs, there exists a substantial controversy of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

129. A judicial declaration is necessary and appropriate so that Plaintiffs may ascertain their rights regarding the '771 patent.

## COUNT XII - DECLARATION OF INVALIDITY OF U.S. PATENT NO. 5,940,771

130. Plaintiffs repeat and reallege the allegations in paragraphs 1-129 as though fully set forth herein.

131. The '771 patent is invalid for failure to meet the conditions of patentability and/or otherwise comply with one or more of 35 U.S.C. §§ 100 *et seq.*, 101, 102, 103, and 112.

132. As a result of the acts described in the foregoing paragraphs, there exists a substantial controversy of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

133. A judicial declaration is necessary and appropriate so that Plaintiffs may ascertain their rights with respect to the '771 patent.

## COUNT XIII - DECLARATION OF NON-INFRINGEMENT OF U.S. PATENT NO. 6,374,311

134. Plaintiffs repeat and reallege the allegations in paragraphs 1-133 as though fully set forth herein.

34

135. The accused mesh networking and WLAN products, networks and/or systems have not infringed and do not infringe, directly or indirectly, any valid and enforceable claim of the '311 patent, either literally or under the doctrine of equivalents.

136. As a result of the acts described in the foregoing paragraphs, there exists a substantial controversy of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

137. A judicial declaration is necessary and appropriate so that Plaintiffs may ascertain their rights regarding the '311 patent.

## COUNT XIV - DECLARATION OF INVALIDITY OF U.S. PATENT NO. 6,374,311

138. Plaintiffs repeat and reallege the allegations in paragraphs 1-137 as though fully set forth herein.

139. The '311 patent is invalid for failure to meet the conditions of patentability and/or otherwise comply with one or more of 35 U.S.C. §§ 100 *et seq.*, 101, 102, 103, and 112.

140. As a result of the acts described in the foregoing paragraphs, there exists a substantial controversy of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

141. A judicial declaration is necessary and appropriate so that Plaintiffs may ascertain their rights with respect to the '311 patent.

## COUNT XV - DECLARATION OF NON-INFRINGEMENT OF U.S. PATENT NO. 7,457,646

142. Plaintiffs repeat and reallege the allegations in paragraphs 1-141 as though fully set forth herein.

143.    The accused mesh networking and WLAN products, networks and/or systems have not infringed and do not infringe, directly or indirectly, any valid and enforceable claim of the '646 patent, either literally or under the doctrine of equivalents.

144.    As a result of the acts described in the foregoing paragraphs, there exists a substantial controversy of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

145.    A judicial declaration is necessary and appropriate so that Plaintiffs may ascertain their rights regarding the '646 patent.

## COUNT XVI - DECLARATION OF INVALIDITY OF U.S. PATENT NO. 7,457,646

146.    Plaintiffs repeat and reallege the allegations in paragraphs 1-145 as though fully set forth herein.

147.    The '646 patent is invalid for failure to meet the conditions of patentability and/or otherwise comply with one or more of 35 U.S.C. §§ 100 *et seq.*, 101, 102, 103, and 112.

148.    As a result of the acts described in the foregoing paragraphs, there exists a substantial controversy of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

149.    A judicial declaration is necessary and appropriate so that Plaintiffs may ascertain their rights with respect to the '646 patent.

## COUNT XVII - DECLARATION OF NON-INFRINGEMENT OF U.S. PATENT NO. 5,546,397

150.    Plaintiffs repeat and reallege the allegations in paragraphs 1-149 as though fully set forth herein.

151.  The accused mesh networking and WLAN products, networks and/or systems have not infringed and do not infringe, directly or indirectly, any valid and enforceable claim of the '397 patent, either literally or under the doctrine of equivalents.

152.  As a result of the acts described in the foregoing paragraphs, there exists a substantial controversy of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

153.  A judicial declaration is necessary and appropriate so that Plaintiffs may ascertain their rights regarding the '397 patent.

### COUNT XVIII - DECLARATION OF INVALIDITY OF U.S. PATENT NO. 5,546,397

154.  Plaintiffs repeat and reallege the allegations in paragraphs 1-153 as though fully set forth herein.

155.  The '397 patent is invalid for failure to meet the conditions of patentability and/or otherwise comply with one or more of 35 U.S.C. §§ 100 *et seq.*, 101, 102, 103, and 112.

156.  As a result of the acts described in the foregoing paragraphs, there exists a substantial controversy of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

157.  A judicial declaration is necessary and appropriate so that Plaintiffs may ascertain their rights with respect to the '397 patent.

### COUNT XIX - DECLARATION OF NON-INFRINGEMENT OF U.S. PATENT NO. 5,844,893

158.  Plaintiffs repeat and reallege the allegations in paragraphs 1-157 as though fully set forth herein.

159.    The accused mesh networking and WLAN products, networks and/or systems have not infringed and do not infringe, directly or indirectly, any valid and enforceable claim of the '893 patent, either literally or under the doctrine of equivalents.

160.    As a result of the acts described in the foregoing paragraphs, there exists a substantial controversy of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

161.    A judicial declaration is necessary and appropriate so that Plaintiffs may ascertain their rights regarding the '893 patent.

## COUNT XX - DECLARATION OF INVALIDITY OF U.S. PATENT NO. 5,844,893

162.    Plaintiffs repeat and reallege the allegations in paragraphs 1-161 as though fully set forth herein.

163.    The '893 patent is invalid for failure to meet the conditions of patentability and/or otherwise comply with one or more of 35 U.S.C. §§ 100 *et seq.*, 101, 102, 103, and 112.

164.    As a result of the acts described in the foregoing paragraphs, there exists a substantial controversy of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

165.    A judicial declaration is necessary and appropriate so that Plaintiffs may ascertain their rights with respect to the '893 patent.

## COUNT XXI - DECLARATION OF NON-INFRINGEMENT OF U.S. PATENT NO. 6,665,536

166.    Plaintiffs repeat and reallege the allegations in paragraphs 1-165 as though fully set forth herein.

167.     The accused mesh networking and WLAN products, networks and/or systems have not infringed and do not infringe, directly or indirectly, any valid and enforceable claim of the '536 patent, either literally or under the doctrine of equivalents.

168.     As a result of the acts described in the foregoing paragraphs, there exists a substantial controversy of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

169.     A judicial declaration is necessary and appropriate so that Plaintiffs may ascertain their rights regarding the '536 patent.

## COUNT XXII - DECLARATION OF INVALIDITY OF U.S. PATENT NO. 6,665,536

170.     Plaintiffs repeat and reallege the allegations in paragraphs 1-169 as though fully set forth herein.

171.     The '536 patent is invalid for failure to meet the conditions of patentability and/or otherwise comply with one or more of 35 U.S.C. §§ 100 *et seq.*, 101, 102, 103, and 112.

172.     As a result of the acts described in the foregoing paragraphs, there exists a substantial controversy of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

173.     A judicial declaration is necessary and appropriate so that Plaintiffs may ascertain their rights with respect to the '536 patent.

## COUNT XXIII - DECLARATION OF NON-INFRINGEMENT OF U.S. PATENT NO. 6,697,415

174.     Plaintiffs repeat and reallege the allegations in paragraphs 1-173 as though fully set forth herein.

175.     The accused mesh networking and WLAN products, networks and/or systems have not infringed and do not infringe, directly or indirectly, any valid and enforceable claim of the '415 patent, either literally or under the doctrine of equivalents.

176.     As a result of the acts described in the foregoing paragraphs, there exists a substantial controversy of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

177.     A judicial declaration is necessary and appropriate so that Plaintiffs may ascertain their rights regarding the '415 patent.

## COUNT XXIV - DECLARATION OF INVALIDITY OF U.S. PATENT NO. 6,697,415

178.     Plaintiffs repeat and reallege the allegations in paragraphs 1-177 as though fully set forth herein.

179.     The '415 patent is invalid for failure to meet the conditions of patentability and/or otherwise comply with one or more of 35 U.S.C. §§ 100 *et seq.*, 101, 102, 103, and 112.

180.     As a result of the acts described in the foregoing paragraphs, there exists a substantial controversy of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

181.     A judicial declaration is necessary and appropriate so that Plaintiffs may ascertain their rights with respect to the '415 patent.

## COUNT XXV - DECLARATION OF NON-INFRINGEMENT OF U.S. PATENT NO. 7,013,138

182.     Plaintiffs repeat and reallege the allegations in paragraphs 1-181 as though fully set forth herein.

183.     The accused mesh networking and WLAN products, networks and/or systems have not infringed and do not infringe, directly or indirectly, any valid and enforceable claim of the '138 patent, either literally or under the doctrine of equivalents.

184.     As a result of the acts described in the foregoing paragraphs, there exists a substantial controversy of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

185.     A judicial declaration is necessary and appropriate so that Plaintiffs may ascertain their rights regarding the '138 patent.

## COUNT XXVI - DECLARATION OF INVALIDITY OF U.S. PATENT NO. 7,013,138

186.     Plaintiffs repeat and reallege the allegations in paragraphs 1-185 as though fully set forth herein.

187.     The '138 patent is invalid for failure to meet the conditions of patentability and/or otherwise comply with one or more of 35 U.S.C. §§ 100 *et seq.*, 101, 102, 103, and 112.

188.     As a result of the acts described in the foregoing paragraphs, there exists a substantial controversy of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

189.     A judicial declaration is necessary and appropriate so that Plaintiffs may ascertain their rights with respect to the '138 patent.

## COUNT XXVII - DECLARATION OF NON-INFRINGEMENT OF U.S. PATENT NO. 7,710,907

190.     Plaintiffs repeat and reallege the allegations in paragraphs 1-189 as though fully set forth herein.

191.     The accused mesh networking and WLAN products, networks and/or systems have not infringed and do not infringe, directly or indirectly, any valid and enforceable claim of the '907 patent, either literally or under the doctrine of equivalents.

192.     As a result of the acts described in the foregoing paragraphs, there exists a substantial controversy of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

193.     A judicial declaration is necessary and appropriate so that Plaintiffs may ascertain their rights regarding the '907 patent.

**COUNT XXVIII - DECLARATION OF INVALIDITY OF U.S. PATENT NO. 7,710,907**

194.     Plaintiffs repeat and reallege the allegations in paragraphs 1-193 as though fully set forth herein.

195.     The '907 patent is invalid for failure to meet the conditions of patentability and/or otherwise comply with one or more of 35 U.S.C. §§ 100 *et seq.*, 101, 102, 103, and 112.

196.     As a result of the acts described in the foregoing paragraphs, there exists a substantial controversy of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

197.     A judicial declaration is necessary and appropriate so that Plaintiffs may ascertain their rights with respect to the '907 patent.

**COUNT XXIX - DECLARATION OF NON-INFRINGEMENT OF U.S. PATENT NO. 7,916,747**

198.     Plaintiffs repeat and reallege the allegations in paragraphs 1-197 as though fully set forth herein.

199.    The accused mesh networking and WLAN products, networks and/or systems have not infringed and do not infringe, directly or indirectly, any valid and enforceable claim of the '747 patent, either literally or under the doctrine of equivalents.

200.    As a result of the acts described in the foregoing paragraphs, there exists a substantial controversy of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

201.    A judicial declaration is necessary and appropriate so that Plaintiffs may ascertain their rights regarding the '747 patent.

## COUNT XXX - DECLARATION OF INVALIDITY OF U.S. PATENT NO. 7,916,747

202.    Plaintiffs repeat and reallege the allegations in paragraphs 1-201 as though fully set forth herein.

203.    The '747 patent is invalid for failure to meet the conditions of patentability and/or otherwise comply with one or more of 35 U.S.C. §§ 100 *et seq.*, 101, 102, 103, and 112.

204.    As a result of the acts described in the foregoing paragraphs, there exists a substantial controversy of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

205.    A judicial declaration is necessary and appropriate so that Plaintiffs may ascertain their rights with respect to the '747 patent.

## COUNT XXXI - DECLARATION OF NON-INFRINGEMENT OF U.S. PATENT NO. 7,873,343

206.    Plaintiffs repeat and reallege the allegations in paragraphs 1-205 as though fully set forth herein.

43

207.     The accused mesh networking and WLAN products, networks and/or systems have not infringed and do not infringe, directly or indirectly, any valid and enforceable claim of the '343 patent, either literally or under the doctrine of equivalents.

208.     As a result of the acts described in the foregoing paragraphs, there exists a substantial controversy of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

209.     A judicial declaration is necessary and appropriate so that Plaintiffs may ascertain their rights regarding the '343 patent.

## COUNT XXXII - DECLARATION OF INVALIDITY OF U.S. PATENT NO. 7,873,343

210.     Plaintiffs repeat and reallege the allegations in paragraphs 1-209 as though fully set forth herein.

211.     The '343 patent is invalid for failure to meet the conditions of patentability and/or otherwise comply with one or more of 35 U.S.C. §§ 100 *et seq.*, 101, 102, 103, and 112.

212.     As a result of the acts described in the foregoing paragraphs, there exists a substantial controversy of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

213.     A judicial declaration is necessary and appropriate so that Plaintiffs may ascertain their rights with respect to the '343 patent.

## COUNT XXXIII - DECLARATION OF NON-INFRINGEMENT OF U.S. PATENT NO. 7,536,167

214.     Plaintiffs repeat and reallege the allegations in paragraphs 1-213 as though fully set forth herein.

215. The accused mesh networking and WLAN products, networks and/or systems have not infringed and do not infringe, directly or indirectly, any valid and enforceable claim of the '167 patent, either literally or under the doctrine of equivalents.

216. As a result of the acts described in the foregoing paragraphs, there exists a substantial controversy of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

217. A judicial declaration is necessary and appropriate so that Plaintiffs may ascertain their rights regarding the '167 patent.

### COUNT XXXIV - DECLARATION OF INVALIDITY OF U.S. PATENT NO. 7,536,167

218. Plaintiffs repeat and reallege the allegations in paragraphs 1-217 as though fully set forth herein.

219. The '167 patent is invalid for failure to meet the conditions of patentability and/or otherwise comply with one or more of 35 U.S.C. §§ 100 *et seq.*, 101, 102, 103, and 112.

220. As a result of the acts described in the foregoing paragraphs, there exists a substantial controversy of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

221. A judicial declaration is necessary and appropriate so that Plaintiffs may ascertain their rights with respect to the '167 patent.

### COUNT XXXV - DECLARATION OF NON-INFRINGEMENT OF U.S. PATENT NO. 5,295,154

222. Plaintiffs repeat and reallege the allegations in paragraphs 1-221 as though fully set forth herein.

223.     The accused mesh networking and WLAN products, networks and/or systems have not infringed and do not infringe, directly or indirectly, any valid and enforceable claim of the '154 patent, either literally or under the doctrine of equivalents.

224.     As a result of the acts described in the foregoing paragraphs, there exists a substantial controversy of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

225.     A judicial declaration is necessary and appropriate so that Plaintiffs may ascertain their rights regarding the '154 patent.

## COUNT XXXVI - DECLARATION OF INVALIDITY OF U.S. PATENT NO. 5,295,154

226.     Plaintiffs repeat and reallege the allegations in paragraphs 1-225 as though fully set forth herein.

227.     The '154 patent is invalid for failure to meet the conditions of patentability and/or otherwise comply with one or more of 35 U.S.C. §§ 100 *et seq.*, 101, 102, 103, and 112.

228.     As a result of the acts described in the foregoing paragraphs, there exists a substantial controversy of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

229.     A judicial declaration is necessary and appropriate so that Plaintiffs may ascertain their rights with respect to the '154 patent.

## COUNT XXXVII - DECLARATION OF NON-INFRINGEMENT OF U.S. PATENT NO. 5,428,636

230.     Plaintiffs repeat and reallege the allegations in paragraphs 1-229 as though fully set forth herein.

231.    The accused mesh networking and WLAN products, networks and/or systems have not infringed and do not infringe, directly or indirectly, any valid and enforceable claim of the '636 patent, either literally or under the doctrine of equivalents.

232.    As a result of the acts described in the foregoing paragraphs, there exists a substantial controversy of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

233.    A judicial declaration is necessary and appropriate so that Plaintiffs may ascertain their rights regarding the '636 patent.

## COUNT XXXVIII - DECLARATION OF INVALIDITY OF U.S. PATENT NO. 5,428,636

234.    Plaintiffs repeat and reallege the allegations in paragraphs 1-233 as though fully set forth herein.

235.    The '636 patent is invalid for failure to meet the conditions of patentability and/or otherwise comply with one or more of 35 U.S.C. §§ 100 *et seq.*, 101, 102, 103, and 112.

236.    As a result of the acts described in the foregoing paragraphs, there exists a substantial controversy of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

237.    A judicial declaration is necessary and appropriate so that Plaintiffs may ascertain their rights with respect to the '636 patent.

## COUNT XXXIX - DECLARATION OF NON-INFRINGEMENT OF U.S. PATENT NO. 5,504,746

238.    Plaintiffs repeat and reallege the allegations in paragraphs 1-237 as though fully set forth herein.

239.     The accused mesh networking and WLAN products, networks and/or systems have not infringed and do not infringe, directly or indirectly, any valid and enforceable claim of the '746 patent, either literally or under the doctrine of equivalents.

240.     As a result of the acts described in the foregoing paragraphs, there exists a substantial controversy of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

241.     A judicial declaration is necessary and appropriate so that Plaintiffs may ascertain their rights regarding the '746 patent.

## COUNT XL - DECLARATION OF INVALIDITY OF U.S. PATENT NO. 5,504,746

242.     Plaintiffs repeat and reallege the allegations in paragraphs 1-241 as though fully set forth herein.

243.     The '746 patent is invalid for failure to meet the conditions of patentability and/or otherwise comply with one or more of 35 U.S.C. §§ 100 *et seq.*, 101, 102, 103, and 112.

244.     As a result of the acts described in the foregoing paragraphs, there exists a substantial controversy of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

245.     A judicial declaration is necessary and appropriate so that Plaintiffs may ascertain their rights with respect to the '746 patent.

## COUNT XLI - DECLARATION OF NON-INFRINGEMENT OF U.S. PATENT NO. 6,826,165

246.     Plaintiffs repeat and reallege the allegations in paragraphs 1-245 as though fully set forth herein.

247.     The accused mesh networking and WLAN products, networks and/or systems have not infringed and do not infringe, directly or indirectly, any valid and enforceable claim of the '165 patent, either literally or under the doctrine of equivalents.

248.     As a result of the acts described in the foregoing paragraphs, there exists a substantial controversy of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

249.     A judicial declaration is necessary and appropriate so that Plaintiffs may ascertain their rights regarding the '165 patent.

## COUNT XLII - DECLARATION OF INVALIDITY OF U.S. PATENT NO. 6,826,165

250.     Plaintiffs repeat and reallege the allegations in paragraphs 1-249 as though fully set forth herein.

251.     The '165 patent is invalid for failure to meet the conditions of patentability and/or otherwise comply with one or more of 35 U.S.C. §§ 100 *et seq.*, 101, 102, 103, and 112.

252.     As a result of the acts described in the foregoing paragraphs, there exists a substantial controversy of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

253.     A judicial declaration is necessary and appropriate so that Plaintiffs may ascertain their rights with respect to the '165 patent.

## COUNT XLIII - DECLARATION OF NON-INFRINGEMENT OF U.S. PATENT NO. 7,107,052

254.     Plaintiffs repeat and reallege the allegations in paragraphs 1-253 as though fully set forth herein.

255.    The accused mesh networking and WLAN products, networks and/or systems have not infringed and do not infringe, directly or indirectly, any valid and enforceable claim of the '052 patent, either literally or under the doctrine of equivalents.

256.    As a result of the acts described in the foregoing paragraphs, there exists a substantial controversy of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

257.    A judicial declaration is necessary and appropriate so that Plaintiffs may ascertain their rights regarding the '052 patent.

## COUNT XLIV - DECLARATION OF INVALIDITY OF U.S. PATENT NO. 7,107,052

258.    Plaintiffs repeat and reallege the allegations in paragraphs 1-257 as though fully set forth herein.

259.    The '052 patent is invalid for failure to meet the conditions of patentability and/or otherwise comply with one or more of 35 U.S.C. §§ 100 *et seq.*, 101, 102, 103, and 112.

260.    As a result of the acts described in the foregoing paragraphs, there exists a substantial controversy of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

261.    A judicial declaration is necessary and appropriate so that Plaintiffs may ascertain their rights with respect to the '052 patent.

## COUNT XLV - DECLARATION OF NON-INFRINGEMENT OF U.S. PATENT NO. 7,710,935

262.    Plaintiffs repeat and reallege the allegations in paragraphs 1-261 as though fully set forth herein.

263. The accused mesh networking and WLAN products, networks and/or systems have not infringed and do not infringe, directly or indirectly, any valid and enforceable claim of the '935 patent, either literally or under the doctrine of equivalents.

264. As a result of the acts described in the foregoing paragraphs, there exists a substantial controversy of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

265. A judicial declaration is necessary and appropriate so that Plaintiffs may ascertain their rights regarding the '935 patent.

## COUNT XLVI - DECLARATION OF INVALIDITY OF U.S. PATENT NO. 7,710,935

266. Plaintiffs repeat and reallege the allegations in paragraphs 1-265 as though fully set forth herein.

267. The '935 patent is invalid for failure to meet the conditions of patentability and/or otherwise comply with one or more of 35 U.S.C. §§ 100 *et seq.*, 101, 102, 103, and 112.

268. As a result of the acts described in the foregoing paragraphs, there exists a substantial controversy of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

269. A judicial declaration is necessary and appropriate so that Plaintiffs may ascertain their rights with respect to the '935 patent.

## COUNT XLVII - LICENSE

270. Plaintiffs repeat and reallege the allegations in paragraphs 1-269 as though fully set forth herein.

271.   As set forth herein, to the extent Innovatio's allegations of infringement are premised on the alleged making, use, sale, offer for sale, or importation of licensed products, such allegations are barred pursuant to such a license.

272.   As a result of the acts described in the foregoing paragraphs, there exists a substantial controversy of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

273.   A judicial declaration is necessary and appropriate so that Plaintiffs may ascertain their rights with respect to the Patents-In-Suit.

### COUNT XLVIII - EXHAUSTION

274.   Plaintiffs repeat and reallege the allegations in paragraphs 1-273 as though fully set forth herein.

275.   As set forth herein, to the extent Innovatio's allegations of infringement are premised on the alleged making, use, sale, offer for sale, or importation of licensed products, such allegations are barred pursuant to the doctrine of exhaustion.

276.   As a result of the acts described in the foregoing paragraphs, there exists a substantial controversy of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

277.   A judicial declaration is necessary and appropriate so that Plaintiffs may ascertain their rights with respect to the Patents-In-Suit.

### COUNT XLIX - RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT (RICO)

278.   Plaintiffs repeat and reallege the allegations in paragraphs 1-277 as though fully set forth herein.

279.    This is an action for civil relief under 18 U.S.C. §§ 1961 *et seq.*

280.    Innovatio and its attorneys, as well as IPDR, VICIS, and Dowell, and Innovatio's "Members" including ███████████████████████████████████████████ ███████████████████████████████████, in any combination associated in fact, are an "Enterprise," as defined in 18 U.S.C. § 1961(4) (referred to herein as the "Associated-in-Fact Enterprise").  Specifically, the above individuals and entities were and are a union or group that are associated in fact, constitute an ongoing organization, and function as a continuing unit.  This is due to, for example, their contractual and financial relationship, their common goal of monetizing the Innovatio Patents, and their continuing and substantial interaction and involvement (including through individuals associated with the entities) as alleged herein.  These individuals and entities were and are associated for a common purpose of engaging in a course of conduct, at least one aspect of which is attempting to extract royalties from the licensing of the Innovatio Patents through improper means.  These individuals and entities have relationships among those associated with the Associated-in-Fact Enterprise, including relationships between and among their respective members, executives, and employees.  The association between these individuals and entities also has longevity sufficient to permit these associates to pursue the Associated-in-Fact Enterprise's purpose, including by virtue of their ongoing contractual and financial relationship, alignment of interests, and ongoing interactions.

281.    Alternatively, or in addition, Innovatio is an "Enterprise," as defined in 18 U.S.C. § 1961(4) (referred to herein as the "Innovatio Enterprise").  For purposes of this Count, the term "Enterprise" encompasses either the Associated-in-Fact Enterprise or the Innovatio Enterprise.

282.     Defendants Innovatio, Whitley and IM are "persons," as that term is defined in 18 U.S.C. § 1961(3), who, individually and collectively, conduct and direct the affairs of the Associated-in-Fact Enterprise described above through a continuing pattern of unlawful conduct. Alternatively, or in addition, Whitley and IM are "persons," as that term is defined in 18 U.S.C. § 1961(3), who, individually and collectively, conduct and direct the affairs of the Innovatio Enterprise described above, through a continuing pattern of unlawful conduct.  As alleged in this Count, the term "Persons" encompasses either Innovatio, Whitley and/or IM with respect to the Associated-in-Fact Enterprise or Whitley and/or IM with respect to the Innovatio Enterprise. Such "Persons" are referred to herein for purposes of this Count as "RICO Defendants."

283.     The Enterprise engages in, and its activities have an effect on, interstate commerce in connection with *inter alia*, the Enterprise's business of acquiring patents, issuing threats to businesses and individuals concerning its patents, coercing businesses and individuals to participate in its licensing program at rates and under conditions that the Enterprise is legally prohibited from seeking, and suing for alleged infringement of certain of its patents without an objective basis and for the illegitimate purpose of bolstering the *in terrorem* effect of its licensing scheme.  The Enterprise has targeted thousands of businesses in all 50 states to date for patent licenses, and has initiated 23 lawsuits to date in the jurisdictions of 4 states.   The Enterprise uses the instrumentalities of interstate travel, interstate mailings, and interstate telephone calls, and it purchases goods and services from various U.S. states – including in connection with RICO Defendants' threats and promoting RICO Defendants' unlawful licensing program.

284.  In violation of 18 U.S.C. § 1962(c), RICO Defendants and those acting at their direction have conducted, controlled, and participated in the conduct of the Enterprise's affairs through a pattern of unlawful racketeering activity.

285.  The pattern of racketeering activity referred to herein consists of a variety of unlawful schemes which were and are specifically intended to and do use unlawful means and influence to enrich RICO Defendants and others at the expense of Plaintiffs and others.  These unlawful schemes involved, for instance, acts of mail and wire fraud in violation of 18 U.S.C. §§ 1341 and 1343, respectively, extortion in violation of 18 U.S.C. § 1951, extortion in violation of California Penal Code § 518, and travelling or using the mail or any facility in interstate commerce in aid of racketeering enterprises in violation of 18 U.S.C. § 1952.

286.  As alleged herein, RICO Defendants, individually or collectively, and through the conduct of the Enterprise, are engaging in numerous acts of mail fraud and/or have devised an overall scheme or artifice to defraud, and are attempting to commit fraud and carry out such scheme in violation of 18 U.S.C. § 1341, which constitute "predicate acts" under 18 U.S.C. § 1961 in furtherance of their campaign to enhance their wealth through unlawful means, including, for example:

- operating a scheme to defraud by which RICO Defendants sought and/or obtained licensing fees from end-user licensing targets for the Innovatio Patents based on unlawful, bad faith, and objectively baseless allegations of patent infringement, such as, for instance, threatening to sue users of products that are already covered under Innovatio's licenses, including a license with Broadcom, █████████████ ██████████████████████████████████████████████████████████; based on, at minimum, this license ████████████, Innovatio has no right to allege

55

infringement or demand money from Plaintiffs' customers on account of their use of Broadcom products;

- as stated herein, beginning at least as early as April 12, 2011 and continuing to date, communicating in bad faith to thousands of licensing targets demands for licensing fees while concealing material information from those targets, such as the existing licenses under the Innovatio Patents held by suppliers of Wi-Fi products like Broadcom, ████████████████████ and Innovatio's RAND obligations with respect to the Innovatio Patents, as well as misrepresenting the scope of Innovatio's prior settlements and the alleged validity of the Innovatio Patents, and having knowledge of the falsity and/or fraudulent incompleteness of its representations to targets, all in an effort to deprive the RICO Defendants' targets of money or property that RICO Defendants had no right to seek or obtain;

- having knowledge of prior licenses to the Innovatio Patents which would cover end-user licensing targets' accused products, such knowledge possessed by, for example, Defendant Whitley in light of his prior work at Broadcom, but hiding such licenses from its targets;

- intending to deceive and defraud, and/or devising a scheme to defraud, end-user licensing targets by unlawfully inducing and attempting to induce them to enter into licensing agreements for the Innovatio Patents to which Innovatio is not entitled;

- mailing or causing the mailing of thousands of letters or other communications, repeatedly, separately, and over the span of many months, such communications containing various false and misleading statements and/or material omissions, and in

furtherance of a scheme reasonably calculated to deceive and to defraud licensing targets into paying substantial and unjustified sums in licensing fees;

- causing licensing targets to reasonably and detrimentally rely on the false or misleading representations, and/or omissions, described above, by paying Innovatio fees to which it is not entitled and/or causing the targets to expend significant sums in the investigation, defense, and/or resolution of Innovatio's demands; and

- exploiting the foregoing misrepresentations and/or omissions, as well as the associated expense of investigating and defending against them, in order to keep the licensing targets from discovering the fraud and to thereby obtain and attempt to obtain licensing fees from end users, including to unlawfully circumvent and violate the licenses encumbering the Innovatio patents and Innovatio's RAND and other commitments concerning licensing those patents.

287.    As alleged herein, RICO Defendants, individually or collectively, and through the conduct of the Enterprise, are engaging in numerous acts of wire fraud and/or devised an overall scheme or artifice to defraud, and are attempting to commit fraud and carry out such scheme in violation of 18 U.S.C. § 1343, which constitute "predicate acts" under 18 U.S.C. § 1961 in furtherance of their campaign to enhance their wealth through unlawful means, including, for example:

- operating a scheme to defraud by which RICO Defendants sought and/or obtained licensing fees from end-user licensing targets for the Innovatio Patents based on unlawful, bad faith, and objectively baseless allegations of patent infringement, such as, for instance, threatening to sue users of products that are already covered under Innovatio's licenses, including a license with Broadcom, ████████████████

██████████████████████████████████████████████████████████;
based on, at minimum, this license ████████, Innovatio has no right to allege
infringement or demand money from Plaintiffs' customers on account of their use of
Broadcom products;

- as stated herein, beginning at least as early as April 12, 2011 and continuing to date,
  communicating in bad faith to thousands of licensing targets demands for licensing
  fees while concealing material information from those targets, such as the existing
  licenses under the Innovatio Patents held by suppliers of Wi-Fi products like
  Broadcom, ████████████████████ and Innovatio's RAND obligations
  with respect to the Innovatio Patents, as well as misrepresenting the scope of
  Innovatio's prior settlements and the alleged validity of the Innovatio Patents, and
  having knowledge of the falsity and/or fraudulent incompleteness of its
  representations to targets, all in an effort to deprive the RICO Defendants' targets of
  money or property that RICO Defendants had no right to seek or obtain;

- having knowledge of the existence of prior licenses to the Innovatio Patents which
  would cover end-user licensing targets' accused products, such knowledge possessed,
  at minimum, by Defendant Whitley in light of his prior work at Broadcom, but hiding
  such licenses from its targets;

- intending to deceive and defraud, and/or devise a scheme to defraud, end-user
  licensing targets by unlawfully inducing and attempting to induce them to enter into
  licensing agreements for the Innovatio Patents to which Innovatio is not entitled;

- sending by electronic mail ("email") or causing the emailing of hundreds of letters or
  other communications containing various false and misleading statements and/or

material omissions, and in furtherance of a scheme reasonably calculated to deceive and to defraud licensing targets into paying substantial sums in licensing fees;

- communicating repeatedly by telephone to licensing targets in furtherance of a scheme to defraud licensing targets into paying substantial and unjustified sums in licensing fees;

- causing licensing targets to reasonably and detrimentally rely on the false or misleading representations, and/or omissions, described above, by paying Innovatio fees to which it is not entitled and/or causing the targets to expend significant sums in the investigation, defense, and/or resolution of Innovatio's demands; and

- exploiting the foregoing misrepresentations and/or omissions as well as the associated expense of investigating and defending against them, in order to keep the licensing targets from discovering the fraud and to thereby obtain and attempt to obtain licensing fees from end users, including to unlawfully circumvent and violate the licenses encumbering the Innovatio patents and Innovatio's RAND and other commitments concerning licensing those patents.

288.   As alleged herein, RICO Defendants, individually or collectively, conducted the affairs of the Enterprise through in numerous acts of extortion, attempted extortion, and conspiracy to commit extortion in violation of 18 U.S.C. § 1951, which constitute "predicate acts" under 18 U.S.C. § 1961 in furtherance of their overall scheme to defraud and enhance their wealth through improper means, including, for example:

- obtaining or attempting to obtain licensing fees from end-user licensing targets, including Plaintiff's customers, by wrongful use of fear, including by intimidating licensing targets to choose between paying fees that RICO Defendants are not entitled

59

to obtain, or to defend expensive legal proceedings and/or undertake costly and burdensome investigation and negotiation procedures, threatening to increase the cost of licensing fees if end-user licensing targets did not comply with Innovatio's demands within thirty days or face legal action, wherein their threats (including any threat of legal action) are objectively baseless and brought with an unlawful motive, without regard to the merits and for an unlawful purpose, and further deprived of legitimacy due to unlawful conduct consisting of fraud or intentional misrepresentations, all while knowing that the Innovatio Patents have been licensed, are subject to RAND obligations (wherein end-user targets are beneficiaries of the IEEE and 802.11 standards-setting process, and knowing that Innovatio's royalty demands are in violation of its IEEE obligations and are intended to circumvent all notions of RAND licensing that are binding on Innovatio), and are not infringed in the manner claimed by Innovatio;

- threatening supposed legitimate enforcement of patent rights as a tactic of fear and to create undue leverage to extract, attempt to extract, and conspire to extract substantial sums from its targets that far exceed licenses on RAND terms (including amounts that are much greater than the price of the Wi-Fi products and technologies being used) and that ignore the existing licenses to the patents, all while knowing that the Innovatio patents are not infringed, have been licensed, and/or are subject to RAND obligations wherein end-user targets are beneficiaries of the IEEE and 802.11 standards-setting process;

- wrongfully using fear to threaten and prey upon end-user licensing targets that are far removed from the development and manufacture of the accused products or the

underlying 802.11 standards and/or that are not sophisticated in the underlying technology, nor have the resources to challenge RICO Defendants' baseless claims, in order for RICO Defendants to circumvent and conceal the license restrictions on the Innovatio patents and the RAND obligations encumbering those patents from end-user targets, who are unaware of those obligations due to RICO Defendants' concealment of those facts;

- instituting bad faith and sham lawsuits in connection with the Innovatio Patents, including against parties and products that are the subject of the consolidated actions in *In re Innovatio IP Ventures, LLC, Patent Litigation* (Case No. 1:11-cv-09308), with the intent to create fear and intimidate thousands of other targets to pay fees that RICO Defendants are not entitled to obtain;

- affecting or attempting to affect commerce between and among the states by, for example, (1) requiring users and implementers of the accused Wi-Fi technologies throughout the U.S. to pay non-RAND fees to continue their use, or begin using, accused Wi-Fi in the conduct of their businesses, and by otherwise threatening or seeking injunctive relief against such users and implementers, having a probability of, for example, depleting the assets of such users and implementers; (2) preventing companies, including Innovatio's end-user licensing targets from continuing their use of standardized Wi-Fi technologies, which RICO Defendants wrongfully claim are covered by the Innovatio Patents and/or causing such targets that use or desire to use the accused Wi-Fi technologies to undertake substantial expenses, and by further using the instrumentalities of interstate commerce (mail and wire) to carry out the pattern of extortion; as alleged herein, based on RICO Defendants' allegations, the

61

Innovatio Patents are subject to RAND contractual commitments, meaning Innovatio must offer RAND license terms, not seek fees many times the value of its targets' accused products, nor seek to impose a discriminatory tax on those targets, which obligations Defendants have concealed and breached.

289.    As alleged herein, RICO Defendants, individually or collectively, conducted the affairs of the Enterprise through numerous acts of extortion in violation of California Penal Code § 518, which constitute "predicate acts" under 18 U.S.C. § 1961 in furtherance of their overall scheme to defraud and enhance their wealth through improper means, including, for example:

- obtaining licensing fees from end-user licensing targets by wrongful use of fear, including by intimidating licensing targets to choose between paying fees that RICO Defendants are not entitled to obtain, or to defend expensive legal proceedings and/or undertake costly and burdensome investigation and negotiation procedures, threatening to increase the cost of licensing fees if end-user licensing targets did not comply with Innovatio's demands within thirty days or face legal action, wherein their threats (including any threat of legal action) are objectively baseless and brought with an unlawful motive, without regard to the merits and for an unlawful purpose, and further deprived of legitimacy due to unlawful conduct consisting of fraud or intentional misrepresentations, all while knowing that the Innovatio Patents have been licensed, are subject to RAND obligations (wherein end-user targets are beneficiaries of the IEEE and 802.11 standards-setting process, and knowing that Innovatio's royalty demands are in violation of its IEEE obligations and are intended to circumvent all notions of RAND licensing that are binding on Innovatio), and are not infringed in the manner claimed by Innovatio;

- threatening supposed legitimate enforcement of patent rights as a tactic of fear and to create undue leverage to extract substantial sums from its targets that far exceed licenses on RAND terms (including amounts that are much greater than the price of the Wi-Fi products and technologies being used) and that ignore the existing licenses to those patents, all while knowing that the Innovatio patents are not infringed, have been licensed, and/or are subject to RAND obligations wherein end-user targets are beneficiaries of the IEEE and 802.11 standards-setting process;

- wrongfully using fear to threaten and prey upon end-user licensing targets that are far removed from the development and manufacture of the accused products or the underlying 802.11 standards and/or that are not sophisticated in the underlying technology, nor have the resources to challenge RICO Defendants' baseless claims, in order for RICO Defendants to circumvent and conceal the license restrictions on the Innovatio patents and the RAND obligations encumbering those patents from end-user targets, who are unaware of those obligations due to RICO Defendants' concealment of those facts;

- instituting bad faith and sham lawsuits in connection with the Innovatio Patents, including against parties and products that are the subject of the consolidated actions in *In re Innovatio IP Ventures, LLC, Patent Litigation* (Case No. 1:11-cv-09308), with the intent to create fear and intimidate thousands of other targets to pay fees that RICO Defendants are not entitled to obtain;

- affecting commerce by, for example, (1) requiring users and implementers of the accused Wi-Fi technologies to pay non-RAND fees to continue their use, or begin using, accused Wi-Fi in the conduct of their businesses, and by otherwise threatening

or seeking injunctive relief against such users and implementers, having a probability of, for example, depleting the assets of such users and implementers; (2) preventing companies, including Innovatio's end-user licensing targets from continuing their use of standardized Wi-Fi technologies, which RICO Defendants wrongfully claim are covered by the Innovatio Patents and/or causing such targets that use or desire to use the accused Wi-Fi technologies to undertake substantial expenses; as alleged herein, based on RICO Defendants' allegations, the Innovatio Patents are subject to RAND contractual commitments, meaning Innovatio must offer RAND license terms, not seek fees many times the value of its targets' accused products, nor seek to impose a discriminatory tax on those targets, which obligations Defendants have concealed and breached.

290. As alleged herein, RICO Defendants, individually or collectively, conducted the affairs of the Enterprise through numerous acts of travelling or using the mail or any facility in interstate commerce in aid of racketeering enterprises in violation of 18 U.S.C. § 1952, which constitute "predicate acts" under 18 U.S.C. § 1961 in furtherance of their overall scheme to defraud and enhance their wealth through improper means, including, for example:

- mailing of or causing the mailing of, e-mailing of or causing the e-mailing of threatening letters in furtherance of a scheme to obtain licensing fees from end-user licensing targets by wrongful use of fear, including by intimidating licensing targets to choose between paying fees that RICO Defendants are not entitled to obtain, or to defend expensive legal proceedings and/or undertake costly and burdensome investigation and negotiation procedures, threatening to increase the cost of licensing fees if end-user licensing targets did not comply with Innovatio's demands within

thirty days or face legal action, wherein their threats are objectively baseless and brought with an unlawful motive, without regard to the merits and for an unlawful purpose, and further deprived of legitimacy due to unlawful conduct consisting of fraud or intentional misrepresentations, all while knowing that the Innovatio Patents are not infringed, have been licensed, and/or are subject to RAND obligations wherein end-user targets are beneficiaries of the IEEE and 802.11 standards-setting process, and knowing that Innovatio's royalty demands are in violation of its IEEE obligations and are intended to circumvent all notions of RAND licensing that are binding on Innovatio;

- threatening supposed legitimate enforcement of patent rights as a tactic of fear and to create undue leverage to extract substantial sums from its targets that far exceed licenses on RAND terms (including amounts that are much greater than the price of the Wi-Fi products and technologies being used), all while knowing that the Innovatio patents are not infringed, have been licensed, and/or are subject to RAND obligations wherein end-user targets are beneficiaries of the IEEE and 802.11 standards-setting process;

- wrongfully using fear to threaten and prey upon end-user licensing targets that are far removed from the development and manufacture of the accused products or the underlying 802.11 standards and/or that are not sophisticated in the underlying technology, nor have the resources to challenge RICO Defendants' baseless claims, in order for RICO Defendants to circumvent RAND obligations to end-user targets that are unaware of those obligations due to RICO Defendants' concealment of those facts;

- instituting bad faith and sham lawsuits in connection with the Innovatio Patents, including against parties and products that are the subject of the consolidated actions in *In re Innovatio IP Ventures, LLC, Patent Litigation* (Case No. 1:11-cv-09308) with the intent to create fear and intimidate thousands of other targets to pay fees that RICO Defendants are not entitled to obtain; and

- affecting or attempting to affect commerce between and among the states by, for example, (1) requiring users and implementers of the accused Wi-Fi technologies throughout the U.S. to pay non-RAND fees to continue their use, or begin using, accused Wi-Fi in the conduct of their businesses, and by otherwise threatening or seeking injunctive relief against such users and implementers, having a probability of, for example, depleting the assets of such users and implementers; (2) preventing companies, including Innovatio's end-user licensing targets, from continuing their use of standardized Wi-Fi technologies, which RICO Defendants wrongfully claim are covered by the Innovatio Patents, and/or causing such targets that use or desire to use the accused Wi-Fi technologies to undertake substantial expenses, and by further using the instrumentalities of interstate commerce to carry out the pattern of racketeering; as alleged herein, based on RICO Defendants' allegations, the Innovatio Patents are subject to RAND contractual commitments, meaning Innovatio must offer RAND license terms, not seek fees many times the value of its targets' accused products, nor seek to impose a discriminatory tax on those targets, which obligations Defendants have concealed and breached.

291. These predicate acts are related because they had common purposes and goals (such as the unlawful enrichment of RICO Defendants in violation of Innovatio's contractual

commitments and promises), common methods of commission (for example, the fraudulent use of the mails or wires, and/or misconduct through fear and extortion using the alleged legitimacy of Innovatio's patent rights), and common participants (Defendants Whitley, IM, and/or Innovatio, and those acting at their direction).

292.    Each of the foregoing acts of racketeering by the RICO Defendants is related, continuous, ongoing, and part of a pattern of conduct pertaining to multiple patents, directed at multiple victims, and continuing since at least early 2011.   Accordingly, RICO Defendants, individually or collectively, have engaged and are engaging in a continuing and related pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(5), which poses a threat of continued unlawful activity.   The RICO Defendants' unlawful acts constitute a "pattern of racketeering activity," as that term is defined in 18 U.S.C. § 1961(5), in that there is a threat of continued unlawful activity.   With respect to each of the RICO Defendants, the pattern of unlawful activity at least has close-ended continuity in that there at least was a closed period of repeated acts covering at least a period from 2011 to present.   With respect to each of the RICO Defendants, the pattern of unlawful activity also has open-ended continuity in that the unlawful acts are continuing, including in connection with the ongoing efforts to improperly threaten, mislead, and defraud targets of its licensing program for the benefit of the Enterprise.

293.    As a direct and proximate result of the participation in and conduct of the affairs of the Enterprise alleged herein by RICO Defendants through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c), Plaintiffs have been directly and proximately injured in their business and property, and are entitled to all remedies available under the law.   As an intended, actual and proximate consequence of RICO Defendants' unlawful actions, Plaintiffs have incurred significant fees and costs in investigating and defending against RICO Defendants'

unlawful licensing campaign against Plaintiffs' customers, including fees and costs with respect to investigating and defending objectively baseless threats made against Plaintiffs' customers based on their alleged use of Plaintiffs' products, and in addition Plaintiffs have been forced to incur the costs associated with significant disruption to their businesses, disruption of the commercial relationship between Plaintiffs and their customers, and other disruptions to Plaintiffs caused by the RICO Defendants' unlawful conduct. Plaintiffs have also been harmed to the extent that the costs of any disruption, investigation, and license or other fees and expenses exceed the value of a RAND license. Moreover, as an intended, actual, and proximate consequence of RICO Defendants' unlawful actions, Plaintiffs have been further injured commercially and financially by the threat of injunctions incident to any conduct other than capitulation to RICO Defendants' unlawful licensing campaign and baseless allegations.

294. RICO Defendants have engaged in a pattern and practice to further their licensing campaign through a series of lawsuits brought pursuant to a pattern of making threats and filing legal action without regard to the merits, without investigation, and for an unlawful purpose (*e.g.*, circumventing Innovatio's binding RAND and other obligations), and/or RICO Defendants' threats and claims are deprived of legitimacy due to unlawful conduct consisting of, for instance, making knowingly fraudulent or intentional misrepresentations to the court (*e.g.*, representing to the Court that the Innovatio Patents are primarily infringed by specific end-user implementations of Wi-Fi, but representing to its licensing targets that the Innovatio Patents are "essential" patents, and therein allegedly needed by anyone using IEEE 802.11 Wi-Fi).

## COUNT L - CAL. BUS. & PROF. CODE §§ 17200, ET SEQ.

295. Plaintiffs repeat and reallege the allegations in paragraphs 1-294 as though fully set forth herein.

296.    Defendants' conduct described herein constitutes unfair, unlawful and/or fraudulent business acts or practices under Cal. Bus. & Prof. Code § 17200 et seq., including, for example: making affirmative misrepresentations and omissions about the need to take a license to the Innovatio Patents, the encumbrances on those patents, the alleged validity of the Innovatio Patents, prior settlements, and the number of licensees; using fear to extort license fees for amounts to which Innovatio is not entitled, including amounts for accused products that are already licensed under the Innovatio Patents and non-RAND amounts; concealing from licensing targets the chip-supplier licenses; violations of RICO, as alleged above; and systematic breach of contract and engaging in a broad scheme to obtain license fees for non-RAND amounts and for accused products that are already licensed.

297.    Misconduct and injuries pertaining to the conduct referenced herein have occurred within California, either of which gives rise to a § 17200 claim.  With respect to injury in California, at least Cisco is incorporated and has its principal place of business in California, conducts business related to the accused standards and products in California, and sells accused products to customers located in California; NETGEAR has its principal place of business in California, conducts business related to the accused standards and products in California, and sells accused products to customers located in California.  Motorola conducts business related to the accused standards and products in California, and sells accused products to customers located in California.  Innovatio has targeted dozens of California customers of Cisco, Motorola, and NETGEAR (and hundreds of California companies overall) with its baseless allegations and unlawful conduct.  Several of Innovatio's licensing agents reside in California.  Customers of Cisco, Motorola, and NETGEAR in California have expended money investigating and preparing to defend against Innovatio's baseless claims and, in some cases, paying the fees

demanded by Innovatio proximately arising out of Defendants' illegal conduct. Cisco, Motorola, and NETGEAR have also expended substantial sums investigating and indemnifying against Innovatio's baseless claims against Plaintiffs' customers.

298.    In addition to injuries in California, various acts of misconduct alleged in the preceding counts occurred in California, including Defendants' threats, bad faith assertion of the Innovatio Patents against Plaintiffs' customers located in California, and acts of misconduct committed by Defendants in California.

299.    Plaintiffs are entitled to remedies, including an injunction barring continued commission of the unlawful activities alleged herein, attorneys' fees, and restitution of ill-gotten gains of Defendants, including investments, licensing royalties, or any recoveries obtained directly or indirectly from Plaintiffs through the inappropriate conduct set forth herein.

## COUNT LI - CIVIL CONSPIRACY

300.    Plaintiffs repeat and reallege the allegations in paragraphs 1-299 as though fully set forth herein.

301.    Defendants Whitley, Innovatio, and/or IM individually or collectively along with investors, counsel, and other entities such as IPDR, VICIS, and Dowell ("Conspirators"), formed an agreement for purposes of engaging in a nationwide pattern and practice of baseless threats, fraud, omission, misrepresentation, unfair competition, breach of contract, and extortion of money from thousands of businesses, both small and large, that use standardized Wi-Fi (802.11) technology. Alternatively Conspirators formed an agreement for purposes of promoting and profiting from Defendants' licensing program and/or enforcing patent rights, but in furthering those purposes agreed to, and did engage in, a nationwide pattern and practice employing unlawful means, including making baseless threats and claims, engaging in fraud, omission,

misrepresentation, unfair competition, and extortion, and breaching promises and contractual commitments, as alleged herein.

302.    In furtherance of this agreement, or these agreements, one or more of Conspirators have engaged in numerous unlawful acts, including without limitation, (1) fraudulently and through acts of extortion sending threat letters while failing to disclose material information and misrepresenting material facts; (2) fraudulently demanding and receiving licensing fees in violation of RAND obligations; (3) systematically inducing the breach of, and breaching, binding RAND contracts and promises (as described below); (4) interfering with Plaintiffs' prospective business relations as described herein; and (5) making baseless and sham threats in bad faith and without a reasonable investigation or belief that the Conspirators' targets infringed or required or already had rights to the Innovatio Patents.

303.    Through these unlawful acts, Conspirators have damaged Plaintiffs including by *inter alia* causing Plaintiffs to expend substantial expenditures investigating, defending, and preparing to defend against fraudulent, extortionate, and baseless threats and claims.

## COUNT LII - BREACH OF CONTRACT

304.    Plaintiffs repeat and reallege the allegations in paragraphs 1-303 as though fully set forth herein.

305.    For consideration, including IEEE membership and participation, Innovatio's Predecessors entered into an express and/or implied contracts with the IEEE's members, or alternatively, with the IEEE to which IEEE members and others are third-party beneficiaries, in which Innovatio's Predecessors agreed, among other things, to abide by the IEEE's policies and rules. The IEEE rules and policies, whether formal or informal, including all stipulations, amendments, modifications, requirements and representations in any form, constitute a contract

between Innovatio's Predecessors and the IEEE's members, or alternatively between Innovatio's Predecessors and the IEEE, to which IEEE members and others, including but not limited to Plaintiffs are third-party beneficiaries.

306. In accordance with the foregoing, the IEEE's rules and policies require its members and patent holders to submit letters of assurance including either a general disclaimer to the effect that the patentee will not enforce any of its present or future patents whose use would be required to implement the proposed IEEE standard against any person or entity using the patents to make, use, sell, import, or offer for sale in the U.S. any product that operates in accordance with the standard or a statements that a license will be made available to all applicants without compensation or under reasonable rates, with reasonable terms and conditions that are demonstrably free of any unfair discrimination.

307. For each of at least the 802.11a, b, e, g, and n standards, the IEEE adopted the respective standards and Innovatio's Predecessors have submitted respective letters of assurance to the IEEE for such standards.

308. IEEE members, the Plaintiffs, their customers, and various third-parties, developed, marketed and/or used products that operate in accordance with the IEEE 802.11 standards. Innovatio's Predecessors' and others' assurances and commitments to RAND were intended to, and did, secure adoption of 802.11 standards by the IEEE, Plaintiffs and others. In reliance on such assurances, companies including Plaintiffs and third parties invested substantial resources in developing, marketing, selling, and improving products that operate in accordance with the accused 802.11 standards.

309. Furthermore, Innovatio's Predecessors' representations and other conduct, including the letters of assurance offering licenses on RAND terms, created express and/or

implied contracts with the IEEE and its members, or alternatively between Innovatio's Predecessors and the IEEE, to which IEEE members and others are third-party beneficiaries.

310.     Innovatio, as assignee to the Innovatio Patents which were subject to Innovatio's Predecessors letters of assurance offering licenses on RAND terms, and other conduct before the IEEE, is bound by the agreements, licenses, covenants, obligations, and promises relating to those patents entered into by Innovatio's Predecessors.

311.     Innovatio breached its contractual obligations, including by, *inter alia*, making demands and/or entering into licenses under terms that are unfair, unreasonable, and not free from discrimination, by seeking to enjoin Plaintiffs from using components that operate in accordance with the accused 802.11 standards, making demands based on the use of products that are already licensed under the Innovatio Patents and/or products that Innovatio is contractually prohibited from accusing of infringement, making demands for licenses to patents that are expired, and through other unlawful conduct such as misrepresentations and/or omissions regarding its patents and licenses, as alleged herein.

312.     Innovatio is further promoting a licensing program that is blatantly unreasonable on its face, including blatantly unreasonable offers and conduct in violation of good faith and fair dealing inherent in all contracts.

313.     Plaintiffs have incurred damages, and will be further damaged in the future, due to Innovatio's breach of its contractual obligations, including as alleged herein.

## COUNT LIII - PROMISSORY ESTOPPEL

314.     Plaintiffs repeat and reallege the allegations in paragraphs 1-313 as though fully set forth herein.

315.     Innovatio's Predecessors made representations and engaged in other conduct, including Innovatio's Predecessors' representations that they would license its existing and future patents relating to IEEE 802.11 Wi-Fi on RAND terms.

316.     Innovatio's Predecessors' representations and other conduct constituted promises to the IEEE, its members and third-party beneficiaries, such as Cisco, Motorola, and NETGEAR, and their customers.  By making those promises, Innovatio's Predecessors knew or reasonably should have known that they would be relied upon.

317.     The IEEE and its members, and third-party beneficiaries including Cisco, Motorola, and NETGEAR, and their customers reasonably relied on the foregoing promises in adopting 802.11 standards.  Cisco, Motorola, and NETGEAR further reasonably relied on the foregoing promises, and/or the 802.11 standards, in investing substantial resources developing and marketing products accused of alleged infringement in this action.

318.     Innovatio, as assignee of the patents subject to these promises, is bound by Innovatio's Predecessors' representations and other conduct constituting promises to the IEEE and its members, and to third-party beneficiaries, including Cisco, Motorola, and NETGEAR.

319.     Plaintiffs have been damaged as a result of their reasonable reliance as alleged herein, in developing, marketing, selling, and using products that have been accused by Innovatio of alleged infringement.  Injustice can be avoided only by enforcement of Innovatio's promises.

## COUNT LIV - INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE

320.     Plaintiffs repeat and reallege the allegations of paragraphs 1-319 as though fully set forth herein.

321. Plaintiffs enjoy economic relationships with numerous customers, including customers that are targets of Defendants' licensing campaign.

322. Innovatio is aware of these relationships, as established, through at minimum, pleadings Innovatio has filed in this matter relating to the suppliers of the accused technologies, including Cisco, Motorola, and NETGEAR; further, Innovatio has been informed by customers of their expectation that their suppliers, such as Cisco, are indemnifying against Innovatio's threats and licensing demands.

323. Despite that knowledge, Innovatio has repeatedly stated in connection with its licensing campaign that Cisco (and other suppliers) are not indemnifying their customers against Innovatio's threats. For example, when in September 2012, a Cisco customer informed Innovatio of its relationship with Cisco, VICIS stated that Innovatio had filed suit against some 200 companies to date, and so far no equipment manufacturer has stepped in to defend. This statement is false, and was knowingly made with unlawful and wrongful intent, designed to disrupt the relationship between the customer and Cisco. On information and belief, Innovatio has repeated such statements to other customers of Plaintiffs.

324. Innovatio's conduct is continuing, and has caused, and will likely cause disruption and harm to Plaintiffs' relationships, advantages, and expectancies with their customers. For example, Innovatio's conduct has caused, *inter alia*, reputational harm to Plaintiffs. In fact, based on VICIS's representations to Cisco customers as alleged above, at least one of Cisco's customers found such representations to be detrimental to Cisco's reputation.

325. Innovatio's conduct as alleged herein constitutes interference with Plaintiffs', including Cisco's, customer relationships and has resulted in damages to Cisco's and, on

information and belief, other Plaintiffs' customer relationships and reputation in an amount to be proven at trial.

## COUNT LV - UNCLEAN HANDS

326. Plaintiffs repeat and reallege the allegations of paragraphs 1-325 as though fully set forth herein.

327. Defendants' wrongful conduct as alleged herein constitutes unclean hands and renders the Innovatio Patents unenforceable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court enter judgment in favor of Plaintiffs granting the following relief:

A.     A declaration that the accused mesh networking and WLAN products, networks and/or systems have not infringed and do not infringe any valid and enforceable claim of any of the Patents-In-Suit;

B.     A declaration that the Patents-In-Suit are invalid for failure to meet the conditions of patentability and/or otherwise comply with the requirements of 35 U.S.C. §§ 100 *et seq.*, 101, 102, 103, and/or 112;

C.     A declaration that Innovatio's allegations of infringement are barred;

D.     An injunction against Defendants and their officers, agents, servants, employees, attorneys, and others in active concert or participation with them from asserting infringement or instituting or continuing any legal action for infringement of the Patents-In-Suit or the Innovatio Patents against Plaintiffs or their suppliers,

manufacturers, distributors, resellers of their products, customers or end users of their products;

E.  An order declaring that this is an exceptional case and awarding Plaintiffs their costs, expenses, disbursements and reasonable attorney fees under 35 U.S.C. § 285 and all other applicable statutes, rules and common law;

F.  A judgment in favor of Plaintiffs on all of their claims;

G.  A judgment requiring Innovatio's specific performance under its contract with IEEE and/or IEEE members to grant licenses to the Innovatio Patents to Plaintiffs on fair, reasonable, and non-discriminatory terms and conditions;

H.  An award to Plaintiffs of, and a declaration that Plaintiffs have, a royalty-free license for the Innovatio Patents;

I.  An award for threefold the actual damages Plaintiffs sustained as a result of Defendants' violations of 18 U.S.C. § 1962(c) and the costs, including attorneys' fees, incurred by Plaintiffs in prosecuting RICO claims against RICO Defendants.

J.  An award to Plaintiffs for the amount of damages as proven at trial;

K.  A judgment in favor of Plaintiffs and against Defendants on Plaintiffs' claims under Cal. Bus. & Prof. Code Section 17200, including for restitution as applicable;

L.  A permanent injunction, pursuant to Cal. Bus. and Prof. Code. § 17203, enjoining Defendants from any further act of unfair competition;

M.  A judgment in favor of Plaintiffs and against Defendants on Plaintiffs' claim for civil conspiracy, and an award of damages, including punitive damages as applicable.

N.      A judgment in favor of Plaintiffs and against Defendants on Plaintiffs' claim for intentional interference with prospective economic advantage, and an award of damages, including punitive damages as applicable.

O.      A declaration that Defendants have come to and proceeded in this litigation with unclean hands;

P.      A declaration that the Patents-In-Suit are unenforceable; and

Q.      Such other and further relief as this Court may deem just and proper.

## **JURY DEMAND**

In accordance with Rule 38 of the Federal Rules of Civil Procedure and Rule 38.1 of the Local Rules of Civil Practice and Procedure of the United States District Court for the Northern District of Illinois, Plaintiffs respectfully demand a jury trial of all issues triable to a jury in this action.

Dated: October 1, 2012        Respectfully submitted,

*/s/ Gianni Cutri*

Steven Cherny *(Pro Hac Vice)*
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022
(212) 446-4800 (Telephone)
steven.cherny@kirkland.com

Gianni Cutri (#6272109)
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, Illinois 60654
312.862.2000 (Telephone)
312.862.2200 (Facsimile)
gcutri@kirkland.com

Adam R. Alper *(Pro Hac Vice)*
KIRKLAND & ELLIS LLP
555 California Street
San Francisco, CA 94104
415.439.1400 (Telephone)
415.439.1500 (Facsimile)
adam.alper@kirkland.com

Michael W. De Vries (*Pro Hac Vice*)
KIRKLAND & ELLIS LLP
333 South Hope Street
Los Angeles, California 90071
213.680.8400 (Telephone)
michael.devries@kirkland.com

***Attorney for Plaintiffs:***
*Cisco Systems, Inc. (Pre-Consolidation Dist. Del. Case No. 1:11-cv-00425-LPS transferred as N.D. Ill. Case No. 1:11-cv-09309)*

*Motorola Solutions, Inc. (Pre-Consolidation Dist. Del. Case No. 1:11-cv-00425-LPS transferred as N.D. Ill. Case No. 1:11-cv-09309)*

79

*Netgear Inc. (Pre-Consolidation Dist. Del. Case
No. 1:11-cv-01139-LPS transferred as N.D. Ill.
Case No. 1:12-cv-00427)*

## CERTIFICATE OF SERVICE

I hereby certify that on October 1, 2012 a true and correct copy of the foregoing document, **PLAINTIFFS' AMENDED COMPLAINT**, was electronically filed with the Court via the CM/ECF system which sent notification of such filing to all Counsel of Record. Copies of documents required to be served by Fed.R.Civ.P. 5(a) have been served.


Dated:     **October 1, 2012**

/s/ *Gianni Cutri*
Gianni Cutri (#6272109)
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, Illinois 60654
312.862.2000 (Telephone)
312.862.2200 (Facsimile)
gcutri@kirkland.com

# Exhibit 2

# CONTRACTUAL GOOD FAITH

## Formation, Performance, Breach, Enforcement

**STEVEN J. BURTON**
**ERIC G. ANDERSEN**



CONTRACTUAL
GOOD FAITH

BURTON
ANDERSEN

KF
801
.B87
1995

LIBRARY OF THE

OCT 3 0 1996

U.S. COURTS

# CONTRACTUAL
# GOOD FAITH

801
· B87
1995

# CONTRACTUAL
## GOOD FAITH

*Formation, Performance,*
*Breach, Enforcement*

STEVEN J. BURTON
*William G. Hammond Professor of Law*
*The University of Iowa*

ERIC G. ANDERSEN
*Professor of Law*
*The University of Iowa*



LITTLE, BROWN AND COMPANY
BOSTON   NEW YORK   TORONTO   LONDON

Copyright © 1995 by Steven J. Burton
and Eric G. Andersen

All rights reserved. No part of this book may be reproduced
in any form or by any electronic or mechanical means in-
cluding information storage and retrieval systems without
permission in writing from the publisher, except by a re-
viewer who may quote brief passages in a review.

Library of Congress Catalog Card No. 94-74417

ISBN 0-316-11492-8

EB-M

*Published simultaneously in Canada
by Little, Brown & Company (Canada) Limited*

**Printed in the United States of America**

*For Serena, my best friend, favorite colleague, and beloved wife.*

S.J.B.

*For Catherine, whose love never fails, and whose faith is much better than good.*

E.G.A.

# Summary of Contents

| Contents | | *ix* |
| Preface | | *xxi* |

| Chapter 1 | Overview: The World of a Contract | 1 |
| Chapter 2 | History and Theory of Good Faith Performance at Common Law | 19 |
| Chapter 3 | Distinguishing Good and Bad Faith Performance | 61 |
| Chapter 4 | Special Problems of Good Faith Performance in Commercial Contracts | 113 |
| Chapter 5 | History and Theory of Good Faith Enforcement | 163 |
| Chapter 6 | Material Breach: Enforcement by Cancellation | 197 |
| Chapter 7 | Enforcement Terms | 269 |
| Chapter 8 | Good Faith in Contract Formation | 327 |
| Chapter 9 | The Future of Good Faith | 391 |

| Table of Cases | *419* |
| Table of Citations to Uniform Commercial Code | *453* |
| Table of Citations to Restatements | *455* |
| Index | *457* |

# CONTENTS

*Preface*                                                          *xxi*

CHAPTER

1

## OVERVIEW: THE WORLD OF A CONTRACT                               1

§1.1   Introduction                                                2
§1.2   Executive Summary                                           4
       §1.2.1   Good Faith in Performance                          4
       §1.2.2   Good Faith in Enforcement                          5
                §1.2.2.1   Material Breach and
                           Cancellation                           6
                §1.2.2.2   Enforcement Terms                      8
       §1.2.3   Good Faith in Contract Formation                 10
§1.3   Glossary of Basic Concepts                                11
       §1.3.1   Promises                                         11
       §1.3.2   Agreements                                       12
       §1.3.3   The Intention of the Parties                     12

CONTENTS

§1.3.4   The Parties' Reasonable Expectations          13
§1.3.5   Contractual Interests                         13
§1.3.6   Contract Rights, Duties, and Powers           14
§1.3.7   Reasons for Action                            15
§1.3.8   Interpretation                                16
§1.4   Roadmap                                         17

CHAPTER

$\boxed{2}$

HISTORY AND THEORY OF
GOOD FAITH PERFORMANCE AT
COMMON LAW                                            19

§2.1   Introduction                                   20
§2.2   History of Good Faith Performance at Common
       Law                                            21
       §2.2.1   Origins of Good Faith in Performance   23
                §2.2.1.1   Satisfaction Clauses        23
                §2.2.1.2   Output and Requirements
                           Contracts                   25
                §2.2.1.3   Other Early Cases           27
       §2.2.2   Two Famous Cases                       29
                §2.2.2.1   *Wood v. Lucy, Lady Duff-
                           Gordon*                     30
                §2.2.2.2   *Kirke La Shelle Co. v. Paul
                           Armstrong Co.*              32
       §2.2.3   Synthesis of Succeeding Cases          34
                §2.2.3.1   Advent of the Uniform
                           Commercial Code             34
                §2.2.3.2   Excluder Analysis           36
                §2.2.3.3   Paying the Costs of
                           Contracting                 38
§2.3   A Theory of Good Faith Performance              40
       §2.3.1   Breach of Contract and Reasons for
                Acting                                 41
       §2.3.2   Breach by Failing to Perform in Good
                Faith                                  44

CONTENTS

| | §2.3.2.1 | Discretion in Perfomance | 45 |
|---|---|---|---|
| | §2.3.2.2 | Reasons for Exercising Discretion | 51 |
| §2.3.3 | Good Faith and Bad Faith Distinguished | | 52 |
| §2.3.4 | Doctrinal Justifications | | 57 |

[3]

## DISTINGUISHING GOOD AND BAD FAITH PERFORMANCE                    61

| §3.1 | Introduction | | 62 |
|---|---|---|---|
| §3.2 | Good Faith and Express Contract Terms | | 62 |
| | §3.2.1 | Priority of Express Terms | 63 |
| | §3.2.2 | Interpretation of Express Terms | 65 |
| | §3.2.3 | Independent Cause of Action | 68 |
| | §3.2.4 | Waiver and Estoppel | 69 |
| | §3.2.5 | Disclaimers of Good Faith | 72 |
| §3.3 | Subjective and Objective Standards | | 74 |
| | §3.3.1 | Subjective Standards: Wrongful Motives | 75 |
| | §3.3.2 | Subjective Standards: Dishonesty | 78 |
| | §3.3.3 | Subjective Standards: Intentional Action on Impermissible Reasons | 80 |
| | §3.3.4 | Subjective v. Objective Standards | 82 |
| | §3.3.5 | Objective Standards: Contractual Reasonableness | 85 |
| | §3.3.6 | Objective Standards: Justified Expectations | 89 |
| | §3.3.7 | Summary | 89 |
| §3.4 | Illustrative Cases | | 90 |
| | §3.4.1 | Example: Employment Terminable "At Will" | 91 |
| | §3.4.2 | Other Examples | 95 |
| | | §3.4.2.1 Discretion as to Quantity | 95 |
| | | §3.4.2.2 Discretion as to Quality | 97 |
| | | §3.4.2.3 Discretion as to Price | 100 |
| | | §3.4.2.4 Discretion as to Time | 103 |

|  | §3.4.2.5 | Discretionary Control of a Condition | 104 |
| §3.5 | Causation | | 106 |
| §3.6 | Burdens of Proof | | 107 |
| §3.7 | Instructing a Jury: Mixed Reasons | | 108 |
| §3.8 | Remedies for Breach by Failing to Perform in Good Faith | | 111 |

CHAPTER

| 4 |

# SPECIAL PROBLEMS OF GOOD FAITH PERFORMANCE IN COMMERCIAL CONTRACTS

| | | | 113 |
| --- | --- | --- | --- |
| §4.1 | Introduction: Good Faith Performance in the U.C.C. | | 114 |
| §4.2 | Scope | | 115 |
| | §4.2.1 | Performance and Enforcement in the U.C.C. | 115 |
| | §4.2.2 | Other Functions of Good Faith in the U.C.C. | 117 |
| §4.3 | General Issues | | 119 |
| | §4.3.1 | U.C.C. Cause of Action for Bad Faith Performance | 120 |
| | §4.3.2 | U.C.C. Definitions of "Good Faith" | 122 |
| | §4.3.3 | Implicit Theory of Good Faith Performance Under the U.C.C. | 126 |
| | §4.3.4 | Priority of Express Terms | 130 |
| §4.4 | Good and Bad Faith Performance Distinguished | | 134 |
| | §4.4.1 | Requirements and Output Contracts Under the U.C.C. | 134 |
| | §4.4.2 | Open Price Contracts | 138 |
| | §4.4.3 | Franchise, Dealership, and Distributorship | 141 |
| | | §4.4.3.1 Termination | 142 |
| | | §4.4.3.2 Performance | 147 |
| | §4.4.4 | Lender and Borrower | 149 |

CONTENTS

| | | |
|---|---|---:|
| §4.4.4.1 | Contractual Obligations | 150 |
| §4.4.4.2 | Express Terms Again | 155 |
| §4.4.4.3 | Refusals to Lend | 159 |

CHAPTER

5

# HISTORY AND THEORY OF GOOD FAITH ENFORCEMENT · 163

| | | | |
|---|---|---|---:|
| §5.1 | Introduction | | 164 |
| §5.2 | The Meaning of Contract Enforcement | | 166 |
| | §5.2.1 | Conventional Understanding of Contract Enforcement | 166 |
| | §5.2.2 | A Broader Perspective on Contract Enforcement | 167 |
| | §5.2.3 | Cancellation and Express Enforcement Terms as Means of Contract Enforcement | 170 |
| | | §5.2.3.1 Cancellation | 170 |
| | | §5.2.3.2 Enforcement Terms | 171 |
| §5.3 | Principles of Contract Enforcement | | 172 |
| | §5.3.1 | Protecting the Injured Party's Interest in Performance | 173 |
| | §5.3.2 | Eliminating Needless Costs for the Party in Breach | 175 |
| | §5.3.3 | The Principles of Enforcement and Contractual Good Faith | 177 |
| §5.4 | Background to the Material Breach Doctrine | | 178 |
| | §5.4.1 | Background | 179 |
| | §5.4.2 | Prevailing Treatments of the Material Breach Doctrine | 181 |
| | | §5.4.2.1 The Restatements of Contract | 182 |
| | | §5.4.2.2 The Restatements in the Courts | 183 |
| | | §5.4.2.3 Materiality by Judicial Fiat or as a Question of Fact | 186 |
| | | §5.4.2.4 The "Essence of the Contract" Test | 187 |

§5.4.3   Costs of Confusion About Material
         Breach                                        189
§5.5   Background to Enforcement Terms                 190
       §5.5.1   Mistake, Impracticability, and Frustration
                of Purpose                             190
       §5.5.2   Waiver                                 191
       §5.5.3   Equitable Discretion                   192
       §5.5.4   Excuse of Conditions to Avoid Forfeiture   194
       §5.5.5   Enforcement Terms as a Legal Category  195

CHAPTER

$\boxed{6}$

# MATERIAL BREACH: ENFORCEMENT BY CANCELLATION                                        197

§6.1   Introduction                                    198
§6.2   Cancellation and the Interest in Future
       Performance                                     201
       §6.2.1   Interests Impaired When a Contract Is
                Breached                                201
                §6.2.1.1   Interest in Present
                           Performance                 201
                §6.2.1.2   Interest in Future
                           Performance                 202
       §6.2.2   Illustrations of Interests in Present and
                Future Performance                     204
       §6.2.3   Protecting the Interest in Future
                Performance                            207
§6.3   Material Breach: A Threat to the Interest in
       Future Performance                              210
       §6.3.1   Preperformance Threats: Anticipatory
                Repudiation                            211
       §6.3.2   Threats Arising from Nonperformance    212
                §6.3.2.1   In General                  212

|  |  | §6.3.2.2 | Unwillingness | 215 |
|  |  | §6.3.2.3 | Prevention of Performance | 220 |
|  |  | §6.3.2.4 | Inability | 222 |
|  | §6.3.3 | Post-Threat Events: Cure by the Party in Breach | | 225 |
| §6.4 | The Reality and Seriousness of the Threat | | | 227 |
|  | §6.4.1 | Reality of the Threat: Disappearance of the Interest in Future Performance | | 228 |
|  |  | §6.4.1.1 | When the Interest in Future Performance Has Expired | 228 |
|  |  | §6.4.1.2 | The Absence of Further Opportunities for Breach | 231 |
|  | §6.4.2 | Seriousness of the Threat | | 233 |
|  |  | §6.4.2.1 | The Seriousness Issue | 233 |
|  |  | §6.4.2.2 | Finding the Threshold of Seriousness | 236 |
|  |  | §6.4.2.3 | Relevance of the Costs of Cancellation for the Party in Breach | 241 |
|  |  | §6.4.2.4 | Bad Faith by the Victim | 245 |
|  | §6.4.3 | A Victim's Mitigation Opportunities | | 248 |
| §6.5 | Monetary Consequences of Material Breach | | | 251 |
|  | §6.5.1 | Introduction | | 251 |
|  | §6.5.2 | Expectation-Based Entitlements for Both Parties | | 253 |
|  |  | §6.5.2.1 | Restitution for the Party in Breach | 253 |
|  |  | §6.5.2.2 | An Expectation-Based Entitlement for the Party in Breach | 256 |
|  | §6.5.3 | Damages in Excess of Expectation | | 259 |
| §6.6 | Consequences of a Breach That Is Not Material | | | 261 |
|  | §6.6.1 | Introduction | | 261 |
|  | §6.6.2 | Victim's Right of Setoff | | 262 |
|  |  | §6.6.2.1 | When the Interest in Future Performance Has Expired | 263 |
|  |  | §6.6.2.2 | "Midstream" Breaches | 264 |
|  |  | §6.6.2.3 | Practical Application | 267 |

CHAPTER

$\boxed{7}$

ENFORCEMENT TERMS                                269

§7.1   Introduction                                                    270
§7.2   Contractual Good Faith Principles as Applied to
       Enforcement Terms                                               271
       §7.2.1   Illustrative Case                                      272
       §7.2.2   Contractual Good Faith and Enforcement
                Terms                                                  274
                §7.2.2.1   Enforcement Terms: In the
                           Service of the Performance Interest         274
                §7.2.2.2   The Consequences of Bad Faith
                           in Enforcement                              276
       §7.2.3   Principal Issues Connected with the Use
                of Enforcement Terms                                   277
                §7.2.3.1   Distinguishing Enforcement
                           Terms from Performance
                           Terms                                       277
                §7.2.3.2   Identifying the Relevant
                           Performance Interest                        281
                §7.2.3.3   Will an Enforcement Term
                           Advance the Intended
                           Performance Interest?                       284
                §7.2.3.4   Would Invoking an
                           Enforcement Term Impose
                           Needless Costs?                             285
       §7.2.4   Other Enforcement Term Issues                          288
                §7.2.4.1   Good Faith in Enforcement and
                           Subjective Motive                           289
                §7.2.4.2   Good Faith Presumed                         290
§7.3   Examples of Enforcement Terms                                   292
       §7.3.1   Acceleration Clauses                                   293
                §7.3.1.1   When Acceleration Advances
                           the Wrong Interest                          293
                §7.3.1.2   Identifying the Performance
                           Interest to Be Protected                    300

CONTENTS

§7.3.1.3   Acceleration and Foreclosure
at Excessive Cost to Obligor        303
§7.3.2   Termination Clauses                         305
§7.3.2.1   Performance Versus
Enforcement                      306
§7.3.2.2   Protecting the Appropriate
Performance Interest             307
§7.3.3   Liquidated Damages Clauses                  312
§7.3.3.1   Liquidated Damages Versus
Alternative Performance          312
§7.3.3.2   Liquidated Damages Versus
Penalties                        315
§7.3.4   Other Enforcement Terms                     318
§7.3.4.1   Enhanced Benefit Terms in
Insurance Policies               318
§7.3.4.2   Release of Mortgagee's Lien      319
§7.3.4.3   Misuse of Right of Assignment    320
§7.3.4.4   Third-Party Approval of
Construction Work                321
§7.3.4.5   Terms Requiring Notice of
Claim or Breach                  323

CHAPTER

| 8 |

## GOOD FAITH IN CONTRACT FORMATION                327

§8.1   Introduction                                      328
§8.2   Duties in Contract Negotiation                    329
§8.2.1   A General Duty to Negotiate in Good
Faith?                                     330
§8.2.2   Noncontractual Duties in Negotiations     332
§8.2.3   Contractual Duties in Negotiations        334
§8.3   Noncontractual Good Faith                         335
§8.3.1   Wrongful Formation of a Contract          335
§8.3.1.1   Meaning of "Avoidance"           336

| | | | |
|---|---|---|---|
| | §8.3.1.2 | Coercive Behavior | 337 |
| | §8.3.1.3 | Misleading Behavior: Fraud and Misrepresentation | 339 |
| §8.3.2 | Wrongful Prevention of a Contract | | 341 |
| | §8.3.2.1 | Unjust Enrichment | 342 |
| | §8.3.2.2 | Promissory Estoppel | 343 |
| | §8.3.2.3 | Misrepresentation | 345 |
| §8.4 | Preliminary Agreements | | 347 |
| §8.4.1 | Characteristics of Preliminary Agreements | | 348 |
| | §8.4.1.1 | Meaning of "Preliminary" | 348 |
| | §8.4.1.2 | Duty to Negotiate | 349 |
| | §8.4.1.3 | Procedural Rules for Negotiations | 350 |
| | §8.4.1.4 | Final Contract Terms | 351 |
| §8.4.2 | Enforceability and Damages for Breach | | 353 |
| | §8.4.2.1 | Intent to Be Bound | 353 |
| | §8.4.2.2 | Definiteness | 358 |
| | §8.4.2.3 | Measure of Damages | 362 |
| §8.5 | Good Faith Performance and Preliminary Agreements | | 366 |
| §8.5.1 | Elements of Good Faith Performance | | 367 |
| §8.5.2 | Disallowing Dissatisfaction with Closed Terms | | 369 |
| | §8.5.2.1 | Duty to Negotiate Is Stated Expressly | 371 |
| | §8.5.2.2 | Duty to Negotiate Is Implied | 373 |
| | §8.5.2.3 | A Closed Term Is Implied | 377 |
| §8.5.3 | Unreasonableness as to Open Terms | | 379 |
| | §8.5.3.1 | Express Limitations on Discretion | 380 |
| | §8.5.3.2 | Implied Limitations on Discretion | 381 |
| §8.5.4 | Obligations to Revise or Renew Existing Terms | | 383 |
| | §8.5.4.1 | Options to Revise or Renew | 385 |
| | §8.5.4.2 | Interpretation of Revision and Renewal Clauses | 386 |

CONTENTS

CHAPTER

| 9 |

THE FUTURE OF GOOD FAITH          391

§9.1   Introduction                                              391
§9.2   Insurance Contracts and Tortious Breach                   393
       §9.2.1   Insurer's Bad Faith in California                394
       §9.2.2   Justifications for Insurer's Special
                Liabilities                                      397
       §9.2.3   Tortious Breach of Contract                      400
                §9.2.3.1   Expansion of Tortious Breach
                           of Contract                           400
                §9.2.3.2   Contraction of Tortious Breach
                           of Contract                           403
§9.3   Contractual Morality                                      405
       §9.3.1   Good Faith as an "Excluder"                      406
       §9.3.2   Relational Contract Theory                       408
§9.4   Efficiency and Opportunism                                414


*Table of Cases*                                                 419
*Table of Citations to Uniform Commercial Code*                  453
*Table of Citations to Restatements*                             455
*Index*                                                          457

CHAPTER

$$2$$

# HISTORY AND THEORY OF GOOD FAITH PERFORMANCE AT COMMON LAW

§2.1   Introduction
§2.2   History of Good Faith Performance at Common Law
    §2.2.1   Origins of Good Faith in Performance
        §2.2.1.1   Satisfaction Clauses
        §2.2.1.2   Output and Requirements Contracts
        §2.2.1.3   Other Early Cases
    §2.2.2   Two Famous Cases
        §2.2.2.1   Wood v. Lucy, Lady Duff-Gordon
        §2.2.2.2   Kirke La Shelle Co. v. Paul
                 Armstrong Co.
    §2.2.3   Syntheses of Succeeding Cases
        §2.2.3.1   Advent of the Uniform Commercial
                 Code
        §2.2.3.2   Excluder Analysis
        §2.2.3.3   Paying the Costs of Contracting
§2.3   A Theory of Good Faith Performance
    §2.3.1   Breach of Contract and Reasons for Acting
    §2.3.2   Breach by Failing to Perform in Good Faith
        §2.3.2.1   Discretion in Performance
        §2.3.2.2   Reasons for Exercising Discretion
    §2.3.3   Good Faith and Bad Faith Distinguished
    §2.3.4   Justifications

## §2.1  INTRODUCTION

This chapter is about an important means of establishing a breach of contract: proving a failure to satisfy the obligation to *perform* a contract in good faith. The Restatement (Second) of Contracts provides:

> Every contract imposes upon each party a duty of good faith and fair dealing in its performance and enforcement.[1]

A strong majority of U.S. jurisdictions explicitly recognizes this common law duty in contract performance, often in terms of an "implied covenant of good faith and fair dealing."[2] Courts often say that "neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract."[3] They also say that every contract includes a duty for each party "to do everything that the contract presupposes he will do to accomplish its purpose."[4] These and other doctrinal formulations emphasize different aspects of the general obligation to perform in good faith. The general obligation provides the ground for implying specific duties in various contracts.

The good faith performance doctrine is a relative newcomer to the common law. It has burgeoned in importance in recent decades; it now seems hardly a complaint is filed stating a claim in contract without including an allegation of bad faith. Most of these claims are rejected by the courts, most often for good reason. Enough of them succeed to make it crucial for lawyers to grasp the shape of current judicial practice.

We now can see that some lines of development that seemed important only a few years ago are dead ends. In particular, case law treating the implied covenant of good faith and fair dealing as a

---

§2.1   [1]Restatement (Second) of Contracts §205 (1979). The counterpart obligation in the Uniform Commercial Code is discussed in Chapter 4.

[2]*E.g.*, Kirke La Shelle Co. v. Paul Armstrong Co., 263 N.Y. 79, 87, 188 N.E. 163, 167 (1933).

[3]*Id.* at 87, 188 N.E. at 167.

[4]Steinmeyer v. Warner Consol. Corp., 42 Cal. App. 3d 515, 519, 116 Cal. Rptr. 57, 60 (1974) (quoting Harm v. Frasher, 181 Cal. App. 2d 405, 417, 5 Cal. Rptr. 367, 374 (1960)). *See also* Sessions, Inc. v. Morton, 491 F.2d 854, 857 (9th Cir. 1974).

basis for claims of tortious breach of contract, allowing damages for emotional distress and even punitive recoveries, now seems much less important.[5] Similarly, early scholarly commentary treating good faith performance as a post-formation counterpart to the unconscionability doctrine, allowing courts to impose obligations of "contractual moral-ity" or "altruism" on the parties irrespective of their agreement, has not gained general favor with the courts.[6] The now-considerable case law has taken on a distinctly free market orientation, regularly constru-ing good faith to protect and serve the parties' justified expectations arising from their agreement.

This chapter will give a brief history of the good faith performance doctrine (§2.2) and a theory of its proper use according to currently prevailing judicial practice (§2.3). Chapter 3 will turn to practical considerations arising at common law. Chapter 4 will look at special problems of good faith in commercial contracts. On its face, "good faith" is a vague concept that lends itself to a wide variety of interpreta-tions. Unorthodox uses of good faith, including those involving tort remedies, imposed contractual morality, and fiduciary duties, will be considered in Chapter 9.

## §2.2   HISTORY OF GOOD FAITH PERFORMANCE AT COMMON LAW

The obligation to perform a contract in good faith emerged at the turn of the twentieth century in scattered cases, mostly in New York. It first gained notoriety as a general principle of contract law after the New York Court of Appeals' opinion in *Kirke La Shelle* Co. *v. Paul Armstrong* Co.[1] Outside of New York, however, few jurisdictions devel-oped much law on the matter until after mid-century. The first major law review articles, by Professors E. Allan Farnsworth and Robert S. Summers, appeared in 1963 and 1968, respectively.[2] By 1980, it could

[5] *See* §9.2.
[6] *See* §9.3.
**§2.2**   [1] 263 N.Y. 79, 87, 188 N.E. 163, 167 (1933).
[2] E. Allan Farnsworth, Good Faith Performance and Commercial Reasonableness Under the Uniform Commercial Code, 30 U. Chi. L. Rev. 666 (1963); Robert S.

be said that "[a] majority of American jurisdictions, the *Restatement (Second) of Contracts*, and the Uniform Commercial Code (U.C.C.) now recognize the obligation to perform a contract in good faith as a general principle of contract law."[3] The doctrine has only gained in importance since then. In all the years before 1980, there were perhaps 350 reported cases interpreting the obligation to perform a contract in good faith. In the dozen years following 1980, there were another 600 or more.

Many scholars characterize contract law at the turn of the century as both formalistic and laissez-faire.[4] By "formalistic," they mean that the courts then would interpret contracts according to the literal meaning of the words in a writing, completely setting aside common-sense interpretations or implications arising from the factual context in which the agreement was concluded. By "laissez-faire," they mean that, whenever possible, the courts would leave the parties free to reach whatever agreements they would, even when the courts thereby left room for imposition or sharp dealing.

These generalizations are obviously true in relation to the jurisprudence of the U.S. Supreme Court, epitomized by the decision in *Lochner v. New York*.[5] The Court in that case held unconstitutional a state statute limiting the working hours of bakery workers in New York:

> It seems to us that the real object and purpose were simply to regulate the hours of labor between the master and his employees . . . in a private business. . . . Under such circumstances the freedom of master and employee to contract with each other in relation to their employment, and in defining the same, cannot be prohibited or interfered with, without violating the Federal Constitution.[6]

It is less clear that this extreme view of freedom of contract characterized the common law even as it animated the Supreme Court's *Lochner* era.[7] The first great contracts treatise-writer, Samuel Williston, was

---

Summers, "Good Faith" in General Contract Law and the Sales Provisions of the Uniform Commercial Code, 54 Va. L. Rev. 195 (1968).

[3] Steven J. Burton, Breach of Contract and the Common Law Duty to Perform in Good Faith, 94 Harv. L. Rev. 369, app. (1980).

[4] *E.g.*, Grant Gilmore, The Death of Contract (1974).

[5] 198 U.S. 45 (1905).

[6] *Id.* at 64.

[7] *See* Friedrich Kessler, Introduction: Contract as a Principle of Order, in Friedrich

strongly critical of it.[8] A number of common law contract cases from the "*Lochner* era" introduced requirements of good faith in ways that contrast with the Supreme Court's practice of the day.

## §2.2.1   Origins of Good Faith in Performance

The earliest cases to introduce explicitly a good faith requirement involved contractual conditions that a recipient of goods or services be "satisfied" with the quality of the other party's performance (§2.2.1.1).[9] Other early cases involved output and requirements contracts, in which the quantity of goods to be delivered under the contract is left to vary with the output of the seller or the requirements of the buyer (§2.2.1.2). Before 1920, significant case law implied a covenant of good faith in a variety of contracts and found in breach a party who controlled aspects of his own performance obligation (§2.2.1.3). These early cases provide a good introduction to the contemporary doctrine even while they offer no useful theories or tests for distinguishing good from bad faith performance of a contract.

### §2.2.1.1   Satisfaction Clauses

In an 1885 case,[10] a contract for the sale and installation of an unusual hydraulic hoist in the defendant's building included a warranty that the hoist should be "satisfactory in every respect." When the hoist was substantially completed, the buyer took it down and

---

Kessler et al., Contracts 1 (3d ed. 1986); Walker F. Pratt, American Contract Law at the Turn of the Century, 39 S.C. L. Rev. 415 (1988); A.W.B. Simpson, The Horwitz Thesis and the History of Contracts, 46 U. Chi. L. Rev. 533 (1979). On the current status of the constitutional issues, see G. Richard Shell, Contracts in the Modern Supreme Court, 81 Cal. L. Rev. 433 (1993).

[8] Samuel Williston, Freedom of Contract, 6 Cornell L.Q. 365 (1921). *See also* Roscoe Pound, Liberty of Contract, 18 Yale L.J. 454 (1909).

[9] Earlier services cases required good faith of a third party, such as an architect or engineer, whose approval of work was a condition to the owner's duty to pay. E.g., Bowery Natl. Bank v. Mayor, 63 N.Y. 336 (1875). Bad faith in that context primarily would involve dishonesty due to collusion between the third party and the party whose duty to pay was conditioned. It is not a matter of nonperformance of a contract giving rise to the breach claimed by the provider of services.

[10] Singerly v. Thayer, 108 Pa. 291, 2 A. 230 (1885).

called the seller to remove it, claiming it was not satisfactory to him. In an action for the price by the seller, the Supreme Court of Pennsylvania reversed a lower court judgment for the seller. The lower court had ruled that the seller could recover the price if the hoist was built and installed in a workmanlike manner. The higher court held that the buyer only need be dissatisfied in good faith and not capriciously in order to reject the hoist rightfully. There was evidence showing that the hoist would drop three floors and then descend slowly in fits and starts. This was enough to establish the buyer's good faith.

In *Baltimore & Ohio Railway Co. v. Brydon*,[11] decided in 1886, a railroad contracted to purchase coal "of such quality as should be satisfactory to the railroad's master of transportation and master of machinery." There was conflicting evidence regarding the quality of the coal rejected by the railroad. The Maryland Supreme Court held that the question of good faith was properly submitted to the jury, whose verdict was not disturbed. The court stated that the satisfaction clause in the contract did not give the buyer a "capricious or arbitrary" discretion to reject the coal. Rather, their decision to reject the coal would be final so long as they made it in "good faith."[12] And in *Doll v. Noble*,[13] decided in 1889, a contract for finishing the woodwork in a home was to be done "to the entire satisfaction of [the owner]." In an action by the woodworker for the balance due on the contract, the jury was instructed that the plaintiff would be entitled to recover if the work was done in the best workmanlike manner and that "the defendant could not defeat such recovery by unreasonably and in bad faith saying the work was not done to his satisfaction."[14] The New York Court of Appeals approved that instruction.

These early satisfaction clause cases are not very informative as indicators of the future shape of the good faith performance doctrine. Significantly, they do recognize implied requirements of good faith when the express contract says no such thing. They do not, however, provide any examples of bad faith to give concrete meaning to the new legal doctrine.

[11] 65 Md. 198, 215, 3 A. 306, 309 (1886).
[12] *Id.* at 202, 3 A.2d at 309.
[13] 116 N.Y. 230, 231, 22 N.E. 406, 406 (1889).
[14] *Id.* at 231, 22 N.E. at 406.

## §2.2.1.2   Output and Requirements Contracts

Requirements contracts allow the quantity of goods to be delivered under the contract to vary with the requirements of the buyer in the operation of its business. This kind of contract leaves the buyer in effective control of its own obligation of performance, much as a buyer has control of its own obligation in a contract with a satisfaction clause. Under the right circumstances, the buyer may have an economic incentive to manipulate its apparent requirements. Since late in the nineteenth century, bad faith fiddling with the quantity required has been held to be a breach of contract.

In *Loudenback Fertilizer Co. v. Tennessee Phosphate Co.*,[15] for example, a buyer contracted to take its entire phosphate rock requirements from a seller for five years at a fixed price. The buyer manufactured acid phosphate with the rock and sold the product as fertilizer. For more than a year during the term, while the market price was below the contract price, the buyer ordered no rock, but purchased acid phosphate from other manufacturers because, the buyer testified, this was more profitable. When the market price of rock rose, the buyer ordered the maximum contract quantity of rock from the seller. The seller did not deliver. In an action by the buyer, the U.S. Court of Appeals for the Sixth Circuit refused to interpret the contract to allow the buyer "discretion" to change its business practices by substituting purchased acid phosphate for its own make whenever that was temporarily advantageous.[16] The parties had agreed to vary the quantity with changes in the market for the buyer's product and, by fixing a price, to isolate themselves from changes in the raw materials market. By purchasing acid phosphate from others, in substitution for that of its own manufacture, in a falling raw materials market, the buyer exercised its discretion for a speculative purpose not reasonably contemplated by the parties.[17] It materially breached the contract by acquiring rock from others at less than the contract price, thereby performing in bad faith and relieving the seller of its obligation to deliver.

---

[15] 121 F. 298 (6th Cir. 1903). *See also* Brawley v. United States, 96 U.S. 168 (1877).
[16] 121 F. at 302-303.
[17] *See also* Asahel Wheeler Co. v. Mendleson, 180 A.D. 9, 12, 167 N.Y.S. 435, 437 (1917); New York Cent. Ironworks Co. v. United States Radiator Co., 174 N.Y. 331, 335-336, 66 N.E. 967, 968 (1903) (dictum).

The converse of a requirements contract is an output contract, in which the contract allows the quantity of goods to be delivered under the contract to vary with the output of the seller in the operation of its business. Courts in the early twentieth century enforced such contracts subject to an implied covenant that the seller's output would occur in good faith. In *Wigand v. Bachmann-Bechtel Brewing Co.*,[18] the contract required the seller to sell to the plaintiff "all of the wet brewery grains produced from the brewing at its brewery and to continue so to do for a period of five years . . . ."[19] No problems occurred for almost two years. The seller then discontinued the operation of its brewery and sold its entire beer trade, business, and some property (other than its real property) to another brewing company and covenanted not to operate its brewery for two years. The buyer brought an action to recover damages sustained by the seller's nondelivery of wet grains. The New York Court of Appeals ruled that "[e]very contract implies good faith and fair dealing between the parties to it,"[20] citing the cases discussed in §2.2.1.2. It held specifically that the express promise quoted above gave rise to an inference that the seller covenanted to continue brewing beer without a voluntary and an intentional discontinuance of the business. Discontinuing brewing operations was a breach of contract.

The result in *Wigand* might not be reached today by a court under the Uniform Commercial Code.[21] Nonetheless, the early output and requirements contract cases were among the first to imply a covenant of good faith performance, rendering bad faith in performance a breach of contract. They also indicate, better than the satisfaction clause cases, the shape that the doctrine would take when fully developed. In particular, the courts focused on the limits on the seller's discretion over the quantity in an output contract and the buyer's similar discretion in a requirements contract. This is much like the buyer's discretion over the quality term in a contract with a satisfaction clause — the express terms of the contract left a party control over the extent of

---

[18] 222 N.Y. 272, 118 N.E. 618 (1918). *See also* Genet v. President of Del. & H. Canal Co., 136 N.Y. 593, 32 N.E. 1078 (1893).

[19] 222 N.Y. at 276, 118 N.E. at 619.

[20] *Id.* at 277, 118 N.E. at 619.

[21] *See* Neofotistos v. Harvard Brewing Co., 341 Mass. 684, 171 N.E.2d 865 (1961); Feld v. Henry S. Levy & Sons, Inc., 37 N.Y.2d 466, 335 N.E.2d 320, 373 N.Y.S.2d 102 (1975); U.C.C. §2-306 cmt. 2; §4.4.1.

its own obligation of performance. In the early quantity cases, the good faith limitation was employed to hold in breach a party who used its contractual discretion opportunistically — to speculate on the contract or to escape a bad bargain — even when no formal contract terms ruled out the specific act constituting the breach. As the New York Court of Appeals put it in a requirements contract case in 1903:

> The obligation of good faith and fair dealing towards each other is implied in every contract of this character. The plaintiff could not use the contract for the purpose of speculation in a rising market, since that would be a plain abuse of the rights conferred.[22]

### §2.2.1.3   Other Early Cases

Other cases illustrate the range of application of the early good faith performance doctrine in New York, anticipating the sweeping character of the modern doctrine. A then-novel approach to interpretation was taken by the New York Court of Appeals in 1905 in *Industrial & General Trust v. Tod*.[23] The bondholders of an insolvent railway company, pending an action to foreclose the mortgage, had entered into a reorganization agreement creating a reorganization committee having legal and equitable title to the bonds and authority to reorganize the company. The committee was required to adopt a plan of reorganization and report it to the bondholders so that any of them might withdraw if the plan were not satisfactory, recovering bonds deposited with the committee. The contract expressly provided that the committee could construe the agreement and that its construction would be final. In fact, the committee sold the property under foreclosure, reorganized the railway, and used the bonds before preparing a plan and submitting it to the bondholders. The court held this a breach of contract. "If one party to a contract has the unrestrained power to say what it means," the court wrote, "the other has no rights except by sufferance. No one can be made by contract the final judge of his own acts, for the law writes 'good faith' into such agreements."[24] In this case, the

[22] New York Cent. Ironworks Co. v. United States Radiator Co., 174 N.Y. 331, 334, 66 N.E. 967, 968 (1903).
[23] 180 N.Y. 215, 73 N.E. 7 (1905). *See also* Hilleary v. Skookum Root Hair-Grower Co., 4 Misc. 127, 23 N.Y.S. 1016 (C.P. 1893).
[24] 180 N.Y. at 225, 73 N.E. at 9.

sole object of the agreement was to provide a plan of reorganization for the bondholders to act on. The committee's actions were in bad faith because they defeated the purpose for which their powers were conferred.

*Brassil v. Maryland Casualty Co.*[25] was a 1914 forerunner of the modern third-party insurance case involving a claim of bad faith in the settlement of a claim.[26] A casualty insurance company concluded a contract that gave it the option of defending any suit, settling at its own cost, or paying the insured the stipulated indemnity. The contract also provided that the insured should not settle any claim except at its own cost or incur any expense without the insurer's consent. The insurer refused an injured person's offer of settlement for $1,500, the amount of the policy, electing instead to defend the suit. The outcome after trial was a liability of $6,000, but the insurer tendered $1,500 to the insured and refused to appeal. The insured, facing a personal liability of $4,500, appealed successfully and sued the insurer for the expenses incurred in prosecuting the appeal. The New York Court of Appeals held that the insurer's failure to continue the defense of the case, after refusing a settlement offer within policy limits, was a breach of contract. It wrote, "[T]here is a contractual obligation of universal force which underlies all written agreements. It is the obligation of good faith in carrying out what is written."[27] As later cases would make clear,[28] the insured and the insurer faced the same probability of success in litigation, but the insured faced a larger potential liability. The insured's interest was to accept the settlement offer within policy limits while the insurer's interest was to litigate. The express contract terms said that the insurer controlled the decisions whether to settle and later appeal. The court held in effect that the insurer could not use that discretionary power to advance its own interest at the expense of the insured's.

In *Simon v. Etgen*,[29] the express contract terms provided that the defendant executor's decedent, Burgess, would pay "whatever sum I may realize on the sale of the Coronet, 58th Street and Sixth Avenue, over and above six hundred and ninety thousand dollars, but only to

[25] 210 N.Y. 235, 104 N.E. 622 (1914).
[26] *See* §9.2.1.
[27] 210 N.Y. at 241, 104 N.E. at 624.
[28] *See* §9.2.1.
[29] 213 N.Y. 589, 107 N.E. 1066 (1915).

the extent, however, of twenty-five thousand dollars" in exchange for a release of all claims of one Mela against him.[30] The contract was silent on the timing of a sale, leaving Burgess discretion in the matter. Over the next four years, the court reported, Burgess received many offers to sell the property at prices above the market value and above $715,000. He then conveyed it to his wife 18 months before his death. The New York Court of Appeals held that the jury was warranted in finding that Burgess had not attempted to sell the property in good faith, but had contrived to prevent a sale and thus to retain the property for his own enrichment. He was obligated to sell within a reasonable time, if there were opportunity, by the implied covenant of good faith and fair dealing.[31] He, therefore, was in breach of the contract. To hold otherwise, the court reasoned, would permit Burgess to enjoy the fruits of Mela's release without making any effort to sell the property, placing Mela at the mercy of Burgess.

To summarize thus far, there was already a developing law requiring good faith in contract performance in New York before 1920 and in scattered opinions from other jurisdictions. As will be seen, it was suggestive of the law that would emerge decades later from many hundreds of successor cases. However, it was not recognized as an important development at the time. Williston's original treatise, for example, did not collect these cases, and they were not considered as a group when the American Law Institute composed the Restatement of Contracts in the 1920s. Consequently, the emerging doctrine remained obscure; perhaps no one had gathered all of these cases in one place or appreciated their importance.

### §2.2.2   Two Famous Cases

The history recounted above is helpful for a contemporary understanding of the good faith performance doctrine as it is used in judicial practice. If the importance of the cases discussed above remained unappreciated, however, two later decisions of the New York Court of Appeals attracted great attention. They may be thought to be "landmark cases," marking an original departure from the formalistic

---

[30] *Id.* at 592, 107 N.E. at 1066.
[31] This case, like many good faith cases, could have been decided without reference to "good faith."

and laissez-faire law of contracts typical of the turn of the twentieth century. There is a tendency to give landmark cases a special role; these two famous cases may be thought to define the content of the obligation to perform in good faith. To the extent the earlier cases are the path breakers and subsequent cases are more akin to them, however, the two famous cases should not have such special significance. The history recounted here suggests that the two famous cases were not originals and should not control interpretation of the doctrine. Subsequent discussion will make clear that contemporary cases have more in common with the originals.

### §2.2.2.1   *Wood v. Lucy, Lady Duff-Gordon*

The more famous of the two is *Wood v. Lucy, Lady Duff-Gordon*,[32] an opinion by Judge Benjamin Cardozo that has been credited as the origin of the modern law of implied promises and an original move away from turn-of-the-century formalism.[33] Lady Duff-Gordon, a well-known designer of fashions, contracted with Wood for him to enjoy the exclusive right to market goods bearing her endorsement. In return, he was to give her one-half of all profits and revenues derived from the project. In fact, Lady Duff-Gordon sold her designs to others in violation of the exclusive dealing arrangement with Wood. In an action by Wood for breach of contract, she defended by claiming her promise was not enforceable because not supported by consideration. Wood's agreement, she argued, did not bind him to do anything and so could not be consideration for her promise of exclusivity. Judge Cardozo disagreed, holding that Wood impliedly promised to use reasonable efforts to place Lady Duff-Gordon's endorsements and to market her designs. Therefore, he concluded, there was consideration for Lady Duff-Gordon's promise of exclusivity.

In often-quoted passages, Cardozo argued elegantly that

> [t]he law has outgrown its primitive stage of formalism when the precise word was the sovereign talisman, and every slip was fatal. . . . A promise may be lacking, and yet the whole writing may be 'instinct with an

[32] 222 N.Y. 88, 118 N.E. 214 (1917).
[33] See Pratt, *supra* note 7.

obligation,' imperfectly expressed. . . . We are not to suppose that one party was to be placed at the mercy of the other.[34]

Accordingly, Wood's acceptance of an exclusive agency was an assumption of its duties, and the agreement should be interpreted to have such business efficacy "as both parties must have intended that at all events it should have."[35]

In light of the cases recounted above, however, it may be doubted that Cardozo was doing anything original whatever (his charming prose excepted). In 1893, a New York court had insisted that

> [c]ommon sense and good faith are the leading stars of all genuine interpretation. . . . If the language involves the intention of the parties in uncertainty and doubt, an interpretation which will make the contract unreasonable, and place one of the contracting parties entirely at the mercy of the other, must give way to one which is equitable towards both. . . . No one will be suffered to take advantage of "adroit and slippery" language.[36]

Also in 1893, the New York Court of Appeals had reached a concrete holding substantially similar to that in *Wood*. The agreement in that case permitted a canal company to take such coal from the plaintiff's land as it would need, provided it took a minimum of 20,000 tons, in return for a royalty. After some years of negligent mining, the canal company ceased taking coal altogether, but continued paying the royalty on the minimum tonnage. In an action for breach of contract, the court held that the contract contained an implied covenant that the mining company would not disable itself from mining beyond the minimum tonnage. Furthermore, the mining company was found to be in bad faith by acting "as if a minimum rent was in the nature of an annual bonus paid to the plaintiffs merely to keep the property out of the market, or to prevent it falling into the hands of a rival."[37] Accordingly, the plaintiff stated a claim for breach of contract.

---

[34] 222 N.Y. at 91, 118 N.E. at 214.

[35] *Id.*, 118 N.E. at 215.

[36] Hilleary v. Skookum Root Hair-Grower Co., 4 Misc. 127, 131, 23 N.Y.S. 1016, 1018 (C.P. 1893). *See also* Wilson v. Mechanical Orguinette Co., 170 N.Y. 542, 63 N.E. 550 (1902).

[37] Genet v. President of Del. & H. Canal Co., 136 N.Y. 593, 611, 32 N.E. 1078, 1082 (1893).

No one can say why Cardozo did not cite these close precedents, or those discussed at §2.2.1, in *Wood*. To be fair, his attention was focused on the doctrine of consideration, which was then a topic of major controversy. *Wood*, however, took on a life of its own.

### §2.2.2.2   *Kirke La Shelle Co. v. Paul Armstrong Co.*

The second famous case is *Kirke La Shelle Co. v. Paul Armstrong Co.*,[38] which is sometimes regarded as the landmark case originating the implied covenant of good faith and fair dealing. The New York Court of Appeals there gave a new formulation of the good faith performance obligation in terms that would become often-repeated boilerplate:

> In every contract there is an implied covenant that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract, which means that in every contract there exists an implied covenant of good faith and fair dealing.[39]

The foregoing history establishes that the *Kirke La Shelle Co.* formulation merely synthesized well-established general law in New York. Moreover, there is serious doubt whether the concrete holding in this case sheds any useful light on the contemporary good faith performance doctrine.

In *Kirke La Shelle Co.*, the plaintiff held a contract right, pursuant to a settlement of a prior suit, to one-half the gross receipts from future stage productions of a play and a right to approve all contracts, sales, licenses, and other arrangements affecting the stage production of the play, except "motion picture" rights. The contract was concluded in 1921, before the invention of talking motion pictures. In 1928, after the invention of "talkies," and without obtaining approval, the defendant sold the "talkie" movie rights. Kirke La Shelle brought an action for one-half of the net amount received from the sale. The court upheld the plaintiff's claim because a "talkie" movie—not invented at the

[38] 263 N.Y. 79, 188 N.E. 163 (1933).
[39] *Id.* at 87, 188 N.E. at 167.

time of contracting—was not within the contemplation of the parties when they excepted "motion pictures," would impair the market for the stage play, and, therefore, would reduce the plaintiff's income from the contract. The express promise giving the plaintiff a right of approval thus was broken. The primary problem was finding a remedy. The court looked mainly to the law of fiduciaries in awarding the plaintiff one-half of the proceeds from the sale of movie rights. The court also relied on the implied covenant of good faith and fair dealing as an alternate basis for liability and the remedy. Since the court found a breach of an express promise and a fiduciary relationship, however, its discussion of the good faith covenant was dictum.[40] Later cases question whether *Kirke La Shelle* was correctly decided on its facts.[41] As an authoritative example of the good faith covenant in application, then, this case is a weak one.[42]

It may be wondered why these two cases gained fame while the earlier line of precedents largely went unnoticed. One can only imagine. A guess: doctrinal research on a national scale was guided until mid-century largely by the West Publishing Company's "key number" system. In fact, West did not spot the good faith trend and begin locating the relevant cases together until some time in the 1960s. Before then, scholars probably came across good faith cases only intermittently in the advance sheets and on specific research projects, placing some in casebooks and passing others around informally. Things changed greatly with the advent of Mead Data Central's LEXIS mode of research in the late 1970s and, soon thereafter, WESTLAW. The original research on which the authors base their present understanding of good faith performance was conducted with word and phrase searches of the computerized texts of the case reports.[43] The New York Court of Appeals must have known its own case law well; others, however, might well have been left in the dark for some time.

[40] *See* Manners v. Morosco, 252 U.S. 317, 327 (1920) (implied negative covenant not to use ungranted rights to the detriment of the other party).

[41] *See* L.C. Page & Co. v. Fox Film Corp., 83 F.2d 196, 199 (2d Cir. 1936) (words "motion picture" in pre-"talkie" contract held to include "talkies"). *See also* Bartsch v. Metro-Goldwyn-Mayer, Inc., 391 F.2d 150 (2d Cir.), *cert. denied*, 393 U.S. 826 (1968).

[42] *See also* Steven J. Burton, Good Faith Performance of a Contract Within Article 2 of the Uniform Commercial Code, 67 Iowa L. Rev. 1, 29-30 (1981).

[43] Burton, *supra* note 3.

## §2.2.3   Syntheses of Succeeding Cases

Through the middle part of the twentieth century, the courts increasingly employed the good faith performance doctrine to imply contract terms. Growth of the doctrine was given considerable impetus by its prominent inclusion in the Uniform Commercial Code.[44] A comprehensive understanding of the new doctrine, however, remained elusive. Collecting the relevant cases is one step toward a good understanding of the law. Synthesizing the collection into a coherent understanding of a legal doctrine is another. It generally falls to the legal scholars to offer general theories on legal developments in the courts, traditionally in an effort to assist practitioners and judges in reaching sound solutions to practical problems. When successful, law review articles can have powerful effects in shaping emerging legal doctrines. Two competing scholarly treatments have influenced recent development of the good faith performance doctrine — "excluder analysis" offered by Professor Robert S. Summers and a "cost perspective" offered by Professor Steven J. Burton, one of the authors of this treatise.

### §2.2.3.1   Advent of the Uniform Commercial Code

The current common law of contracts has been influenced significantly by the Uniform Commercial Code. Promulgated by the Commissioners of Uniform State Laws and by the American Law Institute in 1951, the U.C.C. has been adopted in 49 states. Most of its provisions pertain more to the laws of sales, commercial paper, and secured transactions than to the law of contracts. However, important provisions of Articles 1 and 2 significantly changed the law of contracts, at least as it had been applied to commercial contracts within the U.C.C. On many topics, common law courts subsequently changed the common law to bring it into harmony with the "modern view" represented by the U.C.C. The Restatement (Second) of Contracts was also influenced significantly by the U.C.C.

In general, the contract provisions of Articles 1 and 2 reflect Karl Llewelyn's vision of contract law.[45] He sought to supplant the rigid

---

[44]U.C.C. §1-203. *See* Chapter 4.

[45]Richard Danzig, A Comment on the Jurisprudence of the Uniform Commercial Code, 27 Stan. L. Rev. 621 (1975); Zipporah Batshaw Wiseman, The Limits of Vision: Karl Llewellyn and the Merchant Rules, 100 Harv. L. Rev. 465 (1987).

formalism of classical contract law with a law that would allow judges to respond flexibly to the commercial realities relevant to each transaction. He also sought to rewrite the law to relieve judges of the need to manipulate apparently rigid legal rules and contract provisions to reach a sensible result. Instead, for example, Article 2 allows courts to refuse to enforce "unconscionable" contracts or contract terms without, for example, manipulating the doctrine of consideration or interpreting a contract implausibly.[46]

When the U.C.C. was promulgated, case law applying good faith requirements was scant outside of New York. Consequently, the U.C.C. good faith requirements attracted some attention from many lawyers faced with what appeared to them a novel provision of daunting scope and vague meaning. Understandably, many came to see good faith as a post-formation counterpart to unconscionability, which was limited to policing the formation of enforceable obligations. There are three reasons to resist this approach to good faith requirements at common law or under the U.C.C.

First, the U.C.C. good faith provisions were neither as novel nor as radical as the unconscionability provision. Llewelyn himself stated during the New York Law Revision Commission's hearings in 1956 that "good faith has been part of mercantile obligation since American law began."[47] Professor Edwin Patterson gave the same commission a memorandum showing that the obligation was well established in New York case law.[48] Nothing in the comments to §1-203 suggests that the U.C.C. obligation was intended to vary from the common law.

Second, deciding that an agreement is enforceable (including that it is not unconscionable) entails deciding that the agreement is within the domain of private ordering. Overriding principles of fairness, morality, and policy then are spent, leaving only the obligation to keep the agreement. Unless some event after formation justifies different treatment, as when doctrines of modification, estoppel, waiver, material breach, unjust enrichment, or commercial impracticability are properly invoked, there is no justification for imposing additional obligations on the parties. Having determined that a contract is enforceable, there

[46]U.C.C. §2-302 cmt. 1.
[47]Karl Llewelyn, Memorandum, 1 N.Y. L. Rev. Commn., Report of the Law Revision Commission for 1954, at 106, 116 (1954).
[48]1 N.Y. L. Rev. Commn., Report Relating to the Uniform Commercial Code 310-315 (1956).

is no breach by performing in bad faith when one party only demands that the other perform as agreed.[49]

Third, as the case law has unfolded, it does not assimilate good faith and unconscionability significantly. Indeed, some opinions are careful to distinguish their respective domains, treating good faith as a way of enforcing the letter and the spirit of the parties' agreement.[50] Nor have the U.C.C. good faith provisions influenced the common law more than the reverse. Indeed, the more striking thing about the case law applying good faith requirements is how little the courts seem to care whether the cases before them, or the precedents they employ, are properly governed by the U.C.C. or common law.[51]

### §2.2.3.2   Excluder Analysis

The first influential law review articles on good faith performance, by Professors Farnsworth and Summers, appeared in 1963 and 1968, respectively.[52] Though written before the case law on good faith performance burgeoned in quantity and before available legal research tools allowed access to substantially all of the older precedents, both articles were important contributions. They each have been cited widely. Both informed the commentary on the good faith provision in the Restatement (Second) of Contracts §205.

Professor Farnsworth's article emphasized the role of good faith under the Uniform Commercial Code. His insights, however, influenced thinking in the common law arena as well. Farnsworth's main suggestion was that the obligation to perform a contract in good faith should be understood to further the agreement of the parties. Specifically, he suggested that the obligation requires "cooperation on the part of one party to the contract so that another party will not be deprived of his reasonable expectations."[53] This suggestion is probably the source of

[49] E.g., Wingard v. Exxon Co., 819 F. Supp. 497 (D.S.C. 1992) (applying South Carolina law).

[50] E.g., Tidmore Oil Co. v. BP Oil Co./Gulf Prods. Div., 932 F.2d 1384 (11th Cir. 1991) (applying Alabama law); Corenswet, Inc. v. Amana Refrigeration, Inc., 594 F.2d 129 (5th Cir. 1979) (applying Iowa law).

[51] See Steven J. Burton, Good Faith in Articles 1 and 2 of the Uniform Commercial Code: The Practice View, 35 Wm. & Mary L. Rev. 1533 (1994).

[52] Farnsworth, supra note 2; Summers, supra note 2. See also Edwin Patterson, 1 N.Y. L. Rev. Commn., Report Relating to the Uniform Commercial Code 310-315 (1955).

[53] Farnsworth, supra note 2, at 669.

a Restatement (Second) comment indicating that good faith requires "faithfulness to an agreed common purpose."[54]

Professor Summers' more philosophical thesis was that the good faith obligation is best conceptualized as an "excluder."[55] That is to say, paraphrasing the philosopher J.L. Austin, any attempt to find a characteristic common to all instances of good faith performance is doomed to failure; the function of "good faith" is not to contribute positively to the characterization of anything, but to exclude possible ways of being in bad faith, which are both numerous and varied.[56] Excluder analysis thus considers it impossible to state the necessary and sufficient factual conditions for a finding of good or bad faith. More important, excluder analysis shifts attention to instances of bad faith, offering a list of such instances from which one may reason analogically in light of the rationale of the doctrine.[57] Professor Summers offered the following rationale: "it is a means to 'justice and to justice according to law.' "[58]

Having adopted the excluder approach, Professor Summers classified some bad faith performance cases in one of six general categories, not regarded as exhaustive: evasion of the spirit of the deal; lack of diligence and slacking off; willful rendering of only substantial performance; abuse of a power to specify terms; abuse of a power to determine compliance; and interference with, or failure to cooperate in, the other party's performance.[59] The Restatement (Second) commentary generally follows this approach, adding that "[g]ood faith performance . . . of a contract emphasizes faithfulness to an agreed common purpose and consistency with the justified expectations of the other party; it excludes a variety of types of conduct characterized as involving 'bad faith' because they violate community standards of decency, fairness or reasonableness."[60] Together with the Restatement (Second) illustrations and a fair number of case citations, the foregoing summarizes the Summers approach to good faith performance.

The Summers approach largely is inspired by the view that the good faith performance doctrine "is of a piece with explicit requirements

[54]Restatement (Second) of Contracts §205 cmt. a.
[55]Summers, *supra* note 2, at 200-207.
[56]*See* J.L. Austin, Sense and Sensibilia 70-71 (G. Warnock ed. 1962).
[57]Summers, *supra* note 2, at 206-207.
[58]Robert S. Summers, The General Duty of Good Faith—Its Recognition and Conceptualization, 67 Cornell L. Rev. 810, 826 (1982).
[59]Summers, *supra* note 2, at 232-243.
[60]Restatement (Second) of Contracts §205 cmts. a, d.

of 'contractual morality' such as the unconscionability doctrine and various general equitable principles."[61] "Contractual morality" implies a ground for judicial decision that lies outside of and may take precedence over the agreement of the parties. Explaining the good faith performance doctrine in such terms implies that courts typically use the doctrine to render agreed terms unenforceable or to impose obligations incompatible with the agreement reached at formation. The Summers approach is in tension with Farnsworth's emphasis on the reasonable expectations of the parties arising from their agreement and, as will be seen, the general run of cases. That the Restatement (Second) attempts to marry the two approaches suggests that no consensus had formed on the shape of the new doctrine by 1973, when the relevant provision was approved in tentative draft by the American Law Institute.[62]

### §2.2.3.3  Paying the Costs of Contracting

During the 1960s and 1970s, the case law on good faith in contract performance began to mushroom, and, in the late 1970s, legal research tools improved dramatically. By 1980, it could be written that "[a] majority of American jurisdictions, the *Restatement (Second) of Contracts*, and the Uniform Commercial Code (U.C.C.) now recognize the obligation to perform a contract in good faith as a general principle of contract law."[63] Writing in the Harvard Law Review, Professor Steven Burton presented the results of a more extensive review of the cases than had been undertaken theretofore. In *Breach of Contract and the Common Law Duty to Perform in Good Faith*,[64] he advanced an original analysis and synthesis of the good faith performance doctrine.

This study of the cases led to the conclusion that good faith performance of a contract occurs when a party with discretion in performance exercises its discretion for any reason within the justifiable expectations of the parties arising from their agreement, understood in its context. As a corollary, bad faith performance occurs when such a party uses its discretion to recapture opportunities forgone (costs incurred) on

[61] Summers, *supra* note 58, at 811 (quoting Summers, *supra* note 2, at 198).
[62] On judicial practice implementing the excluder approach, see §9.3.1.
[63] Burton, *supra* note 3.
[64] *Id.*

entering the agreement. This explanation proceeds from a "cost per-spective" on contracts and promises. "Cost" here means "opportunity cost" — the value of incompatible opportunities forgone when taking a specific action, like concluding a contract.

To elaborate briefly, the concept of "discretion in performance," which is developed further below (§2.3.2.1), refers to one party's power after contract formation to set or control the terms of performance. The parties by express agreement commonly confer discretion on one of them, as in conditions of satisfaction (§3.4.2.1), output and require-ments contracts (§3.4.2.2), and other situations in which one party unilaterally controls its own or the other party's obligation (§§3.4.2.3-3.4.2.5). The concept of "recapturing forgone opportunities," which is elaborated further at §2.3.2.2, presupposes that contractual expecta-tions include justified expectations regarding both the benefits to be received under a contract and the costs to be paid by each party. The cost perspective is emphasized when we understand, for example, that a buyer in a requirements contract with a fixed price forgoes the opportunity later to fill its requirements on the spot market even if the spot price falls below the contract price. To continue the same illustration, a fixed-price requirements buyer who uses its discretion over quantity to recapture the opportunity to buy on a lower spot market defeats the other party's justified expectations, arising from the agreement, and is in breach of contract. More generally, it was argued, any promisor who uses discretion in performance to recapture forgone opportunities is in breach of contract.

Following 1980, a great many courts endorsed the basic structure of this thesis. It can safely be said that the common law of good faith in contract performance now is focused on the obligations of a discretion-exercising party, consistent with the early history of the doctrine.[65] The obligation also is almost always tied back to the

[65] *E.g.*, Cross & Cross Properties, Ltd. v. Everett Allied Co., 886 F.2d 497 (2d Cir. 1989) (applying New York law); Greer Properties, Inc. v. LaSalle Natl. Bank, 874 F.2d 457 (7th Cir. 1989) (applying Illinois law); Triangle Mining Co. v. Stauffer Chem. Co., 753 F.2d 734 (9th Cir. 1985) (applying Idaho law); Action Engg. v. Martin Marietta Aluminum, 670 F.2d 456, 460-462 (3d Cir. 1982) (applying Puerto Rico law); Zilg v. Prentice-Hall, Inc., 515 F. Supp. 716, 718-719 (S.D.N.Y. 1981); Carma Developers (Cal.), Inc. v. Marathon Dev. Cal., Inc., 2 Cal. 4th 342, 826 P.2d 710, 6 Cal. Rptr. 2d 467 (1992); Warner v. Konover, 210 Conn. 150, 553 A.2d 1138 (1989); Foster Enters., Inc. v. Germania Fed. Sav. & Loan Assn., 97 Ill. App. 3d 22, 29-30, 421 N.E.2d 1375, 1381 (1981); Julian v. Christopher, 320 Md. 1, 575 A.2d

agreement of the parties: opinions are many in which a court refuses to allow the requirements of good faith to override the express terms of a contract, properly interpreted.[66] Several opinions endorse the specific idea that bad faith consists of a use of discretion to "recapture forgone opportunities."[67] Many more require that discretion be exercised for reasons within the justified expectations of the parties at the time of formation,[68] which is a clearer way to express the same thought. To be sure, the excluder analysis offered by Professor Summers, and embedded in the commentary to the Restatement (Second), has earned the endorsement of some courts. There are a few opinions that seem to take more idiosyncratic approaches.[69] However, the case law of the 1980s made the structure described above the prevailing view, and it will serve as the principal (but not exclusive) vehicle for subsequent discussion.


## §2.3   A THEORY OF GOOD FAITH PERFORMANCE


A theory of good faith performance should meet two criteria: it should show how bad faith performance is like other contract breaches in

---

735 (1990); Centronics Corp. v. Genicom Corp., 132 N.H. 133, 562 A.2d 187 (1989) (Souter, J.); Napolitano v. Trustees of Princeton Univ., 186 N.J. Super. 576, 584, 453 A.2d 279, 283 (Ch. Div. 1982); Best v. United States Natl. Bank, 303 Or. 557, 739 P.2d 554, 558 (1987); D'Ambrosio v. Pennsylvania Natl. Mut. Casualty Ins. Co., 494 Pa. 501, 510-511, 431 A.2d 966, 971 (1981); Brown v. Weis, 234 Utah Adv. Rep. 19, 871 P.2d 552 (1994); E. Allan Farnsworth, 2 Farnsworth on Contracts §7.17, at 311-312 (1990).

[66] See §§3.2.1, 4.3.4.

[67] See Greer Properties, Inc. v. LaSalle Natl. Bank, 874 F.2d 457 (7th Cir. 1989); Richard Short Oil Co., Inc. v. Texaco, Inc., 799 F.2d 415, 422 (8th Cir. 1986) (alternate holding applying Arkansas law); James v. Whirlpool Corp., 806 F. Supp. 835 (E.D. Mo. 1992) (applying Michigan law); Newman v. Snap-On Tools Corp., No. 87-0475-R, 1988 U.S. Dist. LEXIS 18385 (E.D. Va. Feb. 3, 1988) (applying Virginia law) (discussed at §8.5.4.2); Southwest Sav. & Loan Assn. v. SunAmp Sys., Inc., 172 Ariz. 553, 838 P.2d 1314 (Ct. App. 1992); Pannone v. Grandmaison, No. 088912, 1990 WL 265273, 1990 Conn. Super. LEXIS 1916 (Dec. 6, 1990); Anthony's Pier Four, Inc. v. HBC Assocs., 411 Mass. 451, 583 N.E.2d 806 (1991); Centronics Corp. v. Genicom Corp., 132 N.H. 133, 562 A.2d 187 (N.H. 1989) (alternate holding). See also Three D Depts., Inc. v. K Mart Corp., 670 F. Supp. 1404 (N.D. Ill. 1987) (applying Michigan law); Warner v. Konover, 210 Conn. 150, 553 A.2d 1138 (1989) (dicta).

[68] See §§2.3.3, 3.3, 3.4, 4.4.

[69] See §§9.3, 9.4.

some respects and is distinctive in others. In theory, bad faith performance should be a breach of contract only if it is like a breach of contract in other kinds of cases in important respects. The remedies for breach by performing in bad faith are the same as those awarded for "any garden variety breach of contract."[1] Consequently, a breach by performing in bad faith should be like other breaches in that it should involve a harm to the contractual expectation interest. On the other hand, bad faith performance should be unlike other breaches in some way that gives the good faith performance doctrine a distinctive mission. Otherwise, the obligation to perform in good faith would be redundant to other contract obligations. There follows a theory that meets these two criteria. Good and bad faith then are distinguished in principle (§2.3.3), and the justifications of the doctrine are discussed (§2.3.4). Chapter 3 explores the practical applications of the good faith principle in a variety of settings governed by the common law.

### §2.3.1   Breach of Contract and Reasons for Acting

In the abstract, a contract is an exchange expressed imperfectly and projected into an uncertain future.[2] Accordingly, we will focus on two points in time. At the time of formation, a contract party makes a legally enforceable promise in return for another promise or a performance.[3] At the time for performance, the promisor must perform the promise unless intervening events provide a justification or excuse for nonperformance. Nonperformance of an enforceable promise when due is, by definition, a breach unless justified or excused in law.[4]

From a traditional perspective, a promise is analyzed as a commitment to transfer goods, real property, services, or money in the future, on which the promisee is justified in relying from the time of formation until performance is rendered.[5] The enforcement of such promises tends

---

§2.3   [1]Liberty Mut. Ins. Co. v. Altfillisch Constr. Co., 70 Cal. App. 3d 789, 797, 139 Cal. Rptr. 91, 95 (1977); see §3.8.

[2]Ian R. MacNeil, The Many Futures of Contract, 47 S. Cal. L. Rev. 691 (1974).

[3]That is, we will assume a classical bargain contract, leaving to one side unbargained-for promises enforceable because foreseeably relied upon.

[4]Restatement (Second) of Contracts §235(2).

[5]See Restatement (Second) of Contracts §2(1); Restatement [First] of Contracts §2 (1932).

"to eliminate the distinction between present and future (promised) goods."[6] It gives the promisee's expectation of receiving promised benefits the character of present property,[7] enhancing the reliability of promises and thus the security of transactions. Enhancing these values is a key justification for the law of contracts. The availability of reliable and secure promises in a market economy tends to encourage exchange, moving resources to higher-valued uses and increasing the size of the economic pie. Accordingly, a party in breach of contract usually must compensate the injured promisee for harms to its expectation or reliance interests arising from the contract.

The traditional perspective on contract breach focuses on denials of the benefits due the promisee. That perspective is adequate when the promise describes the promised performance with particularity: a breach occurs when the promisee does not receive the performance described by the promise. In many cases, however, the promise does not describe the performance with particularity. Express promises may be unclear, as when a builder promises to build in a workmanlike manner or a seller promises to deliver goods that are satisfactory to the buyer. Implied promises are often unclear, as when delivery must be made within a reasonable time. The traditional perspective then is inadequate for identifying a breach.

A better understanding of contract breach focuses not only on promised benefits, but also on the *reasons* promisors make and breach promises. By hypothesis, a party enters a contract when it believes no greater benefit can be derived by expending elsewhere the resources required for his contract performance.[8] Events between formation and performance time may prove this belief to have been erroneous. Before its own performance is rendered, a party with a losing contract may wish to direct elsewhere the resources committed to the contract. Such a party has conflicting reasons for action in contract performance. His promise is a reason to perform as promised; the opportunity to deal elsewhere more favorably is a reason to break his promise. However, acting as indicated by the latter reason is a breach of contract.

---

[6] Lon L. Fuller & William R. Perdue, The Reliance Interest in Contract Damages (pt. 1), 46 Yale L.J. 52, 59 (1936).

[7] *Id.*

[8] This assumes that the person has a present intention to perform. One who promises without a present intention to perform the promise is liable for "promissory fraud." Good faith is different from promissory fraud. *See* Guardino Tank Processing Corp. v. Olsson, 89 N.Y.S.2d 691 (Sup. Ct. 1949) (claim of promissory fraud rejected while breach of contract by failing to perform in good faith sustained).

Imagine, for example, a contract for the sale of goods in which the seller promises unconditionally to deliver identified goods to the buyer in the future at a price fixed in the contract. When the seller decides whether to enter that contract, it deliberates on a large number of reasons for and against contracting to sell the goods to the buyer at the contract price, including the market price of the goods at that time, forecasts of the price at the time for performance, and sundry other considerations. At the time for performance, however, the context of the contract may change, as when the price then is higher than the forecast. If so, the seller will regret having contracted and may breach to sell on the spot market. Accordingly, the forecast of the market price at the time for performance was a reason for entering the contract; the spot price at the later time may be a reason to breach it.

When promises are authoritative or binding, however, the spot price at the time for performance is not available to justify a seller's failure to deliver as promised (even as it justifies feelings of regret). By contracting with the buyer at a fixed price, the seller considered forecasts of future prices and gave up any justification based in future prices for refusing to deliver the goods as promised. That is, the promise becomes authoritative for the promisor, providing a reason for acting at the time for performance, which reason supplants reasons for doing anything incompatible with performing the promise.[9]

The opportunities given up are the costs of contracting. A binding contract requires the promisor to pay the costs of contracting whether or not the promisor regrets having contracted. Thus, enforcing promises tends to eliminate the distinction between present and future (promised) costs, as it tends to eliminate the distinction between present and future (promised) benefits.

In principle, refusing to pay the costs of contracting by recapturing forgone opportunities should be a breach. A promisee may be justified in relying on a promisor to pay the expected costs of contracting, just as reliance on expected benefits may be justified. A promisor who recaptures forgone opportunities harms the promisee's contractual expectation and reliance interests by redirecting resources away from the contract. Compensation then should be forthcoming for the same reasons compensation is provided for contract breaches generally.

Recapturing forgone opportunities by acting on reasons given up

---

[9] See Steven J. Burton, Default Rules, Legitimacy, and the Authority of a Contract, 3 S. Cal. Interdisciplinary L.J. 115 (1993) and sources cited therein.

when contracting matters when the contract does not describe the promised performance with particularity. A breach then cannot be identified solely on the basis of what the promisor does or what the promisee receives. It often can be determined with reference to the promisor's reasons for acting in contract performance. Consider a buyer entering a contract for future delivery of corn at a fixed price. At formation time, the buyer identifies its set of opportunities, considers the pros and cons of each, and judges the corn contract the most attractive. Assume that, when concluding the deal, the buyer qualifies its obligation by gaining the seller's agreement to call off the deal if the buyer is not satisfied with the quality of the corn. If the buyer later rejects delivery, the fact that it rejected does not suffice to determine whether the buyer is in breach. The buyer preserved the opportunity to pursue other opportunities *for the reason that* the corn was of poor quality, but not otherwise. Consequently, a buyer who redirects resources to alternatives is not in breach if it acts because the contract corn was substandard. The buyer is in breach if it takes the same act *for the reason that* the market fell, allowing him to buy more cheaply elsewhere. Therefore, the question of breach turns not on the act of rejection, but instead on the buyer's *reasons* for acting.

In sum, a promise entails representations as to the future simultaneously regarding *both* the benefits to be received by the promisee and the costs to be paid by the promisor. One can describe a breach of contract either, in the traditional fashion, as failing to deliver the fruits of the contract as promised or, as suggested by this thesis, as acting for reasons given up when entering the contract. As the next section suggests, the latter concept is more general and is crucial to understanding the obligation to perform a contract in good faith.

## §2.3.2   Breach by Failing to Perform in Good Faith

The distinctive mission of the good faith performance doctrine is to protect the justified expectations of one party by constraining the other party's exercise of discretion in contract performance. When a party enjoys discretion, neither the express contract nor the implied covenant describes the promised performance with particularity. Consequently, a breach of the implied covenant cannot be identified only by

ascertaining whether the promisor transferred the goods, real property, services, or money described in the contract. Rather, a breach consists of using contractual discretion for improper reasons—those given up on entering the contract. Bad faith in contract performance is a use of contractual discretion to recapture opportunities forgone when contracting.

### §2.3.2.1   Discretion in Performance

The centrality of discretion to good faith in contract performance has become well established by the case law since 1980.[10] As Justice Souter put it when on the New Hampshire Supreme Court,

> [T]he concept of good faith in performance addresses the particular problem raised by a promise subject to such a degree of discretion that its practical benefit could seemingly be withheld.[11]

In general, "*[d]iscretion* means the power to choose between two or more courses of action each of which is thought of as permissible."[12] It arises whenever a legal directive or contract term is indeterminate because it fails to identify a single specific action that is legally permitted, prohibited, or required under the circumstances. When expressly agreed contract terms leave a party with discretion, one party might act in performance of the contract, believing the act to be allowed while the other believes that act to be disallowed. In the ensuing dispute, no resolution may be possible based solely on the agreed contract terms.

The possibility of discretion is avoided in contracts only when all rights and duties are "fully specified" at the time of contract formation; that is, when the terms of the agreement are consistent and complete, specifying the exact conduct that is permitted, prohibited, or required by each party under all possible eventualities. Of course, no contract is fully specified. Those who say, "If you write at all, write it all," are

---

[10] *See* sources cited at §2.2 note 65.

[11] Centronics Corp. v. Genicom Corp., 132 N.H. 133, 562 A.2d 187, 193 (N.H. 1989).

[12] Henry Hart & Albert Sacks, The Legal Process: Basic Problems in the Making and Application of Law 162 (Tent. ed. 1958) (emphasis in original).

full of bluster. It is not always desirable in contract drafting to aim at a fully specified contract. Flexibility may be what is wanted by both parties. The costs of fully specifying the terms may be greater than the risk that remote contingencies will occur.[13] Residual discretion may not be controllable by contract language, as where a franchisor controls the good will of a franchisee.[14] Mature parties know that unforeseen events can give rise to uncertainties that the parties did not and could not anticipate.[15] In any case, the parties may have a continuing relationship or reputational interests that can be relied on reasonably in place of more fully specifying contract terms. The law is available to supply terms by implication when a contract is less than fully specified, and contracting parties may rely on the law to do so in place of further specifying their contract by agreement.

Accordingly, discretion in contract performance arises in two ways. The parties may find it to their mutual advantage at formation to defer decision on a particular term and to confer decisionmaking authority on one of them as to that term. Thus, one party may be entitled to set terms of quantity, quality, price, or time or to control the occurrence of a contractual condition. Discretion also may arise, with similar effect as things turn out, from a lack of clarity or an omission in the express contract. In either case, one party may be in control of its own or the other party's obligation under the contract. Since the agreed terms are indeterminate, the dependent party must rely on the good faith of the party in control. The law then *implies* an obligation of good faith in contract performance.

The courts could leave all discretion in performance unbridled. This would place the burden on the party relying on the good faith of the other to protect itself by fully specifying the terms of the contract at the time of formation. Every instance of contracted flexibility or lack of clarity would be treated as an assumption of a risk. No U.S. court

[13] *See, e.g.,* Concrete Specialties v. H.C. Smith Constr. Co., 423 F.2d 670 (10th Cir. 1970).
[14] *See* Photovest Corp. v. Fotomat Corp., 606 F.2d 704 (7th Cir. 1979) (applying California law).
[15] *E.g.,* Bartsch v. Metro-Goldwyn-Mayer, Inc., 391 F.2d 150 (2d Cir.) (invention of television renders ambiguous defendant's right, pursuant to a 1935 assignment, to "exhibit" a movie film), *cert. denied,* 393 U.S. 826 (1968); Kirke La Shelle Co. v. Paul Armstrong Co., 263 N.Y. 79, 188 N.E. 163 (1933) (invention of "talkies" affects contract involving "motion picture rights").

now takes this approach, though many will respect a clear agreement of the parties that discretion should be unbridled.[16] When a party has discretion in performance, and when the parties do not make clear that it is unlimited, the courts raise explicitly the implied covenant of good faith or interpret a contract in light of good faith performance.[17] Thus, contractual discretion is presumptively bridled by the law of contracts—by the covenant of good faith implied in every contract.

Accordingly, we should take two steps in analyzing the obligation to perform a contract in good faith. The first step will be to determine whether a contract involves discretion in performance on the part of the party alleged to be in breach. If not, good faith will be relevant only if one of the less widely accepted approaches to good faith performance is adopted.[18] If discretion is involved, the second step will be to determine whether it was abused. The first step will be illustrated here by considering cases involving discretion as to quantity, quality, price, and time; conditions within the control of one party; and thus discretionary acts outside the contract. The second step will be addressed at §2.3.2.2.

Deferred decisions as to quantity take the form of requirements and output contracts, in which specific agreement may be reached on all terms except the quantity of goods bought or sold. A buyer under a requirements contract and a seller under an output contract can have considerable control of the quantity exchanged because they can manipulate their apparent requirements or output by modifying their methods of marketing, production, or consumption or the form of their business organization.[19] At the time of formation, the dependent party could have insisted on fixed quantity terms in the contract or required agreement on detailed provisions governing the other party's method of doing business. The flexibility and simplicity of a requirements or

[16]E.g., Tymshare, Inc. v. Covell, 727 F.2d 1145, 1153 (D.C. Cir. 1984) (applying Virginia law) (citing MacDougald Constr. Co. v. State Highway Dept., 125 Ga. App. 591, 594, 188 S.E.2d 405, 407 (1972)); Bank IV Salina, N.A. v. Aetna Casualty & Sur. Co., 810 F. Supp. 1196 (D. Kan. 1992); Susitna, Ltd. v. Pacific First Fed., 118 Or. App. 126, 846 P.2d 438 (1993).

[17]See sources cited at §2.2 note 65.

[18]See Chapter 9.

[19]Western Oil & Fuel Co. v. Kemp, 245 F.2d 633 (8th Cir. 1957); Loudenback Fertilizer Co. v. Tennessee Phosphate Co., 121 F. 298 (6th Cir. 1903); Chalmers & Williams v. Walter Bledsoe & Co., 218 Ill. App. 363 (1920).

output contract often compensate for the risk of such manipulations. Both at common law and under the U.C.C., a buyer's requirements or a seller's output means such actual quantities as occur in good faith.[20]

Deferred decisions as to quality take the form of conditions of satisfaction or approval. Thus, a contract may provide that a buyer need not pay the price unless "satisfied" by the other party's performance, or a party's obligation may be conditioned on its approval of future plans or other contingencies. A party benefiting from a condition of satisfaction or approval must act at least in good faith in claiming that it is unhappy with the proffered performance or contingency.[21]

Deferred decisions as to price may take two forms. In most jurisdictions at common law, agreement as to price is an essential term and must be set or be ascertainable for a contract to be formed.[22] Agreements to agree on price are not enforceable.[23] There is, however, some authority at common law for enforcing a contract in which the price is to be set by one party. In that case, the price must be set in good faith.[24] The price term more commonly may be left open to vary with sales, production, or other factors through a formula in the contract for determining the price when payment is due. Good faith performance

[20]U.C.C. §2-306(1); John C. Weistart, Requirements and Output Contracts: Quantity Variations Under the UCC, 1973 Duke L.J. 599. *See* §§3.4.2.2, 4.4.1.

[21]*E.g.*, Kendall v. Ernest Pestana, Inc., 40 Cal. 3d 488, 709 P.2d 837, 220 Cal. Rptr. 818 (1985); Anthony's Pier Four, Inc. v. HBC Assocs., 411 Mass. 451, 583 N.E.2d 806 (1991); Maas v. Scoboda, 188 Neb. 189, 195 N.W.2d 491 (1972); Kree Inst. of Electrolysis, Inc. v. Fageros, 478 S.W.2d 569 (Tex. Civ. App. 1972). Different standards may be announced for conditions of satisfaction and conditions of personal satisfaction. When the performance relates to matters of mechanical fitness, utility, and the like, dissatisfaction must be such that a reasonable person would not be satisfied in similar circumstances. Performance relating to matters of personal taste and fancy, however, may be "unreasonably" rejected so long as the dissatisfaction is asserted in good faith. *See, e.g.*, Action Engg. v. Martin Marietta Aluminum, 670 F.2d 456 (3d Cir. 1982) (applying Puerto Rico law); Mattei v Hopper, 51 Cal. 2d 119, 330 P.2d 625 (1958) (en banc); Western Hills, Or., Ltd. v. Pfau, 265 Or. 137, 508 P.2d 201 (1973) (en banc); §3.4.2.2.

[22]*See* Arthur L. Corbin, 1 Corbin on Contracts §97 (1960).

[23]*E.g.*, Sun Printing & Publishing Assn. v. Remington Paper & Power Co., 235 N.Y. 338, 139 N.E. 470 (1923).

[24]Perdue v. Crocker Natl. Bank, 38 Cal. 3d 913, 702 P.2d 503, 216 Cal. Rptr. 345 (1985) (bank has enforceable contract with depositor allowing it to set charges for checks drawn without sufficient funds); Krauss v. Kruechler, 300 Mass. 346, 15 N.E.2d 207 (1938) (upholding close corporation's appraisal of stock to be purchased by the corporation upon shareholder's death); Price v. Speilman Motor Sales Co., 261 A.D. 626, 26 N.Y.S.2d 836 (1941) (automobile dealer's reappraisal of trade-in at time of delivery must be in good faith and not arbitrary). *See* §3.4.2.3.

is required when one party controls the formula or the factors that determine the price.[25]

Deferred decisions as to the time of performance may allow one party to determine when it shall perform, when the other party shall perform, or when the contract shall terminate. Such decisions must be made in good faith.[26] A final decision as to the binding effect of a contract promise on one party similarly may be deferred when the contract is subject to a condition. When occurrence of that condition is within one party's effective control, that party must act in good faith.[27] For example, a party whose performance is conditioned on governmental approval of its plans or on other related contracts may be required to cooperate in good faith to secure the fulfillment of the condition.[28]

The kinds of discretion that may arise and invoke a good faith obligation cannot be exhaustively catalogued.[29] For example, a contract

[25] *E.g.*, Richard Short Oil Co. v. Texaco, Inc., 799 F.2d 415 (8th Cir. 1986) (applying Arkansas law); Tymshare, Inc. v. Covell, 727 F.2d 1145 (D.C. Cir. 1984) (applying Virginia law); Ryder Truck Rental, Inc. v. Central Packing Co., 341 F.2d 321 (10th Cir.), *cert. denied*, 382 U.S. 827 (1965); Baldwin v. Kubetz, 148 Cal. App. 2d 937, 943, 307 P.2d 1005, 1009 (1957).

[26] *See, e.g.*, Sylvan Crest Sand & Gravel Co. v. United States, 150 F.2d 642 (2d Cir. 1945) (party may call for delivery of goods without agreed limitations as to time); McKinney v. National Dairy Council, 491 F. Supp. 1108 (D. Mass. 1980) (discretion to terminate an employment contract at will); Dorsey Bros., Inc. v. Anderson, 264 Md. 446, 287 A.2d 270 (1972) (agreement to harvest crop with discretion to decide when crop is ripe); Simon v. Etgen, 213 N.Y. 589, 107 N.E. 1066 (1915) (agreement to pay debt by selling a real estate property with discretion to decide when to sell). *See* §3.4.2.4.

[27] Cedrone v. Unity Sav. Assn., 609 F. Supp. 250 (E.D. Pa. 1985) (applying Pennsylvania law); Barnes v. Atlantic & Pac. Life Ins. Co. of Am., 295 Ala. 149, 156, 325 So. 2d 143, 150 (1975) (citing J. Murray, Murray on Contracts §187, at 365 (1974)); Bushmiller v. Schiller, 35 Md. App. 1, 368 A.2d 1044 (1977). *See also* Heinrich v. R.L. Oil & Gas Co., 442 N.W.2d 467 (S.D. 1989); §3.4.2.5.

[28] *See, e.g.*, Vanadium Corp. of Am. v. Fidelity & Deposit Co., 159 F.2d 105 (2d Cir. 1947); Fry v. George Elkins Co., 162 Cal. App. 2d 256, 327 P.2d 905 (1958); Kerrigan v. City of Boston, 361 Mass. 24, 278 N.E.2d 387 (1972); Lane v. Elwood Estates, Inc., 31 A.D.2d 949, 298 N.Y.S.2d 751 (1969), *aff'd*, 28 N.Y.2d 620, 268 N.E.2d 805, 320 N.Y.S.2d 79 (1971); Ide Farm & Stable Inc. v. Cardi, 110 R.I. 735, 297 A.2d 643 (1972); Frangesch v. Kamp, 262 Wis. 446, 55 N.W.2d 372 (1952).

[29] For a quaint pair, see Berkeley Lawn Bowling Club v. City of Berkeley, 42 Cal. App. 3d 280, 116 Cal. Rptr. 762 (1974) (city, when leasing clubhouse adjacent to lawn bowling greens to club for 20 years, impliedly promises to maintain the greens for the term); Stromer v. Browning, 65 Cal. 2d 421, 420 P.2d 730, 55 Cal. Rptr. 18 (1966) (seller of real estate who changed terms when reducing oral agreement to writing to preserve his duck-hunting club, as forecast, did not prevent sale in bad faith).

often cannot do much to specify what a party may or may not do outside the subject matter of the contract. A wide range of acts outside the contract may cause the other party to lose some or all of its expected benefit from the contract. A publisher may undertake to publish and promote an author's book and later publish and promote a directly competitive book, a licensee under a patent may market a closely related product that reduces the royalties owed to the licensor, a franchisor may saturate a franchisee's territory with competing franchises, a partnership may dissolve with the effect of cutting off benefits owed to a retired partner, or one who sells a business on condition that it remain solvent may intentionally default on a loan to kill the deal. Such actions, and others too varied to catalogue, must be in good faith in relation to the contract.[30]

The good faith performance doctrine thus may be used to protect a "weaker" party from a "stronger" party.[31] Unlike the unconscionability doctrine, however, weakness and strength in this context do not refer to the substantive fairness of the bargain or to the relative "bargaining power" of the parties. Unconscionability gives the courts latitude to refuse to enforce all or part of an agreement that is not a product of meaningful choice by both parties or that is so one-sided in its terms as to favor one party unreasonably at its inception.[32] It is a limitation on freedom of contract that allows the courts to police the bargaining relationship and to override the agreement of the parties in the interests of justice and public policy. It is a mistake to think that, because unconscionability and good faith emerged in this century and are stated in vague terms, one is a post-formation counterpart to the other. Good faith performance cases typically involve arm's-length transactions, often between sophisticated business persons.[33] The relative strength

---

[30] E.g., Photovest Corp. v. Fotomat Corp., 606 F.2d 704 (7th Cir. 1979) (applying California law); Mechanical Ice Tray Corp. v. General Motors Corp., 144 F.2d 720 (2d Cir. 1944); Bane v. Ferguson, 707 F. Supp. 988 (N.D. Ill. 1989) (applying Illinois law); Brawley v. Crosby Research Found., 73 Cal. App. 2d 103, 166 P.2d 392 (1946); Ligon v. Parr, 471 S.W.2d 1 (Ky. 1971); Ashland Management, Inc. v. Janien, 82 N.Y.2d 395, 624 N.E.2d 1007, 604 N.Y.S.2d 912 (1993); Van Valkenburgh, Nooger & Nelville, Inc. v. Hayden Publishing Co., 30 N.Y.2d 34, 281 N.E.2d 142, 330 N.Y.S.2d 329, cert. denied, 409 U.S. 875 (1972).

[31] See Edwin W. Patterson, The Interpretation and Construction of Contracts, 64 Colum. L. Rev. 833, 858 (1964).

[32] E.g., Williams v. Walker-Thomas Furniture Co., 350 F.2d 445, 449 (D.C. Cir. 1965); U.C.C. §2-302(1).

[33] E.g., Anthony's Pier Four, Inc. v. HBC Assocs., 411 Mass. 451, 583 N.E.2d 806

of the party exercising discretion typically arises from an agreement of the parties to confer control of a contract term on that party. And, as will be seen in the next sections, good faith generally is used not to override the parties' agreement, but rather to implement it.

### §2.3.2.2   Reasons for Exercising Discretion

Good faith is a matter of exercising contractual discretion for reasons within the justified expectations of the parties arising from their agreement. A discretion-exercising party may be entitled to withhold all benefits by exercising its discretion in good faith. Consequently, we cannot distinguish uses from abuses of discretion by asking whether the other party received benefits described in the contract. Dozens of recent cases suggest that the problem of good faith in contract performance can be clarified helpfully when we attend to a party's *reasons* for exercising discretion. Simply put, a party with discretion may withhold benefits for reasons preserved upon entering the contract, but is in breach when acting for reasons then given up—forgone opportunities.

A "reason for action" generally is the marriage of a rule, principle, desire, or other value—paradigmatically, that some act should be done when some generic fact is instantiated—with a concrete fact that invokes it. For example, a complete reason might be stated as follows: all promises should performed; Jake promised to mow the lawn whenever needed; the lawn needs mowing; so Jake should mow. Typically, however, people have several reasons for and against doing most of the things they do. Jake's promise is a reason to mow the lawn, but he also might mow it because he likes to maintain a manicured front yard, he wants to avoid his neighbor's disapproval, the subdivision rules require him to do it, his internalized father insists he do it, and so on. The facts may be such that all of these reasons are available to Jake, but only one of them may *move* him to mow the lawn. An objective conception of a reason for action emphasizes the availability of a reason in the circumstances of action, while a subjective conception focuses on the reasons that move the actor.

---

(1991) (rejecting claim that good faith obligation is not implied in transactions between sophisticated business people, noting no authority for such a position).

A "reason" in the good faith context does not necessarily make reference to a person's motivation, the psychological cause of his action.[34] Rather, it may refer to the *justification* for the act taken. Parties to business contracts generally are motivated to make money, when both performing and breaching contracts. Pecuniary motivations, therefore, could not distinguish performance from breach, uses from abuses of discretion. That crucial distinction depends on the reasons that can be given to show that an exercise of discretion is contractually allowed or disallowed. Some reasons for exercising discretion are not permitted by the agreement, interpreted in the normal manner. Unpermitted reasons, therefore, are not available as justifications for actions taken in performance of the contract. Whether reasons are understood subjectively or objectively, using discretion for improper reasons is widely held to be a breach.

### §2.3.3   *Good Faith and Bad Faith Distinguished*

The problem of greatest practical importance is distinguishing good from bad faith in contract performance. Courts generally use the contract as the basis for distinguishing permissible from impermissible reasons for exercising discretion. On reflection, this makes sense. Contracts are enforceable in the first place only when performance is consistent with all applicable laws and public policies. Once it has been decided that a contract is enforceable, all applicable laws and public policies have been found to leave the parties free to make commitments as they wish. When contracting, however, the parties limit their freedom more tightly than general laws and public policy otherwise permit. General laws and public policies are unlikely to help decide the limits of party discretion under a contract because those limits will be within the realm of freedom allowed by law and public policy. Consequently, the limits will stem from the parties' agreement.

Some courts have articulated standards guiding their judgments in

---

[34] One of the authors once took a more subjective view. Steven J. Burton, Breach of Contract and the Common Law Duty to Perform in Good Faith, 94 Harv. L. Rev. 369 (1980).

terms of the reasonable contemplation of the parties.[35] The good faith performance doctrine may be said to permit the exercise of discretion for any purpose — including ordinary business purposes[36] — reasonably "within the contemplation of the parties."[37] A contract thus would be breached by a failure to perform in good faith if a party uses its discretion for a reason outside the contemplated range — a reason beyond the risks assumed by the party claiming a breach.[38]

The contemplation standard of good faith performance is helpful because it distinguishes the obligation to perform in good faith from duties imposed on the parties for reasons of public policy, unconscionability, or avoidance of unjust enrichment. Unlike those parts of contract law, good faith performance insists that the parties keep their agreement, understood as something more than the express terms interpreted literally. Moreover, once it has been determined that a party has discretion in performance, the contemplation standard suggests two specific further questions for determining good faith or bad faith. First, what was the discretion-exercising party's reason for acting? Sec-

---

[35] As one court stated,

> Where discretion is lodged in one of two parties to a contract or a transaction, such discretion must . . . be exercised in good faith. That simply means that what is done must be done honestly to effectuate the object and purpose the parties had in mind in providing for the exercise of power.

Boone v. Kerr-McGee Oil Indus., 217 F.2d 63, 65 (10th Cir. 1954).

[36] See Burgess Constr. Co. v. M. Morrin & Son Co., 526 F.2d 108 (10th Cir. 1975); Fort Wayne Corrugated Paper Co. v. Anchor Hocking Glass Corp., 130 F.2d 471 (3d Cir. 1942); Martindell v. Lake Shore Natl. Bank, 15 Ill. 2d 272, 286, 154 N.E.2d 683, 690-691 (1958); Food Fair Stores, Inc. v. Blumberg, 234 Md. 521, 200 A.2d 166 (1964); Van Valkenburgh, Nooger & Neville, Inc. v. Hayden Publishing Co., 30 N.Y.2d 34, 281 N.E.2d 142, 330 N.Y.S.2d 329, cert. denied, 409 U.S. 875 (1972).

[37] New York Cent. Iron Works Co. v. United States Radiator Co., 174 N.Y. 331, 335, 66 N.E. 967, 968 (1903). See Milstein v. Security Pac. Natl. Bank, 27 Cal. App. 3d 482, 486-487, 103 Cal. Rptr. 16, 18-19 (1972); Pierce v. MacNeal Memorial Hosp. Assn., 46 Ill. App. 3d 42, 51, 360 N.E.2d 551, 558 (1977); Comini v. Union Oil Co., 277 Or. 753, 756-757, 562 P.2d 175, 176-177 (1977).

[38] See, e.g., Bergum v. Weber, 136 Cal. App. 2d 389, 288 P.2d 623 (1955) (direct solicitation of former customers of a partnership after sale of partnership's good will is bad faith); Devoine Co. v. International Co., 151 Md. 690, 136 A. 37 (1927) (rejection of goods under a condition of satisfaction in order to buy more cheaply elsewhere); Commonwealth Dept. of Property & Supplies v. Berger, 11 Pa. Commw. 332, 312 A.2d 100 (1973) (defendant decided he wanted to get out of the contract); Beckett v. Kornegay, 150 Va. 636, 143 S.E. 296 (1928) (party acting in good faith is not acting for speculative reasons).

ond, was it within the reasonable contemplation of the parties at formation? However, the second question suggested by the contemplation standard makes a highly unrealistic assumption—that the parties "contemplate" quite a lot when entering a contract. This implies a degree of conscious and deliberate decisionmaking with a foresight that is probably missing from most transactions.

More recent cases tend to focus on the justified or reasonable *expectations* of the parties.[39] As applied by the courts, this approach assumes a normal or ordinary course of events that the parties expect or should expect at the time of contract formation and with reference to which they implicitly contract, absent express terms to the contrary. It assumes further that the ordinary or expected course includes not only actions and events, but also the reasons for which discretion may be exercised within the contract. That is, the express agreement of the parties may come together with promissory presuppositions. As Lon Fuller and Robert Braucher put it,

> The absent minded professor stepping from his office into the hall as he reads a book "assumes" that the floor of the hall will be there to receive him. His conduct is conditioned and directed by this assumption, even though the possibility that the floor has been removed does not "occur" to him, that is, is not present in his conscious mental process.[40]

The courts aim at the same thought when they say:

> "Th[e implied] covenant [of good faith and fair dealing] . . . imposes upon each contracting party . . . the duty to do everything that the contract presupposes that he will do to accomplish its purpose."[41]

[39] E.g., M/A-COM Sec. Corp. v. Galesi, 904 F.2d 134 (2d Cir. 1990) (applying New York law); Hoffman-La Roche, Inc. v. Campbell, 512 So. 2d 725 (Ala. 1987); Hagans, Brown & Gibbs v. First Natl. Bank, 783 P.2d 1164 (Alaska 1989); Carma Developers (Cal.), Inc. v. Marathon Dev. Cal., Inc., 2 Cal. 4th 342, 826 P.2d 710, 6 Cal. Rptr. 2d 467 (1992); Magnan v. Anaconda Indus., Inc., 193 Conn. 558, 479 A.2d 781 (1984); Hilton Hotels Corp. v. Butch Lewis Prods., Inc., 808 P.2d 919 (Nev. 1991); Best v. United States Natl. Bank, 303 Or. 557, 739 P.2d 554 (1987); St. Benedict's Dev. Co. v. St. Benedict's Hosp., 811 P.2d 194, 200 (Utah 1991).

[40] Lon L. Fuller & Robert Braucher, Basic Contract Law 555 (1964).

[41] Steinmeyer v. Warner Consol. Corp., 42 Cal. App. 3d 515, 519, 116 Cal. Rptr. 57, 60 (1974) (quoting Harm v. Frasher, 181 Cal. App. 2d 405, 417, 5 Cal. Rptr. 367, 374 (1960)).

As doctrine, the reasonable (or "justified") expectations formulation is preferable to the contemplation formulation. It brings the standard for good faith performance into harmony with the general tenets of contract interpretation and implication. These tenets instruct us to follow the intentions of the parties when their conscious mental states are coincident and, when they miss a connection, to follow that interpretation which would be expected by a reasonable person in the shoes of one party based on the manifestations of intention of the other party at formation.[42] Moreover, the reasonable expectations approach is preferable because it is more realistic. The parties need not deliberate consciously on forgone reasons for action in contract performance; it may be only that, if asked, they would agree on what should happen in a large number of situations, many of which might be unlikely even to occur. Presumably they will agree far less after a deal has soured. The reasonable expectations standard holds them to their agreement at formation whenever their expectations can be reasonably ascertained.[43]

Consider a set of three cases involving actions by lessees under commercial percentage leases in which the implied covenant of good faith and fair dealing was applied. The leases provided for rentals to be paid primarily as a percentage of the gross receipts of the lessee's business on the premises. In each case, the lessee altered its business in a way that reduced sales from the leased premises and, therefore, the amount owed as rent: by moving a lucrative part of the business to other premises leased from the same lessor on a flat rental basis,[44] by opening competing stores in the same neighborhood,[45] or by diverting customers to another store.[46]

The lessor lost in two of the three cases, though the lessee in each instance reduced the actual rent received by the lessor under the contract formula and was motivated to make money. Where the lessee

[42] Restatement (Second) of Contracts §§20, 201-203.

[43] There is no assumption here that all disputes can or should be resolved on the basis of good faith. When the parties had different reasonable expectations, and when neither knew or should have known of the expectations of the other, attention should turn to other contract doctrines. See, e.g., Restatement (Second) of Contracts §204.

[44] Mutual Life Ins. Co. v. Tailored Woman, Inc., 309 N.Y. 248, 128 N.E.2d 401 (1955).

[45] Food Fair Stores, Inc. v. Blumberg, 234 Md. 521, 200 A.2d 166 (1964). See also Stop & Shop, Inc. v. Ganem, 347 Mass. 697, 200 N.E.2d 248 (1964).

[46] Goldberg 168-05 Corp. v. Levy, 170 Misc. 292, 9 N.Y.S.2d 304 (Sup. Ct. 1938), modified and aff'd, 256 A.D. 1086, 11 N.Y.S.2d 315 (1939).

opened competing stores in the same neighborhood, the court observed simply that large chains usually keep adding to the number of their stores.[47] When the lessee moved a lucrative part of its business to other premises in the same building, where a flat rental applied, the court held that the lessee was free to decide on which floor to locate that part of its business, absent fraud, trickery, or express terms to the contrary.[48] However, where the lessee diverted business to other premises for the "sole purpose"[49] of bringing gross receipts down at the leased premises, a "direct violation"[50] of the covenant was established.

The fact that a discretion-exercising party causes the other party to lose some or all of its anticipated benefit from the contract thus is insufficient to establish a breach. These cases affirm that the same act — relocating a part of a business — may or may not be in bad faith depending on the reasons for which it is done — whether for ordinary business reasons within the contract or to evade the rental obligation of the contract. In these cases, it might be that the lessors presupposed that patterns of doing business would continue with variations of an expectable sort in the context and that the lessees were committed not to take actions that would defeat those expectations.

Accordingly, where a lessee opened competing stores in the same neighborhood, the court said there is nothing "unusual" about large retail chains adding to the number of their stores and so held that the act was undertaken in good faith.[51] The implication was that the defendant's action was for expectable reasons within the ordinary course of business. When a lessee moved part of its business to a different floor of the building where a flat rental applied, the rearrangement of the merchant's wares within the rented space was similarly seen as an expectable business practice.[52] However, where a lessee diverted customers to other premises for the *sole* purpose of bringing down gross receipts at the leased premises, the lessee's reason for acting lay outside the bounds of the contract.[53] The lessor reasonably expected variations in the percentage rent to result from market factors affecting the

[47] 234 Md. at 535, 200 A.2d at 174.

[48] 309 N.Y. at 248, 128 N.E.2d at 401.

[49] 170 Misc. at 294, 9 N.Y.S.2d at 306.

[50] *Id.*, 9 N.Y.S.2d at 305.

[51] 234 Md. at 521, 200 A.2d at 166. *See also* Dickey v. Philadelphia Minit-Man Corp., 377 Pa. 549, 105 A.2d 580 (1954).

[52] 309 N.Y. at 248, 128 N.E.2d at 401.

[53] 170 Misc. at 294, 9 N.Y.S.2d at 306.

volume of business at the lessee's location. But, it may be inferred, neither party justifiably expected at formation that the lessee would interfere with the flow of customers to reduce its own sales at the leased premises.[54]

Most cases invoking the obligation to perform in good faith can be synthesized using the following principle: a party performs in bad faith by using discretion in performance for reasons outside the justified expectations of the parties arising from their agreement. Distinguishing allowed from disallowed reasons — opportunities forgone from opportunities preserved on entering a contract — will often be easy. But the distinction will be difficult in some cases. Specific disallowed reasons may be inferred from the express contract terms in light of the ordinary course of business and customary practice, in accordance with the usual principles of contract interpretation. It is not hard to infer from a fixed contract price, for example, that the parties have forgone opportunities to take advantage of market price fluctuations. Their justified expectations with respect to allowed reasons for exercising discretion often can be identified, as the discussion of cases in Chapter 4 will show. Some uncertainty is unavoidable, though no greater here than elsewhere in contract law.

### §2.3.4   Justifications

In the abstract, the good faith performance obligation is the functional equivalent of a modern principle of *pacta sunt servanda* — the obligation to keep agreements, understood contextually. At this general level, good faith requires the keeping of the express promises embodied in an agreement together with their promissory presuppositions. Viewed only at this high level of abstraction, however, the good faith idea seems not to be doing any distinctive work, as two former academics turned judges have noted.[55] Everything seems to turn on identification of the promissory presuppositions, which also ground implied contract terms not generally treated as aspects of "good faith." When

---

[54] *See* HML Corp. v. General Foods Corp., 365 F.2d 77, 81-82 (3d Cir. 1966) (dictum) (analogizing requirements contracts to percentage lease cases).

[55] Market St. Assocs. Ltd. Partnership v. Frey, 941 F.2d 588, 596 (7th Cir. 1991) (Posner, J.) (applying Wisconsin law); Tymshare, Inc. v. Covell, 727 F.2d 1145, 1152-1153 (D.C. Cir. 1984) (Scalia, J.) (applying Virginia law).

we examine the cases in detail, as we shall in Chapter 4, we will see that the distinctive mission of good faith in contract performance is to police the reasons for which a discretion-exercising party may act. Of course, this could be done without using the words "good faith," but we would not do as well were we to dispense with the concept.

The goal should be an accommodation of the contractual interests of the parties. The public has an interest in the security of contractual transactions: in contract performance and enforcement, we should protect the parties' justified expectations arising from agreements that have passed the tests of enforceability. Questions concerning the range of enforceable promises depend significantly on general principles of fairness, morality, and public policy, as implemented by the law. Such principles may justify a broader or narrower domain in which freedom of contract prevails in a society. Once it has been decided that an agreement is enforceable, however, it has been decided that the agreement is within the domain of private ordering. Overriding principles of fairness, morality, and public policy then are spent and replaced by the obligation to keep the agreement. Unless some event after formation justifies different treatment, as when doctrines of modification, estoppel, waiver, material breach, unjust enrichment, or commercial impracticability are properly invoked, there is no justification for imposing additional obligations on the parties or relieving them of obligations they have undertaken.

A discretion-exercising party has an interest in maintaining the full range of discretionary action as agreed, and often bargained for, calling upon judges and juries to refrain from second-guessing amounting to ad hoc regulation. By contrast, the other party has an interest, also often bargained for, in securing some measure of protection from abuses of discretion by his contract partner. Focusing on a discretion-exercising party's reasons for action, finding liability only when a party acts for a reason given up when entering the contract freely, tends to hold a discretion-exercising party to its voluntary undertakings without engaging in second-guessing or hidden regulation. It protects one party's justified expectations that the other will act for expectable reasons in the relevant business context. This approach preserves a reasonable scope for discretion, rooting the limits on discretion in the parties' agreement.

A further justification for the good faith performance doctrine may be economic. The costs of contracting include the costs of gathering

information with which to choose one's contract partners, negotiating and drafting contracts, and taking risk with respect to the future. The good faith performance doctrine reduces all three kinds of costs by encouraging parties to rely on the law in place of incurring some of these costs.

Many contracting parties investigate the market in part to identify and select those prospective contract partners whose reputations for business integrity reduce the risk of disappointing contract performance. Such information never will be wholly complete or trustworthy. A choice is presented if the law offers a prospect of compensation to a contract party who may incur losses due to the other party's lack of business integrity. Parties who wish to reduce uncertainty as to their prospective contract partners' integrity may either gather more information before contracting or, as a substitute for some such information, create a legal incentive for honorable behavior in the form of a prospect of recovering damages. The economically rational person presumably would choose the alternative that is less costly at the margin.

The good faith performance doctrine similarly reduces the costs of negotiating and drafting contracts. After selecting each other as probable contract partners, the parties will choose the amount of detail to include in their express contract. Reducing uncertainty by increasing the detail, however, is expensive. The alternatives to detailed contracts are (1) relying on legal rules that supply default terms, which apply unless displaced by party agreement, and (2) bearing the uncertainty. The good faith performance doctrine provides such a default rule. Hence, parties who wish to reduce uncertainty have the choice of engaging in more detailed negotiation and drafting or of substituting the background obligation of good faith. The good faith performance doctrine thus makes short contracts less risky.

Finally, the good faith performance doctrine enhances the efficiency of contractual exchanges by minimizing the joint costs of contracting. Theoretically, the joint costs of the contract will be minimized if liability is placed on the party who can more cheaply cover the contingency by express terms — the party best able to protect itself.[56] Accordingly, an economic approach asks: which party is in the better position to protect itself by settling matters in the express agreement, thus

[56] See generally Ronald H. Coase, The Problem of Social Cost, 3 J. L. & Econ. 1 (1960).

securing the expectations of both parties? The capacity to protect oneself cuts both ways. A nondiscretion-exercising party may secure additional promises from the discretion-exercising party, making forgone opportunities explicit. A discretion-exercising party, however, may protect itself by conditioning its obligation to perform, making preserved opportunities explicit. The costs of contracting are reduced when the law places liability on the party who can better foresee the risks and, therefore, can settle expectations more cheaply.[57]

By hypothesis, that party will be the discretion-exercising party, who would have far better information concerning its own alternative opportunities and the probability that a later opportunity will prove more attractive. On the other hand, for the dependent party to protect itself, it must secure a lengthy series of express promises as to those alternative opportunities that the other party may *not* pursue. This would involve a potentially costly process of eliminating hypothetical contingencies. The joint cost of contracting, therefore, should be less when a party with discretion is required to protect itself. All it need do is include a condition that preserves particular alternative opportunities under specified circumstances; if it does not, opportunities that are forgone according to ordinary business expectations should not be allowed to ground legitimate reasons for exercising discretion in contract performance.

---

[57] Burton, *supra* note 34. *See also* Ian Ayers & Robert Gertner, Filling Gaps in Incomplete Contracts: An Economic Theory of Default Rules, 99 Yale L.J. 87 (1989).

CHAPTER

$$3$$

# DISTINGUISHING GOOD AND BAD FAITH PERFORMANCE

§3.1   Introduction
§3.2   Good Faith and Express Contract Terms
    §3.2.1   Priority of Express Terms
    §3.2.2   Interpretation of Express Terms
    §3.2.3   Independent Cause of Action
    §3.2.4   Waiver and Estoppel
    §3.2.5   Disclaimers of Good Faith
§3.3   Subjective and Objective Standards
    §3.3.1   Subjective Standards: Wrongful Motives
    §3.3.2   Subjective Standards: Dishonesty
    §3.3.3   Subjective Standards: Intentional Action on Impermissible Reasons
    §3.3.4   Subjective v. Objective Standards
    §3.3.5   Objective Standards: Contractual Reasonableness
    §3.3.6   Objective Standards: Justified Expectations
    §3.3.7   Summary
§3.4   Illustrative Cases
    §3.4.1   Example: Employment Terminable "At Will"
    §3.4.2   Other Examples
        §3.4.2.1   Discretion as to Quantity
        §3.4.2.2   Discretion as to Quality

61

        §3.4.2.3   Discretion as to Price
        §3.4.2.4   Discretion as to Time
        §3.4.2.5   Discretionary Control of a Condition
§3.5   Causation
§3.6   Burdens of Proof
§3.7   Instructing a Jury: Mixed Reasons
§3.8   Remedies for Breach by Failing to Perform in Good Faith

## §3.1   INTRODUCTION

The theory of good faith performance developed in §2.3 represents a synthesis of the case law in light of the general principles underlying and guiding the law of contracts more generally — chiefly, the principle of freedom of contract, which respects the parties' autonomy (within the unregulated domain) to make their own legal relations by promising. Some courts take other approaches, as noted at §2.2.3 and explored at §§9.3 and 9.4. In our opinion, whatever the academic virtues of other approaches, they enjoy relatively little judicial support insofar as the reported cases indicate. Accordingly, this chapter proceeds to emphasize practical matters that arise in the implementation of the theory developed at §2.3. That theory, it will be recalled, understands the good faith performance obligation according to the following principle: a party performs in bad faith by using discretion in performance for reasons outside the justified expectations of the parties arising from their agreement.

## §3.2   GOOD FAITH AND EXPRESS CONTRACT TERMS

The implied covenant of good faith and fair dealing is above all an implied *covenant* — a kind of promise. As the Supreme Court of California put it:

> An allegation of breach of the implied covenant of good faith and fair dealing is an allegation of breach of an "ex contractu" obligation, namely, one arising out of the contract itself. The covenant of good faith is read into contracts in order to protect the express covenants

or promises of the contract, not to protect some general public policy interest not directly tied to the contract's purposes.[1]

Good faith generally binds the parties because of their own autonomous undertakings, not for overriding reasons of public policy or vague notions of fairness.[2] The express terms, in their literal meaning, might not govern in the end for certain reasons: interpretation may lead away from the literal meaning to a meaning better matching the justified expectations of the parties in the context (§3.2.2); express terms may be waived, or a party's departure from express terms in practice may estop that party from relying on express terms thereafter (§3.2.4). Nonetheless, the priority of express terms, properly interpreted, is a strong principle prevailing in the lion's share of cases (§3.2.1).

## §3.2.1   Priority of Express Terms

Party autonomy is implemented when the law leaves contract parties free to determine by agreement what good faith will permit or require of them. The courts, with few exceptions, say that a good faith obligation cannot contradict or override express contract terms. The courts say this with *great* regularity.[3] Two cases from the Supreme Court of California indicate plainly that some courts mean what they say.[4]

---

**§3.2** [1]Foley v. Interactive Data Corp., 47 Cal. 3d 654, 690, 765 P.2d 373, 394, 254 Cal. Rptr. 211, 232 (1988). This does not mean that good faith comes into play only when there is a violation of express contract terms. *E.g.*, Carma Developers (Cal.), Inc. v. Marathon Dev. Cal., Inc., 2 Cal. 4th 342, 826 P.2d 710, 6 Cal. Rptr. 2d 467 (1992); Association Group Life, Inc. v. Catholic War Veterans, 61 N.J. 150, 293 A.2d 382 (1972).

[2]*E.g.*, Market St. Assocs. Ltd. Partnership v. Frey, 941 F.2d 588 (7th Cir. 1991) (applying Wisconsin law); Bushwick-Decatur Motors v. Ford Motor Co., 116 F.2d 675 (2d Cir. 1940) (applying Michigan law); Metro Communications Co. v. Ameritech Mobile Communications, Inc., 788 F. Supp. 1424 (E.D. Mich. 1992) (applying Illinois law); §2.3.4.

[3]*E.g.*, Hubbard Chevrolet Co. v. General Motors Corp., 873 F.2d 873, 877 (5th Cir. 1989) (applying Michigan law) (discussed at §4.3.4); Davis v. Sears, Roebuck & Co., 873 F.2d 888 (6th Cir. 1989) (applying Georgia law); Triangle Mining Co. v. Stauffer Chem. Co., 753 F.2d 734 (9th Cir. 1985) (applying Idaho law); Tymshare, Inc. v. Covell, 727 F.2d 1145 (D.C. Cir. 1984) (applying Virginia law); Foley v. Interactive Data Corp., 47 Cal. 3d 654, 765 P.2d 375, 254 Cal. Rptr. 211 (1988); Rio Algom Corp. v. Jimco, Ltd., 618 P.2d 497 (Utah 1980).

[4]Two cases from Oregon nicely illustrate the same points in a different context. *Compare* Best v. United States Natl. Bank, 303 Or. 557, 739 P.2d 554 (1987) *with* Tolbert v. First Natl. Bank, 312 Or. 485, 823 P.2d 965 (1991).

In *Kendall v. Ernest Pestana, Inc.*,[5] a commercial lease contained a standard clause prohibiting assignments or subleases without the lessor's prior written consent. Departing from the traditional rule allowing a lessor to disapprove such substitutions arbitrarily, the Supreme Court of California held by a vote of 5-2 that, when a contract that confers on one party a discretionary power affecting the rights of the other, an obligation is imposed to exercise that discretion in good faith and in accordance with fair dealing. Further, a commercial lessor who retains the discretionary power to approve or disapprove an assignee must exercise the discretion in accordance with "commercially reasonable standards."[6] The court's opinion suggested that a lessor's refusal to consent might be reasonable if based on factors such as the financial responsibility of the proposed assignee, suitability of the assignee's use for the particular property, legality of the proposed use, or need for alteration of the premises. The court added that approval could not validly be denied for reasons of personal taste, convenience, or sensibility or so the landlord could charge a higher rent than that provided by the original contract. The latter reasons would not justify because, the court said, they stem from the landlord's desire for a better bargain than the contract (a forgone opportunity). Other courts recognizing a good faith limitation on a landlord's discretion concur that a landlord is in bad faith for denying consent in order to gain a higher rent.[7]

Seven years later, the same court[8] considered another restriction on a lessee's power to assign a commercial lease. In *Carma Developers (California), Inc. v. Marathon Development California, Inc.*,[9] there was good evidence that, upon the tenant's request for consent to assign, the landlord terminated the lease in order to obtain the increased rental value of the property in a rising market. The court, however,

---

[5] 40 Cal. 3d 488, 709 P.2d 837, 220 Cal. Rptr. 818 (1985).

[6] *Id.* at 500, 709 P.2d at 845, 220 Cal. Rptr. at 826.

[7] Tucson Medical Ctr. v. Zoslow, 147 Ariz. 612, 712 P.2d 459 (1985) (commercial lessor in bad faith for not consenting to lessee's sublease for reasons other than those relating to the property or the sublessee); Warner v. Konover, 210 Conn. 150, 553 A.2d 1138 (1989) (tenant stated a claim by alleging that landlord was in bad faith for not consenting to tenant's assignment of his commercial lease unless assignee paid higher rent); Fernandez v. Vazquez, 397 So. 2d 1171 (Fla. Dist. Ct. App. 1981) (lessor in good faith only if consent withheld for reasons related to property or proposed assignee); Julian v. Christopher, 320 Md. 1, 575 A.2d 735 (1990) (refusal to consent to transfer of lease solely to extract a rent increase would be bad faith).

[8] Composed for this case of seven court of appeals judges following recusals by all seven justices.

[9] 2 Cal. 4th 342, 826 P.2d 710, 6 Cal. Rptr. 2d 467 (1992).

reversed a lower court judgment based on *Kendall*, which judgment found the landlord in bad faith for acting for that reason. In the Supreme Court's opinion, the difference from *Kendall* lay in the fact that a clause of the contract expressly gave the landlord a right to terminate the lease and enter into a new lease with the proposed assignee or sublessee, or any other person, on such terms as may be agreed. The contract said, "[I]n such event, Tenant shall not be entitled to any portion of the profit, if any, which Landlord may realize on account of such termination and reletting."[10] In a slight overstatement, the court wrote that "[i]t is universally recognized the scope of conduct prohibited by the covenant of good faith is circumscribed by the purposes and express terms of the contract."[11] We would say that the landlord here effectively preserved the opportunity to capture the benefit of a rising market by gaining the tenant's agreement to the quoted contract language.

A contract clause granting the landlord a right to consent to such a transfer might be unenforceable as an unlawful restraint on alienation or, if unconscionable, for reasons of contractual morality. We do not address those specific questions, which are determined as of the time of contract formation. In general, however, courts might well be justified in overriding a contract clause when it is unconscionable or otherwise unenforceable at formation, when estoppel or waiver is properly invoked, or when performance is impossible or commercially impracticable. Considerations of fairness or justice are relevant to interpret or supply terms when the intentions of the parties or their justified expectations cannot be reasonably ascertained. But it is hard to see what justifies a court in disregarding the agreement of the parties when their intentions or justified expectations can be reasonably ascertained and none of the above-mentioned doctrines is properly invoked. Once it has been decided that an agreement is enforceable, requirements of good faith in contract performance should not deprive a party of the benefit of its bargain.

## §3.2.2   *Interpretation of Express Terms*

The priority of express terms over the implications of good faith should not be understood to render sacrosanct the express terms, taken

---

[10]*Id.* at 351, 826 P.2d at 713, 6 Cal. Rptr. 2d at 470. *See also* F & L Ctr. Co. v. Cunningham Drug Stores, Inc., 19 Ohio App. 3d 72, 482 N.E.2d 1296 (1984).
[11]2 Cal. 4th at 373, 826 P.2d at 727, 6 Cal. Rptr. 2d at 484.

literally. Rather, this priority should be understood to give priority to the express terms, *properly interpreted in light of the context in which they were made*.[12] The good faith performance doctrine aims to "preserve the spirit of the contract rather than the form."[13]

In our view, express terms *always* require interpretation before they are given effect. As Judge Frank Easterbrook reminded us:

> Literal implementation of unadorned language may destroy the essence of the venture. Few people pass out of childhood without learning fables about genies, whose wickedly literal interpretation of their "masters'" wishes always leads to calamity.[14]

When we seek to further the autonomous choices of the parties, we should always ask whether what we take to be the obvious meaning of the parties' language was obvious to them.[15] Very often, the literal or obvious meaning will turn out to be the correct interpretation after the interpretative arguments are heard. Sometimes the literal meaning turns out to be a misleading indicator of party intentions or expectations. In the latter cases, settled principles of contract law require that a contract be interpreted to give effect to the justified expectations of the contract parties, arising from their agreement, understood in the context in which it was made. As the Supreme Court of Utah put it:

> An examination of express contract terms alone is insufficient to deter-
> mine whether there has been a breach of the implied covenant of good

---

[12] *See* Iadanza v. Mather, 820 F. Supp. 1371 (D. Utah 1993) (applying Utah law); Southwest Sav. & Loan Assn. v. SunAmp Sys., Inc., 172 Ariz. 553, 838 P.2d 1314 (Ct. App. 1992); Martindell v. Lake Shore Natl. Bank, 15 Ill. 2d 272, 154 N.E.2d 683 (1958); St. Benedict's Dev. Co. v. St. Benedict's Hosp., 811 P.2d 194 (Utah 1991).

[13] Tidmore Oil Co. v. BP Oil Co./Gulf Prods. Div., 932 F.2d 1384, 1390 (11th Cir. 1991) (applying Alabama law) (citing Hoffman-La Roche, Inc. v. Campbell, 512 So. 2d 725, 738 (Ala. 1987)).

[14] Kham & Nate's Shoes No. 2, Inc. v. First Bank, 908 F.2d 1351, 1357 (7th Cir. 1990) (unclear applicable law). Judge Easterbrook, nonetheless, insisted that firms are entitled to enforce negotiated contracts "to the letter." *Id.* The opinion is discussed below at §4.4.4.2.

[15] *See, e.g.,* Pacific Gas & Elec. Co. v. G.W. Thomas Drayage & Rigging Co., 69 Cal. 2d 33, 442 P.2d 641, 69 Cal. Rptr. 561, 40 A.L.R. 3d 1373 (1968); E. Allan Farnsworth, 2 Farnsworth on Contracts §§7.7-7.14 (1990); Arthur L. Corbin, Interpretation of Words and the Parole Evidence Rule, 50 Cornell L.Q. 151 (1965).

faith and fair dealing. To comply with his obligation to perform a contract in good faith, a party's actions must be consistent with the agreed common purpose and the justified expectations of the other party. The purpose, intentions, and expectations of the parties should be determined by considering the contract language *and* the course of dealings between and conduct of the parties.[16]

Consider, for example, a typical termination clause providing that "[t]his Agreement may be cancelled by either party for any reason on 30 days' written notice." Numerous cases involve claims that clauses like this, though enforceable, can be invoked to terminate only if the terminating party acts in good faith.[17] Such claims almost invariably are rejected.[18] When the contract language, upon interpretation, means what it seems to say, the party wishing to terminate did all that could be expected, upon contract formation, to preserve its alternative opportunities, subject to the required notice. There then is nothing inappropriate about pursuing other opportunities, since, normally, none was forgone for more than 30 days when entering the contract. With that one limitation, the contract normally confers almost unbridled discretion to terminate for any reason. The courts generally protect that intention of the parties when shown.[19]

[16]St. Benedict's Dev. Co. v. St. Benedict's Hosp., 811 P.2d 194, 200 (Utah 1991) (emphasis in original, citations omitted). *See also* Oregon RSA No. 6, Inc. v. Castle Rock Cellular Ltd., 840 F. Supp. 770 (D. Or. 1993) (applying Oregon law); Iadanza v. Mather, 820 F. Supp. 1371 (D. Utah 1993) (applying Utah law); Martindell v. Lake Shore Natl. Bank, 15 Ill. 2d 272, 286, 154 N.E.2d 683, 690 (1958); Hilton Hotels Corp. v. Butch Lewis Prods., Inc., 107 Nev. 226, 808 P.2d 919 (1991).

[17]E.g., Rose v. Wells Fargo & Co., 902 F.2d 1417 (9th Cir. 1990) (applying California law); Davis v. Sears, Roebuck & Co., 873 F.2d 888 (6th Cir. 1989) (applying Georgia law); Mason v. Farmers Ins. Co., 281 N.W.2d 344 (Minn. 1979); De Los Santos v. Great W. Sugar Co., 217 Neb. 282, 348 N.W.2d 842 (1984); Melnick v. State Farm Mut. Auto. Ins. Co., 106 N.M. 726, 749 P.2d 1105 (1988).

[18]It is a separate question whether such a provision might be unenforceable because unconscionable. *See, e.g.*, Cardinal Stone Co. v. Rival Mfg. Co., 669 F.2d 395 (6th Cir. 1982) (applying Ohio law); Corenswet, Inc. v. Amana Refrigeration, Inc., 594 F.2d 129 (5th Cir. 1979) (applying Iowa law); Shell Oil Co. v. Marinello, 63 N.J. 402, 307 A.2d 598 (1973); Best v. United States Natl. Bank, 303 Or. 557, 739 P.2d 554 (1987).

[19]E.g., Davis v. Sears, Roebuck & Co., 873 F.2d 888 (6th Cir. 1989) (applying Georgia law); Triangle Mining Co. v. Stauffer Chem. Co., 753 F.2d 734 (9th Cir. 1985) (applying Idaho law); Melnick v. State Farm Mut. Auto. Ins. Co., 106 N.M. 726, 749 P.2d 1105 (1988). *See also* Hubbard Chevrolet Co. v. General Motors Corp., 873 F.2d 873 (5th Cir. 1989) (applying Michigan law); Carrols Corp. v. Canton Joint Venture, No. 88-2115-1, 1990 WL 99047, 1990 Ohio Misc. LEXIS 4 (C.P. June 27, 1990).

In unusual circumstances, however, even a contract expressly terminable at will may turn out upon interpretation to constrain discretion. Consider *Fortune v. National Cash Register Co.*,[20] in which the defendant's salesperson was paid primarily by commission. His written contract was terminable at will, without cause, by either party on written notice. The day after he obtained a $5 million order, but before all formalities were completed, he was discharged without being paid the full commission. The Supreme Judicial Court of Massachusetts reversed an appeals court ruling focusing only on the defendant's compliance with the literal agreement. It held that the plaintiff was entitled to a jury determination as to the defendant's good faith, indicating that the defendant could be in bad faith if it acted to avoid paying the commission. Several other courts have so held,[21] in effect interpreting the contract to place *some* limitation on the employer's discretion to terminate. The pretextual opportunism of such employers may not have been within the reasonable expectations of the parties despite the literal meaning of the express term. If that is shown at trial, neither party would be justified in expecting that the employer could take the benefit of the employee's effort and terminate solely to avoid paying a commission.[22]

## §3.2.3   *Independent Cause of Action*

Courts sometimes insist that the implied covenant of good faith and fair dealing does not ground an "independent cause of action." Such a court might mean either of two things. First, a court may decide that good faith does not ground an action in tort, independent of the contract action.[23] Or a court may decide that good faith does not ground a contract action that is independent of the parties' agreement.[24]

---

[20] 373 Mass. 96, 364 N.E.2d 1251 (1977).

[21] *E.g.*, Wakefield v. Northern Telecom, Inc., 769 F.2d 109 (2d Cir. 1985) (applying New York and New Jersey law); Mitford v. de Lasala, 666 P.2d 1000 (Alaska 1983); Hall v. Farmers Ins. Exch., 713 P.2d 1027 (Okla. 1985). *See also* Caton v. Leach Corp., 896 F.2d 939 (5th Cir. 1990) (applying California law); Tymshare, Inc. v. Covell, 727 F.2d 1145 (D.C. Cir. 1984) (applying Virginia law).

[22] For a discussion of termination clauses as enforcement terms, see §7.3.2.

[23] For discussion, see §9.2.3.

[24] *E.g.*, Fidelity Mut. Life Ins. Co. v. American Natl. Bank & Trust Co., No. 93

Both views allow actions for breach of contract for failing to perform in good faith, in which good faith grounds the implication of promises to further the agreement of the parties. Such an action, whether denominated breach of contract or breach of the covenant of good faith and fair dealing, is generally available in all U.S. jurisdictions, despite occasional confusion in some opinions.[25]

## §3.2.4   Waiver and Estoppel

The priority of express terms over the implications of good faith should not be understood to render sacrosanct the express terms as against ordinary principles of waiver and estoppel. Rather, this priority should be understood to give precedence to the express terms insofar as they are otherwise enforceable under the law of contracts. The law of good faith performance is sometimes used to reinforce the applicability of other principles, though it is neither necessary nor helpful. It goes without saying that express terms do not prevail when they are unenforceable because unconscionable, a product of fraud or duress, or in violation of public policy. It should also go without saying that express terms may be negated by subsequent events giving rise to waivers and estoppels.[26]

---

C 6436, 1994 WL 67852, 1994 U.S. Dist. LEXIS 1968 (N.D. Ill. Feb. 24, 1994); Nelson v. WEB Water Dev. Assn., 507 N.W.2d 691 (S.D. 1993); Lake Tightsqueeze, Inc. v. Chrysler First Fin. Serv. Corp., 20 Ga. App. 178, 435 S.E.2d 486 (1993).

[25] For example, it is not necessary for discretion to be granted by an express term of the contract in order for a party to have contractual discretion invoking a good faith performance obligation. See, e.g., Beraha v. Baxter Health Care Corp., 956 F.2d 1436 (7th Cir. 1992) (applying Illinois law). One opinion holds otherwise. See Fernandes v. First Bank & Trust Co., No. 93 C 2903, 1993 WL 339286, 1993 U.S. Dist. LEXIS 12342 (N.D. Ill. Sept. 3, 1993) (applying Illinois law). In our view, Fernandes misreads Beraha and BA Mortgage & International Realty Corp. v. American National Bank & Trust Co., 706 F. Supp. 1364 (N.D. Ill. 1989) (applying Illinois law). Neither precedent held that good faith performance is required only when express terms repose discretion in one party. See Martindell v. Lake Shore Natl. Bank, 15 Ill. 2d 272, 154 N.E.2d 683 (1958) ("where an instrument is susceptible of two conflicting constructions, one of which imputes bad faith to one of the parties and the other does not, the latter construction should be adopted").

[26] Rights generated by the implied covenant of good faith and fair dealing, too, can be lost through waiver or estoppel. See Federal Deposit Ins. Corp. v. Nobles, 901 F.2d 477 (5th Cir. 1990) (applying Texas law); Nerken v. Standard Oil Co. (Indiana), 810 F.2d 1230 (D.C. Cir. 1987) (applying Delaware law).

In *Tanner v. Baadsgaard*,[27] for example, a contract for the sale of real property included provision for installment payments by the buyer on fixed dates. Due to difficulty in obtaining financing, the buyer was late in making the first installment. The seller made no complaint for almost a year, despite repeated communications indicating that the buyers had continuing difficulties obtaining financing, but were still trying. At one point, the parties modified the interest rate until the transaction closed. The court held that the seller had waived strict compliance with the express provisions of the contract regarding the times for payment. It reasoned that the parties to such contracts assumed they would cooperate with each other in good faith. On that premise, the evidence showed not that the buyer had abandoned the contract, but that seller had waived strict compliance. The good faith premise here is both superfluous and confusing. The better premise is the normal standard for a waiver — the seller waived the timing of payments if he intentionally and knowingly relinquished his right.[28] On that premise, it is easy to see that the express terms did not prevail because of the waiver, not because of the requirements of good faith.

Similarly, in *Bak-A-Lum Corp. of America v. Alcoa Building Products, Inc.*,[29] a distributor of aluminum siding and related products sought damages for breach of an exclusive distributorship agreement granting it exclusive rights in northern New Jersey. Though the distributor apparently performed well for several years, the manufacturer terminated the "exclusive" and allowed four other distributors into the territory. The New Jersey Supreme Court found that the implied contract terms allowed the distributor to terminate after a reasonable period of time had passed and on reasonable notice (but we may assume for this discussion that it was an express term of the contract). The court disagreed with the trial court's finding that seven months was a reasonable period for notice, extending it to 20 months because of the manufacturer's bad faith. Bad faith occurred when, several months before the termination, but after the manufacturer secretly had decided to terminate the "exclusive," the distributor undertook a major expansion of its warehouse facilities at substantial added operating expense, committing itself to a five-year lease on the new facilities. The manufac-

---

[27] 612 P.2d 345 (Utah 1980).

[28] *See* Burger King Corp. v. Family Dining, Inc., 426 F. Supp. 485 (E.D.Pa.), (applying Pennsylvania law), *aff'd mem.*, 566 F.2d 1168 (3d Cir. 1977).

[29] 69 N.J. 123, 351 A.2d 349 (1976).

turer knew of and encouraged this step, leading the distributor to believe it was well warranted in view of the expected enlargement of both businesses. The court concluded that the manufacturer's "selfish withholding from [distributor] of its intention seriously to impair its distributorship although knowing plaintiff was embarking on an investment substantially predicated upon its continuation constituted a breach of the implied covenant of dealing in good faith."[30]

There are two ways to regard this case. On its face, the opinion provides support for the Summers view of good faith, which allows the express (or normally implied) terms of a contract to be overridden for reasons of general fairness or contractual morality.[31] The New Jersey Supreme Court is more prone than most to allow such considerations to dominate over the autonomy of the parties.[32] The result in *Bak-A-Lum* is not objectionable. However, a better rationale — one far more consonant with the case law generally — is the law of estoppel.

Consider *Goodman v. Dicker*,[33] where a manufacturer represented that a distributor's application for a distributorship had been accepted, upon the faith of which the applicant expended money preparing to do business as a distributor. However, the manufacturer delivered no goods and terminated the distributorship before any business was conducted. The Court of Appeals for the District of Columbia Circuit held that, contract or not, the manufacturer's promise to grant a distributorship foreseeably induced the applicant to make the expenditures. On settled law having nothing to do with good faith performance — the law of "promissory estoppel"[34] — the manufacturer was liable for the funds expended in preparing to do business under the distributorship. Similarly, in *Lockewill, Inc. v. United States Shoe Corp.*,[35] the Court of Appeals for the Sixth Circuit applied the "Missouri Rule," which requires a manufacturer who terminates a distributor to compensate the distributor for investments made in reliance on the

---

[30] *Id.* at 130, 351 A.2d at 352.

[31] *See* §§2.2.3.2, 9.3.

[32] *See, e.g.,* Woolley v. Hoffmann-La Roche, Inc., 99 N.J. 284, 491 A.2d 1257 (1985); Shell Oil Co. v. Marinello, 63 N.J. 402, 307 A.2d 598 (1973).

[33] 169 F.2d 684 (D.C. Cir. 1948) (applying D.C. law). *See also* Grouse v. Group Health Plan, Inc., 306 N.W.2d 114 (Minn. 1981).

[34] Restatement (Second) of Contracts §90 (1979).

[35] 547 F.2d 1024 (8th Cir. 1976) (applying Missouri law). *See also* Cambee's Furniture, Inc. v. Doughboy Recreational, Inc., 825 F.2d 167 (8th Cir. 1987) (applying South Dakota law).

contract when the distributor did not get a sufficient opportunity to recoup its investment in the distributorship.

The result in *Bak-A-Lum* should have been cut from this cloth, not the cloth of good faith performance. There is no general requirement that a party give notice of termination as soon as it decides to terminate.[36] The only difference from the estoppel cases is that the manufacturer's assurances and representations concerned the continuation of the distributorship, not its initiation. There is no apparent reason why such representations made in the course of a terminable distributorship, whether or not disingenuous, should incur less legal responsibility than those made at its inception. It makes good sense in this way for the court to extend the period required for notice of termination until the distributor would have a reasonable opportunity to recoup its investment made in reliance on the manufacturer's implied promise.

### §3.2.5   Disclaimers of Good Faith

Section 1-102(3) of the Uniform Commercial Code (U.C.C.) provides:

> The effect of provisions of the Act may be varied by agreement . . . , except that the obligations of good faith, diligence, reasonableness and care prescribed by this Act may not be disclaimed by agreement but the parties may by agreement determine the standards by which the performance of such obligations is to be measured if such standards are not manifestly unreasonable.

The question may arise whether a similar ban on disclaimers of good faith by express contract terms exists, or should exist, in the common law. The question is more likely to arise in transactions involving high-volume repeat players, like the banks and merchants governed by the U.C.C.[37] Counsel for such players may think it to their advantage

---

[36]United Roasters, Inc. v. Colgate-Palmolive Co., 649 F.2d 985 (4th Cir. 1981) (applying North Carolina law).

[37]Marc Galanter, *Reading the Landscape of Disputes: What We Know and Don't Know (and Think We Know) About Our Allegedly Contentious and Litigious Society*, 31 UCLA L. Rev. 4 (1983).

to include a standard clause in their contracts disclaiming any obligation to perform in good faith.

The issue is not resolved by extensive case law. An early common law contract case addresses the issue.[38] The Court of Appeals of New York wrote in dicta:

> If one party to a contract has the unrestrained power to say what it means, the other has no rights except by sufferance. The parties to the contract before us were not in that situation, and human language is not strong enough to place them in that situation. . . . No one can be made by contract the final judge of his own acts, for the law writes "good faith" into such agreements. No covenant of immunity can be drawn that will protect a person who acts in bad faith, because . . . the courts will not enforce it.[39]

More recently, the Illinois Court of Appeals held in a lender liability case that a general waiver of defenses clause did not waive the borrower's defense of bad faith.[40]

We think the Court of Appeals of New York expressed the right view, so long as it is understood that a party who acts fully in accordance with the parties' agreement, properly interpreted, is in good faith.[41] A contract clause providing, for example, that a party "shall not be

[38] Disclaimers of the *tort* of bad faith should be distinguished. In Seaman's Direct Buying Service, Inc. v. Standard Oil Co., 36 Cal. 3d 752, 686 P.2d 1158, 206 Cal. Rptr. 354 (1984), the California Supreme Court wrote in dicta that parties "are not permitted to disclaim the covenant of good faith but they are free, within reasonable limits at least, to agree upon the standards by which application of the covenant is to be measured." *Id.*, 686 P.2d at 1166, 206 Cal. Rptr. at 363 (citing California's enactment of U.C.C. §1-102). Though this language has been quoted by other courts, the cases concern the tort of bad faith denial of the existence of a contract and should not be regarded as helpful for understanding contractual good faith. *See* §9.2.3.

[39] Industrial & Gen. Trust v. Tod, 180 N.Y. 215, 225, 73 N.E. 7, 9 (1905).

[40] Chemical Bank v. Paul, 244 Ill. App. 3d 772, 614 N.E.2d 436 (1993). In Foster Enterprises v. Germania Federal Savings & Loan Association, 97 Ill. App. 3d 22, 421 N.E.2d 1375 (1981), Illinois' intermediate appellate court said, in obiter dicta without citation of authority, that the covenant of good faith is implied into every contract "absent express disavowal." *Id.* at 28, 421 N.E.2d at 1380. The statement was questioned, for good reason in our view, in Audichron Co. v. Phone Programs Illinois, No. 84 C 8773, 1987 WL 8967, 1987 U.S. Dist. LEXIS 2506 (N.D. Ill. Mar. 30, 1987) (contract providing a party with "sole discretion" to terminate does not prevent implication of good faith requirement).

[41] *See* Federal Deposit Ins. Corp. v. Nobles, 901 F.2d 477 (5th Cir. 1990) (applying Texas law).

73

bound by any obligation of good faith under this contract" should be unenforceable. Disclaiming the obligation of good faith in this way amounts to denying any obligation to keep one's contract. Logically, it is a contradiction to make a promise while denying any obligation to keep it. Legally, it is "promissory fraud" to make a promise without a present intention to perform it.[42] Accordingly, the courts could not enforce such a disclaimer without in effect licensing promissory fraud. This they should not do.

## §3.3   SUBJECTIVE AND OBJECTIVE STANDARDS

Much discussion in the cases and scholarly commentaries concerns whether good faith is a "subjective" or an "objective" standard for judging conduct. The discussions are confusing for two main reasons. First, the conduct to be judged is usually described only in the most particular, case-specific terms, if it is described at all. A virtue of the good faith performance theory developed at §2.3 is that it identifies the targeted conduct—a party's exercise of discretion—in generic terms that bring the discussion into the relevant legal context— contract performance. This formulation ties the question of good faith to analogous questions of contract breach, making it evident that we want to know whether a discretionary act was justified action in relation to the contract, just as when we consider any claim of breach. Second, there are several different subjective standards requiring separate analysis. Good faith might require only an absence of any wrongful motive, dishonesty, or action motivated by impermissible reasons. On the objective side, good faith would require a reasonable exercise of discretion; that is, action justified by a reason within the reasonable expectations of the parties.

The case law on this matter is neither consistent nor enlightening. We can only survey the different approaches, give our analysis of the issues and arguments, and offer some recommendations. Throughout, we will indicate our general preference for objective standards of a certain kind while describing precedents supporting other views.

[42] See §2.3.1 note 8.

## §3.3.1   Subjective Standards: Wrongful Motives

A few very weak common law authorities suggest that a party whose exercise of discretion is motivated by malice or other wrongful motives is in breach of contract for failing to perform in good faith.[1] In *Monge v. Beebe Rubber Co.*,[2] a female employee claimed that her employer breached by tolerating a foreman's sexual harassment of her, culminating in her termination by the foreman because she refused his advances. The New Hampshire Supreme Court held that a contract termination motivated by bad faith or malice constitutes a breach of the employment contract.[3] In *Pstragowski v. Metropolitan Life Insurance Co.*,[4] the U.S. Court of Appeals for the First Circuit, applying New Hampshire law, held that a terminated employee presented sufficient evidence that he was discharged because of a supervisor's grudge, with the connivance of a higher supervisor, to submit the question of bad faith to a jury. In *Cancelier v. Federated Department Stores*,[5] the U.S. Court of Appeals for the Ninth Circuit, applying California law, held that an employee's termination based on his age violated the contract's implied covenant of good faith and fair dealing, which sounds in both contract and tort, in addition to the Age Discrimination in Employment Act of 1967.[6] And in *Lubcke v. Boise City/ADA County Housing Authority*,[7] an employer was held in bad faith under a contract allowing dismissal for "unsatisfactory service" when it dismissed an employee for exercising rights of free speech.

**§3.3**   [1] On good faith in Louisiana law, see Brill v. Catfish Shaks of Am., Inc., 727 F. Supp. 1035 (E.D. La. 1989). On good faith in federal government contracts, see Continental Collection & Disposal, Inc. v. United States, 29 Fed. Cl. 644 (1993); A-Transport Co., Inc. v. United States, 27 Fed. Cl. 206 (1992).
[2] 114 N.H. 130, 316 A.2d 549 (1974) (modified by Howard v. Dorr Woolen Co., 120 N.H. 295, 297, 414 A.2d 1273, 1274 (1980), to make employee's claim one in tort for wrongful discharge).
[3] Sexual harassment in employment is actionable under the Civil Rights Act of 1991, 105 Stat. 6071 (1991).
[4] 553 F.2d 1 (1st Cir. 1977) (probably modified by Howard v. Dorr Woolen Co., 120 N.H. 295, 297, 414 A.2d 1273, 1274 (1980) to make employee's claim one in tort for wrongful discharge).
[5] 672 F.2d 1312 (9th Cir. 1982) (probably superseded by Foley v. Interactive Data Corp., 47 Cal. 3d 654, 765 P.2d 373, 254 Cal. Rptr. 211 (1988)). *See also* Wolber v. Service Corp. Intl., 612 F. Supp. 235 (D. Nev. 1985) (applying Nevada law); McKinney v. National Dairy Council, 491 F. Supp. 1108 (D. Mass. 1980).
[6] 29 U.S.C.A. §623(a) (1988 & Supp. II 1990).
[7] 124 Idaho 450, 860 P.2d 653 (1993).

These cases raise two questions. Is bad faith a matter of motives? If so, is it a matter of *wrongful* motives?

On the first question, our view is that it would be better to think of such cases in terms of the *reasons* for exercising discretion, not *motives*, and thus to use an objective, though reason-oriented, standard. The point of the legal inquiry is to evaluate a party's conduct for conformity to the contract, not to engage in psychological speculations about the motives of that conduct or in assessments of a party's character. The relevant concern is with the *justification* for an exercise of discretion, not its causes. When the justification is adequately based in the contract, the exercise of discretion does not harm the other party's contractual expectation interest, whatever the motivation. That interest arises from the contract; to constitute a breach, discretion must be used to deprive the other party of the benefit of the bargain.[8]

Philosophically, some may argue that an exercise of discretion is not justified unless the actor is motivated by the right kind of reasons; others may argue that an act is justified when the right kind of reasons are available to support it — when *the act* is justified — whether or not those reasons moved the actor. This dispute over the nature of justified conduct has been fought since Aristotle. As a practical matter, it makes a difference in the case, rare in the law reports, where a discretion-exercising party had both permitted reasons that fully justified the conduct in question and wrongful reasons for doing the same thing. Only then might a party be moved to act for the wrong reasons even though perfectly good reasons were available.

The court in *Dayan v. McDonald's Corp.*,[9] drew this distinction, rejecting the relevance of motives (whether or not wrongful) when the use of discretion was justified under the contract. McDonald's Paris franchisee brought suit to enjoin McDonald's from terminating its franchise. The agreement permitted McDonald's to terminate for any default not cured within 60 days. The trial court found that the franchisee was in uncured default, giving McDonald's a good reason to terminate. The franchisee argued that, even if McDonald's had good cause, it breached the contract by acting for an improper motive — "a desire to recapture the lucrative Paris market."[10] Because McDonald's had

[8]Tidmore Oil Co. v. BP Oil Co./Gulf Prods. Div., 932 F.2d 1384 (11th Cir. 1991) (applying Alabama law).
[9]125 Ill. App. 3d 972, 466 N.E.2d 958 (1984).
[10]*Id.* at 993, 466 N.E.2d at 973.

discretion to terminate only upon a default by its franchisee, the termination clause was an enforcement term, not a performance term.[11] The court's discussion of reasons for which McDonald's could terminate is, nonetheless, instructive for performance and enforcement cases alike.

The Appellate Court of Illinois recognized that, "[w]here a party acts with improper motive, . . . that party is exercising contractual discretion in a manner inconsistent with the reasonable expectations of the parties and therefore is acting in bad faith."[12] The court refused to hold, however, that an improper motive would constitute bad faith when the discretion-exercising party also had a good reason. That is, McDonald's was in good faith even if it had terminated its franchisee with the motivation to recapture the Paris market, but had an available justification for terminating—the franchisee's uncured default. The court summarized, "As a general proposition of law, it is widely held that where good cause exists, motive is immaterial to a determination of good faith performance."[13]

A virtue of the *Dayan* court's approach is that it avoids giving a court or jury the hopeless task of sorting out which of the available reasons moved the actor. As the *Dayan* court suggested, a claim of contract breach by failing to perform in good faith should be valid when the *only* reasons available to justify a use of discretion are disallowed by the agreement.[14] Acting for such reasons constitutes an abuse of discretion because it is beyond the justified expectations of the parties at the time of contract formation.

On the question whether wrongful motives establish bad faith, our answer is clear and amply supported by the cases: wrongful reasons may establish bad faith, but an absence of wrongful reasons does not establish good faith. Wrongful reasons establish bad faith not because they are wrongful, but instead because they are outside the reasonable expectations of the parties. An absence of such reasons, however, does not suffice to establish good faith because bad faith may also consist

---

[11] *See* §7.3.2.2.

[12] 125 Ill. App. 3d at 991, 466 N.E.2d at 972.

[13] *Id.* at 993, 466 N.E.2d at 974. *See also* Carma Developers (Cal.), Inc. v. Marathon Dev. Cal., Inc., 2 Cal. 4th 342, 826 P.2d 710, 6 Cal. Rptr. 2d 467 (1992) ("the covenant of good faith can be breached for objectively unreasonable conduct, regardless of the actor's motive").

[14] On mixed reasons, see §3.7.

of action for reasons that are disallowed by the contract even though not wrongful. Recall the early requirements and output contracts cases discussed at §2.2.1.2, for example. Bad faith in such cases does not consist of any wrongful act. In the typical cases, bad faith consists of using the discretion over quantity terms to take advantage of rising and falling markets — to "speculate on the contract," as the New York Court of Appeals put it.[15] There is nothing intrinsically wrongful in that. When the speculator concluded a floating-quantity contract with a fixed price term, however, recapturing the forgone opportunity to deal at spot market prices is a breach of contract. The speculative reason for action was disallowed *by the contract*, not by supervening law or morals.

### §3.3.2    Subjective Standards: Dishonesty

Due to the influence of the Uniform Commercial Code, it might be thought that good faith performance at common law requires only subjective honesty by a discretion-exercising party.[16] The obligation to perform a contract in good faith at common law, however, should not be confined to subjective honesty. As in the foregoing point (§3.3.1), dishonesty may establish bad faith, but more than subjective honesty may be needed to establish good faith.[17] A discretion-exercising party's honesty is not the crux of the matter.

A discretion-exercising party's dishonesty may establish bad faith in contracts involving conditions of satisfaction. In *Devoine Co. v. International Co.*,[18] the contract was for the sale of cherries, "quality satisfactory" to the buyer. The Court of Appeals of Maryland held that this allowed the buyer room for judgment and choice, and "an

[15] New York Cent. Ironworks Co. v. United States Radiator Co., 174 N.Y. 331, 335, 66 N.E. 967, 968 (1903).

[16] Section 1-201(19) of the U.C.C. defines "good faith" as "honesty in fact in the conduct or transaction concerned." For discussion, see §4.3.2.

[17] *See* United States Natl. Bank v. Boge, 311 Or. 550, 814 P.2d 1082 (1991) (common law good faith obligation broader than U.C.C. definition of good faith as "honesty in fact"). *Compare* First NH Banks Granite State v. Scarborough, 615 A.2d 248 (Me. 1992) (limiting "good faith" in §1-203 to honesty in fact) *with* St. Benedict's Dev. Co. v. St. Benedict's Hosp., 811 P.2d 194 (Utah 1991) (analogous case governed by common law).

[18] 151 Md. 690, 136 A. 37 (1927).

honest decision by the buyer of that question of satisfactory quality must . . . be accepted, however mistaken or unreasonable a judge or jury might consider it."[19] The seller proved the buyer's dishonesty by showing that the buyer had expressed satisfaction with the cherries until acquiring its own cheaper source of supply; on this basis, a jury was allowed to find the buyer in bad faith and in breach of contract. In a case like this, the dishonesty occurs precisely because the discretion-exercising party intends to recapture a forgone opportunity—using the cheaper source of supply. There need be no dishonesty, however, for bad faith to be evident.[20] On the same facts, assume that the buyer had said to the seller, "Frankly, your cherries are of the highest quality, but I can get them cheaper elsewhere, so I pronounce them unsatisfactory." That the bad faith is all the clearer when the buyer is more honest suggests that dishonesty is not the crux.[21] At best, it may be a helpful *surrogate* for detecting action for improper reasons in a few cases.

The deficiencies of an honesty standard can be seen when a harder question is considered—whether a discretion-exercising party is in bad faith when it holds an erroneous, but honest, belief that its conduct is justified by the facts.[22] Assume that, in a case like *Devoine Co.*, the buyer rejected the cherries claiming they were of poor quality because golden with red streaks, not bright red. It turned out, the buyer claims, it was unaware of a fine species of cherry prized for its great taste and unusual red streaks. With hindsight, the buyer concedes that its belief was in error, but insists that the honest belief establishes good faith. On the facts as just given, we should not be too quick to decide whether the buyer was in good or bad faith. If the buyer was a produce distributor and the price of cherries had fallen, we will suspect that the buyer was being dishonest to take advantage of the market shift.

[19] *Id.* at 696, 136 A. at 39.

[20] *See* Carma Developers (Cal.), Inc. v. Marathon Dev. Cal., Inc., 2 Cal. 4th 342, 826 P.2d 710, 6 Cal. Rptr. 2d 467 (1992) ("nor is it necessary that the party's conduct be dishonest").

[21] Neumiller Farms, Inc. v. Cornett, 368 So. 2d 272 (Ala. 1979).

[22] *See* Burton v. Security Pac. Natl. Bank, 197 Cal. App. 3d 972, 243 Cal. Rptr. 277 (1988). Distinguish the case of a good faith, but erroneous, belief regarding one's legal obligations from that of a good faith belief in the factual predicate for justified action. A good faith belief that one is acting lawfully is not a defense to breach of contract. *E.g.*, Snow v. Western Sav. & Loan Assn., 152 Ariz. 27, 730 P.2d 204 (1986).

If, however, the buyer is a consumer in a steady market, the mistake is understandable. Market shifts thus are relevant to judging honesty.

In these cases, we should go beyond assessing subjective honesty to decide whether or not the buyer acted in good faith. The further analysis should replay the analysis of good faith in §2.3, in which the key fact establishing a breach of contract is the use of discretion for reasons outside the contract, such as a buyer's temptation when the market price falls. But, once we establish that, we do not need the honesty standard at all. The honesty standard can seem to make irrelevant some considerations, like movements in market prices, that are highly relevant in fact. Therefore, subjective honesty should never suffice to establish good faith.[23]

### §3.3.3 Subjective Standards: Intentional Action on Impermissible Reasons

The third kind of subjective standard of good faith abandons the moralistic connotations of wrongful motives or dishonesty. It distinguishes parties who exercise discretion intentionally for reasons allowed by the agreement from those who act for disallowed reasons. Bad faith thus might occur when a discretion-exercising party has an excluded reason, like an advantageous price movement, and is motivated by that reason to withhold contract benefits. This would be a subjective standard focusing on intention, with no requirement of wrongful motives or dishonesty. There are plenty of contracts that exclude action for reasons that, apart from the contract, would be perfectly acceptable to a moralist.

In *Hagans, Brown & Gibbs v. First National Bank of Anchorage*,[24] a client facing litigation entered a 40 percent contingent fee contract with a law firm. The client, of course, controlled the decision whether to accept a settlement offer. The client then refused to accept a settlement offer unless the law firm would accept a substantial reduction of its fee. The law firm refused and later brought an action against the client for breach of its contractual obligation of good faith and fair dealing. The Alaska Supreme Court held that, because the client is

---

[23] Best v. United States Natl. Bank, 303 Or. 557, 564, 739 P.2d 554, 558 (1987).
[24] 783 P.2d 1164 (Alaska 1989).

in control of a condition to its own payment obligation to the attorney (an affirmative recovery), "good faith . . . requires the client to exercise this control in a manner consistent with the reasonable expectations of the parties."[25] The court emphasized that the client retains primary control of settlement decisions and does not breach "merely by refusing to settle, even if such refusal is foolish."[26] A client breaches if it can be shown that a refusal to settle was made "with the intent of taking advantage of the attorney."[27] In this case, the law firm produced evidence indicating that the client's decision to decline a final settlement offer was prompted by dissatisfaction with the contingent fee arrangement, not with the settlement offer. The client had been repeatedly advised that the trial court judgment for $220,000 in favor of the client's assignor might well be reversed on appeal, and the client had offered to compromise the judgment for $200,000, but the client refused a counteroffer of $180,000 unless the law firm reduced its fee substantially. Rejecting the client's claim that the law firm's reasons were irrelevant, the court reversed a grant of summary judgment in the client's favor.

Apart from the contract, the client in *Hagans, Brown & Gibbs* acted for a most common and morally permitted reason: the client wanted to maximize its financial gain from the transaction. It did nothing wrongful or dishonest. If the facts were as alleged by the law firm, however, it breached its contract by performing in bad faith. The breach did not lie in the client's refusal to settle; the court made clear that, provided only that the client refused for reasons within the justified expectations of the parties, this was within the client's discretion. The breach lay in the client's action for a reason given up when entering the contract — dissatisfaction with the contingent fee arrangement that was the law firm's main benefit from the contract.

In *Hagans, Brown & Gibbs*, and a few other cases, the court understood the inquiry into the discretion-exercising party's reasons for action to require an inquiry into its state of mind.[28] It thus takes the view that an exercise of discretion is not justified unless the actor is

[25] *Id.* at 1167.
[26] *Id.* at 1168.
[27] *Id.*
[28] *Id.* at 1168 n.6. *See also* Leberman v. John Blair & Co., 880 F.2d 1555 (2d Cir. 1989) (applying New York law); Richard Short Oil Co. v. Texaco, Inc., 799 F.2d 415 (8th Cir. 1986) (applying Arkansas law).

motivated by contractually permitted reasons. This makes the standard a subjective one in principle: identifying the permitted reasons depends on interpretation of the agreement while identifying the discretion-exercising party's reasons requires a psychological inference from the words and deeds manifesting a mental state. Such inferences inevitably depend on premises concerning what a reasonable person would be doing when the same manifestations of a mental state are present. Consequently, standards that are subjective in principle are objective in practice to a considerable extent. To that extent, subjective standards can be misleading and unsatisfactory.

### §3.3.4   Subjective v. Objective Standards

The parties, of course, can agree that good faith shall be measured by either subjective or objective standards. Often, however, they do not. In those cases, the courts must supply a standard.

On balance, we believe objective standards of the kind explored below are preferable to subjective standards of good faith performance. Consider again the interests of the parties when a question of good faith arises. A discretion-exercising party has an interest in enjoying the full scope of contracted discretion, free of intrusive second-guessing by judge or jury. The other party has a competing interest in limiting the scope of legitimate discretion to the nonarbitrary and reasonably foreseeable, requiring limited legal review. The argument between subjective and objective standards should accommodate these interests in light of the justification for the good faith performance doctrine, if possible.[29]

The main attraction of a subjective standard is its capacity to encourage deference to a contract party's judgment: it lessens the risk that judges or jurors will substitute their own judgments of what is reasonable for a deferential review of the contract party's judgment, protecting the discretion-exercising party's latitude to exercise discretion with finality.[30] Problems of good faith in contract performance arise only after it has been decided that their agreement is enforceable. Having passed the tests of enforceability means the parties are free of govern-

[29] See §2.3.4.
[30] See, e.g., Heltborg v. Modern Mach., 244 Mont. 24, 795 P.2d 954, 961 (1990).

mental regulation, whether by statute or contract doctrines policing the bargain, within the scope of their contract. Ad hoc regulation should not be imposed in the guise of reviewing a party's good faith in performance.

Overemphasis on a subjective standard of good faith, however, can lead to undue passivity by judges and presumably jurors, leaving the nondiscretion-exercising party's interests in nonarbitrary and foreseeable action in contract performance unprotected. Whether courts use subjective or objective standards in practice, good faith performance clearly requires something more than a "kind heart and an empty head." Moreover, a truly subjective standard is difficult, perhaps impossible, to apply in practice. Knowledge of a person's mental states is notoriously difficult to obtain. Inevitably, a purportedly subjective inquiry turns on objective indices of mental states. A reasonableness standard can be a close approximation in principle while less misleading in practice.

In our view, the parties' contractual interests can be accommodated by embracing a reasonableness standard while insisting that "reasonableness" take its meaning from the agreement of the parties. This accommodation requires meaningful review because a discretion-exercising party may be called on to justify its action by giving its reasons. A court or jury must decide whether those reasons reasonably deserved significant weight and were among the reasons allowed by the contract. If they satisfy these criteria, then the discretion-exercising party performed in good faith. At the same time, this standard requires deference to the discretion-exercising party because the *weight* of permitted reasons, beyond a threshold judgment of reasonable significance, is for the discretion-exercising party, not judge or jury. Accordingly, a reasonableness standard allows meaningful legal review of discretion without overreaching—a deferential standard that bites.

The difference emerges in cases like *Pannone v. Grandmaison*,[31] where the buyer acted sincerely on an idiosyncratic reason. The plaintiff-buyer sought the return of a deposit on the purchase of real property from the defendant, relying on a clause in the contract conditioning the sale on the buyer's approval of the result of a radon gas inspection. The inspector's report indicated that radon levels were well below levels of concern to the Environmental Protection Agency, but that exposures in the relevant range "do present some risk, to the more

---

[31] No. 088912, 1990 WL 265273, 1990 Conn. Super. LEXIS 1916 (Dec. 6, 1990).

sensitive occupants, of contracting lung cancer."[32] Reductions below that range, the report continued, would be difficult or impossible; moreover, the inspector testified, lower readings were unlikely anywhere in Connecticut. The buyer called the deal off, he testified, because he had been sensitive to anything radioactive since he was exposed to radiation while in the Air Force, where he monitored radiation from Soviet atomic testing. The trial court found that the buyer could not justify his exercise of discretion in terms of objective reasonableness. It held, however, that this exercise of discretion was subject to a subjective good faith standard; the history of the buyer's phobia barely met the burden of showing a good faith exercise of discretion.

We doubt that this is the correct result. It fully protects the discretion-exercising party's interest in the finality of its judgment, securing great deference from judge or jury. But the result neglects the seller's interests in a nonarbitrary and foreseeable exercise of discretion. The buyer's idiosyncratic phobia would be arbitrary and unforeseeable to a reasonable person in the seller's shoes. To protect the regularity of contractual transactions, the phobia should be a reason for exercising discretion given up by the buyer on entering the contract, one that should not be considered legitimate by the court. Moreover, some people who regret having made a contract deceive themselves into believing their own rationalizations and act sincerely though idiosyncratically. A subjective test of the kind used in *Pannone* is impotent to root out such subtle bad faith.

The result should differ if the buyer had let the seller know of his hypersensitivity in relation to the condition and the parties had agreed to respect that idiosyncrasy. The seller, of course, may assume the unusual risk. As between the two parties in the absence of such notice, however, the buyer was in the better position to settle the expectations of both. Therefore, we should presume that the parties reasonably expect discretion to be exercised only for reasons that are foreseeable in ordinary circumstances.

The implied covenant of good faith in contract performance should not require a court or jury to assess a discretion-exercising party's sincerity or character, nor should it require review of the weight attached to permitted and significant reasons by such a party.[33] Because

---

[32] *Id.* at *1.
[33] The practice is otherwise when the government's bad faith is in issue. *See supra* note 1.

the remedies for breach of contract generally compensate the victim of a breach for harm to its contractual interests, liability should be found only when there has been a harm to those interests. Inquiries into a person's sincerity or character do not tell us when there has been a harm deserving of compensation; people with good and bad characters may use contractual discretion with or without harming the contractual interests of the other party. Contracts allowing discretion to one party are intended and expected to require deference to a discretion-exercising party's view of the weights of permitted and significant reasons. Good faith in contract performance, rather, is a matter of acting for the right kinds of reasons—those permitted by the agreement.

### §3.3.5    Objective Standards: Contractual Reasonableness

A contractual reasonableness standard abandons the subjectivity of the approach in *Hagans, Brown & Gibbs*, discussed at §3.3.3, by dispensing with any requirement pertaining to a discretion-exercising party's motive or mental state. This view requires that a party's exercise of discretion—its act—be justified by the right kinds of reasons. Identifying the right kinds of reasons again depends on the contract. A prevailing standard requires that discretion be exercised reasonably[34] or, in commercial contracts, with commercial reasonableness.[35] Similarly, some courts add that good faith " 'requires that a party vested with contractual discretion must exercise his discretion reasonably and may not do so arbitrarily or capriciously.' "[36]

In addition to the case of idiosyncratic reasons, discussed in the

[34] *E.g.*, E.J. Albrecht Co. v. New Amsterdam Casualty Co., 164 F.2d 389 (7th Cir. 1947); Cheney v. Jemmett, 107 Idaho 829, 693 P.2d 1031 (1984); Foster Enters. v. Germania Fed. Sav. & Loan Assn., 97 Ill. App. 3d 22, 421 N.E.2d 1375 (1981); Centronics Corp. v. Genicom Corp., 132 N.H. 133, 562 A.2d 187 (1989) (Souter, J.); Prince v. Elm Inv. Co., 649 P.2d 820, 825 (Utah 1982).

[35] *E.g.*, Leasing Serv. Corp. v. Broetje, 545 F. Supp. 362 (S.D.N.Y. 1982); Kendall v. Ernest Pestana, Inc., 40 Cal. 3d 488, 709 P.2d 837, 220 Cal. Rptr. 818 (1985); Newman v. Hinky Dinky Omaha-Lincoln, Inc., 229 Neb. 382, 427 N.W.2d 50 (1988); Prince v. Elm Inv. Co., Inc., 649 P.2d 820 (Utah 1982).

[36] Rao v. Rao, 718 F.2d 219, 223 (7th Cir. 1983) (quoting Foster Enters. v. Germania Fed. Sav. & Loan Assn., 97 Ill. App. 3d 22, 30, 421 N.E.2d 1375, 1381 (1981)). *See also* Cheney v. Jemmett, 107 Idaho 829, 693 P.2d 1031 (1984); Resource Management Co. v. Weston Ranch & Livestock Co., 706 P.2d 1028 (Utah 1985).

preceding section, the difference between subjective and objective standards will show up in two kinds of cases. The first is when a party has no good reason to offer for its exercise of discretion while the other party offers no evidence of an improper reason. For example, the client in *Hagans, Brown & Gibbs* had been repeatedly advised that the trial court judgment for $220,000 in favor of the client's assignor might well be reversed on appeal, and the client had offered to compromise the judgment for $200,000, but the client refused a counteroffer of $180,000 unless the law firm reduced its fee substantially. The client offered no reasons for its action, arguing only that its reasons were irrelevant. It would seem better to find the client in bad faith for exercising its discretion unreasonably — without good reason; to find bad faith because its intention was to "take advantage" of its attorney begs the question and involves difficult problems of proof. Even if that had not been its intent, the client should be found in breach for acting arbitrarily because it was without a good reason. The harm to the lawyer's contractual expectation interest would be the same.

The difference between the two standards also makes a difference in the rare case where good reasons are available for a party's action, but it acts on (is moved by) an improper reason. As we have seen, the one known case addressing this issue holds that the availability of significant contractually permitted reasons for the exercise of discretion protects even a badly motivated party from liability for breach of contract.[37] In that case, it seems to us, the party without discretion, having given the discretion-exercising party good grounds for acting as it did, had little to complain about reasonably. It suffered no compensable harm to a contractual interest as a consequence of the discretion-exercising party's choices.

Reasonableness in this context should indicate that an action is sufficiently justified in law if an appropriate reason was available to justify the action in question, regardless of the actor's motive.[38] The

---

[37] *Dayan v. McDonald's Corp.*, 125 Ill. App. 3d 972, 466 N.E.2d 958 (1984) (discussed at §3.3.1).

[38] *See* the discussion of *Dayan v. McDonald's Corp.*, above at §3.3.1. *See also* *Bane v. Ferguson*, 707 F. Supp. 988 (N.D. Ill. 1989) (applying Illinois law) (nothing unreasonable in dissolving partnership for reasons that key partners departed and attempted merger failed, throwing firm into hard times). *Compare* F & L Ctr. Co. v. Cunningham Drug Stores, Inc., 19 Ohio App. 3d 72, 482 N.E.2d 1296 (1984) (landlord's refusal to allow assignment could be unreasonable when lease allowed landlord to refuse assignment "for any reason") *with* Rao v. Rao, 718 F.2d 219 (7th Cir. 1983)

identity of appropriate reasons depends on the contract understood in its context. When there is a justifying reason within the world of the contract, the action in contract performance is reasonable because supported by a contractually permitted reason. Application of the reasonableness standard thus requires two steps. One first must identify the reasons available to justify an exercise of discretion and then decide whether action for that reason falls within the set of opportunities preserved for the discretion-exercising party when entering the contract, properly interpreted.

Operation of the reasonableness standard is illustrated by two previous discussions. Recall the discussion of a lessor's right to approve the assignment of a lease.[39] The California Supreme Court's opinion in *Kendall v. Ernest Pestana, Inc.*,[40] suggested that a lessor's refusal to consent might be reasonable if based on factors such as the financial responsibility of the proposed assignee, suitability of the assignee's use for the particular property, legality of the proposed use, or need for alteration of the premises. But approval could not be validly denied for reasons of personal taste, convenience, or sensibility or in order that the landlord could charge a higher rent than that provided by the original contract. Absent express terms providing otherwise, action for the latter reasons would be forgone because not within the justified expectations of the parties at formation. Similarly, in the suggested reasoning for *Hagans, Brown & Gibbs*, above, the client would act reasonably if it refused a settlement offer on its merits. The client there was unreasonable not because it wanted lesser attorney fees (who wouldn't?), but because it gave up the opportunity to act for that reason when concluding the contingent fee agreement.

Defending against a claim of bad faith requires more than an unsubstantiated assertion of a good reason for the discretionary act in question. In *Nochra Communications, Inc. v. AM Communications, Inc.*,[41] a subcontractor undertook to install underground cable for a new cable television system. The contract included detailed specifications and

---

(applying Illinois law) (employer who dismisses employee to prevent employee from exercising contract right to obtain 50 percent interest in employer corporation in bad faith because exercising discretion unreasonably, despite contract right to terminate "for any reason").

[39] §3.2.1.
[40] 40 Cal. 3d 488, 709 P.2d 837, 220 Cal. Rptr. 818 (1985).
[41] 909 F.2d 1007 (7th Cir. 1990) (applying Pennsylvania law).

required rates of progress, providing also that the subcontractor would be deemed in breach if the prime contractor were not satisfied that the subcontractor was properly performing the work as required. The prime contractor eventually terminated, claiming it was dissatisfied because the subcontractor failed to construct the required 10,000 feet per day, failed to install the cable in continuity, generated excessive homeowner complaints, and lacked experienced personnel. The U.S. Court of Appeals for the Seventh Circuit, applying Pennsylvania law, upheld a district court conclusion that the prime contractor acted in bad faith.

On its face, the prime contractor's claimed reasons would seem to be the kind of ordinary business reason that would justify the prime contractor's dissatisfaction and consequent termination. However, the trial court cast doubt on the validity of the prime contractor's assertion of reasons by finding that the subcontractor's rate of progress was less than the contract requirement because the prime contractor did not assign the sub enough work to meet it, that installations were not in continuity because the local utility companies had failed to inform either prime or sub of the locations of underground utility lines (so the subcontractor could dig only where it had been cleared), that the rate of homeowner complaints was not excessive according to officials of the prime contractor, and that the site supervisor was acknowledged by the prime contractor's project supervisor to be experienced and technically expert. Moreover, the prime contractor had not notified the subcontractor that its performance was inadequate prior to the notice of termination.

The trial court findings indicate the prime contractor's claimed reasons for dissatisfaction in fact were not available to justify termination or, if available, were not significant. Nothing in the reported opinion tells us that the prime contractor had an improper reason for terminating, but this is not necessary under a reasonableness standard.[42] The trial judge found in effect that the termination was not justified by the available significant reasons. To decide for no good reason or a trivial reason would be arbitrary. Asserting that a party had a good reason does not establish that the party had one.

[42] Id. at 1011. The dissenting opinion reasonably challenged the majority opinion for departing from a strictly subjective standard. Id. at 1016 (Coffey, J., dissenting). We agree that the majority in effect applied a reasonableness standard.

## §3.3.6   Objective Standards: Justified Expectations

Many courts require a party with discretion in performance to exercise its discretion within "the reasonable expectations of the parties" stemming from the promises made at contract formation.[43] Like the reasonableness standard, this and similar formulations should be understood to require discretionary action justified by a reason of the appropriate kind, with the appropriateness of a reason depending on the contract. When the reasonableness and reasonable expectations standards are so interpreted, there is no practical difference between them. They both differ from the subjective standards of good faith discussed above because these standards are objective, dispensing with any inquiry into a discretion-exercising party's motivation or state of mind. They both also differ from other implied promises in that, as standards of good faith in contract performance, they address the *reasons* for which discretion may be exercised within the contract. Moreover, the corollary to both is that a party with discretion cannot use its discretion to recapture opportunities to act for reasons forgone when entering the contract.

## §3.3.7   Summary

This analysis and review of the case law concerning subjective and objective standards of good faith reveal that the law here, as in any other of its parts, does not follow a uniform and straightforward rule. We have reviewed three subjective and two objective standards, each of which is used by at least a few courts in a few cases. Whatever the courts say about their standards, moreover, the subtleties of the distinctions between them are sufficient to support some skepticism that a court always applies the standard it announces. It is only prudent for counsel to consider the advantages and disadvantages of each when preparing and litigating a case, for any of them might pop up explicitly or implicitly in a judge's thinking, regardless of the formal law in the relevant jurisdiction.

[43] *See* sources cited in §2.3.3 note 39.

For judges, however, the matter is different. Our advice is to avoid subjective standards focusing on wrongful motives or dishonesty (in common law cases) unless directly applicable precedent requires otherwise. We would also disfavor a subjective standard focusing on intentional action for impermissible reasons, though it is not as misleading and inadequate as the first two standards we considered. We do not see a significant difference between a standard requiring a reasonable exercise of discretion and one requiring discretion to be exercised for reasons within the justified expectations of the parties. This objective standard in our experience is the most commonly employed by the courts. It is also the most salient because it directs attention to the reasons for which discretion was exercised and distinguishes between those within and outside the world of the contract. And it best accommodates the relevant interests of the parties. Accordingly, we recommend that, unless stare decisis or the parties' agreement requires otherwise, courts should use an objective standard.

## §3.4   ILLUSTRATIVE CASES

To illustrate the distinction between good and bad faith performance of a contract, we will look first at the controversial cases involving employments "at will" and then at contracts involving discretion concerning matters of quantity, quality, price, time, and control of a condition. Cases involving discretion as to quantity include requirements and output contracts; those involving quality include satisfaction and approval clauses; those involving control of a condition include conditions that a party seek governmental approval or conclude related contracts with insurers or lenders. The illustrations here, it should be emphasized, are not exhaustive. As indicated at §2.3.2.1, discretion in contract performance can arise in too many ways for any exhaustive rule or case law to give a comprehensive picture of the possibilities.

## §3.4.1   Example: Employment Terminable "At Will"

The operation of a reasonableness (or justified expectations) standard will be illustrated with reference to cases involving an employee's claim for breach of contract upon termination by an employer. Claims of wrongful or tortious discharge and various claims under the labor or anti-discrimination statutes should be distinguished from this kind of employee termination claim. Many courts now recognize an at-will employee's right to damages in tort when discharged for reasons that are wrongful or against public policy. Thus, the Supreme Court of California has held that a claim for wrongful discharge is stated when an employee is terminated because he refused to participate in an illegal price-fixing scheme.[1] Other courts have recognized such a claim when an employee is discharged for refusing to testify falsely to a state legislative committee;[2] reporting criminal activity to proper authorities;[3] disclosing other illegal, unethical, or unsafe practices, such as working conditions hazardous to employees;[4] or filing a worker's compensation claim.[5] Some courts decline to take this course.[6] A full review of the tort cases is beyond the scope of this treatise, as is a review of the labor and anti-discrimination statutes. The general relationship between contractual and tortious good faith is considered in §9.2.3.

Among the cases involving an employee's claim for breach of contract upon termination by an employer, we should distinguish between contracts promising employment for a definite duration, even if equal only to a required period following notice of termination, and those involving employment terminable at the employer's will. The applica-

---

**§3.4**   [1]Tameny v. Atlantic Richfield Co., 27 Cal. 3d 167, 610 P.2d 1330, 164 Cal. Rptr. 839 (1980).

[2]Petermann v. International Bhd. of Teamsters, 174 Cal. App. 2d 184, 344 P.2d 25 (1959).

[3]Garibaldi v. Lucky Food Stores, Inc., 726 F.2d 1367, 1374 (9th Cir. 1984) (applying California law).

[4]Hentzel v. Singer Co., 138 Cal. App. 3d 290, 188 Cal. Rptr. 159 (1982).

[5]E.g., Frampton v. Central Ind. Gas Co., 260 Ind. 249, 253, 297 N.E.2d 425, 428 (1973).

[6]E.g., Bruffett v. Warner Communications, Inc., 692 F.2d 910 (3d Cir. 1982) (applying Pennsylvania law); Mason v. Farmers Ins. Cos. 281 N.W.2d 344 (Minn. 1979); Noye v. Hoffman-La Roche Inc., 238 N.J. Super. 430, 570 A.2d 12 (App. Div. 1990).

bility of a good faith performance covenant is not problematic in the former cases, where there is a contract by any standard. Employments at will, however, traditionally have not been regarded as contracts because they are terminable "for good cause, for no cause or even for cause morally wrong."[7] These agreements lack the commitment necessary for contract formation. The wrongful discharge cases noted above represent a part of the recent trend away from strict application of the at-will rule. Contractual good faith has also been used to qualify the harshness of the traditional rule in some cases.[8] To be sure, the traditional rule remains alive, and many courts decline to impose any good faith limitation on an employer's right to terminate an employment at will.[9]

The implied covenant of good faith and fair dealing says nothing about whether contracts lacking express terms regarding duration are or are not terminable at will; it applies when there is a contract.[10]

[7] Payne v. Western & Atl. R.R., 81 Tenn. 507, 519-520 (1884), *overruled by* Hutton v. Watters, 132 Tenn. 527 (1915). *See generally* Lawrence E. Blades, Employment at Will vs. Individual Freedom: On Limiting the Abusive Exercise of Employer Power, 67 Colum. L. Rev. 1404 (1967); Jay M. Feinman, The Development of the Employment at Will Rule, 20 Am. J. Legal Hist. 118 (1976); Note, Protecting at Will Employees Against Wrongful Discharge: The Duty to Terminate Only in Good Faith, 93 Harv. L. Rev. 1816 (1980).

[8] Wagenseller v. Scottsdale Memorial Hosp., 147 Ariz. 370, 710 P.2d 1025 (1985); Foley v. Interactive Data Corp., 47 Cal. 3d 654, 765 P.2d 373, 254 Cal. Rptr. 211 (1988); Fortune v. National Cash Register Co., 373 Mass. 96, 364 N.E.2d 1257 (1977). *See* Monique C. Lillard, Fifty Jurisdictions in Search of a Standard: The Covenant of Good Faith and Fair Dealing in the Employment Context, 57 Mo. L. Rev. 1233 (1992).

[9] Before Wieder v. Skala, 80 N.Y.2d 628, 609 N.E.2d 105, 593 N.Y.S.2d 752 (1992), New York law was clearest on this point. *See* Gallagher v. Lambert, 74 N.Y.2d 562, 549 N.E.2d 136, 549 N.Y.S.2d 945 (1989); Sabetay v. Sterling Drug, Inc., 69 N.Y.2d 329, 506 N.E.2d 919, 514 N.Y.S.2d 209 (1987); Murphy v. American Home Prods. Corp., 58 N.Y.2d 293, 448 N.E.2d 86, 461 N.Y.S.2d 232 (1983). *See also* Bruffett v. Warner Communications, Inc., 692 F.2d 910 (3d Cir. 1982) (applying Pennsylvania law); Morriss v. Coleman Co., 241 Kan. 501, 738 P.2d 841 (1987); Mers v. Dispatch Printing Co., 19 Ohio St. 3d 100, 483 N.E.2d 150 (1985); Breen v. Dakota Gear & Joint Co., Inc., 433 N.W.2d 221 (S.D. 1988); Brehany v. Nordstrom, Inc., 812 P.2d 49 (Utah 1991).

[10] C & K Petroleum Prods. v. Equibank, 839 F.2d 188 (3d Cir. 1988) (applying Pennsylvania law); Bisel v. Matco Tools, 715 F. Supp. 316 (D. Kan. 1989) (applying Ohio law); Careau & Co. v. Security Pac. Business Credit, Inc., 222 Cal. App. 3d 1371, 272 Cal. Rptr. 387 (1990); Muller v. Stromberg Carlson Corp., 427 So. 2d 266 (Fla. Dist. Ct. App. 1983); Dasenbrock v. Interstate Restaurant Corp., 7 Ill. App. 3d 295, 300, 287 N.E.2d 151, 154 (1972); Bourgeous v. Horizon Healthcare Corp., 117 N.M. 434, 872 P.2d 852 (1994).

Other contract doctrines provide the criteria for contract formation.[11] When there is a contract, however, an employer with discretion to terminate should be required to terminate only in good faith.[12]

As in every other kind of contract, the express terms of an employment contract have priority and may give an employer quite broad discretion. In particular, requirements of good faith should not be confused with "good cause," which ordinarily requires some misconduct before an employee can be discharged. Accordingly, where two employees claimed that an employer breached by firing them "without cause," the U.S. Court of Appeals for the Ninth Circuit held that

> when an employment contract *expressly* provides that it may be terminated at will or for any reason, as the employment contract indisputably did here, the covenant of good faith and fair dealing cannot be used to imply a requirement for good cause to terminate.[13]

Consequently, the employer was in good faith when terminating the employees only because it no longer needed their services, i.e., without cause based in their job performance.[14] Similarly, where a salesman's contract provided for termination by the employer on 30 days' notice, the U.S. Court of Appeals for the Fifth Circuit held that the implied good faith covenant "may not obliterate rights . . . expressly embodied

---

[11] The good faith implication is used to negate claims that a contract allowing discretion to one party is illusory and, therefore, unenforceable for lack of consideration. *E.g.*, Perdue v. Crocker Natl. Bank, 38 Cal. 3d 913, 702 P.2d 503, 216 Cal. Rptr. 345 (1985). It might be argued that a good faith limitation on rights of termination should similarly save a contract terminable at the will of one party. However, a discretionary right of termination is different when it is intended to end the contract. The parties then have done all that they can to preserve all alternative opportunities when concluding the arrangement. In our view, courts should not impose upon them a contract and relationship contrary to their intentions.

[12] *See* Kyriakopoulos v. George Washington Univ., 866 F.2d 438 (D.C. Cir. 1989) (employer in bad faith if it denied employee a promotion for reasons other than those set forth in the contract); Metcalf v. Intermountain Gas Co., 116 Idaho 622, 778 P.2d 744 (1989) (covenant of good faith protects parties' benefits from employment contract).

[13] Rose v. Wells Fargo & Co., 902 F.2d 1417, 1426 (9th Cir. 1990) (emphasis in original). *See also* Melnik v. State Farm Mut. Auto. Ins. Co., 106 N.M. 726, 749 P.2d 1105 (1988).

[14] On the distinction between good faith and good cause in employment contracts, see Magnan v. Anaconda Indus., Inc., 193 Conn. 558, 479 A.2d 781 (1984); Cort v. Bristol-Myers Co., 385 Mass. 300, 431 N.E.2d 908 (1982).

in a written contract."[15] The employer could terminate with notice for any reason without liability for that act. However, if the contract entitled the salesman to commissions on sales accepted before termination, the employer would perform in bad faith by accepting the employee's services while maneuvering to terminate him and cut off his right to receive a commission for his work.[16] And, where a contract of employment automatically terminated after one year by its terms, there was no good faith obligation to consider its renewal.[17]

When an employer is required to terminate in good faith, the courts generally interpret the contract to determine whether it allows or disallows the employer's reason for terminating. If the express contract is unhelpful, background assumptions about the normal course of events are used to decide whether the reason for termination was within the reasonable expectations of the parties. Accordingly, an employer might be found in bad faith when terminating because it discharged the employee for unsatisfactory performance when the employer knew the employee was ill and the employee was instructed by his supervisor not to take sick leave to which he was entitled,[18] when the employer terminated for the sole purpose of depriving a salesman of earned commissions,[19] when termination is in retaliation for a security guard's informing the employer that other security guards were drinking and using drugs on the job,[20] when the employee was present in a confidential area without authorization,[21] when an employee was fired because he was not a "swinger,"[22] or when an employer failed to follow its own procedures to ascertain the relevant reasons.[23] Bad faith may also be

[15]Caton v. Leach Corp., 896 F.2d 939, 946 (5th Cir. 1990) (applying California law). *See also* Borbely v. Nationwide Mut. Ins. Co., 547 F. Supp. 959 (D.N.J. 1981) (applying New Jersey law).

[16]896 F.2d at 947.

[17]Tollefson v. Roman Catholic Bishop of San Diego, 219 Cal. App. 3d 843, 268 Cal. Rptr. 550 (1990).

[18]Hoffman-La Roche, Inc. v. Campbell, 512 So. 2d 725 (Ala. 1987).

[19]*E.g.*, Wakefield v. Northern Telecom, Inc., 769 F.2d 109 (2d Cir. 1985) (applying New York and New Jersey law); Mitford v. de Lasala, 666 P.2d 1000 (Alaska 1983); Fortune v. National Cash Register Co., 373 Mass. 96, 364 N.E.2d 1251 (1977). *See also* Caton v. Leach Corp., 896 F.2d 939 (5th Cir. 1990) (applying California law); Tymshare, Inc. v. Covell, 727 F.2d 1145 (D.C. Cir. 1984) (applying Virginia law).

[20]Knight v. American Guard & Alert, Inc., 714 P.2d 788 (Alaska 1986).

[21]Burton v. Security Pac. Natl. Bank, 197 Cal. App. 3d 972, 243 Cal. Rptr. 277 (1988).

[22]Zimmer v. Wells Management Corp., 348 F. Supp. 540 (S.D.N.Y. 1972) (applying New York law).

[23]*See* Kern v. Levolor Lorentzen, Inc., 899 F.2d 772 (9th Cir. 1990) (applying

found when the employment contract allows for termination if the employee's performance is not satisfactory, but the employee is terminated for other reasons.[24]

By contrast, employers have been found in good faith when terminating an employee because of poor performance on the job,[25] because of insubordination,[26] because of budgetary constraints,[27] because duplicate employees had to be reduced following a merger,[28] or because the employee's services were no longer needed.[29] Despite the academic difficulties in drawing a bright line between good faith and bad faith, these precedents make plain that an employer may exercise its discretion to terminate an employee for ordinary business reasons, which are always within the justified expectations of the parties absent express terms providing otherwise. Similarly, the examples of bad faith represent uses of discretion for reasons beyond the justified expectations of the parties.

## §3.4.2   Other Examples

The practice of the courts in nonemployment contracts is comparable. Consider the following contrasting cases involving a party's discretion as to quantity, quality, price, time, and conditions otherwise within the control of one party. To repeat, the cases and citations are illustrative, not exhaustive.

### §3.4.2.1   Discretion as to Quantity

The common law treatment of output and requirements contracts has been superseded formally by the Uniform Commercial Code.[30] The

---

California law).

[24] Kree Inst. of Electrolysis, Inc. v. Fageros, 478 S.W.2d 569 (Tex. Civ. App. 1972).

[25] Criscione v. Sears, Roebuck & Co., 66 Ill. App. 3d 664, 23 Ill. Dec. 455, 384 N.E.2d 91 (1978).

[26] Nelson v. Crimson Enters., Inc., 777 P.2d 73 (Wyo. 1989).

[27] Rompf v. John Q. Hammons Hotels, Inc., 685 P.2d 25 (Wyo. 1984).

[28] Stevenson v. ITT Harper, Inc., 51 Ill. App. 3d 568, 9 Ill. Dec. 304, 366 N.E.2d 561 (1977).

[29] Rose v. Wells Fargo & Co., 902 F.2d 1417, 1426 (9th Cir. 1990) (applying California law).

[30] See U.C.C. §2-306.

courts in U.C.C. cases, nonetheless, follow the earlier common law precedents interpreting the good faith limit on a quantity-determining party's discretion.[31] The good faith criterion is used to distinguish "situations in which the quantity-determining party was merely pursuing a better bargain elsewhere from those in which a change in needs or output resulted from the exercise of business judgment which the quantity-determining party had reserved for [it]self."[32] Thus, good faith distinguishes cases in which a party exercises the discretion allowed it under the contract for normal business reasons from those in which the party uses its discretion to recapture forgone opportunities.

Recall *Loudenback Fertilizer Co. v. Tennessee Phosphate Co.*,[33] discussed at §2.2.1.2. A buyer contracted to take its entire phosphate rock requirements from a seller for five years at a fixed price. The buyer manufactured acid phosphate with the rock and sold the product as fertilizer. For more than a year during the term, while the market price had fallen, the buyer ordered no rock, but purchased acid phosphate from other manufacturers because, the buyer testified, this was more profitable. When the market price of rock rose, the buyer ordered the maximum contract quantity of rock from the seller. The seller did not deliver. In an action by the buyer, the Sixth Circuit Court of Appeals refused to interpret the contract to allow the buyer discretion to change its business practices by substituting purchased acid phosphate for its own make whenever that was temporarily advantageous.[34] The parties had agreed to vary the quantity with changes in the market for the buyer's product and, by fixing a price, to isolate themselves from changes in the raw materials market. By purchasing acid phosphate from others in substitution for that of its own manufacture, in a falling raw materials market, the buyer exercised its discretion for a speculative purpose not reasonably contemplated by the parties.[35] It materially breached the contract by recapturing the forgone opportunity of acquiring rock from others at less than the contract price.

A contrasting result was reached in *Southwest Natural Gas Co. v.*

---

[31] *See* §4.4.1 note 1.

[32] John C. Weistart, Requirements and Output Contracts: Quantity Variations Under the UCC, 1973 Duke L.J. 599, 647.

[33] 121 F. 298 (6th Cir. 1903) (presumably applying federal common law).

[34] *Id.* at 302-303.

[35] *See also* New York Cent. Ironworkers Co. v. United States Radiator Co., 174 N.Y. 331, 335-336, 66 N.E. 967, 968 (1903) (dictum); Asahel Wheeler Co. v. Mendleson, 180 A.D. 9, 12, 167 N.Y.S. 435, 437 (1917).

*Oklahoma Portland Cement Co.*[36] Southwest's predecessor entered into an agreement to supply, for 15 years, "all 'natural gas as may be needed or required by' the Cement Company 'for fuel, heating, lighting, power purposes and such other purposes as may be necessary, proper or incidental to the operation of' its plant."[37] During the initial years of the contract, the cement company operation consumed from 2.3 to 5.3 million cubic feet of gas daily.[38] Eight years into the term, the company sought to replace its boilers with a system that utilized the waste heat of cement kilns. This operation was to reduce the maximum quantity supplied by the gas company to 4 million cubic feet per day. The gas company sought to enjoin the use of the new boiler system, contending that the contract prevented a change in the buyer's operations that would so drastically reduce its requirements of natural gas. The court held that the alteration in operations was in good faith because the requirements contract did not prevent the buyer from exercising discretion to improve its plant. Noting the duration of the parties' agreement, the court found an implied assumption at formation that existing equipment would require replacement during the life of the contract, probably by a more efficient system.[39] In other words, the parties did not contemplate that the buyer should forgo technological improvements in the normal course of business. The buyer acted in good faith, since it did not act for a contractually disallowed reason.

### §3.4.2.2   Discretion as to Quality

Discretion under the quality terms of a contract normally takes the form of conditions of satisfaction or approval, which were discussed above.[40] The classic case of bad faith performance when a party enjoys discretion under such conditions occurs when a party feigns dissatisfaction as a pretext to get out of the deal, acting neither honestly nor reasonably. Thus, it is said, a party must be dissatisfied with the goods or services in question, not with the contract.[41] If the party in control

[36] 102 F.2d 630 (10th Cir. 1939) (leaving applicable law unspecified).
[37] *Id.* at 631.
[38] *Id.* at 632.
[39] Id. at 633.
[40] *See* §§2.2.1.1, 3.3.2, 3.3.4. Different issues are presented when a contract conditions one party's performance on the satisfaction of a third party. *See* §7.3.4.4.
[41] Devoine Co. v. International Co., 151 Md. 690, 136 A. 37 (1927).

is dissatisfied with the quality of the proffered performance, it may reject such performance and freely pursue alternative opportunities. The condition of satisfaction preserves precisely such a course. But if that party feigns dissatisfaction for disallowed reasons, such as a disadvantageous shift in market price, the discretion is being used for a reason outside the parties' contractual expectations. A jury then may infer that the party was recapturing a forgone opportunity.[42]

For example, the Nebraska Supreme Court held that a buyer of a silo under a one-year warranty of customer satisfaction acted in good faith in claiming dissatisfaction and therefore was entitled to rescind the contract.[43] The buyer introduced evidence showing a large number of serious defects in the silo; diligent, but unsuccessful, efforts to obtain satisfactory performance from the equipment; and ample opportunity given to the seller to make the silo perform satisfactorily. The buyer thus established quality-related grounds for his dissatisfaction that were within the reasonable contemplation of the parties. There was no evidence from which to infer that the buyer sought to recapture a forgone opportunity.

By contrast, the Alabama Supreme Court in *Neumiller Farms, Inc. v. Cornett*[44] held that a broker acted in bad faith in rejecting potatoes tendered by a grower under a condition that the potatoes be satisfactory for making potato chips. The broker accepted the first three shipments under the contract when the market and contract prices were equal. The market price then fell to less than half the contract price, and the broker rejected all further shipments, saying that the potatoes would not "chip" satisfactorily. The rejected potatoes came from the same crop as the accepted potatoes and were found to be suitable for chipping in all respects by an independent expert. The seller also tendered potatoes purchased from another grower, from whom the buyer had recently purchased potatoes at the lower market price, and the buyer again rejected the potatoes as unsatisfactory. The buyer then told the seller that any further tenders would be turned down, commenting that he could buy all the potatoes he wanted at the lower market price. The court employed common law precedents to impose

---

[42] *See* Neumiller Farms, Inc. v. Cornett, 368 So. 2d 272 (Ala. 1979); Devoine Co. v. International Co., 151 Md. 690, 136 A. 37 (1927); Maas v. Scoboda, 188 Neb. 189, 195 N.W.2d 491 (1972).

[43] 188 Neb. at 194-195, 195 N.W.2d at 494-495.

[44] 368 So. 2d 272 (Ala. 1979).

a good faith limitation on the buyer's discretion under the satisfaction clause and construed the obligation to mean that the buyer could not use the satisfaction clause to escape a bad bargain.[45] The recapture of forgone opportunities was the buyer's obvious effort to substitute potatoes purchased on the spot market for the higher-priced potatoes under the futures contract, using the satisfaction clause as a pretext to do so.

Similarly, the precedents finding good and bad faith seem distinguishable on the basis of whether a claim of dissatisfaction is validated by reasons within the contract or whether a jury may infer that the discretion-exercising party really wanted out of the contract, claiming dissatisfaction as a pretext. Bad faith through a misuse of discretion under satisfaction or approval clauses can arise in a variety of settings — when a corporation refuses to remove a restriction on stock after the shareholder satisfies all contractual conditions precedent for removal and alleges that the corporation acted to keep the stock off the market to maintain the price;[46] when a buyer of land had a right to terminate if not satisfied with the city's approval of development plans and then objects to the city's requirement that the buyer install sewers as expected;[47] and when a publisher rejects an author's manuscript because not satisfied, though it did no editorial work and provided no feedback as the author reasonably expected.[48] Contract parties in the same legal posture have been found in good faith when a publisher showed a consistent pattern of dissatisfaction with an author's manuscript, believing it to be beyond help, and the author refused offers of help;[49] when a city rejected cable installed by a contractor that was demonstrably poor in quality;[50] and when an author disapproved the marketing of products based on her character for reasons involving the integrity and commercial value of her creation.[51]

A pretext of dissatisfaction is dishonest. This has led many courts to require only honesty to satisfy the requirements of good faith in

---

[45] Id. at 275.

[46] Ohashi v. Verit Indus., 536 F.2d 849 (9th Cir. 1976) (applying California law).

[47] Western Hills, Or. Ltd. v. Pfau, 265 Or. 137, 508 P.2d 201 (1973).

[48] Harcourt Brace Jovanovich, Inc. v. Goldwater, 532 F. Supp. 619 (S.D.N.Y. 1982) (applying New York law).

[49] Doubleday & Co. v. Curtis, 763 F.2d 495 (2d Cir. 1985) (applying New York law).

[50] City of Rochester v. Vanderlinde Elec. Corp., 56 A.D.2d 185, 392 N.Y.S.2d 167 (App. Div. 1977).

[51] Rey v. Lafferty, 990 F.2d 1379 (1st Cir. 1993) (applying Massachusetts law).

this context, usually when the judgment concerns matters of "fancy, taste or judgment" (including business judgment) by contrast with those of "commercial value or quality, operative fitness, or mechanical utility."[52] For the reasons given at §3.3, we think that too much is made of the difference between these standards.[53] When reasonableness requires action for a reason within the contract, the discretion-exercising party's interest in deference from judge and jury and the other party's interest in protection from dissembling are accommodated optimally.[54] Consider further the case of the land developer who claimed dissatisfaction due to the city's requirement that he install sewers when that need had been within the actual expectations of the parties.[55] The developer was not allowed "to base a claim of dissatisfaction on circumstances which were known or anticipated by the parties at the time of contracting."[56] Were the developer to make such a claim, in what sense would he be dishonest or improperly motivated? The result should not differ if the developer candidly said that he had changed his mind and wanted out of the deal. The seller's justified expectations do not change if the developer had been well motivated. The added cost of sewers in either event should not be available to the buyer as the factual predicate for justified dissatisfaction. It is a reason for dissatisfaction given up by the developer on entering the contract in any variation on the case.

### §3.4.2.3   Discretion as to Price

Though agreement on price was once essential to the formation of a contract, some recent cases suggest that a contract authorizing one party to set a price is not unenforceable for lack of consideration or

---

[52] E.g., Action Engg. v. Martin Marietta Aluminum, 670 F.2d 456 (3d Cir. 1982) (applying Puerto Rico law); Mattei v. Hopper, 51 Cal. 2d 119, 123, 330 P.2d 625, 626-627 (1958) (en banc); Western Hills, Or. Ltd. v. Pfau, 265 Or. 137, 508 P.2d 201 (1973).

[53] Accord Robert Childres, Conditions in the Law of Contracts, 45 N.Y.U. L. Rev. 33, 42-44 (1970).

[54] See §3.3.4.

[55] Western Hills, Or. Ltd. v. Pfau, 265 Or. 137, 508 P.2d 201 (1973).

[56] Id. at 145, 508 P.2d at 205.

indefiniteness because that price must be set in good faith.[57] Parties authorized to set a price following contract formation may be required to set a commercially reasonable price in a commercially reasonable manner or to set a reasonable value.[58] It need not be the market price, unless interpretation of the contract leads to the conclusion market price was reasonably expected.[59] In *Best v. First National Bank of Oregon*,[60] the Oregon Supreme Court held that a bank must act in good faith when unilaterally setting charges for processing checks drawn on insufficient funds. Good faith required the bank to set the fees in accordance with the reasonable expectations of the parties. A trial was needed to determine if this required the bank to set its fees in line with its costs and ordinary profit margin or if the bank could also set a price to deter the writing of rubber checks and take advantage of the inelastic demand in the market for rubber checks.

When one party may not itself set the price, but controls the formula or the factors that go into a formula set in the contract for determining the price, any disingenuity or illegal price fixing by that party similarly suggests that money is being diverted to other opportunities.[61] Less flagrant behavior also may run afoul of good faith.[62] In *Tymshare, Inc. v. Covell*,[63] an employer expressly reserved a power to modify the formula entitling a salesman to commissions. The U.S. Court of Appeals for the District of Columbia Circuit held that such a power, even if granted in the employer's "sole discretion," must be exercised in good faith, which required inquiry into whether it was reasonably

---

[57] Perdue v. Crocker Natl. Bank, 38 Cal. 3d 913, 702 P.2d 503, 216 Cal. Rptr. 345 (1985). *See also* U.C.C. §2-305.

[58] Leasing Serv. Corp. v. Broetje, 545 F. Supp. 362 (S.D.N.Y 1982); Hawaii Leasing v. Klein, 5 Haw. App. 450, 698 P.2d 309 (1985); Corthell v. Summit Thread Co., 132 Me. 94, 167 A. 79 (1933).

[59] People v. Chevron Corp., 872 F.2d 1410 (9th Cir. 1989) (applying California law); Columbus Milk Producers' Coop v. Department of Agric., 48 Wis. 2d 451, 180 N.W.2d 617 (1970).

[60] 303 Or. 557, 739 P.2d 554 (1987). *Cf.* Tolbert v. First Natl. Bank, 96 Or. App. 398, 772 P.2d 1373 (1989).

[61] *See* People v. Chevron Corp., 872 F.2d 1410 (9th Cir. 1989) (applying California law); Leberman v. John Blair & Co., 880 F.2d 1555 (2d Cir. 1989) (applying New York law); Kleiner v. First Natl. Bank, 581 F. Supp. 955 (N.D. Ga. 1984).

[62] *E.g.*, Lazar v. Hertz Corp., 143 Cal. App. 3d 128, 141, 191 Cal. Rptr. 849 (1983); Dorsey Bros., Inc. v. Anderson, 264 Md. 446, 287 A.2d 270 (1972); Miller v. Othello Packers, Inc., 67 Wash. 2d 842, 410 P.2d 33 (1966).

[63] 727 F.2d 1145 (D.C. Cir. 1984) (applying Virginia law).

understood by the parties that there were some purposes for which that power could not be employed. The court continued:

> It seems to us that the "sole discretion" intended was discretion to determine the existence or nonexistence of the various factors that would reasonably justify alteration of the sales quota. Those factors would include . . . an unanticipated volume of business from a particular customer unconnected with the extra sales efforts of the employee . . . ; and they may perhaps include other eventualities, such as a poor overall sales year for the company. . . . But the language [does] not confer discretion to reduce the quota for any reason whatever — including . . . a simple desire to deprive an employee of the fairly agreed benefit of his labors.[64]

This passage draws the now-familiar distinction between acting for reasons preserved when contracting, that is, the ordinary business reasons for which the quota could be modified, and acting for reasons given up on entering the contract, that is, the desire to deny the employee agreed benefits.

The same distinction is more explicit in *Van Valkenburgh, Nooger & Neville, Inc. v. Hayden Publishing Co.*,[65] where, an author claimed, the publisher manipulated the factors that determined the author's royalty under a formula. The publisher promised the author a royalty on sales and its best efforts to promote the books. Nine years later, the author refused the publisher's request to update the books and to accept a reduced royalty. The publisher thereupon hired a third person to update the books at a lower royalty, concealed that fact from the original author, and sought to sell the updated version to buyers requesting the original. The court found no violation of the implied covenant of good faith and fair dealing, though the diversion of customers to the updated book was held to violate the publisher's express promise to use its best efforts on behalf of the plaintiff. The court said that the publisher, by entering the contract, did not "close off" its right to issue books on the same subject, to negotiate with and to pay authors of such books, and to promote them fully according to the publisher's economic interests even though this adversely affected the original

[64]*Id.* at 1154.
[65]30 N.Y.2d 34, 281 N.E.2d 142, 330 N.Y.S.2d 329, *cert. denied*, 409 U.S. 875 (1972).

author.[66] In other words, the publisher had an ordinary business reason for marketing the updated books, a reason that was within the justified expectations of the parties.


### §3.4.2.4   Discretion as to Time

Open terms as to time may confer discretion on one party to decide when it shall perform, when the other party shall perform, or when the contract shall terminate. If one party is given discretion to determine when it shall perform, it may not delay matters for so long that it appears to be abandoning the contract. A party acted in bad faith, for example, when it promised to pay a portion of the proceeds of a sale of real estate in return for the release of a claim, the contract was silent as to the time for performance, and the party delayed selling for eight years.[67] That the defendant was recapturing forgone opportunities is plain. In *Greer Properties, Inc. v. LaSalle National Bank*,[68] a seller of real property contracted to clean up environmental waste on the premises at its own expense. The agreement fixed a selling price, but authorized the seller to terminate if the cleanup costs would be economically impracticable. The termination clause thus gave the seller a constrained discretion to terminate the contract. The Court of Appeals for the Seventh Circuit held that "[w]hen the Sellers entered the contract with [the buyer] and [the buyer] agreed to pay them a specific price for the property, the Sellers gave up their opportunity to shop around for a better price. By using the termination clause to recapture that opportunity, the Sellers would have acted in bad faith."[69]

As the preceding discussion of employment terminations suggests,[70] the exercise of discretionary termination rights is more problematic because it is controversial whether the good faith limitation applies. When a contract includes an express right of termination without cause, the express term usually prevails over any contrary implications

---

[66] *Id.* at 45, 281 N.E.2d at 144, 330 N.Y.S.2d at 333. *See also ParaData Computer Networks, Inc. v. Telebit Corp.*, 830 F. Supp. 1001 (E.D. Mich. 1993) (applying Michigan law).

[67] Simon v. Etgen, 213 N.Y. 589, 107 N.E. 1066 (1915).

[68] 874 F.2d 457 (7th Cir. 1989) (applying Illinois law).

[69] *Id.* at 461.

[70] *See* §3.4.1.

from the context because the party wishing to terminate has done all that could be expected to preserve all of its alternative opportunities.[71] Even when the contract omits a termination provision, the traditional understanding is that such contracts are terminable at will. In addition to employment cases, the issue arises frequently in franchise and dealer termination cases. Franchisees claiming a bad faith termination often have been unsuccessful, whether or not the court applied a good faith limitation. They occasionally have succeeded.[72] A contract granting a party "sole discretion" to terminate for specified reasons, however, does not always negate the implication of a good faith constraint on discretion.[73]

### §3.4.2.5   Discretionary Control of a Condition

In addition to conditions of satisfaction, a contract may also be conditioned on one party obtaining a third party's approval of the deal or on the conclusion of another related contract by one party. Thus, in *Crooks v. Chapman Co.*,[74] a jury was allowed to find that the failure of a buyer of a radio station to secure a Federal Communications Commission license, a condition precedent to sale, was not in good faith. The buyer did not apply for a license within a reasonable time, suggesting abandonment of the contract. Consider also a contract for demolition work to be done by the defendant if it could obtain certain insurance policies. The condition presumably is designed to protect the defendant from normal business difficulties that might prevent it from obtaining insurance. If the defendant makes every reasonable effort to obtain the policies, but cannot do so because of financial difficulty arising from an injury to one of its employees on another

---

[71] *See* Blalock Mach. & Equip. Co. v. Iowa Mfg. Co., 576 F. Supp. 774 (N.D. Ga. 1983) (applying Iowa law); Exxon Corp. v. Atlantic Richfield Co., 678 S.W.2d 944 (Tex. 1984); §3.2.1.

[72] §4.4.3.1.

[73] Audichron Co. v. Phone Programs Ill., No. 84 C 8733, 1987 WL 8967, 1987 U.S. Dist. LEXIS 2506 (N.D. Ill. Mar. 30, 1987).

[74] 124 Ga. App. 718, 185 S.E.2d 787 (1971). *See also* CRI, Inc. v. Watson, 608 F.2d 1137 (8th Cir. 1979) (applying Minnesota law); Vanadium Corp. of Am. v. Fidelity & Deposit Co., 159 F.2d 105 (2d Cir. 1947); Dasenbrock v. Interstate Restaurant Corp., 7 Ill. App. 3d 295, 287 N.E.2d 151 (1972).

job, its obligation to perform will be discharged.[75] A breach may be established, however, if the defendant makes no reasonable effort to obtain the insurance.[76] The latter behavior will often be an attempt to use the condition as a pretext to recapture forgone opportunities.

A similar pattern can be seen from cases in which a buyer's obligation to purchase real estate is conditioned on the buyer obtaining financing. In *Fry v. George Elkins Co.*,[77] the sale of a residential home was conditioned on the buyer securing financing at a specified rate. The buyer was informed at the time of formation that such financing could not be obtained from a bank, but was available from a mortgage company. He applied only to banks, however, and then only after obviously dragging his heels. The buyer refused to close and sought recovery of his deposit on the ground that required financing had not been secured. The court held that the factfinder could find that the buyer had not acted in good faith. The evidence indicated that the buyer had changed his mind and had decided to move to Hawaii,[78] a post-formation decision that would be outside the normal reasons for so conditioning a promise to buy a house. Therefore, the factfinder could conclude that the buyer acted for a reason that was given up upon entering the contract.

In *Ide Farm & Stable, Inc. v. Cardi*,[79] the buyer, also claiming an inability to obtain financing, did not go through with the deal. The seller sued the buyer for breach of contract by failing to perform in good faith. In contrast to the facts in *Fry*, however, the evidence indicated that the buyer had gone to four banks, but was unsuccessful because of a tight money market. The court rejected the claim that the efforts to secure financing were a sham. The reason for the buyer's

[75] Omaha Pub. Power Dist. v. Employers' Fire Ins. Co., 327 F.2d 912 (8th Cir. 1964). The case is the basis for Restatement (Second) of Contracts §205 illus. 4.

[76] 327 F.2d at 916 (dictum). *See also* R.J. Kuhl Corp. v. Sullivan, 13 Cal. App. 4th 1589, 17 Cal. Rptr. 2d 425 (1993); Baldwin v. Kubetz, 148 Cal. App. 2d 937, 307 P.2d 1005 (1957); Hamlin v. Steward, 622 N.E.2d 535 (Ind. Ct. App. 1993); Bushmiller v. Schiller, 35 Md. App. 1, 368 A.2d 1044 (1977); Covington v. Robinson, 723 S.W.2d 643 (Tenn. Ct. App. 1986).

[77] 162 Cal. App. 2d 256, 327 P.2d 905 (1958).

[78] *Id.* at 259, 327 P.2d at 906-907.

[79] 110 R.I. 735, 297 A.2d 643 (1972). *See also* Ponnapula v. CBC Co., 952 F.2d 403 (6th Cir. 1992) (applying Tennessee law); Watkins v. Williamson, 869 S.W.2d 383 (Tex. Ct. App. 1993).

failure was indeed the very one that induces the typical financing condition in land sale contracts. Thus, the buyer's discretion was exercised in good faith in light of the purpose that parties normally have in mind in so conditioning a promise to buy land.

On the seller's side, liability for bad faith performance may be found when the buyer's obligation to close a real estate deal is conditioned on the seller's clearing the title. In *Cedrone v. Unity Savings Association*,[80] the seller refused a tendered settlement of a claim with a third party, and the buyer argued that this action was indicative of its bad faith intent to get out of a deal to which it already had committed itself. On motion for summary judgment against the buyer, the court held that this raised a factual question that should be submitted to a jury. In *La Fond v. Frame*,[81] the seller failed to pay off her own mortgage on the property. The Supreme Judicial Court of Massachusetts held that the condition did not "confer upon the seller an option not to perform merely because she chooses not to do so."[82] The seller was held in bad faith on proof that she was able to give a good and clear title and that she did not intend to carry out the agreement.

# §3.5   CAUSATION

To be a compensable breach of contract, of course, an exercise of discretion for contractually excluded reasons must be the cause of harm to a contractual interest of the other party. Contract law generally compensates for harm to expectation, reliance, and restitution interests of nonbreaching parties; it does not punish promise breakers or wrong-doers.[1] Thus, when a buyer contracted to purchase a hotel and convention center for over $3 million, subject to the usual financing condition, the buyer was entitled to a return of its deposit when its application for financing was disapproved.[2] The seller claimed the buyer was in

---

[80] 609 F. Supp. 250 (E.D. Pa. 1985) (applying Pennsylvania law).

[81] 327 Mass. 364, 99 N.E.2d 51 (1951).

[82] *Id.* at 366, 99 N.E.2d at 52.

**§3.5**   [1] *See* Restatement (Second) of Contracts §344 scope note to ch. 16.

[2] Ponnapula v. CBC Co., 952 F.2d 403 (6th Cir. 1992) (applying Tennessee law). *See also* Continental Potash, Inc. v. Freeport-McMoran, Inc., 115 N.M. 690, 858 P.2d 66 (1993).

bad faith in seeking financing because it failed to supplement its application after a prospective lender expressed deep skepticism that the applicant's net worth was anywhere near adequate. The court held, however, that failing to pursue an abstract possibility was no evidence of bad faith. Apparently it would have made no difference to the outcome had the applicant done so; the exercise of discretion in making application for a loan, even were it faulty, was not the cause of harm to the seller.

# §3.6   BURDENS OF PROOF

Few judicial decisions discuss the allocation of burdens of proof in good faith performance cases, suggesting that most courts handle these questions in the ordinary way. Accordingly, the party claiming a breach by the other will bear the burden of raising a triable issue of fact to avoid summary judgment and also of providing evidence of facts at trial sufficient for a reasonable jury to find in its favor. As one court said, "[S]ince plaintiff claimed a breach it was his duty to prove it, and the burden, therefore, rested upon it to show that defendant had acted in bad faith."[1] Though bad faith is a question of fact for the jury, courts easily and frequently dispose of cases on summary judgment when a claimant alleges bad faith without alleging provable facts to support its claim. Counsel should be under no illusion that groundless allegations of bad faith will achieve anything but a dismissal.

The claimant's burden may be carried, however, by alleging facts from which a reasonable inference of bad faith can be made. In *Mitford v. de Lasala*,[2] an employee who worked for a share of profits under a contract terminable on three months' notice was terminated. The employee claimed the termination was in bad faith because it was done to prevent him from sharing in unexpectedly large future profits. The court reversed a summary judgment for the employer because the circumstances surrounding the termination allowed an inference that

---

§3.6   [1]HML Corp. v. General Foods Corp., 365 F.2d 77, 83 (3d Cir. 1966) (applying New York law).
   [2]666 P.2d 1000 (Alaska 1983).

the employee was fired for that reason. The circumstances were these: upon being reminded of the profit-sharing arrangement, the employer's representative questioned the contract's existence and asserted that it was ambiguous; when the employee replied to these possible evasions, he was terminated. Summary judgment would not be appropriate in favor of the employee, however, because the employer was entitled to an opportunity to rebut the inference of bad faith with appropriate evidence. The discussion in the case is suggestive of what should happen at a trial.

When a claimant succeeds in proving facts from which a jury could reasonably infer bad faith performance, the burden in our view should shift to the other party to justify its exercise of discretion.[3] Doing so requires that party to prove the existence of reasons that were permitted by the agreement, justifying the exercise of discretion. In the above case, the employer should escape liability if it can persuade the fact-finder that the employee was fired for any of a host of ordinary business reasons — because of poor performance, a general downsizing of the company, or a change of strategy making the employee's job useless. This is where the dispute over subjective and objective standards has its most practical impact. The respondent bears a more difficult burden if it must show that it was motivated by contractually permitted reasons than if it must show that such reasons were available to it in the circumstances.

Difficult questions can arise when both allowed and disallowed reasons for exercising discretion were available to the discretion-exercising party. Both parties then may carry their burdens of proof, sending the case to the factfinder. The question of mixed reasons is analyzed in the next section.

## §3.7   INSTRUCTING A JURY: MIXED REASONS

Jury instructions sometimes do no more than repeat that there is an implied covenant of good faith in the contract and require that the

---

[3]Cf. Ponnapula v. CBC Co., 952 F.2d 403 (6th Cir. 1992) (applying Tennessee law) (respondent failed to designate specific facts showing there is a genuine issue for trial); Empire Gas Corp. v. American Bakeries Co., 840 F.2d 1333 (7th Cir. 1988)

jury find bad faith in order to hold the defendant liable. Or they may add, "This means that each party impliedly agrees not to do anything to destroy or injure the right of the other to receive the benefits of the contract."[1] These regurgitations of boilerplate doctrine are not likely to help the jury apply the law (or to help the party proposing the instruction). In the abstract, "good faith" has different meanings for different people. To some, it is little more than an excuse to judge another person moralistically while to others it calls for a judgment on the kindness of another person's heart, however misguided their actions. Good faith in contract law has neither of these meanings. Jury instructions should be more concrete than rote doctrine.[2]

The theory of good faith performance set forth above should help in formulating good jury instructions by providing the criteria for highlighting the relevant facts for the jury. A short jury instruction on good faith performance might follow these lines:

> Every contract requires the parties to act in good faith in its performance. Good faith comes into play when one party has discretion under the contract, as did [the defendant, when . . . ]. The law requires [the defendant] to exercise that discretion for reasons within the expectations of a reasonable person in the position of [the plaintiff]. You must decide (1) for what reasons did [the defendant] use its discretion as it did, and (2) were those reasons allowed by the contract. A party with discretion may not use that discretion to pursue opportunities it gave up on entering the contract.

Better jury instructions would be too case-specific to be offered in this treatise.[3]

---

(applying Illinois law) (discretion-exercising party who gave no reason for its conduct held in bad faith by jury).

**§3.7** [1]Hilton Hotels Corp. v. Butch Lewis Prods., Inc., 808 P.2d 919, 923 (Nev. 1991).

[2]See Empire Gas Corp. v. American Bakeries Co., 840 F.2d 1333 (7th Cir. 1988) (criticizing trial judge for reading U.C.C. §2-306(1) verbatim to jury); Idaho First Natl. Bank v. Bliss Valley Foods, Inc., 121 Idaho 266, 288, 824 P.2d 841, 863-864 (1991) (inadequate to instruct jury that good faith requires honesty).

[3]For examples of approved instructions, see Hoffman-La Roche, Inc. v. Campbell, 512 So. 2d 725 (Ala. 1987); Hilton Hotels v. Butch Lewis Prods., Inc., 107 Nev. 226, 808 P.2d 919, 923 (1991); Wadeson v. American Family Mut. Ins. Co., 343 N.W.2d 367 (N.D. 1984); Siegner v. Interstate Prod. Credit Assn., 109 Or. App. 417, 820 P.2d 20 (1991). For disapproved instructions, see Nilsson v. Mapco, 115 Idaho 18, 764 P.2d 95, 99-100 (Ct. App. 1988); Heltborg v. Modern Mach., 244 Mont. 24, 795 P.2d 954, 959-962 (1990).

A difficult issue that may arise concerns the problem of mixed reasons. Assume that the claimant of bad faith performance carries its burden and the respondent fails to undermine the credibility of the claimant's case, but the respondent presents credible evidence of a reason for exercising discretion that was allowed by the agreement. The totality of the evidence then would be sufficient to sustain a jury finding that the respondent acted for either contractually permitted or contractually excluded reasons or for a mixture of both. Sorting out mixed reasons should depend on whether the applicable law employs a subjective or an objective standard of good faith.

If the standard of good faith is objective, the analysis is relatively straightforward. As we have seen,[4] the court in *Dayan v. McDonald's Corp.*[5] rejected the relevance of motives (whether wrongful or not) when the use of discretion was justified as within the reasonable expectations of the parties. The court refused to hold that an improper motive would constitute bad faith when the discretion-exercising party also had a good reason. This seems correct, as long as the discretion-exercising party is not allowed to conjure up trivial reasons to escape its duty. There is no harm to a party's contractual interests when a use of discretion is objectively justified even if subjectively suspect. Contract law's penchant to compensate harms, not to punish wrongdoers, argues for focusing on the reasonably significant reasons available to a discretion-exercising party at the time for performance to the exclusion of any contrary motives. A discretion-exercising party can have both good and bad reasons available to it, objectively, in the circumstances. As long as the good reasons are reasonably significant, the result should be "good faith" in that case.

If the standard of good faith is subjective, however, matters are more complicated. Though we have found no precedent on the point, it is not hard to imagine a discretion-exercising party who took into account both contractually permitted and contractually excluded reasons, weighed them, and acted on the stronger. Several jury instructions are possible in that case: the discretion-exercising party could be held in bad faith if the contractually excluded reasons were a factor, a significant factor, a substantial factor, or the predominant factor in the decision. Again, no case law addresses this question, though analo-

[4] *See* §3.3.1.
[5] 125 Ill. App. 3d 972, 81 Ill. Dec. 156, 466 N.E.2d 958 (1984).

gies can be found in cases interpreting the federal civil rights statutes.[6] We have stated our preference for objective standards because they are better at balancing the discretion-exercising party's interest in deference from judge and jury with the other party's interest in nonarbitrary and foreseeable reasons for exercising discretion.[7] Assuming that a subjective standard of good faith applies, the same reasons argue in favor of the more deferential standard for sorting mixed reasons. Accordingly, when a jury must sort mixed subjective reasons, we believe it should be instructed to find a party in bad faith only when contractually excluded reasons were the predominant reason for its use of discretion.[8]

# §3.8 REMEDIES FOR BREACH BY FAILING TO PERFORM IN GOOD FAITH

Unless the contract involves a "special relationship" giving rise to tort damages for bad faith,[1] the remedies awarded in contractual bad faith performance cases are the same as those awarded for "any garden variety breach of contract."[2] Expectation damages are the preferred remedy, giving the nonbreaching party the benefit of the bargain.[3] Reliance damages, giving the nonbreaching party its provable losses

---

[6] In those cases, however, the applicable law seeks to do more than compensate the victim of discrimination; it seeks to change social practices to end unlawful discrimination. Accordingly, subjective standards may be more appropriate than in contract law, where compensation is the main goal.

[7] See §§2.3.4, 3.3.4.

[8] Cf. Martindell v. Lake Shore Natl. Bank, 15 Ill. 2d 272, 286, 154 N.E.2d 683, 690 (1958) ("where an instrument is susceptible of two conflicting constructions, one of which imputes bad faith to one of the parties and the other does not, the latter construction should be adopted," citing 12 I.L.P., Contracts, §217).

§3.8 [1] See §9.2.

[2] Liberty Mut. Ins. Co. v. Altfillisch Constr. Co., 70 Cal. App. 3d 789, 797, 139 Cal. Rptr. 91, 95 (1977).

[3] See, e.g., Dasenbrock v. Interstate Restaurant Corp., 7 Ill. App. 3d 295, 287 N.E.2d 151 (1972); Fortune v. National Cash Register Co., 373 Mass. 96, 364 N.E.2d 1251 (1977); Pernet v. Peabody Engg. Corp., 20 A.D.2d 781, 248 N.Y.S.2d 132 (1964); Western Natural Gas Co. v. Cities Serv. Gas Co., 507 P.2d 1236 (Okla. 1972), appeal dismissed and cert. denied, 409 U.S. 1052 (1972).

in reliance on the contract, are available when expectation damages are too speculative.[4] Restitutionary recoveries also are available as in any contract action.[5] A breach of contract by failing to perform in good faith may be a material breach, discharging the other party's duty to perform dependent promises.[6] On the equitable side, specific performance can be awarded when appropriate,[7] and the remedy may include an accounting.[8] Some cases can present difficult challenges in formulating effective compensatory formulae, especially when measuring lost profits due to forgone opportunities.[9] Attorney fees are not awarded for bad faith performance unless the contract or a statute so provides.[10] The remedial purposes of good faith enforcement requirements are discussed in Chapter 5.

[4] Isbell v. Anderson Carriage Co., 170 Mich. 304, 136 N.W. 457 (1912); Wigand v. Bachmann-Bechtel Brewing Co., 222 N.Y. 272, 118 N.E. 618 (1918).

[5] E.g., Miller v. Othello Packers, Inc., 67 Wash. 2d 842, 410 P.2d 33 (1966) (per curiam) (*quantum valebat*).

[6] See Baldwin v. Kubetz, 148 Cal. App. 2d 937, 307 P.2d 1005 (1957); Zion's Properties, Inc. v. Holt, 538 P.2d 1319 (Utah 1975). See Chapter 6.

[7] Western Hills, Or. Ltd., v. Pfau, 265 Or. 137, 508 P.2d 201 (1973) (en banc).

[8] Nelson v. Abraham, 29 Cal. 2d 745, 177 P.2d 931 (1947).

[9] *Compare* Parev Prods. Co. v. I. Rokeach & Sons, 124 F.2d 147 (2d Cir. 1941) *with* Mechanical Ice Tray Corp. v. General Motors Corp., 144 F.2d 720 (2d Cir. 1944), *cert. denied*, 324 U.S. 844 (1945). *See also* Bloor v. Falstaff Brewing Corp., 601 F.2d 609 (2d Cir. 1979).

[10] *See, e.g.*, McDonald v. Winn, 194 Ga. App. 459, 390 S.W.2d 890 (1990) (statute providing for expenses of litigation "where the defendant has acted in bad faith"). An exception is where the defendant's breach of contract foreseeably caused the plaintiff to incur attorney fees through litigation with a third party. D.A.W. Dobbs, Remedies §3.8, at 195 (1973). Insurance contracts, however, may be treated differently. *E.g.*, Canyon Country Store v. Bracey, 781 P.2d 414 (Utah 1989) (discussed in Collier v. Heinz, 827 P.2d 982 (Utah Ct. App. 1992)).

# Exhibit 3

# BREACH OF CONTRACT AND THE COMMON LAW DUTY TO PERFORM IN GOOD FAITH

### Steven J. Burton*

*The contractual expectation interest traditionally is conceived in terms of a promisee's expectation of receiving the promised benefit of the contract. In this Article, Professor Burton argues that the expectation interest also encompasses the expected costs to the promisor, which consist of opportunities forgone at the time of contract formation. This cost perspective makes it possible to articulate an operational standard of good faith performance, which is now an implied covenant in every contract in most American common law jurisdictions. The duty to perform in good faith applies when one party exercises discretion in performance and thereby controls the other party's anticipated benefit. The discretion-exercising party performs in good faith when it exercises discretion for any purpose within the reasonable contemplation of the parties, and in bad faith when discretion is used to recapture forgone opportunities.*

A MAJORITY of American jurisdictions,[1] the *Restatement (Second) of Contracts*,[2] and the Uniform Commercial Code (U.C.C.)[3] now recognize the duty to perform a contract in good faith as a general principle of contract law. The conduct of virtually any party to any contract accordingly may be vulnerable to claims of breach stemming from this obligation.[4] Yet neither courts nor commentators have articulated an operational standard that distinguishes good faith performance from bad faith performance.[5] The good faith performance doctrine consequently appears as a license for the ex-

---

* Associate Professor of Law, University of Iowa. B.A., University of California at Los Angeles, 1970; J.D., University of Southern California, 1973.

The author wishes to express his gratitude to the many colleagues who read and commented on earlier drafts. Special thanks go to Professors Clifford Calhoun, Robert Hillman, and Alan Widiss and to Dr. Serena Stier. Thomas S. Kiriakos and James Stinehart assisted in the research.

[1] Cases indicating jurisdictions that explicitly recognize a general obligation of good faith performance in every contract at common law are set out in the Appendix, p. 404 *infra*.

[2] RESTATEMENT (SECOND) OF CONTRACTS § 231 (Tent. Draft No. 5, 1970).

[3] U.C.C. § 1-203. All citations are to the UNIFORM COMMERCIAL CODE 1978 OFFICIAL TEXT WITH COMMENTS (1978).

[4] This Article concentrates on claims of bad faith giving rise to a breach of contract rather than on claims of bad faith asserted against a party who concedes the breach but claims to have substantially performed. In the latter case, good faith performance is one of several factors bearing upon substantial performance. *See* note 35 *infra*.

[5] *See generally* Farnsworth, *Good Faith Performance and Commercial Reasonableness Under the Uniform Commercial Code*, 30 U. CHI. L. REV. 666 (1963); Summers, *"Good Faith" in General Contract Law and the Sales Provisions of the Uniform Commercial Code*, 54 VA. L. REV. 195 (1968). Professor Summers does not

*HARVARD LAW REVIEW* [Vol. 94:369

ercise of judicial or juror intuition,[6] and presumably results in unpredictable and inconsistent applications.[7] Repeated common law adjudication,[8] however, has enriched the concept of good faith performance so that an operational standard now can be articulated and evaluated.

---

purport to identify the criteria that judges use or ought to use in deciding whether particular conduct is in bad faith. Instead, he asserts that

> good faith is an "excluder." It is a phrase without general meaning or (meanings) of its own and serves to exclude a wide range of heterogeneous forms of bad faith. In a particular context the phrase takes on specific meaning but usually this is only by way of contrast with the specific form of bad faith actually or hypothetically ruled out.

*Id.* at 201. Professor Summers identifies six categories of bad faith in contract performance: evasion of the spirit of the deal, lack of diligence and slacking off, willfully rendering only "substantial" performance, abuse of a power to specify terms, abuse of a power to determine compliance, and interference with or failure to cooperate in the other party's performance. *Id.* at 232–43. He identifies similar categories relating to contract formation and enforcement. *Id.* at 220–32, 243–52. No effort is made to develop a unifying theory that explains what these categories have in common. Indeed, the assertion is made that one cannot or should not do so. *Id.* at 204–07.

On the treatment of good faith performance in the civil law, see J. DAWSON, ORACLES OF THE LAW 461–79 (1968); Powell, *Good Faith in Contracts*, 9 CURRENT LEGAL PROB. 16 (1956). On the treatment of similar matters in the Commonwealth, see Burrows, *Contractual Co-Operation and the Implied Term*, 31 MOD. L. REV. 390 (1968). On the problems of good faith at the bargaining and formation stages of the contracting process, see Kessler & Fine, Culpa in Contrahendo, *Bargaining in Good Faith, and Freedom of Contract: A Comparative Study*, 77 HARV. L. REV. 401 (1964). *See also* Hillman, *Policing Contract Modifications Under the U.C.C.: Good Faith and the Doctrine of Economic Duress*, 64 IOWA L. REV. 849 (1979). On the problem of good faith at the enforcement stage, see Summers, *supra*, at 248–52. *See also* Braucher, *The Legislative History of the Uniform Commercial Code*, 58 COLUM. L. REV. 798, 813 (1958). On good faith in other contexts, see note 17 *infra*.

[6] The question of a contract party's good faith performance generally is one of fact. *See, e.g.,* Dorsey Bros. v. Anderson, 264 Md. 446, 450–51, 287 A.2d 270, 273 (1972); Pernet v. Peabody Eng'r Corp., 20 A.D.2d 781, 782, 248 N.Y.S.2d 132, 135 (1964) (per curiam); Atomic Fuel Extraction Corp. v. Estate of Slick, 386 S.W.2d 180 (Tex. Civ. App. 1964).

[7] *See* Schultze v. Chevron Oil Co., 579 F.2d 776, 779 (3d Cir. 1978); Wolf v. Illustrated World Encyclopedia, Inc., 41 A.D.2d 191, 192–93, 341 N.Y.S.2d 419, 421 (1973); Eisenberg, *Good Faith Under the Uniform Commercial Code — A New Look at an Old Problem*, 54 MARQ. L. REV. 1 (1971); Hillman, *supra* note 5, at 856–76; Summers, *supra* note 5. *See also* R. UNGER, LAW IN MODERN SOCIETY 210 (1976); Kennedy, *Form and Substance in Private Law Adjudication*, 89 HARV. L. REV. 1685, 1713–24 (1976).

[8] This Article does not present a theory of the duty to perform a contract in good faith under the Uniform Commercial Code. The U.C.C. does not reflect a consistent theory of good faith on its face. *See generally* Farnsworth, *supra* note 5, at 673–74 ("future vitality of the Code's obligation of good faith performance depends largely upon the post operative care it receives from the courts"); Hillman, *supra* note 5 (contract modification under U.C.C. § 2-209); Mooney, *Old Kontract Principles and Karl's New Kode: An Essay on the Jurisprudence of our New Commercial Law*, 11 VILL. L. REV. 213, 244–53 (1966); Summers, *supra* note 5, at 215 ("Code's definitions

The good faith performance doctrine establishes a standard for contract interpretation[9] and a covenant that is implied in every contract.[10]  The good faith question often arises because a contract is an exchange expressed imperfectly and projected into an uncertain future.[11]  Contract parties rely on the good faith of their exchange partners because detailed planning may be ineffectual or inadvisable.[12]  Therefore, express contract terms alone are insufficient to determine a party's good faith in performance.

Even so, the courts employ the good faith performance doctrine to effectuate the intentions of parties, or to protect their reasonable expectations.[13]  Standards expressed in these terms, however, are of little aid in applying the doctrine.  They direct the inquiry away from duties imposed upon the parties irrespective of their assent.[14]  But they direct attention to the

[of good faith] restrictively distort the doctrine of good faith"); Note, *Good Faith Under the Uniform Commercial Code*, 23 U. PITT. L. REV. 754 (1962).

Several important good faith provisions of the Code, however, have been interpreted consistently with the common law counterpart. *See generally* Feld v. Henry S. Levy & Sons, 37 N.Y.2d 466, 470, 335 N.E.2d 320, 322, 373 N.Y.S.2d 102, 105 (1975); Weistart, *Requirements and Output Contracts: Quantity Variations Under the UCC*, 1973 DUKE L.J. 599, 600 (U.C.C. § 2-306(1) good faith limitation and common law treatment of good faith in output and requirements contracts indistinguishable.) This Article therefore relies upon cases decided under the U.C.C. only in those areas where the U.C.C.'s compatibility with the common law is clear. The theory presented here in turn should provide a perspective and policy framework that makes full analysis of the U.C.C.'s good faith performance provisions more manageable.

[9] *See* Ryder Truck Rental, Inc. v. Central Packing Co., 341 F.2d 321, 323–24 (10th Cir. 1965); Milstein v. Security Pac. Nat'l Bank, 27 Cal. App. 3d 482, 486–87, 103 Cal. Rptr. 16, 18–19 (1972); Martindell v. Lake Shore Nat'l Bank, 15 Ill. 2d 272, 283–84, 154 N.E.2d 683, 690–91 (1958); Veatch v. Black, 363 Mo. 190, 199, 250 S.W.2d 501, 507 (1952); Association Group Life, Inc. v. Catholic War Veterans of the United States, 61 N.J. 150, 153–54, 293 A.2d 382, 384 (1972) (per curiam); Hilleary v. Skookum Root Hair-Grower Co., 4 Misc. 127, 129–30, 23 N.Y.S. 1016, 1017–18 (C.P. 1893).

[10] *See* Appendix, p. 404 *infra.*

[11] *See generally* Farnsworth, *Disputes Over Omission in Contracts*, 68 COLUM. L. REV. 860 (1968); Macneil, *The Many Futures of Contract*, 47 S. CAL. L. REV. 691 (1974).

[12] *See, e.g.,* Llewellyn, *What Price Contract? — An Essay in Perspective*, 40 YALE L.J. 704, 727 (1931); Macneil, *supra* note 11; Weistart, *supra* note 8, at 618–22. *See also* Kessler & Stern, *Competition, Contract, and Vertical Integration*, 69 YALE L.J. 1 (1959); Klein, Crawford & Alchian, *Vertical Integration, Appropriable Rents, and the Competitive Contracting Process*, 21 J.L. & ECON. 297 (1978).

[13] *E.g.,* Sessions, Inc. v. Morton, 491 F.2d 854, 857 (9th Cir. 1974); Ryder Truck Rental, Inc. v. Central Packing Co., 341 F.2d 321, 323–24 (10th Cir. 1965); Perkins v. Standard Oil Co., 235 Or. 7, 15–17, 383 P.2d 107, 111–12 (1963) (en banc).

[14] The good faith performance doctrine should be distinguished sharply from the doctrine of unconscionability, which governs the formation of a contract. *See, e.g.,* U.C.C. § 2-302; RESTATEMENT (SECOND) OF CONTRACTS § 234 (Tent. Draft No. 5, 1970). Unconscionability gives courts latitude to refuse to enforce all or part of an

amorphous totality of the factual circumstances at the time of formation, and fail to distinguish relevant from irrelevant facts within that realm. The analysis would be advanced further by an operational standard that respects the autonomy of contract parties and calls the relevant facts to the foreground of the totality of the circumstances.

This requires a better understanding of the contractual expectation interest. Traditionally, the expectation interest is viewed as comprising the property, services, or money to be received by the promisee. This Article suggests that it also encompasses the expected cost of performance to the promisor.[15] This expected cost consists of alternative opportunities forgone upon entering a particular contract.[16]

The cost perspective is essential to a proper understanding of the good faith performance doctrine,[17] even though it is not necessary when clear express promises are breached. Good faith

---

agreement that is not a product of meaningful choice by both parties or is so one sided in its terms as to favor one party unreasonably. *E.g.*, Williams v. Walker-Thomas Furniture Co., 350 F.2d 445, 449 (D.C. Cir. 1965); U.C.C. § 2-302(1). Unconscionability thus is a limitation on freedom of contract that allows the courts to police the bargaining relationship and to override the manifested intention of the parties in the interests of justice. *See generally* Ellinghaus, *In Defense of Unconscionability*, 78 YALE L.J. 757 (1969); Leff, *Unconscionability and the Code — The Emperor's New Clause*, 115 U. PA. L. REV. 485 (1967); *see also* p. 383 *infra*.

The good faith performance obligation, in contrast, typically is implied in contracts involving arm's-length transactions, often between sophisticated businesspersons. *See* pp. 380–84 *infra*. Although the parties are not free to disclaim the obligation to perform in good faith as such, Industrial & Gen. Trust, Ltd. v. Tod, 180 N.Y. 215, 225–26, 73 N.E. 7, 9–10 (1905), they are free to determine by agreement what good faith will permit or require of them. *See, e.g.*, VTR, Inc. v. Goodyear Tire & Rubber Co., 303 F. Supp. 773 (S.D.N.Y. 1969); Milstein v. Security Pac. Nat'l Bank, 27 Cal. App. 3d 482, 486, 103 Cal. Rptr. 16, 18 (1972); Zapatha v. Dairy Mart, Inc., 1980 Mass. Adv. Sh. 1837, 408 N.E.2d 1370 (1980).

[15] *See* pp. 374–78 *infra*.

[16] *See* pp. 387–89 *infra*.

[17] The analysis will be confined to good faith in the context of contract performance. The words "good faith" appear in a wide variety of other contexts. Failure to keep different contexts analytically distinct can result in much confusion. Good faith performance thus should not be equated with requirements of "good faith" at the formation or enforcement stages of the contracting process, where "good faith" serves different purposes. *See* sources cited note 5 *supra*.

Good faith performance also should not be equated with "good faith" (1) as an absence of fraud, *e.g.*, Guardino Tank Processing Corp. v. Olsson, 89 N.Y.S.2d 691 (Sup. Ct. 1949) (claim of promissory fraud rejected while breach of contract by failing to perform in good faith sustained); (2) as a fiduciary duty, because the doctrine obviously could not mean that every contract requires "something stricter than the morals of the marketplace," Meinhard v. Salmon, 249 N.Y. 458, 464, 164 N.E. 545, 546 (1928) (Cardozo, C.J.); *see* Broad v. Rockwell Int'l Corp., 614 F.2d 418, 430–31 (5th Cir. 1980); New v. New, 148 Cal. App. 2d 372, 306 P.2d 987 (1957); note 109 *infra*; or (3) in various statutory contexts, *see, e.g.*, Farnsworth, *supra* note 5, at 670–71 (confusion of good faith performance with the good faith of a holder or

limits the exercise of discretion in performance conferred on one party by the contract. When a discretion-exercising party may determine aspects of the contract, such as quantity, price, or time, it controls the other's anticipated benefits. Such a party may deprive the other of these anticipated benefits for a legitimate (or good faith) reason. The same act will be a breach of the contract if undertaken for an illegitimate (or bad faith) reason.[18] Therefore, the traditional focus on the benefits due the promisee is inadequate.

Bad faith performance occurs precisely when discretion is used to recapture opportunities forgone upon contracting — when the discretion-exercising party refuses to pay the expected cost of performance.[19] Good faith performance, in turn, occurs when a party's discretion is exercised for any purpose within the reasonable contemplation of the parties at the time of formation — to capture opportunities that were preserved upon entering the contract, interpreted objectively.[20] The good faith performance doctrine therefore directs attention to the opportunities forgone by a discretion-exercising party at formation, and to that party's reasons for exercising discretion during performance.

Part I of this Article explores the concept of contract breach from a cost perspective, and proposes a general description of the breach of an express promise. Part II presents a theory of the good faith performance doctrine derived from the cases and the general description in Part I. Part III is a survey of cases that illustrates the theory's capacity to distinguish cases holding that a party performed in good faith from cases holding that a party performed in bad faith.

## I. CONTRACT BREACH BEHAVIOR: A COST PERSPECTIVE

This Part explores the concept of contract breach in the context of a simple breach of an express contract. Bad faith performance should be a breach of contract only if in important respects it is like a breach of contract by failing to perform

---

purchaser for value under the U.C.C.); Summers, *supra* note 5, at 208–12 (same). On good faith in insurance contracts, see J. McCARTHY, PUNITIVE DAMAGES IN BAD FAITH CASES (2d ed. 1978); Keeton, *Liability Insurance and Responsibility for Settlement*, 67 HARV. L. REV. 1136 (1954); note 109 *infra*.

If the words "good faith" have a general meaning in all or many of these various contexts, it probably is along the lines of an absence of intention to harm a legally protected pecuniary interest. Such a statement is the reverse side of the doctrine of prima facie tort. Much more specific analysis is needed to render such an abstract statement useful.

[18] *See* pp. 379–85 *infra*.
[19] On noneconomic motives, see note 80 *infra*.
[20] *See* pp. 385–87 *infra*.

Case 2:10-cv-01823-JLR   Document 715-1   Filed 07/01/13   Page 211 of 244

as expressly promised.[21] The simple breach case serves well as a vehicle to develop the basic concept through which to analyze the more difficult problem of good faith performance — the concept of recapturing forgone opportunities.

## A. The Concept of Contract Breach

The concept of a breach of contract is troublesome. The *Restatement (Second) of Contracts*, for example, says that a breach of contract is nonperformance of a legal duty when due under a contract.[22] The drafters' inability to provide a less tautological concept is perhaps a function of the fact that contract rules must operate in a wide diversity of factual situations. This requires that a concept of general contract law be articulated in the abstract, and precludes the development of a mechanical rule. A general concept of contract breach can be made operational, however, if based on a primarily descriptive general model that allows legal consequences to be attached to facts common to many situations. But no complete model has been constructed. Traditional descriptions, which focus on the promised benefit to be received by the promisee, are plainly inadequate when a promise is implied. A better general description of all contract breach behavior can be constructed from an economic analysis of the traditional view of simple express promises.

A simple express promise has been analyzed traditionally as a commitment to transfer goods, services, or money in the future, on which the promisee is justified in relying from the time of formation until performance is rendered.[23] The en-

---

[21] In fact, the remedies awarded in bad faith performance cases are the same as those awarded for "any garden variety breach of contract." Liberty Mut. Ins. Co. v. Altfillisch Constr. Co., 70 Cal. App. 3d 789, 797, 139 Cal. Rptr. 91, 95 (1977). Expectation damages are the preferred remedy. *See, e.g.*, Dasenbrock v. Interstate Restaurant Corp., 7 Ill. App. 3d 295, 287 N.E.2d 151 (1972); Fortune v. National Cash Register Co., 373 Mass. 96, 364 N.E.2d 1251 (1977); Pernet v. Peabody Eng'r Corp., 20 A.D.2d 781, 248 N.Y.S.2d 132 (1964); Western Natural Gas Co. v. Cities Serv. Gas Co., 507 P.2d 1236 (Okla.), *appeal dismissed and cert. denied*, 409 U.S. 1052 (1972). *See also* Baldwin v. Kubetz, 148 Cal. App. 2d 937, 307 P.2d 1005 (1957) (party's duty to perform discharged); Isbell v. Anderson Carriage Co., 170 Mich. 203, 136 N.W. 457 (1912) (reliance damages); Wigand v. Bachmann-Bechtel Brewing Co., 222 N.Y. 272, 118 N.E. 618 (1918) (same); Western Hills, Or., Ltd., v. Pfau, 265 Or. 137, 508 P.2d 201 (1973) (en banc) (specific performance); Miller v. Othello Packers, Inc., 67 Wash. 2d 842, 410 P.2d 33 (1966) (per curiam) (*quantum valebat*); Farnsworth, *Legal Remedies for Breach of Contract*, 70 COLUM. L. REV. 1145 (1970); Vernon, *Expectancy Damages for Breach of Contract: A Primer and Critique*, 1976 WASH. U.L.Q. 179 (1976).

[22] RESTATEMENT (SECOND) OF CONTRACTS § 260 (Tent. Draft No. 8, 1973).

[23] *See* RESTATEMENT (SECOND) OF CONTRACTS § 2 (Tent. Draft No. 1, 1964); RESTATEMENT OF CONTRACTS § 2 (1932).

forcement of promises thus tends "to eliminate the distinction between present and future (promised) goods,"[24] and to give the promisee's expectation of receiving future benefits the character of present property.[25] The security of contractual transactions[26] and the reliability of promises[27] are enhanced by the requirement that a party in breach compensate the promisee for the disappointed expectation.

This classic perspective should be supplemented by focusing attention on the cost side of the coin.[28] If it is true that every present transfer of property, services, or money is costly, it is also true that enforcing promises to transfer such benefits in the future tends to eliminate the distinction between present and future (promised) costs.

The economic cost of any action — including the act of contracting, the act of performing, and the act of breaching a contract — should be viewed descriptively as the value of the next best opportunity necessarily forgone by taking that action.[29] Almost every action entails many forgone opportunities because resources, such as goods, services, money, or reputation, are scarce.[30] In a present exchange, two independent costs — the costs of entering the exchange and the costs of performing — are incurred together. But when an exchange is projected into the future by contract, the economic costs of contracting are incurred separately from the costs of performing later.[31]

For example, if a person contracts to have a swimming pool built that will cost $3,000, the commitment to have the pool built may itself cost only $500, in that a change of mind immediately thereafter will result in an actual loss of only $500. The remaining $2,500 of the costs will be incurred as

---

[24] Fuller & Perdue, *The Reliance Interest in Contract Damages* (pt. 1), 46 YALE L.J. 52, 59 (1936).

[25] *Id.*

[26] *See* Fuller, *Consideration and Form*, 41 COLUM. L. REV. 799, 808–13 (1941). For discussions on related functions of contract law, see Llewellyn, *supra* note 12, at 721–25; Macaulay, *Justice Traynor and the Law of Contracts*, 13 STAN. L. REV. 812, 813–16 (1961); Patterson, *An Apology for Consideration*, 58 COLUM. L. REV. 929, 945 (1958).

[27] *See generally* Fuller & Perdue, *supra* note 24; Goetz & Scott, *Enforcing Promises: An Examination of the Basis of Contract*, 89 YALE L.J. 1261 (1980).

[28] The contracts literature has ignored almost completely the fact that every contract involves a cost to the promisor that may differ from the value to the promisee. This fact was noted in Gardner, *An Inquiry Into the Principles of the Law of Contracts*, 46 HARV. L. REV. 1, 8 (1932), though Professor Gardner did not elaborate on its meaning or implication. *See also* Goetz & Scott, *supra* note 27.

[29] P. SAMUELSON, ECONOMICS 474–75 (10th ed. 1976); Alchian, *Cost*, in 3 INTERNATIONAL ENCYCLOPEDIA OF THE SOCIAL SCIENCES 404 (D. Sills ed. 1968).

[30] Alchian, *supra* note 29, at 404.

[31] *Id.* at 407.

work progresses and payments are made.[32] The posited $500 cost of contracting includes transaction expenditures to gather information concerning alternative opportunities and to negotiate and draft the contract, as well as any deposit.[33] Significantly, the owner's economic cost of *contracting* does not include the value of primary forgone alternative uses to which resources *committed* to the swimming pool contract no longer can be committed honestly[34] — a swimming pool by a different designer, a tennis court, or a new car. These are economic costs not of contracting but of performing the contract in the future.

This wholly economic description of contracting costs maintains the distinction between present and future (promised) costs. But for familiar normative reasons — to enhance the reliability of promises — the expectation principle requires that enforceable promises for an exchange in the future be given present effect. This means that the legal analyst should include the expected cost of performing with the cost of entering the contract. The legal cost of contracting to build a swimming pool for $3,000 consequently is $3,000.

## B. *Contract Breach Behavior: Express Contracts*

A simple breach of an express contract[35] consists of an attempt by one party to recapture opportunities forgone upon

---

[32] *Id.*

[33] The costs of entering the contract also include the risk of breaching the contract later — the costs of breach discounted by the probability that the party later will want to breach. The costs of breach, in turn, include the resulting loss of reputation and good will, as well as any money to be paid in settlement of a contract dispute or as contract damages, attorneys' fees, and other litigation expenses. *See generally* R. POSNER, ECONOMIC ANALYSIS OF LAW § 4.1 (2d ed. 1977); Coase, *The Problem of Social Cost*, 3 J.L. & ECON. 1 (1960); Priest, *Breach and Remedy for the Tender of Nonconforming Goods Under the Uniform Commercial Code: An Economic Approach*, 91 HARV. L. REV. 960 (1978).

[34] A party who enters a contract without a present intention to perform is liable for promissory fraud.

[35] The analysis in the text assumes deliberate behavior because the common law cases generally do not suggest that a negligent or inadvertent action is a breach of contract by failing to perform in good faith. Few cases involving claims of bad faith performance state facts from which negligence can be inferred. Where negligence appears, as in Concrete Specialties v. H.C. Smith Constr. Co., 423 F.2d 670 (10th Cir. 1970); Miller v. Othello Packers, Inc., 67 Wash. 2d 842, 410 P.2d 33 (1966) (per curiam), it is so blatant as to suggest gross negligence or intentional behavior. *But see* Amoco Oil Co. v. Capitol Indem. Corp., 95 Wis. 2d 530, 542–44, 291 N.W.2d 883, 890–91 (Ct. App. 1980) (negligent materials supplier held not to have performed in good faith); p. 398 & note 126 *infra*.

In cases where a party in breach claims to have substantially performed, bad faith as a factor bearing on the substantiality of the performance is treated by the courts

*GOOD FAITH PERFORMANCE*

contracting. By hypothesis, a party enters a contract when it believes that no greater benefit can be derived by expending elsewhere the resources required for the contract performance.[36] Events between the time of formation and the time of performance may prove this belief to have been erroneous.[37] Before its own performance is rendered, a party with a losing contract may seek to recapture forgone opportunities to the extent possible. This can be accomplished *only* by redirecting the resources committed to the promised performance and therefore by failing to perform the promise.

A buyer of corn, for example, may fail to perform a contract for future delivery for a large number of reasons. If the market price falls, the buyer will wish to recapture the opportunity of buying on the spot market or on a changed futures market. If the buyer gets a hot tip on the potato market, it may wish to redirect purchase money earmarked for the corn contract to enable it to purchase more potato contracts. If investor confidence in the commodities market slips, the buyer may wish to move its business into stocks or real estate or may wish to go out of business. These and other uses for the resources committed to the initial corn contract may be opportunities necessarily forgone when entering the corn contract.

An express promise therefore should be viewed as entailing representations as to the future, both regarding the resources to be received by the promisee and simultaneously regarding opportunities forgone by the promisor, even though the iden-

---

as intentional or willful behavior. RESTATEMENT (SECOND) OF CONTRACTS § 266 & Comment f (Tent. Draft No. 8, 1973); *see, e.g.*, Jacob & Youngs, Inc. v. Kent, 230 N.Y. 239, 129 N.E. 889 (1921).

In contrast, discussions of the obligation to perform a contract in good faith under the U.C.C. often do center on the question whether the standard is subjective or objective. "Good faith" generally is defined as "honesty in fact in the conduct or transaction concerned" — a subjective standard. U.C.C. § 1-201(19). For transactions within article 2, however, "good faith" in the case of a merchant is defined as "honesty in fact and the observance of reasonable commercial standards of fair dealing in the trade." U.C.C. § 2-103(1)(b). The latter definition approximates an objective negligence standard. *But see* 1956 ALI RECOMMENDATIONS OF THE EDITORIAL BOARD FOR THE UNIFORM COMMERCIAL CODE 21 (1957) (reference to "fair dealing" added to "eliminate the possibility that the definition might be read as imposing on merchants a general standard of due care"). *See generally* Farnsworth, *supra* note 5; Summers, *supra* note 5, at 208–14. However, the question of subjective and objective standards does not seem to bother the courts in cases governed by the U.C.C. and almost never is mentioned expressly in the common law cases.

[36] This assumes that the person has a present intention to perform. *See* note 35 *supra*.

[37] Any subsequent decline in the value of the contract or any rise in the value of a foregone opportunity may result in a losing contract.

*HARVARD LAW REVIEW*      [Vol. 94:369

tity of opportunities forgone in any case is problematic.[38] Consequently, one can describe a simple breach of an express contract as a failure to do that which one promised to do or doing that which one promised not to do, and independently as a recapture of opportunities forgone upon entering the contract. The effect is identical in the simple case. The concept of recapturing forgone opportunities, however, is more general and can be employed also to embrace at least the implied covenant of good faith.[39]

## II. A THEORY OF THE GOOD FAITH PERFORMANCE DOCTRINE

A breach of contract by failing to perform in good faith is both like and unlike a breach of contract by failing to perform a simple express promise. From the cost perspective, it is similar analytically in that the key fact establishing a breach is a party's recapture of opportunities forgone upon entering the contract. It is different in that an observer cannot know whether a party acted to recapture forgone opportunities by determining that the other party did not receive the property, services, or money to be transferred under the contract. This Part introduces the concept of discretion in contract performance as a means of examining the specific problem governed by the good faith performance doctrine. The theory developed here is that a party fails to perform in good faith when it uses such discretion to recapture forgone opportunities.[40]

---

[38] *See* pp. 389–90 *infra*. A premise of this Article is that the identification of a proper question advances the analysis even if the answer to that question remains elusive in some cases.

[39] This study does not cover some other generally implied promises that might be explained from this cost perspective. One is the implied promise to cooperate with the other party, or not to prevent or hinder the other party's performance. 3 A. CORBIN, CORBIN ON CONTRACTS §§ 570–571 (1960); Patterson, *Constructive Conditions in Contracts*, 42 COLUM. L. REV. 903 (1942). The problem, there, often is to draw a line between noncooperation that is a breach of contract and noncooperation that evidences a merely difficult contract partner who insists on its rights to the letter. Such a line might be drawn on the basis of whether the party is acting to recapture forgone opportunities. A few cases do in fact treat the implied promise of cooperation as an aspect of good faith performance. *See, e.g.*, Burgess Constr. Co. v. M. Morrin & Son Co., 526 F.2d 108 (10th Cir. 1975), *cert. denied*, 429 U.S. 866 (1976); Concrete Specialties v. H.C. Smith Constr. Co., 423 F.2d 670 (10th Cir. 1970); Ligon v. Parr, 471 S.W.2d 1 (Ky. 1971); Odem Realty Co. v. Dyer, 242 Ky. 58, 45 S.W.2d 838 (1932); Carter v. Sherburne Corp., 132 Vt. 88, 315 A.2d 870 (1974). The doctrine of anticipatory breach similarly might be analyzed in these terms. *See* New York Life Ins. Co. v. Viglas, 297 U.S. 672 (1936) (Cardozo, J.); Peter Kiewit Sons' Co. v. Summit Constr. Co., 422 F.2d 242, 257 (8th Cir. 1969); RESTATEMENT (SECOND) OF CONTRACTS § 275, Comment a (Tent. Draft No. 8, 1973).

[40] For a sample of opinions explicitly assimilating good faith to an implied obligation not to abuse discretion in performance, see Boone v. Kerr-McGee Oil Indus.,

## A. The Problem: Legitimate and Illegitimate Uses of Discretion in Contract Performance

The standard doctrinal formulation of the good faith performance duty was first[41] articulated in 1933 by the New York Court of Appeals in *Kirke La Shelle Co. v. Paul Armstrong Co.*:[42]

> In every contract there is an implied covenant that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits

---

217 F.2d 63, 65 (10th Cir. 1954); Loudenback Fertilizer Co. v. Tennessee Phosphate Co., 121 F. 298, 303 (6th Cir. 1903); California Lettuce Growers, Inc. v. Union Sugar Co., 45 Cal. 2d 474, 484, 289 P.2d 785, 791 (1955); Milstein v. Security Pac. Nat'l Bank, 27 Cal. App. 3d 482, 486–87, 103 Cal. Rptr. 16, 18–19 (1972); Oliphant v. Woodburg Coal & Mining Co., 63 Iowa 332, 19 N.W. 212 (1884); Heckard v. Park, 164 Kan. 216, 222, 188 P.2d 926, 930 (1948).

[41] Some of the earliest cases to imply a general obligation of good faith performance were Ratzlaff v. Trainor-Desmond Co., 41 Cal. App. 586, 183 P. 269 (1919); People *ex rel.* Wells & Newton Co. v. Craig, 232 N.Y. 125, 133 N.E. 419 (1921); Wigand v. Bachmann-Bechtel Brewing Co., 222 N.Y. 272, 118 N.E. 618 (1918); Simon v. Etgen, 213 N.Y. 589, 107 N.E. 1066 (1915); Brassil v. Maryland Cas. Co., 210 N.Y. 235, 104 N.E. 622 (1914); Industrial & Gen. Trust, Ltd. v. Tod, 180 N.Y. 215, 225, 73 N.E. 7, 9 (1905); Genet v. President of Del. & Hudson Canal Co., 136 N.Y. 593, 611, 32 N.E. 1078, 1082 (1893); Hilleary v. Skookum Root Hair-Grower Co., 4 Misc. 127, 23 N.Y.S. 1016 (C.P. 1893). Earlier cases implied an obligation of good faith in the context of contracts containing conditions of satisfaction. *See* Baltimore & O. Ry. v. Brydon, 65 Md. 198, 3 A. 306, *aff'd on rehearing*, 65 Md. 611, 9 A. 126 (1886); Doll v. Noble, 116 N.Y. 230, 22 N.E. 406 (1889); Singerly v. Thayer, 108 Pa. 291, 2 A. 230 (1885).

[42] 263 N.Y. 79, 188 N.E. 163 (1933). Pursuant to a settlement of a prior suit, the plaintiff obtained a contract right to one-half the gross receipts from future stage productions of a play, and a right to approve all contracts, sales, licenses, and other arrangements affecting the stage production of the play, except "motion picture" rights. Without obtaining such approval, the defendant sold the "talkie" movie rights. Kirke La Shelle brought an action for one-half of the net amount received from the sale. The New York Court of Appeals upheld the plaintiff's claim because a "talkie" movie — not invented at the time of contracting — was not within the contemplation of the parties when they excepted "motion pictures" and would impair the market for the stage play and therefore the plaintiff's income from the contract. The express promise giving the plaintiff a right of approval thus was broken. The primary problem was finding a remedy. The court looked to the law of fiduciaries in awarding the plaintiff one-half of the proceeds from the sale of movie rights.

The court also found an implied covenant of good faith and fair dealing as an alternate basis for liability and the remedy, although probably improperly. Since the court found a breach of an express promise and a fiduciary relationship, its use of the good faith performance concept was unnecessary. *See* Manners v. Morosco, 252 U.S. 317, 327 (1920) (implied negative covenant not to use ungranted rights to the detriment of the other party). There is some question whether the case was correctly decided on its facts. *See* L.C. Page & Co. v. Fox Film Corp., 83 F.2d 196, 199 (2d Cir. 1936) (words "motion picture" in pre-"talkie" contract held to include "talkies"). *See also* Bartsch v. Metro-Goldwyn-Mayer, Inc., 391 F.2d 150 (2d Cir.), *cert. denied*, 393 U.S. 826 (1968).

of the contract, which means that in every contract there exists an implied covenant of good faith and fair dealing.[43]

Because it adopts the traditional focus on the benefit to be received by the promisee and fails to focus on the problem of discretion in performance, however, this early effort to articulate the good faith principle conceals more than it reveals.

    *1. Discretion in Performance.* — Discretion in performance arises in two ways. The parties may find it to their mutual advantage at formation to defer decision on a particular term and to confer decisionmaking authority as to that term on one of them. Discretion also may arise, with similar effect, from a lack of clarity or from an omission in the express contract.[44] In either case, the dependent party must rely on the good faith of the party in control. Only in such cases do the courts raise explicitly the implied covenant of good faith and fair dealing, or interpret a contract in light of good faith performance.[45] This will be illustrated by examining cases involving discretion as to quantity, price, time, and conditional aspects of a contract.

    Deferred decisions as to quantity take the form of requirements and output contracts, in which specific agreement typically is reached on all terms except the quantity of goods bought or sold. A buyer under a requirements contract and a seller under an output contract have effective control of the quantity exchanged because they can manipulate their apparent requirements or output by modifying their methods of

---

[43] 263 N.Y. at 87, 188 N.E. at 167. The phrases "good faith" and "fair dealing" within the meaning of this covenant appear not to have independent legal significance. A plain meaning interpretation might ascribe a subjective meaning to "good faith" and an objective meaning to "fair dealing," but there is no basis in the cases for such an approach. *See* Moore v. Home Ins. Co., 601 F.2d 1072, 1074 (9th Cir. 1979). On subjective and objective standards of good faith performance, see note 35 *supra*; note 126 *infra*.

[44] It is the potential for a lack of clarity and completeness that necessitates the implication of the good faith covenant in every contract. Contracting parties typically will presuppose a measure of cooperation from each other. Express language accordingly will fail to set forth all of the specific undertakings of the parties. *See, e.g.,* Concrete Specialties v. H.C. Smith Constr. Co., 423 F.2d 670 (10th Cir. 1970). Residual discretion may not be controllable by contract language, as where a franchisor controls the good will of a franchise. *See, e.g.,* Photovest Corp. v. Fotomat Corp., 606 F.2d 704 (7th Cir. 1979). Moreover, unforeseen events may create discretion in performance that the parties did not and could not anticipate. *See, e.g.,* Bartsch v. Metro-Goldwyn-Mayer, Inc., 391 F.2d 150 (2d Cir.) (invention of television renders ambiguous defendant's right, pursuant to a 1935 assignment, to "exhibit" a movie film), *cert. denied,* 393 U.S. 826 (1968).

[45] The analysis in this Article is based on a survey of over 400 cases in which courts explicitly refer to good faith in performance.

marketing[46] or production.[47]  At the time of formation, the dependent party could have insisted on fixed quantity terms in the contract or required agreement on detailed provisions governing the other party's method of doing business.  The flexibility and simplicity of a requirements or output contract, however, often compensate for the risk of such manipulations.[48]  Both at common law and under the U.C.C., a buyer's requirements or a seller's output means such actual quantities as occur in good faith.[49]

Deferred decisions as to price may take two forms.  In most jurisdictions at common law, agreement as to price is an essential term and must be set or be ascertainable for a contract to be formed.[50]  There is, however, some authority at common law for enforcing a contract in which the price is to be set by an appraisal by one party.  In that case, the price must be set in good faith.[51]  In addition, the price term more

---

[46] *See, e.g.,* Loudenback Fertilizer Co. v. Tennessee Phosphate Co., 121 F. 298 (6th Cir. 1903); Chalmers & Williams v. Walter Bledsoe & Co., 218 Ill. App. 363 (1920); Orange & Rockland Utils., Inc., v. Amerada Hess Corp., 59 A.D.2d 110, 397 N.Y.S.2d 814 (1977).

[47] *See, e.g.,* Feld v. Henry S. Levy & Sons, 37 N.Y.2d 466, 335 N.E.2d 320, 373 N.Y.S.2d 102 (1975).  In some cases, a party in control changed the form of legal ownership of its business and claimed that it was free of its obligations because the business no longer was a party to the contract.  Such a ploy was successful prior to the development of the good faith performance doctrine.  *See* Drake v. Vorse, 52 Iowa 417, 3 N.W. 465 (1879).  Good faith may preclude such action today.  *See* Western Oil & Fuel Co. v. Kemp, 245 F.2d 633 (8th Cir. 1957); RESTATEMENT (SECOND) OF CONTRACTS § 231, Illustration 1 (Tent. Draft No. 5, 1970).  On the effect of good faith when parties go out of business altogether, compare Neofotistos v. Harvard Brewing Co., 341 Mass. 684, 171 N.E.2d 865 (1961) (sale of business not seen as a bad faith elimination of output), with Wigand v. Bachmann-Bechtel Brewing Co., 222 N.Y. 272, 118 N.E. 618 (1918) (sale of business seen as a bad faith elimination of output).

[48] *See generally* Weistart, *supra* note 8.  On good faith in relation to freedom of contract ideology, see pp. 392–94 *infra.*

[49] U.C.C. § 2-306(1); Weistart, *supra* note 8; sources cited notes 46–47 *supra.*

[50] *See* 1 A. CORBIN, *supra* note 39, § 97.

[51] Price v. Speilman Motor Sales Co., 261 A.D. 626, 26 N.Y.S.2d 836 (1941) (automobile dealer's reappraisal of trade-in at time of delivery must be in good faith and not arbitrary).  In an almost identical case decided in the same jurisdiction following enactment of the U.C.C., the court relied on the Code to reach the same result, without citing *Price.*  Umlas v. Acey Automobile, Inc., 62 Misc. 2d 819, 310 N.Y.S.2d 147 (Civ. Ct. N.Y. 1970).  *See also* Krauss v. Kruechler, 300 Mass. 346, 15 N.E.2d 207 (1938) (upholding closed corporation's appraisal of stock to be purchased by the corporation upon shareholder's death); RESTATEMENT (SECOND) OF CONTRACTS § 231, Illustration 7 (Tent. Draft No. 5, 1970).

There also is some authority for enforcing an agreement · to agree on price, in which case the parties must negotiate the price in good faith.  Coleman Eng'r Co. v. North Am. Aviation, Inc., 65 Cal. 2d 396, 420 P.2d 713, 55 Cal. Rptr. 1 (1966).  *See also* U.C.C. § 2-305(1); Knapp, *Enforcing the Contract to Bargain,* 44 N.Y.U. L. REV. 673 (1969).

commonly may be left open to vary with sales,[52] production,[53] or other factors[54] through a formula in the contract for determining the price when payment is due.[55] Good faith performance is required when one party controls the factors that determine the price.[56]

Deferred decisions as to the time of performance may allow one party to determine when it shall perform, when the other party shall perform, or when the contract shall terminate. Often such decisions must be made in good faith.[57] A final decision as to the binding effect of a contract promise on one

---

[52] *E.g.*, Malloy v. Coldwater Seafood Corp., 338 Mass. 554, 156 N.E.2d 61 (1959) (broker working on a commission).

[53] *E.g.*, California Lettuce Growers v. Union Sugar Co., 45 Cal. 2d 474, 289 P.2d 785 (1955) (price to be measured by quantity of useful product after processing by buyer); Miller v. Othello Packers, Inc., 67 Wash. 2d 842, 410 P.2d 33 (1966) (same).

[54] *See, e.g.*, Ryder Truck Rental, Inc. v. Central Packing Co., 341 F.2d 321 (10th Cir. 1965) (rental price based on use of trucks).

[55] Because the price is ascertainable, no jurisdiction holds that such floating terms prevent the formation of a contract. 1 A. CORBIN, *supra* note 39, § 98.

[56] Where the price is measured as a percentage of gross receipts, good faith may preclude the party in control of sales from manipulating its bookkeeping, Hempstead Theatre Corp. v. Metropolitan Playhouses, Inc., 16 Misc. 2d 781, 183 N.Y.S.2d 972 (Sup. Ct.), *aff'd*, 7 A.D.2d 625, 179 N.Y.S.2d 306 (1958), *rev'd on other grounds*, 6 N.Y.2d 311, 160 N.E.2d 604, 189 N.Y.S.2d 837 (1959), or from marketing competing products that reduce sales of the contract product. Mechanical Ice Tray Corp. v. General Motors Corp., 144 F.2d 720 (2d Cir. 1944), *cert. denied*, 324 U.S. 844 (1945); Parev Prods. Co. v. I. Rokeach & Sons, 124 F.2d 147 (2d Cir. 1941).

The same good faith requirement is imposed when one party controls the use of property while the other has a right to a portion of the property's earnings stream. *See, e.g.*, Ryder Truck Rental, Inc. v. Central Packing Co., 341 F.2d 321 (10th Cir.) (rental price based on extent of use), *cert. denied*, 382 U.S. 827 (1965); Baldwin v. Kubetz, 148 Cal. App. 2d 937, 943, 307 P.2d 1005, 1009 (1957) (exclusive rights to minerals in return for promised royalties); Brawley v. Crosby Research Foundation, 73 Cal. App. 2d 103, 166 P.2d 392 (1946) (intellectual property rights given in return for royalties); Goldberg 168-05 Corp. v. Levy, 170 Misc. 292, 9 N.Y.S.2d 304 (Sup. Ct. 1938), *modified and aff'd*, 256 A.D. 1086, 11 N.Y.S.2d 315 (1939) (possession of commercial real estate under a percentage lease). *See also* Broad v. Rockwell Int'l Corp., 614 F.2d 418, 429–30 (5th Cir.), *rehearing granted*, 618 F.2d 396 (5th Cir. 1980); Van Gemert v. Boeing Co., 553 F.2d 812 (2d Cir. 1977); Uproar Co. v. National Broadcasting Co., 81 F.2d 373 (1st Cir.), *cert. denied*, 298 U.S. 670 (1936); Matzen v. Horwitz, 102 Cal. App. 2d 884, 228 P.2d 841 (1951).

[57] *See, e.g.*, Sylvan Crest Sand & Gravel Co. v. United States, 150 F.2d 642 (2d Cir. 1945) (party may call for delivery of goods without agreed limitations as to time); McKinney v. National Dairy Council, 491 F. Supp. 1108 (D. Mass. 1980) (discretion to terminate an employment contract at will); Dorsey Bros. v. Anderson, 264 Md. 446, 287 A.2d 270 (1972) (agreement to harvest crop with discretion to decide when crop is ripe); Simon v. Etgen, 213 N.Y. 589, 107 N.E. 1066 (1915) (agreement to pay debt by selling a real estate property with discretion to decide when to sell); Richard Bruce & Co. v. J. Simpson & Co., 40 Misc. 2d 501, 243 N.Y.S.2d 503 (Sup. Ct. 1963) (promise to market securities with discretion to terminate if market unfavorable). *See also* pp. 399–401 *infra*.

party similarly may be deferred when the contract is subject to a condition. When that condition is within one party's effective control, that party must act in good faith.[58] For example, a party whose performance is conditioned on governmental approval of its plans[59] or on other related contracts[60] may be required to act in good faith to secure the fulfillment of the condition. Similarly, a party benefiting from a condition of satisfaction[61] must act at least in good faith in claiming that it is dissatisfied with the proffered performance.[62]

The good faith performance doctrine thus may be used to protect a "weaker" party from a "stronger" party.[63] Unlike the unconscionability doctrine, however, weakness and strength in this context do not refer to the substantive fairness of the bargain or to the relative bargaining power of the parties.[64] Good faith performance cases typically involve arm's-length transactions, often between sophisticated business persons. The relative strength of the party exercising discretion typically arises from an agreement of the parties to confer

---

[58] Barnes v. Atlantic & Pac. Life Ins. Co. of America, 295 Ala. 149, 156, 325 So. 2d 143, 150 (1975) (citing J. MURRAY, MURRAY ON CONTRACTS § 187, at 365 (1974)); *see* Pernet v. Peabody Eng'r Co., 20 A.D.2d 781, 248 N.Y.S.2d 132 (1964) (per curiam). *See also* pp. 392–94 *infra*.

[59] *See, e.g.,* Vanadium Corp. of America v. Fidelity & Deposit Co., 159 F.2d 105 (2d Cir. 1947); Crooks v. Chapman Co., 124 Ga. App. 718, 185 S.E.2d 787 (1971); Dasenbrock v. Interstate Restaurant Corp., 7 Ill. App. 3d 295, 287 N.E.2d 151 (1972); Brenner v. Schreck, 17 Misc. 2d 945, 192 N.Y.S.2d 461 (App. Term. 1959).

[60] *See, e.g.,* Fry v. George Elkins Co., 162 Cal. App. 2d 256, 327 P.2d 905 (1958); Kerrigan v. City of Boston, 361 Mass. 24, 278 N.E.2d 387 (1972); Lane v. Elwood Estates, Inc., 31 A.D.2d 949, 298 N.Y.S.2d 751 (1969), *aff'd,* 28 N.Y.2d 620, 268 N.E.2d 805, 320 N.Y.S.2d 79 (1971); Ide Farm & Stable, Inc. v. Cardi, 110 R.I. 735, 297 A.2d 643 (1972); Frangesch v. Kamp, 262 Wis. 446, 55 N.W.2d 372 (1952).

[61] Different standards normally apply to conditions of satisfaction and conditions of personal satisfaction. When the performance relates to matters of mechanical fitness, utility, and the like, dissatisfaction must be such that a reasonable person would not be satisfied in similar circumstances. Performance relating to matters of personal taste and fancy, however, may be "unreasonably" rejected so long as the dissatisfaction is asserted in good faith. *See, e.g.,* Mattei v. Hopper, 51 Cal. 2d 119, 330 P.2d 625 (1958) (en banc); Western Hills, Or., Ltd. v. Pfau, 265 Or. 137, 508 P.2d 201 (1973) (en banc); 3A A. CORBIN, *supra* note 39, §§ 644–648; Annot., 86 A.L.R.2d 202 (1962). *But see* Childres, *Conditions in the Law of Contracts,* 45 N.Y.U. L. REV. 33, 42–44 (1970) (distinction not neatly observed in practice).

[62] *E.g.,* Neumiller Farms, Inc. v. Cornett, 368 So. 2d 272 (Ala. 1979); Devoine Co. v. International Co., 151 Md. 690, 136 A. 37 (1927); Fechteler v. Whittemore, 205 Mass. 6, 91 N.E. 155 (1910); Maas v. Scoboda, 188 Neb. 189, 195 N.W.2d 491 (1972); Kree Inst. of Electrolysis, Inc. v. Fageros, 478 S.W.2d 569 (Tex. Civ. App. 1972).

[63] *See* Patterson, *The Interpretation and Construction of Contracts,* 64 COLUM. L. REV. 833, 858 (1964).

[64] *See* note 14 *supra* and sources cited therein.

control of a contract term on that party. The dependent party then is left to the good faith of the party in control.

*2. Distinguishing Legitimate and Illegitimate Uses of Discretion.* — The problem of good faith in contract performance can be clarified in terms of a party's reasons for exercising discretion. The *Kirke La Shelle* formulation of the implied covenant of good faith and fair dealing is misleading. It suggests on its face that there are but two issues: whether one party received the fruits of the contract and, if not, whether the other party caused the harm.[65] That the dependent party does not receive anticipated benefits, however, is not dispositive. A party with discretion may withhold all benefits for good reasons. The cases therefore carry the inquiry further and establish that the state of mind of the discretion-exercising party is of central importance. The courts, mindful that good faith should not be used as a vehicle for judicial fiat, defer to a party who acts with no improper purpose.[66]

Consider, for example, a set of cases involving actions by lessees under commercial percentage leases in which the implied covenant of good faith and fair dealing was applied. The leases provided for rentals to be paid primarily as a percentage of the gross receipts of the lessee's business on the premises. In each case, the lessee altered its business in a way that reduced sales from the leased premises and therefore the amount owed as rent: by moving a lucrative part of the business to other premises leased from the same lessor on a flat rental basis;[67] by opening competing stores in the same neighborhood;[68] or by diverting customers to another store.[69]

---

[65] *See* pp. 379–80 & note 43 *supra.* The implied covenant is not invariably explained in terms of denying a party the fruits of the contract. In California, this formulation sometimes is supplemented by the statement: "This covenant not only imposes upon each contracting party the duty to refrain from doing anything which would render performance of the contract impossible by any act of his own, but also the duty to do everything that the contract presupposes that he will do to accomplish its purpose." Steinmeyer v. Warner Consol. Corp., 42 Cal. App. 3d 515, 519, 116 Cal. Rptr. 57, 60 (1974) (quoting Harm v. Frasher, 181 Cal. App. 2d 405, 417, 5 Cal. Rptr. 367, 374 (1960)). But the emphasis here seems to be only that acts of omission and commission equally may run afoul of the implied covenant, and the additional language has no discernible effect on the results in particular cases. *See also* Boone v. Kerr-McGee Oil Indus., 217 F.2d 63 (10th Cir. 1954), *quoted at* note 75 *infra.*

[66] *See, e.g.,* E.J. Albrecht Co. v. New Amsterdam Cas. Co., 164 F.2d 389 (7th Cir. 1947); Dorsey Bros. v. Anderson, 264 Md. 446, 287 A.2d 270 (1972); Tillett v. Deering, Milliken & Co., 88 N.Y.S.2d 148 (Sup. Ct. 1948).

[67] Mutual Life Ins. Co. v. Tailored Woman, Inc., 309 N.Y. 248, 128 N.E.2d 401 (1955).

[68] Food Fair Stores, Inc. v. Blumberg, 234 Md. 521, 200 A.2d 166 (1964). *See also* Stop & Shop, Inc. v. Ganem, 347 Mass. 697, 200 N.E.2d 248 (1964).

[69] Goldberg 168-05 Corp. v. Levy, 170 Misc. 292, 9 N.Y.S.2d 304 (Sup. Ct. 1938), *modified and aff'd,* 256 App. Div. 1086, 11 N.Y.S.2d 315 (1939).

The lessor lost in two of the three cases, even though the lessee in each instance reduced the actual rent received by the lessor under the contract formula. Where the lessee opened competing stores in the same neighborhood, the court observed simply that large chains usually kept adding to the number of their stores.[70] When the lessee moved a lucrative part of its business to other premises in the same building, where a flat rental applied, the court held that the lessee was free to decide on which floor to locate that part of its business, absent fraud, trickery, or express terms to the contrary.[71] However, where the lessee diverted business for the "sole purpose"[72] of bringing gross receipts down at the leased premises, a "direct violation"[73] of the covenant was established.

The fact that a discretion-exercising party causes the dependent party to lose some or all of its anticipated benefit from the contract thus is insufficient to establish a breach of contract by failing to perform in good faith. The *Kirke La Shelle* dictum, although still widely employed, fails to reflect the subsequent common law experience. The cases suggest that the purpose of the discretion-exercising party is a key factor.[74]

### B. Breach of Contract by Failing to Perform in Good Faith

*1. Good Faith: The Reasonable Contemplation of the Parties.* — The results in the percentage lease cases, as in most good faith performance cases, have intuitive appeal. A few courts have sought to articulate this intuition in terms of the reasonable contemplation of the parties.[75] The good faith performance doctrine may be said to permit the exercise of discretion for any purpose — including ordinary business purposes[76] — reasonably within the contemplation of the

---

[70] Food Fair Stores, Inc. v. Blumberg, 234 Md. 521, 535, 200 A.2d 166, 174 (1964).

[71] Mutual Life Ins. Co. v. Tailored Woman, Inc., 309 N.Y. 248, 128 N.E.2d 401 (1955).

[72] Goldberg 168-05 Corp. v. Levy, 170 Misc. 292, 294, 9 N.Y.S.2d 304, 306 (Sup. Ct. 1938), *modified and aff'd*, 256 A.D. 1086, 11 N.Y.S.2d 315 (1939).

[73] *Id.*

[74] *See* Goodman v. Mutual Broadcasting Sys., Inc., 16 Misc. 2d 858, 185 N.Y.S.2d 152 (Sup. Ct. 1959), *aff'd*, 10 A.D.2d 632, 196 N.Y.S.2d 313 (1960); Dickey v. Philadelphia Minit-Man Corp., 377 Pa. 549, 105 A.2d 580 (1954).

[75] As one court stated,

> Where discretion is lodged in one of two parties to a contract or a transaction, such discretion must . . . be exercised in good faith. That simply means that what is done must be done honestly to effectuate the object and purpose the parties had in mind in providing for the exercise of . . . power.

Boone v. Kerr-McGee Oil Indus., 217 F.2d 63, 65 (10th Cir. 1954).

[76] *See* Burgess Constr. Co. v. M. Morrin & Son Co., 526 F.2d 108 (10th Cir. 1975); Fort Wayne Corrugated Paper Co. v. Anchor Hocking Glass Corp., 130 F.2d 471 (3d Cir. 1942); Martindell v. Lake Shore Nat'l Bank, 15 Ill. 2d 272, 286, 154

HeinOnline -- 94 Harv. L. Rev. 385 1980-1981

parties.[77]  A contract thus would be breached by a failure to perform in good faith if a party uses its discretion for a reason outside the contemplated range — a reason beyond the risks assumed by the party claiming a breach.[78]

The contemplation standard of good faith performance ´is helpful because it distinguishes in principle the duty to perform in good faith from duties imposed on the parties either for reasons of public policy or to avoid unjust enrichment. More-over, it suggests two specific questions for determining good faith: (1) what was the discretion-exercising party's purpose in acting; and (2) was that purpose within the reasonable contem-plation of the parties?[79]  The first is an inquiry into subjective intent, as suggested above. The second, in contrast, is an objective inquiry that assumes a normal or ordinary course of events that the parties expect or should expect at the time of contract formation, and with reference to which they implicitly contract, absent express terms to the contrary.

---

N.E.2d 683, 690–91 (1958); Food Fair Stores, Inc. v. Blumberg, 234 Md. 521, 200 A.2d 166 (1964); Van Valkenburgh, Nooger & Neville, Inc. v. Hayden Publishing Co., 30 N.Y.2d 34, 281 N.E.2d 153, 330 N.Y.S.2d 329, *cert. denied*, 409 U.S. 875 (1972), *discussed at* pp. 398–99 *infra*.

[77] New York Cent. Iron Works Co. v. United States Radiator Co., 174 N.Y. 331, 335, 66 N.E. 967, 968 (1903); *see* Milstein v. Security Pac. Nat'l Bank, 27 Cal. App. 3d 482, 486–87, 103 Cal. Rptr. 16, 18–19 (1972); Pierce v. MacNeal Memorial Hosp. Ass'n, 46 Ill. App. 3d 42, 51, 360 N.E.2d 551, 558 (1977); Comini v. Union Oil Co., 277 Or. 753, 756–57, 562 P.2d 175, 176–77 (1977).

[78] *See* pp. 387–92 *infra*; *cf.* Bergum v. Weber, 136 Cal. App. 2d 389, 288 P.2d 623 (1955) (direct solicitation of former customers of a partnership after sale of partnership's good will is bad faith); Devoine Co. v. International Co., 151 Md. 690, 136 A. 37 (1927) (rejection of goods under a condition of satisfaction in order to buy more cheaply elsewhere); Commonwealth Dep't of Property & Supplies v. Berger, 11 Pa. Commw. Ct. 332, 312 A.2d 100 (1973) (defendant decided he wanted to get out of the contract); Beckett v. Kornegay, 150 Va. 636, 143 S.E. 296 (1928) (party acting in good faith is not acting for speculative reasons).

[79] The percentage lease cases may be explained in this light. Where a lessee opened competing stores in the same neighborhood, the court said there is nothing "unusual" about large retail chains adding to the number of their stores, *see* pp. 384–85 & notes 68, 70 *supra*, and so held that the act was undertaken in good faith. The implication was that the defendant's action was within the ordinary course of business and therefore was reasonably within the contemplation of the parties. When a lessee moved part of its business to a different floor of the building where a flat rental applied, *see* pp. 384–85 & notes 67, 71 *supra*, the rearrangement of the mer-chant's wares within the rented space was similarly seen as a normal business practice. However, where a lessee diverted customers to other premises for the sole purpose of bringing down gross receipts at the leased premises, *see* pp. 384–85 & notes 69, 72 *supra*, the lessee's reason for acting lay outside the bounds of the contract. The lessor reasonably contemplated that variations in the percentage rent would result from market factors affecting the volume of business at the lessee's location. But it may be inferred reasonably that neither party contemplated at formation that the lessee would interfere with the flow of customers in order to reduce its own sales at the leased premises. *See* HML Corp. v. General Foods Corp., 365 F.2d 77, 81–82 (3d Cir. 1966) (dictum) (analogizing requirements contracts to percentage lease cases).

Case 2:10-cv-01823-JLR   Document 715-1   Filed 07/01/13   Page 224 of 244

However, the contemplation standard alone leaves much room for manipulation and fiction. It provides little guidance for determining which of the plausible expectations at formation and which of the plausible motives at performance manifest good faith or bad faith performance. The contemplation standard only directs one to consult the parties' intentions and reasonable expectations — an amorphous totality of the circumstances at the time of formation. In contrast, the cost perspective on contract breach behavior makes it possible to identify with greater particularity the relevant expectations and motives that have been held to constitute bad faith.

*2. Bad Faith: Recapturing Forgone Opportunities.* — Bad faith performance consists of an exercise of discretion in performance to recapture opportunities forgone at formation. The dependent promisee's expectations encompass both the subject matter to be received under a contract, and the expected costs of performance by the other party. A recapture by one party of forgone opportunities necessarily harms the other. A reasonable person accordingly would enter a contract that confers discretion on the other party only on the belief that the discretion will not be used to recapture forgone opportunities.[80]

That businesspersons do in fact take into account opportunities forgone by a discretion-exercising party also is suggested by the doctrinal history of good faith performance. Many of the contracts in which good faith performance is of central importance once would have been unenforceable for indefiniteness or lack of mutuality. This generalization is most accurate with respect to conditions of personal satisfaction,[81] discretionary termination clauses,[82] many open and floating quantity contracts,[83] and open price contracts.[84] The definite-

---

[80] The economic motive to be described is not the only motive that is beyond the reasonable expectations of a dependent party. Some noneconomic motives, such as spite or ill will, are likely to run afoul of the good faith performance doctrine and otherwise to result in liability for breach of contract. *See* Monge v. Beebe Rubber Co., 114 N.H. 130, 316 A.2d 549 (1974) (bad faith of employer found when employee under at will contract was fired after refusing sexual advances of her boss). *See also* Pstragowski v. Metropolitan Life Ins. Co., 553 F.2d 1 (1st Cir. 1977); Wild v. Rarig, 302 Minn. 419, 234 N.W.2d 775 (1975), *appeal dismissed*, 424 U.S. 902 (1976). Noneconomic factors so rarely are evidenced in the reported cases, however, that the focus of the theory must be on economic motives.

[81] *See, e.g.,* Mattei v. Hopper, 51 Cal. 2d 119, 330 P.2d 625 (1958) (en banc); De Laurentiis v. Cinematográfica de las Américas, S.A., 9 N.Y.2d 503, 174 N.E.2d 736, 215 N.Y.S.2d 60 (1961).

[82] *See, e.g.,* Miami Coca-Cola Bottling Co. v. Orange Crush Co., 296 F. 693 (5th Cir. 1924); Bernstein v. W.B. Mfg. Co., 238 Mass. 589, 131 N.E. 200 (1921).

[83] *See, e.g.,* Oscar Schlegel Mfg. Co. v. Peter Cooper's Glue Factory, 231 N.Y. 459, 132 N.E. 148 (1921). *See also* Wickham & Burton Coal Co. v. Farmers Lumber Co., 189 Iowa 1183, 179 N.W. 417 (1920).

[84] *See* 1 A. CORBIN, *supra* note 5, § 97.

ness and mutuality requirements indicate that contract formation depends on a real commitment by each party. In other words, each party must forgo some future opportunity upon formation and thus restrain its future freedom in some way.[85] The implication of good faith now renders many of these contracts enforceable,[86] suggesting judicial recognition that the parties in fact were forgoing opportunities in many such contracts.

For example, in an early requirements contract case involving a buyer who was a jobber,[87] the court read discretion regarding quantity as allowing the buyer to deal elsewhere in a falling market, and to increase its orders at the contract price in a rising market.[88] The buyer was seen as having made no legal commitment because it did not forgo its freedom to pursue alternative opportunities — such as purchases on the spot market — in the future. Yet the use of output and requirements contracts persisted and expanded, suggesting that contracting parties believed that they were each getting some commitment in fact[89] — including the discretion-exercising party's forgone opportunity to speculate on the price. Even before adoption of the U.C.C., many courts consequently hurdled the mutuality barrier to enforce such contracts by implying a good faith duty.[90]

The deployment of good faith to avoid finding an illusory promise in these cases suggests that opportunities indeed are forgone upon the formation of contracts.[91] Moreover, a quan-

---

[85] *See* Corbin, *The Effect of Options on Consideration*, 34 YALE L.J. 571, 574 (1925).

[86] *See, e.g.,* Jacobs v. Freeman, 104 Cal. App. 3d 177, 163 Cal. Rptr. 680 (1980); Brawley v. Crosby Research Foundation, 73 Cal. App. 2d 103, 166 P.2d 392 (1946); Heckard v. Park, 164 Kan. 216, 188 P.2d 926 (1948); Phelps v. Shawprint, Inc., 328 Mass. 352, 103 N.E.2d 687 (1952); Griswold v. Heat Inc., 108 N.H. 119, 229 A.2d 183 (1967); De Laurentiis v. Cinematográfica de las Américas, S.A., 9 N.Y.2d 503, 174 N.E.2d 736, 215 N.Y.S.2d 60 (1961); H.P. Hood & Sons v. Heins, 124 Vt. 331, 205 A.2d 561 (1964).

[87] Crane v. C. Crane & Co., 105 F. 869 (7th Cir. 1901).

[88] *Id.* at 872.

[89] *See* 1 S. WILLISTON, CONTRACTS §§ 103–104 (S. Williston & G. Thompson ed. 1937); Havighurst & Berman, *Requirement and Output Contracts,* 27 ILL. L. REV. 1, 1 (1932); Llewellyn, *supra* note 12, at 727.

[90] *See, e.g.,* Imperial Ref. Co. v. Kanotex Ref. Co., 29 F.2d 193 (8th Cir. 1928); Weistart, *supra* note 8. Good faith as such was not the only device used to render such contracts enforceable. *See* Hickey v. O'Brien, 123 Mich. 611, 82 N.W. 241 (1900) (requirements contract enforceable if buyer forgoes opportunity to buy elsewhere).

[91] The view that opportunities are forgone upon contract formation also is central to the classic justification of the expectation measure of contract damages. *See* Fuller & Perdue, *supra* note 24, at 57–66. In that context, it is the promisee's forgone opportunities (its costs) that are taken into account in determining the measure of compensation.

tity-controlling party commonly is found to have acted in bad faith when it speculates in rising or falling markets,[92] recapturing specific opportunities that the other party reasonably expected it had forgone. A seller's belief that a buyer in a requirements contract will not use its discretion to recapture the opportunity of taking advantage of changes in market prices therefore appears as part of the seller's legally protected interest. The principles of formation and breach thus are wholly congruent.

Expectations as to specific forgone opportunities may be inferred from the express contract terms in light of the ordinary course of business and customary practice, in accordance with the objective theory of contract interpretation.[93] Even so, such expectations may be difficult to prove. Some uncertainty is inevitable because dispute settlement proceeds with the benefit of hindsight and refers to the parties' intentions or expectations with respect to the future. The necessary abstraction of a general principle of contract law adds further complications.[94] In these respects, the good faith performance doctrine suffers epistemological and semantic limitations along with other contract doctrines. Contract law generally endeavors to overcome these limitations by presuming that the parties expect future events to proceed in a normal course and expect each other to behave, absent express terms, in accordance with customary practices of trade.[95] Some uncertainty is inevitable, though no greater here than elsewhere in contract law.

The question whether a party used its discretion in order to recapture forgone opportunities is one of subjective intent, and is a question of fact for the jury. In a forerunner of the

---

[92] Loudenback Fertilizer Co. v. Tennessee Phosphate Co., 121 F. 298 (6th Cir. 1903), *discussed at* pp. 395–96 *infra*; New York Cent. Iron Works Co. v. United States Radiator Co., 174 N.Y. 331, 66 N.E. 967 (1903); Orange & Rockland Utils., Inc. v. Amerada Hess Corp., 59 A.D.2d 110, 397 N.Y.S.2d 814 (1977) (under the U.C.C.); Asahel Wheeler Co. v. Mendleson, 180 A.D. 9, 167 N.Y.S. 435 (1917); Moore v. American Molasses Co., 106 Misc. 263, 174 N.Y.S. 440 (Sup. Ct. 1919).

[93] *See, e.g.*, Eastern Air Lines, Inc. v. Gulf Oil Corp., 415 F. Supp. 429 (S.D. Fla. 1975) (under U.C.C.). Moreover, attention to the relationship of the parties may be helpful, if not essential. *See* Macneil, *Contracts: Adjustment of Long-Term Economic Relations Under Classical, Neoclassical, and Relational Contract Law*, 72 Nw. U.L. Rev. 854 (1978); Macneil, *supra* note 11.

[94] *See* p. 375 *supra*.

[95] *Cf.* Jacob & Youngs, Inc. v. Kent, 230 N.Y. 239, 242, 129 N.E. 889, 891 (1921) (Cardozo, J.) ("Intention not otherwise revealed may be presumed to hold in contemplation of the reasonable and probable."); Hadley v. Baxendale, 9 Ex. 341, 355, 156 Eng. Rep. 145, 151 (1854) ("[I]f . . . special circumstances were wholly unknown to the party breaking the contract, he, at the most, could only be supposed to have had in his contemplation the amount of injury which would arise generally, and in the great multitude of cases not affected by any special circumstances, from such a breach of contract."); RESTATEMENT (SECOND) OF CONTRACTS §§ 246–249 (Tent. Draft No. 6, 1971) (standards of interpretation).

modern franchise termination case,[96] for example, the plaintiff claimed wrongful termination of a contract giving him a five-year exclusive agency for the sale of the defendant's automobiles. The conduct of the agency was to be at all times satisfactory to the defendant, thereby contractually conferring upon the defendant discretion as to the duration of the contract. Three months into the contract, the defendant notified the plaintiff that the agency was being conducted unsatisfactorily and that the contract would be cancelled if satisfaction were not achieved. The defendant withheld further cooperation and then cancelled the contract. The plaintiff sued, claiming that the defendant was not dissatisfied in good faith. The evidence indicated that the defendant had been kept well informed of the plaintiff's activities, had repeatedly expressed approval, and had surreptitiously negotiated with another agency for a more favorable commission in a market that would sustain but one distributor. The court held the evidence sufficient to submit the question of the defendant's good faith to the jury. The defendant could have feigned dissatisfaction to recapture the forgone opportunity of dealing with another agent at a lower commission. The condition of satisfaction preserved this alternative only under contemplated circumstances — misconduct of the agency or the running of the term — and could not be used to redirect resources to exploit a newfound economic advantage.[97]

Like the contemplation approach to good faith performance, then, the forgone opportunities approach has both objective and subjective aspects. The identity of forgone oppor-

---

[96] Isbell v. Anderson Carriage Co., 170 Mich. 304, 136 N.W. 457 (1912). On modern franchise terminations, see generally Gellhorn, *Limitations on Contract Termination Rights — Franchise Cancellations*, 1967 DUKE L.J. 465; Hewitt, *Good Faith or Unconscionability — Franchisee Remedies for Termination*, 29 BUS. LAW. 227 (1973); pp. 399–400 & notes 133–37 *infra*.

[97] Though no opinion has been found that discusses what in particular should happen at a new trial in such a case, the following allocation of burdens of proof and treatment of mixed motives is suggested as a consequence of the theory put forth by this Article.

The plaintiff's counsel of course is well advised to reintroduce the evidence from which a jury could conclude that the defendant acted in bad faith — the evidence suggesting that the defendant's subjective reason for claiming dissatisfaction was to pursue the alternative opportunity to enter a more favorable contract with another agent — and that the alternative opportunity was forgone upon entering the contract, according to the plaintiff's reasonable understanding of the contract. If the plaintiff does so, the burden of proof should shift to the defendant to show a subjective reason for acting that objectively was within the contemplation of the parties, or to attack the credibility of the plaintiff's evidence.

The hard case is when the defendant fails to undermine the credibility of the plaintiff's case but presents credible evidence of a reason for its dissatisfaction that

tunities is determined by an objective standard, focusing on the expectations of reasonable persons in the position of the dependent parties. Whether a particular discretion-exercising party acted to recapture forgone opportunities is a question of subjective intent. The two approaches are consistent. If a discretion-exercising party uses its control to recapture a forgone opportunity, it follows that it is not acting for a purpose within the contemplation of the parties. If such a party acts for a reason contemplated by the parties, it is not recapturing a forgone opportunity.[98]

The forgone opportunities approach, however, advances the analysis further than the contemplation approach. It narrows the field of relevant intellectual inquiry by isolating with greater particularity the factors that must be considered in determining good or bad faith performance. The totality of the circumstances contemplated or expected by the parties includes both benefits to the promisee (the traditional focus) and costs to the promisor (forgone opportunities). For the purpose of the good faith performance doctrine, the relevant and distinct set of facts is that subset of the totality of circumstances (1) at formation, bearing on the expected costs to a discretion-exercising promisor; and (2) at performance, bearing on whether the promisor exercised its discretion in performance

relates to the plaintiff's conduct of the agency. The totality of the evidence then would be sufficient to sustain a jury finding that the defendant acted from mixed motives. In such a case, the jury should be instructed in part:

> If you find that both the reasons put forward by the plaintiff and the reasons put forward by the defendant played a significant role in the defendant's decision to claim dissatisfaction with the plaintiff's conduct of the agency and therefore to terminate it, then you must find that the defendant acted in good faith.

This reflects the fact that, in a case of truly mixed motives, the defendant would have been justified in terminating the agency whether or not the illegitimate reason were present, and presumably would have done so. *Cf.* Reuther v. Fowler & Williams, Inc., 255 Pa. Super. Ct. 28, 386 A.2d 119 (1978) (employer may discharge employee in violation of public policy if it also has a separate, plausible, and legitimate reason).

It could be argued that the case of mixed motives should result in a finding of good faith only when legitimate and illegitimate reasons each play a *substantial* part in the defendant's decision. *Cf.* Note, *Free Speech and Impermissible Motive in the Dismissal of Public Employees*, 89 YALE L.J. 376 (1979) (reinstatement should be ordered if an illegitimate motive was a substantial cause of a dismissal). But liability in a case of mixed motives creates insuperable problems as to the remedy. The Second Circuit exposed these difficulties in Parev Prods. Co. v. I. Rokeach & Sons, 124 F.2d 147 (2d Cir. 1941), and seemed to backtrack on the question of liability three years later in Mechanical Ice Tray Corp. v. General Motors Corp., 144 F.2d 720 (2d Cir. 1944), *cert. denied*, 324 U.S. 844 (1945). The quixotic holding in *Parev Products* has been ignored by the courts ever since.

[98] With respect to discretion-exercising parties motivated by spite or ill will, see note 80 *supra*.

to recapture a forgone opportunity. That the dependent prom-
isee did not receive benefits under the contract as it had hoped
simply is not dispositive.

## C. *Justification of the Good Faith Performance Doctrine*

There are two potential justifications of the good faith
performance doctrine — legal and economic.[99] In traditional
legal terms, it can be argued that the security of contractual
transactions is enhanced by the good faith performance doc-
trine.[100] Because contracting parties do not contract with
those they do not trust to some extent, a dependent party will
have reason to rely on the good faith of a discretion-exercising
party. Such reliance plausibly is based on the simple belief
that the party with discretion in performance will keep the
contract, and therefore will not use its discretion to recapture
forgone opportunities.[101] Requiring a party who recaptures
forgone opportunities to compensate the other increases the
reliability of flexible contracts and therefore the security of
such transactions.

The security argument, however, is incomplete because of
the countervailing policy of allowing contracting parties great
freedom of action. One could assert in reply that a discretion-
exercising party should be left free to act for any reason or no
reason at all, limited only by the express terms of the contract.
Although this counterargument proves too much, for it would
eliminate all implied promises, it does raise a question whether
a dependent party should be left to protect itself by securing
the necessary express promises. The real question, however,
is which party is in a better position to protect itself, and thus
to secure the expectations of both parties.[102] The capacity to
protect oneself cuts both ways. As the dependent party may
secure additional promises, the discretion-exercising party may
protect itself by conditioning its duty to perform. Traditional
legal analysis supplies no tools for balancing the relative ca-

---

[99] For a classic exposition on the relationship between juristic and economic jus-
tifications of contract law, see Fuller & Perdue, *supra* note 24, at 60–66.

[100] *See* sources cited notes 26–27 *supra*.

[101] The out-of-pocket loss sustained by a dependent party may be the same whether
the other party exercises discretion in order to pursue alternative opportunities that
were reasonably contemplated by the parties or for other reasons. At the time of
contract formation, however, the hypothetically rational dependent party agrees to a
discretion-conferring contract after calculating the risk of such a loss. The probability
of the loss, and therefore the cost, will vary with the number and intensity of
incentives facing the discretion-exercising party, and will be higher when a recapture
of forgone opportunities is permissible than when it is not.

[102] *See* note 95 *supra*.

*GOOD FAITH PERFORMANCE*

pacities of the parties to protect themselves. An economic analysis, however, suggests an appropriate response.

The good faith performance doctrine may be said to enhance economic efficiency by reducing the costs of contracting.[103] The costs of exchange include the costs of gathering information with which to choose one's contract partners, negotiating and drafting contracts, and risk taking with respect to the future. The good faith performance doctrine reduces all three kinds of costs by allowing parties to rely on the law in place of incurring some of these costs.[104]

Many contracting parties investigate the market in part to identify and select those prospective contract partners whose reputations for business integrity reduce the risk of disappointing contract performance. Such information never will be wholly complete or trustworthy. A choice is presented if the law offers a prospect of compensation to a contract party who may incur losses due to the other party's lack of business integrity. Contract parties who wish to reduce uncertainty as to their prospective partners' integrity either may gather more information before contracting or may substitute the legal incentive for honorable behavior — and the prospect of recovering damages — for some such information. The economically rational person presumably would choose the less costly alternative at the margin.

The good faith performance doctrine similarly reduces the costs of negotiating and drafting contracts. After selecting each other as probable contract partners, the parties will choose the amount of detail to include in their express contract. The alternatives to detailed planning are (1) relying on legal rules that supply a set of normal terms that otherwise would be negotiated,[105] or (2) in the absence of such terms, bearing the cost of uncertainty. The good faith performance doctrine provides such a set of legal rules and gives parties who wish to reduce uncertainty the choice of engaging in more detailed planning or substituting good faith at the margin. The good faith performance doctrine thus makes the short contract, one that requires relatively more interpretation and implication, less risky and therefore less costly.

Finally, the good faith performance doctrine induces the parties to minimize the joint costs of the contract by negotiating and drafting clauses that will reduce the prospect of losses should a party after formation wish to redirect re-

---

[103] *See* sources cited note 33 *supra.*

[104] On the costs of enforcement, see note 108 *infra.*

[105] R. POSNER, *supra* note 33, § 4.1, at 69.

*HARVARD LAW REVIEW*

sources.[106] Theoretically, the joint costs of the contract will be minimized if liability is placed on the party who can more cheaply cover the contingency by express terms — the party best able to protect itself.[107] By hypothesis, that party will be the discretion-exercising party, who would have far better information concerning its own alternative opportunities, and the probability that a later opportunity will prove more attractive. On the other hand, for the dependent party to protect itself, it must secure a lengthy series of express promises as to those alternative opportunities that the other party may not pursue. This would involve a costly process of eliminating hypothetical contingencies. The joint cost of contracting therefore would be less when a party with discretion is required to protect itself. All it need do is include a condition that preserves particular alternative opportunities under specified circumstances.[108]

## III. ILLUSTRATIONS OF GOOD FAITH AND BAD FAITH PERFORMANCE

The theory of the good faith performance doctrine will be illustrated in this Part by a survey of cases involving floating quantity contracts, open or floating price contracts, open time contracts, and contracts subject to conditions within the control of one party. Such contracts represent the typical arm's-length relationships in which the implied covenant of good faith and fair dealing is invoked.[109]

---

[106] *See id.* at 68.

[107] *Id.*; Coase, *supra* note 33.

[108] Like the legal argument based on the security of transactions idea, however, the economic argument is not conclusive on the ultimate question whether the good faith performance doctrine is a good thing. It is costly for the legal system to present the parties with the less costly alternative of relying on the good faith of their contract partners rather than on more information concerning their partners' reputations or on more detailed contracts. There is no empirical basis at present for concluding that the legal system is more efficient than the market alternatives at enhancing the reliability of contracts at the margin, though such a conclusion seems intuitively sound. Suffice it to say that this uncertainty is common to any economic analyses of the common law that compare the alternative of no doctrine with an existing doctrine.

In addition, like any theoretical justification, this argument is vulnerable to the legal realist's claim that capability problems so impede the legal system's operation in fact that the theory is insufficiently reflective of reality. *See generally* R. DANZIG, THE CAPABILITY PROBLEM IN CONTRACT LAW (1978); Leff, *Economic Analysis of Law: Some Realism About Nominalism*, 60 VA. L. REV. 451 (1974).

[109] Good faith performance also is required in insurance contracts and contracts creating fiduciary duties. These are special cases in which the meaning of good faith

## A. Floating Quantity Terms

The common law treatment of output and requirements contracts has been superseded formally by the U.C.C.[110] The Code nonetheless incorporates the common law good faith limit on a quantity-determining party's discretion.[111] The good faith criterion is used to distinguish "situations in which the quantity-determining party was merely pursuing a better bargain elsewhere from those in which a change in needs or output resulted from the exercise of business judgment which the quantity-determining party had reserved for [it]self."[112] Good faith thus distinguishes cases in which a party exercises the discretion allowed it under the contract for normal business reasons from those in which the party uses its discretion to recapture forgone opportunities.

In *Loudenback Fertilizer Co. v. Tennessee Phosphate Co.*,[113] for example, a buyer contracted to take its entire phosphate rock requirements for five years. The buyer manufactured "acid phosphate" with the rock and sold the product as fertilizer. For more than a year during the term, the buyer ordered no rock but purchased acid phosphate from other manufacturers because, the buyer testified, this was more profitable. When the market price of rock rose, the buyer ordered

---

changes complexion, although in a manner broadly consistent with the theory articulated in this Article.

For example, the insurer empowered by contract to defend claims against its insured is obligated by good faith to take into account the insured's interest when responding to settlement offers. *See* Crisci v. Security Ins. Co., 66 Cal. 2d 425, 426 P.2d 173, 58 Cal. Rptr. 13 (1967); Communale v. Traders & Gen. Ins. Co., 50 Cal. 2d 654, 328 P.2d 198 (1958); Keeton, *supra* note 17. The insurer forgoes the opportunity to act *solely* in its own interest.

A fiduciary must act on behalf of the other party. Scott, *The Fiduciary Principle*, 37 CALIF. L. REV. 539, 540 (1949). It thus forgoes the opportunity to act in its own interest at all. Good faith performance of a contract creating a fiduciary duty should be understood in this sense. For examples of such cases, see Brown v. Superior Court, 34 Cal. 2d 559, 212 P.2d 878 (1949) (contract to make joint wills); Davis v. Kahn, 7 Cal. App. 3d 868, 877, 86 Cal. Rptr. 872, 877–78 (1970) (coadventurers); Schmidt v. Waterford Winery, Ltd., 177 Cal. App. 2d 28, 32, 1 Cal. Rptr. 874, 876–77 (1960) (trustee or agent); Wheeler v. Waller, 197 N.W.2d 585, 587 (Iowa 1972) (confidential relationship between real estate brokers).

The analysis in this Article rests on contracts involving arm's-length relationships, in which there is no indication that a discretion-exercising party may not act solely in its own interest, so long as it acts within the scope of the contract. *See, e.g.*, HML Corp. v. General Foods Corp., 365 F.2d 77, 81 (3d Cir. 1966).

[110] *See* U.C.C. § 2-306.

[111] Weistart, *supra* note 8. *See also* Feld v. Henry S. Levy & Sons, 37 N.Y.2d 466, 335 N.E.2d 320, 373 N.Y.S.2d 102 (1975).

[112] Weistart, *supra* note 8, at 647.

[113] 121 F. 298 (6th Cir. 1903).

the maximum contract quantity of rock from the seller. The seller did not deliver. In an action by the buyer, the court refused to interpret the contract as allowing the buyer discretion to change its business practices by substituting purchased acid phosphate for its own make whenever that was temporarily advantageous.[114] The parties had agreed to vary the quantity with changes in the market for the buyer's product, and, by fixing a price, to isolate themselves from changes in the raw materials market. By purchasing acid phosphate from others in substitution for that of its own manufacture, in a falling raw materials market, the buyer exercised its discretion for a speculative purpose not reasonably contemplated by the parties.[115] It materially breached the contract by recapturing the forgone opportunity of acquiring rock from others at less than the contract price.

A contrasting result was reached in *Southwest Natural Gas Co. v. Oklahoma Portland Cement Co.*[116] Southwest's predecessor entered into an agreement to supply, for fifteen years, "all 'natural gas as may be needed or required by' the Cement Company 'for fuel, heating, lighting, power purposes and such other purposes as may be necessary, proper or incidental to the operation of' its plant."[117] During the initial years of the contract, the cement company operation consumed from 2.3 to 5.3 million cubic feet of gas daily.[118] Eight years into the term, the company sought to replace its boilers with a system that utilized the waste heat of cement kilns. This operation was to reduce the maximum quantity supplied by the gas company to .4 million cubic feet per day. The gas company sought to enjoin the use of the new boiler system, contending that the contract prevented a change in the buyer's operations that would so drastically reduce its requirements of natural gas. The court held that the alteration in operations was in good faith because the requirements contract did not prevent the buyer from exercising discretion to improve its plant. Noting the duration of the parties' agreement, the court found an implied assumption at formation that existing equipment would require replacement during the life of the contract, probably by a more efficient system.[119] In other words, the parties did not contemplate that the buyer should forgo tech-

---

[114] *Id.* at 302–03.

[115] *See* Asahel Wheeler Co. v. Mendleson, 180 A.D. 9, 12, 167 N.Y.S. 435, 437 (1917); New York Cent. Ironworkers Co. v. United States Radiator Co., 174 N.Y. 331, 335–36, 66 N.E. 967, 968 (1903) (dictum).

[116] 102 F.2d 630 (10th Cir. 1939).

[117] *Id.* at 631.

[118] *Id.* at 632.

[119] *Id.* at 633.

nological improvements in the normal course of business. The buyer acted in good faith since it did not recapture any forgone opportunity.

### B. Open and Floating Price Terms

In *Umlas v. Acey Oldsmobile, Inc.*,[120] the buyer of a new car claimed a breach of a contract for future delivery that left the price term open by reserving to the seller a right to reappraise the buyer's trade-in at the time of delivery. The seller lowered the appraisal from $650 to $50 at the time of delivery. The court found that the vehicle in fact was worth from $300–$400, based on the salesperson's testimony and the appraisal of another dealer, and held that the seller acted in bad faith in violation of the U.C.C.[121] If the vehicle had deteriorated between the time of formation and the time of reappraisal the seller could have lowered the appraisal in good faith.[122] The seller's exercise of discretion then would be in the normal course of business and reasonably within the contemplation of the parties. That the seller was dishonest, so that it could recapture forgone opportunities with the savings, is apparent. Such dishonesty is sufficient to establish bad faith.

When one party may not itself set the price, but controls the factors that go into a formula set in the contract for determining the price, any dishonesty by that party similarly suggests that money is being diverted to other opportunities.[123] Less flagrant behavior also may run afoul of good faith.[124] In *Miller v. Othello Packers, Inc.*,[125] the plaintiff contracted to

---

[120] 62 Misc. 2d 819, 310 N.Y.S.2d 147 (Civ. Ct. N.Y. 1970).

[121] On the relationship of the U.C.C. to the common law in this context, see notes 8, 51 *supra*.

[122] Price v. Spielman Motor Sales Co., 261 A.D. 626, 26 N.Y.S.2d 836 (1941).

[123] *Cf.* Hempstead Theatre Corp. v. Metropolitan Playhouses, Inc., 16 Misc. 2d 781, 183 N.Y.S.2d 972 (Sup. Ct. 1958) (theater rental measured by percentage of gross receipts, including concessions, could not be diminished where concessions were sold by a sham corporation controlled by lessee), *aff'd mem.*, 7 A.D.2d 625, 179 N.Y.S.2d 306, *rev'd*, 6 N.Y.2d 311, 160 N.E.2d 604, 189 N.Y.S.2d 837 (1959) (reversed on construction of the express contract indicating defendant's actions were within the contemplation of the parties).

[124] *See* Daitch Crystal Dairies, Inc. v. Neisloss, 8 A.D.2d 965, 190 N.Y.S.2d 737 (1959) (lessor who gave exclusive right to operate a supermarket to plaintiff-lessee on percentage lease may not allow a competing supermarket on adjacent land), *aff'd mem.*, 8 N.Y.2d 723, 167 N.E.2d 643, 201 N.Y.S.2d 101 (1960); Goldberg 168-05 Corp. v. Levy, 170 Misc. 292, 9 N.Y.S.2d 304 (Sup. Ct. 1938), *modified and aff'd*, 256 A.D. 1086, 11 N.Y.S.2d 315 (1939).

[125] 67 Wash. 2d 842, 410 P.2d 33 (1966); *see* Dorsey Bros. v. Anderson, 264 Md. 446, 287 A.2d 270 (1972) (harvester delays until crop is spoiled in order to harvest at other farms).

grow beans in return for a price determined by a formula based on the useful product after harvesting, sampling, and grading by the defendant. The plaintiff, dissatisfied with the resulting price, sued for the reasonable value of the crop, claiming a breach of contract due to the defendant's incompetence and inefficiency in harvesting and processing. The defendant, among other things, left three truckloads of beans in the fields to rot. The court summarily found a breach by failure to perform in good faith. The mismanagement can be seen to reflect a redirection of managerial resources away from the plaintiff's crop and toward other opportunities — a partial recapture of forgone opportunities.[126]

In *Van Valkenburgh v. Hayden Publishing Co.*,[127] a publisher promised the author of two books a royalty on sales and its best efforts to promote the books. Nine years later, the author refused the publisher's request to update the books and to accept a reduced royalty. The publisher thereupon hired a third person to update the books at a lower royalty, concealed that fact from the original author, and sought to sell the updated version to buyers requesting the original. The court found no violation of the implied covenant of good faith and fair dealing, though the diversion of customers to the updated book was held to violate the publisher's express promise to use its best efforts on behalf of the plaintiff. The court said that the publisher, by entering the contract, did not "close off" its right to issue books on the same subject, to negotiate with and to pay authors of such books, and to promote them fully according to the publisher's economic interests, even though

---

[126] The partial (and intentional) recapture of forgone opportunities apparent in *Miller* suggests a case where a party negligently exercises discretion in performance with the effect of recapturing forgone opportunities. Only one common law case has been found in which the court discussed the question of liability for such negligence. *See* Amoco Oil Co. v. Capitol Indem. Corp., 95 Wis. 2d 530, 542–44, 291 N.W.2d 883, 890–91 (Ct. App. 1980); note 35 *supra*. There is no reason in principle why such negligence should not be actionable. *See* Farnsworth, *supra* note 5.

Much confusion would be generated, however, if the good faith performance concept itself were to take on subjective and objective standards in order to reach both intentional and negligent behavior. *See* note 35 *supra*. Such confusion would be avoided by extending the implied covenant of due care, *see* Ryan Stevedoring Co. v. Pan-Atlantic S.S. Corp., 350 U.S. 124, 133–34 (1956), to cover the negligent exercise of discretion in performance. *Cf.* Lechmere Tire & Sales Co. v. Burwick, 360 Mass. 718, 277 N.E.2d 503 (1972) (implying covenants of due care and good faith). Alternatively, the words "fair dealing" in the context of the implied covenant of good faith and fair dealing could be given an independent, objective meaning. *See* note 43 *supra*.

[127] 30 N.Y.2d 34, 281 N.E.2d 142, 330 N.Y.S.2d 329, *cert. denied*, 409 U.S. 875 (1972).

this adversely affected the original author.[128]  In other words, the publisher did not recapture a forgone opportunity because it had an ordinary business purpose for marketing the updated books that was within the reasonable contemplation of the parties.

### C. Open Terms as to Time

Open terms as to time may confer discretion on one party to decide when it shall perform, when the other party shall perform, or when the contract shall terminate.  If one party is given discretion to determine when it shall perform, it may not delay matters for so long that it appears to be abandoning the contract.  A party acted in bad faith, for example, when it promised to pay a portion of the proceeds of a sale of real estate in return for the release of a claim, the contract was silent as to the time for performance, and the party delayed selling for eight years.[129]  That the defendant was recapturing forgone opportunities is plain.

Similarly, in *Sylvan Crest Sand & Gravel Co. v. United States*,[130] a contract for trap rock gave the government the right to set times for delivery or to cancel.  The court found that the government was obligated by good faith to request delivery or to give notice of cancellation within a reasonable time.  By doing neither, the government could be seen as attempting to give the contract the effect of an option of unlimited duration.  Such an option was, however, a forgone opportunity under the contract as it would be interpreted by a reasonable businessperson.[131]

The exercise of discretionary termination rights is more problematic because it is not settled whether the good faith limitation applies.[132]  When a contract includes an express right of termination without cause, the express term usually prevails over the implied covenant of good faith[133] because the party wishing to terminate has done all that could be expected to preserve all of its alternative opportunities.  Even when the contract omits a termination provision, the traditional understanding is that such contracts are terminable at will.  This may conflict with the more recently recognized good

---

[128] *Id.* at 45, 281 N.E.2d at 144, 330 N.Y.S.2d at 333.

[129] Simon v. Etgen, 213 N.Y. 589, 107 N.E. 1066 (1915).

[130] 150 F.2d 642 (2d Cir. 1945).

[131] *Id.* at 644.

[132] Good faith is required when a right of termination is conditioned on an event within the control of one party. *See* pp. 401–02 *infra*.

[133] *See* note 14 *supra*.

faith implication. The issue arises frequently in franchise termination cases.[134] Although franchises claiming a bad faith termination often have been unsuccessful, whether the court applied a good faith limitation[135] or not,[136] they occasionally have succeeded.[137]

In a few cases involving employment contracts that once would have been terminable at will,[138] the courts similarly have held that an employer breached the contract by terminating in bad faith.[139] These courts have construed good faith performance as suggested in this Article. In *Fortune v. National Cash Register Co.*,[140] for example, the plaintiff was a salesperson for the defendant and was paid in large part by commission. Soon after he obtained a $5 million order, but before all formalities were completed, he was discharged without being paid the full commission. The court held that the employer's decision to end the contract, even though expressly terminable at will, must be made in good faith. The plaintiff therefore was entitled to a jury determination as to the defendant's motives. The defendant could be acting to recapture forgone opportunities if it acted to avoid paying the commission. According to the practice respecting salespersons operating on commission, such a reason probably would be beyond the reasonable contemplation of the parties when contracting.[141] In another case, by contrast, a dismissed employee

---

[134] *See generally* Gellhorn, *supra* note 96; Hewitt, *supra* note 96. *See also* Spindle v. Travelers Ins. Cos., 66 Cal. App. 3d 951, 136 Cal. Rptr. 404 (1977) (termination of insurance contract); note 138 *infra* (termination of employment contracts).

[135] *E.g.*, Tele-Controls, Inc. v. Ford Indus., 388 F.2d 48 (7th Cir. 1967); 33 Flavors of Greater Delaware Valley, Inc. v. Bresler's 33 Flavors, Inc., 475 F. Supp. 217 (D. Del. 1979).

[136] *See, e.g.*, Niagara Mohawk Power Corp. v. Graver Tank & Mfg. Co., 470 F. Supp. 1308 (N.D.N.Y. 1979); Division of Triple T Serv., Inc. v. Mobil Oil Corp., 60 Misc. 2d 720, 304 N.Y.S.2d 191 (Sup. Ct. 1969), *aff'd*, 34 A.D.2d 618, 311 N.Y.S.2d 961 (1970). *See also* A & M Fix-It, Inc. v. Schwinn Bicycle Co., 494 F. Supp. 175 (D. Utah 1980) (dealership contract).

[137] *See* Baker v. Ratzlaff, 1 Kan. App. 2d 285, 564 P.2d 153 (1977) (applying the U.C.C.); Atlantic Richfield Co. v. Razumic, 480 Pa. 366, 390 A.2d 736 (1978).

[138] On employment contracts that are terminable at will, see Blades, *Employment at Will vs. Individual Freedom: On Limiting the Abusive Exercise of Employer Power*, 67 COLUM. L. REV. 1404 (1967); Note, *Protecting At Will Employees Against Wrongful Discharge: The Duty to Terminate Only in Good Faith*, 93 HARV. L. REV. 1816 (1980); Note, *Implied Contract Rights to Job Security*, 26 STAN. L. REV. 335 (1974); Annot., 62 A.L.R.3d 271 (1975).

[139] *See, e.g.*, McKinney v. National Dairy Council, 491 F. Supp. 1108, 1117-22 (D. Mass. 1980); Malloy v. Coldwater Seafood Corp., 338 Mass. 554, 156 N.E.2d 61 (1959); Monge v. Beebe Rubber Co., 114 N.H. 130, 316 A.2d 549 (1974). *But see* Mason v. Farmers Ins. Cos., 281 N.W.2d 344 (Minn. 1979).

[140] 373 Mass. 96, 364 N.E.2d 1251 (1977).

[141] *See* Colwell Co. v. Hubert, 248 Cal. App. 2d 567, 56 Cal. Rptr. 753 (1967);

brought an action to recover his pension. The claim was rejected because the plaintiff failed to substantiate that the termination was a bad faith effort by the employer to avoid its conditional duty to pay pension benefits. Moreover, the defendant had sound business reasons for the dismissal.[142]

At least in employment contracts at common law, then, the good faith performance doctrine sometimes is applied to limit express or implied discretionary rights of termination. When so applied, it distinguishes the employer's use of discretion for a purpose beyond the reasonable contemplation of the parties from the use of discretion for normal business reasons. In cases involving express termination clauses, however, the range of alternative opportunities that are preserved by the contract is unusually large, and particularly egregious conduct by the employer probably is necessary to breach the contract.

### D. Conditions Within the Control of One Party

A condition of satisfaction may confer discretion upon one party to determine whether the other party's performance is acceptable. If the party in control honestly is dissatisfied with the quality of the proferred performance, it may reject such performance and freely pursue alternative opportunities. The condition of satisfaction preserves precisely such a course.[143] But if that party feigns dissatisfaction for other reasons, such as a falling market price, the discretion obviously is being exercised for a purpose not contemplated by the parties. A jury reasonably may infer that the party was recapturing a forgone opportunity.[144]

A contract also may be conditioned on the conclusion of another related contract by the party in control. Consider a contract for demolition work to be done by the defendant if it can obtain certain insurance policies. The condition presumably is designed to protect the defendant from normal business difficulties that might prevent it from obtaining insurance. So if the defendant makes every reasonable effort to obtain the policies but cannot do so because of financial difficulty arising from an injury to one of its employees on another job, its duty

---

Eline Realty Co. v. Foeman, 252 S.W.2d 15 (Ky. 1952); Association Group Life, Inc. v. Catholic War Veterans of the United States, 61 N.J. 150, 293 A.2d 382 (1972) (per curiam); Perkins v. Standard Oil Co., 235 Or. 7, 383 P.2d 107 (1963) (en banc).

[142] Stevenson v. ITT Harper, Inc., 51 Ill. App. 3d 568, 366 N.E.2d 561 (1977).

[143] *See* pp. 389–90 *supra*.

[144] *See* Neumiller Farms, Inc. v. Cornett, 368 So. 2d 272 (Ala. 1979); Devoine Co. v. International Co., 151 Md. 690, 136 A. 37 (1927); Maas v. Scoboda, 188 Neb. 189, 195 N.W.2d 491 (1972).

*HARVARD LAW REVIEW* [Vol. 94:369]

to perform will be discharged.[145] A breach may be established, however, if the defendant deliberately fails to obtain the insurance.[146] The latter behavior may be characterized as an attempt to use the condition as a pretext to recapture forgone opportunities.

Similarly, in *Ide Farm & Stable, Inc. v. Cardi*,[147] a contract for the sale of land was conditioned on the buyer's obtaining financing. The buyer, claiming an inability to obtain financing, did not go through with the deal. The seller sued the buyer for breach of contract by failing to perform in good faith. The evidence indicated that the buyer had gone to four banks, but was unsuccessful because of a tight money market. The court rejected the claim that the efforts to secure financing were a sham. The reason for the buyer's failure was indeed the very one that induces the typical financing condition in land sale contracts. The buyer's discretion thus was exercised in good faith in light of the purpose that parties normally have in mind in so conditioning a promise to buy land.

A different result was reached in *Fry v. George Elkins Co.*,[148] where a sale of a residential home was conditioned on the buyer securing financing at a specified rate. The buyer was informed at the time of formation that such financing could not be obtained from a bank, but he applied only to banks and only after obviously dragging his heels. The buyer refused to close and sought recovery of his deposit on the ground that required financing had not been secured. The court held that the factfinder could find that the buyer had not acted in good faith. The evidence indicated that the buyer had changed his mind and had decided to move to Hawaii,[149] a postformation decision that would be outside the normal reasons for so conditioning a promise to buy a house. The factfinder therefore could conclude that the buyer sought to recapture an opportunity forgone upon entering the contract.

---

[145] Omaha Pub. Power Dist. v. Employers' Fire Ins. Co., 327 F.2d 912 (8th Cir. 1964). The case is the basis for RESTATEMENT (SECOND) OF CONTRACTS § 231, Illustration 4 (Tent. Draft No. 5, 1970).

[146] Omaha Pub. Power Dist. v. Employers' Fire Ins. Co., 327 F.2d 912, 916 (8th Cir. 1964) (dictum). *See also* Dasenbrock v. Interstate Restaurant Corp., 7 Ill. App. 3d 295, 287 N.E.2d 151 (1972) (lessee was liable for rent when lease was conditioned on lessee obtaining government licenses and lessee did nothing to obtain them).

[147] 110 R.I. 735, 297 A.2d 643 (1972).

[148] 162 Cal. App. 2d 256, 327 P.2d 905 (1958).

[149] *Id.* at 259, 327 P.2d at 906–07.

## IV. CONCLUSION

The theory of contract breach by failing to perform in good faith has been derived from a cost perspective on the contractual expectation interest. Cases holding one party's exercise of discretion in performance to constitute a breach of contract and those holding such conduct to be legitimate can be distinguished with reference to facts tending to show that the discretion-exercising party is or is not using discretion to recapture opportunities forgone upon entering the contract. Discretion in performance may be exercised legitimately for the purposes reasonably contemplated by the parties, including ordinary business reasons. It cannot be exercised for the purpose of recapturing forgone opportunities, for such conduct harms the expectation interest of the dependent party.

The good faith performance doctrine, like contract law generally, functions to support the market. It advances the time at which alternative opportunities are deemed to be forgone to the time of formation, when they otherwise would be forgone upon the expenditure of resources in performance of the contract. A promisee thus may rely not only on the express terms of a contract, but also on the customary implications of the express terms as to opportunities forgone in the commercial setting. The law puts the burden of careful contract planning on the discretion-exercising promisor who wishes to depart from the norm, because such a promisor is in the best position to secure the expectations of both parties. The cost perspective on the contractual expectation interest thus renders the common law good faith performance doctrine reckonable.

*HARVARD LAW REVIEW*          [Vol. 94:369

## APPENDIX

The following cases indicate jurisdictions that explicitly recognize a general obligation of good faith performance in every contract at common law: Commerce Int'l Co. v. United States, 338 F.2d 81, 85 (Ct. Cl. 1964); World's Exposition Shows v. Benevolent Protective Order of Elks, No. 148, 237 Ala. 329, 331, 186 So. 721, 723 (1939); Guin v. Ha, 591 P.2d 1281, 1291 (Alaska 1979); Beaugureau v. Beaugureau, 11 Ariz. App. 234, 236, 463 P.2d 540, 542 (1970); Nelson v. Abraham, 29 Cal. 2d 745, 750–51, 177 P.2d 931, 934 (1947); Blish v. Thompson Automatic Arms Corp., 30 Del. Ch. 538, 569, 64 A.2d 581, 597 (Sup. Ct. 1948); Crooks v. Chapman Co., 124 Ga. App. 718, 719, 185 S.E.2d 787, 789 (1971); Martindell v. Lake Shore Nat'l Bank, 15 Ill. 2d 272, 286, 154 N.E.2d 683, 690–91 (1958); Midwest Management Corp. v. Stephens, 291 N.W.2d 896, 913 (Iowa 1980); Odem Realty Co. v. Dyer, 242 Ky. 58, 61, 45 S.W.2d 838, 840 (1932); Food Fair Stores, Inc. v. Blumberg, 234 Md. 521, 534, 200 A.2d 166, 174 (1964); Kerrigan v. City of Boston, 361 Mass. 24, 33, 278 N.E.2d 387, 393 (1972); Burkhardt v. City Nat'l Bank, 57 Mich. App. 649, 652, 226 N.W.2d 678, 680 (1975); Faust & Forden, Inc. v. Greenbaum, 421 S.W.2d 809, 813 (Mo. 1967); U.V. Indus., Inc. v. Danielson, 602 P.2d 571, 581 (Mont. 1979); Griswold v. Heat, Inc., 108 N.H. 119, 124, 229 A.2d 183, 187 (1967); Palisades Properties, Inc. v. Brunetti, 44 N.J. 117, 130, 207 A.2d 522, 531 (1965); Kirke La Shelle Co. v. Paul Armstrong Co., 263 N.Y. 79, 87, 188 N.E. 163, 167 (1933); Weyerhaeuser Co. v. Godwin Bldg. Supply Co., 40 N.C. App. 743, 746, 253 S.E.2d 625, 627–28 (1979); Miles v. N.J. Motors, Inc., 44 Ohio App. 2d 351, 356, 338 N.E.2d 784, 787–88 (1975); Western Natural Gas Co. v. Cities Serv. Gas Co., 507 P.2d 1236, 1241 (Okla.), *appeal dismissed and cert. denied*, 409 U.S. 1052 (1972); Perkins v. Standard Oil Co., 235 Or. 7, 16–18, 383 P.2d 107, 112 (1963) (en banc); Ide Farm & Stable, Inc. v. Cardi, 110 R.I. 735, 739, 297 A.2d 643, 645 (1972); Commercial Credit Corp. v. Nelson Motors, Inc., 247 S.C. 360, 366–67, 147 S.E.2d 481, 484 (1966); Zion's Properties, Inc. v. Holt, 538 P.2d 1319, 1321 (Utah 1975); H.P. Hood & Sons v. Heins, 124 Vt. 331, 338, 205 A.2d 561, 566 (1964); Miller v. Othello Packers, Inc., 67 Wash. 2d 842, 844, 410 P.2d 33, 34 (1966) (per curiam); Chayka v. Santini, 47 Wis. 2d 102, 108, 176 N.W.2d 561, 564 (1970).

*See also* Howard P. Foley Co. v. J.L. Williams & Co., 622 F.2d 402, 406–07 (8th Cir. 1980) (applying Arkansas law); Rees v. Bank Bldg. & Equip. Corp. of America, 332 F.2d 548, 551–52 (7th Cir.) (applying Missouri law), *cert. denied*, 379 U.S. 932 (1964); National Safe Corp. v. Benedict & Myrick, Inc., 371 So. 2d 792, 795 (La. 1979) (applying LA. CIV. CODE ANN. art. 1901 (West 1977)).

Good faith performance also may be required in specific contexts in any jurisdiction. *See, e.g.*, Wild v. Rarig, 302 Minn. 419, 441–42, 234 N.W.2d 775, 790 (1975), *cert. denied*, 424 U.S. 902 (1976); Singerly v. Thayer, 108 Pa. 291, 298, 2 A. 230, 233 (1885); Atomic Fuel Extraction Corp. v. Estate of Slick, 386 S.W.2d 180, 185 (Tex. Ct. App. 1964); Carpenter & Co. v. Virginia-Carolina Chem. Co., 98 Va. 177, 183, 35 S.E. 358, 360 (1900). Only one case has been found that conceivably could be construed as a rejection of a general obligation of good faith performance. *See* Shoemaker v. Mountain States Tel. & Tel. Co., 38 Colo. App. 321, 325, 559 P.2d 721, 724 (1976). *But see* Eastern Tunneling Corp. v. Southgate Sanitation Dist., 487 F. Supp. 109, 113 (D. Colo. 1980) (applying Colorado law).

# Exhibit 4



Washington State
Courts' Home

Home   Search   Help   ©



Welcome to the online source for the
Washington Civil Jury Instructions

6A WAPRAC WPI 302.11
WPI 302.11 Implied Duty of Good Faith and Fair Dealing

6A Wash. Prac., Wash. Pattern Jury Instr. Civ. WPI 302.11 (6th ed.)

Washington Practice Series TM
Database updated May 2012

Washington Pattern Jury Instructions--Civil
Washington Supreme Court Committee On Jury Instructions

Part XIII. Contracts
Chapter 302. Contracts—Performance and Breach

WPI 302.11 Implied Duty of Good Faith and Fair Dealing

    A duty of good faith and fair dealing is implied in every contract. This duty requires the parties to cooperate with each other so that each may obtain the full benefit of performance. However, this duty does not require a party to accept a material change in the terms of [his] [her] [its] contract.

NOTE ON USE

    Use this instruction whenever the jury requires an explanation of the duty of good faith.
    If it is not clear from the statement of claims instruction, an additional paragraph should be added to inform the jury of the consequence of their finding that a party breached its duty of good faith. See, e.g., the second paragraph of the instruction in WPI 302.08, Excuse of Performance—Interference With Contractual Performance.

COMMENT

    The "implied duty of good faith and fair dealing" in every contract "obligates the parties to cooperate with each other so that each may obtain the full benefit of performance." Badgett v. Security State Bank, 116 Wn.2d 563, 569, 807 P.2d 356 (1991). This obligation, while prohibiting one party from interfering with the other's performance, does not require a party to "affirmatively assist" the other's performance. State v. Trask, 91 Wn.App. 253, 272–73, 957 P.2d 781 (1998).
    Further, the duty of good faith neither obligates a party to accept a material change in the terms of its contract, Betchard-Clayton, Inc. v. King, 41 Wn.App. 887, 890, 707 P.2d 1361 (1985), nor does it "inject substantive terms into the parties' contract." Rather, it requires only that the parties perform in good faith the obligations imposed by their agreement. Barrett v. Weyerhaeuser Co. Severance Pay Plan, 40 Wn.App. 630, 635 n. 6, 700 P.2d 338 (1985). Thus, the duty arises only in connection with terms agreed to by the parties. See Matson v. Emory, 36 Wn.App. 681, 676 P.2d 1029 (1984); Lonsdale v. Chesterfield, 99 Wn.2d 353, 662 P.2d 385 (1983); CHG Intern., Inc. v. Robin Lee Inc., 35 Wn.App. 512, 667 P.2d 1127 (1983); Miller v. Othello Packers, Inc., 67 Wn.2d 842, 843–44, 410 P.2d 33 (1966); Badgett v. Security State Bank, 116 Wn.2d 563, 569, 807 P.2d 356 (1991).
    There is no "free-floating" duty of good faith and fair dealing, unattached to an existing contract; rather, it exists only in relation to performance of a specific contract term. Keystone Land & Development Co. v. Xerox Corp., 152 Wn.2d 171, 177, 94 P.3d 945 (2004); see also Donald B. Murphy Contractors, Inc. v. King County, 112 Wn.App. 192, 197, 49 P.3d 912 (2002) ("If no [specific] contractual duty exists, there is nothing that must be performed in good faith."); Goodyear Tire & Rubber Co. v. Whiteman Tire, Inc., 86 Wn.App. 732, 738–40, 935 P.2d 628 (1997).

Washington Civil Jury Instructions

Washington courts generally do not imply a duty of good faith and fair dealing in at-will employment contracts. Trimble v. Washington State University, 140 Wn.2d 88, 96–97, 993 P.2d 259 (2000); Willis v. Champlain Cable Corp., 109 Wn.2d 747, 748 P.2d 621 (1988). Nevertheless, "under some egregious circumstances an implied covenant of good faith may be appropriate" for these contracts. Trimble v. Washington State University, 140 Wn.2d at 97.

For further discussion of the issues underlying this instruction, see DeWolf and Allen, 25 Washington Practice: Contract Law and Practice § 5:12 (2d ed.).

[Current as of June 2009.]

Westlaw. © 2012 Thomson Reuters. No Claim to Orig. U.S. Govt. Works.

6A WAPRAC WPI 302.11

END OF DOCUMENT

© 2013 Thomson Reuters. No Claim to Orig. U.S. Govt. Works.

