# EXHIBIT U

319

## UNITED STATES INTERNATIONAL TRADE COMMISSION
### Washington, D.C.

In the Matter of

**CERTAIN ELECTRONIC DEVICES,
INCLUDING WIRELESS
COMMUNICATION DEVICES,
PORTABLE MUSIC AND DATA
PROCESSING DEVICES, AND TABLET
COMPUTERS**

Inv. No. 337-TA-794

### NOTICE OF THE COMMISSION'S FINAL DETERMINATION FINDING A VIOLATION OF SECTION 337; ISSUANCE OF A LIMITED EXCLUSION ORDER AND A CEASE AND DESIST ORDER; TERMINATION OF THE INVESTIGATION

**AGENCY:**   U.S. International Trade Commission.

**ACTION:**   Notice.

**SUMMARY:** Notice is hereby given that the U.S. International Trade Commission has found a violation of section 337 in this investigation and has issued a limited exclusion order prohibiting respondent Apple Inc. of Cupertino, California ("Apple"), from importing wireless communication devices, portable music and data processing devices, and tablet computers that infringe claims 75-76 and 82-84 of U.S. Patent No. 7,706,348 ("the '348 patent"). The Commission has also issued a cease and desist order against Apple prohibiting the sale and distribution within the United States of articles that infringe claims 75-76 and 82-84 of the '348 patent. The Commission has found no violation based on U.S. Patent Nos. 7,486,644 ("the '644 patent"), 7,450,114 ("the '114 patent"), and 6,771,980 ("the '980 patent"). The Commission's determination is final, and the investigation is terminated.

**FOR FURTHER INFORMATION:** Clark S. Cheney, Office of the General Counsel, U.S. International Trade Commission, 500 E Street, S.W., Washington, D.C. 20436, telephone (202) 205-2661. Copies of non-confidential documents filed in connection with this investigation are or will be available for inspection during official business hours (8:45 a.m. to 5:15 p.m.) in the Office of the Secretary, U.S. International Trade Commission, 500 E Street, S.W., Washington, D.C. 20436, telephone (202) 205-2000. General information concerning the Commission may also be obtained by accessing its Internet server (*http://www.usitc.gov*). The public record for this investigation may be viewed on the Commission's electronic docket (EDIS) at *http://edis.usitc.gov*. Hearing-impaired persons are advised that information on this matter can be obtained by contacting the Commission's TDD terminal on (202) 205-1810.

**SUPPLEMENTARY INFORMATION:** The Commission instituted this investigation on August 1, 2011, based on a complaint filed by Samsung Electronics Co., Ltd. of Korea and Samsung Telecommunications America, LLC of Richardson, Texas (collectively, "Samsung").

76 *Fed. Reg.* 45860 (Aug. 1, 2011). The complaint alleges violations of section 337 of the Tariff Act of 1930, as amended (19 U.S.C. § 1337), in the importation into the United States, the sale for importation, and the sale within the United States after importation of certain electronic devices, including wireless communication devices, portable music and data processing devices, and tablet computers, by reason of infringement of various U.S. patents. The notice of investigation names Apple as the only respondent. The patents remaining in the investigation are the '348, '644, '114, and '980 patents. The complaint also alleged infringement of U.S. Patent No. 6,879,843, but the investigation with respect to that patent was previously terminated based on withdrawn allegations.

On September 14, 2012, the presiding administrative law judge ("ALJ") issued his final initial determination ("ID") finding no violation of section 337 based on the four patents remaining at issue. The ALJ determined that the '348, '644, and '980 patents are valid but not infringed and that the '114 patent is both invalid and not infringed. The ALJ further determined that the economic prong of the domestic industry requirement was satisfied with respect to the remaining asserted patents, but that the technical prong was not satisfied for any of those patents.

On October 1, 2012, complainant Samsung and the Commission investigative attorney ("IA") filed petitions for review of the ID, while Apple filed a contingent petition for review.

On November 19, 2012, the Commission determined to review the ID in its entirety. 77 *Fed. Reg.* 70464 (Nov. 26, 2012). The Commission issued a public notice requesting written submissions from the parties and the public on various topics, many of which concerned the Commission's authority to issue a remedy for the importation of articles that infringe patents that the patent owner has stated it will license on fair, reasonable, and non-discriminatory ("FRAND") terms. Other topics concerned patent issues specific to this investigation. The Commission received written submissions from Samsung, Apple, and the IA addressing all of the Commission's questions. In response to the FRAND-related topics posed to the public, the Commission received responses from the following: Association for Competitive Technology; Business Software Alliance; Ericsson Inc.; GTW Associates; Hewlett Packard Company; Innovation Alliance; Intel Corporation; Motorola Mobility LLC; Qualcomm Incorporated; Research In Motion Corporation; and Sprint Spectrum, L.P.

On March 13, 2013, the Commission issued another public notice requesting written submissions from the parties and the public on various additional topics, including some FRAND-related topics. 78 *Fed. Reg.* 16865 (March 19, 2013). The Commission received written submissions from Samsung, Apple, and the IA addressing all of the Commission's questions. In response to the FRAND-related topics posed to the public, the Commission received responses from the following: Association for Competitive Technology; Business Software Alliance; Cisco Systems, Inc.; Hewlett Packard Company; Innovation Alliance; Micron Technology, Inc.; and Retail Industry Leaders Association.

Having examined the record of this investigation, including the ALJ's final ID and submissions from the parties and from the public, the Commission has determined that Samsung has proven a violation of section 337 based on articles that infringe claims 75-76 and 82-84 of the '348 patent. The Commission has determined to modify the ALJ's construction of certain terms in the asserted claims of the '348 patent, including "controller," "10 bit TFCI

information," and "puncturing." Under the modified constructions, the Commission has determined that Samsung has proven that the accused iPhone 4 (AT&T models); iPhone 3GS (AT&T models); iPhone 3 (AT&T models); iPad 3G (AT&T models); and iPad 2 3G (AT&T models) infringe the asserted claims of the '348 patent. The Commission has further determined that the properly construed claims have not been proven by Apple to be invalid and that Samsung has proven that a domestic industry exists in the United States with respect to the '348 patent. The Commission has determined that Apple failed to prove an affirmative defense based on Samsung's FRAND declarations.

The Commission has determined that Samsung has not proven a violation based on alleged infringement of the '644, '980, and '114 patents. With some modifications to the ALJ's analysis, the Commission has determined that the asserted claims of the '644 and '980 patents are valid but not infringed and that the asserted claims of the '114 patent are not infringed and are invalid. The Commission has further determined that Samsung did not prove a domestic industry exists in the United States relating to articles protected by the '644, '980, and '114 patents.

The Commission has determined that the appropriate remedy is a limited exclusion order and a cease and desist order prohibiting Apple from importing into the United States or selling or distributing within the United States wireless communication devices, portable music and data processing devices, and tablet computers that infringe claims 75-76 and 82-84 of the '348 patent. The Commission has determined that the public interest factors enumerated in section 337(d)(1) and (f)(1) do not preclude issuance of the limited exclusion order and cease and desist order. The Commission has determined that Samsung's FRAND declarations do not preclude that remedy.

Finally, the Commission has determined that a bond in the amount of zero percent of the entered value is required to permit temporary importation during the period of Presidential review (19 U.S.C. § 1337(j)) of wireless communication devices, portable music and data processing devices, and tablet computers that are subject to the order. The Commission's order and opinion were delivered to the President and to the United States Trade Representative on the day of their issuance.

Commissioner Pinkert dissents on public interest grounds from the determination to issue an exclusion order and cease and desist order.

The authority for the Commission's determination is contained in section 337 of the Tariff Act of 1930, as amended (19 U.S.C. § 1337), and in Part 210 of the Commission's Rules of Practice and Procedure (19 C.F.R. Part 210).

By order of the Commission.

Lisa R. Barton
Acting Secretary to the Commission

Issued:  June 4, 2013

4

323

UNITED STATES INTERNATIONAL TRADE COMMISSION
Washington, D.C.

In the Matter of

**CERTAIN ELECTRONIC DEVICES,
INCLUDING WIRELESS
COMMUNICATION DEVICES,
PORTABLE MUSIC AND DATA
PROCESSING DEVICES, AND TABLET
COMPUTERS**

Inv. No. 337-TA-794

## LIMITED EXCLUSION ORDER

The Commission has determined that there is a violation of Section 337 of the Tariff Act

of 1930, as amended (19 U.S.C. § 1337), in the unlawful importation, sale for importation, and

sale after importation by Respondent Apple, Inc. of certain electronic devices, including wireless

communication devices, portable music and data processing devices, and tablet computers

covered by one or more of claims 75-76 and 82-84 of United States Patent No. 7,706,348 ("the

'348 patent").

Having reviewed the record of this investigation, including the written submissions of the

parties and the public, the Commission has made its determination on the issues of remedy, the

public interest, and bonding. The Commission has determined that the appropriate form of relief

is a limited exclusion order prohibiting the unlicensed entry of infringing electronic devices,

including wireless communication devices, portable music and data processing devices, and

tablet computers, manufactured for or on behalf of Respondent or any of its affiliated companies,

parents, subsidiaries, licensees, or other related business entities, or their successors or assigns.

324

The Commission has also determined that the public interest factors enumerated in 19 U.S.C. § 1337(d) do not preclude the issuance of the limited exclusion order, and that the Respondent may import without posting bond during the Presidential review period.

Accordingly, the Commission hereby **ORDERS** that:

1. Electronic devices, including wireless communication devices, portable music and data processing devices, and tablet computers, covered by one or more of claims 75-76 and 82-84 of the '348 patent and that are manufactured abroad by or on behalf of, or imported by or on behalf of, Respondent or any of its affiliated companies, parents, subsidiaries, or other related business entities, or their successors or assigns, are excluded from entry for consumption into the United States, entry for consumption from a foreign trade zone, or withdrawal from a warehouse for consumption, for the remaining term of the patent, except under license of the patent owner or as provided by law, and except for refurbished articles imported on or before June 3, 2015, for use as a replacement for an identical article that was imported prior to the date of this order.

2. Notwithstanding paragraph 1 of this Order, the aforesaid electronic devices, including wireless communication devices, portable music and data processing devices, and tablet computers are entitled to entry into the United States for consumption, entry for consumption from a foreign-trade zone, or withdrawal from a warehouse for consumption without posting bond, pursuant to subsection (j) of Section 337 (19 U.S.C. § 1337(j)) and the Presidential Memorandum for the United States Trade Representative of July 21, 2005 (70 *Fed. Reg.* 43,251), from the day after this Order is received by the United States Trade Representative until such time as the United

2

States Trade Representative notifies the Commission that this Order is approved or disapproved but, in any event, not later than sixty days after the date of receipt of this Order.

3. At the discretion of U.S. Customs and Border Protection ("CBP") and pursuant to procedures that it establishes, persons seeking to import electronic devices, including wireless communication devices, portable music and data processing devices, and tablet computers, that are potentially subject to this Order may be required to certify that they are familiar with the terms of this Order, that they have made appropriate inquiry, and thereupon state that, to the best of their knowledge and belief, the products being imported are not excluded from entry under paragraph 1 of this Order. At its discretion, CBP may require persons who have provided the certification described in this paragraph to furnish such records or analyses as are necessary to substantiate the certification.

