# EXHIBIT Z

375

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 1

1              IN THE UNITED STATES DISTRICT COURT

2                 FOR THE DISTRICT OF WASHINGTON

3                          AT SEATTLE

4

5   MICROSOFT CORPORATION, a              )

    Washington corporation,              )

6                                        )

                        Plaintiff,       )

7                                        ) No. 2-10-cv-01823-JLR

                vs.                      )

8                                        )

    MOTOROLA, INC., and MOTOROLA         )

9   MOBILITY, INC.,                      )

                                         )

10                      Defendants.      )

11

          VIDEOTAPED DEPOSITION OF TODD D. MENENBERG

12

                        June 20, 2013

13

14                   Seattle, Washington

15

16

17

18

19

20

21

22

23

24

25   Job No. CS1685790

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 5

1           MS. ROBERTS:  Andrea Pallios Roberts

2      of Quinn Emanuel for Defendant Motorola.

3           MR. HARRIGAN:  Art Harrigan for

4      Microsoft.

5

6

7      TODD D. MENENBERG,      having been first duly sworn

8                             by the Certified Court Reporter,

9                             testified as follows:

10

11                        EXAMINATION

12     BY MS. ROBERTS:

13     Q   Good morning.

14     A   Morning.

15     Q   Would you please state your name again for the record?

16     A   Todd D. Menenberg.

17     Q   And what is your business address?

18     A   Navigant Consulting, 1201 Third Avenue, Suite 3320,

19         Seattle, Washington 98101.

20     Q   And what is Navigant Consulting?

21     A   Navigant Consulting is an international consulting firm.

22             We have approximately, I believe, 2,000 employees

23         around the world.

24     Q   Have you ever been deposed before?

25     A   I have.

1   litigation, what tasks to attribute to the antisuit

2   injunction and 9th Circuit appeal, and what tasks to

3   attribute to the 3H.264 patents in the 1823 case?

4   A   I don't know the criteria, how Ms. Robbins sorted them

5   into those categories.

6   Q   Okay.

7   A   I only know she did that.

8   Q   As far as you know, Ms. Robbins is the one that did that

9   though?

10  A   I understand that's the case.

11  Q   I think you already stated this before, but you don't

12  have an opinion whether the attorney fees and costs

13  calculated in your report were caused by the alleged

14  breach of contract by Motorola, correct?

15  A   I think we went over that.

16      I'm not here to give an opinion narrowly on that

17  point.

18      My role was to compile those costs and do the math.

19  Q   Okay.  And you have not formed an opinion regarding the

20  total amount of fees and costs incurred as a result of

21  Motorola's alleged breaches based on work performed in

22  the 1823 action, the action that this deposition is in;

23  is that right?

24  A   I don't believe that's part of the scope of my work.

25  Q   And the same is true with respect to each of the other

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 102

1    individual actions that Microsoft is seeking attorney

2    fees and costs for, you have not performed calculations

3    and therefore formed an opinion as to the total amount of

4    fees and costs incurred in each of the individual

5    actions; is that right?

6  A  That's correct.

7        I've only been asked to do and present them as I've

8    done.

9  Q  Right.  Okay.

10       And have you performed any calculations or formed an

11   opinion regarding the total amount of fees and costs

12   incurred as a result of Motorola having sent letters to

13   Microsoft, dated October 21st and October 29th, offering

14   to license patents to Microsoft?

15  A  I don't recall my work ever considering these specific

16   letters and doing specific calculations related to those

17   letters and those dates.

18  Q  Okay.  Have you done any calculations or formed an

19   opinion regarding the total amount of fees and costs

20   incurred by Microsoft as a result of Motorola having

21   sought injunctive relief for Microsoft's infringement of

22   Motorola's standard essential patents?

23                    THE WITNESS:  Would you please read

24   that back?

25       That was kind of a long question.

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 103

1      (Question on Page 102, Line 18-

2           22 read by the reporter.)

3

4               THE WITNESS:   Only to the extent that

5      it's already reflected in these numbers.

6   Q  (By Ms. Roberts)   Have you performed any calculations or

7      formed an opinion regarding the total amount of fees and

8      costs incurred by Microsoft as a result of Motorola

9      having not issued a patent license to Marvel (phonetic)?

10  A  To Marvel?

11  Q  Mm-hm.

12  A  Only to the extent it's reflected in the invoices.

13      I'm not familiar, as I sit here, with Marvel and the

14      impact, but if it's part of the invoice billed up in the

15      numbers, then it would be there, but I don't know.

16  Q  Have you performed any calculations or formed an opinion

17      regarding the total amount of fees and costs incurred by

18      Microsoft as a result of Motorola allegedly not offering

19      a license to Microsoft on terms of Google's MPEG-LA

20      license?

21  A  Again, only to the extent it's already incorporated in

22      the task and related costs and expenses in the work I've

23      done.

24  Q  Is it fair to say that with respect to the attorney fees

25      and costs, you have calculated a total amount but have

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 104

1    not tied any computations to any specific theories of

2    breach by Microsoft?

3        Is that correct?

4  A  I think that's fair.

5  Q  And you are aware that this is a breach of contract case,

6    correct?

7  A  Yes.

8  Q  And are you aware that Microsoft claims that Motorola

9    breached two different contracts, one with the IEEE and

10   one with the ITU?

11 A  I believe that's correct.

12 Q  And did you perform any calculations or form an opinion

13   regarding the total amount of fees and costs incurred as

14   a result of Motorola allegedly breaching each of those

15   contracts?

16 A  I don't believe we did that.

17 Q  Okay.  So, once again there's just a grand total, no

18   calculation of damages for each contract at issue?

19 A  Well, the numbers are for the respective different sorts

20   that we did.

21     I don't think we did it for the two individual ones,

22   as you posed the question.

23 Q  Okay.  Let's move on to the calculations of the facility

24   relocation.

25     First of all, can you explain to me the methodology

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 105

1    used by you and your team to-- let me start over.

2         If we turn to Page 19 of your report--

3  A  I'm with you.

4  Q  There's a table there.

5         Does that table accurately summarize your opinion

6    with respect to the total amount of damages incurred

7    allegedly, based on the facility relocation and operating

8    costs?

9  A  It does.

10 Q  Okay.  And can you explain to me the methodology that you

11   and your team used to get to these totals?

