# EXHIBIT FF



**GEOTEXT**
Translations, Inc.

STATE OF CALIFORNIA )
)
)
COUNTY OF SAN FRANCISCO )     SS

## CERTIFICATION

This is to certify that the attached translation is, to the best of my knowledge and belief, a true

and accurate translation from German into English of the attached Judgment Pronounced on

May 2, 2012.

Emma Drew, Project Manager
Geotext Translations, Inc.

State of California, County of San Francisco

Subscribed and sworn to (or affirmed) before me

on this _____ day of _____, 201__,

by _____,

proved to me on the basis of satisfactory evidence

to be the person(s) who appeared before me.

Signature: _____

R. L. CREIGHTON
Commission # 1930961
Notary Public - California
San Francisco County
My Comm. Expires Mar 31, 2015

New York  259 West 30th Street, 17th Floor, New York, NY 10001, U.S.A. tel +1.212.631.7432 fax +1.212.631.7778
San Francisco  220 Montgomery Street Ste. 438, San Francisco CA 94104 U.S.A tel +1.415.576.8900 fax +1.415.520.0525
Washington 1025 Connecticut Avenue, Suite 1000, Washington, DC 20036, U.S.A. Tel +1.202.828.1267 Fax +1.202.828.1271
London  8-11 St. John's Lane, London EC1M 4BF, United Kingdom Tel +44.20.7553.4100 Fax+44.20.7990.9909
Paris 75 Boulevard Haussmann, F- 75008 Paris, France tel +33.1.42.68.51.47 fax +33.1.77.72.90.25
Hong Kong  20th Floor, Central Tower, 28 Queen's Road, Central, Hong Kong tel +852.2159.9143 fax +852.3010.0082
translations@geotext.com  |  www.geotext.com

CONFIDENTIAL

431

<table>
<tr><td>

**Reference number:**
2 O 240/11

</td><td>

– *Official Copy* –



</td><td>

Pronounced on
May 2, 2012

Folger, Judicial Employee,
as clerk
of the court's business office

</td></tr>
</table>

# Regional Court of Mannheim [Germany]

## 2nd Civil Division

# In the Name of the People

# Judgment

In the litigation of:

**General Instrument Corporation**
Horsham, PA 19044 / United States

– Plaintiff –

Attorney of record:
Attorneys Quinn Emanuel, and colleagues, Mannheim, Court Box 227
(02426.40235/20161622.1)

**versus**

**Microsoft Deutschland GmbH**
Konrad Zuse Str. 1, 85716 Unterschleissheim

– Defendant –

Attorney of record:
Attorneys Freshfields Bruckhaus Deringer, and colleagues, Prannerstr. 10, 80333 Munich
(PC/CBA 109096:0588)

**for** patent infringement,

the 2nd Civil Division of the Mannheim Regional Court [Landgericht], following a hearing conducted on February 7, 2012, and acting through

Dr. Kircher, Presiding Judge at the Regional Court

Dr. Bauer-Gerland, Judge at the Regional Court

Wedler, Judge at the Regional Court,

**orders and adjudicates:**

CONFIDENTIAL

– 2 –

I.   The Defendant is adjudged:

1. a)

to cease and desist, within the territory of the Federal Republic of Germany, from

offering, putting into circulation, using, importing or possessing for the purposes referred to,

decoder apparatuses (especially Xbox 360) for receiving the blocks of encoded video data, provided by different motion compensators of an apparatus for the adaptive compression of digital video signals,

if they are characterized in that

a means is provided for retrieving, from each received data block, a code word representative of the motion compensator from which the block is received,

a means responsive to said code word is provided for recovering a motion vector for each block from motion vector data received with the block, and

a means responsive to said motion vector is provided for recovering current video image data from data provided by a current data block and at least one prior data block.

(EP 0 538 667 B1, Claim 19, direct infringement)

1.b)

to cease and desist, within the territory of the Federal Republic of Germany, from

offering and/or delivering

computer software (especially Windows 7 and/or Internet Explorer 9),

CONFIDENTIAL

MOTM_WASH1823_0602120

if it is suitable, by installation on a computer,

to form a

decoder apparatus for receiving the blocks of encoded video data, provided by different motion compensators of an apparatus for the adaptive compression of digital video signals,

if the decoder apparatus is characterized in that

a means is provided for retrieving, from each received data block, a code word representative of the motion compensator from which the block is received,

a means responsive to said code word is provided for recovering a motion vector for each block from motion vector data received with the block, and

a means responsive to said motion vector is provided for recovering current video image data from data provided by a current data block and at least one prior data block.

(EP 0 538 667 B1, Claim 19, contributory infringement)

1.c)

to cease and desist, within the territory of the Federal Republic of Germany, from

offering and/or delivering

computer software (especially Windows Media Player 12),

if it is suitable, upon installation on a decoder apparatus in accordance with item I. 1. b), to interact with the computer software in accordance with item I. 1. b) (especially Windows 7)

(EP 0 538 667 B1, Claim 19, contributory infringement)

CONFIDENTIAL

MOTM_WASH1823_0602121

– 4 –

1.d)

For each instance of non-compliance with one of the prohibitions pursuant to item I.1.a) through item I.1.c), the Defendant shall be subject to an administrative fine of up to EUR 250,000, respectively, and, alternatively, confinement, or confinement of up to 6 months, in regard to which the confinement shall be carried out against the legal representatives of the Defendant.

I.2

The Defendant is adjudged to render an accounting to the Plaintiff in writing in an orderly manner (arranged by calendar year quarters) as to the extent to which the Defendant has committed the acts described in item I.1.a) through item I.1.c) since October 19, 2001, stating in each instance:

a) the individual deliveries (with submission of the invoices and/or bills of delivery), together with:

> aa) quantities delivered, times and prices;
> bb) brands of the respective products as well as all identifying features such as designation of type, description of the article, serial number;
> cc) the names and addresses of the recipients;

b) the individual offers (with submission of written offers), together with:

> aa) quantities offered, times and prices;
> bb) brands of the respective products as well as all identifying features such as designation of type, description of the article, serial number;
> cc) the names and addresses of the commercial offerees;

c) the production costs, itemized by the individual cost factors, as well as the profit generated;

d) the names and addresses of the manufacturers, suppliers, and other previous holders, in each instance with the number of products manufactured, received or ordered;

CONFIDENTIAL

MOTM_WASH1823_0602122

– 5 –

e) the advertising undertaken, itemized by advertising media, their volume of circulation, time of circulation, and circulation area;

provided that the information referred to in a) and d) shall be documented by submitting order slips, order confirmations, invoices, as well as delivery and customs papers;

provided that it remains reserved to the Defendant to provide the names and addresses of their non-commercial recipients and the offerees instead of to the Plaintiff to a professional auditor to be designated by the Plaintiff and who is under a duty of confidentiality as against the Plaintiff, under oath, and domiciled in the Federal Republic of Germany, as long as the Defendant assumes the costs arising from the auditor's involvement and authorizes and obligates such auditor to inform the Plaintiff upon a specific inquiry as to whether a certain non-commercial recipient or a certain offeree is included in the accounting.

I.3.

The Defendant is adjudged to recall from the channels of distribution the products described in item I.1.a) that are in the possession of third parties other than end-users and that were put into circulation after April 29, 2006, by earnestly calling upon those third parties to whom possession of the products was granted by the Defendant or with the Defendant's approval, together with a notice that, with the present judgment, the division has found an infringement of the patent in dispute, to return the products and by promising such third parties the return of any purchase price already paid and the assumption of the costs of the return in the event that the products are returned,

and

to remove with finality the products described in item I.1.a), that are in the possession of third parties other than end-users and that were put into circulation

CONFIDENTIAL

MOTM_WASH1823_0602123

after 9/1/2008, in that the Defendant shall repossess these products or arrange for their destruction with the respective party in possession.

II.  It is determined that the Defendant shall compensate the Plaintiff for all damages that the Plaintiff has suffered or may yet suffer due to acts of the Defendant pursuant to items I.1.a) through I.1.c) since October 19, 2001.

III.  The action is otherwise dismissed.

IV.  The Defendant shall bear the cost of the litigation.

V.  The judgment shall be provisionally enforceable on security in the amount of:

- EUR 60 million with respect to item I.1 (injunctive relief);
- EUR 10 million with respect to item I.2 (accounting);
- EUR 10 million with respect to item I.3 (recall/removal), provided, however, that the security to be furnished shall be EUR 30 million in the event of isolated enforcement (without enforcement of the injunctive relief under item I.1.a)).
- 120% of the respective amount to be enforced with respect to item IV.

CONFIDENTIAL

MOTM_WASH1823_0602124

– 7 –

**Findings of Fact**

The Plaintiff is pursuing claims for injunctive relief, an accounting, as well as recall and removal from distribution channels, for alleged direct and contributory patent infringement, and it is requesting that the Defendant be held liable for compensatory damages.

The Plaintiff is a United States company and a wholly-owned subsidiary of Motorola Mobility Inc. The United States company of Google Inc. is planning to acquire Motorola Mobility Inc., as a result of which Google Inc. would also take over all companies held by Motorola Mobility Inc., including the Plaintiff.

The Plaintiff is the owner of European patent EP 0 538 667 B1, which is in force in Germany, (hereinafter: patent in dispute) concerning adaptive motion compensation using a plurality of motion compensators. The patent in dispute was filed on 10/6/1992. Disclosure occurred on 4/28/1993. The mention of the grant of the patent in dispute was published on 9/19/2001. The Federal Republic of Germany is among the designated contracting states. The German translation of the patent in dispute has been published under number DE 692 32 063 T2.

By brief dated 10/5/2011 (Exhibit FBD 19), the Defendant filed an invalidity action with the German Federal Patent Court [Bundespatentgericht] against the German part of the patent in dispute. By brief dated 2/8/2012, the plaintiff in the invalidity action (Defendant here) and the two intervenors in the invalidity proceedings (Microsoft Corporation and Microsoft Ireland Operations Ltd.) moved that the invalidity proceedings be stayed pursuant to Section 251 ZPO [Zivilprozessordnung (German Code of Civil Procedure)] (Exhibit FBD 36).

The Plaintiff is asserting claim 19 of the patent in dispute, which has the following wording in the language of the proceedings (reference numbers omitted):

*Decoder apparatus for receiving the blocks of encoded video data, provided by said different motion compensators of the apparatus of claim 1, characterized in that:*

CONFIDENTIAL

MOTM_WASH1823_0602125

*means are provided for retrieving, from each received data block a code word representative of the motion compensator from which the block is received;*

*means responsive to said code word are provided for recovering a motion vector for each block from motion vector data received with the block; and*

*means responsive to said motion vector are provided for recovering current video image data from data provided by a current data block and at least one prior data block.*

As to the further contents of the patent in dispute, especially the description and the associated figures, reference is made to the patent document (Exhibit KP1-K1) and its German translation (Exhibit KP1-K2).

The Defendant is part of the Microsoft corporate group. In the Federal Republic of Germany, it distributes among other things the Xbox 360 video game console and the Windows 7, Windows Media Player Version 12, and Microsoft Internet Explorer Version 9 computer software (hereinafter: challenged embodiments).

The challenged embodiments support the H.264 video compression standard, which has been published under the designation MPEG-4/AVC (*Advanced Video Coding*) as the tenth part of the MPEG-4 standard (MPEG-4/Part 10, ISO/IEC 14496-10) (hereinafter: standard). The Xbox 360 challenged embodiment enables the playing of H.264 video files. By being installed on a computer, Windows 7 and Windows Internet Explorer Version 9 enable the computer to play H.264 video files. This is also true for Windows Media Player Version 12, which uses the decoder modules from Windows 7.

