decision presumably will be in hand in the Court of Appeal, but rather on the remaining period of protection of the patent in dispute.

In determining the security with regard to the obligations to recall and remove the products described under item I.1.a) (Xbox 360), the division takes into consideration that the isolated enforcement of these obligations to eliminate the patent-infringing conditions are, in fact, equivalent to enforcing the order to cease and desist.

The application by the Defendant according to Section 712 of the ZPO to enforce the protection from enforcement remains unsuccessful.  The declaration by the Defendant of impending financial losses, loss of market share and damage to image, is not sufficient to establish the prerequisites of Section 712, paragraph 1, page 1 of the ZPO. The assertion of claims to cease and desist from technical protective rights usually results in the suspension of business activities related to the patent-infringing products and therefore, per se, does not open up the area of application of Section 712, paragraph 1, page 1 of the ZPO (OLG Düsseldorf, InstGE 8, 117, 121 – *Mobile Concrete Pump*).  That the economic existence of the Defendant, even taking into consideration the liability of the Plaintiff regardless of fault in accordance with Section 717, paragraph 2, page 1 of the ZPO, is threatened, is neither established nor made credible.  With regard to the possible disadvantages stated by the Defendant for the use of the challenged embodiments (company, public administration), these are not irreplaceable disadvantages threatening the Defendant itself.  However, Section 712 of the ZPO does not serve as the protection of third parties.  The fact is that the foreseeable end of the period of protection of the patent in dispute (October 2012) does not work against the predominant interest of the Plaintiff in a preliminary enforceability.

Dr. Kircher
Presiding Judge at the Regional Court

Dr. Bauer-Gerland
Judge at the Regional Court

Wedler
Judge at the Regional Court

CONFIDENTIAL

MOTM_WASH1823_0602172

Executed:

      [signature]

As Clerk of the Court      [stamp:] Mannheim Regional Court

CONFIDENTIAL

MOTM_WASH1823_0602173

CONFIDENTIAL

MOTM_WASH1823_0602174

CONFIDENTIAL

MOTM_WASH1823_0602175

*- Ausfertigung -*

**Geschäftsnummer:**
2 O 240/11



Verkündet am
02. Mai 2012

Folger, JAng.e
als Urkundsbeamtin
der Geschäftsstelle

# Landgericht Mannheim
## 2. Zivilkammer
# Im Namen des Volkes
# Urteil

Im Rechtsstreit

**General Instrument Corporation**
Horsham PA 19044 /USA

- Klägerin -

Prozessbevollmächtigte:
Rechtsanwälte quinn emanuel u. Koll., Mannheim, Gerichts-Fach 227
(02426.40235/20161622.1)

**gegen**

**Microsoft Deutschland GmbH**
Konrad-Zuse-Str. 1, 85716 Unterschleißheim

- Beklagte -

Prozessbevollmächtigte:
Rechtsanwälte Freshfields Bruckhaus Deringer u. Koll., Prannerstr. 10, 80333 München
(PC/CBA 109096:0588)

**wegen** Patentverletzung

hat die 2. Zivilkammer des Landgerichts Mannheim auf die mündliche Verhandlung vom

07. Februar 2012 unter Mitwirkung von

Vors. Richter am Landgericht Dr. Kircher

Richterin am Landgericht Dr. Bauer-Gerland

Richter am Landgericht Wedler

für       **Recht**       erkannt:

CONFIDENTIAL

MOTM_WASH1823_0602176

– 2 –

I.   Die Beklagte wird verurteilt,

    1. a)

       es zu unterlassen, im Gebiet der Bundesrepublik Deutschland

       Dekodiervorrichtungen (insbesondere Xbox 360) zum Empfang der Blöcke an kodierten Videodaten, bereitgestellt von den unterschiedlichen Bewegungskompensatoren einer Vorrichtung zur adaptiven Kompression digitaler Videosignale zur Übertragung,

       anzubieten, in den Verkehr zu bringen oder zu gebrauchen oder zu den genannten Zwecken einzuführen oder zu besitzen,

       wenn diese dadurch gekennzeichnet sind, dass

       ein Mittel zum Auffinden eines Codewortes aus jedem empfangenen Datenblock, das den Bewegungskompensator, von dem der Block empfangen wurde, repräsentiert, bereitgestellt ist,

       ein Mittel, das auf das Codewort reagiert, bereitgestellt ist, um einen Bewegungsvektor für jeden Block von den Bewegungsvektordaten, die mit dem Block empfangen wurden, wiederherzustellen, und

       ein Mittel, das auf diesen Bewegungsvektor reagiert, bereitgestellt ist, um gegenwärtige Videobilddaten von Daten, die von einem gegenwärtigen Datenblock und mindestens einem vorherigen Datenblock bereitgestellt sind, wiederherzustellen.

              (EP 0 538 667 B1, Anspruch 19, unmittelbare Verletzung)

    1.b)

       es zu unterlassen, im Gebiet der Bundesrepublik Deutschland Computersoftware (insbesondere Windows 7 und/oder Internet Explorer 9)

       anzubieten und/oder zu liefern,

CONFIDENTIAL

MOTM_WASH1823_0602177

wenn diese dazu geeignet ist, durch Installation auf einem Computer eine

Dekodiervorrichtung zum Empfang der Blöcke an kodierten Videodaten, bereitge-
stellt von den unterschiedlichen Bewegungskompensatoren einer Vorrichtung zur
adaptiven Kompression digitaler Videosignale zur Übertragung,

zu bilden,

wenn die Dekodiervorrichtung dadurch gekennzeichnet ist, dass

ein Mittel zum Auffinden eines Codewortes aus jedem empfangenen Datenblock,
das den Bewegungskompensator, von dem der Block empfangen wurde, reprä-
sentiert, bereitgestellt ist,

ein Mittel, das auf das Codewort reagiert, bereitgestellt ist, um einen Bewegungs-
vektor für jeden Block von den Bewegungsvektordaten, die mit dem Block emp-
fangen wurden, wiederherzustellen, und

ein Mittel, das auf diesen Bewegungsvektor reagiert, bereitgestellt ist, um gegen-
wärtige Videobilddaten von Daten, die von einem gegenwärtigen Datenblock und
mindestens einem vorherigen Datenblock bereitgestellt sind, wiederherzustellen.

(EP 0 538 667 B1, Anspruch 19, mittelbare Verletzung)

1.c)

es zu unterlassen, im Gebiet der Bundesrepublik Deutschland Computersoftware
(insbesondere Windows Media Player 12)

anzubieten und/oder zu liefern,

wenn diese dazu geeignet ist, nach Installation auf einer Dekodiervorrichtung
gemäß Ziff. I. 1. b) mit der Computersoftware gemäß Ziff. I. 1 b) (insbesondere
Windows 7) zusammenzuwirken.

(EP 0 538 667 B1, Anspruch 19, mittelbare Verletzung)

CONFIDENTIAL

MOTM_WASH1823_0602178

– 4 –

1.d)

Für jeden Fall der Zuwiderhandlung gegen eines der Verbote gemäß Ziffer I.1.a) bis Ziffer I.1.c) wird der Beklagten jeweils Ordnungsgeld bis Euro 250.000, ersatzweise Ordnungshaft, oder Ordnungshaft bis zu 6 Monaten angedroht, wobei die Ordnungshaft an den gesetzlichen Vertretern der Beklagten zu vollziehen ist.

I.2.

Die Beklagte wird verurteilt, der Klägerin schriftlich in geordneter Form (gegliedert nach Kalendervierteljahren) Rechnung zu legen, in welchem Umfang sie die zu Ziffer I.1.a) bis Ziffer I.1.c) bezeichneten Handlungen seit dem 19. Oktober 2001 begangen hat, und zwar jeweils unter Angabe

a) der einzelnen Lieferungen (unter Vorlage der Rechnungen und/oder Lieferscheine) mit

   aa) Liefermengen, Zeiten und Preisen,
   bb) Marken der jeweiligen Erzeugnisse sowie allen Identifikationsmerkmalen wie Typenbezeichnung, Artikelbezeichnung, laufender Produktnummer,
   cc) den Namen und Anschriften der Abnehmer,

b) der einzelnen Angebote (unter Vorlage schriftlicher Angebote) mit

   aa) Angebotsmengen, Zeiten und Preisen,
   bb) Marken der jeweiligen Erzeugnisse sowie allen Identifikationsmerkmalen wie Typenbezeichnung, Artikelbezeichnung, laufender Produktnummer,
   cc) den Namen und Anschriften der gewerblichen Angebotsempfänger,

c) der nach den einzelnen Kostenfaktoren aufgeschlüsselten Gestehungskosten sowie des erzielten Gewinns,

d) der Namen und Anschriften der Hersteller, Lieferanten und anderer Vorbesitzer, jeweils mit der Anzahl der hergestellten, erhaltenen oder bestellten Erzeugnisse,

CONFIDENTIAL

MOTM_WASH1823_0602179

e) der betriebenen Werbung, aufgeschlüsselt nach Werbeträgern, deren Aufla-
genhöhe, Verbreitungszeitraum und Verbreitungsgebiet,

wobei die unter a) und d) genannten Angaben durch Vorlage der Auftragsbelege,
Auftragsbestätigungen, Rechnungen sowie Liefer- und Zollpapiere zu belegen
sind,

wobei der Beklagten vorbehalten bleibt, die Namen und Anschriften ihrer nicht-
gewerblichen Abnehmer und der Angebotsempfänger statt der Klägerin einem
von dieser zu bezeichnenden, dieser gegenüber zur Verschwiegenheit verpflich-
teten, vereidigten und in der Bundesrepublik Deutschland ansässigen Wirt-
schaftsprüfer mitzuteilen, sofern die Beklagte die durch dessen Einschaltung ent-
stehenden Kosten übernimmt und ihn ermächtigt und verpflichtet, der Klägerin
auf konkrete Anfrage mitzuteilen, ob ein bestimmter nicht-gewerblicher Abnehmer
oder ein bestimmter Angebotsempfänger in der Rechnungslegung enthalten ist.

I.3.
Die Beklagte wird verurteilt, die unter Ziffer I. 1 .a) beschriebenen, im Besitz Drit-
ter, die nicht Endabnehmer sind, befindlichen Erzeugnisse, die nach dem 29. Ap-
ril 2006 in Verkehr gebracht wurden, aus den Vertriebswegen zurückzurufen,
indem diejenigen Dritten, denen durch die Beklagte oder mit deren Zustimmung
Besitz an den Erzeugnissen eingeräumt wurde, unter Hinweis darauf, dass die
Kammer mit dem hiesigen Urteil auf eine Verletzung des Klagepatents erkannt
hat, ernsthaft aufgefordert werden, die Erzeugnisse an die Beklagte zurückzuge-
ben und den Dritten für den Fall der Rückgabe der Erzeugnisse eine Rückzah-
lung des gegebenenfalls bereits bezahlten Kaufpreises sowie die Übernahme der
Kosten der Rückgabe zugesagt wird,

und

die unter Ziffer I. 1 .a) beschriebenen, im Besitz Dritter, die nicht Endabnehmer
sind, befindlichen Erzeugnisse, die seit dem 01.09.2008 in Verkehr gebracht wur-

CONFIDENTIAL

MOTM_WASH1823_0602180

– 6 –

den, endgültig zu entfernen, indem die Beklagte diese Erzeugnisse wieder an sich nimmt oder die Vernichtung derselben beim jeweiligen Besitzer veranlasst.

II. Es wird festgestellt, dass die Beklagte verpflichtet ist, der Klägerin allen Schaden zu ersetzen, der der Klägerin durch Handlungen der Beklagten gemäß Ziffern I.1.a) bis I.1.c) seit dem 19. Oktober 2001 entstanden ist und noch entsteht.

III. Im Übrigen wird die Klage abgewiesen.

IV. Die Beklagte trägt die Kosten des Rechtsstreits.

V. Das Urteil ist vorläufig vollstreckbar gegen Sicherheitsleistung in Höhe von

- 60 Mio. € im Hinblick auf Ziffer I.1 [Unterlassung]
- 10 Mio. € im Hinblick auf Ziffer I.2. [Rechnungslegung]
- 10 Mio. € im Hinblick auf Ziffer I.3. [Rückruf/Entfernung], wobei die zu leistende Sicherheit für den Fall der isolierten Vollstreckung (ohne Vollstreckung der Unterlassung nach Ziff. I. 1.a) auf 30 Mio. € festgesetzt wird.
- 120 % des jeweils zu vollstreckenden Betrages im Hinblick auf Ziffer IV.

CONFIDENTIAL

MOTM_WASH1823_0602181

– 7 –

# Tatbestand

Die Klägerin macht gegen die Beklagte wegen behaupteter unmittelbarer und mittelbarer Patentverletzung Ansprüche auf Unterlassung, Rechnungslegung sowie Rückruf und Entfernung aus den Vertriebswegen geltend und begehrt die Feststellung der Schadensersatzpflicht der Beklagten.

Die Klägerin ist eine US-amerikanische Gesellschaft und 100%ige Tochter von Motorola Mobility Inc. Das US-amerikanische Unternehmen Google Inc. plant, Motorola Mobility Inc. zu übernehmen, wodurch Google Inc. auch sämtliche von Motorola Mobility Inc. gehaltenen Unternehmen übernehmen würde, darunter die Klägerin.

Die Klägerin ist Inhaberin des in Deutschland in Kraft stehenden europäischen Patents EP 0 538 667 B1 (nachfolgend: Klagepatent) betreffend eine adaptive Bewegungskompensation mit mehreren Bewegungskompensatoren. Das Klagepatent wurde am 06.10.1992 angemeldet. Die Offenlegung erfolgte am 28.04.1993. Der Hinweis auf die Erteilung des Klagepatents wurde am 19.09.2001 veröffentlicht. Die Bundesrepublik Deutschland zählt zu den benannten Vertragsstaaten. Die deutsche Übersetzung des Klagepatents ist unter der Nummer DE 692 32 063 T2 veröffentlicht.

Mit Schriftsatz vom 05.10.2011 (Anlage FBD 19) erhob die Beklagte Nichtigkeitsklage gegen den deutschen Teil des Klagepatents zum Bundespatentgericht. Mit Schriftsatz vom 08.02.2012 haben die Nichtigkeitsklägerin (hiesige Beklagte) und die beiden Nebenintervenienten im Nichtigkeitsverfahren (Microsoft Corporation und Microsoft Ireland Operations Ltd.) das Ruhen des Nichtigkeitsverfahrens gemäß § 251 ZPO beantragt (Anlage FBD 36).

Die Klägerin macht den Patentanspruch 19 des Klagepatents geltend, der in der Verfahrenssprache den folgenden Wortlaut hat (ohne Bezugsziffern):

*Decoder apparatus for receiving the blocks of encoded video data, provided by said different motion compensators of the apparatus of claim 1, characterized in that:*

CONFIDENTIAL

MOTM_WASH1823_0602182

*means are provided for retrieving, from each received data block a code word*
*representative of the motion compensator from which the block is received;*
*means responsive to said code word are provided for recovering a motion vector*
*for each block from motion vector data received with the block; and*
*means responsive to said motion vector are provided for recovering current video*
*image data from data provided by a current data block and at least one prior data*
*block.*

Wegen des weiteren Inhalts des Klagepatents, insbesondere wegen der Beschreibung und der zugehörigen Figuren, wird auf die Patentschrift (Anlage KP1-K1) und deren deutsche Übersetzung (Anlage KP1-K2) Bezug genommen.

Die Beklagte gehört zur Microsoft-Gruppe. Sie vertreibt in der Bundesrepublik Deutsch-land unter anderem die Videospielkonsole Xbox 360 sowie die Computer-Software Win-dows 7, Windows Media Player Version 12 und Microsoft Internet Explorer Version 9 (im Folgenden: angegriffene Ausführungsformen).

Die angegriffenen Ausführungsformen unterstützen den Videokompressionsstandard H.264, der unter der Bezeichnung MPEG-4/AVC (*Advanced Video Coding*) als zehnter Teil des MPEG-4 Standards (MPEG-4/Part 10, ISO/IEC 14496-10) veröffentlicht ist (im Folgenden: Standard). Die angegriffene Ausführungsform Xbox 360 ermöglicht das Ab-spielen von H.264-Videodateien. Windows 7 sowie Windows Internet Explorer Version 9 versetzen durch Installation auf einen Computer diesen in die Lage, H.264-Videodateien abzuspielen. Dies gilt auch für den Windows Media Player Version 12, der die Dekodiermodule von Windows 7 benutzt.

Der H.264-Standard regelt unter anderem die Dekompression eines standardkompatibel komprimierten digitalen Videosignals und definiert auch das zu dekodierende Kompres-sionsformat für ein digitales Videosignal. Der Standard wurde von der International Telecommunication Union (ITU) in Zusammenarbeit mit der MPEG (*Moving Pictures Experts Group*) erarbeitet und in dem Dokument ITU-T H.264 (03/2010) veröffentlicht (Anlage KP1- K4). Die Vorgängergesellschaft der Muttergesellschaft der Klägerin, die Motorola Inc., hatte in den Jahren 2002 bis 2003 an dem H.264/MPEG4/AVC-Standardsetzungsverfahren teilgenommen.

CONFIDENTIAL

MOTM_WASH1823_0602183

Die Klägerin und auch die Motorola Inc. gaben im Laufe des Standardfestsetzungsver-fahrens mehrere Lizenzbereitschaftserklärungen gegenüber der ITU ab, die ihrer Mei-nung nach standardessentiellen Patente Lizenzsuchenden zu nicht diskriminierenden, fairen und angemessenen Bedingungen zu lizenzieren (Anlagenkonvolut FBD 8).

