# EXHIBIT B

CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

```
 1              IN THE UNITED STATES DISTRICT COURT

 2                 FOR THE DISTRICT OF WASHINGTON

 3                           AT SEATTLE

 4

 5   MICROSOFT CORPORATION, a            )
     Washington corporation,            )
 6                                       )
                        Plaintiff,       )
 7                                       ) No. 2-10-cv-01823-JLR
              vs.                        )
 8                                       )
     MOTOROLA, INC., and MOTOROLA        )
 9   MOBILITY, INC.,                     )
                                         )
10                      Defendants.      )

11

12         VIDEOTAPED DEPOSITION OF TODD D. MENENBERG

13                        June 20, 2013

14                      Seattle, Washington

15

16

17

18

19

20

21

22

23

24

25   Job No. CS1685790
```

CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

23

1  Q  Did he explain to you what the project was?

2  A  Yes, he gave me an overview of the project.

3  Q  And what was your understanding following that call of

4     what the project was?

5  A  I think it was fairly a high-level overview, and it

6     general was about the two areas that we've talked about:

7     quantifying the legal fees and the relocation expenses.

8         I'm not sure that was mentioned in the first

9     meeting, the relocation expenses.  I just don't recall.

10  Q  Okay.  How many communications did you have with

11     Mr. Cramer or anyone else from Mr. Harrigan's firm prior

12     to being formally retained on the case?

13  A  I don't remember, but it wouldn't have been many.

14         Probably a couple.

15  Q  When did you actually begin work on the case?

16  A  As I recall, it was early April 2013.

17  Q  And when you began work on the case, what was your

18     understanding of what you were retained to do?

19  A  Well, at that point I met with Mr. Cramer as well as

20     Chris Wion, and the scope was delineated in more detail,

21     and it was, as we've talked about, to first quantify the

22     legal cost-- I should say accumulate and compile the

23     legal costs related to the litigation we are talking

24     about, and then second, to compile the cost relative to

25     the relocation of the distribution center from Germany to

CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

24

1     The Netherlands.

2  Q  I just want to make sure I heard you correctly.

3       You stated that you were retained to accumulate and

4     compile the legal costs associated with the litigations

5     at issue here and compile the costs relative to the

6     relocation of the distribution center from Germany to The

7     Netherlands.

8       Is that correct?

9  A  Yeah, and I mentioned and described this in the second

10    paragraph on Page 4 of my report, which explains in a

11    little more detail.

12      In terms of the first one, it was to quantify the

13    legal costs, including attorney fees and other litigation

14    costs and expenses incurred by Microsoft and that

15    Microsoft contends were incurred as a consequence for

16    Motorola's breach of contract.

17      Then second, to quantify the costs incurred by

18    Microsoft in connection with the relocation of the

19    distribution center from EMEA, which is European, Middle

20    Eastern, and African market, from the German location to

21    The Netherlands, 2012, as well as the increased cost from

22    operating the distribution center in The Netherlands as

23    compared to Germany.

24  Q  Were you asked to analyze any other issues in the

25    litigation that didn't end up in your report?

CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

27

```
 1        which consists of at least ███████ in legal cost

 2        damages and ██████████ in facility relocation and

 3        operating cost damages.

 4    Q   And when you referred a moment ago to the various other

 5        opinions on-- throughout your report, were you referring

 6        to the sort of subtotals on different categories that

 7        added up to the █████████████████ amount that you

 8        just referenced?

 9    A   Well, certainly those are additional areas that I've had

10        opinions on, but I suspect if you ask me on almost every

11        item, I might have an opinion about it.

12            It depends the-- how granule you want to get to the

13        opinions.

14    Q   Okay.  We'll get to that then, but at a high level, the

15        opinions you intend to offer are the total amount of

16        damages allegedly incurred by Microsoft and then the

17        breakdown of that total amount into the legal cost

18        damages and the facility relocation and operating cost

19        damages, correct?

20    A   That's correct.

21    Q   Now, I would like to start first with the total legal

22        costs that you reached.

23            What is the basis for that total, at a high level?

24    A   Well, at a high level that represented the amounts

25        incurred and paid by Microsoft to the respective
```

CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

28

1    different firms, and there were five different firms, and
2    those are itemized on Page 7.
3         These are the total litigation costs and expenses
4    incurred by Microsoft and that Microsoft contends were
5    incurred as a consequence of Motorola's breach of
6    contract.
7    Q  And in terms of what you actually base these numbers on,
8       what did you rely upon?
9    A  Well, these were based on invoices submitted to Microsoft
10      or in some instances Microsoft has a legal reporting
11      system that also prints out the same information from
12      their financial accounting system.  In some cases we
13      relied on that as well.
14   Q  So referring to the calculations on Page 7, the table at
15      the top of Page 7, is it correct-- Page 7 of your report.
16   A  I'm here.
17   Q  Is it correct that the documents that you relied on for
18      those calculations were the invoices from the various
19      firms or Microsoft's internal accounting system
20      reflecting those amounts and not any other documents?
21   A  Let me just check because the back-- I believe that's
22      correct, but I want to just take a second.
23         Yes, those would have been the foundational
24      documents which I used to compile these numbers.
25   Q  Okay.  Now, in terms of the total amount of costs-- let

CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

38

```
 1      "Let me explain the history."
 2          We just talked as a general group, and he had, as I
 3      recall, a pretty good knowledge of some of information
 4      there, and he talked about some of those things, but I
 5      don't recall specifically what he said.
 6   Q  Now, Page 4 of your report also says you spoke with
 7      Ms. Muldoon?
 8   A  I did.
 9   Q  And she is the finance analyst-- she's finance analysis
10      and controls, IE, EOC, and financial controls at
11      Microsoft?
12   A  Yes.
13   Q  And she's based in Ireland; is that right?
14   A  That's correct.
15   Q  So how many conversations did you have with Ms. Muldoon?
16   A  I think we had at least three, maybe four.
17   Q  And were any in-person?
18   A  No.
19   Q  And tell me everything you can remember about your
20      conversations with Ms. Muldoon.
21   A  Those were fairly detailed.
22          We would get into specifics on the various items
23      related to the relocation and the increased operating
24      costs from the move from Germany to The Netherlands, and
25      we talked in a general sense conceptually, but then we
```

CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

39

1     would also get into specific invoices, and we would have

2     questions with her.

3         Where there were gaps or we felt like we needed

4     additional documentation, we would request that of her,

5     and she would research and come back and maybe e-mail

6     things to counsel who would send them to us, and then we

7     would have follow-up phone calls to further discuss those

8     new documents.

9  Q  When did you first interview Ms. Muldoon?

10 A  I don't recall the exact date, probably sometime mid to

11    late May, I would guess.

12 Q  And then you had subsequent calls after that?

13 A  Well, I didn't have any subsequent calls after my report.

14 Q  Okay.  So let me rephrase.

15        I think you said that you had maybe two to three

16    conversations--

17 A  Three to four calls, as I recall.

18 Q  Okay.

19 A  At least three.

20        I am thinking maybe a fourth, a very short one.

21 Q  I'm just trying to get a sense of when those occurred.

22        I understand your report was served on May 29th--

23 A  Yes, and I would estimate they occurred in the two to

24    three weeks before that.

25 Q  Okay.  And did your conversations with Ms. Muldoon affect

CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

40

```
1        the opinions that you're offering in this case?
2   A    They did.
3   Q    And how so?
4   A    Well, they helped, one-- they helped me locate specific
5        documentation, contemporaneous documents that help
6        support some of the numbers, and she was very helpful
7        there.
8            Two, she was very familiar with the nature of this
9        move and some of these costs, was able to explain some of
10       the background behind just the invoice so I understood a
11       little bit more of what had happened.
12  Q    So when you say that Ms. Muldoon helped locate documents
13       that you reviewed in connection with your report, was she
14       helping locate documents that Microsoft had already
15       produced in the litigation or additional documents that
16       you needed to fill in the gaps in your report?
17  A    I think both because some of the documents we had that
18       had been produced to us were helpful, but as I recall,
19       there were gaps, and we wanted additional documents, and
20       we had to call up her, and I would explain, "Well, you
21       must have X, Y, and Z," and for the most part, with a
22       couple of exceptions that I mentioned earlier, they were
23       able to find those documents and send those along to us.
24  Q    Do you recall whether your conversations with Ms. Muldoon
25       were before or after May 9th?
```

CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

41

1   A   I don't know for sure.

2   Q   Do you recall whether you had reviewed Mr. Davidson's

3       deposition transcript before having your conversations

4       with Ms. Muldoon?

5   A   I can't say for sure.

6           I don't know.

7   Q   But certainly in the course of your work with respect to

8       formulating an opinion on the relocation costs, there

9       were certain documents that you felt that you needed that

10      you discussed with Ms. Muldoon, and she supplied them to

11      you, either directly or via counsel?

12  A   There were additional documents that I thought would

13      buttress our work and my opinions.

14          Were they absolutely necessary?  You'd have to go to

15      each document.

16          I don't know, but I wanted to get as much

17      corroborating evidence as I could, and I would ask that

18      of her.

19          In some cases she was able to give me all that I

20      asked.  In other cases she was still looking.

21          As we sit here today, I don't have every possible

22      document, but I have enough where I'm comfortable with

23      the opinions that I gave.

24  Q   Did Ms. Muldoon explain to you, for example, you know,

25      spreadsheets that Microsoft produced in this case, what

CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

42

1    the numbers in the spreadsheets mean and--

2  A  She did.

3  Q  Okay.  And is that information that you were able to get

4    from any source other than Ms. Muldoon?

5  A  I may have been able to.  I didn't seek it because I got

6    the documents-- I read through them, and in most cases

7    thought I understood them, but again, I would prefer, in

8    these situations, to talk to somebody that's more

9    familiar with the creation of documents, and she was

10    intimately familiar with a number of those sheets, so she

11    helped me understand them.

12      It was just the most sufficient way to understand

13    what the numbers reflected.

14  Q  Right.

15      On Page 6 of your report you reference discussions

16    with counsel.

17      Are there particular discussions that you are

18    referencing here or is that a more general statement?

19  A  I am just looking, what specific statement are you--

20  Q  Right underneath the heading, "III."

21  A  Well, the discussions with counsel helped me understand

22    what was being provided to me.

23      These were invoices incurred-- reflecting legal

24    bills that Microsoft paid relative to this litigation,

25    and they should be considered as part of the damage

CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

48

1   A   That's correct.

2   Q   So if I could turn your attention to Pages 9 through 11

3       of your report--

4   A   Okay.

5   Q   And there's a series of Steps 1 through 8 listed there?

6   A   Yes.

7   Q   Did that accurately describe how you calculated the

8       amount of attorney fees and costs that Microsoft incurred

9       by work from the Sidley law firm?

10  A   I believe it does.

11  Q   Okay.  Focusing first on Step 1, is it correct that that

12      is the creation of an Excel spreadsheet?

13  A   Yes.

14  Q   And then Steps 2, 3, and 4, did those steps entail data

15      entry?

16  A   They did.

17  Q   So you or members of your team reviewed information in

18      the Sidley invoices and inputted that data into your

19      spreadsheet, correct?

20  A   That's correct.

21  Q   And is the same true with respect to Steps 6 and 7, those

22      are data entry steps?

23  A   That's correct.

24  Q   And did all of the information used in Steps 2 through 4

25      and 6 and 7 come from the Sidley invoices themselves,

CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

49

1      including the highlighted version of those invoices?

2  A   I believe that's correct.

3          I'm just looking to see if any of that came from the

4      Microsoft 360--

5  Q   Okay.

6  A   But I don't believe it did.

7          I believe those all came from Sidley invoices

8      themselves, as I recall.

9  Q   And did your team-- did you and your team enter the data

10     into your Excel spreadsheet exactly as it appeared in the

11     highlighted invoices?  In other words, were any changes

12     made?

13 A   I don't believe we made any changes.

14         I do have a recollection we had some questions on

15     some entries that might have resulted in some

16     corrections, but then we put in the correct information,

17     but they were minimal, if any, but there were some

18     questions we had, but as I recall, whatever was given to

19     us was clarified, and we entered the correct number.

20 Q   And do you recall-- well, do you recall with any more

21     specificity these instances where you had questions?

22 A   I don't.

23         They were really minor.

24         They weren't significant.

25 Q   When you had questions, did you ask those questions to

CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

51

1   Q   On Page 10 there's a reference to Step 5 and that there's

2       a calculation that was performed in Step 5.

3           Is that correct?

4   A   Yes.

5   Q   It says that the hours in Steps 2C and 2D were

6       multiplied, but I don't see-- I'm not seeing what 2C and

7       2D are.

8           Can you clarify that?

9   A   Well, it appears what happened in the draft of the

10      report, those step numbers didn't get updated, but what

11      that reflects at Step 5 is the hours, which go back to

12      Step 4, and then the respective rate, which was also

13      entered.

14          I just don't see exactly where it's itemized the

15      steps, but that's also in the database as well.

16  Q   Okay.  And the calculation performed in Step 5, was that

17      performed by the Excel program?

