# EXHIBIT 1

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| MICROSOFT CORPORATION, a Washington corporation,<br><br>Plaintiff,<br><br>v.<br><br>MOTOROLA, INC., and MOTOROLA MOBILITY LLC, and GENERAL INSTRUMENT CORPORATION,<br><br>Defendants. | CASE NO. C10-1823-JLR |
| MOTOROLA MOBILITY LLC, and GENERAL INSTRUMENT CORPORATION,<br><br>Plaintiffs/Counterclaim Defendant,<br><br>v.<br><br>MICROSOFT CORPORATION,<br><br>Defendant/Counterclaim Plaintiff. | |

**EXPERT REPORT OF RICHARD J. HOLLEMAN**

**MAY 29, 2013**

**[CORRECTED June 17, 2013]**

Richard J. Holleman

CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER

## I.    INTRODUCTION, BACKGROUND AND COMPENSATION

1.       My name is Richard J. Holleman.  I have been retained by Defendants Motorola

Mobility, Inc., Motorola Solutions, Inc., and General Instrument Corp. (collectively "Motorola")

as an expert in this case.  I have been asked by counsel for Motorola to offer my expert opinion

concerning the policies of standard setting organizations, in particular relating to licensing of

standards-essential patents on reasonable and non-discriminatory (i.e., "RAND") terms.

2.       I am being compensated at my standard consulting rate of $600 per hour for my

work in this matter.  My fee is not contingent on the outcome in this matter.

## II.    QUALIFICATIONS AND EXPERIENCE

3.       My CV is attached as Attachment A.

4.       I graduated from the United States Military Academy, West Point, NY with a BS

in Engineering in 1960. After serving three years in the U.S. Army, I started my career at IBM in

1963, where I worked until July 2000.  While at IBM, I held various positions including Program

Director of Standards Relations (1977-1989), Director of Standards Practices (1989-1998), and

Director of Standards, Intellectual Property and Licensing, Corporate Staff (March 1998-July

2000).

5.       During the 1980s and 1990s, I was IBM's representative to various national and

international standards organizations and committees including American National Standards

Institute ("ANSI"), the Institute of Electrical and Electronics Engineers ("IEEE"), and the

International Telecommunication Union ("ITU").  I have also been an active participant in the

Internet Engineering Task Force ("IETF"), the Telecommunications Industry Association

("TIA"), the Asynchronous Transfer Mode Forum ("ATM"), the World Wide Web Consortium

("W3C"), and other technology-related groups.  During this period, I was responsible for IBM's

**CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER**

intellectual property rights/standards, negotiations in standards consortia and special interest groups worldwide.  I also attended a few of the early European Telecommunications Standards Institute ("ETSI") General Assembly meetings, including the first ETSI General Assembly meeting in 1988.

6.    I joined the IEEE in January 1991 and participated actively in that organization until January 2006. During this time, I served in a variety of capacities including the following:

- Chairman, IEEE Standards Board Patent Committee (1/94-12/97)

- Standards Board member (1993-95)

- Vice Chairman, IEEE-SA Standards Board (1998)

- Chairman, IEEE-SA Standards Board (1/98-12/99)

- IEEE-SA Board of Governors (1/98-12/01)

- IEEE-SA Representative to IEEE Finance Committee (1/98-12/02)

- Board Chairman, IEEE-Industry Standards and Technology Organization (1/99-6/00)

- IEEE-SA Treasurer (1/02-12/02)

- IEEE-SA Past Standards Board Chairman (1/04-1/05)

7.    The IEEE-SA Standards Board is responsible for encouraging and coordinating the development of IEEE standards, which includes the review of all proposed standards to determine conformance with established requirements and whether consensus has been achieved for approval as an IEEE standard.  As Chairman of the IEEE-SA Standards Board from 1998 through 1999, my responsibility was to oversee the operations of the Standards Board and to ensure that it met its responsibilities in a timely and efficient manner.

8.    From January to May 2003, I served as President and CEO of the Institute of Electrical and Electronic Engineers-Industry Standards and Technology Organization

**CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER**

(IEEEISTO), which provided executive leadership and general management of ISTO business activities.

9.     Since February 2006, I have been employed on a part-time basis as President of SD-3C, LLC, a company that licenses technology for the manufacture and sale of secure digital memory cards.

10.     For about the last twelve years, I have served as a consultant and/or expert witness in more than a dozen activities – including several patent-related matters – concerning industry standardization and standards participation and processes.  In the last seven years, I have provided written or oral testimony in a number of cases involving issues relating to standard activities.  I have also provided written comments and oral testimony for hearings held jointly by the U.S. Department of Justice and the Federal Trade Commission regarding Competition and Intellectual Property in the area of standards setting activities.

11.     I have been an active participant in ANSI's patent policy committee activities.  I was directly involved in the drafting of the initial ANSI patent policy Guidelines as well as in subsequent reconsideration of those Guidelines.  Issues addressed during the time I have served on ANSI's patent committee include ANSI's patent disclosure policy.  I was a member of official U.S. government delegations to international conferences.  I have often served as lead industry advisor to the U.S. State Department on telecommunications standards before the ITU.

12.     I participated as a panelist in the DOJ/FTC hearings on the Implications of Competition and Patent Law and Policy, and in the George Washington University Law School symposium on standards.  I have also been an invited speaker on patent-related standards and licensing issues at the Licensing Executives Seminar, the American Intellectual Property Law

**CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER**

Association, the Intellectual Property Owners Association, the Tilburg Law and Economics Center, and other similar events.

## III.    MATERIALS AND DOCUMENTS REVIEWED

13.    As part of my analysis I have considered numerous documents and other information, including the documents listed in Attachment B.  However, my study of documents and materials relevant to this matter is ongoing.

14.    I reserve the right to supplement this report with any opinions I reach after further study, particularly if new or additional relevant information becomes available.

## IV.    SUMMARY OF OPINIONS

15.    Based on my extensive first-hand knowledge and experience with the intellectual property policies of communications and information technology SDOs including ETSI, IEEE, TIA and ITU, my experience as IBM's Director of Standards for Intellectual Property and Licensing, my understanding of the factors that SDOs consider when establishing and implementing a patent policy, my review of relevant ITU  and IEEE documents, and other related information concerning this matter, I reach the following conclusions:

- SDOs, including the ITU and IEEE, are voluntary organizations.

- SDOs, including the ITU and IEEE recognize the rights of patent holders, including the right to be fairly compensated for the use of patented technology in standards.

