# EXHIBIT 3

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF WASHINGTON

MICROSOFT CORPORATION,

       Plaintiff,

v.

MOTOROLA, INC., MOTOROLA
MOBILITY, INC. and GENERAL
INSTRUMENT CORPORATION,

       Defendants.

CIVIL ACTION FILE
Case No. 2:10-cv-01823

## REBUTTAL EXPERT REPORT OF RICHARD J. HOLLEMAN

**June 10, 2013**

**[CORRECTED – June 17, 2013]**

_____
Richard J. Holleman

I.      QUALIFICATIONS AND ASSIGNMENT

1.      My qualifications were outlined in my opening report dated May 29, 2013 ("Holleman Report").  I have been asked by defendants to review and respond to the Expert Reports submitted on behalf of Plaintiff.  In the course of my analysis, in addition to the documents and other information listed in Attachment B to my opening report, I reviewed the Expert Report of Kevin Murphy ("Murphy Report") dated May 29, 2013.

2.      I have read and reviewed the Murphy Report.  None of the opinions in this report change my ultimate conclusions in my opening report.  I note that the Murphy Report cites heavily to Judge Robart's April 19, 2013 Findings of Fact and Conclusions of Law ("Order").  I understand that there is a dispute between the parties as to whether and the extent to which the Court's Order can be shown to or shared with the jury.  My ultimate opinions do not depend upon whether the Order is evidence or not.

3.      I disagree with Dr. Murphy's assertions in ¶ 27 regarding the potential non-income benefits of having technology incorporated into a standard that would be significant to participants in the standards-setting process.  As discussed in the Holleman Report, even non-participants enjoy benefits from the activities of Standards Development Organizations ("SDOs") including the Institute of Electrical and Electronics Engineers ("IEEE"), and the International Telecommunication Union ("ITU"); furthermore, not all participants will also be implementers of any particular technology incorporated into the standard.[1]

4.      I disagree with Dr. Murphy to the extent that he relies upon the Order as a guide for how negotiations over standard-essential patents take place.  The Order relates to a unique set of circumstances.  That is, the Court set the RAND rate and ranges between Motorola and

---

[1]  Holleman Report ¶¶ 15, 25.

Microsoft based upon the information the Court had available to it.  In my opinion and experience, such a document does not exist in the SDO process.  The Order, or documents like it, is not part of the bylaws or regulations of the IEEE or ITU.  Parties negotiating licenses to standard-essential patents at the time these parties were negotiating would not have had the benefit of the Order, or any document similar to it, to guide their negotiations.  Therefore, it does not make sense to consider it as a guide to the bilateral negotiations that should have occurred between these specific parties and the offers Motorola made.

5.      Similarly, nothing in the Letters of Assurance ("LOA") Motorola submitted to the SDOs references, includes, or contemplates the Order.  The LOAs Motorola submitted to the IEEE and ITU happened between 1994 and 2010.[2]  These agreements occurred many years prior to the April 19, 2013 Order.  In my opinion and experience, the Order was not something contemplated by either the patent holder or the SDO at the time those LOAs were signed.

6.      As stated in the Holleman Report, ITU policies expressly recognize the relative autonomy of the parties in negotiation:  "[t]he detailed arrangements arising from patents (licensing, royalties, etc.) are left to the parties concerned, as these arrangements might differ from case to case."[3]  The ITU Policy and its licensing declaration form further state that "negotiations are left to the parties concerned and are performed outside the [ITU]."[4]

7.      Also, as previously stated in the Holleman Report, ITU LOAs expressly allow parties to condition their RAND obligation on the potential licensee's willingness to grant a

---

[2]  MOTM_WASH1823_0000001-77.

[3]  Holleman Report ¶ 23 (quoting ITU, *Common Patent Policy for ITU-T/ITU-R/ISO/IEC*); *see also* Order ¶ 32.

[4]  Holleman Report ¶ 23 (quoting ITU, *Common Patent Policy for ITU-T/ITU-R/ISO/IEC*; Guidelines for Implementation of the Common Patent Policy for ITU-T/ISO/IEC, Annex 3 (Mar. 1, 2007); *see also* Order ¶ 32.

reciprocal RAND license to its own standard-essential patents,[5] and reciprocity is understood as a common RAND term.  The LOAs define "reciprocity" as "mean[ing] that the Patent Holder shall only be required to license any prospective licensee if such prospective licensee will commit to license its essential patents(s) or essential patent claims for implementation of the same above document free of charge or under reasonable terms and conditions."[6]

8.     Under the ITU policy, when a patent holder has conditioned its licensing commitment on reciprocity, "the Patent Holder shall only be required to license any prospective licensee if such prospective licensee will commit to license its essential patent(s) or essential patent claim(s) for implementation of the same above document free of charge or under reasonable terms and conditions."[7]  All of Motorola's LOAs include language to the effect that it would "grant to an unrestricted number of applicants on a worldwide, non-discriminatory basis and on reasonable terms and conditions" licenses conditioned on reciprocity.[8]

9.     As previously stated, the assurance of a willingness to license is not intended to become the license itself.[9]  Many of the form LOAs explicitly state that no license is implied by the submission of the LOA.[10] A license only exists after the patent holder and the potential licensee successfully negotiate a license agreement.

---

[5]  Holleman Report ¶ 43 (citing "Patent Statement and Licensing Declaration Form For ITU-T OR ITU-R Recommendation," at 2); *see* Order ¶ 33.

[6]  Order ¶ 33 (quoting MOTM_WASH1823_0000036).

[7]  *Id.* ¶ 34 (quoting MOTM_WASH1823_0602818).

[8]  *Id.*¶ 36 (quoting MOTM_WASH1823_0000036).

[9]  Holleman Report ¶ 20.

[10]  *See* Order ¶ 45 ("IEEE-SA Standards Board Bylaws state that '[n]o license is implied by the submission of a Letter of Assurance.'. . . [and] further state that '[t]he IEEE is not responsible . . . for determining whether any licensing terms or conditions provided in connection with submission of a Letter of Assurance, if any, or in any licensing agreements are reasonable or non-discriminatory.'" (*citing* MS-MOTO_1823_00004073098) .

10.     The Holleman Report also discusses how SDOs provide no absolute definition of RAND terms, nor do they provide a definition of what constitutes RAND terms and conditions.[11] SDOs do not attempt to determine what constitutes a reasonable royalty rate or what other terms and conditions are reasonable or nondiscriminatory for any license between interested parties.[12] The market, through bilateral negotiations between licensors and potential licensees, determines what constitutes the RAND terms and conditions of a RAND license on a case-by-case basis based on the particular intellectual property involved in a transaction and the unique circumstances of the parties negotiating in that transaction.[13]

11.     Typically, determining a RAND rate and other terms and conditions of a potential license are matters for the patent holder and the potential licensee to decide upon through good faith, bilateral negotiations.[14]   The actual negotiation of license terms is a process that occurs outside of the activities of ITU and IEEE[15]

---

[11]   *See* Holleman Report ¶ 43; Order ¶ 50.

[12]   Oder ¶ 50.

[13]   Holleman Report ¶ 43.

[14]   Holleman Report ¶ 30.

[15]   *Id.*; Order ¶ 85 ("Typically, the SEP owner and the potential licensee determine RAND terms through good-faith, bilateral negotiations, which take place independent of ITU and IEEE's activities.")