CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| MICROSOFT CORPORATION,<br><br>Plaintiff,<br><br>v.<br><br>MOTOROLA, INC., et al.,<br><br>Defendants. | CASE NO. C10-1823JLR |

EXPERT REBUTTAL REPORT OF GREGORY K. LEONARD, PH.D.

I.      QUALIFICATIONS AND ASSIGNMENT

1.      My qualifications are described in my initial report in this case, dated May 29, 2013.

2.      I have been asked by counsel for defendants (collectively, "Motorola") to analyze and respond to the expert reports of Dr. Kevin Murphy ("the Murphy Report") and Mr. Todd Menenberg ("the Menenberg Report"), both dated May 29, 2013.

3.      In addition to the materials listed in my initial report, I have reviewed the Murphy and Menenberg reports, the materials cited in those reports, and the materials cited in this report. I reserve the right to update my opinions should more relevant information become available in the future.

II.     THE MURPHY REPORT

4.      Dr. Murphy asserts that the fact that Motorola's opening offers were outside the ranges for the RAND royalty rates determined by the Court demonstrates that Motorola was attempting to hold up Microsoft for royalties above the RAND level.[1]  I disagree.  I explained in my initial report that the Court's statements indicate that a good faith opening offer need not be within the RAND range, and that although its offers were outside the ranges for the RAND royalty rates determined by the Court, Motorola was acting in good faith when it made its opening offers to Microsoft.  I further explained the basis for that opinion, including that the Court had available to it substantially more information than Motorola did at the time it made the opening offers.

---

[1] Murphy Report ¶¶ 67-69.

5.      Dr. Murphy is troubled by the fact that Motorola did not conduct an extensive analysis of the value of its SEPs prior to making the opening offers.[2]  I explained in my initial report that (1) Motorola defaulted to the opening offer that it had long used in its cellular licensing negotiations due to its lack of information (which is typical at the outset of a negotiation), the absence of any previous experience licensing the 802.11 and H.264 SEPs on a standalone basis, and the urgency of the situation that it faced at the time (having just been sued for patent infringement by Microsoft and asked by Microsoft to identify its own patents); (2) Motorola expected to obtain more information in subsequent negotiations, in part as a result of Microsoft putting forward its best arguments; (3) good faith negotiation does not require that Motorola bargain against itself; and (4) an opening offer is unlikely to have a substantial effect on the outcome of a negotiation in a situation where the counterparty is a sophisticated company like Microsoft with substantial resources.  In claiming that Motorola should have conducted a thorough analysis of the value of its SEPs prior even to making an opening offer, Dr. Murphy is placing an unreasonable burden on Motorola and absolving Microsoft of any burden to participate in good faith negotiations.

6.      Relatedly, Dr. Murphy claims that Motorola should have been aware of "at least certain" of the information that the Court relied on when determining the ranges for the RAND royalties.[3]  Among the "known" information Dr. Murphy cites to is the licensing fees for the MPEG LA patent pool.  However, even if Mr. Dailey was aware of those rates (a point that Dr. Murphy does not make), the Court recognized that "a rate higher than a pool rate could still be

---

[2] Murphy Report ¶ 74.

[3] Murphy Report ¶ 76.

RAND."[4]  The pool rate does not necessarily reflect the economic value of the portfolio.[5]  Thus, that Motorola's initial offers were higher than the pool rate does not mean that Motorola did not act in good faith. ████████████████████████████████████████████████████

████████████████████████████████████████████████.  Mr. Dailey's area of responsibility historically had been the cellular SEP portfolio.  The 802.11 and H.264 SEP portfolios had originally been developed by General Instruments and Symbol, companies that Motorola later acquired, and had only recently been explicitly included in licenses with cellular handset manufacturers that Mr. Dailey was involved in negotiating.  Given the urgency of the situation at the time Motorola made the opening offers and the role that an opening offer plays in a negotiation, it would not have been reasonable to expect Mr. Dailey to seek out the institutional knowledge of every Motorola employee prior to making the opening offers.  Moreover, had Microsoft engaged in negotiations instead of bringing this lawsuit, it would have had strong incentives to, and been well-positioned to, provide Motorola with this information.

