# EXHIBIT 7

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

MICROSOFT CORPORATION, a Washington
corporation,

                       Plaintiff,

         v.

MOTOROLA, INC., and MOTOROLA
MOBILITY LLC, and GENERAL
INSTRUMENT CORPORATION,

                   Defendants.

CASE NO. C10-1823-JLR

MOTOROLA MOBILITY LLC, and
GENERAL INSTRUMENT CORPORATION,

        Plaintiffs/Counterclaim Defendant,

         v.

MICROSOFT CORPORATION,

         Defendant/Counterclaim Plaintiff.

**EXPERT REPORT OF DR. MAXIMILIAN HAEDICKE**

I.      INTRODUCTION

        1.      I am Full Professor of Law at Albert-Ludwigs-University in Freiburg, Germany. My research and writing is focused on German, European and international intellectual property law, competition law and on contract law. I wrote several books and articles about various issues of civil law, intellectual property law, especially patent law, competition law and licensing. I am also a Judge with the Patent Division of the Düsseldorf Court of Appeals, which handles the majority of the appeal proceedings in patent infringement cases in Germany. I studied law in Munich, Geneva and at Georgetown University Law Center in Washington, D.C., where I received an LL.M. degree. In 1995, I passed the New York Bar Exam. Between 1999 and 2001 I worked in the U.S. department of the Munich-based Research Institute called "Max-Planck-Institute for Foreign and International Patent, Copyright and Competition Law." Between 2001 and 2003, I worked as an attorney for the IP Practice Group of the British/German law firm Freshfields Bruckhaus Deringer in the Munich and Düsseldorf offices. In 2003, I worked for half a year as an attorney for the IP litigation law firm rospatt osten pross.  In 2003, I became Professor at Albert-Ludwigs-University in Freiburg, Germany.

        2.      A copy of my CV and a list of my publications are attached as **Exhibit A**.  My hourly billing rate for this matter is 350 Euros per hour.  My compensation does not depend on the opinions I express our the outcome of this litigation

        3.      I understand that Microsoft has brought a lawsuit in the U.S. District Court for the Western District of Washington at Seattle alleging that Motorola is liable for damages because Motorola has sued Microsoft in Germany for patent

infringement on the basis of standard-essential patents. I have been instructed by Quinn Emanuel Urquhart & Sullivan L.L.P. to act as an expert witness on behalf of Motorola in this action regarding patent law, injunctions and standards-essential patents (SEPs) in Germany.

        4.      In the course of my analysis, I have reviewed the documents and other information listed in Exhibit B to this report.  I reserve the right to update my opinions should more relevant information become available in the future.

## II.      SUMMARY OF CONCLUSIONS

        5.      Germany has a very sophisticated patent system.  Intellectual property is an important part of the German economy and provides incentives and protection for companies to engage in research and development.  It is important to the German and European economy, as well as other advanced economies such as the United States, that non-licensed patent infringement be prevented.

        6.      I understand that Microsoft claims that it had to move a distribution facility because of the threat of an injunction in Germany that Microsoft claims would have prevented it from distributing products in Germany and Europe.  These products I understand infringe German patents.  However, German law has a system in place for preventing the harm that Microsoft claims it would suffer.  Applying law known as the Orange Book rules to the *Motorola vs. Microsoft* case as they stood in 2012, it would have been very easy for Microsoft to avoid an injunction.

        7.      There are similarities in the U.S. and German patent system, but there are also differences.  One of the main differences to the US system is the bifurcation of patent infringement and nullity proceedings.  Nullity proceedings involve

claims that the patent is invalid and should not have been issued by the patent office. Nullity claims may only be brought before the Federal Patent Court which is the only court that has jurisdiction to nullify German patents (or German parts of European patents) after expiration of the term for filing an opposition against the grant of a patent. Thus, the civil courts hearing and deciding infringement cases do not have jurisdiction to rule on the validity of a patent-in-suit.  However, the defendant in an infringement action can file a motion requesting that the infringement action be stayed pending the nullity action before the Federal Patent Court. Such a stay will be granted if the infringement court deems the invalidation of the patent to be likely and usually also requires new prior art that was not considered during prosecution (which reflects the due respect to the autonomous patent grant by the competent patent office). An essential rationale of this bifurcation system is that the Patent Office and the Federal Patent Court are equipped with technical judges who have technical degrees and sufficient technical experience to evaluate the validity of the patent-in-suit.

