# EXHIBIT 10

# In The Matter Of:

*MICROSOFT CORPORATION*
*v.*
*MOTOROLA, INC., MOTOROLA MOBILITY LLC, and*
*GENERAL INSTRUMENT CORPORATION*

_____

*BRADLEY S. KELLER - Vol. 1 - REVISED*

*June 24, 2013*

_____

# *CONFIDENTIAL*
# *SUBJECT TO THE PROTECTIVE ORDER*

**MERRILL CORPORATION**
**LegaLink, Inc.**

135 Main Street
4th Floor
San Francisco, CA 94105
Phone: 415.357.4300
Fax: 415.357.4301

CONFIDENTIAL - SUBJECT TO THE PROTECTIVE ORDER
BRADLEY S. KELLER - 6/24/2013

1      Q.      Paragraph 4.

2      A.      Yes.

3      Q.      On Page 2.  It continues on to Page 3.

4  You state that you've been asked by counsel "to

5  analyze the law firm invoices on which Mr. Menenberg

6  relied in calculating the amount of attorneys' fees

7  and litigation costs allegedly incurred by Microsoft

8  as a result of defending against Motorola's claims of

9  infringement of its 802.11 and H.264 SEPs"; is that

10  correct?

11      A.      That is correct.

12      Q.      Okay.

13              Mr. Keller, are you an expert in

14  accounting?

15      A.      No, I'm not.

16      Q.      Are you an expert on injunctions?

17      A.      I have had more injunctions than most --

18  I've dealt with more injunctions as a litigator than

19  most people do, so I'm not sure if that qualifies me

20  as an expert or someone that has a large degree of

21  concentration in their practice.

22              There are certain restrictions on

23  attorneys in Washington characterizing themselves as

24  being an expert in a particular area, so I would say I

25  have a high degree of concentration and background and

 1   experience in injunctions.

 2        Q.    Have you ever provided expert testimony

 3   or rendered any opinions regarding injunctive relief?

 4        A.    Only in connection with attorney

 5   declarations in support of or in opposition to

 6   injunctions that I've been involved in litigating.

 7        Q.    Those are matters that you've been

 8   representing one of the parties involved?

 9        A.    Correct.

10        Q.    But nothing like this current situation,

11   where you've been retained by someone to opine on the

12   propriety of an injunction or type of injunctive

13   relief?

14        A.    I don't view myself as really opining

15   here today on the propriety of an injunction as

16   distinguished from issues involving fees that were

17   incurred in con -- in conjunction with the request for

18   an injunction.

19        Q.    Understood.

20              Mr. Keller, are you an expert on

21   standard-essential patents?

22        A.    From a substantive patent law standpoint,

23   no.

24        Q.    You don't have a technical degree?

25        A.    No, I do not.

CONFIDENTIAL - SUBJECT TO THE PROTECTIVE ORDER
BRADLEY S. KELLER - 6/24/2013

```
 1          Q.      Are you admitted to the Patent Bar?

 2          A.      No.

 3          Q.      Do you consider yourself an expert in

 4     matters pending before the International Trade

 5     Commission, the ITC?

 6          A.      No.

 7          Q.      Have you ever handled a case pending

 8     before the ITC?

 9          A.      I've been involved in cases that have had

10     ancillary proceedings in front of the ITC, but in

11     terms of my own actual appearance in front of the ITC,

12     the answer is no.

13          Q.      Okay.

14                  Have you ever previously opined regarding

15     the reasonableness of attorneys' fees incurred in

16     connection with an ITC investigation?

17          A.      I've given opinions in cases that had

18     ancillary proceedings in front of the ITC, and I

19     believe some of the fees involved ITC work, yes.

20          Q.      And which matter was that?

21          A.      I'm not recalling the names.

22          Q.      Do you remember what opinion you rendered

23     regarding any fees incurred before the ITC?

24          A.      It was just general opinions regarding

25     the level of attorneys' fees that had been incurred by
```

```
1         A.      From -- from what I could tell from the
2   ALJ's decision and from reviewing Mr. Killough's
3   deposition testimony originally, looked like there
4   were five.
5         Q.      And how many patents were involved in the
6   remand proceeding?
7         A.      Can I break that up to two parts of the
8   remand?
9         Q.      Absolutely.
10        A.      Seemed like at the time of the remand
11  hearing there were still three that were at issue, but
12  by the time of the decision it seemed like there were
13  one.
14        Q.      Other than the docket index for the ITC
15  proceedings and the initial determination that the ALJ
16  rendered prior to the remand proceedings, were there
17  any other documents that you reviewed in connection
18  with your engagement other than what is listed in
19  Attachment 3?
20        A.      I believe that covers it.
21        Q.      Did you review Microsoft's publicly
22  available billing guidelines?
23        A.      No.
24        Q.      Did you review any articles on
25  reasonableness of attorneys' fees?
```

CONFIDENTIAL - SUBJECT TO THE PROTECTIVE ORDER
BRADLEY S. KELLER - 6/24/2013

```
 1        A.     The only thing I looked at -- I looked

 2   at, there was a very recent thing that came out in a

 3   publication, I believe it was of the Seattle King

 4   County Bar Association, but it might have been a WSBA,

 5   and it commented on lawyers' billings where there is

 6   going to be a fee request.  But I really -- I reviewed

 7   it only because I thought, "Ah, this is something that

 8   I'm dealing with myself," but did I rely on it in any

 9   way, shape or form?  No.

10        Q.     Okay.

11               Did you review any studies or research

12   reports on billing rates or attorneys' fees?

13        A.     No.  I relied on my own knowledge of

14   billing rates here in the Pacific Northwest.

15        Q.     Have you ever attended any seminars or

16   taken any classes on billing rates?

17        A.     On rates --

18        Q.     Mm-hmm.

19        A.     -- themselves?

20        Q.     Yeah.

21        A.     No.

22        Q.     Okay.

23               Your knowledge of billing rates in the

24   Pacific Northwest, how have you gained that knowledge?

25   Anything that you've done other than your general
```

CONFIDENTIAL - SUBJECT TO THE PROTECTIVE ORDER
BRADLEY S. KELLER - 6/24/2013

1  practice of law and being managing partner of your

2  film?

