# EXHIBIT 5

# In The Matter Of:

*MICROSOFT CORPORATION*
*v.*
*MOTOROLA INC., et al.*

_____

*GREGORY LEONARD, Ph.D. - Vol. 1*

**June 24, 2013**

_____

***HIGHLY CONFIDENTIAL***

**MERRILL CORPORATION**
**LegaLink, Inc.**
135 Main Street
4th Floor
San Francisco, CA 94105
Phone: 415.357.4300
Fax: 415.357.4301

| | | |
|---|---|---|
| 1 | (Exhibit 6 was marked for identification.) | 09:19 |
| 2 | THE WITNESS:  I got it. | 09:19 |
| 3 | BY MR. PRITIKIN:  Q.  Is Exhibit 6 a copy of an | 09:19 |
| 4 | expert report you prepared and that is dated October 21, | 09:20 |
| 5 | 2011, in the Apple-Motorola litigation? | 09:20 |
| 6 | A.  It seems to be, yes. | 09:20 |
| 7 | Q.  Would you turn, please, to page 7. | 09:20 |
| 8 | A.  Okay. | 09:20 |
| 9 | Q.  Would you read paragraph 9 to yourself. | 09:20 |
| 10 | A.  Okay. | 09:20 |
| 11 | Q.  Do you still agree with this statement in | 09:20 |
| 12 | paragraph 9? | 09:20 |
| 13 | A.  Yes. | 09:20 |
| 14 | Q.  Would you turn to paragraph 10.  In paragraph | 09:20 |
| 15 | 10 you wrote, "For a royalty to be FRAND" -- and you | 09:20 |
| 16 | understand FRAND to mean the same as RAND?  Those are | 09:20 |
| 17 | interchangeable terms? | 09:20 |
| 18 | A.  From an economist's point of view.  And again, | 09:20 |
| 19 | I'm not sure, there may be a legal difference, I guess. | 09:21 |
| 20 | But from my point of view, they're basically the same. | 09:21 |
| 21 | Q.  All right.  In paragraph 10 you wrote, "For a | 09:21 |
| 22 | royalty to be FRAND, it should be commensurate with the | 09:21 |
| 23 | economic value of the patented technology to the | 09:21 |
| 24 | licensee relative to the next best alternative | 09:21 |
| 25 | technology prior to the standard being set, and thus | 09:21 |

| | | |
|---|---|---|
| 1 | should not include any hold-up value that derives simply | 09:21 |
| 2 | from the patented technology being incorporated into the | 09:21 |
| 3 | standard." | 09:21 |
| 4 | Do you believe that is a correct statement? | 09:21 |
| 5 | A.  Yes. | 09:21 |
| 6 | Q.  Now, did you also give a deposition in the | 09:21 |
| 7 | Apple-Motorola litigation? | 09:21 |
| 8 | A.  I did, at least one. | 09:21 |
| 9 | Q.  Let's mark this as Exhibit 7. | 09:21 |
| 10 | (Exhibit 7 was marked for identification.) | 09:21 |
| 11 | BY MR. PRITIKIN:  Q.  And you recognize | 09:22 |
| 12 | Exhibit 7 is the transcript of a deposition that you | 09:22 |
| 13 | gave on April 26, 2012? | 09:22 |
| 14 | A.  20 -- April what?  20? | 09:22 |
| 15 | Q.  26, 2012.  On the last page. | 09:22 |
| 16 | A.  Mine says 25th.  Do I have the same one? | 09:22 |
| 17 | Q.  Well, let's use the date on the cover then. | 09:22 |
| 18 | Different date on the last page, for some reason. | 09:22 |
| 19 | A.  Okay. | 09:22 |
| 20 | Q.  Would you turn to page 25 of the transcript. | 09:22 |
| 21 | A.  Okay. | 09:22 |
| 22 | Q.  Why don't you take a moment and, just to | 09:22 |
| 23 | refresh your memory, read over, to yourself, page 25 | 09:23 |
| 24 | through 28. | 09:23 |
| 25 | MR. CANNON:  28? | 09:23 |

