# EXHIBIT B



**GEOTEXT**
Translations, Inc.

STATE OF CALIFORNIA

)
)
)

COUNTY OF SAN FRANCISCO )          SS

## CERTIFICATION

This is to certify that the attached translation is, to the best of my knowledge and belief, a true

and accurate translation from German into English of the attached Judgment Pronounced on

May 2, 2012.

Emma Drew, Project Manager
Geotext Translations, Inc.

State of California, County of San Francisco

Subscribed and sworn to (or affirmed) before me

on this ____ day of _____, 201__,

by _____,

proved to me on the basis of satisfactory evidence

to be the person(s) who appeared before me.

Signature: _____

R. L. CREIGHTON
Commission # 1930961
Notary Public - California
San Francisco County
My Comm. Expires Mar 31, 2015

New York  259 West 30th Street, 17th Floor, New York, NY 10001, U.S.A. tel +1.212.631.7432 fax +1.212.631.7778
San Francisco  220 Montgomery Street Ste. 438, San Francisco CA 94104 U.S.A tel +1.415.576.8900 fax +1.415.520.0525
Washington 1025 Connecticut Avenue, Suite 1000, Washington, DC 20036, U.S.A. Tel +1.202.828.1267 fax +1.202.828.1271
London  8-11 St. John's Lane, London EC1M 4BF, United Kingdom Tel +44.20.7553.4100 Fax+44.20.7990.9909
Paris 75 Boulevard Haussmann, F- 75008 Paris, France tel +33.1.42.68.51.47 fax +33.1.77.72.90.25
Hong Kong  20th Floor, Central Tower, 28 Queen's Road, Central, Hong Kong tel +852.2159.9143 fax +852.3010.0082
translations@geotext.com  |  www.geotext.com

CONFIDENTIAL

011

**Reference number:**
2 O 240/11

*– Official Copy –*



Pronounced on
May 2, 2012

Folger, Judicial Employee,
as clerk
of the court's business office

# Regional Court of Mannheim [Germany]

## 2nd Civil Division

# In the Name of the People

# Judgment

In the litigation of:

**General Instrument Corporation**
Horsham, PA 19044 / United States

– Plaintiff –

Attorney of record:
Attorneys Quinn Emanuel, and colleagues, Mannheim, Court Box 227
(02426.40235/20161622.1)

**versus**

**Microsoft Deutschland GmbH**
Konrad Zuse Str. 1, 85716 Unterschleissheim

– Defendant –

Attorney of record:
Attorneys Freshfields Bruckhaus Deringer, and colleagues, Prannerstr. 10, 80333
Munich
(PC/CBA 109096:0588)

**for** patent infringement,

the 2nd Civil Division of the Mannheim Regional Court [Landgericht], following a hearing
conducted on February 7, 2012, and acting through

Dr. Kircher, Presiding Judge at the Regional Court

Dr. Bauer-Gerland, Judge at the Regional Court

Wedler, Judge at the Regional Court,

**orders and adjudicates**:

CONFIDENTIAL

012

MOTM_WASH1823_0602119

I.   The Defendant is adjudged:

1. a)

to cease and desist, within the territory of the Federal Republic of Germany, from

offering, putting into circulation, using, importing or possessing for the purposes referred to,

decoder apparatuses (especially Xbox 360) for receiving the blocks of encoded video data, provided by different motion compensators of an apparatus for the adaptive compression of digital video signals,

if they are characterized in that

a means is provided for retrieving, from each received data block, a code word representative of the motion compensator from which the block is received,

a means responsive to said code word is provided for recovering a motion vector for each block from motion vector data received with the block, and

a means responsive to said motion vector is provided for recovering current video image data from data provided by a current data block and at least one prior data block.

(EP 0 538 667 B1, Claim 19, direct infringement)

1.b)

to cease and desist, within the territory of the Federal Republic of Germany, from

offering and/or delivering

computer software (especially Windows 7 and/or Internet Explorer 9),

CONFIDENTIAL

MOTM_WASH1823_0602120

– 3 –

if it is suitable, by installation on a computer,

to form a

decoder apparatus for receiving the blocks of encoded video data, provided by different motion compensators of an apparatus for the adaptive compression of digital video signals,

if the decoder apparatus is characterized in that

a means is provided for retrieving, from each received data block, a code word representative of the motion compensator from which the block is received,

a means responsive to said code word is provided for recovering a motion vector for each block from motion vector data received with the block, and

a means responsive to said motion vector is provided for recovering current video image data from data provided by a current data block and at least one prior data block.

(EP 0 538 667 B1, Claim 19, contributory infringement)

1.c)

to cease and desist, within the territory of the Federal Republic of Germany, from

offering and/or delivering

computer software (especially Windows Media Player 12),

if it is suitable, upon installation on a decoder apparatus in accordance with item I. 1. b), to interact with the computer software in accordance with item I. 1. b) (especially Windows 7)

(EP 0 538 667 B1, Claim 19, contributory infringement)

CONFIDENTIAL

MOTM_WASH1823_0602121

– 4 –

1.d)

For each instance of non-compliance with one of the prohibitions pursuant to item I.1.a) through item I.1.c), the Defendant shall be subject to an administrative fine of up to EUR 250,000, respectively, and, alternatively, confinement, or confinement of up to 6 months, in regard to which the confinement shall be carried out against the legal representatives of the Defendant.

I.2

The Defendant is adjudged to render an accounting to the Plaintiff in writing in an orderly manner (arranged by calendar year quarters) as to the extent to which the Defendant has committed the acts described in item I.1.a) through item I.1.c) since October 19, 2001, stating in each instance:

a) the individual deliveries (with submission of the invoices and/or bills of delivery), together with:

> aa) quantities delivered, times and prices;
> bb) brands of the respective products as well as all identifying features such as designation of type, description of the article, serial number;
> cc) the names and addresses of the recipients;

b) the individual offers (with submission of written offers), together with:

> aa) quantities offered, times and prices;
> bb) brands of the respective products as well as all identifying features such as designation of type, description of the article, serial number;
> cc) the names and addresses of the commercial offerees;

c) the production costs, itemized by the individual cost factors, as well as the profit generated;

d) the names and addresses of the manufacturers, suppliers, and other previous holders, in each instance with the number of products manufactured, received or ordered;

CONFIDENTIAL

MOTM_WASH1823_0602122

– 5 –

e) the advertising undertaken, itemized by advertising media, their volume of circulation, time of circulation, and circulation area;

provided that the information referred to in a) and d) shall be documented by submitting order slips, order confirmations, invoices, as well as delivery and customs papers;

provided that it remains reserved to the Defendant to provide the names and addresses of their non-commercial recipients and the offerees instead of to the Plaintiff to a professional auditor to be designated by the Plaintiff and who is under a duty of confidentiality as against the Plaintiff, under oath, and domiciled in the Federal Republic of Germany, as long as the Defendant assumes the costs arising from the auditor's involvement and authorizes and obligates such auditor to inform the Plaintiff upon a specific inquiry as to whether a certain non-commercial recipient or a certain offeree is included in the accounting.

I.3.

The Defendant is adjudged to recall from the channels of distribution the products described in item I.1.a) that are in the possession of third parties other than end-users and that were put into circulation after April 29, 2006, by earnestly calling upon those third parties to whom possession of the products was granted by the Defendant or with the Defendant's approval, together with a notice that, with the present judgment, the division has found an infringement of the patent in dispute, to return the products and by promising such third parties the return of any purchase price already paid and the assumption of the costs of the return in the event that the products are returned,

and

to remove with finality the products described in item I.1.a), that are in the possession of third parties other than end-users and that were put into circulation

CONFIDENTIAL

MOTM_WASH1823_0602123

– 6 –

after 9/1/2008, in that the Defendant shall repossess these products or arrange for their destruction with the respective party in possession.

II.  It is determined that the Defendant shall compensate the Plaintiff for all damages that the Plaintiff has suffered or may yet suffer due to acts of the Defendant pursuant to items I.1.a) through I.1.c) since October 19, 2001.

III. The action is otherwise dismissed.

IV. The Defendant shall bear the cost of the litigation.

V.  The judgment shall be provisionally enforceable on security in the amount of:

- EUR 60 million with respect to item I.1 (injunctive relief);
- EUR 10 million with respect to item I.2 (accounting);
- EUR 10 million with respect to item I.3 (recall/removal), provided, however, that the security to be furnished shall be EUR 30 million in the event of isolated enforcement (without enforcement of the injunctive relief under item I.1.a)).
- 120% of the respective amount to be enforced with respect to item IV.

CONFIDENTIAL

MOTM_WASH1823_0602124

– 7 –

**Findings of Fact**

The Plaintiff is pursuing claims for injunctive relief, an accounting, as well as recall and removal from distribution channels, for alleged direct and contributory patent infringement, and it is requesting that the Defendant be held liable for compensatory damages.

The Plaintiff is a United States company and a wholly-owned subsidiary of Motorola Mobility Inc. The United States company of Google Inc. is planning to acquire Motorola Mobility Inc., as a result of which Google Inc. would also take over all companies held by Motorola Mobility Inc., including the Plaintiff.

The Plaintiff is the owner of European patent EP 0 538 667 B1, which is in force in Germany, (hereinafter: patent in dispute) concerning adaptive motion compensation using a plurality of motion compensators. The patent in dispute was filed on 10/6/1992. Disclosure occurred on 4/28/1993. The mention of the grant of the patent in dispute was published on 9/19/2001. The Federal Republic of Germany is among the designated contracting states. The German translation of the patent in dispute has been published under number DE 692 32 063 T2.

By brief dated 10/5/2011 (Exhibit FBD 19), the Defendant filed an invalidity action with the German Federal Patent Court [Bundespatentgericht] against the German part of the patent in dispute. By brief dated 2/8/2012, the plaintiff in the invalidity action (Defendant here) and the two intervenors in the invalidity proceedings (Microsoft Corporation and Microsoft Ireland Operations Ltd.) moved that the invalidity proceedings be stayed pursuant to Section 251 ZPO [Zivilprozessordnung (German Code of Civil Procedure)] (Exhibit FBD 36).

The Plaintiff is asserting claim 19 of the patent in dispute, which has the following wording in the language of the proceedings (reference numbers omitted):

*Decoder apparatus for receiving the blocks of encoded video data, provided by said different motion compensators of the apparatus of claim 1, characterized in that:*

CONFIDENTIAL

MOTM_WASH1823_0602125

– 8 –

*means are provided for retrieving, from each received data block a code word representative of the motion compensator from which the block is received;*

*means responsive to said code word are provided for recovering a motion vector for each block from motion vector data received with the block; and*

*means responsive to said motion vector are provided for recovering current video image data from data provided by a current data block and at least one prior data block.*

As to the further contents of the patent in dispute, especially the description and the associated figures, reference is made to the patent document (Exhibit KP1-K1) and its German translation (Exhibit KP1-K2).

The Defendant is part of the Microsoft corporate group. In the Federal Republic of Germany, it distributes among other things the Xbox 360 video game console and the Windows 7, Windows Media Player Version 12, and Microsoft Internet Explorer Version 9 computer software (hereinafter: challenged embodiments).

The challenged embodiments support the H.264 video compression standard, which has been published under the designation MPEG-4/AVC (*Advanced Video Coding*) as the tenth part of the MPEG-4 standard (MPEG-4/Part 10, ISO/IEC 14496-10) (hereinafter: standard). The Xbox 360 challenged embodiment enables the playing of H.264 video files. By being installed on a computer, Windows 7 and Windows Internet Explorer Version 9 enable the computer to play H.264 video files. This is also true for Windows Media Player Version 12, which uses the decoder modules from Windows 7.

Among other things, the H.264 standard regulates the decompression of a digital video signal that is compressed in a manner compatible with the standard, and it also defines the compression format that is to be decoded for a digital video signal. The standard was developed by the International Telecommunication Union (ITU) in collaboration with the MPEG (*Moving Pictures Experts Group*) and published in the document ITU-T H.264 (3/2010) (Exhibit KP1- K4). In 2002 to 2003, the predecessor of the Plaintiff's parent company, Motorola Inc., had participated in the H.264/MPEG4/AVC standard-setting process.

CONFIDENTIAL

019

In the course of the standard-setting process, the Plaintiff and also Motorola Inc. issued a number of Patent Statement and Licensing Declaration Forms to the ITU aimed at, in their view, licensing standard-essential patents to prospective licensees at non-discriminatory, fair and reasonable terms (Exhibit Set FBD 8).

These declarations in part have the following wording (translation):

"*2. The patent owner will grant to an unlimited number of applicants a license, on a worldwide, non-discriminatory basis and at reasonable terms, to use the patented subject matter, [...] Check here* __ [Note by the division: This spot was checked in each instance]*, if the patent owner's willingness to license is under the condition of reciprocity for the aforementioned ITU-T recommendations/the ISO/IEC International Standard.*

*Negotiating the licenses is left to the parties in question and shall take place outside of the ITU-T/ISO/IEC.*"

The Defendant's parent company, Microsoft Corporation, is one of those companies that as a licensor contributed its patents declared essential for the H.264 standard to the MPEG LA H.264/AVC Patent Pool (hereinafter: MPEG LA Pool). In this pool, 171 families of patents that have been declared essential for the standard are being administered by MPEG LA, L.L.C. and jointly licensed. To that end, the MPEG LA H.264/AVC patent pool license agreement applies (hereinafter: MPEG LA Pool Agreement, Exhibit FBD-12). This agreement provides for a scaled license fee system with fixed amounts per device. Products that use the technology relevant to the standard (such as decoding products) are combined into what is referred to as "units." For a given company ("legal entity"), up to 100,000 units per year are free of charge. A license fee of USD 0.20 per unit must then be paid for subsequent units, and at 5,000,001 and more units, the license fee is reduced to USD 0.10 per unit for the additional units. Moreover, the MPEG LA Pool Agreement provides for a capping limit for licensees and their affiliates (2005-2006: maximum of USD 3.5 million/year; 2007-

CONFIDENTIAL

MOTM_WASH1823_0602127

2008: maximum of USD 4.25 million/year; 2009-2010: maximum of USD 5 million/year; 2011-2015: maximum of USD 6.5 million/year).

Terayon Communications Systems, Inc., (hereinafter: Terayon) and Tut Systems, Inc., (hereinafter: Tut Systems) were MPEG LA Pool Agreement licensees. The predecessor of the Plaintiff's parent company, Motorola, Inc., acquired Terayon and Tut Systems in 2007 (FBD 29). Following the split of the Motorola group into Motorola Solutions, Inc., and Motorola Holdings, Inc., Terayon and Tut Systems were assigned to Motorola Mobility Inc. (a subsidiary of Motorola Mobility Holdings, Inc.), the Plaintiff's parent company. In 2011, Terayon and Tut Systems became part of the Plaintiff by way of an acquisition ("*Merger merging Tut Systems [and Terayon] with and into General Instrument Corporation*" – FBD 31).

The company that is planning to acquire the Plaintiff's parent company, Google Inc., is also an MPEG LA Pool Agreement licensee (Exhibit FBD-18).

Section 8.3 of the MPEG Pool Agreement states as follows:

> „*Licensee Grant. Upon full execution of this Agreement, Licensee agrees to grant a worldwide, non-exclusive license and/or sublicense (commensurate to this scope of the licences which Licensee has selected here under) under any and all AVC Essential Patent(s) that Licensee and its Affiliates, if any, have the right to licence and / or sublicense, to any Licensor or any sublicensee of the Licensing Administrator desiring such a licence and/or sublicense on fair and reasonable terms and conditions. [...]*"

Section 8.1.2 states:

> „*This Agreement may not be assigned by the Licensee under any circumstances. This Agreement shall terminate upon the Sale by Licensee of all or substantially all of its assets, or capital shares (or similar indicia of ownership), or upon a similar transaction.*"

Pursuant to Section 6.6.4, the obligation under Section 8.3 survives the expiration or termination of the license agreement.

CONFIDENTIAL

MOTM_WASH1823_0602128

By letter dated 10/29/2010 (Exhibit FBD 9), the Plaintiff's parent company submitted to the Defendant's parent company an offer, effective for 20 days, described as "RAND" (reasonable and non-discriminatory) to enter into an agreement for a worldwide, non-exclusive license for the portfolio of Motorola's H.264-standard-essential patents at a license fee of 2.25% of the sales prices of the standard-compatible end products (e.g., Xbox 360, PC, laptop, smartphone, etc.). The offer also provided for a license back to Microsoft's standard-essential patents at the same terms. Finally, a willingness was stated to also possibly negotiate a license only to individual patents in Motorola's portfolio. This offer was not accepted by the Defendant's parent company.

By attorney's letter dated 12/23/2011, the Defendant's parent company submitted an unconditional offer for a license agreement, effective as well for the Plaintiff's subsidiaries, concerning the German part of the patent in dispute here (also the subject matter of the parallel proceedings under 2 O 376/11) and for the German part of European patent EP 0 615 384 B1, which is the subject matter of the parallel proceedings under 2 O 373/11 and 2 O 387/11 (Exhibit FBD-21 (original English version and German translation)).

The subject matter of that fully worded offer is a non-exclusive, non-assignable right of Microsoft Corp. and its subsidiaries to create a product containing an AVC Decoder or AVC Codec in accordance with the patents and also the right of importation into Germany, as well as the use and possession of such products within Germany.

Section 3.1 of the offer provides for a unit license per "*computing device containing an AVC Decoder or AVC Codec*" (= unit), namely, in the amount of two Euro cents per unit for the first 10 million units per year (= maximum of EUR 200,000.00) and of one Euro cent per unit per year in excess of that.

The Defendant essentially developed the offered license fees as follows:

CONFIDENTIAL

MOTM_WASH1823_0602129

– 12 –

The 270 patent families declared to be standard-essential are said to be attributable to a total of 36 patent owners. If one were to compare how many of these patent families could be attributed to individual patent owners out of the total of 36, the result would then be that the portfolio of the Plaintiff and its parent company would be the fifth largest one of all individual portfolios. If one were to compare this portfolio on the one hand with all of the patent families bundled in the MPEG LA Pool and on the other hand with the patent families held by third parties, the portfolio of the Plaintiff and its parent company would have a proportional share of 6.3% (17 patent families, among them the patent in dispute), while a total of 63.6% of the standard-essential patents are said to be bundled in the patent pool and an additional 30.1% would be held by third parties.

The Defendant determined the purported technical value of the patents held by the Plaintiff and its parent company by means of what it referred to as a citation analysis, the validity of which the Plaintiff disputes. According to it, the frequency with which a certain patent is cited as the pertinent state of the art for subsequent inventions would allow conclusions about the significance of the invention and its technical value (Folios 356 et seq.). According to this so-called citation analysis, the patent portfolio of the Plaintiff and its group parent company supposedly ranks 11th among the patent owners. Several of the 10 patent owners of portfolios with a higher citation value are said to have contributed their patents to the MPEG LA Pool. Compared with all of the standard-essential patents held in the MPEG LA Pool, the result would be that, after all necessary adjustments are made, those patents amount to 72.7% of the total citation value and those of third parties (including the Plaintiff and its group parent company) 27.3%. The patents held altogether by the Plaintiff and its group parent company are said to constitute only 3.8% of the total citation value of all standard-essential patents.

To determine the licensing rates, the Defendant's parent company drew on licensing rates of patent pools or licensing programs that likewise involve the H.264/AVC technology or similar technologies. The market for patents that are part of the MPEG LA Pool could initially be considered as the comparison market. That pool would comprise 171 patent families of 28 patent owners. In the MPEG LA Pool, the license fees for the global manufacture and distribution of standard-compatible decoders are scaled, as already stated above (see also Exhibit FBD-12, Section 3.1.1). The pool's license fees

CONFIDENTIAL

MOTM_WASH1823_0602130

are apportioned proportionately to the number of patents held by the licensors, i.e., at the highest license fee of USD 0.2, a licensor receives 0.082 Euro cents for each unit distributed per patent family. Accordingly, the patent owner that contributed the largest number of patent families would receive, for example, 1.59 Euro cents per unit.

The Defendant also refers to a licensing program of AT&T, in which H.264/AVC-standard-essential patents are licensed outside of a patent pool (folio 268f; AT&T licensing terms: Exhibit FBD-25). According to it, for the global licensing of its portfolio of H.264/AVC-standard-essential patents, AT&T is demanding a unit license fee of USD 0.18 [13.75 Euro cents[1]] for up to 5 million units, with the fee being reduced to USD 0.10 [7.64 Euro cents] for all additional units and a capping limit of USD 5 million per calendar year being provided. In the Defendant's view, it can be assumed that the relevant portfolio held by AT&T is roughly comparable to the portfolio of the Plaintiff and its parent company and even exceeds the latter's value. AT&T is said to have 9 licensees at present.

Finally, the Defendant refers to licensing terms in the market that purportedly are customary for other standards that are said to be comparable with the H.264/AVC standard (Folios 269 et seq.):

- VC-1 standard (pool license): USD 0.20/unit for more than 100,000 and up to 5 million units, USD 0.10 for more than 5 million units, capping limit of USD 5 million;
- MPEG-4 visual standard (pool license): USD 0.25/unit for more than 50,000 units, capping limit of USD 1.25 million;
- Pool licenses for less similar technologies: below USD 1 [sic] per unit, up to merely USD 0.10 per unit.

If the Plaintiff and its group parent company had contributed their patent folio to the MPEG LA Pool, then, for their entire portfolio and applying the pool's usual numerical calculation, they would merely be entitled to 0.082 Euro cents (= proportional share of fee per patent family, assuming a maximum rate between 100,000 and 5 million units) x

---

[1] Exchange rate of 4/18/2012.

CONFIDENTIAL

MOTM_WASH1823_0602131

17 (= patent families of the plaintiff and its group parent company) = 1.394 Euro cents per unit. If the two patents in dispute were each to be viewed as patent families, the licensing rate for the two patents would amount to 2 x 0.082 Euro cents = 0.165 Euro cents. If the pool were based on a calculation of the (citation) value, the Plaintiff and its group parent company would be entitled to an even lesser fee.

The Defendant supposedly is multiplying the amount of 1.394 Euro cents to which the Plaintiff and its group parent company would be entitled for their entire portfolio under a theoretical membership in the pool, by a factor of ten to 14 Euro cents per unit for up to 5 million products and by a factor of five to 7.5 Euro cents per unit for all units in excess of that. Thus, the fee would be roughly comparable to the license fee demanded by the independent offer or AT&T for its (as alleged by the Defendant, more valuable) portfolio.

For the two patents in dispute (the one in this litigation and the German part of European patent EP 0 615 384 B1, which is the subject matter of the parallel proceedings under 2 O 373/11 and 2 O 387/11), the Plaintiff has calculated a unit license fee of 1.65 Euro cents for the first 5 million units per year and 0.83 Euro cents for all additional units per year. This fee equals 2/17 of the fee determined for the entire portfolio of 17 patent families of the Plaintiff and/or its group parent company.

The Defendant is rounding up the license fees mentioned to full Euro cents (1.65 Euro cents to 2 Euro cents, and 0.83 Euro cents to 1 Euro cent), extending the higher initial fee to the first 10 million units, and dispensing with a capping limit.

Alternatively, in the letter dated 12/23/2012, Microsoft Corp. offered to enter into a reciprocal license agreement for Germany with the Plaintiff's parent company, Motorola Mobility Inc., for the entire portfolio of the H.264-standard-essential patents of Microsoft Corp. and its subsidiaries, on the one hand, and Motorola Mobility Inc. and its subsidiaries on the other hand. In its brief of 2/3/2012, Microsoft Corp. offered the conclusion of a reciprocal *worldwide* portfolio license. At the hearing on 2/7/2012, the Defendant's representative made it clear that this cross-license did not constitute an independent license offer but rather a supplementary component of the specified license offer. The offer is not for a *gratuitous cross* license [Freikreuzlizenz] but instead for a non-gratuitous *cross* license [Überkreuzlizenz] at the established licensing rates of

CONFIDENTIAL

MOTM_WASH1823_0602132

– 15 –

2 Euro cents/unit and/or 1 Euro cent/unit. In their brief of 3/2/2012, which in this respect has not been scaled back, the Defendant and/or its parent company, finally declared a willingness to grant the Plaintiff a worldwide *gratuitous* cross-license to its portfolio of standard-essential patents, that is, in addition to its license offer that is limited to the two patents in dispute issued in Germany (Folios 382 et seq.).

Another element of the offer of Microsoft Corp. is the acknowledgment of a duty of compensation in principle for damages from the use of the licensed patents in the past and the obligation to withdraw the invalidity action against the licensed patent in dispute within 10 days following the acceptance of the license offer by the Plaintiff. By brief dated 2/3/2012 (see 2 O 373, folios 364 et seq.), the Defendant expanded the license offer by a right of termination of the Plaintiff in the event that the Defendant were again to bring an invalidity action against one or both of the patents in dispute following the withdrawal of the invalidity action against the two patents asserted in these and the parallel proceedings. At the hearing, the Defendant specified in that regard that according to the Defendant's offer, the Plaintiff would be granted a right to termination for cause also if an invalidity action were to be brought in the future by a party benefitting from the license agreement.

The offer of Microsoft Corp. is said to remain in effect until it has been accepted by the Plaintiff or until a decision is rendered with legal finality to the effect that the products of Microsoft Corp. that are said to be compatible with the H.264/AVC standard do not infringe the two patents in dispute that have been asserted, or that the patents are declared to be invalid, or that the actions are dismissed for any other reason.

The Defendant's group parent company also rendered an accounting concerning the license fees due under the license agreement being offered for the alleged usages in the past up to September 2011 of the patent in dispute by the Defendant, its corporate group parent, and Microsoft Ireland Operations Limited (Exhibit Set FBD-34). The license fees calculated according to the license agreement offer, plus interest in arrears, were deposited by the Defendant's group parent company with the depository of the Mannheim *Amtsgericht* [local court] (depository receipt: Exhibit FBD-35) under waiver of

CONFIDENTIAL

MOTM_WASH1823_0602133

the right of withdrawal (most recently clarified by the letter of 2/8/2012 by the Defendant's representative to the Mannheim Amtsgericht, Folio 360).

With the brief of 3/30/2012, the Defendant stated that its group parent company had determined, also with effect for Defendant, the license fee payments, including interest, pursuant to its license agreement offer, that were due and still outstanding since the first accounting. On 3/30/2012, the Defendant's group parent company likewise deposited the additional amount that had been determined with the depository of the Mannheim Amtsgericht under waiver of the right of withdrawal (Exhibit FBD-40).

**The Plaintiff** is of the view that the invention claimed in the patent in dispute is implemented in the standard as a necessary requirement, for which reason the patent in dispute would be essential for the standard.

As the challenged embodiment Xbox 360 would be able to play compressed video formats in compatibility with the standard, it is said to constitute a decoder apparatus that directly realizes Claim 19 of the patent in dispute. The challenged embodiments Windows 7 and Windows Internet Explorer 9 are said to infringe the patent indirectly because, following the installation of one of these programs, which contain the respective H.264 Codecs (software modules), a computer would constitute a decoder apparatus. Windows Media Player 12 is also said to infringe the patent in dispute indirectly because this software is suitable and intended to interact with an essential element of the invention in that, in accordance with its design, it runs the decoder function provided by Windows 7.

Therefore, Claim 19 is being realized in its literal meaning by the challenged embodiments that are operating in accordance with the standards.

In particular, Claim 19 is said to not protect a system comprised of an encoder and a decoder, so that the design of the encoding process in accordance with the standard does not matter here. The decoder apparatuses in accordance with the standard would also be using features 1 and 2 of Claim 19. Thus, the syntax elements mb_type and sub_mb_type in accordance with the standard would be code words for purposes of

CONFIDENTIAL

MOTM_WASH1823_0602134

feature 2 because they identify the motion compensator being used by type and block size. Even if one were to agree with the Defendant and assume wrongly that a data block for purposes of Claim 19 would necessarily correspond to a macroblock of the standard and that, moreover, a uniform motion compensator had to be used necessarily with this macroblock, the patent in dispute would be infringed by the challenged embodiments because under the standard, an additional partitioning at the 8x8 sub-macroblock level could occur only in the event of an 8x8 partitioning of the macroblock.

