# EXHIBIT F

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WASHINGTON**
**AT SEATTLE**

| | |
|---|---|
| MICROSOFT CORPORATION, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | CASE NO. C-10-1823JLR |
| ) | |
| MOTOROLA, INC., et al., ) | |
| ) | |
| ) | |
| Defendants ) | |

**EXPERT REPORT OF DR. THEO BODEWIG**
**June 10, 2013**

## TABLE OF CONTENTS

I.   INTRODUCTION ............................................................................... - 1 -

   A.   Qualifications ........................................................................... - 1 -

   B.   Summary of Opinions .............................................................. - 2 -

II.  THE ORANGE BOOK PROCESS ..................................................... - 3 -

   A.   Framework Outlined by the Orange Book Decision ...................... - 3 -

      1.   Unconditional Offer to Accept a License ............................... - 5 -

      2.   Compliance With the Obligations of the Proposed License ........ - 7 -

   B.   Orange Book Process as Applied by Lower Courts ....................... - 8 -

   C.   Statements by the European Commission Suggest that European Antitrust Law Requires More from Standard-Essential Patent Holders than the Orange Book Process Does. ............................................................................ - 9 -

   D.   Conclusions and Additional Responses to Professor Haedicke's Report ..................... - 13 -

      1.   The Orange Book Process is Uncertain and Unsettled. ............ - 13 -

      2.   The Orange Book Procedure is not a RAND Determination. ....... - 13 -

III. THE ORANGE BOOK PROCESS IN THE REGIONAL COURT OF MANNHEIM ................................................................................. - 15 -

   A.   History of General Instrument v. Microsoft in Mannheim ........... - 15 -

   B.   The Regional Court's May 2, 2012 Decision ............................ - 18 -

   C.   The Regional Court Mannheim's Decision Demonstrates that the Orange Book Procedure Would Not Have Resulted In a RAND Royalty. ............................. - 19 -

   D.   Additional Responses to Professor Haedicke's Report ................ - 20 -

IV.  ENFORCEMENT .............................................................................. - 22 -

i

139

## I.    INTRODUCTION

1.     My name is Theo Bodewig. I am a Full professor of Law at Humboldt University zu
Berlin, Berlin, Germany.  I hold a chair for Civil, Commercial, Intellectual Property and
Comparative Law.  My teaching and research is focused on Patent, Trademark, Copyright and
Antitrust (Competition) Law, the Law of the European Union, U.S. Law, and Comparative Law.
I have written extensively about all of these subjects.  I have also been a judge at the Munich
Court of Appeals (Oberlandesgericht München) sitting in a chamber (Senate) in charge of
appeals in Trademark, Unfair Competition, Copyright, and Antitrust Law matters.  I have been
retained by counsel for Microsoft Corporation ("Microsoft") as an expert in German patent law
in the above-captioned case.

### A. Qualifications

2.     I studied Economics at the Universities of Münster and Munich from 1967-1971 finishing
with an MA. Econ. (Diplom-Volkswirt).  From 1972-1976 I studied Law at the University of
Munich.  I took the First State Exam in 1976 and the Second State Exam in 1980.  In 1980 I also
earned a Dr. jur. degree (summa cum laude) from the University of Munich and in 1996 a Dr.
jur. habil from the same institution.

3.     From 1975-1980 I was granted a scholarship at the Max Planck Institute for Foreign and
International Patent, Copyright and Competition Law in Munich, Germany.  In 1980, I became a
Senior Research Fellow at this institute and headed the US-Law Department.  After taking up
professorships at the University of Munich (1997), the Free University of Berlin (1997/1998) and
finally the University of Munich again (1998/2004), I was connected to the Max Planck Institute
on a freelance basis until 2002.  Since 2004 I have been a Full Professor at Humboldt University
zu Berlin.

4.     I also have done research at the George Washington University Law School (1978) for
my doctoral thesis "Patents and Licenses in Government Sponsored R&D in the USA" and was a
Visiting Scholar at Stanford University Law School (1984/1985).  I taught courses on European
and International Intellectual Property Law for Duke University Law School (1986), the John
Marshall Law School, Chicago (1991), and Santa Clara University Law School (1998).  I was a
Visiting Professor at Tulane University Law School, New Orleans (1993), Santa Clara

University Law School (2000, 2002, 2003, 2004 and 2009), and The University of Washington Law School, Seattle (2010).  My CV and a list of publications are attached as Appendix A.

### B. Summary of Opinions

5.      This report sets forth my opinions on matters related to the May 29, 2013 Expert Report of Dr. Maximilian Haedicke.  A list of the materials I have relied upon in forming those opinions is attached as Appendix B.  I have reviewed Judge Robart's April 19, 2013 *Findings of Fact and Conclusions of Law* (Dkt. No. 673) ("FOFCOL"), and I am relying on his findings and conclusions as well as the underlying materials and testimony as part of the basis for my opinions.

6.      These opinions are based on the information available to me as of the date of this report.  My work is on-going, and I will continue to collect facts, data, and information relevant to the issues and opinions discussed herein.  I will review, evaluate, and analyze any relevant material that becomes available including any additional report(s) of Defendants' expert(s), and I will supplement my report as necessary to reflect this information.

7.      Based on my work to date, I have reached the following opinions listed here, together with a brief description of the basis for each one.

**<u>Opinion 1</u>:  The Orange Book decision does not provide a settled, readily-applicable, predictable procedure for the user of a standard to avoid an injunction on a standard-essential patent.**

8.      The Orange Book decision was not based on RAND commitments; rather, the Orange Book decision was based on antitrust law.  The Orange Book procedure is far from settled.  The standard, under antitrust law, for evaluating whether a license and royalty offer is high enough to avoid an injunction is unclear.

**<u>Opinion 2</u>:  As applied by the Regional Court Mannheim, the Orange Book procedure would not have produced a RAND royalty.**

9.      The Mannheim court applied a version of the Orange Book procedure that clearly has no relationship to RAND.  Judge Robart's RAND royalty determination for Motorola's world-wide

H.264 standard-essential portfolio shows that Microsoft's Orange Book offer made in Germany was much higher than a RAND royalty yet was still rejected.

**Opinion 3:  Enforcement of German injunctions is not a burdensome procedure for patent holders like Motorola, and Motorola refused to refrain from enforcing any German injunction.**

10.    Professor Haedicke's description of the enforcement of decisions under German law incorrectly suggests that enforcement is a lengthy and burdensome procedure and patent holders would be reluctant to enforce first instance decisions.  His references to the U.S. proceedings fail to take the time line of the German and U.S. cases into account, and he ignores the fact that Microsoft requested that Motorola agree to refrain from enforcing any German injunction, but Motorola refused.

## II.    THE ORANGE BOOK PROCESS

### A.    Framework Outlined by the Orange Book Decision

11.    The Orange Book Decision is a May 6, 2009 decision of the Federal Supreme Court of Germany that set out a framework for a defendant in a patent infringement case to avoid an injunction, in certain limited circumstances, by obtaining a compulsory license based on antitrust law.

12.    The Federal Supreme Court for Civil Matters located in Karlsruhe, Germany is the highest German Court for Civil matters. The Court sits in panels of five professional judges. The 10th Senate rendering the decision is in charge of appeals as to questions of law in patent infringement and invalidity as well as antitrust law cases.

13.    It should be noted that German antitrust law is to a large extent harmonized with EU antitrust law as regulated in Art. 101 and 102 TFEU (Treaty on the Functioning of the European Union).  These provisions are supreme to national law except that under Art. 102 (misuse of a dominant position), German law may be stricter but not more lenient.  Group Exemption Regulations and decisions by the European Commission (especially the Group Exemption Regulation on Technology Transfer Agreements) are also binding on the German Courts.  When European Antitrust Law (or national law harmonized with European law) is applied by a national

court, it has to be construed in line with European law—and European law is finally interpreted in a binding manner by the European Court of Justice.

14.     The Orange Book case concerned a European patent related to compact discs.  These patents were not the subject of a RAND commitment.  Instead, the patent holder alleged that any party who manufactured recordable (CD-R) and rewritable (CD-RW) compact discs had to comply with the specifications for those formats, which were outlined in a document called the Orange Book.  The patent holder alleged that compliance with those specifications necessarily resulted in infringement of the patent.

15.     The Federal Supreme Court analyzed the question of whether the defendant could avoid an injunction by obtaining a license as a matter of antitrust law.  If the patent was in fact necessary to produce CD-R and CD-RW discs, the patent holder held a dominant position in the market for those discs.  The court was concerned with whether the patent holder was abusing its dominant position in that market in violation of the antitrust laws.

16.     The Federal Supreme Court did not consider any question of contract law raised by a RAND commitment, or consider whether any license would need to be on RAND terms, because the patent was not subject to a RAND commitment.

