# EXHIBIT G

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON AT SEATTLE

| | | |
|---|---|---|
| MICROSOFT CORPORATION, a Washington corporation, | ) | Case No. 10-1823 |
| Plaintiff, | ) | |
| | ) | VIDEOTAPE |
| -vs- | ) | DEPOSITION OF: |
| MOTOROLA, INC., MOTOROLA MOBILITY, INC., and GENERAL INSTRUMENT CORPORATION, | ) | PROF. DR. THEO BODEWIG |
| Defendants. | ) | |

______________________________

TRANSCRIPT of the stenographic notes of the proceedings in the above-entitled matter, as taken by and before LINDA M. JORRITSMA, a Certified Court Reporter and Notary Public of the State of New Jersey, held at the office of QUINN EMANUEL URQUHART & SULLIVAN, LLP, 51 Madison Avenue, New York, New York, on Monday, July 1, 2013, commencing at 10:01 a.m.

Job No. CS1692638

MR. CHROCZIEL: Peter Chrocziel, Freshfields.

MR. BEER: Matthias Beer, Freshfields.

THE VIDEOGRAPHER: And at this time the court reporter, Linda Jorritsma, will swear in the witness.

THEO BODEWIG, residing at Emil Dittler Street 17, 81479 Munich, Germany, having been duly sworn by the Notary Public, testified as follows:

EXAMINATION BY MR. PRICE:

Q. Professor Bodewig -- is that close enough pronunciation?

A. That's good.

Q. You've been retained by -- by Microsoft as an expert for this case?

A. Yes.

Q. And my understanding is that you're comfortable speaking English?

A. Yes, I am.

Q. You don't feel you need a translator for this deposition, do you?

A. No.

Q. All right. So have you had your deposition taken before?

A. No.

the German court then relates only to the German national patent or the German part of the European patent.

Q. And so -- so would that mean that that German judgment, then you could not go into another European country and say we're entitled to an injunction or we're entitled to a royalty rate?

A. No. There's no binding effect of one European court -- one national European court for another national European court.

Q. So given that, do you have an understanding as to why so many patent cases are -- are filed in Germany?

A. One of the reasons -- we have talked about three reasons before. And one of the reasons may be that Germany is the biggest market in Germany, and if you have an injunction gotten in Germany, then you have covered a lot of the European Union already therefore. And also another reason may be that decisions of the German courts are not binding on other courts but they may have some authority in other courts.

Q. I think you said that one of the reasons may be that Germany is the biggest market in Germany; you probably meant the biggest market in Europe.

A. Yes.

Q. Okay.

So you've heard of the concept, a willing licensee?

A. Yes.

Q. So prior to being hired for this case, did you have any expertise as to what a -- a willing licensee was in -- in the context of FRAND?

A. No.

Q. Okay. After being hired for this case, did you do any -- any research to determine what the term, quote, willing licensee, close quote, meant in connection with FRAND?

A. I have read the press releases by the European Commission and the question-and-answer part they published and where the term "willing licensee" plays a role.

Q. Okay. So other than reading press releases by the European Commission and the question-and-answer part they published where the term "willing licensee" plays a role, have you done any other research to determine what the term, quote, willing licensee means in connection with FRAND?

A. No.

Q. Now, the -- the press releases by the

European Commission, is it your understanding that those press releases are final positions of the -- the final position of the European Commission?

A. No.

Q. Is it your understanding that those -- the question-and-answer parts that the European Commission published, that -- that those are final positions of the European Commission?

A. No.

Q. Has the European Commission issued any -- a final position with respect to what a willing licensee is in connection with FRAND?

A. Not as far as I know.

Q. Do you know of any other governing body or -- or court that has done so?

A. No.

Q. Now, in this case, were you asked to assume that Microsoft was a willing licensee under FRAND?

A. I was not asked to assume that. I was given the information what Microsoft had done, that they had offered a license -- a license agreement and so on, yes.

Q. Well, I guess, thinking back on your background, I think you've told me you've really

never been hired as an expert before.

A. Um-hum.

Q. Is that right?

A. Yes.

Q. Did you ever learn that sometimes experts can be asked to assume things and then say, you know, well, if that's true, what would result from that?

A. Um-hum, yes.

Q. You're aware of that?

Were there any facts in this case that you were asked to assume so that you could reach your expert opinion?

A. Not that I can remember now, no.

Q. Okay. So are -- are you giving an expert opinion in this case that Microsoft is a willing licensee? Is that your expert opinion?

A. My -- well, Microsoft has -- has told me that they are willing licensees, that they are willing to -- to get into a contract with a FRAND license, yes.

Q. Okay. Well, you just told me Microsoft has told you that they're a willing licensee.

A. Right.

Q. So if -- if -- if you'd been hired by

Motorola and Motorola had told you Microsoft was not a willing licensee, would you give an expert opinion that Microsoft was not a willing licensee?

