# EXHIBIT K

204

**4b O 104/12**



Pronounced on 21 March 2013

Reimers,
The Clerk of Court

## REGIONAL COURT OF DÜSSELDORF
## RULING

In re

pp.

the 4th Civil Division of the Regional Court of Düsseldorf, subsequent to the oral hearing held on 31 January 2013 by Regional Court Presiding Judge Voss, Regional Court Judge Knappke, and Regional Court Judge Dr. Reimnitz, has

**ruled as follows:**

    I.  The proceedings are stayed.

    II.  The following questions are submitted to the Court of Justice of the European Union pursuant to art. 267 of the Treaty on the Functioning of the European Union concerning the interpretation of art. 102 of the Treaty on the Functioning of the European Union:

        1.  Is the holder of a standard-essential patent who has declared to a standardization organization his willingness to grant a license to any third party under fair, reasonable, and non-discriminatory terms abusing his dominant position if he brings an injunction claim in court against a patent infringer even though the

MS-MOTO_1823_00005257641

patent infringer has declared his willingness to negotiate such a license, or

is an abuse of the dominant position to be assumed only if the patent infringer has presented to the holder of the standard-essential patent an acceptable unconditional offer to enter into a license agreement, which the patent holder may not refuse without unfairly impeding the patent infringer or violating the ban on discrimination, and the patent infringer is satisfying his contractual obligations in anticipation of the license to be granted for prior use?

2.  If abuse of a dominant position must be assumed by mere virtue of the patent infringer's willingness to negotiate:

Does art. 102 of the Treaty on the Functioning of the European Union set forth special qualitative and/or temporal requirements for the willingness to negotiate? In particular, can such a willingness be assumed if the patent infringer has only declared (orally) in a general manner that he is willing to enter into negotiations, or must the patent infringer have already entered into negotiations by, for example, naming concrete terms under which he is willing to enter into a license agreement?

3.  If making an acceptable unconditional offer to enter into a license agreement is a condition for abuse of a dominant position:

Does art. 102 of the Treaty on the Functioning of the European Union set forth special qualitative and/or temporal requirements for this offer? Must the offer contain all provisions that are normally contained in license agreements in the respective technical field? In particular, can the offer be made under the condition that the standard-essential patent is actually used and/or proves to be legally valid?

1

MS-MOTO_1823_00005257642

4. If the performance by the patent infringer of duties arising from the license to be granted is a condition for abuse of a dominant position:

   Does art. 102 of the Treaty on the Functioning of the European Union set forth special requirements concerning this performance? Specifically, is the patent infringer required to render account for prior use and/or pay royalties? Can a duty to pay royalties also be satisfied through payment of security, where appropriate?

5. Do the terms under which an abuse of power by the holder of a standard-essential patent is to be assumed also apply to bringing legal action in respect of other claims derived from patent infringement (for rendering of account, recall, damages)?

2

MS-MOTO_1823_00005257643

## Grounds

## I.

1   The Plaintiff has brought action against the Defendants under art. 64 EPC [European Patent Convention] and secs. 139 et seq. PatG [German Patent Act] on charges of patent infringement, thereby seeking forbearance, rendering of account, recall, and ascertainment of damages.

2   The Plaintiff is the registered holder of European Patent EP A (hereinafter: patent-in-suit), the designated contracting states of which include the Federal Republic of Germany. The Opposition Division of the European Patent Office has fully maintained the patent-in-suit.

3   The patent-in-suit concerns the field of mobile telecommunications technology. It is titled "Procedure and Device for Creating a Synchronization Signal in a Switching System." Based on the Court's findings, the patent-in-suit is essential for the long-term evolution (LTE) standard, i.e., its teaching is inevitably realized upon use of the LTE standard.

4   The LTE standard is a mobile communications standard of the next (4th) generation, which is standardized by the 3GPP (3rd Generation Partnership Project) Agreement, to which the European Telecommunications Standards Institute (ETSI) is one of the parties.

5   On 4 March 2009, the Plaintiff informed the ETSI of its application for the patent-in-suit and stated that it considered the patent-in-suit essential for the LTE standard. At the same time, it agreed to grant licenses to third parties under terms that were fair, reasonable, and non-discriminatory (hereinafter: FRAND).

