# EXHIBIT 9

## UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| In re Innovatio IP Ventures, LLC, Patent Litigation | Case No. 1:11-cv-09308 |
| This Document Relates To: | Judge James F. Holderman<br>Magistrate Judge Sidney Schenkier |
| *Cisco Systems, Inc., and Motorola Solutions, Inc., v. Innovatio IP Ventures, LLC*, Case No. 1:11-cv-09309 (originally 1:11-cv-00425 (D. Del.)) | **[PUBLIC REDACTED VERSION]** |
| and | |
| *NETGEAR, INC. v. Innovatio IP Ventures, LLC*, Case No. 1:12-cv-00427 (originally 1:11-cv-01139 (D. Del.)) | |

## THE SUPPLIERS' OPPOSITION TO INNOVATIO'S MOTION TO DISMISS

MS-MOTO_1823_00005255547

## TABLE OF CONTENTS

I.     **Introduction** ....................................................................................................1

II.    **Statement of Facts** ..........................................................................................4
      A.     Innovatio Purchases 31 Patents That Are Heavily Encumbered By Prior Licenses And Other Obligations ................................................................4
      B.     Innovatio Adopts A Licensing Campaign Designed To Avoid The Prior Obligations On The Patents Through Misrepresentations And Coercion .............5
            1.     Innovatio Targets End Users That Do Not Know About The Accused Technology Or The Licensing Of Innovatio's Patents ................6
            2.     Innovatio Misrepresents And Conceals The Substantial Limitations On Its Ability To License The Patents ..........................................6
            3.     Innovatio Threatens A Burdensome Negotiation And Investigation Process To Keep Its Targets From Investigating ...............................8
            4.     Innovatio Threatens Costly Lawsuits To Further Dissuade Its Targets From Investigating ......................................................9
            5.     Innovatio Demands Licensing Fees Less Than The Cost Of Investigation Or Defense, But Orders Of Magnitude Above Any Amount To Which Innovatio Is Entitled ...................................10
      C.     The Suppliers Amended Their Complaint To Address Innovatio's Unlawful Campaign And The Significant Harm It Is Causing............................10

III.   **Argument** .......................................................................................................11
      A.     The Accused Conduct Is Not Immune Under *Noerr-Pennington* .......................11
            1.     Innovatio's Licensing Conduct Is Not Protected Petitioning Activity .................................................................................11
            2.     The "Sham" Exception Would Allow The Suppliers' Claims To Proceed................................................................................13
      B.     The Suppliers Have Standing And Have Pled Direct Injury ...............................16
      C.     The Suppliers Sufficiently Pled An Enterprise...........................................20
      D.     The Suppliers Have Stated Multiple Patterns Of Racketeering Activity...............23
            1.     Mail And Wire Fraud.....................................................................23
            2.     Hobbs Act And Cal. Penal Code § 518.............................................26
      E.     The Suppliers Have Stated A Plausible Claim Under Twombly .........................30
      F.     The Suppliers Properly Allege Breach Of Contract ...............................................30
      G.     The Suppliers Have Standing And Stated A Claim For Promissory Estoppel....................................................................................34
      H.     The Suppliers Have Stated A Claim Under Cal. Bus. & Prof. Code § 17200......................................................................................35
      I.     The Suppliers Have Stated A Claim For Tortious Interference With Prospective Economic Advantage .............................................................38
      J.     The Suppliers Have Stated A Claim For Civil Conspiracy ..................................40
      K.     The Suppliers Have Stated A Claim For Unclean Hands......................................40

MS-MOTO_1823_00005255548

# TABLE OF AUTHORITIES

## Cases

*Action Apartment Ass'n, Inc. v. City of Santa Monica,*
  163 P.3d 89 (Cal. 2007) ......................................................................... 37, 38

*Adamczyk v. Lever Bros. Co.,*
  991 F. Supp. 931 (N.D. Ill. 1997) ......................................................... 24

*Allied Tube & Conduit Corp. v. Indian Head, Inc.,*
  486 U.S. 492 (1988) ............................................................................. 11, 12

*Anza v. Ideal Steel Supply Corp.,*
  547 U.S. 451 (1991) ............................................................................. 19

*Apple Inc. v. Samsung Electronics Co., Ltd.,*
  No. 11-cv-01846, 2012 WL 1672493 (N.D. Cal. May 14, 2012) ................ 32, 33, 34

*Apple, Inc. v. Motorola Mobility, Inc.,*
  No. 11-cv-178, 2011 WL 7324582 (W.D. Wis. June 7, 2011) ................ 32, 34

*Apps Communications, Inc. v. S2000 Corp.,*
  No. 10-c-1618, 2010 WL 3034189 (N.D. Ill. Aug. 3, 2010) .................... 35

*B.V. Optische Industrie De Oude Delft v. Hologic, Inc.,*
  909 F. Supp. 162 (S.D.N.Y. 1995) ......................................................... 29

*Baker v. IBP, Inc.,*
  357 F. 3d 685 (7th Cir. 2004) ............................................................... 22

*BCS Servs., Inc. v. Heartwood 88, LLC,*
  637 F.3d 750 (7th Cir. 2011) ................................................................. 18

*Bridge v. Phoenix Bond & Indemnity Co.,*
  553 U.S. 639 (2008) ............................................................................. 17, 29

*Broadcom Corp. v. Qualcomm Inc.,*
  No. 06-4292 (3d Cir. Dec. 19, 2006) ..................................................... 31

*Brokerage Concepts v. United States Healthcare,*
  140 F.3d 494 (1998) ............................................................................. 29

*Buckland v. Threshold Enterprises, Ltd.,*
  155 Cal. App. 4th 798, 66 Cal.Rptr.3d 543 (2007) ................................ 36

*Cal. Motor Transport Co. v. Trucking Unlimited,*
  404 U.S. 508 (1972) ............................................................................. 14, 15

*Cardtoons L.C. v. Major League Baseball Players Ass'n,*
  208 F.3d 885 (10th Cir. 2000) ............................................................... 11, 13

*Catch Curve v. Venali, Inc.,*
  519 F. Supp. 2d 1028 (C.D. Cal. 2007) ................................................. 39

*Cedric Kushner Promotions, Ltd. v. King,*
  533 U.S. 158 (2001) ............................................................................. 21

iii

*Chen v. Mayflower Transit, Inc.*,
  315 F. Supp. 2d 866 (N.D. Ill. 2004) ...................................................................... 21

*Continental Casualty Co. v. American Nat. Ins. Co.*,
  417 F.3d 727 (7th Cir. 2005) .................................................................................. 31

*Crichton v. Golden Rule Insurance Co.*,
  576 F.3d 392 (7th Cir. 2009) ............................................................................ 22, 24

*Dexia Credit Local v. Cuppy*,
  No. 10-c-1563, 2010 WL 3257873 (N.D. Ill.  Aug. 16, 2010) ............................. 23

*Diagnostics System v. Symantec Corp.*,
  No. SA CV 06-1211 (C.D. Cal. Aug. 28, 2008) ................................................... 12

*Eazypower Corp. v. ICC Innovative Concepts Corp.*,
  98-c-3189, 2002 WL 31473813 (N.D. Ill. 2002) ............................................. 29, 30

*Edwards v. Centex Real Estate Corp.*,
  53 Cal. App. 4th 15, 61 Cal. Rptr. 2d 518 (1997) ................................................ 37

*Emery v. Am. General Finance, Inc.*,
  71 F.3d 1343 (7th Cir. 1995) ............................................................................ 24, 26

*Energy Services Air Conditioning & Heating Co., Inc. v. Nicor, Inc.*,
  No. 97-C-373, 1997 WL 790725 (N.D. Ill. Dec. 22, 1997) .................................. 39

*Erickson v. Pardus*,
  551 U.S. 89 (2007) ................................................................................................. 24

*F.D.I.C. v. Gravee*,
  966 F. Supp. 622 (N.D. Ill. 1997) ......................................................................... 35

*Ficke v. Johns*,
  95-c-939, 1996 WL 99424 (N.D. Ill. Mar. 4, 1996) ............................................. 27

*FTC v. Superior Court Trial Lawyers Ass'n*,
  493 U.S. 411 (1990) ............................................................................................... 11

*Gateway W. Ry. v. Terminal R.R. Ass'n of St. Louis*,
  No. 95-cv-0429-PER, 1998 U.S. Dist. LEXIS 4614 (S.D. Ill. Feb. 5, 1998) .......... 39

*Harris Custom Builders v. Hoffmeyer*,
  No. 90-c-0741, 1994 WL 329962 (N.D. Ill. July 7, 1994) ............................... 27, 30

*Hemi Group, LLC v. City of New York, N.Y.*,
  130 S.Ct. 983 (2010) .............................................................................................. 19

*Holmes v. Securities Investor Protection Corp.*,
  503 U.S. 258 (1992) ........................................................................................... 18, 19

*HTC Swed. AB v. Innovatech Prods. & Equp. Co.*,
  2008 U.S. Dist. LEXIS 76690 (E.D. Tenn. Sept. 30, 2008) ................................. 29

*Hynix Semiconductor Inc. v. Rambus Inc.*,
  441 F. Supp. 2d 1066 (N.D. Cal. 2006) ................................................................ 25

iv

*In re JPMorgan Chase Bank Home Equity Line of Credit Lit.,*
    794 F. Supp. 2d 859 (N.D. Ill. 2011) ................................................................. 29

*Israel Travel Advisory Serv., Inc. v. Isr. Identity Tours, Inc.,*
    61 F.3d 1250 (7th Cir. 1995) ............................................................................ 18

*Johnson Elec. N. Am. Inc. v. Mabuchi Motor Am. Corp.,*
    98 F. Supp.2d 480 (S.D.N.Y. 2000) .................................................................. 29

*Kottle v. Northwest Kidney Ctrs.,*
    146 F.3d 1506 (9th Cir. 1998) .............................................................. 14, 15, 16

*Kwikset Corp. v. Superior Court,*
    246 P.3d 877 (Cal. 2011) .................................................................................. 35

*Lemelson v. Wang Laboratories, Inc.,*
    874 F.Supp. 430 (D. Mass. 1994) ..................................................................... 29

*Linzer Prods. Corp. v. Sekar,*
    499 F. Supp. 2d 540 (S.D.N.Y. 2007) ............................................................... 40

*Livingston Downs Racing Ass'n v. Jefferson Downs Corp.,*
    192 F. Supp. 2d 519 (M.D. La 2001) ................................................................ 15

*MacNeil Automotive Prod., Ltd. v. Cannon Automotive Ltd.,*
    715 F. Supp. 2d 786 (N.D. Ill. 2010) ................................................................ 35

*MCM Partners v. Andrews–Bartlett & Assoc.,*
    62 F.3d 967 (7th Cir. 1995) .............................................................................. 22

*McWright v. Alexander,*
    982 F.2d 222 (7th Cir. 1992) ............................................................................ 29

*Michael v. Letchinger,*
    No. 10-c-3987, 2011 WL 3471082 (N.D. Ill. Aug. 5, 2011) ............................. 15

*Microsoft Corp. v. Motorola, Inc.,*
    864 F. Supp. 2d 1023 (W.D. Wash. June 6, 2012) ............................ 31, 32, 33, 35

*Mitkal v. United Parcel Serv. Co.,*
    No. 09-CV-3355, 2011 WL 148405 (N.D. Ill. Jan. 18, 2011) .......................... 39

*Monex Deposit Co. v. Gilliam,*
    666 F. Supp. 2d 1135 (C.D. Cal. 2009) ............................................................ 27

*Morton Grove Pharmas., Inc. v. Par Pharma. Cos., Inc.,*
    No. 04-c-7007, 2006 WL 850873 (N.D. Ill. Mar. 28, 2006) ....................... 14, 16, 29

*N. Trust Co. v. Ralston Purina Co.,*
    No. 94-c-4045, 1994 U.S. Dist. LEXIS 15730 (N. D. Ill. Oct. 28, 1994) ............ 20

*Nat'l Org. for Women Inc. v. Scheidler,*
    510 U.S. 249 (1994) ............................................................................. 17, 18, 28

*OpenLCR.com, Inc. v. Rates Tech., Inc.,*
    12 F. Supp. 2d 1223 (D. Colo. 2000) ................................................................ 11

v

*Pac. Mar. Freight, Inc. v. Foster*,
   No. 10-cv-0578-BTM-BLM, 2010 WL 3339432 (S.D. Cal. Aug. 24, 2010) ......................... 39

*Pennsylvania Public School Employees' Retirement System v. Bank of Am. Corp.*,
   --- F. Supp. 2d --- , 2012 WL 2847732 (S.D.N.Y. Jul. 11, 2012) .......................................... 26

*Phoenix Bond & Indemnity Co. v. Bridge*,
   477 F.3d 928 (7th Cir. 2007) ......................................................................................... 17, 18

*Powell v. Am. Bank & Trust Co.*,
   640 F. Supp. 1458 (N.D. Ind. 1986) ...................................................................................... 26

*Professional Real Estate Investors, Inc. v. Columbia Pictures, Inc.*,
   508 U.S. 49 (1993) ...................................................................................................... 11, 13, 14

*RehabCare Group, East, Inc. v. Camelot Terrace, Inc.*,
   No. 11-c-6557, 2012 WL 1246560 (N.D. Ill. April 13, 2012) ................................................. 35

*Research in Motion v. Motorola, Inc.*,
   644 F. Supp. 2d 788 (N.D. Tex. 2008) .............................................................................. 32, 33

*Rogers v. Home Shopping Network, Inc.*,
   57 F. Supp. 2d 973 (C.D. Cal. 1999) ..................................................................................... 38

*Rubloff Dev. Grp., Inc. v. SuperValu, Inc.*,
   No. 10-C-3917, 2012 U.S. Dist. LEXIS 4130 (N.D. Ill. Mar. 27, 2012) ................................ 39

*RVB Serv. LLC v. Hartford Computer Group, Inc.*,
   539 F.3d 681 (7th Cir. 2008) ................................................................................................. 18

*Sebastian, Intern., Inc. v. Russolillo*,
   128 F. Supp. 2d 630 (C.D. Cal. 2001) ................................................................................... 39

*Shapo v. O'Shaughnessy*,
   246 F. Supp. 2d 935 (N.D. Ill. 2002) .................................................................................... 22

*Shloss v. Sweeney*,
   515 F. Supp. 2d 1068 (N.D. Cal. 2007) ................................................................................. 40

*Silicon Labs Integration, Inc. v. Melman*,
   No. C-08-04030, 2010 WL 890140 (N.D. Cal. Mar. 8, 2010) ................................................ 39

*Smith v. Levine Leichtman Capital Partners, Inc.*,
   723 F. Supp. 2d 1205 (N.D. Cal. 2010) ................................................................................. 38

*Sosa v. DIRECTV, Inc.*,
   437 F.3d 923 (9th Cir. 2006) ..................................................................................... 12, 13, 16, 27

*Spanish Int'l Commc'ns Corp. v. Leibowitz*,
   608 F. Supp. 178 (S.D. Fla. 1985) ......................................................................................... 16

*U.S. v. Enmons*,
   410 U.S. 396 (1973) ..................................................................................................... 28, 29, 30

*U.S. v. Fawell*,
   02-cr-310, 2003 WL 21544239 (N.D. Ill. July 9, 2003) ........................................................ 28

vi

MS-MOTO_1823_00005255552

*U.S. v. Laraneta,*
    --- F.3d ---, 2012 WL 5897610 (7th Cir. Nov. 14, 2012) ....................................................... 18

*U.S. v. Santoni,*
    585 F.2d 667 (4th Cir.1978), cert. denied, 440 U.S. 910 (1979) .................................... 28

*United Mine Workers v. Pennington,*
    381 U.S. 657 (1965) ....................................................................................................... 13

*Universal Manf. Co. v. Douglas Press, Inc.,*
    89-c-3354, 1991 U.S. Dist. LEXIS 6279 (N.D. Ill. 1991) ......................................... 29

*Village of Lake Barrington v. Hogan,*
    649 N.E.2d 1366 (Ill. App. Ct. 1995) .................................................................. 39, 40

*Visto Corp .v. Sproquit Techs., Inc.,*
    360 F. Supp. 2d 1064 (N.D. Cal. 2005) ................................................................... 27

*Walker v. City of Lakewood,*
    272 F.3d 1114 (9th Cir. 2001) ................................................................................. 37

*Weiland Sliding Doors and Windows v. Panda Windows and Doors, LLC,*
    No. 10-cv-677, 2010 WL 4392547 (S.D. Cal. Oct. 28, 2010) .................................. 38

*Winstead v. EMC Mortg. Corp.,*
    697 F. Supp. 2d 1 (D.D.C. 2010) ........................................................................... 40

*Xilinx, Inc. v. Intellectual Ventures I LLC,*
    No. C 11-0671 SI, 2012 WL 243302 (N.D. Cal. Jan. 25, 2012) ............................... 36

## Statutes

18 U.S.C. § 1951(b)(2) ................................................................................... 29, 30

18 U.S.C. § 1961(4) ....................................................................................... 23, 24

## Other Authorities

Cal. Bus. & Prof. Code § 17200 ................................................... 10, 40, 41, 44

Cal. Civ. Code § 47 ......................................................................................... 42

Cal. Penal Code § 518 ......................................................................... 29, 30, 31

California Code of Civil Procedure § 425.16 ............................................... 43

## Rules

Fed. R. Civ. P. 8(d) ......................................................................................... 38

MS-MOTO_1823_00005255553

## I.    INTRODUCTION

Innovatio does not deny that a key aspect of its licensing program is to hide from its targets that 50% or more of the targeted products are already licensed to Innovatio's patents, or that Innovatio is obligated to license the patents on reasonable and non-discriminatory ("RAND") terms.[1]  Innovatio also does not deny engaging in the other misconduct alleged by the Suppliers.  Instead, Innovatio incorrectly argues the Suppliers should be denied relief from Innovatio's unlawful licensing tactics because of alleged legal deficiencies with the Suppliers' claims.  Contrary to Innovatio's contentions, the Suppliers' claims are well grounded in the law and the Suppliers have more than met the requirements for pleading their new claims:

- **Innovatio Is Not Immune From Suit**: Innovatio's thousands of licensing communications are not immune from liability under *Noerr-Pennington*.  First, they are not protected "petitioning activity"; they are private-party communications made in the ordinary course of Innovatio's licensing business, separate and apart from any reasonably-contemplated litigation.  Innovatio effectively proposes to immunize all patent assertion activities provided the activities are accompanied by threats of litigation, but no such blanket protection for licensing activities exists.  Further, Innovatio's unlawful licensing tactics — which include mass assertion of objectively baseless claims disguised through deceit and intimidation — easily fall within the "sham" exception to *Noerr-Pennington* immunity.

- **Innovatio's Unlawful Conduct Directly Injured the Suppliers**: Not surprisingly given that their customers were targeted by Innovatio based on the customers' use of

---

[1] Defendants Innovatio IP Ventures, LLC, Noel Whitley, and Innovatio Management LLC are referred to collectively herein as "Innovatio," except where otherwise indicated.  Defendants are referred to as "Innovatio" solely for the convenience of the Court, and it should be recognized that each of the Defendants has engaged in the unlawful acts alleged herein.  Cisco Systems, Inc., Motorola Solutions, Inc. and NETGEAR Inc. are referred to collectively herein as the "Suppliers."

MS-MOTO_1823_00005255554

the Suppliers' Wi-Fi products, the Suppliers have suffered cognizable injury as a direct result of Innovatio's unlawful conduct. For instance, the Suppliers have incurred significant sums investigating and dealing with Innovatio's demands and threats against their customers, including numerous requests for defense and indemnification. Cisco alone has received over five hundred inquiries and requests for indemnity from its customers. Additionally, Innovatio's unlawful conduct has harmed the Suppliers' businesses by directly interfering with the Suppliers' sales of Wi-Fi products to customers targeted by Innovatio. The Suppliers have suffered harm sufficient to confer standing to pursue their RICO claim.

- **The Other Elements Of RICO Have Been Met**: The fraud and threats perpetrated by Innovatio qualify as predicate acts of mail fraud, wire fraud, extortion, attempted extortion, and racketeering under the law. Innovatio does not dispute that grounds exist for these claims, and only raises challenges to a small subset of issues. For instance, the Suppliers have alleged numerous, specific instances of fraud with particularity, most of which Innovatio raises no challenge to. Likewise, with respect to extortion, Innovatio raises no challenge to the Suppliers' claim of extortion under state law. Similarly, with respect to the enterprise requirement, Innovatio raises no challenge to one of the two enterprises alleged by the Suppliers.

- **The Suppliers' RAND Claims Should Not Be Dismissed**: Substantial precedent supports the Suppliers' claims seeking to enforce Innovatio's RAND commitments. The Suppliers are at least intended beneficiaries of the RAND commitments governing Innovatio's patents, and it is proper for the Suppliers to plead a promissory estoppel claim in the alternative to the breach of contract claim. Moreover,

2

MS-MOTO_1823_00005255555

Innovatio's suggestion that it can ignore its RAND obligations by bundling RAND-committed patents with patents that it claims are not subject to RAND demonstrates Innovatio's disregard for its legal and RAND obligations.

- **The Suppliers' Section 17200 Claim Is Rooted In Precedent**: The harm suffered by the Suppliers as a direct result of Innovatio's misconduct supports the Suppliers' claim under California Business & Professions Code Section 17200 as well. Moreover, just as Innovatio's out-of-court licensing communications are not immune from liability under the *Noerr-Pennington* doctrine, those communications are not privileged under California law.

- **The Suppliers' Conspiracy And Unclean Hands Claims Are Proper**: Innovatio makes no independent objection to the Suppliers' conspiracy claim. Because the Suppliers' underlying causes of action are legally sound, the Suppliers' civil conspiracy claim also passes muster. Additionally, the law recognizes the Suppliers' claim for a declaratory judgment of unclean hands, an issue that Innovatio concedes is already in the case by virtue of the Suppliers' affirmative defenses.

The Suppliers' claims are properly pled and should not be dismissed. The Suppliers are entitled to pursue their claims against Innovatio in order to put a stop to and remedy the consequences of Innovatio's unlawful conduct. Innovatio's unlawful conduct has directly harmed the Suppliers and their customers, causing them to incur significant financial losses and harm to their business activities. Moreover, Innovatio's pursuit of licenses on already-licensed products and disregard of its RAND obligations threatens the viability of the very Wi-Fi technology it seeks unreasonably to tax. Companies such as the Suppliers would not agree to make the necessary and substantial investments in developing and commercializing a

3

MS-MOTO_1823_00005255556

standardized technology if a patent holder could renege and then extort a non-RAND license —

let alone *two* licenses on the same product — from them once the market is locked in.

Innovatio's motion to dismiss should be denied in its entirety.

## II.     STATEMENT OF FACTS

### A.     Innovatio Purchases 31 Patents That Are Heavily Encumbered By Prior Licenses And Other Obligations

Innovatio was formed in 2011 by Noel Whitley, a former intellectual property executive

at Irvine, California based Broadcom Corporation ("Broadcom").  AC ¶ 57.  Two weeks later,

Broadcom assigned 31 patents to Innovatio.  AC ¶¶ 57–59.  Innovatio makes no products,

engages in no research, and offers no services.  AC ¶ 7.  Rather, it was founded solely to

monetize those patents through licensing and patent assertion.  AC ¶ 7.  Although Innovatio

applies its claims to IEEE 802.11 (or "Wi-Fi") technologies implemented on computer chips

incorporated into products such as access points and laptops which allow users to wirelessly

access the Internet, Innovatio focuses its licensing demands on end users (*e.g.*, small coffee

shops, non-profit medical research organizations, or bookstores) rather than on the manufacturers

of Wi-Fi chips or the suppliers of the products incorporating the chips.  *See, e.g.,* AC ¶¶ 73, 82.

When Innovatio acquired the patents, they were heavily encumbered with prior licenses

and other obligations.  For instance, the patents already are licensed to some of the largest Wi-Fi

chip suppliers, including Broadcom, Qualcomm Atheros, and others.  AC ¶¶ 69–70, 77.[2]  As a

result, a substantial share of Wi-Fi products are already licensed — the Suppliers believe as

much as 50% or more.  Additionally, Innovatio's patents are subject to contractual obligations

made as part of the Wi-Fi standards-setting process which require Innovatio to license the patents

on reasonable and non-discriminatory ("RAND") terms.  AC ¶¶ 67–68, 75–76.  These licenses

---

[2] ██████████████████████████████████████████████████████████
████████████████████████████████████████████ AC ¶ 79.

4

MS-MOTO_1823_00005255557

and obligations severely restrict the pool of potential licensees to whom Innovatio would be entitled to license the patents, and the terms on which Innovatio can license them.  Nevertheless, Innovatio deliberately has sought and obtained license fees from end users of already-licensed equipment, and obtained unreasonable license fees on unfair terms which violate the RAND obligations that attach to the patents.  AC ¶¶ 47, 71–77.

**B.      Innovatio Adopts A Licensing Campaign Designed To Avoid The Prior Obligations On The Patents Through Misrepresentations And Coercion**

Knowing there are substantial restrictions on who may be targeted for licenses and on the amounts that may be requested, Innovatio initiated a nationwide licensing campaign designed to circumvent those restrictions through misrepresentation and intimidation of end users of equipment, to the Suppliers' detriment.  AC ¶¶ 71–85.  Innovatio's scheme is simple: (1) target end users of Wi-Fi devices — *i.e.*, those least knowledgeable about the accused Wi-Fi technologies and the encumbrances on the patents, AC ¶¶ 44, 46; (2) misrepresent and engage in material omissions about the substantial prior licensing of and RAND obligations on the patents, as well as other relevant facts, AC ¶¶ 47, 71–85; (3) threaten a costly and burdensome negotiation and investigation process to persuade the end users not to investigate the facts, AC ¶¶ 46, 84, Exh. 25; (4) use pending litigations to suggest an imminent threat of a costly lawsuit if the end users refuse to pay Innovatio the monies Innovatio demands, AC ¶¶ 46, 75, 78, 84, Exh. 25; and (5) demand licensing fees that Innovatio tells end users are far less than the cost of investigation or defense, but that are (unbeknownst to Innovatio's targets) orders of magnitude greater than the amount, if any, to which Innovatio could ever possibly be entitled.  AC ¶¶ 71–85, Exh. 25.  This scheme, in turn, is causing direct and material harm to the Suppliers, who are inundated with requests for help and indemnification from their customers and have been threatened with loss of business.  The following sections summarize Innovatio's scheme.

