license for all claims under patents and patent applications owned by the member that would necessarily be infringed by conformant implementations of any output of the TC that becomes a TC Specification ("Essential Claims"). The license terms offered by an owner of Essential Claims must conform to one of three possible licensing "modes" defined by the IPR Policy, one of which must be specified in each TC charter: (i) RAND terms, (ii) royalty-free ("RF") with only limited, specified terms, or (iii) RF with a wider range of terms, all of which must nevertheless be RAND. Members also are free to offer broader licenses or covenants not to assert Essential Claims to fulfill this obligation.

The disclosure obligations under the OASIS IPR rules are similar to those of many other comparable organizations, while the licensing modes provide a wider, and in some regards more explicit, set of alternatives than may be found in the IPR policies of many other SDOs. In so doing, the OASIS IPR Policy provides the opportunity for greater competition among the owners of potentially Essential Claims, as well as greater certainty and assurance for those that implement OASIS Committee Specifications and OASIS Standards.

The signed OASIS Membership Application and Agreement and IPR Policy, taken together, constitute an enforceable obligation to license, running to the benefit of all members and third parties that later may seek the right to implement an OASIS Committee Specification or OASIS Standard. As a result, the

16

MS-MOTO_1823_00005255681

composition of a given TC and the specific member patent claims that become

Essential Claims within a given TC are often influenced by the IPR mode (and thus

minimum licensing terms) that the TC selects.

## ARGUMENT

### I. The Fair and Open Standards Development Process Relies on Competition Among Alternative Technical Approaches.

Standards development has long been critical to the economy, and its

importance continues to increase. As the Federal Trade Commission's Chairman

Deborah Platt Majoras recently observed:

> The setting of standards has long been a staple of our market
> economy. The setting of a standard – whether naturally through
> marketplace selection, or deliberately under the auspices of a
> standard setting organization ("SSO") – can allow products
> supplied by different firms to interoperate, making them more
> valuable to consumers and thus increasing the chances of
> market acceptance. The setting of standards for electrical plugs
> and outlets, for example, while now taken for granted, has
> assisted in the proliferation of electrical appliances that
> consumers purchase, secure in the knowledge that they will
> plug into any electrical outlet at home or elsewhere in the
> United States. In an economy increasingly characterized by
> information technology and intellectual property, the setting of
> industry standards has become both more critical and more
> complicated. Technology industries increasingly rely on
> interoperability, which produces efficiencies that can lead to
> increased competition, cost reductions, increased innovation
> and output, and the provision of new services.[20]

---

[20] FTC Chairman Deborah Platt Majoras, *Recognizing the Procompetitive
Potential of Royalty Discussions in Standard Setting* at pp 1-2 (Sept. 23, 2005)
(available at http://www.ftc.gov/speeches/majoras/050923stanford.pdf).

17

MS-MOTO_1823_00005255682

Case 2:10-cv-01823-JLR Document 741-10 Filed 07/12/13 Page 3 of 45

Likewise, the U.S. Department of Justice has recently observed:

> Collaborative standard setting can produce many procompetitive benefits. Performance standards can improve the health and safety of consumers and improve consumers' confidence in a product's quality. Interoperability standards can enable consumers to share information with each other and to interconnect compatible products from different producers. In addition, the collaborative standard-setting process can enable industry participants to share knowledge and develop a "best-of-breed" product or process. Especially in industries with network effects, the collaborative standard-setting process can enlarge markets by overcoming coordination failures among those interested in developing and using the standard so that the products are available to, and used, by more consumers.[21]

While the standards development process has clear benefits for competition, courts have recognized that these benefits can be undermined by participants' abuses or opportunistic manipulations of SDO rules and policies. For example, a company or group of companies might seek to pack a meeting with unqualified

---

[21] DOJ Letter at p. 7.

18

MS-MOTO_1823_00005255683

participants who are there simply to provide votes,[22] or a company might seek to use an SDO to disseminate false or misleading information about a rival's product.[23]

In this case, however, the district court misapprehended the whole connection between competition and open standards development processes. SDOs serve procompetitive purposes but require careful oversight to avoid misuse for anticompetitive ends. Open standards development processes, when all participants follow the rules and otherwise participate in good faith, enable and

---

[22] *See, e.g., Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492, 510-11 (1988), ("To the extent [that] state and local governments are more difficult to persuade through these other avenues, that no doubt reflects their preference for and confidence in the nonpartisan consensus process that petitioner has undermined. Petitioner remains free to take advantage of the forum provided by the standard-setting process by presenting and vigorously arguing accurate scientific evidence before a nonpartisan private standard-setting body. And petitioner can avoid the strictures of the private standard-setting process by attempting to influence legislatures through other forums. What petitioner may not do (without exposing itself to possible antitrust liability for direct injuries) is bias the process by, as in this case, stacking the private standard-setting body with decisionmakers sharing their economic interest in restraining competition." (footnote omitted)).

[23] *See, e.g., American Society of Mechanical Engineers v. Hydrolevel Corp.*, 456 U.S. 556, 571 (1982) ("a standard-setting organization like ASME can be rife with opportunities for anticompetitive activity. Many of ASME's officials are associated with members of the industries regulated by ASME's codes. Although, undoubtedly, most serve ASME without concern for the interests of their corporate employers, some may well view their positions with ASME, at least in part, as an opportunity to benefit their employers. When the great influence of ASME's reputation is placed at their disposal, the less altruistic of ASME's agents have an opportunity to harm their employers' competitors through manipulation of ASME's codes.").

19

MS-MOTO_1823_00005255684

promote the evolution of new, open, and robustly competitive markets, thereby also enabling and promoting competitive innovation. The protections of patent disclosure rules and of RAND and related licensing obligations help ensure that these benefits are achieved and competitive results preserved.

The district court misunderstood the standards development process in two fundamental respects. First, the district court did not understand that there is indeed competition (including competition on license commitments) in the technology selection process. Second, the district court did not understand the effects that deception can have on that competition, particularly when deception causes the SDO to incorporate a patented technology into a final standard that the SDO would otherwise not have selected.

## A. Inclusion in a Standard Enhances the Value of a Patented Technology.

In many circumstances there are multiple technical solutions to a given problem – different technical approaches to achieve a desired outcome. Thus, before a standard's adoption, a participating patent-holder typically faces competition from other available technologies (both patented and non-patented). The inclusion of the patented technology within the standard may not augment the

20

MS-MOTO_1823_00005255685

scope of the patent, but it clearly augments the *value* of the patent.[24]  Once the

standard is adopted, the relevant patent-holder can have the right to exclude

implementers not just from practicing within the scope of the patent but from

practicing within that entire segment of the economy (because the standard has

effectively reduced the competitively viable alternatives for that part of the

economy).  If the SDO's incorporation of the patent holder's technology into the

standard is the result of the patent holder's deliberate deception of other SDO

participants rather than the result of informed decision-making among competing

solutions, the patent-holder's resulting monopoly power cannot be said to flow

simply from rights under the patent code.  In this circumstance, the patent holder's

conduct can reasonably be deemed unlawfully "exclusionary" under Section 2 of

the Sherman Act.[25]

The district court, however, began its antitrust analysis with the proposition

that there was "no competition in the WCDMA technology market," that is, within

the area covered by the standard at issue.  The district court observed that this was

---

[24] *See In the Matter of Rambus*, FTC Docket No. 9302, 2006 WL 2330117, at p.
15 (F.T.C. Aug. 2, 2006) ("A patent holder's market power may be materially
enhanced once the patented technology is incorporated into a standard, as
alternatives become less attractive relative to the chosen technology and less
able to constrain its price.").

