# EXHIBIT 1

Page 1

1           IN THE UNITED STATES DISTRICT COURT
2              FOR THE DISTRICT OF WASHINGTON
3                         AT SEATTLE
4
5    MICROSOFT CORPORATION, a            )
     Washington corporation,             )
6                                        )
                  Plaintiff,             )
7                                        ) No. 2-10-cv-01823-JLR
                  vs.                    )
8                                        )
     MOTOROLA, INC., and MOTOROLA        )
9    MOBILITY, INC.,                     )
                                         )
10                Defendants.            )
11
            VIDEOTAPED DEPOSITION OF TODD D. MENENBERG
12
                        June 20, 2013
13
                     Seattle, Washington
14
15
16
17
18
19
20
21
22
23
24
25   Job No. CS1685790

Page 43

1  claim.
2  Q  So taking a step back, I want to get a list of-- of each
3     of the counsel that you had discussions with.
4        I think we've listed Chris Wion, Shane Cramer, Ellen
5     Robbins, and I understand you met with Mr. Harrigan for
6     some time yesterday.
7        Is there anybody else that you-- well, let me-- what
8     other counsel did you have discussions with in connection
9     with preparing your report?
10 A  Well, I mentioned earlier, I did also speak with David
11    Killough, but that wasn't relative to preparing the
12    report, in the sense of actually starting-- articulating
13    my opinions, but those are all the counsel I spoke with,
14    no one else.
15 Q  Okay.  And then a moment ago you stated that counsel
16    explained to you basically the information in the
17    documents that they were providing to you.
18       Is that correct?
19 A  I think that's fair, yeah.
20 Q  And what did they explain?
21 A  Well, I was given various invoices from five different
22    law firms and there was also a sixth firm at some point I
23    was given but was later-- counsel decided not to request
24    damages related to that, so they're not included in my
25    report, but for these five, I was given invoices, and in

Page 44

1   four of the five firms I was asked to compile all of the
2   costs because 100 percent of those specific invoices was
3   relevant for purposes of the damage calculation.
4       For Sidley Austin many of the invoices, many of the
5   itemized specific tasks and hours incurred by the
6   lawyers, 100 percent of those costs related to this
7   project, but in some instances it was something less than
8   100 percent, and in those I had to work with a
9   color-coded set of invoices that allocated something less
10  than 100 percent for specific entries made by some of the
11  lawyers.
12      My job was to go through that, and that was a lot of
13  data, a tremendous amount of data, and we created a
14  database to enter all of that information and then both
15  compile and sort it, and I report it in a few different
16  ways, but also to do some checks and balances to ensure
17  that it accurately reflected what it intended to reflect.
18 Q  Is there anything else that counsel explained to you
19  regarding the materials that you were being given to
20  review in connection with preparing your report?
21              THE WITNESS:  May I have that question
22  read back, please?
23              (Question on Page 44, Line 18-
24              20 read by the reporter.)
25  /////

```
1    A    That's correct.
2    Q    So if I could turn your attention to Pages 9 through 11
3         of your report--
4    A    Okay.
5    Q    And there's a series of Steps 1 through 8 listed there?
6    A    Yes.
7    Q    Did that accurately describe how you calculated the
8         amount of attorney fees and costs that Microsoft incurred
9         by work from the Sidley law firm?
10   A    I believe it does.
11   Q    Okay.  Focusing first on Step 1, is it correct that that
12        is the creation of an Excel spreadsheet?
13   A    Yes.
14   Q    And then Steps 2, 3, and 4, did those steps entail data
15        entry?
16   A    They did.
17   Q    So you or members of your team reviewed information in
18        the Sidley invoices and inputted that data into your
19        spreadsheet, correct?
20   A    That's correct.
21   Q    And is the same true with respect to Steps 6 and 7, those
22        are data entry steps?
23   A    That's correct.
24   Q    And did all of the information used in Steps 2 through 4
25        and 6 and 7 come from the Sidley invoices themselves,
```

