# EXHIBIT A

3

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 1

1              IN THE UNITED STATES DISTRICT COURT

2                FOR THE DISTRICT OF WASHINGTON

3                         AT SEATTLE

4

5    MICROSOFT CORPORATION, a              )
     Washington corporation,              )
6                                          )
                          Plaintiff,       )
7                                          ) No. 2-10-cv-01823-JLR
                    vs.                    )
8                                          )
     MOTOROLA, INC., and MOTOROLA          )
9    MOBILITY, INC.,                       )
                                           )
10                        Defendants.      )

11

            VIDEOTAPED DEPOSITION OF TODD D. MENENBERG

12

                         June 20, 2013

13

14                   Seattle, Washington

15

16

17

18

19

20

21

22

23

24

25   Job No. CS1685790

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 49

1       including the highlighted version of those invoices?

2   A   I believe that's correct.

3           I'm just looking to see if any of that came from the

4       Microsoft 360--

5   Q   Okay.

6   A   But I don't believe it did.

7           I believe those all came from Sidley invoices

8       themselves, as I recall.

9   Q   And did your team-- did you and your team enter the data

10      into your Excel spreadsheet exactly as it appeared in the

11      highlighted invoices?  In other words, were any changes

12      made?

13  A   I don't believe we made any changes.

14          I do have a recollection we had some questions on

15      some entries that might have resulted in some

16      corrections, but then we put in the correct information,

17      but they were minimal, if any, but there were some

18      questions we had, but as I recall, whatever was given to

19      us was clarified, and we entered the correct number.

20  Q   And do you recall-- well, do you recall with any more

21      specificity these instances where you had questions?

22  A   I don't.

23          They were really minor.

24          They weren't significant.

25  Q   When you had questions, did you ask those questions to

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 50

1      Ms. Robbins?

2   A  Yes.

3   Q  And were the responses that you should use the numbers in

4      the highlighting-- as reflected in the highlighted

5      invoices or were the inputs changed from whatever was

6      reflected in the highlighted invoices?

7   A  I think for the most part it was as given to us.

8         As I say, I think there were a couple small items.

9         I'm literally thinking of a couple out of a thousand

10     entries.

11  Q  And were there any conversations with counsel regarding

12     any changes; for example, Ms. Robbins or another attorney

13     saying, "There is this error in the highlighting.  For

14     this one, you should input this number"?

15  A  You know, there may have been.  I just don't remember

16     that.

17  Q  And when you inputted the information from the invoices,

18     is it correct that you did not input the task

19     descriptions?

20  A  That's correct.

21  Q  Is there a reason why you didn't do that?

22  A  Well, as you can imagine, this was a very time-consuming

23     project, one; two, we really didn't need that information

24     for purposes of what we were trying to do, so for both

25     practical and cost considerations, we didn't do it.

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

1   Q   On Page 10 there's a reference to Step 5 and that there's

2       a calculation that was performed in Step 5.

3           Is that correct?

4   A   Yes.

5   Q   It says that the hours in Steps 2C and 2D were

6       multiplied, but I don't see-- I'm not seeing what 2C and

7       2D are.

8           Can you clarify that?

9   A   Well, it appears what happened in the draft of the

10      report, those step numbers didn't get updated, but what

11      that reflects at Step 5 is the hours, which go back to

12      Step 4, and then the respective rate, which was also

13      entered.

14          I just don't see exactly where it's itemized the

15      steps, but that's also in the database as well.

16  Q   Okay.  And the calculation performed in Step 5, was that

17      performed by the Excel program?

18  A   Yes.

19  Q   Step 8 also refers to a calculation.

20          Was that calculation also performed by Excel?

21  A   Yes.

22  Q   In calculating the amount of fees and costs that

23      Microsoft allegedly incurred from the Sidley Austin law

24      firm, what analysis of your own did you do of those costs

25      and fees?

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 52

1   A   Well, I think I talked about initially we set up a very

2       large database, and it literally is several hundred

3       pages, and each page has perhaps 40 or 50 entries, so

4       there was a substantial amount of data entry that was

5       required.

