LAW OFFICES
**CALFO HARRIGAN LEYH & EAKES** LLP
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON  98104
(206) 623-1700

ARTHUR W. HARRIGAN, JR.

FACSIMILE:  (206) 623-8717
E-MAIL:  ARTHURH@CALFOHARRIGAN.COM

June 26, 2013

The Honorable James L. Robart
United States District Court
Western District of Washington
700 Stewart Street, Suite 14128
Seattle, WA  98101-9906

     Re:    *Microsoft Corp. v. Motorola, Inc.*, et al., No. 10-cv-1823-JLR

Dear Judge Robart:

     In compliance with the Court's July 25 Order, Microsoft provided three witnesses to testify regarding the following three topics identified by the Court (6/25/13 Tr. at 9):

1. A Microsoft 30(b)(6) designee (Jeff Davidson) who could "categorically say, as the witness has implied, that there was no consideration of moving the distribution center prior to mid-January of 2012;"

2. A Microsoft 30(b)(6) designee (David Killough) who "can discuss other patent litigation lawsuits pending in Germany in the 2011, 2012 range" against Microsoft; and

3. "A second two-hour deposition of Ms. McKinley or someone else in the law department who will explain the reasons why the law department made the decision that the distribution center needed to be moved."

     Davidson testified that he spoke to the two other executives who had the authority to make a decision to relocate the distribution facility – Brian Tobey and Owen Roberts.  He testified that he had been in his role for eight years and that, apart from routine reviews of efficacy of distribution centers described in his first deposition (not leading to considering relocation), never during that time had he, Tobey or Roberts considered relocating the German facility.  Davidson testified he had not asked LCA if it had considered moving the distribution center and that LCA had *no authority* to make such a decision.  Ex. 1 at 14-15.  Any "consideration" would be meaningless.  McKinley in fact testified that only upon learning of the German injunction threat did LCA realize that the European (and Middle East) distribution Center was *in* Germany.  Ex. 2 at 43-44.

     Killough provided a chart listing the German patent suits pending in 2011 and 2012.

     McKinley did not need to review documents to remember that LCA, which was powerless to make the relocation decision, had not made it.  She unequivocally said: "**LCA**

**didn't make the decision.**" Ex. 2 at 40 (emphasis supplied). Motorola's real complaint is that McKinley did not recall details about the *legal advice* LCA had given in connection with the relocation and had not used emails containing that advice to refresh her recollection. None of those documents contain statements indicating that LCA *made* the decision. If in fact LCA did *not* make the decision, then the predicate for the claim of waiver is missing. It in fact did not.

This is not surprising in a corporate organization: lawyers do not make business decisions, they provide advice; others make business decisions based on that advice.

Motorola spent two hours examining McKinley. The examination focused on the general nature of the *advice* LCA provided to the business. Counsel never instructed McKinley not to answer a question—because the questions merely sought to identify the role LCA played and the areas in which they provided advice. There were no questions about the substance of the legal advice—only questions designed to show that McKinley could have testified in more detail about the advice if she had reviewed privileged email to prepare for her deposition. McKinley did not review records of this advice because it was not within the scope of Topic 3, which was an event that never occurred: why LCA made the decision to relocate the facility.

Motorola misstates Topic 3 as "'what the law department did' regarding the relocation decision (Brief at 4). Microsoft understood "what the law department did" to refer to the Court's statement, "the law department made us" relocate. McKinley (and Davidson) testified this never happened.

## A.   Microsoft Took Appropriate Steps to Comply with The Court's Order.

Davidson was first deposed on May 9, 2012 and named McKinley as the LCA attorney in charge of the Supply Chain business. Motorola did not ask to depose McKinley. A month after discovery closed Motorola sought leave to depose McKinley and to elicit further 30(b)(6) testimony, resulting in the Court's order of June 25, 2013.

Microsoft made the witnesses available on July 11, but Motorola was not available. Killough and McKinley were deposed on July 15, Davidson on July 16. Killough's deposition was 48 minutes, Davidson's 31 and McKinley's 120.

At 7:30 pm on Wednesday, July 10, 2013, Motorola asked Microsoft to produce McKinley's custodial documents. Microsoft collected and reviewed over one thousand documents, produced documents on Sunday, July 14, and supplied a privilege log the next day.[1]

## B.   Microsoft's Witnesses Complied with Their Obligations Under Rule 30(b)(6).

"Rule 30(b)(6) is intended to allow a party to gather information about a corporation from a person designated to serve as the voice of the corporation." *Shapiro v. America's Credit Union*, 2013 U.S. Dist. LEXIS 77019, *5 (W.D. Wash. May 31, 2013) (Leighton, J.). While the deponent must be prepared to testify about information known or reasonably available to the

---

[1] That Microsoft's privilege log is 28 pages is not surprising. McKinley's job is to provide legal advice to her clients. The log identified all privileged documents from McKinley's, Robert's, and Daly's custodial collections.

organization, "[t]he fact that the corporate designee cannot answer every question posed during the deposition does not mean that the corporation failed to satisfy its Rule 30(b)(6) obligation to prepare the witness." *Id.*  While a corporation has the obligation to prepare its witnesses to testify regarding topics specifically identified in a 30(b)(6) notice, no such obligation exists with respect to questions that fall outside the scope of the notice. *Detoy v. City and County of San Francisco*, 196 F.R.D. 362, 366-67 (N.D. Cal. 2000) (noting that "if the deponent does not know the answer to questions outside the scope of the matters described in the [30(b)(6)] notice, then that is the examining party's problem."); *J.C. v. Soc'y of Jesus, Oregon Province*, 2006 WL 3158814, *6 (W.D. Wash. Oct. 27, 2006) (Robart, J.) ("If counsel strays from the designated topics during the deposition, the deponent is free to answer that he has no responsive knowledge.").

**Davidson:**  Davidson was designated to testify whether Microsoft had considered relocation prior to mid-January 2012.  Davidson had testified earlier that he would have known of any such consideration during the three to four years he managed the distribution operation and there had been none. Ex. 3 at 219.  To assure that he could unequivocally state that his earlier testimony was correct, Davidson spoke "to the only other people that would have ever potentially considered such a situation; Owen Roberts, as well as Brian Tobey."[2]  Ex. 1 at 7.  Davidson also testified that he and Roberts were the people who first raised the topic of whether to move the warehouse when they were informed that Motorola was seeking injunctive relief in Germany.  *Id*, at 17.  Whether others with no conceivable power to make such a decision had dreamed of relocation is not germane to the question posed.

**McKinley:**  McKinley was Microsoft's designee on Topic 3 – "the reasons why the law department made the decision that the distribution center needed to be moved."  McKinley testified that "LCA didn't make the decision." Ex. 2, at 40:4.  McKinley did not need to refresh her recollection or confer with anyone in order to provide the one and only answer she could truthfully give:  it did not happen.[3]

Davidson testified the next day: (1) "the legal department described the risk around injunction to me, as well as Owen.  So the legal department would describe the risk.  It wouldn't be the legal department that considered whether or not a move was necessary.  That was Owen Roberts and myself"; (2) "It was myself and Owen that began articulating here's what we would see as some potential things we'd investigate.  One of those things considered was obviously to move"; (3) "The legal department wouldn't be moving the distribution center.  I would"; and (4) Moving the facility "wouldn't be her [McKinley's] decision." Ex. 1 at 14-17.

Motorola spent the remainder of its time examining McKinley about what LCA *did do* with reference to relocation—including the type of *legal advice* it had provided.  Microsoft counsel did not object to her identifying the subject matter, but not the substance, of this advice.  The advice is privileged, as are any documents embodying it.  McKinley had no obligation

---

[2] Roberts was the General Manager of Global Supply Chain.  Tobey was the Corporate Vice President of Manufacturing, Supply Chain, and Information Systems.  *Id.*, pp. 7-8.

[3] While Motorola's counsel asked McKinley what type of documents she *could* review to refresh her recollection, he never asked whether any such review was necessary for her to answer the specific question posed by Topic 3.  And McKinley's description of documents she could review included documents relating to issues such as the pros and cons of options "from a legal point of view"—i.e., legal advice.  *See, e.g.,* Ex. 2 at 58.

prepare for her deposition on these topics.  *See J.C.,*2006 WL 3158814 at *6.

McKinley supplemented Killough's testimony on other patent cases pending in Germany, testifying that any injunction in the "Sync" case (which did not involve SEPs) "would likely have not prohibited the distribution of the Xbox from the Germany facility, because there were other ways to handle that issue through the Live Messenger," including removal.  Ex. 2 at 22-23.

## C.    Microsoft Has Not Waived Privilege over LCA's Legal Advice.

Any waiver determination implicit in the Court's order permitting McKinley's deposition would arise only if LCA in fact made the decision to relocate.  *Resilient Floor Covering Pension Fund v. Michael's Floor Covering, Inc.*, 2012 WL 3062294, at * 8 (N.D. Cal. July 26, 2012) (scope of waiver should be drawn narrowly).  McKinley was examined on this subject and testified that LCA did not, but that it provided advice to those who did.

Those privileged communications do not become discoverable simply because they are relevant.  Implied waiver exists only when the following elements have been established:

> (1) assertion of the privilege was the result of some affirmative act, such as filing suit, by the asserting party; (2) through this affirmative act, the asserting party put the protected information at issue by making it relevant to the case; and (3) application of the privilege would have denied the opposing party access to information vital to his defense.

*Hearn v. Rhay,* 68 F.R.D. 574 (E.D. Wash. 1975).[4]  Even a statement of the legal conclusions is not a waiver.  *Seattle Nw. Secs. Corp. v. SDG Holding Co.*, 812 P.2d 488, 498 (Wn. App. 1991): "[t]o penalize a disclosure of a legal conclusion by characterizing it as a waiver would greatly hamper attorneys in their ability to effectively represent and advise their clients.  The exception would swallow the rule and render the privilege a virtual nullity."  *Id.*

The waiver issue is "not simply whether the protected communications are at issue," but whether *Microsoft* put them at issue in some way.  *Dana v. Piper*, 295 P.3d 305, 313 (Wn. App. 2013).  Microsoft's relocation damages claim is:  a) Motorola's German litigation entailed a risk of an injunction; b) LCA told the business unit of this risk; c) the business unit evaluated other options but decided relocation was the only safe course.  Microsoft is not relying on advice of counsel as the basis for its relocation beyond the disclosure of what was essentially a matter of public record.  *See* Ex. 1 at 16 (referencing press about the suit).  Both McKinley and Davidson confirmed that the business group made the decision to relocate, and that is what Microsoft will rely on at trial.  *See Lexington Ins. Co. v. Swanson*, 2007 WL 21121730 (W.D. Wash. July 24, 2007) (Pechman, J.) (where party confirms it is not relying on "advice of counsel" defense, the party "has not put the withheld documents at issue by making them relevant to the case").

Roberts initially testified that he was "told based on the litigation, we had to move the facility," by McKinley (Ex. 4 at 40-41).  When asked by Motorola's counsel to confirm her understanding of this testimony, Roberts testified that LCA "presented a case that said we had a

---

[4] Washington law on privilege applies in this instance.  FRE 501.  But Washington courts often rely on federal precedent in analyzing waiver.  *Seattle Nw. Secs. Corp.*, 812 P.2d at 498.

very strong risk of our business being materially impacted if we lost the litigation in Germany, and then it was a decision by the business to say how do we mitigate for that risk and at what stage do we mitigate for that risk. It's not a legal decision." *Id.* at 134-35. The Court noted that Roberts' testimony raised a factual question regarding whether the waiver event actually occurred. 6/25/13 Tr. at 10:2-8. The McKinley testimony confirms that LCA did not make the decision. The Davidson testimony confirms that LCA had no authority to make such a decision. Even if the factual question cannot be absolutely resolved on the basis of the testimony to date, McKinley is unable to testify about "why" she made a decision that she testifies she did not make. Nor is there a privilege waiver where the predicate for the waiver—LCA's having made the decision—is not established.[5]

Motorola, not Microsoft, has worked to inject LCA's advice into the case. Testimony about legal advice extracted in a deposition does not create a waiver. *Metric Constr., Inc. v. Bank of Tokyo-Mitsubishi, Ltd.*, 1998 WL 1742589, *22 (E.D.N.C. Sept. 28, 1998) ("it cannot be possible for one party to justify piercing his adversary's attorney-client privilege by virtue of its *own* injection of the privilege into the lawsuit. A contrary result would enable a skillful questioner to render the privilege a nullity").[6] McKinley testified because the Court ordered an LCA witness to do so. Any testimony she gave was in response to Motorola's examination.

Motorola also cannot meet the third *Hearn* factor. "Protected communications are vital to a party's case when they contain information about a disputed issue that is not available from any other nonprivileged source. But protected communications are not vital to a party's case when there are other sources of indirect evidence about the issue." *Dana*, at 313 (internal citations omitted) (where issue involved the "objective reasonableness" of a settlement; attorney's subjective view of reasonableness of settlement was not vital to opponent's case); *1st Sec. Bank of Wash. v. Eriksen*, 2007 WL 188881 (W.D. Wash. Jan. 22, 2007) (Lasnik, J.) (finding disclosure not vital where opponent had access briefs, experts, and other witnesses who can shed light on issue).

Motorola has now taken six depositions (including one expert deposition) regarding Microsoft's claim for mitigation costs. It has had every opportunity to develop evidence supporting its position that Microsoft's relocation costs were unreasonable. *See Kubista v. Romaine*, 14 Wn. App. 58, 538 P.2d 812 (1975) (setting out standard for recovering mitigation expenses). It has received testimony regarding every option considered by Microsoft and the reasons it chose to relocate to The Netherlands. Motorola was directly involved in the German action in which the injunction issue arose and is well aware of the relevant dates and the timing of the German court's rulings. It does not need to pry into Microsoft's privileged communications. Microsoft has not waived the privilege over any of LCA's privileged communications. Motorola's motion should be denied.

---

[5] If the Court is inclined to find that Roberts' testimony created a broader waiver, Microsoft requests that the court hold an evidentiary hearing in which to resolve any remaining fact issues regarding who made the decision. *See Seattle Nw. Secs. Corp.*, 812 P.2d at 498-99 (court should resolve underlying fact issues before finding waiver).

[6] *Elat v. Emandopngoubene*, 2013 WL 1146205, *6-7 (D. Md. Mar. 18, 2013); *Aull v. Cavalcade Pension Plan*, 185 F.R.D. 618, 630 (D. Colo. 1998*)*.

Very truly yours,

CALFO HARRIGAN LEYH EAKES LLP

/s/ *Arthur W. Harrigan, Jr.*

Arthur W. Harrigan, Jr.

cc: All Counsel (via ECF)
   Enclosures

# Exhibit 1

CONFIDENTIAL

Page 1

1          IN THE UNITED STATES DISTRICT COURT

2          FOR THE WESTERN DISTRICT OF WASHINGTON

3                        AT SEATTLE

4

5

6

7

8    MICROSOFT CORPORATION, a              )

9    Washington corporation,              )

10                                         )

11                   Plaintiff,           )

12                                         ) No. 2-10-cv-01823-JLR

13              vs.                        )

14                                         )

15   MOTOROLA, INC., and MOTOROLA         )

16   MOBILITY, INC.,                      )

17                                         )

18                   Defendants.          )

19

20                      CONFIDENTIAL

21       VIDEOTAPED 30(b)(6) DEPOSITION OF JAMES JEFF DAVIDSON

22                     July 16, 2013

23                   Seattle, Washington

24

25     Job No. CS1699982

CONFIDENTIAL

1        Germany prior to the January of 2012; is that right?

2    A   That's correct.

3    Q   So first, can you tell me, what have you done to try

4        to educate yourself as to whether or not there was

5        any consideration of moving the distribution center

6        prior to January 2012?

7    A   Well, a couple things.

8            One:  I've been in this role for roughly eight

9        years, so I'm pretty intimate with the space.

10           Two:  I've spoken with the only other people that

11       would have ever potentially considered such a

12       situation; Owen Roberts, as well as Brian Tobey.

13           That's what I've done.

14   Q   Okay.  So when you say, first, that you've been in

15       this role, can you explain to us very quickly what

16       you mean by "this role."

