THE HONORABLE JAMES L. ROBART

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

MICROSOFT CORPORATION,

                Plaintiff,

vs.

MOTOROLA, INC.,  et al.,

                Defendants.

MOTOROLA MOBILITY LLC, et al.,

                Plaintiffs,

vs.

MICROSOFT CORPORATION,

                Defendants.

Case No. C10-1823-JLR

DECLARATION OF SHANE P. CRAMER IN SUPPORT OF JOINT STATEMENT OF DISPUTED JURY INSTRUCTIONS PURSUANT TO LR 51

**TRIAL DATE: AUGUST 26, 2013**

I, Shane P. Cramer hereby declare as follows:

    1.      I am an attorney at the law firm of Calfo Harrigan Leyh & Eakes LLP, one of the law firms representing Microsoft Corporation ("Microsoft") in the above-captioned matter, and have personal knowledge of the facts stated herein.

    2.      Attached hereto as Exhibit A is a true and correct copy of excerpts from the Federal Judicial Center, Manual for Complex Litigation, 4th ed., 2004.

DECLARATION OF SHANE P. CRAMER IN
SUPPORT OF JOINT STATEMENT OF
DISPUTED JURY INSTRUCTIONS
PURSUANT TO LR 51- 1

LAW OFFICES
CALFO HARRIGAN LEYH & EAKES LLP
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700   FAX, (206) 623-8717

3.      Attached hereto as Exhibit B is a true and correct copy of excerpts from the Federal Judicial Center's Benchbook for U.S. District Court Judges, 6th ed., March 2013.

4.      Attached hereto as Exhibit C is a true and correct copy Defendants' Pretrial Statement, dated July 15, 2013.

5.      Attached hereto as Exhibit D is a true and correct copy of excerpts from Defendant Motorola's Responses to Microsoft's Third Set of Interrogatories and Eighth Request for Production, dated July 18, 2012.

6.      Attached hereto as Exhibit E is a true and correct copy of Microsoft Corporation's May 21, 2013 Supplemental Answer to Interrogatory No. 3.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

DATED this 26th day of July, 2013 in Seattle, Washington.

SHANE P. CRAMER

DECLARATION OF SHANE P. CRAMER IN
SUPPORT OF JOINT STATEMENT OF
DISPUTED JURY INSTRUCTIONS
PURSUANT TO LR 51- 2

LAW OFFICES
CALFO HARRIGAN LEYH & EAKES LLP
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700   FAX, (206) 623-8717

## CERTIFICATE OF SERVICE

I, Emma Aubrey, swear under penalty of perjury under the laws of the State of Washington to the following:

1.    I am over the age of 21 and not a party to this action.

2.    On the 26th day of July, 2013, I caused the preceding document to be served on counsel of record in the following manner:

**<u>Attorneys for Motorola Solutions, Inc., and Motorola Mobility, Inc.:</u>**

Ralph Palumbo, WSBA #04751
Philip S. McCune, WSBA #21081                  _____ Messenger
Summit Law Group                                        _____ US Mail
315 Fifth Ave. South, Suite 1000                  _____ Facsimile
Seattle, WA  98104-2682                             __X__ ECF
Telephone: 206-676-7000
Email:  Summit1823@summitlaw.com


Steven Pepe (*pro hac vice*)                         _____ Messenger
Jesse J. Jenner (*pro hac vice*)                     _____ US Mail
Ropes & Gray LLP                                       _____ Facsimile
1211 Avenue of the Americas                      __X__ ECF
New York, NY  10036-8704
Telephone: (212) 596-9046
Email:  steven.pepe@ropesgray.com
Email:  jesse.jenner@ropesgray.com


Norman H. Beamer (*pro hac vice*)              _____ Messenger
Ropes & Gray LLP                                       _____ US Mail
1900 University Avenue, 6th Floor               _____. Facsimile
East Palo Alto, CA  94303-2284                    __X__ ECF
Telephone: (650) 617-4030
Email:  norman.beamer@ropesgray.com

**DECLARATION OF SHANE P. CRAMER IN
SUPPORT OF JOINT STATEMENT OF
DISPUTED JURY INSTRUCTIONS
PURSUANT TO LR 51- 3**

1

Paul M. Schoenhard (*pro hac vice*)
Ropes & Gray LLP
One Metro Center
700 12th Street NW, Suite 900
Washington, DC  20005-3948
Telephone:  (202) 508-4693
Email: Paul.schoenhard@ropesgray.com

_____ Messenger
_____ US Mail
_____ Facsimile
   X   ECF

2

3

4

5

6

Andrea Pallios Roberts (*pro hac vice*)
Brian C. Cannon (*pro hac vice*)
Elanor Mangin (*pro hac vice*)
Quinn Emanuel Urquhart & Sullivan, LLP
555 Twin Dolphin Drive, 5th Floor
Redwood Shores, CA 94065
Telephone:  (650) 801-5000
Email: andreaproberts@quinnemanuel.com
Email: briancannon@quinnemanuel.com

_____ Messenger
_____ US Mail
_____ Facsimile
   X   ECF

7

8

9

10

11

12

Kathleen M. Sullivan (*pro hac vice*)
David Elihu (*pro hac vice*)
Ellyde Roko Thompson (*pro hac vice*)
Quinn Emanuel Urquhart & Sullivan, LLP
51 Madison Ave., 22nd Floor
New York, NY 10010
Telephone:  (212) 849-7000
Email: kathleensullivan@quinnemanuel.com

_____ Messenger
_____ US Mail
_____ Facsimile
   X   ECF

13

14

15

16

17

18

William Price (*pro hac vice*)
Quinn Emanuel Urquhart & Sullivan, LLP
865 S. Figuera St., 10th Floor
Los Angeles, CA 90017
Telephone:  (212) 443-3000
Email: williamprice@quinnemanuel.com
MicrosoftvMotoBreachofRANDCase@quinnemanuel.com

_____ Messenger
_____ US Mail
_____ Facsimile
   X   ECF

19

20

21

DATED this 26th day of July, 2013.

22

23

24

s/ Emma Aubrey
_____

EMMA AUBREY

25

**DECLARATION OF SHANE P. CRAMER IN
SUPPORT OF JOINT STATEMENT OF
DISPUTED JURY INSTRUCTIONS
PURSUANT TO LR 51- 4**

# Exhibit A

# Manual for Complex Litigation, Fourth

Federal Judicial Center 2004

Cite as

Manual for Complex Litigation,

Fourth, § _____

or

MCL 4th § _____

# Manual for Complex Litigation, Fourth

*Board of Editors*

Judge Stanley Marcus (Ct. of App., 11th Cir.), *chair*

Judge John G. Koeltl (S.D.N.Y.)       Judge Barefoot Sanders (N.D. Tex.)

Judge J. Frederick Motz (D. Md.)       Sheila Birnbaum, Esq. (N.Y., N.Y.)

Judge Lee H. Rosenthal (S.D. Tex.)       Frank A. Ray, Esq. (Columbus, Ohio)

Judge Fern M. Smith (N.D. Cal.),
*director, Federal Judicial Center 1999–2003*

Federal Judicial Center 2004

The *Manual for Complex Litigation, Fourth* has been produced under the auspices of the Federal Judicial Center. The analyses and recommendations are those of the *Manual*'s Board of Editors.

## 12.43  Jury Instructions[362]

.431 General Principles  154
.432 Preliminary Instructions  154
.433 Interim and Limiting Instructions  156
.434 Final Instructions  156
.435 Jurors' Use of Exhibits During Deliberations  158
.436 Supplemental Instructions and Readbacks  158

## 12.431  General Principles

A complex and protracted trial makes understandable jury instructions particularly important. Instructions should use language that laypersons can understand—instructions should be concise, concrete, and simple, be in the active voice, avoid negatives and double-negatives, and be organized in logical sequence. Counsel should submit proposed instructions at the final pretrial conference to focus the judge's and lawyers' attention on the issues to be tried (see section 11.65).

Substantive instructions should be tailored to the particular case, and the judge should avoid a generalized pattern of instructions. The judge should explain propositions of law with reference to the facts and parties in the case; illustrations familiar to jurors may also help. Instructions using the language of appellate opinions are rarely meaningful to jurors. Most judges reword—or at least edit—counsel's proposed instructions, which are often argumentative and one-sided. Combining the proposals submitted by counsel for each side rarely produces sound and intelligible instructions. Instructions should be read to the jury in a manner that enhances comprehension and retention; rarely should the reading take more than thirty minutes. Some judges use the court's evidence presentation system to put the jury instructions on a screen or monitors in the courtroom so that jurors can read along as the instructions are given orally.[363] Jurors usually like to have one or more copies of the instructions in the jury room (see section 12.434). In complex cases with long verdict forms, it is helpful for each juror to have an individual copy of the verdict form.

## 12.432  Preliminary Instructions

Jurors can deal more effectively with the evidence in a lengthy trial if they are provided with a factual and legal framework to give structure to what they see and hear. Moreover, jurors should understand the trial process in which

---

362. *See generally* Benchbook, *supra* note 45, §§ 2.07–2.08, 6.05–6.06 (jury instructions in criminal and civil cases, respectively).

363. See *Effective Use of Courtroom Technology*, *supra* note 85, at 149–53, for related discussion and suggestions.

*Trial*                                                    § *12.432*

they are about to participate and what they can expect. Preliminary instructions provide context and basic guidance for the jurors' conduct. These instructions typically contain or delineate the following:

- *Preliminary statement of legal principles and factual issues.* The instructions should summarize the key factual issues, including the undisputed facts and the parties' major contentions (which may be drafted jointly by the parties), and explain briefly the basic legal issues and principles, such as the elements of claims and defenses to be proved. The court should emphasize that these instructions are preliminary—they don't cover all the issues or principles—and that instructions given at the conclusion of the case will govern deliberations. Since one purpose of these instructions is to prepare jurors for opening statements, they are usually given first, permitting counsel to refer to them in opening statements. The judge may, however, defer instructions until after opening statements or give supplemental preliminary instructions at that time.

- *The conduct of the trial.* The judge should inform jurors of the anticipated course of the trial from opening statements to verdict, the methods for presenting evidence, and the procedure for raising and resolving objections. It is also useful to introduce court personnel—the clerks, bailiffs, and reporters—and to provide a short orientation to the equipment in the courtroom.[364]

- *Schedule.* Jurors should be informed of the hourly and daily trial schedule and any holidays or other recesses.

- *Precautions to prevent mistrial.*[365] The judge should direct jurors not to discuss the case or communicate with trial participants. It is also important that they be warned against exposure to publicity and attempts at independent fact-finding, such as viewing the scene of some occurrence or undertaking experiments or research.

- *Pretrial procedures.* The instructions should briefly describe the various discovery devices used during the pretrial stage of the litigation, such as depositions, document production, and interrogatories. This information will be helpful when the evidence is introduced, and it explains how the parties learned the facts of the case.

