# Exhibit 1

```
 1              UNITED STATES DISTRICT COURT

 2          WESTERN DISTRICT OF WASHINGTON AT SEATTLE

 3     _____

 4    MICROSOFT CORPORATION,          )
                                      )
 5                   Plaintiff,       )  10-01823-JLR
                                      )
 6    v.                              )  SEATTLE, WASHINGTON
                                      )
 7    MOTOROLA INC., et al,           )  October 29, 2012
                                      )
 8                   Defendant.       )       Pretrial
                                      )       Conference
 9
      _____
10
               VERBATIM REPORT OF PROCEEDINGS
11         BEFORE THE HONORABLE JAMES L. ROBART
                UNITED STATES DISTRICT JUDGE
12     _____

13

14    APPEARANCES:

15

16

17   For the Plaintiff:      Arthur Harrigan, Christopher
                             Wion, David Pritikin and Richard
18                           Cederoth

19

20

21   For the Defendants:     Jesse Jenner, Ralph
                             Palumbo,Steven Pepe, Philip
22                           McCune, Stuart W. Yothers, and
                             Kevin J. Post
23

24

25
```

1    asserting that Motorola's H.264 standard essential patents

2    are worth more than the royalty that is presumed reasonable

3    in the Google license.

4        The court's ruling will be, in summary, granted with

5    respect to part (a) of that and denied with respect to parts

6    (b) and (c).  But I will explain my reasoning.  I will start

7    with a parenthetical, which is, the court has had a lot of

8    experience, both when it was in private practice and from the

9    bench, with the assertion of either work-product privilege or

10   attorney-client privilege.

11       And, apparently, they have changed those doctrines since I

12   graduated, because the notion seems to be that anything that

13   your lawyer has ever said or done is privileged.  And that

14   simply is not the law.  It's not the law in the Ninth

15   Circuit.  It's not the law in the Supreme Court.  It wasn't

16   even the law in 1973 when I graduated.  And a number of the

17   attorneys who are here today have invoked the privilege in a

18   manner that is just completely inappropriate.  So, I would

19   urge you all to go back to Wigmore and read your evidence

20   rules.

21       Turning to (a), Microsoft seeks to exclude Motorola from

22   presenting evidence on the following matters:  Namely,

23   Motorola's reasons for not participating in certain pools,

24   such as the H.264 pool.  From examining the deposition

25   testimony of Motorola's witnesses on this subject, Mr. Dailey

1   and Mr. Kowolski, the court finds that counsel for Motorola

2   instructed Motorola's witnesses to answer the question in a

3   broad sense, but asserted a privilege for specific answers.

4       As an initial matter, any privilege with respect to

5   Motorola's reason for not participating in patent pools

6   appears to have been waived, because Professor Teece, a

7   Motorola witness in the German action, and Mr. Dailey, two

8   non-attorneys, discussed such reasons with one another.

9       Now, I understand Mr. Teece, probably Professor Teece was

10  Motorola's expert in the German action and submitted a

11  declaration which states at paragraph 114, "I discussed with

12  Kirk Dailey why Motorola elected to participate in certain

13  patent pools but not others.  He told me that Motorola is

14  willing to participate in certain patent pools that license

15  technology that Motorola does not see as part of Motorola's

16  key strategic focus, but chooses to administer its own

17  licensing program (and thus not to participate in the pool)

18  for technologies that it sees as part of Motorola's key

19  strategic focus, including wireless communication such as

20  GSM, CDMA, WCDMA, and LTE standards, as well as the A02.11

21  standards) and video compression."

22       When the question was asked in this litigation, there was

23  an instruction not to answer on the grounds that any

24  information would have been obtained from a lawyer and

25  therefore was protected by the privilege.  That is dead

1   wrong.  It's not even in the ballpark close.  If you have had

2   your lawyer say to a witness:  We don't participate in a

3   patent pool because we're dealing with strategic focus, that

4   is not attorney-client privilege.  And the assertion of

5   privilege in regards to it is completely incorrect.

6       Additionally, the instruction by Motorola's counsel that

7   questions related to this subject were privileged and the

8   witnesses should only answer at a general level, precludes

9   Motorola's evidence because Microsoft was unable to continue

10   questioning on the subject.  It would be unfair for Motorola

11   to offer testimony of its choice and have denied Microsoft

12   the opportunity to examine the testimony in detail.

