```
              UNITED STATES DISTRICT COURT
          WESTERN DISTRICT OF WASHINGTON AT SEATTLE
_____

MICROSOFT CORPORATION,              )
                                    )
                   Plaintiff,       ) CASE NO. C10-1823JLR
                                    )
v.                                  ) SEATTLE, WASHINGTON
                                    ) July 30, 2013
MOTOROLA, INC., et al.,             )
                                    ) Daubert hearing
                   Defendant.       )
                                    )
_____

              VERBATIM REPORT OF PROCEEDINGS
         BEFORE THE HONORABLE JAMES L. ROBART
            UNITED STATES DISTRICT JUDGE
_____

APPEARANCES:

  For the Plaintiff:      ARTHUR HARRIGAN
                          RICHARD CEDEROTH
                          ANDREW CULBERT
                          DAVID PRITIKIN
                          CHRISTOPHER WION


  For the Defendant:      KATHLEEN SULLIVAN
                          WILLIAM PRICE
                          PHILIP McCUNE
                          RALPH PALUMBO (by telephone)


  Reported by:            NANCY L. BAUER, CCR, RPR
                          Federal Court Reporter
                          700 Stewart Street, Suite 17205
                          Seattle, WA 98101
                          (206) 370-8506
                          nancy_bauer@wawd.uscourts.gov
```

```
1   July 30, 2013                                1:30 p.m.
                         PROCEEDINGS
2   _____
```

3          THE CLERK:  Case C10-1823, Microsoft Corporation v.

4   Motorola Mobility.

5       Counsel, please make your appearances for the record.

6          MR. HARRIGAN:  Good morning, Your Honor.  Art

7   Harrigan representing Microsoft; and from my office,

8   Mr. Pritikin, who you know; and Mr. Cederoth from Sidley; and

9   Mr. Culvert from Microsoft; and my partner, Chris Wion.

10         MR. MCCUNE:  Good afternoon, Your Honor.  Phil McCune

11  from the Summit Law Group.  On the telephone today is my

12  partner, Ralph Palumbo.  Thank you for giving permission for

13  him to participate by telephone.  Also today we have some new

14  faces who have been looking forward to being here live, in

15  person, today in these proceedings.  To my left is Mr. Bill

16  Price, and to my right is Kathleen Sullivan.

17         MS. SULLIVAN:  Good afternoon, Your Honor.

18         MR. MCCUNE:  And also with us today is Andrea

19  Roberts, Cheryl Berry, and Melanie Thompson.

20         THE COURT:  Thank you.  Well, welcome to all the new

21  faces.

22      Let me do one announcement.  At some point in the

23  afternoon, there will be a delegation of visiting Chinese

24  intellectual property judges who are at the University of

25  Washington, and they were so excited to hear that you all

1   were going to be here that they decided to forego a reception

2   to come.  I'm not sure I'd make that choice, but, anyway,

3   they'll come in, and if you're wondering why we're being

4   invaded, that's what's going on.  I believe they have some

5   folks from the State Department and the University of

6   Washington who are with them, so I'm not sure how big of a

7   group that is, but that is what that is about.

8       We are here for the *Daubert* hearings.  I am told that we

9   communicated with you the schedule for today, but let me go

10  over it with you.  You should attach no significance to the

11  order of these.  It had everything to do with trying to group

12  together things that we thought belonged together.

13      We're going to begin with Motorola's motions, and those

14  deal with Mr. Meneberg and Mr. Bodewig.  I'm sure I'm

15  butchering that one.  They are to be argued together.  I've

16  allocated 40 minutes for them, 20 minutes to each side.  If

17  Motorola wishes to retain some period of its time to do

18  rebuttal, that's fine.  I find that that's often not a very

19  efficient use of your time.

20      Following that, we will do the Brad Keller motion, 20

21  minutes to do that.  That's ten minutes to each side.  And

22  then it may well be that we'll take our break around then

23  simply so that you can go through the remainder of the day.

24  We may try to include Judge Haedicke.  I'm sure I'm

25  butchering that name.  That's 30 minutes total, 15 minutes

 1  each side, and we'll finish up the day between whatever time

 2  is left at 4:30 with Holleman and Leonard, 60 minutes total,

 3  30 minutes to each side.

 4       Any questions about the schedule?

 5           MR. PRICE:  Your Honor, one question.  When you say

 6  we argue together, I'll be arguing, for example, Mr. Meneberg

 7  and argue Mr. Bodewig before their response?

 8           THE COURT:  Yes.  We do a lot of *Markman* hearings in

 9  here, and periodically we look like people either jumping out

10  of cakes or jumping jacks coming out of music boxes.  I'm

11  trying to get you to stand up less often and have more

12  consecutive time.

13       Mr. Price, who is going to argue Mr. Meneberg and

14  Mr. Bodewig?

15           MR. PRICE:  Your Honor, I am.

16       Beginning with Mr. Menenberg, Your Honor, the problem we

17  have with Mr. Menenberg, frankly, is a problem created by

18  Microsoft, and that is when they filed this lawsuit, they

19  obviously knew that they were going to seek attorneys' fees,

20  certainly by February 11th when they filed their contentions

21  and answers to interrogatories, February of 2011, I'm sorry,

22  they knew that they were going to be seeking attorneys' fees.

23       But the record keepers, in recording time, recorded

24  everything in every Microsoft case to a single matter, and

25  that includes cases totally unrelated to this case, totally

1   unrelated to Motorola.  And so that leaves a record where the

2   business record itself is not enough.  Usually it would be,

3   if you have a time sheet that says 3.2 hours of, you know, my

4   time on a case, you might be able to establish as a business

5   record that that actually took place.

6       But here you can't just look at the time sheets and

7   determine what amount of time was spent on the subject

8   matters of defending the anti-injunction suit, appeal to the

9   Ninth Circuit.  You can't determine from just looking at the

10  time sheets.  And so what Mr. Menenberg has done is, he is

11  relying on Ms. Robbins' testimony about those allocations.

12      Now, I know that several days ago that a certain amount of

13  the damages were dropped, and those are the damages where, I

14  think, Ms. Robbins went through and color coded.  So I know

15  those aren't in the case.  But that doesn't solve the

16  problem.  You still can't determine by looking at the face of

17  these time sheets, you know, what was attorney time devoted

18  to what they're entitled to for damages.  For example -- and,

19  Your Honor, if I may pass up a handout I provided to opposing

20  counsel.

21      So, for example, Your Honor, I guess Ms. Robbins and

22  Mr. Meneberg count as a hundred percent time on this case.

23  Time on the time sheet, if you look at the first page, it's

24  June 19, 2002, regarding the appeal to the Ninth Circuit.

25  And it has two cases here, 1408 and 1823, and there were no

 1    Motorola SEPs issued in the 1408 case.  They're not seeking

 2    to recover legal costs for that, but that's been included as

 3    100 percent attributable to Motorola's SEP infringement

 4    claims.

 5        The second page gives another example for deposition

 6    preparation in the Southern District of Florida, ITC 744 and

 7    ITC 752 cases, and, again, there are no Motorola SEPs at

 8    issue in the Southern District of Florida case or in the ITC

 9    744 case, but that's attributed by Ms. Robbins somehow as 100

10    percent for this case.

11        And then the last two pages show preparing for a

12    deposition of Matt Lynde in a Southern District of Florida

13    case where, again, there are no Motorola SEPs at issue, and

14    yet those are allocated a hundred percent to this case.

15        Now, the point isn't that there are, quote, errors made,

16    although there are errors made, and these aren't the only

17    ones.  We selected these because you need no judgment to look

18    at these and determine they are not related to this.  But

19    there are thousands more where someone has to say, you know,

20    is this ambiguous time entry related to the defense of the

21    SEP case, and there's not even any foundation that

22    Ms. Robbins has the knowledge to do that among over 11,000 or

23    so entries.

24        And so this problem was created by Microsoft.  They can't

25    solve it by having an expert come up and say, "I relied on

```
 1    something which is unreliable."  Just as importantly, they
 2    can't have their expert repeat hearsay testimony.  You know,
 3    that's basic Federal Rule of Evidence 703.  You know, an
 4    expert may be able to rely on hearsay, although in this case
 5    the expert should not be able to rely on hearsay because it's
 6    not reliable, it's not something an expert would rely upon,
 7    but you can't repeat the substance of the hearsay.  And here
 8    you have to repeat the substance to get the allocation that
 9    they're seeking in trying to calculate damages.
10        And so the primary problem with Mr. Meneberg's testimony
11    is, you're trying to get testimony in from Ms. Robbins,
12    through him, and there's actually no foundation that even she
13    has the expertise to make the allocations 100 percent or not
14    that she is making, and so it's just unreliable opinion, and
15    there is no foundation for it.
16            THE COURT:  Let me stop you for a moment, Mr. Price.
17    When you go back to the second page of your handout --
18            MR. PRICE:  Yeah.
19            THE COURT:  -- I want to make sure that I understand
20    this.
21        Deposition preparation in "SDFL, ITC 744," is the Southern
22    District of Florida related to the ITC 744, or is that a
23    freestanding case in the Southern District?
24            MR. PRICE:  The SD Florida case is a freestanding
25    case.
```

1            THE COURT:  Because I received one of those as a

2  present from one of my colleagues, which is incorporated into

3  this case, but I can't tell you if this is the case or not.

4            MR. PRICE:  My understanding, Your Honor, and I want

5  to make sure it's accurate, there are no SEPs that are

6  involved in that case.  If I'm wrong, I'll be glad to be

7  corrected, but I don't think there is a dispute there.

8            THE COURT:  I don't know.  We will find out.  We've

9  certainly conducted proceedings in connection with that in

10  this case, but I don't know the specifics, and I can't tell

11  from the entry that you've handed to us.

12            MR. PRICE:  I'll certainly be glad to have light shed

13  on that by opposing counsel, whoever is arguing that.

14    So the unreliability, the inability to get into the

15  foundational evidence is really the key to this.  The

16  other --

17            THE COURT:  Does this impact anyone other than

18  Sidley's fees?

19            MR. PRICE:  Pardon?

20            THE COURT:  Does this impact anyone other than

21  Sidley's fees?

22            MR. PRICE:  No, just Sidley's fees, Your Honor.

23            THE COURT:  All right.

24            MR. PRICE:  The second problem is that -- assuming

25  there is a foundation, and really all Mr. Meneberg is doing

1    is adding and subtracting, he's not applying any expertise,

2    and it's fairly simple math, I'm not suggesting that we

3    should add that together, that the jury should take a bunch

4    of invoices together and add them, or billing entries, but

5    the proper way to do it is through 1006.

6        But what Microsoft is trying to do is kind of get the

7    primatur of an expert to say that these are the damages, when

8    actually he has no expertise to say these are the damages.

9    And you don't need an expert to do a summary of these sorts

10   of bills, and so he should also be excluded on those grounds.

11   That's not really expert testimony.

12            THE COURT:  Is it your contention that ER 1006

13   requires the use of an expert or it disqualifies the use of

14   an expert?

15            MR. PRICE:  No, no.  What I'm saying is 1006, in

16   fact, you don't need an expert at all.  1006 summary says

17   here -- one of the voluminous documents here is the summary.

18            THE COURT:  And if they want to spend their money on

19   an expert to do that, do you have an objection to it?

20            MR. PRICE:  I don't have an objection to spending

21   money on an expert, but that's not how you get the 1006

22   document in.  I think they would probably enter a stipulation

23   that this is a summary of these, if it's accurately

24   calculated.

25            THE COURT:  Mr. Price, you're new to this case.

1    There's never been a stipulation to anything.

2         MR. PRICE:  Well, I think Microsoft -- Motorola will,

3    in this case, stipulate to a lot of things because we want to

4    make this simple.  You know, let's just say that Motorola is

5    not off the ropes, and we're in the case, and I think there,

6    hopefully, will be some stipulations.  But I think that's

7    what that would be used for.  But the primatur of a expert

8    being required to do this and saying, "I'm an expert.  These

9    are the damages," I think is appropriate.

10        We also pointed out, Your Honor, that there are a couple

11   of things that now they're trying to put in his opinion that

12   was not in the report -- the original report, which is a

13   statement that the methodology Ms. Robbins used was reliable,

14   or that there was any causal link between the conduct of

15   Motorola and their relocation, and, again, he's not qualified

16   for that, in any event.

17        So that's the basic part of the Meneberg motion.

18        I'm going to butcher it as well:  Dr. Bodewig.  I think to

19   understand the motion here, Your Honor, you really have to

20   understand what he is rebutting, and that is the relevance of

21   the Orange Book procedure, and I think there's some confusion

22   about this.

23        At the time that Microsoft made the decision, whenever

24   that was, to move, they say, from Germany, they're saying it

25   was because of this -- of this lawsuit -- or, I'm sorry, the

1    lawsuit in Germany.

2        Now, the relevance of the Orange Book decision is, we are

3    entitled to examine whether that is the real reason, or

4    rather was this part sort of a, you know, we're in a

5    situation where they baited us in the filing of a lawsuit

6    without negotiation, and they're trying to get some strategic

7    advantage.  Did they move because it is a better facility and

8    larger?  Those will be issues.  Did they move because they

9    concluded, "Why are we in Germany where it's easier to get

10   injunctions?  We can get a benefit in the future if we move

11   and go into another jurisdiction, so we're not in the largest

12   economy where most of the patent cases are filed."  So there

13   are causation issues.

14       And in examining why they did what they did, we're

15   entitled to look into whether they considered options.  Our

16   expert says, under Orange Book, and their expert,

17   Dr. Bodewig, say that if you use the second alternative,

18   there will be no injunction, period.  Their expert agrees,

19   our expert agrees.  That's where you put a certain amount of

20   money into escrow, and then that's held pending the

21   determination as to what the rate should be.

22       So our expert simply taking the stand to say this was an

23   alternative that was available to them, and then we're going

24   to, well, was that considered, because it seems you would

25   consider that if the reason you were moving is to avoid an

1    injunction.  And all we're saying is apparently it wasn't

2    considered, so there must be another reason they moved.

3         It also goes to communication damages.  You could have

4    avoided the injunction by doing Alternative B in the Orange

5    Book procedure.  Their expert agrees.

6         So Mr. Bodewig, in their rebuttal, cites the statements of

7    the EC, and to a question-and-answer sheet, and then a

8    request to the Dusseldorf District Court, a question that was

9    submitted to the EC as well.  All of these were submitted

10   after Microsoft made its decision.  So they're not relevant

11   as to what Microsoft considered.

12        Now, I have no objection to their expert, if it's in his

13   report, saying at the time of this decision you wouldn't

14   consider Orange Book because of X, Y, Z.  I'll be glad to

15   cross-examine on that, because I've got his admission that

16   you can stop an injunction by using that second procedure.

17   But to say things were set up later is irrelevant,

18   particularly when that unsettling would make it less likely

19   Microsoft would leave Germany.

20        These subsequent statements are all to the effect that you

21   should not get an injunction if it's an SEP patentholder, and

22   the potential licensee has said they will pay FRAND.  That's

23   what they all go to.

24        Now, there are no final decisions at all, and it's

25   undisputed they're not binding on anyone.  They are

1    preliminary.  But if they were to go in at the time, or if

2    they existed at the time the decision was made, I mean, we

3    would actually argue, well, did you consider that the law was

4    actually going to the point where there wouldn't be an

5    injunction at all?  And so these decisions don't even help

6    Microsoft.  These statements don't help Microsoft with

7    respect to why did they move from Germany?  What was really

8    going on here?

9         So --

10         THE COURT:  Let me stop you there.  You have the

11    advantage that you know what likely the testimony is going to

12    be.  But it seems to me that, during the course of this

13    litigation, the argument has been made, one problem with the

14    German Orange Book was it was influx, and if -- even though

15    these are later acquired, if their evidence was it was influx

16    because six months later it's still influx, then why isn't it

17    relevant?

