```
                    UNITED STATES DISTRICT COURT
             WESTERN DISTRICT OF WASHINGTON AT SEATTLE
_____

MICROSOFT CORPORATION,            )
                                  )
                  Plaintiff,      ) CASE NO. C10-1823JLR
                                  )
v.                                ) SEATTLE, WASHINGTON
                                  ) July 31, 2013
MOTOROLA, INC., et al.,           )
                                  ) MOTION HEARING
                  Defendant.      )
                                  )
_____

                 VERBATIM REPORT OF PROCEEDINGS
             BEFORE THE HONORABLE JAMES L. ROBART
                 UNITED STATES DISTRICT JUDGE
_____

APPEARANCES:

  For the Plaintiff:      ARTHUR HARRIGAN
                          RICHARD CEDEROTH
                          ANDREW CULBERT
                          DAVID PRITIKIN
                          CHRISTOPHER WION


  For the Defendant:      KATHLEEN SULLIVAN
                          WILLIAM PRICE
                          PHILIP McCUNE
                          ANDREA ROBERTS
                          CHERYL BERRY
                          ELLYDE THOMPSON
                          RALPH PALUMBO (by telephone)


  Reported by:           NANCY L. BAUER, CCR, RPR
                         Federal Court Reporter
                         700 Stewart Street, Suite 17205
                         Seattle, WA 98101
                         (206) 370-8506
                         nancy_bauer@wawd.uscourts.gov
```

```
 1   July 31, 2013                              10:00 a.m.
                           PROCEEDINGS
 2   _____

 3            THE CLERK:  C10-1823, Microsoft Corporation v.

 4   Motorola Mobility.

 5        Counsel, please make your appearances for the record.

 6            MR. HARRIGAN:  Good morning, Your Honor.  Art

 7   Harrigan representing Microsoft, and to my left is

 8   Mr. Pritikin from the Sidley firm.

 9            MR. PRITIKIN:  Good morning, Your Honor.

10            MR. HARRIGAN:  And Mr. Cederoth from the Sidley firm.

11            MR. CEDEROTH:  Good morning, Your Honor.

12            MR. HARRIGAN:  Mr. Culbert from Microsoft.

13            MR. CULBERT:  Good morning.

14            MR. HARRIGAN:  And Mr. Wion, my partner.

15            MR. WION:  Good morning, Your Honor.

16            MR. HARRIGAN:  And Mr. Love from the Sidley firm.

17            THE COURT:  We finally get to be introduced.

18   Congratulations, sir.

19            MR. MCCUNE:  Good morning, Your Honor.  Phil McCune

20   with Summit Law Group.  My partner, Ralph Palumbo, is on the

21   telephone again.  Thank you for allowing that.  And again

22   with us today from Quinn Emanuel Urquhart & Sullivan is

23   Kathleen Sullivan.

24            MS. SULLIVAN:  Good morning, Your Honor.

25            MR. MCCUNE:  Ms. Sullivan will be arguing today.
```

1    Mr. Bill Price.

2         MR. PRICE:  Good morning, Your Honor.

3         MR. MCCUNE:  Andrea Roberts.

4         MS. ROBERTS:  Good morning, Your Honor.

5         MR. MCCUNE:  Cheryl Berry.

6         MS. BERRY:  Good morning, Your Honor.

7         MR. MCCUNE:  And Ellyde Thompson.

8         MS. THOMPSON:  Good morning, Your Honor.

9         THE COURT:  Thank you, counsel, first, for your

10   courtesy in regards to our visiting judges yesterday.  I met

11   with them at the end of the day, and they were beside

12   themselves that they were now part of history.  It's so hard

13   for me to quite characterize it that way, but I can now say

14   that my photograph, sitting here with various judges standing

15   next to me, will be well publicized, wherever they are, and I

16   never understand why they want to do that.  But that's

17   neither here nor there.

18      We are here today on motions for summary judgment.

19   They're not exactly cross-motions.  And when we talked about

20   these yesterday, I indicated that since Microsoft was the

21   plaintiff, I would allow them to go first.

22      There is a partial -- or a motion in regards to damages

23   caused by seeking injunctive relief.  There is a motion in

24   regards to Marvell.  And what else do we have?  There we are.

25   Docket 729, Microsoft's motion that Motorola breached its

1    duty of good faith and fair dealing by engaging in

2    commercially unreasonable and blatantly unreasonable conduct,

3    Motorola breached its duty of good faith and fair dealing by

4    engaging in conduct that frustrated the purpose of RAND, and

5    then the third aspect of it, Motorola's affirmative defenses.

6    It may be worth more inquiry when we get around to that how

7    many of those Motorola is still asserting.  As of yesterday,

8    we seemed to have some moving targets in regards to the state

9    of the pleadings.

10       Mr. Harrigan, who will be arguing?

11           MR. HARRIGAN:  I will be arguing Microsoft's motion,

12   Your Honor.

13           THE COURT:  All right.  Why don't you assume that you

14   have 20 minutes, plus some time for questions, if it takes

15   very much of your time, and then Ms. Sullivan will have 20

16   minutes in response.

17           MR. HARRIGAN:  Yes, Your Honor.  And, Your Honor, we

18   have handed up a notebook, which has some quotes that I'll be

19   referring to with the goal of saving the time of reading them

20   to you.  Do you have that handy?

21           THE COURT:  It's right here.

22           MR. HARRIGAN:  Okay.  Thank you.

23       Your Honor, as the court has described the jury's job in

24   this case, it is to decide whether Motorola's -- and that's

25   the first item in the notebook.  To decide whether Motorola's

opening offers were in good faith, a fact-finder must be able
to compare them with a reasonable RAND royalty rate.  And,
basically, Your Honor, I think what we're saying here is,
there is only one reasonable answer to that question, if you
make that comparison.

That is partly true because of the court's further
guidance that a blatantly unreasonable offer is a breach of
the duty of good faith.  And getting back to what the court
said yesterday, as I recall the language, an offer can be so
high as to breach the duty of good faith.  We believe that to
be an objective standard.  And I also refer the court to the
next two quotes in the notebook, one being the court's
statement that Motorola has agreed that blatantly
unreasonable offers would violate its RAND obligations.

And secondly, a lawsuit that Motorola filed in October of
2012, accusing another party, under 802.11, of having a
licensing program that is blatantly unreasonable, including
blatantly unreasonable offers and other conduct in violation
of good faith and fair dealing.  So Motorola clearly agrees
that if an offer is blatantly unreasonable, it violates the
covenant.

Now, the other -- I guess, there's another element here,
which -- regarding 802.11, which is, as the court well knows,
Motorola's actual RAND commitment under 802.11 was to make --
its -- its patents available at nominal competitive costs to

1   all who seek to use them.

2       So the question, Your Honor, is whether if the jury also

3   reviews the court's RAND finding, and the result will be that

4   among -- for example, in the case of H.262, a $1,000 laptop,

5   the offer was at 4,000 times RAND.  And if, in fact, as the

6   court has said, there is an objective standard whereby you

7   compare RAND to the offer to determine if it was blatantly

8   unreasonable, that would be a meaningless standard if 4,000

9   times isn't enough.

10      Can a jury reasonably conclude that the 802.11 offer at 60

11  times -- at approximately 60 times the RAND rate is a

12  nominal -- at nominal competitive costs, and when that is the

13  standard -- and that is the standard for the ultimate

14  contract, you would compare the offer to that and ask the

15  same question.  And nominal competitive costs is presumably a

16  more rigorous standard than reasonable.

17      Now, what Motorola says, among other things, is, "Well, we

18  didn't know everything back in October of 2010 that we know

19  now."  Well, there are a few answers to that.  The first one

20  is, the standard is objective.  We do not have to establish

21  that Motorola acted with intentional bad faith.  So what it

22  knew or did not know is not the issue.  The issue is, compare

23  its offer or demand to what the court concluded RAND was, and

24  determine if it is so high as to be blatantly unreasonable.

25  That is an objective standard.  And under the *Scribner v.*

1   *Worldcom* case, that's all we have to do.  We don't have to

2   prove a subjective good faith.

3       Secondly, Motorola's conduct in breach of this contract

4   continued for years, well after it knew everything that was

5   presented to the court in 2012.  In fact, after the trial, it

6   was still pursuing injunctions in the ITC.  It was still

7   appealing the court's anti-suit order to the Ninth Circuit,

8   until that court ruled just before the November trial.

9       So Motorola's conduct with respect to the injunction

10  activity, which I will get to as a separate topic in a

11  minute, continued far beyond the point of the October

12  letters, where it would like to have its knowledge measured.

13  And I believe, Your Honor, we will be -- that the court -- I

14  believe, Your Honor, that under the Ninth Circuit's ruling in

15  this case, it is pretty clear that you can't seek injunctive

16  relief unless someone has rejected a RAND offer.  And there's

17  no dispute that that didn't happen here, because --

18          THE COURT:  Your characterization that the Ninth

19  Circuit order is a final order?  It came up on a question of

20  an interlocutory appeal.

21          MR. HARRIGAN:  I'm citing it as legal authority for

22  the proposition that -- and as the court explained its own

23  views on this, that it is -- it is -- it appears to be

24  improper and a violation of one's obligations as a standard

25  essential patentholder to seek injunctive relief unless one

1   has made a RAND offer and had it rejected.  And, Your Honor,

2   that -- that is also, I believe, simply a reasonable

3   extension of the purposes of the RAND contract.

4            THE COURT:  At the risk of picking the wrong judge, I

5   think Judge Berzon may be surprised to hear you announce that

6   that's a ruling of the Ninth Circuit that's binding on all

7   courts in the circuit.

8            MR. HARRIGAN:  Well, Your Honor, I'm not -- I'm not

9   suggesting that it is absolutely binding, nor am I suggesting

10  that they announce a new rule of law, but I think that their

11  view of this was very clear.  Judge Posner -- we also cited

12  that opinion in here -- has very clearly stated that in his

13  view, there is -- it would be a violation of RAND to seek

14  injunctive relief without first having had a RAND offer

15  rejected.

16     And my point here with regard to --

17           THE COURT:  With all due respect to Judge Posner, I

18  think he was sitting as one of us who laborers in the

19  vineyards as opposed to gazing upon them from high, and I

20  believe that question is now in the federal circuit, which

21  may be better authority than even Judge Posner.

22           MR. HARRIGAN:  I -- I think that's correct.  However,

23  the fact is, this is a legal question, and if the answer to

24  that legal question is that the RAND contract means that you

25  can't seek injunctive relief without first making a RAND

1    offer and having it turned down, then as a matter of law, the

2    efforts to get injunctive relief violated the contract.

3        And -- and -- but my other point, Your Honor, which I'm

4    really focusing on here, is the timing.  Motorola would like

5    the time to be, what did we know in October of 2010?  But the

6    conduct that violated the contract, we believe violated the

7    contract, continued for years.  And so that's -- what we knew

8    in 2010 is not an answer to anything.  The question is, what

9    did they know as they continued to seek injunctive relief

10   without ever making a RAND offer.  Forgot about what their

11   offer was in 2010.  There still wasn't one in November of

12   2012.

13            THE COURT:  Well, I think I heard Mr. Price yesterday

14   saying, with all due respect to the court, they don't agree

15   that my calculation is correct.  Are you saying, then, that,

16   because this case is still going on, that they are obligated

17   to follow it at this time?

18            MR. HARRIGAN:  Well, Your Honor, what I'm saying is,

19   the court's ruling on what RAND is for these two sets of

20   patents, is -- is the rule that applies in this case now, and

21   it's been decided and it's binding, and it's not going to --

22   unless the court changes its mind, it is not going to change.

23   So we take that as a given at this point, That's what all the

24   effort was about, and compare it to what they demanded, and

25   apply the blatantly unreasonable standard.  And if you do

1   that and you get 4,000 times for H.264 on a $1,000 laptop,

2   there's only one answer to the question that the jury can

3   give, which is, yes, this is blatantly unreasonable.  If

4   4,000 times isn't, nothing is.

5          THE COURT:  It seems to me that you have latched on

6   to one element of that offer, and I may be making Motorola's

7   argument for it, but I think what they would say is, you need

8   to be slightly more expansive than simply seizing on a

9   number, and that, for example, you argue sometimes that their

10  conduct is evidence of bad faith, quite independent of the

11  number, and yet today you say that if there's one factor

12  which would suggest that it's not commercially reasonable --

13  and I don't want the parties to latch on to the language

14  "commercially reasonable."  We're still struggling with how

15  to describe this.  But I believe what Motorola originally

16  conceded in this court was, there was a level where an offer

17  could be judged to be in commercial bad faith.  And one

18  component of that would be the royalty rate, but there could

19  be other components.

20     So where is Microsoft's position on that?  Do I look at

21  the greater mix, or am I entitled to seize on one aspect of

22  it?

23          MR. HARRIGAN:  Well, Your Honor, I think you get the

24  same answer either way, but I believe that the court has

25  said, and we'd agree, that making a royalty demand that is

1    astronomically above RAND is a breach of the duty of good

2    faith, because it is clearly frustrating the basic purposes

3    of the contract, which are to avoid holdup and stacking.

