1
2
3
4
5
6
7
8
9

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| MICROSOFT CORPORATION, | CASE NO. C10-1823JLR |
| Plaintiff, | ORDER |
| v. | |
| MOTOROLA, INC., et al., | |
| Defendants. | |
| MOTOROLA MOBILITY, INC., et al., | |
| Plaintiffs, | |
| v. | |
| MICROSOFT CORPORATION, | |
| Defendant. | |

ORDER- 1

# I.    INTRODUCTION

Before the court is Microsoft Corporation's ("Microsoft") motion to exclude testimony of Richard Holleman, Dr. Gregory Leonard, Judge Maximilian Haedicke, and Bradley Keller.  (Microsoft Mot. to Exclude (Dkt. # 724).)  Also before the court are Motorola, Inc., Motorola Mobility, Inc., and General Instrument Corporation's (collectively, "Motorola") motions to exclude the testimony of Todd M. Menenberg (Mot. to Exclude Menenberg (Dkt. ## 722 (redacted), 734 (sealed)) and Dr. Theo Bodewig (Mot. to Exclude Bodewig (Dkt. ## 731 (redacted), 737 (sealed)).  The court has reviewed the motions, the papers filed in opposition and support thereof, and the relevant law.  The court heard oral argument on July 30, 2013, and considering itself fully advised, GRANTS in part and DENIES in part Microsoft's motion to exclude, and GRANTS in part and DENIES in part Motorola's motions to exclude.

At the outset, the court takes the rare opportunity to note that this order may not be as helpful as it could be because after expert discovery the parties continued to modify the expert reports and proffered expert testimony that were the subject of their motions.  Matters were complicated further at oral argument when both parties represented that they would further modify certain expert reports, as explained more fully herein, based on arguments raised in the motions.  The court has found it difficult to gain solid footing on the ever-shifting sands of information contained in the parties' expert reports.  Ruling in this context has been a challenge because the court has been forced to examine newly-submitted testimony without the benefit of argument or briefing.  At this point, the court must rule in order for the trial to move forward; there is no time to order

1  supplemental briefing or argument.  In light of this reality, the court can only express its

2  disapproval of the parties' conduct and warn that similar conduct by either party in the

3  future will not be well received.

4  ## II.    BACKGROUND

5      This is a breach of contract case between Microsoft and Motorola.  Microsoft

6  claims that Motorola has an obligation to license patents to Microsoft at a reasonable and

7  non-discriminatory ("RAND") rate, and that Motorola breached its RAND obligations.

8  (*See generally* Am. Compl. (Dkt. # 53).)  Microsoft sued Motorola for breach of contract

9  in this court in November, 2010.[1]  (*See id.*)

10      Motorola's RAND commitment arises out of its and Microsoft's relationship with

11 two international standard-setting organizations ("SSOs"), the Institute of Electrical

12 Electronics Engineers ("IEEE") and the International Telecommunication Union ("ITU").

13 These organizations create standards for use in designing and manufacturing technology

14 products.  These and other SSOs play a significant role in the technology market by

15 allowing companies to agree on common technological protocols so that products

16 complying with the standards will work together.

17

18  _____

19      [1] This matter has a complex procedural history involving several patent infringement
    claims as well as claims and counter claims relating to Microsoft's breach of contract claim.  As

20 the present motions before the court are discrete evidentiary issues, the court provides only a
    high level background of the case to provide context for the present motions.  Prior court orders

21 provide a more complete procedural and factual history of the case with citations.  (*See* 2/27/12
    Order (Dkt. # 188); 6/6/12 Order (Dkt. # 335); 10/10/12 Order (Dkt. # 465); 4/25/13 Order (Dkt.

22 # 681).)

1    The standards at issue in this case involve wireless communications, commonly

2   known as "WiFi," and video coding technology.  More specifically, this case involves

3   two standards:  an IEEE wireless local area network ("WLAN") standard called the

4   "802.11 Standard" and an ITU[2] advanced video coding technology standard called the

5   "H.264 Standard."

6    Both of these standards incorporate patented technology.  Thus, in order for a

7   company to practice the standard, it is necessary for that company to utilize technology

8   that is covered by one or more patents.  Patents that are essential to the standard (in that

9   they must be practiced to accomplish the standard) are called standard essential patents,

10  or "SEPs."  The existence of SEPs is a common problem in the world of technology

11  standards.  To deal with this problem, SSOs have devised a solution.  To make it easier

12  for companies to practice their standards, SSOs seek commitments from the owners of

13  SEPs to license their patents to standard-users on RAND terms.  Motorola owns patents

14  that are essential to the 802.11 and H.264 Standards and has committed to license them

15  on RAND terms.

16    On October 21, 2010, Motorola sent Microsoft a letter offering to license

17  Motorola's 802.11 SEPs.  Motorola offered to license its patents at what it considered the

18  RAND rate of 2.25 % of the price of the end product:

19    This letter is to confirm Motorola's offer to grant Microsoft a worldwide
      non-exclusive license under Motorola's portfolio of patents and pending
20    applications having claims that may be or become Essential Patent Claims

21  _____

22  [2] The ITU developed the H.264 Standard jointly with two other SSOs—the International
    Organization for Standardization and the International Electrotechnical Commission.

ORDER- 4

1

2

3

4

5

> (as defined in section 6.1 of the IEEE bylaws) for a compliant implementation of the IEEE 802.11 Standards. . . . Motorola offers to license the patents under reasonable and non-discriminatory terms and conditions ("RAND"), including a reasonable royalty of 2.25 % per unit for each 802.11 compliant product, subject to a grant back license under the 802.11 essential patents of Microsoft.  As per Motorola's standard terms, the royalty is calculated based on the price of the end product (e.g, each Xbox 360 product) and not on component software (e.g., Windows Mobile Software).

6   (10/21/10 Offer Ltr. (Dkt. # 79-5) at 2.)  On October 29, 2010, Motorola sent a similar

7   letter offering to license its H.264 SEPs on similar terms.   The letter again offered a

8   royalty rate of 2.25 % of the end product price:

9

10

11

12

13

> Motorola offers to license the patents on a non-discriminatory basis on reasonable terms and conditions ("RAND"), including a reasonable royalty, of 2.25 % per unit for each H.264 compliant product, subject to a grant back license under the H.264 patents of Microsoft, and subject to any Motorola commitments made to JVT in connection with an approved H.264 recommendation.   As per Motorola's standard terms, the royalty is calculated based on the price of the end product (e.g., each Xbox 360 product, each PC/laptop, each smartphone, etc.) and not on component software (e.g., Xbox 360 system software, Windows 7 software, Windows Phone 7 software, etc.).

14   (10/29/10 Offer Ltr. (Dkt. # 79-6) at 2.)

15

16        Eleven days later, on November 9, 2010, Microsoft initiated this breach of

contract action against Motorola based on Motorola's two offer letters, claiming that the

17   letters breached Motorola's RAND commitments to the IEEE and the ITU.  In a previous

18   order, the court held that these RAND commitments create enforceable contracts between

19   Motorola and the respective SSO. (2/27/12 Order (Dkt. # 188).)  The court has also held

20   that Microsoft—as a standard-user—can enforce these contracts as a third-party

21   beneficiary. (*See id.*)  In a separate prior order, the court interpreted Motorola's

22

1  commitments to the ITU and IEEE as requiring initial offers by Motorola to license its

2  SEPs to be made in good faith.  (6/6/12 Order (Dkt. # 335) at 25.)  However, the court

3  has also held that initial offers do not have to be on RAND terms so long as a RAND

4  license eventually issues.  (*Id.*, *see also* 10/10/12 Order (Dkt. # 465).)

5       In November 2012, the court conducted a bench trial to determine a RAND rate

6  and range to assist the finder-of-fact in determining whether or not Motorola had

7  breached its RAND commitments.  On April 19, 2013, the court issued its Findings of

8  Fact and Conclusions of Law ("FFCL") under seal and then issued a public version, with

9  redactions, on April 25, 2013.  (*See* FFCL (Dkt. ## 673 (sealed), 681 (public).)  The

10  court's FFCL set a RAND rate and range for Motorola's 802.11 and H.264 SEP

11  portfolios.  (*See generally id.*)

12       Having issued the FFCL, the next step in the case is a jury trial, scheduled to begin

13  on August 26, 2013, to determine whether Motorola has breached its RAND obligations.

14  According to Microsoft's interrogatory responses, at this trial, Microsoft will contend that

15  Motorola breached its RAND obligations by (1) offering its 802.11 and H.264 patents at

16  a rate that was not RAND; (2) seeking injunctive relief for Microsoft's infringement of

17  Motorola's SEPs; (3) not issuing a patent license to Microsoft's 802.11 chip supplier,

18  Marvell; and (4) Google—Motorola's parent company—not issuing Microsoft a license

19  under the terms of Google's license agreement with a group named MPEG LA.

20  (Microsoft's Rog. Resp. (Dkt. # 733-6) at 23-26.)  In advance of the August 26, 2013,

21  trial, the parties have submitted *Daubert* motions regarding proffered expert testimony.

22

ORDER- 6

1                              **III.   LEGAL STANDARD**

2         Federal Rule of Evidence 702 allows admission of "scientific, technical, or other

3 specialized knowledge" by a qualified expert if it will "help the trier of fact to understand

4 the evidence or to determine a fact in issue."  Expert testimony is admissible pursuant to

5 Rule 702 if it is both relevant and reliable.  *Daubert v. Merrell Dow Pharms., Inc.*, 509

6 U.S. 579, 589 (1993).  A district court's decision to admit expert testimony under

7 *Daubert* in a patent case follows the law of the regional circuit.  *Micro Chem., Inc. v.*

8 *Lextron, Inc.*, 317 F.3d 1387, 1390-91 (Fed. Cir. 2003).  When considering expert

9 testimony offered pursuant to Federal Rule of Evidence 702, the trial court acts as a

10 "gatekeeper" by "making a preliminary determination that the expert's testimony is

11 reliable."  *Elsayed Mukhtar v. Cal. State Univ., Hayward*, 299 F.3d 1053, 1063 (9th Cir.

12 2002); *see Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147-48 (1999); *Gen. Elec. Co.*

13 *v. Joiner*, 522 U.S. 136, 142 (1997); *Daubert*, 509 U.S. at 589-90.  An expert witness

14 may provide opinion testimony if:  (1) the testimony is based upon sufficient facts or

15 data; (2) the testimony is the product of reliable principles and methods; and (3) the

16 expert has reliably applied the principles and methods to the facts of the case.  Fed. R.

