# EXHIBIT 6

# In The Matter Of:

*MICROSOFT CORPORATION*

*v.*

*MOTOROLA INC., et al.*

---

*GREGORY LEONARD, Ph.D. - Vol. 1*

*June 24, 2013*

---

## *HIGHLY CONFIDENTIAL*

**MERRILL CORPORATION**

LegaLink, Inc.

135 Main Street
4th Floor
San Francisco, CA 94105
Phone: 415.357.4300
Fax: 415.357.4301

HIGHLY CONFIDENTIAL
GREGORY LEONARD, Ph.D. - 6/24/2013

Page 28

| | | |
|---|---|---|
| 1 | they had to -- to make the offers, no. | 09:38 |
| 2 |     Q.  So let's leave aside every Motorola employee. | 09:38 |
| 3 | Do you think there were any employees that it was | 09:38 |
| 4 | incumbent on him to talk to before making the opening | 09:38 |
| 5 | offer? | 09:38 |
| 6 |     A.  You know, again, my -- my point is, you know, | 09:38 |
| 7 | did he have a duty.  I don't know.  It doesn't seem to | 09:38 |
| 8 | me that that's in the time frames that we're talking | 09:39 |
| 9 | about, the context we're talking about, that that's -- | 09:39 |
| 10 | and then for what we are talking about here, which is | 09:39 |
| 11 | this opening offer, which would be fully expected to be | 09:39 |
| 12 | the prelude to a -- a continued negotiation, I don't see | 09:39 |
| 13 | that there's a duty to do that at all. | 09:39 |
| 14 |     Q.  How do you know that he expected that to be a | 09:39 |
| 15 | prelude to further negotiations? | 09:39 |
| 16 |     A.  I talked to him and asked that very question. | 09:39 |
| 17 |     And moreover I mean this is the person who was | 09:39 |
| 18 | responsible for negotiating many, many licenses with | 09:39 |
| 19 | many, many licensees and had -- this is the way these | 09:39 |
| 20 | negotiations went. | 09:39 |
| 21 |     Q.  Did he tell you that he had discussions with | 09:39 |
| 22 | lawyers before the letters were sent? | 09:39 |
| 23 |     A.  I mean my under -- I think my understanding was | 09:39 |
| 24 | that because Microsoft had sued Motorola, there were | 09:39 |
| 25 | discussions with lawyers.  I don't know.  But, again, | 09:39 |

HIGHLY CONFIDENTIAL
GREGORY LEONARD, Ph.D. - 6/24/2013

Page 29

| | | |
|---|---|---|
| 1 | with the content of those discussions was. | 09:40 |
| 2 |     Q.  One step at a time. | 09:40 |
| 3 |         Did he tell you that he -- did he know that he | 09:40 |
| 4 | had conversations with lawyers before the offer letters | 09:40 |
| 5 | were sent? | 09:40 |
| 6 |     A.  I believe so, yes. | 09:40 |
| 7 |     Q.  Did you ask him what the strategy was that was | 09:40 |
| 8 | being devised in those conversations with the lawyers? | 09:40 |
| 9 |     A.  No. | 09:40 |
| 10 |     Q.  Do you think that might have been pertinent to | 09:40 |
| 11 | the question of whether he was acting in good faith? | 09:40 |
| 12 |     A.  Again, I've got to go on the evidence that I | 09:40 |
| 13 | have in -- in front of me. And that's what I have. | 09:40 |
| 14 |     Q.  Well, let's suppose he said to -- in the | 09:40 |
| 15 | conversations that he had with the lawyers, there were | 09:40 |
| 16 | discussions between Mr. Dailey and the lawyers to the | 09:40 |
| 17 | effect that they didn't expect Microsoft to accept these | 09:40 |
| 18 | offers and that these would allow Motorola, then, to | 09:40 |
| 19 | file lawsuits against Microsoft. Suppose that was the | 09:40 |
| 20 | substance of those conversations, do you think those | 09:41 |
| 21 | letters would have been sent in good faith then? | 09:41 |
| 22 |         MR. CANNON:  Object to the form of the | 09:41 |
| 23 | question. | 09:41 |
| 24 |         THE WITNESS:  I don't know.  I don't have any | 09:41 |
| 25 | evidence that that's true.  That's not something that | 09:41 |

