# EXHIBIT A

# Filed Under Seal

# EXHIBIT B

# Filed Under Seal

# EXHIBIT C

# Filed Under Seal

# EXHIBIT D

# Filed Under Seal

# EXHIBIT E

# Filed Under Seal

# EXHIBIT F

# Filed Under Seal

# EXHIBIT G

# Filed Under Seal

# EXHIBIT H

Highly Confidential - Attorneys' Eyes Only

Page 1

1            IN THE UNITED STATES DISTRICT COURT

2          FOR THE WESTERN DISTRICT OF WASHINGTON

3                        AT SEATTLE

4

5    MICROSOFT CORPORATION, a

6    Washington corporation,

7            Plaintiff,

8    vs.        No. C10-1823-JLR

9    MOTOROLA, INC. MOTOROLA

10   MOBILITY, INC., and GENERAL

11   INSTRUMENT CORPORATION,

12           Defendants.

13   _____

14                      REVISED

15          DEPOSITION OF HORACIO E. GUTIERREZ

16           Taken on behalf of the Defendants

17                   April 4, 2012

18   BE IT REMEMBERED THAT, pursuant to the Washington Rules of

19   Civil Procedure, the deposition of HORACIO E. GUTIERREZ, was

20   taken before Tia B. Reidt, #2798, a Certified Shorthand

21   Reporter, and a Notary Public for the State of Washington,

22   on April 4, 2012, commencing at the hour of 9:08 a.m., the

23   proceedings being reported at 315 5th Avenue South,

24   Suite 1000, Seattle, Washington.

25   Job Number: 48313

1                      HORACIO E. GUTIERREZ

2    on the other hand, it wasn't necessarily a surprise.

3        Q.     Do you recall what you did in the first instance

4    upon receiving the October 21, 2010 letter?

5        A.     I believe I immediately forwarded it to the

6    litigation team handling the Motorola litigation.

7        Q.     When you refer to the litigation team, are you

8    referring to outside counsel or in-house counsel?

9        A.     It's -- within Microsoft, the litigation team is a

10   separate group in the legal department that does not report

11   to me.  Even the patent litigation team is housed in the

12   litigation department, as opposed to the intellectual

13   property group.  So I was referring to the in-house counsel

14   that was handling the litigation in the litigation

15   department at Microsoft.

16       Q.     Do you recall which individuals in the litigation

17   team you're referring to?

18       A.     I only recall for sure one, David Kehoe, who was

19   the person that at the time was my contact person in the

20   litigation department on the matter.  There may have been

21   others, but that's the one that I recall specifically.

22       Q.     Did you perform any analysis of the patents

23   identified in the annex to the October 21, 2010 letter?

24              MR. PRITIKIN:  Mr. Gutierrez, you can answer the

25   question as to whether or not you performed an analysis, but

Highly Confidential - Attorneys' Eyes Only

Page 21

1                     HORACIO E. GUTIERREZ

2    the subject of what you did, the details of it, would be

3    covered by the attorney-client and work-product privilege,

4    so I would ask that you keep that in mind when giving your

5    response.

6              THE WITNESS:  I did not personally perform an

7    analysis of those patents, but I do believe that the patent

8    analysis team took on performing an analysis of them.

9    BY MR. SCHOENHARD:

10        Q.     Do you know approximately when that analysis was

11   performed?

12        A.     I don't recall specifically, but generally that

13   would have been in the weeks following the receipt of the

14   letter.

15        Q.     Do you know whether that analysis was performed

16   prior to Microsoft filing the patent lawsuit for which we're

17   -- or the lawsuit for which we're appearing here today, the

18   RAND-based lawsuit?

19        A.     I don't recall that specifically, no.

20        Q.     Did Microsoft perform any financial valuation of

21   Motorola's 802.11 standard-essential patent portfolio?

22              MR. PRITIKIN:  I'll give you the same instruction

23   on that.  You can answer "yes" or "no" as to whether you

24   know whether an analysis was done, but beyond that you

25   should not provide any information concerning any work that

087

Highly Confidential - Attorneys' Eyes Only

Page 29

1                      HORACIO E. GUTIERREZ

2      Q.      In response to receiving the October 21, 2010

3    letter, did Microsoft investigate which of its products

4    would be considered licensed under the offer in the

5    October 21 letter?

6             MR. PRITIKIN:   And that question also gets into the

7    subject matter that may be privileged.   You can answer the

8    question "yes" or "no" or you don't recall based on your own

9    personal knowledge, but you should not reveal the substance

10   of any information that you received from lawyers relating

11   to that subject.

12            THE WITNESS:   Yes.

13   BY MR. SCHOENHARD:

14     Q.      Did Microsoft determine that any of its products

15   other than Xbox 360 related products would be considered

16   802.11 compliant products under the terms of the offer of

17   the October 21 letter?

18            MR. PRITIKIN:   And I'm going to instruct the

19   witness not to answer the question on grounds of

20   attorney-client and work-product privilege.

21            MR. PALUMBO:   Could you raise your voice a little

22   bit?  I'm having trouble hearing you.

23            MR. PRITIKIN:   Sure.

24            Will you read back my objection?

25            THE COURT REPORTER:   I'm having a little trouble

Highly Confidential - Attorneys' Eyes Only

Page 30

1                     HORACIO E. GUTIERREZ

2    hearing you, too.

3              MR. PRITIKIN:  Is the microphone not --

4              THE COURT REPORTER:  It's not very loud, no.

5              MR. PRITIKIN:  I'm going to instruct the witness

6    not to answer the question on grounds of attorney-client and

7    work-product privilege.

8              MR. PALUMBO:  Thank you.

9    BY MR. SCHOENHARD:

10       Q.    As of October 21, 2010, were you personally aware

11   of any Microsoft products other than the Xbox 360 that were

12   802.11 compliant?

13             MR. PRITIKIN:  Now, this is a question that is

14   outside the scope of the 30(b)(6) designation.  Do you want

15   to ask this in his personal capacity?

16   BY MR. SCHOENHARD:

17       Q.    Let me rephrase.

18             As of October 21, 2010, did Microsoft sell any

19   802.11 compliance products other than the Xbox 360 related

20   products?

21       A.    I don't know.

22             MR. PRITIKIN:  And I think that is outside the

23   scope of the 30(b)(6) topics, so we'll take that answer to

24   be in his personal capacity, if that's something that you're

25   interested in pursuing.  Pursuant to a 30(b)(6) designation,

Highly Confidential - Attorneys' Eyes Only

Page 43

1               HORACIO E. GUTIERREZ

2           We are going off the record.

3           (Pause in the proceedings.)

4           THE VIDEOGRAPHER:  The time is 10:31.

5           We are going back on the record.

6           Proceed.

7    BY MR. SCHOENHARD:

8       Q.     In response to receiving the October 21, 2010

9    letter, did Microsoft investigate whether Motorola had

10   offered a 2.25 percent royalty for its 802.11

11   standard-essential patents to other parties?

12      A.     I recall having asked whether we were aware of any

13   previous --

14           MR. PRITIKIN:  Mr. Gutierrez, you should not

15   testify about any conversations you may have had with

16   attorneys relating to the subject matter.  So if you can

17   answer the question without reference to conversations you

18   had with counsel, that's fine; otherwise I would instruct

19   you not to answer.

20           We specifically objected to the scope of the

21   30(b)(6) notice insofar as it calls for privileged

22   information.

23           THE WITNESS:  Repeat the question, please.

24   BY MR. SCHOENHARD:

25      Q.     In response to the October 21, 2010 letter, did

Highly Confidential - Attorneys' Eyes Only

Page 44

1                          HORACIO E. GUTIERREZ

2    Microsoft investigate whether Motorola had offered a

3    2.25 percent royalty for its 802.11 standard-essential

4    patents to other parties?

5         A.    I don't know how to answer that question without

6    getting into the privilege issue.

7              MR. PRITIKIN:  Then you should not answer the

8    question.  I'll instruct you not to answer.

9    BY MR. SCHOENHARD:

10        Q.    Are you able to answer that "yes" or "no" or "I

11   don't know"?

12        A.    Yes, I think if that's fine from a privilege

13   perspective.

14        Q.    In response to the October 21, 2010 letter, did

15   Microsoft investigate whether Motorola had offered a

16   2.25 percent royalty for its 802.11 standard-essential

17   patents to any other parties?  And you can answer "yes,"

18   "no," or "I don't know."

19        A.    Yes.

20        Q.    Do you know what the results of that investigation

21   were?

22              MR. PRITIKIN:  You can answer the question "yes" or

23   "no" or you don't recall, but you shouldn't testify about

24   any communications you had with counsel.

25              THE WITNESS:  Yes.

Highly Confidential - Attorneys' Eyes Only

Page 45

1                    HORACIO E. GUTIERREZ

2    BY MR. SCHOENHARD:

3        Q.      In response to the October 21, 2010 letter, did

4    Microsoft learn that Motorola had offered a 2.25 percent

5    royalty for its 802.11 standard-essential patents to other

6    parties?

7              MR. PRITIKIN:  Let me hear that question again.

8              (The following encompasses the entire readback

9    portion.)

10             "Q. In response to the October 21, 2010 letter, did

11   Microsoft learn that Motorola had offered a 2.25 percent

12   royalty for its 802.11 standard-essential patents to other

13   parties?"

14             (Whereupon, the readback was concluded.)

15             MR. PRITIKIN:  So Mr. Gutierrez, to the extent you

16   received information from counsel or as part of the work

17   product that was associated with the litigation, you should

18   not answer the question.  If he is asking you about

19   conversations that you had with Mr. Daily or others at

20   Motorola, you can testify about the conversations you had

21   with the Motorola representatives.

22             THE WITNESS:  I can't answer the question without

23   reference to attorney work product conversations.

24             MR. PRITIKIN:  Then I instruct you not to answer.

25   BY MR. SCHOENHARD:

Highly Confidential - Attorneys' Eyes Only

Page 53

1                    HORACIO E. GUTIERREZ

2   wouldn't have focused on these areas specifically.

3       Q.      In response to receiving the October 21, 2010

4   letter, did Microsoft endeavor to determine whether each of

5   the patents listed in the annex to the October 21 letter is

6   in fact essential to the 802.11 standard?

7            MR. PRITIKIN:   And again, this gets into the

8   subject matter of work-product and attorney-client

9   privilege.   If you would need to reveal communications you

10  had with counsel to answer the question, then I'm going to

11  instruct you not to answer.

12           THE WITNESS:   I cannot answer the question without

13  alluding to conversations with counsel.

