UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| MICROSOFT CORPORATION, | CASE NO. C10-1823JLR |
| Plaintiff, | ORDER ON PARTIES' SUMMARY JUDGMENT MOTIONS |
| v. | |
| MOTOROLA, INC., et al., | |
| Defendants. | |
| MOTOROLA MOBILITY, INC., et al., | |
| Plaintiffs, | |
| v. | |
| MICROSOFT CORPORATION, | |
| Defendant. | |

ORDER- 1

# I.   INTRODUCTION

Before the court is Microsoft Corporation's ("Microsoft") motion for partial summary judgment of breach of contract and summary judgment on Motorola's third, fourth, fifth, seventh, eighth, and ninth affirmative defenses and second counterclaim. (Microsoft Mot. (Dkt. ## 727 (redacted), 729 (sealed).)  Also before the court is Motorola, Inc., Motorola Mobility, Inc., and General Instrument Corporation's (collectively, "Motorola") motion for partial summary judgment.  (Motorola Mot. (Dkt. ## 720 (redacted), 733 (sealed).)  The court has reviewed the motions, the papers filed in opposition and support thereof, and the relevant law.  The court heard oral argument on July 31, 2013, and considering itself fully advised, GRANTS in part and DENIES in part Microsoft's motion, and GRANTS in part and DENIES in part Motorola's motion.

# II.   BACKGROUND

## a.   Factual and Procedural Background

This is a breach of contract case between Microsoft and Motorola.  Microsoft claims that Motorola has an obligation to license patents to Microsoft at a reasonable and non-discriminatory ("RAND") rate, and that Motorola breached its RAND obligations. (*See generally* Am. Compl. (Dkt. # 53).)  Microsoft sued Motorola for breach of contract in this court in November, 2010.[1]  (*See id.*)

---

[1] This matter has a complex procedural history involving several patent infringement claims as well as claims and counter claims relating to Microsoft's breach of contract claim. Prior court orders provide a more complete procedural and factual history of the case with citations.  (*See* 2/27/12 Order (Dkt. # 188); 6/6/12 Order (Dkt. # 335); 10/10/12 Order (Dkt. # 465); 4/25/13 Order (Dkt. # 681).)

1   Motorola's RAND commitment arises out of its and Microsoft's relationship with

2   two international standard-setting organizations ("SSOs"), the Institute of Electrical

3   Electronics Engineers ("IEEE") and the International Telecommunication Union ("ITU").

4   These organizations create standards for use in designing and manufacturing technology

5   products.  These and other SSOs play a significant role in the technology market by

6   allowing companies to agree on common technological protocols so that products

7   complying with the standards will work together.

8   The standards at issue in this case involve wireless communications, commonly

9   known as "WiFi," and video coding technology.  More specifically, this case involves

10   two standards:  an IEEE wireless local area network ("WLAN") standard called the

11   "802.11 Standard" and an ITU[2] advanced video coding technology standard called the

12   "H.264 Standard."

13   Both of these standards incorporate patented technology.  Thus, in order for a

14   company to practice the standard, it is necessary for that company to utilize technology

15   that is covered by one or more patents.  Patents that are essential to the standard (in that

16   they must be practiced to accomplish the standard) are called standard essential patents,

17   or "SEPs."  The existence of SEPs is a common problem in the world of technology

18   standards.  To deal with this problem, SSOs have devised a solution.  To make it easier

19   for companies to practice their standards, SSOs seek commitments from the owners of

20

21

22   [2] The ITU developed the H.264 Standard jointly with two other SSOs—the International
Organization for Standardization and the International Electrotechnical Commission.

SEPs to license their patents to standard-users on RAND terms.  Motorola owns patents that are essential to the 802.11 and H.264 Standards and has committed to license them on RAND terms.

On October 21, 2010, Motorola sent Microsoft a letter offering to license Motorola's 802.11 SEPs.  Motorola offered to license its patents at what it considered the RAND rate of 2.25 % of the price of the end product:

> This letter is to confirm Motorola's offer to grant Microsoft a worldwide non-exclusive license under Motorola's portfolio of patents and pending applications having claims that may be or become Essential Patent Claims (as defined in section 6.1 of the IEEE bylaws) for a compliant implementation of the IEEE 802.11 Standards. . . . Motorola offers to license the patents under reasonable and non-discriminatory terms and conditions ("RAND"), including a reasonable royalty of 2.25 % per unit for each 802.11 compliant product, subject to a grant back license under the 802.11 essential patents of Microsoft.  As per Motorola's standard terms, the royalty is calculated based on the price of the end product (e.g, each Xbox 360 product) and not on component software (e.g., Windows Mobile Software).

(10/21/10 Offer Ltr. (Dkt. # 79-5) at 2.)  On October 29, 2010, Motorola sent a similar letter offering to license its H.264 SEPs on similar terms.   The letter again offered a royalty rate of 2.25 % of the end product price:

> Motorola offers to license the patents on a non-discriminatory basis on reasonable terms and conditions ("RAND"), including a reasonable royalty, of 2.25 % per unit for each H.264 compliant product, subject to a grant back license under the H.264 patents of Microsoft, and subject to any Motorola commitments made to JVT in connection with an approved H.264 recommendation.     As per Motorola's standard terms, the royalty is calculated based on the price of the end product (e.g., each Xbox 360 product, each PC/laptop, each smartphone, etc.) and not on component software (e.g., Xbox 360 system software, Windows 7 software, Windows Phone 7 software, etc.).

(10/29/10 Offer Ltr. (Dkt. # 79-6) at 2.)

1    Eleven days later, on November 9, 2010, Microsoft initiated this breach of

2   contract action against Motorola based on Motorola's two offer letters, claiming that the

3   letters breached Motorola's RAND commitments to the IEEE and the ITU.  (*See*

4   *generally* Am. Compl.)  Microsoft alleges that Motorola's offer letters constituted a

5   refusal to offer Motorola's SEPs on RAND terms.  (*Id.* ¶ 84.)  Microsoft also alleges that

6   Motorola breached its RAND commitment by filing other lawsuits involving Motorola-

7   owned SEPs which seek to enjoin Microsoft's implementation of the standards.  (*Id.*

8   ¶ 85.)  In a previous order, the court held that these RAND commitments create

9   enforceable contracts between Motorola and the respective SSO.  (2/27/12 Order (Dkt.

10   # 188).)  The court has also held that Microsoft—as a standard-user—can enforce these

11   contracts as a third-party beneficiary.  (*See id.*)  In a separate prior order, the court

12   interpreted Motorola's commitments to the ITU and IEEE as requiring initial offers by

13   Motorola to license its SEPs to be made in good faith.  (6/6/12 Order (Dkt. # 335) at 25.)

14   However, the court has also held that initial offers do not have to be on RAND terms so

15   long as a RAND license eventually issues.  (*Id.*; *see also* 10/10/12 Order (Dkt. # 465).)

16    In November 2012, the court conducted a bench trial to determine a RAND rate

17   and range to assist the finder-of-fact in determining whether or not Motorola had

18   breached its RAND commitments.  On April 19, 2013, the court issued its Findings of

19   Fact and Conclusions of Law ("FFCL") under seal and then issued a public version, with

20   redactions, on April 25, 2013.  (*See* FFCL (Dkt. ## 673 (sealed), 681 (public).)  The

21   court's FFCL set a RAND rate and range for Motorola's 802.11 and H.264 SEP

22   portfolios.  (*See generally id.*)

1    Having issued the FFCL, the next step in the case is a jury trial, scheduled to begin

2    on August 26, 2013, to determine whether Motorola has breached its RAND obligations.

3    According to Microsoft's interrogatory responses, at this trial, Microsoft will contend that

4    Motorola breached its RAND obligations by (1) offering its 802.11 and H.264 patents at

5    a rate that was not RAND; (2) seeking injunctive relief for Microsoft's infringement of

6    Motorola's SEPs; (3) not issuing a patent license to Microsoft's 802.11 chip supplier,

7    Marvell; and (4) Google—Motorola's parent company—not issuing Microsoft a license

8    under the terms of Google's license agreement with a group named MPEG LA.

9    (Microsoft's Rog. Resp. (Dkt. # 733-6) at 23-26.)

