# EXHIBIT B

```
                    UNITED STATES DISTRICT COURT.

                WESTERN DISTRICT OF WASHINGTON AT SEATTLE
   _____

   MICROSOFT CORPORATION,        )
                                 )
                  Plaintiff,     ) C10-01823-JLR
                                 )
   v.                            ) SEATTLE, WASHINGTON
                                 )
   MOTOROLA INC., et al,         ) November 20, 2012
                                 )
                  Defendant.     ) TRIAL DAY 6
                                 )
   _____

                   VERBATIM REPORT OF PROCEEDINGS
                BEFORE THE HONORABLE JAMES L. ROBART
                    UNITED STATES DISTRICT JUDGE
   _____


                           Redacted Version



   APPEARANCES:


    For the Plaintiff:      Arthur Harrigan, Christopher
                            Wion, David Pritikin, Rick
                            Cederoth, Ellen Robbins and Andy
                            Culbert




    For the Defendants:     Jesse Jenner, Ralph Palumbo,
                            Philip McCune, Kevin Post, Tom
                            Miller and James R. Batchelder
```

1  Q   Of these, how many agreements were reached through
2  bilateral negotiation?
3  A   All of them.
4  Q   Have you ever seen a bilateral portfolio license
5  negotiation conducted by two people sitting down over a
6  meeting during the course of a day?
7  A   No, I have not.
8  Q   Of the agreements that you negotiated through bilateral
9  negotiation, how many were cross-licenses?
10 A   So all of the agreements that I've done with
11 product-producing companies would have been cross-licenses.
12 Q   Is it standard practice to obtain a cross license?
13 A   It is.  Because, you know, really our first goal is to
14 protect our product business to make sure we can build the
15 products that we want to build.  So, if we grant the license,
16 we want to make sure that we're not blocked from building
17 those very same products that we're licensing our
18 competitors, or others in the industry, to build.
19 Q   Is that important for the company?
20 A   Very important.
21 Q   Has compensation in the form of money been the only form
22 of compensation that arises in license agreements?
23 A   No.  License agreements are fairly complex .  They
24 generally have some form of monetary compensation depending
25 on who has more exposure and who has better -- you know, more

1  patents and less products.  The money flows in one direction
2  or the other.  But it also contains the cross-license, which
3  is of significant value, defensive suspension.  I've also
4  done agreements where there are joint development of
5  products, product commitments to buy certain products from
6  people, all forms of -- a lot of forms of non-monetary
7  compensation and cooperation, in addition to the money.
8  Q    Just to deal with one non-monetary term that you
9  mentioned.  What do you mean when you use the term "defensive
10 suspension"?
11 A    Defensive suspension is a common term in many agreements
12 where if I license a company, say Microsoft, and their
13 customer decides to sue Motorola, there's an ability to
14 suspend my license that would pass through, normally, from
15 Microsoft to their customer, suspend that particular part of
16 the license so I can license directly with the person that's
17 attacking me.
18 Q    Is that a value to Motorola?
19 A    It's very valuable because it goes to the protection of
20 our product business and it ensures that if I give a license
21 here, that I can still, if someone attacks me, one of the
22 customers attacks me, I can still use my patents to have a
23 discussion with that company.
24 Q    In your experience have you seen other companies seek and
25 receive defensive suspension clauses?

```
 1  A   Yes, they're very common.
 2          MR. JENNER:  That's the conclusion of the so-called
 3  unsealed portion, and we can proceed with the sealed portion
 4  with this witness before Mr. Dansky, if that would be the
 5  court's preference.
 6          THE COURT:  I think we need cross examination.
 7          MR. JENNER:  I'm sorry.  Yes, of course.  I'm sorry.
 8  I'd like to preclude it, but I understand that it's
 9  necessary.
10          MR. PRITIKIN:  I'll be going back and forth and
11  getting into confidential topics almost from the very
12  beginning.  I think it would be smart to defer my cross until
13  we've completed the confidential portion.
14          THE COURT:  An alternative would be to conduct your
15  cross during the confidential portion.
16          MR. PRITIKIN:  That's what I meant, Your Honor.
17          THE COURT:  Mr. Jenner, do you have any objection to
18  that?
19          MR. JENNER:  I do not, Your Honor.  That's fine.
20          THE COURT:  All right.  Then at this time the
21  courtroom will be emptied.  Those of you who have significant
22  Starbucks stock holdings, there's one across the street,
23  there's one down the street, there's one behind the
24  courthouse.  I cannot predict when you'll be invited back in,
25  but I'm sure you'll have time for a cup of coffee.
```