LAW OFFICES
**CALFO HARRIGAN LEYH & EAKES** LLP
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
(206) 623-1700

ARTHUR W. HARRIGAN, JR.

FACSIMILE: (206) 623-8717
E-MAIL: ARTHURH@CALFOHARRIGAN.COM

August 16, 2013

The Honorable James L. Robart
United States District Court
Western District of Washington
700 Stewart Street, Suite 14128
Seattle, WA 98101-9906

Re:   Microsoft Corp. v. Motorola, Inc., et al., No. 10-cv-1823-JLR

Dear Judge Robart:

We write in response to the Court's request for letter briefs and proposed jury instructions from the parties on the "legal grounds for Microsoft's assertion that a Motorola-Marvell license would preclude Motorola from seeking a license from Microsoft." (Dkt. No. 843 at 36.) Microsoft's proposed jury instruction is set forth as Appendix A to this letter.

Patent exhaustion "provides that the initial authorized sale of a patented item terminates all patent rights to that item." *Quanta Computer, Inc. v. LG Elecs., Inc.*, 553 U.S. 617, 625 (2008). *See also Rembrandt Data Techs., LP v. AOL, LLC*, 641 F.3d 1331, 1337–38 (Fed. Cir. 2011) (affirming summary judgment of exhaustion); *TransCore, LP v. Elec. Transaction Consultants Corp.*, 563 F.3d 1271, 1274 (Fed. Cir. 2009) (same). The 802.11 functionality in an Xbox 360 is provided by a WiFi-enabling chip that Microsoft purchases from Marvell. If Motorola had granted Marvell Semiconductor, Inc. ("Marvell") a license to Motorola's 802.11 SEPs (as is Motorola's contractual obligation), patent exhaustion would preclude Motorola from seeking additional royalties from Microsoft for the Xbox 360, and Microsoft would not need a license.

Exhaustion is triggered by the authorized sale of a product substantially embodying the patent. *Quanta*, 553 U.S. at 636, citing *United States v. Univis Lens Co.*, 316 U.S. 241, 249 (1942). A RAND license granted by Motorola to Marvell would broadly permit Marvell "to 'make, use [or] sell' products free" of Motorola's patent claims, because Motorola's RAND licensing commitment bars it from imposing any "conditions limit[ing] [Marvell's] authority to sell products substantially embodying the patents." 553 U.S. at 636–37. Accordingly, Marvell's sale of 802.11 chips to Microsoft would be "authorized" if Marvell had a RAND license from Motorola.

A product substantially embodies a patent for the purposes of patent exhaustion if it "embodie[s] essential features of [the] patented invention" and its "only reasonable and intended use [is] to practice the patent." *Quanta*, 553 U.S. at 631. A product may substantially embody an invention **even if additional components are necessary to practice the patent.** *Id.* at 633–34. The Marvell 802.11 chip used in the Xbox 360 satisfies these requirements and therefore substantially embodies Motorola's patents.

The Hon. Judge Robart
August 16, 2013
Page 2

The Marvell chip embodies essential features of any inventions disclosed in patents that are essential to 802.11. The chip is compliant with the 802.11 standard, and contains substantially all of what is needed to provide 802.11 functionality to a product like the Xbox 360. *See* Dkt. No. 673 ("FFCL") ¶ 579; Ex. 1, 11/14/12 Tr. 61:5–13 (Ochs). Motorola contended that its patents "are necessarily and widely used by devices that are compliant with the 802.11 Standard." (Dkt. No. 462, Motorola's Proposed Findings of Fact and Conclusions of Law ¶ 34.)[1]

