HONORABLE JAMES L. ROBART

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| MICROSOFT CORPORATION,<br><br>　　　　　　　　Plaintiff,<br>　　v.<br>MOTOROLA INC., et al.,<br><br>　　　　　　　　Defendant. | No. C10-1823-JLR<br><br>MICROSOFT'S REVISED PROPOSED PRELIMINARY INSTRUCTION NO. 2 |
| MOTOROLA MOBILITY, INC., et al.,<br><br>　　　　　　　　Plaintiffs,<br>　　v.<br>MICROSOFT CORPORATION,<br><br>　　　　　　　　Defendant. | |

MICROSOFT'S REVISED PROPOSED
PRELIMINARY INSTRUCTION NO. 2
C10-1823-JLR

LAW OFFICES
**CALFO HARRIGAN LEYH & EAKES LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700 FAX, (206) 623-8717

1    In the course of this case, the Court has made certain factual and legal rulings that will
2 be important to your decision on the questions you must decide in the case.  You must accept
3 these findings as true and correct.  In this preliminary instruction, I will inform you of some of
4 these earlier rulings.  Witnesses and counsel may refer to these earlier rulings from time to
5 time during the trial.

## Introduction and Overview of Case

7    I will start with a general overview.  This is a breach of contract case between
8 Microsoft Corporation, the plaintiff, and defendants Motorola, Inc., Motorola Mobility, Inc.,
9 and General Instrument Corporation.  I will refer to all of these defendants as "Motorola."  [1]

10   Motorola and Microsoft participate in international organizations that set technical
11 standards, called "standard setting organizations."  Standard setting organizations define
12 standard ways of performing certain functions so that different products can interact, or
13 interoperate, with each other.  Companies that participate in standard setting organizations
14 agree on common technologies so that products complying with the standards will work
15 together.  [2]  There are many standard setting organizations, and many technology standards.
16 This case concerns two standard setting organizations and two technical standards.  The first
17 organization is called the Institute of Electrical and Electronics Engineers, which is called "I-
18 triple-E" for short.  The IEEE defines a standard for wireless communications called the
19 "802.11 standard," which you might be familiar with as "WiFi."  The second organization is
20 the International Telecommunication Union, called the "ITU."  [3]  The ITU defines a standard
21 for video coding technology, called the "H.264 standard."  [4]

22   Much of the technology that is incorporated into the 802.11 and H.264 standards is old
23 and freely available to the public.  Much of the technology in these standards is not patented,
24 and therefore also free for the public to use.  However, each of these standards includes some
25 technology that is covered by patents.  Patents that are used, or infringed, when products are

MICROSOFT'S REVISED PROPOSED
PRELIMINARY INSTRUCTION NO. 2 - 1
C10-1823-JLR

LAW OFFICES
**CALFO HARRIGAN LEYH & EAKES, LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700 FAX, (206) 623-8717

built to comply with a standard are called "standard essential patents." These patents are called "essential" patents because it is not possible to build a product that complies with the standard without infringing the patents.

Standard setting organizations want companies and consumers to adopt technology standards. To encourage widespread adoption, these organizations seek contractual commitments from the owners of standard essential patents. Based on these commitments, the owners of the standard essential patents are contractually required to license those patents to anyone that wants to use the standard on what are called "RAND" terms. The term "RAND" stands for "reasonable and non-discriminatory."

Motorola owns patents that are essential to the 802.11 and H.264 standards and Motorola has committed to the IEEE and the ITU to grant licenses on RAND, again, reasonable and non-discriminatory, terms to anyone and everyone who wants to use the standards. [5] Motorola's commitments to the IEEE and the ITU are contracts. Microsoft—as a user of the 802.11 and H.264 standards—is entitled to enforce these contracts in court. [6] Microsoft claims that Motorola breached these contracts. The following are some of the facts that relate to Microsoft's claims.

On October 21, 2010, Motorola sent Microsoft a letter seeking royalty payments in exchange for a license to Motorola's 802.11 standard essential patents. On October 29, 2010, Motorola sent a similar letter seeking royalty payments in exchange for a license its H.264 standard essential patents. In each of these letters Motorola stated that it would license its standard essential patents for a royalty of 2.25% of the price of the products implementing the standards.

