```
 1                 UNITED STATES DISTRICT COURT

 2            WESTERN DISTRICT OF WASHINGTON AT SEATTLE

 3    _____

      MICROSOFT CORPORATION,          )
 4                                     )
                  Plaintiff,           ) C10-01823-JLR
 5                                     )
      v.                               ) August 13, 2013
 6                                     )
      MOTOROLA, INC., et al,           ) PRETRIAL
 7                                     ) CONFERENCE
                  Defendant.           )
 8                                     )

 9    _____

10          BEFORE THE HONORABLE JAMES L. ROBART
                 UNITED STATES DISTRICT JUDGE
11    _____

12
      APPEARANCES:
13

14     For the Plaintiff:      Arthur Harrigan, Christopher
                               Wion, David Pritikin, Richard
15                             Cederoth, Andy Culbert,
                               Nathaniel Love and Ellen
16                             Robbins

17

18

19     For the Defendants:     Ralph Palumbo, William Price,
                               Brian Cannon, Kathleen Sullivan
20                             and Andrea Roberts

21

22

23

24

25
```

1          THE COURT:  The clerk will call this matter.

2          THE CLERK:  C10-1823, Microsoft versus Motorola.

3    Counsel, please make your appearances for the record.

4          MR. HARRIGAN:  Good afternoon, your Honor.  Art

5    Harrigan representing Microsoft.  And I am here with

6    people that you already know:  Mr. David Pritikin from the

7    Sidley firm.

8          MR. PRITIKIN:  Good afternoon, your Honor.

9          MR. HARRIGAN:  Mr. Cederoth from the Sidley firm.

10   Mr. Andy Culbert from Microsoft.

11         MR. CULBERT:  Good afternoon.

12         MR. HARRIGAN:  My partner, Chris Wion.

13         MR. WION:  Good afternoon.

14         MR. HARRIGAN:  Nat Love from the Sidley firm.

15         MR. PALUMBO:  Good afternoon, your Honor.  Ralph

16   Palumbo representing Motorola.  And I also have folks you

17   have met before:  Mr. Bill Price.  Kathleen Sullivan.

18         MS. SULLIVAN:  Good afternoon, your Honor.

19         MR. PALUMBO:  Brian Cannon and Andrea Roberts.

20         THE COURT:  Thank you.  Nice to see you made it

21   back, Mr. Palumbo.

22         MR. PALUMBO:  Thank you, your Honor.

23         THE COURT:  Counsel, we are here for the pretrial

24   conference.  I will go through my pretrial checklist, then

25   give you rulings on your in limine motions, and at the

1    conclusion of that I intend to take up Mr. Palumbo's

2    letter regarding Mr. Menenberg, Mr. Harrigan's letter

3    involving Germany, and also discuss with you some other

4    procedural matters.

5        Let's begin with the pretrial conference.  I usually

6    take about three pauses as we go through this material.

7    If you have an immediate question that needs an answer,

8    feel free to interrupt.  But know that there will be a

9    couple of times in here when I will ask you if there are

10   any questions.

11       You are scheduled to begin a jury trial on Monday,

12   August 26th, 2013.  Motorola has belatedly asked for a

13   jury, which I have given them.  The trial schedule will be

14   trial on the 26th, 27th, 28th, 29th, 30th, Monday through

15   Friday.  The following Monday is a holiday and the

16   courthouse is closed.  And we will have trial on the 3rd

17   and the 4th.  That is seven trial days, which is an

18   eternity in this court.

19       The jury will be eight people.  Please remember that

20   you are in federal court, and in civil trials there are no

21   alternates.  So everyone who is in the box sits and

22   deliberates.

23       My trial hours are 9:00 to 10:30, 10:45 to noon, 1:30

24   to 3:00, and 3:15 to 4:30.  We try to promptly start at

25   9:00, and we take a hard stop at 4:30.  It is our

1   experience that many of our jurors come via the bus, and

2   in an effort to be courteous to them we ask them to

3   determine which bus going to catch, and then make sure

4   that they are able to do so.  That's roughly five and a

5   half hours a day.

6       As I told you, you are on the clock.  Each side is

7   getting 16 hours.  You may wonder where the other five

8   hours go.  The answer is there are some things for which

9   you are not charged, that seem to inevitably arise, most

10  notably my reading the jury instructions.

11      But know that in terms of charging your time, what I

12  have taken to calling the last minute matters, "Judge, we

13  have to talk about something before we bring the jury up,"

14  that counts, jury selection counts, openings count,

15  presentation of evidence, both direct, cross and rebuttal,

16  counts, and your closings.

17      For those of you who were here for the last trial,

18  there were clock management issues.  And so if you haven't

19  worked under an on-the-clock system, I would urge you to

20  consult with your colleagues who have, and see if they

21  have any tips on how to use your time wisely.

22      In terms of jury impanelment, we will probably bring

23  in 32 to 35 potential jurors.  I will ask them the civil

24  questions out of the recently revised judges' bench book,

25  and I will ask them anything that is in your submissions

1    to the court that I believe to be relevant.

2        I am not a believer in the invasion of the jurors'

3    privacy, and, therefore, questions like what's the last

4    book you read, what's your favorite movie, what do you

5    watch on television, just don't get asked.

6        I leave time for lawyer-conducted voir dire, which

7    makes me an exception around here.  It many times isn't

8    all that long, 20 minutes to a half hour.  Most of the

9    time I try and ask all of the embarrassing questions so

10   that you all can look like heroes in the eyes of the jury.

11       At the conclusion of all of that, we will meet at

12   sidebar, normally I send the jury out, let them take their

13   break, and I will ask you for your for cause challenges.

14   What you need to know about for cause challenges is that I

15   am a sucker for them.  I believe that the parties deserve

16   to have jurors who want to be here, and, therefore, anyone

17   whose grandmother has died for the second or third time,

18   has booked a cruise, is having surgery, whatever, if they

19   don't want to be here they are likely not to be on the

20   jury.  After the for cause challenges have been ruled on,

21   you will know the outcomes of those.  We bring the jury

22   back in if they are on break, have them in their seats,

23   and we will do peremptory challenges.

24       Peremptory challenges here start with the plaintiff

25   doing one, the form goes to the other side and they take

1    one, and it goes back to the plaintiff, one, and to the

2    defendant, one.  It is a practice in some jurisdictions if

3    you have passed Juror 3, you can't go back and do 1 and 2.

4    That is a rule that is not followed in the Western

5    District of Washington.

6        We have a handout about jury impanelment which you are

7    welcome to pick up.  You told me that you wanted to do a

8    questionnaire, and I have not heard anything further about

9    that, so I will ask --  Yes, sir.

10            MR. PRITIKIN:  Your Honor, we have agreed on the

11   questionnaire, and I have a copy of it, which I could hand

12   up to the court if you would like me to.

13            THE COURT:  Please do so.  How long is it?

14            MR. PRITIKIN:  It is short.  We tried to take to

15   heart your admonition and we kept it to just a couple of

16   pages.  I think it is three pages.

17            THE COURT:  Only three is a couple to you guys.  I

18   am going to be able to make it shorter, because they will

19   have completed the court's form and it picks up --

20   Mr. Pritikin, this seems to be double-sided.

21            MR. PRITIKIN:  You're correct.  It is four pages.

22   I stand corrected.

23            THE COURT:  All right.  We will get it reduced in

24   size.  They will have filled out the court's form before

25   they get here and I may include the court's questions into

1    your form.  I won't know who I will be getting as a jury

2    pool that morning if there are other cases going out, so

3    this will not be able to be filled out by that more select

4    group until they know that they are coming up here.  We

5    will see if we can't work with you on that.

6         MR. PRITIKIN:  Thank you.

7         THE COURT:  Time for me to take my first break.

8    Mr. Harrigan, or whoever is speaking for Microsoft, any

9    questions thus far?

10        MR. HARRIGAN:  I don't have any questions so far,

11   your Honor.

12        THE COURT:  Mr. Palumbo.

13        MR. PALUMBO:  Neither do I, your Honor.  Thank

14   you.

15        THE COURT:  Moving on then to opening statements.

16   Prior to the presentation of opening statements, I will

17   read the preliminary jury instructions.  I will tell you,

18   of the preliminary jury instructions, the one that you

19   really need to work on is Number 2, the agreed statement

20   of the case.

21        I noticed in your proposed instructions you were able

22   to agree on this is a case between Microsoft and Motorola.

23   One proposed instruction, I think, is 16 pages long, and

24   one is about two and a half.  If you don't come up with an

25   agreed statement of the case, we will.  That means that we

1  will take our hatchet, as opposed to you taking your

2  scalpel.

3      Having the rare opportunity of going back to talk to

4  jurors now for nine-plus years, I think one of the things

5  that I certainly made as a mistake in private practice was

6  not recognizing that the jury knows absolutely nothing

7  about your case other than what is read to them in that

8  Preliminary Instruction Number 2.  And then you get up and

9  start doing your openings, and they all look at each other

10  like, what language is he speaking?  I really would urge

11  you to be thoughtful in terms of preparation of that.  Our

12  agreed statement of the case will be very brief and not

13  terribly helpful.  You then are going to have an even more

14  difficult time.  Know that that's a wonderful opportunity

15  to educate the jury about the factual context of the

16  arguments that you are going to be making.

17      In terms of the length of openings, I don't care.  It

18  runs against your time.  Take as long as you want.  We

19  have noticed that after about 30 to 40 minutes, the length

20  of a one-hour television show, they start to glaze over.

21  I think the longest opening we have had was four hours,

22  and the jury was out less than seven minutes deciding

23  against that party.  Use your best judgment.  You are all

24  experienced trial counsel.

25      The procedure in opening is one of the two times that

1   you are permitted to roam around in the well.  The line is

2   drawn from me to the clock on that back wall, that space

3   belongs to the jury, and you are to get no closer to them

4   than the line.  You are welcome to come up here and be

5   directly in front of the jury.

6       When we do civil trials with a limited number of

7   jurors we will sit them one, two, three, four in the front

8   row, five, six, seven, eight in the back row.  Those empty

9   seats at the end are going to be empty.

