THE HONORABLE JAMES L. ROBART

1

2

3

4

5

6

7

8

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

9

10

11

12

13

14

15

16

17

18

| | |
|---|---|
| MICROSOFT CORPORATION, | Case No. C10-1823-JLR |
| Plaintiff, | |
| vs. | EXCERPTS OF PRIOR COURT ORDERS UPON WHICH MICROSOFT INTENDS TO RELY *IN MICROSOFT'S OPENING STATEMENT* |
| MOTOROLA, INC., et al., | |
| Defendants. | |
| MOTOROLA MOBILITY LLC, et al., | |
| Plaintiffs, | |
| vs. | |
| MICROSOFT CORPORATION, | |
| Defendant. | |

19

20        Contemporaneously herewith, Microsoft filed a set of excerpts from this Court's prior

21   orders upon which Microsoft intends to rely at trial.  Provided below is a subset of those

22   excerpts that includes those on which Microsoft intends to rely during its opening statement.[1]

23   /

24   /

25

---

[1] Microsoft specifically reserves the right to introduce other findings and excerpts as necessary at trial.

EXCERPTS OF PRIOR COURT ORDERS UPON
WHICH MICROSOFT INTENDS TO RELY *IN
MICROSOFT'S OPENING STATEMENT* - 1
C10-1823-JLR

LAW OFFICES
**CALFO HARRIGAN LEYH & EAKES LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700   FAX, (206) 623-8717

**A.      The Court's April 19, 2013 Findings of Fact and Conclusions of Law (ECF 673)**

| FFCL# | |
|---|---|
| 25 | As the court has previously found: "In order to reduce the likelihood that owners of [standard] essential patents will abuse their market power, many standard setting organizations, including the IEEE and ITU, have adopted rules relating to the disclosure and licensing of essential patents. The policies often require or encourage members of the standards setting organizations to identify patents that are essential to a proposed standard and to agree to license their essential patents on reasonable and non-discriminatory ("RAND") terms to anyone who requests a license. Such rules help to ensure that standards do not allow essential patent owners to extort their competitors or prevent competitors from entering the marketplace." (6/6/12 Order at 3-4; see also Ex. 1414 at 28,036-37 (describing basic elements of SSO intellectual property policies); 11/16/12 Tr. at 19:3-24, 21:24-23:7 (Simcoe Testimony) (same); Exs. 1575 (Guidelines for Implementation of Common Patent Policy of the ITU-T/ITU-R/ISO/IEC) and 1568 (IEEE-SA Standards Board By-Laws).) |
| 36 | All of Motorola's LOAs indicated that it would "grant to an unrestricted number of applicants on a worldwide, non-discriminatory basis and on reasonable terms and conditions" licenses conditioned on reciprocity.6 (Ex. 2838 at MOTM_WASH1823_0000036, 039, 046, 053, 057, 061; 11/20/12 Tr. at 33:21-34:12 (Dailey Testimony).) |
| 47 | The IEEE Operations Manual in place at the time that Motorola and Symbol made their initial 802.11 RAND commitments provided that "[p]atent holders shall submit to the Patent Committee of the IEEE Standards Board, prior to any significant drafting of the standard, a draft of their license that assures that the technology will be made available at nominal competitive costs to all who seek to use it for compliance with an incorporated IEEE standard." (Ex. 1130 at MS-MOTO_1823_00005246490 (§ 6.3.2) (emphasis added).) |
| 52 | When the standard becomes widely used, the holders of SEPs obtain substantial leverage to demand more than the value of their specific patented technology. This is so even if there were equally good alternatives to that technology available when the original standard was adopted. After the standard is widely implemented, switching to those alternatives is either no longer viable or would be very costly. (11/13/12 Tr. at 140:2-23, 141:18-23 (Murphy Testimony); Ex. 1414 at 28036.) |
| 55 | The ability of a holder of an SEP to demand more than the value of its patented technology and to attempt to capture the value of the standard itself is referred to as patent "hold-up." (11/13/12 Tr. at 140:2-23, 141:18-23 (Murphy Testimony); Ex. 1414 at 28036; see also 11/19/12 Tr. 166:24-167:22 (Schmalensee Testimony) (explaining that the "essence of hold-up" is that while ex ante competition constrains what a patent holder can obtain for access to its patent, ex post, the technology in the standard does not face that competition).) |
| 56 | The threat of hold-up increases as the standard becomes more widely implemented and firms make sunk cost investments that cannot be recovered if they are forced to forego implementation of the standard or the standard is changed. (11/13/12 Tr. at 143:1-18 |

