The Honorable James L. Robart

1

2

3

4

5

6

7

8

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

MICROSOFT CORPORATION, a Washington
corporation,

                         Plaintiff,

       v.

MOTOROLA, INC., and MOTOROLA
MOBILITY LLC, and GENERAL
INSTRUMENT CORPORATION,

                     Defendants.

CASE NO. C10-1823-JLR

DEFENDANTS' SUBMISSION
REGARDING THE PARTIES' RELIANCE
ON PRIOR COURT ORDERS AT TRIAL

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

DEFENDANTS' SUBMISSION REGARDING THE
PARTIES' RELIANCE ON PRIOR COURT ORDERS
AT TRIAL
CASE NO. C10-1823-JLR

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

In preparation for the teleconference with the Court scheduled for August 23, 2013, which has been scheduled to discuss, *inter alia*, the parties' ability to introduce at trial the Court's prior orders in this case or portions thereof, Motorola respectfully submits this response to Microsoft's submission of Excerpts of Prior Court Orders Upon Which Microsoft Intends To Rely At Trial (Dkt. 860, 861).

*First,* for the reasons Motorola already set forth in its motion in limine (Dkt. 797) to exclude admission of the Court's April 19, 2013 Findings of Fact and Conclusion of Law ("FFCL") at the jury phase of trial (denied by oral order, 8/13/13 Tr. at 27:10-28:10), Motorola respectfully submits that the FFCL, insofar as they are now relevant to the jury phase of the trial, are properly presented to the jury through the Court's own preliminary and/or final jury instructions.  The parties should not be permitted to use the FFCL or other prior orders of the Court as evidence to bolster or undermine the testimony presented to the jury at the second, jury phase of the trial.  *See, e.g.*, *Zubulake v. UBS Warburg LLC*, 382 F. Supp. 2d 536, 546 (S.D.N.Y. 2005) ("Defendants contend that this Court's previous decisions in this case, . . . , are irrelevant to plaintiff's . . . claims and would unfairly prejudice UBS.  Defendants are right.  Placing the five previous decisions in this case before the jury would serve no legitimate purpose.  The jurors will be told all they need to know through the evidence admitted at trial and my charge.  There is no need to reference my earlier decisions.").

*Second*, in the event that the Court disagrees with Motorola and grants the parties leave to introduce portions of the FFCL or other of the Court's prior orders as evidence to be placed before the jury at trial and used in the questioning of witnesses, Defendants respectfully submit that the Court should limit the parties' reliance on the FFCL to Sections I ("The Parties"), II ("Standards & Standard-Setting Organizations"), and VII ("Conclusion")  (Dkt. 673, ¶¶ 1-9 & 10-69 and p. 207) Those sections contain the findings and conclusions that are summarized in the tentative version of Preliminary Instruction No. 2 which the Court provided to the parties by electronic mail on August 21, 2013, and, as the Court's inclusion in that instruction indicates, those sections of the

---

DEFENDANTS' SUBMISSION REGARDING THE
PARTIES' RELIANCE ON PRIOR COURT ORDERS
AT TRIAL - 1
CASE NO. C10-1823-JLR

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

1  FFCL contain the findings and conclusions most relevant to the breach of good faith issue that is

2  now before the jury.

3          To the extent that Microsoft has proposed to rely upon excerpts from FFCL Sections III

4  ("Economic Guideposts for Assessing RAND Terms"), IV ("The H.264 Standard), V ("The

5  802.11 Standard") and VI ("Appropriate RAND Royalties for Motorola's SEPs"), Motorola

6  respectfully submits that such findings consist of material that the jurors "really don't probably

7  need to know" and "is simply going to be confusing."  8/13/13 Tr. 42:17-23.  All of those sections

8  of the FFCL comprise the Court's extended elaboration of how a "hypothetical negotiation" would

9  be conducted between a holder and implementer of Motorola's H.264 and 802.11 SEPs in light of

10  the factors set forth in *Georgia-Pacific Corp. v. United States Plywood Corp.*, 318 F. Supp. 1116

11  (S.D.N.Y.).  The Court's discussion covers a wide range of considerations bearing on the Court's

12  ultimate finding of a RAND rate and range for Motorola's SEPs, including, *inter alia*, the legal

13  factors for *Georgia-Pacific* damages calculations, the modifications the Court believed appropriate

14  to make to those factors in the context of a hypothetical negotiation under a RAND obligation as

15  opposed to in a traditional patent dispute, and the application of the Court's modified *Georgia-*

16  *Pacific* test to the valuation of Motorola's SEPs—including the Court's evaluation of the weight

17  and credibility of both parties' expert and fact witnesses, review of the contributions made to the

18  H.264 and 802.11 standards by many patents beyond the specific patents at issue in this case,

19  adjudication of the comparative strength of the parties' competing views of comparable

20  benchmark licenses, and other factors.

21          The Court's extended *Georgia-Pacific* analysis, however, should not be introduced before

22  the jury, for two reasons.  To begin with, that analysis is not relevant to the issue the Court has

23  deemed relevant for the jury to consider in relation to the issue of good faith, which is ***what the***

24  ***RAND rate and range are***, not how the Court got there.  See 8/13/13 Tr. 27:17-19 (denying

25  Motorola MIL) ("The actual value of a product is relevant to whether the price requested in an

26  offer is one made in good faith."); *id*. at 27:20-28:1 (using example of a used Blackberry versus a

DEFENDANTS' SUBMISSION REGARDING THE
PARTIES' RELIANCE ON PRIOR COURT ORDERS
AT TRIAL - 2
CASE NO. C10-1823-JLR

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

new model phone, each priced at $500, as an illustration of the relevance of "the value of the actual product," and citing "the RAND rate" as the equivalent of such actual product value). The Court's novel methodology for calculating the RAND rate that would be arrived at in a hypothetical negotiation, involving as it does the review of voluminous evidence and numerous legal assumptions of first impression, is not necessary for the jury to hear in order to understand and apply the Court's conclusions and findings as to what the range and rate for each relevant standard are.

Moreover, placing the Court's *Georgia-Pacific* analysis before the jury creates grave potential to confuse the jury, for it concerns a ***hypothetical*** negotiation that the jury is likely to confuse with the actual negotiations (or lack thereof) between the parties that are the subject matter of the jury phase of this case. The Court has not ruled on what, if anything, the parties need to consider in making an opening offer in a RAND negotiation, but has left that, like all breach questions, to the jury. To introduce before the jury portions of the Court's extended analysis concerning hypothetical negotiations creates the impermissible risk that the jury will assume that Motorola was required to have back in the October-November 2010 timeframe the same depth of knowledge that the FFCL provided in 2013 after extensive discovery and bench trial, and that the jury will use the Court's assessment of the evidence that would have been considered in a hypothetical negotiation between an owner and implementer of Motorola's H.264 and 802.11 SEPs as evidence that Motorola should have considered portions of that evidence or given the same weight to certain portions of that evidence as the Court did in the FFCL. Unlike in a typical patent dispute where *Georgia-Pacific* factors are considered as part of a damages analysis separate and apart from a jury's determination of liability for patent infringement, in this lawsuit the question of breach itself involves inquiry into the parties' negotiations (or lack thereof) concerning a RAND license—creating the risk that the jury will confuse the Court's hypothetical negotiations analysis, used for purposes of arriving at a RAND rate, with the parties' actual negotiations (or

DEFENDANTS' SUBMISSION REGARDING THE
PARTIES' RELIANCE ON PRIOR COURT ORDERS
AT TRIAL - 3
CASE NO. C10-1823-JLR

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

1    lack thereof), a separate and distinct aspect of the jury's determination whether Motorola breached

2    its duty of good faith.

3         For these reasons, introduction of the *Georgia –Pacific* sections of the FFCL would be

4    objectionable under Fed. R. Evid. 402 and 403 as irrelevant and/or confusing to the jury and

5    prejudicial to Motorola.  In order to avoid the distracting and time-consuming process of making

6    piecemeal objections at trial to the admission of Microsoft's proposed portions of the FFCL that

7    are objectionable, Motorola respectfully submits as Appendix A, filed herewith, a set of those

8    portions of Microsoft's excerpts (Dkt. 860) to which Motorola does not object, deleting those

9    excerpts Microsoft proposes to use from Sections III-VI of the Court's FFCL, to which Motorola

10   objects for the reasons set forth herein.

