UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| MICROSOFT CORPORATION, | CASE NO. C10-1823JLR |
| Plaintiff, | ORDER |
| v. | |
| MOTOROLA, INC., et al., | |
| Defendants. | |
| MOTOROLA MOBILITY, INC., et al., | |
| Plaintiffs, | |
| v. | |
| MICROSOFT CORPORATION, | |
| Defendant. | |

# I.   INTRODUCTION & BACKGROUND

In its motion for partial summary judgment, Motorola, Inc., Motorola Mobility, Inc., and General Instrument Corporation's (collectively, "Motorola") argued that it did not breach its contracts with the Institute of Electrical Electronics Engineers ("IEEE") and the International Telecommunication Union ("ITU") by failing to grant a license to Marvell, a third-party to this action and Microsoft's Wi-Fi chip supplier.[1]  (Motorola Mot. (Dkt. ## 720 (redacted), 733 (sealed) at 15-17.)  In its August 12, 2013, order, the court denied Motorola's motion on this issue, but stated the following:

> The ruling on this issue does not end there.  As the court understands it, Microsoft will argue to the jury that Motorola failed to grant a license to Marvell, and if Motorola had granted such a license, Motorola would then be precluded from seeking a license from Microsoft for the SEPs at issue. This argument requires a legal basis.  The argument is premised on the notion that, legally, Motorola's ability to seek a license from Microsoft would be exhausted by granting a license to Marvell.  This issue is not explored in the parties' summary judgment briefing.  Thus, the parties may provide three-page letter briefs no later than August 16, 2013, on the legal grounds for Microsoft's assertion that a Motorola-Marvell license would preclude Motorola from seeking a license from Microsoft.  Additionally, no later than August 16, 2013, the parties may propose jury instructions on this issue.

(8/12/13 Order (Dkt. # 843) at 36.)

In response to the court's order, the parties respectively submitted briefing on the issue of whether a license agreement between Motorola and Marvell would exhaust Motorola's legal rights against Microsoft Corporation ("Microsoft").  (*See* Motorola Ltr.

---

[1] Prior court orders provide the complete procedural and factual background on this case. (*See* 2/27/12 Order (Dkt. # 188); 6/6/12 Order (Dkt. # 335); 10/10/12 Order (Dkt. # 465); 4/25/13 Order (Dkt. # 681); 8/12/13 Order (Dkt. # 843).)

1   (Dkt. # 851); Microsoft Ltr. (Dkt. ## 854 (redacted); 855 (sealed).)  Having reviewed the

2   letters and the governing law, and considering itself fully advised, the court excludes

3   Microsoft's argument that had Motorola given a license to Marvell, Motorola could no

4   longer seek royalties from Microsoft, but will permit Microsoft to introduce evidence of

5   Motorola's conduct vis-à-vis Marvell, as such evidence is relevant to Microsoft's claim

6   that Motorola violated its duty of good faith and fair dealing.

7                                   **II.      ANALYSIS**

8            The law is well settled that an authorized sale of a patented product places that

9   product beyond the reach of the patent.  *See Bloomer v. Millinger*, 68 U.S. (1 Wall.) 340,

10  350-51, 17 L.Ed. 581 (1864).  The patent owner's rights with respect to the product end

11  with its sale, *United States v. Univis Lens Co.*, 316 U.S. 241, 252 (1942), and a purchaser

12  of such a product may use or resell the product free of the patent, *id.* at 250.  This

13  longstanding principle applies similarly to a sale of a patented product manufactured by a

14  licensee acting within the scope of its license.  *See Unidisco, Inc. v. Schattner*, 824 F.2d

15  965, 968 (Fed. Cir. 1987), *cert. denied*, 484 U.S. 1042 (1988).

16           However, for the first sale to exhaust the rights of the patentee, the sale itself must

17  be authorized.  In *Honeywell Int'l., Inc. v. United States*, 609 F.3d 1292, 1304 (Fed. Cir.

18  2010), over the dissent of Judge Mayer, the Federal Circuit reversed a finding that patent

19  rights were exhausted to the accused system sold by the plaintiff at a time before the

20  plaintiff had merged with the holder of the patent.  The *Honeywell* Court determined that

21  there was no *authorized* first sale:  "For the first sale doctrine to apply, there must be an

22  *authorized* first sale."  *Id.* (emphasis added)

1    In the typical situation, courts examining the question of exhaustion look to the

2    license agreement—often between the patentee and licensee—to determine whether a

3    sale of the licensed product was *authorized* by that agreement.  For example, in *Quanta*

4    *Computer, Inc. v. LG Electronics, Inc.*, 553 U.S. 617, 636-37 (2008), cited by the parties

5    in their briefing on the exhaustion issue, the court examined the scope of the license

6    between Intel and LGE.  The *Quanta* Court found that "Nothing in the License

7    Agreement restricts Intel's right to sell its microprocessors and chipsets to purchasers

8    who intend to combine them with non-Intel parts.  It broadly permits Intel to 'make, use,

9    [or] sell' products free of LGE's patent claims." *Id.* at 636.  The *Quanta* Court then

10   found:  "Because Intel was authorized to sell its products to Quanta, the doctrine of patent

