# EXHIBIT 1

UNITED STATES INTERNATIONAL TRADE COMMISSION
Washington, D.C.

In the Matter of

CERTAIN GAMING AND
ENTERTAINMENT CONSOLES,
RELATED SOFTWARE, AND
COMPONENTS THEREOF

Inv. No. 337-TA-752

THIRD PARTY UNITED STATES FEDERAL TRADE COMMISSION'S
STATEMENT ON THE PUBLIC INTEREST

Case No. 10-1823, W.D.Wash.
MICROSOFT TRIAL EXHIBIT
1035

MS-MOTO_1823_00004081164

The United States Federal Trade Commission submits this Statement in response to the United States International Trade Commission's Notices of Request for Statements on the Public Interest in Investigation Nos. 337-TA-745 and 337-TA-752.[1]  These investigations appear to present an issue of first impression for the ITC that has significant implications for the public interest: the propriety of granting an exclusion order in favor of a standard essential patent (SEP) holder that has committed to license on reasonable and non-discriminatory (RAND) terms.[2]  ITC issuance of an exclusion or cease and desist order in matters involving RAND-encumbered SEPs, where infringement is based on implementation of standardized technology, has the potential to cause substantial harm to U.S. competition, consumers and innovation.[3]  Simply put, we are concerned that a patentee can make a RAND commitment as part of the standard setting process, and then seek an exclusion order for infringement of the RAND-encumbered SEP as a way of securing royalties that may be inconsistent with that RAND commitment.  Consistent with the requirement of Congress that the ITC "shall consult with, and seek advice and information from … the Federal Trade Commission … as it considers appropriate" on matters

---

[1] The FTC takes no position on the facts of Investigation Nos. 337-TA-745 and 337-TA-752, or whether Section 337 remedies should issue here.  This Statement also does not address whether seeking an injunction or exclusion order for RAND-encumbered SEPs would violate Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, or Sections 1 or 2 of the Sherman Act. 15 U.S.C. §§ 1-2.

[2] This Statement uses the term RAND, but the analysis applies equally to FRAND-encumbered intellectual property.  This Statement assumes, for the sake of discussion and without deciding, that a RAND commitment was made.

[3] Commissioner Rosch concurs in the filing of this public interest statement but is of the view that the issuance of an exclusion order (or other forms of injunctive relief) is inappropriate where the patent holder has made a RAND commitment for a standard essential patent, even if a reasonable licensing offer is made.  In his view, a RAND pledge appears to be, by its very nature, a commitment to license; if so, seeking injunctive relief would be inconsistent with a commitment to license.  Commissioner Rosch thus submits that if the ITC concludes that Respondent (or its predecessor in interest) made a RAND commitment with respect to a standard essential patent, an exclusion order should be denied for that patent as inconsistent with the public interest, *see* 19 U.S.C. § 1337(d)(1), or as a matter of equity, *see* Certain Amorphous Metals & Amorphous Metal Articles, Inv. No. 337-TA-143, U.S.I.T.C. Pub. 1664, at 89-90 (Oct. 15, 1984) (conduct by a patentee that falls within the unclean hands doctrine "will bar the enforcement of all patents that are sufficiently related to that conduct").

MS-MOTO_1823_00004081165

affecting the public interest in ITC investigations, we submit this statement explaining the potential economic and competitive impact of injunctive relief on disputes involving SEPs.[4]

Firms in the information technology and telecommunications industries frequently resolve interoperability problems through voluntary consensus standard setting conducted by standard setting organizations ("SSOs").  Interoperability standards can create enormous value for consumers by increasing competition, innovation, product quality and choice.  However, incorporating patented technologies into standards also has the potential to distort competition by enabling SEP owners to negotiate high royalty rates and other favorable terms, after a standard is adopted, that they could not credibly demand beforehand, conduct known as "patent hold-up."

The possibility of patent hold-up derives from changes in the relative costs of once competing technologies as a result of the standard setting process.[5]  Prior to adoption of a standard, alternative technologies compete to be included in the standard.   SSO members often agree to license SEPs on RAND terms as a *quid pro* quo for the inclusion of their patents in a standard.  Once a standard is adopted, implementers begin to make investments tied to the implementation of the standard.  Because it may not be feasible to deviate from the standard unless all or most other participants in the industry agree to do so in compatible ways, and because all of these participants may face substantial switching costs in abandoning initial designs and substituting a different technology, an entire industry may become locked in to a standard, giving a SEP owner the ability to demand and obtain royalty payments based not on the true market value of its patents, but on the costs and delays of switching away from the standardized technology.

---

[4] *See* 19 U.S.C. §1337(b)(2) ("During the course of each investigation under this section, the Commission shall consult with, and seek advice and information from, the Department of Health and Human Services, the Department of Justice, the Federal Trade Commission, and such other departments and agencies as it considers appropriate.").
[5] Joseph Farrell et al., *Standard Setting, Patents and Hold-Up*, 74 Antitrust L.J. 603, 607-08 (2007).

MS-MOTO_1823_00004081166

Hold-up and the threat of hold-up can deter innovation by increasing costs and uncertainty for other industry participants, including those engaged in inventive activity.  It can also distort investment and harm consumers by breaking the connection between the value of an invention and its reward – a connection that is the cornerstone of the patent system.[6]  The threat of hold-up may reduce the value of standard-setting, leading firms to rely less on the standard setting process and depriving consumers of the substantial procompetitive benefits of standard setting.

