HONORABLE JAMES L. ROBART

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| MICROSOFT CORPORATION, | No. C10-1823-JLR |
| Plaintiff, | |
| v. | |
| MOTOROLA INC., et al., | MICROSOFT'S MOTION FOR JUDGMENT AS A MATTER OF LAW |
| Defendant. | |
| MOTOROLA MOBILITY, LLC., et al., | |
| Plaintiffs, | |
| v. | |
| MICROSOFT CORPORATION, | |
| Defendant. | |

MICROSOFT'S MOTION FOR JUDGMENT AS
A MATTER OF LAW

**C10-1823-JLR**

# TABLE OF CONTENTS

I.    Motorola Breached The Duty Of Good Faith And Fair Dealing. ....................................... 1

    A.   Motorola's Actions Were Contrary To The Reasonable And Justified Expectations Of The Parties.................................................................................................. 1

    B.   Motorola Engaged In Commercially Unreasonable Conduct. ....................................... 2

    C.   Motorola Engaged In Conduct That Frustrated The Purpose Of Its RAND Licensing Commitments. ......................................................................................... 5

    D.   Motorola's Conduct Failed To Conform To Ordinary Custom And Practice In the Industry. ...................................................................................................... 8

    E.   Motorola Exercised Its Discretion Under Its Contractual Commitments Unreasonably. .................................................................................................. 9

    F.   Subjective Factors Confirm Motorola Breached Its Duty Of Good Faith And Fair Dealing. ........................................................................................................ 10

II.   Motorola Breached Its RAND Commitments By Seeking Injunctions After Microsoft Filed This Lawsuit And Committed To Take A License On RAND Terms. ................... 11

III.  Motorola Breached Its Contracts With The ITU And IEEE By Seeking Injunctions On Its Standard Essential Patents Before Attempting to Offer a License on RAND Terms....... 13

IV.   Motorola Breached Its RAND Obligations By Rejecting Microsoft's Above-RAND Orange Book Offer And Pursuing Injunctions. ................................................. 14

V.    Motorola Breached Its RAND Commitments By Seeking Injunctions On Its Standard Essential Patents. .................................................................................... 15

VI.   Motorola Breached Its Contract With The IEEE By Failing To Make A License To Its 802.11 Essential Patents Available At Nominal Competitive Costs. .............................. 17

VII.  Motorola Breached Its Contracts With The IEEE And ITU By Failing To Make Licenses To Its 802.11 And H.264 Patents Available On RAND Terms........................................ 19

VIII. Motorola's Orange Book Argument Does Not Provide A Mitigation Or Causation Defense. ............................................................................................... 19

IX.   Microsoft's Defenses Of Invalidity And Noninfringement Are Irrelevant To Motorola's Liability For Breach Of Contract...................................................................... 21

X.    Motorola Breached Its Contracts With The IEEE And ITU By Making Blatantly Unreasonable Offers For Licenses To Its Standard Essential Patents. ............................ 22

XI.   All Three Motorola Defendants Are Liable For Breach Of Contract................................ 23

MICROSOFT'S MOTION FOR JUDGMENT AS        C10-1823-JLR
A MATTER OF LAW

LAW OFFICES
CALFO HARRIGAN LEYH & EAKES LLP
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700 FAX, (206) 623-8717

Pursuant to Fed. R. Civ. P. 50(a), Microsoft respectfully requests that the Court enter judgment as a matter of law on the following grounds because "there is no legally sufficient basis for a reasonable jury to find for" Motorola on those grounds. *Jorgensen v. Cassiday*, 320 F.3d 906, 917 (9th Cir. 2003).

## I.   Motorola Breached The Duty Of Good Faith And Fair Dealing.

Whether the finder of fact considers the factors outlined by the Court in Instruction No. 16 individually and independently, or collectively, there is no legally sufficient evidentiary basis for a reasonable juror to find for Motorola on the question of its breach of the duty of good faith and fair dealing.

### A.  Motorola's Actions Were Contrary To The Reasonable And Justified Expectations Of The Parties.

Microsoft's Horacio Gutierrez's testimony establishes that while companies like Microsoft recognize the possibility of assertions and counter-assertions of patents, 8/28/13 Tr. (Gutierrez) 183:24–184:16, Microsoft's reasonable and justified expectations were that no company that had made RAND commitments would use its SEPs in the manner in which Motorola did.  8/28/13 Tr. (Gutierrez) 149:13–150:5.  Microsoft's product developers explained why that reasonable and justified expectation was important for product design decisions. 8/27/13 Tr. (DeVaan) 17:10–18:1, 8/27/13 Tr. (Treadwell) 40:15–22.  Motorola itself knew as much, and its 30(b)(6) witness confirmed that Motorola knew it could not use the threat of injunctions on SEPs to force concessions on non-SEPs.  8/29/13 Tr. (Blasius) 111:14–112:6.  Motorola also knew it was not allowed to ask implementers for unreasonably high royalties.  8/29/13 Tr. (Blasius) 108:7–9.  Finally, by June 2012 Motorola knew its conduct was the subject of FTC scrutiny and by that date (at a minimum) Motorola could not have had a reasonable and justified expectation that pursuing injunctions on SEPs was acceptable.  8/30/13 Tr. (Heiner) 150:23–153:6.

MICROSOFT'S RULE 50(a) MOTION FOR
JUDGMENT AS A MATTER OF LAW- 1

C10-1823-JLR

LAW OFFICES
**CALFO HARRIGAN LEYH & EAKES, LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700 FAX, (206) 623-8717

**B. Motorola Engaged In Commercially Unreasonable Conduct.**

The evidence is overwhelming and essentially uncontradicted that Motorola engaged in commercially unreasonable conduct. Motorola's H.264 royalty demand of 2.25% on the price of end products ranged from $4.50 per unit for the cheapest Xbox, to $11.25 per unit or higher for computers running Windows—but the RAND royalty is only 0.555 cents per unit, and the upper bound of the RAND range determined by the Court is 16.389 cents. Motorola's 802.11 royalty demand of 2.25% equates to $4.50 per unit or higher for the Xbox, but the RAND royalty is only 3.471 cents per unit, with the upper bound of the RAND range at 19.5 cents. If these offers are not commercially unreasonable, it is difficult to conceive of any offer that would be commercially unreasonable. 8/29/13 Tr. (Murphy) 139:12–140:2, 142:6–19.

Given the RAND royalty and royalty range, no reasonable juror could conclude that Motorola had made a commercially reasonable offer—Motorola's demand was not just high, it was wildly excessive. Testimony from Microsoft's Horacio Gutierrez was categorical and uncontested on this point. 8/28/13 Tr. (Gutierrez) 128:22–25, 131:12–14. While a seller may be willing to come down from an opening offer, that does *not* mean that any offer is commercially reasonable just because negotiation might follow. Beyond the yawning chasm that separates Motorola's demands from the RAND royalty, the evidence otherwise confirms that Motorola's demands were completely unfounded and commercially unreasonable.

First, nothing in Motorola's licensing history supports the scale of its demands. Motorola had never received royalties of the kind demanded from Microsoft for Motorola's H.264 or 802.11 standard-essential patents alone. 8/27/13 Tr. (Dailey) 79:7–13. While Motorola offered testimony that 2.25% was a standard opening offer for its cellular SEPs, the rates it sought for its cellular patents shed no light on what royalty is appropriate for its 802.11 or H.264 patents. 9/3/2013 Tr. (Leonard) 154:14–19; 8/29/13 Tr. (Murphy) 166:20–168:3, 168:23–169:8. It is difficult or impossible to break out a separate royalty rate for the 802.11 and H.264 SEP portfolios in Motorola's prior agreements. 8/27/13 Tr. (Dailey) 78:11–18.

MICROSOFT'S RULE 50(a) MOTION FOR
JUDGMENT AS A MATTER OF LAW- 2

C10-1823-JLR

LAW OFFICES
**CALFO HARRIGAN LEYH & EAKES, LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700 FAX, (206) 623-8717

Nothing in Motorola's licensing history indicates that demanding 2.25% on the price of end products for its 802.11 and H.264 patents would be reasonable.

