UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON AT SEATTLE

| | |
|---|---|
| MICROSOFT CORPORATION, Plaintiff, | C10-1823JLR |
| v. | August 23, 2013 |
| MOTOROLA, INC., et al., Defendant. | TELEPHONIC HEARING |

BEFORE THE HONORABLE JAMES L. ROBART
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Plaintiff: Arthur Harrigan, Christopher Wion, David Pritikin, Richard Cederoth, Andy Culbert and Ellen Robbins

For the Defendants: Ralph Palumbo, William Price, Brian Cannon, Kathleen Sullivan and Phillip McCune

THE COURT: Good afternoon.

MR. PALUMBO: Good afternoon, your Honor.

THE COURT: May I have a list of who is going to be speaking for the parties? And I would like to limit it to one or two to each side, please.

MR. HARRIGAN: Your Honor, Art Harrigan. I will be the primary speaker for Microsoft. If possible, Ms. Robbins may chime in at some point.

MR. PALUMBO: Your Honor, Ralph Palumbo. I have with me here Mr. Price, Ms. Sullivan, Ms. Roberts, Mr. Cannon and Mr. McCune, all of whom you've met, and Mr. Elihu of Quinn Emanuel, who I believe you have not met. The people speaking today, principally, will be Mr. Price, Ms. Sullivan and Mr. Cannon.

MR. HARRIGAN: Your Honor, just to complete the introductions, I am here with Mr. Pritikin, Mr. Cederoth, Mr. Wion, Mr. Cramer, and I believe Mr. Culbert from Microsoft is also on the phone.

THE COURT: All right. Well, counsel, to the extent that various people speak, I will ask you to identify yourself before you start in. There is a reporter back in Seattle who will be taking all of this down, and he may not be as familiar with the voices as I am.

So we have a not unlimited amount of time here, so I'm

just going to plunge right in. The first topic that I would like to take up is exceptions to the preliminary jury instructions. I do this so we can save a little bit of time on Monday.

I will start with the plaintiff. Mr. Harrigan, does Microsoft have any objections to the court's preliminary jury instructions?

MR. HARRIGAN: Your Honor, we have a few suggestions. Shall I just go through each one, or do you want to deal with them one at a time?

THE COURT: If we are going to deal with them, just do them all together.

MR. HARRIGAN: The first one has to do with references to the hypothetical negotiations, which are at Page 12, Line 6, and then down again at Line 16. Our thought about that subject is that the concept of putting a hypothetical negotiation in front of the jury has the potential to be confusing. And we have two alternate suggestions: One is to remove Lines 7 and 8, and parts of Lines 15 and 16, where the hypothetical negotiation is referred to, and simply start, "A RAND royalty rate is," and then, "I have concluded in a previous trial that the RAND royalty rate 802.11 would have been." That's the approach we think is preferable.

The alternative approach, we think, is to leave it as

it is, but explain the role of the hypothetical negotiation. Because, given the issue in this case that Motorola -- I mean, that Motorola's approach to this case is, well, this all should have been a negotiation and the letters are beside the point, we are concerned about jury confusion.

So if there is going to be a reference to it, we would request that the court explain that this was a method that the court used to arrive at the rate, it is not something that the court is saying the parties would have been doing or should have been doing.

THE COURT: All right. Mr. Harrigan, I am going to ask you, if you have proposed alternatives, to get those to us before the close of business today. I would make the same request of Motorola.

MR. HARRIGAN: The second one has to do with two statements that the court made with regard to the breach. And I'm going to start with the statement that the court made at Page 13, Line 9 -- excuse me, Line 7, where you say, "During the prior trial I did not examine whether Motorola breached its commitments to provide Microsoft a license to its standards-essential patents on RAND terms, and I did not examine whether Motorola acted in good faith with respect to those commitments." We have no problem with that statement. I am merely pointing out that you

are describing two separate breach theories there, and stating that you didn't decide either one.

Contrasting that with Page 5, Line 20, "The issue in this case is breach of contract. Microsoft claims that Motorola breached the IEEE and ITU contracts by violating the covenant of good faith and fair dealing that is implied in those contracts. Specifically, Microsoft alleges that Motorola breached its duty of good faith and fair dealing under the IEEE contracts by the following actions."

So we would request that in both -- In this section you also acknowledge that the claim of breach is a flat-out breach of the RAND contract obligation, which is potentially separate from the other breach, which is the breach of the covenant of good faith and fair dealing.

THE COURT: All right. Any other comments?

MR. HARRIGAN: Yes. On Page 11, we think there is a potential -- there is some potential confusion in the Microsoft products section, Lines 10 to 14. "The primary Microsoft products at issue in this case that use the H.264 standard are Windows and Xbox. Windows is an operating system for computers, Xbox is historically a video game player, but now also plays video from," and you mention "Hulu, Netflix and DVDs." And it seems to imply that H.264 would be used in those products, but in fact

 the court has found essentially that that is not the case. And I can cite the findings. That is Findings 291, 266 and 292, where the court said, for example, "that DVDs use MPEG 2 and not H.264." We would request that that language be either eliminated or revised in some form so as not to create the impression that H.264 is in those products.

And then there is a typo at Page 5. It is starting at Line 12, "On November 9, 2010, Microsoft filed its lawsuit against Motorola, asserting, among other things, that Motorola breached its contracts with IEEE and ITU by contained in these letters." There is something, we don't know what, omitted there that is needed for that sentence to work. This looks like it was based in part on Microsoft's proposed statement, which was, "Asserting, among other things, that Motorola breached its contracts with the IEEE and ITU by sending these demand letters." I don't know what the court was intending there, but there is an issue with the typo.

