HONORABLE JAMES L. ROBART

1

2

3

4

5

6

7

8

9

10

11

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| MICROSOFT CORPORATION,<br><br>Plaintiff,<br><br>v.<br><br>MOTOROLA INC., et al.,<br><br>Defendant. | No. C10-1823-JLR<br><br><br>MICROSOFT'S OPPOSITION TO MOTOROLA'S RULE 50(a) MOTIONS FOR JUDGMENT AS A MATTER OF LAW (DKT NOS. 904 AND 905) |
| MOTOROLA MOBILITY, LLC., et al.,<br><br>Plaintiffs,<br><br>v.<br><br>MICROSOFT CORPORATION,<br><br>Defendant. | |

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

**TABLE OF CONTENTS**

I.    INTRODUCTION ................................................................................................. 1

II.   MOTOROLA'S RULE 50(a) MOTION MADE AT THE CLOSE OF MICROSOFT'S
      CASE SHOULD BE DENIED. ............................................................................ 1

      A.   The Contracts Are Part Of The Law Of The Case And The Jury Was Properly
           Instructed On Their Terms. ........................................................................ 1

      B.   The Evidence Supports A Finding That Motorola Breached Both Contracts By Failing
           To Grant Microsoft Licenses On RAND Terms. ......................................... 2

      C.   The Evidence Of Motorola's Course Of Conduct Supports A Finding Of Breach Of
           The Duty Of Good Faith And Fair Dealing. ................................................ 3

      D.   The Evidence Supports A Finding That Motorola's October 2010 Letters Constituted
           A Breach Of Its Duty Of Good Faith And Fair Dealing. .............................. 5

           1.   All Objective Factors Support A Finding That Motorola's October 2010 Letters
                Constituted A Breach. ......................................................................... 5

           2.   Evidence Of Motorola's Subjective Intent In Sending The October 2010 Letters
                Supports A Finding Of Breach. ........................................................... 13

      E.   The Evidence Provides A Legally Sufficient Basis For Finding That Motorola's
           Pursuit Of Injunctions Constituted A Breach. ........................................... 16

           1.   Motorola's Arguments Related To The Timing Of Its Filings Of Injunctive
                Actions Are Irrelevant. ...................................................................... 16

           2.   The Record Supports The Conclusion That Microsoft Was Never An Unwilling
                Licensee. ............................................................................................. 17

           3.   All Objective Factors Support A Finding That Motorola's Pursuit Of Injunctions
                Breached Its Duty Of Good Faith And Fair Dealing. .......................... 18

           4.   Evidence of Motorola's Subjective Intent Supports A Finding That Motorola's
                Pursuit Of Injunctions Breached Its Duty Of Good Faith. .................. 21

      F.   Microsoft Presented Legally Sufficient Evidence From Which The Jury Could Award
           Damages. ...................................................................................................... 21

III.  MOTOROLA'S RULE 50(a) MOTION MADE AT THE CLOSE OF THE EVIDENCE
      SHOULD BE DENIED. ...................................................................................... 24

      A.   Evidence In Motorola's Case Confirms Its Offer Letters Were A Breach. ................. 24

MICROSOFT'S OPPOSITIONS TO
MOTOROLA'S RULE 50(a) MOTIONS
FOR JMOL (DKT NOS. 904 AND 905) - i
C10-1823-JLR

LAW OFFICES
**CALFO HARRIGAN LEYH & EAKES, LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700 FAX, (206) 623-8717

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

B.   Evidence In Motorola's Case Confirms It Breached By Pursuing Injunctions. .......... 26

C.   No Evidence In Motorola's Case Impacted The Jury's Basis For Awarding Damages. ................................................................................................................ 28

D.   Motorola Failed To Carry Its Burden On Mitigation. .................................................. 29

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Best v. U.S. Nat. Bank of Oregon,*
    739 P.2d 554 (Or. 1987) ..................................................................................5

*Deep Water Brewing, LLC v. Fairway Resources Ltd.,*
    215 P.3d 990 (Wash. App. 2009)......................................................................14

*Frank Coluccio Constr. Co., Inc. v. King County,*
    150 P.3d 1147 (Wash. App. 2007)......................................................................4

*Jaeger v. Cleaver Const., Inc.,*
    201 P.3d 1028 (Wash. App. 2009)....................................................................29

*Merrell v. Renier,*
    No. C06-404-JLR, 2006 WL 3337368 (W.D. Wash. Nov. 16, 2006) ...................21

*Microsoft Corp. v. Motorola, Inc.,*
    696 F.3d 872 (9th Cir. 2012) ............................................................................2

*Vylene Enterprises, Inc. v. Naugles, Inc.,*
    90 F.3d 1472 (9th Cir. 1996) ............................................................................5

*W.L. Gore & Assoc., Inc. v. Carlisle Corp.,*
    529 F.2d 614 (3d Cir. 1976) ............................................................................5

OTHER AUTHORITIES

*Restatement (Second) of Contracts § 205* ............................................................4

MICROSOFT'S OPPOSITIONS TO
MOTOROLA'S RULE 50(a) MOTIONS
FOR JMOL (DKT NOS. 904 AND 905) - iii
C10-1823-JLR

LAW OFFICES
**CALFO HARRIGAN LEYH & EAKES, LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700 FAX, (206) 623-8717

## I.   INTRODUCTION

Over five days of trial, the jury heard testimony from twelve witnesses called by Microsoft laying out the full scope of Motorola's course of conduct involving its 802.11 and H.264 SEPs, from the October 2010 letters through Motorola's filing for and continuing to seek injunctions until January 2013.  That evidence provided a broad basis from which the jury could conclude on multiple, independent grounds that Motorola breached its contracts with the IEEE and ITU, including breaches of the duty of good faith and fair dealing, and caused significant damage to Microsoft.  The day and a half of Motorola's case (consisting of videos of three Microsoft employees, testimony from three Motorola experts, and no Motorola fact witnesses—although Kirk Dailey had already testified during Microsoft's case) only strengthened the jury's basis to find breach.  Motorola accused Microsoft of suing first, having failed to call Motorola before suing, and seeking patent royalties for Motorola's Android phones, but none of this was relevant to Motorola's breach of contract, and the jury was more than entitled to reject it.  Motorola's two Rule 50(a) motions (Dkt. No. 904, Motorola's Rule 50(a) Mot. for J. as a Matter of Law ("904 Br."); Dkt. No. 905, Motorola's Renewed Rule 50(a) Mot. for J. as a Matter of Law ("905 Br.")) fall far short of establishing that the jury lacked *any* legally-sufficient evidentiary basis to find for Microsoft, and should be denied.

## II.   MOTOROLA'S RULE 50(a) MOTION MADE AT THE CLOSE OF MICROSOFT'S CASE SHOULD BE DENIED.

### A.   The Contracts Are Part Of The Law Of The Case And The Jury Was Properly Instructed On Their Terms.

The existence and legal interpretation of Motorola's contractual RAND licensing obligations are the law of the case.  Motorola preserved no right to challenge the existence of the contracts, or Microsoft's ability to enforce them as a third-party beneficiary, because it unequivocally waived those two issues on the record on February 13, 2012.  (Dkt. No. 317, 2/13/2013 Hearing Tr. 4:7–5:5.)  Those two propositions were essential underpinnings of the

Court's preliminary injunction ruling (*see* Dkt. No. 318 at 14–17), and Motorola did not

challenge either in its appeal of that decision.  The Ninth Circuit repeatedly noted Motorola's

waiver, *Microsoft Corp. v. Motorola, Inc.*, 696 F.3d 872, 878, 884 (9th Cir. 2012), and its

analysis was explicitly premised on the existence and enforceability of the contracts, *id.* at

884–85.  The issue of the terms of the contracts was litigated in the November 2012 RAND

royalty trial, and was settled by the Court's April 2013 Findings of Fact and Conclusions of

Law.  (Dkt. No. 673 at ¶¶ 24–50.)  Accordingly, the Court instructed the jury on the contracts

and their interpretation in both the preliminary (8/26/13 Tr. 104:4–14) and final jury

instructions (Dkt. No. 908, Final Jury Instr. ("Instr.") Nos. 15, 17).  The jury had no need to see

the contracts themselves because it received appropriate instructions, including facts about the

contracts *to which Motorola stipulated*.  (*See* Instr. No. 10 ¶¶ 13–15.)

> **B.  The Evidence Supports A Finding That Motorola Breached Both Contracts By Failing To Grant Microsoft Licenses On RAND Terms.**

Motorola's motions are directed solely at Motorola's breach of its duty of good faith

and fair dealing.  But the jury was also instructed on breach generally (*see* Instr. Nos. 14, 16–

22), and the evidence supports a straightforward conclusion of breach of contract.  The jury

was instructed on the RAND royalty for Motorola's patents (*id.* at No. 20), it had the non-

RAND terms of Motorola's October 2010 letters in hand (Exs. 1, 2), and it heard unrebutted

testimony that Motorola maintained its non-RAND 2.25% demand as late as December 2012

(8/28/13 Tr. (Gutierrez) 160:23–161:6).  That evidence alone supports a finding that Motorola

had failed "to make available and grant a license to its 802.11" SEPs to Microsoft on RAND

terms, and had failed "to grant a license for its H.264" SEPs to Microsoft on RAND terms.

(Instr. No. 15.)  Motorola's failure to address this breach claim is fatal to its motion.

MICROSOFT'S OPPOSITIONS TO
MOTOROLA'S RULE 50(a) MOTIONS
FOR JMOL (DKT NOS. 904 AND 905) - 2
C10-1823-JLR

LAW OFFICES
**CALFO HARRIGAN LEYH & EAKES, LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700 FAX, (206) 623-8717

**C. The Evidence Of Motorola's Course Of Conduct Supports A Finding Of Breach Of The Duty Of Good Faith And Fair Dealing.**

Motorola's motion takes a piecemeal approach of examining the letters, its pursuit of injunctions, and its treatment of Marvell separately, devoting only four conclusory sentences (with no citations to the record) to the question whether its entire course of conduct could be found a breach of the duty of good faith and fair dealing.  (*See* 904 Br. 18–19.)  Motorola's contention that the inquiry into the duty of good faith and fair dealing "*requires* an analysis of a variety of both subjective and objective factors" (904 Br. at 2 (emphasis added)) is inconsistent with the instructions (Instr. No. 16), but even in Motorola's view, nothing would prevent the jury from considering all of those factors and giving them the weight they saw fit (*see* Dkt. No. 901 at 4–5).  As with its failure to address straightforward breach of contract, Motorola's failure to address certain factors from Instruction 16 is fatal to its motion.

