# EXHIBIT A

THE HONORABLE JAMES L. ROBART

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| MICROSOFT CORPORATION,<br><br>        Plaintiff,<br><br>vs.<br><br>MOTOROLA, INC., et al.,<br><br>        Defendants.<br>_____<br>MOTOROLA MOBILITY LLC, et al.,<br><br>        Plaintiffs,<br><br>vs.<br><br>MICROSOFT CORPORATION,<br><br>        Defendants. | Case No. C10-1823-JLR<br><br>DEFENDANT MOTOROLA MOBILITY'S, FIRST SET OF INTERROGATORIES AND REQUESTS FOR PRODUCTION TO PLAINTIFF MICROSOFT CORPORATION **AND MICROSOFT CORPORATION'S** *MAY 21, 2013 SUPPLEMENTAL* **ANSWER TO INTERROGATORY NO. 3** |

Pursuant to Fed. R. Civ. P. 26(e), and all applicable Local Rules, Microsoft Corporation ("Microsoft") hereby submits the following supplemental answer to Motorola Mobility LLC's ("Defendant's" or "Motorola's") Interrogatory No. 3.

**MICROSOFT'S** *MAY 21, 2013 SUPPLEMENTAL* **ANSWER TO INTERROGATORY NO. 3 -** 1

LAW OFFICES
**CALFO HARRIGAN LEYH & EAKES LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700   FAX, (206) 623-8717

**GENERAL OBJECTIONS**

Microsoft hereby incorporates the General Objections set forth in its initial and April 3, 2013 supplemental answers to Motorola's first set of Interrogatories and Requests for Production as though set forth herein. Those General Objections are incorporated into the specific objections to each Interrogatory set forth below.

**INTERROGATORY NO. 3:** State the factual basis for any contention underlying Microsoft's claim that Motorola's October 21, 2010 and October 29, 2010 Letter constituted a breach or other violation of a commitment to license patents on reasonable and non-discriminatory terms.

**ANSWER:** Microsoft incorporates by reference each of its General Objections as though set forth herein. Microsoft further objects that this is a premature contention interrogatory. Microsoft is not obligated to respond to premature contention interrogatories until the parties have substantially completed discovery.

Subject to and without waiving these objections, Microsoft answers that, in willful disregard of the commitments Motorola made to IEEE and the ITU-T, Motorola has refused to extend to Microsoft a license consistent with Motorola's promises for any of Motorola's allegedly "essential" patents. Instead, Motorola is demanding royalty payments that are wholly disproportionate to the royalty that its patents should command under any reasonable calculus. Motorola has discriminatorily chosen Microsoft's Xbox product line and other multi-function, many-featured products and software, such as Windows 7 and Windows Phone 7 and products incorporating Microsoft software, for the purpose of extracting unreasonable royalties from Microsoft that are inconsistent with Motorola's obligation to offer licenses for the relevant patents on RAND terms and conditions.

In further response, Microsoft states as follows:

**MICROSOFT'S** *MAY 21, 2013*
*SUPPLEMENTAL* **ANSWER TO**
**INTERROGATORY NO. 3 -** 2

Ex. A, page 6

LAW OFFICES
**CALFO HARRIGAN LEYH & EAKES LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700   FAX, (206) 623-8717

Motorola's October 21, 2010 Letter

By letter to Microsoft, dated October 21, 2010, Kirk Dailey, Motorola's Corporate Vice President Intellectual Property, offered to license "Motorola's portfolio of patents and pending applications having claims that may be or become Essential Patent Claims (as defined in section 6.1 of the IEEE bylaws) for a compliant implementation of the IEEE 802.11 Standards." Motorola offered to license the relevant patents under terms and conditions that included a "royalty of 2.25% per unit for each 802.11 complaint product[.]" Motorola stated that the royalty "is calculated based on the price of the end product (e.g., each Xbox 360 product) and not on component software."

The cost of the chips and associated components that provide wireless connectivity for Xbox 360 consoles is a small fraction of the overall cost of the device. Moreover, Microsoft sells its Xbox 360 consoles at a number of prices. Each console includes approximately the same chips and associated components for wireless connectivity, providing the same level of relevant functionality. Motorola thus seeks a royalty on components of Xbox 360 that is disproportionate to the value and contribution of its purportedly "essential" patents and has declined to offer a license to its purported "essential" patents unless it receives exorbitant and discriminatory royalty payments to which it is not entitled. On information and belief, Motorola has not previously entered into a license agreement for its purported "essential" patents that is comparable to the demand made of Microsoft. Motorola has thereby refused to offer to license the patents at a reasonable rate, with reasonable terms, under conditions that are demonstrably free of any unfair discrimination.

