# EXHIBIT 3

**quinn emanuel** | deutschland

Mollstraße 42, 68165 Mannheim, Germany | TEL +49 (0) 621 43298-6000 FAX +49 (0) 621 43298-6100

*Vorab per Fax: (0721) 926 5003*

Oberlandesgericht Karlsruhe
6. Zivilsenat
Hoffstr. 10
76133 Karlsruhe

Unser Zeichen     01980.40410 / 20484939.3
                 MG/JE/MK

Dr. Marcus Grosch, LL.M. (Yale)
marcusgrosch@quinnemanuel.com

Dr. Jan Ebersohl
janebersohl@quinnemanuel.com

Michael Krenz
michaelkrenz@quinnemanuel.com

1. August 2013

**Berufungsduplik**

In Sachen

General Instrument Corporation

- Klägerin und Berufungsbeklagte -

**Az.: 6 U 44/12**
Wir stellen selbst zu.
Termin: 11.09.2013

g e g e n

1. Microsoft Corporation

- Beklagte und Berufungsklägerin zu 1 -

2. Microsoft Ireland Operations Limited

- Beklagte und Berufungsklägerin zu 2 -

Proz.Bev.: RAe Freshfields Bruckhaus Deringer LLP,
München

wegen Patentverletzung

quinn emanuel urquhart & sullivan, llp
LOS ANGELES | NEW YORK | SAN FRANCISCO | SILICON VALLEY | CHICAGO | WASHINGTON, DC | LONDON | TOKYO | MOSCOW | HAMBURG | PARIS

nehmen wir nachstehend zur Replik der Beklagten vom 29. Mai 2013 Stellung.

Vorab bemerken wir, dass aufgrund des inzwischen eingetretenen Ablaufs der Schutzrechtshöchstdauer des Klageschutzrechts die Anträge mit Blick auf Schadensersatz und Rechnungslegung in der mündlichen Verhandlung zur Klarstellung mit dem Ablaufzeitpunkt als Endzeitpunkt der begehrten Feststellung und Rechnungslegung verlesen werden. Bekanntlich ist nach der Rechtsprechung des BGH dem Antrag und Tenor diese Schutzrechtshöchstdauer ohnehin immanent, so dass für die Unterlassung keine Erledigung zu erklären ist. Die Änderung der Anträge mit Blick auf Schadensersatz und Rechnungslegung folgt der bisherigen Praxis des Senats und dient lediglich der Klarstellung.

Zunächst werden wir nochmals aufzeigen, dass zwischen den Parteien ein Lizenzvertrag über die hiesigen Klagepatente zustande gekommen ist, als die Klägerin am 15. Januar 2013 den Beklagten ihre Annahme des Orange Book-Angebots übersandte (hierzu **Teil A**). Sodann werden wir nochmals zur Verletzung des Klagepatents vortragen, soweit dies vor dem Hintergrund der knappen Ausführungen der Beklagten in der Replik noch veranlasst ist (hierzu **Teil B**). Danach werden wir zum Lizenzeinwand der Beklagten Stellung nehmen und dabei aufzeigen, dass eine Aussetzung des hiesigen Verfahrens angesichts des in Seattle, Washington, anhängigen US-Verfahrens nicht in Frage kommt (hierzu **Teil C**). Anschließend werden wir nochmals auf den von den Beklagten erhobenen kartellrechtlichen Zwangslizenzeinwand eingehen und in diesem Zusammenhang aufzeigen, dass sich aus den Feststellungen des Gerichts in Seattle kein Anhaltspunkt für einen Kartellverstoß der Klägerin im Zusammenhang mit der Nichtannahme des Orange Book-Angebots der Beklagten ergibt – im Gegenteil (hierzu **Teil D**). Schließlich werden wir noch auf den Antrag der Beklagten eingehen, das hiesige Verfahren bis zur Entscheidung des EuGH über die Vorlagefragen des Landgerichts Düsseldorf im Verfahren 4b O 104/12 auszusetzen (hierzu **Teil E**).

## A.
## Zum Abschluss des Lizenzvertrages

Vorab halten wir fest, dass die Beklagten sich weiterhin dem Umstand zu verschließen scheinen, dass zwischen den Parteien ein Lizenzvertrag über das hiesige Klagepatent – sowie über das Klagepatent im Parallelverfahren 6 U 46/12 – zustande gekommen ist, als die Klägerin das Orange Book-Angebot der Beklagten am 15. Januar 2013 angenommen hat. Ebenso versuchen die Beklagten weiterhin zu verschleiern, dass sie am 23. Dezember 2011 und in der Folgezeit – auch in der Berufungsbegründung – mehrfach und ausdrücklich ihre Schadensersatzpflicht für vergangene Nutzungshandlungen dem Grunde nach anerkannt haben und dabei für die Schadensberechnung auch ganz ausdrücklich auf die

Prinzipien des deutschen Rechts zur Berechnung des Schadensersatzes verwiesen haben. Wir haben dies in unserem Schriftsatz vom 10. Juni 2013 bereits umfassend dargelegt, möchten aber nachstehend nochmals den Geschehensablauf und die rechtliche Einordnung der Erklärungen zusammenfassen.

1. Die Beklagten haben im hiesigen Verletzungsverfahren den kartellrechtlichen Zwangslizenzeinwand erhoben und in diesem Zusammenhang ein Angebot auf Abschluss eines Lizenzvertrages, ein so genanntes Orange Book-Angebot, unterbreitet. Das erste Angebot datiert dabei vom 23. Dezember 2011.

2. In dem Begleitschreiben zu dem Angebot haben die Beklagten ausdrücklich ihre Pflicht, für vergangene Handlungen Schadensersatz nach deutschem Recht zu leisten, dem Grunde nach anerkannt. Wörtlich heißt es in dem Schreiben wie folgt:

   > „As required by the recent case law of the District Court in Mannheim (esp. decision of 9 December 2011, docket no. 7 O 122/11) Microsoft Corp. expressly acknowledges ("erkennt dem Grunde nach an") the duty to cover past damages for any past use of the Licensed Patents. The damages are to be determined in accordance with the respective principles set forth under German law."

   Dieses Anerkenntnis bestätigten die Beklagten auch nochmals in ihrem Schriftsatz vom selben Tag. Auch in der mündlichen Verhandlung vor dem Landgericht stand diese Verpflichtung nie in Streit. Es wurde von den Beklagten betont, dass man sich Orange Book-gemäß verhalten wolle.

3. Die Beklagten haben im Berufungsverfahren mit Schriftsatz vom 3. September 2012 das vom 31. August 2012 datierende Angebot eingereicht. In der Präambel dieses Angebots sind auch die Begleitschreiben – und damit auch das Schreiben vom 23. Dezember 2011 – ausdrücklich einbezogen. In den Berufungsbegründungen vom 3. September 2012 haben die Beklagten dabei ein weiteres Mal das Anerkenntnis ihrer Schadensersatzpflicht nach deutschem Recht bestätigt.

4. Die Klägerin hat am 13. Januar 2013 das Orange Book-Angebot der Beklagten vom 31. August 2012 angenommen. In dem Begleitschreiben vom 15. Januar 2013 verwies die Klägerin nochmals auf das oben dargestellte schriftliche Anerkenntnis der Schadensersatzpflicht der Beklagten.

5. In der Folgezeit verweigerten die Beklagten, den Abschluss des Lizenzvertrages anzuerkennen. Dabei bezeichneten die Beklagten die Annahme ihres Vertragsangebots durch die Klägerin als „Gegenangebot", das angeblich abweichende Vertragsbestimmungen enthalte. Diese Behaup-

3

tung stützten die Beklagten darauf, dass die Klägerin in dem Schreiben vom 15. Januar 2013 auf das Anerkenntnis der Schadensersatzpflicht der Beklagten verwiesen hatte.

6.    Bei der Annahmeerklärung der Klägerin vom 13. Januar 2013 kann es sich jedoch denknotwendig nicht um ein „Gegenangebot" handeln, weil die Klägerin schlicht diejenigen Vertragsbedingungen angenommen hat, die von den Beklagten angeboten wurden. Der Verweis der Klägerin in ihrem Schreiben vom 15. Januar 2013 auf die von den Beklagten anerkannte Schadensersatzpflicht bewirkt keine Annahme unter Erweiterungen, Einschränkungen oder sonstigen Änderungen im Sinne von § 150 Abs. 2 BGB. Denn jenes Anerkenntnis der Schadensersatzpflicht dem Grunde nach wurde sowohl im anhängigen Verfahren als auch in der außergerichtlichen Korrespondenz seitens der Beklagten mehrfach schriftlich dokumentiert. Dass die Beklagten sich nunmehr von ihrem eigenen unmissverständlich erklärten Anerkenntnis lossagen wollen, ist erstaunlich. Auf den wirksam geschlossenen Lizenzvertrag kann sich diese Vertragsreue der Beklagten jedenfalls nicht auswirken.

