# EXHIBIT 18

```
                    UNITED STATES DISTRICT COURT
               WESTERN DISTRICT OF WASHINGTON AT SEATTLE
_____

MICROSOFT CORPORATION,            )
a Washington corporation,         )
                                  ) CASE NO. C10-1823JLR
              Plaintiff,          )
                                  )
v.                                ) SEATTLE, WASHINGTON
                                  ) May 18, 2011
MOTOROLA, INC., MOTOROLA          )
MOBILITY, INC., and GENERAL       )
INSTRUMENT CORPORATION,           )
                                  ) MOTION HEARING
              Defendants.         )
_____ )
                                  )
MOTOROLA, INC., MOTOROLA          )
MOBILITY, INC., and GENERAL       )
INSTRUMENT CORPORATION,           ) CASE NO. C11-00343JLR
                                  )
              Plaintiffs,         )
v.                                )
                                  )
MICROSOFT CORPORATION,            )
a Washington corporation,         )
                                  )
              Defendant.          )
                                  )
_____

                    VERBATIM REPORT OF PROCEEDINGS
                 BEFORE THE HONORABLE JAMES L. ROBART
                      UNITED STATES DISTRICT JUDGE
_____
```

APPEARANCES:

For Microsoft:        ARTHUR HARRIGAN

For Motorola:         JESSE JENNER

Reported by:          NANCY L. BAUER, CCR, RPR
                      Federal Court Reporter
                      700 Stewart Street, Suite 17205
                      Seattle, WA 98101
                      (206) 370-8506
                      nancy_bauer@wawd.uscourts.gov

1    THE COURT: Go ahead. Obviously, it influences the
2 court's analysis.
3    MR. JENNER: Right. I think it's good background. I
4 think, as a generality, what we're talking about here are
5 matters that have arisen over the last, oh, maybe 20 years in
6 the nature of standardization of products and processes.
7    It has become important for manufacturers and service
8 providers to be able to provide their products and services
9 consistently so that consumers can have various products
10 interact with each other and not find they've taken something
11 home that won't work with somebody else's product. Just one
12 example of that would be digital video disks.
13    Standards are needed for the disks and for the players so
14 that if a consumer buys a DVD and puts it in a particular
15 player, it will work in that player, just as in other
16 players, and so that all these devices will be interactive.
17 And the way you get there is by competent engineers and
18 scientists getting together and developing a set of
19 technological requirements for these kinds of products so
20 that if everybody conforms to the requirements that is
21 practiced as the standard, then all of their products will be
22 interactive, the consumer will benefit by being able to go to
23 any source for the product, and there will be a general
24 benefit for this.
25    What we're dealing with here are two of these standards.

1  One of these standards is the so-called 802.11 standard that
2  we will refer to, and that's basically a wireless
3  communications standard that's promulgated by representatives
4  coming together at the IEEE, the Institute of Electrical and
5  Electronics Engineers.  These enable things like laptop
6  computers and cell phones and those kind of devices to
7  communicate wirelessly; for example, when we out-of-towners
8  go to our favorite Starbucks, we can connect through the
9  wireless connections, and we know, because of the
10 standardization, our devices will talk to other people's
11 devices.
12      The other standard is the so-called H.264 standard, which
13 is promulgated by the International Telecommunications Union,
14 or ITU as we refer to it.  It is a video encoding standard
15 that enables users to watch the same video on whatever device
16 that they may happen to have, be it the handheld or a laptop,
17 that has become compatible with the H.264 standard.  So these
18 are standards that have been developed over the years, and
19 they're are the ones that we're playing with here.
20      Companies who developed proprietary technology are able to
21 get patents on portions of what is used in the standard.
22 This could create problems if people have patents on the
23 standard and they don't make them available on so-called
24 reasonable and nondiscriminatory terms, R-A-N-D, or RAND.
25 You'll hear a lot about RAND.

So these standards organizations, or SDOs, have variable requirements, they do it in different ways. But, in essence, they require some sort of an assurance from members of the organization that if they get a patent on a portion of the standard, they will either license it free, if that's what their intention is, or they will license it on RAND terms.

All the standards have different languages. To the extent that we're talking about a breach of contract action here, which we are, as I will come to in a moment, it's important to look at the actual language in order to understand what it is.

So letters of assurances were required, they were provided, in this instance by Motorola for Motorola's products that are consistent with the requirements of the standards body.

So I submit, Your Honor, and I think your question goes to this, in part, what the actual obligation is and how it is satisfied varies from one standards organization to another. We have to look at what it is here that was undertaken in order to understand what we're dealing with.

