```
 1              UNITED STATES DISTRICT COURT

 2          WESTERN DISTRICT OF WASHINGTON AT SEATTLE

 3    ───────────────────────────────────────────────────

      MICROSOFT CORPORATION,        )
 4                                   )
                    Plaintiff,       )
 5                                   )  C10-1823-JLR
      v.                             )
 6                                   )  August 26, 2013
      MOTOROLA, INC., et al,         )
 7                                   )       TRIAL
                    Defendant.       )
 8                                   )

 9    ───────────────────────────────────────────────────

10          BEFORE THE HONORABLE JAMES L. ROBART
                UNITED STATES DISTRICT JUDGE
11    ───────────────────────────────────────────────────

12
      APPEARANCES:
13

14     For the Plaintiff:     Arthur Harrigan, Christopher
                              Wion, David Pritikin, Richard
15                            Cederoth, Andy Culbert, Nathaniel
                              Love and Ellen Robbins
16

17


18
       For the Defendants:    Ralph Palumbo, William Price,
19                            Brian Cannon, Kathleen Sullivan,
                              Andrea Roberts and Phillip McCune
20

21

22

23

24

25
```

1          THE COURT:  Case C10-1823, Microsoft Corporation

2   versus Motorola Mobility.  Counsel, please make your

3   appearances for the record.

4          MR. HARRIGAN:  Good morning, your Honor.  Art

5   Harrigan representing Microsoft; and to my right, Ellen

6   Robbins from the Sidley firm.

7          MS. ROBBINS:  Good morning, your Honor.

8          MR. HARRIGAN:  Mr. Pritikin, whom you have met

9   before, from the Sidley firm.

10          MR. PRITIKIN:  Good morning, your Honor.

11          MR. HARRIGAN:  Mr. Cederoth.

12          MR. CEDEROTH:  Good morning.

13          MR. HARRIGAN:  And Mr. Culbert from Microsoft.

14          MR. CULBERT:  Good morning, your Honor.

15          MR. PALUMBO:  Good morning, your Honor.  Ralph

16   Palumbo, representing Motorola.  With me at counsel table

17   from Quinn Emanuel, Andrea Roberts, who you have met before;

18   Brian Cannon, Kathleen Sullivan --

19          MS. SULLIVAN:  Good morning, your Honor.

20          MR. PALUMBO:  This is Kirk Dailey, who you have seen

21   on the witness stand before, from Motorola.  And Bill Price.

22          MR. PRICE:  Good morning, your Honor.

23          THE COURT:  Counsel, we have the jury pool

24   downstairs.  The only two matters that I have to take up I

25   think we can do fairly briefly.  One is for you to take your

1    exceptions as to the changes in the preliminary jury

2    instructions.

3        And the other one is in preparing my questions for the

4    jurors, I need you to know that because it is going to come

5    out in the final instructions, I intend to ask if they own

6    shares of stock in Google.  And if anyone has an objection to

7    that, we should talk about it before we do that.  There is no

8    way, it seems to me, that we cannot ask, since Google is

9    Motorola's parent company and there would be a financial

10   link.  It is in the final instructions.  Mr. Price, I want to

11   make sure you are aware I am going to do that.

12        MR. PRICE:  No objection, your Honor.

13        THE COURT:  The other matter I want to point out to

14   you is, I mentioned earlier we do a return of service to

15   potential jurors.  One of the jurors, Juror 22, has

16   indicated, and I will simply quote this, "My English of

17   understand is not so well.  Some works to be hard to

18   understand."  That could be intended to be "words."  "My read

19   isn't so well."  That may be something that she will raise

20   voluntarily, but if not, make sure that you are aware of

21   that, and raise it for the court's attention if we don't deal

22   with it.

23        The other is one of the jurors indicated that he has a

24   hearing issue, but as long as the courtroom is amplified,

25   that shouldn't be a problem.  And this courtroom is

1    amplified, and we also have available some hearing assisting
2    devices.  But if that doesn't come up --  That would be Juror
3    Number 7.  Those are two physical limitations that you should
4    be aware of.
5        Mr. Harrigan, does Microsoft have any additional
6    exceptions to the instructions after the revisions done by
7    the court?
8            MR. HARRIGAN:  Your Honor, the only one is
9    essentially the one that we raised earlier; and that is that
10   we believe in its current form the instruction may suggest
11   that the only breach issue in the case is the duty of good
12   faith and fair dealing, as opposed to a breach of RAND
13   commitment.  I think we have raised specifically where that
14   was earlier.
15           THE COURT:  I believe you are talking about the
16   bottom of Page 5, where the court says, "Microsoft claims
17   that Motorola breached the contracts while violating the
18   covenant of good faith and fair dealing that is implied in
19   those contracts."  I considered your exception.  And since
20   the next line reads, "One of the alleged breaches is by
21   offering the term contained in the two letters," I felt that
22   appropriately addressed it.  To change it in the manner you
23   suggested would simply be duplicative.  That's why the court
24   did that.
25           MR. HARRIGAN:  Understood, your Honor.

1           THE COURT:  Ms. Sullivan.

2           MS. SULLIVAN:  Good morning, your Honor.  Just two.

3   We just repeat for the record our objection to the statements

4   of the findings of fact and conclusions of law, RAND rate and

5   range inclusion in the instructions.  We previously expressed

6   our objections in Dockets 797, 791, 857, 864 and 869.

7       And, your Honor, the second one is simply that we object

8   to your Honor not including our suggestion of the statement

9   that under Motorola's contracts with the IEEE and ITU,

10  Motorola did not need to make an initial offer on RAND terms.

11          THE COURT:  And I looked at that one.  That is

12  another one I think is in the final instructions.  And it

13  seems to me I wanted to make clear that -- what I contemplate

14  as the procedure in this, if you have one of those that

15  you're not sure that it is a conclusion of law, and instead

16  it is a finding of fact, raise the issue with me and I will

17  give you clarification if it is all right for you to inquire

18  of witnesses about that kind of question.

19          MS. SULLIVAN:  Thank you, your Honor.

20          THE COURT:  Counsel, other than those points?

21  Mr. Harrigan, anything that you want to raise with the court

22  on behalf of Microsoft?

23          MR. HARRIGAN:  Your Honor, I'm not sure what the

24  court's timing is, but I think both parties have some issues

25  with proposed slides being used in the opening statements.

1           THE COURT:  Let's take them up now.

2           MR. HARRIGAN:  Who would you like to have go first?

3           THE COURT:  Well, you are the plaintiff, so why don't

4    you go ahead?

5           MR. HARRIGAN:  There are two areas, your Honor.  I

6    will address one, and Ms. Robbins will address the other one.

7    The one I want to talk about is Motorola's use of

8    Exhibit 7242, which is a September 24, 2009 negotiation.  It

9    is an exhibit relating to a negotiation with HTC that

10   included 802.11 patent licenses.

11          THE COURT:  Because of your decision to computerize

12   all of these things, I don't have a hard copy of these.  So

13   if you are going to make reference to them, you need to put

14   it up on the screen.

15          MR. HARRIGAN:  There are two different exhibits

16   involved here, one of Motorola's and one of ours.  So we will

17   hand them both up.  The last page of Exhibit 7242 is probably

18   the best place to look.  I think it is Page 11.  It is

19   entitled "H.264's exposure."  About three points down it

20   says, "Motorola's 2.25 percent standard rate applies to

21   sales."  We are not sure exactly what the purpose -- what

22   will be made of this exhibit, but it obviously should not be

23   used to argue with the court's determination that RAND was

24   not 2.25 percent.  And if it is being offered to show that

25   Motorola said its standard rate was 2.25 percent --  If this

1    was something relevant to RAND, it should have come in in the

2    earlier case.  And, secondly, it gets us into a hodgepodge of

3    issues of how do you separate out the 802.11 value from

4    everything else.  Under the final bullet point, at the end,

5    it says, "No royalty stacking," which means if HTC has -- if

6    Motorola has other patents that are in HTC's portfolio, they

7    get them for nothing.  We can't tell whether that refers to

8    only standards-essential patents or any patents.  But either

9    way, you can't separate out the 802.11 within the

10   2.25 percent.

11        The other point related to this exhibit is that later on

12   in the process the same 2.25 percent was applied by Motorola

13   to -- in further negotiations with HTC to a whole bunch of

14   other patents besides -- patent portfolios besides 802.11.

15   February 2 --  This is our exhibit, 3162, which the court

16   has.  And on the last page of that exhibit you will see that

17   there they are still talking about 2.25 percent on the net

18   selling price, but the patents that are covered are GSM CDMA

19   3G Wimax and some nonessential patents.  So we believe this

20   entire -- whatever use is going to be made out of these

21   exhibits, it is either rearguing the court's rate or it is

22   getting us into an area for which there has been, as far as I

23   know, no expert report and no basis on which the jury could

24   figure out what the 2.25 percent applies to.

25             THE COURT:  All right.  Ms. Sullivan, you or

1     Mr. Price.  Mr. Price, by the look of it.

2          MR. PRICE:  Your Honor, I will address this one,

3     because Mr. Dailey -- I will be examining him.

4          THE COURT:  Specifically what I want to know is what

5     is the purpose for this.  I understand the other part of that

6     argument.

7          MR. PRICE:  The purpose of this is Mr. Dailey is

8     going to testify that Motorola's practice was to start its

9     negotiations at 2.25 percent.

10         THE COURT:  Stop there, because you are going to win.

11    Is Mr. Dailey also going to be able to answer

12    cross-examination in regards to the scope of these?

13         MR. PRICE:  Yes.

14         THE COURT:  Then I'm going to overrule the objection.

15     Anything else, Mr. Harrigan?  Ms. Robbins?

16         MS. ROBBINS:  Good morning, your Honor.  Two quick

17    issues.  The first is with respect to opening statements.  We

18    learned last evening that Motorola intends to play some

19    deposition designation video clips during their opening.  As

20    you may recall, during the call last Thursday with the court,

21    the parties had agreed the only deposition designations that

22    would be played in the openings were those that had been

23    designated, disclosed and the objections ruled upon by the

24    court.  That was a call with the clerk and Mr. Cramer and

25    Mr. McCune.  We learn that now Motorola now wants to play

1    deposition excerpts from Bodewig, Microsoft's expert on

2    German law, and two Microsoft fact witnesses who will be

3    testifying live, Jeff Davidson and Horacio Gutierrez.  None

4    of these were disclosed and ruled on by the court.  No

5    Bodewig testimony was ever designated.  The designations of

6    Mr. Davidson and Mr. Gutierrez were withdrawn because they

7    will be testifying live.  So there were never any rulings on

8    Microsoft's objections.  Indeed, some of the portions of

9    Mr. Gutierrez's deposition testimony Motorola intends to play

10   in opening were never designated.  So we think these

11   designations will never be evidence in the case, and we think

12   that use in the opening statement would be improper.

13           THE COURT:  All right.

14           MR. PRICE:  Good morning, your Honor.  The deposition

15   selections that we wish to show in opening statement preview

16   the testimony that we believe will be elicited at trial.

17   They are three separate categories:  The deposition testimony

18   that we submitted to your Honor that Microsoft did not make

19   any objection to.  And then also deposition testimony that we

20   submitted to your Honor and there were objections.  And then

21   deposition testimony that we did not submit to your Honor,

22   particularly from Microsoft's expert.  And if you recall the

23   pretrial conference a couple of weeks ago, there was a

24   discussion about what witnesses would be live, whether there

25   would need to be a trial subpoena.  And your Honor indicated

1    that the court was reviewing the deposition transcripts.  In

2    conversations between counsel that evening, in order to

3    alleviate the burden on the court, we withdrew the formal

4    designations so that your Honor would not have to rule on the

5    objections because Microsoft represented that several of the

6    witnesses would be called live.  And so we wish to show short

7    clips in the opening that would preview the testimony that we

8    believe will be elicited either live or through deposition

9    testimony.

10           THE COURT:  You can play anything that I have ruled

11   on and will be shown to the jury during the trial.  Other

12   than that, no.  I haven't read all of those, because you

13   withdrew them.  And, therefore, I am not comfortable with at

14   least your second category, which seems to be ones where you

15   have designated.  I know that the ones you haven't designated

16   aren't coming in.  So what may be shown will be excerpts that

17   will ultimately be shown to the jury.

18           MR. PRICE:  Would that include also, your Honor,

19   excerpts that we submitted that Microsoft had no objection

20   to?

21           THE COURT:  I don't know what those are.  You say you

22   submitted.  Are you calling them as a witness?

23           MR. PRICE:  Yes.

24           THE COURT:  You are calling them live?

25           MR. PRICE:  It is Microsoft's witness, Mr. Davidson,

1     that we will be calling live.  He will presumably be here

2     live.  We are not absolutely sure because it is a Microsoft

3     witness.

4          THE COURT:  My rule on opening statements is that

5     they are intended to discuss the evidence the jury will hear

6     at trial, not the evidence the jury won't hear at trial.

7     And, therefore, I am comfortable having you play excerpts

8     which are going to be played during the trial.  I am not

9     comfortable with the concept of a preview, since that

10    conceivably will be a preview of something they ultimately

11    don't hear.  Is that clear?

12         MR. PRICE:  It is, your Honor.

13         THE COURT:  Anything else?  You're done, aren't you?

14         MS. ROBBINS:  One more exhibit objection.

15         THE COURT:  All right, counsel.

16         MS. ROBBINS:  7241.  I will hand up a copy.

17         THE COURT:  Is this going to be the last one?

18         MS. ROBBINS:  Yes.

19         MR. PRICE:  Not for us.  We have some, too.

20         THE COURT:  All right.  Apparently we are doing these

21    one at a time.

22         MS. ROBBINS:  Your Honor, this will be brief.  This

23    exhibit we didn't have an objection to until last evening

24    when Motorola advised -- there is a cover e-mail, as you will

25    see, and then there is a copy of the complaint in this

1    action.  Motorola advised us last night that they want to

2    withdraw the complaint portion and just introduce the cover

3    e-mail.  Our objection is that this is -- that would be an

4    incomplete exhibit and in violation of Federal Rule of

5    Evidence 106; that they need to introduce -- if they are

6    going to use the e-mail, they need to use the attachment that

7    is referenced in the e-mail.  It is meaningless without the

8    attachment.

9            THE COURT:  You've lost me, counsel.  Are you telling

10   me that 7241 is going to be offered by Motorola, but only the

11   cover page?

12           MS. ROBBINS:  Yes.  We think that is improper.

13           MR. PRICE:  Your Honor, if you look at the exhibit,

14   what is attached is the complaint that was filed by

15   Microsoft.  It is actually in this case.  We believe it would

16   be prejudicial to include the complaint, because the jurors

17   might consider it for the truth.  They will be told what is

18   attached to this is the complaint that was filed.  The point

19   being, just that there was communication between Microsoft

20   and Motorola on the same day the complaint was filed.  That

21   communication is relevant as to what Microsoft's state of

22   mind was.

23           THE COURT:  Mr. Price, I suspect the purpose of this

24   is to be able to rub Mr. Smith's nose in the fact that he

25   said, "the work of your very good litigation team," since

 1   that is how it was originally presented to the court.  I will

 2   require use of the entire document.

 3          MR. CANNON:  Your Honor, we have three categories of

 4   objections to the opening slides that Microsoft proposes to

 5   provide.  If I may approach?

 6          THE COURT:  Yes.

 7          MR. CANNON:  The first objection we have is to the

 8   very first slide here, which references a litigation between

 9   Nvidia and a number of other companies.  And this is

10   completely separate litigation.  This pleading is being

11   provided, apparently as evidence, even though the Ninth

12   Circuit pleadings are not evidence.  I think, more

13   importantly, this proposed exhibit and proposed slide injects

14   an entirely different litigation into this case.  The

15   connection between this litigation and this other case

16   between Nvidia and Motorola Solutions we believe really ought

17   not to be the subject of this trial.  We would have to

18   explain --

19          THE COURT:  Stop for a second, Mr. Cannon.  What is

20   this?  Are these findings and conclusions?

21          MR. CANNON:  No, this is --

22          THE COURT:  Paragraphs out of the complaint.

23          MR. CANNON:  It is out of the complaint.  It is in

24   fact a RICO complaint brought by a number of people against

25   Nvidia, who were sending letters to users of WiFi, like

14

 1   restaurants and cafes and places like that.

 2        THE COURT:  My concerns are simply the document

 3   doesn't explain what it is.  That's why I need to know.

 4        MR. CANNON:  It is a pleading from another case.  It

 5   is a complaint in which several companies, including Cisco,

 6   Motorola Solutions and others, brought these allegations

 7   against Nvidia.  In order to explain it, we would have to get

 8   into the details of this other pleadings, which we think is a

 9   bit of a sideshow on this case.  You can see from the slide

10   that Microsoft proposes they have highlighted the language

11   about RAND being violated by blatantly unreasonable offers.

12   We think that, to some degree, invades the province of the

13   court, because the issue of what -- you know, the duty of

14   good faith and fair dealing has been hotly contested, and

15   your Honor will provide an instruction on at the end of this

16   case.  This is sort of an attempt by Microsoft to inject a

17   pleading that alleged -- made allegations in another case

18   into this case.

19        THE COURT:  Why don't you run through all of your

20   objections and I will hear from the other side.

21        MR. CANNON:  That is the first one.

22        THE COURT:  You said there were three.

23        MR. CANNON:  There are three.  The second category,

24   your Honor --

25        THE COURT:  By category you mean specific pages?

1          MR. CANNON:  I can walk through.  So if you can go to

2    Page 6, is the first example.  This is, your Honor, what

3    purports to be selections from the findings of fact and

4    conclusion of law.  And there are several of these, about

5    eight different slides, that, your Honor, we believe directly

6    violates your Honor's instruction in the conference from

7    Friday and the order yesterday that counsel are not supposed

8    to display portions of the findings of fact and conclusion of

9    law to the jury.  And this is exactly what slide 6 is, slide

10   12, slide 26, and others.  They are literally quotes,

11   although in some cases the quotes are paraphrased and cut off

12   selectively.  And so we believe that violates the order.

13          THE COURT:  What pages, again?

14          MR. CANNON:  They are 6, 8, 10, 12, 13, 25, 26, and

15   then we've got an additional one, slide 1, from last night,

16   which I can hand up, which is in a separate packet.  If you

17   will allow me to do that, your Honor?

18      So, your Honor, we thought the court was pretty clear that

19   the parties were not supposed to display portions of the FFCL

20   to the jury, and this violates that.  Second of all, it is

21   not clear to us at all that competent witnesses are going to

22   be able to testify to the portions that Microsoft has

23   selected.  We asked Microsoft last night who are the

24   competent witnesses that are going to testify to these facts,

25   and they wouldn't tell us.  We don't believe there are going

1    to be competent witnesses for these facts, we don't think the

2    facts should be up for the jury.  In addition, several of the

3    slides we think are really in there -- they are excessive and

4    violate Rule 403.  And I can point you to those slides.  I

5    will give you an example.  Slide 26 talks about significant

6    stacking concerns.

7              THE COURT:  All right.  What's your third category?

8              MR. CANNON:  The third category, slides 7 and 11 are

9    slides that describe the title of the -- slide 7 is, "At

10   least 92 companies own patents essential to 802.11."  And

11   slide 11, the title is, "At least 52 companies own patents

12   essential to H.264."  Your Honor, the FFCL, in paragraphs 335

13   and 152 make clear, and it is very accurate, that it is not

14   necessarily that these patents -- these companies own

15   essential patents, but letters of assurance have been

16   submitted by this number of companies.  So there is a

17   difference between submitting a letter of assurance and in

18   fact having essential patents.  Anyone can submit a letter of

19   assurance.  We think it is inaccurate that 92 companies

20   submitted such letters to 802.11, and 52 companies submitted

21   letters to H.264.  But the connection between that and saying

22   these companies in fact own essential patents, your Honor, is

23   very different.

24        And we proposed to Microsoft, hey, if you just change the

25   title to more accurately reflect paragraphs 152 and 335, we

1    would be okay with this slide.  But Microsoft would not

2    change its title.  It pointed us to other portions of the

3    findings of fact that it believes supports its

4    interpretation, that this title is okay.  But we think

5    paragraphs 152 and 335 are clearly inaccurate, your Honor.

6           THE COURT:  Mr. Harrigan.

7           MR. HARRIGAN:  I will begin with the last one.  The

8    courts --  With regard to the 92 and 52 companies owning

9    standards-essential patents, and the two standards, finding

10   number 456 says, quote, "There are at least 92 entities that

11   own 802.11 SEPs," and finding number 459 says, "There are at

12   least 52 entities that own H.264 SEPs."  These are simply

13   stating exactly what the court found with respect to those

14   two.

15      With regard to the Nvidia, I guess it is, complaint,

16   Motorola Solutions was a party to this case.  The reason for

17   introducing this is that it is a party admission, yet

18   basically admits that blatantly unreasonable offers are a

19   breach, and it also refers to making demands that are unfair

20   and unreasonable, meaning the breach applies to demands or

21   offers.  It also alludes to injunctive relief as a part of

22   the breach.  So we simply think that the allegation is an

23   admission by a party to this case with respect to those

24   matters, and is admissible for that reason.

25      Then, with regard to the findings, your Honor, what we

1   understand to be the current situation --

2        THE COURT:  Let me ask you this about the findings.

3   Do you have a witness who is going to testify to the material

4   that is on 6, 8, 10, 12, 13, 25 and 26?

5        MR. HARRIGAN:  No, your Honor.  We think it is a

6   matter of judicial notice and public record.  It is a public

7   filing.

8     Your Honor, I have to say we are in a state of uncertainty

9   with regard to the final instructions.  We don't know whether

10  they are going to say the blatantly unreasonable offer is a

11  breach.  We are looking for ways to establish that.

12    Your Honor, I'm not sure whether you and I are now talking

13  about the same topic, because I was about to discuss the

14  findings.  I thought you were wanting to go back to the

15  Nvidia complaint, because I do have some further remarks to

16  make about the findings.

17       THE COURT:  Let me rule then on the Nvidia complaint,

18  which is that I am not going to permit the use of Page 1.

19  That's not to say that when you have a witness on the stand

20  you can't ask them to confirm.  I don't think that it is

21  fair --  If I can't figure out what this is, and I am

22  familiar with complaints and whatever, to simply slap this up

23  and say, this is Motorola, and it is another lawsuit.  That

24  needs much more context than you are proposing to give.

25       MR. HARRIGAN:  When I answered your question, no, I

1   was talking about the Nvidia complaint.

2          THE COURT:  I am talking about Pages 6, 8, 10, 12,

3   13, 25, 26.  I thought my ruling was that you needed to have

4   a witness, that you couldn't use the findings and conclusions

5   as some sort of judicial notice or -- that they are self

6   testifying.

7          MR. HARRIGAN:  We will have a witness to testify to

8   each one of these statements as a matter of fact.  And we

9   understood that that could be done, in effect, in reliance on

10  the findings.  And what we are going to say to the jury is,

11  that these facts that are set forth on these documents will

12  not be disputed.  And we will in fact have a witness on each

13  and every one.

14         THE COURT:  All right.  1 is out for purposes of the

15  opening.  The second category, 6, 8, 10, 12, 13, 25 and 26

16  are permitted to be used.  7 and 11, it sounds like there is

17  an inconsistency in my own findings and conclusions, but I am

18  going to permit the use of them.  I don't think anyone will

19  know what the difference is.

20         MR. CANNON:  Your Honor, may I raise one issue on the

21  findings of fact?  We don't know who the competent witnesses

22  are going to be to testify as to those facts.  We thought

23  your order was pretty clear, and appropriately so, that the

24  findings of fact should not be displayed.  They are proposing

25  to do exactly that.

1          THE COURT:  Those are the findings of fact, sir.

2   Many of them are paraphrases of things that I have found, and

3   it said that ultimately have been established for purposes of

4   this case.

5       Anything else, Mr. Harrigan?

6          MR. HARRIGAN:  Are we clear on those?  No, your

7   Honor, I think we are there.

8          THE COURT:  Mr. Price, I think you asked for an hour

9   to look at jury questionnaires.  We got pretty close to it.

10      Ladies and gentlemen, those of you in the audience, who

11  are on my right-hand side, you will have to become friendly

12  with the people on the left-hand side.  We will need that

13  area for the jurors.

14      Casey, will you have the jury brought up?

15          (Prospective jury entered the courtroom.)

16          THE COURT:  Ladies and gentlemen, welcome.  You are

17  in the United States District Court for the Western District

18  of Washington.  My name is Judge Jim Robart.  In the next

19  couple of hours we are going to be picking the jury in a

20  civil case that is pending here.

21      The questions that I would ask if I were you is:  Well,

22  why am I doing this?  Why are they asking questions?  What's

23  going on here?  And the answer is that the parties have a

24  right to know a little bit about you, to find out if there is

25  some reason why you shouldn't be on the jury.  They are also

1    going to try and figure out why you should be on the jury if

2    they think you are going to be helpful for them.  But mostly

3    my job is to make sure that someone who has a reason why they

4    should not be on the jury will not be on the jury.

5        I am going to ask you some questions, and the way that we

6    respond to those will be for you to hold up your numbers, so

7    don't let those get too far away.  You did a questionnaire,

8    which is a little bit unusual.  I usually don't do jury

9    questionnaires, but this case, as you may have figured out

10   from the questions that were asked, involves Microsoft and it

11   involves Motorola.  And because I have already conducted one

12   phase of this trial, and there was some newspaper publicity

13   about it, some of you may have heard or know something about

14   the case.

15       I can tell you that I have given each side a limited

16   period of time or a specific period of time in which they are

17   going to present their case.  So I know that this case will

18   go to the jury next Wednesday.  So we will be having trial on

19   Monday, Tuesday, Wednesday, Thursday, and Friday of this

20   week, Monday is a holiday, and then on Tuesday and Wednesday

21   of next week.  And that's a hard deadline.  They have a

22   period of time, and they need to get it done.

23       Having conducted a phase of the trial already, I can tell

24   you that it is very interesting.  It has to do with patents

25   and licenses to use those patents.

1          We are going to ask you to be sworn, and then I'm going to

2     ask you some questions, you are going to raise your number,

3     and then I will go back and talk to those people that

4     answered affirmatively to any of those questions.  There may

5     be times during that questioning that you don't want to

6     answer a question in front of everyone else.  That doesn't

7     tend to happen real frequently in civil trials, it does

8     sometimes in criminal trials, people don't want to say that

9     one of their children was arrested for something.  But there

10    may be a question that you want to.  And we are going to add

11    to your lingo.  All you have to do is say, I would like to

12    talk to you at sidebar, and that means the lawyers will come

13    up, the court reporter will step over, and we will talk

14    privately among ourselves.  Other than that, you are all

15    going to get to discuss this in front of each other.  There

16    is going to be one exception to that, and that's the question

17    when I ask you if you have heard anything about this case.

18    The reason that one is, is if you have heard something, I

19    don't want you to tell everyone else.  Your decision is going

20    to be made based on what you hear on this courtroom.

21         Let me add one other fact before I have you sworn.  I have

22    indicated previously that the plaintiff in this case is

23    Microsoft Corporation, the defendant in this case is Motorola

24    Mobility.  You will hear me refer to them as Motorola.

25    Motorola has some patents that are commonly used in

1    electronics, particularly cellular telephones and game boxes

2    of one variety or another, game players.  Those are

3    registered as a part of a standard that is developed.  That

4    standard would then be used by a bunch of different companies

5    so that they will all have the same technology.  Motorola,

6    through this convention you will hear about, agrees it will

7    license everybody on some terms called reasonable and

8    non-discriminatory, R-A-N-D, reasonable and

9    non-discriminatory terms.  Motorola had that offer out to

10   Microsoft, and Microsoft feels that they breached -- Motorola

11   breached its agreement.

12      As I have indicated, at one point there was some publicity

13   about this previously.

14      Some of you I know have backgrounds, some of you I think

15   may even work for Microsoft, and so that's the kind of thing

16   that we would like to have come out so that people will know

17   who you are all dealing with.  At this time I am going to ask

18   the clerk to swear you in, and then we will begin this

19   process.

20   (At this time the clerk swore in the prospective jury.)

21          THE COURT:  Please be seated.  Just to practice, how

22   many of you are still breathing?  Will you please raise your

23   number?  Everyone has a number.

24      Once you raise your number, if you will please keep it up

25   in the air until the clerk calls it.  I write those numbers

```
 1   down so I can go talk to you individually about a question.
 2        I have indicated to you how long this trial is going to
 3   take.  Is there anyone who would have difficulty being here
 4   for the period of time that the trial is going to take and
 5   some period of deliberations?  I can control how long the
 6   trial is, you will control how long the deliberations are.
 7   So I can't tell you that it is a hard end date to the case.
 8        But length of the trial, anyone have a problem with that?
 9   Please raise your numbers.
10             THE CLERK:  6, 4, 11, 18, 20, 22, 24, 25, 27, 37.
11             THE COURT:  All right.  The next one is, this part
12   you can all answer in public.  If some of have you heard
13   about this case, then we will probably do that at sidebar.
14   But how many of you think you have heard about or read about
15   this case?
16             THE CLERK:  2, 4, 5, 15, 23.
17             THE COURT:  I am now going to ask, and this will take
18   a little bit of time, I am going to ask each of the tables of
19   lawyers throughout here to stand up, introduce themselves,
20   introduce the people at their table, introduce their client,
21   so you will know which one is which, and then tell you who
22   are the potential witnesses in the trial.
23        Now, two things about potential witnesses:  One, if they
24   don't name them, they won't get to call them.  So they will
25   be overly inclusive.  Secondly, it is one of Murphy's laws
```

1   that every time one of them will be named John Smith.  And so

2   you may hear them say something like Professor John Smith, or

3   in some cases when I am doing criminal trial, Seattle police

4   officer John Smith.  That is not intended to tell you

5   anything about that individual other than perhaps you know a

6   police officer named John Smith as opposed to anyone in the

7   world.