4. In accordance with 19 U.S.C. § 1337(l), the provisions of this Order shall not apply to electronic devices, including wireless communication devices, portable music and data processing devices, and tablet computers, imported by and for the use of the United States, or imported for, and to be used for, the United States with the authorization or consent of the Government.

5. The Commission may modify this Order in accordance with the procedures described in section 210.76 of the Commission's Rules of Practice and Procedure (19 C.F.R. § 210.76).

3

326

6. The Secretary shall serve copies of this Order upon each party of record in this investigation and upon the Department of Health and Human Services, the Department of Justice, the Federal Trade Commission, and CBP.

7. Notice of this Order shall be published in the *Federal Register*.

By order of the Commission.

Lisa R. Barton
Acting Secretary to the Commission

Issued: June 4, 2013

4

UNITED STATES INTERNATIONAL TRADE COMMISSION
Washington, D.C.

In the Matter of

**CERTAIN ELECTRONIC DEVICES, INCLUDING WIRELESS COMMUNICATION DEVICES, PORTABLE MUSIC AND DATA PROCESSING DEVICES, AND TABLET COMPUTERS**

Inv. No. 337-TA-794

## CEASE AND DESIST ORDER

**IT IS HEREBY ORDERED THAT** Apple Inc., 1 Infinite Loop, Cupertino, CA 95014, cease and desist from conducting any of the following activities in the United States: importing, selling, marketing, advertising, distributing, transferring (except for exportation), and soliciting U.S. agents or distributors for, electronic devices, including wireless communication devices, portable music and data processing devices, and tablet computers, covered by one or more of claims 75-76 and 83-84 of United States Patent No. 7,706,348 ("the '348 patent") in violation of Section 337 of the Tariff Act of 1930, as amended (19 U.S.C. § 1337).

## I.
### Definitions

As used in this order:

(A)     "Commission" shall mean the United States International Trade Commission.

(B)     "Complainants" shall mean Samsung Electronics Co., Ltd. ("SEC"), of Seoul, South Korea; and Samsung Telecommunications America, LLC ("STA"), of Richardson, Texas.

328

(C)   "Respondent" shall mean Apple Inc., 1 Infinite Loop, Cupertino, CA 95014.

(D)   "Person" shall mean an individual, or any non-governmental partnership, firm, association, corporation, or other legal or business entity other than Respondent or its majority-owned or controlled subsidiaries, successors, or assigns.

(E)   "United States" shall mean the fifty States, the District of Columbia, and Puerto Rico.

(F)   The terms "import" and "importation" refer to importation for entry for consumption under the Customs laws of the United States.

(G)   The term "covered products" shall mean electronic devices, including wireless communication devices, portable music and data processing devices, and tablet computers, covered by one or more of claims 75-76 and 82-84 of the '348 patent. Covered products shall not include articles for which a provision of law or license avoids liability for infringement of claims 75-76 and 82-84 of the '348 patent.

## II.
## Applicability

The provisions of this Cease and Desist Order shall apply to Respondent and to any of its principals, stockholders, officers, directors, employees, agents, licensees, distributors, controlled (whether by stock ownership or otherwise) and majority-owned business entities, successors, and assigns, and to each of them, insofar as they are engaging in conduct prohibited by section III, *infra*, for, with, or otherwise on behalf of, Respondent.

## III.
## Conduct Prohibited

The following conduct of Respondent in the United States is prohibited by this Order. For the remaining term of the '348 patent, Respondent shall not:

2

329

(A)     import or sell for importation into the United States covered products;

(B)     market, distribute, sell, or otherwise transfer (except for exportation), in the
        United States imported covered products;

(C)     advertise imported covered products;

(D)     solicit U.S. agents or distributors for imported covered products; or

(E)     aid or abet other entities in the importation, sale for importation, sale after
        importation, transfer, or distribution of covered products.

## IV.
## Conduct Permitted

Notwithstanding any other provision of this Order, Respondent shall be permitted:

(A)     on or before June 3, 2015, to distribute refurbished covered articles for use as a
        replacement for an identical covered article that was imported prior to the date of
        this order;

(B)     to engage in specific conduct otherwise prohibited by the terms of this Order if, in
        a written instrument, the owner of the '348 patent licenses or authorizes such
        specific conduct; or

(C)     to engage in specific conduct otherwise prohibited by the terms of this Order if
        such specific conduct is related to the importation or sale of covered products by
        or for the United States.

## V.
## Reporting

For purposes of this requirement, the reporting periods shall commence on February 1 of
each year and shall end on the subsequent January 31. The first report required under this
section shall cover the period from the date of issuance of this order through January 31, 2014.

3

330

This reporting requirement shall continue in force until such time as Respondent has truthfully reported, in two consecutive timely filed reports, that it has no inventory of covered products in the United States.

Within thirty (30) days of the last day of the reporting period, Respondent shall report to the Commission: (a) the quantity in units and the value in dollars of covered products that it has (i) imported and/or (ii) sold in the United States after importation during the reporting period, and (b) the quantity in units and value in dollars of reported covered products that remain in inventory in the United States at the end of the reporting period. When filing written submissions, Respondent must file the original document electronically on or before the deadlines stated above and submit eight (8) true paper copies to the Office of the Secretary by noon the next day pursuant to section 210.4(f) of the Commission's Rules of Practice and Procedure (19 C.F.R. § 210.4(f)). Submissions should refer to the investigation number ("Inv. No. 337-TA-794") in a prominent place on the cover pages and/or the first page. (*See* Handbook for Electronic Filing Procedures, http://www.usitc.gov/secretary/fed_reg_notices/ rules/handbook_on_electronic_filing.pdf). Persons with questions regarding filing should contact the Secretary (202-205-2000). If Respondent desires to submit a document to the Commission in confidence, it must file the original and a public version of the original with the Office of the Secretary and must serve a copy of the confidential version on Complainants' counsel.[1]

---

[1] Complainants must file a letter with the Secretary identifying the attorney to receive reports and bond information associated with this order. The designated attorney must be on the protective order entered in the investigation.

4

331

Any failure to make the required report or the filing of any false or inaccurate report shall constitute a violation of this Order, and the submission of a false or inaccurate report may be referred to the U.S. Department of Justice as a possible criminal violation of 18 U.S.C. § 1001.

## VI.
## Record-Keeping and Inspection

(A)    For the purpose of securing compliance with this Order, Respondent shall retain any and all records relating to the sale, offer for sale, marketing, or distribution in the United States of covered products, made and received in the usual and ordinary course of business, whether in detail or in summary form, for a period of three (3) years from the close of the fiscal year to which they pertain.

(B)    For the purposes of determining or securing compliance with this Order and for no other purpose, subject to any privilege recognized by the federal courts of the United States, and upon reasonable written notice by the Commission or its staff, duly authorized representatives of the Commission shall be permitted access and the right to inspect and copy, in Respondent's principal offices during office hours, and in the presence of counsel or other representatives if Respondent so chooses, all books, ledgers, accounts, correspondence, memoranda, and other records and documents, in detail and in summary form, that must be retained under subparagraph VI(A) of this Order.

## VII.
## Service of Cease and Desist Order

Respondent is ordered and directed to:

(A)    Serve, within fifteen days after the effective date of this order, a copy of this Order upon each of its respective officers, directors, managing agents, agents, and

employees who have any responsibility for the importation, marketing, distribution, or sale of imported covered products in the United States;

(B)     Serve, within fifteen days after the succession of any persons referred to in subparagraph VII(A) of this order, a copy of the order upon each successor; and

(C)     Maintain such records as will show the name, title, and address of each person upon whom the order has been served, as described in subparagraphs VII( A) and VII(B) of this order, together with the date on which service was made.

The obligations set forth in subparagraphs VII(B) and VII(C) shall remain in effect until the'348 patent expires.

## VIII.
## Confidentiality

Any request for confidential treatment of information obtained by the Commission pursuant to section VI of this order should be made in accordance with section 201.6 of the Commission's Rules of Practice and Procedure (19 C.F.R. § 201.6). For all reports for which confidential treatment is sought, Respondent must provide a public version of such report with confidential information redacted.

## IX.
## Enforcement

Violation of this order may result in any of the actions specified in section 210.75 of the Commission's Rules of Practice and Procedure (19 C.F.R. § 210.75), including an action for civil penalties under section 337(f) of the Tariff Act of 1930 (19 U.S.C. § 1337(f)), as well as any other action that the Commission deems appropriate. In determining whether Respondent is in violation of this order, the Commission may infer facts adverse to Respondent if it fails to provide adequate or timely information.

## X.
## Modification

The Commission may amend this order on its own motion or in accordance with the procedure described in section 210.76 of the Commission's Rules of Practice and Procedure (19 C.F.R. § 210.76).

## XI.
## Bonding

The conduct prohibited by section III of this order may be continued during the sixty-day period in which this order is under review by the United States Trade Representative, as delegated by the President (70 *Fed. Reg.* 43,251 (Jul. 21, 2005)), without Respondent posting a bond.

By order of the Commission.

Lisa R. Barton
Acting Secretary to the Commission

Issued:  June 4, 2013

334

CERTAIN ELECTRONIC DEVICES, INCLUDING WIRELESS          Inv. No. 337-TA-794
COMMUNICATION DEVICES, PORTABLE MUSIC AND DATA
PROCESSING DEVICES, AND TABLET COMPUTERS

## PUBLIC CERTIFICATE OF SERVICE

I, Lisa R. Barton, hereby certify that the attached **NOTICE** has been served by hand upon, the Commission Investigative Attorney, Lisa Murray, Esq., and the following parties as indicated on **June 4, 2013.**

Lisa R. Barton, Acting Secretary
U.S. International Trade Commission
500 E Street, SW, Room 112
Washington, DC  20436

**On Behalf of Complainants Samsung Electronics., Ltd. and Samsung Telecommunications America, LLC:**

S. Alex Lasher, Esq.                                    (   ) Via Hand Delivery
**QUINN EMANUEL URQUHART & SULLIVAN LLP**               (  ) Via Overnight Delivery
1299 Pennsylvania Ave., NW                              (   ) Via First Class Mail
Washington, DC  20004                                   (   ) Other:_____

**On Behalf of Respondent Apple Inc.:**

Nina S. Tallon, Esq.                                    (   ) Via Hand Delivery
**WILMER CUTLER PICKERING HALE AND DORR**               (  ) Via Overnight Delivery
**LLP**                                                 (   ) Via First Class Mail
1875 Pennsylvania Avenue, NW                            (   ) Other:_____
Washington, DC  20006



News, Quotes, Companies, Videos      SEARCH

$1 A WEEK for 12 WEEKS      SUBSCRIBE NOW

U.S. EDITION     Tuesday, June 4, 2013 As of 8:10 PM EDT                    Subscribe   Log In

Home   World   U.S.   New York   Business   **Tech**   Markets   Market Data   Opinion   Life & Culture   Real Estate   Management   C-Suite

Digits   Personal Technology   What They Know   All Things Digital   CIO Journal

TOP STORIES IN WSJ                                                                    1 of 12
Dq Hduo|#Z durlqj#
Derxw#Ddurq#
Khuqdqgh}                                    1 of 12

P ruvl Rxwhg#|#lj|swv##                       2 of 12
P lowdu|

Ehojldq N lqj#
Deglfdwhv                                     3 of 12

Ehnwri#wkh# he#
Wrgd|#Nkh#dfh#rd#
H{wqp lvp                                     4 of 12

TECHNOLOGY   |   Updated June 4, 2013, 8:10 p.m. ET

# Uxdqj Ecrfnv#Skrqh#Vddnv#

*If Upheld, Decision Favoring Samsung Would Halt Sales of Older iPhones, iPads*

Article    Video    Stock Quotes    Comments (82)                    MORE IN TECH »

Email    Print

SUBSCRIBER CONTENT PREVIEW

FOR FULL ACCESS:   LOG IN   OR   SUBSCRIBE NOW - $1 A WEEK FOR 12 WEEKS

By IAN SHERR and JESSICA E. LESSIN

Samsung Electronics won a significant legal victory against Apple: a U.S. International Trade Commission ruling that threatens to halt U.S. sales of some older iPhones and iPads. The WSJ's Min-Jeong Lee has the story.