12 A  Well, we met with counsel.  We had discussions with

13   Microsoft personnel.

14        I tried to learn as much as I could about the

15   context of what happened.

16        We reviewed a lot of source documents.

17        We had discussions with counsel about specific

18   elements of cost that would likely be included in such a

19   move.

20        It was an iterative process where as we started

21   getting documents, we started compiling and computing

22   those costs.

23 Q  With respect to the attorney fees and costs, you and your

24   team primarily relied on the data in invoices and

25   inputted that data into a spreadsheet to make your

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1      understand the nature of the move from the depositions

2      and my discussions with Microsoft, and both of those seem

3      reasonable based on my general understanding of what

4      happened.

5   Q  (By Ms. Roberts)  But you didn't look into or have

6      expertise of your own on, you know, whether certain

7      things must happen when you're relocating a distribution

8      facility, how much security typically costs or anything--

9      I mean, in terms of the actual what was done, you're not

10     in the business of moving facilities, so you can't really

11     say whether it's reasonable or not?

12  A  Well, I think part of that is fair.

13        I'm not a logistics expert.

14  Q  Right.

15  A  And did I look at the airfares that were charged to see

16     if there could have been a lower fare?  No, but I've seen

17     airfare, I've flown before, and it seemed reasonable.

18        When I see trucking costs to move product from

19     Germany to The Netherlands, am I trucker?  No, but I

20     would expect to see trucking costs.

21        When I see all the various items I've listed, they

22     struck me as normal type of costs, in my business

23     experience, and I would expect to see them.

24  Q  Okay.  Is there anything in your report where you have

25     explained the basis for an opinion that the costs were

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 178

1    reasonable?

2  A  I don't recall specifically articulating it in the way

3     you've asked the question, but as I say, they were the

4     types of costs and the amounts, to the extent I was

5     familiar with those particular items, that seemed

6     reasonable.

7  Q  And have you analyzed the costs of any alternatives that

8     were available to Microsoft to relocate in the facility,

9     both those that Microsoft considered and perhaps

10    alternatives Microsoft did not consider?

11 A  I have not.

12 Q  And similar with the attorney fees, you've calculated a

13    total for the amount of costs for the relocation,

14    correct?

15       You have not broken it down based on costs incurred

16    as a result of any particular conduct by Motorola; is

17    that right?

18 A  Yeah, I think we got the relocation and the question--

19    you're asking just about the attorney fees?

20 Q  No.  I'm asking similar to the attorney--

21 A  I misheard you.  I'm sorry.  Please repeat it.

22 Q  So similar to the attorney fees, for the relocation, you

23    calculated sort of a grand total.

24       You have not separately calculated the amount of

25    relocation costs incurred as a result of any particular

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1      conduct of Motorola that Microsoft constitutes-- claims

2      is a breach?

3   A  I am not sure I understand the question.

4         Are you trying-- did I break out the relocation

5      expenses to the specific cases we're talking about?

6   Q  Well, I can be more specific.

7         Earlier we talked about costs incurred as a result

8      of Motorola sending letters to Microsoft in October of

9      2010, offering to license patents to Microsoft.

10        Have you calculated which, if any, of the relocation

11     costs were incurred as a result of Motorola sending those

12     letters?

13  A  No.

14  Q  Okay.

15  A  All those questions I can say no, but I'm comfortable in

16     the relocation costs, that they related to the decision

17     that Microsoft had to move from Germany.

18        They felt it was in their best interest, in light of

19     the litigation, to move from Germany to The Netherlands.

20  Q  Right.

21        So my question is if you've categorized any costs in

22     the specific theories of breach--

23  A  I didn't-- I'm sorry to interrupt you.

24        I didn't further delineate it.

25  Q  Okay.  And is the same true with respect to the two

Veritext Corporate Services

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 180

1    different contracts at issue, the one with the IEEE and

2    the ITU, you haven't segregated in any way the costs

3    incurred as a result of a breach of those contracts by

4    Motorola?

5    A    That's correct.

6                    MS. ROBERTS:  Okay.  I don't have any

7    further questions for you, Mr. Menenberg.  Thank you for

8    your time.

9                    VIDEOGRAPHER:  Do you have any

10   questions?

11                   MR. HARRIGAN:  No.

12                   VIDEOGRAPHER:  We are going off the

13   record at 1:43 p.m.  This is the end of Disc No. 3, and

14   this concludes this deposition for today.

15                   (Deposition concluded at 1:43 p.m.)

16                   (Signature reserved.)

17

18

19

20

21

22

23

24

25

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 181

```
 1      STATE OF WASHINGTON )    I, Terilynn Pritchard, RMR, CRR,.
                            ) ss CLR, a certified court reporter
 2      County of Pierce    )    in the State of Washington, do
                                 hereby certify:

 3

 4
                That the foregoing deposition of TODD D. MENENBERG
 5      was taken before me and completed on June 20, 2013, and
        thereafter was transcribed under my direction; that the
 6      deposition is a full, true and complete transcript of the
        testimony of said witness, including all questions, answers,
 7      objections, motions and exceptions;
 8              That the witness, before examination, was by me
        duly sworn to testify the truth, the whole truth, and
 9      nothing but the truth, and that the witness reserved the
        right of signature;
10
                That I am not a relative, employee, attorney or
11      counsel of any party to this action or relative or employee
        of any such attorney or counsel and that I am not
12      financially interested in the said action or the outcome
        thereof;
13
                That I am herewith securely sealing the said
14      deposition and promptly delivering the same to
        Attorney Andrea Pallios Roberts.
15
                IN WITNESS WHEREOF, I have hereunto set my
16      signature on the 25th day of June, 2013.
17
18
19
20
21
22      _____
        Terilynn Pritchard, CCR, RMR, CRR, CLR
23      Certified Court Reporter No. 2047.
24
25
```

# EXHIBIT AA

CONFIDENTIAL

Page 1

1        IN THE UNITED STATES DISTRICT COURT

2        FOR THE WESTERN DISTRICT OF WASHINGTON

3

4                    AT SEATTLE

5

6

7

8    MICROSOFT CORPORATION, a              )

9    Washington corporation,               )

10                                          )

11                   Plaintiff,             )

12                                          ) No. 2-10-cv-

13             vs.                          ) 01823-JLR

14                                          )

15    MOTOROLA, INC., and MOTOROLA          )

16    MOBILITY, INC.,                       )

17                                          )

18                   Defendants.            )

19

20

21        VIDEOTAPED 30(b)(6) DEPOSITION OF DAVID KILLOUGH

22

23                    May 6, 2013

24

25      Job No. CS1661676      Seattle, Washington

CONFIDENTIAL

Page 7

1    which our court reporter, Karmen Knudson, will swear

2    in the witness and we can proceed.