Among other things, the H.264 standard regulates the decompression of a digital video signal that is compressed in a manner compatible with the standard, and it also defines the compression format that is to be decoded for a digital video signal. The standard was developed by the International Telecommunication Union (ITU) in collaboration with the MPEG (*Moving Pictures Experts Group*) and published in the document ITU-T H.264 (3/2010) (Exhibit KP1- K4). In 2002 to 2003, the predecessor of the Plaintiff's parent company, Motorola Inc., had participated in the H.264/MPEG4/AVC standard-setting process.

CONFIDENTIAL

MOTM_WASH1823_0602126

In the course of the standard-setting process, the Plaintiff and also Motorola Inc. issued a number of Patent Statement and Licensing Declaration Forms to the ITU aimed at, in their view, licensing standard-essential patents to prospective licensees at non-discriminatory, fair and reasonable terms (Exhibit Set FBD 8).

These declarations in part have the following wording (translation):

> "*2. The patent owner will grant to an unlimited number of applicants a license, on a worldwide, non-discriminatory basis and at reasonable terms, to use the patented subject matter, [...] Check here* __ [Note by the division: This spot was checked in each instance]*, if the patent owner's willingness to license is under the condition of reciprocity for the aforementioned ITU-T recommendations/the ISO/IEC International Standard.*
>
> *Negotiating the licenses is left to the parties in question and shall take place outside of the ITU-T/ISO/IEC.*"

The Defendant's parent company, Microsoft Corporation, is one of those companies that as a licensor contributed its patents declared essential for the H.264 standard to the MPEG LA H.264/AVC Patent Pool (hereinafter: MPEG LA Pool). In this pool, 171 families of patents that have been declared essential for the standard are being administered by MPEG LA, L.L.C. and jointly licensed. To that end, the MPEG LA H.264/AVC patent pool license agreement applies (hereinafter: MPEG LA Pool Agreement, Exhibit FBD-12). This agreement provides for a scaled license fee system with fixed amounts per device. Products that use the technology relevant to the standard (such as decoding products) are combined into what is referred to as "units." For a given company ("legal entity"), up to 100,000 units per year are free of charge. A license fee of USD 0.20 per unit must then be paid for subsequent units, and at 5,000,001 and more units, the license fee is reduced to USD 0.10 per unit for the additional units. Moreover, the MPEG LA Pool Agreement provides for a capping limit for licensees and their affiliates (2005-2006: maximum of USD 3.5 million/year; 2007-

CONFIDENTIAL

MOTM_WASH1823_0602127

2008: maximum of USD 4.25 million/year; 2009-2010: maximum of USD 5 million/year; 2011-2015: maximum of USD 6.5 million/year).

Terayon Communications Systems, Inc., (hereinafter: Terayon) and Tut Systems, Inc., (hereinafter: Tut Systems) were MPEG LA Pool Agreement licensees. The predecessor of the Plaintiff's parent company, Motorola, Inc., acquired Terayon and Tut Systems in 2007 (FBD 29). Following the split of the Motorola group into Motorola Solutions, Inc., and Motorola Holdings, Inc., Terayon and Tut Systems were assigned to Motorola Mobility Inc. (a subsidiary of Motorola Mobility Holdings, Inc.), the Plaintiff's parent company. In 2011, Terayon and Tut Systems became part of the Plaintiff by way of an acquisition ("*Merger merging Tut Systems [and Terayon] with and into General Instrument Corporation*" – FBD 31).

The company that is planning to acquire the Plaintiff's parent company, Google Inc., is also an MPEG LA Pool Agreement licensee (Exhibit FBD-18).

Section 8.3 of the MPEG Pool Agreement states as follows:

> „**Licensee Grant.** *Upon full execution of this Agreement, Licensee agrees to grant a worldwide, non-exclusive license and/or sublicense (commensurate to this scope of the licences which Licensee has selected here under) under any and all AVC Essential Patent(s) that Licensee and its Affiliates, if any, have the right to licence and / or sublicense, to any Licensor or any sublicensee of the Licensing Administrator desiring such a licence and/or sublicense on fair and reasonable terms and conditions. [...]"*

Section 8.1.2 states:

> „*This Agreement may not be assigned by the Licensee under any circumstances. This Agreement shall terminate upon the Sale by Licensee of all or substantially all of its assets, or capital shares (or similar indicia of ownership), or upon a similar transaction."*

Pursuant to Section 6.6.4, the obligation under Section 8.3 survives the expiration or termination of the license agreement.

CONFIDENTIAL

MOTM_WASH1823_0602128

– 11 –

By letter dated 10/29/2010 (Exhibit FBD 9), the Plaintiff's parent company submitted to the Defendant's parent company an offer, effective for 20 days, described as "RAND" (reasonable and non-discriminatory) to enter into an agreement for a worldwide, non-exclusive license for the portfolio of Motorola's H.264-standard-essential patents at a license fee of 2.25% of the sales prices of the standard-compatible end products (e.g., Xbox 360, PC, laptop, smartphone, etc.). The offer also provided for a license back to Microsoft's standard-essential patents at the same terms. Finally, a willingness was stated to also possibly negotiate a license only to individual patents in Motorola's portfolio. This offer was not accepted by the Defendant's parent company.

By attorney's letter dated 12/23/2011, the Defendant's parent company submitted an unconditional offer for a license agreement, effective as well for the Plaintiff's subsidiaries, concerning the German part of the patent in dispute here (also the subject matter of the parallel proceedings under 2 O 376/11) and for the German part of European patent EP 0 615 384 B1, which is the subject matter of the parallel proceedings under 2 O 373/11 and 2 O 387/11 (Exhibit FBD-21 (original English version and German translation)).

The subject matter of that fully worded offer is a non-exclusive, non-assignable right of Microsoft Corp. and its subsidiaries to create a product containing an AVC Decoder or AVC Codec in accordance with the patents and also the right of importation into Germany, as well as the use and possession of such products within Germany.

Section 3.1 of the offer provides for a unit license per "*computing device containing an AVC Decoder or AVC Codec*" (= unit), namely, in the amount of two Euro cents per unit for the first 10 million units per year (= maximum of EUR 200,000.00) and of one Euro cent per unit per year in excess of that.

The Defendant essentially developed the offered license fees as follows:

CONFIDENTIAL

MOTM_WASH1823_0602129

The 270 patent families declared to be standard-essential are said to be attributable to a total of 36 patent owners. If one were to compare how many of these patent families could be attributed to individual patent owners out of the total of 36, the result would then be that the portfolio of the Plaintiff and its parent company would be the fifth largest one of all individual portfolios. If one were to compare this portfolio on the one hand with all of the patent families bundled in the MPEG LA Pool and on the other hand with the patent families held by third parties, the portfolio of the Plaintiff and its parent company would have a proportional share of 6.3% (17 patent families, among them the patent in dispute), while a total of 63.6% of the standard-essential patents are said to be bundled in the patent pool and an additional 30.1% would be held by third parties.

The Defendant determined the purported technical value of the patents held by the Plaintiff and its parent company by means of what it referred to as a citation analysis, the validity of which the Plaintiff disputes. According to it, the frequency with which a certain patent is cited as the pertinent state of the art for subsequent inventions would allow conclusions about the significance of the invention and its technical value (Folios 356 et seq.). According to this so-called citation analysis, the patent portfolio of the Plaintiff and its group parent company supposedly ranks 11th among the patent owners. Several of the 10 patent owners of portfolios with a higher citation value are said to have contributed their patents to the MPEG LA Pool. Compared with all of the standard-essential patents held in the MPEG LA Pool, the result would be that, after all necessary adjustments are made, those patents amount to 72.7% of the total citation value and those of third parties (including the Plaintiff and its group parent company) 27.3%. The patents held altogether by the Plaintiff and its group parent company are said to constitute only 3.8% of the total citation value of all standard-essential patents.

To determine the licensing rates, the Defendant's parent company drew on licensing rates of patent pools or licensing programs that likewise involve the H.264/AVC technology or similar technologies. The market for patents that are part of the MPEG LA Pool could initially be considered as the comparison market. That pool would comprise 171 patent families of 28 patent owners. In the MPEG LA Pool, the license fees for the global manufacture and distribution of standard-compatible decoders are scaled, as already stated above (see also Exhibit FBD-12, Section 3.1.1). The pool's license fees

CONFIDENTIAL

MOTM_WASH1823_0602130

are apportioned proportionately to the number of patents held by the licensors, i.e., at the highest license fee of USD 0.2, a licensor receives 0.082 Euro cents for each unit distributed per patent family. Accordingly, the patent owner that contributed the largest number of patent families would receive, for example, 1.59 Euro cents per unit.

The Defendant also refers to a licensing program of AT&T, in which H.264/AVC-standard-essential patents are licensed outside of a patent pool (folio 268f; AT&T licensing terms: Exhibit FBD-25). According to it, for the global licensing of its portfolio of H.264/AVC-standard-essential patents, AT&T is demanding a unit license fee of USD 0.18 [13.75 Euro cents[1]] for up to 5 million units, with the fee being reduced to USD 0.10 [7.64 Euro cents] for all additional units and a capping limit of USD 5 million per calendar year being provided. In the Defendant's view, it can be assumed that the relevant portfolio held by AT&T is roughly comparable to the portfolio of the Plaintiff and its parent company and even exceeds the latter's value. AT&T is said to have 9 licensees at present.

Finally, the Defendant refers to licensing terms in the market that purportedly are customary for other standards that are said to be comparable with the H.264/AVC standard (Folios 269 et seq.):

- VC-1 standard (pool license): USD 0.20/unit for more than 100,000 and up to 5 million units, USD 0.10 for more than 5 million units, capping limit of USD 5 million;
- MPEG-4 visual standard (pool license): USD 0.25/unit for more than 50,000 units, capping limit of USD 1.25 million;
- Pool licenses for less similar technologies: below USD 1 [sic] per unit, up to merely USD 0.10 per unit.

If the Plaintiff and its group parent company had contributed their patent folio to the MPEG LA Pool, then, for their entire portfolio and applying the pool's usual numerical calculation, they would merely be entitled to 0.082 Euro cents (= proportional share of fee per patent family, assuming a maximum rate between 100,000 and 5 million units) x

---

[1] Exchange rate of 4/18/2012.

CONFIDENTIAL

MOTM_WASH1823_0602131

– 14 –

17 (= patent families of the plaintiff and its group parent company) = 1.394 Euro cents per unit. If the two patents in dispute were each to be viewed as patent families, the licensing rate for the two patents would amount to 2 x 0.082 Euro cents = 0.165 Euro cents. If the pool were based on a calculation of the (citation) value, the Plaintiff and its group parent company would be entitled to an even lesser fee.

The Defendant supposedly is multiplying the amount of 1.394 Euro cents to which the Plaintiff and its group parent company would be entitled for their entire portfolio under a theoretical membership in the pool, by a factor of ten to 14 Euro cents per unit for up to 5 million products and by a factor of five to 7.5 Euro cents per unit for all units in excess of that. Thus, the fee would be roughly comparable to the license fee demanded by the independent offer or AT&T for its (as alleged by the Defendant, more valuable) portfolio.

For the two patents in dispute (the one in this litigation and the German part of European patent EP 0 615 384 B1, which is the subject matter of the parallel proceedings under 2 O 373/11 and 2 O 387/11), the Plaintiff has calculated a unit license fee of 1.65 Euro cents for the first 5 million units per year and 0.83 Euro cents for all additional units per year. This fee equals 2/17 of the fee determined for the entire portfolio of 17 patent families of the Plaintiff and/or its group parent company.