Diese Erklärungen haben auszugsweise folgenden Wortlaut (Übersetzung):

> *„2. Der Patentinhaber wird einer unbeschränkten Anzahl von Antragstellern auf einer weltweiten, nicht-diskriminierenden Basis und zu angemessenen Bedingun-gen eine Lizenz erteilen, das patentierte Material zu benutzen, […]. Hier __ an-kreuzen* [Anmerkung der Kammer: diese Stelle wurde jeweils angekreuzt]*, wenn die Lizenzbereitschaft des Patentinhabers unter der Bedingung der Gegenseitig-keit für die oben genannten ITU-T Empfehlungen/ den ISO/IEC International Standard steht.*
>
> *Die Lizenzverhandlungen werden den betroffenen Parteien überlassen und fin-den außerhalb der ITU-T/ISO/IEC statt."*

Die Muttergesellschaft der Beklagten, die Microsoft Corporation, ist eines jener Unter-nehmen, die ihre für H.264-Standard-essentiell erklärten Patente als Lizenzgeberin („Licensor") in den MPEG LA H.264/AVC Patentpool (im Folgenden: MPEG LA Pool) eingebracht haben. In diesem Pool werden 171 Patentfamilien, die als für den Standard essentiell erklärt wurden, von der Gesellschaft MPEG LA, L.L.C. verwaltet und gemein-sam lizenziert. Hierfür besteht der MPEG LA H.264/AVC Patentpool-Lizenzvertrag (im Folgenden: MPEG LA Poolvertrag, Anlage FBD-12). Dieser Vertrag sieht ein gestuftes Lizenzgebührensystem mit fixen Beträgen pro Gerät vor. Produkte, die die standardrele-vante Technologie verwenden (u.a. Dekoderprodukte), werden zu sog. „Units" zusam-mengefasst. Pro Jahr sind bis zu 100.000 Units für ein Unternehmen („*legal entity*") kos-tenlos. Für die danach folgenden Units ist pro Unit eine Lizenzgebühr von 0,20 US-\$ zu entrichten, ab 5.000.001 Units verringert sich die Lizenzgebühr für die weiteren Units auf 0,10 US-\$ pro Unit. Des Weiteren sieht der MPEG LA Poolvertrag eine Kappungsgrenze für Lizenznehmer und die mit ihnen verbundenen Unternehmen vor (2005-2006: max.

CONFIDENTIAL

MOTM_WASH1823_0602184

3,5 Mio. US-$ / Jahr; 2007-2008: max. 4,25 Mio. US-$ / Jahr; 2009-2010: max. 5 Mio.
US-$ / Jahr; 2011-2015: max. 6,5 Mio. US-$ / Jahr).

Die Unternehmen Terayon Communications Systems, Inc. (im Folgenden Terayon) und
Tut Systems, Inc. (im Folgenden: Tut Systems) waren Lizenznehmerinnen („Licensee")
des MPEG LA Poolvertrages. Die Vorgängergesellschaft der Konzernmutter der Kläge-
rin, Motorola, Inc., übernahm Terayon und Tut Systems im Jahr 2007 (FBD 29). Nach
der Aufteilung des Motorola-Konzerns in Motorola Solutions, Inc. und Motorola Holdings,
Inc., wurden Terayon und Tut Systems der Motorola Mobility Inc. (einer Tochtergesell-
schaft der Motorola Mobility Holdings, Inc.), Konzernmutter der Klägerin, zugeteilt. Im
Jahr 2011 wurden Terayon und Tut Systems im Wege der Übernahme Teil der Klägerin
(„*Merger merging Tut Systems [bzw. Terayon] with and into General Instrument Corpo-
ration*" - FBD 31)

Auch das die Übernahme der Muttergesellschaft der Klägerin planende Unternehmen
Google Inc. ist Lizenznehmer des MPEG LA Patentpools (Anlage FBD-18).

Ziff. 8.3 des MPEG LA Poolvertrages lautet wie folgt:

> „**Licensee Grant.** *Upon full execution of this Agreement, Licensee agrees to
> grant a worldwide, non-exclusive license and/or sublicense (commensurate to this
> scope of the licences which Licensee has selected here under) under any and all
> AVC Essential Patent(s) that Licensee and its Affiliates, if any, have the right to
> licence and / or sublicence, to any Licensor or any sublicensee of the Licensing
> Administrator desiring such a licence and/or sublicense on fair and reasonable
> terms and conditions. [...]*"

Ziff. 8.1.2 lautet:

> „*This Agreement may not be assigned by the Licensee under any circumstances.
> This Agreement shall terminate upon the Sale by Licensee of all or substantially
> all of its assets, or capital shares (or similar indicia of ownership), or upon a
> similar transaction.*"

Gemäß Ziff. 6.6.4 überdauert die Pflicht aus Ziff. 8.3 das Auslaufen oder die Beendigung
des Lizenzvertrags.

CONFIDENTIAL

MOTM_WASH1823_0602185

Mit Schreiben vom 29.10.2010 (Anlage FBD 9) unterbreitete die Muttergesellschaft der Klägerin der Muttergesellschaft der Beklagten ein 20 Tage gültiges, als „RAND" (reasonable and non-discriminatory) bezeichnetes Angebot auf Abschluss eines Vertrags über eine weltweite, nicht ausschließliche Lizenz für das Portfolio H.264-standardessentieller Patente von Motorola für eine Lizenzgebühr von 2,25 % der Verkaufspreise der standardkompatiblen Endprodukte (z.B. Xbox 360, PC, Laptop, Smartphone etc.). Ferner sah das Angebot eine Rücklizenz für die standardessentiellen Patente von Microsoft zu den gleichen Bedingungen vor. Schließlich wurde die Bereitschaft erklärt, ggf. auch über eine Lizenz nur für einzelne Patente aus dem Motorola Portfolio zu verhandeln. Dieses Angebot wurde seitens der Muttergesellschaft der Beklagten nicht angenommen.

Mit Anwaltsschreiben vom 23.12.2011 unterbreitete die Konzernmutter der Beklagten mit Wirkung auch für ihre Tochtergesellschaften der Klägerin ein unbedingtes Lizenzvertragsangebot für den deutschen Teil des hiesigen Klagepatents (auch Gegenstand des Parallelverfahrens 2 O 376/11) und den deutschen Teil des Europäischen Patents EP 0 615 384 B1, das Gegenstand der Parallelverfahren 2 O 373/11 und 2 O 387/11 ist (Anlage FBD-21 (engl. Originalfassung und deutsche Übersetzung)).

Gegenstand dieses ausformulierten Lizenzvertragsangebots ist ein nicht ausschließliches, nicht übertragbares Recht der Microsoft Corp. und ihrer Tochtergesellschaften, ein Produkt herzustellen, das einen patentgemäßen AVC-Decoder oder AVC-Codec enthält, und außerdem die Rechte für den Import nach Deutschland, sowie die Nutzung und den Besitz solcher Produkte innerhalb Deutschlands.

Ziff. 3.1 des Angebots sieht eine Stücklizenz pro „computing device containing an AVC Decoder or AVC Codec" (= Einheit) vor, und zwar in Höhe von 2 €-Cents für jede Einheit für die ersten 10 Millionen Einheiten pro Jahr (= max. 200.000,00 €) und von 1 €-Cent für jede Einheit pro Jahr darüber hinaus.

Die angebotenen Lizenzgebühren ermittelte die Beklagte im Wesentlichen wie folgt:

Die als standardessentiell deklarierten 270 Patentfamilien ließen sich insgesamt 36 Patentinhabern zuordnen. Vergleiche man, wie viele dieser Patentfamilien sich den einzel-

CONFIDENTIAL

MOTM_WASH1823_0602186

nen der insgesamt 36 Patentinhabern zuordnen lassen, so ergebe sich, dass das Portfo-
lio der Klägerin und ihrer Muttergesellschaft das fünftgrößte aller einzelnen Portfolios
sei. Wenn man dieses Portfolio einerseits mit den insgesamt im MPEG LA-Pool gebün-
delten Patentfamilien und andererseits mit den von Dritten gehaltenen Patentfamilien
vergleiche, so habe das Portfolio der Klägerin und ihrer Muttergesellschaft einen Anteil
von 6,3 % (17 Patentfamilien, darunter das Klagepatent), während im Patentpool insge-
samt 63,6 % der standardessentiellen Patente gebündelt seien und weitere 30,1 % von
Dritten gehalten würden.

Den angeblichen technischen Wert der von der Klägerin und ihrer Muttergesellschaft
gehaltenen Patente hat die Beklagte über eine von ihr so genannte Zitatanalyse ermit-
telt, deren Validität die Klägerin bestreitet. Danach soll die Häufigkeit, in der ein be-
stimmtes Patent für spätere Erfindungen als einschlägiger Stand der Technik genannt
wird, Rückschlüsse auf die Bedeutung der Erfindung und deren technischen Wert zulas-
sen (Bl. 356 f.). Nach dieser so genannten Zitatanalyse soll das Patentportfolio der Klä-
gerin und ihrer Konzernmutter unter den Patentinhabern den 11. Platz einnehmen. Meh-
rere der 10 Patentinhaber eines Portfolios mit höherem Zitatwert hätten ihre Patente in
den MPEG LA-Pool eingebracht. Im Vergleich zu den insgesamt im MPEG LA Pool ge-
haltenen standardessentiellen Patenten ergebe sich, dass diese nach allen erforderli-
chen Korrekturen 72,7 % des gesamten Zitatwertes ausmachen und die von Dritten
(einschließlich der Klägerin und ihrer Konzernmutter) 27,3 %. Die von der Klägerin und
ihrer Konzernmutter insgesamt gehaltenen Patente stellten nur 3,8 % des gesamten
Zitatwertes aller standardessentiellen Patente dar.

Zur Ermittlung der Lizenzraten zog die Muttergesellschaft der Beklagten Lizenzraten von
Patentpools oder Lizenzprogrammen heran, die ebenfalls die H.264/AVC-Technologie
oder ähnliche Technologien betreffen. Als Vergleichsmarkt komme zunächst der Markt
der Patente in Betracht, die Teil des MPEG LA Pools seien. In diesem Pool seien 171
Patentfamilien von 28 Patentinhabern umfasst. Die Lizenzgebühren für die weltweite
Herstellung bzw. den Vertrieb von standardkompatiblen Dekodern sind im MPEG LA
Pool gestaffelt wie bereits oben dargestellt (vgl. auch Anlage FBD-12, Art. 3.1.1). Die
Lizenzgebühren des Pools werden proportional zur Anzahl der von den Lizenzgebern
gehaltenen Patente aufgeteilt, d.h. ein Lizenzgeber erhält bei der höchsten Lizenzge-
bühr von 0,2 US-$ für jede vertriebene Einheit 0,082 €-Cent pro Patentfamilie. Demnach

CONFIDENTIAL

MOTM_WASH1823_0602187

erhalte etwa der Patentinhaber mit der größten Anzahl eingebrachter Patentfamilien 1,59 €-Cent pro Einheit.

Des Weiteren verweist die Beklagte auf ein Lizenzprogramm des Unternehmens AT&T, in dem H.264/AVC-standardessentielle Patente außerhalb eines Patentpools lizenziert werden (Bl. 268 f.; Lizenzbedingungen von AT&T: Anlage FBD-25). Danach verlangt AT&T für die weltweite Lizenzierung seines Portfolios von H.264/AVC-standardessentiellen Patenten eine Stücklizenz von 18 US-$-Cents [13,75 €-Cent[1]] für bis zu 5 Mio. Einheiten, wobei sich die Gebühr für alle weiteren Einheiten auf 10 US-$-Cents [7,64 €-Cents] reduziert und eine Kappungsgrenze von 5 Mio. US-$ pro Kalenderjahr vorgesehen ist. Nach Auffassung der Beklagten sei davon auszugehen, dass das von AT&T gehaltene relevante Portfolio in etwa dem Portfolio der Klägerin und ihrer Muttergesellschaft entspreche und dessen Wert sogar übersteige. AT&T habe derzeit 9 Lizenznehmer.

Schließlich nimmt die Beklagte Bezug auf angeblich am Markt übliche Lizenzbedingungen für andere Standards, die technisch dem H.264/AVC-Standard vergleichbar seien (Bl. 269 f.):

- VC-1 Standard (Poollizenz): 20 US-$-Cents/Einheit für mehr als 100.000 und bis zu 5 Mio. Einheiten, 10 US-$-Cents für mehr als 5 Mio. Einheiten, Kappungsgrenze 5 Mio. US$.
- MPEG-4 Visual-Standard (Poollizenz): 25 US-$-Cents/Stück für mehr als 50.000 Stück, Kappungsgrenze 1,25 Mio. US$.
- Poollizenzen für weniger ähnliche Technologien: unter 1 US-$ pro Stück bis zu lediglich 10 US-$-Cents pro Stück.

Hätten die Klägerin und ihre Konzernmutter ihr Patentportfolio in den MPEG LA Pool eingebracht, so stünden ihnen bei Anwendung der in dem Pool üblichen numerischen Berechnung für ihr gesamtes Portfolio lediglich (proportionaler Gebührenanteil pro Patentfamilie bei Annahme des Höchstsatzes zwischen 100.000 und 5 Mio. Stück =) 0,082 €-Cents x (Patentfamilien der Klägerin und ihrer Konzernmutter =) 17 = 1,394 €-Cent pro

---

[1] Kurs vom 18.04.2012.

CONFIDENTIAL

MOTM_WASH1823_0602188

Einheit zu. Sofern man die beiden Klagepatente jeweils als Patenfamilien betrachte, würde die Lizenzrate für die beiden Patente 2 x 0,082 €-Cent = 0,165 €-Cent betragen. Würde der Pool auf einer (Zitat-)Wertberechnung basieren, stünde der Klägerin und ihrer Konzernmutter sogar eine noch geringere Gebühr zu.

Den der Klägerin und ihrer Konzernmutter bei theoretischer Mitgliedschaft im Pool für ihr gesamtes Portfolio zustehenden Betrag von 1,394 €-Cent verzehnfache die Beklagte auf 14 €-Cents pro Einheit bis zu 5 Mio. Produkten und verfünffache sie auf 7,5 €-Cents pro Einheit für alle darüber hinausgehenden Einheiten. Damit entspreche die Gebühr in etwa der von der unabhängigen Anbieterin AT&T für deren (nach Behauptung der Beklagten wertvolleres) Portfolio geforderten Lizenzgebühr.

Für die beiden Klagepatente (das hier streitgegenständliche und den deutschen Teil des Europäischen Patents EP 0 615 384 B1, das Gegenstand der Parallelverfahren 2 O 373/11 und 2 O 387/11 ist) errechnet die Klägerin eine Stücklizenz von 1,65 €-Cent für die ersten 5 Mio. Einheiten pro Jahr und 0,83 €-Cent für alle weiteren Einheiten pro Jahr. Diese Gebühr entspricht 2/17 der für das gesamte Portfolio von 17 Patentfamilien der Klägerin bzw. ihrer Konzernmutter ermittelten Gebühr.

Die genannten Lizenzgebühren rundet die Beklagte auf volle €-Cents (1,65 €-Cent auf 2 €-Cent und 0,83 €-Cent auf 1 €-Cent) auf, erstreckt die höhere Einstiegsgebühr auf die ersten 10 Mio. Einheiten und verzichtet auf eine Kappungsgrenze.

Alternativ bot die Microsoft Corp. in dem Schreiben vom 23.12.2012 an, für Deutschland eine wechselseitige Lizenzvereinbarung mit der Muttergesellschaft der Klägerin, Motorola Mobility Inc., für das Gesamtportfolio der H.264-standardessentiellen Patente von Microsoft Corp. und ihren Tochtergesellschaften einerseits und Motorola Mobility Inc. und deren Tochtergesellschaften andererseits abzuschließen. In ihrem Schriftsatz vom 03.02.2012 bot die Microsoft Corp. den Abschluss einer beiderseitigen *weltweiten* Portfolio-Lizenz an. In der mündlichen Verhandlung vom 07.02.2012 stellte der Beklagtenvertreter klar, dass diese Kreuzlizenz kein eigenständiges Lizenzangebot darstelle, sondern eine ergänzende Komponente zu dem spezifizierten Lizenzangebot sei. Angeboten werde keine Freikreuzlizenz, sondern eine entgeltliche Überkreuzlizenz zu den ermittelten Lizenzsätzen von 2 €-Cents/Einheit bzw. 1 €-Cent/Einheit. In ihrem in

CONFIDENTIAL

MOTM_WASH1823_0602189

dieser Hinsicht nicht nachgelassenen Schriftsatz vom 02.03.2012 erklärte die Beklagte bzw. ihre Muttergesellschaft schließlich die Bereitschaft, der Klägerin eine weltweite *kostenlose* Kreuzlizenz an ihrem Portfolio von standardessentiellen Patenten zu erteilen, und zwar zusätzlich zu ihrem auf die beiden in Deutschland erteilten Klagepatente beschränkten Lizenzangebot (Bl. 382 f.).

Weiterer Teil des Angebots der Microsoft Corp. ist das Anerkenntnis einer Schadensersatzpflicht für die Nutzung der lizensierten Patente in der Vergangenheit dem Grunde nach sowie die Verpflichtung, die Nichtigkeitsklage gegen das lizenzierte Klagepatent innerhalb von 10 Tagen nach Annahme des Lizenzangebots durch die Klägerin zurückzunehmen. Mit Schriftsatz vom 03.02.2012 (vgl. 2 O 373, Bl. 364 ff.) erweiterte die Beklagte das Lizenzangebot um ein Kündigungsrecht der Klägerin für den Fall, dass die Beklagte nach der Rücknahme der Nichtigkeitsklagen gegen die beiden in diesem und in den Parallelverfahren geltend gemachten Patente erneut Nichtigkeitsklage gegen eines oder beide Klagepatente erheben sollte. In der mündlichen Verhandlung präzisierte der Beklagtenvertreter insoweit, dass der Klägerin nach dem Angebot der Beklagten ein Recht zur außerordentlichen Kündigung auch dann zugebilligt werden solle, wenn künftig eine Nichtigkeitsklage durch eine durch den Lizenzvertrag begünstigte Partei erhoben werde.