18  A   Yes.

19  Q   Step 8 also refers to a calculation.

20          Was that calculation also performed by Excel?

21  A   Yes.

22  Q   In calculating the amount of fees and costs that

23      Microsoft allegedly incurred from the Sidley Austin law

24      firm, what analysis of your own did you do of those costs

25      and fees?

CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

57

1    few different ways.

2  Q    I guess what I'm trying to get at is-- it appears from

3      your report that your team took the highlighted Sidley

4      invoices, input the information that was in those

5      invoices, and calculated totals based on what the

6      calculations in the Excel program-- I just want to make

7      sure there wasn't any additional analysis that you or

8      your team did with respect to changing data entries or

9      anything else or if it's purely entering the information

10      from the Sidley invoices into a database and coming up

11      with calculations from there.

12  A    I think that's largely accurate what you said.

13  Q    Okay.

14  A    With the-- other than the points I've just talked about,

15      I think that's largely accurate.

16  Q    Okay.  Now, can you explain for me what you understand

17      the methodology was that was used to determine what work

18      was performed by Sidley as a result of Motorola's alleged

19      breach of contract?

20                    THE WITNESS:  I'm sorry, may I have

21      that question read back?

22                    (Question on Page 57, Line 16-

23                    19 read by the reporter.)

24

25                    THE WITNESS:  Well, based on my

CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

58

1    discussion with Ms. Robbins, in an overview sense, I

2    think there's-- I understood that she, who was very

3    familiar with the work done and the people who did the

4    work, reviewed the bills and first looked to see were

5    there areas where the nature of the work was clearly 100

6    percent related to this project.

7         Second, she might identify clear areas that were not

8    related to this work, and she would eliminate those in

9    consideration.

10        Then there were a number of areas that was something

11   more than zero but less than 100 percent, and she looked

12   into it in more detail subjectively, because she had the

13   knowledge, and said, "Well, what would make most sense,"

14   and where she had more knowledge and information, she

15   might ascribe a certain percentage.

16        In many cases that calculation may be based on the

17   number of patents that were still at play, and she can

18   just apportion the methodology that I think was talked

19   about in Mr. Killough's deposition.

20        The nature of her work, she spent, as I understand,

21   a substantial amount of time going through, in some

22   detail, analyzing each of the entries, and being familiar

23   with the work that was done by those people, she would

24   come up with the right percentage.

25        Where the description was applicable over a group of

CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

59

1    patents, the number of patents in play relative to the

2    total formed the percentage.

3         As various patents-- that number got down-- was

4    reduced, the percentage sometimes came down from maybe 80

5    percent to 66 percent, depending on how many patents were

6    at play when that particular legal task was done.

7         That's my general understanding of what she did.

8  Q  (By Ms. Roberts)  And she did that on an individual

9    task-by-task basis, right?

10 A  Yes.

11 Q  Not for overall totals on an invoice dated for a certain

12   month, right?

13 A  That's correct.

14 Q  And do you know who came up with that methodology?

15 A  My understanding is that was done at the direction of

16   Microsoft, through discussion-- I don't know specifically

17   if it was unilaterally done or it was based on

18   collaborative effort, but I understand she was working

19   under the direction of Microsoft in developing that and

20   implementing that methodology.

21 Q  You didn't develop the methodology?

22 A  I did not.

23 Q  Were you part of any of the discussions as to whether to

24   use that methodology?

25 A  I was not.

CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

60

1   Q   Do you recall when you were informed that that

2       methodology was going to be used?

3   A   I don't recall when I was first informed.

4          I recall reading about it in David Killough's

5       deposition, and I certainly talked about it with counsel,

6       but I don't remember when.

7   Q   Do you recall if you knew that that was the methodology

8       being used before you read about it in David Killough's

9       deposition?

10  A   I don't remember when I specifically had these

11      discussions or when I learned specifically when it was

12      done.

13         I just don't remember when.

14  Q   And are you aware of any cases or articles saying that

15      the methodology Ms. Robbins used in allocating

16      percentages of tasks to Motorola's alleged infringement

17      is an appropriate way to approach a project like this?

18  A   I'm not aware of any articles or-- that specifically

19      direct someone how to do that.

20         I am aware of what she did.

21         In light of what we were trying to do, what they

22      were setting out to do, in terms of ascribing what

23      elements of the specific legal work related to these

24      patents, it seemed to me to be a reasonable way to do it.

25  Q   And do you intend to offer an opinion that the

CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

61

1    methodology was reasonable?

2  A  I think in light of the information that was available at

3     this time, the methodology was reasonable, yes.

4  Q  When you say "in light of the information that was

5     available," what are you referring to?

6  A  Well, we have all the invoices, and the task at hand was

7     to try to develop how much of those specific legal hours

8     and related expenses were related to these patents in

9     question.

10      It seems to me Ms. Robbins is very familiar with the

11     project.  I know that from talking with her, and I

12     understand that to be the case as well.

13      It seemed to me that was a reasonable approach to

14     try to figure out how much of those total costs was

15     relevant for purposes of developing the amount claimable.

16  Q  Is there somewhere in your report where you state that

17     you intend to opine that the methodology was reasonable?

18  A  I don't state that in the report, but you asked my

19     opinion whether I think it's reasonable.

20      I think it's a reasonable approach.

21  Q  Do you intend to offer that opinion at trial?

22  A  If I'm asked by you if I think it's reasonable, or by

23     counsel, I will answer it honestly.

24      I think it's reasonable.

25      I'm not sure if that's intended by counsel for me to

CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

62

1     address that, but if it comes up, I will give my opinion.

2  Q  Is it correct that neither you nor anyone on your team

3     actually went through the Sidley invoices and determined

4     the allocation percentages that should be given to any

5     particular task?

6  A  That's correct.

7  Q  That was solely done by Ms. Robbins at Sidley Austin,

8     correct?

9  A  That's correct.

10  Q  Now, do you understand that the reason why Ms. Robbins

11     needed to perform these allocations is that for nearly

12     two years all Microsoft versus Motorola and Motorola

13     versus Microsoft litigation was input by Sidley into one

14     matter and invoiced as one matter to Microsoft?

15  A  I think that's generally correct.

16  Q  Okay.  So there weren't separate invoices for an almost

17     two-year period for the various different litigations

18     between the two parties?

19  A  That's correct.

20  Q  And are you aware that Mr. Killough stated there were--

21     there are close to 50 litigations between Microsoft and

22     Motorola?

23  A  I don't recall the exact number.

24        I remember he talked about there were a lot.

25        I don't remember the exact number as I sit here.

CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

63

1   Q   Okay.  What, if anything, did you do to familiarize

2       yourself with the various litigations between Microsoft

3       and Motorola that are reflected in the invoices that your

4       team relied on?

5   A   Primarily read the pleadings, some of the pleadings, the

6       initial complaint, I believe I read the answer, I read

7       some of the interrogatories, and I read the judge's

8       decision as well.

9   Q   And when you say you read some of the pleadings, and you

10      reference the complaint and the answer, you're referring

11      to the pleadings in this case, correct?

12  A   Yes.

13  Q   Okay.  The list of materials considered in your report

14      doesn't list any legal pleadings from any other cases, so

15      I just wanted to confirm that you did not review any of

16      those pleadings.

17  A   I did not.

18  Q   What is your understanding of the particular litigations

19      between Microsoft and Motorola that Microsoft is seeking

20      to recover attorney fees for?

21  A   Well, my understanding is reflected somewhat in my

22      report, but generally, and this is an oversimplification,

23      I understand there is a dispute about the nature of the

24      royalty rates that were trying to be negotiated between

25      the parties -- Was it a reasonable amount that Motorola

CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

65

1   A   No, I didn't get into that detail.

2       It wasn't really necessary for what I was setting

3       out to do.

4   Q   And you didn't discuss that type of detail with counsel?

5   A   I certainly didn't get into specific pleadings in the

6       other cases with counsel, no.

7   Q   So is it fair to say that with the exception of the

8       example on Page 10 of your report, referring to the ITC,

9       you don't know the number of patents at issue in each of

10      the various litigations that Microsoft is seeking to

11      recover attorney fees and costs from, correct?

12  A   I don't, as I sit here.

13      It might be in my files.  I just don't know as I sit

14      here.

15  Q   Now, we discussed the reason why Ms. Robbins needed to go

16      through Sidley's invoices and allocate on an individual

17      task basis, but the percentage attributable to the

18      litigations that Microsoft is seeking to recover fees and

19      costs for is because for a two-year period, or close to

20      two-year period, all of the litigation between the two

21      parties was included in one invoice to Microsoft, right?

22  A   I believe that's correct.

23  Q   Okay.  So do you understand that in that-- we'll call

24      it--

25  A   Let's clarify, one invoice each month.

CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

66

1   Q   Exactly, okay.

2   A   Okay.

3   Q   Yeah, so-- I'm going to refer to that one invoice as the

4       master bill, okay?

5   A   Okay.

6   Q   So included in that master bill, you understand, was work

7       on the ITC 744 investigation that Microsoft filed against

8       Motorola?

9   A   You know, I would have to look at specific invoices.

10          I don't have anything to dispute, but I don't know

11      affirmatively, as I sit here, if that's correct.

12  Q   And so you don't know-- well, are you familiar with the

13      ITC 744 investigation at all?

14  A   I don't recall what that is, as I sit here.

15  Q   Do you understand that Microsoft filed a lawsuit in--

16      before the ITC against Motorola inserting infringement of

17      Microsoft patents?

18  A   I have a general recollection that's correct.

19  Q   And you understand that Microsoft is not seeking to

20      recover attorney fees and costs associated with work done

21      on that matter?

22  A   I think that's correct.

23  Q   Okay.  And do you understand that included in this master

24      bill was work done on Case No. 1577 in the Western

25      District of Washington, which is a case that-- a patent

CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

67

```
 1      infringement case that Microsoft filed against Motorola

 2      prior to filing the present lawsuit?

 3   A  I'm not familiar with that.

 4   Q  But you have no reason to disagree then?

 5   A  I do not.

 6   Q  Are you familiar with a case between the two parties in

 7      the Southern District of Florida that also was included

 8      in this master bill?

 9   A  I am not familiar.

10         It might be in our files, but I'm not familiar, as I

11      sit here.

12   Q  And so if I told you that Motorola was asserting patents

13      in that case that are not standard essential patents, you

14      wouldn't agree or disagree?

15   A  I have no basis to comment.

16   Q  You wouldn't know-- okay.

17         Do you know when Ms. Robbins performed all of the

18      allegations in the highlighted Sidley invoices that you

19      and your team relied on?

20   A  I don't know exactly when.

21         I believe relatively recently, but I don't know

22      exactly when.

23   Q  I believe Mr. Killough testified that they were done by

24      her this spring.

25         Do you have any reason to disagree with that?
```

CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

68

1    A    That seems to be, as I recall, something around that.

2    Q    Okay.  And do you recall that some of the Sidley invoices

3         that your team relied on date back to October, November

4         of 2010?

5    A    I think that's correct.

6    Q    Would you agree that there would have been less chance

7         for error in making allocations if the allocations were

8         being done closer in time to when the work was being

9         done?

10   A    Ideally that would have been better, but for whatever

11        reason that wasn't done, so this was the best they could

12        do at this time frame-- at this time.

13   Q    Okay.  Now, you're not offering an opinion on causation;

14        is that correct?

15   A    Causation as it relates to legal fees?

16   Q    Right.

17   A    I am not.

18   Q    So you're relying on Sidley's allocations in its invoices

19        as to which fees and costs were incurred as a result of

20        Motorola's alleged breach of contract.

21            You don't have any opinions yourself on the

22        percentages that should be in those allocations, correct?

23   A    That's correct.

24   Q    Now, did you do anything to check or confirm that the

25        allocations made by Ms. Robbins in the Sidley invoices

CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

69

1      were done correctly?

2    A   I accepted those allocations as given to me.

3    Q   Did you or your team review the time entries and ask any

4        questions noting, "There's a reference to the 744 case

5        here.  Is this allocation correct?"

6            Anything like that?

7    A   I would be surprised if we did that.

8    Q   Okay.

9    A   It's possible a member of my team did, but I don't think

10       we got to that detail.

11   Q   Okay.  So basically you and your team accepted the

12       highlighted invoices as they were provided to you by

13       Sidley Austin, correct?

14   A   That's correct.

15   Q   Okay.  So if it turns out that there are errors in

16       Sidley's allocations, that would mean that the totals in

17       your report are incorrect, correct?

18   A   Yes.

19                            (Exhibit No. 1 marked for

20                             identification.)

21

22   Q   (By Ms. Roberts)  Okay.  I am going to hand you what we

23       will mark as Menenberg Exhibit No. 1, which has the Bates

24       No. MS-MOTO_1823_0006003814A.

25   A   Thank you.

CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

71

1      work on a case that does not involve Motorola SEPs, how

2      the 40 percent allocation was made?

3  A   Well, I don't know if, in fact, that's correct.

4         I didn't make that highlighting.  I don't know.

5  Q   Okay.  If I could turn your attention to the page ending

6      in 850A--

7  A   Okay.

8  Q   And you'll see there's several entries that have a yellow

9      highlighting, which is the 80 percent allocation,

10     correct?