- The policies of the ITU and IEEE request assurances or undertakings that patent holders are willing to license standard essential patents on reasonable and non-discriminatory ("RAND") terms.  Submissions of RAND undertakings or RAND assurances by patent holders are made on a voluntary basis.

- The assurance to an SDO of a willingness to license is not intended to become the license itself.

- The policies of the ITU and IEEE do not dictate "RAND terms," and there is no one definition of "RAND terms."  RAND is generally arrived at through negotiations between the parties to that specific license agreement.  Nothing in the SDO patent

**CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER**

policies dictates that a single royalty rate apply in all situations for all implementers and infringers.

- If negotiations fail to result in a license agreement, this does not preclude the essential patent-holder from seeking to enforce its essential patents, or from seeking any remedies available to it under the patent laws, including injunctive relief.

  o SDOs encourage and expect negotiation between patent holders and potential licensees and take no position on what terms and conditions are or are not RAND. SDOs recognize that relationships between patent holders and potential licensees are unique, and terms that may be relevant for one relationship may not be relevant for another. Therefore, SDOs encourage negotiations between patent holders and potential licensees to arrive at reasonable licensing terms that are appropriate between a particular licensor and potential licensee.

  o It is my opinion, based on the testimony of Motorola witness Kirk Dailey and my knowledge of Motorola's licensing practices, that Motorola's letters to Microsoft (the October 21 Letter and the October 29 Letter) constituted Motorola's good-faith attempt to engage Microsoft in a licensing negotiation. It is also my understanding that Microsoft did not respond to Motorola's Letters to Microsoft prior to bringing this lawsuit.

- Not all participants in the standards development process are also implementers of the standard. SDO policies are designed to strike a balance between participants in the standards development process who contribute patented technology to the standard, as well as those who implement the standard. This is because SDOs recognize that not all participants will also be implementers, and that any patent policy must account for the fact that many patent holders will only contribute their patented technology if they know that they are able to receive a reasonable return on their R&D investments. For these reasons, from the perspective of the SDO policies, there is no reason to conclude that a RAND royalty rate must be a small amount.

## V.   STANDARDS DEVELOPMENT ORGANIZATION PATENT POLICIES, INCLUDING THE POLICIES OF THE ITU AND IEEE

16.     Standards Development Organizations ("SDOs") are voluntary organizations. There are SDOs whose participants engage in the development of communication and information technology standards. The ITU and IEEE are examples of SDOs.

17.     An important goal of many SDOs, including the ITU and IEEE, is to approve, publish, and promote standards which incorporate the best technology available, regardless of whether those standards include the use of known patents. SDOs like IEEE and the ITU are

**CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER**

consensus building organizations which develop and advance global technologies through their international standards activities.  They bring together individuals and organizations from a wide range of technical and geographic points of origin to facilitate standards development and standards related collaboration.  Standards provide specifications for features and functions that enable advanced capabilities and interoperability across a wide range of products and services.  For example, in the telecommunications industry, standards from IEEE and the ITU have been applied to cell phone technologies.

18.     SDO rules and procedures govern the standards development processes and provide guidance for what is considered fair and reasonable behavior by participants.  SDO participants rely on those rules and procedures for guidance to govern their actions.  In my experience, SDOs devote substantial effort and care to formulating their written rules because of the importance of providing clear, well-understood guidance to SDO participants.  Generally, the SDO rules, procedures, and policies – including the patent policies – are developed and voted on by the SDO participants themselves.

19.     As part of their written policies, SDOs may request that participants provide notice if they believe one or more of their patent(s) read on a standard and are essential to practicing that standard.  In that instance, the SDO may request the participant to provide assurance that the participant is willing to make licenses to those patents available on reasonable and non-discriminatory terms and conditions ("RAND").[1]  This is often memorialized in a "Letter of Assurance" (or an "LOA").[2]  SDOs, however, do not typically ***require*** participants to

---

[1]     Some organizations, such as ETSI, use the terminology "fair, reasonable, and nondiscriminatory"  ("FRAND").  However, these terms are generally interchangeable.

[2]     The ITU uses a form called a "Patent Statement and Licensing Declaration." For ease of reference, both the ITU and the IEEE forms are referred to collectively herein as "Letters of Assurance" or "LOAs."

**CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER**

disclose the patent interests of their companies, to certify the applicability of their patents, or to certify that they have identified all applicable patents.

20.     A Letter of Assurance provides an assurance that the patent holder will make a license to its essential patents available to all applicants at a reasonable rate and with reasonable terms and conditions, but not that the patent(s) are automatically licensed.  The assurance of a willingness to license is not intended to become the license itself.  Indeed, many of the form LOAs explicitly state that no license is implied by the submission of the LOA.  A license only exists after the patent holder and the potential licensee successfully negotiate a license agreement.

21.     In my experience, RAND commitments made under SDO Intellectual Property Rights ("IPR") policies also are not understood to limit the IPR holder's legal rights to enforce its patents, in the event good faith RAND negotiations with a potential licensee do not lead to a license agreement, or if the potential licensee simply refuses to engage in good faith negotiations. If a party does not intend to enforce its patents, it selects that option *instead of* committing to offering RAND licenses.  For example, the IEEE's letter of assurance form expressly provides a box for parties to state that they will not enforce their essential patents against implementers of the standard.[3]

22.     If operating properly, SDOs can promote the interests of consumers by promoting interconnectivity and interoperability while utilizing the best available technology.  In my experience, SDOs permit, and even encourage, the use of patented technology in standards, where technically justified, to ensure that the standards include the best available technology.

---

[3]   IEEE Form Letter of Assurance for Essential Patent Claims, *available at* http://grouper.ieee.org/groups/1788/Patents/letter-of-assurance-form.pdf.

CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER

23.     The patent policies of SDOs such as ITU and IEEE recognize the critical need to properly balance the rights of patent owners with the need for standards that best meet the technical objectives of the SDOs.  In my experience, RAND undertakings made under SDO IPR policies are not understood to limit the IPR holder's legal rights to enforce its patents, including the right to seek an injunction, in the event licensing negotiations with a potential licensee fail to result in a license agreement.  For example, ITU's Common Patent Policy for ITU-T/ITU-R/ISO/IEC expressly recognizes this point by stating, among other things, that a standard's "objective is to ensure compatibility technologies and systems on a worldwide basis;" and although the standard "must be accessible to everybody without undue constraints[,]" "[t]he detailed arrangements arising from patents (licensing, royalties, etc.) are left to the parties concerned, as these arrangements might differ from case to case."[4]  Also, the ITU Policy and its licensing declaration form further state that "negotiations are left to the parties concerned and are performed outside the [ITU]."[5]  Similarly, the IEEE's Policies and Procedures Section 6.2 recognize that "a [Proposed] IEEE Standard may require the use of a potential Essential Patent Claim[,]" and in such cases "the IEEE shall request licensing assurance . . . from the patent holder or patent applicant[,]" but "[n]o license is implied by the submission of a Letter of Assurance."[6]  The IEEE bylaws further state:

> The IEEE is not responsible . . . for determining whether any
> licensing terms or conditions provided in connection with

---

[4]   ITU, *Common Patent Policy for ITU-T/ITU-R/ISO/IEC*, *available at* http://www.itu.int/en/ITU-T/ipr/Pages/policy.aspx.

[5]   *Id.*; Guidelines for Implementation of the Common Patent Policy for ITU-T/ISO/IEC, Annex 3 (Mar. 1, 2007)

[6]   IEEE, *Policies and Procedures* § 6 (Patents), http://standards.ieee.org/develop/ policies/bylaws/sect6-7.html; *see also* IEEE-SA Standards Board Bylaws (2012), *available at* http://standards.ieee.org/develop/policies/bylaws/sb_bylaws.pdf.

**CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER**

submission of a Letter of Assurance, if any, or in any licensing agreements are reasonable or non-discriminatory.[7]

24.     As described below, the balance is achieved by patent holders being willing to enter negotiations for licenses on commercially reasonable and non-discriminatory terms, but not that SDOs compel licensing or set the terms of the licenses.  The commercial terms are properly left to the market in bilateral negotiation between companies that are typically sophisticated with respect to intellectual property such as, in this case, Motorola and Microsoft.

25.     The goal of balancing the interests of patent holders and implementers stems from the fact that many different companies with different business models and different business interests participate in standards development activities.  For instance, some companies that contribute their intellectual property are licensing entities that seek to make a reasonable return on their investments in research and development, but do not actually produce a standards-compliant product.  Other participants are vertically-integrated companies that both own essential patents and manufacture or sell standards-compliant products.  Still others are so-called "defensive patent aggregators" – companies that invest heavily in research and development and own essential patents, but do not actively attempt to obtain royalties, instead using their essential patents as a shield.  There are also companies that may only manufacture or sell products that implement the standard, but do not hold any essential patents.  Each of these types of companies has different interests and incentives in the standards development process, and one central purpose of the SDO patent policies is to strike a balance between these interests.[8]  If the balance

---

[7]     IEEE, *Policies and Procedures*, *supra* note 6.

[8]     *See, e.g.*, Marasco Ex. 1 (MOTM_WASH1823_0402454-70), at pp. 8-9 (discussing considerations of different business models of essential patent holders).

CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER

tilts too far toward any type of entity, other entities will likely choose not to participate in the standard setting process, resulting in a less technologically-sound standard.[9]

## VI.  THE SOURCE AND MEANING OF THE RAND COMMITMENT

26.    At the outset, it is important to understand that a party does not have a RAND obligation simply based on its ownership of standard-essential patents.  The RAND obligation stems from Letters of Assurance that are submitted to SDOs in accordance with SDO patent policies and procedures.  Therefore, RAND obligations, including the methodology for defining RAND terms and conditions, should be understood in light of the LOAs and the SDO patent policies.

27.    ITU's Common Patent Policy provides that "any party participating in the work of ITU . . . should, from the outset, draw the attention of the Director of ITU-TSB . . . to any known patent or to any known pending patent application" and that the participating party should indicate whether:  1) it "is willing to negotiate licenses free of charge with other parties on a nondiscriminatory basis on reasonable terms and conditions;" 2) it "is willing to negotiate licenses with other parties on a non-discriminatory basis on reasonable terms and conditions;" or 3) it "is not willing to comply with" either of the previous two options.[10]  If a participating party indicates that it is willing to negotiate licenses with other parties on a non-discriminatory basis on reasonable terms and conditions (Option 2), "[s]uch negotiations are left to the parties concerned and are performed outside the ITU-T/ITU-R/ISO/IEC."[11]

The IEEE-SA Standards Board Bylaws provide that  "A Letter of Assurance shall be either (a) A general disclaimer to the effect that the Submitter without conditions will not enforce

---

[9]  *Id.* at 16 (noting that "Balanced IPR policies encourage participation" in SDOs).

[10]  ITU, *Common Patent Policy*, *supra* note 4.

[11]  *Id.*

**CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER**

any present or future Essential Patent Claims against any person or entity making, using, selling, offering to sell, importing, distributing, or implementing a compliant implementation of the standard; or (b) A statement that a license for a compliant implementation of the standard will be made available to an unrestricted number of applicants on a worldwide basis without compensation or under reasonable rates, with reasonable terms and conditions that are demonstrably free of any unfair discrimination."[12]

28.     Other SDOs seek a similar commitment from IPR holders either to license any essential IPR on RAND terms and conditions, license on a royalty-free basis, or not to assert these patents against implementers of the standard.

29.     Based on my experience, SDOs focus on technical issues, and do not engage in negotiations about licensing terms and conditions.  Where a patent essential to practice a standard has been identified, the SDO may request licensing assurances from the patent holder (including, for example, an assurance that the patent holder will agree to license its technology on reasonable and non-discriminatory terms); the patent holder may provide such assurances; and any company may approach the patent holder outside of the activities of the SDO to inquire about available licensing terms.  But standard-setting activities facilitated by the SDOs are not the place for licensing negotiations.  SDO participants are often not the persons knowledgeable about, or authorized to make, decisions about licensing terms.  Moreover, there have been concerns that SDOs could face potential claims of facilitating anticompetitive conduct if such bodies were used as a forum for negotiating or settling licensing terms and conditions.

30.     Therefore, even where a RAND commitment has been made, SDOs do not engage in an attempt to determine what constitutes a reasonable royalty rate or what other terms and

---

[12]   *See* IEEE-SA Standards Board Bylaws *supra* note 6, § 6.2.

**CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER**

conditions are reasonable or nondiscriminatory, and thus do not dictate what terms the patent holder must propose to the potential licensee.  These matters are for the patent holder and the potential licensee to decide upon through good faith, bilateral negotiations.  The RAND commitment is a commitment by the patent owner to engage in good faith bilateral negotiations with all potential licensees to license essential IPR on reasonable terms and conditions.  There is no license until such negotiations have occurred and an agreement has been reached between the patent owner and potential licensees in order to implement the standard.  The actual negotiation of license terms is a process that occurs outside of the activities of ITU and IEEE.  Indeed, the ITU Common Patent Policy recognizes that license terms and arrangements "differ from case to case."[13]  If it wishes, a patent holder is also free publicly to state its license terms, and the IEEE has expressly provided a mechanism for parties to do so.[14]  To my knowledge, however, no party has submitted an LOA containing an *ex ante* royalty term to the IEEE for any of the 802.11 standards.

31.     From the SDO's perspective, the patent holder fulfills its RAND obligation by being willing to enter into good faith negotiations with all potential licensees who wish to negotiate, and attempting in good faith to reach a license on RAND terms and conditions in such an agreement.  Unlike holders of patents that are not subject to RAND assurances, a RAND patent holder foregoes the usual right to negotiate only with parties of its choosing; it cannot simply refuse to negotiate with an interested potential licensee, and it must negotiate in good

---

[13]   ITU *Common Patent Policy*, *supra* note 4.  The ANSI Patent Policy Guidelines, which helped draft, is to similar effect.  It provides:  "It should be reiterated . . . that the determination of specific license terms and conditions, and the evaluation of whether such license terms and conditions are reasonable and demonstrably free of unfair discrimination, are not matters that are properly the subject of discussion or debate at a development meeting.  Such matters should be determined only by the prospective parties to each license . . . ."

[14]   *See* IEEE Form Letter of Assurance, *supra* note 3. However, to my knowledge, no SDO has *required* that parties state any particular license terms in a RAND letter of assurance.

CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER

faith with that potential licensee.  Such negotiations however, do not guarantee that the result of the negotiations will be an executed license agreement.

## VII.   THE MOTOROLA RAND COMMITMENTS AT ISSUE

32.   Motorola, along with Symbol Technologies, which I understand from Counsel was acquired by Motorola in 2007, has submitted various LOAs to both the ITU and the IEEE. In these letters, Motorola stated that it will make licenses to certain of its essential patents available to all applicants on RAND terms and conditions.[15]  The Patent Statement and Licensing Declaration for ITU-T/ITU-R Recommendation Motorola submitted to the ITU states: "The Patent Holder is prepared to grant a license to an unrestricted number of applicants on a worldwide, non-discriminatory basis and on reasonable terms and conditions to make, use and sell implementations of the above document."[16]  The Intellectual Property Statement Motorola submitted to the IEEE for the IEEE 802.11 standard states: "In the event the proposed standard is adopted and the standard cannot be practiced without the use of one or more issued patents which are now or hereafter owned, controlled of assigned to Motorola, Motorola agrees to license those patents on a non-discriminatory basis offering fair and commercially reasonable terms."[17]

---

[15]   *See* Motorola Letters of Assurance (identified in Attachment B).  Although the language in Motorola's letters of assurance relating to the 802.11 and H.264 standards varied slightly depending on the various forms that were submitted, the import of the language is the same – that Motorola was prepared to enter into negotiations with implementers of the relevant standards upon request and negotiate in good faith toward reaching a RAND license.

[16]   *See e.g.*, MOTM_WASH1823_0000035.

[17]   *See e.g.*, MOTM_WASH1823_0000004.

CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER

33.     In October 2010, Motorola offered to license its portfolios of H.264 and 802.11-essential patents to Microsoft, and expressed a willingness to negotiate in good faith with Microsoft toward reaching a RAND license for these patents.[18]

34.     Rather than enter into good faith negotiations with Motorola, Microsoft filed this lawsuit against Motorola on November 9, 2010.  In its complaint, Microsoft sought a declaration from the Court that Motorola breached its alleged contractual obligations to the IEEE and ITU by sending its October 21 and 29 letters to Microsoft, as well as a declaration that Microsoft was entitled to a license to Motorola's H.264 and 802.11-essential patents on unspecified RAND terms.[19]

35.     I understand that on April 19, 2013, Judge Robart issued an order setting a RAND royalty rate and range for Motorola's H.264 and 802.11-essential portfolios.  For the H.264 portfolio, Judge Robart set the rate at 0.555 cents per unit and a range of 0.555-16.389 cents per unit, applicable to both Microsoft Windows and Xbox products.  For the 802.11 portfolio, Judge Robart set the rate at 3.471 cents per unit and a range of 0.8-19.5 cents per unit, again applicable to both Microsoft Windows and Xbox products.  I also understand that Judge Robart has stated that the initial offer to a potential licensee does not need to be on RAND terms.[20]  My analysis herein is thus focused on whether Motorola's initial offers to Microsoft complied with its obligations to SDOs.

---

[18]     *See* October 21 Letter (Heiner Depo., Ex. 9) and October 29 Letter (Heiner Depo., Ex. 10).

[19]     Microsoft Complaint in Case No. 2:10-cv-01823-JLR (W.D. Wash.), dated Nov. 9, 2010.

[20]     *Microsoft Corp. v. Motorola, Inc., et al.,* No. C10-1823JLR, (W.D. Wash. June 6, 2012) (order denying cross motions for summary judgment) at 24 ("Because the IEEE and the ITU agreements anticipate that the parties will negotiate towards a RAND license, it logically does not follow that initial offers must be on RAND terms.")

CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER

## VIII.   MOTOROLA'S ATTEMPTS TO ENGAGE MICROSOFT IN GOOD-FAITH NEGOTIATIONS WERE CONSISTENT WITH ITS RAND OBLIGATIONS

36.     As described above, the purpose of the RAND commitment is to ensure that implementers of the standard will have access to licenses from essential patent holders without undue constraints.  Therefore, from the SDO's perspective, the patent holder acts consistently with its RAND obligation by being willing to enter into negotiations with all potential licensees who wish to negotiate, and attempting in good faith to reach a license on RAND terms and conditions in such an agreement.

37.     Motorola's October 2010 letters to Microsoft, which state that Motorola's offer to Microsoft was based on its "standard terms,"  represented a good faith attempt to enter into licensing negotiations with Microsoft for a license to Motorola's H.264 and 802.11- essential portfolios.  Microsoft filed suit before engaging in any such negotiations with Motorola.

38.     Thus, because Motorola attempted to engage Microsoft in good faith negotiations for a RAND license to its H.264 and 802.11-essential patents prior to the filing of this lawsuit, its actions are fully consistent with its RAND obligations under the ITU and IEEE patent policies, even if its opening offers were not within the ranges set in Judge Robart's April 19, 2013 order.