7.     Dr. Murphy claims that Motorola should have been aware of the number of other 802.11 and H.264 SEP owners and the implications of each such owner asking for a royalty at the level of Motorola's opening offers.[6]  However, rather than this hypothetical royalty stacking calculation that Dr. Murphy suggests, the relevant calculation would be the amount of royalties that Microsoft was actually paying to other 802.11 and H.264 SEP owners (i.e., the actual

---

[4] RAND Order ¶¶ 498-99.  I understand that there is a dispute between the parties as to whether and the extent to which the Court's RAND Order can be shown to or shared with the jury.  My ultimate opinions do not depend upon whether the RAND Order is evidence or not.

[5] RAND Order ¶ 502.

[6] Murphy Report ¶ 77.

amount of royalty stacking, not some hypothetical amount of royalty stacking). This is not information that Motorola could have obtained on its own (since it was confidential Microsoft information), but instead is something that Microsoft could have provided to Motorola had Microsoft engaged in negotiations before filing its lawsuit.

8.      Dr. Murphy asserts that Motorola historically did not have an active standalone licensing program for its H.264 and 802.11 SEPs and sent letters to Microsoft only after Microsoft filed suit.[7] Dr. Murphy, however, ignores the testimony of Mr. Gutierrez that after Microsoft filed its lawsuits against Motorola, it invited Motorola to present its patents and participate in cross licensing negotiations.[8] Motorola did so.

9.      Dr. Murphy claims that the fact of Motorola seeking injunctions/exclusion orders in its patent infringement actions against Microsoft demonstrates that Motorola sought to hold up Microsoft.[9] However, I understand that Microsoft contends that Motorola breached a contract by sending the offer letters. Under this contention, the questions are whether Motorola's opening offers were made in good faith and thus whether the opening offers considered in isolation were an effort to hold up Microsoft. Accordingly, it is important to note that the situation had changed substantially between the time Motorola made its opening offers and the time when it brought its patent infringement actions. Specifically, in the interim, Microsoft filed this lawsuit. Motorola's actions taken in response to Microsoft's lawsuit do not provide reliable evidence about the nature of Motorola's opening offers or Motorola's state of mind in making those offers.

---

[7] Murphy Report ¶ 79.

[8] Gutierrez Dep. II, p. 76 (rough).

[9] Murphy Report ¶ 80.

10. Moreover, it was typical in the 2010 time frame for a plaintiff in a patent infringement action to seek an injunction/exclusion order as a matter of course. I understand there is currently a policy debate concerning whether SEP owners should be granted injunctions, but that debate has been joined in earnest only recently. In fact, Microsoft sought injunctive relief in the actions it filed on October 1, 2010. Moreover, in a letter to the Federal Trade Commission in June 2011, Microsoft stated that a SEP holder should not be precluded from seeking injunctive relief for infringement of its SEPs.[10] I am aware that, just last week, the ITC issued an exclusion order against Apple for infringement of a Samsung SEP, reflecting the ITC's belief that an injunction may be appropriate recourse for an unwilling licensee.[11] Thus, there is no basis to conclude from the fact that Motorola sought an injunction/exclusion order after Microsoft filed this lawsuit that Motorola's opening offers were not made in good faith.

11. I further understand that, according to its discovery responses, Microsoft contends that Motorola is in breach of contract because it sought injunctive relief as a remedy for Microsoft's infringement of Motorola's SEPs.[12] Under this contention, there is no breach in my opinion for the same reasons described above. Indeed, an injunction may be an effective means by which to get an otherwise unwilling party to participate in a RAND negotiation.

12. Finally, seeking an injunction did not (and does not) guarantee that one will in fact issue (even assuming a finding of validity and infringement) because, as I understand the legal structure, a U.S. District Court or the International Trade Commission may consider public

---

[10] Letter, p. 13, available at http://www.ftc.gov/os/comments/patentstandardsworkshop/00009-60523.pdf, visited June 7, 2013.

[11] http://online.wsj.com/article/SB10001424127887323469804578525723885896616.html, visited June 10, 2013.

[12] Microsoft's April 3, 2013 Supplemental Response to Interrogatory No. 3, p. 10.

interest factors, including the implications of any RAND commitment on the part of the patent owner, when determining whether the injunction/exclusion order should issue.