8.      In German patent infringement courts, especially in the District Courts of Mannheim and Düsseldorf and in the Düsseldorf and Karlsruhe Courts of Appeal, many standard essential patents have been tried.

9.      If an implementer of standard essential patents has not been granted a license, he can be sued for patent infringement like any other patent infringer. It is worth noting that any unlicensed use of a patented invention, standard essential or otherwise, is per se illegal under the German Patent Act and is deemed a tort. Either an injunction or damages can be obtained as these are remedies as of right; the German

Patent Act does not provide for judicial discretion with regard to any of the statutory remedies.

10.     When the use of a standard essential patent is at issue, the license seeker is still subject to the rule of per se illegality. If the patentee enjoys a dominant position in the product markets downstream of the patented invention, including by virtue of his patent ownership, applicable German and EU antitrust rules may under certain circumstances prevent the patentee from refusing to grant a license. While such anticompetitive refusal would generally only entitle the license seeker to claim damages, the Federal Supreme Court held in the Orange Book case that a bona fide license seeker may introduce such refusal to license into infringement proceedings by raising an estoppel-type defense (based on § 242 of the German Civil Code).  If successful, this defense insulates a bona fide license seeker from an injunction order. Generally speaking, this special estoppel-type defense permits (and requires) the licensee to act "as if licensed". Since the patentee is under an obligation to grant a license on RAND-terms, the refusal by the patentee to enter into a license will be disregarded when assessing the license-seeker's behavior.  Under this concept, the infringement court needs to decide whether the license-seeker fulfills all the requirements for a licensed use of the RAND-encumbered patent but for the patentee's agreement to enter into a license agreement (which refusal will be disregarded). The license seeker must thus make an unconditional offer to conclude a license contract with an adequate (reasonable) license fee. Alternatively, he can put money into escrow which he considers to be equitable while leaving a contractually binding commitment to a certain rate in the license offer open. In such case, the specification as to the equitable license fee is finally made by a judicial

decision in a separate subsequent action that can be initiated by either the patentee or the licensee once the license agreement is concluded.

11.     Only in cases in which a license seeker did not meet all requirements set out by the Orange Book decision, especially if no sufficient license fee was offered or escrowed, is the Orange Book defense denied.

12.     If Microsoft had made an offer containing equitable license fees or if Microsoft had escrowed a sufficient amount of money and had let the court decide about an equitable license fee, Microsoft would not have been enjoined.

13.     An injunction is not immediately binding on the defendant. Further steps by the court and by plaintiffs have to be taken to enforce an injunction.

14.     In principle, the relief granted by a trial court judgment is enforceable pending an appeal if the plaintiff posts a security bond specified in the judgment. However, upon petition of the defendant/appellant, the infringement court, or after an appeal has been filed, the Court of Appeal may grant a temporary stay of this enforcement, if certain conditions are met.

## III.     SOME FUNDAMENTALS OF THE GERMAN PATENT SYSTEM

15.     Germany is a Contracting State of the European Patent Convention (EPC). Similar to US patent law, under the EPC patents are granted for any inventions, in all fields of technology, providing that they are new, involve an inventive step, and are susceptible of industrial application (Art. 52(1) EPC). Once the European patent is granted by the European Patent Office, it has the same effect as a national patent (Art. 2(2) EPC). Accordingly, if a European patent is in force in Germany, the German courts have jurisdiction to decide on the enforcement and the validity of the German part

of a European patent and treat it as if it were a German patent. Most of the substantive laws applied by the German court are provided for by the EPC or the corresponding implementing German statute, *e.g.* the rules on scope of protection and grounds for invalidity, while the remedies are governed by German law (German Patent Code).