3        A.     I'd say it's largely being an active

4  participant in the Seattle and the Pacific Northwest

5  legal community for over 30 years.  I run a law firm

6  of 10 lawyers, and we need to keep abreast of what our

7  competitor's doing, trying to stay within what's

8  permissible and what's not permissible.  I have

9  numerous conversations with my counterparts at other

10  law firms.

11            The nature of my practice also provides

12  me visibility into the billing rates and practices of

13  virtually all the other large law firms here in the

14  Pacific Northwest.

15            Those would be the primary sources that I

16  would draw on for my own views as to what the rates

17  are for attorneys.

18        Q.     And, now, the rates are for attorneys

19  located where?

20        A.     Largely in the Sea -- greater Seattle and

21  Pacific Northwest area.

22        Q.     Okay.

23            In connection with rendering your

24  opinions in this matter and preparing Exhibit 1, did

25  you talk to anyone about fees incurred in large patent

CONFIDENTIAL - SUBJECT TO THE PROTECTIVE ORDER
BRADLEY S. KELLER - 6/24/2013

```
 1   cases or investigations pending before the ITC?

 2        A.    No one that I was specifically consulting

 3   with regarding this engagement.  I have familiarity

 4   with what patent lawyers charge here in the Northwest

 5   just from my own practice, having been active in a

 6   number of patent cases.

 7        Q.    Now, Mr. Keller, you mentioned in

 8   addition to reviewing the documents listed on

 9   Attachment 3, with the couple of additions that you

10   have told us about, that you also had some

11   conversations with certain attorneys to aid you in

12   preparing your report.  Who did you have conversations

13   with?

14        A.    Just Mr. Palumbo and Ms. Roberts.

15        Q.    Okay.

16              Anyone else?

17        A.    That's all I recall.

18        Q.    Did you speak with anyone from Motorola?

19        A.    You mean either an in-house attorney or a

20   businessperson?

21        Q.    Yes, either one.

22        A.    A real person?

23        Q.    A real --

24        A.    The answer is no.

25        Q.    Did you speak with anyone from
```

```
 1   Ropes & Gray?

 2         A.    Yes.  There were two -- there were two

 3   gentlemen who had been involved in the ITC proceeding

 4   that provided me with a very high-altitude overview.

 5         Q.    Do you remember their names?

 6         A.    I do not.

 7         Q.    When did you speak with them?

 8         A.    Within the last week.

 9         Q.    So this is after you prepared your

10   report?

11         A.    Yes.

12         Q.    In preparing your report, Exhibit 1, I

13   take it you didn't rely on conversations with or

14   information received from Ropes & Gray?

15         A.    No.  As I mentioned earlier, I had looked

16   at the docket index for sort of a very, very

17   high-altitude overview of it, and I really wanted to

18   just speak with someone who had a little more boots on

19   the ground to see if some of the very high-altitude

20   takeaway impressions I had about what was at issue at

21   various points in time was correct.

22         Q.    You stated that you did not speak with

23   anyone either in-house counsel or businessperson from

24   Motorola in connection with your engagement in this

25   matter.  Just to make sure we've covered everything,
```

CONFIDENTIAL - SUBJECT TO THE PROTECTIVE ORDER
BRADLEY S. KELLER - 6/24/2013

```
 1   did you speak with any in-house counsel or

 2   businesspeople from Google in connection with your

 3   work in this matter?

 4        A.     No.

 5        Q.     Other than Ms. Roberts, did you speak

 6   with anyone else from Quinn Emanuel regarding your

 7   engagement in this matter?

 8        A.     I don't believe so.

 9        Q.     And other than Mr. Palumbo, did you speak

10   with anyone from Summit Law Group in connection with

11   your engagement in this matter?

12        A.     No attorneys, no.

13        Q.     Okay.

14               Mr. Keller, in connection with your

15   engagement in this matter, is it correct that you did

16   not review the invoices for fees and expenses incurred

17   by Calfo Harrigan?

18        A.     That is correct.

19        Q.     Okay.

20               Formally known as Danielson --

21        A.     Still correct.

22        Q.     Right.  Okay.

23               So, Mr. Keller, you're not rendering any

24   opinion regarding the Calfo Harrigan fees for which

25   Microsoft is seeking reimbursement?
```