| | | |
|---|---|---|
| 1 | to interconnect with certain other devices somebody | 09:27 |
| 2 | might have in their home.  Those devices would have | 09:27 |
| 3 | 802.11. | 09:27 |
| 4 | So, again, it's probably more likely if there | 09:27 |
| 5 | was lock-in at that point for 802.11. | 09:27 |
| 6 | BY MR. PRITIKIN:  Q.  Have you read the | 09:27 |
| 7 | testimony of Mr. Danski (phonetic) in the first trial? | 09:27 |
| 8 | A.  Probably, I think so. | 09:27 |
| 9 | Q.  Are you aware that he testified that H.264 was | 09:27 |
| 10 | extremely important to Microsoft products? | 09:28 |
| 11 | A.  Yeah.  I mean I do remember that.  But there | 09:28 |
| 12 | are -- all I'm saying is there are alternatives to | 09:28 |
| 13 | H.264.  It's simply a question of, you know, whether | 09:28 |
| 14 | those were viable in those circumstances. | 09:28 |
| 15 | Q.  You're not an offering opinion one way or the | 09:28 |
| 16 | other on that? | 09:28 |
| 17 | A.  I'm not, no.  I'm just trying to answer your | 09:28 |
| 18 | question right now. | 09:28 |
| 19 | Q.  And what is hold-up? | 09:28 |
| 20 | A.  Hold-up is -- the idea there is that if someone | 09:28 |
| 21 | is -- is locked in, that you take advantage of that | 09:28 |
| 22 | lock-in to attempt to extract, in this context again, a | 09:28 |
| 23 | higher royalty than would be -- than you'd be able to | 09:28 |
| 24 | get if they weren't lock-in. | 09:28 |
| 25 | Q.  Now, in the testimony that you provided in this | 09:28 |

HIGHLY CONFIDENTIAL
GREGORY LEONARD, Ph.D. – 6/24/2013

| | | |
|---|---|---|
| 1 | earlier litigation -- if you look at page 27 -- you said | 09:28 |
| 2 | that it has again to do -- I'm starting at line 10.  It | 09:28 |
| 3 | has again to do with the hold-up, which flows from | 09:29 |
| 4 | potential lock-in, that once you've made investments and | 09:29 |
| 5 | setting the standard and companies have designed to the | 09:29 |
| 6 | standard to sell their products, that creates | 09:29 |
| 7 | potentially, not always, but sometimes it creates | 09:29 |
| 8 | switching costs to sort of undoing that.  And that | 09:29 |
| 9 | creates a possibility for hold-up to occur. | 09:29 |
| 10 | Do you agree with that? | 09:29 |
| 11 | A.  Yeah, I think that's what I just said. | 09:29 |
| 12 | Q.  And then you went on to say and, you know, from | 09:29 |
| 13 | my point of view, the whole purpose of FRAND is to try | 09:29 |
| 14 | to avoid that. | 09:29 |
| 15 | Is that a correct statement? | 09:29 |
| 16 | A.  Yes. | 09:29 |
| 17 | Q.  And the "that" you're referring to is hold-up? | 09:29 |
| 18 | A.  Yes, exactly. | 09:29 |
| 19 | Q.  Now, would you expect that the owner of | 09:29 |
| 20 | standard-essential patents that has made RAND | 09:29 |
| 21 | commitments should know that it cannot engage in | 09:29 |
| 22 | hold-up? | 09:29 |
| 23 | MR. CANNON:  Object to the form of the | 09:30 |
| 24 | question. | 09:30 |
| 25 | THE WITNESS:  What do you mean "should know | 09:30 |