The Plaintiff is of the view that the Defendant would not be entitled to a right of use from either the Patent Statement and Licensing Declaration Form of the Plaintiff and/or its former group parent company issued to the ITU or from the MPEG LA Pool Agreement. Furthermore, the MPEG LA Pool Agreement, which has no reference to the patent in dispute anyway, was terminated by the acquisition of Terayon and Tut Systems by Motorola, Inc., in 2007.

Additionally, the Patent Statement and Licensing Declaration Form and the MPEG LA Pool Agreement would not justify a *dolo petit* plea by the Defendant either.

Nor could the Defendant raise a compulsory license defense under antitrust law against the Plaintiff's claim for injunctive relief.

The Defendant would be precluded from such a defense because it submitted its license agreement offer only on 12/23/2011, and thus long after the expiration of the deadline for an answer to the complaint. Nor would the Plaintiff be obligated to accept the 12/23/2011 license agreement offer of the Defendant's group parent company.

The license fee offered by the Defendant's group parent company is said to be completely unreasonable and disproportionately low. The Plaintiff would never license such significant patents as the patents in dispute here for the sum that was offered. If the unit license fee were to be calculated as a percentage of the sales proceeds from the challenged embodiments, a license fee of between 0.00145% and 0.004% of the sales proceeds would result, while license fees of 4% of turnover are typically received in the area of electronics/information technologies or computers. It would neither be in

CONFIDENTIAL

MOTM_WASH1823_0602135

keeping with actual practices nor would it be economically tenable to calculate the value of a standard-essential patent in a linear manner based merely on its numerical share in the totality of the standard-essential patents. A standard-essential patent would not lose value because the patent owner has additional standard-essential patents at its disposal and does not base the licensing of all patents on a cumulative rate escalated in a linear fashion in order to avoid unreasonably high licensing rates for the entire portfolio.

The value of the Motorola patents is said to be supported by, among other things, a cross-license with Nokia, which holds the largest portfolio of patents declared to be H.264-standard-essential.

Furthermore, it must be taken into consideration that the Plaintiff and/or its parent company would be offering its entire patent portfolio of standard-essential mobile communications patents, which contains several parts of various standard-essential technologies, for a license fee of 2.25% of turnover, whereby this fee is due if use is made of a single technology – such as H.264 – or of a single patent. Hence, the rate of 2.25% would not be a total amount that could be allocated among all licensed patents; as a matter of principle, there is no linear relationship between the number of patents and the licensing rate.

Contrary to the Defendant, the Plaintiff deems the basing of the determination of the FRAND licensing rate on the fees of the MPEG LA Patent Pool to be improper because a patent pool could not be a suitable benchmark from the outset. Moreover, there would be no numerical proportionality with the licensing rates for a portfolio of standard-essential patents; such a proportionality would disadvantage companies solely on the ground that they were holding a large number of standard-essential patents. From an economic perspective, the individual patents are really what is of value.

Methodologically, there would be no basis for the Defendant's assumption that the value of a patent could, among other things, be determined by the frequency of its citation in other patents.

A stock depletion period should not be granted to the Defendant because this would ultimately undermine the right of injunctive relief to which the Plaintiff is entitled without

CONFIDENTIAL

MOTM_WASH1823_0602136

restriction. Moreover, it would not seem to be apparent that modifying the challenged embodiments in consideration of the requested injunctive relief against the use of the patent in dispute would lead to disruptions among users of the programs.

An order of protection from execution pursuant to Section 712 ZPO could not be considered because a loss of sales for the Defendant, which in the Plaintiff's view has not been presented in any event, would not suffice here. The Defendant is said to have not credibly shown a serious threat to its economic existence.

The Plaintiff **m o v e s** :

- I.1.a) – I.1.d), as adjudicated;
- I.2., as adjudicated except for the professional auditor proviso;
- I.3

    The Defendant is adjudged to recall from the channels of distribution the products described in item A.I. 1. a), that are in the possession of third parties and were put into circulation after April 29, 2006,

    in that those third parties to whom possession to the products was granted by the Defendant or with the Defendant's approval shall earnestly be called upon, together with a notice that, with the present judgment, the division has found an infringement of the patent in dispute, to return the products, and in that such third parties shall be promised the return of any already paid purchase price and the assumption of the costs of the return in the event that the products are returned,

    and

    to remove [such products] with finality, in that the Defendant shall repossess these products or arrange for their destruction at the respective party in possession.

- II., as adjudicated;

CONFIDENTIAL

MOTM_WASH1823_0602137

The Defendant **m o v e s**:

that the action be dismissed;

<u>alternatively</u>:
that the litigation be stayed until a decision by the competent antitrust authorities concerning the legality of the announced acquisition of the Plaintiff's group parent company by Google Inc.;

<u>alternatively</u>:
that the litigation be stayed until a decision with legal finality concerning the invalidity action against the German part of European patent EP O 538 667 B1 / DE 692 32 063 T2 pursuant to Section 148 ZPO;

<u>in the further alternative</u>:
that the Defendant be granted a reasonable stock depletion period;

<u>in the further alternative</u>:
that with respect to Claim I.1.2., the Defendant only be adjudged to provide information subject to a professional auditor proviso;

<u>in the further alternative</u>:
that the Defendant be permitted to avoid compulsory execution by furnishing security, which may also be provided by a bank or savings association guarantee, irrespective of any provisioning of security by the Plaintiff (Section 712 ZPO);

<u>in the further alternative</u>:
that the security to be furnished by the Plaintiff in conjunction with the provisional enforceability be set at least EUR 236,000,000.00

The Plaintiff opposes the motions for stays and the motion for protection from execution.

CONFIDENTIAL

MOTM_WASH1823_0602138

**The Defendant** is of the view that the challenged embodiments do not infringe the patent in dispute. The H.264 standard, based on which the infringement issue was presented by the Plaintiff, is said to make no use of the features of Patent Claim 19.

To that effect, special consideration should be given to the fact that Claim 19 involves a protected encoder and decoder system and that the coding in accordance with the standard does not operate as described in the patent in dispute. Claim 19 explicitly refers to Claim 1, which discloses an encoder; the use of certain items ("the blocks"; "the different motion compensators") shows that Claim 19 is worded as a claim that is subordinate to Claim 1. The entire conception of the purported invention itself shows that the functionality of the encoder described in Claim 1 must be read as part of the interpretation of Claim 19.

The Defendant is also of the view that the data blocks received by a decoder in accordance with the patent would always require having the same block size and that the blocks contained therein, which in the course of the motion compensation are created through the use of a certain block size by a motion compensator, would likewise require having the same size. A data block containing blocks with different partitions, e.g., a mix of 8x8, 8x4, 4x8 or 4x4 blocks, would not be possible under the purported invention, while this could be the case with the data received by a decoder in accordance with the standard. Under the standard, each of the four sub-macroblocks of a macroblock could be divided into an 8x8 partition, two 8x4 partitions, two 4x8 partitions, or four 4x4 partitions through an appropriate motion compensator. This would show that the data received by a decoder in accordance with the standard would in many cases not be comparable to those received by a decoder in accordance with the invention because, with the former, there would not be "the code word" pursuant to feature 2 that would represent a single motion compensator (using the same block size) for an entire data block. Indeed, for a macroblock (16x16) containing four sub-macroblocks (8x8) in a mix of partition sizes, a prediction would not be created with the help of a single

CONFIDENTIAL

MOTM_WASH1823_0602139

uniform motion compensator. Rather, individual sub-blocks of the 16x16 macroblock would have to pass through at least two different motion compensators and would therefore have been divided into different block sizes.

The Defendant is further of the view that it would be entitled to a right of use of the patent in dispute under article 8.3, in conjunction with 6.6.4, of the MPEG LA Pool Agreement. Article 8.3 does not merely involve a declaration of willingness to grant a license upon an inquiry by a potential licensee. Instead, the license agreement is said to create a duty in the MPEG LA licensee [sic] to offer a license on its own accord to every user of the standard who is either a licensor or also a licensee in the MPEG LA Patent Pool, or to such user's affiliates, at the terms outlined in article 3 of the MPEG LA Pool Agreement. The Plaintiff, as a company affiliated with Terayon and Tut Systems, two licensees or former licensees of the MPEG LA Pool Agreement and/or as their universal successor, would therefore be obligated pursuant to article 8.3, in conjunction with 6.6.4 and 1.1, of the MPEG LA Pool Agreement, to grant a license to the Plaintiff's standard-essential patents to the Defendant's group parent company, as a licensor in the license pool, or to the Defendant itself, as an affiliate of such licensor.

Beyond that, the Defendant is also asserting a right of use based on the Plaintiff's Patent Statement and Licensing Declaration Form issued to the ITU for licensing at FRAND (Fair, Reasonable, And Non-Discriminatory) terms. The Patent Statement and Licensing Declaration Form is said to be an agreement benefitting third parties pursuant to Section 328 BGB [German Civil Code], that is, any and all license-seeking users of the H.264 standard. For one, this form would create a binding offer to enter into a license agreement. Furthermore, the Plaintiff is said to have waived the assertion of its rights of exclusivity under Sections 139ff., PatG [German Patent Act] and would be limited from the outset to a claim for the payment of a reasonable license fee with respect to the purportedly standard-essential patent.

As a most alternative plea, the Defendant raises the Plaintiff's Patent Statement and Licensing Declaration Form as a *dolo petit* objection pursuant to Section 242 BGB. By asserting the claims to injunctive relief, the Plaintiff is said to have placed itself in an irreconcilable conflict with that form because under the terms of the form it would have to give up immediately the prohibition of use by granting a right of use.

CONFIDENTIAL

MOTM_WASH1823_0602140

– 23 –

Finally, the Plaintiff supposedly could not reject the license agreement offer submitted by the Defendant's group parent company on 12/23/2011, without acting contrary to antitrust law. That offer is said to satisfy all requirements for a FRAND license offer in accordance with the *Orange Book Standard* decision of the *Bundesgerichtshof* [German Federal High Court of Justice]. The license offer is said to contain contract terms as are customary in the industry, and both the licensing rate and the licensing basis amount to fair, non-obstructive and non-discriminatory terms. The license fee offered far exceeds the one determined by the Defendant as being customary in the market, hence, a fee that would have to be viewed as a FRAND license fee. This becomes apparent, among other things, from a privately obtained expert opinion (Exhibit FBD-22). The gratuitous cross-license that it had offered for the standard-essential patents of the parties would be advantageous to the Plaintiff in view of the size of the portfolio of standard-essential patents of the Defendant's group parent company and its affiliates.

A unit license fee is also customary in this technological field. In contrast, a value-based licensing rate would not lead to a reasonable outcome because the value of the end product could fluctuate strongly irrespective of the at times identical functionality of the standard-compatible decoders.

The unit licensing rate offered exceeds considerably the licensing rates customary in the market and would therefore lie significantly above that which the Plaintiff could really demand. To determine a reasonable and customary license, the Defendant allegedly correctly applied licensing rates from patent pools or licensing programs that also involve H.264 technology or similar technologies.

Finally, the Defendant has performed all acts in discharge of obligations as required under the *Orange Book Standard* decision.

The Defendant is also of the view that, in the event that the acquisition of the Plaintiff's parent company by Google Inc. is approved, it would be entitled to a *dolo petit* defense (Section 242 BGB) against the claims that have been asserted because under the MPEG LA license agreement, Google Inc. would be obligated to license the H.264-essential patents to which Google Inc. would be entitled, to the Defendant's parent company and to the Defendant.

CONFIDENTIAL

MOTM_WASH1823_0602141

– 24 –

With this background, the proceedings, as moved in the alternative, would have to be stayed until a decision by the antitrust authorities on the acquisition's legality.

Finally, the Defendant is of the view that the patent in dispute lacks legal validity, though the Defendant has moved for a stay of the invalidity proceeding in connection with its *Orange Book Standard* offer.

In any event, in case of an unfavorable decision, the Defendant should be granted a reasonable stock depletion period because the immediate unlimited enforcement of the injunctive relief claim would bring about unreasonable detriment to the Defendant and its customers, and it would be acceptable to subject the Plaintiff to certain constraints in that regard. In view of the complexity and the global use of the challenged embodiments, the Defendant would not be able to react immediately to a potential judgment of injunctive relief by modifying its products. A right of injunctive relief with immediate effect could have serious consequences not only for the Defendant itself but also for its buyers and the users of the challenged products. Additionally, the allegedly patent-infringing decoders play only a small role in the functions of the challenged embodiments. A stock depletion period would be all the more justified in view of the impending expiration of the patent in dispute.

Irrespective of any security to be furnished by the Plaintiff, the provisional enforcement of a judgment in accordance with the complaint would bring about an irreversible detriment to the Defendant that is not balanced by any overriding interest of the Plaintiff in provisional enforceability. For this reason, if the Defendant loses the case, the Defendant should be granted protection from execution pursuant to Section 712 paragraph 1, sentence 1, ZPO, regardless of the furnishing of security by the Plaintiff. The removal of the H.264 decoder from the Defendant's products would impose logistical challenges on the Defendant and its customers due to the interoperability of the H.264 decoders with other functionalities of the product and other products. In addition to serious financial losses, the Defendant would face a loss of market shares and irreparable harm to its image and brand in the event of a provisional enforcement. Innumerable other products based on the challenged embodiments would be affected by any discontinuance of the

CONFIDENTIAL

MOTM_WASH1823_0602142

distribution of the latter ones even though they do not use the patent in dispute at all. Conversely, the Plaintiff, who is not a direct competitor of the Defendant, would face only financial and easily quantifiable losses from a stay of provisional enforceability.

Concerning the further state of the facts and the litigation, reference is made to the contents of the briefs as well as the exhibits and the court records.

The proceeding regarding the infringement of European patent EP 0 615 384 B1 that has also been asserted by the Plaintiff, has been severed by a ruling on 10/17/2011 and will now be conducted under reference number 2 O 373/10.

CONFIDENTIAL

MOTM_WASH1823_0602143

**Reasons for the Decision**

The admissible law suit is predominantly justified.

The challenged embodiments make use of Claim 19 of the patent in dispute (A). The Defendant is not entitled to use the patent in dispute (B) and the Plaintiff is not hindered from enforcing the order to cease and desist, not even for antitrust-law reasons (C).  For this reason, the Plaintiff is entitled quite predominantly to the claims made (D).  A suspension of the lawsuit is not indicated (E).

A.

The Defendant infringes the patent in dispute in accordance with Article 64, paragraph 1 of the EPC in conjunction with Section 9, page 2, No. 1 and Section 10, paragraph 1 of the PatG (Patent Law), because the challenged embodiments make literal direct (Xbox) and indirect (Windows 7, Windows Internet Explorer, Windows Media Player 12) use of Claim 19 of the patent in dispute.

I.

The patent in dispute relates to the compression of digital video signals.

1.   Since very high data volumes arise during the digital transmission of images, if each individual image of a video sequence were to be transmitted completely individually, video data usually is encoded by a combination of different techniques in order to compress the image data as efficiently as possible.  In the prior art, video compression techniques were already known, which made use of the spatial correlation between adjacent pixels in an individual image ("frame") (intra-frame coding).  Likewise, compression systems were known, which used similarities between temporally adjacent frames in order to compress the data even more.  For the latter, so-called inter-frame coding, the difference coding was known, for which only the difference between a current frame and the prediction of the current frame was transmitted.  Moreover, inter-frame video compression systems were also

CONFIDENTIAL

MOTM_WASH1823_0602144

already known in the prior art, which used movement compensation. For movement compensation, it is sufficient to transmit a movement vector, which describes the shift of an unchanged area of an image with respect to the reference image. The patent in dispute names, by way of example, the publication of Ninomiya and Ohtsuka, "A Motion-Compensated Interframe Coding System for Television Pictures, IEEE, Transactions on Communications, volume COM-30, No. 1, January 1982. According to this, a motion vector is determined for each block (image section) in the current frame, in that a block in the preceding frame is identified, which is most like the block in question. The whole frame can then be reconstructed using a decoder, in that the difference between the corresponding block pairs, together with the movement vectors which are required in order to identify the corresponding pairs, is transmitted [0007].

If the movement compensation functions well, the difference image, divided into blocks, can be encoded more efficiently than the original image blocks. The encoded difference image and the information relating to the (encoded) movement vectors are then transmitted together to the decoder apparatus.

The performance of the movement estimation depends on how well the movement between two parts of images can be reproduced as a simple translation. For example, zoom, rotation or other complex rotations of large image areas frequently cannot be reproduced as a simple translation. The efficiency of block-based movement estimation algorithms may therefore depend on the size of the block used, in order to adapt the current frame to the preceding frame. A large block size will function well in areas, in which the image is stationary or is translated uniformly, since less overhead data is required in order to transmit the data linked to each of the image blocks. In other cases, in which complex movements take place from one frame to the other, a smaller block size can achieve better performance [0030]. With this as background, the static evaluation for a particular block size has the disadvantage of loss of efficiency.

CONFIDENTIAL

MOTM_WASH1823_0602145

In order to approach this problem, a method for movement compensation with variable block sizes, known in the prior art from Puri et al., "Interframe coding with variable block-size motion compensation", November 1987, whereby in addition to a block-based movement compensation, alternatively a sub-block based movement compensation is used, and the two movement compensation methods were arranged in a cascade, that is, no movement compensation at the same video data with different block sizes was provided [0010, 0011].   Admittedly, the latter was known from the PCT application WO 91/13514 A1, however, only for intra-coding and not for inter-coding [0012].

2.   On this basis, the patent in dispute set the task to improve the performance of movement-compensated video signal compression systems by making available a compression system which uses an adaptive movement compensation.

To accomplish this objective, the patent in dispute proposes the adaptive use of movement compensators of different block sizes on the encoding side.   Since, depending on the video sequence, different amounts of data may result when different block sizes are used with regard to the respective image section, a decision depending on the amount of data is made on the encoding side for the block size ultimately to be used for the compression and transmission with regard to the respective image area (Claim 1).

On the receiver side, the patent in dispute proposes in Claim 19 a decoder apparatus, the features of which can be grouped as follows, whereby the (judicial) division uses as a basis the grouping of the features as presented by the Plaintiff in Exhibit KP1-K3.  The grouping of the features as presented by Defendant in Exhibit FBD 2 differs from the present grouping of the features in a few instances.  Insofar as it is relevant, this will be dealt with in greater detail in the subsumption of the individual features (see Item II below).

CONFIDENTIAL

MOTM_WASH1823_0602146

*Decoder Apparatus*

1. *for receiving the blocks of encoded video data provided by the different motion compensators of a device for the adaptive compression of digital video signals for transmission*

2. *wherein means are provided for retrieving from each received data block, a code word representative of the motion compensator, from which the block is received,*

3. *wherein means, responsive to said code word, are provided for recovering a motion vector for each block from the motion vector data received with the block, and*

4. *means, responsive to said motion vector, are provided for recovering current video image data from data provided by a current data block and at least one prior data block.*

## II.

The challenged embodiments make literal use of the teachings of Claim 19 of the patent in dispute.

The required interpretation of the patent in dispute as would be understood by the average expert must focus on the wording of the claim (Article 69, paragraph 1, page 1 of the EPC, Section 14, paragraph 1, page 1 of the PatG; BGH GRUR 2004, 1023 et seq. – *Bottom-side Separating device*); the content of the specification and the drawings are to be used as a supplement for the interpretation (Article 69, paragraph 1, page 2 of the EPC, Section 14, paragraph 1, page 2 of the PatG).  In as much as the specification is to be used for interpreting the patent, the technical sense of the words and concepts used in the patent is of decisive importance and not the strictly philological or logical-scientific lexical content (BGHZ 150, 149,156 – *Cutting Knife I*, BGH GRUR 1999, 909 - *Set Screw*).

CONFIDENTIAL

MOTM_WASH1823_0602147

If Claim 19 is interpreted on the basis of these principles, the challenged embodiments make use of all the features of Claim 19.

Since the challenged embodiments indisputably support the H.264 standard, the indirect proof of the infringement of the patent in dispute is permissible based on the specific features of the standard.  A comparison of the relevant requirements of the standard with the patent in dispute shows that a decoder apparatus in accordance with the standard realizes all the features of Claim 19.

1.  The standard provides for decoder apparatuses "for receiving the blocks of encoded video data from the different movement compensators of a device for the adaptive compression of digital video signals for transmission" (<u>feature 1</u>).  The standard presupposes encoding and decoding by means of movement compensation using different movement compensators, which use different block sizes (paragraphs 8.4.1.2.3 and 6.4.2)

The Defendant, among other things, points out in the criticism of this grouping of the features given above, that Claim 19 is explicitly directed to "the blocks of encoded video data, provided by said different motion compensators <u>of the apparatus of Claim 1</u>" (underlining by the division), and while this is correct, it has no effect on the result of the interpretation of the claim and the subsumption of a standard decoder under the claim. In this respect, it is a statement of the purpose of the decoder apparatus in accordance with the patent ("*for receiving the data blocks…*").  This statement defines the protected decoder apparatus in greater detail in that it must fulfill not only the spatial-physical features which are formulated explicitly by the claim, but, moreover, must also be constructed so that it can fulfill the function mentioned in the claim (compare BGH, GRUR 2009, 837 – *Building Envelope Support*).

CONFIDENTIAL

MOTM_WASH1823_0602148

Indisputably, standard decoder apparatuses are able to receive data blocks of encoded video data provided by the different movement compensators of a device of Claim 1 of the patent in dispute (a device for the adaptive compression of digital video signals for transmission), that is, which are selected on the basis of a device taught in Claim 1 by the method described there.  From the point of view of the standard decoder apparatus, which is determined here, the nature and manner in which the data blocks of encoded video data are selected on the encoder side, does not matter (for example, on the basis of an estimate of the encoding costs, a so-called rate distortion optimization or a calculation of the actual amount of the compressed data).  What does matters is that the standard decoder apparatus has the means for receiving data blocks which are provided by the different movement compensators of the device of Claim 1.  Nothing changes this finding even if standard encoders select their movement compensators in a manner, which does not realize Claim 1.

Contrary to the opinion of the Defendant, Claim 19 also does not presuppose a system of encoder (as per Claim 1) and decoder, as a consequence which the means on the side of the encoder (and the nature and manner of its encoding decisions, taught in Claim 1 (and the nature and manner of its encoding decisions), would also be part of Claim 19.  According to its wording alone, Claim 19 is not a system claim but a (decoder) apparatus claim.  The reference in Claim 19 to Claim 1 is limited to stating the objective, according to which the decoder apparatus must be suitable for receiving blocks of encoded video data which are provided by different movement compensators of the apparatus as per Claim 1.  Moreover, the interpretation by the Defendant is refuted by the fact that the patent in dispute, in its Claim 11 (which is not part of the litigation) and in the Sub-Claims 12 to 18, referenced to Claim 11, explicitly teaches a system claim, which includes the receiver side.

2.      A standard decoder apparatus also has "the means for finding a code word from each data block received, which represents the movement compensator, from which the block was received" (underline feature 2).  According to the standard, information bits are inserted into the transmitted data

MOTM_WASH1823_0602149

– 32 –

stream and identify the movement compensator used. These identifiers are assigned, on the one hand, on the macroblock level (so-called mb_type) and, on the other, on the sub-macroblock level (so-called sub_mb_type). In the mb-type syntax element, information on the type of movement compensator (for example, intra macroblock type (I), predictive macroblock type (P) or bi-predictive macroblock type (B) (see Exhibit KP1-K4, Table 7-10 (page 97)) and the size of the blocks used (partitionings in one 16x16 block, two 16x8 blocks, two 8x16 blocks or four 8x8 sub-macroblocks is recorded (Exhibit KP1-K4, Section 7.4.5, Tables 7-13, 7-14). If a P-type macroblock has four 8x8 partitions, a sub_mb_type syntax element is encoded for each of the four 8x8 sub-macroblocks in addition to the mb_type syntax element, which contains information on the partition of the 8x8 sub-macroblocks (namely one 8x8 partition, two 4x8 partitions, two 8x4 partitions or four 4x4 partitions per sub-macroblock (see Exhibit KP1-K3, Section 7.4.5.2). The following photocopied Figures 6 - 9 of the standard (on page 26) show the different partitionings of macroblocks and sub-macroblocks.



Figure 6-9 – Macroblock partitions, sub-macroblock partitions, macroblock partition scans, and sub-macroblock partition scans

In this respect, Defendants take the point of view that the two identifiers, mb_type and sub_mb_type, are not "a code word" from each data block received in the sense of feature 2, because the sub_mb_type syntax element, aside from the mb_type syntax element, is an additional second code word.

CONFIDENTIAL

MOTM_WASH1823_0602150

– 33 –

To begin with, it should be noted that the English method language speaks of *"a code word representative of the motion compensator from which the block is received"* and that, in the German translation, a code word is to be understood in the sense of an indefinite article and not as a numerical word.

On the other hand, the partitioning on the sub_macroblock level, that is, also the "second" sub_mb_type identifier, is only significant for an 8x8 partitioning of the macroblock level. Even if read as strictly as is done by the Defendants (one [1] code word, which may not consist of two identifiers), there are macroblock partitions (16x16, 16x8, 8x16) in the standard with a uniform use of movement compensators, which are represented by (only) one code word, the mb_type syntax element. In any case, since the decoder apparatus in accordance with the standard has means at its disposal for finding this ("one") code word, it realizes feature 2 of Claim 19 as well.

This is also not contradicted by the fact that the means of feature 2 for finding a code word is to be provided by each data block received. It is required but also sufficient that the decoder apparatus be *suitable* for finding a code word from each data block received. This suitability is not put in doubt by the fact that the data blocks received may not contain a code word or more than one code word. The fact alone that the standard decoder apparatuses can locate a code word, namely the mb_type, which anyway, in the event of a macroblock partitioning of 16x16, 16x8 or 8x16, represents the movement compensator from which the block was received, shows the realization of the intended use, described in feature 2, by the means provided by the standard decoder apparatus.

The Defendants furthermore point out that the data, which an H.264-compatible decoder receives, may also have a mixed structure, that is, each of the four sub-macroblocks of a macroblock may also be divided by a corresponding movement compensator into one 8x8 partition, two 8x4 partitions, two 4x8 partitions or four 4x4 partitions. In this respect, it must be conceded to the Defendants that, in these cases, the presence of a code word as per Claim 19, which represents a single movement compensator (which uses the same block size) for a whole data block, may be questionable. However, in the opinion of the judicial division, the question arising in this connection, as to whether the sub-macroblock in the standard isn't also a data block in the sense of feature 2 of the patent in dispute, with the consequence that the sub_mb_type identifier always represents the (one) movement compensator of the (sub-macro) data block received, does not matter. For the special features resulting from a possible mixed structure, the fact applies as well that these occur only in the case of an 8x8 macroblock partition (and also only in the case of different sub-

CONFIDENTIAL

partitioning).   This is the result of the definitions of the syntax elements in the H.264 standard, which comprise the possibility, but not the necessity, of using several information elements in the encoded data (mb_type and sub_mb_type). This, in turn, means that standard decoder apparatuses are able to locate in each data block received a code word which represents the movement compensator, from which the data block was received, provided the data block has one (1) such code word, as is indeed the case with a 16x16, 16x8 and 8x16 partitioning of the macroblock.

3.   A standard decoder apparatus realizes <u>feature 3</u> of Claim 19 as well, which requires a means that is responsive to the code word, in order to restore a movement factor for each block of the movement vector data which were received with the block. In section 7.4.5, the standard standardizes the prediction of the actual block as a function of the used block size of the movement compensator.   Section 8.4 standardizes how, for instance as a function of the mb_type value, the movement vector data is reconstructed and how a movement vector is determined for each block.   Starting out from the assumption, explained in greater detail under item 2, that the standard decoder apparatus is indeed able, for the macroblock partitions 16x16, 16x8, and 8x16, to find a code word which represents the movement compensator, from which the block was received (scil: mb_type), the decoder apparatus also has the means to respond to the (found) mb_type code word, in order to restore a movement vector from the movement vector data received.

4.   Finally, standard decoder apparatuses also make use of <u>feature 4</u> of Claim 19. In a standard decoder apparatus, a means is provided for restoring current video image data from data which was provided from a current data block and at least one previous data block.   Section 8.4 (page 151) of the standard (Exhibit KP1-K4) defines how the samples of the inter-prediction are reconstructed from the movement vectors and additional data series.   Subsequently, the video image data is reconstructed from the sample data series of the inter-prediction (Exhibit KP1-K4, Section 8.5, page 174 f.).   Insofar as the Defendant does not consider feature 4 to be realized because it presupposes one uniform code word for a data block, which is not the case in the standard, it is possible to refer to the corresponding comments on feature 2.