17.     The Federal Supreme Court in this case for the first time acknowledged the admissibility of such a defense against a claim for injunctive relief and set out rules under which it successfully could be invoked.[1]

18.     Following this, in the "Orange Book" case the court decided: If under patent law the patent owner can claim an injunction but overriding antitrust law rules would preclude the patent holder from excluding the defendant from the relevant market, the injunction will be denied.

19.     According to the Federal Supreme Court, the patent holder who asserts a claim for injunctive relief only abuses his dominant position on the market and acts in bad faith if two conditions are met: 1) the accused infringer must make an unconditional offer to accept a license with sufficiently high payments, and 2) the accused infringer must comply with that license immediately, at least by making or securing payment according to the license terms.

---

[1] In an earlier case the Federal Supreme Court had allowed this defense against damage claims, BGH, 13.7.2004, KZR 40-02, NJW-RR 2005, 269 – Standard-Spundfass. English translation in 36 IIC 741 (2005) at MS-MOTO_1823_00005258323- 334.

### 1. Unconditional Offer to Accept a License

20.     The first condition requires the defendant to make an unconditional offer to accept a license:

> "Firstly, the party wishing to obtain a license must have made an unconditional offer to conclude a license agreement which the patent proprietor cannot reject without unreasonably obstructing the party wishing to take a license or without violating the prohibition of discrimination, and the proposed licensee must stay bound by this offer."  (Dkt. No. 245 Ex. 1 at 14–15.)

21.     This wording reflects Sec. 20 (1) GWB (German act against restraints of competition), the German provision addressing the abuse of a dominant position:

> "Dominant undertakings, associations of competing undertakings within the meaning of §§ 2, 3, and 28 (1) and undertakings which set retail prices pursuant to § 28 (2), or § 30 (1) sentence 1, shall not directly or indirectly hinder in an unfair manner another undertaking in business activities which are usually open to similar undertakings, nor directly or indirectly treat it differently from similar undertakings without any objective justification."  (Translation of Sec. 20 (1) GWB at MS-MOTO_1823_00005258303.)

22.     The offer of a license agreement which the patent owner could not reject without running afoul of antitrust law would, at most, only by happenstance reflect a license agreement which would fulfill the RAND principles or be the result of free negotiations.  A negotiated offer most advantageous for the patent owner would only result if he had such strong market position that the license applicant had to accept his dictate.  But this is exactly the situation the antitrust rules want to avoid.  It would be ironic if under the guise of a compulsory antitrust license the applicant would be required or at least be tempted to offer conditions and restrictions which would also be the consequence of the patent owner using his superior market power which antitrust law wants to curtail.

23.     The Federal Supreme Court refutes this danger with the argument that only an offer the patent owner cannot reject without misusing his market power is required.  But the borderline between misuse and legitimate use is unclear. Even if the applicant's offer does not cross the border to the level that—if requested by the patent owner—would be misuse, the Orange Book decision does not explain a principle or general requirement that a patent owner is always entitled to the most favorable contract that nearly touches but still narrowly avoids the antitrust verdict of misuse.

144

24.     Consequently, the Federal Supreme Court's requirement of offering an unconditional license agreement does not provide an easy to follow roadmap to a compulsory antitrust license.

25.     Concerning the question of which royalty rate has to be offered the Federal Supreme Court further held that the defendant had two alternatives.

26.     First, the defendant (the potential licensee) may propose a specific royalty rate.  In the Orange Book decision, the decisive issue was that the potential licensee did not comply with the obligations of the offered license agreement, so there is limited guidance on this option from the Federal Supreme Court.

27.     The Federal Supreme Court made clear that the amount to be paid was limited only by application of the antitrust laws:

> In terms of amount, the royalty and therefore the proposed licensee's obligation to perform, is limited to the amount resulting from the terms and conditions of an agreement that is unobjectionable under cartel law.  (Dkt. No. 245 Ex. 1 at 18.)

28.     This also is not a clear cut criterion because the borderline from which point the patent owner may not reject the offer is open to intense discussion as this case shows.

29.     Second, in the alternative, the potential licensee may have the payment determined by the patent holder according to Sec. 315 BGB.  The Federal Supreme Court stated again that the amount to be paid set by the patent holder was only limited by the antitrust laws:

> [T]he patent proprietor is completely free in determining the royalty amount; his determination is inequitable only if it does not stay within the limits set by cartel law and if it unjustly obstructs the licensee or discriminates him against other licensees.  (Dkt. No. 245 Ex. 1 at 19.)

30.     The defendant can only challenge the payment amount set by the patent holder in later, separate court proceedings—not in the same infringement proceeding already underway.

31.     Professor Haedicke suggests that this is a solution for the dilemma of the defendant to offer an unobjectionable royalty rate as an easy way out.  (Haedicke Rpt. ¶ 57.)  By far it is not.

32.     According to the Federal Supreme Court, the defendant, instead of offering a concrete license fee, can offer a fee to be fixed by the patent owner.  While doing so, according to the Orange Book decision the defendant – to be on the safe side – still has to pay the license fee the patent owner sets into escrow.  If the patent owner sets a fee the defendant considers too high

under antitrust law, the defendant can initiate a new proceeding asking a court to determine an equitable fee.  The same holds if the patent owner does not set a fee at all.

33.     Though the defendant has to make his license offer before the infringement court, that court will not be the one to finally decide about the fee to be paid.  Instead, if the defendant wants to challenge the fee set by the patent owner, this is the subject of entirely new proceedings before a court of first instance to set the correct fee.[2] The latter also holds if the patent owner does not set a fee at all.  If, in this fee setting procedure, all three instances in the German courts up to the Federal Supreme Court are exhausted, it will take at least 4 years until the defendant knows what license fee he finally has to pay.  Furthermore, under German law it is unclear which license fee the defendant during such a proceeding has to pay into escrow: a royalty the defendant has calculated that the patent owner could not reject under the antitrust law, or the (challenged) fee the patent owner actually fixed under § 315 BGB. The Federal Supreme Court seems to tend to the latter.  (*See* Dkt. No. 245 Ex. 1 at 19.)

34.     To avoid the delay of several years and the accompanying risk and cost and find legal security the defendant – to be on the safe side – will deposit the determined fee and may even be tempted to accept even a license fee set by the patent owner that is unreasonably high. This would not only be to his own detriment but also against antitrust principles because the defendant's product would have higher costs and higher prices for the consumer.[3]

### 2.  Compliance With the Obligations of the Proposed License

35.     The Federal Supreme Court set out the second condition as follows:

> "And secondly, the proposed licensee has to comply with the obligations on which the use of the licensed subject matter depends according to the license agreement still to be concluded, if he already uses the subject matter of the patent before the patent proprietor has accepted his offer.  This means in particular that

---

[2] Sec. 315 (3) of the German Civil Code reads: "Where the specification is to be made at the reasonably exercised discretion of a party, the specification made is binding on the other party only if it is equitable. If it is not equitable, the specification is made by judicial decision; the same applies if the specification is delayed."  MS-MOTO_1823_00005257742.

[3] This danger of a pressure to accept unreasonably high license fees has also been recognized by the Federal Supreme Court: "On the other hand, an offer that has been increased 'to be on the safe side' could give the patent proprietor the possibility to secure himself an excessive royalty by accepting this offer…. This is because the proposed licensee will tend to be more ready to deposit a higher amount than the one that he deems appropriate under cartel law, if he is not estopped from asserting that a determination of the royalty by the patent proprietor in this amount is inequitable - for which assertion he still bears the onus of presentation and proof." (Dkt. No. 245 Ex. 1 at 19.)

146

the proposed licensee has to pay the royalties resulting from the contract or ensure their payment."  (Dkt. No. 245 Ex. 1 at 15.)

36.     The arguments in Professor Haedicke's expert report are based on the first condition—the terms of the unconditional offer to license, not on this second condition.  Accordingly, the second condition will not be further discussed here.