MR. CEDEROTH: Objection to form.

A. Could you rephrase the question?

Q. Sure. You said Microsoft told you they're a willing licensee.

A. Yes.

Q. And therefore, you've reached an expert opinion that they're a willing licensee.

A. Yes.

Q. Right?

A. Not only because of that, because Microsoft also gave me the license contract they had offered to Motorola. So this is kind of proof to me that they are willing to -- to get a license, and they are willing to be a licensee, yes.

Q. So is -- let me step back then and say -- okay. So what is your definition that you're using when you give the expert opinion that Microsoft is a willing licensee?

A. A willing licensee is somebody, in my definition, who is willing to get into a -- into a license agreement, is willing to negotiate about a license agreement.

licensee in this case."

A. Yes.

Q. And you said that meant Microsoft was willing to negotiate with Motorola. Remember that?

A. Yes.

MR. CEDEROTH: Object as to form. It misstates the testimony.

Q. Now you said once there are negotiations, then you then have to ask the question, is Microsoft willing to accept a FRAND rate. Do you recall that?

A. Yes.

Q. Okay. When you say, "Microsoft is a willing licensee in this case," when you make that conclusion on page 13, are you also saying -- intending to say that they were willing to accept a FRAND rate, or is that a second step?

A. From -- well, I -- I can only say what Microsoft had offered in -- in its license agree -- the offered license agreement. But I cannot testify as an expert that this is the complete FRAND rate because I do not do the -- cannot do the calculations and so on.

Q. And so all that you're saying in your expert report when you say, "Microsoft is a willing

licensee in this case," is that you, having looked at the evidence found evidence that Microsoft was willing to negotiate.

A. Yes.

Q. And is there anything unique to your expertise that -- that could lead you to conclude Microsoft was willing to negotiate, whereas, someone just looking at the papers wouldn't be able to tell that?

A. I've seen the -- I've seen the offered agreement.

Q. Okay. So -- so what you've looked at is an offer from Microsoft.

A. Yes.

Q. More than one offer from Microsoft. Correct?

A. Yes.

Q. Okay. And I'm -- I'm -- I guess what I'm asking is do you need any particular expertise in German law to determine whether or not those offers mean that Microsoft is willing to negotiate?

A. No, I don't think that I need a special expertise.

Q. Do you think you needed, really, any expertise in German law to determine that?

A. No, I don't think so.

Q. Okay. So let's talk then about the -- the evidence that you are referring to.

Could you refer me to what offers you're talking about that led you to state in your report that Microsoft is a willing licensee?

A. I can -- I cannot give you, by heart, the dates when Microsoft offered what, and so on, but I have seen the papers. I've seen the agreements Microsoft had offered, and the amendments to that, and so on. So they are in the list of the documents I've -- I've seen.

Q. Okay.

A. Yeah.

Q. Well, can you look at your list and maybe identify for me what you're talking about?

A. I cannot identify that, actually, from the list here because I've read this and -- but I haven't -- don't remember the -- the headings you find in the list and which are related to these -- to these documents.

Q. So sitting here today, can you tell me at what time you believe Microsoft became a, quote, willing licensee?

MR. CEDEROTH: Object as to form.

Q. And if you don't understand, I'll -- I'll -- let me rephrase that.

Do you have a general understanding of the timeline of this case?

A. Yes.

Q. Okay. And do you have a general understanding as to when Microsoft first sued Motorola in this case?

A. Um-hum.

Q. Is that a "yes"?

A. Yes.

Q. That's one thing I forgot to say. You've got to say "yes" or "no," instead of "um-hum" or "um-um."

A. Actually, you did say that. It's my fault.

Q. Actually, I don't think I did, but that's something someone would tell you.

But in any event, so what's your understanding as to when Microsoft first sued Motorola in this case?

A. When it was?

Q. Yeah.

A. What, in -- was it 2010? In the end of 2010 or 2011. I don't remember the dates -- the

represent to you that this lawsuit was filed -- the lawsuit was filed in Germany on July 6, 2011. Do you know when Microsoft made its Orange Book offer?

A. I don't remember that. I would have to look it up.

Q. Okay. Do you have any opinion as to -- as to why there was a certain length of time from the time the complaint was filed in Germany and the time Microsoft made an Orange Book offer?

A. I don't know why.

Q. Under German law, could Microsoft have -- have sought a stay of the German proceedings in light of the United States proceedings that -- that we're dealing with now?

A. No.

Q. And why not?

A. Because the German -- German courts would not be bound by any American decision, like it is the other way around, and I can't -- can't think of that a German court would stay the proceeding before the German court because there is a United States case pending.