6   The Defendants belong to a group of companies that is concerned with the manufacture and distribution of technical telecommunications devices and networking equipment. Based on the Court's findings,

3

MS-MOTO_1823_00005257644

in the Federal Republic of Germany they offer and distribute, *inter alia*, base stations with LTE software (hereinafter: challenged embodiments).

7    In the period from November 2010 to the end of March 2011, the Plaintiff was in contact with Defendant 1) *inter alia* in connection with infringement of the patent-in-suit and the possibility of a license under FRAND terms. The Plaintiff named the royalty that it considered reasonable. Defendant 1) sought a cross-licensing whereby no royalties would be owed to the Plaintiff. The Parties did not exchange concrete offers of license agreements.

## II.

8    The Court's decision depends solely on the evaluation of the legal questions named in the operative section above.

### 1)

9    The Plaintiff is in principle entitled to the asserted claims against the Defendants concerning patent infringement, especially the injunction claim pursuant to art. 64 EPC and sec. 139 para. 1 PatG.

10   The challenged embodiments offered and distributed by the Defendants are unquestionably LTE-capable and operate according to the LTE standard. Because of the standard-essentiality of the patent-in-suit, this results automatically in use of the patent-in-suit. That use is unlawful.

11   There is no reason to stay the legal dispute pursuant to sec. 148 ZPO [German Code of Civil Procedure] (staying because of prejudicial effect) owing to the opposition proceedings.

4

MS-MOTO_1823_00005257645

Because the patent-in-suit has been maintained by the European Patent Office, there is no overwhelming probability that the patent-in-suit will prove to be other than legally valid.

**2)**

12   Enforcement of the injunction claim could be thwarted by the compulsory license plea under cartel law pursuant to sec. 242 BGB [German Civil Code] in conjunction with art. 102 of the Treaty on the Functioning of the European Union as raised by the Defendants. This would be the case if the assertion of this claim by the Plaintiff were regarded as abuse of its unquestionable dominant position.

13   Art. 102 of the Treaty on the Functioning of the European Union reads as follows:

> "*Any abuse by one or more undertakings of a dominant position within the internal market or in a substantial part of it shall be prohibited as incompatible with the internal market in so far as it may affect trade between Member States.*
>
> *Such abuse may, in particular, consist in:*
>
> *(a) directly or indirectly imposing unfair purchase or selling prices or other unfair trading conditions;*
>
> *(b) limiting production, markets or technical development to the prejudice of consumers;*
>
> *(c) applying dissimilar conditions to equivalent transactions with other trading parties, thereby placing them at a competitive disadvantage;*
>
> *(d) making the conclusion of contracts subject to acceptance by the other parties of supplementary obligations which, by their nature or according to commercial usage, have no connection with the subject of such contracts.*"

5

MS-MOTO_1823_00005257646

**a)**

14   The compulsory license plea under cartel law is a permissible defense against an injunction claim owing to patent infringement under art. 64 EPC and sec. 139 para. 1 PatG regardless of whether a defendant contests use of the patent (BGH [German Federal Supreme Court], GRUR 2009, 694 – Orange Book Standard; OLG [Higher Regional Court] Karlsruhe, GRUR-RR 2012, 405 – GPRS-Compulsory License Plea III; OLG Karlsruhe, GRUR 2012, 736 – GPRS Compulsory License Plea II; OLG Düsseldorf, InstGE 10, 129 – Printer Cartridge II; OLG Karlsruhe, GRUR-RR 2007, 177 – Orange Book Standard; LG [Regional Court] Düsseldorf, Judgment of 24 April 2012, 4b O 273/10, BeckRS 2012, 09682; LG Düsseldorf, Judgment of 11 December 2012, 4b O 54/12; LG Düsseldorf, Notices 2012, 238 – MPEG-2 Standard XXIII; LG Mannheim, Judgment of 12 May 2012, 2 O 376/11, BeckRs 2012, 11805, LG Mannheim, Notices 2012, 120 – Compulsory License Plea under Cartel Law; LG Mannheim, InstGE 13, 65 – UMTS-Capable Mobile Phone II).