5

1.   **Innovatio Targets End Users That Do Not Know About The Accused Technology Or The Licensing Of Innovatio's Patents**

The volume of illegitimate threats issued by Innovatio is staggering — over thirteen thousand nationwide and growing.  AC ¶ 74.[3]  Innovatio's targets are widely varied, but all are end users ranging from non-profit, health and social welfare and scholarship organizations, bookstores, grocers, retirement homes, publicly-funded media, to major multinational (non-technology) corporations and others.  AC ¶¶ 44, 46, 73, 77, 80.  Most of these businesses have little to no experience with patent litigation or licensing, and lack detailed information about the targeted Wi-Fi products.  AC ¶ 46.  As a result, they cannot evaluate Innovatio's claims without engaging patent counsel and undertaking a costly investigation.  AC ¶ 46.[4]

2.   **Innovatio Misrepresents And Conceals The Substantial Limitations On Its Ability To License The Patents**

In its licensing demands, Innovatio affirmatively misrepresents and conceals numerous critical facts and material omissions.  AC ¶¶ 71–85.  For example, although Innovatio is quick to point out how many *end user* locations have been licensed to the patents, Innovatio conceals the fact that products incorporating Wi-Fi chips from major *Wi-Fi component suppliers* such as Broadcom also are licensed.  *See, e.g.*, AC Exh. 24.  Similarly, Innovatio highlights Broadcom's prior assertions of the patents against Qualcomm to intimidate Innovatio's end user targets but conspicuously fails to say those patents are licensed to Broadcom users.  *See* AC Exh. 25; *see also* Exs. A, B, C.  Innovatio never tells the end users that products incorporating Broadcom Wi-Fi components are licensed, or that a substantial percentage of Wi-Fi products on the market contain Broadcom Wi-Fi chips.  Nor does Innovatio inform its targets that ████████████

---

[3] Innovatio has produced over 13,000 notice letters to date.

[4] Innovatio retained several law firms and licensing entities, including Bluemont IP Partners, LLC, Dowell Baker P.C., IP Dispute Resolution Corporation ("IPDR"), and VICIS Consulting, LLC (VICIS) to manage its sweeping campaign.  AC ¶ 74.

MS-MOTO_1823_00005255559

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.  AC ¶

79.  This is a major omission.[5]

Innovatio also hides from its licensing targets that its patents are subject to RAND-

licensing restrictions.  Innovatio has stated hundreds of times in correspondence that its patents

are essential to the Wi-Fi standards and that the listed inventors are the "fathers" of Wi-Fi.  AC ¶

82; *see, e.g.*, Exs. A, B, C.  Innovatio omits any mention of the fact that the patents are subject to

irrevocable commitments to be licensed on RAND terms — an obligation requiring Innovatio to

license Wi-Fi products at a reasonable rate.  AC ¶ 76.  Innovatio's failure to disclose these facts

is not surprising given that Innovatio seeks objectively unreasonable license fees from end users

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, which is many times the gross price of the entire Wi-Fi

products at issue.  AC ¶ 47.  Innovatio could never approach or demand such unreasonable

amounts from Wi-Fi product suppliers; that is why Innovatio targets unknowledgeable end users,

who then seek to recoup the unreasonable amount from the Suppliers through indemnity.

Innovatio also misrepresents numerous other facts in an effort to intimidate or trick end

users into taking licenses.  For instance, Innovatio represents that it has successfully licensed

"thousands" of business locations, to create the impression that thousands of entities have taken

licenses and that Innovatio's demands are reasonable.  *See, e.g.*, AC ¶ 83, Exhs. 24, 25; Exs. A,

B, C.  However, the impression created by this statement is not true.  *See* Ex. D ▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮).  Innovatio also states that prior "WLAN" settlements "generat[ed]

in excess of $1 Billion in settlements and license fees."  AC ¶ 83, Exh. 25.  This is false and

purposefully intended to mislead Innovatio's targets, as most of the amount referred to comes

from an $891 million settlement between the prior owner Broadcom and its competitor

---

[5] Broadcom is the single largest provider of Wi-Fi chips and Qualcomm-Atheros is the second largest provider.  *See also* AC ¶ 69, 70.

7

MS-MOTO_1823_00005255560

Qualcomm in a case involving *different* technologies (not including WLAN), *different* patents, and numerous claims *other than* patent infringement, including claims of antitrust violations in foreign countries having nothing to do with the Innovatio patents.  AC ¶ 83.

Innovatio's misrepresentations continue and are becoming more extreme.  Since the Amended Complaint was filed, the Suppliers have learned that Innovatio has falsely stated that there has been an adjudication in Federal Court that the patents cover the Wi-Fi products Innovatio is attempting to license.  *See, e.g.*, Ex. E.[6]  However, no judgments or verdicts on the patents have *ever* issued regarding alleged infringement of Wi-Fi products, let alone finding that these patents cover Wi-Fi.  Such misinformation can have a powerful effect on end user targets, who have few means of independently evaluating the strength of Innovatio's claims.  AC ¶ 46.[7]

### 3.    Innovatio Threatens A Burdensome Negotiation And Investigation Process To Keep Its Targets From Investigating

To ensure that end users quickly accede to Innovatio's demands and do not discover the facts that would expose Innovatio's fraud, Innovatio's demand letters purport to require a lengthy and costly negotiation process involving substantial fact collection and the hiring of an attorney specializing in patents unless the target quickly accedes to Innovatio's demands.  AC Exh. 25. For example, licensing demands sent by Innovatio purport to require ten burdensome steps as preconditions to negotiating a resolution, including hiring a patent attorney to read what Innovatio describes as over ten thousand pages of technical and legal documents.  AC Exh. 25. Innovatio's suggestions that the licensing target must hire an attorney and review thousands of pages if it does not wish to pay Innovatio is designed to persuade the target to simply pay the

---

[6] Emphases supplied unless otherwise indicated.
[7] And while Innovatio touts the strength of its portfolio to end user targets, Innovatio omits that eighteen of the thirty-one patents it lists in its letters are currently expired (nine of the patents expire next year and the remaining four expire between 2014–2016).  AC ¶ 81.  In other words, Innovatio fails to tell its targets, and actively encourages its targets not to investigate and thus not to learn, that most of Innovatio's patents do not require a license because those patents no longer are in effect.  AC ¶ 81.

MS-MOTO_1823_00005255561

fees requested rather than engage in any investigation — thereby ensuring that the target never learns of Innovatio's misrepresentations and deceit.  AC ¶¶ 46, 84, Exh. 25.

### 4.   Innovatio Threatens Costly Lawsuits To Further Dissuade Its Targets From Investigating

Innovatio additionally threatens many of its licensing targets with "extremely expensive" litigation if the target does not accede to Innovatio's licensing demands.  *See* AC Exh. 25 ("Patent litigation is an extremely expensive and time-consuming method of resolving disputes."); s*ee also* AC ¶¶ 46, 75, 84; Exs. A; B; C.  Innovatio tells its targets that, unless they agree to a license, they will be "re-assigned back to [Innovatio's counsel of record in this litigation]."  AC ¶¶ 25, 46; *see also* Exh. 25.  Innovatio could never actually file all of these threatened lawsuits, but nevertheless threatens litigation to instill fear in its targets so that they quickly accede to Innovatio's demands without investigation.  Further, to ensure its targets do not turn to their Wi-Fi product suppliers for assistance, Innovatio falsely tells its licensing targets that the suppliers are not defending their customers.  Ex. F ("The equipment manufacturers have sued us, but they have not stepped in to defend any of their users. This means we can still sue your client and they cannot expect equipment manufacturers to aid in the defense."); Ex. G (similar); *see also* AC ¶ 323.[8]  This is false — as Innovatio knows, the Suppliers have stepped in to aid and defend the users of their products in this and other courts.  AC ¶ 323.[9]  Through its threats and lies, Innovatio intends to convince its target to accede to its improper demands without investigation or negotiation.

---

[8] Innovatio also falsely states that the MDL Court has determined that the suppliers' claims will not be resolved until after Innovatio's claims against the end users. *See, e.g.,* Ex. G (repeating that the "equipment manufacturers have sued us, but they have not stepped in to defend any of their users" and falsely asserting that the Court has determined that the claims relating to the suppliers will not be resolved until "the tier two stage").

[9] *See also* Ex. H at 8:6–9:9, 33:4–19 (Innovatio's attorney, who has sent out thousands of licensing communications, acknowledging that Cisco has assured customers that "Cisco will stand by its products," and that it is "not by coincidence" that Cisco's legal team also represents many of the end-user defendants).

MS-MOTO_1823_00005255562

### 5. Innovatio Demands Licensing Fees Less Than The Cost Of Investigation Or Defense, But Orders Of Magnitude Above Any Amount To Which Innovatio Is Entitled

Finally, Innovatio capitalizes on its threats and the target's lack of experience and information by demanding and obtaining unlawful licenses to which Innovatio is not entitled. AC ¶ 46. Innovatio attempts to obtain — and has succeeded in obtaining — thousands of dollars for each location where a business uses Wi-Fi products (in some circumstances, Innovatio has sought substantially more than this from its targets). AC ¶ 47. However, Innovatio does not tell the target and does not take into account whether the business' Wi-Fi products already are licensed; it hides that key fact. AC ¶ 77. In addition, the amounts sought by Innovatio are many times the cost of the accused products, and hundreds of times the cost of the Wi-Fi components within those products that allegedly implement Innovatio's patents.[10] AC ¶¶ 47, 76. Innovatio knows that these amounts violate its RAND obligations and are objectively unreasonable — no one would make Wi-Fi products if they had to pay royalties more than the total revenue they received for the products — so Innovatio targets end users instead, using the cost of investigation and threat of litigation as leverage to obtain royalties to which it knows it is not entitled.

### C. The Suppliers Amended Their Complaint To Address Innovatio's Unlawful Campaign And The Significant Harm It Is Causing

The Suppliers and their end users and other customers have sustained substantial, direct injuries resulting from Innovatio's improper campaign. In order to put a stop to Innovatio's unlawful practices and the harm caused by them, the Suppliers amended their complaint to allege additional claims against Innovatio, Noel Whitley, and Innovatio Management, including civil

---

[10] For example, one small business uses Cisco's E3000 router for Wi-Fi, which is available for $71.50 at Wal-Mart. The licensed Wi-Fi components, such as those provided by Broadcom, can cost less than $5. Given this and other factors, Innovatio's demands of thousands of dollars are objectively unreasonable. AC ¶ 47.

10

MS-MOTO_1823_00005255563

RICO, civil conspiracy, violation of Cal. Bus. & Prof. Code § 17200, breach of contract,[11] intentional interference with prospective business advantage, and unclean hands.

## III.   ARGUMENT

### A.   The Accused Conduct Is Not Immune Under *Noerr-Pennington*

#### 1.   Innovatio's Licensing Conduct Is Not Protected Petitioning Activity

Innovatio's licensing activities are not "petitioning" that is immune under the *Noerr* doctrine. Mot. at 5. Although *Noerr* immunity may protect some of Innovatio's statements *in litigation* from Suppliers' claims,[12] private communications far removed from the litigation context are not protected petitioning activity. *See, e.g., Cardtoons L.C. v. Major League Baseball Players Ass'n*, 208 F.3d 885, 893 (10th Cir. 2000); *OpenLCR.com, Inc. v. Rates Tech., Inc.*, 112 F. Supp. 2d 1223 (D. Colo. 2000). Contrary to Innovatio's assertion, there is no bright line rule establishing that Innovatio's out-of-court licensing conduct constitutes protected "petitioning" activity. As the Supreme Court held in *Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492 (1988), *Noerr* immunity is a fact-bound inquiry, which "depends not only on the impact but also on the context and nature of the activity." *Id.* at 504; *FTC v. Superior Court Trial Lawyers Ass'n*, 493 U.S. 411, 424–25 (1990); *see also Professional Real Estate Investors, Inc. v. Columbia Pictures, Inc.*, 508 U.S. 49, 75 (1993) (hereinafter "*PREI*").

Here, Innovatio's wrongful licensing conduct is not, and should not be considered to be, protected petitioning activity. The Suppliers do not rely on any use of government processes to support their claims. To the contrary, Innovatio's unlawful conduct is rooted in its purely private communications with non-litigants as part of Innovatio's regular business activities — *i.e.*,

---

[11] To the extent Innovatio incorrectly contends that no express contract exists, Defendants alternatively contend in a separate count that Innovatio is promissorily estopped in equity from violating RAND. AC ¶¶ 314–319.

[12] Of course, this Court has other mechanisms to address the misrepresentations Innovatio makes in court.

MS-MOTO_1823_00005255564

negotiations to reach an agreement to pay money for patent rights.  AC ¶¶ 73–75.  The purpose

of these communications is to negotiate a license; they are not a precursor to litigation.  *See id.*

The "impact," "nature" and "context" of Innovatio's licensing communications are not related to

petitioning the government.  *See, e.g.*, *Allied Tube*, 486 U.S. at 504.

Innovatio's proposed application of *Noerr* immunity to its licensing communications is

especially inappropriate as Innovatio is a pure "patent assertion entity" or "PAE", and its entire

business function is licensing.  AC ¶ 7.  Immunizing Innovatio's licensing activities would

immunize Innovatio's entire business from scrutiny, no matter how removed the business

activities are from litigation.  This immunization would apply to any PAE with a similar business

model.  No authority has expanded *Noerr* in such a manner; indeed, the Supreme Court in *Noerr*

distinguished protected petitioning conduct from normal business activity, which is ***not***

protected.  *E. R.R. v. Noerr Motor Freight*, 365 U.S. 127, 137 (1961) ("To hold . . . that the

people cannot freely inform the government of their wishes would impute to the Sherman Act a

purpose to regulate, ***not business activity***, but political activity . . . . ").  And in other contexts,

too, courts have refused to allow licensing entities to characterize their ordinary business

activities as pre-suit litigation conduct, as doing so would allow a licensing business to avoid

discovery and regulation to which every other business is subject.  *See, e.g.*, Ex. I, *Diagnostics*

*System v. Symantec Corp.*, No. SA CV 06-1211, at 9, 11–13 (C.D. Cal. Aug. 28, 2008) (PAEs

cannot shield themselves by describing everything they do as in "anticipation of litigation").

Innovatio cites to *Sosa v. DIRECTV, Inc.*, 437 F.3d 923 (9th Cir. 2006), but that case is

inapplicable.  Mot. at 3–5.  Unlike *Sosa,* the unlawful activity in this case goes far beyond mere

litigation threats, and instead involves communications to numerous entities that contain

misrepresentations and significant omissions unrelated to any threats of litigation.  The mere fact

12

MS-MOTO_1823_00005255565

that Innovatio also threatens some of these entities with litigation does not immunize its conduct from scrutiny.  *See, e.g.*, Ex. J ("To clarify, we are not asserting patent infringement claims against ████ at this point in time. However, please know that Innovatio's current stance is that any and all Wi-Fi usage will give rise to a patent infringement claim under its portfolio. With the above in mind, we wish to discuss a potential license with ████ if ███ does indeed use Wi-Fi (or has used Wi-Fi).").  The vast majority of the alleged misconduct is unrelated to threats of litigation or any other potential petitioning activity.  Neither *Noerr, Sosa*, nor the weight of other authorities on this subject suggest such activities should be immune from suit.  Both as a matter of fact in this case and policy overall, the *Noerr* doctrine should not be allowed to be used to provide carte blanche immunity for otherwise improper or illegal conduct by PAEs in seeking and negotiating license agreements merely because they also threaten (or even intend) litigation.  *Noerr*, 365 U.S. at 143–45; *United Mine Workers v. Pennington*, 381 U.S. 657, 670–71 (1965); *Sosa*, 437 F.3d at 930–32; *Cardtoons*, 208 F.3d at 893.

## 2.    The "Sham" Exception Would Allow The Suppliers' Claims To Proceed

Even if Innovatio's conduct qualified as petitioning activity, *Noerr* immunity does not apply to "sham" conduct.  *Noerr*, 365 U.S. at 144.  Here, Innovatio has engaged in a shakedown of thousands of Wi-Fi end users to obtain license fees to which it is not entitled through deception and improper threats.  *See* AC ¶¶ 47, 71–85, 288–89.  These are precisely the types of sham tactics that are exempt from *Noerr*.

Although there is no single definition for what constitutes a "sham," Innovatio's conduct in this case easily qualifies under any definition.  For example, according to the Supreme Court, conduct is a sham when it is: (1) "objectively baseless" and (2) an attempt to interfere directly with another's business relationships.  *PREI*, 508 U.S. at 60; *Morton Grove Pharmas., Inc. v.*

13

MS-MOTO_1823_00005255566

*Par Pharma. Cos., Inc.*, No. 04-c-7007, 2006 WL 850873, at *3 (N.D. Ill. Mar. 28, 2006) (citing

*PREI*).  Both requirements are met here.  First, as discussed in Part III.A.1 above, Innovatio's

licensing communications are "objectively baseless" because Innovatio tells targets that licenses

are needed on Wi-Fi products that — unbeknownst to the target — are already licensed.  *See,*

*e.g.*, AC ¶¶ 45, 69–85.  Likewise, Innovatio's demands for thousands of dollars per licensed

location are objectively baseless because they directly conflict with Innovatio's RAND

commitments.  *See, e.g.*, AC ¶¶ 45, 60–68.  These are but examples — Innovatio's

correspondence is replete with misrepresentations and material omissions that, when viewed in

context with the truth, reveal numerous claims in Innovatio's correspondence that are objectively

baseless.  *See, e.g.*, AC ¶¶ 80, 81, 83.  Second, Innovatio's licensing communications directly

interfere with the Suppliers' relationships with their customers.  *See* AC ¶¶ 320–25.  For

instance, Innovatio falsely tells targets that the Suppliers have not been defending their

customers, which is evidence of Innovatio's intent to disrupt the Suppliers' relationships with

their customers.  *See, e.g.*, AC ¶¶ 320–25.  This is precisely what the "sham" exception is

designed to protect against.

   Other tests for what constitutes a "sham" are equally applicable.  For instance, the sham

exception applies where, as here, a party improperly files a pattern of lawsuits for the purpose of

injuring another.  *See, e.g., Cal. Motor Transport Co. v. Trucking Unlimited*, 404 U.S. 508, 513

(1972); *Kottle v. Northwest Kidney Ctrs.*, 146 F.3d 1506, 1060 (9th Cir. 1998) ("[I]f the alleged

anticompetitive behavior is the filing of a series of lawsuits, the question is not whether any one

of them has merit-some may turn out to, just as a matter of chance-but whether they are brought

pursuant to a policy of starting legal proceedings without regard to the merits" (internal quotation

marks omitted)).  According to the Supreme Court, this "pattern" exception is meant to protect

MS-MOTO_1823_00005255567

against a pattern of insubstantial, repetitive claims, even where each individual claim may be small or "go unnoticed." *Cal. Motor Transport Co.*, 404 U.S. at 513; *Livingston Downs Racing Ass'n v. Jefferson Downs Corp.*, 192 F. Supp. 2d 519, 539 (M.D. La. 2001).

Here, Innovatio's conduct qualifies under the "pattern" exception. Innovatio's widespread, repetitive pattern of illegal conduct, which includes sending licensing letters to thousands of entities and filing lawsuits against hundreds of others without regard to whether and to what extent they already are licensed or whether such conduct violates Innovatio's RAND obligations ensures that Innovatio has wrongfully targeted and taken money from partially and fully licensed Wi-Fi end users. *See, e.g.,* AC ¶¶ 44–47, 71–85; *see also, e.g.,* Ex. E (misrepresenting that the patents have been adjudicated to cover Wi-Fi). Such "patterns" are excepted from *Noerr* immunity under substantial precedent. *See, e.g., Cal. Motor Transport Co.*, 404 U.S. at 513; *Livingston Downs*, 192 F. Supp. 2d at 539.

Other courts have found the sham exception to apply where there is (1) an intentional misrepresentation that (2) is material. *See, e.g., Michael v. Letchinger*, No. 10-c-3987, 2011 WL 3471082, at *11 (N.D. Ill. Aug. 5, 2011); *Kottle*, 146 F.3d at 1060. The Suppliers' allegations satisfy these criteria as well: Innovatio has made numerous material misrepresentations and omissions, including to this Court. *See generally* AC ¶¶ 44–47, 71–85, 286–290, 294, Exh. 25.[13]

Innovatio's only argument that the sham exception should not apply is that the Suppliers' sham allegations are, according to Innovatio, "conclusory" and "implausible." Mot. at 5. The Suppliers' allegations are the opposite of "conclusory"; as shown above, the Suppliers' claims

---

[13] For example, to shield its licensing communications from discovery, Innovatio misrepresented that it had not been threatening its licensing targets with high litigation costs. *See* Ex. K at 27:16–23 ("And the second point and a very important one, not a single letter that we have sent out has ever referred directly or in a comparative fashion to the costs of defense . . . . We have never suggested or held out the costs of defense as a bargaining tool in any of these negotiations."). This is false. *See, e.g.,* AC Exh. 25.

MS-MOTO_1823_00005255568

are supported by pages of detailed facts satisfying the various sham criteria.[14] Moreover, the Suppliers' allegations are hardly "implausible." Mot. at 6. Innovatio resorts to mischaracterizing the alleged sham as the assertion of "invalid or not infringed" claims. Mot. at 11. But that is not the alleged sham; rather, the sham concerns Innovatio's use of false and objectively baseless statements in an improper attempt to extract licensing payments from end users of products that are already licensed, and at exorbitant rates that violate Innovatio's RAND commitments where Innovatio is fully aware of those facts. *See, e.g.*, AC ¶¶ 44–47, 71–85.[15]

In any event, it is improper to resolve facts surround the sham exception at the pleading stage. *See, e.g.*, *New West v. City of Joliet*, No. 11-c-5305, 2012 WL 366733, at *6 (N.D. Ill. Jan. 30, 2012) ("These factually intricate questions [regarding the sham exception] do not lend themselves to disposition on a motion to dismiss. Courts routinely reserve resolution of *Noerr*'s application for summary judgment.") (internal citations omitted); *Morton Grove*, 2006 WL 850873 at *11 ("On a motion to dismiss, all that is required is that [the party] allege facts that, if proved, show [the patentee] is engaged in sham litigation."). The Suppliers have pled facts sufficient to support a sham exception and that is all that is required at this stage.

**B.    The Suppliers Have Standing And Have Pled Direct Injury**

Contrary to Innovatio's assertions, the Suppliers have pled numerous forms of "direct injuries" caused by Innovatio's unlawful licensing campaign, including:

- Costs to the Suppliers incurred in investigating and addressing customer inquiries regarding Innovatio's unlawful out-of-court conduct, AC ¶¶ 293, 297;

---

[14] The caselaw that Innovatio cites does not compel a different conclusion. *Sosa*, 437 F.3d at 938 (sham not even alleged); *Spanish Int'l Commc'ns Corp. v. Leibowitz*, 608 F. Supp. 178, 184 (S.D. Fla. 1985) (complaint apparently lacked statement of facts and only made legal conclusions).

[15] In any event, even if Innovatio's characterization of the Suppliers' sham allegations were correct, such allegations were found sufficient to support a sham exception by this District in *Morton Grove*. *See Morton Grove*, 2006 WL 850873, at *11 (sham allegation adequately pled on basis that patents were unenforceable or invalid and litigation was brought in bad faith to extort settlements); *cf. Kottle*, 146 F.3d at 1060.

16

- Financial losses suffered by the Suppliers resulting from Innovatio's disruption of their customer relationships, AC ¶¶ 293, 297, 325; and

- The Suppliers' costs in investigating and defending their products and customers against Innovatio's claims made as part of Innovatio's scheme to obtain unlawful licenses, AC ¶¶ 293, 297.[16]

Innovatio's central argument for dismissal is based on an incorrect statement of the law. Contrary to Innovatio's suggestion, a RICO claimant **need not** establish that the unlawful activities were "directed" or "targeted" at the claimant. *See, e.g.*, Mot. at 8. According to the Supreme Court and the Seventh Circuit Court of Appeals, a RICO claimant **need not** show that the unlawful activities were directed at the claimant itself; proximate cause can exist even where the unlawful conduct is not specifically directed at the claimant — for example, where, as here, the unlawful conduct involves fraudulent statements made to third-party customers. *See, e.g., Bridge v. Phoenix Bond & Indemnity Co.*, 553 U.S. 639, 639 (2008); *Phoenix Bond & Indemnity Co. v. Bridge*, 477 F.3d 928, 932 (7th Cir. 2007).

This aspect of RICO law is particularly important here because, although it is the Suppliers' products that are the targets of Innovatio's licensing demands and the Suppliers who have suffered greatly as a result Innovatio's unlawful conduct, claimants' customers are the direct targets of the unlawful acts. In such circumstances, the Supreme Court and Seventh Circuit have repeatedly found the causation requirement to be met even though the unlawful acts are not specifically directed at the claimant. *See, e.g., Bridge*, 553 U.S. at 639; *Nat'l Org. for Women Inc. v. Scheidler*, 510 U.S. 249, 256 (1994) (allegations that conspiracy to use force on staff and patients of health care center injured business interests of health care centers were sufficient for standing); *Phoenix Bond*, 477 F.3d 928, 932, *aff'd*, 553 U.S. 639. According to the

---

[16] Innovatio's claim that "an indemnification obligation . . . has not been pled," Mot. at 9, is simply not true. Indeed, later portions of Innovatio's motion to dismiss even quote sections of the Suppliers' Amended Complaint alleging indemnification obligations. *See* Mot. at 25 (quoting AC ¶ 297).

MS-MOTO_1823_00005255570

Supreme Court, once a claimant has alleged a direct injury based on unlawful acts specifically directed at another, "nothing more is needed to confer standing." *Scheidler*, 510 U.S. at 256.[17]

Innovatio's account of the Seventh Circuit's opinion in *Israel Travel Advisory Serv., Inc. v. Isr. Identity Tours, Inc.*, 61 F.3d 1250 (7th Cir. 1995) is incorrect — *Israel* **did not** require that unlawful acts be specifically directed at a RICO claimant. Mot. at 7–8. *Israel* **rejected** that argument and confirmed that where, as here, unlawful activities are directed at a claimant's customers, a direct injury satisfying the proximate cause requirements of the RICO statutes can still exist. *See* 61 F.3d 1250, 1257 (7th Cir. 1995) ("[T]here is no doubt that a producer injured by a campaign of misinformation directed at its customers suffers an injury compensable under the law of torts; it is not cut off by the proximate-causation and foreseeability requirements."). The Seventh Circuit confirmed this in *Bridge*. 477 F.3d at 932–33.[18]

Innovatio's remaining cases likewise do not support its position. Unlike here, those cases involved highly tenuous, multi-stepped chains of events between the wrongful conduct and the alleged injuries, leading the courts in those cases to find on the facts presented a lack of proximate cause. For example, in *Holmes v. Securities Investor Protection Corp.*, 503 U.S. 258 (1992) , the Supreme Court found that the putative chain of causation — from securities fraud by the defendants, to the loss of money by brokerage firms purchasing those securities, to the brokerage firms being liquidated, to certain customers losing money in entirely independent

---

[17] Innovatio suggests "foreseeability" is not considered in determining whether a "direct injury" exists (Mot. at 7), but that is incorrect. This Circuit routinely considers foreseeability in determining proximate causation for RICO. *See RVB Serv. LLC v. Hartford Computer Group, Inc.*, 539 F.3d 681, 688 (7th Cir. 2008) ("Saying that the injury to the plaintiff is 'direct' is akin to saying that the victim was reasonably foreseeable . . . ."); *see also U.S. v. Laraneta*, --- F.3d ---, 2012 WL 5897610, at \*8 (7th Cir. Nov. 14, 2012) ("All that 'proximate cause' does as a practical matter is require a court to have a reason for picking out one causal relation among the many that may have contributed to an untoward event, a reason such that making that relation a basis of legal liability would have a socially desirable effect, such as deterrence." (citing *Holmes v. Securities Investor Protection Corp.*, 503 U.S. 258 (1992))). Innovatio does not dispute that the Suppliers' injuries were foreseeable — nor could it, as Innovatio's licensing campaign is directed at the Suppliers' Wi-Fi products. Indeed, given principles of indemnity, it is in fact the *Suppliers'* resources that are targeted by Innovatio's unlawful licensing campaign against their products.