[25] *See id.* ("Under Section 2 case law, these circumstances suggest exclusionary
conduct:  deceptive behavior that hides the price of a patented technology is not
competition on the merits, and deception that thwarts informed choice is not
competition on the 'basis [of] efficiency.'").

MS-MOTO_1823_00005255686

"the natural consequence of the standard-setting process," and that Qualcomm has

"a lawful monopoly over the technology claimed in its patents." The district court

offered this assessment of competition:

> When an SDO decides to incorporate one company's patented
> technology into a standard, the company holding the
> incorporated patents will be in a position to control that
> technology's distribution. Qualcomm's "power" to control the
> licensing of its patents is derived from the rights it enjoys as a
> patent-holder. The adoption of an industry standard neither
> diminishes nor augments this exclusionary right.[26]

Here the district court plainly erred. While it may well be true that there is

no competition within the specific technology covered by the Qualcomm patent in

the aftermath of the SDO's adoption of Qualcomm's solution, there certainly can

be and usually are competing technologies *before* the standard is adopted – and

thus competition for inclusion in the standard.[27] Contrary to the district court's

view, the inclusion of a patented technology within a standard clearly can augment

the exclusionary power of the selected technology.

---

[26] *Broadcom Corp.*, 2006 U.S. Dist. LEXIS 62090, at *26.

[27] The district court acknowledged the allegation that the inducement of the SDO
may be considered anticompetitive conduct in the sense that a false promise
biased the SDO in favor of one technology over another, "to the detriment of
those patent-holders competing to have their patents incorporated into the
standard." *Id.* at *37. But the district court nevertheless held that this is
irrelevant because monopoly power would have inevitably resulted from the
standard setting process. *Id.* at **33-34. This reasoning reveals the district
court's fundamental misunderstanding of the standards development process
and of rules established to preserve the value of *ex ante* competition.

22

MS-MOTO_1823_00005255687

Case 2:10-cv-01823-JLR   Document 741-10   Filed 07/12/13   Page 8 of 45

### B.    The SDO Technology Selection Process Considers Alternative Technical Solutions Using a Competitive Process.

By definition, a standard will result in a single technical solution to the problem at hand. As noted above, there usually are multiple available technologies, meaning that the alternative approaches must compete with each other for inclusion in the standard. If an SDO is aware that a technology proposed for inclusion in a standard is or may be covered by an essential patent, the SDO may request or indeed require that the patent-holder provide assurance as to its licensing intentions.[28] In response, the patent-holder may state, for example, that it agrees not to assert its patents, that it will license on a royalty-free basis, that it will license on RAND terms, or that it will not license (or declines to respond). [29] This information can play a critical role in the working group's selection of a

---

[28] As noted above, the proposed new VITA policy mandates disclosure of maximum royalties and other key terms. Other SDOs request or require other kinds of assurance. For example, the World Wide Web consortium obligates participants either to agree to royalty free licensing or to withdraw their IP within well defined timelines, thus allowing other participants to decide whether to continue incorporating that IP in the nascent standard or to look for other paths that would not incorporate it, or to abandon the effort altogether (*see W3C Patent Policy* (available at http://www.w3.org/Consortium/Patent-Policy-20040205)). In contrast, the IEEE patent policy requests voluntary submission of letters of assurance. Regardless of the mechanism, however, the important point is that the patent-holder's intentions are known before the technology is chosen, while different technologies are still in competition.

[29] The IPR policies of some SDOs impose a RAND licensing obligation on members that fail to respond to a disclosure request when required under that policy.

MS-MOTO_1823_00005255688

technology and in the SDO's decision of whether to approve a proposed standard. In other words, whether the assurance takes the form of specific maximum terms or a more general assurance of reasonableness, competition on royalty rates and other commercial terms is an important part of the standards-development process.[30]

In addition to failing to recognize the existence of competition in the standards development process, the district court compounded its error through its misunderstanding of the nature of the selection process within an SDO. In the district court's view, the loss of competition would result regardless of the method or circumstances through which a technology is selected:

> The Court recognizes that Qualcomm's alleged "inducement" of the SDO may be considered anticompetitive conduct in the sense that a false promise biased the SDO in Qualcomm's favor, to the detriment of those patent-holders competing to have their patents incorporated into the standard. *The elimination of competition in the WCDMA technology market, however, would result regardless of how the SDO decided which patents would comprise the standard. While Qualcomm's behavior may have influenced how the SDO would eliminate competition, it is the SDO's decision to set a standard for WCDMA technology, not Qualcomm's "inducement," that results in the absence of competing WCDMA technologies.*[31]

---

[30] Whether this process is as effective with a policy that permits a RAND assurance as with a policy that permits or requires ex ante disclosure of maximum terms is a matter of current debate.

[31] *Broadcom Corp.*, 2006 U.S. Dist. LEXIS 62090, at *27 (emphasis added).

24

MS-MOTO_1823_00005255689

In other words, the district court ignored the role that patent assurances play in the process – and in ensuring that the benefits of competition can be retained once a standard is approved.

Using its mistaken premise, the district court concluded that the means by which the technology is selected cannot provide grounds for an antitrust violation because it does not result in a loss of competition:

> Qualcomm's alleged inducement by false promise may give rise to a cause of action based on another legal theory, but they do not provide an antitrust cause of action. The terms upon which Qualcomm chooses to license its patents since their incorporation into the standard may be considered restrictive and unfair to companies, such as Broadcom, desiring such licenses, but such terms cannot eliminate competition in a technology market that is devoid of competition by virtue of a standard.[32]

This reasoning ignores the competition that does occur for inclusion in a standard. When a patent-holder misleads an SDO into adopting and incorporating the patent-holder's technology (and thus excluding any competitive technology), the patent-holder has in fact deprived affected markets of the benefit of

---

[32] *Id.*

MS-MOTO_1823_00005255690

competition.[33] If the SDO had not been misled, another technology may have been incorporated into the standard instead, and all participants within the affected markets would then have the advantage of a patent-holder that can seek only *reasonable* terms instead of supra-competitive terms. In essence, the district court ignored the allegation that a patent-holder used deception to subvert the intended competition during the standards development process and thereby obtained (after the standard was adopted) monopoly power that it would not otherwise have obtained.