Page 49

1  including the highlighted version of those invoices?
2  A  I believe that's correct.
3     I'm just looking to see if any of that came from the
4  Microsoft 360--
5  Q  Okay.
6  A  But I don't believe it did.
7     I believe those all came from Sidley invoices
8  themselves, as I recall.
9  Q  And did your team-- did you and your team enter the data
10 into your Excel spreadsheet exactly as it appeared in the
11 highlighted invoices?  In other words, were any changes
12 made?
13 A  I don't believe we made any changes.
14    I do have a recollection we had some questions on
15 some entries that might have resulted in some
16 corrections, but then we put in the correct information,
17 but they were minimal, if any, but there were some
18 questions we had, but as I recall, whatever was given to
19 us was clarified, and we entered the correct number.
20 Q  And do you recall-- well, do you recall with any more
21 specificity these instances where you had questions?
22 A  I don't.
23    They were really minor.
24    They weren't significant.
25 Q  When you had questions, did you ask those questions to

Page 51

1  Q   On Page 10 there's a reference to Step 5 and that there's
2      a calculation that was performed in Step 5.
3          Is that correct?
4  A   Yes.
5  Q   It says that the hours in Steps 2C and 2D were
6      multiplied, but I don't see-- I'm not seeing what 2C and
7      2D are.
8          Can you clarify that?
9  A   Well, it appears what happened in the draft of the
10     report, those step numbers didn't get updated, but what
11     that reflects at Step 5 is the hours, which go back to
12     Step 4, and then the respective rate, which was also
13     entered.
14         I just don't see exactly where it's itemized the
15     steps, but that's also in the database as well.
16 Q   Okay.  And the calculation performed in Step 5, was that
17     performed by the Excel program?
18 A   Yes.
19 Q   Step 8 also refers to a calculation.
20         Was that calculation also performed by Excel?
21 A   Yes.
22 Q   In calculating the amount of fees and costs that
23     Microsoft allegedly incurred from the Sidley Austin law
24     firm, what analysis of your own did you do of those costs
25     and fees?

1  A  Well, I think I talked about initially we set up a very
2     large database, and it literally is several hundred
3     pages, and each page has perhaps 40 or 50 entries, so
4     there was a substantial amount of data entry that was
5     required.
6        We also reviewed the invoices to help ensure the
7     accuracy we reviewed to see were there what appear to be
8     errors.  In other words, did anybody charge more than 24
9     hours in a day.
10       We didn't find that, but we looked to see whether an
11    unusual number of hours were incurred.
12       We looked to see-- where there were an odd number of
13    hours billed, for example 1.3 hours, we did a second
14    inspection to make sure it wasn't entered as 13 hours, so
15    we did some additional clerical reviews of the work to
16    make sure that what was ultimately entered in the
17    database was accurate per the invoices.
18       We also did a read of the descriptions just to see
19    was there anything that struck us as extraordinary and,
20    from our perspective, might not be part of their work,
21    and nothing came to our attention.
22        There wasn't a substantial amount of work put in
23    that area, but the people reviewing the work did spend
24    some time doing an overview to see if anything struck
25    them as extraordinary or not potentially claimable.

Page 53

1      To be sure, it wasn't a detailed, you know, legal
2      review because we weren't intimately familiar with the
3      nature of what was being done, but we didn't want to see
4      things on there that were obviously for another client or
5      something that was just a blatant error, and we did take
6      a review to see if we detected any of those type of
7      mistakes.
8      I don't recall us finding those.
9      There were other general checks done on the work.
10     Those are the ones I remember as I sit here, but
11     there were a few others as well.
12     I think we looked to see also some of the timing.
13     We didn't want to see on a particular bill a line
14     item that was extraordinarily filed in the past.
15     In other words, you wouldn't want to see a 2010 bill
16     and someone charging time in 2008 or something of that
17     magnitude, so we also looked to see were the time entries
18     relatively in the ballpark where we would expect them to
19     be.
20     There were some things like that that were done on
21     our part, again with the goal of trying to get the most
22     complete and accurate number.
23  Q  Now this additional analysis that you and your team
24     performed with regard to the Sidley invoices, where is
25     that described in your report?