6           We also reviewed the invoices to help ensure the

7       accuracy we reviewed to see were there what appear to be

8       errors.  In other words, did anybody charge more than 24

9       hours in a day.

10          We didn't find that, but we looked to see whether an

11      unusual number of hours were incurred.

12          We looked to see-- where there were an odd number of

13      hours billed, for example 1.3 hours, we did a second

14      inspection to make sure it wasn't entered as 13 hours, so

15      we did some additional clerical reviews of the work to

16      make sure that what was ultimately entered in the

17      database was accurate per the invoices.

18          We also did a read of the descriptions just to see

19      was there anything that struck us as extraordinary and,

20      from our perspective, might not be part of their work,

21      and nothing came to our attention.

22          There wasn't a substantial amount of work put in

23      that area, but the people reviewing the work did spend

24      some time doing an overview to see if anything struck

25      them as extraordinary or not potentially claimable.

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 53

1        To be sure, it wasn't a detailed, you know, legal

2     review because we weren't intimately familiar with the

3     nature of what was being done, but we didn't want to see

4     things on there that were obviously for another client or

5     something that was just a blatant error, and we did take

6     a review to see if we detected any of those type of

7     mistakes.

8        I don't recall us finding those.

9        There were other general checks done on the work.

10        Those are the ones I remember as I sit here, but

11     there were a few others as well.

12        I think we looked to see also some of the timing.

13        We didn't want to see on a particular bill a line

14     item that was extraordinarily filed in the past.

15        In other words, you wouldn't want to see a 2010 bill

16     and someone charging time in 2008 or something of that

17     magnitude, so we also looked to see were the time entries

18     relatively in the ballpark where we would expect them to

19     be.

20        There were some things like that that were done on

21     our part, again with the goal of trying to get the most

22     complete and accurate number.

23  Q  Now this additional analysis that you and your team

24     performed with regard to the Sidley invoices, where is

25     that described in your report?

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 54

1   A   I don't recall-- I don't think it is actually described

2       in the report.  We just did that as part of our work to

3       help-- again, my goal was to try to get the most accurate

4       number based on the information that was given to me.

5   Q   Did Microsoft or its counsel ask that you and your team

6       do that additional work?

7   A   I don't recall specific discussions about that level of

8       detail, but that was just part of our work that we did.

9   Q   So I would like to just go over each of the examples that

10      you just provided.

11          So the first one was you looked for unusual amounts

12      of hours, like over 24; is that right?

13  A   Well, to be clear, when we met as a team, I instructed

14      the people, as they're doing the work, "Just be on the

15      lookout for something that is obviously potentially

16      incorrect," I should say-- not obviously, but is

17      potentially incorrect, and things of that magnitude were

18      about as detailed as we got.

19  Q   Okay.  But you didn't instruct your team and your team

20      wouldn't be in a position to make a decision as to

21      whether a particular legal task performed by an attorney

22      should have taken more or less hours than what was

23      allocated, right?

24  A   That's correct, we did not do that level of detail.

25  Q   So your team was just looking at something that would be

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 55

1    obviously wrong, like one person billing 25 hours in a

2    day?

3  A  Yes.

4        I have reviewed legal bills for other projects, and

5    I've also had positions where I've had to approve legal

6    bills in other projects, and these are the kinds of

7    things that we are asked to do, the nature of the tasks I

8    just described.

9  Q  And then you said you also looked for odd numbers of

10   hours, and you described an example of a 1.3 time entry

11   being entered as 13.

12       Could you elaborate what you meant by that?

13  A  Well, if we had someone that perhaps had an entry of 1.3

14   hours, we just might ask the individual Navigant person,

15   "Can you go back to the invoice and just double check

16   that, that that's not 13?"

17       It wasn't that the 1.3 in and of itself was a

18   problem.  We just wanted to make sure if it was a little

19   of an odd entry, that we entered it correctly, so we did

20   a little more effort to make sure it was done correct,

21   besides the double coding that I talked about in the

22   report, the double entry.

23  Q  So how did you decide what numbers needed to be

24   rechecked?