17   A   I've been responsible for distribution and logistics

18       at Microsoft since basically 2005.

19   Q   And just so we have it, then, in -- in this

20       transcript, can you tell me, then, the roles of

21       Mr. Roberts and Mr. Tobey.

22   A   Owen Roberts, at the time, was my manager.  He was

23       the general manager of global supply chain.  And

24       Brian Tobey was his manager; corporate vice president

25       of manufacturing, supply chain, and information

CONFIDENTIAL

Page 8

1     systems.

2   Q   So let's -- let's start with the general -- your

3       general testimony, then.

4           Can you tell me, after having looked into this,

5       whether or not there was any consideration of moving

6       that German distribution center prior to mid-January

7       2012.

8   A   I can tell you that moving the distribution center

9       out of Düren never made sense for us prior to January

10      2012.

11  Q   That wasn't my question, so let me ask my question.

12          Can you tell me whether or not there were ever --

13      was ever any consideration of moving the distribution

14      center out of Germany prior to mid-January 2012?

15  A   No.  I've testi- -- I've spoken the last deposition

16      that we'd always routinely evaluated our distribution

17      network.  To that extent, we always have.

18          Did we ever draw a conclusion that it ever made

19      sense to move from Düren?  No.

20  Q   Now, the question wasn't just whether it made sense.

21      The question is whether there was any consideration,

22      was there any discussion, you know, prior to mid-

23      January 2012 --

24  A   We'd always --

25  Q   -- of the possibility of moving the distribution

CONFIDENTIAL

Page 14

```
 1   A   Red would be they're below whatever the target is.
 2       Yellow would be they're in the range; watch out.  And
 3       green would be they're at or above target.
 4   Q   Prior to -- to mid-January 2012, was there ever any
 5       consideration of moving the distribution center to
 6       Heinberg?
 7   A   To where?
 8   Q   Heinberg.
 9   A   No, I don't believe so.  It doesn't -- doesn't ring a
10       bell.
11   Q   Now, you told me that you were relying on your own
12       experience, and speaking with Mr. Roberts and
13       Mr. Tobey.
14           Did you speak with Ms. McKinley about whether or
15       not there was discussion within the legal department
16       of moving the distribution center prior to mid-
17       January 2012?
18   A   I did not discuss with Ms. McKinley.
19   Q   Why not?
20   A   Because that wouldn't be her decision.
21   Q   Well, the -- the question is whether or not there was
22       any consideration of moving the distribution center
23       prior to mid-January of 2012.
24           Can you tell me that there was no consideration
25       in the Microsoft legal department of moving the
```

CONFIDENTIAL

Page 15

```
 1      distribution center prior to mid-January 2012?
 2   A  I cannot tell you if the legal department considered
 3      it, but I can tell you that the legal department
 4      wouldn't be moving the distribution center.  I would.
 5   Q  And I understand that they wouldn't be moving it, but
 6      in 2012, you did have discussions with Ms. McKinley,
 7      and perhaps others in the legal department, about
 8      considerations about considering a move of the
 9      distribution center; correct?
10   A  I did have discussions, yes, with -- after January
11      2012, with the legal department.
12   Q  And I take it you're not an expert in German law or
13      injunctions or --
14   A  I am not.
15   Q  Not.
16          So it's fair to say that to the extent that there
17      was consideration of moving the distribution center
18      from Germany as a result of legal issues, you relied
19      on the legal department to -- to tell you about the
20      concerns?
21   A  They -- the legal department described the risk
22      around injunction to me, as well as Owen.  So the
23      legal department would describe the risk.
24          It wouldn't be the legal department that
25      considered whether or not a move was necessary.  That
```

1      was Owen Roberts and myself.

2   Q  But to be clear, I take it -- did you or Mr. Roberts,

3      to your knowledge, go to the legal department at some

4      point and say, hey, we know there are lawsuits;

5      should we be concerned about that because of possible

6      injunctions or anything?

7          Did you or Mr. Roberts initiate that type of

8      discussion?

9   A  No.

10         That was -- there was some public knowledge of --

11     in the press about litigation, but the legal

12     department -- I was approached by Owen first.  So I

13     couldn't tell you who initiated it.

14  Q  Did -- did Owen tell you that he had initiated

15     discussions with the legal department about the

16     effects of litigation in Germany and -- and how that

17     might impact where the distribution center should be

18     located?

19  A  No, he didn't.

20  Q  And to your knowledge, Mr. Roberts is not a legal

21     expert and -- and couldn't, by himself, figure out

22     what the risks were as a result of litigation in

23     Germany; correct?

24  A  That's correct.

25  Q  So it's your understanding that it was the legal

1   department who -- who raised this issue, the legal

2   issue, of the -- of the implications from -- from

3   litigation on where the German -- the distribution

4   center should be located; correct?

5   A   The legal department described to us what the -- what

6   was happening with the litigation, and described the

7   risk of injunction, yes.

8   Q   And that was in connection with a -- a discussion of

9   whether there should be a consideration of moving the

10   distribution -- the distribution center out of

11   Germany; correct?

12   A   Well, it was myself and Owen that began articulating

13   here's what we would see as some potential things

14   we'd investigate.   One of those things considered was

15   obviously to move.

16   Q   Okay.  So --

17   A   Yeah.

18   Q   I mean, I'm -- I'm not trying to get you to say the

19   legal department made the decision.  But just as a

20   first step, I mean, did the legal department come to

21   you and say, oh, just for your information, you know,

22   there could be an injunction?  You know.  Or was it:

23   Hey, there's something we need to talk about, the

24   injunctions; that could affect the business, you guys

25   need to make a decision?

CONFIDENTIAL

Page 29

1      STATE OF WASHINGTON )    I, Karmen M. Knudson, CCR, RPR, CRR,
                         ) ss a certified court reporter in

2      County of Pierce    )    the State of Washington, do hereby
                            certify:

3

4

             That the foregoing deposition of JAMES JEFF

5      DAVIDSON was taken before me and completed on July 16, 2013,
      and thereafter was transcribed under my direction; that the

6      deposition is a full, true and complete transcript of the
      testimony of said witness, including all questions, answers,

7      objections, motions and exceptions;

8             That the witness, before examination, was by me
      duly sworn to testify the truth, the whole truth, and

9      nothing but the truth, and that the witness reserved the
      right of signature;

10

             That I am not a relative, employee, attorney or

11     counsel of any party to this action or relative or employee
      of any such attorney or counsel and that I am not

12     financially interested in the said action or the outcome
      thereof;

13

             That I am herewith securely sealing the said

14     deposition and promptly delivering the same to
      Attorney Andrea Pallios Roberts.

15

             IN WITNESS WHEREOF, I have hereunto set my

16     signature on July 17, 2013.

17

18

19

20

21

22                    _____

                    Karmen M. Knudson, CCR, RPR, CRR

23                   Certified Court Reporter No. 1935.

24

25

# Exhibit 2

Attorney's Eyes Only

1                    IN THE UNITED STATES DISTRICT COURT

2                  FOR THE WESTERN DISTRICT OF WASHINGTON

3                                AT SEATTLE

4

5    MICROSOFT CORPORATION, a              )
     Washington corporation,               )
6                                          )
                         Plaintiff,        )
7                                          ) No. 2-10-cv-01823-JLR
                 vs.                       )
8                                          )
9    MOTOROLA, INC., and MOTOROLA          )
10   MOBILITY, INC.,                       )
11                                         )
12                    Defendants.          )

13

14                             CONFIDENTIAL

15        VIDEOTAPED 30(b)(6) DEPOSITION OF SHELLEY MCKINLEY

16

17                             July 15, 2013

18

19                         Seattle, Washington

20

21

22

23

24

25   Job No. CS1699980

Attorney's Eyes Only

**2**

```
 1        APPEARANCES
 2
 3   For the Plaintiff:
 4
            Arthur W. Harrigan, Jr.
 5          Calfo Harrigan Leyh & Eakes
            999 Third Avenue
 6          Suite 4400
            Seattle, WA 98104
 7          206.623.1700
            206.623.8717 Fax
 8          arthurh@calfoharrigan.com
 9
            Richard A. Cederoth
10          Sidley Austin, LLP
            One South Dearborn
11          Chicago, IL 60603
            312.853.7000
12          312.853.7036 Fax
            rcederoth@sidley.com
13
14
15   For the Defendants:
16
            William C. Price
17          Quinn Emanuel
            865 South Figueroa Street
18          10th Floor
            Los Angeles, CA 90017
19          213.443.3156
            213.443.3100 Fax
20          williamprice@quinnemanuel.com
21
            Elanor A. Mangin
22          Quinn Emanuel
            555 Twin Dolphin Drive
23          Fifth Floor
            Redwood Shores, CA 94065
24          650.801.5000
            650.801.5100 Fax
25          emangin@quinnemanuel.com
```

**4**

```
 1           EXAMINATION INDEX
 2   EXAMINATION BY:            PAGE NO.
 3   MR. PRICE              6
 4
 5
 6
 7           EXHIBIT INDEX
 8   EXHIBIT NO.   DESCRIPTION      PAGE NO.
 9
10      (No exhibits marked for identification.)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**3**

```
 1        APPEARANCES (Continuing)
 2
 3   Also present: David Killough
                    Andy Culbert
 4
                    Chad Reilly, Videographer
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**5**

```
 1        BE IT REMEMBERED that on Monday,
 2   July 15, 2013, at 315 Fifth Avenue South, Suite 1000,
 3   Seattle, Washington, at 1:51 p.m., before Karmen M.
 4   Knudson, CCR, RPR, CRR, Notary Public in and for the
 5   State of Washington, appeared SHELLEY MCKINLEY, the
 6   witness herein;
 7        WHEREUPON, the following
 8   proceedings were had, to wit:
 9
10          <<<<<< >>>>>>
11
12        THE VIDEOGRAPHER:  We are now on
13   the record.  My name is Chad Reilly, videographer
14   present for Veritext National Deposition and
15   Litigation Services.  The date today is July 15th,
16   2013, and the time is now 1:51 p.m.
17      This deposition is being held in the offices of
18   Summit Law Group, located at 315 Fifth Avenue South
19   in Seattle, Washington.
20      The caption of the case is Microsoft Corporation
21   versus Motorola Mobility, LLC, in the United States
22   District Court for the Western District of Washington
23   at Seattle.
24      The name of the witness is Shirley [sic]
25   McKinley, 30(b)(6) witness for Microsoft Corporation.
```

2 (Pages 2 to 5)

Attorney's Eyes Only

**6**

1    At this time, will the attorneys please identify
2    themselves and the parties they represent, after
3    which our court reporter, Karmen Knudson of Byers &
4    Anderson, will swear in the witness and we will
5    proceed.
6              MR. PRICE:  Bill Price for
7    Motorola.
8              MR. MANGIN:  Elanor Mangin for
9    Motorola.
10             MR. HARRIGAN:  Art Harrigan for
11   Microsoft.
12             MR. CEDEROTH:  Richard Cederoth for
13   Microsoft.
14             MR. CULBERT:  Andy Culbert for
15   Microsoft.
16   SHELLEY MCKINLEY,      having been first duly sworn
17             by the Notary, deposed and
18             testified as follows:
19
20
21             EXAMINATION
22   BY MR. PRICE:
23   Q  Good afternoon.
24   A  Hi.
25   Q  So, Ms. McKinley, my understanding is that you are

**7**

1    here as a Microsoft 30(b)(6) witness to testify as to
2    the reasons why the law department made the decision
3    that the distribution center needed to be moved.
4      Is that correct?
5              MR. HARRIGAN:  I will confirm that
6    that is the topic for which she is here --
7              MR. PRICE:  Okay.
8              MR. HARRIGAN:  -- as described by
9    the Court.
10   Q  (By Mr. Price)  So first, let me ask you, what's your
11   position at Microsoft?
12   A  Today, I am the head of legal and government affairs
13   for the German, Austrian, and Swiss subsidiaries.
14   Q  So let's go back to the 2011/2012 time frame.  What
15   was your position then?
16   A  I was the assistant general counsel for the Xbox
17   hardware manufacturing and supply chain business, and
18   the logistics for all physically distributed
19   products.
20   Q  Now, sometime in 2011/2012, did you become involved
21   in discussions concerning moving -- moving
22   Microsoft's German distribution center out of
23   Germany?
24   A  Yes, I was involved in discussions.
25   Q  When did you become involved in discussions

**8**

1    concerning that move?
2    A  I don't know the exact date, but it in connection
3    with the various proceedings that were going on
4    around that impacted the Xbox 360.  So it would have
5    been from the U.S. case through the German cases, in
6    the fall through winter time frames.  That was
7    2011 -- wait -- 2011.
8    Q  Let me see if I can refresh your memory, then.
9      There were some proceedings against Microsoft
10   that were initiated by Motorola on July 6th and
11   July 7th, 2011.
12      Does that sort of correspond with your memory?
13   A  I don't know when the exact proceedings were
14   initiated, but it would have been after those
15   proceedings were initiated when I -- I became
16   involved through our litigation department.
17   Q  How soon after the proceedings were initiated did you
18   become aware of them?
19   A  I don't know.
20   Q  Do you -- can you give me any estimate at all?  Like
21   was it within a few weeks or -- or months or years?
22   A  Definitely wasn't years.
23      I recall that I became involved at some point --
24   certainly some point after it was filed.
25      I -- I recall that in the fall of 2011, so kind

**9**

1    of after the sort of summer period, we started
2    working on the ITC case.
3    Q  The summer of 2012?
4    A  '11.
5    Q  '11?
6      Well, your understanding is that when Microsoft
7    filed proceedings on July 6th and 7th of 2011,
8    that -- I'm sorry, let me rephrase that.
9      That -- your understanding is that Motorola filed
10   proceedings on July 6th or 7th, 2011, that Motorola
11   sought injunctive relief?
12             MR. HARRIGAN:  Object to the form
13   of the question.  If you can specify the proceedings
14   you're talking about, that would help.
15             MR. PRICE:  In fact, do we still
16   have a copy of Exhibit 1 from -- the 30(b)(6) of
17   Mr. Killough?
18   Q  (By Mr. Price)  So I'm showing you a chart --
19   A  Mm-hm.
20   Q  -- Ms. McKinley, that was prepared by Microsoft and
21   Mr. Killough?
22      Have you seen this chart before?
23   A  Yes.
24   Q  When did you see it?
25   A  I saw it on Friday.