- *The functions and duties of the jury.* The judge should describe the jury's role as fact-finder; the burden of proof; assessing the credibility of witnesses; the nature of evidence, including circumstantial evidence

---

364.  *See id.* at 146–49 (suggesting language for explaining courtroom technology to jurors).
365.  *See also infra* section 12.44 (avoiding mistrial).

and the purpose of rules of evidence; and the jurors' need to rely on their recollection of testimony (including any special instructions about the use of juror notebooks, note taking, or questions). Most of these instructions should be repeated in the final jury charge, supplemented by any special explanations (such as use of convictions to impeach credibility) warranted by developments at trial, or the use of special verdicts or interrogatories.[366]

## 12.433 Interim and Limiting Instructions

Developments in the course of trial may require additional instructions. Under Federal Rule of Evidence 105, when evidence is admitted that is admissible as to some but not all parties or for a limited purpose only, the court must, upon request, instruct the jury accordingly. At counsel's request, the judge may repeat such limiting instructions at the close of trial. Counsel should be advised that when they contemplate offering such evidence, they should raise the issue promptly (if possible, before trial) and submit proposed instructions.

The judge may also give instructions at any point in the trial where they might be helpful to the jury. An explanation of applicable legal principles may be more helpful when the issue arises than if deferred until the close of trial, but counsel should be permitted to comment or object before an instruction is given. As with preliminary instructions, the judge should caution the jury that these are only interim explanations, and that the final, complete instructions on which they will base their verdict will come at the close of trial. If the parties are presenting their evidence according to a prescribed sequence of issues (see section 12.34), the instructions should be structured accordingly.

## 12.434 Final Instructions

Although proposed instructions should generally be submitted to the court in connection with the final pretrial conference, developments during the trial may require their revision or supplementation. Counsel are entitled to file written requests for instructions "at the close of the evidence or at such earlier time as the court reasonably directs," and are entitled to notice of the judge's proposed action before closing arguments.[367] Most judges, rather than responding to particular requests, provide counsel with the entire charge they propose to give and then hold a charge conference to consider counsel's objections and requests; generally there will be little controversy if the judge has

---

366. *See infra* sections 12.436, 12.45 (supplemental instructions and verdicts, respectively).
367. Fed. R. Civ. P. 51; Fed. R. Crim. P. 30.

# Exhibit B

# Benchbook

## for U.S. District Court Judges

### SIXTH EDITION

### Federal Judicial Center
### March 2013

The Federal Judicial Center produced this *Benchbook for U.S. District Court Judges* in furtherance of its mission to develop and conduct education programs for the judicial branch. This *Benchbook* is not a statement of official Federal Judicial Center policy. Rather, it was prepared by, and it represents the considered views of, the Center's Benchbook Committee, a group of experienced district judges appointed by the Chief Justice of the United States in his capacity as chair of the Center's Board. The committee was assisted by Federal Judicial Center staff.

## 6.06   Preliminary jury instructions— civil case

These suggested instructions are designed to be given following the swearing of the jury. They are general and may require modification in light of the nature of the particular case. They are intended to give the jury, briefly and in understandable language, information to make the trial more meaningful. Other instructions, such as explanations of depositions, interrogatories, and the hearsay rule, may be given at appropriate points during the trial.

### Preliminary instructions

Members of the jury: Now that you have been sworn, I will give you some preliminary instructions to guide you in your participation in the trial.

### Duty of the jury

It will be your duty to find from the evidence what the facts are. You and you alone will be the judges of the facts. You will then have to apply to those facts the law as the court will give it to you. You must follow that law whether you agree with it or not.

Nothing the court may say or do during the course of the trial is intended to indicate, or should be taken by you as indicating, what your verdict should be.

### Evidence

The evidence from which you will find the facts will consist of the testimony of witnesses, documents and other things received into the record as exhibits, and any facts that the lawyers agree to or stipulate to or that the court may instruct you to find.

Certain things are not evidence and must not be considered by you. I will list them for you now.

1. Statements, arguments, and questions by lawyers are not evidence.

2. Objections to questions are not evidence. Lawyers have an obligation to their clients to make objections when they believe evidence being offered is improper under the rules of evidence. You should not be influenced by the objection or by the court's ruling on it. If the objection is sustained, ignore the question. If it is overruled, treat the answer like any other. If you are instructed that some item of evidence is received for a limited purpose only, you must follow that instruction.

3. Testimony that the court has excluded or told you to disregard is not evidence and must not be considered.

*Section 6.06: Preliminary jury instructions—civil case*

    4.  Anything you may have seen or heard outside the courtroom is not evidence and must be disregarded. You are to decide the case solely on the evidence presented here in the courtroom.

There are two kinds of evidence: direct and circumstantial. Direct evidence is direct proof of a fact, such as testimony of an eyewitness. Circumstantial evidence is proof of facts from which you may infer or conclude that other facts exist. I will give you further instructions on these as well as other matters at the end of the case, but keep in mind that you may consider both kinds of evidence.

It will be up to you to decide which witnesses to believe, which witnesses not to believe, and how much of any witness's testimony to accept or reject. I will give you some guidelines for determining the credibility of witnesses at the end of the case.

**Burden of proof**

This is a civil case. The plaintiff has the burden of proving his [her] case by what is called the preponderance of the evidence. That means the plaintiff has to produce evidence which, considered in the light of all the facts, leads you to believe that what the plaintiff claims is more likely true than not. To put it differently, if you were to put the plaintiff's and the defendant's evidence on opposite sides of the scales, the plaintiff would have to make the scales tip somewhat on his [her] side. If the plaintiff fails to meet this burden, the verdict must be for the defendant.

Those of you who have sat on criminal cases will have heard of proof beyond a reasonable doubt. That requirement does not apply to a civil case; therefore, you should put it out of your mind.

**Summary of applicable law**

[*Note:* A summary of the elements may not be appropriate in some cases.]

In this case, the plaintiff claims that _____; the defendant claims that _____. I will give you detailed instructions on the law at the end of the case, and those instructions will control your deliberations and decision. But in order to help you follow the evidence, I will now give you a brief summary of the elements which the plaintiff must prove to make his [her] case: [here summarize the elements].

**Conduct of the jury**

Now, a few words about your conduct as jurors.

You, as jurors, must decide this case based solely on the evidence presented here within the four walls of this courtroom. This means that during the trial you must not conduct any independent research about this case, the matters in the case, and the individuals or corporations involved in the case. In other words, you should not consult dictionaries or reference mate-

*Section 6.06: Preliminary jury instructions—civil case*

rials, search the Internet, websites, or blogs, or use any other electronic tools to obtain information about this case or to help you decide the case. Please do not try to find out information from any source outside the confines of this courtroom.

Until you retire to deliberate, you may not discuss this case with anyone, even your fellow jurors. After you retire to deliberate, you may begin discussing the case with your fellow jurors, but you cannot discuss the case with anyone else until you have returned a verdict and the case is at an end.

I know that many of you use cell phones, Blackberries, the Internet, and other tools of technology. You also must not talk to anyone at any time about this case or use these tools to communicate electronically with anyone about the case. This includes your family and friends. You may not communicate with anyone about the case on your cell phone, through e-mail, Blackberry, iPhone, text messaging, or on Twitter, through any blog or website, including Facebook, Google+, My Space, LinkedIn, or YouTube. You may not use any similar technology of social media, even if I have not specifically mentioned it here. I expect you will inform me as soon as you become aware of another juror's violation of these instructions.[1] A juror who violates these restrictions jeopardizes the fairness of these proceedings, and a mistrial could result, which would require the entire trial process to start over.

Finally, do not form any opinion until all the evidence is in. Keep an open mind until you start your deliberations at the end of the case.

I hope that for all of you this case is interesting and noteworthy.

[If the court decides to allow note taking, add:]

If you want to take notes during the course of the trial, you may do so. However, it is difficult to take detailed notes and pay attention to what the witnesses are saying at the same time. If you do take notes, be sure that your note taking does not interfere with your listening to and considering all of the evidence. Also, if you do take notes, do not discuss them with anyone before you begin your deliberations. Do not take your notes with you at the end of the day—be sure to leave them in the jury room.

---

1. Taken from "Proposed Model Jury Instructions: The Use of Electronic Technology to Conduct Research on or Communicate about a Case," prepared by the Judicial Conference Committee on Court Administration and Case Management (June 2012). *See* Memorandum, "Juror Use of Social Media" from Judge Julie A. Robinson, Chair, Committee on Court Administration and Case Management to all United States District Court Judges (Aug. 6, 2012), *available at* http://jnet.ao.dcn/img/assets/7324/DIR12-074.pdf. *See also* "Strategies for Preventing Jurors' Use of Social Media During Trials and Deliberations," *in* Jurors' Use of Social Media During Trials and Deliberations: A Report to the Judicial Conference Committee on Court Administration and Case Management 5–10 (Federal Judicial Center Nov. 22, 2011), *available at* http://cwn.fjc.dcn/public/pdf.nsf/lookup/DunnJuror.pdf/$file/DunnJuror.pdf.

*Section 6.06: Preliminary jury instructions—civil case*

If you choose *not* to take notes, remember that it is your own individual responsibility to listen carefully to the evidence. You cannot give this responsibility to someone who is taking notes. We depend on the judgment of all members of the jury; you all must remember the evidence in this case.[2]

## Course of the trial

The trial will now begin. First, each side may make an opening statement. An opening statement is neither evidence nor argument; it is an outline of what that party intends to prove, offered to help you follow the evidence.

Next, the plaintiff will present his [her] witnesses, and the defendant may cross-examine them. Then the defendant will present his [her] witnesses, and the plaintiff may cross-examine them.

After all the evidence is in, the parties will present their closing arguments to summarize and interpret the evidence for you, and the court will give you instructions on the law.

[*Note:* Some judges may wish to give some instructions before closing arguments. *See* Fed. R. Civ. P. 51(b)(3).]

You will then retire to deliberate on your verdict.

## Other FJC sources

Civil Litigation Management Manual 111–12 & Forms 44, 46 (Judicial Conference of the United States, 2d ed. 2010)

Manual for Complex Litigation, Fourth 154–56 (2004)

---

2. For another sample instruction on note taking, see Civil Litigation Management Manual at Appendix A, Form 44 (Judicial Conference of the United States, 2d ed. 2010).

# 6.07   General instructions to jury at end of civil case

## Introductory note

Fed. R. Civ. P. 51(b) outlines the procedure for the submission and consideration of requests by the parties for specific jury instructions. It requires

1. that the court inform counsel before closing arguments of its proposed instructions and its proposed action upon the instructions requested by counsel; and

2. that the court give counsel adequate opportunity outside the hearing of the jury to object to the court's instructions.

There is no prescribed method for the court to settle on its final set of instructions. Some courts hold an on-the-record charge conference with counsel during trial. At that conference, the tendered instructions are discussed and are accepted, rejected, or modified by the court.

Other courts, without holding a charge conference, prepare a set of proposed instructions from those tendered by counsel. These courts then give a copy of the proposed instructions to all counsel and permit counsel to take exception to the instructions. Thereafter, the court may revise its instructions if convinced by counsel in their objections that the instructions should be modified.

Still other courts require counsel to confer during trial and to agree, to the extent that they can, on the instructions that should be given. The court then considers only those instructions upon which the parties cannot agree.

The court may, of course, give an instruction to the jury that neither party has tendered.

While the court is free to ignore tendered instructions and to instruct the jury sua sponte, the usual practice is for the court to formulate the final instructions with the assistance of counsel and principally from the instructions counsel tendered.

Local practice varies as to whether a written copy of the instructions is given to the jury for use during its deliberations. Many courts always give the jury a written copy of the instructions. Some courts have the instructions recorded as they are given in court and permit the jury to play them back in the jury room. Some courts do neither but will repeat some or all of the instructions in response to a request from the jury.