13       There is a hypothetical way that this motion could be

14   granted.  But even if it were granted, then the testimony

15   wouldn't be allowed.  And so I won't get into it.  But, for

16   example, if the Motorola attorney had told the witness:  In

17   this litigation we are taking this position, and your answer,

18   or the company's reasoning involves the actions we're taking

19   in the litigation.  That conceivably could be privileged.

20   However, the result is the same.  The information would not

21   be available to Microsoft.  So, in regards to part (a) the

22   court is granting the motion.

23       In regards to part (b) and (c) of this, they refer --

24   Microsoft's motion relates to what the parties refer to as

25   the "Google license."  This is a late entry into the case and

1   limine.

2       No. 4.  Microsoft seeks to exclude references to

3   communications by either party during settlement

4   negotiations.  Denied.  The court will examine the offered

5   testimony at trial as it arises.  Both sides correctly point

6   out that the purpose of Rule 408 is to encourage the

7   compromise and settlement of existing disputes.  However,

8   Rule 408 "Does not require the exclusion of any evidence

9   otherwise discoverable, merely because it was presented in

10  the course of compromise negotiations."  Citing *United States*

11  *v. Washington*, out of the Western District of Washington,

12  August 15, 2006.

13      In other words, Rule 408 cannot be read to protect

14  pre-existing information simply because it was presented to

15  the adversary in compromise negotiations.  That comes out of

16  the Evidence Rule 408 Advisory Committee notes.

17      The same is true for the non-disclosure agreement.  The

18  non-disclosure agreement does not require the court to

19  exclude information acquired by either party during

20  discovery.

21      We looked carefully at some of the examples that are

22  offered and concluded that we should follow the general rule

23  in this matter.  If you look at the deposition of Motorola

24  employee Neill Taylor, N-E-I-L-L, the question was asked:

25  "When did Microsoft request Motorola identify its patent

1  value?"  Mr. Taylor responded, "My understanding was that

2  Microsoft really needed Motorola to establish our patent

3  value to able to have some sort of a balanced deal."  That

4  testimony was presented during a deposition, and it's now

5  sought to be excluded as a product of settlement negotiations

6  under 408.  And the court simply will not do that.

7      No. 5.  Microsoft seeks to exclude any assertion or

8  testimony that the '514 known as the Gandhi, and the '317

9  known as the Mathew patents are essential, because Motorola

10  did not timely disclose such a contention in response to

11  interrogatories specifically seeking such information.

12      This one is granted in part and denied in part.  Motorola

13  agrees that the Gandhi and Mathew patents are not essential

14  to the H.264 standard, pursuant to the definition provided by

15  the ITU for essential patents.  Thus, Microsoft's motion is

16  granted insofar as it requests that Motorola not present

17  evidence that its patents are essential to the H.264 standard

18  under the ITU definition.

19      There are other uses of the word "essential," which are

20  not covered by that.  With respect to other definitions of

21  the word "essential," if Microsoft solicits testimony or

22  presents evidence that Motorola's patents are not essential,

23  then Motorola should be allowed to rebut that testimony or

24  evidence.

25      Finally, Motorola seeks to exclude testimony from Dr.

1   privilege.  I guess it's okay for the kettle to call the pot

2   black.

3       The first of those and the one that's directly presented

4   to the court has to do with Mr. Gutierrez.  And this is the

5   depositions of -- apparently taken by Mr. Schoenhard of Ropes

6   and Gray, and defended by Mr. Pritikin.  And it is the

7   deposition of Horatio Gutierrez -- apparently not to be

8   confused with the Mariner's centerfielder -- taken April 4,

9   2012.

10      Mr. Gutierrez provided, properly provided information

11  regarding Microsoft's response to Motorola's offer letters.

12  And I read the deposition transcript, and I frankly found

13  Motorola's motion not to be well taken.  So, as he provided

14  that information, I think the relief that Motorola now seeks

15  is simply too broad.

16      The court will, during the trial, as I indicated, allow

17  renewed objections.  However, Motorola or Microsoft is going

18  to need to demonstrate that the fact being offered into

19  evidence was inquired into, and the discovery was blocked.

20  If that showing is made, then it is likely that the court

21  would exclude the evidence.