18         MR. PRICE:  Well, their expert doesn't say it was

19    influx on these issues at the time, one.  Two, their expert

20    admits that, at the time, there was no question you could use

21    the Alternative B and avoid an injunction.  That's

22    undisputed.

23         Now, if he wants to say at that time that was influx and

24    it was uncertain because we didn't know how much you'd have

25    to put into escrow, we didn't know what Motorola would insist

1    on, that's fair game as to whether or not it was influx on

2    certain issues as of that date.  That's -- that's fair game.

3    But what he's talking about are questions that arose later in

4    the development of this SEP law, which you're sort of at the

5    forefront of, you know.  And my point is, one, it couldn't

6    have been anything considered at the time, and, two, these

7    aren't decisions.

8        And, actually, a third point, Your Honor.  This is quite

9    prejudicial, because what it would give to the jury is a

10   suggestion that at the time Motorola filed the lawsuit in

11   Germany, that it knew that filing such a lawsuit was -- could

12   be considered anticompetitive or an antitrust violation,

13   which is what some of these comments suggest, you know, when,

14   in fact, at that time that was not the law, still isn't, and

15   at that time Motorola, you know, prevailed on the

16   infringement issue and on the injunction issue, because

17   Motorola -- Microsoft used Option A in the Orange Book

18   instead of Option B.  So it's also quite prejudicial and not

19   relevant at all to what Microsoft would have considered at

20   the time that it supposedly made its decision to leave.

21            THE COURT:  All right.  You're going to run out of

22   time, so why don't you wrap up.

23            MR. PRICE:  And the final thing, Your Honor, is just

24   on the opinion that Mr. Bodewig gives that Microsoft was a

25   willing licensee.

1      THE COURT:  That's not going to make it, so don't

2  worry.

3      MR. PRICE:  Okay.

4      THE COURT:  Let me tell both sides, so that it comes

5  not as a surprise to you.  *Daubert* motions and in limine

6  motions are difficult for the court in that they will depend

7  in some part on what the evidence is at trial.  So you are

8  going to get very cold comfort from some of my rulings,

9  because we won't know yet.  An example is this question on

10  Orange Book testimony.  I need to get a better handle on what

11  is said in order to evaluate some of that.  So just know that

12  that's out there.

13    Mr. Harrigan?

14      MR. HARRIGAN:  Yes, Your Honor.  I'm going to discuss

15  Mr. Meneberg briefly, and then Mr. Pritikin will deal with

16  the other portion of this part of matter, if that's all

17  right.

18      THE COURT:  Well, concentrate your remarks in regards

19  to Mr. Meneberg on this issue of how Ms. Robbins can divine

20  inspiration as to what case it was applicable to and what the

21  issue was in the case.

22      MR. HARRIGAN:  Yes, Your Honor.  I believe the issue

23  here really isn't Mr. Meneberg, but whether there is a

24  foundation for Mr. Meneberg to make the calculations.

25    What has happened here is that, first of all, the

1    percentage allocation entries were all eliminated from the

2    claim so that what we were left with was a set of a series of

3    entries that we believed to be, each one, 100 percent

4    allocatable to standard essential patent defense activity.

5            THE COURT:  And how do we know that?

6            MR. HARRIGAN:  So, Your Honor, here -- here is --

7    here is what has occurred since, because I have an update for

8    everyone, which has been happening over the last week, and

9    that is, there were 5,000 entries that were determined by

10   Ms. Robbins to be reasonably -- very clearly 100 percent

11   allocatable to the SEP defense.

12       However, Ms. Robbins is not going to testify.

13   Mr. Killough will be the witness with respect to a number of

14   issues relating to the attorneys' fees.

15       So what has happened in the last week is Ms. Robbins and

16   Mr. Killough have worked together and reduced the 5,000

17   entries to 3,000 entries that are either self-evident 100

18   percent of anyone who knows the slightest thing about this

19   case, or that Mr. Killough has determined he can identify as

20   being 100 percent allocatable to SEP defense.

21       And he testified at his deposition, which is part of our

22   response, that he would be able to do that.  And, in fact,

23   since then, he has actually done that.  And so Mr. Killough

24   will be able to be cross-examined about any of the 3,000

25   entries that are currently in the claim, which is now the

1    Sidley claim, as a result of that is now reduced to

2    approximately $3.7 million.

3        So with respect to Mr. Meneberg, he's also, obviously,

4    been busy with the 3,000 entries, and he has calculated that

5    number I just gave you in the same way that he calculated the

6    earlier numbers, something that the jury would take days

7    doing and probably would get the wrong answer because it's

8    very complicated.

9        And so we believe that Mr. Meneberg's qualifications to do

10   complicated arithmetic are well established, and that under

11   1006, that's something that is appropriate to be done to help

12   the jury.  And he is, you know, a highly qualified expert.

13   He's got a staff, he's got computers, and he checked

14   everything, and we believe he's gotten the right answer.

15       So I don't think there's -- I don't think it would be fair

16   to Mr. Meneberg to have on his record that he was excluded as

17   an expert under a *Daubert* motion, when we just asked him to

18   please perform some complicated calculations carefully and

19   provide the answer to the jury.  So that's basically where we

20   are, and we believe, as the court said, that, you know, the

21   proof will be in the pudding at trial, and if Mr. Killough

22   can't support the foundation for those 3,000 entries, that

23   will be a problem.

24              THE COURT:  When are the 3,000 entries going to be

25   provided to Microsoft -- or Motorola?

 1          MR. HARRIGAN:  We already have them.  In other words,

 2    we haven't changed the target.  We've shrunk the target.

 3    Those 3,000 -- and we -- and I believe we can do that

 4    virtually instantly, correct, Ellen?

 5          MS. ROBBINS:  Yes.

 6          MR. HARRIGAN:  And so they're already identified.

 7    They can be provided.  And Mr. Killough has already testified

 8    at his deposition that he is capable of identifying such 100

 9    percent entries.

10          THE COURT:  Well, here's what I want to know:  You

11    had 5,000.  You've given that to Motorola?

12          MR. HARRIGAN:  Correct.

13          THE COURT:  Now you say you've got 3,000.  Simply

14    saying 3,000 of the 5,000 of the ones we're talking about

15    doesn't help them.  Do they have 3,000 identified entries?

16          MR. HARRIGAN:  I -- I believe we didn't have them

17    until a day or two ago, and they will have them forthwith.

18          THE COURT:  I guess that order about close of

19    discovery wasn't of concern to anyone?

20          MR. HARRIGAN:  Well, Your Honor, I -- this is -- this

21    is actually not discovery.  We're shrinking our claim from

22    5,000 entries to 3,000 entries.  The same 3,000 entries were

23    in the original.  It just gives Motorola fewer entries to

24    deal with.

25          THE COURT:  All right.  Continue.

1          MR. HARRIGAN:  Well, Your Honor, I -- I guess I would

2     just like to say that, you know, that Motorola has cited two

3     cases to suggest that Mr. Meneberg shouldn't be able to

4     testify as an expert on these complex calculations.  And,

5     frankly, the law is that -- and there's the *WWPB Wounded*

6     *Warriors* case that we cited.  There is not an implicit

7     requirement in the Federal Rule of Evidence 702 for the

8     proffered expert to make complicated mathematical

9     calculations.  And, in fact, if it helps the jury, and the

10    jury can't do it itself, it's perfectly appropriate to use an

11    expert to do that.

12        Motorola's cases do not deal with that situation.

13          THE COURT:  I've seen Mr. Meneberg testify.  He can

14    make anything complicated.  So I think I understand.

15          MR. HARRIGAN:  And I didn't hear anything about

16    relocation in the argument, Your Honor, but I think it's very

17    clear that Mr. Meneberg did all of the kinds of things that

18    experts do in determining the relocation cost.

19        He certainly didn't make any determination about what

20    caused relocation.  But what he did do was calculate what the

21    relocation cost -- what caused the costs, that is, the

22    relocation caused the costs.  He did such things such as what

23    was the timing of payment of Microsoft -- by Microsoft of

24    certain bills, and applied a two-percent discount that he

25    determined was available under that contract, whether or not

1   Microsoft actually took the two-percent discount.  He decided

2   that the increased costs of operation at the new facility

3   should be capped at two years by analyzing various factors

4   that could result in a different situation at the end of two

5   years.

6       He corrected some earlier approximations or calculations

7   by Microsoft in many categories of the relocation costs.

8   Some went up, some went down, because he was much more

9   rigorous in looking at the underlying documentation at

10  contract.  So there is no doubt that he performed audit-type

11  work and then calculated the results of what he determined

12  were actually attributable to relocation.

13      Thank you, Your Honor.

14          MR. CEDEROTH:  Good afternoon, Your Honor.  I'm

15  subbing for Mr. Pritikin.

16      On Professor Bodewig, first, counsel's argument today that

17  the Orange Book is somehow relevant to causation is an

18  entirely new construct.  You can go through the briefs.  It's

19  nowhere in there.  Previously the Haedicke testimony in

20  relation to the Orange Book process was identified as being

21  relevant to mitigation, and while that's in mitigation,

22  that's a burden that Motorola bears, and a burden that

23  requires a proven amount, not simply the availability of the

24  process.  But we'll come back to that.

25      There are two basic complaints that they lodge with

respect to Professor Bodewig's testimony.  One is that he relies upon the Dusseldorf and the European Commission's statements that come later in time.  The second is that they say he repeats facts that he is not himself sponsoring.  And let me deal with the statements first.

The statements are relevant to the extent that an Orange Book process is an issue that -- a set of issues that the jury is going to consider.  First, they demonstrate that it was not a settled process at any time, and remains not a settled process today.

Both of the German experts agree that what would have happened in the process that -- that Motorola urges Microsoft should have undertaken or could have undertaken or must have considered to have undertaken, what would have happened there is pure speculation.

These statements from the Dusseldorf court and the European Commission reenforce that outcome.  No one knows how long that process would have gone on.  No one is able to testify or is able to identify with any sort of clarity what would have been considered by the court in the Orange Book process.  No one is able to identify how much money Microsoft would have had to escrow, and whether, if ever, Microsoft could have gotten that back.

The only thing we know, if the court harkened back to a year-plus ago is that when Microsoft offered to put up a $300

 1    million bond in return for Motorola foregoing enforcing an

 2    injunction in Germany, Motorola declined to do that.  That

 3    led to the anti-suit injunction process that we all went

 4    through, which was an appeal to the Ninth Circuit, and in

 5    that instance, Motorola argued again and again and again that

 6    there was no need for the anti-suit injunction.  There was no

 7    need for that process, because Microsoft could have and

 8    should have availed itself of the Orange Book process.  So

 9    it's just a revisiting of that.

10        All Professor Bodewig is doing is showing that had that

11    happened, there's no way of knowing, either now or back in

12    February, March, and April of 2012, what Microsoft would have

13    had to do.  So whether you're talking -- and, again, I think

14    the only issue here is mitigation, not causation.  But even

15    if you're looking at causation, no one can say now what the

16    process would have been then.  And there's two different

17    timeframes.  When looking at mitigation on RAND, it's the

18    entire process.

19            THE COURT:  Where is the predicate in your testimony

20    that a consideration in moving or not moving was this

21    uncertainty?  What witness is going to say that?

22            MR. CEDEROTH:  Your Honor, that has nothing to do

23    with Professor Bodewig, it has nothing to do with Judge

24    Haedicke.  This is an entirely new argument.  The witnesses

25    that relate to relocation are Mr. Davidson, Mr. Roberts, and

1   the folks that made that decision.  They can testify about

2   what they considered and what they didn't consider.

3   Professor Haedicke cannot testify to that, or Judge Haedicke.

4   Professor Bodewig isn't here to testify or will be coming to

5   testify about the facts about what was considered.

6          THE COURT:  Are you prepared to amend that Microsoft

7   was a licensee, or do you need me to rule on that?

8          MR. CEDEROTH:  Your Honor, I don't think that -- you

9   know, I reread that in his report, and I don't think he's

10  really offering that as an opinion.  I think he's simply

11  recounting facts which establish that.  If those facts don't

12  come into the record, then certainly he would not be coming

13  on the stand to say that.

14    Counsel asked him at his deposition about additional

15  reasons.  Certainly the court is aware of Microsoft's status

16  as a known licensee, and has been.

17    All Professor Bodewig did was respond to the questions at

18  the deposition, basically saying, you know, it was a matter

19  of logic.  If they're making an offer under the Orange Book

20  for a license, they must be willing licensees.  That's all

21  that was going on there.

22          THE COURT:  All right.  Anything else?

23          MR. CEDEROTH:  That's all I have, Your Honor.

24          THE COURT:  Thank you.

25    We're moving on to the -- Mr. Price, you have about three

1    minutes left, if you want to use it.

2         MR. PRICE:  Thank you.  I appreciate that, Your

3    Honor.  I'll be very quick with respect to Mr. Meneberg.

4       It's not just close of discovery.  It's notice.  It's -- I

5    mean, look.  Microsoft should have made this allegation back

6    when it filed the case and it knew it was going to claim

7    these damages.

8       Now, we've had an expert, which we're going to hear about

9    next, talk about those calculations, and apparently they're

10   going to change, because now we're going to get a witness who

11   will focus on 3,000, and tell us how they can tell those

12   3,000 deal with damages in this case.

13      We haven't had an opportunity to take a deposition like

14   that.  Mr. Killough, before, didn't know much, shall we say.

15   And so now we need to find out ahead of trial, the day before

16   he testifies, his methodology, and then we'll have to change

17   our expert report to evaluate that methodology.  It's just

18   too little, too late.

19      Now, with respect to Mr. Bodewig, again, I think there's a

20   misunderstanding.

21      Well, the business unit has testified, at Microsoft, that

22   they both -- that both legal made the decision, and that then

23   later, in the same depo, actually, the business made the

24   decision to relocate.  Regardless, they both say, "We were

25   advised by legal as to the consequences about filing of the

1   lawsuit and other legal matters.  Based upon that, we

2   relocated."

3       And one of the things that their 30(b)(6) from the legal

4   department mentioned was that we did talk to them about

5   Orange Book, but I don't remember what we said because she

6   didn't look at any of her notes or anything.  So there is

7   nothing in the record, because it's been hidden from us, as

8   to whether or not Microsoft considered this was a

9   possibility, considered whether Orange Book was a way to

10  avoid an injunction.

11      They did choose the alternative in the Orange Book, which

12  both experts agree that was the least likely to prevent an

13  injunction, because the supreme court in Germany said in that

14  proceeding you've got to hit the nail right on the head, it's

15  got to be blatantly obvious this is the FRAND rate.  And the

16  courts aren't organized to really deal with this issue in

17  that proceeding.  The better way to do it, both experts

18  agreed, was to use the 315 route, where you put an amount in

19  escrow, and for some reason Microsoft did not do that.  They

20  have chosen the less likely route to succeed, which also is a

21  factor in determining why did they really leave here?  Were

22  they really afraid of an injunction in this case, or was

23  there another reason, and they're just trying to ride

24  coattail and get the costs for moving out of Germany.  So

25  this background is necessary.

1        I understand we're going to have a trial, and you'll hear

2    from our expert first, and you'll be in a better position to

3    probably understand that and determine what Mr. Bodewig

4    should say.

5            THE COURT:  Well, I'm a little surprised to hear what

6    you're saying, Mr. Price.  It sounds to me like you're

7    somewhat conceding that if the Bodewig testimony comes in for

8    purposes of responding to your mitigation argument, you have

9    less of a problem with that.

10           MR. PRICE:  No.  I still do, Your Honor, because the

11   question is mitigation, you know, is why did they make the

12   decision at the time?  Were there mitigating alternatives at

13   the time?

14       Now, if he's going to come in and say, no, at the time,

15   you wouldn't have used this as litigation because it was

16   unsettled, again, I think that's -- that's fair game.  But

17   the unsettling has made it potentially more difficult to get

18   an injunction, not less.