4         And, Your Honor, you actually anticipate where I'm headed

5    next, which is, what was obvious about this?  And, you know,

6    it was public knowledge that there were 92 patentholders in

7    the wi-fi standard, and Motorola certainly knew that it was

8    demanding two and a quarter percent, and it's not very hard

9    arithmetic to multiply 92 by two and a quarter and realize

10   that there's a stacking problem consisting of 200 percent of

11   the price of the product, whatever the product is.  You don't

12   need to know the numbers, because two and a quarter times 92

13   is 200 and something.  So the stacking issue was

14   self-evident.  And the reason the stacking issue is so

15   obvious is that the royalty demanded was outrageous, and so

16   it inevitably leads to an enormous stacking problem, which is

17   a fundamental purpose of RAND, i.e., to avoid that.

18             THE COURT:  Well, let me make sure I understand your

19   argument, Mr. Harrigan.

20        For that calculation on stacking, it seems to me you are

21   assuming that each of those 92 patents has equal value to the

22   standard; is that correct?

23             MR. HARRIGAN:  Well, in this case, I'm assuming the

24   accurate -- it would certainly be true if that were correct.

25   However, in this case we know that is not correct, because

1  Motorola is also bound by the court's finding that its 802.11

2  patent portfolio was a sliver of 802.11, and so you would

3  have to multiply it by more than 92 to get the right answer.

4          THE COURT:  All right.  I think you just said you

5  agree with me; is that correct?

6          MR. HARRIGAN:  I agree with you that 92 times two and

7  a quarter would only be correct if all of the patents were of

8  equal value.

9          THE COURT:  Thank you.

10         MR. HARRIGAN:  Then the same is true in H.264, where,

11 I believe, there were approximately 52 contributors, so you

12 only get a little bit over 100 percent.  But all this

13 information was in Motorola's hands in October, and it was in

14 Motorola's hands when they sought injunctive relief.  So they

15 knew that what they were doing was violating the purposes of

16 RAND, and defeating the reasonable expectations of the

17 parties.

18     And if you look at the situation that actually existed,

19 take H.264.  The standards were adopted in '03.  Microsoft

20 puts it into Windows 7 in '09.  A year later, Motorola writes

21 a letter and says it wants 4,000 times RAND.  That's exactly

22 the situation that the standards are aimed at.  Parties

23 should be able to incorporate their technology into their

24 products without going out and negotiating a license in

25 advance.  The standards organizations want that because it

1    leads to widespread adoption, and everybody can relax because

2    they know they're going to get a reasonable royalty whenever

3    it comes up.

4        And what happened here is, Microsoft stuck with H.264 in

5    Windows.  It's a tiny little piece of the -- an optional part

6    of the operating system, and Motorola wants a royalty that's

7    approximately half the price of the operating system for the

8    privilege of using its tiny piece of H.264.  All of that was

9    obvious to Motorola at the time of the letters.

10            THE COURT:  Okay.  Let's go back to the letters that

11   were October 21 and 29.  If I understand the record as it's

12   been presented to me, there has been some claim of privilege

13   in regards to the motives for sending those letters?

14            MR. HARRIGAN:  There were a series of deposition

15   questions of Mr. Dailey and, perhaps, others, all of which

16   were -- the witness was instructed not to answer on grounds

17   of privilege, and the questions related to the basis and the

18   actions that Motorola took to figure out what the royalties

19   would be before sending those letters, yes.

20            THE COURT:  Do I have the Dailey deposition?

21            MR. HARRIGAN:  I believe you have these.  I believe

22   that those parts of it have been cited in our materials on

23   this issue.

24            THE COURT:  All right.  Before you sit down, perhaps

25   one of the people back there will be kind enough to tell me

1    where I'd find those in the record.

2         MR. HARRIGAN:  I was not planning on going through

3    that in my limited time, but we can provide that to you very

4    readily.

5       Your Honor, there's another thing that was obvious to

6    everyone, or to Motorola at the time, which doesn't relate

7    specifically to the amount of the royalty or the -- or the

8    stacking and holdup aspects, and that is, as the court said

9    with regard to the 802.11 issue and the notion that Marvell

10   would have to pay based on the ultimate product price, as

11   Motorola demanded in its letter to Marvell, the court said

12   the chips provide the same functionality of each host device,

13   regardless of the end cost of the device, so it is logical

14   that the royalty rate be the same across all devices.

15       And that is obviously -- it spades true with regard to the

16   Marvell situation, where, as the court said, in an Audi, the

17   royalty rate would be 267 times the price of the chip.

18       But the very same logic applies to both of Motorola's

19   demands of Microsoft, where it's seeking two and a quarter

20   percent of the price of every laptop, whether it's a $500

21   laptop or a $2,000 laptop, its H.264 patents provide the same

22   functionality in all products.

23       The same is true with respect to Xbox, where the same two

24   and a quarter percent was applied to several varieties of

25   Xboxes selling for widely ranging prices.  That is inherently

 1    unreasonable, and it's obvious that it's unreasonable because

 2    there is no relationship.  There is no proportionality

 3    between the royalty amount and the functionality provided.

 4        And that's particularly egregious in this case, where the

 5    court has already determined that the functionality provided

 6    was minute when you take the sliver of 802.11 or H.264 that

 7    was Motorola's and combine it with the minor importance that

 8    the court found in each of those portfolios having

 9    Microsoft's products.

10            THE COURT:  Well, if I extrapolated from that

11    position, then I would be finding that every offer made at a

12    percentage of retail price is commercially unreasonable?

13            MR. HARRIGAN:  Well, Your Honor, I think if the

14    percentage is tiny, it may not be commercially unreasonable.

15    It depends on how --

16            THE COURT:  Let me stop you.  I'm sorry to interrupt.

17    But, you know, what you just told me is that, you know, it is

18    commercially unreasonable, because it would be the same for a

19    thousand-dollar product or a dollar product.  The patent

20    provides the same functionality.  Are you backtracking from

21    that statement?

22            MR. HARRIGAN:  Well, Your Honor, there are two parts

23    to the answer.  The first part is, we start with the fact

24    that two and a quarter percent makes no sense at all, and it

25    makes even less sense when you consider the factor I just

1    mentioned.

2        The other part of it, though, is, I think if prices don't

3    vary widely among the products involved, and if the

4    percentage is very low, you may end up with royalties that,

5    even though they are illogical in terms of the range of

6    royalties are so low that it doesn't matter, they're still

7    RAND.  So I -- you know, I think that situation could exist,

8    but it's certainly not the situation here.

9        What we have here is an aggravating factor of an already

10   obviously blatantly outrageous offer that is aggravating and

11   based on indisputable facts, which is the obvious fact that

12   the operating system performs the same function in every

13   laptop, and there's no reason to change the royalty.

14       The -- now I'm going -- I don't know where I am on time.

15           THE COURT:  You have five minutes.

16           MR. HARRIGAN:  Thank you.

17       There are other -- the other aspect of this, Your Honor,

18   is simply what was generally known to Motorola about what the

19   royalty range was.  And in the interest of time, I'm just

20   going to mention, without -- I have some quotes in here on

21   this, including on the third page of the materials.

22       You recall that Mr. Bawel criticized the MPEG LA proposal

23   that was then pending that called for royalties of 20 cents a

24   copy as being too expensive for mobile devices, and he stated

25   that the manufacturers would look elsewhere if such a royalty

1  were charged.  That's what Motorola knew in 2010, is -- that

2  was their position on H.264.  And they also knew about --

3  they also, presumably, knew about the practice in the chip

4  industry of a one-percent royalty, which the court found was,

5  basically, the commercially-accepted range for 802.11.

6      So let me turn to the other kind of important element of

7  this motion, and that -- we've already discussed it, Your

8  Honor, but I just want to make clear that our view here is

9  that it is inherent in the purposes of the RAND commitment

10 and the contract that one must make technology available at a

11 reasonable rate.

12     It is a very fair reading of that obligation that you

13 cannot seek injunctive relief based on infringement without

14 doing that.  And Motorola did not, as a matter of undisputed

15 fact in view of the court's findings, make its patents

16 available to Microsoft at a RAND rate prior to seeking

17 injunctive relief.  It made them available at a blatantly

18 unreasonable rate.

19     So I'll reserve my remaining time, Your Honor.  We'll

20 stand on the brief with regard to the affirmative defenses,

21 and also listen to the answer to the court's question about

22 what's still there.  And the privilege issues are, with

23 regard to Mr. Dailey and so forth, are in Footnote 1 of

24 Microsoft's summary judgment brief, and they're in Mr. Wion's

25 declaration, Exhibit 1, page 69, and Exhibit 2 to Mr. Wion's

 1    deposition, page 39 through 41.

 2           THE COURT:  All right.  Thank you.

 3       Ms. Sullivan?

 4           MS. SULLIVAN:  Good morning, Your Honor.  Thank you

 5    very much for the privilege of appearing in your court.  I

 6    would like to, if I may, hand up to the court some visual

 7    aids that we have already shared with opposing counsel.  May

 8    I approach?

 9           THE COURT:  You may.

10           MS. SULLIVAN:  Your Honor, I'd like to begin with the

11    point that you just made so ably in describing what

12    Motorola's argument is, and that is that the inquiry on good

13    faith, which is the subject of Microsoft's motion for summary

14    judgment on breach, is a contextual inquiry that looks to

15    both the subject of the intent of Motorola and the objective

16    commercial reasonableness of Motorola's conduct, and looks to

17    all the facts and circumstances surrounding the alleged

18    actions that supposedly breached the commitments to the ITU

19    and the IEEE.

20       Your Honor is absolutely correct about that.  We thank you

21    for the opportunity, Your Honor, to brief good-faith law,

22    which we did extensive briefing.

23       And the Washington law is overwhelmingly clear that the

24    inquiry is into the whole context, the whole timeline --

25    we've given you a timeline on the first page of the handout,

1  Slide No. 2 -- the whole timeline, and not just selected

2  moments in that timeline.

3      Now, Your Honor, just to be clear, I want to make two

4  points about what Washington law does not hold.  And I think

5  you've already mentioned, Your Honor, in a sense, there's no

6  case that has ever held that a mere opening offer by itself

7  can breach a duty of good faith.  By itself.  And there's no

8  case that's ever held that the mere disparity in price terms

9  inconclusively establish a breach of good faith, as Your

10 Honor suggested.  There's no bright-line rule that a term

11 that is too high in an opening offer, there's no case

12 establishing that a term that is too high in an opening offer

13 relative to some objectively appropriate term, is by itself a

14 violation of the duty of good faith.  And that's why the

15 inquiry into the total context for the offer is so important.

16     And if you look at the timeline, Your Honor, what we would

17 suggest is that we have two different views of the history

18 here.

19     Microsoft believes that the timeline begins on October

20 21st, 2010, when Motorola sent the first of the two opening

21 offer letters.

22     But, Your Honor, we would like the chance to argue at

23 trial, and we think Your Honor should deny their motion and

24 let us argue at trial, that the timeline really begins on

25 October 1st, 2010, when Microsoft sued Motorola for

 1   infringement of Microsoft's patents.  And then in early

 2   October, Microsoft said, "Motorola, put your patents on the

 3   table," which we did, and that's where the letter came from.

 4       So we want to suggest that there's no way to simply take

 5   the opening offer letters in isolation or in a vacuum, or the

 6   terms in isolation or in a vacuum, and find as a matter of

 7   law a breach of the duty of good faith.

 8           THE COURT:  Well, let me make sure I understand your

 9   argument.

10       It seems to me that if I took your argument and then I

11   started to look at that larger context, one aspect of it

12   would be, is there injunctive relief sought based on what

13   could be a commercially-unreasonable opening offer, which is

14   the leverage, which various judicial authorities around the

15   world at this point are saying is what we need to strive to

16   eliminate.

17       So, for example, if you make an offer of a royalty that

18   exceeds the value of the end product, you now have your offer

19   on the table, and you, the other side, properly says that

20   doesn't commercially make any sense, it exceeds the value of

21   the product, and the royalty rate is just obviously

22   unreasonable, and then you proceed to seek injunctive relief

23   seeking prohibition of the sale of that product.

24       Isn't that sufficient to constitute bad faith?

25           MS. SULLIVAN:  Well, Your Honor, you've described a

1  different circumstance.  And here, remember that Microsoft

2  was never supposedly a willing licensee, as Your Honor has

3  pointed out numerous times.  They were never a willing

4  licensee.  They never said they would be willing to accept a

5  RAND license until well into this litigation, long after

6  Motorola filed this injunction motion.

7      Your Honor, I was going to discuss injunctions more on our

8  motion, but I'm happy to discuss that point now.

9          THE COURT:  I want to deal with it, because, you

10  know, I understand the argument that you're making, but it

11  seems to me that you're carrying it to an extreme, and I want

12  to know just what limit it has on it.