17 Evid. 702; *see Sundance, Inc. v. DeMonte Fabricating Ltd.*, 550 F.3d 1356, 1360 (Fed.

18 Cir. 2008).  Under *Daubert*, "a court should consider (1) whether a theory or technique

19 'can be (and has been) tested;' (2) 'whether the theory or technique has been subjected to

20 peer review and publication;' (3) 'the known or potential rate of error;' and (4) whether it

21 is generally accepted in the scientific community.  *Wagner v. Cnty. of Maricopa*, 673

22 F.3d 977, 989 (9th Cir. 2012) (quoting *Daubert*, 509 U.S. at 593-94).

1    The inquiry into admissibility of expert opinion is a "flexible one," where "[s]haky

2    but admissible evidence is to be attacked by cross examination, contrary evidence, and

3    attention to the burden of proof, not exclusion." *Primiano v. Cook*, 598 F.3d 558, 564

4    (9th Cir. 2010) (citing *Daubert*, 509 U.S. at 594, 596). "Under *Daubert*, the district judge

5    is 'a gatekeeper, not a fact finder.' When an expert meets the threshold established by

6    Rule 702 as explained in *Daubert*, the expert may testify and the jury decides how much

7    weight to give that testimony." *Id.* (quoting *United States v. Sandoval-Mendoza*, 472

8    F.3d 645, 654 (9th Cir. 2006)).

## IV.    ANALYSIS

### A.    Motorola's *Daubert* Motions

#### 1.    Todd M. Menenberg

12    Microsoft expert Todd M. Menenberg seeks to (1) testify as to the legal fees,

13    costs, and expenses Microsoft incurred as the result of Motorola's alleged breaches and

14    (2) quantify the costs incurred by Microsoft in connection with the relocation of

15    Microsoft's European, Middle Eastern, and African ("EMEA") distribution facility. (*See*

16    Menenberg Rpt. (Dkt. ## 723-1 (redacted), 734-1 (sealed)).) Motorola moves to exclude

17    Mr. Menenberg's expert testimony on the grounds that: (1) Mr. Menenberg's testimony

18    is based on unreliable methods; (2) Mr. Menenberg's testimony violates the well-

19    established advocate-witness rule; (3) Mr. Menenberg merely "parrots" the data

20    contained in underlying legal invoices and conducts simple arithmetic, and therefore his

21    testimony does not amount to expert testimony. (*See generally* Mot. to Exclude

22    Menenberg; *see generally* Reply in Support of Mot. to Exclude Menenberg (Dkt. # 762).)

1    Motorola also moves the court to exclude Mr. Menenberg from offering opinions at trial

2    not disclosed in his Rule 26 expert report.  (*See generally id.*)  Motorola, however,

3    concedes that it will not object to Mr. Menenberg testifying as a lay witness based on his

4    personal knowledge regarding the data entry and calculations performed in determining

5    Microsoft's costs and legal fees, and that Mr. Menenberg's calculations may properly be

6    introduced through summaries pursuant to Federal Rule of Evidence 1006.  (Reply at 10.)

7        As part of its argument contesting the reliability of Mr. Menenberg's testimony,

8    Motorola focuses on Mr. Menenberg's reliance on an attorney's fees allocation

9    methodology created by Ms. Ellen Robbins, an attorney for Microsoft from the law firm

10   Sidley Austin LLP.  (Mot. to Exclude Menenberg at 10-11.)  Mr. Menenberg relied on

11   Ms. Robbins' methodology in part to calculate the attorney's fees incurred by Microsoft

12   in defending against Motorola's standard essential patent claims.  (*See id.*)  From what

13   the court understands, Ms. Robbins allocated attorney time shown by Sidley Austin

14   invoices based on the proportion of standard essential patents involved in lawsuits before

15   the International Trade Commission, in Germany, and in district courts.  (*See id.*)

16   Although Microsoft claims as damages attorney's fees from five different law firms, Ms.

17   Robbins' allocation methodology was employed on only some (not all) of Sidley Austin's

18   invoices and not on invoices from other law firms claimed as damages.  (*See generally*

19   Menenberg Rpt.)  Prior to the *Daubert* hearings, Microsoft sent the court a letter stating

20   that it would remove from Mr. Menenberg's testimony the attorney's fees calculation

21   based on the allocation methodology employed by Ms. Robbins.  (*See* 7/19/13 Ltr. (Dkt.

22   # 775).)  According to Mr. Menenberg, by removing the fees subject to Ms. Robbins'

1   allocation methodology, Microsoft reduced its claim for recovery of legal fees, costs, and

2   expenses by $3,105,517.00.  (*See id.*)  Thus, the court need not address whether Mr.

3   Menenberg may rely on the fee allocation methodology employed by Ms. Robbins.

4          Despite reducing its claim for fees, costs, and expenses subject to Ms. Robbins'

5   methodology, Microsoft continues to claim other legal fees, costs, and expenses via the

6   testimony of Mr. Menenberg and other Microsoft witnesses.  (*See generally* Menenberg

7   Rpt.)  Indeed, Microsoft claims as damages its fees, costs, and expenses incurred for the

8   four other law firms, as well as the Sidley Austin fees, costs, and expenses not subject to

9   the Robbins' methodology.  (*See generally id.*)  Motorola contends that Mr. Menenberg's

10  testimony calculating the fees, costs, and expenses is not reliable.  Specifically, Motorola

11  argues that because Ms. Robbins compiled the invoices and Microsoft apparently will not

12  call Ms. Robbins to testify at trial, using Mr. Menenberg as a "mouthpiece" for fact

13  testimony that only Ms. Robbins has personal knowledge to provide violates the

14  advocate-witness rule prohibiting an attorney from appearing as both a witness and an

15  advocate.  (*Id.* at 11-12 (citing *United States v. Prantil*, 756 F.2d 759, 764 (9th Cir.

16  1985).)  In response, Microsoft argues that Mr. Menenberg's testimony does not

17  implicate the advocate-witness rule because Ms. Robbins is not likely to be a necessary

18  witness in this case as Mr. Killough will take the place of Ms. Robbins with respect to

19  providing first-hand knowledge of the invoices relied upon by Mr. Menenberg.  (Resp. to

20  Mot. to Exclude Menenberg (Dkt. # 744) at 10-11 (citing *Kelly v. CSE Safeguard Ins.*

21  *Co.*, No. 2:08-cv-00088-KJD-RJJ, 2010 WL 3613872, at *2 (D. Nev. Sept. 8, 2010))

22  (The party invoking the witness-advocate rule bears the burden of showing that an

1    attorney is "likely to be a necessary witness" in the case.); Resp. to Mot. to Exclude

2    Menenberg at 11.)  During oral argument, Microsoft explained that it would further limit

3    Mr. Menenberg's report so that the only invoices relied upon by Mr. Menenberg would

4    be invoices that Mr. Killough could identify as costs, fees, and expenses incurred

5    defending standard essential patent lawsuits brought by Motorola.[3]  In other words,

6    because Mr. Killough can provide all the testimony that Ms. Robbins could have

7    provided, Microsoft claims Ms. Robbins is not a necessary witness.

8           Here, to the extent that Mr. Killough can identify the invoices relied upon by Mr.

9    Mr. Menenberg, the court agrees with Microsoft.  The court has reviewed the deposition

10   of Mr. Killough and finds that he is sufficiently familiar with the methodology employed

11   to allocate legal fees such that Ms. Robbins' testimony is unnecessary for purposes of

12   explaining the methodology.  Indeed, during his deposition Mr. Killough explained the

13   methodology employed and the purpose behind it in detail (Killough Dep. Excerpts (Dkt.

14   # 745-1) at 17-19).

15          Next, Motorola argues that Mr. Menenberg merely "parrots" the data contained in

16   underlying legal invoices and enters that data into a Microsoft Excel template to calculate

---

18   [3] Microsoft has provided an amended expert report of Mr. Menenberg which further
     limits the invoices relied upon by Mr. Menenberg in calculating the legal fees, costs, and
19   expenses incurred by Microsoft in defending against lawsuits brought by Motorola involving
     standard essential patents.  (*See generally* Am. Menenberg Rpt. (Dkt. # 812).)  According to
20   Microsoft, Mr. Killough will have first-hand knowledge of each invoice relied upon by Mr.
     Menenberg in his amended report.  Microsoft has further explained that the invoices relied upon
     by Mr. Menenberg in his amended report are simply a subset of those included in his initial
21   report, and thus, Mr. Menenberg is not offering new opinions.  (*See generally* Wion Decl. (Dkt. #
     817).)  In other words, Mr. Menenberg has limited the scope of his expert testimony.  The court
22   has also ordered additional deposition time of Mr. Menenberg so that the changes of his report
     and the basis for his calculations may be addressed.

ORDER- 11

1    Microsoft's legal costs.  Motorola asserts that beyond this simple data entry, Mr.

2    Menenberg's only examination of the underlying data was to inspect for obvious errors in

3    billing and data entries.  (Reply in Support of Mot. to Exclude Menenberg at 8.)

4    Accordingly, Motorola contends that Mr. Menenberg's testimony does not require

5    specialized knowledge and therefore does not constitute expert testimony.  Microsoft

6    responds that Mr. Menenberg performed a review of the entries and source documents

7    and converted entries from foreign currency to U.S. dollars where necessary.  (Resp. to

8    Mot. to Exclude Menenberg at 6-7.)  Microsoft also contends that an accounting expert

9    may quantify damages based on mathematical calculation even where the calculations

10   involve "an exercise in basic math."  (*Id.* at 5 (citing *WWP, Inc. v. Wounded Warriors*

11   *Family Support, Inc.*, 628 F.3d 1032, 1040 (8th Cir. 2011).)   Finally, Microsoft argues

12   that Mr. Menenberg prepared a series of summary tables to make his calculations and

13   conclusions more readily understandable to the trier of fact.  (*Id.* at 6-7.)

14          The court agrees with Microsoft.  Under Federal Rule of Evidence 702, an expert

15   must explain the methodology and principles supporting the opinion and the opinion must

16   amount to "more than a 'bottom line.'"  *See Minix v. Canarecci*, 597 F.3d 824, 835 (7th

17   Cir. 2010).  There is not, however, an implicit requirement in Federal Rule of Evidence

18   702 that the proffered expert make complicated mathematical calculations.  *Wounded*

19   *Warriors*, 628 F.3d at 1040 (citing *In re Prempro Prods. Liab. Litig.*, 514 F.3d 825, 831

20   (8th Cir. 2008) (holding that district court did not abuse its discretion in failing to exclude

21   expert testimony that represented "an exercise in basic math using simple deductive

22   reasoning").  Mr. Menenberg's testimony meets this standard.  Aside from simple data

ORDER- 12

1    entry of information contained in legal invoices, Mr. Menenberg explained at his

2    deposition that his team read and reviewed the invoices for accuracy and discussed

3    potential errors with Microsoft counsel so that they could be corrected.  (Menenberg Dep.

4    Excerpts 2 (Dkt. # 745-1) at 6, 8.)  Mr. Menenberg also worked to express the summaries

5    of the legal invoices in different ways and ensure accuracy on that end.  (*Id.* at 4.)  With

6    respect to the relocation costs of the EMEA distribution center that Microsoft seeks, Mr.

7    Menenberg does even more by including numerous discussions with counsel about

8    specific elements of cost likely included in such a move.  (*Id.* at 11.)  Thus, although Mr.

9    Menenberg generally stated that his role was to "compile the costs and do the math"

10   (Menenberg Dep. Excerpts 1 (Dkt. # 723-2) at 47), it is clear that he did more than that

11   and that what he did required accounting expertise.  Under the relevant case law, the

12   court concludes that Mr. Menenberg's testimony meets the standard for expert testimony.

13   *See Quad/Graphics, Inc. v. One2One Commc'ns, LLC*, 09-CV-99-JPS, 2011 WL

14   4478440, at *3 (E.D. Wis. Sept. 23, 2011) (admitting expert testimony where accountant

15   "reviewed underlying documents for mathematical accuracy, traced information to other

16   documents including cost-sharing spreadsheets and invoices, and went over the materials

17   with [client] officials"); *see also Wounded Warriors*, 628 F.3d at 1040.