HIGHLY CONFIDENTIAL
GREGORY LEONARD, Ph.D. - 6/24/2013

Page 30

| | | |
|---|---|---|
| 1 | I've -- I mean that's not the facts in front of me. So | 09:41 |
| 2 | I haven't looked at that. | 09:41 |
| 3 | I mean, you know, again, Motorola is engaged in | 09:41 |
| 4 | many, many of these negotiations. A lot of them started | 09:41 |
| 5 | in a very similar way, and they successfully negotiated | 09:41 |
| 6 | many, many licenses. | 09:41 |
| 7 | It's -- and talking to Mr. Dailey, there's no | 09:41 |
| 8 | reason to think that this ultimately wouldn't be the | 09:41 |
| 9 | same that -- his expectation was, that this would be the | 09:41 |
| 10 | same, you know, basic deal. | 09:41 |
| 11 | BY MR. PRITIKIN: Q. You don't know those | 09:41 |
| 12 | conversations didn't occur, do you? Because you don't | 09:41 |
| 13 | know what he discussed with the lawyers; isn't that | 09:41 |
| 14 | right? | 09:41 |
| 15 | A. That's true, I didn't ask, I mean, about | 09:41 |
| 16 | whether -- first of all, I didn't -- I don't know that | 09:42 |
| 17 | there were any discussions related to the letters. I | 09:42 |
| 18 | know that they were talking to the lawyers because | 09:42 |
| 19 | they's just been sued, and may have been just about the | 09:42 |
| 20 | Microsoft lawsuits themselves. | 09:42 |
| 21 | Q. Did you ask Mr. Dailey whether he talked to the | 09:42 |
| 22 | lawyers about the letters? | 09:42 |
| 23 | A. I didn't ask that specific question, no. | 09:42 |
| 24 | Q. You said there were other negotiations that | 09:42 |
| 25 | started in a similar way. Which? | 09:42 |

HIGHLY CONFIDENTIAL
GREGORY LEONARD, Ph.D. - 6/24/2013

Page 52

| | | |
|---|---|---|
| 1 | someone else? | 10:24 |
| 2 | A.  I had the impression it was Mr. Dailey, but | 10:24 |
| 3 | I -- I'm not sure about that. | 10:24 |
| 4 | Q.  I'm just trying to find out what you know. | 10:24 |
| 5 | A.  Yeah.  That's what I gave you. | 10:25 |
| 6 | Q.  Now, at the time that the letters were sent -- | 10:25 |
| 7 | and you understand the letters were sent on -- they're | 10:25 |
| 8 | dated October 21 and October 29, 2010? | 10:25 |
| 9 | A.  Yes. | 10:25 |
| 10 | Q.  And at the time the letters were sent, Motorola | 10:25 |
| 11 | was, in fact, planning a countersuit of its on its | 10:25 |
| 12 | standard-essential patents; was it not? | 10:25 |
| 13 | MR. CANNON:  Object to the form of the | 10:25 |
| 14 | question. | 10:25 |
| 15 | THE WITNESS:  I don't -- I don't specifically | 10:25 |
| 16 | know what its legal strategy was.  I'm sure that they | 10:25 |
| 17 | haven't been sued by Microsoft.  You certainly evaluate | 10:25 |
| 18 | your various legal options so it wouldn't surprise me. | 10:25 |
| 19 | But I'm not sure -- you know, I don't have the details | 10:25 |
| 20 | of their specific legal strategy. | 10:25 |
| 21 | BY MR. PRITIKIN:  Q.  So in the interview you | 10:25 |
| 22 | had with Mr. Dailey, that's not a question you asked | 10:25 |
| 23 | him.  At the time you sent the letters, were you already | 10:25 |
| 24 | planning lawsuits on these patents?  Did you ask him | 10:26 |
| 25 | that question? | 10:26 |

HIGHLY CONFIDENTIAL
GREGORY LEONARD, Ph.D. - 6/24/2013

Page 53

| | | |
|---|---|---|
| 1 | A.  You mean -- well, I didn't ask him, but are you | 10:26 |
| 2 | saying -- I mean there is a difference between, you | 10:26 |
| 3 | know, planning with certainty to bring a lawsuit and, | 10:26 |
| 4 | you know, preparing for the eventuality that that might | 10:26 |
| 5 | happen.  You know, the second thing is prudent, even if | 10:26 |
| 6 | you fully hope to negotiate an agreement. | 10:26 |
| 7 | Q.  Did you ask him if they were planning a | 10:26 |
| 8 | lawsuit? | 10:26 |
| 9 | A.  I don't think I asked it in that way.  You | 10:26 |
| 10 | know, were you at that point where you definitely | 10:26 |
| 11 | planning bring a lawsuit, I certainly didn't ask that. | 10:26 |
| 12 | Q.  Do you know who was involved in preparing the | 10:26 |
| 13 | October letters besides Mr. Dailey? | 10:26 |
| 14 | A.  As I'm sitting here, I don't recall.  You know, | 10:26 |
| 15 | there might have been details in the depositions, but I | 10:27 |
| 16 | don't recall what they were.  If there -- if there were | 10:27 |
| 17 | such details. | 10:27 |
| 18 | Q.  Were you aware Mr. Dailey signed the letters, | 10:27 |
| 19 | right? | 10:27 |
| 20 | A.  Yes. | 10:27 |
| 21 | Q.  And he's the only person you talked to? | 10:27 |
| 22 | A.  Yeah.  I mean it's his responsibility, | 10:27 |
| 23 | certainly.  He's the leader of that part of the | 10:27 |
| 24 | organization. | 10:27 |
| 25 | Q.  But there were numerous other people who had an | 10:27 |