14           MR. PRITIKIN:   You should not get into that subject

15  matter.

16  BY MR. SCHOENHARD:

17      Q.      Are you able to answer that question "yes" or "no"

18  or "I don't know"?

19           MR. PRITIKIN:   Let me hear the question again.

20           MR. SCHOENHARD:   Perhaps it would be easier if I

21  restated it.

22  BY MR. SCHOENHARD:

23      Q.      In response to receiving the October 21, 2010

24  letter, did Microsoft endeavor to determine whether each of

25  the patents or patent applications listed in the annex to

Page 54

1                    HORACIO E. GUTIERREZ

2    the October 21 letter is in fact essential to the 802.11

3    standard?

4              MR. PRITIKIN:   And I think that intrudes on the

5    attorney-client work-product privilege, and I'm going to

6    instruct the witness not to answer based on what he told us

7    a few minutes ago.

8              MR. SCHOENHARD:   You will not permit the witness to

9    answer "yes" or "no"?

10             MR. PRITIKIN:   No.

11   BY MR. SCHOENHARD:

12   Q.    The October 21, 2010 letter states in its second

13   paragraph, "As a convenience to its licensees, Motorola

14   includes all of the patents listed on its 802.11 annex in

15   the license without regard to further proof of technical

16   essentiality to the 802.11 standards."

17             Do you see that?

18   A.    Yes.

19   Q.    Did you understand that statement to imply that

20   some of the patents identified in the annex to the October

21   21, 2010 letter may not in fact have been essential to the

22   802.11 standards?

23   A.    No, I did not.

24   Q.    What did you understand that statement to mean?

25   A.    Well, I believe the statement says that they

Highly Confidential - Attorneys' Eyes Only

Page 65

                        HORACIO E. GUTIERREZ

1

2   information in the attachment hasn't been the focus of

3   specific discussions between the companies, the two

4   companies.

5        In the context of the negotiation, we've talked

6   generally about the components that would be in or out of

7   the license.  And at different times the patent portfolios

8   in the field have come in and out of the scope as the two

9   parties have made an effort to explore a satisfactory

10  resolution of the disputes.

11  Q.    In response to receiving the October 29, 2010

12  letter, did Microsoft perform a financial valuation of

13  Motorola's H.264 patent portfolio?

14       MR. PRITIKIN:  We're getting into the same subject

15  we did before.  You should not reveal any communications

16  that you had with counsel.  If you can't answer the question

17  without getting into discussions with counsel, then I would

18  instruct you not to answer.

19       THE WITNESS:  Would you repeat the question?  I'm

20  sorry.

21  BY MR. SCHOENHARD:

22  Q.    In response to receiving the October 29, 2010

23  letter, did Microsoft perform a financial valuation of

24  Motorola's H.264 patent portfolio?

25  A.    I'm not aware of that.

Highly Confidential - Attorneys' Eyes Only

1                    HORACIO E. GUTIERREZ

2      Q.      In response to receiving the October 29, 2010

3  letter, did Microsoft perform an analysis of the

4  essentiality of any of the patents identified in the annex

5  to the October 29 letter?

6           MR. PRITIKIN:   In answering the question, you

7  should not testify about matters that may or may not have

8  been performed by counsel.   You can answer the question with

9  respect to what you personally did.

10           THE WITNESS:   Okay.   I did not personally perform

11  that analysis.

12           MR. PRITIKIN:   Okay.

13  BY MR. SCHOENHARD:

14      Q.      In response to receiving the October 29th, 2010

15  letter, did Microsoft perform an analysis of the

16  essentiality of the patents identified in the annex to the

17  October 29 letter?

18           MR. PRITIKIN:   The same instruction.   I'm going to

19  object to that to the extent that it encompasses work that

20  was done by lawyers.   Again, you can testify about what you

21  did personally.   You should not testify about what counsel

22  did in connection with the litigation.

23           THE WITNESS:   So I already testified personally on

24  the issue, and I don't believe I can go further without

25  answering into attorney-work product.

Highly Confidential - Attorneys' Eyes Only

Page 67

HORACIO E. GUTIERREZ

1

2      MR. PRITIKIN:  Then you should not do so.

3      MR. SCHOENHARD:  Just to try and speed things up a

4  bit, Mr. Pritikin, it would be helpful if you try to limit

5  your objection to the basis for it and a brief instruction

6  to the witness.

7      If the two of you need to confer off the record to

8  determine whether and to what extent we are approaching into

9  privileged matter, I'm always welcome, of course, to go off

10  the record if need be.  But it would be helpful if we could

11  try to get a briefer instruction so that we can keep moving

12  forward.

13      MR. PRITIKIN:  It's pretty hard to do it when

14  you're getting into privileged subject matter, but we'll

15  take it question by question.

16  BY MR. SCHOENHARD:

17  Q.    In response to receiving the October 29, 2010

18  letter, did Microsoft investigate whether Motorola had

19  previously offered a 2.25 percent royalty rate to other

20  parties?

21      MR. PRITIKIN:  Again, the same instruction,

22  Mr. Gutierrez.  You should not testify about any work that

23  was done by counsel in connection with the litigation or the

24  anticipated litigation.  You can testify as to what you

25  personally did or did not do.

097

Highly Confidential - Attorneys' Eyes Only

1                    HORACIO E. GUTIERREZ

2             THE WITNESS:  I did not personally conduct such an

3     investigation.

4     BY MR. SCHOENHARD:

5        Q.    Can you answer with respect to whether Microsoft

6     conducted such an investigation?

7             MR. PRITIKIN:  Same instruction.

8             THE WITNESS:  Not without getting into privilege

9     issues.

10    BY MR. SCHOENHARD:

11       Q.    Did Microsoft investigate which of its products

12    would be impacted by the proposed license in the October 29

13    letter?

14            MR. PRITIKIN:  I'm going to instruct the witness

15    not to answer the question on grounds of attorney-client

16    work-product privilege.

17    BY MR. SCHOENHARD:

18       Q.    In response to receiving the October 29, 2010

19    letter, did Microsoft investigate what portion of its patent

20    portfolio would be subject to proposed grant-back?

21            MR. PRITIKIN:  Same instruction.

22            THE WITNESS:  Unfortunately, this is a field in

23    which, you know, my knowledge all derives from discussions

24    with in-house and outside counsel on a topic that I believe

25    would be the subject of attorney work-product privilege.

Highly Confidential - Attorneys' Eyes Only

Page 69

1                   HORACIO E. GUTIERREZ

2          MR. PRITIKIN:   You should not testify about that.

3          MR. PALUMBO:   Let's take a quick break.

4          MR. SCHOENHARD:   Let's go ahead and take a quick

5   break.

6          THE VIDEOGRAPHER:   The time is 11:16.

7          We are going off the record.

8          Here marks the end of Tape No. 1 in the video

9   deposition of Horacio Gutierrez.

10          (Pause in the proceedings.)

11          THE VIDEOGRAPHER:   The time is 11:28.

12          We are going back on the record.

13          Here marks the beginning of Tape No. 2 in the video

14   deposition of Horacio Gutierrez.

15          Proceed.

16   BY MR. SCHOENHARD:

17      Q.    Earlier, if I heard you correctly, you referred to

18   the 2.25 percent royalty rate offered in the October 29,

19   2010 letter as an additional 2.25 percent.

20          What did you mean by "additional 2.25 percent"?

21      A.    I meant that -- sorry.  I meant that I understood

22   the letter to state that that would be a net royalty rate

23   that we would pay to Motorola on top of a cross-licensing of

24   the -- in that case in our conversation really related to

25   the 802.11 portfolio.

# EXHIBIT I

**From:** Robbins, Ellen S. [mailto:erobbins@Sidley.com]
**Sent:** Wednesday, March 21, 2012 2:34 PM
**To:** Post, Kevin; Giardina, David C.; chrisw@dhlt.com
**Cc:** Project-MS/Moto_WDWA_343/1823; RopesWashington1823 (Microsoft/Motorola); Pepe, Steven; summit1823@summitlaw.com
**Subject:** RE: Summary of Meet and Confer

Kevin,

In addition to being deposed in his individual capacity as you had requested, Mr. Gutierrez will be Microsoft's 30(b)(6) witness on at least Topics 8 and 9 of Motorola's 30(b)(6) deposition notice.  Please note that Mr. Gutierrez has a full schedule, and if Motorola does not proceed with his deposition on Monday, we cannot guarantee that he will be available again in the near future.  Accordingly, we urge Motorola to proceed with his deposition on Monday afternoon as offered.

We are working on securing a date for Amy Marasco, who is traveling overseas, and will get back to you as soon as possible.

*Ellen S. Robbins*
Sidley Austin LLP
One South Dearborn Street
Chicago, IL  60603
Phone:  (312) 853-2931
Fax:  (312) 853-7036
E-mail:  erobbins@sidley.com

**From:** Post, Kevin [mailto:Kevin.Post@ropesgray.com]
**Sent:** Wednesday, March 21, 2012 3:37 PM
**To:** Robbins, Ellen S.; Giardina, David C.; chrisw@dhlt.com
**Cc:** Project-MS/Moto_WDWA_343/1823; RopesWashington1823 (Microsoft/Motorola); Pepe, Steven; summit1823@summitlaw.com
**Subject:** RE: Summary of Meet and Confer

Ellen,

In light of the testimony provided by Neill Taylor yesterday, Motorola is willing to de-prioritize Mr. Gutierrez's deposition for the time being.

We are hopeful that we can confirm Mr. Hachamovitch's deposition date shortly.

Finally, we note that we have not yet received any dates for Amy Marasco (despite that fact that we first requested her deposition over two weeks ago).  As we indicated during  last Friday's meet and confer, and

1

101

confirmed via email on Sunday, Ms. Marasco is a high-priority witness and we request, again, dates on which she is available for deposition.

Thanks,
Kevin


**Kevin J. Post**
**ROPES & GRAY LLP**
T +1 202 508 4653 | F +1 202 383 7768
One Metro Center, 700 12th Street, NW, Suite 900
Washington, DC 20005-3948
kevin.post@ropesgray.com
www.ropesgray.com

---

**From:** Robbins, Ellen S. [mailto:erobbins@Sidley.com]
**Sent:** Tuesday, March 20, 2012 7:53 PM
**To:** Post, Kevin; Giardina, David C.; chrisw@dhlt.com
**Cc:** Project-MS/Moto_WDWA_343/1823; RopesWashington1823 (Microsoft/Motorola); Pepe, Steven; summit1823@summitlaw.com
**Subject:** Re: Summary of Meet and Confer

Kevin,
Horacio Gutierrez will be available for his deposition on Monday, March 26 in Seattle. We anticipate this would be a half day deposition. Please confirm as soon as possible. Thank you.