10   **b.      The Parties' Present Motions**

11            **i.      Microsoft's Summary Judgment Motion**

12           In the motion presently before the court, Microsoft argues that Motorola breached

13   the duty of good faith and fair dealing by engaging in conduct that was commercially

14   unreasonable and that frustrated the purpose of the RAND commitment.  (*See generally*

15   Microsoft Mot.)  Microsoft contends that given the court-determined RAND rate,

16   Motorola's offer letters demanded such a high royalty rate that no reasonable juror could

17   conclude that Motorola had made a commercially reasonable offer.  (*Id.* at 15-17.)

18   Microsoft also contends that Motorola's "demands" in the October offer letters combined

19   with Motorola seeking injunctive relief in U.S. district courts, the ITC, and in Germany

20   frustrated the purpose of the RAND commitment by creating stacking and hold-up

21

22

1   concerns.[3]  (*Id.* at 21-24.)  Microsoft urges the court to decide on summary judgment that

2   Motorola's actions in sending the October offer letters and seeking injunctive relief

3   frustrated the purpose of RAND and thereby breached Motorola's duty of good faith and

4   fair dealing.  (*Id.* at 24.)

5       Microsoft also asserts that it is entitled to summary judgment on Motorola's third,

6   fourth, fifth, seventh, eighth and ninth affirmative defenses, and second counterclaim.

7   Motorola's third, fourth, fifth, seventh, and ninth affirmative defenses are based on the

8   theory that Microsoft should have negotiated and applied for a license prior to filing this

9   lawsuit.  (*See* Motorola Answer (Dkt. # 68) at 13-14; Motorola Rog Resp. (Dkt. # 728-

10  14).)  Motorola's eighth affirmative defense is that Microsoft's breach of contract claim

11  is barred because Microsoft should have mitigated its damages.  (Motorola Answer at

12  14.)

13          **ii.     Motorola's Summary Judgment Motion**

14      Motorola seeks summary judgment on Microsoft's contention that Motorola

15  breached its obligations to the IEEE and ITU by seeking injunctive relief in other courts.

16  Motorola argues that its agreements with the IEEE/ITU do not prohibit it from seeking

17  injunctive relief or an ITC exclusion order, and because statutory rights to seek injunctive

18  relief exist and those rights can only be explicitly waived by contract, Motorola has not

19  breached any duty by seeking injunctive relief.  (Motorola Mot. at 9-15.)  Motorola also

20  seeks summary judgment that Microsoft does not have any evidence that Motorola's

21  _____

22  [3] In its FFCL, the court found that the purpose of the RAND commitment is to encourage
    wide-spread adoption of the standard and prevent hold-up and stacking.  (FFCL ¶¶ 51-69.)

1   seeking injunctive relief proximately caused the attorney-fee damages Microsoft seeks to

2   recover.  (*Id.* at 15.)

3        Motorola also asks the court to grant summary judgment that Motorola did not

4   breach its RAND commitment by not granting a license to Marvell, Microsoft's Wi-Fi

5   chip supplier.  With respect to this argument, Motorola asserts that it had no duty to

6   Marvell and therefore its actions in failing to grant Marvell a license to Motorola's SEP

7   portfolios could not constitute a breach.  (*Id.*)  Urging a similar argument, Motorola

8   argues that summary judgment is appropriate that it did not breach its obligations under

9   the RAND commitment because Google, Motorola's parent company, did not offer a

10  license to Microsoft under Google's agreement with MPEG LA.  Motorola argues that

11  because Google is not a party to this litigation, Motorola could not have breached its

12  RAND commitment by Google purportedly failing to comply with Google's obligations

13  under its MPEG LA license agreement.  (*Id.* at 17-18.)

14       Next, Motorola argues that summary judgment is proper for Microsoft's damages

15  claims because Motorola's actions in petitioning the district courts, the ITC, and the

16  German courts for patent enforcement are protected activity and immune from liability

17  under the *Noerr-Pennington* doctrine and the First Amendment.  (*Id.* at 20-23.)  Raising a

18  similar argument, Motorola contends that Microsoft's claim for attorney's fee damages is

19  barred because under the "American rule," attorney's fees are not recoverable either as

20  costs or as an element of damages unless a recognized exception in statute, contract, or

21  equity permits them.  Here, Motorola argues that there is no basis for awarding fees in

22

ORDER- 8

1   statute, contract, or equity, and therefore, attorney's fees are not recoverable as damages.

2   (*Id.* at 23-26.)

3   ## III.   SUMMARY JUDGMENT STANDARD

4         Summary judgment is appropriate if the evidence, when viewed in the light most

5   favorable to the non-moving party, demonstrates "that there is no genuine dispute as to

6   any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ.

7   P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Galen v. Cnty. of L.A.*,

8   477 F.3d 652, 658 (9th Cir. 2007).  A fact is "material" if it might affect the outcome of

9   the case.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A factual dispute is

10   "genuine" if the evidence is such that reasonable persons could disagree about whether

11   the facts claimed by the moving party are true.  *Aydin Corp. v. Loral Corp.*, 718 F.2d

12   897, 902 (9th Cir. 1983).

13   > [T]he issue of material fact required . . . to be present to entitle a party to
   > proceed to trial is not required to be resolved conclusively in favor of the

14   > party asserting its existence; rather, all that is required is that sufficient
   > evidence supporting the claimed factual dispute be shown to require a jury

15   > or judge to resolve the parties' differing versions of the truth at trial.

16   *First Nat. Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288-89 (1968).

17         The court is "required to view the facts and draw reasonable inferences in the light

18   most favorable to the [non-moving] party."  *Scott v. Harris*, 550 U.S. 372, 378 (2007).

19   The court may not weigh evidence or make credibility determinations in analyzing a

20   motion for summary judgment because these are "jury functions, not those of a judge."

21   *Liberty Lobby*, 477 U.S. at 249-50.

22

1    The moving party bears the initial burden of showing there is no genuine issue of

2    material fact and that he or she is entitled to prevail as a matter of law.  *Celotex*, 477 U.S.

3    at 323.  If the moving party meets his or her burden, the non-moving party "must make a

4    showing sufficient to establish a genuine dispute of material fact regarding the existence

5    of the essential elements of his case that he must prove at trial."  *Galen*, 477 F.3d at 658.

6                            **IV.    GOOD FAITH STANDARD**

7            In this case, Microsoft's theories of breach of the RAND commitment implicate

8    the duty of good faith and fair dealing.  (*See supra* § V.a.i.)  Accordingly, the court sets

9    forth the standard of good faith and fairing dealing in contract law in the State of

10   Washington.  A duty of good faith and fair dealing is implied in every contract.  *Badgett*

11   *v. Sec. State Bank*, 807 P.2d 356, 360 (Wash. 1991).  This duty requires the parties to a

12   contract to cooperate with each other so that each may obtain the full benefit of

13   performance, even if the parties have different requirements under the contract.  *Id.*

14   (citing *Metro. Park Dist. of Tacoma v. Griffith*, 723 P.2d 1093, 1100 (Wash. 1986)).

15   However, this duty does not require a party to accept a material change in the terms of its

16   contract.  *Id.* (citing *Betchard-Clayton, Inc. v. King*, 707 P.2d 1361, 1364 (Wash. Ct.

17   App. 1985).  The implied duty of good faith and fair dealing arises out of the obligations

18   created by a contract and only exists in relation to the performance of specific contract

19   terms.  *Keystone Land & Dev. Co. v. Xerox Corp.*, 94 P.3d 945, 949 (Wash. 2004).  Thus,

20   a party's obligation is only to perform the obligations imposed by the contract in good

21   faith.  *Barrett v. Weyerhauser Co. Severance Pay Plan*, 700 P.2d 338, 342 n.6 (Wash. Ct.

22

App. 1985).  There is no "free-floating" duty of good faith and fair dealing that injects

substantive terms into the parties' contract.  *Id.*; *Keystone*, 94 P.3d at 949.