The reasonable and intended use of the Marvell chip is to allow consumer devices like the Xbox 360 to access wireless networks using 802.11. FFCL ¶ 580 ("The main purpose of the Marvell WiFi chip is to implement the 802.11 Standard: the chip has no other use than to provide 802.11 functionality to a host product."); Ex. 1, 11/14/12 Tr. 61:14–18 (Ochs). Motorola claimed that this reasonable and intended use necessarily practices claims of its 802.11 SEPs, and activities its technical expert identified as part of the alleged infringement of those patents by the Xbox 360 take place in the Marvell chip. *See* FFCL ¶¶ 579–80. Motorola's own theory of the role of its patents in the standard firmly establishes that the Marvell chip embodies the essential features of the alleged inventions in Motorola's 802.11 patents, and that the only reasonable and intended use of the Marvell chipset is to practice the claims of all patents essential to the 802.11 standard. *See LG Elecs., Inc. v. Hitachi, Ltd.*, 655 F. Supp. 2d 1036, 1044 (N.D. Cal. 2009) (holding that a patentee's infringement contentions may establish whether a product substantially embodies an invention under *Quanta*).

While Motorola contended at the November Trial that additional components of the Xbox 360 (outside of the Marvell chip) are necessary for some 802.11 functionality, under *Quanta*, the addition of such standard components does not change the fact that the chip substantially embodies the inventions in Motorola's 802.11 SEPs. *See* 553 U.S. at 633–34 ("Naturally, the Intel Products cannot carry out these functions unless they are attached to memory and buses, but those additions are standard components in the system, providing the material that enables the microprocessors and chipsets to function.") As the quotation demonstrates, the "standard components" considered in *Quanta* are **identical** to the additional component of the Xbox Motorola keyed on at trial: the memory in the Xbox accessed by the chip to store a password. *See* Ex. 2, 11/15/12 Tr. 185:16–189:12 (Gibson).

Presuming a RAND license from Motorola, Marvell's sales of its 802.11 chips—products that substantially embody Motorola's 802.11 standard-essential patents—would take the chips "outside the scope of the patent monopoly" and as a result, Motorola could no longer assert its patent rights to recover for their use in the Xbox 360. *See Quanta*, 553 U.S. at 638. Patent exhaustion means that Motorola could not "invok[e] patent law to control postsale use" of Marvell's chips. *Id.*[2] Allowing Motorola to demand additional payments from Microsoft for using Marvell's chips would, as in *Quanta*, "violate the longstanding principle that, when a patented item is 'once lawfully made and sold, there is no restriction on [its] *use* to be implied for the benefit of the patentee.'" *Id.* at 630, quoting *Adams v. Burke*, 17 Wall. 453, 457 (1873).

---

[1] For the purposes of this question, Motorola's patents are assumed to be essential to the 802.11 standard.
[2] Motorola invoked *Quanta* for this principle in attempting to defend its demand that Microsoft pay 2.25% on the sales price of computers running Windows, noting that if Windows were licensed under Motorola's H.264 patents, exhaustion meant Motorola could not tax computer manufacturers with additional patent royalties. (Dkt. No. 274, Defs.' Resp. to Microsoft's Mot. for Summary J. at 23.)

In prior trial testimony in the ITC, Motorola's Kirk Dailey ▮▮▮▮▮

▮▮▮▮▮

Ex. 3, Dailey 752 Tr. 2551:14–2552:1.

                Very truly yours,

                CALFO HARRIGAN LEYH EAKES LLP

                s/ Arthur W. Harrigan, Jr.

                Arthur W. Harrigan, Jr.

cc:    All Counsel (via ECF)

## Appendix A

### Microsoft's Proposed Jury Instruction
### on Patent Exhaustion Arising from a Motorola-Marvell License

The doctrine of patent exhaustion provides that the authorized sale of an article that substantially embodies a patent exhausts the patent holder's rights and prevents the patent holder from seeking royalties from purchasers of that article. [1] In other words, the authorized sale terminates all of the patent holder's rights to that article. [2]

A RAND license agreement between Motorola and Marvell would have authorized Marvell to make its 802.11-enabling chips and to sell those chips to any party. [3] Marvell's 802.11-enabling chips substantially embody Motorola's 802.11 standard essential patents. [4] Accordingly, if Motorola had granted Marvell a RAND license to Motorola's 802.11 standard essential patents, Motorola's patent rights would have been exhausted and it would not have been entitled to any royalties from Microsoft. [5]

**Authority in support of instruction:**

[1]: *Quanta Computer, Inc. v. LG Elecs., Inc.*, 553 U.S. 617, 638 (2008) ("The authorized sale of an article that substantially embodies a patent exhausts the patent holder's rights and prevents the patent holder from invoking patent law to control postsale use of the article.").