On November 9, 2010, Microsoft filed this lawsuit against Motorola, asserting, among other things, that Motorola breached its contracts with the IEEE and the ITU by sending these demand letters. [7] After this case was filed, Motorola filed patent infringement lawsuits

MICROSOFT'S REVISED PROPOSED
PRELIMINARY INSTRUCTION NO. 2 - 2
C10-1823-JLR

LAW OFFICES
CALFO HARRIGAN LEYH & EAKES, LLP
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700 FAX, (206) 623-8717

against Microsoft for using Motorola's standard essential patents.  In those lawsuits, Motorola was seeking injunctions.  An injunction is an order from a court that requires someone to stop doing something.  Motorola was seeking injunctions that would stop Microsoft from selling products that use either the 802.11 or H.264 standard, and that includes Windows and Xbox.  Microsoft claims that Motorola's actions in pursuing these lawsuits also were a breach of Motorola's contracts with the IEEE and the ITU.  Microsoft was not required to negotiate with Motorola first before filing this lawsuit.  I will now give you some more detailed information about these issues.

## Hold Up and Stacking

The owner of a patent that is not a standard essential patent may grant licenses to other companies, permitting them to sell products that include the patent owner's patented technology.  Such licenses may require the payment of a "licensing fee," which is sometimes called a "royalty" payment.  If the patent is not a "standard essential patent," then the owner of the patent can charge as much as it wants for a license.  If the price is too high, the other companies can just walk away and not use the patents.

There are different rules in the world of standards.  When a standard becomes widely implemented or adopted, the owner of a standard essential patent could have substantial leverage to demand excessive royalties.  [8]  There may have been equally good or better alternatives to patented technology available when the standard was adopted.  [9]  But after the standard is widely implemented, switching to those alternatives is either no longer viable or would be too expensive.  [10]  The ability of an owner of a standard essential patent to demand more than the value of its patented technology, and to attempt to capture value that comes from the standard, is called "hold-up."  [11]  The impact of a hold-up increases as the industry standard becomes more widely implemented.  [12]  Hold-up can undermine the standard-setting process and threaten the adoption of valuable standards.  [13]  Hold up harms

MICROSOFT'S REVISED PROPOSED
PRELIMINARY INSTRUCTION NO. 2 - 3
C10-1823-JLR

LAW OFFICES
CALFO HARRIGAN LEYH & EAKES, LLP
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700 FAX, (206) 623-8717

companies that are forced to pay higher royalties, and also harms consumers through higher prices or fewer choices. [14]

Another problem with standard essential patents is called "royalty stacking," which occurs when technologies used in products are covered by patents owned by many different patent holders. [15] If there are a large number of standard essential patents, the total royalty payments might make the product too expensive to make and sell, and undermine the standards. [16] Complex industry standards like H.264 and 802.11 can require the use of hundreds or thousands of standard essential patents held by dozens of patent holders. [17] Royalties for all of the standard essential patent holders must be taken into account to determine overall reasonableness, otherwise the total "stack" of royalty payments would make use of the standard too expensive and the standard would potentially fail in the market. [18] Royalty stacking can be an even bigger problem for products that must comply with multiple standards. [19]

### **RAND Licensing Commitments**

To address the problems of hold up and stacking, many standard setting organizations, including the IEEE and ITU, have adopted rules relating to the licensing of essential patents. [40] Their policies require or encourage companies participating in the standard setting process to agree to license their standard essential patents on "reasonable and non-discriminatory" or RAND terms to anyone who requests a license. [41] These agreements are contracts called RAND commitments.

The purpose of these contracts is to encourage widespread adoption of the standard and prevent hold up and royalty stacking. RAND commitments address the hold-up problem because a RAND commitment limits a patent holder to a reasonable royalty on the economic value of its patented technology alone, not any of the value of the standard. [22] RAND commitments address the stacking problem by ensuring that the total royalties for all standard

MICROSOFT'S REVISED PROPOSED
PRELIMINARY INSTRUCTION NO. 2 - 4
C10-1823-JLR

LAW OFFICES
CALFO HARRIGAN LEYH & EAKES, LLP
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700 FAX, (206) 623-8717

1  essential patents within any standard are reasonable and non-discriminatory.  [23]  A royalty