10      You can move from the podium.  The configuration for

11  running your electronics is not great.  It will be easier

12  if you have someone running your electronics and you can

13  flash them signals or whatever.  Most people seem to find

14  it most convenient to put their notes on that extension

15  that sticks out from the podium and use that as a place to

16  rest things.

17      If you are going to use visual aids, including

18  potential exhibits, in the opening, they must be disclosed

19  to the other side.  If there are objections to them, they

20  will be included in your last minute matters and I will

21  rule on them at the time.  I just think that it is tacky

22  in opening statement to put up an exhibit and then have

23  the other side object.

24      In terms of your exhibits, both of you have been

25  through a trial here so you know how that works.  We have

1   another handy handout for use with that.

2       In terms of witness disclosure/scheduling, my rule is

3   that by 4:30 of the day before they are scheduled to

4   testify you have to tell the other side who your witnesses

5   are going to be.  The jury hears me say that it is in an

6   effort to use their time wisely that we are taking a

7   witness out of order, and they all smile and think it is

8   great that you are trying to use their time wisely.  They

9   have no trouble understanding that a witness for the

10  plaintiff is appearing in the middle of the defense case

11  or vice versa.  I know you have a number of experts and

12  sometimes getting them to cooperate is a difficult thing.

13  Although if you pay them enough, I guess they will come

14  any time.  Know that if you can't agree among yourselves

15  and you need me to referee it, I will likely say our goal

16  is to get witnesses to testify, and scheduling is kind of

17  secondary.

18      There is technology training available.  It is next

19  Wednesday.  Please come in and play with the machines if

20  you haven't had the chance to.  This courtroom is fairly

21  well equipped.  There are individual screens.  There is a

22  screen back behind Mr. Price, which is on most of the

23  time.  For some reason, putting things on the visual

24  display presenter upside down is a common epidemic for

25  this particular brand of display presenter, and the jury

```
 1    just thinks that is hilarious.  I guess so do I.  So come

 2    in and try the stuff and make sure that you are familiar

 3    with it.

 4       If you want to put someone back on one of those

 5    benches or a chair to run your audio/visual stuff, that's

 6    fine with us.  Work with the clerk on accommodating that

 7    setup.

 8       I will stop once again and ask --  We will switch this

 9    up.  Mr. Palumbo, any questions?

10            MR. PALUMBO:  Just a couple of things, your Honor.

11    My experience is the same as yours.  Our opening won't be

12    longer than 60 minutes, at the most, I think.  And we just

13    wondered whether Microsoft would be willing to share about

14    how much time they are going to take with openings?

15            MR. HARRIGAN:  We have been talking about roughly

16    an hour also, your Honor.

17            MR. PALUMBO:  With respect to the revised

18    preliminary instructions, which we had planned to do in

19    light of your Daubert and summary judgment orders, and

20    also your rulings today on the motions in limine, when

21    would you like to have those?

22            THE COURT:  The earlier the better.  I think those

23    have already been filed.  We have pretty much allocated

24    all of next week to work on them.  By close of business --

25    in fact, by noon on Monday would be best.
```

1           MR. PALUMBO:  I think we can do that.  We will

2     work with Microsoft to see if we can come to an agreement.

3     If not, we will both submit proposed preliminaries.

4        I think you covered this, but we have reached a

5     tentative agreement on exchange of direct exhibits the

6     night before and demonstratives the night before, and

7     objections.  If there is anything to bring to your

8     attention arising out of that exchange for objections, we

9     will deal with that before you bring the jury in in the

10    morning, or do you want to rule as the exhibits come in?

11          THE COURT:  To the extent that you know you have

12    problems with them now, and you know they are going to be

13    introduced, I would rather take that up early.

14          MR. PALUMBO:  Before the jury comes in?

15          THE COURT:  The only thing that I do that is a

16    peculiarity is using the jury's time wisely.  We ask these

17    people to come in, they give up their time, many of them

18    don't get paid to serve as a juror.  They do not

19    understand why I have to keep sending them back into the

20    jury room.  So I discourage sidebars, unless it is really

21    necessary.  I particularly discourage sidebars if it

22    involves sending them back into the jury room.  Sometimes

23    they just can't be helped.  But we try and use their time

24    wisely.  I am happy to come out early during the trial,

25    stay over part of a lunch hour, stay after 4:30 to do

1    things we know are going to be coming up.  If the jury is

2    here, you will find me pretty adamant that we are going to

3    have presentation of evidence.  If the jury is not here, I

4    am a little more flexible.

5          MR. PALUMBO:  We share your appreciation of these

6    people serving and often not getting paid.  We will do

7    everything we can to work out objections and try to

8    minimize it.  If we think we have a significant issue, can

9    we get ahold of you in advance and say -- do something at

10   8:30 so we are ready to go at 9:00?

11         THE COURT:  Yes.  Just call.  This will be

12   particularly difficult, because I assume you are going to

13   have a problem with a lot of Microsoft employees on the

14   jury.  Microsoft is one of the companies that pays its

15   employees to serve on juries.  You are likely going to

16   have a lot of Boeing employees, a lot of Starbucks

17   employees and state employees, because they won't have the

18   economic hardship argument.

19      Mr. Harrigan.

20         MR. HARRIGAN:  Yes, your Honor.  I have basically

21   one area.  It may be premature.  It has to do with

22   assuming the findings are in fact going to be available to

23   use, how to go about that.  Would you like to take that up

24   now or later?

25               THE COURT:  Later.

1        Moving on then to depositions.  I am working my way

2    through your depositions.  There seems to have been an

3    epidemic of objections, most of which are falling by the

4    wayside.  I will get those back to you as promptly as I

5    can, because it appears that most of these are video

6    depositions and you will want to edit out those parts that

7    I have gotten rid of.  So thank you for your compliance

8    with that local rule, and I will get them back to you as

9    soon as I can.  You should see no significance in the fact

10   that Microsoft will get its deposition designations back

11   first, but that is only because they are going to be using

12   them first.  That's the reason for that.  It has no other

13   significance.

14       Mr. Palumbo.

15           MR. PALUMBO:  Your Honor, we would like to save

16   you some time.  Both your Daubert order and your summary

17   judgment order, and perhaps your rulings on motions

18   in limine, we think will permit us to narrow our

19   objections.  To the extent that you haven't started

20   looking at those, we would be happy to, again, look at the

21   designations and, to the maximum extent possible, narrow

22   the testimony that we may offer through depositions at

23   trial.

24           THE COURT:  That would be helpful.

25           MR. PALUMBO:  We can start getting those to you

1  quickly.  We will pick the ones we think need the most

2  significant narrowing.

3      The other issue is, we have designated deposition

4  testimony of Microsoft employees who reside in the Western

5  District.  We have inquired of Microsoft whether they will

6  require us to call those witnesses live.  If those

7  witnesses are going to be live, either Microsoft is going

8  to call them live or they are going to require us to call

9  them live, then you won't have to deal with any of those

10  designations.  So we will try to work that out with

11  Microsoft.  To the extent that witnesses are going to be

12  live, we will immediately notify you so you won't even

13  have to look at those designations.

14      THE COURT:  That would be helpful.  I am in a

15  witness right now where I know that is very much a live

16  witness issue, but I have already marked in the margin any

17  number of circumstances where there is an objection to

18  something that has been excluded by my rulings on motions.

19  That would be helpful.

20      MR. PALUMBO:  Art, can we resolve that issue today

21  or tomorrow so we can let him know to the extent the judge

22  does not have to look at those designations?

23      MR. PRITIKIN:  I think that makes a lot of sense.

24  Your Honor, what I would suggest is that perhaps both

25  sides, in light of the rulings and where we are today, go

1    back and see what we can cut out of it, and then get you a

2    revised set of designations whenever you would like us to

3    do that.  We can turn to it very promptly.

4            THE COURT:  That would be great.  The sooner the

5    better.  Particularly before, say, close of business

6    Friday would be helpful.

7            MR. PALUMBO:  I think we can do that, your Honor.

8    Thank you.

9            MR. PRITIKIN:  Very good, your Honor.

10           THE COURT:  Jury instructions, you have already

11   submitted them.  Mercifully, you have followed the local

12   rule.  Let me explain what will happen next.  We will get

13   you, as soon as we complete them, a draft set of jury

14   instructions.

15      We have an informal conference, which you can tell is

16   informal because I come out without my robe on, that is

17   not on the record, where we simply talk about the

18   instructions that the court has proposed, and then ones

19   that you have proposed that we didn't give.  That's an

20   uphill struggle, but we want to hear why you think we

21   screwed up and didn't get it right.

22      Armed with that discussion, we will then go back and

23   finalize.  It is against that set that you will be taking

24   your formal exceptions.

25      This is, as I have mentioned, for us a longer trial,

1    and therefore there is not quite the time pressure that

2    there is in some, for example, criminal matters, where it

3    is three days, which means you have to take exceptions at

4    the end of the second day.

5        Don't panic when you see the jury instructions and

6    assume, good heavens, this is completely unacceptable.

7    You will get a chance to comment on them, and then the

8    exceptions will be taken.

9        The exception conference may and formal exceptions

10   will run against your time limits, unless I haven't used

11   up all of my time, or we can get it in outside of court

12   hours.  That's how that will work.

13       The last issue that I usually take up is, are there

14   any anticipated problems that the court can help you with

15   now?

16       Mr. Harrigan.

17           MR. HARRIGAN:  My main question is still about the

18   findings.  It sounds like we ought to talk about that

19   after we hear your rulings.

20           THE COURT:  That issue is front square in the

21   motions in limine.

22           MR. HARRIGAN:  The question basically is, we would

23   like to use the findings in the opening, and we would like

24   to know if we are going to --

25           THE COURT:  You will know before then.

1        Mr. Palumbo, issues?

2            MR. PALUMBO:  My questions relate to witnesses

3    whose testimony in either ITC or trial testimony that has

4    been designated, we would like to address whether they

5    testify live.  And then the other thing is witnesses who

6    potentially could be called in Microsoft's case and in our

7    case.  We would like to talk about the best procedure to

8    streamline those witnesses.  I am happy to do that at any

9    point in time.