EXCERPTS OF PRIOR COURT ORDERS UPON WHICH MICROSOFT INTENDS TO RELY *IN MICROSOFT'S OPENING STATEMENT* - 2
C10-1823-JLR

LAW OFFICES
**CALFO HARRIGAN LEYH & EAKES LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700    FAX, (206) 623-8717

| FFCL# | |
|---|---|
| | (Murphy Testimony); 11/16/12 Tr. at 86:20-87:2 (Lynde Testimony).) |
| 57 | Hold-up can threaten the diffusion of valuable standards and undermine the standard-setting process. (Ex. 1414 at 28036; 11/13/12 Tr. at 144:25-145:11, 147:22-148:13 (Murphy Testimony).) |
| 58 | In addition to harming firms that are forced to pay higher royalties, hold-up also harms consumers to the extent that those excess costs are passed onto them. (Ex. 1414 at 28036; 11/13/12 Tr. at 144:25-145:6, 147:22-148:13 (Murphy Testimony).) |
| 59 | Hold-up by one SEP holder also harms other firms that hold SEPs relating to the same standard because it jeopardizes further adoption of the standard and limits the ability of those other holders to obtain appropriate royalties on their technology. (11/13/12 Tr. at 144:25-145:11 (Murphy Testimony).) |
| 60 | Indeed, Motorola's expert, Dr. Richard Schmalensee, acknowledged that "the RAND commitment and the whole apparatus exists [sic] to deal with hold-up." (11/19/12 Tr. at 142:13-16, 157:20-23 (Schmalensee Testimony).) |
| 61 | Similarly, the Federal Trade Commission ("FTC") has stated that "[t]he most common mechanism used by SSOs to attempt to prevent patent hold-up is the RAND commitment." (Ex. 1414 at 28037.) |
| 62 | Complex industry standards like the H.264 and 802.11 Standards can require the use of hundreds or thousands of SEPs held by dozens of patent holders. (Exs. 1150-54 (listing patents claimed or determined to be essential to the H.264 Standard and patent holders that made blanket disclosures); Exs. 1156, 1158-59, 1164 (listing patents claimed or determined to be essential to the 802.11 Standard and patent holders that made blanket disclosures); 11/16/12 Tr. at 108:21-109:8 (Lynde Testimony) (the number of SEPs related to the 802.11 Standard "generally is acknowledged to be in the thousands").) |
| 63 | High-tech products can comply with dozens or even hundreds of different standards. For example, a typical personal computer ("PC") implements as many as 90 different formal standards and over 100 informal interoperability standards. (11/16/12 Tr. at 128:2-10 (Lynde Testimony).) |
| 154 | The H.264 Standard resulted from the contributions of roughly 170 entities that submitted over 2,300 documents. (11/14/12 Tr. at 108 (Orchard Testimony).) H.264 is a large and technically complex standard developed with the goal of providing significantly improved compression compared to prior video standards. (Ex. 610; 11/13/12 Tr. at 211 (Sullivan Testimony).) |
| 157 | Approximately 33 United States companies have enumerated their declared-essential H.264 Patents. All of these patents are subject to the RAND commitment. Nineteen additional companies have provided "blanket" LOAs to the ITU obligating their patents to the RAND commitment. (See Ex. 1544.) |
| 281 | Windows is an operating system that "provides an abstraction over the hardware, and presents an application interface" so that "third parties can write programs that run on the computer." (11/13/12 Tr. at 25-26 (DeVaan Testimony).) With each version of Windows, Microsoft adds thousands of features which typically build on the capabilities of previous releases. (Id. at 28-29.) For example, the new features of Windows 7 are described in two voluminous books. (Exs. 1408-09.) Video encoding and decoding is only a tiny part of what the Windows software does and Windows supports many other video compression |