11        *Third*, if the Court overrules the objections Motorola suggests above, and permits

12   Microsoft to rely on its proposed portions of FFCL Sections III-VI (Dkt. 860 at 8-28), then

13   Motorola respectfully states that it intends to rely on additional excerpts from those sections of the

14   FFCL as set forth in Appendix B filed herewith.  Such additional reliance will be necessary to

15   offset the partial and one-sided selections Microsoft proposes to make from those sections of the

16   FFCL, and to ensure that the parties are able to provide the jury with a more balanced

17   understanding of the Court's conclusions in those sections of the FFCL than Microsoft would

18   provide through its excerpts.  Motorola does not object to the excerpts from other prior Orders of

19   the Court set forth by Microsoft in Dkt. 860, Part B, at 28-29, but if the Court permits Microsoft to

20   rely on those excerpts, Motorola also sets forth in Appendix B, Parts B-D, filed herewith, those

21   portions of other prior Court orders that it intends to rely on in addition to those set forth by

22   Microsoft.

23

24

25

26

DEFENDANTS' SUBMISSION REGARDING THE
PARTIES' RELIANCE ON PRIOR COURT ORDERS
AT TRIAL - 4
CASE NO. C10-1823-JLR

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:   (206) 676-7001

1

2

3      DATED this 23rd day of August, 2013.

4
                                              Respectfully submitted,
5
                                              SUMMIT LAW GROUP PLLC
6                                             By /s/ Ralph H. Palumbo
                                              By /s/ Philip S. McCune
7                                                 Ralph H. Palumbo, WSBA #04751
                                                  Philip S. McCune, WSBA #21081
8                                                 ralphp@summitlaw.com
                                                  philm@summitlaw.com
9
                                              By /s/ Thomas V.  Miller
10                                                Thomas V. Miller
                                                  MOTOROLA MOBILITY LLC
11                                                600 North U.S. Highway 45
                                                  Libertyville, IL  60048-1286
12                                                (847) 523-2162
13                                            QUINN EMANUEL URQUHART &
                                              SULLIVAN, LLP
14                                            By /s/ Kathleen M. Sullivan
15                                                Kathleen M. Sullivan, NY #1804624
                                                  51 Madison Ave., 22nd Floor
16                                                New York, NY 10010
                                                  (212) 849-7000
17                                                kathleensullivan@quinnemanuel.com
18                                            By /s/ Brian C. Cannon
                                                  Brian C. Cannon, CA #193071
19                                                555 Twin Dolphin Drive, 5th Floor
                                                  Redwood Shores, CA 94065
20                                                (650) 801-5000
                                                  briancannon@quinnemanuel.com
21                                            By /s/ William C. Price
22                                                William C. Price, CA #108542
                                                  865 S. Figueroa Street, 10th Floor
23                                                Los Angeles, CA 90017
                                                  (213) 443-3000
24                                                williamprice@quinnemanuel.com
                                              *Attorneys for Motorola Solutions, Inc.,*
25                                            *Motorola Mobility LLC and General*
                                              *Instrument Corp.*
26

DEFENDANTS' SUBMISSION REGARDING THE
PARTIES' RELIANCE ON PRIOR COURT ORDERS
AT TRIAL - 5
CASE NO. C10-1823-JLR

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

**CERTIFICATE OF SERVICE**

I hereby certify that on this day I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

Arthur W. Harrigan, Jr., Esq.
Christopher T. Wion, Esq.
Shane P. Cramer, Esq.
Calfo Harrigan Leyh & Eakes LLP
arthurh@calfoharrigan.com
chrisw@calfoharrigan.com
shanec@calfoharrigan.com

Richard A. Cederoth, Esq.
Brian R. Nester, Esq.
David T. Pritikin, Esq.
Douglas I. Lewis, Esq.
John W. McBride, Esq.
William H. Baumgartner, Jr., Esq.
David C. Giardina, Esq.
Carter G. Phillips, Esq.
Constantine L. Trela, Jr., Esq.
Ellen S. Robbins, Esq.
Nathaniel C. Love, Esq.
Sidley Austin LLP
rcederoth@sidley.com
bnester@sidley.com
dpritikin@sidley.com
dilewis@sidley.com
jwmcbride@sidley.com
wbaumgartner@sidley.com
dgiardina@sidley.com
cphillips@sidley.com
ctrela@sidley.com
erobbins@sidley.com
nlove@sidley.com

T. Andrew Culbert, Esq.
David E. Killough, Esq.
Microsoft Corp.
andycu@microsoft.com
davkill@microsoft.com

DATED this 23rd day of August, 2013.

/s/ *Marcia A. Ripley*
Marcia A. Ripley

DEFENDANTS' SUBMISSION REGARDING THE
PARTIES' RELIANCE ON PRIOR COURT ORDERS
AT TRIAL - 6
CASE NO. C10-1823-JLR

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:   (206) 676-7001

# APPENDIX A

A. <u>**The Court's April 19, 2013 Findings of Fact and Conclusions of Law (ECF 673); Reduced Version Pursuant to Motorola's Objections**</u>

| FFCL# | |
|-------|---|
| 10 | SSOs are voluntary membership organizations whose participants engage in the development of industry standards, including telecommunication and information technology standards. (See, e.g., 11/16/12 Tr. (Dkt. # 631) at 15:15-20 (Simcoe Testimony).) |
| 11 | SSOs "play a significant role in the technology market by allowing companies to agree on common technological standards so that all compliant products will work together." (6/6/12 Order (Dkt. # 335) at 3.) |
| 12 | Standards lower costs by increasing product manufacturing volume, and they increase price competition by eliminating switching costs for consumers who want to switch from products manufactured by one firm to those manufactured by another. (6/6/12 Order at 3.) |
| 13 | SSOs seek to promote widespread adoption of their standards because the interoperability benefits of standards depend on broad implementation. (11/16/12 Tr. at 15:15-20 (Simcoe Testimony); 11/19/12 Tr. (Dkt. # 632) at 136:25-137:3 (Schmalensee Testimony).) |
| 14 | SSOs also seek to develop standards that incorporate technology that will make the standard attractive to implementers, while at the same time ensuring a feasible price to those same implementers to promote broad implementation.5 (11/13/12 Tr. (Dkt. # 629) at 167 (Murphy Testimony); 11/19/12 Tr. at 137:4-8 (Schmalensee Testimony).) |
| 15 | Industry participants in the standard-setting process enjoy significant potential benefits to having their technology incorporated into a standard independent of potential royalty income from licensing patents they own. These non-income benefits can include increased demand for participants' products, advantages flowing from familiarity with the contributed technology potentially leading to shorter development lead times, and improved compatibility with proprietary products using the standard. (11/16/12 Tr. at 39- 40 (Simcoe Testimony).) |
| 16 | This case concerns two standards: the 802.11 Standard and the H.264 Standard. The 802.11 Standard is a wireless communication standard that has been developed over a period of years by the IEEE. (See, e.g., 11/15/12 Tr. (Dkt. # 633 (sealed), Dkt. # 634 (redacted)) at 91:10-12, 92:14-93:11 (Gibson Testimony).) Two different organizations, the International Organization for Standardization and the International Electrotechnical Commission ("ISO/IEC"), and ITU, jointly developed the H.264 Standard, which relates to video compression. (See, e.g., 11/13/12 Tr. at 210:24-211:21; 213:7-214:1; 214:11-12 (Sullivan Testimony).) |
| 17 | The engineers that develop industry standards typically do not know if the use of the technology they are considering implicates a patent or patents. (11/16/12 Tr. at 17:5-8 |

APPENDIX A – 1
CASE NO. C10-1823-JLR

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone: (206) 676-7000
Fax: (206) 676-7001

| FFCL# | |
|---|---|
| | (Simcoe Testimony).) |
| 18 | For example, Gary Sullivan, Co-chairman of the Joint Video Team ("JVT") that developed the H.264 video compression standard, did not analyze any particular patents in his work on the standard. (11/14/12 Tr. (Dkt. # 630) at 44:4-21 (Sullivan Testimony).) |
| 19 | Similarly, Ajay Luthra, the other Co-chairman of the JVT, did not provide other participants with information about relevant Motorola patents. (11 / 19/12 Tr. at 22:6-12 (Luthra Testimony).) |
| 20 | Much of the technology that is incorporated into industry standards is not patented. (11/16/12 Tr. at 17:9-12 (Simcoe Testimony).) |
| 21 | For example, many of the core innovations of the H.264 Standard were made by Telenor Group, which did not obtain patents on the technology that it contributed and made its contributions available to all implementers of the standard without patent licensing restrictions. (11/13/12 Tr. at 215:12-18 (Sullivan Testimony); 11/14/12 Tr. 114:21-115:5 (Orchard Testimony).) |
| 22 | Likewise, the 802.11 Standard was based in part on a long history of publicly-shared research and development by companies, government agencies, and academic institutions. (11/15/12 Tr. at 96:16-24 (Gibson Testimony).) |
| 23 | Nevertheless, using a standard frequently does require use of patented technology. (See, e.g., Ex. 1152 (listing more than 2,400 patents determined to be essential to the H.264 Standard); 11/16/12 Tr. 108:21-109:9 (Lynde Testimony) (stating that there are probably thousands of patents essential to the 802.11 Standard).) |
| 25 | As the court has previously found: "In order to reduce the likelihood that owners of [standard] essential patents will abuse their market power, many standard setting organizations, including the IEEE and ITU, have adopted rules relating to the disclosure and licensing of essential patents. The policies often require or encourage members of the standards setting organizations to identify patents that are essential to a proposed standard and to agree to license their essential patents on reasonable and non-discriminatory ("RAND") terms to anyone who requests a license. Such rules help to ensure that standards do not allow essential patent owners to extort their competitors or prevent competitors from entering the marketplace." (6/6/12 Order at 3-4; see also Ex. 1414 at 28,036-37 (describing basic elements of SSO intellectual property policies); 11/16/12 Tr. at 19:3-24, 21:24-23:7 (Simcoe Testimony) (same); Exs. 1575 (Guidelines for Implementation of Common Patent Policy of the ITU-T/ITU-R/ISO/IEC) and 1568 (IEEE- SA Standards Board By-Laws).) |
| 26 | The ITU and ISO/IEC maintain a common patent policy (the "ITU/ISO/IEC Common Patent Policy"), which constitutes the "code of practice" regarding patents covering subject matters of "Recommendations" and "Deliverables" of the respective SSOs. (Ex. 1575 at MOTM_WASH1823_0602815.) The ITU/ISO/IEC Common Patent Policy states that "Recommendations" and "Deliverables" are drawn up by technical (and not patent) experts who may "not be very familiar with the complex international legal situation of intellectual property rights such as patents." (Id.) |