11   exhaustion prevents LGE from further asserting its patent rights with respect to the

12   patents substantially embodied by those products." *Id.* at 637.  Similarly, in *Cook Inc. v.*

13   *Boston Scientific Corp.*, 208 F. Supp. 2d 874, 881 (N.D. Ill. 2002), the court examined

14   the license agreement between the patentee and licensee and determined that the doctrine

15   of exhaustion did not apply because the license agreement prohibited the downstream

16   assignment to a third-party, such that the third-party could not make the requisite first

17   sale of the patented product.  *Id*.  As a final example, in *Intel Corp. v. ULSI Sys. Tech.,*

18   *Inc.*, 995 F.2d 1566, 1570 (Fed. Cir. 1993), the Federal Circuit examined the specifics of

19   the license agreement between Intel and Hewlett Packard ("HP") to determine that HP's

20   sales of coprocessors "were insulated [by the doctrine of exhaustion] from Intel's claim

21   of infringement because they were sold to ULSI by HP, which was authorized to do so

22   under its licensing agreement with Intel."  From these examples, the court concludes that

1   determination of whether the exhaustion doctrine applies to negate a patentee's rights

2   requires examination of the specific license agreement to determine whether the first sale

3   was in fact authorized.

4        Here, Microsoft asks the court to set forth a jury instruction that a presumed

5   license agreement between Motorola and Marvell for Motorola's 802.11 SEPs would act

6   to exhaust Motorola's patent rights against Microsoft.  Microsoft contends, citing

7   *Quanta*, that a RAND license granted by Motorola to Marvell would broadly permit

8   Marvell "to make use [or] sell products free" of Motorola's patent claims because

9   Motorola's RAND license commitment bars it from imposing any "conditions limit[ing]

10  [Marvell's] authority to sell products substantially embodying the patents."  (Microsoft

11  Ltr.)  The court disagrees that *Quanta* requires such a result.  First, as explained above,

12  the *Quanta* Court examined a specific license agreement and determined that the license

13  agreement between Intel and LGE permitted the sale of patented products.  553 U.S. at

14  637.  Moreover, the holding of Quanta was specific to the license agreement at issue in

15  that case.  *See id.* at 636-37.  Second, *Quanta* does not in any way deal with a RAND

16  commitment, as Microsoft suggests.

17       Here, a Motorola-Marvell license agreement does not exist, but is instead

18  hypothetical.  Thus, it is impossible for the court to examine the specifics of such a

19  license agreement to determine the applicability of the exhaustion doctrine vis-a-vis

20  Microsoft.  Moreover, many predicate questions must be answered.  For instance, it

21  remains undetermined whether Marvell is a third-party beneficiary of Motorola's RAND

22  commitment.  The court declines to issue the advisory opinion Microsoft seeks.

ORDER- 5

1    Alternatively, Microsoft would have the court set forth a broad statement of law

2  that the RAND commitment requires licenses free of downstream restrictions.  The court

3  cannot do that in this case because the record is insufficient.  The legal operation of the

4  RAND commitment on licensing agreements between a patentee and a licensee is an

5  open question at this time.  The court does not have briefing on numerous issues that

6  would need resolution before any such rule of law could be properly set forth.  For

7  instance, *inter alia*, the court would ask for briefing on the following questions:  (1)

8  whether a defensive suspension clause is proper in a RAND license; (2) the proper scope

9  of a defense suspension clause; (3) whether the RAND obligation requires RAND

10  licenses that will cover all downstream customers or whether restrictions may be placed

11  on sales.

12    The issue of a presumed Marvell-Motorola license has been in this case since at

13  least the April 19, 2013, RAND trial, but there is no briefing that answers the open

14  question of the RAND commitment's legal operation on potential licensing agreements

15  between the SEP holder and licensees.  Thus, the court cannot issue a jury instruction of

16  the law regarding a hypothetical Motorola-Marvell license and the effect of this

17  hypothetical license on Motorola's ability to seek royalties from Microsoft.  The result is

18  that Microsoft cannot make an argument to the jury that had Motorola given a license to

19  Marvell, Motorola could no longer seek royalties from Microsoft.  That does not mean,

20  however, that Microsoft cannot introduce evidence Motorola's conduct vis-à-vis Marvell.

21  Such evidence is relevant to Motorola's good faith and bad faith.  Microsoft simply may

22  not connect the dots and state that a Motorola-Marvell license would preclude Motorola

1  from seeking royalties from Microsoft.  That argument turns on legal grounds, which do

2  not exist.

3              **V.     CONCLUSION**

4       Based on the foregoing, the court excludes Microsoft's argument that had

5  Motorola given a license to Marvell, Motorola could no longer seek royalties from

6  Microsoft, but will permit Microsoft to introduce evidence of Motorola's conduct vis-à-

7  vis Marvell, as such evidence is relevant to Microsoft's claim that Motorola violated its

8  duty of good faith and fair dealing.

9       Dated this 26th day of August, 2013.

10

11

12                              _____

13                              JAMES L. ROBART
                                United States District Judge

14

15

16

17

18

19

20

21

22

ORDER- 7