RAND commitments mitigate the risk of patent hold-up, and encourage investment in the standard.[7]  After a RAND commitment is made, the patentee and the implementer will typically negotiate a royalty or, in the event they are unable to agree, may seek a judicial determination of a reasonable rate.  However, a royalty negotiation that occurs under threat of an exclusion order may be weighted heavily in favor of the patentee in a way that is in tension with the RAND commitment.  High switching costs combined with the threat of an exclusion order could allow a patentee to obtain unreasonable licensing terms despite its RAND commitment, not because its invention is valuable, but because implementers are locked in to practicing the standard.  The resulting imbalance between the value of patented technology and the rewards for innovation may be especially acute where the exclusion order is based on a patent covering a small component of a complex multicomponent product.  In these ways, the threat of an exclusion order may allow the holder of a RAND-encumbered SEP to realize royalty rates that reflect

---

[6] *See generally* Fed. Trade Comm'n, *The Evolving IP Marketplace:  Aligning Patent Notice and Remedies with Competition* (2011) ("2011 Report"), *available at* http://www.ftc.gov/os/2011/03/110307patentreport.pdf; Fed. Trade Comm'n, *To Promote Innovation:  The Proper Balance of Competition and Patent Law and Policy* (2003) ("2003 Report"), *available at* http://www.ftc.gov/os/2003/10/innovationrpt.pdf.
[7] U.S. Dep't of Justice & Fed. Trade Comm'n, *Antitrust Enforcement and Intellectual Property Rights: Promoting Innovation and Competition* 46-47 (2007) ("2007 Report"), *available at* http://www.ftc.gov/reports/innovation/P040101PromotingInnovationandCompetitionrpt0704.pdf.

MS-MOTO_1823_00004081167

patent hold-up, rather than the value of the patent relative to alternatives, which could raise prices to consumers while undermining the standard setting process.

The ITC has a range of remedies available to it here to give effect to its statutory obligation to consider "competitive conditions in the United States economy ... and United States consumers[,]"[8] and to refrain from imposing Section 337 remedies in conflict with the public interest. For example, the ITC could find that Section 337's public interest factors support denial of an exclusion order unless the holder of the RAND-encumbered SEP has made a reasonable royalty offer.[9] For example, in the Initial Determination of Investigation No. 337-TA-752, the ITC ALJ found that, "the royalty rate of Motorola of 2.25%, both as to its amount and the products covered, could not possibly have been accepted by Microsoft."[10] While this approach may leave the patentee without a remedy in the ITC, a remedy in district court would remain available. Alternatively, the ITC could delay the effective date of its Section 337 remedies until the parties mediate in good faith for damages for past infringement and/or an ongoing royalty for future licensed use, with the parties facing the respective risks that the exclusion order will (i) eventually go into effect if the implementer refuses a reasonable offer or (ii) be vacated if the ITC finds that the patentee has refused to accept a reasonable offer.[11]

The FTC recognizes that "the [ITC] has consistently held that the benefit of lower prices to consumers does not outweigh the benefit of providing complainants with an effective remedy

---

[8] 19 U.S.C. §§ 1337(d)(1), (f)(1).

[9] See 2011 Report at 243 ("Assertion of a patent against a standard, especially a patent subject to a RAND commitment, creates a particularly important scenario for considering the public interest in deciding whether to grant an exclusion order" before the ITC).

[10] Certain Gaming and Entertainment Consoles, Related Software, and Components Thereof, Initial Determination at 300 (May 2012), see also id. at 303 ("[T]he evidence supports Microsoft's conclusion that Motorola was not interested in good faith negotiations and in extending a RAND license to it.").

[11] There is precedent for such an approach at the ITC. In December 2011, the ITC found that HTC infringed valid Apple patents. "Based on consideration of competitive conditions in the United States economy," the ITC delayed the effective date of the exclusion order for four months "to provide a transition period for U.S. carriers." Certain Personal Data and Mobile Communications Devices and Related Software, Notice of the Comm'n's Final Determination Finding a Violation of Section 337; etc. at 3 (Dec. 2011).

MS-MOTO_1823_00004081168

for an intellectual property-based Section 337 violation."[12]   We agree that an appropriately granted exclusion order preserves the exclusivity that forms the foundation of the patent system's incentives to innovate, and the threat of an exclusion order can provide a significant deterrent to infringement.[13]   In such a case, short run price increases may benefit consumers in the long run by providing incentives for innovation, consistent with the proper role of the patent system.

RAND-encumbered SEPs present considerably different issues.  A RAND commitment provides evidence that the SEP owner planned to monetize its IP through broad licensing on reasonable terms rather than through exclusive use.[14]   Consistent with the proper role of the patent system, remedies that reduce the chance of patent hold-up associated with RAND-encumbered SEPs can encourage innovation by increasing certainty for firms investing in standards-compliant products and complementary technologies.  Such remedies may also prevent the price increases associated with patent hold-up without necessarily reducing incentives to innovate.

In cases that address RAND-encumbered SEPs, the FTC urges the ITC to follow the requirements of Sections 337(d)(1) and (f)(1) and consider the impact of patent hold-up on competitive conditions and United States consumers.

By direction of the Commission.

Donald S. Clark
Secretary

Issued:  June 6, 2012

---

[12] Certain Digital Television Products and Certain Products Containing Same and Methods of Using Same, Inv. No. 337-TA-617, Comm'n Op. at 16 (Apr. 2009).
[13] 2003 Report at 223-28.
[14] *Cf.* 2011 Report at 234-35 ("A prior RAND commitment can provide strong evidence that denial of the injunction and ongoing royalties will not irreparably harm the patentee.").

5

MS-MOTO_1823_00004081169