Second, the limited importance of Motorola's 802.11 and H.264 patents confirms that Motorola's demands were commercially unreasonable. Motorola's 802.11 SEPs provide only minimal technical contribution to the 802.11 Standard. It is an undisputed fact for these proceedings that Motorola's 802.11 portfolio provides only minimal contribution to the 802.11 standard, and Motorola's relevant 802.11 SEPs constitute only a sliver of the overall technology incorporated in the standard. 8/28/13 Tr. (Murphy) 158:10–17. This set of patents cannot possibly justify a demand for a 2.25% royalty on the entire value of the Xbox. Likewise, as with 802.11, Motorola's H.264 patents constitute only a sliver of the overall technology incorporated into the H.264 Standard, and Motorola contributed no inventive technology to the H.264 standard, but instead built upon already existing technology. 8/29/13 Tr. (Murphy) 155:13–19. The marginal value of Motorola's H.264 patents cannot possibly justify a demand for a 2.25% of the entire value of a computer running Windows.

The number of owners of 802.11 and H.264 essential patents who had submitted letters of assurance to the IEEE and ITU could easily have been investigated by Motorola. 8/27/13 Tr. (Dailey) 92:11–14; 9/3/13 Tr. (Taylor) 79:11–18. Motorola's corporate representative admitted that if each of those companies charged a 2.25% royalty on the end product, this would not be viable for the implementer. 8/29/13 Tr. (Blasius) 108:1–110:1. This conduct is especially egregious where there is no basis for believing that the Motorola patents were any more valuable than the patents of the other companies that submitted letters of assurance. 8/27/13 Tr. (Dailey) 90:4–8, 91:13–19.

Motorola was also well aware of the royalties charged by the H.264 and 802.11 pools, and knew the rates in its October offer letters were out of line with those benchmarks. 8/27/13 Tr. (Dailey) 115:9–18, 116:3-10; *see also* 8/29/13 Tr. (Blasius) 109:7–110:12. Motorola had

MICROSOFT'S RULE 50(a) MOTION FOR
JUDGMENT AS A MATTER OF LAW- 3

C10-1823-JLR

LAW OFFICES
**CALFO HARRIGAN LEYH & EAKES, LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700 FAX, (206) 623-8717

1   participated in the formation of the MPEG-LA H.264 pool and joined in press releases

2   characterizing the pool rates as reasonable.  8/28/13 Tr. (Glanz) 65:4–17; Tr. Ex. 1179.

3   Whether the RAND royalty is ultimately the pool rate or somewhat higher, as the Court found,

4   the pool royalty (and Motorola's prior endorsement of it) demonstrates that the Motorola

5   offer—which was orders of magnitude greater, 8/29/13 Tr. (Murphy) 162:8–17—was not

6   commercially reasonable.

7        The evidence provides no legally sufficient basis to conclude that Motorola's 802.11

8   demand was anything but commercially unreasonable.  The royalty Motorola demanded would

9   exceed the cost of the chipset that provides the 802.11 functionality in Xbox, which costs only

10  a few dollars.  8/28/13 Tr. (Ochs) 87:1–3.  Royalty rates of 1% of chip price (*not* end product

11  price) represent a customary high ceiling for licensing in the semiconductor industry for

12  products like Marvell's.  8/28/13 Tr. (Ochs) 95:6–21.  Motorola itself commissioned a study by

13  InteCap to value its 802.11 portfolio which suggested that even lower rates of 0.5% of chip

14  price would be appropriate.  8/29/13 Tr. (Murphy) 164:2–12.  Once its 25x overestimate of

15  Motorola's patent value is corrected for, the InteCap study is indicative of commercially

16  reasonable conduct because it reflected an effort by a company in the business of licensing

17  (RAND) patents to fashion a RAND royalty rate.  8/29/13 Tr. (Murphy) 166:4–13.  Motorola's

18  802.11 demand on the Xbox was $4.50; that the amount suggested by InteCap, its own paid

19  licensing consultant, for the chip alone was 2 cents confirms that Motorola's demand was

20  commercially unreasonable.

21       As to Motorola's H.264 demand, by demanding royalties on the prices of its

22  prospective licensees' *customers'* products, Motorola violated its own claimed practice of

23  licensing its standard-essential patents only at the end-product level.  9/3/13 Tr. (Leonard)

24  151:3–9.  Motorola's H.264 letter explicitly demanded a 2.25% royalty "calculated based on

25  the price of the end product . . . [e.g.] each PC/laptop, each smartphone . . . and not on

26

MICROSOFT'S RULE 50(a) MOTION FOR
JUDGMENT AS A MATTER OF LAW- 4              C10-1823-JLR

LAW OFFICES
CALFO HARRIGAN LEYH & EAKES, LLP
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700 FAX, (206) 623-8717

component software." Trial Ex. 2.  No prior Motorola license agreement based a royalty on the price of products sold by the licensee's customers, and in fact doing so was contrary to Motorola's claimed practice.  8/27/13 Tr. (Dailey) 69:25–70:9; 9/3/13 Tr. (Leonard) 151:3–9.

There is no legally sufficient evidentiary basis to conclude that Motorola's demands as to either standard were anything but commercially unreasonable.  Accordingly, Microsoft is entitled to judgment as a matter of law that Motorola's October 21, 2010 802.11 letter and October 29, 2010 H.264 letter breached the duty of good faith and fair dealing because Motorola's demands were not objectively commercially reasonable.

**C.   Motorola Engaged In Conduct That Frustrated The Purpose Of Its RAND Licensing Commitments.**

Two key purposes of the RAND licensing commitment are prevention of hold up and avoidance of stacking problems.  8/29/13 Tr. (Murphy) 132:11–15.  The record establishes that Motorola violated the duty of good faith and fair dealing by frustrating both purposes.

First, Motorola's Kirk Dailey acknowledged that in formulating Motorola's October 2010 demand letters, he did not consider the effects of royalty stacking among multiple standard essential patent holders.  8/28/13 Tr. (Dailey) 60:13–15.  But the considerable stacking implications of Motorola's demands are readily apparent.  8/29/13 Tr. (Murphy) 160:9–20, 161:3–11.  At least 52 entities own H.264 SEPs, 8/29/13 Tr. (Murphy) 154:22–25, and if each of them made demands like Motorola's (2.25% of the end price of standard-compliant products) the aggregate royalty to implement the H.264 standard would exceed the prices of standard-compliant products.  8/29/13 Tr. (Murphy) 160:12–20.  At least 92 entities own 802.11 standard-essential patents.  8/29/2013 Tr. (Murphy) 158:6–8.  If made by each of the other entities, demands like Motorola's would lead to an aggregate royalty more than double the product price.  8/29/13 Tr. (Murphy) 161:5–11.  Because Motorola's 802.11 and H.264 patents provide only minimal contributions to the respective standards, 8/29/13 Tr. (Murphy) 158:10–17, 156:14–19, the aggregate royalty burden suggested by Motorola's

MICROSOFT'S RULE 50(a) MOTION FOR
JUDGMENT AS A MATTER OF LAW- 5

C10-1823-JLR

LAW OFFICES
**CALFO HARRIGAN LEYH & EAKES, LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700 FAX, (206) 623-8717

demands is even more unreasonable.  Motorola is only one of many standard-essential patent holders who may seek RAND royalties from implementers of the standard—and Motorola is only entitled to its share, corresponding to the contribution of its patents to the standard.  It cannot demand more than its share.[1]  Motorola knew that these other patents were out there, 9/3/13 Tr. (Taylor) 79:4–18, but did not take that fact into account in starting with a 2.25% demand.  8/29/12 Tr. (Blasius) 107:10–24.  Motorola's initial offer did not account for patent stacking, *id.*; 8/28/13 Tr. (Dailey) 60:13–15, which means that Motorola's offer necessarily breached the duty of good faith and fair dealing by frustrating the anti-stacking purpose of the RAND commitment.