THE COURT: Mr. Harrigan, I am responsible for that change. My problem with your proposed language was, I don't think you have ever contended that sending the letters was an improper act. I think what you have contended is the content of the letters.

MR. HARRIGAN: I understand that issue. Your

**Honor, we are not really making any specific request here, other than there is obviously something left out, and whatever you intended to put in there needs to be in there. It just says "by contained in these letters." By something contained in these letters.**

**THE COURT: Next.**

**MR. HARRIGAN: That's it. That's all we have on the preliminary instructions, your Honor.**

**THE COURT: Mr. Palumbo, are you or Mr. Price handling this one?**

**MR. PALUMBO: Ms. Sullivan is handling this one.**

**THE COURT: Ms. Sullivan.**

**MS. SULLIVAN: Good afternoon, your Honor. Kathleen Sullivan for Motorola.**

**Your Honor, we have no quarrel with anything in your proposed preliminary instructions whatsoever, with the exception of one single addition that we proposed in Docket 864, a letter we filed with you on August 22nd. That is, we simply urge that on Page 11, at Line 8, that you add a sentence that states, quoting your earlier conclusions, "That under Motorola's contracts with the IEEE and ITU (sic), Motorola did not need to make an initial offer on RAND terms." That is the sole edit we propose for the instructions.**

**MR. HARRIGAN: We had a response to that, which we**

delivered today, I believe, your Honor, which is, if that sentence goes in, we think it should -- the court's ruling on that subject should be complete by adding, "But a blatantly unreasonable offer is a breach of the duty of good faith and fair dealing, and so a breach of the RAND contract."

THE COURT: All right. Ms. Sullivan, it is your turn to speak here. Can you give me the cite to where you said you filed something earlier?

MS. SULLIVAN: Yes, your Honor. We filed a letter on August 22nd, which is Docket 864.

THE COURT: Great. That's what I need. And, Mr. Harrigan, did you docket your letter, or did you just send it?

MR. HARRIGAN: It is Docket 865. It was filed this morning at 10:00 a.m.

THE COURT: All right. Anything else on the preliminary instructions?

MR. HARRIGAN: Not here, your Honor.

MS. SULLIVAN: Your Honor, Ms. Sullivan again. We object to the addition of the language as quoted by Mr. Harrigan, just because your Honor has not yet defined the duty of good faith and fair dealing in your preliminary instruction, and therefore we think it would be confusing to add what is a breach of good faith and

fair dealing duty that you have not yet defined. So we would object to the inclusion of the sentence with Mr. Harrigan's additional language.

THE COURT: All right.

MR. HARRIGAN: Your Honor, we have no objection to the court's defining the duty in the preliminary instructions, if that would solve the problem.

THE COURT: All right. Counsel, if we make changes to the preliminary instructions, which is likely, because I think your comments were constructive, we will give you a chance to take supplemental exceptions prior to the jury arriving. So know that you will certainly have that right.

For those of you that don't practice regularly in the Ninth Circuit, and I'm not suggesting where this will all end up, the Ninth Circuit has a rather stringent rule that you need to identify with great particularity what it is you don't like and why you don't like it, or else they have a propensity not to consider an exception. Just know that that is out there. These were very constructive suggestions, and I thank you for them.

Number two on my list is the question -- is I would like to know your position on the issue of whether the jury should be allowed to keep the preliminary instructions. I am authorized to go either way. I

 normally do not do it, because I view the preliminary instructions as sort of the operating manual for your new appliance.

It seems to me, and you have heard me say this repeatedly, we are going to have eight people who don't know very much about this dispute, and we are asking them to match wits with you, who have been involved in it in some cases for years, if not decades. It may be helpful if they have something to hold onto. I am going to ask you also about your position on the glossary. That would be another thing that I would allow them to hold onto.

So just to change this up, may I hear Motorola's view on those two issues?

MR. PRICE: Yes, your Honor. This is Bill Price talking. On the preliminary instructions, I don't think the jury should keep those. It would tend to give weight to some instructions over others, such as the instructions you are going to give at the end of the case. It might tend to give weight to some facts over others, because they are going to be hearing facts throughout the trial, but they are not going to get a list of those facts, even though admittedly those facts haven't been determined. I know there is going to be a lot for which there won't be much dispute. So I think it might skew what the jury is going to be looking at and listening to during the trial.

I would rather they, obviously, be given the instructions and told what the court is going to tell them, and then take that into consideration, just as they are going to be taking into consideration the rest of the things they hear throughout the trial.

With respect to the glossary --

THE COURT: Mr. Price, let me ask you this: Do I cure that if I add the language that I think is in the model instructions that says, "At the end of this case you are going to be receiving final instructions, they control," along with the language that says, "All instructions are equal," and somehow make it clear that the final instructions are what controls in this case?

MR. PRICE: Your Honor, I don't think so. I think the reality of the psychology of the folks listening to the trial is that they tend to kind of lean one way or the other along the way. The thought of them having something in their laps that has certain facts and not others, and certain instructions and not others, that they can look at for a period of a week, I think it is probably not correct to assume that they are not going to give that more weight than the later instructions or the facts as they are developed throughout the trial, even though you tell them at the beginning not to do that. I just think that is a matter of the reality of how people make decisions.

THE COURT: All right. Speaking for Microsoft.

MR. HARRIGAN: Yes, your Honor. Art Harrigan. Your Honor, as with many things in this case, we disagree. I think the idea of this instruction is that it does provide a guide to an area that is abstruse to most people who have not dabbled in it before, and it would be more useful if they don't just hear it and then it vanishes without a trace for the rest of the trial. And I concur -- I think that the approach to curing it is appropriate.

Just to shortcut it, we feel the same way about the glossary. It will be more helpful if they have it in their hands.