As to its entire course of conduct, Motorola ignores frustration of purpose, commercial unreasonability, and its unreasonable exercise of discretion.  (904 Br. 18–19.)  The jury had a sufficient evidentiary basis to find that Motorola's course of conduct breached under any of these factors.  The jury heard extensive factual and expert testimony that Motorola's "entire course of conduct" was "much more consistent with them seeking to hold up Microsoft" in frustration of one the purposes of the contracts.  (8/29/13 Tr. (Murphy) 173:22–174:19.)  The jury heard testimony that Motorola's letters were commercially unreasonable (8/28/13 Tr. (Gutierrez) 128:22–25), that the purported "RAND" offer from Motorola was a commercially unreasonable "going-out-of-business model" for Marvell (8/28/13 Tr. (Ochs) 93:24–94:6), that Windows or Xbox had not been threatened previously with an injunction by a RAND-committed SEP holder simply because they comply with a standard (8/27/13 Tr. (DeVaan) 19:1–5; 8/27/13 Tr. (Treadwell) 44:9–13), and that Motorola's course of conduct threatened the entire standards system (8/28/13 Tr. (Gutierrez) 149:12–150:5).  That evidence supports a conclusion that Motorola's entire course of conduct was commercially unreasonable and a

breach.  Finally, the jury viewed the terms chosen by Motorola in its October 2010 letters (Exs. 1, 2), and heard that Motorola could have sought damages (and not injunctions) in its lawsuits (8/27/13 Tr. (Dailey) 132:2–16), that this Court and the Ninth Circuit stopped Motorola from pursuing its injunction in Germany (*id.* 137:6–20; 9/3/13 Tr. (Killough) 13:16–15:10), and that Motorola continued to seek injunctions, even though it knew Microsoft was willing to accept a license on RAND terms (9/3/13 Tr. (Killough) 11:15–12:8, 15:11–18, 16:5–13).  That evidence supports a conclusion that Motorola's entire course of conduct reflects an unreasonable exercise of Motorola's discretion as a RAND-committed SEP holder.

        As set forth in Sections II.D–E, the evidence of Motorola's course of conduct supports a finding of breach, even when viewing the letters, pursuit of injunctions, and treatment of Marvell[1] in isolation.  Motorola argued that "for the reasons that none of the individual theories is legally sufficient to convince a rational jury that Motorola breached its duty of good faith on offer letters, injunctions, or Marvell, for the same reason you can't find a combination of those theories to have created any breach to the duty of good faith."  (9/3/13 Tr. (Motorola Oral JMOL Mot.) 125:9–14.)  But that argument is logically incorrect, legally unfounded,[2] and inconsistent with the instructions, which directed the jury to examine Motorola's actions and conduct "in carrying out the terms of the contracts at issue."  (Instr. No. 16.)  Motorola fails to recognize that the jury was free to conclude that even if Motorola's October 2010 letters and subsequent lawsuits might be considered consistent with custom and practice when viewed separately, the letters coupled with the injunction efforts were not.

---

[1] Motorola's treatment of Marvell is relevant to Motorola's overall course of conduct, as well as to individual objective factors.  Motorola's arguments about Microsoft's standing (904 Br. 15–16) are therefore irrelevant, and Microsoft's responses to Motorola's claims that its treatment of Marvell was consistent with good faith (904 Br. 16–18) are presented throughout this brief in connection with the relevant legal principles.

[2] The duty of good faith and fair dealing is not satisfied by arguing that acts might be justifiable if viewed in isolation.  Rather, the purpose of the duty of good faith is to prevent "evasion of the spirit of the bargain," Restatement (Second) of Contracts § 205 cmt. d, and to enforce "faithfulness to an agreed common purpose and consistency with the justified expectations of the other party," *Frank Coluccio Constr. Co., Inc. v. King County*, 150 P.3d 1147, 1155 (Wash. App. 2007).  Faithfulness, consistency, and evasion cannot be fully evaluated by examining isolated acts and ignoring their context.

MICROSOFT'S OPPOSITIONS TO
MOTOROLA'S RULE 50(a) MOTIONS
FOR JMOL (DKT NOS. 904 AND 905) - 4
C10-1823-JLR

LAW OFFICES
**CALFO HARRIGAN LEYH & EAKES, LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700 FAX, (206) 623-8717

**D.  The Evidence Supports A Finding That Motorola's October 2010 Letters Constituted A Breach Of Its Duty Of Good Faith And Fair Dealing.**

Motorola's claim that a breach "cannot be based exclusively on the difference between Motorola's offers and the RAND rate and ranges" (904 Br. 3) is both inconsistent with the jury instructions and unsupported by the cases it cites, which establish nothing more than that courts have sometimes found opening offers not dispositive.[3]  The jury was told that it could not simply use the size of Motorola's offer alone to find a breach (Instr. No. 19), but that it must apply the standard in Instruction No. 16.  That meant the jury could consider, alone or in combination, whether the offer was commercially unreasonable, contrary to Microsoft's reasonable and justified expectations, etc.  (Instr. No. 16.)  Additionally, the jury was entitled to conclude that given their terms, the letters were an effective refusal to deal.  *See W.L. Gore & Assoc., Inc. v. Carlisle Corp.*, 529 F.2d 614, 623 (3d Cir. 1976) ("A royalty demand which is so high as to preclude acceptance of a license offer is, after all, not appreciably different from a refusal to license upon any terms.").  Ample evidence supports a finding that the October 2010 letters constituted a breach under all and any combination of the factors in Instruction No. 16.

**1.  All Objective Factors Support A Finding That Motorola's October 2010 Letters Constituted A Breach.**

Motorola's brief analyzes just one of the five objective factors—industry custom and practice—and offers neither argument nor record citations as to the other four.  (904 Br. at 7–8.)  As set out below, the evidence as to each of those four factors supports a finding of breach.[4]  Motorola's motion should be denied on this basis alone.

---

[3] Cases not cited by Motorola find that an offer *can* be so extreme as to itself constitute a breach.  *See Vylene Enterprises, Inc. v. Naugles, Inc.*, 90 F.3d 1472, 1477 (9th Cir. 1996) (party breached the duty of good faith and fair dealing by proposing a franchise agreement that was "commercially unreasonable"); *Best v. U.S. Nat. Bank of Oregon*, 739 P.2d 554, 559 (Or. 1987) ("When a party has the contractual right to specify a price term, the term specified may be so high or low that the party will be deemed to have acted in bad faith.").

[4] In many instances the same evidence informs industry custom and practice, commercial reasonability, reasonable and justified expectations of the parties, *and* reasonable exercise of discretion.  For example, if Motorola chose to act in a commercially unreasonable way, that would also indicate breach under the "reasonable exercise of discretion" factor.  Both here, and in Section II.E.3, Microsoft has included specific citations to evidence under each of these factors, but incorporates the evidence cited for the other factors by reference.

MICROSOFT'S OPPOSITIONS TO
MOTOROLA'S RULE 50(a) MOTIONS
FOR JMOL (DKT NOS. 904 AND 905) - 5
C10-1823-JLR

LAW OFFICES
**CALFO HARRIGAN LEYH & EAKES, LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700 FAX, (206) 623-8717

**Custom and Practice:**  Motorola's suggestion that its letters reflected a custom and practice of initiating negotiations is undermined by the record and inconsistent with the jury instructions.  (*See* 904 Br. at 7–8.)  First, on their face the letters were *not* opening offers, but demands open for 20 days that sought Microsoft's confirmation of acceptance.  (Exs. 1, 2.)  By their terms, the offers were withdrawn on the 21st day.  (8/27/13 Tr. (Dailey) 116:14–117:18.)  Second, a custom and practice of negotiation following an opening offer does not imply that *any* opening offer, whatever its terms, is necessarily customary.  Motorola cites no evidence that the terms of its letters would be regarded as customary.  Third, Microsoft's Horacio Gutierrez's testimony related to ordinary patent negotiations, not offers for SEPs.  (8/29/13 Tr. (Gutierrez) 56:5–15.)  For licensing offers to SEPs, Gutierrez expected "that it will be a RAND rate or something close to a RAND rate."  (*Id.* at 61:5–8.)  Fourth, the absence from the letters of other potential license terms (904 Br. at 8) has no relevance to whether the terms that were included were customary.  Finally, the jury was instructed that Microsoft had no obligation to negotiate with Motorola in response to its letters.  (Instr. No. 22.)  Motorola cannot overrule that instruction by claiming it would have been "customary" for Microsoft to do so.

In any event, testimony from Microsoft's witnesses indicates that Motorola's conduct was entirely outside of any customary bounds.  (8/27/13 Tr. (DeVaan) 18:13–15; 8/27/13 Tr. (Treadwell) 41:12–15; 8/28/13 Tr. (Gutierrez) 123:13–18, 121:18–23, 8/30/13 Tr. (Heiner) 160:7–161:3.)  Marvell's Jennifer Ochs' testimony established that 1% of the chip price is a customary high ceiling for royalties in the semiconductor industry, but Motorola's 2.25% of end product price (applied to the Xbox)—which Motorola sought from both Marvell and Microsoft—amounted to over 100% of the chip price.  (8/28/13 Tr. (Ochs) 92:15–93:9.)

Motorola's conduct did not even conform to its own prior custom and practice.  Dailey (Motorola's head of licensing) was unaware of a single Motorola licensee that was paying a royalty based on the selling price of a product sold by the licensee's customer, as Motorola

LAW OFFICES
**CALFO HARRIGAN LEYH & EAKES, LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700 FAX, (206) 623-8717

1   demanded of Microsoft in its H.264 letter (8/27/13 Tr. (Dailey) 69:25–70:4), nor had Microsoft

2   ever agreed to pay patent royalties for Windows based on such a scheme (8/27/13 Tr.

3   (DeVaan) 23:7–10).  Further, Motorola hired InteCap to value Motorola's 802.11 SEP

4   portfolio in an attempt to determine an appropriate RAND royalty, and InteCap proposed

5   royalties far lower than Motorola's demand.  (8/29/13 Tr. (Murphy) 164:15–165:14, 166:4–

6   13.)  The MPEG LA pool includes thousands of patents from dozens of companies (8/28/13 Tr.

7   (Gutierrez) 144:20–145:9), and is therefore indicative of custom and practice for H.264

8   licensing.  After stating that those rates might be too high, Motorola endorsed them (8/28/13

9   Tr. (Glanz) 69:25–71:3, 72:19–75:16, Exs. 1139, 1584, 1179), yet Motorola's demand for its

10  own patents dwarfed the MPEG LA rates which license all of the pooled patents.  (8/29/13 Tr.

11  (Murphy) 162:8–17.)  There was nothing customary about Motorola's October 2010 demands.

12          Motorola's myopic focus on the letters ignores other conduct that the jury was entitled

13  to consider—including evidence that the letters were a setup to justify to-be-filed SEP lawsuits.

14  (8/27/13 Tr. (Dailey) 124:15–126:19; 8/28/13 Tr. (Gutierrez) 135:15–136:7, 144:2–14.)