The royalty demanded by Motorola falls well outside the boundaries of a reasonable and non-discriminatory royalty and therefore violates the commitment Motorola made to the IEEE and its members.

**MICROSOFT'S *MAY 21, 2013 SUPPLEMENTAL* ANSWER TO INTERROGATORY NO. 3 -** 3

LAW OFFICES
**CALFO HARRIGAN LEYH & EAKES LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700   FAX, (206) 623-8717

Ex. A, page 7

Participants in IEEE-SA standards setting efforts, including those directed to WLAN technology, were subject to the IEEE-SA Standard Board Bylaws concerning the submission of Letters of Assurance related to patent claims deemed "essential" by a submitting party. Clause 6 of those Bylaws (which was revised slightly over the years) generally provides in pertinent part:

> A Letter of Assurance shall be either:
>
> a) A general disclaimer to the effect that the submitter without conditions will not enforce any present or future Essential Patent Claims against any person or entity making, using, selling, offering to sell, importing, distributing, or implementing a compliant implementation of the standard; or
>
> b) A statement that a license for a compliant implementation of the standard will be made available to an unrestricted number of applicants on a worldwide basis without compensation or under reasonable rates, with reasonable terms and conditions that are demonstrably free of any unfair discrimination.

Motorola openly and publicly submitted Letters of Assurance pursuant to Clause 6 of the IEEE-SA Standards Board Bylaws that it would offer to license any of its patents essential to the applicable WLAN standard(s) to any entity under reasonable rates on a non-discriminatory basis. IEEE-SA and its participants and affiliates relied on Motorola's promises in developing, adopting and implementing IEEE-SA technical standards. These standards are now implemented worldwide in a variety of electronic devices that have become commonplace.

Microsoft invested substantial resources in developing and marketing products in compliance with these standards, relying on the assurances of participating patent holders – including Motorola – that any essential patents held by such patent holders would be available for licensing by implementers of the standards on such terms.

By way of non-limiting example, each Xbox device includes substantial software and many computer chips and modules that perform various functions, including enabling Xbox's

MICROSOFT'S *MAY 21, 2013*
*SUPPLEMENTAL* ANSWER TO
INTERROGATORY NO. 3 - 4

LAW OFFICES
CALFO HARRIGAN LEYH & EAKES LLP
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700   FAX, (206) 623-8717

Ex. A, page 8

core functionality as a video gaming machine.  Of those, the Xbox console includes one – an interface provided to Microsoft by third-parties – that allows consumers optionally to connect an Xbox to the Internet using a WLAN connection.

The third-party WLAN interface does not enable any of Xbox's core video gaming functionality.  In addition, Microsoft allows consumers an alternative, wired method to connect to the Internet.  This alternative method does not require use of any WLAN technology.

On information and belief, Motorola obtained rights to several of the WLAN patents it has represented as "essential" through its recent acquisition of Symbol Technologies, Inc. ("Symbol").

Prior to the releases of the 802.11 protocols, Motorola and Symbol submitted Letters of Assurance to the IEEE pursuant to Clause 6 of the IEEE-SA Standards Board Bylaws with respect to those protocols, guaranteeing that any "essential" patents would be licensed under reasonable and non-discriminatory terms and conditions.  Both Motorola's and Symbol's Letters of Assurance apply to any "essential" patents they then held as well as any other "essential" patents they subsequently obtained.

In reliance on these letters of assurance, IEEE released the 802.11 standard and various amendments to that standard that Motorola asserts incorporated Motorola's and Symbol's patented technology.  On information and belief, once Motorola and Symbol disclosed that they likely held essential patents, absent a licensing commitment from them to the effect that they would offer licenses to "essential" patents on reasonable and non-discriminatory terms and conditions, the relevant IEEE working groups would have either revised the standards, employing alternative technologies instead, stopped working on the protocols or taken other actions.

In submitting its Letter of Assurance pursuant to the applicable IEEE IPR policy, Motorola entered into an actual or implied contract with IEEE, for the benefit of IEEE

MICROSOFT'S *MAY 21, 2013 SUPPLEMENTAL* ANSWER TO INTERROGATORY NO. 3 - 5

LAW OFFICES
CALFO HARRIGAN LEYH & EAKES LLP
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700   FAX, (206) 623-8717

Ex. A, page 9

1  members and any entity that implements the 802.11 standard.  Motorola is bound by its

2  agreements to offer licenses consistent with the referenced IEEE bylaws.