7.    Auch die Versuche der Beklagten, ihr Anerkenntnis der Schadensersatzpflicht nachträglich auf den angebotenen Lizenzsatz zu beschränken, gehen fehl, weil die Beklagten ganz ausdrücklich anerkannt haben, dass der Schadensersatz nach den anerkannten Schadensersatzbe-rechnungsmethoden des deutschen Rechts zu bestimmen sei. So heißt es im Schreiben vom 23. Dezember 2011, dass der anerkannte Schadensersatz wie folgt zu berechnen sei:

> „*be determined in accordance with the respective principles set forth under German law*"

Damit kann gerade nicht die im Vertrag vorgesehene Lizenzgebühr für „Old Products" gemeint sein. Denn zum einen haben die Beklagten dieses Anerkenntnis stets als zusätzliche vertragliche Pflicht deklariert und nicht als einen anderenfalls redundanten Verweis auf bestehende Regelungen zu Altlizenzgebühren (vgl. etwa die Überschrift „Schadensersatz" im Beklagtenschriftsatz vom 23. Dezember 2011 sowie die Überschrift „Sonstige Vertragsbedingungen" in der Berufungsbegründung vom 3. September 2012). Zum anderen kann der Verweis auf die „Prinzipien des deutschen Rechts" nur verstanden werden als ein Verweis auf die drei Berechnungsmethoden des Schadensersatzes im deutschen Recht. Somit kann der Verweis der Klägerin auf das ausdrückliche und unmissverständlich erklärte Anerkenntnis der Schadensersatzpflicht der Beklagten unter keinem denkbaren Gesichtspunkt

ein „Gegenangebot" sein. Die Klägerin hat schlicht das Vertragsangebot der Beklagten angenommen, sodass ein Lizenzvertrag zustande gekommen ist.

8.    Dem wirksamen Vertragsschluss steht auch das Verfahren vor dem Gericht in Seattle nicht entgegen. Im Gegenteil lässt das Seattle-Gericht vertragliche Regelungen der Parteien zur Lizenzierung der Klagepatente ausdrücklich zu, wie wir nachstehend in **Teil C** aufzeigen werden.

## B.
## Zur Verletzung

Der Vortrag der Beklagten zur Nichtverletzung des Klagepatents in der Berufungsreplik erschöpft sich in bloßen Wiederholungen ihres bisherigen Vortrags. Insbesondere basieren diese Ausführungen auch auf einer patentrechtlich unzulässigen Auslegung des Anspruchs 19. Im Übrigen verletzen die angegriffenen Ausführungsformen das Klagepatent selbst bei Zugrundelegung der Auslegung der Beklagten.

### 1.    Anspruch 19 als Decoder-Anspruch

a)    Auf den von den Beklagten vertretenen – patentrechtlich verfehlten – Ansatz, wonach Anspruch 19 ein System aus Encoder und Decoder schütze bzw. jedenfalls die empfangenen Daten eine Struktur aufweisen müssten, wie sie sich aus einer Kodierung nach Anspruch 1 ergebe, haben wir bereits ausführlich erwidert. Zur Vermeidung von Wiederholungen verweisen wir daher auf unsere Berufungserwiderung, S. 3 f. sowie auf unseren erstinstanzlichen Vortrag (vgl. Replik vom 9. Dezember 2011, S. 3 f.). Demnach ist die Argumentation der Beklagten zur Funktionsweise von H.264 Encodern für die Frage der Verletzung des Vorrichtungsanspruchs 19, der allein einen Decoder beansprucht, irrelevant.

b)    Wie wir bereits in der Berufungserwiderung auf Seite 4 und erstinstanzlich (vgl. Replik vom 9. Dezember 2011, S. 4 ff.) dargelegt haben, verletzen die angegriffenen Ausführungsformen ohnehin selbst bei Zugrundelegung der Auslegung und der Behauptungen der Beklagten das Klagepatent, da nach dem maßgebenden funktionalen Verständnis der Merkmale des Anspruchs 1 (vgl. BGH GRUR 2012, 1124, 1126 – *Polymerschaum*) das Klagepatent auch durch eine Schätzung des Ausgabevolumens verletzt wäre. Insofern ist weder dem von den Beklagten auf Seite 6 f. ihrer

Berufungsreplik zitierten Anspruchswortlaut noch der dort zitierten Beschreibungsstelle aus Absatz [0030] das Erfordernis eines Vergleichs der Ausgabevolumen der einzelnen Bewegungskompensatoren nach der tatsächlichen Komprimierung der Daten bzw. eine Berechnung deren Menge zu entnehmen. Die gewählten Formulierungen lassen es gerade offen, wann ein Vergleich bzw. eine Schätzung stattfindet.

## 2.   Zum Codewort

a)   Die weitere Argumentation der Beklagten, wonach angeblich ein Codewort für den kleinsten Block übertragen werden können soll, verfängt nicht. Der Anspruchswortlaut erfordert lediglich, dass das anspruchsgemäße Codewort einen Bewegungskompensator – also eine im H.264 Standard normierte Blockgröße – spezifiziert. Dies haben wir im Verfahren mehrfach aufgezeigt.

b)   Ebenso wenig greift die Behauptung der Beklagten, wonach im H.264-Standard angeblich niemals ein Codewort übertragen werde, das spezifiziert, welcher aus einer Vielzahl von möglichen Bewegungsvektoren für die Rekonstruktion des Blocks verwendet werden soll. Nach Merkmal 3 sind im anspruchsgemäßen Decoder Mittel erforderlich, *„die auf das Code-Wort reagieren, [...] um einen Bewegungsvektor für jeden Block von den Bewegungsvektordaten, die mit dem Block empfangen wurden, zu rekonstruieren"*. Die Beklagten wollen hier offenbar geltend machen, das Patent erfordere einen einheitlichen Bewegungsvektor für alle Blöcke eines Macroblocks im H.264-Standard. Genau dies lässt sich indes weder dem Anspruchswortlaut noch der Patentbeschreibung entnehmen. Außerdem wäre Merkmal 3 bei einer 16x16-Partitionierung ohnehin selbst nach dem fehlerhaften Verständnis der Beklagten verwirklicht.

## 3.   Ergebnis

Es bleibt mithin dabei, dass sämtliche angegriffenen Ausführungsformen das Klagepatent im Umfang von Anspruch 19 verletzen.

## C.
### Zum Einwand der Lizenzierung aufgrund der ITU-Erklärung

Unter der Überschrift „Lizenzeinwand" machen die Beklagten, wie bereits in der ersten Instanz, unrichtiger Weise geltend, dass sich aus der Lizenzbereitschaftserklärung der Klägerin bereits eine

Lizenz am Klagepatent ergebe. Wir werden nachstehend nochmals in der gebotenen Kürze aufzeigen, warum diese Position verfehlt ist (**sub I**). Weiter beantragen die Beklagten unter Verweis auf die Lizenzbereitschaftserklärung der Klägerin die Aussetzung des hiesigen Rechtsstreits bis zum Abschluss eines derzeit anhängigen Verfahrens in Seattle, USA. Die Beklagten waren indes nicht in der Lage, eine Vorgreiflichkeit des Verfahrens in Seattle für das hiesige Verfahren aufzuzeigen. Dies gilt insbesondere vor dem Hintergrund, dass das Verfahren in Seattle dem Abschluss eines Orange Book-Lizenzvertrages über die hiesigen Klagepatente gerade nicht entgegenstand (**sub II**).

## I.
### Zur rechtlichen Einordnung der Lizenzbereitschaftserklärung

1.  Wir haben bereits erstinstanzlich (Replik vom 9. Dezember 2011, S. 11 ff.) aufgezeigt, warum die Lizenzbereitschaftserklärung, welche die Klägerin gegenüber der Standardisierungsorganisation ITU abgegeben hat, keine Lizenz der Beklagten an den Klagepatenten begründen kann. Auf diese Ausführungen wird zur Vermeidung von Wiederholungen verwiesen.

2.  Nochmals sei darauf hingewiesen, dass sich die Frage, ob an deutschen Patenten durch eine Lizenzbereitschaftserklärung ein Nutzungsrecht eingeräumt wird, nach deutschem Sachrecht bestimmt. Insoweit verweisen wir etwa auf die Entscheidung der 7. Zivilkammer des Landgerichts im Urteil vom 18. Februar 2011, 7 O 100/10, in dem die Anwendbarkeit deutschen Rechts ausführlich und überzeugend dargelegt wird (vgl. hierzu auch Kühnen, Handbuch, Rz. 1298). Nach deutschem Recht lässt sich einer Lizenzbereitschaftserklärung gegenüber einer Standardisierungsorganisation kein verbindlicher Angebotscharakter gegenüber einer Vielzahl, dem Erklärenden außerdem nicht einmal bekannten, Dritten entnehmen. Wie wir bereits aufgezeigt haben, beinhaltet eine Lizenzbereitschaftserklärung *„nicht mehr als eine deklaratorische Konkretisierung des kraft Kartellrechts (Art. 102 AEUV, § 19, 20 GWB) ohnehin bestehenden Abschlusszwanges"* (so ausdrücklich Kühnen, Handbuch, Rz. 1298 sowie BGH, GRUR 2009, 1052 – Seeing is Believing).