So in order to do that, I would like to show Your Honor relevant language, which I think you'll see deviates from what we submit Microsoft has been arguing about. If Your Honor would take the little slide book that I gave you out. The two that are relevant to understanding what the

obligations are, are Slide 3, which is the policy excerpt for the IEEE having to do with 802.11, and Slide 4, which are from the ITU's guidelines that have to do here with H.264.

And just to give you a preview: To the extent that there is or has been a suggestion that Motorola was required to offer a precise RAND rate and royalty base, the absolute exact prevailing RAND rate, that is not what either of these bodies call for.

If you look at Slide 3, the first sentence states, "Not that a precise RAND rate is going to be offered from the outset," which I submit to Your Honor is impossible to figure out. It varies, and every situation is going to be different. But it says, "A license will be made available to an unrestricted number of applicants on RAND terms." "A license will be made available." And then it goes on at the bottom, and it says, "The IEEE is not responsible for determining whether any of the terms or conditions are, in fact, RAND terms and conditions."

And it's implicit, I submit, in that that it is up to the parties to come to an agreement, if they can, on whether or not the actual, final license terms are RAND terms. So you have to get there, and the only other way you can possibly get there is by negotiating.

This is even more explicit in Slide 4, because the ITU, in Slide 4, calls this right out. In Slide 4, in the lower box,

1   No. 2:  "The requirement is that the patent holder is
2   prepared to grant a license to applicants on RAND terms."
3       Not again that you must come forward, having somehow
4   figured out what the precise correct RAND term is, but that
5   you're prepared to grant a license.  And this union, ITU,
6   tells you how to get there, because it goes on to say in the
7   second sentence, "Negotiations are left to the parties'
8   concern and are performed outside the ITU."  And the Annex
9   No. 1 at the top says the same thing:  "The detailed
10  arrangements arising from patents, licensing royalties, et
11  cetera, are left to the parties' concerns, as these
12  arrangements might differ from case to case."
13      So the ITU makes it absolutely explicit that the way you
14  get to the license that is to be provided is by negotiating.
15  Everybody knows that.  And just to show you a couple of
16  examples, I've attached, at Tab 5, a couple of excerpts from
17  the American Bar Associations' committee on standardization.
18  And it says, in the first box at page 49, in the yellow
19  highlighting, "It's reasonable to require that licenses be
20  granted only upon request by a potential licensee."
21      And by the way, Microsoft never even requested a license.
22  To this day, they haven't said they'll take one.  But in any
23  event, it says, "Upon the conclusion of bilateral
24  negotiations."  So the ADA's committee on standardization
25  also recognizes that the way you get there, consistent with

1  common sense, is by negotiations.
2      And finally, at Slide 7, we have brought in as a learned
3  publication, it didn't appear in a law review, it was
4  delivered orally, slides by Ms. Marasco, who is Microsoft's
5  own general manager for standard strategy.  In the lower box,
6  she, too, acknowledges that, "A prospective implementer that
7  has requested a license will negotiate on a private bilateral
8  basis with the patent owner to determine whether they can
9  arrive at a mutually acceptable agreement on RAND terms."  So
10 Microsoft's own general manager knows it.
11     The only way you can possibly deal with what are
12 appropriate RAND terms in any given setting is by
13 negotiating, and that didn't happen here.
14     Why does that even make sense?  It makes sense because we
15 don't know what a RAND rate is in any given situation, but
16 the actual RAND rate at the end of the day may be a high rate
17 for a high user of technology that had nothing to give back
18 in a cross-license.  It may be a lower rate, where the user
19 is a moderate user and has a lot of its own technology to
20 give back as a result of the negotiations.
21     The only way you can get there is by engaging, and if you
22 never engage, you never get the process going, which we
23 submit, Your Honor, is noncompliance with the standards.
24     Why does that matter?  Because even though Microsoft says
25 at page 2 of its brief that it was under no obligation to

1  negotiate, the fact of the matter is, you can see from the
2  standard that they were under an obligation to negotiate.
3      The contract is the entirety of the standards bodies rules
4  that govern this. The ITU makes it plain explicit that the
5  parties are to negotiate. And Microsoft, if it wants to
6  claim to be a third-party beneficiary, which it does, is
7  obligated to comply with the very contract of which it claims
8  to be the third-party beneficiary. And this is true of these
9  standards, it's true of all standards. This is the way
10 people deal with them. They negotiate.
11     So you have a policy, you have requirements for
12 negotiation, you have the common sense, which the *Iqbal* case
13 I will come to in a while calls for, in which we are all
14 called upon to apply our common sense to whether or not a
15 pleading states a plausible cause of action. Common sense
16 even says you have to engage in negotiation.
17     Microsoft, in its brief, says we're not dealers at a rug
18 bazaar. I don't like to think of it as a rug bazaar. I
19 guess that's okay. But think of it as a car situation where
20 you walk into somebody down the street who says, "I've got a
21 car I will sell you. It's a Prius. It's pretty good on fuel
22 economy. I'll give it to you for $100,000." You can walk
23 away, if you choose to, in which case we don't know what the
24 right is for a Prius. Or you can engage and say, "That's
25 ridiculous. Your Prius isn't worth $100,000. I'll give you