8       We are going to do that on both sides.  We will start with

9   Microsoft, and then we will go to Motorola.  They will

10  mention who they are, who their clients are, who their

11  witnesses are.  And when all that is done, I will ask you if

12  you think you know anyone who is involved in this case.

13      Mr. Harrigan.

14          MR. HARRIGAN:  Thank you, your Honor.  Good morning,

15  everyone.  My name is Art Harrigan.  I am from a law firm

16  here in Seattle.

17          JUROR No. 7:  I can't hear what you are saying.

18          THE COURT:  Why don't you go to the podium?

19      Sir, thank you.  Anyone who has trouble hearing, shout out

20  at them.  This is the one chance to order attorneys around.

21          MR. HARRIGAN:  My name is Art Harrigan.  I am from a

22  Seattle law firm.  My client in this case is Microsoft, which

23  is the plaintiff.  I am here with other lawyers, both from my

24  firm and from a firm that is out of Chicago called the Sidley

25  Austin firm.  My firm is called Calfo Harrigan Leyh & Eakes.

1      I will start right here with Ms. Robbins, who will be

2   presenting some of the evidence in this case.

3           MS. ROBBINS:  Good morning.

4           MR. HARRIGAN:  And Mr. David Pritikin.

5           MR. PRITIKIN:  Good morning.

6           MR. HARRIGAN:  And Rick Cederoth, who will be

7   presenting evidence.

8           MR. CEDEROTH:  Good morning.

9           MR. HARRIGAN:  And then to his left is Mr. Andrew

10  Culbert, who is a Microsoft in-house lawyer.  He is going to

11  be here because he is very interested in the case, but he

12  will not be interrogating any witnesses or presenting any

13  evidence.

14     Also here is David Killough.  David Killough is also a

15  Microsoft lawyer.  He is actually going to be the Microsoft

16  corporate representative at this trial.  And you will --  He

17  won't be presenting any evidence, except that he will be

18  sitting in the witness box and testifying at some point

19  during the case.

20     So, your Honor, are witnesses the next item?

21          THE COURT:  Yes.

22          MR. HARRIGAN:  I will give you the names of the

23  witnesses that Microsoft anticipates calling in this case,

24  and then I presume that Motorola will tell you about theirs.

25  I will just give you the names, and obviously let us know if

1    they ring a bell.  Theo Bodewig.  Todd Menenberg.  Kevin

2    Murphy.  Aaron Bernstein.  Brian Blasius.  Kirk Dailey.  Jeff

3    Davidson.  Theresa Dailey.  Jon Devaan.  Garrett Glanz.

4    Horacio Gutierrez.  David Heiner.  David Killough.  Shelley

5    McKinley.  Jennifer Ochs.  Owen Roberts.  David Treadwell.

6            THE COURT:  Thank you, Mr. Harrigan.  Mr. Price,

7    Ms. Sullivan, Mr. Palumbo.

8            MR. PALUMBO:  Good morning, ladies and gentlemen.  My

9    name is Ralph Palumbo.  And like Mr. Harrigan, I am a lawyer

10   here in Seattle with the firm of Summit Law Group.  I have

11   with me -- and if you will stand as we go through this,

12   Andrea Roberts from the Quinn Emanuel firm.

13           MS. ROBERTS:  Good morning.

14           MR. PALUMBO:  Brian Cannon.

15           MR. CANNON:  Good morning.

16           MR. PALUMBO:  David Weinberg, who is a consultant for

17   us.  Kathleen Sullivan.

18           MS. SULLIVAN:  Good morning.

19           MR. PALUMBO:  Kirk Dailey.  Mr. Dailey is the head of

20   licensing for Motorola.  He is our corporate representative

21   at trial.  And William Price, Bill Price.

22           MR. PRICE:  Good morning.

23           MR. HARRIGAN:  The witnesses that Motorola will call,

24   and I'm going to try not to repeat some of the names that

25   Mr. Harrigan gave to you, because there will be some overlap

 1    in the cases.  Maximilian Haedicke.  Richard Holleman.

 2    Bradley Keller.  Gregory Leonard.  Brian Blasius.  Jeff

 3    Davidson.  Jon Devaan.  I believe Mr. Harrigan mentioned

 4    Mr. Dailey.  Mr. Gutierrez, who Mr. Harrigan mentioned.  Tim

 5    Kowalski.  Bob Love.  Amy Marasco.  Gary Sullivan.  Neill

 6    Taylor.  David Treadwell.  David Turner.

 7              THE COURT:  All right.  Ladies and gentlemen, there

 8    were a lot of names.  The question I am going to ask you now

 9    is:  Are you personally acquainted with any of those

10    individuals?  Are you related to any of those individuals?

11    Have you ever had business dealings with any of those

12    individuals?  Are you currently or formerly employed by any

13    of those?  Do you have any business connection with them?

14    Are you a vendor to them, for example.  Are you a shareholder

15    in them?  And I will tell you that Microsoft is a

16    publicly-traded corporation.  Motorola is a wholly-owned

17    subsidiary of Google, so for purposes of being a shareholder,

18    I will ask you do you own shares in Google.  So those are the

19    questions I am asking.  Is there anyone who would respond

20    yes?  Please raise your number.

21              THE CLERK:  1, 4, 5, 7, 8, 9, 11, 29, 35, 38.

22              THE COURT:  All right.  One of the questions that you

23    were asked on your questionnaire was about prior jury

24    service.  That would include both state court, serving as a

25    juror, and previously here in federal court, or if you were

1    ever a grand juror.  And if you were a grand juror, you know

2    what that is.  And if you don't, sometime when we are on a

3    break I will tell you all about the grand jury system.  The

4    reason that we ask that is that I then am going to ask you

5    how long ago that was, what kind of case it was, just to get

6    a sense of was it such a searing experience for you you don't

7    think you would ever want to do it again, and therefore it

8    might impact you being a juror here.

9         So for those of you who have previously served on a jury,

10   would you please raise your numbers?

11              THE CLERK:  2, 4, 7, 21, 29, 30, 35 and 38.

12              THE COURT:  All right.  And then I am going to ask

13   you my last question.  And know that when I finish doing all

14   of these, including the follow-up, I am going to give the

15   parties a chance to ask you some questions.

16        Is there anyone who has a disability or some kind of a

17   special problem; I jokingly like to say, I know my

18   grandmother is going to die on Thursday, we have

19   nonrefundable airline tickets to go on our honeymoon, that

20   sort of thing, that would prevent you from being here for the

21   entire trial?  Anyone that has a disability or problem that

22   would prevent them from serving as a juror?

23        All right.  We will go back and start at the beginning

24   then.  Juror Number 6, you indicated that you had a problem

25   with the length of service?

1              JUROR NO. 6:  Yes.

2              THE COURT:  Would you tell us about that, sir?

3              JUROR NO. 6:  I am a commissioned salesperson, and

4     any minute that I am out of the store I am not making money.

5     I work for Sleep Country.

6              THE COURT:  Does Sleep Country compensate you for

7     jury service?

8              JUROR NO. 6:  A little bit.  Very little.

9              THE COURT:  Number 4.  Tell us about your problem.

10             JUROR NO. 4:  I had a vacation planned, leaving on

11    September 9th.

12             THE COURT:  You are probably going to be done by

13    then.  We won't worry about that.  Where are you going to go?

14             JUROR NO. 4:  California.

15             THE COURT:  Nice place.  Number 11.

16             JUROR NO. 11:  We are moving our house on Wednesday,

17    that is the 28th.  And then my last day at Microsoft is on

18    4th of September, so I need to be there.

19             THE COURT:  You are employed by Microsoft?

20             JUROR NO. 4:  Yes.

21             THE COURT:  Number 18.

22             JUROR NO. 18:  I am an hourly employee, so being out

23    of the office for that long is kind of a hardship.

24             THE COURT:  And where do you work, ma'am?

25             JUROR NO. 18:  CRG Events.

1          THE COURT:  Number 20.

2          JUROR NO. 20:  I have a project deadline coming up

3    this Friday.  Working on the jury service would make it tough

4    to meet that deadline.  Also, I have a vacation scheduled,

5    starting next Wednesday.

6          THE COURT:  What kind of employment do you have, sir?

7          JUROR NO. 20:  I am a civil engineer.

8          THE COURT:  Anyone else in the office who could work

9    on your project?

10          JUROR NO. 20:  There are other people working on the

11    project, but I have been tasked to certain things that only,

12    I guess, I am assigned to.

13          THE COURT:  Number 22.  You're probably going to have

14    to stand up, ma'am.

15          JUROR NO. 22:  I am a mental health counselor, and I

16    have clients that are bilingual, that speak another language,

17    and I have a few that are really high risk, so that's why I

18    cannot serve.

19          THE COURT:  All right.  Thank you.  24.

20          JUROR NO. 24:  I work as a medication safety officer

21    at the University of Washington Medical Center.  It is okay

22    for me to be away for a few days.  But for longer, there is

23    technically no one to cover my role.

24          THE COURT:  I've found your employer to be very

25    reasonable about moving things around, particularly when they

```
 1   know how important this is going to be.
 2        Number 25.
 3             JUROR NO. 25:  I have a vacation scheduled for next
 4   Monday.
 5             THE COURT:  Monday is a holiday for us, too.
 6             JUROR NO. 25:  It is the week following Labor Day.
 7             THE COURT:  An entire week?
 8             JUROR NO. 25:  Yes.
 9             THE COURT:  27.
10             JUROR NO. 27:  My daughter goes back to school
11   Thursday, and I get off at 2:30, and I am the only one that
12   can pick her up.
13             THE COURT:  Tell me a little bit about that.  Is
14   there absolutely positively no one else?
15             JUROR NO. 27:  There is no one else to pick her up
16   from day-care.
17             THE COURT:  Thank you, sir.  37.  Number 37.
18             JUROR NO. 37:  I am a massage therapist.  And I am
19   the only one working in the chiropractic office in Issaquah,
20   plus my own business.  If I'm not working, I don't get paid.
21             THE COURT:  Thank you.  The next question had to do
22   with what you have heard about this case.  I will ask you to
23   stand up and just tell me if you have read about it in the
24   paper.  I don't want you to tell me what you've heard.  If I
25   think it is a problem, then I will have you do that
```

1    individually.

2        Juror Number 2, tell me, what did you hear or who did you

3    hear it from?

4            JUROR NO. 2:  I remember vaguely reading about it

5    last year sometime.  I don't remember any specifics about the

6    case.

7            THE COURT:  Did you form any opinions about it at the

8    time?

9            JUROR NO. 2:  It sounded really complicated.

10           THE COURT:  I can attest to that.  Anything other

11   than that?

12           JUROR NO. 2:  No.

13           THE COURT:  Number 4, can you tell us about it,

14   ma'am?

15           JUROR NO. 4:  I read about it in the newspaper.  I

16   usually read things that have Microsoft in the headline

17   because I own stock.  As she said, it is complicated.

18           THE COURT:  Did you form any opinions about which

19   side was right, which side was wrong, how well informed the

20   judge was?

21           JUROR NO. 4:  That is a trap.  No, I just sort of

22   follow Microsoft for obvious reasons.

23           THE COURT:  Number 5.

24           JUROR NO. 5:  I do work for Microsoft, so I have

25   heard about it in that context.

```
1          THE COURT:  What kind of work do you do for them?

2          JUROR NO. 5:  I am a software engineer.

3          THE COURT:  Are you an independent or employee?

4          JUROR NO. 5:  Employee.

5          THE COURT:  Number 15.

6          JUROR NO. 15:  I just read about it in the paper, and

7   this morning there was announcement of it, things like that.

8   I read the Seattle Times daily, but I don't necessarily

9   follow details.

10          THE COURT:  Those pesky newspapers.  Ladies and

11  gentlemen, for those of you who are going to end up on the

12  jury, please don't read anything more, don't listen to the

13  radio, don't listen to the television, and whatever you do,

14  don't go home tonight and type in on the internet

15  Microsoft/Motorola to see what you missed.  Everything you

16  need to know about this case you will find out here in this

17  courtroom.  You will hear me say that about every three hours

18  during the course of this trial.  For those of you who are

19  not selected on the jury, you are free to stick around, free

20  to follow in the newspaper, or free to ignore us.  For those

21  of you who are in jury service, that is a very important rule

22  for us.

23      Number 23.

24          JUROR NO. 23:  I also read a little bit several

25  months ago in the paper.  And I think Juror Number 2 put her
```

1    finger on it.

2           THE COURT:  You didn't think the judge rendered --

3           JUROR NO. 23:  The judge was extremely impressive.

4           THE COURT:  Anything in that connection that would

5    cause you to start this trial feeling one way or another, who

6    was right, who was wrong?

7           JUROR NO. 23:  No, sir.

8           THE COURT:  The next one was about a whole lot of

9    you, and that was do you know anyone.  Juror Number 1.

10          JUROR NO. 1:  I am a shareholder of Microsoft, an

11   employee of Microsoft.

12          THE COURT:  Let's start with being either of those.

13   You are being asked to give Motorola a fair trial.  Your

14   company is suing them.  Are we starting with a level playing

15   field, or do you go: wherever they came from they can go back

16   there?  Maybe they came from Redmond, for all I know.

17          JUROR NO. 1:  If I was selected I would do my best to

18   give an impartial judgment.  But I don't know --  It would be

19   colored by my employer.

20          THE COURT:  Sir, your honesty is tremendously

21   appreciated.  Number 4.  You're a shareholder?

22          JUROR NO. 4:  Yes, and I have been for a long, long

23   time.  Obviously I am interested in how Microsoft does.

24          THE COURT:  Okay.  And now I'm asking you to set all

25   of that aside, look me square in the eye and say:  I can be

1    fair and impartial.  The fact that I'm going to be

2    financially hurt if this case doesn't go well, or I am going

3    to be benefited if it goes well, or maybe none of the above,

4    or that I have lived in Seattle my entire life and I watched

5    Microsoft grow, and I love them as a company, but I'm going

6    to be fair.  Is that how you really feel?

7            JUROR NO. 4:  How close are you to retirement?

8            THE COURT:  Enjoy that vacation you had planned.

9    Thank you, ma'am.  Number 5.

10           JUROR NO. 5:  I do work for Microsoft.  I own the

11   stock.  I believe I worked with a person, David Treadwell,

12   ten years ago, if that's the person I am thinking.

13           THE COURT:  When Mr. Treadwell testifies, are you

14   going to go:  Hi, Dave, how are you?

15           JUROR NO. 5:  I don't think so.

16           THE COURT:  The same general question, and counsel

17   will likely follow up if you are still in contention here:

18   Can you be fair to Motorola?  Can you be fair to Microsoft?

19           JUROR NO. 5:  It is our duty to be fair, and I will

20   do my best.

21           THE COURT:  You have to take it one step beyond, "I

22   will try."  You need to look me here square in the eye and

23   say:  I know that I can do this; I am not going to favor one

24   way or the other.

25           JUROR NO. 5:  I think I can do this.

```
1           THE COURT:  All right.  Number 7.

2           JUROR NO. 7:  I own stock in both companies.

3           THE COURT:  That is evenhanded.

4           JUROR NO. 7:  I will win either way.

5           THE COURT:  Let me ask you the same question.  You

6  have a financial interest in both sides?

7           JUROR NO. 7:  Yes, sir.

8           THE COURT:  Maybe one is larger than the other, we

9  aren't going to go there.  How do you feel about serving as a

10  jury member?

11           JUROR NO. 7:  It is not a problem.

12           THE COURT:  Do you think you can be fair and

13  impartial?

14           JUROR NO. 7:  Extremely.

15           THE COURT:  Number 8.  There you are.

16           JUROR NO. 8:  I just know one name that came up, and

17  that was from childhood.  A friend of my father's named Bob

18  Love.  I have a feeling it can't be the same person.  Well,

19  no, that is not right to say.  He would probably be about 75

20  or 80.  I don't know if anyone knows the age.

21           THE COURT:  Who is calling Mr. Love?

22           MR. PALUMBO:  He is not 75 or 80, your Honor.

23           THE COURT:  You're safe.

24           MR. HARRIGAN:  Your Honor, I have been informed I

25  left out one witness, Dave Curtis.  I would just like to get
```

1    that out as early as possible.

2           THE COURT:  All right.  Please add to that

3    collection, Dave Curtis.  Mr. Harrigan, where does Mr. Curtis

4    reside?

5           MR. HARRIGAN:  He is a Motorola employee.

6           THE COURT:  We know that if it is Dave Curtis he is a

7    Motorola employee.

8           MR. PRICE:  He is in Chicago, your Honor.

9           THE COURT:  Number 9.  There you are, sir.

10          JUROR NO. 9:  I also have stock in both companies,

11   and know people that work for both companies.  But I feel

12   like I can be impartial.

13          THE COURT:  Do you start this process with favoring

14   either one or you're rooting for both?

15          JUROR NO. 9:  Right down the middle.

16          THE COURT:  Number 11.

17          JUROR NO. 11:  I work in David Treadwell's

18   (inaudible).  I would probably be partial to Microsoft.

19          THE COURT:  All right.  Thank you, ma'am.  Number 29.

20   Yes, sir.

21          JUROR NO. 29:  I just own stock in Microsoft.

22          THE COURT:  For a long time, sir?

23          JUROR NO. 29:  Yes.

24          THE COURT:  I am going to ask you to be a fair and

25   impartial juror in something you have a financial interest

1  in.  That is a pretty high task.  How do you feel about doing

2  that?

3          JUROR NO. 29:  I think I can be fair.

4          THE COURT:  Have you ever faced that kind of

5  situation before?

6          JUROR NO. 29:  Sure.

7          THE COURT:  Were you fair then?

8          JUROR NO. 29:  Yes.

9          THE COURT:  Thank you, sir.  Number 35.

10          JUROR NO. 35:  I know witness Shelley McKinley.

11  Shelley and I worked at the same law firm many years ago for

12  a brief stint.  Microsoft is also a client of our law firm.

13          THE COURT:  All right.  Have you stayed in touch with

14  the person?

15          JUROR NO. 35:  No.

16          THE COURT:  How are you going to feel about being a

17  fair and impartial juror for Motorola here when you know all

18  of those people at Microsoft?

19          JUROR NO. 35:  Once an advocate, always an advocate.

20  However, I do think I can be fair.

21          THE COURT:  All right.  Thank you.  Number 38.

22          JUROR NO. 38:  I have been a Microsoft shareholder

23  for a long time, and my husband is a retired software

24  engineer from Microsoft.

25          THE COURT:  So you know all the answers.  Do you ever

1    discuss software with him?

2           JUROR NO. 38:  No, I don't speak the language.

3           THE COURT:  If you are a shareholder and your husband

4    is retired from there, you have kind of a financial interest

5    in -- you have a financial interest in how Microsoft does.  I

6    am asking you to set that aside for purposes of this trial.

7    How do you feel about being able do that?

8           JUROR NO. 38:  I do believe I could set that aside.

9           THE COURT:  Thank you.  We are going to do prior --

10   Number 18.

11          JUROR NO. 18:  I didn't initially raise my number,

12   but I don't know people personally, and I am not a

13   shareholder, but I am a Microsoft vendor.  My clients are all

14   Microsoft.  I wanted to share that based on the other

15   responses.

16          THE COURT:  What kind of work?  I know you are an

17   hourly employee.

18          JUROR NO. 18:  I am an hourly employee for CRG

19   Events, but we plan corporate events for Microsoft.

20          THE COURT:  Are they a fairly big company that you

21   work for?

22          JUROR NO. 18:  About 50 employees.

23          THE COURT:  And how often do you do Microsoft events.

24          JUROR NO. 18:  I am planning them every day.  It just

25   depends on the event cycle, when they fall.  Ten or so per

```
 1    year.
 2             THE COURT:  Would you say that is a big part of your
 3    job?
 4             JUROR NO. 18:  Yes, my employment is dependent on
 5    Microsoft's success.
 6             THE COURT:  Now I am asking you to set all of that
 7    aside and be fair and impartial, and you could financially
 8    hurt the company that gives you a lot of work.  How are you
 9    going to feel about trying to do that?
10             JUROR NO. 18:  Conflicted.  I think if things look
11    fairly equal, I will probably swings towards Microsoft.
12             THE COURT:  Thank you.  Appreciate your candor.
13    Number 13.
14             JUROR NO. 13:  I don't speak well in front of other
15    people.
16             THE COURT:  Just think of us all as your friends.
17             JUROR NO. 13:  About the financial hardship, I didn't
18    think that I would have a problem, but I did -- I am
19    full-time employed, I am a single mom, and my employer only
20    pays for one week.  They only reimburse my wage up to one
21    week.
22             THE COURT:  Who do you work for?
23             JUROR NO. 13:  Aegis Living.  I am a caregiver.
24             THE COURT:  Why don't you assume that I will call
25    them.  I can be very persuasive, particularly when they have
```

1    cases in the courthouse here.

2        We will give you a break from the jury selection here.

3    One thing that drives me crazy is when you say you are a

4    judge, people start complaining about the judicial system.

5    Many times they are businesspeople.  They say those run-away

6    juries, or those whatever.  I ask one question, which is,

7    have you ever served on a jury?  And they go, oh, no, I am

8    much too busy to do that.  Well, that kind of bothers me,

9    because no wonder you don't like juries when you refuse to

10   participate in the process.

11       When you go back, talk to your employers.  There are

12   really a lot of great companies in the Seattle area, big

13   employers, Boeing and Amazon are a two examples, Starbucks is

14   another, who pay their employees.  And I know it is tough if

15   you are a small businessperson, but small businesspeople get

16   sued also.  Speak up for jury service.  I am happy to talk to

17   your employer, because I think we can work something out with

18   them.

19       Juror Number 1, you said you were on a jury once.  Tell me

20   about it.  Number 2, I'm sorry.  Ma'am.

21           JUROR NO. 2:  I have been on three juries.  They were

22   all criminal.  They were all local level, superior court, in

23   Whatcom County.

24           THE COURT:  Were you able to reach a verdict in each

25   of them?

```
 1              JUROR NO. 2:  Yes.

 2              THE COURT:  That's what I need to know.  Number 4.

 3              JUROR NO. 4:  I was on a jury for a criminal case,

 4    and we reached a verdict on it.

 5              THE COURT:  Okay.  Number 7.

 6              JUROR NO. 7:  King County, criminal case, more than

 7    ten years ago.

 8              THE COURT:  And did they reach a verdict?

 9              JUROR NO. 7:  Sir?

10              THE COURT:  Did it reach a verdict?

11              JUROR NO. 7:  Yes.

12              THE COURT:  Number 21.

13              JUROR NO. 21:  I have been on two juries.  The first

14    one was a civil case, and we reached a verdict.  And the

15    second one was a criminal case, and we reached a verdict on

16    that one.

17              THE COURT:  What was the civil case about, sir?

18              JUROR NO. 21:  It was actually a Labor and Industries

19    claim.

20              THE COURT:  All right.  Number 29.

21              JUROR NO. 29:  I was on one jury.  It was a criminal,

22    and it was a hung jury.

23              THE COURT:  How long ago was that?

24              JUROR NO. 29:  Four or five years ago.

25              THE COURT:  What court was it?
```

1          JUROR NO. 29:  In Snohomish County.

2          THE COURT:  Now, sometimes being on a hung jury

3    causes people to go, I never want to go through that

4    experience again.  Would it have any impact serving on a jury

5    here?

6          JUROR NO. 29:  I don't think so.

7          THE COURT:  Number 30.

8          JUROR NO. 30:  Snohomish County criminal case.  It

9    never got to the jury.  It lasted part of the day, and it

10   just fell apart.

11         THE COURT:  Meaning there was a mistrial or someone

12   decided to plead guilty?

13         JUROR NO. 30:  Yeah, I think somebody decided to

14   plead.

15         THE COURT:  Anything about the experience that would

16   impact you here at all?

17         JUROR NO. 30:  No.

18         THE COURT:  Number 35.

19         JUROR NO. 35:  Mid-1990s, King County, civil case.

20   And it resulted in a verdict.

21         THE COURT:  Number 38.

22         JUROR NO. 38:  I have served on two juries before.

23   The first one was about four years ago, King County Superior

24   Court, a criminal case.  We did reach a decision.  And then

25   in February of this year, Lake Forest Park municipal court, a

1   criminal case.  We also reached a decision.

2           THE COURT:  You are just lucky, twice in the same

3   year.

4           JUROR NO. 30:  The first one was about four years

5   ago.

6           THE COURT:  I am thinking about Lake Forest Park.

7   That is going to be a big chunk of your time potentially, now

8   that we have you here.  Anything about that, or about the

9   jury process that is going to impact you being a fair and

10  impartial juror here?

11          JUROR NO. 30:  I don't think so.

12          THE COURT:  Counsel, at this time I am going to give

13  40 minutes to each side.  We are going to do 40 minutes.  And

14  then we will take a break, which is something we do a lot of

15  around here.  When we take that break, what I'm going to ask

16  you to do is to leave your number on your chair, because you

17  will remember your number, and then when you come back you

18  will be able to sit down in the same spot again.

19      But at this time I am going to --  I'm not sure who is

20  doing it.  Mr. Harrigan?  All right.  Please begin.

21      Ladies and gentlemen, they may do the same thing I did,

22  they may ask one question for the entire audience, they may

23  ask a specific person a question, they may follow up on

24  something I have talked to you about.  There are different

25  ways of doing this.  Mr. Harrigan.

1           MR. HARRIGAN:  Thank you, your Honor.  First of all,

2    I know that both parties, and the lawyers, all appreciate the

3    time that you folks are willing to take to help us resolve

4    this case, and also, obviously, the forthright manner in

5    which everybody has responded to questions.  I will have some

6    questions, some general, and they may lead to more specific

7    questions to individual people.

8        The court has asked some questions that clearly anyone

9    would want to know about prospective jurors.  But there may

10   be things that -- experiences you have had with either one of

11   the two companies here.  Motorola is now owned by Google.

12   And by the way, one of the questions I would like to know is

13   whether anybody owns stock in Google, which I'm not sure

14   whether that question related to Motorola or Google, so we

15   wanted to clarify that.

16       But, at any rate, there may be things that have occurred

17   in your lives, somebody's lives here, that affect whether you

18   can be fair to either Motorola or Microsoft that we haven't

19   been smart enough to ask a question about.  So one general

20   question that I will have is, if any of you, as you go

21   through this, if it occurs to you that you have some

22   experience that would affect your ability to be impartial to

23   these two parties, just raise your hand and let's talk about

24   it.

25       And another thing is, it may be that something has

1   occurred that you don't particularly want to talk about in

2   open court, in which case just say that, and then we can --

3   the court will tell us how to approach that issue.

4        It is possible that some of you will have heard about

5   lawsuits, that there are too many lawsuits or not enough

6   lawsuits.  Anything of that sort that you honestly believe

7   would impact your views on participating here or adversely

8   affect either party would be useful to find that out.

9        I have a few questions here that I would like to ask

10  everybody.  The first one, since we already know that many of

11  you have had dealings with Microsoft, is there anybody here

12  who has never heard of Microsoft?

13       That reminds me of the question somebody asked in Congress

14  about how many people use Windows.  Everybody raised their

15  hands.  In this case nobody raised their hand.

16       Do any of you, apart from -- we don't want to repeat the

17  conversations you have had with the court, but do any of you,

18  for any reason, have a negative view of Microsoft or a view

19  of Microsoft that in any way would impact your ability to be

20  fair and impartial to Microsoft in this case?  And while we

21  are at it, the same for Motorola, although I'm sure they will

22  ask that question.  What I'm looking for is the answer to the

23  specific question that we might not be the smart enough to

24  ask.  Is there anything that would affect your ability to be

25  impartial in this case, in particular be fair to Microsoft?

1    Thank you.

2        I think most of you have heard of Bill Gates, and

3    Mr. Balmer, who I think is going to be retiring soon.  Does

4    anyone have negative views about either of those two

5    gentlemen?  Anything you have read or heard or any other

6    experience that would affect your ability to be fair and

7    impartial here?

8        Let's move on to some questions about some of the subjects

9    that will be involved in this case.  Has anybody here been

10   involved in a situation where either you or another party had

11   to break a contract or not perform a contract, whether it be

12   a car purchase or a house purchase or any other kind of

13   contract?  No. 33, would you tell us a little bit about that.

14            JUROR NO. 33:  I am in the construction industry.  On

15   occasion construction contracts have to be dealt with, where

16   a contract wasn't performed, going through the bonding

17   process, claiming things on the bond.

18            MR. HARRIGAN:  You are talking about the kinds of

19   things that come up where a subcontractor runs out of money

20   or some other problem that prevents them from performing and

21   you just need to deal with that problem somehow?

22            JUROR NO. 33:  That's correct.

23            MR. HARRIGAN:  Has that ever led to a lawsuit in your

24   experience?

25            JUROR NO. 33:  Yes.  Not a lawsuit, mediation.

1          MR. HARRIGAN:  Mediation.  How did that process work

2     from your standpoint?

3          JUROR NO. 33:  Painfully slow.  But it was

4     successful, and in the end it worked out.

5          MR. HARRIGAN:  The good news here is that we are on a

6     clock, so we will be done next Tuesday.  It won't be

7     painfully slow.  It may be painful, but not slow.

8       Anybody else been involved in a situation where either you

9     had to break a contract, cancel a contract or the party on

10    the other side didn't perform, and something was made out of

11    that?  Okay.  Thanks.

12      How about another contract question:  These days we all

13    sign a lot more contracts than we used to, because there are

14    all these things on the internet that says "do you agree to

15    the terms and conditions," and they are 20 pages long, and

16    they are on another screen.  Let's put that category aside

17    and talk about the regular types of contracts that sort of

18    preceded the internet age.  Some people read every word.

19    Let's say you are buying a house or a car.  Some people kind

20    of are in the middle, and some people don't look at the terms

21    at all.  So on a scale of 1 to 9, let's say 1 to 3 is you

22    don't read it; and the next three are you kind of look at it;

23    and the last is you read it very carefully.  How many of you

24    would be in the 1 to 3 category?  How about in the middle?

25    How many of you are in the middle?  And how many of you are

1    at the other extreme?