Samsung Electronics Co.  005930.SE -2.55%  won a significant legal victory against Apple Inc.  AAPL +0.55%  that threatens to halt the sale of some iPhones and iPads in the U.S.

The U.S. International Trade Commission on Tuesday ruled that Apple violated a Samsung patent covering technology used to send information over wireless networks.

George Stahl explains the ramifications of a significant victory Samsung won over Apple in its patent case and how it is likely to result in a series of cross-licensing agreements between the companies. Photo: Getty Images.

Unless vetoed by President Barack Obama or blocked by an appeals court, the ruling would bar the importation of certain iPhones and iPads made to work on AT&T Inc.'s  T +0.25%  network. Among them are the iPhone 4, the iPhone 3GS, the iPad 3G, the iPad 2 3G and the iPad 3.

We serve small and mid-market businesses.
BridgeBank  Be bold, venture wisely.
Member FDIC

THE NEW PORTFOLIO TOOL ON WSJ.COM:
THE ULTIMATE INVESTMENT TRACKER
AVAILABLE EXCLUSIVELY FOR SUBSCRIBERS
LEARN MORE
provided by LikeAssets

**Popular Now**                    What's This?

4   **Morsi Ousted by Egypt's Military**

5   **A Novel Way to Fund College**

6   **Truckers Lose Sleep Over New Rest Rules**

7   **Fans Take Videogame Damsels Out of**

336

---

**More**

*Full text of the ruling*

**Tech Firms Back Obama Patent Move**

**All Things Digital:** Apple Says New Campus Will Pump Jobs, Money Into Cupertino

**Apple, AT&T Vulnerable to ITC Ruling**

The latest Apple products, including the iPhone 5 and the fourth-generation of the iPad, were unaffected.

Once close business partners, Samsung and Apple have become increasingly intense rivals, sparring over the market for smartphones around the globe, with much of the momentum accruing to Samsung in recent months.

The rivalry has spilled into the courts, where barrages of competing patent claims have been lobbed in both directions. Last year, Apple won a jury trial and $1 billion in damages against Samsung over iPhone patents. Tuesday's ruling, which Apple has vowed to take to a federal appeals court, raises the incentives for the two sides to reach a more comprehensive settlement. But so far, both sides offered no hint at a settlement.



**STREAM**

Dsschy1Vdp vxqj=Sdwhqw

WSJ BLOGS        JUN 25, 2013

**Tokyo Court Upholds Samsung Win Vs Apple in Patent Case**
The Tokyo High Court on Tuesday rejected Apple Inc.'s appeal and upheld an

TWITTER        JUN 21, 2013

**Ian Sherr** iansherr
Tim Cook, #Apple's CEO, asks the board to give equity awards based on performance: http://t.co/noGi8bivLm

TWITTER        JUN 20, 2013

**Ian Sherr** iansherr
Reading @WSJ archives, I stumbled on a really cool little piece of #Apple history: http://t.co/VCvqW3L4Ym

GO TO FULL STREAM »

The ruling also came on the day Mr. Obama took steps to rein in companies that buy and enforce patents rather than make their own products and services—firms known as patent trolls by their detractors. He is also trying to reduce the growing use of the ITC to settle patent disputes.

The ITC, which has jurisdiction over certain trade practices, is an appealing legal option for patent holders, particularly tech companies, because the trade body can issue orders banning the importation of products that infringe upon another company's patents. Legal observers say it is easier to win an import ban at the ITC than it is to win a federal court ruling that would block product sales.

The ITC's decision against Apple was largely unexpected, particularly because the initial review by a judge at the agency had found Apple's products weren't infringing Samsung's patents.

The patent itself is a highly technical one, described in patent documents as "an apparatus and method for encoding/decoding a transport format combination indicator (TFCI) in a CDMA mobile communication system."

Dxglr
Listen to the latest technology news from The Wall Street Journal Radio Network.

00:00 | 00:00

"We are disappointed that the Commission has overturned an earlier ruling and we plan to appeal," said Kristin Huguet, an Apple spokeswoman. She said the decision "has no impact on the availability of Apple products in the United States."

Apple doesn't detail sales for each individual product in its quarterly reports, but it has said that the iPhone makes up more than half of its global revenue. Sales in America, where the ban would take place, represented less than a third of overall sales. And aside from the iPhone 4S, which Apple said is popular with customers, the company hasn't detailed sales of its older models.

Gene Munster, an analyst at Piper Jaffray, estimates that world-wide sales of the iPhone 4—which stands to be affected by the ITC order—brought Apple $3.4 billion in revenue in the quarter ended in March. That compares with his estimate of $14.9 billion for the newer iPhone 5, which isn't affected.

---

**Distress, Put Them in...**

8    **Opinion: Best of the Web Today: The Face of Extremism**



Show 5 More

---

**Available to WSJ.com Subscribers**



Sruxjxhvh Frdwhq#
Z runv#r#/xuylh

Wrn|r•vHfrqrp lf#Sdq#/vluv#Krsh#dqg#Thdu



Nrfk Eurwkhv#Dqjdn#iru#Eljjhu#Urdn#q#
Ghdov



Hj|swUhyro#Uhidfw#Heelqj#Lvdp lwv#Vzd|

---

$1 A WEEK FOR 12 WEEKS        SUBSCRIBE NOW

---

**More in Tech**

Z kr Z lq#P dqdjh#P lfurvrw#f{er{E#

Idqy Wdnh#'lghrjdp h#Gdp vhov#xr#r#G lvuhvv#Bxvnhhp#iq#Fkdujh

X $1/1Edfnlqj#Kqohhq#du#'l@#Eddkflh#Wrz#hug#f#Fpdg#Frdx#

Vdp vxqj#v K ljk#l{si#shfwdwrqv#

Vdp vxqj Z lqv#P yhh#l{ydq#Uldydy#Vhfxhm#Vkdwv#l#vpp

---

block product sales.

The iPhone 4 has been marketed as a low-cost option alongside newer models. AT&T offers it for as little as 99 cents with a new contract. An AT&T spokesman didn't return a request for comment.

Apple's Ms. Huguet added that "Samsung is using a strategy which has been rejected by courts and regulators around the world."

Adam Yates, a spokesman for Samsung, said the decision affirmed the company's patents. "We believe the ITC's Final Determination has confirmed Apple's history of free-riding on Samsung's technological innovations," he said.


AP

The Apple store in Santa Monica, Calif.

The ITC ruled against a key Apple theory across its recent litigation, which seeks to limit plaintiffs from using a broad class of patents to win injunctions against sales of infringing products. Such patents are submitted to industry groups that are setting key technology standards, and are deemed as essential to create products in certain categories—such as creating handsets that can communicate using a particular generation of cellular networks.

Apple has argued that in return for becoming part of an industry standard, companies usually promise those groups to license use of their patented technology under fair and reasonable terms. Apple says Samsung isn't doing that.

But the ITC said Apple's argument wasn't valid, potentially hurting Apple's continuing efforts to change the way standards-based patents are used in legal cases.

Brian Love, an assistant professor of law at Santa Clara University School of Law, said it was unclear whether Apple could find a technical workaround for the ruling. He said that companies are sometimes "overzealous" about labeling patents as essential parts of technology standards.

Kevin Taylor, an intellectual property lawyer at Schnader Harrison Segal & Lewis LLP, said this is "a solid win for Samsung."

But he said whether it would set any precedent would depend on the outcome of any appeal in federal court. He said it wouldn't be unusual for a court to temporarily delay the ruling from going into effect, allowing Apple to continue selling its devices during the appeal, which could take months or longer.

But, Mr. Taylor said, if "upheld on appeal, Apple has a big problem."

Lyle Vander Schaaf, an intellectual property lawyer at Brinks Hofer Gilson & Lione, noted that it is rare for federal appeals courts to delay exclusion orders during appeals. And presidential vetoes are even more rare.

There hasn't been a veto "since the Carter administration," he said. "On first blush, this seems like a really impactful decision."

—Don Clark and Brent Kendall contributed to this article.

**Write to** Ian Sherr at ian.sherr@dowjones.com and Jessica E. Lessin at jessica.lessin@wsj.com

*A version of this article appeared June 5, 2013, on page A1 in the U.S. edition of The Wall Street Journal, with the headline: Ruling Blocks iPhone Sales.*

**JOIN THE DISCUSSION**
**82 Comments, add yours**

MORE IN
**Tech »**

**Watch Tech Videos**
A vast collection of cutting-edge gaming and tech videos.
www.mypodstudios.com

**World News News**
Get Breaking News, Headlines & Top Stories With The Free News Toolbar
www.OnlineInsider.com

**www.WorldWideNews.us**
News from around the world
worldwidenews.us

Subscribe / Login                    Back to Top

Customer Service
Customer Center
New! Live Help
Contact Us
WSJ Weekend
Contact Directory
Corrections

Policy
Privacy Policy
Data Policy
Copyright Policy
Subscriber Agreement
& Terms of Use

Ads
Your Ad Choices
Advertise
Advertise Locally
Place a Classified Ad

Tools & Features
Apps
Newsletters and Alerts
Graphics & Photos
Columns
Topics
Guides
Portfolio
Old Portfolio

More
Register for Free
Reprints
Content Partnerships
Conferences
SafeHouse
Mobile Site
News Archive

# EXHIBIT V

UNITED STATES DEPARTMENT OF JUSTICE AND
UNITED STATES PATENT & TRADEMARK OFFICE

POLICY STATEMENT ON REMEDIES FOR STANDARDS-ESSENTIAL PATENTS SUBJECT TO
VOLUNTARY F/RAND COMMITMENTS

January 8, 2013

The U.S. Department of Justice, Antitrust Division (DOJ), and the U.S. Patent &
Trademark Office (USPTO), an agency of the U.S. Department of Commerce, provide
the following perspectives on a topic of significant interest to the patent and standards-
setting communities: whether injunctive relief in judicial proceedings or exclusion orders
in investigations under section 337 of the Tariff Act of 1930[1] are properly issued when a
patent holder seeking such a remedy asserts standards-essential patents that are
encumbered by a RAND or FRAND licensing commitment.[2]

The patent system promotes innovation and economic growth by providing
incentives to inventors to apply their knowledge, take risks, and make investments in
research and development and by publishing patents so that others can build on the
disclosed knowledge with further innovations. These efforts, in turn, benefit society as a
whole by disseminating knowledge and by providing new and valuable technologies,

---

[1] Although the focus of the present policy statement is on exclusion orders issued pursuant to 19 U.S.C. §
1337, similar principles apply to the granting of injunctive relief in U.S. federal courts, which is governed
by the standards set forth by the U.S. Supreme Court in *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388
(2006). The present policy statement is not, however, intended to be a complete legal analysis of injunctive
relief under the *eBay* standard.