3        Starting to my right.

4                    MS. ROBERTS:  My name is Andrea

5    Pallios Roberts of Quinn Emanuel, representing

6    defendant, Motorola.

7                    MS. ROBBINS:  Ellen Robbins, Sidley

8    Austin, representing Microsoft.

9                    MR. WION:  Chris Wion, Calfo

10   Harrigan, representing Microsoft.

11   DAVID KILLOUGH,          having been first duly sworn

12                            by the Notary, deposed and

13                            testified as follows:

14

15

16                    EXAMINATION

17   BY MS. ROBERTS:

18   Q   Good morning, Mr. Killough.

19   A   Good morning.

20   Q   As you just heard, my name is Andrea Roberts and I

21       will be deposing you here today.

22           Have you ever been deposed before?

23   A   Yes.

24   Q   Okay.  So you likely know all -- all of the ground

25       rules.  I'll just go over them very quickly.  And I

CONFIDENTIAL

Page 178

1   Q  Okay.  And in the cases in which -- the cases listed

2      on Pages 6 and 7 of Exhibit 2 in which Motorola

3      asserted patents against Microsoft, is it correct

4      that Motorola sought both monetary relief and

5      injunctive relief?

6                MS. ROBBINS:  Objection.

7      Ambiguous.

8   A  In the -- okay.  In the -- in the Wisconsin

9      complaints, Motorola certainly sought injunctive

10     relief and also prayed for damages.

11        In Germany, certainly sought injunctive relief.

12     I expect -- expect they asked for a right for an

13     accounting of damages.  The procedure is a little

14     different in Germany.

15        And I think that -- that covers it.

16   Q  (By Ms. Roberts)  But in those cases in which

17     Motorola sought injunctive relief, it also sought

18     monetary relief as well; is that right?

19                MS. ROBBINS:  Objection to the

20     extent it mischaracterizes his testimony.

21        You can answer.

22   A  Right, with the exception that the German procedure

23     is a little different --

24   Q  (By Ms. Roberts)  Okay.

25   A  -- than the U.S. procedure.

CONFIDENTIAL

Page 179

1   Q   Fair enough.

2           In preparing its allocations, has Microsoft

3       identified the work that it performed to defend

4       against Motorola's claims for monetary relief versus

5       Motorola's claims for injunctive relief?

6   A   In the ITC claims, there wouldn't have been any

7       claims for damages or monetary relief.  So no such

8       allocation would be possible.

9           And I don't know that, as to the others, that

10      Microsoft has attempted to say X amount of this

11      effort was defending against your claim for

12      injunction versus your claim for damages.

13          The exception to that being the anti-suit

14      injunction piece, which is directed to injunction.

15  Q   So, generally speaking, is it fair to say that the

16      fees and costs reflected in the invoices reflect work

17      both performed to defend against -- defend against

18      the claims for monetary relief and claims for

19      injunctive relief, to the extent both were asserted

20      in the particular action?

21  A   You know, I don't know that an allocation has been

22      attempted with that criteria applied.

23  Q   Okay.  And prior to the date that Microsoft filed the

24      1823 action, had it incurred any attorneys' fees or

25      litigation costs as a result of Motorola seeking

CONFIDENTIAL

Page 180

1       injunctive relief from practicing patent

2       essential (inaudible) in 2011 or --

3                       THE REPORTER:  Could you repeat

4       part of that?

5                       MS. ROBERTS:  Let me start over,

6       then.

7                       THE REPORTER:  There was a cough.

8    Q  (By Ms. Roberts)  Prior to the date that Microsoft

9       filed the 1823 action, had it incurred any attorneys'

10      fees or litigation costs as a result of Motorola

11      seeking injunctive relief from Microsoft practicing

12      its patents essential to the 802.11 or H.264

13      standards?

14   A  I don't think Motorola had filed any actions by that

15      time, seeking injunctive relief, so it would not

16      have -- certainly would not have incurred any fees or

17      expenses associated with defending against any

18      actions that had not yet been filed.

19   Q  Do you have any personal knowledge of Microsoft's

20      alleged relocation of its EMEA distribution

21      facilities from Germany to the Netherlands and the

22      cause of that?

23                      MS. ROBBINS:  I'm going to object.

24      This is outside the scope of the 30(b)(6) topics in

25      which Mr. Killough has been designated.  Also, you've

# EXHIBIT BB

```
                 UNITED STATES DISTRICT COURT
            WESTERN DISTRICT OF WASHINGTON AT SEATTLE
_____

MICROSOFT CORPORATION,              )
                                    )
                Plaintiff,          )
                                    )
v.                                  ) CASE NO. C10-1823JLR
                                    )
MOTOROLA, INC., et al.,             ) SEATTLE, WASHINGTON
                                    ) May 7, 2013
                Defendants.         )
    _____        ) TELEPHONE CONFERENCE
                                    )
MOTOROLA MOBILITY, LLC, et al.,     )
                                    )
                Plaintiffs,         )
v.                                  )
                                    )
MICROSOFT CORPORATION,              )
                                    )
                Defendant.          )
                                    )
_____

                 VERBATIM REPORT OF PROCEEDINGS
            BEFORE THE HONORABLE JAMES L. ROBART
                 UNITED STATES DISTRICT JUDGE
_____

APPEARANCES:


 For the Plaintiff:      ARTHUR HARRIGAN
                         CHRISTOPHER WION
                         SHANE CRAMER
                         DAVID PRITIKIN
                         ANDY CULBERT


 For the Defendants:     RALPH PALUMBO
                         PHILIP McCUNE
                         BRIAN CANNON
                         ANDREA ROBERTS


 Reported by:            NANCY L. BAUER, CCR, RPR
                         (206) 370-8506
                         nancy_bauer@wawd.uscourts.gov
```

May 7, 2013                                        1:30 p.m.
PROCEEDINGS
_____

THE COURT:  Good afternoon, counsel.  This is Judge
Robart.

MR. HARRIGAN:  Good afternoon, Your Honor.