The Defendant is rounding up the license fees mentioned to full Euro cents (1.65 Euro cents to 2 Euro cents, and 0.83 Euro cents to 1 Euro cent), extending the higher initial fee to the first 10 million units, and dispensing with a capping limit.

Alternatively, in the letter dated 12/23/2012, Microsoft Corp. offered to enter into a reciprocal license agreement for Germany with the Plaintiff's parent company, Motorola Mobility Inc., for the entire portfolio of the H.264-standard-essential patents of Microsoft Corp. and its subsidiaries, on the one hand, and Motorola Mobility Inc. and its subsidiaries on the other hand. In its brief of 2/3/2012, Microsoft Corp. offered the conclusion of a reciprocal *worldwide* portfolio license. At the hearing on 2/7/2012, the Defendant's representative made it clear that this cross-license did not constitute an independent license offer but rather a supplementary component of the specified license offer. The offer is not for a *gratuitous cross* license [Freikreuzlizenz] but instead for a non-gratuitous *cross* license [Überkreuzlizenz] at the established licensing rates of

CONFIDENTIAL

MOTM_WASH1823_0602132

2 Euro cents/unit and/or 1 Euro cent/unit. In their brief of 3/2/2012, which in this respect has not been scaled back, the Defendant and/or its parent company, finally declared a willingness to grant the Plaintiff a worldwide *gratuitous* cross-license to its portfolio of standard-essential patents, that is, in addition to its license offer that is limited to the two patents in dispute issued in Germany (Folios 382 et seq.).

Another element of the offer of Microsoft Corp. is the acknowledgment of a duty of compensation in principle for damages from the use of the licensed patents in the past and the obligation to withdraw the invalidity action against the licensed patent in dispute within 10 days following the acceptance of the license offer by the Plaintiff. By brief dated 2/3/2012 (see 2 O 373, folios 364 et seq.), the Defendant expanded the license offer by a right of termination of the Plaintiff in the event that the Defendant were again to bring an invalidity action against one or both of the patents in dispute following the withdrawal of the invalidity action against the two patents asserted in these and the parallel proceedings. At the hearing, the Defendant specified in that regard that according to the Defendant's offer, the Plaintiff would be granted a right to termination for cause also if an invalidity action were to be brought in the future by a party benefitting from the license agreement.

The offer of Microsoft Corp. is said to remain in effect until it has been accepted by the Plaintiff or until a decision is rendered with legal finality to the effect that the products of Microsoft Corp. that are said to be compatible with the H.264/AVC standard do not infringe the two patents in dispute that have been asserted, or that the patents are declared to be invalid, or that the actions are dismissed for any other reason.

The Defendant's group parent company also rendered an accounting concerning the license fees due under the license agreement being offered for the alleged usages in the past up to September 2011 of the patent in dispute by the Defendant, its corporate group parent, and Microsoft Ireland Operations Limited (Exhibit Set FBD-34). The license fees calculated according to the license agreement offer, plus interest in arrears, were deposited by the Defendant's group parent company with the depository of the Mannheim *Amtsgericht* [local court] (depository receipt: Exhibit FBD-35) under waiver of

CONFIDENTIAL

MOTM_WASH1823_0602133

the right of withdrawal (most recently clarified by the letter of 2/8/2012 by the Defendant's representative to the Mannheim Amtsgericht, Folio 360).

With the brief of 3/30/2012, the Defendant stated that its group parent company had determined, also with effect for Defendant, the license fee payments, including interest, pursuant to its license agreement offer, that were due and still outstanding since the first accounting. On 3/30/2012, the Defendant's group parent company likewise deposited the additional amount that had been determined with the depository of the Mannheim Amtsgericht under waiver of the right of withdrawal (Exhibit FBD-40).

**The Plaintiff** is of the view that the invention claimed in the patent in dispute is implemented in the standard as a necessary requirement, for which reason the patent in dispute would be essential for the standard.

As the challenged embodiment Xbox 360 would be able to play compressed video formats in compatibility with the standard, it is said to constitute a decoder apparatus that directly realizes Claim 19 of the patent in dispute. The challenged embodiments Windows 7 and Windows Internet Explorer 9 are said to infringe the patent indirectly because, following the installation of one of these programs, which contain the respective H.264 Codecs (software modules), a computer would constitute a decoder apparatus. Windows Media Player 12 is also said to infringe the patent in dispute indirectly because this software is suitable and intended to interact with an essential element of the invention in that, in accordance with its design, it runs the decoder function provided by Windows 7.

Therefore, Claim 19 is being realized in its literal meaning by the challenged embodiments that are operating in accordance with the standards.

In particular, Claim 19 is said to not protect a system comprised of an encoder and a decoder, so that the design of the encoding process in accordance with the standard does not matter here. The decoder apparatuses in accordance with the standard would also be using features 1 and 2 of Claim 19. Thus, the syntax elements mb_type and sub_mb_type in accordance with the standard would be code words for purposes of

CONFIDENTIAL

MOTM_WASH1823_0602134

feature 2 because they identify the motion compensator being used by type and block size. Even if one were to agree with the Defendant and assume wrongly that a data block for purposes of Claim 19 would necessarily correspond to a macroblock of the standard and that, moreover, a uniform motion compensator had to be used necessarily with this macroblock, the patent in dispute would be infringed by the challenged embodiments because under the standard, an additional partitioning at the 8x8 sub-macroblock level could occur only in the event of an 8x8 partitioning of the macroblock.

The Plaintiff is of the view that the Defendant would not be entitled to a right of use from either the Patent Statement and Licensing Declaration Form of the Plaintiff and/or its former group parent company issued to the ITU or from the MPEG LA Pool Agreement. Furthermore, the MPEG LA Pool Agreement, which has no reference to the patent in dispute anyway, was terminated by the acquisition of Terayon and Tut Systems by Motorola, Inc., in 2007.

Additionally, the Patent Statement and Licensing Declaration Form and the MPEG LA Pool Agreement would not justify a *dolo petit* plea by the Defendant either.

Nor could the Defendant raise a compulsory license defense under antitrust law against the Plaintiff's claim for injunctive relief.

The Defendant would be precluded from such a defense because it submitted its license agreement offer only on 12/23/2011, and thus long after the expiration of the deadline for an answer to the complaint. Nor would the Plaintiff be obligated to accept the 12/23/2011 license agreement offer of the Defendant's group parent company.

The license fee offered by the Defendant's group parent company is said to be completely unreasonable and disproportionately low. The Plaintiff would never license such significant patents as the patents in dispute here for the sum that was offered. If the unit license fee were to be calculated as a percentage of the sales proceeds from the challenged embodiments, a license fee of between 0.00145% and 0.004% of the sales proceeds would result, while license fees of 4% of turnover are typically received in the area of electronics/information technologies or computers. It would neither be in

CONFIDENTIAL

MOTM_WASH1823_0602135

keeping with actual practices nor would it be economically tenable to calculate the value of a standard-essential patent in a linear manner based merely on its numerical share in the totality of the standard-essential patents. A standard-essential patent would not lose value because the patent owner has additional standard-essential patents at its disposal and does not base the licensing of all patents on a cumulative rate escalated in a linear fashion in order to avoid unreasonably high licensing rates for the entire portfolio.

The value of the Motorola patents is said to be supported by, among other things, a cross-license with Nokia, which holds the largest portfolio of patents declared to be H.264-standard-essential.

Furthermore, it must be taken into consideration that the Plaintiff and/or its parent company would be offering its entire patent portfolio of standard-essential mobile communications patents, which contains several parts of various standard-essential technologies, for a license fee of 2.25% of turnover, whereby this fee is due if use is made of a single technology – such as H.264 – or of a single patent. Hence, the rate of 2.25% would not be a total amount that could be allocated among all licensed patents; as a matter of principle, there is no linear relationship between the number of patents and the licensing rate.

Contrary to the Defendant, the Plaintiff deems the basing of the determination of the FRAND licensing rate on the fees of the MPEG LA Patent Pool to be improper because a patent pool could not be a suitable benchmark from the outset. Moreover, there would be no numerical proportionality with the licensing rates for a portfolio of standard-essential patents; such a proportionality would disadvantage companies solely on the ground that they were holding a large number of standard-essential patents. From an economic perspective, the individual patents are really what is of value.

Methodologically, there would be no basis for the Defendant's assumption that the value of a patent could, among other things, be determined by the frequency of its citation in other patents.

A stock depletion period should not be granted to the Defendant because this would ultimately undermine the right of injunctive relief to which the Plaintiff is entitled without

CONFIDENTIAL

MOTM_WASH1823_0602136

restriction. Moreover, it would not seem to be apparent that modifying the challenged embodiments in consideration of the requested injunctive relief against the use of the patent in dispute would lead to disruptions among users of the programs.

An order of protection from execution pursuant to Section 712 ZPO could not be considered because a loss of sales for the Defendant, which in the Plaintiff's view has not been presented in any event, would not suffice here. The Defendant is said to have not credibly shown a serious threat to its economic existence.

The Plaintiff **m o v e s** :

- I.1.a) – I.1.d), as adjudicated;
- I.2., as adjudicated except for the professional auditor proviso;
- I.3

   The Defendant is adjudged to recall from the channels of distribution the products described in item A.I. 1. a), that are in the possession of third parties and were put into circulation after April 29, 2006,

   in that those third parties to whom possession to the products was granted by the Defendant or with the Defendant's approval shall earnestly be called upon, together with a notice that, with the present judgment, the division has found an infringement of the patent in dispute, to return the products, and in that such third parties shall be promised the return of any already paid purchase price and the assumption of the costs of the return in the event that the products are returned,

   and

   to remove [such products] with finality, in that the Defendant shall repossess these products or arrange for their destruction at the respective party in possession.

- II., as adjudicated;

CONFIDENTIAL

MOTM_WASH1823_0602137

The Defendant **m o v e s**:

that the action be dismissed;

alternatively:

that the litigation be stayed until a decision by the competent antitrust authorities concerning the legality of the announced acquisition of the Plaintiff's group parent company by Google Inc.;

alternatively:

that the litigation be stayed until a decision with legal finality concerning the invalidity action against the German part of European patent EP O 538 667 B1 / DE 692 32 063 T2 pursuant to Section 148 ZPO;

in the further alternative:

that the Defendant be granted a reasonable stock depletion period;

in the further alternative:

that with respect to Claim I.1.2., the Defendant only be adjudged to provide information subject to a professional auditor proviso;

in the further alternative:

that the Defendant be permitted to avoid compulsory execution by furnishing security, which may also be provided by a bank or savings association guarantee, irrespective of any provisioning of security by the Plaintiff (Section 712 ZPO);

in the further alternative:

that the security to be furnished by the Plaintiff in conjunction with the provisional enforceability be set at least EUR 236,000,000.00

The Plaintiff opposes the motions for stays and the motion for protection from execution.

CONFIDENTIAL

MOTM_WASH1823_0602138

**The Defendant** is of the view that the challenged embodiments do not infringe the patent in dispute. The H.264 standard, based on which the infringement issue was presented by the Plaintiff, is said to make no use of the features of Patent Claim 19.