Das Angebot der Microsoft Corp. solle bestehen bleiben, bis es von der Klägerin angenommen werde oder bis eine rechtskräftige Entscheidung  dahingehend ergehe, dass die Produkte der Microsoft Corp., die mit dem H.264/AVC-Standard kompatibel seien, die beiden geltend gemachten Klagepatente nicht verletzten, oder die Patente rechtskräftig für nichtig erklärt worden seien oder die Klagen aus einem anderen Grund rechtskräftig abgewiesen worden seien.

Zudem legte die Konzernmutter der Beklagten Rechnung über die nach dem angebotenen Lizenzvertrag fälligen Lizenzgebühren für die angebliche Benutzung des Klagepatents durch die Beklagte, ihre Konzernmutter sowie die Microsoft Ireland Operations Limited in der Vergangenheit bis September 2011 (Anlagenkonvolut FBD-34). Die nach dem Lizenzvertragsangebot errechneten Lizenzgebühren nebst Verzugszinsen hinterlegte die Konzernmutter der Beklagten bei der Hinterlegungsstelle des Amtsgerichts Mannheim (Hinterlegungsbescheinigung: Anlage FBD-35) unter Verzicht auf das Recht

CONFIDENTIAL

der Rücknahme (zuletzt klargestellt mit Schreiben des Beklagtenvertreters vom 08.02.2012 an das Amtsgericht Mannheim, Bl. 360).

Mit Schriftsatz vom 30.03.2012 teilte die Beklagte mit, dass ihre Konzernmutter auch mit Wirkung für die Beklagte die fälligen und seit der ersten Rechnungslegung noch ausstehenden Lizenzgebührenzahlungen samt Zinsen gemäß ihrem Lizenzvertragsangebot ermittelt habe. Die Konzernmutter der Beklagten hinterlegte den ermittelten weiteren Betrag am 30.03.2012 ebenfalls bei der Hinterlegungsstelle des Amtsgerichts Mannheim unter Verzicht auf das Recht der Rücknahme (Anlage FBD-40).

**Die Klägerin** vertritt die Auffassung, die im Klagepatent beanspruchte Erfindung sei in dem Standard als zwingende Anforderung implementiert, weshalb das Klagepatent für den Standard essentiell sei.

Da die angegriffene Ausführungsform Xbox 360 zum Abspielen standardkompatibel komprimierter Videoformate imstande sei, handle es sich um eine Dekodiervorrichtung, die Anspruch 19 des Klagepatents unmittelbar verwirkliche. Die angegriffenen Ausführungsformen Windows 7 und Windows Internet Explorer 9 verletzten das Klagepatent mittelbar, da ein Computer nach der Installation eines dieser Programme, welche die entsprechenden H.264 Codecs (Softwaremodule) enthielten, als Dekodiervorrichtung ausgebildet sei. Auch der Windows Media Player 12 verletze das Klagepatent mittelbar, da diese Software dazu geeignet und bestimmt sei, mit einem wesentlichen Element der Erfindung zusammenzuwirken, indem er bestimmungsgemäß die von Windows 7 bereit gestellte Dekodierfunktion abrufe.

Der Anspruch 19 werde daher von den nach dem Standard arbeitenden angegriffenen Ausführungsformen wortsinngemäß verwirklicht.

Insbesondere schütze Anspruch 19 nicht ein System aus Enkoder und Dekoder, so dass es auf die Ausgestaltung des standardgemäßen Enkodiervorgangs vorliegend nicht weiter ankomme. Die standardgemäßen Dekodiervorrichtungen machten auch von den Merkmalen 1 und 2 des Anspruchs 19 Gebrauch. So seien die standardgemäßen Syntaxelemente mb_type und sub_mb_type Codewörter im Sinne des Merkmals 2, weil sie

CONFIDENTIAL

MOTM_WASH1823_0602191

den verwendeten Bewegungskompensator nach Typ und Blockgröße identifizierten. Selbst wenn man mit der Beklagten zu Unrecht annehmen wollte, dass ein Datenblock im Sinne von Anspruch 19 zwingend einem Macroblock des Standards entspreche und ferner zwingend innerhalb dieses Macroblocks ein einheitlicher Bewegungskompensator zu verwenden sei, würde das Klagepatent durch die angegriffenen Ausführungsformen verletzt, weil im Standard nur für den Fall einer 8x8 Partitionierung des Macroblocks eine weitere Partitionierung auf der 8x8 Sub-Macroblock-Ebene erfolgen könne.

Die Klägerin ist der Ansicht, der Beklagten stehe weder aus der Lizenzbereitschaftserklärung der Klägerin bzw. deren vormaliger Konzernmutter gegenüber der ITU noch aus dem MPEG LA Poolvertrag ein Nutzungsrecht zu. Die MPEG LA Poolverträge, die sich ohnehin nicht auf das Klagepatent bezögen, seien im Übrigen durch die Übernahme der Gesellschaften Terayon und Tut Systems durch Motorola, Inc. im Jahre 2007 beendet worden.

Des Weiteren begründeten die Lizenzbereitschaftserklärung und der MPEG LA Poolvertrag auch keinen *dolo-petit*-Einwand der Beklagten.

Die Beklagte könne dem Unterlassungsanspruch der Klägerin auch keinen kartellrechtlichen Zwangslizenzeinwand entgegenhalten.

Die Beklagte sei mit diesem Einwand präkludiert, weil sie ihr Lizenzvertragsangebot erst am 23.12.2011 und damit weit nach Ablauf der Klageerwiderungsfrist vorgelegt habe. Im Übrigen sei die Klägerin aber auch nicht verpflichtet, das Lizenzvertragsangebot der Konzernmutter der Beklagten vom 23.12.2011 anzunehmen.

Die von der Konzernmutter der Beklagten angebotene Lizenzgebühr sei gänzlich unangemessen und unverhältnismäßig niedrig. Für die angebotene Summe würde die Klägerin niemals so gewichtige Patente wie die vorliegenden Klagepatente lizensieren. Rechne man die angebotene Stücklizenz auf einen Prozentsatz am Verkaufserlös der angegriffenen Ausführungsformen, käme man auf eine Lizenzgebühr zwischen 0,00145 % und 0,004 % der Verkaufserlöse, während im Bereich Elektronik / Informationstechnologien bzw. Computer typischerweise Lizenzsätze von über 4 % der Umsätze genommen würden. Es entspreche weder der Praxis und sei auch ökonomisch unvertretbar, den Wert eines standardessentiellen Patents schlicht aufgrund seines numerischen Anteils

CONFIDENTIAL

MOTM_WASH1823_0602192

– 18 –

an der Gesamtheit der standardessentiellen Patenten linear herunter zu rechnen. Ein standardessentielles Patent werde nicht weniger wert, weil der Patentinhaber über weitere standardessentielle Patente verfüge und zur Vermeidung von unangemessen hohen Lizenzsätzen für das Gesamtportfolio keinen kumulierten Satz mit linearem Anstieg für die Lizenzierung aller Patente zugrundelege.

Der Wert der Motorola Patente werde unter anderem durch eine Kreuzlizenz mit dem Unternehmen Nokia belegt, das über das größte Portfolio von als H.264-standardessentiell erklärten Patenten verfüge.

Weiterhin sei zu berücksichtigen, dass die Klägerin bzw. deren Muttergesellschaft ihr gesamtes Patentportfolio standardessentieller Mobilfunkpatente, das mehrere Teile verschiedener standardessentieller Technologien enthalte, für eine Lizenzgebühr von 2,25 % der Umsätze anböten, wobei diese Gebühr fällig werde, wenn von einer einzigen Technologie - etwa H.264 - bzw. von einem einzigen Patent Gebrauch gemacht werde. Der Satz von 2,25 % sei somit kein Gesamtbetrag, den man auf alle lizensierten Patente umlegen könne; es bestehe grundsätzlich kein linearer Zusammenhang zwischen der Anzahl der Patente und dem Lizenzsatz.

Anders als die Beklagte hält die Klägerin die Ermittlung des FRAND-Lizenzsatzes auf der Grundlage der Gebühren des MPEG LA Patentpools für unzulässig, da ein Patent-Pool von vorneherein kein tauglicher Vergleichsmaßstab sei. Des Weiteren gebe es bei Lizenzsätzen für ein Portfolio standardessentieller Patente keine numerische Proportionalität, eine solche würde Unternehmen allein dadurch benachteiligen, dass sie eine sehr hohe Anzahl standardessentieller Patente innehätten. Wirtschaftlich gesehen seien die Einzelpatente das eigentlich Wertvolle.

Für die Annahme der Beklagten, wonach der Wert eines Patents unter anderem durch die relative Häufigkeit der Zitierung desselben in anderen Patenten bestimmt werden könne, gebe es methodisch keinen Anhaltspunkt.

Eine Aufbrauchfrist sei der Beklagten nicht zu gewähren, da dies letztlich eine Aushöhlung des der Klägerin uneingeschränkt zustehenden Unterlassungsanspruchs bedeuten würde. Im Übrigen sei nicht erkennbar, dass die Anpassung der angegriffenen Ausfüh-

CONFIDENTIAL

MOTM_WASH1823_0602193

rungsformen im Hinblick auf die begehrte Unterlassung der Verwendung des Klagepatents zu Störungen bei den Anwendern der Programme führe.

Eine Anordnung von Vollstreckungsschutz gemäß § 712 ZPO komme nicht in Betracht, weil hierfür ein aus Sicht der Klägerin ohnehin nicht dargelegter Umsatzausfall der Beklagten nicht ausreiche. Eine ernsthafte Gefährdung ihrer wirtschaftlichen Existenz habe die Beklagte nicht glaubhaft gemacht.

Die Klägerin **b e a n t r a g t**,

- - I.1.a) - I.1.d) wie erkannt;
- - I. 2. wie erkannt bis auf den Wirtschaftsprüfervorbehalt;
- - I.3.

    Die Beklagte wird verurteilt, die unter Ziffer A.I. 1 .a) beschriebenen, im Besitz Dritter befindlichen Erzeugnisse, die nach dem 29. April 2006 in Verkehr gebracht wurden, aus den Vertriebswegen zurückzurufen,

    indem diejenigen Dritten, denen durch die Beklagte oder mit deren Zustimmung Besitz an den Erzeugnissen eingeräumt wurde, unter Hinweis darauf, dass die Kammer mit dem hiesigen Urteil auf eine Verletzung des Klagepatents erkannt hat, ernsthaft aufgefordert werden, die Erzeugnisse an die Beklagte zurückzugeben und den Dritten für den Fall der Rückgabe der Erzeugnisse eine Rückzahlung des gegebenenfalls bereits bezahlten Kaufpreises sowie die Übernahme der Kosten der Rückgabe zugesagt wird

    und

    endgültig zu entfernen, indem die Beklagte diese Erzeugnisse wieder an sich nimmt oder die Vernichtung derselben beim jeweiligen Besitzer veranlasst.

- - II. wie erkannt.

CONFIDENTIAL

MOTM_WASH1823_0602194

Die Beklagte **b e a n t r a g t**,

die Klage abzuweisen.

<u>hilfsweise</u>:
den Rechtsstreit bis zur Entscheidung der zuständigen Kartellbehörden über die Zulässigkeit der angekündigten Übernahme der Konzernmutter der Klägerin durch Google Inc. auszusetzen;

<u>hilfsweise</u>:
den Rechtsstreit bis zur rechtskräftigen Entscheidung des Nichtigkeitsverfahrens gegen den deutschen Teil des Europäischen Patents EP 0 538 667 B1 / DE 692 32 063 T2 gemäß § 148 ZPO auszusetzen;

<u>höchst hilfsweise</u>:
der Beklagten eine angemessene Aufbrauchfrist einzuräumen;

<u>höchst hilfsweise</u>:
die Beklagte hinsichtlich Klageantrag I.1.2. lediglich zur Beauskunftung unter Wirtschaftsprüfervorbehalt zu verurteilen;

<u>höchst hilfsweise</u>:
der Beklagten zu gestatten, die Zwangsvollstreckung durch Sicherheitsleistung, die auch durch Bank- oder Sparkassenbürgschaft erbracht werden kann, ohne Rücksicht auf eine Sicherheitsleistung der Klägerin abzuwenden (§ 712 ZPO);

<u>höchst hilfsweise</u>:
die von der Klägerin im Rahmen der vorläufigen Vollstreckbarkeit zu erbringende Sicherheitsleistung auf mindestens 236.000.000,00 € festzusetzen.

Die Klägerin tritt den Aussetzungsanträgen und dem Vollstreckungsschutzantrag entgegen.

CONFIDENTIAL

MOTM_WASH1823_0602195

**Die Beklagte** ist der Auffassung, die angegriffenen Ausführungsformen verletzten das Klagepatent nicht. Der H.264-Standard, anhand dessen die Verletzungsfrage von der Klägerin dargelegt würde, mache von den Merkmalen des Patentanspruchs 19 keinen Gebrauch.

Dabei sei insbesondere zu berücksichtigen, dass es sich bei Anspruch 19 um ein geschütztes System aus Enkoder und Dekoder handele und die standardgemäße Kodierung nicht wie im Klagepatent beschrieben funktioniere. Anspruch 19 verweise explizit auf den einen Enkoder lehrenden Anspruch 1; die Verwendung von bestimmten Artikeln („der Blöcke", „den unterschiedlichen Bewegungskompensatoren") zeige, dass Anspruch 19 wie ein von Anspruch 1 abhängiger Anspruch formuliert sei. Auch aus dem Gesamtkonzept der angeblichen Erfindung ergebe sich, dass die Funktionalität des in Anspruch 1 beschriebenen Enkoders bei der Auslegung des Anspruchs 19 mitgelesen werden müsse.

Die Beklagte ist ferner der Auffassung, die von einem patentgemäßen Dekoder empfangenen Datenblöcke müssten stets die gleiche Blockgröße haben und die darin enthaltenen Blöcke, die bei der Bewegungskompensation durch die Verwendung einer bestimmten Blockgröße durch einen Bewegungskompensator entstehen, müssten ebenfalls die gleiche Größe haben. Ein Datenblock, der Blöcke mit unterschiedlichen Partitionen enthalte, z.B. eine Mischung aus 8x8, 8x4, 4x8 oder 4x4 Blöcken, sei gemäß der angeblichen Erfindung nicht möglich, während dies bei den Daten, die ein standardgemäßer Dekoder empfange, der Fall sein könne. Im Standard könne jeder der vier Sub-Macroblöcke eines Macroblocks durch einen entsprechenden Bewegungskompensator in eine 8x8 Partition, zwei 8x4 Partitionen, zwei 4x8 Partitionen oder vier 4x4 Partitionen unterteilt sein. Dies zeige, dass die Daten, die ein standardgemäßer Dekoder empfange, in vielen Fällen nicht denen entsprächen, die ein erfindungsgemäßer Dekoder empfange, weil es bei ersteren nicht „das Codewort" gemäß Merkmal 2 gebe, das einen einzigen Bewegungskompensator (der die gleiche Blockgröße verwende) für einen ganzen Datenblock repräsentiere. Für einen Macroblock (16x16), der vier Sub-Macroblöcke (8x8) mit einer Mischung von Partitionsgrößen enthalte, werde eine Prädiktion nämlich nicht mit Hilfe eines einzigen einheitlichen Bewegungskompensators erzeugt. Vielmehr

CONFIDENTIAL

MOTM_WASH1823_0602196

hätten einzelne Subblöcke des 16x16 Macroblocks mindestens zwei verschiedene Bewegungskompensatoren durchlaufen und seien somit in unterschiedliche Blockgrößen unterteilt worden.

Die Beklagte ist weiter der Ansicht, ihr stehe nach Art. 8.3 i.V.m. 6.6.4 des MPEG LA Poolvertrages ein Nutzungsrecht an dem Klagepatent zu. Bei Art. 8.3 des MPEG LA Poolvertrages handele es sich nicht nur um eine Bereitschaftserklärung, eine Lizenz auf Anfrage eines potentiellen Lizenznehmers zu erteilen. Der Lizenzvertrag begründe vielmehr die Pflicht des MPEG LA Lizenznehmers, jedem Nutzer des Standards, der entweder Lizenzgeber oder auch Lizenznehmer im MPEG LA Patentpool sei, oder den mit diesen verbundenen Unternehmen von sich aus eine Lizenz zu den in Art. 3 des MPEG LA Poolvertrages umrissenen Bedingungen anzubieten. Die Klägerin als mit Terayon und Tut Systems, zweier Lizenznehmer bzw. ehemaliger Lizenznehmer des MPEG LA Poolvertrages, verbundenes Unternehmen bzw. als deren Gesamtrechtsnachfolgerin sei daher gemäß Art. 8.3 i.V.m. 6.6.4 und 1.1 des MPEG LA Poolvertrages verpflichtet, der Konzernmutter der Beklagten als einer der Lizenzgeberinnen im Lizenzpool bzw. der Beklagten selbst als einem mit dieser Lizenzgeberin verbundenen Unternehmen eine Lizenz an den standardessentiellen Patenten der Klägerin zu erteilen

Darüber hinaus macht die Beklagte ein Nutzungsrecht basierend auf der gegenüber der ITU abgegebenen Lizenzbereitschaftserklärung der Klägerin zur Lizenzierung zu FRAND (Fair, Reasonable And Non-Discriminatory)-Bedingungen geltend. Die Lizenzbereitschaftserklärung sei ein Vertrag zugunsten Dritter gemäß § 328 BGB, nämlich sämtlicher lizenzbereiter Nutzer des H.264-Standards. Aus dieser Erklärung folge zum einen ein bindendes Angebot auf Abschluss eines Lizenzvertrages. Zum anderen habe die Klägerin auf die Geltendmachung ihrer Ausschließlichkeitsrechte gemäß §§ 139 ff. PatG verzichtet und sei hinsichtlich des angeblich standardessentiellen Patents von vornherein auf Zahlungsansprüche nach einer angemessenen Lizenzgebühr beschränkt.