11  A  I see that.

12  Q  And there's one that doesn't have any highlighting, which

13     indicates 100 percent; is that right?

14  A  I do see that.

15  Q  And sitting here today, you can't explain why it was

16     determined that 100 percent of that task was

17     attributable, allegedly, to Motorola's alleged

18     infringement-- alleged breach of contract?

19  A  I cannot.

20                  (Exhibit No. 2 marked for

21                   identification.)

22

23  Q  (By Ms. Roberts)  I am going to hand you what we will

24     mark as Menenberg Exhibit No. 2, which bears the Bates

25     No. MS-MOTO_1823_0006003905A.

CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

72

1   A   Thank you.

2   Q   If I could turn your attention to the page ending in

3       909A-- well, before we do that, does this appear to be a

4       highlighted Sidley invoice, dated May 31st, 2011?

5   A   Yes, it does.

6   Q   So now if I could turn your attention to the page ending

7       in 909A--

8   A   Okay.

9   Q   And there's a time entry dated 4/22/11 for DI Lewis.

10  A   I see that.

11  Q   That's highlighted in orange, I believe.

12  A   Well, you know, it looks more yellow to me, but maybe the

13      original was orange, and I'll accept that.

14  Q   There's a reference to FAT patents in this time entry.

15  A   I see that.

16  Q   Do you know which case the FAT patents were at issue in?

17  A   I do not.

18  Q   So if I told you that those are patents that were

19      asserted by Microsoft against Motorola, you wouldn't be

20      in a position to agree or disagree?

21  A   That's correct.

22  Q   And so you can't explain how the particular allocation

23      percentage was totalled for this particular time entry?

24  A   I cannot.

25      /////

CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

73

1          (Exhibit No. 3 marked for

2              identification.)

3

4   Q   (By Ms. Roberts)  I am going to hand you what we will

5       mark as Menenberg Exhibit No. 3, which has the Bates

6       No. MS-MOTO_1823_0006001488B.

7   A   All right.

8   Q   Does this appear to be a highlighted Sidley invoice,

9       dated June 19, 2012?

10  A   It does, yes.

11  Q   If I could turn your attention to the page ending in

12      489B--

13  A   Okay.  I'm with you.

14  Q   There's an entry there for coordinating the circulation

15      of markman filings and notice of appeal to the 9th

16      Circuit (1408 and 1823)?

17  A   I see that.

18  Q   Do you understand that the case with the-- Case No. 1408

19      is not one of the cases that Motorola-- that Microsoft is

20      seeking to recover fees and costs for?

21  A   I don't know that.

22  Q   Okay.  And so you don't know how this could be 100

23      percent allocations to Motorola's alleged breach of

24      contract?

25  A   I am not in position to comment on that.

CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

74

1           (Exhibit No. 4 marked for

2              identification.)

3

4    Q    (By Ms. Roberts)  I am going to hand you what we will

5         mark as Menenberg Exhibit No. 4, which bears the Bates

6         No. MS-MOTO_1823_0006001607B.

7    A    Thank you.

8    Q    Does this appear to be a highlighted Sidley invoice,

9         dated March 20th, 2012?

10   A    Yes, it does.

11   Q    Can I turn your attention to the page ending in 617B?

12   A    Okay.

13   Q    And right underneath the third redacted, there's a time

14        entry for February 15th, 2012 for HF Webley?

15   A    I see that.

16   Q    And in that time entry it says, "Summarizing pleadings in

17        SDFL Moto/Apple case related to claim scope of Motorola's

18        wireless sync patent."

19           Do you see that?

20   A    I do.

21   Q    Are you aware that the-- well, Southern District of

22        Florida, Motorola/Apple case is not one of the cases that

23        Microsoft is seeking to recover attorney fees and costs

24        for?

25   A    That would make sense to me.

CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

75

1  Q   Okay.  And you had mentioned that your team read through

2      descriptions to see if there were any time entries that

3      didn't appear to belong on these invoices.

4          Is this one referencing a case between Motorola and

5      Apple one that your team noted?

6  A   No, but to be clear, as I mentioned, it was a high-level

7      view.

8          We literally looked at thousands of entries.

9          I don't claim that we looked and scrutinized each

10     one, but having said that, you know, it also goes on to

11     say, "(Counterpart of which is asserted against Microsoft

12     in Germany)," so based on that alone, there may be a

13     valid basis to include it, so you have to read it in

14     total, I think, before making a-- rushing to judgment.

15 Q   And so the reference to the wireless sync patent, the

16     counterpart of which is being asserted against Microsoft

17     in Germany, you don't know whether that's a standard

18     essential patent or a nonessential patent, right?

19 A   I don't, but my point is this particular description

20     mentions Microsoft, that's all.

21 Q   Okay.  And so if it turns out that the wireless sync

22     patent reference here is actually a nonessential patent,

23     would you agree that percentage allocation should be zero

24     percent?

25 A   I'm not in a position to say that.

CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

76

1     There may be other reasons, that Ms. Robbins is

2    familiar with, that warrant leaving it exactly as it is.

3  Q  You don't know because you're not familiar with arguments

4    and the patents at issue in all the various--

5  A  I don't have intimate knowledge of those arguments that

6    you're talking about.

7             (Exhibit No. 5 marked for

8              identification.)

9

10  Q  (By Ms. Roberts)  I will now hand you what we will mark

11    as Menenberg Exhibit No. 5, which bears the Bates

12    No. MS-MOTO_1823_0006002291B.

13  A  Thank you.

14  Q  And do you agree that this appears to be a highlighted

15    Sidley invoice, dated September 20th, 2011?

16  A  I do.

17  Q  If I can turn your attention to the page ending in 355B--

18  A  All right.  I'm with you.

19  Q  And there's a time entry between the third redacted,

20    dated August 10th, 2011, for A McLeod.

21     Do you see where I'm at?

22  A  I don't.

23     You said under the third redacted?

24  Q  Yeah.

25     The second one is actually really tiny underneath

CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

77

1        the big one.

2    A   Okay.  Who's the person you're talking about?

3    Q   A McLeod.

4    A   I do see it.  I'm with you.

5    Q   Okay.  And the time entry refers to assisting with

6        deposition preparation in the SDFL ITC 744, and ITC 752

7        cases?

8    A   I see that.

9    Q   Again, do you understand that the Southern District of

10       Florida ITC 744 cases are cases where Motorola SEPs are

11       not at issue?

12   A   I am not familiar with that.

13   Q   Okay.  If that were the case, would you agree that there

14       should not be 100 percent allocation for this time entry?

15   A   I'm just not in a position to opine on that.

16           I don't know.

17   Q   If you could turn to the page ending in 2500B--

18   A   Okay.

19   Q   And there are several entries that appear to be expenses

20       for the-- preparing for and defending the deposition of

21       Matt Lynde?

22   A   I see that.

23   Q   Do you see that?

24   A   Yes.

25   Q   And in the time entries the dates provided are July 20th

CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

78

1    and July 21st, 2011?

2  A   I see that.

3                         (Exhibit No. 6 marked for

4                          identification.)

5

6  Q   (By Ms. Roberts)  I am going to hand you what we will

7      mark as Menenberg Exhibit No. 6, which is a cover page of

8      the deposition of Matthew Lynde, dated Thursday, July

9      21st, 2011.

10 A   Okay.

11 Q   And you are familiar in your work with deposition

12     transcripts, correct?

13 A   Yes.

14 Q   So you've seen a document that looks like Menenberg

15     Exhibit No. 6 before, correct?

16 A   Yes.

17 Q   And do you see the date in the middle of the page, toward

18     the bottom, July 21st, 2011?

19 A   I do see that.

20 Q   Okay.  And it states that it's a videotaped deposition of

21     Matthew R. Lynde?

22 A   Yes.

23 Q   And that is generally the same date listed in the time

24     entry we were just-- the expense entry we were just

25     looking at in Menenberg Exhibit No. 5, correct?

CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

79

1   A   Yes.

2   Q   Okay.  If I could turn your attention on Menenberg

3       Exhibit No. 6 to the case caption at the top of the

4       page--

5   A   Same page?

6   Q   The same page, yeah, the very--

7   A   Okay.

8   Q   I'm sorry, no, in Menenberg Exhibit No. 6, the

9       deposition--

10  A   Oh, I'm sorry.

11          Okay.

12  Q   You understand at the top of the page that lists the case

13      that the deposition was in, correct?

14  A   Yes, at the very top.

15  Q   Okay.  And it lists it as the Southern District of

16      Florida case?

17  A   Yes.

18  Q   So based on this, would you agree that it appears that

19      the deposition reflected in the invoices on Menenberg

20      Exhibit No. 5 was this deposition of Mr. Lynde in the

21      Southern District of Florida case?

22                  MR. HARRIGAN:  So you're referring--

23      object to the form.

24          You're referring to the entry dated August 12 or 10

25      on the invoice?

CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

80

1           MS. ROBERTS:  Yes, and then the

2     description provides the dates of July 20th and July

3     21st.

4           MR. HARRIGAN:  On the deposition?

5           MS. ROBERTS:  No, in the invoice.

6           MR. HARRIGAN:  Okay.  I've gotcha.

7           THE WITNESS:  Can I have the question

8     read back, please?

9           (Question on Page 79, Line 18-

10             21 read by the reporter.)

11

12           THE WITNESS:  That seems reasonable.

13     I mean, there may be more facts or other information

14     I'm not aware of.

15     It seems to add up, but again, I'm not familiar with

16     this, but as you layout those items, I have no reason to

17     contest that.

18  Q  (By Ms. Roberts)  And so then it's fair to say you don't

19     have any reason-- any knowledge of why 100 percent of the

20     expenses in preparing for and defending the deposition of

21     Mr. Lynde on those dates were allocated to Motorola's

22     alleged breach of contract?

23  A  I have no-- I'm not in a position to comment on that.

24  Q  Okay.  Now, I believe you testified that you and your

25     team relied, for Sidley Austin, on the highlighted

CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

82

1   Q   So for the purposes of your opinions, you've assumed that

2       the entire amounts reflected in the Sidley invoices that

3       you relied upon were paid by Microsoft?

4   A   Well, as I recall, we traced billed amounts to accounting

5       records from the Microsoft legal system to indicate they

6       were paid.

7   Q   And those accounting records are at an invoice level,

8       correct?

9   A   I just don't recall as I sit here.

10  Q   Do you recall seeing any accounting records that were at

11      a task level similar to the Sidley invoices that you and

12      your team relied on?

13  A   You know, we may have.  I just don't remember.

14      I would have to go back to our records.

15  Q   Let's turn next to the Freshfields total.

16      On Page 11 of your report, bottom of the page, you

17      state that the total amount of fees incurred, based on

18      work by the Freshfields firm, was ████████.

19      Is that correct?

20  A   That's correct.

21  Q   And do the steps on Page 13 of your report explain how

22      you calculated the amount of attorney fees and costs

23      incurred based on work performed by the Freshfields firm?

24  A   That's correct.

25  Q   And is Step 1 a creation of an Excel spreadsheet?

CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

83

1   A   Yes.

2   Q   And Step 2, is that just simply data entry based on

3       information in the invoices?

4   A   That's correct.

5   Q   And did you and your team enter the data exactly as it

6       appeared in the invoices?

7   A   I believe we did relative to these items, yes.

8   Q   There weren't any communications with counsel about

9       changes to make for any particular entries?

10  A   Not that I can recall.

11  Q   And then the sum that is the total amount incurred, based

12      on work by the Freshfields firm, was that sum calculated

13      by Excel?

14  A   Yes.

15  Q   And so is there any analysis that you or your team

16      performed in making the calculation with respect to the

17      work performed by the Freshfields firm?

18  A   Analysis in what sense?

19  Q   Well, again, similar to the Sidley firm, I want to get a

20      sense of whether your team entered the data from the

21      invoices into your database and performed the

22      calculations and that's the number that appears or if

23      there was any other analysis that you and your team added

24      to the work.

25  A   I think it was similar to what we just talked about in

CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

84

1    the last hour for all the different law firms.

2                      MS. ROBERTS:  Okay.  Let's go ahead

3    and take a break to change the tape.

4                      VIDEOGRAPHER:  Going off the record at

5    11:05 a.m.

6                      (Recess 11:05 to 11:11 a.m.)

7

8                      VIDEOGRAPHER:  We are back on the

9    record at 11:11 a.m.

10        This is Disc No. 2 in the deposition of Todd

11   Menenberg.

12  Q  (By Ms. Roberts)  Mr. Menenberg, before the break we were

13     talking about the calculation of the total amount of fees

14     and costs allegedly incurred from-- based on work by the

15     Freshfields firm?

16  A  Yes.

17  Q  Is it correct that there weren't any allocations

18     performed similar to those done with the Sidley invoices

19     for the Freshfields firm?

20  A  That's correct.

21  Q  And is that correct, actually, for the other law firm?

22     Sidley is the only one where allocations were performed?

23  A  That's correct.

24  Q  The next law firm that you looked at was Boehmert &

25     Boehmert?

CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

85

1    A    Yes.

2    Q    And you opined that the total amount of fees and costs

3         incurred, based on work performed by the Boehmert firm,

4         was ███████? 