39.     Nothing in SDO IPR or Antitrust policies are understood to limit the IPR holder's legal rights to enforce its patents, including the right to seek an injunction.  Indeed, neither the IEEE nor ITU policies explicitly preclude a patent holder from seeking injunctive relief.  Nor am I aware of Microsoft pointing to any provision of those policies that implicitly precludes seeking injunctive relief, other than the "RAND" requirement itself.[21]  I understand that Microsoft, instead, cites to some Court orders as well as the facts specific to this case.[22]  However, I am also

---

[21]   Microsoft's April 3, 2013 Supplemental Interrogatory Responses.

[22]   *Id.*; Gutierrez Depo. II, Ex. 10.

CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER

aware that in a recent order from *Apple Inc. v. Motorola Mobility Inc.* in the United States

District Court for the Western District of Wisconsin, Judge Crabb found that the SDO policies at

issue did not preclude a member from seeking injunctive relief to enforce its patent rights in its

standards-essential patents.[23]   The judge held that "Motorola did not breach its contracts simply

by requesting an injunction and exclusionary order in its patent infringement actions."[24]   The

same is true here; neither the IEEE nor ITU's policies nor Motorola's LOA's expressly state that

seeking injunctive relief is precluded.

40.     At best, the issue of the availability of  injunctive relief as a remedy for

infringement of a standard essential patent has become an active subject of debate in SDOs and

government agencies in recent years.  One of the outputs of the ITU Patent Round Table held in

Geneva on October 10, 2012 was that, "No consensus was reached on the issue of the availability

of injunctions for SEPs."[25]   Indeed, I am aware that Microsoft has even changed its position

during the course of this case with regard to whether injunctive relief is an available remedy for

infringement of SEPs, having stated to the Federal Trade Commission in June 2011 that

> [t]he existence of a RAND commitment to offer patent licenses should not
> preclude a patent holder from seeking preliminary injunctive relief or
> commencing an action in the International Trade Commission just because the
> patent holder has made a licensing commitment to offer RAND-based licenses in
> connection with a standard.[26]

---

[23]     *Apple Inc. v. Motorola Mobility Inc.*, No. 3:11-cv-00178 (W.D. Wisc. Oct. 29, 2012)
(order and opinion on motions in limine) at 28.

[24]     *Id.* at 29.

[25]     Saba Imru, ITU Telecomm. Standardization Bureau, World Café @ ITU Patent
Round Table, 10 October 2012, Geneva at 4 *available at* http://www.itu.int/en/ITU-
T/Workshops-and-Seminars/patent/Pages/default.aspx

[26]     MOTM_WASH1823_0054670, at 13.

CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER

## IX.   THE APPROPRIATE RAND TERMS AND CONDITIONS FOR A SET OF ESSENTIAL PATENTS NECESSARILY DEPENDS ON THE SPECIFIC PATENTS AND CIRCUMSTANCES OF THE LICENSOR AND POTENTIAL LICENSEE

41.   I understand that Microsoft requested that the Court determine the appropriate RAND terms and conditions for a license between Motorola and Microsoft for the parties' 802.11 and H.264 patent portfolios, in particular the level of royalties payable by the parties, and that the Court did so in its April 19, 2013 order described in ¶ 35.

42.   As described above, SDOs do not engage in an attempt to determine what constitutes a reasonable royalty rate or what other terms and conditions are reasonable.  These matters are for the patent holder and the potential licensee to decide through good faith negotiations.  The patent holder acts consistently with its obligation to the SDO by being willing to enter into good faith negotiations with all potential licensees who wish to negotiate, and attempt in good faith to reach a license on RAND terms and conditions in such an agreement.  The patent holder cannot simply refuse to negotiate, as it could with a patent that was not subject to a RAND commitment.  Such negotiations, however, do not guarantee that the result of the negotiations will be a license agreement.

43.   SDOs acknowledge that there is no absolute definition of RAND terms.  The market, through bilateral negotiations between licensors and potential licensees, determines what constitutes the RAND terms and conditions of a RAND license on a case-by-case basis based on the particular intellectual property involved in a transaction and the unique circumstances of the parties negotiating in that transaction.  Additionally, it is important to understand that SDOs recognize that "terms and conditions" of a license agreement encompass much more than just royalty rates.  There are numerous licensing terms that may be relevant to a particular negotiation, and they can vary greatly from negotiation to negotiation.  For example, the ITU letter of assurance form expressly allows parties to condition their RAND obligation on the

CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER

potential licensee's willingness to grant a reciprocal RAND license to its own standard-essential patents,[27] and reciprocity is understood as a common RAND term.  These additional non-royalty terms and conditions may influence the actual royalty rate present in a particular agreement.  All of these "terms and conditions" must be considered in determining what is reasonable and non-discriminatory, and the concept of RAND is not one that is capable of a having a single definition.

44.     Because RAND requires bilateral negotiations between the patent holder and each of many potential licensees, and those licensees may be a diverse group with different commercial backgrounds, products, patents, and positions with respect to the patent holder, the outcome of RAND negotiations will not necessarily result in the same terms and conditions for all potential licensees.  That does not mean that some licensees have received terms and conditions that are not reasonable or nondiscriminatory.

45.     The patent policy of the ITU-T, for example, states that "[t]he detailed arrangements arising from patents (licensing, royalties, etc.) are being left to the parties concerned, as these arrangements might differ from case to case."[28]

46.     IEEE's bylaws state that the IEEE "is not responsible . . . for determining whether any licensing terms or conditions provided . . . are reasonable or non-discriminatory.[29]  Also, the patent policy of the IEEE allows, but does not require, patent holders to include maximum license fee commitments or other material licensing terms in their LOA.[30]  Therefore, a patent

---

[27]     *See* "Patent Statement and Licensing Declaration Form For ITU-T OR ITU-R Recommendation," *available at* http://www.itu.int/dms_pub/itut/oth/04/04/T040400000 20003PDFE.pdf, at page 2.

[28]     ITU, *Common Patent Policy*, *supra* note 4.

[29]     IEEE-SA Standards Board Bylaws (2010), *supra* note 6.

[30]     IEEE, *Policies and Procedures* § 6 (Patents), *supra* note 6.

CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER

holder declining to provide such terms in a LOA cannot be deemed to have agreed to any

specific patent licensing terms in advance of good faith negotiations.