13.     Dr. Murphy suggests that the timing of the opening offer letters, coming after Microsoft had brought its patent infringement lawsuits against Motorola, is a signal that the opening offers were a strategy for Motorola to offset the royalties it would owe Microsoft by holding up Microsoft.[13]   This argument ignores three facts.  First, as Microsoft itself acknowledges, after it filed its October 1, 2010 actions against Motorola, Microsoft invited Motorola to identify its patents so that the parties could engage in a discussion concerning a broad cross license.  After Motorola did as Microsoft requested, Microsoft filed this lawsuit 20 days after the first offer letter was sent.  Second, when Microsoft requested that Motorola identify its patents, it also indicated that Motorola may need to sue Microsoft to show Microsoft the strength of its patents.[14]   Third, even if Motorola had not been told by Microsoft that it would need to sue, asserting one's own patents in an attempt to negotiate a cross license agreement to lower one's royalty payments is a standard business strategy widely practiced by many companies.  Thus, there is no valid basis to draw conclusions about hold up based solely on an attempt to seek a cross license in response to being sued.

14.     Dr. Murphy attempts to rationalize Microsoft's behavior in suing instead of making a counteroffer by claiming that it was economically rational for it to do so.[15]   However, if it was economically rational for Microsoft to sue instead of negotiate, it would have been

---

[13] Murphy Report ¶ 80.

[14] Interview of Kirk Dailey, May 29, 2013.

[15] Murphy Report ¶ 72.

economically *irrational* for Motorola to pursue the hold-up strategy that Dr. Murphy ascribes to it.  Thus, Dr. Murphy's argument ultimately is internally inconsistent.

15.     Dr. Murphy claims to apply the "economic theory of bargaining" to this case.[16] However, he does not fit the theory to the facts of the case.  For example, he claims "theory" as the basis for his conclusion that Motorola could use its opening offer to affect the outcome of the negotiation with Microsoft.[17]  However, Microsoft's licensing witness Mr. Gutierrez testified that a patent owner's opening offer does not affect Microsoft's view of what it is willing to pay for the technology at issue.[18]  This is consistent with Microsoft being a sophisticated company with substantial licensing experience and resources.  Consequently, Motorola's opening offer could not have affected the outcome of the negotiation in this case significantly, contrary to Dr. Murphy's claim.

16.     Similarly, Dr. Murphy ignores the context in which Motorola made its offers to Microsoft.  Specifically, the offers were made in the context of a broader cross license negotiation.  As explained in my opening report, Microsoft had already sued Motorola and invited Motorola to put forward its own patents and negotiate a patent license agreement.  The parties had scheduled an in-person meeting (which occurred on October 22, 2010) before Motorola sent the first of its two October letters, and the parties had already met before Motorola sent the second of the letters.  Thus, it was reasonable for Motorola to believe that the parties would continue negotiations following the October letters.  Dr. Murphy does not consider this context.

---

[16] Murphy Report ¶ 72.

[17] Murphy Report ¶ 72.

[18] Gutierrez Dep. II, p. 126 (rough).

17.     Dr. Murphy points to Motorola's interactions with Marvell as additional evidence that Motorola was pursuing a strategy to hold up Microsoft.[19]  However, Motorola's interactions with Marvell took place well after Motorola made the opening offers to Microsoft and thus they do not provide reliable evidence for assessing whether the opening offers were made in good faith.

18.     I understand that, according to its discovery responses, Microsoft contends that Motorola is in breach of contract because it did not grant a license to Marvell.[20]  However, this contention (and Dr. Murphy's discussion of Marvell) ignores what actually transpired between Marvell and Motorola.  Marvell approached Motorola for a license in July 2011.[21]  Marvell made clear to Motorola that it was seeking a license at the request of its customer, Microsoft, who had already sued Motorola.[22]  Motorola told Marvell that it was not asserting its 802.11 standard essential patents against Marvell's chips; in other words, Motorola was not requiring a license from Marvell.[23]  Motorola historically had licensed end product manufacturers, rather than component manufacturers, under its SEPs.  In part, this was due to its reasonable goal of obtaining a cross license to its end product competitors' SEPs to allow Motorola to operate freely

---

[19] Murphy Report ¶ 81.

[20] Microsoft's April 3, 2013 Supplemental Response to Interrogatory No. 3, p. 11.

[21] Kowalski Ex. 15.

[22] MS-MOTO_1823_00004079501; MOTM_WASH1823_0620518.

[23] MS-MOTO_1823_00004079501.