16.     To date, there is no Unitary European Patent Court. Patent litigation is remitted to the national courts of the EPC signatory states. The German courts are by far the most important courts for patent litigation proceedings in Europe. Approximately 2/3 of all patent infringement law suits in Europe are litigated in Germany. In Germany, most cases are heard by the patent divisions of the District Courts of Düsseldorf and of Mannheim and by the Appellate Courts in Karlsruhe and Düsseldorf. Accordingly, the judges in Mannheim, Düsseldorf and Karlsruhe are very qualified to hear patent infringement matters. They are internationally renowned for high-quality, moderately priced and speedy patent infringement proceedings.

17.     The validity of the patent in suit can, in principle, not be challenged in German patent infringement proceedings. The infringement court cannot render a judgment which nullifies the patent. German patent infringement courts presume that a patent is valid because it has been subject to a prior examination. Instead, nullity actions are tried before the Federal Patent Court.

18.     However, the patent infringement court by no means ignores validity issues. The court thoroughly assesses the likelihood of success on the merits in a parallel nullity action. If the infringement court deems it likely that the patent will be nullified in the nullity action, it will stay the infringement proceedings until the Federal Patent Court has decided the invalidity claim. In contrast, under the German system the

infringer is banned from unduly delaying the infringement action by asserting frivolous nullity claims in infringement proceedings.

## IV. STANDARD-ESSENTIAL PATENTS IN GERMANY

19.     Germany is Europe's largest economy and the biggest consumer market in Europe. Thus, nearly all European patents are validated in Germany. I am not aware of any European patent in the field of information technology which has not been validated in Germany.

20.     Thus, many important lawsuits relating to standard-essential patents in the field of information technology have been tried in Germany.

21.     For example, as early as in 2007, the Düsseldorf District Court has rendered several judgments relating to standard-essential patents in the field of MPEG-2 (see the unpublished decisions of the 4a. Division of the Düsseldorf District Court dated 11. January 2007, docket nos. 4a O 343/05, 345/05, 347/05, 348/05, 351/05, 511/05 and, as far as the decisions of the 4b Divison of the Düsseldorf District Court are concerned, the decision of 30. November 2006 (InstGE 7, 70 ff. Videosignal-Codierung I). Additionally, in 2008, the MPEG2 standard was litigated again before the Düsseldorf District Court (docket no. 4a O 81/07 MPEG II). Further patent lawsuits relating to standards were tried in Düsseldorf in 2012 (judgment of 24.4.2012 – 4bO 274/10 and 4bO 233/10).

22.     In the last few years, the majority of the patent litigation proceedings relating to standard-essential patents took place before the Mannheim District Court and the Karlsruhe Court of Appeals. These cases concerned, inter alia, the GPRS-standard (see e.g. LG Mannheim docket no.7 O 122/11, Mitt 2012, 120; 7 O

230/11; but also docket no. 7 O 326/11; 7 O 166/11; 7 O 325/11; 7 O 94/08; 7 O 65/10; 2 O 240/11 relating to other mobile communication standards ) as well as since mid-2000 numerous cases relating to the MPEG-1 Audio standard (mp3 and DVB) and since early 2000 cases relating to the Jedec DRAM standards.

24. 23.     Thus it can be summarized that not only the relevant standard-essential patents in the field of information technology are valid in Germany, but that the German courts were, and are until to date, first choice for standard-essential patents-related litigation.

## V.     THE ORANGE BOOK DECISION AND ITS APPLICATION TO THE MICROSOFT VS. MOTOROLA-CASE

A.     <u>General Rules Applying to the Enforcement of Standard-Essential Patents</u>

24.     In principle, a standard-essential patent is not treated differently from any other patent. Unlicensed use of a standard-essential patent is thus the subject of the same per se illegality rule that applies to any other patent.  If somebody makes unauthorized use of a standard-essential patent, the patent holder can seek injunctive relief, damages and rendering of account, and he can recall the patent-infringing objects (see Sec. 139 et seq. of the German Patent Act). The Mannheim District Court stated very clearly that, as a matter of principle, the exclusion of the enforcement of a standard essential patent is not justified:[1]

> "The mere fact that the patent holder owns a standard essential patent does not lead to the consequence that he is impeded from the enforcement of the right to exclude which derives from his intellectual property right. The

---

[1] See Mannheim District Court, judgment of 18th February 2011, docket no. 7 O 100/00, BeckRS 2011, 04156, Section C II 2 of the judgment.

reason for this is that in this the monopoly character of the industrial property rights is revealed."