CONFIDENTIAL - SUBJECT TO THE PROTECTIVE ORDER
BRADLEY S. KELLER - 6/24/2013

```
 1        A.      Yes.

 2        Q.      And you're not rendering any opinion

 3  regarding the fees charged by the Boehmert firm to

 4  Microsoft?

 5        A.      That is correct.

 6        Q.      So the only fees on which you are

 7  rendering an opinion were the Sidley Austin fees for

 8  which Microsoft is seeking reimbursement?

 9        A.      That is correct.

10        Q.      Mr. Keller, were you asked to render an

11  opinion on any other aspect of Microsoft's damages

12  claim in this case?

13        A.      I have some opinions, but whether or not

14  it was appropriate for me to provide them was a

15  question mark, and so I don't -- you know, they're

16  referred to in the report in the initial paragraph,

17  and really has to do with the fundamental issue as to

18  whether or not attorneys' fees can be claimed in the

19  first place as an item of compensable damages, and,

20  you know, I have some views about that that I

21  volunteered rather than being asked.  I don't know

22  what the status of those will end up being.

23        Q.      You testified that you had some opinions,

24  but there's a question as to whether or not it was

25  appropriate for you to provide them.  What do you mean
```

CONFIDENTIAL - SUBJECT TO THE PROTECTIVE ORDER
BRADLEY S. KELLER - 6/24/2013

```
 1        A.      No.

 2        Q.      Did that -- assuming that Microsoft had

 3   offered to pay Motorola a RAND royalty, would that

 4   affect your opinion regarding causation?

 5        A.      My opinion regarding causation is based

 6   strictly on the timing of it, and that there would be

 7   no reason for Motorola to have commenced those

 8   proceedings absent Microsoft having initially shot

 9   first on the 1823.  It doesn't have anything to do

10   with dollars and cents.

11        Q.      What's the basis for that statement that

12   there would have been no reason for Motorola to have

13   filed the lawsuit absent Microsoft having first filed

14   a lawsuit on different patents?

15        A.      Because -- my understanding of what the

16   claims were in the 1823 case, it seemed to me, as an

17   outsider, without any insights into the thinking of

18   the various businesspeople and people who were

19   determining the strategy -- I can't discern a valid

20   reason for why Motorola would have commenced the cases

21   at that time, if it hadn't first been sued by

22   Microsoft.

23        Q.      But you didn't talk to anyone at Motorola

24   about that, did you?

25        A.      Absolutely not.
```

CONFIDENTIAL - SUBJECT TO THE PROTECTIVE ORDER
BRADLEY S. KELLER - 6/24/2013

Page 40

```
 1    Motorola to agree from refraining to enforce any

 2    injunctive relief that it may be able to obtain and

 3    Motorola refused to do that, would that fact impact

 4    the opinions that you're rendering in this case

 5    regarding reasonableness of fees and causation?

 6         A.    I wouldn't render an opinion one way or

 7    the other based on that fact.  I would want to know

 8    all of the -- all of the circumstances of whatever

 9    communication you're referring to and whatever

10    particular injunctions it related to.

11              And at the end of the day I still don't

12    think it would alter any -- alter any of my opinions

13    or conclusions.

14         Q.    Why not?

15         A.    Because, again, I'm not dealing with the

16    substance of the schoolyard fight.  I'm dealing with

17    the tabs that came with them.  The bill.

18         Q.    Right.  In Paragraph 5a you're talking

19    about causation, so why does the fact that an offer

20    was made to void enforcing certain types of relief,

21    types of relief that are the subject of present

22    lawsuit -- why would that not be relevant to your

23    opinion on causation?

24         A.    Because --

25              MR. PALUMBO:  Objection.  Argumentative.
```

CONFIDENTIAL - SUBJECT TO THE PROTECTIVE ORDER
BRADLEY S. KELLER - 6/24/2013

Page 41

1             THE WITNESS:  In Paragraph 5a, that

2    opinion would be ab -- absolutely unimpacted by what

3    the response had been by either party to a request

4    that they not seek injunctive relief.  The -- the

5    application of the rules that govern the

6    recoverability of attorneys' fees as an item of

7    consequential damages do not in any way turn on that

8    issue.

9         Q.    BY MS. ROBBINS:  Did you ask anyone at

10   Motorola about the reference you saw in the Ninth

11   Circuit opinion, the e-mail about refraining from

12   enforcing any injunctive relief?

13        A.    No.  It was not important to any of the

14   opinions I was giving.

15        Q.    I'm going to launch into a fairly long

16   area next.  I don't know if you need a break.  It

17   would be a logical point to do so.  Otherwise we can

18   keep going.  It's completely up to you, Mr. Keller.

19        A.    Why don't we go for another 15 or 20

20   minutes.

21        Q.    That's fine.  No problem.

22             Mr. Keller, in Paragraph 2 of your

23   report, back I think it's on Page 2, you state that

24   you've lectured at -- at various CLEs regarding

25   professional responsibility issues.  Is that true?

CONFIDENTIAL - SUBJECT TO THE PROTECTIVE ORDER
BRADLEY S. KELLER - 6/24/2013

Page 42

```
 1        A.      Yes.

 2        Q.      Mr. Keller, are you familiar with

 3   Rule 1.5, the American Bar Association Model Rules of

 4   Professional Conduct?

 5        A.      I'm much more familiar with the par --

 6   the corollary of 1.5, under the Washington Rules of

 7   Professional Conduct.  And if you ask me if I'm aware

 8   of what the differences are between the Model Rules

 9   and the Washington Rules, the answer would be no.  I

10   don't even know that there are any differences.

11        Q.      Okay.

12                Did you consider either the ABA Model

13   Rule or the Washington Rule in preparing your report

14   in this case?

15        A.      Only from a secondary standpoint.  In

16   effect all of the RPC 1.5 -- I think it's 82 --

17   factors are blended into and reflected in what is the

18   range of rates that you will see for a particular type

19   of practice.

20        Q.      Mm-hmm.

21                Let's go ahead and mark this.

22                (Deposition Exhibit 3 was marked

23                 for identification.)

24                (Discussion off the record.)

25        Q.      BY MS. ROBBINS:  Mr. Keller, I've handed
```