HIGHLY CONFIDENTIAL
GREGORY LEONARD, Ph.D. – 6/24/2013

| | | |
|---|---|---|
| 1 | them to start their -- again, Microsoft had the | 10:49 |
| 2 | negotiation continued instead of having them sue, they | 10:49 |
| 3 | would have been able to -- to make their arguments, | 10:50 |
| 4 | and -- but as far as an opening offer goes in the | 10:50 |
| 5 | context that we're talking about, I don't think it was | 10:50 |
| 6 | unreasonable. | 10:50 |
| 7 | Q.  My question is a little different.  I | 10:50 |
| 8 | understand that because I read your report. | 10:50 |
| 9 | My question is:  Do you think those were RAND | 10:50 |
| 10 | rates? | 10:50 |
| 11 | MR. CANNON:  Object to the form of the | 10:50 |
| 12 | question. | 10:50 |
| 13 | THE WITNESS:  As I've explained, I've taken the | 10:50 |
| 14 | judge's decision as given.  He specified what the RAND | 10:50 |
| 15 | rates are, so I've taken those as given.  In that | 10:50 |
| 16 | context, you know, 2.25 percent, you know, is outside | 10:50 |
| 17 | the range that the judge determined.  So in that sense, | 10:50 |
| 18 | they're certainly above the RAND range that he | 10:50 |
| 19 | identified.  So in that mathematical sense, you know, | 10:50 |
| 20 | that's -- that is what it is. | 10:50 |
| 21 | BY MR. PRITIKIN:  ▮ ▬▬▬▬▬▬▬ | ▬ |

HIGHLY CONFIDENTIAL
GREGORY LEONARD, Ph.D. – 6/24/2013



HIGHLY CONFIDENTIAL
GREGORY LEONARD, Ph.D. – 6/24/2013

Page 72

1

25   have those handy there, those are the October letters.

10:54

HIGHLY CONFIDENTIAL
GREGORY LEONARD, Ph.D. - 6/24/2013

Page 136

| | | |
|---|---|---|
| 1 | consistent with its RAND commitments? | 13:42 |
| 2 | MR. CANNON:  Object to the form of the | 13:42 |
| 3 | question. | 13:42 |
| 4 | THE WITNESS:  First of all, there's -- there's | 13:42 |
| 5 | a legal determination there.  From my point of view, | 13:42 |
| 6 | again, I don't think it necessarily matters subject to | 13:43 |
| 7 | the patent owner, even if they get an injunction, | 13:43 |
| 8 | continuing to -- to work under the RAND commitment. | 13:43 |
| 9 | BY MR. PRITIKIN:  Q.  Do you think there are | 13:43 |
| 10 | any circumstances where the owners of standard-essential | 13:43 |
| 11 | patents would be abusing its RAND commitment by trying | 13:43 |
| 12 | to get an injunction against a prospective licensee? | 13:43 |
| 13 | A.  Well, I think if it used an injunction to | 13:43 |
| 14 | obtain the hold-up value, then that could be a problem. | 13:43 |
| 15 | But it's really getting the hold-up value that's the | 13:43 |
| 16 | real -- the real difficulty there.  They're not | 13:43 |
| 17 | injunction in and of itself.  I mean if you have an | 13:43 |
| 18 | injunction, but again you negotiate on RAND terms, you | 13:43 |
| 19 | know, the outcome of that should be a RAND royalty. | 13:43 |
| 20 | Q.  Do you think the owner of standard-essential | 13:44 |
| 21 | patents is acting in good faith if it tries to obtain an | 13:44 |
| 22 | injunction while it's engaged in good faith negotiations | 13:44 |
| 23 | with the implementer? | 13:44 |
| 24 | A.  Like I said, at some point in the negotiation, | 13:44 |
| 25 | you have two parties that are negotiating in good faith | 13:44 |

HIGHLY CONFIDENTIAL
GREGORY LEONARD, Ph.D. - 6/24/2013

Page 137

```
 1    could just simply disagree.  And at that point, you      13:44
 2    know, there's a litigation process that can be           13:44
 3    instigated and exclusion orders or injunctions are part  13:44
 4    of that process.                                          13:44
 5              Again, if -- if the patent owner then uses that 13:44
 6    to try to get hold-up value, then I think that's         13:44
 7    potentially problematic.  But, you know, in principal, I 13:44
 8    don't think that you should say oh an standard-essential 13:44
 9    patents owner should never get a -- should never be      13:45
10    allowed to have an injunction or exclusion order.        13:45
11         Q.  What do you mean by "hold-up value" in the      13:45
12    context you've testifying about in the last few minutes? 13:45
13         A.  I think we talked about that before.  So it's   13:45
14    hold-up value would be value above -- value of the       13:45
15    technology in the particular application that we're      13:45
16    talking about, as compared to the non-infringing         13:45
17    alternative technologies that could have been used in    13:45
18    the standard at the time the standard was set.  You      13:45
19    know, in broad terms, that's what I'm talking about.     13:45
20         Q.  Now, normally license negotiations take a       13:45
21    period of time to conclude, in your experience?          13:45
22         A.  Yes, some short; some long, yes.                13:45
23         Q.  How long would you have expected reasonably a   13:45
24    negotiation to have taken between Microsoft and Motorola 13:45
25    for the Motorola standard-essential patents?            13:46
```