CONFIDENTIAL

MOTM_WASH1823_0602152

– 35 –

5.    According to all of the above, the embodiment of the decoding realizes all the features of Claim 19 of the patent in dispute.   Therefore, the challenged Xbox 360 embodiment infringes the patent in dispute directly.


6.    The challenged embodiments, Windows 7, Windows Internet Explorer 9, and Windows Media Player 12, infringe the patent in dispute indirectly.

According to Section 10, paragraph 1 of the PatG, an indirect infringement of a patent presupposes that the infringer, without the approval of the patent owner and within the scope of the patent law, offers or supplies to persons other than those entitled to use the patented invention, the tools related to an essential element of the invention, to use the invention within the scope of this law, knowing or it being obvious on the basis of the circumstances that these tools are suitable and intended for the use of the invention.

The challenged embodiments, Windows 7, Windows Internet Explorer 9, and Windows Media Player 12, are tools which are related to an essential element of the invention and were offered and delivered in the Federal Republic of Germany for the use of a patented device.   The fact is that they are installed as intended on computers (for example, PCs, laptops), as a result of which the respective computer becomes a device literally realizing Claim 19.   Moreover, Windows 7 and Windows Internet Explorer 9 with the H.264 Codec make available the essential elements of the invention itself; Windows Media Player 12 represents a tool which relates to an essential element of the invention, namely the Codec of Windows 7.

It is precisely the use of the programs in accordance with the invention, installed on the computer, that is their intended use.   The Defendant produces the programs itself and supplies them to its customers for installation, so that it can only be assumed that the Defendant knew that the tools offered by it are suitable and intended for the use of the invention.

CONFIDENTIAL

MOTM_WASH1823_0602153

## B.

The Defendant cannot claim a right to use the patent in dispute.

## I.

Indisputably, no license agreement has been concluded between the parties.

## II.

Furthermore, the Defendant has no right to use the patent in dispute on the basis of the Patent Statement and Licensing Declaration Form (Exhibit Set FBD-8) submitted by the Plaintiff and its parent company to the standard-setting International Telecommunication Union (ITU).

Contrary to the Defendant's belief, neither the ITU Patent Statement and Licensing Declaration Form submitted by the Plaintiff in December 2002 nor the specific ITU Patent Statement and Licensing Declaration Form from Motorola, Inc., the predecessor

CONFIDENTIAL

MOTM_WASH1823_0602154

of the parent company of the Plaintiff, for the patent in dispute dated October 8, 2007, represents a contract to the benefit of third parties (here: the Defendant) or a waiver of prohibition.

The assessment of whether rights of use are granted under the ITU Patent Statement and Licensing Declaration Form is governed by German substantive law. The legal system under which rights granted to use intellectual property rights are assessed is based on the laws of the country in which protection is sought [*lex loci protectionis*] (see Mannheim Regional Court, Court of First Instance Decision 13, 65, *UMTS-Enabled Mobile Phone II*, margin no. 161 with further references, cited according to Juris; Kühnen, *Hdb. Patentverletzung* [Guide to Patent Infringement], 5th Ed., margin no. 1298).

Based on the court's classification of a non-exclusive license as a right *in rem* (Karlsruhe Higher Regional Court, GRUR Int 1987, 788 et seq., *open end spinning machine*; in detail: Mannheim Regional Court loc. cit., margin no. 166 with further references; German Federal Court of Justice (BGH), GRUR 2009, 946, margin no. 20, cited according to Juris – *Reifen Progressiv* (regarding copyright); contrary (contractual claim only:) Decision of the German Federal Court of Justice in Civil Matters 83, 251 – *Anchor Element*; contrary (materialized obligation): McGuire, *Die Lizenz*, habilitation thesis, Osnabrück 2009), the Defendant would not have the right to use the patent unless, at the very least, a contract to the benefit of license-seeking third parties was already considered in the submission and acceptance of the Patent Statement and Licensing Declaration Form to the standard-setting ITU. However, such a license could not have been granted by means of a contract to the benefit of third parties due to the fact that German law does not recognize contracts *in rem* to the benefit of third parties. Sections 328 et seq. of the German Civil Code (BGB) are neither directly nor analogously applicable to *in rem* contracts (see Mannheim Regional Court, loc. cit., margin no. 167 with further references).

Furthermore, the Patent Statement and Licensing Declaration Form does not encompass a waiver of injunctive relief, one which would limit the Plaintiff to making or accepting a FRAND offer and to demanding payment of FRAND-level license fees, if necessary through damages. Such a waiver of exclusive rights under the patent would be at most of a purely contractual nature and would not constitute an action that would directly limit the rights of the Plaintiff, as holder of the patent, under the patent. The latter, considering the material nature of the right to cease and desist orders, which are inseparably associated with the patent, would be legally impossible (see Mannheim Regional Court, Court of First Instance Decision 11, 9, margin no. 99 et seq., *UMTS-Enabled Mobile Phone*, cited according to Juris; Kühnen, loc. cit., margin no. 1298).

CONFIDENTIAL

MOTM_WASH1823_0602155

However, the Patent Statement and Licensing Declaration Form submitted to the ITU by the Plaintiff and/or its former parent company cannot be understood as a binding license offer to any number of third parties unknown to the Plaintiff, requiring only acceptance by a third party, but as a request to license seekers to submit their own FRAND offers (see also the end of item 2: *"Negotiations of licenses are left to the parties concerned and are performed outside the ITU-T/ISO/IEC"*). Last but not least, the Patent Statement and Licensing Declaration Form merely comprises an explicit declaration of the obligation to contract, which exists in any case under antitrust law (see Kühnen, loc. cit., margin no. 1298). By promising to grant third parties a license under FRAND terms, it creates only a basis for a claim, the fulfillment of which must be specifically demanded by the license seeker (Karlsruhe Higher Regional Court, Court of First Instance Decision 12, 220 – *MP3 Standard*).

An offer for a contractual *"pactum de non petendo"* ("negative license") and thus the waiver by the patent holder of injunctive relief as a means of enforcing its patent claims against an unknown number of potential patent infringers (item 2: "an unrestricted number of applicants") is, after all, implausible. A patent holder who submits a Patent Statement and Licensing Declaration Form merely offers to waive its exclusivity rights under the patent by establishing a license agreement—and not unconditionally (Kühnen, loc. cit., margin no. 1298).

Per the above, the Defendant may not claim a granted positive right to use the patent nor a waiver of prohibition based on the Plaintiff's ITU Patent Statement and Licensing Declaration Form.

### III.

The Defendant is furthermore not entitled to use the patent in dispute under the MPEG LA Pool Agreement (see Exhibit FBD 12).

An assessment of the alleged right to use the patent under the MPEG LA Pool Agreement is in turn based on the laws of the country in which protection is sought (see item II above). Therefore, under German substantive law, which would be applicable in this case, Terayon and Tut Systems were not effectively entitled to use the patent in

CONFIDENTIAL

MOTM_WASH1823_0602156

– 39 –

dispute, which did not belong to them. It has not been presented, nor is it clear in what way Terayon and Tut Systems, licensees under the MPEG LA Pool Agreement, would be entitled to use the patent in dispute. Article 8.3 of the MPEG LA Pool Agreement, if understood as granting a license to the patent in dispute, would represent a right on the part of the Plaintiff to use the patent to the detriment of third parties. As such, the alleged license is invalid.

In light of this, it is unnecessary to determine whether or not a license to the patent in dispute exists at all or whether it would extend to the Defendant as a subsidiary of the licensor, Microsoft Corporation.

## C.

The Defendant cannot successfully defend itself based on the assertion that the Plaintiff was obligated to immediately grant it a license to the patent in dispute and that a cease and desist order is therefore in violation of the law. The Defendant is not entitled to a *dolo petit* plea on the basis of its license agreement offer of December 23, 2012 [sic] (I.), the ITU Patent Statement and Licensing Declaration Form (II.), or the MPEG LA Pool Agreement (III.).

## I.

The Plaintiff is not prevented under antitrust law from exercising its right to issue a cease and desist order against the Defendant due to infringement of the patent in dispute. The Defendant cannot counter the right to issue a cease and desist order with a claim to a license under Section 33 Paragraph 1 of the Act Against Restraints of Competition (GWB) in conjunction with Article 102 of the Treaty on the Functioning of the European Union or Sections 19 and 20 of the GWB.

1. The Plaintiff is an addressee of Article 102 of the Treaty on the Functioning of the European Union and/or GWB Sections 19 and 20, as, per its own assertion, any party that manufactures, offers or sells H.264 decoding devices must comply with the H.264 Standard and must therefore utilize the patent in dispute. The granting of licenses for the patent in dispute thus effectively constitutes a market dominated by the Plaintiff as the sole supplier.

CONFIDENTIAL

MOTM_WASH1823_0602157

2.  The offer of a license made by the Defendant's parent company also with effect for the Defendant (hereinafter: the Defendant's license offer) does not satisfy all requirements that the *Bundesgerichtshof* [German Federal High Court of Justice] established in its *Orange-Book-Standard* decision (judgment of 5/6/2009, KZR 39/09, GRUR 2009, 694 et seq.).

According to that decision, a defendant against whom a claim had been asserted under a patent may raise as a defense against a request for injunctive relief by the petitioning patent owner that the latter is abusing a market dominating position by refusing to enter into a patent license agreement with the defendant at non-discriminatory and non-obstructive terms (BGH, supra, 1st guiding principle, cited according to Juris). However, the patent owner who is asserting the right to injunctive relief under its patent even though the defendant is entitled to have a license granted for the patent in dispute, is only then abusing its market-dominating position and acting in breach of good faith if two preconditions are met: First, the prospective license must have submitted an unconditional offer to the patent owner to enter into a license agreement, which the patent owner may not reject without unreasonably obstructing the prospective licensee or violating the prohibition against discrimination, and the prospective licensee must consider itself bound to that offer. Second, if the prospective licensee is already using the subject matter of the patent before the patent owner has accepted its offer, the prospective licensee must comply with those obligations that would be linked to the use of the licensed subject matter pursuant to the prospective license agreement. This means, in particular, that the prospective licensee must pay the licensing fees arising under the agreement or must ensure such payment (BGH, supra, margin no. 29).

3.  Even though the *Orange-Book-Standard* decision referred to a de facto standard, the criteria established there are likewise applicable to standards that have been developed by standard-setting organizations (here: ITU) in a standardization process (see Mannheim LG [*Landesgericht*; regional court], InstGE 13, 65, margin no. 176, cited according to Juris).

CONFIDENTIAL

MOTM_WASH1823_0602158

4.  The Plaintiff was permitted to reject the Defendant's offer to enter into a license agreement without having thereby unreasonably obstructed or discriminated against the Defendant.

   a.  The unconditional offer on hand here, together with the amendments that were made, is certainly in keeping with the usual contract terms and contains sufficiently detailed provisions. In particular, among other things, the offer, as amended, contains a right of termination for the patent owner in the event of future challenges against the legal validity of the patent in dispute (see Karlsruhe OLG [*Oberlandesgericht*; higher regional court], 1/23/2012, p. 6), and the Defendant also acknowledges in connection with its offer an obligation of compensation in principle for past uses (see Mannheim LG, judgment of 12/09/2011, 7 O 122/11).

   b.  At the same time, the Defendant's offer of a license agreement is not an offer that the Plaintiff may not reject without acting contrary to antitrust law. The reason is that the patent owner is not required to accept an offer at licensing rates that lie below those that it may demand without violating antitrust law.

   The Defendant, who considers the Plaintiff's licensing rate demand (2.25% of turnover) to be abusively excessive, has not made use of the possibility existing in such cases of placing the level of the licensing rate at the patent owner's discretion pursuant to Section 315 BGB (BGH, supra, margin no. 39). Instead, since the Defendant committed itself to a specific basis of calculation (unit license) and a specific licensing rate (2 euro cents or 1 euro cent, as the case may be, per unit), a review was needed as to whether the Plaintiff's rejection of this offer based on the justification that the license fees offered were too low, was contrary to antitrust law.

   In the judicial division's view, this review can be limited to the question of whether the rejection of the offer constituted an *obvious* violation of antitrust law. As the BGH made clear in its *Orange-Book-Standard* decision, the infringement proceedings are to be relieved to an avoidable extent of the difficult and time-consuming task of determining the exact

CONFIDENTIAL

MOTM_WASH1823_0602159

amount of a non-obstructive or non-discriminatory licensing fee (BGH, supra, margin no. 39). In the case of a license offer subject to Section 315 BGB, the infringement court should thus be able to limit itself to finding that the patent owner is obligated to accept the offer of a license agreement and to a determination based on discretion if the prospective licensee has deposited an amount that in any event is sufficient and if the other requirements of a "compulsory license objection" are also present (BGH, supra, margin no. 40). In connection with the question of whether the deposited amount is sufficient for sure (in any event), a summary review by the court is enough (see Kühnen, supra, margin no. 1296). Nor is the prospective license placed at a disadvantage insofar as, in a subsequent proceeding concerning the level of remuneration, the burden of presentment and proof of the reasonability of the amount of the license fee falls on the patent owner.

In contrast, if the prospective licensee offers a specific licensing fee that in its view is reasonable and that the patent owner rejects as being too low, the question arises as to what significance should be attributed to the prospective licensee's assertion that the license fee offered would be reasonable and whether a prospective licensee in the end may compel an extensive and time-consuming taking of evidence with each offer, which, in the BGH's view, is precisely what is to be avoided as much as possible in infringement proceedings.

As only a clearly excessive price would be unreasonable for purposes of Article 102 of the Treaty on the Functioning of the European Union, the rejection of the offer by the patent owner due to licensing fees that purportedly are too low would be contrary to antitrust law only if the prospective licensee is offering such a high licensing fee amount that any change from that in favor of the license owner would be unreasonable. In contrast, if the terms in the prospective licensee's offer are (merely) reasonable, then Article 102 of the Treaty, and Sections 19 and 20 GWB [*Gesetz gegen Wettbewerbsbeschränkungen*; German Antitrust Act], would, however, permit a deviation in favor of the patent owner, [and] the patent owner's refusal to grant a license under these term does not justify an abuse of law objection. An obligation to enter into a contract exists only under such terms as are reasonable *and* from which any modification in favor of the market-dominating party would be unreasonable such that the

CONFIDENTIAL

MOTM_WASH1823_0602160

insistence on these terms must be regarded as the abuse of a market-dominating position (Karlsruhe OLG, 6 U 174/02, GRUR-RR 2007, 177 et seq., margin no. 56, cited according to Juris). As long as the patent owner can plead that within the scope of what is reasonable, there is still room in its favor, the patent owner is not acting contrary to antitrust law. The fact that this "upper limit" as to that which is not yet contrary to antitrust law is not easily ascertainable for the prospective licensee either, does not unfairly burden the prospective licensee, given that with respect to the prerequisites for a right to a license under antitrust law, the prospective licensee in principle has the burden of presentment and proof (see BGH, supra, margin no. 37 et seq.) and, as shown, the prospective licensee has Section 315 BGB as a solution.

Accordingly, if a summary review shows that the licensing fees offered by the prospective licensee in any event are not sufficient for sure (such that any deviation toward the top would clearly be excessive), the rejection by the patent owner is not obviously contrary to antitrust law. The taking of evidence on the issue of whether the offer is reasonable (in any event) is thus not required.

c.    The Defendant's offer does not withstand a review based on these principles. It cannot be determined that the offered licensing fees would be sufficient in each case.

The *Orange-Book-Standard* decision did not have to deal with the question according to what benchmarks the amount, which in any case was sufficient (in that case within the framework of Section 315 BGB), was to be determined (e.g. general comparable market, licensing pools, licensing practice of the patent owner, etc.).

In this case it can remain open whether a patent pool *per se* can be a convincing starting point and benchmark. To that extent the court division has some concerns. First of all, the interests of the patent owners who contribute their standard-essential patents into a pool are not necessarily comparable with those of the patent owner who refrains from doing so. It is likely that at least the manufacturing members of a patent pool are often less interested in achieving the highest possible licensing income from the contributed patents than in the possibility of utilizing the patents of the other pool members as favorably as possible. The suitability of licensing rates of

CONFIDENTIAL

MOTM_WASH1823_0602161

A patent pool to be used as a benchmark can also be limited by the fact that several of the largest patent owners have not become members of the pool, such as is the case with the MPEG LA Pool.

Even disregarding these basic concerns about the Defendant's calculation method, the court division is unable to ascertain that the offered licensing fees definitely are at a level that any deviation upward would result in clearly excessive fees.

d.  This applies particularly against the background of the numeric calculation of the fee determined for the Plaintiff's portfolio of (17) standard-essential patents down to the two patents in dispute (2/17). In doing so, the linear accounting method of the MPEG LA Patent Pool is in the final analysis transferred without variation, even though the Plaintiff specifically did not join this Pool. After all, it does not make a difference whether the licensing share of 0.082 Euro cent granted in the Pool per patent family and unit is multiplied by ten directly (0.82 Euro cent) and then doubled to 1.64 Euro cent (two patents for which licensing is sought), or whether the total share of (0.082 Euro cent x 17 patent families =) € 1.394 theoretically granted in the Pool for the portfolio is multiplied by ten (13.94 Euro cent) and then numerically calculated down to the number of patents in dispute (1/17 and 2/17, respectively, for both patents in dispute = 0.82 Euro cent and 1.64 Euro cent, respectively).

The court division does not ignore the fact that the Defendant has considered the fact that, as a rule, a standard-essential patent as part of a patent pool can be obtained relatively more favorably than on the basis of an individual license by multiplying the pool licensing share theoretically accruing to the Plaintiff's portfolio by ten. However, it is not recognizable that in doing so the Defendant arrives at a licensing level at which any further upward deviation would be inappropriate. From the court division's point of view this is contradicted by the fact that the portfolio licensing fee thus determined corresponds to the licensing fees obtained by AT&T from at least 9 licensees for its somewhat comparable portfolio. It does not appear likely that AT&T was able to enforce a licensing fee against 9

CONFIDENTIAL

MOTM_WASH1823_0602162

licensees to that extent, which is not only not customary in the market but also at the upper limit of what can still be considered reasonable and non-obstructive or non-discriminating.

Nor does it by any means appear certain to the court division that the maximum licensing amount for the two patents in dispute should correspond precisely to 2/17 of the licensing level determined for the portfolio of the Plaintiff and its group parent company. This would not only presuppose the at least questionable application of the licensing calculation method used for pool licensing shares to individual licensing fees, but also the certainty that the two patents in dispute, viewed independently, are actually no more valuable—or possibly only little more valuable—than the remaining 15 patents in the portfolio of the Plaintiff and its group parent company.

e.  A comparison with the patent pool for a predecessor technology of video compression, the H.262 (MPEG 2) Standard, also raises doubt as to whether the licensing fees offered by the Defendant are at a level at which any deviation upward would result in clearly excessive fees. The H.262 Pool initially provided for licensing fees of USD 4 per device (without cap); after reductions, currently the Pool provides for USD 2 per device. These licensing fees are markedly above those of the MPEG LA Patent Pool (USD 0.20 and USD 0.10, respectively), which the Defendant made the basis of its calculation, with the court division having no indications to believe that the fees of the H.262 Pool in turn were (had been) unreasonable, obstructive or discriminating. Even taking into consideration the Defendant's claim that the MPEG 2 Pool was created in 1997, thus at a time at which the products using compressed data were relatively expensive and worked with fewer implemented standards, at least the licensing fee of the MPEG 2 Pool, which is still currently significantly higher, raises doubts that the 2 Euro cents and 1 Euro cent, respectively, per device offered by the Defendant for the patents in dispute are indeed the upper limit of what is reasonable.

f.  It is not necessary to deal with the contested methodology and validity of the citation analysis stated by the Defendant in any more detail, since in

CONFIDENTIAL

MOTM_WASH1823_0602163

the final analysis the Defendant has not based the licensing fees offered by it on the presumed citation value. To that extent, the Defendant only quoted the presumed citation value of the portfolio (3.8% of the total citation value; expert opinion by Bekkers, Exhibit FBD-22, p. 31), but not of the two patents in dispute. Against this background, irrespective of the contested value of the citation method, it is not ascertainable that the offered licensing fees were at the upper limit of what would be reasonable for patents with a corresponding "citation value."

5. To the extent that the Defendant has made clear at the hearing that its offer included, as a supplemental component, a non-gratuitous cross-license at licensing fees determined by it, this, too, does not result in a different assessment of the offer.

It cannot be concluded simply from the fact that the license seeker would be satisfied with a certain licensing fee for its own patents, that this licensing fee must also be accepted for the patents of the patent owner.

First, the interests of the one seeking the license may be totally different with regard to the relevant patents than the interests of the patent owner. This applies in particular if both parties manufacture and/or distribute markedly different unit numbers. The party who sells higher numbers of units usually prefers a lower mutual licensing fee, while the party with the lower numbers of units prefers a higher mutual licensing fee. In the present case, the Plaintiff's lack of interest in the Defendant's standard-essential patents is also demonstrated insofar as the Plaintiff has abstained from taking a license in the past for the MPEG LA Pool into which the Defendant has contributed its own standard-essential patents.

Second, the one seeking a license would be in a position to force the patent owner, by offering a cross-license at the same conditions, to accept a licensing arrangement in which the amount of the licensing fee would specifically not be based on the requested patent but on the patents owned by the party seeking the license and their—possibly lower—value. Also, the fact that a non-gratuitous cross license does not necessarily have to be of identical interest to

CONFIDENTIAL

MOTM_WASH1823_0602164

both sides is further demonstrated by the Defendant and its group parent company, insofar as they in turn refuse to accept the non-gratuitous cross license offered by the Plaintiff at its conditions (2.25% of turnover) as being unreasonably high.

The fact that the seeker of the license is willing to license its own patents within the framework of a non-gratuitous cross license at the same fees as those offered by it for the patents which it seeks, therefore does not *per se* support the argument that the offered fees are so high in each case that the patent owner could refuse the offer only by violating antitrust laws. In view of the fact that the offered licensing fees, viewed independently, are not obviously sufficient in each case (see above), the additional worldwide cross license could result in the Plaintiff not being able to refuse the offer without violating antitrust laws only if the Defendant's portfolio represented the same value for purposes of the Plaintiff (i.e. not only objectively, although the latter aspect, too, is contested between the parties) as the Plaintiff's portfolio for the Defendant, which could, for example, be measured by the necessity to utilize the patents and the volume of the products manufactured or sold in accordance with the patents and/or the sales generated by them.

6. Finally, to the extent that in its brief of 03/02/2012 (page 382 et seq., 391 et seq.) the Defendant has declared its willingness to grant the Plaintiff, in addition to the licensing fees offered for the two patents in dispute granted in Germany, a worldwide gratuitous cross license in its portfolio of H.264 standard-essential patents, the above considerations for the non-gratuitous cross license apply accordingly. To that extent there is no difference whether the party seeking a license wishes to mutually license the relevant patents at a licensing fee which, at least with regard to the patents of the patent owner, is not sufficient in each case, or whether it wishes to license them free of charge. Even a cross license offered free of charge is not provided without consideration; the latter is given by granting the licenses for patents accruing to the licensee and may therefore also be too low. Thus, in the case of the gratuitous cross license as well, the court division is unable to ascertain for the above-explained reasons (see item 5), that the Plaintiff could refuse the offer only by violating the antitrust law.

CONFIDENTIAL

MOTM_WASH1823_0602165

– 48 –

Therefore, the question as to whether the *Orange-Book-Standard* offer of 12/23/2011 as per Section 296 (1) ZPO, and the offer for an additional worldwide gratuitous cross license, first submitted in the brief of 03/02/2012 after the conclusion of the trial hearing as per Section 296a ZPO—not allowed to that extent—are precluded anyway, is a moot point.

In view of all of the above, the Plaintiff did not violate antitrust laws when it failed to accept the offer, submitted in various versions, for a licensing agreement from the group parent company of the Defendant. For this reason the Defendant cannot defend itself against the Plaintiff's claim for an injunction by claiming *dolo-petit* (Section 242 BGB in conjunction with Art. 102 AEUV and Section 19, 20 GWB, respectively).

## II.

Nor can the Defendant successfully defend itself by claiming that, based on the ITU licensing readiness declaration, the Plaintiff is to grant it a license for the patent in dispute without delay and that for that reason the request for an injunction is an abuse of the law (*dolo-petit*-defense, Section 242 BGB). The rules defined in item I regarding the obligation of a licensing offer by the seeker of the license apply equally to the case of the licensing readiness declaration. If the seeker of the license were in a position to successfully defend against claims for an injunction by the patent owner by arguing that the latter was obligated to grant a license anyhow, on its own volition, the patent owner would be at the mercy of any dishonest licensee, for whom there would be no more incentive to enter into licensing negotiations (see Kühnen, loc. cit., margin no. 1298). After all, the licensing readiness declaration does not constitute more than a declaratory specification of the obligation to enter into an agreement based on antitrust law. At the same time, due to the voluntary obligations assumed by the declarer to provide a license free of discrimination and abuse, it renders the antitrust review as to the patent owner's market-dominating position obsolete (see Kühnen, margin no. 1298 et seq.).

CONFIDENTIAL

MOTM_WASH1823_0602166

– 49 –

## III.

Nor does the MPEG LA Pool Agreement justify a *dolo-petit* defense because there is no contractual obligation on the part of the Plaintiff to submit to the Defendant an offer at the terms and conditions set forth in the MPEG LA Pool agreement.

In accordance with Article 8.3 of the Agreement, the licensees, Terayon and Tut Systems, were obligated to grant licenses for their own standard-essential patents and those of their "*Affiliates.*" In accordance with Article 1.1 of the Agreement, "*Affiliates*" includes also such companies held by a joint parent company ("*…or is under common control with Licensee*"). Even though it is likely that as of 2007 (until their merger with the Plaintiff) Terayon and Tut Systems were controlled by the same group parent company (Motorola, Inc., later Motorola Mobility, Inc.) as the Plaintiff (however, the begin of the latter's membership in the group has not been stated), at the most, this could have given rise to obligations on the part of the licensees, i.e. Terayon and Tut Systems, but not of the Plaintiff, which was not a contractual partner of the MPEG LA Pool Agreement. However, even the Plaintiff's merger with Terayon and Tut Systems in 2011 could not establish a licensing obligation on the part of the Plaintiff under the MPEG LA Pool Agreement (by way of the claimed universal succession): The MPEG LA Pool Agreement had already been terminated in accordance with its Article 8.1.2, as a result of the take-over of the licensees Terayon and Tut Systems by Motorola, Inc. in 2007. Even though Article 6.6.4 of the MPEG LA Pool Agreement provides that the licensee's obligation under Article 8.3 shall survive the termination of the Agreement, no such obligation on the part of the licensees Terayon and Tut Systems for the licensing of patents of the Plaintiff beyond the termination of the Agreement existed at the time of the termination of the Agreement, i.e. at the time of the takeover of Terayon and Tut Systems by Motorola, Inc. in 2007, because at the time the Plaintiff was not an "*Affiliate*" of the two licensees.

For that reason it can remain open whether any obligation to grant a license would even extend to the patent in dispute and vis-à-vis the Defendant as an affiliate of the licensor, Microsoft Corporation.

CONFIDENTIAL

MOTM_WASH1823_0602167

– 50 –

**D.**

The claims of the Plaintiff because of the infringement of the patent in dispute associated therewith are determined as per Article 64 of the EPC according to the regulations of the patent law.

1.  Since the Defendant has used the subject matter of the patent in dispute in violation of Section 9 No. 1 of the PatG (Xbox 360) and Section 10 the PatG (Windows 7, Media Player 12, and Internet Explorer 9), the Defendant is obligated to cease and desist with respect to the Plaintiff (Section 139, paragraph 1 of the PatG in conjunction with Article 64 of the EPC). The danger of repetition arises out of the infringement actions, which have already occurred, through the sale of the challenged embodiments.