### B.      Orange Book Process as Applied by Lower Courts

37.     As shown above, the Federal Supreme Court has only in very general and vague terms spelled out the conditions that the license agreement to be offered by the defendant must fulfill. The lower courts, therefore, had to fill those gaps and they have done so in different ways. They have understood the requirement set by the Federal Supreme Court not only to mean that just an acceptable royalty has to be offered but also additional concessions to the patent owner. Consequently the lower courts in Germany have set out and sometimes applied a variety of additional requirements not mentioned in the Orange Book decision, the most important of which are the following:

a)  The offer must be composed in a way that if the patent owner accepts it, all defenses claimed by the patent user against the obligation of injunction and/or compensation of damages are dropped.  This includes defenses such as non-infringement, prior use or exhaustion of the patent but not against the license fee requested by the patent owner (OLG Karlsruhe, 27.02.2012, 6 U 136/11 at MS-MOTO_1823_00005258293–302.)

b)  The offer must not include the reservation of the right to challenge the validity of the patent by the patent user (LG Mannheim, 09.12.2011, 7 O 122/11, MOTM_WASH1823_0626852.)

c)  The offer has to include right for patent owner to terminate licensing agreement in case of future challenges of the validity of the patent (OLG Karlsruhe, 23.01.2012, 6 U 136/11 at MS-MOTO_1823_00005258288–292; LG Mannheim, 02.05.2012, 2 O 240/11, MOTM_WASH1823_0614169; OLG Karlsruhe, 27.02.2012, 6 U 136/11 at MS-MOTO_1823_00005258293–302.)

d)  The defendant has to stay any parallel nullity (invalidity) proceedings (LG Mannheim during the hearing in the GI proceedings).  The defendant is required to commit that

- 8 -

he will withdraw the nullity actions, once the Orange Book Offer is accepted (OLG Karlsruhe, 23.1.2012, 6 U 136/11 at MS-MOTO_1823_00005258288–92.)

e)   The defendant has to acknowledge the obligation to pay damages for the use of the patent in the past on the merits (LG Mannheim, 09.12.2011, 7 O 122/11, MOTM_WASH1823_0626852; LG Mannheim, 02.05.2012, 2 O 240/11, MOTM_WASH1823_0614169; OLG Karlsruhe, 27.02.2012, 6 U 136/11 at MS-MOTO_1823_00005258293–302.)

38.     While there are a number of cases in which German courts have addressed the Orange Book procedure, there are no published decisions in which a court eventually adjudicated that a specific royalty rate offered by a defendant was acceptable and resulted in a defense to an injunction.

39.     The second alternative (that of leaving the determination of a royalty rate to the patent holder according to Sec. 315 BGB) is also not an established process in the context of the Orange Book process, because there have been no completed proceedings regarding the review of the requested royalty rate by a court.  Such proceedings have been initiated between Motorola Mobility and Apple, and are pending in first instance, but there has been no decision yet.

**C.     Statements by the European Commission Suggest that European Antitrust Law Requires More from Standard-Essential Patent Holders than the Orange Book Process Does.**

40.     Additional uncertainty surrounding the Orange Book procedure follows from the fact that antitrust law—the basis of the Orange Book defense—is primarily European antitrust law, in particular Art. 102 TFEU.  As mentioned above, in cases where European antitrust law can be applied (mainly if there is an effect on trade between member states which in cases like the infringement action brought by General Instrument (Motorola) against Microsoft certainly is given) it is supreme to national law.  European antitrust law is binding on national antitrust authorities and national courts.  An exemption from this strict rule only applies to cases of misuse of a dominant position under Art. 102 TFEU, where national law can be *stricter* but not more lenient.  As the following will show, recent statements from the European Commission make clear that it would apply Art. 102 more strictly (against the patent owner) than the German courts have in recent years.  Consequently, the more lenient Orange Book procedure, if German courts were to continue to apply it, would therefore infringe European law.

41.     Applying European antitrust law, the European Commission has initiated proceedings against Motorola Mobility based on the assertion of standard-essential patents against Apple and Microsoft (e.g., LG Mannheim) and against Samsung based on the assertion of standard-essential patents against Apple.

42.     In a press release and a memorandum published in the context of the submission of a statement of objections to Samsung on December 21, 2012, the European Commission preliminarily stated that in case of standard-essential patents the willingness to take a license and pay royalties is the decisive factor:

> "Today's Statement of Objections sets out the Commission's preliminary view that under the specific circumstances of this case, where a commitment to license SEPs on FRAND terms has been given by Samsung, and where a potential licensee, in this case Apple, has shown itself to be willing to negotiate a FRAND licence for the SEPs, then recourse to injunctions harms competition." (IP/12/1448 at MS-MOTO_1823_00005258266.)

43.     This is obviously a stricter standard (willing licensee) against granting an injunction than the Orange Book requirement (unconditional license offer that is unobjectionable under antitrust laws).

44.     This preliminary opinion of the European Commission and its obvious deviation from the Orange Book decision criteria were recently cited in an order by the Regional Court Düsseldorf, which submitted a number of questions in the context of an antitrust law based license defense to the European Court of Justice (ECJ).  (LG Duesseldorf, 21 March 2013, 4  b O 104/12, MS-MOTO_1823_00005258304–22; English Translation at MS-MOTO_1823_00005257641–59.) To harmonize European law in the member states not only in the books but also in its application, European law provides for a reference proceeding from national courts to the ECJ, Art. 267 TFEU.  In short, this means that any lower court in a member state can (and any highest court must), in case of doubts how to interpret and apply European law or national law harmonized on the European level, refer those questions for clarification to the ECJ.  The ECJ then will answer these questions and the national courts will decide the case based on these answers. The Düsseldorf court is obviously in doubt if the Orange Book requirements can hold up under European antitrust law.

45.     The Regional Court Düsseldorf's questions included:

- 10 -

149

> Is the holder of a standard-essential patent who has declared to a standardization organization his willingness to grant a license to any third party under fair, reasonable, and non-discriminatory terms abusing his dominant position if he brings an injunction claim in court against a patent infringer even though the patent infringer has declared his willingness to negotiate such a license,
>
> or
>
> is an abuse of the dominant position to be assumed only if the patent infringer has presented to the holder of the standard-essential patent an acceptable unconditional offer to enter into a license agreement, which the patent holder may not refuse without unfairly impeding the patent infringer or violating the ban on discrimination, and the patent infringer is satisfying his contractual obligations in anticipation of the license to be granted for prior use?  (LG Duesseldorf, 21 March 2013, 4  b O 104/12 at MS-MOTO_1823_00005258304-305; English Translation at MS-MOTO_1823_00005257641-642.)

46.     In other words, the Regional Court Düsseldorf is requesting that the European Court of Justice clarify as a matter of antitrust law whether the Orange Book procedure is adequate, or whether the holder of a standard-essential patent subject to a RAND commitment is always barred from seeking injunctions against a willing licensee.

47.     In the press release and a memorandum published by the European Commission in the context of the submission of a statement of objection to Motorola Mobility with respect to its assertion of SEPs against Apple on 6 May 2013, the European Commission further elaborated on its preliminary opinion.  (See Press Release IP/13/406 at MS-MOTO_1823_00005258267-268; Memo/13/403 at MS-MOTO_1823_00005258272-274.)

48.     The Commission stated that it is an abuse of a dominant position if (1) the holder of a SEP has given a commitment to license these patents on FRAND terms and (2) the company against which an injunction is sought has shown to be willing to enter into a FRAND license (a willing licensee). The term of a willing licensee has already been used in the press release of the European Commission in the context of the submission of a statement of objections to Samsung regarding Samsung's assertion of SEPs against Apple (December 21, 2012):

> "While recourse to injunctions is a possible remedy for patent infringements, such conduct may be abusive where SEPs are concerned and the potential licensee is willing to enter into a licence on Fair, Reasonable and Non-Discriminatory (so-called 'FRAND') terms. In such a situation, the Commission considers at this stage that dominant SEP holders should not have recourse to injunctions, which generally involve a prohibition to sell the product infringing the patent, in order to distort licensing negotiations and impose unjustified licensing terms on patent licensees." (IP/13/406 at MS-MOTO_1823_00005258267.)

49.     The Commission also stated that the fact that a potential licensee challenges the validity, essentiality or infringement of the SEP does not render the potential licensee unwilling.

> "In addition, in the Commission's preliminary view, the fact that the potential licensee challenges the validity, essentiality or infringement of the SEP does not make it unwilling where it otherwise agrees to be bound by the determination of FRAND terms by a third party. In the case at hand, Motorola required clauses that prohibited such challenges by Apple, even after Apple had agreed to be bound by a third party determination of the FRAND terms. The Commission's preliminary view is that it is in the public interest that licensees should be able to challenge the validity, essentiality or infringement of SEPs." (MEMO/13/403, at MS-MOTO_1823_00005258273.)

50.     The published views of the Commission can be summarized as follows: The Commission explicitly based its preliminary opinion on a (F)RAND situation where the patent holder has agreed to grant licenses under (F)RAND conditions.  This was the situation before the Mannheim and Karlsruhe courts in the Motorola/Microsoft and Motorola/Apple cases.  The Orange Book decision was given in the situation of a de facto standard, not a standard developed by a standard-setting organization to which participants made RAND commitments.  The fact situation, therefore, differs.  The Commission's published views suggest that the Orange Book proceeding the Mannheim and Karlsruhe courts applied were not appropriate in (F)RAND cases.

51.     The case at hand is a RAND case.  The opinion of the Commission, therefore, is immediately applicable.  If the defendant is a willing licensee and will accept (F)RAND terms, no injunction is appropriate. The Commission goes even further and declares that if a potential licensee challenges the validity, essentiality or infringement of the SEP this does not render the potential licensee unwilling.  This at least partly goes directly against the requirements a) to e) set up by the Mannheim and Karlsruhe courts summarized above.  It is clearly a stricter standard to find misuse of a dominant position by refusing to grant a license than the Mannheim and Karlsruhe courts have applied.  Since the Commission is the competent antitrust authority of the EU and it has valid reasons for this interpretation of Art. 102 TFEU, it suggests that this will also be the law before German courts.