Q. Do German courts sometimes stay cases as a result of comity, C-O-M-I-T-Y?

A. I'm not aware of that.

Q. So given the explanation you've given us about the Orange Book ruling and the two procedures, it's correct that Microsoft could have avoided an injunction if it had followed the second alternative and placed into escrow an amount that Motorola demanded. Correct?
A. Possible.
Q. Well, in your view, that's correct.
A. Yeah.
Q. Let me ask you if you would look at Section 81 of your report -- paragraph 81, I'm sorry.
And in paragraph 81 you talk about the Regional Court in Mannheim addressing the question of whether Motorola's rejection of Microsoft's offer constituted a blatant or obvious violation of antitrust law. Do you see that?
A. Yes.
Q. All right. In that opinion, the Court also addressed, though, other questions. Correct?
A. Yes.
Q. And it's -- do you remember how long the opinion is?
A. Yeah. Quite some pages. I don't exactly remember. Twenty pages, or something like that.

Q. And one of the things that the Court found was that Microsoft was, in fact, infringing the standard-essential patents. Correct?

A. Yes.

Q. On paragraph 104 of your report, you talk about Motorola being able to enforce a decision regarding injunctive relief even if there was a temporary restraining order by the U.S. District Court for the Western District of Washington in Seattle. Do you see that?

A. Yes.

Q. And what you're saying there is that the German courts, if Motorola had tried to enforce an injunction, would not have given any deference to the U.S. District Court.

A. Yes.

Q. What would have happened to Motorola if it had defied the U.S. District Court's order?

A. In the United States?

Q. In the United States and attempted to enforce an injunction.

A. I am not an expert on U.S. law.

Q. So you can't say one way or another whether or not it would have been wise for Motorola not to seek enforcement --

A. Well, I know that there is something like contempt of court in the United States --

MR. CEDEROTH: I object as to form.

Q. Yeah, you can't say -- let me ask it again.

You can't say -- let me finish. You can't say one way or another whether or not Motorola, you know, would have been wise to seek an injunction in -- in Germany in light of a U.S. District Court decision that it could not do so?

MR. CEDEROTH: Same objection.

A. No.

Q. In paragraph 110 -- and actually I want to refer you to paragraph 111. You say, "The decision on relocating Microsoft's EMEA distribution center in Germany" --

A. Excuse me. Where are you reading? 110?

Q. Sorry. It's page 23 and it's paragraph 111.

A. 111. Okay. Yeah.

Q. Yeah. You say, "The decision on relocating Microsoft's EMEA distribution center in Germany required considerable preparation beginning in January/February 2012 in order to meet the possible April 17 deadline."

Do you see that?
A. Yes.
Q. Now, are you giving that opinion as an expert?
A. No.
Q. Then why are you giving that opinion?
A. Because it's from the deposition of Mr. Roberts here, and this is my -- I was -- in this way I was informed to how the proceeding was for the relocation. But I wasn't involved in the relocation, or anything like that.
Q. Okay. I mean, can you give any expert opinion on -- on why Microsoft relocated its German facility?
A. Why they did that?
Q. Yes.
A. I can only say what -- what I have heard from Microsoft why they did it. But it's not -- I wasn't involved in this decision.
Q. And -- and you're not giving expert opinion then.
A. No.
Q. Correct?
A. Yes.
Q. And then in Section 112,

there's -- there's a paragraph about the effect of the U.S. District Court's decision and whether it can be appealed and whether Motorola appealed. Again, is this part of your expert opinion?

A. No, I wouldn't say it's part of my expert opinion. It's part of my general expert -- general knowledge of law.

Q. But Section 112 is not something on which you were making an expert opinion in this case.

A. No.

Q. Correct?

A. Right.

Q. In your expert opinion, if you were a defendant in an -- in a patent case and you wanted to avoid an injunction, which of the Orange Book alternatives would you choose?

MR. CEDEROTH: Object as to form.

A. That's a very hypothetical question. If I were in a situation like that, it would depend on the specifics of the case, or so -- which I would recommend. And I'm not a lawyer, I'm not an attorney advising clients in this respect, so I cannot say what I in general would do.

Q. So do you have an opinion one way or another which one of the two Orange Book alternatives

is more likely to insulate the defendant from an injunction?

A. No, I don't have an opinion on that.

Q. I always regret saying this after I say it, but I don't think I have any other questions.

MR. CEDEROTH: I have one point of clarification. I have to find it.

EXAMINATION BY MR. CEDEROTH:

Q. Doctor, do you have your expert report?

A. Um-hum.

Q. I call your attention to paragraph 37 and subsections of that.

A. Yeah.

Q. And in addition -- what exhibit was this?

MR. PRICE: His report?

MR. CEDEROTH: No, the --

THE WITNESS: Six. This one?

MR. CEDEROTH: Yes. Let me start again then.

MR. PRICE: Sure.

Q. Looking at paragraph 37 and the subsections of -- of -- let me just start with Exhibit 6.

Counsel asked you about Exhibit 6 which