**b)**

15   The question of when a holder of a standard-essential patent abuses his dominant position toward a patent infringer within the meaning of art. 102 of the Treaty on the Functioning of the European Union is answered through different approaches.

**aa)**

16   In the "Orange Book Standard" decision (GRUR 2009, 694), the German Federal Supreme Court developed the following concept with reference to art. 82 TEC [Treaty Establishing the European Community], sec. 20 para. 1 GWB [German Act Against Restraint of Competition], and sec. 242 BGB:

17   A plaintiff that asserts the injunction claim on the basis of his standard-essential patent, even though the defendant has a right to be granted

6

MS-MOTO_1823_00005257647

a license to the patent, abuses his dominant position only if the following conditions are met:

18    First, the defendant must have made the plaintiff an unconditional offer (i.e., in particular one that is not made under an infringement proviso) to enter into a license agreement, to which he is bound, and which the plaintiff may not refuse without unfairly impeding the defendant or violating the ban on discrimination.

19    If the defendant considers the royalty demanded by the plaintiff abusively excessive or if the plaintiff refuses to quantify the royalties, the requirement of an unconditional offer is satisfied by an offer to enter into a license agreement in which the plaintiff determines the amount of the royalty at his reasonable discretion.

20    Secondly, if the defendant has already used the object of the patent before the plaintiff has accepted his offer, the defendant must comply with the obligations that the license agreement to entered into stipulates for use of the licensed object. This means especially that the defendant, under the terms of a non-discriminatory agreement, must render account for the scope of his use and that he must satisfy the payment obligations arising from the accounting.

21    In performing his payment obligation, the defendant is not required to pay the royalty directly to the plaintiff. Rather, he has the option of lodging the royalties with a local court.


      **bb)**

22    In contrast, the following concept was set forth in a press release by the European Commission dated 21 December 2012 concerning the Statement of Objections in respect of possible abuse of patent in the mobile phone market in proceedings instituted against B:

7

MS-MOTO_1823_00005257648

23      The European Commission's preliminary view is that the assertion of injunction claims in this case is detrimental to competition and constitutes abusive conduct. The reason cited by the European Commission for the preliminary assessment of B's conduct as being in abuse of law is the "specific circumstances" that B, as the holder of a standard-essential patent, issued a statement of willingness to enter into a FRAND license to a standardization organization, that the competitor must use the standard-essential patent in order to be able at all to participate in the market, and that this competitor or patent infringer is willing to negotiate a license. Because actual specifics of the circumstances to be reviewed have not been disclosed beyond the preceding, it must be assumed that other aspects for the preliminary evaluation of B's conduct as being in abuse of law did not play a significant role in the European Commission's preliminary view.

24      Accordingly, the European Commission takes the preliminary position that the enforcement of an injunction claim is in abuse of law under art. 102 of the Treaty on the Functioning of the European Union by mere virtue of a standard-essential patent being in dispute, the patent holder having pledged to the standardization organization that it will grant licenses to that patent under FRAND terms, and the patent infringer being willing to negotiate. The press release does not state when a patent infringer is willing to negotiate. There is also no mention of the criteria set forth by the German Federal Supreme Court.

**cc)**

25      If the criteria of the German Federal Supreme Court were to be applied, the Defendants' compulsory license plea under cartel law would not succeed and it would be necessary find for the Plaintiff in the infringement action.

26      The Plaintiff was not obligated to accept any of the written license agreement offers presented by the Defendants (Rejoinder dated 31 December 2012, license agreement offer dated 30 January 2013,

8

MS-MOTO_1823_00005257649

pleading dated 5 March 2013).

27   The license agreement offers are insufficient by mere virtue of the fact that they are not "unconditional" offers within the meaning of the German Federal Supreme Court case law. The "licensed products" expressly defined in the Defendants' offers are only base stations that support the LTE standard and that make use of the licensed patent, which means that the offer applies exclusively to those products for which an infringement of the patent-in-suit is ascertained.