[18] Moreover, the language Innovatio quotes from *Israel* as well as its basis for rejecting the RICO claim under 18 U.S.C. 1341 were both explicitly overruled by the Seventh Circuit in *Bridge*. 477 F.3d at 933, *aff'd*, 553 U.S. 639.

MS-MOTO_1823_00005255571

investments held by the brokerage firms — was too attenuated.[19] This is completely different from the situation here, where Innovatio has attempted to obtain unlawful licenses on *the Suppliers'* Wi-Fi products from *the Suppliers'* customers, not surprisingly causing the Suppliers to incur significant costs investigating and responding to customer inquiries and causing disruption to the Suppliers' relationships with their customers. *See* AC ¶¶ 71–85, 293, 297, 324–25; Ex. H at 8:6–9:9, 33:4–19 (Innovatio acknowledging Cisco has assured customers that "Cisco will stand by its products," and that it is "not by coincidence" that Cisco's legal team also represents many of the end-user defendants). This is sufficient to survive a motion to dismiss.

Similarly, in *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451 (1991), on which Innovatio relies, the alleged improper conduct was entirely removed from the alleged injuries. There, the defendant defrauded the state by filing false sales tax information. A competitor of the defendant alleged that it suffered injuries because (i) the defendant's illegal tax savings (ii) allowed it to lower prices, (iii) thereby causing the competitor to lose sales. This causal connection — from the defendant's tax fraud, to the defendant's lowering of prices, to the competitor's alleged loss of sales due to the lowered prices — was deemed too remote because "the fact that a company commits tax fraud does not mean the company will lower its prices," and the company "could have lowered its prices for any number of reasons unconnected to the asserted pattern of fraud." *Id.* at 459. Unlike *Anza*, here the Suppliers' injuries have only one cause — *i.e.,* Innovatio's unlawful scheme; there are no intervening causes of the Suppliers' injuries.[20]

---

[19] Contrary to Innovatio's assertions, *Holmes* did *not* reject the claims because the claimant was subrogated to rights of third parties. Mot. Dismiss at 7, 9 (characterizing *Holmes* as "rejecting injury based on subrogation rights"). Rather, *Holmes* assumed subrogation was proper, and then went on to evaluate the chain of causation between the securities fraud and the affected customers of the liquidated brokerage firms. 503 U.S. at 270.

[20] The causal connection in *Hemi* was even more remote and the facts in that case are nothing like the facts presented here. *See Hemi Group, LLC v. City of New York, N.Y.*, 130 S.Ct. 983 (2010) (loss of tax revenues by City of New York caused by failure of cigarette purchasers to pay cigarette taxes, not by allegedly wrongful failure of online cigarette sellers to send purchaser information to New York State).

MS-MOTO_1823_00005255572

Lastly, in *N. Trust Co. v. Ralston Purina Co.*, the RICO claimant's sole injury occurred when it was required to reimburse an accused infringer for damages awarded to the RICO defendant for patent infringement. *See* No. 94-c-4045, 1994 U.S. Dist. LEXIS 15730 at *13 (N. D. Ill. Oct. 28, 1994). Innovatio uses this case to confuse the issues. Although the Suppliers may ultimately be required to reimburse their customers for patent infringement damages, that is not what the Suppliers are relying on as RICO injuries. Rather, unlike *N. Trust*, the Suppliers' injuries include their own *direct costs* incurred in addressing Innovatio's out-of-court licensing campaign (*e.g.*, the Suppliers' investigation costs), *direct* financial losses to the Suppliers caused by Innovatio's disruption to their customer relations, and *direct* costs of defending their products in court. AC ¶¶ 293, 297, 325. Moreover, the Suppliers are not shareholders of their customers — a primary issue addressed by *N. Trust* — but instead have suffered direct injuries in their own right. *See N. Trust*, 1994 U.S. Dist. LEXIS at *4–*5. These losses are the natural and expected consequence of the unlawful licensing campaign that Innovatio is waging against the Suppliers' products. *BCS Servs., Inc. v. Heartwood 88, LLC*, 637 F.3d 750, 758 (7th Cir. 2011) ("Once a plaintiff presents evidence that he suffered the sort of injury that would be the expected consequence of the defendant's wrongful conduct, he has done enough to withstand summary judgment on the ground of absence of causation.").

## C.   The Suppliers Sufficiently Pled An Enterprise

The Suppliers have sufficiently alleged *two* legally cognizable enterprises, and there are no grounds for dismissing the Suppliers' RICO claim on the enterprise requirement. First, the Suppliers allege the "enterprise" is Innovatio IP Ventures, LLC, the affairs of which are directed by Whitley and IM. *See* AC ¶¶ 281–82. The RICO statute provides that a legal entity, such as an LLC, may be an enterprise. *See* 18 U.S.C. § 1961(4). Further, Whitley and IM are

MS-MOTO_1823_00005255573

sufficiently distinct from Innovatio for purposes of RICO. *See Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 163 (2001). Innovatio does not challenge these allegations.

Second, the Suppliers allege an associated-in-fact enterprise comprising Innovatio, its attorneys, IPDR, VICIS, Dowell, Lunar Investments LLC, WDHM LLC, Innovatio Management LLC, and Huntington Venture Partners, LLC, referred to in the Amended Complaint as the "Associated-in-Fact Enterprise." AC ¶ 280. The RICO statute expressly recognizes associated-in-fact enterprises. *See* 18 U.S.C. § 1961(4). Innovatio's sole challenge to the "Associated-in-Fact Enterprise" is its argument that IPDR, VICIS, Dowell, Lunar Investments LLC, WDHM LLC, Innovatio Management LLC, and Huntington Venture Partners, LLC are "agents" and/or "members" of Innovatio, and that a RICO enterprise cannot comprise a company and its agents or members. Mot. at 14. This however is not the law. "[T]he fact that the [entities making up an enterprise] may be deemed 'agents' or 'affiliates' of [the RICO person] does not, by itself, preclude [a plaintiff] from establishing her RICO claim." *Chen v. Mayflower Transit, Inc.*, 315 F. Supp. 2d 866, 902 (N.D. Ill. 2004).

The Associated-in-Fact Enterprise alleged by the Suppliers is precisely the type of RICO enterprise envisioned by the courts. By working through the Associated-in-Fact Enterprise, Innovatio (along with Whitley and IM) was able to engage in the unlawful activity in a way that would not have been possible if Innovatio had worked alone. *See Mayflower*, 315 F. Supp. 2d at 905; *cf. Fitzgerald v. Chrysler*, 116 F.3d 225, 228 (7th Cir. 1997). For example, by working through the Associated-in-Fact Enterprise, Innovatio concealed material information requested by licensing targets who attempted to investigate Innovatio's claims, ███████████████

███████████████████████████████████████

███████████████████████. *See* AC ¶¶ 74–77; Ex. L at 135:3–138:9;

MS-MOTO_1823_00005255574

144:10–19. Likewise, the Associated-in-Fact Enterprise allows Innovatio to create the false impression that it would sue the target immediately if a license is not executed on Innovatio's terms, thereby magnifying the threat of imminent litigation to prevent its targets from taking time to investigate Innovatio's claims. *See* AC ¶¶ 74–77, 84.[21]

The cases cited by Innovatio do not suggest a different result. In *Baker v. IBP, Inc.*, the court modified and affirmed a dismissal of RICO claims, because, *inter alia*, an enterprise had not been pled. 357 F. 3d 685, 691–92 (7th Cir. 2004). According to the court, the complaint did not allege that "IBP operates or manages [the] *enterprise* [alleged in the complaint] through a pattern of racketeering activity"; rather, the court found that the "nub of the complaint is that IBP operates *itself* unlawfully—it is IBP that supposedly hires, harbors, and pays the unlawful workers, for the purpose of reducing its payroll." *See id.* at 691 (emphasis in original). Hence, the issue in *Baker* was whether the complaint alleged that the RICO defendant operated or managed the affairs of the enterprise as a whole or just itself, and did not concern whether that alleged association was sufficiently distinct from the RICO defendant. *See id.* at 691–92.

*Crichton v. Golden Rule Insurance Co.* also does not support Innovatio's position. *See* 576 F.3d 392 (7th Cir. 2009). The court in *Crichton* found that the plaintiff alleged that the fraud was only perpetrated by the RICO "person," Golden Rule — not by others that were alleged to comprise the associated-in-fact enterprise. Id. at 400 ("That is, Chrichton's claim 'begins and ends' with the fraud allegedly committed by Golden Rule."). Here, in contrast, the Suppliers allege that the

---

[21] Embedded in Innovatio's argument is a suggestion that the RICO defendants — Whitley, IM, and Innovatio, who are "persons" under the RICO statute, *see* AC ¶ 282 — are not sufficiently distinct from the Associated-in-Fact Enterprise. *See* Mot. at 12. To the contrary, there are numerous entities in the Associated-in-Fact Enterprise distinct from Whitley, IM and Innovatio — including IPDR, VICIS, Dowell, Lunar Investments LLC, WDHM LLC, and Huntington Venture Partners, LLC, *see* AC ¶ 280 — and there is no prohibition against IM and Innovatio being both RICO "persons" and also part of an associated-in-fact enterprise. *See, e.g., Shapo v. O'Shaughnessy*, 246 F. Supp. 2d 935, 963 (N.D. Ill. 2002) ("TCO Illinois and TCO California can each be a person related to this enterprise, even when collectively they encompass the enterprise."); *see also MCM Partners v. Andrews–Bartlett & Assoc.*, 62 F.3d 967, 979 (7th Cir. 1995) (a RICO person can be part of an associated-in-fact enterprise).

MS-MOTO_1823_00005255575

fraud was consciously perpetrated through the Associated-in-Fact Enterprise — indeed, as explained above, Innovatio, Whitley and IM purposefully conducted their unlawful activities through that enterprise to further their fraudulent aims. The Suppliers have alleged a valid associated-in-fact enterprise, which also is a sufficient basis for the claim to proceed.

### D. The Suppliers Have Stated Multiple Patterns Of Racketeering Activity

#### 1. Mail And Wire Fraud

As one of several predicate criminal acts supporting the Suppliers' RICO claim, the Suppliers allege that Innovatio committed mail and wire fraud by making numerous affirmative misrepresentations and omissions intended to intimidate Innovatio's targets into acceding to Innovatio's unlawful license demands without further investigation or negotiation, including:

- Informing targets that numerous end-users have taken licenses, but failing to disclose that suppliers of wireless components have licensed the patents, thereby concealing the fact that a substantial percentage of the accused products are already licensed, AC ¶ 77, 80;

- Informing targets that Innovatio acquired the rights to assert the Innovatio Patents from Broadcom, but failing to disclose that ████████████████████████████ ████████████████████████████ AC ¶¶ 69, 77, 79, 80;

- Informing targets that Innovatio Patents are essential to the Wi-Fi standard and claiming that the inventors are the "fathers" of the Wi-Fi standards, but failing to disclose Innovatio's obligation to license Wi-Fi products on RAND terms, AC ¶¶ 76, 80;

- Misrepresenting that "thousands" of locations have been licensed, ██████████ ██████████████, AC ¶ 83;

- Misrepresenting that the value of Wi-Fi licenses to the Innovatio Patents is over a billion dollars, ████████████████████████, AC ¶ 83; and

- Misrepresenting that the targets are currently infringing all 31 patents in Innovatio's portfolio, when 18 are already expired, AC ¶ 81.

These allegations of fraudulent misrepresentations are more than sufficient. *See Dexia Credit Local v. Cuppy*, No. 10-c-1563, 2010 WL 3257873, at *2 (N.D. Ill. Aug. 16, 2010).

23

MS-MOTO_1823_00005255576

Innovatio's primary argument is that the Suppliers do not sufficiently plead a "duty to disclose." However, a "duty to disclose" is only relevant to omissions. *See Adamczyk v. Lever Bros. Co.*, 991 F. Supp. 931, 939–40 (N.D. Ill. 1997). It is not relevant to Innovatio's numerous affirmative misrepresentations, which Innovatio does not even bother to deny.[22] Innovatio also does not dispute that these statements have been material to the targets' decision-making process in determining whether to take a license, investigate Innovatio's claims, seek indemnity or support from suppliers, or fight Innovatio in court. AC ¶¶ 71, 80, 83, 286–87. Moreover, Innovatio continues to make ever more misrepresentations to its targets — since filing their complaint, the Suppliers have discovered that Innovatio is now making additional misrepresentations in connection with its efforts to license the patents, including by falsely suggesting to numerous targets that its patents have been adjudicated to cover Wi-Fi (they have not). *See, e.g.*, Ex. E.

With respect to Innovatio's fraudulent omissions, it is well-established that a "duty to disclose" arises when making an affirmative statement while omitting material facts, rendering the statement a misleading "half-truth." *See Crichton*, 576 F.3d at 398. The Seventh Circuit has specifically found that such "half-truths" are actionable as mail and wire fraud. *See Emery v. Am. General*, 71 F.3d 1343, 1346–47 (7th Cir. 1995) ("omissions or concealment of material information can constitute fraud cognizable under the mail fraud statute, ***without proof of a duty to disclose*** the information pursuant to a specific statute or regulation") (citation omitted); *Hynix*

---

[22] Innovatio attempts to explain away a small subset of its misrepresentations (Mot. at 17–18), but these are matters of factual dispute and not proper to resolve on a motion to dismiss. *See Erickson v. Pardus*, 551 U.S. 89, 94, (2007) ("In addition, when ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint."). Moreover, Innovatio's explanations are incorrect. ██████████████████████████████████████████████████████████████████████████████████████████████████████████████ Innovatio's remaining few attempts to explain away its misrepresentations are similarly nonsensical. *See* Mot. at 17–18.

24

*Semiconductor Inc. v. Rambus Inc.*, 441 F. Supp. 2d 1066, 1076–77 (N.D. Cal. 2006) ("Even where no duty to disclose would otherwise exist, where one does speak he must speak the whole truth to the end that he does not conceal any facts which materially qualify those stated.").

The Suppliers adequately plead facts supporting Innovatio's duty to disclose the facts it has concealed. For example, Innovatio informs its targets that its patents have been licensed to end users, but never discloses the much more significant fact that the patents have also been licensed to the largest Wi-Fi component suppliers, thereby exhausting Innovatio's claims against a large percentage of Wi-Fi users. *See* AC ¶¶ 77, 79, 80. Nor does Innovatio mention 

. *See* AC ¶¶ 77, 79, 80. Innovatio does not dispute these facts are highly material to the targets' decision to take a license. *See* AC ¶¶ 71, 77, 80, 286–87. Nor does Innovatio dispute that its omissions were intentional — to the contrary,

. *See* Ex. M at 9 (

; Ex. N

.

As another example, Innovatio discusses the relationship between the patents and the accused Wi-Fi standards, stating that its patents are essential to the Wi-Fi standards, and that the inventors are the "fathers" of the Wi-Fi standards. *See* AC ¶¶ 76, 80, 82; Exs. A, B, C, O, P. Nowhere in its letters, however, does Innovatio disclose arguably the most important part of the relationship between the patents and the Wi-Fi standards — *i.e.*, Innovatio's legal obligations to license the patents on RAND terms materially more favorable than those it is demanding. AC ¶¶ 60–68, 76. As with its other omissions, Innovatio does not dispute that the omissions were

25

MS-MOTO_1823_00005255578

intential █████████████████████████████████████████████████

████████████. *See* Ex. N █████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████

Nor does Innovatio dispute that these facts have been highly material to the targets' decision-

making process on whether to take a license. *See* AC ¶¶ 76, 80, 82.

Innovatio's failure to disclose the truth is especially egregious considering that its targets

— businesses that neither develop nor supply the accused technologies such as retirement homes,

cafés, restaurants, convenience stores, and health-care providers — are least likely to suspect

fraud. *See Emery*, 71 F.3d at 1347–48 (allegations of misleading omissions directed at

vulnerable persons can constitute the predicate act of mail fraud).[23]   The Suppliers have more

than adequately alleged mail and wire fraud.

### 2.   Hobbs Act And Cal. Penal Code § 518

Innovatio's unlawful conduct is not limited only to fraud; Innovatio also engages in

extortion in its attempts to obtain unlawful licenses to the patents, violating both the federal

extortion statute (the Hobbs Act, 18 U.S.C. § 1951(b)(2)) and state law extortion statutes (*e.g.,*

Cal. Penal Code § 518).   The Suppliers' allegations readily meet the requirements for extortion.

The Suppliers allege Innovatio is obtaining property — *i.e.,* unlawful license fees — by

intimidating licensing targets to choose between paying fees that Innovatio is not entitled to or

face an expensive investigation and negotiation process, and wrongful lawsuits. AC ¶¶ 78, 288–

---

[23] Although Innovatio contends the truth could have been uncovered through costly investigation, Mot. at 17–18, that is highly unlikely as a factual matter, considering that many of the misrepresentations are based on confidential facts. In any event, the likelihood of uncovering the truth is not a defense to fraudulent misrepresentation, let alone a basis to dismiss the Suppliers' RICO claim. *Cf., e.g., Powell v. Am. Bank & Trust Co.*, 640 F. Supp. 1458, 1579 (N.D. Ind. 1986) ("The 'reasonably should have been made aware' aspect of this rule implicitly rejects the defendants' position that any publication of information relieves the duty to disclose."); *Pennsylvania Public School Employees' Retirement System v. Bank of Am. Corp.*, --- F. Supp. 2d --- , 2012 WL 2847732, at *6–7 (S.D.N.Y. Jul. 11, 2012) (shareholders not "reasonably aware" of information buried in SEC filing).

26

89; 18 U.S.C. § 1951(b)(2) (defining extortion as the "obtaining of property from another, with his consent, induced by wrongful use of actual or threatened force, violence, or fear, or under color of official right"); *see also* Cal. Penal Code § 518.

As an initial matter, Innovatio's arguments are directed exclusively at the Suppliers' Hobbs Act claims; Innovatio does not argue that the Suppliers' state law extortion claims are untenable. That is not surprising, as Innovatio's "claim of right" arguments for the Hobbs Act are not applicable to the Suppliers' claims based on state extortion laws such as Cal. Penal Code § 518, *et seq.* Indeed, courts routinely recognize that bad faith litigation threats such as those at issue here may be relied on to establish state law extortion claims. *See, e.g., Monex Deposit Co. v. Gilliam*, 666 F. Supp. 2d 1135, 1137 (C.D. Cal. 2009) ("California has recognized a civil cause of action for the recovery of money obtained by the wrongful threat of criminal or civil prosecution, whether the claim is denominated as extortion, menace, or duress.") (internal marks omitted); *Sosa*, 437 F.3d at 940 (state extortion statute may impose liability for threats of litigation where the asserted claims rise to the level of a sham) (citing *In re Nichols*, 82 Cal. App. 73 (1927)); *Harris Custom Builders v. Hoffmeyer*, No. 90-c-0741, 1994 WL 329962, *4 (N.D. Ill. July 7, 1994); *cf. Visto Corp .v. Sproquit Techs., Inc.*, 360 F. Supp. 2d 1064, 1070 (N.D. Cal. 2005); *Ficke v. Johns*, 95-c-939, 1996 WL 99424 (N.D. Ill. Mar. 4, 1996). Here, Innovatio demands license fees for already-licensed products at exorbitant rates which unlawfully breach Innovatio's RAND obligations, threatening to commence lawsuits if the licensing fees are not paid. AC ¶¶ 71–85, 288–89. Of course, with respect to already licensed products, any lawsuit filed by Innovatio would be objectively baseless, so its threats to file such a lawsuit are necessarily baseless. Such bad faith, objectively baseless demands may be redressed under state

27

MS-MOTO_1823_00005255580

extortion statutes such as Cal. Penal Code § 518 *et seq.* Innovatio does not argue to the contrary and at a minimum the Suppliers' extortion claims may proceed under state extortion law.

With respect to the Hobbs Act, Innovatio makes two arguments. First, Innovatio contends that the Suppliers do not allege that anyone "actually lost property they were entitled to." Mot. at 19. That, however, is incorrect. For example, the Suppliers specifically allege that at least some of Innovatio's targets have spent funds negotiating and licensing already-licensed products. AC ¶¶ 75, 77. Likewise, numerous of Innovatio's targets have paid licensing fees that are hundreds of times higher than that which could ever possibly be owed in view of Innovatio's RAND commitments. AC ¶¶ 75, 76. These are precisely the types of "lost property" that form the basis for extortion claims. *See, e.g., Scheidler*, 537 U.S. at 404–05 (property is "'something of value from' [victim] that [extortionist] could exercise, transfer, or sell"); *see also U.S. v. Santoni*, 585 F.2d 667, 672–73 (4th Cir.1978), *cert. denied,* 440 U.S. 910 (1979). Moreover, the Suppliers also allege attempted extortion, which does not require an allegation that anyone "actually lost property." AC ¶ 288; *U.S. v. Fawell*, 02-cr-310, 2003 WL 21544239, at *11 (N.D. Ill. July 9, 2003) ("an effort to obtain property may be a Hobbs Act violation, even if it is unsuccessful"). Innovatio takes no issue with these allegations.

Innovatio's other argument concerning the Hobbs Act — that there is no extortion because its licensing assertions constitute "claims of right" — has no application to ***unlawful*** threats of litigation such as those made by Innovatio this case. *U.S. v. Enmons*, 410 U.S. 396, 400 (1973) (confirming that the "claim of right" defense is inapplicable where the extortionist uses threats of litigation to obtain property it ***"has no lawful claim to."***). Here, Innovatio does not have a lawful claim for licensing fees on already-licensed products, or for the exorbitant rates that violate Innovatio's RAND obligations. AC ¶¶ 71–85, 288–89. The Supreme Court and

28

numerous other courts addressing the "claim of right" defense have confirmed that this type of

"wrongful" conduct qualifies as the basis for a Hobbs Act extortion claim. *Emmons*, 410 U.S. at

400; *see also Morton Grove*, 2006 WL 850873 (denying motion to dismiss sham allegation

based on patents being unenforceable or invalid and litigation being brought in bad faith to extort

settlements); *Eazypower Corp. v. ICC Innovative Concepts Corp.*, 98-c-3189, 2002 WL

31473813, at *2 (N.D. Ill. 2002) ("filing of lawsuits as part of a scheme to extort money may

support a RICO claim in patent cases");[24] *Lemelson v. Wang Laboratories, Inc.*, 874 F.Supp.

430, 434 (D. Mass. 1994) (denying motion to dismiss RICO claim based on "extort[ing] millions

of dollars in settlement monies through a pattern of litigation involving infringement claims

based on fraudulently obtained patents."). At a minimum, Innovatio's "claim of right" defense

presents factual issues which should not be resolved on a motion to dismiss. *Cf. McWright v.*

*Alexander*, 982 F.2d 222, 227 (7th Cir. 1992) (questions of fact generally inappropriate for

resolution on the pleadings); *In re JPMorgan Chase Bank Home Equity Line of Credit Lit.*, 794

F. Supp. 2d 859, 891 (N.D. Ill. 2011) ("The determination of whether a business practice is

unfair is usually a question of fact and inappropriate for a motion to dismiss.").

Most of Innovatio's authorities are in accord.[25] Although some cases, such as *HTC Swed.*

*AB v. Innovatech Prods.*, 2008 U.S. Dist. LEXIS 76690 (E.D. Tenn. Sept. 30, 2008), *Universal*

*Manf. Co. v. Douglas Press, Inc.*, 89-c-3354, 1991 U.S. Dist. LEXIS 6279 (N.D. Ill. 1991), and

---

[24] Contrary to Innovatio's assertions, *Eazypower Corp. v. ICC Innovative Concepts Corp.*, 98-c-3189, 2002 U.S.
Dist. LEXIS 21323 (N.D. Ill. Oct. 31, 2002), confirms that "the filing of lawsuits as part of a scheme to extort
money may support a RICO claim in patent cases" — even though it did not so find in that particular case. *Id.* at *4.
Innovatio also incorrectly claims the *Eazypower* decision "rejected" *Lemelson*, Mot. at 20. To the contrary,
*Eazypower* decision cites *Lemelson* precisely *for* the language quoted in the parenthetical.
[25] *Brokerage Concepts v. United States Healthcare*, 140 F.3d 494 (1998); *Eazypower Corp v. ICC Innovative
Concepts Corp.*, No. 98-c-3189, 2002 U.S. Dist. LEXIS 21323 (N.D. Ill. Oct. 31, 2002); *Johnson Elec. N. Am. Inc.*
*v. Mabuchi Motor Am. Corp.*, 98 F. Supp.2d 480 (S.D.N.Y. 2000); *B.V. Optische Industrie De Oude Delft v.*
*Hologic, Inc.*, 909 F. Supp. 162 (S.D.N.Y. 1995). Neither *Johnson* nor *B.V. Optische* involved extortion claims, nor
do they acknowledge *Emmons*. In *Johnson* the RICO was claim brought by the *patent-holder*, alleging patent
infringement as the predicate act. *Johnson*, 98 F. Supp. 2d at 490. The language Innovatio quotes from *B.V.*
*Optische* was overruled by the Supreme Court. *Bridge*, 553 U.S. at 639.

MS-MOTO_1823_00005255582

*Harris Custom Builders, Inc. v. Hoffmeyer*, No. 90-c-0741, 1994 WL 329962 (N.D. Ill. Jul. 7, 1994) (not cited by Innovatio), have disallowed Hobbs Act extortion claims based on fear of litigation, those cases did not involve facts such as those presented here, where Innovatio's claims are objectively wrongful. *See Enmons*, 410 U.S. at 400; *cf. Eazypower Corp.*, 2002 U.S. Dist. LEXIS 21323 at *4. In any event, as *Harris* recognized, state tort law allows for extortion claims based on threats of bad faith litigation. *See id.* at 1994 WL 329962, *4. This case law therefore does not impact the aspects of the Suppliers' RICO claim based on state law extortion.