Moreover, the district court's rationale would encourage patent-holders to mislead participants in the standards development process in order to secure a place in a standard. Once its technology is included in the standard, the worst that the patent-holder can expect is to be confined to its licensing terms. If there is no risk to seeking supra-competitive and discriminatory terms, the patent-holder will do so. After all, the risks are likely to be asymmetric: the would-be implementer will face the risk of being shut out of the industry altogether, giving the patent-

---

[33] *See Rambus*, 2006 WL 2330117, at p. 14 ("The risk of competitive harm is heightened in the face of exclusionary conduct that does not constitute competition on the basis of efficiency and that interferes with the cooperative nature of the standard-setting process. Exclusionary conduct such as deception may distort the selection of technologies and evade protections designed by SSOs to constrain the exercise of monopoly power, with substantial and lasting harm to competition.").

26

MS-MOTO_1823_00005255691

holder the ability to demand more than it could have obtained in the competitive pre-standard environment in which it made its licensing commitment.

### C. This Court Should Consider the Fundamental Role of SDOs' Reliance on the Provision of Patent License Assurances.

In framing the appropriate rule, this Court should be mindful of SDOs' concerns. SDOs seek assurances from holders of essential patents because the assurances are necessary to avoid "patent hold-up." Avoiding hold-up outcomes (with their exorbitant and exclusionary license demands) is critical to ensuring that a standard will be genuinely "open" to implementation by all interested parties, thereby enabling the growth of robustly competitive markets around the new technology that the standard encompasses.

Sometimes it is clear that the patent-holder has proprietary technology that it seeks to include in the standard. But sometimes the patent-holder may not be able to determine whether it holds essential IP without conducting a patent search. Sometimes a patent-holder will conduct such a search, but sometimes the patent-holder will choose to avoid the costs of a search and instead simply provide an assurance that, if any of its patents should prove essential, it will license the patents on RAND or royalty-free terms. In all cases, the SDO must be able to rely on the assurance that is provided; deception or other bad faith regarding assurances given under any of the foregoing circumstances can undermine the entire open-standards

MS-MOTO_1823_00005255692

objective with serious anticompetitive consequences for affected technology and product markets.

An appropriate rule will balance the need for assurances (and, indeed, the willingness of companies to participate in the standards process at all) with the need to avoid abuses of the process. While abuse of an SDO's processes through deceptive manipulation will deprive the public of the benefit of competition, an overly broad rule that creates too much legal risk could likewise discourage submission of assurances and increase costs for implementers (and, ultimately, for consumers or other end-users).

Mere disagreement as to the reasonableness of license terms should not ordinarily provide a basis for an antitrust claim. But a blanket rule precluding antitrust liability under all circumstances is equally inappropriate. As the Federal Trade Commission has recognized, the ability to abuse an SDO's processes with impunity will itself create disincentives for participation in SDOs:

> Rambus's argument ignores the potentially serious chilling effect of deceptive conduct in the [SDO] context.... That conduct, if established, might itself chill participation in cooperative standard-setting activities. The success of cooperative standard setting depends on some assurance that other participants will not exploit the process by acting deceptively.[34]

---

[34] *Id.* at p. 11.

28

MS-MOTO_1823_00005255693

In short, where the conduct goes beyond a mere ex post disagreement over license terms and instead entails deliberate deception before the standard's adoption,[35] antitrust liability may be warranted.

## Conclusion

This Court should reject the district court's conclusion that abuse of the standards development process can never give rise to antitrust liability.

Respectfully submitted,

DORSEY & WHITNEY LLP

By /s Frederick A. Nicoll
Frederick A. Nicoll
Dorsey & Whitney LLP
95 Route 17 South, Suite 203
Paramus, NJ 07652
Telephone (201) 291-8904

Attorneys for The Institute of
Electrical and Electronics Engineers,
Incorporated

DRINKER BIDDLE & REATH LLP

By /s Robert A. Skitol
Robert A. Skitol
1500 K Street, NW
Washington, DC 20005
Telephone: 202-842-8824

Attorneys for VITA, OASIS Open, The
Open Group, and PCI Industrial
Computer Manufacturers Group

---

[35] Like the IEEE-SA has done and VITA is considering, an SDO may choose to adopt a policy permitting or requiring a patent-holder to disclose *ex ante* the maximum terms it will seek. If the patent-holder's commitment is to offer "reasonable" terms, then a patent-holder's offer of those maximum terms may or may not satisfy the patent-holder's contractual or quasi-contractual obligation. But standing on those terms would presumptively not give rise to an antitrust claim.

MS-MOTO_1823_00005255694

*Of Counsel to The Institute of*
*Electrical and Electronics Engineers,*
*Incorporated:*

Michael A. Lindsay
DORSEY & WHITNEY LLP
50 South Sixth Street
Minneapolis MN 55402
Telephone: 612.340.7819

*Of Counsel for OASIS Open, The Open*
*Group, and PCI Industrial Computer*
*Manufacturers Group:*

Andrew Updegrove
GESMER UPDEGROVE LLP
40 Broad Street
Boston, MA 02109
Telephone: 617/350-6800

30

MS-MOTO_1823_00005255695

## CERTIFICATE OF BAR MEMBERSHIP

I hereby certify that Frederick A. Nicoll and Robert A. Skitol are members

in good standing of the bar of this Court.

Dated: December 19, 2006        /s Robert A. Skitol
                                Robert A. Skitol

MS-MOTO_1823_00005255696

## CERTIFICATE OF COMPLIANCE
### WITH F.R.A.P. 32(a)

I hereby certify that the foregoing brief employs Times New Roman 14-point font using Microsoft Word 2000 for Windows (Version 9.0.6926 SP-3) and thus complies with the typeface and type style requirements of F.R.A.P. 32(a)(5) and (a)(6).

I further certify that it contains 6,878 words, exclusive of the cover pages, Corporate Disclosure, Tables of Contents and Authorities, and certificates of counsel as specified in F.R.A.P. 32(a)(7)(B)(iii).

Dated: December 19, 2006          /s Robert A. Skitol
                                  Robert A. Skitol

MS-MOTO_1823_00000255697

## CERTIFICATE PURSUANT TO L.A.R. 31.1(c)

I hereby certify that (1) the text of the electronic version of the foregoing brief is identical to the text in the paper copies and (2) that I caused the file containing the electronic version to be scanned using Symantec Anti-Virus, version 10.0.1.1000, and that the file was found to be virus-free.

Dated: December 19, 2006       /s Robert A. Skitol
                              Robert A. Skitol

## CERTIFICATE OF SERVICE

I, Robert A. Skitol, certify that on this 19th day of December, 2006, I caused two copies of the foregoing Brief of Amici Curiae The Institute of Electrical and Electronics Engineers, Incorporated, VITA, OASIS Open (Organization for the Advancement of Structured Information Standards), The Open Group, and PCI Industrial Computer Manufacturers Group In Support of Neither Party, to be served on each of the parties at the addresses below as indicated, and that I simultaneously caused ten copies to be filed with the Clerk of the Court of the United States Court of Appeals for the Third Circuit by hand and one copy by electronic submission.