Page 61

1               methodology was reasonable?
2      A    I think in light of the information that was available at
3           this time, the methodology was reasonable, yes.
4      Q    When you say "in light of the information that was
5           available," what are you referring to?
6      A    Well, we have all the invoices, and the task at hand was
7           to try to develop how much of those specific legal hours
8           and related expenses were related to these patents in
9           question.
10              It seems to me Ms. Robbins is very familiar with the
11          project.  I know that from talking with her, and I
12          understand that to be the case as well.
13              It seemed to me that was a reasonable approach to
14          try to figure out how much of those total costs was
15          relevant for purposes of developing the amount claimable.
16     Q    Is there somewhere in your report where you state that
17          you intend to opine that the methodology was reasonable?
18     A    I don't state that in the report, but you asked my
19          opinion whether I think it's reasonable.
20              I think it's a reasonable approach.
21     Q    Do you intend to offer that opinion at trial?
22     A    If I'm asked by you if I think it's reasonable, or by
23          counsel, I will answer it honestly.
24              I think it's reasonable.
25              I'm not sure if that's intended by counsel for me to

Page 105

```
 1        used by you and your team to-- let me start over.
 2              If we turn to Page 19 of your report--
 3     A  I'm with you.
 4     Q  There's a table there.
 5              Does that table accurately summarize your opinion
 6        with respect to the total amount of damages incurred
 7        allegedly, based on the facility relocation and operating
 8        costs?
 9     A  It does.
10     Q  Okay.  And can you explain to me the methodology that you
11        and your team used to get to these totals?
12     A  Well, we met with counsel.  We had discussions with
13        Microsoft personnel.
14              I tried to learn as much as I could about the
15        context of what happened.
16              We reviewed a lot of source documents.
17              We had discussions with counsel about specific
18        elements of cost that would likely be included in such a
19        move.
20              It was an iterative process where as we started
21        getting documents, we started compiling and computing
22        those costs.
23     Q  With respect to the attorney fees and costs, you and your
24        team primarily relied on the data in invoices and
25        inputted that data into a spreadsheet to make your
```

Page 106

1       calculations, correct?
2 A   That's an oversimplification, but that's generally
3       correct.
4 Q   Is that generally what you did with respect to the
5       facility relocation?
6 A   I think here, because of the nature of these costs, we
7       delved deeper into getting underlying support in
8       contemporaneous accounting records.
9 Q   Can you sort of expand on that for me?
10 A   Well, in the case of the legal invoices, we didn't ask
11       for timecards or timesheets from the lawyers.  We took,
12       as our basic underlying document, the invoice provided by
13       the lawyers.
14       Here, rather than just accept a sum total, we said,
15       "Well, let's look at the invoices behind that or let's
16       look at a contract behind that or some other underlying
17       corroborating evidence."
18 Q   Other than requesting the corroborating evidence, was
19       there analysis that you and your team performed separate
20       and apart from the calculations of the numbers in the
21       invoices?
22 A   I don't understand your question.
23       What other analysis are you talking about?
24 Q   Well, I'm not sure if there is any that exists.
25       I want to make sure I understand everything that you

Page 107

1        did.
2   A    Well, this is a lot of work.
3            I mean, just saying was there any other analysis-- I
4        mean, all of these things involved detailed analysis and
5        a lot of hours and a lot of calculations, and auditing
6        was done.
7   Q    If you could describe for me what the analysis was.
8            Were you making decisions about whether invoices
9        should or should not be included?
10  A    We inquired about invoices, the logic as to why they were
11       included and didn't make sense and was it appropriate to
12       include them.
13           Based on our work, we included those that we thought
14       there was a reasonable basis to include them.
15  Q    How did you determine whether there was a reasonable
16       basis or not to include invoices?
17  A    You know, we looked at a lot of invoices.
18           I just-- as I sit here, I don't recall specifically
19       a particular invoice that we said was rejected.
20           I just don't remember, but we looked at a lot of
21       different ones and ultimately concluded the amounts
22       reflected here are supported by the documentation
23       indicated in the report-- was appropriate and reasonable.
24  Q    Do you recall there being invoices that you were
25       presented with that you chose not to include and rely