25  A  This was more of an overview.

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 56

1      It's not like we sorted the database and identified

2      every 1.3 and did them all.

3          This was just something I wanted them, in a general

4      sense, to be aware of, and if they chance to come upon

5      those things, to do a little more work just to help

6      ensure the overall accuracy.

7   Q  And then I think you also stated that you and your team

8      read the task descriptions in the Sidley invoices to see

9      if the work was for these cases or not.

10         Can you better--

11  A  We read the task descriptions in a general sense to see

12     if there was anything that jumped out at us that might

13     relate to a different client perhaps or, as I say, a

14     totally different time period that was unrelated to this

15     project, and then if we found those, to do further

16     inquiry, but I don't recall us finding those things.

17  Q  Okay.  Other than those checks that you and your team

18     performed, was there any other analysis that you did to

19     calculate any amount of fees and costs associated with

20     the Sidley invoices?

21  A  Yeah.  We were asked to delineate it in a few different

22     ways, and that's in the report, as you recall, by

23     subject, and then we also did it by whether it was 100

24     percent of the specific task or something less than 100

25     percent, so we delineated the results of our work in a

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 57

1       few different ways.

2    Q   I guess what I'm trying to get at is-- it appears from

3        your report that your team took the highlighted Sidley

4        invoices, input the information that was in those

5        invoices, and calculated totals based on what the

6        calculations in the Excel program-- I just want to make

7        sure there wasn't any additional analysis that you or

8        your team did with respect to changing data entries or

9        anything else or if it's purely entering the information

10       from the Sidley invoices into a database and coming up

11       with calculations from there.

12   A   I think that's largely accurate what you said.

13   Q   Okay.

14   A   With the-- other than the points I've just talked about,

15       I think that's largely accurate.

16   Q   Okay.  Now, can you explain for me what you understand

17       the methodology was that was used to determine what work

18       was performed by Sidley as a result of Motorola's alleged

19       breach of contract?

20                       THE WITNESS:  I'm sorry, may I have

21       that question read back?

22                          (Question on Page 57, Line 16-

23                           19 read by the reporter.)

24

25                       THE WITNESS:  Well, based on my

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 93

1      And in preparing Exhibit No. 1, did you rely on the

2     invoices from the various firms and the TyMetrix 360

3     system?

4  A  Yes.

5  Q  Anything else?

6  A  Well, the allocations that were done by Sidley Austin.

7  Q  Right.

8      So the highlighted invoices as well?

9  A  Yes.

10  Q  Okay.  Turning to Exhibit No. 2, there's a 2A and a 2B, I

11     believe.

12      2A is for the Sidley Austin firm and 2B is for the

13     Calfo Harrigan firm?

14  A  That's correct.

15  Q  Can you explain to me how Exhibit No. 2 was created?

16  A  Well, after creating an Excel database, I mean,

17     essentially what this has done is just to sort, using a

18     pivot table that creates this sorting based on hourly

19     rate-- minimal hourly rate at the top and expands to the

20     most expensive rate at the bottom.

21  Q  Okay.  And Exhibit No. 2 only covers the Sidley Austin

22     and Calfo Harrigan firms, correct?

23  A  That's correct.

24  Q  Do you know why that is?

25  A  We were asked to do that by counsel.

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 94

1          I don't know exactly why only those two firms, but

2     we were asked to do that.

3  Q  Okay.  And why did you sort the data entered into your

4     Excel spreadsheet by hourly rate?

5  A  We were asked to do that.

6  Q  Okay.  Is there any-- do you have any particular purpose

7     for that, that you're aware of?

8  A  No, I'm not aware of the reason that it would be used,

9     but we were asked to do that, and it was relatively easy

10    for us to do that.

11 Q  Okay.  And you don't intend to offer an opinion regarding

12    whether the hourly rates of various attorneys are

13    reasonable or not.

14        Is that correct?

15 A  I don't believe I'll be asked to give an opinion on that.

16 Q  Okay.  Turning to the next exhibit, it's Exhibit No. 3.

17        Again, there's a 3A and a 3B for the Sidley Austin

18    and Calfo Harrigan firms.