3 (Pages 6 to 9)

Attorney's Eyes Only

10

```
1   Q   And -- and you see, if you look at the first page and
2       then -- actually, the first two boxes on the second
3       page has some of groups of cases.
4   A   Mm-hm.
5   Q   Do you see?
6   A   I do.
7   Q   Okay.  And you see those -- those cases have -- where
8       it says date filed, they both have 7/6-7/11.
9   A   Okay.
10  Q   Do you see that?
11  A   Mm-hm.  Yes.
12  Q   So did there come a time when you became aware that
13      those cases that are described in -- in this exhibit,
14      in those boxes, was filed by Motorola against
15      Microsoft?
16  A   Yes.
17  Q   At the time those cases were filed in July of 2011,
18      were you aware that Motorola was seeking injunctive
19      relief?
20  A   I would have been aware that Motorola was seeking
21      injunctive relief as soon as I was briefed on the
22      cases that were filed.
23  Q   Given the position you had, do you have any
24      understanding as to -- as to how close to the filing
25      of the case seeking injunctive relief on, say, the
```

11

```
1       Xbox, how soon you would have been notified of that?
2   A   I -- as I said, I don't recall the exact date or
3       exactly when it was in the process.
4           I recall that it was somewhere in the --
5       somewhere after -- after this date, in the fall time
6       frame.
7   Q   Well, as a matter of -- of practice, if there was
8       such a practice at Microsoft, if a case were filed
9       seeking injunctive relief in Germany against the
10      product that you're sort of in charge of, related to,
11      in terms of legal issues, would you have been
12      informed shortly after the case was filed?
13  A   I -- I don't know that we have a standard date on
14      when -- when product attorneys are informed of
15      actions that are filed, but I -- I -- I would have
16      been brought in at a point after the case was filed.
17  Q   Okay.  Obviously you wouldn't have been brought in
18      before the case was filed, or I guess maybe given a
19      heads-up.
20          But if the cases were filed in July of 2011 and
21      they implicated Xbox -- and you were the product
22      attorney with respect to Xbox; correct?
23  A   Yes; the hardware.
24  Q   -- would it have been the responsibility of someone
25      to inform you that a case had been filed seeking to
```

12

```
1       enjoin the distribution or sale of Xbox from the
2       German facility?
3   A   I would have been -- I guess maybe if you could
4       repeat the question.  I'm not sure...
5   Q   Within Microsoft, if someone files -- filed a lawsuit
6       in Germany in July 2011 seeking injunctive relief in
7       connection with the Xbox, were they supposed to tell
8       you about that?
9   A   If someone filed a lawsuit seeking injunction of
10      Xbox, I would have been told about the case.
11  Q   And you have been -- you would have been told fairly
12      close to the time the case was filed?
13  A   I -- I just don't know when I was told.  I recall,
14      again, that we started working on it in kind of that
15      fall time frame.
16  Q   And I know that you may not have a specific
17      recollection of when you were told, so I'm kind of
18      asking, you know, whether or not -- given the
19      practices, when you would have expected to have been
20      told.
21          If a lawsuit is filed in July of 2011, seeking
22      injunctive relief that is prohibiting the sale of a
23      product over which you have primary responsibility as
24      legal counsel, if that's filed in July, you would
25      have expected to have been told very, very shortly
```

13

```
1       after that?
2                   MR. HARRIGAN:  Assuming facts not
3       in evidence.
4           Go ahead.  Go ahead and answer.
5   A   I would have been -- I would have expected to have
6       been told when it was relevant for me to start
7       working on the issue.  That's right.
8   Q   (By Mr. Price)  Well, if a case is filed seeking
9       injunctive relief against the Xbox, when would you
10      have expected to start working on that?
11  A   I would have been expected to start working on it as
12      soon as we needed to start working on it.
13  Q   Well, do you have any idea of having had the case
14      filed --
15  A   Again, I --
16  Q   -- against Microsoft when you needed to start working
17      on it?
18  A   I -- again, I -- I started working on it as soon as
19      we -- it became an issue that I needed to start
20      working on.  And I don't remember how close to the
21      filing date that was.  I just simply don't know.
22  Q   Well, you've said the fall.  And, of course,
23      October --
24  A   I --
25  Q   -- October could be fall.
```

4 (Pages 10 to 13)

Attorney's Eyes Only

14

1 A  I recall that it was the fall that we were working
2     heavily on it.
3 Q  Well, that's a --
4 A  So I don't remember what the date was when I was
5     initially told.  I recall the fall is when we started
6     working on it.
7 Q  And you know that I am entitled to estimates, even if
8     you can't recall specific dates; correct?  You
9     understand that?
10 A  I just -- you just told me that.
11 Q  Okay.
12 A  I --
13 Q  So -- and -- by the way, is there anywhere in writing
14    where we might find, you know, some indication as to
15    when you started working on these cases?
16 A  I don't know.
17 Q  Do you keep notations of what you work on every day?
18 A  No.  I -- I have emails.
19 Q  So --
20 A  Everyone works on email.
21 Q  So -- so do you think that there might be emails to
22    indicate when you first started working on these
23    cases that were filed in July of 2011?
24 A  I assume that there could be, yeah.
25 Q  And I assume you had discussions about -- about how

15

1     Microsoft would respond to the case.
2               MR. HARRIGAN:  That could be
3     answered "yes" or "no."
4 A  Yes.
5 Q  (By Mr. Price)  Would you have notes about that?
6 A  Notes?  No, probably not notes.
7 Q  Would you have something in writing somewhere
8     about -- concerning the discussions that you had with
9     people within Microsoft on how to respond to these
10    cases that were filed in July of 2011?
11 A  Certainly there would have been emails discussing the
12    case between me and my clients.
13 Q  Who do you consider to be your clients?
14 A  Those are the business groups that I support.
15 Q  And in connection with -- with this -- the cases that
16    were filed in July of 2011, who would -- who would
17    that have been?
18              MR. HARRIGAN:  Object to the form
19    of the question.
20    I really think, at this point, we need to
21    differentiate between the cases so we know what the
22    answer means.
23 Q  (By Mr. Price)  Looking at the chart that
24    Mr. Killough supplied us, which cases were you
25    involved in, in looking at the first two pages on

16

1     the --
2 A  First two pages?
3        So the -- my clients were primarily responsible
4     for the Xbox 360.
5 Q  Mm-hm.
6 A  And the -- the key case for the Xbox 360 was the
7     H.264 case.  And --
8 Q  I'm sorry; which -- which -- how did you describe
9     that?
10 A  I said the case for the -- the key case that impacted
11    the Xbox 360 was the H.264 case.
12 Q  Mm-hm.
13 A  The one on the first page.
14       And the -- the second page is referring to the
15    Exchange ActiveSync case, which -- which -- which
16    only impacted the Xbox 360 through the -- the Live
17    Messenger, which was shipped with the Xbox.
18 Q  When you said Live Messenger was shipped with Xbox,
19    does that mean if you had Xboxes in the distribution
20    center in Germany, that they would have Live
21    Messenger with it?
22 A  There's -- there's X- -- there -- at the time, there
23    was Live Messenger functionality that was shipped on
24    the operating system of the Xbox.
25 Q  And so with respect to the case which is on the

17

1     second page of the chart that you have involving the
2     Motorola Sync patents, you were involved in that case
3     to the extent -- or because one of the allegations of
4     infringement was the Live Messenger functionality
5     that was on the Xbox?
6 A  I would put that a little bit different way, which
7     is:  I was involved as the product attorney for Xbox.
8     As with many technologies that ship within one
9     product are supplied by a different part of the
10    company, Live Messenger functionality was -- my
11    recollection, was -- was available within the Xbox.
12    There was some kind of availability of that
13    functionality within the Xbox.
14 Q  And so as a result of the -- of the case that we have
15    here on the second page, which we've called the
16    Motorola Sync patent cases, as a result of that, at
17    least as of January 12, there was the potential that
18    an injunction could issue, which would prohibit the
19    distribution of Xboxes which had the Live Messenger
20    functionality on it?
21 A  So as of -- let's see, what did you say when the case
22    was filed?  January 9th, 2012?
23 Q  No.  The case here is in July of 2011.
24 A  Sorry.  July of 2011?
25 Q  Yes.

5 (Pages 14 to 17)

Attorney's Eyes Only

18

1  A  That in terms of the Xbox, there was Live Messenger
2     functionality that was being claimed to have been
3     infringing.  And that functionality shipped with the
4     Xbox.
5  Q  So as a result of what you just said, there was as of
6     January 2012, February 2012, there was -- because of
7     this case involving the Motorola Sync patents, there
8     was the possibility of an injunction prohibiting the
9     distribution from the German distribution center of
10    the Xbox because it had on it software -- this Live
11    Messenger software?
12 A  The injunction, as I understood, would not have been
13    directed to the Xbox, but to the Live Messenger.
14 Q  And you couldn't distribute Xbox that had that on it?
15    That was your understanding of what could happen?
16 A  So -- right, but that functionality was a different
17    product group's issue to deal with.
18       We were an Xbox -- as an Xbox lawyer, my concern
19    was around the full Xbox 360.
20 Q  Okay.  So the full Xbox 360 includes the stuff that's
21    on it, I take it.  Right?
22 A  Yes.  The --
23 Q  Yeah.
24 A  That's -- the Live Messenger functionality was --
25    there was some part of that functionality that

19

1     shipped with the Xbox.  Mm-hm.
2  Q  And because of the Motorola Sync patent case -- cases
3     that were filed in July 2011, then at least as of
4     January/February 2012, there was the possibility that
5     an injunction would issue which would prohibit the
6     German distributor from distributing Xboxes which had
7     this Live Messenger function in it; right?
8  A  It would -- it would -- there would be an impact to
9     the Live Messenger functionality that was included in
10    the Xbox.  That's right.
11 Q  Which means you couldn't distribute an Xbox that had
12    that in it; right?
13 A  That had -- if there was an injunction issued against
14    functionality that was shipping on Live Messenger
15    that was in the Xbox, then, that's right, we couldn't
16    ship the Xbox.
17 Q  So were you involved with -- with that issue -- I'm
18    talking about the January or February 2012 time
19    frame.
20       Were you involved with the issue -- that issue;
21    that is, the possibility that there could be an
22    injunction issued which prohibited the German
23    distribution facility from distributing these Xboxes
24    that had the Live Messenger functionality?
25 A  I was involved as -- I wasn't involved in the Live

20

1     Messenger side of that.  That wasn't my
2     responsibility.  My responsibility was around the
3     Xbox side.
4        So my involvement would have been as a recipient
5     of that technology versus the person who was
6     responsible for helping advise the business on how to
7     solve that issue.
8  Q  Well, one of your -- would one of your concerns have
9     been:  I want to be able to distribute the Xbox out
10    of this facility?
11 A  Yes.
12 Q  And that would be impacted by whether or not there
13    was an injunction on the Live Messenger functionality
14    which was on the Xbox; correct?
15 A  I would have looked to the Live Messenger team to
16    solve that issue.
17 Q  Did you interact with the Live Messenger team to say,
18    hey, how is this -- how are these cases going to
19    impact Microsoft's ability to distribute the Xbox
20    that has this functionality on them?
21       MR. HARRIGAN:  You can answer that
22    "yes" or "no," for starters.
23       I'm sorry, go ahead.
24 A  Yes, I was involved in discussing issues with the
25    entire team, including the person who would have been

21

1     responsible for Live Messenger.
2  Q  (By Mr. Price)  And did you have discussions
3     concerning the impact on the business in Germany if
4     there was an injunction prohibiting the German
5     distribution center from distributing these Xboxes
6     that had the Live Messenger functionality on them?
7  A  Did I have discussions with the business?
8        So I understand the question, you're asking did I
9     have discussions with the business about whether
10    there would be impact if Live Messenger was enjoined?
11 Q  Or not just with the business, but with anyone.
12       MR. HARRIGAN:  You can answer that
13    "yes" or "no."
14 A  Yes.
15 Q  (By Mr. Price)  And what was the analysis of the
16    impact on the business -- on the -- on the -- on the
17    distribution center of an injunction that would
18    prohibit the Xboxes from shipping from the
19    distribution center, the ones that had this Live
20    Messenger on it?
21 A  The Live Messenger issue wasn't the primary -- the
22    primary focus of our concerns.  We had -- we had
23    other -- other ways to handle the -- that -- that
24    issue.
25 Q  And so perhaps since you did have these discussions,

6 (Pages 18 to 21)

Attorney's Eyes Only

22

1  you can answer the following question:  What was
2  the analysis as to the impact on Microsoft of an
3  injunction prohibiting the distribution of Xboxes
4  with the Live Messenger function on it?  What was the
5  conclusion as to the impact?
6  A  We -- we would not have been able to ship the Live
7  Messenger functionality, but it wouldn't have --
8  it -- it was a different situation than with the
9  H.24- -- H.264 functionality.
10 Q  And I understand that you're saying there's a
11 difference.  I'm trying to divide them up, if you can
12 tell me what one is and what another is.  You've
13 paired them, so --
14 A  Mm-hm.
15 Q  -- I'm focusing just on one now.
16 A  Mm-hm.
17 Q  What was the conclusion as to the effect on Microsoft
18 of an injunction prohibiting the distribution from
19 the German facility of Xboxes with this Live
20 Messenger functionality?
21 A  The -- an injunction would likely have not prohibited
22 the distribution of the Xbox from the German
23 facility, because there are other ways to handle that
24 issue through the Live Messenger.
25 Q  And what would the ways have been to handle the Live

23

1  Messenger issue?
2  A  There could have been removal, or any other ways that
3  could have been explored.
4  Q  And was -- you mentioned removal.  Was there any
5  other -- and I assume if you removed the Live
6  Messenger function, you would be taking the function
7  off the Xbox which was formerly on it.
8  A  Yes.
9  Q  Right?  Okay.
10    So you'd be delivering a product that had
11 fewer -- less functionality than the one that was
12 originally intended?
13 A  It would no longer have that functionality.
14 Q  And what's your understanding as to what the Live
15 Messenger functionality was?
16 A  The Live Messenger functionality was a minor
17 functionality on the -- that showed, I believe,
18 status of friends or something on the Xbox.  I don't
19 know exactly what it was.
20    It was a -- it was an integration or an inclusion
21 of Live Messenger.
22 Q  So what's the Live -- what is the Live Messenger
23 functionality that you'd have to remove?
24 A  I don't know exactly -- I don't know exactly what the
25 technology was.  I know that it was -- I don't recall

24

1  exactly what it was.  It was a messaging
2  functionality of some sort.
3  Q  Is there -- was there an analysis as to what the cost
4  would be to Microsoft of getting around an injunction
5  that would prohibit the distribution of Xboxes with
6  Live Messenger on it?
7  A  That would have --
8    MR. HARRIGAN:  You can answer that
9  "yes" or "no."
10 A  I don't know.  That would have all been done on the
11 Live Messenger side.
12 Q  (By Mr. Price)  So let me ask you then about -- then
13 about when you were advised that there were lawsuits
14 filed in January 2011 that could result in
15 injunctions in connection with the Xbox.
16    You mentioned the fall.  And obviously the fall
17 could be October or November.
18    You really think that it was, you know, three
19 months, four months, before you became aware that
20 there was a lawsuit filed by Motorola in July of 2011
21 that could result in distribution of products being
22 enjoined from the German distribution center?
23    MR. HARRIGAN:  Objection.  Asked
24 and answered.  Go ahead and answer.
25 A  I recall that the fall was when we started working on

25

1  it.
2    I don't recall, again, what the exact date was
3  that I became aware.
4  Q  (By Mr. Price)  And I understand you -- you don't
5  recall the exact date.  I'm entitled to estimates.
6  A  I --
7  Q  And so I'm asking you -- so I'm asking you, are you
8  really saying you think it's possible that three
9  three to four months before you learned about the
10 litigation?
11    MR. HARRIGAN:  Same objection.
12    Go ahead and answer.
13 A  I don't -- I don't know when -- I would have become
14 aware of it at some point before we actually started
15 really working on it, which was the fall.  I just
16 don't know when that was.
17 Q  (By Mr. Price)  You have no estimate at all?  It
18 could have been October?  It could have been
19 November?  It could have been three or four months
20 before you knew that -- that Motorola was filing a
21 lawsuit seeking injunctive relief against the product
22 that you were in charge of?
23 A  I think it -- again, that's when we started working
24 on it.  Before that, I would have known about it.  I
25 just don't know exactly when.

7 (Pages 22 to 25)

Attorney's Eyes Only

26

1      And before that, somewhere between July and the
2   fall, I became aware.  And in the fall, we started
3   working on it.
4      That's the best of my recollection.
5   Q  Now, when you became aware of -- finally became aware
6   of the lawsuits -- lawsuit that was filed, was it
7   your understanding that an injunction couldn't issue
8   from the German court unless there was some finding
9   by the Court that there was infringement?
10  A  On the -- in the -- in the German cases, my
11  understanding was, injunctions are issued relatively
12  routinely when you lose.
13  Q  So when you say injunctions are issued routinely,
14  quote, when you lose --
15  A  Mm-hm.
16  Q  -- what do you mean by injunctions are issued
17  routinely, quote, when you lose?
18  A  When you -- when you lose the case, the initial
19  instance of the case.
20  Q  So -- so when there's a finding by a Court that you
21  are infringing the patent?
22  A  That's -- that's right.  There's an -- my
23  understanding is, there's an infringement proceeding;
24  and if you lose that, an injunction is issued
25  relatively quickly.

27

1   Q  Now -- so it's your understanding that for Motorola
2   to get an injunction in the German case, then there
3   would at least have to be an initial hearing or
4   finding that -- that Microsoft was in fact infringing
5   patents?
6   A  I believe so.
7   Q  Now, with respect to when an injunction issues, did
8   you have an understanding as to whether or not
9   Microsoft could do anything to avoid an injunction,
10  even if there was a finding of liability?
11     MR. HARRIGAN:  Objection for lack
12  of foundation.
13     You can answer if you have an answer.
14  A  Can you repeat that?
15  Q  (By Mr. Price) Sure.
16     At the time, did you have an understanding as to
17  whether or not Microsoft could avoid an injunction
18  even if there was a finding by the Court that there
19  was infringement?
20     MR. HARRIGAN:  Same objection.
21     Go ahead and answer if you can.
22  A  When an injunction --  I don't know what -- I don't
23  know what the -- what the potential avenues are on a
24  finding infringement and avoiding the injunction, at
25  the time.