## Outline of instructions

Instructions delivered at the end of a case consist of three parts: Instructions on general rules that define and control the jury's duties; statement of rules of law that the jury must apply; and rules and guidelines for jury deliberation and return of verdict.

*Section 6.07: General instructions to jury at end of civil case*

A. General rules
   1. Outline the duty of the jury
      (a) to find facts from admitted evidence;
      (b) to apply law as given by the court to the facts as found by the jury; and
      (c) to decide the case on the evidence and the law regardless of personal opinions and without bias, prejudice, or sympathy.
   2. Discuss the burden of proof in civil trials and explain how it differs from the burden of proof in criminal trials.
   3. Indicate the evidence to be considered:
      (a) sworn testimony of witnesses;
      (b) exhibits;
      (c) stipulations; and
      (d) facts judicially noticed.
   4. Indicate what is not evidence:
      (a) arguments and statements of counsel;
      (b) questions to witnesses;
      (c) evidence excluded by rulings of the court.
B. Delineate with precision and with specific consideration of the law of your circuit each claim and defense of the parties that is to be submitted to the jury for their consideration.
C. Jury procedure
   1. Selection and duty of the foreperson.
   2. Process of jury deliberation:
      (a) rational discussion of the evidence by all jurors for the purpose of reaching a unanimous verdict;
      (b) each juror is to decide the case for himself or herself in the context of the evidence and the law, with proper consideration of other jurors' views; and
      (c) jurors may reconsider their views if persuaded by rational discussion but not solely for the sake of reaching a unanimous verdict.
   3. Absent a stipulation, the verdict must be unanimous on the issue submitted (Fed. R. Civ. P. 48).
   4. Explain the verdict form, if used.[1]
   5. Jury communications with the court during deliberations must be in writing and signed by the foreperson.

---

1. Consider whether to use a special verdict (Fed. R. Civ. P. 49(a)). It can be a useful device to reduce the risk of having to retry the entire case.

*Section 6.07: General instructions to jury at end of civil case*

6. The jury must not disclose how it stands numerically or otherwise on the issues submitted.

7. Consider giving the jury the following instruction:

During your deliberations, you must not communicate with or provide any information to anyone by any means about this case. You may not use any electronic device or media, such as a telephone, cell phone, smart phone, iPhone, Blackberry, or computer; the Internet, any Internet service, or any text or instant messaging service; or any Internet chat room, blog, or website, such as Facebook, MySpace, LinkedIn, YouTube, or Twitter, to communicate to anyone any information about this case or to conduct any research about this case until I accept your verdict. In other words, you cannot talk to anyone on the phone, correspond with anyone, or electronically communicate with anyone about this case. You can only discuss the case in the jury room with your fellow jurors during deliberations. I expect you will inform me as soon as you become aware of another juror's violation of these instructions.

You may not use these electronic means to investigate or communicate about the case because it is important that you decide this case based solely on the evidence presented in this courtroom. Information on the Internet or available through social media might be wrong, incomplete, or inaccurate. You are only permitted to discuss the case with your fellow jurors during deliberations because they have seen and heard the same evidence you have. In our judicial system, it is important that you are not influenced by anything or anyone outside of this courtroom. Otherwise, your decision may be based on information known only by you and not your fellow jurors or the parties in the case. This would unfairly and adversely impact the judicial process.[2] If a juror violates these restrictions, it could cause a mistrial, which would require the entire trial process to start over.

---

2. Taken from "Proposed Model Jury Instructions: The Use of Electronic Technology to Conduct Research on or Communicate about a Case," prepared by the Judicial Conference Committee on Court Administration and Case Management (June 2012). *See* Memorandum, "Juror Use of Social Media" from Judge Julie A. Robinson, Chair, Committee on Court Administration and Case Management to all United States District Court Judges (Aug. 6, 2012), *available at* http://jnet.ao.dcn/img/assets/7324/DIR12-074.pdf. *See also* "Strategies for Preventing Jurors' Use of Social Media During Trials and Deliberations," *in* Jurors' Use of Social Media During Trials and Deliberations: A Report to the Judicial Conference Committee on Court Administration and Case Management 5–10 (Federal Judicial Center Nov. 22, 2011), *available at* http://cwn.fjc.dcn/public/pdf.nsf/lookup/DunnJuror.pdf/$file/DunnJuror.pdf.

*Section 6.07: General instructions to jury at end of civil case*

D.  Consider providing the jury with a written copy or transcript of the jury instructions.

**Other FJC sources**

Civil Litigation Management Manual 111–12 & Forms 44, 47 (Judicial Conference of the United States, 2d ed. 2010)

Manual for Complex Litigation, Fourth 156–59 (2004)

# Exhibit C

The Honorable James L. Robart

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| MICROSOFT CORPORATION, a Washington corporation, | CASE NO. C10-1823-JLR |
| Plaintiff, | **DEFENDANTS' PRETRIAL STATEMENT** |
| vs. | |
| MOTOROLA, INC., MOTOROLA MOBILITY LLC, and GENERAL INSTRUMENT CORPORATION, | |
| Defendants. | |

Defendants, through their undersigned counsel, serve their pretrial statement. Defendants reserve the right to amend or supplement this statement should additional facts or issues arise as the parties prepare their Joint Pretrial Order.

**A.      Statement Regarding Federal Jurisdiction**

This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 and personal jurisdiction over the Defendants.

Motorola maintains its position that this dispute was not ripe for this Court to hear when filed and reserves all arguments for appeal.

**B.      Claims And Issues That Will Be Adjudicated At The August 26, 2013 Trial**

At the August 26, 2013 trial in this matter, the Court will adjudicate the following issues:

1

2   1.  Whether Motorola breached its purported contract with the IEEE, and whether that

3 breach was material.

4   2.  Whether Microsoft suffered any damage as a result of Motorola's alleged breach of

5 its purported contract with the IEEE.

6   3.  Whether Motorola breached its purported contract with the ITU, and whether that

7 breach was material.

8   4.  Whether Microsoft suffered any damage as a result of Motorola's alleged breach of

9 its purported contract with the ITU.

10   5.  Whether Microsoft's actions constituted unclean hands.

11   6.  Whether Microsoft failed to mitigate its damages allegedly suffered as a result of

12 Motorola's alleged breach of its purported contract with the IEEE.

13   7.  Whether Microsoft failed to mitigate its damages allegedly suffered as a result of

14 Motorola's alleged breach of its purported contract with the ITU..

15 **C.**  **Relevant Facts About Which There Is No Dispute And Which Motorola is**
    **Prepared to Admit**

16

17   The Court entered findings of fact from the November 2012 trial on April 19, 2013.  Dkt.

18 No. 673.  Motorola does not dispute that those findings are now law of the case.  Motorola objects

19 to presenting those findings to the jury.

20 **D.**  **Motorola's Factual Contentions**

21   1.  Motorola had a license to Microsoft's ActiveSync patents, which expired in 2007.

22   2.  The parties engaged in negotiations for a renewal of Motorola's ActiveSync license

23 for approximately three years.  During those negotiations, Microsoft sought to license its

24 ActiveSync patents to Motorola, and Motorola repeatedly advised Microsoft that it had patents

25 that read on Microsoft's products.

26   3.  At no time prior to October 1, 2010 did Microsoft ask Motorola for more details

27 about the patents Motorola believed read on Microsoft's products.

28

4.    Microsoft has a market share of over 90% for its Windows operating system for desktop computers.  Microsoft's mobile operating system has not achieved the same adoption.

5.    By 2010, all of Motorola's smartphone products used the Android mobile operating system, an open source operating system offered by Google.

6.    On October 1, 2010, without prior notice, Microsoft sued Motorola, filing a complaint in the International Trade Commission alleging infringement by Motorola's Android smartphones.  Microsoft also filed a patent infringement action against Motorola in the U.S. District Court for the Western District of Washington, asserting infringement of the same patents at issue before the ITC.  In both actions, Microsoft asserted its ActiveSync, computer file system patents, and other patents, some of which had never before been the subject of prior negotiations, against Motorola.

7.    Microsoft sought an exclusion order in the ITC and an injunction in the district court, even though Microsoft had committed to license its ActiveSync and computer file system patents on RAND terms.

8.    After it filed its lawsuits against Motorola, Microsoft reached out to Motorola and told Motorola that Microsoft was interested in finding a resolution of the parties' dispute that would cover both parties' intellectual property, and that it was interested in discussing a cross-license agreement.  Part of Microsoft's message was to convey to Motorola that it wanted to quickly resolve the parties' dispute since the parties were already engaged in litigation.

9.    As is typical in patent licensing negotiations, Microsoft invited Motorola to present its patents for discussion.

10.    The parties also scheduled a meeting for October 22, 2010 to discuss a broad patent cross-license, which would include a discussion of both parties' intellectual property.  This meeting was scheduled before Microsoft received Motorola's October 21, 2010 letter.  The parties did not discuss which patents would be discussed at that meeting.

11.    On October 21, 2010, in advance of the parties' scheduled meeting, Motorola sent Microsoft a letter offering to grant Microsoft a worldwide license to Motorola's portfolio of

1   patents and patent applications relating to the IEEE 802.11 standards, and identifying the patents

2   and patent applications covered by that offer.

3         12.     On October 29, 2010, Motorola sent Microsoft a second letter, which offered to

4   grant Microsoft a worldwide license to Motorola's portfolio of patents and patent applications

5   relating to the ITU-T Recommendation H.264, again identifying the patents and patent

6   applications covered by the offer.

7         13.     Both letters offered to license these patent portfolios at a royalty rate of 2.25%, and

8   stated that the offers would remain open for 20 days.  Motorola was under significant time

9   pressure to quickly respond to Microsoft's request and to identify patents to Microsoft for

10  discussion.  Motorola chose 2.25% as the proposed royalty rate because that is Motorola's

11  historical opening offer for its standard essential patent portfolios.  It was an opening offer used in

12  many previous bilateral negotiations with other companies and was not a number unique to

13  Microsoft.  Motorola intended to have continued discussions about Motorola's patents and

14  Microsoft's patents.  Contrary to its typical practice of responding in some way to a potential

15  licensor's offer, Microsoft did not respond to Motorola's October 21 and 29, 2010 offer letters.

16        14.     The parties then proceeded with the already-scheduled October 22 licensing

17  meeting.  The meeting went forward and was amicable.  The parties did not discuss Motorola's

18  standard essential patents or Motorola's October 21, 2010 letter.

19        15.     On November 9, 2010, Microsoft filed the complaint in this action, asserting,

20  among other claims, that Motorola breached its obligations to the IEEE and ITU by failing to offer

21  to license its 802.11 and H.264 SEP portfolios on RAND terms.

22        16.     Right after Microsoft filed its complaint, its executives told Motorola not to be

23  concerned about the lawsuit.  The parties continued to negotiate a cross-license agreement

24  thereafter.

25        17.     After Microsoft sued Motorola in the ITC and this Court alleging patent

26  infringement, and then invited Motorola to present its patents for negotiation but then filed the

27  present action alleging breach of contract, Motorola filed patent infringement cases against

28

1   Microsoft in the Western District of Wisconsin, ITC, and Germany.  Motorola sought, among

2   other relief, an injunction.

3          18.     Microsoft failed to mitigate its attorneys fees and litigation costs damages by

4   running the cases without a budget, retaining non-Seattle lawyers even though Seattle lawyers

5   have lower billing rates, and using an excessive number of timekeepers.  Microsoft also failed to

6   use a reasonable and reliable methodology to identify the attorneys fees and litigation costs

7   incurred defending against Motorola's claims of SEP infringement.