22      No. 2 for Motorola.  Testimony regarding an analysis of

23  the facts under the *Georgia-Pacific* factors.  There's nothing

24  like a broad topic to raise.  I am going to deny it.  This

25  largely centers on Mr. Lynde, L-Y-N-D-E, who provides a

CERTIFICATE


I, Debbie K. Zurn, RPR, CRR, Court Reporter for the United States District Court in the Western District of Washington at Seattle, do hereby certify that I was present in court during the foregoing matter and reported said proceedings stenographically.

I further certify that thereafter, I have caused said stenographic notes to be transcribed under my direction and that the foregoing pages are a true and accurate transcription to the best of my ability.


Dated this 30th day of October, 2012.



/s/ *Debbie Zurn*

DEBBIE ZURN
OFFICIAL COURT REPORTER

# EXHIBIT 2
# FILED UNDER SEAL

# EXHIBIT 3
# FILED UNDER SEAL

# EXHIBIT 4
# FILED UNDER SEAL

# Exhibit 5

**CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER**

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| MICROSOFT CORPORATION,<br><br>Plaintiff,<br><br>v.<br><br>MOTOROLA, INC., et al.,<br><br>Defendants. | CASE NO. C10-1823JLR |

EXPERT REPORT OF GREGORY K. LEONARD, PH.D.

CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER

Gutierrez, an offer to grant Microsoft a worldwide license to Motorola's portfolio of patents and patent applications relating to the IEEE 802.11 standards.[37]  The letter included an annex that identified Motorola's patents that Motorola believed to be essential to the 802.11 standard.  The letter included Motorola's offer to grant the license under reasonable and non-discriminatory terms and conditions.  Motorola offered a royalty rate of 2.25% of the price per unit for each unit sold by Microsoft.  The letter also stated that the offer was subject to a grant back license (cross license) under Microsoft's 802.11 essential patents.  Motorola also offered to license less than its entire portfolio of 802.11 essential patents on RAND terms.

48.    According to Mr. Dailey, the request for a cross license was part of Motorola's usual practice to decrease the royalty rate if the other party agreed to cross license its patents. The offer was left open for 20 days, which I understand from Mr. Dailey was Motorola's standard practice[38] as a way to move the negotiations along; it was not meant to be an "exploding" offer or a "take-it-or-leave it" offer.  Instead, it was a way to try to encourage the other side to give a prompt response.

49.    According to Mr. Gutierrez, Microsoft received the October 21, 2010 letter on the morning of October 22, 2010.  He forwarded the letter immediately to Microsoft's litigation counsel.  Although the parties met in person later that day to discuss a resolution of the parties' disputes, the parties did not discuss the October 21 letter.  In particular, Microsoft did not ask for any clarification of any of the terms in the October 21 letter.[39]

---

[37]  MOTM_WASH1823_0018476-97; Trial Transcript, Day 6, p. 36 (Dailey).

[38]  Trial Transcript, Day 6, p. 76 (Dailey).

[39]  Gutierrez Dep. II (rough), p. 60.

01980.62689/5340640.1

17

CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER

50.    On October 29, 2010, Motorola sent Microsoft another letter, which offered to grant Microsoft a worldwide license to Motorola's portfolio of patents and patent applications relating to the ITU-T Recommendation H.264.  Like the previous letter, this letter included an annex identifying Motorola's patents that are essential to the H.264 standard.  This letter also offered to grant the license under reasonable and non-discriminatory terms and conditions and specified an offer of a 2.25% royalty rate per unit.  This offer was subject to a cross license under Microsoft's H.264 essential patents.  Again, according to Mr. Dailey, if Microsoft had agreed to a cross license, the royalty rate would have been reduced by an amount to be determined that would depend on the value of Microsoft's patents.  Motorola also offered to license less than its entire portfolio of H.264 essential patents, on RAND terms.  The same 20 day period was given in this letter, as well, which again I understand to have been a way to facilitate a prompt response.[40]

51.    In the Patent Declarations Motorola submitted related to the H.264 patents, there was an option for granting licenses based on "reciprocity."  Motorola selected that option, which indicates that Motorola wanted to license its patents on the condition that the other party cross license its own H.264 essential patents to Motorola.[41]

52.    Based on Mr. Dailey's testimony, I understand that, Motorola does not stack royalties for its SEP portfolios.[42]  Thus, Motorola's offer for a license to both its 802.11 and H.264 portfolios would have been a royalty rate of 2.25%, not a combined 4.5%.

---

[40]  MOTM_WASH1823_0018498-521 at 498.