19       I mean, the comments, again, which are not binding by the

20   EC, have been, you shouldn't be able to get an injunction.

21   So there's kind of logical, you know, disconnect here.

22           THE COURT:  Not to the Germans.

23           MR. PRICE:  I can't -- nothing on the record on that.

24           THE COURT:  All right.  Let's discuss Brad Keller.

25   Mr. Harrigan, I believe you reserved that one for yourself.

1          MR. HARRIGAN:  I didn't volunteer.  I was drafted.

2      So, Your Honor, I'm going to address this motion by going

3   through, essentially, the main topics that Mr. Keller

4   summarizes in his summary of opinions and explaining why we

5   believe each of them -- he should not be permitted to testify

6   with regard to these matters, and I'm starting at summary of

7   opinions, page 3 of his report, and the first paragraph,

8   which is A.

9      It first discusses the American rule on fees, which is a

10  legal opinion, and under numerous cases, quote, When an

11  attorney is allowed to usurp the function of the court, the

12  harm is manifest, unquote, if that were -- in any event, Your

13  Honor, I think that that is an issue for the court, so

14  there's really no reason to be talking about it.  But it

15  certainly shouldn't be an attorney witness talking about it.

16  It has to be an instruction that comes from the court.

17     I believe that the consequential damages portion of that

18  statement has now been withdrawn as a legal opinion.

19     Then Mr. Keller goes on to say that, "Microsoft has the

20  burden of proof on fees."  We don't dispute that, but there's

21  no reason for him to be telling that to the jury.

22     And then he says, quote, Is required to contemporaneously

23  segregate fees, and that is a legal conclusion, which, if, in

24  fact, is correct, the court can instruct the jury on, but it

25  is not correct.

1    There are numerous cases, one Ninth Circuit case, *Diamond*

2  *v. John Martin*, 753 F.2d 1465, that says that they don't need

3  to be apportioned when incurred for representation of a

4  petition common to both the cause of action for which they

5  are proper and one in which they are not allowed.

6    THE COURT:  You need to slow down when you read.

7    MR. HARRIGAN:  Yeah, sorry.

8    What we're doing here, Your Honor, is, we're saying that

9  because of the breach, fees were incurred defending the

10  standard essential patent claims, both the injunctive relief

11  part and just the dealing with issues that would never have

12  been before any court if a RAND offer had been made.  So

13  we're attributing the SEP defense to the breach.  And all of

14  the entries that are going to be at issue are entries that

15  may involve both the injunctive relief part and the basic

16  defense of the claim, but they relate to the standard

17  essential patent claims.  So there is no obligation to

18  segregate those 100 percent entries, because they're 100

19  percent attributable to what we claim the breach is.

20    So -- but in any event, if there is a segregation

21  obligation under the law, that's not something Mr. Keller

22  should be telling the jury about.

23    THE COURT:  Well, I've read that testimony, and what

24  I took away from it was that Mr. Keller is prepared to say

25  that he's looked at the bulk time entries, he's looked at the

1  segregation process, and he disagrees that some of the items

2  have been properly segregated.  Do you have a problem with

3  that testimony?

4       MR. HARRIGAN:  Well, Your Honor, to the extent that

5  Mr. Keller's report, and quite a bit of it deals with the

6  80/60 percent apportionment process, that's no longer in the

7  case.  All of those entries have been excluded.  And I -- I

8  don't think -- I think that part of his opinion is now simply

9  irrelevant.

10     The issue for the fact finder will be, when Mr. Killough

11  is cross-examined about the 3,000 entries, can he identify

12  that, in fact, each of them is 100 percent attributable to

13  the defense of the SEP claims?

14       THE COURT:  Well, are you prepared to make

15  Mr. Killough available for another deposition, since it

16  appears he's done further work?

17       MR. HARRIGAN:  I presume that we are, but, Your

18  Honor, I -- I would also suggest that the very same entries

19  were in Motorola's hands when he was deposed most recently,

20  and the same issue.

21       THE COURT:  Save your breath on that argument,

22  counsel.  You started with five, now you're down to three.

23  You're not telling them which are which.  They get to find

24  that out.

25       MR. HARRIGAN:  We're -- we're -- Your Honor --

1          THE COURT:  I know.  You're going to tell them at

2    some point in the future.  You haven't done so yet.

3          MR. HARRIGAN:  I'm not 100 percent up to speed on

4    whether a piece of paper with all 3,000 exists at this

5    second, but I'm sure there will be tomorrow.  So there will

6    be no -- we have not been hanging on to this for days.  This

7    work has actually been going on for the last week.  I don't

8    know exactly when it got done.  But then Mr. Meneberg had to

9    do his calculations, and essentially this is a

10   contemporaneous effort, and they will have the entries.  And

11   whether the court wishes to order another deposition, that's,

12   obviously, not my call.

13      But all I'm saying is that the same 3,000 entries that are

14   now claimed to be a hundred percent were already claimed to

15   be a hundred percent the last time Mr. Killough was deposed.

16   There are just 2,000 fewer of them.

17      So at any rate, Your Honor, the segregation aspect of

18   Mr. Keller's testimony is no longer relevant.

19      Now, the next main point in his report is, both Microsoft

20   should have used almost all Seattle lawyers on this case, and

21   I --

22          THE COURT:  Certainly you must agree with that.

23          MR. HARRIGAN:  Well, I certainly would like to

24   express my gratitude to him for advocating that thought.  I'm

25   sure it would have been helpful.  The problem is, the duty of

1  Microsoft -- first of all, this opinion isn't relevant unless

2  Motorola has, in fact, caused Microsoft to incur legal fees,

3  and the question is, did Microsoft do a reasonable job of

4  defending -- of managing the expenses of defending itself.

5  That is a question for the jury.

6      Mr. Keller is invading the province of the jury in

7  suggesting that he should be in the position of

8  second-guessing Microsoft's effort to mitigate its damages by

9  defending these cases, and how it went about choosing

10  attorneys.

11      THE COURT:  Well, Mr. Keller is saying that a good

12  Sidley lawyer goes for $1,200 an hour, and a good Harrigan

13  attorney goes for $800, and therefore it's cheaper to use

14  Harrigan.  How can you argue -- you know, you may disagree

15  with it, you may agree with it, but they're entitled to say

16  that.  I suspect there's going to be some mention of the fact

17  that theirs used to be from Boston and it cost 14, but, you

18  know, that seems to me to be a legitimate area of inquiry.

19      MR. HARRIGAN:  Well, Your Honor, I'm not disagreeing

20  that it's a legitimate cross-examination question for one or

21  more Microsoft witnesses, probably Mr. Killough, as to why it

22  was done this way.  But, quote, a wide latitude of discretion

23  must be allowed of the person who by another's wrong has been

24  forced into a predicament, where he is faced with injury or

25  loss.  So Microsoft --

1              THE COURT:  Is that words from a song?

2              MR. HARRIGAN:  Yes, it is.  It is -- it's *Hoagland v.*

3    *Klein,* 49 Southern Second 216, citing *McCormick* on damages.

4         And, Your Honor, Microsoft is entitled to be -- to

5    exercise its reasonable judgment, and it doesn't help the

6    jury to have another lawyer who would prefer to sit as

7    general counsel for Microsoft in this case and say here is

8    what I would have done.  I just think it's up to the jury to

9    decide if the judgment was reasonable.

10        And generally speaking, testimony on things like the

11   defendant was negligent is not allowed, unless the defendant

12   is accused of malpractice and the jury needs an expert to

13   tell them what constitutes malpractice.

14        This is simply a case where a company makes a judgment

15   about how to staff up its defense of claims, and with the

16   predicate that they wouldn't be doing that but for the

17   breach, which, of course, we have to prove.

18             THE COURT:  And you have an obligation to mitigate

19   the damages you're trying to pin on them, and if he wants to

20   say Seattle rates are lower, that's an argument about

21   mitigation.

22             MR. HARRIGAN:  Well, I think he's doing more than

23   saying Seattle rates are lower, Your Honor.  We'll stipulate

24   that Seattle rates are lower.  What he's saying is, "In my

25   opinion, this judgment call was wrong," and that's invading

1    the province of the jury.  That's substituting his judgment

2    for Microsoft's judgment.

3        Now, if he could lay a foundation for testifying that it

4    was reckless for this to be done, or it somehow exceeded the

5    bounds of some recognized standard on which he is an expert,

6    that would be different.  But all he's doing is saying, "If I

7    were sitting in the general counsel's office, I wouldn't have

8    done it this way, because it would have been cheaper to hire

9    Seattle lawyers," and he doesn't get to tell the jury whether

10   somebody was negligent or unreasonable.

11           THE COURT:  All right.  You're about out of time, so

12   wrap up.

13           MR. HARRIGAN:  The only other thing I would say, Your

14   Honor, I'll just refer to what's in the briefs.

15       Mr. Keller objected to staffing levels by Sidley and so

16   forth, and fundamentally he didn't take into account what the

17   schedule was in the ITC case, he didn't take into account

18   that there were sometimes eight depositions taking place on

19   one day.  He knew nothing about any of those things.  He

20   never read the record.  He was completely unfamiliar with

21   what actually was going on, and, therefore, there is, we

22   believe, no foundation for his opining about the

23   reasonableness of Sidley's judgment calls on staffing.

24       Thank you.

25           THE COURT:  All right.

1          MR. PRICE:  Your Honor, I'll be very quick.  I think

2     we made most of the points in the papers.  I do want to

3     address the issue now, though, concerning the issue of what

4     to do with Mr. Killough, just to make sure the court is aware

5     of the facts.

6          Originally, there were 11,000 entries, not 5,000.  And the

7     deposition of Mr. Killough previously, obviously, could have

8     had no effect or couldn't help us, because apparently he's

9     done work since then.  That was the representation to the

10    court.  In fact, Mr. Killough didn't know what Ms. Robbins

11    did.  So this is another one of those things where it was

12    really too little, too late.

13         And -- but it requires that Mr. Keller, you know, then

14    focus on whatever Mr. Killough's methodology is going to be

15    that they came up with since the last deposition, and then

16    write a report.  Or maybe he doesn't have to write a report,

17    he can just testify as to his criticisms of that.

18         With respect to the issue as to him being able to testify

19    about mitigation, again, I think the jury is entitled to hear

20    that testimony.  It will be their decision as to whether or

21    not that's reasonable, whether or not Microsoft should be

22    able to indulge its whims in trying to be compensated for

23    damages for the attorneys they select.  And I think the jury

24    is entitled to hear Mr. Keller's testimony that you could

25    have gotten more bang for your buck with a lot less money,

1    and Motorola shouldn't be burdened with that decision.

2              MR. HARRIGAN:  Your Honor, may I have 30 seconds?

3              THE COURT:  No.  Mr. Price is still at the podium.  I

4    have some questions for him.

5              MR. HARRIGAN:  I'm sorry.

6              THE COURT:  My comment about Mr. Keller's report is

7    that it's got a lot of legal conclusions in it.

8              MR. PRICE:  And I agree.

9              THE COURT:  Were you writing that part, also?

10             MR. PRICE:  Yes.  Actually, Your Honor -- I'm glad

11   you reminded me of that.  Actually, when we have a break, I'm

12   going to give Microsoft a piece of paper that explains the

13   paragraphs and the upcoming experts we're talking about that

14   we are not planning to present so that they're not wasting

15   their time on things which we agree with, and we agree that

16   he should not be telling them about the American rule or the

17   burdens of proof, or anything like that.

18             THE COURT:  You know, with my tongue planted firmly

19   in cheek, are you sure you guys are ready for trial?  I mean,

20   it sounds like you're about six months out.

21             MR. PRICE:  Well, if we're not ready for trial, Your

22   Honor, I don't -- I don't think it's our fault.  But there

23   are some issues that need to be resolved because we haven't

24   gotten information.  What do you expect me to say?  I

25   actually believe that.

 1          THE COURT:  You know, when your expert changes his

 2   opinion because you're now advising him, I don't think that's

 3   the other side's fault.

 4          MR. PRICE:  Well, we're just dropping things, Your

 5   Honor.

 6          THE COURT:  All right.  Let's deal with Mr. Killough.

 7      Mr. Harrigan, I heard you graciously say that you would

 8   have this report to them by noon tomorrow.  Is that accurate?

 9          MR. HARRIGAN:  Yes.

10          THE COURT:  All right.  And in what form will it

11   take?

12          MR. HARRIGAN:  Ms. Robbins, why don't you tell us

13   about this.  There's no point in me talking about things I

14   don't know the details about.

15          MS. ROBBINS:  Good afternoon, Your Honor.  Ellen

16   Robbins on behalf of Microsoft.

17      We have the invoices, the same invoices that we've

18   previously produced, although there are far more redactions.

19   All that will be left on the new set of invoices are the

20   3,000 entries that we are now seeking as attorneys' fees.

21   They also have indication on whether the time entry relates

22   to the H.264 patent, the 802.11 patent, or both.

23          THE COURT:  In what format is that in?

24          MS. ROBBINS:  Invoices.  They're the actual invoices.

25          THE COURT:  And this is only Sidley's fees?

1          MS. ROBBINS:  Correct.  There have not been

2    adjustments to the other ones.

3          THE COURT:  All right.  Thank you.

4          MR. HARRIGAN:  Your Honor, just one point here.  Our

5    goal here is to try to get this down to something that nobody

6    can really argue about.  I know that may be an impossible

7    task, but we would be more than happy to go through the 3,000

8    and see if -- maybe there are a hundred of them that Motorola

9    disagrees with, and we might just take a bow.  I mean, the

10   idea is to get to a point where it's obvious that these are

11   about defending standard essential patents, and nobody needs

12   to dispute it.  So that's the goal.  And maybe, you know, if

13   we winnow out a few more, we can get to the point where at

14   least they're not admitting anything other than, yes, this

15   was about defending SEP patents.  So that's where we're

16   trying to get to.

17          MR. PRICE:  Your Honor, that's a pretty big burden to

18   put on us right before trial.  But Ms. Robbins, it would be

19   nice if she'd testify, we might be able to ask her questions.

20   But Mr. Killough, we don't need just invoices, 3,000

21   invoices.  We'd need to know methodology.  We'd need to know

22   how they came up with the conclusion that these 3,000 entries

23   relate to this case and our damages.  And when are we going

24   to find that out?

25        I mean, never before, to our knowledge, have they

 1  differentiated between 26482.11 [sic] entries, for example.

 2  So, you know --

 3          THE COURT:  Sorry?

 4          MR. PRICE:  802.11.  I'm sorry.

 5     I mean, just giving us invoices isn't going to help us

 6  prepare for trial and to respond to their damages claims.

 7          THE COURT:  I'm going to order that the invoices be

 8  provided by close of business tomorrow.  I'm going to give

 9  Motorola sufficient time to review them, which will take you

10  through, probably, Wednesday of next week.  And Mr. Killough

11  needs to be available for a four-hour deposition, either late

12  next week or early the following week, at Motorola's choice.

13     Following that, if Mr. Keller needs to revise his report,

14  he needs to revise his report, and Microsoft will have the

15  opportunity to re-depose him for two hours.

16     I can't begin to express my dismay that we're on-the-fly

17  doing this stuff.  You both have unlimited resources, and you

18  fully utilize them, and you've known the trial date was

19  coming for a long time, and to be in this situation just

20  seems to me to be creating a difficult situation for you and

21  a difficult situation for the court.

22     Mr. Price, you look like you were going to leap out of

23  your seat.

24          MR. PRICE:  Just to ask a question.

25     Mr. Keller would only be responding to an expert report by

1    Mr. Meneberg.  Is he going to --

2          THE COURT:  He's going to attend your deposition of

3    Mr. Killough, and it may be that he's going to have to -- as

4    I understand it, you've now pinned Mr. Meneberg down to,

5    basically, being an adding machine, so I'm not sure he's

6    going to need to depose him.  Do you disagree with that

7    characterization of what --

8          MR. PRICE:  I do not disagree with that

9    characterization, and that may be enough.