13          MS. SULLIVAN:  Sure, Your Honor.

14          THE COURT:  Because your client has previously

15  represented in this court, and, in fact, at that very podium,

16  that they acknowledge the fact that you could have a price

17  term that was so commercially unreasonable as to be in bad

18  faith.

19          MS. SULLIVAN:  So, Your Honor, two points on that

20  concession.

21      First, we went back -- I was perplexed by that, Your

22  Honor, because I thought, why would my predecessor counselor

23  for Motorola made such a concession that Your Honor pointed

24  out?  And I went back and I checked the transcript pretty

25  carefully.  This is the February 13th, 2012, hearing, the

```
 1    transcript at 9:19 to 10:6, and what I believe counsel for

 2    Motorola -- well, what the transcript reflects he actually

 3    said was, "I am not suggesting that Motorola should come in

 4    and say we want a 50-percent royalty on all your products,

 5    but I think it is appropriate for Motorola to make a starting

 6    offer and expect to enter into negotiations, which is what

 7    the standards bodies accept."  And then he went on to say,

 8    Your Honor, which is really the core of my argument today,

 9    that every single aspect of that requires fact

10    determinations.

11         So putting that aside, Your Honor -- so I don't think he

12    conceded that you can have a per se blatantly unreasonable

13    opening offer letter.  He just said it wouldn't be a good

14    idea.

15              THE COURT:  Well, the record will speak for itself,

16    but that's not, I believe, what he said.

17              MS. SULLIVAN:  Well, Your Honor, I was just quoting

18    from the transcript.

19              THE COURT:  I don't think you're at the part that

20    references what -- we had this discussion, and as part of

21    that discussion, he ultimately conceded that, yes, there

22    could be bad faith.

23              MS. SULLIVAN:  Well --

24              THE COURT:  So that's -- we'll look in the

25    transcript.
```

1          MS. SULLIVAN:  Your Honor, my second point is that

2     counsel can't really waive the governing law, and we've had a

3     lot more briefing and a lot more opportunity to look at

4     Washington law, and there just isn't any case in Washington,

5     or any other jurisdiction, that's ever found the disparity

6     between a stated term and what the court ultimately

7     determined is the appropriate term is a self-conclusive

8     proof of bad faith, which truly is the point here, Your

9     Honor.

10         We want to get to a jury, we want to have the entire

11    context considered, we want to have the timeline considered,

12    and we want to see whether injunctions in this circumstance

13    indicated a departure from the duty of good faith, whether

14    opening offers in this circumstance did.

15          THE COURT:  Two questions, then.  One of my favorite

16    things to do is try and put words in your mouth.

17         Is it Motorola's position that there can never be an offer

18    in bad faith, regardless of the dimension of the demanded

19    royalty?

20          MS. SULLIVAN:  Your Honor, Motorola does not concede

21    that an opening offer with a high term by itself can be a

22    violation by itself of the RAND commitment.  And the reason

23    for that is, Your Honor -- and I'm not fighting Your Honor's

24    prior rulings, believe me.

25         Your Honor has previously said that the RAND commitment,

1  the ITU and IEEE declarations and letters of assurance, are

2  agreements to enter into a RAND license.  It's our position

3  that to get to a RAND license, the industry custom and

4  practice is you engage in bilateral negotiations.  And it may

5  be that an opening offer is too high.  The typical practice,

6  as borne out by Microsoft's own witness in this case, is

7  Microsoft would have made a counteroffer.  In the

8  overwhelming majority of cases -- Your Honor, I want to refer

9  you to cases in the handout, which are under seal, so I'm not

10 going to read them in open court, but I can summarize.

11       THE COURT:  Before you move on, I want to make sure I

12 understand this.

13    So you're telling me that Motorola's position is that a

14 RAND royalty rate exceeding the retail value of the product

15 would not be in bad faith?

16       MS. SULLIVAN:  Well, Your Honor, an opening offer

17 asking for in excess of the royalty rate, in excess of the

18 price of the end product, an opening offer, by itself, cannot

19 constitute a departure from the duty of good faith.  It's

20 just an opening offer, and it's just a disparate term, and we

21 would like the chance to prove that, in industry custom and

22 practice, you're supposed to say, "That's outrageous.  How

23 about a couple of pennies?  Here's a counteroffer."

24    And the overwhelming evidence of the industry custom and

25 practice is, you engage in bilateral negotiations.  And in

1   the overwhelming majority of cases, Microsoft's own witness

2   makes clear that the typical response is a counteroffer or a

3   response.  The overwhelming number of cases, you don't simply

4   remain silent.  In fact, it's atypical to engage in a

5   nonresponse.  If you look through the pages that are under

6   seal that I've given you in the handout, you're familiar with

7   this testimony, it's our position that industry custom and

8   practice is, it's typical to get a counteroffer or a

9   response.  It's atypical not to get a response.  In fact,

10   this case may be unique.  We don't know of any other case

11   where, instead of a counteroffer to an offer, there was a

12   lawsuit, not a response.  And we're not saying they had an

13   obligation to.  We're just saying it all goes into the duty

14   of good faith, Your Honor.  And the opening offer is not

15   determinative of the final outcome.

16       So four points, Your Honor:  Typical to give a response.

17   Atypical not to give a response or a counteroffer.  Third,

18   the commercial practice is to exchange information about

19   relative portfolios, see which way the payment should flow,

20   or if there should be a zero/zero royalty-free cross-license.

21   And very importantly, the fourth point of that commercial

22   practice is that an opening offer is never considered

23   determinative of final outcomes.

24       On this one, I think it's really helpful, Your Honor, to

25   look at Slide No. 16 in the handout I've just given you.

1          THE COURT:  Before you move on, I want to make sure I

2     understand your position.

3       So your position is, you can make any convention of

4     opening royalty demand you want without regard to commercial

5     reasonableness, and now -- I'm adding a fact -- seek an

6     injunction prohibiting introduction of the product, and the

7     court may not find that process to be in bad faith?

8          MS. SULLIVAN:  No, Your Honor.  I am not arguing for

9     any categorical rules.  What I am arguing is that there --

10    the other side is arguing for categorical rules.  You heard

11    Mr. Harrigan inably represent to you an argument that is not

12    supported in the law.  He says if there is a

13    commercially-unreasonable term in the opening offer, boom,

14    we're done.  And there's no fact determination.

15      Respectfully, Your Honor, there's no case that supports

16    that.  None.  And we've now done the research, and thank you

17    for giving us the benefit of the time to that research.

18    There is no case that supports that.  There is no categorical

19    rule, and there's no categorical rule as to an opening offer.

20       There's never been a case that found a breach of contract,

21    in this or any other contract setting, based on a single

22    offer letter.  So you've got to put it in context, Your

23    Honor.

24       And I -- look.  There are cases where seeking injunctions

25    might be in violation of the RAND duty.  Judge Whyte found

1   that in *Realtek*.  So that was a case that's very different

2   from ours.  There was no opening offer letter.  Here, we sent

3   a letter.  Got no response.  We got a lawsuit in return.

4   It's the only case of its kind.

5       And, Your Honor, if you look at page 16 of the handout, I

6   just want to complete the argument.

7       What I'm really saying, Your Honor, here, is the objective

8   of good faith turns on matters of disputed fact, and

9   therefore you can't grant summary judgment.  And I can boil

10  that down, Your Honor, but I just want to focus on commercial

11  practice by having you look at No. 16.

12      This is the key point that the opening offer --

13          THE COURT:  Are your slides numbered?

14          MS. SULLIVAN:  I'm sorry.  The slide number is on the

15  lower right, and I'm referring to Slide 16.  Forgive me, Your

16  Honor.  I'm trying to respect Microsoft's assertion of

17  confidential information, so I'm not going to read it aloud.

18  I'll let Your Honor read it.

19          THE COURT:  I couldn't see the numbers.

20          MS. SULLIVAN:  It's very small, Your Honor.  It's in

21  the lower right.

22      The key points of this slide, Your Honor, is an opening

23  offer is not determinative.  Industry practice is, it's

24  never, because this is not a situation of an employer.  Judge

25  Trott, in the *Scribner* case, was talking about an employer

1   who was interpreting a term unilaterally, and he quoted *Alice*

2   *in Wonderland*, and he said, "You can't be like the Red Queen

3   and say a word means unilaterally what you say it means."

4   This is not a case of *Scribner* or *Clark* or the other cases

5   cited by Microsoft, where one party had the unilateral

6   discretion to set a final term.  This is a case in which the

7   industry custom and practice demands bilateral negotiations

8   back and forth.

9       And so, Your Honor, I just want to be very clear.  Our

10  position is, there is no categorical rule that an opening

11  offer can be determinative of bad faith.  There's no

12  categorical rule of the disparity between the price term

13  offered and the ultimately reasonable price term is itself a

14  violation of good faith.  Any opening offer and any disparity

15  has to be put into context.  And if there were an opening

16  offer that was outrageous and an immediate search for

17  injunctions, it may in some other case possibly be a

18  violation of good faith.  But what you can't do is hold, as a

19  matter of law, that the opening offers and a request for

20  injunctions were violations of good faith here, and that's

21  why we respectfully request you deny Microsoft's motion for

22  summary judgment.

23          THE COURT:  Let me take you further off point.

24      In your page 1, procedural history, you have October 1,

25  2010, Microsoft files two patent infringement actions in the

```
 1   ITC.  Did those involve standard essential patents?
 2           MS. SULLIVAN:  No, Your Honor, they didn't.  And
 3   we're not making an argument here that they're part of the
 4   standard essential patent arguments.  What we're arguing is,
 5   Microsoft sues us on nonessentials, and then says, "Put your
 6   patents on the table."  In fact, Your Honor, I'd be very
 7   happy to have you look at a slide here that I think is very
 8   helpful.
 9       If you could turn to Slide No. 6.  I'm sorry to make you
10   jump, Your Honor.  This is deposition testimony from one of
11   Motorola's witnesses, Mr. Taylor, and so I can speak about it
12   in open court, because it's Motorola's witness, and we don't
13   insist on this being confidential.
14       This slide says, "We didn't have any time."  Why did we
15   respond this way?  Microsoft said put our patents on the
16   table.  Microsoft asked us to put our patents on the table,
17   and that's what we did.
18       The -- I'm sorry, Your Honor.  Can I confer for a moment?
19   I want to make sure I answer you accurately.
20       Your Honor, my points stand legally, that the context here
21   is about being asked to put our patents on the table, that's
22   where our letters of October 21st and 29th came from.  But I
23   stand corrected.  There was, actually, initially, SEPs
24   inserted in the October suit.  There's an issue about whether
25   they were later withdrawn.  That's subject to one of
```

1    Microsoft's motions in limine.

2         But what I want to argue, Your Honor, is that it doesn't

3    matter either way whether SEPs were or were not in the

4    October suit.  They were initially.

5         The point is, once Microsoft invited us to put our patents

6    on the table, and we did so in haste without engaging in the

7    necessarily detailed inquiries that Your Honor engaged in

8    over a long period of discovery and bench trial, in which the

9    first phase of the case was held, it was done in haste.

10   Microsoft asked us to put our patents on the table, and we

11   did.

12        So, Your Honor, let me try and simplify our arguments, if

13   I may.

14             THE COURT:  Let me ask you a question, and then

15   please simplify.

16        Is it accurate that you have asserted privilege over your

17   motives for sending those letters?

18             MS. SULLIVAN:  Both sides have asserted privilege

19   over the sending of the letters and the response to the

20   letters, that's correct, Your Honor.  But there --

21             THE COURT:  What is the privilege?

22             MS. SULLIVAN:  Well, attorney-client privilege, Your

23   Honor, about legal analysis about the Motorola letter.

24             THE COURT:  So, I mean, that's what I'm trying to

25   find out.  I don't see all this stuff, and then suddenly

1   someone describes it in a brief, and it leaves us somewhat in

2   the dark.

3        You're saying that the -- I assume it's the law department

4   inside Motorola, had some role in sending those offer

5   letters, and you declined to disclose that role.  Would that

6   be accurate?

7             MS. SULLIVAN:  Well, Your Honor, obviously the

8   letters are disclosed, and certain aspects of the

9   back-and-forth between the parties have been disclosed, and

10  certain parts have been reserved with attorney-client

11  privilege assertions on both sides.

12       But what the jury can hear, Your Honor, is a story in

13  which unprivileged and undisputed facts, and then disputed

14  interpretation of those facts, will determine whether there

15  was a violation of the duty of good faith.

16       And what I am really trying to argue to you today, Your

17  Honor, is there can't be a decision as a matter of law.

18             THE COURT:  You've argued that.  I understand that.

19             MS. SULLIVAN:  You've got that well and truly, Your

20  Honor, and you said very much yourself earlier that you've

21  got it.  This is a question for the fact-finder.

22       But I think it's Microsoft that's trying to, in a sense,

23  defy Your Honor's approach to how to try this case.  You said

24  you were going to determine RAND range and rate in order to

25  inform the fact-finder.  So RAND range and rate may be a

1    relevant factor for the fact-finder to consider, but our

2    argument is that that has to be considered in the context in

3    which it arose.