18        Motorola also contends that Mr. Menenberg's testimony related to Microsoft's

19   relocation costs is unhelpful to the jury because Mr. Menenberg only opined as to the

20   total legal costs and relocation costs and did not calculate such costs as related to each

21   specific Microsoft breach of contract claim.  (Mot. to Exclude Menenberg at 10; Reply in

22   Support of Mot. to Exclude Menenberg at 10-11.)  The court disagrees and concludes that

1   this attack on Mr. Menenberg's testimony goes to weight and not admissibility. *See*

2   *Primrose Operating Co. v. Nat'l Am. Ins. Co.*, 382 F.3d 546, 562 (5th Cir. 2004) (holding

3   that allegations that the data relied on by an attorney's fees expert did not clearly

4   demarcate fees attributable to a specific defendant were not grounds for exclusion, but

5   were for the jury to consider).  Here, the question is whether Mr. Menenberg's testimony

6   will be helpful to the jury, and the court finds that it will be.  Certainly, Motorola may

7   cross-examine Mr. Menenberg's conclusions and the court is confident the jury will

8   understand that different breach theories may result in differing amounts in damage

9   awards.

10          Finally, Motorola also asks that Mr. Menenberg be precluded from offering an

11   opinion not disclosed in his report:  whether Motorola's alleged conducted caused

12   Microsoft to relocate the EMEA distribution facility.[4]  (Mot. to Exclude Menenberg at

13   12-13.)  This topic was not disclosed in Mr. Menenberg's report (*see generally*

14   Menenberg Rpt.), and the court further finds that Mr. Menenberg, as an accountant, has

15   not demonstrated a reliable basis in knowledge or experience to offer an opinion as to a

16   legal fee counting methodology utilized in the legal community or as to legal causation.

17   *Daubert*, 509 U.S. at 592; s*ee also Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*, 259

18

19   _____

20          [4] Motorola's motion to exclude Mr. Menenberg also asks that Mr. Menenberg be
     precluded from offering testimony regarding whether the methodology used to allocate the work
21   performed by Sidley was reliable.  (Mot. to Exclude Menenberg at 12-13.)  It is the court's
     understanding that Mr. Menenberg will offer no testimony related in any way to the fee
22   allocation methodology used by Ms. Robbins.  (*See generally* Am. Menenberg Rpt.)  The court
     thus need not issue a ruling as to whether Mr. Menenberg may offer such testimony.

1    F.3d 1101, 1106 (9th Cir. 2001); *United States v. Hankey*, 203 F.3d 1160, 1168 (9th Cir.

2    2000).

3          **2.     Dr. Theo Bodewig**

4          Motorola moves to exclude Dr. Theo Bodewig's testimony regarding (1)

5    statements the European Commission made about the Orange Book procedure and a

6    request for clarification made by the Düsseldorf court to the European Court of Justice on

7    the grounds that such testimony is irrelevant under *Daubert* and Federal Rule of Civil

8    Procedure 403.  (*See generally* Mot. to Exclude Bodewig.)  Motorola also moves to

9    exclude Dr. Bodewig's opinions regarding (2) whether Microsoft was a willing licensee;

10   (3) why Microsoft moved its EMEA distribution facility from Germany to the

11   Netherlands; and (4) the potential effects of this court's anti-suit injunction.  (*See*

12   *generally id.*)

13         It is the court's understanding that one of Microsoft's breach of contract claims is

14   that it incurred damages from being forced to move its EMEA distribution facility as the

15   result of Motorola's German patent infringement suit in the Mannheim court which

16   resulted in a finding of infringement and the issuance of an injunction in May 2012.  (*See*

17   *generally id.* at 2-7.)  In response to this claim, Motorola intends to introduce testimony

18   of a German law expert, Dr. Maximilian Haedicke (*see infra* § IV.B.3), who will explain

19   that Microsoft could have used a procedure under German law referred to as the Orange

20   Book (or Section 315) procedure to have avoided the injunction issued by the Mannheim

21   court, thereby mitigating Microsoft's damages.   (Mot. to Exclude Bodewig at 2-9.)

22   Microsoft seeks to rebut this theory through its expert Dr. Bodewig, who will testify that

1   (1) the Orange Book does not provide a settled and predictable procedure to avoid an

2   injunction on a standard-essential patent; (2) the Orange Book procedure would not have

3   produced a RAND royalty rate; and (3) enforcement of an injunction in Germany is not a

4   burdensome procedure for patent holders like Motorola.  (*See* Bodewig Rpt. (Dkt. # 732-

5   6) at 5-6.)

6          Motorola argues that Dr. Bodewig's testimony regarding statements by the

7   European Commission and the Düsseldorf court's request for clarification is irrelevant

8   because the statements and request are not final positions and were made after the

9   Mannheim court found Microsoft infringed Motorola's patents and issued an injunction,

10  and thus have no bearing to Microsoft's options at that time.  (Mot. to Exclude Bodewig

11  at 8-9.)  Specifically, Dr. Bodewig discusses statements made in a press release and a

12  question-and-answer sheet from the European Commission on December 21, 2012, and

13  May 6, 2013, respectively.  (Bodewig Rpt. ¶¶ 40-43, 47-52.)  The December 21, 2012,

14  press release involved Apple and Samsung and the ETSI SSO, and the European

15  Commission stated that its preliminary view, limited to the circumstances of the case,

16  was that given a FRAND commitment and a willing licensee, recourse to injunctions

17  harms competition.  (*See* 12/21/12 Press Release (Dkt. # 732-8).)   Similarly, in the May

18  6, 2013, press release involving Motorola and Apple, the European Commission stated

19  that its preliminary view was that given a FRAND Commitment and the agreement of

20  Apple to accept a binding determining of FRAND terms by a third party, recourse to

21  injunctions harms competition.  (*See* 5/6/13 Press Release (Dkt. # 732-9).)  Dr. Bodewig

22  also discusses questions submitted by the Düsseldorf district court to the European Court

ORDER- 16

1   of Justice on March 21, 2013 relating to the use of the Orange Book procedure for SEPs

2   involving FRAND commitments.  (Bodewig Rpt. ¶¶ 44-46.)  Motorola seeks to preclude

3   Dr. Bodewig from testifying to and relying upon these statements in support of his

4   opinion that the Orange Book does not provide a settled and predictable procedure to

5   avoid an injunction.  (Mot. to Exclude Bodewig at 8-9.)

6        Microsoft responds that Dr. Bodewig's rebuttal report—which includes the

7   argument that the outcome of Orange Book proceedings would have been highly

8   uncertain—is corroborated by the statements of the European Commission and the

9   Düsseldorf court, and is therefore relevant.  (Resp. to Mot. to Exclude Bodewig (Dkt.

10  # 747) at 5-9.)  Microsoft also argues that Motorola's expert Dr. Haedicke admitted that

11  the Orange Book procedure was in flux from July 2011 onward, prior to the issuance of

12  any injunction in Germany, and the statements by the European Commission and the

13  Düsseldorf court illustrate the evolution of the Orange Book procedure over time.  (*Id.* at

14  8.)

15       Under Federal Rule of Evidence 702, evidence or testimony from an expert must

16  be relevant.  *Daubert*, 509 U.S. at 591 ("Expert testimony which does not relate to any

17  issue in the case is not relevant and, ergo, not helpful.").  To be relevant, the evidence

18  must assist the trier of fact to understand or determine a fact in issue.  *Id.* at 592.  Here,

19  Motorola contends that, instead of moving its EMEA distribution facilities out of

20  Germany because of the threat of a looming German injunction, Microsoft could have

21  taken an alternative, mitigating course of action and employed the German Orange Book

22  procedure, which (according to at least Motorola's expert) would have worked to remove

1   the threat of an injunction.  Thus, the relevant questions are what options were available

2   to Microsoft and how viable were those options at the time it chose to move its EMEA

3   distribution facility from Germany to the Netherlands in March 2012.

4          Under this rubric, the court concludes that Dr. Bodewig's testimony regarding

5   statements of the European Commission and the Düsseldorf court are irrelevant to the

6   viability of mitigations courses that Microsoft could have taken, but did not.  Microsoft's

7   argument that the law surrounding the Orange Book procedure was evolving at the time

8   Microsoft made the decision to move its EMEA facility does not persuade the court.

9   Microsoft has not shown, and Dr. Bodewig does not testify, that Microsoft understood the

10  changes in the law and believed at the time it made its decision to relocate that the

11  German Orange Book procedure would face the possible scrutiny relevant to the

12  statements by the European Commission and the Düsseldorf court.  Monday morning

13  quarterbacking is an easy job, but decisions by companies are certainly made in real time

14  and on circumstances that existed at that time.  To say ex post that a decision made was

15  actually a good one is irrelevant to the factors that went into the decision, unless the ex

16  post events were evaluated prior to the actual decision.  Accordingly, the court grants

17  Motorola's motion as to Dr. Bodewig's testimony regarding the statements of the

18  European Commission and the Düsseldorf court.

19          Motorola also seeks to exclude Dr. Bodewig's testimony about (1) why Microsoft

20  chose to relocate its distribution facility; (2) the potential effects of this court's anti-suit

21  injunction; and (3) whether Microsoft is a willing licensee.  (*See* Mot. to Exclude

22  Bodewig at 9-10.)  The court has examined Dr. Bodewig's expert report and cannot find

1  any instance where Dr. Bodewig offers an expert opinion as to *why* Microsoft chose to

2  relocate its distribution facility.  Instead, Dr. Bodewig simply explains that based on the

3  Mannheim court's schedule, there would not have been sufficient time for Microsoft to

4  await a decision before relocating the facility.  (Bodewig Rpt. ¶¶ 108-12.)  Motorola does

5  not challenge Dr. Bodewig's qualifications as an expert of German law, and therefore,

6  Dr. Bodewig is certainly qualified to testify as to the timing of the court's schedule and

7  compare it to facts concerning Microsoft's EMEA facility relocation that he has learned

8  from counsel.  (*Id.* ¶¶ 110-11); *Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134,

9  1142 (9th Cir. 1997) ("The fact that [an expert's] opinions are based on data collected by

10 others is immaterial.").  Accordingly, the court denies Motorola's motion as to Dr.

11 Bodewig's testimony about why Microsoft chose to relocate its EMEA facility.  Indeed,

12 Dr. Bodewig offers no such opinion in his report.

13        Similarly, Dr. Bodewig's testimony about the potential effects of this court's anti-

14 suit injunction on Microsoft's decision to relocate its EMEA facility is proper.  Dr.

15 Bodewig properly relied on the underlying record of this case, his knowledge of German

16 legal procedures, and his general legal background to opine that Microsoft had to move

17 its facility prior to this court's anti-suit injunction ruling.  (Bodewig Rpt. ¶ 112.)  Dr.

18 Bodewig further opined that if Motorola had been successful in appealing this court's

19 anti-suit injunction, Microsoft would have again been subject to the Mannheim court's

20 injunction.  This opinion is clearly relevant to Microsoft's decision not to pursue

21 alternative Orange Book procedures in Germany, but instead to move its relocation

22 facility.  Moreover, this opinion is properly within Dr. Bodewig's knowledge as an expert

1    on German law and provides information that will assist the trier of fact in understanding

2    the legal framework surrounding Microsoft's decision to relocate.  *Elsayed Mukhtar*, 299

3    F.3d at 1065 n.9 (To be helpful to the jury, expert testimony must address an issue

4    "beyond the common knowledge of the average layman.").  Accordingly, the court denies

5    Motorola's motion as to Dr. Bodewig's testimony as to the effect of this court's anti-suit

6    injunction on Microsoft's decision to relocate its EMEA facility.