HIGHLY CONFIDENTIAL
GREGORY LEONARD, Ph.D. - 6/24/2013

Page 98

| | | |
|---|---|---|
| 1 | we learn in the negotiation. It's hard to -- to say | 11:43 |
| 2 | that in advance before you know anything. | 11:43 |
| 3 | Q. Did you ask Dailey that question straight out, | 11:43 |
| 4 | how low were you willing to go as of October 2010? | 11:43 |
| 5 | A. I don't think I asked because, again, it seemed | 11:43 |
| 6 | to me it wasn't really relevant. It would depend on | 11:43 |
| 7 | what you learned in negotiation. I mean you would be | 11:43 |
| 8 | willing to go to zero if Microsoft came back and said, | 11:43 |
| 9 | you know what, we aren't actually using any of your | 11:43 |
| 10 | patents, if that turned out to be the case. | 11:43 |
| 11 | So, you know, until you know more, I think it's | 11:43 |
| 12 | pretty hard to -- to say -- to make an assessment like | 11:43 |
| 13 | that without it being, you know, not a very useful | 11:43 |
| 14 | statement. | 11:43 |
| 15 | Q. As of October 2010, did Motorola think that | 11:43 |
| 16 | Microsoft was using the H.264 and the 802.11 essential | 11:44 |
| 17 | patents? | 11:44 |
| 18 | A. Well, I think they had a reason to -- to think | 11:44 |
| 19 | that, which is why they initiated these -- when | 11:44 |
| 20 | Microsoft asked them for the patents, that's why they | 11:44 |
| 21 | talked about these patents in particular. But, you | 11:44 |
| 22 | know, I think one thing that came out at trial was that | 11:44 |
| 23 | Microsoft wasn't really using, at least very | 11:44 |
| 24 | extensively, the H.264 patents. So that was something | 11:44 |
| 25 | that, you know, the judge found very persuasive, and | 11:44 |

HIGHLY CONFIDENTIAL
GREGORY LEONARD, Ph.D. - 6/24/2013

Page 152

| | | |
|---|---|---|
| 1 | A. Well, I think the letters themselves say that | 14:05 |
| 2 | they're -- that the offer is RAND. And, again, in | 14:06 |
| 3 | talking to Mr. Dailey, my -- I -- it sounds to me that | 14:06 |
| 4 | the -- my analysis leads to conclusion that, you know, | 14:06 |
| 5 | given the context of time pressure and everything else, | 14:06 |
| 6 | that this was kind of a central number that they -- they | 14:06 |
| 7 | went to. And in that context. And it was certainly not | 14:06 |
| 8 | based on the type of information that was available | 14:06 |
| 9 | ultimately in this case. | 14:06 |
| 10 | Q. Are you aware of the deposition testimony given | 14:06 |
| 11 | by Mr. Dailey to the effect that he thought 2.25 percent | 14:07 |
| 12 | was RAND for these patents? | 14:07 |
| 13 | A. I guess that would even reinforce my point. | 14:07 |
| 14 | He's saying he thought it was RAND. And, you know, | 14:07 |
| 15 | obviously if you look at what the judge decided, the | 14:07 |
| 16 | judge decided that the right RAND rate was lower than | 14:07 |
| 17 | what -- what was in that initial offer. I mean that's | 14:07 |
| 18 | just one more reason that Motorola wasn't doing was bad | 14:07 |
| 19 | faith. It was just -- it's a disagreement about what | 14:07 |
| 20 | RAND was. But I think, you know, more the point, they | 14:07 |
| 21 | were in a rush. They're trying to get this letter out | 14:07 |
| 22 | and this was a natural thing for them to fall back on. | 14:07 |
| 23 | Q. Yeah. My question is a little more focused on | 14:07 |
| 24 | that. Which do you think it is, based on your | 14:07 |
| 25 | conversations with Mr. Dailey, that he didn't know what | 14:07 |