---

**From**: Post, Kevin [mailto:Kevin.Post@ropesgray.com]
**Sent**: Monday, March 19, 2012 12:29 PM
**To**: Robbins, Ellen S.; Giardina, David C.; Chris Wion <chrisw@dhlt.com>
**Cc**: Project-MS/Moto_WDWA_343/1823; RopesWashington1823 (Microsoft/Motorola) <RopesWashington1823-Microsoft_Motorola@ropesgray.com>; Pepe, Steven <Steven.Pepe@ropesgray.com>; Summit1823 <Summit1823@SummitLaw.com>
**Subject**: RE: Summary of Meet and Confer

Counsel,

In addition to the witnesses previously identified, Motorola requests potential dates for the deposition of Horacio Gutierrez.  Please prioritize this witness, along with dates for Amy Marasco.

Regards,
Kevin


**Kevin J. Post**
**ROPES & GRAY LLP**
T +1 202 508 4653 | F +1 202 383 7768
One Metro Center, 700 12th Street, NW, Suite 900
Washington, DC 20005-3948
kevin.post@ropesgray.com
www.ropesgray.com

Circular 230 Disclosure (R&G): To ensure compliance with Treasury Department regulations, we inform you that any U.S. tax advice contained in this communication (including any attachments) was not intended or written to be used, and cannot be used, for the purpose of avoiding U.S. tax-related penalties or promoting, marketing or recommending to another party any tax-related matters addressed herein.

2

102

This message (including attachments) is privileged and confidential. If you are not the intended recipient, please delete it without further distribution and reply to the sender that you have received the message in error.

**From:** Post, Kevin
**Sent:** Sunday, March 18, 2012 11:08 AM
**To:** Robbins, Ellen S.; Giardina, David C.; Chris Wion
**Cc:** Project-MS/Moto_WDWA_343/1823; RopesWashington1823 (Microsoft/Motorola); Pepe, Steven; Summit1823
**Subject:** Summary of Meet and Confer

Ellen, Dave and Chris,

Thank you for a productive meet and confer on Friday.

You proposed that we de-prioritize the deposition of Mr. Shively, given his recent (July 2011) transition to the Corporate Standards Group. In his place, Mr. Heiner would be deposed Mach 28. We agreed to do so, pending the deposition of Mr. Heiner and a review of any documents related to Mr. Shively. As we agreed, we would re-visit the need for Mr. Shively's deposition at that time.

With respect to Ms. Gordon, we agreed to de-prioritize her deposition pending consideration of the terms of her departure from Motorola/Motorola Solutions and any employment agreement she has with Microsoft. We can revisit her deposition after these issue have been considered.

With respect to Microsoft's Third Amended 30(b)(6) Notice of Deposition, we indicated that Mr. Taylor would be designated for Topics 1, 2, 7, 10, 11, 12, and 14, subject to Motorola's Objections. Based on the agreement reached between the parties, however, Topics 1, 2, 11, and 12 will now be treated as interrogatories.

Finally, we discussed a prioritization of the witnesses and topics for which Motorola has requested deposition. We indicated that Ms. Marasco was a high-priority witness and we will provide you with any additional names, along with a list of high-priority deposition topics, over the weekend.

Please let me know if you have any disagreement with this summary.

Thanks,
Kevin

**Kevin J. Post**
**ROPES & GRAY LLP**
T +1 202 508 4653 | F +1 202 383 7768
One Metro Center, 700 12th Street, NW, Suite 900
Washington, DC 20005-3948
kevin.post@ropesgray.com
www.ropesgray.com

------------------------------------------------------------------------------------------------
IRS Circular 230 Disclosure: To comply with certain U.S. Treasury regulations, we inform you that, unless expressly stated otherwise, any U.S. federal tax advice contained in this communication, including attachments, was not intended or written to be used, and cannot be used, by any taxpayer for the purpose of avoiding any penalties that may be imposed on such taxpayer by the Internal Revenue Service. In addition, if any such tax advice is used or referred to by other parties in promoting, marketing or recommending any partnership or other entity, investment plan or arrangement, then (i) the advice should be construed as written in connection with the promotion or marketing by others of the transaction(s) or matter(s) addressed in this

3

103

communication and (ii) the taxpayer should seek advice based on the taxpayer's particular circumstances from an independent tax advisor.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

This e-mail is sent by a law firm and may contain information that is privileged or confidential. If you are not the intended recipient, please delete the e-mail and any attachments and notify us immediately.


\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

104

# EXHIBIT J

The Honorable James L. Robart

1

2

3

4

5

6                UNITED STATES DISTRICT COURT
         FOR THE WESTERN DISTRICT OF WASHINGTON
7                        AT SEATTLE

8   MICROSOFT CORPORATION,

9            Plaintiff,                    CASE NO. C10-1823 JLR

10           v.                            DEFENDANT MOTOROLA MOBILITY,
                                           INC.'S NOTICE OF DEPOSITION OF
11  MOTOROLA, INC., and MOTOROLA           MICROSOFT CORPORATION
    MOBILITY, INC.,
12

13           Defendants.

14

15

16

17

18

19

20

21

22

23

24

25

26

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

1    PLEASE TAKE NOTICE that pursuant to Rule 30(b)(6), Fed. R. Civ. P., Motorola

2  Mobility, Inc. ("Motorola Mobility") will take the deposition upon oral examination of Microsoft

3  Corporation ("Microsoft") on the topics set forth in the attached Schedule A, through one or more

4  of its officers, directors, or managing agents, or other persons who consent to testify on

5  Microsoft's behalf, commencing on March 13, 2012, at 9:00 AM.  Motorola Mobility requests that

6  Microsoft identify in writing at least five (5) business days in advance of the deposition the

7  person(s) designated by Microsoft to testify on its behalf, the job title of each such person(s), and

8  the topic(s) on which each such person(s) will testify.  Each such designated person is requested to

9  bring with him/her all documents upon which that person relies or any documents which he/she

10  has consulted in preparation for deposition in this matter.

11    The deposition will take place at the offices of the Summit Law Group PLLC, 315 Fifth

12  Avenue South, Suite 1000, Seattle, Washington 98104-2682, beginning on the date and time

13  specified above, or at such other time and place as may be agreed to by counsel.  The deposition

14  will be taken before an officer authorized to administer oaths by the laws of the United States and

15  will be recorded by stenographic, audio and/or videographic means.  The deposition will continue

16  from day to day until completed, with such adjournments as to time and place that may be

17  necessary.

18    DATED this 6th day of March, 2012.

19                                                    SUMMIT LAW GROUP PLLC

20                                          By_____

21                                              Ralph H. Palumbo, WSBA #04751
                                              Philip S. McCune, WSBA #21081
22                                              Lynn M. Engel, WSBA #21934
                                              *ralphp@summitlaw.com*
23                                              *philm@summitlaw.com*
                                              *lynne@summitlaw.com*
24

25

26

DEFENDANT MOTOROLA MOBILITY, INC.'S NOTICE OF                SUMMIT LAW GROUP PLLC
DEPOSITION OF MICROSOFT CORPORATION - 1                     315 FIFTH AVENUE SOUTH, SUITE 1000
CASE NO. C10-1823-JLR                                        SEATTLE, WASHINGTON 98104-2682
                                                              Telephone:  (206) 676-7000
                                                                  Fax:  (206) 676-7001

107

And by

Steven Pepe (*pro hac vice*)
Jesse J. Jenner (*pro hac vice*)
Stuart W. Yothers (*pro hac vice*)
Ropes & Gray LLP
1211 Avenue of the Americas
New York, NY 10036-8704
(212) 596-9046
*steven.pepe@ropesgray.com*
*jesse.jenner@ropesgray.com*
*stuart.yothers@ropesgray.com*

Norman H. Beamer (*pro hac vice*)
Gabrielle E. Higgins (*pro hac vice*)
Ropes & Gray LLP
1900 University Avenue, 6th Floor
East Palo Alto, CA 94303-2284
(650) 617-4030
*norman.beamer@ropesgray.com*
*gabrielle.higgins@ropesgray.com*

Paul M. Schoenhard (*pro hac vice*)
Kevin J. Post (*pro hac vice*)
Ropes & Gray LLP
One Metro Center
700 12th Street NW, Suite 900
Washington, DC 20005-3948
(202) 508-4693
*paul.schoenhard@ropesgray.com*
*kevin.post@ropesgray.com*

***Attorneys for Defendants Motorola Solutions,
Inc., Motorola Mobility, Inc., and General
Instrument Corporation***

DEFENDANT MOTOROLA MOBILITY, INC.'S NOTICE OF
DEPOSITION OF MICROSOFT CORPORATION - 2
CASE NO. C10-1823-JLR

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone: (206) 676-7000
Fax: (206) 676-7001

1

**SCHEDULE A**

2

**DEFINITIONS AND INSTRUCTIONS**

3

Motorola incorporates by reference in each of the requests below the definitions and

4

instructions set forth in Defendant Motorola Mobility, Inc.'s January 27, 2011 First Set and

5

October 21, 2011 Second Set of Interrogatories and Requests for Production to Microsoft

6

Corporation, as well as the following definitions and instructions used herein.

7

**DEFINITIONS**

8

1.      "IPR" means "intellectual property rights."

9

2.      "SSO" means "SDO," as defined in Motorola Mobility's January 27, 2011

10

discovery requests.

11

3.      "ETSI" means European Telecommunications Standards Institute.

12

4.      "Marvell" refers collectively and individually to Marvell Semiconductor Inc., and

13

all its predecessors or successors (merged, acquired, or otherwise), parents, divisions, subsidiaries,

14

and affiliates thereof, and all officers, agents, employees, counsel and other persons acting on its

15

behalf, or any other person or entity subject to Marvell Semiconductor Inc.'s control, or which

16

controls Marvell Semiconductor Inc.

17

5.      "Affiliate" means with respect to a specified Entity, any Entity that directly, or

18

indirectly through one or more intermediaries, controls, is controlled by, or is under common

19

control with, the specified Entity, now, or at any time hereafter, but such Entity shall be deemed to

20

be an Affiliate of the specified Entity only so long as such control exists.  For purposes of this

21

definition, (i) "control" (including the terms "controlling," "controlled by," and "under common

22

control with") means the possession, direct or indirect of the power to direct or cause the direction

23

of the management and policies of any Entity, whether through ownership of more than fifty

24

percent (50%) of the voting securities or more than fifty percent (50%) of the ownership interest

25

representing the right to make decisions for such Entity, by contract or otherwise, and (ii) "Entity"

26

means any legal entity including a corporation, association, partnership, business trust, joint

DEFENDANT MOTOROLA MOBILITY, INC.'S NOTICE OF
DEPOSITION OF MICROSOFT CORPORATION - 3
CASE NO. C10-1823-JLR

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

109

1  venture, or sole proprietorship, governmental organization or body, or any agency, department or

2  instrumentality thereof, and includes a natural person.