There is no one-size-fits-all definition of good faith and fair dealing.  Rather, the

duty varies somewhat with the context in which it arises.  *See* RESTATEMENT (SECOND)

OF CONTRACTS § 205 cmt. d.[4]  It may violate the duty of good faith and fair dealing to,

for example, (1) evade the spirit of a bargain; (2) willfully render imperfect performance;

(3) interfere with or fail to cooperate in the other party's performance; (4) abuse

discretion granted under the contract; or (5) perform the contract without diligence.  *Id.*

This list is in no way exhaustive, and indeed it would be nearly impossible to create a

complete catalogue of conduct that violates the duty of good faith and fair dealing.  *Id.*

It is the fact finder's job—in this case the jury—to determine whether a party

breached its duty of good faith and fair dealing.  *See, e.g.*, *Columbia Park Golf Course,*

*Inc. v. City of Kennewick*, 248 P.3d 1067, 1074 (Wash. Ct. App. 2011).  Good faith

performance of a contract requires being faithful to the agreed common purpose of the

contract and performing consistently with the justified expectations of the other parties.

*Frank Coluccio Const. Co., Inc. v. King County*, 150 P.3d 1147, 1155 (Wash. Ct. App.

2007) (citing RESTATEMENT (SECOND) OF CONTRACTS § 205 cmt. a).  On the other hand,

bad faith performance involves conduct that violates community standards of decency,

---

[4] Washington courts consistently rely on the Restatement (Second) of Contracts in
defining the parameters of the duty of good faith and fair dealing.  *See, e.g.*, *Frank Coluccio
Const. Co., Inc. v. King County*, 150 P.3d 1147, 1155 (Wash. Ct. App. 2007).  Likewise, federal
courts rely on the Restatement to predict Washington law regarding the same.  *See, e.g.*, *Scribner
v. WorldCom, Inc.*, 249 F.3d 902, 910 (9th Cir. 2001).

1  fairness, or reasonableness.  RESTATEMENT (SECOND) OF CONTRACTS § 205 cmt. a;

2  *G Four Bellingham, LLC v. Oishii Teriyaki, Inc.*, 2008 WL 176389, at *3 (Wash. Ct.

3  App. 2008) (citing RESTATEMENT (SECOND) OF CONTRACTS § 205 cmt. a) (unpublished).

4        Washington law establishes that numerous considerations may inform a fact-

5  finder's determination of whether the defendant's conduct violated the covenant of good

6  faith and fair dealing.  In particular, a review of state and federal case law reveals that a

7  fact finder may consider:  (1) whether the defendant's actions were contrary to the

8  reasonable and justified expectations of other parties to the contract, *Scribner*, 249 F.3d at

9  909; *Frank Coluccio*, 150 P.3d at 1155 (citing RESTATEMENT (SECOND) OF CONTRACTS

10  § 205 cmt. a); (2) whether the defendant's conduct would frustrate the purpose of the

11  contract, *Aventa Learning, Inc. v. K12, Inc.*, 830 F. Supp. 2d 1083, 1101 (W.D. Wash.

12  2011) ("The duty prevents a contracting party from engaging in conduct that frustrates

13  the other party's right to the benefits of the contract.") (citing *Woodworkers of Am. v.*

14  *DAW Forest Prods. Co.*, 833 F.2d 789, 795 (9th Cir. 1987)); *Cavell v. Hughes*, 629 P.2d

15  927, 929 (Wash. Ct. App. 1981); (3) whether the defendant's conduct was commercially

16  reasonable, *Craig v. Pillsbury Non-Qualified Pension Plan*, 458 F.3d 748, 752 (8th Cir.

17  2006) (applying Washington law); *Vylene Enters., Inc. v. Naugles, Inc.*, 90 F.3d 1472,

18  1477 (9th Cir. 1996) (applying California law); (4) whether and to what extent the

19  defendant's conduct conformed with ordinary custom or practice in the industry, *Curtis v.*

20  *Northern Life Ins. Co.*, 2008 WL 4927365, at *6 (Wash. Ct. App. 2008) (unpublished);

21  *Amerigraphics, Inc. v. Mercury Cas. Co.*, 107 Cal. Rptr. 3d, 321-23 (Cal. Ct. App. 2010);

22  (5) to the extent the contract vested the defendant with discretion in deciding how to act,

1   whether that discretion was exercised reasonably, *Craig*, 458 F.3d at 752; *Aventa*, 830 F.

2   Supp. 2d at 1101; and (6) subjective factors such as the defendant's intent and motive.

3   *See Scribner*, 249 F.3d at 910 ("[A] party can breach the duty of good faith and fair

4   dealing by acting dishonestly."); *Cavell*, 629 P.2d at 929 (considering the "purpose,"

5   knowledge, and intent behind defendant's conduct to assess good faith); *Jones v.*

6   *Hollingsworth*, 560 P.2d 348, 351-52 (1977) (considering subjective intent of defendant

7   to determine whether duty of good faith and fair dealing was met with respect to a

8   particular contract term vesting defendant with discretion).

9         The last consideration, subjective intent, is a subject of frequent dispute between

10   the parties and so requires some elaboration.  Several Washington cases have considered

11   subjective factors in determining whether a party violated its duty of good faith and fair

12   dealing.  *See Cavell*, 629 P.2d at 929; *Hollingsworth*, 560 P.2d at 351-52.  Thus, the court

13   concludes that, under Washington law, these factors are relevant to the good faith inquiry.

14   However, other cases have made it clear that bad motive does not equate to bad faith and

15   good motive does not equate to good faith.  *See, e.g.*, *Scribner*, 249 F.3d at 910

16   ("Dishonesty or an unlawful purpose is [not] a necessary predicate to proving bad

17   faith.").  To be more specific, bad motive or intent does not necessarily imply bad faith,

18   *see Frank Coluccio*, 150 P.3d at 1155 (no bad faith if parties are faithful to agreed

19   common purpose and perform consistently with the justified expectations of the other

20

21

22

1   parties),[5] and good motive or intent does not necessarily imply good faith, *Scribner*, 249

2   F.3d at 910 ("'[F]air dealing may require more than honesty.'" (citing RESTATEMENT

3   (SECOND) OF CONTRACTS § 205 cmt. d)).  Likewise, bad motive or intent is not a

4   prerequisite to bad faith, *Scribner*, 249 P.2d at 910, nor is good motive or intent a

5   prerequisite to good faith, *see Frank Coluccio*, 150 P.3d at 1155.

6          While some of the six considerations listed above may appear to be merely

7   different formulations of the same basic standard, careful examination reveals that each

8   suggests a different shade of meaning—that is, a different way of looking at the question

9   of good faith that may or may not be useful within a given context or when examining a

10  particular piece of evidence.  All of these different considerations have been held by

11  courts to be relevant to the ultimate determination of good faith under Washington law.

12  Thus, it is appropriate for the fact finder to consider them all.  This allows the fact finder

13  to draw careful, thorough, and nuanced conclusions from the evidence.

14                              **V.      ANALYSIS**

15  **a.      Microsoft's Summary Judgment Motion**

16          **i.      Microsoft Contends Motorola Breached the Duty of Good Faith and
                       Fair Dealing**

17
        Microsoft contends that given the determined RAND rate, Motorola's October

18  offer letters sought such an exorbitant royalty rate that no reasonable juror could

19  conclude that Motorola had made a commercially reasonable offer.  (Microsoft Mot. at

20

21          [5] Thus, even if there were a bad motive, there would be no breach of the good faith duty
22  as long as the defendant carried out the terms of the contract reasonably and in accord with the
    other party's reasonable expectations.

ORDER- 14

15-17.)  Microsoft also contends that Motorola's "demands" in the October offer letters combined with Motorola seeking injunctive relief in U.S. district courts, the ITC, and in Germany frustrated the purpose of the RAND commitment.  (*Id.* at 21-24.)  By way of these arguments, Microsoft seeks summary judgment that Motorola breached its duty of good faith and fair dealing with respect to the RAND commitment.  (*Id.* at 15-24.)