[2]: *Quanta*, 553 U.S. at 625 ("The longstanding doctrine of patent exhaustion provides that the initial authorized sale of a patented item terminates all patent rights to that item.").

[3]: *See* Microsoft's letter brief, set forth above.

[4]: *See* Microsoft's letter brief, set forth above.

[5]: *Quanta*, 553 U.S. at 638.

## CERTIFICATE OF SERVICE

I, Florine Fujita, swear under penalty of perjury under the laws of the State of Washington to the following:

1. I am over the age of 21 and not a party to this action.

2. On the 16th day of August, 2013, I caused the preceding document to be served on counsel of record in the following manner:

**Attorneys for Motorola Solutions, Inc., and Motorola Mobility, Inc.:**

| | |
|---|---|
| Ralph Palumbo, WSBA #04751 | |
| Philip S. McCune, WSBA #21081 | _____ Messenger |
| Summit Law Group | _____ US Mail |
| 315 Fifth Ave. South, Suite 1000 | _____ Facsimile |
| Seattle, WA 98104-2682 | __X__ ECF |
| Telephone: 206-676-7000 | |
| Email: Summit1823@summitlaw.com | |

| | |
|---|---|
| Steven Pepe (*pro hac vice*) | _____ Messenger |
| Jesse J. Jenner (*pro hac vice*) | _____ US Mail |
| Ropes & Gray LLP | _____ Facsimile |
| 1211 Avenue of the Americas | __X__ ECF |
| New York, NY 10036-8704 | |
| Telephone: (212) 596-9046 | |
| Email: steven.pepe@ropesgray.com | |
| Email: jesse.jenner@ropesgray.com | |

| | |
|---|---|
| Norman H. Beamer (*pro hac vice*) | _____ Messenger |
| Ropes & Gray LLP | _____ US Mail |
| 1900 University Avenue, 6th Floor | _____ Facsimile |
| East Palo Alto, CA 94303-2284 | __X__ ECF |
| Telephone: (650) 617-4030 | |
| Email: norman.beamer@ropesgray.com | |

| | |
|---|---|
| Paul M. Schoenhard (*pro hac vice*)<br>Ropes & Gray LLP<br>One Metro Center<br>700 12th Street NW, Suite 900<br>Washington, DC 20005-3948<br>Telephone: (202) 508-4693<br>Email: Paul.schoenhard@ropesgray.com | _____ Messenger<br>_____ US Mail<br>_____ Facsimile<br>__X__ ECF |
| Andrea Pallios Roberts (*pro hac vice*)<br>Brian C. Cannon (*pro hac vice*)<br>Quinn Emanuel Urquhart & Sullivan, LLP<br>555 Twin Dolphin Drive, 5th Floor<br>Redwood Shores, CA 94065<br>Telephone: (650) 801-5000<br>Email: andreaproberts@quinnemanuel.com<br>Email: briancannon@quinnemanuel.com | _____ Messenger<br>_____ US Mail<br>_____ Facsimile<br>__X__ ECF |
| Kathleen M. Sullivan (*pro hac vice*)<br>David Elihu (*pro hac vice*)<br>Quinn Emanuel Urquhart & Sullivan, LLP<br>51 Madison Ave., 22nd Floor<br>New York, NY 10010<br>Telephone: (212) 849-7000<br>Email: kathleensullivan@quinnemanuel.com | _____ Messenger<br>_____ US Mail<br>_____ Facsimile<br>__X__ ECF |
| William Price (*pro hac vice*)<br>Quinn Emanuel Urquhart & Sullivan, LLP<br>865 S. Figuera St., 10th Floor<br>Los Angeles, CA 90017<br>Telephone: (212) 443-3000<br>Email: williamprice@quinnemanuel.com<br>MicrosoftvMotoBreachofRANDCase@quinnemanuel.com | _____ Messenger<br>_____ US Mail<br>_____ Facsimile<br>__X__ ECF |