2  that, if adopted by all standard essential patent holders, would result in total royalty payments

3  that exceed the total product price would not be a RAND royalty.  [24]

### The Standards at Issue

5      This case concerns two standards called 802.11 and H.264.  [25]  The 802.11 standard

6  is a wireless communication standard developed over many years by the IEEE [26], and you

7  may know it by its more common name of "WiFi."  [27]  The H.264 standard is a video coding

8  compression standard.  [28]  Popular examples of technologies that use the H.264 video

9  compression standard include Blu-ray movies and YouTube videos.  [29]  Two different

10  standard setting organizations were involved in developing the H.264 standard, [30] but for

11  simplicity, I will refer to H.264's standard setting organizations as just "ITU."

12      The 802.11 standard allows companies to build products for wireless local area

13  networking of computers and other electronic devices.  [31]  If you have a home "WiFi"

14  network, a computer chip in your laptop uses the 802.11 standard to connect to that network

15  and, through it, to the Internet.  The 802.11 standard is the most widely used and universally

16  accepted wireless communications standard for ordinary consumer and business use.  [32]  The

17  IEEE spent seven years developing the first draft of the 802.11 standard [33] with the

18  participation of over 1,000 companies.  [34]  The 802.11 standard today is immense and

19  complex and the current version of the standard is almost 3000 pages long.  [35]

20      Although there are many video coding standards, the H.264 standard developed by the

21  ITU is currently the most widely used video coding and compression format.  [36]  Video

22  coding and compression is the process of transforming video into compressed files that take up

23  less space and can sent be over the Internet more quickly.  [37]  Later, such as when a

24  consumer is ready to watch a video, the video will be decoded by hardware or software on the

25  device that is being used to watch the video.  Decoding turns an encoded, smaller file back into

MICROSOFT'S REVISED PROPOSED
PRELIMINARY INSTRUCTION NO. 2 - 5
C10-1823-JLR

LAW OFFICES
CALFO HARRIGAN LEYH & EAKES, LLP
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700 FAX, (206) 623-8717

1   an uncompressed video for viewing.  [38]  H.264 is a large and complex standard, and was

2   developed over more than 5 years by about 170 companies and organizations.  [39].

### Motorola's RAND Licensing Commitments to ITU and IEEE

I will now explain the rules that the IEEE and ITU adopted and the RAND licensing commitments that Motorola made to the IEEE and ITU.

The ITU's policies require that a patent essential to the H.264 standard must be accessible to everybody without undue constraints. [40]  When patent owners disclose that they may have a patent essential to the standard, the ITU will seek a licensing commitment from the patent-holder.  [41]  This licensing commitment is often referred to as a "Letter of Assurance," or an "LOA" for short.  [41]  The ITU provides three options:  [42]  (1) First, the patent holder may commit to license its standard essential patents on a royalty-free basis;  (2) Second, the patent holder may commit to license its standard essential patents on RAND, again, reasonable and non-discriminatory, terms; or  (3) Third, the patent holder may decline to make any licensing commitment.  However, if a standard essential patent holder declines to make a RAND or royalty-free licensing commitment, the ITU's policy is that the standard will <u>not</u> include any technology that might depend on the patent.  [43]  In other words, either the patented technology must be free, or the licensing terms must be reasonable and non-discriminatory.  Otherwise, the ITU will not incorporate the technology in the standard but will find another way to achieve the desired result.

Motorola submitted several Letters of Assurance to the ITU in connection with H.264. [44]  Motorola's Letters of Assurance stated that it would grant licenses to an unrestricted number of applicants on a worldwide, non-discriminatory basis and on reasonable terms and conditions conditioned on reciprocity.  [45]  "Reciprocity" means that if Company X wanted a license on RAND terms to Motorola's H.264 patents, it had to provide Motorola with a license on RAND terms to any of Company X's H.264 patents.  [46]