10           THE COURT:  I will tell you that I was surprised

11   to get to -- let's see, I think it is in Microsoft's

12   designations, and find testimony from an ITC hearing being

13   sponsored apparently as testimony to be used at trial.  I

14   turned that one sideways in my pile of depositions.  I

15   need to go back and read the circumstances in which use of

16   such testimony is permissible.  It seems to me it falls

17   under 32(a)(4), unavailable witness, because you are not

18   using it for impeachment, which would be 32(a)(2).  So I'm

19   not sure who these people are in terms of 32(a)(3),

20   "deposition of a party, agent or designee," which may be

21   used for any purpose.  And so I'm not sure that I am

22   prepared to rule on that today.  But if we have some time

23   at the end, I will hear the parties' positions on that

24   particular question.

25        Where that seems to me most likely will arise will be

1   32(a)(5), depositions taken in an earlier action, appears

2   to also be at play in this.  Although, it then simply

3   contains a cross-reference to the Federal Rules of

4   Evidence, which will send me further into my research.  I

5   would welcome your points of view on that.  We will take

6   that up in a moment.

7       Motions in limine --  Unless people have any other

8   anticipated problems?  All right.  There are three

9   Microsoft motions in limine.  I will do those first.  The

10  first of which is -- these are all found in Docket 799,

11  which is the redacted version, or 801, the sealed version.

12      Microsoft seeks to exclude everything Motorola or

13  Google claimed privilege on during discovery.  In

14  particular, all information relating to the reasoning

15  behind its October 2010 demand letters.

16      First, in my reoccurring habit of haranguing you, I

17  asked for a timeline or chronology which you all agreed

18  and said you would get to us promptly, and I have never

19  seen.  Does anyone know where that project is?

20          MR. PRITIKIN:  Yes, your Honor.  They had agreed

21  to take a first stab at it.  We got the draft from them at

22  12:01 a.m. this morning.  We are looking at.  I think we

23  will be able to get you the timelines in the next day or

24  so.

25          THE COURT:  It would have been helpful.  I will

1    remember to give you deadlines in the future.

2        I deny Microsoft's motion regarding "privilege."  My

3    reasoning for doing so is the following:  In this pending

4    litigation --  At the time that these letters were sent

5    there was pending litigation, as I understand it.

6    Particularly, there was litigation pending when Microsoft

7    filed the present lawsuit.  And, therefore, as the court

8    has worked its way through the very specific questions

9    that you have raised, in Mr. Leonard's testimony, an

10   argument about were Motorola's letters just Motorola's

11   customary offer letter.  There is a lack of context

12   regarding Microsoft's and/or Motorola's particular

13   circumstances at the time that the letters were sent, and

14   I find that there is a good-faith basis for Motorola's

15   assertion of privilege.

16       I would note that I am misusing a term here that I'm

17   not sure you all appreciate.  It is the attorney-client

18   privilege, and it is the attorney work-product doctrine.

19   You all call both of them privileges, which I think is

20   technically incorrect.  Were Wigmore, wherever he is,

21   still alive, he would be rolling over in his grave.

22       As I understand Microsoft's challenge to this, it is

23   not that the privilege claims aren't well taken, but more

24   an argument that it is unfair for Motorola being able to

25   present an explanation for sending the letters, and then

1    claiming privilege over other aspects of the background

2    where they say a privilege covers.  My sense is, that is

3    litigation, folks.

4        This is not a situation where Microsoft has asked for

5    documents to be submitted for in camera review, and

6    therefore I have not had occasion to find that Motorola

7    has failed to sustain its burden of showing that a

8    privilege exists.

9        Generally, I think, to the extent that some of the

10   things you have asked for are privileged, and Motorola has

11   taken the position that it is, and Microsoft says that it

12   is not, or it would certainly be helpful if we could have

13   access to it --  I am not convinced.  For example, I

14   recently finished reading the Brian Blasius deposition.

15   It is clear that he mentions claim charts, but he also

16   contends that they are privileged.  And there is not a

17   showing to overcome that.

18       Finally, our examination in this area takes us into

19   something that has been very much a black hole for us.

20   And that is, should we exclude evidence of the reduced 50¢

21   per copy offer.  That has driven us into a distinction

22   between business negotiations and settlement negotiations.

23   A business negotiation can potentially lead to a

24   settlement of a lawsuit as a collateral impact.  But I

25   don't think that it is correct to attempt to claim

1   privilege or prevent introduction of evidence by saying it

2   is a settlement negotiation when the clear purpose appears

3   to have been business negotiations.  That's particularly

4   true in this case because Microsoft has placed Motorola's

5   business negotiations in issue in regards to its bad faith

6   allegation.

7        Ultimately, we have come to the conclusion that the

8   question of material that was claimed as privileged, as it

9   pertains to those October demand letters, that motion

10  excluding any mention of the area is denied.  We will

11  permit Motorola to present the related evidence, even

12  though Microsoft has not had an opportunity to conduct

13  discovery concerning certain aspects of those particular

14  negotiations or reasons.

15       The second motion is one in which Microsoft seeks to

16  exclude Motorola's argument that Microsoft has "unclean

17  hands," including making a RAND commitment to the SD Card

18  Association, and made a RAND commitment to the public at

19  large in its interoperability principles.  I grant this

20  motion.

21       This is something that has appeared quite late in the

22  lawsuit, and seems nothing more to the court than, if our

23  hands are dirty, theirs are dirty also.  This question has

24  been in the lawsuit for a long time, the unclean hands

25  argument, but it has always been based on Microsoft's

 1    filing of the lawsuit before negotiating and applying for

 2    a license.  I think it is too late at this time to now

 3    launch a new theory of unclean hands in aspects unrelated

 4    to SEPs into the case.

 5        In addition, the probative value of this area seems to

 6    me to be remarkably low, since I'm not going to permit

 7    testimony as to the SD Card Association or the

 8    interoperability principles.  That just seems like a black

 9    hole that the jury will go down and be thoroughly confused

10    about:  "What does it have to do with this lawsuit?"  It

11    simply seems to me to be an effort by Motorola to attack

12    Microsoft's credibility as a company.

13        There is a high risk of delay and confusion, and,

14    furthermore, a high risk of taking a lot of time to lay a

15    foundation for that and explain the relevance of it for

16    actually no purpose.  So the court is granting the unclean

17    hands motion in limine.

18        The third Microsoft motion in limine is moving to

19    exclude evidence and arguments concerning the parties'

20    settlement communications and negotiations status.

21    Included in that motion is both Federal Rule of Evidence

22    408 and nondisclosure agreement arguments.

23        In this instance Microsoft is seeking to use this as

24    both a sword and a shield.  It was a sword when Microsoft

25    wanted to obtain discovery concerning these issues, and it

1   is a shield when it wants to protect or prevent the jury

2   from hearing evidence.   I am going to deny the motion

3   in limine.

4       My reason for doing so is that I was persuaded by the

5   line of cases cited by Motorola, which say, in essence,

6   that when settlement conduct is the subject of litigation,

7   Rule 408 does not prevent parties from introducing

8   evidence of settlement negotiations to prove their claims.

9   The authority for that is the Century Indemnity Company

10  case at 336 Fed.Supp. 2d 739, and the Pacific Federal

11  Savings Bank case, which is -- I will give this as a

12  non-case cite, WL 188409, at apparently Page 2.

13      The quotation I found significant there is, "Federal

14  Rule of Evidence 408 does not preclude evidence of

15  settlement discussions that is offered to show an

16  insurer's bad faith failure to settle a claim."

17      Using an analogy of a party suing an insurance company

18  for bad faith failure to settle, evidence of what was said

19  in the original settlement negotiations could be used

20  against it in the ensuing bad faith action.   That, in our

21  mind, is analogous to what we have here, and the same

22  principle applies.   Thus, the licensing negotiation over

23  the patents are the subject of the good faith/bad faith

24  lawsuit about the parties' conduct during the

25  negotiations.

1      Under the authority that we cited above, it makes no

2  sense to exclude evidence from these negotiations in the

3  ensuing lawsuit.  Otherwise, the ensuing bad faith lawsuit

4  simply could not exist.

5      These cases concluded, and we should conclude, that

6  408 does not bar evidence of negotiations in a lawsuit

7  regarding the conduct during those negotiations.  Thus,

8  Microsoft's motion to exclude under 408 will be denied

9  entirely.

10     The same reasoning applies to Microsoft's motion to

11 exclude under the nondisclosure agreement.  The

12 nondisclosure agreement is more expansive than Rule 408.

13 It basically says that no settlement discussions between

14 the parties can be used in court ever, unless the evidence

15 was independently obtained during discovery.

16     However, applying the above reasoning, it is easy to

17 conclude that the intent of the parties in crafting the

18 nondisclosure agreement could not have been to prevent the

19 parties from litigating bad faith in negotiating claims.

20 Thus, Microsoft's motion to exclude settlement

21 negotiations under the NDA also is denied.

22     There is another argument for why Federal Rule 408

23 does not bar evidence relating to the licensing

24 negotiations.  It is analytically related to the above

25 argument but creates a slightly different result.  If you

 1    dissect the grammar of Federal Rule 408, it appears to bar

 2    evidence of efforts to settle the claim being actively

 3    disputed in the lawsuit.  In this case that means neither

 4    side could introduce evidence of efforts to settle the

 5    breach of contract claim.

 6        It would not mean that they couldn't introduce

 7    evidence of efforts to settle separate patent infringement

 8    claims.  In other words, pure licensing negotiations would

 9    be in under 408, but not efforts to settle the breach of

10    contract case.

11        That would be an awfully fine line between efforts to

12    negotiate a license versus efforts to settle the breach of

13    contract claim.  They are closely related.  And it is

14    probably fair to say that licensing negotiations occurring

15    prior to the filing of the breach of contract lawsuit are

16    pure licensing discussions and would be admissible.