EXCERPTS OF PRIOR COURT ORDERS UPON
WHICH MICROSOFT INTENDS TO RELY *IN
MICROSOFT'S OPENING STATEMENT* - 3
C10-1823-JLR

LAW OFFICES
**CALFO HARRIGAN LEYH & EAKES LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700   FAX, (206) 623-8717

| FFCL# | |
|---|---|
| | standards in addition to H.264. (11/13/12 Tr. at 34 (DeVaan Testimony).) |
| 289 | The court concludes, based on this evidence, that Motorola's H.264 SEPs provide only minor importance to the overall functionality of Microsoft's Windows product. Windows is first and foremost an operating system designed to permit various applications to operate vis-à-vis a user. As explained by Microsoft at trial, the Windows operating system has vast functionality completely unrelated to any video playing. Only when a Microsoft Windows user chooses to play interlaced video would Windows employ the functionality of Motorola's H.264 SEPs, which in turn only provide a portion of the coding tools necessary to view the interlaced video. Moreover, the interlaced video would still play without Motorola's H.264 SEPs, it might just be 5-8 % slower. |
| 299 | The court concludes, based on this evidence, that Motorola's H.264 SEPs provide only minor importance to the overall functionality of Microsoft's Xbox product.  Although it is important that the Xbox have the ability to play video, the evidence suggests that much of that video will be in progressive form. Motorola points to Xbox Live as a source of such video, but Xbox Live does not support interlaced video at this time, and in the past it appears that video over Xbox Live was also in progressive form. (See 11/15/12 Tr. at 31 (Del Castillo Testimony).) Similarly, Motorola offered evidence that some AT&T U-verse content is interlaced and could be received on the Xbox after special software was added, but this software is no longer available and was installed by only 10,000 to 11,000 users out of 35 million Xbox owners. (Id. at 24.) |
| 315 | The 802.11 Working Group spent seven years developing the first draft of the 802.11 Standard. (11/15/12 Tr. at 92-93 (Gibson Testimony).) |
| 316 | The Working Group issued its first standard, "IEEE 802.11," in 1997 (referred to as "802.11-1997"). |
| 318 | The 802.11 Standard today is immense and complex; the current version is 2,793 pages long. (Ex. 386A.) |
| 335 | Since 1994, approximately 92 companies have identified—in LOAs—over 350 patents and 30 patent applications as essential to the 802.11 Standard.11 (11/15/12 Tr. at 99 (Gibson Testimony); Exs. 7, 1592.) Companies may also provide "blanket" LOAs to the IEEE, which do not identify specific patents. (Supra ¶ 43.) As stated previously, through "blanket" LOAs, SEP holders commit to license unspecified patents or pending applications for a particular standard. (Id.) At this time, approximately 59 companies have filed these blanket LOAs for the 802.11 Standard, including wireless communication industry leaders such as Atheros, Broadcom, Qualcomm, Research in Motion, and Intel.12 (Exs. 7, 1592.) Thus, according to the expert testimony of Dr. Lynde, there are possibly thousands of essential patents to the 802.11 Standard at any one time. (See 11/16/12 Tr. at 108-109 (Lynde).) |
| 456 | There are at least 92 entities that own 802.11 SEPs. (Supra ¶ 335.) If each of these 92 entities sought royalties similar to Motorola's request of 1.15 % to 1.73 % of the end-product price, the aggregate royalty to implement the 802.11 Standard, which is only one feature of the Xbox product, would exceed the total product price. The court concludes that a royalty rate that implicates such clear stacking concerns cannot be a RAND royalty rate because such a royalty rate does not stand up to the central principle of the RAND commitment—widespread adoption of the standard. As Dr. Lynde explained, "[i]f |