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

| FFCL# | |
|---|---|
| 27 | The objective of "Recommendations" and "Deliverables" is to "ensure compatibility of technologies and systems on a worldwide basis." (Ex. 1575 at MOTM_WASH1823_0602815.) To meet this objective, "Recommendations" and "Deliverables" must be accessible to everybody. It follows then that the "sole objective" of the ITU/ISO/IEC Common Patent Policy is to ensure that "a patent embodied fully or partly in a Recommendation \| Deliverable must be accessible to everybody without undue constraints." (Id. at MOTM WASH1823 0602815.) |
| 29 | Once a patent holder has disclosed a potentially essential patent or has made a blanket disclosure stating that one or more of its patents may be essential to a proposed standard, the ITU will seek a licensing commitment from the patent-holder using a standardized intellectual property rights ("IPR") disclosure form. The ITU refers to such an assurance as a "Patent Statement and Licensing Declaration." (See, e.g., Exs. 2838, 2839.) In practice, this assurance is often referred to as a "Letter of Assurance," or an "LOA" for short. |
| 30 | The ITU LOA provides three options to the patent holder: (1) the patent holder may commit to license its essential patent(s) on a royalty-free basis; (2) the patent holder may commit to license its essential patent(s) on RAND terms and conditions; or (3) the patent holder may decline to make any licensing commitment. (Ex. 1575 at MOTM_WASH1823_0602815, MOTM_WASH1823_0602818.) |
| 31 | If the owner of a declared essential patent declines to make a RAND or royalty-free licensing commitment, the ISO/IEC/ITU policy indicates that the approved standard "shall not include provisions depending on the patent." (Ex. 1575 at MOTM_WASH 1823_0602815.) |
| 32 | With respect to licensing arrangements for SEPs, the ITU/ISO/IEC Common Patent Policy provides that "[t]he detailed arrangements arising from patents (licensing, royalties, etc.) are left to the parties concerned, as these arrangements might differ from case to case." (Ex. 1575 at MOTM_WASH1823_0602815.) Also, the ITU/ISO/IEC Common Patent Policy and its licensing declaration form further state that "negotiations are left to the parties concerned and are performed outside the [ITU]." (Id. at MOTM_WASH1823_0602815, MOTM_WASH1823_0602818.) |
| 33 | A patent holder willing to make a licensing commitment is given the option of making its commitment conditional on "reciprocity." (Ex. 1575 at MOTM_WASH1823_0602818.) The LOAs further state that "[a]s used herein, the word 'reciprocity' means that the Patent Holder shall only be required to license any prospective licensee if such prospective licensee will commit to license its essential patents(s) or essential patent claims for implementation of the same above document free of charge or under reasonable terms and conditions." (See, e.g., Ex. 2838 at MOTM_WASH1823_0000036; see also id. at MOTM_WASH1823_0000040, 046, 053, 057, 061.) |
| 34 | Under the ISO/IEC/ITU policy, when a patent holder has conditioned its licensing commitment on reciprocity, "the Patent Holder shall only be required to license any prospective licensee if such prospective licensee will commit to license its essential |

APPENDIX A – 3
CASE NO. C10-1823-JLR

| FFCL# | |
|---|---|
| | patent(s) or essential patent claim(s) for implementation of the same above document free of charge or under reasonable terms and conditions." (Ex. 1575 at MOTM_WASH 1823_0602818.) |
| 35 | Motorola Mobility, its predecessors, and its wholly-owned subsidiary General Instrument submitted several intellectual property disclosures to the ITU in connection with the development of the H.264 Standard. (Ex. 2838.) |
| 36 | All of Motorola's LOAs indicated that it would "grant to an unrestricted number of applicants on a worldwide, non-discriminatory basis and on reasonable terms and conditions" licenses conditioned on reciprocity.6 (Ex. 2838 at MOTM WASH1823 0000036, 039, 046, 053, 057, 061; 11/20/12 Tr. at 33:21-34:12 (Dailey Testimony).) |
| 37 | The IEEE Standards Association ("IEEE-SA") established the 802.11 Standard, which relates to WLAN and is the second of the standards at issue here. |
| 38 | The intellectual property policy of the IEEE is set forth in the IEEE-SA Standards Board Bylaws and the IEEE Standards Operations Manual (collectively, the "IEEE IPR Policy"). (11/16/12 Tr. at 27:22-28:9 (Simcoe Testimony); Ex. 1568 at MS-MOTO_1823 _00004073082; Ex. 1130 at MS-MOTO_1823_00005246469.) |
| 39 | The IEEE-SA Standards Board Bylaws provide that IEEE standards may include "Essential Patent Claims," which it defines as "any Patent Claim the use of which was necessary to create a compliant implementation of either mandatory or optional portions of the normative clauses of the [Proposed] IEEE Standard when, at the time of the [Proposed] IEEE Standard's approval, there was no commercially and technically non-infringing alternative." (Ex. 1568 at MS-MOTO 1823 00004073097 (§ 6.2).) |
| 40 | The IEEE-SA Standards Board Bylaws indicate that "[i]f the IEEE receives notice that a [Proposed] IEEE Standard may require the use of a potential Essential Patent Claim, the IEEE shall request licensing assurance, on the IEEE Standards Board approved Letter of Assurance form, from the patent holder or patent applicant." (Ex. 1568 at MS-MOTO_ 1823_000040730976 (§ 6.2).) This Letter of Assurance form is the IEEE version of an LOA. |
| 41 | The IEEE LOA form allows declared essential patent holders to provide either "[a] general disclaimer to the effect that the Submitter without conditions will not enforce any present or future Essential Patent Claims" or "[a] statement that a license for a compliant implementation of the standard will be made available to an unrestricted number of applicants on a worldwide basis without compensation or under reasonable rates, with reasonable terms and conditions that are demonstrably free of any unfair discrimination." (Ex. 1568 at MS-MOTO_1823_000040730977 (§ 6.2).) The latter option constitutes the IEEE RAND commitment for "Essential Patent Claims," or SEPs. |
| 42 | The IEEE LOA form allows, but does not require, the disclosure of specific patents or pending patent applications that may be or become essential to the standard under consideration. (11/16/12 Tr. at 19:3-24 (Simcoe Testimony); 11/16/12 Tr. at 108:21-109:4 (Lynde Testimony).) |
| 43 | An IEEE LOA from an SEP holder that commits to license unspecified patents or pending applications for a particular standard is called a "blanket" disclosure. (11/16/12 |

| FFCL# | |
|---|---|
| | Tr. at 19:21-24 (Simcoe Testimony); 11/16/12 Tr. at 108:21-109:4 (Lynde Testimony).) |
| 44 | Motorola and Symbol Technologies submitted numerous blanket LOAs to the IEEE in relation to the 802.11 Standard. (Exs. 1407, 2839.) With these LOAs, Motorola and Symbol agreed to grant, on reasonable terms and conditions, licenses to their patents that are essential to the 802.11 Standard on a worldwide and non-discriminatory basis. (11/20/12 Tr. at 32:19-23 (Dailey Testimony).) |
| 46 | Symbol and Motorola submitted their first blanket LOAs committing to license their patents essential to the 802.11 Standard in 1993 and 1994, respectively. (Ex. 1407 (Symbol Letter of Assurance dated 11/8/1993); Ex. 2839 at MOTM_WASH1823_0000004 (Motorola Letter of Assurance dated 3/1/1994).) |
| 47 | The IEEE Operations Manual in place at the time that Motorola and Symbol made their initial 802.11 RAND commitments provided that "[p]atent holders shall submit to the Patent Committee of the IEEE Standards Board, prior to any significant drafting of the standard, a draft of their license that assures that the technology will be made available at nominal competitive costs to all who seek to use it for compliance with an incorporated IEEE standard." (Ex. 1130 at MS-MOTO_1823_00005246490 (§ 6.3.2) (emphasis added).) |
| 48 | The requirement to license at nominal competitive costs was part of the RAND commitment at the time Motorola and Symbol first committed to license their 802.11 SEPs on RAND terms. (11/16/12 Tr. at 28:10-30:9 (Simcoe Testimony).) |
| 51 | The purpose of the RAND commitment is to encourage widespread adoption of the standard. (11/13/12 Tr. at 147:19-21 (Murphy Testimony).) |
| 52 | When the standard becomes widely used, the holders of SEPs obtain substantial leverage to demand more than the value of their specific patented technology. This is so even if there were equally good alternatives to that technology available when the original standard was adopted. After the standard is widely implemented, switching to those alternatives is either no longer viable or would be very costly. (11/13/12 Tr. at 140:2-23, 141:18-23 (Murphy Testimony); Ex. 1414 at 28036.) |
| 53 | A given patent is "essential" to a standard if use of the standard requires infringement of the patent, even if acceptable alternatives of that patent could have been written into the standard. (11/16/12 Tr. at 18:9-21 (Simcoe Testimony); 11/13/12 Tr. at 199:11-200:15 (Murphy Testimony).) |
| 54 | SSOs define a patent as essential even if the patent only reads onto an optional portion of the standard. (11/16/12 Tr. at 18:1-6 (Simcoe Testimony).) |
| 55 | The ability of a holder of an SEP to demand more than the value of its patented technology and to attempt to capture the value of the standard itself is referred to as patent "hold-up." (11/13/12 Tr. at 140:2-23, 141:18-23 (Murphy Testimony); Ex. 1414 at 28036; see also 11/19/12 Tr. 166:24-167:22 (Schmalensee Testimony) (explaining that the "essence of hold-up" is that while ex ante competition constrains what a patent holder can obtain for access to its patent, ex post, the technology in the standard does not face that competition).) |
| 56 | The threat of hold-up increases as the standard becomes more widely implemented and |