Second, Motorola was engaged in hold up:  Its royalty demands exceeded the value of its patented technology by such a large margin that no rational company could accept them; it accompanied those demands with 20-day ultimatums; and backed them up by pursuing lawsuits and injunctions around the world.  8/29/13 Tr. (Murphy) 125:11-–127:2.  The demands Motorola made were merely a prelude to the barrage of lawsuits launched against Microsoft, consistent with a strategy of hold up, not with an attempt to enter into a RAND license.  8/28/13 Tr. (Gutierrez) 154:24–155:23, 156:9–16.  Motorola has confirmed that it was its policy to make an offer before seeking injunctions for alleged infringement of its standard-essential patents.  8/27/13 Tr. (Dailey) 125:23–126:11; 8/29/13 Tr. (Blasius) 107:16–19.  Motorola cannot claim it filed those actions only as a necessary, and unanticipated, response to Microsoft having filed this suit, because Motorola filed the 699 and 700 Actions on November 10, 2010—the day after Microsoft filed here—and its ITC action followed only 12 days later.  Motorola's complaints for suits seeking injunctions on SEPs were being prepared at the same time Motorola sent its demand letters to Microsoft.  8/27/13 Tr. (Dailey) 124:15–125:7.

---

[1] Stacking concerns are particularly heightened here, because products on which Motorola demanded royalties need to comply with many other standards besides H.264 and 802.11.  8/28/13 Tr. (Gutierrez) 128:3-21.

MICROSOFT'S RULE 50(a) MOTION FOR JUDGMENT AS A MATTER OF LAW- 6    C10-1823-JLR

LAW OFFICES
CALFO HARRIGAN LEYH & EAKES, LLP
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700 FAX, (206) 623-8717

1    Motorola's immediate pursuit of injunctions confirms that its letters were the first step

2  of an attempt to hold up Microsoft.  If granted, the injunctions Motorola pursued would have

3  left Microsoft with a choice between pulling its standard-compliant products out of the U.S.

4  and German markets, or removing standard-compliant functionality that had little or nothing to

5  do with Motorola's technology, but was critical to customer demand for products that were

6  standard-compliant.  8/28/13 Tr. (Gutierrez) 151:1–152:10.  The threat of injunctions is key

7  leverage in forcing standard implementers to accept non-RAND terms.  8/29/13 Tr. (Murphy)

8  125:11–126:12.

9    A RAND royalty must reflect the economic value of the patented technology to the

10  licensee relative to the next best alternative technology prior to the standard being set, and

11  hold-up value is value above RAND that derives simply from the patented technology being

12  incorporated into the standard.  8/29/13 Tr. (Murphy) 157:14–25.  At the November 2012 trial,

13  and afterwards, Motorola still sought a 2.25% royalty.  8/30/13 Tr. (Murphy) 72:12–15;

14  8/28/13 Tr. (Gutierrez) 161:1–6.  Motorola continued to seek an exclusion order on its H.264

15  standard-essential patents in the ITC as late as January 2013.  9/3/13 Tr. (Killough) 17:19–21.

16  There is no explanation other than hold-up for Motorola's continued demands for exorbitant

17  royalties while pursuing injunctions.

18    Both Motorola's conduct in sending the October 21, 2010 and October 29, 2010 letters,

19  and Motorola's conduct in subsequently filing actions and seeking injunctions in U.S. district

20  court, the ITC, and Germany frustrated the purposes of the RAND licensing commitment.

21  There is no legally sufficient basis for a reasonable jury to conclude otherwise, and Microsoft

22  is entitled to judgment as a matter of law that Motorola breached its duty of good faith and fair

23  dealing by engaging in this conduct.

24

25

26

MICROSOFT'S RULE 50(a) MOTION FOR          C10-1823-JLR
JUDGMENT AS A MATTER OF LAW- 7

LAW OFFICES
**CALFO HARRIGAN LEYH & EAKES, LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700 FAX, (206) 623-8717

1

2

### D.  Motorola's Conduct Failed To Conform To Ordinary Custom And Practice In the Industry.

No reasonable juror would have a legally sufficient evidentiary basis to conclude that Motorola's conduct conformed to ordinary custom and practice in the industry.  Microsoft's witnesses in unrebutted testimony established that the terms of the letters were entirely outside any customary bounds.  8/27/13 Tr. (Devaan) 18:13–15; 8/27/13 Tr. (Treadwell) 41:12–15; 8/28/13 Tr. (Gutierrez) 123:13–18, 121:18–23, 8/30/13 Tr. (Heiner) 160:7–161:3.  Marvell's Jennifer Ochs' testimony established that 1% of chip price is a customary high ceiling for royalties in the semiconductor industry, but Motorola's 2.25% of end product price (applied to the Xbox)—which it sought from both Marvell and Microsoft—amounted to over 100% of chip price.  8/28/13 Tr. (Ochs) 92:15–93:9.  Motorola had engaged in hold up before with RIM, and had been accused of violating its RAND obligations in a lawsuit RIM filed, signaling that using injunctive leverage to extract excessive royalties on SEPs is not accepted custom and practice.  Even if such activities were considered acceptable before 2012 (and there is no evidence that they were), the FTC's public interest statement in the ITC 752 Investigation, 8/30/13 Tr. (Heiner) 150:23–151:17, establishes that regulators viewed that conduct as contrary to the public interest, and as a "custom and practice" that, if it ever existed, should be abandoned.  Even further, the FTC opened an investigation into Motorola's conduct with respect to its standard-essential patents in late spring of 2012.  8/30/13 Tr. (Heiner) 149:20–25.  The subject matter of that investigation was whether "Motorola reneged on a licensing commitment made to several standard-setting bodies to license its standards-essential patents relating to smartphones, tablet computers and video game systems on FRAND terms by seeking injunctions against willing licensees of those SEPs."  8/30/13 Tr. (Heiner) 153:2–6.  The FTC clearly took the position that Motorola's conduct was so far from "ordinary custom and practice" as to merit regulatory oversight.

MICROSOFT'S RULE 50(a) MOTION FOR JUDGMENT AS A MATTER OF LAW- 8

C10-1823-JLR

LAW OFFICES
**CALFO HARRIGAN LEYH & EAKES, LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700 FAX, (206) 623-8717

1    Motorola's conduct did not even conform to its own prior custom and practice.

2    Motorola's October 29, 2010 H.264 letter violated Motorola's own policy of licensing its SEPs

3    to producers of end products.  9/3/13 Tr. (Leonard) 151:3–9.  Motorola's head of licensing

4    Kirk Dailey was unaware of a single Motorola licensee that was paying a royalty based on the

5    selling price of a product sold by the licensee's customer.  8/27/13 Tr. (Dailey) 69:25–70:4.

6    Motorola had enlisted Intecap to value Motorola's 802.11 SEP portfolio in an attempt to

7    determine an appropriate RAND royalty, but did not consider the results of that patent

8    valuation analysis when making its demands of Microsoft.  8/27/13 Tr. (Dailey) 114:10–22.

9    The Intecap study proposed royalties far lower than Motorola's demand, it was available to

10   Motorola personnel, and it should have been considered by a company that sought to comply

11   with its RAND obligations.  8/29/13 Tr. (Murphy) 164:15–165:14, 166:4–13.

12          In subsequent negotiations with Microsoft, Motorola conditioned a license to its SEPs

13   on a grantback of a license to Microsoft patents that were unrelated to the standards in

14   question.  8/28/13 Tr. (Gutierrez) 162:17–163:15.  This was wrong, and Motorola knew it,

15   because it had always been its own practice not to do so.  8/29/13 Tr. (Blasius) 110:6–111:6;

16   8/27/13 Tr. (Dailey) 67:1-5.  Motorola's conduct cannot be excused on the grounds that

17   defensive suspension clauses are customary, because Motorola admitted that defensive

18   suspension cannot amount to conditioning the SEP license on concessions on patents that are

19   not essential to those standards.  8/27/13 Tr. (Dailey) 67:1–5; 8/29/13 Tr. (Blasius) 110:6–

20   111:6.  Motorola's offer to Marvell of a non-RAND license that openly discriminated against

21   Microsoft violated that policy and was not consistent with any accepted industry notion of

22   defensive suspension.