THE COURT: Mr. Price, did you have any objection to the glossary?

MR. PRICE: We have no objection to that, your Honor, because I do think it is useful for them to be able to flip through that so they can see what these acronyms mean.

THE COURT: All right. My third question today has to do with the jury questionnaire in voir dire. Let me tell you what I now know from talking to the jury coordinator and the in-court deputy. These folks apparently arrive around 8:00, maybe a little bit earlier. In lieu of the court's standard questionnaire, we are

 going to give them your questionnaire, and they fill that out. I have asked them to rearrange their procedures so they are going to see Raymond Burr, or whoever plays Perry Mason, in the video "Welcome to Jury Service" after they have filled out that questionnaire. So you will not have a long time to look at those jury questionnaires, but you will have some time, particularly if you have a lot of last minute matters that you want me to take up.

I am told that we send out a jury summons, and they send back something acknowledging receipt of that. And on there it asks questions like, "How far away from the courthouse do you live?" which assists us if we need to make hotel reservations for them, and, secondly, to calculate how much they get for their per diem. Apparently it also asks for their employment. Out of the 35 to 40 jurors, apparently three of them are Microsoft employees. I have directed that they come in, because it doesn't seem to me I have the power to strike them until they say something. So know that out of your jury pool at least three work for one of the parties. Apparently no one wrote down that they or their spouse work for Motorola. Just for your background, know that is what I know on that subject at this time.

Are there any questions about the court's revisions of the jury questionnaire? I think it is Microsoft's turn to

go first.

MR. HARRIGAN: No, your Honor, we don't have any questions about that. I have a question about whether we need permission to have a jury consultant at counsel table.

THE COURT: You do not need to have permission, although you do so at your own peril. O.J. Simpson has made a definite impression on the jurors, and that is one of the topics that comes up nearly every time I talk to the jury after the trial.

MR. HARRIGAN: Can we agree that there would be no mention of the presence of such a person?

THE COURT: Mr. Price, do you intend to mention that?

MR. PRICE: No, your Honor, we do not intend to mention that. We may have our own.

THE COURT: All right.

MR. HARRIGAN: Thank you.

MR. PRICE: Your Honor, this is Bill Price. The only question I have, and maybe we can get some clarification, is, I know you have said we will have some time to review the jury questionnaires. Would it be possible to at least give us a guarantee of like an hour or so to look at those?

THE COURT: The answer for an hour is no, unless

you want to take it out of your trial time. As I mentioned when we started this, jury selection is part of the hours that are allocated in your trial time. I would say there is a period of time in which I am going to ask redundantly some of the questions that are on the questionnaire, just to highlight for you who it is that answered affirmatively. So in terms of practical time, you are going -- depending on if you are allocating the task to someone else, you will certainly have some time during which you can examine the questionnaires, and also make note of who it is that is responding affirmatively to the questions.

MR. PALUMBO: Your Honor, this is Mr. Palumbo. In terms of our planning for time, how do you allocate the time that you spend asking questions during jury selection?

THE COURT: It goes 50/50 to the parties. I am doing that because -- You have a much more complete questionnaire. Some of those questions I don't think I need to ask. The first question in the bench book is, "Have any of you heard about this case?" That one, periodically, takes a lot of time, because I -- depending on how many people raise their hand. What I don't want to have happen is one person say, "Oh, yes, I went and conducted an internet search on this case and do you know

that it has been mentioned in X number," and basically start to poison the jury pool. The only way that you can avoid that is to question them at sidebar one by one.

My guess is that there has been some publicity, but not all that many people read the business section, and not that many people read the Seattle Times anymore. I am really not very comfortable in predicting what the response will be to that first question. But that's an example of something that seems to me better asked by me than by you, and we will see what the response is going to be.

Any questions about that?

MR. HARRIGAN: Not here, your Honor.

MR. PRICE: No, your Honor.

THE COURT: All right. Let me then turn to one of the two highlights of today. This is going to address the question of use of the findings of fact and the conclusions of law. I have some extensive written remarks which I'm going to read. And I do so because I recognize that one of the parties has made this a centerpiece of our preparation here.

Know that I will be filing a written order on this so that you have a fixed target to shoot against. We hope to do that early on. When you see that written order, it will be adding some case cites, and whatever, which I

**don't intend to do that now, unless I think you need to know where I am pulling this stuff from.**

**This is in response to the question of what use can the parties make of the findings of fact and conclusions of law.**

**The court will now take up how the parties may use the findings of fact and conclusions of law, which I will shorthand call FFCL, from the November bench trial in this case.**

**This question presents a unique legal issue, and it appears there is limited precedent available to guide the court's decision.**

**What the court has done, with the consent of the parties, is take a single claim for breach of contract and split that trial into two different phases, a bench phase and a jury phase. As the parties are well aware, the court issued a 200-plus-page findings of fact and conclusions of law concerning the bench trial results.**

**Along the way, the court found numerous facts bearing directly on the ultimate question of a RAND rate and range. For example, the court made findings related to the value of Motorola's patents, the extent of their contribution to the standard, and the value of Microsoft's products. This obviously was because the court could not set a RAND rate or range in a vacuum; it was necessary to**

understand Motorola's patents in context and to hear testimony from experts on the value of those patents.

The individual findings of fact were the building blocks of the court's ultimate RAND determination, and without those building blocks the final determination could not exist.

The question now before the court is how the findings of fact and conclusions of law should be used in the upcoming jury phase of the trial. The court has already ruled, in deciding motions in limine, that the jury may hear the RAND rate and range. This is not in dispute at this point. The question now is whether the jury will be permitted to hear the individual factual findings on which the RAND rate and range are predicated; in other words, whether the jury will be permitted to hear the building blocks that made up the court's ultimate RAND determination.