15  Motorola later conditioned a license to its SEPs on a grantback of a license to Microsoft

16  patents unrelated to the standards (8/28/13 Tr. (Gutierrez) 162:17–163:15), even though

17  Motorola's practice was not to do so (8/29/13 Tr. (Blasius) 110:6–111:6; 8/27/13 Tr. (Dailey)

18  67:1–5).  Motorola admitted that defensive suspension does not include conditioning an SEP

19  license on concessions on patents that are not essential to those standards.  (*Id.*)  Motorola's

20  offer to Marvell of a non-RAND license that openly discriminated against Microsoft violated

21  that policy and was not consistent with any accepted industry practice concerning defensive

22  suspension.  (*See* 8/28/13 Tr. (Ochs) 92:2–14; Ex. 16 at §§ 3.4–3.5.)

23          **Frustration of Purpose:**  The only other objective factor tangentially addressed by

24  Motorola is whether its October 2010 letters frustrated the purpose of the contracts through

25  hold up.  (904 Br. at 8.)  But the record plainly contains evidence from which a reasonable

26

MICROSOFT'S OPPOSITIONS TO
MOTOROLA'S RULE 50(a) MOTIONS
FOR JMOL (DKT NOS. 904 AND 905) - 7
C10-1823-JLR

LAW OFFICES
**CALFO HARRIGAN LEYH & EAKES, LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700 FAX, (206) 623-8717

juror could conclude that Motorola was engaged in hold-up, which was defined for the jury as "the ability of a standard-essential patent holder to demand more than the value of its patented technology." (Instr. No. 18.)  Evidence of the value of Motorola's H.264 and 802.11 SEPs was undisputed:  Motorola's patents constitute only a sliver of the overall technology incorporated into those standards (8/29/13 Tr. (Murphy) 156:15–19, 158:12–17), and the jury was instructed that the RAND royalties for those patents were 0.555 and 3.471 cents per unit, respectively (Instr. No. 20).  Motorola's October 2010 letters demanded vastly more than the value of its patents, seeking royalties on the order of $11.25 per unit for H.264 (8/27/13 Tr. (Dailey) 71:9–11), and as much as $9 per unit on 802.11 (*id.* at 74:17–25).  This evidence meets the definition of hold up, compelling (and certainly permitting) the conclusion that Motorola's demands frustrated a purpose of the contracts and constituted a breach.

If these facts were not enough, the jury heard extensive expert testimony that the demands were consistent with an economic strategy of hold up.  (8/29/13 Tr. (Murphy) 138:12–143:8.)  Motorola confirmed its policy was to make an offer before seeking injunctions on its SEPs (8/27/13 Tr. (Dailey) 125:23–126:11; 8/29/13 Tr. (Blasius) 107:16–19), and conceded that its suits were being prepared even as it sent Microsoft the letters (8/27/13 Tr. (Dailey) 123:18–23, 124:15–125:7).  Motorola's immediate pursuit of injunctions confirms the expert testimony that the letters were part of a hold up strategy.  (8/29/13 Tr. (Murphy) 146:23–147:10.)[5]  The jury also heard testimony that Motorola's efforts to secure a royalty-free grantback to Microsoft's patents not essential to the standards was consistent with hold up (*id.* at 135:18–136:19), and that "negotiating" as Motorola did was consistent with hold up (*id.* at 169:18–170:17).  Motorola's treatment of Marvell—depriving it of the RAND license that

---

[5] Motorola's citations to the June 2011 FTC letter (Ex. 2970) and accompanying testimony concerning hold up do not support its Rule 50(a) argument, because the jury heard competent testimony from the author of the letter, and from an expert economist that Motorola's counsel's interpretation of the letter's language (904 Br. at 8–9) is incorrect.  (*See* 8/30/13 Tr. (Heiner) 145:17–147:25; 8/30/13 Tr. (Murphy) 76:18–78:17.)  No Motorola witness, expert or otherwise, testified about the letter.

MICROSOFT'S OPPOSITIONS TO
MOTOROLA'S RULE 50(a) MOTIONS
FOR JMOL (DKT NOS. 904 AND 905) - 8
C10-1823-JLR

LAW OFFICES
**CALFO HARRIGAN LEYH & EAKES, LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700 FAX, (206) 623-8717

1   would cover Microsoft—also confirmed the hold up strategy:  Marvell's request for a license

2   that would cover chips sold to Microsoft was a perfectly legitimate pathway to secure the

3   rights Microsoft was entitled to and that Motorola was withholding.  (8/29/13 Tr. (Murphy)

4   170:23–171:10.)  Motorola's royalty-free cross license argument (904 Br. at 18) ignores that

5   the jury heard unrebutted testimony that Marvell's 802.11 SEPs were very valuable (8/28/13

6   Tr. (Ochs) 88:3–24), coupled with undisputed testimony that Motorola's 802.11 SEPs were not

7   (8/29/13 Tr. (Murphy) 156:15–19, 158:12–17).  That evidence would permit the jury to find

8   that the cross-license proposal confirmed Motorola's hold-up objective (*see* 8/29/13 Tr.

9   (Murphy) 135:2–17) and goal of denying Microsoft a RAND license by any means.

10          In another fatal defect, Motorola's motion ignores a key purpose of the RAND

11   commitment—preventing royalty stacking.  (Instr. No. 18.)  Motorola failed to consider the

12   stacking implications of dozens of SEP holders (8/29/13 Tr. (Blasius) 108:21–25), even though

13   the implications of Motorola's demands were obvious.  (8/29/13 Tr. (Murphy) 160:9–20,

14   161:3–11.)  At least 52 entities own H.264 SEPs (*id.* at 154:22–25), and if each made 2.25%

15   demands like Motorola's, the aggregate royalty would exceed the prices of standard-compliant

16   products (*id.* at 160:12–20).  At least 92 entities own 802.11 SEPs (*id.* at 158:6–8), and if each

17   made demands like Motorola's, the aggregate royalty would be more than double the end-

18   product price (*id.* at 161:5–11).  Because Motorola's 802.11 and H.264 patents provide only

19   minimal contributions to the standards (*id.* at 158:10–17, 156:14–19), the aggregate royalty

20   burden suggested by Motorola's demands is even more unreasonable—especially as

21   Microsoft's products need to comply with many other standards (8/27/13 Tr. (DeVaan) 16:17–

22   22; 8/27/13 Tr. (Treadwell) 39:19–22; 8/28/13 Tr. (Gutierrez) 128:3–21).  That evidence

23   supports a finding that Motorola's demands frustrated a purpose of the contracts.

24          **Commercially Unreasonable:**  The evidence is overwhelming that Motorola engaged

25   in commercially unreasonable conduct, providing a basis for a reasonable juror to conclude

26

MICROSOFT'S OPPOSITIONS TO
MOTOROLA'S RULE 50(a) MOTIONS
FOR JMOL (DKT NOS. 904 AND 905) - 9
C10-1823-JLR

LAW OFFICES
**CALFO HARRIGAN LEYH & EAKES, LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700 FAX, (206) 623-8717

1   that Motorola's demands constituted a breach.  Motorola's failure even to argue otherwise

2   compels denial of its motion.  Motorola's H.264 royalty demand of 2.25% on the price of end

3   products ranged from $4.50 per unit for the cheapest Xbox, to $11.25 per unit or higher for

4   Windows computers—but the RAND royalty is 0.555 cents per unit, and the upper bound of

5   the RAND range is 16.389 cents.  Motorola's 802.11 royalty demand equates to $4.50 per unit

6   or higher for the Xbox, but the RAND royalty is 3.471 cents per unit, with an upper bound of

7   19.5 cents.  While a seller may be willing to come down from an opening offer, that does *not*

8   mean that any offer is commercially reasonable just because negotiation might follow.  Given

9   the RAND rate and range, a reasonable juror could readily conclude that Motorola's demand

10  was not just high, it was wildly excessive and commercially unreasonable.  (8/29/13 Tr.

11  (Murphy) 139:12–140:2, 142:6–19; 8/28/13 Tr. (Gutierrez) 128:22–25, 131:12–14.)

12         Nothing in Motorola's licensing history suggests its demands were commercially

13  reasonable.  Motorola had never received royalties of the kind demanded from Microsoft for

14  Motorola's H.264 or 802.11 SEPs alone.  (8/27/13 Tr. (Dailey) 79:7–13.)  It is difficult, if not

15  impossible, to break out separate royalty rates for the 802.11 and H.264 SEPs in Motorola's

16  prior agreements.  (*Id.* at 78:11–18.)  The rates Motorola sought for its cellular patents shed no

17  light on an appropriate royalty for its 802.11 or H.264 SEPs.  (8/29/13 Tr. (Murphy) 166:20–

18  168:3, 168:23–169:8.)  Motorola could easily have determined the number of owners of 802.11

19  and H.264 SEPs who had submitted letters of assurance to the IEEE and ITU.  (8/27/13 Tr.

20  (Dailey) 92:11–14.)  Motorola's corporate representative admitted that if each of those

21  companies charged a 2.25% royalty on the end product, implementing the standard would not

22  be viable.  (8/29/13 Tr. (Blasius) 108:1–110:1.)  Motorola had no basis for believing that its

23  802.11 and H.264 SEPs were any more valuable than those of the other companies that

24  submitted letters of assurance (8/27/13 Tr. (Dailey) 90:4–8, 91:13–19), and in fact Motorola's

25  SEPs contribute minimal value to the standards (8/28/13 Tr. (Murphy) 158:10–17, 155:13–19).

26

MICROSOFT'S OPPOSITIONS TO
MOTOROLA'S RULE 50(a) MOTIONS
FOR JMOL (DKT NOS. 904 AND 905) - 10
C10-1823-JLR

LAW OFFICES
**CALFO HARRIGAN LEYH & EAKES, LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700 FAX, (206) 623-8717

1    Motorola was also well aware of the royalties charged by the H.264 and 802.11 pools,

2    and knew the rates in its October offer letters were out of line with those benchmarks,

3    including those (as noted above) it had previously endorsed.  (8/27/13 Tr. (Dailey) 115:9–18,

4    116:3–10; *see also* 8/29/13 Tr. (Blasius) 109:7–110:12.)  The MPEG LA rates (and Motorola's

5    endorsement of them) demonstrates that Motorola's demand (orders of magnitude greater,

6    (8/29/13 Tr. (Murphy) 162:8–17)) was not commercially reasonable.  No prior Motorola

7    license agreement based a royalty on the price of products sold by the licensee's customers, as

8    Motorola's H.264 demand did, and in fact doing so was both contrary to Motorola's own

9    claimed practice (8/27/13 Tr. (Dailey) 69:25–70:9) and commercially impossible for Microsoft

10   to accept (8/27/13 Tr. (DeVaan) 18:16–25, 22:9–12; 8/28/13 Tr. (Gutierrez) 123:1–24).