3  Similarly, Symbol, in submitting its Letter of Assurance pursuant to the applicable

4  IEEE IPR policy, entered into an actual or implied contract with IEEE, for the benefit of IEEE

5  members and any other entity that implements the 802.11 standard, and Motorola is bound by

6  that commitment.

7  Motorola broke its promise to IEEE-SA and its members and affiliates by refusing to

8  offer to Microsoft a license that is consistent with Motorola's Letter(s) of Assurance and

9  Clause 6 of the IEEE-SA Standards Board Bylaws, instead demanding royalties that are

10 excessive and discriminatory.

11 Motorola's October 29, 2010 Letter

12 By letter to Microsoft, dated October 29, 2010, Kirk Dailey, Motorola's Corporate Vice

13 President Intellectual Property, offered to license "Motorola's portfolio of patents and pending

14 applications covering the subject matter of ITU-T Recommendation H.264[.]"  Motorola

15 offered to license the relevant patents under terms and conditions that included a "royalty of

16 2.25% per unit for each H.264 complaint product[.]"  Motorola stated that the royalty "is

17 calculated based on the price of the end product (e.g., each Xbox 360 product, each PC/laptop,

18 each smartphone, etc.) and not on component software (e.g., Xbox 360 system software,

19 Windows 7 software, Windows Phone 7 software, etc.)."

20 The cost of such component software and any inter-related hardware is a small fraction

21 of the overall cost of the listed devices.  Moreover, Microsoft sells products having H.264

22 related capabilities at a wide range of prices, without regard to the significance of such H.264

23 related capabilities to the primary or expected use of the products.  Motorola thus seeks a

24 royalty on software and hardware components of Xbox 360 and other devices that are

25 unrelated to its identified patents and has declined to offer a license unless it receives

**MICROSOFT'S  *MAY 21, 2013*
*SUPPLEMENTAL* ANSWER TO
INTERROGATORY NO. 3 -** 6

LAW OFFICES
**CALFO HARRIGAN LEYH & EAKES LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700   FAX, (206) 623-8717

Ex. A, page 10

exorbitant royalty payments to which it is not entitled. On information and belief, Motorola has not previously entered into a license agreement for its identified patents that is comparable to the demand made of Microsoft. Motorola has thereby refused to offer to license the patents at a reasonable rate, with reasonable terms, on a non-discriminatory basis.

The royalty demanded by Motorola falls well outside the boundaries of a reasonable and non-discriminatory royalty and therefore violates the commitment Motorola made to the ITU and its members.

Participants in ITU-T standards setting efforts, including those directed to H.264 technology, were subject to the ITU-T Common Patent Policy concerning the submission of Patent Statement and Licensing Declarations related to patents identified by a submitting party. The ITU-T Common Patent Policy generally provides, in pertinent part, that a patent holder's statement may declare that:

> (2.1) The patent holder is willing to negotiate licenses free of charge with other parties on a non-discriminatory basis on reasonable terms and conditions.
>
> (2.2) The patent holder is willing to negotiate licenses with other parties on a non-discriminatory basis on reasonable terms and conditions.

Motorola openly and publicly submitted Patent Statement and Licensing Declarations pursuant to the ITU-T's Common Patent Policy that it would offer to license any of its patents essential for the relevant H.264 Recommendation(s) to any entity under reasonable rates on a non-discriminatory basis. The ITU-T and its participants and affiliates relied on Motorola's promises in developing, adopting and implementing the ITU-T H.264 Recommendations (or standards). These standards are now implemented worldwide in a variety of electronic devices and software that have become commonplace. Microsoft invested substantial resources in developing and marketing products in compliance with these standards, relying on the assurances of participating patent holders – including Motorola – that any "essential" patents

**MICROSOFT'S *MAY 21, 2013 SUPPLEMENTAL* ANSWER TO INTERROGATORY NO. 3 -** 7

LAW OFFICES
**CALFO HARRIGAN LEYH & EAKES LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700   FAX, (206) 623-8717

Ex. A, page 11

held by such patent holders would be available for licensing by implementers of the standards on such terms.

In submitting its Patent Statement and Licensing Declarations pursuant to the applicable ITU-T policy, Motorola entered into an actual or implied contract with the ITU-T, for the benefit of ITU-T members and any entity that implements the H.264 technologies. Motorola is bound by its agreements to offer licenses consistent with the referenced ITU-T Common Patent Policy.