3.  Auch der Senat geht in seiner Rechtsprechung davon aus, dass sich aus einer Lizenzbereitschaftserklärung keine Nutzungsrechtseinräumung ergibt. Dies zeigt sich etwa in dem Beschluss vom 23. Januar 2012 in der Sache 6 U 136/11 (GPRS-Zwangslizenz), in dem der Senat angesichts einer Lizenzbereitschaftserklärung der dortigen Klägerin ausschließlich die Voraussetzungen des kartellrechtlichen Zwangslizenzeinwandes – und gerade nicht eine etwaige

7

bereits bestehende Lizenzierung – geprüft hat. Es bleibt mithin dabei, dass die Beklagten aus der ITU-Erklärung der Klägerin keinen Lizenzeinwand ableiten können.

## II.
## Zum Aussetzungsantrag der Beklagten

In ihrer Replik behaupten die Beklagten nunmehr angesichts der Lizenzbereitschaftserklärung der Klägerin, eine weltweite Lizenz am H.264-Portfolio der Klägerin sei das „zu erwartende Ergebnis" des anhängigen US-Verfahrens in Seattle, Washington. Auf dieses Postulat stützen die Beklagten ihren Antrag, das hiesige Verfahren bis zum rechtskräftigen Abschluss des US-Verfahrens auszusetzen.

### 1.     Verspätung des Aussetzungsantrags

Zunächst rügen wir den Aussetzungsantrag der Beklagten als verspätet. Wie wir bereits in unserem Schriftsatz vom 10. Juni 2013 geltend gemacht haben, war den Beklagten das – von ihnen selbst eingeleitete – US-Verfahren zu jedem Zeitpunkt des hiesigen Verfahrens bekannt. Gleichwohl haben die Beklagten sich in der gesamten Vorinstanz und auch in ihrer Berufungsbegründung gerade nicht auf eine angebliche Vorgreiflichkeit des US-Verfahrens für den Ausgang des hiesigen Verfahrens berufen. Ebenso wenig haben die Beklagten im Verfahren vor dem Landgericht oder in ihrer Berufungsbegründung einen Aussetzungsantrag mit Blick auf das US-Verfahren gestellt. Der nunmehr erstmals gestellte Antrag ist damit bereits als verspätet zurückzuweisen. Dabei kann es dahinstehen, ob der Antrag selbst nach Berufungsrecht verspätet ist (als Verteidigungsmittel). Jedenfalls sind die Verspätungsaspekte im Rahmen der Ermessensausübung nach § 148 ZPO zu berücksichtigen (genau wie bei § 296 ZPO, wo das ständiger Rechtsprechung entspricht). Wenn ein solcher Einwand noch nicht einmal in der Berufungsbegründung gebracht wird, dann kann eine Aussetzung nicht mehr in Betracht kommen.

### 2.     Unbegründetheit des Aussetzungsantrags

Unabhängig von seiner Verspätung ist der Aussetzungsantrag der Beklagten auch unbegründet. Das US-Verfahren ist für den von den Beklagten erhobenen Lizenzeinwand aufgrund der ITU-Lizenzbereitschaftserklärung der Klägerin nicht vorgreiflich. Insbesondere stand das Verfahren in Seattle auch nicht dem erfolgten Abschluss einer Orange Book-Lizenzvereinbarung an den hiesigen Klagepatenten entgegen.

**a)      Zu den Ansprüchen für vergangene Verletzungshandlungen**

Für die in die Vergangenheit gerichteten Klageansprüche im hiesigen Verfahren kommt eine Vorgreiflichkeit des US-Verfahrens schon nicht in Betracht, weil die Beklagten – wie wir bereits in unserem Schriftsatz vom 10. Juni 2013 aufgezeigt haben – mehrfach und ausdrücklich ihre Pflicht, Schadensersatz nach deutschem Recht für die Verletzung der hiesigen Klagepatente zu leisten, anerkannt haben. Dieses Anerkenntnis erfolgte in Kenntnis des anhängigen US-Verfahrens. Was mehr sollte man noch verlangen als eine ausdrückliche Verpflichtungserklärung eines der größten Unternehmen der Welt in Kenntnis aller Umstände? Dass die Beklagten davon jetzt nichts mehr wissen wollen, ist rechtlich schon mehr als erstaunlich.

**b)      Keine Vorgreiflichkeit mit Blick auf den Lizenzeinwand**

(1)      Auch ungeachtet des Anerkenntnisses der Beklagten kommt eine Aussetzung mangels Vorgreiflichkeit für die von den Beklagten herangezogene Vorfrage – nämlich einer angeblichen Lizenz an den Klagepatenten aufgrund der ITU-Lizenzbereitschaftserklärung der Klägerin – nicht in Betracht. Die Beklagten haben, obwohl sie sich auch ausweislich der Überschrift in ihrer Replik auf einen „Lizenzeinwand" berufen, nicht einmal den Versuch unternommen aufzuzeigen, dass im US-Verfahren die Frage einer bereits bestehenden Lizenz aufgrund der ITU-Lizenzbereitschaftserklärung der Klägerin geprüft wird. Dies aus gutem Grund, weil diese Frage im US-Verfahren kein Prüfungspunkt – geschweige denn Streitgegenstand – ist, was durch zahlreiche Zitatstellen in den US-Verfügungen belegt wird. Beispielhaft sei der einleitende Passus aus der Verfügung vom 25. April 2013 (Anlage FBD-BK 26a, S. 2) herangezogen (Hervorhebung diesseits):

> „(...) Microsoft claims that Motorola has **an obligation to license** patents to Microsoft at a reasonable and non-discriminatory ('RAND') rate, and that Motorola breached its RAND obligations through two offer letters."

(2)      Es geht den Beklagten im US-Verfahren also um eine Lizenzierungspflicht („*an obligation to license patents*") und gerade nicht um eine im hiesigen Verfahren behauptete, aus der ITU-Erklärung folgende Lizenz. Der Lizenzeinwand der Beklagten und der hierauf gestützte Aussetzungsantrag sind somit bereits aus

diesem Grund zurückzuweisen. Auf eine bindende Entscheidung des US-Gerichts über das Entstehen einer Lizenz durch die ITU-Erklärung könnte man lange warten; sie würde nie gefällt werden und das wissen die Beklagten am besten, weil Microsoft die Klägerseite im US-Verfahren ist.

c)      **Das US-Verfahren steht auch nicht dem Abschluss eines Orange Book-Lizenzvertrages entgegen**

(1)      Die Beklagten wollen offenbar mit ihren Behauptungen (vgl. Replik, S. 9 ff.), wonach am Ende des US-Verfahrens „ein weltweit gültiger Lizenzvertrag" stünde, der „unmittelbar und rückwirkend" ein Nutzungsrecht der Beklagten begründen werde, erneut den Eindruck erwecken, das Verfahren in Seattle stünde der am 15. Januar 2013 abgeschlossenen Lizenzvereinbarung über die hiesigen Klagepatente entgegen. Dieses Postulat findet indes gerade keine Stütze in den von den Beklagten bemühten Zitaten aus der Verfügung vom 29. November 2012. Vielmehr wird bei einer Analyse der vorgelegten Verfügungen aus dem US-Verfahren offenbar, dass die Beklagten den Versuch unternehmen, durch eine irreführende Zitierweise das hiesige und das US-Verfahren gleichsam gegeneinander auszuspielen und insbesondere das hiesige Verfahren zu torpedieren.

(2)      Die Behauptung der Beklagten ist durch den ausdrücklichen Wortlaut der US-Verfügungen widerlegt. So lautet das Zitat aus S. 9 der Replik (S. 13 der US-Verfügung vom 29. November 2012, Anlage FBD-BK 19a) wie folgt (Hervorhebung diesseits):

> *„As Microsoft has committed to accept a license on RAND terms for Motorola's entire H.264 standard essential portfolio, and the litigation is continuing to determine the details of such license, it is now clear that at some point in the future (**either by agreement of the parties or by court adjudication**) a license agreement for the Motorola Asserted Patents will become a reality."*

(3)      Das Gericht in Seattle lässt mithin ausdrücklich offen, ob ein Lizenzvertrag durch Parteivereinbarung oder durch gerichtliche Anordnung zustande kommt („*either by agreement of the parties or by court adjudication*"). Mithin stand das US-Verfahren, anders als die Beklagten geltend machen wollen, dem Abschluss

des Orange Book-Vertrages durch Annahme des – nicht zurückgenommenen – Angebots der Beklagten gerade nicht entgegen, sondern ließ diesen Vertragsschluss ausdrücklich zu. Wie wir im Schriftsatz vom 10. Juni 2013 nochmals aufgezeigt haben, ist jener Orange Book-Vertrag mit Blick auf die hiesigen Klagepatente am 15. Januar 2013 zustande gekommen.