13

1  $30,000 for it." And then you get into an engagement, and
2  you might get comparable to a RAND term. You might get the
3  actual price of the car and reach an agreement.
4      On the other hand, in the RAND negotiations setting it is
5  possible, you will get the impasse, and the court may have to
6  intervene. You've seen cases where courts were prepared to
7  intervene in setting a RAND rate, but it never came to that,
8  it was always settled.
9      The point is, you don't get to that situation unless you
10 engage and negotiate the way the standards require, and
11 verbatim in the standards. It's part of the contract. And
12 that's why I say, as a matter of understanding the legal
13 basis for -- under which Microsoft needs to negotiate, I
14 submit, Your Honor, it is in the agreements themselves as a
15 whole, as recognized by people like the ABA and Microsoft's
16 own standards manager. So that is the basis on which we say
17 that there has to be a negotiation.
18     Now, here, Microsoft simply never engaged and never
19 negotiated. This is unlike all the other authorities on
20 which Microsoft relies in its briefs, and that's why they're
21 distinguishable. The *Wi-Lan case, the RIM* case, these cases
22 that you saw in Microsoft's briefs all involved negotiations
23 that came to an impasse. Well, if negotiations came to an
24 impasse, then I'd submit to Your Honor that it's appropriate
25 at impasse for someone to consider invoking the court, but

1  that should only be after the negotiations have failed and
2  the parties can no longer make any progress.
3      Why?  Because no court has ever set a RAND rate.  I don't
4  mean to suggest for a second that the court can't do that.
5  The court can do that.  But it is a novel process, there's no
6  meaningful guidance for it, it is basically setting sail on
7  an uncharted sea.  The only body that has ever tried to
8  actually determine a RAND rate was the Federal Trade
9  Commission in part of its RAND investigation, where it spent
10 55 months, 55 months conducting the entirety of the
11 proceedings that resulted partially in a so-called RAND rate.
12     This is the multipage copy of 80,000 words worth of what
13 the Federal Trade Commission came up with, and then it was
14 duly thrown out by the D.C. circuit.
15     So I submit to Your Honor that while the court certainly
16 can be the pioneer that goes off and tries to determine what
17 it is that ought to be considered in setting a RAND rate,
18 that should only be done on a record of bilateral
19 negotiations, the way that happened in other every other case
20 that the parties have referred to, and you shouldn't be
21 required by Microsoft to put yourself in the position of a
22 rate-making proceeding, an agency, essentially, conducting a
23 rate-making proceeding that will go on for a considerable
24 period of time on a basis which we've not yet determined.
25     I know Microsoft says it's an easy thing to do,

straightforward.  They've proposed a short schedule for doing it.  I don't know how anybody can suggest that.  We're going to have to consider unknown factors.  Some of the factors could be, if we're going to value Motorola's H.264 portfolio, who else has an H.264 portfolio?  How many portfolios are there?  How valuable is each one?  How can you assess that without looking at the patents in each portfolio and figuring out what they're worth in order to figure out proportionally who gets what share of some proposed total royalty package, if that's the way you're going to approach it?  I don't know how you're going to approach it.

But what I'm suggesting is that if you have to go through a process in which, among other things, you have to value the standards essential patent portfolios, that is much more than a single patent infringement proceeding; whereas my patent or my five patents against the products that are said to infringe the way courts have done thousands of times in the past, you're asking to set forth, as I said, on uncharted sea, and I submit if there isn't a legitimate basis for it in the contract, you shouldn't do it.

And I guess I should also emphasize -- I don't want to lose sight of this fact -- that you're being asked to do it for an unclear purpose.  At the end of the day, you may go through the FTC 55-month-style proceeding to set a RAND rate that Microsoft has studiously avoided saying that they're

# C E R T I F I C A T E

I, Nancy L. Bauer, CCR, RPR, Court Reporter for the United States District Court in the Western District of Washington at Seattle, do hereby certify that I was present in court during the foregoing matter and reported said proceedings stenographically.

I further certify that thereafter, I have caused said stenographic notes to be transcribed under my direction and that the foregoing pages are a true and accurate transcription to the best of my ability.

Dated this 23rd day of May 2011.

/S/ Nancy L. Bauer

Nancy L. Bauer, CCR, RPR
Official Court Reporter