2        I think in the questions that were asked earlier, the

3    issue that came up was experience with software with respect

4    to parties.  How many of you, generally speaking, have had

5    experience with software production or dealing with software

6    without regard to whether it was with Microsoft or some

7    other -- Motorola or some other company?

8            JUROR NO. 23:  Somebody using software?

9            MR. HARRIGAN:  My question wasn't very precise.

10   Let's leave out using software.  I guess we are all using

11   software.  I am talking about experience with writing

12   software, manipulating software.  Let's start with Number 1.

13   Number 1, what has been your experience?

14           JUROR NO. 1:  I am a software development engineer

15   and test for Microsoft.

16           MR. HARRIGAN:  That's right.  And Number 2.

17           JUROR NO. 2:  I worked on a land-use tracking system

18   in the mid-1980s.  I did some programing, really mild

19   programming, and assisted other people to understand the

20   system.

21           MR. HARRIGAN:  Let's go down here in order.

22   Number 5, we have already heard from you.  Number 11.

23           JUROR NO. 11:  I am a software developer at

24   Microsoft.

25           MR. HARRIGAN:  12.

1            JUROR NO. 12:  I started programming in the early

2    '70s, mainframe.  I am an IT project manager now at Boeing.

3            MR. HARRIGAN:  Where is that?

4            JUROR NO. 12:  Boeing.

5            MR. HARRIGAN:  Number 16.

6            JUROR NO. 16:  I work in information technology as

7    well, and a little bit of development, just as a hobby.

8            MR. HARRIGAN:  Number 26.

9            JUROR NO. 26:  Yes.  I helped develop some software

10   with my husband for Hughes Electronics, a CHINS application,

11   so you can see it was a number of years ago, for the Network

12   Enterprise Healthcare.  And some other vendor presentations

13   when we were vendors for Microsoft.  But that has been ten

14   years ago.

15           MR. HARRIGAN:  So the time when you were vendors for

16   Microsoft was ten years ago?

17           JUROR NO. 26:  I believe so, yes.

18           MR. HARRIGAN:  Anyone else?  Who here does not own a

19   smart phone?  Number 2, is there any particular reason why

20   you have not joined the bandwagon?

21           JUROR NO. 2:  I am cheap and I don't need it.

22           MR. HARRIGAN:  How about Number 4?

23           JUROR NO. 4:  I have never felt the need for it.

24           MR. HARRIGAN:  Anybody else?  Number 15.

25           JUROR NO. 15:  I just haven't needed it.  When this

```
 1   one breaks, I will probably get one.
 2            MR. HARRIGAN:  17.
 3            JUROR NO. 17:  I live in one of those rare places
 4   that doesn't get cell coverage.
 5            MR. HARRIGAN:  So you would if you could?
 6            JUROR NO. 17:  Probably not.
 7            MR. HARRIGAN:  Number 18.
 8            JUROR NO. 18:  Just a way to disconnect from work
 9   when I have the opportunity to.
10            MR. HARRIGAN:  19.
11            JUROR NO. 19:  I just don't want one.  My friends are
12   all sucked into them.
13            MR. HARRIGAN:  So you have to communicate some other
14   way?
15            JUROR NO. 19:  Yeah.  With my mouth usually.
16            MR. HARRIGAN:  Number 21.
17            JUROR NO. 21:  The pressure is on at home, but we
18   just have regular cell phones at this point.
19            MR. HARRIGAN:  Number 24.
20            JUROR NO. 24:  I agree with Number 18, a way to not
21   be accessible to work all the time.
22            MR. HARRIGAN:  I think some of us think of them as
23   necessary evils.  It would be nice if they weren't always
24   necessary.  Anybody else?
25        How about the same question, a tablet, like an iPad or
```

1   something like that.  Who does not own one of those?

2   Number 3, what's your feeling about that?

3           JUROR NO. 3:  I don't have a use for a tablet right

4   now.  I have a laptop.  I don't want to buy one at the

5   moment.

6           MR. HARRIGAN:  Juror Number 2, you don't have a

7   tablet.  Do you have a laptop?

8           JUROR NO. 2:  I have a laptop.  I probably spend some

9   where between 10 and 12 hours a day in front of a computer.

10  I don't need any additional --

11          MR. HARRIGAN:  Number 4.

12          JUROR NO. 4:  I have a life already.

13          MR. HARRIGAN:  Who else was there back there?

14  Number 7.

15          JUROR NO. 7:  I have a laptop and an iPhone.  I don't

16  need -- I'm not ready --

17          MR. HARRIGAN:  I have one of those things, but I

18  never take it out for the same reason.  In the back row

19  there, Number 8.

20          JUROR NO. 8:  A smart phone and computer is enough.

21          MR. HARRIGAN:  Number 15 again.

22          JUROR NO. 15:  My wife has one, so I use it once in a

23  while.  It is basically a giant smart phone.

24          MR. HARRIGAN:  I missed the juror --

25          JUROR NO. 14:  I don't need it.  I have a computer

1    and an iPhone.

2              MR. HARRIGAN:  Number 17.

3              JUROR NO. 17:  No need for that connectivity.

4              MR. HARRIGAN:  Number 18.

5              JUROR NO. 18:  I use Surface on site as an event

6    tool.

7              JUROR NO. 19:  My computer is enough for me.

8              MR. HARRIGAN:  23.

9              JUROR NO. 23:  I have a smart phone, a laptop,

10   desktop, and work on both computers.  Don't need another.

11             MR. HARRIGAN:  Another.

12             JUROR NO. 24:  I also don't have an iPad.

13             MR. HARRIGAN:  25.

14             JUROR NO. 25:  I don't have one.

15             MR. HARRIGAN:  I know some people that basically use

16   them just like a computer.  They don't have a computer

17   anymore.  I like that --  I am more comfortable with the

18   laptop.  Number 27.

19             JUROR NO. 27:  I own a computer.

20             MR. HARRIGAN:  Number 28.

21             JUROR NO. 28:  It is on my Christmas list.

22             MR. HARRIGAN:  29.

23             JUROR NO. 29:  My laptop is sufficient.

24             THE COURT:  Anybody else?  36.  We can't hear you.

25             JUROR NO. 36:  (Inaudible.)

1          THE COURT:  I didn't hear that.  Can you say that

2    again?

3          JUROR NO. 36:  I just don't have the money to buy a

4    tablet.

5          THE COURT:  Thank you.

6          UNIDENTIFIED JUROR:  I don't need it.  I have a smart

7    phone and two other computers.

8          MR. HARRIGAN:  Does anybody here have his or her own

9    blog that you work on to any degree?  Number 28.  What is it

10   about?

11         JUROR NO. 28:  It is called Excess Freight.  It is

12   about unhealthy truck drivers.

13         MR. HARRIGAN:  About?

14         JUROR NO. 28:  Unhealthy truck drivers.

15         MR. HARRIGAN:  Do you have a lot of readers?

16         JUROR NO. 28:  Yeah, there are a lot of truck drivers

17   carrying excess freight.

18         MR. HARRIGAN:  Did I see somebody else?  Number 27.

19         JUROR NO. 27:  Yeah, I have one for my real estate

20   business.

21         MR. HARRIGAN:  For your?

22         JUROR NO. 27:  For real estate.

23         THE COURT:  Sir, I will need you to stand up.

24         JUROR NO. 27:  I have a blog for my real estate

25   business.  It is a website.

1           MR. HARRIGAN:  That takes care of that question.

2   Nobody else is in that category?

3       Have any of you ever called in to a radio or TV show to

4   answer a question or make a comment or otherwise appear on

5   the airwaves?  Number 1, tell us about that.

6           JUROR NO. 1:  I called in to a sports talk show once.

7   Yeah.

8           MR. HARRIGAN:  How was it?

9           JUROR NO. 1:  I am an introvert, so it wasn't all

10  that exciting, and they didn't like my opinion.

11          MR. HARRIGAN:  Number 2.

12          JUROR NO. 2:  We have a little morning show up in

13  Bellingham, and I call in every once in a while.  Trivia

14  questions, where did the word Halloween come from.  Stuff

15  like that.  Occasionally you listen to all of the wrong

16  answers and you force yourself to answer it.

17          MR. HARRIGAN:  Where did the word Halloween come

18  from.

19          JUROR NO. 2:  It is the day before All Hallows Eve,

20  which is the first day of November.  So it is the ween of All

21  Hallows Eve.

22          MR. HARRIGAN:  I had heard that before, but have

23  forgotten it.

24          JUROR NO. 5:  I was once on David Letterman show as

25  an attendee.

1            MR. HARRIGAN:  Impressive.  Anybody else?  Number 23.

2            JUROR NO. 23:  I have been asked to be on quite a lot

3    of radio shows and television shows in the context of my

4    work.

5            MR. HARRIGAN:  What are some of those --

6            JUROR NO. 23:  For example, NPR the local KUOW, but

7    also on national NPR for Science Friday, Talk of the Nation

8    back when that was on, most of the national television

9    networks, and CBC, BBC and so on.

10           THE COURT:  Dr. King, now you are going to make me do

11   this.  Would you like to stand up and introduce yourself?

12   This is a real hero in our community.  Would you introduce

13   yourself?

14           JUROR NO. 23:  Thank you.  You would like my name?

15           THE COURT:  I want you to explain to them what you

16   do.

17           JUROR NO. 23:  In this context it is that I developed

18   the sequencing approach called mitochondrial DNA sequencing.

19   I developed it for the purpose of reuniting Argentinian

20   kidnapped grandchildren with their grandparents.  It is used

21   internationally in forensic cases everywhere.  That has kept

22   me off every criminal trial since 1981.  But I don't believe

23   it has any bearing on this case at all.

24           MR. HARRIGAN:  Anyone else?  Number 2.

25           JUROR NO. 2:  Nowhere near that level.  But I have

1    been interviewed on radio, television, as part of my job.

2         MR. HARRIGAN:  What subject?

3         JUROR NO. 2:  Environmental planning, urban planning

4    in Whatcom County, in Bellingham.

5         MR. HARRIGAN:  May I have a moment to check with my

6    colleagues to see if they can figure out anything else I

7    should be doing?

8         THE COURT:  Yes.

9         MR. HARRIGAN:  No further questions, your Honor.

10   Thank you all very much for your responsiveness.

11        THE COURT:  Ms. Sullivan.  Ladies and gentlemen, I

12   would like you to now give your attention to Ms. Sullivan,

13   who will be doing the same thing on behalf of Motorola.

14        MS. SULLIVAN:  Good morning, ladies and gentlemen.  I

15   just want to say, on behalf of all of our team for Motorola,

16   how grateful we are to you for coming out to be -- prepared

17   to serve as jurors.  We are extremely grateful for your time,

18   for your candor, for your patience and your attention.  I

19   just want to express our great gratitude to you for being

20   here, whatever happens in the rest of the day.

21        I would like you to answer a few questions.  You have

22   answered a lot of questions already, and you have answered

23   them truthfully, and that's very helpful to us.  I just

24   wanted to ask a few in addition to those the judge has asked

25   you and that Mr. Harrigan has asked you.

1        I don't know if you are like any folks in my family, but

2   are any of you union members?  Raise your hand if you are a

3   member of a union.

4            JUROR NO. 2:  Now or ever?

5            MS. SULLIVAN:  Now or ever been the member of a

6   union, please raise your hands.  I will ask you a few

7   follow-up questions.  Juror Number 2, did you ever have any

8   leadership position in your union?

9            JUROR NO. 2:  No.

10           MS. SULLIVAN:  Juror number 4?

11           JUROR NO. 4:  No.

12           MS. SULLIVAN:  Can you tell us what union you were

13  in?

14           JUROR NO. 4:  I am a part-time teacher in a community

15  college, and you are automatically enrolled when you accept

16  the position.

17           MS. SULLIVAN:  Understood.  Thank you.  Juror

18  Number 6, what union?

19           JUROR NO. 6:  A few of them, restaurants, when I was

20  going through college.

21           MS. SULLIVAN:  Service Employees Union.  Any

22  leadership positions?

23           JUROR NO. 6:  No.

24           MS. SULLIVAN:  Thank you.  Number 7.

25           JUROR NO. 7:  National Treasurer Employees Union.

```
 1                MS. SULLIVAN:  Anybody in the back row that I missed?
 2     Juror Number 8.
 3                JUROR NO. 8:  Some years ago at the University of
 4     Washington, no leadership.
 5                MS. SULLIVAN:  Juror number 14.
 6                JUROR NO. 14:  Service employees, no leadership.
 7                MS. SULLIVAN:  Ladies and gentlemen, Juror Number 21.
 8                JUROR NO. 21:  United Steel Workers, no leadership
 9     position.
10                MS. SULLIVAN:  Juror Number 23.
11                JUROR NO. 23:  AFSCMI when I was a graduate student.
12     No leadership.
13                MS. SULLIVAN:  Juror Number 25.
14                JUROR NO. 25:  (Inaudible.)
15                MS. SULLIVAN:  Thank you.  Number 28, you may have to
16     stand up.
17                JUROR NO. 28:  I don't remember the name.  It was
18     with the Washington State Patrol.  I left.
19                MS. SULLIVAN:  I missed some people in the back row.
20     Juror Number 36.  I'm sorry, Juror Number 32.  We will go
21     with you first.
22                JUROR NO. 36:  I was with the CWA.  Now I supervise
23     the CWA.
24                THE COURT:  Ma'am, you need to stand up.
25                JUROR NO. 36:  I was with CWA, and now I supervise
```

```
 1    the CWA.
 2            MS. SULLIVAN:  You are a supervisor.
 3            JUROR NO. 36:  Yes.
 4            MS. SULLIVAN:  Juror Number 33.
 5            JUROR NO. 33:  International Brotherhood of
 6    Electrical Workers.
 7            MS. SULLIVAN:  IBEW.  Thank you very much, sir.
 8    Juror Number 36.
 9            JUROR NO. 36:  SCIU, no leadership.
10            MS. SULLIVAN:  SCIU, no leadership.  Thank you.
11    Anybody I missed?  Juror Number 40.
12            JUROR NO. 40:  SCIU, no leadership.
13            MS. SULLIVAN:  Thank you very much for answering my
14    questions.  You were very candid in your forms about where
15    you worked.  This is one more question we had for some of
16    you.
17       Now, I would like to ask, does anybody on the jury pool,
18    in the jury pool, or any member of your family own a
19    business, anybody own a business?  Mind if I just ask you a
20    few questions?  Juror Number 8, what kind of business?
21            JUROR NO. 8:  You said in the family.  My father owns
22    a business.
23            MS. SULLIVAN:  It is still operating?
24            JUROR NO. 8:  It is a really small business.
25            MS. SULLIVAN:  What kind of business?
```

1           JUROR NO. 8:  Rescreening screens.

2           MS. SULLIVAN:  Rescreening screens.  I missed one

3    here.  Juror Number 1.

4           JUROR NO. 1:  My mom was a dentist, owned a dental

5    office.

6           MS. SULLIVAN:  Thank you.  Juror Number 7.

7           JUROR NO. 7:  My wife is a piano instructor.

8           MS. SULLIVAN:  She owns her own piano instruction

9    business.  In the back now, Juror Number 16.

10           JUROR NO. 16:  My uncle owns a clothing store.

11           MS. SULLIVAN:  Still operating?

12           JUROR NO. 16:  Yes.

13           MS. SULLIVAN:  Yes, ma'am.

14           JUROR NO. 28:  I am an independent caregiver, so

15    that's my business, plus the Excess Freight.

16           MS. SULLIVAN:  Blog.  I didn't mean to miss Juror

17    Number 26.

18           JUROR NO. 26:  I have a consulting firm.  My husband

19    has a -- mainly in risk management to small start-up

20    companies in the software industry and major healthcare

21    enterprises.

22           MS. SULLIVAN:  Thank you very much.  That is still

23    operating?

24           JUROR NO. 26:  Yes.

25           MS. SULLIVAN:  Juror 16.

1              JUROR NO. 16:  For years my wife ran a home daycare.

2              MS. SULLIVAN:  Thank you.  Who did I miss back here?

3    31.

4              JUROR NO. 31:  My sister and I own a ranch.

5              THE COURT:  Once again, ma'am, you need to stand up.

6    You have a soft voice.

7              JUROR NO. 31:  My sister and I own a ranch in

8    Montana.

9              MS. SULLIVAN:  That is operated as a business?

10             JUROR NO. 31:  Yes.  But it is not my full-time job.

11             MS. SULLIVAN:  What kind of ranch?

12             JUROR NO. 31:  A Cattle ranch.

13             MS. SULLIVAN:  Cattle/dairy both?

14             JUROR NO. 31:  No dairy.

15             MS. SULLIVAN:  Who did I miss that owns a business or

16   knows an immediate family member that does?  Number 32.

17             JUROR NO. 32:  My significant other owns and operates

18   a software business.  I know nothing about it.

19             MS. SULLIVAN:  33.

20             JUROR NO. 33:  My son-in-law's parents own a cleaning

21   business.

22             MS. SULLIVAN:  Still operating?

23             JUROR NO. 33:  Yes.

24             MS. SULLIVAN:  Did I miss anyone on owning a

25   business?  Juror Number 13.

```
 1              JUROR NO. 13:  My grandmother owns a clothing

 2   business.  It is closing.

 3              MS. SULLIVAN:  Who does?

 4              JUROR NO. 13:  My grandmother.

 5              MS. SULLIVAN:  Still operating?

 6              JUROR NO. 13:  No, it is closing this year.

 7              MS. SULLIVAN:  Anyone else?  Juror Number 38.

 8              JUROR NO. 38:  After my husband left Microsoft, he

 9   started his own business where he designs and manufactures

10   custom parts for racing motorcycles.

11              MS. SULLIVAN:  He is still operating that?

12              JUROR NO. 38:  Yes.

13              MS. SULLIVAN:  Did I miss anyone on owning your own

14   business or family member that does?  Thank you very much for

15   filling us in on that.

16       I would like to turn next to something that was touched on

17   before by the judge, but I just want to be sure we know if

18   any of you or an immediate family member was ever a plaintiff

19   or a defendant in a lawsuit.  Let's start with anyone who was

20   ever a plaintiff in a lawsuit.  Can you raise your number?

21   Juror Number 12.

22              JUROR NO. 12:  I'm not sure I understand plaintiff

23   currently.  It was a class action suit.

24              MS. SULLIVAN:  You were a member of a large class?

25              JUROR NO. 12:  Yeah.
```

1          MS. SULLIVAN:  You weren't personally involved in

2     bringing the lawsuit?

3          JUROR NO. 12:  No.

4          MS. SULLIVAN:  How many were personally involved in

5     bringing a lawsuit?

6          JUROR NO. 40:  I had a landlord issue, and this was

7     in Texas, but we were advised towards the end of it that we

8     would most likely lose, just to drop the case altogether.

9          MS. SULLIVAN:  Okay.  Thank you very much.  Juror

10    Number 16.

11         JUROR NO. 16:  I was involved in a landlord/tenant

12    situation.  It was against a landlord that owed us some

13    money.

14         MS. SULLIVAN:  How did it resolve?

15         JUROR NO. 16:  I was ordered a favorable ruling.

16         MS. SULLIVAN:  Juror Number 23.

17         JUROR NO. 23:  This may be not be direct enough for

18    your purpose, but for the sake of completeness, the Myriad

19    case that recently went to the Supreme Court, I was not

20    involved directly as a plaintiff, although I was certainly

21    involved in the history of the case, but I was president of

22    the American Society of Human Genetics which submitted an

23    Amicus brief.

24         MS. SULLIVAN:  A friend of the court brief.  Anybody

25    else that has been a plaintiff?

1      Let me turn to the other side.  I think we heard from a

2    juror earlier who had been in a litigation dispute.  Has

3    anyone ever been in a litigation dispute where you or an

4    immediate family member was the defendant in a lawsuit, the

5    person being sued?  Anyone?

6      Anyone personally involved in being part of a defendant --

7    your company or your business being the defendant in a suit

8    where you had to participate?  Juror Number 33.

9          JUROR NO. 33:  Again, I mentioned earlier we had

10   mediation for a subcontractor issue.  We didn't end up going

11   to actual litigation.  It was binding arbitration.

12         MS. SULLIVAN:  Thank you, Juror Number 33.  I was

13   thinking of you.  I was wondering if anyone else had an

14   experience like Juror Number 33 they had a chance to tell us

15   about it.  Did I miss someone over here?  Juror Number 2,

16   thank you.

17         JUROR NO. 2:  The City of Bellingham was sued in

18   violation for the Growth Management Act, and I testified in

19   that case.

20         MS. SULLIVAN:  And what was your role, just as a

21   witness?

22         JUROR NO. 2:  Just a witness.

23         MS. SULLIVAN:  You weren't a party to the case?

24         JUROR NO. 2:  No.

25         MS. SULLIVAN:  Did you form a view of how the

1   litigation went?

2        JUROR NO. 2:  By that time I had been on three

3   juries, so it seemed very straightforward to me.

4        MS. SULLIVAN:  Very good.  Thank you.  I want to turn

5   now to something that Mr. Harrigan mentioned to you before,

6   but I want to go a little bit further.  He reminded you that

7   there are some very famous names involved in the case.  There

8   is Microsoft.  And then, of course, there is Bill Gates.  A

9   lot of you certainly recognize that name, and his wife

10  Melinda Gates.  And they have a foundation.  I would just

11  like to know if any members of the jury pool has ever

12  received or been part of a charitable organization that has

13  received any charitable donations from either Microsoft, or

14  from the Bill and Melinda Gates Foundation.  Raise your

15  number if that sounds familiar to you.

16     Can we go through quickly?  Juror Number 1.

17        JUROR NO. 1:  As an employee of Microsoft, they pay

18  money to anything that I volunteer in.

19        MS. SULLIVAN:  Juror Number 8.

20        JUROR NO. 8:  Does it qualify, the University of

21  Washington?  There has been a lot of benefits.  I have been

22  an employee there, and I appreciate all of the philanthropy.

23  Tough word.

24        MS. SULLIVAN:  Thank you for your candor.  Anyone on

25  this side of the jury pool?  If not, let me turn to a number

1    of signs here.  Juror Number 18.

2         JUROR NO. 18:  Actually, just my mom has received

3    grants for her classroom.  My only non-Microsoft client is

4    the Bill and Melinda Gates Foundation.

5         MS. SULLIVAN:  Thank you for that.  Juror Number 20.

6         JUROR NO. 20:  Are we sticking to just the charitable

7    contributions from --

8         MS. SULLIVAN:  From Microsoft or the Gates

9    Foundation, yes.

10         JUROR NO. 20:  The company I works for is privately

11    associated with the Gates Foundation, working on the

12    construction of the campus.

13         MS. SULLIVAN:  Say that a little more clearly for us,

14    if you could, and a little more loudly.

15         JUROR NO. 20:  It is not charitable, it is private.

16    They hired us as engineers to work on the campus.

17         MS. SULLIVAN:  Understood.  Number 23.

18         JUROR NO. 23:  I am a member of the Genome Sciences

19    Department at the University of Washington, and this

20    department exists because the Gates family gave money to

21    found it.

22         MS. SULLIVAN:  Thank you.  Number 25.

23         JUROR NO. 25:  I work for the Girl Scouts of Western

24    Washington, and they do a lot of partner/sponsorship work.

25         MS. SULLIVAN:  That would include charitable

1    donations from Microsoft?

2              JUROR NO. 25:  Yes.

3         MS. SULLIVAN:  Thank you.  Juror Number 27.

4              JUROR NO. 27:  I worked at Overlake many years ago.

5    I know they had a plaque that said there was a donation to

6    Overlake from the Foundation.

7         MS. SULLIVAN:  Thank you.  Anybody --  Juror 38.

8              JUROR NO. 38:  When my husband worked at Microsoft

9    they had a 100 percent matching program.  So any charitable

10   organization that my husband and I worked with or gave money

11   to, they donated 100 percent.

12        MS. SULLIVAN:  Juror Number 40.

13             JUROR NO. 40:  As others mentioned, they worked for

14   the University of Washington Medical Center, I do, too.  I

15   have been there for 25 years.

16        MS. SULLIVAN:  Did I miss anyone on the Microsoft or

17   Gates Foundation charitable contributions?  Juror Number 24.

18   Thank you.

19             JUROR NO. 24:  Similar, working for the University of

20   Washington.

21        MS. SULLIVAN:  Juror Number 31.

22             JUROR NO. 31:  The same, UW Med Center.

23        MS. SULLIVAN:  Are you personally aware of those

24   contributions?

25             JUROR NO. 31:  Particularly the grant submissions

```
 1   that they have, the Bill and Melinda Gates Foundation.
 2          MS. SULLIVAN:  Sometimes grants are granted by the
 3   foundation to yourself or to people you work with?
 4          JUROR NO. 31:  (Inaudible.)
 5          MS. SULLIVAN:  Number 5.
 6          JUROR NO. 5:  Just so I understand, whether you have
 7   made or received a contribution?
 8          MS. SULLIVAN:  Received a contribution.  I understand
 9   if you are working for Microsoft you may have made one.
10   Thank you for sharing that information.  I greatly appreciate
11   it.
12      I want to ask you next, the judge asked you earlier
13   whether you recognize the name Google.  He told you that
14   Google is now the owner of Motorola Mobility.  This lawsuit
15   began when my client included Motorola Mobility, the cell
16   phone company.  But now the company Google has acquired
17   Motorola Mobility.  I wanted to ask whether any of the
18   members of the jury have strong opinions, favorable or
19   unfavorable, about Google?  No opinions about Google that are
20   strong one way or the other?  I see some people thinking.
21   Anybody have a strong negative or positive opinion about
22   Google?  Juror Number 12.
23          JUROR NO. 12:  It is my search engine of choice.
24          MS. SULLIVAN:  Thank you.  That's very honest.  Juror
25   number 26.
```

1          JUROR NO. 26:  I think it balances out.  That's why I

2    have been thinking back and forth.  I think most of us don't

3    like, from time to time, what Google does with privacy.  But

4    at other times the other things that they do seem very good.

5    It balances.

6          MS. SULLIVAN:  When you say things they do with

7    privacy, what do you have in mind?

8          JUROR NO. 26:  It seems that we have to sign away a

9    great deal of our privacy in order to access Google benefits.

10   They changed them.  I'm not totally aware of when they

11   changed them.  Sometimes they send a notice saying that they

12   are changing things.  That's as far as I want to go.  But I

13   think it balances.

14         MS. SULLIVAN:  Thank you very much.  I noticed that,

15   as is not too surprising here in Seattle, quite a few of you

16   have friends who work at Microsoft.  And I just wanted to ask

17   you to think very hard about whether you think having

18   friends, former coworkers who work at Microsoft, might cause

19   you to lean even slightly toward Microsoft before you hear

20   the evidence and the instructions from the judge in this

21   case.  Think hard for a minute.  It is just lots of you are

22   going to have such friends.  I just wanted you to think about

23   whether having friends who work at the Microsoft Corporation

24   would give you any tendency to lean slightly in Microsoft's

25   favor when it comes to deciding the case based on the

1    evidence and the instructions the judge will give you.

2        Having thought about that question, is there anyone here

3    who feels that their friendships with folks who work at

4    Microsoft might affect your view of the evidence in the case?

5    Juror Number 26.

6            JUROR NO. 26:  A subjective feeling, I guess it would

7    be 56 out of 100.  I don't think that is enough to make a

8    difference.  I think I can handle that.

9            MS. SULLIVAN:  Obviously those of you who work at

10   Microsoft, and we have discussed that, we obviously

11   understand that you have many coworkers at Microsoft, you

12   don't need to follow up on that.

13           THE COURT:  Counsel, you have a number.

14           MS. SULLIVAN:  I'm sorry.  Juror Number 30.

15           JUROR NO. 30:  Yeah, I have worked at Microsoft since

16   the late '80s.  Everybody I know my entire working life has

17   been there.

18           MS. SULLIVAN:  Your Honor, were you able to hear that

19   answer?  Thank you very much.  A question quickly about

20   Motorola products.  We heard from a number of the jurors that

21   you have experience using Motorola products or are currently

22   using Motorola products.  Do any of you have any issues with

23   your Motorola products, any negative experiences?  Could you

24   please raise your number if you do?  Juror Number 8.

25           JUROR NO. 8:  Well, it was a while ago.  It was like

1   five years ago, and I got a phone and it was a really bad

2   phone.

3           MS. SULLIVAN:  Did you get another one?

4           JUROR NO. 8:  No, I did not.

5           MS. SULLIVAN:  Ever again?

6           JUROR NO. 8:  From Motorola?  No, I didn't.

7           MS. SULLIVAN:  You never got a Motorola phone.  You

8   got a different company's phone?

9           JUROR NO. 8:  Yes.

10          MS. SULLIVAN:  Thank you for sharing that.  Did you

11  have a Motorola issue?  Anybody else on this part of the jury

12  have an issue with a Motorola product?  No one.  All right.

13      I think that covers all of the general questions we had to

14  ask you.  I would just ask your patience in asking a few

15  questions to individual jurors who brought some things up in

16  the questionnaire or here in court that we would like to

17  explore a little bit further.  And I just need to follow up

18  on things you have already told us.  It will be very brief.

19      I wonder if we could start, Juror Number 26, with you.

20  You mentioned that your husband filed a patent application

21  with Microsoft.  Can you tell us what that patent application

22  was for?

23          JUROR NO. 26:  Yes.  At that time he was an

24  architect -- software architect for Microsoft.  And then he

25  filed six patents that I am aware of in the context of his

1    employment there.  Most of them were on process.

2         MS. SULLIVAN:  That was how long ago?

3         JUROR NO. 26:  I guess about five years, maybe more.

4    I have forgotten.  Let's see --  What year is it?  It's '13.

5    Probably culminating around 2004, 2005, somewhere in there.

6         MS. SULLIVAN:  Thank you.  Juror Number 27, you

7    mentioned to us that your father-in-law works at Microsoft.

8    Can you tell us what your father-in-law does at Microsoft?

9         JUROR NO. 27:  I believe a project manager.

10         MS. SULLIVAN:  Do you talk to him about his work at

11    Microsoft.

12         JUROR NO. 27:  Not a lot.  I probably see him twice a

13    month.