[2] For purposes of this statement, a patent is RAND- or FRAND-encumbered where a patent holder has
voluntarily agreed to license the patent on reasonable and non-discriminatory (RAND) terms or fair,
reasonable, and non-discriminatory (FRAND) terms while participating in standards-setting activities at a
standards-developing organization (SDO). In the United States, SDO members may commit to license all
of their patents that are essential to the SDO standard on RAND terms. In other jurisdictions, SDO
members may commit to license such patents on FRAND terms. For the purposes of this letter, F/RAND
refers to both types of licensing commitments. Commentators frequently use the terms interchangeably to
denote the same substantive type of commitment.

lower prices, improved quality, and increased consumer choice.[3]   The DOJ and USPTO
recognize that the right of a patent holder to exclude others from practicing patented
inventions is fundamental to obtaining these benefits.  It is incorporated into section 337
of the Tariff Act of 1930 itself, which forbids the unlawful "importation into the United
States . . . of articles that . . . infringe a valid and enforceable United States patent."[4]  As
noted in the Administration's 2010 Joint Strategic Plan on Intellectual Property
Enforcement, "[s]trong enforcement of intellectual property rights is an essential part of
the Administration's efforts to promote innovation and ensure that the U.S. is a global
leader in creative and innovative industries."[5]   Accordingly, as historically has been the
case, exclusion typically is the appropriate remedy when an imported good infringes a
valid and enforceable U.S. patent.

Standards, and particularly voluntary consensus standards set by standards-
developing organizations (SDOs), have come to play an increasingly important role in
our economy.[6]  Voluntary consensus standards, i.e., agreements containing technical

---

[3] *See, e.g.*, OFFICE OF THE U.S. INTELLECTUAL PROP. ENFORCEMENT COORDINATOR, OFFICE OF MGMT. &
BUDGET, EXEC. OFFICE OF THE PRESIDENT, 2010 JOINT STRATEGIC PLAN ON INTELLECTUAL PROP.
ENFORCEMENT 3 (2010) [hereinafter 2010 JOINT STRATEGIC PLAN],
http://www.whitehouse.gov/sites/default/files/omb/assets/intellectualproperty/intellectualproperty_strategic
_plan.pdf.  ("Enforcement of intellectual property rights is a critical and efficient tool we can use, as a gov-
ernment, to strengthen the economy, support jobs and promote exports. Intellectual property supports jobs
across all industries, and in particular where there is a high degree of creativity, research and innovation.").

[4] 19 U.S.C. § 1337(a)(1)(B)(i) (2006).

[5] 2010 JOINT STRATEGIC PLAN, *supra* note 3, at 4.

[6] Congress and the Executive Branch have recognized the benefits of voluntary consensus standards.  SDOs
play an essential role in the development of such standards.  *See, e.g.*, National Technology Transfer and
Advancement Act of 1995, Pub. L. No. 104-113 § 12(d), 110 Stat. 775, 783 (1996), 15 U.S.C. § 272 note
(2006)); OFFICE OF MGMT. & BUDGET, EXEC. OFFICE OF THE PRESIDENT, OMB CIRCULAR A-119, FED.
PARTICIPATION IN THE DEV. AND USE OF VOLUNTARY CONSENSUS STANDARDS AND IN CONFORMITY
ASSESSMENT ACTIVITIES (1998), www.whitehouse.gov/omb/circulars_a119; *see also* Mem. from the Exec.

specifications or other criteria, are generally produced by private-sector organizations engaged in the development of standards.[7]

Voluntary consensus standards serve the public interest in a variety of ways, from helping protect public health and safety to promoting efficient resource allocation and production by facilitating interoperability among complementary products.[8] Interoperability standards have paved the way for moving many important innovations into the marketplace, including the complex communications networks and sophisticated mobile computing devices that are hallmarks of the modern age.  Indeed, voluntary consensus standards, whether mechanical, electrical, computer-related, or communications-related, have incorporated important technical advances that are

---

Office of the President on the Principles for Fed. Engagement in Standards Activities to Address Nat'l Priorities for the Heads of Exec. Dep'ts and Agencies (Jan. 17, 2012), http://www.whitehouse.gov/sites/default/files/omb/memoranda/2012/m-12-08_1.pdf.

[7] Participation in their development is optional and the resulting standards are generally intended for voluntary use.  U.S. Dep't of Commerce, Standards and Competitiveness: Coordinating for Results 5 (2004), http://www.ita.doc.gov/td/standards/pdf%20files/Standards%20and%20Competitiveness.pdf. In the United States alone, there are approximately 50,000 private-sector voluntary standards developed by more than 600 organizations.  *See Overview of the U.S. Standardization System*, Am. Nat'l Standards Inst., http://www.standardsportal.org/usa_en/standards_system.aspx (last visited Dec. 7, 2012).  The U.S. standards system is tremendously diverse, resulting in a system that is largely sectoral in focus.  This is a logical approach because SDOs developing standards for use in each industrial sector, such as the information technology, telecommunications, automotive, medical devices, and building technology sectors, are most likely to understand that sector's needs and to know what standards best meet those needs. Many products, including those in the telecommunications sector, are based on multiple voluntary consensus standards developed by a number of different SDOs with different patent-licensing policies.

[8] Due to the important role of F/RAND-licensed intellectual property in the standards process, we understand that the National Science and Technology Council Subcommittee on Standards, which includes broad representation from stakeholder agencies, plans to study this issue to explore any broader potential impacts of this, and other, related policies.

fundamental to the interoperability of many of the products on which consumers have come to rely.[9]

However, collaborative standards setting does not come without some risks.  For example, when a standard incorporates patented technology owned by a participant in the standards-setting process, and the standard becomes established, it may be prohibitively difficult and expensive to switch to a different technology within the established standard or to a different standard entirely.  As a result, the owner of that patented technology may gain market power and potentially take advantage of it by engaging in patent hold-up, which entails asserting the patent to exclude a competitor from a market or obtain a higher price for its use than would have been possible before the standard was set, when alternative technologies could have been chosen.  This type of patent hold-up can cause other problems as well.  For example, it may induce prospective implementers to postpone or avoid making commitments to a standardized technology or to make inefficient investments in developing and implementing a standard in an effort to protect themselves.  Consumers of products implementing the standard could also be harmed to the extent that the hold-up generates unwarranted higher royalties and those royalties are passed on to consumers in the form of higher prices.[10]

---

[9] *See* SUBCOMM. ON STANDARDS, NAT'L SCI. & TECH. COUNCIL, OFFICE OF SCI. & TECH. POLICY, EXEC. OFFICE OF THE PRESIDENT, FED. ENGAGEMENT IN STANDARDS ACTIVITIES TO ADDRESS NAT'L PRIORITIES: BACKGROUND AND PROPOSED POLICY RECOMMENDATIONS 1 (Oct. 10, 2011), http://standards.gov/upload/Federal_Engagement_in_Standards_Activities_October12_final.pdf.

[10] *See* U.S. DEP'T OF JUSTICE & FED. TRADE COMM'N, ANTITRUST ENFORCEMENT AND INTELLECTUAL PROPERTY RIGHTS: PROMOTING INNOVATION AND COMPETITION 35-36 (2007), http://www.justice.gov/atr/public/hearings/ip/222655.htm.

In an effort to reduce the occurrences of opportunistic conduct in the adoption of voluntary consensus standards, while encouraging participants to include the best available technology in standards, some SDOs have relied on voluntary licensing commitments by their participants, including commitments to license the patents they own that are essential to the standard on F/RAND terms. SDOs and their members rely on these voluntary F/RAND commitments to facilitate the bilateral licensing negotiations necessary for successful widespread adoption of a standard and to provide assurances to implementers of the standard that the patented technologies will be available to parties seeking to license them.[11]

In making such voluntary F/RAND licensing commitments, patent holders that also sell products and services related to the standard benefit from expanded marketing opportunities, and patent holders that focus on licensing their inventions benefit from an expanded source of revenues. These incentives encourage patent holders to contribute their best technology to the standardization process. F/RAND commitments may also contribute to increased follow-on innovation by allowing non-discriminatory access to networks both to new entrants and to established market participants to introduce new generations of network-operable devices.[12] In light of these and other potential benefits, the United States continues to encourage systems that support voluntary F/RAND licensing—both domestically and abroad—rather than the imposition of one-size-fits-all

---

[11] By participating in the standards-setting activities at the SDO and by voluntarily making a F/RAND licensing commitment under the SDO's policies, the patent holder may be implicitly acknowledging that money damages, rather than injunctive or exclusionary relief, is the appropriate remedy for infringement in certain circumstances, as discussed below.

[12] *See* Letter from Thomas O. Barnett, Assistant Att'y Gen., U.S. Dep't of Justice, to Robert A. Skitol, Esq. 7 (Oct. 30, 2006), http://www.usdoj.gov/atr/public/busreview/219380.pdf.

344

mandates for royalty-free or below-market licensing, which would undermine the effectiveness of the standardization process and incentives for innovation.

A patent owner's voluntary F/RAND commitments may also affect the appropriate choice of remedy for infringement of a valid and enforceable standards-essential patent.  In some circumstances, the remedy of an injunction or exclusion order may be inconsistent with the public interest.  This concern is particularly acute in cases where an exclusion order based on a F/RAND-encumbered patent appears to be incompatible with the terms of a patent holder's existing F/RAND licensing commitment to an SDO.  A decision maker could conclude that the holder of a F/RAND-encumbered, standards-essential patent had attempted to use an exclusion order to pressure an implementer of a standard to accept more onerous licensing terms than the patent holder would be entitled to receive consistent with the F/RAND commitment—in essence concluding that the patent holder had sought to reclaim some of its enhanced market power over firms that relied on the assurance that F/RAND-encumbered patents included in the standard would be available on reasonable licensing terms under the SDO's policy.[13]  Such an order may harm competition and consumers by degrading one of the tools SDOs employ to mitigate the threat of such opportunistic actions by the holders of F/RAND-encumbered patents that are essential to their standards.