THE COURT:  Mr. Palumbo, Mr. Harrigan.  Who all do we
have with us today?

MR. PALUMBO:  Ralph Palumbo, Your Honor.  For
Motorola, I have Brian Cannon and Andrea Roberts from
Quinn Emanuel, myself and Phil McCune from Summit.
Mr. Cannon will be our primary spokesperson today.

MR. HARRIGAN:  And, Your Honor, for Microsoft, you
have yours truly, and my partners, Mr. Wion, Mr. Cramer,
David Pritikin from Sidley, I believe, is on the line, and I
think Mr. Culbert from Microsoft is auditing.  I will be the
speaker.

THE COURT:  All right.  Well, counsel, I've had an
opportunity to review Mr. Palumbo's letter, which we are
construing as a motion.  And I appreciate you using the
court's 7(i) feature so we can get this done expeditiously,
and I believe it's dated May 1, 2013.  And in response to
that, I have Mr. Harrigan's letter of May 3, 2013.

At issue, as I understand it, is a request that the court
preclude Microsoft from relying on or introducing evidence
related to four damage theories.

1    So, in effect, this is somewhat like a motion in limine,

2    although it really is more in the order of a disguise motion

3    for summary judgment.

4    I've had a chance to go back and look at this, and let me

5    give you my chronology, and then I have one question for both

6    sides, and it's my intention to rule today.

7    Mr. Palumbo, in his letter, describes whatever was done by

8    Microsoft on February 7, 2011, as initial disclosures.  That

9    is a term of art under the civil rules, and it is, perhaps,

10   the most general lay-down disclosure I've ever seen, in that

11   it says, "Microsoft claims its damages," and later it says,

12   "All damages available under the law."  And by way of further

13   clarification says, "Suffered as a result of defending

14   against Motorola's action in the district court for the

15   Western District of Wisconsin and before the ITC."

16   That seems to me to address or go to one of the items of

17   damage that's claimed by Microsoft in its subsequent more

18   detailed disclosures.

19   On May 7th, 2012, and I actually have a recollection of

20   this, Mr. Harrigan was passionately arguing to the court and

21   announced that one of the Microsoft's items of damage was the

22   costs associated with its move of its distribution center to

23   the Netherlands.  That was a new fact to the court at the

24   time.

25   I do not have as detailed recollection of the July 9,

1    2012, phone call, but I haven't seen anyone contest that

2    Mr. Harrigan at that time said something to the effect of the

3    damages associated with dismantling Microsoft's facilities in

4    Germany.

5         There is no question but that on July 10, 2012, I entered

6    an order which stayed everything except a few limited number

7    of items.  Included in that was accept injunctive relief and

8    pretrial and trial RAND issues.

9         That was apparently then clarified by the parties in the

10   some emails exchanged, which the court was not privileged to.

11   I guess my order was the 11th of July.

12        Not much then happens until trial last fall.  Both parties

13   seem to have operated with the assumption that damage

14   discovery was stayed.  I would have expected some

15   continuation of damage discovery because I know that there

16   was written discovery exchanged between the parties prior to

17   the time of the stay, and it would have been my expectation

18   that there would have been continued supplementation of that,

19   but I can understand how you were busy concentrating on

20   something else, and I certainly understand what you did.

21        We then, in March, issue a scheduling order setting a

22   schedule for what was going to be permissible, and second,

23   setting the date for the trial.

24        Your letters confirm that on March 29, 2013, apparently

25   Microsoft had a conversation with Motorola regarding damages.

1   Once again, that comes outside the material that the court

2   would be aware of.

3       And apparently on April 3rd, 2013, Microsoft served

4   supplemental interrogatory answers, which would confirm the

5   fact that there had been prior discovery served.

6       In that there are four items of claimed damage.  First --

7   and I'm taking this from one of the letters -- it's

8   attorneys' fees, Microsoft's attorneys' fees defending, and I

9   underline the word "defending," Motorola's claims in the ITC,

10  the U.S. district court in Germany.  And since it seems to me

11  there is a difference in attorneys' fees defending and

12  attorneys' fees in prosecuting, I assume that the word was

13  chosen intentionally.

14      Motorola, for its part, does not seek to exclude that as

15  an item of damage in the upcoming trial, and therefore it

16  seems to me that one is in there.

17      I would think that as part of either your motions in

18  limine or your dispositive motions, someone will flesh out

19  legal basis for that claim.  Right now I guess I can create

20  one in my mind, but that's not an area of damages law that I

21  know off the top of my head, and it would be helpful to

22  understand your basis for it.

23      The second is the relocation from Germany to the

24  Netherlands, and I hold that that has previously been

25  disclosed, and therefore is legitimately part of the damages

1   that will be pursued in the upcoming trial.

2       The third item of damage is Motorola's refusal to grant

3   Marvell a license, which I do not find having been raised

4   anywhere, and it certainly has not been raised to the court.

5   Microsoft does not respond to that, which, under the local

6   rules, is deemed to be a concession of its correctness, and

7   therefore I am tentatively striking that as an item of

8   damage.

9       And then the fourth, Motorola's refusal to grant Microsoft

10  a license under Google's MPEG LA license.  Once again,

11  Motorola has brought that on as a motion to exclude.

12  Microsoft has not responded.  In fact, there's no further

13  discussion of either of those, the Marvell license or the

14  MPEG LA license, and therefore I'm excluding it.

15      The trial in this matter remains as fixed in the March

16  2013 minute order.  I guess all I can say is welcome to the

17  party.  The time and the date is set, and it's not going to

18  get moved on the basis of some trumped-up stuff, and that

19  trial will go forward on issues No. 1 and 2, namely

20  attorneys' fees and the relocation.

21      At the very end of Mr. Palumbo's letter, there is a wish

22  list of items that Motorola would like, and that includes ten

23  requests for production of documents, three interrogatories,

24  50 requests for admissions, two additional depositions, and a

25  partridge in a pear tree.  They're not going to get very much

1  of that.  I see no reason to allow requests for production of

2  documents when there's already been documents produced.  If

3  you have not explored among yourselves areas where you

4  believe documents need to be produced, or you think documents

5  are being withheld, bring that matter on to the court.