To that effect, special consideration should be given to the fact that Claim 19 involves a protected encoder and decoder system and that the coding in accordance with the standard does not operate as described in the patent in dispute. Claim 19 explicitly refers to Claim 1, which discloses an encoder; the use of certain items ("the blocks"; "the different motion compensators") shows that Claim 19 is worded as a claim that is subordinate to Claim 1. The entire conception of the purported invention itself shows that the functionality of the encoder described in Claim 1 must be read as part of the interpretation of Claim 19.

The Defendant is also of the view that the data blocks received by a decoder in accordance with the patent would always require having the same block size and that the blocks contained therein, which in the course of the motion compensation are created through the use of a certain block size by a motion compensator, would likewise require having the same size. A data block containing blocks with different partitions, e.g., a mix of 8x8, 8x4, 4x8 or 4x4 blocks, would not be possible under the purported invention, while this could be the case with the data received by a decoder in accordance with the standard. Under the standard, each of the four sub-macroblocks of a macroblock could be divided into an 8x8 partition, two 8x4 partitions, two 4x8 partitions, or four 4x4 partitions through an appropriate motion compensator. This would show that the data received by a decoder in accordance with the standard would in many cases not be comparable to those received by a decoder in accordance with the invention because, with the former, there would not be "the code word" pursuant to feature 2 that would represent a single motion compensator (using the same block size) for an entire data block. Indeed, for a macroblock (16x16) containing four sub-macroblocks (8x8) in a mix of partition sizes, a prediction would not be created with the help of a single

CONFIDENTIAL

MOTM_WASH1823_0602139

uniform motion compensator. Rather, individual sub-blocks of the 16x16 macroblock would have to pass through at least two different motion compensators and would therefore have been divided into different block sizes.

The Defendant is further of the view that it would be entitled to a right of use of the patent in dispute under article 8.3, in conjunction with 6.6.4, of the MPEG LA Pool Agreement. Article 8.3 does not merely involve a declaration of willingness to grant a license upon an inquiry by a potential licensee. Instead, the license agreement is said to create a duty in the MPEG LA licensee [sic] to offer a license on its own accord to every user of the standard who is either a licensor or also a licensee in the MPEG LA Patent Pool, or to such user's affiliates, at the terms outlined in article 3 of the MPEG LA Pool Agreement. The Plaintiff, as a company affiliated with Terayon and Tut Systems, two licensees or former licensees of the MPEG LA Pool Agreement and/or as their universal successor, would therefore be obligated pursuant to article 8.3, in conjunction with 6.6.4 and 1.1, of the MPEG LA Pool Agreement, to grant a license to the Plaintiff's standard-essential patents to the Defendant's group parent company, as a licensor in the license pool, or to the Defendant itself, as an affiliate of such licensor.

Beyond that, the Defendant is also asserting a right of use based on the Plaintiff's Patent Statement and Licensing Declaration Form issued to the ITU for licensing at FRAND (Fair, Reasonable, And Non-Discriminatory) terms. The Patent Statement and Licensing Declaration Form is said to be an agreement benefitting third parties pursuant to Section 328 BGB [German Civil Code], that is, any and all license-seeking users of the H.264 standard. For one, this form would create a binding offer to enter into a license agreement. Furthermore, the Plaintiff is said to have waived the assertion of its rights of exclusivity under Sections 139ff., PatG [German Patent Act] and would be limited from the outset to a claim for the payment of a reasonable license fee with respect to the purportedly standard-essential patent.

As a most alternative plea, the Defendant raises the Plaintiff's Patent Statement and Licensing Declaration Form as a *dolo petit* objection pursuant to Section 242 BGB. By asserting the claims to injunctive relief, the Plaintiff is said to have placed itself in an irreconcilable conflict with that form because under the terms of the form it would have to give up immediately the prohibition of use by granting a right of use.

CONFIDENTIAL

MOTM_WASH1823_0602140

– 23 –

Finally, the Plaintiff supposedly could not reject the license agreement offer submitted by the Defendant's group parent company on 12/23/2011, without acting contrary to antitrust law. That offer is said to satisfy all requirements for a FRAND license offer in accordance with the *Orange Book Standard* decision of the *Bundesgerichtshof* [German Federal High Court of Justice]. The license offer is said to contain contract terms as are customary in the industry, and both the licensing rate and the licensing basis amount to fair, non-obstructive and non-discriminatory terms. The license fee offered far exceeds the one determined by the Defendant as being customary in the market, hence, a fee that would have to be viewed as a FRAND license fee. This becomes apparent, among other things, from a privately obtained expert opinion (Exhibit FBD-22). The gratuitous cross-license that it had offered for the standard-essential patents of the parties would be advantageous to the Plaintiff in view of the size of the portfolio of standard-essential patents of the Defendant's group parent company and its affiliates.

A unit license fee is also customary in this technological field. In contrast, a value-based licensing rate would not lead to a reasonable outcome because the value of the end product could fluctuate strongly irrespective of the at times identical functionality of the standard-compatible decoders.

The unit licensing rate offered exceeds considerably the licensing rates customary in the market and would therefore lie significantly above that which the Plaintiff could really demand. To determine a reasonable and customary license, the Defendant allegedly correctly applied licensing rates from patent pools or licensing programs that also involve H.264 technology or similar technologies.

Finally, the Defendant has performed all acts in discharge of obligations as required under the *Orange Book Standard* decision.

The Defendant is also of the view that, in the event that the acquisition of the Plaintiff's parent company by Google Inc. is approved, it would be entitled to a *dolo petit* defense (Section 242 BGB) against the claims that have been asserted because under the MPEG LA license agreement, Google Inc. would be obligated to license the H.264-essential patents to which Google Inc. would be entitled, to the Defendant's parent company and to the Defendant.

CONFIDENTIAL

MOTM_WASH1823_0602141

– 24 –

With this background, the proceedings, as moved in the alternative, would have to be stayed until a decision by the antitrust authorities on the acquisition's legality.

Finally, the Defendant is of the view that the patent in dispute lacks legal validity, though the Defendant has moved for a stay of the invalidity proceeding in connection with its *Orange Book Standard* offer.

In any event, in case of an unfavorable decision, the Defendant should be granted a reasonable stock depletion period because the immediate unlimited enforcement of the injunctive relief claim would bring about unreasonable detriment to the Defendant and its customers, and it would be acceptable to subject the Plaintiff to certain constraints in that regard. In view of the complexity and the global use of the challenged embodiments, the Defendant would not be able to react immediately to a potential judgment of injunctive relief by modifying its products. A right of injunctive relief with immediate effect could have serious consequences not only for the Defendant itself but also for its buyers and the users of the challenged products. Additionally, the allegedly patent-infringing decoders play only a small role in the functions of the challenged embodiments. A stock depletion period would be all the more justified in view of the impending expiration of the patent in dispute.

Irrespective of any security to be furnished by the Plaintiff, the provisional enforcement of a judgment in accordance with the complaint would bring about an irreversible detriment to the Defendant that is not balanced by any overriding interest of the Plaintiff in provisional enforceability. For this reason, if the Defendant loses the case, the Defendant should be granted protection from execution pursuant to Section 712 paragraph 1, sentence 1, ZPO, regardless of the furnishing of security by the Plaintiff. The removal of the H.264 decoder from the Defendant's products would impose logistical challenges on the Defendant and its customers due to the interoperability of the H.264 decoders with other functionalities of the product and other products. In addition to serious financial losses, the Defendant would face a loss of market shares and irreparable harm to its image and brand in the event of a provisional enforcement. Innumerable other products based on the challenged embodiments would be affected by any discontinuance of the

CONFIDENTIAL

MOTM_WASH1823_0602142

distribution of the latter ones even though they do not use the patent in dispute at all. Conversely, the Plaintiff, who is not a direct competitor of the Defendant, would face only financial and easily quantifiable losses from a stay of provisional enforceability.

Concerning the further state of the facts and the litigation, reference is made to the contents of the briefs as well as the exhibits and the court records.

The proceeding regarding the infringement of European patent EP 0 615 384 B1 that has also been asserted by the Plaintiff, has been severed by a ruling on 10/17/2011 and will now be conducted under reference number 2 O 373/10.

CONFIDENTIAL

MOTM_WASH1823_0602143

**Reasons for the Decision**

The admissible law suit is predominantly justified.

The challenged embodiments make use of Claim 19 of the patent in dispute (A). The Defendant is not entitled to use the patent in dispute (B) and the Plaintiff is not hindered from enforcing the order to cease and desist, not even for antitrust-law reasons (C).  For this reason, the Plaintiff is entitled quite predominantly to the claims made (D).  A suspension of the lawsuit is not indicated (E).

A.

The Defendant infringes the patent in dispute in accordance with Article 64, paragraph 1 of the EPC in conjunction with Section 9, page 2, No. 1 and Section 10, paragraph 1 of the PatG (Patent Law), because the challenged embodiments make literal direct (Xbox) and indirect (Windows 7, Windows Internet Explorer, Windows Media Player 12) use of Claim 19 of the patent in dispute.

I.

The patent in dispute relates to the compression of digital video signals.

1.  Since very high data volumes arise during the digital transmission of images, if each individual image of a video sequence were to be transmitted completely individually, video data usually is encoded by a combination of different techniques in order to compress the image data as efficiently as possible.  In the prior art, video compression techniques were already known, which made use of the spatial correlation between adjacent pixels in an individual image ("frame") (intra-frame coding).  Likewise, compression systems were known, which used similarities between temporally adjacent frames in order to compress the data even more.  For the latter, so-called inter-frame coding, the difference coding was known, for which only the difference between a current frame and the prediction of the current frame was transmitted.  Moreover, inter-frame video compression systems were also

CONFIDENTIAL

MOTM_WASH1823_0602144

already known in the prior art, which used movement compensation. For movement compensation, it is sufficient to transmit a movement vector, which describes the shift of an unchanged area of an image with respect to the reference image. The patent in dispute names, by way of example, the publication of Ninomiya and Ohtsuka, "A Motion-Compensated Interframe Coding System for Television Pictures, IEEE, Transactions on Communications, volume COM-30, No. 1, January 1982. According to this, a motion vector is determined for each block (image section) in the current frame, in that a block in the preceding frame is identified, which is most like the block in question. The whole frame can then be reconstructed using a decoder, in that the difference between the corresponding block pairs, together with the movement vectors which are required in order to identify the corresponding pairs, is transmitted [0007].

If the movement compensation functions well, the difference image, divided into blocks, can be encoded more efficiently than the original image blocks. The encoded difference image and the information relating to the (encoded) movement vectors are then transmitted together to the decoder apparatus.

The performance of the movement estimation depends on how well the movement between two parts of images can be reproduced as a simple translation. For example, zoom, rotation or other complex rotations of large image areas frequently cannot be reproduced as a simple translation. The efficiency of block-based movement estimation algorithms may therefore depend on the size of the block used, in order to adapt the current frame to the preceding frame. A large block size will function well in areas, in which the image is stationary or is translated uniformly, since less overhead data is required in order to transmit the data linked to each of the image blocks. In other cases, in which complex movements take place from one frame to the other, a smaller block size can achieve better performance [0030]. With this as background, the static evaluation for a particular block size has the disadvantage of loss of efficiency.

CONFIDENTIAL

MOTM_WASH1823_0602145

In order to approach this problem, a method for movement compensation with variable block sizes, known in the prior art from Puri et al., "Interframe coding with variable block-size motion compensation", November 1987, whereby in addition to a block-based movement compensation, alternatively a sub-block based movement compensation is used, and the two movement compensation methods were arranged in a cascade, that is, no movement compensation at the same video data with different block sizes was provided [0010, 0011].   Admittedly, the latter was known from the PCT application WO 91/13514 A1, however, only for intra-coding and not for inter-coding [0012].