Äußerst hilfsweise hält die Beklagte der Klägerin deren Lizenzbereitschaftserklärung als dolo-petit-Einwand gemäß § 242 BGB entgegen. Durch die Geltendmachung der Unterlassungsansprüche begebe sich die Klägerin in einen unlösbaren Widerspruch zu dieser Erklärung, weil sie die Untersagung der Nutzung aufgrund der Bereitschaftserklärung unmittelbar wieder durch Einräumung eines Nutzungsrechts herausgeben müsse.

CONFIDENTIAL

MOTM_WASH1823_0602197

Schließlich könne die Klägerin das ihr von der Konzernmütter der Beklagten am 23.12.2011 unterbreitete Lizenzvertragsangebot nicht ablehnen, ohne sich kartellrechtswidrig zu verhalten. Dieses Angebot erfülle sämtliche Anforderungen an ein FRAND-Lizenzangebot nach Maßgabe der *Orange Book Standard* - Entscheidung des Bundesgerichtshofs. Das Lizenzangebot enthalte branchenübliche Vertragsbedingungen und sowohl Lizenzsatz als auch Lizenzbasis entsprächen fairen, nicht behindernden und nicht diskriminierenden Bedingungen. Die angebotene Lizenzgebühr übersteige die von der Beklagten als marktüblich ermittelten Lizenzraten bei weitem und damit das, was als FRAND-Lizenzgebühr anzusehen sei. Dies ergebe sich unter anderem aus einem von ihr eingeholten Privatgutachten (Anlage FBD-22). Die gebührenfreie Kreuzlizenz, die sie für die standardessentiellen Patente der Parteien angeboten habe, sei angesichts der Größe des Portfolios der Konzernmutter der Beklagten und deren Tochterunternehmen an standardessentiellen Patenten vorteilhaft für die Klägerin.

Eine Stücklizenzgebühr sei in diesem Technologiebereich auch üblich. Dagegen führe eine wertbasierte Lizenzrate zu keinem angemessenen Ergebnis, weil der Wert des Endprodukts unabhängig von der stets gleichen Funktionalität des standardkompatiblen Dekoders stark schwanken könne.

Der angebotene Stücklizenzsatz überschreite die marktüblichen Lizenzraten erheblich und liege damit deutlich oberhalb dessen, was die Klägerin eigentlich verlangen könne. Zur Ermittlung einer angemessenen und marktüblichen Lizenz habe die Beklagte richtigerweise Lizenzraten von Patentpools oder Lizenzprogrammen, die ebenfalls die H.264-Technologie oder ähnliche Technologien beträfen, herangezogen.

Schließlich habe die Beklagte auch sämtliche nach der *Orange Book Standard* - Entscheidung erforderlichen Erfüllungshandlungen vorgenommen.

Weiterhin ist die Beklagte der Ansicht, im Falle einer Genehmigung der Übernahme der Muttergesellschaft der Klägerin durch Google Inc. stehe ihr eine *dolo-petit*-Einrede (§ 242 BGB) gegen die geltend gemachten Ansprüche zu, weil Google Inc. nach dem MPEG LA Lizenzvertrag verpflichtet sei, der Muttergesellschaft der Beklagten und der Beklagten die der Google Inc. zustehenden H.264-essentiellen Patente zu lizensieren.

CONFIDENTIAL

MOTM_WASH1823_0602198

Vor diesem Hintergrund sei das Verfahren, wie hilfsweise beantragt, bis zur Entscheidung der Kartellbehörden über die Zulässigkeit der Übernahme auszusetzen.

Schließlich ist die Beklagte der Auffassung, dem Klagepatent fehle es an der Rechtsbeständigkeit; sie hat allerdings im Zusammenhang mit ihrem *Orange-Book-Standard* - Angebot das Ruhen des Nichtigkeitsverfahrens beantragt.

Im Falle einer Verurteilung sei der Beklagten jedenfalls eine angemessene Aufbrauchfrist einzuräumen, weil die sofortige uneingeschränkte Durchsetzung des Unterlassungsanspruchs für die Beklagten und ihre Kunden mit unverhältnismäßigen Nachteilen verbunden sei und der Klägerin insoweit eine gewisse Einschränkung zumutbar sei. Der Beklagten sei es angesichts der Komplexität und der weltweiten Verwendung der angegriffenen Ausführungsformen nicht möglich, durch Umstellung ihrer Produkte unmittelbar auf ein etwaiges Unterlassungsurteil zu reagieren. Ein sofort wirksamer Unterlassungsanspruch könne gravierende Folgen nicht nur für die Beklagte selbst, sondern auch für ihre Abnehmer und die Benutzer der angegriffenen Produkte haben. Im Übrigen hätten die angeblich patentverletzenden Dekoder nur einen geringen Anteil an den Funktionen der angegriffenen Ausführungsformen. Im Hinblick auf den baldigen Ablauf des Klagepatents sei eine Aufbrauchfrist erst recht gerechtfertigt.

Unabhängig von einer durch die Klägerin zu erbringenden Sicherheitsleistung würde die vorläufige Vollstreckung eines antragsgemäßen Urteils der Beklagten einen nicht zu ersetzenden Nachteil bringen, welchem kein überwiegendes Interesse der Klägerin an der vorläufigen Vollstreckbarkeit entgegenstehe, weshalb der Beklagten im Falle des Unterliegens Vollstreckungsschutz nach § 712 Abs. 1 S. 1 ZPO ohne Rücksicht auf die Sicherheitsleistung der Klägerin zu gewähren sei. Die Entfernung des H.264-Dekoders von ihren Produkten stelle die Beklagte und ihre Kunden wegen der Interoperabilität des H.264-Dekoders mit anderen Funktionalitäten des Produkts und anderer Produkte vor logistische Herausforderungen. Neben gravierenden finanziellen Einbußen drohten der Beklagten im Falle einer vorläufigen Vollstreckung der Verlust von Marktanteilen und eine irreparable Beschädigung des Images und der Marke der Beklagten. Unzählige weitere Produkte, die auf den angegriffenen Ausführungsformen basierten, wären von einer Einstellung des Vertriebs der letztgenannten betroffen, obwohl sie das Klagepatent gar nicht verwendeten. Der Klägerin, die kein direkter Wettbewerber der Beklagten sei,

CONFIDENTIAL

MOTM_WASH1823_0602199

drohten demgegenüber durch eine Aussetzung der vorläufigen Vollstreckbarkeit ledig-lich finanzielle und einfach zu beziffernde Einbußen.

Wegen des weiteren Sach- und Streitstandes wird auf den Inhalt der Schriftsätze nebst Anlagen und das Sitzungsprotokoll Bezug genommen.

Das Verfahren betreffend die von der Klägerin ebenfalls geltend gemachte Verletzung des europäischen Patents EP 0 615 384 B1 wurde mit Beschluss vom 17.10.2011 abge-trennt und wird nunmehr unter dem Aktenzeichen 2 O 373/10 geführt.

CONFIDENTIAL

MOTM_WASH1823_0602200

# Entscheidungsgründe

Die zulässige Klage ist ganz überwiegend begründet.

Die angegriffenen Ausführungsformen machen von Anspruch 19 des Klagepatents Gebrauch (A.). Die Beklagte ist zur Nutzung des Klagepatents nicht berechtigt (B.), und die Klägerin ist an der Durchsetzung ihres Unterlassungsanspruchs auch nicht aus kartellrechtlichen Gründen gehindert (C.), weshalb der Klägerin die geltend gemachten Ansprüche ganz überwiegend zustehen (D.). Eine Aussetzung des Rechtsstreits ist nicht angezeigt (E.)

## A.

Die Beklagte verletzt das Klagepatent gemäß Art. 64 Abs. 1 EPÜ i.V.m. § 9 S. 2 Nr. 1 und § 10 Abs. 1 PatG, weil die angegriffenen Ausführungsformen von Anspruch 19 des Klagepatents unmittelbar (Xbox 360) und mittelbar (Windows 7, Windows Internet Explorer 9, Windows Media Player 12) wortsinngemäßen Gebrauch machen.

## I.

Das Klagepatent bezieht sich auf die Kompression von digitalen Videosignalen.

1.  Da bei digitaler Bildübertragung sehr hohe Datenvolumen anfielen, wenn jedes Einzelbild einer Videosequenz einzeln vollständig übertragen würde, werden Videodaten in der Regel aus einer Kombination verschiedener Techniken kodiert, um die Bilddaten möglichst effizient zu komprimieren. Im Stand der Technik waren Videokompressionstechniken bereits bekannt, die sich die räumliche Korrelation zwischen aneinander liegenden Pixeln in einem Einzelbild („Frame") zunutze machen (Intra-Frame Kodierung), ebenso Kompressionssysteme, die Ähnlichkeiten zwischen zeitlich aneinander liegenden Frames nutzen, um die Daten noch mehr zu verdichten. Bei der letzteren, so genannten Inter-Frame-Kodierung war die Differenzkodierung bekannt, bei der nur der Unterschied zwischen einem gegenwärtigen Frame und der Prädiktion des gegenwärtigen Frames übertragen wird. Darüber hinaus waren auch Inter-Frame-Videokompressionssysteme, die

CONFIDENTIAL

MOTM_WASH1823_0602201

Bewegungskompensation verwenden, im Stand der Technik bereits bekannt. Bei der Bewegungskompensation genügt die Übertragung eines Bewegungsvektors, der die Verschiebung eines unveränderten Bildbereichs gegenüber dem Referenzbild beschreibt. Das Klagepatent nennt beispielhaft die Veröffentlichung von Ninomiya und Ohtsuka „A Motion-Compensated Interframe Coding System for Television Pictures", IEEE Transactions on Communications, Band COM-30, Nr. 1, Januar 1982. Danach wird ein Bewegungsvektor für jeden Block (Bildausschnitt) im gegenwärtigen Frame bestimmt, indem ein Block im vorhergehenden Frame identifiziert wird, der dem bestimmten Block am meisten ähnelt. Der gesamte Frame kann dann an einem Dekodierer rekonstruiert werden, indem der Unterschied zwischen den sich entsprechenden Blockpaaren, zusammen mit den Bewegungsvektoren, die erforderlich sind, um die sich entsprechenden Paare zu identifizieren, übermittelt wird [0007].

Wenn die Bewegungskompensation gut funktioniert, kann das Differenzbild - in Blöcke unterteilt - effizienter kodiert werden als die ursprünglichen Bildblöcke. Das kodierte Differenzbild und die Informationen zu den (kodierten) Bewegungsvektoren werden dann zusammen an die Dekodier-Vorrichtung übertragen.

Die Leistung der Bewegungsschätzung hängt davon ab, wie gut die Bewegung zwischen Teilen von Bildern als einfache Übersetzung nachgebildet werden kann. So können Zoom, Rotation oder andere komplexe Verdrehungen großer Bildbereiche häufig nicht als einfache Übersetzung nachgebildet werden. Die Effizienz blockbasierter Bewegungsschätzalgorithmen kann daher von der Größe des Blocks, der verwendet wird, um den gegenwärtigen Frame an den vorhergehenden Frame anzupassen, abhängen. Eine große Blockgröße wird in Bereichen, in denen das Bild unbewegt ist oder einheitlich übersetzt wird, gut funktionieren, da weniger Overhead-Daten erforderlich sind, um die mit jedem der Bildblöcke verknüpften Daten zu übertragen. In anderen Fällen, in denen komplexe Bewegungen von einem Frame zum anderen erfolgen, kann eine kleinere Blockgröße bessere Leistungen erzielen [0030]. Vor diesem Hintergrund hat die statische Entscheidung für eine bestimmte Blockgröße den Nachteil von Effizienzverlusten.

CONFIDENTIAL

MOTM_WASH1823_0602202

Um dieses Problem anzugehen, war im Stand der Technik aus Puri et al., „Inter-frame coding with variable block-size motion compensation", November 1987, ein Verfahren zur Bewegungskompensation mit variablen Blockgrößen bekannt, bei dem neben einer Block-basierten Bewegungskompensation auch alternativ eine Sub-Block-basierte Bewegungskompensation genutzt wird, wobei die beiden Be-wegungskompensationsverfahren in einer Kaskade eingesetzt wurden, d.h. es war keine Bewegungskompensation an denselben Videodaten mit verschiedenen Blockgrößen vorgesehen [0010, 0011]. Letzteres war zwar aus der PCT-Anmeldung WO 91/13514 A1 bekannt, jedoch nur bei der Intra-Kodierung und nicht bei der Inter-Kodierung [0012].

2.  Auf dieser Basis stellt sich das Klagepatent die Aufgabe, die Leistung bewe-gungskompensierter Videosignalkompressionssysteme zu verbessern, indem es ein Kompressionssystem bereitstellt, das eine adaptive Bewegungskompensation verwendet.

Zur Lösung dieser Aufgabenstellung schlägt das Klagepatent auf der Kodierseite den adaptiven Einsatz von Bewegungskompensatoren verschiedener Blockgrö-ßen vor. Da je nach Videosequenz bei Verwendung verschiedener Blockgrößen im Hinblick auf den jeweiligen Bildausschnitt unterschiedliche Datenmengen an-fallen können, wird auf der Kodierseite eine von der Datenmenge abhängige Ent-scheidung für die letztlich für die Kompression und Übertragung einzusetzende Blockgröße im Hinblick auf den jeweiligen Bildbereich getroffen (Anspruch 1).

Auf der Empfängerseite schlägt das Klagepatent in Anspruch 19 eine Dekodiervorrichtung vor, deren Merkmale sich wie folgt gliedern lassen, wobei die Kammer die von der Klägerin als Anlage KP1-K3 vorgelegte Merkmalsgliederung zugrunde legt. Die seitens der Beklagten als Anlage FBD 2 vorgelegte Merkmals-gliederung weicht von dieser Merkmalsgliederung an wenigen Stellen ab. Soweit relevant, wird hierauf bei der Subsumption der einzelnen Merkmale (vgl. unten Ziff. II.) näher eingegangen.

CONFIDENTIAL

MOTM_WASH1823_0602203

– 29 –

*Dekodiervorrichtung*

1. *zum Empfang der Blöcke an kodierten Videodaten, bereitgestellt von den unterschiedlichen Bewegungskompensatoren einer Vorrichtung zur adaptiven Kompression digitaler Videosignale zur Übertragung*

2. *wobei ein Mittel zum Auffinden eines Codewortes aus jedem empfangenen Datenblock, das den Bewegungskompensator, von dem der Block empfangen wurde, repräsentiert, bereitgestellt ist,*

3. *wobei ein Mittel, das auf das Codewort reagiert, bereitgestellt ist, um einen Bewegungsvektor für jeden Block von den Bewegungsvektordaten, die mit dem Block empfangen wurden, wiederherzustellen, und*

4. *ein Mittel, das auf diesen Bewegungsvektor reagiert, bereitgestellt ist, um gegenwärtige Videobilddaten von Daten, die von einem gegenwärtigen Datenblock und mindestens einem vorherigen Datenblock bereitgestellt sind, wiederherzustellen.*

### II.

Die angegriffenen Ausführungsformen machen von der Lehre des Anspruchs 19 des Klagepatents wortsinngemäß Gebrauch.

Die erforderliche Auslegung des Klagepatents nach dem Verständnis des Durchschnittsfachmanns hat sich auf den Anspruchswortlaut zu fokussieren (Art. 69 Abs. 1 S.1 EPÜ, § 14 Abs. 1 S. 1 PatG; BGH GRUR 2004, 1023 ff. - *bodenseitige Vereinzelungsvorrichtung*), der Inhalt der Beschreibung und der Zeichnungen ist zur Auslegung ergänzend heranzuziehen (Art. 69 Abs. 1 S. 2 EPÜ, § 14 Abs. 1 S. 2 PatG). Soweit die Beschreibung zur Auslegung der Patentschrift herangezogen wird, ist der technische Sinn der in der Patentschrift verwendeten Worte und Begriffe entscheidend und nicht deren rein philologischer oder logisch-wissenschaftlicher Bedeutungsgehalt (BGHZ 150, 149, 156 - *Schneidmesser I*, BGH GRUR 1999, 909 - *Spannschraube*).

CONFIDENTIAL

MOTM_WASH1823_0602204

Bei einer an diesen Grundsätzen orientierten Auslegung des Anspruchs 19 machen die angegriffenen Ausführungsformen von dessen sämtlichen Merkmalen Gebrauch.

Nachdem die angegriffenen Ausführungsformen unstreitig den H.264-Standard unterstützen, ist der mittelbare Nachweis der Verletzung des Klagepatents durch Zugrundelegung der Eigenheiten des Standards zulässig. Eine Gegenüberstellung der einschlägigen Vorschriften des Standards mit dem Klagepatent zeigt, dass eine standardgemäße Dekodiervorrichtung sämtliche Merkmale des Anspruchs 19 verwirklicht.

1.  Im Standard sind Dekodiervorrichtungen vorgesehen „zum Empfang der Blöcke an kodierten Videodaten, bereitgestellt von den unterschiedlichen Bewegungskompensatoren einer Vorrichtung zur adaptiven Kompression digitaler Videosignale zur Übertragung" (Merkmal 1). Der Standard setzt eine Kodierung und Dekodierung im Wege der Bewegungskompensation unter Verwendung unterschiedlicher Bewegungskompensatoren, die verschiedene Blockgrößen verwenden, voraus (Abschnitte 8.4.1.2.3 und 6.4.2).