5    A    That's correct.

6    Q    And in calculating that total, did you use the same steps

7         reflected on Page 13 with respect to the Freshfields

8         firm?

9    A    Well, if you read at Page 15, it talks about that we did

10        the same first two work steps as described for

11        Freshfields.

12   Q    Okay.  And so is it correct that with respect to the

13        Boehmert firm, you and your team similarly input the data

14        in invoices into an Excel spreadsheet and then calculated

15        the total?

16            Is that right?

17   A    Yes.

18   Q    And there wasn't additional analysis that was performed

19        by your team in making those calculations?

20   A    Nothing more than what we've talked about.

21   Q    Okay.  Turning next to the Klarquist Sparkman law firm.

22   A    Okay.

23   Q    Is it your opinion that Microsoft incurred ████████ in

24        fees and costs based on the work performed by the

25        Klarquist firm?

CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

86

1   A   Yes.

2   Q   And in making that calculation, did you follow those same

3       two steps outlined on Page 13 of your report?

4   A   Yes.

5   Q   And so did your team similarly rely on the information in

6       the invoices that you were provided, enter that

7       information into an Excel spreadsheet, and Excel

8       calculate the total?

9   A   Yes.

10  Q   And there wasn't any additional analysis that you and

11      your team performed in making those calculations,

12      correct?

13  A   Other than what we've described.

14  Q   Turning, lastly, to the Calfo Harrigan law firm--

15  A   Yes.

16  Q   Which you begin discussing on Page 16 of your report, is

17      it your opinion that Microsoft incurred ██████ in

18      attorney fees and costs from the work that the Calfo

19      Harrigan firm did?

20  A   That's correct.

21  Q   Do the steps on Page 17 of your report reflect how you

22      calculated the total for the Calfo Harrigan firm?

23  A   Yes.

24  Q   Is it correct that Step 1 is just the creation of an

25      Excel spreadsheet?

CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

87

1  A   Yes, a data entry template so we can input the data.

2  Q   And Steps 2 and 3 are the inputs of that data, correct?

3  A   That's correct.

4  Q   It looks like it jumps from Step 3 to Step 5.

5      Is that just a--

6  A   I think that's an error.  I think that's a typo.

7      I apologize for that.

8  Q   Step 5 and 6 are-- appear to be calculations; is that

9      right?

10  A   Yes.

11  Q   And were those calculations performed by Excel?

12  A   Yes.

13  Q   Was there any analysis that you or your team performed in

14     making these calculations for the Calfo Harrigan firm?

15  A   In the same sense that we've talked about.

16  Q   You relied on what was in the invoices, input that into

17     an Excel spreadsheet, and Excel calculated the totals,

18     correct?

19  A   That's correct.

20  Q   Now, for Calfo Harrigan, to perform the calculations, you

21     relied on invoices from the Calfo Harrigan firm, correct?

22  A   That's correct.

23  Q   And is it correct that from-- for the Freshfields,

24     Boehmert, and Klarquist law firms, you relied on data

25     from Microsoft's TyMetrix 360 system?

CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

96

1   A   That's correct.

2   Q   Okay.  And was it similarly created, sorting in the Excel

3       spreadsheet that you created?

4   A   Yes, using a pivot table.

5   Q   And when it refers to the client matter, there are only

6       three listed here, right?

7   A   That's correct.

8   Q   And is that because the Sidley invoices used-- ultimately

9       ended up using three different matters for-- that cover

10      work that they're claiming fees and costs for in this

11      case?

12  A   I believe that's correct.

13  Q   So when you refer to a client matter here, you're not

14      referring-- you're referring to a client matter as

15      referenced in invoices from Sidley to Microsoft, not

16      separate legal matters in various courts, correct?

17  A   That's correct.

18  Q   Turning next to Exhibit No. 5, can you explain to me what

19      this exhibit is intended to show?

20  A   We were asked to also prepare a schedule that showed the

21      Sidley Austin fees and expenses by various subjects, so

22      these were the subjects that were given to us by

23      Ms. Robbins, and this is how the numbers came out.

24  Q   Do you recall when you were asked to divide up the

25      information by various subjects?

CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

97

1  A   In a general sense, probably towards mid May, maybe a
2      little more towards when the report was issued.
3          Sometime probably in the May 15th, May 29th time
4      frame.
5          I don't remember exactly when.
6  Q   How did you determine how to divide up the work by
7      various subject matters?
8  A   That was given to us by Ms. Robbins.
9  Q   Okay.  In what form?
10 A   I believe the-- it was listed on-- and you had one of the
11     invoices here, either 1, 2, or 3 next to the entries.
12 Q   And you're referring, for the record--
13 A   I'm referring to Exhibit No. 5, which is a Sidley
14     invoice.
15 Q   And is it correct that it's the invoices that end with
16     the letter B that have the, in addition to highlighting,
17     numbers 1, 2, and 3 added to them?
18 A   I believe that's correct.
19 Q   And do you know when you were given those invoices?
20 A   I don't recall the exact timing of those.
21 Q   Can you recall sort of the proximity to the May 29th date
22     that you served your report?
23 A   Again, it was probably sometime in the latter-- the
24     second half of the month.
25         I would be guessing what date.

CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

98

1  Q  Do you know the purposes of dividing up the data into
2     these different subject matters?
3  A  The ultimate purpose, no.
4        I was asked to do this, and it was relatively easy
5     for us to do it.
6  Q  You said Ms. Robbins asked you to do it; is that right?
7  A  That's correct.
8  Q  Do you know whose idea it was to divide up the data in
9     this way?
10 A  I do not.
11 Q  Do you know how-- we discussed earlier the methodology
12    used by Ms. Robbins for going through and highlighting
13    the various task entries on the Sidley invoices.
14       Do you know what methodology was used to identify
15    which tasks fall into these subject matters?
16 A  I do not.
17 Q  Did you ask Ms. Robbins or anybody else how that was
18    done?
19 A  I don't remember that conversation, having that such
20    conversation.
21 Q  And is it correct that-- and if you want to refer to
22    Menenberg Exhibit No. 5, you're welcome to, but not every
23    task that was allocated to Motorola's alleged breach of
24    contract falls into the three subject matter areas
25    reflected in Exhibit No. 5; is that right?

CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

100

1   so I haven't done the math, but that might be the grand

2   total for Freshfields as well?

3  A   It is.

4  Q   Okay.  So there weren't allocations that were performed

5   for those three firms, correct?

6  A   No.

7  Q   You relied on the invoices themselves?

8  A   That's correct.

9  Q   So it's only the Sidley firm where you had this

10   additional system of assigning tasks to 1, 2, or 3 to

11   break them down into these subject matters, correct?

12  A   That's correct.

13  Q   For the antisuit injunction and 9th Circuit appeal,

14   there's an entry for Sidley Austin, and then there's the

15   summed amount from the invoices and the allocated amount

16   for claim.

17  A   Right.

18  Q   The latter number is lower.

19       Do you know why that is?

20  A   I would have to look into the specific line item.

21       I don't know as I sit here.

22       It's approximately $560 lower.

23        I don't recall as I sit here.

24  Q   And is it correct that you don't know how Sidley

25   determined what tasks to attribute to the German

CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

101

1    litigation, what tasks to attribute to the antisuit

2    injunction and 9th Circuit appeal, and what tasks to

3    attribute to the 3H.264 patents in the 1823 case?

4  A  I don't know the criteria, how Ms. Robbins sorted them

5    into those categories.

6  Q  Okay.

7  A  I only know she did that.

8  Q  As far as you know, Ms. Robbins is the one that did that

9    though?

10  A  I understand that's the case.

11  Q  I think you already stated this before, but you don't

12    have an opinion whether the attorney fees and costs

13    calculated in your report were caused by the alleged

14    breach of contract by Motorola, correct?

15  A  I think we went over that.

16      I'm not here to give an opinion narrowly on that

17    point.

18      My role was to compile those costs and do the math.

19  Q  Okay.  And you have not formed an opinion regarding the

20    total amount of fees and costs incurred as a result of

21    Motorola's alleged breaches based on work performed in

22    the 1823 action, the action that this deposition is in;

23    is that right?

24  A  I don't believe that's part of the scope of my work.

25  Q  And the same is true with respect to each of the other

CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

102

1    individual actions that Microsoft is seeking attorney

2    fees and costs for, you have not performed calculations

3    and therefore formed an opinion as to the total amount of

4    fees and costs incurred in each of the individual

5    actions; is that right?

6  A    That's correct.

7        I've only been asked to do and present them as I've

8    done.

9  Q    Right.  Okay.

10        And have you performed any calculations or formed an

11    opinion regarding the total amount of fees and costs

12    incurred as a result of Motorola having sent letters to

13    Microsoft, dated October 21st and October 29th, offering

14    to license patents to Microsoft?

15  A    I don't recall my work ever considering these specific

16    letters and doing specific calculations related to those

17    letters and those dates.

18  Q    Okay.  Have you done any calculations or formed an

19    opinion regarding the total amount of fees and costs

20    incurred by Microsoft as a result of Motorola having

21    sought injunctive relief for Microsoft's infringement of

22    Motorola's standard essential patents?

23                    THE WITNESS:  Would you please read

24    that back?

25        That was kind of a long question.

CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

103

1              (Question on Page 102, Line 18-

2                22 read by the reporter.)

3

4              THE WITNESS:  Only to the extent that

5      it's already reflected in these numbers.

6    Q  (By Ms. Roberts)  Have you performed any calculations or

7      formed an opinion regarding the total amount of fees and

8      costs incurred by Microsoft as a result of Motorola

9      having not issued a patent license to Marvel (phonetic)?

10   A  To Marvel?

11   Q  Mm-hm.

12   A  Only to the extent it's reflected in the invoices.

13        I'm not familiar, as I sit here, with Marvel and the

14      impact, but if it's part of the invoice billed up in the

15      numbers, then it would be there, but I don't know.

16   Q  Have you performed any calculations or formed an opinion

17      regarding the total amount of fees and costs incurred by

18      Microsoft as a result of Motorola allegedly not offering

19      a license to Microsoft on terms of Google's MPEG-LA

20      license?

21   A  Again, only to the extent it's already incorporated in

22      the task and related costs and expenses in the work I've

23      done.

24   Q  Is it fair to say that with respect to the attorney fees

25      and costs, you have calculated a total amount but have

CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

104

 1      not tied any computations to any specific theories of

 2      breach by Microsoft?

 3          Is that correct?

 4  A   I think that's fair.

 5  Q   And you are aware that this is a breach of contract case,

 6      correct?

 7  A   Yes.

 8  Q   And are you aware that Microsoft claims that Motorola

 9      breached two different contracts, one with the IEEE and

10      one with the ITU?

11  A   I believe that's correct.

12  Q   And did you perform any calculations or form an opinion

13      regarding the total amount of fees and costs incurred as

14      a result of Motorola allegedly breaching each of those

15      contracts?

16  A   I don't believe we did that.

17  Q   Okay.  So, once again there's just a grand total, no

18      calculation of damages for each contract at issue?

19  A   Well, the numbers are for the respective different sorts

20      that we did.

21          I don't think we did it for the two individual ones,

22      as you posed the question.

23  Q   Okay.  Let's move on to the calculations of the facility

24      relocation.

25          First of all, can you explain to me the methodology

Veritext Corporate Services

CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

105

1      used by you and your team to-- let me start over.

2          If we turn to Page 19 of your report--

3   A  I'm with you.

4   Q  There's a table there.

5          Does that table accurately summarize your opinion

6      with respect to the total amount of damages incurred

7      allegedly, based on the facility relocation and operating

8      costs?

9   A  It does.

10  Q  Okay.  And can you explain to me the methodology that you

11     and your team used to get to these totals?

12  A  Well, we met with counsel.  We had discussions with

13     Microsoft personnel.

14         I tried to learn as much as I could about the

15     context of what happened.

16         We reviewed a lot of source documents.

17         We had discussions with counsel about specific

18     elements of cost that would likely be included in such a

19     move.

20         It was an iterative process where as we started

21     getting documents, we started compiling and computing

22     those costs.

23  Q  With respect to the attorney fees and costs, you and your

24     team primarily relied on the data in invoices and

25     inputted that data into a spreadsheet to make your

CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

106

1    calculations, correct?

2  A  That's an oversimplification, but that's generally

3     correct.

4  Q  Is that generally what you did with respect to the

5     facility relocation?

6  A  I think here, because of the nature of these costs, we

7     delved deeper into getting underlying support in

8     contemporaneous accounting records.

9  Q  Can you sort of expand on that for me?

10  A  Well, in the case of the legal invoices, we didn't ask

11     for timecards or timesheets from the lawyers.  We took,

12     as our basic underlying document, the invoice provided by

13     the lawyers.

14        Here, rather than just accept a sum total, we said,

15     "Well, let's look at the invoices behind that or let's

16     look at a contract behind that or some other underlying

17     corroborating evidence."

18  Q  Other than requesting the corroborating evidence, was

19     there analysis that you and your team performed separate

20     and apart from the calculations of the numbers in the

21     invoices?

22  A  I don't understand your question.

23        What other analysis are you talking about?

24  Q  Well, I'm not sure if there is any that exists.

25        I want to make sure I understand everything that you

CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

107

1      did.