## X.  SDO RAND OBLIGATIONS DO NOT MANDATE ANY PARTICULAR RATE, RANGE, OR NEGOTIATION METHODOLOGY

47.     There are no RAND provisions in SDO policies requiring a specific range, near-

zero or nominal royalty rates, a single royalty rate for all situations, a specific royalty format or

base, or a particular methodology for determining or negotiating to RAND terms.  There

similarly are no RAND provisions in SDO policies requiring that an opening offer be a certain

rate, form, or relation to the final agreed-upon RAND license rate.  And, there are no RAND

provisions in SDO policies mandating the steps or analysis that a standard essential patent owner

must take in formulating an opening offer.  For example, there are no provisions in SDO policies

requiring the patent holder to consider royalty stacking or patent pool rates in formulating its

opening offer.

48.     There is nothing in ITU or IEEE's written policies requiring that each offer made

by Motorola at each stage of negotiations, and certainly not at the opening of negotiations, must

be RAND, or within a specific RAND range.  As noted above, I understand that Judge Robart

has additionally clarified that an opening offer need not be within the "RAND range."[31]  The

submission of a Letter of Assurance or RAND undertaking indicates that the patent holder is

willing to negotiate for RAND licenses.  The SDO expects that companies like Motorola and

---

[31]  *Microsoft Corp. v. Motorola, Inc., et al.,* No. C10-1823JLR, (W.D. Wash. June 6, 2012) (order denying cross motions for summary judgment) at 23-24 ("The language of Motorola's agreements focuses on the resulting RAND license between the patent holder and the implementer, not on the opening offer.") ("Because the IEEE and the ITU agreements anticipate that the parties will negotiate towards a RAND license, it logically does not follow that initial offers must be on RAND terms.")

**CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER**

Microsoft will arrive at RAND terms through negotiation and does not dictate requirements for each stage of negotiations or specify what terms must be offered.

49.     Nothing in the SDO policies indicates that a RAND commitment means that the licensor has agreed to license its patents at a minimal, or near-zero, royalty.  If a patent holder is not concerned with receiving royalties, as is the case for some patent holders, it is free to select the options in the letter of assurance either to license on a royalty free basis or not to assert its patents against implementers.

50.     I understand, however, that Motorola did not select those options, instead offering licenses at "reasonable rates" and on "reasonable terms and conditions."[32]  Given the SDOs' goal of balancing the interests of both patent holders and implementers, "reasonable" should be viewed both in terms of the return on investment received by the patent holder (here, Motorola), as well as the costs paid by the implementer (here, Microsoft) – as well as other considerations and terms that the parties might negotiate.  There is no language in the SDO patent policies that equates "reasonable rates" or "reasonable terms and conditions" with "minimal royalties."

51.     Similarly, nothing in SDO patent polices require a single royalty amount for essential patents (or indeed, for each company's set of essential patents) should apply in all situations, because the same benchmarks – the patent pools – should always be used.  Indeed, this is in direct conflict with the ITU policy, which expressly recognizes that RAND terms and conditions may vary case by case depending on the unique circumstances of the parties.  A restrictive, uniform approach to determining RAND royalty rates is not what is expected by the SDO policies, which expect that RAND terms and conditions may vary greatly depending on the unique circumstances of each licensing negotiation.

---

[32]     *See* Motorola Letters of Assurance (MOTM_WASH1823_0000001-77).

CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER

52.     There is nothing in the SDO policies that indicates that a royalty for RAND-committed patents need be limited to either a flat fee per unit royalty or component-only determination.  As described above, the SDOs do not concern themselves with the particular terms and conditions of a RAND license, nor do they prescribe or forbid any specific terms, royalty format, or royalty base.

53.     If anything, there is certain language in the IEEE letter of assurance that shows that a flat fee per unit royalty is *not* the only appropriate royalty format.  The IEEE form LOA provides an option for submitters to indicate a "not to exceed" royalty rate, and one of the options is "percent of product price."[33]  While the IEEE does not comment on whether disclosed terms are or are not RAND, the inclusion of this percentage-based option, among others, indicates that a RAND royalty need not be limited to a flat fee per unit.

54.     I note that certain companies, including Apple and Microsoft, have recently urged SDOs to adopt a requirement that RAND royalties should only be applied to a single common royalty base in any RAND license agreement.[34]  However, I am not aware of any SDO – including the ITU or IEEE – that has adopted this policy, nor any similar limitations on the appropriate royalty structure or base for a RAND license.  As with all RAND terms and conditions, this is left for the parties to decide upon through bilateral negotiations.

55.     As described above, the SDOs do not prescribe any particular method for determining what constitutes RAND terms and conditions, other than leaving it to the parties that are in a particular licensing negotiation.  Implicitly, this means that there are many ways to

---

[33]   IEEE Form Letter of Assurance, *available at* http://grouper.ieee.org/groups/1788/Patents/letter-of-assurance-form.pdf.

[34]   *See, e.g.*, Nov. 11, 2011 Letter from Apple, Inc. to ETSI, *available at* http://www.appleinsider.com/articles/12/02/07/apple_asks_etsi_standards_body_to_set_rules_for_standards_essential_patents.html.

CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER

determine the appropriate RAND terms and conditions for a particular set of patents in a given licensing negotiation.

56.     Neither the IEEE nor the ITU, nor any SDO that I am aware of, mandate that RAND terms be restricted to those that are determined in a multilateral negotiation that took place *ex ante*, or before the standard is adopted.  To the contrary, I am aware that there have been concerns in the past that multilateral negotiation of license terms might expose the SDOs and their participants to potential antitrust risks.  As described above, SDOs recognize that RAND terms and conditions may vary considerably from negotiation to negotiation, and that is why they are left to the parties to negotiate in light of each other's unique circumstances and business needs and interests.

57.     As described above, SDO patent policies are designed to balance the interests of patent holders and implementers, and to allow all implementers the opportunity to practice standards without facing undue cost constraints while ensuring that patent holders receive reasonable compensation in return.

58.     SDOs do not concern themselves with the particular level of royalties paid by or offered to any potential licensee, unless the royalties would effectively prohibit the potential licensee from implementing the standard.

59.     Business disagreements over RAND licensing terms and conditions are precisely the issues that the SDOs leave to the parties concerned to deal with, based on the unique circumstances of the negotiation at issue.  RAND commitments are simply intended to foster good faith negotiations between essential patent holders and standards implementers.  Motorola satisfied those commitments by attempting to enter into good faith negotiations with Microsoft.