9

in the end product markets.[24]  Nevertheless, Motorola responded in good faith to Marvell's

license inquiries, and Marvell did not actively pursue a license.[25]

19.     Dr. Murphy also claims that Motorola treated Microsoft differently than other

802.11 implementers when it offered Marvell a licensing agreement with Microsoft carved out.[26]

However, Microsoft was not situated similarly to other 802.11 implementers—it had sued

Motorola.  RAND does not require an SEP owner to treat differently situated licensees similarly.

In fact, Microsoft previously acknowledged to the Federal Trade Commission that provisions

such as that proposed to Marvell (a defensive suspension provision) are not uncommon.[27]

20.     Dr. Murphy states that Motorola's opening offers were more than just a throw-

away because Motorola has stated that negotiations were only about the form of consideration,

not the amount; that is, the total consideration that it sought to receive and in fact received for

licensing its SEP portfolios was always 2.25%.[28]  However, the reality is that Motorola does not

appear to always obtain 2.25% in consideration even on its cellular SEP portfolio in all cases.

Moreover, this statement, like the opening offers, was a default position in regards to the 802.11

and H.264 SEP portfolios because Motorola had no experience licensing these portfolios on a

standalone basis.  Further negotiations would have given Microsoft the opportunity to convince

---

[24] Trial Transcript, Day 6, p. 113 (Dailey).

[25] Kowalski Dep., pp. 11-15, 16-17, 27-28; MS-MOTO_1823_00004080454, MS-MOTO_1823_00004080477, MS-MOTO_1823_00004080458, MOTM_WASH1823_0620518, MOTM_WASH1823_0620498, MOTM_WASH1823_ 0621460,MOTM_WASH1823_ 0620542, MOTM_WASH1823_0620363, MOTM_WASH1823_0620546, MOTM_WASH1823_0620564, MOTM_WASH1823_0620618,and MOTM_WASH1823_ 0620625; MOTM_WASH1823_0620363.

[26] Murphy Report ¶ 81.

[27] MOTM_WASH1823_0054670, at 6 (Heiner Depo. Ex. 2).

[28] Murphy Report ¶ 72.

Motorola that the total consideration should be less than 2.25% for these patents. That Microsoft could have done so does not mean that Motorola's opening offers were not made in good faith.

21.     Dr. Murphy suggests that in bilateral negotiations an SEP holder has the incentive to extract hold up value from the licensee.[29]  However, real-world bilateral negotiations between sophisticated parties acting in good faith have often led to licenses consistent with RAND.  I understand that the Court agrees that "[t]ypically, the SEP owner and the potential licensee determine RAND terms through good-faith, bilateral negotiations, which take place independent of ITU and IEEE's activities."[30]

22.     I also understand that Microsoft has agreed in the past that bilateral negotiations are usually a successful approach to determining RAND licensing terms.  On June 14, 2011, David Heiner, Microsoft's Vice President and Deputy General Counsel, and Amy Marasco, Microsoft's General Manager for Standards Strategy and Policy submitted a letter to the FTC on behalf of Microsoft in response to the FTC's May 13, 2011 Request for Comments and Announcement of Workshop on Standards-Setting Issues regarding "patent hold-up" in connection with standardization efforts.[31]  Microsoft's letter stated that "RAND-based IPR policies provide a flexible framework to help enable customized bi-lateral negotiations for patent licenses that generally are not limited to just the essential patent claims in connection with a standard."[32]  In addition, Microsoft stated that "companies make decisions about whether to initiate licensing discussions and, if so, what considerations beyond just the essential claims vis-

---

[29] Murphy Report ¶ 13.

[30] RAND Order ¶ 85.

[31] Trial Ex. 2970.

[32] Trial Ex. 2970, p. 3.

à-vis the final standard will be included.  The negotiation associated with a standards-related patent license typically is not different from any general patent licensing discussion and will involve trade-offs on all of the terms and conditions."[33]

23.      Dr. Murphy claims that certain economic theories of negotiation suggest that parties that have relevant information have incentives to reveal at least some of that information in their opening offers.[34]  As I explained in my opening report, however, parties in the early stages of a negotiation often have incomplete and sometimes incorrect information.  In this case, Motorola did not have full information about Microsoft's products, the nature of Microsoft's business, the extent of participation of other companies in the standard, various licensing agreements, patent pools, and other analyses that might have been relevant.  The Court had access to a five day trial with numerous witnesses, including several experts, and still found on some occasions that it could "not determine a winner" in the battle of the experts due to insufficient evidence.[35]  In my opinion, with much less information than what was available to the Court during the trial, Motorola was acting in good faith to open the negotiations the way that it did.  Indeed, by opening negotiations, Motorola invited Microsoft to provide the information that the Court had available to it so that the parties could use that information in their negotiations.