25.      However, certain additional rules apply to standard-essential patents which are framed under German and European antitrust law. Depending on the circumstances of the case, a standard-essential patent can lead to a dominant position in the downstream licensing and product markets. Thus, the patentee is subject to Article 102 TFEU (and corresponding German antitrust rules). In particular, he may not discriminate against bona fide license-seekers and may not exploit the market power to secure excessive royalties. He must license on fair, reasonable and non-discriminatory (FRAND) terms.

B.      The Orange Book Decision of the German Federal Supreme Court

26.      In order to achieve a balance of interest between the holder of a standard-essential patent and the license seeker, German courts, above all the German Federal Supreme Court, have developed a certain procedure according to which the patent seeker can ensure that no injunctive relief is granted if the patent holder refuses to grant a license.

27.      This procedure is based on the Orange Book Standard Decision of the German Federal Supreme Court.[2] This case deals with the admissibility and the substance of the competition law defense which insulates the license-seeker from cease and desist claims by the patentee if he fulfills all the requirements of lawful, licensed use. More precisely, the issue of the decision is whether, in a patent infringement lawsuit, an

---

[2] German Federal Civil Court, Antitrust Division, Judgment of 6th May 2009 – Orange Book Standard, Docket No KZR 39/06, English Version available in IIC 2010, 369 and Case Document 245-1 German version available e.g. in GRUR 2009, 694.

alleged patent infringer may defend himself against a motion for injunctive relief on the basis of the argument that, under competition law, the patent holder is obliged to grant a license to him.

28.     The Orange Book Standard Decision is based on the following facts: Plaintiff is holder of a patent which is essential for the production of recordable compact discs and rewritable compact discs (CD-Rs and CD-RWs). Plaintiff has granted licenses to several companies. Defendants use the patented subject matter to produce and distribute recordable compact discs and rewritable compact discs without a license. The District Court and the Court of Appeals granted the injunction and prohibited defendants from manufacturing, supplying, putting into circulation, using or importing or possessing for the said purposes CD-Rs and CD-RWs that have not been put into circulation with plaintiff's consent.

29.     The Federal Supreme Court decided that defendants were liable for patent infringement. The alleged infringer may raise the defense that the patent holder is abusing a market-dominant position by refusing to conclude a patent license contract with the defendant on non-discriminatory conditions. However the patent holder only acts abusively if the defendant has made him an unconditional offer to conclude a license contract that the patent holder cannot refuse without violating the FRAND obligation. Furthermore, if the license seeker is already using the patent, he has to anticipate the execution of the license agreement and therefore unilaterally has to comply with those obligations that the proposed license contract imposes on the use of the licensed object.

30.     In the Orange Book Case itself, defendants had not successfully asserted the compulsory license defense since they had not made an offer which would have met the requirements as they were laid out in the Orange Book Decision.

31.     As the court points out, the denial of a license only infringes the principle of good faith if the following conditions are met: (i) First, the party seeking a license must have made to the patent holder a binding and unconditional offer to conclude a license on FRAND terms, which the patent holder cannot refuse without violating the prohibition on discrimination. (ii) Second, the party seeking a license must, if he has already used the subject matter of the patent before the patent holder has accepted his offer, comply with those obligations that the license contract to be concluded imposes on the use of the licensed subject matter and especially has to render account with respect to the use of the patent. (iii) Finally, the license seeker must pay or guarantee the payment of the license fees, at least escrowing a sufficient amount in favor of the patent holder.

32.     Beyond the above-mentioned principles, the exact conditions under which an offer by the license seeker is deemed to be such that the patent holder has to accept the offer were not entirely clarified by the judgment. This was not necessary under the facts of this case. The Court merely stated that the license fee to be paid or escrowed amounts to what results from the conditions of a contract which is unobjectionable under antitrust law.[3] The Court further pointed out that, if this amount cannot be determined by the party seeking a license, this is not an inequitable burden

---

[3] See No. 37 of the judgment.