Page 45

```
 1        A.      Yes.

 2        Q.      Okay.

 3                What did do you to consider this factor?

 4        A.      Subpart (1), along with many of the other

 5   subparts, is part of what comprises the reasonable

 6   range for attorneys doing this type of work for our

 7   community.

 8        Q.      With respect to the ITC 752

 9   investigation, other than reading the docket and the

10   initial determination rendered by the ALJ, did you do

11   anything else to educate yourself regarding that

12   investigation before preparing your report?

13        A.      I did -- I wanted to satisfy myself that

14   any attorney could participate in a particular matter

15   in front of the ITC.  And so I did look at the --

16   online to look at what the rules for practice were, to

17   see if they had separate admission criteria, separate

18   bar, that kind of thing, and -- because my impression

19   before had been -- before this is that there was no

20   such requirement, and that was generally confirmed.

21        Q.      Did you sign on to the protective order

22   in ITC 752?

23        A.      The protective order in ITC 752?

24                I signed on to the protective order in

25   the 1823 case.
```

CONFIDENTIAL - SUBJECT TO THE PROTECTIVE ORDER
BRADLEY S. KELLER - 6/24/2013

Page 46

```
 1        Q.      Right.

 2        A.      I don't know if that hooks into anything

 3   else, but I did not sign anything separate regarding

 4   752.

 5        Q.      So you didn't have any access to the

 6   confidential information that was filed before the

 7   ITC?

 8        A.      Correct.

 9        Q.      The review of any of the ID or the

10   docket, that was all done --

11        A.      Correct.

12        Q.      The review you did was what any person

13   could do by logging onto the ITC Web site?  You looked

14   at the publicly available version of the docket and

15   the initial determination?

16        A.      Correct.

17        Q.      Any pleadings from ITC 752 that you

18   recall reviewing other than the ALJ's initial

19   determination?

20        A.      I'm pausing only because I'm seeing in my

21   mind's eye a pretrial order and trial briefs, but

22   I'm -- I'm leaning towards those were in the 1823

23   matter, not the 752 ITC proceeding.

24        Q.      If it helps jog your memory, the

25   prehearing briefs in the ITC are hundreds of pages
```

CONFIDENTIAL - SUBJECT TO THE PROTECTIVE ORDER
BRADLEY S. KELLER - 6/24/2013

```
 1   long.

 2              Not that that narrows down the universe

 3   in this case.

 4              Don't remember?

 5      A.     No.

 6      Q.     Okay.

 7      A.     I have no specific recollection of

 8   reviewing anything else.

 9      Q.     Mr. Keller, you mentioned that you --

10   you've looked to see if there were any separate

11   admission criteria for an attorney to practice before

12   the ITC.  Where did you look to determine that?

13      A.     There were some general rules that -- I

14   can't remember what the number of it was, but it was,

15   you know, what -- what do you have to do in front of

16   the -- to appear in front of the ITC.  I wanted to

17   satisfy myself that, you know, somebody who is a --

18   somebody like myself could just do it.

19      Q.     Okay.

20      A.     And that was my impression before going

21   into this, and I wanted to confirm it.

22      Q.     Is it your opinion that Microsoft should

23   have used counsel who had never before appeared before

24   the ITC?

25      A.     It's -- it's my opinion that Microsoft
```

CONFIDENTIAL - SUBJECT TO THE PROTECTIVE ORDER
BRADLEY S. KELLER - 6/24/2013

Page 49

1   proceedings a firm that had experience in handling

2   matters before the ITC?

3          A.     No, they were firms that had experience

4   in substantive patent litigation.

5          Q.     Did they have experience before the ITC?

6          A.     Not that I'm aware of.  That was

7   certainly not their calling card.  Calling card was

8   as -- as experienced patent folks.

9          Q.     And which firms were those?

10         A.     Oh, the one that comes to mind that I

11  believe we had a significant -- you know, relatively

12  significant ITC proceeding involved an Oklahoma

13  company.  The law firm was McAfee & Taft, out of

14  Oklahoma City.

15         Q.     Did you speak to any ITC practitioners

16  about practice of the ITC?

17         A.     The fellas from Ropes & Gray, who I think

18  were more general patent litigators with significant

19  ITC experience.  I don't -- I don't really think of it

20  as ITC practitioner as a separate group.  To me it's

21  patent -- patent litigators and trial lawyers.

22         Q.     And those conversations, again, with

23  attorneys from Ropes & Gray happened within the last

24  week?