HIGHLY CONFIDENTIAL
GREGORY LEONARD, Ph.D. – 6/24/2013

| | | |
|---|---|---|
| 1 | have been a lot of discussion about.  And, you know, | 14:10 |
| 2 | given Motorola's history, I think they would have | 14:10 |
| 3 | responded to that discussion.  But as an opening offer, | 14:10 |
| 4 | again, I think it's in the time period you had and the | 14:11 |
| 5 | context that was at issue and with the lack of | 14:11 |
| 6 | experience, I think it was a reasonable thing for | 14:11 |
| 7 | Motorola to default to that as an opening offer. | 14:11 |
| 8 | Q.  You understand that the cellular portfolio is a | 14:11 |
| 9 | strong portfolio? | 14:11 |
| 10 | A.  Yes. | 14:11 |
| 11 | Q.  You've been told that by Mr. Dailey? | 14:11 |
| 12 | A.  And it's just true, from market evidence. | 14:11 |
| 13 | Q.  And Motorola knew that in 2010? | 14:11 |
| 14 | A.  Yes. | 14:11 |
| 21 | Q.  And you understand that the cellular licenses | 14:11 |
| 22 | are not comparable licenses for purposes of determining | 14:11 |
| 23 | a royalty for 802.11 and H.264, don't you? | 14:11 |
| 24 | A.  I think that's again something that we can know | 14:12 |
| 25 | now by looking at all the materials been produced in | 14:12 |

HIGHLY CONFIDENTIAL
GREGORY LEONARD, Ph.D. – 6/24/2013

Page 191

13          MR. CANNON:  Object to the form of the

14    question.

24          BY MR. PRITIKIN:  Q.  It's apparent from the

25    letters without doing any sophisticated analysis that

HIGHLY CONFIDENTIAL
GREGORY LEONARD, Ph.D. - 6/24/2013

| | | |
|---|---|---|
| 1 | the amounts that are being sought are enormous; isn't | 15:13 |
| 2 | that correct, sir? | 15:13 |
| 3 | A.  I don't know what you mean by "enormous." | 15:13 |
| 4 | Q.  Do you think billions of dollars are enormous? | 15:13 |
| 5 | A.  Well, I mean as sitting here myself, you know, | 15:13 |
| 6 | for one thing we don't know what time frame we're | 15:13 |
| 7 | covering.  I'm not sure I could tell you what the -- | 15:13 |
| 8 | what the amount is we're talking about without doing | 15:13 |
| 9 | some more work. | 15:13 |
| 10 | Q.  Now, based on publicly available information, | 15:13 |
| 11 | Motorola could have figured out approximately what it | 15:13 |
| 12 | was demanding at a 2.25 percent royalty; could it not? | 15:13 |
| | ██   ██  ████████████████████ | ██ |
| | ██   ███████████████████████████████ | ██ |
| | ██   █████████████████████  So, again, you | 15:13 |
| 16 | know, I think what we're talking about here is a | 15:13 |
| 17 | situation where they put something in this letter | 15:14 |
| 18 | because they were expecting to get more information that | 15:14 |
| 19 | would allow them to reach a conclusion later on. | 15:14 |
| 20 | So I mean especially in that context, given | 15:14 |
| 21 | that he's very clear that that's one of the things he | 15:14 |
| 22 | wanted to understand better.  You know, I don't -- if I | 15:14 |
| 23 | were him, I would be sitting there saying, okay, I got | 15:14 |
| 24 | this -- I am going to put this in the letter, but I | 15:14 |
| 25 | don't really know what's going on with Microsoft. | 15:14 |