    The obligation to cease and desist must be stated without reservation, because a use of the apparatus of the challenged embodiments for decoding H.264 video data, which did not infringe the patent in dispute, could not be identified. The other functions of the challenged embodiments are not dependent on a decoder apparatus in accordance with the invention. Therefore, the Defendant has no recognizable interest to continue to offer and sell the challenged embodiments in an embodiment which enables the use of the patent in dispute.

    A stock depletion period could not be granted the Defendant. In view of the fact that the patent protection expires already on 10/06/2012, that is, in less than 6 months, a stock depletion period would practically cancel out the judgment to cease and desist and devalue the cease and desist claim of the Plaintiff. Independently of this, there is a lack of substantiation of the serious consequences for the Defendant of a cease and desist order, effective immediately.

    Since the Defendant has been sentenced to cease and desist, the Defendant should be warned, upon request by Plaintiff, of the legal consequences in accordance with Section 890 of the ZPO, of a violation of the cease and desist order.

    .

CONFIDENTIAL

2.   The granted claim for information and an accounting emanates from Section 140b of the PatG and Section 242 of the BGB, in conjunction with Article 64 of the EPC.  If an auditor proviso was not requested by the Plaintiff, it was to be added (see Kühnen, supra, margin no. 1045 et seq., with additional comments) and the continuing law suit in that regard rejected.

3.   The recall and removal claim arises out of Section 140a, paragraph 3, page 1 of the PatG., as amended, in conjunction with Article 64 of the EPC for the products distributed since 09/01/2008.   For the products which entered the channels of distribution before 09/01/2008, only a claim for recall from the channels of distribution to an extent as per Section 140a, paragraph 3, page 1 of the PatG, as amended, but not for a removal from the channels of distribution.

The condition of fault, already existing on 09/01/2008 due to the (culpable) patent-infringing actions before the law to improve the enforcement of intellectual property rights (BGBl. 2008 I, page 1191) became effective on 09/01/2008, is subject, for lack of explicit legal transition regulations, with respect to its contents and its effects, only to the law which was in force at the time of the emergence of the fault, that is until 09/01/2008 (see BGH GRUR 2009, 515, 517 – *Motor Bike Cleaner*).  The recall claim is already based on an earlier law, without involving an interpretation conforming to the guidelines, as per Section 139, paragraph 2 of the PatG, Section 249, paragraph 1, of the BGB, as compensation by way of restitution in kind and/or as removal claim unrelated to any fault as per Section 1004, paragraph 1, page 1 of the BGP analog (LG Mannheim, judgment of 11/13/2009, 7 O 92/08 – not published).  A prerequisite for such a claim, similar in content to Section 140a, paragraph 3, page 1 of the PatG, as amended, risk-removal claim directed towards a recall according to an earlier law, is not a right of the infringer to dispose of the objects to be recalled in the sense of a legal disposition through intermediaries within the channels of distribution (different, too, from a mere recall: BGH, GRUR 1974, 666, 669 – repair insurance, with additional comments).  Different rules apply for the removal from the channels of distribution. Since removal from the channels of distribution by the infringer disregarding an appeal for a voluntary return (recall) requires the successful "ultimate removal" itself, it is basically a prerequisite of the earlier law that the infringer has the right to

CONFIDENTIAL

MOTM_WASH1823_0602169

dispose of the objects to be recalled in the sense of a legal disposition via intermediaries in the channel of distribution (see BGH, GRUR 1974, 666, 669 – Repair Insurance, with additional comments).   The Plaintiff has neither demonstrated such a power to dispose of the Defendant nor is this evident otherwise.  A different application of the law as a result of the delayed converted so-called enforcement guidelines is out of the question.   The guideline shows neither a direct horizontal effect between the parties, nor is an evolution of the law, in conformity with the guideline of the general claim to eliminate consequences, possible insofar as the court would take the place of the legislators (LG Mannheim, InstGE 12, 200 margin no.  42 – *Nitrogen Monoxide Detection*; a.A. OLG Düsseldorf, InstGE 13, 15 – *Factor VIII Concentrate*).

Following the wording of the law (in looking at the "channels of distribution"), it still needed to be clarified that objects which are in the possession of private or commercial end users, are covered by the operative provisions (compare LG Mannheim, InstGE 12, 200, 208–210, Tz.   45 et seq.   – *Nitrogen Oxide Detection*; a.A. Kühnen, supra, margin no. 1082).

4.   With regard to the patent infringement, which has been established since 10/19/2001, the Defendant, one month after the publication of the notice that the patent in dispute has been granted, the Defendant could be reproached for negligence at the very least.  For this reason, the Defendant is also obligated to pay damages to the Plaintiff from this time onwards in accordance with Section 139, paragraph 2 of the PatG, in conjunction with Article 64 of the EPC.  At the present time, the Plaintiff is not in a position to quantify the claim for damages; this justifies the determination application  under Section 256 of the ZPO.

CONFIDENTIAL

MOTM_WASH1823_0602170

Case 2:10-cv-01823-JLR   Document 732-2   Filed 07/03/13   Page 55 of 115

– 53 –

**E.**

A suspension of the lawsuit as per Section 148 of the ZPO is not warranted.

I.

The lawsuit must not be suspended until a decision was reached in the matter of the invalidity suit against the patent in dispute.  While the decision concerning the invalidity suit takes precedence as per Section 148 of the ZPO, the division has exercised the discretion accorded it by this regulation and dispensed with a suspension of the infringement process.  Since the invalidity Plaintiff, the Defendant in this case has requested the suspension of the invalidity proceedings and has declared to waive the right to a revision of the invalidity proceedings, as long as it adheres to the license agreement offer, it is, for the time being, improbable that there will be an annulment of the patent in dispute.

II.

Nor was a suspension in accordance with Section 148 of the ZPO taken into consideration in regard to the examination by the antitrust authorities of the admissibility of the takeover of the parent company of the Plaintiff by Google Inc., because the decision of the antitrust authorities is not anticipatory.  Any future changes in the legal status are not anticipatory with regard to the decision to be made on the basis of the current legal status (see Zöller/Greger, ZPO, 29th edition, Section 148, margin no.  6a).

**F.**

The cost determination emanates from Section 92, paragraph 2, No. 1 of the ZPO.

The decision concerning the preliminary enforceability is based on Section 709, pages 1 and 2 of the ZPO.

Contrary to the parallel proceedings relating to the European patent EP 0 615 384 B1, the determination of the amount of security with regard to a preliminary enforcement of the claim to cease and desist, was not focused on the time period until a

CONFIDENTIAL

064                                                          MOTM_WASH1823_0602171

decision presumably will be in hand in the Court of Appeal, but rather on the remaining period of protection of the patent in dispute.

In determining the security with regard to the obligations to recall and remove the products described under item I.1.a) (Xbox 360), the division takes into consideration that the isolated enforcement of these obligations to eliminate the patent-infringing conditions are, in fact, equivalent to enforcing the order to cease and desist.

The application by the Defendant according to Section 712 of the ZPO to enforce the protection from enforcement remains unsuccessful.  The declaration by the Defendant of impending financial losses, loss of market share and damage to image, is not sufficient to establish the prerequisites of Section 712, paragraph 1, page 1 of the ZPO. The assertion of claims to cease and desist from technical protective rights usually results in the suspension of business activities related to the patent-infringing products and therefore, per se, does not open up the area of application of Section 712, paragraph 1, page 1 of the ZPO (OLG Düsseldorf, InstGE 8, 117, 121 – *Mobile Concrete Pump*).  That the economic existence of the Defendant, even taking into consideration the liability of the Plaintiff regardless of fault in accordance with Section 717, paragraph 2, page 1 of the ZPO, is threatened, is neither established nor made credible.  With regard to the possible disadvantages stated by the Defendant for the use of the challenged embodiments (company, public administration), these are not irreplaceable disadvantages threatening the Defendant itself.  However, Section 712 of the ZPO does not serve as the protection of third parties.  The fact is that the foreseeable end of the period of protection of the patent in dispute (October 2012) does not work against the predominant interest of the Plaintiff in a preliminary enforceability.

Dr. Kircher
Presiding Judge at the
Regional Court

Dr. Bauer-Gerland
Judge at the Regional
Court

Wedler
Judge at the Regional
Court

CONFIDENTIAL

MOTM_WASH1823_0602172

Executed:

        [signature]

As Clerk of the Court        [stamp:] Mannheim Regional Court

CONFIDENTIAL

MOTM_WASH1823_0602173

CONFIDENTIAL

MOTM_WASH1823_0602174

CONFIDENTIAL

MOTM_WASH1823_0602175

*- Ausfertigung -*



Verkündet am
02. Mai 2012

Folger, JAng.e
als Urkundsbeamtin
der Geschäftsstelle

# Landgericht Mannheim

## 2. Zivilkammer

# Im Namen des Volkes
# Urteil

Im Rechtsstreit

**General Instrument Corporation**
Horsham PA 19044 /USA

- Klägerin -

Prozessbevollmächtigte:
Rechtsanwälte quinn emanuel u. Koll., Mannheim, Gerichts-Fach 227
(02426.40235/20161622.1)

**gegen**

**Microsoft Deutschland GmbH**
Konrad-Zuse-Str. 1, 85716 Unterschleißheim

- Beklagte -

Prozessbevollmächtigte:
Rechtsanwälte Freshfields Bruckhaus Deringer u. Koll., Prannerstr. 10, 80333 München
(PC/CBA 109096:0588)

**wegen** Patentverletzung

hat die 2. Zivilkammer des Landgerichts Mannheim auf die mündliche Verhandlung vom

07. Februar 2012 unter Mitwirkung von

Vors. Richter am Landgericht Dr. Kircher

Richterin am Landgericht Dr. Bauer-Gerland

Richter am Landgericht Wedler

für     **Recht**     erkannt:

CONFIDENTIAL

MOTM_WASH1823_0602176

I.   Die Beklagte wird verurteilt,

    1. a)

      es zu unterlassen, im Gebiet der Bundesrepublik Deutschland

      Dekodiervorrichtungen (insbesondere Xbox 360) zum Empfang der Blöcke an kodierten Videodaten, bereitgestellt von den unterschiedlichen Bewegungskompensatoren einer Vorrichtung zur adaptiven Kompression digitaler Videosignale zur Übertragung,

      anzubieten, in den Verkehr zu bringen oder zu gebrauchen oder zu den genannten Zwecken einzuführen oder zu besitzen,

      wenn diese dadurch gekennzeichnet sind, dass

      ein Mittel zum Auffinden eines Codewortes aus jedem empfangenen Datenblock, das den Bewegungskompensator, von dem der Block empfangen wurde, repräsentiert, bereitgestellt ist,

      ein Mittel, das auf das Codewort reagiert, bereitgestellt ist, um einen Bewegungsvektor für jeden Block von den Bewegungsvektordaten, die mit dem Block empfangen wurden, wiederherzustellen, und

      ein Mittel, das auf diesen Bewegungsvektor reagiert, bereitgestellt ist, um gegenwärtige Videobilddaten von Daten, die von einem gegenwärtigen Datenblock und mindestens einem vorherigen Datenblock bereitgestellt sind, wiederherzustellen.

                          (EP 0 538 667 B1, Anspruch 19, unmittelbare Verletzung)

    1.b)

      es zu unterlassen, im Gebiet der Bundesrepublik Deutschland Computersoftware (insbesondere Windows 7 und/oder Internet Explorer 9)

      anzubieten und/oder zu liefern,

CONFIDENTIAL

MOTM_WASH1823_0602177

wenn diese dazu geeignet ist, durch Installation auf einem Computer eine

Dekodiervorrichtung zum Empfang der Blocke an kodierten Videodaten, bereitge-
stellt von den unterschiedlichen Bewegungskompensatoren einer Vorrichtung zur
adaptiven Kompression digitaler Videosignale zur Übertragung,

zu bilden,

wenn die Dekodiervorrichtung dadurch gekennzeichnet ist, dass

ein Mittel zum Auffinden eines Codewortes aus jedem empfangenen Datenblock,
das den Bewegungskompensator, von dem der Block empfangen wurde, reprä-
sentiert, bereitgestellt ist,

ein Mittel, das auf das Codewort reagiert, bereitgestellt ist, um einen Bewegungs-
vektor für jeden Block von den Bewegungsvektordaten, die mit dem Block emp-
fangen wurden, wiederherzustellen, und

ein Mittel, das auf diesen Bewegungsvektor reagiert, bereitgestellt ist, um gegen-
wärtige Videobilddaten von Daten, die von einem gegenwärtigen Datenblock und
mindestens einem vorherigen Datenblock bereitgestellt sind, wiederherzustellen.

(EP 0 538 667 B1, Anspruch 19, mittelbare Verletzung)

1.c)

es zu unterlassen, im Gebiet der Bundesrepublik Deutschland Computersoftware
(insbesondere Windows Media Player 12)

anzubieten und/oder zu liefern,

wenn diese dazu geeignet ist, nach Installation auf einer Dekodiervorrichtung
gemäß Ziff. I. 1. b) mit der Computersoftware gemäß Ziff. I. 1 b) (insbesondere
Windows 7) zusammenzuwirken.

(EP 0 538 667 B1, Anspruch 19, mittelbare Verletzung)

CONFIDENTIAL

MOTM_WASH1823_0602178

1.d)

Für jeden Fall der Zuwiderhandlung gegen eines der Verbote gemäß Ziffer I.1.a) bis Ziffer I.1.c) wird der Beklagten jeweils Ordnungsgeld bis Euro 250.000, ersatzweise Ordnungshaft, oder Ordnungshaft bis zu 6 Monaten angedroht, wobei die Ordnungshaft an den gesetzlichen Vertretern der Beklagten zu vollziehen ist.

I.2.

Die Beklagte wird verurteilt, der Klägerin schriftlich in geordneter Form (gegliedert nach Kalendervierteljahren) Rechnung zu legen, in welchem Umfang sie die zu Ziffer I.1.a) bis Ziffer I.1.c) bezeichneten Handlungen seit dem 19. Oktober 2001 begangen hat, und zwar jeweils unter Angabe

a) der einzelnen Lieferungen (unter Vorlage der Rechnungen und/oder Lieferscheine) mit

  aa) Liefermengen, Zeiten und Preisen,
  bb) Marken der jeweiligen Erzeugnisse sowie allen Identifikationsmerkmalen
       wie Typenbezeichnung, Artikelbezeichnung, laufender Produktnummer,
  cc) den Namen und Anschriften der Abnehmer,

b) der einzelnen Angebote (unter Vorlage schriftlicher Angebote) mit

  aa) Angebotsmengen, Zeiten und Preisen,
  bb) Marken der jeweiligen Erzeugnisse sowie allen Identifikationsmerkmalen
       wie Typenbezeichnung, Artikelbezeichnung, laufender Produktnummer,
  cc) den Namen und Anschriften der gewerblichen Angebotsempfänger,

c) der nach den einzelnen Kostenfaktoren aufgeschlüsselten Gestehungskosten sowie des erzielten Gewinns,

d) der Namen und Anschriften der Hersteller, Lieferanten und anderer Vorbesitzer, jeweils mit der Anzahl der hergestellten, erhaltenen oder bestellten Erzeugnisse,

CONFIDENTIAL

MOTM_WASH1823_0602179

– 5 –

e) der betriebenen Werbung, aufgeschlüsselt nach Werbeträgern, deren Aufla-
genhöhe, Verbreitungszeitraum und Verbreitungsgebiet,

wobei die unter a) und d) genannten Angaben durch Vorlage der Auftragsbelege,
Auftragsbestätigungen, Rechnungen sowie Liefer- und Zollpapiere zu belegen
sind,

wobei der Beklagten vorbehalten bleibt, die Namen und Anschriften ihrer nicht-
gewerblichen Abnehmer und der Angebotsempfänger statt der Klägerin einem
von dieser zu bezeichnenden, dieser gegenüber zur Verschwiegenheit verpflich-
teten, vereidigten und in der Bundesrepublik Deutschland ansässigen Wirt-
schaftsprüfer mitzuteilen, sofern die Beklagte die durch dessen Einschaltung ent-
stehenden Kosten übernimmt und ihn ermächtigt und verpflichtet, der Klägerin
auf konkrete Anfrage mitzuteilen, ob ein bestimmter nicht-gewerblicher Abnehmer
oder ein bestimmter Angebotsempfänger in der Rechnungslegung enthalten ist.

I.3.

Die Beklagte wird verurteilt, die unter Ziffer I. 1 .a) beschriebenen, im Besitz Drit-
ter, die nicht Endabnehmer sind, befindlichen Erzeugnisse, die nach dem 29. Ap-
ril 2006 in Verkehr gebracht wurden, aus den Vertriebswegen zurückzurufen,
indem diejenigen Dritten, denen durch die Beklagte oder mit deren Zustimmung
Besitz an den Erzeugnissen eingeräumt wurde, unter Hinweis darauf, dass die
Kammer mit dem hiesigen Urteil auf eine Verletzung des Klagepatents erkannt
hat, ernsthaft aufgefordert werden, die Erzeugnisse an die Beklagte zurückzuge-
ben und den Dritten für den Fall der Rückgabe der Erzeugnisse eine Rückzah-
lung des gegebenenfalls bereits bezahlten Kaufpreises sowie die Übernahme der
Kosten der Rückgabe zugesagt wird,

und

die unter Ziffer I. 1 .a) beschriebenen, im Besitz Dritter, die nicht Endabnehmer
sind, befindlichen Erzeugnisse, die seit dem 01.09.2008 in Verkehr gebracht wur-

CONFIDENTIAL

MOTM_WASH1823_0602180

– 6 –

den, endgültig zu entfernen, indem die Beklagte diese Erzeugnisse wieder an sich nimmt oder die Vernichtung derselben beim jeweiligen Besitzer veranlasst.

II. Es wird festgestellt, dass die Beklagte verpflichtet ist, der Klägerin allen Schaden zu ersetzen, der der Klägerin durch Handlungen der Beklagten gemäß Ziffern I.1.a) bis I.1.c) seit dem 19. Oktober 2001 entstanden ist und noch entsteht.

III. Im Übrigen wird die Klage abgewiesen.

IV. Die Beklagte trägt die Kosten des Rechtsstreits.

V. Das Urteil ist vorläufig vollstreckbar gegen Sicherheitsleistung in Höhe von

- 60 Mio. € im Hinblick auf Ziffer I.1 [Unterlassung]
- 10 Mio. € im Hinblick auf Ziffer I.2. [Rechnungslegung]
- 10 Mio. € im Hinblick auf Ziffer I.3. [Rückruf/Entfernung], wobei die zu leistende Sicherheit für den Fall der isolierten Vollstreckung (ohne Vollstreckung der Unterlassung nach Ziff. I. 1.a) auf 30 Mio. € festgesetzt wird.
- 120 % des jeweils zu vollstreckenden Betrages im Hinblick auf Ziffer IV.

CONFIDENTIAL

MOTM_WASH1823_0602181

## Tatbestand

Die Klägerin macht gegen die Beklagte wegen behaupteter unmittelbarer und mittelbarer Patentverletzung Ansprüche auf Unterlassung, Rechnungslegung sowie Rückruf und Entfernung aus den Vertriebswegen geltend und begehrt die Feststellung der Schadensersatzpflicht der Beklagten.

Die Klägerin ist eine US-amerikanische Gesellschaft und 100%ige Tochter von Motorola Mobility Inc. Das US-amerikanische Unternehmen Google Inc. plant, Motorola Mobility Inc. zu übernehmen, wodurch Google Inc. auch sämtliche von Motorola Mobility Inc. gehaltenen Unternehmen übernehmen würde, darunter die Klägerin.

Die Klägerin ist Inhaberin des in Deutschland in Kraft stehenden europäischen Patents EP 0 538 667 B1 (nachfolgend: Klagepatent) betreffend eine adaptive Bewegungskompensation mit mehreren Bewegungskompensatoren. Das Klagepatent wurde am 06.10.1992 angemeldet. Die Offenlegung erfolgte am 28.04.1993. Der Hinweis auf die Erteilung des Klagepatents wurde am 19.09.2001 veröffentlicht. Die Bundesrepublik Deutschland zählt zu den benannten Vertragsstaaten. Die deutsche Übersetzung des Klagepatents ist unter der Nummer DE 692 32 063 T2 veröffentlicht.

Mit Schriftsatz vom 05.10.2011 (Anlage FBD 19) erhob die Beklagte Nichtigkeitsklage gegen den deutschen Teil des Klagepatents zum Bundespatentgericht. Mit Schriftsatz vom 08.02.2012 haben die Nichtigkeitsklägerin (hiesige Beklagte) und die beiden Nebenintervenienten im Nichtigkeitsverfahren (Microsoft Corporation und Microsoft Ireland Operations Ltd.) das Ruhen des Nichtigkeitsverfahrens gemäß § 251 ZPO beantragt (Anlage FBD 36).

Die Klägerin macht den Patentanspruch 19 des Klagepatents geltend, der in der Verfahrenssprache den folgenden Wortlaut hat (ohne Bezugsziffern):

*Decoder apparatus for receiving the blocks of encoded video data, provided by said different motion compensators of the apparatus of claim 1, characterized in that:*

CONFIDENTIAL

MOTM_WASH1823_0602182

*means are provided for retrieving, from each received data block a code word*
*representative of the motion compensator from which the block is received;*
*means responsive to said code word are provided for recovering a motion vector*
*for each block from motion vector data received with the block; and*
*means responsive to said motion vector are provided for recovering current video*
*image data from data provided by a current data block and at least one prior data*
*block.*

Wegen des weiteren Inhalts des Klagepatents, insbesondere wegen der Beschreibung und der zugehörigen Figuren, wird auf die Patentschrift (Anlage KP1-K1) und deren deutsche Übersetzung (Anlage KP1-K2) Bezug genommen.

Die Beklagte gehört zur Microsoft-Gruppe. Sie vertreibt in der Bundesrepublik Deutschland unter anderem die Videospielkonsole Xbox 360 sowie die Computer-Software Windows 7, Windows Media Player Version 12 und Microsoft Internet Explorer Version 9 (im Folgenden: angegriffene Ausführungsformen).

Die angegriffenen Ausführungsformen unterstützen den Videokompressionsstandard H.264, der unter der Bezeichnung MPEG-4/AVC (*Advanced Video Coding*) als zehnter Teil des MPEG-4 Standards (MPEG-4/Part 10, ISO/IEC 14496-10) veröffentlicht ist (im Folgenden: Standard). Die angegriffene Ausführungsform Xbox 360 ermöglicht das Abspielen von H.264-Videodateien. Windows 7 sowie Windows Internet Explorer Version 9 versetzen durch Installation auf einen Computer diesen in die Lage, H.264-Videodateien abzuspielen. Dies gilt auch für den Windows Media Player Version 12, der die Dekodiermodule von Windows 7 benutzt.

Der H.264-Standard regelt unter anderem die Dekompression eines standardkompatibel komprimierten digitalen Videosignals und definiert auch das zu dekodierende Kompressionsformat für ein digitales Videosignal. Der Standard wurde von der International Telecommunication Union (ITU) in Zusammenarbeit mit der MPEG (*Moving Pictures Experts Group*) erarbeitet und in dem Dokument ITU-T H.264 (03/2010) veröffentlicht (Anlage KP1- K4). Die Vorgängergesellschaft der Muttergesellschaft der Klägerin, die Motorola Inc., hatte in den Jahren 2002 bis 2003 an dem H.264/MPEG4/AVC-Standardsetzungsverfahren teilgenommen.

CONFIDENTIAL

MOTM_WASH1823_0602183

Die Klägerin und auch die Motorola Inc. gaben im Laufe des Standardfestsetzungsver-
fahrens mehrere Lizenzbereitschaftserklärungen gegenüber der ITU ab, die ihrer Mei-
nung nach standardessentiellen Patente Lizenzsuchenden zu nicht diskriminierenden,
fairen und angemessenen Bedingungen zu lizenzieren (Anlagenkonvolut FBD 8).

Diese Erklärungen haben auszugsweise folgenden Wortlaut (Übersetzung):

> *„2. Der Patentinhaber wird einer unbeschränkten Anzahl von Antragstellern auf
> einer weltweiten, nicht-diskriminierenden Basis und zu angemessenen Bedingun-
> gen eine Lizenz erteilen, das patentierte Material zu benutzen, […]. Hier __ an-
> kreuzen* [Anmerkung der Kammer: diese Stelle wurde jeweils angekreuzt]*, wenn
> die Lizenzbereitschaft des Patentinhabers unter der Bedingung der Gegenseitig-
> keit für die oben genannten ITU-T Empfehlungen/ den ISO/IEC International
> Standard steht.*
>
> *Die Lizenzverhandlungen werden den betroffenen Parteien überlassen und fin-
> den außerhalb der ITU-T/ISO/IEC statt."*

Die Muttergesellschaft der Beklagten, die Microsoft Corporation, ist eines jener Unter-
nehmen, die ihre für H.264-Standard-essentiell erklärten Patente als Lizenzgeberin
(„Licensor") in den MPEG LA H.264/AVC Patentpool (im Folgenden: MPEG LA Pool)
eingebracht haben. In diesem Pool werden 171 Patentfamilien, die als für den Standard
essentiell erklärt wurden, von der Gesellschaft MPEG LA, L.L.C. verwaltet und gemein-
sam lizenziert. Hierfür besteht der MPEG LA H.264/AVC Patentpool-Lizenzvertrag (im
Folgenden: MPEG LA Poolvertrag, Anlage FBD-12). Dieser Vertrag sieht ein gestuftes
Lizenzgebührensystem mit fixen Beträgen pro Gerät vor. Produkte, die die standardrele-
vante Technologie verwenden (u.a. Dekoderprodukte), werden zu sog. „Units" zusam-
mengefasst. Pro Jahr sind bis zu 100.000 Units für ein Unternehmen (*„legal entity"*) kos-
tenlos. Für die danach folgenden Units ist pro Unit eine Lizenzgebühr von 0,20 US-$ zu
entrichten, ab 5.000.001 Units verringert sich die Lizenzgebühr für die weiteren Units auf
0,10 US-$ pro Unit. Des Weiteren sieht der MPEG LA Poolvertrag eine Kappungsgrenze
für Lizenznehmer und die mit ihnen verbundenen Unternehmen vor (2005-2006: max.

CONFIDENTIAL

MOTM_WASH1823_0602184

3,5 Mio. US-$ / Jahr; 2007-2008: max. 4,25 Mio. US-$ / Jahr; 2009-2010: max. 5 Mio.
US-$ / Jahr; 2011-2015: max. 6,5 Mio. US-$ / Jahr).

Die Unternehmen Terayon Communications Systems, Inc. (im Folgenden Terayon) und
Tut Systems, Inc. (im Folgenden: Tut Systems) waren Lizenznehmerinnen („Licensee")
des MPEG LA Poolvertrages. Die Vorgängergesellschaft der Konzernmutter der Kläge-
rin, Motorola, Inc., übernahm Terayon und Tut Systems im Jahr 2007 (FBD 29). Nach
der Aufteilung des Motorola-Konzerns in Motorola Solutions, Inc. und Motorola Holdings,
Inc., wurden Terayon und Tut Systems der Motorola Mobility Inc. (einer Tochtergesell-
schaft der Motorola Mobility Holdings, Inc.), Konzernmutter der Klägerin, zugeteilt. Im
Jahr 2011 wurden Terayon und Tut Systems im Wege der Übernahme Teil der Klägerin
(„Merger merging Tut Systems [bzw. Terayon] with and into General Instrument Corpo-
ration" - FBD 31)

Auch das die Übernahme der Muttergesellschaft der Klägerin planende Unternehmen
Google Inc. ist Lizenznehmer des MPEG LA Patentpools (Anlage FBD-18).

Ziff. 8.3 des MPEG LA Poolvertrages lautet wie folgt:

> „**Licensee Grant.** Upon full execution of this Agreement, Licensee agrees to
> grant a worldwide, non-exclusive license and/or sublicense (commensurate to this
> scope of the licences which Licensee has selected here under) under any and all
> AVC Essential Patent(s) that Licensee and its Affiliates, if any, have the right to
> licence and / or sublicence, to any Licensor or any sublicensee of the Licensing
> Administrator desiring such a licence and/or sublicense on fair and reasonable
> terms and conditions. [...]"

Ziff. 8.1.2 lautet:

> „This Agreement may not be assigned by the Licensee under any circumstances.
> This Agreement shall terminate upon the Sale by Licensee of all or substantially
> all of its assets, or capital shares (or similar indicia of ownership), or upon a
> similar transaction."