52.     Accordingly one can conclude:  The Orange Book process was based on European competition law, and the German courts only require that a patentee accept a license at the outer limits of competition law, and also require that the defendant drop any defenses.  But the European Commission is taking the position that in the case of standard-essential patents, the

patentee must accept a RAND license from a willing licensee, and that licensee is still entitled to challenge the patent.  Microsoft is a willing licensee in this case.

**D.    Conclusions and Additional Responses to Professor Haedicke's Report**

**1.  The Orange Book Process is Uncertain and Unsettled.**

53.    As demonstrated above, the Orange Book process is not an established process that has been applied consistently over time.  It was only vaguely defined by the Federal Supreme Court in 2009, and the lower instance courts applying it since then have done so differently with respect to various specific issues and inconsistently set up a number of additional prerequisites for the defendant.

54.    Further, the Orange Book decision relies on European competition law, but the European Commission's recent statements concerning standard-essential patents suggest that the Orange Book process as interpreted by the Mannheim and Karlsruhe courts is unsatisfactory to address cases involving injunctions on standard-essential patents.

55.    Given these crucial uncertainties with respect to the application of the general criteria set out by the Orange Book decision (especially in the case of standard-essential patents), Professor Haedicke's suggestion that the Orange Book process would be a settled, readily-applicable, and predictable procedure is incorrect.

**2.  The Orange Book Procedure is not a RAND Determination.**

56.    Professor Haedicke's report repeatedly suggests that Microsoft needed only to offer a "reasonable," "equitable," or "FRAND" royalty in order to avoid an injunction:

> "If Microsoft had made an offer containing equitable license fees or if Microsoft had escrowed a sufficient amount of money and had let the court decide about an equitable license fee, Microsoft would not have been enjoined."  (Haedicke Rpt. ¶ 12.)

> "The license seeker must thus make an unconditional offer to conclude a license contract with an adequate (reasonable) license fee."  (Haedicke Rpt. ¶ 10.)

> "The Federal Supreme Court ruled that if the patent holder enforces his patent by claiming an injunction, there can be an abuse of his market-dominant position if the patent holder refuses to conclude a fair and equitable patent license contract which has been offered to him by the party seeking the license."  (Haedicke Rpt. ¶ 58.)

> "[T]he patentee is subject to Article 102 TFEU (and corresponding German antitrust rules).  In particular, he may not discriminate against bona fide license-

seekers and may not exploit the market power to secure excessive royalties.  He must license on fair, reasonable and non-discriminatory (FRAND) terms." (Haedicke Rpt. ¶ 25.)

"For the purposes of permitting the infringer the exceptional defense envisaged under the Orange Book Standard case, the obligation to conclude a license contract under FRAND conditions can be regarded as equivalent to a duty under competition law."  (Haedicke Rpt. ¶ 36.)

57.     The Federal Supreme Court's Orange Book decision, however, does not define a clear standard.  The Federal Supreme Court held only that an unconditional and unobjectionable (under the antitrust laws) offer for a license agreement must be made.

58.     There is no clear guidance for the royalty rate to be offered.  The Federal Supreme Court held that a specific rate would have to be "customary" (31) (Dkt. No. 245 Ex. 1 at 11), but that the offered license is only limited to the amount resulting from the terms and conditions of an agreement that is unobjectionable under cartel law (37) (Dkt. No. 245 Ex. 1 at 19).

59.     With respect to the scope of review in the second procedure under Sec. 315 BGB, the Federal Supreme Court suggested that the scope of review is whether the license requested by the patent holder was set using his "reasonably exercised discretion" (billiges Ermessen)  (Dkt. No. 245 Ex. 1 at 19.).

60.     Since the Orange Book decision did not concern a standard-essential patent subject to a FRAND contractual commitment but a *de facto* standard, and because the Federal Supreme Court did not address the question whether the royalty offered by the defendant need only be FRAND.  FRAND (or RAND) is not the standard set out by the Federal Supreme Court for a payment to be made under the Orange Book decision, and the resulting payment would only be FRAND (or RAND) by happenstance.

61.     I am not aware of any published decisions in which a German court used FRAND as a standard to evaluate whether a specific royalty rate satisfies with the Orange Book procedure (either in the case of a standard-essential patent or other patent), and Professor Haedicke does not cite to any.

62.     FRAND is also not the standard explicitly set out by Sec. 315 (3) BGB, which is the basis for the second alternative under the Orange Book procedure.  As explained above, I am not

aware of any decisions from German courts following the Orange Book decision and evaluating royalties under Sec. 315 (3) BGB, and Professor Haedicke does not cite to any.

63.     In various instances, Professor Haedicke employs wording that suggests that the second alternative Orange Book procedure, under Sec. 315 BGB, would result in the court determining the royalty rate in the same proceedings as the patent infringement case:

> "Then he is allowed to deposit the license fees which he deems equitable in escrow in accordance to Sec. 372 of the German Civil Code. According to Sec. 315 (3) of the German Civil Code, the courts are then entitled to examine whether the rate has been set fairly by the patent holder in accordance with his legal obligations and if not, the court sets an appropriate rate."  (Haedicke Rpt. ¶ 33.)

> "Should the court have found that Motorola's request was not FRAND, it would have determined the FRAND rate itself."  (Haedicke Rpt. ¶ 57.)

64.     That suggestion is incorrect.  Under the second alternative (making reference to Sec. 315 BGB), the patent holder determines the royalty rate.  For the purpose of the infringement proceedings in which the Orange Book defense is raised, the court will not review the royalty rate determined by the patent holder.  "If a sufficient amount has been deposited, and if the other prerequisites of the 'compulsory license defence' are met, the infringement court may simply establish that the patent proprietor is obliged to accept the license offer and to determine the royalty as appears just."  (Dkt. No. 245 Ex. 1 at 20.)

65.     The defendant may only later initiate entirely separate court proceedings under Sec. 315 (3) BGB to have a court determine whether the royalty rate set by the patent holder is within the limits of antitrust law.  The defendant may be obliged to pay the royalty rate set by the patent holder immediately, regardless of whether the defendant is seeking to challenge the rate by filing a separate proceeding.

## III.   THE ORANGE BOOK PROCESS IN THE REGIONAL COURT OF MANNHEIM

### A.     History of General Instrument v. Microsoft in Mannheim

66.     On July 6 and 7, 2011, General Instrument filed patent infringement actions in Germany regarding the H.264 standard.  These evolved, after separation by the court, into overall four actions.  In two of them General Instrument alleged infringement of European Patent No. 0 538 667 against Microsoft Corporation, Microsoft Ireland Operations Ltd. (both are defendants in one action), and Microsoft Deutschland GmbH (defendant in the second EP 0 538 667 based

action) (in the following I will refer to all defendants together as Microsoft).  The other two actions alleged infringement of European Patent No. 0 615 384 against the same defendants.  I understand that Motorola alleges that both of these patents are essential to the H.264 standard, and the Mannheim court relied on that allegation.

67.     In these actions, General Instrument sought an order enjoining Microsoft from (a) offering, distributing, using or importing the Xbox 360 game console in Germany and (b) offering or supplying its software products that support video decoding according to the H.264 standard in Germany, including Microsoft's Windows 7 operating system software.  Furthermore, General Instrument petitioned the court to order Microsoft to render account, recall allegedly infringing products and declare that Microsoft is obliged to compensate for damages.

68.     Microsoft filed its response briefs to General Instrument's complaints on October 5 and 7, 2011, respectively.  Microsoft argued, amongst others, that the patents are not infringed and that Microsoft is licensed to use the patents based on the declaration of willingness to license to the ITU-standard setting organization.  Furthermore, Motorola, the parent company of General Instrument, was at least barred from asserting claims for injunctive relief due to antitrust law since the letter sent by Motorola to Microsoft on October 29, 2010 was far from RAND as required under the ITU-agreement.

69.     The German legal system separates the issue of infringement, which is dealt with by specialized chambers of the courts of civil law, and the issue of validity, which is dealt with by the Federal Patent Court in Munich.  This separation is called bifurcation and results in the fact that only the Federal Patent Court in Munich is competent to adjudicate on the validity of a patent.  The infringement courts can not declare a patent invalid, but under limited circumstances can stay the infringement proceedings until the Federal Patent Court has rendered a decision.  The infringement court orders a stay only if it considers the likelihood of success in the invalidity proceedings to be high.

70.     On October 5, 2011, Microsoft filed two nullity actions against the German parts of both patents asserted in Germany.  In the nullity actions, Microsoft argued that the asserted claims lack novelty and inventive step in light of prior art and are therefore invalid. In the infringement proceedings, Microsoft requested a stay of the proceedings.