28   The Defendants have also failed to adequately comply with their obligations from the license to be granted. Independently of whether the amount of the royalties to be paid was determined accurately, the Defendants did not pay what they consider the resulting royalty of € 50, nor has the presence of a local court acceptance request needed for lodging that amount been ascertained. Moreover, there is no full and proper rendering of account concerning prior use.

29   In contrast, if the legal opinion of the European Commission expressed in the press release were to be applied, the Plaintiff's injunction action would have to be dismissed as being in abuse of law.

30   The Plaintiff bases its claim on a standard-essential patent which the Defendants must use in order to bring the LTE-capable challenged embodiments onto the market. The Plaintiff has issued a statement to the standardization organization ETSI indicating its willingness to grant a license. Moreover, the Defendants, at least at the moment relevant to the Court, namely the conclusion of the oral hearing, must be regarded as "willing to negotiate" within the meaning of the European Commission's legal opinion. Their willingness to negotiate is in any event expressed through the submission of the written license agreement offers, some of which include proposals by the Plaintiff. Based on the aforementioned legal opinion, the fact that the Parties are in dispute concerning the content of various clauses and especially concerning the amount of the royalties to be paid is

9

MS-MOTO_1823_00005257650

of no relevance to the willingness to negotiate.

**3)**

31    The Court is inclined to take the view that in the present situation an assumption of abuse of a dominant position within the meaning of art. 102 of the Treaty on the Functioning of the European Union requires more than merely ascertaining a willingness to negotiate on the part of the patent infringer and ascertaining that the patent holder issued a statement of willingness to grant a license to a standardization organization. This is essentially because of the following considerations:

32    Patents contribute to competitiveness. They create important incentives for technical developments which, after they have been made available to the public by the patent holder, for their part invite further innovation. Developing patents often entails high costs for the patent holder which, experience shows, can be raised only if they can be profitably paid off through the later marketing of the technical teaching. Even if the incorporation of a patent into a standard promotes this payoff, Europe-wide, publicly accessible, and standardized (industry) standards are economically meaningful, expedient, and—in view of the investment volume in question for technologies being developed in parallel— necessary. A technology standard creates compatibility norms, which are an essential condition for opening a new technology up to a broad public within a reasonable time and at acceptable prices. Access to the market is facilitated by a publicly accessible standard, which among other things generates and promotes competition between various manufacturers and service providers and ultimately results in a larger selection of compatible products at low cost to the consumer.

33    As a subjective property right, a patent is a right of exclusivity to which everyone is bound. Art. 64 EPC and sec. 139 para. 1 PatG thus grant the patent holder an injunction claim through which the nuisance caused by illegal use of the patent

10

MS-MOTO_1823_00005257651

can be eliminated. By law, the only condition for this legal position is the presence of use. In principle, special circumstances in the person of the patent holder or infringer or special types of patents are not necessary to enforce injunction claims (LG Düsseldorf, Judgment of 24 April 2012, 4b O 273/10, BeckRS 2012, 09682; LG Mannheim, NJOZ 2009, 1458 – FRAND Statement). Thus, the holder of a standard-essential patent is also entitled to bring an injunction claim in order to protect his legal position. Of course, the injunction claim exists alongside the claim for damages that is also provided by law and that is concerned with the past. Both claims can be asserted cumulatively.

34   The exercise of a right afforded by law in and of itself cannot be regarded as abuse of a dominant position. Rather, there must be additional circumstances that cause the assertion of the injunction claim before a court to be deemed in abuse of law. In this light, it is not acceptable to automatically or necessarily deny an injunction claim that is based on a standard-essential right.

35   It must be acknowledged, however, that by virtue of the dominant position that the standard provides for him in negotiating licenses, the holder of a standard-essential patent occupies a powerful position specifically because of the injunction claim at his disposal. That position may not be used abusively for the purpose of forcing competitors or a license seeker into a license that is not FRAND. In particular, it must be ensured that the holder of a standard-essential patent cannot enforce unreasonably high royalties.