### E. The Suppliers Have Stated A Plausible Claim Under Twombly

Innovatio's arguments that the Suppliers' RICO claim fails to satisfy *Twombly* (Mot. at 10–12) mainly re-hash arguments in other sections of Innovatio's brief.[26] Innovatio's suggestion that the damages suffered by the Suppliers are "speculative" (Mot. at 12) mischaracterizes the Suppliers' allegations: the Suppliers have ***already been*** harmed as a result of Innovatio's unlawful conduct (*e.g.*, by way of fees and costs the Suppliers paid ***in the past***); the Suppliers' RICO claim is not based on future harm.

### F. The Suppliers Properly Allege Breach Of Contract

As discussed above, Innovatio's licensing conduct is in breach of its contractual obligations to license its patents on RAND terms. *See AC* ¶¶ 304–13. Standard-setting organizations, regulators, and courts consistently recognize the importance of RAND obligations in promoting broad adoption of standardized technologies. Proper adherence to RAND commitments is critical to the development of standardized technologies, as the "[i]nclusion of patented technology [into an industry standard] without a [RAND] patent commitment . . .

---

[26] Innovatio's contention that the Suppliers fail to adequately allege predicate act-based claims is addressed above in Part III.D. Innovatio's contention that the Suppliers fail to adequately allege their FRAND-based claims are addressed below in Part III.F. Innovatio's contention that the Suppliers fail to adequately allege the applicability of the sham exception to the *Noerr-Pennington* doctrine is addressed above at III.A.

MS-MOTO_1823_00005255583

jeopardizes the goal of widespread adoption."[27]   The RAND obligations here were formed when

Innovatio's Predecessors submitted letters of assurance to the IEEE to license the Innovatio

Patents on RAND terms.   Consistent with the widely recognized purpose of RAND obligations,

the letters further confirm that the RAND terms must be made available to an "unrestricted

number of applicants."   AC ¶¶ 60–68, 305–10.   The IEEE explicitly requires this assurance to be

made for the benefit of users and implementers of the standards.   *See, e.g.*, AC ¶¶ 51, 306 (letter

of assurance confirming license is offered on any patents essential to create "a compliant

implementation" of the standard).   As such, Innovatio's RAND commitments form binding

contracts, enforceable by implementers such as the Suppliers, whether as parties to the contract

(because of their membership in the IEEE) or third-party intended beneficiaries (as a result of

their implementation of 802.11 into products).   *See, e.g.*, *Microsoft Corp. v. Motorola, Inc.*, 864

F. Supp. 2d 1023, 1031 (W.D. Wash. June 6, 2012) ("[A] contract is formed through Motorola's

(or any essential patent holder's) commitments to the IEEE . . . to license patents on RAND

terms. . . .  Microsoft, as a potential user of the 802.11 Standard . . . is a third-party beneficiary

of the agreements between Motorola and the IEEE."); *Continental Casualty Co. v. American*

*Nat. Ins. Co.*, 417 F.3d 727 (7th Cir. 2005) (Illinois law recognizes intended and incidental third-

party beneficiaries).[28]

Numerous courts, faced with the same issues presented in Innovatio's motion, have

upheld such F/RAND-based contract claims.   For example, in *Microsoft Corp. v. Motorola, Inc.*,

---

[27] Comments of IEEE-SA, FTC Patent Standards Workshop, at 2 (Aug. 5, 2011), *available at* http://www.ftc.gov/
os/comments/patentstandardsworkshop/00046-80184.pdf ("IEEE-SA Comments"); *see also* Ex. Q (Amicus Curiae
Br. of the IEEE, *et al.*, In Support of Neither Party, *Broadcom Corp. v. Qualcomm Inc.*, No. 06-4292 (3d Cir. Dec.
19, 2006) ("IEEE Amicus Br.")) at 8; Ex. R (Amicus Curiae Br. of the Fed. Trade Comm'n, Supporting Neither
Party, *Apple Inc. et al. v. Motorola Mobility, Inc.*, No. 2012-1548, 2012-1549 (Fed. Cir. Dec. 4, 2012)); Letter from
Thomas O. Barnett to Michael A. Lindsay, at 1 (Apr. 30, 2007), *available at*
http://www.justice.gov/atr/public/busreview/222978.pdf ("IEEE Business Review Letter").
[28] Innovatio contends without analysis that Illinois law applies to the breach of contract claim. Mot. at 22 n.2.  The
Suppliers note that under the "most significant contacts" test, there are arguably more contacts with California.
However, which state's law is used is not material to the basic contract issues presented in Innovatio's motion.

MS-MOTO_1823_00005255584

No. 10–cv–1823–JLR, slip op. at 4–5 (W.D. Wash. May 31, 2011), the Court denied motions to dismiss Microsoft's breach of contract claim for alleged lack of standing and failure to state a claim based on the patentee's challenge to the same contract theory relied upon by the Suppliers. *See also Research in Motion v. Motorola, Inc.*, 644 F. Supp. 2d 788, 792, 797 (N.D. Tex. 2008); *Apple Inc. v. Samsung Electronics Co., Ltd.*, No. 11-cv-01846, 2012 WL 1672493, at *11–12 (N.D. Cal. May 14, 2012).  And although Innovatio cites *Apple, Inc. v. Motorola Mobility, Inc.*, for a point about choice of law, Innovatio misses the larger point: the *Apple* Court and numerous other authorities around the country recognize breach of contract claims premised on Apple's ability to enforce defendant's commitments to the IEEE regarding licensing of alleged standard-essential patents on RAND terms.  No. 11-cv-178, 2011 WL 7324582, at *9–11 (W.D. Wis. June 7, 2011).

Innovatio largely ignores these authorities and instead presents three arguments.  First, Innovatio urges dismissal because the Suppliers "do not include any allegations that Innovatio breached a contract with the Manufacturing Defendants."  Mot. at 22–24.  That, however, is not true — as discussed above, the letters of assurance relating to Innovatio's patents agree to license to an "unrestricted number of applicants" that use or implement the standard.  AC ¶ 66.  The Suppliers are, therefore, ***explicitly*** identified as intended beneficiaries of the contract. Innovatio's argument attempts to undo its RAND commitments by turning them from commitments to ***everyone*** practicing the standard into commitments to ***no one*** practicing the standard, or perhaps only those with whom Innovatio decides it will deal.  This is in direct conflict with one of the central tenets of RAND commitments — that anyone using the technology is entitled to a license, expressly to avoid the dangers of "patent hold-up" in the standards-setting context.  *See Microsoft*, 864 F. Supp. 2d at 1027 ("Such [RAND] rules help to

MS-MOTO_1823_00005255585

insure that standards do not allow essential patent owners to extort their competitors or prevent
competitors from entering the marketplace.").

Second, Innovatio argues that only the Suppliers' customers could qualify as third-party
intended beneficiaries of the RAND contract. Innovatio provides no analysis supporting this
assertion. Moreover, Innovatio's position conflicts with (1) the actual RAND assurances given
(*e.g.*, agreeing to license to an "unrestricted number of applicants"); (2) the IEEE RAND policies
governing those assurances; and (3) the weight of authorities on this issue. AC ¶¶ 48–56, 60–
68; *Microsoft*, No. 10–cv–1823–JLR, slip op. at 4–5; *Research in Motion*, 644 F. Supp. 2d at 797;
*Apple Inc.*, Ltd., No. 11-cv-01846, 2012 WL 1672493, at *11–12. Moreover, Innovatio ignores
that Cisco and Motorola Solutions are members of the IEEE, and thus, as also alleged,
Innovatio's breach of its RAND obligations constitute a ***first-party*** breach of contract directly
with them. *See e.g.*, AC ¶¶ 48–56, 60–68, 304–13.[29]

Third, contrary to Innovatio's assertions, there is no requirement that a party first request
a license to be entitled to RAND terms. Mot. at 23. In fact, the *Microsoft* Court recently
rejected the same argument, finding a requirement to request a license to be "contrary to the
purpose" of RAND commitments, which is "to ensure that standard essential patents are
available to *all* implementers on RAND terms." 864 F. Supp. 2d at 1034. Although Innovatio
identifies one letter of assurance submitted by one of Innovatio's predecessors stating that it will
provide a RAND license "upon written request" (Mot. at 24), Innovatio ignores three other
subsequent letters of assurance from Innovatio's predecessors that do not include that language.
AC ¶¶ 64–66. Nor can Innovatio rely on that language to eviscerate its RAND obligations to an
"unrestricted number" of implementers. *Microsoft*, 2012 WL 2030098, *7–8 (analyzing

---

[29] Innovatio nonsensically labels the Suppliers as "fourth party beneficiaries" (Mot. at 24), but as explained above,
the Suppliers are both direct parties to the contract with respect to Cisco and Motorola (as members of the IEEE)
and intended third-party beneficiaries (as implementers of the 802.11 standards).

33

language of assurances almost identical to language in the assurances Innovatio ignores, and

holding there is no requirement that users first request a license to sue for breach).

Finally, Innovatio contends the Suppliers must plead that they will "agree to be bound"

by a judicial determination of a RAND royalty, relying on *Apple, Inc. v. Motorola Mobility, Inc.*,

No. 11-cv-178-bbc (W.D. Wis. Nov. 2, 2012). Mot. at 23. However, the portion of the holding

in that case relied on by Innovatio did not involve the sufficiency of the pleadings, but rather was

issued by the court on the eve of a bench trial to determine the FRAND rate, when Apple

equivocated as to whether it would be willing to accept the court's determination of FRAND.

*Apple*, 11-cv-1178-bbc at 2–3, 6. The case actually proves the contrary point: Apple's breach of

contract claim related to FRAND compliance by Motorola and was deemed to be sufficiently

pled, even though no allegations "agreeing to be bound" appear to have been made.

### G. The Suppliers Have Standing And Stated A Claim For Promissory Estoppel

As an alternative to their breach of contract claim, the Suppliers allege that Innovatio is

promissorily estopped from non-RAND licensing by promises its predecessors made to license

the patents on RAND terms. *See* AC ¶¶ 314–19. Innovatio does not challenge that its

predecessors gave these promises, or that Innovatio is bound by them, instead raising two

arguments, neither of which holds water. First, Innovatio contends the Suppliers' claim must be

dismissed because the promises at issue were not made directly to the Suppliers. Mot. at 22–24.

As discussed above, that is not true — the letters of assurance promise to license any user of

802.11 technology on RAND terms. AC ¶ 63. Like Innovatio's arguments on breach of

contract, this argument attempts to undo Innovatio's RAND obligations. Recognizing that, other

courts have had no trouble rejecting identical arguments in similar contexts. *Apple*, 2011 WL

7324582, at *9–11 ("Motorola contends that Apple's promissory estoppel claim should be

dismissed as inadequately pleaded because Apple has not alleged that Motorola made any

34

MS-MOTO_1823_00005255587

promise to Apple. I disagree."); *see also Microsoft Corp. v. Motorola, Inc.*, No. 10–cv–1823–JLR, slip op. at 4–5.[30]

Innovatio's second argument is that the Suppliers' claims for promissory estoppel and breach of contract cannot co-exist. The Federal Rules, however, explicitly permit such pleading. Fed. R. Civ. P. 8(d); *RehabCare Group, East, Inc. v. Camelot Terrace, Inc.*, No. 11-c-6557, 2012 WL 1246560, at *5 (N.D. Ill. April 13, 2012) (refusing to dismiss promissory estoppel claim notwithstanding that plaintiff also alleged existence of an express contract); *MacNeil Automotive Prods., Ltd. v. Cannon Automotive Ltd.*, 715 F. Supp. 2d 786, 791–92 (N.D. Ill. 2010).[31]

## H.    The Suppliers Have Stated A Claim Under Cal. Bus. & Prof. Code § 17200

Contrary to Innovatio's claims, the Suppliers have suffered economic injuries as a direct result of Innovatio's unlawful conduct sufficient to sustain their claim under Cal. Bus. & Prof. Code § 17200. As described above in Part III.B, Innovatio's baseless claims and sham litigation have caused the Suppliers to (i) expend substantial sums investigating demands made by the Suppliers' customers in connection with Innovatio's licensing demands, including with respect to customers who are already licensed to Innovatio's patents, (ii) incur costs associated with defending already-licensed customers, and (iii) suffer harm associated with disruption to their businesses and commercial relationships with their customers. *See* AC ¶¶ 77–78, 293, 297. The Suppliers have also been injured insofar as their expenses and losses exceed the value of a RAND license. AC ¶ 293. These injuries are cognizable under § 17200. *See, e.g., Kwikset Corp. v. Superior Court*, 246 P.3d 877, 885 (Cal. 2011).

---

[30] Innovatio's sole authority — *FDIC v. Gravee* — is not on point. Mot. at 24. In *Gravee*, promises directed to a corporation were not enforceable by individual board members in their personal capacity. 966 F. Supp. 622, 632–33 (N.D. Ill. 1997). Here, the promises are explicitly directed to the Suppliers and all other users of 802.11 technology.
[31] In *MacNeil*, the Court permitted leave to re-plead where plaintiff incorporated contract allegations into the promissory estoppel claim. Other courts in this District, however, have found such re-pleading unnecessary. *See Apps Communications, Inc. v. S2000 Corp.*, No. 10-c-1618, 2010 WL 3034189, at *2 (N.D. Ill. Aug. 3, 2010) (denying motion to dismiss unjust enrichment claim and construing incorporated contract allegations as background).

35

MS-MOTO_1823_00005255588

Innovatio cites only one case in support of its argument: *Xilinx, Inc. v. Intellectual Ventures I LLC*, No. C 11-0671 SI, 2012 WL 243302, at *6–8 (N.D. Cal. Jan. 25, 2012).  In *Xilinx*, the court found that legal fees incurred solely to *initiate* litigation could not constitute injury sufficient to support a Section 17200 claim.  *See id.* at *2–3, 7.[32]  The holding in *Xilinx* does not impact the Suppliers' Section 17200 claim, however, as the Suppliers have suffered (and alleged) numerous economic injuries other than legal fees incurred in connection with litigation, including substantial sums that the Suppliers have paid (*e.g.*, to its employees and outside lawyers) to investigate and respond to Innovatio's out-of-court licensing demands to the Suppliers' customers.  *See* AC ¶¶ 77–78, 293, 297.  Such injuries are sufficient to support a Section 17200 claim.  *See, e.g., Buckland v. Threshold Enterprises, Ltd.*, 155 Cal. App. 4th at 815 ("[F]unds expended independently of the litigation to investigate or combat the defendant's misconduct may establish an injury in fact.").  *Xilinx* does not suggest to the contrary.  2012 WL 243302, at *8.

Moreover, the concerns present in *Xilinx* are not present here.  In that case, the plaintiff's injury was based on its costs incurred in investigating and filing a declaratory judgment action against the patent holder.  On that basis, the court found that Xilinx *chose* to incur the costs, which was an insufficient injury for standing.  *See Xilinx*, 2012 WL 243302, at *7; *see also Buckland*, 155 Cal. App. 4th at 815–16.  By contrast, even if the Suppliers voluntarily incurred their costs in connection with bringing claims against Innovatio, the Suppliers also were forced to incur the additional costs as a direct result of Innovatio's unlawful conduct directed at the Suppliers' Wi-Fi products and customers.  AC ¶ 297; *see also Walker v. City of Lakewood*, 272

---

[32] The case on which the *Xilinx* court relied, *Buckland*, concerned the same alleged injury: costs incurred by the plaintiff solely in order to bring a claim. *Buckland v. Threshold Enterprises, Ltd.*, 155 Cal. 4th 798, 815–16, 66 Cal.Rptr.3d 543 (2007) ("Buckland purchased the product to establish standing for litigation against Threshold."). The *Buckland* court found the plaintiff was injured "solely by expending funds to pursue litigation," which is insufficient for standing. *See id.* at 815. The *Xilinx* opinion rests on the same logic.

36

MS-MOTO_1823_00005255589

F.3d 1114, 1124 n.3 (9th Cir. 2001) ("time and money [] expended defending itself against

[defendants'] claims," in contrast to plaintiff's "filing its own lawsuit," is considered when

deciding whether plaintiff suffered an "injury in fact").  These costs include dealing with

Innovatio's licensing campaign and also costs defending their customers in litigation filed by

Innovatio (not by the Suppliers) as a necessary result of the Suppliers' indemnity obligations.

      Innovatio's assertion that Innovatio's licensing demands are privileged under Section 47

of the California Civil Code is likewise incorrect.  Innovatio's licensing communications to the

Suppliers' customers are not "made . . . in any (1) legislative proceeding, (2) judicial proceeding,

(3) in any other official proceeding authorized by law, or (4) in the initiation or course of any

other proceeding authorized by law."  *See* Cal. Civ. Code § 47(b).  Moreover, it is well-settled

that the party seeking to invoke the protections of privilege for pre-litigation statements must

demonstrate that the statements relate to litigation that is contemplated in good faith and under

"serious consideration" — *i.e.*, litigation that is actually going to be brought.  *Action Apartment*

*Ass'n, Inc. v. City of Santa Monica*, 163 P.3d 89, 102 (Cal. 2007) ("A prelitigation

communication is privileged only when it relates to litigation that is contemplated in good faith

and under serious consideration . . . . No public policy supports extending a privilege to persons

who attempt to profit from hollow threats of litigation."); *Edwards v. Centex Real Estate Corp.*,

53 Cal. App. 4th 15, 36, 61 Cal. Rptr. 2d 518, 531 (1997) ("the privilege attaches at that point in

time that imminent access to the courts is seriously proposed by a party in good faith for the

purpose of resolving a dispute ... not when a threat of litigation is made merely as a means of

obtaining a settlement," and "not simply as a tactical ploy to negotiate a bargain").  Here, the

out-of-court communications that are the subject of the Suppliers' claims are not legitimate

attempts to resolve a dispute that Innovatio expects to litigate, but rather they are licensing

37

MS-MOTO_1823_00005255590

communications attempting to negotiate licenses in the course of Innovatio's licensing business.

Moreover, as alleged, these communications do not relate to any litigation that is contemplated in

good faith or under serious consideration by Innovatio.  In fact, in some of the letters, Innovatio

admits that it has not conducted any investigation that would provide the basis to bring litigation.

Likewise, the Suppliers specifically allege that Innovatio's licensing communications are a

negotiation tactic to extort exorbitant licenses, and do not reflect a good faith intent to actually

sue the thousands of entities from which it has sought licensing fees.  AC ¶¶ 71–75, 84.

Moreover, "[w]hether a prelitigation communication relates to litigation that is contemplated in

good faith and under serious consideration *is an issue of fact*."  *Action Apartment*, 163 P.3d at

102.[33]  It is not appropriate to determine issues of fact on a motion to dismiss.

## I.     The Suppliers Have Stated A Claim For Tortious Interference With Prospective Economic Advantage

Contrary to Innovatio's claims, the Suppliers have sufficiently alleged a tortious

interference claim.  Innovatio suggests that the Suppliers have not sufficiently alleged damages

under Illinois law, but that is incorrect.  The Suppliers specifically alleged that "Innovatio's

conduct is continuing, and has caused, and will likely cause disruption and harm to Plaintiffs'

relationships, advantages, and expectancies with their customers.  For example, Innovatio's

conduct has caused, *inter alia*, reputational harm to Plaintiffs," AC ¶ 324, consistent with Illinois

law. *See Energy Services Air Conditioning & Heating Co., Inc. v. Nicor, Inc.*, No. 97-C-373,

---

[33] Innovatio's motion to dismiss at one point purports to be a motion to strike under the California anti-SLAPP statute, Cal. Code of Civil Procedure § 425.16.  Mot. at 27.  Even if Innovatio's motion to dismiss is properly characterized as a motion to strike, which Defendants dispute, Innovatio's unlawful licensing conduct is not immunized from the Suppliers' Section 17200 claim. *See, e.g., Smith v. Levine Leichtman Capital Partners, Inc.*, 723 F. Supp. 2d 1205, 1218 (N.D. Cal. 2010) (collection letters not protected under anti-SLAPP statute when the action is brought solely in the public interest or on behalf of the general public); *Weiland Sliding Doors and Windows v. Panda Windows and Doors, LLC*, No. 10-cv-677, 2010 WL 4392547, at *2–3 (S.D. Cal. Oct. 28, 2010) (licensing solicitations directed to claimant's customers not protected under anti-SLAPP statute); *see also Rogers v. Home Shopping Network, Inc.*, 57 F. Supp. 2d 973, 982–83 (C.D. Cal. 1999) (in deciding anti-SLAPP motion, well-pleaded allegations must be taken as true).

MS-MOTO_1823_00005255591

1997 WL 790725, at *11–12 (N.D. Ill. Dec. 22, 1997) (damages sufficiently pled by alleging

damage to reputation and goodwill). Additionally, because Innovatio's conduct is ongoing, the

harm is continuing — and playing out in real-time. Similarly, to the extent that California law

governs this claim, there is no question that California law holds that allegations concerning

reputational harm and the prospect of losing future business — like those included in the

Suppliers' Amended Complaint — are sufficient. *See, e.g.*, *Silicon Labs Integration, Inc. v.*

*Melman*, No. C-08-04030, 2010 WL 890140, at *2 (N.D. Cal. Mar. 8, 2010); *Pac. Mar. Freight,*

*Inc. v. Foster*, No. 10-cv-0578-BTM-BLM, 2010 WL 3339432 (S.D. Cal. Aug. 24, 2010);

*Sebastian, Intern., Inc. v. Russolillo*, 128 F. Supp. 2d 630 (C.D. Cal. 2001).[34]

    Finally, Innovatio's conduct is not protected under *Noerr* for the reasons discussed in Part

III.A. *See, e.g.*, *Catch Curve v. Venali, Inc.*, 519 F. Supp. 2d 1028, 1034, 1039–40 (C.D. Cal.

2007) (denying motion to dismiss tortious interference claim). The authorities relied on by

Innovatio do not suggest otherwise. Innovatio cites *Rubloff Dev. Grp., Inc. v. SuperValu, Inc.*,

No. 10-C-3917, 2012 U.S. Dist. LEXIS 4130 (N.D. Ill. Mar. 27, 2012), but *Rubloff* relates only

to the actual filing of lawsuits, not to the types of out-of-court conduct (such as sending baseless

licensing demands to licensed customers) perpetrated by Innovatio and its cohorts. Innovatio

also cites *Gateway W. Ry. v. Terminal R.R. Ass'n of St. Louis*, No. 95-cv-0429-PER, 1998 U.S.

Dist. LEXIS 4614 (S.D. Ill. Feb. 5, 1998), but the sham exception to the *Noerr* doctrine is

notably absent from that decision. Finally, Innovatio cites *Village of Lake Barrington v. Hogan*,

649 N.E.2d 1366 (Ill. App. Ct. 1995), a case also cited by *Gateway*. In *Village of Lake*

---

[34] Under choice of law rules of this forum, the "most significant relationship test" from the Restatement of Contracts is applied to resolve what law applies. *See Mitkal v. United Parcel Serv. Co.*, No. 09-CV-3355, 2011 WL 148405 (N.D. Ill. Jan. 18, 2011). At least certain of the factors considered in that analysis suggest that California law applies to this claim. The place of the injury is California, the state of incorporation and principal place of business of Cisco. AC ¶ 2. In addition, NETGEAR's principal place of business is California, AC ¶ 4, and Motorola, although its principal place of business is Illinois, does substantial business in California as well. Also, injury-causing conduct is also occurring in California: misrepresentations alleged in the Amended Complaint were made by Innovatio's licensing entity VICIS, which is based in California. AC Exh. 29.

MS-MOTO_1823_00005255592

*Barrington* the court immunized the unlawful conduct under a "***conditional*** privilege" because "the plaintiff failed to allege facts indicating that the defendants' conduct was unjustified" — ***not*** because the conduct was absolutely protected. *Id.* at 1374. Here, the Suppliers have repeatedly alleged that Innovatio's conduct was unjustified — indeed, that it was a sham — and Innovatio provides no authority that its sham conduct should qualify as protected petitioning activity.[35]

### J.    The Suppliers Have Stated A Claim For Civil Conspiracy

Innovatio raises only one argument in response to the Suppliers' claim for Civil Conspiracy: that it cannot survive because Innovatio contends the Suppliers' other claims should be dismissed. But as Innovatio acknowledges, the Suppliers' conspiracy claim will remain to the extent that the Suppliers' prevail on any of their other claims. Since, as demonstrated above, Innovatio's motion to dismiss should be denied with respect to these other claims, Innovatio's motion with respect to Suppliers' civil conspiracy claims likewise should be denied.

### K.    The Suppliers Have Stated A Claim For Unclean Hands

Contrary to Innovatio's assertion, courts routinely allow unclean hands allegations in declaratory judgment complaints of non-infringement. *See, e.g.*, *Shloss v. Sweeney*, 515 F. Supp. 2d 1068, 1082 (N.D. Cal. 2007); *Linzer Prods. Corp. v. Sekar*, 499 F. Supp. 2d 540, 557 (S.D.N.Y. 2007). *Winstead v. EMC Mortg. Corp.*, 697 F. Supp. 2d 1 (D.D.C. 2010), is readily distinguishable, as it did not concern a declaratory judgment complaint, did not involve intellectual property rights, and the unclean hands count did not include any substantive allegations. In any event, the Suppliers have also raised unclean hands as an affirmative defense to Innovatio's infringement counterclaims, so the allegations are already properly before this Court, *see* Dkt. # 355 at ¶ 268, Dkt. # 356 at ¶ 272.

---

[35] *Village* extensively discusses the sham exception to *Noerr* for other claims, specifically rejecting an argument that "a party could file sham litigation as long as one of several counts in the complaint had merit." *Id.* at 237.

MS-MOTO_1823_00005255593

Dated:  December 14, 2012                   Respectfully submitted,

                                            _/s/_ *Gianni Cutri*
                                            _____
                                            Steven Cherny *(Pro Hac Vice)*
                                            KIRKLAND & ELLIS LLP
                                            601 Lexington Avenue
                                            New York, NY 10022
                                            (212) 446-4800 (Telephone)
                                            steven.cherny@kirkland.com

                                            Gianni Cutri (#6272109)
                                            KIRKLAND & ELLIS LLP
                                            300 North LaSalle
                                            Chicago, Illinois 60654
                                            312.862.2000 (Telephone)
                                            312.862.2200 (Facsimile)
                                            gcutri@kirkland.com

                                            Adam R. Alper *(Pro Hac Vice)*
                                            KIRKLAND & ELLIS LLP
                                            555 California Street
                                            San Francisco, CA 94104
                                            415.439.1400 (Telephone)
                                            415.439.1500 (Facsimile)
                                            adam.alper@kirkland.com

                                            Michael W. De Vries (*Pro Hac Vice*)
                                            KIRKLAND & ELLIS LLP
                                            333 South Hope Street
                                            Los Angeles, California 90071
                                            213.680.8400 (Telephone)
                                            michael.devries@kirkland.com

                                            ***Attorney for Plaintiffs:***
                                            *Cisco Systems, Inc. (Pre-Consolidation Dist. Del.*
                                            *Case No. 1:11-cv-00425-LPS transferred as N.D.*
                                            *Ill. Case No. 1:11-cv-09309)*

                                            *Motorola Solutions, Inc. (Pre-Consolidation Dist.*
                                            *Del. Case No. 1:11-cv-00425-LPS transferred as*
                                            *N.D. Ill. Case No. 1:11-cv-09309)*

MS-MOTO_1823_00005255594

## CERTIFICATE OF SERVICE

I hereby certify that on December 14, 2012 a true and correct copy of the foregoing

document, **THE SUPPLIERS' OPPOSITION TO INNOVATIO'S MOTION TO DISMISS**,

was electronically filed with the Court via the CM/ECF system which sent notification of such

filing to all Counsel of Record. Copies of documents required to be served by Fed.R.Civ.P. 5(a)

have been served.