BY FEDERAL EXPRESS:

> David S. Stone
> Boies, Schiller & Flexner
> 150 John F. Kennedy Parkway
> 4th Floor
> Short Hills, NJ 07078

> Richard J. Stark
> Cravath, Swaine & Moore
> 825 Eighth Avenue
> Worldwide Plaza
> New York, NY 10019

Dated: December 19, 2006            /s Robert A. Skitol
                                    Robert A. Skitol

MS-MOTO_1823_00005255699

# Exhibit R

MS-MOTO_1823_00005255700

**Nos. 2012-1548, 2012-1549**

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

———————

APPLE INC. AND NEXT SOFTWARE, INC. (formerly known as NeXT
Computer, Inc.),

*Plaintiffs-Appellants,*

— v. —

MOTOROLA, INC. (now known as Motorola Solutions, Inc.) AND MOTOROLA
MOBILITY, INC.,

*Defendants-Cross-Appellants.*

———————

Appeals from the United States District Court for the Northern District
of Illinois, Case No. 11-CV-8540, Judge Richard A. Posner

———————

## BRIEF OF AMICUS CURIAE FEDERAL TRADE COMMISSION
## SUPPORTING NEITHER PARTY

———————

DAVID C. SHONKA,
*Acting General Counsel*

RICHARD M. BRUNELL,
*Senior Advisor for Competition
Matters*

WILLIAM COHEN,
*Deputy General Counsel*

SUZANNE MUNCK af ROSENCHOLD,
*Chief Counsel for Intellectual
Property*

WILLIAM F. ADKINSON Jr.,
*Attorney*

**FEDERAL TRADE COMMISSION**
600 Pennsylvania Ave, NW
Washington, DC 20580
202-326-2709

MS-MOTO_1823_00005255701

# TABLE OF CONTENTS

PAGE

TABLE OF AUTHORITIES……………………………………………………ii

INTEREST OF AMICUS CURIAE CURIAE………..…………………………1

INTRODUCTION……………………………………………………………….2

ARGUMENT…………………………………………………………………….4

    I.    AVOIDING PATENT HOLD-UP IS AN IMPORTANT
        CONSIDERATION IN EVALUATING WHETHER AN
        INJUNCTION SHOULD BE ENTERED……..…................................4

    II.    THE DISTRICT COURT PROPERLY APPLIED THE *EBAY*
        FACTORS IN DENYING MOTOROLA REQUEST FOR
        INJUNCTIVE RELIEF……………………………………….…....…7

CONCLUSION……………………………………………………………….....16

CERTIFICATE OF COMPLIANCE……………………………………….…....17

CERTIFICATE OF SERVICE……………………………………………………18

i

# TABLE OF AUTHORITIES

CASES                                                                                                            PAGE

*Active Video Networks, Inc. v. Verizon Communs., Inc.,*
    694 F.3d 1312 (Fed. Cir. 2012)……………………………………………………..8, 10

*Advanced Cardiovascular Sys., Inc. v. Medtronic Vascular, Inc.,*
    579 F. Supp. 2d 554 (D. Del. 2008)…………………………………………………10-11

*Apple Inc. v. Samsung Elecs. Co.,*
    695 F. 3d 1370 (Fed. Cir. 2012) ....................................................................... 3-4

*Apple, Inc. v. Motorola Mobility, Inc.,*
    2012 WL 3289835 (W.D. Wisc. Aug. 10, 2012).....................................................12

*Apple, Inc. v. Motorola Mobility, Inc.,*
    2012 WL 5416941 (W.D. Wisc. Oct. 29, 2012) ........................................ 6-7, 10

*Broadcom Corp. v. Qualcomm Inc.,*
    501 F.3d 297 (3d Cir. 2007) ...............................................................................4

*eBay Inc. v. MercExchange, L.L.C.,*
    547 U.S. 388 (2006) ................................................................................ *passim*

*Foster v. Am. Mach. & Foundry Co.,*
    492 F.2d 1317 (2d Cir. 1974) ..........................................................................14

*Hoe v. Boston Daily Adver. Corp.,*
    14 F. 914 (Cir. Ct. D. Mass. 1883) ..................................................................14

*Hynix Semiconductor Inc. v. Rambus Inc.,*
    609 F. Supp. 2d 951 (N.D. Cal. 2009).................................................. 11, 12, 14

*MercExchange, L.L.C. v. eBay, Inc.,*
    500 F. Supp. 2d 556 (E.D. Va. 2007)……………………………….…..10, 14-15

*Microsoft Corp. v. Motorola Inc.,* No. C10-1823-JLR
    (W.D. Wash. Nov. 30, 2012)……………………………………………………..10

MS-MOTO_1823_00005255703

*New York City v. Pine*,
　　185 U.S. 93 (1902) ............................................................9

*Ricoh Co. Ltd. v. Quanta Computer, Inc.*,
　　2010 WL 1607908 (W.D. Wisc. 2010)..............................15

*Robert Bosch LLC v. Pylon Mfg. Corp.*,
　　659 F.3d 1142 (Fed. Cir. 2011) .........................................8

*Telcordia Technologies, Inc. v, Cisco Systems, Inc.*,
　　592 F. Supp. 2d 727 (D. Del. 2009)……………………………………11

STATUTES

Federal Trade Commission Act, 15 U.S.C. §§ 41 *et seq*……………………..……..… 1

35 U.S.C. § 283……………………………………………………………7

MISCELLANEOUS

Knut Blind et al., *Study on the Interplay Between Standards and Intellectual
　　Property Rights (IPRs)* (Apr. 2011)……………………………………………....13

Michael W. Carroll, *Patent Injunctions and the Problem of Uniformity of Cost*,
　　13 Mich. Telecomm. Tech. L. Rev. 421 (2007)..................................13

Joseph Farrell et al., *Standard Setting, Patents and Hold-Up*,
　　74 Antitrust L.J. 603 (2007) ..............................................4

Fed. Trade Comm'n, *The Evolving IP Marketplace: Aligning Patent
　　Notice and Remedies with Competition* (Mar. 2011)…………………..1, 7, 8, 12

Fed. Trade Comm'n, *To Promote Innovation: The Proper Balance of Competition
　　and Patent Law and Policy* (Oct. 2003)…………..…………………………....1

Herbert Hovenkamp, *Competition in Information Technologies: Standards-
　　Essential Patents, Non-Practicing Entities and FRAND Bidding*
　　(Oct. 2012)……………………………………………………………………9

Mark A. Lemley, *The Ongoing Confusion Over Ongoing Royalties*,
　　76 Mo. L. Rev. 695 (2011) ...................................................8

MS-MOTO_1823_00005255704

Mark A. Lemley & Carl Shapiro, *Patent Holdup and Royalty Stacking*, 85 Tex. L. Rev. 1991 (2007)……………………………………………………7, 13

Prepared Statement of the Federal Trade Commission Before the U.S. Senate Committee on the Judiciary Concerning "Oversight of the Impact on Competition of Exclusion Orders to Enforce Standard-Essential Patents," July 11, 2012……………………………………………………...…….…………..1-2

Suzanne Michel, *Bargaining for RAND Royalties in the Shadow of Patent Remedies Law*, 77 Antitrust L. J. 889 (2011) ...............................................................................9