|   |   |   |
|---|---|---|
| 1 |   | particular categories should be included or there should |
| 2 |   | be any particular offsets of any of these? |
| 3 | A | Well, I read through them, and they seemed reasonable to |
| 4 |   | me in light of my background and experience. |
| 5 | Q | But did you do anything to determine if any of the |
| 6 |   | amounts should be offset by anything else? |
| 7 |   | For example, we used the example of Microsoft having |
| 8 |   | decided to use a new vendor instead of continuing with |
| 9 |   | Arvato and therefore incurring some of the new vendor |
| 10 |   | development fees. |
| 11 | A | I don't see-- I'm not aware of any evidence indicating |
| 12 |   | any offsets are appropriate here. |
| 13 | Q | Let's next discuss the increased facility operating |
| 14 |   | costs. |
| 15 |   | Is it your opinion that the total increased facility |
| 16 |   | operating cost is ▓▓▓▓▓▓▓▓? |
| 17 | A | Yes, that's correct. |
| 18 | Q | Okay.  And you state in your report that the increase in |
| 19 |   | facility operating costs is expected to continue into the |
| 20 |   | foreseeable future, but your analysis only accounts for |
| 21 |   | the difference over a two-year period? |
| 22 | A | That's correct. |
| 23 | Q | How did you decide to use a two-year period? |
| 24 | A | Well, I did it primarily to be conservative. |
| 25 |   | I could have went further out, but in this |

Page 142

1   particular instance, the further out you get, the numbers
2   have less certainty, and at some point if we had such a
3   large amount of annual difference, that may have
4   suggested it might be prudent to move back to Germany,
5   which that's really getting speculative because who knows
6   what facilities would be available and at what price.
7       I didn't really want to go down that path, and I
8   thought to be conservative, "Let's just do two years."
9 Q On Page 27 of your report-- well, one minute here.
10      Okay. You list as the total annual increase
11  facility operations ( ██████████ ), correct?
12 A Well, that's the net.
13      I have a ( ██████ ) deduction for a contingency, but
14  that's the net number I have, yes.
15 Q And then you multiply that by two to get the ██████████
16  number that's your total, correct?
17 A That's correct.
18 Q Okay. And in Davidson Exhibit No. 15, on that same page
19  that has a breakdown, Microsoft responded to this
20  discovery request saying that the annual cost of
21  operating out of The Netherlands is approximately
22  ██████████ greater than the cost of operating out of
23  Germany.
24      Do you know why the number increased by over ██
25  ██████████?

Page 174

```
1       or it has additional cost compared to the other one, then
2       you have to make that calculation adjustment.
3            To the extent it impacted their fixed or variable
4       costs of doing operations, it's in my numbers.
5    Q  So you didn't look ahead to the benefits that Microsoft
6       would realize from this facility?
7    A  That would be speculative to go into the future and try
8       to guess what might happen.
9            I only went two years in the future, so it kind of
10      minimizes the outside risks way in the future.
11           Yes, if you are going ten years in the future,
12      perhaps something changes, but that's speculative.
13           I didn't want to get too far down that path.
14   Q  So your report is limited to basically what Microsoft
15      actually spent without considering future benefits of the
16      move?
17   A  No, because to the extent there are benefits in the
18      processing cost, which is a large portion of this, we see
19      that in the per-unit cost.
20           That's in the contract.
21   Q  And that's reflected in your variable costs?
22   A  Yeah, and in the fixed costs, it's a contractual amount,
23      so that number is known.
24           The total variable costs can change, depending on
25      the volumes, but it's embedded in the per-unit cost.
```

Page 181

```
 1    STATE OF WASHINGTON  )      I, Terilynn Pritchard, RMR, CRR,.
                           ) ss CLR, a certified court reporter
 2    County of Pierce     )      in the State of Washington, do
                                  hereby certify:
 3
 4
              That the foregoing deposition of TODD D. MENENBERG
 5    was taken before me and completed on June 20, 2013, and
      thereafter was transcribed under my direction; that the
 6    deposition is a full, true and complete transcript of the
      testimony of said witness, including all questions, answers,
 7    objections, motions and exceptions;
 8            That the witness, before examination, was by me
      duly sworn to testify the truth, the whole truth, and
 9    nothing but the truth, and that the witness reserved the
      right of signature;
10
              That I am not a relative, employee, attorney or
11    counsel of any party to this action or relative or employee
      of any such attorney or counsel and that I am not
12    financially interested in the said action or the outcome
      thereof;
13
              That I am herewith securely sealing the said
14    deposition and promptly delivering the same to
      Attorney Andrea Pallios Roberts.
15
              IN WITNESS WHEREOF, I have hereunto set my
16    signature on the 25th day of June, 2013.
17
18
19
20
21
22                         _____
                           Terilynn Pritchard, CCR, RMR, CRR, CLR
23                         Certified Court Reporter No. 2047.
24
25
```