19        Can you explain to me how Exhibit No. 3 was created?

20 A  Again, this would have been off the same database using a

21    pivot table.

22        We, again, sort by hourly rates, but this time we

23    have the employees' names as well.

24 Q  Again, this only covers the Sidley and Calfo Harrigan

25    firms as well, correct?

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 95

1   A   That's correct.

2   Q   Is there a reason you didn't do the same for others?

3   A   Only that we were asked to do it for these two firms.

4   Q   And what is the purpose of having this exhibit that sorts

5       by time keeper?

6   A   We were asked to do that.

7           Its ultimate purpose, I don't know, but we were

8       asked to do that, so we did it.

9           It was relatively easy for us to do that.

10  Q   You don't intend to offer an opinion regarding whether

11      the number of time keepers who worked on these matters

12      was reasonable, do you?

13  A   That's not within the scope of what I've been asked to

14      do.

15  Q   And there's no opinion of that nature in your report,

16      correct?

17  A   There is not.

18  Q   Is it correct that in Exhibit No. 3A there are over 100

19      unique time keepers listed?

20  A   I believe that's correct.

21  Q   Turning next to Exhibit No. 4, can you tell me what this

22      exhibit is intended to show?

23  A   This is another sorting of the information, just broken

24      up by client matter number.

25  Q   And this is specific to Sidley Austin, correct?

HIGHLY CONFIDENTIAL - ATTORNEYS EYES ONLY

Page 96

1  A  That's correct.

2  Q  Okay.  And was it similarly created, sorting in the Excel

3     spreadsheet that you created?

4  A  Yes, using a pivot table.

5  Q  And when it refers to the client matter, there are only

6     three listed here, right?

7  A  That's correct.

8  Q  And is that because the Sidley invoices used-- ultimately

9     ended up using three different matters for-- that cover

10    work that they're claiming fees and costs for in this

11    case?

12 A  I believe that's correct.

13 Q  So when you refer to a client matter here, you're not

14    referring-- you're referring to a client matter as

15    referenced in invoices from Sidley to Microsoft, not

16    separate legal matters in various courts, correct?

17 A  That's correct.

18 Q  Turning next to Exhibit No. 5, can you explain to me what

19    this exhibit is intended to show?

20 A  We were asked to also prepare a schedule that showed the

21    Sidley Austin fees and expenses by various subjects, so

22    these were the subjects that were given to us by

23    Ms. Robbins, and this is how the numbers came out.

24 Q  Do you recall when you were asked to divide up the

25    information by various subjects?

# EXHIBIT B

CONFIDENTIAL

Page 1

1          IN THE UNITED STATES DISTRICT COURT

2          FOR THE WESTERN DISTRICT OF WASHINGTON

3

4                          AT SEATTLE

5

6

7

8     MICROSOFT CORPORATION, a                 )

9     Washington corporation,                  )

10                                             )

11                    Plaintiff,              )

12                                             ) No. 2-10-cv-

13              vs.                            ) 01823-JLR

14                                             )

15    MOTOROLA, INC., and MOTOROLA             )

16    MOBILITY, INC.,                          )

17                                             )

18                    Defendants.             )

19

20

21        VIDEOTAPED 30(b)(6) DEPOSITION OF DAVID KILLOUGH

22

23                       May 6, 2013

24

25      Job No. CS1661676      Seattle, Washington

CONFIDENTIAL

Page 47

1      to H.264, and they -- you know, numbers of them just

2      typically were focused on those things.

3            And the same would be true for, you know, patents

4      that were declared essential to 801.11; there would

5      be some subset of folks that would spend, you know,

6      their time working on those, and might not do any

7      work on H.264 declared patents, for example.

8            That's the kind of, you know, specialization/

9      segregation of labor that I was thinking of.

10  Q   Okay.  And was that segregation of labor solely at

11      Sidley, or was that also at Harrigan and Michael

12      Best's firm?

13  A   I typically think of it as it would be, you know,

14      Sidley with that kind of segregation.

15  Q   Do you know the names of the attorneys who were

16      focused on the 802.11 standard-essential patents?