28

1   Q  (By Mr. Price) Did you interact with attorneys who
2   you believe had knowledge of German law and could
3   give you advice as to, you know, the -- what
4   Microsoft could do to avoid an injunction?
5      MR. HARRIGAN:  Answer "yes" or
6   "no," so we can avoid problems --
7   A  Yes.
8      MR. HARRIGAN:  Okay.
9   Q  (By Mr. Price)  And in those discussions, did --
10  were you advised about procedures in Germany that
11  Microsoft could use so that it could avoid an
12  injunction even if it was infringing patents?
13     MR. HARRIGAN:  Also "yes" or "no,"
14  please.
15  A  Yes.
16  Q  (By Mr. Price)  And did those -- did the advice that
17  you get play any role in connection with decisions
18  that were made as to whether or not Microsoft should
19  move its facility from Germany to somewhere else?
20  A  Which case are you -- are you talking about both
21  cases that were filed in Germany?
22  Q  The H-- -- well, right now I'm talking about the cases
23  that you identified that I guess were on the first
24  page --
25  A  On the first page?

29

1   A  Yes.
2   A  Okay.  So repeat the question, then, with that
3   background.
4   Q  Did the discussions you had with lawyers who talked
5   to you about German law and about what Microsoft
6   could do to avoid an injunction in Germany, did those
7   discussions have any impact at all in the decision
8   that Microsoft move its facilities from Germany to
9   somewhere else?
10     MR. HARRIGAN:  And I'm going to
11  object for lack of foundation.
12     But you can answer if you know.
13  A  Yes.
14  Q  (By Mr. Price)  And what was the impact of those
15  discussions?
16  A  The impact of our discussions with external lawyers?
17  Q  Yes.
18  A  The impact informed our -- the business's decision to
19  relocate the warehouse.
20  Q  And did you transmit the -- the legal advice that you
21  had received, concerning how Microsoft could avoid
22  injunctions in the proceedings in Germany, to the
23  business people?
24     MR. HARRIGAN:  You can answer that
25  with "yes" or "no."

8 (Pages 26 to 29)

Attorney's Eyes Only

30

1   A   Yes.
2   Q   (By Mr. Price)  And obviously in order to do that, in
3       order to transfer the advice from your German law
4       experts to the business people, you had to have some
5       understanding as to what the German law experts were
6       saying.  Right?
7   A   Yes, it was explained -- explained to me what they --
8       what their -- the German landscape looked like.
9   Q   And one of the things that they talked to you about
10      were -- these German lawyers, was these Orange Book
11      options that Microsoft could use to avoid an
12      injunction; correct?
13  A   I recall discussion of Orange Book.
14  Q   Whatever you were told about that in connection with
15      avoiding the injunction, you passed on to the
16      business people?
17  A   I would have passed on legal advice to the business
18      people.  Presumably that would have included
19      information that was given to me around Orange Book.
20          I recall discussing -- I recall the term "Orange
21      Book."
22  Q   So you certainly would have told the business people
23      about any options that Microsoft would have had to
24      avoid an injunction and remain in Germany?
25  A   I would have told the business -- I would have

31

1       told -- I would have worked with the business to
2       understand what the options were around remaining or
3       moving from Germany.
4   Q   So let me talk about, then, your -- your role in
5       connection with -- with our discussions
6       about remaining or staying in Germany.
7           And if I could show you what has been marked
8       as -- previously marked as Daly Exhibit 1.
9           Ms. McKinley, you'll notice that you aren't -- I
10      don't think you're on this email exchange.
11  A   Yep.
12  Q   First let me ask you, is this a document that you've
13      seen before?
14  A   Not that I recall.
15  Q   Okay.  So let me see if I can use this to help get me
16      a time frame.
17          If you look at the -- third page, I think it
18      is, at the bottom, there's an email dated January 19,
19      2012.
20          And if you go on to the last page, it says:  I've
21      answered all of Shelley's -- paren -- LCA questions,
22      comma, so she should be fully briefed.
23  A   Mm-hm.
24  Q   And that's an email sent by Fergus Rigley.
25  A   Mm-hm.

32

1   Q   Do you know who Mr. Rigley is?
2   A   I do.
3   Q   Who is he?
4   A   He is -- or at least at the time, was one of my
5       clients.  And he was responsible for logistics.  And
6       he -- in the EMEA zone.  So...
7   Q   And you see this is an email to Mr. Roberts and
8       Mr. Davidson; correct?
9   A   Yes.
10  Q   And they were some of the people that you had
11      discussions with about -- about whether Microsoft's
12      distribution center should be transferred?
13  A   Yes, I would have had discussions with Fergus, Owen,
14      and Jeff about the -- the warehouse.
15  Q   And do you know what is referred to when it says:
16      "I've answered all of Shelley's questions, so she
17      should be fully briefed"?
18  A   Let me see if I can...
19          MR. HARRIGAN:  Feel free to read as
20      much as this as you need to --
21          THE WITNESS:  Okay.
22          MR. HARRIGAN:  -- to respond.
23  A   So you're referring to the bottom of the string of my
24      questions that I must have had?
25  Q   (By Mr. Price)  Yes.  For instance --

33

1   A   Okay.  What I can -- I mean, what I can tell from the
2       string, from the bottom of the string, it was --
3       it -- it was some work that they were doing to
4       analyze a potential move of the warehouse.
5           And I -- I don't know what my questions were,
6       obviously, because they're not here and I can't
7       recall them, but it looks like my questions would
8       have been related to that topic.
9   Q   To prepare to testify as a 30(b)(6) witness on why
10      there was a move of the -- of the warehouse, what did
11      you do?
12  A   I -- I essentially looked at this document to refresh
13      my recollection around the timeline.  And --
14  Q   And "this document" you're referring to --
15  A   Sorry.  It's this document you've already given me in
16      evidence.
17  Q   The Killough Exhibit --
18  A   Killough Exhibit 1, yeah.
19  Q   Okay.
20  A   And I put some thought into putting my head back in
21      the frame of mind I was -- what was it?  A year and a
22      half, two years ago.
23  Q   Well, did you -- did you look at any emails from the
24      time period?
25  A   No.

9 (Pages 30 to 33)

Attorney's Eyes Only

34

1  Q  Did you talk to anybody?
2  A  Just -- just my lawyers.
3  Q  And these are the lawyers in this case who are
4     representing Microsoft?
5  A  That's right.
6  Q  So other than looking at the chart, which is
7     Mr. Killough's Exhibit 1 to --
8  A  Mm-hm.
9  Q  -- his 30(b)(6), and just kind of thinking about it,
10    did you do anything else to prepare yourself to
11    testify as to -- as to why there was a move?
12           MR. HARRIGAN:  Are you done --
13           MR. PRICE:  Yes.
14           MR. HARRIGAN:  -- with the
15    question?
16     Okay.  Object to the form, if that it
17    mischaracterizes the topic, which was why LCA made
18    the decision.
19           MR. PRICE:  Okay.
20  A  In terms of preparing?
21  Q  (By Mr. Price)  So let me rephrase it.
22     Other than looking at Mr. Killough's chart from
23    his 30(b)(6) deposition, and just thinking about it,
24    did you do anything else to testify as to the reasons
25    why the law department made the decision that the

35

1     distribution center needed to be moved?  Did you do
2     anything else?
3  A  I did nothing else to prepare myself for the
4     deposition.
5  Q  Did anyone tell you that, you know, maybe you should
6     look at some of your emails or look at some memos
7     that were circulated at the time or talk to anyone to
8     educate yourself?
9  A  No one advised me to do that.
10  Q  Did you think you needed to do that?
11           MR. HARRIGAN:  Object to the form.
12    And for lack of foundation.
13  A  No.
14  Q  (By Mr. Price)  You understand you're testifying as
15    to Microsoft's position here?  Not just of your
16    personal knowledge, but you're testifying as to
17    Microsoft's position as to why the law department
18    made the decision that the distribution center needed
19    to be moved?
20     You understand that?
21  A  I understand that I am here to testify on the --
22    the -- for that purpose.
23  Q  And that you're here to testify not just on your own
24    personal recollection, but you're giving Microsoft's
25    official testimony on this topic?  You understand

36

1     that?
2  A  I understand that I am the witness that's giving the
3     testimony on the topic that's -- that I'm going to
4     testify on.
5  Q  And you understand you're supposed to kind of educate
6     yourself about the topic, to the extent you don't
7     have personal knowledge?
8           MR. HARRIGAN:  Objection to lack of
9     foundation.
10     Go ahead and answer if you know.
11  A  I don't know.
12  Q  (By Mr. Price)  So -- so today, Ms. McKinley, you're
13    just testifying about your -- really your personal
14    knowledge as to the reasons the law department made
15    the decision about whether the distribution center
16    needed to be moved?
17  A  I'm testifying as to my recollection as the -- the
18    product group attorney who was advising this product
19    group on legal issues around their -- decisions they
20    had to make on the German warehouse.
21  Q  So in -- in coming here to testify about your own
22    recollection, I guess -- we've already talked that it
23    was a couple years ago and there's some things that
24    you don't recall.  Correct?
25  A  Mm-hm.  That's right.

37

1  Q  So did you do anything -- so that we could accurately
2     get your recollection, did you do anything to try to
3     refresh your recollection, like look at emails or
4     talk to people or look at memos?
5  A  I think I've already answered that, but the answer
6     is --
7  Q  The answer is "no"?
8  A  -- still:  No, I did not look at emails or memos to
9     refresh my recollection.
10  Q  Why not?
11           MR. HARRIGAN:  Objection.  For
12    lack --
13  A  I -- I wasn't advised to look at those.
14  Q  (By Mr. Price)  Well, you knew that if you didn't
15    refresh your recollection, that because of the time
16    between the decision and today, that there are going
17    to be many things that you could not recall; right?
18  A  I didn't know what you were going to ask me and -- or
19    whether I would recall.
20  Q  Did you think that you might be asked, you know, when
21    did you first learn that -- that Motorola was seeking
22    injunctive relief?
23  A  I didn't know you would ask me that.
24  Q  You didn't think that might be a topic that would be
25    covered?

10 (Pages 34 to 37)

Attorney's Eyes Only

38

1   A  It could have been.  I -- I didn't -- I didn't think
2      of that specific question that you might ask me.
3      I...
4   Q  What would you do if you wanted to refresh your
5      recollection so that you could give us the most full
6      and accurate testimony as to the -- the reasons why
7      the law department made the decision that the
8      distribution center needed to be moved?
9          What would you do to try to be in the best
10     position to testify about that?
11  A  If -- I think there's any number of ways you can --
12     you can testify from your recollection, or you can --
13     you could look at documents to refresh your
14     recollection, or things that were done at the time.
15         I didn't look at any of that.
16  Q  So among the things you might do to make sure, you
17     know, you had the best recollection possible would be
18     to look at documents generated at the time; correct?
19  A  That could refresh your recollection.
20  Q  Or talk to people that you talked to at the time;
21     correct?
22  A  I assume you could do that.
23  Q  And it's correct that you didn't do either of those
24     things; right?
25  A  I did not -- again, I did not look at emails, I did

39

1      not talk to people about the --
2   Q  What --
3   A  -- this matter.
4   Q  Who -- what kind of documents would you have looked
5      at to refresh your recollection as to, you know, what
6      was -- as to the reasons the law department made the
7      decision that the distribution center needed to be
8      moved?
9          What kind of documents would be available
10     during --
11  A  Documents would be primarily Microsoft -- we work a
12     lot on email.
13             THE REPORTER:  Microsoft -- what?
14             THE WITNESS:  We work a lot on
15     email.
16  Q  (By Mr. Price)  Any other way that, you know, in your
17     position, that you would have kept notes or have
18     files or anything else --
19             MR. HARRIGAN:  I --
20  Q  (By Mr. Price)  -- that might refresh your
21     recollection?
22             MR. HARRIGAN:  Before you answer
23     the question.
24         You're speaking now about documents that she
25     would have looked at to address why LCA made the

40

1      decision; is that right?
2             MR. PRICE:  Right.
3             MR. HARRIGAN:  Okay.
4   A  So LCA didn't make the decision, but to look at the
5      documents about why L-- -- who made the decision,
6      there would be emails.
7   Q  (By Mr. Price)  And anything else?
8   A  There could have been any other number of documents,
9      like memos or notes.  I don't take a lot of notes
10     that aren't already documented in email.
11  Q  So we've -- we've looked at at least Daly Exhibit 1,
12     which shows that as of June -- I'm sorry -- as of
13     January 2012, you were answering a lot of questions
14     about the possibility of moving out of Germany.
15  A  Mm-hm.
16  Q  Correct?  Right?
17  A  I was answering a lot of questions?
18  Q  Yes.
19  A  Yes, this was a topic that we were discussing with
20     the business.
21  Q  So let's -- let's step back, and let's say -- this is
22     January 2012 --
23  A  Mm-hm.
24  Q  -- this email was sent.  So obviously prior to then,
25     there would have been some discussions about the

41

1      possibility of moving.  Right?
2   A  So it looks like at least in this string, the first
3      date is January 19th --
4   Q  Okay.
5   A  -- 2012.  It indicates I had questions that would
6      have been prior to that.
7   Q  So let's talk about, then, prior to January 19th.
8          What's the first involvement you had in
9      connection with any discussion about whether or not
10     Microsoft should move its distribution facility out
11     of Germany?
12  A  The first discussion I had about that --
13  Q  I don't need a precise date.
14  A  Oh.
15  Q  I don't need a precise date.  I just want to know,
16     what was it?  Who initiated it?  Who was it with?
17  A  So my recollection of the initiation of this
18     discussion was, initially we were focusing on the
19     U.S. ITC case, and that was the primary focus at
20     least after -- after I became aware of the cases and
21     we started working on them.
22         At some point, we started focusing in on the
23     German cases.
24  Q  You keep saying "we," so I want to know who you're
25     talking about.

Attorney's Eyes Only

42

1  A  "We" as a business, and the legal department.
2  Q  Well, for example, with respect to the ITC case --
3  A  Mm-hm.
4  Q  -- were you conferring with Mr. Roberts,
5     Mr. Davidson, about these cases?
6  A  Yes, I would have been conferring -- conferring with
7     them as well.
8  Q  So you say "we" were focusing on ITC, and at some
9     point you started looking at the German situation?
10 A  My recollection is, the German situation, we -- was
11    later in time, in terms of the focus we put on trying
12    to handle those issues.
13 Q  So in connection with the discussions about the ITC
14    case, were there any discussions about moving the
15    German facility?
16 A  No.  That wasn't relevant to the German facility.
17 Q  So with respect to the issue of the possibility of
18    moving the German facility, who first brought that
19    up, asked the question, saying what should we do,
20    does it matter, et cetera?
21 A  Who first brought it up?
22    I -- I don't remember exactly who raised --
23    raised the issue, but I recall that it was in the
24    discussion as to -- as we were thinking through the
25    cases and trying to figure out what our -- what --

43

1     what the options the business had to respond, at some
2     point during that time frame, we realized in LCA that
3     the physical distribution of the Xbox and other
4     physical products was handled primarily out of a
5     warehouse that was in Germany.
6  Q  So when you say that -- that some initial
7     discussions, that at some point LCA realized --
8  A  At some point, the business told us.
9  Q  So -- so what's LCA -- LCA is --
10 A  I'm sorry.  Law and Corporate Affairs.  The legal
11    department.
12 Q  So at some point, Law and Corporate Affairs developed
13    the understanding that the Xbox was distributed out
14    of a facility in Germany?
15 A  Correct.
16 Q  And so once the LCA, the legal department, realized
17    that there was a distribution facility in Germany,
18    you know, how did then this issue of the German --
19    whether it should be moved or not, what should go
20    into it, how did that come up?
21 A  So we -- it came up in that we -- as we were talking
22    through this with the business and trying to
23    understand the impact of a potential injunction,
24    ==the -- through -- through the business talking==
25    ==through what their logistics chain was, they==

44

1  ==identified that in fact the warehouse out of which==
2  ==potentially impacted product would be shipped was in==
3  ==Germany.==
4     So on top of just the German distribution, it
5     impacted worldwide distribution.
6  Q  So far, what you're discussing is learning from the
7     business basically how the distribution facility
8     functioned?
9  A  Where it was, what -- where it shipped to; all those
10    things that weren't things that I or anyone in legal
11    department was aware of.
12 Q  And so once you learned in the legal department, you
13    know, the nature of this distribution facility, then
14    how did the issue of whether or not it should be
15    moved or transferred -- how did that come up, after
16    you learned from the business people this is what the
17    facility does?
18 A  Well, we knew at that point, if an injunction is
19    issued against the product, it cannot be -- in the
20    enjoined form, cannot be distributed out of that
21    facility.
22 Q  So was it then -- once you learned about the role of
23    the German distribution facility, was it your role to
24    advise the business folks as to the possible legal
25    repercussions of the litigation in Germany?