8          19.     Microsoft failed to mitigate its damages in Germany by using the appropriate

9   Orange Book procedure to guarantee that an injunction would not issue.  Microsoft further failed

10  to mitigate its damages in Germany by failing to file its motion for an anti-suit injunction with this

11  Court prior to March 28, 2012.  Microsoft also failed to mitigate its damages in Germany by not

12  beginning to relocate its EMEA distribution facility until January 2012, when it could have saved

13  costs had it performed the relocation over a longer period of time.

14         20.     Google is not a party to this action, and therefore its participation in the MPEG LA

15  patent pool has no bearing on the circumstances of this case.

16         21.     Motorola entered into licensing negotiations with Marvell but those negotiations

17  have not resulted in a license.

18     **E.     <u>Issues of Law</u>**

19         1.     Whether Motorola breached the duty of good faith and fair dealing as part of its

20  purported contractual obligations to the IEEE.

21         2.     Whether Motorola breached the duty of good faith and fair dealing as part of its

22  purported contractual obligations to the ITU.

23         3.     Whether attorney fees are an appropriate measure of damages in a breach of

24  contract case.

25         4.     Whether the costs incurred preparing to comply with a properly issued injunction

26  are an appropriate measure of damages in a breach of contract case.

27         5.     Whether Motorola's act of sending the October 21, 2010 offer letter can be

28  considered a breach of its purported contract with the IEEE.

6.     Whether Motorola's act of sending the October 29, 2010 offer letter can be considered a breach of its purported contract with the ITU.

7.     Whether Motorola's act of seeking injunctive relief for infringement of its 802.11 SEPs  in the Western District of Washington and/or ITC can be considered a breach of its purported contract with the IEEE.

8.     Whether Motorola's act of seeking injunctive relief for infringement of its H.264 SEPs in the Western District of Washington, ITC, and/or Germany can be considered a breach of its purported contract with the ITU.

9.     Whether Motorola not completing a license with Marvell can be considered a breach of its purported contract with the IEEE.

10.     Whether non-party Google's alleged refusal to license Microsoft under Google's MPEG LA license can be considered a breach by Motorola of Motorola's purported contracts with the ITU.

11.     Whether Microsoft can prove the elements of its breach of contract claims, including material breach, proximate cause and damages with respect to its purported contract with the IEEE.

12.     Whether Microsoft can prove the elements of its breach of contract claims, including material breach, proximate cause and damages with respect to its purported contract with the ITU.

13.     Whether Microsoft failed to mitigate its damages.

14.     Whether Microsoft's conduct constitutes unclean hands.

**F.     <u>Witnesses</u>**

1.     Brian Blasius (may call):  Mr. Blasius will be called to testify regarding Motorola's licensing practices and licensing history involving standards-essential patents.  Mr. Blasius can be contacted through counsel for Motorola.

2.     Kirk Dailey (will call):  Mr. Dailey will be called to testify regarding Motorola's licensing practices and licensing history involving standards-essential patents, and Motorola's licensing negotiations with Microsoft.  Mr. Dailey can be contacted through counsel for Motorola.

3.      Jeff Davidson (will call):  Mr. Davidson will be called to testify regarding Microsoft's failure to mitigate damages with respect to relocating its EMEA distribution facility. Mr. Davidson can be contacted through counsel for Microsoft.

4.      Jon Devaan (may call):  Mr. Devaan may be called to testify regarding Microsoft's lack of irreparable harm resulting from Motorola's alleged conduct with respect to Windows.  Mr. Devaan can be contacted through counsel for Microsoft.

5.      Garrett Glanz (may call):  Mr. Glanz may be called to testify regarding MPEG LA. Mr. Glanz can be contacted through counsel for Microsoft.

6.      Horacio Gutierrez (will call):  Mr. Gutierrez will be called to testify regarding Motorola's negotiations with Microsoft, Microsoft's licensing practices and licenses, Microsoft's litigation against Motorola, and Microsoft's interoperability program.  Mr. Gutierrez can be contacted through counsel for Microsoft.

7.      Maximilian Haedicke (will call):  Dr. Haedicke will be called to testify regarding the Orange Book procedure in Germany and the options available to avoid an injunction in Germany as well as any issues that were addressed in his expert reports or that were raised during his deposition in this matter.  Dr. Haedicke can be contacted through counsel for Motorola.

8.      David Heiner (will call):  Mr. Heiner will be called to testify regarding Microsoft's communications with the FTC regarding the availability of injunctions for SEPs, licensing of standards-essential patents and Microsoft's interoperability program.  Mr. Heiner can be contacted through counsel for Microsoft.

9.      Richard Holleman (will call):  Mr. Holleman will be called to testify regarding the issues that were addressed in his expert report or that were raised during his deposition in this matter.  Mr. Holleman can be contacted through counsel for Motorola.

10.     Brad Keller (will call):  Mr. Keller will be called to testify regarding the issues that were addressed in his expert report or that were raised during his deposition in this matter.  Mr. Keller can be contacted through counsel for Motorola.

1    11.    David Killough (will call):  Mr. Killough will be called to testify regarding

2    Microsoft's failure to mitigate damages with respect to attorneys' fees and litigation costs.  Mr.

3    Killough can be contacted through counsel for Microsoft.

4    12.    Tim Kowalski (may call):  Mr. Kowalski may be called to testify regarding

5    Motorola's licensing negotiations with Marvell.  Mr. Kowalski can be contacted through counsel

6    for Motorola.

7    13.    Gregory Leonard (will call):  Dr. Leonard will be called to testify regarding the

8    issues that were addressed in his expert reports or that were raised during his deposition in this

9    matter.  Dr. Leonard can be contacted through counsel for Motorola.

10    14.    Bob Love (will call):  Mr. Love will be called to testify regarding SSOs and

11    Motorola's participation in them, including the development of the IEEE 802.11 family of

12    wireless networking standards.  Mr. Love can be contacted through counsel for Motorola.

13    15.    Amy Marasco (will call):  Ms. Marasco will be called to testify regarding SSOs,

14    Microsoft's communications with the FTC regarding the availability of injunctions for SEPs,

15    standards organizations and licensing of standards-essential patents.  Ms. Marasco can be

16    contacted through counsel for Microsoft.

17    16.    Gary Sullivan (may call):  Mr. Sullivan may be called to testify regarding standards

18    organizations.  Mr. Sullivan can be contacted through counsel for Microsoft.

19    17.    K. McNeill Taylor, Jr. (may call):  Mr. Taylor may be called to testify regarding

20    Motorola's licensing practices involving standards-essential patents.  Mr. Taylor can be contacted

21    through counsel for Motorola.

22    18.    David Treadwell (may call):  Mr. Treadwell may be called to testify regarding

23    Microsoft's lack of irreparable harm resulting from Motorola's alleged conduct with respect to

24    Windows.  Mr. Treadwell can be contacted through counsel for Microsoft.

25    19.    David Turner (may call):  Mr. Turner may be called to testify regarding standards

26    organizations and Microsoft's interoperability program.  Mr. Turner can be contacted through

27    counsel for Microsoft.

28

20.     Witnesses identified by Microsoft in its pretrial statement from this phase of the case.

Motorola reserves the right to introduce deposition testimony of the following individuals: K. McNeill Taylor, Jr., Owen Roberts, Teresa Daly, Jeff Davidson, Garrett Glanz, David Killough, Jon Devaan, Horacio Gutierrez, David Heiner, Amy Marasco, Gary Sullivan, David Treadwell, and David Turner.

**G.     Exhibits**

Motorola's exhibit list is attached as Exhibit A.  Exhibits 1 through 3,422 were identified in connection with the November 2012 trial in this matter.  Exhibits designated for the first time in conjunction with this pretrial statement begin at Exhibit No. 7000.[1]

---

[1]  The fact that an exhibit appears on Motorola's exhibit list does not mean that Motorola concedes the exhibit is necessarily admissible.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1    DATED this 15th day of July, 2013.

2

3                                                    **RESPECTFULLY SUBMITTED,**

4                                                    SUMMIT LAW GROUP PLLC

5                                                    By */s/ Ralph H. Palumbo*
                                                         Ralph H. Palumbo, WSBA #04751
6                                                        Philip S. McCune, WSBA #21081
                                                         Lynn M. Engel, WSBA #21934
7                                                        *ralphp@summitlaw.com*
                                                         *philm@summitlaw.com*
8                                                        *lynne@summitlaw.com*

9

10                                                   By */s/ Thomas V. Miller*
                                                         Thomas V. Miller
11                                                       MOTOROLA MOBILITY LLC
                                                         600 North U.S. Highway 45
12                                                       Libertyville, IL 60048-1286
                                                         (847) 523-2162
13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

2

QUINN EMANUEL URQUHART &
SULLIVAN, LLP

3

4

5

6

By /s/ Kathleen M. Sullivan
     Kathleen M. Sullivan, NY #1804624
     51 Madison Ave., 22nd Floor
     New York, NY 10010
     (212) 849-7000
     kathleensullivan@quinnemanuel.com

7

8

9

10

By /s/ Brian C. Cannon
     Brian C. Cannon, CA #193071
     555 Twin Dolphin Drive, 5th Floor
     Redwood Shores, CA 94065
     (650) 801-5000
     briancannon@quinnemanuel.com

11

12

13

14

By /s/ William C. Price
     William C. Price, CA #108542
     865 S. Figueroa Street, 10th Floor
     Los Angeles, CA 90017
     (213) 443-3000
     williamprice@quinnemanuel.com

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# CERTIFICATE OF SERVICE

I hereby certify that on this day I caused the foregoing to be served, as indicated, upon the following, via the parties agreed service distribution list:

Arthur W. Harrigan, Jr., Esq.
Christopher T. Wion, Esq.
Shane P. Cramer, Esq.
Calfo Harrigan Leyh & Eakes LLP
*arthurh@calfoharrigan.com*
*chrisw@calfoharrigan.com*
*shanec@calfoharrigan.com*

Richard A. Cederoth, Esq.
Brian R. Nester, Esq.
David T. Pritikin, Esq.
Douglas I. Lewis, Esq.
John W. McBride, Esq.
David Greenfield, Esq.
William H. Baumgartner, Jr., Esq.
David C. Giardina, Esq.
Carter G. Phillips, Esq.
Constantine L. Trela, Jr., Esq.
Ellen S. Robbins, Esq.
Nathaniel C. Love, Esq.
Sidley Austin LLP
*rcederoth@sidley.com*
*bnester@sidley.com*
*dpritikin@sidley.com*
*dilewis@sidley.com*
*jwmcbride@sidley.com*
*david.greenfield@sidley.com*
*wbaumgartner@sidley.com*
*dgiardina@sidley.com*
*cphillips@sidley.com*
*ctrela@sidley.com*
*erobbins@sidley.com*
*nlove@sidley.com*

T. Andrew Culbert, Esq.
David E. Killough, Esq.
Microsoft Corp.
*andycu@microsoft.com*
*davkill@microsoft.com*

DATED this 15th day of July, 2013.