[41]  MOTM_WASH1823_0000035-77 at 36.

[42]  Trial Transcript, Day 6, p. 66 (Dailey).

01980.62689/5340640.1

18

CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER

technical, economic, and licensing experts submitted reports and were deposed.  Thus, in making

its determination of a RAND royalty, the Court had access to substantial information on, among

other things, the nature of Motorola's technology and its relation to the standard, the use of the

Motorola technology in Microsoft's products, the nature of Microsoft's business, the extent of

participation of other companies in the standard, and various licensing agreements, patent pools,

and other analyses that might have been relevant.[52]  In addition, each company presented their

best arguments in a coherent and organized fashion to the Court.

63.     As a general matter, in my experience, it would be extraordinary for the parties in

a patent licensing negotiation to have available to them the level of information that was

available to the Court in this case.  This statement would apply at the conclusion of a negotiation,

let alone at the very beginning.

64.     In particular, when it made its opening offers, Motorola did not have the benefit

of the knowledge that was developed through this legal proceeding.  While Motorola was

presumably aware of the nature of its own technology in isolation, it was not fully aware of how

the technology was used in the Microsoft products[53] or the nature of Microsoft's business.[54]

Nor did Motorola know how any Microsoft patents might apply to Motorola products.[55]  Indeed,

Mr. Gutierrez testified that, in a typical Microsoft license negotiation, Microsoft does not have

non-public information about the other party to the negotiations.[56]  Moreover, there is no

evidence that Motorola was aware of the arguments made by Microsoft during the hearing as to

---

[52]  RAND Order, pp. 7-8.

[53]  Dailey Dep., pp. 30, 33.

[54]  Trial Transcript, Day 6, pp. 118-121 (Dailey).

[55]  Dailey Dep., pp. 29.

[56]  Gutierrez Dep. II (rough), pp. 124-125.

CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER

the relative unimportance of the Motorola technologies to the standards, both in a technical sense and relative to other contributors to the standards.

65.     As discussed above, parties to a license negotiation may have particular preferences about the terms and conditions of the license agreement, including but not limited to the structure of the licensing fees.  At the time it made its initial offer, Motorola was not aware of Microsoft's preferences regarding these issues.[57]

66.     Furthermore, as of October 2010, Motorola had no experience licensing its 802.11 and H.264 SEP portfolios on a standalone basis.  More generally, its licensing experience was in hardware, not software.  As discussed above, at that time, Wi-Fi functionality had only recently been widely incorporated into smartphones and sales of smartphones had only recently started growing rapidly.  As of October 2010, Motorola's 802.11 and H.264 SEP portfolios had not been separately licensed. ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████[58]  It is difficult or impossible to break out a separate royalty rate for the 802.11 and H.264 SEP portfolios in these agreements, and they do not cover software.[59]  Accordingly, Motorola had no past experience on which it could draw when it attempted to negotiate a RAND license with Microsoft.  This is in direct

---

[57]  Dailey Dep., pp. 39-40.

[58]  Motorola Mobility, Inc.'s Supplemental Written Responses to Topics 11-12 of Microsoft's Third Amended 30(b)(6) Notice of Deposition, Exhibit E.

[59]  The Court reached a similar conclusion with respect to the Motorola-RIM license.  RAND Order ¶¶ 425-429.

**CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER**

contrast to the situation with its cellular SEP portfolio, which Motorola had licensed many times to many licensees by October 2010.[60]

67.     The absence of any past experience with a particular type of licensing situation is common in situations where a licensor is licensing patents for the first time or for the first time in a new industry.  In fact, Mr. Gutierrez testified that when Microsoft licenses a new patent licensing program, it effectively has a "pilot" for the new program.  It sets the royalty rate based on its analyses, but that rate may not be accepted by the market.  If that is the case, Microsoft will adjust the rate accordingly.[61]

68.     Motorola had ultimately declined to participate in the MPEG LA H.264 patent pool and did not participate in the Via Licensing pool, presumably in both cases because it thought its patents were more valuable than the average patent in the respective pools. Accordingly, as of October 2010, it would have been reasonable for Motorola not to consider these patent pools as a useful benchmark for a royalty rate in a RAND license for its patents.

69.     The outcome of the 2003 Proxim litigation may have indicated to Motorola that its initial offer of 2.25% was reasonable.  In that litigation, Motorola (then Symbol) had been awarded reasonable royalties at a 6% royalty rate.