10         THE COURT:  All right.  Any questions in regards to

11   this?

12         MR. HARRIGAN:  Your Honor, Ms. Robbins was just

13   reminding me, and I think I said it earlier, but, obviously,

14   Mr. Meneberg has added up the 3,000 entries that were

15   originally part of the 5,000.  So we have a new number, which

16   is the 3.7 million number that we gave you.  We have a

17   precise number, and I'll be happy to hand counsel a sheet

18   that contains the new precise damage number for Sidley, along

19   with the others that were previously on the list.

20         THE COURT:  Well, if you have it, then why don't you

21   also give them the work papers for Mr. Meneberg so they can

22   understand how those were arrived at.

23         MR. HARRIGAN:  Yes, Your Honor.

24         THE COURT:  All right.  Counsel, it's 2:30, and we're

25   right on schedule.  We get to do one of my personal

1   favorites, the Microsoft attack on Judge Haedicke, or however

2   we say this.

3          MR. CEDEROTH:  Your Honor, I'll weigh in on that.  I

4   believe it's pronounced *Hay-di-ka*.

5          THE COURT:  Someone in the back, who usually knows

6   more than we do, is nodding affirmative.  You have 15

7   minutes, Mr. Cederoth.

8          MR. CEDEROTH:  Thank you, Your Honor.

9      The issue with Judge Haedicke is, what issue is it that

10  the jury is going to receive his expert opinions on and be

11  helped in resolving?

12     In their opposition brief, Motorola posits that the issue

13  is one of mitigation.  Did Microsoft properly mitigate its

14  damages in the German arena in relation to the claimed harm

15  caused by Motorola seeking exclusion or an injunction in

16  Germany.  And there, just as the court probably knows, as

17  sort of a background issue, it wasn't simply being enjoined

18  against sales in Germany.

19     There was a background issue that came to light, in that

20  Microsoft's distribution center for the entire Europe, Middle

21  East, and Asia regions, particularly for Xbox, was located --

22  physically located in Germany such that an injunction would

23  have frozen shipment and sales throughout the entire region,

24  not just Germany.  So, again, the question is, did Microsoft

25  properly mitigate its damages by moving the distribution

center?

Well, mitigation is an issue that if Motorola wants to take it on, Motorola has to prove the reasonableness of the alternative, and they have to prove the amount or the cost of the alternative so that the jury could assess whether Microsoft's actions that were taken were, in fact, proper and duly mitigated.  It's not an absolute test.  It's one of reasonableness.  There may be multiple reasonable options, and as long as a reasonable option is taken, then there is not a failure to mitigate.

That's really an issue for a further day, though, because Motorola can't get there.  Motorola does not offer any proof, through Judge Haedicke or otherwise, as to what was the cost of the Orange Book procedure that they urge that Microsoft should have undertaken instead of moving the distribution center.  They just don't have any proof of what that would have cost.

And, in fact, Judge Haedicke admits that he has no idea how much it would have cost.  In fact, he testified it would have been pure speculation as to, in the end, what the process would have been, what the considerations would have been, what the cost would have been to Microsoft.

So as such, on that basis alone, his testimony cannot be helpful to the jury on the issue of mitigation, and therefore, since it is not helpful, it does not satisfy Rule

1    702, it should not be brought into trial.

2        We've already been around how if it comes in, it's going

3    to trigger the need for more testimony to further expand.

4    And what is the jury going to decide?  Are they -- is the

5    jury going to be the first set of people on earth to fully

6    understand and decide what the German Orange Book process is?

7        You know, and that goes back to a discussion we had on

8    Professor Bodewig.  It remains uncertain, and that's admitted

9    by Judge Haedicke.

10       There's another, I suppose, another way to look at this in

11   terms of mitigation.

12           THE COURT:  Let me stop you.  Trying to distill your

13   argument, everything you just mentioned seems to me to be

14   fertile ground for cross-examination, but not a reason to

15   exclude it in its entirety.

16       You know, you're coming in and sponsoring to the jury the

17   notion that you had no choice but to make the decision to

18   move out of Germany, and you have a series of reasons why you

19   think that.  Motorola is sponsoring testimony that says,

20   yeah, they had an option, they chose not to exercise it, and

21   you're going to say to them, well, what about this and this

22   and this?  Aren't those all factors that would have argued

23   against attacking -- or utilizing the Option B in the Orange

24   Book as opposed to moving?  That seems to me what trials are

25   made out of.

1      MR. CEDEROTH:  A little more -- more carefully on

2  this.

3      First, there's separate issues here in terms of mitigation

4  and causation.  The causation argument, as I mentioned

5  before, is something which has arisen again today.  It is not

6  set forth in the papers.  The -- the purpose provided in

7  Motorola's opposition with respect to Judge Haedicke is that

8  he was testifying as to mitigation.

9      On the points of mitigation, Your Honor --

10      THE COURT:  Well, you said it before.  I mean, I've

11  already been forced to rule once on access to testimony from

12  the Microsoft legal department in response to the fact that

13  Motorola's been scratching at this for a while, saying, who

14  made the decision to move, and why?  So I don't understand

15  why you keep telling me that it's never been in the case

16  before.  It's been abundantly in the case, hasn't it?

17      MR. CEDEROTH:  It's never been offered as a basis for

18  providing Judge Haedicke as a witness here.  And the briefing

19  on these motions isn't that ancient, Your Honor.  This was

20  part of our role as argument.  It could have at least been

21  flagged; perhaps a footnote to alert everyone that this is

22  the secondary reason for bring him in.  But I think that to

23  some extent that does miss the point.

24      THE COURT:  It won't be the first time, so go ahead.

25      MR. CEDEROTH:  No, I'm not attempting to criticize

1    the court's analysis, but simply to the extent you're framing

2    Motorola's argument for them.

3        The issue there is that in terms of mitigating damages,

4    the issue is whether it was reasonable conduct, not whether

5    it was the only conduct that was an option.

6        And, you know, this is not something that I think

7    Microsoft has to bring and prove, that moving the

8    distribution center was the only option.  I don't think

9    that's a burden we have to establish, Your Honor.

10       I mean, at some level, I mean, it's almost chronological.

11   We could have just paid Motorola what they demanded.  That

12   would have done it.  We could have given them all the money

13   they demanded in October of 2010.  Now, that -- you know,

14   that's irrespective of any Orange Book procedures.  It's

15   irrespective of the laws of any country.  We could have just

16   folded.  We would not have had to move the distribution

17   center, we would have not had to pay lawyers.  But it assumes

18   too much.

19       On the mitigation front, though, if they want to urge that

20   selecting the second Orange Book option was -- a failure to

21   do that was a failure to mitigate, then they have to prove

22   how much it would have cost Microsoft to do that.  They have

23   to prove what the outcome would have been.  They have to

24   prove that, in fact, it wouldn't be just some pig in the

25   poke.  It wouldn't be the functional equivalent of simply

1   capitulating, which was always an option.  Microsoft could

2   have capitulated.  But that's why -- that's why we have this

3   case.  That's why we're fighting about RAND here.  And moving

4   the distribution center in Germany was in response to the

5   German lawsuit.  Whether it was the only possible response is

6   just not an issue, really.

7          THE COURT:  Let me see if I can frame your argument.

8   It seems to me that Haedicke is not saying that it was a good

9   decision or a bad decision to move the distribution center.

10  What he's saying, strictly, is that under German law, there

11  was an option open to Microsoft that would have not involved

12  moving.  Would you agree that that's the predicate that this

13  is in?

14         MR. CEDEROTH:  I think that that almost gets there.

15  He goes further, and he attempts to say that there was a

16  clear-cut, well-defined, clearly-visible transparent process

17  that Microsoft could have chosen, and that's -- you know,

18  that's belied by his own testimony, and rebutted by Professor

19  Bodewig.

20         THE COURT:  Isn't that what's supposed to happen at

21  trial?  I mean, they're going to sponsor their version of the

22  facts, and you're going to attack it, trying to get their

23  witness to agree with you, and if there aren't any loose

24  ends, you have your clean up hitter who's going to come in

25  and say that's all nonsense.

1          MR. CEDEROTH:  It still comes back, Your Honor.  The

2     burden in terms of mitigation is on Motorola to prove the

3     amount; that what the other option was would have been less

4     costly, would have been more reasonable.  And -- and Judge

5     Haedicke cannot sponsor that testimony.  No one, no Motorola

6     witness is prepared to sponsor that testimony.  And Judge

7     Haedicke has testified that the outcome was pure speculation.

8     That cannot reach the threshold to go to the jury, because

9     how is the jury, then, going to decide how much it would have

10    cost, would it have been a viable alternative, as opposed to

11    moving, in terms of mitigation.

12          THE COURT:  It seems to me -- and perhaps I don't

13    understand this -- that you're going to put on a damages case

14    in which the jury is going to know to the penny how much it

15    costs to move.  So we've got one bogey established.  And

16    Haedicke is going to say, "And I have another option, which

17    was to stay in Germany," which would have cost you a number,

18    and then you're going to say, "But you don't know what that

19    number is."

20          MR. CEDEROTH:  But because that number is never

21    coming.  The testimony about the other option is irrelevant

22    to the determination.  And in -- the testimony is that that

23    number would be pure speculation.  The jury can't just

24    speculate.  That's the flaw in the position, Your Honor, is

25    that without it being pure speculation, it cannot be another

 1  reasonable alternative.  And -- and, you know, what's the

 2  number?  How do we respond to that?  He says, "Well, I think

 3  it would have been less."  It's not here.  It's not in his

 4  testimony, it's not in anyone else's.

 5      And, again -- sorry to keep coming back to this -- but he

 6  admits it would be pure speculation.  That cannot be a

 7  reliable methodology.  That cannot be testimony that's

 8  helpful to a jury in resolving the issue of mitigation, or

 9  call it causation.  But in the absence of that critical

10  piece, Motorola just cannot establish the relevance of

11  Professor or Judge Haedicke's testimony.

12          THE COURT:  I'm quite enamored with the idea that

13  judges can earn a living on the side as expert witnesses.

14  You can call him a professor if you want.

15          MR. CEDEROTH:  I understand he prefers to be called

16  "Judge," but I'm staying away from that, Your Honor.

17          THE COURT:  All right.  I'd like to hear from

18  Motorola.  Mr. Price?

19          MR. PRICE:  Unless you ask me a question I don't know

20  the answer to, I'm the one you're hearing from today.

21      The basic response is -- the two responses, one is on the

22  causation issue.  Microsoft complains that -- that we didn't

23  spell that out in our opposition brief, which I think, even

24  if true, is of no consequence, because causation is a key

25  issue in the case, and they know that.

1      The fact that Microsoft did not do its internal analysis,

2   comparing costs, looking at the option of doing the second

3   alternative, the Orange Book, which Professor Haedicke is

4   quite clear on, he says that the process isn't ambiguous.

5   You deposit a certain amount in escrow, that amount he can't

6   tell you what that amount would be, and he tells you that

7   once you deposit it, there would be a trial, and then he

8   testified that the standard in that trial would be, you know,

9   did Motorola demand the rate that wasn't FRAND, because he

10  equates -- he says it's the same thing under German law when

11  you look at the antitrust provisions as FRAND, and he says,

12  "I can't tell you what the result would be, but if Motorola

13  was charged FRAND, it would go back to you."  He says that

14  process is uncertain, "I'm not certain about the amount."

15      So the question is, if Motorola -- Microsoft really moved

16  from Germany because of this lawsuit, you would expect an

17  analysis comparing the cost.  You'd expect him to say, "Well,

18  there's this procedure which guarantees we don't have an

19  injunction, but the moving cost this much, we're going to

20  sweat the move."  You might expect that, certainly entitled

21  to argue to the jury that you would expect that.  And, of

22  course, the basis for that argument would be, partly,

23  Judge -- Professor Haedicke's explanation to the jury as to

24  what that procedure would allow Microsoft to do.  And, of

25  course, they can have their expert say, "No, that procedure

1   is ridiculous."

2       But our point is, yeah, but if we're trying to look to see

3   why Microsoft really left Germany, let's see what they

4   considered.  And if they didn't even consider this, if

5   there's no analysis when our expert says there's a clear way

6   to avoid an injunction, then maybe they didn't leave to avoid

7   the injunction.  Maybe there was another reason.

8           THE COURT:  Well, it seems to me what you're

9   attacking, you're saying they engaged in sloppy

10  decision-making, and I'm not sure that they're not permitted

11  to engage in sloppy decision-making.

12          MR. PRICE:  And that's an argument they can make,

13  which is our decision-making was sloppy.  What the jury would

14  have to decide is, we know they had German counsel.  We know

15  German counsel advised in-house counsel about Orange Book.

16  That has come out.  We know in-house counsel considered that.

17  We know in-house counsel talked to the business people.  You

18  know, we could argue, actually, the decision-making wasn't

19  sloppy.  They knew they could protest an injunction easily.

20  They went somewhere else because of some other reason.

21          THE COURT:  I understand that you're going to argue

22  that, but let's go back.  I now know a little more about

23  German Orange Book law than I wanted to, and one of the

24  things that I've heard repeatedly is what I think I just

25  heard you say, which is, Judge Haedicke is candid when he

1   says you have no way of knowing what the amount of money is

2   that needs to be deposited as the bond.

3          MR. PRICE:  And that may be, again, something

4   which -- which Microsoft might have analyzed and said,

5   "That's why we need to move."  But --

6          THE COURT:  Let's assume that it's your royalty

7   demand of $4 billion.  Now, if you're asking them to deposit

8   $4 billion, and they say, "The Netherlands looks pretty good

9   to us," why does Haedicke testify?

10         MR. PRICE:  Well, what Haedicke testifies to is that

11  if you deposit the amount that the patentholder demands, and

12  he says, "I don't know what that was," and we will have

13  testimony, and, I mean, the jury can make inferences as to

14  what that would be.

15         THE COURT:  Well, was it ever communicated?

16         MR. PRICE:  They never pursued that.  Microsoft never

17  pursued that option.  But the money goes back.  It is an

18  escrow, it is a bond, and there may be costs associated with

19  that bond, and we know it was considered tangentially.  We

20  haven't been able to get at those communications.  And so a

21  jury is entitled to ask themselves, okay.

22     But, frankly, if -- if -- if the evidence shows we haven't

23  been able to see it, if the evidence shows that Microsoft did

24  consider it and rejected it, that may support their

25  contention that they moved out of Germany because of this

1   lawsuit.

2           THE COURT:  I'm not asking you to practice German

3   law, but are you confident they get the money back?

4           MR. PRICE:  Yes.  If the court finds -- I mean, it's

5   a judicial proceeding with a trial.  If the court finds that

6   the amount that Motorola demanded is above the amount they

7   should have demanded, that is, above that with suppressed

8   competition, and would discriminate against Microsoft

9   compared to others similarly situated, and Professor Haedicke

10  says that's the same as FRAND.

11     In fact, Mr. --

12          THE COURT:  Professor.

13          MR. PRICE:  -- Professor Bodewig, when I took him

14  through the German law on that, I mean, I believe I'd be able

15  to use that effectively to have him say that.  He denies it,

16  but I think when you look at the details, I think we have a

17  convincing argument that even if he agrees, then there's no

18  question, under German law, it goes back to Microsoft.

19          THE COURT:  What I hear you saying is that I'm

20  trusting some German court to make a decision with my $4

21  billion.  Is that what that boils down to?

22          MR. PRICE:  It boils down to, yes, I'm trusting the

23  German court and will have evidence on how trustworthy German

24  courts are, too.  Experts will testify on that, just as we

25  trust your decisions on where money should go and where it

1   shouldn't go.

2         THE COURT:  But I have to give it back.  That's the

3   difference that I see.

4         MR. PRICE:  Well, sometimes you give it to someone

5   else, actually.  It's the same concept.