4        And one last point, Your Honor.  It's our position that

5    the jury wants to focus -- you want to keep the jury focused

6    on what was in Motorola's knowledge base, intent,

7    commercially-reasonable decision-making process at the time,

8    back in October of 2010, not with the benefit of hindsight,

9    not with much greater insight that one might have in a

10   hypothetical negotiation.  The key is at the time.

11       And so the RAND range and rate that is being compared by

12   Mr. Harrigan to the opening offer letters, that may be a

13   factor to throw into the mix, but it's going to be thrown

14   into the mix at trial in a context, a timeline in which we

15   see that Microsoft started this war by suing us, asking us to

16   put our patents on the table, having a discussion with us in

17   which -- after we filed the first letter, in which they

18   didn't say anything about how they thought it was an

19   outrageous demand, and then responding atypically in a novel

20   departure from all industry customs and practice by suing us

21   without any counteroffer, without any response, something

22   that happens in virtually no other case.  None that we're

23   aware of.  So, Your Honor, that's why we think it has to be

24   tried to the jury.

25            THE COURT:  Let me ask you some yes or no questions.

1    Are you still asserting a ripeness affirmative defense?

2           MS. SULLIVAN:  Your Honor, we are asserting ripeness

3    and unclean hands as equitable defenses that we don't think

4    Your Honor should determine on summary judgment now, because

5    the very same facts that are at issue about the parties' good

6    faith goes to whether Microsoft pulled the trigger too soon.

7        I understand, Your Honor.  I'm not defying your decision

8    on the motion to dismiss.  You absolutely said there was no

9    basis for dismissal on Article III ripeness found earlier.

10   We accept that opinion.

11       What we're suggesting, Your Honor, is that the good-faith

12   inquiry is intertwined with the ripeness and good-faith

13   inquiry.  So we would still like to preserve those, Your

14   Honor, unless Your Honor -- one way you might preserve them,

15   Your Honor, is postpone equitable defenses until after the

16   trial.  That's one option.

17          THE COURT:  Well, you're asking eight people to do a

18   lot in a relatively short period of time, and, frankly, I'm

19   not sure that the marginal -- there are other ways to deal

20   with the equitable arguments you want to make other than

21   having, you know, jury instructions on ripeness and unclean

22   hands.  That's --

23          MS. SULLIVAN:  Understood, Your Honor.  Well, those

24   can be postponed until after trial.  The one thing we do

25   think needs to stay in, Your Honor, and I think yesterday's

1  colloquy that you had with counsel really shows why it does

2  need to stay in, is mitigation of damages.  We do think that

3  one needs to stay in for the jury.

4      Your Honor saw that there were many disputed issues of

5  fact about why Microsoft relocated, when Microsoft relocated,

6  causation, damages related to that.  So mitigation, we think,

7  does need to stay before the jury.  If Your Honor wants to

8  postpone ripeness and unclean hands, that's fine.

9      On our motion, Your Honor, we will try to streamline the

10  trial.  It's our goal to try to remove some issues from the

11  case and make it shorter and simpler, but I'll turn to that

12  when you recognize our motion, Your Honor.

13      Do you have any further questions, Your Honor?

14          THE COURT:  No.  Thank you.

15          MS. SULLIVAN:  Thank you.

16          THE COURT:  Mr. Harrigan, you have three minutes.

17          MR. HARRIGAN:  So, Your Honor, with regard to the

18  injunction issue, I would like to identify some categories of

19  issues.

20      The first one is, can you -- is it bad faith to seek

21  injunctive relief preceded by a blatantly unreasonable offer

22  that is essentially illusory?  That is one question to which

23  I believe the answer is clearly that it is, and that simply

24  requires that the court also conclude that the offer is

25  blatantly unreasonable as a matter of fact.

1      Then the next question is, is it bad faith to sue for

2  injunctive relief before making a RAND offer and having it

3  rejected?  That is a legal issue, and there is no factual

4  question, because the court's rulings determine that no RAND

5  offer was made.  It wasn't even close.

6      The third question is one that I didn't mention earlier,

7  and that is, is it proper to be seeking injunctive relief in

8  the face of the absolute readiness and willingness of the

9  patentee to accept a RAND royalty in the pendency of a

10  judicial proceeding in which it will occur, which was the

11  situation from September of 2011, on, while Motorola

12  persisted in its German proceedings, persisted in the ITC,

13  and persisted in appealing the court's anti-suit injunction.

14      In other words, from that day, when we filed our reply

15  brief and we said we will take a license at whatever rate the

16  court sets, we were not only a willing licensee, we were in a

17  situation where it was inevitable that Motorola would get

18  everything it was ever entitled to, and it is obvious that

19  that is not what it wanted.  It wanted to engage in

20  extortion.

21          THE COURT:  Have you ever considered how much easier

22  my life would be if you had just said you wouldn't accept it,

23  and then I could have taken the Judge Crabb approach?

24          MR. HARRIGAN:  So, Your Honor, if I may, just

25  quickly.

1          The concession that was debated, I just wanted to remind

2     the court that, on page 1 of our materials, we have

3     Motorola's judicial allegation that a blatantly unreasonable

4     offer is a breach of the duty of good faith.  That's their

5     pleading.  And, in addition, the court was correct in

6     characterizing what was conceded here.

7          And the other points with regard to the -- just to clear

8     up the issue with regard to the withholding on grounds of

9     privilege, that was Mr. Dailey who was in charge of the

10    licensing department and who signed the letters, and

11    Mr. Blasius, who was also there and worked for Mr. Dailey.

12    They were both asked about what the basis was and how they

13    arrived at the numbers, and they were directed not to answer.

14         With regard to mitigation, Your Honor, the only point I

15    would like to make is echoing what Mr. Cederoth was talking

16    about yesterday, and that is that mitigation is an

17    affirmative defense on which Motorola has the burden.  But

18    our basic point with regard to the whole mitigation issue is

19    that the duty that Microsoft has is to choose a reasonable

20    alternative.  It is not a failure to mitigate to identify

21    another reasonable alternative that might be cheaper.  As

22    long as the one chosen is reasonable, that's the end of the

23    debate.  So Motorola has to show that it, essentially, was

24    negligent on Microsoft's part not to choose some alternative,

25    not simply that there was another alternative that might have

1    been cheaper.

2           THE COURT:  All right.  Counsel, you've been very

3    efficient this morning.  I'm going to take a five-minute

4    break.  When we come back, we'll argue Motorola's motions.

5                      (COURT IN RECESS.)

6           THE COURT:  Ms. Sullivan, I believe you're up first.

7           MS. SULLIVAN:  Thank you, Your Honor.  If I may

8    approach, I have a handout for this motion as well.  They're

9    very short, Your Honor.  We previously shared that with

10   opposing counsel.

11       So, Your Honor, we turn now to what we intend on

12   Motorola's part to be an aid to the court in what you just

13   mentioned before the break, and that is, how do we streamline

14   this case and take some issues out of the case rather than

15   put more in.

16       And we respectively have suggested in our motion that

17   there are three theories of breach that Your Honor could

18   decide in Motorola's favor on summary judgment as a matter of

19   law now.  Those are the seeking injunctions theory, the

20   Marvell theory, and the MPEG LA pool theory.  And I'd like to

21   begin, if I could, with the injunction theory, and that's

22   what we've focused on here in the handout.

23       And I want to start with the key point here, which is,

24   Microsoft asserts it was a violation of good faith, under the

25   RAND commitments to the ITU and the IEEE, to seek

1   injunctions.  And with respect, we think that position is

2   foreclosed as a matter of law.

3       Now, Your Honor, I think, absolutely correctly said a few

4   moments ago, when we were speaking about Judge Posner's

5   ruling that Mr. Harrigan referenced, that when the judge is

6   in the trenches deciding upon injunctive relief in a patent

7   infringement action, if it's a standard essential patent, the

8   judge might well say, "Well, I'm not going to give you

9   injunctive relief because you made a RAND commitment, and

10  that shows money might compensate you."  In other words, it

11  may be the case that injunctions are ultimately denied in

12  standard essential patent cases.

13      But what we are suggesting here is, the mere act of

14  seeking an injunction on a standard essential patent cannot,

15  by itself, be a violation of the duty of good faith.  And it

16  certainly comes in in the circumstances here, where we sought

17  those injunctions at a time when Microsoft had not told the

18  court it was willing to be a willing licensee, and at a time

19  after we'd been sued initially by Microsoft, so we'd been put

20  on the defensive.

21      So, Your Honor, our point is, we think you can decide as a

22  matter of law now that the seeking injunctions theory is not

23  a basis for a breach.  That should be taken out of the

24  picture.  And if you take that out and Marvell and MPEG LA,

25  what we'll be left with is the offer letters, which is where

the case began, and we're not moving for summary judgment on

those.  We think there are contested issues of fact there.

     And, Your Honor, you've already previewed this, but let's

just review where the law is.

     Standard essential patent injunctions -- and I think

you've got it right already, Your Honor.  I just want to

review the bidding, if I may.

     So we start out on the slide, and, again, the tiny little

numbers are in the lower right --

          THE COURT:  I've been waiting for you to tell me the

ITC has accepted where the courts are headed.

          MS. SULLIVAN:  I'm sorry, Your Honor?

          THE COURT:  I've been waiting for you to tell me the

ITC has accepted where the courts are headed.

          MS. SULLIVAN:  Well, Your Honor, I think where the

courts are headed right now are, you know, is that the

smartest judges in the nation are engaged in a discussion of

how injunctions relate to standard essential patents, and

this court is very much engaged in that debate.

     But with respect, we think that no court has held what

Microsoft is arguing to you, which is, injunction-seeking is

categorically barred.  And you haven't held that, Your Honor.

     In fact, why don't we start with that.  That's the place

to really begin, which is this court's own ruling, which is

that in dismissing our motion -- in rejecting our motion for

1   injunctive relief -- I'm sorry to jump, Your Honor, but if

2   you turn to page 5 of the handout, this is Your Honor's

3   decision in Docket 607, where you were very clear to say that

4   the dismissal of the motion for injunctive relief at that

5   juncture was without prejudice.

6       And at the last two lines of that quote, on page 5, Your

7   Honor, from Docket 607, at page 15, from last November, you

8   said, "If, in the future, those circumstances change in a

9   manner to warrant injunctive relief, Motorola may, at that

10  time, seek such relief."

11      Your Honor, we think your ruling there is in keeping with

12  literally all of the decisions out there that currently

13  exist.  Literally all of them.  In other words, there is no

14  decision that has said that injunctions are categorically

15  barred for essential patents, and there is literally no

16  decision that says seeking an injunction alone without more

17  is a violation of a RAND commitment.  Again, *Realtek*, Judge

18  Whyte.  There are a lot of other circumstances there,

19  including no initial offer letter.

20      *Innovatio*, the case that my adversaries referred to, where

21  Motorola supposedly said you can't get injunctive relief for

22  standard essential patents, that was a case involving very

23  different circumstances, where the defendants in that case

24  were going after end users, as if somebody was going after

25  the purchasers of Xboxes here, which is not the case.

1     Your Honor, our key point here is, the law is unanimous

2     that injunctions are not categorically barred for SEPs and

3     are not -- and seeking an injunction is not, per se, a

4     violation of a RAND commitment.  You said it yourself, and

5     you're right, because all the other courts agree with you.

6          THE COURT:  I think, counsel, you may be reading too

7     much into the 607 statement.

8     For example, if Microsoft had said, "We will not take a

9     license," much like the situation Judge Crabb faced, where

10    they, basically, disqualified themselves, then injunctive

11    relief may well be possible.  But it seems to me you're

12    taking that principle and running one step too far with it.

13          MS. SULLIVAN:  I don't mean to be, Your Honor.  I'm

14    just saying whether Microsoft was or wasn't a willing

15    licensee at the time Motorola sent the offer letters is a

16    question that goes into the good-faith contextual fact

17    inquiries that the jury should decide.

18    Remember, you didn't get that concession out of Microsoft

19    until well into trial, something you pointed out yourself a

20    number of times.  They didn't put it in their opening

21    pleadings that they would willingly take the RAND license.

22    And at the time that we sent the letters, we certainly had no

23    assurance that they were a willing licensee.  We sent out

24    opening offer letters, and atypically, unlike industry custom

25    and practice, unlike any other case of which we're aware --

 1          THE COURT:  I think you've said that part before.

 2          MS. SULLIVAN:  I think you've heard that part before,

 3   Your Honor.

 4      So I don't think we can jump to their litigation-driven

 5   concession to you to get out of the dilemma that Apple faced

 6   in front of Judge Crabb.  I don't know if they'll take a RAND

 7   licence late in the litigation.  You can't compute that back

 8   to whether Motorola was acting in good faith by seeking

 9   injunctions back in the fall of 2011.

10          THE COURT:  Let me understand what you're asking for.

11   It seems to me you're now arguing against what you argued in

12   favor of a few moments ago, that this has to be a factor

13   considered in this context.  And now you're saying I should

14   take that factor out in regards to Microsoft.