7        Dr. Bodewig's testimony as to whether Microsoft is a willing licensee under the

8    European Commission's recent statements regarding the availability of injunctive relief

9    in the context of a RAND commitment is a different story.  As the court has already

10   excluded the European Commission's recent statements as irrelevant, an opinion as to

11   whether Microsoft fits under the European Commission's definition of a willing licensee

12   is likewise irrelevant.  Accordingly, the court grants Motorola's motion as to Dr.

13   Bodewig's testimony that Microsoft is a willing licensee.

14   **B.    Microsoft's *Daubert* Motions**

15       **1.    Bradley Keller**

16       Bradley Keller seeks to testify about damages, and specifically about whether the

17   attorney's fees Microsoft claims as damages are reasonable.  (*See generally* Keller Rpt.

18   (Dkt. ## 725-11 (redacted), 726-4 (sealed)).)  Mr. Keller is the managing partner of a

19   Seattle law firm.  (*Id.* ¶ 2.)  He seeks to testify that (1) no attorney's fees should be

20   awarded because Microsoft did not adequately track its fees and segregate claimed fees

21   from unclaimed fees and employed an after-the-fact methodology for doing so that is

22   unreliable, unverifiable, and speculative; (2) to the extent attorney's fees are awarded as

ORDER- 20

1   damages, they should be awarded at Seattle billing rates because Microsoft could have

2   retained Seattle attorneys (who charge less than the Chicago attorneys it did retain)

3   consistent with its obligation to mitigate damages; and (3) Microsoft incurred significant

4   unnecessary legal fees due to how the cases in question were staffed.  (*Id.* ¶ 5.)

5       Microsoft moves to exclude Mr. Keller's testimony in its entirety, making three

6   primary arguments.  (Microsoft Mot. to Exclude at 22-29.)   First, Microsoft argues that

7   Mr. Keller should be excluded from testifying because he is not qualified as an expert and

8   his opinions are not based on sufficient facts and data to meet the *Daubert* threshold.  (*Id.*

9   at 22-26.)  In this regard, Microsoft argues that Mr. Keller is unqualified because he has

10   no experience with SEP litigation, no technical training, and has never appeared before

11   the International Trade Commission ("ITC").  (*Id.* at 23-24.)  This is beside the point.

12   Mr. Keller will not testify about SEP litigation or the ITC.  He will testify about fees.

13   Mr. Keller has substantial experience with fees—a point Microsoft does not dispute.  (*See*

14   Keller Rpt. ¶ 2; Keller Dep. Excerpts (Dkt. ## 725-10, 726-3 (sealed)) at 8.)  Microsoft

15   correct that in order for Mr. Keller's opinion to be admissible, there must be a foundation

16   for his knowledge about fees generally, and in particular about fees that would be

17   charged in SEP and ITC litigation.  However, it is not necessary that he himself have

18   experience in these fields—only that he establish a foundation to testify about the fees

19   charged in those fields.  There is sufficient evidence in the record to satisfy the court, in

20   its *Daubert* gatekeeping capacity, that Mr. Keller is qualified to testify on these topics.

21   (*See, e.g.*, Keller Dep. Excerpts (Dkt. # 725-10) at 5, 8, 9.)  Certainly, at trial, Microsoft

22   may object to testimonial foundation and may voir dire Mr. Keller regarding his personal

1    knowledge of certain topics in accordance with ordinary court procedures.  But the court

2    concludes that Microsoft's argument is insufficient to exclude Mr. Keller's testimony

3    entirely on a *Daubert* motion.[5]

4         Along these same lines, Microsoft makes several arguments that Mr. Keller's

5    opinions should be excluded because they do not have adequate factual support.

6    (Microsoft Mot. to Exclude at 22-25.)  Microsoft argues that Motorola "failed to provide

7    [Mr.] Keller with even the most basic information regarding the procedural history of

8    these cases, the specific work required, or the time frame in which the work had to be

9    completed." (*Id.* at 23; *see also id.* at 26.)  The record refutes this argument.  Mr.

10   Keller's deposition reveals that he has substantial familiarity with this case and has

11   discussed it with several attorneys including Mr. Palumbo and Ms. Roberts.  (*See, e.g.*,

12   Keller Dep. Excerpts (Dkt. # 726-3 (sealed)) at 8-10.)  Mr. Keller received a "high

13   altitude overview" of the ITC proceeding from several more attorneys (*id.* at 13) and also

14   reviewed numerous billing records in the case (*see id.* at 14-16).  The record also

15   indicates that Mr. Keller is familiar with the proceedings in front of this court.  (*Id.* at 17.)

16   Based on all of this, the court has no trouble rejecting Microsoft's argument that Mr.

17   Keller's opinions do not cross the *Daubert* threshold because they are not supported by

18   sufficient facts and data.[6]

19

20        [5] In addition, as Motorola points out, to the extent a problem exists, it is at least partly
21   one of Microsoft's own making.  (Motorola Resp. at 25.)  Microsoft did not segregate its billing
     records into different jurisdictions and forums and therefore can hardly be heard to complain that
22   Mr. Keller does not break down his expert testimony into those categories either.

ORDER- 22

1   Microsoft's second primary argument is that much of Mr. Keller's testimony

2   should be excluded because it consists of legal conclusions.  (Microsoft Mot. to Exclude

3   at 27.)  The court agrees in part.  An expert is not permitted to testify about legal

4   conclusions because the law is the province of the court.  *Crow Tribe of Indians v.*

5   *Racicot*, 87 F.3d 1039, 1045 (9th Cir. 1996) ("Experts 'interpret and analyze factual

6   evidence.  They do not testify about the law.'").  The judge's expert knowledge of the

7   law makes any such testimony at best cumulative and at worst prejudicial.  *Nieves-*

8   *Villanueva v. Soto-Rivera*, 133 F.3d 92, 99 (1st Cir. 1997).  Microsoft argues that Mr.

9   Keller should not be permitted to testify about whether, as a legal matter, attorney's fees

10  are recoverable as damages in this action.  (Microsoft Mot. to Exclude at 27-28.)

11  Motorola agrees (*see* Motorola Resp. (Dkt. # 749) at 26), and so does the court.  This

12  testimony is excluded.  Microsoft similarly argues that Mr. Keller should not be

13  permitted to offer his opinions about the "American Rule" that parties generally pay their

14  own attorney's fees.  (Motorola Reply (Dkt. # 766) at 15.)  The court agrees that this

15  would constitute a legal opinion and would invade the province of the court.  The same is

16

17       [6] Microsoft makes several related arguments that the court also rejects.  Microsoft argues
         that Mr. Keller's expert report does not take into account the fact that specialized attorneys were
18       assigned to this matter whose rates are higher than non-specialized attorneys.  (Microsoft Mot. to
         Exclude at 22.)  This is wrong.  Mr. Keller's methodology uses the rates of the highest-paid local
19       attorneys, some of whom are specialized and practice before the ITC, and takes specialization
         into account.  (*See* Keller Rpt. ¶ 14, 15; *id.* at 24.)  Microsoft also argues that Mr. Keller did not
20       consider outside authority on rates in other jurisdictions and did not properly consider certain
         factors set forth by the American Bar Association.  (Microsoft Mot. to Exclude at 24-25.)  These
21       arguments (even more so than the rest of Microsoft's arguments) do not cast serious doubt on
         Mr. Keller's methodology and are emphatically more appropriate for cross examination than for
22       a *Daubert* motion.  The court rejects these arguments as insufficient to exclude Mr. Keller under
         *Daubert*.

ORDER- 23

1 true of several other legal opinions that appear in Mr. Keller's expert report, and

2 accordingly, the court excludes the first sentence of ¶ 5b, the last sentence of ¶ 5c, the

3 first and fourth sentences of ¶ 6, the last second to last sentence of ¶ 9, and the fifth and

4 sixth sentences of ¶ 13.[7]  The court also excludes Motorola's proffered testimony by Mr.

5 Keller with respect to causation (*see, e.g.*, Keller Rpt. ¶ 5a) because, although causation is

6 a factual question and may be an appropriate subject for expert testimony, *see Nielson v.*

7 *Armstrong Rubber Co.*, 570 F.2d 272, 276-77 (8th Cir. 1978), Mr. Keller is not qualified

8 to testify as an expert on causation in this case.

9        Finally, Microsoft argues that Mr. Keller's testimony should be excluded because

10 it would not be helpful to the jury, asserting that "[t]he fact that attorney billing rates are

11 generally higher in larger markets is well-known and hardly the proper subject of expert

12 testimony."  (Microsoft Mot. to Exclude at 26-27.)  Rule 702 requires that expert

13 testimony "help the trier of fact to understand the evidence or to determine a fact in

14 issue."  Fed. R. Evid. 702.  To be helpful to the jury, expert testimony must address an

15 issue "beyond the common knowledge of the average layman."  *Elsayed Mukhtar*, 299

16 F.3d at 1065 n.9.  In the Ninth Circuit, courts sometimes address this question in terms of

17 whether the jury will receive "appreciable help" from the testimony.  *E.g.*, *Little Oil Co.*

18 *v. Atlantic Richfield Co.*, 852 F.2d 441, 446 (9th Cir. 1988); *Tubar v. Clift*, No. C05-

19 1154-JCC, 2009 WL 1325952, at *3 (W.D. Wash. May 12, 2009).  The court concludes

20

21        [7] Motorola sent a letter to the court the day following the *Daubert* hearing indicating that
22 it would not seek to introduce the final sentence of paragraph 5a and the final sentence of
paragraph 9 from Mr. Keller's report.  (7/31/13 Ltr. (Dkt. # 810) at 4.)

ORDER- 24

1   that Mr. Keller's testimony would be helpful to the jury because the average layman is

2   not familiar with the billing practices of attorneys, let alone the billing practices of

3   attorneys across different legal markets.  *See Elsayed Mukhtar*, 299 F.3d at 1065 n.9.

4   This is not part of the "common knowledge" of the average person, and the jury will

5   receive "appreciable help" from hearing Mr. Keller's expert opinion.  *See id.*; *see also*

6   *Little Oil*, 852 F.2d at 446.  The court rejects Microsoft's argument to the contrary.

7          Last, the court points out that Microsoft does not directly challenge the majority of

8   Mr. Keller's proposed testimony.  The bulk of Mr. Keller's expert report is dedicated to

9   explaining how, in Mr. Keller's opinion, Microsoft did not do an adequate job of

10  contemporaneously identifying and segregating attorneys' fees as consequential damages

11  (Keller Rpt. ¶¶ 6-8), and to his opinion that Microsoft's after-the-fact method for doing

12  so is unreliable and speculative (*Id.* ¶¶ 9-12.)  Microsoft does not challenge this

13  testimony.  (*See* Microsoft Mot. to Exclude at 22-29; Microsoft Reply at 13-15.)  In light

14  of this fact, Microsoft's request that the court exclude Mr. Keller's testimony in its

15  entirety is not well taken.