HIGHLY CONFIDENTIAL
GREGORY LEONARD, Ph.D. - 6/24/2013

Page 153

| | | |
|---|---|---|
| 1 | RAND was for these patents, and selected 2.25 percent | 14:07 |
| 2 | from the cellular licenses?  Or he thought 2.25 percent | 14:08 |
| 3 | was about right for H.264 and 802.11?  Which is it? | 14:08 |
| 4 | A.  Well, I think it's -- I think what it was is | 14:08 |
| 5 | he, again, he fell back on that without -- because -- | 14:08 |
| 6 | from not having any experience with these patents in | 14:08 |
| 7 | particular on a standalone basis.  And then given the | 14:08 |
| 8 | rest of the context.  And I think when he said he | 14:08 |
| 9 | thought it was RAND, I think what he's saying is that he | 14:08 |
| 10 | felt as if he -- that that was consistent with his RAND | 14:08 |
| 11 | obligations.  And I also know that, you know, he has | 14:08 |
| 12 | said he was certainly standing ready to negotiate | 14:08 |
| 13 | further.  So I think he just viewed it as part of the -- | 14:08 |
| 14 | the process, and -- but I don't think he saying | 14:08 |
| 15 | necessarily the specific rate itself is RAND.  But we | 14:08 |
| 16 | can look at his testimony and see. | 14:08 |
| 17 | Q.  Did you ask him whether he thought the specific | 14:08 |
| 18 | rate was RAND? | 14:08 |
| 19 | A.  I don't think I asked it that way.  I asked | 14:09 |
| 20 | again, you know, the sequence of events and -- and what | 14:09 |
| 21 | happened and -- | 14:09 |
| 22 | Q.  I want to be clear on the answer to this | 14:09 |
| 23 | question, sir. | 14:09 |
| 24 | Did you ask Mr. Dailey in the conversations you | 14:09 |
| 25 | had with him whether he thought 2.25 percent at the time | 14:09 |

HIGHLY CONFIDENTIAL
GREGORY LEONARD, Ph.D. - 6/24/2013

Page 154

| | | |
|---|---|---|
| 1 | was RAND for the 802.11 and the H.264 portfolios? | 14:09 |
| 2 | A.  And I would say again, I think what he thought | 14:09 |
| 3 | was -- from what he told me was that in making this | 14:09 |
| 4 | offer, that that was consistent with the RAND | 14:09 |
| 5 | obligations.  Again, I don't think it's necessarily the | 14:09 |
| 6 | case at that point in the negotiation.  You can say with | 14:09 |
| 7 | absolute certainty that this number is absolutely RAND | 14:09 |
| 8 | because you don't have all the information that you need | 14:09 |
| 9 | to make that assessment at that time. | 14:09 |
| 10 | Q.  Did you ask him whether that was a reasonable | 14:09 |
| 11 | royalty for the Motorola patents? | 14:09 |
| 12 | A.  I don't think I asked him that specific | 14:09 |
| 13 | question.  And, again, without having more information | 14:09 |
| 14 | of the type that was developed for this case, I'm not | 14:10 |
| 15 | really sure that -- that that's answerable at that point | 14:10 |
| 16 | in time. | 14:10 |
| 17 | Q.  Do you think that the royalties they had gotten | 14:10 |
| 18 | for their cellular patents are relevant to knowing what | 14:10 |
| 19 | the H.264 and the 802.11 patents are worth? | 14:10 |
| 20 | A.  Well, they're relevant again it provides -- | 14:10 |
| 21 | again, gives you a -- it's a default position to which | 14:10 |
| 22 | it's natural to turn. | 14:10 |
| 23 | Now, their cellular portfolio is different than | 14:10 |
| 24 | these other portfolios.  You know, again, ultimately | 14:10 |
| 25 | that's something if a negotiation continued, there would | 14:10 |

1

2        I declare under penalty of perjury that the

3   foregoing is true and correct.  Subscribed at

4   _____, California, this ____ day of

5   _____, 2013.

6

7

8                                    _____

9                                    GREGORY LEONARD, Ph.D.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1           CERTIFICATE OF REPORTER

2

3        I, Sheila Arceno, RPR, a Certified Shorthand

4   Reporter, do hereby certify:

5        That the foregoing witness was by me duly

6   sworn; that the deposition was taken before me at the

7   time and place therein set forth; that the testimony and

8   proceedings were reported stenographically by me and

9   later transcribed into typewriting under my direction;

10       That before completion of the deposition,

11  review of the transcript [ ] was [X] was not requested.

12  If requested, any changes made by the deponent (and

13  provided to the reporter) during the period allowed are

14  appended hereto.

15       I further certify that I am not of counsel or

16  attorney for either or any of the parties to the said

17  deposition, nor in any way interested in the event of

18  this cause, and that I am not related to any of the

19  parties thereto.

20

21  Dated _____

22

23

24                              _____

                                Sheila Arceno, RPR
25                              CSR No. 13293