3       6.     "MOSAID" refers collectively and individually to MOSAID Technologies Inc.,

4  and all its predecessors or successors (merged, acquired, or otherwise), parents, divisions,

5  subsidiaries, and affiliates thereof, and all officers, agents, employees, counsel and other persons

6  acting on its behalf, or any other person or entity subject to MOSAID Technologies Inc.'s control,

7  or which controls MOSAID Technologies Inc.

8       7.     "Nokia" refers collectively and individually to Nokia Corp., and all its predecessors

9  or successors (merged, acquired, or otherwise), parents, divisions, subsidiaries, and affiliates

10  thereof, and all officers, agents, employees, counsel and other persons acting on its behalf, or any

11  other person or entity subject to Nokia Corp.'s control, or which controls Nokia Corp.

12       8.     "Core Wireless" refers collectively and individually to Core Wireless Licensing

13  S.a.r.l., and all its predecessors or successors (merged, acquired, or otherwise), parents, divisions,

14  subsidiaries, and affiliates thereof, and all officers, agents, employees, counsel and other persons

15  acting on its behalf, or any other person or entity subject to Core Wireless Licensing S.a.r.l.'s

16  control, or which controls Core Wireless Licensing S.a.r.l.

17       9.     "Apple" refers collectively and individually to Apple Inc., and all its predecessors

18  or successors (merged, acquired, or otherwise), parents, divisions, subsidiaries, and affiliates

19  thereof, and all officers, agents, employees, counsel and other persons acting on its behalf, or any

20  other person or entity subject to Apple Inc.'s control, or which controls Apple Inc.

21       10.     "Cisco" refers collectively and individually to Cisco Systems, Inc., and all its

22  predecessors or successors (merged, acquired, or otherwise), parents, divisions, subsidiaries, and

23  affiliates thereof, and all officers, agents, employees, counsel and other persons acting on its

24  behalf, or any other person or entity subject to Cisco Systems, Inc.'s control, or which controls

25  Cisco Systems, Inc.

26

DEFENDANT MOTOROLA MOBILITY, INC.'S NOTICE OF
DEPOSITION OF MICROSOFT CORPORATION - 4
CASE NO. C10-1823-JLR

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone: (206) 676-7000
Fax: (206) 676-7001

110

1

**TOPICS**

2  1.  Microsoft's Corporate Standards & Antitrust Group and its organizational structure and
3      composition for the past 3 years, including an explanation and identification of each
       individual employee within the Corporate Standards Group, and each individual's title and
4      job responsibilities.

5  2.  The factual bases for and all evidence supporting Microsoft's contention at ¶ 86 of its
       February 23, 2011 Amended and Supplemental Complaint that it "has been injured in its
6      business or property, including damages associated with the cost of defending the
       improperly filed Motorola Patent Actions, and is otherwise threatened by imminent loss of
7      profits, loss of customers and potential customers, and loss of goodwill and product
8      image."

9  3.  The factual bases for and all evidence supporting Microsoft's contention at ¶ 87 of its
       February 23, 2011 Amended and Supplemental Complaint that it "has suffered damages
10     and irreparable harm, and will suffer further damage and irreparable harm, by reason of
       each and all of the acts, practices, breaches and conduct of Defendants alleged above until
11     and unless the Court enjoins such acts, practices, and conduct."

12 4.  The factual bases for and all evidence supporting Microsoft's contention at ¶ 89 of its
13     February 23, 2011 Amended and Supplemental Complaint that Motorola "made a clear and
       definite promise to potential licensees through their commitments to IEEE and the ITU that
14     they would license any essential patents under reasonable rates, with reasonable terms, and
       on a non-discriminatory basis."
15
   5.  The factual bases for and all evidence supporting Microsoft's contention at ¶ 91 of its
16     February 23, 2011 Amended and Supplemental Complaint that it "developed and marketed
       its products and services in reliance on Defendants' promises," including without
17     limitation all facts supporting Microsoft's allegations that it relied on Motorola's RAND
18     assurances in implementing 802.11 and H.264 functionality in its products.

19 6.  The factual bases for and all evidence supporting Microsoft's contention at ¶ 93 of its
20     February 23, 2011 Amended and Supplemental Complaint that it "has been harmed as a
       result of its reasonable reliance on Defendants' promises and is threatened by the imminent
21     loss of profits, loss of customers and potential customers, and loss of goodwill and product
       image."

22 7.  The factual bases for and all evidence supporting Microsoft's contention at ¶ 94 of its
23     February 23, 2011 Amended and Supplemental Complaint that it "will suffer irreparable
       injury by reason of the acts and conduct of Defendants alleged above until and unless the
24     court enjoins such acts, practices, and conduct."

25 8.  A description and explanation of all actions Microsoft took in response to receiving
26     Motorola's October 21, 2010 offer letter, including any financial or technical analyses of
       the value of Motorola and/or Microsoft's 802.11-essential patent portfolio.

DEFENDANT MOTOROLA MOBILITY, INC.'S NOTICE OF
DEPOSITION OF MICROSOFT CORPORATION - 5
CASE NO. C10-1823-JLR

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone: (206) 676-7000
Fax: (206) 676-7001

111

9.   A description and explanation of all actions Microsoft took in response to receiving Motorola's October 29, 2010 offer letter, including any financial or technical analyses of the value of Motorola and/or Microsoft's H.264-essential patent portfolio.

10.  All facts, if any, showing that Microsoft is an "applicant" with respect to Motorola's 802.11-essential patent portfolio, as described in Motorola's IEEE letters of assurance (MOTM_WASH1823_0000001-34).

11.  All facts, if any, showing that Microsoft is an "applicant" with respect to Motorola's H.264-essential patent portfolio, as described in Motorola's ITU letters of assurance (MOTM_WASH1823_0000035-77).

12.  All facts supporting Microsoft's understanding of the scope and meaning of Motorola's RAND commitments to the ITU and IEEE, including without limitation an explanation of which of Motorola's letters of assurance obligate Motorola to license each of the patents included in its October 2010 letters on RAND terms.

13.  All facts supporting Microsoft's contention that Motorola's RAND commitments to the ITU and IEEE required that the terms included in Motorola's October 2010 offer letters be RAND-compliant.

14.  All facts supporting each of the contentions in Microsoft's November 29, 2011 supplemental response to Motorola's Interrogatory No. 6 regarding the appropriate method for the determination of a RAND royalty rate in a RAND license.

15.  All facts supporting Microsoft's contention that a RAND commitment to an SSO reflects the patent holder's agreement not to exclude others from using patent(s) that are subject to this RAND commitment to practice the relevant standard.

16.  All facts supporting Microsoft's contention that licenses to RAND-committed patents for the 802.11 standard should be available on "a nominal cost basis."

17.  All facts supporting Microsoft's contention that licenses to RAND-committed patents for the H.264 standard should be available on "a nominal cost basis."

18.  Microsoft's understanding of all of the terms and conditions that would be included in a RAND license between Motorola and Microsoft, including without limitation a list of all such terms and conditions, the contents of such terms and conditions, and the effect, if any, that each such term or condition would have on any royalty rate.

19.  For each of Motorola's 802.11-essential patents, an explanation of how to determine the incremental value of each patent over and above the value of alternatives to each patent and the processes specified by the standard.

DEFENDANT MOTOROLA MOBILITY, INC.'S NOTICE OF
DEPOSITION OF MICROSOFT CORPORATION - 6
CASE NO. C10-1823-JLR

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone: (206) 676-7000
Fax: (206) 676-7001

112

20. For each of Motorola's H.264-essential patents, an explanation of how to determine the incremental value of each patent over and above the value of alternatives to each patent and the processes specified by the standard.

21. For each of Microsoft's 802.11-essential patents, the description and circumstances regarding whether or not each patent has been licensed to another party as the result of a bilateral negotiation and any royalties received for each patent pursuant to any bilaterally negotiated license agreements.

22. For each of Microsoft's 802.11-essential patents, the description and circumstances regarding whether or not each patent has been licensed to another party as the result of a bilateral negotiation and any royalties received for each patent pursuant to any bilaterally negotiated license agreements.

23. The factual background and circumstances regarding each of the licenses identified in Microsoft's November 29, 2011 supplemental response to Motorola's Interrogatory No. 10, including without limitation an identification of the relevant patent policies or provisions upon which Microsoft bases its contention that these licenses were granted on RAND terms and conditions.

24. The factual background and circumstances regarding Microsoft's April 10, 2009 patent license agreement with CSIRO (MS-MOTO_1823_00005195128-52), including any RAND analysis performed by Microsoft prior to entering into that agreement or attempt by Microsoft to determine the incremental value of the licensed patents over and above the value of alternatives to each patent.

25. The factual background and circumstances regarding Microsoft's relationship with Florian Mueller, including whether Mr. Mueller has entered into any agreement with Microsoft, the terms and conditions of any such agreement, the individuals at Microsoft that correspond and communicate with Mr. Mueller, the purposes of those communications, the frequency of those communications, and the dates of those communications.

26. Statements made to Florian Mueller by Microsoft or any of its attorneys, representatives or agents concerning Motorola.

27. The compensation (financial or otherwise) that Florian Mueller has received from Microsoft since 2010.

28. An explanation and description of the circumstances under and purposes for which Microsoft commissioned Florian Mueller to perform his "study on the worldwide use of FRAND-committed patents" detailed at http://fosspatents.blogspot.com/2011/10/study-on-worldwide-use-of-frand.html.

29. The factual background and circumstances concerning the drafting of and decision to send the June 14, 2011 letter sent by Amy Marasco and David Heiner on behalf of Microsoft to the Federal Trade Commission (MOTM_WASH1823_0054670-86).

DEFENDANT MOTOROLA MOBILITY, INC.'S NOTICE OF
DEPOSITION OF MICROSOFT CORPORATION - 7
CASE NO. C10-1823-JLR

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone: (206) 676-7000
Fax: (206) 676-7001

113

30. An identification of all currently available and planned Microsoft products that comply (or are planned to comply) with the 802.11 standard, including but not limited to Xbox consoles or adapters, computers, laptops, tablets, smartphones, WiFi hotspots, routers, etc.