On the evidence before it and under the good faith legal framework set forth above, the court concludes that genuine issues of material fact remain such that summary judgment is inappropriate on both of Microsoft's arguments.  In this case, whether Motorola's offer letters were commercially reasonable requires more than a simple comparison between the royalty rate included in the offer letters and the determined RAND rate, as Microsoft urges.  Such a determination requires examination and interpretation of the language in the letters themselves, including the language therein suggesting Motorola sent the letters in the hopes of receiving a cross-license agreement from Microsoft ("subject to a grant back license").  Additionally, the finder-of-fact will hear evidence of the circumstances surrounding Motorola's October offer letters. Motorola will present evidence that Microsoft requested Motorola make an offer for Motorola's 802.11 and H.264 SEPs and that the parties were engaged in licensing negotiations prior to the October offer letters.  (Motorola Resp. (Dkt. # 757) at 8-13, 20-25 (citing to relevant evidence).)   Motorola will also present evidence that the industry custom and practice was to negotiate upon receiving an opening offer; and, indeed, Microsoft's own practice was to respond to an opening offer.  (*Id.*)  Finally, the jury should at least be able to hear evidence of Motorola's intent in sending the October offer

1    letters.  (*Id.*)  Each of these pieces of evidence is relevant under the law to determine

2    whether Motorola's opening offers breached the duty of good faith by acting in a

3    commercially unreasonable manner.  The court further concludes that these pieces of

4    evidence create a genuine material issue of fact for the jury to decide.

5         For similar reasons, the court cannot say on summary judgment that Motorola's

6    offer letters and actions in seeking injunctive relief in other forums frustrated the purpose

7    of the RAND commitment.  At the outset, the court notes that the terms of the RAND

8    commitment obligate Motorola to license its SEPs on RAND terms to Microsoft.

9    (10/10/12 Order (Dkt. # 465) at 14 (holding that Motorola's commitments to the IEEE

10   and the ITU "require Motorola to eventually grant a license on RAND terms").)  The

11   specific terms of the ensuing RAND license are not, however, determined by the RAND

12   commitment.  (*See* FFCL ¶¶ 32 (With respect to licensing arrangements for SEPs, the

13   ITU/ISO/IEC Common Patent Policy provides that "[t]he detailed arrangements arising

14   from patents (licensing, royalties, etc.) are left to the parties concerned, as these

15   arrangements might differ from case to case."), 45 (IEEE-SA Standards Board Bylaws

16   state that "[n]o license is implied by the submission of a Letter of Assurance."  The

17   bylaws further state that "[t]he IEEE is not responsible . . . for determining whether any

18   licensing terms or conditions provided in connection with submission of a Letter of

19   Assurance, if any, or in any licensing agreements are reasonable or non-

20   discriminatory.").)  Thus, the duty of good faith and fair dealing requires Motorola to act

21   in accordance with its obligation to grant a RAND license.  Microsoft argues that by

22   seeking injunctive relief, Motorola frustrated the purpose of RAND because the threat of

ORDER- 16

1  an injunction would provide Motorola with leverage to obtain a non-RAND license.

2  (Microsoft Mot. at 23.)

3      Although the court finds Microsoft's argument regarding injunctive relief

4  persuasive, Motorola's actions in this case in seeking injunctive relief cannot be viewed

5  in a vacuum.  Certainly, there are circumstances where seeking injunctive relief would

6  constitute a violation of the RAND commitment.  Indeed, in the Northern District of

7  California, Judge Whyte held that it was a breach of the RAND commitment to seek

8  injunctive relief in another forum (there, the ITC) before offering a license to an

9  implementer of the standard willing to accept a RAND license.  *Realtek Semiconductor*

10 *Corp. v. LSI Corp.*, --- F. Supp.2d ----, 2013 WL 2181717, at *7 (N.D. Cal. May 20,

11 2013).  On the other side of the coin, there are certain circumstances under which a SEP

12 owner rightfully seeks injunctive relief.  *See Apple, Inc. v. Motorola Mobility, Inc.*, No.

13 11-cv-178-bbc, 2012 WL 5416941, at *15 (W.D. Wis. Oct. 29, 2012) (holding that the

14 RAND commitment did not deprive defendant of its right to seek injunctive relief).[6]

15     Here, Microsoft asks the court to grant summary judgment that Motorola's actions

16 in sending the October offer letters and seeking injunctive relief in other forums

17 frustrated the purpose of the contract.  (Microsoft Mot. at 22-24.)  Regarding Motorola's

18 action in seeking injunctive relief, Microsoft has not pointed to a specific action by

19

20     [6] The court notes that much of the commentary discussing whether injunctive relief is
21 proper vis-à-vis a RAND-committed patent has focused the analysis on whether the implementer
   is a willing or unwilling licensee.  (*See* Motorola Mot. 11-15 (discussing the opinions of various
22 courts and administrative bodies that have examined the propriety of injunctive relief in the
   RAND context).)

1    Motorola that Microsoft believes as a matter of law violates the duty of good faith.  (*See*

2    *id.*)  Whether seeking injunctive relief for a SEP frustrates the purpose of the contract is

3    based on the specific circumstances of the case, and here Microsoft has failed to carry its

4    burden on summary judgment to demonstrate that a specific action by Motorola in

5    seeking injunctive relief violated its duty of good faith.  (*See id.*)  In fact, in this case, it is

6    unlikely that Microsoft could do so.  This is a case unlike the one before Judge Whyte.

7    The circumstances surrounding Motorola's actions in seeking injunctive relief are

8    muddied by the history of Microsoft and Motorola who have worked actively in the past,

9    the prior licensing negotiations of the parties, and the mere fact that Microsoft filed

10   several lawsuits before Motorola sought injunctive relief.  (*See* Motorola Resp. at 8-13,

11   20-25.)  These circumstances make it unlikely that either party could prevail as a matter

12   of law on the injunctive relief question.

13         Additionally, as explained above, material issues of fact exist regarding whether

14   the October offer letters violated the duty of good faith.  In addition to the rate contained

15   in the offer letters, the jury will consider language of the letters, the circumstances

16   surrounding the letters, the industry custom and practice, and Motorola's intent in

17   sending the letters.  Motorola has presented evidence that the letters were sent in good

18   faith, and the jury will make the final determination.  Because the court concludes that

19   material issues of fact exist in determining whether Microsoft's offer letters and actions

20   in seeking injunctive relief individually violate the duty of good faith, material issues of

21   fact exist to preclude summary judgment regarding the combination of the two acts.

22   *//*

ORDER- 18

1        **ii.**    **Motorola's Affirmative Defenses**

2        Motorola's interrogatory responses demonstrate that Motorola's third, fourth, fifth,

3  seventh, eighth, and ninth affirmative defenses and second counterclaim all turn on

4  Motorola's argument that Microsoft should have negotiated in good faith and/or applied

5  for a license rather than filing this lawsuit.  For example, Motorola's fourth affirmative

6  defense states:

7          Microsoft's First and Second Causes of Action are barred because, by
           failing to apply for a RAND license and to negotiate the terms of a RAND

8          license and instead filing the present action, Microsoft breached the
           contract to which it claims to be a third party beneficiary, and failed to

9          satisfy the conditions precedent to any obligations that it was owed as an
           alleged third party beneficiary, and thereby forfeited all benefits of any

10         purported RAND statement made by the Defendants.

11 (Motorola Answer at 13-14.)  Likewise, Motorola's third affirmative defense is that

12 "[t]here is no subject matter jurisdiction for Microsoft's First and Second Causes of

13 Action because they were not ripe for adjudication when filed."  (*Id.* at 13.)  Motorola's

14 subsequent interrogatory response explained that Microsoft's claims "are not ripe for

15 adjudication because Microsoft has repudiated, or failed to satisfy any condition

16 precedent, any right to a RAND license pursuant to Motorola's RAND obligations."

17 (Motorola Rog Resp. at 3-4.)   Similarly, Motorola's interrogatory response regarding its

18 fifth affirmative defense ("waiver") is that "because Microsoft has neither applied for a

19 license, nor engaged in good-faith negotiations for a license, Microsoft has repudiated

20 and waived any benefit that it otherwise would have enjoyed based on Motorola's RAND

21 assurances."  (Motorola Rog Resp. at 5-6.)  These arguments have come and gone.  The

22 parties fully briefed a repudiation partial summary judgment motion brought by Motorola

ORDER- 19

1    wherein Motorola argued that Microsoft had forgone its rights to a RAND license for

2    Motorola's SEPs by failing to engage in good-faith negotiations and/or apply for a

3    license before initiating a lawsuit.  The court rejected that argument and held that neither

4    good-faith negotiations nor applying for a license was a condition precedent to

5    Motorola's obligation to grant a RAND license.  Accordingly, the court grants

6    Microsoft's summary judgment motion regarding Motorola's third, fourth, fifth, seventh,

7    eighth, and ninth affirmative defense and second counterclaim.