DATED this 16th day of August, 2013.

s/ Florine Fujita
FLORINE FUJITA

# EXHIBIT 1

```
 1              UNITED STATES DISTRICT COURT
 2          WESTERN DISTRICT OF WASHINGTON AT SEATTLE
 3   _____
 4   MICROSOFT CORPORATION,        )
                                   )
 5              Plaintiff,         ) C10-01823-JLR
                                   )
 6   v.                            ) SEATTLE, WASHINGTON
                                   )
 7   MOTOROLA INC., et al,         ) November 14, 2012
                                   )
 8              Defendant.         ) TRIAL DAY 2
                                   )
 9   _____
10            VERBATIM REPORT OF PROCEEDINGS
           BEFORE THE HONORABLE JAMES L. ROBART
11              UNITED STATES DISTRICT JUDGE
     _____
12
13
     APPEARANCES:
14
15
16   For the Plaintiff:     Arthur Harrigan, Christopher
                            Wion, David Pritikin, Rick
17                          Cederoth, Ellen Robbins and Andy
                            Culbert
18
19
20
     For the Defendants:    Jesse Jenner, Ralph Palumbo,
21                          Philip McCune, Kevin Post, Tom
                            Miller and Mark Rowland
22
23
24
25
```

```
 1   the standard the decoder supports.  So within the bounds of a
 2   particular profile, you should get a license to the patents
 3   necessary to implement that part of the standard.
 4           THE COURT:  Mr. Pritikin, any follow-up?
 5           MR. PRITIKIN:  No, sir.
 6           MR. ROWLAND:  No, Your Honor.
 7           THE COURT:  Mr. Sullivan, thank you very much.  You
 8   may step down.
 9       Microsoft will call its next witness, please.
10           MR. PRITIKIN:  Yes, Your Honor, as its next witness
11   Microsoft calls Jennifer Ochs.
12                         JENNIFER OCHS
13       Having been sworn under oath, testified as follows:
14           THE CLERK:  Take the stand, please.
15       Will you state your name for the record and spell your
16   last name, please?
17           THE WITNESS:  Jennifer Ochs, O-C-H-S.
18           THE COURT:  You may inquire.
19                       DIRECT EXAMINATION
20   BY MR. PRITIKIN:
21   Q   Ms. Ochs, by whom are you employed?
22   A   Marvell Semiconductor, Inc.
23   Q   Are you testifying here pursuant to a trial subpoena?
24   A   Yes.
25   Q   What business is Marvell in?
```

```
 1   Motorola a customer of Marvell?
 2   A   Yes.
 3   Q   Is Microsoft a customer of Marvell?
 4   A   Yes.
 5   Q   What products does Marvell sell to Microsoft for use in
 6   Microsoft's Xbox gaming consoles?
 7   A   We sell WiFi chips.
 8   Q   What is a WiFi chip?
 9   A   It's a chip that implements the 802.11 standard.
10   Q   Do the chips sold by Marvell, that you referred to,
11   contain substantially all that is needed to provide 802.11
12   functionality in a product like Xbox?
13   A   Yes.
14   Q   And is that the intended use?
15   A   Yes.
16   Q   Do these WiFi chips have any other use besides providing
17   802.11 functionality?
18   A   No.
19   Q   Approximately how much does Marvell charge for the WiFi
20   chips of the kind it sells to Microsoft?
21   A   Between $3 to $4.
22   Q   And does Marvell sell similar WiFi chips to other
23   customers?
24   A   Yes.
25   Q   What sorts of products?  Can you give us some examples of
```