MICROSOFT'S REVISED PROPOSED
PRELIMINARY INSTRUCTION NO. 2 - 6
C10-1823-JLR

LAW OFFICES
**CALFO HARRIGAN LEYH & EAKES, LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700 FAX, (206) 623-8717

Case 2:10-cv-01823-JLR   Document 856   Filed 08/19/13   Page 8 of 15

Like the ITU, the IEEE has policies that encourage standard essential patent holders to make RAND commitments and provide letters of assurance. The IEEE does not require that specific patents be identified; instead it only requires that the contributing patent holder make the licensing commitment for all patents that may potentially be essential to the standard. [47] Like the ITU, the IEEE has not included technology into a standard unless it obtained such a Letter of Assurance from the holder of a patent that may be essential. [48] Motorola submitted Letters of Assurance to the IEEE and agreed to grant licenses to any of its patents that are essential to the 802.11 standard on RAND terms. [49] When Motorola made its first RAND licensing commitments regarding 802.11, the IEEE policy specified that royalties would be charged based on "nominal competitive costs." [50]

### H.264 and 802.11 Standard Essential Patents

Motorola owns or controls a number of patents that it has alleged to be essential to either the 802.11 or H.264 standards, and are accordingly subject to its RAND, reasonable and non-discriminatory, licensing contractual commitments to the IEEE or ITU. The Court has made certain findings related to these patents.

H.264 is a large and technically complex standard. [51] The largest contributor to H.264 was a company called Telenor, which contributed many of the core innovations of H.264 and submitted the proposal that became the basis of the first draft of the H.264 standard. [52] Telenor did not seek patents on its contributions to the H.264 standard. [53] Before Motorola became involved, other companies and research institutes had already contributed much of the innovation associated with the H.264 standard. [54] Some companies did obtain patents on their contributions to the standard, and there are at least 2,500 patents worldwide that are essential to the H.264 standard [55] and over 360 of them are U.S. patents. [56]

Motorola did not provide the foundational technology to the H.264 standard, but instead built upon already-existing technology. [57] Motorola's H.264 standard essential

MICROSOFT'S REVISED PROPOSED
PRELIMINARY INSTRUCTION NO. 2 - 7
C10-1823-JLR

LAW OFFICES
CALFO HARRIGAN LEYH & EAKES, LLP
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700 FAX, (206) 623-8717

1  patents constitute only a sliver of the overall technology incorporated in the H.264 standard.

2  [58]  Motorola's role in H.264 development related almost entirely to a type of video called

3  "interlaced video" that is of little relevance in the marketplace.  [59]

4        The development of the 802.11 standard dealt primarily with the implementation of

5  well-known technologies.  [60]  The majority of the technologies adopted by the 802.11

6  drafters as the central elements of the standard were in the "public domain," which means they

7  are not covered by patents.  [61].  However, there are possibly thousands of patents essential to

8  the 802.11 standard.  [62]  Motorola's 802.11 standard essential patents provide only a

9  minimal contribution to the 802.11 standard.  [63]  Motorola's patents constitute only a sliver

10  of the overall technology incorporated into the 802.11 standard.  [64]  In 2003, Motorola hired

11  a company called InteCap to evaluate Motorola's 802.11 standard essential patents and provide

12  a licensing recommendation.  [65]  InteCap proposed that Motorola charge the companies that

13  made 802.11-enabled consumer products a royalty of 0.1% of the price of consumer products,

14  including game consoles like the Xbox.  [66]  However, InteCap had overestimated the

15  importance of Motorola's patents to the 802.11 standard.  [67]

**Microsoft's Products**

17      The primary Microsoft products at issue in this case that use the H.264 standard are

18  Windows and Xbox.  Windows is an operating system for computers.  [68]  With each version

19  of Windows, Microsoft adds thousands of features which typically build on the capabilities of

20  previous releases.  [69]  Video encoding and decoding is only a tiny part of what the Windows

21  software does, and Windows supports many other video compression standards in addition to

22  the H.264 standard.  [70]  Motorola's H.264 standard essential patents provide only minor

23  importance to the overall functionality of Windows.  [71]

24       The biggest use of Xbox is to play single player video games.  [72]  Xbox games never

25  contain H.264 video content.  [73]  Xbox can access video from sources such as Hulu and

26

MICROSOFT'S REVISED PROPOSED
PRELIMINARY INSTRUCTION NO. 2 - 8
C10-1823-JLR

LAW OFFICES
CALFO HARRIGAN LEYH & EAKES, LLP
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700 FAX, (206) 623-8717