17        On the other hand, any licensing discussions after the

18    breach of contract case was filed are probably too closely

19    related to the breach of contract claim, and would be

20    excluded under 408.  In other words, any post-lawsuit

21    licensing discussions would presumably implicate a global

22    settlement deal.

23        That would give us an easy dividing line to drive the

24    parties at trial.  If we went that route, we could

25    mechanically apply the line of cases described earlier, or

1   allow things to work out independently through discovery.

2       As you can see, I read this particular segment of my

3   opinion because we spent a lot of time trying to see which

4   side of the head of the needle the evidence falls on.  And

5   this is our best effort.  This is why we have jury trials,

6   and you both are going to get to present your best

7   evidence.

8       Turning then to Motorola's motions, which are found in

9   redacted form in Docket 795 and in sealed form in

10  Docket 797.  Number one, Motorola asks the court to

11  exclude from the jury's consideration the court's

12  determination of RAND rate and range.  That one is easy.

13  It is denied.

14      The Findings of Fact and Conclusions of Law are

15  relevant to the upcoming trial on bad faith because they

16  are central to the upcoming trial, and so are Motorola's

17  October offer letters.  The actual value of a product is

18  relevant to whether the price requested in an offer is one

19  made in good faith.

20      The best analogy that we could come up with is that if

21  I offer you my federal-issued beat up old Blackberry for

22  $500, it could be bad faith.  Whereas, if you offered a

23  brand new model phone, I won't mention who is the

24  manufacturer, for $500, that could be a great deal.  It

25  all depends on the value of the actual product.  That is

1    why the RAND rate is relevant.

2        Regarding Motorola's proposed jury instruction, we

3    will issue our ruling on that when we release the jury

4    instructions.  It is something that we are continuing to

5    work on at this time.

6        We need to figure out how to provide the Findings of

7    Fact and Conclusions of Law to the jury, and we are not

8    finding a lot of guidance or practical help from other

9    sources on how we do that in a manner that satisfies 401

10   and 403.

11       Motorola motion two seeks to exclude opinions and

12   argument concerning positions taken in the November 2012

13   RAND trial.  As a preliminary matter, I would note that

14   the parties have agreed that the only experts who could

15   testify at trial were those that provided expert reports

16   according to the court's prior schedule.  Nowhere in there

17   was there an agreement that the testimony would exclude

18   all opinions and arguments concerning positions taken at

19   the RAND trial.

20       And Motorola offered any number of instances where it

21   cherry-picked out things that it liked from the Findings

22   of Fact and Conclusions of Law and put them into its

23   expert reports.  For example, "Judge Robart held that the

24   initial offer didn't have to be RAND."  So I find its

25   current motion almost disingenuous.  I am denying it.  A

1   party does not get to say one thing in litigation and then

2   pretend it didn't happen.

3        I actually was going to go on the internet and try and

4   find the analogy of the 800-pound gorilla in the room, or

5   it may be an 800-pound pink elephant in the room, which

6   everyone ignores and doesn't mention.  Here, Microsoft

7   wants to use Motorola's prior positions and arguments to

8   impeach Motorola's expert witnesses.  The court finds that

9   under the balancing argument, implicit in Evidence Rules

10  401 and 403, that the balance shifts favorably towards

11  admission of those prior positions.  The motion is denied.

12       Finally, the third Motorola motion in limine was to

13  exclude evidence and argument or reference to privileged

14  communications.  This is very similar to Microsoft's

15  in limine motion number one, which dealt with everything

16  Motorola or Google claimed privilege on during discovery,

17  and in particular all information concerning the

18  reasoning.

19       In this particular litigation the court has previously

20  ruled that those matters which are privileged, properly

21  so, are going to be excluded because they are privileged.

22  There has been no challenge presented to this evidence in

23  which the court has been asked to examine the documents,

24  and therefore I have no basis to conclude that any of the

25  claims of privilege are incorrect.

1    I think, once again, this is one of those

2 circumstances where the complaint that we have from

3 Microsoft is that it is unfair that some stuff comes in

4 and some stuff stays out.  That's particularly true in

5 regards to Mr. Leonard.  Our answer to that is, that is

6 basically how litigation works.  The motion is granted.

7    Those will be the rulings of the court on the motions

8 in limine.

9    Counsel, starting with Mr. Harrigan, any questions?

10         MR. HARRIGAN:  No, your Honor.

11         THE COURT:  Mr. Palumbo?  Mr. Price, you can talk

12 if you want.

13         MR. PRICE:  In addressing our third motion

14 in limine, I don't think you quite said on the record

15 whether you are denying it or you are granting it.

16         THE COURT:  I am granting it, in that if you

17 claimed it was privileged, then it is privileged, and it

18 is not going to be admitted.

19         MR. PRICE:  That's what I inferred.  Thank you.

20         MR. HARRIGAN:  Your Honor, back to my earlier

21 question about findings.  Is this an appropriate time?

22         THE COURT:  Sure.  Go ahead.  Are you going to

23 offer a solution to this dilemma?

24         MR. HARRIGAN:  I was hoping to at least get

25 something out for discussion.  Our view on this is that

1    the parties should each have the findings available for

2    their use, that if any finding is going to be used, it

3    needs to be read into the record and probably marked as an

4    exhibit.   The court can rule on them, but it could -- in

5    terms of designating exhibits in advance and giving the

6    other side notice that would apply to the findings.

7         The way that we actually envisioned using the

8    findings, your Honor, for the most part, is, for example,

9    if Mr. Murphy -- if Dr. Murphy, the economist, is up

10   there, he could refer to the findings in connection with

11   his opinion testimony, and those findings would be read at

12   that time and marked at that time, rather than --  In

13   other words, we don't propose to stand up and read 80

14   findings to the jury.  We propose to weave them into the

15   presentation of the case.  We believe they are up for

16   grabs -- the whole collection is up for grabs by either

17   side.  Obviously you would be crazy to use more than the

18   ones that are directly relevant.  We assumed that would be

19   sort of self-regulating.  That is our basic --

20           THE COURT:  When would you disclose to the other

21   side which ones you intend to examine?

22           MR. HARRIGAN:  Yes, your Honor.  In fact, frankly,

23   I was thinking in a week we ought to say, here are the

24   ones we currently believe that we are going to use.  We

25   would still have the ability to designate others as they

1  became relevant, but we would make a good faith effort to

2  identify all of the ones that we think we are going to

3  use.  And then if there is some particular reason why

4  Motorola objects to one or more of those, that could be

5  dealt with before the trial starts, and we will all know

6  what we can do in the opening statement, which would be

7  very helpful.

8          THE COURT:  All right.  Mr. Price, do you want to

9  take this one?

10         MR. PRICE:  Your Honor, we are in a difficult

11 situation here.  Obviously we know that your Honor said

12 that you were going to resolve two discreet issues in the

13 first trial.  That was the RAND royalty range and the RAND

14 royalty point.  Of course, I think we have preserved our

15 Seventh Amendment arguments in our motion.  I just want to

16 make sure we don't waive those.

17         THE COURT:  Tell me, does the Apprendi decision

18 apply to civil cases?

19         MR. PRICE:  Let me ask somebody who knows

20 constitutional law, the expert.

21         MS. SULLIVAN:  Your Honor, you are talking about

22 what issues are for the court and what are for the jury?

23         THE COURT:  I am curious, you make the argument

24 that I have to exclude the findings and conclusions under

25 Apprendi.  I have some real questions about that.

1          MS. SULLIVAN:   I don't believe we relied on it for

2   that point.   The point we are making here is much more

3   just an old -- the old doctrine that common issues of

4   law -- common issues of fact common to a bench phase and a

5   jury phase can't be decided by the bench, they need to be

6   decided by the jury.

7          Our position in the case I think has been consistent,

8   that your Honor decided to adjudicate, in your words, two

9   discreet issues, a RAND royalty range for Motorola's

10   standards-essential patents and a RAND royalty point for

11   Motorola's standards-essential patents.   There are 200

12   pages of learning.   And they exist, of course.   But our

13   position is those should not be evidence before the jury.

14          You can encapsulate the law in the case in your

15   instructions to the jury.   That is the proper way to deal

16   with bench findings.   But the idea that your findings are

17   going to be turned into evidence and speaking in the court

18   through Mr. Murphy's mouth is completely inconsistent with

19   the notion of a jury trial.   Mr. Murphy can speak for

20   himself about what he has to say.   But he can't channel

21   your Honor.

22          So our position is that the instructions are the place

23   to deal with the findings.   Obviously we will take to

24   heart your Honor's view that there is a gap between the

25   18-page version of Preliminary Instruction Number 2

1   Microsoft proposes and the succinct paragraph we proposed

2   as our fallback.  But it is the instructions where your

3   Honor's findings should be set forth.  That shouldn't come

4   in as evidence to be whipped out any time Microsoft wants

5   to make the judge a witness in this case.  You shouldn't

6   be a witness in the case.  That is really our point, your

7   Honor.

8           THE COURT:  I am not a witness in this case.  I am

9   the judge.  And --

10          MS. SULLIVAN:  Of course, your Honor.  That's why

11  it should be in the instructions, not in the evidence --

12          THE COURT:  You should allow the judge to speak

13  then, counsel, as opposed to interrupting.

14          MS. SULLIVAN:  Excuse me, your Honor.

15          THE COURT:  I know that works in the appellate

16  courts.  It doesn't work around here.  In fact, I'm not

17  sure it always works in the appellate courts from what I

18  have seen.

19      You, being Motorola, committed to a bench trial.  In

20  the course of that the court made numerous findings, one

21  of which is a range of RAND rates in this case.  If I take

22  your assumptions, the jury would never know that until it

23  got to the final findings -- jury instructions because it

24  is a secret that I can't tell them what has already been

25  ruled on in the case.  And yet, you have -- I believe it

1   is Mr. Holleman.  You have Mr. Holleman up there saying:

2   The judge has found as part of his ruling what Motorola

3   like from the Findings and Conclusions.  I find some real

4   inconsistencies in the position here.  Help me with that.