EXCERPTS OF PRIOR COURT ORDERS UPON
WHICH MICROSOFT INTENDS TO RELY *IN
MICROSOFT'S OPENING STATEMENT* - 4
C10-1823-JLR

LAW OFFICES
**CALFO HARRIGAN LEYH & EAKES LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700   FAX, (206) 623-8717

| FFCL# | |
|---|---|
| | everyone wanted the same deal [as Motorola], it would quickly make the end-product price untenable commercially." (11/16/12 Tr. at 179:1-8 (Lynde Testimony).) |
| 457 | Additionally, the court concludes that stacking concerns are heightened in this case because Motorola's 802.11 SEP portfolio provides only minimal contribution to the 802.11 Standard. |
| 531 | Additionally, the court conducted a comprehensive and detailed examination of the importance of each patent in Motorola's H.264 SEP portfolio to the H.264 Standard or to Microsoft's products. This examination revealed that although some of the patents contributed to the H.264 Standard, others provided only minimal contribution due to the availability of alternative technology. The examination further revealed that, of the patents contributing to the H.264 Standard, Motorola did not provide the inventive technology, but instead built upon already-existing technology. |
| 533 | Finally, the court concludes that Motorola's H.264 SEP portfolio only constitutes a sliver of the overall technology incorporated in the H.264 Standard. Indeed, the largest technology contributor to the H.264 Standard was Telenor Group, which contributed many of the core innovations of H.264 and submitted the August 1999 proposal that became the basis of the first draft of the design. (11/13/12 Tr. at 215 (Sullivan Testimony); 11/14/12 Tr. at 115 (Orchard Testimony).) Telenor decided not to seek patents on its contributions and notified the JVT of its decision. (11/14/12 Tr. at 52 (Sullivan Testimony); 11/14/12 Tr. at 115 (Orchard Testimony).) |
| 536 | In sum, Motorola did not demonstrate that its H.264 SEP portfolio provided significant contribution to the H.264 Standard or would provide significant technological value to Microsoft's products. |
| 576 | Finally, the court must consider Motorola's contribution in relation to the standard as a whole. The amount of technology involved in the 802.11 Standard is immense. Indeed, the contributions by the University of Hawaii in developing ALOHAnet constitute the basis for the 802.11 Standard. (11/15/12 Tr. at 90-91 (Gibson Testimony).) Additionally, the 802.11 Working Group spent seven years developing the first draft of the 802.11 Standard. (Id. at 92-93.) Over 1,000 companies have participated in the development of the 802.11 Standard. (Id. at 94-95; Ex. 514.) The 802.11 Standard today is large and complex; the current version is 2,793 pages long. (Ex. 386A.) Approximately 92 companies have identified essential patents or submitted blanket LOAs to the IEEE. With this large scale contribution in mind, the court finds that Motorola's 11 relevant SEPs constitute only a sliver of the overall technology incorporated in the 802.11 Standard. |
| 585 | Marvell also considers the ARM rate an appropriate benchmark because the rate is based on the selling price of the chip, not the sale price of the end-user product into which the chip is embedded. According to Ms. Ochs, the denominator in the royalty calculation must be the price of the chip rather than the price of the user end-product because even a low royalty rate applied to an expensive end-product would quickly outstrip Marvell's profit margins on its chips. (See 11/14/12 Tr. at 68, 69:1-3 (Ochs Testimony).) For example, a 1 % royalty on a chip placed in an $80,000.00 Audi A8 would be $800.00, or about 267 times the retail price of the chip. (See id. at 69:1-3.) Ms. Ochs further testified that, not only would a royalty rate based on the consumer end product often be cost-prohibitive, it would also be impractical because when Marvell sells the chips it usually does not know |