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

| FFCL# | |
|---|---|
| | firms make sunk cost investments that cannot be recovered if they are forced to forego implementation of the standard or the standard is changed. (11/13/12 Tr. at 143:1-18 (Murphy Testimony); 11/16/12 Tr. at 86:20-87:2 (Lynde Testimony).) |
| 57 | Hold-up can threaten the diffusion of valuable standards and undermine the standard-setting process. (Ex. 1414 at 28036; 11/13/12 Tr. at 144:25-145:11, 147:22-148:13 (Murphy Testimony).) |
| 58 | In addition to harming firms that are forced to pay higher royalties, hold-up also harms consumers to the extent that those excess costs are passed onto them. (Ex. 1414 at 28036; 11/13/12 Tr. at 144:25-145:6, 147:22-148:13 (Murphy Testimony).) |
| 59 | Hold-up by one SEP holder also harms other firms that hold SEPs relating to the same standard because it jeopardizes further adoption of the standard and limits the ability of those other holders to obtain appropriate royalties on their technology. (11/13/12 Tr. at 144:25-145:11 (Murphy Testimony).) |
| 60 | Indeed, Motorola's expert, Dr. Richard Schmalensee, acknowledged that "the RAND commitment and the whole apparatus exists [sic] to deal with hold-up." (11/19/12 Tr. at 142:13-16, 157:20-23 (Schmalensee Testimony).) |
| 61 | Similarly, the Federal Trade Commission ("FTC") has stated that "[t]he most common mechanism used by SSOs to attempt to prevent patent hold-up is the RAND commitment." (Ex. 1414 at 28037.) |
| 62 | Complex industry standards like the H.264 and 802.11 Standards can require the use of hundreds or thousands of SEPs held by dozens of patent holders. (Exs. 1150-54 (listing patents claimed or determined to be essential to the H.264 Standard and patent holders that made blanket disclosures); Exs. 1156, 1158-59, 1164 (listing patents claimed or determined to be essential to the 802.11 Standard and patent holders that made blanket disclosures); 11/16/12 Tr. at 108:21-109:8 (Lynde Testimony) (the number of SEPs related to the 802.11 Standard "generally is acknowledged to be in the thousands").) |
| 63 | High-tech products can comply with dozens or even hundreds of different standards. For example, a typical personal computer ("PC") implements as many as 90 different formal standards and over 100 informal interoperability standards. (11/16/12 Tr. at 128:2-10 (Lynde Testimony).) |
| 64 | In the context of standards having many SEPs and products that comply with multiple standards, the risk of the use of post-adoption leverage to exact excessive royalties is compounded by the number of potential licensors and can result in cumulative royalty payments that can undermine the standards. (11/13/12 Tr. at 141:24-142:22, 145:12-146:14 (Murphy Testimony); 11/16/12 Tr. at 127:23-128:10 (Lynde Testimony).) |
| 65 | The payment of excessive royalties to many different holders of SEPs is referred to as "royalty stacking." (11/13/12 Tr. at 141:24-142:22 (Murphy Testimony).) |
| 66 | The RAND commitment also addresses royalty stacking and the need to ensure that the aggregate royalties associated with a given standard are reasonable. (11/13/12 Tr. at 146:15-147:2 (Murphy Testimony); 11/16/12 Tr. at 15:14-16:7 (Simcoe Testimony).) |
| 67 | Indeed, Motorola emphasized the risk of royalty stacking in the standards context in a submission it made (together with Nokia and Ericsson) to the European |

APPENDIX A – 6
CASE NO. C10-1823-JLR

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone: (206) 676-7000
Fax: (206) 676-7001

| FFCL# | |
|---|---|
| | Telecommunications Standards Institute ("ETSI") in 2006. (Ex. 1031 at MOTM_WASH1823_0420998 ("cumulative royalties are perceived to be uncertain and often too high, possibly even prohibitive"); 11/16/12 Tr. at 25:16-24 (Simcoe Testimony).) In its ETSI submission, Motorola recited a commonly understood purpose that RAND commitments be interpreted to require patent holders "to grant licenses on terms that are objectively commercially reasonable taking into account the overall licensing situation and including the cost of obtaining all necessary licenses from all other relevant patent holders for the technologies in the end product." (Ex. 1031 at MOTM_WASH1823_0420999; 11/16/12 Tr. 25:25-26-22 (Simcoe Testimony) (agreeing with the statements contained in Motorola's ETSI submission).) |
| 68 | In the same submission, Motorola also explained a commonly understood principle of proportionality that "[c]ompensation under FRAND7 must reflect the patent owner's proportion of all essential patents. This is not simply a numeric equation but the compensation must, within reasonable bounds, reflect the contribution." (Ex. 1031 at MOTM_WASH1823_0420999; 11/16/12 Tr. 25:25-26:22 (Simcoe Testimony) (agreeing with the statements contained in Motorola's ETSI submission).) |
| 69 | Motorola sought to "signal to judges in patent litigation that they can and should look at the overall cumulative royalty costs for a given standard and not just assess whether the terms being offered by one particular licensor are fair and reasonable in vacuo." (Ex. 1031 at MOTM_ WASH 1823_042999; 11/16/12 Tr. at 76:2-10 (Simcoe Testimony) (agreeing with statement contained in Motorola's ETSI submission).) |
| Page 6 | To decide whether Motorola's opening offers were in good faith, a fact-finder must be able to compare them with a reasonable RAND royalty rate and, because more than one rate could conceivably be RAND, a reasonable RAND royalty range. However, as the court ruled on October 10, 2012, the RAND royalty rate is a heavily disputed, fact-sensitive issue that must be resolved by a finder of fact. (10/10/12 Order at 22.) Accordingly, the court held a bench trial to determine: (1) a RAND royalty range for Motorola's SEPs; and (2) a specific RAND royalty rate for Motorola's SEPs. The purpose of this is to enable a fact-finder in a later trial to determine whether Motorola's offer letters breached Motorola's RAND obligation to offer a license for its patents in good faith. |

Pursuant to Fed. R. Evid. 402, 403, and the Seventh Amendment to the Constitution, Motorola objects to Microsoft's reliance on any portions of Sections III ("Economic Guideposts for Assessing RAND Terms"), IV ("The H.264 Standard"), V ("The 802.11 Standard"), or VI ("Appropriate RAND Royalties for Motorola's SEPs") of the Court's April 19, 2013 Findings of Fact and Conclusions of Law. *See* Dkt. 673 at 25-207, ¶¶ 70-627; *see also* Dkt. 860 at 8-27; Dkt. 861 at 3-6.