23          **E.  Motorola Exercised Its Discretion Under Its Contractual Commitments**
            **Unreasonably.**

24

25          Based on the Court's instructions that Motorola did not need to make offers on RAND

26   terms, the contracts vested Motorola with discretion in formulating its offers to Microsoft, and

LAW OFFICES
**CALFO HARRIGAN LEYH & EAKES, LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700 FAX, (206) 623-8717

Motorola breached the duty of good faith and fair dealing by exercising that discretion unreasonably.  Motorola knew about the royalty rates offered by pools, even blessing them as reasonable, 8/28/13 Tr. (Glanz) 65:4–16; Tr. Ex. 1179, yet ignored them in drafting the letters. Motorola knew about the results of the Intecap valuation and ignored it when making its demands.  8/27/13 Tr. (Dailey) 114:10–22.  Dailey acknowledged it was easy to go on the Internet and find out that 2.25% of the Windows-based PC market amounted to around $4 billion, knew that there were billions of dollars of Xbox consoles sold every year, and was generally aware of Xbox and Windows revenues.  8/27/13 Tr. (Dailey) at 72:17–73:3.  Yet he still put 2.25% into the letter without having any reasonable basis for it.  Further, as to PCs and smartphones, Motorola knew that Microsoft made component software, and that Microsoft's customers sold the end products, 8/27/13 Tr. (Dailey) 68:22–69:1; 75:9–12, yet Motorola deviated from the offer it described as "standard" in situations in which the licensee was a component supplier, rather than the manufacturer of the end product.  *Id*. at 191:9–14; 212:5–9. Using the end product as the royalty base, while knowing that Microsoft supplied component software, was an unreasonable exercise of discretion.  For these reasons, as well as those outlined for the four factors above, no reasonable juror would have a legally-sufficient evidentiary basis to find Motorola's exercise of discretion in formulating its offers reasonable.

### F.  Subjective Factors Confirm Motorola Breached Its Duty Of Good Faith And Fair Dealing.

Motorola may argue that it did not know at the time the demand letters were sent that the royalties demanded were exorbitant and unjustified and that knowledge of that could only be acquired by examining the information that was before the Court at the November trial.  But the record establishes that facts (including the Intecap study, the scope and nature of its own contributions to the standards, the pool rates, the number of other licensees, and more) within the corporate knowledge of Motorola prior to that trial confirmed the demands were commercially unreasonable.

MICROSOFT'S RULE 50(a) MOTION FOR
JUDGMENT AS A MATTER OF LAW- 10

C10-1823-JLR

LAW OFFICES
**CALFO HARRIGAN LEYH & EAKES, LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700 FAX, (206) 623-8717

Moreover, the manner in which the standards were used in Microsoft products was facially apparent:  Xbox was known to be a game console, with 802.11 needed only as an alternative means of connecting to the Internet; and Windows is a computer operating system, with the ability to display H.264 video being only one of thousands of features.  8/27/13 Tr. (DeVaan) 13:21–15:10.   While more information about the Microsoft products might have been interesting, it was not necessary to ascertain that the demanded royalties were not even in the ballpark of commercially reasonable.  The argument information adduced at trial was necessary for Motorola to understand that its demands were outrageous is demonstrably false—even when possessed of all of this information, Motorola continued to urge a 2.25% royalty at trial and beyond.  8/29/13 Tr. (Murphy) 171:1–5; 8/28/13 Tr. (Gutierrez) 161:1–6.

## II.  Motorola Breached Its RAND Commitments By Seeking Injunctions After Microsoft Filed This Lawsuit And Committed To Take A License On RAND Terms.

The undisputed evidence shows that Microsoft's licensing personnel expressed  to Motorola's licensing personnel Microsoft's willingness to take a reasonable license to Motorola's patents in October 2010.  8/28/13 Tr. (Gutierrez) 167:21–168:7.  Microsoft confirmed this willingness in its complaint in this case, which sought a judicial accounting of RAND terms for Motorola's SEPs.  8/29/13 Tr. (Gutierrez) 59:11–17; 8/30/13 Tr. (Killough) 228:1–14.  To the extent not firmly established by Microsoft's discussions with Motorola or its Complaint, Microsoft committed in September 2011 to take a license to Motorola's patents on RAND terms.  The conclusion that pursuing injunctions breaches the RAND commitment is clear when the SEP owner seeks injunctions *after* the commencement of litigation that will determine the RAND rate.

Any concern that the threat of injunctive relief could be justified by a need to bring implementers to the negotiating table was never present in this case because the RAND determination was already underway, and was underway on Microsoft's initiative.  From

MICROSOFT'S RULE 50(a) MOTION FOR
JUDGMENT AS A MATTER OF LAW- 11

**C10-1823-JLR**

LAW OFFICES
**CALFO HARRIGAN LEYH & EAKES, LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1745 FAX, (206) 623-8717

1   November 2010 on, and certainly from September 2011 on, it is indisputable that the only

2   purpose to seeking an injunction was to put improper pressure on Microsoft to settle on supra-

3   RAND terms.  Microsoft's complaint made clear that despite uncertainties over the validity

4   and essentiality of Motorola's patents, Microsoft would accept a portfolio license to resolve the

5   issue.  8/29/13 Tr. (Gutierrez) 57:15–58:9; 9/3/13 Tr. (Killough) 45:15–23.  If Motorola or any

6   other SEP owner wants a RAND royalty, it can attempt to obtain one in such a lawsuit and

7   need not seek an injunction.  8/27/13 Tr. (Dailey) 132:8–16; 9/3/13 Tr. (Leonard) 135:2–3

8   ("[F]rom an economic point of view, you don't really need an injunction, you just award a

9   money amount of damages.")

10          In its exceptions to jury instructions, Motorola contended for the first time that its

11   continued pursuit of injunctions falls outside the scope of this case because Microsoft's claim

12   is limited in time to the moment when Motorola initially filed for injunctions, apparently based

13   on a linguistic contortion of terms like "seeking."  Discovery and pleadings confirm that

14   Motorola's new theory is incorrect.  Microsoft's interrogatory responses plainly contended that

15   Motorola's pursuit of or attempts to secure injunctions were improper, not just the initial act of

16   filing for injunctions.  Wion Decl. Ex. 1 (Microsoft's May 21, 2013 Supplemental Response to

17   Interrogatory No. 3) at 10 ("Repeated judicial and administrative rulings specific to Motorola

18   have confirmed that its *pursuit* of injunctive relief was improper") (emphasis added); *id.* at 11

19   ("Motorola's objective from the beginning was to *secure* crippling injunctive relief in some

20   forum) (emphasis added); *id.* at 13 ("The *ultimate goal* of Motorola's conduct was to pressure

21   Microsoft into relinquishing its rights under non-standard essential patents by threatening *or*

22   *securing* injunctions on Motorola's standard essential patents with devastating consequences")

23   (emphasis added).

24          Moreover, the pretrial order frames Microsoft's contention as "[w]hether Motorola

25   breached its contractual obligations to the IEEE, ITU, and/or Microsoft by filing lawsuits and

26

MICROSOFT'S RULE 50(a) MOTION FOR          **C10-1823-JLR**
JUDGMENT AS A MATTER OF LAW- 12

seeking injunctive relief."  (Dkt. 803 at 2); *see also id.* at 2–4.  "Seeking" is in no way time-limited to the act of filing the lawsuits, as other language in the pretrial order makes clear.  *E.g. id.* at 3 (referring to "Motorola's ongoing efforts to enjoin Microsoft's H.264 compliant products"); *id.* at 9 ("The pursuit of those injunctions wrongfully inflicted substantial harm on Microsoft.").  And Microsoft's amended complaint alleged that "Defendants are not entitled to enjoin or exclude Microsoft from implementing the technology of the SDO Litigated Patents" (Dkt. 53 at ¶ 85), a claim clearly not time-limited to the filing of a patent infringement suit.  The plain meaning of this allegation encompasses any and all actions targeted to "enjoin or exclude" Microsoft's products from the market—it is not limited to the act of filing for an injunction.  Finally, although it failed to carry its burden at trial, Motorola itself has argued that it has a mitigation defense against Microsoft's claim that the pursuit of the German injunction was a breach.  (Dkt. No. 803, Pretrial Order at 14.)  Motorola clearly understood and attempted to rebut Microsoft's claim that "seeking" or "pursuing" injunctions extended beyond the filing of an infringement complaint, and throughout a progressing infringement case.

No reasonable juror would have a legally sufficient evidentiary basis to conclude that Motorola's pursuit of injunctions after this RAND determination was underway and after Microsoft had committed to accept a RAND license was consistent with Motorola's contractual RAND obligations.

### III.   Motorola Breached Its Contracts With The ITU And IEEE By Seeking Injunctions On Its Standard Essential Patents Before Attempting to Offer a License on RAND Terms.