There are two overriding concerns with respect to this issue. First, the court must protect the parties' right to a jury trial where that right has been preserved. It is clear that it would violate the Seventh Amendment if the court, through its Findings and Conclusions, precluded the jury from deciding factual questions on which the parties preserve their jury trial rights.

However, it is equally clear that it does not violate

 **the Seventh Amendment for the court to decide factual questions, and thus preclude the jury from deciding those questions, where the parties have waived their right to a jury trial.**

**This leads to the second major area of concern on this issue: holding the parties to the commitments they have made in this case and not allowing them to negate their prior representations to the court.**

**The parties charted a course with this case that included waiving their jury trial rights on certain issues. It now appears that Motorola seeks to recant this prior agreement, having not achieved its desired result it hoped for in the first phase. The court must be mindful not to allow the parties to re-litigate the issues that they agreed to have the court decide, and the court did decide, simply because a party does not like the court's findings.**

**With these concerns in mind, the court now turns to the central issue to be decided. There is no dispute that the parties have waived some of their jury trial rights in this case; thus, the critical issue is what is the scope of the parties' waiver? This question can be answered in one of two ways. First, one can argue that the parties' waiver of their jury trial rights was narrow, in accordance with how waivers of constitutional rights are**

usually construed, and the parties only agreed to have the
court decide two issues, a specific RAND rate and a
specific RAND range for Motorola's standards-essential
patents.  Motorola now takes this position.

Second, one could argue that the parties' waiver, even
narrowly construed, necessarily covered not only a RAND
rate and range, but also all of the factual predicates
necessary to determining a RAND rate and range.  Microsoft
takes this position.

In the unique context of this case, and given the
parties' actions in the course of the litigation, the
court finds that the first proposition is unsupportable.
There are several reasons why this is true.  First, the
parties' waiver of its jury trial rights does not seek to
strictly limit the waiver to only two narrow findings, and
does not attempt to preserve the parties' jury trial
rights with respect to the RAND issues decided in the
bench trial.  In short, there is no indication that the
parties sought to restrict their jury trial waiver to only
a RAND rate and range to be given to the jury with no
factual context.

The parties' actions throughout this litigation
suggests that Motorola's position is not the correct one.
Motorola fully participated in the bench trial.  Motorola
presented evidence on and vigorously disputed all of the

**factual findings that it now claims should be kept from the jury. Motorola presented extensive evidence on the importance of the H.264 and 802.11 patent portfolios to the respective standards and to Microsoft's products. Additionally, Motorola presented evidence of the importance of the standards to Microsoft's products.**

**Further, Motorola suggested, and the court adopted, a modified Georgia-Pacific analysis as the framework for the court's RAND determination, which placed at issue nearly all of the facts which Motorola now wants to keep from the jury.**

**At no point did Motorola attempt to prevent the court from making the findings on the issue it now believes violates the Seventh Amendment. In fact, Motorola submitted 100 pages of proposed findings of fact and conclusions of law on these issues, urging the court to decide the very facts that it now seeks to exclude. At no point did Motorola qualify those proposed findings or attempt to preserve its rights to a jury trial with respect to the facts it proposed to the court. All of this behavior shows the court that Motorola's waiver is not only of the RAND rate and range, but also of the factual predicates necessary to determine that rate and range.**

**Second, the parties' reasons for agreeing to a bench**

trial in the first place favor Microsoft's position.  The
parties agreed to hold a bench trial in part because this
case presents a lot of complicated technical issues.  The
point of having a bench trial was to let the court sort
through Motorola's patents to determine what they were
worth and to spare the jury that task.  It is not that the
bench phase and the jury phase were on separate issues.
There can be no doubt that the findings of fact made in
the bench trial were relevant to the ultimate questions of
breach of contract.  Instead, the parties simply decided
that the judge, not the jury, could make the findings
because it could prove difficult for a jury.  Indeed, the
court sympathizes with this view, having spent a
substantial amount of time on the FFCL.

     The whole effort to spare the jury a difficult task
would be wasted if Motorola were now permitted to reargue
the court's findings at this point.  The jury would be
asked to determine anew the facts already found.
Likewise, the effort would be wasted if the parties were
required to present evidence again to prove facts that
have already been proved once.  The court cannot conclude
that this was the intent of the parties in waiving their
jury trial rights, nor does this viewpoint make any sense
from the context of this litigation.

     And to be clear, this is not to suggest that concerns

about conserving resources somehow trumps the Seventh Amendment. They do not. It is merely to demonstrate the reasons why the parties agreed to waive the jury trial and why the court should construe the waiver in harmony with those reasons.

Third, during the bench trial the court took great care to avoid deciding unnecessary factual issues in the bench phase and directly implicated issues to be decided in the jury phase. When such issues arose in the RAND trial, and they appeared to wander into the jury's territory, the court did not decide those issues. Further, in crafting our findings and conclusions the court was mindful not to include anything that would infringe on Motorola's right to a jury trial on the breach of contract issue.