11   The 802.11 royalty Motorola demanded would exceed the cost of the chipset that

12   provides the 802.11 functionality in Xbox, which costs only a few dollars.  (8/28/13 Tr. (Ochs)

13   87:1–3.)  Royalty rates of 1% of chip price (*not* end product price) represent a commercially

14   reasonable *high ceiling* for licensing in the semiconductor industry for products like Marvell's.

15   (8/28/13 Tr. (Ochs) 95:6–21.)  Motorola itself commissioned the InteCap study to value its

16   802.11 portfolio, and that study suggested that even lower rates of 0.5% of chip price would be

17   appropriate.  (8/29/13 Tr. (Murphy) 164:2–12.)  Once its 25x overestimate of Motorola's

18   patent value is accounted for, the InteCap study indicates a commercially reasonable royalty

19   because it reflected an effort by a company in the business of licensing patents to fashion a

20   RAND royalty rate.  (*Id.* at 166:4–13.)  Motorola's 802.11 demand on the Xbox was $4.50;

21   that the amount suggested by InteCap for the chip alone was 2 cents confirms that Motorola's

22   demand was commercially unreasonable.  (*Id.* at 164:15–165:1.)

23   **Reasonable and Justified Expectations:**  The evidence provides a sufficient basis

24   from which a reasonable juror could conclude that Motorola's October 2010 letters were

25   contrary to the reasonable and justified expectations of the parties, and constituted a breach.

26

1   Again, Motorola's failure even to argue otherwise compels denial of its motion.  Gutierrez

2   testified that while companies like Microsoft recognize the possibility of assertions and

3   counter-assertions of patents (8/28/13 Tr. (Gutierrez) 183:24–184:16), Microsoft's reasonable

4   and justified expectations were that a company that had made RAND commitments "would

5   offer a RAND rate, or something close to a RAND rate," when licensing SEPs (*Id.* at 61:5–8).

6   Microsoft's witnesses explained that the reasonable and justified expectation that a license

7   would be available on RAND terms for SEPs was critical for product design decisions.

8   (8/27/13 Tr. (DeVaan) 17:10–18:1, 8/27/13 Tr. (Treadwell) 40:15–22; 8/30/13 Tr. (Heiner)

9   141:4–143:9.)  Motorola also knew it was not allowed to ask implementers for unreasonably

10  high royalties (8/29/13 Tr. (Blasius) 108:7–9), Dailey admitted Motorola had to make a license

11  available on reasonable (and nondiscriminatory) terms, and understood that "reasonable"

12  imposed a limit on what Motorola could ask for (8/27/13 Tr. (Dailey) 63:3–6, 63:22–24).

13          **Unreasonable Exercise of Discretion:**  The contracts vested Motorola with discretion

14  in formulating its offers to Microsoft, and the evidence provides a legally-sufficient basis for

15  finding Motorola's exercise of that discretion unreasonable, and accordingly a breach.

16  Motorola's failure to address this factor as to its October 2010 letters (*see* 904 Br. 6–9)

17  compels denial of its motion.  Motorola knew about the royalty rates offered by pools, even

18  blessing them as reasonable (8/28/13 Tr. (Glanz) 72:15–75:16; Exs. 1179, 1584), yet ignored

19  them in drafting the letters.  Motorola knew about the InteCap valuation and ignored it as well.

20  (8/27/13 Tr. (Dailey) 114:10–22.)  Dailey acknowledged that it was easy to go on the Internet

21  and find out that 2.25% of the Windows-based PC market amounted to around $4 billion, knew

22  that there were billions of dollars of Xbox consoles sold every year, and was generally aware

23  of Xbox and Windows revenues.  (8/27/13 Tr. (Dailey) at 72:17–73:3.)  Yet Dailey still put

24  2.25% into the letter without having any reasonable basis for it.  Further, as to PCs and

25  smartphones, Motorola knew that Microsoft made component software, and that Microsoft's

26

MICROSOFT'S OPPOSITIONS TO
MOTOROLA'S RULE 50(a) MOTIONS
FOR JMOL (DKT NOS. 904 AND 905) - 12
C10-1823-JLR

LAW OFFICES
**CALFO HARRIGAN LEYH & EAKES, LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700 FAX, (206) 623-8717

customers sold the end products (8/27/13 Tr. (Dailey) 68:22–69:1; 75:9–12), yet Motorola deviated from the offer it described as "standard" in situations in which the licensee was a component supplier, rather than the manufacturer of the end product. (*Id.* at 191:9–14; 212:5–9.) Using the end product as the royalty base, while knowing that Microsoft supplied component software, was an unreasonable exercise of discretion.

### 2. Evidence Of Motorola's Subjective Intent In Sending The October 2010 Letters Supports A Finding Of Breach.

Contrary to Motorola's contentions, there is ample evidence from which a reasonable juror could conclude that Motorola acted with subjective bad faith when selecting the terms of its October 2010 offer letters. Motorola first argues that it acted in good faith because it was simply applying the royalty rate it had used in prior agreements. (904 Br. at 4.) But as of October 2010, Motorola knew its 802.11 and H.264 SEPs had never been licensed on a standalone basis. (8/27/13 Tr. (Dailey) 77:15–21.) Those patents had only been included in broad and complex cross licenses with the primary focus generally being Motorola's cellular patents. (*Id.* at 77:22–78:6.) There is no dispute that it is difficult or impossible to break out a separate royalty rate for the 802.11 and H.264 SEPs from these agreements. (*Id.* at 78:11–18.) And there is no dispute that agreements involving Motorola's cellular patents as well as other patents may be dominated, in terms of value, by the cellular patents. (*Id.* at 87:22–88:2.) Dailey knew that Motorola had a strong position with respect to cellular patents (*id.* at 82:6–8), but had no reason to believe that Motorola's 802.11 or H.264 SEPs were any more valuable than the SEPs of dozens of other companies. (*Id.* at 90:4–8, 91:13–17.)

Motorola's disregard of legitimate RAND benchmarks within its corporate knowledge, including the MPEG LA patent pool rates for H.264 SEPs and the InteCap study Motorola commissioned for its 802.11 SEPs, also supports a finding that Motorola acted in subjective bad faith. Motorola was aware of MPEG LA pool rates. (8/29/13 Tr. (Blasius) 110:4–18.)

MICROSOFT'S OPPOSITIONS TO
MOTOROLA'S RULE 50(a) MOTIONS
FOR JMOL (DKT NOS. 904 AND 905) - 13
C10-1823-JLR

LAW OFFICES
**CALFO HARRIGAN LEYH & EAKES, LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700 FAX, (206) 623-8717

1   Dailey thought they could be a factor in determining RAND, but decided they were "different"

2   from the royalty demanded in the offer letters.  (8/27/13 Tr. (Dailey) 116:3–13.)  Motorola

3   personnel knew about the InteCap study, which advised Motorola that an appropriate royalty

4   for its 802.11 SEPs was a small fraction of what Motorola demanded from Microsoft.  (8/29/13

5   Tr. (Murphy) 163:16–165:10; 165:23–166:3.)  Dailey's claimed ignorance of the study

6   (8/27/13 Tr. (Dailey) 113:3–8) is legally irrelevant because a corporation is charged with any

7   knowledge acquired by any of its employees acting within the scope of his duties.  *Deep Water*

8   *Brewing, LLC v. Fairway Resources Ltd.*, 215 P.3d 990, 1011 (Wash. App. 2009).  Moreover,

9   Motorola's subsequent conduct confirms its intent in October—Dailey was informed of the

10  InteCap study by July 2012 but never took curative actions to offer Microsoft a rate consistent

11  with what he learned.  (8/27/13 Tr. (Dailey) 114:10–22.)

12       Motorola's argument that it expected Microsoft to respond (904 Br. at 5) fares no

13  better.[6]  It defies common sense to suggest that a party bound by a RAND obligation may use

14  the prospect of future negotiations to knowingly send a wildly excessive, non-RAND offer.  As

15  the jury was instructed, Microsoft had no obligation to negotiate for a RAND license—rather,

16  Dailey admitted it was incumbent on Motorola to honor its contractual commitments and make

17  its SEPs available on RAND terms.  (8/27/13 Tr. (Dailey) 63:3–6.)  Motorola's attempt to

18  blame Microsoft is not legally-sufficient evidence of Motorola's subjective good faith.  The

19  jury was also entitled to reject the notion that Motorola intended its offers as mere placeholders

20  and not to propose actual RAND rates, because the letters expressly state that the offered rates

21  are "RAND." (Exs. 1, 2.)  The jury heard testimony that Motorola *knew* its offers could not be

22  accepted but made them anyway.  (8/27/13 Tr. (Dailey) 118:4–7, 185:5–11.)

23

24  _____

25  [6] Motorola's citations to Gutierrez's testimony (904 Br. at 5) and that of other Microsoft witnesses concerning
    Microsoft's experiences do not support Motorola's claim of subjective good faith, because Motorola presented no
    evidence that it was aware of Microsoft's experiences and relied on them in October 2010 or at any other time.

26

MICROSOFT'S OPPOSITIONS TO
MOTOROLA'S RULE 50(a) MOTIONS
FOR JMOL (DKT NOS. 904 AND 905) - 14
C10-1823-JLR

LAW OFFICES
**CALFO HARRIGAN LEYH & EAKES, LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700 FAX, (206) 623-8717

1      Motorola's argument that it was too rushed to responsibly select a proper royalty rate

2  (904 Br. at 5–6) is undermined by the record.  Dailey was aware of the letters' financial

3  implications.  (8/27/13 Tr. (Dailey) 71:15–73:3, 100:9–14.)  The math required to compute the

4  scope of Motorola's demands was so simple that the jury could conclude that Motorola was

5  well aware of exactly what it sought.  (*Id.* at 71:9–11, 71:20–72:1, 74:23–25.)  Further, before

6  formulating the letters, Dailey and his team investigated how the Motorola patents and the

7  standards applied to the Microsoft products, relying on experts within Motorola to investigate

8  Microsoft's alleged infringement.  (*Id.* at 98:5–10, 99:8–23, 100:15–20, 101:2–5.)  Even absent

9  these investigations, the manner in which the standards were used by Microsoft was facially

10  apparent:  Xbox is a game console, with 802.11 needed only as an alternative means of

11  connecting to the Internet; and Windows is a computer operating system, with the ability to

12  display H.264 video being only one of thousands of features.  (8/27/13 Tr. (DeVaan) 13:21–

13  15:10; *see also* 8/28/13 Tr. (Gutierrez) 133:17–134:1.)  More information about Microsoft's

14  products might have been interesting, but Motorola needed nothing more to ascertain that the

15  royalties it demanded were not even in the ballpark of commercially reasonable.

16      Finally, Motorola's later conduct confirms its intent in October 2010.  Dailey refused to

17  include the 802.11 and H.264 SEPs in the parties' licensing discussions in late 2010.  (8/30/13

18  Tr. (Gutierrez) 152:20–153:16.)  Any argument that Motorola needed information adduced at

19  the November trial to understand that its demands were outrageous was shown to be false—

20  even after Motorola obtained all of this information, it continued to urge a 2.25% royalty.