Microsoft has participated in the development of the 802.11 and H.264 standards. Microsoft and other companies participating in the development of these standards relied on Motorola's commitments to ensure that the royalties Motorola would seek would conform to the promises made by Motorola.

In reliance on the integrity of the SDO process and the commitments made by Motorola and others regarding 802.11 patents they deem "essential," Microsoft began providing its Xbox video game consoles with WLAN connectivity. By way of example, Microsoft purchased and incorporated into its Xbox 360 video game consoles third-party-manufactured interfaces that provide Xbox 360 devices with WLAN connectivity. Microsoft made its decision to provide its Xbox video game consoles with WLAN connectivity in reliance on, and under the assumption that, it and/or any third party supplier could avoid patent litigation and take a license to "essential" patents that Motorola, or any other company submitting a Letter of Assurance, holds with regard to the WLAN standard under IEEE's well publicized IPR policy.

Microsoft and other manufacturers of WLAN-compliant devices necessarily relied on the assurances of participating patent holders – including Motorola – that any "essential" patents held by such patent holders would be available for licensing by implementers of the standards on such terms.

MICROSOFT'S *MAY 21, 2013*
*SUPPLEMENTAL* ANSWER TO
INTERROGATORY NO. 3 - 8

LAW OFFICES
CALFO HARRIGAN LEYH & EAKES LLP
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700   FAX, (206) 623-8717

Ex. A, page 12

1          Correspondingly, in reliance on the integrity of the SDO process and specifically the
2   commitments made by Motorola and others regarding patents related to H.264 technologies,
3   Microsoft began providing its H.264 technology capability in its Xbox video game consoles.
4   Microsoft made its decision to provide its Xbox video game consoles with H.264 technology in
5   reliance on, and under the assumption that, it and/or any third party supplier could avoid patent
6   litigation and take a license to any "essential" patents held by Motorola, or any other company
7   submitting a Patent Statement and Licensing Declaration, under the ITU-T's well-publicized
8   IPR policy.
9          Microsoft made similar investments in other fields, including Windows 7 and Windows
10  Phone 7, based upon Motorola's representations in relation to the H.264 technology standards.
11  Microsoft and other manufacturers and suppliers of H.264 compliant technology necessarily
12  relied on the commitments of Motorola and others to license their "essential" patents under
13  these terms.
14         By way of non-limiting example, each personal computer running Windows 7 includes
15  substantial software and many computer chips and modules that perform various functions,
16  including those related to the general operation of a computing device.  Of those, each personal
17  computer includes just a portion directed to H.264 technologies.
18         By way of further non-limiting example, each smartphone running Windows Phone 7
19  includes substantial software and many computer chips and modules that perform various
20  functions, including those related to the general and particularized operation of a smartphone
21  independent of H.264 technology.  Of those, each smartphone includes just a portion directed
22  to H.264 technologies.
23         Motorola broke its promise to the ITU-T and its members and affiliates by refusing to
24  offer to Microsoft a license that is consistent with Motorola's Patent Statement and Licensing
25

**MICROSOFT'S** *MAY 21, 2013* *SUPPLEMENTAL* **ANSWER TO INTERROGATORY NO. 3 -** 9

LAW OFFICES
**CALFO HARRIGAN LEYH & EAKES LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700   FAX, (206) 623-8717

Ex. A, page 13

Declaration(s) and the Common Patent Policy of the ITU-T, instead demanding royalties that are excessive and discriminatory.

### SUPPLEMENTAL RESPONSE OF APRIL 3, 2013:

Motorola committed to license its standard essential patents on RAND terms. This meant that Motorola had to make a license available to any implementer of the standards. Offers made to prospective licensees had to be commercially reasonable. Motorola could not seek injunctive relief instead of entering into a license on RAND terms, especially in circumstances where its license offers were not commercially reasonable. In addition, Motorola was subject to a duty of good faith and fair dealing in licensing and offering to license its standard essential patents.

As a consequence of these contractual obligations undertaken by Motorola, Motorola breached its RAND commitments in at least the following respects. Motorola's breach is not limited to the October 2010 demand letters.

- Motorola's October 2010 demand letters did not offer licenses to Microsoft on RAND terms, and, to the contrary, were commercially unreasonable and facially outrageous; Motorola improperly sought the holdup value of its patents rather than their RAND value and improperly sought a royalty on the entire market value of products, which included many components and features for which Motorola was not entitled to any compensation.