(4)     Die Vorgehensweise der Beklagten, die beiden Verfahren gegeneinander auszuspielen, ist bereits aus einer so genannten Anti Suit Injunction bekannt, welche die Beklagten noch vor Erlass des Urteils des Landgerichts im hiesigen Verfahren erwirkt hatten.

      (a)     Durch diese Anti Suit Injunction ließen die Beklagten der Klägerin durch das US-Gericht in Seattle, Washington untersagen, einen eventuellen Unterlassungstitel aus den hiesigen Verfahren zu vollstrecken. In diesem Zusammenhang sei zur Information des Senats noch darauf hingewiesen, dass der Prozessbevollmächtigte der Beklagten im Rahmen jenes Antrags noch eine erstaunliche eidesstattliche Versicherung abgegeben hat. Mit dieser Erklärung, die wir als

**- Anlage K II 1 -**

beifügen, sollte dem US-Gericht offenbar die Notwendigkeit aufgezeigt werden, in das deutsche Verfahren einzugreifen. Darin sagte der Prozessbevollmächtigte der Beklagten unter anderem aus, dass die Vollstreckung eines erstinstanzlichen Urteils in Deutschland etwas Ungewöhnliches sei und dass das Verhalten Motorolas in anderen Fällen nahelege, dass dieses angeblich ungewöhnliche Verhalten auch künftig praktiziert werde.

      (b)     Wörtlich heißt es in der Erklärung:

> *„In Germany, the majority of prevailing patentees do not enforce an injunction while a matter is on appeal. Prior behavior by Motorola in another case involving a standard-essential patent, however, suggests that it will immediately attempt to enforce any order entered by the Mannheim court."*

(c)     Über die Richtigkeit der Aussage des Prozessbevollmächtigten möge der Senat sich sein eigenes Bild machen. Der Vollständigkeit halber sei noch angemerkt, dass im Rahmen der Auseinandersetzung der Parteien die Beklagten das angeblich so ungewöhnliche Verhalten freilich stets selbst praktiziert und aus verschiedenen beim Landgericht München erwirkten Unterlassungsurteilen während der Dauer des Berufungsverfahrens vollstreckt haben.

(5)     Festzuhalten ist, dass das US-Verfahren dem wirksamen Abschluss einer Lizenzvereinbarung durch Annahme des Orange Book-Angebots der Beklagten über die hiesigen Klagepatente gerade nicht entgegenstand.

## d)     Zum Gegenstand des US-Verfahrens

(1)     Nachstehend sei zur Information des Senats noch der Gegenstand des Verfahrens in Seattle auf der Grundlage der von den Beklagten eingereichten Verfügungen dargestellt. Den von den Beklagten eingereichten Verfügungen, in denen die Historie und der Hintergrund des Verfahrens erläutert sind, zeigen, dass um die Frage gestritten wird, ob die hiesige Klägerin bzw. Motorola mit einem Vertragsangebot aus dem Jahr 2010 einen Verstoß gegen ihr aus der ITU-Lizenzbereitschaftserklärung obliegende Verpflichtungen begangen haben.

(2)     Dies ergibt sich etwa aus der einleitenden Beschreibung der Verfügung des Gerichts in Seattle vom 25. April 2013 (Anlage FBD-BK 26a, S. 2):

> *„ This is a breach of contract case between Microsoft Corporation ('Microsoft') and Motorola, Inc., Motorola Mobility, Inc., and General Instrument Corporation (collectively 'Motorola'). Microsoft claims that Motorola has an obligation to license patents to Microsoft at a reasonable and non-discriminatory ('RAND') rate, and that Motorola breached its RAND obligations through two offer letters.*
>
> *[...]*
>
> *The parties disagree substantially about the meaning of RAND. Thus, to resolve the dispute, the court held a bench trial from November 13-20, 2012, with the aim of determining a RAND licensing rate and a RAND royalty range for Motorola's patents. "*

01980.40410/20484939.3     12     Berufungsduplik vom 1. August 2013
i. Sa. General Instrument / Microsoft Corp. u.a.
Oberlandesgericht Karlsruhe, Az. 6 U 44/12

Es handelt sich mithin um ein Vertragsverletzungsverfahren („breach of contract case"), und das Gericht in Seattle hielt es offenbar für erforderlich, zunächst eine „RAND"-Lizenzrate bzw. einen „RAND"-Lizenzbereich festzusetzen, um eine Jury auf der Grundlage dieser Lizenzrate und dieses Lizenzbereichs prüfen zu lassen, ob das ursprüngliche Angebot Motorolas aus dem Jahr 2010 einen so genannten „RAND"-Verstoß bedeutet hat. In diesem Zusammenhang sei noch erwähnt, dass es im laufenden US-Verfahren höchst streitig ist, ob und inwieweit diese Verfügungen des Gerichts in Seattle überhaupt der Jury als Entscheidungsgrundlage vorgelegt werden.

(3)     Die Historie und der genaue Prüfungsumfang sind dabei auf S. 4 der Verfügung vom 25. April 2013 näher beschrieben, wo es heißt:

> *„Microsoft claims that Motorola breached its RAND obligation by making an unreasonable offer in a negotiation to license Motorola's 802.11 and H.264 SEPs. On October 21, 2010, Motorola sent Microsoft a letter offering to license Motorola's 802.11 SEPs. Motorola offered to license its patents at what it considered the RAND rate of 2.25% of the price of the end product:*
>
> *[...]*
>
> *On October 29, 2010, Motorola sent a similar letter offering to license its H.264 SEPs on similar terms. The letter again offered a royalty rate of 2.25% of the end product price:*
>
> *[...]*
>
> *Eleven days later, on November 9, 2010, Microsoft initiated this breach of contract action against Motorola based on Motorola's two offer letters, claiming that the letters breached Motorola's RAND commitments to the IEEE and the ITU."*

(4)     Nachdem also Motorola die Verhandlungen durch Angebotsschreiben vom 21. und 29. Oktober 2010 eröffnet hatte, haben die Beklagten auf diese Schreiben nicht geantwortet, sondern schlicht am 9. November 2010 Motorola wegen angeblichen „RAND"-Verstoßes verklagt. Im Zusammenhang mit der Prüfung des behaupteten Verstoßes hat das Gericht in Seattle in seiner Verfügung vom 25. April 2013 (S. 5) klargestellt, dass das ursprüngliche Angebot eines Inhabers eines standardessentiellen Patents nicht den RAND-Anforderungen genügen muss. Vielmehr müsse es sich um ein Angebot „in good faith" handeln, wobei es

zur Überprüfung dieses Kriteriums durch eine Jury zunächst die Festlegung der RAND-Rate bzw. des RAND-Bereichs für angezeigt hält:

> *"However, the court has also held that initial offers do not have to be RAND terms so long as RAND license eventually issues."*

> *"To decide whether Motorola's opening offers were in good faith, a fact-finder must be able to compare them with a reasonable RAND royalty rate and, because more than one rate could conceivably be RAND, a reasonably RAND royalty range."*

(5)     Wie die vorstehende Frage im US-Verfahren entschieden wird, ist für das hiesige Verfahren ohne Belang, weil das Seattle-Gericht ganz ausdrücklich den Abschluss von Parteivereinbarungen – und damit auch den Abschluss der im hiesigen Verfahren abgeschlossenen Orange Book-Lizenz – zulässt. Selbst wenn man also annähme, dass am Ende des Verfahrens vor dem Seattle-Gericht – wie die Beklagten behaupten wollen und wie diesseits bestritten wird – eine Lizenzvereinbarung stünde, würde sich dieses Ergebnis nicht auf das hiesige Verfahren auswirken, weil das Seattle-Gericht Parteivereinbarungen ausdrücklich zulässt und mit Blick auf die hiesigen Klagepatente eine solche Parteivereinbarung bereits getroffen wurde. Wohl genau aus diesem Grund haben die Beklagten auch während der gesamten Vorinstanz keine angebliche Vorgreiflichkeit geltend gemacht. Stattdessen haben die Beklagten ein Orange Book-Angebot unterbreitet – und ihre Schadensersatzpflicht nach deutschem Recht anerkannt – als das Verfahren in Seattle bereits anhängig war und dieses Angebot auch nicht zurückgenommen, als es am 15. Januar 2013 durch die Klägerin angenommen wurde.