14         MS. SULLIVAN:  Twice a month?  Juror Number 30.  Can

15    you just remind me where you're sitting?  You already told us

16    what -- you were very candid with us.  Just to be clear, your

17    work at Microsoft was prior -- it was previous to now?

18         JUROR NO. 30:  It started in the '80s as a vendor,

19    and then an employee for 14 years, and a few years off, and

20    then went back as a vendor.  So it has pretty much been my

21    entire life.

22         MS. SULLIVAN:  Employer and vendor relationship.

23    Thank you very much.

24      Juror Number 35.  Thank you for standing.  You mentioned

25    you know people at Microsoft that includes in-house counsel.

1     Could you tell us whether you think knowing in-house counsel

2     for Microsoft would make you more disposed to believe, say,

3     Microsoft's lawyers rather than Motorola's lawyers?

4            JUROR NO. 35:  I don't think so.  I do work with

5     Microsoft in-house counsel fairly regularly.  So it is a

6     fairly active relationship.

7            MS. SULLIVAN:  Could you estimate how many hours a

8     week?

9            JUROR NO. 35:  Probably by month I would say ten to

10    fifteen.

11           MS. SULLIVAN:  Anyone else who had a relationship

12    with people who work at Microsoft who wants to add anything

13    to what you have said already?  Yes, Juror Number 33.

14           JUROR NO. 33:  Your question kind of changed a little

15    bit in terms of -- it kind of went towards do you know

16    anybody at Microsoft.

17           MS. SULLIVAN:  I'm sorry.  I was imprecise there.  I

18    know that a lot of you know people at Microsoft.  What I am

19    really asking here is do you know people at Microsoft in such

20    a close capacity, like being a vendor or working with

21    in-house counsel.  If you don't have that relationship, I

22    don't mean to bother you any further.

23           JUROR NO. 33:  I only know one Microsoft person.

24    That is a personal relationship/friendship outside of

25    Microsoft.  I don't even know if the person worked at --  I

1    do have to say, if he can't -- if he isn't at the top, he can

2    probably see the top.

3              MS. SULLIVAN:  Thank you.  Juror No. 11.

4              JUROR NO. 11:  My husband, he also works at

5    Microsoft, and he did file a patent.

6              MS. SULLIVAN:  Filed a patent with Microsoft?

7              JUROR NO. 11:  Yes.

8              MS. SULLIVAN:  That was successful?

9              JUROR NO. 11:  Yes.

10             MS. SULLIVAN:  Thank you for sharing that.  Your

11   Honor, may I have one minute?  Did I miss a juror?  Juror

12   Number 16.

13             JUROR NO. 16:  I had previously worked for a company

14   that had sold Microsoft products, and made brief

15   acquaintances with Microsoft employees.  But I have no idea

16   if they would still be employed by Microsoft.

17             MS. SULLIVAN:  Thank you very much.  Anyone else on

18   close relationship with Microsoft employees beyond mere

19   friendship?  Juror No. 22.

20             JUROR NO. 22:  I have a brother who works for the

21   Bill and Melinda Foundation.

22             MS. SULLIVAN:  Your brother works for the Bill and

23   Melinda Gates Foundation?

24             JUROR NO. 22:  Yes.

25             MS. SULLIVAN:  Anyone else?

1       Your Honor, may I confer for one moment?  Thank you,

2   ladies and gentlemen.  You have been extremely patient.  I

3   want to say we are extremely grateful for your

4   thoughtfulness, your candor with the process.

5       I just have one final question for the panel.  I just want

6   you ask you to think about whether there is anything in your

7   experience or your opinions as you have heard about this case

8   that you haven't told us about that you think might

9   influence, even slightly, your ability to be fair and

10  impartial in this case, and to listen to the evidence in the

11  case, and the judge's instructions in the case?  Anything at

12  all you can think of that might lead you to have something to

13  tell us about an opinion or an experience that might make it

14  hard for you to be impartial?

15      I will give you a minute to think.  I don't see any

16  numbers.  So with that, your Honor, thank you very much.

17  Motorola is done questioning the jury.  Thank you very much,

18  ladies and gentlemen.

19              THE COURT:  Ladies and gentlemen, Ms. Sullivan just

20  asked a question that I normally ask, which is, sometimes

21  when you sit here and you hear other people talk something

22  occurs to you, some issues came up.  A number of you were

23  aware of some philanthropic activity by either Microsoft or

24  the Gates family.  Is there anything that I have asked you

25  already about being a fair and impartial juror that those

1    questions have triggered some additional thoughts that you

2    would like to share with us?  I don't see any more hands.

3        I will tell you, that this is a really great jury pool.

4    If all of our jury pools could be this much fun and also this

5    well informed this would be a great job.  It already is a

6    pretty special job.

7        I will give you about 20 minutes.  We will be working

8    while you're out enjoying the view or wherever you want to

9    go.  Please leave your number on your chair.  That way, when

10   you come back you will know where to sit.

11       These are really smart people, as you have figured out,

12   but they haven't memorized all of your names yet.  When we

13   come back they have the right to ask three of you to be

14   excused.  They have to explain to me why, but it is something

15   that isn't done publicly.  There are some reasons why they

16   can't ask you to be excused and there are other reasons they

17   can, if they feel you just wouldn't be a fair and impartial

18   juror.  To do that, they pass a sheet of paperback back and

19   forth.  It is more helpful if you are sitting there so they

20   can go, 1, 2, 3, and figure out which one you are, since they

21   designate by number.

22       It is five after 11:00.  I would ask you to be back in

23   your seats by about 11:25, with the incentive that if we get

24   the next process done, the jury will know who the jury is,

25   and I can release the rest of you.  I'm sure that will urge

1    you to be on time.

2        Counsel, I will see you at sidebar.

3    (Sidebar conference out of the hearing of the jury.)

4        THE COURT:  Counsel, thank you.  That is an unusually

5    well-educated jury out there.  That was a bit of a surprise.

6    What I'm going to do now is I'm going to tell you those

7    people that I'm inclined to remove from the jury.  There are

8    some definites, and then there are some I would like to talk

9    to you about, and then ask if there is anyone you think we

10   should remove who I haven't mentioned.

11       Juror Number 1 is a Microsoft shareholder and employee who

12   said he couldn't be fair.  He is gone.

13       Juror Number 4 says -- I believe it was a she, was pro

14   Microsoft, and therefore I have removed her.

15       Juror Number 5 works, apparently, for Microsoft, but

16   answered the question can be fair, and therefore, at least

17   for the time being, I am leaving that person on.

18       Number 6 is the first of the economic hardship people.  He

19   is the salesman for Sleep Country.  If anyone doesn't know

20   what Sleep Country is, they are a mattress -- a

21   well-publicized cheap mattress outfit.  As I think I told you

22   in the pretrial conference, I am a sucker for economic

23   hardship.  If they don't want to be here, I don't think they

24   would make good jurors.  Is there anyone who objects to

25   removing 6?

1          MS. SULLIVAN:  No, your Honor.

2          MR. PRITIKIN:  We do not, your Honor.

3          THE COURT:  Then 6 is gone.

4      Number 11 is the Microsoft employee who is moving on

5  Wednesday.  She said she couldn't be fair, so 11 is gone.

6      18 is the hourly employee who does events, and said she

7  couldn't be fair.  So I have removed 18.

8      Number 20 is the next economic hardship.  That's the

9  person who has a project due, and then he had a vacation, and

10  he had two other reasons why he couldn't possibly serve as a

11  juror.  Any objection to removing him?

12          MS. SULLIVAN:  No objection.

13          THE COURT:  20 is gone.

14      22 is the woman who works at a mental health counseling

15  organization, who noted on her form that she has English

16  issues.  She also said that she didn't think she could be

17  fair.  So I have removed her.

18      24 was the medical safety officer at the University of

19  Washington.  The University of Washington has lots of medical

20  safety officers, so she gets to stay.

21      Juror Number 23, by the way, is quite famous around here.

22  She is an extremely accomplished person.  I haven't looked at

23  those briefings for a while, I don't know if you were

24  involved in that case, but I think she also has a role in the

25  gene for women's breast cancer.

1          MS. SULLIVAN:  That's correct, your Honor.

2          THE COURT:  25 is the one who says she is going on

3    vacation next week for the entire week.  I would remove 25.

4    Any objection?

5          MS. SULLIVAN:  No objection.

6          MR. PRITIKIN:  No objection.

7          THE COURT:  27 is the young man who said he had to

8    pick his child up for childcare.  That is pretty iffy, but he

9    says he doesn't really have anyone else to do it.  I would be

10   inclined to remove him.  We have lots of jurors.  Any

11   objection?

12         MS. SULLIVAN:  No objection.

13         MR. PRITIKIN:  No objection.

14         THE COURT:  27 is gone.  30, Ms. Sullivan got her to

15   say she can't be fair, so she is gone.  That was a surprise.

16   We asked that question three times before.

17      35 is a lawyer for the Perkins Coie firm.  They do work, I

18   think, for both sides.  Apparently she doesn't do the Google

19   trademark work.  She said she could be fair.  If you want, I

20   will hear argument on 35, but I don't think I have enough to

21   remove her.

22      And I don't think we will ever get to 37, but that was the

23   massage therapist who said he had an economic hardship.  So I

24   have removed 37.

25         MS. SULLIVAN:  No objection.

 1          MR. PRITIKIN:  No objection.

 2          THE COURT:  Let me recap then.  The court has struck

 3   1, 4, 6, 11, 18, 20, 22, 25, 27, 30 and 37.  And I will hear

 4   argument on others.  Mr. Harrigan.  Mr. Pritikin.

 5          MR. PRITIKIN:  There are none others that we are

 6   asking to be excused for cause, your Honor.

 7          THE COURT:  Okay.  Ms. Sullivan.

 8          MS. SULLIVAN:  Your Honor, several more for cause due

 9   to a relationship with Microsoft.  With respect, we would

10   like to strike for cause Juror Number 5.  Notwithstanding his

11   answer that he could be fair, he later answered that he works

12   for Microsoft and has a lot of close associations with

13   coworkers and has made donations to the Gates Foundation.  We

14   think Juror Number 5, like Juror Numbers 1 and 11, should be

15   struck because of his relationship with Microsoft.

16          THE COURT:  How do I get around the "I can be fair

17   response"?

18          MS. SULLIVAN:  I think, your Honor, it is simply that

19   he has a financial interest, and that a financial interest

20   often colors our own ability to be fair.

21          THE COURT:  All right.  Let me think about that one.

22   I will give you an answer in a moment here.  Who else?

23          MS. SULLIVAN:  We would also respectfully ask that

24   you strike Juror Number 38, who is the juror who said she has

25   a husband who retired from Microsoft, and that -- I think for

1    the same reason, financial interest.

2            THE COURT:  You actually won't get to 38.  What does

3    Microsoft think on that one?

4            MR. PRITIKIN:  She said she could be fair.  We would

5    take her at her word, your Honor.

6            THE COURT:  The fact that he is retired, I don't

7    think, without some showing that he is receiving a pension or

8    whatever, which I don't believe to be true, I am not going to

9    sustain 38.

10           MS. SULLIVAN:  Your Honor, I just have one more for

11   cause because of the financial interest in Microsoft.  And

12   that is Juror Number 35.  We do think that she said she works

13   10 to 15 hours a week on a Microsoft account, and we think

14   that being a lawyer -- outside counsel for Microsoft really

15   should lead you to excuse her for cause.

16           THE COURT:  Mr. Pritikin.

17           MR. PRITIKIN:  Again, she said she could be fair.  I

18   think her firm does work for both companies.  Unlikely we

19   will get that far anyway.  I see no reason.

20           THE COURT:  I will strike Number 35.  She is a

21   partner, which means she has a financial interest in an

22   entity, which means she is a direct customer of Microsoft.

23   It seems to me that is sufficient.

24       Any others?  Number 5 is pending.

25           MS. SULLIVAN:  Your Honor, we had several -- we noted

1    several other jurors that owned Microsoft stock, some of them

2    also owned Google stock.  Some of them only owned Microsoft

3    stock.  Is your Honor inclined to strike anyone who said they

4    owned stock in either company?

5            THE COURT:  No.  I asked --  We had people out there

6    on both sides of that question.  And I asked if it would

7    influence them one way or the other, and the answer was no.

8    I am not inclined --  If we did that --  Around here you've

9    got 30,000 employees in the Puget Sound area, you have a lot

10   of shareholders.  This just happens to be one of the parts of

11   the country where there are a lot of investors in that

12   industry.

13       I am going to take 5 off, even though he says he can be

14   fair.  His body language and such when he was giving those

15   answers wasn't convincing to me.

16           MS. SULLIVAN:  Thank you, your Honor.

17           THE COURT:  Mr. Pritikin, anything more?

18           MR. PRITIKIN:  Nothing further, your Honor.

19           THE COURT:  Let me confirm that I have removed, 1, 4,

20   5, 6, 11, 18, 20, 22, 25, 27, 30, 35 and 37.  Anyone disagree

21   with that?

22           MS. SULLIVAN:  That's correct, your Honor.  Is 38

23   still pending, that's the retired husband, or did you rule?

24           THE COURT:  He is on for the time being.

25           MS. SULLIVAN:  We have several others to raise per

1    your invitation about hardship.

2          THE COURT:  When you finish, let's be finished.

3    Let's not just keep going through these.  What is your

4    hardship?

5          MS. SULLIVAN:  On hardship, I didn't think we got to

6    that category.

7          THE COURT:  We are done --

8          MS. SULLIVAN:  We just have one more, Juror Number

9    28.  Juror Number 28 said, I have just obtained a care-giving

10   position to begin Wednesday, a woman with hip surgery whose

11   husband had a stroke.

12         THE COURT:  Did they ever say anything in the course

13   of --  I don't remember her ever speaking up.  If that's the

14   case, I would be inclined to remove 28 also.  Any objection?

15         MR. PRITIKIN:  No, sir.

16         MS. SULLIVAN:  Thank you, your Honor.  We are done.

17         THE COURT:  Counsel, Casey will start with the

18   plaintiff, we will do one number, it goes to the defense, it

19   does one number, goes back to the plaintiff for the second.

20   If at any point you have exhausted who you want to perempt,

21   draw a line through the rest of the spots, sign it and give

22   it back to Casey.  I do not employ the rule, although I'm not

23   sure where it comes from, if you have perempted 15 you can

24   never go back to anyone before 15.  It is free go.

25       They will be back in five minutes.  In the meantime you

1    all can go talk, and I will probably come out around 11:25.

2    (Break.)

3              THE COURT:  Ladies and gentlemen, what is happening

4    currently is what I was telling you about:  At the end we

5    have what we call for-cause challenges, which are people who

6    have reasons for which they have indicated they can't be fair

7    or they have vacation plans.  Those are excused.  And then

8    the parties are given three peremptory challenges each.

9    Those are exercised by the piece of paper that is being

10   passed back and forth.  And takes us a little bit of time to

11   do that.  Once we do that, we will get the actual jury

12   seated, and we will excuse everyone else.

13       When we do that, you will find us blockading the door to

14   collect all of the numbers.  You are in federal court.  I

15   have lifetime tenure, unless I commit high crimes or treason.

16   However, they only give me one set of numbers.  We are very

17   careful to get them back each time.  Please introduce

18   yourself to your neighbor and make yourself comfortable and

19   we will get on as soon as we finish the peremptory challenge

20   part.

21             JUROR NO. 15:  I apologize.  It occurred to me, since

22   you were talking earlier, as far as timing and things like

23   that, on September 4th I do have a commitment with my job.

24   It is really important.  I am the only one that is doing --

25   I work in biotech, and this is an experiment that is set up

1    over a couple of weeks.  And I am helping somebody finish it

2    off on that day.

3             THE COURT:  Is there anyone else that would be able

4    to do that, sir?

5             JUROR NO. 15:  I really don't know at this time.  I

6    don't know exactly what the situation is.  This is

7    something --  I apologize.

8             THE COURT:  I will see one lawyer from each side at

9    sidebar, please.

10   (Sidebar out of the hearing of the jury.)

11            THE COURT:  What do we do with Mr. 15 here?  The 4th

12   is dead-on.  It is a trial day.

13            MR. PRITIKIN:  I know.  It will be a conflict that

14   day.  We would leave it to your discretion, your Honor.

15            MS. SULLIVAN:  We have no objection to excusing him.

16            THE COURT:  I will excuse him.  It makes you wonder,

17   you have asked these questions over and over again.  15 will

18   be excused then.

19   (End of sidebar.)

20            THE COURT:  Ladies and gentlemen, the following have

21   been selected to serve as the jurors in this matter.  Please

22   let me finish reading the list of all eight of you, and then

23   the rest of you are free to gather up your stuff and depart,

24   knowing that we have that back door blockaded until we

25   collect the numbers.  For the eight of you who are serving,

88

1  you can just stay seated and we'll get you moved up here

2  where you need to be in the jury box.

3      The last thing I will say is, don't try and figure out why

4  you were or weren't selected for the jury.  I love to tell

5  the story of the man who I started work with, who very

6  carefully told me, never, under any circumstances, put

7  someone with tinted glasses on the jury.  In later age he got

8  tinted glasses.  This is some science, some art, and some

9  just what your stomach tells you.  Don't think somehow that

10 you were not selected because of something you said or --

11 Perhaps it was because of something you said, because I

12 removed several people who said they couldn't be fair or who

13 said they had plans and wouldn't be available for the full

14 trial.

15     Ladies and gentlemen, the following jurors have been

16 selected as the jury in this matter:  Number 2, Number 3,

17 Number 9, Number 10, Number 12, Number 13, Number 14, and

18 Number 23.

19     To the rest of you, thank you very much for coming in.  I

20 know this is not your favorite thing to do, but please go

21 home and tell all your friends, having gone through voir dire

22 at least in this courtroom, it was an entertaining morning.

23 Thank you very much.  And you are excused.

24     Please be seated, ladies and gentlemen.  Mr. Harrigan,

25 does Microsoft accept the jury as constituted?

1           MR. HARRIGAN:  Yes, your Honor.

2           THE COURT:  And I'm not sure --  Ms. Sullivan, does

3   Motorola accept the jury as constituted?

4           MS. SULLIVAN:  Yes, your Honor.

5           THE COURT:  All right.  Ladies and gentlemen, let me

6   tell you what we are going to do, other than let you go to

7   lunch:  Which is, I am not going to swear you in.  We will

8   leave you unsworn until you come back.  When you come back we

9   will have you swear another short oath saying you will be

10  good jurors.

11      Let me talk with you, though, in the meantime about just a

12  couple of practical details.  The first of which is,

13  everything that you need to know about this case you are

14  going to learn here in the courtroom.  We have rules about

15  what is received into evidence and what is not.  There is a

16  lot of other stuff out there.  There was a lot of comment at

17  one point about this case among a very narrow slice of the

18  population.  But you can find it easily enough on the

19  internet if you wanted to.  You can't.  The reason is that

20  some of that is just completely wrong, some of it is not

21  based on any facts, some of it is just opinions.  We can't

22  have you exposed to that.  We want to you hear what is heard

23  here, because it has been vetted, and, most importantly, also

24  all of you are going to hear it at the same time so you can

25  have the same body of knowledge to deal with.  Secondly, both

1    sides will know what you have heard, and they will have a

2    chance to ask questions of the witnesses to produce that

3    material.  You will hear me say over and over again, please

4    don't consult the internet.  I know it is so tempting.  I

5    know some of you undoubtedly want to have your own blog: I

6    was a juror in this trial.  And you are welcome to do that,

7    but not until it is over with.  Otherwise, counsel would know

8    way too much about the jury deliberations, which are your

9    matter and no one else's.

10        Finally, from time to time there may be news accounts

11   about this trial.  If there are, please don't read them.

12   Don't let anyone talk to you about the case.  When you go

13   home tonight they are going to say:  What is the case about?

14   The answer is going to be:  I can't talk to you about what it

15   is about.  You are free to advise your employers that you are

16   on jury duty.  If they have any questions about that, I will

17   be happy to give them a call and explain to them you are

18   doing something that is extremely important, and they need to

19   pay you.

20        Finally, because of the configurations in this courthouse,

21   you are going to be riding the public elevator.  You have a

22   badge on that says juror.  These are nice people.  They are

23   not going to do anything other than be in the elevator, but

24   they will pretend you are not there.  And the reason they are

25   pretending you are not there is, if they say something to you

1    as innocent as good morning, and someone else sees it, they

2    don't know whether it was good morning.  It could have been,

3    vote my way, or, boy, isn't that other side terrible?  The

4    lawyers and the witnesses are under instructions never to

5    talk to you.  It is not that they are being rude, it is just

6    the fact that we need to do that in order to make sure that

7    you don't receive anything improper.

8        If someone does try to talk to you about the case, let me

9    know about it immediately.  We have had that happen once.  It

10   was a client representative who was trying to pick up a juror

11   to go on a date.  He was very surprised when the date turned

12   out to be three United States marshals who took him down to

13   the jail on the tenth floor.  We finally got it sorted out

14   after he spent four hours in a cell.  There is a good reason

15   for folks not to do that.

16       Other than that, there are lots of places to go to lunch.

17   I am going to release you.  I would like you back here about

18   1:20, 1:25.  We can't start without all of you being here.

19   So not only will I be unhappy with you, but your seven other

20   jurors will be unhappy with you.

21       There is lots of restaurants in this area, and they are

22   pretty used to having people get in and out promptly.

23       The clerk will take you back and show you your luxurious

24   quarters, with your dynamic view of the skyline, and the

25   56-inch television we have back there.  If you believe any of

1   that, I also have the Brooklyn Bridge for sale.

2       Other than that, I will see you shortly when you come

3   back.  I will have you sworn in.  I am going to read you some

4   very long jury instructions, that are kind of like the

5   operating manual for how to be a juror.  One of those

6   instructions is much longer than usual, and it is an outline

7   of the case.  I do that because, with the assistance of the

8   lawyers, this is an unusual case and we want you to know a

9   bit more about it so that you understand the context of the

10  testimony you are about to hear.  That will probably take

11  about 20, 25 minutes, and then we are going to go directly

12  into opening statements.

13      For those of you who watch a lot of television and watch

14  any of those crime and courtroom shows, they don't touch

15  reality in the slightest.  I can promise you that I will

16  never say, "Dial it back, Mr. McCoy," or have someone ask a

17  question and then when it is objected to, say, withdrawn, and

18  turn dismissively.  If they did that they would be on their

19  way out of here.

20      An opening statement is a statement.  It is what the

21  parties intend to prove during the trial.  The part where

22  they all wave their arms and argue, that is closing argument.

23  Notice the difference between a statement and an argument.

24  And that will happen next week.

25      So look forward to opening statement.  It will be

1    interesting.  These are very talented lawyers.  They have

2    important questions for their clients, and so they are going

3    to do a very good job.  I will promise you when you are here

4    we will use your time wisely.  That is our deal with you.

5        Yes, ma'am.

6            JUROR:  May we take notes?

7            THE COURT:  You may take notes.  One of those

8    operating instructions will say that.  I will give you a copy

9    of the jury instructions to follow along with me, because

10   studies suggest if you are reading and listening at the same

11   time you will pay closer attention.  I am then going to take

12   those back, because at the end of the trial I will give you

13   the final instructions.  Those will be the ones that control

14   your deliberations.  In the meantime, I want to give you

15   every advantage I can in order to help you understand the

16   evidence and help you keep track of it.

17       I have been asked on occasion whether you can keep your

18   notes on your computer.  I would prefer you not do that.  We

19   are going to give you something that I grew up with, which is

20   a steno pad.  I think we are using pens, and not pencils at

21   this point, but who knows.  It may be a rather antique

22   process, but it seems to work pretty well.

23       Your notes stay in the jury room.  No one else ever sees

24   them.  At the end of the trial they are destroyed, so you can

25   be as candid as you want to be in terms of writing things

```
 1   down.  They are exclusively for your use.

 2       Ladies and gentlemen, please rise for the jury.  We will

 3   see you all around 1:25, and you will be out here at 1:30.

 4   (At this time the jury left the courtroom.)

 5           THE COURT:  I am advised by my in-court clerk that we

 6   are now all one degree of separation closer to Helen Hunt,

 7   because apparently Helen Hunt played Juror 23 in some movie.

 8       Mr. Harrigan, anything else before we break for lunch?

 9           MR. HARRIGAN:  Yes, your Honor.  We have a question.

10   The court has said that the conclusions of law are free to be

11   used.  We are uncertain whether that applies to conclusions

12   of law that the court has reached in the course of making

13   various rulings in this case.  And I am coming back to my

14   favorite subject of whether blatantly unreasonable offers are

15   a breach of the duty of good faith and fair dealing.  And I

16   can cite to the court the rulings the court has made on that

17   point, which is basically at Docket 335.  The court said,

18   "Although initial offers don't need to be on RAND terms, that

19   does not mean that Motorola, as the owner of

20   standards-essential patents subject to RAND licensing

21   agreements with the IEEE and ITU, may make blatantly

22   unreasonable offers to implementers."  And went on to say,

23   "Thus, although the language of Motorola's agreements do not

24   require it to make offers on RAND terms, any offer by

25   Motorola, be it an initial offer or an offer during a
```

1    back-and-forth negotiation, must comport --"

2          THE COURT:  Mr. Harrigan, you are not speaking

3    distinctly.  Why don't we try the podium?  If you are going

4    to read, you need to go slowly.

5          MR. HARRIGAN:  "Whether an initial offer or an offer

6    during a back-and-forth negotiation must comport with the

7    implied duty of good faith and fair dealing inherent in every

8    contract."  And went on to hold, "To determine whether

9    Motorola's offers were so blatant that the fact finder would

10   need to compare Motorola's offers against a RAND royalty in

11   order," quote, "to determine whether Motorola's offers were

12   so blatantly unreasonable as to breach its duty of good

13   faith," unquote.

14     So we believe that those rulings say that the good-faith

15   determination can be made based upon whether an offer is so

16   blatantly unreasonable as to reach that level of a breach of

17   the covenant.  We would like to be able to say that to the

18   jury in opening statement, but we don't know if the court

19   considers that a conclusion of law, number one, or whether it

20   is going to be in instructions at the end of the case.

21   That's our question.

22          THE COURT:  It is a mixed finding of fact and

23   conclusion of law, because it is hard to keep the two

24   distinct.  I can tell you that in what is proposed to you all

25   as Instruction 19 in the final jury instructions, it says,

1    after some introduction, "Initial offers in a RAND licensing

2    negotiation do not need to be on RAND terms; two, any offer

3    by Motorola, be it an initial offer or an offering during a

4    back-and-forth negotiation must comport with the duty of good

5    faith and fair dealing as set forth in Instruction 19."

6    Those numbers are going to change because we are still

7    putting things in and pulling them out.  And "Number 3, in

8    determining whether Motorola's October offer letters complied

9    with Motorola's duty of good faith and fair dealing, you may

10   compare Motorola's offers against the RAND royalty rate and

11   range determined by the court, and set forth in Instruction

12   20.  However, the size of an offer alone is not dispositive

13   of whether Motorola has breached the duty of good faith and

14   fair dealing."  I believe we have interlineated the words "is

15   not exclusively dispositive."  "Of whether Motorola has

16   breached its duty of good faith and fair dealing.  To

17   determine whether Motorola's offer breached its duty of good

18   faith and fair dealing you must use the standards set forth

19   in Instruction 19," which is what I have just read to you.

20   That's the answer to your question.

21       We hope to get you these soon.  As you can see, the

22   post-its are getting fewer.  Does that answer your question,

23   Mr. Harrigan?

24            MR. HARRIGAN:  Yes, your Honor.

25            THE COURT:  Anything further?

1          MR. HARRIGAN:  Not here, your Honor.

2          THE COURT:  Mr. Sullivan?  Mr. Cannon?

3          MS. SULLIVAN:  Mr. Cannon has one item.

4          MR. CANNON:  A question.  One of the witnesses that

5    could potentially testify today, Mr. Treadwell from

6    Microsoft, we had a couple of objections.  We knew it was an

7    unusual morning, so I don't know when you might like to take

8    those up.

9          THE COURT:  "Objections" meaning?

10         MR. CANNON:  To the two demonstratives.  We have an

11   objection to the two demonstratives.

12         THE COURT:  I will see you about 1:25.  It would be

13   helpful if the demonstratives either be on the screen or you

14   have them here.  We will be in recess.  Counsel, thank you.

15       This was an interesting morning.  I really do want to

16   stress, particularly to the audience, this was an unusually

17   educated jury pool for us.  That's good.

18       I believe we are giving you copies of the preliminary

19   instructions at this time if anyone wants to collect them for

20   the parties.  We will be in recess.

21                   (The proceedings recessed.)

22

23

24

25

1                        AFTERNOON SESSION

2              THE COURT:  Counsel, I understand you don't need to

3     talk about the Treadwell exhibits.

4              MR. CANNON:  Correct, Your Honor.

5              THE COURT:  Are there questions, then, before we

6     bring the jury in?  Mr. Harrigan?

7              MR. HARRIGAN:  Not here, Your Honor.

8              THE COURT:  Mr. Palumbo, Mr. Price?

9              MR. PRICE:  No, Your Honor.

10             THE COURT:  All right.  I intend to distribute, as I

11    indicated this morning, the preliminary copies of the

12    preliminary jury instructions, one for each juror.  We will

13    collect those at the end of opening statements.  They're not

14    going to stay with the jury during the entire time.  I was

15    persuaded by the parties' comments in our telephone

16    conference.

17        It occurred to me that in order to make your comments more

18    understandable for the jury, I was also going to give them a

19    copy of the glossary, because some of the terms that are

20    defined in the preliminary instructions pick up things like

21    SEP, as opposed to standards-essential patent every time.

22    And I tend to leave those with the jurors so they have those

23    during the course of trial.  Those have been agreed to by

24    both parties.

25        I believe we're ready to bring the jury in.

1      Mr. Harrigan, does Microsoft have its first witness ready

2   for after opening?