---

[13] Moreover, this type of hold-up may be exacerbated when patents are sold or otherwise transferred by their owners.  If F/RAND licensing obligations do not travel with a transferred patent , the potential for hold-up from the network effects of a standard may be substantially increased.  For this reason, we believe that F/RAND commitments should bind subsequent patent transferees.  *See* Renata B. Hesse, Deputy Assistant Att'y Gen., Antitrust Div., U.S. Dep't of Justice, Six "Small" Proposals for SSOs before Lunch: Remarks as Prepared for the ITU-T Patent Roundtable (Oct. 10, 2012), http://www.justice.gov/atr/public/speeches/287855.pdf.

This is not to say that consideration of the public interest factors set out in the statute would always counsel against the issuance of an exclusion order to address infringement of a F/RAND-encumbered, standards-essential patent.  An exclusion order may still be an appropriate remedy in some circumstances, such as where the putative licensee is unable or refuses to take a F/RAND license and is acting outside the scope of the patent holder's commitment to license on F/RAND terms.[14]  For example, if a putative licensee refuses to pay what has been determined to be a F/RAND royalty, or refuses to engage in a negotiation to determine F/RAND terms, an exclusion order could be appropriate.  Such a refusal could take the form of a constructive refusal to negotiate, such as by insisting on terms clearly outside the bounds of what could reasonably be considered to be F/RAND terms in an attempt to evade the putative licensee's obligation to fairly compensate the patent holder.[15]  An exclusion order also could be appropriate if a putative licensee is not subject to the jurisdiction of a court that could award damages. This list is not an exhaustive one.  Rather, it identifies relevant factors when determining whether public interest considerations should prevent the issuance of an exclusion order

---

[14] As courts have found, when a holder of a standards-essential patent makes a commitment to an SDO to license such patents on F/RAND terms, it does so for the intended benefit of members of the SDO and third parties implementing the standard.  These putative licensees are beneficiaries with rights to sue for breach of that commitment.  *See Microsoft Corp. v. Motorola, Inc.,* 864 F. Supp. 2d 1023, 1030-33 (W.D. Wash. 2012); *Microsoft Corp. v. Motorola, Inc.,* 854 F. Supp. 2d 993, 999-1001 (W.D. Wash. 2012); *see also Microsoft Corp. v. Motorola, Inc.,* 696 F.3d 872, 884 (9th Cir. 2012) (holding that the "district court's conclusions that Motorola's RAND declarations to the ITU created a contract enforceable by Microsoft as a third-party beneficiary (which Motorola concedes), and that this contract governs in some way what actions Motorola may take to enforce its ITU standard-essential patents (including the patents at issue in the German suit), were not legally erroneous"); *Apple, Inc. v. Motorola Mobility, Inc.,* --- F. Supp. 2d ---, No. 11-cv-178bbc, 2012 WL 3289835, at *21-22 (W.D. Wis. Aug. 10, 2012); *Apple, Inc. v. Motorola Mobility, Inc.,* No. 11-cv-178bbc, 2011 WL 7324582, at *7-11 (W.D. Wis. June 10, 2011).

[15] We recognize that the risk of a refusal to license decreases where the putative licensee perceives a cost associated with delay and increases where the putative licensee believes its worst-case outcome after litigation is to pay the same amount it would have paid earlier for a license.

based on infringement of a F/RAND-encumbered, standards-essential patent or when shaping such a remedy.

Voluntary consensus standards-setting activities benefit consumers and are in the public interest. Although we recommend caution in granting injunctions or exclusion orders based on infringement of voluntarily F/RAND-encumbered patents essential to a standard, DOJ and USPTO strongly support the protection of intellectual property rights and believe that a patent holder who makes such a F/RAND commitment should receive appropriate compensation that reflects the value of the technology contributed to the standard. It is important for innovators to continue to have incentives to participate in standards-setting activities and for technological breakthroughs in standardized technologies to be fairly rewarded. By providing these views on ways in which opportunistic conduct by patent holders and putative licensees may be mitigated, the DOJ and USPTO seek to ensure that there is greater certainty concerning the meaning of a F/RAND commitment so that incentives to participate in voluntary consensus standards-setting activities continue to be strong.

The DOJ is the executive-branch agency charged with protecting U.S. consumers by promoting and protecting competition. The USPTO, an agency of the Department of Commerce, is the executive-branch agency charged with responsibility for examining patent applications, issuing patents, and—through the Secretary of Commerce—advising the President on domestic and certain international issues of intellectual property policy.[16] The DOJ and USPTO are concerned about the potential impact of exclusion

---

[16] *See* 35 U.S.C. §§ 1, 2 (2006).

orders on "competitive conditions in the United States" and "United States consumers" in some cases involving F/RAND-encumbered patents that are essential to a standard, and the conditions under which they may be denied.[17]  Although, as described above, an exclusion order for infringement of F/RAND-encumbered patents essential to a standard may be appropriate in some circumstances, we believe that, depending on the facts of individual cases, the public interest may preclude the issuance of an exclusion order in cases where the infringer is acting within the scope of the patent holder's F/RAND commitment and is able, and has not refused, to license on F/RAND terms.

The approach the U.S. International Trade Commission (USITC) adopts in cases involving voluntarily F/RAND-encumbered patents that are essential to a standard will be important to the continued vitality of the voluntary consensus standards-setting process and thus to competitive conditions and consumers in the United States.  In an era where competition and consumer welfare thrive on interconnected, interoperable network platforms, the DOJ and USPTO[18] urge the USITC to consider whether a patent holder has acknowledged voluntarily through a commitment to license its patents on F/RAND terms that money damages, rather than injunctive or exclusionary relief, is the appropriate remedy for infringement.

The USITC has a mandate to consider the "effect of such exclusion upon the public health and welfare, competitive conditions in the United States economy, the

---

[17] 19 U.S.C. § 1337(d)(1) (2006).

[18] *See* 19 U.S.C. § 1337(b)(2) (2006) (directing the USITC to consult with the Department of Justice and "other departments and agencies as it considers appropriate").

9

production of like or directly competitive articles in the United States, and United States consumers."[19]  As the USITC has observed, these public interest factors "'are not meant to be given mere lip service," but rather "'public health and welfare and the assurance of competitive conditions in the United States economy must be the <u>overriding considerations</u> in the administration of this statute.'"[20]

The USITC may conclude, after applying its public interest factors, that exclusion orders are inappropriate in the circumstances described in more detail above. Alternatively, it may be appropriate for the USITC, as it has done for other reasons in the past, to delay the effective date of an exclusion order for a limited period of time to provide parties the opportunity to conclude a F/RAND license.

Finally, determinations on the appropriate remedy in cases involving F/RAND-encumbered, standards-essential patents should be made against the backdrop of promoting both appropriate compensation to patent holders and strong incentives for innovators to participate in standards-setting activities.

---

[19] 19 U.S.C. § 1337(d)(1).

[20] *Certain Inclined Field Acceleration Tubes & Components Thereof*, Inv. No. 337-TA-67, USITC Pub. 1119, Comm'n Op., at 22 (Dec. 1980) (emphasis in original) (quoting S. REP. 93-1298, at 197 (1974), *reprinted in* 1974 U.S.C.C.A.N. 7186, 7330).

# EXHIBIT W



**Microsoft**

June 14, 2011

Federal Trade Commission
Office of the Secretary
Room H-113 (Annex X)
600 Pennsylvania Avenue
Washington, DC 20580

Re:  Patent Standards Workshop, Project No. P11-1204

Dear Commissioners and FTC executive staff:

Microsoft appreciates the opportunity to provide comments in response to the Request for
Comments and Announcement of Workshop on Standards-Setting Issues regarding ―patent hold-
up" in connection with standardization efforts.

At their most fundamental, technical standards are tools that promote efficiency and
innovation by making it easier to create products and services that work together—or
―interoperate"—better.  This is especially true in the information and communications
technology (ICT) environment.  With new ICT solutions and services appearing in the market
almost daily, often connected to one another by the Internet or other networks, interoperability
has become a market imperative.  The development and implementation of standards is one of
the ways in which the technology industry is able to meet consumer demand for interoperability.[1]
By helping to enhance interoperability among products or services within a market, and being
responsive to real marketplace needs, standards can help promote innovation, fuel market
growth, and protect investments in new technologies.

Microsoft plays a dual role in standardization activities.  First, we actively contribute
innovative technology to standardization related to computing hardware, software and associated
devices, the Internet and its infrastructure, consumer electronics devices, and
telecommunications systems.  Second, we are an active implementer of standards.  Microsoft
supports a very large number of standards that are formulated by a broad diversity of standards-
setting organizations (SSOs) in our products.  For example, Microsoft's Windows 7 operating

---

[1] Microsoft's commitment to standardization to help further interoperability is reflected in our
Interoperability Principles, available at http://www.microsoft.com/interop/principles/default.mspx.
Additional information about Microsoft's standards policies and activities can be found at:
http://www.microsoft.com/standards/.



**DEFENDANT'S EXHIBIT**

CASE NO. C10-1823-JLR

EXHIBIT NO. **2970**

MOTM_WASH1823_0054670

system supports more than sixty industry standards (by a conservative count). [2] Ultimately, both of these roles are deeply informed by the market, and in particular by feedback on the way customers use ICT products and services in their day-to-day lives.

Because of this dual role as contributor and implementer, Microsoft takes a balanced approach to standards development and related intellectual property rights (IPR) issues. We understand the particular needs and concerns of those contributing time, resources, and innovative technologies to the development of standards, but we are equally sensitive to the needs of those who are implementing the resulting standards in their products and services. Patents are of particular concern to Microsoft because Microsoft is perhaps the No. 1 target of patent infringement actions in the ICT industry (given the breadth of its product portfolio and large revenue). Our involvement on both sides of the standards fence frames our perspective that a diverse standards ecosystem that supports multiple technologies is good for the U.S. and global economies.

Our comments in response to the RFC can be summarized as follows:

- Microsoft strongly supports President Obama's focus on technology and the promotion of innovation. In looking at issues relating to the inclusion of IPR (primarily patent rights) in standards, it is critical to preserve and cultivate incentives to innovate. In addition, the United States should promote respect for the value of IPR on a global basis, including the IPR reflected in standards.

- Government should take an inclusive view of SSOs' diverse IPR policies and not promote one approach over the other.

- Concerns about ―patent hold-up" should not extend to any bi-lateral business disagreement between two companies regarding proposed licensing terms. These discussions typically pertain to a broader set of questions than just the proposed licensing terms for essential patent claims reading on a standard. In addition, if

---

[2] A typical personal computer running Windows 7 will support more than 200 additional standards, facilitating compatibility among hardware components from various vendors and promoting interoperability between PCs and other computers. These standards were developed by a broad range of SSOs with diverse processes and IPR policy approaches (including those that seek commitments to offer patent licenses on reasonable and non-discriminatory terms and conditions, whether with compensation or on a royalty-free basis).

2

MOTM_WASH1823_0054671

the Government were to attempt to quasi-regulate RAND licensing terms, then they arguably should review the inter-play among all of the substantive terms (and not just the monetary component) for all aspects of patent licensing terms. Yet that would likely be unworkable.