6      The question I'm going to ask the parties at the end of

7  this is, why do you need interrogatories?  As to the 50

8  requests for admissions, the answer is no.  I'm going to

9  authorize two additional depositions so that you now have

10  eight total.  Originally two were going to be on liability

11  and four were going to be on damages.  And I'm not going to

12  allocate the two additional ones, but my assumption is, if

13  you're telling me the truth, those will probably be going to

14  damages.

15      And if you need some additional time to get your discovery

16  done before the cutoff date set by the court, I'm happy to

17  hear that, as I'm now at the end of my prepared remarks.  So

18  Mr. Palumbo on behalf of Motorola?

19          MR. CANNON:  Good afternoon, Your Honor.  This is

20  Brian Cannon for Motorola.  I think the two additional,

21  you're correct, will go to damages, at least on the Motorola

22  side.

23      The wish list request, I think, was primarily directed to

24  the moving of the Germany facilities.  Your Honor is

25  absolutely correct about Microsoft potential damages theory

1     last year.

2          The issue from our end, or the reason we brought the

3     motion was that we actually thought the computation related

4     to that were not produced until this year.  However, Your

5     Honor ruled, and I have nothing further to say on that.

6          The interrogatory I had in mind was having to do with

7     moving the facility and asking Microsoft for its business

8     reasons in addition to what it alleges its damages theory is

9     as to why the facility moved.  But I think with the

10    additional deposition, we should be able to cover that

11    ground.

12               THE COURT:  Great.  Thank you.  Mr. Harrigan?

13               MR. HARRIGAN:  Yes, Your Honor.  I think the only

14    items that I would like to briefly address are the Marvell

15    and Google items, and to clarify that, there is no separate

16    damages claim for either one of those items -- either one of

17    those alleged breaches.

18         We were responding or supplementing by identifying those

19    as elements of our breach claim, and in the April -- and we

20    did refer to the April 3rd -- the supplemental disclosure in

21    our letter, and what that says is, with respect to, for

22    example, Google, Motorola failed to make a license available

23    on those terms.  If the license had been available, Microsoft

24    would not have incurred any further damage by virtue of -- by

25    failure of Motorola to make available a license on RAND terms

1    on its H.264 patents.  In other words, what we're saying is

2    that had the license been granted, some of the attorneys'

3    fees we're claiming would not have been incurred.  And the

4    same claim is made with respect to the Marvell issue.

5        So there is no need for any different or new damages

6    disclosure.  The damages are exactly the same as are asserted

7    on the other claims.  These are simply two additional grounds

8    on which those damages occurred that would have been avoided

9    had Motorola acted as we believe it was required to act.

10       So we would ask that -- that this motion has to do with

11   precluding presentation of damages proof.  We're not going to

12   be producing or seeking to introduce any different damages

13   proof based on those two claims.  We're simply clarifying

14   that they are part of the actions or failures to act by

15   Motorola that support the claims with respect to -- and I

16   believe in this case it would be just the attorneys' fees,

17   because I don't think that those would have affected the

18   German relocation issue.

19            THE COURT:  Mr. Harrigan, I can recall reading that

20   statement in regards to -- I think it was Marvell, although

21   I'm not finding it as I'm looking through your letter right

22   now.  And I think that's the first time I've seen that

23   argument.  Where in your letter does it mention the MPEG LA?

24            MR. HARRIGAN:  Your Honor, what I'm referring to is

25   that the letter references the April 3rd, 2013, supplemental

1    disclosures.  And at page 27 and 28 of that document, the

2    last two pages, we make the statements that I just described

3    with regard to the Marvell and Google issues, basically

4    saying that if the license had been granted, as we believe it

5    was required under either of those, that would have avoided

6    the fees -- some of the fees that we are claiming.  Those

7    elements of damage are no different from the fees that we are

8    otherwise claiming that, obviously, the court has already

9    held were properly disclosed.

10           THE COURT:  Well, my problem with that is, that just

11   opens up a black hole in that we're then going to get into

12   the question of the Marvell license, which was covered in

13   part at trial by, I think it was general counsel for Marvell,

14   and it was certainly the subject of discovery in regards to

15   MPEG LA, which was done at the last minute on a rushed basis.

16      How do we not have that swamp what is intended to be a

17   breach of contract and damages case?

18           MR. HARRIGAN:  Well, Your Honor, first of all, what I

19   think I'm saying here is that since this motion is based upon

20   the failure to disclose the damages arising from these

21   breaches, there is no difference in the damages, based on

22   these two items.  And as you know, you know, the Google issue

23   didn't even become real until May of 2012, and the Marvell

24   issue, which has, obviously, as you say, been the subject of

25   testimony.  So I think that those two are fairly in the case.

1    And, you know, one of the things that we are actually

2  thinking that might be appropriate here is, at some point in

3  the not too distant future, at least when the court decides

4  whether this is going to be a jury trial or not, that we have

5  a conference and talk about how the trial can be structured

6  so as to get it over with in the time prescribed.  And I

7  think that we can figure out ways, to the extent these issues

8  need to be addressed, get them addressed in a short

9  limitation.

10         THE COURT:  All right.  Mr. Cannon, may I hear you,

11  please?

12         MR. CANNON:  Yes, Your Honor.  It's news to me that

13  the Marvell theory and the MPEG LA theory are not really

14  damages theory.  They're more of an offset theory.  I think,

15  as Your Honor noted at the outset, these are new theories and

16  it is a new computation that Microsoft is offering here in

17  terms of how to calculate the damages from the alleged

18  breach.

19    So I think Your Honor was correct to compare the

20  disclosures and the response of the interrogatory and leave

21  it at the MPEG LA and the Marvell issue, since they didn't

22  appear in the record until recently.  And so it's on that

23  basis that Motorola feels the new theory and new computation

24  and new ways to look at damages should have been disclosed

25  before.

1     MR. HARRIGAN:  And just one further comment, Your

2  Honor.

3     Really, the Marvell issue is an effort by Microsoft to get

4  a license via another method, which, obviously, hadn't been

5  granted would, you know, cut off whatever damages arose from

6  not having a license, including attorneys' fees.  And it's

7  certainly no mystery to anyone what the facts are surrounding

8  that, and all we would be intending to do at trial is to say,

9  you know, at our request Marvell asked for a license, and

10  they were essentially given the same royalty demand based on

11  the laptop price that we're claiming is a breach.