2.   On this basis, the patent in dispute set the task to improve the performance of movement-compensated video signal compression systems by making available a compression system which uses an adaptive movement compensation.

To accomplish this objective, the patent in dispute proposes the adaptive use of movement compensators of different block sizes on the encoding side.   Since, depending on the video sequence, different amounts of data may result when different block sizes are used with regard to the respective image section, a decision depending on the amount of data is made on the encoding side for the block size ultimately to be used for the compression and transmission with regard to the respective image area (Claim 1).

On the receiver side, the patent in dispute proposes in Claim 19 a decoder apparatus, the features of which can be grouped as follows, whereby the (judicial) division uses as a basis the grouping of the features as presented by the Plaintiff in Exhibit KP1-K3.   The grouping of the features as presented by Defendant in Exhibit FBD 2 differs from the present grouping of the features in a few instances.   Insofar as it is relevant, this will be dealt with in greater detail in the subsumption of the individual features (see Item II below).

CONFIDENTIAL

MOTM_WASH1823_0602146

*Decoder Apparatus*

1. *for receiving the blocks of encoded video data provided by the different motion compensators of a device for the adaptive compression of digital video signals for transmission*

2. *wherein means are provided for retrieving from each received data block, a code word representative of the motion compensator, from which the block is received,*

3. *wherein means, responsive to said code word, are provided for recovering a motion vector for each block from the motion vector data received with the block, and*

4. *means, responsive to said motion vector, are provided for recovering current video image data from data provided by a current data block and at least one prior data block.*

## II.

The challenged embodiments make literal use of the teachings of Claim 19 of the patent in dispute.

The required interpretation of the patent in dispute as would be understood by the average expert must focus on the wording of the claim (Article 69, paragraph 1, page 1 of the EPC, Section 14, paragraph 1, page 1 of the PatG; BGH GRUR 2004, 1023 et seq. – *Bottom-side Separating device*); the content of the specification and the drawings are to be used as a supplement for the interpretation (Article 69, paragraph 1, page 2 of the EPC, Section 14, paragraph 1, page 2 of the PatG).  In as much as the specification is to be used for interpreting the patent, the technical sense of the words and concepts used in the patent is of decisive importance and not the strictly philological or logical-scientific lexical content (BGHZ 150, 149,156 – *Cutting Knife I*, BGH GRUR 1999, 909 - *Set Screw*).

CONFIDENTIAL

MOTM_WASH1823_0602147

If Claim 19 is interpreted on the basis of these principles, the challenged embodiments make use of all the features of Claim 19.

Since the challenged embodiments indisputably support the H.264 standard, the indirect proof of the infringement of the patent in dispute is permissible based on the specific features of the standard. A comparison of the relevant requirements of the standard with the patent in dispute shows that a decoder apparatus in accordance with the standard realizes all the features of Claim 19.

1.      The standard provides for decoder apparatuses "for receiving the blocks of encoded video data from the different movement compensators of a device for the adaptive compression of digital video signals for transmission" (<u>feature 1</u>). The standard presupposes encoding and decoding by means of movement compensation using different movement compensators, which use different block sizes (paragraphs 8.4.1.2.3 and 6.4.2)

The Defendant, among other things, points out in the criticism of this grouping of the features given above, that Claim 19 is explicitly directed to "the blocks of encoded video data, provided by said different motion compensators <u>of the apparatus of Claim 1</u>" (underlining by the division), and while this is correct, it has no effect on the result of the interpretation of the claim and the subsumption of a standard decoder under the claim. In this respect, it is a statement of the purpose of the decoder apparatus in accordance with the patent ("*for receiving the data blocks…*"). This statement defines the protected decoder apparatus in greater detail in that it must fulfill not only the spatial-physical features which are formulated explicitly by the claim, but, moreover, must also be constructed so that it can fulfill the function mentioned in the claim (compare BGH, GRUR 2009, 837 – *Building Envelope Support*).

CONFIDENTIAL

MOTM_WASH1823_0602148

Indisputably, standard decoder apparatuses are able to receive data blocks of encoded video data provided by the different movement compensators of a device of Claim 1 of the patent in dispute (a device for the adaptive compression of digital video signals for transmission), that is, which are selected on the basis of a device taught in Claim 1 by the method described there.  From the point of view of the standard decoder apparatus, which is determined here, the nature and manner in which the data blocks of encoded video data are selected on the encoder side, does not matter (for example, on the basis of an estimate of the encoding costs, a so-called rate distortion optimization or a calculation of the actual amount of the compressed data).  What does matters is that the standard decoder apparatus has the means for receiving data blocks which are provided by the different movement compensators of the device of Claim 1.  Nothing changes this finding even if standard encoders select their movement compensators in a manner, which does not realize Claim 1.

Contrary to the opinion of the Defendant, Claim 19 also does not presuppose a system of encoder (as per Claim 1) and decoder, as a consequence which the means on the side of the encoder (and the nature and manner of its encoding decisions, taught in Claim 1 (and the nature and manner of its encoding decisions), would also be part of Claim 19.  According to its wording alone, Claim 19 is not a system claim but a (decoder) apparatus claim.  The reference in Claim 19 to Claim 1 is limited to stating the objective, according to which the decoder apparatus must be suitable for receiving blocks of encoded video data which are provided by different movement compensators of the apparatus as per Claim 1.  Moreover, the interpretation by the Defendant is refuted by the fact that the patent in dispute, in its Claim 11 (which is not part of the litigation) and in the Sub-Claims 12 to 18, referenced to Claim 11, explicitly teaches a system claim, which includes the receiver side.

2.      A standard decoder apparatus also has "the means for finding a code word from each data block received, which represents the movement compensator, from which the block was received" (<u>feature 2</u>).  According to the standard, information bits are inserted into the transmitted data

MOTM_WASH1823_0602149

stream and identify the movement compensator used.  These identifiers are assigned, on the one hand, on the macroblock level (so-called mb_type) and, on the other, on the sub-macroblock level (so-called sub_mb_type).  In the mb-type syntax element, information on the type of movement compensator (for example, intra macroblock type (I), predictive macroblock type (P) or bi-predictive macroblock type (B) (see Exhibit KP1-K4, Table 7-10 (page 97)) and the size of the blocks used (partitionings in one 16x16 block, two 16x8 blocks, two 8x16 blocks or four 8x8 sub-macroblocks is recorded (Exhibit KP1-K4, Section 7.4.5, Tables 7-13, 7-14).  If a P-type macroblock has four 8x8 partitions, a sub_mb_type syntax element is encoded for each of the four 8x8 sub-macroblocks in addition to the mb_type syntax element, which contains information on the partition of the 8x8 sub-macroblocks (namely one 8x8 partition, two 4x8 partitions, two 8x4 partitions or four 4x4 partitions per sub-macroblock (see Exhibit KP1-K3, Section 7.4.5.2).  The following photocopied Figures 6 – 9 of the standard (on page 26) show the different partitionings of macroblocks and sub-macroblocks.



**Figure 6-9 – Macroblock partitions, sub-macroblock partitions, macroblock partition scans, and sub-macroblock partition scans**

In this respect, Defendants take the point of view that the two identifiers, mb_type and sub_mb_type, are not "a code word" from each data block received in the sense of feature 2, because the sub_mb_type syntax element, aside from the mb_type syntax element, is an additional second code word.

CONFIDENTIAL

MOTM_WASH1823_0602150

– 33 –

To begin with, it should be noted that the English method language speaks of *"a code word representative of the motion compensator from which the block is received"* and that, in the German translation, <u>a</u> code word is to be understood in the sense of an indefinite article and not as a numerical word.

On the other hand, the partitioning on the sub_macroblock level, that is, also the "second" sub_mb_type identifier, is only significant for an 8x8 partitioning of the macroblock level. Even if read as strictly as is done by the Defendants (one [1] code word, which may not consist of two identifiers), there are macroblock partitions (16x16, 16x8, 8x16) in the standard with a uniform use of movement compensators, which are represented by (only) one code word, the mb_type syntax element. In any case, since the decoder apparatus in accordance with the standard has means at its disposal for finding this ("one") code word, it realizes feature 2 of Claim 19 as well.

This is also not contradicted by the fact that the means of feature 2 for finding a code word is to be provided by <u>each</u> data block received. It is required but also sufficient that the decoder apparatus be *suitable* for finding a code word from each data block received. This suitability is not put in doubt by the fact that the data blocks received may not contain a code word or more than one code word. The fact alone that the standard decoder apparatuses can locate a code word, namely the mb_type, which anyway, in the event of a macroblock partitioning of 16x16, 16x8 or 8x16, represents the movement compensator from which the block was received, shows the realization of the intended use, described in feature 2, by the means provided by the standard decoder apparatus.

The Defendants furthermore point out that the data, which an H.264-compatible decoder receives, may also have a mixed structure, that is, each of the four sub-macroblocks of a macroblock may also be divided by a corresponding movement compensator into one 8x8 partition, two 8x4 partitions, two 4x8 partitions or four 4x4 partitions. In this respect, it must be conceded to the Defendants that, in these cases, the presence of a code word as per Claim 19, which represents a single movement compensator (which uses the same block size) for a whole data block, may be questionable. However, in the opinion of the judicial division, the question arising in this connection, as to whether the sub-macroblock in the standard isn't also a data block in the sense of feature 2 of the patent in dispute, with the consequence that the sub_mb_type identifier always represents the (one) movement compensator of the (sub-macro) data block received, does not matter. For the special features resulting from a possible mixed structure, the fact applies as well that these occur only in the case of an 8x8 macroblock partition (and also only in the case of different sub-

CONFIDENTIAL

partitioning).  This is the result of the definitions of the syntax elements in the H.264 standard, which comprise the possibility, but not the necessity, of using several information elements in the encoded data (mb_type and sub_mb_type). This, in turn, means that standard decoder apparatuses are able to locate in each data block received a code word which represents the movement compensator, from which the data block was received, provided the data block has one (1) such code word, as is indeed the case with a 16x16, 16x8 and 8x16 partitioning of the macroblock.

3.    A standard decoder apparatus realizes feature 3 of Claim 19 as well, which requires a means that is responsive to the code word, in order to restore a movement factor for each block of the movement vector data which were received with the block. In section 7.4.5, the standard standardizes the prediction of the actual block as a function of the used block size of the movement compensator.  Section 8.4 standardizes how, for instance as a function of the mb_type value, the movement vector data is reconstructed and how a movement vector is determined for each block.  Starting out from the assumption, explained in greater detail under item 2, that the standard decoder apparatus is indeed able, for the macroblock partitions 16x16, 16x8, and 8x16, to find a code word which represents the movement compensator, from which the block was received (scil: mb_type), the decoder apparatus also has the means to respond to the (found) mb_type code word, in order to restore a movement vector from the movement vector data received.

4.    Finally, standard decoder apparatuses also make use of feature 4 of Claim 19. In a standard decoder apparatus, a means is provided for restoring current video image data from data which was provided from a current data block and at least one previous data block.  Section 8.4 (page 151) of the standard (Exhibit KP1-K4) defines how the samples of the inter-prediction are reconstructed from the movement vectors and additional data series.  Subsequently, the video image data is reconstructed from the sample data series of the inter-prediction (Exhibit KP1-K4, Section 8.5, page 174 f.).  Insofar as the Defendant does not consider feature 4 to be realized because it presupposes one uniform code word for a data block, which is not the case in the standard, it is possible to refer to the corresponding comments on feature 2.