Soweit die Beklagte unter anderem in ihrer Kritik an der oben wiedergegebenen Merkmalsgliederung darauf hinweist, dass Anspruch 19 ausdrücklich auf „die Datenblöcke an kodierten Videodaten bereitgestellt von den unterschiedlichen Bewegungskompensatoren der Vorrichtung aus Anspruch 1" abstellt („*the blocks of encoded video data, provided by said different motion compensators of the apparatus of claim 1*", Unterstr. d.d. Kammer), ist dies zwar zutreffend, jedoch ohne Auswirkung auf das Ergebnis der Auslegung des Patentanspruchs und der Subsumption eines standardgemäßen Dekoders unter den Anspruch. Es handelt sich insoweit um eine Angabe des Zwecks der patentgemäßen Dekodiervorrichtung (*„for receiving the blocks…*" / „zum Empfang der Datenblöcke…"). Diese Angabe definiert die geschützte Dekodiervorrichtung näher dahin, dass sie nicht nur die räumlich-körperlichen Merkmale erfüllen muss, die der Patentanspruch explizit formuliert, sondern darüber hinaus so ausgebildet sein muss, dass sie die im Patentanspruch erwähnte Funktion erfüllen kann (vgl. BGH, GRUR 2009, 837 - *Bauschalungsstütze*).

CONFIDENTIAL

MOTM_WASH1823_0602205

Standardgemäße Dekoder sind unstreitig in der Lage, Datenblöcke an kodierten Videodaten zu empfangen, die von den unterschiedlichen Bewegungskompensatoren einer Vorrichtung aus Klagepatentanspruch 1 (einer Vorrichtung zur adaptiven Kompression digitaler Videosignale zur Übertragung) bereitgestellt sind, d.h. die aufgrund einer in Anspruch 1 gelehrten Vorrichtung in dem dort beschriebenen Verfahren ausgewählt worden sind. Aus der hier maßgeblichen Sicht des standardgemäßen Dekoders ist es nämlich nicht entscheidend, auf welche Art und Weise die Datenblöcke an kodierten Videodaten enkoderseitig ausgewählt worden sind (z.B. aufgrund einer Schätzung der Kodierungskosten, einer sog. Rate-Distortion Optimierung oder einer Berechnung der tatsächlichen Menge der komprimierten Daten). Maßgeblich ist, dass die standardgemäße Dekodiervorrichtung jedenfalls über Mittel verfügt, Datenblöcke zu empfangen, die von den unterschiedlichen Bewegungskompensatoren der Vorrichtung aus Anspruch 1 bereitgestellt sind. An diesem Befund ändert sich nichts, sollten standardgemäße Enkoder ihre Bewegungskompensatoren-Auswahl tatsächlich auf eine Anspruch 1 nicht verwirklichende Art und Weise treffen.

Entgegen der Ansicht der Beklagten setzt Anspruch 19 auch kein System aus Enkoder (gemäß Anspruch 1) und Dekoder voraus mit der Folge, dass die in Anspruch 1 gelehrten Mittel auf Seiten des Enkoders (und die Art und Weise seiner Kodierentscheidungen) ebenfalls Teil des Anspruchs 19 wären. Anspruch 19 ist schon nach seinem Wortlaut kein Systemanspruch, sondern ein (Dekodier-) Vorrichtungsanspruch. Der Bezug in Anspruch 19 auf Anspruch 1 erschöpft sich in der Zweckangabe, wonach die Dekodiervorrichtung geeignet sein muss, Blöcke kodierter Videodaten, die von den unterschiedlichen Bewegungskompensatoren der Vorrichtung nach Anspruch 1 bereitgestellt sind, zu empfangen. Gegen die Auffassung der Beklagten spricht überdies, dass das Klagepatent in seinem nicht streitgegenständlichen Anspruch 11 und den auf diesen rückbezogenen Unteransprüchen 12-18 einen die Empfängerseite einbeziehenden Systemanspruch ausdrücklich lehrt.

2. Ein standardgemäßer Dekoder verfügt auch über „ein Mittel zum Auffinden eines Codewortes aus jedem empfangenen Datenblock, das den Bewegungskompensator, von dem der Block empfangen wurde, repräsentiert" (Merkmal 2). Gemäß

CONFIDENTIAL

MOTM_WASH1823_0602206

dem Standard werden in den gesendeten Datenstrom Informationsbits eingefügt, die den verwendeten Bewegungskompensator identifizieren. Diese Kennungen werden zum einen auf Macroblock-Ebene vergeben (sog. mb_type), zum anderen auf der Sub-Macroblock-Ebene (sog. sub_mb_type). In dem Syntaxelement mb_type werden Informationen über den Typ des Bewegungskompensators (z.B. intra Macroblock-Typ (I), predictive Macroblock-Typ (P) oder bi-predictive Macroblock-Typ (B), vgl. Anlage KP1-K4, Tab. 7-10 (S. 97)) und die Größe des verwendeten Blocks (Partitionierungen in einen 16x16 Block, zwei 16x8 Blöcke, zwei 8x16 Blöcke oder vier 8x8 Sub-Macroblöcke) aufgenommen (Anlage KP1-K4, Abschnitt 7.4.5, Tab. 7-13, 7-14). Wenn ein P-Type Macroblock vier 8x8 Partitionen hat, wird zusätzlich zum mb_type Syntaxelement für jeden der vier 8x8 Sub-Macroblöcke ein sub_mb_type Syntax-Element kodiert, das Informationen zu der Partition der 8x8 Sub-Macroblöcke enthält (nämlich je Sub-Macroblock eine 8x8 Partition, zwei 4x8 Partitionen, zwei 8x4 Partitionen oder vier 4x4 Partitionen, vgl. Anlage KP1-K4, Abschnitt 7.4.5.2). Nachfolgend eingelichtete Figur 6-9 des Standards (dort S. 26) zeigt die unterschiedlichen Partitionierungen von Macroblöcken und Sub-Macroblöcken.



**Figure 6-9 – Macroblock partitions, sub-macroblock partitions, macroblock partition scans, and sub-macroblock partition scans**

Die Beklagten vertreten insoweit die Ansicht, die zwei Kennungen mb_type und sub_mb_type seien nicht „ein Codewort" aus jedem empfangenen Datenblock im Sinne des Merkmals 2, weil das sub_mb_type Syntaxelement neben dem mb_type Syntaxelement ein weiteres, zweites Codewort sei.

CONFIDENTIAL

MOTM_WASH1823_0602207

Zunächst ist festzustellen, dass in der englischen Verfahrenssprache von „*a code word representative of the motion compensator from which the block is received*" die Rede ist, in der deutschen Übersetzung <u>ein</u> Codewort also im Sinne eines unbestimmten Artikels und nicht als Zahlwort zu verstehen ist.

Zum anderen spielt die Partitionierung auf Sub-Macroblock-Ebene - also auch die „zweite" Kennung sub_mb_type - nur bei einer 8x8-Partitionierung der Macroblock-Ebene eine Rolle. Das heißt, selbst nach der engen Lesart der Beklagten (ein [1] Codewort, das nicht aus zwei Kennungen bestehen darf) gibt es im Standard Macroblock-Partitionen (16x16, 16x8, 8x16) mit einer einheitlichen Verwendung von Bewegungskompensatoren, die durch (nur) ein Codewort - das mb_type Syntaxelement - repräsentiert werden. Da die standardgemäße Dekodiervorrichtung jedenfalls über Mittel zum Auffinden dieses („einen") Codeworts verfügt, verwirklicht sie auch Merkmal 2 des Anspruchs 19.

Dem steht auch nicht entgegen, dass das Mittel gemäß Merkmal 2 zum Auffinden eines Codewortes aus <u>jedem</u> empfangenen Datenblock bereitgestellt sein soll. Erforderlich, aber auch ausreichend ist, dass die Dekodiervorrichtung *geeignet* sein muss, aus jedem empfangenen Datenblock ein Codewort aufzufinden. Diese Eignung wird nicht dadurch in Frage gestellt, dass empfangene Datenblöcke eventuell gar kein Codewort oder mehr als ein Codewort enthalten. Bereits die Tatsache, dass die standardgemäßen Dekodiervorrichtungen ein Codewort, nämlich den mb_type, auffinden können, der jedenfalls im Falle einer Macroblock-Partitionierung von 16x16, 16x8 oder 8x16 den Bewegungskompensator, von dem der Block empfangen wurde, repräsentiert, zeigt die Verwirklichung der in Merkmal 2 beschriebenen Zweckbestimmung durch das in der standardgemäßen Dekodiervorrichtung bereit gestellte Mittel.

Die Beklagten weisen weiter darauf hin, dass die Daten, die ein H.264-kompatibler Dekoder empfängt, auch eine Mischstruktur aufweisen könnten, d.h. jeder der vier Sub-Macroblöcke eines Macroblocks könne durch einen entsprechenden Bewegungskompensator in eine 8x8 Partition, zwei 8x4 Partitionen, zwei 4x8 Partitionen oder vier 4x4 Partitionen unterteilt sein. Insoweit ist der Be-

CONFIDENTIAL

MOTM_WASH1823_0602208

klagten zuzugeben, dass in diesen Fällen das Vorliegen eines Codeworts gemäß
Anspruch 19 fraglich sein könnte, das einen einzigen Bewegungskompensator
(der die gleiche Blockgröße verwendet) für einen ganzen Datenblock repräsen-
tiert. Auf die sich in diesem Zusammenhang stellende Frage, ob aber nicht auch
der Sub-Macroblock im Standard ein Datenblock im Sinne des Merkmals 2 des
Klagepatents ist mit der Folge, dass die Kennung sub_mb_type stets den (einen)
Bewegungskompensator des empfangenen (Sub-Macro-)Datenblocks repräsen-
tiert, kommt es nach Ansicht der Kammer dennoch nicht an. Auch für die aus ei-
ner möglichen Mischstruktur resultierenden Besonderheiten gilt, dass diese ledig-
lich bei einer 8x8 Macroblock-Partition auftreten (und auch dort nur bei unter-
schiedlicher Unter-Partitionierung). Dies ist Ausfluss der Definitionen der Syntax-
Elemente im H.264-Standard, die die Möglichkeit - nicht aber den Zwang - um-
fassen, mehrere Informationselemente in den kodierten Daten zu verwenden
(mb_type und sub_mb_type). Damit gilt wiederum, dass standardgemäße
Dekodiervorrichtungen in der Lage sind, aus jedem empfangenen Datenblock ein
Codewort, das den Bewegungskompensator, von dem der Datenblock empfan-
gen wurde, repräsentiert, aufzufinden, sofern der Datenblock über ein (1) solches
Codewort verfügt, was jedenfalls bei einer 16x16, 16x8 und 8x16 Partitionierung
des Macroblocks der Fall ist.

3.   Eine standardgemäße Dekodiervorrichtung verwirklicht auch <u>Merkmal 3</u> des An-
spruchs 19, welches ein Mittel fordert, das auf das Codewort reagiert, um einen
Bewegungsvektor für jeden Block von den Bewegungsvektordaten, die mit dem
Block empfangen wurden, wiederherzustellen. Der Standard normiert in Abschnitt
7.4.5 die Vorhersage des aktuellen Blocks in Abhängigkeit von der verwendeten
Blockgröße des Bewegungskompensators. Abschnitt 8.4 normiert, wie unter an-
derem in Abhängigkeit von dem Wert mb_type die Bewegungsvektordaten rekon-
struiert werden und wie für jeden Block ein Bewegungsvektor ermittelt wird. Aus-
gehend von der unter Ziff. 2 näher erläuterten Annahme, dass die standardge-
mäße Dekodiervorrichtung jedenfalls für die Macroblock-Partitionen 16x16, 16x8
und 8x16 in der Lage ist, ein Codewort, das den Bewegungskompensator, von
dem der Block empfangen worden ist, repräsentiert (scil: mb_type), aufzufinden,
verfügt die standardgemäße Dekodiervorrichtung auch über ein Mittel, das auf

CONFIDENTIAL

MOTM_WASH1823_0602209

– 35 –

das (aufgefundene) Codewort mb_type reagiert, um einen Bewegungsvektor von den empfangenen Bewegungsvektordaten wiederherzustellen.

4. Schließlich machen standardgemäße Dekodiervorrichtungen auch von <u>Merkmal 4</u> des Anspruchs 19 Gebrauch. In einer standardgemäßen Dekodiervorrichtung ist ein Mittel bereitgestellt, um gegenwärtige Videobilddaten von Daten, die von einem gegenwärtigen Datenblock und mindestens einem vorherigen Datenblock bereitgestellt sind, wiederherzustellen. Abschnitt 8.4 (S. 151) des Standards (Anlage KP1-K4) definiert, wie aus den Bewegungsvektoren und weiteren Datenreihen die Samples der Inter-Vorhersage rekonstruiert werden. Anschließend werden aus den Sample-Datenreihen der Inter-Vorhersage die Videobilddaten rekonstruiert (Anlage KP1-K4, Abschnitt 8.5, S. 174 f.). Soweit die Beklagte Merkmal 4 deshalb für nicht verwirklicht hält, weil es ein einheitliches Codewort für einen Datenblock voraussetze, was im Standard nicht der Fall sei, kann auf die diesbezüglichen Ausführungen zu Merkmal 2 verwiesen werden.

5. Nach alledem verwirklicht die standardgemäße Ausführung der Dekodierung alle Merkmale des Anspruchs 19 des Klagepatents. Die angegriffene Ausführungsform Xbox 360 verletzt das Klagepatent daher unmittelbar.

6. Die angegriffenen Ausführungsformen Windows 7, Windows Internet Explorer 9 sowie Windows Media Player 12 verletzen das Klagepatent mittelbar.

Eine mittelbare Patentverletzung setzt nach § 10 Abs. 1 PatG voraus, dass der Verletzer ohne Zustimmung des Patentinhabers im Geltungsbereich des Patentgesetzes anderen als zur Benutzung der patentierten Erfindung berechtigten Personen Mittel, die sich auf ein wesentliches Element der Erfindung beziehen, zur Benutzung der Erfindung im Geltungsbereich dieses Gesetzes anbietet oder liefert, wobei er weiß oder es auf Grund der Umstände offensichtlich ist, dass diese Mittel dazu geeignet und bestimmt sind, für die Benutzung der Erfindung verwendet zu werden.

Die angegriffenen Ausführungsformen Windows 7, Windows Internet Explorer 9 sowie Windows Media Player 12 sind jeweils Mittel, die sich auf ein wesentliches

CONFIDENTIAL

523

MOTM_WASH1823_0602210

Element der Erfindung beziehen, und wurden zur Benutzung einer patentgemäßen Vorrichtung in der Bundesrepublik angeboten und ausgeliefert. Sie werden nämlich bestimmungsgemäß auf Computern (z.B. PC, Laptop) installiert, wodurch der jeweilige Computer zu einer den Anspruch 19 wortsinngemäß verwirklichenden Vorrichtung wird. Dabei stellen Windows 7 und Windows Internet Explorer 9 mit dem H.264 Codec das wesentliche Element der Erfindung selbst zur Verfügung; Windows Media Player 12 stellt ein Mittel dar, das sich auf ein wesentliches Element der Erfindung, nämlich den Codec von Windows 7, bezieht.

Der erfindungsgemäße Gebrauch der auf dem Computer installierten Programme ist gerade deren bestimmungsgemäßer Einsatz. Die Beklagte selbst stellt die Programme her und liefert sie an ihre Kunden zur Installation, so dass ohne weiteres davon ausgegangen werden kann, dass die Beklagte wusste, dass die von ihr angebotenen Mittel dazu geeignet und bestimmt sind, für die Benutzung der Erfindung verwendet zu werden.

**B.**

Die Beklagte kann sich nicht auf ein Nutzungsrecht am Klagepatent berufen.

**I.**

Zwischen den Parteien ist unstreitig kein Lizenzvertrag abgeschlossen worden.

**II.**

Der Beklagten steht auch aufgrund der Lizenzbereitschaftserklärungen („*Patent Statement and Licencing Declaration Form*", Anlagenkonvolut FBD-8) der Klägerin und deren Konzernmutter gegenüber der Standardsetzungsorganisation International Telecommunication Union (ITU) kein Nutzungsrecht am Klagepatent zu.

Entgegen der Auffassung der Beklagten stellt weder die allgemeine ITU-Lizenzbereitschaftserklärung der Klägerin vom Dezember 2002 noch die spezifische ITU-Lizenzbereitschaftserklärung der Motorola Inc., Vorgängerin der Muttergesellschaft

CONFIDENTIAL

MOTM_WASH1823_0602211

der Klägerin, für das Klagepatent vom 08.10.2007 einen Vertrag zugunsten Dritter (hier: der Beklagten) oder einen Verbotsverzicht dar.

Die Beurteilung einer etwaigen Nutzungsberechtigung aus der Lizenzbereitschaftserklärung gegenüber der ITU unterliegt deutschem Sachrecht. Die Frage, nach welcher Rechtsordnung die Einräumung eines Nutzungsrechts an einem Immaterialgüterrecht zu beurteilen ist, ist nach dem Schutzlandstatut zu beantworten (vgl. LG Mannheim, InstGE 13, 65 - *UMTS-fähiges Mobiltelefon II*, Rz. 161 m.w.N., zit. n. juris; Kühnen, Hdb. Patentverletzung, 5. Aufl., Rn. 1298).