2    A    Well, this is a lot of work.

3         I mean, just saying was there any other analysis-- I

4      mean, all of these things involved detailed analysis and

5      a lot of hours and a lot of calculations, and auditing

6      was done.

7    Q    If you could describe for me what the analysis was.

8         Were you making decisions about whether invoices

9      should or should not be included?

10   A    We inquired about invoices, the logic as to why they were

11     included and didn't make sense and was it appropriate to

12     include them.

13         Based on our work, we included those that we thought

14     there was a reasonable basis to include them.

15   Q    How did you determine whether there was a reasonable

16     basis or not to include invoices?

17   A    You know, we looked at a lot of invoices.

18         I just-- as I sit here, I don't recall specifically

19     a particular invoice that we said was rejected.

20         I just don't remember, but we looked at a lot of

21     different ones and ultimately concluded the amounts

22     reflected here are supported by the documentation

23     indicated in the report-- was appropriate and reasonable.

24   Q    Do you recall there being invoices that you were

25     presented with that you chose not to include and rely

CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

147

1    recall-- I think I know the spreadsheet you are talking

2    about.

3         It had a lot of tabs and a lot of calculations--

4  Q  Yeah.  It was unfortunately way too large for me to bring

5    today--

6  A  It's cumbersome.

7  Q  Yeah.

8  A  Well, that schedule was largely supported by the price

9    book and other source documents, so you could reference

10   to that schedule and you probably could come to the

11   same-- I think you could come to the same numbers, but we

12   just used that as a tool to go back to the source

13   documents and recalculate it ourselves.

14 Q  Okay.

15 A  So ultimately I'm relying on, for example, in this case,

16   the price book, although I think those spreadsheets that

17   you talked-- I don't have that in front of me, but I

18   believe that also developed a similar calculation.

19 Q  That large cumbersome spreadsheet, do you recall if that

20   was a spreadsheet that Microsoft kept in the ordinary

21   course of business and provided to you or is that

22   something that your team created--

23 A  No.  That was something that was provided to us.

24 Q  Okay.

25 A  Prepared in the ordinary course of business?  I don't

CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

148

1    recall if it was or if it was provided to help develop

2    the calculation for the claim, but I'm not sure what you

3    mean when you say "ordinary course of business," if

4    that's also the course of business--

5  Q  Fair point.

6         The reason I asked is because it was produced on the

7    same day as your report, so I wasn't sure if it was part

8    of your work papers or--

9  A  It was not part of my work papers.

10 Q  Okay.

11 A  I don't think so, if we're talking about the same

12   schedule.

13 Q  Okay.  So going back to the fixed costs and the totals

14   that you rely upon to calculate the difference in fixed

15   costs between operating in The Netherlands and in

16   Germany, so are you-- is it your testimony that those

17   numbers came largely from the Arvato price book that you

18   have in front of you?

19 A  For the German ones, yes.

20 Q  For the German ones?

21 A  And other sources, but most of them are from their Arvato

22   price book, and then I can go to each of the different

23   ones.

24 Q  Before you do, could you tell me the date of the Arvato

25   price book you were just looking at?

CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

175

1  Q   Now, what about Mr. Davidson's testimony that-- at which

2      you alluded to earlier, that Arvato was not very

3      cooperative in the transition with Ceva, and Mr. Davidson

4      said that that was a distraction for management and they

5      had to deal with that.

6          Did you make any adjustments to the numbers based on

7      that problem caused by Arvato?

8                      MR. HARRIGAN:   Objection; lack of

9      foundation.

10         Go ahead.

11                     THE WITNESS:   I didn't make any

12     adjustment based on what the predicate of your question

13     was.

14         I don't know necessarily how-- if, in fact, that

15     changes any number.

16  Q   (By Ms. Roberts)  Now, to confirm, you do not have an

17     opinion regarding whether Motorola's conduct caused

18     Microsoft to relocate the EMEA distribution facility,

19     correct?

20  A   Well, I've read the depositions, and it's, I think,

21     pretty apparent this move was caused by the issue that

22     we're debating in this litigation.

23         I don't think they just did this exclusive of what

24     happened.

25  Q   Do you have an opinion in your report on causation?

CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

176

1  A   It's not in my report, but you asked me my opinion.

2       Really, through the depositions, it's pretty

3      apparent to me that this was something done as a result

4      of this litigation.

5  Q   Okay.  Are you planning to testify at trial that

6      Microsoft moved as a result of Motorola's alleged breach

7      of contract?

8  A   I haven't been asked to do that, but if Counsel asks me a

9      question, I'll answer honestly what I think about it.

10 Q   And all you've considered-- well, I'll withdraw that.

11      In terms of your calculations of the costs incurred

12     by Microsoft in association with the relocation, have you

13     done anything to form an opinion as to whether those

14     costs were reasonable?

15                    THE WITNESS:  May I have that read

16     back, please?

17                         (Question on Page 176, Line 11-

18                          14 read by the reporter.)

19

20                    THE WITNESS:  Well, two things:

21      One, and we've talked about it at some length, and I

22     talk about it in my report, I did a substantial amount of

23     work to validate those costs where that's concerned.

24      Second, in terms of the reasonableness as to the

25     types and amounts, I've read through the descriptions.  I

CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

178

1    reasonable?

2  A  I don't recall specifically articulating it in the way

3    you've asked the question, but as I say, they were the

4    types of costs and the amounts, to the extent I was

5    familiar with those particular items, that seemed

6    reasonable.

7  Q  And have you analyzed the costs of any alternatives that

8    were available to Microsoft to relocate in the facility,

9    both those that Microsoft considered and perhaps

10    alternatives Microsoft did not consider?

11  A  I have not.

12  Q  And similar with the attorney fees, you've calculated a

13    total for the amount of costs for the relocation,

14    correct?

15       You have not broken it down based on costs incurred

16    as a result of any particular conduct by Motorola; is

17    that right?

18  A  Yeah, I think we got the relocation and the question--

19    you're asking just about the attorney fees?

20  Q  No.  I'm asking similar to the attorney--

21  A  I misheard you.  I'm sorry.  Please repeat it.

22  Q  So similar to the attorney fees, for the relocation, you

23    calculated sort of a grand total.

24       You have not separately calculated the amount of

25    relocation costs incurred as a result of any particular

CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

179

1     conduct of Motorola that Microsoft constitutes-- claims

2     is a breach?

3  A  I am not sure I understand the question.

4        Are you trying-- did I break out the relocation

5     expenses to the specific cases we're talking about?

6  Q  Well, I can be more specific.

7        Earlier we talked about costs incurred as a result

8     of Motorola sending letters to Microsoft in October of

9     2010, offering to license patents to Microsoft.

10       Have you calculated which, if any, of the relocation

11    costs were incurred as a result of Motorola sending those

12    letters?

13 A  No.

14 Q  Okay.

15 A  All those questions I can say no, but I'm comfortable in

16    the relocation costs, that they related to the decision

17    that Microsoft had to move from Germany.

18       They felt it was in their best interest, in light of

19    the litigation, to move from Germany to The Netherlands.

20 Q  Right.

21       So my question is if you've categorized any costs in

22    the specific theories of breach--

23 A  I didn't-- I'm sorry to interrupt you.

24       I didn't further delineate it.

25 Q  Okay.  And is the same true with respect to the two

CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

180

1    different contracts at issue, the one with the IEEE and

2    the ITU, you haven't segregated in any way the costs

3    incurred as a result of a breach of those contracts by

4    Motorola?

5  A    That's correct.

6                    MS. ROBERTS:  Okay.  I don't have any

7    further questions for you, Mr. Menenberg.  Thank you for

8    your time.

9                    VIDEOGRAPHER:  Do you have any

10   questions?

11                   MR. HARRIGAN:  No.

12                   VIDEOGRAPHER:  We are going off the

13   record at 1:43 p.m.  This is the end of Disc No. 3, and

14   this concludes this deposition for today.

15                   (Deposition concluded at 1:43 p.m.)

16                   (Signature reserved.)

17

18

19

20

21

22

23

24

25

CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

```
1    STATE OF WASHINGTON )    I, Terilynn Pritchard, RMR, CRR,.
                         ) ss CLR, a certified court reporter
2    County of Pierce    )    in the State of Washington, do
                              hereby certify:
3

4
            That the foregoing deposition of TODD D. MENENBERG
5    was taken before me and completed on June 20, 2013, and
     thereafter was transcribed under my direction; that the
6    deposition is a full, true and complete transcript of the
     testimony of said witness, including all questions, answers,
7    objections, motions and exceptions;

8           That the witness, before examination, was by me
     duly sworn to testify the truth, the whole truth, and
9    nothing but the truth, and that the witness reserved the
     right of signature;
10
            That I am not a relative, employee, attorney or
11   counsel of any party to this action or relative or employee
     of any such attorney or counsel and that I am not
12   financially interested in the said action or the outcome
     thereof;
13
            That I am herewith securely sealing the said
14   deposition and promptly delivering the same to
     Attorney Andrea Pallios Roberts.
15
            IN WITNESS WHEREOF, I have hereunto set my
16   signature on the 25th day of June, 2013.

17

18

19

20

21

22           _____
             Terilynn Pritchard, CCR, RMR, CRR, CLR
23           Certified Court Reporter No. 2047.

24

25
```

EXHIBIT

PENGAD 800-631-6989

120
MICROSOFT CONFIDENTIAL FINANCIAL INFORMATION - OUTSIDE ATTORNEYS' EYES ONLY -
SUBJECT TO PROTECTIVE ORDER

MS-MOTO_1823_0006003905A

MICROSOFT CONFIDENTIAL FINANCIAL INFORMATION - OUTSIDE ATTORNEYS' EYES ONLY -
SUBJECT TO PROTECTIVE ORDER
MS-MOTO_1823_0006003910A



MICROSOFT CONFIDENTIAL FINANCIAL INFORMATION - OUTSIDE ATTORNEYS' EYES ONLY - SUBJECT TO PROTECTIVE ORDER

MS-MOTO_1823_0006003911A



123

MICROSOFT CONFIDENTIAL FINANCIAL INFORMATION - OUTSIDE ATTORNEYS' EYES ONLY - SUBJECT TO PROTECTIVE ORDER

MS-MOTO_1823_0006003912A

124

MICROSOFT CONFIDENTIAL FINANCIAL INFORMATION - OUTSIDE ATTORNEYS' EYES ONLY -
SUBJECT TO PROTECTIVE ORDER

MICROSOFT CONFIDENTIAL FINANCIAL INFORMATION - OUTSIDE ATTORNEYS' EYES ONLY - SUBJECT TO PROTECTIVE ORDER

MS-MOTO_1823_0006003919A



126

MICROSOFT CONFIDENTIAL FINANCIAL INFORMATION - OUTSIDE ATTORNEYS' EYES ONLY -
SUBJECT TO PROTECTIVE ORDER

PENGAD 800-631-6989

Merenberg

EXHIBIT

3

6-20-13

MICROSOFT CONFIDENTIAL FINANCIAL INFORMATION
OUTSIDE ATTORNEYS' EYES ONLY - SUBJECT TO PROTECTIVE ORDER
MS-MOTO_1823_0006001488B



MICROSOFT CONFIDENTIAL FINANCIAL INFORMATION
OUTSIDE ATTORNEYS' EYES ONLY - SUBJECT TO PROTECTIVE ORDER

MS-MOTO_1823_0006001489B

MICROSOFT CONFIDENTIAL FINANCIAL INFORMATION
OUTSIDE ATTORNEYS' EYES ONLY - SUBJECT TO PROTECTIVE ORDER

MS-MOTO_1823_0006001490B



MICROSOFT CONFIDENTIAL FINANCIAL INFORMATION
OUTSIDE ATTORNEYS' EYES ONLY - SUBJECT TO PROTECTIVE ORDER

MS-MOTO_1823_0006001606B



Redacted



MICROSOFT CONFIDENTIAL FINANCIAL INFORMATION
OUTSIDE ATTORNEYS' EYES ONLY - SUBJECT TO PROTECTIVE ORDER



MICROSOFT CONFIDENTIAL FINANCIAL INFORMATION
OUTSIDE ATTORNEYS' EYES ONLY - SUBJECT TO PROTECTIVE ORDER

MS-MOTO_1823_0006002354B



MICROSOFT CONFIDENTIAL FINANCIAL INFORMATION
OUTSIDE ATTORNEYS' EYES ONLY - SUBJECT TO PROTECTIVE ORDER

MS-MOTO_1823_0006002355B



MICROSOFT CONFIDENTIAL FINANCIAL INFORMATION
OUTSIDE ATTORNEYS' EYES ONLY - SUBJECT TO PROTECTIVE ORDER

MS-MOTO_1823_0006002356B



MICROSOFT CONFIDENTIAL FINANCIAL INFORMATION
OUTSIDE ATTORNEYS' EYES ONLY - SUBJECT TO PROTECTIVE ORDER

MS-MOTO_1823_0006002500B



MICROSOFT CONFIDENTIAL FINANCIAL INFORMATION
OUTSIDE ATTORNEYS' EYES ONLY - SUBJECT TO PROTECTIVE ORDER

MS-MOTO_1823_0006002501B



137
MICROSOFT CONFIDENTIAL FINANCIAL INFORMATION
OUTSIDE ATTORNEYS' EYES ONLY - SUBJECT TO PROTECTIVE ORDER

CONFIDENTIAL FINANCIAL INFORMATION PURSUANT TO PROTECTIVE ORDER

Page 1

1                    IN THE UNITED STATES DISTRICT COURT

2                    FOR THE SOUTHERN DISTRICT OF FLORIDA

3                         Case No. 1:10-CV-24063

4

5     MOTOROLA MOBILITY, INC.,

6          Plaintiff,

7     vs.