X.     CONCLUSIONS

**CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER**

60.     Motorola has fully complied with its RAND obligations from the perspective of

the SDOs, and has not violated any provision of the SDO policies because:

- SDOs, including the ITU and IEEE, are voluntary organizations.

- SDOs, including the ITU and IEEE recognize the rights of patent holders, including the right to be fairly compensated for the use of patented technology in standards.

- The policies of the ITU and IEEE request assurances or undertakings that patent holders are willing to license standard essential patents on reasonable and non-discriminatory ("RAND") terms.  Submissions of RAND undertakings or RAND assurances by patent holders are made on a voluntary basis.

- The assurance to an SDO of a willingness to license is not intended to become the license itself.

- The policies of the ITU and IEEE do not dictate "RAND terms," and there is no one definition of "RAND terms."  RAND is arrived at through negotiations between the parties to that specific license agreement.  Nothing in the SDO patent policies dictates that a single royalty rate apply in all situations.

- If negotiations fail to result in a license agreement, this does not preclude the essential patent-holder from seeking to enforce its essential patents, or from seeking any remedies available to it under the patent laws, including injunctive relief.

  o SDOs encourage and expect negotiation between patent holders and potential licensees and take no position on what terms and conditions are or are not RAND. SDOs recognize that relationships between patent holders and potential licensees are unique, and terms that may be relevant for one relationship may not be relevant for another.  Therefore, SDOs encourage negotiations between patent holders and potential licensees to arrive at reasonable licensing terms that are appropriate between a particular licensor and potential licensee.

  o Motorola's October 2010 letters to Microsoft constituted Motorola's good-faith attempt to engage Microsoft in a licensing negotiation.  Microsoft did not respond to Motorola's Letters to Microsoft prior to bringing this lawsuit.

- SDO patent policies and procedures do not establish that the *only* appropriate RAND terms are those that reflect the *ex ante* incremental value of the patented technology as determined in a hypothetical multilateral negotiation prior to the adoption of the standard. SDO patent policies contemplate bilateral negotiations, not multilateral negotiations, in part because the latter may involve antitrust risks.  And SDOs, including the ITU and IEEE generally do not define RAND terms and conditions and take no position on what is or is not RAND for any given licensing situation, recognizing that the individual circumstances of the parties and intellectual property involved in any bilateral negotiation may vary significantly.  From the perspective of the SDO policies, there is no reason to

**CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER**

conclude that the royalty term in a RAND license agreement must be determined by any particular formula or limited to any particular royalty structure or range.

- Not all participants in the standards development process are also implementers of the standard.  SDO policies are designed to strike a balance between participants in the standards development process who contribute patented technology to the standard, as well as those who implement the standard.  This is because SDOs recognize that not all participants will also be implementers, and that any patent policy must account for the fact that many patent holders will only contribute their patented technology if they know that they are able to receive a reasonable return on their R&D investments.  For these reasons, from the perspective of the SDO policies, there is no reason to conclude that a RAND royalty rate must be a small amount.

61.     SDOs, including the IEEE and ITU, expect that RAND terms and conditions are determined through bilateral negotiations and may vary from case to case depending on the unique facts and circumstances of the particular negotiation.

CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER

# Attachment A

Richard J. Holleman
Industry Standards Consulting

| | |
|---|---|
| 18 Arrowhead Road | 2600 S.E. Ocean Blvd. N-15 |
| Plymouth, MA. 02360 | Stuart, FL. 34996 |
| 508-759-6184 | 772-287-7348 |
| r.j.holleman@att.net | |

**Education:**
United States Military Academy, West Point, NY
B.S., Engineering
June 1960

**Professional Experience:**
Consultant, Industry Standards and Intellectual Property, 7/00-present
Retained by clients for expert advice and guidance on industry standards activities, processes and patent-related matters.

SD-3C, LLC
President, 2/06-present
Part-time position with responsibility for the operational management of the company which licenses Secure Digital (SD) memory card technology.

Institute of Electrical and Electronic Engineers-Industry Standards and Technology Organization (IEEE-ISTO)
President and CEO, 1/03-5/03
Provided executive leadership and general management of ISTO business activities.

IBM Corp., Armonk, NY
Director of Standards, Intellectual Property and Licensing, Corporate Staff, 3/98-7/00
Responsible for the management of IBM's worldwide standards program.

Director of Standards Practices, 3/89-3/98
In addition to standards, also responsible for telecommunications practices and IBM's activities with the FCC.

Program Director of Standards Relations, 2/77-3/89
Responsible for IBM's internal standards programs and numerous external industry standards activities.

Senior Marketing Manager, 6/75-2/77
Responsible for supermarket store systems marketing and systems in greater NY area.

Program Manager for Management Development, 1/73-75

CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER

Staff instructor in Middle Management Development School, Sands Point, NY.

Marketing Manager, 1/69-1/73
Responsible for distribution industry marketing in NY Distribution Branch Office.

Marketing Representative, 4/64-1/69
New account and general territory salesman in Garden City, NY Branch Office.

Sales Trainee, 6/63-4/64
New hire/trainee in data processing sales in Garden City, NY Branch Office.

**Professional Activities:**
Invited panelist in the DOJ/FTC IPR hearings on industry standards setting and in the GWU Law School symposium on standards. 4/02

IBM Representative to National and International Standards Organizations, 2/77-7/00
Participated in standards committees of the ITU, ANSI, the IEEE and others. Also a member of U.S. government delegations to international conferences and mission activities.

IBM Representative to Patent Policy Committees, 1/83-7/00
Participated in the standards-related patent policy activities of ANSI, the IETF, TIA, the ATM Forum, the W3C and other telecommunications and information technology groups.

IBM Intellectual Property and Licensing Activity, 1/84-7/00
Represented IBM's interest in the patent-related standards aspects of contractual negotiations in industry consortia and special interest groups.