24.      Dr. Murphy states that Motorola should have fashioned its offers based on the patent pool rates for the MPEG LA H. 264 pool and the Via 802.11 pool.[36]  I disagree.  At that

---

[33] Trial Ex. 2970, p. 12; RAND Order ¶ 86.

[34] Murphy Report ¶ 65.

[35] RAND Order ¶ 370.

[36] Murphy Report ¶ 76.

stage in the negotiation, Motorola did not have any reason to believe that the patents in these pools were comparable to its patents.  Moreover, as the Court noted, patent pool royalty rates can be lower than RAND royalty rates that parties negotiate in bilateral negotiations.  The Court stated that "the uncontroverted . . . evidence is that a rate higher than a pool rate could still be RAND."[37]

25.     The Court found several reasons for patent pools having lower royalty rates than bilateral negotiations:  (1) the principal objective of most pools is to minimize royalty exposure and maximize freedom of operation for licensees, rather than to maximize licensing revenue; (2) pools ignore the value of the individual patents being licensed; (3) royalty rates must be low to encourage widespread adoption by licensees, since the licenses are non-negotiable; (4) pools have low licensing transaction costs, since negotiations are not necessary; and (5) rates are sometimes lower due to antitrust concerns.[38]  Moreover, there can be a "sample selection problem," whereby only patent owners with weak patents agree to join the pool, while the patent owners with strong patents choose to pursue bilateral negotiations.  For these reasons, as well as those set forth in my opening report, I disagree with Dr. Murphy's opinion that Motorola necessarily should have considered the pool rates in formulating its opening offers.

III.     **THE MENENBERG REPORT**

26.     Mr. Menenberg calculates Microsoft's alleged damages related to the alleged contract breach.  The claimed damages arise from (1) attorney's fees and litigation costs incurred defending against Motorola's claims of patent infringement in the ITC, U.S. District Court, and

---

[37] RAND Order ¶¶ 498, 499.

[38] RAND Order ¶ 498.

German court proceedings, and (2) the incremental costs Microsoft incurred in moving its distribution center from Germany to the Netherlands.

27.     I understand that the plaintiff in a contract breach case must prove that the alleged breach *caused* the damages that are claimed.  From an economist's point of view, damages are the difference in the plaintiff's financial position between (1) the counterfactual "but for" world that would have existed absent the alleged breach and (2) the actual world.  I also understand that a plaintiff has a duty to mitigate its damages.

28.     Mr. Menenberg does not opine that Motorola's alleged breach caused the damage to Microsoft.  Rather, his report only calculates the amount of the alleged damage, apparently under an assumption of causality.  None of Microsoft's other experts opine on causation either. For both of the categories of claimed damages, serious doubt exists as to causality.  With respect to attorney's fees and litigation costs, I understand that Motorola was well within its rights to bring the patent infringement lawsuits it filed.  Microsoft filed suit *first* and invited Motorola to present its patents and engage in a cross license negotiation.  Motorola did as Microsoft had requested and, rather than respond to Motorola's opening offers, Microsoft filed the present action.  After Microsoft's refusal to negotiate, it was reasonable for Motorola to file suit.  Thus, when assessing causation, Microsoft's actions in initiating the litigation must be taken into account.  Moreover, even had Microsoft responded to Motorola's offer letters before filing suit, I understand that there is no prohibition against bringing a lawsuit asserting infringement of an SEP.  Mr. Menenberg has not delineated the "but for" world.  Had the lawsuits occurred in the "but for" world (in full or in part), at least some of the attorneys' fees that Mr. Menenberg has identified would have been incurred by Microsoft even in the "but for" world.  Such attorneys' fees should not be included as damages.