-12-

upon the license seeker since he has the burden of substantiation and proof that the conditions for the claim to a license have been satisfied.

33.    As the determination of the equitable royalty may be difficult for the license seeker, the court has shown an alternative. The license seeker does not necessarily have to include a specific royalty into his offer. Rather he may include a contract clause according to which the patent holder shall determine the appropriate rate at its fair discretion. Then he is allowed to deposit the license fees which he deems equitable in escrow in accordance to Sec. 372 of the German Civil Code.[4] According to Sec. 315 (3) of the German Civil Code, the courts are then entitled to examine whether the rate has been set fairly by the patent holder in accordance with his legal obligations and if not, the court sets an appropriate rate.[5]

34.    Thus, under Sec. 315 of the German Civil Code, if a license seeker choses to make such an open offer, the burden of making a binding offer at a concrete rate is taken away from him. The license seeker is protected against committing to a rate that may be too high.

---

[4] Sec. 372 of the German Civil Code has the following wording: "Section 372 – Requirements: Money, securities and other documents as well as valuables may be deposited by the obligor for the obligee with a public authority intended for this purpose if the obligee is in default of acceptance. The same applies if the obligor cannot fulfill his obligation or cannot do so with certainty for another reason that is in the person of the obligee or as the result of uncertainty, not due to negligence, as to the identity of the obligee.

[5] Sec. 315 (3) of the German Civil Code has the following wording: "Where the specification is to be made at the reasonably exercised discretion of a party, the specification made is binding on the other party only if it is equitable. If it is not equitable, the specification is made by judicial decision; the same applies if the specification is delayed."

35.     The Orange Book decision can therefore be summarized as follows:  (1) Unlicensed patent use constitutes a German law tort and the very existence of a patent requires all third parties to refrain from using the patent; (2) a patentee as a private party is entitled to due process and may thus commence infringement proceedings seeking a court order enjoining the defendant from continuing its infringing use; (3) the seeking of an injunction is subject to estoppel-type defenses if the patentee is required to permit the license-seeker to use the patented invention. This estoppel-type defense is based on the notion that no patentee is entitled to an injunction order enjoining defendant from using a patent if he must grant the defendant permission to use the patent anyway; (4) the estoppel-type defense acknowledged by the Federal Supreme Court in the Orange Book Decision implies that a license-seeker will be insulated from the patentee's cease-and-desist claim if he fulfills all the requirements of licensed use but for the patentee's consent to the license, which was discriminatorily refused; (5) accordingly, the license-seeker is entitled to self-help (of sorts) by commencing use of the patent without a license (which would otherwise constitute a tort) provided that he acts as if licensed; (6) while the Federal Supreme Court did not spell out all the details of what a license-seeker is required to do to meet the "act-as-if-licensed" standard, the Court's opinion includes the basic test that only needs to be applied to the facts of a given case.

36.     The reasoning underlying the Federal Supreme Court's Orange Book Standard Decision applies equally in cases of *de facto* standards and SSO essential patents subject to FRAND declarations, which are also *de facto* standards.  There is no different test for patents that are part of standards adopted by private standard setting

organizations. First, as the courts have repeatedly stated, [6] the compulsory license is an exception from the general principle that the patent holder has an exclusive right which can be suspended only under narrow conditions. The license seeker has to fulfil substantial requirements when he wants to make use of the exclusive right of the patent holder without his consent. From the perspective of the patent holder, there is no difference between a third party's use of the patent which, by itself, constitutes a market-dominant position and a patent which is part of a *de jure*-standard. In both cases the patent holder is subject to an obligation to license. For the purposes of permitting the infringer the exceptional defense envisaged under the Orange Book Standard case, the obligation to conclude a license contract under FRAND conditions can be regarded as equivalent to a duty under competition law.