25         A.     Yes.

CONFIDENTIAL - SUBJECT TO THE PROTECTIVE ORDER
BRADLEY S. KELLER - 6/24/2013

```
 1        Q.      Prior to submitting your report, did you

 2   speak to any Motorola's counsel about ITC 752?

 3        A.      I'm sure it was covered in my discussions

 4   with Ms. Roberts and Mr. Palumbo, but in terms of

 5   getting granular, no.  I didn't really get granular

 6   with the Ropes & Gray folks, either.

 7        Q.      To your knowledge, did either Mr. Palumbo

 8   or Ms. Roberts play any role in the ITC 752

 9   investigation?

10        A.      I don't know one way or the other.

11        Q.      What about -- you indicated you're

12   familiar with the fact that Motorola filed lawsuit in

13   the Western District of Wisconsin, correct?

14        A.      I saw that in -- I think it was in -- in

15   Judge Robart's summary judgment ruling, early on he

16   says that the case had a very complicated procedural

17   history.

18        Q.      Mm-hmm.

19        A.      And he refers back to an earlier order.

20                And I did go read that earlier order, and

21   I thought to myself, Do I need to diagram out this

22   complicated procedural history of all these cases?

23   And I came to the conclusion I didn't.

24        Q.      Okay.

25        A.      Rightly or wrongly.
```

CONFIDENTIAL - SUBJECT TO THE PROTECTIVE ORDER
BRADLEY S. KELLER - 6/24/2013

1             So -- but the answer is, yes, I know at

2   some point there was a case in the Western District of

3   Wisconsin that got transferred over to the Western

4   District of Washington.

5        Q.     Okay.

6             Did you do anything to educate yourself

7   regarding that litigation that was filed in the

8   Western District of Wisconsin?

9        A.     The details of it, no.

10       Q.     Did you ever review the complaint?

11       A.     No.

12       Q.     Did you ever review any of the patents?

13       A.     The patents themselves?  Actually read

14   the patents?

15       Q.     Yeah.

16       A.     No.

17       Q.     Did you -- did you review any of the

18   pleadings from the Western District of Wisconsin?

19       A.     No.

20       Q.     Did you speak with anyone about the

21   Western District of Wisconsin litigation?

22       A.     Other than to generally confirm the

23   high-altitude procedural overview that I gleaned from

24   Judge Robart's order, no.

25       Q.     Did you discuss the Wisconsin litigation

CONFIDENTIAL - SUBJECT TO THE PROTECTIVE ORDER
BRADLEY S. KELLER - 6/24/2013

Page 56

```
 1    other than Seattle area?
 2          A.     Well, I did -- I did consider other
 3    locales, but I felt that they needed to be kept in
 4    their proper perspective.
 5          Q.     Which other locales did you consider?
 6          A.     I felt that -- that's why I say the
 7    needs -- reasonable needs of Microsoft, what was
 8    necessary, could have been largely fulfilled by
 9    utilizing attorneys from the Seattle area and the
10    Pacific Northwest.
11          Q.     Which other locales did you consider?
12          A.     I didn't really consider any other
13    specific locales other than the reality I knew of here
14    was that there were members of the Sidley team from
15    certain other locales, so I looked at those for
16    purposes of comparing what their counterparts here in
17    the Pacific Northwest would have charged in some
18    instances.
19          Q.     Okay.
20                 Factor No. 4, "the amount involved and
21    the results obtained."  Mr. Keller, did you consider
22    that factor in rendering your opinion?
23          A.     Yes.
24          Q.     How did you consider that factor?
25          A.     That this was a substantial case, that
```

CONFIDENTIAL - SUBJECT TO THE PROTECTIVE ORDER
BRADLEY S. KELLER - 6/24/2013

```
 1   the ITC 752 proceedings is?

 2        A.     Not other than we are at a period of time

 3   post the ALJ's decision, post remand on one non-SEP.

 4        Q.     Are you familiar, Mr. Keller, with the

 5   summary judgment proceedings relating to the '374,

 6   '375 and '376 patents, which were originally asserted

 7   in the Western District of Wisconsin?

 8               And I should clarify.  The summary

 9   judgment proceedings before Judge Robart in the

10   Western District of Washington.

11        A.     Not to any degree of detail.

12        Q.     Do you have any understanding of -- that

13   there were such proceedings, that there was summary

14   judgment motion and ruling on those patents?

15        A.     Summary judgment regarding something

16   other than claim construction but summary judgment

17   dealing with what?

18        Q.     Validity and other matters on those

19   patents.

20        A.     I could tell from reviewing the billings

21   that there had been issues involving invalidity

22   contentions regarding the -- I'll get the numbers

23   wrong.  '374 --

24        Q.     '374, '75 and '76.

25               To clarify, they're H.264-related
```

CONFIDENTIAL - SUBJECT TO THE PROTECTIVE ORDER
BRADLEY S. KELLER - 6/24/2013

Page 66

```
 1    the fact that there were the proceedings is -- and the

 2    fees that were incurred in connection with those

 3    proceedings are part of my opinions.

 4              We've been going at it for about an hour

 5    and a half.

 6         Q.    We can take a break now.  Is that fine

 7    with you, Ralph?

 8              THE VIDEOGRAPHER:  We're going off the

 9    record.  The time is 10:26 a.m.

10              (Short recess.)

11              THE VIDEOGRAPHER:  This is the beginning

12    of Disk No. 2 in the deposition of Brad Keller.  We

13    are back on the record.  The time is 10:39 a.m.

14         Q.    BY MS. ROBBINS:  Okay.  Mr. Keller, when

15    we broke, we were looking at Exhibit No. 3, and I

16    think we're now going to be moving on to Factor No. 5

17    listed there, "the time limitations imposed by the

18    client or the" -- "or by the circumstances."

19              Are you familiar with that factor, either

20    from the ABA Model Rule or the Washington Rule?

21         A.    Yes, I am.

22         Q.    Did you consider this factor at all in

23    rendering your opinion or preparing your report in

24    this matter?

25         A.    I considered it only in the sense that it
```

CONFIDENTIAL - SUBJECT TO THE PROTECTIVE ORDER
BRADLEY S. KELLER - 6/24/2013

 1  did not strike me as being a particularly germane

 2  factor to these fee issues.