HIGHLY CONFIDENTIAL
GREGORY LEONARD, Ph.D. - 6/24/2013

Page 193

| | |
|---|---|
| 1 | So, you know, this calculation that you're | 15:14 |
| 2 | suggesting, it's not even worth the time to do it | 15:14 |
| 3 | because undoubtedly things are going to change when you | 15:14 |
| 4 | hear back from Microsoft if -- if that had happened. | 15:14 |
| 5 | Q. Well, let's indulge me, please. Let's see if | 15:14 |
| 6 | we can figure out what had been readily knowable to | 15:14 |
| 7 | Motorola at the time the letters were sent. There is | 15:14 |
| 8 | publicly available information on global sales and | 15:14 |
| 9 | personal computers, right? You know that? | 15:14 |
| 10 | A. Yes, yes. | 15:14 |
| 11 | Q. And you've heard of a company called Gartner? | 15:14 |
| 12 | A. Sure. | 15:15 |
| 13 | Q. They issue forecasts and reports on sales of | 15:15 |
| 14 | personal computer? | 15:15 |
| 15 | A. They do. | 15:15 |
| 16 | Q. And you can get information about that on the | 15:15 |
| 17 | Internet, right? | 15:15 |
| 18 | A. Well, I don't know. You can get very summary | 15:15 |
| 19 | information. Typically you need to pay them a fair | 15:15 |
| 20 | amount of money to get something more detailed. | 15:15 |
| 21 | Q. Motorola could readily have ascertained the | 15:15 |
| 22 | approximate number of PC and laptop sales at the time it | 15:15 |
| 23 | sent the letter in May of 2010, right? | 15:15 |
| 24 | A. I'm sorry, they could have ascertained what? | 15:15 |
| 25 | Q. Readily have ascertained the amount of | 15:15 |

HIGHLY CONFIDENTIAL
GREGORY LEONARD, Ph.D. - 6/24/2013

Page 194

| | | |
|---|---|---|
| 1 | worldwide laptop and PC sales at the time it sent the | 15:15 |
| 2 | letters in October of 2010? | 15:15 |
| 3 | A.  Well, they -- they could get an estimate from a | 15:15 |
| 4 | company like Gartner.  I mean that is an estimate. | 15:16 |
| 5 | Q.  And you could have gotten that -- they could | 15:16 |
| 6 | have gotten that on the Internet, right? | 15:16 |
| 7 | A.  Again, I don't know what Gartner posts on the | 15:16 |
| 8 | Internet.  Of course you would want to have -- you know, | 15:16 |
| 9 | you wouldn't want to have, for instance, the Apple units | 15:16 |
| 10 | in there and stuff like that. | 15:16 |
| 11 | (Exhibit 16 was marked for identification.) | 15:16 |
| 12 | BY MR. PRITIKIN:  Q.  Could you take a look at | 15:16 |
| 13 | Exhibit 16. | 15:16 |
| 14 | A.  Sure. | 15:16 |
| 15 | Q.  You see the date on that?  It's pulled off the | 15:16 |
| 16 | Internet dated May 27, 2010.  The dates. | 15:16 |
| 17 | A.  Which dates? | 15:16 |
| 18 | Q.  The date of the article. | 15:16 |
| 19 | A.  Okay. | 15:16 |
| 20 | Q.  So that's prior to October of 2010 when the | 15:17 |
| 21 | letters were sent? | 15:17 |
| 22 | A.  Right. | 15:17 |
| 23 | Q.  And if you look at the second paragraph of the | 15:17 |
| 24 | article, it says that Gartner projects PC shipments will | 15:17 |
| 25 | reach 376 million units in 2010. | 15:17 |