Gemäß Ziff. 6.6.4 überdauert die Pflicht aus Ziff. 8.3 das Auslaufen oder die Beendigung
des Lizenzvertrags.

CONFIDENTIAL

MOTM_WASH1823_0602185

– 11 –

Mit Schreiben vom 29.10.2010 (Anlage FBD 9) unterbreitete die Muttergesellschaft der Klägerin der Muttergesellschaft der Beklagten ein 20 Tage gültiges, als „RAND" (reasonable and non-discriminatory) bezeichnetes Angebot auf Abschluss eines Vertrags über eine weltweite, nicht ausschließliche Lizenz für das Portfolio H.264-standardessentieller Patente von Motorola für eine Lizenzgebühr von 2,25 % der Verkaufspreise der standardkompatiblen Endprodukte (z.B. Xbox 360, PC, Laptop, Smartphone etc.). Ferner sah das Angebot eine Rücklizenz für die standardessentiellen Patente von Microsoft zu den gleichen Bedingungen vor. Schließlich wurde die Bereitschaft erklärt, ggf. auch über eine Lizenz nur für einzelne Patente aus dem Motorola Portfolio zu verhandeln. Dieses Angebot wurde seitens der Muttergesellschaft der Beklagten nicht angenommen.

Mit Anwaltsschreiben vom 23.12.2011 unterbreitete die Konzernmutter der Beklagten mit Wirkung auch für ihre Tochtergesellschaften der Klägerin ein unbedingtes Lizenzvertragsangebot für den deutschen Teil des hiesigen Klagepatents (auch Gegenstand des Parallelverfahrens 2 O 376/11) und den deutschen Teil des Europäischen Patents EP 0 615 384 B1, das Gegenstand der Parallelverfahren 2 O 373/11 und 2 O 387/11 ist (Anlage FBD-21 (engl. Originalfassung und deutsche Übersetzung)).

Gegenstand dieses ausformulierten Lizenzvertragsangebots ist ein nicht ausschließliches, nicht übertragbares Recht der Microsoft Corp. und ihrer Tochtergesellschaften, ein Produkt herzustellen, das einen patentgemäßen AVC-Decoder oder AVC-Codec enthält, und außerdem die Rechte für den Import nach Deutschland, sowie die Nutzung und den Besitz solcher Produkte innerhalb Deutschlands.

Ziff. 3.1 des Angebots sieht eine Stücklizenz pro „computing device containing an AVC Decoder or AVC Codec" (= Einheit) vor, und zwar in Höhe von 2 €-Cents für jede Einheit für die ersten 10 Millionen Einheiten pro Jahr (= max. 200.000,00 €) und von 1 €-Cent für jede Einheit pro Jahr darüber hinaus.

Die angebotenen Lizenzgebühren ermittelte die Beklagte im Wesentlichen wie folgt:

Die als standardessentiell deklarierten 270 Patentfamilien ließen sich insgesamt 36 Patentinhabern zuordnen. Vergleiche man, wie viele dieser Patentfamilien sich den einzel-

CONFIDENTIAL

MOTM_WASH1823_0602186

nen der insgesamt 36 Patentinhabern zuordnen lassen, so ergebe sich, dass das Portfo-
lio der Klägerin und ihrer Muttergesellschaft das fünftgrößte aller einzelnen Portfolios
sei. Wenn man dieses Portfolio einerseits mit den insgesamt im MPEG LA-Pool gebün-
delten Patentfamilien und andererseits mit den von Dritten gehaltenen Patentfamilien
vergleiche, so habe das Portfolio der Klägerin und ihrer Muttergesellschaft einen Anteil
von 6,3 % (17 Patentfamilien, darunter das Klagepatent), während im Patentpool insge-
samt 63,6 % der standardessentiellen Patente gebündelt seien und weitere 30,1 % von
Dritten gehalten würden.

Den angeblichen technischen Wert der von der Klägerin und ihrer Muttergesellschaft
gehaltenen Patente hat die Beklagte über eine von ihr so genannte Zitatanalyse ermit-
telt, deren Validität die Klägerin bestreitet. Danach soll die Häufigkeit, in der ein be-
stimmtes Patent für spätere Erfindungen als einschlägiger Stand der Technik genannt
wird, Rückschlüsse auf die Bedeutung der Erfindung und deren technischen Wert zulas-
sen (Bl. 356 f.). Nach dieser so genannten Zitatanalyse soll das Patentportfolio der Klä-
gerin und ihrer Konzernmutter unter den Patentinhabern den 11. Platz einnehmen. Meh-
rere der 10 Patentinhaber eines Portfolios mit höherem Zitatwert hätten ihre Patente in
den MPEG LA-Pool eingebracht. Im Vergleich zu den insgesamt im MPEG LA Pool ge-
haltenen standardessentiellen Patenten ergebe sich, dass diese nach allen erforderli-
chen Korrekturen 72,7 % des gesamten Zitatwertes ausmachen und die von Dritten
(einschließlich der Klägerin und ihrer Konzernmutter) 27,3 %. Die von der Klägerin und
ihrer Konzernmutter insgesamt gehaltenen Patente stellten nur 3,8 % des gesamten
Zitatwertes aller standardessentiellen Patente dar.

Zur Ermittlung der Lizenzraten zog die Muttergesellschaft der Beklagten Lizenzraten von
Patentpools oder Lizenzprogrammen heran, die ebenfalls die H.264/AVC-Technologie
oder ähnliche Technologien betreffen. Als Vergleichsmarkt komme zunächst der Markt
der Patente in Betracht, die Teil des MPEG LA Pools seien. In diesem Pool seien 171
Patentfamilien von 28 Patentinhabern umfasst. Die Lizenzgebühren für die weltweite
Herstellung bzw. den Vertrieb von standardkompatiblen Dekodern sind im MPEG LA
Pool gestaffelt wie bereits oben dargestellt (vgl. auch Anlage FBD-12, Art. 3.1.1). Die
Lizenzgebühren des Pools werden proportional zur Anzahl der von den Lizenzgebern
gehaltenen Patente aufgeteilt, d.h. ein Lizenzgeber erhält bei der höchsten Lizenzge-
bühr von 0,2 US-$ für jede vertriebene Einheit 0,082 €-Cent pro Patentfamilie. Demnach

CONFIDENTIAL

MOTM_WASH1823_0602187

erhalte etwa der Patentinhaber mit der größten Anzahl eingebrachter Patentfamilien 1,59 €-Cent pro Einheit.

Des Weiteren verweist die Beklagte auf ein Lizenzprogramm des Unternehmens AT&T, in dem H.264/AVC-standardessentielle Patente außerhalb eines Patentpools lizenziert werden (Bl. 268 f.; Lizenzbedingungen von AT&T: Anlage FBD-25). Danach verlangt AT&T für die weltweite Lizenzierung seines Portfolios von H.264/AVC-standardessentiellen Patenten eine Stücklizenz von 18 US-$-Cents [13,75 €-Cent[1]] für bis zu 5 Mio. Einheiten, wobei sich die Gebühr für alle weiteren Einheiten auf 10 US-$-Cents [7,64 €-Cents] reduziert und eine Kappungsgrenze von 5 Mio. US-$ pro Kalender-jahr vorgesehen ist. Nach Auffassung der Beklagten sei davon auszugehen, dass das von AT&T gehaltene relevante Portfolio in etwa dem Portfolio der Klägerin und ihrer Muttergesellschaft entspreche und dessen Wert sogar übersteige. AT&T habe derzeit 9 Lizenznehmer.

Schließlich nimmt die Beklagte Bezug auf angeblich am Markt übliche Lizenzbedingun-gen für andere Standards, die technisch dem H.264/AVC-Standard vergleichbar seien (Bl. 269 f.):

- VC-1 Standard (Poollizenz): 20 US-$-Cents/Einheit für mehr als 100.000 und bis zu 5 Mio. Einheiten, 10 US-$-Cents für mehr als 5 Mio. Einheiten, Kappungs-grenze 5 Mio. US$.
- MPEG-4 Visual-Standard (Poollizenz): 25 US-$-Cents/Stück für mehr als 50.000 Stück, Kappungsgrenze 1,25 Mio. US$.
- Poollizenzen für weniger ähnliche Technologien: unter 1 US-$ pro Stück bis zu lediglich 10 US-$-Cents pro Stück.

Hätten die Klägerin und ihre Konzernmutter ihr Patentportfolio in den MPEG LA Pool eingebracht, so stünden ihnen bei Anwendung der in dem Pool üblichen numerischen Berechnung für ihr gesamtes Portfolio lediglich (proportionaler Gebührenanteil pro Pa-tentfamilie bei Annahme des Höchstsatzes zwischen 100.000 und 5 Mio. Stück =) 0,082 €-Cents x (Patentfamilien der Klägerin und ihrer Konzernmutter =) 17 = 1,394 €-Cent pro

---

[1] Kurs vom 18.04.2012.

CONFIDENTIAL

MOTM_WASH1823_0602188

Einheit zu. Sofern man die beiden Klagepatente jeweils als Patenfamilien betrachte, würde die Lizenzrate für die beiden Patente 2 x 0,082 €-Cent = 0,165 €-Cent betragen. Würde der Pool auf einer (Zitat-)Wertberechnung basieren, stünde der Klägerin und ihrer Konzernmutter sogar eine noch geringere Gebühr zu.

Den der Klägerin und ihrer Konzernmutter bei theoretischer Mitgliedschaft im Pool für ihr gesamtes Portfolio zustehenden Betrag von 1,394 €-Cent verzehnfache die Beklagte auf 14 €-Cents pro Einheit bis zu 5 Mio. Produkten und verfünffache sie auf 7,5 €-Cents pro Einheit für alle darüber hinausgehenden Einheiten. Damit entspreche die Gebühr in etwa der von der unabhängigen Anbieterin AT&T für deren (nach Behauptung der Beklagten wertvolleres) Portfolio geforderten Lizenzgebühr.

Für die beiden Klagepatente (das hier streitgegenständliche und den deutschen Teil des Europäischen Patents EP 0 615 384 B1, das Gegenstand der Parallelverfahren 2 O 373/11 und 2 O 387/11 ist) errechnet die Klägerin eine Stücklizenz von 1,65 €-Cent für die ersten 5 Mio. Einheiten pro Jahr und 0,83 €-Cent für alle weiteren Einheiten pro Jahr. Diese Gebühr entspricht 2/17 der für das gesamte Portfolio von 17 Patentfamilien der Klägerin bzw. ihrer Konzernmutter ermittelten Gebühr.

Die genannten Lizenzgebühren rundet die Beklagte auf volle €-Cents (1,65 €-Cent auf 2 €-Cent und 0,83 €-Cent auf 1 €-Cent) auf, erstreckt die höhere Einstiegsgebühr auf die ersten 10 Mio. Einheiten und verzichtet auf eine Kappungsgrenze.

Alternativ bot die Microsoft Corp. in dem Schreiben vom 23.12.2012 an, für Deutschland eine wechselseitige Lizenzvereinbarung mit der Muttergesellschaft der Klägerin, Motorola Mobility Inc., für das Gesamtportfolio der H.264-standardessentiellen Patente von Microsoft Corp. und ihren Tochtergesellschaften einerseits und Motorola Mobility Inc. und deren Tochtergesellschaften andererseits abzuschließen. In ihrem Schriftsatz vom 03.02.2012 bot die Microsoft Corp. den Abschluss einer beiderseitigen *weltweiten* Portfolio-Lizenz an. In der mündlichen Verhandlung vom 07.02.2012 stellte der Beklagtenvertreter klar, dass diese Kreuzlizenz kein eigenständiges Lizenzangebot darstelle, sondern eine ergänzende Komponente zu dem spezifizierten Lizenzangebot sei. Angeboten werde keine Freikreuzlizenz, sondern eine entgeltliche Überkreuzlizenz zu den ermittelten Lizenzsätzen von 2 €-Cents/Einheit bzw. 1 €-Cent/Einheit. In ihrem in

CONFIDENTIAL

MOTM_WASH1823_0602189

dieser Hinsicht nicht nachgelassenen Schriftsatz vom 02.03.2012 erklärte die Beklagte bzw. ihre Muttergesellschaft schließlich die Bereitschaft, der Klägerin eine weltweite *kostenlose* Kreuzlizenz an ihrem Portfolio von standardessentiellen Patenten zu erteilen, und zwar zusätzlich zu ihrem auf die beiden in Deutschland erteilten Klagepatente beschränkten Lizenzangebot (Bl. 382 f.).

Weiterer Teil des Angebots der Microsoft Corp. ist das Anerkenntnis einer Schadensersatzpflicht für die Nutzung der lizensierten Patente in der Vergangenheit dem Grunde nach sowie die Verpflichtung, die Nichtigkeitsklage gegen das lizenzierte Klagepatent innerhalb von 10 Tagen nach Annahme des Lizenzangebots durch die Klägerin zurückzunehmen. Mit Schriftsatz vom 03.02.2012 (vgl. 2 O 373, Bl. 364 ff.) erweiterte die Beklagte das Lizenzangebot um ein Kündigungsrecht der Klägerin für den Fall, dass die Beklagte nach der Rücknahme der Nichtigkeitsklagen gegen die beiden in diesem und in den Parallelverfahren geltend gemachten Patente erneut Nichtigkeitsklage gegen eines oder beide Klagepatente erheben sollte. In der mündlichen Verhandlung präzisierte der Beklagtenvertreter insoweit, dass der Klägerin nach dem Angebot der Beklagten ein Recht zur außerordentlichen Kündigung auch dann zugebilligt werden solle, wenn künftig eine Nichtigkeitsklage durch eine durch den Lizenzvertrag begünstigte Partei erhoben werde.

Das Angebot der Microsoft Corp. solle bestehen bleiben, bis es von der Klägerin angenommen werde oder bis eine rechtskräftige Entscheidung dahingehend ergehe, dass die Produkte der Microsoft Corp., die mit dem H.264/AVC-Standard kompatibel seien, die beiden geltend gemachten Klagepatente nicht verletzten, oder die Patente rechtskräftig für nichtig erklärt worden seien oder die Klagen aus einem anderen Grund rechtskräftig abgewiesen worden seien.

Zudem legte die Konzernmutter der Beklagten Rechnung über die nach dem angebotenen Lizenzvertrag fälligen Lizenzgebühren für die angebliche Benutzung des Klagepatents durch die Beklagte, ihre Konzernmutter sowie die Microsoft Ireland Operations Limited in der Vergangenheit bis September 2011 (Anlagenkonvolut FBD-34). Die nach dem Lizenzvertragsangebot errechneten Lizenzgebühren nebst Verzugszinsen hinterlegte die Konzernmutter der Beklagten bei der Hinterlegungsstelle des Amtsgerichts Mannheim (Hinterlegungsbescheinigung: Anlage FBD-35) unter Verzicht auf das Recht

CONFIDENTIAL

MOTM_WASH1823_0602190

der Rücknahme (zuletzt klargestellt mit Schreiben des Beklagtenvertreters vom 08.02.2012 an das Amtsgericht Mannheim, Bl. 360).

Mit Schriftsatz vom 30.03.2012 teilte die Beklagte mit, dass ihre Konzernmutter auch mit Wirkung für die Beklagte die fälligen und seit der ersten Rechnungslegung noch ausstehenden Lizenzgebührenzahlungen samt Zinsen gemäß ihrem Lizenzvertragsangebot ermittelt habe. Die Konzernmutter der Beklagten hinterlegte den ermittelten weiteren Betrag am 30.03.2012 ebenfalls bei der Hinterlegungsstelle des Amtsgerichts Mannheim unter Verzicht auf das Recht der Rücknahme (Anlage FBD-40).

**Die Klägerin** vertritt die Auffassung, die im Klagepatent beanspruchte Erfindung sei in dem Standard als zwingende Anforderung implementiert, weshalb das Klagepatent für den Standard essentiell sei.

Da die angegriffene Ausführungsform Xbox 360 zum Abspielen standardkompatibel komprimierter Videoformate imstande sei, handle es sich um eine Dekodiervorrichtung, die Anspruch 19 des Klagepatents unmittelbar verwirkliche. Die angegriffenen Ausführungsformen Windows 7 und Windows Internet Explorer 9 verletzten das Klagepatent mittelbar, da ein Computer nach der Installation eines dieser Programme, welche die entsprechenden H.264 Codecs (Softwaremodule) enthielten, als Dekodiervorrichtung ausgebildet sei. Auch der Windows Media Player 12 verletze das Klagepatent mittelbar, da diese Software dazu geeignet und bestimmt sei, mit einem wesentlichen Element der Erfindung zusammenzuwirken, indem er bestimmungsgemäß die von Windows 7 bereit gestellte Dekodierfunktion abrufe.

Der Anspruch 19 werde daher von den nach dem Standard arbeitenden angegriffenen Ausführungsformen wortsinngemäß verwirklicht.

Insbesondere schütze Anspruch 19 nicht ein System aus Enkoder und Dekoder, so dass es auf die Ausgestaltung des standardgemäßen Enkodiervorgangs vorliegend nicht weiter ankomme. Die standardgemäßen Dekodiervorrichtungen machten auch von den Merkmalen 1 und 2 des Anspruchs 19 Gebrauch. So seien die standardgemäßen Syntaxelemente mb_type und sub_mb_type Codewörter im Sinne des Merkmals 2, weil sie

CONFIDENTIAL

MOTM_WASH1823_0602191

den verwendeten Bewegungskompensator nach Typ und Blockgröße identifizierten. Selbst wenn man mit der Beklagten zu Unrecht annehmen wollte, dass ein Datenblock im Sinne von Anspruch 19 zwingend einem Macroblock des Standards entspreche und ferner zwingend innerhalb dieses Macroblocks ein einheitlicher Bewegungskompensator zu verwenden sei, würde das Klagepatent durch die angegriffenen Ausführungsformen verletzt, weil im Standard nur für den Fall einer 8x8 Partitionierung des Macroblocks eine weitere Partitionierung auf der 8x8 Sub-Macroblock-Ebene erfolgen könne.

Die Klägerin ist der Ansicht, der Beklagten stehe weder aus der Lizenzbereitschaftserklärung der Klägerin bzw. deren vormaliger Konzernmutter gegenüber der ITU noch aus dem MPEG LA Poolvertrag ein Nutzungsrecht zu. Die MPEG LA Poolverträge, die sich ohnehin nicht auf das Klagepatent bezögen, seien im Übrigen durch die Übernahme der Gesellschaften Terayon und Tut Systems durch Motorola, Inc. im Jahre 2007 beendet worden.

Des Weiteren begründeten die Lizenzbereitschaftserklärung und der MPEG LA Poolvertrag auch keinen *dolo-petit*-Einwand der Beklagten.

Die Beklagte könne dem Unterlassungsanspruch der Klägerin auch keinen kartellrechtlichen Zwangslizenzeinwand entgegenhalten.

Die Beklagte sei mit diesem Einwand präkludiert, weil sie ihr Lizenzvertragsangebot erst am 23.12.2011 und damit weit nach Ablauf der Klageerwiderungsfrist vorgelegt habe. Im Übrigen sei die Klägerin aber auch nicht verpflichtet, das Lizenzvertragsangebot der Konzernmutter der Beklagten vom 23.12.2011 anzunehmen.

Die von der Konzernmutter der Beklagten angebotene Lizenzgebühr sei gänzlich unangemessen und unverhältnismäßig niedrig. Für die angebotene Summe würde die Klägerin niemals so gewichtige Patente wie die vorliegenden Klagepatente lizensieren. Rechne man die angebotene Stücklizenz auf einen Prozentsatz am Verkaufserlös der angegriffenen Ausführungsformen, käme man auf eine Lizenzgebühr zwischen 0,00145 % und 0,004 % der Verkaufserlöse, während im Bereich Elektronik / Informationstechnologien bzw. Computer typischerweise Lizenzsätze von über 4 % der Umsätze genommen würden. Es entspreche weder der Praxis und sei auch ökonomisch unvertretbar, den Wert eines standardessentiellen Patents schlicht aufgrund seines numerischen Anteils

CONFIDENTIAL

an der Gesamtheit der standardessentiellen Patenten linear herunter zu rechnen. Ein standardessentielles Patent werde nicht weniger wert, weil der Patentinhaber über weitere standardessentielle Patente verfüge und zur Vermeidung von unangemessen hohen Lizenzsätzen für das Gesamtportfolio keinen kumulierten Satz mit linearem Anstieg für die Lizenzierung aller Patente zugrundelege.

Der Wert der Motorola Patente werde unter anderem durch eine Kreuzlizenz mit dem Unternehmen Nokia belegt, das über das größte Portfolio von als H.264-standardessentiell erklärten Patenten verfüge.

Weiterhin sei zu berücksichtigen, dass die Klägerin bzw. deren Muttergesellschaft ihr gesamtes Patentportfolio standardessentieller Mobilfunkpatente, das mehrere Teile verschiedener standardessentieller Technologien enthalte, für eine Lizenzgebühr von 2,25 % der Umsätze anböten, wobei diese Gebühr fällig werde, wenn von einer einzigen Technologie - etwa H.264 - bzw. von einem einzigen Patent Gebrauch gemacht werde. Der Satz von 2,25 % sei somit kein Gesamtbetrag, den man auf alle lizensierten Patente umlegen könne; es bestehe grundsätzlich kein linearer Zusammenhang zwischen der Anzahl der Patente und dem Lizenzsatz.

Anders als die Beklagte hält die Klägerin die Ermittlung des FRAND-Lizenzsatzes auf der Grundlage der Gebühren des MPEG LA Patentpools für unzulässig, da ein Patent-Pool von vorneherein kein tauglicher Vergleichsmaßstab sei. Des Weiteren gebe es bei Lizenzsätzen für ein Portfolio standardessentieller Patente keine numerische Proportionalität, eine solche würde Unternehmen allein dadurch benachteiligen, dass sie eine sehr hohe Anzahl standardessentieller Patente innehätten. Wirtschaftlich gesehen seien die Einzelpatente das eigentlich Wertvolle.

Für die Annahme der Beklagten, wonach der Wert eines Patents unter anderem durch die relative Häufigkeit der Zitierung desselben in anderen Patenten bestimmt werden könne, gebe es methodisch keinen Anhaltspunkt.

Eine Aufbrauchfrist sei der Beklagten nicht zu gewähren, da dies letztlich eine Aushöhlung des der Klägerin uneingeschränkt zustehenden Unterlassungsanspruchs bedeuten würde. Im Übrigen sei nicht erkennbar, dass die Anpassung der angegriffenen Ausfüh-

CONFIDENTIAL

MOTM_WASH1823_0602193

– 19 –

rungsformen im Hinblick auf die begehrte Unterlassung der Verwendung des Klagepatents zu Störungen bei den Anwendern der Programme führe.

Eine Anordnung von Vollstreckungsschutz gemäß § 712 ZPO komme nicht in Betracht, weil hierfür ein aus Sicht der Klägerin ohnehin nicht dargelegter Umsatzausfall der Beklagten nicht ausreiche. Eine ernsthafte Gefährdung ihrer wirtschaftlichen Existenz habe die Beklagte nicht glaubhaft gemacht.

Die Klägerin **b e a n t r a g t**,

- I.1.a) - I.1.d) wie erkannt;
- I. 2. wie erkannt bis auf den Wirtschaftsprüfervorbehalt;
- I.3.
  Die Beklagte wird verurteilt, die unter Ziffer A.I. 1 .a) beschriebenen, im Besitz Dritter befindlichen Erzeugnisse, die nach dem 29. April 2006 in Verkehr gebracht wurden, aus den Vertriebswegen zurückzurufen,

  indem diejenigen Dritten, denen durch die Beklagte oder mit deren Zustimmung Besitz an den Erzeugnissen eingeräumt wurde, unter Hinweis darauf, dass die Kammer mit dem hiesigen Urteil auf eine Verletzung des Klagepatents erkannt hat, ernsthaft aufgefordert werden, die Erzeugnisse an die Beklagte zurückzugeben und den Dritten für den Fall der Rückgabe der Erzeugnisse eine Rückzahlung des gegebenenfalls bereits bezahlten Kaufpreises sowie die Übernahme der Kosten der Rückgabe zugesagt wird

  und

  endgültig zu entfernen, indem die Beklagte diese Erzeugnisse wieder an sich nimmt oder die Vernichtung derselben beim jeweiligen Besitzer veranlasst.

- II. wie erkannt.

CONFIDENTIAL

MOTM_WASH1823_0602194

Die Beklagte **b e a n t r a g t**,

> die Klage abzuweisen.

> <u>hilfsweise</u>:

> den Rechtsstreit bis zur Entscheidung der zuständigen Kartellbehörden über die Zulässigkeit der angekündigten Übernahme der Konzernmutter der Klägerin durch Google Inc. auszusetzen;

> <u>hilfsweise</u>:

> den Rechtsstreit bis zur rechtskräftigen Entscheidung des Nichtigkeitsverfahrens gegen den deutschen Teil des Europäischen Patents EP 0 538 667 B1 / DE 692 32 063 T2 gemäß § 148 ZPO auszusetzen;

> <u>höchst hilfsweise</u>:

> der Beklagten eine angemessene Aufbrauchfrist einzuräumen;

> <u>höchst hilfsweise</u>:

> die Beklagte hinsichtlich Klageantrag I.1.2. lediglich zur Beauskunftung unter Wirtschaftsprüfervorbehalt zu verurteilen;

> <u>höchst hilfsweise</u>:

> der Beklagten zu gestatten, die Zwangsvollstreckung durch Sicherheitsleistung, die auch durch Bank- oder Sparkassenbürgschaft erbracht werden kann, ohne Rücksicht auf eine Sicherheitsleistung der Klägerin abzuwenden (§ 712 ZPO);

> <u>höchst hilfsweise</u>:

> die von der Klägerin im Rahmen der vorläufigen Vollstreckbarkeit zu erbringende Sicherheitsleistung auf mindestens 236.000.000,00 € festzusetzen.

Die Klägerin tritt den Aussetzungsanträgen und dem Vollstreckungsschutzantrag entgegen.

CONFIDENTIAL

MOTM_WASH1823_0602195

**Die Beklagte** ist der Auffassung, die angegriffenen Ausführungsformen verletzten das Klagepatent nicht. Der H.264-Standard, anhand dessen die Verletzungsfrage von der Klägerin dargelegt würde, mache von den Merkmalen des Patentanspruchs 19 keinen Gebrauch.

Dabei sei insbesondere zu berücksichtigen, dass es sich bei Anspruch 19 um ein geschütztes System aus Enkoder und Dekoder handele und die standardgemäße Kodierung nicht wie im Klagepatent beschrieben funktioniere. Anspruch 19 verweise explizit auf den einen Enkoder lehrenden Anspruch 1; die Verwendung von bestimmten Artikeln („der Blöcke", „den unterschiedlichen Bewegungskompensatoren") zeige, dass Anspruch 19 wie ein von Anspruch 1 abhängiger Anspruch formuliert sei. Auch aus dem Gesamtkonzept der angeblichen Erfindung ergebe sich, dass die Funktionalität des in Anspruch 1 beschriebenen Enkoders bei der Auslegung des Anspruchs 19 mitgelesen werden müsse.

Die Beklagte ist ferner der Auffassung, die von einem patentgemäßen Dekoder empfangenen Datenblöcke müssten stets die gleiche Blockgröße haben und die darin enthaltenen Blöcke, die bei der Bewegungskompensation durch die Verwendung einer bestimmten Blockgröße durch einen Bewegungskompensator entstehen, müssten ebenfalls die gleiche Größe haben. Ein Datenblock, der Blöcke mit unterschiedlichen Partitionen enthalte, z.B. eine Mischung aus 8x8, 8x4, 4x8 oder 4x4 Blöcken, sei gemäß der angeblichen Erfindung nicht möglich, während dies bei den Daten, die ein standardgemäßer Dekoder empfange, der Fall sein könne. Im Standard könne jeder der vier Sub-Macroblöcke eines Macroblocks durch einen entsprechenden Bewegungskompensator in eine 8x8 Partition, zwei 8x4 Partitionen, zwei 4x8 Partitionen oder vier 4x4 Partitionen unterteilt sein. Dies zeige, dass die Daten, die ein standardgemäßer Dekoder empfange, in vielen Fällen nicht denen entsprächen, die ein erfindungsgemäßer Dekoder empfange, weil es bei ersteren nicht „das Codewort" gemäß Merkmal 2 gebe, das einen einzigen Bewegungskompensator (der die gleiche Blockgröße verwende) für einen ganzen Datenblock repräsentiere. Für einen Macroblock (16x16), der vier Sub-Macroblöcke (8x8) mit einer Mischung von Partitionsgrößen enthalte, werde eine Prädiktion nämlich nicht mit Hilfe eines einzigen einheitlichen Bewegungskompensators erzeugt. Vielmehr

CONFIDENTIAL

MOTM_WASH1823_0602196

– 22 –

hätten einzelne Subblöcke des 16x16 Macroblocks mindestens zwei verschiedene Bewegungskompensatoren durchlaufen und seien somit in unterschiedliche Blockgrößen unterteilt worden.