71.     On December 9, 2011, General Instrument filed reply briefs to Microsoft's response briefs and argued in particular that Microsoft infringed, was not licensed under the ITU agreement, that no antitrust law based defenses applied and that the patents were valid.

72.     On December 23, 2011, Microsoft submitted a fully formulated offer for a license agreement to General Instrument.  It encompassed a license for the two European Patents in litigation in Germany and – for these two patents – offered a license rate of 2 Eurocents per unit for up to 10 million units per fiscal year and 1 Eurocent per unit above 10 million units per fiscal year.

73.     Further arguments were exchanged between the parties with Microsoft's rejoinders dated January 13, 2012 and General Instruments surrejoinders dated January 30, 2012. In the meantime, on January 2012, Microsoft submitted to the court proof of deposit of royalty payments due under its offer for a license agreement.

74.     To address issues General Instrument had raised in its surrejoinders, Microsoft on February 3, 2012 amended and clarified its offer for a license agreement.

75.     On February 7 the oral hearing in front of the Regional Court Mannheim took place. In the hearing the Regional Court Mannheim – without precedent – stated that under the Orange Book process Microsoft would have to suspend its nullity actions, which Microsoft did. The announcement of the decision was scheduled for April 17, 2012.

76.     On February 9, March 2, March 30, April 5, and April 10, further briefs were filed.

77.     On April 12, 2012, the United States District Court for the Western District of Washington, granted a temporary restraining order against Motorola enjoining Motorola from enforcing any injunctive relief it may receive in the German infringement proceedings.  This temporary restraining order was converted into a preliminary injunction and was later affirmed by the United States Court of Appeals for the Ninth Circuit on September 28, 2012.

78.     After postponing the original April 17 announcement of the decisions, on May 2, 2012 the Regional Court Mannheim, in four judgments, ruled inter alia that the rejection of Microsoft's Orange Book offer would not constitute an antitrust violation and granted General Instrument's motions, including the motion for injunctive relief.

79.     Microsoft appealed these decisions on May 15, 2012 to the Higher Regional Court Karlsruhe, with grounds of appeal submitted on September 3, 2012.  In the appeal proceedings further briefs were exchanged and hearings are scheduled for September 11, 2013 in the two EP 667 proceedings, and for October 9, 2013 in the two EP 384 proceedings.

### B.       The Regional Court's May 2, 2012 Decision

80.     In evaluating Microsoft's Orange Book offer, the Regional Court Mannheim applied the following standard: the offered rate needed to be so high that any rate beyond the offered rate would clearly and obviously violate antitrust law (LG Mannheim, 02.05.2012, 2 O 240/11; LG Mannheim, 02.05.2012, 2 O 387/11):

> "After the Defendant rather committed itself to a specific calculation basis (quota license) and a specific licensing rate (2 €cents or 1 €cent per unit), it had to be considered whether the rejection of this offer by the Plaintiff on the grounds that the license fees offered were too low is in violation of antitrust law.  In the opinion of the Court, this consideration may be restricted to the question whether the offer constitutes a blatant violation of antitrust law."  (Dkt. No. 308 Ex. 4 at 26.)

> "Since only a clearly excessive price is unreasonable within the meaning of Art. 102 TFEU, the rejection of the offer by the patent holder due to allegedly to[o] low license fees is only in violation of antitrust law if the party requesting the license offers such a high license price that any change compared with this for the benefit of the patent holder would be unreasonable."  (Dkt. No. 308 Ex. 4 at 27.)

81.     In the opinion of the Regional Court Mannheim, the question was whether Motorola's rejection of Microsoft's offer constituted a blatant or obvious violation of antitrust law.  Unless Microsoft's offered royalty rate was exactly at the upper limit of compliance with antitrust law, it would not be sufficient for the Orange Book defense and Microsoft would still be enjoined.  The court found that Microsoft's offer was unsatisfactory because the royalty was not so high that Motorola's rejection of it would be a blatant antitrust violation:

> "Defendant's offer does not stand up to a review oriented to these principles.  It cannot be established that the license fees offered would be sufficient in any case."  (Dkt. No. 308 Ex. 4 at 28.)

> "[T]he court can in any case not determine that the license fees offered certainly move in such amount that a deviation upwards would lead to clearly excessive fees."  (Dkt. No. 308 Ex. 4 at 28.)

82.     Under the standard applied by the Regional Court Mannheim, offering to accept license at a RAND rate would not have been sufficient for Microsoft to avoid an injunction.

**C.    The Regional Court Mannheim's Decision Demonstrates that the Orange Book Procedure Would Not Have Resulted In a RAND Royalty.**

83.    The proceedings in the Regional Court Mannheim, viewed in light of Judge Robart's Findings of Fact and Conclusions of Law, demonstrate that the Orange Book process as implemented in that court does not result in a RAND royalty determination.  In fact, the Regional Court Mannheim made no assessment of whether Microsoft's Orange Book offer(s) were RAND, FRAND, or reasonable in any sense other than whether they were so high that even 1 € cent higher in overall payment would have violated the governing antitrust laws.  The Regional Court Mannheim never considered in any way how Motorola's RAND commitments to the ITU limited the amount that Motorola could legitimately demand to be paid.

84.    Microsoft made an offer of 2 €cents or 1 €cent per unit for two Motorola German H.264 patents.  Motorola had 17 total German patent families declared essential to H.264, but was only asserting two of them in the litigation.

85.    Because Microsoft's offer was computed in part by multiplying a full-portfolio royalty by 2/17 (to compute a royalty for two patents), Microsoft's portfolio-level royalty offer was 17 € cents or 8.5 €cents per unit.  See Microsoft's brief dated 23 December 2012, MOTM_WASH1823_0614354, III.5.b. and c.; *see also*  Decision of the Regional Court Mannheim, Dkt. No. 308 Ex. 4 at 28–29.

86.    Judge Robart has already determined that a RAND royalty for Motorola's entire, worldwide H.264 portfolio is 0.555 cents per unit (in U.S. Dollars) (FOFCOL ¶ 537) , and that the upper bound of a RAND royalty rate for all of Motorola's H.264 patents is 16.389 cents per unit (in U.S. Dollars) (FOFCOL ¶ 545).  That high end is approximately 12.6 €cents per unit based on May 2012 exchange rates (when the German court made its determination).  The low end is 0.427 €cent per unit.

87.    Microsoft's offer was two to four times higher than the RAND royalty set by Judge Robart for all of Motorola's H.264 SEPs world-wide, but would only have given Microsoft rights for only 2 of the 17 H.264 standard-essential patents Motorola claimed to have in Germany if accepted.

88.     Microsoft's offer, at the portfolio level, was 17 €cents per unit, which exceeded the high end of the RAND royalty range determined by Judge Robart of 12.6 €cents per unit, and greatly exceeded the true RAND royalty determined by Judge Robart of 0.427 €cent per unit.

89.     At the portfolio level, Microsoft's offer was as much as 35 times higher than the RAND royalty to which Motorola was entitled.

90.     Because the outcome of any further Orange Book process in the Regional Court Mannheim (involving escalating offers by Microsoft) would have necessarily resulted in a higher royalty, the outcome would not have been a RAND royalty.

91.     Professor Haedicke claims that "If Microsoft had made an offer containing equitable license fees . . . Microsoft would not have been enjoined."  (Haedicke Rpt. ¶ 12.)

92.     In light of Judge Robart's Findings of Fact and Conclusions of Law, Professor Haedicke's claim is incorrect, because Microsoft *did* make an offer that was more than equitable for Motorola—it was as much as 35 times higher than a RAND royalty—yet the Regional Court Mannheim granted Motorola an injunction.

> **D.     Additional Responses to Professor Haedicke's Report**

93.     Professor Haedicke's statement that "[T]he Court found that Microsoft had not submitted an offer that was a reasonable rate" (Haedicke Rpt. ¶ 55) is incorrect.  The court's conclusion was that Microsoft's offer was not so high that Motorola's rejection would be a blatant antitrust violation.  Further, the court specifically stated that "A hearing of evidence on the question of whether the offer (in any case) is reasonable is not required therefore."  (Dkt. No. 308-4 at 27.)  This conclusively demonstrates that the court made no inquiry as to whether Microsoft's offer was reasonable.

94.     Professor Haedicke mistakenly describes the alternative of Sec. 315 BGB as an option the Microsoft was *required* to choose because the parties could not agree on a license fee:

> "As the parties could not agree on a license fee, German law would have required that Microsoft should not insist on calculating a license fee on a specific calculation basis (per unit royalty) and a specific royalty rate (2 €cents and 1 € cent, respectively, per unit). Microsoft could instead have followed the alternative procedure set up by the Orange Book decision. Microsoft could have left unspecified the license fee in its binding offer."  (Haedicke Rpt. ¶ 57.)