36   On the other hand, there is no reason to give the patent infringer an advantage and provide him with the possibility of dictating a license agreement under *his* terms only—allowing him to enforce unreasonably low royalties, for example. But that is the threat if a holder of a standard-essential patent is barred from asserting the injunction claim per se. The patent holder's negotiating position is weakened considerably because he lacks the "leverage" necessary for license negotiations on equal terms. He must tolerate the ongoing,

11

MS-MOTO_1823_00005257652

illegal use of his patent and must do so permanently, regardless of if and when a license agreement is actually entered into. Only after the fact does he receive damages at a time that he cannot yet predict, the enforceability and amount of which are uncertain. If the patent holder does not have the ability to prohibit use of the patent, the license seeker cannot anticipate timely sanctions. This is true even if the negotiations on a license drag on exclusively for reasons for which he bears responsibility.

37   A weakening of the patent holder's negotiating position is even less appropriate by virtue of the fact that the infringer against whom the claim is brought is generally not the only licensee of the standard-essential patent. Rather, there are usually a number of competitors who have inquired with the patent holder about a license before beginning their use and who since then have complied with their duties of disclosure and payment under the license agreement. The principle of equal treatment applies fundamentally to these licensees and to the infringer against whom the claim is brought. In any event, there is no discernible objective reason for granting a party seeking a license by entering the compulsory license plea under cartel law privileged status relative to other licensees. A better position for the patent infringer would in fact be tantamount to "rewarding" initially illegal conduct. There is even less reason for this by virtue of the fact that a patent holder who takes legal action against an unlicensed infringer of his standard-essential patent is not only acting in his own interest, the aim being to end the illegal encroachment on his intellectual property and to restore the proper legal situation. He is also acting in the interest of his licensees, who are at a competitive disadvantage if the patent infringer evades the duties under the license agreement and consequently does not have to factor in the licensing costs that the other licensees must pay. The less strictly the requirements for the infringer's licensing efforts are defined, the longer he will be able to maintain the imbalance in competition with the contractual licensees that he has achieved to his advantage through the illegal infringing actions.

38   Accordingly, neither an unjustified dominant position by the patent holder nor an unjustified dominance by the patent infringer is conducive to the aim of entering into a license agreement under FRAND terms immediately.

12

MS-MOTO_1823_00005257653

Both situations are detrimental to competition, dishonest, and unworthy of protection. What is instead required is a reasonable and fair reconciliation of interests that takes into account all of the parties' legitimate interests and in the end provides a situation in which both sides have an approximately equal negotiating position.

39    It seems doubtful that such a reconciliation is possible if, in the presence of a statement by the patent holder of his willingness to grant a license, the patent infringer's willingness to negotiate serves as the sole criterion for judging conduct by the patent holder to be in violation of cartel law. The concept of "willingness to negotiate" leaves much room for various interpretations. With a possible broad understanding of the concept, there is no need to enter into negotiations; all that is needed is a general, oral statement containing no concrete terms and merely evincing a willingness to enter into license negotiations (sometime and in some way). Such a statement can be made effortlessly, is hardly reliable, and can be modified, retracted, and if necessary repeated at any time. Moreover, it says nothing about the concrete terms that must be addressed in order to tell whether the license in question is FRAND. But even if a statement includes concrete licensing terms, misgivings can exist concerning its seriousness. The patent infringer can also modify or retract it at any time or name terms that are obviously unreasonable. The fact that these are not purely theoretical misgivings is shown by the experiences that the Court has had in various patent infringement disputes of this type. It has often had the impression that defendants that have used the compulsory license plea as their defense were in fact not seriously interested in a FRAND license and thus made only minimal efforts to enter into an agreement.

40    If the willingness to negotiate is to be used as a suitable criterion, then in order to rule out purely tactical, delaying, and non-serious conduct it would have to satisfy certain standards as to quality and timing that make it clear that the defendant is honest and deserves protection. For example, it could be required that the patent infringer has already entered into negotiations by naming concrete terms under which he is willing to enter into a license agreement.

13

MS-MOTO_1823_00005257654

41    It must also be considered that a license essentially produces an effect only for the future. It is only after a license is granted that the licensee is entitled to use the object of the license agreement. Therefore, each license seeker is required to obtain a license before using a patent. For that reason, a proper licensee typically submits an offer to enter into a license agreement before commencing use. If the holder of a standard-essential patent refuses to grant a license, the license seeker can bring legal action to assert a claim for the granting of a license under cartel law. In view of the required equal treatment of license seekers or licensees, therefore, an infringer against whom a claim is brought must also be required to request a license or assert a claim to that effect through legal action before using the patent.