Dated:    December 14, 2012                    */s/ Gianni Cutri*
                                               Gianni Cutri (#6272109)
                                               KIRKLAND & ELLIS LLP
                                               300 North LaSalle
                                               Chicago, Illinois 60654
                                               312.862.2000 (Telephone)
                                               312.862.2200 (Facsimile)
                                               gcutri@kirkland.com

MS-MOTO_1823_00005255595

# Exhibit A

MS-MOTO_1823_00005255596



LLC

July 20, 2012



Re:     Innovatio IP Ventures, LLC Licensing Proposal

**FOR SETTLEMENT PURPOSES ONLY**
**PURSUANT TO FRE 408**

Dear Ms. █████

In May 2012, Noel Whitley of Innovatio IP Ventures, LLC ("Innovatio") sent a letter to ██████ ████████ regarding Innovatio's portfolio of patents.

Mr. Whitley did not receive a response.

Our firm has been retained by Innovatio to follow up on that earlier correspondence and hopefully negotiate an amicable licensing arrangement between ████████████ and Innovatio. Innovatio has recently accelerated its litigation efforts and has filed almost twenty lawsuits since May 2011. Although litigation can result in an enormous recovery after trial, the process generally proves to be costly and time consuming for both parties. I hope that we can reach an amicable agreement and that litigation will not be necessary.

As mentioned in Mr. Whitley's letter, the following U.S. Patents are in the Innovatio portfolio:

| | | | |
|---|---|---|---|
| 5,295,154 | 5,940,771 | 7,107,052 | 7,558,557 |
| 5,428,636 | 6,046,992 | 7,386,002 | 7,710,907 |
| 5,504,746 | 6,374,311 | 7,457,646 | 7,710,935 |
| 5,546,397 | 6,665,536 | 7,483,397 | 7,826,818 |
| 5,673,031 | 6,697,415 | 7,535,921 | 7,856,003 |
| 5,740,366 | 6,714,559 | 7,536,167 | 7,873,343 |
| 5,844,893 | 6,826,165 | 7,548,553 | 7,916,747 |
| | 7,013,138 | 7,552,246 | 7,917,145 |

MS-MOTO_1823_00005255597

██████████

July 20, 2012
Page 2

The earliest of these patents were developed by Ronald Mahany and Robert Meier who are widely considered to be among the "Fathers of Wi-Fi." From their pioneering work in the early 1990s there are now 31 patents with over 1,400 patent claims in the Innovatio portfolio generally covering wireless routers, wireless devices, and the manner in which these devices communicate with each other.

For example, local wireless networks (e.g. "hotspots") in corporate offices, warehouses, retail stores and other public locations used to access the Internet or local servers are covered by the Innovatio patents. In addition to covering the manner in which the devices communicate, the portfolio of patents covers the wireless routers and devices believed to be used by ███████████. For example, routers, computers, printers, mobile phones, and bar code scanners that communicate over local wireless networks are covered by the Innovatio patents.

Certain of the patents have already been successfully litigated. In 2009, Broadcom, which previously owned the Innovatio portfolio of patents, settled patent infringement cases with competitor Qualcomm. As widely publicized, under the parties' global settlement, Qualcomm paid Broadcom $891 million for a license to Broadcom's patents.

The validity of certain Innovatio patents has been upheld in U.S. International Trade Commission proceedings and on appeal to the U.S. Court of Appeals for the Federal Circuit. Further, claims of one of the important members of the Innovatio portfolio survived reexamination at the U.S. Patent and Trademark Office. That patent and the continuations from that patent are routinely asserted in Innovatio's litigation efforts.

Since Innovatio was formed in early 2011, Innovatio has successfully licensed thousands of business locations, including businesses in the corporate, banking, retail, hospitality and hotel, restaurant and café, healthcare, insurance, and manufacturing market segments, among others. With a few exceptions, the terms of most of Innovatio's licensing and settlement agreements to date are confidential.

Recently, all of Innovatio's litigation efforts have been consolidated into a single master case (1:11-cv-09308) in the U.S. district court in Chicago. It is expected that as additional lawsuits are filed against other infringers, those cases will be rolled into the master case. However, as previously mentioned, litigation generally proves to be costly and time consuming for both parties, and we hope to avoid it whenever possible.

Please contact me, or have your attorney contact me, by August 3, 2012 to let me know that you have received this correspondence, and to at least establish a schedule to respond to our concerns. You may reach me at (415)503-9918 or by email at licensing@vicisconsulting.com.

If I do not hear from you by August 3, 2012, I will assume that ███████████ is not interested in an amicable resolution of this matter and we will proceed accordingly. Thank you for your prompt attention to our concerns and I look forward to hearing from you.

Sincerely,

*Samik Bhattacharyya* (signature)

Samik Bhattacharyya

VICIS Consulting LLC | 665 Third Street, Suite 508, San Francisco CA 94107 | 415.503.9918

MS-MOTO_1823_00005255598

# Exhibit B

MS-MOTO_1823_00005255599




October 3, 2012



Re:     *Innovatio IP Ventures, LLC Licensing Proposal*
        *FOR SETTLEMENT PURPOSES ONLY - PURSUANT TO Federal Rules of Evidence 408*

In May 2012, Noel Whitley of Innovatio IP Ventures, LLC ("Innovatio") sent a letter to ▮▮▮▮▮▮
▮▮▮▮▮▮ regarding Innovatio's portfolio of patents. Mr. Whitley did not receive a response.

Our company has been retained by Innovatio to follow up on that earlier correspondence and hopefully
negotiate an amicable licensing arrangement between ▮▮▮▮ and Innovatio. Innovatio has recently
accelerated its litigation efforts and has filed almost twenty lawsuits since May 2011. Although litigation can
result in an enormous recovery after trial, the process generally proves to be costly and time consuming for
both parties. We hope that we can reach an amicable agreement and that litigation will not be necessary.

As mentioned in Mr. Whitley's letter, the following U.S. Patents are in the Innovatio portfolio:

| | | | |
|---|---|---|---|
| 5,295,154 | 5,940,771 | 7,107,052 | 7,558,557 |
| 5,428,636 | 6,046,992 | 7,386,002 | 7,710,907 |
| 5,504,746 | 6,374,311 | 7,457,646 | 7,710,935 |
| 5,546,397 | 6,665,536 | 7,483,397 | 7,826,818 |
| 5,673,031 | 6,697,415 | 7,535,921 | 7,856,003 |
| 5,740,366 | 6,714,559 | 7,536,167 | 7,873,343 |
| 5,844,893 | 6,826,165 | 7,548,553 | 7,916,747 |
| 7,013,138 | 7,552,246 | 7,917,145 | |

The earliest of these patents were developed by Ronald Mahany and Robert Meier who are widely considered
to be among the "Fathers of Wi-Fi." From their pioneering work in the early 1990s there are now 31 patents
with over 1,400 patent claims in the Innovatio portfolio generally covering wireless routers, wireless devices,
and the manner in which these devices communicate with each other.

For example, local wireless networks (e.g. "hotspots") in corporate offices, warehouses, retail stores and other
public locations used to access the Internet or local servers are covered by the Innovatio patents. In addition
to covering the manner in which the devices communicate, the portfolio of patents covers the wireless
routers and devices believed to be used by ▮▮▮▮ For example, routers, computers, printers, mobile phones
and bar code scanners that communicate over local wireless networks are covered by the Innovatio patents.

Licensing@BluemontIP.com
PO Box 140696
Irving, TX 75014

MS-MOTO_1823_00005255600

October 3, 2012
Page 2 of 2

Certain of the patents have already been successfully litigated. In 2009, Broadcom, the previous owner of the Innovatio patent portfolio, settled patent infringement cases with competitor Qualcomm. As widely publicized, under the parties' global settlement, Qualcomm paid Broadcom $891 million for a license to Broadcom's patents.

The validity of certain of the Innovatio patents has been upheld in U.S. International Trade Commission proceedings and on appeal to the U.S. Court of Appeals for the Federal Circuit. Further, the Innovatio portfolio has survived reexamination at the U.S. Patent and Trademark Office.

Since Innovatio was formed in early 2011, Innovatio has successfully licensed thousands of business locations, including businesses in the corporate, banking, retail, hospitality and hotel, restaurant and cafe, healthcare, insurance and manufacturing market segments, among others. The terms of most of Innovatio's licensing and settlement agreements to date are confidential.

Recently, all of Innovatio's litigation efforts have been consolidated into a single master case (1:11-CV-09308) in the United States Federal District Court in Chicago. It is expected that as additional lawsuits are filed against other infringers, those cases will be rolled into the master case.

Please contact me, or have your attorney contact me, by October 17, 2012 to let us know that you have received this correspondence, and to at least establish a schedule to respond to our concerns. You may reach me at 866-429-9629 or by email at licensing@BluemontIP.com. If we do not hear from you by October 17, 2012, we will assume that ███████ is not interested in an amicable resolution of this matter and we will proceed accordingly. Thank you for your prompt attention to our concerns and we look forward to hearing from you.

Sincerely,

Bluemont IP Partners

# Exhibit C

MS-MOTO_1823_00005255602



ANTHONY E. DOWELL *

GEOFFREY A. BAKER **

■ ■

GEOFFREY D. SMITH

■ ■

BRIAN P. LYNCH
*REGISTERED PATENT AGENT*

**VIA UNITED STATES MAIL**

June 8, 2012



       Re:    Innovatio IP Ventures, LLC Licensing Proposal
              Our File No. DBX92-1069

**FOR SETTLEMENT PURPOSES ONLY
PURSUANT TO FRE 408**

On April 25, 2011, Matthew McAndrews of Niro, Haller & Niro sent a letter to ███████████ regarding the Innovatio IP Ventures, LLC ("Innovatio") portfolio of patents.

Mr. McAndrews did not receive a response.

Our firm has been retained by Innovatio to follow up on that earlier correspondence and hopefully negotiate an amicable licensing arrangement between ███████████ and Innovatio. Innovatio has recently accelerated its litigation efforts and has filed over twelve lawsuits since the first of the year. Although litigation can result in an enormous recovery after trial, the process generally proves to be costly and time consuming for both parties. I hope that we can reach an amicable agreement and that litigation will not be necessary.

As mentioned in Mr. McAndrews letter, the following U.S. Patents are in the Innovatio portfolio.

| | | | |
|---|---|---|---|
| 5,295,154 | 5,940,771 | 7,107,052 | 7,558,557 |
| 5,428,636 | 6,046,992 | 7,386,002 | 7,710,907 |
| 5,504,746 | 6,374,311 | 7,457,646 | 7,710,935 |
| 5,546,397 | 6,665,536 | 7,483,397 | 7,826,818 |
| 5,673,031 | 6,697,415 | 7,535,921 | 7,856,003 |

201 MAIN STREET

SUITE 710

LAFAYETTE, IN 47901

■ ■

765.429.4004 *p*

765.429.4114 *f*

■ ■

www.dowellbaker.com

PATENT   ■   COPYRIGHT   ■   TRADEMARK



June 8, 2012
Page 2

**FOR SETTLEMENT PURPOSES ONLY**
**PURSUANT TO FRE 408**

| | | | |
|---|---|---|---|
| 5,740,366 | 6,714,559 | 7,536,167 | 7,873,343 |
| 5,844,893 | 6,826,165 | 7,548,553 | 7,916,747 |
| | 7,013,138 | 7,552,246 | 7,917,145 |

The earliest of these patents were developed by Ronald Mahany and Robert Meier who are widely considered to be among the "Fathers of Wi-Fi." From their pioneering work in the early 1990s there are now 31 patents with over 1,400 patent claims in the Innovatio portfolio generally covering wireless routers, wireless devices, and the manner in which these devices communicate with each other.

For example, local wireless networks (e.g. "hotspots") in corporate offices, warehouses, retail stores and other public locations used to access the Internet or local servers are covered by the Innovatio patents. In addition to covering the manner in which the devices communicate, the portfolio of patents covers the wireless routers and devices believed to be used by ▮▮▮▮▮▮▮▮▮▮ For example, routers, computers, printers, mobile phones, and bar code scanners that communicate over local wireless networks are covered by the Innovatio patents.

Certain of the patents have already been successfully litigated. In 2009, Broadcom, which previously owned the Innovatio portfolio of patents, settled patent infringement cases with competitor Qualcomm. As widely publicized, under the parties' global settlement, Qualcomm paid Broadcom $891 million for a license to Broadcom's patents.

The validity of certain of the Innovatio patents has been upheld in U.S. International Trade Commission proceedings and on appeal to the U.S. Court of Appeals for the Federal Circuit. Further, claims of one of the important members of the Innovatio portfolio survived reexamination at the U.S. Patent and Trademark Office. That patent and the continuations from that patent are routinely asserted in Innovatio's litigation efforts.

Since Innovatio was formed in early 2011, Innovatio has successfully licensed thousands of business locations, including businesses in the corporate, banking, retail, hospitality and hotel, restaurant and café, healthcare, insurance, and manufacturing market segments, among others. With a few exceptions, the terms of most of Innovatio's licensing and settlement agreements to date are confidential.

MS-MOTO_1823_00005255604



**DOWELL**
**BAKER**

June 8, 2012
Page 3

**FOR SETTLEMENT PURPOSES ONLY**
**PURSUANT TO FRE 408**

Recently, all of Innovatio's litigation efforts have been consolidated into a single master case (1:11-cv-09308) in the U.S. district court in Chicago. It is expected that as additional lawsuits are filed against other infringers, those cases will be rolled into the master case. However, as previously mentioned, litigation generally proves to be costly and time consuming for both parties, and we hope to avoid it whenever possible.

Please contact me, or have your attorney contact me, by June 27, 2012 to let me know that you have received this correspondence, and to at least establish a schedule to respond to our concerns. You may reach me at (765)429-4004 or by email at aedowell@dowellbaker.com. If I am not available, you may also contact Geoff Smith or Brian Lynch in my office, who may be reached at the same number, or at gsmith@dowellbaker.com and bplynch@dowellbaker.com.

If I do not hear from you by June 27, 2012, I will assume that ████████████ is not interested in an amicable resolution of this matter and we will proceed accordingly. Thank you for your prompt attention to our concerns and I look forward to hearing from you.

Sincerely,

Anthony Dowell

MS-MOTO_1823_00005255605

# Exhibit D
# (Filed Under Seal)

MS-MOTO_1823_00005255606

# Exhibit E

MS-MOTO_1823_00005255607



## Fax Coversheet

ATTN: LEGAL

c/o Lisa Brody

**From: VICIS Consulting, LLC**

Fax No: (415)275-3210

-----------------------------------------------------------------------------------

Please find attached the most recent of several introductory letters we improperly sent to your offices at ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ most recently in late July. These letters were sent with the intention of initiating licensing talks with your company for the use of several patented technologies which we believe your company has implemented without a license in its locations and/or subsidiaries; locations. This was based on a general understanding that technologies which have been recognized in federal court as within the scope of our client's patents are commonly implemented in your industry.

Please take the time to examine the claims set forth within the attached correspondence.

Cordially,

Eric Ogawa
Staff Attorney
VICIS Consulting Group, LLC
665 Third St. Suite 508
San Francisco, CA 94107
415-503-9918 office
650-399-6154 mobile

MS-MOTO_1823_00005255608

# Exhibit F

MS-MOTO_1823_00005255609

**From:** Eric Ogawa [mailto:eric@vicisconsulting.com]
**Sent:** Thursday, September 20, 2012 2:17 PM
**To:** ████████████
**Subject:** Re: ████████████  Innovatio IP Ventures Patent License Proposal

Thanks, █████

Please know that we have filed suit against some 200 companies to date, and so far no equipment manufacturer has stepped in to defend. The equipment manufacturers have sued us, but they have not stepped in to defend any of their users.  This means we can still sue your client and they cannot expect equipment manufacturers to aid in the defense.

We of course hope to continue licensing talks.

Sincerely,
Eric

 Eric Ogawa
Staff Attorney
VICIS Consulting Group, LLC
665 Third St. Suite 508
San Francisco, CA 94107
415-503-9918 office

2

MS-MOTO_1823_00005255610

# Exhibit G

MS-MOTO_1823_00005255611

**From:** Panagiotis Prountzos [mailto:panagiotis@vicisconsulting.com]
**Sent:** Tuesday, November 06, 2012 7:06 PM
█████████████
**Subject:** Re: VICIS Consulting

██████████

Thank you for the response. I hope that we can set up a time to speak once more. Please know that we have filed suit against some 200 companies to date, and so far no equipment manufacturer has stepped in to defend. The equipment manufacturers have sued us, but they have not stepped in to defend any of their users. Further, Judge Holderman has stated that we will be able to add Cisco at the tier two stage of defendants which will be added to the case.

Thank you,
Panagiotis Prountzos


On Thu, Nov 1, 2012 at 10:51 AM, ████████████████████████████████ wrote:

Dear Mr. Prountzos,


████ is 100 % supplied by Cisco and we see that Cisco has filed suit against Innovatio directly; therefore it is unnecessary for █████ to respond further.


Best Regards,


████████████


3

MS-MOTO_1823_00005255612

**From:** Panagiotis Prountzos [mailto:panagiotis@vicisconsulting.com]
**Sent:** Tuesday, October 30, 2012 6:22 PM
▓▓▓▓▓▓▓▓▓
**Subject:** VICIS Consulting


▓▓▓▓▓▓▓▓▓


It's Panagiotis Prountzos, attorney at VICIS Consulting. Just checking in with you regarding the patent issue, and whether you would like to continue discussions. Feel free to contact me via email of phone anytime.


Best,

Panagiotis Prountzos

--

Panagiotis Prountzos

Staff Attorney

VICIS Consulting Group LLC
665 Third St.
Suite 508
San Francisco, CA 94107
Phone: 415-503-9918

Email: panagiotis@vicisconsulting.com




--
Panagiotis Prountzos
Staff Attorney
VICIS Consulting Group LLC
665 Third St.
Suite 508
San Francisco, CA 94107
Phone: 415-503-9918
Email: panagiotis@vicisconsulting.com

MS-MOTO_1823_00005255613

# Exhibit H

MS-MOTO_1823_00005255614

Case 2:10-cv-01823-JLR   Document 741-9   Filed 07/12/13   Page 70 of 135
Case: 1:11-cv-09308 Document #: 508-8 Filed: 12/19/12 Page 2 of 7 PageID #:17584

1

```
 1                    IN THE UNITED STATES DISTRICT COURT

 2                    IN AND FOR THE DISTRICT OF DELAWARE

 3                              - - -
      CISCO SYSTEMS, INC. and MOTOROLA
 4    SOLUTIONS, INC.,                    :   CIVIL ACTION
                                          :
 5              Plaintiffs,               :
                                          :
 6         v.                             :
                                          :
 7    INNOVATIO IP VENTURES, LLC,         :
                                          :   NO. 11-425 (LPS)
 8              Defendant.                     - - -

 9
                              Wilmington, Delaware
10                            Friday, October 7, 2011
                              Oral Argument Hearing
11
                                    - - -
12
      BEFORE:      HONORABLE LEONARD P. STARK, U.S.D.C.J.
13
      APPEARANCES:                     - - -
14

15              MORRIS NICHOLS ARSHT & TUNNELL, LLP
                BY:  JACK B. BLUMENFELD, ESQ.
16
                     and
17
                KIRKLAND & ELLIS, LLP
18              BY:  STEVEN CHERNY, ESQ.
                     (New York, New York)
19
                     and
20
                KIRKLAND & ELLIS, LLP
21              BY:  ADAM ALPER, ESQ.
                     (San Francisco, California)
22
                     and
23

24
                              Brian P. Gaffigan
25                            Registered Merit Reporter
```

Case 2:10-cv-01823-JLR   Document 741-9   Filed 07/12/13   Page 71 of 135
Case: 1:11-cv-09308 Document #: 508-8 Filed: 12/19/12 Page 3 of 7 PageID #:17585

2

```
1    APPEARANCES:   (Continued)

2
                    KIRKLAND & ELLIS, LLP
3                   BY:   AMANDA HOLLIS, ESQ.
                          (Chicago, Illinois)
4
                              Counsel for Cisco Systems, Inc. and
5                             Motorola Solutions, Inc.

6
                    MORRIS JAMES, LLP
7                   BY:   KENNETH L. DORSNEY, ESQ.

8                        and

9                   NIRO, HALLER & NIRO
                    BY:   MATTHEW G. McANDREWS, ESQ.
10                        (Chicago, Illinois)

11                            Counsel for Innovatio IP Ventures, LLC

12

13                            - oOo -

14                       P R O C E E D I N G S

15                  (REPORTER'S NOTE:  The following telephone

16   conference took place in chambers, beginning at 2:05 p.m.)

17                  THE COURT:  Good afternoon, everyone.

18                  (The attorneys respond, "Good afternoon, your

19   Honor.")

20                  THE COURT:  Let's start by noting your

21   appearances on the record, please.

22                  MR. BLUMENFELD:  Good afternoon, your Honor.

23   Jack Blumenfeld for the plaintiffs Cisco and Motorola

24   Solutions, along with Steven Cherny, Adam Alper, and Amanda

25   Hollis, all from various offices of Kirkland & Ellis.
```

Case 2:10-cv-01823-JLR   Document 741-9   Filed 07/12/13   Page 72 of 135
Case: 1:11-cv-09308 Document #: 508-8 Filed: 12/19/12 Page 4 of 7 PageID #:17586

8

1    Chicago action and those issues would involve necessarily

2    Cisco and Motorola.

3              THE COURT:  What would be the statutory basis

4    for me to transfer this case to the Northern District of

5    Illinois?

6              MR. McANDREWS:  Well, the relief we have asked

7    for, and then I will answer your question directly, is

8    dismissal, of course, which I think would result in a de

9    facto transfer because there is no question in my mind that

10   Cisco and Motorola would seek immediately to intervene.

11   They are already de facto parties in the Chicago action.

12   And I say that because as your Honor is aware from the

13   written submissions, they are, at least in the case of Cisco

14   and I presume in the case of Motorola, they are indemnifying

15   defendants in the Chicago action.

16             THE COURT:  So they confirmed that for you now?

17   Because in the papers, I thought you said you didn't know

18   that they were indemnifying anyone.

19             MR. McANDREWS:  No, I think it's -- it's not

20   only clear, the very same legal team is representing parties.

21             THE COURT:  I understand that, but I thought you

22   were complaining in your briefing that there is a difference

23   between being asked to indemnify and actually having to

24   indemnify.

25             MR. McANDREWS:  Your Honor, earlier on in the

1    process, it was not clear to us, as we're establishing our

2    relationship with counsel.  We have also certainly heard

3    back through the very substantial grapevine we're dealing

4    with an awful lot of parties.  Some are now licensees,

5    others are not.

6                As I was saying, the very same fine legal team

7    that sits here now also represents several of the defendants

8    in the Chicago action.  That is not by coincidence.  That is

9    because we're talking about indemnification issues.

10               THE COURT:  So put aside for the moment dismissal,

11   which may be de facto transfer, depending on how they would

12   react to dismissal.  If I don't think I can or should dismiss,

13   but perhaps I think I should transfer, is it 1404(a) or is it

14   something else that would allow me to do that?

15               MR. McANDREWS:  I don't have my book in front of

16   me.  I think it is 1404.

17               THE COURT:  You can address it when you get back

18   up on the podium.

19               MR. McANDREWS:  Your Honor, sure.

20               THE COURT:  Can I take it that -- I don't

21   believe a motion to intervene has been filed by Cisco or

22   Motorola in the ABP action; is that correct?

23               MR. McANDREWS:  No, that is correct.  It has not

24   been filed, and I don't mean to suggest that it has.

25               THE COURT:  No, no.  But you can tell me, if you

1           THE COURT:  You say half and half, but for Cisco

2     and Motorola, it's 100 percent here versus some percentage

3     smaller than 100 in Illinois.

4           MR. McANDREWS:  As to their products, yes.  But,

5     again, they are de facto parties in the Chicago litigation.

6     I heard you ask Mr. Alper specifically about the issue of

7     indemnification, and I'd be happy to be clear, and I'd be

8     happy to supplement the record.  The grapevine that I was

9     actually talking about was a Cisco Legal Department letter-

10    head that we got from one of their customers that we have

11    subsequently licensed, entered into a license with.  And

12    the gist of the document, your Honor -- as I said, I'll

13    submit that at a later date, if you would like -- was that

14    Cisco will stand by its products.  It certainly referred to

15    Innovatio and the notice letters that we had sent out.  But

16    then it followed up very specifically and made the point

17    that if there are additional issues between Innovatio and

18    you, the user, the customer, those are things you are going

19    to have to decide on in terms of resolution within Innovatio.

20          THE COURT:  What about Mr. Alper's point that

21    to the extent the issues are so individualized with each of

22    the defendants that you sued around the country, that that

23    undermines your first to file argument because it really

24    suggestions your suit in Illinois really isn't that close to

25    the suit I have in front of me?

MS-MOTO_1823_00005255619

Case 2:10-cv-01823-JLR  Document 741-9  Filed 07/12/13  Page 75 of 135
Case: 1:11-cv-09308 Document #: 508-8 Filed: 12/19/12 Page 7 of 7 PageID #:17589

37

 1    when I was talking about a subset, I was referring to a

 2    subset of the asserted claims out of the 300-or-so discrete

 3    patent claims that Innovatio has asserted in the Chicago and

 4    other actions.  A subset of those claims is directed to

 5    devices such as wireless access points or wireless terminal

 6    devices.

 7              Mr. Alper used the term "subset" I think in a

 8    different context to talk about the specific products that

 9    might be at issue in the Chicago action versus this one.  I

10    just wanted to make sure that the point is made.

11              Of course, if this action is transferred to

12    Chicago, in their compulsory claims or counterclaims, they

13    would, of course, assert claims with respect to all of their

14    products, just as they had done in this case.

15              THE COURT:  Okay.  Thank you very much.

16              MR. McANDREWS:  Thank you, your Honor.

17              THE COURT:  Thank you, all.  We'll be in recess.

18              (Hearing ends at 2:57 p.m.)

19

20

21        I hereby certify the foregoing is a true and accurate

      transcript from my stenographic notes in the proceeding.