Eric Stasik, *Royalty Rates and Licensing Strategies for Essential Patents on LTE (4G) Telecommunications Standards*, les Nouvelles, Sept. 2010 …………… .13

Third Party United States Federal Trade Commission's Statement on the Public Interest, In re Certain Gaming and Entertainment Consoles, Related Software, and Components Thereof, ITC Inv. No. 337-TA-752 (June 6, 2012)..…..............1

U.S. Dep't of Justice & Fed. Trade Comm'n, *Antitrust Enforcement and Intellectual Property Rights Promoting Innovation and Competition* (Apr. 2007) ……………......……..…………………………...........1, 4

U.S. Dep't of Justice & Fed. Trade Comm'n, *Antitrust Guidelines for the Licensing of Intellectual Property* (1995)…………………………………………………......1

MS-MOTO_1823_00005255705

## INTEREST OF AMICUS CURIAE

The Federal Trade Commission ("FTC") is an independent federal agency,

charged with enforcing the antitrust laws, promoting the efficient function of the

marketplace, and protecting consumer welfare. *See* 15 U.S.C. §§ 41 *et seq.* The

FTC has substantial experience applying its competition policy expertise to the

patent system to advance the goals of enhancing consumer welfare and promoting

innovation.[1] Among other issues, the FTC has addressed the competitive effects of

injunctive relief for infringement of patented technologies that are essential to

implementing consensus industry standards.[2] In filing this amicus brief, the

---

[1] Fed. Trade Comm'n, *The Evolving IP Marketplace: Aligning Patent Notice and Remedies with Competition* (Mar. 2011) ("*2011 FTC IP Report*"), *available at* http://www.ftc.gov/os/2011/03/110307patentreport.pdf; *see also* U.S. Dep't of Justice & Fed. Trade Comm'n, *Antitrust Enforcement and Intellectual Property Rights: Promoting Innovation and Competition* (Apr. 2007) ("*2007 FTC/DOJ IP Report*"), *available at* http://www.ftc.gov/reports/innovation/P040101Promoting InnovationandCompetitionrpt0704.pdf; Fed. Trade Comm'n, *To Promote Innovation: The Proper Balance of Competition and Patent Law and Policy* (Oct. 2003), *available at* http://www.ftc.gov/os/2003/10/innovationrpt.pdf; U.S. Dep't of Justice & Fed. Trade Comm'n, *Antitrust Guidelines for the Licensing of Intellectual Property* (1995), *available at* http://www.ftc.gov/bc/0558.pdf.

[2] *See 2011 FTC IP Report* at 234-35; 2007 *FTC/DOJ IP Report* at 35 n.11; Third Party U.S. Federal Trade Commission's Statement on the Public Interest, *In re Certain Gaming and Entertainment Consoles, Related Software, and Components Thereof*, ITC Inv. No. 337-TA-752 (June 6, 2012), *available at* http://www.ftc.gov/os/2012/06/1206ftcgamingconsole.pdf; Prepared Statement of the FTC Before the U.S. Senate Committee on the Judiciary Concerning "Oversight of the Impact on Competition of Exclusion Orders to Enforce Standard-Essential Patents," July 11, 2012, *available at* http://www.ftc.gov/os/testimony/ 120711standardpatents.pdf.

MS-MOTO_1823_00005255706

Commission seeks to ensure that any ruling in this case takes into account the competition policy issues associated with injunctions as a remedy for infringement of a standard-essential patent ("SEP").[3]

## INTRODUCTION

These appeals involve patent infringement claims asserted by Apple, Inc. ("Apple") and Motorola, Inc. ("Motorola") against each other relating to technologies used in mobile phones and tablets. After dismissing a number of the patent claims on the merits on partial summary judgment, the district court dismissed all of the remaining claims (involving four Apple patents and one Motorola "standard-essential" patent) on the ground that, assuming infringement, neither Apple nor Motorola offered sufficient evidence to prove damages or an entitlement to injunctive or any other relief. *See* Opinion and Order of June 22, 2012 ("Remedy Op.").

---

[3] Commissioner Rosch concurs in the submission of this brief. He is of the view that the issuance of injunctive relief is inappropriate where the patent holder has made a FRAND commitment for a standard essential patent, even if the patentee contends that it has met its FRAND obligation. In his view, a FRAND pledge appears to be, by its very nature, a commitment to license; if so, seeking injunctive relief would be inconsistent with that commitment. Commissioner Rosch thus submits that if a court concludes that a party, or its predecessor in interest, made a FRAND commitment with respect to a SEP, an injunction should be denied for that patent. In his view, the only exception to this is when the licensee refuses to comply with the decision of a federal court or some other neutral arbitrator defining the FRAND terms.

2

The FTC submits this brief to address the district court's application of *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388 (2006), to Motorola's request for injunctive relief for infringement of its standard-essential patent.[4] Specifically, the brief explains that the district court properly applied *eBay* in determining that Motorola was not entitled to an injunction, where Motorola had committed to license that patent to anyone willing to accept fair, reasonable, and non-discriminatory ("FRAND" or "RAND") terms, and hence "implicitly acknowledged that a royalty is adequate compensation for a license to use that patent." Remedy Op. at 18-19. More generally, this brief addresses the question of how the *eBay* factors may be applied to mitigate the problem of patent hold-up, namely the use of injunctive relief as "undue leverage in negotiations" to obtain compensation in excess of the actual value of the patented technology. *eBay*, 547 U.S. at 396 (Kennedy, J., concurring); *see Apple Inc. v. Samsung Elecs. Co.*, 695 F. 3d 1370, 1375 (Fed. Cir. 2012) (suggesting that injunction is inappropriate when "the patentee seeks to leverage its patent for competitive gain beyond that which the inventive contribution and value of the patent warrant"). The problem of patent hold-up can be particularly acute in the standard-setting context, where an

---

[4] For purposes of this brief, the FTC assumes that the district court's factual determinations are correct. While the district court's opinion raises additional issues regarding remedies for infringement of non-standard-essential patents that could have important implications for competition and innovation, we do not address those issues here.

3

MS-MOTO_1823_00005255708

entire industry may be locked into a standard that cannot be avoided without infringing or obtaining a license for numerous (sometimes thousands) of standard-essential patents.

## ARGUMENT

## I. AVOIDING PATENT HOLD-UP IS AN IMPORTANT CONSIDERATION IN EVALUATING WHETHER AN INJUNCTION SHOULD BE ENTERED

Firms in the information technology and telecommunications industries frequently resolve interoperability problems through voluntary consensus standard setting conducted by standard-setting organizations ("SSOs"). Interoperability standards can create enormous value for consumers by increasing competition, innovation, product quality, and choice. However, incorporating patented technologies into standards also has the potential to distort competition by enabling SEP owners to negotiate high royalty rates and other favorable terms, after a standard is adopted, that they could not credibly demand beforehand, a form of "patent hold-up." *See generally* Joseph Farrell et al., *Standard Setting, Patents and Hold-Up*, 74 Antitrust L.J. 603 (2007); *2007 FTC/DOJ IP Report* at 35 n.11, 37-40; *Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297, 310-14 (3d Cir. 2007).