17  A   No, I don't have a clear recollection as I sit here.

18  Q   Do you know the names of the attorneys who were

19      focused on the H.264 standard-essential patents?

20  A   Yeah.  Certainly Doug Lewis was -- was one of them.

21            And I just don't have a clear recollection of

22      whether John McBride was principally H.264 or 801.11,

23      but there were, you know, several folks.  I'm just --

24      just can't sort out in my mind who exactly was the --

25      you know, focusing on which bucket versus another

CONFIDENTIAL

Page 48

1    bucket of patents.

2  Q  And to your knowledge, was there any -- any groups of

3     subsets of attorneys at Sidley focused on the '680

4     patent or the '582 patent asserted by Microsoft?

5  A  Certainly there would have been attorneys that would

6     do just spadework and the due diligence necessary to

7     assert, you know, a patent.  And I can't remember who

8     that may be.  And they may have and expect would be

9     involved in other things, you know, as well and not

10    dedicated just to that.

11        It would seem to me to be unlikely that we had

12    anybody dedicated to the 699 counterclaims, the

13    patent aspects of those.

14  Q  Okay.  And to your knowledge, when you were speaking

15    about the people who were focused on the 802.11 and

16    H.264 patents, did those attorneys also work on other

17    aspects of the cases, or did they solely work on --

18    on those patents?

19  A  I don't have a specific recollection.  They may well

20    have worked on other patents as well and other

21    aspects of the case.  I think that would be, in many

22    instances, likely that they didn't just do H.264 or

23    just 802.11 patents.

24  Q  Are you aware of any documentation that breaks down

25    the different sets of attorneys at Sidley that had

CONFIDENTIAL

Page 119

1     allocation for that particular entry and it's

2     indicated in yellow.

3  Q  And so for that particular entry, I think -- are you

4     looking at one of the ones on November 22nd, 2010?

5  A  Right.

6  Q  So we'll take the very first one for JL Secord.

7        Am I understanding you correctly that Microsoft

8     is going to be seeking to recover 80 percent of

9     the .5 hours that Mr. or Ms. Secord billed on that

10    particular task?

11 A  Correct.

12 Q  So if you could tell me how -- how the various

13    different percentages reflected in the color

14    coding -- how Microsoft got to each one.

15 A  Yeah.  There -- there are certainly some broad

16    categories.  I think the broadest one is probably,

17    you know, the yellow one that -- that reflects the --

18    something that was done that was spread across all

19    five patents and, therefore, is allocated for, you

20    know, 80 percent, because there's four out of five

21    are standard-essential patents.

22        And so you'll probably see a lot of yellow in

23    here.  I haven't studied it to see that, but that's

24    my best guess.

25        And then at a point in time where one of

CONFIDENTIAL

Page 121

1    allow you to make that finer allocation, did
2    Microsoft basically apply a general percentage rule
3    based on the patents in play at that time in the
4    case?
5  A  One of two things would happen.  It would either be
6    thrown out and not requested recovery at all.  If --
7    if there wasn't enough information from the entry to
8    determine, then it would just be thrown out.
9        If the entry reflected, you know -- it was
10   clearly, for example, on the ITC 752 case, if it was
11   clearly an activity that, you know, could have
12   applied across the board to all patents, then, yes,
13   you apply the general rule.
14 Q  Now, who -- who actually went through and did all the
15   allocations?
16 A  For Sidley, I believe Ellen Robbins did.
17 Q  Poor Ellen, all by herself?
18 A  That's my understanding.
19                    MS. ROBERTS:  Sounds like fun.
20                    MS. ROBBINS:  True.
21 Q  (By Ms. Roberts)  Okay.  And --
22                    MS. ROBBINS:  Let's repeat that
23   "poor Ellen" part again a little louder, to make
24   sure...
25 Q  (By Ms. Roberts)  So Ellen did the allocations.

CONFIDENTIAL

Page 129

1    Q    Okay.

2    A    -- is, they didn't do the highlighting.  They would

3         take the highlighting into account in crunching the

4         numbers.