45

1  A  It was my -- it was my role to advise them on what
2     the possible repercussions were, work through options
3     with them, to allow them to make their decision.
4  Q  And you understood that the business folks would be
5     relying on your -- your advice as to how the German,
6     you know, legal system might work and how that might
7     impact the business; right?
8        MR. HARRIGAN:  Objection for lack
9     of foundation.
10       Go ahead.
11 A  My role would have been to advise them on the legal
12    side.
13 Q  (By Mr. Price)  And the legal side would include the
14    risk from German litigation, the costs, things of
15    that nature?
16 A  It would have included updating them on the case.  It
17    would have included -- the costs certainly wouldn't
18    have been in the legal department's --
19 Q  The cost of litigation.
20 A  Sorry.  The cost of litigation -- the financial cost
21    of litigation?
22 Q  Yeah.
23 A  I don't know that I was -- I don't -- I don't recall
24    advising them on -- on the cost of litigation.
25    But I would have been advising them on what

12 (Pages 42 to 45)

Attorney's Eyes Only

46

```
 1    happens if there's an injunction against a product in
 2    Germany.
 3  Q  And you would have been advising them on the -- the
 4    risks of getting -- of an injunction issuing and how
 5    to avoid an injunction, whether or not an injunction
 6    was certain, things of that nature?
 7        MR. HARRIGAN:  Object to the form
 8    of the question.  Multiple, among other things.
 9  A  Can you restate that?
10  Q  (By Mr. Price)  No.  You can answer what I asked,
11    unless you can't understand it.  If you can't
12    understand it, that's -- if you're confused by it, I
13    can re-ask it.
14      Your counsel has to make objections for the
15    record, but unless he instructs you not to answer, if
16    you understand the question, you should answer it.
17  A  Okay.  Go ahead and repeat it, then.
18  Q  Sure.
19      On the legal side --
20  A  Mm-hm.
21  Q  -- I mean, you were -- your role was to advise
22    business as to the risks in Germany of an injunction;
23    correct?
24  A  One of my roles would have been to advise on the
25    German litigation.
```

47

```
 1  Q  Well, and to do that, you had to -- you had to know
 2    and advise them about what the risks would be of
 3    getting an injunction.
 4  A  That there was an injunction that had been requested.
 5    Absolutely.
 6  Q  Is that all you told them, was that an injunction has
 7    been requested?
 8  A  I would have told them -- I certainly would have told
 9    them that an injunction had been requested, yeah.
10  Q  But would you have --
11  A  That's not all I would have told them.
12  Q  Right.
13      So what else -- in connection with an injunction
14    being requested, what else would you have advised the
15    business folks on in terms of the possible -- the
16    possibility of there being an injunction with
17    repercussions?
18        MR. HARRIGAN:  Before you answer, I
19    object to the form of the question in that I think we
20    need to break this down between the two actions in
21    order to get an answer that means anything.
22        MR. PRICE:  Well, there are a
23    number of actions.  I mean, if you look at the
24    chart -- do you mean on Page 1 versus Page 2 or...
25        MR. HARRIGAN:  I think you've been
```

48

```
 1    focusing on what's called the H.264, and also on the
 2    Sync case.  Those are the two I'm talking about.
 3  A  I've been answering as to the H.264 case.  I thought
 4    that was what you -- are we talking about the H.264
 5    or the Sync case?
 6  Q  (By Mr. Price)  Let me just ask you, with respect to
 7    giving advice --
 8  A  Okay.
 9  Q  -- to the business folks --
10  A  Mm-hm.
11  Q  -- on the possibility of injunctions --
12  A  Mm-hm.
13  Q  -- what more did you do other than just say, "An
14    injunction has been requested"?
15        MR. HARRIGAN:  I -- same objection
16    with regard to the two cases.
17      Go ahead and answer the question.
18  A  Okay.  In terms of the H.264 case, I would have
19    advised the business that an injunction had been
20    requested, that it was a standard-essential patent.
21    I would have relayed to them what's on this exhibit;
22    that there's certain dates, and that we needed to do
23    it -- we needed to explore the options for how to
24    handle it.
25  Q  (By Mr. Price)  So let me ask you this:  In terms of
```

49

```
 1    what was being done, you were the person that the
 2    business people was looking -- were looking to in
 3    Legal to advise them on the risks, legal risks, of
 4    keeping the facility in Germany; correct?
 5  A  I was -- I was the primary product attorney that was
 6    responsible for this business.  So there were a
 7    number -- a number of people involved.  I was the
 8    primary product attorney.
 9  Q  And so, for example, if we look at what we'll --
10    what's been marked as Roberts Exhibit 1, do you see
11    that the -- on the third page of that, there's a page
12    that says "Project Structure"?
13  A  Yep.
14  Q  And it shows LCA, Shelley McKinley --
15  A  Mm-hm.
16  Q  -- and then arrow down to Mr. Roberts, Ms. Daly,
17    et cetera.
18      Do you see that?
19  A  Yes.
20  Q  And is -- is this project structure concerning the
21    project of a move from Germany of the distribution
22    facility?
23  A  So I don't know if this is solely about the
24    distribution facility or this is also in regards to
25    other options that we pursued, that the business
```

13 (Pages 46 to 49)

Attorney's Eyes Only

50

1      evaluated.  But this would have included the -- the
2      movement of the distribution facility, which is the
3      reference to Arvato and CEVA.
4  Q   So this -- this organizational structure may have
5      applied to a project that was broader in scope than
6      just the move, but included the potential move?
7  A   It -- it -- it appears to have included the potential
8      move, with the mention of Arvato and CEVA.  And it
9      could have been broader in looking at the other
10     options.
11 Q   Now, this is a document dated February 21st, 2012.
12         Have you seen this before?
13 A   I don't recall seeing exactly this document.
14 Q   Is it -- is it fair to say that you were the person
15     giving legal guidance as to the options -- that is,
16     what the options were -- as a result of the
17     possibility of injunctions being issued in Germany?
18 A   I was the person giving legal guidance on -- on
19     options that they were exploring.
20 Q   Now, you told me that -- that -- earlier on, that in
21     Germany, the injunctions -- it was not unusual for
22     injunctions to be issued in patent infringement
23     cases.
24         Do you recall that?
25 A   That's -- I recall -- I recall -- that's what I

51

1      understood, yes.
2  Q   And that would be in connection with any patent
3      infringement case; that it's not unusual for
4      injunctions to issue in Germany.  Correct?
5  A   That's what I understand.
6  Q   Now, in -- in connection with giving legal advice/
7      guidance to the business folks, did you tell them
8      that?  Did you tell them that -- that in general, in
9      patent infringement cases filed in Germany, that it's
10     not unusual that an injunction is issued?
11         MR. HARRIGAN:  Objection.  Asked
12     and answered.
13         You can answer it again.
14 A   I would have told them that it's not unusual, yes.
15 Q   (By Mr. Price)  And that would be whether it was this
16     case or any other case that was filed against
17     Microsoft in Germany; correct?
18 A   I would have told them it's -- it's generally --
19     generally if -- if you lose, is I think what I said,
20     there's an injunction that issues.
21 Q   Now, did you --
22 A   Not specific to this case.
23 Q   Now, did you distinguish that from other
24     jurisdictions at all?
25         Did you say, in other jurisdictions, that's

52

1      the case, or were you suggesting Germany was unique?
2  A   I -- I don't recall we were discussing comparative
3      jurisdictions at that point.  We were talking about
4      specific -- specifically the German cases.
5  Q   Was there ever a time when you did talk about it
6      comparatively in connection with you, know, where one
7      should move, for example?
8  A   Where one should move a warehouse?
9  Q   Mm-hm.  Yes.  I'm sorry.
10 A   We -- yes, we would have discussed in terms of the
11     options.
12 Q   So --
13 A   We would have discussed legal situations in various
14     places.
15 Q   So you would have discussed -- for example, where did
16     the facility eventually move?
17 A   The facility moved to Holland.
18 Q   And so you -- would you have discussed, then, hey, if
19     you have a facility in Holland, then this is kind of
20     the legal framework there; if a patent infringement
21     case is filed there, as to whether or not an
22     injunction is typically issued?
23 A   I would have discussed the general -- received advice
24     on the general situation in Holland, and passed that
25     on.

53

1  Q   And one of the topics that you would have been
2      interested in, in talking about, is, okay, if we
3      switched to a different jurisdiction, do injunctions
4      easily issue in that jurisdiction?
5  A   We would have discussed -- certainly we would have
6      discussed implications of lawsuits and how -- how
7      injunctions are handled.
8  Q   So let me try to -- to step back, then, again and get
9      into -- to kind of how these discussions carried
10     forward.
11 A   Mm-hm.
12 Q   You said, at some point, LCA realized what happened
13     at the German physical distribution -- the actual
14     warehouse and what products would be implicated
15     there.  Correct?
16 A   Correct.  During this, we were, at some point,
17     informed this is where our physical facility is.
18 Q   And at that point, then, Legal advised the business
19     on what were the options to deal with certain risks?
20 A   You mean as a result --
21 Q   As a result of the lawsuits being filed; let's say
22     the H.264 -- I forget -- being filed in Germany.
23 A   So at some point, we were made aware that the
24     physical distribution happened out of a warehouse in
25     Germany, for the German market and multiple other

Veritext Corporate Services

Attorney's Eyes Only

54

1  markets.  And at that point, we would have discussed
2  with the business, options available.
3             MR. HARRIGAN:  So we've been at
4  this for an hour or so.  At a convenient moment --
5             MR. PRICE:  Okay.
6             MR. HARRIGAN:  -- this might be a
7  break time.
8             MR. PRICE:  You want to take a
9  break?
10    Okay, that's fine.
11             THE WITNESS:  All right.
12             THE VIDEOGRAPHER:  The deposition
13  will now go off the record.  The time is 2:54 p.m.
14             (Recess 2:54-3:06 p.m..)
15
16             THE VIDEOGRAPHER:  We are now back
17  on the record.  The time is 3:06 p.m.
18    Please proceed.
19
20
21             EXAMINATION (Continuing)
22  BY MR. PRICE:
23  Q  Ms. McKinley, did the legal department advise the
24  business folks that Microsoft should move the German
25  distribution facility out of Germany?

55

1  A  The legal department advised the business that there
2  were a number of options to handle -- to address,
3  react to, an injunction; one of which would have been
4  moving the warehouse.
5  Q  Did the -- let me ask you, did the business -- did
6  the legal department give advice to the business
7  folks as to what the legal department thought was the
8  best option?
9  A  The -- normally the -- yes, the legal department
10  would give the business folks advice as to what the
11  options are and what the legal department's view is
12  the best option.
13  Q  And in this case, did the legal department give the
14  business folks their advice as to what the best
15  option was?
16  A  So I was the legal department and giving the advice,
17  and we looked at a number of options.
18  Q  That wasn't my question.
19    You said normally the legal department tells the
20  business folks what the legal department thinks the
21  best option is.
22    Did you do that in this case?
23  A  I don't recall that there was a best option in this
24  case.
25  Q  So the answer to my question is -- is:  No, you did

56

1  not tell the business folks who you, the legal
2  department, thought was the best option?
3  A  I told the business what the -- I guess I would say I
4  explored with the business what the range of options
5  were.
6  Q  And it's correct to say that you did not tell the
7  business folks what you, as the legal department,
8  thought was the best option in this case; is that
9  right?
10  A  I don't recall there being a best option in this
11  case, is what I'm saying.
12  Q  Did you rank the options?
13             MR. HARRIGAN:  Objection.  Asked
14  and answered.
15    Go ahead and answer again.
16  A  I don't recall ranking the options.
17  Q  (By Mr. Price)  In this case, did the legal
18  department tell the -- the business folks the
19  advantages and disadvantages of the various options?
20  A  So the -- the way this would have happened in reality
21  is that there were a number of options, and we would
22  work through each of the options together; me
23  providing legal input, the business providing the
24  business input.
25    And in this case, there -- there were other

57

1  options, such as a bonded warehouse.
2  Q  So did the legal department in this case advise the
3  business department what the legal department thought
4  were the pros and cons of each option?
5  A  Certainly we would have provided pros and cons on
6  each option.
7  Q  Now, is there anywhere in writing, that you're aware
8  of, where it describes what the legal department said
9  as to the pros and cons of each option?
10  A  As a consolidated writing?  I don't know.
11  Q  Are you aware of a single piece of paper that
12  discusses the pros and cons of any option?
13  A  I'm not aware of a single piece of paper, no.
14  Q  Are you aware of a single piece of paper which
15  discusses the pros and cons of moving a distribution
16  facility out of Germany, from the legal department's
17  point of view?
18  A  I'm not aware of a single piece of paper.
19  Q  Well --
20  A  I think what you're asking me, is there a memo
21  that --
22  Q  Memo or --
23  A  I don't know.
24  Q  A memo or email or -- or anything in writing where
25  the legal department discusses the pros and cons of

15 (Pages 54 to 57)

Attorney's Eyes Only

58

1    any option.
2  A  There would be multiple emails discussing situation
3    and pros and cons.
4      If there is one single unified writing -- which I
5    think is what you're asking me -- I don't know.
6  Q  No. In which case, I want to clarify.
7      Are -- are you aware of documents in which the
8    legal department discusses pros and cons of an
9    option?
10  A  There would be emails from me to my clients that
11    discuss, out of a legal point of view, pros and cons
12    to options.
13  Q  And have you seen any of those emails in preparation
14    for your testimony today?
15  A  No.
16  Q  All right. Now, as of January of 2012, as of that
17    date, you were aware that injunctions -- it's not
18    unusual for injunctions to be issued under German
19    law; correct?
20  A  Correct.
21  Q  And you became aware by then of sort of this central
22    role that the German distribution facility played
23    with respect to the distribution of products in
24    Europe; correct?
25  A  In that time frame, the January time frame, is likely

59

1    when I would have become aware. I don't recall
2    exactly when I became aware.
3  Q  But at least as of January 2012, when you were
4    answering -- getting these questions asked of you;
5    correct?
6  A  You showed me an email that looks like I was asking
7    questions about -- this email that you showed me
8    shows a January date.
9  Q  And also in that time frame, 2012 time frame, you
10    were aware that -- that Germany was the largest
11    economy in Europe?
12  A  I -- I don't know if you're asking me about Microsoft
13    sales figures that aren't separately reported, or the
14    German economy in general as being a large European
15    powerhouse.
16  Q  Okay. Let's go to the first -- at the time that you
17    were aware that injunctions -- it's not unusual for
18    them to issue in Germany and that -- and the central
19    role that this warehouse played in Germany, at the
20    same time, you were aware that Germany was a European
21    powerhouse, I think you said, in terms its economy;
22    correct?
23  A  In January of 2012, I was aware that Germany is a
24    powerhouse in the European economy.
25      I was also, at that time, aware that the