# Exhibit D

**CONTAINS CONFIDENTIAL BUSINESS INFORMATION, SUBJECT TO PROTECTIVE ORDER – ATTORNEYS' EYES ONLY**

HONORABLE JAMES L. ROBART

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF
WASHINGTON AT SEATTLE

| | |
|---|---|
| MICROSOFT CORPORATION,<br><br>   Plaintiff,<br><br>  v.<br><br>MOTOROLA, INC., et al.,<br><br>   Defendants. | Case No. C10-1823-JLR |
| MOTOROLA MOBILITY, INC., et al.,<br><br>   Plaintiffs,<br><br>  v.<br><br>MICROSOFT CORPORATION,<br><br>   Defendant. | **CONTAINS CONFIDENTIAL BUSINESS INFORMATION, SUBJECT TO PROTECTIVE ORDER – ATTORNEYS' EYES ONLY** |

**PLAINTIFF MICROSOFT'S THIRD SET OF INTERROGATORIES AND EIGHTH REQUESTS FOR PRODUCTION TO DEFENDANTS MOTOROLA, MOTOROLA MOBILITY, AND GENERAL INSTRUMENT AND DEFENDANTS MOTOROLA MOBILITY, INC. AND GENERAL INSTRUMENT CORP.'S RESPONSES THERETO**

Defendants Motorola Mobility, Inc. and General Instrument Corp. ("Defendant," "Motorola," or "Motorola Mobility") hereby responds to plaintiff Microsoft Corporation's ("Microsoft") Third Set of Interrogatories and Eighth Set of Requests for Production to Defendants Motorola and Motorola Mobility as follows (collectively the "Requests"):

**CONTAINS CONFIDENTIAL BUSINESS INFORMATION, SUBJECT TO
PROTECTIVE ORDER – ATTORNEYS' EYES ONLY**

Subject to and without waiving its General Objections and foregoing specific objections, and based on its investigation to date, Motorola states that although Judge Robart denied Motorola's motion for partial summary judgment that Microsoft failed to satisfy the conditions necessary to obtain a RAND license, and has repudiated any right to a RAND license, Motorola stands by the positions advanced in its motion and incorporates by reference its statements and arguments from that motion into this response.

Specifically, the plain language of the IEEE and ITU Policies and Motorola's conforming Letters of Assurance ("LOAs") establish that the parties (Motorola and the IEEE or ITU, respectively) intend that a RAND licensing obligation is triggered only upon a request from an "applicant."  Had the parties intended that Motorola provide RAND licenses to all implementers of the standard, even those implementers who had not applied, the policies and LOAs would have said as much.  Even more important, the IEEE and ITU Policies and Motorola's conforming LOAs also establish that Motorola's assurances are conditioned on the applicant negotiating RAND terms in good faith.  Because Microsoft has neither applied for a license, nor engaged in good-faith negotiations for a license, Microsoft failed to satisfy conditions precedent necessary to benefit as a third party to any contract between Motorola and the IEEE or ITU. Further, Microsoft's inaction is a repudiation on the part of Microsoft of any benefit that it otherwise would have enjoyed as a result of Motorola's RAND assurances.  Therefore, Microsoft's breach of contract and promissory estoppel claims are not ripe for adjudication because Microsoft has repudiated, or failed to satisfy any condition precedent, any right to a RAND license pursuant to Motorola's RAND obligations.  Any such duty would not arise until Microsoft has applied for a license and negotiated the terms of such a license in good faith.

CONTAINS CONFIDENTIAL BUSINESS INFORMATION, SUBJECT TO
PROTECTIVE ORDER – ATTORNEYS' EYES ONLY

**INTERROGATORY NO. 22:**

Describe in detail all facts upon which You rely for Your contention in Your Seventh
Affirmative Defense that "Microsoft's First and Second Causes of Action are barred by the
doctrine of unclean hands."

**ANSWER TO INTERROGATORY NO. 22:**

In addition to its General Objections, Motorola objects to this interrogatory to the extent

it seeks information protected by the attorney-client privilege, work product immunity, or other

applicable privilege or immunity.  Motorola objects that Microsoft has exceeded the number of

interrogatories permitted by Rule 33(a)(1), Fed. R. Civ. P.  Motorola further objects to the phrase

"Describe in detail" as vague and ambiguous, because Microsoft has identified no basis on which

Motorola can determine the extent of "detail" required.  Under a reasonable interpretation of this

interrogatory, Motorola will identify those facts upon which Motorola principally relies in its

response.   Under a reasonable interpretation of this interrogatory, Motorola will identify those

facts upon which Motorola principally relies in its First Affirmative Defense in Defendants'

Answer, Defenses, and Counterclaims to Plaintiff's Amended and Supplemental Complaint,"

Dkt. No. 68.

Subject to and without waiving its General Objections and foregoing specific objections,

and based on its investigation to date, Motorola states that Microsoft's willful decision to engage

in its admitted "litigation tactics," which entailed suing Motorola for breach of contract, rather

than negotiating the terms of a RAND license in good faith, demonstrate Microsoft's lack of

good faith.  In response to receipt of Motorola's October 21 and October 29, 2010 letters offering

a RAND license, the appropriate, customary, and expected course of conduct would have been

for Microsoft to respond and to engage in good faith licensing negotiations.  Instead, Microsoft

CONTAINS CONFIDENTIAL BUSINESS INFORMATION, SUBJECT TO
PROTECTIVE ORDER – ATTORNEYS' EYES ONLY

rushed to the courthouse without giving good-faith negotiations a chance to take place.  Because

of Microsoft's willful and unjust conduct, the doctrine of unclean hands precludes Microsoft

from obtaining equitable relief.

Pursuant to Rule 26(e), Fed R. Civ. P., Motorola states that, if necessary, it will

supplement its response to this interrogatory to the extent additional information requested by

this Interrogatory is located.

## INTERROGATORY NO. 23:

Describe in detail all facts upon which You rely for Your contention in Your Eighth Affirmative
Defense that "Microsoft's First and Second Causes of Action are barred by its failure to
mitigate."

## ANSWER TO INTERROGATORY NO. 23:

In addition to its General Objections, Motorola objects to this interrogatory to the extent

it seeks information protected by the attorney-client privilege, work product immunity, or other

applicable privilege or immunity.  Motorola objects that Microsoft has exceeded the number of

interrogatories permitted by Rule 33(a)(1), Fed. R. Civ. P.  Motorola further objects to the phrase

"Describe in detail" as vague and ambiguous, because Microsoft has identified no basis on which

Motorola can determine the extent of "detail" required.  Under a reasonable interpretation of this

interrogatory, Motorola will identify those facts upon which Motorola principally relies in its

response.   Under a reasonable interpretation of this interrogatory, Motorola will identify those

facts upon which Motorola principally relies in its First Affirmative Defense in Defendants'

Answer, Defenses, and Counterclaims to Plaintiff's Amended and Supplemental Complaint,"

Dkt. No. 68.

Subject to and without waiving its General Objections and foregoing specific objections,

and based on its investigation to date, Motorola states that Microsoft was required to mitigate its

CONTAINS CONFIDENTIAL BUSINESS INFORMATION, SUBJECT TO
PROTECTIVE ORDER – ATTORNEYS' EYES ONLY

purported damages by applying for a RAND license from Motorola and by negotiating the terms

of such a license in a bilateral, good-faith manner.  Had Microsoft engaged in bilateral, good-

faith negotiations, as Motorola expected it to do upon receipt of Motorola's October 21 and 29,

2010 offer letters, Microsoft's purported damages would be minimized.

Motorola's expectation – as is typically done with RAND licenses – was that the parties

would exchange information that would allow them to discuss the value of Microsoft's patents

with respect to Motorola's products, and how that value should impact the overall terms of a

cross-license.  In addition, based on the terms in the October letters, Motorola expected that

Microsoft would present its own 802.11 and/or H.264 patent portfolios and would demonstrate

value that those portfolios had with respect to Motorola's own products.  Motorola expected that

the parties would also exchange confidential and highly sensitive financial and marketing

information, information about current and future product lines, and any other information that

would allow the parties to better understand each other's respective business (and how their

patents applied to those businesses).  Through such a bilateral negotiation, a RAND license

agreement could have been reached.

In this way, Microsoft could have avoided any purported damages associated with

maintaining this action and defending the lawsuits brought by Motorola.  Had Microsoft engaged

in good-faith negotiations leading to a RAND license, the present suit – and any expenses

associated therewith – would have been unnecessary.  Further, even if such negotiations were not

fully successful, it is likely that the parties would have reached agreement on some terms or

aspects of a RAND license.  Based on that, even if a fully formed agreement was not

consummated, such negotiations would have mitigated any purported damages by minimizing

**CONTAINS CONFIDENTIAL BUSINESS INFORMATION, SUBJECT TO
PROTECTIVE ORDER – ATTORNEYS' EYES ONLY**

ROPES & GRAY LLP

By: /s/ Steven Pepe
_____

Dated:  July 18, 2012

Jesse J. Jenner (*pro hac vice*)
Steven Pepe (*pro hac vice*)
Kevin J. Post (*pro hac vice*)
1211 Avenue of the Americas
New York, NY 10036-8704
(212) 596-9000
*jesse.jenner@ropesgray.com*
*steven.pepe@ropesgray.com*
*kevin.post@ropesgray.com*

Norman H. Beamer (*pro hac vice*)
Gabrielle E. Higgins (*pro hac vice*)
Ropes & Gray LLP
1900 University Avenue, 6th Floor
East Palo Alto, CA 94303-2284
(650) 617-4000
*norman.beamer@ropesgray.com*
*gabrielle.higgins@ropesgray.com*

Paul M. Schoenhard (*pro hac vice*)
Ropes & Gray LLP
One Metro Center
700 12th Street NW, Suite 900
Washington, DC 20005-3948
(202) 508-4600
*paul.schoenhard@ropesgray.com*

And By

SUMMIT LAW GROUP PLLC

Ralph H. Palumbo, WSBA #04751
Philip S. McCune, WSBA #21081
Lynn M. Engel, WSBA #21934

***Attorneys for Motorola Mobility, Inc.,
and General Instrument Corporation***

**CONTAINS CONFIDENTIAL BUSINESS INFORMATION, SUBJECT TO
PROTECTIVE ORDER – ATTORNEYS' EYES ONLY**

**CERTIFICATE OF SERVICE**

I hereby certify that on this day I caused the foregoing to be served, per the parties' eService Agreement, via email, upon:

> Arthur W. Harrigan, Jr., Esq.
> Christopher T. Wion, Esq.
> Shane P. Cramer, Esq.
> Danielson Harrigan Leyh & Tollefson
> *arthurh@dhlt.com*
> *chrisw@dhlt.com*
> *shanec@dhlt.com*
>
> Richard A. Cederoth, Esq.
> Sidley Austin LLP
> *rcederoth@sidley.com*

DATED this 18th day of July, 2012.

/s/ Matthew J. Rizzolo
Matthew J. Rizzolo

# Exhibit E

THE HONORABLE JAMES L. ROBART

1

2

3

4

5

6

7

8

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

9

MICROSOFT CORPORATION,

10
                Plaintiff,

11
    vs.

12
MOTOROLA, INC.,  et al.,

13
                Defendants.

14
MOTOROLA MOBILITY LLC, et al.,

15
                Plaintiffs,

16
    vs.