70.     Motorola had a "STAMP Board working group" that in 2003 put together a presentation regarding licensing 802.11 patents.  As this was well before the events at issue in this case, Microsoft cannot claim that this presentation was put together by Motorola as part of

---

[60]  Even with Motorola's cellular patent licenses, comparing one license to another is difficult given their complexity and differences between them in terms of royalty structures, the value of the patents being cross licensed to Motorola, other types of consideration, and the characteristics of the licensee's business, among other things.  However, while the final agreement differed widely across licensees, Motorola consistently used 2.25% as its opening offer.

[61]  Gutierrez Dep. II (rough), pp. 120-121.

**CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER**

party, as Motorola unexpectedly had been, so that the negotiation is expected to be of long duration and closely fought.

76.     It is my opinion that, for these reasons, when formulating its opening offers to Microsoft in October 2010, Motorola defaulted to the standard opening offer of 2.25% on the end product that it had long used successfully when negotiating licenses to its cellular SEP portfolio.[70]  While this opening offer is outside the RAND royalty ranges for Motorola's 802.11 and H.264 SEP portfolios that have been determined by the Court, Motorola was operating at that point in the negotiation on the basis of substantially less information, as well as an expectation that the negotiation would continue[71], and thus resorted to its customary default offer.  Motorola had not been prepared for in-depth cross-licensing discussions when Microsoft unexpectedly filed its lawsuit on October 1, 2010, and thus had to start from scratch to quickly identify its patents to Microsoft (at Microsoft's request).  However, defaulting to its custom when making an opening offer, particularly given the particular situation in which Motorola found itself, does not constitute a lack of good faith.

77.     Moreover, Motorola would not have reasonably expected to affect, through its opening offers, Microsoft's willingness to pay a royalty for the Motorola portfolios.  Microsoft is a sophisticated company, with its own large patent portfolio, extensive knowledge of technology, substantial experience in licensing, deep financial resources, and the recourse of bringing a lawsuit such as this one.  Indeed, Microsoft's licensing witness, Mr. Gutierrez, testified that ███

████████████████████████████████████████████

---

[70]  Dailey Dep., p. 25; Kowalski Dep., pp. 20-21

[71]  In negotiating its various cellular license agreements, Motorola has demonstrated substantial flexibility, having agreed to many different types of licensing fee structures, such as lump sum royalties, running royalties with per unit caps, running royalties with an overall annual cap, as well as other forms of consideration.

01980.62689/5340640.1

27

**CONFIDENTIAL BUSINESS INFORMATION SUBJECT TO PROTECTIVE ORDER**

Dated:  May 29, 2013

Exhibit 6

1          UNITED STATES DISTRICT COURT.

2        WESTERN DISTRICT OF WASHINGTON AT SEATTLE

3    _____

4    MICROSOFT CORPORATION,              )
                                         )
5                    Plaintiff,          )  C10-01823-JLR
                                         )
6    v.                                  )  SEATTLE, WASHINGTON
                                         )
7    MOTOROLA INC., et al,               )  November 20, 2012
                                         )
8                    Defendant.          )  TRIAL DAY 6
                                         )
9    _____

10             VERBATIM REPORT OF PROCEEDINGS
          BEFORE THE HONORABLE JAMES L. ROBART
11            UNITED STATES DISTRICT JUDGE

12   _____

                    Sealed by Court Order
13
                    Unredacted Version
14

15   APPEARANCES:

16

17

18   For the Plaintiff:      Arthur Harrigan, Christopher
                             Wion, David Pritikin, Rick
19                           Cederoth, Ellen Robbins and Andy
                             Culbert
20

21

22
     For the Defendants:     Jesse Jenner, Ralph Palumbo,
23                           Philip McCune, Kevin Post, Tom
                             Miller and James R. Batchelder
24

25

1      THE COURT:  They are admitted.

2      (Exhibit Nos. 1 and 2 were admitted into evidence.)

3   Q   Let's talk about Exhibit 1, the 802.11 offer.  At a high

4   level will you explain what you were intending to do in

5   connection with Exhibit 1?

6   A   We sent this letter -- we had been sued by Microsoft in

7   early October, and we had been invited by Microsoft to put

8   our patents on the table with respect to their product, so we

9   could have a discussion.  So this was intended to be an

10  initial offer under our 802.11 patents so that we could have

11  a discussion and a negotiation with Microsoft.