6         THE COURT:  All right.  Please continue, sir.

7         MR. PRICE:  I believe those were the only points

8   covered by opposing counsel.  And also, of course, it goes to

9   mitigation, and the jury can, again, reject that argument.

10        THE COURT:  Are you abandoning your argument on

11  attorneys' fees being recoverable in Germany?

12        MR. PRICE:  No, no, we're not abandoning that as a

13  reduction of the fees that should be recovered here.  We're

14  not abandoning Professor Haedicke's opinion on that, to the

15  extent it sheds light on what should be recovered here.

16        THE COURT:  Why is that relevant?

17        MR. PRICE:  It would be relevant, Your Honor, because

18  it's, again, a guidepost as to reasonableness, as to the

19  recovery of attorneys' fees and action in Germany.  The fact

20  that what they're trying to recover here is, I think, about

21  five times more than they would have been entitled to recover

22  in Germany, suggests that the fees they're trying to recover

23  here are unreasonable.

24        THE COURT:  Help me with that one, because I'm

25  misunderstanding your logic.

1      I mean, let's assume I file this action in Ecuador, or

2   even better, in the Eastern District of Texas.

3           MR. PRICE:  Uh-huh.

4           THE COURT:  Are you going to tell me that has any

5   bearing?  The question is, you're in a foreign jurisdiction,

6   and you're comparing it to United States law.  Why is he

7   permitted to testify to that?

8           MR. PRICE:  Well, he's not testifying as to -- as to

9   liability under German law.

10          THE COURT:  Let me rephrase my question so it's

11  clear.

12      You're going to say in Germany you can do an Orange Book

13  proceeding because it only takes three days, and it starts

14  off with presumptions and you don't get to present evidence,

15  and it's going to cost $100, and instead we come to the

16  United States and we hired Sidley and Austin, and it costs

17  $600, and therefore you want to limit your damage, your

18  attorney fees to $100.

19          MR. PRICE:  No, Your Honor.  What he's saying is,

20  they're trying to recover attorneys' fees for litigating in

21  Germany for defending that action in Germany.  A portion of

22  their attorneys' fees is allocated to that action in Germany.

23      I mean, you're correct, the German rules would not have

24  any significance whatsoever as to whether you're allowed to

25  get attorneys' fees as damages in the Eastern District of

1   Texas or before Your Honor.

2        What this goes to is, what is a reasonable amount of

3   attorneys' fees to collect as a result of litigating in

4   Germany and defending the action in Germany?

5             THE COURT:  Then I need to go back and read the

6   rebuttal opinion, because what I have in my notes is -- and

7   this is a quote -- Microsoft has requested damages for

8   attorneys' fees far in excess of the amount of attorneys'

9   fees Microsoft could receive in Germany.

10       Does that mean they paid their German lawyers more and it

11  would have been more than a court would have awarded?

12            MR. PRICE:  Yes.

13            THE COURT:  Okay.  I understand that argument better

14  now.  Thank you.

15            MR. CEDEROTH:  May I take one minute?

16            THE COURT:  You actually have a couple minutes left,

17  Mr. Cederoth.  You all are extremely short-winded today.

18            MR. CEDEROTH:  I -- I -- I can't change that.  Sorry.

19       Two points:  One is, counsel posits that in this grand

20  analysis of whether to move or not move, that somehow

21  Microsoft must have succeeded in calculating what their

22  German law expert concedes in testifying to is impossible to

23  calculate, which is, how much it would have cost them under

24  the Orange Book proceedings.

25       The other -- had they chosen the second option, the

other -- the other piece, and the discussion the court was just having -- in terms of whether Microsoft could get back what it paid in, even though it doesn't know how much it would have to pay in.

Two things on that piece:  One is, you know, counsel went on to explain how, under factors that he did not articulate, and that Judge Haedicke was unable to articulate that would be unknown, the German court would decide under German law how much Microsoft would owe, the proposition being that maybe Microsoft then could get it back if it had paid in more than that.

The issue really is, and I think the court touched on it with the $4 billion piece, is that, would Microsoft be able to get back from the deposits in Germany, however large they may be, the difference between that payment and the payment determined by the court here that's setting a worldwide rate. There's no one that's prepared to sponsor the testimony, nor is Motorola prepared to sponsor the testimony to say with any certainty that that would have occurred.  And, again, the only thing we know, the only data point that those in the courtroom have, is that Microsoft offered to put a $300 million bond in place to forego the injunction, and Motorola turned that down.  That's our only hard data.

That's all I have, Your Honor.

THE COURT:  Mr. Price, you get the last word, if you

1    want it.  Here's a wonderful opportunity for you to say that

2    Motorola is acquiescing the position that I set a worldwide

3    rate.

4            MR. PRICE:  I respectfully decline that.

5        Under the Orange Book procedure, the second alternative,

6    Microsoft would say, "We will deposit in escrow what you,

7    Motorola, say we should.  That way we can continue

8    operating."

9        Now, once we say, "Okay, deposit this amount," Microsoft

10   could say, "Ah, no, not going to happen.  We're not going to

11   pursue this route."

12       What is clear is -- both what's critical here is the

13   question of, did they consider any of this before making a

14   move?  Because I think it's a fair argument to say this would

15   be considered, if the reason was to avoid the injunction.

16   They may say it was dismissed out of hand.  Okay.  Fine.  It

17   would be nice to have someone say that.  But the jury can't

18   evaluate this at all unless they know what the procedure is,

19   and that's all Professor Haedicke is saying:  This is the

20   procedure, this is how it would have worked, they would have

21   got their money back if the court in Germany had said this is

22   too high and it's more than FRAND.  They could have avoided

23   an injunction altogether.

24       Then the question is, okay, what did Microsoft do in

25   deciding to move?  What factors did they consider?  We're

1   saying it wasn't because of this lawsuit.  It's a fair

2   argument to say that if it was, there would be a discussion

3   about Orange Book.  In fact, we know there hasn't been one,

4   because they used the first alternative in Orange Book, the

5   one in which the supreme court -- and both experts agree --

6   was the least likely to succeed.  So this is relevant

7   evidence for the jury to have to evaluate this, what

8   Microsoft did before it moved and what it considered.  Well,

9   why did they really move?  Now, the question is still pending

10  as to whether or not we get more information on that

11  decision-making process, but I know that's for another day,

12  for another hour.

13          THE COURT:  Is Judge Haedicke going to say that there

14  needs to be a RAND resolution in Germany before there was a

15  return of the deposit?

16          MR. PRICE:  What he would say is that that court

17  would be the one that would make the decision as to what

18  FRAND is.

19          THE COURT:  So you're then sponsoring a resolution or

20  an argument whereby having committed that decision to this

21  court, as evidenced by my anti-injunction ruling, that I can

22  be trumped by them collectively in a procedure in Germany?

23          MR. PRICE:  No, not trumped, Your Honor.  First, the

24  decision took place before -- before this court issued its

25  injunction.  The question is what Microsoft considered, they

1    say, in January of 2012.

2            THE COURT:  I'm not interested in when I issued the

3    injunction.  I'm interested in when the case was filed.

4            MR. PRICE:  The case was filed after this one.  So

5    Microsoft could say it could be the reason they didn't invoke

6    the Orange Book procedure.  They could say it was because we

7    didn't want the German court to decide that.  They could say

8    that, then the jury would determine whether or not that made

9    sense.  Because it would have been their decision.  I'm not

10   saying -- we're not saying the German court trumps you.  The

11   German court would not trump you, but beat you to the punch.

12           THE COURT:  They will, because, I mean, as I

13   understand it, I have this wonderful understanding of the

14   German Orange Book, which is based on sitting in a beer

15   garden in Germany listening to three patent judges discuss

16   it, and one of the wonders of it was, my gosh, it's done so

17   promptly, completely arbitrarily, but very promptly.

18           MR. PRICE:  Well, you're talking about Option 1,

19   because Option 1 --

20           THE COURT:  What I refer to as Plan B, which they

21   didn't see the humor in it at all, because they didn't know

22   what it was.

23           MR. PRICE:  Plan A, the first option, is done very

24   quickly because the court is not going to have a full hearing

25   on what the appropriate rate is, and everybody knows that.

1    And that's why Microsoft went in and proposed its rate.  It

2    knew it was not going to get a full hearing on that, because

3    the supreme court had said, no, if you want to get a full

4    hearing, you're going to have to go to Plan B, and that's

5    what Professor Haedicke is testifying about, is Plan B, under

6    Orange Book, which would, without a doubt, avoid an

7    injunction.

8              THE COURT:  Counsel, I won't make any Plan B

9    promises.  We're going to take a break at this time, and

10   given that we're going long on our schedule, I'll probably be

11   back a little bit after 3:15, and we'll pick up with Holleman

12   and Leonard.

13                     (COURT IN RECESS.)

14             THE COURT:  I believe when we left off, we were going

15   to turn to Holleman and Leonard, and I'm not sure who is

16   doing those.

17             MR. PRITIKIN:  I will, Your Honor.

18             THE COURT:  All right.

19             MR. PRITIKIN:  And I'm going to be covering both

20   Holleman and Leonard.  And the fundamental problem -- we'll

21   get to some of the other kind of subsidiary issues -- the

22   fundamental problem is that Motorola wants to use these two

23   witnesses to contradict findings and rulings that the court

24   has already made.  And it is -- in a sense, it's a recurring

25   theme that we're going to see this afternoon, and we're going

1    to see again tomorrow in connection with the summary judgment

2    motions.

3        What Motorola really wants to do is to cast aside

4    everything that's happened today, start afresh, and to put up

5    these experts, Holleman and Leonard, to tell the jury things

6    that are absolutely inconsistent with what the court has

7    already decided.

8        It's of a piece -- I looked quickly at the motion in

9    limine that they filed last night, one of which is to ask the

10   court to throw out the findings of fact from the November

11   trial.  But it's really --

12           THE COURT:  I think they had nicer language than that

13   that they used.

14           MR. PRITIKIN:  I provided a couple of handouts, Your

15   Honor.  Hopefully you have them.  We handed them to Casey

16   during the break.  And we would -- I'm going to start with

17   Holleman.  And what I've tried to do in these handouts, if

18   Your Honor has them there, is I've tried to put them into

19   buckets, some of the statements and paragraphs that are most

20   objectionable, and those are in the red boxes, and to

21   contrast them with rulings that the court has already made

22   that are in the green boxes below, and I think it becomes

23   fairly self-evident fairly quickly that what they're trying

24   to do is to really replace the court's findings with new

25   opinions that these experts would offer.

1      Holleman is somebody who has worked for various

2   standard-setting organizations.  They provided an expert

3   report from him before the trial last fall, and then in the

4   end they decided not to call him.  A lot of the report is a

5   rehash of that on how the standard-setting organizations

6   work.  Most of this has already been covered.  The court has

7   already issued ruling addressing it.

8      But let's go through the key points here.  And during the

9   break, Mr. Price gave me a couple of paragraphs that they

10  said they're going to withdraw, and I'll note those as I go

11  through.  There are only a couple of them that are affected

12  by this.

13     The first category for Holleman, on page 1, are opinions

14  that Holleman wants to offer that really contradict what the

15  court has found.  And the essence of all of these statements

16  is that you satisfy your RAND obligations by entering into

17  good-faith negotiations.

18     Now, we've been around and around and around on that for

19  two years, and the court has issued a number of rulings on

20  it.  One of them is the summary judgment ruling excerpted at

21  the bottom where the court said that it has already twice

22  rejected Motorola's contention that the agreements only

23  require it to negotiate toward a RAND license.

24     And yet if we look at, for example, Holleman's opening

25  report, paragraph 31, they want to put him up and tell the

1   jury that the patentholder fulfills its RAND obligations by

2   being willing to enter into good-faith negotiations.

3       59:  RAND commitments are simply intended to foster

4   good-faith negotiations.

5       30:  The RAND commitment is a commitment for the patent

6   owner to engage in good-faith bilateral negotiations, and so

7   forth as you read down.  And this is just fundamentally at

8   odds with where we are at this stage of the case.  And it

9   would be wrong to put up an expert to provide those opinions

10  at trial.

11      Now, if we go to the next page, page 2, Your Honor, this

12  is the second category.  I was told that they are withdrawing

13  paragraph 37, but, again, in many respects, the paragraphs --

14  the report is very redundant, and it's not that easy to catch

15  the paragraph that says the same thing throughout.  So in a

16  sense, these are representative, these categories of opinions

17  that he should not be allowed to offer.

18      But the second category is where they're trying to pin the

19  blame on us, that somehow we did something wrong by filing

20  this lawsuit in this court, asking the court to resolve the

21  controversy, to hold them to a RAND commitment, and

22  ultimately to set up the RAND royalty.

23      Again, this has been the subject of numerous rulings by

24  the court.  We referenced one of them here, but it appears in

25  other rulings the court has made.  And court has rejected the

1    notion that somehow we repudiated or that we had an

2    obligation to negotiate with them, but they're trying to turn

3    the tables and put us on trial.  But that's not what this

4    case is about.  It is about whether they breached their RAND

5    commitment.

6        If we look at the language from paragraph 34 of the

7    report, they say, "Rather than enter into good-faith

8    negotiations with Motorola, Microsoft filed this lawsuit

9    against Motorola on November 9th, 2010."

10       There are many statements to the same effect.  When we go

11   back and look at Leonard, it's the same thing.  He's trying

12   to point the blame at us; that the problem was that we didn't

13   negotiate with them.  That's something that is irrelevant to

14   the claim.  It's something that has already been ruled upon

15   by the court, and they shouldn't be putting up experts to

16   tell the jury -- to offer opinions of that kind.

17       If we go to page 3, this is another category of statements

18   that are being provided.  Again, we're going to see these

19   echoed when we get back to Leonard in a few minutes.  But on

20   page 3, they're trying to put up experts to tell the jury

21   that royalty stacking is somehow not relevant and doesn't

22   enter into whether or not the rates that are being offered

23   are RAND rates, or that you don't have to look to comparable

24   licenses like Google's.  But this is in the findings of fact.

25   And, again, we've quoted some of them on the same page here,

1   where the court said -- that concluded the pool rate is a

2   strong indicator of a RAND royalty for the H.264 portfolio.

3        The court said that the anti-stacking principle constrains

4   RAND because parties in a RAND negotiation would determine a

5   reasonable royalty by considering how much in total a license

6   fee implementer can pay.  And what do they want Holleman to

7   say?  Well, look at paragraph 47.

8        They want Holleman to say -- highly misleading -- to

9   convey the impression to the jury that there are no

10  provisions in the SPO policies requiring the patentholder to

11  consider royalty stacking or patent pool rates in formulating

12  its opening offer.  And the implication of that is that it

13  was just fine for them to ignore all of those things in

14  trying to put together the opening offer that was made.

15       If we go to page 4, this touches directly on the

16  obligations that surround the opening offer that is made with

17  respect to a RAND royalty.  And this is a topic the court has

18  addressed a couple of times.  And what the court has said is,

19  that the opening offer does not have to be a RAND offer, but

20  the court has also said that the patent owner may not make

21  blatantly unreasonable offers to implementers.  And the court

22  has said that a couple of times.  It was based initially on a

23  concession from counsel for Motorola that a blatantly

24  unreasonable offer would violate the RAND commitment.

25       But what do they want Holleman to do?  They want to put

 1    Holleman on the stand -- he's not a lawyer, by the way.  I

 2    mean, this is just somebody who's worked for various

 3    standard-setting organizations over the years.  They want to

 4    put Holleman on the stand to leave the impression that

 5    anything goes in an opening offer.

 6         So if you look at paragraph 47, he would say there are no

 7    RAND provisions in SPO policies requiring that an opening

 8    offer be a certain rate and so forth in relation to the

 9    agreed-upon RAND license rate.  48, he says certainly not at

10    the opening negotiations does it have to be RAND or within a

11    specific RAND range.