15          MS. SULLIVAN:  Yes, Your Honor, and let me be clear.

16   I'm not -- I don't think there's a categorical rule barring

17   injunction, and I don't think there's a categorical rule

18   making seeking an injunction a SEP violation.  I also don't

19   think there's a categorical rule that you can always seek

20   injunction.

21      But what we're arguing here, Your Honor, is that on the

22   undisputed facts before you now, this is a case in which,

23   given the timeline we discussed earlier, seeking injunctions

24   was not a violation of RAND commitments.  And the key facts

25   that are undisputed are, Microsoft sued us first and said put

1    your patents on the table.  We sent offer letters.  They then

2    sued us for breach of RAND, and only then did we sue for

3    injunction in the ITC in the district court, and only after

4    that, long after that, long after that did Microsoft say it

5    would be a willing licensee.

6        So given that timeline, we think as a matter of law,

7    seeking injunctions in this case was not, as it might be in

8    some other case, a violation of the duty of good faith.

9    That's the argument, Your Honor.

10       And, again, I'm trying to be consistent here, because as

11   Your Honor has said, good faith is a context-specific

12   totality of the facts and circumstances inquiry that we think

13   should go to the jury where there are disputed facts about

14   good faith.  But we think there are no disputed facts here

15   about whether we sought injunctions in a way that was

16   inconsistent with that duty.

17       Your Honor asked about the ITC.  I do think it's important

18   to note that the ITC and Judge Crabb now create two

19   precedents, saying that seeking injunctions is not

20   impermissible.  You're right, you know, that even Judge

21   Posner said it might be okay for an unwilling licensee.

22       And with respect, Your Honor, I want to just go back to

23   your statements about the Ninth Circuit ruling and

24   strenuously disagree with my opponents at Microsoft that the

25   Ninth Circuit's ruling could have been a final order.

1    I got well and truly flaked in that case, Your Honor, I'll

2    be the first to say it, but it was on an interlocutory

3    appeal, and it was at a stage in which it certainly was not a

4    final order.  And, Your Honor, what Judge Berzon said in

5    upholding Your Honor's anti-suit injunction was simply it is

6    arguable, it is arguable that seeking an injunction might be

7    impermissible once you made a RAND commitment.  And

8    therefore, it was within your discretion -- it was an abuse

9    of discretion in interlocutory review -- it was within your

10   discretion to issue the anti-suit injunction.  Nothing there

11   is the law of the case, and nothing there is Ninth Circuit

12   law on seeking injunctions.  So I agree with Your Honor, it

13   was not final, and it was not an obstacle to our argument

14   here.

15         THE COURT:  I must say I enjoyed the thrashing, but

16   that's neither here nor there.

17     I need you to pin down the timeline here.

18     Are you telling me that Motorola has never sought an

19   injunction in Germany after Microsoft just said that it was a

20   willing licensee?

21         MS. SULLIVAN:  If I could just grab the timeline for

22   a second, Your Honor.

23     Your Honor, I went back to the timeline from the first

24   motion that I gave you before, on page 2, and just to refresh

25   myself, the filing of the patent infringement suit in Germany

1   was in July of 2011.  Microsoft's concession is in September.

2   We did not file another infringement action thereafter.  The

3   controversy was we should have withdrawn it.

4           THE COURT:  Yes.

5           MS. SULLIVAN:  So that's the answer to Your Honor's

6   question.

7           THE COURT:  You've now clarified the timeline, but I

8   think you've now isolated the question I'm asking, which is,

9   what I heard Microsoft arguing in its jump-the-gun portion

10  here was, now that they know we're a willing licensee, how

11  can they continue to request an injunction?

12          MS. SULLIVAN:  Well, Your Honor, we think that the

13  breach case here can't be a moving target.  We can't be

14  talking about breach throughout the litigation.  The question

15  is, did we breach at the time the lawsuit -- that this breach

16  lawsuit was filed and at the time that it was amended to

17  include the injunction period?

18      And our argument to you is that, on the undisputed facts

19  on those timeframes, not what happened subsequently, there

20  couldn't have been a breach, because we're within the world

21  in which all the law says we may seek an injunction, and that

22  is where we're afraid we've got a willing -- an unwilling

23  licensee.  We didn't know we had a willing licensee at that

24  time, and that's the timeframe where the breach should be

25  tried.

1    I don't know of any case in which everything in the course

2    of ongoing litigation gets to sort of sub rosa amend the

3    complaint as amended.  They're stuck with the facts as they

4    were at the time of the complaint and the amendment.  And at

5    that time we didn't know they were an unwilling licensee.

6    And all the law, including Your Honor, has suggested there

7    may be a case of an unwilling licensee where seeking an

8    injunction would be appropriate.  So that's really the point,

9    Your Honor.

10         THE COURT:  Do you have authority for that

11   proposition?

12         MS. SULLIVAN:  At the time?  Yes, Your Honor.  We've

13   cited in our -- we'll be happy to refresh it later, but in

14   our good-faith briefing, we've cited Washington law to

15   suggest that the issue is what was the subjective intent and

16   the objective commercial reasonableness of the defendant's

17   conduct at the time of the breach.  And I don't think there's

18   any case that suggests that breach is just an ongoing moving

19   target.  But, Your Honor, I'll be happy to try to refresh on

20   that and send a subsequent letter.

21    So, Your Honor -- I'm sorry.  Your Honor still seems to

22   have some concern about that line of argument.

23         THE COURT:  I think you're wrong, but I'll be

24   interested to read your authority for that proposition.

25    Let me ask you this:  When does this duty of good faith

1  and fair dealing begin and when does it end?  I think I just

2  heard you say it ended at the time that you filed suit.

3          MS. SULLIVAN:  Oh, no, Your Honor.  We have an

4  ongoing duty of good faith.  We have an ongoing contractual

5  commitment and an ongoing -- a commitment that Your Honor has

6  construed as contractual, and we have an ongoing duty of good

7  faith.

8      Your Honor, of course we have an ongoing duty, but that

9  doesn't mean that a breach action doesn't have to be confined

10 to the pleadings.  The breach action here, if they want to

11 sue us in another breach action for some conduct after their

12 pleading and amendment -- their complaint and amendment,

13 that's a different matter.

14     But the suit here is, Motorola, you acted unreasonably in

15 October of 2010 when you sent us these offer letters, and you

16 acted unreasonably in November when you sued us.  And they

17 cannot now say that each and every thing we did during the

18 litigation creates a new breach.  They haven't amended their

19 complaint to say that.

20     Your Honor, ongoing duty, but finite breach complaint.

21 That's all I wanted to say.  Does that clarify?

22          THE COURT:  That helps.

23          MS. SULLIVAN:  Okay.  Your Honor, if I could turn

24 your attention, if I could, to one more -- what I'm trying to

25 do here is lay the basis for how it cannot have been a

1    violation of good faith for us to seek injunctions in

2    November of 2010.  And that is, I -- don't take it from me.

3    Take it from Microsoft's witness, and that's on page 7 here,

4    and Your Honor has seen this before.  But this is Microsoft's

5    own letter to the FTC dated June of 2011.  You know this

6    letter, Your Honor.

7            THE COURT:  I do.

8            MS. SULLIVAN:  It's where Microsoft said the

9    existence of a RAND commitment to offer patent licenses

10   should not preclude a patentholder from seeking preliminary

11   injunctive relief or commencing an action in the ITC just

12   because the patentholder has made a licensing commitment to

13   offer RAND-based licenses in connection with the standard.

14      Now, Your Honor, we -- we put that into our motion not to

15   suggest that Microsoft's subjective beliefs are

16   determinative.  We just think this makes it objectively

17   reasonable.

18      If Microsoft itself thinks in June 2011, this is long

19   after the November of 2010 lawsuit was filed by Motorola,

20   that it was perfectly reasonable to have a SEP holder file an

21   injunction claim, how could it have been unreasonable or a

22   violation of good faith for Motorola to have done in November

23   of 2010 what Microsoft itself said was perfectly permissible

24   in June of 2011?

25           THE COURT:  Counsel, aren't you busy undercutting

1    Mr. Price's word yesterday in regards to Professor Bodewig?

2    I mean, you're arguing to me that the material which is

3    generated after the date that you've now established is

4    critical, which is the filing, suddenly has relevance because

5    it expresses subjective intent or understanding.  Yesterday I

6    heard Mr. Price arguing that, oh, my heavens, we can't have

7    something that happened six, seven months later possibly be

8    admitted because it would, you know, not be relevant as of a

9    prior date.  I find some inconsistency here, counsel.

10          MS. SULLIVAN:  Your Honor, I would never wish to do

11   anything to undercut my colleague, Mr. Price.  What I'm doing

12   here is I'm trying to suggest to you that you have multiple

13   sources of information to inform your decision of whether it

14   was reasonable in October, November 2010.

15          THE COURT:  Does the jury have those same multiple

16   sources?

17          MS. SULLIVAN:  Well, Your Honor, we think you should

18   take this away from the jury.  We think the

19   injunction-seeking can't be part of the case.  We think this

20   issue -- on this issue.

21       Let me try and be clear, Your Honor.  We want you to focus

22   on October, November 2010.  We think at that time -- let's

23   remember some things that were true at that time.  First, we

24   didn't know that Microsoft was going to later change its

25   litigation position and say it would take a license.  The

1    second thing, we didn't know that you would reject the

2    repudiation defense.  It was not yet clear to us that we had

3    to give them a license after they'd sued us, instead of

4    sending a counteroffer.  That hadn't happened yet.  There

5    hadn't been any rulings -- you know, the Posner rulings, the

6    FTC, those were all in the future.  So it was perfectly

7    reasonable for Motorola, in that timeframe, knowing what it

8    knew, to think it was reasonable and not a violation of the

9    duty of good faith to file an injunction.

10        All we're suggesting, Your Honor, is that -- sort of

11   additional corroboration of that timeframe.  Microsoft itself

12   thought our position was reasonable when it filed its letter

13   to the FTC later.

14        Your Honor, you mentioned yesterday, and I took note of

15   it, that -- you wondered if maybe the FTC is now the key

16   jurisdiction I mentioned to you, the Northern District of

17   Illinois and the Western District of Wisconsin and the ITC.

18   Well, yes, the ITC has entered into a consent for Google

19   after the acquisition of Motorola.  But I want to clarify

20   something that's very important, if I could, Your Honor.

21        You've got a notice of supplemental authority from

22   Microsoft, dated July 30th.  I'm sorry that you keep being

23   given all this paper, Your Honor, from both sides.  But you

24   mentioned it in court yesterday, and I just wanted to point

25   something very important out about that.

1      When you go to the supplemental authority, and that's what

2  Microsoft gave you on July 30th, the FTC's new July 23rd

3  clarification of the Google consent order with respect to

4  SEPs, and there's one very important piece I want to just

5  point out to Your Honor, if I may.

6      Your Honor, this is Docket 807, and it's in the addendum

7  at the end, page 5.  It's Section D of the response to

8  comment by the FTC, in which the FTC clarified some comment

9  whose question was the order requires Google to immediately

10  withdraw all pending legal claims that seek injunctive

11  relief.  That's an insertion Microsoft made numerous times in

12  the briefing.

13      They said, "Well, how can injunctive relief be proper when

14  this consent order made Google withdraw its motions and

15  actions for injunctive relief?"  That turns out to be a

16  misstatement of the order.  We now have it from the FTC that

17  it was a misstatement.

18      Footnote 11 says, oh, that was just a commissioner, that

19  wasn't the order.  And it clarifies that there is no

20  requirement that Google or Motorola withdraw a prior request

21  for injunctive relief.

22      So I would even say FTC is on our side of the ledger, that

23  I can line up yourself with Judge Crabb, Judge Berzon, Judge

24  Posner, the ITC, and the FTC.  And just to put the icing on

25  the cake, the DOJ TTO policy again said that injunctions are

1    not foreclosed for unwilling licensees.

2        And, Your Honor, we think that given that Microsoft was

3    not an unwilling licensee -- was not a willing licensee,

4    known to us to be a willing licensee back in October,

5    November 2010, we respectfully suggest you should decide the

6    injunction issue now in Motorola's favor, take that out of

7    the case, simplify the timeline, and get us focused on the

8    offer letters.

9            THE COURT:  Let me ask you one question about the

10   timeline, and then I'm going to ask you to move on, because

11   otherwise you're going to run out of time.

12           MS. SULLIVAN:  Yes, Your Honor.

13           THE COURT:  And I want to hear about Marvell and I

14   want to hear about MPEG.

15       One of the things that would be helpful to the court is a

16   timeline.  These actions in Germany and these actions in the

17   ITC and the action here, does counsel have one of those, and

18   if so, can you share it with us?

19           MS. SULLIVAN:  We do, Your Honor.  We've given you

20   the very abbreviated one here, and we'd be happy to provide a

21   detailed timeline that we've compiled for internal purposes.