16          **2.      Richard J. Holleman and Dr. Gregory Leonard**

17          Microsoft seeks to exclude the testimony of Richard Holleman and Gregory

18  Leonard on the grounds that their proffered testimony (1) contradicts this court's prior

19  legal rulings pertaining to the duties and obligations of the parties under the RAND

20  commitment; and (2) impermissibly seeks to offer legal conclusions regarding the

21  meaning of the RAND commitment that should be only within the province of the court.

22  (Microsoft Mot. to Exclude at 9-17.)  Additionally, Microsoft argues that neither Mr.

1  Holleman nor Dr. Leonard should be able to testify as to whether Motorola acted in good

2  faith or breached its RAND commitments.  (*Id.*)

3      An expert witness may testify about ultimate issues of fact, but not ultimate issues

4  of law.  Fed. R. Evid. 704(a); *Nationwide Transp. Fin. v. Cass Info Sys., Inc.*, 523 F.3d

5  1051, 1058 (9th Cir. 2008).  It is clear that under Federal Rule of Evidence 704(a), expert

6  testimony that is "otherwise admissible is not objectionable because it embraces an

7  ultimate issue to be decided by the trier of fact."  Fed. R. Evid. 704(a).  However, it is

8  equally clear that an expert witness "cannot give an opinion as to her legal conclusion—

9  i.e., an opinion on an ultimate issue of law."  *Nationwide*, 523 F.3d at 1058.  That is

10 because legal conclusions are the province of the court.  *Crow Tribe of Indians*, 87 F.3d

11 at 1045 ("Experts 'interpret and analyze factual evidence.  They do not testify about the

12 law.'").  The judge's expert knowledge of the law makes any such testimony at best

13 cumulative and at worst prejudicial.  *Nieves-Villanueva*, 133 F.3d at 99.

14      "Despite the apparent clarity of Rule 704, courts interpreting it often struggle in

15 attempting to characterize challenged testimony as either admissible factual opinions or

16 inadmissible legal conclusions."  *Haney v. Mizell Memorial Hosp.*, 744 F.2d 1467, 1473

17 (11th Cir. 1984); *Burkhart v. Wash. Metro. Area Transit Auth.*, 112 F.3d 1207, 1212

18 (D.C. Cir. 1997) ("[T]he line between an inadmissible legal conclusion and admissible

19 assistance to the trier of fact . . . is not always bright.")  It is well accepted that an expert

20 witness may always testify to facts and opinions that, if found, would allow the trier of

21 fact to reach its own conclusion on an ultimate issue of fact.  *Burkhart*, 112 F.3d at 1212-

22 13.  It is a more nuanced question whether the expert is permitted to directly express an

1   opinion on that ultimate issue—for example, to offer an opinion about whether the

2   defendant "caused" an accident, *see Nielson*, 570 F.2d at 276-77, was "reckless," *see*

3   *Davis v. Mason Cty.*, 927 F.2d 1473, 1484-86 (9th Cir. 1991) or, as is relevant here,

4   whether the defendant acted in "good faith."

5          The touchstone of this inquiry is whether the expert's testimony on an ultimate

6   issue of fact will be helpful to the jury.  *See, e.g.*, *Strong v. E.I. DuPont de Nemours Co.,*

7   *Inc.*, 667 F.2d 682, 685-86 (8th Cir. 1981).  Where the jury is in as good a position as the

8   expert to draw conclusions from the evidence, and is capable of drawing its own

9   inferences, the expert's ultimate issue testimony is not helpful and should be excluded.

10  *See, e.g.*, *id.* (excluding expert testimony about whether a product was "unreasonably

11  dangerous" because jury was capable of drawing its own inferences and conclusions from

12  the evidence); *United States v. Duncan*, 42 F.3d 97, 101-02 (2d Cir. 1994).  On the other

13  hand, in a more complicated case or a case dealing with a concept less familiar to

14  ordinary jurors, expert testimony on an ultimate issue may be useful for "guiding the trier

15  of fact through a complicated morass of obscure terms and concepts."  *Duncan*, 42 F.3d

16  at 101.  Thus, where it would be helpful, experts are permitted to testify on ultimate fact

17  issues such as whether police officers used "excessive force," *see Champion v. Outlook*

18  *Nashville, Inc.*, 380 F.3d 893, 908-09 (6th Cir. 2004), whether a complex manufacturing

19  process "caused" a product defect, *see Nielson*, 570 F.2d at 276-77, or whether a sheriff's

20  failure to adequately train his deputies was "reckless," *see Davis*, 927 F.2d at 1484-86.

21         Several other principles are clear from the case law as well.  First, courts generally

22  exclude expert testimony that attempts to define the applicable legal standard or the law

ORDER- 27

1  governing the case.  *Burkhart*, 112 F.3d at 1212.  By implication, courts also exclude any

2  testimony regarding a legal standard that will appear in the court's instructions to the

3  jury.  *E.g.*, *United States v. Caputo*, 382 F. Supp. 2d 1045, 1053 (N.D. Ill. 2005) ("Instead

4  of giving expert legal opinions, [the parties] can refer to the jury instructions to explain

5  the necessary legal principles.")  On the other hand, courts may permit experts to use

6  legal terminology in expressing their opinions, particularly where it would advance the

7  jury's understanding of the case.  *Nationwide*, 523 F.3d at 1059 (citing *Hangarter v.*

8  *Provident Life & Accident Ins. Co.*, 373 F.3d 998, 1017 (9th Cir. 2004)).  Last, evidence

9  that merely tells the jury what result to reach is inadmissible if witnesses are in no better

10  position than the jury to draw legal conclusions from the evidence presented at trial.  *Id.*

11  at 1060; *Duncan*, 42 F.3d at 102.  Again, the touchstone in making this determination is

12  whether the opinion offered would be helpful to the trier of fact.  *See Duncan*, 42 F.3d at

13  101-02.  With this legal framework in mind, the court examines Mr. Holleman's and Dr.

14  Leonard's proffered testimony.

15          **a.**       **Richard Holleman's Contested Testimony**

16         Mr. Holleman seeks to testify, based on his more than 30 years of experience

17  working with and in SSOs, about the obligations of patent holders and implementers

18  under the RAND commitment, the duties and obligations of patent holders and

19  implementers as contemplated by the ITU and IEEE policies, the language of the ITU

20  and IEEE polices, and the actions of Microsoft and Motorola at issue in this lawsuit.  (*See*

21  Holleman Rpt. (Dkt. # 725-1) at 6-7 (summarizing Holleman's opinions).)  Microsoft

22  objects to a litany of Mr. Holleman's opinions.  At oral argument, in response to

1    Microsoft's motion, Motorola's counsel informed the court that it would be withdrawing

2    certain proffered opinions of Mr. Holleman and would focus his testimony on the custom

3    and practice in the SSOs.  The day after oral argument, Motorola filed a letter with the

4    court offering "clarifications" regarding the opinions it would solicit from Mr. Holleman

5    at trial.  (7/31/13 Ltr.)   Instead of merely withdrawing certain testimony of Mr.

6    Holleman, Motorola's letter both struck and added to the testimony Motorola seeks to

7    elicit from Mr. Holleman.  (*See generally id.*)  For example, Motorola modified the sixth

8    bullet point from Mr. Holleman's expert report as follows:  "If negotiations fail to result

9    in a license agreement, **the ITU and IEEE do** ~~this does~~ not preclude the essential patent-

10   holder from seeking to enforce its essential patents, or from seeking any remedies

11   available to it under the patent laws, including injunctive relief **if appropriate under**

12   **applicable law.**"  (*Compare* 7/31/13 Ltr. *with* Holleman Rpt. ¶ 15 (bolding denotes

13   Motorola modifications and strikethrough denotes Motorola withdrawals).)

14         Generally, the modifications of Mr. Holleman's report offered by Motorola in its

15   post-*Daubert* hearing seek to exchange legal conclusions as to the rights and obligations

16   of the parties under a RAND commitment with statements concerning the language and

17   expectations of the ITU and IEEE intellectual property rights policies.  (*See generally*

18   7/31/13 Ltr.; Holleman Rpt.)  As an initial matter, the court STRIKES the new additions

19   to Mr. Holleman's expert report and rebuttal report that go beyond the scope of the

20   opening and rebuttal reports.  It would be profoundly unfair to Microsoft to allow

21   Motorola to amend the substance of Mr. Holleman's expert report beyond the scope of

22   the opening and rebuttal reports after the close of fact discovery, the exchange of opening

1   and rebuttal expert reports, expert discovery, filing of *Daubert* motions, and the *Daubert*

2   hearing.  Permitting such amendment would leave Microsoft without recourse to

3   challenge Mr. Holleman's proffered testimony.  With that said, however, the court has

4   examined the proposed additions to Mr. Holleman's testimony and concludes that they

5   provide only limited expansion in terms of the scope of Mr. Holleman's testimony when

6   compared against Mr. Holleman's opening and rebuttal expert reports.  Thus, as limited

7   below, Mr. Holleman will be allowed to express his opinions concerning the language of

8   the IEEE and the ITU.

9          The court now examines Microsoft's objections to Mr. Holleman's proffered

10   testimony.  Although Motorola has withdrawn much of Mr. Holleman's contested

11   testimony, the court examines Mr. Holleman's testimony as it appeared in his opening

12   and rebuttal reports (prior to Motorola's post-*Daubert* hearing letter modifying Mr.

13   Holleman's testimony) as it was challenged by Microsoft.  There appears to be confusion

14   amongst both parties as to the permissible scope of Mr. Holleman's and other expert

15   witnesses' testimony.  The court's goal in part in addressing Mr. Holleman's report as it

16   existed at the time of the *Daubert* hearing is to provide the parties with clear direction

17   regarding permissible testimony in advance of the upcoming trial.

18          Mr. Holleman seeks to testify to the following statements:

19   -   "The RAND commitment is a commitment by the patent owner to engage in
        good faith bilateral negotiations with all potential licensees to license essential

20

21

22

ORDER- 30

1    IPR [Intellectual Property Rights] on reasonable terms and conditions."[8]
     (Holleman Rpt. ¶ 30.)

2

3    -    "[T]he patent holder fulfills its RAND obligation by being willing to enter into
          good faith negotiations with all potential licensees who wish to negotiate, and
          attempting in good faith to reach a license on RAND terms and conditions in
4         such an agreement."[9]  (Holleman Rpt. ¶ 31.)

5         The court concludes that these statements are paradigm legal conclusions and

6    therefore constitute impermissible testimony by an expert witness.  The court, through its

7    jury instructions, determines the rights and obligations of the parties under the RAND

8    commitment and will convey those rights and obligations to the jury.  Those jury

9    instructions will act as the law of the case and Mr. Holleman or any other witness must be

10   prohibited from opining on the interpretation of the RAND obligation vis-à-vis the rights

11   and obligations of the SEP holder and implementer.  Mr. Holleman's opinions as to these

12   rights and obligations are certainly appropriate in briefing related to proposed jury

13   instructions, but there is little question that statements by an expert witness as to the

14   circumstances under which a patent holder fulfills its RAND obligation is beyond the

15   scope of permissible expert testimony.  Additionally, although Mr. Holleman's testimony

16   in paragraph 31 is prefaced with the statement "[f]rom the SDO's perspective," the court

17   concludes in this instance that the statement that follows leaves the jury with the

18   impression that the SDO's perspective may serve as the governing law and therefore is

19   _____

20        [8] Motorola appears to have withdrawn this proffered testimony of Mr. Holleman.  (*See*
     7/31/13 Ltr. at 2.)