31. For each currently available and planned Microsoft product that complies (or are planned to comply) with the 802.11 standard, all facts regarding Microsoft's knowledge of the importance or use of the standard by that product's users, including without limitation consumer surveys, feedback or other usage statistics.

32. An identification of all currently available and planned Microsoft products that comply (or are planned to comply) with the H.264 standard, including but not limited to Xbox consoles or adapters, computers, laptops, tablets, smartphones, WiFi hotspots, routers, etc.

33. For each currently available and planned Microsoft product that complies (or are planned to comply) with the H.264 standard, all facts regarding Microsoft's knowledge of the importance or use of the standard by that product's users, including without limitation consumer surveys, feedback, or other usage statistics.

34. The factual background and circumstances surrounding Microsoft's decision to become a licensor to the MPEG LA AVC/H.264 patent pool.

35. The factual background and circumstances surrounding any decision by Microsoft to not become a licensor or licensee to the Via Licensing 802.11 patent pool.

36. A description of all facts and circumstances regarding the publishing of the statement titled "Microsoft's Support For Industry Standards" (http://www.microsoft.com/about/legal/en/us/IntellectualProperty/iplicensing/ip2.aspx) on February 8, 2012, including without limitation an identification of all persons involved in or consulted with regarding the content or decision to publish the statement and all communications (prior or subsequent to February 8, 2012) relating to or concerning the statement and/or its contents.

37. An explanation of the nature of the relationship and any communications between Microsoft and Apple regarding Apple's November 11, 2011 letter to ETSI regarding the licensing of standards-essential patents, which may be found at http://www.appleinsider.com/articles/12/02/07/apple_asks_etsi_standards_body_to_set_rules_for_standards_essential_patents.html.

38. An explanation of the nature of the relationship and any communications between Microsoft and Cisco regarding Cisco's January 31, 2012 letter to ETSI regarding the licensing of standards-essential patents, which may be found at http://www.appleinsider.com/articles/12/02/08/cisco_backs_apples_etsi_request_for_fair_and_open_licensing_of_standards_patents.html.

39. An explanation of the relationship and communications between Marvell and/or its counsel with Microsoft and/or its counsel concerning each of the following: (1) Microsoft's request that Marvell indemnify Microsoft for possible infringement of any of Motorola's 802.11

DEFENDANT MOTOROLA MOBILITY, INC.'S NOTICE OF
DEPOSITION OF MICROSOFT CORPORATION - 8
CASE NO. C10-1823-JLR

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone: (206) 676-7000
Fax: (206) 676-7001

114

1    patents; (2) Microsoft's request that Marvell seek a patent license for any of Motorola's

2    802.11 patents; (3) ITC Investigation No. 337-TA-752; and (4) Motorola, including any
license negotiations or discussions between Motorola and Marvell.

3

4    40.    The factual background and circumstances behind all of the patent license agreements that
Microsoft has granted on what Microsoft believes to be RAND terms, including without

5    limitation the patent license agreements Microsoft offers pursuant to its Open Specification
Promise, Community Promise, Interoperability Principles or as part of Microsoft's

6    Interoperability Program, as detailed on Microsoft web site http://www.microsoft.com/
openspecifications/en/us/programs/default.aspx.

7    41.    An explanation of the relationship and communications or agreements between Microsoft

8    and MOSAID or its Affiliates regarding patent licensing or patent transfer, and any
royalties or revenue obtained or expected to be obtained by Microsoft from MOSAID or its

9    Affiliates.

10   42.    An explanation of the relationship and communications or agreements between Microsoft
and Nokia or its Affiliates regarding patent licensing or patent transfer, and any royalties or

11   revenue obtained or expected to be obtained by Microsoft from Nokia or its Affiliates.

12   43.    An explanation of the relationship and communications or agreements between Microsoft

13   and Core Wireless or its Affiliates regarding patent licensing or patent transfer, and any
royalties or revenue obtained or expected to be obtained by Microsoft from Core Wireless

14   or its Affiliates.

15

16

17

18

19

20

21

22

23

24

25

26

DEFENDANT MOTOROLA MOBILITY, INC.'S NOTICE OF
DEPOSITION OF MICROSOFT CORPORATION - 9
CASE NO. C10-1823-JLR

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone: (206) 676-7000
Fax: (206) 676-7001

1

## CERTIFICATE OF SERVICE

2    I hereby certify that on this day I served a true and correct copy of the foregoing Defendant
Motorola Mobility, Inc.'s Notice of Deposition of Microsoft Corporation to Microsoft Corporation
3    via electronic mail on counsel of record below.

4
Arthur W. Harrigan, Jr., Esq.
5    Christopher T. Wion, Esq.
Shane P. Cramer, Esq.
6    Danielson Harrigan Leyh & Tollefson
*arthurh@dhlt.com*
7    *chrisw@dhlt.com*
*shanec@dhlt.com*
8
9    Richard A. Cederoth, Esq.
Sidley Austin LLP
10   *rcederoth@sidley.com*

11

12   DATED this 6th day of March, 2012.

13

14   _____
Marcia A. Ripley

15

16

17

18

19

20

21

22

23

24

25

26

DEFENDANT MOTOROLA MOBILITY, INC.'S NOTICE OF
DEPOSITION OF MICROSOFT CORPORATION - 10
CASE NO. C10-1823-JLR

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone: (206) 676-7000
Fax: (206) 676-7001

116

# EXHIBIT K

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT SEATTLE

_____

MICROSOFT CORPORATION,        )
                              )
              Plaintiff,      ) CASE NO. C10-01823JLR
                              )
v.                            ) SEATTLE, WASHINGTON
                              ) June 25, 2013
MOTOROLA INC., et al.,,       )
                              ) TELEPHONE CONFERENCE
              Defendant.      )
                              )
_____

VERBATIM REPORT OF PROCEEDINGS
BEFORE THE HONORABLE JAMES L. ROBART
UNITED STATES DISTRICT JUDGE
_____

APPEARANCES:

  For the Plaintiff:    ARTHUR HARRIGAN


  For the Defendant:    BRIAN CANNON


  Reported by:          NANCY L. BAUER, CCR, RPR
                        Federal Court Reporter
                        700 Stewart Street, Suite 17205
                        Seattle, WA 98101
                        (206) 370-8506
                        nancy_bauer@wawd.uscourts.gov

```
 1   June 25, 2013                              3:00 p.m.
                              PROCEEDINGS
 2   _____

 3            THE COURT:  Good afternoon, counsel.  This is Judge

 4   Robart.

 5            MR. HARRIGAN:  Good afternoon, Your Honor.

 6            THE COURT:  Mr. Harrigan.

 7            MR. PALUMBO:  Good afternoon, Your Honor.

 8            THE COURT:  Mr. Palumbo.

 9         Counsel, who is going to be speaking for the parties

10   today?

11            MR. HARRIGAN:  Art Harrigan for Microsoft, Your

12   Honor.

13            MR. PALUMBO:  Your Honor, this is Ralph Palumbo.  I

14   have Brian Cannon and Andrea Roberts from the Quinn Emanuel

15   firm, and they will be speaking for Motorola.  And Mr.

16   McCune, from my office, is also on the line.

17            MR. HARRIGAN:  We have others on the line, Your

18   Honor.  My partners, Mr. Wion and Mr. Cramer, Mr. Killough

19   and Mr. Culbert from Microsoft, and Mr. Pritikin from the

20   Sidley Firm.

21            THE COURT:  All right.  I would ask that we only have

22   one person speak for each party, since we have a court

23   reporter present and it's going to assist her in keeping

24   track of who is who.  If you'll introduce yourself when you

25   start, and then she'll be able to recognize your voice after
```

that.

Do either of the parties have anything that they wish to add to their briefing, which we've had an opportunity to review and have some preliminary thoughts on about how to proceed?

MR. HARRIGAN:  Not here, Your Honor.  We have nothing to add.

THE COURT:  Mr. Palumbo?

MR. PALUMBO:  Mr. Cannon will be speaking.

MR. CANNON:  Your Honor, Brian Cannon for Motorola. Nothing to add to the papers at this time.

THE COURT:  All right.  Let me start on the easier of these two issues, then.

As I understand it, Microsoft wants its bond to be released, and Motorola opposes that.  I guess that I would start with this, by asking you to go back and look at why that bond was posted in the first place, and that was the request by Microsoft for a temporary restraining order, which was later converted into a preliminary injunction.  That was a bond that was posted in connection with that preliminary injunction, and the situation in regards to the injunction was, it prohibited Motorola from enforcing an injunction it might receive in Germany.

I have subsequently discharged that preliminary injunction, having found that it was no longer necessary, and

1   therefore it seems to me that the proper resolution of this

2   question is, then, since the purpose of the bond was securing

3   the court's anti-suit injunction, and the purpose of that was

4   to determine if Motorola could obtain injunctive relief under

5   the H.264 standard and the 802.11 standard essential patents,

6   it seems to me that we have now determined that Motorola is

7   not entitled to injunctive relief for H.264 or 802.11.

8       And the court has further set the royalty rates to be

9   imposed under the license for those; thus, the purpose of the

10  anti-suit injunction was no longer necessary, and the

11  injunction was no longer necessary, and therefore the bond is

12  no longer necessary.  So I am releasing the $100 million

13  security bond at this time.

14      Let me then take you to what seems to be more of your real

15  battleground these days, which is a discovery dispute.

16      I am obligated to express my displeasure that you all

17  seemed to have treated my discovery schedule as a suggestion

18  and not a court order.

19      I set the discovery schedule in this matter on March 14th

20  of 2013.  Somewhat promptly, three weeks later, Motorola

21  apparently notes a 30(b)(6) deposition.  On May 1st,

22  Microsoft designates Mr. Davidson to be a witness in response

23  to the 30(b)(6) motion.  On May 9th, apparently that

24  deposition is taken.  On May 16th, according to your

25  submissions to the court, Microsoft says that it is going to

1    provide no further 30(b)(6) witnesses.  Meaningfully to,

2    apparently, no one other than the court, on May 20th, fact

3    discovery closed.

4        Since then you've had a May 22nd deposition of

5    Mr. Roberts, and a May 30th deposition of Daly.  I'm not sure

6    if Roberts and Daly are a Mr. or a Ms., so if I've got the

7    genders wrong, I apologize.

8        On June 11th, apparently you met and conferred.  On June

9    17th, you contacted the court and asked to file your letter

10   briefs, and those were filed on June 18th.