8            Motorola argues that its mitigation affirmative defense must remain in the case so

9    that it may present a defense that Microsoft should have mitigated its damages.  Here,

10   Motorola confuses an affirmative defense with an argument that Microsoft's damages, if

11   any, should be reduced.  Motorola may certainly argue under the law that Microsoft had a

12   duty to mitigate its damages and failed to do so.  That is not, however, an affirmative

13   defense to Microsoft's breach claims.  *See* Wright & Miller, FEDERAL PRACTICE &

14   PROCEDURE § 1270 (2013) ("An affirmative defense will defeat the plaintiff's claim if it

15   is accepted by the district court or the jury.").

16   **b.     Motorola's Summary Judgment Motion**

17            **i.     Motorola Argues Microsoft's Injunctive Relief Claim Should be
18                    Dismissed**

19           Motorola first argues that the court should grant summary judgment that it was not

20   a breach of contract for Motorola to seek injunctive relief in U.S. District Court, the ITC,

21   and in Germany.  (Motorola Mot. for SJ at 9.)  Motorola argues that the RAND

22   commitment does not prohibit SEP holders from seeking injunctive relief to enforce their

1   patents.  (*Id.* at 10.)  In particular, Motorola argues that SEP holders have a statutory right

2   to seek injunctive relief and that the RAND commitment does not operate as a waiver of

3   that right.  (*Id.* (citing 35 U.S.C. § 283).)  Microsoft responds that Motorola is not entitled

4   to summary judgment because Microsoft's claim is properly understood as a claim for

5   breach of the duty of good faith and fair dealing and it is wrong to isolate the injunctive

6   relief portion of the claim from the rest of Motorola's conduct.  (Microsoft Resp. (Dkt.

7   # 740) at 6-7.)  In the alternative, Microsoft argues that Motorola directly breached the

8   RAND commitment by seeking injunctive relief because the RAND commitment is an

9   express waiver of the right to seek injunctive relief.  (*Id.* at 8-13.)

10          This disagreement raises an important distinction between a claim for direct

11   breach of contract and a claim that a party violated the duty of good faith and fair dealing.

12   Plainly, both types of claim assert that the other party breached the contract.  In that way,

13   they are not so different from each other.  Nevertheless, there are subtle differences

14   between the two types of claims—particularly in terms of the standards that the fact

15   finder is obliged to apply in determining whether a breach has occurred.  As outlined

16   above, the duty of good faith and fair dealing is governed by cases specifically

17   interpreting parties' obligations under that duty.  *See, e.g.*, *Badgett*, 807 P.2d at 360.  It

18   should be self-evident that a claim of direct breach would not be governed by those same

19   standards, but by ordinary breach of contract principles.  *Compare, e.g.*, Washington

20   Pattern Jury Instruction ("WPI") 3.01 (Breach of Contract) *with* WPI 302.11 (Implied

21   Duty of Good Faith and Fair Dealing).  For example, a party alleging a direct breach of

22   contract must be able to point to a specific provision of the contract that has been

1    breached.  *See, e.g.*, *Elliot Bay Seafoods v. Port of Seattle*, 98 P.3d 491, 494 (Wash. Ct.

2    App. 2004).  On the other hand, while a party alleging breach of the good faith duty must

3    point to a specific contract term to which the duty of good faith attaches, *Keystone*, 94

4    P.3d at 949, that party can argue grounds for breach other than strict non-performance.

5    *See, e.g.*, *Frank Coluccio*, 150 P.3d at 1155 (good faith breach can be based on actions

6    contrary to reasonable and justified expectations of the parties); *see also Aventa*, 830 F.

7    Supp. 2d at 1101 (good faith breach can be based on actions that would frustrate the

8    purpose of the contract).  Thus, it is important, at least in this case, to be able to

9    determine when a party is advancing a theory of direct breach as opposed to a theory that

10   the other side breached the duty of good faith and fair dealing.

11       Distinguishing between these types of claims is relatively straightforward.  A

12   claim of direct breach exists where a party alleges failure to perform in accordance with a

13   specific provision in the contract.  *Elliot Bay Seafoods*, 98 P.3d at 494.  On the other

14   hand, a claim for breach of the good faith duty exists where the contract gives a party

15   discretion or leeway in determining how to act and that party exercises its discretion in a

16   manner inconsistent with the reasonable expectations of the parties or in some other

17   objectionable manner, as described above, even if there is no express, clear-cut breach.

18   *Craig*, 458 F.3d at 752; *Aventa*, 830 F. Supp. 2d at 1101.

19       Microsoft frames its injunctive relief-related claim primarily as a claim for breach

20   of the duty of good faith and fair dealing (*see* Microsoft Resp. at 6-7), and the court

21   agrees that this is the correct way to construe that claim.  There is no provision in

22   Motorola's contracts with the IEEE and ITU expressly stating that Motorola is prohibited

1    from seeking injunctive relief against SEP implementers.  Neither party argues that such

2    a provision exists.  That is not to say that a direct breach of contract claim could never be

3    predicated on a commitment to license on RAND terms; indeed, other courts have

4    reached differing results regarding whether and when a RAND-committed SEP holder

5    may seek injunctive relief against a SEP implementer.  *Compare Realtek Semiconductor*,

6    2013 WL 2181717, at *7 (holding that it was a breach of the RAND commitment to seek

7    injunctive relief before even offering a license) *and Apple, Inc. v. Motorola, Inc.*, 869 F.

8    Supp. 2d at 913-14 (finding injunctive relief unavailable unless the implementer has

9    refused to pay a RAND royalty) *with Apple, Inc. v. Motorola Mobility, Inc.*, 2012 WL

10   5416941, at *15 (holding that the RAND commitment did not deprive defendant of its

11   right to seek injunctive relief).

12        This case, unlike those cases, presents a question not of direct breach of contract

13   but of breach of the duty of good faith and fair dealing.  Microsoft plans to argue that

14   Motorola's "whole course of conduct" vis-à-vis Microsoft breached the RAND

15   commitment, not just its decision to seek injunctive relief.  (Microsoft Resp. at 6-7.)

16   Microsoft's claim characterizes Motorola's conduct as part of a unified "strategy to hold

17   up Microsoft in frustration of the purposes of the RAND licensing commitment."  (*Id.*)

18   Motorola committed to license its SEPs on RAND terms but, even under the confines of

19   its contracts, it had discretion in determining an overall course of conduct in carrying out

20   the RAND commitment:  there was not one single permissible way for it to arrive at a

21   RAND license.  Thus, the question is whether Motorola exercised that discretion

22   reasonably, i.e., whether it complied with its duty of good faith and fair dealing in

ORDER- 23

1  carrying out its obligation to license on RAND terms.  It does not make sense to treat this

2  as a direct breach claim because that would require excising the injunctive relief claim

3  from the rest of the case, at least to an extent.  The court will not do this.  Microsoft's

4  claim is a claim for breach of the duty of good faith and fair dealing, and the court will

5  treat it as such going forward.

6       Having thusly construed Microsoft's claim, the following propositions of law are

7  relevant to Motorola's summary judgment motion.  First, the RAND commitment does

8  not by itself bar SEP holders from ever, in any circumstance, seeking injunctive relief to

9  enforce their patents.  However, in some circumstances, it may be a breach of the duty of

10  good faith and fair dealing for a SEP holder to seek injunctive relief against a SEP

11  implementer.  As for what circumstances constitute a breach of the good faith duty, this

12  question must be answered through the lens of the good faith standards outlined in detail

13  above.  It is those standards that the fact finder must apply to Microsoft's claim as it

14  relates to injunctive relief.

15       As discussed above with respect to Microsoft's motion, there are numerous

16  disputed issues of material fact precluding summary judgment on Microsoft's claim that

17  Motorola violated its good faith duty.  To name a few, the parties dispute whether

18  seeking injunctive relief was commercially reasonable, whether it frustrated the purpose

19  of the contract, and whether Motorola's actions were contrary to Microsoft's reasonable

20  and justified expectations.  Further, even if there were no disputed facts related

21  specifically to injunctive relief, there are genuine issues of material fact regarding

22

1   whether Motorola's overall course of conduct breached Motorola's duty of good faith and

2   fair dealing to reach a license on RAND terms.