# EXHIBIT 2

```
 1                    UNITED STATES DISTRICT COURT

 2              WESTERN DISTRICT OF WASHINGTON AT SEATTLE

 3       _____

 4       MICROSOFT CORPORATION,         )
                                        )
 5                   Plaintiff,         ) C10-01823-JLR
                                        )
 6       v.                             ) SEATTLE, WASHINGTON
                                        )
 7       MOTOROLA INC., et al,          ) November 15, 2012
                                        )
 8                   Defendant.         ) TRIAL DAY 3
                                        )
 9       _____

10                    VERBATIM REPORT OF PROCEEDINGS
                  BEFORE THE HONORABLE JAMES L. ROBART
11                     UNITED STATES DISTRICT JUDGE

12       _____

                              SEALED VERSION
13

14       APPEARANCES:

15

16

17       For the Plaintiff:    Arthur Harrigan, Christopher
                                Wion, David Pritikin, Rick
18                              Cederoth, Ellen Robbins and Andy
                                Culbert
19

20

21
         For the Defendants:   Jesse Jenner, Ralph Palumbo,
22                              Philip McCune, Kevin Post, Tom
                                Miller and Mark Rowland
23

24

25
```

1       MR. ROGERS:  May I proceed, Your Honor?
2       THE COURT:  Mr. Rogers, I'll give you about ten
3  minutes, then we'll take our afternoon break.
4       MR. ROGERS:  Very good.
5                    CROSS EXAMINATION
6  BY MR. ROGERS:
7  Q   Good afternoon, Dr. Gibson.  My name is Lawrence Rogers.
8  I'm going to ask you some questions on cross.
9       You testified just now about certain patents of
10 Motorola allegedly being not essential to the standard.  Do
11 you remember that?
12 A   I have testified about, I think, three patents as not
13 essential.  Is that the ones you're talking about?
14 Q   That's right.  Isn't it a fact that you submitted your
15 expert report in this case, and your last one was submitted
16 in August of 2012; is that right?
17 A   I believe that's correct.
18 Q   And you were deposed after that on August 22nd, correct?
19 A   I'll depend on you for the exact date.  I think that's
20 correct.
21 Q   I'll represent that to you, sir.  And isn't it correct
22 that notwithstanding that you had submitted your expert
23 report at that time, when you were deposed you had no
24 opinions as to whether or not any Motorola patents are or are
25 not essential to the 802.11 standard?

1  A    Well, I am trying to make a distinction here between --
2  If you are streaming video, or accessing e-mail, or looking
3  at some other secure site, they are not going to stream that
4  in the clear, because they don't trust the network either.
5  So if it is not protected by something else, information that
6  is unprotected would be sent in the clear if WiFi security is
7  turned off.
8  Q    Notwithstanding the existence of Xbox security, correct?
9  A    Yes.
10 Q    So there again, 802.11 security adds technical value to
11 the Xbox, doesn't it?
12 A    In the context we just talked about, yes.
13 Q    And 802.11 security in that context is not redundant to
14 Xbox security, is it?
15 A    Not in that context.
16 Q    Now, isn't it correct, sir, that 802.11 security requires
17 the entry of a pass phrase by a user?
18 A    Yes.
19 Q    And are you familiar with where that pass phrase is stored
20 in the Xbox when the Xbox is set to CCMP security?
21 A    No, I am not.
22 Q    Have you seen anything that suggests or that tells you
23 that pass phrase is stored in the Xbox in system flash?
24 A    No, I have not.
25 Q    System flash you understand is flash memory?

1  A   Yes.

2  Q   I would like to show you Exhibit 502.  And you can look at
3  it in your book or you can turn to --  I would like you to
4  look at Paragraph 54.  This is testimony from the U.S.
5  International Trade Commission, in an investigation of
6  337-TA-752, of a Mr. Jonathan James Koruna (phonetic) of
7  Microsoft.