Netflix [74], but many of these third-party sources do not use H.264 and instead use a different video compression standard. [75] Xbox can be used to play DVDs, but DVDs do not use H.264. [76] Motorola's H.264 standard essential patents are of only minor importance to the overall functionality of the Xbox. [77] As for the 802.11 standard, Xbox is the only Microsoft product at issue. [78] The Xbox supports 802.11 and can be connected to network by means of a WiFi connection. [79] However, every Xbox can also connect to the Internet using a wired connection instead. [80] The 802.11 capability in the Xbox is provided by a chip that Microsoft buys from a company called Marvell for about $3 to $4. [81]

### RAND Royalty Determination and the Issues for Trial

Microsoft claims that Motorola breached its contracts both through its October 2010 letters and through its subsequent conduct. Microsoft claims Motorola's conduct violates the duty of good faith and fair dealing that is part of every contract.

In its October 2010 letters, Motorola proposed royalties for use of its 802.11 and H.264 portfolios of 2.25% of the net selling price of Xbox and of computers running Windows. [82] Motorola had entered into other license agreements with other companies, some of which included Motorola's 802.11 or H.264 standard essential patents, but none of those licenses support a royalty rate of 2.25% for Motorola's patents. [83]. Motorola had widely licensed its extremely strong cellular portfolio [84] but Motorola had never received royalties of 2.25% for its 802.11 or H.264 patents. [84]. Instead, Motorola had a practice of providing licensees with a license to its 802.11 and H.264 portfolios at no additional charge if a licensee takes a license to Motorola's cellular portfolios. [85].

The Court has determined that the RAND, reasonable and non-discriminatory, royalty that Microsoft should pay for a license to Motorola's H.264 standard essential patents is 0.555 cents per unit for Windows and Xbox. [86] The RAND royalty that the Court has determined Microsoft should pay for a license to Motorola's 802.11 standard essential patent portfolio is

MICROSOFT'S REVISED PROPOSED
PRELIMINARY INSTRUCTION NO. 2 - 9
C10-1823-JLR

LAW OFFICES
CALFO HARRIGAN LEYH & EAKES, LLP
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700 FAX, (206) 623-8717

3.471 cents per unit for Xbox.  [87]  Motorola's opening offer did not have to be RAND, but a blatantly unreasonable offer is a breach of the duty of good faith and fair dealing and so a breach of the RAND contract.  Motorola's subsequent conduct included filing lawsuits and seeking injunctions against Microsoft in the International Trade Commission in Washington DC, in federal court in the United States, and in German courts.  Motorola filed those suits after Microsoft had sought to have the parties' RAND contract dispute resolved in this Court.

**Authority in support of instruction**:

[1] *See* Dkt. No. 673, Findings of Fact and Conclusions of Law ("FFCL"), at ¶¶ 1-7; [2] FFCL ¶ 11; [3] Dkt. No. 188 at p. 2; [4] FFCL at p. 3; [5] FFCL at 3-4; [6] *See, e.g.*, Dkt. 335 at 6; [7] FFCL at 4-5; [8] FFCL ¶ 52; [9] FFCL ¶ 52; [10] FFCL ¶ 52; [11] FFCL ¶ 55; [12] FFCL ¶ 56; [13] FFCL ¶ 57; [14] FFCL ¶ 58; [15] FFCL ¶ 65; [16] FFCL ¶¶ 64, 456; [17] FFCL ¶ 62; [18] FFCL ¶456; [19] FFCL ¶ 64; [20] FFCL ¶ 25; [21] FFCL ¶ 25; [22] FFCL ¶ 109; [23] FFCL ¶ 66; [24] FFCL ¶ 456; [25] FFCL ¶ 16; [26] FFCL ¶ 16; [27] FFCL at p. 3; [28] FFCL ¶ 16; [29] FFCL ¶¶ 285, 298; [30] FFCL ¶ 16; [31] FFCL ¶ 308; [32] FFCL ¶ 323; [33] FFCL ¶ 315; [34] FFCL ¶ 317; [35] FFCL ¶ 318; [36] FFCL ¶ 133; [37] FFCL ¶ 114; [38] FFCL ¶ 116; [39] FFCL ¶¶ 129,135, 154; [40] FFCL ¶ 27; [41] FFCL ¶ 29; [41] FFCL ¶ 29; [42] FFCL ¶ 30; [43] FFCL ¶ 31; [44] FFCL ¶ 35; [45] FFCL ¶ 36; [46] FFCL ¶ 34; [47] FFCL ¶ 42; [48] Dkt. 335 at 12; [49] FFCL ¶ 44; [50] FFCL ¶ 48; [51] FFCL ¶ 154; [52] FFCL ¶ 533; [53] FFCL ¶ 533; [54] FFCL ¶ 160; [55] FFCL ¶ 156; [56] FFCL ¶ 534; [57] FFCL ¶ 531; [58] FFCL ¶ 533; [59] FFCL ¶¶ 162, 279; [60] FFCL ¶ 321; [61] FFCL ¶ 321; [62] FFCL ¶ 335;  *See also* FFCL ¶ 573; [63] FFCL ¶ 457, 575; [64] FFCL ¶ 576; [65] FFCL ¶¶ 591, 600; [66] FFCL ¶¶ 592, 596; [67] FFCL ¶ 610; [68] FFCL ¶ 281; [69] FFCL ¶ 281; [70] FFCL ¶ 281; [71] FFCL ¶ 289; [72] FFCL ¶ 290; [73] FFCL ¶ 290; [74] FFCL ¶ 291; [75] FFCL ¶ 291; [76] FFCL ¶ 292; [77] FFCL ¶ 299; [78] FFCL ¶¶ 347, 338; [79] FFCL ¶ 350; [80] FFCL ¶