5           MS. SULLIVAN:  May I answer, your Honor?

6           THE COURT:  Yes.

7           MS. SULLIVAN:  Well, thank you, your Honor.  We

8   are now informed by your Honor's ruling on the motion

9   in limine.  We now are not, obviously, pursuing the

10  position that there should be exclusion.  What I was

11  trying to address, and I'm afraid it has necessarily not

12  been fully briefed, because Mr. Harrigan's statement just

13  now was not briefed to us, so I am trying to spontaneously

14  answer his spontaneous suggestion that the findings be

15  available freely to be used in evidence.  To that, your

16  Honor, I guess I am trying to draw a new distinction that

17  is subsequent to your Honor's motion in limine ruling.

18      We accept, as we must, that you have ruled against

19  excluding findings.  I am respectfully suggesting that our

20  position is that your findings should come in through

21  instructions to the jury that guide them on the law of the

22  case, and the findings not come in as free-form evidence

23  to be introduced later in the case.  That's the best way

24  to deal with them.

25      Obviously, if your Honor keeps them out for one set of

1    witnesses, you should keep them out for the others as

2    well.  We wouldn't be suggesting any asymmetry here.

3        Your Honor, we are hoping that we can clarify what the

4    instructions should say about the findings, but then that

5    neither side use them opportunistically as evidence.

6        I understand your role completely, your Honor.  I am

7    trying to respect that role, and suggest that you

8    shouldn't be invoked as evidence.  You are the law-giver

9    here, and you should speak through the instructions and

10   not through the mouths of Dr. Murphy or Mr. Holleman or

11   anyone else.  That's the suggestion.

12           THE COURT:  Before you sit down, I want to make

13   sure I understand this.  Let's deal precisely with the

14   paragraph in the Findings and Conclusions where I set a

15   RAND rate on H.264.  Your position would be that the jury

16   would never know that until it got to the final jury

17   instructions?

18           MS. SULLIVAN:  Not at all, your Honor.  You could

19   set it forth in the preliminary jury instructions as well,

20   as part of the framework for the case.  I am trying to

21   draw as a distinction between you setting the law of the

22   case and your findings being used to provide evidence in

23   the case.  That's the fundamental distinction here.  We

24   are not suggesting at all that you wait until the final

25   instructions.  What we proposed as our fallback

1   alternative instruction was a preliminary instruction.

2            THE COURT:  I don't think I would characterize the

3   Findings of Fact that the court reached after a trial as

4   evidence.  I would characterize them as Findings of Fact

5   that were made by the court.

6       Mr. Price, only one of you gets to argue at a time, so

7   sit down.

8       In the first trial phase, I sat as both the finder of

9   fact and as the judge making conclusions of law.  Now you

10  somehow want to repudiate those Findings of Fact, which

11  are facts that have been decided as the facts of this

12  case.  We are not in a separate case, we are in the same

13  case.  You are saying, oh, but that would be evidence.  It

14  seems to me they are not.  They are findings of fact.  The

15  court has made that decision.  That's where we seem to

16  have this disconnect.  I am not trying to blame you for

17  this, I am just apparently not understanding your

18  argument.

19           MS. SULLIVAN:  Your Honor, may I ask Mr. Price to

20  answer that one?

21           MR. PRICE:  I think I can bridge that, your Honor.

22  I think what the court, given where we are now, should

23  tell the jury is that certain things are not in dispute,

24  because at this point you made findings.  I actually think

25  it is prejudicial to say there has been a trial, one side

```
 1    took one position, one side took the other, and I decided
 2    they are right, they are wrong, because they might think
 3    this is just a victory dance.  But you made certain
 4    findings of fact.  As part of an instruction you can say
 5    to them it is fact, certain things are no longer in
 6    dispute.  The question is what exactly in all of that you
 7    have written, you know, do plaintiffs want to tell the
 8    jury.  Because I think there are solid arguments that some
 9    of those findings are relevant to what you found, for
10    those two ultimate issue on range and a particular point,
11    may not be relevant to this part of the trial where the
12    question isn't where would you end up after a negotiation,
13    but what happens here and what has to happen before you
14    reach the end.
15              THE COURT:  Let me ask you this hypothetical,
16    Mr. Price:  You need to defend Microsoft contending that
17    you are in bad faith?
18              MR. PRICE:  Yes.
19              THE COURT:  And Microsoft stands up and says, they
20    wanted 2.25 percent for interlaced video.  In the course
21    of the first phase of this case I found that interlaced
22    video was an antique technology that had little to no
23    value.  That's a finding of fact.  Where does that fall in
24    your spectrum of things that they shouldn't know because
25    they are really irrelevant?
```

1            MR. PRICE:  That is actually a good question.  I

2    haven't had time to think that completely through.  My

3    initial reaction is that the ultimate issue -- the two

4    issues that you decided, two distinct issues, which were

5    the range and the point, I think the jury can be told,

6    given where we are now, again, without waiving any of our

7    arguments.  But the facts leading up to that I believe are

8    not facts -- at least many of them, that Motorola believes

9    it ever conceded should be tried by the court instead of a

10   jury.

11        And we are not to argue about how great these patents

12   are.  It is not an issue here, in the sense that you are

13   not going to have Motorola experts say, we thought these

14   were the greatest patents ever, et cetera, et cetera,

15   because that is not our defense.  Our defense is, we were

16   in a rush to put out these offers, and that's what we did

17   without much examination.  And then the courts and the

18   jury determine whether that is fair or bad faith or not.

19        But I agree to the extent this should be an

20   issue-by-issue question.  That is, is a finding of fact

21   that you made in leading up to your conclusions, is it

22   first necessary to those conclusions?  And, second, is it

23   relevant to this proceeding?

24        For example, your Honor, if on appeal a court of

25   appeals said, well, Findings of Fact Number 8, we are

 1    throwing it out as being totally wrong.  There would still

 2    be the issue of, okay, is that something necessary to the

 3    conclusion that you came to?  I know that you have dealt

 4    with these sorts of issues.

 5        And so I think you have to analyze on that sort of

 6    basis.  That is, what is necessary for that conclusion?

 7    And, two, what is the jury entitled to decide because of

 8    the right to a jury trial?

 9            THE COURT:  With all due respect, sir, I would

10    love to see you on the dance floor, because that is really

11    fast-moving feet.  But the reason I am smiling is, you

12    picked Finding of Fact Number 8, which says I have subject

13    matter jurisdiction, which is what I thought it was.

14        All right.  I understand.  You can tell we don't see

15    this eye to eye, but I would welcome your proposal on how

16    to deal with this.

17            MR. PALUMBO:  I don't suppose you would entertain

18    one more voice?

19            THE COURT:  Why not?  You can be entree number

20    three from the smorgasbord.

21            MR. PALUMBO:  I think if we take Mr. Harrigan's

22    proposal, which is they are going to tell you all the

23    findings they should be able to use during the course of

24    the trial, it strikes me that the danger here is 200 times

25    Microsoft having a witness repeat your findings, and say:

```
 1   And what was Motorola's position on that?  Oh, they lost
 2   that.
 3       It strikes me that the way to handle this is, you are
 4   going to give preliminary instructions to the jury.  We
 5   are in novel territory because we don't typically have a
 6   situation --  There is a good deal in your findings which
 7   would just be evidence offered in this trial as new
 8   evidence.  But we do understand your rulings, and we do
 9   understand that the rate is going to come in, the range is
10   going to come in, and there are other facts which you
11   would consider to be the law of the case.
12       My suggestion is that we deal with this in a
13   preliminary instruction.  That is, we may -- we and
14   Microsoft may disagree about what the jury hears in the
15   preliminary instruction, but you control that, and you are
16   in a position to decide which of your findings and
17   conclusions the jury needs to know in fairness to decide
18   the breach issue that they are asked to decide.  So you
19   would give those -- everything that you thought the jury
20   could absorb and was necessary for them to hear in the
21   preliminary instructions.  Thereafter, Microsoft's counsel
22   is free to argue, well, the judge has already instructed
23   you on this issue, there is no dispute about that.
24       But rather than have repeatedly during the trial some
25   Microsoft witness effectively speaking in your voice and
```

1    saying this is what the judge decided, and it is in our

2    favor, you make the decision and give everything to the

3    jury that you believe the jury needs to do its job and

4    decide the issues in this case, and that's how we deal

5    with it.  Which I think is somewhat of a compromise

6    between what Microsoft advocates and what we advocate.

7    But it retains your role as the judge who instructs the

8    jury on the law and what they should know in order to do

9    their job.  And it happens in the preliminary

10   instructions.

11           THE COURT:  Counsel, at least as of today my view

12   of this is the following:  It took us five months to write

13   findings and conclusions after you had a full and complete

14   opportunity to put on any evidence that you wanted.  That

15   is the law of the case, those Findings of Fact and

16   Conclusions of Law.

17      I agree with Ms. Sullivan, Mr. Price and Mr. Palumbo

18   that all, whatever it is, 208 pages or 214 pages shouldn't

19   come in, because there is a lot of stuff that they really

20   don't probably need to know.  It is in there and it is

21   simply going to be confusing, and if it goes back to the

22   jury room it will create some difficulty with them getting

23   home before Christmas.

24      I believe that the appropriate way to deal with this

25   is for you all to prepare your agreed Instruction

```
 1   Number 2, and include in there anything that you think is
 2   appropriate, and also, as Mr. Harrigan has suggested, you
 3   give me a list of those items that are going to come up as
 4   part of your testimony.  That way we won't have the
 5   discussion of items that are in the Findings of Fact and
 6   Conclusions of Law, which are irrelevant to the second
 7   part of this case.  But that's the way, at least as it
 8   stands right now, is the only way we can deal with this.
 9       Mr. Palumbo, the problem I have with your proposal is
10   I don't know what you are putting on for your evidence,
11   and therefore I can't tell you what appropriately needs to
12   come out of those Findings and Conclusions.  The best way
13   that I know how to deal with that is to have both counsel
14   come up with a list of Findings and Conclusions that they
15   intend to use, and then allow you the opportunity to say
16   here is what the problem is with them.
17       That will be the court's tentative resolution of how
18   to deal with this.
19       Mr. Harrigan.
20           MR. HARRIGAN:  Your Honor, would Monday of next
21   week be an appropriate time for us to -- for the parties
22   to provide that to the court?
23           THE COURT:  That would be fine.
24       All right.  Moving on.  Menenberg, I have a nice
25   letter from -- I think they are making Mr. Palumbo sign
```

1    these these days, saying, Menenberg, Judge, you can't let

2    them do that to us.