| FFCL# | |
|---|---|
| | their intended end use. (11/14/12 Tr. at 68:5-25, 69:15-16 (Ochs Testimony).) Finally, the chips provide the same functionality in each host device regardless of the end cost of the device, so it is logical that the royalty rate be the same across all devices. (See id. at 62:17-20.) Likely because of these reasons, Ms. Ochs testified that she had never heard of a chip maker paying a running royalty on the end-product price of its consumers' products. (Id. at 70:7-10.) |
| 587 | Thus, the court concludes that Marvell's experience with the ARM rate shows that the 1 % rate represents a reasonable "high ceiling" royalty rate in semiconductor intellectual property licensing. |
| Page 207 | In conclusion and as explained herein, the court concludes as follows:<br>• The RAND royalty rate for Motorola's H.264 SEP portfolio is 0.555 cents per unit; the upper bound of a RAND royalty for Motorola's H.264 SEP portfolio is 16.389 cents per unit; and the lower bound is 0.555 cents per unit. This rate and range are applicable to both Microsoft Windows and Xbox products. For all other Microsoft products using the H.264 Standard, the royalty rate will be the lower bound of 0.555 cents.<br>• The RAND royalty rate for Motorola's 802.11 SEP portfolio is 3.471 cents per unit; the upper bound of a RAND royalty for Motorola's 802.11 SEP portfolio is 19.5 cents per unit; and the lower bound is 0.8 cents per unit. This rate and range are applicable to Microsoft Xbox products. For all other Microsoft products using the 802.11 Standard, the royalty rate will be the low bound of 0.8 cents per unit. |

**B.       The Court's November 30, 2012 Order (ECF 607)**

| 11/30/12 Order ECF 607, at pp. 13-14 | "As Microsoft has committed to accept a license on RAND terms for Motorola's entire H.264 standard essential patent portfolio, and the litigation is continuing to determine the details of such a license, it is now clear that at some point in the future (either by agreement of the parties or by court adjudication) a license agreement for the Motorola Asserted Patents will become a reality." |
|---|---|

DATED this 19th day of August, 2013.

**RESPECTFULLY SUBMITTED,**

CALFO HARRIGAN LEYH & EAKES LLP

By      s/Arthur W. Harrigan, Jr.
           Arthur W. Harrigan, Jr., WSBA #1751
By      s/Christopher Wion
           Christopher Wion, WSBA #33207
By      s/Shane P. Cramer
           Shane P. Cramer, WSBA #35099
           999 Third Avenue, Suite 4400

EXCERPTS OF PRIOR COURT ORDERS UPON WHICH MICROSOFT INTENDS TO RELY *IN MICROSOFT'S OPENING STATEMENT* - 6
C10-1823-JLR

LAW OFFICES
**CALFO HARRIGAN LEYH & EAKES LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700    FAX, (206) 623-8717

1

Seattle, WA  98104
Phone:  206-623-1700
arthurh@calfoharrigan.com
chrisw@calfoharrigan.com
shanec@calfoharrigan.com

By _____ s/T. Andrew Culbert _____
        T. Andrew Culbert

By _____ s/David E. Killough _____
        David E. Killough

MICROSOFT CORPORATION
        1 Microsoft Way
        Redmond, WA  98052
        Phone:  425-882-8080
        Fax:  425-869-1327

        David T. Pritikin
        Richard A. Cederoth
        Constantine L. Trela, Jr.
        William H. Baumgartner, Jr.
        Ellen S. Robbins
        Douglas I. Lewis
        David C. Giardina
        John W. McBride
        Nathaniel C. Love


        SIDLEY AUSTIN LLP
        One South Dearborn
        Chicago, IL  60603
        Phone:  312-853-7000
        Fax:  312-853-7036

        Carter G. Phillips
        Brian R. Nester

        SIDLEY AUSTIN LLP
        1501 K Street NW
        Washington, DC  20005
        Telephone:  202-736-8000
        Fax:  202-736-8711

        Counsel for Microsoft Corp.