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

| FFCL # | |
|---|---|
| Page 207 | In conclusion and as explained herein, the court concludes as follows:<br>• The RAND royalty rate for Motorola's H.264 SEP portfolio is 0.555 cents per unit; the upper bound of a RAND royalty for Motorola's H.264 SEP portfolio is 16.389 cents per unit; and the lower bound is 0.555 cents per unit. This rate and range are applicable to both Microsoft Windows and Xbox products. For all other Microsoft products using the H.264 Standard, the royalty rate will be the lower bound of 0.555 cents.<br>• The RAND royalty rate for Motorola's 802.11 SEP portfolio is 3.471 cents per unit; the upper bound of a RAND royalty for Motorola's 802.11 SEP portfolio is 19.5 cents per unit; and the lower bound is 0.8 cents per unit. This rate and range are applicable to Microsoft Xbox products. For all other Microsoft products using the 802.11 Standard, the royalty rate will be the low bound of 0.8 cents per unit. |

## B.    The Court's Other Prior Orders

| | |
|---|---|
| 6/6/12 Order ECF 335, at page 19 | A standard essential patent owner who has made a commitment to grant licenses on RAND terms cannot preemptively request exorbitant compensation for its standard essential technology, and compel the implementer to negotiate in good faith in response to the exorbitant demand. |
| 6/6/12 Order ECF 335, at page 25 | A standard essential patent owner who has made a RAND commitment may not make blatantly unreasonable offers to implementers. Such behavior would frustrate the purpose behind the agreements by allowing the standard essential patent owner to abuse its power as a standard essential patent holder and extract higher than reasonable royalty rates (or, at a minimum, royalty rates consistently on the high range of RAND terms). Thus, although the language of the LOAs do not require the SEP owner to make offers on RAND terms, any offer made (be it an initial offer or an offer during a back-and-forth negotiation) must comport with the implied duty of good faith and fair dealing inherent in every contract." |
| 6/6/12 Order ECF 335, at pp. 25-26 | "To determine whether Motorola's offers were so blatantly unreasonable as to breach its duty of good faith, it is necessary in this instance to compare the offer against a true RAND royalty rate." |
| 11/30/12 Order ECF 607, at pp. 13-14 | "As Microsoft has committed to accept a license on RAND terms for Motorola's entire H.264 standard essential patent portfolio, and the litigation is continuing to determine the details of such a license, it is now clear that at some point in the future (either by agreement of the parties or by court adjudication) a license agreement for the Motorola Asserted Patents will become a reality." |

Summit Law Group pllc
315 Fifth Avenue South, Suite 1000
Seattle, Washington 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

# APPENDIX B

## EXCERPTS OF PRIOR COURT ORDERS UPON WHICH DEFENDANTS INTEND TO RELY AT TRIAL

Like Microsoft, Motorola "reserves the right to introduce other findings and excerpts as necessary at trial" (*See* Dkt. 860 at 1 Dkt. 861 at 1), including those Microsoft indicated in its own submission that it intends to rely on.

## A.   The Court's April 19, 2013 Findings of Fact and Conclusions of Law (Dkt. 673)

| FFCL # | |
|---|---|
| 73 | At the same time, a RAND royalty should be set with the understanding that SSOs include technology intended to create valuable standards. (11/19/12 Tr. at 136:24-137:8 (Schmalensee Testimony).) To induce the creation of valuable standards, the RAND commitment must guarantee that holders of valuable intellectual property will receive reasonable royalties on that property. (*Id.*) |
| 77 | One flaw in Microsoft's approach is its lack of real-world applicability. Neither the IEEE nor the ITU specifies that RAND terms must be determined using an incremental value approach. (11/16/12 Tr. at 63:10-12 (Simcoe Testimony).) Moreover, neither the IEEE nor the ITU require *ex ante* disclosure of RAND terms during the standard setting process. In fact, explicit multilateral *ex ante* negotiations cannot be conducted under the auspices of many SSOs, including the IEEE. (*Id.* at 67:11-68:1.) |
| 79 | Another flaw in Microsoft's approach is its impracticability with respect to implementation by courts. In practice, approaches linking the value of a patent to its incremental contribution to a standard are hard to implement. (Ex. 293 at 676.) Calculating incremental value for multi-patent standards "gets very complicated, because when you take one patent out of a standard and put another one in you may make other changes, the performance of the standard is multidimensional, different people value different aspects." (11/19/12 Tr. at 168:3-9 (Schmalensee Testimony).) |
| 83 | Motorola suggests that RAND terms and conditions can be determined by simulating a hypothetical bilateral negotiation under the RAND obligation. (11/19/12 Tr. at 149:14-17 (Schmalensee Testimony).) As explained and modified herein, the court generally agrees with Motorola's approach. |
| 84 | Support for a hypothetical bilateral negotiation approach is found in real-world negotiations. Indeed, based on the evidence before the court, RAND license agreements often consummate through bilateral negotiations between the SEP owner and the implementer. (11/19/12 Tr. at 149:18-150:3 (Schmalensee Testimony).) Because bilateral negotiations occur in practice, there exists |

CASE NO. C10-1823-JLR
APPENDIX B – 1

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

| | | |
|---|---|---|
| | | evidence of the results of such real-world negotiations that can be used in simulating the hypothetical negotiation. (*Id.*) |
| | 85 | Typically, the SEP owner and the potential licensee determine RAND terms through good-faith, bilateral negotiations, which take place independent of ITU and IEEE's activities. (*See, e.g.*, Ex. 2838 at MOTM_WASH1823_0000036, 039, 046, 053; Ex. 2970 at 14; 11/16/12 Tr. at 137:3-138:18 (Lynde Testimony); see also 11/13/12 Tr. at 181:12-15 (Murphy Testimony); 11/19/12 Tr. at 142:17-21, 149:18-22 (Schmalensee Testimony); 11/20/12 Tr. at 45:23-46:3 (Dailey Testimony).) Microsoft's experts agree that RAND licenses can be determined between parties through private bilateral negotiations after an SSO adopts a standard. (11/16/12 Tr. at 65:15-66:2 (Simcoe Testimony); 11/13/12 Tr. at 181:12-15 (Murphy Testimony); 11/16/12 Tr. at 138:7-18 (Lynde Testimony).) |
| | 86 | Indeed, Microsoft's statements regarding the RAND commitment show that bilateral negotiations take place in real world settings. On June 14, 2011, seven months after Microsoft filed its complaint in this case, David Heiner, Microsoft's Vice President and Deputy General Counsel, and Amy Marasco, Microsoft's General Manager for Standards Strategy and Policy, submitted a letter (Ex. 2970) to the FTC on behalf of Microsoft in response to the FTC's May 13, 2011, Request for Comments and Announcement of Workshop on Standards-Setting Issues regarding "patent hold-up" in connection with standardization efforts. The letter included the following statements:<br><br>a. "RAND-based IPR policies provide a flexible framework to help enable customized bi-lateral negotiations for patent licenses that generally are not limited to just the essential patent claims in connection with a standard." (Ex. 2970 at 3.)<br><br>b. "RAND is a time-tested and effective approach to licensing commitments. Like other 'reasonableness' standards, it does not dictate specific licensing terms, but it does provide flexibility across a diverse range of situations. As mentioned above, companies make decisions about whether to initiate licensing discussions and, if so, what considerations beyond just the essential claims vis-a-vis the final standard will be included. The negotiation associated with a standards-related patent license typically is no different from any general patent licensing discussion and will involve trade-offs on all of the terms and conditions." (Ex. 2970 at 12.) |
| | 113 | Finally, reasonable parties in search of a reasonable royalty rate under the RAND commitment would consider the fact that, to induce the creation of valuable standards, the RAND commitment must guarantee that holders of valuable intellectual property will receive reasonable royalties on that property. With the aforementioned framework for determining a RAND royalty rate set forth, the court conducts a hypothetical negotiation for Motorola's 802.11 and H.264 SEPs. First, the court examines Motorola's H.264 and 802.11 patent portfolios to determine each portfolio's importance to its respective standard as well as the importance to Microsoft's products. Second, the court fashions a |

CASE NO. C10-1823-JLR
APPENDIX B – 2

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone: (206) 676-7000
Fax: (206) 676-7001

| | | |
|---|---|---|
| | | royalty rate and range for Motorola's H.264 and 802.11 patent portfolios based on certain Microsoft products. In determining a royalty rate and range, the court considers possible comparable licensing agreements and patent pools, which could provide indications of a reasonable royalty rate for Motorola's patent portfolios. The court also applies the principles behind the RAND commitment in finding the appropriate royalty rate and range. |
| | 170 | Motorola presented undisputed evidence that the '419 Patent contributed to the 50 % coding gain reported for H.264 (progressive scan sequences only). (11/16/12 Tr. at 192:25-193:16 (Luthra Testimony); Ex. 424 at 574-75.) |
| | 171 | The '419 Patent expired in October 2011, approximately a year after Motorola sent its letter to Microsoft offering to license Motorola's H.264 SEPs. (11/14/12 Tr. at 133 (Orchard Testimony); 11/19/12 Tr. at 56-57 (Drabik Testimony); Ex. 270.) During trial, Microsoft did not present sufficient evidence that, despite the relatively older age of the '419 Patent, it had lost importance to the H.264 Standard. |
| | 172 | Microsoft did assert that the JVT could have adopted alternatives to the '419 Patent, including similar methods of motion compensation on blocks or sub-blocks described in Exhibits 1477, 633, 462, and 632. (11/14/12 Tr. at 135 (Orchard Testimony).) Microsoft did not, however, provide detail, aside from *ipse dixit* expert testimony, as to how these alternatives would have fully replaced the '419 Patent or how they would have affected related aspects of the H.264 Standard. Moreover, the court concludes, on the evidence before it, that Motorola, through its expert Dr. Drabik, has provided sufficient evidence and explanation as to why the Krause Family of patents are superior in functionality to any of the alternatives set forth by Microsoft. (*See* 11/19/12 Tr. at 25, 44-45 (Drabik Testimony).) |
| | 174 | The Wu Family of patents consists of U.S. Patent No. 5,376,968 (the '968 Patent) and foreign counterparts 663671(AU), 2118668(CA), EP0615384 (FR, GER, GB, IRE, NETH, ES, SWED), 2945268(JP), 187606(MX), 311960(NOR), 244827(KR), and NI-084114(TAI). (Ex. 283; Ex. 2 at 19; 11/19/12 Tr. at 26:3-19 (Drabik Testimony).) |
| | 175 | The '968 Patent discloses a system that enables compression of video data by providing adaptive video compression using a plurality of compression modes. (Ex. 283 ('968 Patent) at Abstract, Fig. 1; 11/19/12 Tr. at 29:3-13 (Drabik Testimony).) Specifically, the patent discloses that compression can occur on an entire block or indicate with a code that the block should be broken up into sub-blocks. (11/14/12 Tr. at 138 (Orchard Testimony).) |
| | 176 | The Wu Family of patents is "essential" to the H.264 Standard at the Baseline, Main, and High profiles. (11/19/12 Tr. at 26:3-19, 36:18-37:17 (Drabik Testimony).) |
| | 177 | Importance to the Standard. The Wu Family has technical value to the H.264 Standard because it is directed to the core H.264 feature of prediction. The Wu Family patents provide flexibility in adaptively choosing compression modes leading to enhanced coding efficiency. (11/19/12 Tr. at 29:3-13 (Drabik Testimony).) Likewise, |