It is a breach of the RAND commitment to seek injunctive relief before even attempting to offer a license, on "RAND" terms or otherwise.  *Realtek Semiconductor Corp. v. LSI Corp.*, -- F. Supp. 2d --, 2013 WL 2181717, at *7 (N.D. Cal. May 20, 2013).  It is undisputed that Motorola did not make an offer on RAND terms before seeking injunctive relief.  8/27/13 Tr. (Dailey) 95:15–20, 8/28/13 Tr. (Gutierrez) 123:25–125:7, 130:4–9; 150:21–151:15.  To rule

MICROSOFT'S RULE 50(a) MOTION FOR
JUDGMENT AS A MATTER OF LAW- 13

C10-1823-JLR

LAW OFFICES
CALFO HARRIGAN LEYH & EAKES, LLP
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700 FAX, (206) 623-8717

1    that the fact that Motorola made *some* offers distinguishes this case from the situation in

2    *Realtek* would elevate form over substance.  *See WL Gore and Associates,* 529 F.2d 614, 623

3    (5th Cir. 1976) ("A royalty demand which is so high as to preclude acceptance of a license

4    offer is, after all, not appreciably different from a refusal of a license upon any terms.").

5    Although Motorola sent letters before seeking injunctions, the demands were such that no

6    reasonable company could have accepted them.  8/28/13 Tr. (Gutierrez) 128:22-25, 131:12-14,

7    135:21-136:7.  Motorola's October 2010 offer letters asked Microsoft to confirm that it

8    accepted the offers.  Tr. Exs. 1, 2.  But Motorola's principal witness and author of the letters

9    confirmed that Motorola never expected an acceptance.  8/27/13 Tr. (Dailey) 118:4–7 ("You

10   didn't think that Microsoft would accept this offer in 20 days, did you, as stated?"  A: "No.  I

11   expected them to respond."), 185:5–11; *see also* 9/3/2013 Tr. (Leonard) 151:22–152:3.

### IV.    Motorola Breached Its RAND Obligations By Rejecting Microsoft's Above-RAND Orange Book Offer And Pursuing Injunctions.

In December 2011, Microsoft made an offer to take a license to Motorola's two

German H.264 patents at a rate of 1-2 euro cents per unit, at least four times higher than the

0.555 (US) cent per unit RAND rate for Motorola's entire portfolio.  *See* 8/30/13 Tr.

(Haedicke) 201:1–16, 211:18–212:5.  The offer was clearly in excess of RAND, yet Motorola

rejected it, 8/30/13 Tr. (Haedicke) 201:17–18, and continued to pursue an injunction in

Germany until April 2012 when the Court ordered it to stop.  9/3/12 Tr. (Killough) 13:21–

14:11.  Motorola was in breach of its contractual obligation to grant licenses on RAND terms,

and compounded that breach by pursuing an injunction in Germany, thereby forcing Microsoft

to relocate its distribution center.  8/29/13 Tr. (Davidson) 69:8–13, 71:18–20.  Moreover, given

that suing for injunctions on SEPs constitutes a breach of the RAND commitment if no RAND

offer has been made, no reasonable juror would have a legally sufficient basis to find that

Motorola's pursuit of injunctions after rejecting an above-RAND offer was consistent with its

RAND commitments.  *See Realtek*, 2013 WL 2181717, at *6–7.

MICROSOFT'S RULE 50(a) MOTION FOR
JUDGMENT AS A MATTER OF LAW- 14

C10-1823-JLR

LAW OFFICES
**CALFO HARRIGAN LEYH & EAKES, LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700 FAX, (206) 623-8717

**V.    Motorola Breached Its RAND Commitments By Seeking Injunctions On Its Standard Essential Patents.**

Motorola's RAND licensing commitments expressly require that it make available RAND licenses to any standard implementer.  Final Jury Instr. 15; 8/27/13 Tr. (Dailey) 63:3–6. This means that Motorola will not pursue injunctions against implementers—that extends to all implementers, and certainly to those implementers subject to a court's jurisdiction,  and those able *and* willing to pay RAND royalties.  That obligation is within the four corners of the RAND licensing contracts, independent of the duty of good faith and fair dealing, and necessarily follows from Motorola's promise to grant licenses to anyone.  Motorola *surrendered* some of its statutorily-granted property rights in order to gain a foothold in the standard.  Had it not made the RAND licensing commitment, Motorola could have attempted to exclude every party that allegedly used its patented technology.  But when it participated in the SSOs' formation of these standards, and made its contractual RAND licensing commitments, Motorola promised it would do just the opposite—it promised that *it would exclude no one*, and would make licenses available to *every* standard implementer.

While a patent grant gives a patent holder "the right to exclude others from making, using, . . . or selling the invention," 35 U.S.C. § 154, the right to exclude can be waived by contract.  *See Mallinckrodt, Inc. v. Medipart, Inc.*, 976 F.2d 700, 703 (Fed. Cir. 1992) ("This right to exclude may be waived in whole or in part.  The conditions of such waiver are subject to patent, contract, antitrust, and any other applicable law, as well as equitable considerations such as are reflected in the law of patent misuse.").  *See also Morrow v. Microsoft Corp.*, 499 F.3d 1332, 1342 (Fed. Cir. 2007) ("[I]mplicit in the right to exclude is the right to waive that right.").  A patent license is one example of such a waiver.  *Morrow*, 499 F.3d at 1342.  A RAND licensing commitment is simply another example.[2]  It is hard to imagine a clearer

---

[2] A patent "contain[s] a short title of the invention and a grant to the patentee, his heirs or assigns, of the right to exclude others from making, using, offering for sale, or selling the invention throughout the United States or importing the invention into the United States."  35 U.S.C. § 154(a)(1).  Patents are a "in effect, a bundle of rights which may be divided and assigned, or retained in whole or part."  *Alfred E. Mann Foundation For Scientific*

MICROSOFT'S RULE 50(a) MOTION FOR
JUDGMENT AS A MATTER OF LAW- 15

C10-1823-JLR

LAW OFFICES
**CALFO HARRIGAN LEYH & EAKES, LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700 FAX, (206) 623-8717

1   waiver of the right to exclude than a contractual promise to grant licenses (*i.e.*, forego

2   exclusion) on reasonable and non-discriminatory terms to anyone who wants to make use of

3   the technology.  *See* 9/3/13 Tr. (Leonard) 135:2–3 ("[Y]ou don't really need an injunction, you

4   just award a money amount of damages.")

5          The Ninth Circuit, in affirming the Court's preliminary injunction, recognized that

6   Motorola's RAND licensing commitments were not consistent with pursuing injunctions.

7   *Microsoft Corp. v. Motorola, Inc.,* 696 F.3d 872, 884 (9th Cir. 2012) ("Implicit in such a

8   sweeping promise is, at least arguably, a guarantee that the patent-holder will not take steps to

9   keep would-be users from using the patented material, such as seeking an injunction, but will

10  instead proffer licenses consistent with the commitment made.").  Where the patent holder has

11  demanded royalties far in excess of RAND, and then predicates a claim for injunctive relief on

12  the absence of a license, the "arguable" nature of this inconsistency vanishes and is replaced by

13  a certainty.  *See id.* at 885 ("[I]t could well be that retrospective payment at the rate ultimately

14  determined and a determination of the future rate, not an injunction banning sales while that

15  rate is determined, is the only remedy consistent with the contractual commitment to license

16  users of [ ] standard-essential patents.").  Moreover, Microsoft's ability to pay such a rate has

17  never been in question, and was affirmed by Microsoft's posting of a $100 million bond in this

18  case.  (Dkt. No. 265.)[3]

19         Judge Posner agrees that RAND licensing commitments waive injunctive relief.  *See*

20  *Apple, Inc. v. Motorola, Inc.,* 869 F. Supp. 2d 901, 913–14 (N.D. Ill. 2012) (endorsing the

21  FTC's position that "injunctive relief is indeed unavailable for infringement of a patent

22  governed by FRAND" and holding "I don't see how, given FRAND, I would be justified in

23

24  *Research v. Cochlear Corp.*, 604 F.3d 1354, 1360 (Fed. Cir. 2010) (citing *Vaupel Textilmaschinen KG v. Meccanica Euro Italia SPA*, 944 F.2d 870 (Fed. Cir. 1991)).

25  [3] At a minimum, the RAND commitment bars pursuing injunctive relief against standard implementers who are subject to jurisdiction and able to pay—i.e., not judgment proof in an infringement action to recover RAND royalties.