Fourth, there is another important reason to reject Motorola's position. Motorola's position is grounded in the notion that they should be allowed to reargue the court's factual findings to the jury, even though it cannot re-argue the final RAND rate and range. This cannot be. As stated above, the court's individual findings of fact are the building blocks on the RAND rate and range. If each of these building blocks could be challenged in front of the jury, Motorola would in effect be allowed a second bite at the apple on the RAND rate and

**range. It is impossible to successfully challenge the individual factual findings without undermining the court's ultimate RAND conclusions. Allowing such challenges would permit Motorola to have it both ways. Motorola would get to argue the value of its patents to the judge, and then if the judge disagreed with them, Motorola could simply ask the jury to reach a different result. That is not what the parties agreed to. The RAND rate and range have been decided. The parties consented to a bench trial, and they got one. The court will now hold the parties to their commitments.**

**Finally, the parties sought to have the court determine, broadly, the RAND portion of the case, and to have the jury determine the breach of contract portion. Quoting Mr. Harrigan: "In a nutshell, your Honor, the parties agree that there is no jury involved, there is no jury requirement with respect to the court's determination of what is RAND, and the contract and so forth; and disagree with respect to whether a jury would be required to deal with the breach of contract part of the case."**

**The parties agreed to have the court determine, quote, "all material terms of the RAND contract," unquote. Quoting Mr. Palumbo: "That's right, your Honor. Our agreement is the court would decide all of the material terms of the RAND license. And we currently have a**

**disagreement with respect to whether the breach of contract action should be tried by the court or by the jury."**

**Further, the court has been clear throughout this case that the purpose of the bench trial was to determine a RAND rate for use by the jury in the second phase of the trial. Quoting the court: "It seems to me what you're really asking is what's going to happen in November. So let me tell you what I think is going to happen in November, and then I'm happy to hear from you. In November, I expect us to try in a bench trial the RAND terms for patents covered by ITU's standard H.264, and the patents pertaining to IEEE 802.11. I understand from the complaint, and from Motorola's offer letters of October 21, 2010 and October 29, 2010, that there are patents at issue in what we call the 1823 litigation. That mostly is a question of the royalty rate since that is what is covered by your letters. In regards to the breach of contract claim, that will not be tried at the November trial date. As I have explained to you previously, my reasons for that is the breach of contract, as Motorola has admitted, exists in relation to the RAND rate. I think Mr. Jenner's example was a million-dollar royalty rate for one patent and the RAND rate turned out to be 15¢. Since I don't know what the RAND terms are yet, it**

seems to me I can't deal with a breach of contract until RAND is determined."

Indeed, Motorola preserved its jury trial right only with respect to the breach of the issue of the duty of good faith. Mr. Palumbo: "In answer to your question, we have decided not to waive the jury trial on the breach of the duty of good faith issue, and with respect to that issue, we think -- we do agree that it is a triable issue which the jury can determine. In other words, did Motorola accord to its obligation to negotiate the contract in good faith? We may have issues with respect to whether the court can instruct the jury as to the proper RAND rate, but we agree that it is a jury question as to whether Motorola has conformed to its obligation to negotiate a RAND license in good faith. So you would have to decide, if you go forward, to actually set the terms of the RAND license, you would need to decide only which terms are material, and then what each of those material terms would be."

The parties understood that the project of the court would be to determine what the RAND terms are. Quoting the court: "I will tell you that the operating assumption of the court as to right now is that Motorola, when it contracts for industry standard patent status, obligated itself to make an offer on RAND terms for a license to the

**patents that are covered, the H.264 and 802.11 patents; that Microsoft has accepted that offer on RAND terms; and what the court is doing is determining what those RAND terms are."**

**Thus, the parties' waiver of their jury trial rights does not support Motorola's position that it waived its jury trial rights exclusively with respect to the RAND rate and range and none of the other facts found in the bench trial.**

**Accordingly, the court concludes that the scope of the parties' jury trial waiver, even narrowly construed, must include not only the RAND rate and range, but also all of the factual predicates contained in the findings of fact and conclusions of law that were necessary to determine that rate and range. It will not violate Motorola's Seventh Amendment right to allow the jury to hear the court's factual findings.**

**The remaining question is how, from a mechanical standpoint, the parties will be permitted to make use of the findings and conclusions. This is subject to varying approaches, but the court will now establish several principles to guide the parties:**

**First, that the FFCLs will not be admitted in their entirety.**

**Second, the court will not specifically instruct the**

jury on a particular finding of fact, with the exception
of the RAND rate and range.  Instead, the findings must
come in through witness testimony.

Third, conclusions of law in the court's orders may be
freely used and referred to.

Fourth, the use of the court's findings are subject to
Federal Rules of Evidence 401, 402 and 403.  In
particular, the court is unwilling to allow the parties to
go into excessive detail about the specific nonessential
issues explored in the previous trial, and will exclude
attempts to do so under 403.

Fifth, if a witness testifies on direct examination
concerning a subject covered by the findings and
conclusions, and the underlying finding is challenged on
cross, the court will not permit evidence in an effort to
re-litigate that issue if the court has already decided
it.

Sixth, the parties should minimize the use of phrases
like, "Judge Robart says," and "the court has ruled."  The
parties should also not attempt to improperly use the
imprimatur of the court to imply that the jury should
reach a certain result or view the evidence in a certain
way.

Seventh, witnesses may not simply read from the FFCL.
Instead, they must testify to the underlying facts, and

may, if necessary, use the court's finding as the basis for those facts. As a corollary, counsel may not display excerpts from the findings of fact and conclusions of law to the jury using PowerPoint or any other display mechanism. If a witness testifies to a fact contrary to something contained in the findings and conclusions, the opposing party may use the findings and conclusions to impeach that witness.

Finally, the court will obviously entertain legitimate objections to the use of the court's findings and conclusions during the trial, and will address those issues on a case-by-case basis. As I said, we are going to be confirming that in a written order, which will be available to you.

Turning then to -- It seemed helpful to have an example to guide you. Microsoft filed at Docket 861 excerpts of the court's orders upon which Microsoft intends to rely in Microsoft's opening statements. If you look on Page 4 of that order, at Paragraph 289, to what the court would believe to be acceptable, would be, taking the language out of the Findings of Fact and Conclusions of Law, 289: "Motorola's H.264 SEPS provide only minor importance to the overall functionality of Microsoft's Windows products. Windows, first and foremost, is an operating system designed to permit various applications

to operate via a user. The Windows operating system has vast functionality completely unrelated to any video viewing. Only when a Microsoft Windows user chooses to play interlaced video would Windows employ the functionality of Motorola's H.264, which in turn only provide a portion of the coding tools necessary to view the interlaced video. Moreover, the interlaced video would still play without Motorola's H.264, it might just be five to eight percent slower."