21  (8/29/13 Tr. (Murphy) 171:1–5; 8/28/13 Tr. (Gutierrez) 161:1–6.)  The evidence fully supports

22  a finding that Motorola's conduct in sending the October 2010 letters reflected subjective bad

23  faith, and a reasonable jury would be fully justified in considering that finding in making a

24  finding of breach, consistent with the Court's instructions.

25

26

MICROSOFT'S OPPOSITIONS TO
MOTOROLA'S RULE 50(a) MOTIONS
FOR JMOL (DKT NOS. 904 AND 905) - 15
C10-1823-JLR

LAW OFFICES
**CALFO HARRIGAN LEYH & EAKES, LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700 FAX, (206) 623-8717

**E.  The Evidence Provides A Legally Sufficient Basis For Finding That Motorola's Pursuit Of Injunctions Constituted A Breach.**

**1.  Motorola's Arguments Related To The Timing Of Its Filings Of Injunctive Actions Are Irrelevant.**

Motorola's extensive arguments about the legal status of pursuing injunctions on SEPs, and the timing of the progression of court rulings on the issue (904 Br. at 10, 12–14), are irrelevant.  The jury was instructed (over Microsoft's objection) that the contracts do not bar SEP holders from seeking injunctions.  (Instr. No. 21.)  Regardless of where courts stood on the issue at any point in time, the jury was entitled to conclude that Motorola could not file such suits without regard for its duty of good faith and fair dealing.  (*Id.*)

Motorola also contends for the first time that its continued pursuit of injunctions somehow falls outside the scope of this case because Microsoft's claim is limited in time to the moment when Motorola initially filed for injunctions, based on a linguistic contortion of terms like "seeking."  (*See* 904 Br. at 15.)  Motorola's new theory is incorrect.  Microsoft's interrogatory responses contended that Motorola's pursuit of and attempts to secure injunctions, not just the initial act of filing for injunctions, were improper.  (Dkt. No. 903 Ex. 1 at 10 ("[R]ulings specific to Motorola have confirmed that its pursuit of injunctive relief was improper."); *id.* at 11 ("Motorola's objective from the beginning was to secure crippling injunctive relief."); *id.* at 13 ("The ultimate goal of Motorola's conduct was to pressure Microsoft . . . by threatening or securing injunctions.").)

Microsoft framed the issue in the pretrial order as whether Motorola breached "by filing lawsuits and seeking injunctive relief."  (Dkt. 803 at 2; *see also id.* at 2–4.)  "Seeking" is in no way time-limited to the act of filing the suits, as other language in the pretrial order makes clear.  (*E.g. id.* at 3 (referring to "Motorola's ongoing efforts to enjoin Microsoft's H.264 compliant products"); *id.* at 9 ("The pursuit of those injunctions wrongfully inflicted substantial harm on Microsoft.").)  Microsoft's amended complaint alleged that "Defendants

MICROSOFT'S OPPOSITIONS TO
MOTOROLA'S RULE 50(a) MOTIONS
FOR JMOL (DKT NOS. 904 AND 905) - 16
C10-1823-JLR

LAW OFFICES
**CALFO HARRIGAN LEYH & EAKES, LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700 FAX, (206) 623-8717

are not entitled to enjoin or exclude Microsoft . . ." (Dkt. 53 at ¶ 85), a claim clearly not time-limited to the initial act of filing.  The allegation encompasses any and all ongoing conduct targeted to "enjoin or exclude" Microsoft's products.  Finally, Motorola argued for a mitigation defense against the claim that the pursuit of the German injunction was a breach.  (Dkt. No. 803, Pretrial Order at 14.)  Motorola clearly understood, and attempted to rebut, Microsoft's claim that "seeking" or "pursuing" injunctions extended beyond the filing of a complaint.

### 2. The Record Supports The Conclusion That Microsoft Was Never An Unwilling Licensee.

Despite having never attempted to define the term, Motorola argues that Microsoft was not a "willing licensee" at various times.  (*See* 904 Br. at 9, 11–14.)  But the evidence shows that Microsoft expressed to Motorola a willingness to take a reasonable license to Motorola's patents in early October 2010.  (8/28/13 Tr. (Gutierrez) 167:21–168:7.)  Microsoft confirmed this willingness in its complaint, which sought an accounting of RAND terms for Motorola's SEPs.  (*Id.* at 59:11–17; 8/30/13 Tr. (Killough) 228:1–14.)  Motorola's legal interpretations of that clause (904 Br. at 11 n. 4) are irrelevant,[7] because the clause plainly put Motorola on notice that Microsoft wanted RAND royalties determined in this case.  The complaint made clear that despite uncertainties over the validity and essentiality of Motorola's patents, Microsoft would accept a portfolio license to resolve the issue.  (8/29/13 Tr. (Gutierrez) 57:15–58:9; 9/3/13 Tr. (Killough) 45:15–23.)  Microsoft had to maintain those defenses in Motorola's injunctive actions lest it simply concede liability and have its products enjoined.  (9/3/13 Tr. (Killough) 45:3–14.)  To the extent not already established by Microsoft's discussions with Motorola or its complaint, Microsoft committed in September 2011 to take a license to

---

[7] Motorola is also incorrect.  The placement of the statement within Microsoft's complaint is of no consequence, and Microsoft sought both monetary and equitable remedies and is entitled to both.  Further, an accounting *can* be used to deal with complex accounts, regardless of which way funds ultimately flow between a plaintiff and defendant.  1 Dan B. Dobbs, *Law of Remedies* § 4.3(5) at 609–10 (2d ed. 1993).

MICROSOFT'S OPPOSITIONS TO
MOTOROLA'S RULE 50(a) MOTIONS
FOR JMOL (DKT NOS. 904 AND 905) - 17
C10-1823-JLR

LAW OFFICES
**CALFO HARRIGAN LEYH & EAKES, LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700 FAX, (206) 623-8717

1  Motorola's patents on RAND terms.[8]  (*Id.* at 10:17–11:14.)  Motorola continued seeking

2  injunctions through January 2013.  (*Id.* at 17:13–23.)

3      Any supposed concern that the threat of injunctions is needed to bring implementers to

4  the table was never present here because a RAND determination was already underway, at

5  *Microsoft's* initiative.  From November 2010 on, and certainly from September 2011 on, the

6  only purpose in seeking injunctions was to put improper pressure on Microsoft to settle on

7  supra-RAND terms.  Microsoft had not merely told Motorola it was willing to take a RAND

8  license—Microsoft had committed to this Court that it would do so.  If Motorola truly wanted

9  a RAND royalty, it could obtain one through this lawsuit with this Court's assistance and had

10  no need to seek an injunction to force Microsoft's hand.  (8/27/13 Tr. (Dailey) 132:8–16;

11  8/30/13 Tr. (Murphy) 84:1–7.)  Further, Motorola had no need to take its SEPs to the ITC at

12  all, because the ITC cannot award RAND royalties or any other form of damages.  (9/3/13 Tr.

13  (Killough) 36:2–10.)  This evidence provided a legally-sufficient basis for the jury to conclude

14  that Microsoft was never unwilling to take a license to Motorola's patents on RAND terms.

15      ### 3.  All Objective Factors Support A Finding That Motorola's Pursuit Of
16      ### Injunctions Breached Its Duty Of Good Faith And Fair Dealing.

17      As with its arguments concerning the October 2010 demands, in arguing about

18  objective factors relating to its pursuit of injunctions Motorola fails to address four of the five

19  relevant factors—each of which, alone or in combination, supports a finding of breach,

20  compelling denial of Motorola's motion.  The only factor Motorola addresses specifically is

21  frustration of purpose, to which Microsoft responds below.

22      **Frustration of Purpose:**  The jury had ample evidence to conclude that Motorola's

23  pursuit of injunctions constituted hold up:  Motorola backed its unreasonable royalty demands

---

[8] Motorola continues to press a claim that Microsoft never made such a statement until sometime "recently" before May 2012.  (904 Br. at 11; *see also* 9/4/13 Tr. (Motorola closing) 84:6–7 ("And here we're talking about recently.  Recently compared to May 14, 2012.").)  Motorola was served with Microsoft's brief containing this commitment on September 30, 2011, and any suggestion that Microsoft's statement came only later is baseless.

MICROSOFT'S OPPOSITIONS TO
MOTOROLA'S RULE 50(a) MOTIONS
FOR JMOL (DKT NOS. 904 AND 905) - 18
C10-1823-JLR

LAW OFFICES
**CALFO HARRIGAN LEYH & EAKES, LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700 FAX, (206) 623-8717

by pursuing lawsuits and injunctions around the world.  (8/29/13 Tr. (Murphy) 125:11–127:2; 8/28/13 Tr. (Gutierrez) 154:24–155:23, 156:9–16.)  The jury was entitled to disbelieve Motorola's weak claim that it filed those actions only as a necessary, unplanned, response to Microsoft's suit, because Motorola filed the 699 and 700 Actions on November 10, 2010—the day after Microsoft filed here—and its ITC action followed only 12 days later.  The jury heard that it was Motorola's policy to make an offer before seeking injunctions on its SEPs (8/27/13 Tr. (Dailey) 125:23–126:11; 8/29/13 Tr. (Blasius) 107:16–19), and Motorola's complaints seeking injunctions were being prepared at the same time Motorola sent its demand letters. (8/27/13 Tr. (Dailey) 124:15–125:7.)  Motorola's suggestion that Heiner testified that injunctions on SEPs "should not be considered hold up" (904 Br. at 10) mischaracterized his testimony, which did not mention injunctions at all (*see* 8/30/13 Tr. (Heiner) 178:19–179:18).

If granted, the injunctions Motorola pursued would have left Microsoft with a choice between pulling its standard-compliant products out of the U.S. and German markets, or removing standard-compliant functionality that had little or nothing to do with Motorola's technology, but was critical to customer demand for standard-compliant products.  (8/28/13 Tr. (Gutierrez) 151:1–152:10.)  The threat of injunctions is key leverage in forcing implementers to accept non-RAND terms.  (8/29/13 Tr. (Murphy) 125:11–126:12.)  Motorola continued to seek an exclusion order on its H.264 SEPs in the ITC as late as January 2013.  (9/3/13 Tr. (Killough) 17:19–21.)  There is no explanation other than hold-up for Motorola's continued demands for exorbitant royalties while pursuing injunctions, and there is ample evidence for a reasonable jury to conclude that Motorola's conduct frustrated the purposes of the contracts.[9]

**Commercially Unreasonable, Custom and Practice, and Unreasonable Exercise of Discretion:**  The evidence is sufficient to support a jury finding that Motorola's pursuit of

[9] Given that *threats* of injunctions are key to hold up, Motorola's claim that it cannot have engaged in hold up because only courts grant injunctions (904 Br. at 14) fails entirely.  Moreover, Motorola ignores the facts that no court would ever issue such an injunction unless Motorola sought one—and that Motorola convinced a German court to issue one, but was stopped from enforcing it by this Court.  (9/3/13 Tr. (Killough) 13:16–15:10.)