- Motorola improperly sought injunctive relief in the ITC, the district courts and Germany instead of honoring its commitment to make licenses available on RAND terms. Repeated judicial and administrative rulings specific to Motorola have confirmed that its pursuit of injunctive relief was improper, including Judge Posner's June 22, 2012 determination that Motorola could not obtain injunctive relief on its 802.11 standard-essential patents; the Court's November 29, 2012 order enjoining Motorola from seeking injunctive relief against Microsoft with respect to Motorola's H.264 and 802.11 standard essential patent portfolios; and the January 3, 2013 FTC consent order prohibiting Google and Motorola from obtaining or enforcing injunctive relief on standard-essential patents during the pendency of district court's resolution of a request for a RAND determination. As the FTC explained, the consent order barring Motorola from pursuing injunctive relief targeted "breaches by Google and its

MICROSOFT'S *MAY 21, 2013 SUPPLEMENTAL* ANSWER TO INTERROGATORY NO. 3 - 10

LAW OFFICES
CALFO HARRIGAN LEYH & EAKES LLP
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700   FAX, (206) 623-8717

Ex. A, page 14

subsidiary [Motorola] of Motorola's commitments to license standard-essential patents ('SEPs') on terms that are fair, reasonable and non-discriminatory ('FRAND')." Statement of the Federal Trade Commission, *In the Matter of Google Inc.,* FTC File No. 121-0120 (Jan. 3, 2013).

- Motorola declined to offer a license to Microsoft's chip supplier Marvell (which requested a license for the specific benefit of Microsoft) on RAND terms that would cover product shipped to Microsoft and acted in a way that was both unreasonable and discriminatory.

- Once Motorola was acquired by Google and Microsoft had a right to a license to Motorola's H.264 standard essential patents by virtue of Google's participation in the MPEG-LA AVC pool, Motorola refused to grant a license on those terms, which would have complied with the RAND commitment.

- Motorola violated the covenant of good faith and fair dealing by reason of all of the actions recited above, whether considered separately or collectively, on an objective standard.

- Motorola also violated the covenant of good faith and fair dealing because it knew it was acting, and intended to act, inconsistently with the covenant of good faith and fair dealing by virtue of the actions recited above and the following additional indicia of intent:

    o Motorola's objective from the beginning was to secure crippling injunctive relief in some forum so that Microsoft would be deterred from seeking compensation for Motorola's infringement of Microsoft's non standard essential patents in Motorola's Android phones. Motorola's demand letters in October 2010 were intended to set forth offers that it knew no reasonable company would accept.

    o In furtherance of the pursuit of injunctive relief, Motorola stated that the offers in the demand letters would remain open for only 20 days.

    o At the time that the demand letters were sent, Motorola had never entered into a license with anyone for its H.264 or 802.11 standard essential patents that was remotely comparable to the terms of the demand letter

    o Motorola understood the financial implications of the demand letter, including that it would be compensated for components and features as to which it had no patents.

**MICROSOFT'S *MAY 21, 2013 SUPPLEMENTAL* ANSWER TO INTERROGATORY NO. 3 -** 11

LAW OFFICES
**CALFO HARRIGAN LEYH & EAKES LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700   FAX, (206) 623-8717

Ex. A, page 15

- o Motorola sought injunctions knowing that the terms in its October 2010 demand letters would be unacceptable to Microsoft and would not be accepted.

- o Motorola demanded that Marvell pay royalties on the end product sales of its downstream customers even though no one had ever agreed to pay royalties to Motorola on this basis.

- o Motorola discriminated against Marvell and Microsoft by excluding chips sold to Microsoft from the license offered to Marvell.

- o Motorola in league with its parent company Google evaded the requirements of the MPEG-LA AVC pool agreement.

### MICROSOFT'S SUPPLEMENTAL RESPONSE OF MAY 21, 2013:

Based on the Findings of Fact and Conclusions of Law issued in this matter on April 19, 2013, Motorola's demands in its letters of October 21 and 29, 2010 and its offer to Marvell were so far from offers made on RAND terms that Motorola was in breach of its RAND obligations.

Motorola's demands were so excessive that they constituted an effective refusal to deal under Motorola's contractual commitments to the ITU and IEEE. No reasonable company would have accepted the terms and conditions demanded by Motorola, and the excessive nature of the demands demonstrated that they were simply sham offers.