### e)     Jedenfalls keine Aussetzung mangels Anerkennungsfähigkeit nach § 328 ZPO

(1)     Selbst wenn das US-Verfahren aufgrund seines Streitgegenstandes vorgreiflich für das hiesige Verfahren wäre – quod non –, käme eine Aussetzung nach § 148 ZPO nicht in Betracht. Die Beklagten führen selbst aus, dass eine Aussetzung wegen eines vorgreiflichen ausländischen Gerichtsverfahrens voraussetzt, dass die ausländische Entscheidung überhaupt in Deutschland anerkennungsfähig wäre. Im Verhältnis zu den USA ist dabei der Maßstab des § 328 ZPO anzuwenden. Die deutschen Gerichte haben zwar nicht die Möglichkeit, den

Parteien die Vollstreckung ausländischer Urteile (im Ausland) zu verbieten (wie es auf Betreiben der Beklagten mit Blick auf die Urteile des Landgerichts hinsichtlich der deutschen Patente der Klägerin geschehen ist). Aber die Wirkungen eines ausländischen Urteils sind in inländischen Verfahren nur dann gegeben, wenn dieses anerkennungsfähig ist.

(2)     Eine Entscheidung des US-Gerichts über die „angemessene" Lizenzrate für die deutschen Klagepatente wäre gemäß § 328 Abs. 1 Nr. 4 ZPO nicht anerkennungsfähig, weil das US-Gericht bei der Bewertung der deutschen Schutzrechte ausschließlich die Maßstäbe des US-Patentrechts (insbesondere zu so genannten „*means plus function*"-Ansprüchen) anwendet und dabei eine Abwertung vornimmt, die für deutsche Patente schlechterdings nicht gelten kann. Das ist mit wesentlichen Grundsätzen des deutschen Rechts, nämlich mit denen, die den Inhalt des deutschen Schutzrechts gesetzlich definieren, offensichtlich unvereinbar. Dies werden wir nachstehend in **Teil D** nochmals gesondert erörtern.

## D.
### Zum kartellrechtlichen Zwangslizenzeinwand

Die Beklagten berufen sich in ihrer Replik weiterhin auf den kartellrechtlichen Zwangslizenzeinwand. Neben einer Wiederholung ihrer – bereits mehrfach widerlegten – Position aus der Vorinstanz bzw. der Berufungsbegründung machen die Beklagten ferner geltend, dass die Nichtannahme ihres Orange Book-Angebots – mit einem Lizenzsatz von EUR 0,01 bzw. EUR 0,02 pro Verletzungsform – aus dem Grund kartellrechtswidrig sei, weil im US-Verfahren angeblich eine noch niedrigere Rate als „RAND"-Rate festgesetzt worden sei. Wie wir nachstehend aufzeigen werden, ist dieses Vorbringen gleich in mehrfacher Hinsicht unzutreffend. Insbesondere wäre auch unter Zugrundelegung der Methodik des Gerichts in Seattle für die beiden Klagepatente der hiesigen Verletzungsverfahren ein Lizenzsatz anzusetzen, der deutlich über dem von den Beklagten angebotenen Satz liegt. Denn das Gericht in Seattle hat gerade die beiden hiesigen Klagepatente als technisch besonders wertvoll eingestuft und sie lediglich auf der Grundlage von US-patentrechtlichen Erwägungen „entwertet", die für ein deutsches Patent keine Anwendung finden können.

Nachstehend werden wir zunächst anlässlich der Ausführungen in der Replik die Verteilung der Darlegungs- und Beweislast nach der Orange Book-Rechtsprechung des BGH erörtern (**sub I**). Sodann

werden wir auf die Feststellungen des Gerichts in Seattle eingehen und aufzeigen, wie das Orange Book-Angebot der Beklagten vor diesem Hintergrund zu bewerten ist (**sub II**). Schließlich werden wir noch zum Zwangslizenzeinwand der Beklagten Stellung nehmen, soweit dieser gegen andere als Unterlassungsansprüche erhoben wurde (**sub III**).

# I.
## Zur Verteilung der Darlegungs- und Beweislast

1. Wie bereits das Landgericht zutreffend festgestellt hat, hätte es den Beklagten oblegen, darzulegen und zu beweisen, dass die Nichtannahme des Orange Book-Angebots einen Kartellverstoß der Klägerin bedeutete. Nochmals sei festgehalten, dass die Beklagten nicht den ihnen offenstehenden Weg des § 315 BGB beschritten haben, sondern ein konkretes beziffertes Angebot vorgelegt haben. Der Beklagte, der sein Lizenzangebot beziffert, muss indes nachweisen, dass das Bestehen auf einem höheren Lizenzsatz kartellrechtswidrig wäre.

2. Diese Verteilung der Beweislast lässt sich unmissverständlich der Orange Book-Entscheidung des BGH entnehmen, wo es in Tz. 38 ausdrücklich heißt:

   *„[38] Dass dieser Betrag auch für den Lizenzsucher nicht ohne Weiteres feststellbar ist, belastet ihn nicht unbillig, denn ihn trifft für die Voraussetzungen des Lizenzierungsanspruchs grundsätzlich ohnehin die Darlegungs- und Beweislast."*

   Hinsichtlich der Höhe des Angebots heißt es zur Darlegungs- und Beweislast in Tz. 39 weiterhin wie folgt:

   *„Denn der Lizenzsucher wird eher bereit sein, eine höhere, über dem aus seiner Sicht kartellrechtlich angemessenen Betrag liegende Summe zu hinterlegen, wenn ihm der – grundsätzlich weiterhin zu seiner Darlegungs- und Beweislast stehende – Einwand nicht abgeschnitten ist, eine Bestimmung der Lizenzgebühr durch den Patentinhaber in dieser Höhe sei unbillig."*

3. Mithin gilt nach der Rechtsprechung des BGH, dass auch im hiesigen Verfahren die Darlegungs- und Beweislast für den Zwangslizenzeinwand bei den Beklagten gelegen hätte. Die Beklagten haben indes nicht nachgewiesen, dass die Nichtannahme ihres Angebots – das ursprünglich einen Lizenzsatz von EUR 0,01 bzw. EUR 0,02 pro angegriffener Ausführungsform vorsah und zwischenzeitlich mit Blick auf das US-Verfahren sogar noch weiter reduziert wurde – einen Kartellrechtsverstoß bedeutete.

## II.
### Zu den Feststellungen des Gerichts in Seattle

Nunmehr wollen die Beklagten sich zur Rechtfertigung ihrer niedrigen angebotenen Lizenzsätze auf die Feststellungen im US-Verfahren berufen. Insoweit ist nochmals festzuhalten, dass es sich bei den durch das Gericht in Seattle genannten Lizenzsätzen bzw. Lizenzbereichen um richterliche Verfügungen in erster Instanz eines anhängigen Rechtsstreits handelt, deren Bindungswirkung und weitere Verwendung im Verfahren streitig ist. Eine Indizwirkung für das hiesige Verfahren kann schon aus diesem Grund nicht bestehen. Darüber hinaus gilt, dass die Feststellungen des Gerichts in Seattle genau das Gegenteil von dem belegen, was die Beklagten geltend machen wollen. Denn wie wir nachstehend aufzeigen werden, demonstriert die Verfügung vom 25. April 2013, dass das Angebot der Beklagten für die hiesigen Klagepatente unzureichend war. Ohne dass die Methodik oder die Ergebnisse des Gerichts in Seattle hiermit in irgendeiner Weise anerkannt würden, ist festzuhalten, dass die Übertragung der Bewertungsgrundsätze des Gerichts auf die hiesigen Klagepatente zu deutlich höheren Lizenzsätzen als den von den Beklagten angebotenen führen würde.

Nachstehend werden wir zunächst die Bewertungsmethodik des Gerichts in Seattle, die dieses seiner Verfügung vom 25. April 2013 zugrunde gelegt hat, erläutern (**sub 1**). Sodann werden wir darstellen, wie das Gericht seine Bewertungsgrundsätze auf die parallelen US-Patente der hiesigen Klagepatente angewendet hat (**sub 2**). Hieran anschließend werden wir aufzeigen, dass der einzige Grund für die Abwertung der US-Patente auf die hiesigen Klagepatente nicht übertragen werden kann, sodass selbst unter Zugrundelegung der Kriterien des Gerichts in Seattle von einem besonders hohen Wert der hiesigen Klagepatente auszugehen ist (**sub 3**). Schließlich werden wir aufzeigen, dass selbst bei Zugrundelegung des vom Gericht in Seattle angegebenen RAND-Bereichs eine Nichtannahme des Angebots der Beklagten keinen Kartellrechtsverstoß begründen konnte (**sub 4**).