3            MR. HARRIGAN:  Yes, Your Honor.

4      (The following occurred in the presence of the jury.)

5            THE COURT:  Ladies and gentlemen, as I indicated,

6   we're going to read you some preliminary instructions.  Think

7   of it a bit like the operating instructions for your

8   television set.  They're designed to help you figure out

9   what's going on.

10     No. 2 is not one of those.  No. 2 is a fairly lengthy

11  discussion of the case to give you some factual context.

12     In addition, each of you are receiving a glossary.  As you

13  will find out during the course of this trial, there are some

14  terms that we throw around a lot, in which you're going to

15  wonder what in heaven's name are we talking about.  And I

16  will tell you that one that I noticed that we were using

17  ahead of time was SEP.  SEP, which you will see, stands for

18  standards-essential patent.  After I finish reading all of

19  these instructions to you, you'll understand perfectly what

20  that means and how it fits into the case.  But this is yours

21  to hold onto and keep with your notebook.

22     Once I finish reading these instructions, then we will

23  have the opening statement by Microsoft, followed by the

24  opening statement by Motorola.  And then Microsoft will be

25  calling its first witness.

1      The other thing I remind you is the difference between an

2  opening statement and a closing argument.  So don't have your

3  expectations too high to see any fireworks.  And at this time

4  I'm going to ask the clerk to swear you all in as jurors.

5                    (The jury panel was sworn.)

6          THE COURT:  Ladies and gentlemen, when I have

7  occasion these days to fly across country -- I do it a lot

8  less than when I was a lawyer in private practice -- I always

9  buy a really cheap Elmore Leonard novel, and then turn to the

10  last page to find out who did it.  I'm going to ask you not

11  to do that.  Studies show that if we read you something and

12  you have it in front of you and can follow along, your

13  retention of that material is quite a bit higher.  So I would

14  ask that you not flip ahead to see "who did it" but follow

15  along with me as I read these.

16      No. 1.  Duty of the jury.  Ladies and gentlemen, you are

17  now the jury in this case.  It is my duty to instruct you on

18  the law.  You must not infer from these instructions, or from

19  anything I may say or do, as indicating that I have an

20  opinion regarding the evidence or what your verdict should

21  be.  It is your duty to find the facts from all the evidence

22  in the case.  To those facts you will apply the law as I give

23  it to you.  You must follow the law as I give it to you,

24  whether you agree with it or not.  You are not to be

25  influenced by any personal likes or dislikes, opinions,

1    prejudices or sympathy.  That means you must decide the case

2    solely on the evidence before you.  You will recall that you

3    took an oath to do so.  In following my instructions, you

4    must follow all of them, and not single out some and ignore

5    others; they are all equally important.

6        No. 2.  This is the one I've talked to you about now a

7    couple of times.  This is a more expanded version than what

8    we normally give.  The reason is that I've already conducted

9    one phase of this proceeding.  And so, as they say on the

10   television, "This is what happened in the first season," and

11   now you get to be the second.

12       No. 2.  This case is being conducted in two phases.  This

13   is the second phase.  The first phase was what was called a

14   bench trial.  In a bench trial there is no jury, only a judge

15   (in this case me) who listens to evidence presented by the

16   parties and makes certain factual findings and legal rulings.

17   You must follow the legal rulings I made in that trial, and

18   accept as true the facts that I found.  In this preliminary

19   instruction, I will inform you of some of these earlier

20   rulings.

21       Moreover, witnesses and counsel may refer to these earlier

22   rulings from time to time during the trial.  Importantly, in

23   the prior trial I did not examine the issues that are before

24   you in this phase of the trial.  The issues before you are

25   for you and you alone to decide based on the evidence you

1    will hear.

2        I will start with a general overview of this case.  This

3    is a breach of contract case between Microsoft Corporation,

4    the plaintiff, and the defendant, Motorola Inc., Motorola

5    Mobility Inc., and General Instrument Corporation.  I will

6    refer to all of these defendants as Motorola.

7        Motorola and Microsoft participate in international

8    organizations that set technical standards called

9    standard-setting organizations.  You'll see on your glossary

10   for standard-setting organizations they sometimes are called

11   standard-developing organizations, or standard-setting

12   organizations.  These are organizations that develop and

13   adopt standards.  So you may hear from time to time them

14   being called SDOs or SSOs.

15       Standard-setting organizations define standard ways of

16   performing certain functions so that different products can

17   interact or interoperate with each other.  These

18   organizations bring together scientists and engineers from

19   leading companies to share technologies to improve technology

20   standards.  Companies that participate in standard setting

21   organizations agree on common technologies so that products

22   comply with the standards and work together.  The agreed

23   standards are published and shared with the industry.  The

24   standard-setting organizations hope to achieve widespread

25   industry adoption of the agreed standards.

1       There are many standard-setting organizations and many
2    technology standards.  This case concerns two standard
3    setting organizations and two technical standards.  The first
4    one is called Institute of Electrical and Electronic
5    Engineers.  It is call the IEEE for short.  The IEEE defines
6    a standard for wireless communications as the "802.11
7    standard," which you might be familiar with as WiFi.  The
8    second organization is the International Telecommunication
9    Union called the ITU.  The ITU defines a standard for video
10   coding technology called the H.264 standard.

11      Some of the technology in these standards is not patented,
12   and therefore available for public use.  However, each of
13   these standards includes some technology that is covered by
14   patents.  The patents that are used or infringed when
15   products are built to comply with a standard are sometimes
16   called standards-essential patents.  Once again, if you look
17   at your glossary you would see SEP, standards-essential
18   patent.  That's a term you'll hear thrown around by us all
19   the time.

20      Standard-setting organizations want companies and
21   consumers to adopt the agreed standards.  To encourage
22   widespread adoption, these organizations seek contractual
23   commitments from the owners of the standards-essential
24   patents.  Based on these commitments, the owners of the
25   standards-essential patents are contractually required to

1     license those patents to anyone that wants to use the

2     standard on what are called RAND, or RAND terms.  The term

3     RAND stands for reasonable and non-discriminatory.

4         Motorola owns patents that are essential to the 802.11 and

5     the H.264 standards and Motorola has committed to the IEEE

6     and the ITU to grant licenses on RAND -- again, reasonable

7     and non-discriminatory -- to anyone and everyone who wants to

8     use the standards.  The court has determined that Motorola's

9     commitments to the IEEE and the ITU are enforceable

10    contracts, and Microsoft, as a user of the 802.11 and H.264

11    standards, is entitled to enforce these contracts in court.

12    Microsoft claims that Motorola breached these contracts.  The

13    following are some of the facts that relate to Microsoft's

14    claims.

15        On October 21, 2010, Motorola sent Microsoft a letter

16    seeking royalty payments in exchange for a license to

17    Motorola's 802.11 standards-essential patent.  On October 29,

18    2010, Motorola sent a similar letter seeking royalty payments

19    in exchange for a license to its H.264 standard essential

20    patents.

21        On November 9, 2010, Microsoft filed this lawsuit against

22    Motorola, asserting, among other things, that Motorola

23    breached its contracts with the IEEE and the ITU by the terms

24    contained in these letters.  After this case was filed,

25    Motorola filed patent infringement lawsuits against Microsoft

1   for using Motorola's standard essential patents.  In those

2   lawsuits Motorola sought injunctions.  An injunction is an

3   order from a court that requires someone to stop doing

4   something.  Motorola was seeking injunctions that would stop

5   Microsoft from selling products that use either the 802.11 or

6   H.264 standard, including Windows and Xbox.

7        The issue in this case is breach of contract.  Microsoft

8   claims that Motorola breached the IEEE and ITU contracts by

9   violating the covenant of good faith and fair dealing that is

10  implied in these contracts.  Specifically, Microsoft alleges

11  that Motorola breached the IEEE contract by the following

12  actions:  By the terms contained in the October 21, 2010

13  letter offering to license Motorola's 802.11 standard

14  essential patents; seeking injunctive relief in lawsuits

15  based on standard essential patents; and not executing a

16  license agreement covering its 802.11 standard essential

17  patents with a company called Marvell, Microsoft's WiFi chip

18  supplier.

19       Similarly, Microsoft alleges that Motorola breached the

20  ITU contract by the following actions:  By the terms

21  contained in the October 29, 2010 letter offering to license

22  Motorola's H.264 standards-essential patent, and seeking

23  injunctive relief in lawsuits based on standards-essential

24  patents.  Microsoft has the burden of proving these claims.

25       Motorola denies that any of its conduct constituted a

1   breach of its RAND commitments and denies that it violated

2   any duty of good faith and fair dealing implied in its

3   contract with the IEEE and the ITU.  Motorola also denies

4   that any of its conduct in this case caused Microsoft

5   damages.  Motorola contends that Microsoft has not taken

6   reasonable steps to mitigate any damages that it may have

7   suffered.

8        Having given you this general overview, I will now provide

9   you with additional detail on some of the concepts that are

10  important in this case.  The owner of a patent that is not a

11  standards-essential patent may grant licenses to other

12  companies permitting them to sell products that include the

13  patent owner's patented technology.  Such licenses may

14  require payment of a licensing fee, which is sometimes called

15  a royalty payment.  If the patent is not a

16  standards-essential patent, then the owner of the patent can

17  charge as much as it wants for the license.  If the price is

18  too high, the other companies can just walk away and not use

19  the patents.

20       There are different rules regarding standards and

21  standards-essential patents.  When a standard becomes widely

22  implemented or adopted, the owner of a standards-essential

23  patent could have substantial leverage to demand excessive

24  royalties.  Indeed, there may have been alternatives to the

25  patented technology available when the standard was agreed

1   to, but after the standard is widely adopted by the industry,

2   switching to those alternatives is either no longer viable or

3   would be too expensive.

4       The ability of an owner of a standards-essential patent to

5   demand more than the value of its patented technology and

6   attempt to capture that value that comes from being the

7   standard is called "hold-up."  Hold-up can undermine the

8   standard-setting process and threaten the adoption of

9   valuable standards.

10      Another issue with standards and standards-essential

11  patents is called royalty stacking, which occurs when many

12  different holders of standards-essential patents seeks

13  excessive royalty payments for a given standard.  If there

14  are a large number of owners of standards-essential patents

15  for a given standard, the total royalty payments might make

16  the product too expensive to make and sell and undermine the

17  standard.

18      Complex industry standards like H.264 and 802.11 can

19  require the use of hundreds or thousands of

20  standards-essential patents held by dozens of patent holders.

21  Stacking concerns arise if the total "stack" of royalty

22  payments would make the use of the standard too expensive and

23  the standard would potentially fail in the market.  Royalty

24  stacking can be an even bigger problem for products that must

25  comply with multiple standards.  The RAND commitment seeks to

1    prevent royalty stacking and ensures that the aggregate

2    royalties associated with a given standard are reasonable.

3        To address the problems of hold-up and stacking, many

4    standard-setting organizations, including the IEEE and the

5    ITU, have adopted rules relating to the licensing of

6    essential patents.  Their policies require or encourage

7    companies participating in the standard-setting process to

8    agree to license their standards-essential patents on

9    reasonable and non-discriminatory or RAND terms to anyone who

10   requests a license.  These agreements are contracts called

11   RAND commitments.

12       The purpose of these contracts is to encourage widespread

13   adoption of the standard and prevent hold-up and royalty

14   stacking.  RAND commitments address the hold-up problem

15   because a RAND commitment limits a patent holder to a

16   reasonable royalty on the economic value of its patented

17   technology alone, not any value of the standard.  RAND

18   commitments address the stacking problem by ensuring that the

19   total royalties for all standards-essential patents within

20   any standard are reasonable and non-discriminatory.

21       As I mentioned earlier, this case involves two standards

22   called 802.11 and H.264.  The 802.11 standard is a wireless

23   communication standard developed over many years by the IEEE,

24   and you may know it by its more common name of "WiFi."  The

25   H.264 standard is a video coding compression standard.

 1   Popular examples of technologies that use the H.264 video

 2   compression standard include Blu-ray movies and YouTube

 3   videos.  Two different standard-setting organizations were

 4   involved in developing the H.264 standard, but for

 5   simplicity, I will refer to H.264's standard-setting

 6   organizations as just ITU.

 7        The 802.11 standard allows companies to build products for

 8   wireless local area networking of computers and other

 9   electronic devices.  If you have a home WiFi network, a

10   computer chip in your laptop uses the 802.11 standard to

11   connect to that network through the internet.  The 802.11

12   standard is the most widely used and universally accepted

13   wireless communication standard for ordinary and consumer

14   business use.

15        Although there are many video coding standards, the H.264

16   standard developed by the ITU is currently the most widely

17   used video coding and compression format.  Video coding and

18   compression is the process of transforming video into

19   compressed files that take up less space.  When a consumer is

20   ready to watch a video, the video will be decoded by hardware

21   or software on the device that is being used to watch the

22   video.  Such a computer decoding turns an encoded smaller

23   file back into an uncompressed video for viewing.

24        I will now explain the rules that the IEEE and the ITU

25   adopted and the RAND licensing commitments that Motorola made

1  to the IEEE and ITU.  The ITU's policies require that a

2  patent essential to the H.264 standard must be accessible to

3  everyone without undue constraints.  When patent owners

4  disclose they may have a patent essential to the standard,

5  the ITU will seek a licensing commitment from the patent

6  holder.  The licensing commitment is often referred to as a

7  Letter of Assurance, or an LOA for short.  The ITU provides

8  three options:  First, the patent holder may commit to

9  license its standards-essential patents on a royalty-free

10 basis; second, the patent holder may commit to license its

11 standards-essential patents on RAND -- again, reasonable and

12 non-discriminatory -- or, third, the patent holder may

13 decline to make any licensing commitment.  However, if a

14 standard essential holder declines to make to make a RAND or

15 royalty-free licensing commitment, the ITU's policy is that

16 the standard will not include any technology that might

17 depend on the patent.  In other words, either the patented

18 technology must be free, or the licensing terms must be

19 reasonable and non-discriminatory; otherwise, the ITU will

20 not incorporate the technology in the standard.

21     Motorola submitted several Letters of Assurance to the ITU

22 in connection with its H.264 standards-essential patents.

23 Motorola's Letters of Assurance stated it would grant

24 licenses to an unrestricted number of applicants on a

25 worldwide, non-discriminatory basis and on reasonable terms

1    and conditioned on reciprocity.  Reciprocity means if Company

2    X wanted a license on RAND terms to Motorola's H.264 patents,

3    it has to provide Motorola with a license on RAND terms to

4    any of Company X's H.264 patents.

5        Like the ITU, the IEEE has policies that encourage

6    standards-essential patent holders to make RAND commitments

7    and provide Letters of Assurance.  The IEEE does not require

8    that specific patents be identified; instead, it only

9    requires that the contributing patent holder make the

10   licensing commitment for all patents that may potentially be

11   essential to the standard.  Like the ITU, the IEEE

12   historically has not included technology into a standard

13   unless it obtained such a Letter of Assurance from the holder

14   of standards essential patents.  Motorola submitted Letters

15   of Assurance to the IEEE and agreed to grant licenses to any

16   of its patents that are essential to the 802.11 standard on

17   RAND terms.

18       The IEEE and the ITU do not define what RAND licensing

19   terms are, but leave negotiation of such terms to the parties

20   involved.

21       The primary Microsoft products at issue in this case that

22   use the H.264 standard are Windows and Xbox.  Windows is an

23   operating system for computers.  Xbox is historically a video

24   game player, but now also plays video from sources on the

25   internet and can be used to play DVDs.  As for the 802.11

 1    standard, Xbox is the only Microsoft product at issue.

 2        As I stated at the beginning, this case is being conducted

 3    in two phases, and this is the second phase.  In the first

 4    phase I conducted a bench trial, the purpose of which was to

 5    determine a RAND royalty rate and range for Motorola's

 6    standards-essential patents.  As I told you before, the IEEE

 7    and ITU do not set RAND rates at which the parties are

 8    required to license their standards-essential patents.

 9    Instead, negotiations over RAND rates are left to the

10    parties.

11        Here the parties never agreed on a RAND rate to license

12    Motorola's standards-essential patents.  However, in order

13    for you to properly assess Microsoft's breach of contract

14    claim, you must know what a RAND royalty rate and range would

15    be for Motorola's standards-essential patents.  I will now

16    tell you what those rates are.

17        You will be provided these rates again at the end of the

18    trial.  For each group of standards-essential patents, I have

19    found both a RAND rate and a RAND range.  This reflects the

20    fact that more than one licensing rate could be RAND.  The

21    RAND ranges are defined by an upper bound and a lower bound.

22    To determine the RAND rate and range, I assumed that

23    Microsoft and Motorola engaged in negotiations and found the

24    rate and range that the parties would have agreed to through

25    such negotiations.  I found that the RAND rate for Motorola's

1    H.264 standards-essential patent portfolio is 0.555 cents per

2    unit, with the upper bound of a RAND royalty for Motorola's

3    H.264 SEP portfolio being 16.389 cents per unit and the lower

4    bound being 0.555 cents per unit.  This rate and range is

5    applicable to both Microsoft Windows and Xbox products.  For

6    all other Microsoft products using the H.264 standard, the

7    royalty rate is the lower bound of 0.555 cents per unit.

8        I also concluded in that previous trial that the RAND

9    royalty rate for Motorola's 802.11 standards-essential patent

10   portfolio is 3.471 cents per unit, with the upper bound being

11   19.5 cents per unit and the lower bound being 0.8 cents per

12   unit.  This rate and range is applicable to Microsoft Xbox

13   products.  For all other Microsoft products using the 802.11

14   standard, the royalty rate is the lower bound of 0.8 cents

15   per unit.

16       In the bench trial, I did not decide whether Motorola

17   breached its contracts with the IEEE and ITU.  That is for

18   you to decide, and you alone.  Throughout this trial you may

19   hear lawyers refer to the bench trial, and to the findings of

20   fact and conclusions of law that I made in that trial.  You

21   must follow the legal rulings I made in that trial and accept

22   the facts that I found, but you are not to take any reference

23   to the previous trial as deciding any of the

24   breach-of-contract issues or as implying for which side your

25   verdict should be rendered.  In the prior trial, I did not

1    examine whether Motorola breached its contractual commitments

2    with the IEEE and the ITU by violating the covenant of good

3    faith and fair dealing that is implied in those contracts.  I

4    have not made a decision on those issues.  It is for you, and

5    you alone, to determine whether Motorola breached its

6    contractual commitments based on the evidence you will hear

7    in the trial.  You'll be happy to hear there won't be a quiz.

8        No. 3.  When a party has the burden of proof on any claim

9    by a preponderance of the evidence, it means that you must be

10   persuaded by the evidence that the claim is more probably

11   true than not true.  You should base your decision on all the

12   evidence regardless of which party presented it.

13       The evidence you are to consider in deciding what the

14   facts are consists of:  The sworn testimony of any witness;

15   the exhibits which are received into evidence; and any facts

16   to which the lawyers have agreed.

17       In reaching your verdict, you may consider only the

18   testimony and exhibits received into evidence.  Certain

19   things are not evidence and you may not consider them in

20   deciding what the facts are.  I will list them for you:

21       Arguments and statements by lawyers are not evidence.  The

22   lawyers are not witnesses.  What they have said in their

23   opening statements, will say in their closing arguments and

24   at other times is intended to help you interpret the

25   evidence.  But it is not evidence.  If the facts as you

1   remember them differ from the way the lawyers have stated

2   them, your memory of them controls.

3       Questions and objections by lawyers are not evidence.

4   Attorneys have a duty to their clients to object when they

5   believe a question is improper under the rules of evidence.

6   You should not be influenced by the objection or by the

7   court's ruling on it.

8       Testimony that has been excluded or stricken, or that you

9   have been instructed to disregard, is not evidence and must

10  not be considered.  In addition, sometimes testimony and

11  exhibits are received only for a limited purpose; when I give

12  a limiting instruction, you must follow it.

13      Anything you may have seen or heard when the court was not

14  in session is not evidence.  You are to decide the case

15  solely on the evidence received at the trial.

16      Some evidence may be admitted for a limited purpose only.

17  When I instruct you that an item of evidence has been

18  admitted for a limited purpose, you must consider it only for

19  that limited purpose and for no other.

20      Evidence may be direct or circumstantial.  Direct evidence

21  is direct proof of a fact, such as testimony by a witness

22  about what that witness personally saw or heard or did.

23  Circumstantial evidence is proof of one or more facts from

24  which you could find another fact.  You should consider both

25  kinds of evidence.  The law makes no distinction between the

1   weight to be given to either direct or circumstantial

2   evidence.  It is for you to decide how much weight to give to

3   any evidence.

4       By way of example, if you wake up in the morning and see

5   the sidewalk is wet, you may have found -- you may find from

6   that fact that it rained during the night.  However, other

7   evidence such as a turned-on garden hose may offer a

8   different explanation for the presence of water on the

9   sidewalk.  Therefore, before you decide that a fact has been

10  proved by circumstantial evidence, you must consider all of

11  the evidence in the light of reason, experience, and common

12  sense.

13      There are rules of evidence that control what can be

14  received into evidence.  When a lawyer asks a question or

15  offers an exhibit into evidence, and the lawyer on the other

16  side thinks that it is not permitted by the rules of

17  evidence, that lawyer may object.  If I overrule the

18  objection, the question may be answered and the exhibit

19  received.  If I sustain the objection the question cannot be

20  answered and the exhibit cannot be received.  However, when I

21  sustain an objection to a question, you must ignore the

22  question and must not guess what the answer might have been.

23      Sometimes I may order that evidence be stricken from the

24  record and that you disregard or ignore the evidence.  That

25  means when you are deciding the case you must not consider

1    the evidence I have told you to disregard.

2        In deciding the facts in this case you may have to decide

3    which testimony to believe and which testimony not to

4    believe.  You may believe everything a witness says, or part

5    of it, or none of it.  Proof of a fact does not necessarily

6    depend on the number of witnesses who testify about it.

7        In considering the testimony of any witness, you may take

8    into account the opportunity and ability of the witness to

9    see or hear or know the things testified to; the witness's

10   memory; the witness's manner while testifying; the witness's

11   interest in the outcome of the case and any bias or

12   prejudice; whether other evidence contradicted the witness's

13   testimony; the reasonableness of the witness's testimony in

14   light of all the evidence; and any other facts that bear on

15   believability.  The weight of the evidence as to a fact does

16   not necessarily depend on the number of witnesses who testify

17   about it.

18       Some witnesses, because of education or experience, are

19   permitted to state opinions and the reason for those

20   opinions.  Opinion testimony should be judged like any other

21   testimony.  You may accept it or reject it, and give it as

22   much weight as you think it deserves, considering the

23   witness's education and experience, the reasons for the

24   opinion, and all the other evidence in the case.

25       The parties have agreed to certain facts.  These facts

1   will be placed in an exhibit and read to you before closing

2   arguments. Therefore, you should treat these facts as having

3   been proved.

4       Now I will say a few words about your conduct as jurors.

5   This is going to sound familiar from before lunch. First,

6   keep an open mind throughout the trial and do not decide what

7   the verdict should be until you and your fellow jurors have

8   completed your deliberations at the end of the case.

9       Second, because you must decide this case only on the

10  evidence received in the case and my instructions on the law

11  that applies, you must not be exposed to any evidence about

12  the case or any of the issues it involves during the course

13  of your jury duty. Thus, until the end of the case or until

14  I tell you otherwise, do not communicate with anyone in any

15  way, and do not let anyone communicate with you in any way

16  about the merits of the case or anything to do with it. This

17  includes discussing the case in person, in writing, by phone

18  or other electronic means, via e-mail, text messaging, or any

19  internet chat rooms, blog, website or other feature. This

20  applies to communicating with your fellow jurors until I give

21  you the case for deliberation, and it applies to

22  communicating with everyone else, including your family

23  members, your employer, and the people involved in the trial,

24  although you may notify your family and your employer that

25  you have been seated as a juror in the case.

1    But, if you are asked or approached in any way about your

2    jury service or anything about the case, you must respond

3    that you have been ordered not to discuss the case and report

4    the contact to the court.

5    Because you will receive all the evidence and legal

6    instructions you properly may consider to return a verdict,

7    do not read, watch, or listen to any news or media accounts

8    or commentary about the case or anything to do with it.  Do

9    not do any research such as consulting dictionaries,

10   searching the internet or using other reference materials,

11   and do not make any investigation or in any way try to learn

12   more about the case on your own.

13   Third, during the trial do not talk with or speak to any

14   of the parties, lawyers, or witnesses in the case.  Not even

15   to pass the time of day.  It is important not only that you

16   do justice in the case, but that you act accordingly.  If a

17   person from one side of the lawsuit sees you talking to a

18   person from the other side, even if it's just about the

19   weather, that might raise a suspicion about your fairness.

20   So, when the lawyers, parties and witnesses do not speak to

21   you in the halls, on the elevator and the like, you must

22   understand they are not being rude.  They know they are not

23   supposed to talk to you during the trial, and they are

24   following the rules.

25   The law requires these restrictions to make sure the

1   parties have a fair trial on the same evidence that each

2   party has had an opportunity to address.  A juror who

3   violates these restrictions jeopardizes the fairness of the

4   proceedings, and a mistrial could result that would require

5   the entire process to start over.  If any juror is exposed to

6   any outside information, please notify the court immediately.

7       During deliberations you will have to make your decision

8   based on what you recall of the evidence.  You will not have

9   a transcript of the trial.  I urge you to pay close attention

10  to the evidence as it is given.  If at any time you cannot

11  see or hear the testimony, evidence, questions or arguments,

12  let me know so I can correct the problem.

13      If you wish, you may take notes to help you remember the

14  evidence.  If you do take notes, please keep them to yourself

15  until you and your fellow jurors go to the jury room to

16  decide the case.  Do not let note taking distract you.  When

17  you leave, your notes should be left in the jury room.  No

18  one will read your notes.  They will be destroyed at the

19  conclusion of the case.

20      Whether or not you take notes, you should rely on your own

21  memory of the evidence.  Notes are only to assist your

22  memory.  You should not be overly influenced by your notes or

23  those of your fellow jurors.

24      From time to time during the trial it may be necessary for

25  me to talk with the attorneys out of the hearing of the jury,

1    either by having a conference at the bench when the jury is

2    present in the courtroom or by calling a recess.

3        Please understand that while you are waiting we are

4    working.  The purpose of these conferences is not to keep

5    relevant information from you, but to decide how certain

6    evidence is to be treated under the rules of evidence and

7    avoid confusion and error.  Of course, I will do what I can

8    to keep the number and length of these conferences to a

9    minimum.  I may not always grant an attorney's request for a

10   conference.  Do not consider my granting or denying a request

11   for a conference as any indication of my opinion of the case

12   or what your verdict should be.

13       And, finally, trials proceed in the following way:  First,

14   each side may make an opening statement.  An opening

15   statement is not evidence.  It is simply an outline to help

16   you understand what the party expects the evidence will show.

17   A party is not required to make an opening statement.  The

18   plaintiff will then present evidence, and counsel for the

19   defendant may cross examine.  Then the defendant may present

20   evidence and counsel for the plaintiff may cross examine.

21       After the evidence has been presented I will instruct you

22   on the law that applies to the case and the attorneys will

23   make closing arguments.  After that you will go to the jury

24   room to deliberate on your verdict.

25       Those are the court's preliminary instructions.  At this

1    time I would ask you to give your attention to counsel for

2    Microsoft, who will make Microsoft's opening statement.

3    We'll then take a break so that you'll have an opportunity to

4    use the restroom or go back and stretch your legs.  Then

5    we'll come out and we'll hear Motorola's opening statement.

6    And if we have enough time, we'll at least get our first

7    witness of the day started.

8        We take a hard stop at 4:30.  For those of you who don't

9    work downtown and have made bus arrangements, you can count

10   on us being done at 4:30, so plan your bus schedules

11   accordingly.  Usually we'll stop about 4:25.  I have some

12   instructions about not doing internet research, and whatever,

13   that I read to you, then we talk about what time to be here

14   the next day.  I don't know who will be doing this for

15   Microsoft.

16            MR. HARRIGAN:  I will be doing it, Your Honor.

17            THE COURT:  All right.  Please give your attention to

18   Mr. Harrigan.

19            MR. HARRIGAN:  Good afternoon.  It's my honor to make

20   Microsoft's opening statement in this case.  My colleagues,

21   Mr. Pritikin, Mr. Cederoth and Ms. Robbins, whom I introduced

22   earlier, will be, along with me, presenting some of the

23   evidence for Microsoft and questioning witnesses.  But I am

24   going to provide you with the opening statement.

25        As the court said, nothing that I say in this opening

1  statement is evidence.  My purpose in making the opening

2  statement is to provide a framework to tell you what

3  Microsoft is claiming in this case, and also to outline the

4  evidence that we believe will be presented during the trial

5  in support of those claims.  But it will be up to you to

6  decide whether anything I predicted was going to happen

7  actually happens during the trial.

8       So, I'm going to start with an outline of Microsoft's

9  basic claim, and then get into some details of the evidence

10 that we believe supports that.  This case is about an

11 important contract commitment that Motorola made, and it made

12 it before the two standards organizations that are involved

13 here would allow it to contribute to the standards, to

14 contribute its technology to the standards; that is, the RAND

15 commitment that the court has talked to you about.

16      Pardon me if I'm repeating some things that the court

17 said, but I want to put this all in context.  So RAND stands

18 for reasonable and non-discriminatory.  And RAND is talking

19 about royalties.  It's saying if you have a patent in the

20 standard, you must provide a license to that patent on terms

21 that are both reasonable and non-discriminatory.  And

22 Motorola submitted letters to these two organizations stating

23 it would do that.  And only because it did so, was it allowed

24 to contribute its technology to the standards.

25      And as the court said, that commitment applies to what we

1    will fondly call SEPs, or standards-essential patents, which

2    means patents that if you are using the standard, you're

3    basically using that technology, even if it's only a tiny

4    little part of the entire standard which consists of

5    thousands of little components.  But any patent that's used,

6    when you're using the standard, is called a

7    standards-essential patent.