- Disclosure-based IPR policies help provide useful information as to which patent holders likely will have essential patent claims vis-à-vis the final standard, which enables parties to make an informed decision whether to engage in patent licensing negotiations and the scope of such discussions.

  o However, it is not possible for an SSO technical committee to have full and complete information regarding the patent rights implicated by a draft standard, especially those rights held by non-participants in the process. IPR policies ideally should take a balanced approach that does not unduly burden patent holders and encourages them to participate and contribute innovative technology.

- RAND-based IPR policies provide a flexible framework to help enable customized bi-lateral negotiations for patent licenses that generally are not limited to just the essential patent claims in connection with a standard.

- While almost all of the ICT industry stakeholders support policies that permit the voluntary and unilateral —"ex ante" disclosure of specific licensing terms by a patent holder, proposals for the U.S. Government to promote a mandatory —"ex ante" IPR policy approach or promote the group discussion of proffered licensing terms are not widely supported because such an approach is viewed as:

  o being of little value,

  o creating many practical inefficiencies and possible legal challenges, and

  o something that could be used internationally to undermine the value of patented technology that is included in standards used in other countries.

3

MOTM_WASH1823_0054672

353

**In looking at issues relating to the inclusion of intellectual property in standards, it is critical to ensure that incentives to innovate are preserved.**

We strongly support President Obama and his Administration's focus on technology and the promotion of innovation. Innovation historically has been a catalyst for economic growth and the creation of jobs. The United States, in recognizing the need to preserve incentives for innovation through a healthy patent system and marketplace competition, has been and remains a global technology leader. It is therefore important to ensure that the treatment of patented technology in standards does not undermine incentives to continue to invest in new innovation in standardized technology areas.

As the Antitrust Division of the U.S. Department of Justice has observed:

―The goal of policies involving IP, licensing, and standards should be to promote efficiency, just as it is with antitrust policy. . . . Static efficiency occurs when firms compete within an existing technology to streamline their methods, cut costs, and drive the price of a product embodying that technology down to something close to the cost of unit production. **Static efficiency is a powerful force for increasing consumer welfare, but an even greater driver of consumer welfare is dynamic efficiency, which results from entirely new ways of doing business. Economists now recognize that the gains from dynamic efficiency, also called "leapfrog" competition, can far outstrip the gains from incremental static improvements.** It follows that policymakers should pay particular attention to the impact of laws and enforcement decisions on dynamic efficiency."[3] (Emphasis added.)

In developing policy positions relating to standards, governments should pay special attention to the importance of promoting the dynamic efficiencies that arise from preserving incentives for innovation. Through balanced IPR policies that help make innovative technology available to implementers on reasonable terms, and that do not undercut the value of patented

---

[3] *See* Gerald F. Masoudi, Deputy Assistant Attorney Gen., Antitrust Div., U.S. Dep't of Justice, Address at the High-Level Workshop on Standardization, IP Licensing, and Antitrust, Tilburg Law & Economic Center, Tilburg University: Efficiency in Analysis of Antitrust, Standard Setting, and Intellectual Property 2–3 (Jan. 18, 2007), *available at* http://www.justice.gov/atr/public/speeches/220972.pdf.

MOTM_WASH1823_0054673

technology or overly burden patent holders, standards can help to catalyze innovation by encouraging companies to contribute their innovative technology to collaborative standards-setting activities and to share their intellectual property with others via the standardization process. Standards will not fulfill their salutary purposes if standards policies deter innovators from contributing patented technologies or investing in further innovation related to standardized technology.

In addition, the United States Government should continue to advocate for the fair treatment of patented technology in standards on a global basis.

### Government should take an inclusive view towards SSOs' diverse IPR policies and not promote one approach over another.

Most SSOs have an IPR (or patent) policy that seeks to balance the rights and interests of their stakeholders by seeking commitments from participating patent holders that they will offer patent licenses for their essential patent claims on reasonable and non-discriminatory (RAND) terms and conditions. Currently there is significant diversity with regard to how, and the detail with which, these policies are articulated by various SSOs. This diversity is healthy and should be encouraged, and any articulation by the government of one or more preferred approaches should be avoided. This diversity and breadth of SSOs has emerged as a result of market forces in response to varying business needs, and provides for flexibility, competition and choice. No one SSO or standardization process necessarily produces —b器er" standards; the test of success and relevance of a standard is the extent to which it ultimately gets used in the marketplace. This view is widely supported by the ICT industry.[4]

The FTC should encourage SSOs to ensure that their IPR policies are clearly worded, publicly available, and easy to find. Although many SSOs make their IPR policies easily available to the public on their websites, others make them difficult to find or available only to their members. In addition, we support FTC efforts to encourage SSOs to make any patent

---

[4] *See, e.g.,* Comments submitted by the Information Technology Industry Council in response to a recent NIST Request for Information (—ITI encourages the US Government to embrace a variety of ICT standards and standards-setting processes, and avoid policy decisions that might discourage a broad diversity of approaches to ICT standardization. This diversity provides for choice, competition and flexibility that further enable the ICT sector to respond to a rapidly changing marketplace with new, innovative solutions.") (http://standards.gov/standards_gov/mastercomments030711.cfm).

5

declarations, letters of assurance, or other licensing information they receive from patent holders easily available to the public on their websites. The information contained in IPR policies, and, if applicable, patent declarations, letters of assurance, or other licensing information is important to all stakeholders in the ICT industry, including current and potential SSO participants and standards implementers.

**The concept of "patent hold-up" should map to marketplace realities.**

The notion that ―patent hold-up" is a substantial problem that should be addressed by government action seems to stem from a largely theoretical analysis of the situation. If a patent holder can charge implementers more than a reasonable royalty because those implementers are (perhaps) ―locked into" the standard, then is it not likely that it would take advantage of this opportunity?

We believe that this reasoning greatly over-simplifies—and obscures—the realities of standards-related patent licensing. How any individual company will approach patent licensing will depend on many factors, such as:

- What is the company's primary business model implicated by the relevant standard? Is it likely that the company will proactively seek patent licenses (either as a licensor, a licensee or both)?
- Who are the likely companies holding essential patent claims, and what are their business models, products and patent portfolios?
- What licensing or other agreements are already in place between the parties?
- If the parties decide to enter into an agreement, then what are all of the issues (including all of the IPR-related issues) that likely will be negotiated?
- Are there trade-offs that may be made with regard to royalty payments or other financial terms?
  - For example, there are companies who sometimes are willing to offer their essential patent claims to a particular standard free of charge, but they also include a defensive suspension clause that causes the free license in connection with these patent claims to terminate if the licensee commences litigation against the licensor on any grounds whatsoever.

6

MOTM_WASH1823_0054675

As a result, we respectfully suggest that a simplified and theoretical approach to defining ―patent hold-up" may not sufficiently map to complex marketplace realities. It may pull in what are essentially routine business negotiations between two parties. These negotiations almost always include considerations beyond the proposed licensing terms for just the essential claims in a standard (and just the royalty element of any such terms). Many companies question whether these types of business negotiations should be labeled as ―patent hold-up" and scrutinized by regulators. We believe that there is an important difference between intentional or deceptive conduct in connection with patents that read on standards and routine bilateral disagreements over licensing terms for the use of patented technology.

In the former context, there seems to be a dearth of examples of actual patent hold-up with regard to the essential patent claims reading on a standard. Microsoft has never been accused of patent hold-up in this regard, nor has it accused any other company of such behavior. This is not to say that Microsoft has never been a party to litigation where the parties disagree whether proffered licensing terms were consistent with the relevant patent licensing commitment (such as RAND). When companies have such bilateral disagreements, it may make sense for them to seek resolution in the courts. But such litigation is rarely limited to the proposed licensing terms for just the essential claims reading on a standard, typically such litigation is addressing other patent-related issues or even other business terms that the parties have been unable to reach agreement on.

Depending on their applicable business model, many companies largely use their patents vis-à-vis standards defensively. Far from seeking to ―hold up" implementers, these firms will not seek patent royalties at all in the ordinary course of business. Rather, they will seek a patent license from an implementer only when that implementer has first challenged them on other patent infringement issues.

In addition, it is important to consider the healthy competition among different business models and how that influences debates regarding ―patent hold-up" and whether there is a need to impose further restrictions on patent holders. Some companies are largely innovators who predictably will seek a return on their investments in innovation through licensing their patents. Some product-based companies take a more nuanced position, often using their patents vis-à-vis standards defensively (as described above). Still others have a significant consulting or

7

MOTM_WASH1823_0054676

integration services focus, and they may benefit from having access to others' innovative technology in standards at a reduced cost if not for free. The current RAND-based structure balances these different interests. Proponents seeking to tilt that balance may largely be seeking reduced licensing costs and a related competitive advantage as opposed to solving a documented and widespread problem.[5]

### Disclosure-based IPR policies provide useful information regarding likely holders of essential patent claims.

There are hundreds of different SSO IPR policies and they vary significantly. As a general matter, the IPR policies of most formal SSOs and many consortia are ‑disclosure-based". Under these types of IPR policies, participating companies generally are required (or encouraged) to disclose either (a) patents they hold that are likely to contain patent claims that will be essential to implementing the final standard, or (b) the fact that they likely hold such patents (but without identifying specific patents). The disclosing participant is then typically requested to declare its intention with regard to licensing such essential claims (such as RAND, RAND without a royalty, or ‑will not agree to offer RAND licenses"). If specific patents were

---

[5] See remarks by Keith Mallinson (a long-standing research analyst and consultant in the telecommunications industry) at http://ipfinance.blogspot.com/2011/05/fruits-of-labour-not-windfall-gains-in.html: ‑Regulatory price-setting in the arena of innovative technologies neither reflects the market reality of commercial negotiation nor is it related to the costs, efforts and technical or commercial risks involved in developing those technologies. Defining (F)RAND [fair, reasonable and non-discriminatory] according to an imposed pricing structure would severely limit the ability of licensors and licensees to negotiate bilateral commercial terms that reflect their respective positions and needs....

Further, minimizing the cost of licensed technologies may not result in a minimum cost solution. In addition to providing higher performance and improved features, incorporating patented IP into a standard may actually reduce the cost of implementing the standard. For example, patented IP might reduce the total cost of ownership to the end consumer of a product such as a mobile phone – including phone acquisition costs (with costs of design, development, bill of materials and assembly) and network service charges (reflecting costs of bandwidth acquisition, network equipment, operations, and maintenance). The impact of such cost reductions may far exceed any additional costs in licensing fees. Market forces are best at determining the value to be attributed to any input component in such a system, including technology licences. Regulators should be careful to avoid favouring particular business models or making decisions on which part of the value chain deserves to make the greater profit, especially where dynamic innovation is concerned....

The principle of (F)RAND licensing has been broadly adopted to ensure that patent owners who contribute technology to standards agree to make licences available to their standards-essential IP to all comers on terms that are reasonable and free from unfair discrimination, while maintaining the ability to achieve adequate reward for their innovations. There will at times be significant contention between the patent owner and implementer about what constitutes reasonable licensing terms, but this is to be expected as with commercial negotiation on any input cost component and has, for the most part, been readily resolved through bilateral negotiations. In the rare instances where such negotiations have not been successful, contract law is applicable to the (F)RAND commitment and the courts are able to deal with such disputes...."