12     THE COURT:  All right.  Well, the court's ruling on

13  this is as follows:

14     I am going to permit that as an argument in support of the

15  identical damages that would have been presented anyway.  It

16  seems to me that both of those subjects were brought up and

17  discussed as part of the underlying trial on RAND rates, and

18  therefore the parties should not need to do any additional

19  discovery.  And since you're not asking for any additional

20  damages, I'm not sure that there is any prejudice in this

21  matter.

22     In terms of an answer on jury or nonjury, we're going

23  start working on that in the near future.

24     In the meantime, I would hope that you will concentrate

25  your efforts in regards to getting your discovery done.  It

1    sounds like you're wasting a lot of time quibbling back and

2    forth over how many hours count as a deposition.  Let's use

3    some common sense there and get that done.

4        My goal in this is that if there is a witness that needs

5    to be deposed, they don't need to be burdened.  So between

6    yes to a deposition and no to burden, I think you guys can

7    figure out what you need to get done.

8        That will be the ruling of the court.

9        Mr. Cannon, anything else?

10        MR. CANNON:  The only thing I might ask, Your Honor,

11   is if there is any computations relating to the Marvell and

12   MPEG LA theory, we would get those before the close of that

13   discovery.  That would be helpful.

14        THE COURT:  I think what I heard Mr. Harrigan say is

15   it would not change what they've already given you.  They're

16   just arguing it is one more reason why they needed to do it,

17   and you have the information on what they've done.

18   Mr. Harrigan, is that an accurate statement?

19        MR. HARRIGAN:  Yes, that is accurate.

20        THE COURT:  Mr. Cannon, does that satisfy your

21   concern?

22        MR. CANNON:  Yes, Your Honor.

23        THE COURT:  All right.  All right, counsel, anything

24   else the court can do for you today?

25        MR. HARRIGAN:  Not from here.

1          MR. CANNON:  Thank you.

2          THE COURT:  All right.  Thank you, counsel.

3

4                    (PROCEEDINGS CONCLUDED.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

C E R T I F I C A T E


I, Nancy L. Bauer, CCR, RPR, Court Reporter for the United States District Court in the Western District of Washington at Seattle, do hereby certify that I was present in court during the foregoing matter and reported said proceedings stenographically.

I further certify that thereafter, I have caused said stenographic notes to be transcribed under my direction and that the foregoing pages are a true and accurate transcription to the best of my ability.


Dated this 12th day of May 2013.


/S/  Nancy L. Bauer

Nancy L. Bauer, CCR, RPR
Official Court Reporter

# EXHIBIT CC

1            UNITED STATES DISTRICT COURT.

2        WESTERN DISTRICT OF WASHINGTON AT SEATTLE

3

4  MICROSOFT CORPORATION,      )

5               Plaintiff,  ) C 10-01823-JLR

6  v.                 ) SEATTLE, WASHINGTON

7  MOTOROLA INC., et al,     ) January 28, 2013

8              Defendant.  ) Motion Hearing

9

10          VERBATIM REPORT OF PROCEEDINGS
        BEFORE THE HONORABLE JAMES L. ROBART

11         UNITED STATES DISTRICT JUDGE

12

13

  APPEARANCES:

14

15

16  For the Plaintiff:     Arthur Harrigan, Christopher
                     Wion, David Pritikin, Rick

17                   Cederoth, Andy Culbert and Doug
                   Lewis

18

19

20

21  For the Defendants:    Jesse Jenner, Ralph Palumbo,
                    Philip McCune, Steve Pepe, Kevin

22                   Post, Gabrielle Higgins and
                   Carolyn Redding

23

24

25

1          THE COURT:   The clerk will call this matter.

2          THE CLERK:   C 10-1823 Microsoft versus Motorola.

3     Counsel, please make your appearance.

4          MR. HARRIGAN:   Good afternoon, Your Honor.   Art

5     Harrigan here representing Microsoft.   And to my left is

6     David Pritikin, who you've met before; and Rick Cederoth; and

7     Andy Culbert from Microsoft; my partner Chris Wion; and David

8     Lewis from Sidley -- excuse me, Doug Lewis from Sidley.

9          MR. McCUNE:   Good afternoon, Your Honor, and a

10    belated Happy New Year to you.   Phil McCune for Motorola.

11    And on the phone is my partner, Ralph Palumbo.   And also with

12    us today is Mr. Jenner, Jesse Jenner, Steve Pepe, Gabrielle

13    Higgins --

14         MS. HIGGINS:   Good afternoon, Your Honor.

15         MR. McCUNE:   Kevin Post and Carolyn Redding from

16    Ropes and Gray for Motorola.

17         THE COURT:   Thank you.   Counsel, I'm delighted to see

18    you all again, it's been so long.   We scheduled this hearing

19    because we are earnestly working on findings and conclusions.

20    And in order to have those be complete, there seems to be

21    like two matters that we needed to get finalized.

22         One of those is a matter that has been pending on the

23    court's calendar for some time, and that would be Microsoft's

24    motion for summary judgment of invalidity, found in the

25    docket at 205.   That arose out of the Markman hearing that

1   all AVC essential patents which the party and its affiliates

2   presently or in the future has the right to license or

3   sublicense."

4       So, Microsoft has exactly the same obligation to provide

5   its affiliates SEPs to MPEG LA that its complaining that

6   Google has.  In other words, Google's obligation and

7   Microsoft's obligation with respect to affiliates are in

8   tandem.

9       So, Your Honor, we don't believe there is any inequity.

10  But more fundamentally, of course, this is a contract, and it

11  says very clearly that the grant-back obligation depends

12  solely upon the fact that Motorola is an affiliate, a

13  controlled affiliate in this case, and the scope limitations

14  simply depend upon which licenses Google selected.  And we

15  know what they are, AVC and OEM, both of which are -- and

16  those are the two licenses that involve the SEPs that are at

17  issue in this case.  And the issue of the Enterprise license

18  doesn't have anything to do with it.  The Enterprise license

19  doesn't even cover those two license scopes.

20      Now, I need to address a few other items that are raised

21  in Motorola's brief, one of which is the argument that this

22  agreement should be construed against MPEG LA as the drafter.

23  In Motorola's brief they don't mention Section 8.13 of the

24  agreement, which appears at page 3 of the excerpts.  Section

25  8.13 is entitled, "Representation of counsel; mutual

1  negotiation." And on the last line it provides that the

2  agreement shall be construed in accordance with its terms,

3  without favor to any party. So this entire subject is

4  superseded by the document, by the agreement, which Motorola

5  did not address.