CONFIDENTIAL

MOTM_WASH1823_0602152

5.   According to all of the above, the embodiment of the decoding realizes all the features of Claim 19 of the patent in dispute.  Therefore, the challenged Xbox 360 embodiment infringes the patent in dispute directly.


6.   The challenged embodiments, Windows 7, Windows Internet Explorer 9, and Windows Media Player 12, infringe the patent in dispute indirectly.

According to Section 10, paragraph 1 of the PatG, an indirect infringement of a patent presupposes that the infringer, without the approval of the patent owner and within the scope of the patent law, offers or supplies to persons other than those entitled to use the patented invention, the tools related to an essential element of the invention, to use the invention within the scope of this law, knowing or it being obvious on the basis of the circumstances that these tools are suitable and intended for the use of the invention.

The challenged embodiments, Windows 7, Windows Internet Explorer 9, and Windows Media Player 12, are tools which are related to an essential element of the invention and were offered and delivered in the Federal Republic of Germany for the use of a patented device.  The fact is that they are installed as intended on computers (for example, PCs, laptops), as a result of which the respective computer becomes a device literally realizing Claim 19.  Moreover, Windows 7 and Windows Internet Explorer 9 with the H.264 Codec make available the essential elements of the invention itself; Windows Media Player 12 represents a tool which relates to an essential element of the invention, namely the Codec of Windows 7.

It is precisely the use of the programs in accordance with the invention, installed on the computer, that is their intended use.  The Defendant produces the programs itself and supplies them to its customers for installation, so that it can only be assumed that the Defendant knew that the tools offered by it are suitable and intended for the use of the invention.

CONFIDENTIAL

MOTM_WASH1823_0602153

**B.**

The Defendant cannot claim a right to use the patent in dispute.

**I.**

Indisputably, no license agreement has been concluded between the parties.

**II.**

Furthermore, the Defendant has no right to use the patent in dispute on the basis of the Patent Statement and Licensing Declaration Form (Exhibit Set FBD-8) submitted by the Plaintiff and its parent company to the standard-setting International Telecommunication Union (ITU).

Contrary to the Defendant's belief, neither the ITU Patent Statement and Licensing Declaration Form submitted by the Plaintiff in December 2002 nor the specific ITU Patent Statement and Licensing Declaration Form from Motorola, Inc., the predecessor

CONFIDENTIAL

MOTM_WASH1823_0602154

of the parent company of the Plaintiff, for the patent in dispute dated October 8, 2007, represents a contract to the benefit of third parties (here: the Defendant) or a waiver of prohibition.

The assessment of whether rights of use are granted under the ITU Patent Statement and Licensing Declaration Form is governed by German substantive law. The legal system under which rights granted to use intellectual property rights are assessed is based on the laws of the country in which protection is sought [*lex loci protectionis*] (see Mannheim Regional Court, Court of First Instance Decision 13, 65, *UMTS-Enabled Mobile Phone II*, margin no. 161 with further references, cited according to Juris; Kühnen, *Hdb. Patentverletzung* [Guide to Patent Infringement], 5th Ed., margin no. 1298).

Based on the court's classification of a non-exclusive license as a right *in rem* (Karlsruhe Higher Regional Court, GRUR Int 1987, 788 et seq., *open end spinning machine*; in detail: Mannheim Regional Court loc. cit., margin no. 166 with further references; German Federal Court of Justice (BGH), GRUR 2009, 946, margin no. 20, cited according to Juris – *Reifen Progressiv* (regarding copyright); contrary (contractual claim only:) Decision of the German Federal Court of Justice in Civil Matters 83, 251 – *Anchor Element*; contrary (materialized obligation): McGuire, *Die Lizenz*, habilitation thesis, Osnabrück 2009), the Defendant would not have the right to use the patent unless, at the very least, a contract to the benefit of license-seeking third parties was already considered in the submission and acceptance of the Patent Statement and Licensing Declaration Form to the standard-setting ITU. However, such a license could not have been granted by means of a contract to the benefit of third parties due to the fact that German law does not recognize contracts *in rem* to the benefit of third parties. Sections 328 et seq. of the German Civil Code (BGB) are neither directly nor analogously applicable to *in rem* contracts (see Mannheim Regional Court, loc. cit., margin no. 167 with further references).

Furthermore, the Patent Statement and Licensing Declaration Form does not encompass a waiver of injunctive relief, one which would limit the Plaintiff to making or accepting a FRAND offer and to demanding payment of FRAND-level license fees, if necessary through damages. Such a waiver of exclusive rights under the patent would be at most of a purely contractual nature and would not constitute an action that would directly limit the rights of the Plaintiff, as holder of the patent, under the patent. The latter, considering the material nature of the right to cease and desist orders, which are inseparably associated with the patent, would be legally impossible (see Mannheim Regional Court, Court of First Instance Decision 11, 9, margin no. 99 et seq., *UMTS-Enabled Mobile Phone*, cited according to Juris; Kühnen, loc. cit., margin no. 1298).

CONFIDENTIAL

MOTM_WASH1823_0602155

However, the Patent Statement and Licensing Declaration Form submitted to the ITU by the Plaintiff and/or its former parent company cannot be understood as a binding license offer to any number of third parties unknown to the Plaintiff, requiring only acceptance by a third party, but as a request to license seekers to submit their own FRAND offers (see also the end of item 2: *"Negotiations of licenses are left to the parties concerned and are performed outside the ITU-T/ISO/IEC"*). Last but not least, the Patent Statement and Licensing Declaration Form merely comprises an explicit declaration of the obligation to contract, which exists in any case under antitrust law (see Kühnen, loc. cit., margin no. 1298). By promising to grant third parties a license under FRAND terms, it creates only a basis for a claim, the fulfillment of which must be specifically demanded by the license seeker (Karlsruhe Higher Regional Court, Court of First Instance Decision 12, 220 – *MP3 Standard*).

An offer for a contractual "*pactum de non petendo*" ("negative license") and thus the waiver by the patent holder of injunctive relief as a means of enforcing its patent claims against an unknown number of potential patent infringers (item 2: "an unrestricted number of applicants") is, after all, implausible. A patent holder who submits a Patent Statement and Licensing Declaration Form merely offers to waive its exclusivity rights under the patent by establishing a license agreement—and not unconditionally (Kühnen, loc. cit., margin no. 1298).

Per the above, the Defendant may not claim a granted positive right to use the patent nor a waiver of prohibition based on the Plaintiff's ITU Patent Statement and Licensing Declaration Form.


**III.**


The Defendant is furthermore not entitled to use the patent in dispute under the MPEG LA Pool Agreement (see Exhibit FBD 12).

An assessment of the alleged right to use the patent under the MPEG LA Pool Agreement is in turn based on the laws of the country in which protection is sought (see item II above). Therefore, under German substantive law, which would be applicable in this case, Terayon and Tut Systems were not effectively entitled to use the patent in

CONFIDENTIAL

MOTM_WASH1823_0602156

dispute, which did not belong to them. It has not been presented, nor is it clear in what way Terayon and Tut Systems, licensees under the MPEG LA Pool Agreement, would be entitled to use the patent in dispute. Article 8.3 of the MPEG LA Pool Agreement, if understood as granting a license to the patent in dispute, would represent a right on the part of the Plaintiff to use the patent to the detriment of third parties. As such, the alleged license is invalid.

In light of this, it is unnecessary to determine whether or not a license to the patent in dispute exists at all or whether it would extend to the Defendant as a subsidiary of the licensor, Microsoft Corporation.

## C.

The Defendant cannot successfully defend itself based on the assertion that the Plaintiff was obligated to immediately grant it a license to the patent in dispute and that a cease and desist order is therefore in violation of the law. The Defendant is not entitled to a *dolo petit* plea on the basis of its license agreement offer of December 23, 2012 [sic] (I.), the ITU Patent Statement and Licensing Declaration Form (II.), or the MPEG LA Pool Agreement (III.).

## I.

The Plaintiff is not prevented under antitrust law from exercising its right to issue a cease and desist order against the Defendant due to infringement of the patent in dispute. The Defendant cannot counter the right to issue a cease and desist order with a claim to a license under Section 33 Paragraph 1 of the Act Against Restraints of Competition (GWB) in conjunction with Article 102 of the Treaty on the Functioning of the European Union or Sections 19 and 20 of the GWB.

1. The Plaintiff is an addressee of Article 102 of the Treaty on the Functioning of the European Union and/or GWB Sections 19 and 20, as, per its own assertion, any party that manufactures, offers or sells H.264 decoding devices must comply with the H.264 Standard and must therefore utilize the patent in dispute. The granting of licenses for the patent in dispute thus effectively constitutes a market dominated by the Plaintiff as the sole supplier.

CONFIDENTIAL

MOTM_WASH1823_0602157

2.  The offer of a license made by the Defendant's parent company also with effect for the Defendant (hereinafter: the Defendant's license offer) does not satisfy all requirements that the *Bundesgerichtshof* [German Federal High Court of Justice] established in its *Orange-Book-Standard* decision (judgment of 5/6/2009, KZR 39/09, GRUR 2009, 694 et seq.).

According to that decision, a defendant against whom a claim had been asserted under a patent may raise as a defense against a request for injunctive relief by the petitioning patent owner that the latter is abusing a market dominating position by refusing to enter into a patent license agreement with the defendant at non-discriminatory and non-obstructive terms (BGH, supra, 1st guiding principle, cited according to Juris). However, the patent owner who is asserting the right to injunctive relief under its patent even though the defendant is entitled to have a license granted for the patent in dispute, is only then abusing its market-dominating position and acting in breach of good faith if two preconditions are met: First, the prospective license must have submitted an unconditional offer to the patent owner to enter into a license agreement, which the patent owner may not reject without unreasonably obstructing the prospective licensee or violating the prohibition against discrimination, and the prospective licensee must consider itself bound to that offer. Second, if the prospective licensee is already using the subject matter of the patent before the patent owner has accepted its offer, the prospective licensee must comply with those obligations that would be linked to the use of the licensed subject matter pursuant to the prospective license agreement. This means, in particular, that the prospective licensee must pay the licensing fees arising under the agreement or must ensure such payment (BGH, supra, margin no. 29).

3.  Even though the *Orange-Book-Standard* decision referred to a de facto standard, the criteria established there are likewise applicable to standards that have been developed by standard-setting organizations (here: ITU) in a standardization process (see Mannheim LG [*Landesgericht*; regional court], InstGE 13, 65, margin no. 176, cited according to Juris).

CONFIDENTIAL

MOTM_WASH1823_0602158

4.   The Plaintiff was permitted to reject the Defendant's offer to enter into a license agreement without having thereby unreasonably obstructed or discriminated against the Defendant.

    a.   The unconditional offer on hand here, together with the amendments that were made, is certainly in keeping with the usual contract terms and contains sufficiently detailed provisions. In particular, among other things, the offer, as amended, contains a right of termination for the patent owner in the event of future challenges against the legal validity of the patent in dispute (see Karlsruhe OLG [*Oberlandesgericht*; higher regional court], 1/23/2012, p. 6), and the Defendant also acknowledges in connection with its offer an obligation of compensation in principle for past uses (see Mannheim LG, judgment of 12/09/2011, 7 O 122/11).

    b.   At the same time, the Defendant's offer of a license agreement is not an offer that the Plaintiff may not reject without acting contrary to antitrust law. The reason is that the patent owner is not required to accept an offer at licensing rates that lie below those that it may demand without violating antitrust law.