Unter Zugrundelegung der aus Sicht der Kammer zutreffenden Einordnung der einfachen Lizenz als dinglichem Recht (OLG Karlsruhe, GRUR Int 1987, 788 ff. *Offenendspinnmaschine*; ausführlich LG Mannheim a.a.O., Rz. 166, m.w.N.; BGH, GRUR 2009, 946, Rz. 20, zit. n. juris - *Reifen Progressiv* (zum Urheberrecht); a.A. (nur schuldrechtlicher Anspruch:) BGHZ 83, 251 - *Verankerungsteil*; a.A. (verdinglichte Obligation): McGuire, Die Lizenz, zugl. Habil. Osnabrück 2009) käme eine Nutzungsberechtigung der Beklagten allenfalls dann in Betracht, wenn man in der Abgabe der Lizenzbereitschaftserklärung gegenüber der Standardsetzungsorganisation ITU und deren Entgegennahme bereits einen Vertrag zugunsten lizenzwilliger Dritter sehen würde. Einer solchen Lizenzeinräumung mit verfügendem Charakter durch einen Vertrag zugunsten Dritter steht jedoch entgegen, dass das deutsche Recht einen dinglichen Vertrag zugunsten Dritter nicht kennt. Die §§ 328 ff. BGB sind weder unmittelbar noch analog auf dingliche Verträge anwendbar (vgl. LG Mannheim, a.a.O., Rz. 167 m.w.N.).

In der Lizenzbereitschaftserklärung liegt auch kein Verzicht auf Unterlassungsansprüche mit der Folge, dass die Klägerin darauf beschränkt wäre, ein FRAND-Angebot zu unterbreiten oder entgegenzunehmen und Lizenzgebühren in FRAND-Höhe, ggf. im Wege des Schadensersatzes, einzufordern. Ein solcher Verzicht auf die Ausschließlichkeitsbefugnis aus dem Patent könnte allenfalls rein schuldrechtlichen Charakter haben, wäre aber keine auf den Bestand des Patentrechts einwirkende verfügende Handlung, die die Klägerin als Patentinhaberin unmittelbar in ihren Rechten aus dem Patent beschränkt. Letzteres wäre mit Rücksicht auf die dingliche, untrennbar mit dem Schutzrecht als solchem verbundene Natur des Unterlassungsanspruchs rechtlich gar nicht möglich (vgl. LG Mannheim, InstGE 11, 9, Rz. 99 f. - *UMTS-fähiges Mobiltelefon*, zit. n. juris; Kühnen, a.a.O., Rn. 1298).

CONFIDENTIAL

MOTM_WASH1823_0602212

Die Lizenzbereitschaftserklärung der Klägerin bzw. ihrer vormaligen Muttergesellschaft gegenüber der ITU kann allerdings auch nicht als verbindliches Lizenzangebot gegenüber einer Vielzahl, der Klägerin noch unbekannten Dritten verstanden werden, das nur noch einer Annahme eines Dritten bedarf, sondern als eine Aufforderung an Lizenzsuchende, ihrerseits ein FRAND-Angebot zu unterbreiten (vgl. auch Ziff. 2 a.E.: *„Negotiations of licences are left to the parties concerned and are performed outside the ITU-T/ISO/IEC"*). Die Lizenzbereitschaftserklärung beinhaltet damit letztlich lediglich eine deklaratorische Konkretisierung des kraft Kartellrechts ohnehin bestehenden Abschlusszwangs (vgl. Kühnen, a.a.O., Rn. 1298). Sie schafft mit der Zusage, Dritten zu FRAND-Bedingungen eine Lizenz einzuräumen, nur eine Anspruchsgrundlage, für die der Lizenzsucher ein konkretes, die Anspruchsgrundlage ausfüllendes Verlangen zu formulieren hat (OLG Karlsruhe, InstGE 12, 220 - *MP3-Standard*).

Schließlich ist auch ein Angebot auf ein schuldrechtliches *„pactum de non petendo"* („negative Lizenz") und damit der Verzicht des Patentinhabers auf das Druckmittel des Unterlassungsanspruchs zur Durchsetzung seiner patentrechtlichen Ansprüche gegenüber einer ihm unbekannten Vielzahl potentieller Patentverletzer (Ziff. 2 :*„an unrestricted number of applicants"*) fernliegend. Der seine Lizenzierungsbereitschaft erklärende Patentinhaber bietet lediglich an, die Ausschließlichkeitsrechte aus dem Patent durch Abschluss eines Lizenzvertrages  - und eben nicht bedingungslos - zu Fall bringen zu lassen (Kühnen, a.a.O., Rn. 1298).

Nach alledem kann sich die Beklagte im Hinblick auf die ITU-Lizenzbereitschaftserklärung der Klägerin weder auf eine ihr eingeräumte positive Nutzungsberechtigung noch auf einen Verbotsverzicht berufen.

### III.

Der Beklagten steht auch aus dem MPEG LA Poolvertrag (vgl. Anlage FBD 12) kein Nutzungsrecht am Klagepatent zu.

Die Beurteilung der behaupteten Nutzungsrechtseinräumung in dem MPEG LA Poolvertrag richtet sich wiederum nach dem Schutzlandstatut (vgl. oben Ziff. II.). Nach dem danach anzuwendenden deutschen Sachrecht konnten Terayon und Tut Systems nicht

CONFIDENTIAL

MOTM_WASH1823_0602213

wirksam über das nicht ihnen gehörende Klagepatent verfügen. Es ist weder vorgetragen noch sonst ersichtlich, woraus sich eine entsprechende Verfügungsbefugnis der MPEG LA Pool-Lizenznehmerinnen Terayon und Tut Systems über das Klagepatent ergeben haben soll. Als Einräumung einer Lizenz an dem Klagepatent verstanden würde Art. 8.3 des MPEG LA Poolvertrages eine Verfügung zu Lasten Dritter, der Klägerin, darstellen. Als solche ist die behauptete Lizenz unwirksam.

Vor diesem Hintergrund kann dahinstehen, ob sich eine Lizenz überhaupt auf das Klagepatent und auf die Beklagte als Tochterunternehmen der Lizenzgeberin Microsoft Corporation erstrecken würde.

## C.

Die Beklagte kann sich nicht mit Erfolg mit dem Einwand verteidigen, dass die Klägerin ihr umgehend eine Lizenz für das Klagepatent zu erteilen hätte, weshalb das Unterlassungsbegehren rechtsmissbräuchlich sei. Ein *dolo-petit*-Einwand steht der Beklagten weder aufgrund ihres Lizenzvertragsangebots vom 23.12.2012 (I.), noch im Zusammenhang mit der Lizenzbereitschaftserklärung gegenüber der ITU (II.) noch aufgrund des MPEG LA Poolvertrages (III.) zu.

## I.

Die Klägerin ist nicht aus kartellrechtlichen Gründen gehindert, ihren aus der Verletzung des Klagepatents resultierenden Unterlassungsanspruch gegen die Beklagte durchzusetzen. Die Beklagte kann dem Unterlassungsanspruch keinen Anspruch auf Erteilung einer Lizenz aus § 33 Abs. 1 GWB i.V.m. Art. 102 AEUV oder §§ 19, 20 GWB entgegenhalten.

1. Die Klägerin ist Normadressatin des Art. 102 AEUV bzw. der §§ 19, 20 GWB, da nach ihrem eigenen Vorbringen jeder, der H.264-Dekodiervorrichtungen herstellt, anbietet und vertreibt, den H.264-Standard einhalten muss und damit notwendigerweise auch vom Klagepatent Gebrauch macht. Die Vergabe von Lizenzen am Klagepatent bildet damit sachlich einen eigenen Markt, den die Klägerin als einzige Anbieterin beherrscht.

CONFIDENTIAL

MOTM_WASH1823_0602214

2.  Das seitens der Muttergesellschaft der Beklagten auch mit Wirkung für die Be-
klagten der Klägerin unterbreitete Lizenzangebot (im Folgenden: Lizenzangebot
der Beklagten) erfüllt nicht alle Voraussetzungen, die der Bundesgerichtshof in
seiner Entscheidung *Orange-Book-Standard* (Urt. v. 06.05.2009, KZR 39/09,
GRUR 2009, 694 ff.) aufgestellt hat.

Danach kann der aus einem Patent in Anspruch genommene Beklagte gegen-
über dem Unterlassungsbegehren des klagenden Patentinhabers einwenden,
dieser missbrauche eine marktbeherrschende Stellung, wenn er sich weigere, mit
dem Beklagten einen Patentlizenzvertrag zu nicht diskriminierenden und nicht
behindernden Bedingungen abzuschließen (BGH, a.a.O., 1. Leitsatz, zit. n. juris).
Der Patentinhaber, der den Unterlassungsanspruch aus seinem Patent geltend
macht, obwohl dem Beklagten ein Anspruch auf Einräumung einer Lizenz am
Klagepatent zusteht, missbraucht jedoch nur dann seine marktbeherrschende
Stellung und handelt nur dann treuwidrig, wenn zwei Voraussetzungen erfüllt
sind: Zum einen muss der Lizenzsucher ihm ein unbedingtes Angebot auf Ab-
schluss eines Lizenzvertrages gemacht haben, das der Patentinhaber nicht ab-
lehnen darf, ohne den Lizenzsucher unbillig zu behindern oder gegen das Diskri-
minierungsverbot zu verstoßen, und sich an dieses Angebot gebunden halten.
Zum anderen muss der Lizenzsucher, wenn er den Gegenstand des Patents be-
reits benutzt, bevor der Patentinhaber sein Angebot angenommen hat, diejenigen
Verpflichtungen einhalten, die der abzuschließende Lizenzvertrag an die Benut-
zung des lizenzierten Gegenstandes knüpft. Dies bedeutet insbesondere, dass
der Lizenzsucher die sich aus dem Vertrag ergebenden Lizenzgebühren zahlen
oder die Zahlung sicherstellen muss (BGH, a.a.O., Rz. 29).

3.  Auch wenn sich die Entscheidung *Orange-Book-Standard* auf einen de-facto-
Standard bezogen hatte, sind die dort aufgestellten Kriterien auf Standards, die
von Standardsetzungsorganisationen (hier: ITU) in einem Standardisierungspro-
zess ausgearbeitet worden sind, gleichfalls anwendbar (vgl. LG Mannheim,
InstGE 13, 65, Rz. 176, zit.n.juris).

CONFIDENTIAL

MOTM_WASH1823_0602215

4. Die Klägerin durfte das Angebot der Beklagten auf Abschluss eines Lizenzvertrages ablehnen, ohne dass sie hierdurch die Beklagte unbillig behindert oder diskriminiert hätte.

    a. Zwar entspricht das vorliegende, unbedingte Angebot unter Berücksichtigung der erfolgten Ergänzungen im Wesentlichen üblichen Vertragsbedingungen und weist eine hinreichende Regelungsdichte auf. Das Angebot enthält in seiner ergänzten Fassung unter anderem insbesondere ein Kündigungsrecht der Patentinhaberin für den Fall künftiger Angriffe auf den Rechtsbestand des Klagepatents (vgl. OLG Karlsruhe, 23.01.2012, S. 6), und die Beklagte erkennt im Zusammenhang mit ihrem Angebot auch eine Schadensersatzpflicht für Benutzungshandlungen in der Vergangenheit dem Grunde nach an (vgl. LG Mannheim, Urt. v. 09.12.2011, 7 O 122/11).

    b. Gleichwohl ist das Lizenzvertragsangebot der Beklagten kein Angebot, das die Klägerin nicht ablehnen darf, ohne sich kartellrechtswidrig zu verhalten. Der Patentinhaber ist nämlich nicht gehalten, ein Angebot zu Lizenzsätzen anzunehmen, die unterhalb dessen liegen, was er ohne Verstoß gegen Kartellrecht verlangen könnte.

Die Beklagte, die die Lizenzforderung der Klägerin (2,25 % der Umsätze) für missbräuchlich überhöht hält, hat von der in solchen Fällen bestehenden Möglichkeit, die Lizenzhöhe gemäß § 315 BGB in das billige Ermessen der Patentinhaberin zu stellen (BGH, a.a.O., Rz. 39), keinen Gebrauch gemacht. Nachdem sich die Beklagte vielmehr auf eine konkrete Berechnungsgrundlage (Stücklizenz) und einen konkreten Lizenzsatz (2 €-Cents bzw. 1 €-Cent pro Einheit) festgelegt hat, war zu prüfen, ob die Ablehnung dieses Angebots durch die Klägerin mit der Begründung, die angebotenen Lizenzgebühren seien zu niedrig, kartellrechtswidrig ist.

Nach Auffassung der Kammer kann sich diese Prüfung auf die Frage beschränken, ob in der Ablehnung des Angebots ein *offensichtlicher* Kartellrechtsverstoß liegt. Wie der BGH in der Entscheidung *Orange-Book-Standard* deutlich gemacht hat, soll der Verletzungsprozess in vermeidbarem Umfang von der schwierigen und zeitaufwändigen Aufgabe entlastet werden, die genaue Höhe einer nicht behindernden oder diskriminierenden

CONFIDENTIAL

MOTM_WASH1823_0602216

Lizenzgebühr festzustellen (BGH, a.a.O., Rz. 39). Im Falle eines Lizenzangebots nach Maßgabe von § 315 BGB soll sich das Verletzungsgericht daher mit der Feststellung begnügen können, dass der Patentinhaber zur Annahme des Lizenzvertragsangebots und zur Bestimmung nach billigem Ermessen verpflichtet ist, wenn der Lizenzsuchende einen in jedem Fall ausreichenden Betrag hinterlegt und auch die übrigen Voraussetzungen des „Zwangslizenzeinwands" vorliegen (BGH, a.a.O., Rz. 40). Im Zusammenhang mit der Frage, ob der hinterlegte Betrag (in jedem Fall) sicher ausreicht, soll eine summarische Prüfung des Gerichts genügen (vgl. Kühnen, a.a.O., Rn. 1296). Dem Lizenzsuchenden erwächst insoweit auch kein Nachteil, da in einem nachfolgenden Prozess zur Vergütungshöhe die Darlegungs- und Beweislast für die Angemessenheit der getroffenen Lizenzhöhe beim Patentinhaber liegt.

Bietet der Lizenzsucher dagegen eine konkrete, aus seiner Sicht angemessene Lizenzgebühr an, die der Patentinhaber als zu niedrig ablehnt, stellt sich die Frage, welche Bedeutung der Behauptung des Lizenzsuchers, die angebotene Lizenzgebühr sei angemessen, zukommt und ob ein Lizenzsucher letztlich mit jedem Angebot eine aufwändige und zeitintensive Beweisaufnahme erzwingen kann, die es nach der Auffassung des BGH im Verletzungsprozess soweit möglich gerade zu vermeiden gilt.

Da nur ein eindeutig überhöhter Preis unangemessen im Sinne des Art. 102 AEUV ist, ist die Ablehnung des Angebots durch den Patentinhaber wegen angeblich zu niedriger Lizenzgebühren nur dann kartellrechtswidrig, wenn der Lizenzsucher einen so hohen Lizenzbetrag anbietet, dass dem gegenüber jegliche Änderung zugunsten des Patentinhabers unangemessen wäre. Sind die Bedingungen im Angebot des Lizenzsuchers dagegen (nur) angemessen, lassen Art. 102 AEUV, §§ 19, 20 GWB jedoch eine Abweichung zugunsten des Patentinhabers zu, begründet die Weigerung des Patentinhabers, eine Lizenz zu diesen Bedingungen zu gewähren, nicht den Einwand des Rechtsmissbrauchs. Ein Kontrahierungszwang besteht nur zu solchen Bedingungen, die angemessen sind *und* denen gegenüber jegliche Änderung zugunsten des Marktbeherrschers in einer Weise unangemessen ist, dass das Beharren auf diesen Bedingungen als

CONFIDENTIAL

MOTM_WASH1823_0602217

Missbrauch einer marktbeherrschenden Stellung anzusehen ist (OLG Karlsruhe, 6 U 174/02, GRUR-RR 2007, 177 f., Rz. 56, zit. n. juris). Solange sich der Patentinhaber darauf berufen kann, dass es innerhalb dessen, was angemessen ist, noch Spielraum zu seinen Gunsten gibt, verhält er sich nicht kartellrechtswidrig. Dass diese „Obergrenze" des noch nicht Kartellrechtswidrigen auch für den Lizenzsucher nicht ohne weiteres feststellbar ist, belastet ihn nicht unbillig, denn ihn trifft für die Voraussetzungen des kartellrechtlichen Lizenzierungsanspruchs grundsätzlich ohnehin die Darlegungs- und Beweislast (vgl. BGH, a.a.O., Rn. 37 f.) und ihm bleibt wie gezeigt die Lösung über § 315 BGB.

Ergibt sich demnach bei summarischer Prüfung, dass die seitens des Lizenzsuchers angebotenen Lizenzgebühren jedenfalls nicht sicher ausreichend sind (so dass jede Abweichung nach oben eindeutig überhöht wäre), ist die Ablehnung durch den Patentinhaber nicht offensichtlich kartellrechtswidrig. Einer Beweisaufnahme zu der Frage, ob das Angebot (jedenfalls) angemessen ist, bedarf es damit nicht.

c. Das Angebot der Beklagten hält einer an diesen Grundsätzen orientierten Prüfung nicht stand. Es kann nicht festgestellt werden, dass die angebotenen Lizenzgebühren in jedem Fall ausreichend wären.

Die Entscheidung *Orange-Book-Standard* hatte sich nicht mit der Frage zu befassen, nach welchen Maßstäben der (dort im Rahmen des § 315 BGB) jedenfalls ausreichende Betrag zu ermitteln ist (z.B. allgemeiner vergleichbarer Markt, Lizenzpools, Lizenzierungspraxis des Patentinhabers etc.)

Vorliegend kann dahinstehen, ob ein Patentpool für sich genommen ein überzeugender Ausgangspunkt und Vergleichsmaßstab sein kann. Insoweit bestehen aus Sicht der Kammer zumindest Bedenken. Zum einen dürfte die Interessenlage der Patentinhaber, die ihre standardessentiellen Patente in einen Pool einbringen, nicht ohne weiteres vergleichbar sein mit demjenigen Patentinhaber, der hierauf verzichtet. So dürfte es zumindest produzierenden Mitgliedern eines Patentpools nicht selten weniger auf die Erzielung von möglichst hohen Lizenzeinnahmen aus den eingebrachten Patenten ankommen als auf die Möglichkeit, die Patente der anderen

CONFIDENTIAL

MOTM_WASH1823_0602218

– 44 –

Poolmitglieder möglichst günstig gebrauchen zu können. Die Tauglichkeit der Lizenzsätze eines Patentpools als Vergleichsmaßstab kann auch dadurch eingeschränkt sein, dass - wie beim MPEG LA Pool - mehrere der größten Patentinhaber dem Pool nicht beigetreten sind.