8     MICROSOFT CORPORATION,

9             Defendant.

10    -----------------------------/
      MICROSOFT CORPORATION,
11

12         Counterclaim Plaintiff,

13    vs.

14    MOTOROLA MOBILITY, INC.,

15         Counterclaim Defendant.

16    -----------------------------/

17                  CONFIDENTIAL FINANCIAL INFORMATION

18                  PURSUANT TO PROTECTIVE ORDER

19       VIDEOTAPED DEPOSITION OF MATTHEW R. LYNDE, Ph.D.

20                   East Palo Alto, California

21                   Thursday, July 21, 2011

22

23    Reported by:

24    LORRIE L. MARCHANT, CSR No. 10523, RPR, CRR, CCRR, CLR

25    JOB NO. 40487

EXHIBIT
6
Mesenberg

138

CONFIDENTIAL FINANCIAL INFORMATION PURSUANT TO PROTECTIVE ORDER

Page 2

```
 1                    July 21, 2011

 2                    9:01 a.m.

 3

 4          Videotaped deposition of MATTHEW R.

 5          LYNDE, Ph.D., held at the offices of

 6          Ropes & Gray, 1900 University Avenue,

 7          6th Floor, East Palo Alto, California,

 8          before Lorrie L. Marchant, a Certified

 9          Shorthand Reporter, Registered

10          Professional Reporter, Certified

11          Realtime Reporter, California

12          Certified Realtime Reporter and

13          Certified LiveNote Reporter.

14

15

16

17

18

19

20

21

22

23

24

25
```

139

# EXHIBIT C

CONFIDENTIAL

Page 1

1            IN THE UNITED STATES DISTRICT COURT

2          FOR THE WESTERN DISTRICT OF WASHINGTON

3

4                        AT SEATTLE

5

6

7

8      MICROSOFT CORPORATION, a              )

9      Washington corporation,              )

10                                          )

11                  Plaintiff,              )

12                                          ) No. 2-10-cv-

13                vs.                       ) 01823-JLR

14                                          )

15     MOTOROLA, INC., and MOTOROLA         )

16     MOBILITY, INC.,                      )

17                                          )

18                  Defendants.             )

19

20

21        VIDEOTAPED 30(b)(6) DEPOSITION OF DAVID KILLOUGH

22

23                      May 6, 2013

24

25      Job No. CS1661676     Seattle, Washington

CONFIDENTIAL

Page 49

1      these different responsibilities?

2   A  I personally am not aware of anything like that,

3      other than the -- as would be reflected in the

4      billings.

5   Q  So if you wanted to figure that out, you would have

6      to -- you would look at the invoices and try to

7      figure it out, or ask your counsel?

8   A  One of those two things.

9   Q  Okay.

10  A  That's -- that's what I would do, is either look at

11     the billings and determine it for myself or ask

12     outside counsel to give me the information.

13  Q  Got it.

14        And then was work performed -- let me start over.

15        Was Sidley's work on Motorola's affirmative

16     claims in the 699 action and Sidley's work on

17     Microsoft's counterclaims in the 699 action, was that

18     billed to different matter numbers or other- --

19     otherwise segregated in bills?

20  A  The -- you know, for a considerable time -- you know,

21     in excess of a year, I think -- all of the Sidley

22     work was billed to a single matter regardless of --

23     you know, a single internal billing matter at

24     Microsoft and was not divided out between, you know,

25     Florida or the ITC or Wisconsin.  It was all billed

CONFIDENTIAL

Page 50

1      to the same matter for some long period of time; in

2      excess of a year.

3          And then later, it was broken down to different

4      matters.  I can't remember, you know, how many

5      different matters.

6   Q  I -- I've seen some Sidley bills that say "Cell Phone

7      Patents" on them in the re: line on the first --

8      first page, as opposed to Motorola RAND 1823 case or

9      ITC 752 investigation.

10          The ones labeled "Cell Phone Patents," is that

11      what you're referring to as everything being billed

12      in one matter?

13   A  I wouldn't know without looking.

14   Q  Okay.  We'll -- we'll take a look at one of those in

15      a bit.

16          So just to make sure I understand, though, you

17      said for a period of about a year, Sidley's bill --

18      Sidley's bills included all of their work on

19      Microsoft's matters versus Motorola.

20          Is that correct?

21   A  In -- yes.  In excess of a year, I said.

22   Q  Okay, in excess of a year.

23          And so that would include -- let me rephrase.

24          Would that include both work on cases where

25      Microsoft was a plaintiff and cases where Motorola

CONFIDENTIAL

Page 51

1       was a plaintiff?

2   A   Right.

3   Q   Okay.  And would that include work on affirmative

4       claims and counterclaims?

5   A   Right.

6   Q   And was there any procedure for differentiating the

7       work in -- in the bills that you received to

8       designate which matter or which claims the work

9       related to?

10  A   Nothing that I would categorize as procedural.  You

11      know, one could tell from the matter descriptions,

12      you know, what -- you know, that's how I would

13      determine if I were attempting to determine, was by

14      looking at the matter -- by looking at the

15      description of the activity that was being billed

16      for; the line item.

17  Q   Okay.  But otherwise, that would be the only way

18      to -- to figure that out, or ask the time- --

19      timekeeper at issue?

20  A   Right.  Right.  Or -- yeah, look at the -- look at

21      the substance of the time entry, you know, ask the

22      timekeeper.  And both of those things, you know,

23      would be in the context of understanding otherwise

24      what was going on in the cases at the particular time

25      of the entry.

CONFIDENTIAL

Page 114

1      Patents."

2   Q   Do you know which case number is reflected by the

3      bills designated "RE: Cell Phone Patents"?

4   A   My -- I would -- I would expect that this would be

5      the internal Microsoft ITC 744 matter, is what I

6      would call it.  And it would be named something

7      similar to that.

8         There may have been an evolution of name for it,

9      but I think that's -- that's what I expect that this

10      one is.

11   Q   Okay.  And the ITC 744 matter, that was one initiated

12      by Microsoft against Motorola; correct?

13   A   That's correct.  And that's also the umbrella matter

14      for which, in excess of a year, Sidley was billing

15      all of their time to on Microsoft/Motorola matters

16      regardless of the court it was in or who filed the

17      case.

18   Q   Okay.  Can I ask you if there -- was there something

19      specific that you saw in Exhibit 11 that made you

20      think that this relates to the 744 matter?

21   A   Let's see.

22         Well, the December 22, 2010, was a big clue,

23      because that's really early and that's definitely

24      within the first year.  And so that -- that certainly

25      was a big clue for me.

CONFIDENTIAL

Page 119

1     allocation for that particular entry and it's

2     indicated in yellow.

3   Q   And so for that particular entry, I think -- are you

4     looking at one of the ones on November 22nd, 2010?

5   A   Right.

6   Q   So we'll take the very first one for JL Secord.

7         Am I understanding you correctly that Microsoft

8     is going to be seeking to recover 80 percent of

9     the .5 hours that Mr. or Ms. Secord billed on that

10    particular task?

11  A   Correct.

12  Q   So if you could tell me how -- how the various

13    different percentages reflected in the color

14    coding -- how Microsoft got to each one.

15  A   Yeah.  There -- there are certainly some broad

16    categories.  I think the broadest one is probably,

17    you know, the yellow one that -- that reflects the --

18    something that was done that was spread across all

19    five patents and, therefore, is allocated for, you

20    know, 80 percent, because there's four out of five

21    are standard-essential patents.

22        And so you'll probably see a lot of yellow in

23    here.  I haven't studied it to see that, but that's

24    my best guess.

25        And then at a point in time where one of

CONFIDENTIAL

Page 120

1    Motorola's patents would be essentially withdrawn, at
2    the point where Motorola filed a motion to terminate
3    in the ITC as to a particular patent or patents, then
4    it's obviously no longer in play.  So after the point
5    of the motion to terminate by Motorola as to that
6    patent, then the allocation would change.

7        And I think there were two instances where they
8    dropped patents, and they dropped two each time.  So
9    that would affect, again, an allocation for a general
10   activity that was spread across all patents at issue.
11   But if it occurred -- if it occurred after the date,
12   for example, that the -- a motion to terminate had
13   been filed by Motorola as to those patents, then
14   those would be off the table and it would change the
15   allocation.

16       And so those are some of the principles.

17       Now, some -- some of the allocations could be
18   much more fact-specific based on a particular time
19   entry, because if one could tell from the particular
20   time entry that, you know, it related to, you know, a
21   more refined allocation, if the entry was such that
22   it allowed you to allocate with a better fine point
23   than four to one, then that finer allocation would be
24   applied.

25   Q  But if the entry did not have the detail that would

CONFIDENTIAL

Page 121

1      allow you to make that finer allocation, did

2      Microsoft basically apply a general percentage rule

3      based on the patents in play at that time in the

4      case?

5  A   One of two things would happen. It would either be

6      thrown out and not requested recovery at all. If --

7      if there wasn't enough information from the entry to

8      determine, then it would just be thrown out.

9          If the entry reflected, you know -- it was

10     clearly, for example, on the ITC 752 case, if it was

11     clearly an activity that, you know, could have

12     applied across the board to all patents, then, yes,

13     you apply the general rule.

14 Q   Now, who -- who actually went through and did all the

15     allocations?

16 A   For Sidley, I believe Ellen Robbins did.

17 Q   Poor Ellen, all by herself?

18 A   That's my understanding.

19                     MS. ROBERTS: Sounds like fun.

20                     MS. ROBBINS: True.

21 Q   (By Ms. Roberts) Okay. And --

22                     MS. ROBBINS: Let's repeat that

23     "poor Ellen" part again a little louder, to make

24     sure...

25 Q   (By Ms. Roberts) So Ellen did the allocations.

Page 122

1        Who determined the -- I guess, the methodology of
2    using the percentages based on the number of patents
3    in play in the particular case at the time?
4  A  I'd say I dictated the methodology.
5  Q  Okay.  What documents did Microsoft review and rely
6    on to determine how to make specific allocations in
7    the invoices?
8  A  You know, I -- the invoices themselves, I'm sure,
9    were the principal source.  And, you know, beyond the
10    invoices themselves and determining a -- sort of a
11    historical timeline date -- for example, when did
12    Motorola file its motion to terminate as to a
13    particular patent -- I'm not aware of anything else.
14    But it's possible something else was looked at, but
15    I'm not aware of it.
16  Q  Was an -- was an actual timeline created for the
17    purposes of this allocation process, to determine
18    what you just described?
19  A  I don't know if a timeline was created or simply was
20    done from memory of the dates or -- you know, I don't
21    know either way.
22  Q  Okay.  Did Microsoft -- Microsoft speak to anyone in
23    connection with preparing the allocations?
24  A  In actually executing the allocations, I don't know
25    that Ms. Robbins spoke to anyone about it, in

CONFIDENTIAL

Page 123

1       actually executing them.  I don't know.

2   Q   Did Microsoft speak to any of the specific

3       timekeepers on the invoices to ask them about certain

4       entries?

5   A   I don't know one way or the other.

6   Q   Do you know if there are any -- well, let's see.

7           Did any of the timekeepers at Sidley -- well, let

8       me start over.

9           Earlier today, you indicated that you thought

10      there were sort of buckets of people at Sidley that

11      might have worked on H.264 patents and 802.11 patents

12      and then, you know, perhaps some of the counterclaim

13      patents.

14          Is that right?

15  A   There certainly were, you know, groups, possibly some

16      overlap, but -- but largely segregated between, you

17      know, folks that were working on H.264 and folks that

18      were working on 802.11.  There are probably core

19      groups that spent a lot of time doing those things.

20          They also did other things in the cases, but as

21      to those two topics, I do remember, you know, there

22      were sort of core teams addressing those.

23  Q   Okay.  But then there was also overlap between those

24      core members and other tasks on the cases; right?

25  A   Yes.

CONFIDENTIAL

Page 125

1    allocated?

2    A    I'm unaware of whether or not that happened.

3    Q    How long did the process of preparing the

4         allocations, the color-coded allocations -- examples

5         of which are in Exhibits 9, 10, and 11 -- take?

6    A    As best as I can recall, weeks.  I couldn't pin it

7         down better than that.

8             When I say "weeks," I don't just mean two.  I

9         think quite some -- quite some time, but I can't -- I

10        can't pin it down better than that.

11            Four to eight weeks, something around that.  It's

12        hard for me to pin it down.  Seems like a lot of time

13        was spent doing it.

14   Q    Do you recall when the process of creating the

15        allocations started?

16   A    No, I don't recall exactly.  Since it just concluded,

17        you know, recently, I'd suspect within the last two

18        months.