**Associations:**
The Institute of Electrical and Electronic Engineers (IEEE), 1/91-present
Participant in a variety of activities for IEEE and IEEE Standards Association (IEEE-SA)

IEEE-SA Past Standards Board Chairman, 1/04-1/05

IEEE-SA Treasurer, 1/02-12/02

IEEE-SA Representative to IEEE Finance Committee, 1/98-12/02

IEEE-SA Board of Governors, 1/98-12/01

Board Chairman, IEEE-Industry Standards and Technology Organization, 1/99-6/00

Chairman, IEEE-SA Standards Board, 1/98-12/99
Chairman, IEEE Standards Board Patent Committee, 1/94-12/97

Association of Graduates, USMA, West Point, NY, 6/60-present

**CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER**

**Publications:**
"Comments on Standards Setting and Intellectual Property". Published on the FTC web site. 4/02.

"A Response: Government Guidelines Should Not be Issued in Connection with Standards Setting". Published on the FTC web site, the ABA FTC Watch and in the GWU Symposium proceedings. 4/02

"IEEE Standards Association Comments Regarding Competition and Intellectual Property". Prepared initial draft for submission to the DOJ/FTC. Published on the FTC web site. 4/02

"Comments of the IEEE Standards Board". Prepared initial draft for submission to the FTC in the Dell case. Published as documentation in the FTC proceeding. 1/96

"Guidelines for Implementation of the ANSI Patent Policy". Participated as a member of the ad hoc group which drafted the guidelines. Published on the ANSI web site. 1991-1992

"ITU-T Patent Policy Guidelines" - Authored initial draft of the guidelines. Published on the ITU-T web site. 1995-1996.

"IETF Intellectual Property Policy- RFC2026" - Participated as a member of the ad hoc group which drafted RFC 2026. Published on the IETF web site. 1996-1997

"TIA Engineering Handbook- Section 7". Participated as a member of the ad hoc group drafting revisions to the handbook. Published on the TIA web site. 1999

**Oral Presentations:**
Presentations on patent-related standards and licensing issues, 1/93-present.
Examples are:
International Intellectual Property Society Panel, 5/03
Intellectual Property Owners Association, 12/02
American Intellectual Property Law Association, 4/98
Licensing Executives Seminar, 3/97

**Military Experience:**
U.S. Army Corps of Engineers, 101st Airborne Div., Ft. Campbell, KY, 2/61-6/63
        Responsible for atomic demolitions, staff intelligence office and airborne platoon.
U.S. Army Ranger School, Ft. Benning, GA., 12/60- 2/61
        Attended and graduated.
U.S. Army Airborne School, Ft. Benning, GA., 10/60-11/60
        Attended and graduated.
U.S. Army Corps of Engineers Officers School, Ft. Belvoir, VA. 8/60-10/60
        Attended and graduated.

**CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER**

**Attachment B**

Letters of Assurance submitted to the ITU and IEEE for Motorola's Essential Patents ("Motorola Letters of Assurance") (MOTM_WASH1823_0000001-77)
ETSI Intellectual Property Rights Policy (MOTM_WASH1823_0470205)
ETSI Guide on Intellectual Property Rights (MOTM_WASH1823_0435974)
ETSI IPR Policy FAQs
IEEE-SA Operations Manual
IEEE-SA Standards Board Bylaws (MOTM_WASH1823_0054722)
IEEE-SA Standards Board Operations Manual
IEEE-SA Standards Style Manual (MOTM_WASH18236_0610908)
IEEE-SA FAQ "Understanding Patent Issues During IEEE Standards Development" (MOTM_WASH1823_0402083)
IEEE Form Letter of Assurance (MOTM_WASH1823_0092328)
Common Patent Policy for ITU-T/ITU-R/ISO/IEC (MOTM_WASH18236_0092757)
Guidelines for Implementation of the Common Patent Policy for ITU-T/ISO/IEC (MOTM_WASH1823_0053630)
Constitution of the ITU
Convention of the ITU
ITU Patent Statement and Licensing Declaration Form For ITU-T OR ITU-R Recommendation (MOTM_WASH1823_0610987)
Saba Imru, ITU Telecomm. Standardization Bureau, World Café @ ITU Patent Round Table, 10 October 2012, Geneva (http://www.itu.int/en/ITU-T/Workshops-and-Seminars/patent/Pages/default.aspx)
Motorola's Patent Statement and Licensing Declaration for ITU-T/ITU-R Recommendation (MOTM_WASH1823_0000035)
Motorola's IEEE Intellectual Property Statement Motorola for the IEEE 802.11 (MOTM_WASH1823_0000004)
Complaint in Case No. 2:10-cv-01823-JLR (W.D. Wash.), dated Nov. 9, 2010
*Microsoft Corp. v. Motorola, Inc., et al.,* No. C10-1823JLR, (W.D. Wash. Apr. 19, 2013) (findings of fact and conclusions of law)
*Microsoft Corp. v. Motorola, Inc., et al.,* No. C10-1823JLR, (W.D. Wash. June 6, 2012) (order denying cross motions for summary judgment)
Microsoft's April 3, 2013 Supplemental Interrogatory Responses
*FTC:Watch*, Issue No. 811 (July 16, 2012) (MOTM_WASH1823_0605259)
*Apple Inc. v. Motorola Mobility Inc.*, No. 3:11-cv-00178 (W.D. Wisc. Oct. 29, 2012) (order and opinion on motions in limine)
Letter from Apple, Inc. to ETSI, Nov. 11, 2011 (MS-MOTO_1823_2277027)
Letter from Dan Bart to FTC, dated Aug. 5, 2011 (MOTM_WASH1823_0053471)
Letter from Michele Herman to National Science and Technology Council, dated Mar. 4, 2011, (http://www.nist.gov/standardsgov/upload/DWTllp.pdf)
Letter from Kirk Dailey to Horacio Gutierrez (October 21, 2010) (MOTM_WASH1823_0400142-63)
Letter from Kirk Dailey to Horacio Gutierrez (October 29, 2010) (MOTM_WASH1823_0400164-87)
Letter from Kirk Dailey to Horacio Gutierrez (June 18, 2012) (MOTM_WASH1823_0575681-

**CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER**

83)
Letter from Horacio Gutierrez to Kirk Dailey (June 21, 2012) (MOTM_WASH1823_0575830-31)
Letter from Kirk Dailey to Horacio Gutierrez (June 27, 2012) (MOTM_WASH1823_0575832-33)
Letter from Horacio Gutierrez to Kirk Dailey (July 3, 2012) (MOTM_WASH1823_0575827-29)
Transcript of May 24, 2013 Deposition of Horacio Guiterrez and exhibits thereto
Transcript of September 2, 2011 Deposition of Kirk Dailey and exhibits thereto
Transcript of March 20, 2012 Deposition of K. McNeill Taylor and exhibits thereto
Transcript of March 28, 2012 Deposition of David Heiner and exhibits thereto
Transcript of April 4, 2012 Deposition of Horacio Gutierrez and exhibits thereto
Transcript of April 10, 2012 Deposition of Amy Marasco and exhibits thereto
Rebuttal Testimony of Kirk Dailey in U.S. International Trade Commission Inv. No. 337-TA-752