14

29.     Causality regarding the claimed distribution center damages is questionable for several reasons.  Preliminarily, the timing of Microsoft's move of its EMEA distribution center from Duren, Germany to Venray, the Netherlands, suggests that the move was caused, at least in part, by factors other than the alleged contract breach.  First, when Microsoft relocated its facility, it also changed vendors from Arvato to CEVA.  Arvato  was demanding price increases and was very hesitant to reduce costs, and refused to have an "open book" policy in which Microsoft was provided with the actual costs of running the facility.[39]  In contrast, CEVA has provided Microsoft with an "open book" policy.[40]  Microsoft's contract with Arvato to run the operations of the Duren facility was set to expire on May 31, 2012, the day before the Venray facility ultimately began operations.[41]  Microsoft gave notice to Arvato of its intent to terminate its contract early on February 13, 2012, which is before the date that Microsoft's 30(b)(6) witness claims Microsoft decided to relocate the facilities.[42]  Arvato then quickly found another tenant to replace Microsoft at the Duren facility.[43]  Having terminated the contract, Microsoft had to find another facility.  This suggests that Microsoft's termination of its relationship with Arvato with respect to the Duren facility was at least a factor in the decision to relocate the

---

[39] Davidson Dep., pp. 48, 49-50, 51-52, 224-225.

[40] Davidson Dep., pp. 50, 134-135.

[41] Davidson Dep., pp. 53, 95.

[42] Davidson Dep., p. 101.  I understand that Mr. Davidson testified that the decision to move was made by his team on or about March 8, 2012 (Davidson Dep., pp. 34-35).  Assuming that is true, Microsoft gave notice of termination to Arvato before it had even decided to move out of Germany.  Mr. Roberts, however, testified that in January 2012 he was informed by legal that there was pending litigation that might require Microsoft to move its facility.  The timing of the decision does not affect my opinion that there are serious questions as to causation.

[43] Davidson Dep., pp. 101, 131-132.

facility.  Also a factor in the timing of completing the move was ensuring that the move was completed prior to Microsoft's peak period.[44]

30.     Second, even if Microsoft did relocate the distribution facility as a result of the potential for an injunction in Germany, the new Microsoft distribution center is not a replica of the older one.  The correct measure of damages is the incremental costs to Microsoft associated with duplicating its old distribution facility in the Netherlands.  In short, Mr. Menenberg's analysis ignores the benefits Microsoft realized from the move.  As explained above, Microsoft started working with a new vendor in connection with the move.  CEVA is based in the Netherlands and has a much larger scale worldwide and in Europe than does Arvato.[45]  In this transition, Microsoft also shifted management models to an operate model, which gives Microsoft more insight into costs.[46]  Additionally, the Venray facility is in closer proximity to a port than the Duren facility, which is beneficial.[47]  Microsoft's 30(b)(6) witness testified that the Duren facility was two and a half hours further from a barge terminal than the Venray facility.[48]  Further, the Netherlands facility is much larger than the Duren facility.[49]  This larger size allows

---

[44] Roberts Dep., pp. 86-87.

[45] Davidson Dep., pp. 134, 136-137.

[46] Roberts Dep., pp. 95-97.

[47] Davidson Dep., pp. 113, 114; Roberts Dep., p. 28; http://maps.google.com/maps?hl=en&tab=wl, visited June 7, 2013 (directions from Duren, Germany to Rotterdam, The Netherlands, a distance of 244-286 km, depending on route); http://maps.google.com/maps?hl=en&tab=wl, visited June 7, 2013 (directions from Venray, The Netherlands to Rotterdam, The Netherlands, a distance of 132-174 km, depending on route).

[48] Davidson Dep., p. 114.

[49] Davidson Dep., Ex. 12, pp. 153, 155-158, 159-160; Roberts Dep., Ex. 14, pp. 111, 112, 113-114, 114-115, 144-145.

Microsoft to store and move more products if demand requires it.[50]  Indeed, Microsoft witness

Owen Roberts testified that during peak periods, the Duren facility could not store all of

Microsoft's products.  During those periods, Microsoft would obtain temporary warehouse space

to store its products.  Microsoft has not had to do that since it relocated to the larger facility in

the Netherlands.[51]  Additionally, Microsoft shared the Duren facility with other tenants, whereas

it has the entire Venray facility and its resources to itself.[52]  Indeed, Microsoft reassured its sales

team about the move by explaining that the move was made "with a vision for the future."[53]

Both the larger size and the fact that it is not a shared facility contribute to Microsoft's operating

costs being higher in Venray than in Duren.[54]   Mr. Menenberg's calculations do not account for

the benefits realized with the new facility.  At the very least, these benefits should be an offset

against the incremental costs Mr. Menenberg has identified.