C.      Further Developments of the Orange Book Standards by German Courts

37.      After the Orange Book decision was handed down in 2009, the District Courts and Courts of Appeals have continued to develop the Orange Book procedure by refining the preconditions under which a license seeker can assert an Orange Book defense. Some of these conditions are still contested, as the Federal Supreme Court has not yet decided upon these issues.

38.      German courts unanimously share the view that the minimum requirement for a contract under FRAND conditions – likewise to any other contract – is

---

[6] See Mannheim District Court, judgment of 18th February 2011, docket no. 7 O 100/00, BeckRS 2011, 04156.

that the parties have agreed on the basic elements of the contract.[7] If there has been no agreement on the license fees and/or on the object of the contract there is no contract and no right to use. Instead, then there is an overt lack of agreement pursuant to Sec. 154 (1) of the German Civil Code.[8]

        39.        According to a judgment of the Mannheim District Court[9], the patent holder does not act abusively if he refuses to conclude a license if the license seeker contests infringement and validity of the patent. The license-seeker must act "as if licensed" and no licensee is permitted to take a license and still contest validity.  German law takes the position that a license grant implies that the parties have agreed that the patent is probably valid.  Because parties to a license cannot know whether the patent would survive validity challenges, the license is the result of both parties' evaluation of probabilities; challenging a licensed patent after a license grant calls that bargain into question and frustrates the license.  As the Mannheim District Court pointed out, it is not considered an abuse of law if the patent holder refuses to conclude a license contract if the license seeker reserves the right to contest the validity of the patent. The license

---

[7] See especially the judgment of the Karlsruhe Court of Appeal, Judgment of 23. March 2011, Docket No 6 U 66/09 where, in a similar case, the court stated that a licensing contract was not concluded.

[8] Sec. 154 (1) of the German Civil Code has the following wording: "Section 154 - Overt lack of agreement; lack of notarial recording: (1)As long as the parties have not yet agreed on all points of a contract on which an agreement was required to be reached according to the declaration even of only one party, the contract is, in case of doubt, not entered into. An agreement on individual points is not legally binding even if they have been recorded."

[9] Mannheim District Court, Motorola vs. Apple, docket No. 7 O 122/11 of December 9, 2011, BeckRS 2011, 29013, sub III 2 b cc.

seeker who reserves the right to file a nullity action requests the conclusion of a license

agreement which the prospective licensor could terminate immediately.

40.     Furthermore, the Mannheim District Court stated in the same

judgment[10] that the license seeker acts contradictory – and thus cannot in good faith

demand the conclusion of a license agreement – if he denies a patent infringement for the

past, i.e. for the time prior to the period which would be covered by a prospective license

agreement. In such case he may not in good faith demand the conclusion of an

unconditional license agreement for the future in which, according to the Orange Book

Standard Decision, the use of the licensed patent must not be put into question by the

license seeker.

41.     In sum, the Orange Book proceeding requires an unconditional

offer of the license seeker to conclude a license agreement including the offer of a

payment or the guarantee of a license fee which the patent holder cannot refuse without

violating his FRAND obligation.  Alternatively the license seeker may escrow an amount

of money which he deems to be adequate. Then the court examines whether the rate has

been set fairly by the patent holder in accordance with his legal obligations and if not, the

court sets an appropriate rate.

D.     No Injunction Based on Standard-Essential Patents if the Orange Book-
        Rules are Applied

42.     If a license seeker makes use of the Orange Book procedure and

thoroughly follows its rules, he will not be enjoined from the use of the standard-essential

---

[10] Mannheim District Court, Motorola vs. Apple, docket No. 7 O 122/11 of
December 9, 2011, BeckRS 2011, 29013, sub III 2 b cc.

patent. If the parties, even under the threat of an imminent injunction, finally conclude a license agreement, there will be no court procedure and the agreement will neither be disclosed to the courts nor to the public. Thus, in this expert testimony these undisclosed Orange Book procedures cannot be reported.