 3      Q.      Okay.

 4              Mr. Keller, in conjunction with your

 5  review of the ITC docket, did you review any of the

 6  scheduling orders in the ITC 752 investigation?

 7      A.      The actual orders themselves, no.

 8      Q.      Are you familiar at all with the schedule

 9  and the various deadlines that were set in that case

10  preparing for the original hearing?

11      A.      I knew that -- I knew generally when the

12  first evidentiary hearing was going to be happening,

13  and I knew from the review of materials approximately

14  how much time there was going to be between the remand

15  and the subsequent hearing in front of the ALJ, but

16  other than that, no.

17      Q.      Do you have an understanding of how much

18  time was permitted for discovery in the case before

19  the initial hearing?

20      A.      Not with -- to any degree of precision.

21  I knew that -- I knew that there was discovery, I knew

22  that there were depositions, and that there was a time

23  for that prior -- prior to the first hearing.

24      Q.      Are you aware that the first hearing was

25  originally scheduled approximately nine months after

CONFIDENTIAL - SUBJECT TO THE PROTECTIVE ORDER
BRADLEY S. KELLER - 6/24/2013

Page 68

```
 1    the case was filed?

 2         A.     I didn't know specifically nine months,

 3    but that's not inconsistent with what I, you know,

 4    would have expected initially.

 5         Q.     Did you discuss at all with any of

 6    Motorola's counsel the schedules in the various cases?

 7         A.     Not to any degree of specificity.  You

 8    know, again, I had a big-picture timeline.  I wanted

 9    to -- I wanted to keep in focus also what years most

10    of the fees that were at issue were being incurred.

11         Q.     Mm-hmm.

12         A.     So when you juxtapose that with certain

13    milestones that I knew that had occurred at certain

14    junctures, I had a general understanding of the

15    timeline, but not to any degree of specificity.

16              I couldn't tell you when the discovery

17    cutoff date was, either in this 1823 case or in the

18    57 -- 752 case.  I transpose digits all the time.

19    You'll have to excuse me.

20         Q.     All right.

21              Let's take a look now at Factor No. 6 on

22    Exhibit 3, "the nature and length of the professional

23    relationship with the client."

24              Did you consider Sidley's relationship

25    with Microsoft at all in rendering your opinion?
```

CONFIDENTIAL - SUBJECT TO THE PROTECTIVE ORDER
BRADLEY S. KELLER - 6/24/2013

```
 1   matter, you didn't make any attempt to determine rates

 2   charged by topflight partner-level litigators or

 3   associates either with or without technical degrees in

 4   Chicago, did you?

 5        A.    That's correct.

 6        Q.    And you didn't make any effort to

 7   determine rates charged by either partners or

 8   associates with or without technical degrees in

 9   Washington, D.C.?

10        A.    That's correct, because my working

11   assumption is that the ITC proceeding could have been

12   predominantly handled by attorneys here, in our

13   community.

14        Q.    And you made no attempt to determine the

15   standard rates charged by partners or associates in

16   Dallas?

17        A.    Well, there was only one lawyer that I

18   was looking at from Dallas, and he was neither fish

19   nor fowl; he was of counsel --

20        Q.    Right.

21        A.    -- as I understood it.  And I did not

22   compare how his Dallas rate would compare to his

23   counterpart in Dallas, which I think is what you're

24   asking me.

25        Q.    Yes.
```

CONFIDENTIAL - SUBJECT TO THE PROTECTIVE ORDER
BRADLEY S. KELLER - 6/24/2013

Page 82

```
 1        A.        Because what either Microsoft or Motorola

 2    chooses to do regarding who it asks to get up on their

 3    feet and speak for them is not important to me.

 4    What's important to me is what's necessary.

 5        Q.        Were any of the lawyers who appeared in

 6    the I -- in the ITC proceeding and participated in

 7    those proceedings based in Seattle?

 8        A.        That actually had speaking roles at the

 9    evidentiary hearing?

10                  I don't know one way or the other.

11        Q.        Okay.

12        A.        I haven't reviewed the transcript from

13    the evidentiary hearing, if there is a transcript.

14        Q.        Do you know where the Ropes & Gray

15    attorneys who handled ITC 752 on behalf of Motorola

16    were based?

17        A.        No, I don't.

18        Q.        Did you ever ask?

19        A.        No.

20        Q.        Do you know what law firm Motorola used

21    in the Western District of Wisconsin case that was

22    eventually transferred to Seattle?

23        A.        I did, but I don't remember.

24        Q.        Okay.

25                  Were those attorneys based in Seattle?
```

CONFIDENTIAL - SUBJECT TO THE PROTECTIVE ORDER
BRADLEY S. KELLER - 6/24/2013

Page 143

```
 1        A.      No.  It in effect I think sort of shows

 2   that the client can use whoever they want and spend

 3   whatever they want, but there's a difference between

 4   that and, on the other hand, what's necessary.

 5        Q.      Paragraph 14 of your report, you state

 6   that in Seattle the topflight partner-level litigators

 7   range from 450 to $600 per hour, in some unusual cases

 8   $625 per hour, and then you discuss rates that second-

 9   or third-year associate in Seattle would not exceed

10   $240 per hour, or if the person has a technical

11   background, $255 per hour.

12              What is the source of that information in

13   Paragraph 14 of your report?

14        A.      33 years of practicing law in our

15   community and as part of my responsibilities of

16   practicing law and running a 10-person law firm,

17   needing to stay abreast of what my neighbors are

18   doing.

19        Q.      Any other source of that information?

20        A.      And the review of bills from other firms.

21        Q.      Okay.

22        A.      And I think --

23        Q.      Anything else?

24        A.      And I think one of the prior engagements

25   that I referenced was actually providing some
```