HIGHLY CONFIDENTIAL
GREGORY LEONARD, Ph.D. - 6/24/2013

| | | |
|---|---|---|
| 1 | A.  Okay. | 15:17 |
| 2 | Q.  And you would agree with me that data of this | 15:17 |
| 3 | kind is -- was readily available in 2010? | 15:17 |
| 4 | MR. CANNON:  Object to the form of the | 15:17 |
| 5 | question. | 15:17 |
| 6 | THE WITNESS:  Just, for instance, I'm not sure | 15:17 |
| 7 | whether these include Apple products or not. | 15:17 |
| 8 | BY MR. PRITIKIN:  Q.  Well, let's assume it | 15:17 |
| 9 | does.  But data of this sort was readily available, | 15:17 |
| 10 | wasn't it? | 15:17 |
| 11 | A.  That's my point, is if you wanted to pull Apple | 15:17 |
| 12 | out of it, which would make a lot of sense since they | 15:17 |
| 13 | wouldn't have Microsoft operating systems on it.  Then | 15:17 |
| 14 | you would probably have to buy the report from -- from | 15:17 |
| 15 | Gartner.  Obviously Motorola could have done that. | 15:18 |
| 16 | But, again, for an opening offer, when you | 15:18 |
| 17 | expect to just get the information from -- from | 15:18 |
| 18 | Microsoft itself.  And what's more understand the way | 15:18 |
| 19 | the business operates, then, you know, why go through | 15:18 |
| 20 | this effort when you're about to get what you think -- | 15:18 |
| 21 | or you think you're about to get the actual information | 15:18 |
| 22 | that's truly relevant. | 15:18 |
| 23 | Q.  You can volunteer that whatever answer if you | 15:18 |
| 24 | want to, Dr. Leonard.  And at some point we may go back | 15:18 |
| 25 | to the court to ask for more time for the deposition. | 15:18 |

HIGHLY CONFIDENTIAL
GREGORY LEONARD, Ph.D. - 6/24/2013

```
 1        A.  Please do.                                15:18
 2        Q.  Would you please listen to my question and 15:18
 3   answer the question I'm asking.                    15:18
 4        A.  I answer the question -- I'll answer the  15:18
 5   question the way that I see fit.  I know very well how 15:18
 6   this works.  And your posturing is not going to have any 15:18
 7   impact on me whatsoever.                           15:18
 8        Q.  We'll call Judge Robart at some point, sir. 15:18
 9        A.  Okay.  Go ahead.                          15:18
10        Q.  You've been through this drill before.   15:18
11        A.  Okay.  Go ahead.                          15:18
12        Q.  Well, we will at some point if you don't answer 15:18
13   the question.                                      15:18
14             MR. CANNON:  He's answering the question. 15:18
15   Let's take a short break.  Let's take a break.     15:18
16             MR. PRITIKIN:  Why don't you talk to this guy. 15:18
17             THE VIDEOGRAPHER:  Off the record at 3:19. 15:18
18             (Short break taken.)                     15:30
19             THE VIDEOGRAPHER:  Back on the record at 3:30. 15:30
20             BY MR. PRITIKIN:  Q.  Dr. Leonard, just so 15:30
21   we're clear.  I'm going to be asking you questions about 15:30
22   information that could have been obtained by Motorola. 15:30
23   I'm not asking you what was actually known.  I'm asking 15:30
24   you questions about what was available or what could 15:31
25   have been obtained.                                15:31
```

| | | |
|---|---|---|
| 1 | Do you understand the predicate for the | 15:31 |
| 2 | questions? | 15:31 |
| 3 | A.  Sure. | 15:31 |
| 4 | MR. PRITIKIN:  Mark this as the next exhibit. | 15:31 |
| 5 | What number? | 15:31 |
| 6 | THE REPORTER:  17. | 15:31 |
| 7 | (Exhibit 17 was marked for identification.) | 15:31 |
| 8 | BY MR. PRITIKIN:  Q.  Do you see Exhibit 17 is | 15:31 |
| 9 | information obtained from the internet, the article is | 15:31 |
| 10 | dated January 22, 2010? | 15:31 |
| 11 | A.  Yes. | 15:31 |
| 12 | Q.  And it shows the Microsoft operating system | 15:31 |
| 13 | market share at around 90 percent.  Do you see that? | 15:31 |
| 14 | A.  Yes. | 15:31 |
| 15 | Q.  And is that consistent with what your | 15:31 |
| 16 | understanding was at the time of approximately what | 15:32 |
| 17 | Microsoft's market share was of the operating system | 15:32 |
| 18 | market? | 15:32 |
| 19 | A.  I mean I didn't go back to look at that myself | 15:32 |
| 20 | specifically, so -- this is the end of 2009.  So I'd | 15:32 |
| 21 | have to go back to look at it. | 15:32 |
| 22 | Q.  That percentage doesn't surprise you, does it? | 15:32 |
| 23 | Just based on your own -- do you try to keep up with the | 15:32 |
| 24 | computer markets and industry? | 15:32 |
| 25 | A.  Yes, I do. | 15:32 |