Die Beklagte ist weiter der Ansicht, ihr stehe nach Art. 8.3 i.V.m. 6.6.4 des MPEG LA Poolvertrages ein Nutzungsrecht an dem Klagepatent zu. Bei Art. 8.3 des MPEG LA Poolvertrages handele es sich nicht nur um eine Bereitschaftserklärung, eine Lizenz auf Anfrage eines potentiellen Lizenznehmers zu erteilen. Der Lizenzvertrag begründe vielmehr die Pflicht des MPEG LA Lizenznehmers, jedem Nutzer des Standards, der entweder Lizenzgeber oder auch Lizenznehmer im MPEG LA Patentpool sei, oder den mit diesen verbundenen Unternehmen von sich aus eine Lizenz zu den in Art. 3 des MPEG LA Poolvertrages umrissenen Bedingungen anzubieten. Die Klägerin als mit Terayon und Tut Systems, zweier Lizenznehmer bzw. ehemaliger Lizenznehmer des MPEG LA Poolvertrages, verbundenes Unternehmen bzw. als deren Gesamtrechtsnachfolgerin sei daher gemäß Art. 8.3 i.V.m. 6.6.4 und 1.1 des MPEG LA Poolvertrages verpflichtet, der Konzernmutter der Beklagten als einer der Lizenzgeberinnen im Lizenzpool bzw. der Beklagten selbst als einem mit dieser Lizenzgeber verbundenen Unternehmen eine Lizenz an den standardessentiellen Patenten der Klägerin zu erteilen

Darüber hinaus macht die Beklagte ein Nutzungsrecht basierend auf der gegenüber der ITU abgegebenen Lizenzbereitschaftserklärung der Klägerin zur Lizenzierung zu FRAND (Fair, Reasonable And Non-Discriminatory)-Bedingungen geltend. Die Lizenzbereitschaftserklärung sei ein Vertrag zugunsten Dritter gemäß § 328 BGB, nämlich sämtlicher lizenzbereiter Nutzer des H.264-Standards. Aus dieser Erklärung folge zum einen ein bindendes Angebot auf Abschluss eines Lizenzvertrages. Zum anderen habe die Klägerin auf die Geltendmachung ihrer Ausschließlichkeitsrechte gemäß §§ 139 ff. PatG verzichtet und sei hinsichtlich des angeblich standardessentiellen Patents von vornereherein auf Zahlungsansprüche nach einer angemessenen Lizenzgebühr beschränkt.

Äußerst hilfsweise hält die Beklagte der Klägerin deren Lizenzbereitschaftserklärung als *dolo-petit*-Einwand gemäß § 242 BGB entgegen. Durch die Geltendmachung der Unterlassungsansprüche begebe sich die Klägerin in einen unlösbaren Widerspruch zu dieser Erklärung, weil sie die Untersagung der Nutzung aufgrund der Bereitschaftserklärung unmittelbar wieder durch Einräumung eines Nutzungsrechts herausgeben müsse.

CONFIDENTIAL

MOTM_WASH1823_0602197

– 23 –

Schließlich könne die Klägerin das ihr von der Konzernmutter der Beklagten am 23.12.2011 unterbreitete Lizenzvertragsangebot nicht ablehnen, ohne sich kartell-rechtswidrig zu verhalten. Dieses Angebot erfülle sämtliche Anforderungen an ein FRAND-Lizenzangebot nach Maßgabe der *Orange Book Standard* - Entscheidung des Bundesgerichtshofs. Das Lizenzangebot enthalte branchenübliche Vertragsbedingungen und sowohl Lizenzsatz als auch Lizenzbasis entsprächen fairen, nicht behindernden und nicht diskriminierenden Bedingungen. Die angebotene Lizenzgebühr übersteige die von der Beklagten als marktüblich ermittelten Lizenzraten bei weitem und damit das, was als FRAND-Lizenzgebühr anzusehen sei. Dies ergebe sich unter anderem aus einem von ihr eingeholten Privatgutachten (Anlage FBD-22). Die gebührenfreie Kreuzlizenz, die sie für die standardessentiellen Patente der Parteien angeboten habe, sei angesichts der Größe des Portfolios der Konzernmutter der Beklagten und deren Tochterunternehmen an standardessentiellen Patenten vorteilhaft für die Klägerin.

Eine Stücklizenzgebühr sei in diesem Technologiebereich auch üblich. Dagegen führe eine wertbasierte Lizenzrate zu keinem angemessenen Ergebnis, weil der Wert des Endprodukts unabhängig von der stets gleichen Funktionalität des standardkompatiblen Dekoders stark schwanken könne.

Der angebotene Stücklizenzsatz überschreite die marktüblichen Lizenzraten erheblich und liege damit deutlich oberhalb dessen, was die Klägerin eigentlich verlangen könne. Zur Ermittlung einer angemessenen und marktüblichen Lizenz habe die Beklagte richtigerweise Lizenzraten von Patentpools oder Lizenzprogrammen, die ebenfalls die H.264-Technologie oder ähnliche Technologien beträfen, herangezogen.

Schließlich habe die Beklagte auch sämtliche nach der *Orange Book Standard* - Entscheidung erforderlichen Erfüllungshandlungen vorgenommen.

Weiterhin ist die Beklagte der Ansicht, im Falle einer Genehmigung der Übernahme der Muttergesellschaft der Klägerin durch Google Inc. stehe ihr eine *dolo-petit*-Einrede (§ 242 BGB) gegen die geltend gemachten Ansprüche zu, weil Google Inc. nach dem MPEG LA Lizenzvertrag verpflichtet sei, der Muttergesellschaft der Beklagten und der Beklagten die der Google Inc. zustehenden H.264-essentiellen Patente zu lizensieren.

CONFIDENTIAL

MOTM_WASH1823_0602198

Vor diesem Hintergrund sei das Verfahren, wie hilfsweise beantragt, bis zur Entscheidung der Kartellbehörden über die Zulässigkeit der Übernahme auszusetzen.

Schließlich ist die Beklagte der Auffassung, dem Klagepatent fehle es an der Rechtsbeständigkeit; sie hat allerdings im Zusammenhang mit ihrem *Orange-Book-Standard -* Angebot das Ruhen des Nichtigkeitsverfahrens beantragt.

Im Falle einer Verurteilung sei der Beklagten jedenfalls eine angemessene Aufbrauchfrist einzuräumen, weil die sofortige uneingeschränkte Durchsetzung des Unterlassungsanspruchs für die Beklagten und ihre Kunden mit unverhältnismäßigen Nachteilen verbunden sei und der Klägerin insoweit eine gewisse Einschränkung zumutbar sei. Der Beklagten sei es angesichts der Komplexität und der weltweiten Verwendung der angegriffenen Ausführungsformen nicht möglich, durch Umstellung ihrer Produkte unmittelbar auf ein etwaiges Unterlassungsurteil zu reagieren. Ein sofort wirksamer Unterlassungsanspruch könne gravierende Folgen nicht nur für die Beklagte selbst, sondern auch für ihre Abnehmer und die Benutzer der angegriffenen Produkte haben. Im Übrigen hätten die angeblich patentverletzenden Dekoder nur einen geringen Anteil an den Funktionen der angegriffenen Ausführungsformen. Im Hinblick auf den baldigen Ablauf des Klagepatents sei eine Aufbrauchfrist erst recht gerechtfertigt.

Unabhängig von einer durch die Klägerin zu erbringenden Sicherheitsleistung würde  die vorläufige Vollstreckung eines antragsgemäßen Urteils der Beklagten einen nicht zu ersetzenden Nachteil bringen, welchem kein überwiegendes Interesse der Klägerin an der vorläufigen Vollstreckbarkeit entgegenstehe, weshalb der Beklagten im Falle des Unterliegens Vollstreckungsschutz nach § 712 Abs. 1 S. 1 ZPO ohne Rücksicht auf die Sicherheitsleistung der Klägerin zu gewähren sei. Die Entfernung des H.264-Dekoders von ihren Produkten stelle die Beklagte und ihre Kunden wegen der Interoperabilität des H.264-Dekoders mit anderen Funktionalitäten des Produkts und anderer Produkte vor logistische Herausforderungen. Neben gravierenden finanziellen Einbußen drohten der Beklagten im Falle einer vorläufigen Vollstreckung der Verlust von Marktanteilen und eine irreparabie Beschädigung des Images und der Marke der Beklagten. Unzählige weitere Produkte, die auf den angegriffenen Ausführungsformen basierten, wären von einer Einstellung des Vertriebs der letztgenannten betroffen, obwohl sie das Klagepatent gar nicht verwendeten. Der Klägerin, die kein direkter Wettbewerber der Beklagten sei,

CONFIDENTIAL

MOTM_WASH1823_0602199

– 25 –

drohten demgegenüber durch eine Aussetzung der vorläufigen Vollstreckbarkeit lediglich finanzielle und einfach zu beziffernde Einbußen.

Wegen des weiteren Sach- und Streitstandes wird auf den Inhalt der Schriftsätze nebst Anlagen und das Sitzungsprotokoll Bezug genommen.

Das Verfahren betreffend die von der Klägerin ebenfalls geltend gemachte Verletzung des europäischen Patents EP 0 615 384 B1 wurde mit Beschluss vom 17.10.2011 abgetrennt und wird nunmehr unter dem Aktenzeichen 2 O 373/10 geführt.

CONFIDENTIAL

MOTM_WASH1823_0602200

~ 26 ~

# Entscheidungsgründe

Die zulässige Klage ist ganz überwiegend begründet.

Die angegriffenen Ausführungsformen machen von Anspruch 19 des Klagepatents Gebrauch (A.). Die Beklagte ist zur Nutzung des Klagepatents nicht berechtigt (B.), und die Klägerin ist an der Durchsetzung ihres Unterlassungsanspruchs auch nicht aus kartellrechtlichen Gründen gehindert (C.), weshalb der Klägerin die geltend gemachten Ansprüche ganz überwiegend zustehen (D.). Eine Aussetzung des Rechtsstreits ist nicht angezeigt (E.)

### A.

Die Beklagte verletzt das Klagepatent gemäß Art. 64 Abs. 1 EPÜ i.V.m. § 9 S. 2 Nr. 1 und § 10 Abs. 1 PatG, weil die angegriffenen Ausführungsformen von Anspruch 19 des Klagepatents unmittelbar (Xbox 360) und mittelbar (Windows 7, Windows Internet Explorer 9, Windows Media Player 12) wortsinngemäßen Gebrauch machen.

### I.

Das Klagepatent bezieht sich auf die Kompression von digitalen Videosignalen.

1.  Da bei digitaler Bildübertragung sehr hohe Datenvolumen anfielen, wenn jedes Einzelbild einer Videosequenz einzeln vollständig übertragen würde, werden Videodaten in der Regel aus einer Kombination verschiedener Techniken kodiert, um die Bilddaten möglichst effizient zu komprimieren. Im Stand der Technik waren Videokompressionstechniken bereits bekannt, die sich die räumliche Korrelation zwischen aneinander liegenden Pixeln in einem Einzelbild („Frame") zunutze machen (Intra-Frame Kodierung), ebenso Kompressionssysteme, die Ähnlichkeiten zwischen zeitlich aneinander liegenden Frames nutzen, um die Daten noch mehr zu verdichten. Bei der letzteren, so genannten Inter-Frame-Kodierung war die Differenzkodierung bekannt, bei der nur der Unterschied zwischen einem gegenwärtigen Frame und der Prädiktion des gegenwärtigen Frames übertragen wird. Darüber hinaus waren auch Inter-Frame-Videokompressionssysteme, die

CONFIDENTIAL

MOTM_WASH1823_0602201

Bewegungskompensation verwenden, im Stand der Technik bereits bekannt. Bei der Bewegungskompensation genügt die Übertragung eines Bewegungsvektors, der die Verschiebung eines unveränderten Bildbereichs gegenüber dem Referenzbild beschreibt. Das Klagepatent nennt beispielhaft die Veröffentlichung von Ninomiya und Ohtsuka „A Motion-Compensated Interframe Coding System for Television Pictures", IEEE Transactions on Communications, Band COM-30, Nr. 1, Januar 1982. Danach wird ein Bewegungsvektor für jeden Block (Bildausschnitt) im gegenwärtigen Frame bestimmt, indem ein Block im vorhergehenden Frame identifiziert wird, der dem bestimmten Block am meisten ähnelt. Der gesamte Frame kann dann an einem Dekodierer rekonstruiert werden, indem der Unterschied zwischen den sich entsprechenden Blockpaaren, zusammen mit den Bewegungsvektoren, die erforderlich sind, um die sich entsprechenden Paare zu identifizieren, übermittelt wird [0007].

Wenn die Bewegungskompensation gut funktioniert, kann das Differenzbild - in Blöcke unterteilt - effizienter kodiert werden als die ursprünglichen Bildblöcke. Das kodierte Differenzbild und die Informationen zu den (kodierten) Bewegungsvektoren werden dann zusammen an die Dekodier-Vorrichtung übertragen.

Die Leistung der Bewegungsschätzung hängt davon ab, wie gut die Bewegung zwischen Teilen von Bildern als einfache Übersetzung nachgebildet werden kann. So können Zoom, Rotation oder andere komplexe Verdrehungen großer Bildbereiche häufig nicht als einfache Übersetzung nachgebildet werden. Die Effizienz blockbasierter Bewegungsschätzalgorithmen kann daher von der Größe des Blocks, der verwendet wird, um den gegenwärtigen Frame an den vorhergehenden Frame anzupassen, abhängen. Eine große Blockgröße wird in Bereichen, in denen das Bild unbewegt ist oder einheitlich übersetzt wird, gut funktionieren, da weniger Overhead-Daten erforderlich sind, um die mit jedem der Bildblöcke verknüpften Daten zu übertragen. In anderen Fällen, in denen komplexe Bewegungen von einem Frame zum anderen erfolgen, kann eine kleinere Blockgröße bessere Leistungen erzielen [0030]. Vor diesem Hintergrund hat die statische Entscheidung für eine bestimmte Blockgröße den Nachteil von Effizienzverlusten.

CONFIDENTIAL

MOTM_WASH1823_0602202

Um dieses Problem anzugehen, war im Stand der Technik aus Puri et al., „Inter-frame coding with variable block-size motion compensation", November 1987, ein Verfahren zur Bewegungskompensation mit variablen Blockgrößen bekannt, bei dem neben einer Block-basierten Bewegungskompensation auch alternativ eine Sub-Block-basierte Bewegungskompensation genutzt wird, wobei die beiden Bewegungskompensationsverfahren in einer Kaskade eingesetzt wurden, d.h. es war keine Bewegungskompensation an denselben Videodaten mit verschiedenen Blockgrößen vorgesehen [0010, 0011]. Letzteres war zwar aus der PCT-Anmeldung WO 91/13514 A1 bekannt, jedoch nur bei der Intra-Kodierung und nicht bei der Inter-Kodierung [0012].

2.  Auf dieser Basis stellt sich das Klagepatent die Aufgabe, die Leistung bewe-gungskompensierter Videosignalkompressionssysteme zu verbessern, indem es ein Kompressionssystem bereitstellt, das eine adaptive Bewegungskompensation verwendet.

Zur Lösung dieser Aufgabenstellung schlägt das Klagepatent auf der Kodierseite den adaptiven Einsatz von Bewegungskompensatoren verschiedener Blockgrö-ßen vor. Da je nach Videosequenz bei Verwendung verschiedener Blockgrößen im Hinblick auf den jeweiligen Bildausschnitt unterschiedliche Datenmengen an-fallen können, wird auf der Kodierseite eine von der Datenmenge abhängige Ent-scheidung für die letztlich für die Kompression und Übertragung einzusetzende Blockgröße im Hinblick auf den jeweiligen Bildbereich getroffen (Anspruch 1).

Auf der Empfängerseite schlägt das Klagepatent in Anspruch 19 eine Dekodiervorrichtung vor, deren Merkmale sich wie folgt gliedern lassen, wobei die Kammer die von der Klägerin als Anlage KP1-K3 vorgelegte Merkmalsgliederung zugrunde legt. Die seitens der Beklagten als Anlage FBD 2 vorgelegte Merkmals-gliederung weicht von dieser Merkmalsgliederung an wenigen Stellen ab. Soweit relevant, wird hierauf bei der Subsumption der einzelnen Merkmale (vgl. unten Ziff. II.) näher eingegangen.

CONFIDENTIAL

MOTM_WASH1823_0602203

*Dekodiervorrichtung*

1. *zum Empfang der Blöcke an kodierten Videodaten, bereitgestellt von den unterschiedlichen Bewegungskompensatoren einer Vorrichtung zur adaptiven Kompression digitaler Videosignale zur Übertragung*

2. *wobei ein Mittel zum Auffinden eines Codewortes aus jedem empfangenen Datenblock, das den Bewegungskompensator, von dem der Block empfangen wurde, repräsentiert, bereitgestellt ist,*

3. *wobei ein Mittel, das auf das Codewort reagiert, bereitgestellt ist, um einen Bewegungsvektor für jeden Block von den Bewegungsvektordaten, die mit dem Block empfangen wurden, wiederherzustellen, und*

4. *ein Mittel, das auf diesen Bewegungsvektor reagiert, bereitgestellt ist, um gegenwärtige Videobilddaten von Daten, die von einem gegenwärtigen Datenblock und mindestens einem vorherigen Datenblock bereitgestellt sind, wiederherzustellen.*

## II.

Die angegriffenen Ausführungsformen machen von der Lehre des Anspruchs 19 des Klagepatents wortsinngemäß Gebrauch.

Die erforderliche Auslegung des Klagepatents nach dem Verständnis des Durchschnittsfachmanns hat sich auf den Anspruchswortlaut zu fokussieren (Art. 69 Abs. 1 S.1 EPÜ, § 14 Abs. 1 S. 1 PatG; BGH GRUR 2004, 1023 ff. - *bodenseitige Vereinzelungsvorrichtung*), der Inhalt der Beschreibung und der Zeichnungen ist zur Auslegung ergänzend heranzuziehen (Art. 69 Abs. 1 S. 2 EPÜ, § 14 Abs. 1 S. 2 PatG). Soweit die Beschreibung zur Auslegung der Patentschrift herangezogen wird, ist der technische Sinn der in der Patentschrift verwendeten Worte und Begriffe entscheidend und nicht deren rein philologischer oder logisch-wissenschaftlicher Bedeutungsgehalt (BGHZ 150, 149, 156 - *Schneidmesser I*, BGH GRUR 1999, 909 - *Spannschraube*).

CONFIDENTIAL

MOTM_WASH1823_0602204

Bei einer an diesen Grundsätzen orientierten Auslegung des Anspruchs 19 machen die angegriffenen Ausführungsformen von dessen sämtlichen Merkmalen Gebrauch.

Nachdem die angegriffenen Ausführungsformen unstreitig den H.264-Standard unterstützen, ist der mittelbare Nachweis der Verletzung des Klagepatents durch Zugrundelegung der Eigenheiten des Standards zulässig. Eine Gegenüberstellung der einschlägigen Vorschriften des Standards mit dem Klagepatent zeigt, dass eine standardgemäße Dekodiervorrichtung sämtliche Merkmale des Anspruchs 19 verwirklicht.

1.  Im Standard sind Dekodiervorrichtungen vorgesehen „zum Empfang der Blöcke an kodierten Videodaten, bereitgestellt von den unterschiedlichen Bewegungskompensatoren einer Vorrichtung zur adaptiven Kompression digitaler Videosignale zur Übertragung" (Merkmal 1). Der Standard setzt eine Kodierung und Dekodierung im Wege der Bewegungskompensation unter Verwendung unterschiedlicher Bewegungskompensatoren, die verschiedene Blockgrößen verwenden, voraus (Abschnitte 8.4.1.2.3 und 6.4.2).

    Soweit die Beklagte unter anderem in ihrer Kritik an der oben wiedergegebenen Merkmalsgliederung darauf hinweist, dass Anspruch 19 ausdrücklich auf „die Datenblöcke an kodierten Videodaten bereitgestellt von den unterschiedlichen Bewegungskompensatoren der Vorrichtung aus Anspruch 1" abstellt („*the blocks of encoded video data, provided by said different motion compensators of the apparatus of claim 1*", Unterstr. d.d. Kammer), ist dies zwar zutreffend, jedoch ohne Auswirkung auf das Ergebnis der Auslegung des Patentanspruchs und der Subsumption eines standardgemäßen Dekoders unter den Anspruch. Es handelt sich insoweit um eine Angabe des Zwecks der patentgemäßen Dekodiervorrichtung („*for receiving the blocks…*" / „zum Empfang der Datenblöcke…"). Diese Angabe definiert die geschützte Dekodiervorrichtung näher dahin, dass sie nicht nur die räumlich-körperlichen Merkmale erfüllen muss, die der Patentanspruch explizit formuliert, sondern darüber hinaus so ausgebildet sein muss, dass sie die im Patentanspruch erwähnte Funktion erfüllen kann (vgl. BGH, GRUR 2009, 837 - *Bauschalungsstütze*).

CONFIDENTIAL

MOTM_WASH1823_0602205

Standardgemäße Dekoder sind unstreitig in der Lage, Datenblöcke an kodierten Videodaten zu empfangen, die von den unterschiedlichen Bewegungskompensatoren einer Vorrichtung aus Klagepatentanspruch 1 (einer Vorrichtung zur adaptiven Kompression digitaler Videosignale zur Übertragung) bereitgestellt sind, d.h. die aufgrund einer in Anspruch 1 gelehrten Vorrichtung in dem dort beschriebenen Verfahren ausgewählt worden sind. Aus der hier maßgeblichen Sicht des standardgemäßen Dekoders ist es nämlich nicht entscheidend, auf welche Art und Weise die Datenblöcke an kodierten Videodaten enkoderseitig ausgewählt worden sind (z.B. aufgrund einer Schätzung der Kodierungskosten, einer sog. Rate-Distortion Optimierung oder einer Berechnung der tatsächlichen Menge der komprimierten Daten). Maßgeblich ist, dass die standardgemäße Dekodiervorrichtung jedenfalls über Mittel verfügt, Datenblöcke zu empfangen, die von den unterschiedlichen Bewegungskompensatoren der Vorrichtung aus Anspruch 1 bereitgestellt sind. An diesem Befund ändert sich nichts, sollten standardgemäße Enkoder ihre Bewegungskompensatoren-Auswahl tatsächlich auf eine Anspruch 1 nicht verwirklichende Art und Weise treffen.

Entgegen der Ansicht der Beklagten setzt Anspruch 19 auch kein System aus Enkoder (gemäß Anspruch 1) und Dekoder voraus mit der Folge, dass die in Anspruch 1 gelehrten Mittel auf Seiten des Enkoders (und die Art und Weise seiner Kodierentscheidungen) ebenfalls Teil des Anspruchs 19 wären. Anspruch 19 ist schon nach seinem Wortlaut kein Systemanspruch, sondern ein (Dekodier-) Vorrichtungsanspruch. Der Bezug in Anspruch 19 auf Anspruch 1 erschöpft sich in der Zweckangabe, wonach die Dekodiervorrichtung geeignet sein muss, Blöcke kodierter Videodaten, die von den unterschiedlichen Bewegungskompensatoren der Vorrichtung nach Anspruch 1 bereitgestellt sind, zu empfangen. Gegen die Auffassung der Beklagten spricht überdies, dass das Klagepatent in seinem nicht streitgegenständlichen Anspruch 11 und den auf diesen rückbezogenen Unteransprüchen 12-18 einen die Empfängerseite einbeziehenden Systemanspruch ausdrücklich lehrt.

2.  Ein standardgemäßer Dekoder verfügt auch über „ein Mittel zum Auffinden eines Codewortes aus jedem empfangenen Datenblock, das den Bewegungskompensator, von dem der Block empfangen wurde, repräsentiert" (Merkmal 2). Gemäß

CONFIDENTIAL

MOTM_WASH1823_0602206

dem Standard werden in den gesendeten Datenstrom Informationsbits eingefügt, die den verwendeten Bewegungskompensator identifizieren. Diese Kennungen werden zum einen auf Macroblock-Ebene vergeben (sog. mb_type), zum anderen auf der Sub-Macroblock-Ebene (sog. sub_mb_type). In dem Syntaxelement mb_type werden Informationen über den Typ des Bewegungskompensators (z.B. intra Macroblock-Typ (I), predictive Macroblock-Typ (P) oder bi-predictive Macroblock-Typ (B), vgl. Anlage KP1-K4, Tab. 7-10 (S. 97)) und die Größe des verwendeten Blocks (Partitionierungen in einen 16x16 Block, zwei 16x8 Blöcke, zwei 8x16 Blöcke oder vier 8x8 Sub-Macroblöcke) aufgenommen (Anlage KP1-K4, Abschnitt 7.4.5, Tab. 7-13, 7-14). Wenn ein P-Type Macroblock vier 8x8 Partitionen hat, wird zusätzlich zum mb_type Syntaxelement für jeden der vier 8x8 Sub-Macroblöcke ein sub_mb_type Syntax-Element kodiert, das Informationen zu der Partition der 8x8 Sub-Macroblöcke enthält (nämlich je Sub-Macroblock eine 8x8 Partition, zwei 4x8 Partitionen, zwei 8x4 Partitionen oder vier 4x4 Partitionen, vgl. Anlage KP1-K4, Abschnitt 7.4.5.2). Nachfolgend eingelichtete Figur 6-9 des Standards (dort S. 26) zeigt die unterschiedlichen Partitionierungen von Macroblöcken und Sub-Macroblöcken.



Figure 6-9 – Macroblock partitions, sub-macroblock partitions, macroblock partition scans, and sub-macroblock partition scans

Die Beklagten vertreten insoweit die Ansicht, die zwei Kennungen mb_type und sub_mb_type seien nicht „ein Codewort" aus jedem empfangenen Datenblock im Sinne des Merkmals 2, weil das sub_mb_type Syntaxelement neben dem mb_type Syntaxelement ein weiteres, zweites Codewort sei.

CONFIDENTIAL

MOTM_WASH1823_0602207

Zunächst ist festzustellen, dass in der englischen Verfahrenssprache von *„a code word representative of the motion compensator from which the block is received"* die Rede ist, in der deutschen Übersetzung ein Codewort also im Sinne eines unbestimmten Artikels und nicht als Zahlwort zu verstehen ist.

Zum anderen spielt die Partitionierung auf Sub-Macroblock-Ebene - also auch die „zweite" Kennung sub_mb_type - nur bei einer 8x8-Partitionierung der Macroblock-Ebene eine Rolle. Das heißt, selbst nach der engen Lesart der Beklagten (ein [1] Codewort, das nicht aus zwei Kennungen bestehen darf) gibt es im Standard Macroblock-Partitionen (16x16, 16x8, 8x16) mit einer einheitlichen Verwendung von Bewegungskompensatoren, die durch (nur) ein Codewort - das mb_type Syntaxelement - repräsentiert werden. Da die standardgemäße . Dekodiervorrichtung jedenfalls über Mittel zum Auffinden dieses („einen") Codeworts verfügt, verwirklicht sie auch Merkmal 2 des Anspruchs 19.