95.     This is incorrect, and inconsistent with Professor Haedicke's earlier description of this alternative Orange Book procedure in his report at ¶ 33.  Under the Orange Book decision, both options (offering to enter into a license at a specific rate, or allowing the patent holder to set the royalty) are available to a defendant like Microsoft at its discretion.

96.     It is irrelevant whether the parties can agree on a license fee—in fact, if the two parties in an infringement proceeding already agreed on a license fee, they would enter into a license without the Orange Book procedure.

97.     Further, if Microsoft had allowed Motorola to set the royalty rate itself, as Professor Haedicke suggests, this alternative procedure would likely have proceeded as follows.  Assuming that Motorola had determined the rate to be 2.25 % per unit of the product's retail price, as I understand Motorola demanded in its October 2010 letter to Microsoft, this would have resulted in entirely excessive royalty payments.  See FOFCOL ¶ 527 (explaining that "the RAND royalty for Motorola's H.264 SEP portfolio with respect to all Microsoft products utilizing the H.264 Standard is 0.555 cents per unit").

98.     To be on the safe side, Microsoft would have been obliged to pay or deposit this amount until a court—in separate, later-filed proceedings under Sec. 315 (3) BGB—had determined whether this rate is within the limits set by antitrust law.  Although (as discussed above) there are no reported decisions outlining the proceedings under this alternative in the Orange Book process, this would most probably have required lengthy proceedings including expert testimony in order to determine a royalty rate, and given the state of the law it is entirely unclear how the resulting royalty would have compared to the actual FRAND value as determined by the court in Seattle.  Of course, proceedings to determine a RAND royalty for *all* of Motorola's 802.11 and H.264 standard-essential patents, including the two asserted in Germany, were already underway.

99.     This underlines that the alternative of having the patent holder (preliminarily) determine the royalty rate comes with very significant drawbacks for the license seeker and is therefore not an easy way of avoiding an injunction, nor would it result in a RAND royalty, as Professor Haedicke tries to suggest.

- 21 -

## IV.   ENFORCEMENT

100.   Several statements of Professor Haedicke regarding the enforcement under German law and the connection to the proceedings in front of the U.S. District Court for the Western District of Washington in Seattle need to be clarified.

101.   In ¶¶ 59 *et seq.* of his report, Professor Haedicke states the prerequisites for enforcement under German law in a way that appears to be rather burdensome. In fact, in order to enforce a decision, the following steps have to be taken:

> An enforceable copy of the decision has to be requested from the court.
>
> A security bond has to be posted as set out in the decision of the court.
>
> The enforceable copy and evidence of the posting of a security bond has to be served on defendant or defendant's counsel.

102.   Since the posting of the bond can be prepared beforehand so that only the amount has to be put in once the decision is rendered, these prerequisites can be easily fulfilled within a week or even less time.  Even if enforcement might not be "instantaneous[ ]" (Haedicke Rpt. ¶ 59), these procedural steps do not result in any relevant delay with respect to enforcement.  Even challenging enforcement measures in court (Vollstreckungsabwehrklage) would not have automatic suspensive effect.

103.   Furthermore, while the party preliminarily enforcing a first instance decision could be liable for damages if the decision is overturned on appeal (Haedicke Rpt. ¶ 60), this does not mean that parties are reluctant to enforce first instance decisions.  Specifically for Motorola, this can be seen from Motorola enforcing a first instance decision against Apple which required Apple to change their iCloud-E-Mail Synchronization technology.  (*See* http://appleinsider.com/articles/12/02/24/apple_halts_icloud_push_services_in_germany at MS-MOTO_1823_00005258277-279.)

104.   Lastly, under German procedural law, Motorola could have enforced the decision regarding injunctive relief even under a temporary restraining order by the U.S. District Court for the Western District of Washington in Seattle. A U.S. Court's decision is not binding on a German Court.  While violating the order under U.S. law may have subjected Motorola to consequences in the United States, there would not have been a remedy under German law allowing Microsoft to stop enforcement of the injunction.

105.    Professor Haedicke's suggestion that Microsoft might have avoided an injunction because Motorola might not have enforced an injunction also ignores the fact that Motorola rejected Microsoft's proposal that the parties agree that Motorola would not enforce the injunction while the case in the Western District of Washington was proceeding.

106.    On March 14, 2012, Microsoft asked Motorola to "agree that it would not seek enforcement of a German injunction pending a ruling on the RAND related issues by Judge Robart," and agreed to post a $300 million bond to secure any possible injury to Motorola.  (Dkt. No. 211 Ex. 2.)

107.    On March 19, 2012, Motorola responded and did not agree that it would not seek enforcement of the German Injunction—instead it suggested that Microsoft use the Orange Book process to avoid an injunction.  (Dkt. No. 211 Ex. 3.)  Motorola refused to abstain from enforcing injunctive relief in Germany.

108.    Professor Haedicke also inaccurately suggests that Judge Robart's grant of Microsoft's motion for a temporary restraining order and preliminary injunction, which barred Motorola from enforcing any German injunction, would have enabled Microsoft to retain its German facilities and avoid any relocation costs.

109.    Under the section heading "Microsoft's Options to Avoid an Injunction in the First Instance Lawsuit in Mannheim," Professor Haedicke states: "Furthermore, had Motorola enforced the German judgments, it would have violated the court order of the United States District Court for the Western District of Washington in Seattle and would have faced sanctions accordingly."  (Haedicke ¶ 62.)

110.    Microsoft's motion for a temporary restraining order and preliminary injunction was fully briefed in the Court in Washington only on April 9, 2012.  (See Dkt. No. 257.)  Given the timing of the German proceedings, the German court was scheduled to make a ruling that could have resulted in an injunction on April 17, 2012.  (See Dkt. No. 209.)  Judge Robart heard arguments on April 11, 2012 and granted Microsoft's motion on April 12, 2012.  (See Dkt. No. 261.)

111.    The decision on relocating Microsoft's EMEA distribution center in Germany required considerable preparation beginning in January / February 2012 in order to meet the possible April 17 deadline.  Owen Roberts Dep. Tr. 15:14–24:12; 85:3–86:23; 126:6–128:12.

- 23 -

112.    Accordingly, Microsoft had made its decision and begun the process of implementing the actual relocation by March 2012 and therefore before the U.S. District Court for the Western District of Washington in Seattle rendered the temporary restraining order on April 12, 2012. Even after that date, the Western District of Washington's order was subject to appellate review by the Ninth Circuit Court of Appeals, because Motorola appealed the order on May 2, 2012. (See Dkt. Nos. 303, 319.)  If the Ninth Circuit had reversed the Western District of Washington's order, Microsoft would have again been subject to an injunction in Germany without Motorola running the risk of any sanctions in the U.S.


Dr. Theo Bodewig
June 10, 2013


- 24 -

163



HUMBOLDT-UNIVERSITÄT ZU BERLIN

Appendix A

# Curriculum Vitae
# Prof. Dr. Theo Bodewig



PROF. DR. THEO BODEWIG

| Academic Education | |
|---|---|
| 1967-1971 | Study of Economics (Univ. of Muenster and Munich) |
| 1971 | M.A. Economics (Diplomvolkswirt, Univ. of Munich) |
| 1972-1976 | Study of Law (Univ. of Munich) |
| 1976 | First State Exam in Law (State of Bavaria) |
| 1980 | Second State Exam in Law (State of Bavaria) |
| 1980 | Dr. jur. (Univ. of Munich) summa cum laude, prize of the law faculty |
| 1996 | Dr. jur. habil. (Univ. of Munich) |
| **Academic Appointments** | |
| 1975-1980 | Fellowship of Max Planck Society |
| 1980-2002 | Senior Research Fellow and Head of Department (for US-Law) at Max Planck Institute for Foreign and International Patent, Copyright and Competition Law, Munich |
| 1997 | Professor, Univ. of Munich Law School (Summer Semester) |
| 1997-1998 | Professor, Free Univ. of Berlin Law School (Winter Semester) |
| 1998-2004 | Professor, Univ. of Munich Law School |
| 2004-date | Professor, Humboldt-Univ. of Berlin Law School (Chair for Civil Law, Intellectual Property Law, Commercial Law and Comparative Law) |
| **Other Research and Teaching Appointments** | |

HUMBOLDT-UNIVERSITÄT ZU BERLIN

**Appendix A**

| | |
|---|---|
| 1978 | Research stay at George Washington University, Washington, D.C. |
| 1980-1984 | Adjunct, teaching Economics at Univ. of Munich Law School and Civil Law at Univ. of Munich Department of Social Sciences |
| 1984-1985 | Visiting Scholar, Stanford Univ. Law School, Stanford, CA |
| 1985-1986 | Teaching Civil Law at Univ. of Munich Law School and Department of Social Sciences |
| 1986 | Teaching at Duke Univ. Law School, Durham, N.C. Summer Program in Copenhagen |
| 1991 | Teaching Master Class at John Marshall Law School, Chicago, Ill. |
| 1993 | Visiting Professor, Tulane Univ. Law School, New Orleans, LA |
| 1998-date | Teaching at Santa Clara Univ. Law School, Santa Clara, CA Summer Program in Munich |
| 2000 (Aug.-Oct.), | |
| 2002 (Aug.-Oct.), | |
| 2003 (Aug.) to | Visiting Professor, Santa Clara Univ. Law School, Santa Clara, CA |
| 2004 (March), | |
| 2009 (Aug.-Dec.), | |
| 2010 (Jan.-March) | Visiting Professor, University of Washington Law School, Seattle, WA |
| **Other Appointments** | |
| 1985-1997 | Attorney at Law, admitted to the Munich Bar |
| 2002-2011 | Judge, Court of Appeals, Munich |

# Research Interests

Prof. Bodewig's principle research interest lies in Industrial Property Law and Copyright Law, Antitrust Law, the Law of the European Union, US-Law and Comparative Law.