42    In the present situation, however, it seems appropriate to exempt a patent infringer from the requirement of obtaining prior permission. In exchange for this privileged status, he must be required to submit a well-formulated, acceptable license agreement offer containing all provisions that are usually found in license agreements in the respective technical field. Only then can a patent holder reasonably be accused of discrimination against the license seeker—relative to other licensees—if he refuses to accept such an offer (OLG Karlsruhe, GRUR-RR 2012, 124 – GPRS Compulsory License; OLG Karlsruhe GRUR-RR 2007, 177 – Orange Book Standard; LG Düsseldorf, Judgment of 24 April 2012, 4b O 273/10, BeckRS 2012, 09682; LG Mannheim, Notices 2012, 120 – Compulsory License Plea under Cartel Law). Moreover, the submission of such an offer confirms the seriousness of the plea entered. In addition, the license seeker can be reasonably expected to do this. Aside from the fact that in many cases licensing agreements concerning the respective standard already exist, which the patent holder typically uses and which could thus serve as orientation, in the Court's experience the patent infringers are generally (specialized) companies that are active participants in economic life and that have knowledge of license agreements in the respective technical field. This is confirmed by the present proceedings. The internationally active Parties were already in contact extrajudicially, and Defendant 1 has also considered a (cross-)license.

14

MS-MOTO_1823_00005257655

43   A license seeker's obligation to make such an offer is not altered by the fact that a patent holder has previously told a standardization organization of his willingness to grant a license. By pledging to grant a license to third parties under FRAND terms, the patent holder has indeed made it clear that he sees it as his duty to grant licenses under FRAND terms. However, no positive right of use or obligation by the patent holder to make an offer can be deduced from the general FRAND statement. A patent holder's intent with such a statement is not to grant a right of use to a large number of (unknown) third parties without securing his royalty claim and to additionally take on the duties of a licensor. Thus, the statement of willingness to grant a license creates only a further basis for the granting of a FRAND license, for which the license seeker—like any other party desiring a license—must formulate a corresponding request (OLG Karlsruhe, InstGE 12, 220 – MP3 Standard; LG Düsseldorf, Judgment of 24 April 2012, 4b O 273/10, BeckRS 2012, 09682; LG Düsseldorf, Notices 2012, 238 – MPEG-2 Standard XXIII; LG Mannheim, InstGE 13, 65 – UMTS-Capable Mobile Phone II; Kühnen, Handbook of Patent Infringement, 6th edition, section 1459).

44   It does not seem imperative that this offer must be "unconditional" in the sense that the licensee may not make it subject to the proviso that the challenged embodiments make use (as determined by the court) of the patent-in-suit. Even a freely negotiated license agreement often covers only objects that use the technical teaching of the licensed patent. Therefore, the inclusion of an infringement proviso in a license agreement offer does not necessary raise doubts about the seriousness of the offer. A requirement to that effect is moreover in conflict with the ability rightly enjoyed by the defendant to deny use of the patent-in-suit. Whether use of the patent has been credibly contested in cases of a standard-essential patent must be examined in the specific case based on the national procedural law.

45   In addition, it does not see imperative to require that this offer be "unconditional" in the sense that the licensee may not make it subject to the proviso that the patent-in-suit proves to be legally valid. If the license seeker is prohibited from

15

MS-MOTO_1823_00005257656

challenging the legal validity of the patent or if the patent holder is automatically granted a right to terminate in the event of such a challenge, this could lead to a situation in which the legal validity of standard-essential patents that all market players must use is never reviewed. There is no interest, however, in maintaining patents that are not legally valid. The only "choice" available to a competitor who doubts the legal validity of the standard-essential patent would be to pursue proceedings on legal validity before commencing his business activity and to wait for those proceedings to be completed.