22

23                      /s Brian P. Gaffigan
                      Official Court Reporter
24                      U.S. District Court

25

# Exhibit I

MS-MOTO_1823_00005255621

O

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| DIAGNOSTICS SYSTEMS CORPORATION, | ) ) ) | CASE NO. SA CV 06-1211 DOC (ANx) |
| Plaintiff, | ) ) | |
| v. | ) ) | **O R D E R** ADOPTING REPORT OF SPECIAL MASTER/DISCOVERY REFEREE WITH SOME MODIFICATIONS |
| SYMANTEC CORPORATION; F-SECURE, INC.; NETIQ CORPORATION; QUEST SOFTWARE, INC.; NETSCOUT SYSTEMS, INC.; ORACLE CORPORATION; SAS INSTITUTE, INC.; BUSINESS OBJECTS AMERICAS f/k/a BUSINESS OBJECTS INC.; BMC SOFTWARE, INC.; COGNOS CORPORATION; INTERNATIONAL BUSINESS MACHINES CORPORATION; SAP AMERICA, INC.; MICROSTRATEGY, INC. d/b/a MSIMICROSTRATEGY INCORPORATED; INFORMATION BUILDERS, INC.; ASPEN TECHNOLOGY, INC. d/b/a MASSACHUSETTS ASPEN TECHNOLOGY, INC., | ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | | |

Before the Court is NetScout Systems, Inc.'s Motion to Compel Documents ("Motion").

The Court issued an Order on April 4, 2008, resolving all pending motions, with the exception of

1  the attorney-client privilege and work product doctrine claims made by Plaintiff.  In that Order,

2  the Court appointed Hon. James L. Smith of JAMS as a Special Master ("Special Master") to

3  review documents for which DSC asserts the attorney-client privilege and/or the work product

4  doctrine.  The Special Master has provided the Report and Recommendation of Special

5  Master/Discovery Referee ("R&R") to the Court, and the parties have been provided a copy.

6  The Court gave the parties the opportunity to make oral arguments regarding their objections to

7  the R&R.  After considering the papers filed by the parties, oral argument by the parties, and the

8  R&R, the Court hereby ADOPTS the R&R with some modifications.

9  **I.    BACKGROUND**

10      The present lawsuit involves two patents for which Plaintiff alleges infringement by

11  Defendants.

12      On December 23, 1997, the U.S. Patent & Trademark Office issued U.S. Letters Patent

13  No. 5,701,400 ("the '400 patent") entitled "Method and apparatus for applying if-then-else rules

14  to data sets in a relational database and generating from the results of application of said rules a

15  database of diagnostics linked to said data sets to aid in executive analysis of financial data."

16  Plaintiff Diagnostic Systems Corporation ("DSC") alleges that it is the owner by assignment of

17  all rights and interests in the '400 patent.

18      On July 16, 1996, the U.S. Patent & Trademark Office issued U.S. Letters Patent No.

19  5,537,590 ("the '590 patent") entitled "Apparatus for applying rules to data sets in a relational

20  database to generate a database of diagnostic records linked to the data sets."  DSC alleges that it

21  is the owner by assignment of all rights and interests in the '590 patent.

22      The '590 and '400 patents came into DSC's possession after tracing a circuitous path.

23  Carlos Armando Amado ("Amado") is the named inventor of the '590 Patent, the 400 Patent,

24  and U.S. Patent No. 5,293,615 ("'615 Patent").  On March 7, 2003, Amado filed a patent

25  infringement action against Microsoft Corporation ("Microsoft"), claiming that Microsoft had

26  infringed the '590, '400, and '615 patents.  Amado dismissed his causes of action against

27  Microsoft arising from the '590 Patent and the '400 Patent on September 13, 2004, after

28  receiving the Court's claim construction ruling and before the summary judgment hearing.  The

2

1  '615 Patent was not dismissed and was litigated to a verdict.

2       Amado assigned the '590 Patent and '400 Patent to Acacia Patent Acquisition

3  Corporation ("APAC") on December 6, 2005.  Pursuant to this assignment, Amado retained a

4  50% royalty for any proceeds obtained from enforcement of the patents.  In addition, Amado

5  agreed in the assignment to "execute and deliver all papers" and "generally do everything

6  possible to aid ASSIGNEE [APAC] to obtain and enforce proper patent protection for said

7  inventions in all countries."  APAC assigned its interest in the '590 Patent and '400 Patent to

8  DSC on September 6, 2006.  In this Assignment and Assumption Agreement, DSC assumed all

9  of APAC's "rights, obligations, interests and liabilities under the Amado Assignment

10 Agreement."  Furthermore, APAC agreed in the assignment to "execute and deliver all papers"

11 and "generally do everything possible to aid ASSIGNEE [DSC] to obtain and enforce proper

12 patent protection."  In the same month, DSC allegedly contacted over 100 companies to seek

13 licenses on these patents and offered to disclose details of the patents, explain the due diligence

14 process, and discuss the reasons DSC believed that the other companies' products infringed the

15 patents.

16      Both DSC and APAC are wholly-owned subsidiaries of Acacia Research Corporation

17 ("Acacia") and are in the business of acquiring, licensing, and enforcing patented technologies.

18 Furthermore, APAC and DSC share the same officers, directors, and address.

19      On December 14, 2006, DSC filed its initial Complaint in this action.  Subsequently, on

20 November 8, 2007, DSC filed its Consolidated First Amended Complaint, adding additional

21 defendants.  DSC alleges that Defendants have directly infringed and continue to directly

22 infringe the '400 and '590 patents (collectively, "the Patents").  DSC also alleges Defendants

23 have indirectly infringed the Patents by providing non-staple articles of commerce to others for

24 use in an infringing system and by inducing others to infringe.  DSC alleges that Defendants'

25 acts of infringement include making, using, selling, or offering for sale numerous products.

26 DSC claims Defendants' infringement of the Patents has been willful and deliberate.

27      DSC is seeking a declaration, decree, damages, a preliminary injunction, a permanent

28 injunction, costs, expenses, and pre and post-judgment interest on DSC's damages, and

3

1  attorneys' fees. DSC alleges infringement by the following remaining defendants in the action:

2  Symantec Corporation ("Symantec"); NetIQ Corporation ("NetIQ"); NetScout Systems, Inc.

3  ("NetScout"); Oracle Corporation ("Oracle"); Business Objects Americas f/k/a Business Objects

4  Inc. ("BOA"); Cognos Corporation ("Cognos"); International Business Machines Corporation

5  ("IBM"); SAP America, Inc. ("SAP"); Microstrategy, Inc. d/b/a MSIMicroStrategy Incorporated

6  ("Microstrategy"); and Information Builders, Inc. ("Information Builders").

7       DSC has reached settlement agreements with numerous defendants who were previously

8  named in the case. The action against Motive, Inc. was dismissed pursuant to a settlement

9  agreement on August 9, 2007. The action against CA, Inc. was dismissed pursuant to a

10 settlement and licensing agreement on August 15, 2007. The action against BMC Software, Inc.

11 was dismissed pursuant to a stipulated dismissal on March 24, 2008. Finally, the actions against

12 SAS Institute, Inc., Aspen Technology, Inc. d/b/a Massachusetts Aspen Technology, Inc., F-

13 Secure, Inc., and Quest Software, Inc. were dismissed pursuant to stipulated dismissals on March

14 25, 2008.

15      NetScout's Motion to Compel was originally scheduled for hearing on September 25,

16 2007. The week of the September 25, 2007 hearing, the parties discussed their discovery

17 disputes and conducted depositions. They ultimately resolved the majority of their discovery

18 disputes through an agreement reported to the Court on September 27, 2007. In addition, the

19 Court's Order on April 4, 2008 resolved other issues in NetScout's Motion to Compel.

20 Accordingly, only one remaining unresolved issue exists in NetScout's Motion to Compel,

21 which the Court addresses in this Order. The remaining unresolved issue is the discovery of

22 documents for which DSC claims the attorney-client privilege and/or work product doctrine.

23 NetScout seeks to compel discovery of certain documents for which DSC claims the attorney-

24 client privilege and work product doctrine.

25      The Court assigned a Special Master to review, *in camera*, the documents at issue. The

26 Special Master reviewed each of the 1,302 documents identified in "PLAINTIFF'S PRIVILEGE

27 LOG 10-29-2007" ("Privilege Log") for the purposes of determining whether the listed

28 documents are protected by the attorney-client privilege and/or work product doctrine. The

1   Special Master provided a copy of the Privilege Log with two additional columns on the right

2   hand side of the spreadsheet labeled "Sustained" and "Produce." For each of the 1,302

3   documents, the Special Master indicated his recommendation to sustain the attorney-client

4   privilege or work product doctrine or to produce the document.

5       In the R&R, the Special Master made special note of the fact that, during the relevant

6   time period, the management team of DSC included 5 attorneys. However, in addition to acting

7   as attorneys, these individuals also functioned in the capacity of corporate executives to further

8   the business goals of DSC, primarily in regard to the licensing of the technology that is the

9   subject of this action. Accordingly, the Special Master recommended that communications

10  related primarily to these business functions should generally not be protected by the privileges

11  asserted. The Special Master determined that over 550 of the documents were mislabeled in the

12  privilege log and should be produced.

13      The Court gave the parties the opportunity to conduct oral arguments regarding the

14  Special Master's recommendations on May 23, 2008. Plaintiff and NetScout each submitted

15  supplemental briefing following that hearing. Briefing in this matter is now complete, and the

16  Court addresses the Special Master's R&R in the instant Order.

17  **II.   LEGAL STANDARD**

18      A party may serve on another party a request to produce all relevant and non-privileged

19  documents in the possession, custody or control of the party served. Fed. R. Civ. P. 34(a). The

20  party receiving the request shall serve a written response within 30 days, either stating that

21  inspection will be permitted or objecting to the request and stating the reasons for the objection.

22  Fed. R. Civ. P. 34(b). The party making the request may seek a court order to compel disclosure

23  when the responding party objects to the requests or otherwise fails to respond to the request or

24  to produce the documents. *Id.*

25      "The attorney-client privilege is the oldest of the privileges for confidential

26  communications known to the common law. *Upjohn Co. v. U.S.*, 449 U.S. 383, 389, 101 S.Ct.

27  677 (1981) (citing 8 J. Wigmore, *Evidence* § 2290 (McNaughton rev. 1961)). The elements of

28  the attorney-client privilege are:

5

MS-MOTO_1823_00005255626

(1) Where legal advice of any kind is sought (2) from a professional

legal adviser in his capacity as such, (3) the communications relating

to that purpose, (4) made in confidence (5) by the client, (6) are at

his instance permanently protected (7) from disclosure by himself or

by the legal advisor, (8) except the protection be waived.

8 J. Wigmore, *Evidence* § 2292, at 554.

The work product doctrine is set forth in Fed. R. Civ. P. 26(b)(3).  Pursuant to Rule

26(b)(3), "[o]rdinarily, a party may not discover documents and tangible things that are prepared

in anticipation of litigation or for trial by or for another party or its representative."  The United

States Supreme Court has set forth the essential nature of the doctrine as follows:

In performing his various duties . . . it is essential that a lawyer work

with a certain degree of privacy, free from unnecessary intrusion by

opposing parties and their counsel.  Proper preparation of a client's

case demands that he assemble information, sift what he considers to

be the relevant from the irrelevant facts, prepare his legal theories

and plan his strategy without undue and needless interference.  That

is the historical and the necessary way in which lawyers act within

the framework of our system of jurisprudence to promote justice and

to protect their clients' interests.  This work is reflected, of course, in

interviews, statements, memoranda, correspondence, briefs, mental

impressions, personal beliefs, and countless other tangible and

intangible ways-aptly though roughly termed . . . as the 'Work

product of the lawyer.'  Were such materials open to opposing

counsel on mere demand, much of what is now put down in writing

would remain unwritten. An attorney's thoughts, heretofore

inviolate, would not be his own.  Inefficiency, unfairness and sharp

practices would inevitably develop in the giving of legal advice and

in the preparation of cases for trial.

1 | *Hickman v. Taylor*, 329 U.S. 495, 510-11, 67 S.Ct. 385 (1947).

2 | **III.    DISCUSSION**

3 |       Upon referral of this matter to the Special Master, the Special Master conducted a

4 | thorough and comprehensive review of all 1,302 documents in the Privilege Log.  After

5 | analyzing and reviewing each document, the Special Master denoted whether the privilege

6 | asserted should be sustained, or whether the document should be produced.  The following

7 | findings were crucial to the Special Master's determinations:

8 |                       It should be noted that during the time period reflected in the

9 |                       documents the management team of Plaintiff Diagnostic Systems

10 |                      Corporation (DSC) included 5 attorneys.  All of these individuals, in

11 |                      addition to being designated as 'General Counsel' or 'Counsel'

12 |                      carried other titles including 'Director,' 'Chief Operating Officer,'

13 |                      and 'Vice-President.'  In reviewing the documents it became clear

14 |                      these individuals were at times functioning primarily as attorneys

15 |                      representing DSC and at other times were functioning in the capacity

16 |                      of corporate executives furthering the business goals of DSC,

17 |                      primarily in regard to the licensing of the technology that is the

18 |                      subject of this action.  Communications relating primarily to these

19 |                      business functions were generally found not to be protected by the

20 |                      privileges asserted.

21 | R&R at 2:9-2:17.

22 |       In response, Plaintiff objects to many of the findings in the Special Master's R&R.  For

23 | the majority of these objections, Plaintiff argues that these documents were created in

24 | anticipation of litigation, even if the documents were also generated for, or also serve, a business

25 | purpose.  Plaintiff further argues that the documents relate to the Rule 11 investigation for the

26 | instant lawsuit, and that any discovery of the documents would be premature.  Plaintiff asks the

27 | Court to reverse the Special Master and sustain Plaintiff's assertion under the attorney-client

28 | privilege, work product doctrine, and/or common-interest doctrine for the following privilege

7

1   entry numbers: 1144; 855; 797; 942; 794-796; 730; 776; 784; 12-13; 1061; 1067-1068;

2   1097-1112; 1114-1117; 1118; 1120-1121; 1272-1273; 1284-1287; 1289-1298; 40-43; 433-434;

3   443; 526-527; 553-588; 594; 596-609; 612-623; 626-699; 701-706; 708-730; 738-747; 749-759;

4   765-771; 775-777; 779-780; 784; 789-790; 793-800; 802-805; 807-896; 957; 960; 962-963;

5   969-970; 975-981; 983-984; 989; 991; 994-1007; 1009; 1011-1022; 1026-

6   1056; 1058; 1278-1280; 1288; and 1300-1301.

7           Defendants argue that the Court should order production of the documents marked

8   "Produce" by the Special Master.  In addition, Defendants argue that the Special Master did not

9   go far enough.  Although Defendants do not have access to the *in camera* documents for the

10  purposes of making specific objections, Defendants object to the privilege being sustained as to

11  documents such as privilege entry number 917, as well as communications between Amado and

12  his counsel in the Microsoft action, Morrison & Foerster, and between Amado and his patent

13  attorney, Ronald Fish.

14          At the outset, the Court notes that Plaintiff, through its business structure, attempts to

15  sweep wide swaths of documents within the scope of the privileges asserted.  Plaintiff has set up

16  its business in such a way to allow Plaintiff to argue that many documents, including those

17  central to Plaintiff's primary business, are privileged documents.  "[T]he burden is on a party

18  claiming the protection of a privilege to establish those facts that are the essential elements of the

19  privileged relationship." *von Bulow v. von Bulow*, 811 F.2d 136, 144 (2d Cir. 1987) (citation

20  omitted).  Although Plaintiff has met its burden with respect to many of the documents for which

21  the protected status is sustained, Plaintiff has failed to do so with respect to a substantial number

22  of documents.  As such, the Court adopts the Special Master's report in large part, with some

23  modifications to the Special Master's findings.  Applying a *de novo* standard of review, *see* Fed.

24  R. Civ. P. 53(f), the Court finds the vast majority of the Special Master's recommendations to be

25  well reasoned and correct.

26          The Court upholds the distinction drawn by the Special Master between documents

27  created when DSC employees were functioning primarily as attorneys representing DSC and

28  documents created when the DSC employees were functioning in the capacity of corporate

8

1   executives furthering the business goals of DSC. The latter category should not fall within the

2   scope of the broad protection to which DSC claims entitlement. Further, the record is replete

3   with evidence demonstrating the DSC employees' dual roles as both attorneys and business

4   executives. This evidence is affirmed by an *in camera* review of the documents contained

5   within the privilege log.

6         DSC's only business is to analyze, investigate, and attempt to enforce the patents-in-suit.

7   While much of DSC's activities relate to litigation and legal advice, for which the protection

8   asserted by DSC is proper, much of DSC and the related entities' activities center on their

9   business objectives to license and acquire patents and do not bestow the same protections on

10   related documents. Acacia's business "is to acquire rights and patents and monetize them."

11   Vella Dep. at 17. APAC, a subsidiary of Acacia was created to acquire patents and portfolios on

12   behalf of Acacia, which are subsequently assigned to additional subsidiaries because the

13   "economic interests in those portfolios varied." Vella Dep. at 18, 21. DSC is a subsidiary

14   whose only business is "the business of monetizing the patents in suit." *See* Vella Dep. at 18,

15   64, 177. DSC does not make any products and the patents are its only asset. *Id.* at 64, 173, 194.

16   DSC's purpose is to either attempt to license the patents or enforce them through litigation and

17   judgment. *Id.* at 64, 177. In this vein, some of DSC, Acacia, and APAC's employees' functions

18   do occur in anticipation of litigation, but not all. In addition some of the employees'

19   communications are subject to the attorney-client privilege, but not all.

20         As explained by the Special Master, the DSC entities' employees take multiple roles, both

21   business and legal. This distinction is evidenced by examining the activities of Matthew Vella

22   ("Vella"), DSC's corporate representative who is also an attorney. When asked about the

23   company's financial reporting, Vella explained that DSC is a public company and further stated,

24   "I'm the person that tells the rest of the company what might or might not happen with DSC's

25   business. . . . And what I do is meet with them . . . and I give them a state of DSC and a state of

26   other subsidiaries address, if you will. [Lately,] the reporting was so simple that I think I had to

27   create a spreadsheet for DSC." Vella Dep. at 170-174. Vella also prepared a presentation titled

28   "Next Generation Patent Appraisal (Buying Patents)" for the Ocean Tomo Spring 2008 Live IP

1   Auction held in San Francisco at the end of March 2008. *See* Fossum Decl., Ex. A. The

2   presentation is focused on the business of how to identify patents to acquire and "targets" to

3   assert them against, how to "assess value," and how to develop an "assertion plan." *See id.* The

4   presentation details the extensive process and analysis Vella goes through when evaluating

5   patents to acquire and targets to assert those patents against. *See id.* These functions are clearly

6   business functions, and documents resulting from these functions cannot be categorized in

7   sweeping assertions of privileges and protection in order shield the documents from discovery

8   simply because Vella is a lawyer.

9        Just as distinctions can be drawn between specific employees' roles, distinctions can also

10  be drawn between the relevant time periods. Plaintiff attempts to make the time period during

11  which litigation was anticipated as broad as possible. However, Plaintiff's business model does

12  not allow it to claim such broad privileges. The events leading up to the instant litigation

13  demonstrate the distinctions based on relevant time periods. DSC sent out letters to over 100

14  potential licensees in September 2006, seeking to obtain licenses of the patents-in-suit. Vella

15  Dep. at 64. As explained by Vella, during the period leading up to the issuance of these letters,

16  "there [was] a bunch of evidence flying around. We're trying to figure out not only who's

17  getting letters, but who's likely to get sued." Vella Dep. at 127. When speaking about these

18  September 2006 letters, DSC's counsel stated that "none of these letters are accusations of

19  infringement. They're offers to license." *Id.* at 299. Vella further explains, "We merely offer

20  that they might want to evaluate taking a license. That's very different [from an accusation of

21  infringement]. And many of them said no thanks." *Id.* at 304. Such offers to license are a

22  central aspect of DSC's business model. Thus, although DSC claims that litigation was

23  anticipated related to many potential defendants during this time period, the record negates such

24  a claim. It would be illogical for the Court to conclude that DSC anticipated litigation against all

25  of these companies to whom DSC sent letters. After sending the letters, DSC waited several

26  months to sue the Defendants in this action, then waited another ten months to add additional

27  Defendants. The anticipation of litigation was a developing process and varied as to the relevant

28  Defendants. DSC initially pursued its business to monetize the patents, and had not yet

10

1    formalized specific litigation plans in order to allow it to claim such broad, sweeping

2    protections.

3          These facts negate the broad claims to the work product doctrine and attorney-client

4    privilege that DSC asks the Court to uphold.  With respect to the work product doctrine,

5    numerous authorities have drawn a line between documents created in anticipation of litigation

6    and those not subject to work product protections based on the use of those documents in

7    activities related to the ordinary course of a company's business.  The advisory committee's note

8    to Rule 26(b)(3) explains that "materials assembled in the ordinary course of business . . . are not

9    under the qualified immunity provided by this subdivision."  Rule 26(b)(3), advisory

10   committee's note.  One court explained that "patent infringement investigations, tests or analyses

11   . . . would not be protected from disclosure as work product if they were prepared in the normal

12   course of plaintiff's business."  *Phillips Elecs. North Am. Corp. v. Universal Elecs. Inc.*, 892

13   F.Supp. 108, 110 (D. Del. 1995).  Further, "[a] more or less routine investigation . . . is not

14   sufficient to immunize an investigative report developed in the ordinary course of business."

15   *Green v. Baca*, 2004 WL 1151649, at *5 (C.D. Cal. May 19, 2004) (citation omitted).  "There is

16   no protection for documents prepared in the ordinary course of business, even if they may be

17   useful in litigation."  *Clavo v. Zarrabian*, 2003 WL 24272641, at *2 (C.D. Cal. Sep. 24, 2003);

18   *see also L.H. v. Schwarzenegger*, 2007 WL 2009807, at *8-9 (E.D. Cal. Jul. 6, 2007) (holding

19   that documents prepared as part of "routine" procedures are not protected by work product

20   doctrine); *Kintera, Inc. v. Convio, Inc.*, 219 F.R.D. 503, 507 (S.D. Cal. 2003) (holding that, in

21   order for a document to be protected, it must be one "that would not have been generated but for

22   the pendency or imminence of litigation").  If the Court were to adopt DSC's position with

23   respect to the work product doctrine, virtually all activities engaged in by a company premised

24   entirely on licensing and/or enforcing patents via litigation would be classified as "in

25   anticipation of litigation" and would therefore be work product; such a sweeping application of

26   the work product doctrine is unsupported.  In this case, many of DSC's business activities are

27   distinguishable from DSC's activities in anticipation of litigation.  The Special Master properly

28   excluded documents deriving from these business activities from the scope of the work product

11

Case 2:10-cv-01823-JLR Document 741-9 Filed 07/12/13 Page 88 of 135
Case 1:11-cv-09308 Document #: 50-8 Filed: 12/19/12 Page 13 of 19 PageID #:7002
#:7001

1 doctrine.

2     A similar conclusion is reached with respect to DSC's claims of the attorney-client

3 privilege. In order for the attorney-client privilege to apply, among other factors, legal advice

4 must be sought from a professional legal adviser in his capacity as such, and the communications

5 must relate to that legal advice. 8 J. Wigmore, *Evidence* § 2292, at 554. "The mere fact that

6 outside counsel was copied with the e-mail will not shield communication not made for the

7 purpose of securing legal advice." *United States v. ChevronTexaco Corp.*, 241 F.Supp.2d 1065,

8 1075 (N.D. Cal. 2002). As further explained by the Court in *ChevronTexaco*:

9         Corporations may not conduct their business affairs in private simply

10         by staffing a transaction with attorneys. Because in-house counsel

11         may operate in a purely or primarily business capacity in connection

12         with many corporate endeavors, the presumption that attaches to

13         communications with outside counsel does not extend to

14         communications with in-house counsel.

15         With respect to internal communications involving in-house

16         counsel, Chevron must make a 'clear showing' that the 'speaker'

17         made the communications for the purpose of obtaining or providing

18         legal advice. In order to show that a communication relates to *legal*

19         advice, the proponent of the privilege must demonstrate that the

20         'primary purpose' of the communication was securing legal advice.

21         Extending protection to communications primarily and sufficiently

22         animated by some other purpose would not be necessary to

23         encourage forthright disclosures by clients to lawyers-so such

24         communications should not be privileged.

25         . . .

26         [W]here . . . the attorneys not only served as legal advisors

27         but also helped implement the business transaction, we cannot

28         simply assume that every communication involving in-house counsel

MS-MOTO_1823_00005255633

Case 2:10-cv-01823-JLR   Document 741-9   Filed 07/12/13   Page 89 of 135
Case 1:11-cv-09308 Document #: 50-8 Filed: 12/19/12 Page 14 of 19 PageID #:7003
#:7002

1        that related to this transaction was made primarily for the purpose of

2        securing legal advice.

3  *Id.* at 1076 (internal citations omitted).

4       Here, DSC properly claims the attorney-client privilege in some instances.  However,

5  DSC is not entitled to protection by the privilege simply because in house counsel were involved

6  in the transactions.  The management team of DSC and the related entities consisted of five

7  attorneys during the relevant time period, and these attorneys fulfill important business roles for

8  the companies.  In those instances where DSC has failed to make a clear showing that the

9  primary purpose of the communication was securing legal advice, the assertion of the privilege is

10  overturned.  The Court does not support an assertion of the privilege that will allow DSC to hide

11  behind communications involving its in-house counsel to protect broad swaths of documents,

12  where those communications are not clearly related to a primary purpose of securing legal

13  advice.  The Special Master was correct to construe the attorney-client privilege strictly, and to

14  only apply protections where there was a clear showing that the communication was directed

15  specifically toward legal advice.

16       In sum, the Special Master properly parsed the specific roles of the employees and the

17  relevant time periods to determine which communications were related purely to DSC's business

18  and which were subject to the attorney client privilege and work product doctrine.  Furthermore,

19  DSC's arguments regarding the Rule 11 pre-filing investigation discovery being premature do

20  not preclude production of the documents that the Special Master has recommended be

21  produced.  These documents are not the Rule 11 pre-filing investigation; instead, they are

22  documents generated in the ordinary course of DSC and the related entities' line of business.

23  For these reasons, the Court adopts the Special Master's R&R with modifications set forth

24  below.

25       Prior to setting forth this Court's modifications to the R&R, however, the Court first

26  addresses the recent arguments made by the parties related to waiver of the privilege between

27  Amado and Ronald Fish ("Fish") and between Amado and Morrison & Foerster ("MoFo"), as

28  well as the Petition to Make Special "search report" ("PTMS Report").