The possibility of patent hold-up derives from changes in the relative costs of once competing technologies as a result of the standard setting process. Prior to adoption of a standard, alternative technologies compete to be included in the

MS-MOTO_1823_00005255709

Case 2:10-cv-01823-JLR Document 741-10 Filed 07/12/13 Page 30 of 45

standard. SSO members often agree to license SEPs on RAND terms as a *quid pro quo* for the inclusion of their patents in a standard. Once a standard is adopted, implementers begin to make investments tied to the standard. Because it may not be feasible to deviate from the standard unless all or most other participants in the industry agree to do so in compatible ways, and because all of these participants may face substantial switching costs in abandoning initial designs and substituting a different technology, an entire industry may become locked into a standard, giving a SEP owner ability to demand and obtain royalty payments based not on the value of the invention, but on the costs and delays of switching away from the standardized technology.

Hold-up and the threat of hold-up can deter innovation by increasing costs and uncertainty for other industry participants, including those engaged in inventive activity. It can also distort investment and harm consumers by breaking the connection between the value of an invention and its reward – a connection that is the cornerstone of the patent system. The threat of hold-up may reduce the value of standard setting, leading firms to rely less on the standard setting process and depriving consumers of the substantial procompetitive benefits of standard setting.

RAND commitments mitigate the risk of patent hold-up, and encourage investment in the standard. After a RAND commitment is made, the patentee and the implementer will typically negotiate a royalty or, in the event they are unable to

MS-MOTO_1823_00005255710

agree, may seek a judicial determination of a reasonable rate. However, a royalty

negotiation that occurs under the threat of an injunction may be heavily weighted

in favor of the patentee in a way that is in tension with the RAND commitment.

High switching costs combined with the threat of an injunction could allow the

patentee to obtain unreasonable licensing terms despite its RAND commitment

because implementers are locked into practicing the standard. The resulting

imbalance between the value of the patented technology and the rewards to the

patentee may be especially acute where the injunction is based on a patent covering

a minor component of a complex multicomponent product, as is often the case with

standard-essential patents in information technology industries.

Under these circumstances, the threat of an injunction may allow the holder

of a RAND-encumbered SEP to realize royalty rates that reflect the investments

firms make to implement the standard, rather than the competitive value of the

patented technology, which could raise prices to consumers while undermining the

standard-setting process. *See Apple, Inc. v. Motorola Mobility, Inc.*, 2012 WL

5416941, *15 (W.D. Wisc. Oct. 29, 2012) ("[F]rom a policy and economic

standpoint, it makes sense that in most situations owners of declared-essential

patents that have made licensing commitments to standards-setting organizations

6

MS-MOTO_1823_00005255711

should be precluded from obtaining an injunction or exclusionary order that would bar a company from practicing the patents.").[5]

## II.   THE DISTRICT COURT PROPERLY APPLIED THE *EBAY* FACTORS IN DENYING MOTOROLA'S REQUEST FOR INJUNCTIVE RELIEF

*eBay* provides a framework that courts can use to mitigate the risk of patent hold-up.  Rejecting any categorical rule favoring injunctions, the Court in *eBay* held that well-established principles of equity applied to permanent injunctions under the Patent Act.  547 U.S. at 391; *see* 35 U.S.C. § 283 (district court "*may* grant injunctions in accordance with the principles of equity") (emphasis added). The Court listed four equitable factors that a patentee must satisfy to obtain an injunction:

> A plaintiff must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and

---

[5] An injunction may also facilitate patent hold-up outside the standard-setting context when the patent covers only a minor feature of a multicomponent product. If the patent is easy to design around at the product development stage (and hence its value is relatively low), but costly to do so after the implementer has made irreversible investments in producing and distributing the product with the infringing feature, the patent holder may be able to use the injunction to obtain compensation far greater than the competitive value of the technology. *See generally* Mark A. Lemley & Carl Shapiro, *Patent Holdup and Royalty Stacking*, 85 Tex. L. Rev. 1991, 1993 (2007); *2011 FTC IP Report* at 225-27.

7

(4) that the public interest would not be disserved by a
permanent injunction.

547 U.S. at 391.[6]

The district court held that the first two *eBay* factors militate against

injunctive relief against Apple because Motorola could not establish that it would

be irreparably harmed or that monetary relief (an ongoing royalty) would be

inadequate[7] where Motorola had committed to the European Telecommunications

Standards Institute (ETSI) to license its '898 patent at issue "to anyone on fair,

reasonable, and nondiscriminatory [FRAND] terms, as required by the standards-

setting organization as a condition of the patented technology's being deemed

---

[6] *eBay's* equitable analysis allows a court "to compare the costs and benefits of an injunction with the costs and benefits of the substitute equitable remedy of a . . . running (ongoing) royalty." Remedy Op. at 31; *see ActiveVideo Networks, Inc. v. Verizon Commc'ns., Inc.*, 694 F.3d 1312 (Fed. Cir. 2012) (district court abused its discretion in granting permanent injunction where ongoing royalty would be adequate to compensate patentee); *see generally* Mark A. Lemley, *The Ongoing Confusion Over Ongoing Royalties*, 76 Mo. L. Rev. 695 (2011). In particular, a court may consider the extent to which an ongoing royalty may undercompensate the patentee because it does not capture all the harms from infringement, versus the extent to which an injunction may overcompensate the patentee because of hold-up. *See 2011 FTC IP Report* at 141 ("To align the patent system and competition policy, it is important that compensatory damages and injunctions be assessed in a manner that aligns a patentee's compensation with the invention's economic value.").

[7] This court has noted that "the issues of irreparable harm and adequacy of remedies at law are inextricably intertwined." *ActiveVideo Networks*, 694 F.3d at 1337. Following *eBay*, there is no presumption of irreparable harm. *See Robert Bosch LLC v. Pylon Mfg. Corp.*, 659 F.3d 1142, 1149 (Fed. Cir. 2011).

8

MS-MOTO_1823_00005255713

essential to compliance with the standard." Remedy Op. at 15. The court

concluded, "A FRAND royalty would provide all the relief to which Motorola

would be entitled if it proved infringement of the '898 patent, and thus it is not

entitled to an injunction." *Id.* at 21.