5    Q    Okay.  If you look at -- let's see here.

6              If I could turn your attention to Exhibit 11.

7    A    Mm-hm.

8    Q    There's a lot of material redacted in this exhibit.

9         There's also some material that is blacked out.

10             So when I say "redacted," I'm referring to

11        entries that say "Redacted."  And then an example of

12        something blacked out is on the page ending in 740A.

13             Is there a difference in meaning between redacted

14        and blacked out?

15   A    I can make an assumption based on the allocation key,

16        but it's only an assumption.  I don't know that

17        there's any difference.

18             The -- you know, the -- the highlighting key on

19        the first page appears to have a black for a zero

20        percent allocation.  And so that might be distinct

21        from redacted, even though both result in a zero

22        percent charge.

23   Q    So is -- for information that is redacted, using the

24        term "Redacted," is Microsoft seeking any fees or

25        costs in association with that redacted material?

CONFIDENTIAL

Page 138

1      to reflect 75 percent?

2   A   That's the only thing close.

3   Q   Okay.

4   A   I'd read it that way.

5   Q   It's not the 33 percent that's the lighter purple?

6   A   Looks like the 75 percent to me, comparing it.

7   Q   And do you know how -- how Microsoft determined to

8      allocate these entries at 75 percent?

9   A   I expect it's based on the ratio of number of

10      standard-essential patents versus number of not

11      standard-essential patents that were in play at this

12      particular point in time in the ITC.

13   Q   So the determination to allocate these entries at 75

14      percent, was it based on any of the specific

15      narrative entries or application of the ratio of the

16      number of patents in play at the time?

17   A   From the entries, I would expect it would be that --

18      the general rule versus some more specific knowledge

19      of these particular activities.

20   Q   Okay.  If you turn to the next -- flip the page to

21      552A.

22   A   Okay.

23   Q   There are some entries there that are not

24      highlighted.

25   A   Right.

CONFIDENTIAL

```
                                            Page 147

  1                 EXAMINATION (Continuing)

  2      BY MS. ROBERTS:

  3  Q   Mr. Killough, you've been handed what was marked

  4      as Exhibit 14, which has the Bates No.

  5      MS-MOTO_1823_0006000695A.

  6          If I could turn your attention to Page 723A.

  7  A   Okay.

  8  Q   At the top of the page there, there are four entries

  9      for December 3rd, 2012, three of which are

 10      highlighted in blue, and the other, the fourth, is

 11      not highlighted.

 12          Do you see where I'm referring to?

 13  A   December 4?

 14  Q   December 3rd.

 15          Well, I guess it says -- yeah, sorry.

 16  A   12/4 --

 17  Q   In the date column, it's 12/4/2012.

 18  A   Ah, okay.

 19  Q   In the description column, it's listed as 12/3/12

 20      through 12/7/12.

 21  A   Right.

 22  Q   Do you see what I'm referring to there?

 23  A   Right.

 24  Q   So I'm wondering if you know why three of these

 25      entries for the same date range and identified as
```

CONFIDENTIAL

Page 148

1    "Preparation for ITC hearing in DC" were given 50

2    percent allocation and one was given a hundred

3    percent allocation.

4  A  I don't know.  Based on the information provided

5    here, I can't tell.

6  Q  I'm going to hand you what we will mark as Exhibit

7    15, which has the Bates No. MS-MOTO_1823_0006001082A.

8                         (Exhibit No. 15 marked

9                          for identification.)

10

11 Q  (By Ms. Roberts)  And if I can turn your attention to

12    Page 1144A.

13 A  Okay.

14 Q  And certain of the entries on this page are not

15    highlighted, which indicates, as I understand it,

16    that Microsoft is seeking to recover a hundred

17    percent of those fees; whereas, others are

18    highlighted in yellow, indicating 80 percent.

19        How was it determined which should receive the

20    80 percent indication versus the hundred percent

21    indication?

22 A  It's by the -- the persons' activities.

23 Q  So, for example, on January 8th, 2012, JW McBride

24    drafted cross-examination outlines --

25 A  Right.