60

1    warehouse was an issue.
2  Q  And that same time frame of 2012, were you aware
3    that -- that Microsoft was suing Motorola in the
4    United States to seek damages as a result of Motorola
5    seeking injunctions in Germany?
6  A  Hm. I -- I don't know.
7  Q  Did --
8  A  I don't know.
9      I knew there were cases pending. I knew there
10    was a breach of contract case pending.
11  Q  You knew that the breach of contract case pending was
12    an allegation that Motorola was demanding a rate that
13    was higher than FRAND; correct?
14  A  Let's see. The breach of contract case?
15    I -- I -- what I knew about the case, I think, is
16    probably what was reported in the media and what the
17    litigation team told me; that it was a breach of
18    contract case on Motorola's failure to live up to its
19    obligations to the standards body.
20      That's what I recall being -- of knowing about
21    that case.
22  Q  And you understood that the standards body had this
23    concept of FRAND?
24  A  Yep.
25  Q  And that the standards -- and that Microsoft was

61

1    making the allegation that part of that is that you
2    shouldn't be able to get an injunction if you're not
3    offering a FRAND rate?
4  A  I realize -- I recognize that Microsoft's position is
5    that you should not be able to get an injunction --
6  Q  In fact, that was Microsoft's position in the -- in
7    the German H.264 case; correct?
8        MR. HARRIGAN: Objection for lack
9    of foundation.
10      You can answer if you know.
11  A  (By Mr. Price) The case that you were involved in.
12  A  Okay, so can you repeat that --
13  Q  Sure.
14  A  Rephrase that question, so it's clear.
15  Q  In fact, Microsoft's position in Germany and the case
16    that was filed that you were involved in, the H.264
17    case, was that, you know, you -- you can't issue --
18    shouldn't issue an injunction on SEP patent if -- if
19    Motorola hasn't offered a FRAND rate?
20        MR. HARRIGAN: Same objection.
21      Go ahead and answer.
22  A  I don't know specifically how that issue was raised
23    in this case.
24  Q  (By Mr. Price) But you know it was raised?
25  A  I know this -- I know this was the position of

16 (Pages 58 to 61)

Attorney's Eyes Only

62

1    Microsoft.  I don't know how it was raised in the
2    German case.
3  Q  And didn't you know that in the American case, that,
4    as you said, Microsoft was suing Motorola for
5    breaching that -- that contract as a result of the
6    standards setting organization; correct?
7  A  I recall that's what I knew about the case.  So I --
8    I can't testify that I know exactly what was alleged
9    in that case.  I never read the pleadings.
10  Q  But as a lawyer, you know that when you're suing for
11    breach of contract, you're usually looking for
12    damages?
13  A  Or specific performance.
14  Q  And you had a general understanding that -- that
15    Microsoft was, in the United States, seeking damages
16    on the allegation that Motorola was breaching its
17    contract in association with the standard--
18    essential -- Standard Setting Organizations?
19  A  I -- I just wasn't involved in that case enough to --
20    to tell you exactly what the -- what the claims were
21    that were made, other than generally I knew that the
22    case was a breach of contract case.
23  Q  Certainly you know that Microsoft is seeking damages
24    that would include the cost of moving from Germany,
25    because that was caused by allegedly Motorola seeking

63

1    an injunction that had not offered the FRAND rate?
2        MR. HARRIGAN:  Object to the form
3    of the question, in that I believe the time frame has
4    been switched from a previous question.
5        But go ahead and answer.
6  A  The -- I think originally you're referring to the
7    breach of contract case.  And I don't know what
8    damages were being claimed there.
9  Q  (By Mr. Price)  Sitting -- sitting here today, you
10    understand you're testifying on the breach of
11    contract case?
12  A  I understand it's -- it's a case, and that the
13    damages for the movement of the warehouse are part of
14    that.
15        I just don't know -- I don't know which -- if
16    it's the same case that we would have had at the
17    time.  I don't know.  There are a lot of cases.
18  Q  In discussions you had like in the -- in the January
19    2012 period, did you have discussions with anyone
20    within Microsoft about what the United States case
21    was about?
22  A  I would have had general -- been provided general
23    information on what the United States case was about.
24    That's how I learned it was a breach of contract
25    case.

64

1  Q  So in connection with discussing with the business
2    folks the legal department's -- the pros and cons of
3    various options, obviously you wanted to give the
4    business folks the best legal advice you could in
5    connection with those options.  Correct?
6  A  Of course I wanted to give the best legal advice I
7    could.
8  Q  So was one of the things you told them was that no
9    injunction would issue in the German case unless
10    there was a finding of infringement?
11        MR. HARRIGAN:  Objection; unless we
12    talk about which case we're referring to here.
13  Q  (By Mr. Price)  We're talking about -- let's say the
14    H.264 case.
15  A  Okay.  In the H.264 case, if there was a finding -- a
16    finding of infringement, my understanding is that an
17    injunction would be issued.
18  Q  And that's one of the things you would have told the
19    business folks, that:  you're not going to get an
20    injunction in Germany unless there's a finding that
21    in fact Microsoft has infringed the patents?
22  A  I -- I can't think of another reason that I would
23    have told them that there was an injunction pending,
24    beyond a -- a finding by the Court -- a Court
25    granting an injunction.

65

1  Q  My question is different.
2        I mean, in telling them about the pros and cons
3    of various options --
4  A  Mm-hm.
5  Q  -- one of the things you'd be talking about would be
6    the risks and benefits; correct?
7  A  Risks and benefits --
8  Q  Of an option.  Correct?
9  A  We would be discussing the -- risks and benefits
10    of -- of options.
11  Q  And, of course, an option might be stay in Germany;
12    correct?
13  A  Certainly.
14  Q  Okay.  And so one of the things, then, you obviously
15    talked to the business folks about was that -- that,
16    in terms of risk, that you're not going to get an
17    injunction in Germany unless there's a finding by a
18    Court that Microsoft has infringed the patent?
19        MR. HARRIGAN:  Are we still talking
20    about H.264?
21        MR. PRICE:  Yes.
22  A  So on the H.264 patent, if there was -- my
23    understanding was, if there was a finding of
24    infringement, then the Court would grant an
25    injunction.

17 (Pages 62 to 65)

66

1  Q   (By Mr. Price)  And so that's what I'm saying.
2        You told the business folks that, that -- that
3     you don't get an injunction unless you get a finding
4     of infringement?
5  A   I would have -- I would have told them if there's
6     a -- the court case is such that we lose and are
7     found to infringe, then there would be an injunction
8     issued on that.
9  Q   Now, did you also tell the business folks that --
10    that a move from Germany would insulate you from --
11    from all parties now and the future, you know,
12    seeking an injunction against Microsoft products in
13    Germany?
14 A   The -- I would not have said that.
15 Q   Well, it's true, is it not, that -- that if you moved
16    the distribution facility out of Germany --
17 A   Mm-hm.
18 Q   -- to another country, that that would insulate that
19    distribution facility from injunction by German
20    courts, which you say are granted routinely, against
21    distribution in Germany?
22 A   No.  No, I wouldn't say that -- we wouldn't -- the
23    injunction that would be granted by a German court
24    would apply in Germany irrespective of where the
25    warehouse is.

67

1        The distribution of products outside of Germany
2     is -- is what would not -- at least I -- I don't know
3     what all cases are like, but --
4  Q   It's --
5  A   -- we're talking about the distribution of products
6     globally from a warehouse, whether it's located in
7     Germany or in another jurisdiction.
8  Q   So you make a good distinction here.  So let me --
9     let me follow up on that.
10       So one thing you would tell them -- would have
11    told them, in terms of the risks and benefits, is
12    that if you move a facility outside of Germany, you
13    can still have a German -- a German court issue an
14    injunction about distribution within Germany; right?
15       That doesn't insulate you from that; correct?
16 A   My understanding is, an injunction issued in Germany
17    applies in the borders of Germany.
18 Q   So you would have told the business folks, when
19    giving them, you know, your advice on this, that a
20    move would not insulate you from that.  That if
21    there's an injunction in Germany, you still can't
22    distribute the products in Germany.  Right?  Moving
23    is not going to change that.
24 A   Change being able to distribute a product in Germany
25    that's enjoined?  No.

68

1  Q   So my statement is correct?
2  A   Can you restate what your statement is, and then I
3     can tell you?
4  Q   Yes.  Yeah.  That -- one of the things you would have
5     told them in evaluating risks and benefits is that if
6     you move the facility out of -- the facility out of
7     Germany, that a German court can still stop you from
8     distributing products within Germany; right?
9  A   That's my assumption.
10 Q   So what the move might affect is the ability of a
11    German court to stop you from distributing products
12    outside of Germany; right?
13 A   Moving -- so moving the facility is one -- one
14    potential option to handle distribution of products
15    outside of the German territory.
16 Q   And what you advised them was that if you move the
17    facility outside of Germany, then the German court
18    would not be able to issue an injunction preventing
19    Microsoft from distributing products from that
20    distribution facility to the rest of Europe; correct?
21 A   Hm.  I -- I don't know that I said it ever that way,
22    but certainly, I think as I've already testified, the
23    German injunction would apply to the distribution of
24    products within Germany, as well as from a location
25    in Germany.

69

1  Q   So you told them there's a benefit to moving out of
2     Germany, with respect to a German injunction; right?
3        MR. HARRIGAN:  Objection.  Asked
4     and answered several times.
5        Go ahead and answer it again.
6  Q   (By Mr. Price)  I'm asking what you told them.
7  A   I -- I -- I told them it's one of the possible ways,
8     yeah.  One of the possible ways to react to an
9     injunction.
10 Q   And I'm trying to figure out why.
11       So -- so you told them that one of the possible
12    ways to react to an injunction is, if you move your
13    distribution facility outside of Germany --
14 A   Mm-hm.
15 Q   -- the German court can't stop you from distributing
16    to areas other than Germany?
17 A   In this case, my understanding was, the injunction
18    would apply only to the territory of Germany and
19    would not apply outside of the territory of Germany.
20 Q   And that would be true with respect to any case filed
21    against Microsoft in Germany; correct?  That if your
22    distribution -- if your distribution center is not in
23    Germany, then the German courts can't issue an
24    injunction preventing you from distributing to the
25    rest of the world?

18 (Pages 66 to 69)

Attorney's Eyes Only

70

1  A  I guess, I'm not an expert in that area.
2      In this case, that was -- I don't know every
3  single case, if they couldn't stop outside of
4  Germany.  I -- I don't -- I can't answer that
5  question.
6  Q  Was --
7  A  I know the case that you're talking about, the H.264
8  case, which is the case I was looking at.
9  Q  So --
10 A  Are you --
11     MR. HARRIGAN:  Did you finish your
12 answer?
13 Q  (By Mr. Price) I'm sorry, go ahead.
14 A  So are you asking me to opine to all other cases that
15 could be filed in Germany, or --
16 Q  No.
17 A  -- to the case that we're talking about, the H.264
18 case?
19 Q  No.  I'm asking about the legal principle that you
20 applied, which -- and I'll ask you your understanding
21 as it would apply to general.
22     Was there something unique about the H.264 case,
23 such that if you moved the distribution center out of
24 Germany, a German injunction would not apply?
25 A  This was a case I was looking at, was the H.264 case.

71

1  I wasn't looking at all cases ever filed against
2  Microsoft.
3  Q  I know.
4      And in doing that, you apply a legal analysis
5  that looks at some general principles; right?
6  A  I was looking at the specific case and how the law
7  applied to the specific case we had in front of us.
8  Q  So what was the law that you applied; that is, when
9  you gave the advice?
10     You said that you advised if you moved out of
11 Germany, the German court could not issue an
12 injunction that would prohibit you from distributing
13 products to the rest of the world.
14 A  In this case --
15 Q  So what was the legal principle you applied to that?
16 A  In this case, the injunction that was at issue was
17 applicable in the territory of Germany.
18 Q  Why is that?  Is it something unique to this case?
19 A  I don't think so.  I just don't know.
20 Q  Well, I mean, did you look for principles on
21 injunctions that applied just to this case?
22 A  Again, this was a case I was looking at.  And these
23 were the -- the -- the principles that we applied to
24 the case.
25     Again, I don't know if it applies in every single

72

1  case.  I don't -- I don't recall that it didn't or
2  that it did.
3  Q  Did you in -- in analyzing the situation, did you
4  come upon the legal principle that, in a patent case,
5  a German court can enjoin activity within Germany,
6  but it cannot enjoin activity outside the territory
7  of Germany?  Is that a legal principle you stumbled
8  upon?
9      MR. HARRIGAN:  Objection.  Lack of
10 foundation.
11     Go ahead and answer if you can.
12 A  I -- well, I didn't -- I didn't stumble upon
13 anything.  What I knew was, the case that we were
14 looking at, the injunction that was sought, and the
15 law that we had was that it was within the territory
16 of Germany.
17     I can --
18 Q  (By Mr. Price)  And was that --
19 A  I don't recall looking at it beyond -- beyond that.
20 Q  And when you say the law that was applied to this
21 case, is the law that you were applying to this case
22 that Germans -- Germany -- that German courts'
23 injunctive orders impacting cases did not have any
24 effect outside the territory of Germany?
25     Is that a legal principle that you discovered in

73

1  evaluating this case and giving advice to the
2  business folks?
3      MR. HARRIGAN:  Objection.  Asked
4  and answered.
5      Go ahead and answer.
6  A  Yeah, so I -- I know that when we looked at it in
7  this case, it wasn't applying outside of Germany.
8      I don't know if there are exceptions to that in
9  other cases.  I just -- I simply don't know.
10     But I know when we were looking at this case, we
11 felt this was one of the options to respond to the
12 H.264 case.
13 Q  (By Mr. Price)  Was there something unique about this
14 case compared to any other patent case --
15     MR. HARRIGAN:  Objection for lack
16 of foundation.
17 Q  (By Mr. Price)  -- where --
18     MR. HARRIGAN:  Sorry.  I didn't
19 mean to interrupt.
20     MR. PRICE:  Sure.
21 Q  (By Mr. Price)  Was there anything unique about this
22 case compared to any other patent case --
23     MR. HARRIGAN:  Same objection --
24 Q  (By Mr. Price)  -- that led you to conclude that a
25 Court's order for an injunction in Germany would not

19 (Pages 70 to 73)

Attorney's Eyes Only

74

1    apply outside the territory of Germany?
2            MR. HARRIGAN:  Same objection.
3        Go ahead.
4    A  There was nothing -- this was -- this wasn't a unique
5        case that was somehow an exception to a standard rule
6        that I was aware of.
7    Q  (By Mr. Price)  And the standard rule that you were
8        aware of was that if an injunction was issued in a
9        patent case in Germany, that it would not enjoin
10       activity outside of Germany?  That's the general rule
11       you were just referring to; right?
12   A  No.  I was referring to that I wasn't aware that this
13       was an exception to some standard rule.
14   Q  I know you --
15   A  I -- I'm not saying there's a standard rule that I
16       was aware of.  I'm saying I looked at one case.  When
17       I advised the clients on this, I would have been
18       looking at this specific case.  We would have been
19       reviewing specific options around this case.
20   Q  In advising the client, were you -- was it also your
21       responsibility to advise them as to the effect this
22       move would have on the distribution center, you know,
23       in terms of the future business, in terms of future
24       activity?
25   A  So we knew that injunctions are -- are frequent in

75

1        Germany.  And we -- I would have advised the business
2        on that.
3    Q  Okay.  And why would that have had any application to
4        future business?
5    A  Having -- having your global logistics tied up in
6        Germany is -- foreseeably puts you in a situation in
7        other cases.
8    Q  Now, and what's the reason that having your -- was it
9        logistical --
10           THE REPORTER:  "Global logistics
11       tied up in Germany."
12   Q  (By Mr. Price)  Why would having your global
13       logistics tied up in Germany -- in Germany put you at
14       risk or have an effect on future cases?
15   A  I think I've answered that.  That's -- again, I -- my
16       understanding is, Germans are -- injunctions are
17       frequent in patent infringement cases in Germany.
18   Q  Do you recall a response to that, anyone in the
19       business arena gave to you, Mr. Roberts or -- or
20       anyone else, when you talked about the potential
21       effect on future cases of having your global
22       logistics distribution center centered in Germany
23       or -- in Germany?
24       Do you recall any response they had to that
25       advice?