17
MICROSOFT CORPORATION,

18
                Defendants.

Case No. C10-1823-JLR

DEFENDANT MOTOROLA MOBILITY'S, FIRST SET OF INTERROGATORIES AND REQUESTS FOR PRODUCTION TO PLAINTIFF MICROSOFT CORPORATION **AND MICROSOFT CORPORATION'S *MAY 21, 2013 SUPPLEMENTAL* ANSWER TO INTERROGATORY NO. 3**

19

20
      Pursuant to Fed. R. Civ. P. 26(e), and all applicable Local Rules, Microsoft Corporation

21
("Microsoft") hereby submits the following supplemental answer to Motorola Mobility LLC's

22
("Defendant's" or "Motorola's") Interrogatory No. 3.

23

24

25

**MICROSOFT'S *MAY 21, 2013 SUPPLEMENTAL* ANSWER TO INTERROGATORY NO. 3** - 1

LAW OFFICES
**CALFO HARRIGAN LEYH & EAKES LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700   FAX, (206) 623-8717

**GENERAL OBJECTIONS**

Microsoft hereby incorporates the General Objections set forth in its initial and April 3, 2013 supplemental answers to Motorola's first set of Interrogatories and Requests for Production as though set forth herein.  Those General Objections are incorporated into the specific objections to each Interrogatory set forth below.

**INTERROGATORY NO. 3:**   State the factual basis for any contention underlying Microsoft's claim that Motorola's October 21, 2010 and October 29, 2010 Letter constituted a breach or other violation of a commitment to license patents on reasonable and non-discriminatory terms.

**ANSWER:** Microsoft incorporates by reference each of its General Objections as though set forth herein.  Microsoft further objects that this is a premature contention interrogatory.  Microsoft is not obligated to respond to premature contention interrogatories until the parties have substantially completed discovery.

Subject to and without waiving these objections, Microsoft answers that, in willful disregard of the commitments Motorola made to IEEE and the ITU-T, Motorola has refused to extend to Microsoft a license consistent with Motorola's promises for any of Motorola's allegedly "essential" patents.  Instead, Motorola is demanding royalty payments that are wholly disproportionate to the royalty that its patents should command under any reasonable calculus.  Motorola has discriminatorily chosen Microsoft's Xbox product line and other multi-function, many-featured products and software, such as Windows 7 and Windows Phone 7 and products incorporating Microsoft software, for the purpose of extracting unreasonable royalties from Microsoft that are inconsistent with Motorola's obligation to offer licenses for the relevant patents on RAND terms and conditions.

In further response, Microsoft states as follows:

**MICROSOFT'S  *MAY 21, 2013
SUPPLEMENTAL* ANSWER TO
INTERROGATORY NO. 3 - 2**

LAW OFFICES
**CALFO HARRIGAN LEYH & EAKES LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700   FAX, (206) 623-8717

1    Motorola's October 21, 2010 Letter

2         By letter to Microsoft, dated October 21, 2010, Kirk Dailey, Motorola's Corporate Vice

3    President Intellectual Property, offered to license "Motorola's portfolio of patents and pending

4    applications having claims that may be or become Essential Patent Claims (as defined in

5    section 6.1 of the IEEE bylaws) for a compliant implementation of the IEEE 802.11

6    Standards."  Motorola offered to license the relevant patents under terms and conditions that

7    included a "royalty of 2.25% per unit for each 802.11 complaint product[.]"  Motorola stated

8    that the royalty "is calculated based on the price of the end product (e.g., each Xbox 360

9    product) and not on component software."

10        The cost of the chips and associated components that provide wireless connectivity for

11   Xbox 360 consoles is a small fraction of the overall cost of the device.  Moreover, Microsoft

12   sells its Xbox 360 consoles at a number of prices.  Each console includes approximately the

13   same chips and associated components for wireless connectivity, providing the same level of

14   relevant functionality.  Motorola thus seeks a royalty on components of Xbox 360 that is

15   disproportionate to the value and contribution of its purportedly "essential" patents and has

16   declined to offer a license to its purported "essential" patents unless it receives exorbitant and

17   discriminatory royalty payments to which it is not entitled.  On information and belief,

18   Motorola has not previously entered into a license agreement for its purported "essential"

19   patents that is comparable to the demand made of Microsoft.  Motorola has thereby refused to

20   offer to license the patents at a reasonable rate, with reasonable terms, under conditions that are

21   demonstrably free of any unfair discrimination.

22        The royalty demanded by Motorola falls well outside the boundaries of a reasonable

23   and non-discriminatory royalty and therefore violates the commitment Motorola made to the

24   IEEE and its members.

25

**MICROSOFT'S *MAY 21, 2013***
***SUPPLEMENTAL* ANSWER TO**
**INTERROGATORY NO. 3 -** 3

Participants in IEEE-SA standards setting efforts, including those directed to WLAN technology, were subject to the IEEE-SA Standard Board Bylaws concerning the submission of Letters of Assurance related to patent claims deemed "essential" by a submitting party. Clause 6 of those Bylaws (which was revised slightly over the years) generally provides in pertinent part:

A Letter of Assurance shall be either:

a) A general disclaimer to the effect that the submitter without conditions will not enforce any present or future Essential Patent Claims against any person or entity making, using, selling, offering to sell, importing, distributing, or implementing a compliant implementation of the standard; or

b) A statement that a license for a compliant implementation of the standard will be made available to an unrestricted number of applicants on a worldwide basis without compensation or under reasonable rates, with reasonable terms and conditions that are demonstrably free of any unfair discrimination.

Motorola openly and publicly submitted Letters of Assurance pursuant to Clause 6 of the IEEE-SA Standards Board Bylaws that it would offer to license any of its patents essential to the applicable WLAN standard(s) to any entity under reasonable rates on a non-discriminatory basis. IEEE-SA and its participants and affiliates relied on Motorola's promises in developing, adopting and implementing IEEE-SA technical standards. These standards are now implemented worldwide in a variety of electronic devices that have become commonplace.

Microsoft invested substantial resources in developing and marketing products in compliance with these standards, relying on the assurances of participating patent holders – including Motorola – that any essential patents held by such patent holders would be available for licensing by implementers of the standards on such terms.

By way of non-limiting example, each Xbox device includes substantial software and many computer chips and modules that perform various functions, including enabling Xbox's

MICROSOFT'S *MAY 21, 2013 SUPPLEMENTAL* ANSWER TO INTERROGATORY NO. 3 - 4

LAW OFFICES
CALFO HARRIGAN LEYH & EAKES LLP
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700   FAX, (206) 623-8717

core functionality as a video gaming machine.  Of those, the Xbox console includes one – an interface provided to Microsoft by third-parties – that allows consumers optionally to connect an Xbox to the Internet using a WLAN connection.

The third-party WLAN interface does not enable any of Xbox's core video gaming functionality.  In addition, Microsoft allows consumers an alternative, wired method to connect to the Internet.  This alternative method does not require use of any WLAN technology.

On information and belief, Motorola obtained rights to several of the WLAN patents it has represented as "essential" through its recent acquisition of Symbol Technologies, Inc. ("Symbol").

Prior to the releases of the 802.11 protocols, Motorola and Symbol submitted Letters of Assurance to the IEEE pursuant to Clause 6 of the IEEE-SA Standards Board Bylaws with respect to those protocols, guaranteeing that any "essential" patents would be licensed under reasonable and non-discriminatory terms and conditions.  Both Motorola's and Symbol's Letters of Assurance apply to any "essential" patents they then held as well as any other "essential" patents they subsequently obtained.

In reliance on these letters of assurance, IEEE released the 802.11 standard and various amendments to that standard that Motorola asserts incorporated Motorola's and Symbol's patented technology.  On information and belief, once Motorola and Symbol disclosed that they likely held essential patents, absent a licensing commitment from them to the effect that they would offer licenses to "essential" patents on reasonable and non-discriminatory terms and conditions, the relevant IEEE working groups would have either revised the standards, employing alternative technologies instead, stopped working on the protocols or taken other actions.

In submitting its Letter of Assurance pursuant to the applicable IEEE IPR policy, Motorola entered into an actual or implied contract with IEEE, for the benefit of IEEE

MICROSOFT'S  *MAY 21, 2013*
*SUPPLEMENTAL* ANSWER TO
INTERROGATORY NO. 3 - 5

LAW OFFICES
**CALFO HARRIGAN LEYH & EAKES LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700    FAX, (206) 623-8717

1    members and any entity that implements the 802.11 standard.  Motorola is bound by its

2    agreements to offer licenses consistent with the referenced IEEE bylaws.

3         Similarly, Symbol, in submitting its Letter of Assurance pursuant to the applicable

4    IEEE IPR policy, entered into an actual or implied contract with IEEE, for the benefit of IEEE

5    members and any other entity that implements the 802.11 standard, and Motorola is bound by

6    that commitment.

7         Motorola broke its promise to IEEE-SA and its members and affiliates by refusing to

8    offer to Microsoft a license that is consistent with Motorola's Letter(s) of Assurance and

9    Clause 6 of the IEEE-SA Standards Board Bylaws, instead demanding royalties that are

10   excessive and discriminatory.

11   Motorola's October 29, 2010 Letter

12        By letter to Microsoft, dated October 29, 2010, Kirk Dailey, Motorola's Corporate Vice

13   President Intellectual Property, offered to license "Motorola's portfolio of patents and pending

14   applications covering the subject matter of ITU-T Recommendation H.264[.]"  Motorola

15   offered to license the relevant patents under terms and conditions that included a "royalty of

16   2.25% per unit for each H.264 complaint product[.]"  Motorola stated that the royalty "is

17   calculated based on the price of the end product (e.g., each Xbox 360 product, each PC/laptop,

18   each smartphone, etc.) and not on component software (e.g., Xbox 360 system software,

19   Windows 7 software, Windows Phone 7 software, etc.)."

20        The cost of such component software and any inter-related hardware is a small fraction

21   of the overall cost of the listed devices.  Moreover, Microsoft sells products having H.264

22   related capabilities at a wide range of prices, without regard to the significance of such H.264

23   related capabilities to the primary or expected use of the products.  Motorola thus seeks a

24   royalty on software and hardware components of Xbox 360 and other devices that are

25   unrelated to its identified patents and has declined to offer a license unless it receives

MICROSOFT'S *MAY 21, 2013*
*SUPPLEMENTAL* ANSWER TO
INTERROGATORY NO. 3 - 6

1   exorbitant royalty payments to which it is not entitled.  On information and belief, Motorola

2   has not previously entered into a license agreement for its identified patents that is comparable

3   to the demand made of Microsoft.  Motorola has thereby refused to offer to license the patents

4   at a reasonable rate, with reasonable terms, on a non-discriminatory basis.

5          The royalty demanded by Motorola falls well outside the boundaries of a reasonable

6   and non-discriminatory royalty and therefore violates the commitment Motorola made to the

7   ITU and its members.

8          Participants in ITU-T standards setting efforts, including those directed to H.264

9   technology, were subject to the ITU-T Common Patent Policy concerning the submission of

10  Patent Statement and Licensing Declarations related to patents identified by a submitting party.

11  The ITU-T Common Patent Policy generally provides, in pertinent part, that a patent holder's

12  statement may declare that:

> (2.1) The patent holder is willing to negotiate licenses free of charge with other
> parties on a non-discriminatory basis on reasonable terms and conditions.

> (2.2) The patent holder is willing to negotiate licenses with other parties on a
> non-discriminatory basis on reasonable terms and conditions.