12  Q   Now, in the middle of the first paragraph it refers to an

13  offer being at a reasonable royalty of 2.25 percent per unit.

14  Do you see that?

15  A   Yes.

16  Q   What is 2.25 percent per unit in Motorola's licensing

17  lexicon?

18  A   So, 2.25 percent is our standard opening offer for any of

19  our core essential patent portfolios, such as WiFi, or

20  802.11, H.264, or any of the cellular standards.

21  Q   What's the basis for 2.25 percent being a standard offer

22  at Motorola?

23  A   It's a historical number.  Back in the early '90s we had a

24  fixed dollar unit in our cellular licensing program.  I

25  believe it was $9 a unit that was applied to some very

1    expensive cellular phones that were in the $2,000 range.   As

2    those prices were quickly coming down, our licensees had

3    asked to convert to a running royalty in order to be more

4    reasonable and stay in line with the product, the average

5    selling price of the products.

6    Q   So you actually converted to a percent of end price at the

7    request of licensees in the '90s?

8    A   Yes.

9    Q   Is 2.25 percent Motorola's standard rate for every

10   essential portfolio?

11   A   No.   I think I mentioned, we have really three areas.   The

12   core wireless research areas, like 802.11 and cellular, and

13   also core video compression technologies, like H.264, we use

14   the 2.25 percent.

15   Q   Since about when in time has 2.25 percent been the

16   so-called standard offering rate?

17   A   Since sometime in the mid-'90s.

18   Q   Since before 2000?

19   A   Yes.

20   Q   Turning to the other portion of this, the end product.

21   Based on your experience in licensing, do negotiating parties

22   often use end product as the royalty base?

23   A   Yes, they do.

24   Q   Why do they do that?

25   A   For several reasons.   Historically in my space we've

1   A    So, we were in the midst of having conversations with

2   Microsoft.  They wanted to understand the value of our patent

3   portfolios.  We knew these two patent portfolios in

4   particular were relevant to the discussion.  So we sent the

5   letters, putting them on notice so that we could carry

6   forward with good-faith negotiations.

7   Q    Were these letters, you say, in request for information

8   that Microsoft wanted about your patents?

9   A    Yes.

10  Q    Did Microsoft respond to either of these letters before

11  filing the breach of complaint -- the breach of contract

12  complaint in this action?

13  A    They did not, no.

14  Q    Did Microsoft respond after the breach complaint was

15  filed?

16  A    Yes, they did.

17  Q    How did they respond?

18  A    They actually -- I think they -- we spoke to them right

19  after they filed the breach of contract complaint, and they

20  said, don't be concerned about the complaint, it was a

21  litigation tactics week, and they expected some good work

22  from our lawyers as well.

23      So, it was really -- that was the start of it.  And then

24  we entered into negotiations.

25          MR. PRITIKIN:  Your Honor, we're going to object.

1   The exhibits are here.  We're also going to object to

2   questions and answers, testimony about settlement discussions

3   that occurred between Microsoft and Motorola.  It's no secret

4   that, like all big companies, they have had a dialogue that's

5   been going on over the last couple of years.  We think it is

6   inappropriate for two reasons.  First, under Rule 408; and

7   second, on relevance grounds.

8        What we're trying to determine here is what is a RAND

9   royalty.  And the settlement discussions that the parties

10  have had regarding this case and related disputes really

11  don't have a bearing on that.  It's not evidence that ought

12  to be considered because of the principle underlying Rule

13  408.

14       We also think that as the finder of fact it's particularly

15  inappropriate for the court to be relying on and hearing

16  evidence about offers and counteroffers that have been made

17  over the intervening year and a half or two years.  They have

18  a number of exhibits here that get into that.  We object to

19  that.  We also object to the testimony on this subject.

20            MR. JENNER:  Your Honor, if I may.  Two things.

21  First of all, as I think Your Honor indicated at the in

22  limine rulings, Rule 408 has a particular focus, it doesn't

23  apply to everything in the universe having to do with talks

24  about settlement or resolving conflict.  We do not offer

25  anything that we're about to get into for the purpose of



Exhibit 7

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
ALLEN LO - 7/12/2012

1

1          UNITED STATES DISTRICT COURT
     FOR THE WESTERN DISTRICT OF WASHINGTON
2                  AT SEATTLE

3                 ---oOo---

4   MICROSOFT CORPORATION, a
    Washington corporation,
5
            Plaintiff,
6
        vs.                        No. C10-1823-JLR
7
    MOTOROLA INC., et al.,
8
            Defendants.
9   _____/

10  MOTOROLA MOBILITY, INC., et al.,

11   Plaintiffs/Counterclaim Defendant,

12      vs.