12         And the problem with that is, it's in a sense a half

13    truth.  No, the opening offer doesn't have to be a RAND

14    offer, but it cannot be blatantly unreasonable.  And the

15    impression he's going to leave with the jury, based on this,

16    is that they can do anything they want to do in the opening

17    offer, and that is not consistent with where we are in the

18    case at this point.

19              THE COURT:  Well, let me stop you.

20              MR. CEDEROTH:  Sure.

21              THE COURT:  Other than you think there needs to be a

22    qualifying line, is there anything objectionable about 48?

23              MR. PRITIKIN: No.  It's the half truth aspect of it,

24    Your Honor.  You put your finger right on it.  It's a classic

25    half truth.  It conveys what is said is literally true, that

1   the opening offer doesn't have to be RAND.  It's not what is

2   said.  And the impression it leaves is that Holleman is

3   telling them what the law is, and that this is somehow a

4   complete and accurate statement of the law.

5       He shouldn't be instructing them on the law in the first

6   place.  We'll come back to that in a moment.  But if he goes

7   there, it has to be an accurate statement, and it would have

8   to be consistent with what the court has said is the

9   governing law.

10          THE COURT:  Since I've taken you off of your train of

11  thought here, what is Microsoft's position on how the court's

12  prior rulings ought to be made available to the jury?

13          MR. PRITIKIN:  That's a fair question.  It's an

14  important question to all the parties, Your Honor.

15      There are a couple of things that we think should be done.

16  First, we think that the court should instruct the jury as to

17  the key portions of that as a matter of law.  And included in

18  the preliminary instructions that we provided to the court,

19  we have taken, and we've tried to be faithful to the language

20  of the court's finding, the background, the findings, the

21  portions that are important, and that the jury needs to know

22  and that neither side should be contradicting in the course

23  of the trial.  So that should be the first step, and the jury

24  should be provided with those, both at the outset and in the

25  final instructions, and we think preferably in writing as

1  well.

2      Secondly, we think -- I think the findings that Your Honor

3  prepared are approximately 200 pages in length, and we think

4  that to the extent one of their witnesses -- or for that

5  matter, one of our witnesses -- contradicts that on the

6  stand, that there has to be a mechanism for either the court

7  informing the jury that that is inconsistent with the

8  findings that have been made, or a mechanism by which the

9  witness can be impeached with that.  And we can talk about

10  what the best procedures are in front of the jury.  It may be

11  we ought to approach the bench when we think something like

12  that happens so we can discuss it with Your Honor, the

13  testimony that had just been heard, and show you the findings

14  or curative instruction that we think needs to be provided.

15      But essentially the position that Motorola is taking is

16  that we're going to have a fresh start and somehow ignore

17  everything that's happened, and there's a lot more in those

18  findings than simply the ultimate RAND rate range that the

19  court found that really is important and has a direct bearing

20  on the issues that are going to be decided at trial.

21      We tried to provide a workable summary of that in the

22  preliminary instructions.  I think they're on the order of 10

23  to 15 pages, and that would be our proposal.

24          THE COURT:  And have the parties started to discuss

25  that among themselves?

1            MR. PRITIKIN:  They have not, Your Honor.  I mean, we

2    would be open -- I think, perhaps, the best way to proceed,

3    they have our preliminary instructions.  They've had them for

4    a long time.  We've exchanged those.  And they certainly have

5    their objections to them.  But once we get guidance from the

6    court that this would be an acceptable procedure, what I

7    would suggest is that the parties then, if there are portions

8    of the findings that they think should be added to that and

9    also ought to be presented to the jury, we can meet and

10   confer on that, and Your Honor can be, obviously, the arbiter

11   on what is going to be provided to the jury or not.

12       Now, they provided -- they proposed a version of what they

13   wanted to add in the preliminary instructions, but it does

14   not include what we consider to be the essence of the

15   findings that were entered by the court in April.

16           THE COURT:  All right.  I'm going to interrupt you

17   for a moment.

18       Mr. Price, I'd like to hear from you on this question, if

19   you're prepared to address it at this time.  I'm not looking

20   for the answer.  I'm looking for the mechanism that's going

21   to get us to the answer.

22           MR. PRICE:  Right.  We actually filed -- one

23   mechanism we filed last night was the motion in limine that

24   covers much of this topic, which is what portions should get

25   in and what should not.  So that was the mechanism we used,

1    and, obviously, guidance on that, when that's discussed, that

2    will give us guidance on how to proceed after that.  So,

3    quite frankly, I haven't thought about the mechanism without

4    first having a ruling on that.

5              THE COURT:  If I order the two of you to confer on

6    the subject -- I mean, ultimately, I would like us to come up

7    with a mechanism that both of you can live with.  If you

8    can't, then I'll order you to submit your respective

9    positions, and I'll pick one, or I'll pick a little bit out

10   of each one.

11         But it seems to me is that -- I think the proper amount is

12   204 or 208 pages, it's not going to be realistic to give each

13   jury member a copy of that, although it probably is more

14   interesting than *People* magazine.

15         On the other hand, I'm not sure that Mr. Pritikin, talking

16   about it today, also makes a lot of sense in that conclusions

17   to be drawn of the fact that there are numbered paragraphs

18   doesn't mean there aren't other things in there that address

19   the same topic.  So I'm looking for some assistance from the

20   parties on how to proceed with that.  It's something that we,

21   likewise, have been thinking about.

22              MR. PRICE:  Sorry, Your Honor, I didn't get that last

23   point.

24              THE COURT:  We, likewise, have been looking at a way

25   to address that.  It seems to me one problem with having the

1    numbered paragraphs for findings and conclusions is you can

2    have them in fairly disparate places, writings on the same

3    subject, and I'm not sure how we meld that together.

4          MR. PRITIKIN:  We tried to do that in our draft of

5    these preliminary instructions, to put something together

6    that flows logically.  We did not take them just strictly in

7    the same order in which your findings are prepared, but we

8    tried to be faithful to the language of them and to put them

9    into sections so that they're comprehensible and they flow.

10       And what I would propose, Your Honor, is we meet and

11    confer on this very promptly, and either get the court an

12    agreed set, or an agreed set with small portions where

13    they're disputed, because clearly it's going to behoove

14    everybody to have this resolved sooner rather than later.

15    It's going to be an important backdrop for framing the

16    opening statements and testimony that's given at trial, and

17    so clarity on what the jury is going to know as a baseline is

18    certainly important to everybody.

19         MR. PRICE:  Your Honor, I agree and would like to

20    know that as soon as possible.  There's obviously a big gap

21    between the parties as to whether any of the order should go

22    to the jury.  And we know, obviously, we have a disagreement

23    with the court on that.  But also if something goes to the

24    jury, what should, and whether it should be a jury

25    instruction.  And I just think, given the gap, it would be

1   easier than to try to formulate a way of implementing what

2   the court wants to do once we understand, based upon the

3   motion in limine, what the court thinks the jury should hear.

4           THE COURT:  Well, I will get you that, but let me

5   give you some preliminary thoughts.

6       This notion that what happened before didn't happen isn't

7   going to fly.  I've said that now twice, and I'll say it

8   again, so let's listen this time.

9       We had a great deal of time and effort that went into a

10  trial and the production of an order.  This notion that we're

11  going to start over again that I keep hearing about is not

12  going to work.  The jury is not going to have pretended to it

13  that the court did not issue an order.

14      Now, the portions of it that come in and the form that it

15  comes in, that's up for consideration.  But I don't -- I have

16  not read your motion, but, you know, this is the third time

17  now that I've listened to Motorola announce, you know,

18  whatever happened before didn't count and we get to start

19  over again.  And, frankly, reading some of the Holleman

20  observations -- you know, for example, there are similarly no

21  RAND provisions in SPO policies requiring that an opening

22  offer be of a certain rate, or in relation to the final

23  agreed-upon RAND license rates.

24      Yes, it does not say in my order in regards to SPO

25  policies, but it says that as a matter of law, which your

1  counsel agreed to, there is a relation to the RAND rate.

2      So, you know, Mr. Price, I don't know where this is coming

3  from, but you're not going to get there.

4          MR. PRICE:  Let me respond very briefly to give you

5  some assurance, and I'll respond to what's in Mr. Holleman's

6  report.  I can do it now or later.

7      With respect to the motion in limine, obviously, we take

8  the position, which the court disagrees with, on pretending

9  that the first part didn't happen.  But -- but conceding

10  that -- or not conceding that, but assuming that part of the

11  orders will get to the jury -- and I've certainly heard the

12  court time and again say the jury will be told what the court

13  determined was the RAND range and RAND rate, and I've seen

14  you in writing and I've heard you say that the jury is

15  entitled to hear that in order to make a determination as to

16  whether or not Motorola acted in good faith.

17      So even given that, then the question is, how much of this

18  detail would go to the jury?  That is, the court, in effect,

19  did the hypothetical negotiation.  Now, Motorola's position

20  is -- the key question here is good faith.  It's not -- you

21  know, Motorola is not required to have that conversation in

22  its head at the time of the opening offer.  You know, the

23  question is, was Motorola, in good faith, willing to

24  negotiate for a FRAND rate?  And if the parties disagreed,

25  perhaps the court would have to determine what that FRAND

1   rate was.

2       So given that position, you know, the question is, you

3   know, how much of the court's order -- or the court goes

4   through this negotiation and comes up with a rate, does the

5   jury have to hear, or even should they hear, because our, you

6   know, our position is that -- that internal dialogue, which

7   the parties would be having or would actually have in

8   negotiation, is irrelevant to the question as to how Motorola

9   acted when it made its offers.

10      The question at that time was whether Motorola acted in

11  good faith, whether they were trying to impose a holdup, you

12  know, whether or not they, in effect, had the intent not to

13  grant, you know, a license under FRAND.  And so I understand,

14  you know, Your Honor wanting to tell the jury about, you

15  know, what the FRAND rate was that was determined and the

16  range that we, on the record, have a disagreement as to that.

17  But if we get past that, the question is, what else of this

18  200-page order comes in?

19          THE COURT:  I agree with you, sir, that there are

20  large portions of it that the jury is not going to need to

21  see, but, you know, let's get it on the table right now.

22  Starting two and a half years ago, your predecessor agreed

23  with the fact that in order to determine if Motorola breached

24  its obligation of good faith, a jury would need to know a

25  RAND rate, and the only way we were going to get there was to

1    have the court set it.

2        So I'll read your motion, but, you know, this is just

3    backtracking, and it's, frankly, very frustrating to me.

4    We're trying to move forward, and you're putting forward what

5    I consider to be obstacles.

6        There are other things in there.  There are some holdings

7    as a matter of law, one of which you like, and therefore you

8    quote frequently, which is your initial offer doesn't have to

9    be RAND.  You apparently like that.  You mention it often.

10   It's all over your briefing here.  I'm not going to let you

11   pick and choose over, oh, we like that one so it gets to come

12   in, but, oh, nothing else does.

13       So I understand what you're doing here and I understand

14   why you're doing it, but let's recognize that you have a very

15   limited time for trial, and we are not going to relitigate

16   issues that we have already decided.

17       So I think we understand each other.  I don't really

18   disagree.  But I want to make it very clear that, you know,

19   when I see this sort of thing, I'm intending to call both

20   sides out, because otherwise this case will go on forever,

21   and as fond as I am of all of you, I'm happy to have you out

22   of this courtroom at some point before I retire.

23           MR. PRICE:  I'm glad you developed a fondness in such

24   a short time for us.  I'll be happy to look at the motion.

25   But, obviously, on the record, we're taking a position as to

1   the preliminary matter of the rate and the range.  But I

2   think you'll see we're not being unreasonable in the, you

3   know, what do we do, you know, if that's going to go to the

4   jury.

5       I don't expect to win that first argument.  The motion

6   wasn't filed with any expectation that you would decide the

7   jury is not going to hear what you determined was the FRAND

8   rate and the FRAND range.  You know, we're keeping our record

9   on that, but I do think that you might find persuasively on

10  the arguments on the rest to the court.  At least I hope so.

11          THE COURT:  All right.  Why don't you resume your

12  seat.  We'll let Mr. Pritikin pick up where he left off.

13          MR. PRITIKIN:  I don't want to belabor this, Your

14  Honor, but a couple of highlights.  We were on page 4.  Let's

15  go to page 5.

16      Page 5, what they have is an opinion from Holleman that

17  suggests that what the court did in setting the RAND rate is

18  irrelevant to the proceeding.

19      We go to page 6, this is a direct attack on the relevance

20  of the findings of fact.  Holleman says that it does not make

21  sense to consider the court's findings of fact and

22  conclusions of law as a guide to the bilateral negotiations

23  that should have occurred between these specific parties and

24  the offers Motorola made.

25      What can I say about that?  I mean, it's just...

1      We go to page 7.  This is a little different category that

2  we're getting into next with Holleman, and this is an

3  ultimate opinion on good faith.

4      We've cited the cases in our brief, Your Honor, but there

5  are certain topics as to which experts are allowed to opine

6  as to the ultimate conclusion.  Good faith is not one of

7  them, because it's a state of mind, typically, good faith,

8  and it's the sort of thing that no one, unless you can read

9  minds, is in a position to opine as to what somebody's

10 internal and subjective motives were.  And yet the Holleman

11 report -- and we're going to see this again with Leonard, the

12 economist, is just filled with conclusions where they want to

13 put him up to opine and bless their actions as being in good

14 faith.

15     So if you look at 37, the letters represented a good-faith

16 attempt to enter into licensing negotiations with Microsoft.

17 How can an expert possibly know that or bless it?

18     38 fully consists -- they say that because Motorola

19 attempted to engage Microsoft in good-faith negotiations, the

20 actions are fully consistent with RAND obligations.  Now,

21 that's problematic on many scores.  It's an incorrect

22 statement of the law, he's purporting to tell them what the

23 law is, and he's opining on good faith.

24     59, Motorola satisfied its commitment by attempting to

25 enter into good-faith negotiations.

1        Finally, if we go to page 8, there are many places where

2    he's offering legal opinions and interpretations.  And,

3    again, he's not qualified to do that.  An expert shouldn't be

4    doing that.  But he's going to instruct the jury as to what's

5    in the SPO, IPR, and antitrust policies, of all things.  He's

6    not a lawyer.

7        Paragraph 30, again, it's a misstatement of what the RAND

8    commitment is, and the court, obviously, is familiar with the

9    rulings, so I don't think I need to repeat what the court has

10   said about those things.

11       What is it that Holleman can actually say?  I'm really at

12   a loss, because most of what's in that report that isn't

13   objectionable will be just general background on what SSOs

14   are and what the process is and how standard essential

15   patents are declared.  All of that was covered in the first

16   trial.  They may have run out of time, and that's why they

17   didn't call him.  But there really isn't much to add.  Once

18   we have preliminary instructions from the court, the jury is

19   going to know all of this because it's already been found, to

20   the extent it's not objectionable.

21       Let me move on briefly to Leonard.  Now, Leonard is the

22   third economist that they've used in these matters.  They

23   started with Teece in the ITC case, they replaced him with

24   Schmalensee at the trial last November, and now they've

25   replaced Schmalensee with Leonard.  And one of their motions

1    in limine is, in addition, we can't use anything that any

2    other witness had said at the November trial.  So to the

3    extent that Schmalensee said things like the whole purpose of

4    RAND is to prevent holdup, that can't be used, because that

5    would be subject to their motion in limine in the fresh

6    start.

7        The problem with Leonard is, again, he's doing essentially

8    the same things as Holleman.  He's contradicting the court's

9    rulings, he's offering impermissible legal opinions, and as

10   an economist, he is also offering opinions on subjective good

11   faith.  It's the sort of thing that an expert ought not to be

12   doing.

13       And we can go through these fairly quickly.  If we look at

14   the first page of the handout, we saw this with Holleman, and

15   this is all over the Leonard report.  I took his deposition;

16   all over the deposition.  With virtually every answer he

17   tries to turn the table and point the blame at Microsoft.