22   Would Your Honor like us to meet and confer with Microsoft so

23   that what you get is an agreed-upon representation?

24           THE COURT:  Well, after Mr. Price's presentation

25   yesterday, if there were going to be an agreement, I'd be

delighted if there was.  If there isn't, I'll take one from
each side.

MS. SULLIVAN:  All right, Your Honor.  So we'll try
to agree upon one, and submit it by letter to Your Honor.
Would that be acceptable?

THE COURT:  That would be fine.

MS. SULLIVAN:  And if we can't, we'll submit them
separately.

But I think you're right, Your Honor, in the thinking
about this, in light of Washington law, that all the facts
and circumstances are relevant.  We think that the order of
events is very important.  So, thank you, Your Honor, we're
happy to supply that.

Your Honor, I can be very brief on Marvell and MPEG LA.
We think those can go out of the case quite readily now.  The
key points are very simple.  Let me turn to Marvell first.

We think, Your Honor, their -- the key point is really
that Microsoft needs to plead damages that are proximately
caused.  It's an element of their breach claim.  And I think
we saw from yesterday's continuing confusion about allocation
of attorneys' fees to different lawsuits and to different
matters, there is no certainty from the other side about
which damages go with which claim, which damages go with
which contract, which damages go with Marvell as opposed to
the rest of the case.  We think since the test is

1    conjunctive, you need to have breach -- duty, breach,

2    proximate causation and damages, and Microsoft has failed,

3    even with Your Honor's liberal allowance of new discovery

4    opportunities, has failed to give us a damages theory that

5    Marvell should go out.

6        But second, Your Honor, we think even if you don't think

7    damages is dispositive, we think the basic facts on Marvell

8    require you to reject the breach claim.  And the basic facts,

9    just to summarize them that are undisputed is, Motorola told

10   Marvell that it didn't need a license.

11            THE COURT:  Oh, great.  Stop right there.  Will you

12   tell me where in the record is the accurate information on

13   that?  Because Microsoft seems to say, no, that's not true.

14            MS. SULLIVAN:  Your Honor, I wanted to be very

15   careful here about what is and is not confidential.  But what

16   I believe is in the public record is --

17            THE COURT:  It doesn't have to be public.  Just cite

18   to where it is in the record.

19            MS. SULLIVAN:  I'll refer you to Roberts'

20   declaration, Exhibit L, Roberts' declaration in support of

21   Motorola's motion, Exhibit L, at page 86, line 10, through

22   page 87,

23   line 9.  That's the place in the record that we'd refer Your

24   Honor to.  And I think --

25            THE COURT:  Do you have a docket number for the

1  Roberts' declaration?

2          MS. SULLIVAN:  Yes, Your Honor.  Docket No. 721-2.

3          THE COURT:  All right.  Thank you.

4          MS. SULLIVAN:  So in a nutshell, Your Honor, we

5   believe what Your Honor will find there is, Motorola did not

6   assert standard essential patents under 802.11 against

7   Marvell, said it didn't needed a license; that Motorola,

8   nonetheless, did offer a license; that Marvell thought it was

9   too high and said -- sent us a claim chart, and there's been

10  no further response from Marvell to this day.

11      So we think on breach, there simply was no breach at the

12  time with respect to Marvell and Microsoft, and there is no

13  breach today.  We think you can get rid of that claim.

14          THE COURT:  Would Microsoft have standing to sue in

15  place of Marvell?

16          MS. SULLIVAN:  On Marvell's behalf?

17          THE COURT:  Yes.

18          MS. SULLIVAN:  We think there's a serious question as

19  to whether Microsoft could stand in Marvell's shoes.  Marvell

20  is not a party, and what Microsoft will assert, Your Honor,

21  is, well, this just shows their continuing pattern and

22  practice and course of conduct.  And if Microsoft couldn't

23  get a license through -- directly, it results in trying to

24  get a license through its counterparty, we think there is a

25  serious standing question.

1    But the -- Your Honor, what we -- that's one way you could

2    get rid of it.  Just say we certainly think you have to get

3    rid of MPEG LA, because Google is not a party to the case,

4    and there may be jurisdictional grounds here, too.

5    But what I really wanted to point out, Your Honor, is, in

6    some ways, the Marvell story proves Motorola's point.  And

7    let me just restate the facts in order.  I think I may have

8    garbled them a bit.

9    Motorola did offer a license.  Marvell thought it was  too

10   high.  Marvell offered a royalty-free cross-licensing

11   agreement.  Motorola said, "How about seeing your claim

12   charts in order to evaluate that offer," and then Marvell

13   never supplied the responsive claim charts.  I'm sorry if I

14   didn't explain that clearly before.

15   But the -- so the point there is, we actually think that's

16   the way a bilateral negotiation should go.  If you think the

17   offer is too high, come back with a counteroffer, like a

18   royalty-free cross-license, and now let's talk about it in

19   exchange for a portfolio.

20   So, you know, I'm arguing that you should exclude this

21   theory.  The theory actually could be helpful to Motorola as

22   presented to the jury.  But we think the key point here is

23   that we shouldn't take the jury's time here, because there's

24   no evidence of breach based on the undisputed facts, and

25   there's no theory of causation of damages that relates to

1   this theory, so you should exclude it.

2       And, Your Honor, I'm informed that the additional places

3   for you to look in the record to see if what I'm telling you

4   bears out, are Exhibits G, H, I, J, K, and L to the Roberts'

5   declaration.  So I pointed you before to L, but if you go G

6   through L in that exhibit list, you'll see the Marvell story.

7           THE COURT:  All right.

8           MS. SULLIVAN:  On MPEG LA, Your Honor, the argument

9   is very simple.  Google is not a party to this case.

10      In the last slide of the handout, you'll see why Microsoft

11  didn't bring it in.  The last slide of the handout is page 8.

12  Mr. Harrigan, in answer to the court's question, why wasn't

13  this MPEG LA issue, which has been extensively briefed,

14  brought up to the court sooner?  Mr. Harrigan said, "The

15  basic reason was the concern about maintaining the trial

16  date.  The process of getting Google into this case would

17  have been complicated, and we were concerned about a

18  continuance."

19      Well, a strategic decision about the trial date, however

20  efficient it might be, can't waive Article III.  Article III

21  can't just be bent to accommodate a strategic consideration.

22  Google's not a party to the case, the court had to adjudicate

23  its rights, and the MEP LA agreement undisputedly does not

24  cover Motorola.  The MPEG LA agreement applies by its terms

25  only to signatories.  Motorola is not part of the agreement.

```
 1        Even if you breached it, there would be no breach because
 2   Google has offered a license on MPEG LA terms as of August
 3   2012, and Microsoft rejected the offer.  It insisted on
 4   putting terms into that offer not covered by the MPEG LA
 5   agreement.
 6        I won't go into the details, Your Honor, but the point is,
 7   Google is not a party, Motorola is not a signatory, and in
 8   any event, we did make an offer, and Microsoft refused it.
 9        So, Your Honor, we think MPEG LA, at a minimum, has to
10   come out of the case.
11             THE COURT:  Unless you tell me otherwise, I assume
12   your failure to address *Noerr-Pennington* is that you dropped
13   that argument?
14             MS. SULLIVAN:  Dropped *Noerr-Pennington*, Your Honor?
15             THE COURT:  Yes.
16             MS. SULLIVAN:  No, not so fast.  Can we talk about it
17   for one minute?
18             THE COURT:  Yes.  You haven't raised it.
19             MS. SULLIVAN:  I'm sorry, Your Honor.  I wanted to
20   make sure I answered your questions on Marvell and MPEG LA.
21   I'll be very brief on *Noerr-Pennington* and attorneys' fees
22   and damages.
23             THE COURT:  Save the attorneys' fees.  That one is
24   well briefed.
25             MS. SULLIVAN:  Okay, Your Honor.
```

1      We think *Noerr-Pennington* includes all the damages here,

2  because we think we did have a right to petition.  It's clear

3  in the Ninth Circuit that *Noerr-Pennington* does extend to

4  state law claims and is not limited to antitrust or federal

5  claims.  We think the fact that this is a contract action

6  does not make it any different from other cases.  So we've --

7  and we cite, in particular, Your Honor, to Judge Crabb's

8  ruling.  I know you're very familiar with Judge Crabb's

9  ruling.  And I understand the nuances here.  We think Judge

10 Crabb was correct to say that receiving attorneys' fees from

11 patent litigation as damages violates *Noerr-Pennington*,

12 because we have a right, under the Patent Act, to go seek

13 recompense under the Patent Act.

14     And, in fact, the Ninth Circuit, Your Honor, made very

15 clear that whatever it was saying about injunction, Motorola

16 still had the right to seek damages.  So of course we have a

17 right to bring patent suits.  How else might we get our

18 back-royalties?  And what if you declare a RAND license, and

19 they say they're not going to pay?  We have to go somewhere.

20 We have to have a -- there's no covenant not to sue involved

21 in a RAND agreement.

22     So *Noerr-Pennington* does extend the right to seek patent

23 remedies in other courts.  And Judge Crabb, we think,

24 correctly held in the Western District of Wisconsin that you

25 can't get attorneys' fees through *Noerr-Pennington* because

1    somebody sued you for patent infringement in another case.

2        Now, it's true Judge Crabb didn't dismiss the contract

3    action --

4            THE COURT:  I was just going to say, you can't pick

5    and choose between Judge Crabb what you like and Judge Crabb

6    what you don't like.

7            MS. SULLIVAN:  Fair enough, Your Honor.  But we think

8    the *Noerr-Pennington* holding there is not limited to the

9    antitrust claim.  The *Noerr-Pennington* holding was damages in

10   the form of attorneys' fees incurred in defending against a

11   patent infringement action can't be awarded as damages

12   because that would interfere with our right to seek redress

13   of our patent infringement claims.

14       So, Your Honor, it's -- it's -- I recognize that we're

15   working in a bit of a new field here, but if you accept, as

16   the Ninth Circuit has said, that *Noerr-Pennington* extends to

17   state law claims, it should be just as true here in this

18   contract action that attorneys' fee damages from patent

19   infringement actions shouldn't be awarded because that would

20   discourage our right to seek patent relief.

21       So we think that Judge Crabb is consistent.  We're not

22   trying to pick and choose.  We think the only relevant

23   *Noerr-Pennington* holding there applies equally here.  There

24   are other contract issues in the case, which Your Honor has

25   suggested.

 1      And certainly just -- there's no sham litigation.  There

 2  can't be a sham litigation, as Your Honor can readily see.

 3  So we don't waive *Noerr-Pennington*.  We respectfully submit

 4  that the attorneys' fees issue --

 5      This last point, Your Honor.  We had a big colloquy

 6  yesterday about the shifting theories, the ever-shifting

 7  theories that Microsoft has for how to allocate its

 8  attorneys' fees across the contracts, across the breach

 9  theories.  You heard Microsoft's counsel hopping up and down

10  yesterday, testifying on the spot as to how they were going

11  to change those, and Your Honor ordered additional discovery

12  on that matter.

13      We respectfully suggest that Washington law enables you to

14  take the entire attorneys' fees issue out of the case,

15  leaving us with the relocation costs issue, because you can't

16  get attorneys' fees as consequential damages for a contract

17  action, absent very clear Washington law exceptions, and for

18  reasons in the brief, this case doesn't fit any of those.

19      Thank you, Your Honor.

20          THE COURT:  I have to ask you, do you want to be

21  characterized as the pot or the kettle?

22          MS. SULLIVAN:  And with respect to which

23  countervailing argument that Microsoft has made, Your Honor?

24          THE COURT:  Well, it seems to me both sides here are

25  somewhat on the fly.

1          MS. SULLIVAN:  Well, Your Honor, I don't mean to

2     put -- all I'm suggesting is that Your Honor has made the

3     point that we take very seriously, that it's very important

4     to try to get this case ready for trial.  We think we've

5     given you a very powerful legal argument for why the

6     attorneys' fees should be excluded as damages theory.  It

7     doesn't mean we don't have a trial.  It just means that

8     damages would be limited to relocation costs theory.

9          Your Honor, if I can refer you to one key case in the

10    damages argument.  It's *Seattle v. McCready*, which crucially

11    says that it's not just costs you can't get in a contract

12    action without violating the American rule, it's damages.  So

13    I expect Microsoft to say, "Oh, pay no attention to

14    Motorola's arguments.  This is a case about getting damages

15    from other cases."  We think Washington law doesn't let you

16    get attorneys' fees from damages from that case or another

17    case.  So with respect, Your Honor, we think you can take

18    attorneys' fees out of the damages.  It wouldn't end the

19    case, but it would take that out of the case.

20          THE COURT:  Thank you.  Ms. Sullivan, I'm not

21    surprised to find you to be a contextualist in this argument.

22    It would be in keeping with your prior views.  So, thank you.

23          MS. SULLIVAN:  Thank you, Your Honor.

24          THE COURT:  Mr. Pritikin?

25          Mr. Love and Ms. Robbins, the rule in this court is that

1  at the end of them arguing, each of you are going to be given

2  five minutes on what they should have said.  So you might

3  start preparing yourself.  And if you want to check between

4  your colleagues there on who is going to do that, you seem to

5  be the one who knows the record the best.