21        [9] Paragraphs 36, 42, 59 of Mr. Holleman's report contain very similar language regarding
22   the patent holder's obligations under the RAND commitment.

1   likely to confuse the jury as to the proper legal framework to apply to the facts.  Indeed,

2   the following statement explicitly opines that by meeting certain circumstances (being

3   willing to enter into good faith negotiations), a SEP patent holder meets its RAND

4   obligations.  Simply put, expert testimony leaving an impression on the fact-finder

5   concerning the duties and obligations pursuant to the RAND commitment is

6   impermissible.  Accordingly, Microsoft's motion is granted as to the above-referenced

7   testimony and any similar testimony.

8          Microsoft also takes issue with Mr. Holleman's proffered testimony regarding the

9   duty of Motorola at the initial offer stage.  Specifically, Mr. Holleman seeks to introduce

10  the following testimony:

11         -   "I understand that Judge Robart has stated that the initial offer to a potential
               licensee does not need to be on RAND terms."  (Holleman Rpt. ¶ 35.)

12
           -   "Thus, because Motorola attempted to engage Microsoft in good faith
13             negotiations for a RAND license . . . its actions are fully consistent with its
               RAND obligations . . . ."  (Holleman Rpt. ¶ 38.)

14
           Although these statements are slightly different from Mr. Holleman's overt

15  statements expounding on the parties' RAND obligations, the court concludes these

16  statements also implicate legal conclusions that are within the province of the court.  The

17  jury instructions in this case are yet to come, and how the court decides to frame those

18  instructions is solely within its discretion.  Mr. Holleman's statements at issue here

19  implicate the law as Mr. Holleman seeks to describe it.  This is improper.  In paragraph

20  38, Mr. Holleman again explains that because certain circumstances are met, Motorola

21  has met its RAND obligations.  As for paragraph 35, although Mr. Holleman attempts to

22

1  couch his testimony as a statement of law from this court, at best, the statement is a half

2  truth in that it leaves the impression that opening offers can be any amount or on any

3  terms, whereas to the contrary, the court has previously held that opening offers must at

4  least be made in good faith.  In this case, the court will issue a jury instruction explaining

5  the obligations of the parties in a RAND context at the initial offer stage.  Mr.

6  Holleman's contested testimony—which assumes the law and the parties' obligations or

7  touches on what the law should be—invades the court's province to instruct the jury on

8  the law.  Accordingly, Microsoft's motion is granted as to the above-referenced

9  testimony and any similar testimony.

10        Microsoft next seeks to preclude Mr. Holleman from introducing the following

11  testimony at trial.

12        -  "There are no RAND provisions in SDO policies requiring a specific range,
            near-zero or nominal royalty rates, a single royalty rate for all situations, a
13          specific royalty format or base, or a particular methodology for determining or
            negotiating to RAND terms.  There similarly are no RAND provisions in SDO
14          policies requiring that an opening offer be a certain rate, form, or relation to the
            final agreed-upon RAND license rate.  And, there are no RAND provisions in
15          SDO policies mandating the steps or analysis that a standard essential patent
            owner must take in formulating an opening offer.  For example, there are no
16          provisions in SDO policies requiring the patent holder to consider royalty
            stacking or patent poll rates in formulating its opening offer."  (Holleman Rpt.
17          ¶ 47.)

18        -  "There is nothing in the ITU or IEEE's written policies requiring that each
            offer made by Motorola at each stage of negotiations, and certainly not at the
19          opening of negotiations, must be RAND, or within a specific RAND range.  As
            noted above, I understand that Judge Robart has additionally clarified that an
20          opening offer need not be within the RAND range."  (Holleman Rpt. ¶ 48.)

21  Compared with one another, Paragraphs 47 and 48 demonstrate the line between proper

22  and improper expert testimony in this case, and the court will thus analyze both

ORDER- 33

1   paragraphs together.  Paragraph 47 is replete with statements to the effect that there are

2   "no RAND provisions in SDO policies" requiring certain action by the SEP owner vis-à-

3   vis licensing.  These statements invade the province of the court to instruct the jury on the

4   law.  There are in fact "provisions" in the policies of the IEEE and ITU that require the

5   SEP owner to act in a certain way when licensing or enforcing its standard essential

6   patents.  In previous orders, the court has interpreted the "provisions" of the ITU and

7   IEEE policies to mean, *inter alia*, that SEP owners must offer SEPs in good faith and

8   must grant RAND licenses.  Were Mr. Holleman to testify that there are no "provisions"

9   in the ITU and IEEE policies requiring SEP owners to make offers in good faith and then

10   have the court instruct the jury that the ITU and IEEE policies require SEP owners to

11   make offers in good faith, the resulting combination of these seemingly conflicting

12   statements would be at best confusing and at worst contradictory from the perspective of

13   the jury.  Said differently, the court concludes that Mr. Holleman's testimony in

14   paragraph 47 leaves the impression on the jury that the law is something other than that

15   provided by the court.  Mr. Holleman is precluded from testifying to the statements in

16   paragraph 47 or any similar statements.

17         Paragraph 48, however, provides a different story.  The first disputed sentence

18   reads:  "There is nothing in the ITU or IEEE's written policies requiring that each offer

19   made by Motorola at each stage of negotiations, and certainly not at the opening of

20   negotiations, must be RAND, or within a specific RAND range."  (Holleman Rpt. ¶ 48.)

21   Although this statement goes too far, it comes close to permissible expert testimony.  The

22   court's concern is with the use of the word "requiring" and the phrase "or within a

1  specific RAND range." As before, the court has interpreted the ITU and IEEE policies to

2  require opening offers to be made in good faith and it would make little sense and invade

3  the province of the court to permit Mr. Holleman to state otherwise. It is true that this

4  statement does not directly contradict the court's prior orders, but that misses the point: it

5  is the province of the court to instruct the jury on the duties and obligations that arise

6  under the ITU and IEEE policies.

7       With that said, Mr. Holleman may properly testify as to the *language* of the ITU

8  and IEEE policies. The court concludes that it will assist the trier of fact for Mr.

9  Holleman, if he so chooses, to state what is and is not included in the ITU and IEEE

10  written policies. Thus, to the extent that Mr. Holleman can confine his testimony to the

11  language of the policies—as opposed to duties and obligations of the patent holder and

12  implementer arising from those policies—his testimony is proper. In other words, the

13  court has no objection to Mr. Holleman stating the language of the ITU and IEEE polices,

14  but Mr. Holleman's testimony cannot leave the impression on the jury that the language

15  of the ITU and IEEE policies do or do not place particular duties and obligations on the

16  parties. The court will trust that the experienced trial attorneys in this case can properly

17  understand and try their respective cases within the legal framework set forth by this

18  court. The court further cautions the parties that testimony elicited from a witness in

19  contravention of the court's legal framework runs the risk of the court striking the

20  entirety of that witness' testimony.

21       As for the second disputed sentence of paragraph 48, the court concludes that this

22  sentence clearly invades the province of the court. The second sentence states: "I

ORDER- 35

1    understand that Judge Robart has additionally clarified that an opening offer need not be

2    within the RAND range." (Holleman Rpt. ¶ 48.)  This statement is an improper recitation

3    of the law; this court has determined that opening offers cannot be blatantly unreasonable

4    and must be made in good faith.  Permitting Mr. Holleman to make statements regarding

5    the law in a manner different than how the court describes the law invades the court's

6    province.  Mr. Holleman is precluded from offering the second sentence and any similar

7    testimony.

8            Microsoft also argues that Mr. Holleman should not be permitted to testify to the

9    effect that RAND licensing commitments do not bar SEP holders from pursuing

10   injunctions.  (Microsoft Mot. to Exclude at 11; *see* Holleman Rpt. ¶¶ 15, 21, 23, 39, 60.)

11   For example, Mr. Holleman testifies:

12           In my experience, RAND commitments made under SDO [standard
             determining organizations] Intellectual Property Rights ("IPR") policies
13           also are not understood to limit the IPR holder's legal rights to enforce its
             patents, in the event good faith RAND negotiations with a potential
14           licensee do not lead to a license agreement, or if the potential licensee
             simply refuses to engage in good faith negotiations.
15

16   (Holleman Rpt. ¶ 21.)  As explained more fully below, the court disagrees with

17   Microsoft.  It is the court's understanding that Microsoft intends to argue at trial that

18   Motorola breached its RAND commitment by seeking injunctive relief on its standard

19   essential patents in Germany and at the ITC.  In other words, Microsoft will argue that

20   Motorola's actions in seeking injunctive relief constitute bad faith.  Motorola then must

21   be able to rebut this contention by arguing that it understood its efforts to seek injunctive

22   relief to be in compliance with the general understanding of the RAND obligations at the

ORDER- 36

time it sought such injunctive relief.  Nevertheless, Mr. Holleman's testimony may be understood by a jury as explaining the rights and obligations of the parties under a RAND commitment with respect to injunctive relief.  This would be improper, as explained above, in that Mr. Holleman cannot testify as to legal conclusions.  Thus, so long as Mr. Holleman makes clear that his testimony is based on his knowledge of what was understood in the legal community, and hence by Motorola, as to Motorola's right to seek injunctive relief in other courts, this testimony is relevant and proper.

Next, Microsoft contests the following statements by Mr. Holleman:

- "Rather than enter into good faith negotiations with Motorola, Microsoft filed this lawsuit against Motorola."  (Holleman Rpt. ¶ 34.)
- "Microsoft filed suit before engaging in any such negotiations with Motorola." (Holleman Rpt. ¶ 37.)

The court has examined both of these statements within the context of Mr. Holleman's expert report and concludes that they are both within the proper scope of expert testimony and will assist the trier of fact.  Unlike Mr. Holleman's statements concerning the rights and obligations of the parties under the RAND commitment, these two statements merely recite factual background relevant to Motorola's intentions in sending the October 21 and 29 offer letters that constitute one of Microsoft's breach of contract claims.  In this case, Microsoft alleges that Motorola's offer letters breached Motorola's RAND commitments. Motorola should certainly be permitted to offer testimony of an expert in the SEP industry about whether such offer letters were in fact sent in good faith and about Microsoft's response to those letters.  Additionally, the court is not persuaded by Microsoft's argument that Mr. Holleman's testimony contained in paragraphs 34 and 37

1   of his report contradicts the court's prior rulings.  As Microsoft correctly points out, the

2   court has previously held that negotiating in good faith is not a condition precedent to

3   Motorola's obligation to grant licenses on RAND terms.  (6/6/12 Order at 18-19.)  Mr.

4   Holleman's statements do not undermine this holding, but instead merely explain the

5   actions of Microsoft and Motorola during the time Motorola sent the offer letters that are

6   now the subject of Microsoft's breach claims.