11       That is significantly out of compliance with the discovery

12   schedule that was set in this matter, and, frankly, on that

13   basis alone, I'm inclined to say that neither of you are

14   getting anything that you want.

15       However, because we would rather resolve matters on the

16   merits rather than on the arbitrariness of the court, I have

17   looked at the pleadings.  Microsoft does not respond to

18   Motorola's contention that there are at least two areas where

19   there was not a witness responsive to the 30(b)(6) notice, at

20   least based on the pleadings you've given me.

21       First is a witness who could categorically testify of any

22   consideration of moving the distribution center prior to

23   mid-January 2012.  The only witness who seems to have spoken

24   to that said they were not personally aware of it, and it

25   seems to me there's a difference between saying, "I'm

6

1    personally not aware of it," and a witness who represents the

2    entire company who will say it wasn't under consideration.

3        Secondly, Motorola notes that no witness was able to

4    respond to the item in the 30(b)(6) designation concerning

5    what lawsuits against Microsoft were pending in Germany.  And

6    I've added the timeframe of 2011, 2012.  Therefore, I'm going

7    to order that Motorola is permitted a two-hour deposition

8    from a witness who can respond to each of those two discrete

9    issues.

10       That leaves open the interesting question of the sword and

11   the shield, as you all have taken to calling it, and,

12   frankly, there seems to be a certain amount of lack of condor

13   in the briefing that you've provided me.

14       The representation is made by Microsoft that there was a

15   clear, definitive statement by the Microsoft witnesses that

16   there was -- it was their decision, let's put it that way, to

17   move the distribution center.  And I'm noting on page 3 of

18   Mr. Harrigan's letter, found in the docket at 704, which

19   reads, "Davidson's and Roberts' deposition testimony

20   demonstrates that there is nothing of consequence remaining

21   to discover.  They made the decision to relocate."

22       That's a flat out, unambiguous declarative statement.

23       The question to the court, then, is, how do you reconcile

24   that with the deposition transcripts in this matter?  Let's

25   start with Mr. Davidson.

1       On page 61, he seems to be the low man on the totem pole.
2  What he says is, in response to a question on page 56, "And
3  who -- who ultimately made the decision to move the
4  facilities?
5  "ANSWER:  It would have been me; Owen Roberts, my boss; and
6  his boss, Brian Tobey."
7       That would be consistent with the statement in the
8  Microsoft briefing
9       However, if you go to Mr. Roberts, who is identified as
10  Mr. Davidson's superior, you get a much different answer.  On
11  pages 40 and 41, the following took place:
12       The question was asked, "And then the decision to relocate
13  the facility out of Germany, do you know who ultimately had
14  sign-off authority on that decision?
15  "ANSWER:  That was -- I would rephrase the point to say it
16  wasn't a decision to move it.  We were told, based on the
17  litigation, we had to move the facility.
18  "QUESTION:  So I guess just to clarify, I understand your
19  team -- your team did not make the decision --
20  "ANSWER:  Correct.
21  "QUESTION:  -- to relocate out of Germany?
22  "ANSWER:  No.  We were not planning to move warehouses in
23  Europe.
24  "QUESTION:  That was a decision that your team was informed
25  by legal counsel?

1  "ANSWER:   Correct.

2  "QUESTION:   Okay.   And who on the legal team made the

3  decision to move?

4  "ANSWER:   Shelley McKinley was my contact."

5      The court is unable to reconcile the statement in

6  Microsoft's briefing that Davidson and Roberts made the

7  decision to relocate with the direct deposition testimony of

8  the witness.   That's either a lack of understanding of the

9  witness's testimony, an effort to characterize the testimony,

10  or an outright misstatement, but it's going to cause the

11  court to enter the following ruling:

12      I will allow the deposition of two hours of Ms. McKinley,

13  who, according to the deposition testimony of Microsoft, was

14  the person who made the decision.   You can't simply say, one,

15  we made the decision, when your own witnesses don't testify

16  contrary to that, and secondly, you can't say, "The law

17  department made us do it," without opening yourself open to

18  examination of what the law department did.

19      I will say that the list of questions that Motorola seeks

20  to ask is much too broad, and it seems to have little

21  significance to the question at hand.   But since Microsoft

22  has opened the door to why the law department told the

23  business people that they were moving the warehouse, it seems

24  to me, as a matter of fairness, that Motorola is permitted to

25  examine that question.

1        So in summary, I've authorized a two-hour deposition on a

2   question that I assume should, frankly, not take more than

3   about ten minutes.  One, a witness who can categorically say,

4   as the witness has implied, that there was no consideration

5   of moving the distribution center prior to mid-January of

6   2012, and someone who can discuss other patent litigation

7   lawsuits pending in Germany in the 2011, 2012 range, and a

8   second two-hour deposition of Ms. McKinley or someone else in

9   the law department who will explain the reasons why the law

10  department made the decision that the distribution center

11  needed to be moved.

12        So that will be the ruling of the court on your letter

13  motions.

14        Mr. Harrigan, any questions?

15          MR. HARRIGAN:  No, Your Honor.  I -- and I'm not

16  saying this to argue with your ruling at all, I'm not arguing

17  with it, but I do want to simply point out that the same

18  witness, Mr. Roberts, was invited later in the deposition to

19  clarify, and that was the word, I believe.  "I want to make

20  sure I'm understanding your testimony," was the question, and

21  he unequivocally testified later in that deposition that it

22  was a decision made by the business people and not the legal

23  people.

24          THE COURT:  Okay.  We read --

25          MR. HARRIGAN:  But I agree with you that the first

1    quote is something that should have been addressed.

2          THE COURT:  Well, we read both of them, and it seems

3    to me that, at best, it creates an ambiguity in his

4    testimony, and if the law department wants to say, "We don't

5    have any authority over the business people, all we can do is

6    explain the consequences of their actions," you're going to

7    be living with that at trial.  But that's what he says in his

8    deposition, and that's what the court is going to rely on.

9          MR. HARRIGAN:  I understand.

10          THE COURT:  Mr. Cannon?

11          MR. CANNON:  Nothing from me, Your Honor.  Thank you.

12          THE COURT:  All right.  Counsel, you have motions

13    coming up, you have dispositive motions coming up, and you

14    have a trial coming up.  I would urge you to get this stuff

15    done promptly, because it's not going to change the court's

16    schedule, and it's not going to impact your trial date.

17       I think that covers all of the areas.

18       There's a discussion of efforts to mitigate damages, and,

19    frankly, I did not understand what Motorola was trying to say

20    in regards to that.  It seems to me that, based on the

21    testimony, the record is that Microsoft made the decision to

22    move in response to what it perceived to be the legal

23    situation in Germany, and that really is the question of

24    mitigating damages.

25       So if you think that I've missed something in regards to

1  that, I'm happy to talk to you, but I think you have covered

2  that at the present time.

3      So that will complete the sequence of events or areas of

4  questioning that Motorola has raised today.

5      Anything further, counsel?

6          MR. HARRIGAN:  Not here, Your Honor.

7          MR. CANNON:  No, Your Honor.

8          THE COURT:  All right.  Thank you.  We'll be in

9  recess.

10

11                  (THE PROCEEDINGS CONCLUDED.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

C E R T I F I C A T E

       I, Nancy L. Bauer, CCR, RPR, Court Reporter for the United States District Court in the Western District of Washington at Seattle, do hereby certify that I was present in court during the foregoing matter and reported said proceedings stenographically.

       I further certify that thereafter, I have caused said stenographic notes to be transcribed under my direction and that the foregoing pages are a true and accurate transcription to the best of my ability.

       Dated this 26th day of June 2013.

       /S/  Nancy L. Bauer

       Nancy L. Bauer, CCR, RPR
       Official Court Reporter

# EXHIBIT L

# Filed Under Seal

# EXHIBIT M

```
                UNITED STATES DISTRICT COURT
           WESTERN DISTRICT OF WASHINGTON AT SEATTLE
_____

 MICROSOFT CORPORATION,            )
                                   )
                 Plaintiff,        ) CASE NO. C10-1823JLR
                                   )
 v.                                ) SEATTLE, WASHINGTON
                                   ) July 31, 2013
 MOTOROLA, INC., et al.,           )
                                   ) MOTION HEARING
                 Defendant.        )
                                   )
_____

                VERBATIM REPORT OF PROCEEDINGS
           BEFORE THE HONORABLE JAMES L. ROBART
               UNITED STATES DISTRICT JUDGE
_____

 APPEARANCES:

  For the Plaintiff:      ARTHUR HARRIGAN
                          RICHARD CEDEROTH
                          ANDREW CULBERT
                          DAVID PRITIKIN
                          CHRISTOPHER WION


  For the Defendant:      KATHLEEN SULLIVAN
                          WILLIAM PRICE
                          PHILIP McCUNE
                          ANDREA ROBERTS
                          CHERYL BERRY
                          ELLYDE THOMPSON
                          RALPH PALUMBO (by telephone)


  Reported by:            NANCY L. BAUER, CCR, RPR
                          Federal Court Reporter
                          700 Stewart Street, Suite 17205
                          Seattle, WA 98101
                          (206) 370-8506
                          nancy_bauer@wawd.uscourts.gov
```

1    Are you still asserting a ripeness affirmative defense?

2              MS. SULLIVAN:  Your Honor, we are asserting ripeness

3    and unclean hands as equitable defenses that we don't think

4    Your Honor should determine on summary judgment now, because

5    the very same facts that are at issue about the parties' good

6    faith goes to whether Microsoft pulled the trigger too soon.

7         I understand, Your Honor.  I'm not defying your decision

8    on the motion to dismiss.  You absolutely said there was no

9    basis for dismissal on Article III ripeness found earlier.

10   We accept that opinion.

11        What we're suggesting, Your Honor, is that the good-faith

12   inquiry is intertwined with the ripeness and good-faith

13   inquiry.  So we would still like to preserve those, Your

14   Honor, unless Your Honor -- one way you might preserve them,

15   Your Honor, is postpone equitable defenses until after the

16   trial.  That's one option.

17             THE COURT:  Well, you're asking eight people to do a

18   lot in a relatively short period of time, and, frankly, I'm

19   not sure that the marginal -- there are other ways to deal

20   with the equitable arguments you want to make other than

21   having, you know, jury instructions on ripeness and unclean

22   hands.  That's --

23             MS. SULLIVAN:  Understood, Your Honor.  Well, those

24   can be postponed until after trial.  The one thing we do

25   think needs to stay in, Your Honor, and I think yesterday's

1  standard essential patents, and we believe there is and

2  should be a categorical rule that you don't do that, but

3  without reaching that question, clearly on the facts of this

4  case as this has unfolded and the timeline that exists here,

5  they were engaged in holdup.  The court could find that, we

6  think, as Mr. Harrigan argued yesterday, as a matter of

7  summary judgment, but there's no basis for removing that from

8  the case.