3     Finally, at oral argument Motorola raised the contention that the relevant time for

4   assessment of any breach of the duty of good faith and fair dealing is when Motorola sent

5   the October 2010 offer letters and when Motorola filed its lawsuits seeking injunctive

6   relief in November 2010.  Counsel for Motorola argued that any actions by Motorola

7   after the initiation of this lawsuit could not be the basis for a breach of contract.[7]  At the

8   court's invitation, Motorola sent a letter to the court with authority supporting this

9   contention.  (8/6/13 Ltr. (Dkt. # 833).)

10    The court disagrees with Motorola.  First, in February 2011, Microsoft filed an

11  amended complaint that included the allegation that Motorola breached its RAND

12  commitment by filing lawsuits that seek to enjoin Microsoft's implementation of the

13  standardized technology.  (Am. Compl. ¶ 85.)  Microsoft further alleged in its amended

14  complaint that Motorola is not entitled to exclude or enjoin Microsoft from using the

15  H.264 and 802.11 standards.  (*Id.*)  Thus, Motorola was on notice from this point forward

16  of Microsoft's theory that seeking injunctive relief constituted a breach of the RAND

17  commitment.  Second, in the RAND context, Motorola's argument that conduct relevant

18  to a breach must take place before or at the time of the filing of an action makes little

19      ——————————

20    [7] The court notes that Motorola's statements on this issue are internally inconsistent.
    This case was filed in October 2010.  Motorola states that only actions that occurred before or at
21  the time of the lawsuit should be considered in Microsoft's claim for breach of contract, but at
    the same time states that Motorola's filing of the November 2010 lawsuit should be considered,
22  although nothing after that date.  (8/6/13 Ltr at 1.)

1    sense.  As discussed above, in certain circumstances seeking injunctive relief may

2    constitute a breach of the RAND commitment, whereas in other circumstances such

3    conduct may be proper.  The timing of when a party seeks injunctive relief in a separate

4    forum relative to a pending action is germane to whether that party acted in bad faith in

5    seeking such relief.  In other words, it may very well be the case that seeking injunctive

6    relief absent a pending lawsuit is good faith, whereas seeking the same relief during the

7    pendency of litigation over a RAND rate is bad faith.

8            In support of its argument, Motorola directs the court to *Gaglidari v. Denny's*

9    *Restaurants, Inc.*, 615 P.2d 1362, 1369 (Wash. 1991) and *Bonneview Homeowners Ass'n*

10   *v. Woodmont Builders, LLC*, 655 F. Supp. 2d 473, 511 (D.N.J. 2009).  These cases are

11   inapposite.  Here, Microsoft is arguing that Motorola's course of conduct, of which

12   seeking injunctive relief is a part, breached the duty of good faith and fair dealing.  Both

13   *Gagliadari* and *Bonneview* involve an alleged breach based on a discrete act.

14   Additionally, both cases stand for the proposition that you examine the conduct of the

15   alleged breach at the time of the conduct.  *Id.*  Neither case supports Motorola's

16   contention that a court can only examine the conduct of the defendant at the time the

17   lawsuit is filed.  *Id.*  As such, Motorola's motion for summary judgment on this issue is

18   denied.

19          **ii.    Attorney's Fees as Damages**

20          Next, Motorola argues that Washington law prohibits Microsoft from claiming

21   attorney's fees as damages.  Motorola correctly states that, under the "American rule," a

22   party may not recover attorney's fees either as costs or as an element of damages unless a

1   contractual, statutory, or equitable exception applies.[8]  *City of Seattle v. McCready*, 931

2   P.2d 156, 160-61 ("[A]ttorney's fees are not available as *costs or damages* absent a

3   contract, statute, or recognized ground in equity.") (emphasis in original).  Neither party

4   argues that there is a contractual or statutory ground for allowing attorney's fees in this

5   case, so the court turns to recognized exceptions in equity.

6       The Washington Supreme Court has recognized four major equitable exceptions to

7   the American rule:  (1) the common fund exception; (2) actions by a third person

8   subjecting a party to litigation; (3) bad faith or misconduct of a party; and (4) dissolving

9   wrongfully issued temporary injunctions or restraining orders.  *Id.* at 160.  These

10  exceptions are to be construed narrowly.  *Id.* at 162.  Microsoft argues that two of these

11  exceptions apply:  the exception for dissolving wrongfully-issued preliminary injunctions

12  and the exception for bad faith or misconduct in litigation.  (Microsoft Resp. at 23-25.)

13      The court disagrees.  First, the wrongful injunction exception does not apply on

14  these facts.  Washington courts have carefully proscribed the availability of this

15  exception, stating that "equitable attorney's fees incurred in dissolving a wrongfully

16  issued temporary injunction are only available *after a trial on the merits*, where the sole

17  issue at trial was whether to make the temporary injunction permanent or dissolve it, the

18  _____

19      [8] Microsoft argues that the American rule does not apply when a party is claiming as
    damages attorney's fees from a separate action.  (Microsoft Resp. at 22-23.)  Microsoft cites no
    authority for this proposition, which would create a rather large loophole in the American rule.

20  (*See id.*)  The court must predict whether Washington courts would accept this argument.  The
    court predicts that they would not.  The court bases this prediction on the seemingly crystal clear
    language of *McCready* ("[A]ttorney's fees are not available as *costs or damages* absent a

21  contract, statute, or recognized ground in equity.") and the Washington Supreme Court's general
    unwillingness to award attorney's fees as damages.  931 P.2d at 160-62 ("Washington courts

22  have narrowly limited the type of actions where attorney fees are awarded as damages.")

1   trial court dissolves the temporary injunction, and the trial was the only available option

2   for the party seeking to dissolve it." *Gander v. Yeager*, 282 P.3d 1100, 1105 (Wash. Ct.

3   App. 2012) (citing *McCready*, 931 P.2d at 162 (explaining the rationale for limiting the

4   exception); *Cecil v. Dominy*, 418 P.2d 233, 234 (Wash. 1966).)  Without a doubt, the

5   exception does not apply unless a temporary injunction actually issues.  *Id.*  Thus, only

6   the German injunction could possibly fit within this exception.  But for that injunction,

7   there was never a "trial on the merits, where the sole issue at trial was whether to make

8   the temporary injunction permanent or dissolve it."  *See id.*  Instead, this court issued an

9   anti-suit injunction, the issuance of which did not turn on the merits of the German

10  injunction.  *See id.*  Nor was "the sole issue . . . whether to make the temporary injunction

11  permanent or dissolve it."  *See id.*  The court must construe exceptions to the American

12  rule narrowly and, accordingly, can reach no conclusion other than that the wrongful

13  injunction exception does not apply in this case.

14       The "bad faith" exception does not apply either.  Under that exception, attorney's

15  fees may be permissible where there is prelitigation misconduct, procedural bad faith, or

16  substantive bad faith.  *Forbes v. Am. Bldg. Maint. Co. W.*, 198 P.3d 1042, 1057 (Wash.

17  Ct. App. 2009).  Microsoft argues only procedural bad faith.  Procedural bad faith

18  includes "vexatious conduct during litigation and is unrelated to the merits of the case."

19  *Id.*  This exception arises from the court's inherent authority to sanction litigation conduct

20  and requires a finding of "bad faith" similar to that required under Federal Rule of Civil

21  Procedure 11 and, accordingly, is different in substance from a breach of the duty of good

22  faith and fair dealing.  *See Rogerson Hiller Corp. v. Port of Port Angeles*, 982 P.2d 131,

136 (Wash. Ct. App. 1999).  The court dismisses Microsoft's argument that the

procedural bad faith exception applies, finding that Motorola's conduct, considered in

context, comes nowhere close to the kind of vexatious conduct that would support an

award of sanctions under the court's inherent authority or an award of attorney's fees

under the bad faith exception.

Last, Microsoft argues that the court should apply an exception that has not yet

been recognized in Washington:  the exception for violation of a covenant not to sue.