8         THE COURT:  Counsel, you are not going to ask him
9  questions unless you introduce this exhibit.

10        MR. ROGERS:  I was just about to do that.

11        MR. CEDEROTH:  Your Honor, this is testimony that was
12 submitted in another proceeding under seal.

13        MR. ROGERS:  Right, it is not published.  We are not
14 publishing this.

15        MR. CEDEROTH:  I don't know that we have any
16 objection.  I am just seeing it for the first time.  I am
17 familiar with the testimony from the other proceeding.

18        MR. ROGERS:  I move admission of Exhibit 502, your
19 Honor.

20        THE COURT:  Denied.  You have to admit an exhibit in
21 connection with a witness.  You don't just pull one out.
22 Let's lay some foundation for it.

23 By Mr. Rogers:

24 Q   Would you please look at Paragraph 54?

25        THE COURT:  Counsel, you can't examine him until --

1    MR. ROGERS: Your Honor, this is testimony of a
2    Microsoft employee, and it is therefore admissible --
3    THE COURT: Counsel, I have no reason to doubt your
4    integrity. You can't simply announce what something is and
5    start questioning. You are asking the witness to assume the
6    veracity of whatever it is. He needs to indicate that he
7    knows what it is and that he understands what it is, and then
8    you get to question him about it.
9    MR. ROGERS: Thank you, your Honor.
10   By Mr. Rogers:
11   Q   You understand that system flash is memory, correct, sir?
12   A   At a very high level, yes.
13   Q   But it is computer memory in which information can be
14   stored --
15   A   Yes.
16   Q   -- in a nonvolatile way? So if you pull the plug it is
17   not lost, correct?
18   A   That's what I understand.
19   Q   And you understand that information, such as a pass
20   phrase, could be stored in system memory; is that not
21   correct?
22   A   I don't know. I haven't really discussed that or thought
23   about that.
24   THE COURT: Counsel, you can ask him to assume.
25   MR. ROGERS: Yes.

```
 1  By Mr. Rogers:
 2  Q   Dr. Gibson, I want you to assume for the moment that the
 3  pass phrase for CCMP security is stored in system memory
 4  called flash memory in the Xbox.  Okay.  Can you assume that
 5  with me?
 6  A   So far so good.
 7  Q   Isn't it correct, sir, that the Xbox includes system
 8  memory, its flash, separate and apart from the WiFi chip?
 9  A   I don't know that.
10  Q   You never made that investigation?
11  A   No.
12  Q   So is it correct that you do not know where the pass
13  phrase is stored on the Xbox?
14  A   That's correct.
15  Q   And isn't it correct that the pass phrase is an 802.11
16  feature?
17  A   No, I don't know if I would conclude that.  I haven't
18  really thought about this.
19  Q   Do you know whether or not the 802.11 standard requires a
20  pass phrase?
21  A   I believe I answered that earlier, yes.
22  Q   It does?
23  A   Yes.
24  Q   And if the pass phrase for the Xbox -- for 802.11
25  security, is stored in system flash and not on the WiFi chip,
```

1  then wouldn't you agree that more than simply the WiFi chip
2  is required in the Xbox to implement 802.11 functionality?
3  A    Well, assuming something I don't know, that information
4  would be in the Xbox.
5  Q    Right.  If the pass phrase is in the Xbox, and not on the
6  WiFi chip, then isn't it correct that 802.11 functionality
7  exists in the Xbox beyond the WiFi chip?
8  A    Functionality seems like an awfully expansive word for
9  storing a few bits.
10 Q    A pass phrase is essential, is it not, for establishing
11 CCMP security?
12 A    Yes.
13 Q    Isn't it correct, sir, in order to achieve compliance by
14 the WiFi Alliance for the n standard --  Let me rephrase.
15 You testified earlier about n modulation?
16 A    You are talking about 802.11n?
17 Q    Yes.
18 A    Okay.
19 Q    There is something called 802.11b and something called
20 802.11g, correct?
21 A    That's correct.
22 Q    Those are different methods for transmitting data from one
23 station to an access point, correct?
24 A    Those are different physical layer amendments to the
25 standard.

# EXHIBIT 3
# FILED UNDER SEAL