MICROSOFT'S REVISED PROPOSED
PRELIMINARY INSTRUCTION NO. 2 - 10
C10-1823-JLR

LAW OFFICES
**CALFO HARRIGAN LEYH & EAKES, LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700 FAX, (206) 623-8717

1  349; **[81]** FFCL ¶ 581; **[82]** FFCL at pp. 4-5; **[83]** FFCL ¶¶ 420, 425, 435, 440, 443, 445, 451,

2  454; **[84]** FFCL ¶ 430; **[84]** ¶¶ 418-419, 425-434; **[85]** FFCL ¶ 428; **[86]** FFCL at p. 207; **[87]**

3  FFCL at p. 207.

4    DATED this 19th day of August, 2013.

   CALFO HARRIGAN LEYH & EAKES LLP

   By   s/Arthur W. Harrigan, Jr.
        Arthur W. Harrigan, Jr., WSBA #1751

   By   s/Christopher Wion
        Christopher Wion, WSBA #33207

   By   s/Shane P. Cramer
        Shane P. Cramer, WSBA #35099
        999 Third Avenue, Suite 4400
        Seattle, WA  98104
        Phone:  206-623-1700
        arthurh@calfoharrigan.com
        chrisw@calfoharrigan.com
        shanec@calfoharrigan.com

   By   s/T. Andrew Culbert
        T. Andrew Culbert

   By   s/David E. Killough
        David E. Killough

   MICROSOFT CORPORATION
   1 Microsoft Way
   Redmond, WA  98052
   Phone:  425-882-8080
   Fax:  425-869-1327

   David T. Pritikin
   Richard A. Cederoth
   Constantine L. Trela, Jr.
   William H. Baumgartner, Jr.
   Ellen S. Robbins
   Douglas I. Lewis
   David C. Giardina

MICROSOFT'S REVISED PROPOSED
PRELIMINARY INSTRUCTION NO. 2 - 11
C10-1823-JLR

LAW OFFICES
**CALFO HARRIGAN LEYH & EAKES, LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700 FAX, (206) 623-8717

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

John W. McBride
Nathaniel C. Love

SIDLEY AUSTIN LLP
One South Dearborn
Chicago, IL  60603
Phone:  312-853-7000
Fax:  312-853-7036

Carter G. Phillips
Brian R. Nester

SIDLEY AUSTIN LLP
1501 K Street NW
Washington, DC  20005
Telephone:  202-736-8000
Fax:  202-736-8711

Counsel for Microsoft Corp.