3        I must say that Ms. Robbins, who seems to be in the

4    back row here today, slipped in some language that I

5    didn't catch in regards to allocation of time entries to

6    the H.264 patent and the 802.11 patent.  When was the

7    first time that Mr. Menenberg had in a proffered report

8    that allocation to which standard?

9              MR. HARRIGAN:  By the way, your Honor, we have a

10   response to the letter that you got from Motorola to hand

11   up to you now, and would be happy to talk about that.  But

12   Ms. Robbins is the leading expert on this, so I think --

13             THE COURT:  I want to know, was the first time

14   when you walked from your table and went over and handed

15   something to Mr. Price, or was it previous to that?

16             MS. ROBBINS:  July 31st, your Honor.

17             THE COURT:  Pardon me?

18             MS. ROBBINS:  July 31st.

19             THE COURT:  When was that, in terms of hearings

20   that we have held here?

21             MS. ROBBINS:  Right.  It was following the hearing

22   where we said that we were going to be doing that.

23             THE COURT:  Then he is not going to be permitted

24   to allocate time entries between to the standards.  I laid

25   down a clear rule in regards to Mr. Holleman that we would

 1   not allow people to change their disclosed opinions to add

 2   new opinions.  And it sounds to me like this is clearly an

 3   addition that now Microsoft is attempting to put in in

 4   Menenberg's report what was previously not present.

 5        Mr. Harrigan, if you would like to respond, or,

 6   Ms. Robbins, whoever wants to do it.

 7            MR. HARRIGAN:  Yes, your Honor.  Thank you.  In

 8   this letter we can hand up to you --  Here is what

 9   happened:  First of all, you have already noted

10   Ms. Robbins' comment at the hearing on July 30th with

11   regard to the allocation of 802.11, and so forth.

12   Motorola's counsel responded indicating that, in part,

13   because they have differentiated between H.264 and 802.11

14   entries, we need a deposition.  Well, the person who --

15   And there were two depositions set.  Actually, the court

16   said since Menenberg is, quote, "down to basically being

17   an adding machine," unquote, you weren't sure any

18   deposition of him was necessary, but one of Mr. Killough

19   is necessary because he had done the allocations.  He also

20   did the 802.11 and H.264 allocation.  His deposition was

21   taken yesterday with that information in front

22   of counsel --

23            THE COURT:  And I have not made any ruling in

24   regards to Mr. Killough testifying about it.  But

25   Menenberg is not going to testify about it, because it is

1    not in his report.

2         MR. HARRIGAN:  Right.  Essentially, your Honor,

3    they will also, by the way, be deposing Menenberg in a day

4    or two.

5         The analytical work here of making this allocation

6    between 802.11 and H.264 was all done by Mr. Killough.

7    Menenberg is in fact acting as an adding machine.  And

8    Mr. Killough has already testified and been interrogated

9    about this.  And, if necessary, I guess, he could add up

10   the numbers.  But all we are doing is saving, in effect,

11   the jury the trouble if this ever comes up, because it

12   doesn't even matter unless we win on one and lose on the

13   other standard.  So it is only a contingency plan anyway.

14   The essence of the testimony is which entry belongs to

15   which category and which belongs to both.

16        THE COURT:  I understand that.  If I were Motorola

17   I would be standing up in my rebuttal and saying, well,

18   then, let them depose Mr. Holleman, because, gosh, he can

19   be deposed and he can have all of his revised testimony

20   can come into this case.

21        The rule I laid down was if it wasn't in the expert

22   reports, you are not going to get to slip it in after the

23   Daubert motions.  That is basic fairness.  It applies to

24   both sides.

25        Mr. Killough, if he did that calculation, and he was

 1    deposed, then I'm more likely than not going to permit him

 2    to testify about it.  But you don't then get to have your

 3    expert opine on something that is not in his expert

 4    report.

 5            MR. HARRIGAN:  Thank you, your Honor.

 6            THE COURT:  Following that one then is my personal

 7    favorite, which is back to Germany.  I have before me

 8    Mr. Harrigan's letter of August 8th saying they want

 9    permission to file a motion in regards to what's going on

10    in Germany.

11        And I have made some notes in regards to this, so

12    please listen carefully.  I think this is the last thing I

13    am doing out here today, so I started off saying,

14    "finally."  On October 21st, 2010, Motorola sent Microsoft

15    a letter offering a worldwide RAND license on 802.11

16    standards-essential patents.  On October 29, 2010,

17    Motorola sent Microsoft a similar letter in regard to

18    H.264 standards-essential patents.  Since November 2010

19    the parties have litigated in this court what the

20    worldwide, and I stress "worldwide," RAND rate should be.

21    And if you have any questions about where I come up with

22    the word "worldwide," I would invite you to look at

23    Motorola's letter which sets forth that they are offering

24    a worldwide RAND rate.  Quote, "This letter is to confirm

25    Motorola's offer to grant Microsoft a worldwide

1    nonexclusive license."  The last time I checked, Germany

2    was included in worldwide.

3        Taking up the challenge, this court set the worldwide

4    RAND rate in an order dated April 25, 2013.  In this

5    proceeding Motorola has presented evidence regarding both

6    its American and European patents.  If you wanted to see

7    some proof of that, take a look at paragraphs 163, 165 and

8    521 in the Findings of Fact and Conclusions of Law which

9    reference the presentation of the European patents as part

10   of this lawsuit, this litigation, this courthouse and this

11   order.

12       Motorola took up my order in regards to the German

13   litigation to the Ninth Circuit -- Motorola's pursuit of

14   the German litigation, to the Ninth Circuit Court of

15   Appeals -- which specifically notes that Motorola

16   presented American and European patents, and affirms this

17   court's ruling over the advocacy of the distinguished

18   litigator who argued on behalf of Motorola.

19       The court is aware that Motorola now disagrees with

20   the rates set by the court.  I am left with the feeling,

21   however, that Motorola also feels that if it simply

22   ignores the order, it is free to re-litigate decided

23   issues.  This is wrong.  The appropriate remedy is to seek

24   appellate review of this court's ruling.

25       And I will tell you that at the conclusion of the jury

1    trial on breach of contract it is my intention to invite

2    the parties, as I assume they will want to do, to ask me

3    to certify the rulings in regards to RAND and breach of

4    contract for appellate review.

5        I do that because it doesn't make any sense for us to

6    continue to toil here in the vineyards for another two

7    years before you have a chance to ask the Court of Appeals

8    to review my ruling.  That's your remedy.  And the court

9    will hold you to that remedy.

10       Turning then to --

11           MS. SULLIVAN:  Your Honor, may we be heard on this

12   issue?

13           THE COURT:  Not right now.  Let me finish first.

14           MS. SULLIVAN:  Thank you.

15           THE COURT:  On August 8th of 2013, Microsoft

16   notifies the court that something has happened in Germany,

17   which it characterizes as seeking further action in the

18   pending German action where the court has already dealt

19   with its prior order, and, in addition, has filed a new

20   action in its favorite forum in Mannheim, Germany.

21       Significantly, the court lacks details about both of

22   these actions and will not deal with them until after the

23   conclusion of the August 26th trial.  So, in effect, I am

24   granting the motion to file a motion, but it will not

25   occur until after you have finished exhausting the

 1    resources of the court in your upcoming trial.

 2       I would like to give you some ground rules, however.

 3    I will not take any action against the sovereign German

 4    legal system.  I will not enjoin the German court and

 5    proceed to provoke the legal equivalent of World War III.

 6    That is not a free ride for Motorola.  If I find that

 7    Motorola, its parent company, if it is directing this

 8    strategy, or the lawyers involved in it, are undertaking

 9    actions which are an effort to avoid the clear mandate of

10    this court, which was to set a worldwide RAND rate, I will

11    feel free to impose sanctions and potentially civil

12    contempt if I find that that conduct is inconsistent under

13    the court's prior ruling.

14       I do not understand the details of German law, and I

15    do not understand, based on what has been found in

16    Mr. Harrigan's letter, the two proceedings that are now

17    apparently pending.  One appears to be -- what you all

18    refer to as the newly-filed action, appears to be an

19    acceptance of a Microsoft offer made under the procedures

20    employed by the German courts.  As I have indicated

21    previously, I am not inclined to take action to contravene

22    what is the proper procedure in Germany.

23       The other action appears to be a continuation of the

24    lawsuit that I have already impacted, but which I have

25    impacted by directing what Motorola can or cannot do.  And

1  without a better understanding of the procedural posture

2  and the details of that case, I am not going to take any

3  action at this time.

4      I have had really the wonderful benefit of spending

5  time with a number of judges, including Judge Zigann and

6  Judge Grabinski from Germany, Judge Limura from Japan,

7  Justice Floyd from England, and Judge Zhou of China.  I

8  must say, there is a broad consensus on certain principles

9  that exists in this area.  One principle is that the

10  industry technology -- industry and society benefits from

11  standardization; second, that patentholders are entitled

12  to a reasonable royalty; third, that royalty stacking can

13  create unacceptable royalty burdens; and, fourth, that the

14  royalty must be related to the patent's technology

15  contribution to the standard, and that standard to the

16  product.

17      But we all have slightly different systems as it

18  pertains to the procedures of our patent law.  That is

19  particularly true with Germany and with Japan, who base

20  their systems on, quote, "natural law," unquote, as

21  opposed to what they would call American civil law.