EXCERPTS OF PRIOR COURT ORDERS UPON
WHICH MICROSOFT INTENDS TO RELY *IN
MICROSOFT'S OPENING STATEMENT* - 7
C10-1823-JLR

## CERTIFICATE OF SERVICE

1

2        I, Florine Fujita, swear under penalty of perjury under the laws of the State of

Washington to the following:

3

4        1.     I am over the age of 21 and not a party to this action.

5        2.     On the 19th day of August, 2013, I caused the preceding document to be served

6   on counsel of record in the following manner:

7   **Attorneys for Motorola Solutions, Inc., and Motorola Mobility, Inc.:**

8   Ralph Palumbo, WSBA #04751
    Philip S. McCune, WSBA #21081      _____ Messenger
9   Summit Law Group      _____ US Mail
    315 Fifth Ave. South, Suite 1000      _____ Facsimile
10  Seattle, WA  98104-2682      ___X___ ECF
    Telephone:  206-676-7000
11  Email:  Summit1823@summitlaw.com

12  Steven Pepe (*pro hac vice*)      _____ Messenger
    Jesse J. Jenner (*pro hac vice*)      _____ US Mail
13  Ropes & Gray LLP      _____ Facsimile
    1211 Avenue of the Americas      ___X___ ECF
14  New York, NY  10036-8704
    Telephone:  (212) 596-9046
15  Email:  steven.pepe@ropesgray.com
16  Email:  jesse.jenner@ropesgray.com

17  Norman H. Beamer (*pro hac vice*)      _____ Messenger
    Ropes & Gray LLP      _____ US Mail
18  1900 University Avenue, 6th Floor      _____ Facsimile
    East Palo Alto, CA  94303-2284      ___X___ ECF
19  Telephone:  (650) 617-4030
20  Email:  norman.beamer@ropesgray.com

21  Paul M. Schoenhard (*pro hac vice*)      _____ Messenger
    Ropes & Gray LLP      _____ US Mail
22  One Metro Center      _____ Facsimile
    700 12th Street NW, Suite 900      ___X___ ECF
23  Washington, DC  20005-3948
    Telephone:  (202) 508-4693
24  Email: Paul.schoenhard@ropesgray.com

25

LAW OFFICES
**CALFO HARRIGAN LEYH & EAKES LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700   FAX, (206) 623-8717

Andrea Pallios Roberts (*pro hac vice*)                    _____ Messenger
Brian C. Cannon (*pro hac vice*)                           _____ US Mail
Quinn Emanuel Urquhart & Sullivan, LLP      _____ Facsimile
555 Twin Dolphin Drive, 5th Floor                   ___X___ ECF
Redwood Shores, CA 94065
Telephone:  (650) 801-5000
Email: andreaproberts@quinnemanuel.com
Email: briancannon@quinnemanuel.com


Kathleen M. Sullivan (*pro hac vice*)                    _____ Messenger
David Elihu (*pro hac vice*)                               _____ US Mail
Quinn Emanuel Urquhart & Sullivan, LLP      _____ Facsimile
51 Madison Ave., 22nd Floor                          ___X___ ECF
New York, NY 10010
Telephone:  (212) 849-7000
Email: kathleensullivan@quinnemanuel.com


William Price (*pro hac vice*)                              _____ Messenger
Quinn Emanuel Urquhart & Sullivan, LLP      _____ US Mail
865 S. Figuera St., 10th Floor                         _____ Facsimile
Los Angeles, CA 90017                                  ___X___ ECF
Telephone:  (212) 443-3000
Email: williamprice@quinnemanuel.com
MicrosoftvMotoBreachofRANDCase@quinnemanuel.com


        DATED this 19th day of August, 2013.



                                s/  Florine Fujita
                                FLORINE FUJITA


EXCERPTS OF PRIOR COURT ORDERS UPON
WHICH MICROSOFT INTENDS TO RELY *IN
MICROSOFT'S OPENING STATEMENT* - 9
C10-1823-JLR

LAW OFFICES
**CALFO HARRIGAN LEYH & EAKES LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700   FAX, (206) 623-8717