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone: (206) 676-7000
Fax: (206) 676-7001

| | |
|---|---|
| | the Wu Family patents allow video decoders to retrieve overhead data so that they know the compression mode used by the encoder and can perform the appropriate decompression corresponding to that compression mode. (*Id.*) |
| 178 | At trial, Motorola presented uncontested opinion evidence from Dr. Timothy Drabik that at least one claim of the '968 Patent covers adaptive compression as employed by the H.264 Standard. (11/19/12 Tr. at 26:3-19 (Drabik Testimony).) Like with the '419 Patent, the court credits this testimony with the caveat that none of the terms comprising the claims of the '968 Patent have been construed by a court. Thus, Dr. Drabik's ultimate opinion requires the assumption that a court of law would construe the claim terms to cover a similar scope as Dr. Drabik used in his analysis. |
| 179 | Motorola presented uncontroverted evidence that the technology claimed in the '968 patent contributed to the 50 % coding gain reported for H.264 (progressive scan sequences only). (11/16/12 Tr. at 192:25-193:11 (Luthra Testimony); Ex. 424 at 574-75.) |
| 180 | The '968 Patent expired March 11, 2013, approximately two and a half years after Motorola sent its letter to Microsoft offering to license Motorola's H.264 SEPs. (*See* 11/14/12 Tr. at 138 (Orchard Testimony); Ex. 283.) Similar to evidence presented about the '419 Patent, during trial, Microsoft did not provide sufficient evidence that despite the relatively older age of the '968 Patent, it had lost importance to the H.264 Standard. |
| 181 | With respect to the '968 Patent, Microsoft asserted that alternatives could have been adopted by the JVT. Microsoft's suggested alternatives are found in Exhibits 462, 632, 633, and 1477. (11/14/12 Tr. at 135 (Orchard Testimony).) However, Microsoft did not provide detail, aside from *ipse dixit* expert testimony, as to how these alternatives would have fully replaced the '968 Patent or how they would have affected related aspects of the H.264 Standard. (*See* 11/14/12 Tr. at 138-39 (Orchard Testimony) (opining, without explanation, that Microsoft's alternatives would practice or be equivalent to the '968 Patent).) Moreover, the court concludes on the evidence before it that Motorola, through its expert Dr. Drabik, has provided sufficient evidence and explanation as to why the Wu Family of patents are superior in functionality to any of the alternatives set forth by Microsoft. (*See* 11/19/12 Tr. at 45-46 (Drabik Testimony).) |
| 185 | The Eifrig Family consists of U.S. Patent No. 6,005,980 (the '980 Patent) and foreign counterparts 2230567(CA), 2702769(CA), and 245861(MX). (Ex. 268; Ex. 2 at 1; 11/19/12 Tr. at 26:3-19 (Drabik Testimony).) |
| 186 | The '980 Patent is directed to deriving a predictor motion vector ("PMV") for a block based on the motion vectors of that block's three neighboring blocks (left (A), top (B), and top-right (C)), where there is at least one field coded block. (11/19/12 Tr. at 30:6-16 (Drabik Testimony); 11/16/12 Tr. at 200:15-201:10 (Luthra Testimony).) |
| 187 | The Eifrig Family is declared "essential" to the H.264 Standard at the Main and High profiles, levels 2.1 to 4.1. (11/19/12 Tr. at 26:3-12, 37:6-9, 37:14-19 (Drabik Testimony).) |

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone: (206) 676-7000
Fax: (206) 676-7001

| 188 | Importance to the Standard. The Eifrig Family has technical value to the H.264 Standard because it is directed to the core H.264 feature of prediction. It improves the coding gain over other choices of blocks for motion vector prediction. (11/19/12 Tr. at 30:4-23 (Drabik Testimony); 11/16/12 Tr. at 200:21-202:11 (Luthra Testimony).) |
|---|---|
| 197 | The MBAFF Family consists of U.S. Patent Nos. 6,980,596 (the '596 Patent), 7,310,374 (the '374 Patent), 7,310,375 (the '375 Patent), 7,310,376 (the '376 Patent), 7,310,377 (the '377 Patent), 7,421,025 (the '025 Patent), 7,477,690 (the '690 Patent), and 7,817,718 (the '718 Patent) and foreign counterparts 2468087(CA), 10182726.9(EP), 10182629.5(EP), 10182686.5 (EP), 10182624.6(EP), 10182654.3(EP), 2804054.1(EP), 2009-244955(JP), 2008-234061(JP), 244982(MX), 20042544 (NOR), 10-2004-7007762(KR). (Exs. 271-78; Ex. 2 at 2-17; 11/19/12 Tr. at 26:3-19 (Drabik Testimony).) |
| 200 | Motorola's MBAFF Patents—the '374, '375, '376, '377, '025, '690, and '718 Patents, along with the '590 Patent—all stem from the same initial patent application, and they all share the same specification. (11/14/12 Tr. at 116 (Orchard Testimony); Exs. 271-78.) |
| 201 | The MBAFF Family of patents is "essential" to the H.264 Standard at the Main and High profiles, levels 2.1 to 4.1. (11/19/12 Tr. at 26:3-19, 31:22-32:3, 37:6-19 (Drabik Testimony).) |
| 202 | Importance to the Standard. The MBAFF Family is technically valuable because it is directed to the core H.264 features of AFF coding and prediction. It provides coding gain through the use of macroblock pairs, which permit prediction on all seven block sizes in frame and field mode. (11/19/12 Tr. at 30:24-32:3 (Drabik Testimony); Ex. 424 at 566-68; Ex. 574 (Marpe paper) at 136-37 (describing MBAFF as a "main innovative feature" of H.264); 11/14/12 Tr. at 27:23-28:6, 28:22-29:4, 31:21-32:14 (Sullivan Testimony).) |
| 219 | The PAFF Family consists of U.S. Patent Nos. 7,769,087 (the '087 Patent), 7,660,353 (the '353 Patent), and 7,839,931 (the '931 Patent) and foreign counterparts 2468086(CA), 200910254137.9(CN), 200910254136.4(CN), 200910254135.X(CN), ZL02827402.4(CN), 200910254134.5(CN), 10182595.8(EP), 10182605.5(EP), 10182643.6 (EP), 10183042(EP), 2804044.2(EP), 2003-548552(JP), MX/a/2008/001309(MX), MX/a/2008/001308(MX), MX/a/2008/001311(MX), MX/a/2008/001312(MX), 253886(MX), 20042543(NOR), 10-2010-7006173(KR), and 10-2004-7007734(KR). (Exs. 280-82; Ex. 2 at 20-23; 11/19/12 Tr. at 26:3-19 (Drabik Testimony).) |
| 224 | The PAFF Family is "essential" to the H.264 Standard at the Main and High profiles, levels 2.1 to 4.1. (11/19/12 Tr. at 26:3-19, 31:22-32:22, 37:6-19 (Drabik Testimony).) |
| 225 | Importance to the Standard. The PAFF Family is technically valuable because it is directed to core features of the H.264 Standard—coding and prediction. It provides coding gain by applying PAFF to "bi-predicted" pictures (pictures having two motion vectors) through flexibility not found in prior PAFF methods. (11/19/12 Tr. at 32:7-22 (Drabik Testimony); 11/16/12 Tr. at 210:12- |