26

MICROSOFT'S RULE 50(a) MOTION FOR
JUDGMENT AS A MATTER OF LAW- 16          **C10-1823-JLR**

LAW OFFICES
**CALFO HARRIGAN LEYH & EAKES, LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700 FAX, (206) 623-8717

1   enjoining Apple . . . unless Apple refuses to pay a royalty that meets the FRAND

2   requirement.").

3        The public interest supports this construction.  "In choosing among the reasonable

4   meanings of a promise or agreement or a term thereof, a meaning that serves the public interest

5   is generally preferred."  Restatement (Second) of Contracts § 207.  In Motorola's 752 ITC

6   Investigation, the FTC explained "Simply put, we are concerned that a patentee can make a

7   RAND commitment as part of the standard-setting process and then seek an exclusion order for

8   infringement of the RAND-encumbered SEP as a way of securing royalties that may be

9   inconsistent with the RAND commitments." 8/30/13 Tr. (Heiner) 151:13–17.

10       If Motorola's view were accepted, as long as it simply asserted it was willing to

11   "negotiate," it could file lawsuits seeking injunctions against *every* implementer of the 802.11

12   or H.264 standards; it could obtain those injunctions; it could *actually exclude* all implementers

13   from the market for standard-compliant products; and it could use the leverage of those

14   proceedings to extract non-RAND royalties or any other concessions it wished.  Motorola's

15   position that it can freely enjoin standard-implementers is impossible to reconcile with the

16   RAND licensing commitment—especially where it is clear that the licensing offers it made far

17   exceeded RAND—and must be rejected.  No reasonable juror would have a legally sufficient

18   evidentiary basis to find that Motorola's pursuit of injunctions was consistent with its RAND

19   commitments.

20   **VI.   Motorola Breached Its Contract With The IEEE By Failing To Make A License**
         **To Its 802.11 Essential Patents Available At Nominal Competitive Costs.**

22       Motorola breached its contract with the IEEE by failing to make its 802.11 standard

23   essential patents available at nominal competitive costs, and no legally sufficient evidentiary

24   basis exists for a reasonable juror to find otherwise.  The Court has ruled that "the requirement

25   to license at nominal competitive costs was part of the RAND commitment at the time

26   Motorola and Symbol first committed to license their 802.11 SEPs on RAND terms."  (Dkt.

MICROSOFT'S RULE 50(a) MOTION FOR          **C10-1823-JLR**
JUDGMENT AS A MATTER OF LAW- 17

673 at ¶¶ 47-48); 9/3/13 Tr. (Holleman) 97:6–13. "Nominal competitive costs" requires that

the costs associated with the patented technology be both nominal and competitive.

Motorola's licensing conduct fails on both grounds.

A "nominal" cost is a cost that is trifling. *See, e.g.*, *Cummings v. Connell*, 402 F.3d

936, 943 (9th Cir. 2005). Unrebutted testimony establishes that for 802.11, a royalty of 1% of

chip price represents a customary high ceiling for royalty rates in the semiconductor industry,

8/28/13 Tr. (Ochs) 95:6–21; any nominal *competitive* cost must be below that amount. No

evidentiary basis exists for concluding that Motorola's royalty demands were trifling.

Motorola demanded royalties of approximately $100 million per year from Microsoft's sales of

Xbox. 8/27/13 Tr. (Treadwell) 46:14-20. Its demand equated to up to $9 per Xbox, an amount

that significantly exceeds the cost of the entire chip that provides the Xbox with 802.11

functionality, and vastly exceeds the customary 1% chip price ceiling. 8/28/13 Tr. (Gutierrez)

130:4–6, 130:10–23; 8/27/13 Tr. (Dailey) 74:23–25, 102:4–7. A charge for access to

technology that exceeds the cost of the component implementing that technology cannot is not

"nominal," nor is a royalty that exceeds the customary industry ceiling by orders of magnitude.

Nor could any reasonable juror conclude that Motorola's demands were competitive.

Unrefuted testimony confirms that Motorola's offer was not commercially reasonable. 8/28/13

Tr. (Gutierrez) 131:12–14. The record establishes that it would have been commercially

impossible for Microsoft to pay the royalties that Motorola sought to all companies with

802.11 standard essential patents, 8/28/13 Tr. (Gutierrez) 131:3–1, a fact that went undisputed

by Motorola's former corporate vice president of intellectual property. 8/27/13 Tr. (Dailey)

93:14-25. Marvell, Microsoft's supplier for 802.11 chips, described Motorola's demands as

commercially unreasonable and a "going-out-of-business" model. 8/28/13 Tr. (Ochs) 93:24-

94:6. Such commercially unreasonable and impractical rates cannot be considered

"competitive," and no evidentiary basis exists for a reasonable juror to find otherwise.

MICROSOFT'S RULE 50(a) MOTION FOR
JUDGMENT AS A MATTER OF LAW- 18

C10-1823-JLR

LAW OFFICES
**CALFO HARRIGAN LEYH & EAKES, LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700 FAX, (206) 623-8717

**VII.   Motorola Breached Its Contracts With The IEEE And ITU By Failing To Make Licenses To Its 802.11 And H.264 Patents Available On RAND Terms.**

Both contracts require Motorola to make licenses to its SEPs available to Microsoft on RAND terms.  8/27/13 Tr. (Dailey) 63:3–6; Final Jury Instr. No. 15.  The RAND rate for Motorola's patents has been set: 0.555 cents per unit for its H.264 SEPs and 3.471 cents per unit for its 802.11 SEPs.  Final Jury Instr. No. 20; 8/29/2013 Tr. (Murphy) 138:22–139:3, 141:10–15.  The record contains no evidence that Motorola has ever offered Microsoft a license on these terms.  To the contrary, the record establishes that as recently as December 2012, Motorola continued to demanded a supra-RAND royalty of 2.25% of the end product price.  8/28/13 Tr. (Gutierrez) 160:23–161:6.  Microsoft has been clear and unequivocal going back at least two years that it is ready and willing to accept a license at the Court-determined RAND rate.  8/29/13 Tr. (Murphy) 47:23–48:10; 9/3/13 Tr. (Killough) 10:20–11:14.  Microsoft has yet to receive an offer for a RAND license, and there is no evidentiary basis from which a reasonable juror could conclude otherwise.

**VIII.   Motorola's Orange Book Argument Does Not Provide A Mitigation Or Causation Defense.**

To establish that Microsoft failed to mitigate damages, Motorola must prove both that Microsoft failed to use reasonable efforts to minimize its loss *and* the amount of damages that Microsoft could have minimized or avoided.  Final Jury Intr. 26.  Motorola's Orange Book "Road B" fails as a mitigation argument for two reasons:  First, the record contains no evidence as to the amount of damages that could have been avoided by following that path.  Second, no reasonable juror would have a legally sufficient basis to conclude that the procedure proposed was reasonable.   Motorola's witness explained that to be on the absolutely safe side in following "Road B," Microsoft would first have had to place into escrow the full amount that Motorola had demanded.  8/30/13 Tr. (Haedicke) 208:2–13.  There is no evidence what that amount would have been.  8/30/13 Tr. (Haedicke) 216:1–3.  Motorola's witness claimed that Microsoft—presumably, if it were willing to be less than absolutely safe--could

MICROSOFT'S RULE 50(a) MOTION FOR
JUDGMENT AS A MATTER OF LAW- 19

C10-1823-JLR

LAW OFFICES
**CALFO HARRIGAN LEYH & EAKES, LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700 FAX, (206) 623-8717

1   instead have escrowed "a reasonable amount," but the witness could not identify what that

2   amount would have been either.  8/30/13 Tr. (Haedicke) 208:12–17.  In either case, Microsoft

3   would then have had to file a separate lawsuit to challenge the rate and try to get its money

4   back.  8/30/13 Tr. (Haedicke) 207:4–208:1.  Motorola's witness admitted it was pure

5   speculation to guess how long that process would take in months or years, 8/30/13 Tr.

6   (Haedicke) 208:18–24, and that he could only speculate what evidence might be considered in

7   that type of proceeding.  8/30/13 Tr. (Haedicke) 209:19–210:11.  Motorola's witness could not

8   say what costs, legal or otherwise, Microsoft would incur by following the "Road B" path.