Contrast that with Findings of Fact 533, which would be, "The court concludes that Motorola's H.264 portfolio only constitutes a sliver of the overall technology incorporated in the H.264 standard." The remainder of that finding and conclusion has to do with Telenor Group. And it talks about what they did. It says, "Telenor decided not to seek patents on its contributions, and notified JVT of its decision."

That, in the eyes of the court, would not be an appropriate use of the findings and conclusions, as it does not have anything to do with the overall question of breach of contract.

So, I offer those as examples to help you with how to approach this issue.

You all created a controversy, as exemplified in Mr. Harrigan's August 20 letter dealing with the

defendant's revised proposed preliminary instructions. It says, "Motorola's submission does not contain stipulated facts." The court believes that the only stipulated facts in this matter are found in your pretrial order on Page 5. It is entitled "admitted facts." It says, "facts to which all the parties agree." Short of that, I see nothing that each of you has submitted that says both of you agree as to anything. So know that is our operating assumption as to where you are in terms of stipulated facts.

That was a long section of me talking. Mr. Price, I think you are up first on this one. Any questions in regards to the court's ruling?

MR. PRICE: No questions, your Honor. We obviously look forward to (phone malfunction) --

THE COURT: I'm sorry. You cut out on me there.

MR. PRICE: I'm sorry. We have no questions, your Honor. We obviously look forward to seeing it in writing so we can give it the attention it deserves.

THE COURT: Thank you. Mr. Harrigan.

MR. HARRIGAN: Yes, your Honor. I have a couple of questions. First of all, I just want to make sure I understood your examples. So with regard to 533, what I believe you said was the first sentence about the "sliver" is appropriate, and the rest of that is not?

THE COURT: A witness will be able to testify to

it. You don't get to put it up as a PowerPoint presentation.

MR. HARRIGAN: I understand. Let me just give you an example. Maybe this will help us to make sure we understand. If we put Mr. Glanz on, the approach I was thinking that would be efficient is, rather than have him reiterate everything he said in an hour in the last trial, to use the court's findings with regard to what happened with MPEG LA and Motorola's approval of rates, and so forth, and then have him simply give a little context to it, with the idea that we could cover this in 20 minutes instead of 45 minutes to an hour. And I was contemplating that I would read to him during his testimony maybe five of the court's findings on the subject of MPEG LA, and he would put them in a little bit larger context for the jury. You said that the witness could testify from the findings, but I'm not sure whether the lawyers are allowed to read them into the record as part of the witness' testimony. Is it that the witness should refer to the findings and quote from them, and then explain some of the context? In other words -- I am babbling a little bit here, but I am just trying to figure out what the right approach is.

THE COURT: You're not going to be able to read them to him and say, "Is that a finding?" That is not a

 proper bit of evidence. He is not going to be permitted to say, the court found in finding such and such, and then recite what that is. If he is competent to state the area, he can say, this is MPEG 2, this is what happened in MPEG 2, this was the ultimate conclusion of MPEG 2. If he is assaulted on cross-examination, and they say that can't possibly be right, he would be permitted to say, you know, the court found in its prior order what I have just testified to. But you have to put these findings and conclusions into evidentiary form. You don't simply get to put them up there under limited or no context, because at that point you are converting the court into a witness, which I don't believe is proper under the circumstances.

MR. HARRIGAN: Would Mr. Glanz be able to use the court's findings to -- In other words, the thing I am concerned about is that it sounds as though we would be in effect re-presenting the evidence that underlies the court's findings, which I thought I understood from your other remarks is something that you want to avoid. And so it is unclear to me how we get the finding into evidence if the witness can't read it, we can't read it and we can't put it up on a screen. How do we use the findings to get this trial done in the amount of time that we have available?

THE COURT: That's why they are paying you the big

bucks, to figure that out. He is not going to get to say, my testimony is the court found at Finding 581 such and such. He can say the substance of the findings, you know, what happened in MPEG.

MR. HARRIGAN: I think I get it. I take it the jury is never going to actually see or hear these findings; is that right?

THE COURT: They are going to hear and see the finding on rates and range, and they are going to hear testimony from witnesses; and if the witness is cross-examined in regards to the accuracy of that testimony, they are going to be able to ultimately say, this was previously determined by the court and that's why I believe this is what happened.

There seems to be some stunned silence. Does that mean that I can move on?

MR. HARRIGAN: I guess, your Honor, we are a little bit puzzled by how we are going to get this done in the available time. I guess we will just have to figure that out. Assuming that the court was going to adhere to your original view, that the findings were verities, and the jury in effect wasn't going to have to revisit them, our operating assumption in getting ready for trial was that we didn't have to re-prove the findings, and we could in effect use them in some form. But it sounds like you

have excluded all of the forms in which we thought we potentially could use them. I am just a little puzzled about how we avoid retrying the case.

THE COURT: I would urge you to retry the case on the breach of contract question and not on the RAND rate question. That's the original distinction that we had. I have read your -- the excerpts that were going to be used as part of the opening statement, and I simply don't think that many of them have anything to do with the breach of contract.

MR. HARRIGAN: Right. We may have been overinclusive. But, for example, the issue of whether Motorola's patents are a sliver of either of the two standards, obviously as it bears on the good faith issue it bears on whether Motorola was frustrating the purpose of RAND because of stacking and so forth. I mean, we would have to call an expert from the prior trial to testify that they were a sliver. And we were of the understanding that the court, having gone through an enormous amount of analysis to reach that one-sentence conclusion, that we would be able to present that finding and not go back through the analysis that created it.