MICROSOFT'S OPPOSITIONS TO
MOTOROLA'S RULE 50(a) MOTIONS
FOR JMOL (DKT NOS. 904 AND 905) - 19
C10-1823-JLR

LAW OFFICES
**CALFO HARRIGAN LEYH & EAKES, LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700 FAX, (206) 623-8717

1   injunctions on its SEPs was commercially unreasonable, contrary to industry custom and

2   practice, and/or an unreasonable exercise of discretion—factors Motorola entirely fails to

3   address.  Motorola's use of injunctive leverage to extract excessive royalties on SEPs is neither

4   reasonable nor an accepted custom and practice.  (8/30/13 Tr. (Gutierrez) 61:9–13.)  Even if

5   such activities were considered reasonable or customary before 2012 (and there is no evidence

6   that they were), the FTC's public interest statement in the ITC 752 Investigation (8/30/13 Tr.

7   (Heiner) 150:23–151:17) establishes that regulators viewed that conduct as unreasonable,

8   contrary to the public interest, and a "custom and practice" that should be abandoned (if it had

9   ever existed).  Further, the FTC opened an investigation into Motorola's conduct with respect

10  to its SEPs in late spring of 2012 (8/30/13 Tr. (Heiner) 149:20–25), to determine whether

11  "Motorola reneged on a licensing commitment made to several standard-setting bodies to

12  license its standards-essential patents relating to smartphones, tablet computers and video game

13  systems on FRAND terms by seeking injunctions against willing licensees of those SEPs" (*id.*

14  at 153:2–6).  The FTC took the position that Motorola's conduct was so far from "ordinary

15  custom and practice" and so unreasonable as to merit regulatory oversight.

16        **Reasonable and Justified Expectations:**  Gutierrez's testimony establishes that while

17  companies like Microsoft recognize the possibility of assertions and counter-assertions of

18  patents (8/28/13 Tr. (Gutierrez) 183:24–184:16), Microsoft's reasonable and justified

19  expectations were that no company that had made RAND commitments would use its SEPs in

20  the manner in which Motorola did.  (8/28/13 Tr. (Gutierrez) 149:13–150:5.)  Motorola's

21  30(b)(6) witness confirmed that Motorola knew it could not use its SEPs to force concessions

22  on non-SEPs.  (8/29/13 Tr. (Blasius) 111:14–112:6.)  Finally, by June 2012 Motorola knew its

23  conduct was the subject of FTC scrutiny and by that date (at the latest), Motorola could not

24  have had a reasonable and justified expectation that pursuing injunctions on SEPs was

25

26

MICROSOFT'S OPPOSITIONS TO
MOTOROLA'S RULE 50(a) MOTIONS
FOR JMOL (DKT NOS. 904 AND 905) - 20
C10-1823-JLR

LAW OFFICES
**CALFO HARRIGAN LEYH & EAKES, LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700 FAX, (206) 623-8717

1   acceptable.  (8/30/13 Tr. (Heiner) 150:23–153:6.)  This evidence, and Motorola's failure to

2   address this factor, require denial of Motorola's motion as to its pursuit of injunctions.

### 4. Evidence of Motorola's Subjective Intent Supports A Finding That Motorola's Pursuit Of Injunctions Breached Its Duty Of Good Faith.

5   The jury had ample evidence to conclude that Motorola pursued injunctions in

6   subjective bad faith.  It is irrelevant that Dailey had seen injunctions in prior patent cases (904

7   Br. at 9), because he admitted injunctions were unnecessary in Motorola's SEP lawsuits

8   against Microsoft.  (8/27/13 Tr. (Dailey) 132:2–16.)  It is also irrelevant that Microsoft had

9   sued Motorola first on patents unrelated to 802.11 and H.264 (904 Br. 10), and Motorola offers

10  no explanation why Microsoft's lawsuits could excuse Motorola's breach.  This suit put

11  Motorola on notice that the RAND license issue would be litigated here, yet Motorola

12  subsequently sought injunctions elsewhere in an end run around this case that required this

13  Court's intervention.  (9/3/13 Tr. (Killough) 13:3–15:10.)

### F. Microsoft Presented Legally Sufficient Evidence From Which The Jury Could Award Damages.

15  Motorola concedes that Microsoft's complaint and amended complaint are not limited

16  to damages—in fact, Microsoft sought broad categories of equitable relief (904 Br. at 20)—so

17  the cases Motorola cites disapproving of nominal damages when only damages are sought do

18  not apply.  When equitable relief is sought, nominal damages are appropriate.  *See Merrell v.*

19  *Renier*, No. C06-404-JLR, 2006 WL 3337368, at *5–6 (W.D. Wash. Nov. 16, 2006).  The jury

20  heard ample evidence of the significant prospective harm to Microsoft from being deprived of

21  a RAND license (8/27/13 Tr. (DeVaan) 23:11–25:21; 8/27/13 Tr. (Treadwell) 44:14–46:13)

22  and actual harm to Microsoft's customer relationships (8/29/13 Tr. (Davidson) 94:16–95:6)—

23  evidence that would support an award of nominal damages.

24  Motorola re-argues the legal issue whether its pursuit of injunctions on RAND-

25  committed SEPs can justify awarding attorneys' fees as damages.  (904 Br. at 21.)  But the

26

MICROSOFT'S OPPOSITIONS TO
MOTOROLA'S RULE 50(a) MOTIONS
FOR JMOL (DKT NOS. 904 AND 905) - 21
C10-1823-JLR

LAW OFFICES
**CALFO HARRIGAN LEYH & EAKES, LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700 FAX, (206) 623-8717

1   instructions made clear that the jury can award fees as damages for the pursuit of injunctions,

2   under the rubric of the duty of good faith and fair dealing and with consideration of the

3   surrounding circumstances.  (Instr. No. 24.)  As outlined above, there is ample evidence from

4   which the jury could conclude that the circumstances surrounding Motorola's injunctive

5   actions amounted to a breach compensable by fees as damages.  The legal issue (decided

6   against Motorola elsewhere, *see* Dkt. No. 843 at 29–33) provides no basis for Rule 50(a) relief.

7        The remainder of Motorola's damages argument fails because the evidence provides a

8   legally sufficient basis for a jury to find for Microsoft.  Jeff Davidson's testimony established

9   that Motorola's pursuit of injunctions in Germany forced the German relocation (8/29/13 Tr.

10  (Davidson) 68:6–13, 69:8–13, 71:18–20, 83:1–4; *see also* 8/27/13 Tr. (Treadwell) 56:19–

11  57:12), and the relocation's costs were calculated by Todd Menenberg (8/30/13 Tr.

12  (Menenberg) 94:26–116:8; PDX 18–22).  The fact that Microsoft's new facility is larger than

13  the old facility does not negate that evidence, because while similar expansion in Germany was

14  possible (8/29/13 Tr. (Davidson) 95:21–96:9), it could not be pursued because of Motorola's

15  injunctive threat.  And although Microsoft might have been in the future subject to other

16  injunctions in Germany, unrebutted testimony established the distinction between injunctions

17  on non-SEPs and the SEP injunction Motorola obtained from the German court (8/27/13 Tr.

18  (DeVaan) 19:6–21:6; 8/27/13 Tr. (Treadwell) 40:23–41:7, 54:15–55:4; 8/28/13 Tr. (Gutierrez)

19  151:16–152:10), which left Microsoft with no choice but to relocate.

20       As for attorneys' fees as damages, the jury heard unrebutted testimony from

21  Microsoft's David Killough that Motorola's injunctive actions directly caused Microsoft to

22  incur the fees in question.  (9/3/13 Tr. (Killough) 21:10–36:21; Ex. 6651–56, 6658–59, 6339–

23  59, 6187–6196, 6179, 6180, 6182, 6186, 6202–10, 6212, 6608; PDX 23–24.)  Contrary to

24  Motorola's claim (904 Br. 24), Microsoft did not expect Motorola to file suits on SEPs and

25  seek injunctions (8/28/13 Tr. (Gutierrez) 153:17–154:9), and as noted above, Dailey conceded

26

MICROSOFT'S OPPOSITIONS TO
MOTOROLA'S RULE 50(a) MOTIONS
FOR JMOL (DKT NOS. 904 AND 905) - 22
C10-1823-JLR

LAW OFFICES
**CALFO HARRIGAN LEYH & EAKES, LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700 FAX, (206) 623-8717

1    it was unnecessary for Motorola to do so.  The jury had sufficient basis to conclude that all of

2    Microsoft's claimed damages were caused by Motorola's conduct.

3           Finally, Microsoft introduced evidence that Motorola Solutions can be held liable for

4    damages, including the attorneys' fees.  The evidence establishes that Dailey was acting on

5    behalf of all involved Motorola entities.  The October 2010 letters were on the letterhead of

6    Motorola, Inc. (the corporate predecessor of Motorola Solutions, Inc. (Dkt. No. 803 at 5)) and

7    purport to offer licenses to patents held by a variety of the Motorola entities.  (Exs. 1, 2.)

8    Dailey's initial conduct in sending the letters relates to all of Motorola Mobility, Inc., Motorola

9    Solutions, Inc., and General Instrument Corporation because their patents were the subject of

10   the offers.  Throughout the period of negotiations that was the subject of both Gutierrez's and

11   Dailey's testimony, those patents have been the subject of the parties' dispute.  Motorola

12   collectively used the H.264 and 802.11 portfolios together as leverage to extract concessions

13   on Microsoft's patents to the benefit of all three entities—there was no evidence that the H.264

14   patents were somehow part of a distinct strategy disconnected from Motorola Solutions.

15          Moreover, Motorola has waived this argument.  Throughout this case, Motorola has

16   conducted itself as "Motorola"—collectively Motorola, Inc. (now Motorola Solutions),

17   Motorola Mobility, and General Instrument.  Motorola filed the Joint Pretrial Order under that

18   collective identity.  (Dkt. No. 803 at 1.)  Motorola stipulated to admitted facts that "Defendants

19   sent Microsoft" the two October 2010 letters.  (*Id.* at 6.)  Motorola repeatedly displayed a

20   timeline to the jury that shows that "Motorola files suit in WD WI," that "Motorola files suit in

21   ITC," and that "Motorola files in Germany."  (Dkt. No. 903 Ex. 2.)  Motorola affirmatively

22   represented to the jury that the key relevant conduct—the letters and the pursuit of

23   injunctions—was undertaken by "Motorola," *i.e.*, all three entities.  The jury received

24   instructions defining Motorola collectively (8/26/13 Tr. (Preliminary Instructions) 102:2–6), an

25

26

MICROSOFT'S OPPOSITIONS TO
MOTOROLA'S RULE 50(a) MOTIONS
FOR JMOL (DKT NOS. 904 AND 905) - 23
C10-1823-JLR

approach Motorola endorsed (*see* Dkt No. 857, Defs.' Revised Proposed Prelim. Instr. at 2). This trial, like the last trial, proceeded on that definition, and Motorola cannot change it now.