Further, by making demands that were so far removed from RAND, Motorola violated its duty of good faith and fair dealing. Not only would no reasonable company have accepted the terms and conditions demanded by Motorola, but Motorola could not have reasonably expected that they would have been accepted. Nor were the offered terms and conditions a reasonable or legitimate basis for negotiating to a lower RAND royalty. By making these demands, Motorola was signaling that it intended to seek a hold-up royalty from Microsoft. Indeed, Motorola has stated that it expects consideration equal to a 2.25% royalty for any

MICROSOFT'S *MAY 21, 2013*
*SUPPLEMENTAL* ANSWER TO
INTERROGATORY NO. 3 - 12

LAW OFFICES
CALFO HARRIGAN LEYH & EAKES LLP
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700 FAX, (206) 623-8717

Ex. A, page 16

portfolio of standard essential patents; the only point of negotiation is about the form – not the value – of consideration.

Although Microsoft does not believe that it is required to prove an absence of good faith on the part of Motorola in order to establish a breach of the RAND obligation, there is abundant evidence that Motorola was not acting in good faith in making its demands to Microsoft and Marvell.  The offers were a sham and intended as a predicate to filing lawsuits and seeking injunctions and exclusion orders on standard essential patents.  This conduct is consistent with a strategy of hold-up, the very conduct that RAND commitments seek to prevent.  The ultimate goal of Motorola's conduct was to pressure Microsoft into relinquishing its rights under non-standard essential patents by threatening or securing injunctions on Motorola's standard essential patents with devastating consequences.  Motorola understood that it was improper and inconsistent with RAND obligations to seek to use the hold-up power of its standard essential patents to demand grantback rights under a putative licensee's non-standard essential patents, but nevertheless pursued this course.

At least the following facts and circumstances demonstrate that Motorola breached its RAND commitments in its contract with the IEEE regarding the 802.11 WiFi standard. Further, at the time Motorola sent its October 21, 2010 demand letter and at the time of its offer to Marvell relating to Motorola's 802.11 essential patents, Motorola was or should have been aware of at least the following in addition to matters set forth in prior responses:

> Motorola has claimed that 2.25% was its standard offer for any portfolio of its standard essential patents, but it had no legitimate basis for selecting that rate for its 802.11 essential patents.

> Motorola had committed to licensing its 802.11 patents at a nominal competitive royalty.

> No claim charts had been prepared showing that all of the patents claimed by Motorola to be essential to 802.11 were, in fact, essential.

**MICROSOFT'S  *MAY 21, 2013***
***SUPPLEMENTAL* ANSWER TO**
**INTERROGATORY NO. 3 -** 13

LAW OFFICES
**CALFO HARRIGAN LEYH & EAKES LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700   FAX, (206) 623-8717

Ex. A, page 17

No one had ever agreed to a license to Motorola's 802.11 essential patents, alone, at a royalty rate of 2.25%.

A large number of companies had submitted letters of assurance to the IEEE in connection with 802.11 and if each of those companies demanded a royalty of 2.25%, the total royalty would have been in excess of 200%, a royalty that was patently unreasonable and not viable from a business standpoint.

Motorola failed to take into account royalty stacking in setting a rate of 2.25% for its 802.11 essential patents, either in connection with royalties due other owners of 802.11 essential patents or owners of patents essential to other standards.

Motorola had no evidence that its 802.11 essential patents had any greater value than those of other owners of standard essential patents.

Motorola was aware of the rates charged by the Via 802.11 pool and had no knowledge that its own 802.11 essential patents had any greater value than those of pool members.

Although from an economic perspective, a RAND commitment limits a patent holder to a reasonable royalty on the economic value of its patented technology itself, apart from the value associated with incorporation of the patented technology into the standard, Motorola made no attempt to determine this economic value with respect to its 802.11 essential patents.

Although the actual value provided by an essential patent is its incremental contribution in comparison to alternatives that would have provided the same or a similar technical contribution, Motorola made no attempt to value its 802.11 essential patents in this way.

Motorola had in its possession an analysis of reasonable royalties for its 802.11 essential patents conducted by InteCap in 2003, but made no use of that in reaching the conclusion that it would seek 2.25% for its 802.11 patents. Motorola was aware that 802.11 functionality is substantially embodied in commodity chipsets that sell for a few dollars and that its demanded 2.25% royalty for Xbox consoles is exorbitant in light of the economics.

Microsoft had a right to a license to allow its making, using, and selling of 802.11-compliant products pursuant to Motorola's contractual obligations to the IEEE, either directly or indirectly.  Marvell was similarly entitled to a license, whether specific to its sales to Microsoft or otherwise.