### 1.    Zur Methodik des Gerichts in Seattle

a)      Wie oben erörtert, hielt das Gericht für die spätere Entscheidung einer Jury über die Frage, ob das Angebotsschreiben Motorolas aus dem Jahr 2010 einen „RAND-Verstoß" bedeutete, für erforderlich, einen „RAND-Bereich", also einen Lizenzsatzbereich, den es für „vernünftig und nicht-diskriminierend" (*„reasonable and non-discriminatory"*) hält, festzulegen. Zu diesem Zweck setzt sich das Seattle-Gericht in der Verfügung vom 25. April 2013 mit 16 US-Patenten Motorolas, die den H.264-Standard betreffen, auseinander. Diese Patente sind auf S. 54 der Verfügung (Anlage FBD-BK 26a)

aufgeführt. Daneben setzt sich das Seattle-Gericht zum Zwecke der Bewertung des – im hiesigen Verfahren nicht interessierenden – Angebots von Motorola über die Lizenzierung des WiFi-Portfolios mit elf US-Patenten Motorolas auseinander, die den 802.11-Standard betreffen. Diese Patente sind auf S. 110 f. der Verfügung aufgeführt.

b)   Das US-Gericht schildert seine Methodik, die es zur Bestimmung des RAND-Bereichs anwendet, auf den S. 25-41 seiner Verfügung. Auf S. 40 unten der Verfügung erläutert es dabei, dass die Bedeutung der Motorola-Patente für die Standards sowie für Microsofts Produkte die Grundlage der Bewertung darstellen:

> *„First, the court examines Motorola's H.264 and 802.11 patent portfolios to determine each portfolio's importance to its respective standard as well as the importance to Microsoft's products."*

c)   Zuvor (S. 37 oben) hat das Seattle-Gericht ausgeführt, dass bei der Bewertung der Bedeutung der Patente der Wert der geschützten Technologie unabhängig vom Wert, der sich aus der Standardessentialität ergibt, zu ermitteln sei:

> *„Factors 6 and 8 examine the importance of the patented invention to both the licensor and licensee's sales, as well as to derivative and convoyed sales to the licensee. Although both of these factors are relevant to a reasonably royalty in the RAND context, it is important to focus the analysis of these factors on the value of the patented technology apart from the value associated with incorporation of the patented technology into the standard."*

Zu diesem Zweck hat das Seattle-Gericht – auch mit Blick auf die parallelen US-Patente der hiesigen Klagepatente – für jedes einzelne Patent untersucht, welchen technologischen Wert die Patente haben, inwieweit die Lehre der Motorola-Patente im Standard durch andere Technologie hätte substituiert werden können und inwieweit die Microsoft-Produkte tatsächlich auf die geschützte Technologie angewiesen sind.

## 2.   Zur Bewertung der parallelen US-Patente der hiesigen Klagepatente

Nachstehend geben wir wieder, wie das Gericht in Seattle seine soeben dargestellten Bewertungsgrundsätze auf die in den deutschen Verletzungsverfahren interessierenden Patente Krause (EP'667, hierzu **sub a)** und Wu (EP'384, hierzu **sub b)** angewendet hat. Sodann werden wir die Schlussfolgerungen des Seattle-Gerichts zum Wert der beiden Patente Wu und Krause sowie zum gesamten H.264-Portfolio Motorolas nochmals systematisch zusammenfassen **(sub c)**.

a)    **Ausführungen des Seattle-Gerichts zum Krause-Patent (US'419 – EP'667)**

(1)    Das Seattle-Gericht hat in seiner Verfügung vom 25. April 2013 ausdrücklich festgestellt, dass das Krause-Patent von hohem technischen Wert ist, weil es die Kernfunktion der Prognose betrifft und mit der adaptiven Verwendung verschiedener Blockgrößen eine effizientere Kodierung ermöglicht. Wörtlich heißt es auf S. 55 der Verfügung wie folgt:

> „*The Krause Family has technical value with respect to the H.264 Standard because it is directed to the core feature of prediction. It allows video encoders to encode video more efficiently by adaptively using the block size that results in the most compression of the video data.*"

(2)    Dabei war zwischen den Parteien des Verfahrens sogar unstreitig, dass das Krause-Patent zu dem fünfzigprozentigen Kodierungsgewinn der H.264-Methodik beiträgt, wie das Seattle-Gericht auf S. 56 seiner Verfügung weiter festhält:

> „*Motorola presented undisputed evidence that the '419 Patent contributed to the 50% coding gain reported for H.264 (progressive scan sequences only).*"

(3)    Darüber hinaus befand das Seattle-Gericht ausdrücklich, dass das Krause-Patent allen alternativen Technologien funktional überlegen ist. Insoweit heißt es auf S. 57 der Verfügung:

> „*Moreover, the court concludes, on the evidence before it, that Motorola, through its expert Dr. Drabik, has provided sufficient evidence and explanation as to why the Krause Family of patents are superior in functionality to any of the alternatives set forth by Microsoft.*"

(4)    Trotz dieser Feststellungen zum hohen technischen Wert des Krause-Patents und seiner geringen bzw. nicht vorhandenen Substituierbarkeit durch andere Technologien hat das Seattle-Gericht bei der Bestimmung des RAND-Bereichs für das H.264-Portfolio das Krause-Patent als geringwertig (bzw. praktisch wertlos) eingeordnet. Abgewertet wurde das Patent dabei nur aus einem einzigen Grund, der auf S. 57 der Verfügung wiedergegeben ist:

> „*The court has examined the specification of the '419 Patent and concludes that it only discloses specific hardware implementations of the*

> *means-plus-function elements. [...] Thus, the '419 Patent contributes to the standard, but its contribution is limited to implementation of the standard through hardware."*

(5)     Das Seattle-Gericht hielt das Krause-Patent – genauer gesagt: das US-Patent '419 – somit aus dem Grund für praktisch wertlos, weil es lediglich „*means-plus-function*"-Ansprüche zum Gegenstand hat. Der Schutzumfang derartiger Ansprüche ist nach US-Patentrecht auf die ausdrücklich in der Patentschrift offenbarten Funktionen beschränkt. Das Seattle-Gericht kam anhand der US-Patentbeschreibung zu dem Schluss, dass nur Hardware-Encoder und -Decoder offenbart seien, sodass letztlich auch nur Hardware geschützt sei. Angesichts dieser Besonderheit des US-Patentrechts und vor dem Hintergrund, dass Microsoft Software herstelle, kam das Seattle-Gericht zu dem Schluss, dass das Krause-Patent zwar technisch von besonders hohem Wert sei, es aber praktisch für Microsoft unbedeutend sei, weil Microsoft – als Software-Hersteller – von diesem Patent überhaupt keinen Gebrauch mache.

(6)     Wie wir nachstehend aufzeigen werden, ist diese Auffassung des Gerichts in Seattle auf die hiesigen (deutschen) Klagepatente nicht übertragbar. Das ist für alle am Verfahren beteiligte Patentrechtler evident.

**b)     Ausführungen des Seattle-Gerichts zum Wu-Patent (US'968 – EP'384)**

(1)     Die Feststellungen des Seattle-Gerichts zum Wu-Patent (dem Klagepatent der Verfahren 6 U 46/12 und 6 U 47/12) entsprechen weitgehend denjenigen zum Krause-Patent. So hält es auf S. 58 seiner Verfügung ausdrücklich den hohen technischen Wert auch dieses Patents fest:

> *„ The Wu Family has technical value to the H.264 Standard because it is directed to the core H.264 feature of prediction."*

(2)     Ebenso war auch hinsichtlich des Wu-Patents unstreitig, dass die geschützte Technologie zu dem fünfzigprozentigen Kodierungsgewinn der H.264-Technologie beiträgt, wie das Seattle-Gericht auf S. 59 festhält:

> *„Motorola presented uncontroverted evidence that the technology claimed in the '968 Patent contributed to the 50% coding gain reported for H.264 (progressive scan only)."*

(3)   Auch im Gleichklang mit den Ausführungen zum Krause-Patent befand das Seattle-Gericht, dass das Wu-Patent alternativen Technologien überlegen ist. Insoweit heißt es auf S. 60 der Verfügung:

> *„ Moreover, the court concludes on the evidence before it that Motorola, through its expert Dr. Drabik, has provided sufficient evidence and explanation as to why the Wu Family of patents are superior in functionality to any of the alternatives set forth by Microsoft. "*

(4)   Mit Blick auf die praktische Bedeutung des Patents für Microsoft kam das Seattle-Gericht zu einem ähnlichen Ergebnis wie beim Krause-Patent. Zwar machte es einen Anspruch des US-Patents aus, der keine *„means-plus-function"*-Einschränkung beinhaltete. Es hielt es jedoch nicht für erwiesen, dass gerade dieser Anspruch standardessentiell ist. Dementsprechend hielt es auch das Wu-Patent für praktisch wertlos. Insoweit heißt es auf S. 61 der Verfügung:

> *„ Unlike the '419 Patent, the '968 Patent includes a claim, claim 16, which does not include means-plus-function limitations. Thus, on its face, claim 16 is not limited to the hardware structures disclosed in the '968 specification. Motorola did not, however, provide evidence that claim 16 of the '968 patent covers the technology of the H.264 Standard. "*

### c)   Schlussfolgerungen des Seattle-Gerichts

(1)   Das Seattle-Gericht stellt bei der Bewertung des H.264-Patentportfolios entscheidend darauf ab, ob die jeweiligen Patente das progressive Codieren und Decodieren von Videodateien betreffen oder das so genannte „interlaced"-Verfahren. Die Hintergründe der Technologien sind auf den Seiten 41-44 der Verfügung vom 25. April 2013 erläutert. Dabei gelangt das Gericht zu der Einschätzung, dass das progressive Verfahren – auch und gerade mit Blick auf die Microsoft-Produkte – praktisch höchst relevant ist, während es das „interlaced"-Verfahren für veraltet und praktisch nicht relevant hält. So führt es etwa auf S. 43 seiner Verfügung aus:

> *„The weight of the evidence before the court demonstrates that interlaced content is increasingly rare in today's world."*

Die aus Sicht des Scattle-Gerichts geringe Bedeutung des „interlaced"-Verfahrens für Microsoft-Produkte wird auf den Seiten 84-96 der Verfügung im Einzelnen begründet.