8        The RAND commitment includes some other language, which is

9    that you must make your technology, your standards-essential

10   patents, available to anyone on reasonable terms and

11   conditions and non-discriminatory terms and conditions.

12       So if someone comes along and they say, we want to use

13   this H.264 standard, please give us a license to your part of

14   it, your patent, you must make it available to that person or

15   any other person that wants to use the standard.  You must

16   make it available on reasonable terms and conditions to

17   anyone.

18       Now, the basic purpose of this RAND obligation is to

19   prevent abuse of the power of being part of the standard.

20   And the court covered some of this already.  In fact, we're

21   going to review certain parts of his preliminary instructions

22   as we go through this.  But the purpose -- because being in

23   the standard, once the standard is successful, gives leverage

24   that you wouldn't have had before you were in the standard.

25   And so the RAND commitment has to be made before the

1   technology goes into the standard.  And it applies from that

2   point forward to protect the people who want to use the

3   standard from having to pay excessive royalties, because now

4   suddenly a patent that was included before there was a

5   standard is part of a big and valuable standard, and so there

6   would be leverage to get a higher royalty.

7       Now, Microsoft brought this action in order to require

8   Motorola to honor the RAND commitments that it made to the

9   two standards organizations, the H.264 organization and the

10  802.11 or WiFi organization.

11      Microsoft brought this action to ask the court to decide

12  what RAND was, what the royalties were that were required by

13  the RAND commitment for Motorola's patents in those two

14  standards.  And that's the trial that happened in November.

15  And the court made its ruling on that issue in April of this

16  year.  And the court did decide, as the court just described,

17  what those royalty amounts were, what true RAND was for

18  Motorola's patents in the two standards, and Microsoft will

19  get a license to that part of the standard on those

20  reasonable terms.

21      But the reason that we are here now is that this was

22  accomplished -- that is, this ruling, and the fact that

23  Microsoft would now get a license -- was accomplished over

24  strenuous efforts by Motorola to extract excessive royalties

25  from Microsoft and get Microsoft to agree to them before this

1    court could decide the case.  And that's really the story

2    that I'll be telling you when I get up to the timeline here.

3        But let's start at the beginning.  The beginning is that

4    Motorola did contribute technology to each of these

5    standards.  And it was required to, and it did, enter into

6    the RAND commitment.  And there are basically two reasons why

7    a company with technology in a standard can get leverage to

8    extract excessive royalties, and therefore the RAND

9    commitment is required.

10       One is that once you've put the standard into a product,

11   let's say -- you'll be hearing about this -- Microsoft

12   decides to put H.264 video compression technology into

13   Windows.  Then it's distributing Windows every day.  It

14   distributes millions of copies.  Once it's done that, it

15   can't take it back out.  And so if there weren't a commitment

16   to license on reasonable terms, when you go to the holder of,

17   let's say, one-hundredth of the patents in the standard and

18   say, "I want a license," that person could say -- well, you

19   know, it's kind of like being out in the desert and needing a

20   glass of water -- "Here's the price."  And it could be

21   astronomical.

22       That's one reason why the company is stuck with having the

23   standard in its products; it needs to know before it puts

24   them in there that it's going to be able to get a reasonable

25   royalty.  If it didn't have that assurance and couldn't rely

1  on it, it wouldn't put the standard into its products and the

2  standard would not be successful.  So that's one reason.

3       The other reason is, the other reason why a RAND

4  commitment is necessary, is that once a standard does become

5  successful, like WiFi, consumers expect it.  And so even if a

6  company hasn't put it into its products, it feels now it

7  needs to do that.  And so it's also to protect the standard

8  process from its own success, to protect companies that want

9  to put the standard in from having to pay excessive

10  royalties.  So those are the two basic purposes of RAND.

11       And a point here that's important, and it will be very

12  important in this case, is that one patent -- in these

13  standards there are thousands of individual pieces of

14  technology, and many of them are patented.  You need a

15  license to the whole standard, which means that you need a

16  license from each holder of one or more of those patents.

17  And so it means that one -- the holder of one patent out of a

18  couple of thousand could insist upon an astronomical royalty,

19  but for the RAND commitment.  So that's kind of the situation

20  that we're in.  And insisting upon an excessive royalty is

21  commonly, in this standards business, called hold-up, for

22  obvious reasons.

23       Now, an important fact in this case that will not be

24  disputed relating to Motorola's patents is that in both the

25  case of H.264 and 802.11, Motorola's patents are a sliver --

1    and that word is used, and this will not be disputed -- is a

2    sliver of the overall technology.  And to put it in

3    perspective, for WiFi, 92 companies contributed patents to

4    that standard.  And Motorola, therefore, starts out being

5    1/92nd, if they were all the same.  But it is undisputed

6    that, in fact, Motorola is a sliver of that standard, and the

7    same is true of the H.264 standard.

8        And the evidence in this case will be that -- we believe

9    will be that instead of making its technology available for

10   reasonable and non-discriminatory terms, Motorola demanded

11   excessive, very excessive royalties.  Then, and this is what

12   occurred in October of 2010, then when Microsoft did not

13   agree to pay those amounts, Motorola launched a campaign

14   seeking injunctive relief, literally, against all sales of

15   Xbox and Windows over a large part of the globe through a

16   series of lawsuits, that we'll get into in a minute.

17       And Microsoft contends that the purpose of its doing so

18   was to threaten Microsoft with the enormous damage that would

19   occur from having all of its distribution of its most

20   valuable products interrupted by an injunction from some

21   court -- and I'll tell you which courts in a minute -- to

22   threaten Microsoft with that huge damage in order to get it

23   to agree to an excessive royalty before this court could

24   decide the case and Microsoft get a license on RAND terms.

25       Now, the beginning of this effort was in October of 2010

1   when Motorola sent two letters to Microsoft, which we'll get

2   into in more detail in a minute, demanding royalties that

3   were extremely excessive.  This is not just an argument I'm

4   making, because the court has told us what the actual RAND

5   royalties should be.  And, in fact, what Motorola is

6   demanding in those letters was thousands of times higher than

7   the amounts that the court found were, in fact, reasonable.

8       Why did Motorola do this?  It did it so that it could

9   check off a box.  It did it so it could say:  We offered

10  Microsoft a license.  They didn't take it.  Then they could

11  go to court and say:  Microsoft does not have a license to

12  our sliver of these two standards, therefore the court should

13  block its sales of the products containing the two standards,

14  which included Windows and Xbox, and thus creating an

15  enormous incentive, shall we say, for Microsoft to agree to a

16  high royalty, and to do that before this court could decide

17  the case.

18      When Microsoft received these letters in October of 2010,

19  it believed that that was exactly what was coming.  The

20  reason was, first of all, that the royalty amounts were

21  absurdly high.  And secondly, there had been conversations

22  before the letters were delivered between Microsoft's head of

23  licensing and Motorola's head of licensing in which Motorola

24  had threatened litigation.

25      So, shortly after receiving the letters, Microsoft filed

1    this lawsuit and said to this court, please determine what

2    RAND is so that we can get a license on RAND terms.  And you

3    can see that that process would have given Motorola

4    everything it was entitled to.  Once it played out and the

5    court decided what the correct RAND rate was, Motorola would

6    be getting the proper royalty, Microsoft would have a

7    license, and that would be that.

8        But, instead, literally the day after Microsoft filed this

9    case in November of 2010 asking for the court to set the RAND

10   rate, Motorola filed the first of its injunction actions in

11   Wisconsin, followed shortly thereafter by another injunction

12   action in the International Trade Commission.  The first one

13   would have blocked Windows and Xbox sales in the United

14   States.  The second would block the importation of Xbox into

15   the United States.

16       And in July of 2010, Motorola filed an action in Germany,

17   where they have a very fast procedure toward getting an

18   injunction.  And that lawsuit would not only have blocked

19   sales in Germany, but because Microsoft's distribution

20   center, for a large part of the globe, was located there, it

21   would have blocked sales from that distribution center,

22   distribution of products from that center to other parts of

23   the world.

24       After the German lawsuit was filed, and with this case

25   being set for trial in November of 2012, Microsoft came back

1   to this court for help, again, and said, please stop Motorola

2   from enforcing any injunction that it gets in Germany.

3   Because the German injunction was potentially coming as early

4   as April of 2012.  And so this court did, in fact, enter an

5   order stopping Motorola from enforcing any German injunction,

6   so that Microsoft would not be subject to this type of

7   pressure, and then this court could decide what the RAND rate

8   is, proper RAND rate is.  And Microsoft would get a license.

9   And Motorola would get what it's entitled to.

10       So that part of the case has been accomplished.  This part

11  of the case deals with the fact that Microsoft suffered

12  damages along the way.  And we're here to ask you to decide

13  whether Motorola's actions were a breach of its contract and

14  thus entitling Microsoft to damages.  The damages consist of

15  two components.

16       One is that while the German injunction threat was

17  looming, Microsoft realized that the only certain way that it

18  could avoid the tremendous impact of that injunction against

19  its distribution of products was to literally pick up that

20  massive distribution center and take it out of Germany.  And

21  Microsoft moved it to the Netherlands in a record time of

22  four months at a cost of about $23 million.  That's one

23  component of the damages that we're seeking.

24       The other is about $6 million in attorneys fees incurred

25  in resisting the injunction effort.

1        Now, before I get to the details of what I have just

2    described, let's revisit the subject of what are the purposes

3    behind the RAND contract.  And the reason I want to do that

4    is that the breach of contract that we're really talking

5    about here is the breach of what is known as the covenant of

6    good faith and fair dealing.  And that is not written into a

7    contract, but it is part of every contract.  It's implied.

8    And that, the covenant of good faith and fair dealings says

9    that a contracting party will not take any action that

10   frustrates the purposes of the contract.  So in order to

11   figure out whether there's a breach of the covenant of good

12   faith and fair dealing, we need to look in more detail at

13   what the purposes are of this RAND contract.

14       So let's begin with why there are standards.  And I'll

15   keep this short.  But WiFi is a good example.  It was

16   developed by the IEEE.  It's a very complex system.  It has

17   thousands of technical elements.  It took seven years for it

18   to be developed.  Many, many companies and universities

19   participated.  It was issued in 1997.  After all that work,

20   the IEEE wants that standard to be successful.  And so in

21   order to make that happen they have to deal with the risks

22   that I've already described, that those with patents that are

23   essential to the standard will abuse that power.  And so they

24   require the RAND commitment in advance in order to avoid

25   that.

1    And I'd like now to just take a look at what the court has

2   said in its preliminary instruction in a little bit of detail

3   about this issue.  You should see it up here on your screen.

4   Now this is out of the instruction.

5        THE COURT:  Excuse me, Mr. Harrigan.  Ladies and

6   gentlemen, is everyone's screens on?  They're under the

7   control of the podium, and lawyers have been known to put

8   their elbow on them, or do other things.  So, if at any point

9   you don't, start waving your hands.  Go ahead, Mr. Harrigan.

10        MR. HARRIGAN:  Thank you, Your Honor.  So in the

11   preliminary instructions the court referred to the rules that

12   apply to standards and standards-essential patents.  And

13   here, as you see, the court said, "When a standard becomes

14   widely implemented or adopted, the owner of a

15   standards-essential patent could have substantial leverage to

16   demand excessive royalties."

17    Then a little bit farther on the court says, "The ability

18   of an owner of a -- notice the word "a" --

19   standards-essential patent, to demand more than the value of

20   its patented technology and to attempt to capture value that

21   comes from the standard is called hold-up."  So this is a

22   well-recognized problem, that there's leverage to demand

23   excessive royalties, and doing so is considered hold-up.  And

24   doing so is also a breach of the covenant of good faith and

25   fair dealing because it frustrates the basic purpose of the

1    contract, which is to assure people who are putting the

2    standard into their products that they will not have to face

3    that risk.

4        So, in this case what we're going to ask you to do, among

5    other things, is to compare Motorola's demands that were

6    delivered in October of 2010, and continued thereafter, to

7    the RAND amounts set by the court, and decide if they were

8    for excessive royalties, whether that was the case where the

9    owner of a standards-essential patent demanded excessive

10   royalties using the power of the standard.

11       Now, one thing that is also not disputed in this case is

12   that the opening offer does not have to be a RAND offer; it

13   can be somewhat above RAND.  But every offer, even the first

14   offer, has to comply with the covenant of good faith and fair

15   dealing.  And that means that it can't be part of a program

16   to use the leverage of the standard to demand excessive

17   royalties, as this -- I'm not very good at underlining, I

18   crossed it out instead -- but the leverage, using a demand

19   letter for excessive royalties as part of a program to

20   extract excessive royalties would be a breach of the covenant

21   of good faith and fair dealing.

22       And we are going to show you, in this case, that Motorola

23   did just that; that these demands in October were part of an

24   overall plan, that went on for a couple of years, to extract

25   excessive royalties from Microsoft.

1          Now, let's take a look at Motorola's actual contracts.  So

2     this is -- as I think the court has told you, the RAND

3     commitment comes in the form of a Letter of Assurance, which

4     is in this case written by Motorola, before the standards

5     organization will accept its patents for its technology as

6     part of the standard.  Motorola said the patent holder is

7     prepared to grant a license to an unrestricted number of

8     applicants on a worldwide, non-discriminatory basis, and on

9     reasonable terms and conditions.

10         So the license is to anyone -- an unrestricted number of

11    applicants worldwide -- and it has to be on reasonable terms

12    and conditions.  And Motorola assured the ITU that it would

13    do that with respect to its H.264 patents.

14         Then there was a similar commitment made to the IEEE with

15    regard to WiFi.  The patent holder will grant a license under

16    reasonable rates to an unrestricted number of applicants on a

17    worldwide, non-discriminatory basis, with reasonable terms

18    and conditions.  I really am bad at this.  So that basically

19    is the same one.

20         In the case of the IEEE, Motorola made a second commitment

21    which actually refines what "reasonable" means, at least with

22    respect to that organization.  The requirement to license at

23    nominal competitive costs was part of the RAND commitment at

24    the time that Motorola first committed to license its 802.11

25    standards-essential patents on RAND terms.

1        So, in the case of 802.11, the reasonableness requirement

2   was further defined to be nominal, competitive costs.  So we

3   all know that a nominal cost is not a high cost, and it has

4   to be competitive.  So that is sort of a further iteration of

5   what "reasonable" meant in the case of the WiFi standard.

6        Now, I'd like to get to the part of the case where we look

7   at Motorola's demands and compare them to the actual RAND

8   rates.

9        I'd like to start with some basic facts that directly bear

10  on this comparison.  So these are facts that will not be

11  disputed in this case.  First, we're going to talk about the

12  size of the standards and the relative importance of

13  Motorola's technology to those standards.  The 802.11

14  standard today is immense and complex and is over nearly

15  3,000 pages long.  Since 1994 approximately 92 companies have

16  identified, in Letters of Assurance, over 350 patents and 30

17  patent applications as essential.

18       This is simply depicting the 92 companies, the at least 92

19  companies that own patents that are essential to that

20  standard.  It will not be disputed in this case that

21  Motorola's SEP portfolio provides only a minimal contribution

22  to the 802.11 standard.  So out of all of the companies that

23  contributed technology to that standard, Motorola's portfolio

24  for a number of patents is only a minimal contribution to

25  that overall standard.

 1     And, secondly, that Motorola's 11 relevant

 2  standards-essential patents constitute only a sliver of the

 3  overall technology incorporated into the 802.11 standard.

 4  These facts will be important in considering whether Motorola

 5  was seeking excessive royalties.

 6     Then the court ruled, as stated here and as the court

 7  already said, that the RAND royalty rate for Motorola's

 8  802.11 standards-essential patent portfolio is, and for

 9  simplicity I'll call it three-and-a-half cents per unit.  So

10  if we're talking about WiFi going into an Xbox, every Xbox

11  Microsoft sells it has to pay Motorola three-and-a-half cents

12  for Motorola's part for the WiFi standard.  Now, bear in

13  mind, that doesn't get Microsoft a license to the WiFi

14  standard; it gets Microsoft a license to the sliver of that

15  standard that Motorola owns.  Okay?

16     Now, let's look at H.264.  Similarly, it is a large and

17  technically-complex standard, resulting from contribution of

18  roughly 170 entities submitting over 2,300 documents.  And

19  approximately 52 companies submitted Letters of Assurance to

20  the ITU committing to license their H.264 standards-essential

21  patents on RAND terms .  So, again, these are the companies

22  that contributed.  Motorola is one of them.

23     And just as in the case of 802.11, WiFi, it is undisputed,

24  Motorola did not provide the inventive technology to the

25  H.264 standard, but instead built on already existing

 1    technology.  And Motorola's H.264 portfolio only constitutes

 2    a sliver of the overall technology incorporated into the

 3    standard.

 4        So if you go to Motorola and ask for a license to their

 5    patents, you're just getting started.  You've got most of the

 6    rest of the standard to pay royalties to, to get a license to

 7    the entire standard.

 8        Now, the other factor which is important here, in addition

 9    to how much of the standard does Motorola actually have, is

10    how important is that part to Microsoft's products?  And

11    there are undisputed facts about that, also.  So, for

12    example, with respect to Windows, Microsoft adds thousands of

13    features which typically, with each version of Windows,

14    Microsoft adds thousands of features which build on the

15    capabilities of previous releases.

16        And as you will recall, H.264 is video compression, video

17    coding and decoding, and it is undisputed that that function

18    of video coding is only a tiny part of what Windows software

19    does.  And, in addition, Windows supports other video

20    compression standards besides H.264.

21        And, finally, Motorola's H.264 standards-essential patents

22    are of only minor importance to the overall functionality of

23    Microsoft's Windows products.  And you'll see the same is

24    true with respect to Microsoft's Xbox products.

25        So to put it in total perspective, taking H.264, Motorola

```
 1    is a sliver of the standard, one standard which provides
 2    video compression.  Video compression is only a tiny part of
 3    what Windows does.  And Motorola's particular patents in that
 4    standard are of only minor importance to the overall
 5    functionality.  So this all, obviously, has a lot to do with
 6    how much Microsoft should pay for the privilege of having a
 7    license to this technology.  And here the court ruled that
 8    the correct RAND -- the true RAND royalty rate for Motorola's
 9    H.264 portfolio is .555 cents, or basically a half a cent per
10    unit.
11        Now let's take this information that we just went through
12    and take a look at Motorola's demands sent to Microsoft in
13    October of 2010.  This is the H.264 letter.  It's not that
14    easy to read, but we're going to pull out some of the key
15    elements.  So this was written on October 29th of 2010, and
16    it's about the video compression standard, H.264, the one
17    that we just reviewed, for which the court said the correct
18    RAND royalty was a half a cent per unit.  And we'll get to
19    how that relates to this in a second.
20        So Motorola offers to, "License the patents on a
21    non-discriminatory basis, on reasonable terms and conditions
22    (RAND).  In other words, Motorola is saying, we're giving you
23    this license, and the terms on which we're giving it to you
24    are RAND."  They are RAND terms.  So even though an opening
25    offer does not have to be RAND, Motorola is saying it is.
```

1  "Including a reasonable royalty of 2.25 percent per unit for

2  each H.264-compliant product."

3      So, we have to go a little deeper into this to figure out

4  what that means.  Here is some more.  "As per Motorola's

5  standard terms, the royalty is calculated based on the price

6  of the end product, e.g. each Xbox 360 product, each PC

7  laptop, each smartphone, and not on component software."

8      Now, here's what that -- it may not be immediately obvious

9  what that means, but here is what it means.  "Not on

10 component software" is talking about the operating system.

11 So here's the picture.  Microsoft sells operating systems; it

12 doesn't sell laptops.  It sells operating systems to other

13 people who make laptops and sell them.  And they put the

14 operating system into their laptop.  So if Microsoft sells an

15 operating system to HP and HP sells a laptop, Motorola is

16 saying, we get 2.25 percent per unit for each PC or laptop.

17 So if it's a $500 laptop, Motorola is getting 2.25 percent of

18 the price of the laptop.  And if it is a $1,000 laptop,

19 they're getting 2.25 percent of the $1,000.  And this is for

20 a license to Microsoft, which makes operating systems, which

21 are the same in both of those laptops.

22     Then Motorola says, "We will leave this offer open for 20

23 days.  Please confirm whether Microsoft accepts the offer."

24 So at the end of 20 days if Microsoft doesn't say, "We

25 accept," the offer ends, and Motorola is in a position to

1    say, "We offered Microsoft a license, they didn't take it."

2    And then to use that and go to court and say, "They don't

3    have a license, you should enjoin the sale of their

4    products," which is what happened.  And we'll get there in a

5    second.

6         But first let's look at the actual comparison between this

7    demand and the royalty the court found was reasonable.  The

8    .00555 I find a little bit confusing, but that's the decimal

9    version of half a cent.  There's half a cent that's the RAND

10   royalty.  For a $500 laptop the 2.25 percent is $11.25.  So

11   as you can see, we're talking about a ratio here of a couple

12   thousand times.  Now, you can look at this ratio another way

13   and that is that at the half-a-cent rate that the court set

14   for RAND, based on the number of operating systems that

15   Microsoft sells every year, Motorola would get $2 million a

16   year.

17        Based upon the average laptop price being $500, in that

18   same year using Motorola's 2.25 percent, it would be paid

19   $4 billion per year in royalties.  $4 billion for a sliver of

20   the H.264 standard, which is of minor importance to

21   Microsoft's products, and is one of hundreds of standards

22   that Microsoft needs to comply with in its products.

23        So what is Motorola going to say about this?  Well, they

24   may say, well, Microsoft should have just made a

25   counteroffer.  And, you know, some of you may have experience

1    in negotiations.  And it's not unusual to start with a higher

2    number than you expect to get.  And car dealers could make --

3    ask for too much money for a car.  But one difference is car

4    dealers don't have a RAND obligation.  There is no issue of

5    their using the power of a standard to demand excessive

6    prices.  But it is not within RAND to use the power of the

7    standard to gain leverage to demand excessive royalties, as

8    the court's preliminary instruction says.

9         But beyond that, we're going to present economic

10   testimony, expert economic testimony, that Motorola's demands

11   aren't even consistent with a normal economic negotiation,

12   and that they had a different purpose from just asking for a

13   higher price than you expect to get.

14        A normal negotiation, you go to the car dealer to buy a

15   Honda worth about $15,000.  He says, I want $20,000.  Do you

16   counteroffer at $14,000?  Maybe.  If he says, I want $50,000

17   for the $15,000 car, do you counter?  Probably not.  What if

18   he says, I want $30 million for the $15,000 Honda?  That is

19   what we just looked at in terms of the ratio between the

20   right price and what Motorola was demanding in October of

21   2010.

22        Now, in the case of a car dealer who said that, you would

23   laugh and go down the street.  But the point is, there is no

24   down the street here.  You've got the technology in your

25   products.  You've distributed millions of them.  You have to

1   get a license from Motorola.  It's the only game in town.

2   And they're demanding an absurd amount.

3        Let's take a look the Motorola's letter for 802.11, WiFi.

4   This was sent before the other letter on October 21, 2010.

5   And you'll see it has much the same characteristics.  The

6   same rate, 2.25 percent.  In this case the only product

7   that's at issue is the Xbox 360 product.  This offer is also

8   open for 20 days.  "Please confirm whether Microsoft accepts

9   the offer."  And it also says that the offer being made is a

10  RAND offer.  So let's take a look at what that translates

11  into in terms of dollars.

12       The court, as you heard, has said that the RAND royalty

13  for Motorola's 802.11, it's part of 802.11, is about

14  three-and-a-half cents.  Motorola's demand based on $199 Xbox

15  is $4.48.  But there's a more expensive version of Xbox.  On

16  a $399 version, which has Kinect in it and more memory,

17  Motorola's demand is $8.98.  But the royalty set by the court

18  doesn't change depending on the price of the product, it's

19  the same.  And, of course, WiFi is a chip that goes into the

20  Xbox.  And I'll get to that in a bit.  But the chip costs $3.

21  Motorola wants $8.98 for its tiny piece of that chip, a piece

22  that the court said was worth three-and-a-half cents.

23       And, of course, WiFi is exactly the same in both versions

24  of Xbox.  The difference in price has to do with memory and

25  Kinect.  So there's no linkage between the amount of the

1    royalty that Motorola is seeking and any value that it

2    contributes to the product.

3         And remember the earlier slide we looked at where

4    Motorola's commitment on the 802.11 was the requirement to

5    license at nominal competitive costs, was part of the RAND

6    commitment when Motorola first committed to license its WiFi

7    standards-essential patents.

8         Now, these demands, we contend, violate the covenant of

9    good faith and fair dealing, because they were an effort to

10   extract excessive royalties by virtue of owning a tiny slice

11   of these two standards.  But they also frustrate a second

12   purpose of the RAND commitment, which has to do with

13   stacking, which the court also described in the opening

14   instruction.  And we're going to put that up.  And that is,

15   "If there are a large number of owners of standards-essential

16   patents for a given standard, the total royalty payments

17   might make the product too expensive to make and sell."

18        And then the last line, "The RAND commitment seeks to

19   prevent royalty stacking and ensures that the aggregate

20   royalties associated with a given standard are reasonable ."

21        So, again, when we're looking at was there a breach of the

22   covenant of good faith and fair dealing, that consists of

23   actions that frustrate a purpose of the contract.  And a key

24   purpose of the RAND contract is to prevent royalty stacking.

25   So let's see where Motorola's demands fit into the

1    royalty-stacking picture.

2         Just to put this in perspective, we've looked at the

3    October 2010 letters.  Another fact that will not be disputed

4    in this case is that two years later, at the time of the

5    trial in November of 2012, it was still Motorola's position

6    that its WiFi portfolio was worth 2.25 percent of the net

7    selling price of Microsoft's products.  So, we don't need, on

8    this issue, to focus only on those letters.  They were still

9    asking for the same thing last November.

10        And on the issue of stacking, another fact that will not

11   be disputed is this:  Motorola's royalty requests for its

12   802.11 SEP portfolio raises significant stacking concerns.

13   There are at least 92 entities that own 802.11

14   standards-essential patents.  If each of these 92 entities

15   sought royalties similar to Motorola's request, the aggregate

16   royalty to implement the 802.11 standard, which is only one

17   feature of the Xbox product, would exceed the total product

18   price.  A royalty rate that implicates such clear stacking

19   concerns cannot be a RAND royalty, because such a royalty

20   rate does not stand up to the central principle of the RAND

21   commitment, widespread adoption of the standard.

22        And the arithmetic here is interesting.  The arithmetic is

23   that everybody with a sliver of this standard, of which there

24   are 92 who have patents, Motorola's is a sliver, even if it

25   were bigger than a sliver, if it was just 1/92nd, the total

1  royalty, if everybody else did the same thing, would be

2  207 percent.  In other words, Microsoft would be paying two

3  times what it gets for the Xbox, in royalties, to get a

4  sliver of one standard that's not particularly important to

5  the function of the product.

6      And in the case of H.264, the difference is that there are

7  only 52 patentholders.  So if everybody asked for 2.25

8  percent, it would be 117 percent of the price.  And bear in

9  mind that what Motorola wanted on H.264 was not 2.25 percent

10  of the cost of Windows, but two-and-a-quarter percent of the

11  cost of laptops.  So it would actually be, if everybody did

12  the same thing, the royalty would be 117 percent of the cost

13  of the laptop, which would be hundreds and hundreds of times

14  the amount Microsoft gets for the operating system.

15      So, there is a clear issue here that if Motorola's conduct

16  were duplicated by everybody else, the standard would be out

17  of business, or else the people selling the products would be

18  out of business.  And, bottom line is that this is, in fact,

19  conduct that frustrates another basic purpose of a RAND

20  commitment, which is to prevent stacking.

21      Now, Motorola may say that, you know, hold-up and stacking

22  have not really been a big problem.  And that is not a

23  surprising fact, because everybody else is behaving

24  themselves.

25      In fact, these standards are cooperative ventures, which

1    everybody gets together to create something quite wonderful.

2    It's very useful to consumers and others.  And they agree to

3    cooperate.  They put the standard together.  And they all

4    agree to charge only a reasonable amount.  And that's what

5    they do.  And so it hasn't been a problem.  But the fact that

6    everybody else is behaving is not an excuse for Motorola not

7    to honor its commitment.

8         And, in fact, the head of Microsoft standards department,

9    Dave Heiner, sent a letter in June of 2011 to the FTC, which

10   said most companies play by the rules.  And Motorola might

11   try to make use of that letter here.  But the fact that

12   everybody else is playing properly does not excuse Motorola

13   doing otherwise.  Now, what I'd like to do is go through --

14   explain how these letters and subsequent conduct play

15   together into a campaign that Motorola pursued to extract

16   royalties.

17        The story begins with some discussions between Microsoft

18   and Motorola that took place between 2007 and 2010 dealing

19   with a license agreement between Motorola and Microsoft to

20   some Microsoft patents.  And that license agreement had

21   expired in 2007.  Motorola was unwilling to renew.  Microsoft

22   wanted it renewed.  And then in 2009 the patents in question

23   were used in an Android phone that Motorola made.  And so

24   finally, after three years, Microsoft sued, on October 1st of

25   2010, for infringement of its patents.  Those were not H.264

1    or 802.11 patents.  And the heads of licensing of the two

2    companies had some discussions about this, Mr. Gutierrez for

3    Microsoft and Mr. Dailey from Motorola.  They will both

4    testify in this case.

5        And Mr. Gutierrez will testify to a comment made by Mr.

6    Dailey in referring to Microsoft's action filed on October

7    1st relating to the expired -- to the patents under the

8    expired licensing agreement, which was, "If Microsoft wanted

9    war, Motorola had patents too, and Microsoft was going to

10   lose in the end."  This was a conversation occurring in early

11   October of 2010.  Mr. Gutierrez said that Microsoft would be

12   happy to pay a reasonable royalty for Motorola's patents, and

13   let us know what they are.

14       A meeting was set up for October 22, 2010 in Redmond.  And

15   on the day before the meeting Motorola sent the first of the

16   two demand letters that we've looked at, the one relating to

17   WiFi.  Obviously that letter dealt with standards-essential

18   patents in the WiFi standard.