8

MOTM_WASH1823_0054677

disclosed, then the licensing commitment will apply only to any claims in the identified patents that end up being essential vis-à-vis the final version of the standard.  In the case of a patent holder disclosing more generally that it likely will have essential claims, the licensing commitment generally will apply to any and all essential claims the patent holder has vis-à-vis the final standard.

A large number of SSOs, including ISO/IEC/ITU, CEN/CENELEC, ETSI, AFNOR, Ecma International, OMG (Object Management Group), PWG (Printer Working Group), TTA (Telecommunications Technology Association of Korea), TTC (Telecommunication Technology Committee in Japan) and ANSI-accredited SSOs (such as the IEEE, TIA, ATIS and ASTM), have some form of disclosure-based IPR policy.

Some SSOs have adopted "participation-based" IPR policies. Under this type of IPR policy, a participating company undertakes a RAND (with or without a royalty) licensing commitment for any essential claims it may have vis-à-vis the final standard just by joining the SSO or by joining a technical committee of the SSO.  Standardization efforts under a participation-based IPR policy typically are scoped very narrowly.  They also often include safeguards for participants to opt out or exclude certain essential claims by disclosing the patents containing those essential claims and stating that the automatic commitment will not apply to them.  This provides some protection to participating patent holders in the event a competitor contributes their technology to the standardization effort, either inadvertently or in an effort to obtain access to such technology under the relevant IPR policy framework.

With "participation-based" IPR policies, sometimes the automatic commitments are RAND-RF (free of charge but with other RAND terms), as was the case with the popular USB standard and the W3C standards.  Some examples of SSOs that use a participation-based approach are Bluetooth SIG, GS1, BIAN (Banking Industry Architecture Network), DVB, Infiniband Association, MIPI Alliance, SD Card Association, Serial ATA International Organization, SIGIS, WiFi Alliance, WiMAX Forum and the W3C.

Typically, because SSOs want to encourage disclosures as early as possible during the development of a standard, disclosure is not limited to just known essential claims because those claims can only be accurately identified when the standard is almost final and the draft text is stable.  So there often is a trade-off in terms of getting more information early on in the process

MOTM_WASH1823_0054678

(recognizing that some portion of it likely will end up not being relevant), as opposed to having most (if not all) of the disclosed information be accurate and directly applicable to the final standard.

In some ways, the value of a disclosure-based policy is finding out which patent holders likely will have essential patent claims vis-à-vis the final standard. Companies then typically consider that information in the context of its affected product(s) and make decisions, including whether to approach any of those patent holders to discuss licensing terms. What they decide to do depends on a number of different factors, such as whether the parties have existing agreements that may be applicable, the patent portfolio positioning between the parties (which is not a consideration based on just the total number of patents but more likely focused on whether they have patents that read on the other's products, and which products), the companies' applicable business models (which may suggest whether or not the patent holder will proactively seek a license from implementers) and past experiences with each other. In addition, these considerations will of necessity include patents that go beyond just the essential patent claims relating to a standard. If an implementer is going to enter into a license agreement with the disclosing patent holder, such implementer will want to protect its entire product(s) and will need to consider a broader (and perhaps cross-) licensing arrangement.

The RFC also seeks feedback with regard to the fact that most disclosure-based policies do not require participating patent holders to conduct patent searches, nor do they bind non-participants.

As a practical matter, a requirement to conduct patent searches would be a strong disincentive for patent holders to participate in standards-setting activities and contribute their technology so that it can be used by others. Many U.S.-based firms have hundreds of employees participating in hundreds of different SSO engagements, and thousands of patents in their portfolios. The cost and resources needed to conduct multiple patent searches vis-à-vis a developing standard spread across a significant number of standards engagements would be very significant.[6]

---

[6] Assessing whether a single patent reads on a particular version of a draft standard could cost tens of thousands of dollars. If patent searches were required in order for patent holders to make definitive disclosures, then there would be a need to conduct several such searches in connection with a single draft standard as it evolves. Multiply that by hundreds of potential standards and the ongoing costs becomes prohibitive.

MOTM_WASH1823_0054679

This is why the ICT industry sought clarification from the FTC in connection with the *Dell* consent decree.[7] The FTC clarified that the consent decree was not intended to support a ‒disclose it or lose it" approach to patent disclosures in the standards context and that Dell's failure to disclose was ‒ot inadvertent". Similarly, back in the early 1990's the European Telecommunications Standards Institute (ETSI) proposed an IPR policy pursuant to which a patent holder's failure to make timely and complete disclosures would result in arguably compulsory licensing on ETSI-sanctioned terms (which were perceived to permit very low royalties). Working with U.S.-based trade associations, the U.S. Government intervened and the ETSI policy was modified to be more consistent with other disclosure-based SSO policies.

It is difficult to envision how an SSO IPR policy would apply to non-participants. It is estimated that there are at least 1,000 ICT SSOs around the world. Any absolute disclosure policy would create a huge burden on ICT companies to police all of those developing standards, conduct interminable patent searches, and make definitive disclosures or risk losing valuable patent rights. When the Standardization Administration of China (SAC) released its draft *Interim Provisions on Formulation and Revision of Patent-related National Standards* for public comment on November 2, 2009, a number of U.S.-based trade associations provided comments seeking clarification that the proposed IPR policy would only cover those patent holders who were participating in the development of the relevant Chinese National Standard (and, for example, not patent holders who may have made a licensing commitment in connection with an ISO/IEC-related standard being modified during the Chinese standardization process).

There rarely will be a complete and accurate portrait of the patents that contain essential claims with regard to a particular draft standard. This is not surprising. Standards are often lengthy technical documents. Many of the essential patents are not included as the result of a formal contribution or a technology ‒bake off" pursuant to which the technical committee makes a decision among competing patented technologies. Engineers create a technical document that, not surprisingly, affects a range of patented technology. That said, there still seems to be only limited patent infringement litigation based solely on essential patent claims vis-à-vis a standard where the essential patents were unknown to the participants at the time the participants selected among competing proposals to include in the standard. And those cases, although very limited in

---

[7] *In re Dell Computer Corp.*, 121 F.T.C. 616 (May 20, 1996).

MOTM_WASH1823_0054680

number, typically have involved allegations that the patent owner intentionally failed to disclose its patents in violation of the applicable SSO IPR policy.

**RAND licensing commitments provide a balanced and flexible approach to patent licensing.**

RAND is a time-tested and effective approach to licensing commitments. Like other "reasonableness" standards, it does not dictate specific licensing terms, but it does provide flexibility across a diverse range of situations. As mentioned above, companies make decisions about whether to initiate licensing discussions and, if so, what considerations beyond just the essential claims vis-à-vis the final standard will be included. The negotiation associated with a standards-related patent license typically is no different from any general patent licensing discussion and will involve trade-offs on all of the terms and conditions.

While there is no exhaustive list of traditional RAND licensing terms, in addition to a possible compensation element, such terms may include a field-of-use restriction, reciprocity, non-sublicenseability, defensive suspension and other common patent licensing considerations. Whether specific articulations of these types of terms are RAND can be a matter of some debate. For example, if a standard acquires market power (most don't), a patent owner who requires broad grant backs in the form of reciprocity or broad defensive termination provisions in exchange for its license of essential patent claims to implement such standard arguably may not be offering a RAND license. With regard to defensive termination, if the standard has market power and if the "trigger" for suspension is much broader than the actual license grant, it is not clear that the term is RAND. For example, if the defensive suspension is triggered by the implementer asserting any type of IPR against the patent holder (or even any litigation claim on any topic), then arguably the patent holder is receiving a free-of-charge cross-license to the implementer's entire IPR portfolio in exchange for a license to just the patent holder's essential claims vis-à-vis a standard. As with other "reasonableness" tests, these and other questions can be resolved through litigation in the relatively rare circumstances where business discussions fail (and the risks for each side inherent in such litigation of course inform the business discussions).

Proposals to somehow reduce "RAND" to some uniform formula could undermine the value of current practices and restrict some of the flexibility that helps to enable current licensing practices and protect the defensive value of contributed patent technology. There are many

12

MOTM_WASH1823_0054681

362

existing patent licenses that include access to essential patent claims vis-à-vis one or more standards that reflect a customized solution between the two parties that takes into consideration all of the licensing terms (and not just the financial component).

In addition, the existence of a RAND commitment to offer patent licenses should not preclude a patent holder from seeking preliminary injunctive relief or commencing an action in the International Trade Commission just because the patent holder has made a licensing commitment to offer RAND-based licenses in connection with a standard. Whether such relief is available should be assessed under the current legal framework in the applicable jurisdiction, which often is premised substantially on the specific facts and circumstances at issue. Any uniform declaration that such relief would not be available if the patent holder has made a commitment to offer a RAND license for its essential patent claims in connection with a standard may reduce any incentives that implementers might have to engage in good faith negotiations with the patent holder.

With regard to the issue whether the licensing commitment should be binding on the successor-in-interest of the implicated patent rights, we believe that there is a fairly broad consensus that this outcome would be ideal. The issue is how to effectuate this in practice. If a patent holder makes a specific patent disclosure to a SSO, then it should be able to track that commitment and bind the transferee as part of the transfer agreement.

This becomes more challenging when the patent holder has made a more general licensing commitment that it will license any essential claims that it has (and when the patent holder has made such general commitments to many SSOs). In order to bind a transferee, such patent holder would have to conduct patent searches to determine what patent claims were implicated by the commitment(s). Many patent holders that use their patents largely for defensive purposes vis-à-vis standards do not want to undertake this significant expense. This is especially true when the patent holder has made a commitment to license on RAND terms on a royalty-free (or compensation-free) basis. If such patent holders are required to conduct patent searches to determine what they are giving away for free, then they may be less willing to agree to a RAND-RF licensing commitment. We believe that SSOs should seek to help address this issue in their IPR policy, but it is not realistic to expect that they alone can fully solve this issue.

13

MOTM_WASH1823_0054682

**Proposals for the U.S. Government to promote a mandatory "ex ante" IPR policy approach are not supported by the broader ICT industry because such an approach is viewed as (a) being of little value, (b) creating many practical inefficiencies and possible legal challenges, and (c) something that could be used internationally to possibly undermine the value of patented technology that is included in standards.**

Almost all disclosure-based IPR policies address (a) the extent to which patent holders have to disclose whether they have any patent claims that likely will be essential to implement the standard under development and/or (b) the choices such patent holders have with regard to the licensing commitment they can make vis-à-vis those claims (such as a commitment to license under RAND terms and conditions).

If a patent holder makes a disclosure about its essential patent claims, potential implementers can decide when (or even whether) to contact the patent holder to obtain information about actual license terms. Depending on when the patent holder makes such a patent disclosure, this may occur *ex ante* (before the standard is finalized). Any negotiations typically are conducted bilaterally and outside the SSO.