6      Secondly, the issue of construction against the drafter in

7  this case needs to be considered in light of the fact that

8  Motorola itself was part of the drafting process, got all the

9  e-mails, understood, had every reason to understand why this

10  provision was in there, and that its scope was as stated in

11  the e-mails, and as effected by the interpretation that we

12  are advancing.

13      Finally, I would just say if you look at the New York

14  cases cited by Motorola -- in fact, two things. One is that

15  in New York construction against the drafter is a last-resort

16  rule that applies when all other efforts to construe the

17  document have failed. And secondly, it is generally not

18  applied to sophisticated parties.

19          THE COURT: Mr. Harrigan, when did Google acquire

20  Motorola?

21          MR. HARRIGAN: It was in, I believe, mid-2012.

22          THE COURT: Why wasn't this issue brought up to the

23  court sooner?

24          MR. HARRIGAN: Well, Your Honor, the basic reason was

25  the concern about maintaining the trial date. The process --

1    there were various reasons.  The process of getting Google

2    into this case would have been complicated.  And we were

3    concerned if we undertook that, that we would end up

4    potentially with a continuance.  That was the primary

5    concern.

6            THE COURT:  But you inserted the issue into the

7    trial.  I'm at a loss why it wasn't raised sooner so that we

8    could have had a fuller record.

9            MR. HARRIGAN:  Well, Your Honor, I believe what we

10   did was to argue that the acquisition and the agreement

11   created a very clear comparable, number one.  And number two,

12   as a matter of law this will determine what Motorola's

13   royalty rate is.  And that is a legal issue that we believe

14   the court can decide without Google being in the case.  It's

15   a legal issue that bears on the RAND rate as between

16   Microsoft and Motorola, because at the end of the day it will

17   determine that.  And it wouldn't make much sense to adopt a

18   rate that's different from the one that the contract is going

19   to compel.

20        So, I'm frankly not -- I don't have memorized exactly what

21   the procedural sequence was.  But we did argue it soon after

22   it came up.  We wrote a letter to Google and asked for them

23   to honor the agreement.  And I apologize if we didn't act as

24   promptly as we might have.  But our main concern was, do we

25   need to bring Google in?  And we concluded that whether we

did or not, we didn't want to lose the trial date.

THE COURT: All right. Thank you. Who is arguing? Are you done?

MR. HARRIGAN: Where am I?

THE COURT: You have about five minutes.

MR. HARRIGAN: Okay. So, I just want to address one other issue that may come up. And that is that we also believe that the same rate will govern the question of back royalties. And I'm not going to attempt to reproduce the calculation or potential calculations of the rate under this contract. But we believe that the fact that the contract involves, in effect, a presumption as to what the reasonable rate is, means that that presumption would apply both forward and backward, because it doesn't make any sense for those two rates to be different. And the contractual obligation is essentially accepting the presumption as to what the reasonable rate is, which obviously would be the same for the past and for the future. Thank you.

MR. JENNER: May I proceed, Your Honor?

THE COURT: Good afternoon, Mr. Jenner.

MR. JENNER: Your Honor, we overview on Tab 2 of the binder what we think the general issues are that we ought to cover. And the first of those issues, the second bullet is the issue that I had thought had arisen when Your Honor first addressed this at the end of the trial. You noted that the

# C E R T I F I C A T E

I, Debbie K. Zurn, RPR, CRR, Court Reporter for the United States District Court in the Western District of Washington at Seattle, do hereby certify that I was present in court during the foregoing matter and reported said proceedings stenographically.

I further certify that thereafter, I have caused said stenographic notes to be transcribed under my direction and that the foregoing pages are a true and accurate transcription to the best of my ability.

Dated this 6th day of February, 2013.

/s/ *Debbie Zurn*

DEBBIE ZURN
OFFICIAL COURT REPORTER

417

# EXHIBIT DD

CONFIDENTIAL

Page 1

1          IN THE UNITED STATES DISTRICT COURT

2        FOR THE WESTERN DISTRICT OF WASHINGTON

3

4                      AT SEATTLE

5

6

7

8    MICROSOFT CORPORATION, a              )

9    Washington corporation,              )

10                                         )

11                  Plaintiff,             )

12                                         ) No. 2-10-cv-

13              vs.                        )   01823-JLR

14                                         )

15    MOTOROLA, INC., and MOTOROLA         )

16    MOBILITY, INC.,                      )

17                                         )

18                  Defendants.            )

19

20

21    VIDEOTAPED 30(b)(6) DEPOSITION OF

22

23                      May 9, 2013

24    Job No. CS1663256

25                  Seattle, Washington

CONFIDENTIAL

Page 7

1              MS. ROBERTS:  Andrea Pallios

2      Roberts of Quinn Emanuel, representing defendant

3      Motorola.

4              MS. MANGIN:  Elanor Mangin of Quinn

5      Emanuel, representing Motorola.

6              MR. WION:  Chris Wion from Calfo

7      Harrigan, representing Microsoft and the witness.

8              THE VIDEOGRAPHER:  Thank you.

9          At this time, we'd ask the court reporter, Karmen

10     Knudson of Veritext, to please swear in the witness

11     and proceed with the deposition.

12     JAMES JEFF DAVIDSON,    having been first duly sworn

13                            by the Notary, deposed and

14                            testified as follows:

15

16

17                      EXAMINATION

18     BY MS. ROBERTS:

19   Q  Good morning, Mr. Davidson.

20   A  Good morning.

21   Q  As you heard, my name is Andrea Roberts and I'm going

22      to be taking your deposition taken today.

23          Have you ever been deposed before?

24   A  Never.

25   Q  Okay.  Well, I'm going to go over some of the ground

CONFIDENTIAL

Page 79

1   A   I can't control everybody else.  So in my role, I

2       would expect so.

3   Q   Okay.  I'm going to hand you what we will mark as

4       Davidson Exhibit 2, which is a document which has the

5       Bates number MS-MOTO_1823_00004082856.

6                           (Exhibit No. 2 marked

7                               for identification.)

8

9   Q   (By Ms. Roberts)  And I'll give you a minute to look

10      through it.  Let me know when you're ready.

11          So, first of all, I'll direct your attention to

12      the -- well, have you seen this document before?