The Defendant, who considers the Plaintiff's licensing rate demand (2.25% of turnover) to be abusively excessive, has not made use of the possibility existing in such cases of placing the level of the licensing rate at the patent owner's discretion pursuant to Section 315 BGB (BGH, supra, margin no. 39). Instead, since the Defendant committed itself to a specific basis of calculation (unit license) and a specific licensing rate (2 euro cents or 1 euro cent, as the case may be, per unit), a review was needed as to whether the Plaintiff's rejection of this offer based on the justification that the license fees offered were too low, was contrary to antitrust law.

In the judicial division's view, this review can be limited to the question of whether the rejection of the offer constituted an *obvious* violation of antitrust law. As the BGH made clear in its *Orange-Book-Standard* decision, the infringement proceedings are to be relieved to an avoidable extent of the difficult and time-consuming task of determining the exact

CONFIDENTIAL

MOTM_WASH1823_0602159

amount of a non-obstructive or non-discriminatory licensing fee (BGH, supra, margin no. 39). In the case of a license offer subject to Section 315 BGB, the infringement court should thus be able to limit itself to finding that the patent owner is obligated to accept the offer of a license agreement and to a determination based on discretion if the prospective licensee has deposited an amount that in any event is sufficient and if the other requirements of a "compulsory license objection" are also present (BGH, supra, margin no. 40). In connection with the question of whether the deposited amount is sufficient for sure (in any event), a summary review by the court is enough (see Kühnen, supra, margin no. 1296). Nor is the prospective license placed at a disadvantage insofar as, in a subsequent proceeding concerning the level of remuneration, the burden of presentment and proof of the reasonability of the amount of the license fee falls on the patent owner.

In contrast, if the prospective licensee offers a specific licensing fee that in its view is reasonable and that the patent owner rejects as being too low, the question arises as to what significance should be attributed to the prospective licensee's assertion that the license fee offered would be reasonable and whether a prospective licensee in the end may compel an extensive and time-consuming taking of evidence with each offer, which, in the BGH's view, is precisely what is to be avoided as much as possible in infringement proceedings.

As only a clearly excessive price would be unreasonable for purposes of Article 102 of the Treaty on the Functioning of the European Union, the rejection of the offer by the patent owner due to licensing fees that purportedly are too low would be contrary to antitrust law only if the prospective licensee is offering such a high licensing fee amount that any change from that in favor of the license owner would be unreasonable. In contrast, if the terms in the prospective licensee's offer are (merely) reasonable, then Article 102 of the Treaty, and Sections 19 and 20 GWB [*Gesetz gegen Wettbewerbsbeschränkungen*; German Antitrust Act], would, however, permit a deviation in favor of the patent owner, [and] the patent owner's refusal to grant a license under these term does not justify an abuse of law objection. An obligation to enter into a contract exists only under such terms as are reasonable *and* from which any modification in favor of the market-dominating party would be unreasonable such that the

CONFIDENTIAL

MOTM_WASH1823_0602160

insistence on these terms must be regarded as the abuse of a market-dominating position (Karlsruhe OLG, 6 U 174/02, GRUR-RR 2007, 177 et seq., margin no. 56, cited according to Juris). As long as the patent owner can plead that within the scope of what is reasonable, there is still room in its favor, the patent owner is not acting contrary to antitrust law. The fact that this "upper limit" as to that which is not yet contrary to antitrust law is not easily ascertainable for the prospective licensee either, does not unfairly burden the prospective licensee, given that with respect to the prerequisites for a right to a license under antitrust law, the prospective licensee in principle has the burden of presentment and proof (see BGH, supra, margin no. 37 et seq.) and, as shown, the prospective licensee has Section 315 BGB as a solution.

Accordingly, if a summary review shows that the licensing fees offered by the prospective licensee in any event are not sufficient for sure (such that any deviation toward the top would clearly be excessive), the rejection by the patent owner is not obviously contrary to antitrust law. The taking of evidence on the issue of whether the offer is reasonable (in any event) is thus not required.

c.   The Defendant's offer does not withstand a review based on these principles. It cannot be determined that the offered licensing fees would be sufficient in each case.

The *Orange-Book-Standard* decision did not have to deal with the question according to what benchmarks the amount, which in any case was sufficient (in that case within the framework of Section 315 BGB), was to be determined (e.g. general comparable market, licensing pools, licensing practice of the patent owner, etc.).

In this case it can remain open whether a patent pool *per se* can be a convincing starting point and benchmark. To that extent the court division has some concerns. First of all, the interests of the patent owners who contribute their standard-essential patents into a pool are not necessarily comparable with those of the patent owner who refrains from doing so. It is likely that at least the manufacturing members of a patent pool are often less interested in achieving the highest possible licensing income from the contributed patents than in the possibility of utilizing the patents of the other pool members as favorably as possible. The suitability of licensing rates of

CONFIDENTIAL

MOTM_WASH1823_0602161

A patent pool to be used as a benchmark can also be limited by the fact that several of the largest patent owners have not become members of the pool, such as is the case with the MPEG LA Pool.

Even disregarding these basic concerns about the Defendant's calculation method, the court division is unable to ascertain that the offered licensing fees definitely are at a level that any deviation upward would result in clearly excessive fees.

d.  This applies particularly against the background of the numeric calculation of the fee determined for the Plaintiff's portfolio of (17) standard-essential patents down to the two patents in dispute (2/17). In doing so, the linear accounting method of the MPEG LA Patent Pool is in the final analysis transferred without variation, even though the Plaintiff specifically did not join this Pool. After all, it does not make a difference whether the licensing share of 0.082 Euro cent granted in the Pool per patent family and unit is multiplied by ten directly (0.82 Euro cent) and then doubled to 1.64 Euro cent (two patents for which licensing is sought), or whether the total share of (0.082 Euro cent x 17 patent families =) € 1.394 theoretically granted in the Pool for the portfolio is multiplied by ten (13.94 Euro cent) and then numerically calculated down to the number of patents in dispute (1/17 and 2/17, respectively, for both patents in dispute = 0.82 Euro cent and 1.64 Euro cent, respectively).

The court division does not ignore the fact that the Defendant has considered the fact that, as a rule, a standard-essential patent as part of a patent pool can be obtained relatively more favorably than on the basis of an individual license by multiplying the pool licensing share theoretically accruing to the Plaintiff's portfolio by ten. However, it is not recognizable that in doing so the Defendant arrives at a licensing level at which any further upward deviation would be inappropriate. From the court division's point of view this is contradicted by the fact that the portfolio licensing fee thus determined corresponds to the licensing fees obtained by AT&T from at least 9 licensees for its somewhat comparable portfolio. It does not appear likely that AT&T was able to enforce a licensing fee against 9

CONFIDENTIAL

MOTM_WASH1823_0602162

licensees to that extent, which is not only not customary in the market but also at the upper limit of what can still be considered reasonable and non-obstructive or non-discriminating.

Nor does it by any means appear certain to the court division that the maximum licensing amount for the two patents in dispute should correspond precisely to 2/17 of the licensing level determined for the portfolio of the Plaintiff and its group parent company. This would not only presuppose the at least questionable application of the licensing calculation method used for pool licensing shares to individual licensing fees, but also the certainty that the two patents in dispute, viewed independently, are actually no more valuable—or possibly only little more valuable—than the remaining 15 patents in the portfolio of the Plaintiff and its group parent company.

e.  A comparison with the patent pool for a predecessor technology of video compression, the H.262 (MPEG 2) Standard, also raises doubt as to whether the licensing fees offered by the Defendant are at a level at which any deviation upward would result in clearly excessive fees. The H.262 Pool initially provided for licensing fees of USD 4 per device (without cap); after reductions, currently the Pool provides for USD 2 per device. These licensing fees are markedly above those of the MPEG LA Patent Pool (USD 0.20 and USD 0.10, respectively), which the Defendant made the basis of its calculation, with the court division having no indications to believe that the fees of the H.262 Pool in turn were (had been) unreasonable, obstructive or discriminating. Even taking into consideration the Defendant's claim that the MPEG 2 Pool was created in 1997, thus at a time at which the products using compressed data were relatively expensive and worked with fewer implemented standards, at least the licensing fee of the MPEG 2 Pool, which is still currently significantly higher, raises doubts that the 2 Euro cents and 1 Euro cent, respectively, per device offered by the Defendant for the patents in dispute are indeed the upper limit of what is reasonable.

f.  It is not necessary to deal with the contested methodology and validity of the citation analysis stated by the Defendant in any more detail, since in

CONFIDENTIAL

MOTM_WASH1823_0602163

the final analysis the Defendant has not based the licensing fees offered by it on the presumed citation value. To that extent, the Defendant only quoted the presumed citation value of the portfolio (3.8% of the total citation value; expert opinion by Bekkers, Exhibit FBD-22, p. 31), but not of the two patents in dispute. Against this background, irrespective of the contested value of the citation method, it is not ascertainable that the offered licensing fees were at the upper limit of what would be reasonable for patents with a corresponding "citation value."

5. To the extent that the Defendant has made clear at the hearing that its offer included, as a supplemental component, a non-gratuitous cross-license at licensing fees determined by it, this, too, does not result in a different assessment of the offer.

It cannot be concluded simply from the fact that the license seeker would be satisfied with a certain licensing fee for its own patents, that this licensing fee must also be accepted for the patents of the patent owner.

First, the interests of the one seeking the license may be totally different with regard to the relevant patents than the interests of the patent owner. This applies in particular if both parties manufacture and/or distribute markedly different unit numbers. The party who sells higher numbers of units usually prefers a lower mutual licensing fee, while the party with the lower numbers of units prefers a higher mutual licensing fee. In the present case, the Plaintiff's lack of interest in the Defendant's standard-essential patents is also demonstrated insofar as the Plaintiff has abstained from taking a license in the past for the MPEG LA Pool into which the Defendant has contributed its own standard-essential patents.

Second, the one seeking a license would be in a position to force the patent owner, by offering a cross-license at the same conditions, to accept a licensing arrangement in which the amount of the licensing fee would specifically not be based on the requested patent but on the patents owned by the party seeking the license and their—possibly lower—value. Also, the fact that a non-gratuitous cross license does not necessarily have to be of identical interest to

CONFIDENTIAL

MOTM_WASH1823_0602164

both sides is further demonstrated by the Defendant and its group parent company, insofar as they in turn refuse to accept the non-gratuitous cross license offered by the Plaintiff at its conditions (2.25% of turnover) as being unreasonably high.

The fact that the seeker of the license is willing to license its own patents within the framework of a non-gratuitous cross license at the same fees as those offered by it for the patents which it seeks, therefore does not *per se* support the argument that the offered fees are so high in each case that the patent owner could refuse the offer only by violating antitrust laws. In view of the fact that the offered licensing fees, viewed independently, are not obviously sufficient in each case (see above), the additional worldwide cross license could result in the Plaintiff not being able to refuse the offer without violating antitrust laws only if the Defendant's portfolio represented the same value for purposes of the Plaintiff (i.e. not only objectively, although the latter aspect, too, is contested between the parties) as the Plaintiff's portfolio for the Defendant, which could, for example, be measured by the necessity to utilize the patents and the volume of the products manufactured or sold in accordance with the patents and/or the sales generated by them.