Auch unter Außerachtlassung dieser grundsätzlichen Bedenken gegen die Berechnungsmethode der Beklagten kann die Kammer jedenfalls nicht feststellen, dass sich die angebotenen Lizenzgebühren mit Sicherheit in einer solchen Höhe bewegen, dass eine Abweichung nach oben zu eindeutig überhöhten Gebühren führen würde.

d. Dies gilt insbesondere vor dem Hintergrund des numerischen Herunterrechnens der für das Portfolio der Klägerin an (17) standardessentiellen Patenten ermittelten Gebühr auf die beiden Klagepatente (2/17). Damit wird im Ergebnis der lineare Abrechnungsmodus des MPEG LA Patentpools eins zu eins übertragen, obwohl die Klägerin diesem Pool gerade nicht beigetreten ist. Es macht nämlich keinen Unterschied, ob der im Pool pro Patentfamilie und Einheit gewährte Lizenzanteil von 0,082 €-Cent direkt verzehnfacht (0,82 €-Cent) und sodann auf 1,64 €-Cent verdoppelt wird (zwei Patente, um deren Lizenzierung ersucht wird) oder ob zunächst der im Pool für das Portfolio theoretisch gewährte Gesamtanteil von (0,082 €-Cent x 17 Patentfamilien=) 1,394 € verzehnfacht (13,94 €-Cent) und sodann numerisch auf die Anzahl der Klagepatente herunter gerechnet wird (1/17 bzw. 2/17 für beide Klagepatente = 0,82 €-Cent bzw. 1,64 €-Cent).

Die Kammer verkennt nicht, dass die Beklagte dem Umstand, dass ein standardessentielles Patent als Teil eines Patentpools in der Regel verhältnismäßig günstiger zu haben ist als durch eine Einzellizenz, Rechnung getragen hat, indem sie den für das klägerische Portfolio theoretisch anfallenden Pool-Lizenzanteil verzehnfacht. Es ist jedoch nicht erkennbar, dass die Beklagte damit zu einer Lizenzhöhe gelangt, bei der jede weitere Abweichung nach oben unangemessen wäre. Dagegen spricht aus Sicht der Kammer bereits, dass die so ermittelte Portfolio-Lizenz den Lizenzgebühren entspricht, die AT&T von zumindest 9 Lizenznehmern für sein in etwa vergleichbares Portfolio erhält. Dass AT&T insoweit gleich gegenüber 9 Lizenznehmern eine Lizenzgebühr durchgesetzt hätte, die nicht nur marktüb-

CONFIDENTIAL

MOTM_WASH1823_0602219

lich ist, sondern sich an der Obergrenze dessen bewegt, was gerade noch als angemessen und nicht behindernd oder diskriminierend angesehen werden kann, erscheint nicht naheliegend.

Es erscheint der Kammer auch keineswegs sicher, dass die maximale Lizenzhöhe für die beiden Klagepatente exakt bei 2/17 der für das Portfolio der Klägerin und ihrer Konzernmutter ermittelten Lizenzhöhe liegen soll. Dies würde nicht nur die zumindest fragliche Anwendung der Lizenzberechnungsweise für Poollizenzanteile auf Einzellizenzgebühren voraussetzen, sondern auch die Gewissheit, dass die beiden Klagepatente für sich genommen tatsächlich nicht - ggf. auch nur wenig - wertvoller sind als die übrigen 15 Patente des Portfolios der Klägerin und ihrer Konzernmutter.

e. Auch ein Vergleich mit dem Patentpool für eine Vorgängertechnologie zur Videokompression, dem H.262 (MPEG 2)-Standard lässt Zweifel daran aufkommen, dass sich die von der Beklagten angebotenen Lizenzsätze in einer Höhe bewegen, bei denen eine Abweichung nach oben zu eindeutig überhöhten Gebühren führen würde. Der H.262-Pool sah zunächst Lizenzgebühren von 4 US-$ pro Gerät vor (ohne Kappungsgrenze), nach Reduzierungen werden gegenwärtig noch 2 US-$ pro Stück verlangt. Diese Lizenzgebühren liegen deutlich über denjenigen des MPEG LA Patentpools (0,2 US-$ bzw. 0,1 US-$), die die Beklagte zur Grundlage ihrer Berechnungen gemacht hat, ohne dass die Kammer Anhaltspunkte dafür hätte, dass die Gebühren des H.262-Pools ihrerseits unangemessen, behindernd oder diskriminierend (gewesen) wären. Auch unter Berücksichtigung des Vortrags der Beklagten, wonach der MPEG 2 Pool im Jahre 1997 und damit zu einer Zeit gebildet worden sei, in der die mit komprimierten Daten arbeitenden Produkte relativ teuer waren und mit weniger implementierten Standards arbeiteten, weckt zumindest die auch noch gegenwärtig deutlich höhere Lizenzgebühr des MPEG 2 Pools Zweifel daran, dass die von der Beklagten für die Klagepatente angebotenen 2 €-Cents bzw. 1 €-Cent pro Stück tatsächlich die Obergrenze des Angemessenen sind.

f. Einer näheren Auseinandersetzung mit der umstrittenen Methodik und der Validität der von der Beklagten so genannten Zitatanalyse bedarf es nicht,

CONFIDENTIAL

MOTM_WASH1823_0602220

da die Beklagte die von ihr angebotenen Lizenzsätze letztlich nicht am vermeintlichen Zitatwert orientiert hat. Insoweit hat die Beklagte auch nur den vermeintlichen Zitatwert des Portfolios (3,8 % des gesamten Zitatwertes; Gutachten Bekkers, Anlage FBD-22, S. 31), nicht aber der beiden Klagepatente genannt. Vor diesem Hintergrund ist ungeachtet des umstrittenen Werts der Zitatmethode jedenfalls nicht feststellbar, dass sich die angebotenen Lizenzsätze an der Obergrenze dessen bewegten, was für Patente mit einem entsprechenden „Zitatwert" angemessen wäre.

5.  Soweit die Beklagte in der mündlichen Verhandlung klar gestellt hat, dass ihr Angebot als ergänzende Komponente eine entgeltliche Kreuzlizenz zu den von ihr ermittelten Lizenzsätzen umfasse, führt auch dies nicht zu einer anderen Beurteilung des Angebots.

Allein aus der Tatsache, dass der Lizenzsucher für seine eigenen Patente mit einem bestimmten Lizenzsatz zufrieden wäre, kann nicht gefolgert werden, dass dieser Lizenzsatz auch für die Patente des Patentinhabers akzeptiert werden müsste.

Zum einen mag die Interessenlage hinsichtlich der jeweiligen Patente auf Lizenzsucherseite eine völlig andere sein als auf der Seite des Patentinhabers. Dies gilt insbesondere dann, wenn beide Seiten deutlich unterschiedliche Stückzahlen herstellen und/oder vertreiben. So wird derjenige, der höhere Stückzahlen verkauft, in der Regel einen niedrigen wechselseitigen Lizenzsatz präferieren und derjenige mit niedrigeren eigenen Stückzahlen einen höheren wechselseitigen Lizenzsatz. Im vorliegenden Fall zeigt sich das geringe Interesse der Klägerin an den standardessentiellen Patenten der Beklagten auch darin, dass die Klägerin in der Vergangenheit für den MPEG LA Pool, in den die Beklagte ihre eigenen standardessentiellen Patente eingebracht hat, keine Lizenz genommen hat.

Zum anderen hätte es der Lizenzsucher sonst in der Hand, den Patentinhaber über ein Kreuzlizenzangebot zu gleichen Bedingungen zu einer Lizenzierung zu zwingen, bei der sich die Lizenzhöhe gerade nicht an den nachgefragten Patenten, sondern an den eigenen Patenten des Lizenzsuchers und deren - evtl. geringem - Wert orientieren könnte. Dass eine entgeltliche Kreuzlizenz nicht per se für

CONFIDENTIAL

MOTM_WASH1823_0602221

beide Seiten interessengerecht sein muss, zeigen im Übrigen auch die Beklagten und ihre Konzernmutter selbst, wenn sie ihrerseits die seitens der Klägerin angebotene entgeltliche Kreuzlizenz zu deren Bedingungen (2,25 % der Umsätze) als unangemessen hoch ablehnen.

Dass der Lizenzsucher bereit ist, seine eigenen Patente im Rahmen einer entgeltlichen Kreuzlizenz zu den gleichen Gebührensätzen, die er für die von ihm nachgefragten Patente anbietet, zu lizenzieren, spricht daher nicht ohne weiteres dafür, dass die angebotenen Gebührensätze in jedem Fall so hoch sind, dass der Patentinhaber das Angebot nur unter Verstoß gegen Kartellrecht ablehnen könnte. Angesichts dessen, dass die angebotenen Lizenzsätze für sich genommen nicht offensichtlich in jedem Fall ausreichend sind (vgl. oben), könnte die zusätzliche weltweite Kreuzlizenz nur dann dazu führen, dass die Klägerin das Angebot nicht ohne Verstoß gegen Kartellrecht ablehnen könnte, wenn das Portfolio der Beklagten für die Klägerin (d.h. nicht nur objektiv, wobei auch letzteres zwischen den Parteien streitig ist) mindestens den gleichen Wert hätte wie das Portfolio der Klägerin für die Beklagte, was sich etwa an der Notwendigkeit, die Patente zu benutzen, und der Menge an hergestellten oder verkauften patentgemäßen Produkten bzw. dem dadurch generierten Umsatz bemessen ließe.

6. Soweit die Beklagte schließlich im Schriftsatz vom 02.03.2012 (Bl. 382 f., 391 f.) ihre Bereitschaft erklärt hat, der Klägerin zusätzlich zu den für die beiden in Deutschland erteilten Klagepatente angebotenen Lizenzgebühren eine weltweite, kostenlose Kreuzlizenz an ihrem Portfolio von H.264-standardessentiellen Patenten zu erteilen, gelten die vorstehenden Erwägungen zur entgeltlichen Kreuzlizenz entsprechend. Insoweit besteht kein Unterschied, ob der Lizenzsucher die jeweiligen Patente zu einem jedenfalls hinsichtlich der Patente des Patentinhabers nicht in jedem Falle ausreichenden Lizenzsatz oder gleich kostenlos wechselseitig lizenzieren will. Auch eine kostenlose Kreuzlizenz ist nicht ohne Entgelt, letzteres wird durch die Gewährung der Lizenzen an dem Lizenznehmer zustehenden Patenten gewährt und kann somit gleichfalls zu niedrig sein. Auch im Fall der kostenlosen Kreuzlizenz kann die Kammer aus den vorstehend (vgl. Ziff. 5) genannten Gründen somit nicht feststellen, dass die Klägerin das Angebot nur unter Verstoß gegen Kartellrecht ablehnen könnte.

.

CONFIDENTIAL

MOTM_WASH1823_0602222

Damit kommt es auf die Frage, ob das *Orange-Book-Standard* Angebot vom 23.12.2011 gemäß § 296 Abs. 1 ZPO und das erstmals in dem insoweit nicht nachgelassenen Schriftsatz vom 02.03.2012 nach Schluss der mündlichen Verhandlung unterbreitete Angebot einer zusätzlichen weltweiten kostenlosen Kreuzlizenz gemäß § 296a ZPO ohnehin präkludiert sind, nicht an.

Nach alledem verstieß die Klägerin durch die Nichtannahme des in verschiedenen Varianten unterbreiteten Lizenzvertragsangebots der Konzernmutter der Beklagten nicht gegen Kartellrecht, weshalb die Beklagte dem Unterlassungsanspruch der Klägerin nicht den *dolo-petit*-Einwand (§ 242 BGB i.V.m. Art. 102 AEUV bzw. §§ 19, 20 GWB) entgegenhalten kann.

II.

Die Beklagte kann sich auch nicht mit Erfolg mit dem Einwand verteidigen, dass die Klägerin ihr aufgrund der ITU-Lizenzbereitschaftserklärung umgehend eine Lizenz für das Klagepatent zu erteilen hätte, weshalb das Unterlassungsbegehren rechtsmissbräuchlich sei (*dolo-petit*-Einwand, § 242 BGB). Für den Fall der Lizenzbereitschaftserklärung gelten die unter Ziff. I dargelegten Regeln zur Erforderlichkeit eines Lizenzangebots durch den Lizenzsucher in gleicher Weise. Könnte der Lizenzsucher Unterlassungsansprüche des Patentinhabers erfolgreich mit dem Argument abwehren, letzterer sei schließlich ohnehin verpflichtet, ihm - von sich aus - eine Lizenz einzuräumen, würde man den Patentinhaber jedem unredlichen Lizenznehmer ausliefern, für den kein Anreiz mehr zur Aufnahme von Lizenzverhandlungen bestünde (vgl. Kühnen, a.a.O., Rn. 1298). Die Lizenzbereitschaftserklärung beinhaltet letztlich nicht mehr als eine deklaratorische Konkretisierung des kraft Kartellrechts ohnehin bestehenden Abschlusszwanges, wobei sie infolge der vom Erklärenden freiwillig übernommenen Pflichten zur diskriminierungs- und missbrauchsfreien Lizenzierung von der kartellrechtlichen Prüfung suspendiert, ob der Patentinhaber über eine marktbeherrschende Stellung verfügt (vgl. Kühnen, Rn. 1298 f.).

CONFIDENTIAL

MOTM_WASH1823_0602223

– 49 –

III.

Ein begründeter *dolo-petit*-Einwand ergibt sich auch nicht aus dem MPEG LA Poolver-
trag, weil eine vertragliche Verpflichtung der Klägerin, der Beklagten ein Angebot zu den
in dem MPEG LA Poolvertrag umrissenen Bedingungen zu machen, nicht besteht.

Gemäß Ziff. 8.3 des Vertrages waren die Lizenznehmer Terayon und Tut Systems ver-
pflichtet, Lizenzen für eigene standardessentielle Patente und solche ihrer *„Affiliates"* zu
erteilen. *„Affiliates"* sind gemäß Ziff. 1.1 des Vertrages auch solche Unternehmen, die
von einem gemeinsamen Mutterkonzern gehalten werden („…*or is under common
control with Licensee"*). Zwar dürften Terayon und Tut Systems ab 2007 (bis zu ihrer
Verschmelzung mit der Klägerin) von der gleichen Konzernmutter (Motorola, Inc., später
Motorola Mobility, Inc.) wie die Klägerin (der Beginn deren Konzernzugehörigkeit ist
nicht vorgetragen) gehalten worden sein. Aus diesem Umstand hätten sich jedoch allen-
falls Pflichten der Lizenznehmerinnen Terayon und Tut Systems, nicht aber der Kläge-
rin, die nicht Vertragspartner des MPEG LA Poolvertrages war, ergeben können. Aber
auch die Verschmelzung der Klägerin mit Terayon und Tut Systems im Jahr 2011 konn-
te keine Lizenzpflicht der Klägerin aus dem MPEG LA Poolvertrag (im Wege der be-
haupteten Gesamtrechtsnachfolge) begründen: Der MPEG LA Poolvertrag war nämlich
gemäß Ziff. 8.1.2 bereits durch die Übernahme der Lizenznehmer Terayon und Tut Sys-
tems durch Motorola, Inc. im Jahr 2007 beendet worden. Zwar sieht Ziff. 6.6.4 des
MPEG LA Poolvertrages vor, dass die Pflicht des Lizenznehmers aus Ziff. 8.3 die Been-
digung des Vertrages überdauert. Eine solche das Vertragsende überdauernde Pflicht
der Lizenznehmerinnen Terayon und Tut Systems zur Lizenzierung von Patenten der
Klägerin bestand jedoch zum Zeitpunkt der Vertragsbeendigung, d.h. der Übernahme
von Terayon und Tut Systems durch Motorola, Inc. im Jahr 2007, nicht, weil die Klägerin
damals nicht *„Affiliate"* der beiden Lizenznehmerinnen war.
Damit kann dahinstehen, ob sich eine Lizenzerteilungspflicht überhaupt auf das Klage-
patent und gegenüber der Beklagten als Tochterunternehmen der Lizenzgeberin Micro-
soft Corporation erstrecken würde.

CONFIDENTIAL

MOTM_WASH1823_0602224

**D.**

Die Ansprüche der Klägerin wegen der damit feststehenden Verletzung des Klagepatents bestimmen sich gemäß Art. 64 EPÜ nach den Vorschriften des Patentgesetzes.

1. Da die Beklagte den Gegenstand des Klagepatents unter Verstoß gegen § 9 Nr. 1 PatG (Xbox 360) und § 10 PatG (Windows 7, Media Player 12 und Internet Explorer 9) benutzt hat, ist sie der Klägerin zur Unterlassung verpflichtet, § 139 Abs. 1 PatG i.V.m. Art. 64 EPÜ. Die Wiederholungsgefahr ergibt sich aus den bereits geschehenen Verletzungshandlungen durch den Vertrieb der angegriffenen Ausführungsformen.

   Die Unterlassungsverpflichtung war uneingeschränkt auszusprechen, weil eine nicht patentverletzende Verwendung der Vorrichtung der angegriffenen Ausführungsformen zum Dekodieren von H.264-Videodaten nicht erkennbar ist. Die anderen Funktionen der angegriffenen Ausführungsformen sind nicht auf eine erfindungsgemäße Dekodiervorrichtung angewiesen, weshalb kein anerkennenswertes Interesse der Beklagten daran besteht, die angegriffenen Ausführungsformen weiterhin in einer die Benutzung des Klagepatents ermöglichenden Ausgestaltung anzubieten und zu vertreiben.