19   Q    That it started?

20   A    Yeah, I mean, that's -- but -- you know, but again,

21        there may be something that would help me, you know,

22        figure that out.  Probably -- maybe some new invoices

23        that show it.

24   Q    The Court held a hearing on March 14th, in which he

25        set a schedule for the case.

# EXHIBIT D

THE HONORABLE JAMES L. ROBART

1

2

3

4

5

6

7

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

8

9

MICROSOFT CORPORATION,

10                              Plaintiff,

11        vs.

12   MOTOROLA, INC.,  et al.,

13                              Defendants.

14   MOTOROLA MOBILITY LLC, et al.,

15                              Plaintiffs,

16

17        vs.

18   MICROSOFT CORPORATION,

                                Defendants.

Case No. C10-1823-JLR

DEFENDANT MOTOROLA
MOBILITY, INC.'S FIRST SET OF
INTERROGATORIES AND
REQUESTS FOR PRODUCTION TO
PLAINTIFF MICROSOFT
CORPORATION **AND
MICROSOFT CORPORATION'S
*APRIL 3, 2013 SUPPLEMENTAL*
OBJECTIONS, ANSWERS, AND
RESPONSES THERETO**

19

20   **MICROSOFT CORPORATION'S *APRIL 3, 2013 SUPPLEMENTAL* OBJECTIONS,
     ANSWERS, AND RESPONSES TO MOTOROLA MOBILITY, INC.'S
     FIRST SET OF INTERROGATORIES AND REQUESTS FOR PRODUCTION**

21

22        Pursuant to Fed. R. Civ. P. 26, 33, and 34 and all applicable Local Rules, Microsoft

23   Corporation ("Microsoft") hereby submits the following answers, responses,  and objections to

24   Motorola Mobility, Inc.'s ("Defendant's" or "Motorola's") First Set of Interrogatories and

25   Requests for Production ("Discovery Requests").

**MICROSOFT CORPORATION'S *APRIL 3,
2013 SUPPLEMENTAL* OBJECTIONS,
ANSWERS, AND RESPONSES - 1**

LAW OFFICES
CALFO HARRIGAN LEYH & EAKES LLP
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700   FAX, (206) 623-8717

153

1   **INTERROGATORY NO. 3:**   State the factual basis for any contention underlying

2   Microsoft's claim that Motorola's October 21, 2010 and October 29, 2010 Letter constituted a

3   breach or other violation of a commitment to license patents on reasonable and non-

4   discriminatory terms.

5   **ANSWER:** Microsoft incorporates by reference each of its General Objections as

6   though set forth herein.  Microsoft further objects that this is a premature contention

7   interrogatory.  Microsoft is not obligated to respond to premature contention interrogatories

8   until the parties have substantially completed discovery.

9   Subject to and without waiving these objections, Microsoft answers that, in willful

10   disregard of the commitments Motorola made to IEEE and the ITU-T, Motorola has refused to

11   extend to Microsoft a license consistent with Motorola's promises for any of Motorola's

12   allegedly "essential" patents.  Instead, Motorola is demanding royalty payments that are wholly

13   disproportionate to the royalty that its patents should command under any reasonable calculus.

14   Motorola has discriminatorily chosen Microsoft's Xbox product line and other multi-function,

15   many-featured products and software, such as Windows 7 and Windows Phone 7 and products

16   incorporating Microsoft software, for the purpose of extracting unreasonable royalties from

17   Microsoft that are inconsistent with Motorola's obligation to offer licenses for the relevant

18   patents on RAND terms and conditions.

19   In further response, Microsoft states as follows:

20   Motorola's October 21, 2010 Letter

21   By letter to Microsoft, dated October 21, 2010, Kirk Dailey, Motorola's Corporate Vice

22   President Intellectual Property, offered to license "Motorola's portfolio of patents and pending

23   applications having claims that may be or become Essential Patent Claims (as defined in

24   section 6.1 of the IEEE bylaws) for a compliant implementation of the IEEE 802.11

25   Standards." Motorola offered to license the relevant patents under terms and conditions that

MICROSOFT CORPORATION'S *APRIL 3,*
*2013 SUPPLEMENTAL* OBJECTIONS,
ANSWERS, AND RESPONSES - 15

LAW OFFICES
**CALFO HARRIGAN LEYH & EAKES LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700   FAX, (206) 623-8717

1   included a "royalty of 2.25% per unit for each 802.11 complaint product[.]" Motorola stated

2   that the royalty "is calculated based on the price of the end product (e.g., each Xbox 360

3   product) and not on component software."

4           The cost of the chips and associated components that provide wireless connectivity for

5   Xbox 360 consoles is a small fraction of the overall cost of the device. Moreover, Microsoft

6   sells its Xbox 360 consoles at a number of prices. Each console includes approximately the

7   same chips and associated components for wireless connectivity, providing the same level of

8   relevant functionality. Motorola thus seeks a royalty on components of Xbox 360 that is

9   disproportionate to the value and contribution of its purportedly "essential" patents and has

10  declined to offer a license to its purported "essential" patents unless it receives exorbitant and

11  discriminatory royalty payments to which it is not entitled. On information and belief,

12  Motorola has not previously entered into a license agreement for its purported "essential"

13  patents that is comparable to the demand made of Microsoft. Motorola has thereby refused to

14  offer to license the patents at a reasonable rate, with reasonable terms, under conditions that are

15  demonstrably free of any unfair discrimination.

16          The royalty demanded by Motorola falls well outside the boundaries of a reasonable

17  and non-discriminatory royalty and therefore violates the commitment Motorola made to the

18  IEEE and its members.

19          Participants in IEEE-SA standards setting efforts, including those directed to WLAN

20  technology, were subject to the IEEE-SA Standard Board Bylaws concerning the submission

21  of Letters of Assurance related to patent claims deemed "essential" by a submitting party.

22  Clause 6 of those Bylaws (which was revised slightly over the years) generally provides in

23  pertinent part:

24          A Letter of Assurance shall be either:

25

MICROSOFT CORPORATION'S *APRIL 3,*
*2013 SUPPLEMENTAL* OBJECTIONS,
ANSWERS, AND RESPONSES - 16

LAW OFFICES
CALFO HARRIGAN LEYH & EAKES LLP
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700   FAX, (206) 623-8717

a) A general disclaimer to the effect that the submitter without conditions will not enforce any present or future Essential Patent Claims against any person or entity making, using, selling, offering to sell, importing, distributing, or implementing a compliant implementation of the standard; or

b) A statement that a license for a compliant implementation of the standard will be made available to an unrestricted number of applicants on a worldwide basis without compensation or under reasonable rates, with reasonable terms and conditions that are demonstrably free of any unfair discrimination.

Motorola openly and publicly submitted Letters of Assurance pursuant to Clause 6 of the IEEE-SA Standards Board Bylaws that it would offer to license any of its patents essential to the applicable WLAN standard(s) to any entity under reasonable rates on a non-discriminatory basis.  IEEE-SA and its participants and affiliates relied on Motorola's promises in developing, adopting and implementing IEEE-SA technical standards.  These standards are now implemented worldwide in a variety of electronic devices that have become commonplace.

Microsoft invested substantial resources in developing and marketing products in compliance with these standards, relying on the assurances of participating patent holders – including Motorola – that any essential patents held by such patent holders would be available for licensing by implementers of the standards on such terms.

By way of non-limiting example, each Xbox device includes substantial software and many computer chips and modules that perform various functions, including enabling Xbox's core functionality as a video gaming machine.  Of those, the Xbox console includes one – an interface provided to Microsoft by third-parties – that allows consumers optionally to connect an Xbox to the Internet using a WLAN connection.

The third-party WLAN interface does not enable any of Xbox's core video gaming functionality.  In addition, Microsoft allows consumers an alternative, wired method to connect to the Internet.  This alternative method does not require use of any WLAN technology.

**MICROSOFT CORPORATION'S** *APRIL 3,*
*2013 SUPPLEMENTAL* **OBJECTIONS,**
**ANSWERS, AND RESPONSES - 17**

LAW OFFICES
CALFO HARRIGAN LEYH & EAKES LLP
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700   FAX, (206) 623-8717

1      On information and belief, Motorola obtained rights to several of the WLAN patents it

2  has represented as "essential" through its recent acquisition of Symbol Technologies, Inc.

3  ("Symbol").

4      Prior to the releases of the 802.11 protocols, Motorola and Symbol submitted Letters of

5  Assurance to the IEEE pursuant to Clause 6 of the IEEE-SA Standards Board Bylaws with

6  respect to those protocols, guaranteeing that any "essential" patents would be licensed under

7  reasonable and non-discriminatory terms and conditions.  Both Motorola's and Symbol's

8  Letters of Assurance apply to any "essential" patents they then held as well as any other

9  "essential" patents they subsequently obtained.

10     In reliance on these letters of assurance, IEEE released the 802.11 standard and various

11  amendments to that standard that Motorola asserts incorporated Motorola's and Symbol's

12  patented technology.  On information and belief, once Motorola and Symbol disclosed that

13  they likely held essential patents, absent a licensing commitment from them to the effect that

14  they would offer licenses to "essential" patents on reasonable and non-discriminatory terms

15  and conditions, the relevant IEEE working groups would have either revised the standards,

16  employing alternative technologies instead, stopped working on the protocols or taken other

17  actions.

18     In submitting its Letter of Assurance pursuant to the applicable IEEE IPR policy,

19  Motorola entered into an actual or implied contract with IEEE, for the benefit of IEEE

20  members and any entity that implements the 802.11 standard.  Motorola is bound by its

21  agreements to offer licenses consistent with the referenced IEEE bylaws.

22     Similarly, Symbol, in submitting its Letter of Assurance pursuant to the applicable

23  IEEE IPR policy, entered into an actual or implied contract with IEEE, for the benefit of IEEE

24  members and any other entity that implements the 802.11 standard, and Motorola is bound by

25  that commitment.

**MICROSOFT CORPORATION'S** *APRIL 3,*
*2013 SUPPLEMENTAL* **OBJECTIONS,**
**ANSWERS, AND RESPONSES - 18**

LAW OFFICES
**CALFO HARRIGAN LEYH & EAKES LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700   FAX, (206) 623-8717

157

1    Motorola broke its promise to IEEE-SA and its members and affiliates by refusing to

2    offer to Microsoft a license that is consistent with Motorola's Letter(s) of Assurance and

3    Clause 6 of the IEEE-SA Standards Board Bylaws, instead demanding royalties that are

4    excessive and discriminatory.

5    Motorola's October 29, 2010 Letter

6    By letter to Microsoft, dated October 29, 2010, Kirk Dailey, Motorola's Corporate Vice

7    President Intellectual Property, offered to license "Motorola's portfolio of patents and pending

8    applications covering the subject matter of ITU-T Recommendation H.264[.]"  Motorola

9    offered to license the relevant patents under terms and conditions that included a "royalty of

10   2.25% per unit for each H.264 complaint product[.]"  Motorola stated that the royalty "is

11   calculated based on the price of the end product (e.g., each Xbox 360 product, each PC/laptop,

12   each smartphone, etc.) and not on component software (e.g., Xbox 360 system software,

13   Windows 7 software, Windows Phone 7 software, etc.)."

14   The cost of such component software and any inter-related hardware is a small fraction

15   of the overall cost of the listed devices.  Moreover, Microsoft sells products having H.264

16   related capabilities at a wide range of prices, without regard to the significance of such H.264

17   related capabilities to the primary or expected use of the products.  Motorola thus seeks a

18   royalty on software and hardware components of Xbox 360 and other devices that are

19   unrelated to its identified patents and has declined to offer a license unless it receives

20   exorbitant royalty payments to which it is not entitled.  On information and belief, Motorola

21   has not previously entered into a license agreement for its identified patents that is comparable

22   to the demand made of Microsoft.  Motorola has thereby refused to offer to license the patents

23   at a reasonable rate, with reasonable terms, on a non-discriminatory basis.

24

25

**MICROSOFT CORPORATION'S** *APRIL 3,*
*2013 SUPPLEMENTAL* **OBJECTIONS,**
**ANSWERS, AND RESPONSES - 19**

LAW OFFICES
CALFO HARRIGAN LEYH & EAKES LLP
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700   FAX, (206) 623-8717

1     The royalty demanded by Motorola falls well outside the boundaries of a reasonable

2   and non-discriminatory royalty and therefore violates the commitment Motorola made to the

3   ITU and its members.

4     Participants in ITU-T standards setting efforts, including those directed to H.264

5   technology, were subject to the ITU-T Common Patent Policy concerning the submission of

6   Patent Statement and Licensing Declarations related to patents identified by a submitting party.

7   The ITU-T Common Patent Policy generally provides, in pertinent part, that a patent holder's

8   statement may declare that:

9        (2.1) The patent holder is willing to negotiate licenses free of charge with other
         parties on a non-discriminatory basis on reasonable terms and conditions.
10

11       (2.2) The patent holder is willing to negotiate licenses with other parties on a
         non-discriminatory basis on reasonable terms and conditions.