31.     Third, Mr. Menenberg's calculated damages include costs associated with

terminating the agreement with Arvato.  However, these costs were not caused by the alleged

contract breach.  Microsoft incurred a penalty for having terminated the Arvato contract early, in

April 2012.[55]  As a result, Mr. Menenberg includes €490,000 in "exit costs for termination of

German vendor services" that relate to the early termination by Microsoft of its agreement with

---

[50] Roberts Dep., p. 116.

[51] Roberts Dep., pp. 146, 146-147.

[52] Davidson Dep., pp. 84 (noting that a possible Belgium site was not "ready" because there were other tenants there and Microsoft would not be able to occupy it completely), 170, 171.

[53] Davidson Dep., Ex. 12, pp. 147-148.

[54] Davidson Dep., pp. 198-199, 199-202, 203, 204.

[55] Davidson Dep., pp. 96, 187-188; Roberts Dep., p. 63.

Arvato.[56]  Given that the contract with Arvato was scheduled to expire on May 31, 2012 and the

Venray facility began operations on June 1, 2012, even under the alleged contract breach, there

was no need to terminate the Arvato contract early and incur those early termination fees.[57]

Microsoft's 30(b)(6) witness also provided testimony regarding Arvato's refusal to cooperate in

the transition with CEVA.[58]  Mr. Menenberg's calculations do not attempt to identify and

exclude any costs incurred as a result of Microsoft's decision to end its long relationship with

Arvato.  Again, such costs were not caused by the alleged breach.  Given the long relationship,

Arvato had institutional knowledge that CEVA did not.[59]  Had Microsoft chosen to use Arvato at

the new facility, rather than CEVA, it would have saved on some of the $152,868  in vendor

development costs that it now seeks to recover from Motorola.[60]

32.     Fourth, it appears that there were various ways in which Microsoft could have

reduced the costs of the relocation, or potentially avoided it altogether.  Microsoft's 30(b)(6)

witness acknowledged that the process of relocating likely would have been less costly if it had

been done over a longer period of time than the six months Microsoft took.[61]  He did not explain,

however, why Microsoft did not begin work on the move prior to January 2012, which was six

months after the German actions were filed.[62]  Similarly, Mr. Roberts testified that one

alternative Microsoft considered was to set up a bonded warehouse in Duren, but that would take

---

[56] Menenberg Report p. 22.

[57] Davidson Dep., pp. 120, 121-122.

[58] Davidson Dep., pp. 127-128, 129, 140, 143-144.

[59] Davidson Dep., pp. 137-138, 139.

[60] Davidson Dep., pp. 192-193.

[61] Davidson Dep., p. 172; Roberts Dep., p. 42.

[62] Davidson Dep., pp. 81, 172; Roberts Dep., pp. 16, 132.

a minimum of six months to do.[63]  Had Microsoft started the work on the move earlier, it might

have been able to reduce the costs of the move that it is now seeking to recover from Motorola.[64]

Microsoft's 30(b)(6) witness also did not explain why Microsoft did not file a motion with this

Court earlier than March 2012 to preclude Motorola from enforcing an injunction in Germany, a

motion that was granted.[65]  Had Microsoft filed that motion earlier, the Court in this matter may

have issued its ruling earlier and Microsoft could have avoided relocating altogether.

Microsoft's 30(b)(6) witness also did not have any knowledge of what Microsoft did to avoid

litigation in Germany in terms of legal procedures.[66]  I understand from the Expert Report of

Professor Maximillian Haedicke that there are German legal procedures that Microsoft could

have followed that would have protected Microsoft from an injunction, and thus made the

relocation unnecessary.

33.     Because of its failure to prove causality and to account for mitigation, I conclude

that Microsoft has not established a reliable basis for calculating its damages and thus should not

be awarded any damages in this case.

_____

Gregory K. Leonard

Dated:  June 10, 2013

---

[63] Roberts Dep., pp. 35-36.

[64] Mr. Roberts also testified that Microsoft did not consider the costs of setting up a bonded warehouse because there was not enough time to set it up (Roberts Dep., p. 37).

[65] Davidson Dep., p. 173.

[66] Davidson Dep., pp. 175, 179.