43.     However, one case has been reported in which a patent infringement suit was initiated but in which the parties finally reached a FRAND-related settlement agreement. The parties concluded an agreement in which a license relating to the patent was granted and in which the license seeker finally agreed to pay damages and to render account for patent-infringing actions committed by him in the past.[11]

E.     Timeline and Content of the Orange Book-Proceedings in the Motorola vs. Microsoft case

44.     On 6th July 2011 proceedings were initiated by General Instruments Corporation ("GIC"), which is part of the Motorola Group ("Motorola"), against Microsoft Deutschland GmbH and on 7th July against Microsoft Corporation and Microsoft Ireland Operations Ltd. (together "Microsoft") before the Mannheim District Court. Motorola is seeking, inter alia, injunctive relief prohibiting Microsoft from offering decoder apparatus and computer software in Germany that infringe GIC's H.264 standard essential patents. The patents asserted by GIC were EP 0 615 384 and EP 0 538 667 that are essential to the H.264 standard for video compression. This standard is used

---

[11] See the facts presented in Karlsruhe Court of Appeals, Judgment of 13. June 2012, docket no 6 U 136/11, GRUR-RR 2012, 405. After they concluded a license agreement, the parties still argued about the rendering of account and the amount of damages.

by both apparatus (such as Xbox 360) and software (such as Windows 7, Internet Explorer 9, Windows Media Player 12) offered by Microsoft.

45.     The proceedings before the Mannheim District Court in relation to the infringement of these two patents are running in parallel and the complaints against Microsoft Corporation and Microsoft Ireland Operations Ltd. are mirroring the complaint against Microsoft Deutschland GmbH.

46.     On 5 October and 7 October 2011, Microsoft filed its defense with the Mannheim District Court. Microsoft failed to raise the Orange Book defense at this stage. Rather, Microsoft denied infringement of GIC's patents and also asserted that it was entitled to make use of GIC's H.264 standard essential patents arguing that GIC had agreed to license these standard essential patents on FRAND terms pursuant to ITU's and ISO/IEC's common patent guidelines.

47.     Microsoft further denied that GIC's license offer of 29 October 2010 was FRAND. Microsoft indicated its intention to submit a license offer to GIC.

48.     On 9 December 2011, GIC filed its reply disputing that an ITU-declaration of willingness to license standard essential patents allows the would-be licensee to make use of the patent in suit. GIC further claimed that Microsoft could not rely on the Orange Book defense as Microsoft had not made any Orange Book offer and any deposit into an escrow account at that stage.

49.     Following GIC's reply, Microsoft finally submitted an Orange Book offer on 23 December 2011.

50.     On 13 January 2012, Microsoft filed a rejoinder reiterating that (i) it had not infringed GIC's H.264 patent and that (ii) GIC/MMI's declaration to license

these standard essential patents on FRAND terms pursuant to the ITU guidelines constitutes a binding offer. In addition, Microsoft referred to its 23 December 2011 Orange Book offer, which Microsoft asserted met the conditions set out in the Federal Supreme Court decision, and therefore had to be accepted.

51.     On 3 February 2012, Microsoft submitted a supplement to its Orange Book offer dated 23 December 2011.

52.     On 7 February 2012, the Mannheim District Court heard arguments in this case.

53.     In a brief filed on 2 March 2012, Microsoft reiterated its Orange Book offer submitted on 23 December 2011 and amended on 3 February 2012 is FRAND.

54.     In a brief filed by GIC on 2 March 2012, GIC denied that it is obliged under competition law to accept this offer.

55.     On 2 May 2012, the Mannheim District Court rendered two judgments. In both judgments, Microsoft was found to infringe and Motorola was granted the right of preliminary enforcement of injunctive relief. The Court found that Microsoft had not submitted an offer that was a reasonable rate.  Microsoft was also ordered to render account of their patent-infringing use and to recall the products. The court further determined that defendants are obligated to compensate plaintiff for all damages incurred.