CONFIDENTIAL - SUBJECT TO THE PROTECTIVE ORDER
BRADLEY S. KELLER - 6/24/2013

Page 144

```
 1    information about a patent litigator.
 2         Q.     And which engagement was that?  Let's
 3    take a look.
 4                 I believe that's on Attachment 2 to your
 5    report.
 6         A.     I believe the Malico case versus Cooler
 7    Master.
 8         Q.     And that case do you believe involved a
 9    patent?
10         A.     I -- yes.
11         Q.     Okay.
12         A.     Although I don't think the case ever got
13    to the point where the substantive patent knowledge
14    became germane.  I believe it was tossed on either
15    personal jurisdiction or venue was transferred, some
16    sort of a threshold issue.
17         Q.     And in -- in that case you submitted a
18    declaration stating that a billing rate for an IP
19    litigator of -- in Seattle of $575 an hour was
20    reasonable and within the customary charges of others
21    in Seattle with similar experience; is that correct?
22         A.     I wouldn't phrase it that way.  It was
23    for that particular person, who is one of the top
24    patent litigators in the city.
25                 MS. ROBBINS:  Why don't we go ahead and
```

CONFIDENTIAL - SUBJECT TO THE PROTECTIVE ORDER
BRADLEY S. KELLER - 6/24/2013

1    What's important to me is was it necessary for them to

2    incur the level of fees.

3         Q.    Is it your opinion it was unreasonable

4    for Microsoft to engage Sidley Austin on these

5    matters?

6              MR. PALUMBO:  Asked and answered.

7              THE WITNESS:  Only in the sense that if

8    Microsoft had confined itself to what was necessary,

9    there was no need for it to go out of town for much of

10   the horsepower it sought to put on its legal team.

11   And in the sense that it was not necessary, it

12   resulted in an unreasonably high level of fees.

13             But I do not challenge its right to make

14   the choice to incur unnecessary fees if it wants to do

15   so.  What I challenge is the ability to recover it

16   from somebody else.

17        Q.    BY MS. ROBBINS:  What counsel in Seattle

18   do you think Microsoft should have used for the

19   ITC 752 proceeding?

20        A.    I'm not opining as to any particular

21   lawyer that it should have used.  I would say that

22   there are many lawyers here that would have the

23   requisite skill set and level of skills to have either

24   led the charge or been all the positional players and

25   the bench players, even if -- even if it decided it

CONFIDENTIAL - SUBJECT TO THE PROTECTIVE ORDER
BRADLEY S. KELLER - 6/24/2013

Page 149

```
 1   wanted to have, you know, a, as in singular, local

 2   D.C. lawyer.

 3           It -- we're talking about -- you're

 4   fielding a team.  We're talking about the size of the

 5   team and who the players are on the team, and the

 6   overwhelming bulk of the players, in my view, could

 7   have been capa -- those roles could have been more

 8   than capably filled by a number of lawyers in our

 9   community.

10       Q.     As you sit here today you don't have any

11   particular firm or lawyer in mind?

12       A.     There are many.  Part of my opinion is

13   not telling Microsoft what specific individual or law

14   firm it should have hired, just -- part of my opinion

15   is just there are a number of very capable lawyers

16   with the bench to deal with something like this.

17       Q.     If I told you that Motorola paid

18   attorneys' fees in excess of ████████  and expenses

19   of approximately ████████  in connection with the

20   lawsuits it brought against Microsoft, would that

21   alter your opinion --

22       A.     Not at all, no.

23       Q.     -- to Microsoft's fees?

24       A.     Not at all, no.

25       Q.     Why not?
```

Page 152

```
 1        Q.      Okay.

 2        A.      So your question was compare that number

 3   to ████.

 4        Q.      ███.

 5        A.      ████.

 6        Q.      Ropes is higher?

 7        A.      Yeah.

 8        Q.      If I told you that Sidley had ████ hours

 9   billed at rates of ███ per hour or higher and

10   Motorola's counsel had approximately ████ hours

11   billed in excess of ███ an hour, would you have a

12   basis to disagree with that?

13        A.      I would have no basis to agree with it or

14   disagree with it.  That sounds like a good exercise

15   for Mr. Menenberg.  For which you can then pay him

16   $550 an hour to do.

17        Q.      You've paid Mr. Menenberg to do some work

18   for your firm, haven't you?

19        A.      I don't believe I have ever hired

20   Mr. Menenberg.  I've cross-examined him quite a few

21   times, but I don't know that I've ever used

22   Mr. Menenberg.

23        Q.      Hasn't your firm?

24        A.      My firm?

25        Q.      I think -- isn't your firm current --
```