HIGHLY CONFIDENTIAL
GREGORY LEONARD, Ph.D. - 6/24/2013

Page 198

| | | |
|---|---|---|
| 1 | Q.  Is that consistent with what your understanding | 15:32 |
| 2 | is, around 90 percent was Windows? | 15:32 |
| 3 | A.  Certainly in a rough -- in a rough sense.  I | 15:32 |
| 4 | guess I don't know whether this is worldwide or U.S. | 15:32 |
| 5 | again.  But... | 15:32 |
| 6 | Q.  I think it shows worldwide, doesn't it, on the | 15:32 |
| 7 | left there?  That's what it says. | 15:32 |
| 8 | A.  I think that does say worldwide there, yes. | 15:33 |
| 9 | Q.  All right.  Now, if we go back to Exhibit 16. | 15:33 |
| 10 | And if you look down a little further to the second | 15:33 |
| 11 | paragraph that says, "Gartner projects worldwide PC | 15:33 |
| 12 | shipments will reach 376 million units in 2010.  Total | 15:33 |
| 13 | spending is expected to reach 245 billion in 2010." | 15:33 |
| 14 | Do you see that? | 15:33 |
| 15 | A.  Yes. | 15:33 |
| 16 | Q.  And if we assume that the Microsoft share of | 15:33 |
| 17 | the operating system market is around 90 percent, that | 15:33 |
| 18 | would mean that worldwide sales of PCs with Windows | 15:33 |
| 19 | operating systems would be around $220 billion? | 15:34 |
| 20 | A.  Just in -- provides us here this is the | 15:34 |
| 21 | forecast and the -- the time periods don't match up. | 15:34 |
| 22 | But, you know, it's going to be in that ballpark | 15:34 |
| 23 | probably. | 15:34 |
| 24 | Q.  Now, assuming that worldwide sales of PCs with | 15:34 |
| 25 | Windows were on the order of -- let's just take a round | 15:34 |

| | | |
|---|---|---|
| 1 | number -- $200 billion.  Can you make that assumption | 15:34 |
| 2 | for me? | 15:34 |
| 3 | A.  Okay. | 15:34 |
| 4 | Q.  If we go back to the October 29 letter, if a | 15:34 |
| 5 | 2.25 percent royalty were calculated on $200 billion of | 15:34 |
| 6 | sales, that would be around 4 and a half billion | 15:35 |
| 7 | dollars, right? | 15:35 |
| 8 | A.  Let's see.  Are you talking about -- sorry -- | 15:35 |
| 9 | H.264 here? | 15:35 |
| 10 | Q.  Yes. | 15:35 |
| 11 | A.  Okay.  I mean if you took 2.25 percent, you | 15:35 |
| 12 | multiplied it by the other number you gave, I think the | 15:35 |
| 13 | math is approximately correct. | 15:35 |
| 14 | Q.  Now, if someone at Motorola had gone through | 15:35 |
| 15 | the exercise we just went through, it would have been | 15:35 |
| 16 | fairly easy to determine that a 2.25 percent royalty on | 15:35 |
| 17 | all of the Windows-based PCs is going to be -- produce | 15:36 |
| 18 | an annual royalty of in excess of $4 billion a year, | 15:36 |
| 19 | correct? | 15:36 |
| 20 | A.  I mean if somebody pulled these number off the | 15:36 |
| 21 | Internet and done that math, they could have in | 15:36 |
| 22 | principal. | 15:36 |
| 23 | Q.  Now, there also was publicly available | 15:36 |
| 24 | information in October of 2010 concerning what OEMs paid | 15:36 |
| 25 | Microsoft for Windows; was there not? | 15:37 |