Dem steht auch nicht entgegen, dass das Mittel gemäß Merkmal 2 zum Auffinden eines Codewortes aus jedem empfangenen Datenblock bereitgestellt sein soll. Erforderlich, aber auch ausreichend ist, dass die Dekodiervorrichtung *geeignet* sein muss, aus jedem empfangenen Datenblock ein Codewort aufzufinden. Diese Eignung wird nicht dadurch in Frage gestellt, dass empfangene Datenblöcke eventuell gar kein Codewort oder mehr als ein Codewort enthalten. Bereits die Tatsache, dass die standardgemäßen Dekodiervorrichtungen ein Codewort, nämlich den mb_type, auffinden können, der jedenfalls im Falle einer Macroblock-Partitionierung von 16x16, 16x8 oder 8x16 den Bewegungskompensator, von dem der Block empfangen wurde, repräsentiert, zeigt die Verwirklichung der in Merkmal 2 beschriebenen Zweckbestimmung durch das in der standardgemäßen Dekodiervorrichtung bereit gestellte Mittel.

Die Beklagten weisen weiter darauf hin, dass die Daten, die ein H.264-kompatibler Dekoder empfängt, auch eine Mischstruktur aufweisen könnten, d.h. jeder der vier Sub-Macroblöcke eines Macroblocks könne durch einen entsprechenden Bewegungskompensator in eine 8x8 Partition, zwei 8x4 Partitionen, zwei 4x8 Partitionen oder vier 4x4 Partitionen unterteilt sein. Insoweit ist der Be-

CONFIDENTIAL

MOTM_WASH1823_0602208

klagten zuzugeben, dass in diesen Fällen das Vorliegen eines Codeworts gemäß Anspruch 19 fraglich sein könnte, das einen einzigen Bewegungskompensator (der die gleiche Blockgröße verwendet) für einen ganzen Datenblock repräsentiert. Auf die sich in diesem Zusammenhang stellende Frage, ob aber nicht auch der Sub-Macroblock im Standard ein Datenblock im Sinne des Merkmals 2 des Klagepatents ist mit der Folge, dass die Kennung sub_mb_type stets den (einen) Bewegungskompensator des empfangenen (Sub-Macro-)Datenblocks repräsentiert, kommt es nach Ansicht der Kammer dennoch nicht an. Auch für die aus einer möglichen Mischstruktur resultierenden Besonderheiten gilt, dass diese lediglich bei einer 8x8 Macroblock-Partition auftreten (und auch dort nur bei unterschiedlicher Unter-Partitionierung). Dies ist Ausfluss der Definitionen der Syntax-Elemente im H.264-Standard, die die Möglichkeit - nicht aber den Zwang - umfassen, mehrere Informationselemente in den kodierten Daten zu verwenden (mb_type und sub_mb_type). Damit gilt wiederum, dass standardgemäße Dekodiervorrichtungen in der Lage sind, aus jedem empfangenen Datenblock ein Codewort, das den Bewegungskompensator, von dem der Datenblock empfangen wurde, repräsentiert, aufzufinden, sofern der Datenblock über ein (1) solches Codewort verfügt, was jedenfalls bei einer 16x16, 16x8 und 8x16 Partitionierung des Macroblocks der Fall ist.

3. Eine standardgemäße Dekodiervorrichtung verwirklicht auch Merkmal 3 des Anspruchs 19, welches ein Mittel fordert, das auf das Codewort reagiert, um einen Bewegungsvektor für jeden Block von den Bewegungsvektordaten, die mit dem Block empfangen wurden, wiederherzustellen. Der Standard normiert in Abschnitt 7.4.5 die Vorhersage des aktuellen Blocks in Abhängigkeit von der verwendeten Blockgröße des Bewegungskompensators. Abschnitt 8.4 normiert, wie unter anderem in Abhängigkeit von dem Wert mb_type die Bewegungsvektordaten rekonstruiert werden und wie für jeden Block ein Bewegungsvektor ermittelt wird. Ausgehend von der unter Ziff. 2 näher erläuterten Annahme, dass die standardgemäße Dekodiervorrichtung jedenfalls für die Macroblock-Partitionen 16x16, 16x8 und 8x16 in der Lage ist, ein Codewort, das den Bewegungskompensator, von dem der Block empfangen worden ist, repräsentiert (scil: mb_type), aufzufinden, verfügt die standardgemäße Dekodiervorrichtung auch über ein Mittel, das auf

CONFIDENTIAL

MOTM_WASH1823_0602209

das (aufgefundene) Codewort mb_type reagiert, um einen Bewegungsvektor von den empfangenen Bewegungsvektordaten wiederherzustellen.

4.  Schließlich machen standardgemäße Dekodiervorrichtungen auch von <u>Merkmal 4</u> des Anspruchs 19 Gebrauch. In einer standardgemäßen Dekodiervorrichtung ist ein Mittel bereitgestellt, um gegenwärtige Videobilddaten von Daten, die von einem gegenwärtigen Datenblock und mindestens einem vorherigen Datenblock bereitgestellt sind, wiederherzustellen. Abschnitt 8.4 (S. 151) des Standards (Anlage KP1-K4) definiert, wie aus den Bewegungsvektoren und weiteren Datenreihen die Samples der Inter-Vorhersage rekonstruiert werden. Anschließend werden aus den Sample-Datenreihen der Inter-Vorhersage die Videobilddaten rekonstruiert (Anlage KP1-K4, Abschnitt 8.5, S. 174 f.). Soweit die Beklagte Merkmal 4 deshalb für nicht verwirklicht hält, weil es ein einheitliches Codewort für einen Datenblock voraussetze, was im Standard nicht der Fall sei, kann auf die diesbezüglichen Ausführungen zu Merkmal 2 verwiesen werden.

5.  Nach alledem verwirklicht die standardgemäße Ausführung der Dekodierung alle Merkmale des Anspruchs 19 des Klagepatents. Die angegriffene Ausführungsform Xbox 360 verletzt das Klagepatent daher unmittelbar.

6.  Die angegriffenen Ausführungsformen Windows 7, Windows Internet Explorer 9 sowie Windows Media Player 12 verletzen das Klagepatent mittelbar.

Eine mittelbare Patentverletzung setzt nach § 10 Abs. 1 PatG voraus, dass der Verletzer ohne Zustimmung des Patentinhabers im Geltungsbereich des Patentgesetzes anderen als zur Benutzung der patentierten Erfindung berechtigten Personen Mittel, die sich auf ein wesentliches Element der Erfindung beziehen, zur Benutzung der Erfindung im Geltungsbereich dieses Gesetzes anbietet oder liefert, wobei er weiß oder es auf Grund der Umstände offensichtlich ist, dass diese Mittel dazu geeignet und bestimmt sind, für die Benutzung der Erfindung verwendet zu werden.

Die angegriffenen Ausführungsformen Windows 7, Windows Internet Explorer 9 sowie Windows Media Player 12 sind jeweils Mittel, die sich auf ein wesentliches

CONFIDENTIAL

MOTM_WASH1823_0602210

Element der Erfindung beziehen, und wurden zur Benutzung einer patentgemä-
ßen Vorrichtung in der Bundesrepublik angeboten und ausgeliefert. Sie werden
nämlich bestimmungsgemäß auf Computern (z.B. PC, Laptop) installiert, wodurch
der jeweilige Computer zu einer den Anspruch 19 wortsinngemäß verwirklichen-
den Vorrichtung wird. Dabei stellen Windows 7 und Windows Internet Explorer 9
mit dem H.264 Codec das wesentliche Element der Erfindung selbst zur Verfü-
gung; Windows Media Player 12 stellt ein Mittel dar, das sich auf ein wesentliches
Element der Erfindung, nämlich den Codec von Windows 7, bezieht.

Der erfindungsgemäße Gebrauch der auf dem Computer installierten Programme
ist gerade deren bestimmungsgemäßer Einsatz. Die Beklagte selbst stellt die
Programme her und liefert sie an ihre Kunden zur Installation, so dass ohne wei-
teres davon ausgegangen werden kann, dass die Beklagte wusste, dass die von
ihr angebotenen Mittel dazu geeignet und bestimmt sind, für die Benutzung der
Erfindung verwendet zu werden.

**B.**

Die Beklagte kann sich nicht auf ein Nutzungsrecht am Klagepatent berufen.

**I.**

Zwischen den Parteien ist unstreitig kein Lizenzvertrag abgeschlossen worden.

**II.**

Der Beklagten steht auch aufgrund der Lizenzbereitschaftserklärungen (*„Patent State-
ment and Licencing Declaration Form"*, Anlagenkonvolut FBD-8) der Klägerin und deren
Konzernmutter       gegenüber       der       Standardsetzungsorganisation       International
Telecommunication Union (ITU) kein Nutzungsrecht am Klagepatent zu.

Entgegen der Auffassung der Beklagten stellt weder die allgemeine ITU-
Lizenzbereitschaftserklärung der Klägerin vom Dezember 2002 noch die spezifische
ITU-Lizenzbereitschaftserklärung der Motorola Inc., Vorgängerin der Muttergesellschaft

CONFIDENTIAL

MOTM_WASH1823_0602211

der Klägerin, für das Klagepatent vom 08.10.2007 einen Vertrag zugunsten Dritter (hier: der Beklagten) oder einen Verbotsverzicht dar.

Die Beurteilung einer etwaigen Nutzungsberechtigung aus der Lizenzbereitschaftserklärung gegenüber der ITU unterliegt deutschem Sachrecht. Die Frage, nach welcher Rechtsordnung die Einräumung eines Nutzungsrechts an einem Immaterialgüterrecht zu beurteilen ist, ist nach dem Schutzlandstatut zu beantworten (vgl. LG Mannheim, InstGE 13, 65 - *UMTS-fähiges Mobiltelefon II*, Rz. 161 m.w.N., zit. n. juris; Kühnen, Hdb. Patentverletzung, 5. Aufl., Rn. 1298).

Unter Zugrundelegung der aus Sicht der Kammer zutreffenden Einordnung der einfachen Lizenz als dinglichem Recht (OLG Karlsruhe, GRUR Int 1987, 788 ff. *Offenendspinnmaschine*; ausführlich LG Mannheim a.a.O., Rz. 166, m.w.N.; BGH, GRUR 2009, 946, Rz. 20, zit. n. juris - *Reifen Progressiv* (zum Urheberrecht); a.A. (nur schuldrechtlicher Anspruch:) BGHZ 83, 251 - *Verankerungsteil*; a.A. (verdinglichte Obligation): McGuire, Die Lizenz, zugl. Habil. Osnabrück 2009) käme eine Nutzungsberechtigung der Beklagten allenfalls dann in Betracht, wenn man in der Abgabe der Lizenzbereitschaftserklärung gegenüber der Standardsetzungsorganisation ITU und deren Entgegennahme bereits einen Vertrag zugunsten lizenzwilliger Dritter sehen würde. Einer solchen Lizenzeinräumung mit verfügendem Charakter durch einen Vertrag zugunsten Dritter steht jedoch entgegen, dass das deutsche Recht einen dinglichen Vertrag zugunsten Dritter nicht kennt. Die §§ 328 ff. BGB sind weder unmittelbar noch analog auf dingliche Verträge anwendbar (vgl. LG Mannheim, a.a.O., Rz. 167 m.w.N.).

In der Lizenzbereitschaftserklärung liegt auch kein Verzicht auf Unterlassungsansprüche mit der Folge, dass die Klägerin darauf beschränkt wäre, ein FRAND-Angebot zu unterbreiten oder entgegenzunehmen und Lizenzgebühren in FRAND-Höhe, ggf. im Wege des Schadensersatzes, einzufordern. Ein solcher Verzicht auf die Ausschließlichkeitsbefugnis aus dem Patent könnte allenfalls rein schuldrechtlichen Charakter haben, wäre aber keine auf den Bestand des Patentrechts einwirkende verfügende Handlung, die die Klägerin als Patentinhaberin unmittelbar in ihren Rechten aus dem Patent beschränkt. Letzteres wäre mit Rücksicht auf die dingliche, untrennbar mit dem Schutzrecht als solchem verbundene Natur des Unterlassungsanspruchs rechtlich gar nicht möglich (vgl. LG Mannheim, InstGE 11, 9, Rz. 99 f. - *UMTS-fähiges Mobiltelefon*, zit. n. juris; Kühnen, a.a.O., Rn. 1298).

CONFIDENTIAL

MOTM_WASH1823_0602212

Die Lizenzbereitschaftserklärung der Klägerin bzw. ihrer vormaligen Muttergesellschaft gegenüber der ITU kann allerdings auch nicht als verbindliches Lizenzangebot gegenüber einer Vielzahl, der Klägerin noch unbekannten Dritten verstanden werden, das nur noch einer Annahme eines Dritten bedarf, sondern als eine Aufforderung an Lizenzsuchende, ihrerseits ein FRAND-Angebot zu unterbreiten (vgl. auch Ziff. 2 a.E.: *„Negotiations of licences are left to the parties concerned and are performed outside the ITU-T/ISO/IEC"*). Die Lizenzbereitschaftserklärung beinhaltet damit letztlich lediglich eine deklaratorische Konkretisierung des kraft Kartellrechts ohnehin bestehenden Abschlusszwangs (vgl. Kühnen, a.a.O., Rn. 1298). Sie schafft mit der Zusage, Dritten zu FRAND-Bedingungen eine Lizenz einzuräumen, nur eine Anspruchsgrundlage, für die der Lizenzsucher ein konkretes, die Anspruchsgrundlage ausfüllendes Verlangen zu formulieren hat (OLG Karlsruhe, InstGE 12, 220 - *MP3-Standard*).

Schließlich ist auch ein Angebot auf ein schuldrechtliches *„pactum de non petendo"* („negative Lizenz") und damit der Verzicht des Patentinhabers auf das Druckmittel des Unterlassungsanspruchs zur Durchsetzung seiner patentrechtlichen Ansprüche gegenüber einer ihm unbekannten Vielzahl potentieller Patentverletzer (Ziff. 2 :*„an unrestricted number of applicants"*) fernliegend. Der seine Lizenzierungsbereitschaft erklärende Patentinhaber bietet lediglich an, die Ausschließlichkeitsrechte aus dem Patent durch Abschluss eines Lizenzvertrages  - und eben nicht bedingungslos - zu Fall bringen zu lassen (Kühnen, a.a.O., Rn. 1298).

Nach alledem kann sich die Beklagte im Hinblick auf die ITU-Lizenzbereitschaftserklärung der Klägerin weder auf eine ihr eingeräumte positive Nutzungsberechtigung noch auf einen Verbotsverzicht berufen.

III.

Der Beklagten steht auch aus dem MPEG LA Poolvertrag (vgl. Anlage FBD 12) kein Nutzungsrecht am Klagepatent zu.

Die Beurteilung der behaupteten Nutzungsrechtseinräumung in dem MPEG LA Poolvertrag richtet sich wiederum nach dem Schutzlandstatut (vgl. oben Ziff. II.). Nach dem danach anzuwendenden deutschen Sachrecht konnten Terayon und Tut Systems nicht

CONFIDENTIAL

MOTM_WASH1823_0602213

wirksam über das nicht ihnen gehörende Klagepatent verfügen. Es ist weder vorgetragen noch sonst ersichtlich, woraus sich eine entsprechende Verfügungsbefugnis der MPEG LA Pool-Lizenznehmerinnen Terayon und Tut Systems über das Klagepatent ergeben haben soll. Als Einräumung einer Lizenz an dem Klagepatent verstanden würde Art. 8.3 des MPEG LA Poolvertrages eine Verfügung zu Lasten Dritter, der Klägerin, darstellen. Als solche ist die behauptete Lizenz unwirksam.

Vor diesem Hintergrund kann dahinstehen, ob sich eine Lizenz überhaupt auf das Klagepatent und auf die Beklagte als Tochterunternehmen der Lizenzgeberin Microsoft Corporation erstrecken würde.

## C.

Die Beklagte kann sich nicht mit Erfolg mit dem Einwand verteidigen, dass die Klägerin ihr umgehend eine Lizenz für das Klagepatent zu erteilen hätte, weshalb das Unterlassungsbegehren rechtsmissbräuchlich sei. Ein *dolo-petit*-Einwand steht der Beklagten weder aufgrund ihres Lizenzvertragsangebots vom 23.12.2012 (I.), noch im Zusammenhang mit der Lizenzbereitschaftserklärung gegenüber der ITU (II.) noch aufgrund des MPEG LA Poolvertrages (III.) zu.

## I.

Die Klägerin ist nicht aus kartellrechtlichen Gründen gehindert, ihren aus der Verletzung des Klagepatents resultierenden Unterlassungsanspruch gegen die Beklagte durchzusetzen. Die Beklagte kann dem Unterlassungsanspruch keinen Anspruch auf Erteilung einer Lizenz aus § 33 Abs. 1 GWB i.V.m. Art. 102 AEUV oder §§ 19, 20 GWB entgegenhalten.

1. Die Klägerin ist Normadressatin des Art. 102 AEUV bzw. der §§ 19, 20 GWB, da nach ihrem eigenen Vorbringen jeder, der H.264-Dekodiervorrichtungen herstellt, anbietet und vertreibt, den H.264-Standard einhalten muss und damit notwendigerweise auch vom Klagepatent Gebrauch macht. Die Vergabe von Lizenzen am Klagepatent bildet damit sachlich einen eigenen Markt, den die Klägerin als einzige Anbieterin beherrscht.

CONFIDENTIAL

MOTM_WASH1823_0602214

2.  Das seitens der Muttergesellschaft der Beklagten auch mit Wirkung für die Beklagten der Klägerin unterbreitete Lizenzangebot (im Folgenden: Lizenzangebot der Beklagten) erfüllt nicht alle Voraussetzungen, die der Bundesgerichtshof in seiner Entscheidung *Orange-Book-Standard* (Urt. v. 06.05.2009, KZR 39/09, GRUR 2009, 694 ff.) aufgestellt hat.

Danach kann der aus einem Patent in Anspruch genommene Beklagte gegenüber dem Unterlassungsbegehren des klagenden Patentinhabers einwenden, dieser missbrauche eine marktbeherrschende Stellung, wenn er sich weigere, mit dem Beklagten einen Patentlizenzvertrag zu nicht diskriminierenden und nicht behindernden Bedingungen abzuschließen (BGH, a.a.O., 1. Leitsatz, zit. n. juris). Der Patentinhaber, der den Unterlassungsanspruch aus seinem Patent geltend macht, obwohl dem Beklagten ein Anspruch auf Einräumung einer Lizenz am Klagepatent zusteht, missbraucht jedoch nur dann seine marktbeherrschende Stellung und handelt nur dann treuwidrig, wenn zwei Voraussetzungen erfüllt sind: Zum einen muss der Lizenzsucher ihm ein unbedingtes Angebot auf Abschluss eines Lizenzvertrages gemacht haben, das der Patentinhaber nicht ablehnen darf, ohne den Lizenzsucher unbillig zu behindern oder gegen das Diskriminierungsverbot zu verstoßen, und sich an dieses Angebot gebunden halten. Zum anderen muss der Lizenzsucher, wenn er den Gegenstand des Patents bereits benutzt, bevor der Patentinhaber sein Angebot angenommen hat, diejenigen Verpflichtungen einhalten, die der abzuschließende Lizenzvertrag an die Benutzung des lizenzierten Gegenstandes knüpft. Dies bedeutet insbesondere, dass der Lizenzsucher die sich aus dem Vertrag ergebenden Lizenzgebühren zahlen oder die Zahlung sicherstellen muss (BGH, a.a.O., Rz. 29).

3.  Auch wenn sich die Entscheidung *Orange-Book-Standard* auf einen de-facto-Standard bezogen hatte, sind die dort aufgestellten Kriterien auf Standards, die von Standardsetzungsorganisationen (hier: ITU) in einem Standardisierungsprozess ausgearbeitet worden sind, gleichfalls anwendbar (vgl. LG Mannheim, InstGE 13, 65, Rz. 176, zit.n.juris).

CONFIDENTIAL

MOTM_WASH1823_0602215

– 41 –

4. Die Klägerin durfte das Angebot der Beklagten auf Abschluss eines Lizenzvertra-
ges ablehnen, ohne dass sie hierdurch die Beklagte unbillig behindert oder dis-
kriminiert hätte.

a. Zwar entspricht das vorliegende, unbedingte Angebot unter Berücksichti-
gung der erfolgten Ergänzungen im Wesentlichen üblichen Vertragsbedin-
gungen und weist eine hinreichende Regelungsdichte auf. Das Angebot
enthält in seiner ergänzten Fassung unter anderem insbesondere ein Kün-
digungsrecht der Patentinhaberin für den Fall künftiger Angriffe auf den
Rechtsbestand des Klagepatents (vgl. OLG Karlsruhe, 23.01.2012, S. 6),
und die Beklagte erkennt im Zusammenhang mit ihrem Angebot auch eine
Schadensersatzpflicht für Benutzungshandlungen in der Vergangenheit
dem Grunde nach an (vgl. LG Mannheim, Urt. v. 09.12.2011, 7 O 122/11).

b. Gleichwohl ist das Lizenzvertragsangebot der Beklagten kein Angebot, das
die Klägerin nicht ablehnen darf, ohne sich kartellrechtswidrig zu verhalten.
Der Patentinhaber ist nämlich nicht gehalten, ein Angebot zu Lizenzsätzen
anzunehmen, die unterhalb dessen liegen, was er ohne Verstoß gegen
Kartellrecht verlangen könnte.

Die Beklagte, die die Lizenzforderung der Klägerin (2,25 % der Umsätze)
für missbräuchlich überhöht hält, hat von der in solchen Fällen bestehen-
den Möglichkeit, die Lizenzhöhe gemäß § 315 BGB in das billige Ermes-
sen der Patentinhaberin zu stellen (BGH, a.a.O., Rz. 39), keinen Gebrauch
gemacht. Nachdem sich die Beklagte vielmehr auf eine konkrete Berech-
nungsgrundlage (Stücklizenz) und einen konkreten Lizenzsatz (2 €-Cents
bzw. 1 €-Cent pro Einheit) festgelegt hat, war zu prüfen, ob die Ablehnung
dieses Angebots durch die Klägerin mit der Begründung, die angebotenen
Lizenzgebühren seien zu niedrig, kartellrechtswidrig ist.

Nach Auffassung der Kammer kann sich diese Prüfung auf die Frage be-
schränken, ob in der Ablehnung des Angebots ein *offensichtlicher* Kartell-
rechtsverstoß liegt. Wie der BGH in der Entscheidung *Orange-Book-
Standard* deutlich gemacht hat, soll der Verletzungsprozess in vermeidba-
rem Umfang von der schwierigen und zeitaufwändigen Aufgabe entlastet
werden, die genaue Höhe einer nicht behindernden oder diskriminierenden

CONFIDENTIAL

MOTM_WASH1823_0602216

– 42 –

Lizenzgebühr festzustellen (BGH, a.a.O., Rz. 39). Im Falle eines Lizenzan-
gebots nach Maßgabe von § 315 BGB soll sich das Verletzungsgericht da-
her mit der Feststellung begnügen können, dass der Patentinhaber zur
Annahme des Lizenzvertragsangebots und zur Bestimmung nach billigem
Ermessen verpflichtet ist, wenn der Lizenzsuchende einen in jedem Fall
ausreichenden Betrag hinterlegt und auch die übrigen Voraussetzungen
des „Zwangslizenzeinwands" vorliegen (BGH, a.a.O., Rz. 40). Im Zusam-
menhang mit der Frage, ob der hinterlegte Betrag (in jedem Fall) sicher
ausreicht, soll eine summarische Prüfung des Gerichts genügen (vgl. Küh-
nen, a.a.O., Rn. 1296). Dem Lizenzsuchenden erwächst insoweit auch
kein Nachteil, da in einem nachfolgenden Prozess zur Vergütungshöhe die
Darlegungs- und Beweislast für die Angemessenheit der getroffenen Li-
zenzhöhe beim Patentinhaber liegt.

Bietet der Lizenzsucher dagegen eine konkrete, aus seiner Sicht ange-
messene Lizenzgebühr an, die der Patentinhaber als zu niedrig ablehnt,
stellt sich die Frage, welche Bedeutung der Behauptung des Lizenzsu-
chers, die angebotene Lizenzgebühr sei angemessen, zukommt und ob
ein Lizenzsucher letztlich mit jedem Angebot eine aufwändige und zeitin-
tensive Beweisaufnahme erzwingen kann, die es nach der Auffassung des
BGH im Verletzungsprozess soweit möglich gerade zu vermeiden gilt.

Da nur ein eindeutig überhöhter Preis unangemessen im Sinne des Art.
102 AEUV ist, ist die Ablehnung des Angebots durch den Patentinhaber
wegen angeblich zu niedriger Lizenzgebühren nur dann kartellrechtswidrig,
wenn der Lizenzsucher einen so hohen Lizenzbetrag anbietet, dass dem
gegenüber jegliche Änderung zugunsten des Patentinhabers unangemes-
sen wäre. Sind die Bedingungen im Angebot des Lizenzsuchers dagegen
(nur) angemessen, lassen Art. 102 AEUV, §§ 19, 20 GWB jedoch eine
Abweichung zugunsten des Patentinhabers zu, begründet die Weigerung
des Patentinhabers, eine Lizenz zu diesen Bedingungen zu gewähren,
nicht den Einwand des Rechtsmissbrauchs. Ein Kontrahierungszwang be-
steht nur zu solchen Bedingungen, die angemessen sind *und* denen ge-
genüber jegliche Änderung zugunsten des Marktbeherrschers in einer
Weise unangemessen ist, dass das Beharren auf diesen Bedingungen als

CONFIDENTIAL

MOTM_WASH1823_0602217

Missbrauch einer marktbeherrschenden Stellung anzusehen ist   (OLG Karlsruhe, 6 U 174/02, GRUR-RR 2007, 177 f., Rz. 56, zit. n. juris). Solange sich der Patentinhaber darauf berufen kann, dass es innerhalb dessen, was angemessen ist, noch Spielraum zu seinen Gunsten gibt, verhält er sich nicht kartellrechtswidrig. Dass diese „Obergrenze" des noch nicht Kartellrechtswidrigen auch für den Lizenzsucher nicht ohne weiteres feststellbar ist, belastet ihn nicht unbillig, denn ihn trifft für die Voraussetzungen des kartellrechtlichen Lizenzierungsanspruchs grundsätzlich ohnehin die Darlegungs- und Beweislast (vgl. BGH, a.a.O., Rn. 37 f.) und ihm bleibt wie gezeigt die Lösung über § 315 BGB.

Ergibt sich demnach bei summarischer Prüfung, dass die seitens des Lizenzsuchers angebotenen Lizenzgebühren jedenfalls nicht sicher ausreichend sind (so dass jede Abweichung nach oben eindeutig überhöht wäre), ist die Ablehnung durch den Patentinhaber nicht offensichtlich kartellrechtswidrig. Einer Beweisaufnahme zu der Frage, ob das Angebot (jedenfalls) angemessen ist, bedarf es damit nicht.

c.  Das Angebot der Beklagten hält einer an diesen Grundsätzen orientierten Prüfung nicht stand. Es kann nicht festgestellt werden, dass die angebotenen Lizenzgebühren in jedem Fall ausreichend wären.

Die Entscheidung *Orange-Book-Standard* hatte sich nicht mit der Frage zu befassen, nach welchen Maßstäben der (dort im Rahmen des § 315 BGB) jedenfalls ausreichende Betrag zu ermitteln ist (z.B. allgemeiner vergleichbarer Markt, Lizenzpools, Lizenzierungspraxis des Patentinhabers etc.)

Vorliegend kann dahinstehen, ob ein Patentpool für sich genommen ein überzeugender Ausgangspunkt und Vergleichsmaßstab sein kann. Insoweit bestehen aus Sicht der Kammer zumindest Bedenken. Zum einen dürfte die Interessenlage der Patentinhaber, die ihre standardessentiellen Patente in einen Pool einbringen, nicht ohne weiteres vergleichbar sein mit demjenigen Patentinhaber, der hierauf verzichtet. So dürfte es zumindest produzierenden Mitgliedern eines Patentpools nicht selten weniger auf die Erzielung von möglichst hohen Lizenzeinnahmen aus den eingebrachten Patenten ankommen als auf die Möglichkeit, die Patente der anderen

CONFIDENTIAL

MOTM_WASH1823_0602218

Poolmitglieder möglichst günstig gebrauchen zu können. Die Tauglichkeit der Lizenzsätze eines Patentpools als Vergleichsmaßstab kann auch dadurch eingeschränkt sein, dass - wie beim MPEG LA Pool - mehrere der größten Patentinhaber dem Pool nicht beigetreten sind.