HUMBOLDT-UNIVERSITÄT ZU BERLIN

# Main Teaching Areas

International, European and German Intellectual Property Law; European and German Competition Law; Commercial Law; Comparative Law

# Publications

### Books

Government Funded R&D and Patent Protection in the USA (in German)
Basel 1982, XXXII, 513 pp.

The Recall of Defective Products - A Study of the Duty to Recall under German, European and US Civil Law (in German)
Tübingen 1999, XXVI, 486 pp.

Perspectives of Intellectual Property and Competition Law. Festschrift für Gerhard Schricker zum 70th Birthday. (co-editor)
München 2005, XII, 944 pp.

Pharmaceutical, Biotechnology and Chemical Inventions, ed. D. Bucknell
Oxford GB,2011 (consulting editor)

Patentrechtskommentar, ed. Fitzner, Lutz, Bodewig
Munich 2012 (forthcoming) (coeditor)

### Major Articles

The 1980 Amendments to US Patent Law (in German)
GRUR Int. 1982, 19-32

Recent Developments Regarding the Protection of Innovations in the USA (in German)
in: Patentschutz und Innovation, ed. by the Commission of the European Community, Directorat General for the Information Market and Innovation, Luxemburg 1983, pp. III-183 to III-200

Problems of Alternative Causation in Mass Tort Cases (in German)
AcP 185 (1985), 506-558



HUMBOLDT-UNIVERSITÄT ZU BERLIN

**Appendix A**

The Protection of Unregistered Trademarks and Franchising - Economic and Legal Aspects (in German)
in: Handbuch des Ausstattungsschutzes, ed. by. G. Schricker and D. Stauder, Weinheim 1986, pp. 937-980

The Economic Empirical Data and Analyses of the Institute for Economic Research (Ifo-Institut) in the View of Industrial Property Law and Copyright Law (in German)
Ifo-Studien, 35. Jhg. 1989, Heft 2-4, pp. 333-339 (co-authored with F.K. Beier)

Franchise Agreements (in German)
in: Innovation, Industrial Property Protection Today and Tomorrow, Budapest 1989, pp. 169-183

The Construction of Licensing Agreements under US-American Law (in German)
Festschrift für Mario M. Pedrazzini, 1990, pp. 513-534 (coauthored with F.K. Beier)

Franchising under EC Competition Law (in German)
in: Marke und Marketing, ed. by Institut für Gewerblichen Rechtsschutz, Zürich, Bern 1990, pp. 419-442

Environmental Protection and Patent Law - Protection of Recyclable Products (in German)
GRUR 1992, 567-578

Franchising in Europe - Recent Developments
24 Int'l Rev. Industrial Property & Copyright L. 155-178 (1993)

Utility Models for the EU. The Max Planck Institute's Proposal for a Community Utility Model Law
Second Tier Protection. Report and Proceedings of a Symposium, hrsg. v. Chartered Institute of Patent Agents, London 1994, S. 45-53

The Regulation of Comparative Advertising in the European Union
9 Tulane Eur. & Civ. L. Forum 179-214 (1994) = Advertising Law Anthology, Bd. 18, part II, July-December 1995, pp. 325-214

The Rights of Universities and Research Institutes to the Results of Self-Financed Research and Government Sponsored Research Projects
European Research Structures - Changes and Challenges
in: The Role and Function of Intellectual Property, München 1995, pp. 118-132

The Interfaces of Intellectual Property Law and Academic Research European Research Structures - Changes and Challenges
in: The Role and Function of Intellectual Property, München 1995, pp. 197-222



HUMBOLDT·UNIVERSITÄT ZU BERLIN

**Appendix A**

Copyright Contracts in the USA (in German)
in: Urhebervertragsrecht. Festgabe f. Gerhard Schricker z. 60. Geburtstag, München 1995, pp. 833-883

On the Misuse of Intellectual Property Rights
in: Intellectual Property Rights and Global Competition, Berlin 1995, pp. 231-252

Products Liability of Franchisors under the Products Liability Statute (in German)
in: Aktuelle Herausforderungen des Geistigen Eigentums. Festgabe von Freunden und Mitarbeitern für F. K. Beier zum 70. Geburtstag, ed. by v. J. Straus, München 1996, pp. 577-591

Civil Law Problems of the Duty to Recall Defective Products in the Automobile Industry (in German)
DAR 1996, 341-347 = 34. Deutscher Verkehrsgerichtstag 1996, ed. by Deutsche Akademie für Verkehrswissenschaft, Hamburg 1996, pp. 141-158

Franchisees' Right to Compensation under Commercial Law upon the Termination of Their Contract (in German)
BB 1997, 637-644

New Licensing Guidelines in the USA (in German)
GRUR Int. 1997, 958-971

The New EU Directive on Distance Selling (in German)
DZWiR 1997, 447-455

E-Commerce and Unfair Competition (in German)
GRUR Int. 2000, 475-482

Exhaustion of Intellectual Property Rights in the USA (in German)
GRUR Int. 2000, 597-610

Priority for Commercial Interests in Media Law? The ECJ' s Interpretation of the Television Directive (in German)
JZ 2000, 659-664

The Law of Rebates and Premiums in the EU (in German)
WRP 2000, 1341-1365 (co-authored with Frauke Henning-Bodewig)



H·U·M·B·O·L·D·T - U·N·I·V·E·R·S·I·T·Ä·T   Z·U   B·E·R·L·I·N

**Appendix A**

Remedies for the Violation of Pre-contractual Duties by Breaking Off Negotiations (in German)
JURA 2001, 1-8

The EC Proposal for a Utility Model Directive
in: Creative Ideas for Intellectual Property, ed. by F. Dessemontet und R. Gani, Lausanne 2002, pp. 339-363

Comments on Andreas Heinemann: Antitrust Law and the Internet
in: The Future of Transnational Antitrust - From Comparative to Common Competition Law, ed. by J. Drexl, Bern 2003, pp. 155-158

The Law of Unfair Competition in the United Kingdom: Case Law, Statutory Law and Self Regulation (in German)
GRUR Int. 2004, 543-558

Country Report: United Kingdom (in German)
in: Kommentar zum UWG, ed. by H. Harte-Bavendamm and F. Henning-Bodewig, München 2004, pp. 226-239 (1st and 2nd ed.)

The Law of Unfair Competition in Ireland (in German)
GRUR Int. 2004, 827-831

Country Report: Ireland (in German)
in: Kommentar zum UWG, ed.by H. Harte-Bavendamm and F. Henning-Bodewig, München 2004, pp. 239-247 (1st and 2nd ed.)

No Challenge Clauses for the Assignor in US Patent Law (in German)
GRUR Int. 2004, 918-923

Contractual Obligations "post contractum finitum" (in German)
JURA 2005, 505-511

Legal Problems of Importing Products Covered by a Process Patent under US Patent and Tarif Law (in German)
VPP-Rundbrief Nr. 1 / März 2005

Some Comparative Remarks on the Protection of Products Covered by a Patented Process in the USA and Germany (in German)
in: VPP-Rundbrief Sonderausgabe "Festschrift 50 Jahre VPP", pp. 452-464

Damages in US Copyright Law (in German)
in: Perspektiven des Geistigen Eigentums und Wettbewerbsrechts. Festschrift für Gerhard Schricker, München 2005, pp. 235-248



HUMBOLDT-UNIVERSITÄT ZU BERLIN

**Appendix A**

Practical Problems of Remedies for Patent Infringement - Injunctive Relief, Claim for Abatement, Right of Disclosure (in German)
GRUR 2005, 632-639

Double License Fee as A Method of Accounting Damages in Light of the Enforcement Directive (in German)
co-authored with A. A. Wandtke), GRUR 2008, 220-229

Use Restrictions on Trade Marks Under Art. 20 TRIPS
in: Technology and Competition. Contributions in Honor of Hanns Ullrich, ed. by J. Drexl, R. M. Hilty, L. Boy, C. Godt and B. Remiche, Bruxelle 2009, pp 15-12

Protection of Inventions and Freedom of Movement of Goods in Germany up to the Imperial Patent Law 1877 - Two Early Parallels to the Recent History of Patent Law (in German)
in: Festschrift 200 Jahre Juristische Fakultät der Humboldt-Universität zu Berlin. Geschichte, Gegenwart und Zukunft, ed. by S. Grundmann, M. Kloepfer, C.G. Paulus, R. Schröder and G. Werle, Berlin 2010, pp. 1185-1200

Exhaustion of IP Rights in Europe
in: IP Systems in Common Law and Civil Law Countries, ed. by Toshiko Takenaka, forthcoming 2012

### Case Notes

Diamond v. Chakrabarty (447 U.S. 303, 65 L.Ed.2d 144, 100 S.Ct.2204) (with German Translations of the Decision)
GRUR Int. 1980, 631 pp.