46    Furthermore, it seems appropriate and logical in the case of a defendant who has assumed the right to bring patent-infringing objects onto the market even before a license has been granted to impose on him the duties that would come with the license to be granted, which he is in fact seeking through the license agreement under cartel law. With "anticipation" of the rights comes "anticipation" of the obligations. It is not only the patent holder who must be treated as if the license had already been granted because of the factual situation created by the infringement; the patent infringer must also be treated in that way. This ensures a balanced relationship between the parties to the license. By satisfying his duties, the patent infringer also proves the seriousness of his request for license. Finally, it is unclear in this regard why the patent infringer should be in a better position relative to another licensee. Therefore, it seems appropriate to also require the patent infringer to render accounts properly and pay royalties in particular.

47    The parties often argue over what amount of royalties is reasonable, which may in some cases be hard to determine. In such a situation, a patent holder must not be able to enforce unreasonable royalty demands.

48    Reasonable protection can be achieved, for example, by giving the patent infringer the option of not paying the royalty directly to the patent holder, but instead initially furnishing "security" only. The amount of security would have to correspond to the reasonable royalty, the amount of which could be roughly reviewed by the infringement court. German

16

MS-MOTO_1823_00005257657

law, for example, provides for lodging a sum with a local court (secs. 372 et seq. BGB). Subsequent proceedings would determine whether and to what extent the security is to be released to the patent holder as royalty. If all other conditions are satisfied and adequate security has been paid for the royalty, the defendant's license plea would be accepted and the plaintiff would no longer have an injunction claim, even though a final decision has not yet been made about the actual amount of the royalty to be paid.

49    Another possibly additional approach is for the infringer to leave it up to the patent holder to determine the royalties at his reasonable discretion. In German law, this possibility is set forth in sec. 315 BGB. The question of whether the determination made by the patent holder is legal would in turn be clarified by the court in subsequent proceedings. If a patent infringer offers to allow a patent holder to determine the royalty and the patent holder refuses to accept the license agreement offer, then the patent holder is acting in abuse of law, and so the compulsory license plea under cartel law succeeds and the injunction action must be dismissed. Here too, the advantage is that a final resolution of the usually hotly contested issue of royalties need not take place conclusively in the infringement proceedings. With this approach, the patent infringer does not run the risk of offering a royalty that is too high, which would be to the patent holder's advantage, or of offering a royalty that is too low, which would render his license request unsuccessful.

**4)**

50    Besides the injunction claim, the Plaintiff is also asserting against the Defendants claims for disclosure, recall, and damages or ascertainment of damages. The Defendants can enter the compulsory license plea under cartel law with regard to these claims as well. Therefore, the question is whether the conditions under which an abuse of power by the holder of a standard-essential patent must be assumed also claim validity for the assertion of the other claims derived from a patent infringement.

17

MS-MOTO_1823_00005257658

## III.

51    The Court is aware that it is not subject to the duty of referral pursuant to art. 267 para. 3 of the Treaty on the Functioning of the European Union. In exercising its discretion under art. 267 para. 2 of the Treaty on the Functioning of the European Union, however, the Court has given particular consideration to the fact that art. 102 of the Treaty on the Functioning of the European Union allows for multiple interpretations that must reasonably be deemed equally possible for an informed jurist and that the issues relevant to a decision have not previously been interpreted by the Court of Justice. The decision by the Court of Justice in the "IMS Health" case (ECJ 2004 ECR I-5069 et seq.) concerned only cases in which a property right holder refused in principle to grant licenses. The proper application of Community law also does not appear to be so obvious that there is no room for reasonable doubt.

52    Moreover, the answers to the submitted questions have far-reaching significance. A large number of patent infringement actions relating to standard-essential patents are pending in Europe. The question of whether and under what conditions rights can be derived from such a patent, in particular whether the infringement claim is enforceable, is not assessed uniformly by the competent institutions (German Federal Supreme Court, European Commission). Only a decision by the Court of Justice can bring final clarity. The submission of the questions on interpretation of art. 102 of the Treaty on the Functioning of the European Union by a court of first instance results in timely clarification by the Court of Justice, which is in the interest of all involved parties.


Voss                          Knappke                          Dr. Reimnitz


Copy produced:


Reimers
Judicial Officer
as Clerk of Court


18

MS-MOTO_1823_00005257659