13

Case 2:10-cv-01823-JLR Document 741-9 Filed 07/12/13 Page 90 of 135
Case 1:11-cv-09308 Document #: 50-8 Filed: 12/19/12 Page 15 of 19 PageID #:7004
#:7003

1   Defendants argue that Amado waived any attorney client privilege due to the fact that

2   DSC has listed communications between Amado and Fish and between Amado and MoFo on its

3   privilege log. This argument fails for several reasons. At the outset, the evidence indicates that

4   Amado provided these documents to Shore Chan Bragalone LLP ("SCB"), the law firm

5   providing counsel to both DSC and Amado in this action. Amado cannot have waived the

6   privilege by providing this information to his counsel, SCB. Furthermore, there is no indication

7   that Amado provided this information to DSC himself. Defendants ask the Court to infer that

8   Amado provided the information to DSC based on its inclusion on the privilege log. However, if

9   anything, the evidence would likely lead to an inference that SCB provided the information to

10  DSC. An inference that SCB shared these documents with DSC is insufficient to waive

11  Amado's privilege, and it would require inference upon inference to conclude that Amado

12  waived his privilege as to these documents to which the attorney-client privilege clearly applies.

13  Even if DSC possesses this information, DSC is entitled to protection based on the

14  common interest privilege. "[W]here the same attorney represents two parties having a common

15  interest, and each party communicates with the attorney, the communications are privileged from

16  disclosure at the instance of a third person." *Simpson v. Motorists Mutual Ins. Co.*, 494 F.2d

17  850, 855 (7th Cir. 1974). Under the joint client or common interest doctrine, "communications

18  among joint clients and their counsel are not privileged in disputes between the joint clients, but

19  are protected from disclosure to others." *Griffith v. Davis*, 161 F.R.D. 687, 693 (C.D. Cal.

20  1995). "[T]he joint client doctrine typically has been applied to overcome what would otherwise

21  have constituted a waiver of confidentiality because a communication has been shared between

22  two clients." *Id.* Defendants argue that the common interest doctrine does not apply between

23  Amado and DSC because the shared interest is only a financial interest. However, in this case,

24  the shared interest is greater than simply financial. Amado and DSC share an interest in the

25  outcome of the instant litigation. Amado has been substantially involved in this litigation

26  through depositions and numerous court appearances, through which he has been represented by

27  SCB. Although he is not a named party, he is nearly a Plaintiff in the instant action. His clear

28  common goal and involvement in the instant action, as well as his shared counsel with DSC,

14

Case 2:10-cv-01823-JLR Document 741-9 Filed 07/12/13 Page 91 of 135
Case 1:11-cv-09308 Document #: 508 Filed: 12/19/12 Page 16 of 19 PageID #:7805
#:7004

1    create a common interest privilege. For these reasons, the Special Master was correct in

2    sustaining the privilege as to those communications between MoFo and Amado and Fish and

3    Amado arising from the prior action.

4         Plaintiff argues in its recent briefing that the Special Master erred in recommending that

5    privilege entry numbers 1272 and 1273 be produced. These documents constitute a Petition to

6    Make Special "search report" ("PTMS Report") and associated invoice, conducted by Patent

7    Agent Matt Kasap ("Kasap"). A petition to make special is a procedural device available to

8    applicants to accelerate and review prosecution of a patent application. Manual of Patent

9    Examination Procedure (8th ed. Rev. 5 2007) § 708.02 ("MPEP"). Section 708.02 requires that

10   the applicant "[s]ubmit[] a statement(s) that a pre-examination search was made, listing the field

11   of search by class and subclass, publication . . . [and] [s]ubmit[] one copy each of the references

12   deemed most closely related to the subject matter encompassed by the claims if said references

13   are not already of record . . . ." *Id.*

14        Plaintiff argues that the "search report" and invoice constitute communications between

15   Kasap (a non-lawyer patent agent), Amado, and Fish (Amado's patent attorney), subject to the

16   attorney-client privilege. The Court finds the reasoning in *Gorman v. Polar Electro, Inc.*, 137

17   F.Supp.2d 223 (E.D.N.Y. 2001), to be directly on point. There, the Court reached a correct

18   holding in explaining that "the attorney-client privilege applies to confidential communications

19   with patent agents acting under the authority and control of counsel, when the communications

20   relate to the prosecution of a patent application in the United States." *Id.* at 227 (internal

21   citations omitted). Thus, it is necessary to determine whether the patent agent was "acting under

22   the authority and control of an attorney when he obtained the information sought to be

23   disclosed." *Id.* at 228.

24        Here, the evidence indicates that Kasap was not acting under the authority and control of

25   Fish. It was Amado himself who sent a letter by facsimile to Kasap requesting performance of

26   the PTMS search report. The letter indicates that Amado had been referred to Kasap by Fish.

27   Kasap then provided the search report to Amado and billed Amado for the services, as evidenced

28   by an *in camera* review of privilege entry numbers 1272 and 1273. The facts that Fish referred

Case 2:10-cv-01823-JLR Document 741-9 Filed 07/12/13 Page 92 of 135
Case 1:11-cv-09308 Document #: 508-9 Filed: 12/19/12 Page 17 of 19 PageID #:10606
#:7005

1     Amado to Kasap and was copied on the invoice and the search report are insufficient to support

2     a finding that Kasap was acting under Fish's authority and control. Instead, Kasap was acting

3     under the authority and control of Amado directly. Under these authorities and this evidence,

4     the Court finds that this was an unprivileged patent agent-client relationship. Thus, DSC has

5     failed to meet its burden as to the attorney-client privilege for these documents. Accordingly,

6     the Special Master was correct in his recommendation that privilege entry numbers 1272 and

7     1273 be produced.

8         With this analysis and perspective in mind, the Court adopts the Special Master's R&R

9     with the following modifications after reviewing, *in camera*, each of the documents pertaining to

10    the parties' objections:

11          •    Privilege entry number 1144 is hereby sustained. Both the "Sustained" and

12                "Produce" boxes were inadvertently checked. This is a communication between

13                Amado and outside counsel.

14          •    Privilege entry number 849 is hereby ordered to be produced. This is consistent

15                with the finding as to privilege entry number 855. The document pertains to

16                licensing activities in the ordinary course of DSC's business.

17          •    Privilege entry number 797 is hereby sustained. This consistent with the finding

18                as to privilege entry numbers 800 and 801. The document includes

19                communication with outside counsel for the purposes of obtaining legal advice.

20          •    Privilege entry number 940 is hereby ordered to be produced. This is consistent

21                with the finding as to privilege entry number 942. This is a communication

22                between Amado and DSC regarding DSC's ordinary course of business and

23                licensing plans.

24          •    Privilege entry numbers 795 and 796 are hereby sustained. These documents are

25                draft claim constructions prepared by outside litigation counsel. This is consistent

26                with the findings as to privilege entry numbers 541, 542, and 986.

27          •    Privilege entry number 730 is hereby sustained. This document was prepared by

28                outside legal counsel and compares claims of patent and infringer products. This

MS-MOTO_1823_00005255637

Case 2:10-cv-01823-JLR   Document 741-9   Filed 07/12/13   Page 93 of 135
Case 1:11-cv-09308 Document #: 508-9 Filed: 12/19/12 Page 18 of 91 PageID #:16307
#:7006

1    is consistent with the findings as to privilege entry numbers 541, 542, and 986.

2    • Privilege entry number 776 is hereby sustained.  This is consistent with the

3    findings as to privilege entry numbers 541, 542, and 986.

4    • Privilege entry number 778 is hereby ordered to be produced.  This is consistent

5    with the finding as to privilege entry number 784.  This is a communication

6    between Amado and DSC regarding DSC's ordinary course of business and

7    licensing plans.

8    • Privilege entry number 443 is hereby sustained.  The communication between

9    counsel clearly demonstrates specific considerations related to anticipated

10    litigation.

11    DSC has failed to meet its burden to show that the privileges asserted apply to all other

12    documents for which the Special Master has recommended production.  All other objections by

13    DSC and Defendants are hereby OVERRULED.  DSC is hereby ORDERED to produce all

14    documents in compliance with the findings contained in the REPORT OF SPECIAL MASTER /

15    DISCOVERY REFEREE subject to the above modifications.  DSC shall produce these

16    documents no later than August 27, 2008.

17    **IV.    DISPOSITION**

18    For the above mentioned reasons, the Court hereby adopts the Report of the Special

19    Master with modifications.  DSC is hereby ORDERED to PRODUCE the documents denoted by

20    the following privilege entry numbers:

21    • 12-13;

22    • 40-43;

23    • 204;

24    • 234-235;

25    • 431-436;

26    • 444;

27    • 479;

28    • 481;

17

Case 2:10-cv-01823-JLR   Document 741-9   Filed 07/12/13   Page 94 of 135
Case 1:11-cv-09308 Document #: 50-1 Filed: 12/13/12 Page 19 of 19 PageID #:1808
#:7007

1      •      526-527;

2      •      553-729;

3      •      731-775;

4      •      777-794;

5      •      798-799;

6      •      802-842;

7      •      845;

8      •      849-852;

9      •      854;

10     •      856-896;

11     •      925;

12     •      940-985;

13     •      987-991;

14     •      993-1022;

15     •      1024-1121;

16     •      1272-1273;

17     •      1278-1280; and

18     •      1282-1302.

19

20          These documents shall be produced no later than August 27, 2008.

21

22     IT IS SO ORDERED.

23     DATED: August 12, 2008

24

25          _____

26          DAVID O. CARTER
            United States District Judge

27

28

18

MS-MOTO_1823_00005255639

# Exhibit J

MS-MOTO_1823_00005255640

**From:** Eric Ogawa [mailto:eric@vicisconsulting.com]
**Sent:** Wednesday, November 14, 2012 5:44 PM

**Subject:** Innovatio ▮▮▮▮▮▮▮▮▮ Patent Licensing

▮▮▮

We are in receipt of your August 24, 2012 letter in the above referenced matter.

To clarify, we are not asserting patent infringement claims against ▮▮▮ at this point in time.

However, please know that Innovatio's current stance is that any and all Wi-Fi usage will give rise to a patent infringement claim under its portfolio.

With the above in mind, we wish to discuss a potential license with ▮▮▮ if ▮▮▮ does indeed use Wi-Fi (or has used Wi-Fi).

Please give me a call at your earliest convenience. My contact info is below.

Your sincere attention to this matter is greatly appreciated.

Sincerely,

--
Eric Ogawa
**Staff Attorney**
VICIS Consulting Group, LLC
665 Third St. Suite 508
San Francisco, CA 94107
415-503-9918 office

2

# Exhibit K

MS-MOTO_1823_00005255642

```
1              IN THE UNITED STATES DISTRICT COURT
                  NORTHERN DISTRICT OF ILLINOIS
2                       EASTERN DIVISION

3   IN RE:                         ) MDL 2303
                                   ) 11 C 9308 and
4   INNOVATIO IP VENTURES, L.L.C   ) related cases
                                   )
5   PATENT LITIGATION.             ) August 21, 2012
                                   ) Chicago, Illinois
6                                  ) 9:36 a.m.
                                   ) Status Hearing
7
                  TRANSCRIPT OF PROCEEDINGS
8   BEFORE THE HONORABLE MAGISTRATE SIDNEY I. SCHENKIER

9   APPEARANCES:

10  For the Plaintiff        NIRO HALLER & NIRO, LTD.
    Innovatio IP Ventures:   181 West Madison Street
11                           Suite 4600
                             Chicago, Illinois  60602-4515
12                           BY:  MR. MATTHEW G. McANDREWS

13                           McANDREWS HELD & MALLOY, P.C.
                             500 West Madison Street
14                           Suite 3400
                             Chicago, Illinois  60661
15                           BY:  MR. GREGORY C. SCHODDE
                                  MR. RONALD "HANK" SPUHLER
16                                MR. THOMAS J. WIMBISCUS

17  For Plaintiff SonicWALL:  KRAUS FLAMING, LLC
                              20 South Clark Street
18                            Suite 2620
                              Chicago, Illinois  60603
19                            BY:  MR. TODD H. FLAMING

20

21

22

23          TRACEY DANA McCULLOUGH, CSR, RPR
                 Official Court Reporter
24              219 South Dearborn Street
                    Room 1426
25           Chicago, Illinois  60604
                  (312) 922-3716
```

MS-MOTO_1823_00005255643

```
 1   APPEARANCES CONTINUED:

 2
     For Plaintiffs Cosi,           KIRKLAND & ELLIS LLP
 3   Dominick's, Meijer,            300 North LaSalle Street
     Cisco Systems, Motorola,       Suite 2500
 4   and NETGEAR, and a             Chicago, Illinois  60654
     number of hotel defts:         BY:  MR. ADAM R. ALPER
 5                                        MR. GIANNI L. CUTRI

 6                                  KIRKLAND & ELLIS LLP
                                    333 South Hope Street
 7                                  Los Angeles, California  90071
                                    BY:  MR. MICHAEL W. DeVRIES
 8
                                    KIRKLAND & ELLIS LLP
 9                                  601 Lexington Avenue
                                    New York, New York  10022
10                                  BY:  MR. BRIAN P. GEARING

11   For Defendant                  MANDELL MENKES, LLC
     Dominick's:                    One North Franklin Street
12                                  Suite 3600
                                    Chicago, Illinois  60606
13                                  BY:  MR. STEVEN P. MANDELL

14   For Plaintiff Hewlett-         ICE MILLER
     Packard Company:               200 West Madison Street
15                                  Suite 3500
                                    Chicago, Illinois  60601
16                                  BY:  MS. JENNIFER M. DIENES

17   For Counter-Claimants          HOLLAND & KNIGHT, LLP
     Meijer, Inc., and             131 South Dearborn Street
18   Accor North America:           30th Floor
                                    Chicago, Illinois 60603
19                                  BY:  MR. STEVEN E. JEDLINSKI

20   For HVM, LLC:                  MAYER BROWN LLP
                                    71 South Wacker Drive
21                                  Chicago, Illinois 606036-4637
                                    BY:  MR. MICHAEL J. WORD
22

23

24

25
```

 1          MR. SCHODDE:  No, Your Honor.  Thank you.  That's --

 2     I will --

 3          THE COURT:  You already did.

 4          MR. McANDREWS:   Your Honor, Matt McAndrews on the

 5     behalf of the plaintiff.  I've been involved in the licensing

 6     process, and I just -- I briefly want to address two points.  I

 7     think that the history of our licensing practices will be borne

 8     out in what is produced in the form of finalized agreements.

 9     And I will -- my colleagues have probably already seen this,

10     but I think they'll continue to see, you are going to see

11     precious few AIDS foundations and Children's Memorial Hospitals

12     as licensees.  We are not taking a very bullish approach to

13     licensing those.  When you're dealing with thousands of

14     potential infringers and licensees, things are to going to slip

15     through the cracks in the database.

16          And the second point and a very important one, not a

17     single letter that we have sent out has ever referred directly

18     or in a comparative fashion to the costs of defense.  I work

19     for a firm that does primarily plaintiff's side work in patent

20     litigation cases.  And I listened carefully to Mr. DeVries'

21     comment in that regard.  We have never suggested or held out

22     the costs of defense as a bargaining tool in any of these

23     negotiations.

24          THE COURT:  Well, I understand what you're saying,

25     Mr. DeVries.  It does strike me that to the extent that the

54

1          THE COURT:  All right.  Very good.  Enjoy the Labor

2     Day holiday.

3          MR. ALPER:  Thank you, Your Honor.

4          MR. SCHODDE:  Thank you, Your Honor.

5                    CERTIFICATE

6          I HEREBY CERTIFY that the foregoing is a true,

7     correct and complete transcript of the proceedings had at the

8     hearing of the aforementioned cause on the day and date hereof.

9

10    */s/TRACEY D. McCULLOUGH          August 23, 2012*

11    Official Court Reporter                    Date
      United States District Court
12    Northern District of Illinois
      Eastern Division
13

14

15

16

17

18

19

20

21

22

23

24

25

MS-MOTO_1823_00005255646

# Exhibit L
# (Filed Under Seal)

MS-MOTO_1823_00005255647

# Exhibit M
# (Filed Under Seal)

MS-MOTO_1823_00005255648

# Exhibit N
# (Filed Under Seal)

MS-MOTO_1823_00005255649

# Exhibit O

MS-MOTO_1823_00005255650

From:    Eric Ogawa <eric@vicisconsulting.com>
Date:    09/27/2012 05:50 PM
Subject:  Re: Innovatio IP Ventures- Settlement Communications Fed. R. Evid. 408

As a follow up, please have a look at the attached claim charts. They are only 8 pages long and generally illustrate the manner in which we believe the Innovatio patents read on Wi-Fi technology generally. Most anyone with Wi-Fi will fall under the activity described in these claim charts.

Thank you,
Eric

On Thu, Sep 27, 2012 at 2:34 PM, Eric Ogawa <eric@vicisconsulting.com> wrote:

Thanks for your message. Your attention to this matter is of course appreciated.

We invited [redacted] to license Innovatio's patent portfolio based on the knowledge that Wi-Fi implementation is common within [redacted]'s industry or industries. We hope that your IP counsel can independently evaluate the Innovatio patents, and then come to their own conclusion as to the applicability of the portfolio to [redacted]'s wireless technology infrastructure. We are highly confident that the Innovatio portfolio covers effectively ALL currently implemented embodiments of Wi-Fi technology in use today, and in past litigations this perspective has held persuasive as evidenced by the hundred of licenses we have agreed to with companies from a vast range of industries.

Sincerely,

Eric

Eric Ogawa
**Staff Attorney**

VICIS Consulting Group, LLC
665 Third St. Suite 508
San Francisco, CA 94107
415-503-9918 office

On Thu, Sep 27, 2012 at 1:03 PM, [redacted] wrote:

Dear Eric,

We have printed the claims charts you provided.  As you pointed out, these charts are clearly not directed to any activities of the [redacted]

As you're aware, your letters to date have not demonstrated that you have any factual basis with which to proceed with the allegations of infringement.  In order for us to have any meaningful evaluation of your patents, we would greatly appreciate the specific factual basis that leads you to believe [redacted]

4

is using any patented technology.



From:       Eric Ogawa <eric@vicisconsulting.com>
Date:       09/13/2012 06:43 PM
Subject:    Re: Innovatio IP Ventures

Just thought I'd follow-up on the below. How are things going with your evaluations?

Thanks and best,
Eric

On Mon, Aug 27, 2012 at 10:51 AM, Eric Ogawa <eric@vicisconsulting.com> wrote:

SETTLEMENT COMMUNICATION - SUBJECT TO F.R.E. §408

Per our conversation, I am writing to supply you with a variety of claims charts generally illustrating how Innovatio's patents have been asserted in court toward 802.xx ("Wi-Fi") networking. Please note that these claim charts are generalized and not specifically directed to ████████'s particular Wi-Fi implementation.

https://www.████████████████████████████████

Please let me know if you have any questions.  We look forward to future communications on this matter.

Cordially,

--
Eric Ogawa
Staff Attorney
VICIS Consulting Group, LLC
665 Third St. Suite 508
San Francisco, CA 94107
415-503-9918 office
415-881-7262 mobile

5

MS-MOTO_1823_00005255652

--
Eric Ogawa
Staff Attorney
VICIS Consulting Group, LLC
665 Third St. Suite 508
San Francisco, CA 94107
415-503-9918 office

The information transmitted is intended only for the
person or entity to which it is addressed and may
contain confidential and/or privileged material. Any
review, retransmission, dissemination or other use
of, or taking of any action in reliance upon, this
information by persons or entities other than the
intended recipient is prohibited. If you received this
in error, please delete the material from any
computer.

MS-MOTO_1823_00005255653

# Exhibit P

MS-MOTO_1823_00005255654

# NIRO, HALLER & NIRO

RAYMOND P. NIRO
TIMOTHY J. HALLER
WILLIAM L. NIRO
JOSEPH N. HOSTENY, III
ROBERT A. VITALE, JR.
PAUL K. VICKREY
DEAN D. NIRO
RAYMOND P. NIRO, JR.
PATRICK F. SOLON
ARTHUR A. GASEY
CHRISTOPHER J. LEE
DAVID J. SHEIKH
VASILIOS D. DOSSAS
RICHARD B. MEGLEY, JR.
MATTHEW G. McANDREWS
PAUL C. GIBBONS

181 WEST MADISON STREET–SUITE 4600

CHICAGO, ILLINOIS 60602

————

TELEPHONE (312) 236-0733

FACSIMILE (312) 236-3137

GREGORY P. CASIMER
DINA M. HAYES
FREDERICK C. LANEY
DAVID J. MAHALEK
KARA L. SZPONDOWSKI
ROBERT A. CONLEY
LAURA A. KENNEALLY
TAHITI ARSULOWICZ
BRIAN E. HAAN
JOSEPH A. CULIG
ANNA B. FOLGERS
CHRISTOPHER W. NIRO
DANIEL R. FERRI
GABRIEL I. OPATKEN
OLIVER D. YANG

OF COUNSEL:
JOHN C. JANKA

April 27, 2011

## VIA CERTIFIED MAIL

Writer's E-mail: mmcandrews@nshn.com
Writer's Direct: (312) 377-3291



Re:   Innovatio IP Ventures, LLC

We represent Innovatio IP Ventures, LLC ("Innovatio") in the licensing and enforcement of its patent portfolio, which has broad application in the field of wireless local area network ("WLAN") technology (popularly referred to as "Wi-Fi"), including the emerging field of wireless "mesh" networking. The Innovatio portfolio currently includes 31 issued United States patents (collectively, "the Innovatio Patents"). The issued Innovatio Patents are:

| | |
|---|---|
| U.S. Patent No. 5,295,154 | U.S. Patent No. 7,386,002 |
| U.S. Patent No. 5,428,636 | U.S. Patent No. 7,457,646 |
| U.S. Patent No. 5,504,746 | U.S. Patent No. 7,483,397 |
| U.S. Patent No. 5,546,397 | U.S. Patent No. 7,535,921 |
| U.S. Patent No. 5,673,031 | U.S. Patent No. 7,536,167 |
| U.S. Patent No. 5,740,366 | U.S. Patent No. 7,548,553 |
| U.S. Patent No. 5,844,893 | U.S. Patent No. 7,552,246 |
| U.S. Patent No. 5,940,771 | U.S. Patent No. 7,558,557 |
| U.S. Patent No. 6,046,992 | U.S. Patent No. 7,710,907 |
| U.S. Patent No. 6,374,311 | U.S. Patent No. 7,710,935 |
| U.S. Patent No. 6,665,536 | U.S. Patent No. 7,826,818 |
| U.S. Patent No. 6,697,415 | U.S. Patent No. 7,856,003 |
| U.S. Patent No. 6,714,559 | U.S. Patent No. 7,873,343 |
| U.S. Patent No. 6,826,165 | U.S. Patent No. 7,916,747 |
| U.S. Patent No. 7,013,138 | U.S. Patent No. 7,917,145 |
| U.S. Patent No. 7,107,052 | |

██████████████████████████

April 27, 2011
Page 2 of 4

  The newest members of the Innovatio portfolio, U.S. Patent Nos. 7,916,747 and 7,917,145, issued just recently on March 29, 2011. We encourage you to obtain copies of the Innovatio Patents, which you can download free of charge from the United States Patent and Trademark Office's website at www.uspto.gov or the free online service "PAT2PDF" at www.pat2pdf.org.

  Our purpose in writing is threefold. First, we wish to specifically acquaint ██████████ with the Innovatio Patents, which are controlling patents in the area of WLAN (e.g., Wi-Fi) and mesh networking technologies. In this regard, we have identified the Innovatio Patents above and asked that you obtain copies of those patents for your review and analysis. Further, as discussed in greater detail below, this notifies ██████████ of its likely infringement of the Innovatio Patents. And, finally, we write to offer ████████ a license with highly favorable terms under the Innovatio Patents. The general terms of Innovatio's licensing offer are summarized in the last section of this letter below.

### The Methods and Systems at Issue

  Although an exhaustive analysis of infringement of the Innovatio Patents by ████████ ████ is beyond the scope of this letter, the following generally summarizes its likely areas of infringement:

### 1. WLANs Used in Business Operations

  ████████████ infringes numerous of the Innovatio Patents to the extent it operates WLANs deployed in any manufacturing, distribution, retail, inventory management, warehousing, industrial monitoring or control, "smart energy," or corporate office environments. Claims of the Innovatio Patents cover, among other things, WLANs that use the IEEE 802.11 communication protocols. The operation and use of any such systems by ████████████ would constitute infringement of, by way of example and not limitation, claims of at least the following Innovatio Patents:

| | |
|---|---|
| U.S. Patent No. 5,546,397 | U.S. Patent No. 7,457,646 |
| U.S. Patent No. 5,740,366 | U.S. Patent No. 7,535,921 |
| U.S. Patent No. 5,844,893 | U.S. Patent No. 7,536,167 |
| U.S. Patent No. 5,940,771 | U.S. Patent No. 7,548,553 |
| U.S. Patent No. 6,374,311 | U.S. Patent No. 7,558,557 |
| U.S. Patent No. 6,665,536 | U.S. Patent No. 7,710,907 |
| U.S. Patent No. 6,697,415 | U.S. Patent No. 7,826,818 |
| U.S. Patent No. 6,714,559 | U.S. Patent No. 7,873,343 |
| U.S. Patent No. 7,013,138 | U.S. Patent No. 7,916,747 |
| U.S. Patent No. 7,386,002 | U.S. Patent No. 7,917,145 |

MS-MOTO_1823_00005255656

████████████████████

April 27, 2011
Page 3 of 4


        To the extent ████████████ has implemented mesh networking technology in any of the environments identified above, it likely infringes claims of the 20 Innovatio Patents identified immediately above as well as, by way of example and not limitation, claims of at least the following additional Innovatio Patents:

                        U.S. Patent No. 5,295,154
                        U.S. Patent No. 5,428,636
                        U.S. Patent No. 5,504,746
                        U.S. Patent No. 6,046,992
                        U.S. Patent No. 6,826,165
                        U.S. Patent No. 7,483,397

## 2.   WLANs Providing User-Level "Hotspot" Services to the Public

        ████████████ further infringes numerous of the Innovatio Patents to the extent it operates WLANs at its retail locations, which networks provide ████████████ customers and/or employees wireless network access.  Locations that provide this type of service are frequently (but not always) referred to as "hotspots."  Certain companies charge users for use of their hotspot; others provide hotspot connectivity free of charge as a value-added service.