The district court was correct.[8] As the court noted, a FRAND commitment

means that the patentee "implicitly acknowledged that a royalty is adequate

compensation for a license to use that patent." Remedy Op. at 18-19; *see* Herbert

Hovenkamp, *Competition in Information Technologies: Standards-Essential*

*Patents, Non-Practicing Entities and FRAND Bidding* 14 (Nov. 2012), *available at*

http://ssrn.com/abstract=2154203 ("The fact that the patent in question has already

been FRAND encumbered establishes that the patentee's reasonable expectation

was the right to obtain FRAND royalties, not to exclude."); Suzanne Michel,

*Bargaining for RAND Royalties in the Shadow of Patent Remedies Law*, 77

Antitrust L. J. 889, 908 (2011) ("A prior RAND commitment, as an expressed

intention to license broadly, provides strong evidence that denial of an injunction

---

[8] The district court recognized that an injunction may be warranted under *eBay* if "Apple refuses to pay a royalty that meets the FRAND requirement." Remedy Op. at 18. More generally, in circumstances where an infringer is unable or unwilling to pay an ongoing royalty, the harm to the patentee presumably cannot be compensated with damages. *See New York City v. Pine*, 185 U.S. 93, 108 (1902) (court may order that injunction will issue if the defendant fails to pay damages). However, the district court apparently determined that Apple is not an unwilling licensee that waived its right to a FRAND license. Remedy Op. at 20.

MS-MOTO_1823_00005255714

and ongoing royalties will not irreparably harm the patentee."). Similarly, Judge Robart recently dismissed Motorola's claim for injunctive relief on RAND-encumbered patents, finding that the RAND license that the parties will enter into though the litigation "will adequately remedy Motorola as a matter of law," precluding Motorola from establishing irreparable harm and inadequate remedy at law as required under *eBay*. Order Granting Microsoft's Motion Dismissing Motorola's Claim for Injunctive Relief at 12-15, *Microsoft Corp. v. Motorola Inc.*, No. C10-1823-JLR (W.D. Wash. Nov. 30, 2012).

This court has held that a practice of widespread licensing, including offers to license to the defendant, strongly militates against a finding of irreparable harm. *See ActiveVideo Networks*, 694 F.3d at 1339 (reversing grant of injunction: "In light of the record evidence including ActiveVideo's past licensing of this technology and its pursuit of Verizon as a licensee, no fact finder could reasonably conclude that ActiveVideo would be irreparably harmed by the payment of a royalty (a licensing fee)."); *see also MercExchange, L.L.C. v. eBay, Inc.*, 500 F. Supp. 2d 556, 570-71 (E.D. Va. 2007) (patentee's "willingness to freely license its patents . . . weighs against the need for an equitable remedy as it evidences MercExchange's willingness to forego its right to exclude in return for money"); *Advanced Cardiovascular Sys., Inc. v. Medtronic Vascular, Inc.*, 579 F. Supp. 2d

10

554, 560 (D. Del. 2008) ("[m]oney damages are rarely inadequate" when patentee

has been willing to grant license to competitors).

*A fortiori*, a commitment to offer a license to *all* comers on FRAND terms

should be sufficient to establish that a reasonable royalty is adequate to

compensate the patentee for infringement by any particular implementer willing

and able to abide by those terms. *Cf. Hynix Semiconductor Inc. v. Rambus Inc.*,

609 F. Supp. 2d 951, 986 (N.D. Cal. 2009) (injunction denied with respect to

standard-essential patents that were not even subject to FRAND commitments

where, *inter alia*, patentee's historical practice of licensing suggests that it "is

primarily concerned with monetary compensation for the use of its patented

technology"); *Telcordia Techs., Inc. v. Cisco Systems, Inc.*, 592 F. Supp. 2d 727,

748 & n.10 (D. Del. 2009) (same), *aff'd in relevant part*, 612 F.3d 1365 (Fed. Cir.

2010).[9]

The other *eBay* factors (balance of hardships and public interest) also can be

expected to militate against injunctive relief in the case of standard-essential

patents. "The infringer [of a standard-essential patent] may face significant

hardship as a result of an injunction if it is impossible to participate effectively in

---

[9] Motorola acknowledges that its "patents in suit enjoy a rich history of being a
part of [a] licensing portfolio granted to much of the wireless industry."
Motorola's Motion for Summary Judgment Regarding Damages for the Apple
Asserted Patents at 4 n.1 (Dkt. #982, filed June 1, 2012).

11

Case 2:10-cv-01823-JLR Document 741-10 Filed 07/12/13 Page 37 of 45

the market without complying with the standard. Design-around, at any cost, may not be an option." *FTC 2011 IP Report* at 234; *cf. Hynix*, 609 F. Supp. 2d at 984-85 (injunction with respect to SEP would "decimate" infringer's business). The district court recognized this hardship when it asked, "How could [Motorola] be permitted to enjoin Apple from using an invention that it contends Apple *must* use if it wants to make a cell phone with UMTS telecommunications capability— without which it would not be a cell *phone*." Remedy Op. at 19; *see* Opinion and Order of May 22, 2012 at 45 (explaining that an injunction would prevent Apple from selling iPhones that work on the AT&T network).

The public interest in promoting innovation and protecting consumers also weighs heavily against an injunction here. To be sure, consumers would be harmed by the immediate impact of being deprived of a popular product.[10] But consumers would also suffer in the longer run because an injunction would reduce the returns to innovation by Apple and other patent holders who have patents that are essential to the same standard or otherwise read on Apple's excluded products,

_____

[10] In arguing that an injunction should not issue in favor of Apple, Motorola noted that "any injunction against Motorola would be a disservice to competition in the cell phone market." Motorola's Motion and Memorandum in Support of its Motion for Summary Judgment of No Injunctive Relief at 2 n.1 (Doc. #974, filed May 30, 2012) (citation and internal quote marks omitted). The same logic would seem to apply to an injunction against Apple.

12

MS-MOTO_1823_00005255717

who may face lower royalties.[11] *See* Lemley & Shapiro, *supra*, at 2010-17;

Michael W. Carroll, *Patent Injunctions and the Problem of Uniformity of Cost*, 13

Mich. Telecomm. Tech. L. Rev. 421, 437 (2007) ("From the perspective of the

patent system, an injunction in favor of the small-component patentee may well be

robbing Peter to pay Paul.").  Injunctive relief should not be permitted to allow the

owner of standard-essential patent subject to a RAND obligation to appropriate for

itself the value created by numerous other innovators that build on or contribute to

the standard at issue.[12]

　　Insofar as Motorola seeks an injunction not for the purpose of excluding

Apple's products from the market, but to bring Apple to the table to negotiate a

---

[11] The '898 patent was declared essential to the Universal Mobile Telecommunications Standard (UMTS), a third-generation (3G) standard used by certain cell phone carriers (such as AT&T) that enables communication between cell phones and cell towers. *See* Remedy Op. at 14; *Apple, Inc. v. Motorola Mobility, Inc.*, 2012 WL 3289835, *5-6 (W.D. Wisc. Aug. 10, 2012).  Motorola's patent is one of more than 2000 patents that have been declared essential to the UMTS standard. *See* Knut Blind et al., *Study on the Interplay Between Standards and Intellectual Property Rights (IPRs)* 32, 36 (Apr. 2011), http://ec.europa.eu/enterprise/policies/ european-standards/files/standards_policy/ipr-workshop/ipr_study_final_report _en.pdf (count based on eliminating duplicates).