76

1    A  The response they had to moving the distribution
2        center was certainly one of hesitance.  It's not easy
3        to move a distribution center.
4        We looked at other options.
5    Q  I apologize; I wasn't --
6            MR. HARRIGAN:  Excuse me.  Have you
7        finished your answer?
8    Q  (By Mr. Price)  I'm sorry.
9    A  And things such as a bonded warehouse is what the --
10       the business looked into.
11   Q  I didn't mean to interrupt.  I'm sorry.  And I'm
12       sorry that my question wasn't what I intended.
13       When you told the business folks that having your
14       global logistics distribution center in Germany,
15       given the fact that German courts often issue
16       injunctions and it could affect your future business,
17       when you told them that, did they say anything in
18       response to you telling them that?  Like, oh, we
19       didn't know that; or --
20   A  No.
21   Q  -- or, really, we thought Germany was like everybody
22       else; or anything like that?
23   A  I don't -- I don't recall any specific -- I don't
24       recall that -- any specific conversation like that.
25   Q  Wouldn't this be something that might be reflected in

77

1        emails; these kinds of conversations that we're
2        talking about?
3    A  I -- I can't rule out that there could be email on
4        that.
5        Again, I don't recall the sort of specific
6        conversation.
7    Q  You said that there are options you were -- that were
8        being considered in these discussions.
9        When was the -- a decision made that an option
10       that we're going to choose is to move the
11       distribution facility outside of Germany?
12   A  You're asking me for specific dates again, aren't
13       you?
14   Q  Well --
15   A  Okay, let me -- let me try to give you an
16       approximate.
17   Q  Yeah.  The best estimate --
18   A  Just what you're looking for; right?
19   Q  Yes.  Yes.
20   A  The -- as the business was considering the options, I
21       know that I was providing them information on when
22       the date was that an injunction could hit depending
23       on when -- the court case, right, when -- when the
24       different hearings are.
25       And they had, then, a work-back schedule from

20 (Pages 74 to 77)

Attorney's Eyes Only

78

1    those target dates.  So the date that we would have
2    been -- that we were looking at was a date for
3    possible H.264 injunction, because that's what was
4    driving this.
5    Q   But my understanding is, you're saying in the face of
6        an injunction, you were considering various options?
7    A   Mm-hm.
8    Q   Correct?  "Yes" or "no"?
9    A   Yes.  Sorry.  Yes, that's correct.
10   Q   And that there came a time when you had to decide on
11       an option; correct?
12   A   That's correct.
13   Q   And do you have any idea of when the time was that
14       you had decided on the option?
15   A   I -- I don't know the exact -- what the exact date
16       would have been.
17          My recollection is that the business told me that
18       they had to -- whoops, we lost him.
19   Q   Sorry.
20   A   That they -- in order -- they were looking for plans
21       that got them to the ability to continue after the --
22       the date that the injunction could issue.  And the
23       different options brought with them different time
24       schedules.
25          And the -- I don't know the -- I don't know the

79

1    exact date, but my recollection is that it was
2    somewhere in the range of six to eight weeks.
3    Q   From...?
4    A   From the -- from the date that an injunction could
5        issue.
6    Q   So if you look at --
7    A   Maybe a little more than that, but --
8    Q   So --
9    A   -- it was pretty -- it was -- it was going to be
10       tight.
11   Q   So let me ask you to look at what was marked as
12       Exhibit 1 to Mr. Killough's 30(b)(6) --
13   A   Yep.
14   Q   -- deposition.  And see on the first page, under Case
15       Status, it has April 11 -- well, let's see -- 2012,
16       you see there's a temporary restraining order issued
17       in Microsoft versus Motorola?
18   A   Mm-hm.
19   Q   And I'm sorry, in depositions, you have to say "yes"
20       or "no."
21   A   Oh, I'm sorry.  Yes.  I see it.
22   Q   All right.  So -- and then you see on April 12th,
23       2012, a decision by the German court is delayed until
24       May 2, 2012?
25   A   I see that.

80

1    Q   And then on May 2, 2012, do you see there's a -- an
2        issuance of injunction?
3    A   Yes.
4    Q   So is the date that you're thinking of, in terms of
5        when you were saying an injunction might issue, was
6        that sometime in April or May?
7    A   That an injunction might issue?
8    Q   Yes.
9    A   Yes.  This would have been the hearing -- the --
10       the -- well, looks like there was -- yeah, I recall
11       this move.
12          There was an April 17th original announcement
13       that moved out to May 2nd, when we would understand
14       what the -- what the result was of the infringement
15       claim.
16   Q   So --
17   A   And an injunction would be issued with that.
18   Q   So under the February 7, 2012 entry here, at the end,
19       it says April 17, 2012, was set as the date of
20       announcement of the decision.
21          Do you see that?
22   A   Yes.
23   Q   And so was that sort of the date that we're working
24       back from?
25   A   The -- it's -- I can't remember if it was the exact

81

1    date.  There was some movement in the day given
2    the -- the time lag between the actual issuance of
3    the injunction and the ability to enforce the
4    injunction and all of that.
5       So April 17th would have been one of the key
6    days.
7    Q   Do you recall that, at some point within Microsoft,
8        the date for moving changed from some date in April
9        to June?
10   A   June?  I know the date moved around quite a bit for a
11       number of reasons.
12   Q   And why did the date move around?
13   A   Court schedule would move around.  The speed in which
14       the business team could execute on a move would move
15       around.  The other -- the other options, the bonded
16       warehouse, those dates.
17       So it was a process of the team evaluating their
18       options and finding out which option they could
19       execute and which time frame.
20       And as you go down those discussions, you find
21       out, well, we can cut a week here; huh-oh, we're
22       stuck with three more weeks there.
23       So your -- your work-back schedule changes based
24       on your analysis of the situation.
25   Q   And do you have any recollection of the details of

21 (Pages 78 to 81)

Attorney's Eyes Only

82

1    any of that?
2    A   Of the changes?
3    Q   And why the changes were made.
4    A   I -- I know that the business told me about changes
5        and things they were finding out.  I don't recall
6        what the details were of each of the things.
7    Q   Did these dates ever move around based upon the --
8        the injunction -- or the temporary restraining order
9        that was issued in the United States prohibiting
10       Motorola from enforcing any injunction from the
11       German proceedings?
12   A   My recollection is, at the time the restraining order
13       was issued, we were already beyond the point of no
14       return.
15   Q   So that as of that date -- here we have April 11,
16       2012 -- you're saying that Microsoft had to move even
17       if their -- Motorola was prohibited from enforcing
18       any injunction?
19   A   My recollection is that that -- the temporary
20       restraining order came after we had already -- had
21       already had to be moving.
22   Q   Okay.  So -- so let me ask you this one:  When the
23       restraining order came out prohibiting Motorola from
24       enforcing an injunction, did you give any advice to
25       the business folks as to the effect of that order?

83

1    A   I would have told them about the order.
2    Q   What would you have told them?
3    A   That we were granted a temporary restraining order
4        that prohibited Motorola from enforcing the
5        injunction, and that that was temporary and was going
6        to be heard later.
7            I recall there was a later hearing, and I see it
8        on here.
9    Q   And that's May 14, 2012?
10   A   That -- that looks to be the right -- the right
11       hearing.
12   Q   And that's an order granting a preliminary
13       injunction; correct?
14   A   Order granting a preliminary injunction entered,
15       yeah.  That's May 14th.
16   Q   And did you have an understanding as to how long that
17       injunction would stay in place?
18   A   Hm.  Yeah, my recollection is that it was -- there
19       were -- and I see it here that refreshes me.  There
20       was an appeal -- no, that's the Karlsruhe appeal.
21           I thought there was an appeal to the Ninth
22       Circuit -- order granting -- there we go.
23           So there -- the preliminary injunction would stay
24       into effect until the resolution of the trial or an
25       appeal.

84

1    Q   So obviously on -- on -- on May 14th, you -- you
2        didn't know whether there would be an appeal, or how
3        long it would be.
4            So what did you advise the business folks as
5        to -- as to the effect of the injunction prohibiting
6        Motorola from enforcing an injunction against
7        Microsoft?  What did you say to them about the
8        effect --
9    A   I would have --
10   Q   -- on the business?
11   A   I would have given them the -- we moved from
12       temporary restraining order to preliminary
13       injunction, and the next steps are appeal or final
14       termination of the case.
15   Q   Now, when you advised the business folks of that, was
16       the response you got back that, well, that's great,
17       but it's too late; we're past the point of no return?
18   A   I recall, at that time, that we were past the point
19       of no return.
20   Q   Was that based upon your analysis or the business --
21   A   I recall being told that.
22   Q   Okay.  So who told you that, if you remember?
23   A   Oh.  It -- well, it would have been Owen, Jeff, or
24       someone who worked for them.
25   Q   And did they tell you why they were past the point of

85

1    no return?
2    A   Again, I don't recall specific conversation, so I
3        don't -- I don't know what exactly was said.  But I
4        know, based on my discussions with them all along,
5        that there was -- once -- once you started moving and
6        had your new vendor in place, you were -- you were
7        past the --
8    Q   Well, were you asked to analyze any agreements or
9        contracts or anything to tell them whether or not
10       they were past the point of no return, from a legal
11       perspective?
12   A   I did not do the contract with the vendor in Holland.
13       We --
14   Q   So the answer is:  No, you didn't -- you didn't give
15       any advice?
16   A   I didn't advise -- I didn't specifically review that
17       contract.
18           I think the decision had to be made to hit the
19       target date and they had to start going.  And
20       that's -- that's where they were.
21   Q   And you told me that they told you that.
22           Did they -- I mean, was the response from the
23       business people basically, well, you know, because of
24       this, we might not move, but too late?
25   A   I don't recall that specific -- a specific discussion

22 (Pages 82 to 85)

Attorney's Eyes Only

86

1    like that. I -- and you're talking -- are you
2    talking about the 5/14 decision --
3  Q  Actually, let's talk about --
4  A  -- or the --
5  Q  -- either one. Either the April 11th temporary
6    restraining order or the May 14th preliminary
7    injunction?
8  A  Mm-hm. Mm-hm.
9  Q  Was their response that: Well, you know, maybe we
10   wouldn't move now, but we have -- it's too far along?
11 A  Again, I don't remember the exact discussion around
12   that time, but I know they didn't want to move the
13   warehouse.
14     And what they told me when we were working on
15   this was, the decisions were going to be too late for
16   them to -- to reverse a move.
17 Q  Let me -- let me ask you, when you -- when you gave
18   them advice on the -- the risks, the pros and cons of
19   various options, did you tell them that under -- one
20   alternative the Orange Book procedure, that
21   Microsoft could avoid an injunction by putting into
22   escrow an amount that -- that -- that Motorola would
23   demand as a royalty, and that later it would be
24   determined whether or not that was an appropriate
25   amount?

87

1  A  I did not advise them that there was a -- an Orange
2    Book procedure that would allow them to eliminate
3    risk related to the lawsuit.
4  Q  Why not? Why didn't you inform them about that in
5    making the decision as to whether or not it was in
6    the best interest to move the facility?
7  A  I -- I -- I informed them of the Orange Book -- I
8    know we talked about the Orange Book.
9      My recollection from the Orange Book issue is
10   that there was never -- the Orange Book route was
11   never a real option to -- that they could rely on to
12   not have an issue in Germany.
13 Q  And how did you conclude that the Orange Book option
14   wasn't something they could rely on? Who told you
15   that?
16 A  I know that we talked about the Orange Book and how
17   the Orange Book would -- would work, but it wasn't --
18   in the business mind, it wasn't one of the options
19   that got us to the point of addressing the lawsuit.
20 Q  And why not? Why wouldn't it address the lawsuit to
21   choose the second alternative, the Orange Book, and
22   agree to a rate determined by Motorola to be put in
23   escrow and then there be the determination as to
24   whether or not Motorola gets the funds or some is
25   returned to Microsoft?

88

1        MR. HARRIGAN: Objection for lack
2    of foundation.
3      You can answer if you know.
4        THE WITNESS: Mm-hm.
5  A  My recollection of the Orange Book discussion is that
6    it wasn't an option that got us to the level of
7    definitiveness we needed by the time the decisions
8    had to be made on what other options we were
9    pursuing.
10 Q  (By Mr. Price) And I guess my question is: What was
11   that based on?
12       MR. HARRIGAN: Same objection.
13 Q  (By Mr. Price) What -- what did you base -- first of
14   all, let me ask you, did you advise the business
15   folks that there was not an alternative under Orange
16   Book which would guarantee that no injunction would
17   issue?
18       MR. HARRIGAN: Objection. Asked
19   and answered.
20     Go ahead and answer it again.
21 Q  (By Mr. Price) Did you advise them of that?
22 A  That there was no option that an Orange Book would
23   guarantee --
24 Q  No Orange Book option that would guarantee that an
25   injunction would not issue. Did you advise the

89

1    business folks of that?
2  A  I advised them that the Orange Book option was not
3    going to remove the -- all of the potential risk of
4    an injunction.
5  Q  And why did you advise them on that? Why did you
6    tell them that?
7        MR. HARRIGAN: Objection for lack
8    of foundation.
9      Go ahead and answer.
10 Q  (By Mr. Price) If you had no foundation for telling
11   them that, that's fine.
12 A  I -- again, I recall that that -- that we had
13   discussions around the Orange Book, and for the
14   business, it wasn't an option to get them to be sure
15   they could continue without disruption to their
16   supply chain.
17 Q  Okay. Now, the business people were relying on you
18   to tell them what the law was; correct?
19 A  Correct.
20 Q  So they weren't telling you how the Orange Book
21   procedure worked; right? You were telling them.
22 A  They did not tell me how the Orange Book procedure
23   worked, no.
24 Q  So you were telling them how it worked; correct?
25 A  I would have told them about the Orange Book. I

23 (Pages 86 to 89)

Attorney's Eyes Only

90

1    don't know to what level of detail we went through
2    the Orange Book offer --
3  Q   So --
4  A   -- procedure, but -- or -- but I -- I -- I can assume
5    that, yes, I talked to them about an Orange Book.
6  Q   Did you tell them that there was -- there was a
7    procedure in the Orange Book decision where Microsoft
8    could agree to a license at the rate determined by
9    Motorola and put those payments into escrow, for a
10    Court to then decide whether or not those payments
11    were reasonable and whether they should go to -- to
12    Motorola as opposed to some going back to Microsoft?
13          MR. HARRIGAN:  Object to the -- I
14    object to the question as improperly characterizing
15    the procedure.
16      But go ahead and answer if you can.
17  A   I don't -- I don't remember all the details of what
18    were around the -- the Orange Book process.  And what
19    I would have told them at the time was based on what
20    I understood about the Orange Book process.
21  Q   (By Mr. Price)  Who -- I take it you didn't know much
22    about the Orange Book process before this case.  Is
23    that accurate?
24  A   I had never heard of the Orange Book process before
25    this case.

91

1  Q   So obviously you're relying on somebody.  Who were
2    you relying on in forming your understanding of the
3    Orange Book process?
4  A   We were relying -- the legal department was relying
5    on German counsel.
6  Q   Anyone in particular?
7  A   I think -- I think -- I think Freshfields was our
8    counsel on that.
9  Q   So did you have an understanding that there was an
10    option through the Orange Book process that would
11    guarantee that Microsoft would not be enjoined from
12    distributing its products in Germany?
13          MR. HARRIGAN:  Objection based on
14    mischaracterizing the procedure.
15      Go ahead and answer.
16  A   I didn't -- I didn't -- the Orange Book -- the Orange
17    Book offer -- the Orange Book procedure at the
18    time -- I mean, I can't remember the details of how
19    it works now, but at the time, I don't recall there
20    being an Orange Book offer/procedure that was going
21    to completely resolve the issue for my clients.
22  Q   (By Mr. Price)  And did you have any -- do you have
23    any recollection as to why the Orange Book procedure
24    would not have resolved the issue as to whether or
25    not an injunction would be issued?