16         Motorola openly and publicly submitted Patent Statement and Licensing Declarations

17  pursuant to the ITU-T's Common Patent Policy that it would offer to license any of its patents

18  essential for the relevant H.264 Recommendation(s) to any entity under reasonable rates on a

19  non-discriminatory basis.  The ITU-T and its participants and affiliates relied on Motorola's

20  promises in developing, adopting and implementing the ITU-T H.264 Recommendations (or

21  standards).  These standards are now implemented worldwide in a variety of electronic devices

22  and software that have become commonplace.  Microsoft invested substantial resources in

23  developing and marketing products in compliance with these standards, relying on the

24  assurances of participating patent holders – including Motorola – that any "essential" patents

25

MICROSOFT'S *MAY 21, 2013*
*SUPPLEMENTAL* ANSWER TO
INTERROGATORY NO. 3 - 7

LAW OFFICES
**CALFO HARRIGAN LEYH & EAKES LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700   FAX, (206) 623-8717

1   held by such patent holders would be available for licensing by implementers of the standards

2   on such terms.

3         In submitting its Patent Statement and Licensing Declarations pursuant to the

4   applicable ITU-T policy, Motorola entered into an actual or implied contract with the ITU-T,

5   for the benefit of ITU-T members and any entity that implements the H.264 technologies.

6   Motorola is bound by its agreements to offer licenses consistent with the referenced ITU-T

7   Common Patent Policy.

8         Microsoft has participated in the development of the 802.11 and H.264 standards.

9   Microsoft and other companies participating in the development of these standards relied on

10   Motorola's commitments to ensure that the royalties Motorola would seek would conform to

11   the promises made by Motorola.

12         In reliance on the integrity of the SDO process and the commitments made by Motorola

13   and others regarding 802.11 patents they deem "essential," Microsoft began providing its Xbox

14   video game consoles with WLAN connectivity.  By way of example, Microsoft purchased and

15   incorporated into its Xbox 360 video game consoles third-party-manufactured interfaces that

16   provide Xbox 360 devices with WLAN connectivity.  Microsoft made its decision to provide

17   its Xbox video game consoles with WLAN connectivity in reliance on, and under the

18   assumption that, it and/or any third party supplier could avoid patent litigation and take a

19   license to "essential" patents that Motorola, or any other company submitting a Letter of

20   Assurance, holds with regard to the WLAN standard under IEEE's well publicized IPR policy.

21         Microsoft and other manufacturers of WLAN-compliant devices necessarily relied on

22   the assurances of participating patent holders – including Motorola – that any "essential"

23   patents held by such patent holders would be available for licensing by implementers of the

24   standards on such terms.

25

**MICROSOFT'S** *MAY 21, 2013*
*SUPPLEMENTAL* **ANSWER TO**
**INTERROGATORY NO. 3** - 8

1    Correspondingly, in reliance on the integrity of the SDO process and specifically the

2  commitments made by Motorola and others regarding patents related to H.264 technologies,

3  Microsoft began providing its H.264 technology capability in its Xbox video game consoles.

4  Microsoft made its decision to provide its Xbox video game consoles with H.264 technology in

5  reliance on, and under the assumption that, it and/or any third party supplier could avoid patent

6  litigation and take a license to any "essential" patents held by Motorola, or any other company

7  submitting a Patent Statement and Licensing Declaration, under the ITU-T's well-publicized

8  IPR policy.

9    Microsoft made similar investments in other fields, including Windows 7 and Windows

10  Phone 7, based upon Motorola's representations in relation to the H.264 technology standards.

11  Microsoft and other manufacturers and suppliers of H.264 compliant technology necessarily

12  relied on the commitments of Motorola and others to license their "essential" patents under

13  these terms.

14    By way of non-limiting example, each personal computer running Windows 7 includes

15  substantial software and many computer chips and modules that perform various functions,

16  including those related to the general operation of a computing device.  Of those, each personal

17  computer includes just a portion directed to H.264 technologies.

18    By way of further non-limiting example, each smartphone running Windows Phone 7

19  includes substantial software and many computer chips and modules that perform various

20  functions, including those related to the general and particularized operation of a smartphone

21  independent of H.264 technology.  Of those, each smartphone includes just a portion directed

22  to H.264 technologies.

23    Motorola broke its promise to the ITU-T and its members and affiliates by refusing to

24  offer to Microsoft a license that is consistent with Motorola's Patent Statement and Licensing

25

**MICROSOFT'S** *MAY 21, 2013*
*SUPPLEMENTAL* **ANSWER TO**
**INTERROGATORY NO. 3 -** 9

1   Declaration(s) and the Common Patent Policy of the ITU-T, instead demanding royalties that

2   are excessive and discriminatory.

3                    **SUPPLEMENTAL RESPONSE OF APRIL 3, 2013:**

4          Motorola committed to license its standard essential patents on RAND terms.  This

5   meant that Motorola had to make a license available to any implementer of the standards.

6   Offers made to prospective licensees had to be commercially reasonable.  Motorola could not

7   seek injunctive relief instead of entering into a license on RAND terms, especially in

8   circumstances where its license offers were not commercially reasonable.  In addition,

9   Motorola was subject to a duty of good faith and fair dealing in licensing and offering to

10  license its standard essential patents.

11         As a consequence of these contractual obligations undertaken by Motorola, Motorola

12  breached its RAND commitments in at least the following respects.  Motorola's breach is not

13  limited to the October 2010 demand letters.

14      • Motorola's October 2010 demand letters did not offer licenses to Microsoft on
15        RAND terms, and, to the contrary, were commercially unreasonable and
          facially outrageous; Motorola improperly sought the holdup value of its patents
16        rather than their RAND value and improperly sought a royalty on the entire
          market value of products, which included many components and features for
17        which Motorola was not entitled to any compensation.

18      • Motorola improperly sought injunctive relief in the ITC, the district courts and
          Germany instead of honoring its commitment to make licenses available on
19        RAND terms.  Repeated judicial and administrative rulings specific to Motorola
          have confirmed that its pursuit of injunctive relief was improper, including
20        Judge Posner's June 22, 2012 determination that Motorola could not obtain
          injunctive relief on its 802.11 standard-essential patents; the Court's November
21        29, 2012 order enjoining Motorola from seeking injunctive relief against
          Microsoft with respect to Motorola's H.264 and 802.11 standard essential patent
22        portfolios; and the January 3, 2013 FTC consent order prohibiting Google and
          Motorola from obtaining or enforcing injunctive relief on standard-essential
23        patents during the pendency of district court's resolution of a request for a
          RAND determination.  As the FTC explained, the consent order barring
24        Motorola from pursuing injunctive relief targeted "breaches by Google and its

25

**MICROSOFT'S  *MAY 21, 2013***
***SUPPLEMENTAL* ANSWER TO**
**INTERROGATORY NO. 3 -** 10

LAW OFFICES
**CALFO HARRIGAN LEYH & EAKES LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700   FAX, (206) 623-8717

subsidiary [Motorola] of Motorola's commitments to license standard-essential patents ('SEPs') on terms that are fair, reasonable and non-discriminatory ('FRAND')."  Statement of the Federal Trade Commission, *In the Matter of Google Inc.,* FTC File No. 121-0120 (Jan. 3, 2013).

- Motorola declined to offer a license to Microsoft's chip supplier Marvell (which requested a license for the specific benefit of Microsoft) on RAND terms that would cover product shipped to Microsoft and acted in a way that was both unreasonable and discriminatory.

- Once Motorola was acquired by Google and Microsoft had a right to a license to Motorola's H.264 standard essential patents by virtue of Google's participation in the MPEG-LA AVC pool, Motorola refused to grant a license on those terms, which would have complied with the RAND commitment.

- Motorola violated the covenant of good faith and fair dealing by reason of all of the actions recited above, whether considered separately or collectively, on an objective standard.

- Motorola also violated the covenant of good faith and fair dealing because it knew it was acting, and intended to act, inconsistently with the covenant of good faith and fair dealing by virtue of the actions recited above and the following additional indicia of intent:

  o Motorola's objective from the beginning was to secure crippling injunctive relief in some forum so that Microsoft would be deterred from seeking compensation for Motorola's infringement of Microsoft's non standard essential patents in Motorola's Android phones.  Motorola's demand letters in October 2010 were intended to set forth offers that it knew no reasonable company would accept.

  o In furtherance of the pursuit of injunctive relief, Motorola stated that the offers in the demand letters would remain open for only 20 days.

  o At the time that the demand letters were sent, Motorola had never entered into a license with anyone for its H.264 or 802.11 standard essential patents that was remotely comparable to the terms of the demand letter

  o Motorola understood the financial implications of the demand letter, including that it would be compensated for components and features as to which it had no patents.

**MICROSOFT'S** *MAY 21, 2013*
*SUPPLEMENTAL* **ANSWER TO**
**INTERROGATORY NO. 3 -** 11

> o   Motorola sought injunctions knowing that the terms in its October 2010
>     demand letters would be unacceptable to Microsoft and would not be
>     accepted.
>
> o   Motorola demanded that Marvell pay royalties on the end product sales
>     of its downstream customers even though no one had ever agreed to pay
>     royalties to Motorola on this basis.
>
> o   Motorola discriminated against Marvell and Microsoft by excluding
>     chips sold to Microsoft from the license offered to Marvell.
>
> o   Motorola in league with its parent company Google evaded the
>     requirements of the MPEG-LA AVC pool agreement.

### <u>MICROSOFT'S SUPPLEMENTAL RESPONSE OF MAY 21, 2013:</u>

Based on the Findings of Fact and Conclusions of Law issued in this matter on April 19, 2013, Motorola's demands in its letters of October 21 and 29, 2010 and its offer to Marvell were so far from offers made on RAND terms that Motorola was in breach of its RAND obligations.

Motorola's demands were so excessive that they constituted an effective refusal to deal under Motorola's contractual commitments to the ITU and IEEE. No reasonable company would have accepted the terms and conditions demanded by Motorola, and the excessive nature of the demands demonstrated that they were simply sham offers.

Further, by making demands that were so far removed from RAND, Motorola violated its duty of good faith and fair dealing. Not only would no reasonable company have accepted the terms and conditions demanded by Motorola, but Motorola could not have reasonably expected that they would have been accepted. Nor were the offered terms and conditions a reasonable or legitimate basis for negotiating to a lower RAND royalty. By making these demands, Motorola was signaling that it intended to seek a hold-up royalty from Microsoft. Indeed, Motorola has stated that it expects consideration equal to a 2.25% royalty for any

**MICROSOFT'S *MAY 21, 2013***
***SUPPLEMENTAL* ANSWER TO**
**INTERROGATORY NO. 3 -** 12

LAW OFFICES
**CALFO HARRIGAN LEYH & EAKES LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700   FAX, (206) 623-8717

portfolio of standard essential patents; the only point of negotiation is about the form – not the value – of consideration.

Although Microsoft does not believe that it is required to prove an absence of good faith on the part of Motorola in order to establish a breach of the RAND obligation, there is abundant evidence that Motorola was not acting in good faith in making its demands to Microsoft and Marvell.  The offers were a sham and intended as a predicate to filing lawsuits and seeking injunctions and exclusion orders on standard essential patents.  This conduct is consistent with a strategy of hold-up, the very conduct that RAND commitments seek to prevent.  The ultimate goal of Motorola's conduct was to pressure Microsoft into relinquishing its rights under non-standard essential patents by threatening or securing injunctions on Motorola's standard essential patents with devastating consequences.  Motorola understood that it was improper and inconsistent with RAND obligations to seek to use the hold-up power of its standard essential patents to demand grantback rights under a putative licensee's non-standard essential patents, but nevertheless pursued this course.