13  MICROSOFT CORPORATION,

14   Defendant/Counterclaim Plaintiff.
    _____/

15

16

17      Rule 30(b)(6) and Personal Deposition of

18                  ALLEN LO

19            Thursday, July 12, 2012

20

21      HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

22          PURSUANT TO PROTECTIVE ORDER

23

24  REPORTED BY:  JOHN WISSENBACH, RDR, CRR, CBC, CCP,

25            CLR, CSR 6862            01-444456

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
ALLEN  LO - 7/12/2012

7

1   his personal capacity.

2          MR. CANNON:  This is Brian Cannon, from

3   Quinn Emanuel, for Google and the witness.

4          MR. JENNER:  Jesse Jenner, from Ropes &

5   Gray, for the defendants.

6          MR. COLGAN:  John Colgan, in-house counsel

7   at Google.

8          THE VIDEOGRAPHER:  Thank you.  The court

9   reporter today is John Wissenbach, of Merrill Court

10  Reporting.  Would the court reporter please swear in

11  the witness.

12                    ALLEN LO,

13  having been first duly sworn, testified as follows:

14         THE VIDEOGRAPHER:  Thank you.  Please

15  begin.

16              EXAMINATION BY MR. PRITIKIN

17     Q.  Good morning, Mr. Lo.  Could you please

18  state your full name and address for the record.

19     A.  Yes.  Allen Mingren Lo.  Address is 20880

20  Jacks Road, in Saratoga, California.

21     Q.  For whom do you work?

22     A.  Google.

23     Q.  And what is your title?

24     A.  Deputy general counsel for patents and

25  patent litigation.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
ALLEN  LO - 7/12/2012

11

1      A.  1990.

2      Q.  What did you do --

3      A.  I'm sorry, 1995.  I graduated from Ohio

4  State in 1990, law school in 1995.

5      Q.  Now, you are appearing today in response to

6  subpoenas that were served on you and on your

7  employer, Google; is that correct?

8      A.  I know they were served on Google.  They

9  may have been served on me.  I'm not sure.  But yes.

10      Q.  Let me hand you what has been marked as

11  PX-100, 101, and 102.

12          Do you have -- let me -- let me trade you

13  these.  I think I have the originals.

14          MR. CANNON:  And these were served on

15  Google's counsel.

16  BY MR. PRITIKIN:

17      Q.  Have you seen the subpoenas before, Mr. Lo?

18      A.  I've seen at least one of them.

19      Q.  And do you see that PX-100 is a subpoena

20  served on -- directed to you?

21      A.  Yes.

22      Q.  And you're appearing today in response to

23  this subpoena?

24      A.  Yes.

25      Q.  And PX-101 is a subpoena directed to

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
ALLEN LO - 7/12/2012

12

1   Google, and you're appearing in response to this as

2   well?

3         A.   Yes, for certain topics.

4         Q.   All right.   And would you look at PX-102.

5   And if you turn to the text beginning at page 5, do

6   you see that there are certain deposition topics

7   that are listed?

8         A.   Yes.

9         Q.   And is it correct that you have been

10  designated by Google to testify as its corporate

11  representative as to certain of these topics?

12        A.   Yes.

13        Q.   And is it correct that you have been

14  designated to testify on Google's behalf as to

15  topics 1, 3, 4, 5, 7, 8, 9, 10, 11, 12, 13, and 14?

16             MR. CANNON:   Counsel, I might need to

17  clarify some of the -- some of the designations that

18  we had previously provided.   Topics numbers 5 and 9

19  will be handled by Mr. Peterson.

20  BY MR. PRITIKIN:

21        Q.   Other than topics 5 and 9, are you Google's

22  corporate representative for purposes of the other

23  topics that I listed?

24        A.   Yes.

25        Q.   What have you done to prepare yourself to

# Selected Page Filed Under Seal

# EXHIBIT 8
# FILED UNDER SEAL

# EXHIBIT 9
# FILED UNDER SEAL

# EXHIBIT 10
# FILED UNDER SEAL

# EXHIBIT 11
# FILED UNDER SEAL