18   "Well, you filed suit.  You stopped it from happening," and

19   it happens over and over and over again.  Virtually every

20   question has that answer embedded in it.  And he shouldn't be

21   allowed to go there.  It's just inconsistent with the rulings

22   the court has made.

23       If we look at the second slide, he has opinions that he's

24   offering on ultimate conclusions on good faith.  Again, as an

25   economist, I mean, how can he say that Motorola was acting in

1   good faith when it made its opening offers?

2       If we go to the third slide, he has a direct frontal

3   attack on the court's use of the anti-stacking

4   considerations.  We think that's pretty important.  It's

5   pretty fundamental to the court's findings.  It's --

6   throughout the findings, the court made the point that that's

7   one of the important reasons, the rationale for the RAND

8   commitment.  Leonard disagrees.  Well, he's entitled to hold

9   those opinions, I suppose, but those are not opinions that he

10  ought to be allowed to express to the jury in this case.

11      If we go to the fourth page, this gets, again, into the

12  subject of the opening offers, where, you know, they like the

13  language.  The opening offer doesn't have to be RAND, but

14  it's, again, the classic half truth, where he doesn't want to

15  acknowledge the other parts of it that the court surrounded

16  it with, namely, it can be blatantly unreasonable.

17      And when I asked him about that in the deposition, he said

18  he didn't agree, he didn't think there was any problem with

19  making a blatantly unreasonable offer.  Well, again, he

20  should not be able to give half of what the court said, leave

21  the other part out, and either be silent on it or express a

22  disagreement on the decisions the court reached.

23      On page 5, finally, a number of the opinions he's offering

24  are strictly legal conclusions.

25      They're withdrawing paragraph 33, I'm told.

1    As to these others, these are just statements of the law,

2  and they're not right.  He says, "As an economist," paragraph

3  60, "it is my opinion that a opening offer is made in good

4  faith if it is meant to be the start of a negotiation through

5  which the parties can reach a RAND license," again suggesting

6  that that's all you need to do as the owner of standard

7  essential patents.

8    And if you look at paragraph 28, this one is especially

9  egregious, again, because he's pointing back at Microsoft.

10  The opinion is, after Microsoft's refusal to negotiate, it

11  was reasonable for Motorola to file suit.  Thus, when

12  assessing causation, Microsoft's actions in initiating the

13  litigation must be taken into account.  Well, you really

14  can't square that with what the court already ruled with

15  respect to our not having repudiated and our having every

16  right to be here to have this dispute resolved.  It's a

17  legitimate way to get the RAND rate determined.

18    And by the way, Schamlensee, when he was on the stand

19  there, agreed with it.  And presumably they wouldn't want us

20  to use that.  They want to use Leonard now, who has a

21  different view of the subject.

22    So beyond that, I'm not going to repeat what is in the

23  briefs, Your Honor, but that's the essence of the motion.

24        THE COURT:  All right.  Counsel, we're going to take

25  a short break here.

```
 1                    (Off the record.)
 2          MR. PRICE:  So, Your Honor, with respect to
 3   Mr. Holleman, it's essential that he be entitled to testify
 4   as to the custom and practice of the industry so that the
 5   jury can -- can -- to help the jury determine whether or not
 6   Motorola in this case acted in good faith.  And so the
 7   question that's been raised by Microsoft is whether or not
 8   that testimony is inconsistent with the court's order.
 9          I know there is also a question of whether or not he is
10   testifying to legal conclusions.  I find it interesting that,
11   I think, Dr. Murphy is testifying for Microsoft that
12   Motorola's actions constituted a holdup and that they weren't
13   in good faith.  I think we're, likewise, entitled to have an
14   expert.  It will be Mr. Holleman testifying about Motorola's
15   actions and that they are, in fact, consistent with good
16   faith.
17          But beyond that issue of, you know, should they be able to
18   testify to that ultimate issue, it basically comes down to
19   whether or not Holleman has gone too far and is inconsistent
20   with what the court has ruled.
21          And if we look at some of the examples, I think you can
22   kind of see why -- and a couple of things in the report, he
23   did go beyond what I think he should have, and I informed
24   counsel that we're not going to express those opinions.  And
25   a couple of those include points that were actually talked
```

1  about, and I'll tell the court we also are dropping those.

2  And I think those, in particular, are, if we go to page 7,

3  paragraphs 37 and 38, we do not -- we do not intend to

4  present -- also paragraph 59, because Mr. Holleman is not

5  going to be giving an opinion on whether or not these actions

6  were, in fact, in good faith.  What he will testify to is

7  what was custom and practice in the standard-setting

8  organizations.

9      Now, let's start with his testimony, and it is

10  illustrative on page 1, which is concerning the obligation to

11  negotiate in good faith.  And, Your Honor, Mr. Holleman will

12  not testify that -- that contrary to what you have ruled, and

13  if I can try to summarize this correctly, which is that an

14  SEP patentholder has an obligation to license to a

15  prospective patentee at a FRAND rate.  He will not disagree

16  with that.

17      What he's going to testify to is that the expectation, you

18  know, as reflected in the provisions of the SSO procedures,

19  the expectation, the general way this works, the custom and

20  practice is, there is an opening offer, there are

21  negotiations, and the SSO doesn't determine FRAND.  It

22  actually doesn't determine good faith.  They're out there

23  outside the organization, trying to negotiate toward a FRAND

24  rate.  He'll testify that is the custom and practice.  He

25  will -- he will not say -- and I'm not going to say

1    internally he -- he wouldn't want to say -- he won't say that
2    there is no obligation to give a FRAND license if the
3    patentee says, "I will accept that licensee."  He will not
4    testify to that.
5         But what he will testify to -- because that would be
6    inconsistent with the order.  But what he will testify to is
7    that part of the commitment is that you negotiate in good
8    faith.  Now -- and that covers sort of what we have here on
9    the first page.  And I actually don't think that's in
10   dispute.  I think that even Microsoft would agree that that's
11   one of the obligations, you know, certainly that the SEP
12   holder has, which is they're supposed to negotiate in good
13   faith.  But that's the question, you know, are we acting in
14   good faith?  And he'll testify that that's how you evaluate
15   whether or not the opening offer was appropriate, was it in
16   good faith?
17        And I'll give Your Honor an example.  Your Honor has said
18   that an unreasonable offer, you know, is inappropriate.  I
19   think that if --
20             THE COURT:  I think what I said was an initial offer
21   could be so out of proportion to RAND that it would
22   constitute bad faith.
23             MR. PRICE:  Thank you for clarifying that.  And I
24   think -- I think that's important, because I think what you
25   were saying is that a jury could conclude if it's totally

1   outrageous that there was bad faith.

2       However, you could imagine a negotiation where the

3   patentholder said, "Oh, gosh, I don't know what to ask for

4   this.  I've never done it before.  A zillion dollars.  Just

5   tell me what you think you should pay."  I'm asking for a

6   zillion.  "Give me an idea of what you think you should pay."

7       And if that person, in good faith, is trying to negotiate

8   in good faith, but is trying to seek information from the

9   other side, then I don't know if you conclude that, you know,

10  saying that outrageous number is, by itself, bad faith.  The

11  question is, what is evidence of good faith, given all the

12  circumstances?  And I believe that's what Mr. Holleman would

13  testify to on that issue.

14          THE COURT:  Well, let's take page 1, paragraph 59 as

15  an example.  You struck that.  Is that correct?

16          MR. PRICE:  Yes.

17          THE COURT:  Okay.  Then that's the one I want to

18  concentrate on, because it will no longer be in the case.

19      When you insert the words "simply intended," I would use

20  "simply intended" to be contrary to my order in this matter.

21          MR. PRICE:  And I understand.

22          THE COURT:  And, you know, I don't want to ask you if

23  you agree or disagree with that.  I'm glad you struck it.

24  But that's the kind of thing that I need to prevent you from

25  doing, because it's going to waste everybody's time, and all

we're going to do is have objections to it at trial, and I'll

sustain them.

Your description of what Holleman would testify to is that

we have negotiations, the standard-setting organization is

not involved in setting the rate, and, in fact, they're not

even involved in the negotiation.  Those are all components

of the negotiation process that I have no trouble with the

jury hearing.  It's when we start to get into these

conclusions about this is what we are obligating ourselves

to, simply to intend to foster good faith.  That's -- that's

what my point of concern is.

MR. PRICE:  And at trial we'll very carefully

articulate that so he's not saying that's the only

obligation, because obviously we don't want to say anything

that's inconsistent with Your Honor's order, and this wasn't

that clear.

But there are a couple of other areas where I think we

need further discussion, because I don't think what he's

testifying to is inconsistent with this court's order at all.

And, in fact, maybe we shouldn't have a trial.  And those are

two areas.

One is whether or not it's under the SSO policies, whether

or not it's inappropriate to seek an injunction.  And you see

Mr. Holleman's testimony that -- that the policies say

nothing about that.  And, quite frankly, neither does Your

 1   Honor's opinion.  What -- what the court did in its opinion

 2   was state, look, and it applied basic injunction law, right,

 3   is there irreparable harm, the first question, very

 4   important.  And what the court found was, in a situation

 5   where the patentholder has an obligation to license a FRAND,

 6   and the patentee has said, "I will pay whatever FRAND that's

 7   determined to be," in that situation there is no irreparable

 8   harm, because you're going to get the payment that the court

 9   orders.  And that was an application of a general, you know,

10   law, to a specific factual situation.

11       What Mr. Holleman is saying is -- is -- he's not

12   disagreeing that that would be the just result in those

13   circumstances.  I don't think he's qualified to say whether

14   or not that would be the just result and the correct result

15   in those circumstances.  But what he can say is that there's

16   nothing in the procedure, the rules themselves, that say you

17   can't get an injunction.

18       What Microsoft is trying to do is turn your order into a

19   ruling by Your Honor that the policies and procedures of the

20   standard-setting organizations prohibit injunctions.  They

21   don't.  And we're entitled, I think, to tell the jury that

22   there's nothing in there that does that.  That is not

23   inconsistent with Your Honor's rulings at all.  It's not

24   inconsistent with the other cases that were cited, which all

25   said, you know, in these specific circumstances, injunctive

1   relief is not appropriate, because, for example, in this

2   case, Your Honor has decided there can be no irreparable

3   harm.

4           THE COURT:  Well, let me ask you this.  It seems to

5   me one of the questions that we're dealing with is, is what

6   forum are we in?  I suggest to you that it's not the court

7   that's in the forefront of the injunction question.  Right

8   now it appears to be the FTC.

9           MR. PRICE:  I agree.

10          THE COURT:  If we were in Japan, for example, there

11  would be a very clear answer to this.  Apparently in Germany

12  we're going to have a trial over it, if there is a clear

13  answer to this or not.

14      But what worries me is, if asked the question, a

15  patentholder who has entered into a standard essential patent

16  arrangement, and one of the things we need to do is recognize

17  we only have two contracts here.  I'm nervous about the idea

18  that there is a universe out there of standard-setting

19  organizations, because the language does vary in these, from

20  contract to contract.

21      But let's assume that we have someone who's entered into a

22  standard essential patent agreement, we have a willing

23  licensee, and the only thing that's keeping them apart is

24  establishing RAND rate.  If your witness then says, "I think

25  that they're entitled to an injunction," I think they're

1    reaching a legal conclusion.

2         MR. PRICE:  And he's not going to say that.  What

3    he's going to say is that the standard-setting organization

4    hasn't taken a position on that.  That's a question for

5    specific circumstances that come before a court.  What

6    they've taken a position on is, is you have to offer FRAND,

7    and he's not going to be inconsistent with the court saying

8    you actually have to license FRAND, if that is agreed to by

9    the licensee.  It's not the standard setting organization's

10   job to determine whether or not, in this particular case,

11   injunctive relief is appropriate.

12        THE COURT:  And if that's Motorola's position in

13   this, then why is this testimony relevant?

14        MR. PRICE:  It's relevant because we believe

15   Microsoft will take the position.  In fact, I think I asked

16   the court to take the position by objecting to what's being

17   said by Mr. Holleman, that the standard-setting organizations

18   prohibit seeking injunctions if you have committed to license

19   at a FRAND rate.  And that's not -- that's not true.  It's --

20   it's a question of the specific circumstances between the two

21   parties, applying the law of that jurisdiction, as you have.

22        THE COURT:  I'm going to trust you that that's the

23   correct statement.  That's not -- to the limited extent that

24   I've read this material, which obviously has arrived very

25   recently, that's not what I understand the parties' positions

1    to be.

2             MR. PRICE:  I could be wrong.

3             THE COURT:  We need to look at the concrete details

4    of this transaction as opposed to discussing standard-setting

5    organizations, generally.  And to the extent that you can

6    tell Mr. Holleman he needs to be thoughtful about that, that

7    would be appreciated.

8             MR. PRICE:  And, you know, it could be that someone

9    from Motorola would testify that they didn't think there was

10   anything wrong with filing this, and they can be

11   cross-examined on that.  But what Mr. Holleman is going to

12   say is, "In the rules of my organization, there's nothing

13   about that," and I think that's what he said.

14        The second issue is whether or not -- I probably didn't

15   count it correctly, because there's another one.

16        The second issue is whether or not his statements on

17   page 4, for example, the opening offer doesn't have to be

18   within a range or FRAND, and the court has said that.

19        But more importantly -- and I shouldn't have -- and that

20   is page 3.  More importantly, in making the opening offer,

21   there isn't any provision that when you do that, you have to

22   have already taken into account royalty stacking or patent

23   rules in formulating that opening offer.

24        Now, Microsoft has taken the position that you have ruled,

25   because of your ruling on what the appropriate FRAND rate and

1    range are, you have ruled that has to be taken into account

2    in the opening offer.  I don't think you've ruled that.  If

3    you have, maybe we can avoid part of a trial, because I don't

4    think we're going to be putting on any witnesses for Motorola

5    saying we did a royalty-stacking analysis before we made the

6    opening offer.  They're going to testify that they had to get

7    an offer out, they didn't have time to analyze it, you know,

8    specifically, they, in good faith, wanted to enter into

9    negotiations, they went back to standard rates they asked for

10   in the past, and they expected conversations to continue.

11            THE COURT:  Well, without offering you an advisory

12   opinion, what I would say is, I did not say in the order that

13   the patentholder was required to consider royalty stacking or

14   patent pools in formulating that opening offer.  What I did

15   say is you need to have it in relation to the RAND rate, and

16   the RAND rate, I have held, needs to consider royalty

17   stacking and patent pools, if they are available.  So it's a

18   subtle distinction, but it is a distinction.

19            MR. PRICE:  And it's not -- here's the reason I think

20   it's not -- it won't be as subtle when it's presented to the

21   jury.

22        Your Honor is obviously going to tell them the RAND rate

23   which the court came up with, and the RAND range.  We have

24   our other expert, Mr. Leonard, who will testify that, yeah,

25   royalty stacking comes up in these negotiations.  You would

 1    expect it.  You expect, he will testify, that it will be the

 2    person who wants the license so that they can make that

 3    device that complies with the standard, who will say, hey,

 4    there's a problem here.  We can't pay that because we have to

 5    pay everybody else.  In fact, he's going to testify that

 6    they'll be in a better position to know that because they,

 7    hypothetically, are practicing the standard, and they either

 8    have permission, or they're in discussions with the people

 9    that have permission, and that it would not be unexpected for

10    that to come up in the negotiations themselves.  But, he will

11    testify, that in his experience you wouldn't expect the

12    opening offer of the patentholder to necessarily consider

13    that at all.  It's part of negotiations.  It's much more

14    likely that the potential patentee would bring that up.

15        So that's not inconsistent with this court's order at all

16    that that's something that can be considered and the parties

17    would talk about.  It just isn't.  And Motorola is going to

18    say, "Here is why we did this opening offer."  They're not

19    going to issue royalty stacking.  And so these opinions

20    aren't inconsistent with what Your Honor said.