6      MR. PRITIKIN:  I would suggest Mr. Love, Your Honor.

7      I am going to address the liability issues that came up

8  this morning.  I want to reserve just a few minutes for

9  Mr. Harrigan to discuss the damages issues.  There are a

10  couple of points that he would like to make on that.

11      The fallacy in the argument that is being presented by

12  Motorola is that Microsoft had somehow asserted three or four

13  different breach of contract cases, and that simply is not

14  what we have pled, and it's not the way the case has

15  unfolded.

16      The individual acts that we've referred to are evidence of

17  the violation of the covenant of good faith and fair dealing.

18  One has to view them together, and they really are

19  inextricably linked.

20      Breaking them out as they want to do really misses the

21  broader point.  We know that the purpose of the contract is

22  to prevent holdup.  We know from Washington law and from the

23  restatement that an invasion of the spirit of the bargain

24  will violate the covenant of good faith and fair dealing.

25      Our claim here is a fairly simply one, and that is,

1   Motorola was engaged in holdup, in evasion of the bargain in

2   the individual actions that we've pointed to, in the initial

3   offer letter, following that up with pursuing the

4   injunctions, blocking the Marvell avenue, refusing to honor

5   the MPEG LA commitment, all of this is evidence.  And we're

6   seeking separate damages based on what happened in connection

7   with Marvell or MPEG LA.  It's really a misstatement and a

8   mischaracterization of the claim.

9       So with that background, let me turn to the individual

10  items that Ms. Sullivan addressed this morning.  I'm going to

11  start with the subject of the injunctions.

12      As the court has recognized previously, the injunction

13  gives you enormous leverage.  In fact, seeking the injunction

14  on standard essential patents in and of itself gives you

15  tremendous leverage, and that's really what this was about.

16      There was an initial demand letter that had terms in it

17  that no reasonable company could have accepted.  And so long

18  as that is out there, and so long as they can argue there's

19  been no contract entered into, the arguments they made all

20  along the way, that the ITC case doesn't end, the German

21  cases don't end, because there's no license that's actually

22  been entered into, and then they can move out the threat of

23  the injunctions, and then that gives them the leverage that

24  they were looking for in order to rebring Microsoft to heel

25  on the standard essential patents.  It's classic holdup, and

1  all of these things are, as I said, inextricably

2  interrelated.

3             THE COURT:  Well, the problem that I have, though,

4  is, we keep tacking on -- we have events which occurred in

5  October, letters are exchanged, and then 24 months later, or

6  whatever it is, all of a sudden Marvell pops up and, oh, this

7  is further evidence of bad faith.  And then up pops the

8  Google situation in regards to MPEG.  Oh, that's bad faith.

9  At some point, counsel, it seems to me you need to be

10 confined to what you've pled, and simply saying it's evidence

11 doesn't get around the fact that, you know, it's not evidence

12 from back then, it's more recently-acquired evidence.

13    I mean, what stops you from, at trial, whatever happens

14 between now and the end of the August, saying, oh, we found

15 something new?

16             MR. PRITIKIN:  Well, the pretrial order itself

17 precedes the pleading and it defines the issues for trial.

18 Whether or not something has been presented properly and

19 preserved, we depend on the discovery that's been taken and

20 whether there's been a disclosure of the theories.

21    There really isn't an argument that they weren't on notice

22 that Marvell, seeking the injunctions they specifically pled,

23 the offer letters, all of this clearly is part of the case.

24 There was extensive testimony on the Marvell incident in the

25 November trial.

1    And it occurred, Your Honor, the initial request from

2    Marvell for the license occurred in June of 2011.  Now, had

3    the license been granted to Marvell at that time, virtually

4    all of the things that subsequently unfolded with respect to

5    802.11 could and would have been avoided.

6    Let me go back to the subject of the injunctions, and I

7    think the place to start there is with the timeline as to how

8    this unfolded.

9    I think the central fallacy in the argument that we heard

10   from Ms. Sullivan this morning is that there is no

11   categorical rule which bars seeking injunctions on standard

12   essential patents.  And she turns that around, then, and then

13   tells the court that means that, because there is no

14   categorical rule, in their view, it could never be a part of

15   the violation of the RAND commitment.  And logically those

16   two don't follow.

17   We think, first, the weight of authority and the evolving

18   law is one that ought not be seeking injunctions on standard

19   essential patents.  It's an interesting issue of law.  It's

20   one that courts are writing about.  Some of it is dicta.  We

21   think that's a direction that the law is moving in.

22   But the court doesn't have to reach that question for

23   purposes of these proceedings, because on the facts that we

24   have here, there is a compelling argument that seeking the

25   injunctions as they did was a violation of the RAND

1    commitment, coupled with those demand letters that put

2    Microsoft in a position where the license on RAND terms had

3    been effectively denied.

4        It's reinforced by the timeline, Your Honor.  Remember, we

5    filed this case, I believe it was on November the 9th of

6    2010.  They didn't file these lawsuits until after we had

7    already filed this case.

8        If we go back to the initial complaint in this case, in

9    the complaint we had asked for an accounting.  It's there.

10   Specifically, an accounting of what is owed.  Now, we clearly

11   and unequivocally had stated by September of 2011 that we

12   would take the license on the RAND terms submitted by the

13   court, but I would submit, Your Honor, in view of the

14   pleadings that were filed in November of 2010, asking the

15   court to enforce the RAND commitment that they had made

16   containing the statement that we asked the court for an

17   accounting of what would be owed by way of the RAND royalties

18   that, after that, to proceed as they did, seeking an

19   injunction, coupled with those demands letters, that that was

20   a violation of the RAND commitment.  And the court would be

21   amply supported in finding that as a matter of law.

22   Certainly there would be no basis for dismissing that as part

23   of the case.

24       We noted, by September of 2011, a clear and unequivocal

25   statement had been made by Microsoft in its pleading that

1    they would accept the contract on RAND terms that were

2    determined by the court.

3        Thereafter, what happened?  Well, we know after September

4    of 2011, they continued to pursue aggressively the request

5    for the injunction in Germany.  And a lot of the damages

6    incurred are after that date, the relocation of that German

7    facility after that date, all of these things unfolded after

8    the dispute.  There's no dispute that Microsoft was prepared

9    to take the license on the terms that this court had

10   provided.  At that point it was essentially a race.

11       The feeling must have been that if they can get the

12   injunction somewhere, in Germany or in the International

13   Trade Commission, we'd have to capitulate.  That's holdup,

14   holdup combined with the initial demand letter and the

15   conduct that unfolded.

16       What about the International Trade Commission?  The trial

17   in the ITC on standard essential patents occurred in January

18   of 2012, again, months after there was no doubt that

19   Microsoft was going to take the contract on the terms that

20   had been decided by the court.

21       And it was in April of 2012, six months after that

22   statement had been made unequivocally to the court, that we

23   finally had to relocate the German distribution facility.

24       And so the point that comes from this, Your Honor, is that

25   whatever the categorical rule is on seeking injunctions on

1   standard essential patents, and we believe there is and

2   should be a categorical rule that you don't do that, but

3   without reaching that question, clearly on the facts of this

4   case as this has unfolded and the timeline that exists here,

5   they were engaged in holdup.  The court could find that, we

6   think, as Mr. Harrigan argued yesterday, as a matter of

7   summary judgment, but there's no basis for removing that from

8   the case.

9        Let me turn to a couple other points that were made by

10  Ms. Sullivan in the course of her arguments.

11       Let me come back for just a moment to the Marvell issue.

12       So in June of 2011, Microsoft had asked Marvell to get the

13  license.  Now, this didn't just come out of the blue.  This

14  isn't something that Marvell, on its own, decided to do.  It

15  was done at the specific request of Microsoft, because having

16  a license for the chip that substantially embodied the wi-fi

17  in the 802.11 capabilities would have provided Microsoft the

18  ability to continue to sell the Xbox console regardless of

19  what would have happened with their continuing law

20  enforcements.  There would have been an exhaustion, since

21  that would have been created.

22       Ms. Sullivan told you 10 or 15 minutes ago that Motorola

23  came back and offered a license to Marvell, but she left out

24  one very, very important fact, and that is, the license that

25  they provided to Marvell had a specific exclusion in it for

1   Microsoft.  And so as a result, the whole purpose of Marvell
2   asking for the license was to be able to provide -- they had
3   an indemnification obligation to Microsoft.  The whole
4   purpose is to provide protection for those chips.  And the
5   license that came back excluded the Microsoft products,
6   anything sold to Microsoft, and then said to Marvell, oh, and
7   by the way, with respect to your products, guess what, you're
8   going to pay two and a quarter percent of the end product
9   price of your customer.
10      Now, I think one can fairly view that as pretty
11  heavy-handed intimidation of Marvell that they ought not be
12  pursuing this further by way of trying to provide
13  indemnification or protection or exhaustion for the products
14  they're selling to Microsoft.  And although Motorola hadn't
15  previously came after them, but be forewarned that we're
16  going to want four and a quarter percent of the Audi
17  automobile that's going to contain one of your $3 chips.
18      Microsoft had requested this.  This was a reasonable way
19  of trying to provide the ability to continue to sell its
20  products in the face of this onslaught with the standard
21  essential patents, and it is evidence -- it is further
22  evidence of what we consider to be the scheme of holdup in
23  which Motorola was engaged.
24      Now, with respect to MPEG LA, I think I can state this
25  fairly simply, Your Honor.  The issue of whether or not the

1    obligations in the Google agreement with MPEG LA required

2    that the license be provided to Microsoft was something that

3    was briefed for Your Honor.  It was argued, I believe it was

4    in January or February of this year.  We think that issue

5    still, Your Honor, is ripe for a decision by the court one

6    way or the other.  If the court were to accept the Motorola

7    position that there was no corresponding obligation there,

8    then, obviously, we would drop that from the case.  It would

9    no longer be a part of it.

10       If the court were to rule as a matter of law, and contract

11   interpretation is a question of law for the court, that there

12   was an obligation on the part of Google to provide this

13   license, again, we have think that that is further evidence

14   of the pattern and practice of holdup in which Motorola was

15   engaged.

16           THE COURT:  Well, did Motorola offer Microsoft a

17   license in the MPEG context, and if so, on what terms?

18           MR. PRITIKIN:  There was -- this gets into the

19   subject -- I believe, Your Honor, part of it would be subject

20   to Rule 408.  There were exchanges back and forth and offers

21   that were made over the intervening two years.  There was

22   a -- one of the offers that was made by Motorola would have

23   extended the -- my understanding of it is that it would have

24   provided that, going forward, there would be a license on the

25   MPEG LA terms, but that they were going to reserve their

1  right for back damages at whatever enormous amount of money

2  they would come in and try to prove up.

3      And so we don't think it really was something that would

4  have resolved it, and so there was not an agreement on it at

5  that point, Your Honor.

6          THE COURT:  I will say the same thing that I said to

7  Ms. Sullivan.  At some point we're going down too many rabbit

8  holes, and this strikes me as a rabbit hole of immense

9  dimension.

10     Are we really going to litigate MPEG LA as part of this,

11  when it's not even Motorola, it's Motorola's parent company?

12         MR. PRITIKIN:  Well, again, Your Honor, as I said, if

13  the court were to conclude -- we think it is an issue of law

14  as to whether or not the license was required.  As I said,

15  we'd certainly be prepared -- if the court didn't agree with

16  us, we'd be prepared to drop it.  If the court does agree

17  with us, it was another way of securing the relief that we

18  needed and that we wanted in order to have coverage for the

19  products that use the standard essential patents.

20         THE COURT:  You have about five minutes left, if you

21  want to finish up.

22         MR. PRITIKIN:  On the subject of *Noerr*, just one

23  quick point on that, Your Honor.

24     We would encourage the court to read what Judge Crabb

25  wrote.  I agree you can't pick and choose.  She said that in

 1   the contract claims, which is what we have here, that there
 2   the *Noerr-Pennington* defense is not applicable.  It can be
 3   waived by contract.  And a point of fact, they're trying to
 4   parse this out.  I don't even understand the argument.  You
 5   can sue, but you can't sue for damages.  In any event, if you
 6   read Judge Crabb's opinion, the damages that were sought in
 7   the contract part of the case were the attorneys' fees.
 8   Those were the contract damages.  And so we think that that
 9   case provides absolutely no support for them.  It only
10   covers, to the extent pertinent, that there is
11   *Noerr-Pennington* protection for the antitrust claims.
12       Unless the court has questions on this, I'll yield the
13   rest of my time to Mr. Harrigan.
14           THE COURT:  All right.  Mr. Harrigan, you have three
15   minutes.
16           MR. HARRIGAN:  The back end of that notebook has the
17   material that I'd like to call the court's attention to
18   briefly here.
19       We think there are at least two grounds on which
20   attorneys' fees are appropriate as damages in this case.  The
21   first begins with the law in other jurisdictions, that
22   attorneys' fees can be recovered for a lawsuit that was
23   barred by a covenant not to sue, because the promise was to
24   be free from litigation.  And that's the *Anchor Motor Freight*
25   case in Section 2 of that notebook.