7       Next, Microsoft contests the following statement in Mr. Holleman's rebuttal

8   expert report that discusses this court's April 19, 2013, Findings of Fact and Conclusions

9   of Law ("FFCL"):

10          I disagree with Dr. Murphy to the extent that he relies upon the Order [the
            FFCL] as a guide for how negotiations over standard-essential patents take
11          place.  The Order relates to a unique set of circumstances.  That is, the
            Court set the RAND rate and ranges between Motorola and Microsoft
12          based upon the information the Court had available to it.  In my opinion
            and experience, such a document does not exist in the SDO process.  The
13          Order, or documents like it, is not part of the bylaws or regulations of the
            IEEE or ITU.  Parties negotiating licenses to standard-essential patents at
14          the time these parties were negotiating would not have had the benefit of
            the Order, or any document similar to it, to guide their negotiations.
15          Therefore, it does not make sense to consider it as a guide to the bilateral
            negotiations that *should have occurred* between these specific parties and
16          the offers Motorola made."

17   (Holleman Rebuttal Rpt. (Dkt. # 725-3) ¶ 4 (emphasis added).)   Microsoft contends that

18   the FFCL are a guide to bilateral negotiations and Mr. Holleman should not be permitted

19   to question the court.  (Microsoft Mot. to Exclude at 12.)

20       The court disagrees.  Again, the question at trial will be:  was Motorola acting in

21   bad faith when it made its initial offer letters to license its standard essential patents?

22   Microsoft contends that those initial offers were made in bad faith; Motorola disagrees.

ORDER- 38

1    Motorola must be able to rebut Microsoft's contention by introducing expert testimony

2    setting forth its understanding of its RAND obligations and duties at the time it sent the

3    offer letters.  Such evidence is relevant to Motorola's intentions in sending the offer

4    letters.  To be sure, the court's FFCL did not exist at the time Motorola sent its offer

5    letters and thus, Motorola would have made those offer letters without the benefit of the

6    court's ruling.  In other words, evidence of Motorola's understanding of how it should

7    conduct a RAND negotiation at the time it sent its offer letters should not be limited to

8    what the court has later determined to be the proper way to conduct a RAND negotiation

9    in this case.  Thus, consistent with the court's prior orders on the *Daubert* motions, the

10   proponent of any expert testimony will need to show that it does not amount to a legal

11   conclusion and will assist the trier of fact in deciding a relevant issue in dispute.

12          Notwithstanding the foregoing, the court notes that it has not yet determined what

13   portions of and the manner in which the court's FFCL will be conveyed to the jury.

14   Insofar as either Mr. Murphy or Mr. Holleman's testimony seeks to instruct the jury on

15   the way to use the FFCL, such testimony may invade the province of the court and

16   constitute a legal conclusion.  Accordingly, the court's ruling here is subject to change as

17   the legal framework of the trial sharpens.

18          Finally, Microsoft argues that Mr. Holleman should be precluded from testifying

19   to the ultimate conclusion that Motorola's offer letters were made in "good faith" and

20   therefore did not breach Motorola's RAND obligation.  First, Microsoft asks the court to

21   exclude the following testimony on the basis that expert testimony should not be

22

ORDER- 39

1    permitted as to the conclusion that a party acted in good faith (Microsoft Mot. to Exclude

2    at 9, 13-14):

3          -    "In October 2010, Motorola offered to license its portfolios of H.264
                and 802.11- essential patents to Microsoft, and expressed a willingness

4               to negotiate in good faith with Microsoft toward reaching a RAND
                license for these patents."  (Holleman Rpt. ¶ 33.)

5
           -    "Motorola's October 2010 letters to Microsoft, which state that
6               Motorola's offer to Microsoft was based on its 'standard terms,'
                represented a good faith attempt to enter into licensing negotiations with

7               Microsoft for a license to Motorola's H.264 and 802.11- essential
                portfolios.  Microsoft filed suit before engaging in any such negotiations

8               with Motorola."  (Holleman Rpt. ¶ 37.)

9          With respect to this testimony, the court disagrees with Microsoft and declines to

10   exclude it.  As stated above, Federal Rule of Evidence 704(a) permits expert testimony

11   that embraces an ultimate issue to be decided by the jury.  Thus, on its face, there is

12   nothing wrong with Mr. Holleman testifying that Motorola's offers were made in good

13   faith.  The question is whether that testimony would be helpful to the jury.  Here, the

14   court concludes that it would be.  This is a complicated case and the jury will be asked to

15   hear, among other things, evidence regarding offer letters of patent portfolios, industry

16   royalty rates and ranges determined by analysis of those patent portfolios, and the legal

17   framework surrounding RAND licensing both domestic and abroad.  Mr. Holleman has

18   extensive experience with SSOs, negotiations in standards consortia and special interest

19   groups, and licensing technology.  (Holleman Rpt. ¶¶ 5-12.)  The court believes that Mr.

20   Holleman's opinion, which pieces together the evidence heard by the jury into an opinion

21   on the issue of good faith, will assist the trier of fact in reaching its own decision on the

22

ORDER- 40

1    issue of good faith.  Accordingly, as to the testimony in paragraphs 33 and 37 of Mr.

2    Holleman's report, the court denies Microsoft's motion.

3         Second, for the same reasons, Microsoft asks the court to exclude the following

4    testimony of Mr. Holleman:

5    -    "Thus, because Motorola attempted to engage Microsoft in good faith
          negotiations for a RAND license to its H.264 and 802.11-essential
6         patents prior to filing of this lawsuit, its actions are fully consistent with
          its RAND obligations under the ITU and IEEE patent policies, even if
7         its opening offers were not within the ranges set in Judge Robart's April
          19, 2013 order."  (Holleman Rpt. ¶ 38.)

8
     -    "Motorola has fully complied with its RAND obligations from the
9         perspective of the SDOs, and has not violated any provision of the SDO
          policies because . . . Motorola's October 2010 letters to Microsoft
10        constituted Motorola's good-faith attempt to engage Microsoft in a
          licensing negotiation."   (Holleman Rpt. ¶ 60.)

11
         Here, the court agrees with Microsoft.  Although the court does not preclude Mr.

12   Holleman from testifying as to the ultimate issue—breach of the good faith obligation—

13   this testimony of Mr. Holleman goes too far in that it intertwines a legal conclusion as to

14   Motorola's RAND obligations with Mr. Holleman's opinion on the legal meaning of

15   good faith.  With this specific testimony, there is no way to separate Mr. Holleman's

16   legal conclusion that Motorola's RAND obligation requires only an "attempt[] to engage

17   Microsoft in good faith negotiations" from his opinion on the ultimate issue that

18   Motorola met its RAND obligations in this case.  As stated before, the legal conclusion as

19   to the parties' RAND obligations and duties is solely within the province of the court.

20   Accordingly, the court grants Microsoft's motion as to this specific testimony.

21   //

22

1          **b.      Dr. Leonard's Contested Testimony**

2          Dr. Leonard is an economist with extensive experience in the economics of

3    intellectual property.  (Leonard Rpt. (Dkt. ## 725-4 (redacted), 726-1 (sealed)) ¶¶ 1-3.)

4    He seeks to testify on a broad range of topics related to patent licensing, negotiations in

5    the RAND context, and Microsoft and Motorola's actions in connection with this dispute.

6    (*See generally id.*)  Microsoft seeks to exclude numerous portions of Dr. Leonard's

7    expert report and rebuttal report and also seeks to exclude certain testimony that arose

8    during Dr. Leonard's deposition.  (Microsoft Mot. to Exclude at 14-17.)

9          Like with Mr. Holleman, the day after oral argument, Motorola filed a letter with

10   the court offering "clarifications" regarding the opinions it would solicit from Dr.

11   Leonard at trial.  (7/31/13 Ltr.)  Motorola's letter both struck and added to the testimony

12   Motorola seeks to elicit from Dr. Leonard.  (*See generally id.*)  For the same reasons that

13   it struck new additions to Mr. Holleman's expert report, the court STRIKES the new

14   additions to Dr. Leonard's expert report.  (*See generally id.*)

15         Microsoft contends that Dr. Leonard should be precluded from offering the

16   following testimony:

17         -    "Microsoft filed this lawsuit without making any counter-offer or otherwise
                engaging in negotiation.  Thus, Microsoft effectively ended the negotiation."
18              (Leonard Rpt. (Dkt. # 726-1) ¶ 78.)

19         -    "Microsoft could have negotiated further and brought the lawsuit if, after a
                good faith effort, it still believed Motorola was not negotiating in good faith."
20              (Leonard Rpt. ¶ 79.)

21   Microsoft argues that these statements contradict the court's prior rulings that Microsoft

22   was not obligated to negotiate with Motorola before filing suit.  The court disagrees.  The

ORDER- 42

1   court's prior ruling was a legal determination that Microsoft had not foregone its right to

2   a RAND license by filing a lawsuit upon receiving Motorola's offer letters.  That ruling

3   does not extend to what an expert's opinion is as to the appropriate conduct of the parties

4   after Motorola sent its offer letters.  Such opinion goes to Motorola's expectations and

5   understanding in sending the offer letters and is thus relevant.

6          Microsoft also points to a statement from Dr. Leonard's deposition, where Dr.

7   Leonard states that "[Microsoft] should have to negotiate in good faith as well."

8   (Leonard Dep. (Dkt. # 724-5) at 10.)  This statement is not in Dr. Leonard's report and

9   was elicited at a deposition from a question by Microsoft counsel.  On its face, however,

10  this statement would constitute an opinion as to a legal conclusion regarding the

11  obligations and duties of the parties under the RAND commitment.  As stated, legal

12  conclusions are left to the court.  At this time, the court finds it premature to exclude

13  testimony that Dr. Leonard is not offering.  Accordingly, Microsoft's motion is denied as

14  to paragraphs 78 and 79 of Dr. Leonard's report.

15         Microsoft next asks the court to exclude the following statement from Dr.

16  Leonard's rebuttal report:  "After Microsoft's refusal to negotiate, it was reasonable for

17  Motorola to file suit.  Thus, when assessing causation, Microsoft's actions in initiating

18  the litigation must be taken into account."  (Leonard Rebuttal Rpt. (Dkt. ## 725-6

19  (redacted), 726-2 (sealed)) ¶ 28.)  Microsoft argues that this is a legal conclusion, and the

20  court agrees.  The court will provide a jury instruction on causation and will instruct the

21  jury as to what should be considered.  Without a doubt, Dr. Leonard's statement

22  regarding the appropriate factors to consider in assessing causation is proper in briefing

1   concerning jury instructions.  It is not, however, proper testimony to the jury.

2   Microsoft's motion to exclude this specific statement from Dr. Leonard's testimony is

3   granted.

4        Microsoft also urges the court to find that the following statements in Dr.

5   Leonard's report and rebuttal report constitute legal conclusions:

6        -   "I do not agree that Motorola has a responsibility to conduct [a stacking]
             analysis before making an initial offer.  Instead, the royalty stacking argument
7            is one that would most likely benefit Microsoft.  It is Microsoft's responsibility
             to form its own arguments and persuade Motorola of its positions by way of
8            negotiation." (Leonard Rpt. ¶ 81.)

9        -   In discussing the level of analysis required by Motorola prior to making an
             initial offer Dr. Leonard states that "the relevant calculation would be the
10           amount of royalties that Microsoft was actually paying." (Leonard Rebuttal
             Rpt. ¶ 7.)
11
     The court agrees with Microsoft.  Both of these statements directly explain the duties and
12
     obligations of the parties when making an initial offer.  Again, it is the court's province to
13
     instruct the jury on the duties and obligations and what factors should be considered in
14
     examining whether the parties met their duties and obligations.  Accordingly, Microsoft's
15
     motion is granted with respect to this testimony.
16
          Next, Microsoft moves to exclude the following statements, arguing that they are
17
     inadmissible legal conclusions:
18
         -   "RAND does not require an SEP owner to treat differently situated licensees
19           similarly." (Leonard Rebuttal Rpt. ¶ 19.)