9      Let me turn to a couple other points that were made by

10  Ms. Sullivan in the course of her arguments.

11      Let me come back for just a moment to the Marvell issue.

12      So in June of 2011, Microsoft had asked Marvell to get the

13  license.  Now, this didn't just come out of the blue.  This

14  isn't something that Marvell, on its own, decided to do.  It

15  was done at the specific request of Microsoft, because having

16  a license for the chip that substantially embodied the wi-fi

17  in the 802.11 capabilities would have provided Microsoft the

18  ability to continue to sell the Xbox console regardless of

19  what would have happened with their continuing law

20  enforcements.  There would have been an exhaustion, since

21  that would have been created.

22      Ms. Sullivan told you 10 or 15 minutes ago that Motorola

23  came back and offered a license to Marvell, but she left out

24  one very, very important fact, and that is, the license that

25  they provided to Marvell had a specific exclusion in it for

# EXHIBIT N

Microsoft Corporation
One Microsoft Way
Redmond, WA 98052-6399

Tel 425 882 8080
Fax 425 936 7329
http://www.microsoft.com/

*Microsoft*

August 31, 2005

**VIA OVERNIGHT MAIL**

Mr. Paul Reinhardt
Executive Director
SD Card Association
c/o Global Inventures, Inc.
2400 Camino Ramon
Suite 375
San Ramon, CA 94583

Subject: Microsoft Contribution to SD Card Association

Dear Mr. Reinhardt:

Microsoft has developed an implementation of the File Allocation Table file system for organizing and managing computer data files stored on digital storage media ("FAT32 File System"), and technology that provides long file names support in the FAT32 File System ("Long File Name Support"). Microsoft has also developed a FAT32 File System specification ("Microsoft FAT32 Specification"); a Long File Name Support specification which may consist of portions of the Microsoft FAT32 Specification specifically identified by Microsoft as comprising the long file name features ("Microsoft LFN Specification") and a test specification ("Microsoft Compliance Test Specification") which describes how a device or process can be tested for compliance with the technical requirements relating to the Microsoft FAT32 Specification. The Microsoft FAT32 Specification, Microsoft LFN Specification and the Microsoft Compliance Test Specification are collectively referred to herein as the "Microsoft Contribution."

Microsoft desires to provide to the SD Card Association ("SDA") the Microsoft Contribution for use in developing and publishing SDA file system specifications and/or SDA test specification ("SDA Specification") that may incorporate the Microsoft Contribution and/or portions thereof. Pursuant to the "copyright issues" portion of this letter set forth below, SDA may incorporate all, any portion or none of the Microsoft Contribution into an SDA Specification, in any manner it determines in its sole discretion. Without limiting SDA's rights, but for avoidance of doubt, SDA may make the Microsoft LFN Specification and/or the Microsoft Compliance Test Specification an optional portion of any SDA Specification, incorporate portions thereof as a separate specification from other FAT32 File System specifications and/or elect not to incorporate such portions thereof into an SDA Specification. In the event that SDA elects to incorporate any portion of the Microsoft Contribution as an optional portion of an SDA Specification, Microsoft agrees to provide the RAND license assurance set forth below for those patent claims which are required to implement such optional portions.

The Microsoft Contribution is made under the following considerations/conditions:

Essential Patent Claims Disclosure: As required by, and defined in the SDA Intellectual Property Policy, Microsoft hereby discloses that it is aware of the following Patents that have essential patent claims with respect to the Microsoft Contribution. At or before

Microsoft Corporation is an equal opportunity employer.

1

CONFIDENTIAL BUSINESS INFORMATION,
SUBJECT TO PROTECTIVE ORDER

141

Microsoft Corporation
One Microsoft Way          Tel 425-882-8080
Redmond, WA 98052-6399     Fax 425-936-7329
                           http://www.microsoft.com/



such time as SDA adopts an SDA Specification incorporating some or all the Microsoft Contribution, Microsoft will provide an updated Essential Patent disclosure relating to any finally-adopted SDA Specifications:

- U.S. Patent No. 5,579,517, entitled "Common Name Space for Long and Short Filenames", issued 11/26/1996 to Reynolds, *et al.*
- U.S. Patent No. 5,758,352, entitled "Common Name Space for Long and Short Filenames, issued 5/26/1998 to Reynolds, *et al.*
- U.S. Patent No. 6,286,013, entitled "Method and System for Providing a Common Name Space for Long and Short File Names in an Operating System", issued 9/4/2001 to Reynolds, *et al.*
- DE Patent No. 618540, entitled "Common Name Space for Long and Short Filenames" issued to Reynolds, *et al.*
- FR Patent No. 618540, entitled "Common Name Space for Long and Short Filenames", issued to Reynolds, *et al.*
- GB Patent No. 618540, entitled "Common Name Space for Long and Short Filenames", issued to Reynolds, *et al.*
- Pending Canadian Application Ser. No. 2120461, entitled "Common Name Space for Long and Short Filenames", filed 3/31/1994.
- Pending Japanese Application Ser. 1994/064808, entitled "Common Name Space for Long and Short Filenames", filed 4/01/1994.

License assurance: Microsoft is not aware at this time of any other Essential Patents it holds that are necessary to implement the Microsoft Contribution. Pursuant to Section 5(ii) of the SDA Intellectual Property Policy, Microsoft commits to the SDA that Microsoft will license its Essential Patent Claims in a non-discriminatory fashion and under reasonable terms and conditions to all SDA Member and non-SDA-Member licensees, solely to the extent required for such entities to implement finally-adopted SDA Specifications.   Microsoft will grant such licenses to SDA Members and non-SDA-Members pursuant to separate agreements.   Vendors should seek their own legal counsel to assess whether products implement the patented technology because each implementation may be unique. As stated above, Microsoft is willing to make licenses available for products implementing the Microsoft LFN Specification on a RAND, royalty-bearing basis. To the extent Microsoft has patent claims essential to implementing the Microsoft FAT32 Specification, Microsoft will offer licenses to such patent claims on a RAND, royalty-free basis for products conforming to the specification. To the extent that a company makes or distributes preformatted media cards that themselves (a) do not implement the Microsoft LFN Specification, and (b) do not contain or use any long file names, Microsoft will not assert patent claims essential to implementing the Microsoft LFN Specification against those cards. No other license or agreement not to assert any other patent claim is granted or made, express or implied or by waiver, estoppel, or otherwise.

Copyright issues:

a) *Ownership*. Microsoft retains ownership of its copyrights in and to the Microsoft Contribution. Nothing in this letter or in SDA's Intellectual Property Policy shall be construed as an assignment of such copyrights to SDA or any other person or entity.

Microsoft Corporation is an equal opportunity employer.          2

CONFIDENTIAL BUSINESS INFORMATION,
SUBJECT TO PROTECTIVE ORDER

142

MS-MOTO_1823_00002370169

Microsoft Corporation
One Microsoft Way
Redmond, WA 98052-6399
Tel 425 882-8080
Fax 425 936-7329
http://www.microsoft.com/



Microsoft acknowledges and will not challenge SDA's assertion of copyright ownership according to SDA's Intellectual Property Policy of final SDA specifications subject to the underlying copyrights in Microsoft's Contribution and the terms hereof.

(b) *Development License.* Microsoft hereby grants to SDA and to each other Member a worldwide, irrevocable, non-transferable, non-sublicensable, royalty-free, non-exclusive, perpetual, fully-paid, copyright license under its copyrights in the Microsoft Contribution to use, copy, modify, disclose and create derivative works of such Microsoft Contribution for the sole purpose of incorporation (whether by express incorporation or incorporation by reference) of such Microsoft Contribution, and/or modifications thereof into any SDA Specifications, and for the development of any SDA Specifications.

(c) *Publication License.* Microsoft hereby grants to SDA a worldwide, irrevocable, non-transferable, royalty-free, non-exclusive, perpetual, fully-paid, copyright license (with the right to sublicense) under its copyrights in the Microsoft Contribution to use, copy, disclose, publicly display and perform, publish and distribute such Microsoft Contribution, and/or modifications thereof (which may be made by SDA or any Member), solely as part of and/or incorporated in (whether by express incorporation or incorporation by reference) one or more SDA Final Specification(s).

Please be advised that Microsoft is not providing any warranties of any kind (express or implied) with regard to this copyrighted material.

Please let us know if you have any questions or comments regarding this contribution. We look forward to our continued working relationship with the SDA and its members.

Sincerely,

Vishal Ghotge
Windows Core File Services
Microsoft Corporation

Enclosure

Cc:     James Vickery, Esq. (via e-mail without enclosure)
        SD Card Association Board of Directors (via e-mail without enclosure)

CONFIDENTIAL BUSINESS INFORMATION,
SUBJECT TO PROTECTIVE ORDER                              MS-MOTO_1823_00002370170

# EXHIBIT O



TopStories

Tech students square off in Imagine Cup
2012-07-05

Startups take Kinect into uncharted territory
2012-06-29

Office 365 marks first year with new customers, education offering
2012-06-27

## Microsoft Makes Strategic Changes in Technology and Business Practices to Expand Interoperability

Feb. 21, 2008

New interoperability principles and actions will increase openness of key products.







**REDMOND, Wash. — Feb. 21, 2008 —** Microsoft Corp. today announced a set of broad-reaching changes to its technology and business practices to increase the openness of its products and drive greater interoperability, opportunity and choice for developers, partners, customers and competitors.

Specifically, Microsoft is implementing four new interoperability principles and corresponding actions across its high-volume business products: (1) ensuring open connections; (2) promoting data portability; (3) enhancing support for industry standards; and (4) fostering more open engagement with customers and the industry, including open source communities.

"These steps represent an important step and significant change in how we share information about our products and technologies," said Microsoft chief executive officer Steve Ballmer. "For the past 33 years, we have shared a lot of information with hundreds of thousands of partners around the world and helped build the industry, but today's announcement represents a significant expansion toward even greater transparency. Our goal is to promote greater interoperability, opportunity and choice for customers and developers throughout the industry by making our products more open and by sharing even more information about our technologies."

According to Ray Ozzie, Microsoft chief software architect, the company's announcement reflects the significance that individuals and businesses place upon the ease of information-sharing. As heterogeneity is the norm within enterprise architectures, interoperability across applications and services has become a key requirement.