(Microsoft Resp. at 24-25.)  The court agrees.  This exception applies when one party

agrees not to sue the other but then does anyway.  *See, e.g.*, *Anchor Motor Freight, Inc. v.*

*Int'l Bhd. of Teamsters, Local Union No. 377*, 700 F.2d 1067, 1072 (6th Cir. 1983); *See*

Dan B. Dobbs, LAW OF REMEDIES, § 310(3), at 406.  When this happens, the primary

form of damages flowing from the breach will likely be attorney's fees, and it would be

inequitable to deprive the aggrieved party of those damages.  *See Anchor Motor Freight*,

700 F.2d at 1072; *Widener v. Arco*, 717 F. Supp. 1211, 1217 (N.D. Tex. 1989).  Thus,

courts interpret a covenant not to sue as an implied agreement to protect the other party

from the costs of litigation and decline to blindly apply the American rule.  *See Anchor*

*Motor Freight*, 100 F.2d at 1072; *Widener v. Arco*, 717 F. Supp. at 1217; Dobbs, LAW OF

REMEDIES, § 310(3), at 406.  While this exception has been accepted in many of our

nation's courts, it has been rejected in others.  *See Bunnett v. Smallwood*, 793 P.2d 157

(Colo. 1990) (rejecting exception under Colorado law after reviewing issue in depth);

*Gruver v. Midas Intern. Corp.*, 925 F.2d 280, 283-84 (9th Cir. 1991) (predicting that

1   Oregon courts would reject exception).  It appears that no Washington case has addressed

2   the issue.

3          Before doing so in this case, it is necessary to understand how the exception would

4   apply in the RAND context.  The argument for the exception's application is simple:  as

5   explained above, in certain circumstances it may violate the duty of good faith and fair

6   dealing for a SEP holder to seek an injunction to enforce a RAND-committed patent.

7   Under those circumstances, the SEP holder has effectively agreed not to sue

8   implementers for injunctive relief.  Thus, under those circumstances and those

9   circumstances only, the RAND commitment is analogous to a covenant not to sue for

10  injunctive relief, and the implementer may recover attorney's fees as an element of

11  damages in the bad faith action.  This argument makes sense.  However, it only works if,

12  in fact, Washington courts would recognize an exception to the American rule for

13  violation of a covenant not to sue.

14         The court predicts that, were a Washington court to consider this exception in the

15  context of RAND, it would recognize it.  There are several reasons why this is so.  First,

16  if there is one unifying principle underlying Washington's different equitable exceptions

17  to the American rule, it is that they all involve a wrongful act by the defendant that forces

18  the other party to defend litigation.  *See McCready*, 931 P.2d at 160 ("listing exceptions);

19  *cf. Flint v. Hart*, 917 P.2d 590, 598 (Wash. Ct. App. 1996) ("An equitable ground exists

20  'when the natural and proximate consequences of a wrongful act by defendant involve

21  plaintiff in litigation with others . . . .'").  Thus, it is reasonable to conclude that any

22  newly-recognized exception would follow this same pattern.  In the RAND context,

ORDER- 30

1   where the defendant is alleged to have breached its duty of good faith and fair dealing, a

2   wrongful act is alleged and attorney's fees are a natural and proximate consequence of

3   that act.  That alone is not enough to justify an award of attorney's fees, but it does

4   suggest that Washington courts would recognize a narrow equitable exception in this

5   limited scenario.

6       Second, many of the justifications other courts have relied on in rejecting the

7   covenant-not-to-sue exception simply do not apply in the RAND context.  For example,

8   the court in *Bunnett* reasoned that it would not be inequitable to deny attorney-fee

9   damages because "the potential legal costs" of enforcing a covenant not to sue were

10  foreseeable and the party enforcing it receives a benefit commensurate to the cost.  793

11  P.2d at 161.  This may be true with respect to ordinary two-party contracts, but RAND

12  litigation is a different animal.  It is one thing to require a party to assert a covenant not to

13  sue as a defense to a run-of-the-mill lawsuit.  It is another thing entirely to force a party

14  like Microsoft to defend multiple injunction actions throughout the world, asserting its

15  defense in a legal landscape that is far from well-travelled, after Motorola has already

16  committed to license its patents on RAND terms.  This concern is especially valid in light

17  of the fact that standard implementers practice numerous SEPs, exposing them to

18  litigation by a vast number of SEP holders.  Thus, in the RAND context, the legal costs

19  are not foreseeable at all and the implementer does not receive a benefit commensurate

20  with the cost.  A Washington court would recognize this logic.

21      Finally, the exception makes particular sense in light of the purpose of the RAND

22  commitment, which is to encourage widespread adoption of the standard.  Widespread

1   adoption would be discouraged if standard implementers were forced to defend injunctive

2   relief claims brought in bad faith with no possibility of recovering the attorney's fees

3   associated with doing so.  Potential implementers would be less likely to adopt the

4   standard if doing so would expose them to bad faith injunctive relief claims and they

5   were forced to absorb the cost of defending themselves.  Conversely, faced with no legal

6   consequences, SEP holders would not think twice about bringing claims for injunctive

7   relief (even in bad faith) to gain leverage in licensing negotiations.  As discussed above,

8   standard implementers practice many patents and expose themselves to lawsuits from a

9   substantial number of SEP holders.  In this unique context, it would not be equitable to

10  prohibit the award of attorney's fees as an element of damages.  Accordingly, the court

11  concludes that Washington courts would recognize an exception to the American rule

12  where seeking injunctive relief to enforce a RAND-committed patent is found to be a

13  violation of the duty of good faith and fair dealing.

14          This conclusion is limited to this context and will require certain safeguards at

15  trial.  In particular, the court is mindful of the fact that attorney's fees are only

16  recoverable as damages under this framework if Motorola's efforts to seek injunctive

17  relief are in bad faith.  Thus, it will be necessary to instruct the jury that it may not award

18  attorney's fees as damages unless it finds that Motorola violated its duty of good faith

19  and fair dealing specifically by seeking injunctive relief.  If the jury finds only that

20  Motorola's general course of conduct, but not its efforts to seek injunctive relief, violated

21  the good faith duty, attorney's fees will be unavailable as damages.  The court will

22  prepare a verdict form requiring the jury to indicate whether it finds that Motorola's

1    efforts to seek injunctive relief, specifically, were in violation of its good faith duty in

2    addition to more general inquires relevant to Microsoft's other theories of breach.

3         For the reasons explained above, Motorola's motion for summary judgment that

4    Microsoft may not claim attorney's fees as damages is denied.

5         **iii.    Noerr-Pennington**

6         Next, Motorola argues that Microsoft's damages claims are barred by the *Noerr-*

7    *Pennington* doctrine.  The *Noerr-Pennington* doctrine shields litigants from claims

8    related to filing litigation.  *See Sosa v. DIRECTV, Inc.*, 437 F.3d 923, 929 (9th Cir. 2006).

9    It is derived from the First Amendment right to petition the government for a redress of

10   grievances.  *See id.*  The essence of *Noerr-Pennington* is that you can't be sued for suing

11   someone else unless certain conditions apply.  *See id.*

12        Motorola contends that its actions in petitioning the district courts, the ITC, and

13   the German courts for patent enforcement are protected activity and immune from

14   liability under *Noerr-Pennington* and the First Amendment.  (Motorola Mot. at 20-23.)

15   On the other hand, Microsoft argues that the *Noerr-Pennington* doctrine does not bar its

16   claims because Motorola waived or limited its petitioning rights by contract.  (Microsoft

17   Resp. at 18-21.)  Microsoft argues that, having waived its right to seek injunctive relief,

18   Motorola cannot now rely on *Noerr-Pennington* to nullify that waiver.  (*Id.*)

19        The court agrees with Microsoft.  This issue has already been settled by Judge

20   Crabb in a similar case in the Western District of Wisconsin.  Judge Crabb ruled in *Apple,*

21   *Inc. v. Motorola Mobility, Inc.* that Motorola could not rely on *Noerr-Pennington* to

22

1  avoid a claim predicated on seeking injunctive relief because its RAND commitment

2  limited its petitioning rights:

3      Motorola has cited no authority for the proposition that the *Noerr-Pennington* doctrine should apply to Apple's breach of contract

4  claims . . . and I conclude that applying immunity to Motorola from Apple's breach of contract claims is not appropriate.  Although the First

5  Amendment protects Motorola's right to petition the courts to enforce its patents, Apple's breach of contract claims are based on the theory that

6  Motorola agreed by contract that it would not enforce its patent rights until it offered a license to Apple on fair, reasonable and nondiscriminatory

7  terms.  In other words, Apple contends that Motorola waived some of its petitioning rights through contract.  It would be improper to use the *Noerr-*

8  *Pennington* doctrine to bar Apple from enforcing that contract.