MICROSOFT'S REVISED PROPOSED
PRELIMINARY INSTRUCTION NO. 2 - 12
C10-1823-JLR

LAW OFFICES
**CALFO HARRIGAN LEYH & EAKES, LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700 FAX, (206) 623-8717

# CERTIFICATE OF SERVICE

I, Florine Fujita, swear under penalty of perjury under the laws of the State of Washington to the following:

1. I am over the age of 21 and not a party to this action.

2. On the 19th day of August, 2013, I caused the preceding document to be served on counsel of record in the following manner:

**Attorneys for Motorola Solutions, Inc., and Motorola Mobility, Inc.:**

| | |
|---|---|
| Ralph Palumbo, WSBA #04751<br>Philip S. McCune, WSBA #21081<br>Summit Law Group<br>315 Fifth Ave. South, Suite 1000<br>Seattle, WA 98104-2682<br>Telephone: 206-676-7000<br>Email: Summit1823@summitlaw.com | _____ Messenger<br>_____ US Mail<br>_____ Facsimile<br>__X__ ECF |
| Steven Pepe (*pro hac vice*)<br>Jesse J. Jenner (*pro hac vice*)<br>Ropes & Gray LLP<br>1211 Avenue of the Americas<br>New York, NY 10036-8704<br>Telephone: (212) 596-9046<br>Email: steven.pepe@ropesgray.com<br>Email: jesse.jenner@ropesgray.com | _____ Messenger<br>_____ US Mail<br>_____ Facsimile<br>__X__ ECF |
| Norman H. Beamer (*pro hac vice*)<br>Ropes & Gray LLP<br>1900 University Avenue, 6th Floor<br>East Palo Alto, CA 94303-2284<br>Telephone: (650) 617-4030<br>Email: norman.beamer@ropesgray.com | _____ Messenger<br>_____ US Mail<br>_____ Facsimile<br>__X__ ECF |
| Paul M. Schoenhard (*pro hac vice*)<br>Ropes & Gray LLP<br>One Metro Center<br>700 12th Street NW, Suite 900<br>Washington, DC 20005-3948<br>Telephone: (202) 508-4693<br>Email: Paul.schoenhard@ropesgray.com | _____ Messenger<br>_____ US Mail<br>_____ Facsimile<br>__X__ ECF |

MICROSOFT'S REVISED PROPOSED
PRELIMINARY INSTRUCTION NO. 2 - 13
C10-1823-JLR

LAW OFFICES
**CALFO HARRIGAN LEYH & EAKES, LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700 FAX, (206) 623-8717

| | |
|---|---|
| Andrea Pallios Roberts (*pro hac vice*) | _____ Messenger |
| Brian C. Cannon (*pro hac vice*) | _____ US Mail |
| Quinn Emanuel Urquhart & Sullivan, LLP | _____ Facsimile |
| 555 Twin Dolphin Drive, 5th Floor | \_\_X\_\_ ECF |
| Redwood Shores, CA 94065 | |
| Telephone:  (650) 801-5000 | |
| Email: andreaproberts@quinnemanuel.com | |
| Email: briancannon@quinnemanuel.com | |
| | |
| Kathleen M. Sullivan (*pro hac vice*) | _____ Messenger |
| David Elihu (*pro hac vice*) | _____ US Mail |
| Quinn Emanuel Urquhart & Sullivan, LLP | _____ Facsimile |
| 51 Madison Ave., 22nd Floor | \_\_X\_\_ ECF |
| New York, NY 10010 | |
| Telephone:  (212) 849-7000 | |
| Email: kathleensullivan@quinnemanuel.com | |
| | |
| William Price (*pro hac vice*) | _____ Messenger |
| Quinn Emanuel Urquhart & Sullivan, LLP | _____ US Mail |
| 865 S. Figuera St., 10th Floor | _____ Facsimile |
| Los Angeles, CA 90017 | \_\_X\_\_ ECF |
| Telephone:  (212) 443-3000 | |
| Email: williamprice@quinnemanuel.com | |
| MicrosoftvMotoBreachofRANDCase@quinnemanuel.com | |

DATED this 19th day of August, 2013.

                                                  s/  Florine Fujita_____
                                                  FLORINE FUJITA

MICROSOFT'S REVISED PROPOSED
PRELIMINARY INSTRUCTION NO. 2 - 14
C10-1823-JLR

LAW OFFICES
**CALFO HARRIGAN LEYH & EAKES, LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700 FAX, (206) 623-8717