22      Let me give you two markers then.  One, I do not

23  intend to interfere with the German system; and the second

24  marker, Motorola is firmly within the jurisdiction of this

25  court, and the court will not allow an effort to take a

1   second bite at the apple after it has committed itself in

2   its own offer letter and in its pleadings and its

3   presentation of evidence to the fact that it litigated a

4   worldwide RAND rate in this courtroom.

5       So that will be the court's ruling in regard to the

6   Harrigan letter.

7       Ms. Sullivan.  Mr. Palumbo.

8           MR. PALUMBO:  Let me say something first,

9   Kathleen.  Your reaction to Mr. Harrigan's letter is

10  precisely what I knew it would be.  I don't hear so good

11  anymore.  I have got my hearing aid in today and I had my

12  hearing aid in during the injunction hearing when you

13  repeatedly pointed to the language in Motorola's offer

14  letter regarding a worldwide license.

15      There are facts about which you are not aware which we

16  came prepared to explain to you today.  I now understand

17  that you would like us to do that in briefing later.  But

18  I can assure your Honor that in no way is Motorola

19  attempting to either get a second bite at the apple or

20  circumvent your very clear understanding that this was to

21  be a worldwide licensing.  If you would like to hear the

22  explanation, we are ready to do that.  We can do it in the

23  briefing later on.  I didn't want to leave the floor open

24  for you to think that we hadn't heard what the court just

25  said.

```
 1          THE COURT:  I don't understand what is going on in
 2   Germany, and I don't draw any conclusions from it.  I
 3   simply want it clearly understood that the consequences,
 4   and I am literally talking about eight- or nine-figure
 5   daily sanctions, applicable to the lawyers and the clients
 6   if I find that we are playing games with my ruling.  I am
 7   deadly serious about this.  If you want to exclude
 8   yourselves from practicing in federal court, you can
 9   figure out a way to do it.
10          MS. SULLIVAN:  Your Honor, when your Honor speaks
11   in those terms I would respectfully request a few moments
12   of your Honor's time --
13          THE COURT:  You are up.  You can stay at counsel
14   table.
15          MS. SULLIVAN:  Your Honor, we were quite surprised
16   to receive Mr. Harrigan's letter and find in it no
17   reference to what the German dispute is actually about,
18   which is that Microsoft offered to take a license and
19   Motorola accepted the license.  The actions in Germany are
20   quite consistent with your Honor's boundaries.
21       Your Honor --  Believe me, I know all too well what
22   the boundaries of your Honor's ruling was, because it was
23   extremely important in the Ninth Circuit matter.
24       But your Honor will recall that in Docket Number 318,
25   when you formalized the anti-suit injunction, you said,
```

1    importantly, the order in no way enjoins Motorola from

2    pursuing the German action and receiving monetary damages

3    or any other non-injunctive relief, and in no way

4    prohibits further proceedings in Germany.

5         And, your Honor, that was very meaningful to the Ninth

6    Circuit, because the Ninth Circuit, in affirming your

7    Honor's anti-suit injunction, ruled specifically that

8    Motorola urges that the anti-suit injunction must be

9    overturned because it has disabled Motorola from enforcing

10   its German patents in the only forum in which they can be

11   enforced.  This argument exaggerates the scope of the

12   injunction, which leaves Motorola free to continue

13   litigating its German patents claims against Microsoft as

14   to damages or other non-injunctive remedies to which it

15   may be entitled.

16        So, your Honor, nothing could have been more

17   scrupulously appropriate under your Honor's ruling than

18   for Motorola to continue to pursue in Germany the damages

19   and other non-injunctive relief that your Honor left open,

20   and which I would submit was a very important factor in

21   the Ninth Circuit's ruling.  It is why they found your

22   ruling appropriately narrow.  They said damages is left

23   open.

24        Well, what did Microsoft's offer say?  We offered to

25   take a license, and it expressly said by its terms that we

```
 1    accept for the term of this license we will pay any past

 2    damages that are owed to Motorola.

 3        So what is going on in Germany now?  Obviously

 4    Motorola is not pursuing injunctions.  It has expressly

 5    told the Karlsruhe appellate court that it is dropping any

 6    injunctive relief claims in light of your Honor's

 7    anti-suit injunction.  And one of the patents has now

 8    expired.  So the claims have been mooted on the injunction

 9    side in Germany, both by your Honor's ruling and by the

10    expiration of one of the German patents.

11        So Motorola is not seeking injunctive relief in

12    Germany, is not defying your Honor's ruling, and in fact

13    is doing exactly what your Honor and the Ninth Circuit

14    left open to it in express terms.

15        So the so-called new action, which was not sprung on

16    Microsoft last week, it was filed in July, and it is only

17    by virtue of the Hague Convention that service occurred

18    only recently, that is an action to try to obtain the very

19    thing your Honor left open, which is past damages under

20    the license that Microsoft offered to take and which

21    Motorola accepted.  Sorry.  It was filed in April.  I

22    stand corrected.  The suit was filed in April and served

23    in July by virtue of the Hague Convention.

24        Your Honor, I have to just say, what kind of irony is

25    there that Microsoft is again using things as a sword and
```

1    a shield?  Over in Germany it is saying, well, Motorola

2    had to accept their offer in order to avoid

3    anti-competition sanctions under European law.  Now they

4    come to your court and they say, oh, no, no, they can't

5    accept an offer because that would be in violation of your

6    Honor's ruling.  That can't be the case.  They can't use

7    an offer that they made, and that Motorola accepted, a

8    license offer, and a rate --  By the way, the acceptance

9    was in January of 2013, before your Honor issued the

10   Findings of Fact and Conclusions of Law in April.

11        So what we are arguing about in Germany is Motorola

12   contends that we have an executed contract, a license to

13   the German patents, at a rate that Microsoft offered, and

14   that we are entitled to enforcement of that as a matter of

15   contract, a license agreement, under German law, and that

16   is entirely within the bounds your Honor expressly left

17   open and was a condition of the Ninth Circuit ruling.

18        Microsoft shouldn't be telling us we had to accept the

19   offer in Germany, and then coming to this court and saying

20   you have to void the acceptance of the offer as precluded

21   by this court's jurisdiction.

22        So, your Honor, we can obviously accept your Honor's

23   offer to brief this in detail, but I needed to put on the

24   record now that Motorola is not in defiance of your

25   Honor's orders, that we have adhered to the absolute

1    letter and boundaries of those orders.  We have argued

2    over two things, a license that Microsoft offered to take

3    in December of 2011, and never withdrew throughout the

4    entire course of the anti-suit proceedings right through

5    the Ninth Circuit, that Motorola accepted in January 2013.

6    The so-called new action is just a contract action seeking

7    to enforce that contract -- or to adjudicate whether that

8    is an accepted contract.

9        Microsoft is now arguing, never mind, we didn't mean

10   to accept it.  We actually -- we didn't mean for your

11   response to us to be an acceptance.  We will read it as a

12   counteroffer.  That is a dispute of German contract law,

13   whether the license was offered and accepted.  That is

14   what is going on in the so-called new action.

15       The other action is an accounting for past damages,

16   which is also within your Honor's ruling.

17       So it pains me to hear you talking about Motorola

18   trying to avoid the court's order when that is not the

19   facts at all.

20           THE COURT:  Counsel, what I have said is I don't

21   know what is going on in Germany, which is why I have

22   invited the briefing.  But it is not going to be now.  I

23   don't wish to impugn Motorola, I don't wish to impugn

24   Google, I don't wish to impugn Quinn Emanuel.  I simply

25   want the marker out there that if I find conduct which is

1    inconsistent with the fact that I set a worldwide RAND

2    rate, there will be extreme consequences.  That's all I

3    want my remarks to suggest.

4            MS. SULLIVAN:  Your Honor, we didn't understand

5    anything in the court's prior ruling to preclude the

6    parties from entering into a voluntary license.

7            THE COURT:  I'm not saying you did.  I assume you

8    are going to litigate this in Germany.  They are going to

9    try to litigate it here.  That's fine.  We will figure all

10   of this out then.  I just want the marker out there that I

11   am not going to tolerate a worldwide license which is

12   subject to a second bite at the apple in Germany; if that

13   one doesn't work, we will try Estonia.  That is not what I

14   am going to permit.  I am not saying you are doing that,

15   but I just want it clear that is not going to go over well

16   here.

17           MS. SULLIVAN:  Understood, your Honor.

18           THE COURT:  Mr. Harrigan.

19           MR. HARRIGAN:  Your Honor, I will be 30 seconds,

20   but I would like to recall to the court the comments by

21   Mr. Jenner with respect to the anti-suit issue and other

22   related matters, which was:  Your Honor, no matter what

23   happens in Germany, once this court rules, you can always

24   go back and adjust the amount that is set by any German

25   court, and so there is no problem.  And what this is, is

```
 1    very simply an end run around that very statement to try

 2    to get a higher royalty in Germany through yet another

 3    effort to preempt this court's decision.

 4            THE COURT:  A topic to be taken up on another day

 5    when the court is better informed.

 6        Counsel, I will see you all on the 26th --

 7            MR. PRITIKIN:  We have one more loose end.

 8            MR. PALUMBO:  We have several, your Honor.  Sorry.

 9            THE COURT:  Mr. Pritikin, you got up first.

10            MR. PRITIKIN:  You had mentioned earlier a

11    question about the ITC transcripts, I think it was

12    Jennifer Ochs and Kirk Dailey.  And what I would suggest

13    is that perhaps we can send you a short letter on that in

14    the next day or so explaining it.  They are not offered

15    under Rule 32, which governs the use of deposition

16    transcripts.  In the case of Dailey, it is an admission.

17    In the case of Jennifer Ochs, Federal Rule of Evidence

18    804(b) governs the use of that transcript.  We can provide

19    this in a short letter, your Honor.

20            THE COURT:  Recognize I don't know who you are

21    calling as witnesses.  You have given me a deposition

22    transcript with objections in it.  That sounds to me like

23    you are using the deposition, and it is not for

24    impeachment purposes.

25            MR. PRITIKIN:  Yes, your Honor.  What we had done
```

1   was we had submitted these transcripts along with the

2   deposition designations.  Probably shouldn't have been

3   done that way.  These are otherwise admissible.  And,

4   again, I would be happy to provide a short letter I think

5   that will clear this up.