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

| | | 212:16 (Luthra Testimony).) |
|---|---|---|
| | 228 | Motorola's test results demonstrated that PAFF improved coding efficiency by up to 20-30 % over the frame and field coding in the draft standard. (Ex. 654 (JVT-B071) at 1 ("[PAFF] guarantees a performance over frame and field coding"), 5, Fig. 23; 11/16/12 Tr. at 210:12-212:5 (Luthra Testimony); Ex. 424 at 567 ("During the development of the H.264/AVC standard, PAFF coding was reported to reduce bit rates in the range of 16 % to 20 % over frame-only coding mode for ITU-R 601 resolution sequences like 'Canoa,' 'Rugby', etc.").) |
| | 229 | Motorola's PAFF inventions further improved coding efficiency because being able to choose two reference pictures in the future or two reference pictures in the past provided more flexibility than being limited to choosing one reference picture in the future and one in the past. (11/16/12 Tr. at 210:12-212:22 (Luthra Testimony); 11/19/12 Tr. at 32:4-22 (Drabik Testimony).) |
| | 230 | The JVT adopted Motorola's proposed PAFF techniques into the H.264 Standard. (11/16/12 Tr. at 212:17-19 (Luthra Testimony).) |
| | 233 | Microsoft, however, provides only *ipse dixit* expert testimony that there was no significant difference between PAFF in the H.264 Standard compared with prior standards. Moreover, the court concludes on the evidence before it that Motorola, through its expert Dr. Luthra, has provided sufficient evidence and explanation as to why the PAFF Family of patents provides superior functionality to that employed by prior standards. For instance, Dr. Luthra testified that PAFF as it existed in MPEG-2 does not disclose a suitable alternative to the '087 Patent because it did not permit the additional flexibility of how motion is estimated and motion vectors are compressed that Motorola's PAFF inventions provided, and therefore had worse efficiency. (11/16/12 Tr. at 211:4-212:16 (Luthra Testimony).) |
| | 235 | Microsoft asserts that Motorola's own test results show that PAFF performs worse than single macroblock MBAFF. (11/14/12 Tr. at 124-25 (Orchard Testimony); Ex. 423 at 12-16.) Based on the evidence before it, the court disagrees. As Motorola correctly explains, the test results Microsoft relies on (provided in VCEG-O37) are irrelevant to Motorola's improved PAFF Patent Family because they were based on PAFF found in earlier standards, not Motorola's improved PAFF. (11/16/12 Tr. at 203:7-18 (Luthra Testimony).) The VCEG-O37 contains no test results for single macroblock adaptive frame/field ("AFF") using bi-predicted pictures, which is an element of Motorola's PAFF patent claims. (Ex. 423 at 10-11 (under "Results for I, P and B," VCEG-O37 states: "Simulations on MB and picture levels are still in progress.").) |
| | 239 | Motorola's Scan Family consists of U.S. Patent Nos. 7,162,094 (the '094 Patent) and 6,987,888 (the '888 Patent). (Exs. 265-66; Ex. 2 at 18; 11/19/12 Tr. at 26:3-19 (Drabik Testimony).) Motorola's Scan Family patents share the same specification. (11/14/12 Tr. at 116 (Orchard Testimony); Exs. 265-66.) |
| | 242 | The '094 Patent is "essential" to the H.264 Standard at the Main and High profiles, levels 2.1 to 4.1. (11/19/12 Tr. at 26:3-19, 37:6-19 (Drabik |

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone: (206) 676-7000
Fax: (206) 676-7001

| | | |
|---|---|---|
| | | Testimony).) The '888 Patent is "essential" to the H.264 Standard at the High profile, levels 2.1 to 4.1. (*Id.* at 26:3-19, 37:6-19; 11/16/12 Tr. at 214:18-25 (Luthra Testimony).) |
| | 243 | Importance to the Standard. The Scan Family is technically valuable because it is directed to the core features the H.264 Standard of transform and quantization. (11/19/12 Tr. at 32:23-33:18 (Drabik Testimony).) The claimed 4×4 and 8×8 scan patterns improve coding efficiency. (*Id.* at 32:23-33:18; 11/16/12 Tr. at 213:14-214:11 (Luthra Testimony).) |
| | 428 | Such apportionment would be difficult. (11/19/12 Tr. at 160:10-19 (Schmalensee Testimony) (agreeing it would be a "pretty tough thing to do").) Here, the challenge in apportionment is made more difficult by Motorola's practice of providing licensees with a license to its 802.11 and H.264 portfolios at no additional charge if a licensee takes a license to its cellular portfolios. (*See* 11/20/12 Tr. at 74:16-20, 74:25-75:11 (Dailey Testimony) ("It makes it challenging, I suppose.").) |
| | 463 | Participation in a patent pool is voluntary. (11/13/12 Tr. at 98:7-12 (Glanz Testimony); 11/13/12 Tr. at 169:12-14 (Murphy Testimony).) A patent holder can choose to license its SEPs outside of a pool.20 (11/16/12 Tr. at 151:10-13 (Lynde Testimony).) |
| | 464 | Patent pools are also independent from SSOs. As Microsoft's Gary Sullivan— who was the chairman of the JVT, the organization that finalized the H.264 video standard (11/13/12 Tr. at 208:24-209:16 (Sullivan Testimony))— explained, "[o]pen standards (e.g., ITU-T, ISO, IECI) . . . do not force anyone to join any pool and have no relationship whatsoever with any pools that do form." (Ex. 2345 at MS-MOTO_1823_00002433307.) |
| | 498 | For its part, Motorola presented significant evidence that patent pools generally have lower rates than those that can be achieved through bilateral, private negotiations. (Ex. 3013 at 167; 11/16/12 Tr. at 72:6-12 (Simcoe Testimony); 11/19/12 Tr. at 137:13-138:3 (Schmalensee Testimony); 11/16/12 Tr. at 141:25-142:13 (Lynde Testimony).) According to Motorola, there are many factors that make patent pools more likely to have rates lower than the rates in bilaterally-negotiated licenses. The main factors are: (1) the principal objective of most pools is not to maximize licensing revenue but instead to minimize royalty exposure and maximize freedom of operation for licensees, which drives down the royalty rate (11/19/12 Tr. at 143:23-144:6 (Schmalensee Testimony)); (2) pools that allocate revenue based on patent-counting ignore the value of the individual patents being licensed (*see* 11/13/12 Tr. at 125:11-21, 134:3-6 (Glanz Testimony); *see also* 11/16/12 Tr. at 143:3-6, 145:11-13, 146:16-20 (Lynde Testimony)); (3) due to the non-negotiable nature of patent pool licenses, royalty rates must be low to entice licensees to join (*see, e.g.*, 11/19/12 Tr. at 147:25-148:4 (Schmalensee Testimony)); (4) pools have low licensing transaction costs that allow for lower rates (11/16/12 Tr. at 147:11-148:8 (Lynde Testimony)); and (5) concerns over antitrust scrutiny lead to lower rates (*see* 11/16/12 Tr. at 68:2-6 (Simcoe Testimony)). Motorola elicited testimony |

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

| | | |
|---|---|---|
| | | that because of the typically lower rates found in patent pools, if a patent holder wanted to pursue an "aggressive" licensing strategy, "the pool is not the place to do that." (11/13/12 Tr. at 134:3-6 (Glanz Testimony).) |
| | 499 | Based on this extensive testimony, the court agrees as a general matter that patent pools tend to produce lower rates than those that could be achieved through bi-lateral negotiations. Indeed, the uncontroverted trial evidence is that a rate higher than a pool rate could still be RAND. (11/16/12 Tr. at 71:14-72:10 (Simcoe Testimony); 11/19/12 Tr. at 137:13-17 (Schmalensee Testimony).) |
| | 500 | Another problem with using patent pools as the *de facto* RAND royalty rate is that the patent-counting royalty allocation structure of pools does not consider the importance of a particular SEP to the standard or to the implementer's products as the court's hypothetical negotiation requires. (*See* 11/16/12 Tr. at 143:7-10, 143:24-144:11 (Lynde Testimony).) As explained in the court's RAND-modified *Georgia-Pacific* analysis, it is entirely reasonable for the owner of a patent that is extremely important and central to the standard to seek a higher royalty rate than the owner of a less important patent. Under a patent-counting pool system, however, "one patent in the pool could be critical to a core feature of the standard and it could be a feature that most standard-compliant products use and rely on heavily. And another patent could be directed to a feature that's tangential or optional and rarely ever used, and in the pool both would get the identical royalty rate." (11/16/12 Tr. at 143:25-144:11 (Lynde Testimony).) |
| | 502 | The court also has policy concerns with applying a pool rate as the *de facto* RAND royalty rate for all SEPs relevant to a given standard. If pool rates were held to be the most appropriate RAND royalty rates, SEP holders with valuable SEPs would be hesitant to participate in standard-setting activities and might instead try to develop proprietary standards.21 (11/19/12 Tr. at 146:6-23 (Schmalensee Testimony); 11/13/12 Tr. at 168:16-20 (Murphy Testimony).) Companies and SEP holders might not participate in the standard-setting process or contribute their patents to the standard if they believe that they will not receive full and fair value for their patents. As a result, the standards might fail to incorporate the best technology available. (*See* 11/13/12 Tr. at 169:2-5 (Murphy Testimony).) Moreover, since licensing through SSOs under the RAND commitment is, at least for some entities, an important component of profitability, reducing that component would reduce the incentive to innovate and thereby slow the pace of innovation in the economy. (11/19/12 Tr. at 146:24-147:3 (Schmalensee Testimony).) |
| | 503 | Finally, the uncontroverted evidence before the court demonstrates that an SEP licensor in a patent pool receives both royalty rates from the pool and value to the SEP holder in terms of unfettered access to the intellectual property of the pool. Thus, companies that have SEPs for a given standard, but also have products with high potential infringement exposure to others' SEPs for that standard, may decide to join a pool even though they may not obtain as much value for their SEPs. In a paper entitled "Public Policy Toward Patent Pools," Josh |