9   8/30/13 Tr. (Haedicke) 217:11–217:15.  Motorola's witness could not say what amount the

10  German court would set as the royalty, or even confirm it could not be as much as $4 billion.

11  8/30/13 Tr. (Haedicke) 216:16–217:10.  Motorola's witness could only guess whether in total,

12  going down "Road B" would cost Microsoft more or less than the $25 million Microsoft seeks

13  as damages for Motorola's breaches in Germany.  8/30/13 Tr. (Haedicke) 217:16–20.

14          A procedure of unknowable costs that could result in a German court's order to pay

15  some unknown amount up to $4 billion in royalties for two patents, when a RAND royalty is

16  less than $2 million annually for Motorola's entire H.264 portfolio, cannot be a "reasonable

17  effort" Microsoft was obligated to take to minimize the damages caused by Motorola.  *See,*

18  *e.g.*, *Jaeger v. Cleaver Const., Inc.*, 201 P.3d 1028, 1037 (Wash. App. 2009) ("Courts allow a

19  wide latitude of discretion to the person who, by another's wrong … is faced with a probability

20  of injury or loss.") (citing cases).  Motorola cannot carry its burden of establishing the amount

21  of damages that could have been minimized or avoided by following "Road B" because it

22  offered no evidence of the costs of that option.  There is no legally sufficient evidentiary basis

23  to find that Microsoft failed in its duty to minimize damages.

24          Further, there is no legally sufficient basis for evidence related to the Orange Book to

25  play any role in assessing Motorola's liability or damages.  The existence of the Orange Book

26

MICROSOFT'S RULE 50(a) MOTION FOR          **C10-1823-JLR**
JUDGMENT AS A MATTER OF LAW- 20

1    procedures does not affect the direct causal link between Motorola's pursuit of injunctions and

2    Microsoft's decision to relocate its distribution facility.  8/29/13 Tr. (Davidson) 70:7–15, 83:1–

3    4.  Microsoft *did* take the "Road A" option of making an Orange Book offer which was both

4    higher than RAND and rejected by Motorola.  And Road B provided no path to avoid the

5    necessity of moving the distribution facility for the same reasons outlined above—Motorola

6    produced no evidence of its costs, and indeed the record its expert created established that the

7    outcome under that path is purely speculative.  An argument that Microsoft did not pursue one

8    of multiple options to avoid severe harm is a mitigation argument, not a causation argument.

9    Such "evidence" of other possible routes to avoid the harm Motorola's injunction would have

10   caused cannot undermine the concrete evidence that Microsoft was forced by Motorola to take

11   some action.

**IX.   Microsoft's Defenses Of Invalidity And Noninfringement Are Irrelevant To
        Motorola's Liability For Breach Of Contract.**

13         Microsoft did not repudiate or forfeit any of its rights under the contracts by arguing

14   that Motorola's SEPs were invalid or not infringed by Microsoft.  Motorola's suggestions that

15   Microsoft was not entitled to a RAND license because it did not concede the validity and

16   essentiality of Motorola's SEPs are inconsistent with the conclusions reached by regulatory

17   agencies investigating Motorola's conduct and otherwise are without legal basis.

18         Motorola argued in its opening statement that seeking injunctions does not breach the

19   RAND commitment if the implementer is not a "willing licensee," and that Microsoft is not a

20   willing licensee because it presented noninfringement and invalidity defenses in Motorola's

21   various infringement suits.  8/26/13 Tr. at 182:22–183:6 ("[R]emember, as of this time

22   Microsoft never said it was willing to pay or had said, we do, in fact, infringe your patents;

23   and, yes, they're valid"); *id*. at 159:17–21 (arguing Microsoft is not a willing licensee); *id*. at

24   178:23–179:8 (same).  But, as Motorola knows, the FTC disagrees—but the Court's rulings at

25   trial, which were made at Motorola's insistence that it would be severely prejudiced by

1   introduction of any FTC evidence, barred Microsoft from presenting this evidence.  Ex. 6089

2   at MOTM_WASH1823_0620163, ¶¶ 25–27 (Microsoft was a willing licensee).  Motorola

3   ultimately signed an agreement with the FTC stating that asserting such defenses does not

4   render an implementer an unwilling licensee.  Ex. 6090 at MOTM_WASH1823_0620228.

5   Motorola fought vigorously to keep the existence of this investigation out of the record of this

6   trial, but the statements made by the FTC in the course of investigating Motorola's conduct

7   contradict the position Motorola sought to advance at trial.[4]

8         Further, Microsoft's witnesses testified that in spite of any defenses of invalidity or

9   noninfringement asserted in Motorola's patent actions, Microsoft stated in its complaint in this

10  case that despite any concerns about invalidity and noninfringement: "Microsoft has to rely

11  upon Motorola's and other similarly-situated patentholders' representations that all patent

12  controversies may be avoided based on the offer of patent licenses on reasonable rates and

13  non-discriminatory terms."  8/29/13 Tr. (Gutierrez) 56:20–24.  Microsoft's witness David

14  Killough also explained why such defenses must be asserted in patent infringement cases,

15  because otherwise the implementer would simply be conceding liability, 9/3/13 Tr. (Killough)

16  45:3–14, and Motorola sought injunctions in those actions.  Microsoft sought a judicial

17  accounting in its complaint, and at least as of September 2011 cemented its commitment to

18  take a RAND license in this litigation.  9/2/13 Tr. (Killough) 228:4–14; 9/3/13 Tr. (Killough)

19  11:8–14.  Microsoft's patent defenses are simply irrelevant to Motorola's contract liability.

20  **X.   Motorola Breached Its Contracts With The IEEE And ITU By Making Blatantly
         Unreasonable Offers For Licenses To Its Standard Essential Patents.**

21

22        The Court has already ruled, and the parties have never disputed, that blatantly

23  unreasonable offers always violate the duty of good faith and fair dealing.  (Dkt. 335 at 25;

24  ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯
       [4] Motorola also knows that European Commission disagrees.  Ex. 6076 at MS-MOTO_1823_00005258273

25  ("[I]n the Commission's preliminary view, the fact that the potential licensee challenges the validity, essentiality
    or infringement of the SEP does not make it unwilling where it otherwise agrees to be bound by the determination

26  of FRAND terms by a third party.").

Dkt. 188 at 15 ("To wit, during the February 13, 2012 status conference, counsel for Motorola agreed that blatantly unreasonable offers would violate its RAND obligations under the policies.").)  There is no legally sufficient evidentiary basis on which a reasonable juror could conclude that Motorola's offers were anything but blatantly unreasonable.

For its H.264 SEPs, Motorola sought royalties of $11.25 for a $500 laptop, with even higher royalties attaching to more expensive laptops.  8/28/13 Tr. (Gutierrez) 123:25–124:11.  This is in contrast to a RAND rate of 0.555 cents per unit.  Final Jury Instr. No. 20; 8/29/2013 Tr. (Murphy) 138:22–139:3.  Motorola's demand for its H.264 patents amounted to more than $4 billion per year where a RAND royalty would have amounted to less than $2 million per year.  8/28/13 Tr. (Gutierrez) 124:16–22, 125:4–7.  As for its 802.11 patents, Motorola sought royalties of up to $9 per Xbox where a RAND rate was just 3.471 cents per unit.  Final Jury Instr. No. 20; 8/28/13 Tr. (Gutierrez) 130:4–6.  In fact, Motorola's demand for its 802.11 SEPs exceeded the cost of the chip that provides Xbox with 802.11 functionality.  8/28/13 Tr. (Gutierrez) 130:18–23.  Dailey agreed that Motorola's October 2010 offers were "orders of magnitude" higher than the RAND rate.  8/27/13 Tr. (Dailey) 95:15–20.  Motorola has presented no evidence contradicting these facts, leaving a reasonable juror with no legally sufficient evidentiary basis to conclude that Motorola's offers were anything but blatantly unreasonable.[5]

## XI.   All Three Motorola Defendants Are Liable For Breach Of Contract.

The evidence establishes that Kirk Dailey was acting on behalf of all involved Motorola entities.  The October 2010 letters were on Motorola, Inc., letterhead and purport to offer licenses to patents held by a variety of Motorola entities.  Exs. 1, 2.  In the negotiations through the period that was the subject of both Horacio Gutierrez's and Kirk Dailey's

---

[5] Consideration of the upper bound of the RAND range compels the same conclusion.  8/29/13 Tr. (Murphy) 139:12–140:2, 142:6–19

MICROSOFT'S RULE 50(a) MOTION FOR
JUDGMENT AS A MATTER OF LAW- 23

C10-1823-JLR

LAW OFFICES
CALFO HARRIGAN LEYH & EAKES, LLP
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700 FAX, (206) 623-8717

1    testimony, those patents, and patents subsequently owned by both Motorola Mobility, Inc.,

2    Motorola Solutions, Inc., and General Instrument Corporation have been the subject of the

3    parties' dispute.  Dailey's initial conduct in sending the letters relates to all three entities

4    because their patents were the subject of the offers.  Dailey's continued conduct and the pursuit

5    of injunctions—not only as leverage to back up Motorola's demands for its SEPs, but also for

6    concessions on non-standard-essential patents—is likewise attributable to all entities.