THE COURT: I don't want you to go back through the analysis that created it. You are going to be able to allow your witnesses to testify that this is a very large

standard, it has a lot of stuff in it, it went through an extended and complicated process to be created, and that Motorola's patents are but a sliver of it. That's what the court found, and that's what I understand you are presenting testimony about.

Are we going to go back and talk about the particular value of interlaced video? No. We are trying a breach of contract case, we are not retrying the RAND rate case.

MR. HARRIGAN: I think I get it.

THE COURT: Good. Let me move on to Marvell then. Once again, this is going to be one where we are going to give you a written order. But much to the disappointment of the blogosphere, I am not going to wade into the question of exhaustion, particularly in this trial.

Once again, this is one where the court will give you a written order so that you know my thinking on this.

The law is well established that an authorized sale of a patent product places that product beyond the reach of the patents. The patent owner's rights with respect to the product end with its sale, and a purchaser of such products may use or resell the product free of the patent. This longstanding principle applies similarly to a sale of a patented product manufactured by a licensee acting within the scope of its license.

I am omitting the case cites that go along with this

since I'm sure you all know them by heart.

In Honeywell, over the dissent of Judge Mayer, the Federal Circuit reversed a finding that patent rights were exhausted to the accused systems sold by the plaintiff at a time before the plaintiff had merged with the holder of the patent, the majority ruling that there was no authorized first sale.  And then it has a quote about, "For the first sale doctrine to apply, there must be an authorized first sale."

In other words, courts examining the question of exhaustion look to the license agreement, typically between the patentee and licensee, to determine whether a sale of a licensed product was authorized by that agreement.  For example, in Quanta, cited by the parties in their briefing on the exhaustion issue, the court examined the scope of the license between Intel and LGE. The court found that, "Nothing in the license agreement restricts Intel's right to sell its microprocessors and chipset to purchasers who intend to combine them with non-Intel parts.  It broadly permits Intel to make, use, or sell products free of LGE's patent claims."  The Quanta court then found:  "Because Intel was authorized to sell its products to Quanta, the doctrine of patent exhaustion prevents LGE from further asserting its patent rights with respect to the patents substantially embodied by those

products."

As another example, in Cook, Inc. versus Boston Scientific, the court examined license agreements between the patentee and the licensee, and determined that the doctrine of exhaustion did not apply because the license agreement prohibited the downstream assignment to a third party, such that the third party could not make the requisite first sale of the patented product." See also Intel versus ULSI System Technology.

In that case it is examining the specifics of the license agreement between Intel and Hewlett Packard to determine if HP's sale of the 'C87 coprocessors were insulated by the doctrine of exhaustion from Intel's claim of infringement because they were sold by ULSI to HP, which was authorized to do so under the license agreement with Intel.

Here, Microsoft asked the court to set forth a jury instruction that a presumed license agreement between Motorola and Marvell for Motorola's 802.11 SEPs would act to exhaust Motorola's patent rights against Microsoft. Motorola states, citing Quanta, "that a RAND license agreement granted by Motorola to Marvell would broadly permit Marvell to make, use or sell products free from Motorola's patent claims, because Motorola's RAND license agreement bars it from imposing any conditions limiting

 Marvell's authority to sell products substantially embodying the patent."

First, as explained above, Quanta examined a specific license agreement and determined that the license agreement between Intel and LGE permitted the sale of patented products. The holding of Quanta was specific to the license agreement at issue in that case.

Second, Quanta does not in any way deal with the RAND commitment, as Microsoft suggests.

The bottom line here is that each license agreement is specific, and whether or not the downstream sale is authorized by the license agreement between the patentee and the licensee is dispositive of authorization and thus whether the exhaustion doctrine applies. Here, we do not have a Motorola-Marvell license agreement. Although it is likely, we do not know if Marvell is a third-party beneficiary from Motorola's RAND commitment. Microsoft is asking the court to make a contractual determination of a license agreement that does not exist. The court will not issue such an advisory opinion.

Alternatively, Microsoft would ask the court to set forth a rule of law that a RAND commitment requires licenses free of downstream restrictions. The court cannot do that in this case because there is simply an insufficient record. The requirements of the RAND

**commitment on licensing agreements is an open question at this point, and the numerous questions of law, some of which have been briefed, some not, do not need to be resolved in this case; for instance, is a defensive suspension clause proper in a RAND license; what is the proper scope of a defensive suspension clause; does the RAND obligation require RAND licenses that will cover all downstream customers, or may restrictions be imposed on sales.**

**The Marvell issue has been in this case for a while, but there is no briefing that answers the open question of the RAND commitment's legal operation in potential licensing agreements between a SEP holder and licensees. Thus, the court cannot issue a jury instruction construing the law regarding a hypothetical Motorola-Marvell license and the effect of this hypothetical license on Motorola's ability to seek royalties from Microsoft.**

**The result is that Microsoft cannot make this argument to the jury, that had Motorola given the license to Marvell, Motorola could no longer seek royalties from Microsoft.**

**This does not mean, however, that Microsoft cannot introduce evidence regarding Motorola's conduct vis-a-vis Marvell, because such evidence is still relevant to Motorola's good faith or bad faith. Microsoft simply may**

not connect the dots and state a Motorola-Marvell license would preclude Motorola from seeking royalties from Microsoft, because such an argument turns on legal grounds which do not exist.

This will be greatly disappointing to all of those law firms who have been publishing things in the last couple of weeks, saying, oh, boy, we are looking forward to having a resolution of these issues. I don't see how I can do that, given the state of the record here, when we do not have a license, and therefore we don't know the terms of it.