### III.   MOTOROLA'S RULE 50(a) MOTION MADE AT THE CLOSE OF THE EVIDENCE SHOULD BE DENIED.

Motorola's renewed motion (Dkt. No. 905, Motorola's Renewed Rule 50(a) Mot. for J. as a Matter of Law ("905 Br.")) largely rehashes the arguments made in its first Rule 50(a) brief, and Microsoft in response incorporates by reference all arguments and evidence identified in Section II, *supra*.  Aside from Dailey, Motorola's case consisted of testimony from three experts, video depositions of three Microsoft employees related to the German relocation, and a video deposition of a single fact witness.[10]  None of the evidence introduced in Motorola's case deprives the jury of any of the above bases for finding for Microsoft, nor does it establish any defenses for Motorola.  In many instances, the evidence in Motorola's case only provided further support for a jury finding of breach.  Additionally, as with its first Rule 50(a) motion, Motorola makes no argument as to whether the evidence supports a straightforward finding of breach of contract, compelling denial of its motion.

### A.  Evidence In Motorola's Case Confirms Its Offer Letters Were A Breach.

Motorola adds to its previous arguments about its subjective intent citations to testimony of Neill Taylor (cumulative of Dailey's) that Motorola expected negotiations (905 Br. at 4), but as noted in Section II.D.2, despite that contention the jury had ample evidence to conclude that Motorola sent the letters in bad faith.  The jury heard Taylor claim it "would never have entered [his] mind" to offer 0.1% because he viewed it as "a ludicrous rate," but the jury knew that rate exceeds RAND for both 802.11 and H.264.  (9/3/12 Tr. (Taylor) 77:24–78:6.)  Motorola also cites Taylor's testimony (cumulative of Blasius's) that Motorola had

---

[10] Dailey was called once (by Microsoft in its case) and by agreement Motorola's examination was not limited by the scope of Microsoft's examination.  Motorola's first Rule 50(a) motion corresponding to the close of Microsoft's case (Dkt. No. 904) contains dozens of citations to Dailey testimony elicited by Motorola's counsel. Without taking any position as to whether such Dailey testimony is properly part of Microsoft's case, Microsoft responded to Motorola's arguments in Section II, *supra*, and incorporates by reference all of those responses here.

MICROSOFT'S OPPOSITIONS TO
MOTOROLA'S RULE 50(a) MOTIONS
FOR JMOL (DKT NOS. 904 AND 905) - 24
C10-1823-JLR

LAW OFFICES
**CALFO HARRIGAN LEYH & EAKES, LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700 FAX, (206) 623-8717

1   licensed its cellular portfolio with an opening offer of 2.25% (905 Br. at 4), but the jury heard

2   directly contradictory testimony from Motorola's expert that "Motorola had no past experience

3   on which it could draw when it attempted to negotiate a RAND license with Microsoft,"

4   referencing that same history of cellular licensing.  (9/3/13 Tr. (Leonard) 153:18–154:19.)

5          It is not "undisputed" that "Motorola did not have the information that the Court

6   considered" at the November trial (905 Br. at 5)—testimony established that Motorola knew of

7   the MPEG LA rates and InteCap study that provided close benchmarks for the RAND

8   determination.  Further, Leonard admitted that information establishing the scope of its

9   demands was available to Motorola at the time.  (9/3/13 Tr. (Leonard) 151:12–21.)  He also

10  admitted that he never spoke to key Motorola personnel to determine what they knew about

11  Motorola's patent value.  (9/3/13 Tr. (Leonard) 160:5–19.)  The notion that Motorola had

12  never before tried to license these patents on a standalone basis (905 Br. at 5–6) was belied by

13  Leonard's concession that there were some instances in which Motorola had previously done

14  so.  (9/3/13 Tr. (Leonard) 165:18–166:19.)  Moreover, Leonard had failed to consider this

15  activity (*id.*), giving the jury a firm basis to disregard both his testimony and Taylor's rhetoric.

16         As for objective factors, Motorola identifies no evidence introduced in its case

17  concerning industry custom and practice (905 Br. at 7–8), and fails to argue that its letters were

18  commercially reasonable or reflected a reasonable exercise of discretion, or that the jury lacked

19  an adequate evidentiary basis to find for Microsoft on either ground.  In fact, evidence in

20  Motorola's case only provided further support for such findings:  For example, Leonard

21  admitted that Motorola's H.264 letter violated Motorola's own policy of licensing its SEPs to

22  producers of end products.  (9/3/13 Tr. (Leonard) 151:3–9.)

23         **Frustration of Purpose:**  As with its earlier motion, Motorola makes no argument

24  concerning its frustration of the anti-stacking purpose of the contracts.  Evidence in Motorola's

25  case bolsters the jury's basis for drawing that conclusion, as Taylor admitted that Motorola

26

MICROSOFT'S OPPOSITIONS TO
MOTOROLA'S RULE 50(a) MOTIONS
FOR JMOL (DKT NOS. 904 AND 905) - 25
C10-1823-JLR

LAW OFFICES
**CALFO HARRIGAN LEYH & EAKES, LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700 FAX, (206) 623-8717

"understood there were a lot of 802.11 patents out there" subject to declarations and letters of assurance (9/3/13 Tr. (Taylor) 79:4–18), and Dailey admitted he had not taken this into account in sending the letters (8/28/13 Tr. (Dailey) 60:13–15).  Motorola focuses only on hold up, but the incoherent testimony provided by Leonard on this issue by no means deprived the jury of the basis it already had to find that Motorola's offers constituted hold up.  Leonard claimed that excessive demands were irrational because agreement must be reached for hold up to succeed (905 Br. 8), but the jury heard evidence that Motorola's policy was to make some license offer before suing on its SEPs (9/3/13 Tr. (Leonard) 152:18–153:5) and could readily conclude that Motorola's letters rationally served that purpose, which Leonard had ignored.

**Reasonable and Justified Expectations:**  Motorola's citations to Holleman's testimony on the SSOs' view of RAND (905 Br. at 9) are cumulative of the contents of the Court's instructions (*see* Instr. No. 20), and do not change the legally-sufficient basis the jury had to find for Microsoft on this issue.  But Holleman also admitted that Motorola was obligated to license its 802.11 patents at "nominal competitive cost" (9/3/13 Tr. (Holleman) 97:6–19), and that the ITU and IEEE IPR policies were silent concerning the actual royalty that patent holders could expect (*id.* at 98:24–99:4).  Those concessions by Motorola's SSO expert were more than adequate to permit the jury to find for Microsoft as to the reasonable and justified expectations of the parties, regardless of any vague suggestions from Motorola's economist that Motorola was entitled to compensation.  (*See* 905 Br. at 9.)

**B.  Evidence In Motorola's Case Confirms It Breached By Pursuing Injunctions.**

Motorola's renewed argument on injunctions (*see* 905 Br. at 9–15) contains only two propositions based on additional evidence introduced in its case.  Motorola cites a statement from Leonard (cumulative of Dailey's testimony and addressed previously) that seeking injunctions is common (905 Br. at 10), and it cites Leonard's claim that filing an injunctive action gives little leverage because courts may find money damages adequate and refuse to

1    enter an injunction (905 Br. at 15).  That testimony supports a finding for Microsoft.  In effect,

2    Leonard told the jury that what Motorola was trying to do in seeking injunctions (i) was

3    unnecessary (9/3/13 Tr. (Leonard) 135:2–3 ("[F]rom an economic point of view, you don't

4    really need an injunction, you just award a money amount of damages."); *id.* 106:1–6 ("[I]f

5    you end up in litigation . . . what is going to happen is the court is going to determine a RAND

6    rate.")) and (ii) that courts were likely to refuse to permit it (*id.* 140:2–7 ("[T]he economic

7    arguments against getting an injunction [on Motorola's SEPs] were pretty strong.")).

8         Motorola's case strengthened the basis for finding frustration of purpose on multiple

9    other grounds.  RIM had previously accused Motorola of violating its RAND commitments,

10   and the jury heard undisputed evidence that RIM would not have agreed to pay Motorola the

11   royalty reflected in the agreement for Motorola's SEPs had it not been for a broader agreement

12   that allowed RIM to avoid an exclusion order Motorola sought.[11]  (8/28/13 Tr. (Dailey) 22:12–

13   23:8.)  Motorola's German expert Haedicke conceded that the injunction Motorola sought in

14   Germany would have devastating consequences for Microsoft's business.  (8/30/13 Tr.

15   (Haedicke) 205:17–25.)  Leonard conceded that the threat of injunction makes it easier to

16   extract hold up value.  (9/3/13 Tr. (Leonard) 143:4–16.)  Leonard also acknowledged the

17   September 2011 date when Microsoft clarified its commitment to take a RAND license, and

18   conceded Motorola did not give up its pursuit of injunctions until well after.  (*Id.* at 144:18–25;

19   *see also* 8/27/13 Tr. (Dailey) 136:14–18.)  Finally, the jury was entitled to reject Leonard's

20   views about hold up because he admitted he had not asked Dailey even basic questions about

21   Motorola's pursuit of injunctions.  (9/3/13 Tr. (Leonard) 146:23–147:10.)[12]  As for Motorola's

22

23   _____

     [11] This evidence also supports a finding that using injunctive leverage to extract excessive royalties on SEPs
     was neither commercially reasonable nor an accepted custom and practice.

24   [12] Motorola otherwise advances no new arguments concerning injunctions based on evidence presented in its

25   case, and Microsoft incorporates its responses in Section II.E, *supra*.  Motorola advances no new arguments
     connected to evidence in its case as to Marvell or as to its entire course of conduct, and Microsoft similarly
     incorporates its earlier responses throughout Section II (as to Marvell) and Section II.C.

26

MICROSOFT'S OPPOSITIONS TO
MOTOROLA'S RULE 50(a) MOTIONS
FOR JMOL (DKT NOS. 904 AND 905) - 27
C10-1823-JLR

subjective good faith, while Dailey claimed ignorance of RIM's allegations of SEP abuse, he

admitted that as head of licensing it would have been important to know of those accusations

(8/28/13 Tr. (Dailey) 23:19–25:11), which were within Motorola's corporate knowledge.