A license to Marvell that covered its 802.11 chips as supplied to Microsoft would have exhausted Motorola's 802.11 standard-essential patents vis-à-vis

MICROSOFT'S *MAY 21, 2013*
*SUPPLEMENTAL* ANSWER TO
INTERROGATORY NO. 3 - 14

LAW OFFICES
CALFO HARRIGAN LEYH & EAKES LLP
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700   FAX, (206) 623-8717

Ex. A, page 18

> Microsoft. Motorola's express refusal to extend a license to Marvell that would have covered its sales of 802.11 chips/chipsets to Microsoft was effectively a refusal to license Microsoft on RAND terms and conditions, and was expressly discriminatory with respect to Microsoft.

> Marvell could not maintain a viable business model by paying 802.11 royalties in excess of the cost of its chipsets on the end product prices charged by its customers or others downstream.

At least the following facts and circumstances demonstrate that Motorola breached its RAND commitments in its contract with the ITU regarding the H.264 video coding standard. Further, at the time Motorola sent its October 29, 2010 demand letter relating to Motorola's H.264 essential patents, Motorola was or should have been aware of at least the following in addition to matters set forth in prior responses:

> Motorola has claimed that 2.25% was its standard offer for any portfolio of its standard essential patents, but it had no legitimate basis for selecting that rate for its H.264 essential patents.

> No claim charts had been prepared showing that all of the patents claimed by Motorola to be essential to H.264 were, in fact, essential.

> Motorola's role in H.264 development related almost entirely to interlaced video and its H.264 essential patents are almost entirely directed to interlaced video; interlaced video was of little importance to Microsoft's products.

> No one had ever agreed to a license to Motorola's H.264 essential patents, alone, at a royalty rate of 2.25% of the price of the compliant end product.

> No one had ever agreed to pay Motorola a royalty based on the price of products sold by its customers or others downstream.

> A large number of companies had submitted letters of assurance to the ITU in connection with H.264 and if each of those companies demanded a royalty of 2.25%, the total royalty would have been in excess of 100%, a royalty that was patently unreasonable and not viable from a business standpoint.

> Motorola failed to take into account royalty stacking in setting a rate of 2.25% for its H.264 essential patents, either in connection with royalties due other owners of H.264 essential patents or owners of patents essential to other standards.

**MICROSOFT'S** *MAY 21, 2013*
*SUPPLEMENTAL* **ANSWER TO**
**INTERROGATORY NO. 3 -** 15

LAW OFFICES
**CALFO HARRIGAN LEYH & EAKES LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700   FAX, (206) 623-8717

Ex. A, page 19

Motorola had no evidence that its H.264 essential patents had any greater value than those of other owners of standard essential patents.

Motorola was aware of the rates charged by the MPEG LA H.264 pool and that 2.25% was exorbitant in light of the number of patents included in the pool license; in addition, Motorola had no knowledge that its own H.264 essential patents had any greater value than those of pool members.

Motorola was aware that it had participated in the negotiations regarding the formation of the MPEG LA H.264 pool, had agreed to the rates the pool ultimately adopted, and had authorized the use of its name in announcing the finalization of those rates to the public.

Although from an economic perspective, a RAND commitment limits a patent holder to a reasonable royalty on the economic value of its patented technology itself, apart from the value associated with incorporation of the patented technology into the standard, Motorola made no attempt to determine this economic value with respect to its H.264 essential patents.

Although the actual value provided by an essential patent is its incremental contribution in comparison to alternatives that would have provided the same or a similar technical contribution, Motorola made no attempt to value its H.264 essential patents in this way.

DATED this 21st day of May, 2013.

                CALFO HARRIGAN LEYH & EAKES LLP

        By    s/ Shane P. Cramer
            Arthur W. Harrigan, Jr., WSBA #1751
            Christopher Wion, WSBA #33207
            Shane P. Cramer, WSBA #35099
            999 Third Avenue, Suite 4400
            Seattle, WA  98104
            Phone:  206-623-1700

            T. Andrew Culbert
            David E. Killough
            MICROSOFT CORPORATION
            1 Microsoft Way
            Redmond, WA  98052
            Phone:  425-882-8080

MICROSOFT'S *MAY 21, 2013 SUPPLEMENTAL* ANSWER TO INTERROGATORY NO. 3 - 16

Ex. A, page 20

LAW OFFICES
CALFO HARRIGAN LEYH & EAKES LLP
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700   FAX, (206) 623-8717

David T. Pritikin
Richard A. Cederoth
Constantine L. Trela, Jr.
William H. Baumgartner, Jr.
Ellen S. Robbins
Douglas I. Lewis
David C. Giardina
John W. McBride
David Greenfield

SIDLEY AUSTIN LLP
One South Dearborn
Chicago, IL  60603
Phone:  312-853-7000
Fax:  312-853-7036


Carter G. Phillips
Brian R. Nester

SIDLEY AUSTIN LLP
1501 K Street NW
Washington, DC  20005
Telephone:  202-736-8000
Fax:  202-736-8711

Counsel for Microsoft Corp.