(2)   Das Seattle-Gericht hält in seiner Verfügung ferner fest, dass überhaupt nur zwei der 16 H.264-Patente von Motorola das progressive Codieren und Decodieren von Videodaten – und damit das aus seiner Sicht praktisch relevante Einsatzgebiet – betreffen. Bei den beiden Patenten, die dem progressiven Codieren und Decodieren gelten, handelt es sich um die beiden hiesigen Klagepatente, also Krause und Wu. Insoweit heißt es zum Krause-Patent etwa auf S. 56 der Verfügung (Hervorhebung diesseits):

> „Motorola presented undisputed evidence that the '419 Patent contributed to the 50% coding gain reported for H.264 (**progressive scan sequences only**)."

Ebenso heißt es zum Wu-Patent auf S. 56 der Verfügung (Hervorhebung diesseits):

> „Motorola presented uncontroverted evidence that the technology claimed in the '968 Patent contributed to the 50% coding gain reported for H.264 (**progressive scan only**)."

(3)   Die Feststellungen des Seattle-Gerichts lassen sich dementsprechend wie folgt zusammenfassen:

- Nur die beiden Patente Krause und Wu – also die beiden im deutschen Verfahren gegenständlichen Patente – betreffen die praktisch höchst relevante progressive Technologie.

- Die 14 übrigen H.264-Patente betreffen die praktisch nicht relevante interlaced-Technologie.

- Die beiden Patente Krause und Wu sind von großem technischen Nutzen, betreffen die Kernfunktion des H.264-Standards und tragen zum fünfzigprozentigen Kodierungsgewinn bei.

- Für beide Patente Krause und Wu existiert keine gleichwertige Alternativtechnologie.

•     Der einzige Grund, warum die beiden Patente Krause und Wu nicht hoch
bewertet wurden, ist, dass nach Auffassung des Seattle-Gerichts die
Formulierung der Ansprüche des US-Patents als so genannte *„means-
plus-function"* Ansprüche nur Hardware-Decoder und -Encoder betreffen
und nicht die von Microsoft angebotene Software.

(4)     Mit anderen Worten hielt das Seattle-Gericht die beiden hiesigen Klagepatente –
bzw. richtiger: deren parallele US-Patente – aus patentrechtlichen Gründen für
geringwertig und die 14 weiteren Patente des Motorola-Portfolios aus dem
Grund, weil sie die „interlaced"-Technologie betreffen. Vor dem Hintergrund
dieser Einschätzung zog es dann – da es keinen besonderen wirtschaftlichen
Wert der Patente Motorolas ausmachte – Patent-Pools als Maßstab für die
Bewertung heran (vgl. S. 168-178 der Verfügung) und kam letztlich zu einem
„RAND-Bereich" für Microsoft Windows-Produkte und Xbox von USD
0,00555 bis USD 0,16389 (vgl. „Conclusion" auf S. 207 der Verfügung).

## 3.    Zur Übertragbarkeit der Einschätzungen des Seattle-Gerichts auf die hiesigen Klagepatente

a)     Die Vorgehensweise des Seattle-Gerichts ist nicht geeignet, einen „RAND"-Bereich
oder einen fixen „RAND"-Lizenzsatz für die hiesigen deutschen Klagepatente Krause
(EP'667) und Wu (EP'384) zu ermitteln. Denn das Seattle-Gericht hat ausschließlich
den Anspruchswortlaut der US-Patente und ausschließlich die Regeln des US-
Patentrechts für eine Bestimmung des Schutzumfangs und damit des praktischen Werts
der Patente herangezogen. Dabei ist das Gericht mit keinem Wort darauf eingegangen,
dass der Anspruchswortlaut und der Schutzbereich der H.264-Patente Motorolas im
Ausland gänzlich anderes bewertet werden können.

b)     Daher ist der von dem US-Gericht herangezogene Grund für die Abwertung der im
hiesigen Verfahren einzig interessierenden Schutzrechte Krause und Wu auf die
deutschen Patente nicht übertragbar. Denn beide Patente Krause und Wu erfassen nach
deutschem Patentrecht selbstverständlich auch Software-Encoder und -Decoder, sodass
sämtliche angegriffenen Ausführungsformen der Beklagten in den Schutzbereich der
beiden Patente fallen. Dementsprechend hat das Landgericht auch zurecht die
Verletzung angenommen. Bezeichnender Weise haben auch die Beklagten im hiesigen

01980.40410/20484939.3       23       Berufungsduplik vom 1. August 2013
i. Sa. General Instrument / Microsoft Corp. u.a.
Oberlandesgericht Karlsruhe, Az. 6 U 44/12

Verfahren nicht einmal eingewandt, dass die Klagepatente nur Hardware-Decoder erfassten.

c)      Wenn man nunmehr – wie es die Beklagten offenbar anstreben – die Feststellungen des Seattle-Gerichts der Bemessung des Orange Book-Angebots der Beklagten zugrunde legt, gelangt man mitnichten zu dem Ergebnis, dass die Klägerin das Angebot nicht hätte ablehnen dürfen, ohne gegen kartellrechtliche Verpflichtungen zu verstoßen. Vielmehr handelt es sich unter Zugrundelegung der Feststellungen des Seattle-Gerichts bei den beiden Klagepatenten Krause und Wu um praktisch höchst bedeutsame, technisch maßgebende und zu der Dateneinsparung des H.264-Verfahrens maßgeblich beisteuernde und nicht zu substituierende Technologien. Der wirtschaftliche Wert der beiden Klagepatente unter Außerachtlassung der Standardessentialität ist also ausgesprochen hoch.

d)      Demgegenüber kann der von dem Seattle-Gericht vorgenommene Abzug wegen angeblicher Beschränkung auf Hardware-Geräte (aufgrund der Formulierung als *„means plus function"*-Ansprüche nach US-amerikanischem Recht) in Deutschland gerade nicht vorgenommen werden. Somit kann die von dem Seattle-Gericht angesetzte Rate gerade nicht die Bemessungsgrundlage für die Kartellrechtmäßigkeit der Nichtannahme des Angebots durch die Klägerin sein.

e)      Der von dem Seattle-Gericht angesetzte RAND-Bereich beträgt für Microsoft Windows und die Xbox zwischen USD 0,00555 und USD 0,16389. Für sonstige Produkte setzt es einen fixen RAND-Satz von USD 0,00555 an. Diese Lizenzsätze setzt das Gericht angesichts seiner Annahme an, dass letztlich sämtliche 16 H.264-Patente aus dem Motorola-Portfolio für Microsoft praktisch unbedeutend seien. Berücksichtigt man, dass das Seattle-Gericht die Patente Krause und Wu – jenseits der US-amerikanischen Besonderheit der *„means plus function"*-Ansprüche – als technisch wie praktisch besonders bedeutsam einstuft, wird offenbar, dass in Deutschland ein deutlich höherer Lizenzsatz als der US-amerikanische „RAND"-Bereich zur Anwendung gelangen müsste. In jedem Fall wäre ein Lizenzsatz in Ansatz zu bringen, der deutlich über den von den Beklagten angebotenen EUR 0,01 bzw. EUR 0,02 pro angegriffener Ausführungsform liegt. Denn der angebotene Lizenzsatz liegt bereits am unteren Ende des von dem Gericht in Seattle festgesetzten Bereichs – dazu sogleich mehr. Von einem

Kartellrechtsverstoß der Klägerin aufgrund der Nichtannahme des Orange Book-Angebots der Beklagten kann daher auch und gerade angesichts der Feststellungen des Gerichts in Seattle keine Rede sein.

f)    Wenn man also die von den Beklagten vorgelegten Verfügungen nur einmal auf ihre tragenden Gründe untersucht, wie es bei jedem juristischen „Präjudiz" der Fall sein sollte, und diese nach dem hier anwendbaren deutschen Recht misst, so ist es rational nicht mehr nachvollziehbar, dass sich die Beklagten auf diese Einordnungen aus dem parallelen US-Verfahren zur Begründung einer niedrigen Lizenz glauben berufen zu können. Das kann nur im Vertrauen darauf geschehen, dass im vorliegenden Verfahren schlicht überhaupt keine Prüfung mehr stattfindet, sondern die bloße Existenz des US-Verfahrens die hiesigen Verfahren lähmen oder im Sinne der Beklagten beeinflussen sollte. Das wird keinen Erfolg haben.