19       Now, why did -- we've already looked at these letters.

20   You've seen what the royalties were compared to RAND.  Why

21   did Motorola make these demands in these two letters?  Why?

22   Well, one thing that relates to that is that Mr. Dailey also

23   testified that it was Motorola's normal practice not to sue

24   for injunctions against parties using its technology unless

25   they had been offered a license.  So the letter was to be

1   able to say, "We offered Microsoft a license."  But under the
2   RAND commitment, seeking injunctive relief without offering a
3   RAND license is a breach.
4       In other words, you have to make your technology available
5   to anyone on reasonable terms.  If you write a letter making
6   it available on outrageous terms, you haven't put yourself in
7   a position to where you can go and ask for injunctive relief,
8   because you haven't made it available on RAND terms.  And in
9   this case there isn't any dispute about that anymore.  We
10  know what Motorola demanded, and we know what RAND is.  So
11  Motorola did not -- because the court has decided it --
12  Motorola did not make a RAND offer before it proceeded to ask
13  for injunctive relief.  What it did was, it made an offer so
14  that it could say it had done so.
15      And when Microsoft received these letters based upon the
16  conversation that Mr. Gutierrez had had with Mr. Dailey
17  already about threatening litigation, and based upon the
18  absurd royalties set forth in the letters, Mr. Gutierrez
19  regarded them as essentially a setup for the forthcoming
20  litigation.  And he also noticed that the letter said, if you
21  don't accept, basically this offer is open for 20 days, so
22  that on day 21 Motorola could say:  Expired offer.  We
23  offered a license.  They don't have one.  And they could go
24  to court and ask for injunctive relief, which is what they
25  did.

1      Microsoft basically saw this coming and decided to protect

2   itself as best it could by coming to court here in Seattle

3   and asking this court to decide what the rate was, decide

4   what RAND is.  And I'm going to put up the slide of exactly

5   what Microsoft did ask for in that complaint.  Microsoft

6   asked for a judicial accounting of what constitutes a royalty

7   rate in all respects, consistent with Motorola's promises for

8   -- and this is another word for WiFi -- for WiFi patents

9   identified as essential by Motorola and for H.264 patents

10   identified by Motorola.

11      In other words, we want an accounting of what we owe on a

12   true RAND basis for these two sets of patents of Motorola's.

13   And then to make sure there wasn't any question, in September

14   of 2011 in this same case, Microsoft said, "Microsoft is

15   seeking and remains ready and willing to take a license to

16   Motorola's H.264 and 802.11 declared-essential patents on

17   RAND terms."

18      So, the lawsuit that Microsoft filed was filed on

19   November 9th of 2010.  The trial in this case about the RAND

20   rate took place in November of 2012.  All Motorola ever had

21   to do to get a RAND royalty for its patents was let that case

22   unfold.  And that's what it would have gotten.  That's what

23   Microsoft asked for.  And Microsoft said it would take a

24   license at whatever rate the court decided was RAND.  So that

25   is why Microsoft filed the action on November 9th.

1          Now, let's take a look at what happened after that.  May

2     I, Your Honor?

3              THE COURT:  Yes.

4              MR. HARRIGAN:  Come down here?

5              THE COURT:  Yes.

6              MR. HARRIGAN:  Thank you.

7          So this is the date when Microsoft sued for patent

8     infringement on the expired license agreement.  Then the two

9     letters, demand letters, come in on the 21st and 29th.  Then

10    Microsoft filed this action asking for a royalty accounting

11    on November the 9th.  Motorola sued the next day in Wisconsin

12    to enjoin the sales of Windows and Xbox in the United States,

13    based upon its part of these two standards.  Motorola then

14    sued in the International Trade Commission to block Xbox

15    imports into the United States, based on the 802.11 and H.264

16    standards, on November 22nd.

17        And then in July of 2011 Motorola sued in Germany to

18    enjoin Windows and Xbox distribution based on the H.264

19    standard.  And I will cover more about this in a minute.

20        Then there was a hearing set in the German case for

21    February the 7th.  It was anticipated that the German

22    injunction would be entered on April 17th.  Microsoft asked

23    this court to order Motorola not to enforce any injunction

24    that it got in Germany so that the rest of this case could

25    play out and in November the court would be able to determine

1    a RAND rate and Motorola would get what it's entitled to and

2    Microsoft would pay the proper royalty.

3        And only because this court ordered Motorola not to

4    enforce this anticipated injunction in Germany was Microsoft

5    not facing disruption of its entire distribution operation

6    for Europe, the Middle East, and Africa, based upon this

7    German injunction.  Because it was ordered not to enforce it,

8    that stopped that problem, and the case was able to proceed.

9    And the net result was the court decided what RAND was in

10   April of this year.

11       And with regard to the court's order barring enforcement

12   of the German injunction, it is important to note that was a

13   temporary order entered on April 12th of 2012.  It was, in

14   fact, extended.  But it wasn't a final order that anyone

15   could be sure would stay in place until the appeals court,

16   the Ninth Circuit, affirmed that ruling by this court at the

17   end of September of 2012.  And that's because Motorola

18   appealed the court's order restraining them from enforcing

19   the German injunction.  And that appeal wasn't decided until

20   the end of September of 2012.

21       Then, finally, the court did rule on the RAND royalty

22   again on April 19th of 2013.

23            THE COURT:  Mr. Harrigan, watch your time.

24            MR. HARRIGAN:  Yes, Your Honor.

25       Now, what will Motorola say to explain what I just

1    described?  You may hear:  We wanted to get our letters out

2    quickly and get negotiations started, so we just used our

3    standard rate.  But they need to be careful about that,

4    because Motorola's standard rate related to cell phone

5    patents and not the two standards that are at issue here.

6    And secondly, Motorola was not seeking to negotiate toward

7    RAND when it wrote the letters; it was telling Microsoft that

8    this was a RAND rate.

9        Third, these letters were not form letters that were

10   dashed off in a hurry.  And there's a key point here, which

11   is, that the letter says that, as we discussed earlier, that

12   the royalty is on each PC or laptop, not on component

13   software.  That royalty setup was unique.  Motorola had never

14   done that before.  This was a letter that was custom-tailored

15   to Microsoft and designed to be unacceptable.

16       Motorola also was well aware that the demands that it was

17   making were far above what would be commercially reasonable

18   or nominal.  We will be hearing in this case about patent

19   pools.  A patent pool is a collection of companies who get

20   together who have patents in a particular standard and agree

21   upon a royalty rate that can be paid for all of the patents

22   in the pool.  And that such a pool was set up for the H.264

23   standard.  It's called MPEG LA.  And Motorola and Microsoft

24   both participated in the discussion about what those royalty

25   rates should be.  And you'll hear from Mr. Glanz from

1    Microsoft about what Motorola said at those meetings.  And

2    basically the bottom line is that Motorola approved royalties

3    for the entire collection of patents in that pool that are a

4    tiny fraction of what it was demanding in October of 2010.

5        In addition, Motorola commissioned a study itself relating

6    to its WiFi portfolio, in 2003, which concluded that the

7    value of that portfolio was approximately a tenth of a

8    percent of the price of a game console, like Xbox.  So

9    Motorola had an internal study that showed the royalties it

10   was seeking in October of 2010 were vastly in excess of what

11   was commercially reasonable.

12       THE COURT:  Mr. Harrigan, you're running over your

13   estimate.  You have ten minutes left.

14       MR. HARRIGAN:  Thank you, Your Honor.

15       Now, there is one more chapter to this story that I would

16   like to visit with you.  And that is that there is a company

17   called Marvell Semiconductor that makes chips that deliver

18   the WiFi function.  Marvell sells them for about $3.  When

19   Microsoft was not having much luck with Motorola on getting a

20   license, it asked Marvell to request a license from Motorola

21   for Motorola's part of that chip.  That is the part of WiFi

22   that belonged to Motorola that was embodied in that chip.

23       Motorola said to Marvell, we will give you a license for

24   two-and-a-quarter percent of the price of the product that

25   your chip goes into.  So if it were Microsoft, that would be

1  the very same royalty that we've been looking at here, which

2  is $11.25 for a $500 laptop.  And that would be for a chip

3  that Marvell sells for $3.  So its royalty, according to the

4  license agreement that Motorola offered, would be $11.25 on a

5  product that Marvell sells for only $3.  And that would only

6  be for a portion of the WiFi function that's embodied in that

7  chip.

8      So that is a sort of independent corroboration of the fact

9  that Motorola was aware that its demands were excessive,

10  because Motorola is also a Marvell customer.  It was well

11  aware of what the price of the chip was.  And, therefore, it

12  was well aware that the royalty being demanded was very

13  excessive.

14      Now, to wrap up, we are going to present evidence along

15  the lines that I have described.  The court is going to give

16  you instructions.  And you're going to decide whether

17  Motorola's conduct was in breach of its contractual

18  obligations.  And if you do, then Microsoft is going to ask

19  for damages.  And I'll just briefly tell you what those

20  consist of.

21      The first part is the relocation of the German

22  distribution facility.  That was done in order to escape what

23  would otherwise have been the devastating effects of the

24  German injunction.  And Microsoft moved that facility during

25  this timeframe while the injunction -- Microsoft committed to

1    the German relocation in March of 2012, and it accomplished

2    it in a very short period of time in order to get its

3    activities out of Germany so that the impact of the German

4    injunction wouldn't apply.  Because Germany can't enjoin you

5    from doing something in another country, Microsoft moved to

6    the Netherlands.  And the cost of doing that and avoiding

7    much greater damage that would have occurred was $23 million.

8        Then the second part of our damages claim is simply the

9    approximately $6 million in legal fees that were incurred in

10   resisting Motorola's injunction efforts.

11       Thank you for your attention.

12       THE COURT:  Ladies and gentlemen, I promised you an

13   afternoon break.  We're going to be ten minutes long.  So the

14   court clerk will be back in to get you a little bit before 20

15   after.  And then between then and 4:30 you will hear the

16   opening statement made by Motorola.

17     (The following occurred outside the presence of the jury.)

18       THE COURT:  We'll be in recess.

19                     (The proceedings recessed.)

20     (The following occurred in the presence of the jury.)

21       THE COURT:  I'd ask you at this time to give your

22   attention to Mr. Price, who will be giving the opening

23   statement on behalf of Motorola.

24       MR. PRICE:  Ladies and gentlemen, good afternoon.

25   It's always hard to start after a presentation like that,

1    because even though you were told to keep an open mind until

2    you've heard all the evidence, I kind of feel like I'm

3    starting out with one foot in the grave, and one foot on a

4    banana peel.  That was a pretty good presentation.  But you

5    were asked to keep an open mind for a reason, and that's

6    because you need to hear about context.

7         You know, the court has decided, a couple years after 2010

8    what FRAND is, after hearing lots of evidence and experts, et

9    cetera.  Now, the question though here is good faith.  And

10   you remember the court told you that the court hasn't decided

11   that issue.  That's your issue.  And the reason that's your

12   issue is because you need to know the context.  And there is

13   much, much, much more to the context than what you were told.

14   I think you will be surprised at how much more there is.

15        And when you look at that much more, when you look at what

16   the evidence really shows as to what was happening between

17   these parties, you'll see this is not a case of bad faith, a

18   bad faith violation of a RAND commitment; it is, instead, a

19   litigation tactic used in connection with Microsoft's attempt

20   to impose the Windows operating system on Motorola and on

21   others in the marketplace.  And that's how this all began.

22        What the evidence is going to show is that Microsoft sued

23   Motorola twice, on October 1, 2010.  And you heard that it

24   was because of something called ActiveSync?  No.  There were

25   nine patents asserted in that case.  Only two involved that

1    technology.  Most of the others involved Microsoft saying,

2    you know, this Android operating system, Motorola, that you

3    just started using, that you've committed to, when you

4    changed from Windows -- because they used to use Windows --

5    that operating system, we have patents on that, and we're

6    going to shut you down.  On October 1st, 2010 Microsoft sued

7    to shut Motorola down from selling smartphones that had the

8    Android system in them.  They sued them twice on that day.

9        On that same day, Microsoft said to Motorola, on the same

10   day, we want you to put your patents forward.  We want to get

11   this over quickly.  We want you to put your patents forward,

12   so we can all get together and discuss these issues.  In

13   fact, as I will tell you in a few minutes, there was already

14   a meeting scheduled for October 22nd for the executives to

15   meet to discuss business.

16       And so Microsoft invited Motorola, said, we want you to

17   put your patents on the table.  And what you're going to hear

18   is what Motorola did in this short timeframe, where they were

19   under the gun because they had just been sued, where

20   Microsoft was trying to prevent Motorola from selling its

21   phones in the U.S., that Motorola identified

22   standards-essential patents.  Because of the 10,000 patents

23   Motorola had, they knew that Microsoft used WiFi.  They knew

24   there was a standard.  And they knew they had standard

25   patents.  So they did what Microsoft asked and sent a letter

1    saying, well, here's some of the patents that we found.  And

2    they put a cover letter to that.  And I'll talk to you about

3    that.

4        And you'll hear what Motorola expected, which is the

5    custom and practice in the industry, which is that you then

6    talk, and that you learn about the other business, that you

7    learn what Microsoft's point of view is.  And you're going to

8    hear that after Motorola sent the letter, and then a

9    subsequent letter, that Microsoft never said this violates

10   some commitment.  They never said this is outrageous.  They

11   never said, we're not going to respond, this is ridiculous.

12   Instead, they actually met with Motorola and said nothing.

13   And smiled.  And said, put some more of your patents on the

14   table so we can all resolve this.  And that's what we did.

15       And then what you're going to hear is that Microsoft then

16   sued, for putting patents on the table.  And then you're

17   going to hear that what we did was then sue back.  And

18   Microsoft in response didn't say, oh, we're willing to pay a

19   RAND rate on your patents.  No.  Instead Microsoft said, your

20   patents don't apply to us.  And, in fact, your patents aren't

21   valid, and we don't owe you a penny.

22       And then you're going to learn, to show that this is just

23   litigation tactics, is that some eight months, seven months

24   after all these events in October and November of 2010,

25   Microsoft went to the Federal Trade Commission.  And they

1    sent a letter -- they were making a presentation as to what

2    they thought about patent hold-up and RAND royalties, and

3    they made the representation then, after all this had

4    happened, that Microsoft had never, to that date, ever

5    accused anyone of patent hold-up.  And that is because that

6    wasn't what happened in October or November of 2012.

7        So let me go into that with a little bit of detail now so

8    you can kind of see the overall picture here as to what was

9    happening.  And remember you were told by Mr. Harrigan that

10   there was some contention between Microsoft and Motorola

11   before October of 2010, about some patents?  Their ActiveSync

12   patents, is the name.

13       Well, actually what happened is Microsoft and Motorola

14   were business partners once upon a time.  In the early 2000s,

15   Motorola made smartphones, made cell phones, smartphones, and

16   it had the capability of syncing with Microsoft's Windows,

17   for its application, so you could sync your e-mail.  Kind of

18   a cool thing, right?  Benefited both parties.  Motorola used

19   it.  Microsoft had some patents on that, and said, here's a

20   license for our help and our patents.  It was four years,

21   from 2003 to 2007.  And the total price for that for four

22   years was $100,000.

23       It was in both parties' interest to be able to use this,

24   because it made our phone better, and it allowed Microsoft

25   and its product to mate with our phone.  So we had that

1   business relationship.  That patent expired -- I'm sorry, the

2   license expired.

3       Then there were discussions among the companies.  And

4   you're going to hear Mr. Dailey, who is sitting here with us

5   at counsel table, who, from Motorola, was in charge of

6   licensing.  You're going to hear Mr. Dailey talk about how

7   Microsoft and Motorola would talk every now and then.  And

8   then you'll hear these almost amusing stories of Mr. Dailey

9   reaching out to Microsoft and saying, hey, let's get together

10  and talk.  There was nothing contentious.  There was no

11  hold-up.  There was no impasse.  In fact, at one point Mr.

12  Dailey even went to a conference that was being held just so

13  that he could catch up to Microsoft's general counsel and

14  say, hey, let's get together and talk about this stuff and

15  our business relationship.

16      And you're going to hear that that lead-up -- and people

17  weren't in town or whatever -- and they finally set a meeting

18  in August of 2010 to get together on that.  And that was set

19  by Mr. Dailey here, and Mr. Horatio Gutierrez of Microsoft,

20  who I think I saw him a few times here, too.  I took his

21  deposition and recognize him.  And so that was in August of

22  2010.

23      But some things had happened in the meantime.  And one of

24  the things that had happened is one of the business

25  partnerships they had was that Motorola used the Windows

1    operating systems on its phones.  But then in 2008-2009,

2    Motorola decided it needed to make a change, that it wanted

3    to switch to a different operating system.

4         So we put up a timeline here.  In November of 2009

5    Motorola released, finally, the Droid phone.  And there was a

6    lot of publicity about that.  I don't know if you guys

7    remember it.  It had committed at that time, in kind of a

8    vet-the-company move, that we are going to be using and

9    committing ourselves to the Android operating system on the

10   phone, like Samsung has.  Right now the world is kind of

11   divided into Android and Apple's IOS.  So, Motorola wasn't

12   going to be putting anything into development for Microsoft's

13   Windows anymore.  So that had been a big change, but it

14   didn't seem to raise much contention.

15        But then when that August meeting was postponed and

16   Mr. Gutierrez will tell you, I'm pretty confident, that that

17   was nobody's fault, it was just scheduling.  And when I

18   predict to you what Mr. Gutierrez will say, I can predict

19   that because we've taken his sworn testimony already.  And

20   he's going to take the witness stand.  And so I can predict

21   to you what he's going to say, based upon his sworn

22   testimony, I think.  So he's going to say it really was no

23   big deal.  And they set a meeting for October 22nd.  Okay.

24   This is when the general counsel, you know, the big guys can

25   get together, and Mr. Gutierrez was going to come, and Mr.

1    Dailey, and talk about business issues.

2        Now I want to take you to October 1st.  It's a Friday.

3    It's always good to get bad news right before the weekend,

4    right?  It's Friday.  And on Friday, October 1st, without any

5    warning, without a phone call, without an e-mail, without a

6    letter, Microsoft files two lawsuits against Motorola.  One

7    is here in this court, and the other is the International

8    Trade Commission.  And in those lawsuits Microsoft asserts

9    not just these patents that were concerning this syncing --

10   as I said, there were about, I think, nine patents asserted,

11   and only two were those patents.

12       The majority were about Android, were about that Android

13   operating system.  You know, we own part of that.  And we are

14   going to try to stop you, Motorola, from selling these in the

15   United States.  And then the International Trade Commission,

16   they prevent you from importing them in.  So you can't even

17   bring them into the United States if they're made out of the

18   United States.

19       And you're going to hear Mr. Dailey testify that this was

20   shocking to him, because they already had this October 22nd

21   meeting set up.  Microsoft had never said anything about, you

22   know, your operating system that you have committed your

23   company to is owned partly by us.  He will tell you that in

24   all of his years of licensing that what happens is that

25   companies get together and they say, here is my intellectual

1    property, and I think you're using it.  And the other company

2    says, that's my intellectual property, and I think you're

3    using it.  And they get together and discuss things and try

4    to negotiate.  And this can take months and years, actually.

5    And they try to reach an agreement so they can basically both

6    have freedom of action, which means they can both sell in the

7    marketplace.  And if those break down, then you might get

8    involved in this kind of venue, in litigation.

9         But that's not what happened here.  Microsoft started out

10   like that.  But he didn't know why.  Well, one thing that he

11   didn't know, by the way, is that Microsoft was unveiling its

12   new Windows Phone 7, its new operating system for phones,

13   just a few days later.  He found that out a few days later

14   when it was, in fact, unveiled.  But at the time he was sued

15   he didn't know about this.

16        But when the lawsuit took place, Mr. Gutierrez called Mr.

17   Dailey, and actually there was -- the general counsel called

18   the general counsel as well.  Microsoft had a plan in place,

19   and Mr. Gutierrez will testify to this, where Microsoft would

20   call Motorola and say, we've sued you, don't worry about it,

21   please let's go forward with that October 22nd meeting.  And

22   we want you to put your patents on the table so we can

23   resolve this.

24        And one thing you'll hear is that when you get involved in

25   litigation like this, that what happens usually is the other

1    side comes back with their patents.  So that when you reach a

2    resolution you've got some kind of net resolution.  I have

3    patents against you.  You have patents against me.

4         So, Mr. Gutierrez said, we want you to come forward with

5    your patents.  We want you to present those to us.  Now, this

6    was the problem that Mr. Dailey faced at that time.  Motorola

7    has, in the last ten years, invested about $13 billion

8    dollars in cellular and WiFi and video -- I'm sorry,

9    cellular, WiFi, and other mobile.  And about $3 billion in

10   video.  It has about 10,000 U.S. patents, just in the U.S.

11   It has 24,000 patent applications worldwide.  And here

12   Microsoft has sued it and said, come back with your patents.

13        Motorola had mainly used its patents to achieve what we'll

14   hear this phrase, freedom of action.  And what that means is,

15   various companies have standards-essential patents, and also

16   companies, as these smartphones got more and more

17   complicated, ended up patenting other features as well.  So

18   what a company like Motorola wanted -- and a company like

19   Samsung and Ericsson and LG, who had come up with a lot of

20   the standard-essential inventions, and other inventions --

21   mainly what they wanted to get in the marketplace at that

22   time, what Motorola wanted was, freedom of action, which was

23   like a peace.  We get together, we discuss all of our

24   portfolios, both SEPs and non-SEPs, and we figure out which

25   way the money flows.

1      And in doing those negotiations, Motorola had always

2   talked, really, in terms of a package.  The package was

3   cellular, where Motorola was very, very strong.  It included

4   WiFi.  It included video, video compression.  It included

5   things like wireless e-mails.  It included maps.  It included

6   ways to manage your applications.  And all of these would be

7   discussed among the companies.

8      And Mr. Dailey will tell you that Motorola's practice in

9   doing that, in starting an opening offer, was that he would

10  come forward with 2.25 percent.  That's usually where he

11  would start.  And it was just, let's get things started.

12  And, in fact, you're going to see documents where he did just

13  that with this package.

14      And if we could very briefly go to Slide 16, Exhibit 7242.

15  And here you'll see this was a presentation to HTC where Mr.

16  Dailey said, we want a 2.25 percent rate.  And it goes on at

17  the end there, you can see, "no royalty stacking?"  Well,

18  that means something a little different than what the judge

19  told you guys.  What it means is that, within Motorola, they

20  wouldn't add one SEP to another and increase the rate.  So

21  like 2.25 percent was the maximum rate for the package.  That

22  was the standard kind of offer.  You get all of our

23  standards-essential patents on cellular, WiFi, and video

24  compression.  And all of this for 2.25 percent.  So that's

25  how he started in all these negotiations.

1       Now, another problem he had in trying to do this very

2   quickly -- oh, and by the way, this was well known.  There

3   were actually articles written about the standard rate that

4   Motorola would come out with, and then would negotiate after

5   that.

6       So, when Microsoft says, come forward with your patents.

7   And there's a time pressure here, because, you know, when you

8   get that complaint, there's a summons with it that says

9   you've got to respond within 21 days.  And there is usually,

10  again, postponements of that.  But you were under time

11  pressure, and Microsoft is trying to prevent you from selling

12  your product in the United States.  So there's some time

13  pressure here.

14      And so another problem he had was, well, what patents do I

15  put on the table?  And in that regard we have so many patents

16  here -- oh, Ken is nice enough to put up one of these

17  articles that talks about the 2.25 percent as a published

18  rate that we had.  And that is we have 10,000 patents.  And

19  we want to get stuff together quickly.  We know that we have

20  essentials on WiFi, video compression.  We know that

21  Microsoft uses that.  So those are easier to identify.  So

22  you can kind of put those together quickly.

23      It's still a difficult thing to figure out what to do in

24  terms of a rate and stuff, because we had always licensed to

25  hardware companies, you know.  And when you're talking about

1    Samsung and Ericsson and these other cellular companies,

2    we're trying to get freedom of action, it's hardware to

3    hardware.  It's these phones, you know, or tablets, or

4    whatever.  Microsoft was a little different.  They had some

5    hardware, like the Xbox, but they had software.  And Mr.

6    Dailey said he didn't exactly know what to do with that.  He

7    knew there were going to be lots of discussions between him

8    and Mr. Gutierrez as to how to sort all of this stuff out.

9        So, he had all this in mind.  And so what he does on

10   October 21st, you'll see, and you saw, a letter that was sent

11   out.  The context of which was:  We've sued you.  We're

12   trying to put you out of business.  Put your patents on the

13   table.  And that letter -- and I'm putting up a graphic now

14   -- it's the October 21st letter regarding 802.11 patents.

15   And I've spread this out here because the attachment to the

16   letter are those patents.  It's like 22 pages that show the

17   patents, so we can give that to Microsoft.  And then there

18   was a cover letter there.

19       And if you look at the cover letter, it has the rate of

20   2.25 percent.  And as I said, Motorola had never licensed to

21   a company like Microsoft before, and it had never licensed

22   the WiFi and the video compression separately.  It always had

23   these packages that you'd go into the other companies for to

24   try to get freedom of action.

25       So, if you look at this, there are a couple things that

1    I'd like to point out to you.  One is that -- you see, and

2    I'm going to try to see if my finger is any better than

3    Mr. Harrigan's here.  It's not.  Okay.  It says, "Subject to

4    a grant-back license."

5        And what you're going to hear Mr. Dailey testify about is

6    that, you know, when you go into other companies, they have

7    SEPs, too.  They can prevent you from practicing.  Right?

8    Because they have standards-essential patents.  And so one

9    thing that you want to make sure you're talking about is,

10   well, what do you have?  And we thought that Microsoft had

11   some standards-essential patents as well.  So that's going to

12   be part of the discussion.  You've heard the discussion, this

13   is $4 million.  No, it's not.  This is what Motorola would

14   come out and offer, this package, in quite a bit of ignorance

15   in this case, quite frankly, because it was a new area, and

16   it was a subpart of the package.  And we know there's going

17   to be negotiation about, for example, grant-backs, expressed

18   right there.

19       Another thing, if we can go to -- I think this is Slide

20   15, -- and when it was blown out in Mr. Harrigan's

21   presentation you didn't see this, because this wasn't part of

22   the letter that was blown out.  So you couldn't really read

23   it unless you had a telescope.

24       You see, it says, if Microsoft was only interested in

25   licensing some portion of the portfolio, they were willing to

1   enter into such a license, Motorola was, again, also on RAND

2   terms.  And the reason for that is, we didn't know what --

3   how Microsoft used these patents.  And that's pretty

4   important when you do license negotiations.  What products do

5   you use them in?  How important are they?

6       I mean, Microsoft, for example, later said that some of

7   our patents go to security in WiFi.  That is, you know,

8   whether or not the signals are secure.  And they said, well,

9   we have it in the standards, but we actually have a better

10  way of doing it.  And you'd want to know that so you could

11  say, well, gosh, is what we're doing really that valuable?

12  Are our patents that valuable if you're actually doing

13  something else?

14      So he says, Mr. Dailey says, "Is there just some portion

15  of this that you need?"  And the important part of this is

16  the context, the context, the much more.  Mr. Dailey

17  expected, after this, that there would be negotiation, about

18  how significant these technologies are, how significant the

19  patents are.  And you're going to hear, I believe, I'm pretty

20  confident in saying, at the end of the case, that opening

21  offers don't have to be RAND, that what you do is you

22  negotiate to try to arrive at RAND.  Right?

23      And, in fact, that's what those policies say, those

24  standards-setting organizations policies, that's what they

25  say is, we expect you to negotiate.  And I think Mr. Harrigan

1   put up one of them, I'm going to put up the same one.  This

2   is Exhibit 1136.  And you were shown the first paragraph of

3   this.  But see here, "Negotiations are left to the parties

4   concerned and are performed outside the ITU-T," et cetera.

5   And that's the standards-setting organizations.  What they

6   expect is for you guys to get together and talk.  And, you

7   see, actually there's a little box there that says, "Also

8   mark here if the patent holder's willingness to license is

9   conditioned on reciprocity for the above document."

10      That's this grant-back idea, that you may have these

11  standards-essential patents that prevents me from selling my

12  phone, too.  So, you know, I have to give you patents only if

13  you have to give me patents.  And then we have to talk about

14  that.  That's how the system works, so that somebody can't

15  hold up somebody else.  And it just makes sense, you know,

16  from a business perspective.  You want to make sure, after

17  these negotiations are done, that you can sell your product.

18  And they're not going to come back at you again and say,

19  ah-hah, we got this much money from you, but there is this

20  other patent that can prevent you from operating in the

21  marketplace.

22      Now, something else you should think about in this

23  respect, and that is, you heard this analogy about going to

24  get a Honda, and pay for it, and what if they ask a

25  ridiculous amount of money, you know?  In this case, if you

1   look at that analogy, what happened here is Microsoft already

2   had the Honda.  It had been driving around in it, had been

3   driving around in it for years.  It had been using WiFi and

4   video compression in its products.  It hadn't paid any

5   royalties.

6       And if Motorola wanted to be paid royalties, or if

7   Motorola wanted Microsoft to bring the Honda back, and give

8   it back to us, we had no power to do that except to go to a

9   judge, and a court, and say, "Is this reasonable?"  We would

10  like to be paid royalties.  Pay us reasonable royalties.  We

11  would like them to stop driving our Honda.  And they would

12  have to have a court decide whether or not that was

13  reasonable.  It's nothing that Motorola had the power to do

14  by itself at all.

15      And while the threat of a lawsuit saying, pay me

16  reasonable royalties, you know, might have an effect on a

17  small, mom-and-pop organization that couldn't afford to fight

18  a lawsuit like that against Motorola, that's not a factor

19  when it comes to Microsoft.  Motorola could get a rate it

20  asks for only if Microsoft agreed and accepted or if a court

21  said this is reasonable.  There was no leverage there at all.