"*Ex ante*" IPR policies typically refers to those disclosure-based policies that either permit or require patent holders to disclose specific licensing terms, including royalty rates, to the standards body before the standard is finalized. While almost all ICT industry stakeholders (including Microsoft) support policies that permit the voluntary and unilateral "ex ante" disclosure of specific licensing terms by a patent holder, there are differing views with regard to proposed IPR policies that would <u>mandate</u> the "ex ante" disclosure of specific licensing terms and/or permit group discussions of those terms. Advocates of mandatory "ex ante" IPR policies argue that this is necessary to prevent patent holders from "holding up" implementers and extracting onerous terms after the standard is completed and everyone is attempting to implement the standard as written. Opponents highlight that "patent hold-up" occurs rarely when viewed across thousands of ICT standards, and such policies would unduly burden the standardization process and create many unnecessary practical inefficiencies and potential legal problems.

14

MOTM_WASH1823_0054683

There are literally thousands of ICT standards in existence today. Hundreds of these standards have been referenced in eGovernment Interoperability Frameworks,[8] with no apparent documented problems relating to IPR issues.[9] There have been a relatively small number of noteworthy litigations that have been commenced when two parties have been unable to agree on whether proffered licensing terms were RAND and/or otherwise met the requirements of the applicable SSO's IPR policy. These are very much the exception, not the rule. Most SSOs review and regularly update their IPR policy to address broad issues, but they often are reluctant to add substantial burdens to the process to address relatively rare, potential "one-off" disputes that are fact-specific and can be litigated if the two parties cannot come to an agreement.

The debate over mandatory "ex ante" IPR policies has been underway for more than a decade. During this time, many ICT SSOs and their members with disclosure-based IPR policy approaches have thoughtfully considered whether to adopt such a policy, and with the exception of the VITA standards body, they largely have rejected adopting such an approach. The principle reasons typically include the following considerations:

- A mandatory "ex ante" IPR policy would require patent holders to disclose proposed licensing terms for their essential patent claims. Most stakeholders have observed that, for various reasons, such a disclosure is of little practical value. When a patent holder discloses to a SSO that it likely holds essential patent claims, a prospective implementer makes a decision whether to approach this patent holder to discuss possible licensing terms (and that decision is dependent on a number of factors). Any implementer actually deciding to negotiate a license will rarely, if ever, want a license for just the patent holder's essential patent claims in connection with that standard. An implementer seeking a license likely will want to negotiate a bi-lateral, customized agreement that will include other IPR (including related patent claims that it may be infringing) that impact its entire product or at least those product features that relate to and utilize the standard. The license also likely will reflect a range of possible trade-offs between the two parties based on their respective IPR portfolios and other business

---

[8]  *See* "Government Interoperability: A comparative analysis of 30 countries" by CSTransform at http://www.cstransform.com/white_papers/InteropAnalysisV2.0.pdf.

[9]  The existence of competing standards also can help reduce the threat of possible patent "hold up".

MOTM_WASH1823_0054684

opportunities.  So adding a requirement to an SSO IPR policy to the effect that disclosing patent holders must prepare and submit licensing terms for just its essential patent claims creates an obligation and burden on patent holders that arguably adds little or no value to the standardization process.

- Standards technical committees make hundreds of technical decisions and, as has been much noted, the process is often lengthy.  Experienced stakeholders have noted that injecting licensing terms into the standardization process will inevitably delay the process further still without improving the technical value of the standard.

- Some patent holders make RAND licensing commitments largely for defensive purposes to further their own freedom of action, such as seeking to protect their products that implement standards from patent infringement claims asserted by others.  As a result, quite often they will not proactively seek to obtain licenses from implementers.  It has been observed during stakeholder debates on the ―ex ante" issue that requiring these patent holders to prepare patent licensing terms unnecessarily creates burdens and complications for them without adding value to the standardization effort.

- There is little evidence that ―patent hold-up" in the standards context is a real problem.  Most patent holders also are implementers, whether with regard to the same standard or in terms of the broader ICT standards landscape, and thus share an interest in maintaining reasonable royalty rates.  This ecosystem generates few IPR-related disputes as a result.

- Under a mandatory ―ex ante" IPR policy, there is a substantial risk—even a likelihood—of buyer cartel or group boycott behavior.  An SSO obviously is a forum for participants to discuss the development of technical standards.  Those discussions are likely to extend to price if price terms are disclosed in connection with the offer of technology to a standard-setting effort.  The technical committee members may explicitly or implicitly pressure a disclosing patent holder to modify its proposed licensing terms or risk not having its technology included in the standard.  This is especially true if the IPR policy permits the group discussion of proposed licensing terms as part of the standardization process.  For this reason, mandatory ―ex ante" IPR

16

MOTM_WASH1823_0054685

366

policy approaches also may discourage key patent holders from participating in the process and contributing their valuable patented technology. They also could create disincentives to invest further in innovation in that technology area.

Most of the SSOs and their stakeholders that have considered these proposals over the years have determined that there are only a limited number of situations where "patent hold-up" takes place in the context of standards-setting. The industry has determined that those situations generally are best addressed through bi-lateral negotiation (and, in rare cases, litigation) as opposed to modifying the SSO's IPR policy and arguably unnecessarily burdening the standardization process for the many ICT standards that are being widely implemented in the marketplace with no apparent IPR-related challenges.

Accordingly, we support the majority of ICT companies who believe that SSOs should develop their IPR policies based on a consensus of their stakeholders, and that governments should not promote one approach over another, including a mandatory "ex ante" IPR policy regime and the group discussion of proposed licensing terms.

In conclusion, we thank you for the opportunity to provide comments in response to the RFC.

Respectfully submitted,
Microsoft Corporation


David Heiner
Vice President and Deputy General Counsel



Amy Marasco
General Manager, Standards Strategy and Policy

17

MOTM_WASH1823_0054686

367

# EXHIBIT X

1              IN THE UNITED STATES DISTRICT COURT

2           FOR THE WESTERN DISTRICT OF WASHINGTON

3                    AT SEATTLE

4

5   MICROSOFT CORPORATION, a

6   Washington corporation,

7           Plaintiff,

8   vs.     No. C10-1823-JLR

9   MOTOROLA, INC., MOTOROLA

10  MOBILITY, INC., and GENERAL

11  INSTRUMENT CORPORATION,

12         Defendants.

13  _____

14

15          DEPOSITION OF DAVID A. HEINER

16        Taken on behalf of the Defendants

17            March 28, 2012

18              - - -

19  BE IT REMEMBERED THAT, pursuant to the Washington Rules of

20  Civil Procedure, the deposition of DAVID A. HEINER, was

21  taken before Tia B. Reidt, #2798, a Certified Shorthand

22  Reporter, and a Notary Public for the State of Washington,

23  on March 28, 2012, commencing at the hour of 8:48 a.m., the

24  proceedings being reported at 315 5th Avenue South,

25  Suite 1000, Seattle, Washington. TSG Job # 47848.

1                        DAVID A. HEINER

2    representing Microsoft and the witness.

3              THE VIDEOGRAPHER:  Will the court reporter please

4    swear the witness in.

5    DAVID A. HEINER, having been first duly sworn, was

6    examined and testified as follows:

7

8    EXAMINATION

9    BY MR. SCHOENHARD:

10       Q.    Good morning, Mr. Heiner.

11       A.    Good morning.

12       Q.    Please state your full name and home address for

13   the record.

14       A.    David A. Heiner, 14314 227th Avenue Northeast,

15   Woodinville, Washington, 98077.

16       Q.    And do you understand that you're testifying under

17   oath here today?

18       A.    I do.

19       Q.    Is there any reason you won't be able to provide

20   honest testimony today?

21       A.    No.

22       Q.    You are currently employed by Microsoft?

23       A.    Yes.

24       Q.    What is your current title?

25       A.    Vice president and deputy general counsel.

1                    DAVID A. HEINER

2      A.     Yes.

3      Q.     -- relating to a February 8th, 2012 statement,

4    "Microsoft Support for Industry Standards"?

5      A.     Yes.

6      Q.     Do you believe that you are prepared today to

7    speak with respect to that topic?

8      A.     Yes.

9             (Whereupon, a 1-page Microsoft's Support for

10   Industry Standards document was marked Exhibit 3 for

11   identification.)

12            THE COURT REPORTER:  Exhibit 3.

13   BY MR. SCHOENHARD:

14     Q.     Mr. Heiner, you have been handed a document that

15   has been marked as Heiner Exhibit 3, bearing Production No.

16   MS-MOTO_1823_00005196256.

17            Please take a moment to review this document and

18   tell me whether you recognize it.

19     A.     Yes, I recognize this document.

20     Q.     What is this document, Heiner Exhibit 3?

21     A.     This document is a printout of a web page where

22   Microsoft made a statement regarding its support for

23   industry standards.

24     Q.     As part of this February 8th, 2012 statement,

25   Microsoft stated, under the No. 2, "This means that

1                          DAVID A. HEINER

2    Microsoft will not seek an injunction or exclusion order

3    against any firm on the basis of those essential patents,"

4    correct?

5        A.    Correct.

6        Q.    As of today, is that Microsoft's official

7    position?

8        A.    Yes.

9        Q.    As of today, is it Microsoft's position that it is

10   inappropriate for standards-essential patent holders to seek

11   injunctive-style relief?

12       A.    Yes.

13       Q.    That position is directly contrary to the position

14   taken at Page 13 of the June 2011 Federal Trade Commission

15   letter we discussed a moment ago, correct?

16       A.    Our position changed from June 14th to more

17   recently, yes.

18       Q.    Why did Microsoft's position change?

19       A.    Based on experience since then, based on thinking

20   about the subject more deeply, and based on discussions with

21   the US Department of Justice.

22       Q.    When you say "based or our experience since then,"

23   are you referring to your experience as, for example, a

24   defendant against the Motorola entities?

25       A.    Yes.

1                          DAVID A. HEINER

2       Q.      When Microsoft shifted its position on the

3   availability of injunctive relief, it did so in coordination

4   with other industry players, including Apple, correct?

5       A.      I don't think it's correct to say "in coordination

6   with."

7       Q.      What would a more correct statement be?

8       A.      There was some communication between Microsoft and

9   Apple and perhaps Cisco around the week that includes

10  February 8th, maybe the week before, on this topic.

11      Q.      Do you recall why those communications occurred?

12      A.      Yes, because the Justice Department was asking us,

13  at least Microsoft and Apple, I believe, to make a statement

14  such as Exhibit 3.

15      Q.      Did the Justice Department suggest to Microsoft

16  what position should be taken or simply ask that Microsoft

17  make an official statement?

18      A.      It suggested what positions should be taken.

19              (Whereupon, a 2-page e-mail string re: Microsoft

20  statement was marked Exhibit 4 for identification.)

21              THE COURT REPORTER:  Exhibit 4.

22  BY MR. SCHOENHARD:

23      Q.      Before turning to Exhibit 4, with respect to the

24  Department of Justice, do you recall who at the Department

25  of Justice was in contact with Microsoft?

# EXHIBIT Y
# FILED UNDER SEAL

374