13  A   I have seen this document before.

14  Q   And what do you understand this document to be?

15  A   This was a proposal from CEVA -- or investigation

16      "slash" proposal from CEVA as they investigated

17      potential sites.

18  Q   And it's dated January 26, 2012?

19  A   That is correct.

20  Q   Is that correct?  Okay.

21          So if I can turn your attention to the second

22      page.

23  A   Mm-hm.

24  Q   And there's a list of countries -- Netherlands,

25      Belgium, UK and France -- in this chart.

CONFIDENTIAL

Page 80

1        Do you see that?

2 A   Yes, I do.

3 Q   Were those locations that CEVA was investigating for

4      potential locations to relocate to?

5 A   These were some of them, yes.

6 Q   What other locations were considered?

7 A   Belgium, UK, France -- there would be other locations

8      that we talked about.  Poland, Czech Republic.

9        Those are some that I recall.

10 Q   Okay.  And as you may recall, I asked you a few

11      moments ago sort of which came first; the decision to

12      move or the decision to relocate.

13 A   Mm-hm.

14 Q   And I believe you testified earlier that the ultimate

15      decision to move wasn't made until March of 2012.

16        This document, looking at other facilities, is

17      dated January 2012.

18        Does that refresh your recollection as to the

19      timeline as to when -- when Microsoft analyzed each

20      of those issues, whether to move and where to move

21      to?

22 A   Our decision to move was in March.  Our evaluation,

23      it was earlier.

24 Q   And was there any evaluation done prior to January of

25      2012?

Veritext Corporate Services

CONFIDENTIAL

1   A   Not that I'm aware of.

2   Q   Okay.  I guess, is it fair to say there wasn't any

3       evaluation that you were involved in prior to January

4       2012?

5   A   Correct.

6   Q   Could there have been evaluation by others at

7       Microsoft prior to January of 2012; you just don't

8       know one way or the other?

9   A   As it relates to the injunction and -- or as it

10      relates to --

11  Q   As it relates to whether to move.

12  A   We've never -- I mean, we've done -- as part of the

13      course of doing business, you do what's -- a network

14      analysis to make sure you're optimally situated.  So

15      it's not an evaluation of should we move.  It's an

16      evaluation of are we in the right places.

17          Those evaluations would consistently -- nope, you

18      should stay in Germany, you're in the right place.

19          So prior to that, that would be the extent of our

20      evaluations.

21  Q   How often were those evaluations done?

22  A   Those evaluations we did -- would be done every few

23      years.

24          Yeah, it wouldn't be -- it would be pretty --

25      yeah, every few years, just to make sure where are we

1    change the direction we were heading.  And so how
2    alert I was to those proceedings wasn't a major focus
3    of mine, because we were already down a path and I
4    didn't -- I didn't see a way to change that path.
5        We were committed financially.  We had alerted
6    customers.  We had terminated with Arvato.  They had
7    found another client.  They had given a definitive
8    date for which we needed to be out of the facility.
9        So turning back and changing direction wasn't an
10   option.
11       I don't recall exactly what -- at what specific
12   date that was, but it wasn't long after we put in a
13   motion.
14   Q  So -- so you can't recall if there was a -- sort of a
15      date where, once we get past this, there's no turning
16      back now?
17   A  I don't recall when that was.  But through the course
18      of going through it, I mean, I can recall knowing
19      when that was.  I just don't -- looking back now, I
20      don't recall the specific date.
21   Q  In relation to when Microsoft gave notice to Arvato
22      that it was terminating the relationship for the
23      Düren facility, would that have been the no-turning-
24      back point?
25   A  It would be very close to that.

CONFIDENTIAL

Page 231

1         We saw the back-and-forth with Hans Peter.  And

2    they were very serious, at which point they secured

3    and moved on with other clients.

4         There's a point where we signed an LOI with CEVA

5    right around that same period, and we were locked.

6  Q  And so then to the extent that in May of -- well, are

7    you aware that in May of 2012, the Washington court

8    actually issued an order precluding Motorola from

9    enforcing an injunction in Germany?

10                 MR. WION:  I'm going to object

11    again.  That's outside the scope of the Topic 8 for

12    which Mr. Davidson has been designated.

13         To the extent, in your individual capacity, you

14    can answer the question without disclosing privileged

15    communications, you may.

16  A  Repeat it, please.

17  Q  (By Ms. Roberts)  Are you aware that in May of 2012,

18    the Washington court issued an order precluding

19    Motorola from enforcing an injunction in Germany?

20  A  Yes.

21  Q  And did that factor into the -- the move at all?

22  A  It was too late at that point.

23  Q  Now, when we were discussing the operating costs,

24    the comparison between the Düren and the Venray

25    facilities, you noted that there were lower costs in

CONFIDENTIAL

Page 232

1       the Düren facility because it's a shared facility.

2       You said the costs were spread among the other

3       tenants.

4            Is that correct?

5    A  Correct.

6    Q  Okay.  Are there any benefits to having a facility

7       that's not shared with other tenants?

8    A  It wouldn't be economic benefits.  I mean, it's

9       dedicated to you.  You can maneuver in the facility

10      how you want.

11           Was it ever an impediment?  I wouldn't say it was

12      ever an impediment to the way we operated in a shared

13      facility.  I mean, we never felt lack of agility or

14      capacity, to my knowledge.

15           You know, so to that extent, no, not an

16      impediment.

17           A dedicated site, it's -- you're free to do

18      whatever you want in it, but it does cost more, and

19      if you're sitting on assets, capital that aren't

20      fully utilized.

21                     MS. ROBERTS:  I think I have no

22      further questions.

23                     THE WITNESS:  Okay.

24                     MR. WION:  No questions for me.

25                     THE VIDEOGRAPHER:  Please stand by.

# EXHIBIT EE

# Microsoft Corporation

## v.

## Motorola, Inc., et al.

Expert Witness Report

Signed: _____

Todd D. Menenberg

Navigant Consulting, Inc.

May 29, 2013

428

**Expert Report of Todd D. Menenberg**
**May 29, 2013**

3) above was calculated based on actual Arvato storage costs incurred by Microsoft for fiscal year 2012 (July 2011 through June 2012).

## V.    Summary of Opinions

In conclusion, I believe total estimated damages are at least ███████, which consists of at least ███████ in legal cost damages and ███████ in facility relocation and operating costs damages.

429