6. Finally, to the extent that in its brief of 03/02/2012 (page 382 et seq., 391 et seq.) the Defendant has declared its willingness to grant the Plaintiff, in addition to the licensing fees offered for the two patents in dispute granted in Germany, a worldwide gratuitous cross license in its portfolio of H.264 standard-essential patents, the above considerations for the non-gratuitous cross license apply accordingly. To that extent there is no difference whether the party seeking a license wishes to mutually license the relevant patents at a licensing fee which, at least with regard to the patents of the patent owner, is not sufficient in each case, or whether it wishes to license them free of charge. Even a cross license offered free of charge is not provided without consideration; the latter is given by granting the licenses for patents accruing to the licensee and may therefore also be too low. Thus, in the case of the gratuitous cross license as well, the court division is unable to ascertain for the above-explained reasons (see item 5), that the Plaintiff could refuse the offer only by violating the antitrust law.

CONFIDENTIAL

MOTM_WASH1823_0602165

– 48 –

Therefore, the question as to whether the *Orange-Book-Standard* offer of 12/23/2011 as per Section 296 (1) ZPO, and the offer for an additional worldwide gratuitous cross license, first submitted in the brief of 03/02/2012 after the conclusion of the trial hearing as per Section 296a ZPO—not allowed to that extent—are precluded anyway, is a moot point.

In view of all of the above, the Plaintiff did not violate antitrust laws when it failed to accept the offer, submitted in various versions, for a licensing agreement from the group parent company of the Defendant. For this reason the Defendant cannot defend itself against the Plaintiff's claim for an injunction by claiming *dolo-petit* (Section 242 BGB in conjunction with Art. 102 AEUV and Section 19, 20 GWB, respectively).

## II.

Nor can the Defendant successfully defend itself by claiming that, based on the ITU licensing readiness declaration, the Plaintiff is to grant it a license for the patent in dispute without delay and that for that reason the request for an injunction is an abuse of the law (*dolo-petit*-defense, Section 242 BGB). The rules defined in item I regarding the obligation of a licensing offer by the seeker of the license apply equally to the case of the licensing readiness declaration. If the seeker of the license were in a position to successfully defend against claims for an injunction by the patent owner by arguing that the latter was obligated to grant a license anyhow, on its own volition, the patent owner would be at the mercy of any dishonest licensee, for whom there would be no more incentive to enter into licensing negotiations (see Kühnen, loc. cit., margin no. 1298). After all, the licensing readiness declaration does not constitute more than a declaratory specification of the obligation to enter into an agreement based on antitrust law. At the same time, due to the voluntary obligations assumed by the declarer to provide a license free of discrimination and abuse, it renders the antitrust review as to the patent owner's market-dominating position obsolete (see Kühnen, margin no. 1298 et seq.).

CONFIDENTIAL

MOTM_WASH1823_0602166

**III.**

Nor does the MPEG LA Pool Agreement justify a *dolo-petit* defense because there is no contractual obligation on the part of the Plaintiff to submit to the Defendant an offer at the terms and conditions set forth in the MPEG LA Pool agreement.

In accordance with Article 8.3 of the Agreement, the licensees, Terayon and Tut Systems, were obligated to grant licenses for their own standard-essential patents and those of their "*Affiliates.*" In accordance with Article 1.1 of the Agreement, "*Affiliates*" includes also such companies held by a joint parent company ("*…or is under common control with Licensee*"). Even though it is likely that as of 2007 (until their merger with the Plaintiff) Terayon and Tut Systems were controlled by the same group parent company (Motorola, Inc., later Motorola Mobility, Inc.) as the Plaintiff (however, the begin of the latter's membership in the group has not been stated), at the most, this could have given rise to obligations on the part of the licensees, i.e. Terayon and Tut Systems, but not of the Plaintiff, which was not a contractual partner of the MPEG LA Pool Agreement. However, even the Plaintiff's merger with Terayon and Tut Systems in 2011 could not establish a licensing obligation on the part of the Plaintiff under the MPEG LA Pool Agreement (by way of the claimed universal succession): The MPEG LA Pool Agreement had already been terminated in accordance with its Article 8.1.2, as a result of the take-over of the licensees Terayon and Tut Systems by Motorola, Inc. in 2007. Even though Article 6.6.4 of the MPEG LA Pool Agreement provides that the licensee's obligation under Article 8.3 shall survive the termination of the Agreement, no such obligation on the part of the licensees Terayon and Tut Systems for the licensing of patents of the Plaintiff beyond the termination of the Agreement existed at the time of the termination of the Agreement, i.e. at the time of the takeover of Terayon and Tut Systems by Motorola, Inc. in 2007, because at the time the Plaintiff was not an "*Affiliate*" of the two licensees.

For that reason it can remain open whether any obligation to grant a license would even extend to the patent in dispute and vis-à-vis the Defendant as an affiliate of the licensor, Microsoft Corporation.

CONFIDENTIAL

MOTM_WASH1823_0602167

– 50 –

**D.**

The claims of the Plaintiff because of the infringement of the patent in dispute associated therewith are determined as per Article 64 of the EPC according to the regulations of the patent law.

1.  Since the Defendant has used the subject matter of the patent in dispute in violation of Section 9 No. 1 of the PatG (Xbox 360) and Section 10 the PatG (Windows 7, Media Player 12, and Internet Explorer 9), the Defendant is obligated to cease and desist with respect to the Plaintiff (Section 139, paragraph 1 of the PatG in conjunction with Article 64 of the EPC). The danger of repetition arises out of the infringement actions, which have already occurred, through the sale of the challenged embodiments.

    The obligation to cease and desist must be stated without reservation, because a use of the apparatus of the challenged embodiments for decoding H.264 video data, which did not infringe the patent in dispute, could not be identified. The other functions of the challenged embodiments are not dependent on a decoder apparatus in accordance with the invention. Therefore, the Defendant has no recognizable interest to continue to offer and sell the challenged embodiments in an embodiment which enables the use of the patent in dispute.

    A stock depletion period could not be granted the Defendant. In view of the fact that the patent protection expires already on 10/06/2012, that is, in less than 6 months, a stock depletion period would practically cancel out the judgment to cease and desist and devalue the cease and desist claim of the Plaintiff. Independently of this, there is a lack of substantiation of the serious consequences for the Defendant of a cease and desist order, effective immediately.

    Since the Defendant has been sentenced to cease and desist, the Defendant should be warned, upon request by Plaintiff, of the legal consequences in accordance with Section 890 of the ZPO, of a violation of the cease and desist order.

    .

CONFIDENTIAL

MOTM_WASH1823_0602168

2.  The granted claim for information and an accounting emanates from Section 140b of the PatG and Section 242 of the BGB, in conjunction with Article 64 of the EPC.  If an auditor proviso was not requested by the Plaintiff, it was to be added (see Kühnen, supra, margin no. 1045 et seq., with additional comments) and the continuing law suit in that regard rejected.


3.  The recall and removal claim arises out of Section 140a, paragraph 3, page 1 of the PatG., as amended, in conjunction with Article 64 of the EPC for the products distributed since 09/01/2008.  For the products which entered the channels of distribution before 09/01/2008, only a claim for recall from the channels of distribution to an extent as per Section 140a, paragraph 3, page 1 of the PatG, as amended, but not for a removal from the channels of distribution.

The condition of fault, already existing on 09/01/2008 due to the (culpable) patent-infringing actions before the law to improve the enforcement of intellectual property rights (BGBl. 2008 I, page 1191) became effective on 09/01/2008, is subject, for lack of explicit legal transition regulations, with respect to its contents and its effects, only to the law which was in force at the time of the emergence of the fault, that is until 09/01/2008 (see BGH GRUR 2009, 515, 517 – *Motor Bike Cleaner*).  The recall claim is already based on an earlier law, without involving an interpretation conforming to the guidelines, as per Section 139, paragraph 2 of the PatG, Section 249, paragraph 1, of the BGB, as compensation by way of restitution in kind and/or as removal claim unrelated to any fault as per Section 1004, paragraph 1, page 1 of the BGP analog (LG Mannheim, judgment of 11/13/2009, 7 O 92/08 – not published).  A prerequisite for such a claim, similar in content to Section 140a, paragraph 3, page 1 of the PatG, as amended, risk-removal claim directed towards a recall according to an earlier law, is not a right of the infringer to dispose of the objects to be recalled in the sense of a legal disposition through intermediaries within the channels of distribution (different, too, from a mere recall: BGH, GRUR 1974, 666, 669 – repair insurance, with additional comments).  Different rules apply for the removal from the channels of distribution. Since removal from the channels of distribution by the infringer disregarding an appeal for a voluntary return (recall) requires the successful "ultimate removal" itself, it is basically a prerequisite of the earlier law that the infringer has the right to

CONFIDENTIAL

MOTM_WASH1823_0602169

dispose of the objects to be recalled in the sense of a legal disposition via intermediaries in the channel of distribution (see BGH, GRUR 1974, 666, 669 – Repair Insurance, with additional comments).   The Plaintiff has neither demonstrated such a power to dispose of the Defendant nor is this evident otherwise.  A different application of the law as a result of the delayed converted so-called enforcement guidelines is out of the question.  The guideline shows neither a direct horizontal effect between the parties, nor is an evolution of the law, in conformity with the guideline of the general claim to eliminate consequences, possible insofar as the court would take the place of the legislators (LG Mannheim, InstGE 12, 200 margin no.  42 – *Nitrogen Monoxide Detection*; a.A. OLG Düsseldorf, InstGE 13, 15 – *Factor VIII Concentrate*).

Following the wording of the law (in looking at the "channels of distribution"), it still needed to be clarified that objects which are in the possession of private or commercial end users, are covered by the operative provisions (compare LG Mannheim, InstGE 12, 200, 208–210, Tz.   45 et seq.   – *Nitrogen Oxide Detection*; a.A. Kühnen, supra, margin no. 1082).

4.  With regard to the patent infringement, which has been established since 10/19/2001, the Defendant, one month after the publication of the notice that the patent in dispute has been granted, the Defendant could be reproached for negligence at the very least.  For this reason, the Defendant is also obligated to pay damages to the Plaintiff from this time onwards in accordance with Section 139, paragraph 2 of the PatG, in conjunction with Article 64 of the EPC.  At the present time, the Plaintiff is not in a position to quantify the claim for damages; this justifies the determination application  under Section 256 of the ZPO.

CONFIDENTIAL

MOTM_WASH1823_0602170

## E.

A suspension of the lawsuit as per Section 148 of the ZPO is not warranted.

### I.

The lawsuit must not be suspended until a decision was reached in the matter of the invalidity suit against the patent in dispute.  While the decision concerning the invalidity suit takes precedence as per Section 148 of the ZPO, the division has exercised the discretion accorded it by this regulation and dispensed with a suspension of the infringement process.  Since the invalidity Plaintiff, the Defendant in this case has requested the suspension of the invalidity proceedings and has declared to waive the right to a revision of the invalidity proceedings, as long as it adheres to the license agreement offer, it is, for the time being, improbable that there will be an annulment of the patent in dispute.

### II.

Nor was a suspension in accordance with Section 148 of the ZPO taken into consideration in regard to the examination by the antitrust authorities of the admissibility of the takeover of the parent company of the Plaintiff by Google Inc., because the decision of the antitrust authorities is not anticipatory.  Any future changes in the legal status are not anticipatory with regard to the decision to be made on the basis of the current legal status (see Zöller/Greger, ZPO, 29th edition, Section 148, margin no.  6a).

## F.

The cost determination emanates from Section 92, paragraph 2, No. 1 of the ZPO.

The decision concerning the preliminary enforceability is based on Section 709, pages 1 and 2 of the ZPO.

Contrary to the parallel proceedings relating to the European patent EP 0 615 384 B1, the determination of the amount of security with regard to a preliminary enforcement of the claim to cease and desist, was not focused on the time period until a

CONFIDENTIAL

MOTM_WASH1823_0602171