   Eine Aufbrauchfrist war der Beklagten nicht zu gewähren. In Anbetracht des bereits am 06.10.2012, d.h. in weniger als 6 Monaten ablaufenden Patentschutzes würde eine Aufbrauchfrist die Wirkung des Unterlassungsurteils praktisch wieder aufheben und den Unterlassungsanspruch der Klägerin entwerten. Unabhängig hiervon fehlt es an einer hinreichenden Konkretisierung der seitens der Beklagten behaupteten gravierenden Folgen einer sofort wirksamen Unterlassungsverpflichtung.

   Da die Beklagte zur Unterlassung verurteilt wird, sind ihr gemäß § 890 ZPO auf Antrag der Klägerin die gesetzlichen Folgen einer Zuwiderhandlung gegen die Unterlassungsverpflichtung anzudrohen.

CONFIDENTIAL

MOTM_WASH1823_0602225

2. Der zugesprochene Anspruch auf Auskunft und Rechnungslegung folgt aus
§ 140b PatG und § 242 BGB i.V.m. Art. 64 EPÜ. Soweit im Antrag der Klägerin
kein Wirtschaftsprüfervorbehalt vorgesehen war, war dieser zu ergänzen (vgl.
Kühnen, a.a.O., Rn. 1045 ff. m.w.N.) und die weitergehende Klage insoweit ab-
zuweisen.

3. Der geltend gemachte Rückruf- und Entfernungsanspruch ergibt sich für die seit
dem 01.09.2008 in die Vertriebswege gelangten Erzeugnisse aus § 140a Abs.3
S. 1 PatG n.F. i.V.m. Art. 64 EPÜ. Für die vor dem 01.09.2008 in die Vertriebs-
wege gelangten Erzeugnisse besteht lediglich ein Anspruch auf Rückruf aus den
Vertriebswegen in einem § 140a Abs. 3 S. 1 PatG n.F. entsprechenden Umfang,
jedoch nicht auf Entfernung aus den Vertriebswegen.

Das durch (schuldhafte) patentverletzende Handlungen vor dem Inkrafttreten des
Gesetzes zur Verbesserung der Durchsetzung von Rechten des geistigen Eigen-
tums (BGBl. 2008 I, S. 1191) am 01.09.2008 bereits entstandene Schuldverhält-
nis unterliegt - mangels ausdrücklicher gesetzlicher Übergangsbestimmungen -
hinsichtlich seines Inhalts und seiner Wirkungen allein dem Recht, das zur Zeit
der Entstehung, also bis zum 01.09.2008 gegolten hat (vgl. BGH, GRUR 2009,
515, 517 - *Motorradreiniger*). Der Rückrufanspruch ergibt sich bereits nach frühe-
rem Recht - ohne dass es auf eine richtlinienkonforme Auslegung ankäme - ge-
mäß §§ 139 Abs. 2 PatG, 249 Abs. 1 BGB als Schadensersatz im Wege der
Naturalrestitution bzw. als verschuldensunabhängiger Beseitigungsanspruch
nach § 1004 Abs. 1 S. 1 BGB analog (LG Mannheim, Urt. v. 13.11.2009, 7 O
92/08 - unveröffentlicht). Voraussetzung eines solchen zu § 140a Abs. 3 S. 1
PatG n.F. inhaltsgleich auf Rückruf gerichteten Gefahrbeseitigungsanspruchs
nach früherem Recht ist nicht eine Verfügungsmacht des Verletzers über die zu-
rückzurufenden Gegenstände i.S. einer rechtlichen Handhabe über die Zwi-
schenabnehmer im Vertriebsweg (anders zum schlichten Rückruf wohl auch:
BGH, GRUR 1974, 666, 669 - Reparaturversicherung, m.w.N.). Anderes gilt hin-
sichtlich der Entfernung aus den Vertriebswegen. Da die Entfernung aus den
Vertriebswegen vom Verletzer über den Appell an eine freiwillige Herausgabe
(Rückruf) hinaus den Erfolg des „endgültigen Entfernens" selbst fordert, ist nach
früherem Recht grundsätzlich Voraussetzung, dass der Verletzer Verfügungs-

CONFIDENTIAL

MOTM_WASH1823_0602226

macht über die zurückzurufenden Gegenstände i.S. einer rechtlichen Handhabe über die Zwischenabnehmer im Vertriebsweg hat (vgl. BGH, GRUR 1974, 666, 669 - Reparaturversicherung, m.w.N.). Eine solche Verfügungsgewalt der Beklagten hat die Klägerin weder dargetan noch ist diese sonst ersichtlich. Eine anderweitige Rechtsanwendung infolge der verspätet umgesetzten sog. Enforcement-Richtlinie kommt nicht in Betracht. Die Richtlinie zeitigt weder eine horizontale Direktwirkung zwischen den Parteien, noch ist insoweit eine richtlinienkonforme Rechtsfortbildung des allgemeinen Folgenbeseitigungsanspruchs möglich, da sich das Gericht insoweit an die Stelle des Gesetzgebers setzen würde (LG Mannheim, InstGE 12, 200 Rz. 42 - Stickstoffmonoxyd-Nachweis; a.A. OLG Düsseldorf, InstGE 13, 15 - Faktor VIII-Konzentrat).

Dem Gesetzeswortlaut (in Ansehung der „Vertriebswege") folgend war noch klarzustellen, dass Gegenstände, die sich bei privaten oder gewerblichen Endabnehmern befinden, vom Tenor nicht erfasst werden (vgl. LG Mannheim, InstGE 12, 200, 208-210 – Tz. 45 f. – Stickstoffmonoxyd-Nachweis; a.A. Kühnen, a.a.O., Rz. 1082).

4. Die Beklagte trifft im Hinblick auf die festgestellte Patentverletzung ab 19.10.2001, einen Monat nach Veröffentlichung des Hinweises auf die Erteilung des Klagepatents, zumindest der Fahrlässigkeitsvorwurf, weshalb sie der Klägerin ab diesem Zeitpunkt gemäß § 139 Abs. 2 PatG i.V.m. Art. 64 EPÜ auch zum Schadensersatz verpflichtet ist. Zu einer Bezifferung ihres Schadensersatzanspruchs ist die Klägerin derzeit nicht in der Lage; dies rechtfertigt den Feststellungsantrag, § 256 ZPO.

CONFIDENTIAL

MOTM_WASH1823_0602227

– 53 –

**E.**

Eine Aussetzung des Rechtsstreits gemäß § 148 ZPO ist nicht angezeigt.

**I.**

Der Rechtsstreit war nicht bis zur Entscheidung über die gegen das Klagepatent erhobene Nichtigkeitsklage auszusetzen. Die Entscheidung über die Nichtigkeitsklage ist zwar vorgreiflich im Sinne des § 148 ZPO. Die Kammer hat aber das ihr durch diese Vorschrift eingeräumte Ermessen dahingehend ausgeübt, dass von einer Aussetzung des Verletzungsprozesses abgesehen wird. Nachdem die Nichtigkeitsklägerin und hiesige Beklagte das Ruhen des Nichtigkeitsklageverfahrens beantragt und erklärt hat, auf eine Wiederanrufung des Nichtigkeitsverfahrens zu verzichten, solange sie sich an ihr Lizenzvertragsangebot gebunden halte, ist es bis auf Weiteres unwahrscheinlich, dass es zu einer Vernichtung des Klagepatents kommen wird.

**II.**

Eine Aussetzung gemäß § 148 ZPO kam auch nicht im Hinblick auf die kartellbehördliche Prüfung der Zulässigkeit der Übernahme der Muttergesellschaft der Klägerin durch die Google Inc. in Betracht, weil die Entscheidung der Kartellbehörden nicht vorgreiflich ist. Etwaige zukünftige Veränderungen der Rechtslage sind nicht vorgreiflich für die aufgrund der gegenwärtigen Rechtslage zu treffenden Entscheidung (vgl. Zöller/Greger, ZPO, 29. Aufl., § 148, Rn. 6a).

**F.**

Die Kostenentscheidung folgt aus § 92 Abs. 2 Nr. 1 ZPO.

Die Entscheidung zur vorläufigen Vollstreckbarkeit beruht auf § 709 S. 1 und S. 2 ZPO.

Bei der Bestimmung der Höhe der Sicherheitsleistung hinsichtlich einer vorläufigen Vollstreckung des Unterlassungsanspruchs war vorliegend - anders als in den das Europäische Patent EP 0 615 384 B1 betreffenden Parallelverfahren - nicht auf die Zeitdauer

CONFIDENTIAL

MOTM_WASH1823_0602228

abzustellen, bis eine Entscheidung in der Berufungsinstanz voraussichtlich vorliegen wird, sondern auf die verbleibende Schutzdauer des Klagepatents.

Bei der Bestimmung der Sicherheitsleistung hinsichtlich der Verpflichtungen zu Rückruf und Entfernung der unter Ziff. I.1.a) beschriebenen Erzeugnisse (Xbox 360) berücksichtigt die Kammer, dass die isolierte Vollstreckung dieser der Beseitigung patentrechtswidriger Zustände dienenden Verpflichtungen faktisch der Unterlassungsvollstreckung gleichkommt.

Der Vollstreckungsschutzantrag der Beklagten nach § 712 ZPO bleibt ohne Erfolg. Der Vortrag der Beklagten, ihr drohten finanzielle Einbußen, der Verlust von Marktanteilen und ein Imageschaden, genügt nicht, um die Voraussetzungen des § 712 Abs. 1 S. 1 ZPO darzutun. Die Durchsetzung von Unterlassungsansprüchen aus technischen Schutzrechten hat regelmäßig die Einstellung im Zusammenhang mit den patentverletzenden Produkten stehender Geschäftsaktivitäten zur Folge und eröffnet daher nicht per se den Anwendungsbereich des § 712 Abs. 1 S. 1 ZPO (OLG Düsseldorf, InstGE 8, 117, 121 - *Fahrbare Betonpumpe*). Dass die wirtschaftliche Existenz der Beklagten - auch unter Berücksichtigung der verschuldensunabhängigen Haftung der Klägerin gemäß § 717 Abs. 2 S. 1 ZPO - bedroht wäre, ist weder dargetan noch glaubhaft gemacht. Hinsichtlich der von der Beklagten vorgetragenen möglichen Nachteile für die Verwender der angegriffenen Ausführungsformen (Unternehmen, öffentliche Verwaltung) handelt es sich nicht um der Beklagten selbst drohende unersetzbare Nachteile. Dem Schutz Dritter dient § 712 ZPO jedoch nicht. Schließlich streitet auch das absehbare Ende der Schutzdauer des Klagepatents (Oktober 2012) nicht gegen ein überwiegendes Interesse der Klägerin an der vorläufigen Vollstreckbarkeit.

Dr. Kircher
Vors. Richter am
Landgericht

Dr. Bauer-Gerland
Richterin am Landgericht

Wedler
Richter am Landgericht

CONFIDENTIAL

MOTM_WASH1823_0602229

Ausgefertigt:

als Urkundsbeamtin der Geschäftsstelle



CONFIDENTIAL

MOTM_WASH1823_0602230

CONFIDENTIAL

MOTM_WASH1823_0602231

# EXHIBIT GG

UNITED STATES INTERNATIONAL TRADE COMMISSION
WASHINGTON, D.C.  20436

In the Matter of

**CERTAIN GAMING AND
ENTERTAINMENT CONSOLES,
RELATED SOFTWARE, AND
COMPONENTS THEREOF**

Investigation No. 337-TA-752

### INITIAL DETERMINATION
#### Administrative Law Judge David P. Shaw

Pursuant to the notice of investigation, 75 Fed. Reg. 80843 (2010), this is the
Initial Determination in *Certain Gaming and Entertainment Consoles, Related Software,
and Components Thereof*, United States International Trade Commission Investigation
No. 337-TA-752.

It is held that a violation of section 337 of the Tariff Act, as amended, has
occurred in the importation into the United States, the sale for importation, or the sale
within the United States after importation, of certain gaming and entertainment consoles,
related software, or components thereof that infringe asserted claims 1 and 12 of U.S.
Patent No. 6,069,896; asserted claims 7, 8, and 10 of U.S. Patent No. 7,162,094; claim 2
of U.S. Patent No. 6,980,596; and asserted claims 12 and 13 of U.S. Patent No.
5,357,571.  A violation of section 337 has not occurred with respect to asserted claim 1 of
U.S. Patent No. 6,980,596, or asserted claims 6, 8, or 17 of U.S. Patent No. 5,319,712.

prong of the domestic industry requirement has not been satisfied, and it has not been shown that the economic prong has been satisfied with respect to section 337(a)(3)(A) or (B).

**XII.    Conclusions of Law**

1.    The Commission has subject matter, personal, and *in rem* jurisdiction in this investigation.

2.    The importation requirement is satisfied.

3.    Respondent's accused products infringe asserted claims 1 and 12 of the '896 patent.

4.    Respondent's accused products infringe asserted claims 7, 8, and 10 of the '094 patent.

5.    Respondent's accused products infringe asserted claims 1 and 2 of the '596 patent.

6.    Respondent's accused products infringe asserted claims 12 and 13 of the '571 patent.

7.    Respondent's accused products do not infringe asserted claims 6, 8, and 17 of the '712 patent.

8.    It has not been shown by clear and convincing evidence that any asserted claim of the '896, '094, '571, or the '712 patents is invalid.

9.    It has been shown by clear and convincing evidence that asserted claim 1 of the '596 patent is invalid as anticipated. It has not been shown by clear and convincing evidence that asserted claim 2 is invalid as anticipated.

330

547

10.    The domestic industry requirement is satisfied with respect to all asserted patents.

11.    Respondent has not prevailed on any equitable or RAND defense.

## XIII.  Initial Determination and Order

Accordingly, it is the INITIAL DETERMINATION of the undersigned that a violation of section 337 (19 U.S.C. § 1337) has occurred in the importation into the United States, the sale for importation, or the sale within the United States after importation of certain gaming and entertainment consoles, related software, and components thereof, with respect to asserted claims 1 and 12 of U.S. Patent No. 6,069,896; asserted claims 7, 8, and 10 of U.S. Patent No. 7,162,094; claim 2 of U.S. Patent No. 6,980,596; and asserted claims 12 and 13 of U.S. Patent No. 5,357,571. A violation of section 337 has not occurred with respect to asserted claim 1 of U.S. Patent No. 6,980,596, or asserted claims 6, 8, or 17 of U.S. Patent No. 5,319,712.

Further, this Initial Determination, together with the record of the hearing in this investigation consisting of (1) the transcript of the hearing, with appropriate corrections as may hereafter be ordered, and (2) the exhibits received into evidence in this investigation, is CERTIFIED to the Commission.

In accordance with 19 C.F.R. § 210.39(c), all material found to be confidential by the undersigned under 19 C.F.R. § 210.5 is to be given *in camera* treatment.

The Secretary shall serve a public version of this ID upon all parties of record and the confidential version upon counsel who are signatories to the Protective Order, as amended, issued in this investigation.

**PUBLIC VERSION**

To expedite service of the public version, each party is hereby ORDERED to file with the Commission Secretary by no later than May 7, 2012, a copy of this Initial Determination with brackets that show any portion considered by the party (or its suppliers of information) to be confidential, accompanied by a list indicating each page on which such a bracket is to be found. At least one copy of such a filing shall be served upon the office of the undersigned, and the brackets shall be marked in red. If a party (and its suppliers of information) considers nothing in the Initial Determination to be confidential, and thus makes no request that any portion be redacted from the public version, then a statement to that effect shall be filed.

Pursuant to 19 C.F.R. § 210.42(h), this Initial Determination shall become the determination of the Commission unless a party files a petition for review pursuant to § 210.43(a) or the Commission, pursuant to § 210.44, orders on its own motion a review of the ID or certain issues herein.

David P. Shaw
Administrative Law Judge

Issued: April 23, 2012

332

549

CERTAIN GAMING AND ENTERTAINMENT CONSOLES, RELATED SOFTWARE,
AND COMPONENTS THEREOF                                      337-TA-752

## PUBLIC CERTIFICATE OF SERVICE

I, Lisa R. Barton, hereby certify that the attached **INITIAL DETERMINATION ON
VIOLATION** has been served upon the following parties as indicated, on
_____May 11, 2012_____.

Lisa R. Barton, Acting Secretary
U.S. International Trade Commission
500 E Street SW, Room 112A
Washington, D.C. 20436

## FOR COMPLAINANT MOTOROLA MOBILITY, INC.
## AND GENERAL INSTRUMENT CORPORATION:

Stephen J. Rosenman, Esq.                    ( ) Via Hand Delivery
**ROPES & GRAY LLP**                         (X) Via Overnight Mail
One Metro Center                             ( ) Via First Class Mail
700 12ᵗʰ St., N.W., Suite 900                ( ) Other: _____
Washington, D.C. 20005

## FOR RESPONDENT MICROSOFT CORPORATION:

Brian R. Nester, Esq.                        ( ) Via Hand Delivery
**SIDLEY AUSTIN LLP**                        (X) Via Overnight Mail
1501 K Street, N.W.                          ( ) Via First Class Mail
Washington, D.C. 20005                       ( ) Other: _____

550

**CERTAIN GAMING AND ENTERTAINMENT CONSOLES, RELATED SOFTWARE, AND COMPONENTS THEREOF**                    337-TA-752

## PUBLIC MAILING LIST

Heather Hall
**LEXIS - NEXIS**
9443 Springboro Pike
Miamisburg, OH   45342

( )Via Hand Delivery
( )Via Overnight Mail
(✗)Via First Class Mail
( )Other:_____

Kenneth Clair
**THOMSON WEST**
1100 – 13th Street NW, Suite 200
Washington, DC 20005

( )Via Hand Delivery
( )Via Overnight Mail
(✗)Via First Class M ail
( )Other:_____

551