12     Motorola openly and publicly submitted Patent Statement and Licensing Declarations

13  pursuant to the ITU-T's Common Patent Policy that it would offer to license any of its patents

14  essential for the relevant H.264 Recommendation(s) to any entity under reasonable rates on a

15  non-discriminatory basis.  The ITU-T and its participants and affiliates relied on Motorola's

16  promises in developing, adopting and implementing the ITU-T H.264 Recommendations (or

17  standards).  These standards are now implemented worldwide in a variety of electronic devices

18  and software that have become commonplace.  Microsoft invested substantial resources in

19  developing and marketing products in compliance with these standards, relying on the

20  assurances of participating patent holders – including Motorola – that any "essential" patents

21  held by such patent holders would be available for licensing by implementers of the standards

22  on such terms.

23     In submitting its Patent Statement and Licensing Declarations pursuant to the

24  applicable ITU-T policy, Motorola entered into an actual or implied contract with the ITU-T,

25

**MICROSOFT CORPORATION'S *APRIL 3,
2013 SUPPLEMENTAL* OBJECTIONS,
ANSWERS, AND RESPONSES - 20**

LAW OFFICES
**CALFO HARRIGAN LEYH & EAKES LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700   FAX, (206) 623-8717

159

1   for the benefit of ITU-T members and any entity that implements the H.264 technologies.

2   Motorola is bound by its agreements to offer licenses consistent with the referenced ITU-T

3   Common Patent Policy.

4          Microsoft has participated in the development of the 802.11 and H.264 standards.

5   Microsoft and other companies participating in the development of these standards relied on

6   Motorola's commitments to ensure that the royalties Motorola would seek would conform to

7   the promises made by Motorola.

8          In reliance on the integrity of the SDO process and the commitments made by Motorola

9   and others regarding 802.11 patents they deem "essential," Microsoft began providing its Xbox

10  video game consoles with WLAN connectivity.  By way of example, Microsoft purchased and

11  incorporated into its Xbox 360 video game consoles third-party-manufactured interfaces that

12  provide Xbox 360 devices with WLAN connectivity.  Microsoft made its decision to provide

13  its Xbox video game consoles with WLAN connectivity in reliance on, and under the

14  assumption that, it and/or any third party supplier could avoid patent litigation and take a

15  license to "essential" patents that Motorola, or any other company submitting a Letter of

16  Assurance, holds with regard to the WLAN standard under IEEE's well publicized IPR policy.

17         Microsoft and other manufacturers of WLAN-compliant devices necessarily relied on

18  the assurances of participating patent holders – including Motorola – that any "essential"

19  patents held by such patent holders would be available for licensing by implementers of the

20  standards on such terms.

21         Correspondingly, in reliance on the integrity of the SDO process and specifically the

22  commitments made by Motorola and others regarding patents related to H.264 technologies,

23  Microsoft began providing its H.264 technology capability in its Xbox video game consoles.

24  Microsoft made its decision to provide its Xbox video game consoles with H.264 technology in

25  reliance on, and under the assumption that, it and/or any third party supplier could avoid patent

**MICROSOFT CORPORATION'S** *APRIL 3,*
*2013 SUPPLEMENTAL* **OBJECTIONS,**
**ANSWERS, AND RESPONSES** - 21

LAW OFFICES
**CALFO HARRIGAN LEYH & EAKES LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700   FAX, (206) 623-8717

1   litigation and take a license to any "essential" patents held by Motorola, or any other company

2   submitting a Patent Statement and Licensing Declaration, under the ITU-T's well-publicized

3   IPR policy.

4          Microsoft made similar investments in other fields, including Windows 7 and Windows

5   Phone 7, based upon Motorola's representations in relation to the H.264 technology standards.

6   Microsoft and other manufacturers and suppliers of H.264 compliant technology necessarily

7   relied on the commitments of Motorola and others to license their "essential" patents under

8   these terms.

9          By way of non-limiting example, each personal computer running Windows 7 includes

10  substantial software and many computer chips and modules that perform various functions,

11  including those related to the general operation of a computing device.  Of those, each personal

12  computer includes just a portion directed to H.264 technologies.

13         By way of further non-limiting example, each smartphone running Windows Phone 7

14  includes substantial software and many computer chips and modules that perform various

15  functions, including those related to the general and particularized operation of a smartphone

16  independent of H.264 technology.  Of those, each smartphone includes just a portion directed

17  to H.264 technologies.

18         Motorola broke its promise to the ITU-T and its members and affiliates by refusing to

19  offer to Microsoft a license that is consistent with Motorola's Patent Statement and Licensing

20  Declaration(s) and the Common Patent Policy of the ITU-T, instead demanding royalties that

21  are excessive and discriminatory.

22                    **SUPPLEMENTAL RESPONSE OF APRIL 3, 2013:**

23         Motorola committed to license its standard essential patents on RAND terms.  This

24  meant that Motorola had to make a license available to any implementer of the standards.

25

**MICROSOFT CORPORATION'S *APRIL 3,
2013 SUPPLEMENTAL* OBJECTIONS,
ANSWERS, AND RESPONSES - 22**

LAW OFFICES
CALFO HARRIGAN LEYH & EAKES LLP
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700   FAX, (206) 623-8717

1   Offers made to prospective licensees had to be commercially reasonable.  Motorola could not

2   seek injunctive relief instead of entering into a license on RAND terms, especially in

3   circumstances where its license offers were not commercially reasonable.  In addition,

4   Motorola was subject to a duty of good faith and fair dealing in licensing and offering to

5   license its standard essential patents.

6       As a consequence of these contractual obligations undertaken by Motorola, Motorola

7   breached its RAND commitments in at least the following respects.  Motorola's breach is not

8   limited to the October 2010 demand letters.

- Motorola's October 2010 demand letters did not offer licenses to Microsoft on RAND terms, and, to the contrary, were commercially unreasonable and facially outrageous; Motorola improperly sought the holdup value of its patents rather than their RAND value and improperly sought a royalty on the entire market value of products, which included many components and features for which Motorola was not entitled to any compensation.

- Motorola improperly sought injunctive relief in the ITC, the district courts and Germany instead of honoring its commitment to make licenses available on RAND terms.  Repeated judicial and administrative rulings specific to Motorola have confirmed that its pursuit of injunctive relief was improper, including Judge Posner's June 22, 2012 determination that Motorola could not obtain injunctive relief on its 802.11 standard-essential patents; the Court's November 29, 2012 order enjoining Motorola from seeking injunctive relief against Microsoft with respect to Motorola's H.264 and 802.11 standard essential patent portfolios; and the January 3, 2013 FTC consent order prohibiting Google and Motorola from obtaining or enforcing injunctive relief on standard-essential patents during the pendency of district court's resolution of a request for a RAND determination.  As the FTC explained, the consent order barring Motorola from pursuing injunctive relief targeted "breaches by Google and its subsidiary [Motorola] of Motorola's commitments to license standard-essential patents ('SEPs') on terms that are fair, reasonable and non-discriminatory ('FRAND')."  Statement of the Federal Trade Commission, *In the Matter of Google Inc.,* FTC File No. 121-0120 (Jan. 3, 2013).

- Motorola declined to offer a license to Microsoft's chip supplier Marvell (which requested a license for the specific benefit of Microsoft) on RAND terms that would cover product shipped to Microsoft and acted in a way that was both unreasonable and discriminatory.

**MICROSOFT CORPORATION'S *APRIL 3,*
*2013 SUPPLEMENTAL* OBJECTIONS,
ANSWERS, AND RESPONSES - 23**

LAW OFFICES
**CALFO HARRIGAN LEYH & EAKES LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700   FAX, (206) 623-8717

162

- Once Motorola was acquired by Google and Microsoft had a right to a license to Motorola's H.264 standard essential patents by virtue of Google's participation in the MPEG-LA AVC pool, Motorola refused to grant a license on those terms, which would have complied with the RAND commitment.

- Motorola violated the covenant of good faith and fair dealing by reason of all of the actions recited above, whether considered separately or collectively, on an objective standard.

- Motorola also violated the covenant of good faith and fair dealing because it knew it was acting, and intended to act, inconsistently with the covenant of good faith and fair dealing by virtue of the actions recited above and the following additional indicia of intent:

    o Motorola's objective from the beginning was to secure crippling injunctive relief in some forum so that Microsoft would be deterred from seeking compensation for Motorola's infringement of Microsoft's non standard essential patents in Motorola's Android phones. Motorola's demand letters in October 2010 were intended to set forth offers that it knew no reasonable company would accept.

    o In furtherance of the pursuit of injunctive relief, Motorola stated that the offers in the demand letters would remain open for only 20 days.

    o At the time that the demand letters were sent, Motorola had never entered into a license with anyone for its H.264 or 802.11 standard essential patents that was remotely comparable to the terms of the demand letter

    o Motorola understood the financial implications of the demand letter, including that it would be compensated for components and features as to which it had no patents.

    o Motorola sought injunctions knowing that the terms in its October 2010 demand letters would be unacceptable to Microsoft and would not be accepted.

    o Motorola demanded that Marvell pay royalties on the end product sales of its downstream customers even though no one had ever agreed to pay royalties to Motorola on this basis.

    o Motorola discriminated against Marvell and Microsoft by excluding chips sold to Microsoft from the license offered to Marvell.

**MICROSOFT CORPORATION'S** *APRIL 3,*
*2013 SUPPLEMENTAL* **OBJECTIONS,**
**ANSWERS, AND RESPONSES - 24**

LAW OFFICES
**CALFO HARRIGAN LEYH & EAKES LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700   FAX, (206) 623-8717

163

o   Motorola in league with its parent company Google evaded the
requirements of the MPEG-LA AVC pool agreement.

**INTERROGATORY NO. 4:**  State the factual basis for any contention that Microsoft
suffered damage to its business or property, or was irreparably injured, by reason of the
October 21, 2010 Letter and/or October 29, 2010 Letter.

**ANSWER:**  Microsoft incorporates by reference each of its General Objections as
though set forth herein.  Microsoft further objects that this is a premature contention
interrogatory.  Microsoft is not obligated to respond to premature contention interrogatories
until the parties have substantially completed discovery.

Subject to and without waiving the foregoing objections, Microsoft answers that it has
suffered damage because, and to the extent that, Microsoft and its employees have been forced
to expend a significant amount of time, money and resources on issues relating to this dispute
and the Motorola Patent Actions.  But for Motorola's failure to offer Microsoft licenses to
those patents Motorola alleges are "essential" to implementation of the H.264 and 802.11
standards on RAND terms and conditions, Microsoft would not have incurred these costs,
expenses or losses of productivity.  It will be difficult, if not impossible, for Microsoft to
recoup this lost time and productivity, and Microsoft's losses will continue until Motorola
complies with the contractual commitments it made to the IEEE, ITU, and their members.
Microsoft has also been damaged as a result of having to defend the Motorola Patent Actions,
in which Motorola seeks to enjoin or exclude Microsoft from practicing, or importing products
that practice, the 802.11 and H.264 standards.  Further, Microsoft may also suffer imminent
loss of profits, loss of customers and potential customers, and loss of goodwill and product
image as a result of Motorola's refusal to offer licenses to the relevant technologies on fair and
reasonable terms.

MICROSOFT CORPORATION'S *APRIL 3,
2013 SUPPLEMENTAL* OBJECTIONS,
ANSWERS, AND RESPONSES - 25

LAW OFFICES
CALFO HARRIGAN LEYH & EAKES LLP
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700   FAX, (206) 623-8717

164

1   license had been available at that time, Microsoft would not have incurred any further damage

2   by failure of Motorola to make available a license on RAND terms for its 802.11 patents.

3          On May 22, 2012, Motorola was acquired by Google, and Microsoft was entitled to a

4   license to Motorola's H.264 patents under the terms of Google's license agreement with

5   MPEG-LA on terms set forth in the pool license.  Motorola failed to make available a license

6   on those terms.  If the license had been available at that time, Microsoft would not have

7   incurred any further damage by failure of Motorola to make available a license on RAND

8   terms for its H.264 patents.

9          SUPPLEMENTAL OBJECTIONS, ANSWERS, AND RESPONSES DATED this 3rd

10  day of April, 2013.

11         DATED this 3rd day of April, 2012.

12             CALFO HARRIGAN LEYH & EAKES LLP

13

14             By   s/ Christopher Wion
                   Arthur W. Harrigan, Jr., WSBA #1751

15                 Christopher Wion, WSBA #33207
                   Shane P. Cramer, WSBA #35099

16                 999 Third Avenue, Suite 4400
                   Seattle, WA  98104

17                 Phone: 206-623-1700
                   arthurh@calfoharrigan.com

18                 chrisw@calfoharrigan.com
                   shanec@calfoharrigan.com

19

20                 T. Andrew Culbert
                   David E. Killough

21                 MICROSOFT CORPORATION
                   1 Microsoft Way

22                 Redmond, WA  98052
                   Phone:  425-882-8080

23                 Fax: 425-869-1327

24

25

**MICROSOFT CORPORATION'S** *APRIL 3,*
*2013 SUPPLEMENTAL* **OBJECTIONS,**
**ANSWERS, AND RESPONSES - 28**

LAW OFFICES
**CALFO HARRIGAN LEYH & EAKES LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700   FAX, (206) 623-8717