56.     On 15 May 2012 Microsoft lodged an appeal against the judgments.

F.     Microsoft's Options to Avoid an Injunction in the First Instance Lawsuit
       in Mannheim

57.     Applying the Orange Book rules to the *Motorola vs. Microsoft*
case as they stood in 2012, it would have been very easy for Microsoft to avoid an
injunction. As the parties could not agree on a license fee, German law would have
required that Microsoft should not insist on calculating a license fee on a specific
calculation basis (per-unit royalty) and a specific royalty rate (2 €cents and 1 €cent,
respectively, per unit). Microsoft could instead have followed the alternative procedure
set up by the Orange Book decision. Microsoft could have left unspecified the license fee
in its binding offer. It could have escrowed a sum which Motorola could not have
rejected without acting in contravention of competition law. Then the court would have
reviewed the rate mentioned in Motorola's request in accordance with § 315 of the
German Civil Code. Should the court have found that Motorola's request was not
FRAND, it would have determined the FRAND rate itself.[12] Microsoft was not precluded
from offering evidence about what a FRAND rate is in the German proceedings.

58.     Had Microsoft followed the above-mentioned Orange Book
rules, it would not have been enjoined; the patent infringement action would have been
dismissed. The court only grants injunctive relief if the patent-in-suit is infringed and if
the competition law compulsory license defense is without merit. The Federal Supreme
Court ruled that if the patent holder enforces his patent by claiming an injunction, there
can be an abuse of his market-dominant position if the patent holder refuses to conclude a
fair and equitable patent license contract which has been offered to him by the party

---

[12] See p. 41 of the Microsoft vs. Motorola – judgment sub C I 4.b (p. 41).

seeking the license. For if the patent holder files for an injunction in such case, he requests something (i.e. the cease and desist order) that he will immediately have to return in the form of the grant of a license under competition law ("dolo agit qui petit quod statim redditurus est"). According to the Court, such request infringes the principle of good faith as laid down in Sec. 242 of the German Federal Civil Code. [13]

59.     The judgment itself would not automatically have subjected Microsoft to enforcement proceedings. Instead, the judgment first has to be served on the defendant and the court has to issue a special copy ("enforceable copy") to plaintiff. Most importantly, pending the defendant's appeal, the plaintiff has to serve the security bond as fixed in the judgment on the defendant.  Only when the security bond is served would the injunctive relief granted in the judgment be binding. In many patent infringement cases, the patent holder chooses not to enforce his first instance judgment instantaneously.

60.     The patent holder may also be reluctant to enforce the judgment of first instance because he still might lose the case on appeal. Then he would be liable for damages because he had enforced a judgment which later, i.e. in the 2d instance, has turned out to be wrong. If the alleged infringer was forced to stop his production because of the enforcement and if he even may have lost market share, the amount of damages which the patent holder has to pay may be very substantial. The legal basis for damages is the strict liability rule of Sec. 717 (2) of the German Code of Civil Procedure: According to this provision, if a judgment declared provisionally enforceable is reversed

---

[13] Section 242 of the German Civil Code (BGB) has the following wording: "§ 242 Performance in good faith: An obligor has a duty to perform according to the requirements of good faith, taking customary practice into consideration".

or modified, the plaintiff is obligated to compensate the defendant for the damages he has suffered by the judgment being enforced.

61.     Furthermore, as stated above, Motorola could have enforced the judgment only after previously having posted a security bond. The security bond serves to protect the interests of the party against whom enforcement is to be carried out. It is intended to compensate for any disadvantages defendant may suffer in the event that any enforcement of the judgment subsequently turns out to be unjustified. Thus, alongside the fees of the plaintiff's attorney and the court costs, the bond has to cover all potential damages incurred by defendant when the judgment is enforced. The bond which Motorola would have had to post under the Mannheim judgments would have been unusually high. Microsoft would have had to post security in the amount of 60 million € for the enforcement of the injunctive relief alone in the Mannheim case docket No 2 O 240/111 ( relating to EP 0 538 667 B1) and 160 Million €in the case Docket No 2 O 387/11 relating to the EP 0 615 384). These extremely high bonds underline the risk which Motorola would have taken if it had enforced the judgment.

62.     Furthermore, had Motorola enforced the German judgments, it would have violated the court order of the United States District Court for the Western District of Washington in Seattle and would have faced sanctions accordingly.  Motorola did not enforce its right to injunctive relief.

I declare that the foregoing is true and correct.  Executed in Freiburg im
Breisgau, Germany on May 29, 2013.

Prof. Dr. Maximilian Haedicke