CONFIDENTIAL - SUBJECT TO THE PROTECTIVE ORDER
BRADLEY S. KELLER - 6/24/2013

```
 1   15 -- in the 30 -- 15 to 30 percent higher than what
 2   would have been required in our community, and looking
 3   at it from the standpoint of figuring out how many
 4   timekeepers are in here and the potential impact on
 5   necessary legal fees because of the unwieldy and too
 6   many folks, no.
 7        Q.    Were there any of the attorneys whose
 8   billing rates you found to be in line with what you
 9   would have expected be?
10        A.    Clearly, a number of the partners fall
11   generally within the range of 450 to $600, so it would
12   be tempting to say yes.  But I'd have to also add that
13   in general, even within that range, looking at those
14   people and looking at their back -- you know, my
15   understanding of their background and experience, they
16   were in general 15 to 30 percent higher than what you
17   would pay here.
18        Q.    And what about the associates?
19        A.    Same thing.
20        Q.    In Paragraph 16 of your report you state
21   that the Sidley billings reflect an excessive number
22   of timekeepers.  Did you make any effort to compare
23   the number of Sidley timekeepers with the number of
24   timekeepers at Ropes & Gray, Steptoe & Johnson, Quinn
25   Emanuel?
```

CONFIDENTIAL - SUBJECT TO THE PROTECTIVE ORDER
BRADLEY S. KELLER - 6/24/2013

Page 175

```
 1        A.      I did not review the Quinn Emanuel or the

 2   Ropes billings for the purposes of determining the

 3   number of timekeepers in the brackets that I did so

 4   for the Sidley billings.

 5        Q.      Did you ask Ropes & Gray or Quinn how

 6   many lawyers they had on these -- staffed on these

 7   matters?

 8        A.      No, because, again, I'm focusing on

 9   what's necessary.

10        Q.      Prior to rendering your opinion, did you

11   speak to any of Motorola's counsel to ask about what

12   was going on in the various cases that might have

13   required such ample staffing?

14        A.      Only in the most -- indirectly and in a

15   most general way, by trying to familiarize myself

16   generally with what had happened over time, and then

17   comparing that to my own experience of, you know, is

18   this going to warrant close to a hundred and ninety

19   timekeepers over two and a half years?  No.  Over a

20   hundred and twenty five?  No.  Over 61 people billing

21   more than $50,000?  No.

22        Q.      Are you aware that there were days where

23   there were as many as seven to eight depositions per

24   day?

25        A.      Seven or eight substantive depositions --
```

CONFIDENTIAL - SUBJECT TO THE PROTECTIVE ORDER
BRADLEY S. KELLER - 6/24/2013

```
 1    context, of reductions ranging from 10 to 30-plus

 2    percent, and that I felt I couldn't go in and try and

 3    be more precise because of the lack of granularity to

 4    the billing records that I was dealing with.

 5         Q.    Have you made any effort to come up with

 6    an alternative fee that you believe would be -- would

 7    constitute a reasonable and necessary fee?

 8         A.    Not a number, no.

 9               Bearing in mind that you're talking to

10    someone who's of the view that this is not a

11    compensable component of damages.

12         Q.    And that is based on your legal opinion?

13         A.    Yes.

14         Q.    Mr. Keller, you're currently counsel in a

15    case where you're adverse to Microsoft; is that right?

16         A.    I'm trying to think.  Is it only one?

17               Yes, at least one.

18         Q.    Okay.

19               And which case is that?

20         A.    It's a patent case, REC Software.

21         Q.    Okay.

22               And that case is pending before Judge

23    Robart?

24         A.    Yes, it is.  Hopefully be tried this

25    October.
```

CONFIDENTIAL - SUBJECT TO THE PROTECTIVE ORDER
BRADLEY S. KELLER - 6/24/2013

Page 180

```
 1       A.     I think all -- all the cases that we've
 2  talked about were IP cases or trade secret, and I
 3  think that is it.
 4              That's all I can recall, but --
 5              Seems like there should be one or two
 6  others.
 7              MS. ROBBINS:  Why don't we take a
 8  five-minute break, let me go over my notes and see if
 9  there's any other exhibits, and I think you're looking
10  pretty good for your three o'clock.
11              THE VIDEOGRAPHER:  We're going off the
12  record.  The time is 2:10 p.m.
13              (Short recess.)
14              THE VIDEOGRAPHER:  We are back on the
15  record.  The time is 2:24 p.m.
16       Q.     BY MS. ROBBINS:  Mr. Keller, just to
17  clarify, have you ever retained Todd Menenberg from
18  Navigant Consulting as an expert witness?
19       A.     Myself personally, no.  I'm uncertain
20  about my partners, though.
21              I know that my partners have retained
22  Navigant.
23       Q.     Okay.
24              Just to sum up some of your opinions
25  here.  You have no opinion on the reasonableness or
```

CONFIDENTIAL - SUBJECT TO THE PROTECTIVE ORDER
BRADLEY S. KELLER - 6/24/2013

1    necessity of the fees incurred by Calfo Harrigan,

2    formerly Danielson firm?

3        A.    I'm only pausing because of the necessary

4    part of it, because -- but I think the answer to your

5    question is that's correct, I do not have a -- I am

6    not giving any opinion that any portion of their fees

7    were not reasonable or that they were not necessary,

8    assuming fees are otherwise compensable consequential

9    damages.

10       Q.    You've already expressed your legal

11   opinion that in your view they're not compensable,

12   correct?

13       A.    Correct.

14       Q.    And you're not rendering an opinion on

15   whether the fees Microsoft paid to Freshfields were

16   reasonable or necessary?

17       A.    I have not -- I have not reviewed their

18   billings and would not be in a position to offer an

19   opinion one way or the other on that subject.

20       Q.    On the fees charged by Freshfields,

21   correct?

22       A.    I'm not in a position to have an opinion

23   one way or the other.

24       Q.    And would the same be true with respect

25   to the fees charged by the Boehmert & Boehmert firm?