Auch unter Außerachtlassung dieser grundsätzlichen Bedenken gegen die Berechnungsmethode der Beklagten kann die Kammer jedenfalls nicht feststellen, dass sich die angebotenen Lizenzgebühren mit Sicherheit in einer solchen Höhe bewegen, dass eine Abweichung nach oben zu eindeutig überhöhten Gebühren führen würde.

d. Dies gilt insbesondere vor dem Hintergrund des numerischen Herunterrechnens der für das Portfolio der Klägerin an (17) standardessentiellen Patenten ermittelten Gebühr auf die beiden Klagepatente (2/17). Damit wird im Ergebnis der lineare Abrechnungsmodus des MPEG LA Patentpools eins zu eins übertragen, obwohl die Klägerin diesem Pool gerade nicht beigetreten ist. Es macht nämlich keinen Unterschied, ob der im Pool pro Patentfamilie und Einheit gewährte Lizenzanteil von 0,082 €-Cent direkt verzehnfacht (0,82 €-Cent) und sodann auf 1,64 €-Cent verdoppelt wird (zwei Patente, um deren Lizenzierung ersucht wird) oder ob zunächst der im Pool für das Portfolio theoretisch gewährte Gesamtanteil von (0,082 €-Cent x 17 Patentfamilien=) 1,394 € verzehnfacht (13,94 €-Cent) und sodann numerisch auf die Anzahl der Klagepatente herunter gerechnet wird (1/17 bzw. 2/17 für beide Klagepatente = 0,82 €-Cent bzw. 1,64 €-Cent).

Die Kammer verkennt nicht, dass die Beklagte dem Umstand, dass ein standardessentielles Patent als Teil eines Patentpools in der Regel verhältnismäßig günstiger zu haben ist als durch eine Einzellizenz, Rechnung getragen hat, indem sie den für das klägerische Portfolio theoretisch anfallenden Pool-Lizenzanteil verzehnfacht. Es ist jedoch nicht erkennbar, dass die Beklagte damit zu einer Lizenzhöhe gelangt, bei der jede weitere Abweichung nach oben unangemessen wäre. Dagegen spricht aus Sicht der Kammer bereits, dass die so ermittelte Portfolio-Lizenz den Lizenzgebühren entspricht, die AT&T von zumindest 9 Lizenznehmern für sein in etwa vergleichbares Portfolio erhält. Dass AT&T insoweit gleich gegenüber 9 Lizenznehmern eine Lizenzgebühr durchgesetzt hätte, die nicht nur marktüb-

CONFIDENTIAL

MOTM_WASH1823_0602219

lich ist, sondern sich an der Obergrenze dessen bewegt, was gerade noch als angemessen und nicht behindernd oder diskriminierend angesehen werden kann, erscheint nicht naheliegend.

Es erscheint der Kammer auch keineswegs sicher, dass die maximale Lizenzhöhe für die beiden Klagepatente exakt bei 2/17 der für das Portfolio der Klägerin und ihrer Konzernmutter ermittelten Lizenzhöhe liegen soll. Dies würde nicht nur die zumindest fragliche Anwendung der Lizenzberechnungweise für Poollizenzanteile auf Einzellizenzgebühren voraussetzen, sondern auch die Gewissheit, dass die beiden Klagepatente für sich genommen tatsächlich nicht - ggf. auch nur wenig - wertvoller sind als die übrigen 15 Patente des Portfolios der Klägerin und ihrer Konzernmutter.

e.  Auch ein Vergleich mit dem Patentpool für eine Vorgängertechnologie zur Videokompression, dem H.262 (MPEG 2)-Standard lässt Zweifel daran aufkommen, dass sich die von der Beklagten angebotenen Lizenzsätze in einer Höhe bewegen, bei denen eine Abweichung nach oben zu eindeutig überhöhten Gebühren führen würde. Der H.262-Pool sah zunächst Lizenzgebühren von 4 US-$ pro Gerät vor (ohne Kappungsgrenze), nach Reduzierungen werden gegenwärtig noch 2 US-$ pro Stück verlangt. Diese Lizenzgebühren liegen deutlich über denjenigen des MPEG LA Patenpools (0,2 US-$ bzw. 0,1 US-$), die die Beklagte zur Grundlage ihrer Berechnungen gemacht hat, ohne dass die Kammer Anhaltspunkte dafür hätte, dass die Gebühren des H.262-Pools ihrerseits unangemessen, behindernd oder diskriminierend (gewesen) wären. Auch unter Berücksichtigung des Vortrags der Beklagten, wonach der MPEG 2 Pool im Jahre 1997 und damit zu einer Zeit gebildet worden sei, in der die mit komprimierten Daten arbeitenden Produkte relativ teuer waren und mit weniger implementierten Standards arbeiteten, weckt zumindest die auch noch gegenwärtig deutlich höhere Lizenzgebühr des MPEG 2 Pools Zweifel daran, dass die von der Beklagten für die Klagepatente angebotenen 2 €-Cents bzw. 1 €-Cent pro Stück tatsächlich die Obergrenze des Angemessenen sind.

f.  Einer näheren Auseinandersetzung mit der umstrittenen Methodik und der Validität der von der Beklagten so genannten Zitatanalyse bedarf es nicht,

CONFIDENTIAL

MOTM_WASH1823_0602220

da die Beklagte die von ihr angebotenen Lizenzsätze letztlich nicht am vermeintlichen Zitatwert orientiert hat. Insoweit hat die Beklagte auch nur den vermeintlichen Zitatwert des Portfolios (3,8 % des gesamten Zitatwertes; Gutachten Bekkers, Anlage FBD-22, S. 31), nicht aber der beiden Klagepatente genannt. Vor diesem Hintergrund ist ungeachtet des umstrittenen Werts der Zitatmethode jedenfalls nicht feststellbar, dass sich die angebotenen Lizenzsätze an der Obergrenze dessen bewegten, was für Patente mit einem entsprechenden „Zitatwert" angemessen wäre.

5.   Soweit die Beklagte in der mündlichen Verhandlung klar gestellt hat, dass ihr Angebot als ergänzende Komponente eine entgeltliche Kreuzlizenz zu den von ihr ermittelten Lizenzsätzen umfasse, führt auch dies nicht zu einer anderen Beurteilung des Angebots.

Allein aus der Tatsache, dass der Lizenzsucher für seine eigenen Patente mit einem bestimmten Lizenzsatz zufrieden wäre, kann nicht gefolgert werden, dass dieser Lizenzsatz auch für die Patente des Patentinhabers akzeptiert werden müsste.

Zum einen mag die Interessenlage hinsichtlich der jeweiligen Patente auf Lizenzsucherseite eine völlig andere sein als auf der Seite des Patentinhabers. Dies gilt insbesondere dann, wenn beide Seiten deutlich unterschiedliche Stückzahlen herstellen und/oder vertreiben. So wird derjenige, der höhere Stückzahlen verkauft, in der Regel einen niedrigen wechselseitigen Lizenzsatz präferieren und derjenige mit niedrigeren eigenen Stückzahlen einen höheren wechselseitigen Lizenzsatz. Im vorliegenden Fall zeigt sich das geringe Interesse der Klägerin an den standardessentiellen Patenten der Beklagten auch darin, dass die Klägerin in der Vergangenheit für den MPEG LA Pool, in den die Beklagte ihre eigenen standardessentiellen Patente eingebracht hat, keine Lizenz genommen hat.

Zum anderen hätte es der Lizenzsucher sonst in der Hand, den Patentinhaber über ein Kreuzlizenzangebot zu gleichen Bedingungen zu einer Lizenzierung zu zwingen, bei der sich die Lizenzhöhe gerade nicht an den nachgefragten Patenten, sondern an den eigenen Patenten des Lizenzsuchers und deren - evtl. geringem - Wert orientieren könnte. Dass eine entgeltliche Kreuzlizenz nicht per se für

CONFIDENTIAL

MOTM_WASH1823_0602221

– 47 –

beide Seiten interessengerecht sein muss, zeigen im Übrigen auch die Beklagten und ihre Konzernmutter selbst, wenn sie ihrerseits die seitens der Klägerin angebotene entgeltliche Kreuzlizenz zu deren Bedingungen (2,25 % der Umsätze) als unangemessen hoch ablehnen.

Dass der Lizenzsucher bereit ist, seine eigenen Patente im Rahmen einer entgeltlichen Kreuzlizenz zu den gleichen Gebührensätzen, die er für die von ihm nachgefragten Patente anbietet, zu lizenzieren, spricht daher nicht ohne weiteres dafür, dass die angebotenen Gebührensätze in jedem Fall so hoch sind, dass der Patentinhaber das Angebot nur unter Verstoß gegen Kartellrecht ablehnen könnte. Angesichts dessen, dass die angebotenen Lizenzsätze für sich genommen nicht offensichtlich in jedem Fall ausreichend sind (vgl. oben), könnte die zusätzliche weltweite Kreuzlizenz nur dann dazu führen, dass die Klägerin das Angebot nicht ohne Verstoß gegen Kartellrecht ablehnen könnte, wenn das Portfolio der Beklagten für die Klägerin (d.h. nicht nur objektiv, wobei auch letzteres zwischen den Parteien streitig ist) mindestens den gleichen Wert hätte wie das Portfolio der Klägerin für die Beklagte, was sich etwa an der Notwendigkeit, die Patente zu benutzen, und der Menge an hergestellten oder verkauften patentgemäßen Produkten bzw. dem dadurch generierten Umsatz bemessen ließe.

6. Soweit die Beklagte schließlich im Schriftsatz vom 02.03.2012 (Bl. 382 f., 391 f.) ihre Bereitschaft erklärt hat, der Klägerin zusätzlich zu den für die beiden in Deutschland erteilten Klagepatente angebotenen Lizenzgebühren eine weltweite, kostenlose Kreuzlizenz an ihrem Portfolio von H.264-standardessentiellen Patenten zu erteilen, gelten die vorstehenden Erwägungen zur entgeltlichen Kreuzlizenz entsprechend. Insoweit besteht kein Unterschied, ob der Lizenzsucher die jeweiligen Patente zu einem jedenfalls hinsichtlich der Patente des Patentinhabers nicht in jedem Falle ausreichenden Lizenzsatz oder gleich kostenlos wechselseitig lizenzieren will. Auch eine kostenlose Kreuzlizenz ist nicht ohne Entgelt, letzteres wird durch die Gewährung der Lizenzen an dem Lizenznehmer zustehenden Patenten gewährt und kann somit gleichfalls zu niedrig sein. Auch im Fall der kostenlosen Kreuzlizenz kann die Kammer aus den vorstehend (vgl. Ziff. 5) genannten Gründen somit nicht feststellen, dass die Klägerin das Angebot nur unter Verstoß gegen Kartellrecht ablehnen könnte.

.

CONFIDENTIAL

MOTM_WASH1823_0602222

– 48 –

Damit kommt es auf die Frage, ob das *Orange-Book-Standard* Angebot vom 23.12.2011 gemäß § 296 Abs. 1 ZPO und das erstmals in dem insoweit nicht nachgelassenen Schriftsatz vom 02.03.2012 nach Schluss der mündlichen Verhandlung unterbreitete Angebot einer zusätzlichen weltweiten kostenlosen Kreuzlizenz gemäß § 296a ZPO ohnehin präkludiert sind, nicht an.


Nach alledem verstieß die Klägerin durch die Nichtannahme des in verschiedenen Varianten unterbreiteten Lizenzvertragsangebots der Konzernmutter der Beklagten nicht gegen Kartellrecht, weshalb die Beklagte dem Unterlassungsanspruch der Klägerin nicht den *dolo-petit*-Einwand (§ 242 BGB i.V.m. Art. 102 AEUV bzw. §§ 19, 20 GWB) entgegenhalten kann.


                                          II.


Die Beklagte kann sich auch nicht mit Erfolg mit dem Einwand verteidigen, dass die Klägerin ihr aufgrund der ITU-Lizenzbereitschaftserklärung umgehend eine Lizenz für das Klagepatent zu erteilen hätte, weshalb das Unterlassungsbegehren rechtsmissbräuchlich sei (*dolo-petit*-Einwand, § 242 BGB). Für den Fall der Lizenzbereitschaftserklärung gelten die unter Ziff. I dargelegten Regeln zur Erforderlichkeit eines Lizenzangebots durch den Lizenzsucher in gleicher Weise. Könnte der Lizenzsucher Unterlassungsansprüche des Patentinhabers erfolgreich mit dem Argument abwehren, letzterer sei schließlich ohnehin verpflichtet, ihm - von sich aus - eine Lizenz einzuräumen, würde man den Patentinhaber jedem unredlichen Lizenznehmer ausliefern, für den kein Anreiz mehr zur Aufnahme von Lizenzverhandlungen bestünde (vgl. Kühnen, a.a.O., Rn. 1298). Die Lizenzbereitschaftserklärung beinhaltet letztlich nicht mehr als eine deklaratorische Konkretisierung des kraft Kartellrechts ohnehin bestehenden Abschlusszwanges, wobei sie infolge der vom Erklärenden freiwillig übernommenen Pflichten zur diskriminierungs- und missbrauchsfreien Lizenzierung von der kartellrechtlichen Prüfung suspendiert, ob der Patentinhaber über eine marktbeherrschende Stellung verfügt (vgl. Kühnen, Rn. 1298 f.).


CONFIDENTIAL

MOTM_WASH1823_0602223

– 49 –

III.

Ein begründeter *dolo-petit*-Einwand ergibt sich auch nicht aus dem MPEG LA Poolvertrag, weil eine vertragliche Verpflichtung der Klägerin, der Beklagten ein Angebot zu den in dem MPEG LA Poolvertrag umrissenen Bedingungen zu machen, nicht besteht.

Gemäß Ziff. 8.3 des Vertrages waren die Lizenznehmer Terayon und Tut Systems verpflichtet, Lizenzen für eigene standardessentielle Patente und solche ihrer *„Affiliates"* zu erteilen. *„Affiliates"* sind gemäß Ziff. 1.1 des Vertrages auch solche Unternehmen, die von einem gemeinsamen Mutterkonzern gehalten werden („...*or is under common control with Licensee"*). Zwar dürften Terayon und Tut Systems ab 2007 (bis zu ihrer Verschmelzung mit der Klägerin) von der gleichen Konzernmutter (Motorola, Inc., später Motorola Mobility, Inc.) wie die Klägerin (der Beginn deren Konzernzugehörigkeit ist nicht vorgetragen) gehalten worden sein. Aus diesem Umstand hätten sich jedoch allenfalls Pflichten der Lizenznehmerinnen Terayon und Tut Systems, nicht aber der Klägerin, die nicht Vertragspartner des MPEG LA Poolvertrages war, ergeben können. Aber auch die Verschmelzung der Klägerin mit Terayon und Tut Systems im Jahr 2011 konnte keine Lizenzpflicht der Klägerin aus dem MPEG LA Poolvertrag (im Wege der behaupteten Gesamtrechtsnachfolge) begründen: Der MPEG LA Poolvertrag war nämlich gemäß Ziff. 8.1.2 bereits durch die Übernahme der Lizenznehmer Terayon und Tut Systems durch Motorola, Inc. im Jahr 2007 beendet worden. Zwar sieht Ziff. 6.6.4 des MPEG LA Poolvertrages vor, dass die Pflicht des Lizenznehmers aus Ziff. 8.3 die Beendigung des Vertrages überdauert. Eine solche das Vertragsende überdauernde Pflicht der Lizenznehmerinnen Terayon und Tut Systems zur Lizenzierung von Patenten der Klägerin bestand jedoch zum Zeitpunkt der Vertragsbeendigung, d.h. der Übernahme von Terayon und Tut Systems durch Motorola, Inc. im Jahr 2007, nicht, weil die Klägerin damals nicht *„Affiliate"* der beiden Lizenznehmerinnen war.
Damit kann dahinstehen, ob sich eine Lizenzerteilungspflicht überhaupt auf das Klagepatent und gegenüber der Beklagten als Tochterunternehmen der Lizenzgeberin Microsoft Corporation erstrecken würde.

CONFIDENTIAL

MOTM_WASH1823_0602224

**D.**

Die Ansprüche der Klägerin wegen der damit feststehenden Verletzung des Klagepatents bestimmen sich gemäß Art. 64 EPÜ nach den Vorschriften des Patentgesetzes.

1.  Da die Beklagte den Gegenstand des Klagepatents unter Verstoß gegen § 9 Nr. 1 PatG (Xbox 360) und § 10 PatG (Windows 7, Media Player 12 und Internet Explorer 9) benutzt hat, ist sie der Klägerin zur Unterlassung verpflichtet, § 139 Abs. 1 PatG i.V.m. Art. 64 EPÜ. Die Wiederholungsgefahr ergibt sich aus den bereits geschehenen Verletzungshandlungen durch den Vertrieb der angegriffenen Ausführungsformen.

    Die Unterlassungsverpflichtung war uneingeschränkt auszusprechen, weil eine nicht patentverletzende Verwendung der Vorrichtung der angegriffenen Ausführungsformen zum Dekodieren von H.264-Videodaten nicht erkennbar ist. Die anderen Funktionen der angegriffenen Ausführungsformen sind nicht auf eine erfindungsgemäße Dekodiervorrichtung angewiesen, weshalb kein anerkennenswertes Interesse der Beklagten daran besteht, die angegriffenen Ausführungsformen weiterhin in einer die Benutzung des Klagepatents ermöglichenden Ausgestaltung anzubieten und zu vertreiben.

    Eine Aufbrauchfrist war der Beklagten nicht zu gewähren. In Anbetracht des bereits am 06.10.2012, d.h. in weniger als 6 Monaten ablaufenden Patentschutzes würde eine Aufbrauchfrist die Wirkung des Unterlassungsurteils praktisch wieder aufheben und den Unterlassungsanspruch der Klägerin entwerten. Unabhängig hiervon fehlt es an einer hinreichenden Konkretisierung der seitens der Beklagten behaupteten gravierenden Folgen einer sofort wirksamen Unterlassungsverpflichtung.

    Da die Beklagte zur Unterlassung verurteilt wird, sind ihr gemäß § 890 ZPO auf Antrag der Klägerin die gesetzlichen Folgen einer Zuwiderhandlung gegen die Unterlassungsverpflichtung anzudrohen.

CONFIDENTIAL

MOTM_WASH1823_0602225

2. Der zugesprochene Anspruch auf Auskunft und Rechnungslegung folgt aus § 140b PatG und § 242 BGB i.V.m. Art. 64 EPÜ. Soweit im Antrag der Klägerin kein Wirtschaftsprüfervorbehalt vorgesehen war, war dieser zu ergänzen (vgl. Kühnen, a.a.O., Rn. 1045 ff. m.w.N.) und die weitergehende Klage insoweit abzuweisen.

3. Der geltend gemachte Rückruf- und Entfernungsanspruch ergibt sich für die seit dem 01.09.2008 in die Vertriebswege gelangten Erzeugnisse aus § 140a Abs.3 S. 1 PatG n.F. i.V.m. Art. 64 EPÜ. Für die vor dem 01.09.2008 in die Vertriebswege gelangten Erzeugnisse besteht lediglich ein Anspruch auf Rückruf aus den Vertriebswegen in einem § 140a Abs. 3 S. 1 PatG n.F. entsprechenden Umfang, jedoch nicht auf Entfernung aus den Vertriebswegen.

Das durch (schuldhafte) patentverletzende Handlungen vor dem Inkrafttreten des Gesetzes zur Verbesserung der Durchsetzung von Rechten des geistigen Eigentums (BGBl. 2008 I, S. 1191) am 01.09.2008 bereits entstandene Schuldverhältnis unterliegt - mangels ausdrücklicher gesetzlicher Übergangsbestimmungen - hinsichtlich seines Inhalts und seiner Wirkungen allein dem Recht, das zur Zeit der Entstehung, also bis zum 01.09.2008 gegolten hat (vgl. BGH, GRUR 2009, 515, 517 - *Motorradreiniger*). Der Rückrufanspruch ergibt sich bereits nach früherem Recht - ohne dass es auf eine richtlinienkonforme Auslegung ankäme - gemäß §§ 139 Abs. 2 PatG, 249 Abs. 1 BGB als Schadensersatz im Wege der Naturalrestitution bzw. als verschuldensunabhängiger Beseitigungsanspruch nach § 1004 Abs. 1 S. 1 BGB analog (LG Mannheim, Urt. v. 13.11.2009, 7 O 92/08 - unveröffentlicht). Voraussetzung eines solchen zu § 140a Abs. 3 S. 1 PatG n.F. inhaltsgleich auf Rückruf gerichteten Gefahrbeseitigungsanspruchs nach früherem Recht ist nicht eine Verfügungsmacht des Verletzers über die zurückzurufenden Gegenstände i.S. einer rechtlichen Handhabe über die Zwischenabnehmer im Vertriebsweg (anders zum schlichten Rückruf wohl auch: BGH, GRUR 1974, 666, 669 - Reparaturversicherung, m.w.N.). Anderes gilt hinsichtlich der Entfernung aus den Vertriebswegen. Da die Entfernung aus den Vertriebswegen vom Verletzer über den Appell an eine freiwillige Herausgabe (Rückruf) hinaus den Erfolg des „endgültigen Entfernens" selbst fordert, ist nach früherem Recht grundsätzlich Voraussetzung, dass der Verletzer Verfügungs-

CONFIDENTIAL

MOTM_WASH1823_0602226

macht über die zurückzurufenden Gegenstände i.S. einer rechtlichen Handhabe über die Zwischenabnehmer im Vertriebsweg hat (vgl. BGH, GRUR 1974, 666, 669 - Reparaturversicherung, m.w.N.). Eine solche Verfügungsgewalt der Beklagten hat die Klägerin weder dargetan noch ist diese sonst ersichtlich. Eine anderweitige Rechtsanwendung infolge der verspätet umgesetzten sog. Enforcement-Richtlinie kommt nicht in Betracht. Die Richtlinie zeitigt weder eine horizontale Direktwirkung zwischen den Parteien, noch ist insoweit eine richtlinienkonforme Rechtsfortbildung des allgemeinen Folgenbeseitigungsanspruchs möglich, da sich das Gericht insoweit an die Stelle des Gesetzgebers setzen würde (LG Mannheim, InstGE 12, 200 Rz. 42 - Stickstoffmonoxyd-Nachweis; a.A. OLG Düsseldorf, InstGE 13, 15 - Faktor VIII-Konzentrat).

Dem Gesetzeswortlaut (in Ansehung der „Vertriebswege") folgend war noch klarzustellen, dass Gegenstände, die sich bei privaten oder gewerblichen Endabnehmern befinden, vom Tenor nicht erfasst werden (vgl. LG Mannheim, InstGE 12, 200, 208-210 – Tz. 45 f. – Stickstoffmonoxyd-Nachweis; a.A. Kühnen, a.a.O., Rz. 1082).

4. Die Beklagte trifft im Hinblick auf die festgestellte Patentverletzung ab 19.10.2001, einen Monat nach Veröffentlichung des Hinweises auf die Erteilung des Klagepatents, zumindest der Fahrlässigkeitsvorwurf, weshalb sie der Klägerin ab diesem Zeitpunkt gemäß § 139 Abs. 2 PatG i.V.m. Art. 64 EPÜ auch zum Schadensersatz verpflichtet ist. Zu einer Bezifferung ihres Schadensersatzanspruchs ist die Klägerin derzeit nicht in der Lage; dies rechtfertigt den Feststellungsantrag, § 256 ZPO.

CONFIDENTIAL

MOTM_WASH1823_0602227

## E.

Eine Aussetzung des Rechtsstreits gemäß § 148 ZPO ist nicht angezeigt.

## I.

Der Rechtsstreit war nicht bis zur Entscheidung über die gegen das Klagepatent erhobene Nichtigkeitsklage auszusetzen. Die Entscheidung über die Nichtigkeitsklage ist zwar vorgreiflich im Sinne des § 148 ZPO. Die Kammer hat aber das ihr durch diese Vorschrift eingeräumte Ermessen dahingehend ausgeübt, dass von einer Aussetzung des Verletzungsprozesses abgesehen wird. Nachdem die Nichtigkeitsklägerin und hiesige Beklagte das Ruhen des Nichtigkeitsklageverfahrens beantragt und erklärt hat, auf eine Wiederanrufung des Nichtigkeitsverfahrens zu verzichten, solange sie sich an ihr Lizenzvertragsangebot gebunden halte, ist es bis auf Weiteres unwahrscheinlich, dass es zu einer Vernichtung des Klagepatents kommen wird.

## II.

Eine Aussetzung gemäß § 148 ZPO kam auch nicht im Hinblick auf die kartellbehördliche Prüfung der Zulässigkeit der Übernahme der Muttergesellschaft der Klägerin durch die Google Inc. in Betracht, weil die Entscheidung der Kartellbehörden nicht vorgreiflich ist. Etwaige zukünftige Veränderungen der Rechtslage sind nicht vorgreiflich für die aufgrund der gegenwärtigen Rechtslage zu treffenden Entscheidung (vgl. Zöller/Greger, ZPO, 29. Aufl., § 148, Rn. 6a).

## F.

Die Kostenentscheidung folgt aus § 92 Abs. 2 Nr. 1 ZPO.

Die Entscheidung zur vorläufigen Vollstreckbarkeit beruht auf § 709 S. 1 und S. 2 ZPO.

Bei der Bestimmung der Höhe der Sicherheitsleistung hinsichtlich einer vorläufigen Vollstreckung des Unterlassungsanspruchs war vorliegend - anders als in den das Europäische Patent EP 0 615 384 B1 betreffenden Parallelverfahren - nicht auf die Zeitdauer

CONFIDENTIAL

MOTM_WASH1823_0602228

abzustellen, bis eine Entscheidung in der Berufungsinstanz voraussichtlich vorliegen wird, sondern auf die verbleibende Schutzdauer des Klagepatents.

Bei der Bestimmung der Sicherheitsleistung hinsichtlich der Verpflichtungen zu Rückruf und Entfernung der unter Ziff. I.1.a) beschriebenen Erzeugnisse (Xbox 360) berücksichtigt die Kammer, dass die isolierte Vollstreckung dieser der Beseitigung patentrechtswidriger Zustände dienenden Verpflichtungen faktisch der Unterlassungsvollstreckung gleichkommt.

Der Vollstreckungsschutzantrag der Beklagten nach § 712 ZPO bleibt ohne Erfolg. Der Vortrag der Beklagten, ihr drohten finanzielle Einbußen, der Verlust von Marktanteilen und ein Imageschaden, genügt nicht, um die Voraussetzungen des § 712 Abs. 1 S. 1 ZPO darzutun. Die Durchsetzung von Unterlassungsansprüchen aus technischen Schutzrechten hat regelmäßig die Einstellung im Zusammenhang mit den patentverletzenden Produkten stehender Geschäftsaktivitäten zur Folge und eröffnet daher nicht per se den Anwendungsbereich des § 712 Abs. 1 S. 1 ZPO (OLG Düsseldorf, InstGE 8, 117, 121 - *Fahrbare Betonpumpe*). Dass die wirtschaftliche Existenz der Beklagten - auch unter Berücksichtigung der verschuldensunabhängigen Haftung der Klägerin gemäß § 717 Abs. 2 S. 1 ZPO - bedroht wäre, ist weder dargetan noch glaubhaft gemacht. Hinsichtlich der von der Beklagten vorgetragenen möglichen Nachteile für die Verwender der angegriffenen Ausführungsformen (Unternehmen, öffentliche Verwaltung) handelt es sich nicht um der Beklagten selbst drohende unersetzbare Nachteile. Dem Schutz Dritter dient § 712 ZPO jedoch nicht. Schließlich streitet auch das absehbare Ende der Schutzdauer des Klagepatents (Oktober 2012) nicht gegen ein überwiegendes Interesse der Klägerin an der vorläufigen Vollstreckbarkeit.

Dr. Kircher
Vors. Richter am
Landgericht

Dr. Bauer-Gerland
Richterin am Landgericht

Wedler
Richter am Landgericht

CONFIDENTIAL

MOTM_WASH1823_0602229

Ausgefertigt:



als Urkundsbeamtin der Geschäftsstelle

CONFIDENTIAL

MOTM_WASH1823_0602230

CONFIDENTIAL

MOTM_WASH1823_0602231