Diamond v. Diehr (450 U.S. 175, 67 L.Ed.2d 155, 101 S.Ct. 1048) (with German Translation of the Decision)
GRUR Int. 1981, 646 pp.

**APPENDIX B**

**Microsoft Corporation v. Motorola, Inc., et al.**
**June 10, 2013 Expert Report of Dr. Theo Bodewig**
**Materials Considered**

2013-05-29 Expert Report of Dr. Maximilian Haedicke with Exhibits

2012-03-28 (Dkt. No. 211) Declaration of Christopher Wion in support of Microsoft's Motion for Temporary Restraining Order and Prelim Injunction (Exhibit 2 – Harrigan 3/14/12 Letter to Jenner and Palumbo; and Exhibit 3 – Jenner 3/19/12 Letter to Harrigan)

2012-03-28 (Dkt. No. 212) Declaration of Peter Chrocziel in support of Microsoft's Motion for Temporary Restraining Order and Prelim Injunction and exhibits thereto [SEALED] (Exhibit 1 – Barth 12/23/11 Letters [German & English translation] to General Instrument c/o Quinn Emanuel with H.264/AVC Patent License Agreement)

2012-03-28 (Dkt. No. 214) Declaration of Marcelo Prieto in support of Microsoft's Motion for Temporary Restraining Order and Prelim Injunction [SEALED]

2012-03-28 (Dkt. No. 216) Declaration of Josh Hutto in support of Microsoft's Motion for Temporary Restraining Order and Prelim Injunction [SEALED]

2012-04-06 (Dkt. No. 244) Defendants' Opposition to Microsoft's Motion for Temporary Restraining Order and Prelim Injunction

2012-04-06 (Dkt. No. 245) Declaration of Dr. Marcus Grosch in support of Defendants' Opposition to Microsoft's Motion for Temporary Restraining Order and Prelim Injunction and exhibit thereto [REDACTED] (Exhibit A - Federal Supreme Court "Orange Book" Decision, KZR 39/06, dated 5/6/09)

2012-04-11 (Dkt. No. 260) Transcript of Temporary Restraining Order Hearing and the Court's Ruling

2012-04-12 (Dkt. No. 261) Order granting Microsoft's Motion for a Temporary Restraining Order

2012-05-02 (Dkt. No. 303) Defendants' Notice of Appeal of Temporary Restraining Order/ Preliminary Injunction

2012-05-04 (Dkt. No. 308) Joint Notice of Ruling In Related Case and Motion to Supplement the Record on Summary Judgment and exhibit thereto (Exhibit 1 – Initial Determination, ITC Inv. No. 337-TA-752, 4/23/12 [SEALED]; Exhibit 2 – Mannheim District Court Opinion, No. 2 O 240/11, 5/2/12; Exhibit 3 – Motorola's prelim translation of pp. 36-49 of Mannheim District Court Opinion; Exhibit 4 – Microsoft's prelim of Mannheim District Court Opinion)

2012-05-14 (Dkt. No. 318) Order Granting Microsoft's Motion for Prelim Injunction and

Converts the Court's 4-11-12 Temporary Restraining Order into a Prelim Injunction

2012-05-17 (Dkt. No. 319) Defendants' Amended Notice of Appeal of Temporary Restraining Order/Preliminary Injunction and exhibits thereto (Exhibit A – 5/14/12 Order; Exhibit B – 4/12/12 Order; Exhibit C – Transcript of 4/12/12 Ruling)

2012-09-28 (Dkt. No. 48) 9th Cir. Opinion (No. 12-35352)

2013-04-19 (Dkt. No. 673) Findings of Fact and Conclusions of Law entered by the Court

2013-04-03 Microsoft's Supplemental Objections, Answers & Responses to Motorola Mobility Inc.'s First Set of Interrogatories and Requests for Production, Nos. 3 & 4

2013-05-21 Microsoft's Supplemental Objections, Answers & Responses to Motorola Mobility Inc.'s First Set of Interrogatories and Requests for Production, No. 3

2013-05-22 Owen Roberts Deposition Transcript

2004-07-13 Federal Supreme Court Decision, BGH, No. KZR 40/02, NJW-RR 2005 (MS-MOTO_1823_00005258323 - MS-MOTO_1823_00005258334)

2013-03-21 Vorlagebeschluss LG Düsseldorf, No. 4b O 104/12 (MS-MOTO_1823_00005257641 - MS-MOTO_1823_00005257659) (English translation at MS-MOTO_1823_00005258304 - MS-MOTO_1823_00005258322)

2012-01-23 OLG Karlsruhe, No. 6 U 136/11 (MS-MOTO_1823_00005258288 - MS-MOTO_1823_00005258292)

German Civil Code BGB (English translation) (MS-MOTO_1823_00005257660 - MS-MOTO_1823_00005258264)

2012-02-27 OLG Karlsruhe, No. 6 U 136/11 (MS-MOTO_1823_00005258293 - MS-MOTO_1823_00005258302)

Section 20 GWB (Act Against Restraints of Competition) Prohibition of Discrimination, Prohibition of Unfair Hindrance (German and English translation) (MS-MOTO_1823_00005258303 - MS-MOTO_1823_00005258303)

2010-10-29 H.264 Offer Letter (MOTM_WASH1823_0018498 - MOTM_WASH1823_0018521)

"Antitrust: Commission sends Statement of Objections to Samsung on potential misuse of mobile phone standard-essential patents," European Commission press release, IP/12/1448 (Dec. 21, 2012) (MS-MOTO_1823_00005258265 - MS-MOTO_1823_00005258266)

 "Antitrust: Commission sends Statement of Objections to Motorola Mobility on potential misuse of mobile phone standard-essential patents," European Commission press release, IP/13/406

Page 2

172

(May 6, 2013) (MS-MOTO_1823_00005258267 - MS-MOTO_1823_00005258268)

"Samsung – Enforcement of ETSI standards essential patents (SEPs), Questions and Answers" European Commission memo, memo/12/1021 (Dec. 21, 2012) (MS-MOTO_1823_00005258269 - MS-MOTO_1823_00005258271)

"Antitrust: Commission sends Statement of Objections to Motorola Mobility on potential misuse of mobile phone standard-essential patents- Questions and Answers," European Commission memo, memo/13/403 (May 6, 2013) (MS-MOTO_1823_00005258272 - MS-MOTO_1823_00005258274)

MOTM_WASH1823_0614131 - MOTM_WASH1823_0614134

MOTM_WASH1823_0614135 - MOTM_WASH1823_0614168

MOTM_WASH1823_0614169 - MOTM_WASH1823_0614224

MOTM_WASH1823_0614225 - MOTM_WASH1823_0614244

MOTM_WASH1823_0614245 - MOTM_WASH1823_0614259

MOTM_WASH1823_0614260 - MOTM_WASH1823_0614341

MOTM_WASH1823_0614342 - MOTM_WASH1823_0614353

MOTM_WASH1823_0614354 - MOTM_WASH1823_0614376

MOTM_WASH1823_0626283 - MOTM_WASH1823_0626314

MOTM_WASH1823_0614354 - MOTM_WASH1823_0626700

MOTM_WASH1823_0626701 - MOTM_WASH1823_0626705

MOTM_WASH1823_0626706 - MOTM_WASH1823_0626713

MOTM_WASH1823_0626714 - MOTM_WASH1823_0626719

MOTM_WASH1823_0626720 - MOTM_WASH1823_0626748

MOTM_WASH1823_0626749 - MOTM_WASH1823_0626786

MOTM_WASH1823_0626787 - MOTM_WASH1823_0626825

MOTM_WASH1823_0626826 - MOTM_WASH1823_0626851

MOTM_WASH1823_0626852 - MOTM_WASH1823_0626862

MOTM_WASH1823_0626863 - MOTM_WASH1823_0626879

MOTM_WASH1823_0626880 - MOTM_WASH1823_0626882

MOTM_WASH1823_0626883 - MOTM_WASH1823_0626902