        The operation and use of any such hotspot-type systems by ████████████ would constitute infringement, including contributing to or inducing infringing operation or use by others, of, by way of example and not limitation, claims of at least the following Innovatio Patents:

        U.S. Patent No. 5,546,397          U.S. Patent No. 7,457,646
        U.S. Patent No. 5,740,366          U.S. Patent No. 7,535,921
        U.S. Patent No. 5,844,893          U.S. Patent No. 7,536,167
        U.S. Patent No. 5,940,771          U.S. Patent No. 7,548,553
        U.S. Patent No. 6,374,311          U.S. Patent No. 7,558,557
        U.S. Patent No. 6,665,536          U.S. Patent No. 7,710,907
        U.S. Patent No. 6,697,415          U.S. Patent No. 7,826,818
        U.S. Patent No. 6,714,559          U.S. Patent No. 7,873,343
        U.S. Patent No. 7,013,138          U.S. Patent No. 7,916,747
        U.S. Patent No. 7,386,002          U.S. Patent No. 7,917,145

### Innovatio's Proposed License

        Innovatio proposes that the most reasonable, practical, and economical course of action is for the parties to amicably and promptly resolve issues relating to the use of Innovatio Patents through a suitable negotiated licensing arrangement.  To that end, and to encourage the continued use of Innovatio's essential patented technology in the marketplace, Innovatio proposes granting

█████████████████████████

April 27, 2011
Page 4 of 4

████████████ an upfront, paid-up license for its use under all of 31 of the issued Innovatio Patents. The amount of Innovatio's paid-up license fee will be determined by the specific nature and extent of the use of WLAN (e.g., Wi-Fi) and meshing networking technologies by ██████ █████ covered by the Innovatio Patents. Innovatio will also discount the license fee if the parties are able to finalize a suitable license within the next 30 days.

Please contact me at your earliest possible convenience to discuss this important matter, and thank you in advance for considering Innovatio's licensing proposal. I can be reached at direct dial (312) 377-3292 or e-mail address mmcandrews@nshn.com.

Very truly yours,

Matthew G. McAndrews

# Exhibit Q

MS-MOTO_1823_00005255659

No. 06-4292

RECEIVED

DEC 19 2006

S.C.A. 3rd. CIR.

# IN THE UNITED STATES COURT OF APPEALS

## FOR THE THIRD CIRCUIT

### BROADCOM CORPORATION,

PLAINTIFF-APPELLANT,

v.

### QUALCOMM INCORPORATED,

DEFENDANT-APPELLEE.

Appeal of the Order and Judgment of
the United States District Court for
the District of New Jersey (C.A. No. 05-3350 (MJC))

Brief of Amici Curiae The Institute of Electrical and Electronics Engineers,
Incorporated, VITA, OASIS Open (Organization for the Advancement of
Structured Information Standards), The Open Group, and PCI Industrial
Computer Manufacturers Group In Support of Neither Party

MS-MOTO_1823_00005255660

Frederick A. Nicoll
Dorsey & Whitney LLP
95 Route 17 South, Suite 203
Paramus, NJ 07652
Telephone (201) 291-8904

Attorneys for The Institute of
Electrical and Electronics Engineers,
Incorporated


*Of Counsel to The Institute of
Electrical and Electronics Engineers,
Incorporated:*

Michael A. Lindsay
DORSEY & WHITNEY LLP
50 South Sixth Street
Minneapolis MN 55402
Telephone: 612.340.7819

Robert A. Skitol
DRINKER BIDDLE & REATH LLP
1500 K Street, NW
Washington, DC 20005
Telephone: 202-842-8824

Attorneys for VITA, OASIS Open, The
Open Group, and PCI Industrial
Computer Manufacturers Group


*Of Counsel for OASIS Open, The Open
Group, and PCI Industrial Computer
Manufacturers Group:*

Andrew Updegrove
GESMER UPDEGROVE LLP
40 Broad Street
Boston, MA 02109
Telephone: 617/350-6800

MS-MOTO_1823_00005255661

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Fed. R. App. P. 29(c) and 26.1, amici state as follows:

The Institute of Electrical and Electronics Engineers, Incorporated is a nonprofit corporation and has no shareholders; VITA is a nonprofit corporation and has no shareholders; OASIS Open (Organization for the Advancement of Structured Information Standards) is a nonprofit corporation and has no shareholders; PCI Industrial Computer Manufacturers Group is a nonprofit corporation and has no shareholders; The Open Group is a limited liability company operating on a nonprofit basis, and no person holds 10% or more of the LLC interests.  None of the amici has a parent corporation.

MS-MOTO_1823_00005255662

# Table of Contents

CORPORATE DISCLOSURE STATEMENT ........................................... I

TABLE OF AUTHORITIES ............................................................ III

INTEREST OF AMICI ................................................................... 1

I.   Introduction ....................................................................... 1

II.  SDOs Strive to Implement Fair and Open Processes for Decision-Making Among Competing Technologies ................................... 3

    A.  The IEEE-SA and Standards Development ............................ 4

        1.  The IEEE-SA Standards Development Process ................. 5

        2.  The IEEE-SA and Intellectual Property Rights .............. 8

    B.  VITA and Standards Development ..................................... 10

    C.  OASIS and Standards Development .................................. 13

ARGUMENT ............................................................................. 17

I.   The Fair and Open Standards Development Process Relies on Competition Among Alternative Technical Approaches. ........................ 17

    A.  Inclusion in a Standard Enhances the Value of a Patented Technology. ............................................................... 20

    B.  The SDO Technology Selection Process Considers Alternative Technical Solutions Using a Competitive Process. ................ 23

    C.  This Court Should Consider the Fundamental Role of SDOs' Reliance on the Provision of Patent License Assurances. ........ 27

CONCLUSION .......................................................................... 29

ii

MS-MOTO_1823_00005255663

## Table of Authorities

### Cases

*Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492, 510-11 (1988) .................................................................................................. 19

*American Society of Mechanical. Engineers v. Hydrolevel Corp.*, 456 U.S. 556, 571 (1982) ..................................................................................... 19

*Broadcom Corp. v. Qualcomm, Inc.*, Civ. Action No. 05-3350 (MLC), 2006 U.S. Dist. LEXIS 62090, at *32 (D.N.J. Aug. 31, 2006) .................. 1, 22, 24, 25

*In the Matter of Rambus*, FTC Docket No. 9302, 2006 WL 2330117, at p. 15 (F.T.C. Aug. 2, 2006) ...................................................................... 21

### Statutes and Regulations

Standards Development Organization Advancement Act of 2004 § 102(5), 102(6) ................................................................................................... 1

28 C.F.R. § 50.6. ................................................................................... 10

### Other Authorities

*Backgrounder: Standards Development at the IEEE Standards Association* (*available at* http://standards.ieee.org/announcements/bkgnd_stds process.html) .................................................................................. 6

Business Review Letter from Asst. Attorney General Thomas O. Barnett to Robert Skitol (Oct. 30, 2006), available at http://www.usdoj.gov/atr/public/busreview/219380.htm .......................... 13, 18

Deborah Platt Majoras, *Recognizing the Procompetitive Potential of Royalty Discussions in Standard Setting* at pp 1-2 (Sept. 23, 2005), available at http://www.ftc.gov/speeches/majoras/050923stanford.pdf ............................... 17

*Governing the OASIS Technical Committee Process*, available at http://www.oasis-open.org/committees/process.php ........................................ 14

IEEE Alters Its Standards Patent Policy To Provide Fuller Disclosure On Licensing (Dec. 4, 2006), available at http://standards.ieee.org/announcements pr_043007discl.html) ...................... 10

MS-MOTO_1823_00005255664

IEEE Patent Slide Set, available at http://standards.ieee.org/ board/pat/pat-
  slideset.ppt.................................................................................................... 8

IEEE Policies § 7.13 (Nov. 16, 2006), available at
  http://http://www.ieee.org/web/aboutus /whatis/policies/index.html)....... 3, 8, 15

IEEE Standards Board Bylaws § 6, available at
  http://www.ieee.org/web/aboutus/whatis/bylaws/index.html.............................. 9

IEEE-SA Standards Board Operations Manual § 6.3, available at
  http://standards.ieee.org/guides/opman/sect6.html - 6.3).................................. 8

*Membership Application and Agreement*, available at
  http://http://www.oasis-open.org/join/membership-agreement-
  interactive.pdf ......................................................................................... 15

*OASIS Intellectual Property Rights (IPR) Policy*, available at
  http://www.oasis-open.org/who/intellectualproperty.php ................................. 15

U.S. Office of Management & Budget (OMB), *Circular A-119, Revised, on
  Federal Participation in the Development and Use of Voluntary
  Consensus Standards and in Conformity Assessment Activities*, available
  at http://www.whitehouse.gov/omb/circulars/a119/a119fr.html ...................... 14

W3C Patent Policy, available at http://www.w3.org/Consortium/Patent-
  Policy-20040205 ......................................................................................... 23

iv

MS-MOTO_1823_00005255665

## Interest of Amici

### I.    Introduction

Standards development organizations ("SDOs") promote competition through the creation of standards. Hundreds of nonprofit standards organizations throughout the country have developed tens of thousands of standards.[1] Each SDO is governed by its own distinct set of rules and policies aimed at ensuring fair and open standards development processes. But SDOs also depend on the application of the antitrust laws to prevent the misuse of their processes for anticompetitive purposes.

The court below correctly acknowledged that a patent-holder's assurance to other SDO participants, at the time they consider incorporation of its patented technology in a draft standard, that it will offer reasonable license terms, may give a contractual or quasi-contractual right to all would-be implementers of a final standard.[2] The amici SDOs have no quarrel with that proposition. Likewise, the

---

[1]  *See* Standards Development Organization Advancement Act of 2004 § 102(5), 102(6).

[2]  *See Broadcom Corp. v. Qualcomm, Inc.*, Civ. Action No. 05-3350 (MLC), 2006 U.S. Dist. LEXIS 62090, at *32 (D.N.J. Aug. 31, 2006) ("The Court recognizes that as alleged by Broadcom, Qualcomm agreed to license its patents on FRAND terms, and is now refusing to honor this promise. While this 'agreement' may give rise to liability based on another theory such as breach of contract, it does not give rise to antitrust liability."). While the existence of a contractual or quasi-contractual right seems highly likely in these circumstances, the amici SDOs take no position on whether Qualcomm has breached its obligations under any such theory.

1

amici agree that holders of valid patents are entitled to be compensated appropriately for their inventive contributions (unless they have chosen to forego compensation by providing an assurance of a royalty-free license or a covenant not to assert a patent). Finally, the amici take no position on whether the conduct of defendant-appellee Qualcomm Incorporated violated the antitrust laws; rather, the amici note that the reasoning that the district court used to reach the conclusion of no violation is incorrect.

The court below fundamentally misunderstood the way that SDOs work, the significance of a patented technology's inclusion in a standard, and the role that antitrust law must play in these situations. The rule that the district court adopted – that a deceptive licensing commitment can never constitute an antitrust violation – is demonstrably wrong and, if adopted by this Court, would gravely threaten the standards development process. The five SDOs that have joined as amici[3] submit

---

[3] In addition to the three organizations described more fully in the text below, the amici include The Open Group and PCI Industrial Computer Manufacturers Group (PICMG). The Open Group is an SDO with members from all over the world – 50% from North America, 25% from Europe, and 25% from Asia-Pacific – including a diverse group that spans all sectors of the IT community – IT customers, systems and solutions suppliers, tool vendors, integrators and consultants, as well as academia and researchers. It is a vendor- and technology-neutral consortium that seeks to enhance access to integrated information within and between enterprises based on open standards and global interoperability. PICMG is a consortium of over 450 companies that collaboratively develop open specifications for high performance telecommunications and industrial computing applications.

2

MS-MOTO_1823_00005255667

this brief[4] to help the Court understand how SDOs function and how the mistaken rationale adopted below can jeopardize the important work of such organizations.[5]

## II.    SDOs Strive to Implement Fair and Open Processes for Decision-Making Among Competing Technologies

SDOs develop standards to solve issues ranging from product compatibility to consumer safety and health.  Standards also simplify product development and reduce non-value-adding costs, thereby increasing a user's ability to compare competing products.  They also are fundamental building blocks for international trade.  Only through the use of standards can the requirements of interconnectivity and interoperability be assured and the credibility of new products and new markets verified, thereby enabling the rapid implementation of new technologies.

As technology has become more advanced, SDOs increasingly have created standards that are based on one technology to the exclusion of other technologies.

---

[4]  A motion for leave to file this brief has been separately submitted.

[5]  This amicus brief represents the views of the amici SDOs and not necessarily the views of all of their members.  The consensus process used in developing standards that is described below (as "consensus" is defined within the particular SDO) is not necessarily incorporated in the SDO's legal, policy, and business decision-making process. For example, the IEEE has empowered the President of the IEEE (with the concurrence of a majority of the members of the Executive Committee of the IEEE Board of Directors) to decide whether the IEEE should file an amicus brief in any specific instance.  IEEE Policies § 7.13 (Nov. 16, 2006) (available at http://www.ieee.org/web/aboutus /whatis/policies/index.html).  In this instance, the IEEE also submitted the issue to the IEEE-SA Board of Governors, which voted in favor of submitting this brief.

3

MS-MOTO_1823_00005255668

SDOs create forums in which experts and other interested parties review and evaluate competing technologies for possible inclusion in a standard.

Each of the amici has its own organizational model for standards development: for example, one is a division of a 501(c)(3) organization dedicated more broadly to the advancement of knowledge, and another is a 501(c)(6) trade association. Three of the amici describe their own respective processes below to provide the Court with greater insight into how SDOs function. Regardless of the specifics of their organizational model, however, SDOs – and those that implement the standards that SDOs develop – require and rely upon the protection of the antitrust laws to preserve the benefits of competition that exists prior to adoption of a standard.

### A.   The IEEE-SA and Standards Development

The Institute of Electrical and Electronics Engineers, Incorporated ("IEEE") is an educational and scientific organization, with more than 365,000 members in over 150 countries. The IEEE seeks to advance global prosperity by fostering technological innovation, enabling members' careers, and promoting community worldwide. The IEEE promotes the engineering process of creating, developing, integrating, sharing, and applying knowledge about electronics and information technologies and sciences for the benefit of humanity and the profession.

4

Through the IEEE Standards Association ("IEEE-SA"), the IEEE is a leading forum for development of standards that underpin many of today's technologies. The IEEE-SA's standards are developed in a unique environment that builds consensus in an open process based on input from all interested parties. With nearly 1,300 standards either completed or under development, the IEEE-SA is a central source of standardization in both traditional and emerging fields, particularly telecommunications, information technology, and power generation. The IEEE-SA conducts over 200 standards ballots every year, through which proposed standards are voted upon for technical accuracy, soundness, and acceptance. IEEE-SA thrives because of the technical diversity of its 20,000 plus participants, consisting of technology experts and interested parties from around the globe, and including individuals in corporations, organizations, universities, and government agencies.

### 1. The IEEE-SA Standards Development Process

The IEEE-SA has essentially two types of standards-development processes. First, the IEEE-SA has traditionally operated an individual-based process. In this program, the entire process is open to any individual who wants to participate, and the process works on the principle of one-person / one-vote. Second, for approximately the last four years the IEEE-SA has also operated a corporate-based program. Standards development groups in this program operate on the principle

5

MS-MOTO_1823_00005255670

of one-corporation / one-vote and are open to materially interested corporations and other entities, e.g., educational institutions and government agencies.

IEEE standards follow a well-defined path from concept to completion, guided by a set of five basic principles: due process, openness, consensus, balance, and right of appeal.[6] A standard begins with a project authorization request (PAR), which is usually sponsored by one of forty-four IEEE Technical Societies or Councils, each of which specializes in a specific technology, industry sector, or other related interest; where more than one Society is interested in the subject matter, the IEEE Standards Board can create a Standards Coordinating Committee. The IEEE Standards Board determines whether the contemplated standard falls within the technical scope of IEEE, appears to fulfill a technical and/or market need, and whether enough volunteers are likely to step forward to develop it. With PAR approval, the study group or other proposer that requested the project authorization forms a working group. Working groups are open to the public and have well-publicized procedures regarding membership, voting, officers, and other areas.

Formal consensus balloting begins when the sponsor decides that the draft of the developing standard is stable. The sponsor forms a balloting group containing

---

[6]   Material in this section is largely drawn from *Backgrounder: Standards Development at the IEEE Standards Association* (available at http://standards.ieee.org/announcements/bkgnd_stds_process.html).

MS-MOTO_1823_00005255671

Case 2:10-cv-01823-JLR Document 741-9 Filed 07/12/13 Page 127 of 135

persons interested in the standard. While anyone can contribute comments, the only votes that count toward approval are those of the eligible members of the balloting group. IEEE-SA's rules require that a balloting group be balanced, to prevent any one group or company from dominating the process. Balloters usually fall into one of several classes (e.g., manufacturers, other implementers, customers, government, or general interest). No interest category can comprise over one-half of the balloting group.[7]

A standard will not pass unless at least 75 percent of all ballots from a balloting group are returned and at least 75 percent of the returned ballots bear a "yes" vote. Reaching consensus also includes receiving and resolving comments. Negative ballots must include comments, but the ballot resolution group responds to all comments, whether submitted from within or outside of the balloting group.[8]

The IEEE Standards Board approves or disapproves standards based on the recommendation of its Standards Review Committee. This committee makes sure that working groups follow all procedures and guiding principles in drafting and balloting a standard.

---

[7] The IEEE-SA has recently devoted more attention to balance of interests in its working groups as well.

[8] Once the ballot review group has examined and dealt with all comments, the working group must recirculate the ballot if there is a need for that (for example, because of new technical changes introduced into the document or because of unresolved negative comments).

MS-MOTO_1823_00005255672

### 2. The IEEE-SA and Intellectual Property Rights

The IEEE-SA seeks to produce standards that any willing implementer can use and that will become widely adopted. With the increasing prevalence and scope of patents and the potential for their inclusion in standards, the IEEE-SA modified its patent policy several years ago to explicitly permit the inclusion of patented technology in certain circumstances. The IEEE-SA seeks to become aware of potentially essential patents through inquiry to all working group participants as early in the process as feasible.[9]

At the beginning of every working group meeting, the chair displays a slide set that states the IEEE-SA's patent policy,[10] and he or she invites every participant to disclose patents (or identify the holders of patents) that the working group member believes may be essential for implementing the proposed standard.[11] The IEEE-SA expects that working group members will act in good faith and will

---

[9] *See* IEEE-SA Standards Board Operations Manual § 6.3 ("The patent holder or applicant should provide this assurance as soon as reasonably feasible in the standards development process. This assurance shall be provided no later than the time of IEEE-SA Standards Board review of the standard for approval.") (available at http://standards.ieee.org/guides/opman/sect6.html - 6.3).

[10] The current IEEE Patent Slide Set is available at http://standards.ieee.org/board/pat/pat-slideset.ppt. This slide set will be revised during the first quarter of 2007 to reflect planned changes in the IEEE-SA's Patent Policy.

[11] Indeed, the instructions to the working group chair state that "[e]arly disclosure of patents which may be essential for the use of standards under development is encouraged."

MS-MOTO_1823_00005255673

disclose any known patents that might prove essential (or identify any persons who might hold potentially essential patents).

Once a working group participant discloses a potentially essential patent or identifies a possible holder of such a patent, the working group chair will ask the holder to state its intentions as to licensing.  The IEEE-SA policy currently permits the known use of essential patents (and patent applications), but only if the IEEE-SA receives the patent-holder's or applicant's assurance that either (a) the patent-holder or applicant will not enforce any of its present or future essential patent(s) against any person complying with the standard; or (b) the patent-holder or applicant will make available a license for such implementation without compensation or under reasonable rates, with reasonable terms and conditions that are demonstrably free of any unfair discrimination (RAND — i.e., reasonable and non-discriminatory).[12]  This assurance is irrevocable once submitted and accepted. While the IEEE-SA cannot compel a patent-holder to provide an assurance, the absence of an assurance is a factor that the IEEE-SA will consider when deciding whether to approve the draft standard.[13]

---

[12]  IEEE Standards Board Bylaws § 6, *available at* http://www.ieee.org/web/aboutus/whatis/bylaws/index.html.

[13]  If the patent is known and is clearly essential (for example, if the standard expressly should require compliance with a specifically identified patent), then the absence of the requested Letter of Assurance will preclude approval of the standard (as noted in IEEE Standards Board Bylaws § 6).

9

MS-MOTO_1823_00005255674

The use of licensing commitments is part of an effort to preserve the competitive benefits of *ex ante* technology competition. The IEEE-SA has recently adopted a new patent policy intended to enhance the competitive aspects of its technology selection process and improve the role that licensing commitments can play.[14] Under the new policy, holders of potentially "essential" patent claims will still be asked to provide assurance that they will offer reasonable and nondiscriminatory terms, but they will also be asked (and encouraged) but not required to state "not to exceed" or maximum terms. The assurance will be irrevocable; a patent-holder can provide a further assurance with different terms, but if an implementer prefers the earlier terms, the patent-holder must make those earlier terms available.

In short, the IEEE-SA standards development process is carefully crafted to develop consensus-based standards. The rules rest on the premise that participants in the process will conduct themselves in good faith.

## B.    VITA and Standards Development

VITA is a non-profit association of developers, vendors, and users of real-time modular embedded computing systems. VITA members share longstanding

---

[14] *See* IEEE Alters Its Standards Patent Policy To Provide Fuller Disclosure On Licensing (Dec. 4, 2006) (available at http://standards.ieee.org/announcements pr_043007discl.html). The policy does not take effect until April 30, 2007. The IEEE-SA has sought a business review letter from the U.S. Department of Justice under 28 C.F.R. § 50.6.

MS-MOTO_1823_00005255675

interests in the development of "VME" technology as it has evolved and continues to evolve from its genesis around the Motorola 68000 line of microprocessors and its Virtual Memory Bus.

The VITA Standards Organization ("VSO") is VITA's SDO that develops and promulgates open architecture standards supporting the growth of competitive markets for a broad range of products employing VME technology. It is committed to standards development activity that continually enhances the capabilities and uses of VME technology while also ensuring interoperability among both competing and complementary VME-based products. These efforts support users' choice among an expanding array of vendors and deployment of the technology from one generation to another with minimum cost associated with new-product development cycles.

The VSO standard-setting process generally begins when a member proposes work on a new standard. If at least two other members are interested, they can form a working group and begin to draft a specification in a series of face-to-face meetings, teleconferences, and electronic communications. When the working group members are satisfied with the draft specification, the draft is published. The draft specification can then be formally accepted as a VITA Specification or an International Electrotechnical Commission Industry Technical Agreement ("IEC-ITA") by the full VITA membership; or it can be approved as an

11

MS-MOTO_1823_00005255676

American National Standards Institute ("ANSI") Standard through a slightly different process.

VSO working groups may consider and accept patented solutions for incorporation into standard specifications; doing so can enhance the technical merits of the adopted standards and thus the quality and range of applications for compliant products. But VSO considers this use of patented inputs to be consistent with its open architecture objectives only if patent-holders agree to license their patents on reasonable terms for use in commercially viable products. VSO has traditionally sought to ensure this availability by requiring a patent owner's general commitment to RAND licensing as a condition to incorporating the owner's technology into a final standard.

VITA and VSO are now moving toward adoption of a new patent policy that would, in addition to continuing to require RAND commitments, require early disclosure of (a) patents believed to contain claims essential to a draft specification and (b) maximum royalty rates and other material license terms. The Antitrust Division of the U.S. Department of Justice ("DOJ") has issued a favorable letter under its Business Review Procedure about the proposed policy, characterizing it as "an attempt to preserve competition and thereby to avoid unreasonable patent licensing terms that might threaten the success of future standards," avoiding "disputes over licensing terms that can delay adoption and implementation after

12

MS-MOTO_1823_00005255677

standards are set," and thus "a sensible effort by VITA to address a problem that is created by the standard-setting process itself."[15]

The proposed new policy is subject to approval by the VSO membership in January 2007. But while such a policy can be expected to provide benefits of the kind highlighted in the DOJ letter,[16] it will be no substitute for continued application of the antitrust laws against any efforts by patent-holders to manipulate or subvert VSO standards processes in opportunistic ways that enable anticompetitive patent holdup outcomes.

### C. OASIS and Standards Development

OASIS Open (Organization for the Advancement of Structured Information Standards) is a not-for-profit, international consortium that drives the development, convergence, and adoption of electronic business data standards. The consortium

---

[15] Business Review Letter from Asst. Attorney General Thomas O. Barnett to Robert Skitol (Oct. 30, 2006) at p.10 (available at http://www.usdoj.gov/atr/public/busreview/219380.htm) ("DOJ Letter").

[16] DOJ Letter at p.10 ("Early in the standard-setting process, VITA working group members often can choose among multiple substitute technological solutions, some of which may be patented. Once a particular technology is chosen and the standard is developed, however, it can be extremely expensive or even impossible to substitute one technology for another. In most cases, the entire standard-setting process would have to be repeated to develop an alternative standard around a different technology. Thus, those seeking to implement a given standard may be willing to license a patented technology included in the standard on more onerous terms than they would have been prior to the standard's adoption in order to avoid the expense and delay of developing a new standard around a different technology.").

13

produces open standards for Web services, security and e-business, as well as standards for the public sector and for application-specific markets. Founded in the United States as a not-for-profit corporation in 1993, OASIS has more than 5,000 participants representing over 600 organizations and individual members in about 100 countries.

OASIS members contribute and develop data specifications under the rules specified in the OASIS TC Process.[17] These rules have been designed to provide an open, fair, and transparent process, as described in the qualitative standardization process principles defined in the World Trade Organization's Agreement on Technical Barriers to Trade (WTO-TBT), and the U.S. Office of Management & Budget (OMB)'s Circular A-119, Revised, on Federal Participation in the Development and Use of Voluntary Consensus Standards and in Conformity Assessment Activities.[18]

New standards work is proposed at OASIS by means of a draft charter for a "technical committee" (TC), which states the project scope, anticipated contributions of work, anticipated deliverables, and the IPR mode under which the TC will operate (as explained below).

---

[17] The rules *Governing the OASIS Technical Committee Process* are available at http://www.oasis-open.org/committees/process.php.

[18] The *Circular* is available at http://www.whitehouse.gov/omb/circulars/a119/a119fr.html.

14

MS-MOTO_1823_00005255679

In order to approve a specification as its final work product, and declare it ready for broad implementation, the TC first conducts a public review; receives and resolves the comments received; and then conducts a ballot of committee members to approve the draft as an "OASIS Committee Specification." Committee Specifications also may be submitted to the OASIS membership for further approval as an "OASIS Standard."

OASIS addresses the availability of licensing rights to support its issued specifications and standards in its Intellectual Property Rights (IPR) Policy, by which OASIS members are contractually bound under the OASIS Membership Application and Agreement.[19]  Under the IPR Policy, each member of OASIS is required to accept a variety of obligations, with respect to those TCs that the member actually joins.  Two of these obligations are especially relevant to the questions here at issue.

First, the member accepts certain disclosure obligations regarding all claims under patents and patent applications owned by the member and known to its TC representative that may be essential to the implementation of the draft specification in its current draft form.  Second, the member commits affirmatively to provide a

---

[19]  The *OASIS Intellectual Property Rights (IPR) Policy* is available at http://www.oasis-open.org/who/intellectualproperty.php, and the *Membership Application and Agreement* at http://www.oasis-open.org/join/membership-agreement-interactive.pdf.

MS-MOTO_1823_00005255680