[12] Dozens of companies have patents that are declared essential to the UMTS standard. *See* Eric Stasik, Royalty Rates and Licensing Strategies for Essential Patents on LTE (4G) Telecommunications Standards, les Nouvelles, Sept. 2010, at 114, 117 (57 companies with UMTS declarations); Blind, *supra*, at 45 (nine companies with more than 50 UMTS SEPs).  Moreover, smartphones such as the iPhone incorporate numerous other standards, each with hundreds of additional SEPs. *See* Stasik, *supra*, at 117; Blind, *supra*, at 36.

MS-MOTO_1823_00005255718

favorable royalty, its argument does not support an injunction against a willing

licensee. On the contrary, the use of such leverage is the essence of hold-up. The

district court correctly observed:

> [D]amages [are not] an inadequate remedy just because, unless backed
> by the threat of injunction, it may induce a settlement for less than the
> damages rightly sought by the plaintiff. You can't obtain an
> injunction for a simple breach of contract on the ground that you need
> the injunction to pressure the defendant to settle your damages claim
> on terms more advantageous to you than if there were no such
> pressure.

Remedy Op. at 20-21; *see Foster v. Am. Mach. & Foundry Co.*, 492 F.2d 1317,

1324 (2d Cir. 1974) (injunction "is not intended as a club to be wielded by a

patentee to enhance his negotiating stance").

As the concurring Justices explained in *eBay*, an injunction should not be

used to "as a bargaining tool to charge exorbitant fees" or for "undue leverage in

negotiations." 547 U.S. at 396 (Kennedy, J., concurring); *see also Hoe v. Boston

Daily Adver. Corp.*, 14 F. 914, 915 (Cir. Ct. D. Mass. 1883) (denying injunction

where it would be of no "advantage to the plaintiffs, except to coerce a

settlement"); *Hynix*, 609 F. Supp. 2d at 983 n. 29 (denying injunction where

patentee's "motivation in seeking an injunction is less about preventing irreparable

harm and more about extracting punishment or leverage in negotiating with"

infringer); *MercExchange*, 500 F. Supp. 2d at 582 ("Utilization of a ruling in

equity as a bargaining chip suggests both that such party never deserved a ruling in

MS-MOTO_1823_00005255719

equity and that money is all that such party truly seeks, rendering money damages an adequate remedy in the first instance."); *Ricoh Co. v. Quanta Computer, Inc.*, 2010 WL 1607908, *4 (W.D. Wisc. 2010) (denying injunction where it "would [not] serve any purpose other than to increase [patentee's] leverage in negotiations for a higher licensing fee.").

15

MS-MOTO_1823_00005255720

# CONCLUSION

Patent hold-up risks harming competition, innovation, and consumers because it allows a patentee to be rewarded not based on the competitive value of its technology, but based on the infringer's costs to switch to a non-infringing alternative when an injunction is issued. *eBay* allows courts to take these important competition and innovation policy issues into account. When a patentee makes a FRAND commitment to an SSO, the irreparable harm analysis, balance of harms, and the public interest will, as here, generally militate against an injunction.

Respectfully submitted,

/s/ Richard M. Brunell

|  |  |
|---|---|
| David C. Shonka | Richard M. Brunell |
|   Acting General Counsel |   Senior Advisor for Competition Matters |
| William E. Cohen | Suzanne Munck af Rosenschold |
|   Deputy General Counsel |   Chief Counsel for Intellectual Property |
|  | William Adkinson, Attorney |
|  |   Office of General Counsel Policy Studies |

FEDERAL TRADE COMMISSION
600 Pennsylvania Ave., N.W.
Washington, DC 20550
(202) 326-3020

December 4, 2012

16

MS-MOTO_1823_00005255721

## CERTIFICATE OF COMPLIANCE

1. This brief complies with the type-volume limitations of Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure because it contains 3,814 words, excluding the parts of the brief exempted by Rule 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Rule 32(a)(5) of the Federal Rules of Appellate Procedure and the type style requirements of Rule 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Office Word 2010 with 14-point Times New Roman font.

December 4, 2012                                        /s/ Richard M. Brunell

MS-MOTO_1823_00005255722

## CERTIFICATE OF SERVICE

I hereby certify that on December 4, 2012, I electronically filed a copy of

this Amicus Curiae Brief of the Federal Trade Commission in Support of Neither

Party with the Clerk of the Court using CM/ECF, which will automatically send

email notification of such filing to the following counsel of record:

E. Joshua Rosenkranz
Orrick, Herrington & Sutcliffe LLP
51 West 52nd Street
New York, NY 10019
Direct: 212-506-5380
Email: jrosenkranz@orrick.com
Fax: 212-506-5151

Mark S. Davies
Orrick, Herrington & Sutcliffe LLP
Columbia Center
1152 15th Street, N.W.
Washington, DC 20005
Direct: 202-339-8631
Email: mark.davies@orrick.com
Fax: 202-339-8500

Katherine M. Kopp
Orrick, Herrington & Sutcliffe LLP
Columbia Center
1152 15th Street, N.W.
Washington, DC 20005
Direct: 202-339-8400
Email: kkopp@orrick.com
Fax: 202-339-8500

Rachel M. McKenzie
Orrick, Herrington & Sutcliffe LLP
Columbia Center
1152 15th Street, N.W.

18

MS-MOTO_1823_00005255723

Washington, DC 20005
Direct: 202-339-8490
Email: rmckenzie@orrick.com
Fax: 202-339-5800

T. Vann Pearce, Jr.
Orrick, Herrington & Sutcliffe LLP
Columbia Center
1152 15th Street, N.W.
Washington, DC 20005
Direct: 202-339-8696
Email: vpearce@orrick.com
Fax: 202-339-8500

Matthew D. Powers
Tensegrity Law Group, LLP
Suite 360
555 Twin Dolphin Drive
Redwood City, CA 94065
Direct: 650-802-6010
Email: matthew.powers@tensegritylawgroup.com

Brian E. Ferguson
Weil, Gotshal & Manges LLP
1300 Eye Street, N.W., Ste 900
Washington, DC 20005

David A. Nelson
Quinn Emanuel Urquhart & Sullivan, LLP
500 West Madison Street, Suite 2450
Chicago, IL 60661
Email: davenelson@quinnemanuel.com

Brian Cosmo Cannon
Quinn Emanuel Urquhart & Sullivan, LLP
555 Twin Dolphin Drive, 5th Floor
Redwood Shores, CA 94065
Email: briancannon@quinnemanuel.com

MS-MOTO_1823_00005255724

Raymond N. Nimrod
Quinn Emanuel Urquhart & Sullivan, LLP
51 Madison Avenue, 22nd Floor
New York, NY 10010-1601
Email: raynimrod@quinnemanuel.com

Stephen A. Swedlow
Quinn Emanuel Urquhart & Sullivan, LLP
500 West Madison Street, Suite 2450
Chicago, IL 60661
Email: stephenswedlow@quinnemanuel.com

Amanda Scott Williamson
Quinn Emanuel Urquhart & Sullivan, LLP
Suite 2450
500 West Madison Street
Chicago, IL 60661
Email: amandawilliamson@quinnemanuel.com

December 4, 2012                                              /s/ Richard M. Brunell

MS-MOTO_1823_00005255725