92

1  A   I recall that the Orange Book procedure was very --
2    it -- it wasn't necessarily a very clear procedure
3    for an American to understand.
4  Q   But that -- that's why you had German counsel.
5    Right?
6  A   That is why we had German counsel to deal with the
7    Orange Book offer.  But there wasn't a -- for me,
8    there wasn't a clear, obvious way to resolve the
9    problem with an Orange Book.
10  Q   Did your German counsel tell you that -- that there
11    was not a clear way, using an Orange Book procedure,
12    to avoid an injunction?  Is that what you were told
13    by your German counsel?
14  A   I --
15          THE WITNESS:  Well, the --
16  A   The --
17          MR. HARRIGAN:  Why don't you hold
18    on for a second.
19          THE WITNESS:  Yeah, the...
20          MR. HARRIGAN:  Go ahead.
21          THE WITNESS:  All right.
22  A   The -- the German counsel was advising us on the
23    Orange Book proceeding.  And for me, as a product
24    attorney advising my clients, the team -- they
25    business team that had to decide what they were going

93

1    to do, I could only pass on what I -- what the
2    assessment was on that proceeding.
3      And my recollection is that it didn't -- it
4    didn't -- it wasn't a way to respond to the problem
5    to a potential injunction with the guarantee that we
6    weren't going to be enjoined in Germany.
7  Q   (By Mr. Price)  Is this assessment of your German
8    counsel in writing somewhere?
9  A   German counsel would not have been involved in
10    advising my clients.  I would have looked at whatever
11    German counsel told us about the Orange Book and
12    interpreted that and talked to my clients about that.
13  Q   So two steps.
14      The German counsel's advice to you, would that be
15    in writing?
16  A   I assume that there's written mails or memos on
17    Orange Book defense.
18  Q   And your interpretation of that, relaying that to the
19    business folks, would that likely be in writing?
20  A   On the Orange Book?  I don't recall ever writing
21    anything about that in detail.
22  Q   Obviously the issue of whether or not you could avoid
23    an injunction in Germany through a procedure would be
24    an important issue.  Right?
25  A   Well, that -- was that a question?

24 (Pages 90 to 93)

Attorney's Eyes Only

94

1  Q  Yes.
2  A  Avoiding an injunction in Germany is an important
3     issue, was an important issue, yes.
4  Q  So give me your best recollection as to -- as to why
5     the business folks -- why -- thought that using the
6     Orange Book procedure was not a viable option.
7            MR. HARRIGAN:  Objection for lack
8     of foundation.
9            Go ahead and answer the you can.
10 A  Again, I recall having discussions that included
11    something about Orange Book, but I don't know -- I
12    can't -- I don't know what the specifics were that
13    made it not a viable option.
14           MR. PRICE:  Let's take a quick
15    break.  I might have two minutes left.
16           MR. HARRIGAN:  I thought that was
17    about right.
18           THE VIDEOGRAPHER:  This marks the
19    end of Disc No. 1 of today's deposition.  We are
20    going off the record at 4:01 p.m.
21           (Recess 4:01-4:07 p.m.)
22
23           THE VIDEOGRAPHER:  We are now back
24    on the record.  The time is 4:07 p.m.
25    ////

95

1  Q  (By Mr. Price)  Other than the bonded warehouse and
2     moving out of Germany, what other options were
3     discussed?
4  A  The other options that would have been discussed were
5     a -- I think -- those were the two main options that
6     were discussed.
7       I don't -- I know we looked at a number of
8     things -- I don't recall specifically what the other
9     ones were -- around sort of some importing/exporting,
10    if we could do something around that.  That was a
11    little different than the bonded warehouse.  That
12    sort of an option.
13      And I know that was -- that was -- those were
14    mainly the two options that the logistics team looked
15    at.
16           MR. PRICE:  I have many further
17    questions, but -- but my time's up.
18      I assume you're not going to give me more time.
19           MR. HARRIGAN:  Correct.
20           THE VIDEOGRAPHER:  Anything further
21    for the record?
22           MR. HARRIGAN:  Sorry?
23           THE VIDEOGRAPHER:  Anything further
24    for the record?
25           MR. HARRIGAN:  Nope.

96

1            THE VIDEOGRAPHER:  This marks the
2     conclusion of today's deposition.  We are going off
3     the record at 4:08 p.m.
4            (Signature reserved.)
5            (Deposition concluded at
6            4:08 p.m.)
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1  STATE OF WASHINGTON )   I, Karmen M. Knudson, CCR, RPR, CRR,
2  County of Pierce    )  ss a certified court reporter in
        )    the State of Washington, do hereby
          certify:
3
4       That the foregoing deposition of SHELLEY MCKINLEY
5  was taken before me and completed on July 15, 2013, and
   thereafter was transcribed under my direction; that the
6  deposition is a full, true and complete transcript of the
   testimony of said witness, including all questions, answers,
7  objections, motions and exceptions;
8       That the witness, before examination, was by me
   duly sworn to testify the truth, the whole truth, and
9  nothing but the truth, and that the witness reserved the
   right of signature;
10
11      That I am not a relative, employee, attorney or
   counsel of any party to this action or relative or employee
12  of any such attorney or counsel and that I am not
   financially interested in the said action or the outcome
   thereof;
13
14      That I am herewith securely sealing the said
   deposition and promptly delivering the same to
15  Attorney Andrea Pallios Roberts.
16      IN WITNESS WHEREOF, I have hereunto set my
   signature on July 16, 2013.
17
18
19
20
21
22
23      _____
        Karmen M. Knudson, CCR, RPR, CRR
24      Certified Court Reporter No. 1935.
25

25 (Pages 94 to 97)

Attorney's Eyes Only

```
 1        ERRATA SHEET
          VERITEXT CORPORATE SERVICES
 2          800-567-8658
          ASSIGNMENT NO. CS1699980
 3        CASE NAME: Microsoft Corp. v. Motorola, Inc.
          DATE OF DEPOSITION: 7/15/2013
 4        WITNESS' NAME: Shelley McKinley

 5
          PAGE/LINE(S)/   CHANGE        REASON
 6        ___/___/_____/_____

 7        ___/___/_____/_____

 8        ___/___/_____/_____

 9        ___/___/_____/_____

10        ___/___/_____/_____

11        ___/___/_____/_____

12        ___/___/_____/_____

13        ___/___/_____/_____

14        ___/___/_____/_____

15        ___/___/_____/_____

16        ___/___/_____/_____

17        ___/___/_____/_____

18        ___/___/_____/_____

19        ___/___/_____/_____
20
              Shelley McKinley
21
          SUBSCRIBED AND SWORN TO
22        BEFORE ME THIS_____DAY
          OF_____, 2013.
23
          _____
24          NOTARY PUBLIC
25        MY COMMISSION EXPIRES_____
```

```
 1           Veritext Legal Solutions
           290 W. Mt. Pleasant Ave. - Suite 3200
 2           Livingston, New Jersey 07039
           Toll Free: 800-227-8440  Fax: 973-629-1287

 3
 4        _____, 2013
 5        To: Richard Cederoth, Esq.
 6        Case Name: Microsoft Corp. v. Motorola, Inc.
          Veritext Reference Number: 1699980
 7        Witness:  Shelley McKinley Deposition Date:  7/15/2013
 8
          Dear Sir/Madam:
 9
          Enclosed please find a deposition transcript.  Please have the witness
10        review the transcript and note any changes or corrections on the
          included errata sheet, indicating the page, line number, change, and
11        the reason for the change.  Have the witness' signature at the bottom
          of the sheet notarized and forward errata sheet back to us at the
12        address shown above.
13
14        If the jurat is not returned within thirty days of your receipt of
          this letter, the reading and signing will be deemed waived.
15
16
17        Sincerely,
18
19        Production Department
20
21        Encl.
22        Cc: Andrea Pallios Roberts, Esq.
23
24
25
```

26 (Pages 98 to 99)

# Exhibit 3

IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WASHINGTON


AT SEATTLE




MICROSOFT CORPORATION, a            )

Washington corporation,             )

                                    )

                Plaintiff,          )

                                    ) No. 2-10-cv-01823-JLR

           vs.                      )

                                    )

MOTOROLA, INC., and MOTOROLA        )

MOBILITY, INC.,                     )

                                    )

                Defendants.         )



    VIDEOTAPED 30(b)(6) DEPOSITION OF JAMES JEFF DAVIDSON


                    May 9, 2013


                Seattle, Washington

219

1  Q   Well, do you understand the question?

2  A   I understand the question vaguely.

3  Q   What part of the question don't you understand?

4  A   Is there a specific time frame you're referencing

5      considering a change?

6  Q   Well, I -- I am referencing the entire time period in

7      which the EMEA distribution facilities were located

8      in Arvato's distribution facilities.

9          So at any time in that time period, did Microsoft

10     consider changing facilities?

11 A   In my tenure, I don't recall considering in earnest

12     ever changing facilities.

13 Q   And when you say your tenure, is that your full eight

14     years of employment at Microsoft, or sort of more

15     recent as you moved up the chain?

16 A   At least the last three or four years.

17 Q   And in the time period in which Microsoft was working

18     with the -- let me start over.

19         In the time period in which Microsoft's EMEA

20     distribution facilities were located in Düren,

21     Germany, did Microsoft consider searching for a

22     vendor other than Arvato?

23 A   No.

24 Q   No?

25         And is that, again, within the last three or four

```
 1    STATE OF WASHINGTON )    I, Karmen M. Knudson, CCR, RPR, CRR,
                          ) ss a certified court reporter in
 2    County of Pierce    )    the State of Washington, do hereby
                               certify:
 3

 4
                 That the foregoing deposition of JAMES JEFF
 5    DAVIDSON was taken before me and completed on May 9, 2013,
      and thereafter was transcribed under my direction; that the
 6    deposition is a full, true and complete transcript of the
      testimony of said witness, including all questions, answers,
 7    objections, motions and exceptions;

 8               That the witness, before examination, was by me
      duly sworn to testify the truth, the whole truth, and
 9    nothing but the truth, and that the witness reserved the
      right of signature;
10
                 That I am not a relative, employee, attorney or
11    counsel of any party to this action or relative or employee
      of any such attorney or counsel and that I am not
12    financially interested in the said action or the outcome
      thereof;
13
                 That I am herewith securely sealing the said
14    deposition and promptly delivering the same to
      Attorney Andrea Pallios Roberts.
15
                 IN WITNESS WHEREOF, I have hereunto set my
16    signature on May 13, 2013.

17

18

19

20

21

22                          _____
                            Karmen M. Knudson, CCR, RPR, CRR
23                          Certified Court Reporter No. 1935.

24

25
```

Exhibit 4

CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

1

1

2              IN THE UNITED STATES DISTRICT COURT

3               WESTERN DISTRICT OF WASHINGTON

4                        AT SEATTLE

5                          oOo

6
MICROSOFT CORPORATION,

7
              Plaintiff,

8                              CASE NO. C10-1823-JLR
     vs.

9
MOTOROLA, INC., et al.,

10
              Defendant.

11 _____
MOTOROLA MOBILITY LLC,

12 et al.,

13        Plaintiff,

14 vs.

15 MICROSOFT CORPORATION,

16        Defendant.        /

17

18            VIDEOTAPED DEPOSITION OF

19               OWEN ROBERTS

20            Wednesday, May 22, 2013

21               Reno, Nevada

22

23
Job No. CS1671951

24
              REPORTED BY:  MICHELLE BLAZER

25            CCR #469 (NV) - CSR #3361 (CA)

CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

40

 1  they believed our last drop dead date would be the 1st of

 2  June and therefore I made a decision to tell the teams to

 3  shoot for the first of June.

 4       As a backup plan, if April the 17th had happened

 5  we had a separate backup plan which basically meant we

 6  were going to shut down the facility in Germany and make

 7  best effort out of Venray at that date.

 8    Q    And when you say you went back to the legal team

 9  to let them know that the April 17th date was not

10  achievable, who did you go back to?

11    A    To Shelley McKinley.

12    Q    Going back to the actual decisions that

13  Microsoft had to make, the decision between choosing

14  Arvato or CEVA, who had sort of the final say in making

15  that decision; was that you or Mr. Tobey or somebody

16  else?

17    A    That decision ultimately rested with me.

18    Q    Okay.  And then the decision to relocate the

19  facility out of Germany, do you know who ultimately had

20  signoff authority on that decision?

21    A    That was -- I would rephrase the point to say it

22  wasn't a decision to move it, we were told, based on the

23  litigation, we had to move the facility.

24    Q    Okay.  So I guess just to clarify, I understand

25  your team, your team did not make the decision --

CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

41

1     A    Correct.

2     Q    -- to relocate out of Germany?

3     A    No.  We were not planning to move warehouses in

4 Europe.

5     Q    Okay.  That was a decision that your team was

6 informed by legal counsel?

7     A    Correct.

8     Q    Okay, and do you know who on the legal team --

9 or do you know who made the decision to move, which was

10 then conveyed to you by legal counsel?

11    A    Shelley McKinley was my contact.

12    Q    Okay.  But do you know whether she is the one

13 that made the decision to move?

14    A    I don't know that.

15    Q    Okay.  All right.  So then going back to the

16 go-live date, it was initially April 17th of 2012, it was

17 moved to June 1st, 2012; correct?

18    A    Correct.

19    Q    In sort of -- in the time period between January

20 and June 1st of 2012, were you in communication with the

21 legal team to determine what was going on in the

22 litigation and whether the need to move diminished or

23 went away?

24    A    No, I wasn't.

25    Q    Okay.  Do you know if anybody on your team was?

CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

134

 1  January of 2012 or early March when the decision was made

 2  to go with CEVA?

 3      A    Can you clarify the question?  I thought I had

 4  already testified that the first I heard about this was

 5  in mid to late January.

 6      Q    Right.  I'm trying to get an idea from your

 7  perspective when you are thinking about when the move

 8  process started, do you go back to the January date or

 9  once you selected a vendor and were, you know, moving

10  forward with that vendor?

11      A    No.  As far as my recollection is concerned, and

12  we had not made a decision to move the facility in that

13  January date.  We had the potential risk of a move and

14  that's why we were being prudent and starting the work of

15  due diligence.  And it was at some later stage, some date

16  between that date and March the 8th when we finally

17  awarded the business that we had decided that we were

18  going that way.  And I think that was closer to the March

19  time frame than the January time frame.

20      Q    Okay.  And I just want to make sure I am

21  understanding your testimony correctly.

22           I believe you testified earlier today that you

23  and your team decided between going with Arvato versus

24  CEVA, whereas the legal team was -- was the group that --

25  that made the decision whether or not to move; is that

CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

135

1  correct?

2      A     No, that is not correct.

3      Q     Okay.

4      A     No.  The legal team is there to give us advice.

5  We own the business and we make the business decision

6  based on the risks that are presented to us.  And so the

7  legal team had presented a case that said we had a very

8  strong risk of our business being materially impacted if

9  we lost the litigation in Germany, and then it was a

10  decision by the business to say how to we mitigate for

11  that risk and at what stage do we mitigate for that risk.

12  It's not a legal decision.

13      Q     So when I asked you who made the decision to

14  relocate the distribution facility out of Germany, who

15  was that?

16      A     That was my decision with Brian Tobey as my

17  support as far as for that.  But when I presented it to

18  Brian, where we were, the business risks associated with

19  it, Brian agreed with my proposal.

20      Q     Okay.  Can you then explain to me, I guess, what

21  information was provided to you by legal to advise you of

22  the risk?

23      A     As I stated earlier, Shelley had told us that

24  there was this litigation pending and it didn't appear

25  that -- and as a result of that we would be -- materially

CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

150

1   STATE OF NEVADA        )

2                          )    ss.

3   COUNTY OF WASHOE       )

4

5          I, MICHELLE BLAZER, a Certified Court Reporter

6   in and for the State of Nevada, do hereby certify:

7          That I was personally present for the purpose of

8   acting as Certified Court Reporter in the matter entitled

9   herein;  that the witness was by me duly sworn; that

10  before the proceedings completion, the reading and

11  signing of the deposition has not been requested by the

12  deponent or party;

13         That the foregoing transcript is a true and

14  correct transcript of the stenographic notes of testimony

15  taken by me in the above-captioned matter to the best of

16  my knowledge, skill and ability.

17         I further certify that I am not an attorney or

18  counsel for any of the parties, nor a relative or

19  employee of any attorney or counsel connected with the

20  action, nor financially interested in the action.

21

22  _____

23      MICHELLE BLAZER, CCR #469 (NV) CSR #3361 (CA)

24              BONANZA REPORTING - RENO

25