At least the following facts and circumstances demonstrate that Motorola breached its RAND commitments in its contract with the IEEE regarding the 802.11 WiFi standard. Further, at the time Motorola sent its October 21, 2010 demand letter and at the time of its offer to Marvell relating to Motorola's 802.11 essential patents, Motorola was or should have been aware of at least the following in addition to matters set forth in prior responses:

> Motorola has claimed that 2.25% was its standard offer for any portfolio of its standard essential patents, but it had no legitimate basis for selecting that rate for its 802.11 essential patents.

> Motorola had committed to licensing its 802.11 patents at a nominal competitive royalty.

> No claim charts had been prepared showing that all of the patents claimed by Motorola to be essential to 802.11 were, in fact, essential.

**MICROSOFT'S  *MAY 21, 2013 SUPPLEMENTAL* ANSWER TO INTERROGATORY NO. 3 -** 13

LAW OFFICES
**CALFO HARRIGAN LEYH & EAKES LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700    FAX, (206) 623-8717

No one had ever agreed to a license to Motorola's 802.11 essential patents, alone, at a royalty rate of 2.25%.

A large number of companies had submitted letters of assurance to the IEEE in connection with 802.11 and if each of those companies demanded a royalty of 2.25%, the total royalty would have been in excess of 200%, a royalty that was patently unreasonable and not viable from a business standpoint.

Motorola failed to take into account royalty stacking in setting a rate of 2.25% for its 802.11 essential patents, either in connection with royalties due other owners of 802.11 essential patents or owners of patents essential to other standards.

Motorola had no evidence that its 802.11 essential patents had any greater value than those of other owners of standard essential patents.

Motorola was aware of the rates charged by the Via 802.11 pool and had no knowledge that its own 802.11 essential patents had any greater value than those of pool members.

Although from an economic perspective, a RAND commitment limits a patent holder to a reasonable royalty on the economic value of its patented technology itself, apart from the value associated with incorporation of the patented technology into the standard, Motorola made no attempt to determine this economic value with respect to its 802.11 essential patents.

Although the actual value provided by an essential patent is its incremental contribution in comparison to alternatives that would have provided the same or a similar technical contribution, Motorola made no attempt to value its 802.11 essential patents in this way.

Motorola had in its possession an analysis of reasonable royalties for its 802.11 essential patents conducted by InteCap in 2003, but made no use of that in reaching the conclusion that it would seek 2.25% for its 802.11 patents. Motorola was aware that 802.11 functionality is substantially embodied in commodity chipsets that sell for a few dollars and that its demanded 2.25% royalty for Xbox consoles is exorbitant in light of the economics.

Microsoft had a right to a license to allow its making, using, and selling of 802.11-compliant products pursuant to Motorola's contractual obligations to the IEEE, either directly or indirectly.  Marvell was similarly entitled to a license, whether specific to its sales to Microsoft or otherwise.

A license to Marvell that covered its 802.11 chips as supplied to Microsoft would have exhausted Motorola's 802.11 standard-essential patents vis-à-vis

MICROSOFT'S *MAY 21, 2013*
*SUPPLEMENTAL* ANSWER TO
INTERROGATORY NO. 3 - 14

LAW OFFICES
**CALFO HARRIGAN LEYH & EAKES LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700   FAX, (206) 623-8717

Microsoft.  Motorola's express refusal to extend a license to Marvell that would have covered its sales of 802.11 chips/chipsets to Microsoft was effectively a refusal to license Microsoft on RAND terms and conditions, and was expressly discriminatory with respect to Microsoft.

Marvell could not maintain a viable business model by paying 802.11 royalties in excess of the cost of its chipsets on the end product prices charged by its customers or others downstream.

At least the following facts and circumstances demonstrate that Motorola breached its RAND commitments in its contract with the ITU regarding the H.264 video coding standard. Further, at the time Motorola sent its October 29, 2010 demand letter relating to Motorola's H.264 essential patents, Motorola was or should have been aware of at least the following in addition to matters set forth in prior responses:

Motorola has claimed that 2.25% was its standard offer for any portfolio of its standard essential patents, but it had no legitimate basis for selecting that rate for its H.264 essential patents.

No claim charts had been prepared showing that all of the patents claimed by Motorola to be essential to H.264 were, in fact, essential.

Motorola's role in H.264 development related almost entirely to interlaced video and its H.264 essential patents are almost entirely directed to interlaced video; interlaced video was of little importance to Microsoft's products.

No one had ever agreed to a license to Motorola's H.264 essential patents, alone, at a royalty rate of 2.25% of the price of the compliant end product.

No one had ever agreed to pay Motorola a royalty based on the price of products sold by its customers or others downstream.

A large number of companies had submitted letters of assurance to the ITU in connection with H.264 and if each of those companies demanded a royalty of 2.25%, the total royalty would have been in excess of 100%, a royalty that was patently unreasonable and not viable from a business standpoint.

Motorola failed to take into account royalty stacking in setting a rate of 2.25% for its H.264 essential patents, either in connection with royalties due other owners of H.264 essential patents or owners of patents essential to other standards.

**MICROSOFT'S** *MAY 21, 2013*
*SUPPLEMENTAL* **ANSWER TO**
**INTERROGATORY NO. 3 -** 15

LAW OFFICES
**CALFO HARRIGAN LEYH & EAKES LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700    FAX, (206) 623-8717

Motorola had no evidence that its H.264 essential patents had any greater value than those of other owners of standard essential patents.

Motorola was aware of the rates charged by the MPEG LA H.264 pool and that 2.25% was exorbitant in light of the number of patents included in the pool license; in addition, Motorola had no knowledge that its own H.264 essential patents had any greater value than those of pool members.

Motorola was aware that it had participated in the negotiations regarding the formation of the MPEG LA H.264 pool, had agreed to the rates the pool ultimately adopted, and had authorized the use of its name in announcing the finalization of those rates to the public.

Although from an economic perspective, a RAND commitment limits a patent holder to a reasonable royalty on the economic value of its patented technology itself, apart from the value associated with incorporation of the patented technology into the standard, Motorola made no attempt to determine this economic value with respect to its H.264 essential patents.

Although the actual value provided by an essential patent is its incremental contribution in comparison to alternatives that would have provided the same or a similar technical contribution, Motorola made no attempt to value its H.264 essential patents in this way.

DATED this 21st day of May, 2013.

CALFO HARRIGAN LEYH & EAKES LLP

By ____s/ Shane P. Cramer_____
      Arthur W. Harrigan, Jr., WSBA #1751
      Christopher Wion, WSBA #33207
      Shane P. Cramer, WSBA #35099
      999 Third Avenue, Suite 4400
      Seattle, WA  98104
      Phone:  206-623-1700

      T. Andrew Culbert
      David E. Killough
      MICROSOFT CORPORATION
      1 Microsoft Way
      Redmond, WA  98052
      Phone:  425-882-8080

MICROSOFT'S *MAY 21, 2013 SUPPLEMENTAL* ANSWER TO INTERROGATORY NO. 3 - 16

LAW OFFICES
**CALFO HARRIGAN LEYH & EAKES LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700   FAX, (206) 623-8717

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

David T. Pritikin
Richard A. Cederoth
Constantine L. Trela, Jr.
William H. Baumgartner, Jr.
Ellen S. Robbins
Douglas I. Lewis
David C. Giardina
John W. McBride
David Greenfield

SIDLEY AUSTIN LLP
One South Dearborn
Chicago, IL  60603
Phone:  312-853-7000
Fax:  312-853-7036


Carter G. Phillips
Brian R. Nester

SIDLEY AUSTIN LLP
1501 K Street NW
Washington, DC  20005
Telephone:  202-736-8000
Fax:  202-736-8711

Counsel for Microsoft Corp.

**MICROSOFT'S** *MAY 21, 2013*
*SUPPLEMENTAL* **ANSWER TO**
**INTERROGATORY NO. 3 -** 17

1

## CERTIFICATE OF SERVICE

2           I, Emma Chapman, swear under penalty of perjury under the laws of the State of

3   Washington to the following:

4           1.      I am over the age of 21 and not a party to this action.

5           2.      On the 21st day of May, 2013, I caused the preceding document to be served on

6   counsel of record in the following manner:

7   **Attorneys for Motorola Solutions, Inc., and Motorola Mobility, Inc.:**

8
    Ralph Palumbo, WSBA #04751
9   Philip S. McCune, WSBA #21081                    _____ Messenger
    Summit Law Group                                 _____ US Mail
10  315 Fifth Ave. South, Suite 1000                 _____ Facsimile
    Seattle, WA  98104-2682                          __X__ Email
11  Telephone:  206-676-7000
    Email:  Summit1823@summitlaw.com
12

13
    Steven Pepe (*pro hac vice*)                     _____ Messenger
14  Jesse J. Jenner (*pro hac vice*)                 _____ US Mail
    Ropes & Gray LLP                                 _____ Facsimile
15  1211 Avenue of the Americas                      __X__ Email
    New York, NY  10036-8704
16  Telephone:  (212) 596-9046
    Email:  steven.pepe@ropesgray.com
17  Email:  jesse.jenner@ropesgray.com

18
    Norman H. Beamer (*pro hac vice*)                _____ Messenger
19  Ropes & Gray LLP                                 _____ US Mail
    1900 University Avenue, 6th Floor                _____ Facsimile
20  East Palo Alto, CA  94303-2284                   __X__ Email
    Telephone:  (650) 617-4030
21  Email:  norman.beamer@ropesgray.com

22

23

24

25

**MICROSOFT'S  *MAY 21, 2013***
***SUPPLEMENTAL* ANSWER TO**
**INTERROGATORY NO. 3 -** 18                             LAW OFFICES
                                              **CALFO HARRIGAN LEYH & EAKES LLP**
                                                    999 THIRD AVENUE, SUITE 4400
                                                     SEATTLE, WASHINGTON 98104
                                              TEL, (206) 623-1700   FAX, (206) 623-8717

1    Paul M. Schoenhard (*pro hac vice*)     _____ Messenger
    Ropes & Gray LLP     _____ US Mail

2    One Metro Center     _____ Facsimile
    700 12th Street NW, Suite 900     \_\_X\_\_\_ Email

3    Washington, DC  20005-3948
    Telephone:  (202) 508-4693

4    Email: Paul.schoenhard@ropesgray.com

5    William Price (*pro hac vice*)     _____ Messenger
    Brian Cannon (*pro hac vice*)     _____ US Mail

6    Andrea Pallios Roberts (*pro hac vice*)     _____ Facsimile
    Quinn Emanuel     \_\_X\_\_\_ Email

7    555 Twin Dolphin Drive, 5th Floor

8    Redwood Shores, CA  94065-2139
    williamprice@quinnemanuel.com

9    briancannon@quinnemanuel.com
    andreaproberts@quinnemanuel.com

10

11    DATED this 21st day of May, 2013.

12

13                 s/ Emma Chapman

14                 EMMA CHAPMAN

15

16

17

18

19

20

21

22

23

24

25

MICROSOFT'S  *MAY 21, 2013*
*SUPPLEMENTAL* ANSWER TO
INTERROGATORY NO. 3 - 19

LAW OFFICES
**CALFO HARRIGAN LEYH & EAKES LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700   FAX, (206) 623-8717