21        What Mr. Holleman is saying is necessary to be said,

22    because you heard Microsoft say this is inconsistent with

23    your opinion.  They're taking the position that an opening

24    offer has to take that into consideration, and we're entitled

25    to say that's not the customary practice.

1    THE COURT:  You're going to run out of time if you
2    don't get to Mr. Leonard.
3    MR. PRICE:  With respect to Mr. Leonard, Your Honor,
4    two things:  One, I believe he is entitled to conclude
5    whether or not, given the facts he knows, Motorola's offer
6    was in good faith, just as Dr. Murphy can testify.  Given the
7    facts he knows, Motorola's opening offer was an attempt to
8    holdup.  I mean, they're two sides of the same coin.  Because
9    what Mr. Leonard does is, he applies his expertise in
10   economics and negotiation and licensing to tell you that this
11   is how negotiations take place.  And he's entitled to say
12   that Microsoft did not respond to an offer.  He's entitled to
13   say it for this reason.  And the vast majority of cases -- in
14   fact, Microsoft's witnesses have said in every other case
15   they're aware of involving patent controls, Microsoft has
16   come back with the response about, why didn't they this time?
17   Why didn't they?
18       It is Motorola's position that the reason they didn't is
19   because they were trying to gain leverage against Motorola,
20   and, in part, force Motorola to start making phones that had
21   Windows.  And in connection with that, they saw this
22   opportunity.  They demanded an offer.  They demanded, "Put
23   your patents on the table."  Motorola did it as quickly as
24   they could.  And what did Microsoft do?  They didn't
25   negotiate.  We're not saying that they were required to, by

1    policy, to negotiate.  In fact, Your Honor -- that's what

2    Your Honor decided with respect to the affirmative defense of

3    repudiation.  They weren't required to, but it is a fact the

4    jury can consider as to whether or not Microsoft thought that

5    Motorola was acting in bad faith.

6              THE COURT:  Well, let me stop you there.  I agree

7    with you that you're entitled to have your witness, although

8    I'm not sure it should be this witness, say they did not

9    respond to the offer.  That clearly is extremely relevant.

10   But when you start speculating about why Microsoft did that,

11   having an economist who lacks any grounding in this, make

12   that speculation, that's what starts to cause me to be

13   concerned.

14             MR. PRICE:  And I agree.  He's not going to speculate

15   as to why Microsoft did not negotiate.  What he will say is,

16   standard practice is you negotiate.  His opinion is that --

17             THE COURT:  Does he know that?  I mean, I don't -- I

18   understood Holleman as being your licensing person who was

19   experienced, and he has 30 years' experience in this.

20       Leonard was an economist, and perhaps I don't understand

21   his background, but how is he suddenly qualified to talk

22   about what goes on in negotiations?

23             MR. PRICE:  He's also -- he's also an expert in

24   intellectual property and also in licensing consultation.

25   Look at his background.  He gives advice to companies on

1  license negotiations.  So he's familiar with how these

2  negotiations usually play out.  And he's not going to testify

3  that Microsoft refused to negotiate for a specific purpose,

4  but he is going to say they didn't negotiate -- they didn't

5  negotiate, so we don't have more data.  And -- and we would

6  have more data if they'd negotiated, and therefore he thinks

7  it's speculation.

8      We've withdrawn the opinions, Your Honor, about his

9  testifying as to, you know -- as to whether there are any

10  damages.  Paragraph 33, the last paragraph in the rebuttal

11  report, we've withdrawn that because, again, I don't think

12  he's the witness for that.  What he will testify to, however,

13  is that the damages experts have not taken into account the

14  benefits to Microsoft, which the move -- some of the

15  testimony suggests the move gave to Microsoft, so therefore

16  the damages experts haven't really arrived at a net damages

17  number, because Microsoft was benefitted in many ways by

18  moving out of Germany, and that was not taken into account.

19          THE COURT:  All right.  Anything else, sir?

20          MR. PRICE:  I don't think I have any time left.  I

21  thought I was running out of time.

22          THE COURT:  You probably have about a minute and a

23  half.

24          MR. PRICE:  I'll wait to try to get the last three

25  sentences in.

1          MR. PRITIKIN:  Let me start with Holleman, Your

2    Honor.  I've got to confess.  I don't have the foggiest idea

3    of what Holleman is going to testify to at trial.

4       The report on page 1, all these statements about how all

5    you've got to do is negotiate to fulfill your RAND

6    commitment.  Now, before we came in to argue, I was given

7    three paragraphs they were going to drop.  Apparently now

8    there are more paragraphs they're going to drop.  And as

9    Mr. Price was standing here, he was, rather inartfully,

10   rephrasing all of the sentences.  So whatever the problems

11   are with Meneberg, they are really compounded here, because

12   given the expert report that's out there, the gloss that was

13   put on it this afternoon, we really don't know what this

14   witness is going to be offered to say or what they are going

15   to try to elicit from him.

16      Substantively on a couple of these points, the first is --

17   if we look at page 8.

18          THE COURT:  Of Holleman?

19          MR. PRITIKIN: Yes, of Holleman, Your Honor, on page

20   8.  Now Mr. Price tells us that what he's going to talk about

21   is expectations, what SS Os normally do and don't do, and

22   what the commitment is.  But paragraph 39, interestingly, is

23   in the passive voice, where it talks about nothing in the

24   policies are understood to limit the rights to enforce the

25   patents and to seek an injunction.  Well, that just isn't

1    right on its face.

2        There are circumstances where it is understood by force of

3    law, as, for example, happened in this case, and the

4    particular circumstances of the case, that the patent owner

5    is limited in the right to seek an injunction.  There's a

6    willing licensee, if somebody has filed suit, as we have, to

7    try to get the court to determine what the RAND rate is.

8    There are many circumstances where the right to seek an

9    injunction is severely curtailed.  And for them to put on a

10   witness such as Holleman to say to the contrary, it just

11   ought not be permitted.

12       The other specific point -- and I think it is important to

13   get clear guidance on what these witnesses can say and what

14   they can't say -- concerns the --

15            THE COURT:  Are you trying to read your own writing?

16            MR. PRITIKIN:  I am trying to read my own writing,

17   Your Honor.

18       On page 3, on the question of stacking and what needs to

19   be considered and what doesn't need to be considered, one of

20   the findings of the court was that this is one of the

21   purposes of RAND, is to prevent royalty stacking.

22       And, again, I suppose it may be in the phrasing, but for

23   them to have carte blanche to put this expert on the stand to

24   talk about what needs or doesn't need to be taken into

25   account about the importance of stacking, and that ought not

1    happen.

2        Lastly, let me turn to the subject of Leonard and the

3    question of whether or not Microsoft responded to the offer.

4    And this is a very important point, Your Honor.

5        They want to convey to the jury the misleading impression

6    that we did something wrong when, instead of giving them a

7    counteroffer, we came to the court, which is the place that

8    was available for us to get relief.  The demand they made in

9    relation to RAND is outrageous.  There is no counteroffer

10   that can be made to that that would bring you down to RAND as

11   the court found it.  It was transparently a sham designed to

12   set up the lawsuit.  It was going to expire on the 20th day,

13   and we filed suit on that 20th day in order to get the court

14   to enforce the RAND commitments.

15       They want to turn the tables on that and suggest to the

16   jury that we didn't respond, that normally parties will make

17   counteroffers and negotiate.  But we had a right to come to

18   court to get relief when they did what they did, when they

19   were setting up the lawsuits that they ultimately filed.

20       And so for them to say to the jury, through an expert, an

21   economist, of all things, that Microsoft didn't come back and

22   didn't respond, we did respond.  We filed this lawsuit.  That

23   was the response to it.  It's contrary to the facts, it is

24   misleading, and it is inconsistent with the obligation that

25   the owner of the standard essential patent has.  They have to

1    make available the RAND license.  And there's no

2    obligation -- the court has specifically held this -- there

3    is no obligation on the part of the implementer, the would-be

4    licensee, to make a counteroffer.  We didn't have to do that

5    in order to enforce a RAND commitment.  The court has said

6    that in black and white.

7         And so, again, this is being massaged on the fly here

8    today as to -- and they're rephrasing what these experts are

9    going to say, trying to find something that maybe will slip

10   in, but those kinds of arguments, it's really snake oil, Your

11   Honor.  They should not be able to tell the jury that we did

12   something wrong or to imply it or suggest by coming to court

13   seeking a remedy that was available to us to stop the holdup

14   that they were engaged in.  Now --

15            THE COURT:  Mr. Pritikin, let me cut you off here,

16   because you're running out of time.

17        They are going to be able to testify to what happened.

18   You didn't submit a counteroffer.  You exercised your

19   prerogative to come to court.  Motorola doesn't think that

20   the mechanism of having a court set a RAND rate is a

21   particularly good idea.

22        I expect both sides are going to present those points of

23   view to the jury.  What I can tell you is, you're going to

24   have a sufficient legal framework to be able to say, if I've

25   said it, this is permissible in these circumstances, this is

1  not permissible.  Beyond that, both sides are going to be

2  able to present their cases.

3      I must say, there are a lot of conclusions drawn by

4  economists, accountants, licensing experts that invade things

5  that the court has ruled on, and we're going to go through

6  and cross those out, and you all are going to help us,

7  because by close of business tomorrow, someone is going to

8  give us a statement on behalf of what is still in and what

9  has been withdrawn.

10      MR. PRITIKIN:  That would be very helpful.

11      THE COURT:  Yes.  And I'm asking both sides to do

12  that, so you'll have some homework in addition to getting

13  ready for arguments tomorrow.

14      But as it stands right now, I agree with you.  I not only

15  heard stuff being withdrawn, but I've heard it modified on

16  both sides in the course of the argument today.  That harkens

17  back to my concern that you all are not ready to go to trial,

18  and you know that I am a complete tyrant on the question of

19  we are going to get this case resolved.  We're not going to

20  tolerate having it just sort of slip away from us.  So

21  further work on that effort will be required, but you pretty

22  much have our attention for the next bit while we try and get

23  you ready to actually try the case.  It's not that difficult

24  of a case to try.  I mean, it just isn't, folks.

25      Mr. Price, I promised you the last word.  You have one

1   minute.

2           MR. PRICE:  Your Honor, I want to make clear that on

3   the two paragraphs that were just pointed out to you, we are

4   not modifying them and we don't suggest that we have to,

5   because on page 3, what Mr. Holleman says is that there is

6   nothing -- RAND provisions are nothing in the SSO policies

7   mandating the steps or analysis that the standard essential

8   patent owner must take in formulating an opening offer, and

9   that's what the second sentence says.

10      And maybe he doesn't have to give this opinion because

11  Microsoft won't take the position that you do have to do that

12  before the opening offer.  But if Microsoft takes that

13  position, and I believe they will, then we're entitled to

14  have an expert say, "Wait a minute.  There's nothing in these

15  policies that say you have to do that in the opening offer."

16  The come-up negotiation, but not the opening offer.

17      The second thing you pointed out --

18          THE COURT:  Let's stop there, because I want to make

19  this point once again.

20      The statement, "There are no provisions in the SPO

21  policies requiring you to consider royalty stacking or patent

22  pool rates," is accurate.  However, it's also irrelevant.

23  The court has ruled as a matter of law, with the agreement of

24  your client, that the initial offer cannot be in bad faith.

25  And bad faith takes us back to the RAND rate, and the RAND

1  rate, according to the court, includes royalty stacking and

2  potential patent pools.

3      I would suggest to you that we're getting all wound up

4  about some language as opposed to the real issue here.  But

5  if you're forcing me today to say is that an accurate or not

6  an accurate statement, I'd say it's accurate and it's also

7  irrelevant.

8          MR. PRICE:  Well, I agree that it's irrelevant if --

9  if Microsoft would have taken the position, you have to take

10  that into account as a matter of policy, as a matter of law

11  before you make the offer.

12          THE COURT:  There's a difference between policy and

13  law, and I've walked you through this.  I'll walk you through

14  it one more time.  Bad faith, RAND.  RAND is composed of some

15  *Georgia Pacific* factors and modified *Georgia Pacific* factors,

16  two of which are royalty stacking and patent pools.  I don't

17  know how to be clearer than that, sir.

18          MR. PRICE:  And you are clear, Your Honor.  What I

19  don't think you're saying, just to make sure, is -- because,

20  again, I said we're not going to present evidence on this --

21  that you must, in that opening offer, have done all that in

22  your head and considered that, because we're not going to be

23  presenting testimony that we did.

24          THE COURT:  I don't think you have to present

25  testimony that you did, but you recognize the peril of if

1    your opening offer is truly -- where are you at?  One

2    trillion?

3              MR. PRICE:  I think I said a zillion.

4              THE COURT:  A zillion.  And I know nothing else about

5    the circumstance.  That may be bad faith simply because it is

6    so detached from reality, and that you have to consider.

7              MR. PRICE:  And we will.

8         One final thing.  On page 8, again, Holleman says nothing

9    in the SPO or IPR or antitrust policies talks about these

10   organizations, this particular organization.  Nothing in the

11   policies limits the IPR holder's rights.  That's -- that's

12   true.  That's absolutely true.

13             THE COURT:  Absolutely true.

14             MR. PRICE:  He's not saying that there are situations

15   where you can't get an injunction.  And your court, Your

16   Honor, has said that.

17        So the statements are accurate.  In fact, they're accurate

18   in context, and they're only stated because we believe

19   Microsoft is going to suggest to the contrary.

20             THE COURT:  All right.  I believe I'm seeing you all

21   in the morning at ten o'clock.

22             MR. PRICE:  And, Your Honor, tomorrow Ms. Sullivan is

23   going to be arguing the summary judgment motions.  Do you

24   have any idea as to how much time or in what order you're

25   going to want to hear things?

1           THE COURT:  I know that I've set aside two hours,

2   which probably means you have about 40 minutes to argue your

3   motion and respond to the other side.  If I ask a lot of

4   questions, I extend that period of time.  I don't suffer from

5   ADD, but, you know, trust me, after about 30 minutes of

6   argument, I usually have heard what most people have to say.

7   Although I expect a brilliant argument from both sides.

8       In terms of actual motions, I'll probably do Microsoft

9   first, because they're the plaintiff, and then I'll do

10  Motorola second.  So it will go Microsoft moving on its own

11  motion, Motorola responding, Motorola moving on its motion,

12  we'll take a break at that point, Motorola moving on its

13  motion, and then Microsoft will respond.

14          MR. PRICE:  And finally, Your Honor, just a request.

15  I know you're burdened with a lot of work right now.  Both

16  parties have put in, I think, five-page letters on one of the

17  issues that kind of came up tangentially today, which is

18  discovery of -- of why Microsoft left Germany and whether or

19  not Motorola was given adequate access to testimony and

20  documents.  And certainly as soon as possible we'll be happy

21  to argue that.  We'd be happy to argue that tomorrow.  But I

22  think it's something which -- we want the trial to start on

23  August 26th.

24          THE COURT:  Well, I will simply say something that I

25  have been going around the world saying, which is, there is a

1    huge mismatch between your capacity to generate paper and the

2    court's capacity to intelligently process it.

3        The motions in limine that were filed by everyone are an

4    example of that problem for us.  So we will deal with these

5    in the order that we think they need to be dealt with so you

6    can go to trial.

7        Counsel, thank you.  I appreciate you being here.  I

8    appreciate the argument.  We will be in recess.

9

10                    (THE PROCEEDINGS CONCLUDED.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

C E R T I F I C A T E

          I, Nancy L. Bauer, CCR, RPR, Court Reporter for
the United States District Court in the Western District of
Washington at Seattle, do hereby certify that I was present
in court during the foregoing matter and reported said
proceedings stenographically.

          I further certify that thereafter, I have caused
said stenographic notes to be transcribed under my direction
and that the foregoing pages are a true and accurate
transcription to the best of my ability.

          Dated this 1st day of August 2013.


                         /S/   Nancy L. Bauer

                         Nancy L. Bauer, CCR, RPR
                         Official Court Reporter