1    And in the *River Ridge Associates* case out of the District

2  Court of New Jersey, attorneys' fees are a proper element of

3  damage when the right violated is the right to be free from

4  suit, and in that case the court held that the right to be

5  free from suit included when the lawsuit was brought in the

6  breach of the covenant of good faith and fair dealing.  In

7  that case, I think it was a bank that had asserted an

8  untenable interpretation as the basis for the action, and the

9  court held that was a breach of the covenant, and that,

10  therefore, fees were awarded because it was the equivalent of

11  a covenant of good faith -- I mean, of a covenant not to sue.

12    And in this case, if the court agrees with our position

13  that, under the circumstances, there's even an issue of fact

14  as to whether injunctive relief -- seeking injunctive relief

15  here was a breach of the covenant of good faith, then this

16  rule -- this applied elsewhere would apply logically in

17  Washington.

18    And Washington is not -- there's no Washington case on the

19  point of whether breach of a covenant not to sue is an

20  exception to the American rule, but there is plenty of courts

21  that haven't reached that result, and we think it's likely it

22  will be in Washington.

23    The second basis is that the fees are awarded for what is

24  generally referred to as dissolving preliminary or permanent

25  injunctions.  And I'll just quickly note that in this case,

1    Motorola's injunctive relief action was brought in Germany

2    in order to achieve injunctive relief before this court could

3    reach the issue.

4        As a result of the anti-suit motion, the court held that

5    it would intercede because Motorola was seeking to have it

6    decided before a court with a different legal standard and

7    before this court could adjudicate the issues.  The court

8    ultimately said it would decide whether any German

9    injunctions were improper.  The court decided they were not,

10   and, in fact, that no injunctions were improper.

11       And now, Your Honor, I would take you to the *All Star Gas*

12   case, which is a Court of Appeals case, which basically the

13   trial court said -- awarded attorneys' fees to Rick, who said

14   it was not within the scope of an injunction.  And the Court

15   of Appeals said that he was entitled to attorneys' fees under

16   those circumstances, even though the injunction was not

17   dissolved because -- and -- and it was not wrongfully issued,

18   but he was -- he won the argument that he wasn't within it.

19   And then they remanded the case because there was an issue of

20   whether the trial court was right that he wasn't within it.

21   But the court squarely held that -- that a case where you

22   don't dissolve the injunction, and you don't prove that it

23   was wrongfully issued, but you simply get yourself out from

24   under it, is one in which you get attorneys' fees, and we

25   think that the anti-suit effort in this case and the other

1    efforts that were made with respect to the injunction come

2    within that Court of Appeals case.

3        Thank you.

4            MS. SULLIVAN:  Your Honor, could I give you 30

5    seconds on attorneys' fees?

6            THE COURT:  Yes.

7            MS. SULLIVAN:  Just very quickly, Your Honor.

8    Mr. Harrigan said there were two exceptions:  The covenant

9    not to sue and the wrongful injunction.

10       With respect, the cases he cites are not applicable.

11   *Anchor Motor Freight* and *River Ridge* were about express

12   contractual covenants not to sue.  In *Anchor,* it was a

13   question of a covenant not to sue in a collective bargaining

14   agreement.

15       Your Honor has never held the RAND agreement is a covenant

16   not to sue.  I think all of the courts in America that are

17   engaged in deciding these open questions about remedies in

18   the standard essential patent context would be very surprised

19   that they were foreclosed from jurisdiction because these

20   were covenants not to sue, so that argument fails.

21       On wrongful injunction, Your Honor, although it pains me

22   to say it, because we were -- we sought to oppose your

23   anti-suit injunction.  Your anti-suit injunction really did

24   take care of that argument.  There never was any jeopardy

25   from the German injunction because you said they couldn't be

1   enforced and the Ninth Circuit upheld you.  So with all

2   respect, that theory doesn't wash here.

3        And this isn't a case in which Microsoft has to go undo an

4   injunction that puts it in jeopardy.  You prevented that

5   problem, so those damages are not in the case.

6        Thank you, Your Honor.  We're happy to have Ms. Robbins

7   speak.

8            THE COURT:  We'll start with Mr. Love.  Counsel, just

9   so that you all can sit more calmly, the age of the court

10  worries me, that almost everyone I see around here, you

11  practically have to be dead in order to make it into federal

12  court, and therefore one of the things that I do with

13  regularity is, if you bring younger lawyers, they get to

14  speak.

15       So, Mr. Love, please take the stand and tell me in five

16  minutes how you would have done this and what your betters

17  missed.

18           MR. LOVE:  Thank you, Your Honor.  With all due

19  respect, I think I can't take you up on suggesting what

20  Mr. Pritikin and Mr. Harrigan should have argued instead.  I

21  think they both did an excellent job.

22       Within the constraints of time, there are two points I'd

23  like to make.

24       First of all, the privilege issue on the question as to

25  what was the analytical basis for the letters, we had

 1    referred you to Footnote 1 in our summary judgment brief.

 2         THE COURT:  You want to slow down a little.  The

 3    reporter is the most important person in the courtroom.  If

 4    she doesn't write it down, I won't be able to remember it.

 5         MR. LOVE:  Absolutely.

 6       That issue is taken up in detail in our first motion,

 7    which was filed on Monday night.  And the same deposition

 8    excerpts, in addition, I think there's one or two others that

 9    cover similar questions are -- are there and attached to that

10    motion.

11       The other point that I would just make, the *Realtek* case,

12    which was referred to in Ms. Sullivan's argument.

13       The *Realtek* decision granted summary judgment on the

14    question of whether pursuing an injunction in the ITC was a

15    breach when no offer had been made.  And to the extent

16    there's a distinction between that case and this case, it's

17    whether there's any distinction between the offer of the

18    defendant in October, which was excessive, an offer that no

19    reasonable company could have accepted.

20       And we had cited to Your Honor previously in the summary

21    judgment briefing back in 2012 a case from the Third Circuit,

22    *WL Gore and Associates*, 529 F.2d 614.  A royalty demand which

23    is so high as to preclude acceptance of a license offer is,

24    after all, not appreciably different from a refusal of a

25    license upon any terms.  And I think that holding brings the

1   situation here directly in line with *Realtek,* and the

2   question as to whether pursuing an injunction was a breach.

3           THE COURT:  Who wrote that decision?

4           MR. LOVE:  I don't know.  It's dated 1976, so some

5   time ago.

6           THE COURT:  All right.  Thank you.

7           MR. LOVE:  Thank you very much.

8           THE COURT:  Ms. Roberts.

9           MS. ROBERTS:  Good morning, Your Honor.  I think

10  Ms. Sullivan covered our arguments well.  There's just one

11  thing I think she might have emphasized a little bit more,

12  and that's on the MPEG LA issue.

13      Much like the Marvell breach theory, MPEG LA's breach

14  theory, Microsoft doesn't have any evidence of damages as a

15  result of Motorola's or Google's conduct vis-à-vis MPEG LA,

16  and that's an essential element of Microsoft's claim.

17      There's nothing in Mr. Meneberg's report allocating any

18  attorneys' fees to that breach theory.  In fact, he didn't

19  allocate any -- any costs ever or any damages to any

20  particular theory.

21      The relocation fees couldn't possibly apply to that

22  theory, because everything that occurred -- with regard to

23  MPEG LA occurred after Microsoft alleges it made the decision

24  to relocate, so that's a separate basis for granting summary

25  judgment on the MPEG LA theory.

```
 1              THE COURT:  All right.  Anything else you'd like to
 2    say?
 3              MS. ROBERTS:  That's all, Your Honor.
 4              THE COURT:  All right.  Thank you, counsel.
 5              MR. HARRIGAN:  Your Honor, if you have a moment, we
 6    have a couple of housekeeping questions that we'd like to
 7    raise.
 8              THE COURT:  All right.
 9              MR. HARRIGAN:  Which Mr. Pritikin will do.
10              THE COURT:  All right.
11              MR. PRITIKIN:  Two items, Your Honor.  We had been
12    talking to Motorola's counsel about the possibility of
13    putting together a written questionnaire that will be
14    submitted to the prospective jurors, and I don't know what
15    the court's typical practice is on that, but --
16              THE COURT:  Save your time.  You don't have enough
17    time to get it out and get it back before we pick the jury.
18              MR. PRITIKIN:  That was the question.
19              THE COURT:  It basically takes us a minimum of 45
20    days and preferably about 70 to get it out and get it back
21    from the panel that needs to receive it.
22              MR. PRICE:  There goes one stipulation.
23              MR. PRITIKIN:  Would it be possible to put together a
24    short written questionnaire that they can do it that morning
25    when they arrive?  Something brief, but we think it would be
```

1    useful for everyone.

2           THE COURT:  You know, counsel, the answer is yes.

3    But let me offer you the following warning:

4        The last time I agreed to this, the short questionnaire

5    involved a woman who died from lung cancer, and her estate

6    was suing a tobacco company, and a short questionnaire turned

7    into 17 pages.  I hope that you will know that Judge Koh and

8    I have gone to school on what happened in that case, and

9    we're not going to have any more 17-page questionnaires.

10       My process of picking a jury is that it usually takes us a

11   morning.  I understand I need to give you some greater

12   leeway, because one of the parties is a major employer in

13   this area.  But we're going to be moving along expeditiously.

14   You have a relatively small jury.  We should be able to get

15   it done pretty promptly.

16          MR. PRITIKIN:  All right.  The other thing I wanted

17   to mention, Your Honor, is, we had talked yesterday about the

18   jury instructions that we think should provide the jury the

19   background they need on the court's findings of fact.

20       They were included in the pretrial order submissions, but

21   we thought it might be useful if I could hand up to the court

22   the preliminary instructions that we propose and those that

23   have been proposed by Motorola.  Again, this was taken from

24   the pretrial order, but it would give the court a sense of

25   what we think the jury should be instructed on.

1          THE COURT:  All right.  You may approach.  Anything

2    else?

3          MR. PRITIKIN:  No.

4          MS. SULLIVAN:  Mr. Pritikin, what did you just give

5    the court?  May we see it?

6          MR. PRITIKIN:  Oh, yes.  It's taken from the pretrial

7    order.

8          THE COURT:  It appears, counsel, to be the

9    preliminary instruction proposed by Microsoft, the

10   preliminary instruction proposed by Motorola for the summary

11   of claims.

12         MS. SULLIVAN:  Thank you, Your Honor.

13         THE COURT:  All right.  Anything further?

14         MR. PRITIKIN:  Nothing from us, Your Honor.

15         THE COURT:  Counsel, let me give you a couple of

16   observations.

17     First, you have trial on -- I think it starts the 26th, so

18   it's Monday, Tuesday, Wednesday, Thursday, Friday.  The

19   following Monday is a holiday, and I think I gave you Tuesday

20   and Wednesday.  You should plan, basically, to have 16 hours

21   per side.

22     The reason that I've reserved some time in that is that I

23   will have to read 145 jury instructions.  That's going to

24   take me some time, and my rule is jury selection, opening

25   statements, direct examinations and cross-examinations and

1    closing arguments all come out of your time.  So in terms of

2    sizing your case, you should know that that's what you're

3    dealing with.

4        Secondly, I came out here today prepared to announce that

5    Microsoft witnesses Davidson, Roberts, and McKinley were not

6    going to testify because of the discovery approach that was

7    taken by Microsoft, and I would extend that to doing

8    something to the lawyer that advised McKinley not to prepare

9    for a 30(b)(6) deposition.  However, I've heard some things

10   today that cause me to question that ruling.

11       You know, you can't use your law departments as a sword

12   and a shield.  I thought I made that quite clear.  But we

13   will take that issue up at some point before trial.

14       I am disappointed that there was not better conformity

15   with the court's rulings on that matter.

16       Counsel, anything further at this time?  Mr. Harrigan?

17           MR. HARRIGAN:  Not here.

18           MR. MCCUNE:  No, Your Honor.

19           THE COURT:  All right.  Then we'll be in recess.

20       Counsel, thank you.  I suspect you didn't enjoy this, but

21   I did.  It's nice to see good lawyering, and these are really

22   interesting questions, so I appreciate your contributions.

23       We'll be in recess.

24

                    (THE PROCEEDINGS CONCLUDED.)

# C E R T I F I C A T E

I, Nancy L. Bauer, CCR, RPR, Court Reporter for the United States District Court in the Western District of Washington at Seattle, do hereby certify that I was present in court during the foregoing matter and reported said proceedings stenographically.

I further certify that thereafter, I have caused said stenographic notes to be transcribed under my direction and that the foregoing pages are a true and accurate transcription to the best of my ability.

Dated this 2nd day of August 2013.

/S/  Nancy L. Bauer

Nancy L. Bauer, CCR, RPR
Official Court Reporter