20       -   "An opening offer is made in good faith if it meant to be the start of a
             negotiation through which the parties can reach a RAND license." (Leonard
21           Rpt. ¶ 60.)

22

ORDER- 44

1     -    "I conclude that Microsoft has not established a reliable basis for calculating its damages and thus should not be awarded any damages in this case."
2             (Leonard Rebuttal Rpt. ¶ 33.)

3     The court agrees with Microsoft that these are classic legal conclusions and not the

4 proper subject of expert testimony.  With respect to the first two, the court, through its

5 jury instructions, determines the rights and obligations of the parties under the RAND

6 commitment and will convey those rights and obligations to the jury.  Those jury

7 instructions will act as the law of the case and Dr. Leonard or any other witness must be

8 prohibited from opining on the interpretation of the RAND obligation vis-à-vis the rights

9 and obligations of the SEP holder and implementer.  Dr. Leonard's opinions as to these

10 rights and obligations are certainly appropriate in briefing related to the proposed jury

11 instructions, but there is little question that statements by an expert witness as to the

12 circumstances under which a patent holder fulfills its RAND obligation are beyond the

13 scope of permissible expert testimony.

14     Likewise, Dr. Leonard's statement regarding damages represents an inadmissible

15 legal conclusion or, at best, an opinion on an ultimate issue of fact that is not helpful to

16 the jury.  The court, in its jury instructions, will instruct the jury as to how to calculate

17 damages.  The jury will make a factual determination based on that instruction and the

18 evidence presented during trial.  Dr. Leonard's opinion invades both of these functions.

19 To the extent Dr. Leonard seeks to establish a standard for assessing damages, his

20 opinion is an inadmissible legal conclusion.  *See Burkhart*, 112 F.3d at 1212; *see also*

21 *Caputo*, 382 F. Supp. 2d at 1053.  To the extent he seeks to advise the jury on how to

22 synthesize the evidence and reach a conclusion, his opinion is not helpful and is excluded

ORDER- 45

1  because the jury is capable of drawing its own inferences with respect to damages.  *See*

2  *Duncan*, 42 F.3d at 102; *see also Strong*, 667 F.2d at 685-86.  In any event, Dr. Leonard

3  is not permitted to testify to this conclusion.

4         Next, Microsoft moves to exclude testimony reflected in Dr. Leonard's deposition

5  regarding whether a blatantly unreasonable opening offer would be consistent with good

6  faith.  (Microsoft Mot. to Exclude at 16.)  Dr. Leonard's testimony reflects his opinion

7  that good faith is not open and shut in this context and that there are many factors that

8  could play into whether Motorola acted in good faith.  (Leonard Dep. Excerpts (Dkt.

9  # 725-5) at 4-9.)  Dr. Leonard's testimony explores these factors and whether a blatantly

10  unreasonable offer would violate good faith.  (*See id.*)

11         As a preliminary matter, Microsoft is seeking to exclude testimony that Motorola

12  is not even offering.  Dr. Leonard's statements were made in response to questions from

13  Microsoft's counsel—they do not appear in Dr. Leonard's expert report.  (*See generally*

14  Leonard Rpt.; Leonard Rebuttal Rpt.)  If Microsoft does not wish to have this testimony

15  in front of the jury, it need only refrain from asking these questions on cross examination.

16  As such, the court finds it premature to rule on this motion at this time.  Nevertheless, to

17  the extent Dr. Leonard seeks to offer testimony regarding the legal meaning of the good

18  faith obligation under the RAND commitment, he will not be permitted to do so.  *See*

19  *Crow Tribe of Indians*, 87 F.3d at 1045 ("Experts 'interpret and analyze factual evidence.

20  They do not testify about the law.'").

21         Last, Microsoft moves to exclude Dr. Leonard from testifying that Motorola was

22  acting in "good faith" when it made its offer letters to Microsoft, arguing that this opinion

1   is inadmissible.  (Microsoft Mot. to Exclude at 16.)  The court disagrees for the reasons

2   described above with respect to Mr. Holleman.  To summarize, this is an ultimate issue of

3   fact that is admissible as expert testimony under Rule 704(a) if it would be helpful to the

4   jury.  The court concludes that this testimony will be helpful given the complexity of the

5   case, the amount of testimony on topics outside the ordinary understanding of common

6   jurors, and Dr. Leonard's extensive experience in the field of intellectual property

7   economics (*see* Leonard Rpt. ¶¶ 1-9).  Just like with Mr. Holleman, Dr. Leonard's

8   opinion regarding good faith will assist the jury in reaching its own conclusions with

9   respect to the ultimate issue before the court.  Accordingly, this testimony will be

10  allowed.

11      **3.      Dr. Maximilian Haedicke**

12      Dr. Maximilian Haedicke seeks to testify about German patent law, and

13  specifically about the options available to Microsoft to avoid an injunction in Germany.

14  (*See generally* Haedicke Rpt. (Dkt. # 725-7).)  Dr. Haedicke is an intellectual property

15  law professor and a judge in a German patent court.  (Haedicke Rpt. Ex. A (Dkt. # 725-9)

16  at 17-18.)  He seeks to testify about (1) German patent law and the options available in a

17  German patent court to a person facing an injunction (Haedicke Rpt. at 4-19); (2) certain

18  background facts related to litigation between Microsoft and Motorola in German courts

19  (*id.* at 19-21); (3) what Microsoft could have done under German patent law to avoid

20  being subject to an injunction (*id.* at 22-24); (4) what would have happened if Motorola

21  had tried to enforce an injunction (*id.* at 24); and (5) the amount of fees Microsoft would

22

1    have been able to recover if it had prevailed in the German action (Haedicke Rebuttal

2    Rpt. (Dkt. # 725-9).)

3         Microsoft moves to exclude Dr. Haedicke's testimony in its entirety, arguing that

4    it is baseless and not helpful to the jury.  (Microsoft Mot. to Exclude at 17-18.)  Dr.

5    Haedicke's testimony is aimed at rebutting Microsoft's claim that it suffered damages

6    because it had to move its EMEA facility out of Germany.  (Motorola Resp. at 15-16.)

7    Dr. Haedicke's testimony is designed to show that Microsoft had other options available

8    to it under German law.  (*Id.*)  Motorola argues that Dr. Haedicke's testimony is

9    inadmissible under Evidence Rule 702 because Dr. Haedicke is not familiar with all of

10   the facts and circumstances surrounding Microsoft's decision to relocate its facility.

11   (Microsoft Mot. to Exclude at 17-18.)  For the same reason, Microsoft argues that Dr.

12   Haedicke's testimony is unhelpful to the jury and irrelevant because Dr. Haedicke does

13   not have enough information about Microsoft's different options to opine about what

14   Microsoft should have done.  (*Id.* at 20.)

15        Microsoft's argument is off base.  As Motorola points out in its response, Dr.

16   Haedicke will not testify about what Microsoft should have done.  (Motorola Resp. at

17   16.)  Instead, he will testify about what Microsoft could have done under German law—

18   about what options were available to Microsoft.  (*Id.*)  He will not testify about the

19   wisdom of Microsoft's decision.  (*See* Haedicke Rpt.)  The court agrees with Microsoft

20   that if he did, his opinion might lack sufficient facts and data to carry it past the *Daubert*

21   threshold.  But the testimony that actually appears in Dr. Haedicke's expert report relates

22   to German law, not to the wisdom of Microsoft's decision to relocate, and is adequately

1    supported by facts and data.  (*See id.*)  This testimony will be relevant and helpful to the

2    jury.  Microsoft argues that it is unhelpful and irrelevant because Dr. Haedicke cannot

3    testify about the facts or circumstances surrounding Microsoft's decision.  (Microsoft

4    Mot. to Exclude at 20.)  But the testimony will assist the jury in understanding the

5    options that Microsoft had to mitigate its damages.  And while Dr. Haedicke's testimony

6    alone may not tell the entire story behind Microsoft's decision to relocate, Microsoft has

7    opened the door to the defense that Motorola now raises and cannot deprive Motorola of

8    the building blocks necessary to assert that defense.  Dr. Haedicke's testimony is one of

9    those building blocks, and Motorola is correct that there is no valid basis for excluding

10   it.[10]  Microsoft is certainly permitted to raise its objections on cross examination, but they

11   are not enough to exclude Dr. Haedicke's testimony on a *Daubert* motion.

12         Microsoft also moves to exclude Dr. Haedicke's testimony regarding what

13   attorney's fees would be recoverable in a German court, arguing that this testimony has

14   no relevance to this case.  (*Id.* at 21-22.)  The court agrees.  Dr. Haedicke submitted a

15   rebuttal expert report in which he states his opinion that "Microsoft has requested

16   damages for attorney's fees far in excess of the amount of attorneys' fees that Microsoft

17   could receive in Germany . . . ."  (Haedicke Rebuttal Rpt. at 4.)  This testimony simply is

18   _____

19   [10] Microsoft makes two further arguments that are irrelevant to this motion.  Microsoft
     takes issue with certain objections made during Dr. Haedicke's deposition.  (Microsoft Mot. to
20   Exclude at 18; Microsoft Reply at 10-11.)  Dr. Haedicke refused to answer several questions,
     claiming the answers are protected by attorney client privilege.  (*See id.*)  Microsoft requests no
21   relief with respect to this contention, so the court will not address it.  Second, Microsoft makes
     ad hominem attacks on Dr. Haedicke by implying that he has disdain for the court's opinions in
     this case.  (*See* Microsoft Mot. to Exclude at 20; Microsoft Reply at 11-12.)  Again, Microsoft
22   requests no relief with respect to this contention so the court will not address it.

1  not relevant to this case and has the potential to confuse the jury.  Microsoft has claimed

2  as damages the attorney's fees it expended defending against lawsuits brought by

3  Motorola.  Those damages are restrained by principles of contract law and causation—

4  not by the law governing recoverable attorney's fees in Germany or elsewhere.  The court

5  can discern no relevance whatsoever to this testimony.  Motorola, in its response to this

6  motion, opts not to explain the relevance of the testimony, claiming that it need not reveal

7  its trial strategy.  Yet, on a *Daubert* motion, it is Motorola's burden to demonstrate that

8  its expert testimony is relevant.  *Daubert*, 509 U.S. at 593 n.10.  Motorola has not carried

9  this burden with respect to the contents of Dr. Haedicke's rebuttal report, so the court

10 excludes that testimony.

11                          **V.    CONCLUSION**

12       Based on the foregoing, the court GRANTS in part and DENIES in part

13 Microsoft's motion to exclude testimony of Richard Holleman, Dr. Gregory Leonard,

14 Judge Maximilian Haedicke, and Bradley Keller (Dkt. # 724).  The court also GRANTS

15 in part and DENIES in part Motorola's motion to exclude testimony of Todd M.

16 Menenberg ((Dkt. ## 722, 734) and Dr. Theo Bodewig (Dkt. ## 731, 737).

17       Dated this 5th day of August, 2013.

18

19

20  JAMES L. ROBART
    United States District Judge

21

22

ORDER- 50