"Customers need all their vendors, including and especially Microsoft, to deliver software and services that are flexible enough such that any developer can use their open interfaces and data to effectively integrate applications or to compose entirely new solutions," said Ozzie. "By increasing the openness of our products, we will provide developers additional opportunity to innovate and deliver value for customers."

"The principles and actions announced today by Microsoft are a very significant expansion of its efforts to promote interoperability," said Manfred Wangler, vice president, Corporate Research and Technology, Software and Engineering, Siemens. "While Microsoft has made considerable progress on interoperability over the past several years, including working with us on the Interoperability Executive Customer Council, today's news take Microsoft's interoperability commitment to a whole new level."

"The interoperability principles and actions announced today by Microsoft will benefit the broader IT community," said Thomas Vogel, head, Information Management, Novartis Pharma. "Ensuring open connections to Microsoft's high-volume products presents significant opportunities for the vast majority of software developers, which will help foster greater interoperability, opportunity and choice in the marketplace. We look forward to a constructive, structured, and multilateral dialogue to ensure stakeholder-driven evolution of these principles and actions."

The interoperability principles and actions announced today apply to the following high-volume

### Press Contacts

Rapid Response Team
Waggener Edstrom Worldwide
(503) 433-7070

### Related Links

**Feature Stories:**
New Microsoft Interoperability Principles Ensure Open Connections and Promote Data Portability – Feb. 21, 2008

**Microsoft Resources:**
Quote Sheet: Microsoft Interoperability Principles

Microsoft Interoperability Virtual Pressroom

Microsoft Interoperability Web site

**Transcript:**
Press Conference Call on Microsoft Interoperability Announcement - Feb. 21, 2008

### Mentioned in this Story

PEOPLE

Steve Ballmer
Chief Executive Officer

Brad Smith
General Counsel and Executive Vice President, Legal and Corporate Affairs

Microsoft products: Windows Vista (including the .NET Framework), Windows Server 2008, SQL Server 2008, Office 2007, Exchange Server 2007, and Office SharePoint Server 2007, and future versions of all these products. Highlights of the specific actions Microsoft is taking to implement its new interoperability principles are described below.

- **Ensuring open connections to Microsoft's high-volume products**. To enhance connections with third-party products, Microsoft will publish on its Web site documentation for all application programming interfaces (APIs) and communications protocols in its high-volume products that are used by other Microsoft products. Developers do not need to take a license or pay a royalty or other fee to access this information. Open access to this documentation will ensure that third-party developers can connect to Microsoft's high-volume products just as Microsoft's other products do.

  - As an immediate next step, starting today Microsoft will openly publish on MSDN over 30,000 pages of documentation for Windows client and server protocols that were previously available only under a trade secret license through the Microsoft Work Group Server Protocol Program (WSPP) and the Microsoft Communication Protocol Program (MCPP). Protocol documentation for additional products, such as Office 2007 and all of the other high-volume products covered by these principles, will be published in the upcoming months.

  - Microsoft will indicate on its Web site which protocols are covered by Microsoft patents and will license all of these patents on reasonable and non-discriminatory terms, at low royalty rates. To assist those interested in considering a patent license, Microsoft will make available a list of specific Microsoft patents and patent applications that cover each protocol.

  - Microsoft is providing a covenant not to sue open source developers for development or non-commercial distribution of implementations of these protocols. These developers will be able to use the documentation for free to develop products. Companies that engage in commercial distribution of these protocol implementations will be able to obtain a patent license from Microsoft, as will enterprises that obtain these implementations from a distributor that does not have such a patent license.

- **Documenting how Microsoft supports industry standards and extensions**. To increase transparency and promote interoperability, when Microsoft supports a standard in a high-volume product, it will work with other major implementers of the standard toward achieving robust, consistent and interoperable implementations across a broad range of widely deployed products.

  - Microsoft will document for the development community how it supports such standards, including those Microsoft extensions that affect interoperability with other implementations of these standards. This documentation will be published on Microsoft's Web site and it will be accessible without a license, royalty or other fee. These actions will allow third-party developers implementing standards to understand how a standard is used in a Microsoft product and foster improved interoperability for customers. Microsoft will make available a list of any of its patents that cover any of these extensions, and will make available patent licenses on reasonable and non-discriminatory terms.

- **Enhancing Office 2007 to provide greater flexibility of document formats**. To promote user choice among document formats, Microsoft will design new APIs for the Word, Excel and PowerPoint applications in Office 2007 to enable developers to plug in additional document formats and to enable users to set these formats as their default for saving documents.

- **Launching the Open Source Interoperability Initiative**. To promote and enable more interoperability between commercial and community-based open source technologies and Microsoft products, this initiative will provide resources, including labs and events, including labs, plug fests, technical content and opportunities for ongoing cooperative development.

- **Expanding industry outreach and dialogue**. An ongoing dialogue with customers, developers and open source communities will be created through an online Interoperability Forum. In addition, a Document Interoperability Initiative will be launched to address data exchange between widely deployed formats.

The Interoperability Executive Customer (IEC) Council, an advisory organization established in 2006 and consisting mainly of chief information and technology officers from more than 40 companies

146

and government bodies around the world, will help guide Microsoft in its work under these principles and actions. The full text of Microsoft's new Interoperability Principles, and a full list of the actions Microsoft is taking, can be found on Microsoft's Interoperability site.

The interoperability principles and actions announced today reflect the changed legal landscape for Microsoft and the IT industry. They are an important step forward for the company in its ongoing efforts to fulfill the responsibilities and obligations outlined in the September 2007 judgment of the European Court of First Instance (CFI).

"As we said immediately after the CFI decision last September, Microsoft is committed to taking all necessary steps to ensure we are in full compliance with European law," said Brad Smith, Microsoft general counsel. "Through the initiatives we are announcing, we are taking responsibility for implementing the principles in the interoperability portion of the CFI decision across all of Microsoft's high-volume products. We will take additional steps in the coming weeks to address the remaining portion of the CFI decision, and we are committed to providing full information to the European Commission so it can evaluate all of these steps."

**About Microsoft**

Founded in 1975, Microsoft (Nasdaq "MSFT") is the worldwide leader in software, services and solutions that help people and businesses realize their full potential.

**For more information, press only:**

Rapid Response Team, Waggener Edstrom Worldwide for Microsoft, (503) 443-7070, rrt@waggeneredstrom.com

*Note to editors:* If you are interested in viewing additional information on Microsoft, please visit the Microsoft Web page at http://www.microsoft.com/presspass on Microsoft's corporate information pages. Web links, telephone numbers and titles were correct at time of publication, but may since have changed. For additional assistance, journalists and analysts may contact Microsoft's Rapid Response Team or other appropriate contacts listed at http://www.microsoft.com/presspass/contactpr.mspx.

Read More: **Developer Tools, Windows Server System, Steve Ballmer, Ray Ozzie, Brad Smith, Interoperability, Developer, IT Professional, Technical Decision Maker**

- **Microsoft to Acquire Yammer.**  June 25, 2012
- **Second Community Technology Preview for Windows Embedded Standard 8 Now Available.**  June 06, 2012
- **Intelligent Systems Open Doors for Vertical Solution Providers.**  May 31, 2012
- **Microsoft Strengthens Commitment to Addressing Youth Unemployment in Latin America and the Caribbean.**  May 31, 2012
- **Steve Ballmer Highlights Opportunity in Asia.**  May 25, 2012



Site Map  **Microsoft**
©2012 Microsoft

Manage Profiles  |  Contact Us  |  Terms of Use  |  Trademarks  |  Privacy Statement

147

# EXHIBIT P

LAW OFFICES
**DANIELSON HARRIGAN LEYH & TOLLEFSON** LLP
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
(206) 623-1700

ARTHUR W. HARRIGAN, JR.

E-MAIL: ARTHURH@DHLT.COM
FACSIMILE: (206) 623-8717

April 4, 2012

**VIA EMAIL**
Ralph Palumbo
Summit Law Group
315 Fifth Ave. South, Suite 1000
Seattle, WA  98104-2682

**VIA EMAIL**
Jesse J. Jenner
Ropes & Gray LLP
1211 Avenue of the Americas
New York, NY  10036-8704

RE:   *Microsoft v. Motorola* – 10-1823
      Motorola's Motion for Summary Judgment

Dear Ralph and Jesse:

Motorola's summary judgment filing of Friday, March 30th impermissibly includes references to settlement discussions that the parties explicitly agreed would not be disclosed to the court under Federal Rule of Evidence 408 and the parties' non-disclosure agreement dated November 12, 2010 (the "NDA").  To ensure that the parties' settlement communications remained confidential, Microsoft requested Motorola to sign a non-disclosure agreement confirming in writing that the substance of the parties' conversations would be protected from disclosure under FRE 408 and the non-disclosure provisions of the NDA.  In the NDA, Motorola agreed that "documents, discussion or correspondence constituting or relating to the subject matter of the settlement discussions shall be deemed and kept strictly confidential. . . ." (NDA, ¶ 4).  Motorola also agreed that "No Party to this Agreement shall use any documents or information contained or exchanged in any such meeting, discussion or correspondence in any adversarial proceeding. . . ."  (NDA, ¶ 3).

In direct violation of FRE 408 and the NDA, Motorola's March 30th court filing discloses and/or discusses the content of documents and communications that were exchanged between the parties in their effort to explore settlement of the litigation.  (*See* Motorola Brief, pp. 1:12-16; 2:2-3; 7:1-12; 8:4-6, 11-17 & n. 7; 20:6-9 & n. 16; 22 n. 19; Exhibit 26; and Taylor Decl. ¶¶ 13, 14, 15, and 17.)   Indeed, Motorola's brief acknowledges the genesis of those communications, stating, "Microsoft assured Motorola that it wanted to engage in licensing negotiations and reach a settlement.  To do this, Microsoft encouraged Motorola to put its strongest patents on the table so that Microsoft could assess the value of Motorola's portfolios." (*See* Motorola Brief, p. 1.)

We request that Motorola immediately comply with the NDA by withdrawing its summary judgment brief.  If Motorola desires to file a revised motion, Motorola must remove the

149

Ralph Palumbo
Jesse J. Jenner
April 4, 2012
Page 2

content of any of the parties' settlement discussions.  In light of the seriousness and urgency of this matter, please advise by 5 p.m. today (PDT) whether Motorola intends to comply with FRE 408 and the NDA and withdraw its March 30th summary judgment motion.

Very truly yours,

DANIELSON HARRIGAN LEYH & TOLLEFSON LLP

Arthur W. Harrigan, Jr.

AWH:lb

150