9  886 F. Supp. 2d at 1078.

10      Judge Crabb's reasoning is correct and applies to this case.  There are some

11  differences between the factual context and legal framework governing this case and

12  governing the *Apple* case, but the logic of Judge Crabb's ruling nevertheless controls.

13  Here, as the court explains in this order, Motorola's RAND commitment is analogous to a

14  covenant not to seek injunctive relief in circumstances that would amount to a breach of

15  the duty of good faith and fair dealing.  Thus, Motorola has limited, by contract, its right

16  to seek injunctive relief.  As Judge Crabb ruled, it would be improper to use the *Noerr-*

17  *Pennington* doctrine to bar Microsoft from enforcing that contract.  Accordingly, the

18  court denies Motorola's motion for summary judgment on this issue.

19      **iv.    Communications Regarding a Marvell License**

20      Motorola contends that because it had no duty to Marvell, its actions in failing to

21  grant Marvell a license to Motorola's SEP portfolios could not constitute a breach of

22  contract.  (Motorola Mot. at 15-17.)  Motorola also asserts that it did in fact offer Marvell

1   a license to Motorola's SEP portfolios, but that Marvell failed to continue with

2   communications in that regard.  (*Id.*)  Microsoft argues that summary judgment on this

3   issue should be denied, asserting that Motorola's offer to Marvell explicitly excluded

4   products sold by Marvell to Microsoft, further evidencing Motorola's course of conduct

5   that frustrated the purpose of the RAND commitment.  (Microsoft Resp. at  26-27.)

6          The court agrees with Microsoft.  Again, the RAND commitment obligates

7   Motorola to grant a RAND license to Microsoft for Motorola's SEPs.  Motorola must act

8   in good faith in attempting to reach the RAND license it is obligated to provide.  The

9   question for the jury is whether Motorola breached this good faith obligation by its

10  actions.  In this case, the court understands that Microsoft will argue a theory of breach

11  that Motorola's course of conduct over time demonstrates a breach of the good faith duty.

12  Indeed, where the contract at issue requires the SEP owner to grant a RAND license but

13  leaves the SEP owner and implementer discretion in performance of that contract, the fact

14  finder may need to examine the actions of the parties over the course of the negotiation to

15  ultimately determine if a party acted in bad faith.

16         Here, Microsoft contends that Motorola made a licensing offer to Marvell that

17  explicitly excluded only Microsoft as an end purchaser of Marvell products.  Presumably,

18  Microsoft will argue that Motorola's offer to Marvell is evidence that Motorola did not

19  want to grant Microsoft a RAND license.  Further, as explained above, the mere fact that

20  the Motorola-Marvell communications occurred after commencement of this litigation in

21  no way diminishes its import regarding Motorola's alleged bad faith course of conduct

22  vis-à-vis the RAND commitment.  The court concludes that this evidence may form at

1  least part of the basis for the jury to decide whether Motorola acted in bad faith.

2  Accordingly, Motorola's summary judgment motion with respect to the Marvell licensing

3  offer is denied.[9]

4       The ruling on this issue does not end there.  As the court understands it, Microsoft

5  will argue to the jury that Motorola failed to grant a license to Marvell, and if Motorola

6  had granted such a license, Motorola would then be precluded from seeking a license

7  from Microsoft for the SEPs at issue.  This argument requires a legal basis.  The

8  argument is premised on the notion that, legally, Motorola's ability to seek a license from

9  Microsoft would be exhausted by granting a license to Marvell.  This issue is not

10  explored in the parties' summary judgment briefing.  Thus, the parties may provide three-

11  page letter briefs no later than August 16, 2013, on the legal grounds for Microsoft's

12  assertion that a Motorola-Marvell license would preclude Motorola from seeking a

13  license from Microsoft.  Additionally, no later than August 16, 2013, the parties may

14  propose jury instructions on this issue.

15       **v.**    **Google-MPEG LA License**

16       Motorola argues that it did not breach any contract by Google's failure to license

17  Microsoft under Google Inc.'s ("Google") license with MPEG LA.  By way of

18  ————————————

19      [9] Having already determined that under the legal framework set forth in this order
Microsoft may properly seek attorney's fees as damages, the court rejects Motorola's argument

20  that Microsoft cannot show damages proximately caused by Motorola's failure to license
Marvell.  (Motorola Mot. at 16-17.)  Microsoft is not claiming additional attorney's fees as
damages from the alleged conduct with Marvell, but only that a Motorola-Marvell license would

21  have precluded any further litigation.  (Microsoft Resp. at 28.)  Further, Microsoft has evidence
of attorney's fees incurred after the relevant date—the date Marvell sought a license from

22  Motorola.  (*Id.*)

1   background, the court understands that Google, Motorola's parent company,[10] entered

2   into a license agreement with MPEG LA for Google's patents essential to the H.264

3   Standard.  Microsoft contends that under the terms of the Google-MPEG LA agreement,

4   Google is obligated to license Motorola's H.264 SEPs.  Motorola contends that (1)

5   Google is a non-party and as Microsoft has not joined Google as a party, Microsoft

6   should not be permitted to pursue a breach of contract claim against Google, which is not

7   in the case to defend itself; and (2) Motorola did not breach any Google-MPEG LA

8   agreement because in June 2012, Motorola offered to license Motorola's H.264 SEPs

9   under the terms of the Google-MPEG LA agreement, but Microsoft refused.[11][12]

10  Microsoft responds that Google's failure to grant a license to Microsoft under the

11  Google-MPEG LA agreement is further evidence that Motorola frustrated the purpose of

12  the RAND commitment.

13        Here, the court agrees with Motorola and grants summary judgment that Google's

14  failure to grant a license to Microsoft under the Google-MPEG LA agreement cannot

15  form the basis of Microsoft's claim that Motorola breached its RAND commitment.

16  Despite opportunity to plead Google into this matter, Microsoft has not done so, and

17  _____

18        [10] As of May 22, 2012, after commencement of this litigation, Motorola Mobility
     Holdings, Inc. became a wholly-owned subsidiary of Google, Inc.  (*See* Dkt. # 331.)

19        [11] Motorola also contends that the terms of the Google-MPEG LA agreement do not
     require Google to grant a license for Motorola's patents.  Because the court agrees with Motorola
20   that Microsoft cannot pursue a claim of breach under the Google-MPEG LA agreement for other
     reasons, the court need not determine Google's precise obligations under the Google-MPEG LA
21   agreement.

22        [12] Motorola states that Microsoft insisted that any license include not only Motorola's
     H.264 patents but also Motorola's 802.11 SEPs.

1   accordingly Google is not a party to this lawsuit.  Motorola cannot reasonably be

2   expected to answer for the actions of Google, because Motorola does not in any way

3   control Google.  The court is unaware of any authority that permits Microsoft to sue

4   Motorola for the actions of another entity, Google, and Microsoft has pointed the court to

5   no such authority.  In any event, the court concludes that it would be unfair for Motorola

6   to be put on trial for the actions of another.  Taken to its logical extreme, Microsoft's

7   argument would allow Microsoft to accuse Motorola of breach of contract based on

8   actions by any other with whom Motorola has some sort of affiliation.  That cannot be a

9   just result.  Accordingly, the court grants Motorola's motion for summary judgment

10  regarding the Google-MPEG LA license agreement and any failure on the part of Google

11  to provide a license under that agreement.

12                      **VI.    CONCLUSION**

13          Based on the foregoing, the court GRANTS in part and DENIES in part

14  Microsoft's motion for summary judgment (Dkt. ## 727, 729) and GRANTS in part and

15  DENIES in part Motorola's motion for summary judgment (Dkt. ## 720, 733).

16          Dated this 11th day of August, 2013.

17

18                                          _____

19                                          JAMES L. ROBART
                                            United States District Judge
20

21

22

ORDER- 38