6           THE COURT:  Anything you can do to reduce the

7   workload on us would be appreciated.

8       Mr. Palumbo.

9           MR. PALUMBO:  Your Honor, I would like to address

10  related questions, and then we also have an issue with

11  respect to the German 30(b)(6), which Mr. Cannon is going

12  to discuss.

13      First, with respect to Mr. Dailey --

14          THE COURT:  Is the German 30(b)(6) some kind of

15  weapon?

16          MR. PALUMBO:  It relates to the 30(b)(6) witness

17  that was proffered on the German move and where we stand

18  on that.

19      With respect to Mr. Dailey, Mr. Dailey will be

20  Motorola's corporate representative at trial.  Microsoft

21  has designated his testimony in the November trial,

22  perhaps his ITC testimony, as well as his deposition.

23      Because we are all on the clock, and because it is our

24  view that the witness testimony will be more

25  understandable and less confusing to the jury if a witness

1    testifies a single time, first, we think it would be

2    appropriate if Microsoft wants to put on Mr. Dailey's

3    testimony during its case, they call Mr. Dailey live, and

4    that we are then permitted to ask Mr. Dailey questions,

5    and our examination of Mr. Dailey would not be limited by

6    the scope of Microsoft's questioning of Mr. Dailey.  That

7    permits him to be up and down in a single setting, rather

8    than up in their case, and then up again in our case to

9    cover anything that is outside the scope of their

10   testimony.

11       If you permit them to use his deposition testimony,

12   and they choose not to call him live, then we still

13   believe that we should be permitted then to put Mr. Dailey

14   on the stand and ask him our questions so he would --

15             THE COURT:  At that time or in your case?

16             MR. PALUMBO:  I'm sorry?

17             THE COURT:  In their case or in your case?

18             MR. PALUMBO:  If they put him on in their case,

19   either live, which we think is the appropriate way to do

20   it, or via deposition testimony, all we are asking is that

21   our examination not be limited by the scope of their

22   examination.  That permits Mr. Dailey to get on the

23   witness stand one time and then he is done.

24             THE COURT:  That is customarily how I do it.  I

25   have had people say that they don't want to do it that way

```
 1   and they are reserving the right to call him as part of
 2   their own case.  The jury doesn't understand why --  They
 3   have seen enough talking heads.  They don't understand why
 4   they have appeared twice.  Most of the time they are eager
 5   to get out of here.  That's something I would expect
 6   counsel to work out, unless you have a problem.  The time
 7   allocation is easy, I know who is asking the questions.  I
 8   think I just heard Mr. Pritikin say they are going to call
 9   him live.
10         MR. PRITIKIN:  Your Honor, this is the first I
11   knew that he would be available during our case.  Let us
12   consider it, and we will get back to Mr. Palumbo.  It is
13   the sort of thing we ought to be able to work out, I would
14   think.
15         THE COURT:  I would think so, too.
16         MR. PALUMBO:  The second issue is McNeill Taylor.
17   They say we should bring in Mr. Taylor live because he is
18   in our control.  He is actually not in our control.  He
19   has left Motorola and works for a competitor.  So they can
20   clearly use his deposition testimony.  But we don't have
21   the ability to require him to come live.  I don't think
22   there should be any dispute about that, but if there is,
23   we would like to address it now.
24         MR. PRITIKIN:  There is no problem with that, your
25   Honor.  We just want to clarify whether we are going to
```

1    use the deposition or he would be here live.  I think the

2    question has been answered for us.

3              MR. PALUMBO:  Thank you.

4         Finally, Microsoft has designated the November 16

5    trial testimony of Jennifer Ochs from Marvell.  As you

6    remember, Ms. Ochs came to the November trial voluntarily

7    from California.  First, as you have noted, under Civil

8    Rule 32, it is not clear that you can use prior trial

9    testimony in addition to deposition testimony.  But even

10   if that were permitted, the issue in the November trial

11   was royalty rate.  The issue here is breach.  So if

12   Ms. Ochs does not testify live, then I can't ask her

13   questions on cross that I would have asked her the first

14   time around had the issue been breach instead of rate.

15        As you will also recall, Microsoft did not disclose

16   its theory that Motorola's failure to grant a RAND license

17   to Marvell was part of the breach until after the November

18   trial date.  I think that disclosure was May of this year.

19   If they are permitted to use Ms. Ochs' testimony from

20   November, and she doesn't show up live, then I don't have

21   the opportunity to ask Ms. Ochs questions, which I had no

22   reason or basis to ask when she testified at the November

23   trial.

24        I can give you specific examples of questions which I

25   didn't ask at that trial which I would ask now that we

1    know that the failure to give Marvell a RAND license is

2    part of their breach theory, and with the issue being

3    different --  I can give you just one example.

4              THE COURT:  Here is my question:  Why didn't you

5    depose her in the discovery phase of this trial?

6              MR. PALUMBO:  Because you limited the number of

7    fact depositions we could take and we had to be selective.

8    She just didn't get that high a priority.  But the fact

9    that we didn't have enough depositions to go take her

10   deposition -- enough fact depositions allocated to us to

11   go take her deposition.  She came live voluntarily last

12   time.  We think if they want to put her on, they ought to

13   call her up and have her come live this time so we can ask

14   her the questions we would ask, now that we know of their

15   new theory, and now that we have a new issue to talk

16   about.

17             THE COURT:  Mr. Pritikin.

18             MR. PRITIKIN:  Let me respond briefly, your Honor.

19   First, under Rule 804(b), this is the use of prior

20   testimony.  If the witness is unavailable, then of course

21   it is an exception to the hearsay rule.  Ms. Ochs at the

22   time she testified last November was an employee of

23   Marvell.  She has since left Marvell, and she is not

24   willing to come and testify now.  She came because she was

25   working for Marvell.  The best we can find out is that she

1    lives somewhere in the northern California area, perhaps

2    in Palo Alto.  We haven't been able to track her down

3    since she left Marvell.  Clearly she is unavailable, and

4    it qualifies under Rule 804(b)(1) in that respect.

5         Insofar as what we would like to do and what we plan

6    to do is simply to read to the jury the testimony that she

7    gave in November.  That testimony went not only to the

8    issue of what a RAND royalty would be, it went to the

9    whole question of what was happening with respect to

10   Marvell.  Much of the testimony related to that did not

11   find its way into your Findings of Fact for the reason

12   that it was more relevant to the general background of why

13   Marvell was requesting the license and how this came

14   about.

15        The cross-examination during the trial in November, if

16   you look at that cross-examination, that too went to that

17   issue, and not to the amount of the royalty.  The

18   questions that were asked of her during the

19   cross-examination related to the issue of:  Why wasn't a

20   license concluded?  Were you put up to this by Microsoft?

21   How did it come about?  Where do the negotiations stand

22   now?  So those questions, anything that related to why it

23   was that Marvell was seeking the license from Motorola,

24   those questions were explored during the

25   cross-examination.  I would be hard-pressed to think of

1    questions that were not asked that they would still ask

2    her on cross-examination today if she were here.

3              THE COURT:  Aren't you now arguing that the

4    relevance of her testimony is that they were willing to

5    grant a license but it had to exclude Microsoft?  As I

6    read your trial submissions, that's now your point.  That

7    wasn't what she testified to last time.

8              MR. PRITIKIN:  I believe that is in the testimony,

9    your Honor.  I'm quite certain it is.  The thrust of our

10   argument with respect to Marvell --  There are really a

11   couple of aspects to it.  One is that the license that

12   they provided to Marvell, the proposal, excluded

13   Microsoft, that breached the RAND commitment and was

14   discriminatory, and cut off that other avenue, that other

15   opportunity, to provided the license for the WiFi

16   technology.

17      Second, the terms of it were, as your Honor recalls, I

18   think those are probably laid out in your Findings of

19   Fact, that it was two and a quarter percent on the end

20   product that contained the Marvell chip, and that those

21   terms themselves were so onerous and so unreasonable, even

22   if they included Microsoft, those were terms that were

23   unreasonable as well.

24              THE COURT:  Mr. Palumbo, I believe that your

25   client's owner is somewhere in California.

1           MR. PALUMBO:  Somewhere.

2           THE COURT:  I think they could find her if they

3    wanted to.  If you need to take her deposition, you will

4    find a receptive party here that will allow you to do that

5    for an hour or two hours.

6           MR. PALUMBO:  If that is your Honor's ruling.  Let

7    me give you a couple of examples of --

8           THE COURT:  You don't need to.  I recall this

9    because I have been recently reading it.  Quit while you

10   are ahead, sir.  If you run into a problem locating her,

11   you have some time.

12      Mr. Cannon.

13          MR. CANNON:  Good afternoon, your Honor.  There

14   was one other issue that remained.  That was the letter we

15   sent in on July 23rd, and Microsoft sent an opposing

16   letter the 26th, having to do with discovery into the

17   causation aspects as to why Microsoft moved its European

18   distribution.

19          THE COURT:  You lost on it.

20          MR. CANNON:  Okay.

21          THE COURT:  At some point it has to end.  You got

22   as much out of it as you were going to get.  I am not

23   prepared to reopen it.  Both sides played the "privilege"

24   card.  I'm not going to hear anything further beyond my

25   rulings today.  Sorry.  I'm sure you had a brilliant

1  argument planned.

2        MR. CANNON:  I was ready to go.

3        THE COURT:  Anything further, counsel?

4        MR. HARRIGAN:  No, your Honor.

5        MR. PALUMBO:  Thank you, your Honor.  Nothing

6  more.

7        THE COURT:  We will be in recess.  Thank you,

8  counsel.

9                    (Adjourned.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                              CERTIFICATE

2

3

4

5

6

7

8
        I, Barry L. Fanning, Official Court Reporter, do hereby
9    certify that the foregoing transcript is true and correct.

10

11                                  S/Barry L. Fanning

12                                  _____

13                                  Barry L. Fanning

14

15

16

17

18

19

20

21

22

23

24

25