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001

| | | |
|---|---|---|
| | | Lerner and Jean Tirole stated that, for the MPEG-2 pool, "[t]he primary motive for certain companies was not to maximize licensing revenues, but rather to accelerate the adoption of the standard." (Ex. 2945 at 175.) |
| | 504 | Indeed, with respect to the MPEG LA H.264 patent pool, Microsoft's motive in joining the pool was explicitly not to generate a revenue stream from its SEPs. (11/13/12 (Glanz) Tr. at 99:4-100:14; Ex. 3088; Ex. 2840 at MOTM_WASH1823_0392239.) On May 3, 2010, Dean Hachamovitch, Microsoft's Vice President of Internet Explorer (4/3 Hachamovitch Dep. Tr. at 19:8-14), published a blog posting entitled "Follow Up on HTML5 Video in IE9" on Microsoft's MSDN Blogs, in which he explained that:<br><br>Microsoft pays into MPEG LA about twice as much as it receives back for rights to H.264. Much of what Microsoft pays in royalties is so that people who buy Windows (on a new PC from an OEM or as a packaged product) can just play H.264 video or DVD movies. Microsoft receives back from MPEG LA less than half the amount for the patent rights that it contributes because there are many other companies that provide the licensed functionality in content and products that sell in high volume. Microsoft pledged its patent rights to this neutral organization in order to make its rights broadly available under clear terms, not because it thought this might be a good revenue stream. We do not foresee this patent pool ever producing a material revenue stream, and revenue plays no part in our decision here.<br>(Ex. 2840 at MOTM_WASH1823_0392239.) |
| | 506 | Accordingly, a RAND royalty rate based on a patent pool must consider both royalties received by the pool and the value received by the company through membership in the pool. The value to the company will depend on the circumstances of the individual company. |
| | 507 | In sum, on the evidence before it, the court concludes that a pool rate itself does not constitute a RAND royalty rate for an SEP holder who is not a member of the pool. |
| | 554 | Microsoft is not a licensor or licensee of the Via Licensing 802.11 patent pool. (11/13/12 Tr. at 173:6-9 (Murphy Testimony).) Microsoft informed Via Licensing Corporation that Microsoft's objections to taking a license "were the lack of Licensees and critical mass of the program," and that Microsoft "prefers to enter into bi-lateral discussions with the Licensors individually." (Ex. 3194.) Dr. Lynde, Microsoft's patent valuation expert, agreed that this strategy "makes sense" for Microsoft. (11/16/12 Tr. at 154:3-155:10 (Lynde Testimony); Ex. 3194.) |
| | 555 | Like Microsoft, Motorola has not joined the pool. (11/13/12 Tr. at 173:16-21 (Murphy Testimony).) |
| | 556 | At the outset, the court notes that the Via Licensing 802.11 patent pool as a *de facto* RAND royalty rate for Motorola's 802.11 SEP portfolio suffers from the same concerns as all patent-counting patent pools in regards to the court's RAND-modified *Georgia-Pacific* methodology. Namely, the Via Licensing 802.11 pool does not distinguish between patents in the pool on the basis of |

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone: (206) 676-7000
Fax: (206) 676-7001

| | |
|---|---|
| | technical merit, but rather gives the exact same royalty to all patents in the pool. Also, the pool does not consider the importance of patents to the implementer's products. Likewise, setting the Via Licensing 802.11 rate as the *de facto* RAND rate would implicate the court's aforementioned policy concerns regarding an SSO's ability to obtain quality technology and the possibility of stifling innovation. (*See supra* ¶ 502.) |
| Page 6 | The court recognizes that real-world negotiations involving patents committed to the RAND obligation might include layers of complexity beyond determining monetary royalty rates |

## B.   June 6, 2012 Order, Dkt. 335

| Page Number | |
|---|---|
| 23-24 | Motorola's Letters of Assurance to the IEEE and declarations to the ITU state that it "will grant" or "is prepared to grant" licenses on RAND terms to all applicants. The language of Motorola's agreements focuses on the resulting RAND license between the patent holder and the implementer, not on the opening offer. The words of the agreement must be given their ordinary meaning. *Hearst Commc'ns*, 115 P.3d at 267. Additionally, Motorola's declarations to the ITU state that "[n]egotiations are left to the parties concerned and are performed outside [the ITU]." (ITU Policy at 12.) Similarly, the IEEE Policy recites that the IEEE is not responsible "for determining whether any licensing terms or conditions provided in connection with submission of a Letter of Assurance, if any, or in any licensing agreements are reasonable and non-discriminatory." (IEEE Policy at 19.) Thus, the language of Motorola's agreements with the IEEE and the ITU envisions a negotiation between the parties towards a resulting RAND license. This give-and-take understanding of the RAND licensing process is buttressed by testimony of Michele Herman, Microsoft's former Associate General Counsel and Senior Director of Intellectual Property, who stated that the negotiation process was critical to the process of determining a RAND license. (Post Decl. Ex. 21 (Dkt. # 230-5) at 23-25 (Herman Tr.); Post Decl. Ex. 22 (Dkt. # 230-5) at 28 (Herman Article).) |
| 24-25 | Because the IEEE and the ITU agreements anticipate that the parties will negotiate towards a RAND license, it logically does not follow that initial offers must be on RAND terms. Here, critical to the court is the observation that RAND terms cannot be determined until after a negotiation by the parties (or, in this case, after a court determines RAND terms because the parties cannot agree). Indeed, Microsoft's expert in a related matter stated that "RAND does not dictate specific licensing terms, but provides flexibility with respect to specific deals." (Berneman Rpt. (Dkt. # 275-1) at 4.) As stated above, the purpose behind the IEEE and the ITU agreements is to ensure widespread access to standard essential patents. Thus, a requirement that the standard essential patent holder (here, Motorola) make unsolicited offers on RAND terms would frustrate this purpose by discouraging the standard essential patent holder to make initial |

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone: (206) 676-7000
Fax: (206) 676-7001

| | |
|---|---|
| | contact with implementers for fear that it will later be sued for making an initial offer that is later determined as not RAND. Accordingly, the court concludes that under Motorola's agreements with the IEEE and the ITU, Motorola need not make initial offers on RAND terms. |
| 25 | Thus, although the language of Motorola's agreements do not require it to make offers on RAND terms, any offer by Motorola (be it an initial offer or an offer during a back-and-forth negotiation) must comport with the implied duty of good faith and fair dealing inherent in every contract.8 *Badgett v. Sec. State Bank*, 807 P.2d 356, 360 (Wash. 1991). |
| 27 | Microsoft has only offered testimony tending to show that Motorola understood the financial impact of its offers. (Wion Decl. Ex. 12 (Dkt. # 238-12) at 27-28 (Dailey Tr.).) This showing, on its own, however, does not establish that Motorola was acting dishonestly. Motorola very well could have intended the offers in its October 21 and 29 Letters as initial contacts with a potential licensee of its patents. Indeed, Motorola offered on its standard terms. |

**C.   October 10, 2012 Order, Dkt. 465**

| Page Number | |
|---|---|
| 15, fn. 9 | In making this determination, the court is well aware of Motorola's concern that because RAND terms are complex and specific to the parties involved, at the time a standard essential patent holder makes an initial offer, he or she may not have sufficient information to offer on RAND terms. The court agrees with Motorola insofar as patentee may have a legitimate concern that mistakenly offering its essential patents at a non-RAND rate could lead to an imminent lawsuit; and, such a concern on the part of the patentee would similarly defeat the purpose behind the ITU and IEEE agreements of widespread availability. But, this is precisely the reason the court previously held that initial offers for standard essential patents need not be on RAND terms, but only must be made in accordance with good faith. (6/6/12 Order at 24-25.) Moreover, the simple fact that offers for essential patents need not comport with RAND does not excuse Motorola from eventually honoring its commitments to grant licenses on RAND terms. |

**D.   November 30, 2012 Order, Dkt. 607**

| Page Number | |
|---|---|
| 15 | Accordingly, the court grants Microsoft's motion dismissing Motorola's request for injunctive relief in this action. The dismissal is without prejudice. The court's determination that injunctive relief is no longer available for the Motorola Asserted Patents is based on the specific circumstances and rulings that have developed in this litigation. If, in the future, those circumstances change in a manner to warrant injunctive relief, Motorola may at that time seek such relief. |

SUMMIT LAW GROUP PLLC
315 FIFTH AVENUE SOUTH, SUITE 1000
SEATTLE, WASHINGTON 98104-2682
Telephone:  (206) 676-7000
Fax:  (206) 676-7001