7         Any Motorola objection on this ground has been waived.  Across the entire scope of

8    this litigation, through and including the November trial, Motorola has conducted this case as

9    "Motorola"—collectively as Motorola, Inc. (now Motorola Solutions, Inc.), Motorola

10   Mobility, Inc., and General Instrument.  Motorola filed the Joint Pretrial Order as "Defendants

11   Motorola, Inc. (n/k/a Motorola Solutions, Inc.), Motorola Mobility LLC, and General

12   Instrument Corporation (collectively 'Motorola' or 'Defendants')."  (Dkt. No. 803 at 1.)

13   Motorola stipulated to admitted facts that "Defendants sent Microsoft" the two October 2010

14   letters.  (Dkt. No. 803 at 6.)  Motorola repeatedly displayed its own demonstrative timeline to

15   the jury that shows that "Motorola files suit in WD WI," that "Motorola files suit in ITC," and

16   that "Motorola files in Germany."  Wion Dec. Ex. 2 (Motorola Timeline Demonstrative); *see

17   also* 8/30/13 Tr. (Haedicke) 200:8–13.  In other words, Motorola has affirmatively represented

18   to the jury that the key relevant conduct—the letters and the pursuit of injunctions—was

19   undertaken by "Motorola"—*i.e.*, all three entities.  And Motorola stood by while the jury

20   received preliminary instructions defining Motorola collectively as the three entities.  This

21   trial, like the last trial, has proceeded on that definition, and Motorola cannot change it now.

22        DATED this 4th day of September, 2013.

23                                              CALFO HARRIGAN LEYH & EAKES LLP

24

25                                              By ____s/Arthur W. Harrigan, Jr._____
                                                   Arthur W. Harrigan, Jr., WSBA #1751

26

1

2

By     s/Christopher Wion
        Christopher Wion, WSBA #33207

3

By     s/Shane P. Cramer
        Shane P. Cramer, WSBA #35099

4

        999 Third Avenue, Suite 4400
        Seattle, WA 98104

5

        Phone: 206-623-1700
        arthurh@calfoharrigan.com

6

        chrisw@calfoharrigan.com
        shanec@calfoharrigan.com

7

8

By     s/T. Andrew Culbert
        T. Andrew Culbert

9

10

By     s/David E. Killough
        David E. Killough

11

12

MICROSOFT CORPORATION
1 Microsoft Way

13

Redmond, WA 98052
Phone: 425-882-8080

14

Fax: 425-869-1327

15

David T. Pritikin
Richard A. Cederoth

16

Constantine L. Trela, Jr.
William H. Baumgartner, Jr.

17

Ellen S. Robbins
Douglas I. Lewis

18

David C. Giardina
John W. McBride

19

Nathaniel C. Love

20

SIDLEY AUSTIN LLP

21

One South Dearborn
Chicago, IL 60603

22

Phone: 312-853-7000
Fax: 312-853-7036

23

24

Carter G. Phillips
Brian R. Nester

25

SIDLEY AUSTIN LLP

26

MICROSOFT'S RULE 50(a) MOTION FOR
JUDGMENT AS A MATTER OF LAW- 25

C10-1823-JLR

1501 K Street NW
Washington, DC  20005
Telephone:  202-736-8000
Fax:  202-736-8711

Counsel for Microsoft Corp.

MICROSOFT'S RULE 50(a) MOTION FOR
JUDGMENT AS A MATTER OF LAW- 26          C10-1823-JLR

LAW OFFICES
CALFO HARRIGAN LEYH & EAKES, LLP
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700 FAX, (206) 623-8717

**CERTIFICATE OF SERVICE**

I, Florine Fujita, swear under penalty of perjury under the laws of the State of Washington to the following:

1.      I am over the age of 21 and not a party to this action.

2.      On the 4th day of September, 2013, I caused the preceding document to be served on counsel of record in the following manner:

**<u>Attorneys for Motorola Solutions, Inc., and Motorola Mobility, Inc.:</u>**

Ralph Palumbo, WSBA #04751  
Philip S. McCune, WSBA #21081     _____ Messenger  
Summit Law Group                  _____ US Mail  
315 Fifth Ave. South, Suite 1000    _____ Facsimile  
Seattle, WA  98104-2682          \_\_X\_\_ ECF  
Telephone:  206-676-7000  
Email:  Summit1823@summitlaw.com

Steven Pepe (*pro hac vice*)         _____ Messenger  
Jesse J. Jenner (*pro hac vice*)       _____ US Mail  
Ropes & Gray LLP                 _____ Facsimile  
1211 Avenue of the Americas     \_\_X\_\_ ECF  
New York, NY  10036-8704  
Telephone:  (212) 596-9046  
Email:  steven.pepe@ropesgray.com  
Email:  jesse.jenner@ropesgray.com

Norman H. Beamer (*pro hac vice*)   _____ Messenger  
Ropes & Gray LLP                 _____ US Mail  
1900 University Avenue, 6th Floor   _____ Facsimile  
East Palo Alto, CA  94303-2284    \_\_X\_\_ ECF  
Telephone:  (650) 617-4030  
Email:  norman.beamer@ropesgray.com

Paul M. Schoenhard (*pro hac vice*)  _____ Messenger  
Ropes & Gray LLP                 _____ US Mail  
One Metro Center                 _____ Facsimile  
700 12th Street NW, Suite 900     \_\_X\_\_ ECF  
Washington, DC  20005-3948  
Telephone:  (202) 508-4693  
Email: Paul.schoenhard@ropesgray.com

LAW OFFICES  
**CALFO HARRIGAN LEYH & EAKES, LLP**  
999 THIRD AVENUE, SUITE 4400  
SEATTLE, WASHINGTON 98104  
TEL, (206) 623-1700 FAX, (206) 623-8717

Andrea Pallios Roberts (*pro hac vice*)             _____ Messenger
Brian C. Cannon (*pro hac vice*)                    _____ US Mail
Quinn Emanuel Urquhart & Sullivan, LLP             _____ Facsimile
555 Twin Dolphin Drive, 5th Floor                  ___X___ ECF
Redwood Shores, CA 94065
Telephone:  (650) 801-5000
Email: andreaproberts@quinnemanuel.com
Email: briancannon@quinnemanuel.com

Kathleen M. Sullivan (*pro hac vice*)              _____ Messenger
David Elihu (*pro hac vice*)                        _____ US Mail
Quinn Emanuel Urquhart & Sullivan, LLP             _____ Facsimile
51 Madison Ave., 22nd Floor                   ___X___ ECF
New York, NY 10010
Telephone:  (212) 849-7000
Email: kathleensullivan@quinnemanuel.com

William Price (*pro hac vice*)                      _____ Messenger
Quinn Emanuel Urquhart & Sullivan, LLP             _____ US Mail
865 S. Figuera St., 10th Floor                 _____ Facsimile
Los Angeles, CA 90017                              ___X___ ECF
Telephone:  (212) 443-3000
Email: williamprice@quinnemanuel.com
MicrosoftvMotoBreachofRANDCase@quinnemanuel.com

DATED this 4th day of September, 2013.

s/  Florine Fujita
FLORINE FUJITA

MICROSOFT'S RULE 50(a) MOTION FOR        **C10-1823-JLR**
JUDGMENT AS A MATTER OF LAW- 28

LAW OFFICES
**CALFO HARRIGAN LEYH & EAKES, LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700 FAX, (206) 623-8717