Mr. Harrigan, I think you are first this time. Any question about the court's ruling on Marvell?

MR. HARRIGAN: No, your Honor.

THE COURT: Mr. Price?

MR. PRICE: No questions, your Honor.

THE COURT: All right. Moving right along then. The court received either a phone call or an e-mail, I'm not sure which, late last night, saying: Here are some miscellaneous items. We have covered the glossary. Will the court approve an agreement of calling witnesses only once?

The answer is yes.

And, finally, there would be some miscellaneous matters that might need to be sealed, and the example

given was attorneys' fees. Be mindful of the Ninth Circuit's presumption against sealing anything other than a trade secret. I don't think that attorneys' fees rates are probably a trade secret. I will keep an open mind on it, but if I were asked to rule on that at the present time, I would say we would not be sealing that.

Motorola asked: May we use video depositions in openings?

I have made rulings on all of your objections. The other side needs to know in advance what you are going to use, but I guess I have permitted videotaped deposition excerpts to be used.

And then there were some questions about time allotment. If I come out and say an issue has arisen, and I ask for comments from both of you, that usually gets allocated 50/50. If a party raises an issue, and they are the only ones that argue, it gets charged to them. I don't divide that 50/50. I will go by the actual time that each side uses.

Are there any other miscellaneous matters that you would like to take up today?

MR. HARRIGAN: Your Honor, I have one question, which I think we all reached an understanding about this subject at our last meeting with the court. But specifically with reference to Mr. Dailey, a Motorola

witness who testified at the last trial, we plan to call Mr. Dailey in our case. We understand that we had agreed that that meant that Motorola would do their full direct for their case during our case; and to the extent there is an issue regarding rebuttal, any recalling of Mr. Dailey for rebuttal would be strictly limited to new material that came up after he testified in our case. I just want to make sure we are all on the same page on that.

THE COURT: That's what I understood the agreement was. Mr. Price? Ms. Sullivan?

MR. PRICE: Your Honor, this is Bill Price talking. Yes, if Mr. Dailey is called in plaintiff's case, we would do our full examination. Obviously we would not recall him unless we made some showing that something happened that could not have been reasonably anticipated, like if a witness comes forward and says, Mr. Dailey said he had voodoo dolls of Microsoft executives, we think we should be able to come back and say, no, he didn't.

One thing I wanted to alert you to that just occurred to me, your Honor, that given your ruling today, particularly on the use of the court's order, we may want to have a few moments to reexamine whether we are going to have Mr. Dailey here for the first part of the case. We just need to think about that now that I have a clear

understanding of how your order is going to be used in the examination of witnesses.

THE COURT: Where does Mr. Dailey reside?

MR. PRICE: He is in Chicago, your Honor.

THE COURT: Here is my concern: I don't want Microsoft to be disadvantaged and I don't want Motorola to be disadvantaged. If the assumption has been that he was going to be here and therefore they didn't need to designate his testimony or whatever, and now all of a sudden you are saying, well, we might not have him appear at the start, that's not going to fly well with me. You need to live up to those commitments. On the other hand, I applaud both of you. Juries really don't get why witnesses are called and recalled. They find that very confusing.

MR. PRICE: Your Honor, I understand exactly what you are saying. Microsoft has already designated Mr. Dailey's deposition testimony. The question is whether or not we don't have to deal with that because he is going to be live. And we represented to the court that in fact was what we were going to do, is have him available live. I am just saying, given the court's order, I just need time to think about whether or not we still want to do that, and whether or not -- Of course, we would have to have the court's permission to change

that. I understand that. But Microsoft has already designated deposition testimony of him in case he was not going to be available.

MR. PRITIKIN: Your Honor, this is David Pritikin. We were told last week, I think, that Mr. Dailey was going to be their corporate representative, meaning that he would be present through the entire trial. It was Motorola that had asked that we call him in our case so that we could avoid having to call him twice. There are various pieces of testimony he has given before, some of it is the trial transcript from the trial last fall, some of it is the trial transcript from the International Trade Commission. There are no videos of this. What it would entail, if they decide he is not going to be the corporate representative now, and they are going to absent him from the jurisdiction, we would have to actually read all this stuff to the jury, and then I guess they are going to bring him in later in the week to testify in their case. It seems to me, based on where we are now, they ought to just bring him in and let us question him as we intended to do in our case.

THE COURT: Have I reviewed the objections to any of this material?

MR. HARRIGAN: Your Honor, I believe you have. I believe you have. I want to double-check that. But

that's my recollection.

MR. PRICE: Your Honor has ruled on those designations.

THE COURT: Mr. Price, you can think about it, but if your answer is anything other than he is showing up, I may well order him to appear. It seems to me we are kind of down the road here a bit and people have relied on prior representations. It is not to suggest anyone did anything wrong, but people make trial plans, and I think that we want to try and honor those.

MR. PRICE: I understand, your Honor. I'm sorry. I didn't mean to interrupt you. I understand that. I would make my position clear by the end of the day, in case we do need to discuss the issue further.

THE COURT: All right. That may be a potential matter for Monday morning, but tell him to keep a bag packed.

MR. PRICE: I will.

THE COURT: Counsel, anything else at this time?

MR. HARRIGAN: Not here, your Honor.

MR. PRICE: Not here, your Honor.

MR. PALUMBO: Thank you.

THE COURT: Bye-bye.

(Adjourned.)

**CERTIFICATE**

**I, Barry L. Fanning, Official Court Reporter, do hereby certify that the foregoing transcript is true and correct.**

**S/Barry L. Fanning**

**____________________________**
**Barry L. Fanning**