## C.  No Evidence In Motorola's Case Impacted The Jury's Basis For Awarding Damages.[13]

Motorola attempts to bolster its failed causation argument concerning the German

relocation with additional citations to the testimony of Microsoft employees introduced in

Motorola's case.  (905 Br. at 22–23.)  All of that evidence is subsumed by Microsoft's earlier

arguments (Section II.F, *supra*) that regardless of any upside to Microsoft's new facility, the

jury had an adequate basis to conclude that Motorola's conduct left Microsoft with no choice

but to relocate.  (*See also* 9/3/13 Tr. (Daly) 54:10–14; 9/3/13 Tr. (Roberts) 64:15–22.)  The

supposed reasonableness of the Section 315 procedure (*see* 905 Br. at 23) is addressed below

in Section III.E, but Motorola's rejection of Microsoft's Orange Book offer (far in excess of

RAND) and the German court's approval of that rejection (8/30/13 Tr. (Haedicke) 201:13–22)

only provided a further basis for the jury to find the relocation reasonable and necessary.

Although it cites no evidence from its case, Motorola advances new arguments in its

second Rule 50(a) motion citing only to Microsoft's case.  (*Compare* 905 Br. at 23–24 *with*

904 Br. at 24.)  Microsoft's ITC action did not "cause" Motorola to seek injunctions on its

SEPs (905 Br. at 23)—Motorola took that action voluntarily, and the jury was entitled to find

that conduct a breach of the duty of good faith and fair dealing compensable by damages.

Motorola also argues that only fees defending against injunctions would be relevant, but the

jury heard testimony that all of the fees Microsoft sought so qualified, because seeking to

invalidate patents provides a defense to injunctions (9/3/13 Tr. (Killough) 41:16–42:2), as

---

[13] The first two sections of Motorola's damages argument (*see* 905 Br. at 18–22) do not cite to any evidence introduced in Motorola's case, and Microsoft incorporates its response in Section II.F, *supra*.

MICROSOFT'S OPPOSITIONS TO
MOTOROLA'S RULE 50(a) MOTIONS
FOR JMOL (DKT NOS. 904 AND 905) - 28
C10-1823-JLR

LAW OFFICES
**CALFO HARRIGAN LEYH & EAKES, LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700 FAX, (206) 623-8717

1    would non-infringement (*id.* 45:3–14).  (*See also id.* 36:2–21.)  The jury had an adequate

2    evidentiary basis to award Microsoft all of the fees it sought.

3        **D.  Motorola Failed To Carry Its Burden On Mitigation.**

4        To establish that Microsoft failed to mitigate damages, Motorola had to prove that

5    Microsoft failed to use reasonable efforts to minimize its loss *and* the amount of damages that

6    Microsoft could have avoided.  (Instr. No. 26.)  Motorola's Orange Book "Road B" fails as a

7    mitigation argument for two reasons:  First, there is no evidence as to the amount of damages

8    that Microsoft could have avoided.  Second, no reasonable juror would have a legally sufficient

9    basis to find the "Road B" procedure reasonable.  Haedicke explained that to be on the safe

10   side Microsoft would have had to place into escrow the full amount that Motorola demanded

11   (8/30/13 Tr. (Haedicke) 208:2–13), but he did not know what royalty Motorola would have set

12   (*id.* at 216:1–3).  Haedicke claimed that Microsoft—presumably if it were willing to be less

13   than absolutely safe—could instead have escrowed "a reasonable amount," but he could not

14   say how much.  (*Id.* at 208:12–17.)  In either case, Microsoft would then have had to file a

15   separate lawsuit to challenge the rate and try to get its money back.  (*Id.* at 207:4–208:1.)

16   Haedicke admitted it was pure speculation to guess how long that process would take (*id.* at

17   208:18–24), and that he could only speculate what evidence might be considered in that

18   proceeding.  (*Id.* at 209:19–210:11.)  Haedicke could not say what costs, legal or otherwise,

19   Microsoft would incur by following "Road B," or what amount the German court would set as

20   the royalty (even whether it could be as much as $4 billion).  (*Id.* at 216:16–217:15.)  Haedicke

21   could only guess whether going down "Road B" would cost Microsoft more or less than what

22   Microsoft sought as damages for Motorola's breaches in Germany.  (*Id.* at 217:16–20.)

23        A procedure with unknowable costs that could result in a German court's order to pay

24   some unknown amount up to $4 billion in royalties for two patents, when a RAND royalty is

25   less than $2 million annually for Motorola's entire H.264 portfolio, cannot be a "reasonable

26

MICROSOFT'S OPPOSITIONS TO
MOTOROLA'S RULE 50(a) MOTIONS
FOR JMOL (DKT NOS. 904 AND 905) - 29
C10-1823-JLR

LAW OFFICES
**CALFO HARRIGAN LEYH & EAKES, LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700 FAX, (206) 623-8717

effort" Microsoft was obligated to take to minimize the damages Motorola caused.  *See, e.g.*,

*Jaeger v. Cleaver Const., Inc.*, 201 P.3d 1028, 1037 (Wash. App. 2009) ("Courts allow a wide

latitude of discretion to the person who, by another's wrong . . . is faced with a probability of

injury or loss.") (citing cases).  Motorola failed to carry its burden of establishing the amount

of damages that could have been minimized or avoided by following "Road B" because it

offered no evidence as to its costs.  There is no legally sufficient evidentiary basis to find that

Microsoft failed in its duty to minimize damages.[14]

DATED this 13th day of September, 2013.

CALFO HARRIGAN LEYH & EAKES LLP

By    s/Arthur W. Harrigan, Jr.        
        Arthur W. Harrigan, Jr., WSBA #1751

By    s/Christopher Wion            
        Christopher Wion, WSBA #33207

By    s/Shane P. Cramer            
        Shane P. Cramer, WSBA #35099
        999 Third Avenue, Suite 4400
        Seattle, WA  98104
        Phone:  206-623-1700
        arthurh@calfoharrigan.com
        chrisw@calfoharrigan.com
        shanec@calfoharrigan.com

By    s/T. Andrew Culbert           
        T. Andrew Culbert

By    s/David E. Killough            
        David E. Killough

        MICROSOFT CORPORATION
        1 Microsoft Way

---

[14] Motorola suggests that Microsoft relocating earlier (or, bizarrely, moving for a preliminary injunction against Motorola earlier) might have reduced costs (905 Br. at 24), but Motorola never offered any number and likewise failed to carry its burden of establishing the amount of damages that could have been avoided.

MICROSOFT'S OPPOSITIONS TO
MOTOROLA'S RULE 50(a) MOTIONS
FOR JMOL (DKT NOS. 904 AND 905) - 30
C10-1823-JLR

LAW OFFICES
**CALFO HARRIGAN LEYH & EAKES, LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700 FAX, (206) 623-8717

Redmond, WA  98052
Phone:  425-882-8080
Fax:  425-869-1327

David T. Pritikin
Richard A. Cederoth
Constantine L. Trela, Jr.
William H. Baumgartner, Jr.
Ellen S. Robbins
Douglas I. Lewis
David C. Giardina
John W. McBride
Nathaniel C. Love

SIDLEY AUSTIN LLP
One South Dearborn
Chicago, IL  60603
Phone:  312-853-7000
Fax:  312-853-7036

Carter G. Phillips
Brian R. Nester

SIDLEY AUSTIN LLP
1501 K Street NW
Washington, DC  20005
Telephone:  202-736-8000
Fax:  202-736-8711

Counsel for Microsoft Corp.

MICROSOFT'S OPPOSITIONS TO
MOTOROLA'S RULE 50(a) MOTIONS
FOR JMOL (DKT NOS. 904 AND 905) - 31
C10-1823-JLR

## CERTIFICATE OF SERVICE

I, Florine Fujita, swear under penalty of perjury under the laws of the State of Washington to the following:

1.      I am over the age of 21 and not a party to this action.

2.      On this 13th day of September, 2013, I caused the preceding document to be served on counsel of record in the following manner:

**Attorneys for Motorola Solutions, Inc., and Motorola Mobility, Inc.:**

Ralph Palumbo, WSBA #04751
Philip S. McCune, WSBA #21081          _____ Messenger
Summit Law Group                               _____ US Mail
315 Fifth Ave. South, Suite 1000               _____ Facsimile
Seattle, WA  98104-2682                        __X___ ECF
Telephone:  206-676-7000
Email:  Summit1823@summitlaw.com

Steven Pepe (*pro hac vice*)                   _____ Messenger
Jesse J. Jenner (*pro hac vice*)               _____ US Mail
Ropes & Gray LLP                               _____ Facsimile
1211 Avenue of the Americas                    __X___ ECF
New York, NY  10036-8704
Telephone:  (212) 596-9046
Email:  steven.pepe@ropesgray.com
Email:  jesse.jenner@ropesgray.com

Norman H. Beamer (*pro hac vice*)              _____ Messenger
Ropes & Gray LLP                               _____ US Mail
1900 University Avenue, 6th Floor              _____ Facsimile
East Palo Alto, CA  94303-2284                 __X___ ECF
Telephone:  (650) 617-4030
Email:  norman.beamer@ropesgray.com

Paul M. Schoenhard (*pro hac vice*)            _____ Messenger
Ropes & Gray LLP                               _____ US Mail
One Metro Center                               _____ Facsimile
700 12th Street NW, Suite 900                  __X___ ECF
Washington, DC  20005-3948
Telephone:  (202) 508-4693
Email: Paul.schoenhard@ropesgray.com

MICROSOFT'S OPPOSITIONS TO
MOTOROLA'S RULE 50(a) MOTIONS
FOR JMOL (DKT NOS. 904 AND 905) - 32
C10-1823-JLR

Andrea Pallios Roberts (*pro hac vice*)                    _____ Messenger
Brian C. Cannon (*pro hac vice*)                          _____ US Mail
Quinn Emanuel Urquhart & Sullivan, LLP                    _____ Facsimile
555 Twin Dolphin Drive, 5th Floor                             X     ECF
Redwood Shores, CA 94065
Telephone:  (650) 801-5000
Email: andreaproberts@quinnemanuel.com
Email: briancannon@quinnemanuel.com


Kathleen M. Sullivan (*pro hac vice*)                      _____ Messenger
David Elihu (*pro hac vice*)                              _____ US Mail
Quinn Emanuel Urquhart & Sullivan, LLP                    _____ Facsimile
51 Madison Ave., 22nd Floor                                   X     ECF
New York, NY 10010
Telephone:  (212) 849-7000
Email: kathleensullivan@quinnemanuel.com


William Price (*pro hac vice*)                             _____ Messenger
Quinn Emanuel Urquhart & Sullivan, LLP                    _____ US Mail
865 S. Figuera St., 10th Floor                            _____ Facsimile
Los Angeles, CA 90017                                         X     ECF
Telephone:  (212) 443-3000
Email: williamprice@quinnemanuel.com
MicrosoftvMotoBreachofRANDCase@quinnemanuel.com

DATED this 13th day of September, 2013.


                              */s/ Florine Fujita*_____
                              FLORINE FUJITA

LAW OFFICES
**CALFO HARRIGAN LEYH & EAKES, LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700 FAX, (206) 623-8717