MICROSOFT'S *MAY 21, 2013 SUPPLEMENTAL* ANSWER TO INTERROGATORY NO. 3 - 17

Ex. A, page 21

LAW OFFICES
CALFO HARRIGAN LEYH & EAKES LLP
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700   FAX, (206) 623-8717

**CERTIFICATE OF SERVICE**

I, Emma Chapman, swear under penalty of perjury under the laws of the State of Washington to the following:

1. I am over the age of 21 and not a party to this action.

2. On the 21st day of May, 2013, I caused the preceding document to be served on counsel of record in the following manner:

**Attorneys for Motorola Solutions, Inc., and Motorola Mobility, Inc.:**

| | |
|---|---|
| Ralph Palumbo, WSBA #04751<br>Philip S. McCune, WSBA #21081<br>Summit Law Group<br>315 Fifth Ave. South, Suite 1000<br>Seattle, WA  98104-2682<br>Telephone:  206-676-7000<br>Email:  Summit1823@summitlaw.com | _____ Messenger<br>_____ US Mail<br>_____ Facsimile<br>__X__ Email |
| Steven Pepe (*pro hac vice*)<br>Jesse J. Jenner (*pro hac vice*)<br>Ropes & Gray LLP<br>1211 Avenue of the Americas<br>New York, NY  10036-8704<br>Telephone:  (212) 596-9046<br>Email:  steven.pepe@ropesgray.com<br>Email:  jesse.jenner@ropesgray.com | _____ Messenger<br>_____ US Mail<br>_____ Facsimile<br>__X__ Email |
| Norman H. Beamer (*pro hac vice*)<br>Ropes & Gray LLP<br>1900 University Avenue, 6th Floor<br>East Palo Alto, CA  94303-2284<br>Telephone:  (650) 617-4030<br>Email:  norman.beamer@ropesgray.com | _____ Messenger<br>_____ US Mail<br>_____ Facsimile<br>__X__ Email |

**MICROSOFT'S *MAY 21, 2013 SUPPLEMENTAL* ANSWER TO INTERROGATORY NO. 3 -** 18

LAW OFFICES
**CALFO HARRIGAN LEYH & EAKES LLP**
999 THIRD AVENUE, SUITE 4400
SEATTLE, WASHINGTON 98104
TEL, (206) 623-1700   FAX, (206) 623-8717

Ex. A, page 22

| | | |
|---|---|---|
| Paul M. Schoenhard (*pro hac vice*) | _____ | Messenger |
| Ropes & Gray LLP | _____ | US Mail |
| One Metro Center | _____ | Facsimile |
| 700 12th Street NW, Suite 900 | __X__ | Email |
| Washington, DC  20005-3948 | | |
| Telephone:  (202) 508-4693 | | |
| Email: Paul.schoenhard@ropesgray.com | | |
| | | |
| William Price (*pro hac vice*) | _____ | Messenger |
| Brian Cannon (*pro hac vice*) | _____ | US Mail |
| Andrea Pallios Roberts (*pro hac vice*) | _____ | Facsimile |
| Quinn Emanuel | __X__ | Email |
| 555 Twin Dolphin Drive, 5th Floor | | |
| Redwood Shores, CA  94065-2139 | | |
| williamprice@quinnemanuel.com | | |
| briancannon@quinnemanuel.com | | |
| andreaproberts@quinnemanuel.com | | |

DATED this 21st day of May, 2013.

 s/ Emma Chapman  
EMMA CHAPMAN

**MICROSOFT'S** *MAY 21, 2013*  
*SUPPLEMENTAL* **ANSWER TO**  
**INTERROGATORY NO. 3 -** 19

Ex. A, page 23

LAW OFFICES  
**CALFO HARRIGAN LEYH & EAKES LLP**  
999 THIRD AVENUE, SUITE 4400  
SEATTLE, WASHINGTON 98104  
TEL, (206) 623-1700   FAX, (206) 623-8717