## 4.    Ein Lizenzsatz oberhalb des Angebots der Beklagten liegt innerhalb des im US-Verfahren angesetzten Bereichs

a)    Der Vollständigkeit halber sei noch festgehalten, dass die Nichtannahme des Orange Book-Angebots der Beklagten im Rahmen des hiesigen Verfahrens selbst dann keinen Kartellrechtsverstoß bedeuten könnte, wenn die Feststellungen des Seattle-Gerichts – wie nicht – auf die deutschen Klagepatente übertragbar wären. Denn nochmals sei festgehalten, dass das Seattle-Gericht einen „RAND"-Bereich für Microsoft Windows-Produkte und die Xbox zwischen 0,5 US-Cent und 16 US-Cent festgelegt hat. Demgegenüber haben die Beklagten im hiesigen Verfahren einen Lizenzsatz von 1 EUR-Cent bzw. 2 EUR-Cent angeboten.

b)    Das Angebot der Beklagten – das insoweit nicht zwischen den verschiedenen Produkten unterschied und damit auch für Windows-Produkte und die Xbox galt – lag damit im untersten Bereich der von dem Seattle-Gericht angegebenen Spanne. Die Nichtannahme dieses Angebots kann damit selbst bei Anwendung der Maßstäbe des Seattle-Gerichts nicht kartellrechtswidrig gewesen sein. Ein Kartellrechtsverstoß der Klägerin scheidet daher unter allen denkbaren Gesichtspunkten aus.

### III.
### Zum Einwand gegen andere als Unterlassungsansprüche

1.  Sofern die Beklagten in ihrer Berufungsreplik den Versuch unternehmen, den Zwangslizenzeinwand auch gegenüber anderen als Unterlassungsansprüchen zu erheben, ist dieses Verteidigungsmittel in der Berufungsinstanz verspätet und nicht mehr zuzulassen.

2.  Letztlich kommt es auf die Zulassung des Einwands nicht an, weil jede Ausdehnung des kartellrechtlichen Zwangslizenzeinwandes auf andere Ansprüche einer gesetzlichen Lizenz gleichkäme, die dem deutschen Recht schlechterdings fremd ist. Auch die EU-Kommission hat in ihren Stellungnahmen an keiner Stelle die Geltendmachung anderer als Unterlassungsansprüche aus standardessentiellen Patenten in Frage gestellt. Darüber hinaus sei ein weiteres Mal darauf hingewiesen, dass die Beklagten ihre Schadensersatzverpflichtung ohnehin mehrfach und ausdrücklich anerkannt haben und dabei auf die Berechnungsprinzipien nach deutschem Recht verwiesen haben

### E.
### Zum Aussetzungsantrag mit Blick auf die Vorlagefragen des LG Düsseldorf

Schließlich treten wir dem Antrag der Beklagten entgegen, das Verfahren bis zur Entscheidung des EuGH über die Vorlagefragen des Landgerichts Düsseldorf im Verfahren 4b O 104/12 auszusetzen. Ebenso treten wir dem Aussetzungsantrag der Beklagten mit Blick auf die weiteren Vorlagefragen der Beklagten entgegen.

### I.
### Zur Stellungnahme der Kommission

Sämtlichen Stellungnahmen der EU-Kommission – auch und insbesondere den von den Beklagten vorgelegten – ist zu entnehmen, dass die Kommission einen eventuellen Missbrauch der marktbeherrschenden Stellung daran festmacht, dass Unterlassungsansprüche gegenüber einem *„willing licensee"* durchgesetzt werden. In der Stellungnahme der Kommission aus Anlage FBD-BK 28 führt die Kommission mit Blick auf das – dem Senat bekannte – deutsche Patentverletzungsverfahren zwischen Motorola und Apple aus, dass die Abgabe eines Orange Book-Angebots unter Ingebrauchnahme des Mechanismus des § 315 BGB den Beklagten grundsätzlich dafür spreche, den Beklagten als *„willing licensee"* anzusehen. Diese Feststellung als solche ist keine Besonderheit gegenüber dem deutschen Recht, sondern ist insoweit schlicht und einfach die Bestätigung der Orange Book-Entscheidung des BGH.

## II.
## Die Beklagten sind keine „willing licensees"

1.    Legt man die Ausführungen der Kommission zugrunde, so wird klar, dass die Beklagten im hiesigen Verfahren unter keinem denkbaren Gesichtspunkt als „*willing licensees*" zu qualifizieren sind. Auf das ursprüngliche Lizenzangebot der Motorola-Gruppe aus dem Oktober 2010 haben die Beklagten nicht geantwortet, sie haben vielmehr nur elf Tage später in Seattle, Washington, Klage wegen angeblichen „RAND"-Verstoßes erhoben.

2.    Im hiesigen Verfahren haben sich die Beklagten auch nicht verhandlungsbereit gezeigt, sondern haben sich stets auf ein Angebot mit einem festen Lizenzsatz von EUR 0,01 bzw. EUR 0,02 (der später noch weiter reduziert wurde) zurückgezogen. Eine Verhandlungsbereitschaft mit Blick auf diese Lizenzsätze haben die Beklagten zu keinem Zeitpunkt gezeigt, und dies, obwohl die Klägerin mehrfach aufgezeigt hat, warum die angebotenen Zahlungen nicht angemessen waren. Die Beklagten haben bewusst nicht von der Möglichkeit des § 315 BGB Gebrauch gemacht und haben sich damit gerade nicht bereit gezeigt, eine bindende Festlegung des Lizenzsatzes durch einen Dritten zu akzeptieren, wie es die Kommission mit Blick auf das Verfahren Motorola gegen Apple herausgestellt hat.

   a)    In diesem Zusammenhang versuchen die Beklagten nunmehr, ihre angebliche Eigenschaft als „*willing licensee*" im Sinne der Kommission daraus abzuleiten, dass die Beklagten angeblich bereit seien, die Feststellungen des US-Gerichts in Seattle, Washington, als „weltweite RAND-Rate" anzuerkennen. Dabei stützen sie sich auf das nachstehende Zitat aus der Mitteilung der Kommission (Anlage FBD-BK 29):

        „*The Commission's preliminary view is that the acceptance of binding third party determination for the terms of a FRAND licence in the event that bilateral negotiations do not come to a fruitful conclusion is a clear indication that a potential licensee is willing to enter into a FRAND licence.*"

   b)    Ein weiteres Mal versuchen die Beklagten hier, durch ein aus dem Zusammenhang gerissenes Zitat, das US-Verfahren mit den hiesigen Verfahren zu vermischen und die deutschen Verletzungsverfahren zu torpedieren. Die Stellungnahme der Kommission gilt dem Verfahren zwischen Motorola und Apple, und die dort referenzierte „*binding third party determination*" ist die Überprüfung der durch den Patentinhaber festgesetzten Lizenzrate nach § 315 BGB. Genau diesen – ihnen selbstverständlich offen stehenden – Mechanismus des § 315 BGB haben die Beklagten indes nicht gewählt.

3.  Eine Aussetzung des hiesigen Verfahrens kommt daher nicht in Betracht, weil keinerlei Anhaltspunkt dafür besteht, dass die Kommission die Beklagten im hiesigen Verfahren als „*willing licensee*" ansehen würden.

### III.
### Aussetzung ist nicht angezeigt

1.  Eine Aussetzung kommt auch unabhängig von den vorstehend aufgezeigten Umständen nicht in Betracht, weil den Beklagten wegen Ablaufs des Schutzrechts ohnehin keinerlei Vollstreckung eines Unterlassungstitels droht und weil ein Lizenzvertrag über die hiesigen Klagepatente abgeschlossen wurde.

2.  Mit Blick auf andere Klageansprüche als Unterlassungsansprüche kommt eine Aussetzung ebenfalls nicht in Betracht. Die Kommission hat die Geltendmachung von Schadensersatz- oder Rechnungslegungsansprüchen aus einem standardessentiellen Patent gerade nicht in Frage gestellt. Außerdem haben die Beklagten die Schadensersatzansprüche der Klägerin, wie mehrfach aufgezeigt, ohnehin ausdrücklich anerkannt. Das nach § 148 ZPO dem Senat eingeräumte Ermessen ist demnach jedenfalls dahingehend auszuüben, dass die Aussetzungsanträge der Beklagten zurückzuweisen sind.

(Dr. M. Grosch)
Rechtsanwalt

Anlage
K II 1

Berufungsduplik vom 1. August 2013
i. Sa. General Instrument / Microsoft Corp. u.a.
Oberlandesgericht Karlsruhe, Az. 6 U 44/12