22      What really happened here -- and you might think the

23  language here is a little bit strange when I show you a

24  graphic, and I'll explain to you why I use this language.

25  What really happened after these letters were sent, after

1    these patents were put on the table at the request of

2    Microsoft, is the following:  Here's what I'm going to prove

3    to you:

4        The October 21st letter has to be looked at in the context

5    of the realities of the dynamic of the engagement between the

6    two companies.  I'm going to tell you what that means and why

7    I use those words in just a second.

8        Motorola did not signal that it wanted to handle these

9    patents as a separate track of negotiation apart from the

10   overall discussions.  I mean, the idea here was to meet and

11   get all the patents on the table, and discuss a business

12   resolution, given the fact that Microsoft was trying to put

13   Motorola out of business.  In fact, when this letter was

14   sent, remember there was an October 22nd meeting already

15   scheduled.

16       And then, finally, the parties expected and had broader

17   negotiations that encompassed but didn't focus on these

18   patents at all.  This was sent in response to Microsoft's

19   request.  When the parties got together to discuss the

20   resolution, these patents weren't discussed, these royalty

21   rates weren't discussed.  What they discussed is, how do we

22   get peace?  What are you asking for as a net?  What are we

23   asking for as a net?  Looking at all of our patents that we

24   have.

25       And the reason I'm confident that that's the reality, that

1   that's the context, that that's the realities of the dynamic

2   of the engagement, is that it's Mr. Gutierrez, I think, who

3   will tell you this.  And, again, I think he will tell you

4   this because he's already sworn under oath on this topic.

5   And one way or another you will learn these facts.

6        So, the realities, the context, was this a business

7   negotiation, where it wasn't Motorola exerting pressure, it

8   was Microsoft suing and saying, we have patents that can keep

9   you out.

10        As an example of kind of a litigation tactic, you were

11   shown that 20-day provision in the offer letter -- and this

12   is Slide 15, Ken -- "Motorola will leave this offer open for

13   20 days.  Please confirm whether Microsoft accepts the

14   offer."  And Microsoft contended this showed some sort of

15   hostility or something.

16        Well, what you're going to learn is, first, there was huge

17   time pressure here, because at this point there were two

18   lawsuits against Motorola, and we needed to get this thing

19   resolved as quickly as possible, or we faced being barred

20   from the United States for selling our phones.

21        The second thing is all this means is that you can't come

22   on day 21 and say, I accept.  It means the offer is open for

23   20 days.  And that had no significance whatsoever to

24   Microsoft because, again, I think you'll hear Mr. Gutierrez

25   testify that Microsoft virtually never says yes to that first

1   offer.  I think it's less than one percent of the time where

2   Microsoft comes forward and says, yes, I'm going to pay that.

3       And Mr. Gutierrez, I think, will also tell you that under

4   this, his understanding is that Microsoft was absolutely free

5   to come back with a response saying, wait a minute, that's

6   ridiculous.  I mean, let's look at how much it would cost for

7   us to do this.  That's ridiculous.  Let's look at how we use

8   your technology in our products.  That's ridiculous.  We

9   think it should be something like this.  This doesn't prevent

10  them from doing that at all, Mr. Gutierrez will tell you

11  that.

12      And here's another thing you'll hear.  Never, ever, ever

13  did Microsoft or Mr. Gutierrez say, we need more time.  Can

14  you give us more time to respond?  It didn't happen.

15      So what was Microsoft's response to this letter?  Well,

16  they didn't say they were outraged.  They didn't protest at

17  all.  Not a peep.  There was a meeting that day, the day they

18  received this, October 22nd.  There was a meeting, 2010.  It

19  was Mr. Dailey, Motorola's general counsel, Scott Offer -- an

20  ironic name, Mr. Offer -- and it was Mr. Gutierrez and his

21  boss, Brad Smith I believe is his name.  I hope I got that

22  right, guys.  And they met here.  Motorola came out here.

23  And it was the friendliest meeting you would expect.

24  Mr. Gutierrez laughed and said, "We got your missive."  And

25  then they sat down and they discussed how to get the freedom

1   of action, peace among the two parties.

2       Among the things that were said there is, Microsoft said,

3   we want you to continue to put your patents on the table.  In

4   fact, Microsoft said, we realize in this context you may have

5   to sue us.  That's what happens in these things.  But we want

6   these discussions to continue.

7       And at one point Mr. Dailey said, why did you sue us?  We

8   had this agreement to meet on October 22nd.  And what they

9   said was, well, they approached another company, HTC, about

10  saying the Android system was owned partially by Microsoft,

11  and they were going to sue HTC, but they folded.  And they

12  wanted some lawsuit that demonstrated to the world that they

13  were going to say, if you don't use Windows but you use

14  Android, you're still going to have to pay us.  They wanted

15  some lawsuit that they could tell the world that was the

16  case.

17      And they wanted to time it with -- if we can go back to

18  the timeline again -- they wanted to time it with them

19  unveiling their new Windows Phone 7.  That was the first time

20  they had the software that was the sensitive touch, you know,

21  as opposed to being the Blackberry-type of software.  It was

22  when they, you know, Apple and Android -- well, Apple did

23  that years earlier, Android was doing it.  This was

24  Microsoft's first attempt at it.  They wanted to time that.

25  In fact, they said, what we want to do is get this resolved

1    as quickly as possible so our two CEOs can be up there on the

2    stage shaking hands and getting that publicity about

3    Microsoft owning part of Android.

4        So at the end of that they shook hands, no one said a

5    thing about an outrageous offer.  They said they were going

6    to schedule future meetings.  Motorola said, you've got to

7    give us a few weeks, because we've got a lot of patents, and

8    you want us to put all our patents on the table.  A few weeks

9    later Motorola sent the other letter, which was basically

10   just like the one of October 21st.  It was October 29th.

11   They were looking into one of their patents.

12       And what happens is -- if we can go back to the

13   timeline -- is they sue us.  Oh, I'm sorry, I'm going to skip

14   this.  That's why I have a timeline, so I don't forget what

15   to say.

16       On November 8, 2010, Microsoft's Windows Phone 7 is in the

17   stores.  It's finally there.  You can go and get it.  Then

18   what happens?  Again, without a phone call or an e-mail or a

19   howdy-do, on November 9th Microsoft sues, for the third time,

20   sues Motorola.  Context to context.  Now saying, oh, those

21   two offers you sent us, they're outrageous, they're not RAND,

22   you breached your contract, you owe us money.

23       At that point what Motorola did was not surprising at all.

24   Now, look, Microsoft will tell you, I think Mr. Dailey will

25   tell you in this situation, it's common for people to put

1   patents on the table, that they sue each other.  Microsoft

2   said, you might want to do that in the October 22nd meeting.

3   So after we were sued for the third time, then Motorola filed

4   three lawsuits.  But they were kind of to mirror the

5   Microsoft lawsuits.

6       On November 10 we filed a lawsuit in Wisconsin which had

7   SEP patents and non-SEP standards-essential patents.  We

8   filed a suit in the Southern District of Florida, which had

9   more non-SEP patents.  They weren't standards-essential.  So

10  we're talking like the wireless e-mail patents that Motorola

11  had, or the application syncing, some voice-recognition

12  patents as well.

13      And then a little bit later we sued in the ITC on both

14  standards-essential patents and patents that weren't

15  standards-essential.  So, basically, everything was put on

16  the table now.  The patent portfolios of the two companies.

17  And what later happened is that some of these were

18  transferred here to Seattle.  Because sometimes that's what

19  happens.  Motorola might want to be in Florida where its

20  company is that does pagers, and Microsoft might want to be

21  in Seattle, for obvious reasons.  And there's a decision that

22  for efficiency it should be done in the same place.

23      You were told in the lawsuit Microsoft filed there was

24  suggestion they were willing to pay a RAND rate on these

25  patents.  Do you recall that?  Well, actually, that's not

1   what that lawsuit says.  It does ask for a determination of,

2   what would RAND be.  Let's have the court determine.  But

3   what the response was to Motorola's lawsuits, actually suing

4   on these patents, was Microsoft said, we don't use this

5   technology.  We do not infringe.  We don't owe you a penny.

6   And, indeed, their defenses included, you waited too long to

7   sue.  And, your patents aren't valid.  You can't assert your

8   patents against anybody in the world.  And that, obviously,

9   is, again, a huge threat to Motorola, saying our patents

10  aren't valid.  And this was the vortex.  This is what

11  Motorola got sucked into because of this goal of asserting

12  leverage on Android.

13      And I mentioned that there was a presentation to the FTC

14  by Microsoft months later.  So to show you that this is a

15  litigation tactic, after we filed our suit in Wisconsin, and

16  one of the things we asked for was an injunction.  And you're

17  going to hear testimony, there isn't a patent lawsuit around

18  where you file where you don't ask for damages and an

19  injunction, if the court thinks that is reasonable and

20  appropriate.  It's not something we can decide.

21      After we filed those lawsuits, after we filed the suit in

22  the ITC, Microsoft sends a letter to the Federal Trade

23  Commission.  Its purpose is to say, you don't have to worry

24  about patent hold-up in the world.  It's not a real problem.

25      Here is what they said with respect to their own

1    experience.  It's June 14, 2011, this is page 7.  Microsoft

2    says to this government agency, "In the former context there

3    seems to be a dearth of examples of actual patent hold-up

4    with regard to the essential patent claims reading on a

5    standard."  You were told what Microsoft was saying was

6    generally that's not a problem, but there are some bad actors

7    like Motorola.  I don't know if you recall that.

8        Here's what they said to the federal government in June of

9    2011.  "Microsoft has never been accused of patent hold-up in

10   this regard, nor has it accused any other company of such

11   behavior."  It goes on to say, "This is not to say that

12   Microsoft has never been a party to litigation where the

13   parties disagree whether preferred licensing terms were

14   consistent with the relevant patent licensing commitment,

15   such as RAND.  When companies have such bilateral

16   disagreements, it may make sense for them to seek resolution

17   in the courts.  But such litigation is rarely limited to the

18   proposed licensing terms for just the essential claims

19   reading on a standard.  Typically such litigation is

20   addressing other patent-related issues, or even other

21   business terms that the parties have been unable to reach

22   agreement on."

23       And all of that is true here.  They're right.  There

24   wasn't any patent hold-up.  What we had here was a broader

25   discussion between the companies -- on other patents and

1    other business issues -- that were important to both

2    companies.

3         So that having been said about how we were drawn into

4    this, and how this was basically a dispute between the

5    company that was much larger, and is only being described as

6    patent hold-up now, so Motorola has to fund attorneys fees

7    and their move from Germany.

8         Let me go to the next part of the story.  I'm going to put

9    up a timeline now, if I can, about what happened in Germany.

10   And Motorola filed a patent suit against Microsoft in Germany

11   in July, 2011.  It says two days there because, in Germany,

12   you can only file one patent per suit, so it took actually

13   two days to file those lawsuits.  As of that time the parties

14   had been having discussions for months.  Microsoft had never

15   said that they were going to pay RAND.  Microsoft took the

16   position, your patents are worthless, they aren't valid, we

17   aren't even infringing.  Now, this lawsuit was a breach of

18   contract lawsuit, so Microsoft filed that here in the United

19   States.

20        For patent lawsuits you have to go where the patent is.

21   That is, we have patents, Motorola and Microsoft, in the U.S.

22   But if you want to enforce patents in Germany, you've got to

23   go to Germany where there are German patents and actually,

24   sometimes, different rules of law.

25        Now, we're not going to ask an American court to try to

1    determine whether a German patent is valid.  So, companies,

2    Microsoft, Samsung, Apple, they file in other countries to

3    enforce their patents in those countries.

4        Why Germany?  Well, Microsoft suggests the reason they do

5    it in Germany is they have this big distribution center.

6    Well, here's what's going to be undisputed, and that is

7    72 percent -- I'm sorry, two-thirds, I got that wrong

8    again -- two-thirds of all patent suits filed in Europe are

9    filed in Germany.

10       Now, both sides here have German law experts to kind of

11   explain to you what the law is.  And they agree on a

12   surprising number of things.  There's a Professor Haedicke

13   and a Professor Bodewig.  I think they're both here today.

14   And one thing they'll agree on is that the German courts have

15   a reputation for being the best, most efficient, most

16   technologically savvy courts in Europe.  Mr. Bodewig, who is

17   Microsoft's expert, said people file in Germany because the

18   courts have a particular expertise.  It is efficient, a lot

19   cheaper than in the UK.  I don't know if any of you have

20   traveled in the UK lately, you might understand that.  And

21   that it's quick.  It's very quick.  So that's Germany.

22       Now, it is not a breach of a RAND obligation to seek an

23   injunction when someone is not willing to pay you anything,

24   saying your patents aren't valid, saying they don't infringe.

25   The RAND obligation does not prevent you from seeking an

1    injunction.  You have to look at particular cases.  There may

2    be somewhere it would, but not in these circumstances, when

3    you look at the facts.  And, in fact, remember, as of this

4    time Microsoft never said it was willing to pay or had said,

5    we do, in fact, infringe your patents; and, yes, they're

6    valid.

7         When Microsoft made its presentation to the FTC in June of

8    2011, it told the FTC what Microsoft's view was on

9    injunctions under the RAND circumstances.  And so what

10   Microsoft said to the government at that time is that same

11   document.  They say, "In addition, the existence of a RAND

12   commitment to offer patent licenses should not preclude a

13   patent holder from seeking preliminary injunctive relief or

14   commencing an action in the International Trade Commission,

15   just because the patent holder has made a licensing

16   commitment to offer RAND-based licenses in connection with

17   such a standard."

18        They go on to say, "Whether such relief is available

19   should be assessed under the current legal framework in the

20   applicable jurisdiction, which often is premised

21   substantially on the specific facts and circumstances at

22   issue ."  Now, pay attention to the last line here.  "Any

23   uniform declaration that such relief would not be available

24   if the patent holder has made a commitment to offer a RAND

25   license for its essential patent claims in connection with

1    the standard, may reduce any incentives that implementers

2    might have to engage in good-faith negotiations with the

3    patent holder."  Now, in this case Microsoft is the

4    implementer, because they're the ones using the patent.

5        And the reason that you can still try to get injunctive

6    relief is sometimes those people using their patents won't

7    come forward and say, okay, okay, we'll pay you something,

8    unless you seek this kind of relief.  And that, by the way,

9    is what happened here.  Microsoft didn't come forward and say

10   we'll pay your RAND rate until after this lawsuit was filed

11   in Germany.  So, that's concerning the filing of the lawsuit.

12       Now, let me talk to you about, Microsoft is coming here

13   and saying, we moved because of this.  We moved because you

14   filed in Germany.

15       Well, to be clear, there was never an injunction in

16   Germany.  If Microsoft had not moved they'd still be selling

17   whatever they wanted to sell in Germany and elsewhere.  And

18   also to be clear, you don't get an injunction in Germany

19   unless there's a finding that you use and infringe the

20   patents, that you're actually using the technology.

21       But here's what the evidence will show, and this is kind

22   of in the timeline you already saw, is Microsoft files the

23   infringement suit -- Motorola files it in Germany July 6, 7.

24   Microsoft said that made us move because we knew there would

25   be injunctive relief.  It was six months before Microsoft

1    said it even considered moving out of Germany.  It was

2    eight months after filing that lawsuit before they say they

3    decided to move out of Germany.

4        And only after deciding to move, if you look at the

5    March 20th, only after deciding to move did they go to the

6    court here and say, hey, could you tell us that we don't have

7    to move?  They didn't ask this court previously, before they

8    decided to move, whether or not they actually had to.

9        If Microsoft feared an injunction -- by the way, the

10   evidence is going to show that if a fear of injunction is why

11   they moved, they would have moved despite this lawsuit, our

12   lawsuit, about standards-essential patents.  And here's why.

13   For one thing, the lawsuit we filed also had

14   non-standards-essential patents.  There's no breach of

15   contract with any of these standard-setting organizations, or

16   with Microsoft, by seeking an injunction against these

17   non-standards-essential patents.  Just as Microsoft sued

18   against Motorola on the Android stuff.  It's not a breach of

19   contract.

20       And at the time that Microsoft says it decided to move,

21   that was over their heads, too, that there would be an

22   injunction on these non-standards-essential patents.  So if

23   that's why they were going to move, they were going to move

24   anyway.

25       The second thing you're going to hear is that Microsoft's

1    in-house counsel, and you're going to hear from one of them,

2    Sheila -- I think McKinley is her name, and I hope I didn't

3    get that wrong, but if I did I apologize, I'm terrible at

4    names -- but she testified that the legal staff realized,

5    wait a minute, we have our distribution center in Germany,

6    two-thirds of all patent suits in Europe are filed here.  The

7    German courts issue injunctions a lot.

8        So she'll tell you that for the future, for other

9    lawsuits, for an Apple suing, or a Samsung, or whatever, that

10   they should get out of Germany.  That was a bad place to have

11   their distribution center because of the legal scheme there.

12   And because it was such a popular place to be.  So she

13   advised the business people of that.  Which is, you know, for

14   the future, you've got to get out of here.  It's not just

15   because Motorola filed a lawsuit here; it was because they

16   realized they were in the wrong place, and they should move

17   their distribution facility somewhere else, like, say, the

18   Netherlands, which is what they did.

19       Now, another thing; this move benefited them.  Now, the

20   move -- I think the distance, if we can put up 32 -- the

21   distance was about 75 miles from Germany to the new facility

22   in the Netherlands.  I guess about from Microsoft's campus

23   here, to Olympia, about, you know, a little more, maybe three

24   or four miles more.

25       And Ms. Teresa Daly was working on this move.  She was a

1  general manager.  She's based in Ireland.  And she sent an

2  e-mail describing the benefits of this move.  And this is in

3  an unreadable form, so we'll pull it out.  This is on

4  June 12, 2012.  And she said, "The decision to move our main

5  distribution center in Europe was made with a vision for the

6  future.  To support the growth in our business over the years

7  ahead, we need to significantly scale our distribution

8  footprint and capabilities in EMEA."  And this is this whole

9  area where Microsoft was distributing.  And she talks about

10 the transition not being easy.

11      And there's, attached to the bottom of this, some

12 statistics.  And we're going to make this a little bit

13 readable for you.  And she talks about how much bigger the

14 new facility is, how much more storage space, how many more

15 production lanes and loading bays.  And let's put up 36.

16      And when you look at those figures, they're increasing

17 their footprint, which they said was needed for the future,

18 by like 91 percent, their storage space by 90 percent, they

19 were doubling their production lanes.  They were increasing

20 their loading bay doors by 171 percent.  So, there are

21 benefits to this move, apart from just getting out of Germany

22 because of the legal system.

23      So you're going to be told by witnesses of Microsoft, we

24 moved because of the Motorola lawsuit, and that alone.  And

25 you're going to have to evaluate that testimony.  Now, let me

 1    give you an example of what I think you're going to hear.

 2    Now, you're going to hear from Mr. Davidson, who is a general

 3    manager of the supply chain.  He is going to testify, for

 4    Microsoft, the reason we moved is because of this possibility

 5    of an injunction.  So, I predict that when we show him that

 6    e-mail -- I predict, because I've taken his deposition, and

 7    he was sworn under oath -- that this particular e-mail, if we

 8    can go back to it from Ms. Daly, he said, I never reviewed

 9    it, and those numbers are wrong anyway.

10        Well, we took Ms. Daly's deposition.  She's the person who

11    sent this.  I predict that what she will say is that not only

12    did Mr. Davidson review this, he supplied the numbers for the

13    e-mail.  We should not pay for Microsoft's move.

14             THE COURT:  You have ten minutes left.

15             MR. PRICE:  Almost ahead of myself here.  You'll be

16    glad to hear that.

17        I want to talk about one more area, that is you were --

18    there was discussion about this company, Marvell.  And what

19    we will prove to you during this trial, that again is a

20    litigation tactic by Microsoft to apply pressure to Motorola.

21    Because here is what happened.  Marvell is a supplier of

22    Microsoft, a huge supplier to Microsoft.  So, when these

23    lawsuits were filed, Microsoft contacts Marvell.  Marvell has

24    been selling their chips for years.  Motorola has never gone

25    to Marvell and said, you know, we demand you stop, we're

1   going to exercise leverage and make you pay a lot.  Motorola

2   has never done that to anybody on these technologies.

3       But they went to Marvell, and you're going to see an

4   e-mail from Ms. Ochs, Jennifer Ochs, who was at Marvell.  She

5   sends it to Timothy Kowalski, who you'll hear from, from

6   Motorola.  She says, Marvell is prompted to make this request

7   for a license in response to Microsoft's assertion that

8   Marvell is contractually obligated to obtain such a license

9   to cover the chips Marvell supplies to Microsoft for its Xbox

10  console and wireless internet adapter.  Then she asks for a

11  price.  This was leverage.  This was bending somebody's arm

12  to ask them to do something they did not want to do.  Why?

13  To set up this lawsuit.

14      And you're going to hear what happened, actually, is kind

15  of what should happen.  And that is, Motorola sent the

16  standard letter, okay, 2.25 percent.  Let's talk.  And what

17  Marvell did back is they said, you know, let's talk about

18  this.  We have standards-essential patents, too.  So we

19  should cross-license and come to a business resolution of

20  this.  And then we did what you're going to hear is the

21  custom and practice, the way this usually works out if you're

22  not rushed because you're already sued, and that is, we said,

23  well, can you provide us something called claim charts.

24      And what claim charts are is where, you know, I say I have

25  a patent and what you're doing infringes it.  Well, the

1    patent says, A, B, C, D is what you need to do to infringe my

2    patent.  So I give you a chart that says, my patent says A,

3    B, C, D, and here's your product.  And it does A, B, C, D.

4    And you chart that out.  So we said, why don't you give us

5    that.  And, in fact, let's look at 42.  This is going to be

6    Exhibit 3404.  This is Mr. Kowalski talking to Ms. Ochs.  And

7    toward the end there it says, "I requested that Marvell

8    provide to Motorola Mobility, and Marvell agreed to provide,

9    claim charts demonstrating the purported relevance of

10   Marvell's patents to the 802.11 standard.  Please provide

11   Motorola Mobility with the requested claim charts so that we

12   can understand Marvell's assertion regarding the essentiality

13   of its patents and evaluate Marvell's proposal."  That's the

14   way it works in a good-faith negotiation.  You don't say,

15   give us more patents, tell us about more patents, and then

16   sue.  You engage in these negotiations.

17       And what happened here is that the response -- this was

18   from Ms. Ochs -- was, "Thank you for the update, and all the

19   best to you and your new position at Google."  Because Google

20   took over Motorola.  Most of this time Motorola is out there

21   by itself.  But Google bought Motorola at some point in 2012.

22   And they say, "We will work on providing the supporting claim

23   charts."

24       Now, Marvell was so into this, so incentivized to ask for

25   this license, that they didn't do that, that they didn't

1    provide the charts.  They just let it drop.  Because the

2    evidence is going to show they didn't really want to engage

3    in negotiations either; they were being forced to do this by

4    Microsoft for this litigation.  Litigation tactics.

5        What I am going to show you during this trial is Motorola

6    acted in utmost good faith, continued after these lawsuits,

7    actually.  Mr. Dailey and Mr. Gutierrez continued to try to

8    reach some business resolutions and weren't able to.  But the

9    reason we're here, and the reason this leverage is still

10   being applied at this late date, is it has nothing to do with

11   those two letters or the lawsuit in Germany; it has

12   everything to do with the overall marketplace for phones and

13   what role people are going to have.

14       So thank you.  And I hope you enjoy the trial.

15           THE COURT:  Thank you, Mr. Price.  We have about ten

16   minutes before I'm going to release you for the day.  I'm

17   going to give you five minutes off, because I'll take five

18   minutes and read you something that you will know by heart by

19   the time we finish, then I'll talk a little bit about what

20   will happen tomorrow.

21       We are about to take our first recess.  Remember that,

22   until the trial is over, do not discuss this case with

23   anyone, including your fellow jurors, members of your family,

24   people involved in the trial, or anyone else.  And do not

25   allow others to discuss the case with you.  This includes

1    discussing the case in internet chat rooms, or through

2    internet blogs, internet bulletin boards, e-mails or text

3    messaging.

4        If anyone tries to communicate with you about the case,

5    please let me know about it immediately.  Do not read, watch,

6    or listen to any news reports or other accounts about the

7    trial or anyone associated with it, including any online

8    information.

9        Do not do any research, such as consulting dictionaries,

10   searching the internet, or using other reference materials,

11   and do not make any investigation about the case on your own.

12       Finally, keep an open mind until all the evidence has been

13   presented and you have heard the arguments of counsel, my

14   instructions on the law, and the views of your fellow jurors.

15   If at any time you need to speak with me about anything,

16   simply give a signed note to the clerk, who will give it to

17   me.

18       I'm sure you're all familiar with those by now, having

19   heard them two or three times.  Let me talk a little bit

20   about them.  The internet has changed a lot of things, one of

21   which is the court system.  It's changed it in a couple of

22   ways.  One way is it's made online research very simple.  I'm

23   going to say something that will shock you.  Not everything

24   you read on the internet is accurate.  That's what we're

25   trying to shield you from, the person who has something out

1    there that's just nutty.  You read it.  You don't have the

2    context.  You don't have the background to know if it's

3    accurate or not.  And now you know it because you read it on

4    the internet.

5        This has been frighteningly demonstrated in a number of

6    cases, and it's something we spend a lot of time worrying

7    about and warning you about.

8        Secondly, this is a wonderful form of communication,

9    particularly people who have Facebook accounts, or whatever.

10   They have social chat rooms, they go online and say, boy, I'm

11   having this great experience, and you should know how

12   interesting this case is.  And I'm so impressed with this and

13   not at all impressed with that.  That's absolutely contrary

14   to everything.  But somehow we don't have that linkage that

15   this is what I'm doing, and this is what the judge said, and,

16   you know, I'm not supposed to be doing that.  So I'll remind

17   you of that regularly.

18       And then, finally, there's some really interesting work

19   being done on how to do jury deliberations.  It's funny that

20   we say to you, don't talk to each other until the case is

21   over with.  What we're trying to prevent is you hearing one

22   set of witnesses, Microsoft is going to go first, and hearing

23   that, and talk, and start to form those opinions.  And

24   Motorola hasn't had a chance to present any evidence yet.  So

25   there's a lot of discussion of what's the best way to do it.

1    But for the time being the rule is I'm going to ask you not

2    to discuss the case among yourselves until you've heard all

3    of the evidence.

4        And don't forget those very important instructions of law

5    that I'm going to read to you at the end of the case.  So

6    it's not that we're trying to hide stuff from you.  It's not

7    that we're not trying to ask you to be well-informed.  We

8    hope everything that you'll need to decide the case will

9    occur here in the courtroom.  After it's gone through, as you

10   can see, it's obviously a very full vetting process.

11       For those of you who don't work downtown, it's August

12   still, so snowstorms are probably not likely.  Earthquakes,

13   floods, traffic accidents, kind of you-name-it, still

14   happens.  However long you think that it will take you to get

15   downtown, roughly double it, and you'll be fairly accurate.

16   It really is embarrassing when you have to call at 8:55 and

17   tell the clerk that you're at Northgate, but the traffic is

18   really slow, and the bus will get there sooner or later.

19       For those people who don't work downtown, Seattle does

20   have a traffic problem, and sometimes it's an issue for us.

21   And if you come early, you can make coffee back there and

22   entertain yourself, meet your fellow jurors, just not talking

23   about the case.

24       Other than that, we got through a lot of material today.

25   I thought the lawyers were very efficient in the use of their

1    time.  That's what our goal is.  We know this is an

2    inconvenience for you.  When you're here, we're going to have

3    you working.  You may come by and see us in here early in the

4    morning, over the lunch hour sometimes, or staying after.

5    We're doing things that have to do with organizing the next

6    day.  There is a reason we didn't invite you to attend.  It's

7    usually because we're talking about something that will

8    happen in front of you, and what fun would that be if you

9    already knew what the result was going to be?

10        So, with those cautions -- if I'm doing something else,

11   I'll usually try and tell you, and you're welcome to come in

12   and watch.  I need to do a criminal sentencing sometimes

13   outside of hours, since we're having the trial during the

14   day.  And that usually will cause you to not want to spend

15   any more time in the courthouse than you have to.

16        So, with those admonitions, thank you for your attention

17   today.  The parties appreciate it, and so do I.  We'll see

18   you all, if you could be here at 8:50 or so in the morning.

19   We start at nine, go to 10:30, take a break for 15 minutes,

20   go to noon.  We take an hour and a half lunch hour, go to

21   3:00, take a 15-minute break, then a hard stop at 4:30.

22   That's our day tomorrow.  Microsoft will be calling their

23   first witness, and we'll get the trial underway.

24      (The following occurred outside the presence of the jury.)

25           THE COURT:  Mr. Harrigan, any matters we need to take

1    up?

2         MR. HARRIGAN:  I don't know of any, Your Honor.

3         THE COURT:  All right.  Mr. Price?

4         MR. PRICE:  None, Your Honor.

5         THE COURT:  All right.  Counsel, timing today, if you

6    tell me you're going to take an hour for opening statement,

7    you need to take an hour, because it's my hard rule that we

8    fit both of them in on the same day.  So, Mr. Harrigan,

9    that's why I prompted you to move along.

10        MR. HARRIGAN:  I wasn't keeping very good track

11   myself.

12        THE COURT:  All right.  We'll see you all tomorrow.

13   Other than that, we'll be in recess.  Good night.

14                  (The proceedings recessed.)

15

16

17

18

19

20

21

22

23

24

25

1             C E R T I F I C A T E

2

3

4        We, Barry Fanning and Debbie Zurn, Official Court

5    Reporters for the United States District Court, Western

6    District of Washington, certify that the foregoing is a true

7    and correct transcript from the record of proceedings in the

8    above-entitled matter.

9

10

11    DATED this ^  day of August, 2013.

12

13

14    /s/ Barry Fanning            /s/ Debbie Zurn

15    Barry Fanning, Court Reporter    Debbie Zurn, Court Reporter

16

17

18

19

20

21

22

23

24

25