1      UNITED STATES DISTRICT COURT.

2      WESTERN DISTRICT OF WASHINGTON AT SEATTLE

3    _____

4    MICROSOFT CORPORATION,          )
                                     )
5                    Plaintiff,      )  C10-1823-JLR
                                     )
6    v.                              )  SEATTLE, WASHINGTON
                                     )
7    MOTOROLA INC., et al,           )  August 27,2013
                                     )
8                    Defendant.      )        TRIAL
                                     )
9    _____

10             VERBATIM REPORT OF PROCEEDINGS
            BEFORE THE HONORABLE JAMES L. ROBART
11              UNITED STATES DISTRICT JUDGE
     _____

12

13

     APPEARANCES:
14

15

16    For the Plaintiff:      Arthur Harrigan, Christopher
                              Wion, David Pritikin Richard
17                            Cederoth, Andy Culbert,Nathaniel
                              Love and Ellen Robbins
18

19

20
      For the Defendants:     Ralph Palumbo, William Price
21                            Brian Cannon, Kathleen Sullivan
                              Andrea Roberts and Philip McCune
22

23

24

25

```
1                          EXAMINATION INDEX

2    EXAMINATION OF                                        PAGE
      JON DEVAAN          DIRECT EXAMINATION                12
3                         BY MR. HARRIGAN
                          CROSS EXAMINATION                 26
4                         BY MR. PRICE
      DAVID TREADWELL     DIRECT EXAMINATION                34
5                         BY MR. CEDEROTH:
                          CROSS EXAMINATION                 47
6                         BY MR. PRICE:
                          REDIRECT EXAMINATION              56
7                         By Mr. Cederoth:
                          REDIRECT EXAMINATION              57
8                         By Mr. Price:
      KIRK DAILEY,        DIRECT EXAMINATION                59
9                         By Mr. Pritikin:
                          CROSS EXAMINATION                143
10                        BY MR. PRICE

11

12

13                          EXHIBIT INDEX
     EXHIBITS ADMITTED                                     PAGE
14     2                                                     67
       1                                                     74
15     16                                                   143
       7239                                                 163
16     7240                                                 165
       7274                                                 192
17     7252                                                 195

18

19

20

21

22

23

24

25
```

1          THE COURT:  Mr. Harrigan, I understand Microsoft has

2   a matter they want to take up before the jury comes in.

3          MR. HARRIGAN:  Mr. Pritikin will address that, Your

4   Honor.

5          MR. PRITIKIN:  Good morning, Your Honor.

6          THE COURT:  Good morning, Mr. Pritikin.

7          MR. PRITIKIN:  There are a couple of documents that

8   Motorola indicated it plans to use with Mr. Dailey, and we

9   thought it would be appropriate to address these now.  I

10  think there were four documents, Your Honor, that are at

11  issue here.

12         THE COURT:  I should also note -- to interrupt you

13  for a moment -- we have a motion from Qualcomm, apparently on

14  confidential documents, that was filed.  I don't know who is

15  going to use them or when, but we need to make sure that we

16  get that covered prior to that happening.

17         MR. PRITIKIN:  I don't believe we intend to, Your

18  Honor.

19         THE COURT:  Mr. Price?

20         MR. PRICE:  I don't think we intend to either, Your

21  Honor.  But we'll certainly let you know if I learn that we

22  are.

23         THE COURT:  Please continue, Mr. Pritikin.

24         MR. PRITIKIN:  Let's start with the first two

25  documents.  These relate to the VTech license which was the

1    subject -- this relates to the VTech license, if Your Honor

2    recalls, was the result of extensive testimony during the

3    November trial.  And the first of these is the VTech license

4    that was discussed extensively in the findings of fact.  The

5    second, Exhibit 2832, is an e-mail where VTech supposedly

6    asked for the 802.11 and H.264 license, also discussed

7    extensively in the court's findings of fact.

8         We think it is improper to offer these in the course of

9    this trial.  Apparently what Motorola wants to do is to argue

10   that these implicitly endorse the 2.25 percent royalty.  That

11   issue -- the ship has sailed on that.  That's the issue that

12   was litigated last fall.  And we don't think we should be in

13   a position of relitigating that now.  So we would ask that

14   these documents be excluded.

15        Should I treat them all at once, Your Honor?

16             THE COURT:  Yes.

17             MR. PRITIKIN:  The next is the RIM license.  And

18   this, too, is deja vu all over again.  There are extensive

19   findings made by the court on the RIM license.  Like the

20   VTech license, the court ruled that this does not support a

21   2.25 percent royalty.  And, again, that's kind of the

22   impression, the innuendo they want to leave with the jury by

23   using it.  Again, we don't think they should be offered or

24   used in this case.  Those are the first three documents, Your

25   Honor.

1      The last document -- and again, I can hand up the specific

2  findings if it would be helpful to remind the court of what

3  you ruled, but I think you probably have it well in mind.

4          THE COURT:  You're going to have to do that, because

5  I'm going to ask you, if you say this is inconsistent with a

6  prior ruling, you give me the number of that ruling.

7          MR. PRITIKIN:  Absolutely, Your Honor.

8      With respect to the VTech license, the findings that we

9  would reference --

10         THE COURT:  VTech is 420.  I have that in front of

11 me.

12         MR. PRITIKIN:  420.  But there are others that

13 surround that that are also important and relevant to that.

14         THE COURT:  I think you want to look at 416, 414,

15 415, 418.

16         MR. PRITIKIN:  VTech is 420, 16, 14, 415, 418, 417,

17 413.

18         THE COURT:  All right.

19         MR. PRITIKIN:  And for the RIM license, I would

20 direct the court to findings -- these are not in order -- but

21 435, 426, 430, 431, 425, 429, 432, and 433.  The bottom line

22 was the court concluded with respect to each of them that

23 they are not an indicator as to what is, in fact, an

24 appropriate RAND royalty rate for the 802.11 and H.264 patent

25 portfolios.  Among other things --

1        THE COURT:  I understand your position.

2        MR. PRITIKIN:  You understand our position.  Sure.

3    All right.  And the other document that they've indicated

4    they intend to use with Mr. Dailey is Exhibit 7243.  And I

5    think we've given you a copy of that, Your Honor.

6        And this was attached to a declaration that Mr. Dailey had

7    provided in the Apple versus Motorola case.  And if you look

8    at the article that is Exhibit 5, it's highly objectionable

9    on many grounds and is rank hearsay.  It's an article that

10   appeared in Le Nouvel, and it's on royalty rates and

11   licensing strategies for essential patents and

12   telecommunication standards.  And I suspect the reason they

13   want to use it is to say, well, there's an article saying

14   that Motorola asks for 2.25 percent on its telecommunication

15   standards, and there's data in here on what other companies

16   are asking for on telecom standards.

17       It is irrelevant and prejudicial under 403 and creates a

18   sideshow in these proceedings.  That's our position simply

19   stated on those documents, Your Honor.

20       THE COURT:  All right.  Mr. Price.  Why don't you

21   start with the VTech license, please.

22       MR. PRICE:  Sure, Your Honor.  You started with the

23   most difficult one, I understand.  The VTech --

24       THE COURT:  It was the first one handed up, that's

25   how I chose.

1            MR. PRICE:  I understand counsel is afraid that we're

2    going to argue from VTech the appropriate rate is 2.25.  And

3    that's not going to be the argument at all.  What Mr. Dailey

4    -- and, Your Honor, this may be relevant for another witness

5    which we'll deal with on another day for a much different

6    topic.  But for Mr. Dailey the purpose would be is to show

7    that he is being consistent -- and I know plaintiffs want to

8    say consistently wrong -- but consistent in his expectations,

9    in his good-faith expectations.  This isn't being offered to

10   show that this is, in fact, the RAND rate.  It's being

11   offered to show that that was, at the time, Mr. Dailey's

12   custom and practice to try to get value of about 2.25 percent

13   when he had these negotiations with other companies.

14        That also relates to the other documents in the following

15   way, Your Honor.  Plaintiff has said, and I believe this

16   court has also found, that some of these licenses have a

17   number of technologies in them when they come to the final

18   rate.  And that is actually our point.  That is, when you

19   have the negotiations between these two companies, between

20   Motorola and Microsoft, although in the negotiations there

21   were discussions of 2.25 percent rates, that encompassed all

22   the technologies that were going to end up being in the

23   eventual license; or at least that was Mr. Dailey's

24   expectation while trying to negotiate to an eventual

25   zero-zero license.

1     And so this shows the thought process and the negotiation

2    strategy that Motorola used indiscriminately.  And, again, I

3    know plaintiffs are going to say wrongfully, because this

4    comes as more than just this patent.

5           THE COURT:  Why don't you turn to the RIM license.

6           MR. PRICE:  The RIM license is a good example of

7    that, Your Honor.  There's going to be evidence that, again,

8    that Motorola starts with a 2.25, that there are

9    negotiations, as are expected, and that at the end what you

10   get is a negotiation with a broader set of licenses.  And

11   then you get a net royalty rate based upon that package of

12   licenses.  And what Mr. Dailey is going to testify to is

13   that's the process and the custom and practice that he

14   expected here.  He starts out with an expectation of what

15   they're going to get overall with the entire package of

16   patents that are going to be discussed in the discussions.

17   And then, of course, you're going to hear evidence, from

18   Mr. Gutierrez and Mr. Dailey both, that those are what the

19   discussions encompass, not just these standard essential

20   patents, but a panoply of patents.

21          THE COURT:  Doesn't your original October offer

22   letter say that these are RAND rates, which would imply that

23   they're standard essential patents?

24          MR. PRICE:  Yes.  Yes.  There's no question that

25   original letter -- which was sent in the context of

1    litigation and trying to put your patents forward -- says

2    these are essential patents --

3            THE COURT:  You can spare me the "context of

4    litigation," counsel, the jury is not here.  Let's just stay

5    with the facts.

6            MR. PRICE:  That letter says 2.25 percent.  These are

7    RAND essential patents.  And it attaches the patents.

8            THE COURT:  It strikes me the difficulty with your

9    position is that if you're offering to license the standard

10   essential patents for 2.25 percent, then -- and the

11   grant-back license that you're asking for is essential

12   patents of Microsoft, that would then value all of your other

13   patents as worthless.

14           MR. PRICE:  Actually I think their expert testifies

15   to that.  And I think that was Your Honor's problem with

16   VTech, is that you could write an agreement that basically

17   said that.  But what the parties would tell you is during

18   negotiations they're valuing everything.  And, quite frankly,

19   on Motorola's side they don't care, you know, whether you say

20   the WiFi and video compression are worthless, or whether you

21   say the wireless e-mail was worthless, or whether you say the

22   exchange sync patents that were asserted were worthless, or

23   the mapping patents were worthless.  And these are all part

24   of the discussions between the two parties.  All they care

25   about is the bottom line.

1    THE COURT:  All right.  I'm going to rule as follows

2  -- well, you've got an uphill path on the article and royalty

3  rates.  But go ahead and give me your best shot.

4    MR. PRICE:  Sure.  The article on royalty rate isn't

5  being offered for a hearsay purpose.  The article on royalty

6  rate is simply to make a point that it was well known that

7  that was Motorola's opening offer, not that that is a RAND

8  rate, but that it was well known in the industry that when

9  you negotiate with Motorola they start out in every

10  negotiation at 2.25 percent.

11    THE COURT:  All right.  I'm going to allow the use of

12  the VTech license with a limiting instruction.  I think the

13  appropriate way to deal with the remainder of the argument

14  that Motorola wants to make is through cross examination.

15    I'm going to allow the RIM license with the same, a

16  limiting instruction, that is not an appropriate discussion

17  of the RAND royalty rate.  And I'm going to exclude use of

18  7243 and the declaration that goes with it on the grounds

19  that under 403, I don't think the usefulness of it for the

20  point that Mr. Price mentions it for is clearly outweighed by

21  the confusion that it's going to generate among the jury and

22  the court as to practice in the industry.  Those will be the

23  rulings of the court.

24    I warned you all yesterday that snowstorms were not

25  likely.  We avoided the earthquake.  We did not avoid an

1  accident on 405.  And our juror who is coming on 405 is

2  missing-in-action.  If she's not here by 9:15 and we haven't

3  found out where she is, then I'm going to start without her.

4  But we'll give her six more minutes, given that it was 405.

5  So we'll be in recess until we locate our missing-in-action

6  juror.

7                    (The proceedings recessed.)

8          THE COURT:  Please bring the jury in.

9      (The following occurred in the presence of the jury.)

10         THE COURT:  Mr. Harrigan, are you ready to call your

11  first witness?

12         MR. HARRIGAN:  Yes.  We will call Mr. John DeVaan.

13                         JON DEVAAN

14    Having been sworn under oath, testified as follows:

15         THE COURT:  Counsel, you don't have any witnesses in

16  the courtroom, I trust?  All right.  Thank you.

17         THE CLERK:  Will you state your name for the record

18  please?

19         THE WITNESS:  John DeVaan.

20         MR. PRICE:  We do have an expert in the courtroom.

21         THE COURT:  Not without permission of the court.  Had

22  we talked about that subject?

23         MR. PRICE:  I'm sorry, I don't recall.  We have

24  Professor Haedicke.

25         MR. HARRIGAN:  We also have an expert, I just

1   realized.

2           THE COURT:  All right.  Since both sides are doing

3   it, we'll allow experts to stay.

4           Please proceed, Mr. Harrigan.

5                          DIRECT EXAMINATION

6   BY MR. HARRIGAN:

7   Q   Mr. DeVaan, by whom are you employed?

8   A   Microsoft Corporation.

9   Q   Please tell the jury what your current position is.

10  A   I am the corporate vice president of development for

11  Windows.

12  Q   And in that capacity what are your responsibilities?

13  A   I work on designing and implementing and bringing to

14  market new versions of Windows.

15  Q   How many people work for you?

16  A   About 1,200.

17  Q   Are those engineers, mainly?

18  A   Those are all engineers.  They're what we call the

19  software design engineers that write the program code for

20  Windows.

21  Q   Okay.  How long have you been with Microsoft?

22  A   In a week it will be 29 years.

23  Q   So let's talk about Windows.  Basically you're in charge

24  of the design of Windows; is that it?

25  A   Correct.

1    Q    What is Microsoft Windows?

2    A    Microsoft Windows is an operating system.  And I think the

3    best way to explain that is to ask people to think about if

4    you've ever taken the lid off the computer, you see all those

5    parts in there, and that's the hardware.  And then if you use

6    a program on your computer, say Word, or Firefox, or

7    something like that, Windows is the software in between

8    those.

9         And its primary purpose is to make it so the people

10   writing that application program, they don't need to know any

11   of the details about what brand of hard disk it is or what

12   kind of interface the hard disk has with the CPU or what the

13   RAM is or what the networking chip is.  Windows, in computer

14   science terms, creates an abstraction that's consistent so

15   the application programmers can write their program once and

16   it works across many different kinds of computers no matter

17   which specific components are inside the computer.

18   Q    How long has Microsoft been producing and marketing

19   Windows?

20   A    Almost 30 years.

21   Q    And take Windows 7, how many features did Microsoft add to

22   Windows 7?

23   A    It's very difficult to say precisely, but it's thousands.

24   Thousands of features.

25   Q    Okay.  Are you familiar with a video coding technology

1    known as H.264?

2    A    I am.

3    Q    What's your understanding of what that is?

4    A    H.264, think of it as the software.  If you can imagine

5    the screen on the camera when the camera person is actually

6    looking at a scene, and then the screen of your computer.

7    And H.264 takes the source and compresses it down into a data

8    stream, whether that ends up on a hard disk or gets sent over

9    the internet, the idea is to make that data stream as tiny as

10   possible to be as efficient as it can be.  Then it goes to

11   the destination.  Then H.264 takes it apart and turns it into

12   the image that you see on the screen.

13   Q    Is H.264 a so-called standard?

14   A    Yes.

15   Q    Who developed it?

16   A    It was developed by the ITU.

17   Q    Is it fairly or widely used, H.264, these days?

18   A    Today it is.  When we started designing Windows 7 it was

19   not.

20   Q    Are there other ways to do this video compression besides

21   H.264?

22   A    Yes.  Thinking back to when we were designing Windows 7,

23   there were a variety of proprietary and competing standards

24   for video compression and playback.

25   Q    Okay.  Taking Windows as a whole, how large a portion of

1    Windows is the H.264 capability?

2    A    The code for H.264 comes in two ways, actually.  The part

3    of Windows which is the software version of it is a pretty

4    tiny part.  When you think about Windows itself is a couple

5    gigabytes or more in size, H.264 may be a percent of that or

6    less.  And then oftentimes the H.264 functionality will come

7    in a hardware chip that the computer maker chose to put

8    inside the computer.

9    Q    If that happens, then what role does it play in Windows?

10   A    We're just passing the data through to the chip.

11   Q    Okay.  How did Microsoft go about adding H.264 to Windows?

12   A    So when we started, we were looking at the notion that

13   high-definition video is becoming more popular.  So this is

14   back in, you know, 2006 even when we're looking at this.  And

15   so we're trying to predict which of all these competing

16   technologies will be the one that will become popular or

17   popular enough that we should include it.

18        And our thinking at the time was taking H.264 as a

19   standard, we thought that its basis as a standard would mean

20   that its growth would accelerate.  And today when you look

21   around, that's really quite true.  There's still a lot of

22   flash video and a few other technologies, but the standard

23   H.264 grew.  And I think our choosing to put it in Windows

24   helped it grow to that position.

25        But, you know, we're looking at these technologies on a

1    variety of bases.  One is that it's a standard, which means

2    we're free to implement with expected terms on the

3    technology.  And also its overall quality.  Will it deliver a

4    good result for the end customer?  And, of course, can we

5    make it and do it?  And, again, because it's a standard it

6    makes it easier for us to complete the work.

7    Q    Okay.  Why is it easier because it's a standard?

8    A    Well, it comes with all kinds of documentation, and even

9    sample code in this case, which makes it faster to do.

10   Q    In terms of people and time, how long -- what were the

11   resources required?

12   A    So we organize the work for a feature like this in a set

13   of engineers.  So there's a developer that works for me.

14   There's a tester and a program manager, two other types of

15   engineers that we have.  And so that team worked for a couple

16   months.

17   Q    Does Windows include other technology that is defined in

18   other industry standards?

19   A    Certainly.

20   Q    How many industry standards are included in Windows,

21   roughly?

22   A    Many hundreds if not thousands.

23   Q    Of which H.264 is one?

24   A    Correct.

25   Q    So how does Microsoft approach the business decision to

1    incorporate a standardized technology in Windows?  What are

2    the factors you consider?

3    A    When we're looking at adopting a standard technology, we

4    do review the intellectual property basis of it and the

5    strength of the standards organization in setting up what

6    everyone here has come to know as RAND on the technology.

7    And that gives us the freedom to implement the technology and

8    feature without undue worry that something will happen later

9    that will cause us to have a problem.

10   Q    What does RAND have to do with whether you have to have

11   undue worry?

12   A    The notion -- it was discussed yesterday in legal terms --

13   but you create a product, this is the convention with the

14   standards body, because they get that -- what was it

15   called -- LOA, a Letter of Assurance, that people are free to

16   implement the standard understanding that any negotiations

17   around the terms of any possible patent will be done on a

18   reasonable manner and in a way that builds success for the

19   standard.

20   Q    Okay.  Why would you not use a standard without a RAND

21   commitment?

22   A    It would be a recipe for potential trouble in the future

23   where some company could come from anywhere and demand a

24   large amount of money.  And that would cause us to have to

25   change the product in the market, which is costly and

1  difficult and disappointing for our customers.

2  Q    Are you familiar with the letter regarding the H.264

3  license that Motorola sent to Microsoft on October 29, 2010?

4  A    I am.

5  Q    Do you recall what the royalty percentage was that was

6  proposed in that letter?

7  A    The court has reminded me plenty of times so far, 2.25

8  percent.

9  Q    2.25 percent of what?

10 A    Of the end cost of a PC.

11 Q    Not of Windows?

12 A    Correct.

13 Q    In your years at Microsoft have you ever encountered a

14 demand of that kind before?

15 A    No.

16 Q    Is there, in your view, an issue with the application of

17 the royalty percentage to the laptop or PC instead of to

18 Windows?

19 A    It's impossible for us on a bunch of dimensions.  For one

20 thing, the PC might have a price that would be more than the

21 price of Windows itself.  And then the other is, we don't

22 really know what the revenues of the computer makers are.

23 That doesn't get reported to us.  We'd have to invent a whole

24 mechanism to even begin to approximate what the number should

25 be.

1    Q    In your experience of almost 30 years at Microsoft, have

2    you ever seen Microsoft threatened with an injunction by a

3    RAND patent holder simply because Windows included an

4    industry standard?

5    A    No.

6    Q    Would it have been feasible, in the fall of 2010, to

7    remove the H.264 feature from Windows?

8    A    Feasible is an interesting word.  There's the technical

9    feasibility of which it's possible.  But I think for the

10   product definition it would be very difficult because we

11   promoted that aspect of the product.  And pursuant with our

12   thinking when we were designing Windows 7, the playing of

13   high-definition video, in fact, became more popular and H.264

14   was a major share of it.  So we'd be removing a feature which

15   was pretty broadly used.  And that would hurt us with our

16   customers.

17   Q    How about in January -- in the January to April timeframe

18   in 2012, a little over two years later, would it have been

19   any more feasible then?

20   A    No.  Worse.

21   Q    Why?

22   A    I think the notion that high-definition video is becoming

23   more and more popular with the larger penetration of

24   broadband networking, it would have had even more people

25   using it.

Q    How about geography.  Was it practical to make -- or would
it have been practical to make a special version of Windows
that would be shipped to only a specific geographic region?
In other words, one that didn't have H.264 in it, for
example, shipped to regions served by the German distribution
center?

A    So there are a couple interesting parts to the question.
One is when Microsoft sells Windows directly, the technical
feasibility of it is not too difficult.  We have all the
market things that I was talking about before of how good
would that product be versus competitors that we would have
to worry about.

        But most people don't get Windows from Microsoft directly,
they get it on a new PC.  And our partners, the HPs, the
Dells the Lenovos, they tend to make one computer model for
multiple countries.  So it's not just imposing that on
Microsoft itself, it's also imposing that on our partners,
which would be a huge logistical challenge for them and also
raise costs, because the reason they do this is to get larger
runs on the assembly line, and so forth, to keep production
costs lower.

Q    How about the customers served by the distribution center,
how would such a differentiation affect them?

A    Talking about the distribution center in Germany, it would
have been impossible to serve all the other countries in

1    Europe, Middle East, and Africa.  Those countries wouldn't be

2    strictly enjoined.  We'd have to find an alternative

3    distribution mechanism and our partners would have to find

4    alternative distribution mechanisms, perhaps, for those

5    countries, where people have no reason they couldn't have

6    these features.

7    Q    Okay.  Could we take a look at the demonstrative -- did

8    you prepare a demonstrative of some varying computer

9    configurations?

10   A    Yes.

11   Q    So what are we looking at here?  What are these different

12   computers?

13   A    There are four different computers shown here.  In the

14   upper left is the least expensive, a category of inexpensive

15   laptop known popularly as a netbook.  Then on the upper right

16   is a laptop, which is a very typical laptop that people would

17   buy to use.  And the lower left is a desktop PC.  And on the

18   lower right is called a gamer PC.  These are people who

19   really care about having the biggest screen with the highest

20   number of frames per second so that their games play very

21   quickly.  Then it includes the prices for each of those.

22   Q    Okay.  Thanks.

23        So, with reference to the 2.25 percent we were talking

24   about, does Microsoft get any additional revenue when a PC

25   maker installs Windows in a more expensive computer?

1   A    No.  The computer maker has the choice of Windows and

2   Windows Pro.  There's a higher price for Windows Pro.  But

3   they could install Windows Pro or regular Windows on any of

4   these.

5   Q    So whatever the price is of each version of Windows

6   doesn't change depending on the cost of the computer it goes

7   into?

8   A    That's correct.

9   Q    Was it practical in October of 2010 for Microsoft to pay

10  2.25 percent of the end-computer price for each worldwide

11  copy of Windows?

12  A    No.

13  Q    So suppose that Microsoft had agreed to pay 2.25 percent

14  of the worldwide PC sales -- Microsoft had agreed to pay

15  Motorola 2.25 percent of the worldwide PC sales in 2010.

16  What would that have been?

17  A    In a total amount of dollars?

18  Q    Um-hum.

19  A    Well, we don't -- Microsoft doesn't know exactly.  For

20  such a calculation to be precisely computed it would be hard

21  to get that exactly.  So I have to rely on industry analyst

22  reports which vary a little bit.  But using Gartner as one,

23  the estimated revenue is about 240, $250 billion a year.

24  That's the revenue of computer makers selling PCs.

25  Q    What does that tell you about what the royalty would have

1    been?

2    A    Well, two percent would be $5 billion of $250.  Windows

3    doesn't have a 100 percent share, so you could trim that by

4    ten percent or so and get around $4.5 billion.

5    Q    That would be the royalty?

6    A    Right.

7    Q    Has Microsoft ever agreed to pay patent royalties based on

8    the price charged by its customers for their products that

9    include Windows?

10    A    No.

11    Q    Let's talk about injunctions, which is an issue which

12    arose over a two-year period between 2010 and 2012.  All

13    right.  Do you have an understanding of the practical impact

14    that Microsoft would experience if it faced a potential

15    injunction against ongoing sales of Windows in any particular

16    market?  What would be the effect?

17    A    So the effect would -- first for the companies that make

18    computers -- would create a large number of logistical

19    problems.  As I was talking about before, as they have to

20    scramble to perhaps create new distribution, they have to

21    create new SKUs for production in their production

22    facilities.  And that would be quite an undertaking.

23    Q    How would such an injunction potentially impact Microsoft

24    in relationship to its competitors?

25    A    I think you have to answer that as a person walking into a

1    store, and there's a table -- you can walk into Best Buy here

2    -- and there's a table with PCs on it, a table with

3    Macintoshes on it, and iPads and Android devices.  And what

4    are people going to think when they come in, which device do

5    they want?  I mentioned earlier that playing high-definition

6    video is something that's just becoming more popular.  And if

7    there was any concern that they wouldn't be able to go to a

8    YouTube or Vimeo and the video might not work, I think people

9    would hesitate to choose Windows.

10   Q   In other words, if Microsoft dealt with the injunction by

11   taking H.264 out, that's the situation that would arise?

12   A   Correct.

13   Q   Okay.  What would be the impact of an injunction if

14   Microsoft were enjoined from shipping Windows in any

15   particular market because it included the H.264 standard?

16   And you might want to separately describe what happens with

17   the manufacturers of the PCs and the consumer.

18   A   So if --

19         MR. PRICE:  Your Honor, I'll object.  It's vague,

20   compound and asks for a narrative, as well as expert

21   testimony, I believe.

22         THE COURT:  Overruled.

23   A   So, I think for Microsoft, doing the technology work for

24   it would not be too difficult.  It does create complexity for

25   us.  We have to manage that very precisely.  And it's hard to

1   understand what the rules would be about people taking PCs

2   between countries and stuff like that; that would have to be

3   figured out.

4       I mentioned before that it's traditional in many parts of

5   the world -- we're unique in the United States, we don't have

6   to deal with this very much -- but the computer manufacturers

7   create a model, and when you start it up you pick a language,

8   and that's the language you have when you're done with it.

9   But it's a model that serves many countries and many

10  different languages.

11      So if it was required to ship something different in a

12  specific geography, that would essentially double the number

13  of computer models that the manufacturer would have to make.

14  And it would impact the run rates in the factory and that

15  would make PCs more expensive.

16      If the country with the injunction happened to be a

17  distribution center, then presumably that country couldn't

18  distribute with that technology in it to other countries.

19  And so that would mean having to move distribution out of

20  that country or allow the product to be less competitive in

21  countries where it doesn't strictly need to be.

22  Q   Okay.  Has Windows actually lost any sales or profits

23  because of any actions by Motorola?

24          MR. PRICE:  Objection.  Lack of foundation.

25          THE COURT:  Sustained.

1    Q   You're aware that efforts were made to obtain injunctions

2    in various forums, the ITC, the state of Wisconsin, and

3    Germany.  Did any of those attempts, to your knowledge,

4    result in lost sales or profits of Windows?

5            MR. PRICE:  Same objection.

6            THE COURT:  I'll permit that question.

7    A   I think it's very difficult to quantify the impact of the

8    uncertainty created in people that pay attention to the

9    industry.  So measurably I'd have to say no.

10   Q   Then why is Microsoft worried about Motorola and its H.264

11   patent portfolio?

12           MR. PRICE:  Objection.  Lack of foundation.

13           THE COURT:  Sustained.

14           MR. HARRIGAN:  No further questions.

15           THE COURT:  Mr. Price.

16                      CROSS EXAMINATION

17   BY MR. PRICE:

18   Q   Good morning, Mr. DeVaan.  Let me ask you, do you have a

19   -- I'm told you have a kit like a notebook up there.  Oh,

20   it's arriving.

21           THE COURT:  Mr. Price, does Microsoft have a copy

22   also?

23   Q   First I want to ask you about those letters that you

24   talked about, the letters in October of 2010.  And first, as

25   of May of this year, May of 2013, you had never seen those

1  letters, right?

2  A   I had not seen them at the point in time.  But I had seen

3  them later as presented to me as part of this matter.

4  Q   Sure.  So in other words, between October 2010 and around

5  May of 2013, during that timeframe you had not seen the

6  letters, but in connection with litigation you saw the

7  letters for the first time?

8  A   That's correct.

9  Q   And so you're aware that at least as early as October 22,

10  2010 there were actually discussions between Motorola and

11  Microsoft about patent issues, correct?

12  A   I am not aware.  I was not, at the time, aware of any

13  discussions going on, because it's not my area of

14  responsibility.

15  Q   Okay.  Well, you used the number $4.5 billion.  It's

16  correct that you're not aware of that number in those

17  negotiations ever being mentioned, that is, Motorola ever

18  saying we want $4.5 billion dollars from Microsoft, correct?

19  A   I was not part of the negotiations, so I'd have no way to

20  know.

21  Q   And you talked about the number of topics concerning why

22  it would be unfair and inappropriate to apply a 2.25 percent

23  rate to the Windows operating system.  Do you recall that?

24  A   Yes.

25  Q   You think those are pretty compelling arguments?

1    A    I think those are compelling arguments when you think

2    about Microsoft's business model on Windows and the business

3    model of our partners.

4    Q    Now, do you know whether or not those arguments were

5    presented in the negotiations between Microsoft and Motorola?

6    A    I do not.

7    Q    Certainly you would expect them to be?

8    A    I don't know what to say.  It's not my area.

9    Q    Okay.  So just to be clear, then, you don't really have

10   any knowledge as to, you know, what was actually discussed

11   substantively between Microsoft and Motorola, beginning

12   October 22, 2010, about what kind of money should flow from

13   one company to another with respect to these various patents;

14   is that accurate?

15   A    I was not party to any negotiations about it.

16   Q    Okay.  Well, let me ask you.  You did talk about kind of

17   the scope of the Windows operating system and kind of sales

18   relating to that.  So let me ask you, in the 2009/2010

19   timeframe, is it correct that Microsoft's share of operating

20   systems for personal computers was somewhere over 90 percent?

21   A    That's correct.

22   Q    And Microsoft also had operating systems for mobile

23   phones, right?

24   A    That's correct.

25   Q    By 2010, because mobile phones were becoming fairly

1   important as operating systems or as sources for operating

2   systems, Microsoft considered as competitors in the mobile

3   system area Android and Apple's IOS, right?

4   A    That's correct.

5           THE COURT:   Mr. Price, you might explain what an IOS

6   is.

7           MR. PRICE:   Thank you.

8   Q    What is the Apple IOS?

9   A    So when you get devices they come with operating systems.

10  So when you buy a Windows device you get Windows.  If you buy

11  an iPad or an iPhone you get IOS.  If you buy Android phone

12  you get the Android operating system.

13  Q    If you look at -- well, also some time around 2008, 2009,

14  2010, people began thinking of the market for operating

15  systems as including both PCs for desktops and also phones,

16  and then later tablets, right?

17  A    I'm going to take a minute to think about the timeframe

18  that you mentioned.  So, 2008 is probably a little early.

19  But not too long after that I'd say it was an emerging thing

20  where we did start thinking about it in that way.

21  Q    And in 2007 Apple had come out with this kind of cool

22  operating system that was touch sensitive?

23  A    Well, the device, yes, the iPhone.

24  Q    They didn't invent the actual technology but they were

25  first to market with that feature?

1   A    Yeah.  I don't think so.  But they made it popular.

2   Q    Okay.  That's fair enough.  Certainly Microsoft's

3   operating system did not provide that feature at that time?

4   A    For a particular kind of touch, that's true.

5   Q    What particular kind of touch are you talking about?

6   A    It's called capacitive touch.

7   Q    So can you --

8   A    There were touch screens before the iPhone.  And they used

9   the technology called resistive, which was just not as

10  responsive to your finger as capacitive touch was.

11  Q    Resistive uses like the little stylus, or something that

12  you push?

13  A    Or press very hard, yeah.

14  Q    So it's true that if you looked at the entire spectrum

15  then of this market as of -- let's say as of today.  If you

16  look at the entire spectrum of personal computers and laptops

17  or tablets and phones, that instead of being over 90 percent

18  of the market, Microsoft has more like a 30 percent market

19  share?

20  A    I haven't seen a specific report where I could answer to

21  the 30.  But much less than 90 I could say.

22  Q    Well, your best -- let's say your rough, swag scientific

23  estimate is about 30 percent, right?

24  A    That is true.

25  Q    Okay.  And, in fact, Microsoft began losing share in the

1  phone operating system market until it came out with its own

2  capacitive touch interface, which was Windows Phone 7, right?

3  A    In which timeframes are you talking?

4  Q    I'm talking about until -- after Apple came out with its

5  capacitive touch phone and up until Microsoft came out with

6  its own, its Windows Phone 7, the 2010 Windows phone, from

7  that timeframe Microsoft was losing market share because it

8  wasn't keeping up with its competitor?

9  A    Well, we were losing market share.

10 Q    And you thought it was because it wasn't providing an

11 operating system that had this feature, this capacitive

12 touch?  That was one of the main reasons?

13 A    I'll --

14       MR. HARRIGAN:  Objection, lack of foundation.

15       THE COURT:  I'll overrule the objection.

16 A    I think there were a lot of factors and that was certainly

17 one of them.

18 Q    Was Microsoft paid for use of its IOS system on phones?

19 A    We don't market IOS.

20 Q    I'm sorry.  Yeah, thanks.  Microsoft was paid for its

21 operating system on phones?

22 A    Yes.

23 Q    Okay.  At least until it came out with its Windows Phone 7

24 it was losing market share in connection with that product,

25 between the time Apple came out with its IOS systems and when

1    Windows Phone 7 came out?

2    A    Yes.

3    Q    And there was a big unveiling around October 11, 2010, of

4    this Windows Phone 7 that Microsoft was going to try to use

5    to regain the market share?

6    A    I saw that in the exhibits yesterday during the opening

7    presentations.  I don't remember exactly when we launched

8    Windows Phone 7.

9    Q    Well, do you have a rough scientific-swag guess?

10   A    I'll accept what was presented yesterday.  That's fine.

11   Q    So you were here during the opening statements?

12   A    Yes.

13   Q    Well, let me ask you this.  Do you have some recollection

14   that that unveiling was done just about ten days after

15   Microsoft filed its lawsuit against Motorola?

16   A    I couldn't speak to specifics about the timing on it.

17   Really, I couldn't.  I saw it was presented yesterday.

18   Q    That's fair enough.

19        So you also talked a little bit about injunctions and

20   royalty rates and how that would affect Microsoft's business,

21   correct?

22   A    I did.

23   Q    Did you have any understanding at any timeframe after 2010

24   that a company, any company, could get Microsoft to pay it

25   any royalty if Microsoft refused, without the assistance of a

1  court?

2          MR. HARRIGAN:  Objection for lack of foundation.

3          THE COURT:  I didn't understand the question, so I'll

4  sustain that one.

5          MR. PRICE:  Let me see if I can make it

6  understandable.

7  Q   You understand that in this lawsuit there have been

8  discussions about royalty rates, correct?

9  A   In this lawsuit or the prior lawsuit?

10  Q   Let's say -- well, let me be clear.  Let's make it

11  broader.

12          You understand that Microsoft is often approached by

13  people, companies that have patents, that say we would like

14  you to pay a certain rate?

15  A   Microsoft is approached by companies that ask for

16  royalties, that's true.

17  Q   Okay.  Do you have any understanding that any of those

18  companies are able to force Microsoft to pay a royalty

19  without first going to a court and asking that there be some

20  determination that that's appropriate?

21          MR. HARRIGAN:  Lack of foundation.

22          THE COURT:  Overruled.

23  A   As a person that doesn't engage in the negotiations, I

24  don't know what to say to that question.  I think before, I

25  said we've never paid a royalty like Motorola was asking at

1    the time.

2    Q    And so if you don't know the answer, that's fine.  But you

3    don't know whether or not a company like Motorola is able to

4    somehow force Microsoft to pay a specific royalty without

5    going to court and getting a determination as to whether or

6    not that's fair?

7    A    I don't know.  I don't engage in that part of the business

8    directly so I couldn't tell you.

9    Q    Okay.  So licensing is not your thing?

10   A    The negotiations of licensing, correct.

11   Q    Okay.

12           MR. PRICE:  No further questions, Your Honor.

13           THE COURT:  Redirect?

14           MR. HARRIGAN:  No questions, Your Honor.

15           THE COURT:  All right.  You may step down.

16       Next witness please, counsel.

17           MR. CEDEROTH:  Microsoft calls David Treadwell.

18                        DAVID TREADWELL

19        Having been sworn under oath, testified as follows:

20           THE CLERK:  Will you state your name for the record,

21   please.

22           THE WITNESS:  David Treadwell.

23           THE COURT:  You may proceed, counsel.

24                      DIRECT EXAMINATION

25   BY MR. CEDEROTH:

Q    Mr. Treadwell, by whom are you employed?

A    Microsoft.

Q    What's your current position?

A    I'm the corporate vice president for the Xbox software and

services engineering team.  That means I'm responsible for

the development, the testing, the operations, of all of our

Xbox software and services development, people that write the

code, testing, in other words, the people that confirm the

code does what it is supposed to do, and the operations

confirm or operate the service to make sure that it's up and

doing what it's supposed to be doing.

Q    And in your position are you part of a senior leadership

team for the Xbox group?

A    Yes, I am.  There's about eight of us who are on the Xbox

leadership team.

Q    And how many people report to you today?

A    About 1,500.

Q    Mr. Treadwell, how long have you been with Microsoft?

A    24 years.

Q    Now, have you prepared a chart that might help us

understand just briefly what Xbox is?

A    Have I prepared a chart?

Q    An image of Xbox?

A    You want me to describe what the Xbox --

Q    I wonder if we could put up PDX4.  And the question I have

1   for you is not so much what's shown on the screen, but rather

2   could you describe briefly to the jury what is the Xbox?  I'm

3   not sure if everyone here has spent as much time running a

4   game machine as maybe you have.

5   A   Yes.  Fair enough.  Yes, I do spend a little time with

6   this, as do my kids.  So an Xbox -- originally Xbox was

7   designed as a gaming console.  So what that means is it's a

8   device that attaches to your television, and the purpose of

9   it is to play games.

10      Over time we've extended from the gaming core, which is

11  what most people do with Xbox, to add various video and music

12  services.  So in addition to gaming, which is still the thing

13  people use it for primarily, you can also do things like

14  watch Hulu or Netflix or YouTube on an Xbox.

15  Q   How long has Microsoft been producing and marketing the

16  Xbox platform?

17  A   The Xbox project started in 1999.  The original Xbox

18  started selling in 2001.  So we have been selling it for

19  about 12 years now.

20  Q   Let's talk a little bit about the standards that are at

21  issue in this case.  Are you familiar with a video coding

22  technology known as H.264?

23  A   Yes, I am.

24  Q   Just at a general level, what's your understanding of that

25  technology?

1   A    Sure.  So the concept of a codec is that it takes the data

2   that is involved in something like a video -- and there's a

3   whole lot of data involved in a video.  Each point on the

4   screen, we call that a pixel.  There's a huge amount of data

5   involved in transmitting a video.  So the purpose of a

6   codec -- compression decompression, it's a short word for

7   compression decompression -- the purpose of a codec is to

8   take that giant amount of data that is involved in a video

9   and compress it down to something very small, so it can be

10  successfully transmitted over the internet or stored on an

11  optical disk.

12      Then the decompression phase is on the device where it

13  takes that compressed form of the data and it blows it back

14  up to the full size so it can send it out to a television.

15  Q    Is that a standard?

16  A    Yes.  H.264 is a specific standard form of codec.  There

17  are many other codecs in the industry.  But H.264 is

18  basically the premier industry standard of codecs at this

19  point in time.

20  Q    Does Xbox include H.264 capabilities?

21  A    Yes, we do.  We need H.264 to work with many of the video

22  services I described, like YouTube.

23  Q    Now, how did Microsoft come to build and add this H.264

24  functionality to the Xbox?

25  A    What happened is that the Windows organization created an

1  implementation of H.264.  And then several years ago when we

2  started to incorporate these video services in Xbox, we

3  imported that implementation from the Windows team to the

4  Xbox platform.

5  Q    Now the other standard that's at issue in this case is

6  802.11, sometimes called WiFi.  Are you familiar with that

7  technology?

8  A    Yes, I am.

9  Q    Again, at a general level, could you explain your

10 understanding of what that technology is?

11 A    Sure.  So the purpose of WiFi is to allow a device to

12 connect to a network without requiring a wire.  Historically

13 there was -- there are cables such as an Ethernet cable, and

14 you actually have to plug a device into the network to get it

15 to talk on the network.

16     WiFi is the very common standard that all of us use today

17 to connect our devices to the internet, such as pretty much

18 any device in your home that's talking, whether it's your

19 laptop or iPad or Android device or Windows machine.  If it's

20 not connected by a wire, it's talking on the internet by

21 virtue of WiFi.

22 Q    And does Xbox include 802.11 with WiFi capabilities?

23 A    Yes, it does.

24 Q    How did Microsoft come to build and add this standardized

25 technology into the Xbox?

A    Sure.  So, many years ago we recognized the importance of
WiFi to the console.  Many people don't have a physical
network connection near where their TV is, and they need that
in order to connect on the network.  So we built the WiFi
technology into the Xbox so if a customer wants to use the
internet services, either online gaming or video services, so
they can get at those services without having to rewire their
house to have a physical wire.

Q    And did you rely on the standard?  Or what role did that
play in terms of creating the technology that was used?

A    Absolutely.  The existence of that standard is super
important.  When you buy a WiFi router, it has that standard
embedded in it.  And it was very important to us that we
worked with a standard so that we wouldn't require somebody
to get a different WiFi router than they already have in
their house.  That's a very difficult thing for people.  So
we very much relied on the existence of that standard to
incorporate WiFi into that Xbox.

Q    Does the Xbox include other technology that is defined in
the industry standards?

A    Yes.  We have dozens if not hundreds of standards we rely
on in the Xbox.

Q    When it comes to your level, introducing the engineering,
creating the engineering in adding one of those standards to
the Xbox, how does Microsoft approach the business decision

1  of whether to include that technology?

2  A   Sure.  So the business decision is we weigh two high-level

3  factors:  The benefit of the technology and the costs to us

4  to incorporate the technology.  So we look at the customer

5  benefits.  How much do people want something like WiFi in

6  order to connect their machines to the internet?  And then we

7  look at the costs?  There are many dimensions of costs.

8  There's the engineering costs that we incur to build the

9  hardware into the Xbox, to design the software to make use of

10  that.  And there are also the physical costs.  Including that

11  hardware in the Xbox console costs us money.  Then we look at

12  the licensing costs.  How much is it going to cost us to

13  license any intellectual property that we need to include

14  that technology.

15  Q   There's been quite a bit of discussion about RAND

16  commitments so far.  What role, if any, do RAND commitments

17  in relation to an industry standard play in the Xbox decision

18  as to whether to include that industry standard in the Xbox?

19  A   The existence of RAND commitments are a foundational part

20  of our decision to include standards in the Xbox.  We need to

21  know that we can depend on including that technology for the

22  benefit of customers at a reasonable price to us.

23  Q   Does the approach for Xbox in terms of incorporating new

24  technology differ for technology that does not include a RAND

25  commitment?

A    Yes.  Technologies that don't have a RAND commitment, more
typically we can work around those technologies.  We don't
necessarily need to have them for our standard.  For a
standard, however, in order to incorporate that standard,
it's typically the case that the intellectual property that
there might be a RAND license for, we cannot implement that
standard without having access to that intellectual property.

Q    At some level over the last several years have you become
aware of the letters that Motorola sent to Microsoft in
October 2010 concerning 802.11 and H.264?

A    Yes, I'm aware of them.

Q    Now, in all your years at Xbox or Microsoft, have you
encountered a demand like this before?

A    I have never encountered a demand like this one on
standards-essential patents.

Q    I'm going to go back to the technology in terms of 802.11
that goes into the Xbox.  Is there hardware involved in that?

A    Yes, there is.  There is a chip that is actually included
in the Xbox.  It's the thing that talks, the radiowaves that
are the basis of WiFi.

Q    How much does Microsoft pay for that chip?  I assume they
buy it?

A    Correct.  We buy that from a subcontractor Marvell.  It's
a commodity chip so price has been driven down pretty well.
It costs us about $3 for that chip.

1  Q   I'd like to talk a little bit about packages and how

2  Microsoft sells the Xbox and packages it for sale.  Have you

3  prepared a chart that has some samples of those packages?

4  A   Sure.

5  Q   Mr. Treadwell, in relation to this chart, can you briefly

6  describe a couple of examples in terms of what goes into a

7  bundle that Microsoft sells of Xbox products and how it

8  affects the price?

9  A   Sure.  So what we have here is several of the Xbox bundles

10  that we sold last holiday season, last Christmas.  For

11  example, in the upper left we have the 360, 4 gigabyte Kinect

12  bundle.  So what that was, was the basic console with 4

13  gigabytes of storage, including the new Kinect sensor.  And

14  we sold that for $249.  In the upper middle there's another

15  package that has the same Kinect and same Xbox, except it has

16  250 gigabytes of storage.  So the primary difference between

17  those is the additional storage space.  And because of that

18  additional storage space we sell it for $100 more.

19       If you look at the lower left, the 360 limited edition

20  Halo 4 console.  That's another 250 gigabyte console.  But

21  what it has is the decorations on the box and on the game

22  controllers for Halo 4.  It's basically just some fun

23  decoration on the outside.  The innards of that are all the

24  same.  It does not include Kinect but it does have an

25  additional control, it has a second controller.

1     Then the bottom middle is the Star Wars console.  That is

2  another 250 gigabyte with Kinect console.  It includes the

3  Star Wars game.  And it has some Star Wars packaging that

4  looks like -- the console looks like R2-D2, the controller

5  looks like C-3PO.  When you start the console, it makes an

6  R2-D2 sound.  And that one sells for about $400.

7  Q    Now, with respect to the WiFi capabilities and the H.264

8  capabilities, do they differ over the various packages and

9  bundles you show there?

10 A    No.  The WiFi capabilities in all of the consoles shown

11 here are absolutely identical.  It's the same hardware.  It's

12 the same software.  There's no difference in the WiFi

13 capabilities in these bundles.

14 Q    In your description of some of these bundles you mention a

15 product called Kinect.  Please tell us briefly what that

16 product is.

17 A    Sure.  So Kinect is a sensor, we call it.  What it does is

18 it senses people's movements and your voice.  So it's really

19 a cool new device.  It enables new scenarios.  Like instead

20 of physically holding a controller to tell the Xbox what to

21 do, you can gesture at it.  You can wave your hand and it

22 will see what you're doing.  You can do a dance game and it

23 will see how well you're dancing in front of it.  It also

24 recognizes your voice so you can give the Xbox commands.  If

25 you're laying on your couch and you want to watch the next

1    episode of a show on Netflix, you can say, "Xbox, next

2    episode."  And it will skip to the next episode.  So you

3    don't even have to move your arms to get to the next episode.

4    Q    A slightly more serious topic, then.  There's been some

5    discussion about injunctions that Motorola has sought in

6    various jurisdictions.  Are you familiar with those from your

7    role on the Xbox solutions team?

8    A    Yes, I am.

9    Q    Now, have you ever seen Microsoft or Xbox threatened with

10   an injunction by a RAND patent holder previously solely

11   because Xbox used an industry standard?

12   A    This is the only time I've ever seen a threat on a

13   standards-essential patent with a RAND commitment on it.

14   Q    Well, would it have been feasible for you and Xbox to

15   remove the H.264 or the 802.11 support from Xbox in the fall

16   of 2010?

17   A    Technically we could have removed those standards.  We

18   could have shipped a product that didn't have 802.11.  We

19   could have shipped a product that didn't have H.264.

20   However, it wouldn't have been a viable product.  So many

21   people -- a large percentage of our customers access the

22   internet by WiFi.  A large percentage of our customers watch

23   videos on their Xbox by H.264.  So it wouldn't have been a

24   commercially-viable product to ship without 802.11 or without

25   H.264.

1    Q   Let's take a step forward in time to early 2012.  Did the

2    situation change as of then or what would the considerations

3    be then?

4    A   In 2012, if anything, that functionality would be more

5    important.  More people are getting on the internet by WiFi.

6    More people are using videos on the Xbox with H.264.  So in

7    2012 it's even more critical that we have that foundational

8    functionality.

9    Q   How about today?

10   A   Even more critical today.  These pieces of functionality,

11   people embrace them and they demand them ever more.

12   Q   Over that timeframe, 2010 through today, was it practical

13   for Xbox to create a special version to ship only to a

14   specific geographic region such as Germany?

15   A   The same factors apply.  Technically it would have been

16   practical to ship a version without H.264 or 802.11.

17   Business-wise it would have been devastating in that market

18   if we had to create a version that didn't have that base

19   functionality.

20   Q   How would a specialized version like that affect, if at

21   all, your relationship with the game makers that actually

22   make the Xbox games?

23   A   One of the things that's very important to us in Xbox is

24   the whole ecosystem of gaming.  We work very hard to appeal

25   to game developers, other companies who create games that run

1   on our system.  What those people want to know is that they

2   can sell lots of copies of their games.  So if we had not

3   been able to sell Xbox as a viable product in markets, what

4   would have happened is it would have been significantly

5   damaging to our entire ecosystem companies.  Like Electronic

6   Arts, which ships the FIFA soccer game.  Super popular in

7   Europe and in Germany.  Had we not been able to ship Xbox in

8   Germany, a company like Electronic Arts would have been much

9   less interested in making FIFA great on our platform.  And

10  they would have, therefore, spent more time making FIFA great

11  on our competitors' platform.  And thereby advantage those

12  competitors in other markets even beyond the market in which

13  we were impacted.

14  Q   Going back to the October 2010 letters, briefly.  You

15  understand that Motorola had sought 2.25 percent for the

16  802.11, 2.25 percent for H.264.  Do you have an understanding

17  as to how much that would have been for 2010 in terms of

18  royalties?

19  A   Yeah.  The all-up costs would have been on the order of

20  around a hundred million dollars across the Xbox business.

21  Q   In today's world and competition, does Microsoft Xbox face

22  competition solely from the traditional game makers such as

23  Sony and Nintendo?

24  A   No.  Sony and Nintendo, they also sell game consoles and

25  they are most direct competitors.  But what's happening more

1    and more in the world is people are playing games on other

2    devices even beyond game consoles.  So what we see is -- we

3    call it disruption -- where other kinds of devices are

4    starting to disrupt what's going on in game consoles.

5    Specifically two devices making a lot of traction here are

6    the IOS, the iPad and iPhone devices from Apple.  And Android

7    devices are also making a lot of traction in terms of getting

8    customers' energy on gaming.

9    Q    Let me ask you.  There's a new version of Xbox coming to

10   stores soon, as I understand it?

11   A    Yes, there is.

12   Q    And what role did industry standards having RAND

13   commitments such as H.264 and 802.11 play in that product?

14   A    With the Xbox One, the new product we have coming out this

15   holiday, it basically plays the same exact role.  We included

16   WiFi and included H.264 in that product on the assumption

17   that we could include those technologies for reasonable

18   license fees.

19          MR. CEDEROTH:  Thank you.  Pass the witness, Your

20   Honor.

21          THE COURT:  Mr. Price, we're going to go until about

22   10:35 and then take our morning break.

23          MR. PRICE:  I'll try to finish by then, Your Honor.

24                        CROSS EXAMINATION

25   BY MR. PRICE:

1    Q    Good morning, Mr. Treadwell.  Now one of the questions you

2    were asked was whether or not you had ever encountered a

3    "demand" like the October 2010 letters.  Do you recall that?

4    A    Yes I do.

5    Q    And I think you testified you were on some sort of a

6    council with respect to the Xbox.

7    A    Right.  We call it the Xbox leadership team.  It's a group

8    of about eight executives that kind of make the fundamental

9    decisions what we do with Xbox.

10   Q    When you're on that leadership team are important things

11   that are impacting the Xbox communicated to you?

12   A    Yes, absolutely.

13   Q    And you said you hadn't encountered a demand like these

14   letters before.  When is the first time you encountered the

15   letters?

16   A    I don't recall the specific time, I'm afraid.

17   Q    It wasn't until very recently that you even knew about the

18   letters, right?

19   A    No.  I believe we discussed in the Xbox leadership team

20   the letters -- I don't want to guess exactly when it was, but

21   it was a while ago that we actually talked about those.

22   Q    Well, was it in October 2010 that the leadership team all

23   of a sudden hear about some letters from Motorola concerning

24   the Xbox?

25   A    Honestly, I don't remember when we first started talking

1    about the letters.  With the leadership team it was an

2    ongoing topic of conversation and decision-making that there

3    was this threat of a lawsuit and an injunction.  But I don't

4    recall the exact dates when we first started talking about

5    it.

6    Q    So you said there was a discussion about a threat of a

7    lawsuit.  So are you saying you heard about these letters

8    prior to November 10, 2010?

9    A    I don't recall when we first started talking about the

10   letters.  I don't remember when that was.  It was an ongoing

11   topic of conversation for several years.  I'd have to go look

12   at my records and figure out when it was.

13   Q    Is it your belief that these letters, just on their face,

14   were of such importance that they would have been brought to

15   the leadership council?

16   A    What was important is the overall framework of what was

17   going on with these legal matters and how that might impact

18   our business.  The focus of our discussions in the leadership

19   team was the potential threats we had for things like an

20   injunction and how that might affect our business.

21   Q    My question was a little bit different.  And that is,

22   looking at these letters just on their face, was that

23   something that you think was of such importance that it would

24   have been, if it was of such importance, brought to the

25   leadership council?

1   A    The letters themselves didn't play a significant role with

2   the leadership team.  What played a significant role was the

3   proceedings and what was going on and the threats to our

4   business.

5   Q    Okay.  So you're saying that what played a significant

6   role would be actual lawsuits, for example?

7   A    Lawsuits and how the legal staff advises us on how to

8   handle those lawsuits.

9   Q    Okay.  So if you look at the letters themselves, you saw

10  they had some references to grant-backs.  Do you remember

11  that?

12  A    I remember that from seeing that yesterday, sir.  That's

13  my only recollection of it.

14  Q    Is that something that you remembered recently or that you

15  have known for a while?

16  A    I only saw the letters or read that part of the letters

17  yesterday.

18  Q    Okay.  So that part of the letters you only read

19  yesterday.  How about the part of the letters that talked

20  about the possibility of licensing just a portion of the

21  patents?

22  A    This wasn't a topic of conversation amongst us in the Xbox

23  leadership team.

24  Q    And you now understand that right after, like that

25  October 21st letter was sent, that there were, in fact,

1   discussions among the parties, correct?

2   A    I understand that to be true, yes.

3   Q    And were you involved in those discussions among the

4   parties as to what the companies were actually looking for in

5   connection with their respective patents?

6   A    No, I was not involved in that.

7   Q    Now, in connection with discussing possible impacts of

8   things like injunctions, did you in those discussions have

9   any discussions about whether an injunction could issue

10   without the approval of the court saying that that's

11   reasonable?

12   A    Yes, we did have many discussions about the possibility of

13   an injunction and what that might mean for us as a business.

14   Q    And I understand you might have had discussions about what

15   an injunction might mean as a business, but did you have some

16   understanding that Motorola, without getting a court

17   involved, could somehow stop Microsoft from selling Xbox?

18   A    I'm sorry, I don't understand your question.

19   Q    Did you talk about -- was there some possibility that

20   Motorola, without getting the court involved, could somehow

21   stop Microsoft from selling Xboxes?

22   A    Well, we had discussions about how Motorola might involve

23   government entities to prevent things like the importation of

24   Xbox into various countries.  And there was high-level

25   discussion about the legal matters around that.  What we

1    focused on in the business teams was what we might do about

2    those injunctions, both in our products and in our business.

3    Q    So what you talked about was that Motorola couldn't just

4    stop Microsoft from selling Xboxes; it would have to get some

5    sort of approval from a government entity or from a court,

6    right?

7    A    That's correct.  We knew that Motorola would have to have

8    some government-sponsored entity that would be the thing that

9    actually enjoins us from shipping Xbox or from selling Xbox.

10   Q    So there would have to be some finding by some entity that

11   that was a reasonable and appropriate thing to do.  Motorola

12   couldn't do it on its own?

13   A    Yes, that's correct.

14   Q    And now getting on to the grant-back question.  Microsoft

15   itself had essential patents on these standards, right?

16   A    That's my understanding, yes.

17   Q    And so -- you understand essential patents are patents

18   where you can say, you know, you may not be able to make your

19   product without using my technology, correct?

20   A    That's correct.

21   Q    And so Microsoft had patents itself on technologies that

22   Motorola was using in its products?

23   A    Yes.  That's correct.

24   Q    In fact, it had standards-essential patents that Microsoft

25   thought Motorola was using the technology in those patents?

1    A    Yeah.

2    Q    And so Microsoft, absent the RAND obligation, could have

3    said, we don't want you to produce those.  We can stop you

4    from producing them?

5    A    Well, absent a RAND obligation, those patents wouldn't

6    have been required for the standard, because we wouldn't have

7    -- the standard-setting bodies would not have let us

8    incorporate that intellectual property into the standards

9    without a RAND commitment on our part.

10   Q    Let me ask you this.  In the conversations between the

11   companies that took place after October 21, 2010, did the

12   parties talk about how they both had essential patents and

13   they had to come somehow to some kind of resolution, an

14   overall resolution?

15   A    I don't know.  I was not involved in that.

16   Q    And you did some multiplication as to what 2.25 percent

17   would mean to Xbox sales.  Are you aware of conversations

18   between the parties after October 22nd or after October 21st,

19   2010, where that amount was demanded by Motorola?

20   A    I'm aware of those conversations.  I had no involvement in

21   them and I'm not able to speak to what happened in them.

22   Q    And let me ask you what I think is probably one final

23   topic.  That is, if we look at PDX004 which is the Star Wars

24   and everything.

25   A    Um-hum.

1   Q    First of all, there's a controller there, do you see that?

2   A    Yes.

3   Q    That controller has to communicate with the Xbox, right?

4   A    Correct.

5   Q    And there's technology involved in that communication that

6   goes beyond the standards essential WiFi technology, correct?

7   A    Yes.

8   Q    And one of the things Motorola contended in these

9   conversations was it had a non-standards essential patent

10  that read on those communications; that is how the controller

11  works with the Xbox?

12          THE COURT:  Mr. Price, you've said the magic word

13  "read on."  Will you explain to the jury what that term

14  means?

15  Q    Let me make those magic words into un-magic words.  That

16  Motorola contended that it had patents which covered the

17  technology that Microsoft was using in its controller to

18  communicate with the Xbox.  And that is that, in other words,

19  that Microsoft was infringing that patent, correct?

20  A    Yes, that's correct.  There is an important difference,

21  however.  With the WiFi patents, for example, we could not

22  implement the WiFi standards without reading on Motorola's

23  patents onto those standards.  They're essential to the

24  standard.  The fundamental difference with the controller

25  patents is we had the ability to work around those patents

1    and still deliver the product.  So we could have had

2    engineering solutions that do not depend on those patents,

3    which is different from WiFi, where we could not ship WiFi

4    without a license to those patents.

5    Q   Let me ask you about that.  You just said that Microsoft

6    couldn't change its products so that it wouldn't read on

7    Motorola's patents.  When is the first time Microsoft

8    admitted that Motorola's patents were standards essential and

9    that they were breaching them?

10   A   I don't know the answer to that question.

11   Q   Isn't that kind of essential to the answer you just gave?

12   You just said that Microsoft was using Motorola's patents

13   which were standards essential.  When did you first come to

14   that conclusion?

15   A   I don't recall when we came to that conclusion.

16   Q   Last year?

17   A   Internally in the businesses, it was probably early 2012.

18   I don't recall the exact timing of that, though.

19   Q   Your understanding, though, that as of 2010 when these

20   negotiations were taking place, that Microsoft's position was

21   that Motorola's patents were not standards essential and that

22   they weren't valid patents and that Microsoft didn't owe a

23   penny on them?

24   A   I wasn't involved in that.  That could be.

25            MR. PRICE:  I'm finished, Your Honor.  Thank you.

1      THE COURT:  All right.  Ladies and gentlemen we're

2  going to take our morning break.  Let's take it ten minutes

3  long, so that you'll all be back in at ten minutes to eleven.

4  We'll shorten it up a bit and see if we can't make up some

5  time.

6    (The following occurred outside the presence of the jury.)

7      THE COURT:  We'll be in recess for ten minutes.

8                 (The court recessed.)

9

10      THE COURT:  Mr. Cederoth, are you going to have

11  redirect?

12      MR. CEDEROTH:  Very briefly, your Honor.

13      THE COURT:  Please be seated.  Bring the jury in.

14  (At this time the jury entered the courtroom.)

15      THE COURT:  Mr. Cederoth.

16      MR. CEDEROTH:  Thank you, your Honor.

17                 REDIRECT EXAMINATION

18  By Mr. Cederoth:

19  Q   I want to clarify one thing after Mr. Price's questions.

20  Specifically, he asked you about timing and participation on

21  the senior leadership team.  Was there concern on the Xbox

22  senior leadership team about potential injunctions on

23  Motorola's H.264 and 802.11 standards-essential patents in

24  the ITC in Germany?

25      MR. PRICE:  Objection.  Vague as to time.

1          MR. CEDEROTH:  That was my next question.

2          THE COURT:  All right.  Let's ask the question then,

3    counsel.

4          MR. CEDEROTH:  I was going to ask was there --  The

5    next question is, "When?"

6          THE COURT:  I will overrule the objection.

7          THE WITNESS:  Yes, there was significant concern.

8    By Mr. Cederoth:

9    Q   And did that concern pre-date the relocation of the German

10   distribution center?

11   A   Yes, it definitely predated the relocation of the German

12   distribution center.

13         MR. CEDEROTH:  No further questions, your Honor.

14         THE COURT:  Redirect.

15         MR. PRICE:  Yes.

16                    REDIRECT EXAMINATION

17   By Mr. Price:

18   Q   Are you saying you were involved in the decision to

19   relocate the German distribution maker?

20   A   I was not personally a decision-maker in that, but I was

21   involved as the leadership team was making the decision.

22   Q   So you weren't involved in the decision on that, right?

23   A   I was involved in the discussions that led to the

24   decision.

25         MR. PRICE:  Your Honor, in that case, this is a new

1   topic area and we need to recall Mr. Treadwell.  This is new

2   information.

3           THE COURT:  All right.  You may step down, sir.

4   Microsoft may call its next witness.

5           MR. HARRIGAN:  Yes, Mr. Pritikin will be examining

6   the next witness.

7           MR. PRITIKIN:  Your Honor, we are going to be calling

8   Mr. Kirk Dailey as an adverse witness.

9           THE COURT:  All right.

10  Whereupon

11                       KIRK DAILEY,

12  Called as a witness, was sworn and testified as follows:

13          THE COURT:  Ladies and gentlemen, while they are

14  handing out notebooks, you just heard Mr. Dailey referred to

15  as an adverse witness.  That doesn't mean is he an adverse

16  guy.  There is a legal distinction here.  Witnesses are

17  called by a party as part of their case.  Sometimes they are

18  going to offer testimony, which is supportive, sometimes they

19  represent the other side, and they are referred to as an

20  adverse witness.  It makes a difference in the form of the

21  question, which information they are permitted to ask about.

22  Don't draw any inferences other than, it is a legal matter

23  that the lawyers understand.  If any of you are interested at

24  all, I will talk to you after the case is over with.

25          THE CLERK:  Will you state your full name for the

1    record, please.

2            THE WITNESS:  Kirk Dailey.

3                        DIRECT EXAMINATION

4    By Mr. Pritikin:

5    Q    Good morning, Mr. Dailey.

6    A    Good morning.

7    Q    Now, you are the Motorola executive who signed the

8    October 21 and October 29 letters to Microsoft, correct?

9    A    Yes.

10   Q    And at the time you were the corporate vice-president for

11   intellectual property at Motorola?

12   A    Yes, that's correct.

13   Q    And you now hold a similar position at Google?

14   A    Somewhat similar.  I am the head of patent transactions at

15   Google.

16   Q    Now, you are trained as both an engineer and a lawyer,

17   right?

18   A    Correct.

19   Q    And you ran the business aspects of patent licensing at

20   Motorola?

21   A    For a period of time I did, yes.

22   Q    And is it also correct that you have been involved in the

23   licensing of Motorola's intellectual property in one way or

24   another since 1990 or 1991?

25   A    That's correct, yes.

1    Q    Let's talk about Motorola's RAND commitment and what that

2    means.  Now, do you understand that there are special rules

3    that govern a licensing of standards-essential patents?

4    A    Yes.

5    Q    And these arise because of contractual commitments that

6    companies make to standard-setting organizations in order to

7    get their technology included in the standards, right?

8             MR. PRICE:  I will object.  That calls for a legal

9    conclusion from the witness.

10            THE COURT:  The witness can testify to his

11   understanding.

12            THE WITNESS:  My understanding is there are rules of

13   engaging with the standards.  Whether it is a contract or

14   not, I'm not sure.  But there are rules.

15   By Mr. Pritikin:

16   Q    As the person who is responsible or certainly was

17   responsible for patent licensing at Motorola, you were aware

18   that you needed to follow the special rules when you tried to

19   license your standards-essential patents, didn't you?

20   A    Yes.

21   Q    Now, for nonessential patents, those patents for which

22   there is no commitment to license on RAND terms, you can

23   refuse to license the patents, right?

24   A    I believe that's correct, sure.

25   Q    And in theory you can demand any royalty rate that you

1    want on nonessential patents for which there is no RAND

2    commitment?

3    A    I'm not sure what the limitations are.  If you are going

4    to license, you need to get the other party to agree to it.

5    Q    Do you have the notebook there, Mr. Dailey?

6    A    Yes.

7    Q    And do you recall that in the ITC trial in this case you

8    testified, right?

9    A    Yes.

10          THE COURT:  Counsel, you have just said the ITC trial

11    in this case.  I am going to sustain the objection to that

12    question and ask you to rephrase it.

13    By Mr. Pritikin:

14    Q    Do you recall there was a hearing at the ITC between

15    Motorola and Microsoft in 2012?

16    A    Yes.

17    Q    And you testified at that?

18    A    I did, yes.

19    Q    I think we have the transcript of your testimony in the

20    notebook.  I believe it is the third tab.  Could you turn,

21    please, to Page 2483?

22    A    I'm sorry, what page?

23    Q    Page 2483.  And looking down --  Do you have it there,

24    Mr. Dailey?

25    A    Yes.

1    Q   Now, looking down at Line 6.  Question:  "Now for

2    nonessential patents --"

3            MR. PRICE:  Your Honor, I am going to object.  There

4    is nothing -- there is no impeachment in Lines 6 through 9.

5    He just testified to that.  I would request that counsel tell

6    us what lines he is going to read before so I can have a

7    chance to look at it.

8            MR. PRITIKIN:  I was going to read Lines 6 through 9.

9    I don't think that is what he just said, your Honor.

10           MR. PRICE:  He just said --

11           THE COURT:  Counsel, let me read this.  I am going to

12   permit the question.  I think there is a difference in the

13   second question being asked.  The first one is foundation.

14           MR. PRITIKIN:  Very well, your Honor.

15   By Mr. Pritikin:

16   Q   Beginning at Line 6.  Question:  "Now for nonessential

17   patents, those patents for which no commitment has been made,

18   you can refuse to license the patents, right?"  Answer:

19   "Sure."  Were you asked that question and did you give that

20   response, sir?

21   A   I did, yes.

22   Q   And for nonessential patents, you can get whatever the

23   traffic will bear, can't you?

24   A   I'm sorry.  We are not looking at this anymore?

25   Q   No, this is another question.  For nonessential patents

1   you can get whatever the traffic will bear, right?

2   A   Yes.

3   Q   But for essential patents, when you have made a RAND

4   commitment, you have to make a license available on

5   reasonable and non-discriminatory terms, right?

6   A   Generally, that's correct, yes.

7   Q   Now, you understand, and you did understand as the head of

8   licensing for Motorola, that companies that implement the

9   standards actually rely on those RAND commitments, didn't

10  you?

11  A   I'm sorry.  Could you repeat that question?

12  Q   You understood, didn't you, that companies that want to

13  implement the standards in their products rely on the RAND

14  commitments?

15  A   They can.  They certainly could, sure.

16  Q   And they know that they can make products that comply with

17  standards, and that they won't be held up later by one patent

18  owner who wants excessive royalty?  You understood that, too,

19  didn't you, sir?

20  A   I understand they need -- that licenses will be available

21  for people that are willing to take a license, yes.

22  Q   Now, you understand that the term "reasonable" in RAND

23  imposes a limit on what you can ask for, doesn't it?

24  A   Yes.

25  Q   Now, let's talk about the letters that you sent to

1  Microsoft in October of 2010.  You were present when the

2  opening statements were given yesterday?

3  A   Yes, I was.

4  Q   And you recall that in his opening statement Mr. Price

5  talked about the lawsuit that Microsoft filed against

6  Motorola on October 1st of 2010?

7  A   Yes.

8  Q   Microsoft filed an action in the IPC accusing the Android

9  phone of infringing a number of Microsoft patents, right?

10  A   That's correct.

11  Q   And you became aware of the October 1st complaint filed by

12  Microsoft virtually the same day, didn't you?

13  A   The same day, yes.

14  Q   And you also were aware that there was a parallel district

15  court action filed here in Seattle?

16  A   Yes.

17  Q   And it involved the same patents as in the ITC?

18  A   I presume so, yes.

19  Q   But this case was stayed, and that is what typically

20  happens when ITC actions are filed, right?

21  A   I'm not sure what normally happens in an ITC and a

22  district court case.  I will take your word for it.

23  Q   In his opening statement Mr. Price made it sound like this

24  was somehow -- when you filed something -- the demand letters

25  to Microsoft, that this was tit for tat, and that both sides

1    had patent claims.  But the patent claims were very

2    different, weren't they?

3                MR. PRICE:  I will object to it as argumentative as

4    phrased, and also vague.

5                THE COURT:  Overruled.

6                THE WITNESS:  There were different patents.

7    Microsoft sued on Microsoft patents.  And we didn't sue

8    Microsoft.  I'm not sure what your question is.

9    By Mr. Pritikin:

10   Q    Let me see if I can be a little more specific.  The

11   letters you sent to Microsoft dealt with patents that were

12   essential to two standards, 802.11 and H.264, correct?

13   A    Yes.

14   Q    And let's be clear on this, Mr. Dailey.  It is true, is it

15   not, that in the lawsuits that Microsoft brought against

16   Motorola, it did not assert patents against Motorola that are

17   essential to the 802.11 standard or to the H.264 standard?

18   Isn't that correct?

19   A    Yeah, there were other standards -- patents --

20   Q    That wasn't my question.  My question is --

21               THE COURT:  Don't interrupt the witness, counsel.

22   Did you finish your answer, sir?

23               THE WITNESS:  Yeah, I was just mentioning there were

24   other standards-essential patents in that suit, but not

25   802.11 or H.264.

1   By Mr. Pritikin:

2   Q   That's what I want to be clear on.  There were no 802.11

3   and no H.264 patents that were asserted, were there?

4   A   That's correct.

5   Q   Now, you understand that you cannot use

6   standards-essential patents to force someone to pay excessive

7   royalties, right?

8   A   I'm not sure what you mean by that statement.  We have

9   FRAND obligations, and we license our patents on fair and

10  reasonable terms, non-discriminatory.

11  Q   That means you can't force someone to pay excessive

12  royalties, doesn't it?  Wouldn't you agree with that, sir?

13  A   That's correct.  They are typically negotiated between the

14  parties.

15  Q   And you can't force -- you can't use your

16  standards-essential patents to try to extract a more

17  favorable license on patents that are not essential to the

18  same standard either, can you?

19  A   Again, could you repeat that question?

20  Q   Sure.  You can't use your standards-essential patents to

21  try to force someone to take a license on more favorable

22  terms on patents that are not essential to the same standard?

23  You wouldn't do that, would you?

24  A   Yeah, I'm not sure what you mean by that.  I don't think

25  so.

1   Q   Well, you would agree with me, wouldn't you, that

2   Motorola's policy is that you do not ask for reciprocity,

3   other than a grant-back license on the same standard, from

4   the prospective licensee?

5   A   Yes.

6   Q   So in this case, that would be 802.11 and H.264, right?

7   Those were the patents --

8   A   Concerning the letter I sent in October, yes.

9   Q   Now, the truth of the matter here is, Mr. Dailey, is it

10  not, that you tried to use your 802.11 and your H.264

11  standards-essential patents to extract money and other

12  concessions from Microsoft on patents that were not essential

13  to 802.11 and H.264?  Isn't that true?

14  A   That is not true, no.

15  Q   Well, let's talk about the two letters, and we will go

16  into this in a bit more detail.  Let's start with the H.264

17  letter that was sent on October 29th of 2010.  Can we put up

18  Exhibit 2?  Now, you recognize Exhibit 2 as the letter that

19  you sent to Mr. Gutierrez on October 29th, 2010?

20  A   Yes.

21          MR. PRITIKIN:  We move the admission of Exhibit 2.

22          MR. PRICE:  No objection.

23          THE COURT:  Exhibit 2 is admitted.  It may be

24  published.

25          (Exhibit 2 admitted into evidence.)

1    By Mr. Pritikin:

2    Q   Let's focus on the last sentence of the second paragraph.

3    I think the jury has seen this language a number of times,

4    but I want to ask you a few questions about it, Mr. Dailey.

5    What you said here was, "The royalty is calculated based on

6    the price of the end product, e.g., each Xbox 360 product,

7    each PC laptop, each smart phone, et cetera, and not on

8    component software, e.g., Xbox 360 system software, Windows 7

9    software, Windows Phone 7 software, et cetera."  And what

10   this said is that the royalty was going to be calculated

11   based on the price of the end product and not on components,

12   right?

13   A   That's correct, yes.

14   Q   And so when you wrote this you understood that Windows 7,

15   the operating system, is a component, correct?  That's the

16   word you used?

17   A   That's correct, because we had an obligation to be

18   non-discriminatory, and my licensing practice was licensing

19   end-product manufacturers.  And Microsoft was a little bit

20   different, in that they were a software component

21   manufacturer.

22   Q   We will come back to that in a minute.  Let's take it one

23   step at a time.  There was no doubt in your mind that

24   Windows 7 was just a component, right, because you used the

25   word "component"?

1    A    Component software, that's correct.

2    Q    And you also were aware at the time that the end price of

3    the computer includes the price of the hardware, it includes

4    many other things besides the software that is supplied by

5    Microsoft, right?

6    A    Sorry.  Could you repeat that?

7    Q    You understood at the time that the end price of the

8    computer includes the price of the hardware and includes many

9    things besides the software that is supplied by Microsoft?

10   A    That's correct.

11   Q    Now, if a computer sold for $1,000, it is simple

12   arithmetic that you were asking for a royalty of $22.50 on

13   that computer, right?

14   A    That's correct, yes.

15   Q    And the royalty you were asking Microsoft to pay was on

16   the selling price of computers by Microsoft's customers,

17   companies like Dell and Hewlett Packard and Lenovo, right?

18   A    Right.  This is an initial offer, and we were expecting --

19         THE COURT:  Sir, you need to answer his question.

20   His question was something to the effect of specific

21   computers.  Let's try and do that and save ourselves a lot of

22   trouble.

23         THE WITNESS:  Sure.

24   By Mr. Pritikin:

25   Q    Now, at the time you wrote this letter, it is true, is it

1    not, Mr. Dailey, that you were not aware of a single Motorola

2    licensee that was paying a royalty based on the selling price

3    of a product sold by its customer?

4    A    That's correct.

5    Q    And so it is fair to say, is it not, that you were asking

6    Microsoft to do something that no other Motorola licensee was

7    doing?  Isn't that true?

8    A    That's right, because we expected to deal with that in

9    negotiations.  That's correct.

10   Q    We will come to that in a minute.  I am asking what you

11   were asking in this letter.

12   A    That was the initial offer, yes.

13   Q    Now, you do understand that the ND in the term RAND stands

14   for non-discriminatory?

15   A    Yes.

16   Q    And that means you can't treat different licensees

17   differently?

18   A    I'm not sure if it means that exactly.  It means you can't

19   be discriminatory, that's correct.

20   Q    In any event, it is fair to say that you made a conscious

21   and deliberate decision to ask Microsoft to pay a royalty

22   based on the sales revenues of its downstream customers?

23   Isn't that correct?

24   A    That was the initial offer, yes.

25   Q    I would like to put up one of the demonstratives that was

1  used in the opening by Mr. Harrigan yesterday.  I believe you

2  were present when the openings were given?

3  A   Yes.

4  Q   Can we put up PDX 1?  Now, you understand that the court

5  found that a true RAND rate for Motorola's H.264 patents for

6  Microsoft's products, like Windows, is about a half cent a

7  unit, right?

8  A   That's correct.

9  Q   Again, it is simple arithmetic, for a $500 laptop, your

10  letter was asking for $11.25, right?

11  A   Yes.

12  Q   Put up slide 18, the next one in the series.  Again, you

13  saw this yesterday during the opening?

14  A   Yes.

15  Q   Now, when you sent this letter, you did have some idea of

16  what the financial impact would be of the offer you had made,

17  didn't you?

18  A   We had some rough calculations of Microsoft revenues, yes.

19  But I never asked for $4 billion a year.

20  Q   We will come back to that.  I want to find out what was in

21  your head at the time and what you knew, Mr. Dailey.  It is

22  easy to go on the internet and find out that worldwide sales

23  of Windows-based PCs earn more than $200 billion a year, and

24  that 2.25 percent of that is around $4 billion a year; isn't

25  it?

1  A   I believe that's correct, yes.

2  Q   And when you prepared the two letters, you actually did

3  some calculations of how much Motorola stood to gain in

4  royalty revenue if Microsoft accepted the terms as set forth

5  in the letters, didn't you?

6  A   I don't recall those calculations.

7  Q   Could you turn back to the testimony you gave in the ITC,

8  sir?

9  A   Sure.

10  Q   And turn, please, to Page 2544.

11         MR. PRITIKIN:  And I would propose to read, your

12  Honor, Lines 4 through 10.  Actually 4 through 14.

13         MR. PRICE:  4 through 14?

14         MR. PRITIKIN:  Yes.

15         MR. PRICE:  No objection.

16  By Mr. Pritikin:

17  Q   Mr. Dailey, looking at the transcript.  Question:  "When

18  you put together the two letters that we looked at, did you

19  estimate how much Motorola stood to gain in royalty revenue

20  if Microsoft accepted the terms as set forth in the letters?"

21  Answer:  "We had some calculations around in line with that

22  somewhere, yes."  Question:  "Okay.  So you knew that there

23  were billions of dollars of Xbox consoles sold every year?"

24  Were you asked those questions and did you give those

25  answers?

1    A    Yes.

2    Q    So you were aware of both the Xbox and Windows revenues?

3    A    Yes.

4    Q    Now, the 2.25 percent in your letter was going to be based

5    on the end sales price of the computers and other products

6    that had Windows in it.  But even if you had attached the

7    2.25 percent just to Windows, you knew that that was going to

8    be a very large number by itself, didn't you?

9    A    It is a large number, yes.

10   Q    In fact, you were asking Microsoft to pay Motorola many

11   times each year what Motorola received from all of its other

12   licensees for all of its patents combined, right?

13   A    I was actually expecting a negotiation with Microsoft

14   based on that letter.

15   Q    Not my question, sir.  I am asking about the letters.  The

16   letters asked Microsoft to pay Motorola a royalty that was

17   many times the combined amount you were getting from all of

18   your other licensees on an annual basis?

19   A    Yeah, I don't know that I did that calculation, but it is

20   probably true.

21   Q    Now, you didn't think there was any possibility when you

22   sent this letter, did you, that Microsoft would agree to pay

23   you a royalty on the end-seller price of all of the computers

24   in the world that have Microsoft software on them for your

25   piece of the H.264 technology?

1    A    I was expecting to engage in a negotiation.

2    Q    Not my question, sir.  My question is, you didn't expect

3    that Microsoft would agree to pay what was in these letters,

4    did you?

5    A    I don't recall whether I did or did not.

6    Q    Let's turn to the other letter, the letter on 802.11.  Can

7    we put up Exhibit 1?  Is this a copy of the letter you sent

8    on October 1st -- excuse me, October 21st, 2010?

9    A    Yes.

10        MR. PRITIKIN:  And Microsoft moves the admission of

11   Exhibit 1, your Honor.

12        MR. PRICE:  No objection.

13        THE COURT:  Exhibit 1 is admitted and may be

14   published.

15        (Exhibit 1 was admitted into evidence.)

16   By Mr. Pritikin:

17   Q    Now, again, you heard in the opening Mr. Harrigan say that

18   your demand for Motorola's 802.11 essential patents equated

19   to a royalty of up to $9 per Xbox console, and that a true

20   RAND royalty was less than three and a half cents.  Do you

21   recall that?

22   A    Yes.

23   Q    And, again, simple arithmetic, if the Xbox console, an

24   expensive one, sells for $400, 2.25 is $9, right?

25   A    That's correct.

Q   Now, in the same letter you also asked for a royalty on --
There is a reference to Windows mobile software.  Do you see
that?  It is further down.  It is the last sentence in the
second paragraph, that asks for Motorola's standard terms.
You said, "The royalty is calculated based on the price of
the end product, e.g. Xbox 360 product, not a component
software, e.g., Windows mobile software"?

A   Yes, that's correct.

Q   So at the time you sent this letter, you understood that
Windows mobile software was a component, and that it would be
put in an end product like a mobile phone?

A   That's correct, yes.

Q   But you wanted a royalty on the phone, not on the software
supplied by Microsoft, right?

A   Yes.

Q   And a mobile phone would be a phone sold by a Microsoft
customer, like Nokia, or one of the other phone makers?

A   That's correct.

Q   Now, you understand in this case Motorola has hired an
expert to testify by the name of Gregory Leonard?

A   I recognize the name, yes.

Q   Well, you talked to him, didn't you?

A   I believe I did, yes.

Q   He submitted an expert report in which he said he had a
conversation with you.  Do you recall that conversation?

1    A   I --

2         MR. PRICE:  Objection, your Honor.  This is vague,

3    ambiguous.

4         THE COURT:  Overruled.

5    By Mr. Pritikin:

6    Q   He said in his expert report that he had a

7    conversation with --

8         MR. PRICE:  Objection, your Honor.  This is hearsay

9    at this point.  It has not been admitted and it is not

10   admissible, the expert report.

11        THE COURT:  I have overruled the objection.  He is

12   not questioning on the expert report, at least thus far; he

13   is asking if he had a conversation.

14        MR. PRICE:  He is reading --

15        THE COURT:  Don't argue with me, counsel.  I have

16   ruled.  Ask your question, again, please.

17   By Mr. Pritikin:

18   Q   You said in his report he talked to you on May 29th, 2013.

19   You don't disagree with that, do you?

20   A   I don't recall.  But that's fine.  I don't disagree with

21   that.

22   Q   Now, I want to ask you about a couple of things that

23   Dr. Leonard said, and I want to find out whether this came

24   from you and whether you agree with what he said.  In

25   Paragraph 66 of his report --

1     MR. PRICE:  I object to the representations as to

2  what Mr. Leonard said.  That's hearsay.

3     THE COURT:  I am going to sustain that objection.

4     MR. PRITIKIN:  I am happy to show him a copy of the

5  report, your Honor.

6     THE COURT:  It is still going to be hearsay.

7     MR. PRITIKIN:  The report is, but I am not offering

8  it for the truth of the matter asserted.  I want to find out

9  what it is -- whether Mr. Dailey agrees with these

10  statements, which I think is a proper subject of examination.

11     THE COURT:  Why don't you make a statement then, and

12  not attribute it to a witness who has not yet testified.

13     MR. PRITIKIN:  Absolutely.  That's fine.

14  By Mr. Pritikin:

15  Q   Let me make a statement and find out if this is something

16  you agree with, Mr. Dailey.  "As of October 2010, Motorola's

17  802.11 and H.264 standards-essential patent portfolios had

18  not been separately licensed."  Would you agree with that?

19  A   "Separately licensed," meaning what?

20  Q   Meaning licensed by themselves.  Stand-alone.

21  A   I think that's correct a statement, sure.

22  Q   And while these portfolios had been included as licensed

23  patents in some Motorola license agreements, these licenses

24  were all broad and complex cross licenses covering hardware

25  with the primary focus generally being the cellular

1    standards-essential patents; you would agree with that, too,

2    would you not?

3    A    I don't have the knowledge of all of the license

4    agreements at Motorola, but certainly with respect to

5    licensing in the mobile device business, I believe that's

6    accurate.

7    Q    Let me read you another statement.

8    A    Because there were other agreements with Handheld Products

9    and with Terabeam, et cetera, that were 802.11-only based

10   agreements.

11   Q    Now, it is difficult or impossible to break out a separate

12   royalty rate for the 802.11 and H.264 patent

13   standards-essential patent portfolios in these complex

14   cross-license agreements, you would agree with that, too,

15   would you not?

16   A    Sorry?  That it is difficult to break them out?

17   Q    Yes.

18   A    I guess --  Yeah, I guess you could, but it is difficult.

19   Q    Now, let me read you another statement.  "Accordingly,

20   Motorola had"--  And this is in 2010.  "Accordingly, Motorola

21   had no past experience on which it could draw when it

22   attempted to negotiate a RAND license with Microsoft."  Do

23   you agree with that statement?

24   A    Could you reread it?  I apologize.

25   Q    Sure.  "Accordingly, Motorola had no past experience on

1  which it could draw when it attempted to negotiate a RAND

2  license with Microsoft."

3  A    No.  We drew on our licensing experience with our H.264 --

4  with our SEPs at 2.25 percent.  That's what we drew upon.

5  Q    The SEPs you are talking about are for the cellular

6  licenses or the cross licenses, the complex licenses, aren't

7  they?  You didn't have a stand-alone license as of 2010 that

8  was comparable for 802.11 or H.264, as of October 2010, did

9  you, sir?

10 A    No.  We were licensing -- I drew on my experience of

11 licensing SEPs in the mobile space.  It was a little bit

12 different because Microsoft was a software -- as you pointed

13 out, software components and Xbox entertainment systems.

14 Q    The truth is, in October of 2010 you did not have a basis

15 for thinking that your H.264 or 802.11 portfolios were

16 actually worth 2.25 percent, did you, on a stand-alone basis?

17 A    I had a basis for thinking that.

18 Q    Well, it wasn't based on the prior license of those on a

19 stand-alone basis, was it?

20 A    No.  We talked about the RIM agreement, and the fact that

21 it had -- it called out the WLAN portfolio, which is the same

22 as 802.11.

23       MR. PRITIKIN:  Your Honor, there was a mention of the

24 RIM agreement.  I think there are additional things that I

25 would like to bring to the jury's attention at this point.

1   He interjected it.

2           THE COURT:  All right.

3           MR. PRICE:  He interjected his reasonable belief.

4   But there is an instruction that --  I will have no objection

5   to a limiting instruction, if I knew what it was.

6           THE COURT:  All right.  Ladies and gentlemen, I have

7   one great advantage over you, in that this extraordinarily

8   competent individual sitting down there, our court reporter,

9   provides me with a copy of a real time transcript.  That

10  allows me to go back and check as to what the question

11  actually said, as opposed to relying on my memory, which is

12  why you will see me from time to time come over here and go

13  back and find a particular thing that I am looking for, which

14  is what is going to happen now.

15      Ladies and gentlemen, one of the things that I said to you

16  yesterday was that at times I would give you a limiting

17  instruction.  And we are going to ask you to do some mental

18  gymnastics with this, which is not terribly easy, but you are

19  more than capable of it.  Sometimes you are going to hear

20  evidence, and I am going to direct you that the evidence may

21  be considered for one purpose, but it is not to be considered

22  for anything else.  The reason is, it is relevant evidence to

23  a purpose in the trial, some issue that is in the trial, but

24  it is not admissible in regards to other issues in the trial.

25  So I will ask to you cleave your mind in half and make that

1    distinction for me.

2       In this instance there was a lot of discussion in the

3    prior trial about the RIM license.  RIM is Research in

4    Motion; it makes BlackBerries.  And I held that the RIM

5    license could not be used as an indicator as to what is an

6    appropriate RAND royalty rate for Motorola's 802.11 and H.264

7    patent portfolios in its negotiations with Microsoft.  The

8    purpose for which the discussion -- you may consider it, is

9    in regards to Motorola's mindset at the time.  And for that

10   reason I am going to allow this testimony.  But it is not for

11   the purpose of is it an indicator of what the RAND rate

12   should be.  You can accept it as an indicator of Motorola's

13   mindset at the time.

14      With that instruction, Mr. Pritikin, your next question,

15   please.

16          MR. PRITIKIN:  Thank you, your Honor.

17   By Mr. Pritikin:

18   Q   Now, in fact, the RIM arrangement involved a

19   cross-license -- involved a license of lots of Motorola

20   patents, your whole portfolio, everything,

21   standards-essential, nonessential, right?

22   A   That's correct, yes.

23   Q   Let's talk for a moment about the difference in these

24   standards.  I'm not sure the jury has heard about this.  A

25   cellular standard is the standard that governs cell phone

1    communications, right?

2    A    That's correct.

3    Q    And so that is like 3G or 4G, it is what allows a cell

4    phone to work, to communicate, correct?

5    A    Yes, that's correct.

6    Q    And Motorola has a very strong position with respect to

7    cellular patents, right?

8    A    I believe so, yes.

9    Q    And historically those are the standards-essential patents

10   that you licensed, if you go back into the '80s and '90s,

11   right?

12   A    In the '80s and '90s, right, WiFi and H dot video

13   compression wasn't widely adopted, that's correct.

14   Q    And then when you licensed 802.11 and you licensed H.264,

15   you threw that into the licenses of the cellular patents,

16   right?

17   A    We were using 802.11 and H.264 in our --  As it got

18   adopted in the mobile space with our competitors, we began to

19   use it as a discussion point.

20   Q    But you didn't charge more?  You paid 2.25 for the

21   cellular patents, you didn't pay more for 802.11 or H.264,

22   right?

23   A    That's right.  We had portfolios we believed were worth

24   2.25 percent, and then we didn't stack.  So if you developed

25   a WiFi-only tablet, as an example, you may pay 2.25, but if

1     you add cellular to it, it would still be the same price.  So

2     we had multiple portfolios that we licensed on the same

3     terms, but then we didn't stack the licensing royalties that

4     would have been due.

5     Q   Now, at the time that you sent the letters in October

6     of 2010, the 2.25 percent you are referring to was for a

7     license to your cellular portfolio -- all of your portfolios?

8     That's where the 2.25 percent came from, right?

9     A   The 2.25 percent, we were asking -- the initial offer that

10    we sent to Microsoft was for H.264 in one letter and WiFi in

11    the second letter.

12    Q   But the 2.25 percent that you have referred to that

13    Motorola had received in the past, that was for the cellular

14    licenses -- the cellular portfolios and the cellular

15    portfolios along with additional --

16    A   No.  We made initial offers of 2.25 on WiFi and H.264 as

17    well.

18    Q   We will come back to that in a minute.  But the licenses

19    you had were licenses that granted licenses to the cellular

20    portfolios, along with other things, at 2.25 percent; isn't

21    that correct, sir?

22    A   Well, some of the licenses had WiFi licenses in them as

23    well, and H.264.

24    Q   Are you referring again to the RIM license?

25    A   That's one example, yes.

1          MR. PRITIKIN:  Your Honor, I think there is

2    additional information that should be provided to the jury at

3    this time.

4          THE COURT:  I will see counsel at sidebar.

5    (Sidebar conference out of the hearing of the jury.)

6          THE COURT:  What is it you want to bring forth?

7          MR. PRITIKIN:  What I would like to do, your Honor --

8    These are just the findings, the same findings we talked

9    about earlier this morning.  I think that these are all

10   established facts, and now he has waded into this and left

11   the impression that they have gotten 2.25 percent on WiFi

12   alone or on H.264 alone.  Those are the issues we tried.

13   They haven't.  There are extensive findings on this that

14   really contradict what he is saying.  Now, you indicated if a

15   witness says something that is inconsistent with these

16   findings, we can use them to impeach him.  I'm not sure quite

17   sure of the mechanism your Honor would prefer.  But I really

18   think there are four or five of these findings now that put

19   the RIM license in context that we should be allowed to read

20   to the jury.  We don't necessarily have to bless it with the

21   imprimatur of the court, in a prejudicial way, but to say

22   these are facts that are undisputed.

23         MR. PRICE:  I think, given the last answer, he

24   misunderstood the question.  He said we had a license, which

25   is true, and you haven't made a finding one way or the other

1    on.  I think what Microsoft wants is for him to say it wasn't

2    separate.  And he will say that if he understands that

3    question.  But he hasn't waded into whether or not this was

4    the right RAND rate for these two.  The question said, and

5    the licenses you had, you didn't have these in them?  Well,

6    they did.  But they were packaged.  And that's all this

7    colloquy has been about.  I think you have to clarify, it was

8    packaged with the cellular.

9         MR. PRITIKIN:  That isn't what he said.  And they

10   tried this argument at the trial last fall, your Honor.  They

11   tried to suggest there was a separate call-out, and he just

12   talked about it again, for a device like a WiFi tablet.  That

13   was one of the issues that came up in the trial last fall.

14   And he tried to imply, if you read the RIM agreement, there

15   would be a separate, whatever it is, 1.7 percent for that.

16   And you don't have all of that in the findings.  And I think

17   it is going to be the jury that it is misleading.  To the

18   extent they are trying to offer what his state of mind is,

19   again, it is misleading, because that isn't the way it works.

20   I mean, you spent a lot of time analyzing it.

21        THE COURT:  I think it goes to the question of good

22   faith.  I mean, if he has a basis for good faith, one of

23   which is this is what we have always done when we offered

24   these terms, I think they are permitted to say that.  I am

25   going to go back and reread his answer.  I think that it is

1   closer to the position, but I want to make sure I track the

2   language.  And if it is, I am going to permit some limited

3   questions in this area.

4       Mr. Price, one thing I will say, since we are out of the

5   presence of the jury, we have a local rule here that says

6   objections are supposed to be you stand up and say,

7   "hearsay."  The reason is, some of my colleagues feel more

8   strongly about this, if you start arguing your objections in

9   front of the jury, then you might as well not have asked the

10  question.  That's why I shut you down.  If I have ruled, I

11  think I understand the objection.  If we need a sidebar, ask

12  for it.  If you keep talking, you have pretty much let the

13  cat out of the bag.

14          MR. PRITIKIN:  In terms of presenting additional

15  material to the jury, how would you prefer that we do it?

16  Can I simply read them and say these are undisputed facts?

17          THE COURT:  I think what you should do is say, in

18  general, do you understand it is a determined fact such and

19  such, or you can say, you understand in this trial it is not

20  disputed that.  That is probably more neutral language.  Let

21  me read this, and I will let you know what the answer is.

22          MR. PRITIKIN:  Thank you.

23  (End of sidebar.)

24          THE COURT:  Mr. Pritikin, I am going to sustain the

25  objection.  Please move on.

1           MR. PRITIKIN:  Let me ask a couple of other questions

2    along these lines and we will see what the responses are,

3    your Honor.

4    By Mr. Pritikin:

5    Q   Mr. Dailey, you understand that an agreement that licenses

6    Motorola's cell phone portfolio, as well as other Motorola

7    patents may, in terms of value, be dominated by the cell

8    phone portfolio as opposed to the other patents included in

9    the agreement?

10   A   I'm not sure what you mean by "dominated."  It may or may

11   not be dominated by that.  It depends on what the company's

12   product business is.

13          MR. PRITIKIN:  Your Honor, may I read from 430?

14          THE COURT:  Mr. Price, do you wish to be heard on

15   this before I rule?

16          MR. PRICE:  Yes, your Honor.  The answer is not

17   consistent with the finding.  It may or may not, depending on

18   the portfolio -- I'm sorry, the product business, your Honor.

19          THE COURT:  I am going to permit you to ask the

20   undisputed fact question in regards to finding 430.

21   By Mr. Pritikin:

22   Q   Mr. Dailey, you do you understand it is an undisputed fact

23   in this case that an agreement that licenses Motorola's cell

24   phone portfolio, as well as other Motorola patents, may, in

25   terms of value, be dominated by the cell phone portfolio, as

1    opposed to the other patents included in the agreement?

2    A    Yes, it may be dominated.  That's correct.

3    Q    Now, you understand that the RIM license agreement

4    provided for a comprehensive settlement of a wide range of

5    litigation between the two companies?

6    A    Yes.

7    Q    And you understand that there is no evidence tending to

8    prove that RIM would have agreed to royalties for either

9    802.11 or H.264 patents alone, apart from this broader

10   agreement that allowed RIM to avoid an exclusion order on its

11   BlackBerry products?

12   A    Where would I --  I'm not sure what you're asking me.

13        MR. PRITIKIN:  Again, your Honor, I would like to

14   read then from 431, the last sentence?

15        MR. PRICE:  I object.  This is not a competent

16   witness.

17        THE COURT:  I will sustain that.  I don't think this

18   comes in through this witness, counsel.

19   By Mr. Pritikin:

20   Q    You do understand that the RIM license agreement is not

21   comparable to a RAND royalty rate between Microsoft and

22   Motorola in this case?

23   A    That's correct, yes.

24   Q    Now, let's turn to another topic relating to the 2.25

25   percent that you were asking for.  You are familiar with the

1    concept of royalty stacking?

2    A    Yes.

3    Q    And so you know that there are a number of other patent

4    owners besides Motorola that have told the IEEE that they

5    have essential patents?

6    A    There are people that made letters of assurances.

7    Q    Dozens?

8    A    There were a number of them, yes.

9    Q    In fact, you would not disagree that there were over 92

10   companies that have provided letters of assurance to the IEEE

11   on 802.11, right?

12   A    I don't know the exact number.

13   Q    Now, you were aware that there were hundreds of patents

14   that had been declared essential to 802.11 by a large number

15   of companies when you sent the letter to Microsoft, right?

16   A    I was not aware of that.

17   Q    Well, by the time you testified at the ITC you were aware

18   of that, weren't you?

19   A    On the 802.11 standard?

20   Q    Yes.

21   A    I knew there were other WiFi patents, yes.

22   Q    And if one wanted to assure that the royalty rate that

23   Motorola was demanding for its 802.11 standards-essential

24   patents was a RAND royalty, one factor that you could take

25   into consideration is how many other companies had 802.11

1    standards-essential patents of their own?

2    A    That is a factor that someone could take into

3    consideration, yes.

4    Q    When you sent the letters to Microsoft on 802.11, you had

5    no reason to believe that the Motorola essential patents were

6    any more valuable than the patents of these dozens of other

7    companies, did you?

8    A    That's right, I hadn't studied all of them.

9    Q    And you are not going to tell this jury that Motorola's

10   802.11 patents constituted any more than only a sliver of the

11   overall technology incorporated into the 802.11 standard, are

12   you?

13           MR. PRICE:  I will object as to the competence of

14   this witness to testify on this topic at all.

15           THE COURT:  Overruled.

16           THE WITNESS:  I didn't study the entire -- all of the

17   patents related to 802.11 before I sent the letter to

18   Microsoft, that's correct.

19   By Mr. Pritikin:

20   Q    And no other Motorola witness is going to say in this

21   trial that the 802.11 patents constitute more than a sliver

22   of the overall technology incorporated into the standard, are

23   they, to your knowledge?

24           MR. PRICE:  Objection.

25           THE COURT:  Sustained.

1    By Mr. Pritikin:

2    Q    Let's move on to H.264.  And, again, there are a lot of

3    companies that contributed to that standard, aren't there?

4    A    I believe so, yes.

5    Q    You understand that there are over 52 companies that have

6    declared patents essential to H.264?

7              MR. PRICE:  Objection.  Vague as to time.

8              THE COURT:  I think the witness can answer that.

9              THE WITNESS:  I heard someone talk about it

10   yesterday.  There are a number of companies that were

11   involved in the development of the standard.

12   By Mr. Pritikin:

13   Q    And, again, in terms of its technological contribution to

14   the H.264 standard, you are not in a position, and were not

15   at the time you sent the letters, to say whether Motorola

16   ranked in the top half or the bottom half of the companies

17   that had contributed patented technology to the standard?

18   A    That's correct.  It was one of our core research areas,

19   but I wasn't sure where our patents -- how they all came out.

20   Q    And, again, I will ask you, you are not going to tell this

21   jury that Motorola's H.264 essential patents constitute more

22   than a sliver of the overall technology incorporated into the

23   standard, are you, sir?

24   A    No.  I said I didn't study all of the patents.  I am not

25   going to tell the jury that, that's correct.

1  Q   Now, when you sent the 802.11 and H.264 letters, you could

2  have taken into account the royalty stacking potential,

3  couldn't you, in framing a 2.25 percent royalty?

4  A   I wasn't aware of any royalty stacking issue at the time I

5  sent the letters.

6  Q   That's not my question.  You knew -- you could have easily

7  found out how many companies there were that had declared

8  standards, and that would have given you an idea of the

9  proportionality of your asking for 2.25 percent, wouldn't it?

10 A   I'm sorry.  Could you repeat that?

11 Q   You could easily have figured out how many companies had

12 provided letters of assurance?  It is publicly available

13 information, right?

14 A   Sure.

15 Q   In fact, people in your organization did it, like Brian

16 Blasius, right?

17 A   I'm not sure.

18 Q   Well, there are standards people at Motorola that get

19 involved in standards and are aware of this, and you

20 consulted them at the time you framed these initial offers to

21 Microsoft, didn't you?

22 A   Yeah.  But Brian Blasius isn't one of those standards

23 people.

24 Q   What about Ray Warren?

25 A   Ray Warren is.

1    Q    He works for you?

2    A    No, he does not.

3    Q    But he is in the same group, he works in the same building

4    you do in Chicago, right?

5    A    Yes.

6    Q    And he follows the standards, doesn't he?

7    A    Some of them, yes.

8    Q    And he participated?  People who are involved in that

9    actually participated in establishing your initial offers to

10   Microsoft, didn't they?

11   A    I'm not sure if Ray Warren did.  But the people on Neill

12   Taylor's team, the litigation licensing attorneys as well as

13   the finance people.

14   Q    Now, as a practical matter, no company could afford to pay

15   a 2.25 percent royalty to every company that owned patents

16   essential to 802.11, could they?

17   A    Again, I'm not sure I have studied them.  I wasn't aware

18   that there was a stacking problem at the time I sent the

19   letter.

20   Q    Mr. Dailey, if everybody who had patents that are

21   essential to 802.11 or H.264 came along and said, I want 2.25

22   percent like you did, it wouldn't be feasible, would it, to

23   pay those royalties?  You will agree with that?

24   A    Yeah.  I guess it would be a lot of money if they did

25   that.  But they --

1  Q    Now --  I'm sorry.  I thought you were finished.

2  A    My experience is people would negotiate with us, or they

3  would contribute to the standards that they wanted to use and

4  then trade.  That's my experience.  To avoid that stacking

5  problem.

6  Q    Now, even though you didn't --  Did you know what RAND was

7  for your patents or not when you sent the letters in October

8  of 2010?

9  A    At the time I sent the letters I believed I understood

10  what RAND was, yes.

11  Q    Did you understand what a RAND rate was for your patents,

12  the 802.11 and your H.264 patents?

13  A    Specifically with respect to Microsoft, I knew there

14  were -- we would have discussions about how they used them

15  and the value to the products.  I didn't understand

16  everything that would result in a RAND license with

17  Microsoft.

18  Q    That is not my question.  It is a simple question, sir.

19  Did you or didn't you know what a RAND rate was for your

20  patents when you sent those letters in October of 2010 for

21  Microsoft?

22  A    Sir, are you asking me did I know what the RAND rate was

23  for Microsoft or did I know --

24  Q    Yes.

25  A    No, it needed negotiation with Microsoft.

1    Q    Did you know what a RAND rate was for your H.264 patents

2    or your 802.11 patents when you sent those letters?

3    A    I sent an initial offer that I thought was a fair initial

4    offer.

5    Q    My question isn't about the offer.  I am asking about the

6    rate.  Did you know what a RAND rate was when you sent those

7    letters?

8    A    At the time, based on what I knew, I thought what I sent

9    was a fair offer.

10   Q    Did you think it was a RAND rate?

11   A    It was a RAND offer, yes.

12   Q    There is a difference here.  I don't want to quibble on

13   words.  I am asking you, did you think it was a RAND rate?

14   A    I did, yes.

15   Q    Now, you actually had some idea of -- you are aware the

16   court found that a RAND rate was much less than the amounts

17   requested in your letters, aren't you?

18   A    Yes.

19   Q    I mean, orders of magnitude difference, right?

20   A    Yes.

21   Q    In fact, you did have some idea of what your 802.11 and

22   H.264 patents were worth when you sent the letters, didn't

23   you?

24   A    Yes, I did.

25   Q    As of 2010 there were over 60 Motorola employees involved

1   in your patent-licensing activities?

2   A    That could be.  That is probably about right.

3   Q    And, in fact, you had a group of some 25, didn't you, who

4   worked for you?

5   A    Technology trademarks and patent licensing.  But, yes,

6   that's correct.

7   Q    And employees in other departments, such as legal, were

8   also involved in patent licensing?

9   A    Yes.

10  Q    In fact, some of the people on your team were involved in

11  coming up with the terms that you put in the Microsoft

12  letters, right?

13  A    That's correct.

14  Q    And Neill Taylor, who is the chief IP counsel, also had a

15  team that helped you put those letters together, right?

16  A    He is part of that team you referred to, yes.

17  Q    Well, let's talk a little bit about what you knew when you

18  sent these letters to Microsoft.  And I want to start with

19  H.264.  Now, Motorola had been a long-time participant in the

20  video standards and had contributed for a number of years?

21  A    That's correct, yes.

22  Q    They participated in the work of the ITU in developing the

23  H.264 standard?

24  A    They did, yes.

25  Q    And there were employees who had served on the working

1    groups, that is, Motorola employees?

2    A    I believe that's correct.  I'm not sure.

3    Q    Now, you know a Motorola employee by the name of Ajay

4    Luthra, don't you?

5    A    I recognize the name.

6    Q    Dr. Luthra is a vice-president at Motorola, and he is

7    considered to be a Motorola fellow, isn't he?

8    A    I'm not sure of his title.

9    Q    From 2001 through 2009, Dr. Luthra was actually a co-chair

10   of the JVT, the group that developed the H.264 standard,

11   right?

12   A    There were people involved, yes.

13   Q    Dr. Luther was the co-chair, right?

14   A    Again, I'm not sure who was the co-chair.

15   Q    You know he was involved, right?

16   A    I know his name, and I know that Motorola people were

17   involved.  I'm not sure that it was AJ Luthra or not.

18   Q    Did you know that Dr. Luthra came to Seattle last fall for

19   trial and sat in that chair and testified about his work

20   involving the JVT?  Did anybody tell you that?

21           MR. PRICE:  Objection.  Relevance.

22           THE COURT:  Overruled.

23           THE WITNESS:  No, I didn't know that.

24   By Mr. Pritikin:

25   Q    You would expect Dr. Luthra to know how important or

1   unimportant Motorola's overall contributions to the H.264

2   standard were, wouldn't you?

3   A   Again, I am not -- I don't know him that well that I would

4   know what his opinion is.

5   Q   Well, there were people at Motorola you could easily have

6   called to find out how important or unimportant Motorola's

7   contributions to the standards were, weren't there?

8   A   There were people that worked on the standards, so there

9   were -- there could have been work done.  I think there was

10  work done.

11  Q   And you also knew about how your H.264 patents were used

12  in the Microsoft products, and you knew enough to understand

13  that 2.25 percent is excessive, didn't you?

14  A   The first question is how they were used.  We understood

15  that Microsoft used H.264 technology, but we were expecting

16  to discuss with Microsoft the value of that contribution to

17  their products.

18  Q   Well, let's see what you did do.  So you and others at

19  Motorola specifically investigated the relevance of the H.264

20  patents to Microsoft products, right?

21  A   I was not involved in that investigation.

22  Q   Would you look again at the testimony you gave.  This time

23  let's look at the deposition you gave in this case.  It is

24  the 1823 case, deposition testimony.  Would you turn, please,

25  to Page 20?

1    A    Sorry.  The deposition?

2    Q    Yes.

3              MR. PRITIKIN:  What I would like to read is Page 19,

4    Line 25, excluding the objection, to Page 20, Line 10.

5              MR. PRICE:  I have no objection.

6              THE COURT:  Yes, you may do so.

7    By Mr. Pritikin:

8    Q    Looking at the deposition, Mr. Dailey.  Question:  "Did

9    you consult an expert before sending the PX-2 letter as to

10   what aspects of the standard were covered by Motorola

11   patents?"  Answer:  "I have people that would have provided

12   information with respect to the relevance of H.264 to

13   Microsoft products."  Were you asked that question and did

14   you give that response?

15   A    I presume I did.  I'm sorry, which page are you looking

16   at?  I am trying --

17   Q    19 over to 20.

18   A    I'm sorry.  Right at the bottom.  Got it.  Yeah, that's

19   correct.

20   Q    And you also relied on experts within Motorola to

21   investigate the infringement that you thought you found in

22   the Microsoft products, didn't you?

23   A    Yes, that's correct.

24   Q    Now, let's talk about what you knew about the 802.11

25   patents.  Similarly with 802.11, there were Motorola

1    employees who had served on the working groups on the

2    standards, put it together?

3    A    That was a question?  Yeah, I believe there were people

4    involved in the working groups.  Yes.

5    Q    And you are familiar with Xbox?

6    A    At a very high level.

7    Q    Well, you own one, right?

8    A    I do.

9    Q    And before sending the letters, you actually posted data

10   on what the Xbox sells for, correct?

11   A    The average selling price, yeah.

12   Q    And you knew what the retail price was of the Xbox

13   console?

14   A    Yeah, the selling price.  Yeah.

15   Q    And, again, you took steps to find out about the

16   analytical work that was done at Motorola to come up with a

17   reasonable royalty for the company's 802.11 essential patents

18   before you sent the letter?

19   A    Yeah, there were people that did that for me, like we

20   spoke about before.

21   Q    Before you sent the letters, an analysis would be done at

22   Motorola to understand how the patents are used by the

23   company you are asking to take a license?

24   A    To the best that we can --  I mean, it is clearly -- We

25   are going to get a better answer from Microsoft themselves

1    when we talk to them.  But there was some analysis done.

2    Q    And someone at Motorola did technical due diligence on how

3    the Motorola patents applied to the Microsoft products before

4    you sent them the demand letter, right?

5    A    To some level, yes.

6    Q    Well, the lawyers and engineers who worked for you did an

7    analysis, correct?

8    A    There is no lawyers that work for me, but there were

9    engineers that worked for me that worked with lawyers, yes.

10   Q    Now, when you sent the letter to Microsoft on 802.11, you

11   understood that the WiFi functionality in the Xbox 360

12   console is provided by a chip purchased from a chip supplier?

13   A    I don't think I knew that at the time, but I do now.

14   Q    Well, you knew it --

15   A    It is not uncommon.  I mean, people use chips.  I'm not

16   sure it provides all the functionality of WiFi.  There are

17   other components that are necessary --

18   Q    Well, you certainly understood a chip provides a certain

19   amount of the functionality?

20   A    Not me personally.  But, sure, a WiFi chip provides some

21   of the functionality.

22   Q    You knew enough about WiFi chips to know that they don't

23   sell for a lot of money, just a few dollars, it is a

24   commodity chip?

25   A    In 2010?  I don't know that I had that study at that time.

1    Q    Well, you knew it by the time you testified at the

2    International Trade Commission, didn't you?

3    A    I know it now.  It is a couple, $3 or something.

4    Q    Now, on the $400 Xbox, the royalty would have been about

5    $9.  That is about three times the cost of the WiFi chip; is

6    that right?

7    A    That's correct, yeah.

8    Q    And if you had applied the 2.25 percent royalty just to

9    the chip itself, the WiFi chip, the royalty would have been

10   just pennies, right?

11   A    It would have been, yeah, much less, absolutely.

12   Q    In 2003 a consulting firm called InteCap --

13             THE COURT:  Counsel, are you moving on to a new area?

14             MR. PRITIKIN:  I am.

15             THE COURT:  We will take our lunch break at this

16   time.  Ladies and gentlemen, you should know that all those

17   things that I have told you over and over and over are still

18   true.  Please don't discuss the case among yourselves.  Wait

19   until you hear all of the evidence.  You heard a number of

20   witnesses this morning, but Motorola has not gotten into its

21   case, so we need to you keep an open mind.  You are not going

22   to do any research and attempt to talk to anyone else or do

23   internet research about the case.  If anyone tries to talk to

24   you about the case, you will tell me about it promptly.

25             Other than that --  I would ask you to come back about --

1    We are going to try and make up some more time.  How about

2    1:20, we will ask you to come out, and we will make up ten

3    more minutes, and then maybe we will squeeze five more in the

4    afternoon, and we will be back on schedule.

5        I'm glad that you seven made an accurate prophet out of

6    me.  It is an interesting experience to commute into Seattle

7    every day.

8        Ladies and gentlemen, please rise for the jury.

9    (Lunch recess.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

 1                    AFTERNOON SESSION

 2          MR. PRITIKIN:  A couple of quick items, and we

 3    thought it would be more efficient now before we bring the

 4    jury back.

 5       One of the depositions that may be played later this

 6    afternoon is the deposition of McNeill Taylor.  And Your

 7    Honor ruled on the objections that had been made.  There was

 8    one hearsay objection we had made, and I think it may not

 9    have been evident from the text that Your Honor got what the

10    basis for the hearsay objection was.  And what I wanted to do

11    is have a second to explain to Your Honor what the nature of

12    the hearsay objection is.

13          THE COURT:  Do you have the pages?

14          MR. PRITIKIN:  I do.  I was going to hand them up,

15    Your Honor.

16       So, Your Honor, if you look at page 40, there was

17    testimony from Mr. Taylor about a conversation after the

18    October 21st letter.  And he says after, I think,

19    November 9th was when there was a breach of contract action

20    filed, that's when Brad Smith called Scott Offer and said,

21    "Don't worry about this, this is just litigation tactics

22    week."  And we had made a hearsay objection to that.  And it

23    may be that when Your Honor looked at that, that it did not

24    appear to be a legitimate hearsay objection because it's an

25    admission by Mr. Smith who's obviously an officer of

1   Microsoft.

2       But the problem is evident if you read further down on

3   page 41, and there wasn't a way to signal this in the

4   objections we made, it's a double hearsay problem.  And that

5   was the nature of the objection.  Because if you look on page

6   41, what you see is that Mr. Taylor said that he did not

7   participate in that conversation.  So there's a layer of

8   hearsay in between.  He says, "Did you personally participate

9   in any of these phone calls or meetings?"  I'm starting at

10  page 40.  He says, "I was in the later timeframe.  But the

11  meetings I had discussed were telephone meetings that I was

12  not on the call.  I might have been in the room, but I wasn't

13  on the call."

14      And so what one has here is two layers of hearsay.  And

15  ours was not directed to the fact that this statement is

16  attributed to Mr. Smith, our problem is that there apparently

17  is further hearsay, somewhere between Taylor and Offer, and

18  maybe a whole chain of people in between.  Who knows?  That

19  was the problem.

20          THE COURT:  Line 7 he says, "I just say I may have

21  participated in those other calls in the sense of being in

22  the room and hearing the phone.  I just don't remember.  I'd

23  have to go back and try to reconstruct.  But the later

24  meetings I can't exactly.  I remember there was a meeting in

25  the airport."  And then the November comment.  So help me

1   with the chronology here.  When he says "other calls" is he

2   referring to what's above?

3           MR. PRITIKIN:  I think he's talking about the other

4   calls, the later ones.  And even when he says he may have

5   been in the room, he certainly doesn't say it was on a

6   speaker phone or that he heard it himself.  That's the basic

7   problem here, we don't know.

8           THE COURT:  In the sense of being in the room and

9   hearing the phone, I interpreted phone to mean phone.  All

10  right.  Mr. Cannon, do you want to respond?

11          MR. CANNON:  Thank you, Your Honor.  So we obviously

12  agree with the ruling.  We thought this was fully vetted

13  through the designation and counter-designation process.  And

14  so we would ask you to keep the ruling that you made the

15  same.

16      And as Your Honor pointed out, as you read through the

17  actual entirety of the exchange -- it's going to be the

18  entirety of the exchange that will be played for the jury --

19  Mr. Taylor is pretty clear, I think, that he was in the room

20  and so he would have heard this phone call that went on

21  between the officer of Microsoft and the officer of Motorola.

22      So we believe the objection was appropriately overruled

23  and we'd ask Your Honor to keep the ruling the same.

24      This section of the transcript I think is helpful to the

25  jury in that it shows some of the interactions that are at

1   issue.  Mr. Taylor is no longer with Motorola, and so that's

2   why this was designated.  And we think the full playing of

3   this page or two will give the jury the appropriate context

4   and your ruling was correct.

5            MR. PRITIKIN:  Your Honor, I think the reference, as

6   I look at this more closely, he says the "later calls."  That

7   is not the call that is attributed to Mr. Smith.  Those are

8   later calls in November.  This call they say was between

9   Offer and Smith, was actually around November 9 and not the

10  later calls in November.  He says categorically up above,

11  "The meetings that I have discussed were telephone meetings

12  that I was not on the call."

13           THE COURT:  Well, I'll tell you, when I ruled on this

14  I understood him to be in the room and considered it an

15  admission against interest.  And it appears, I stress it

16  "appears" that he --

17           MR. CANNON:  Your Honor, I just would like to add

18  that it doesn't appear they objected for any lack of

19  foundation, at the deposition.  And in addition, the way I

20  interpret it, is that there was a speaker phone, there were

21  two primary participants in the call but others were in the

22  room listening.  Because there's teams of people often

23  involved here.  There may be one participant who is doing the

24  talking, but others were in the room such, as the chief IP

25  counsel, who was Mr. Taylor, who heard this conversation.

 1          THE COURT:  I assume Mr. Taylor is not available as a

 2   witness in person.

 3          MR. CANNON:  He is not, Your Honor.

 4          THE COURT:  I'm going to reverse myself.  I can't say

 5   there's a sufficient basis that he was attending that or

 6   heard that particular reference.  I believe it's in this case

 7   anyway, because isn't it in one of your exhibits?  It's

 8   called --

 9          MR. CANNON:  I think this is the reference, Your

10   Honor, so we had understood from this ruling -- this ruling

11   was before the opening in this case -- so we relied upon Your

12   Honor's ruling in this deposition designation since we don't

13   have the live witness.

14          THE COURT:  Okay.  I'm going to reverse myself and

15   sustain the objection on hearsay grounds.

16          MR. PRITIKIN:  Thank you, Your Honor.  The second

17   question came up in Mr. Dailey's testimony this morning.

18   There was a reference he made to the fact that Microsoft was

19   asserting standards-essential patents.  And there is an in

20   limine ruling on this.  I'm assuming that they've advised

21   their witnesses of the in limine rulings.  I didn't say

22   anything because it was just a passing reference.  And I

23   don't think it would help at this point to call additional

24   attention to it.  But I do think that they should be advised

25   that going forward this is not a suitable subject for them to

 1    be intruding on, the subject of in limine rulings.

 2         THE COURT:  I think both sides can take some share of

 3    the blame for that.  That question clearly invited the answer

 4    you got.  So please advise both sides' witnesses to remember

 5    my in limine rulings.

 6       Mr. Price.

 7         MR. PRICE:  The matter we want to take up, Your

 8    Honor, is apparently Microsoft intends to use this

 9    demonstrative during the examination.  My understanding, when

10    you're actually in the evidence phase, you can't use

11    demonstratives to show the jury things that are not in

12    evidence.  You can't have argumentative demonstratives.  Here

13    we have facts which -- you can get the witness to say

14    something, then put it on a demonstrative.  But here they're

15    saying things like Microsoft committed to German relocation

16    on March 12th.  They need a witness to establish that before

17    you put it on a demonstrative.  They need witnesses to

18    establish any fact before they blow it up and show it to the

19    jury.  It's just an inappropriate use of demonstrative during

20    the evidentiary-phase of trial.

21         THE COURT:  Well, my practice has been that it either

22    has to be a fact that both sides agree to, or the

23    alternative, the court is assured that there will be a

24    witness that testifies to it.  And I don't know if that

25    assurance is prepared to be made.  When this chart was

1    originally used I couldn't see it so I have no idea what's on

2    it.

3            MR. PRITIKIN:  We can give such an assurance, Your

4    Honor, we intend to offer witnesses and fully expect we will

5    establish all of the events on the timeline.

6            THE COURT:  Mr. Price, go ahead.

7            MR. PRICE:  For example, it's argumentative in the

8    sense that "Motorola demand letter."  This witness didn't say

9    it was a demand letter.  That there are no "H" patents.  That

10   Marvell requests RAND terms.

11           THE COURT:  I'm sorry, there are no "H" patents?

12           MR. PRICE:  H.264 and 802.11 patents.  That Marvell

13   requested RAND terms.  There is no foundation, no expectation

14   that this witness is going to be able to testify about any of

15   this.  So it's argument, by putting in other witness

16   testimony, expected testimony they're telling us, to then

17   confront with this witness.  And that's an inappropriate

18   examination.

19           THE COURT:  All right.  Mr. Pritikin, do you intend

20   to ask the witness on any of these items?

21           MR. PRITIKIN:  No.  What I intend to use it for, Your

22   Honor, is as you know --

23           THE COURT:  First off, we argue from the podium.  And

24   if you're going to come up you need to ask permission.  So

25   both of you should follow the rules.

1          MR. PRITIKIN:  May I approach?

2          THE COURT:  Go ahead, sir.

3          MR. PRITIKIN:  The dates are very hard to keep in

4    mind, as Your Honor knows from the chronology that you have

5    requested.  And I do intend to ask Mr. Dailey about the

6    sequence of events:  When the letters were sent, when the

7    various lawsuits began, when the injunctions were sought in

8    Germany.  And I think it's going to be a very helpful aid to

9    the jury in putting these things in the time sequence.  It's

10   very hard to keep this straight without doing it.  We have

11   witnesses who are going to be providing the evidence that is

12   necessary to support each of these entries.

13        As far as it's argumentative, I'm not putting these words

14   in Mr. Dailey's mouth.  I'm not going to do that.  I'm

15   assuming he's not going to want to call it a demand letter.

16   I'm not going to ask him to do that.  But the critical events

17   on when these things happened, it's going to be very helpful.

18   Otherwise it's going to be very confusing to the jury.

19          THE COURT:  I'm going to stay with my usual practice.

20   But I direct that this thing be folded up and put on the

21   ground until it's going to be used.  And at that point I'm

22   going to give the jury a cautionary instruction that will

23   follow the cautionary instruction that they get in the

24   finals, that this is not evidence and it's only as good as

25   what it comes in based on.

 1          MR. PRITIKIN:  Thank you.

 2          THE COURT:  Any other matters to take up before we

 3   bring the jury in?

 4          MR. PRITIKIN:  Not from us, Your Honor.

 5          THE COURT:  Mr. Cannon?

 6          MR. CANNON:  Can I get a clarification on the ruling?

 7   Because the objection that was lodged by Microsoft in the

 8   designation reached about three or four pages.

 9          THE COURT:  I took out that one line.

10          MR. CANNON:  That one little section?

11          THE COURT:  Yes.

12          MR. CANNON:  Okay.  Thank you, Your Honor.

13          THE COURT:  All right.  Let's bring the jury in.

14      (The following occurred in the presence of the jury.)

15          THE COURT:  You may continue with your examination.

16   Q   (By Mr. Pritikin) Good afternoon, Mr. Dailey.

17   A   Good afternoon.

18   Q   Now, when we broke for lunch, I think we were about to

19   turn to the InteCap study.  And I think you said you weren't

20   aware of that InteCap study that was done when you sent those

21   letters in 2010; is that right?

22   A   That's correct.

23   Q   But you're aware of it now, right?

24   A   I am, yes.

25   Q   You've heard a fair amount about it.  You know what

1    InteCap is, it's an outside consulting firm that values an

2    intellectual property?

3    A    I don't know that but I'll take your word for it.

4    Q    And you understand that InteCap recommended to Motorola in

5    2003 that the appropriate royalty for products like computers

6    and an Xbox game console would be one-tenth of one-percent?

7    A    I have never studied the InteCap report or whatever it is

8    that you refer to.

9    Q    You're aware of that, though, weren't you, that the

10   recommendation in the InteCap study is .1 percent.  You've

11   heard that?

12   A    I haven't, actually.

13   Q    Now, you recall in July of 2012 your deposition was taken

14   in this case.  Do you recall that?

15   A    Yes.

16   Q    And the transcript is in the binder.  And do you recall at

17   your deposition you were shown the InteCap study, and it was

18   marked as a deposition exhibit and you were asked about it?

19   A    I recall it's been put in front of me before, yes.

20   Q    Let's confirm that.  Could you turn, please, to page 66 of

21   the deposition transcript?

22   A    (Witness complies.)

23   Q    And you see that you were asked about the InteCap study at

24   that time?

25            THE COURT:  I'm sorry, page 66 of the deposition?

1    A    Is it the 1823 deposition?

2    Q    Yes, it's the 1823 deposition.

3              THE COURT:  Page 66?

4              MR. PRITIKIN:  Yes.

5              THE COURT:  What line?  There it is, 23.

6    Q    And you see that at that time on July 12th of 2012 it was

7    called to your attention that the InteCap study had

8    recommended a royalty of .1 percent?

9    A    Yes.  Yeah, I see that.

10   Q    At least as of July of 2012 you were aware of the fact

11   that the InteCap study had been done for Motorola and it

12   recommended a royalty of .1 percent, right?

13   A    Yes.

14   Q    After July of 2012, did you call Mr. Gutierrez at

15   Microsoft and tell him that it was all a big mistake and that

16   the 2.25 percent royalty you asked for for 802.11 should have

17   been just .1 percent?

18   A    No.  I have never looked into the InteCap study and

19   patents they reviewed or what market they studied.  Other

20   than you bringing it to my attention, that's the limitation

21   of my knowledge, sir.  So, no, I didn't tell that to

22   Mr. Gutierrez.

23   Q    Let's talk about your knowledge of the rates that are

24   charged by patent pools.  Now, a patent pool is an

25   organization that licenses patents of a number of companies

1    that are essential to the standard.  Would you agree with

2    that?

3    A    Yes.

4    Q    And there's a pool for 802.11 where a number of companies

5    have agreed to license their patents as a package, as it

6    were?

7    A    I'm not aware of one that's active right now.  But I know

8    there's at least two initiatives to get one started.

9    Q    You're aware there's a Via pool that has members and has

10   802.11 patents, aren't you?

11   A    I do recall the Via pool, yes.

12   Q    And in the H.264 area, you're aware of the MPEG LA pool

13   that licenses H.264 patents?

14   A    Yes.

15   Q    That's quite a large pool, over 2,000 patents, right?

16   A    There's a lot of patents.  I'm not sure how many.

17   Q    A couple dozen companies?

18   A    Yeah.  There's a lot of companies.

19   Q    Motorola is not a member of that pool?

20   A    That's correct.

21   Q    And so to the extent Motorola is using the H.264 patents

22   of the companies in that pool, you're not paying royalties to

23   the pool for those, are you?

24   A    We are not, no.

25   Q    Now --

1    A    We typically negotiate bilateral licenses to get coverage

2    we need.

3    Q    Now, at the time you formulated the letters that were sent

4    to Microsoft in October of 2010, did you go back and check to

5    see what the pool rates were to see whether this 2.25 percent

6    was just out of line or how it compared to the pool rates?

7    A    So, we were aware of the H.264 pool and the rates.  We

8    didn't think they were relevant because pools are different

9    sorts of arrangements than bilateral arrangements.  So we

10   were aware of those, yes.

11   Q    In fact, the H.264 pool is an indicator of what a RAND

12   rate is for your patents here; is it not, sir?

13   A    I think it could be a factor, yes.

14   Q    Let's go back to the letter and let's see -- let's put up

15   Exhibit 1, please.  Let's pull out the last paragraph.

16        Now, this is a letter in which you had said you want

17   the 2.25 percent, you wanted it on the end product, you

18   wanted it on the Xbox, and then the last two sentences you

19   close the letter by saying, "Motorola will leave this offer

20   open for 20 days.  Please confirm whether Microsoft accepts

21   the offer."  Now, that's language you drafted?

22   A    I didn't draft it, but I reviewed and signed it, sure.

23   Q    By the terms of the letter, on day 21 the offer was

24   withdrawn, correct?

25   A    It could be open or it could be withdrawn.  It's not

1  withdrawn.  It just says it will remain open for 20 days.

2  Q   Let's look back at the testimony you gave at the ITC, sir.

3  Would you turn to page 2500.

4  A   Which number is that?  Oh, I have it.

5  Q   Page 2500.  And I'd direct your attention to page 23 to

6  25.

7         MR. PRITIKIN:  May I read those, Your Honor?

8         MR. PRICE:  No objection.

9         THE COURT:  You may.

10  Q   "Question:  By the terms of this letter, on day 21 the

11  offer was withdrawn?

12       "Answer:  That's correct."

13       Were you asked that question and did you give that

14  answer?

15  A   I did, yes.

16  Q   Now, your letter asked Microsoft to accept the terms of

17  the letter, right?

18  A   Yes.

19  Q   Now, you didn't really expect Microsoft to respond to an

20  offer of this sort in 20 days, did you?

21  A   Yes, I did.  That's why the 20 days is in there.

22  Q   You thought they might accept this in 20 days?

23  A   The question was whether they would respond.  I expected

24  them to respond.

25  Q   The question was whether they would accept.

1    MR. PRICE:  Objection, Your Honor, that was not the

2  question.

3    THE COURT:  That was not the question.

4  Q   My fault.  Let me ask that question, then, sir.  You

5  didn't think that Microsoft would accept this offer in

6  20 days, did you, as stated?

7  A   No.  I expected them to respond.

8  Q   And at the time you sent the letter, you were not aware of

9  another letter where an opening offer was explicitly stated

10  to be left open for 20 days with a statement, "Please confirm

11  whether you accept."

12  A   At the time I sent the letter, that's correct.  But since

13  then I --

14  Q   My question is at the time, sir.

15    THE COURT:  You don't want to volunteer.

16  Q   I'm asking what was in your head when you sent the letter.

17  You were not aware of another letter like that, were you?

18  A   Right.  It's common practice to put a time --

19  Q   That's not my question.

20    THE COURT:  Let him finish.

21  A   It's common practice to put a deadline in so you elicit a

22  response from the other side.  I don't know of one that said

23  20 days.  I think that was the question you asked me before.

24  Q   Not my question, sir.  Please listen to it.

25    The question is, you were not aware of another letter

1  that said you would leave an offer open for 20 days and ask

2  somebody to accept it, were you?

3  A    That's correct.

4  Q    Now --

5           MR. PRITIKIN:  Your Honor, I have a timeline I'd like

6  to put up that I think would be helpful.  With permission of

7  the court.

8           THE COURT:  In a moment.  Ladies and gentlemen, this

9  is a demonstrative exhibit -- in a moment, sir.

10  Demonstrative exhibits are exactly that.  They're

11  demonstrative.  They're intended to help you understand the

12  evidence.  In and of themselves, they are not an exhibit.

13  Exhibits go back into the jury room with you at the

14  conclusion of the case and you have access to them.  These

15  don't because they're not exhibits.  And, very importantly,

16  they're no more correct than the material that's going to

17  come in or has come into the trial.  So if they misstate a

18  fact, then you're going to have to remember what that

19  demonstrative said and know that it was not supported by

20  ultimately what happened.

21      They are, however -- particularly chronologies -- many

22  times are very helpful to help you follow along with the

23  witness's testimony.  So for that reason I'm going to allow

24  Microsoft to use this demonstrative.  And I caution you that

25  it is no more accurate than the underlying testimony that

1   needs to come in to justify each of the entries on that.

2       You may now put it up, sir.  Ms. Sullivan, if you need to

3   move.

4           MS. SULLIVAN:  Thank you, Your Honor.

5           THE COURT:  We may have a glare problem, I'm told.

6   Madame clerk, can you adjust the lighting on that side?  Any

7   better?

8           A JUROR:  It was closer last time.

9           THE COURT:  We need to make a little space behind the

10  Microsoft table.  Let us know when you can see it well.  All

11  right.  Everyone can see it now?

12      Mr. Price, I'm not sure where you ended up.  If you need

13  to stand up, sir, feel free.

14          MR. PRICE:  Thank you.

15          MR. PRITIKIN:  Your Honor, may I come up to the

16  timeline for a few questions?

17          THE COURT:  Yes.

18          MR. PRITIKIN:  I'll come back when I -- all right.

19  Q   Now, Mr. Dailey, I want to just get oriented because there

20  are a lot of events here that occurred over quite a sustained

21  period of time.  But as far as the letter, the first letter

22  you sent was on October 21, 2010.  Do you recall that?

23  A   That's correct.

24  Q   Okay.  And that meant that the 20 days would run on

25  November the 10th of 2010, correct?

1    A    I believe that's correct, yes.

2    Q    Now --

3         MR. PRITIKIN:  I'll go back to the lectern and come

4    back when I need to point to this.

5    Q    Now, you sent the demand letters because Microsoft had

6    filed the ITC complaint; is that right?

7    A    I sent the initial offer letters that we discussed because

8    Microsoft invited me to put my patents on the table after a

9    phone call with Mr. Gutierrez.

10   Q    I understand.  But the precipitating event was the fact

11   that Microsoft had filed an ITC complaint on October 1?

12   A    They had filed an ITC complaint, yes.

13        MR. PRICE:  I object.  That's ambiguous whether it

14   caused him to do it.

15        THE COURT:  I'll overrule.  The witness answered.

16   Q    Now, I want to see if we can put the letters that you sent

17   in some context.  You were present when Mr. Price made his

18   opening statement and talked about the need for context; do

19   you recall that?

20   A    Yes.

21   Q    Now, you did not think, did you, that the fact that

22   Microsoft had filed its lawsuit in the ITC eliminated your

23   obligation to provide a license on RAND terms for your

24   essential patents, did you?

25   A    I didn't have that thought process.  It wasn't part of the

1    process.  I was asked by Mr. Gutierrez to put my patents on

2    the table.  So we attempted to identify patents to send to

3    Microsoft that were of value to them so we could have a

4    negotiation.

5    Q   Mr. Dailey, would you look again at your ITC testimony?

6    And I would direct your attention to page 2558.  Page 2558.

7            MR. PRITIKIN:  And I would like to read, Your Honor,

8    lines 13 through 20.

9            MR. PRICE:  Just a second.  It's taking me more time

10   than usual because I'm standing up.

11       No objection.

12           THE COURT:  They can be read.

13   Q   "Question:  So it's fair to say that you didn't think that

14   the fact that Microsoft had filed the ITC complaint, that

15   that eliminated your obligation to provide a license on

16   reasonable and non-discriminatory terms for your 802.11

17   essential patents, did you?

18           "Answer:  No.  I don't -- I don't -- that's correct."

19           Were you asked that question and did you give that

20   response?

21   A   I did, yes.

22   Q   The fact that Microsoft had sued Motorola did not change

23   your contractual obligations to the standards-setting

24   organizations, did it sir?

25   A   Again, I didn't know I had contractual obligations.  It

1   didn't change my behavior, offering what I believed to be a

2   FRAND offer to Microsoft on our 802.11 and H.264 patents.

3   Q   Are you saying here today you didn't know whether you had

4   contractual obligations to the standards-setting

5   organizations?  Did I hear you say that?

6   A   We already discussed this earlier.

7   Q   Now, at the time that you sent the letters to Microsoft --

8          MR. PRITIKIN:  Your Honor, may I come forward again?

9          THE COURT:  Yes.

10  Q   The --

11         THE WITNESS:  Can I just clarify one thing?

12         THE COURT:  He's moved on.

13  Q   Now, the first lawsuit that was filed by Motorola was

14  filed on the 21st day after the October 21st letter, was it

15  not?

16  A   It was filed on November 9th, I think, or 10th.

17  Q   The 10th.

18         Now, at the time you sent the two letters to Microsoft,

19  the letters on October 21st and October 29th, you've

20  testified, I believe, that your litigation team was already

21  preparing the lawsuit, a countersuit?

22  A   Yeah.  So normal practice -- we were sued by Microsoft, so

23  we were preparing to defend ourselves, yes.

24  Q   The point is, you were preparing those lawsuits even as

25  you were sending the letters; is that not true?

1    A    I wasn't preparing the lawsuits.  That's Neill Taylor and

2    the litigation team.  I'm not sure when they started or what

3    they were doing.

4    Q    Let's look back at your testimony from the trial last

5    fall.  And would you turn please, in the trial testimony, to

6    page 75?

7    A    The 1823 case?

8    Q    Yes, sir.  Would you look, please, at the ITC testimony,

9    page 2498?

10          MR. PRITIKIN:  I'd like to read from page 2498, Your

11   Honor, at lines 6 through 10.

12          MR. PRICE:  Your Honor, I object.  The full answer

13   goes through 19.

14          THE COURT:  Well, read through 19.

15   Q    "Question:  The lawsuits were filed in November?

16          "Answer:  I believe so, yeah.

17          "Question:  So you were preparing those lawsuits in

18   October, weren't you?

19          "Answer:  Yes.

20          "Question:  In fact --

21          "Answer:  Yes.

22          "Question:  You began work preparing those lawsuits as

23   soon as you got the -- you learned of the ITC complaint,

24   didn't you?

25          "Answer:  We -- after we -- I know it was certainly

1   after we met with Microsoft, we did start preparing

2   complaints and looking at our patent portfolio, sure."

3          Were you asked those questions and did you give those

4   responses?

5   A   I did.  The meeting with Microsoft was October 22nd, I

6   believe, that's referring to in that answer.  But yes, I did

7   give that answer.

8   Q   Now, your practice was that you would not have filed a

9   lawsuit on standards-essential patents without first making

10  an offer, would you?

11  A   Yeah, our practice is to negotiate and not litigate unless

12  we find no good result in the negotiation.

13  Q   Let's look at your testimony from the trial last fall.

14  Would you turn to page 76.

15         MR. PRITIKIN:  I'd like to read lines 8 through 11,

16  Your Honor.

17         THE COURT:  9 through 11?

18         MR. PRITIKIN:  Yes, sir.

19         MR. PRICE:  I object.  I think 3 through 11 is the

20  complete.

21         MR. PRITIKIN:  I'll read it all.

22         THE COURT:  Okay.

23  Q   "Question:  And you understood at that time as to

24  standards-essential patents you could not file a lawsuit on

25  those patents without at least first making a license offer

1    to Microsoft, right?

2         "Answer:  I don't know whether I could or couldn't, but

3    it was certainly my practice to negotiate.

4         "Question.  You wouldn't have filed a lawsuit on

5    standards-essential patents without first making an offer,

6    would you?

7         "Answer:  That would be -- that is my practice.  That's

8    correct."

9         Were you asked those questions and did you give those

10   responses, sir?

11   A    I sure did, yes.

12   Q    Now, in truth, when you prepared these letters and sent

13   them to Microsoft, these were a prelude to allow Motorola to

14   be able to say, "We've made an offer.  They didn't accept it.

15   Now we can sue."  Isn't that what was going on, sir?

16   A    No.  This was my attempt to negotiate with Microsoft.

17   They requested to put my patents on the table so we could

18   negotiate and come to a reasonable settlement.  And that was

19   what I was attempting to do in October of 2010.

20   Q    Now during his opening, Mr. Price said that -- he pointed

21   to some other language.  Let's put the letter back up.  Let's

22   put up Exhibit 1.  And I believe Mr. Price pointed to some

23   language in here.  Let's look at the second-to-the-last

24   paragraph.  Let's pull that one up.  I think he pointed to

25   some language that says that Microsoft is only interested in

1   licensing some portion of the portfolio.  Motorola is willing

2   to enter into such a license also on RAND terms.  And you

3   included language similar to that in both letters, didn't

4   you?

5   A   Yes.

6   Q   But point of fact when, you have standards-essential

7   patents, isn't it true that people don't license standards on

8   a patent-by-patent basis, it's on a portfolio-basis that they

9   take them?

10  A   I think that's a normal practice.  But understanding

11  Microsoft's use, I mean, the standards are very complex, as

12  we talked about.  You may use all or a portion of those

13  standards.  So that's why that was in there, to offer if they

14  only wanted a license to a portion.

15  Q   You knew the normal practice was to license on a

16  portfolio-basis, right?

17  A   That's been my experience, yes.

18  Q   All right.  Now, let's talk about the lawsuits that were

19  filed by Motorola.

20       MR. PRITIKIN:  Your Honor, may I come up to the

21  timeline, again?

22       THE COURT:  Yes.

23  Q   Now, you're aware that Microsoft filed the lawsuit in this

24  court on day 20.  The letter came in on October 21st, then on

25  November 9th Microsoft filed this lawsuit.  And it was after

1    that that Motorola started filing its lawsuits; is that

2    correct?

3    A    I believe that's correct, yes.

4    Q    And the lawsuits that you filed -- well, you sued on

5    November 10th.  You sued in the district court a lawsuit

6    involving Windows and Xbox and 802.11 and H.264, right?

7              MR. PRICE:  I object, Your Honor, to the phrase

8    "you."

9    Q    Motorola.

10   A    Yeah.  There were lawsuits filed on November 10th, that's

11   correct.  It was more than what you're pointing out, though,

12   I believe.  But I'm not an expert on the litigation.

13   Q    Then the ITC was filed in November of 2010, and that

14   involved Xbox and both standards 802.11 and H.264?

15   A    I know it had an additional non-essential patent as well.

16   But that's correct.

17   Q    And then in July of 2011 Motorola filed the lawsuit in

18   Germany to enjoin Windows and Xbox.  And that involved H.264?

19   A    So, are you asking me --

20   Q    If you're aware the suit was filed in Germany.

21   A    I know there was a German lawsuit.  I didn't know when it

22   was filed.

23   Q    Now, Microsoft had filed this case, though, back on

24   November 9th of 2010.  And in this lawsuit Microsoft did ask

25   the court to determine what a RAND royalty was, correct?

```
 1            MR. PRICE:  Object to lack of foundation --
 2    A   Again, I'm not sure.
 3            THE COURT:  Hold on, I have to rule on the objection.
 4    I'm going to sustain the objection and ask you to lay a
 5    foundation with this witness.
 6    Q   Mr. Dailey, you've testified before, have you not, that
 7    Microsoft, in filing this lawsuit was saying that it wanted
 8    the court to order a license be granted on reasonable and
 9    non-discriminatory terms?
10    A   I don't recall saying that, but --
11    Q   Let's a take a look at your --
12            THE COURT:  I don't think he's finished.
13    A   No, I don't recall saying that, but I may have said it, I
14    don't know.
15    Q   Let's take a look at your ITC testimony.  Let's turn,
16    please, to page 2509.
17            MR. PRICE:  Counsel, what's the date of that?
18            MR. PRITIKIN:  The first one.
19            MR. PRICE:  January 20, 2012?
20            MR. PRITIKIN:  Yes.
21    A   What was the page?
22    Q   Page 2509 to 2510, lines 22 through 2.
23            MR. PRICE:  Your Honor, the full context begins at
24    2508, line 10.
25            THE COURT:  Mr. Pritikin, what lines do you want the
```

1   witness to acknowledge?

2           MR. PRITIKIN:  2509, lines 22, to 2510 line 2.

3           MR. PRICE:  The foundation of that, Your Honor, comes

4   from page 2508, line 10 on.

5           THE COURT:  I'll allow 2509 starting on line 4

6   through 2510.  I think we don't need to interject Judge Shaw

7   into all of this.

8           MR. PRICE:  I didn't mean to include that.

9   Q   "Question:  During this period of time in November of 2010

10  you understood, didn't you, that Microsoft wanted a license

11  to the standards-essential patents on reasonable and

12  non-discriminatory terms?

13          "Answer:  So that's not my, my understanding.  I did

14  not read this document.  But my understanding was that they

15  had rejected our offer, was my broad understanding.

16          "Question:  And what's your understanding based on that

17  Microsoft rejected the offer?  Did you get a letter saying,

18  'I reject the offer'?

19          "Answer.  I spoke to the litigation attorneys in our

20  department.

21          "Question.  Did you ever see a letter from Microsoft

22  saying, 'I reject the offer'?

23          "Answer: No.

24          "Question:  Okay.  And in point of fact as you look at

25  the prayer for relief, Microsoft" --

```
 1            MR. PRICE:  I'll object.  This is irrelevant.  He's

 2   asking him to read a document in the deposition.

 3            THE COURT:  Let's stop on line 12.

 4            MR. PRITIKIN:  Of the next page, Your Honor?

 5            THE COURT:  No, this page.

 6            MR. PRITIKIN:  I'm already beyond that.  That's fine.

 7            MR. PRICE:  Officially I move to strike lines 12

 8   through whenever he stopped.

 9            THE COURT:  They're stricken.  Ladies and gentlemen,

10   disregard them.

11            MR. PRITIKIN:  May I approach the timeline, Your

12   Honor?

13            THE COURT:  Yes.

14   Q   Now, you understand that in the International Trade

15   Commission that the remedy that's available is an exclusion

16   order or a cease-and-desist order?

17   A   Yes.

18   Q   The ITC doesn't give monetary damages, does it?

19   A   That's correct.

20   Q   So what you wanted in the ITC was an order that would

21   block the importation of Xbox consoles if you were

22   successful, right?

23   A   I think that's the remedy, yes, that's correct.

24   Q   And, of course, you sought an injunction in Germany as

25   well, right?
```

1    A    I don't know, but I believe that's correct, yes.

2    Q    Now, you understand that when you file a patent

3    infringement case you can get damages in the case without

4    asking for an injunction, can't you?

5    A    I don't know.  You know, every case I've ever been a part

6    of on the receiving end, it always requests either an

7    exclusion order or an injunction.

8    Q    But a court can award damages, can it not?  You know that

9    from your legal training?

10   A    Sure.

11   Q    And the damages could include a RAND royalty, right?

12   A    Yes.  The court makes the determination.  But I think

13   everyone asks for an injunction, it's normal practice.

14   Q    But you don't need to ask for the injunction to get

15   damages, do you?  You know that as a lawyer?

16   A    I think you're probably correct, yeah.

17   Q    Let's put up Exhibit 6087.

18              MR. PRITIKIN:  Your Honor, what I would like to show

19   -- we won't display it, but let's put up 6087, page 9.

20              THE COURT:  Ladies and gentlemen, are you able to see

21   this?

22              A JUROR:  We were and now it's gone.

23              MR. PRICE:  I don't see that in the binder.

24              THE WITNESS:  I can't see it, if I'm supposed to.

25              THE COURT:  Either can I.

1  Q   Mr. Dailey, this is a copy of a pleading that was filed by

2  Microsoft in this court in this case on September 30, 2011.

3  Do you recognize it as a pleading?

4  A   If you tell me it is, I'll believe you.  I don't know

5  where it says pleading, but that's fine.

6  Q   I'd like to direct your attention to page 9, the first

7  sentence on page 9.

8  A   This says it's filed under seal, so does that mean -- I

9  don't think I have access to this normally.

10         THE COURT:  You do now.

11  Q   Would you look at the first sentence on page 9, sir?

12         MR. PRICE:  Your Honor, I object to foundation if the

13  witness has never seen the document.

14         THE COURT:  I don't know what the question is yet, so

15  we'll find out if he needs to know anything about it.

16  Q   Mr. Dailey, in the first sentence the statement is made in

17  the pleading --

18         MR. PRICE:  Objection to --

19         THE COURT:  Counsel, where are you going with this?

20  I mean, this is your pleading.  You're not going to have him

21  read your pleading.

22         MR. PRITIKIN:  Should I explain it at side bar, Your

23  Honor?

24         (Court and counsel met at side bar as follows:)

25         MR. PRITIKIN:  It's this sentence, Your Honor, where

 1    it says, "Microsoft is seeking and remains ready and willing

 2    to take a license to Motorola's H.264 and 802.11 declared

 3    essential patents on RAND terms."  It's a very important

 4    statement.  It's a statement by Microsoft that it was willing

 5    to do it.  He's made the statements that he didn't think we

 6    were ever willing to do it, and it dates it as of September

 7    of 2011.

 8           THE COURT:  Then you should ask him if he is aware

 9    that Microsoft made the statement.

10           MR. PRITIKIN:  That's fine.

11           MR. PRICE:  Your Honor, actually I would object that

12    it assumes facts not in evidence.  This is the wrong witness

13    to do this with.

14           THE COURT:  He has said -- earlier in his testimony

15    he commented on the not to take it on RAND terms.

16           MR. PRICE:  He didn't say forever.

17                (The side bar concluded.)

18    Q   Mr. Dailey, were you aware that on September 30th of 2011

19    Microsoft had said to this court that it was ready and

20    willing to take a license to Motorola's H.264 and 802.11

21    essential patents on RAND terms?

22    A   I don't know that specific date.  I know at some point in

23    time Microsoft said they were willing to take a RAND license.

24    I'm not sure what the date was.

25    Q   So as the person who was the head of licensing, certainly

1    you were aware that Microsoft had made a statement that it

2    was ready, willing and able to take a license on the terms

3    determined by this court?

4    A   Yeah.  But it was sometime in 2012, not in 2010.

5         MR. PRITIKIN:  Well, Your Honor, may I --

6         THE COURT:  Yes, you can ask if this witness has seen

7    this document.  And if he says no --

8    Q   I'm holding a pleading that was filed by Microsoft.  I

9    take it you have never seen this document, that's what you're

10   saying?

11   A   I have never, no.  I was not under the protective order,

12   so I had no access to any litigation documents.

13   Q   But no one told you, as the head of licensing, that back

14   in September of 2011 Microsoft had said it was ready, willing

15   and able to take a license on terms set by this court?

16        MR. PRICE:  I'm going to object.  That may go into

17   privileged areas.

18        THE COURT:  I'm going to permit that yes or no

19   answer.

20   A   I was aware that Microsoft was willing to take a license

21   at some point in time.  I don't recall the date.

22   Q   Now, you did understand that the commitment that had been

23   made applied worldwide, right, the RAND commitment?

24   A   Yes.  That's the way we practiced.  Whether it was a

25   requirement or not, that's how we licensed.

1  Q    That included Germany.  It wasn't just the United States.

2  You had to license on reasonable or non-discriminatory terms

3  for anywhere in the world, right?

4  A    To willing licensees, yes.

5  Q    Were you aware that this court said that it was going to

6  hold Microsoft to that commitment?  Microsoft had said it

7  would take a license on RAND terms, and this court said it

8  would hold us to that.  Were you aware of that?

9  A    I don't know the details of the litigation.

10  Q    Now, let's talk about what happened --

11        MR. PRITIKIN:  May I come back up to the timeline,

12  Your Honor?

13        THE COURT:  Yes.

14  Q    After September of 2011, the pleading I was asking you

15  about, so subsequent to that the trial in the ITC -- you went

16  ahead, didn't you, there was a trial in ITC in January of

17  2012?

18  A    Yeah, sorry.  Yes.

19  Q    And by April of 2012 Motorola was on the verge of getting

20  an injunction in Germany, right?

21  A    Again, I'm not exactly sure.

22  Q    Now it's true, is it not, sir, that your goal or your

23  strategy here was to beat the clock to try to get an order

24  from the ITC, or from Germany, before this court was able to

25  set the RAND royalty that Microsoft said it would take?

1    That's what you were trying to do, isn't it?

2    A   My goal was to negotiate a reasonable cross-license with

3    Microsoft.  I wasn't in charge of litigation strategy.  And

4    I'm not sure what you're trying to imply with my behavior,

5    but --

6    Q   Well, in point of fact, you were aware of the fact that an

7    injunction was being sought in Germany, weren't you?

8    A   I was aware there was German litigation and there was

9    something -- yeah, there was an injunction or an Orange Book

10   license being discussed.

11   Q   It also came to your attention that at some point this

12   court enjoined Motorola from enforcing any injunction it got

13   in Germany.  That came to your attention, didn't it, sir?

14   A   Yes.

15   Q   Now, if this court hadn't stepped in and you had gotten

16   that injunction in Germany, you really would have had

17   Microsoft over a barrel, wouldn't you, at that point?

18   A   Um, I don't know.  I was hopeful that we could get a

19   settlement with Microsoft through negotiation.  That's what

20   we were trying to do.

21   Q   What you wanted were concessions you weren't entitled to

22   by using your standards-essential patents; isn't that true,

23   sir?

24   A   That's not what I said, no.

25   Q   Let's turn to the subject of Marvell.  Now, you did learn

1  at some point that part of the WiFi capability in the Xbox is

2  provided by a chipset that Microsoft purchases from Marvell?

3  A   Yes.

4  Q   And you recall that in 2011 Marvell asked for a license to

5  Motorola's 802.11 essential patents?

6  A   I know they asked for a license.  I don't know the date.

7  But they did ask for a license, yes.

8  Q   You knew that the whole reason Marvell was asking for the

9  license was to cover the chips it sold to Microsoft for the

10  Xbox, right?

11        MR. PRICE:  Object to foundation.

12        THE COURT:  Overruled.

13  A   I wasn't directly involved in communications with Marvell,

14  so I don't really know the reason why.  But that makes sense.

15  Q   At some point an offer was made to Marvell, right?

16  A   Yeah.

17  Q   By Motorola?

18  A   By Motorola, yeah.

19  Q   And you were involved in the decision-making to approve

20  the offer that was made to Marvell, right?

21  A   Yeah.  I knew the offer was being made to Marvell.

22  Q   You were involved in the decision-making to approve the

23  offer, weren't you, sir?

24  A   Yes.

25  Q   So let's go back.  You understood the whole reason Marvell

1    was asking for this was to cover the chips it was selling to

2    Microsoft, didn't you?

3    A   Again, I don't recall that fact.  But that could have been

4    the case.

5    Q   And you also understood that you can't double dip.  You

6    testified before that you can't hit up the chip supplier and

7    the end-user, right?

8    A   Right.  We only license our patents to one person, that's

9    correct.

10   Q   And you understood you had an obligation to license

11   anyone, whether it was Marvell or Microsoft?

12   A   Sure.  That's correct.

13   Q   Now, you were here yesterday in the opening statements

14   where Mr. Price talked a little about Motorola's licensing

15   offer to Marvell.  Do you remember that?

16   A   I was here, yes.

17   Q   And do you recall Mr. Price saying that Motorola had sent

18   the standard letter, 2.25 percent on the end product, to

19   Marvell.  Do you remember that?

20   A   Yes.

21   Q   Now, the letter that Motorola sent to Marvell wasn't a

22   standard letter at all, was it?

23   A   You're talking about the offer?

24   Q   Yes.

25   A   It was a draft agreement, I believe.

1    Q   It was a draft agreement that was prepared and sent.  Why

2    don't we take a look at it.  That's Exhibit 16.

3        Do you recognize Exhibit 16 as a copy of an e-mail and

4    an attached agreement sent by Mr. Kowalski from Motorola to

5    Jennifer Ochs at Marvell on November 25, 2011.

6    A   That's what it appears to be, yes.

7    Q   Now, there was something very unusual about this letter

8    and offer that Mr. Price didn't mention yesterday, wasn't it?

9    And that's the fact that this agreement carved out Microsoft.

10       MR. PRICE:  I'm going to object.  The question is

11   argumentative and compound.

12       THE COURT:  Overruled.

13   A   I'm sorry, could you repeat the question?

14   Q   Yes.  The draft agreement you sent to Marvell carved out

15   Microsoft.  So it excluded any chips Marvell would sell to

16   Microsoft.  It covered chips they would sell to other

17   companies, but it carved out Apple and it carved out

18   Microsoft; isn't that right?

19   A   It may have.  I don't know where that section is.

20   Q   Could you turn to the last page.  You call them

21   repudiating parties.  You see Microsoft Corporation is the

22   first company you listed there?

23   A   Yeah.  There were three companies that we were currently

24   in litigation with that we put in what's called defensive

25   suspension, so that we can negotiate directly with those

1   parties.  That's why that term was in there.

2   Q   But you knew the whole purpose of Marvell coming to

3   Motorola and asking for a license was to cover the chips it

4   sent to Microsoft.  And then you sent back a license

5   agreement that excluded Microsoft.  That's what happened,

6   isn't it, sir?

7          MR. PRICE:  I object.  That's compound.

8          THE COURT:  I'll overrule the objection.

9   A   I think you already asked me the question and I answered.

10  I wasn't aware that they were doing this on behalf or only

11  for the sole purpose of Microsoft.

12  Q   Well, the people at Motorola knew that this was being done

13  because Marvell had been asked to do it on behalf of

14  Microsoft.  Mr. Kowalski knew that, didn't he?

15         MR. PRICE:  Objection, lack of foundation.

16         THE COURT:  I'll sustain that objection.  You need to

17  lay a foundation.

18  Q   You said you were the one who approved this offer.  You

19  didn't know that Marvell was asking for this on behalf of

20  Microsoft?

21  A   I knew Marvell asked for a license and we sent a draft to

22  Marvell.

23  Q   Now, you knew that Marvell, which was in the business of

24  selling $3 or $4 chips, was hardly in a position to pay a

25  2.25 percent royalty on the end-product price of products

1   that had its chip in it, didn't you?

2   A    I didn't study Marvell's financial situation before this

3   letter was sent out, I don't think.

4   Q    You don't have to study very hard to know that the

5   commodity chips sell for a few dollars.  You said you knew

6   that.

7   A    Yeah.  I thought it was $3, but that's fine.

8   Q    And if you're asking for a 2.25 percent royalty to be paid

9   by Marvell on the price of products that its customers sell,

10  that's not a very good business model for Marvell, is it?

11  A    I don't know about Marvell's business model, but it's our

12  standard opening offer, which is based upon the finished

13  equipment, the royalty is based upon that, that's our

14  standard.

15  Q    But you don't have any license agreements where people are

16  paying you on the end-product price of their downstream

17  customer.  You told us that earlier.

18  A    Right.  Because we negotiate different arrangements that

19  cover that issue.

20          MR. PRITIKIN:  No further questions, Your Honor.

21          THE COURT:  Mr. Price.

22          MR. PRITIKIN:  I neglected to move the admission of

23  Exhibit 6087 -- no, the agreement, 16.

24          MR. PRICE:  If that's the right number, I have no

25  objection.

 1          THE COURT:  All right.  16 is admitted.

 2          (Exhibit No. 16 was admitted into evidence.)

 3          THE COURT:  Mr. Price, let me say one thing before

 4   you start.

 5      Ladies and gentlemen, normally in a lawsuit a party calls

 6   a witness.  And we talked about adverse and non-adverse

 7   witnesses.  And then the other side cross examines.  In an

 8   effort to use your time more wisely, I have asked the

 9   parties, and they've agreed, that we're only going to call a

10   witness once.  So part of the testimony that Mr. Price is now

11   going to elicit would be his cross examination of Mr. Dailey

12   based on things that Mr. Pritikin had asked; but also will be

13   questions that he would ask him were he calling him in his

14   own case in chief.

15      I've assured them you're all smart enough to figure this

16   all out because it really won't make much of a difference.

17   And it means your time is going to be spent more wisely.  And

18   I appreciate counsel cooperating in this.  It is clear some

19   of our witnesses are coming from out of town and it's a way

20   to get them on and off and use everyone's time wisely.

21                        CROSS EXAMINATION

22   BY MR. PRICE:

23   Q   Very quickly, we were talking about Exhibit 16, I believe,

24   which includes a draft agreement that was sent to Marvell.

25   And you were asked questions, you recall, as to whether or

1    not you knew that the sole purpose that Marvell did this was

2    because of Microsoft.  Do you recall those questions?

3    A    That's correct.

4    Q    Now, with respect to what you call defensive -- what's the

5    name of it again?

6    A    Defensive termination or defensive suspension.

7    Q    You had in a draft a defensive suspension paragraph.  I

8    can't find it here.  If you can point it out to me.  In fact,

9    why don't you do that.  I see the names here, but --

10   A    So it's in section 3.4, I believe.

11   Q    And does section 3.4 then refer to Annex C?

12   A    No.  Repudiation is 3.5.

13   Q    In fact, maybe we can put that up so the jury knows what

14   we're talking about.  This is paragraph 3.5 of Exhibit 16.

15   This is the defensive suspension provision you're talking

16   about?

17   A    Yes.

18   Q    Now, if Marvell had asked for a license on behalf of

19   anyone, given the state of affairs at the time they asked for

20   the license, would you have put in a defensive-suspension

21   provision?

22   A    It's a normal part of our practice, yes.

23   Q    So if Samsung had asked for a license, and Samsung

24   manufactured chips, would you have asked for a

25   defensive-suspension provision?

A    It's a normal part of our agreement.  It may get

negotiated out through negotiations, but generally we put

this in place to protect ourselves.  We're concerned about

being able to manufacture products ourself and sell products.

So we don't want to give an important license to a party that

then sells those chips to someone who's fighting with us and

trying to keep us out of the marketplace.

So we put in provisions that would allow us to suspend or

terminate the license with respect to any party that's a

customer of Marvell, in the event they attack us, so that we

can have a negotiation directly with that third customer.

And it's not just me, it's kind of an industry practice.

Q    If we look at the last page here, you see there's an

Annex C where it lists repudiating parties and it lists

Microsoft, Apple Inc. and Gemalto?

A    Yes.

Q    Why are those names there?

A    Those are parties that were currently in litigation with

us at the time we sent the draft, apparently.

Q    At the time of the draft here, if you see this is a -- you

see what refers to -- there's a date here, at least on the

last line, where it says, "Confidential discussion draft

subject to October 12, 2011," et cetera.  Do you see that?

A    Yes.

Q    So in the October 2011 timeframe, had Microsoft done

1  anything to try to keep Motorola's products out of the

2  marketplace?

3  A   Yes.  We had been sued in the ITC on all of our Android

4  phones.  And there were various district court cases as well

5  pending at that time.

6  Q   In October of 2011, what was the significance of the

7  Android operating system software to Motorola's business?

8  A   So, we had decided at some point in the 2009 timeframe to

9  move exclusively onto the Android operating system as the

10  smartphone operating system for our products.  So I believe

11  around 60 percent of our revenue was dependent upon sales of

12  Android devices.

13  Q   And was that a decision which Motorola had kept to itself?

14  A   It was pretty apparent in the marketplace.  You couldn't

15  go buy a Motorola phone that had a Microsoft operating

16  system, or a Motorola phone that had a Symbian operating

17  system at the time, it was only Android.

18  Q   And before October 1, 2010, and first let me just ask you

19  generally, had you had discussions with anyone at Microsoft

20  about business relationships between Microsoft and Motorola?

21  A   Sure.

22  Q   How would you characterize the discussions you had before

23  October 1, 2010?

24  A   They were very amicable.  There was -- there is always

25  some levels of disputes to certain things.  But I had

1    actually reached out and set up a meeting for October 22nd to

2    meet with Brad Smith, the general counsel, and Horatio

3    Gutierrez, the head of licensing, to make sure that we had a

4    good relationship.  There were different touch points

5    throughout the business.  We had a Microsoft business

6    representative that managed kind of the relationship on a

7    day-to-day basis.

8    Q    Let me ask you, prior to October 1, 2010, prior to then,

9    had Microsoft ever come to you and said, you know, we have

10   patents which we think can prevent you from selling phones

11   with the Android operating system on it in the United States?

12   A    No.  They had talked about only ActiveSync patents.  And

13   we were trying to have discussions about those, which is how

14   you synchronize your e-mail.  But never a broader discussion

15   on the Android operating system.

16   Q    Would that topic have been of some interest to Motorola if

17   it was committing itself to using Android on its handsets?

18   A    Well, at the time -- I mean, we were separating -- the

19   business was separating from Motorola, we were splitting it

20   into two.  So a larger percentage of our revenue was

21   dependent upon the Android operating system.  So if, in

22   effect, we were going to get shut out of that market, that

23   would have been a very major decision of the CEO and the

24   board.

25   Q    So except for this case, except for the Microsoft suing

1   Motorola, except for that, had you been involved in any

2   situations where Motorola had been sued by a major player in

3   the industry without having any negotiations beforehand about

4   the patents and what they covered?

5   A   No.  The practice in my industry -- I've done this for

6   20 years or so -- if it's another operating business, they

7   generally are fairly, you know, they're fairly open.  We know

8   a lot of the people in the industry.  We talk to them.  They

9   come to us and say they have patents.  And we spend, you

10  know, a year or two in an engagement to find a good

11  resolution to that.

12  Q   So kind of walk us through how this typically takes place,

13  then.  The custom and practice in the industry that you knew

14  about prior to October 1, 2010, when it came to how the

15  larger operating companies would operate if there were

16  disputes about that.

17  A   Sure.  So we would look at the marketplace and study who

18  had patents that are relevant to our business.  We typically

19  understood that to be the other major handset manufacturers,

20  Samsung, Nokia, RIM.  So we would engage in, how do we get

21  freedom of action?  We have a lot of patents, Motorola has a

22  lot of patents that are relevant to their product business.

23  They have a lot of patents that are relevant to our business.

24  So you either send a letter saying, you know, we believe we

25  should have some discussions.  Or you know someone, you've

1    seen them at a conference, you make a phone call and you say,

2    I'd like to -- you know, I think we should talk and talk

3    about IP issues between the companies.

4        And then there's typically going to be some people that

5    will get together, the head of licensing or a team of -- a

6    negotiation team which is made up of patent experts and

7    business people that understand the marketplace and how big

8    Samsung's product business is and how big Motorola's is

9    projected to be.  Because analysts follow all this.  So you

10   have a debate about everyone's patents.  And it depends on

11   who you're talking to.  Some people have more interest in

12   talking about patents than others.  But those patent meetings

13   can go on for a very long time talking about -- somebody

14   explained yesterday, I think, claim charts.

15   Q   Yes, could you -- that was mentioned yesterday.  I'm going

16   to try to break this down into understandable bites instead

17   of a 30-minute speech if we can.

18        So in these typical negotiations, then, when one

19   company says another company might be infringing its patents,

20   you mention claim charts.  So let's kind of explain what that

21   is.

22   A   So claim charts, typically when you have a patent that's

23   granted, in the back of the patent there are claims, and

24   those claims outline your piece of property.  Kind of like,

25   you know, this is the piece of property that I own.  But it's

1    done in legal language and it's very complex, especially when

2    it's describing technical steps.

3         Then you have to map each element of those claims onto the

4    person's product or in some cases the person's use of a

5    standard.  And you debate those.  So someone explained it as

6    you may have four elements in a claim, A, B, C and D, that's

7    in your patent that you receive.  And then you take elements

8    of the competitor's products and you map those, each of those

9    elements to the product and where they show up in their

10   product.  And that's called a claim chart.  And then you

11   share those with the other side.

12        And there's a back-and-forth debate about whether or not

13   the patent is valid.  Is it really used?  Maybe my product

14   doesn't really work the way you've illustrated it.  So

15   there's a lot of back and forth how the patents really map to

16   the products.

17   Q    Do you gain any information about -- from the other side

18   during these kind of negotiations?

19   A    Sure.  Because the other side is very motivated to show

20   you that your patents aren't really that great, or maybe that

21   they don't really need as much of the claim element -- you

22   know, they don't really need this, it's not as important to

23   their business.  Or maybe they do things differently.  Or

24   they will do things differently.  They'll do a design-around

25   if that's appropriate.  So you learn a lot about the value of

1   your patents through that engagement.

2   Q   So when you have this engagement and you have the claim

3   charts, what kind of other issues are discussed in this

4   process that's sort of the custom and practice?

5   A   With respect to the patents or other things?

6   Q   The deal.

7   A   Yeah.  So then you have to look at, typically you look at

8   what their past sales were.  So how many phones, for example,

9   have they sold over the past several years?  And then how

10  many phones or widgets are they projected to sell over the

11  next term of the agreement?  And when you talk about a term,

12  because people will -- some will be comfortable with five

13  years, some are comfortable with ten years.  Some only want

14  no forward-looking license only covering the past, because

15  they're going to change all their products.

16      So, you have a lot of different complex terms that you

17  need to agree with the parties as to what they're comfortable

18  paying.  You might say, you know, if the cumulative royalties

19  are too imbalanced, you'll agree to a cap.  So the other

20  party won't have to pay any more than X.

21      Or you can carve out certain parts of the product so the

22  royalty base is smaller.  So you have all those discussions.

23  It generally takes, you know, nine months to two years to put

24  a first agreement in place.  And then it's shorter if it's

25  original.

1   Q   Is that nine months to a couple years, is that timeframe

2   compacted if you're sued by someone trying to keep you out of

3   the market?

4   A   Yes.  So, I mean, if there's -- you know, if there's an

5   exclusion order being sought or something like that, you have

6   to react a lot more quickly.  You have to scramble, really,

7   especially if you're not prepared with -- you haven't thought

8   about the company, you have to go look at your patents and

9   see how they relate to the company that you're going to talk

10  to.  It's a complicated process.  You need lawyers and

11  technologists to understand it.

12  Q   You were asked questions on your examination concerning

13  the offer letter where you had the 20 days to respond to the

14  offer.  Do you recall that?

15  A   Yes.

16  Q   And I think you said that since your deposition you recall

17  another letter that also had that sort of 20-day provision?

18  A   Yeah.  It's very common --

19  Q   That's a yes or no, right there.

20  A   Yes.

21       MR. PRICE:  Your Honor, I'd like, if I may approach

22  the court and I'm handing to opposing counsel a copy of what

23  we've marked for identification as 7252.

24       THE COURT:  You may approach.

25  Q   Mr. Dailey, do you have Exhibit 7252 for identification in

1    front of you?

2    A   I do, yes.

3            MR. PRITIKIN:  Your Honor, we will have an objection

4    to this.  I don't believe this document was on the exhibit

5    list.

6            MR. PRICE:  That's correct.  I'd be happy to address

7    that at side bar, Your Honor.

8            THE COURT:  Why don't we leave this topic for the

9    time being and we'll take it up outside the presence of the

10   jury.

11           MR. PRICE:  Very well.

12   Q   Well, let me ask you generally then, sir, without

13   reference to the exhibit.  Where have you seen such a

14   provision that you had 20 days to confirm whether or not a

15   company would accept an offer?

16           MR. PRITIKIN:  Your Honor, I would have the same

17   objection.  I don't think we should be getting into this

18   unless the document --

19           THE COURT:  Let's wait until we get a chance to talk.

20   We'll break off at five minutes to three and talk about it

21   then.

22   Q   Let me step back a little bit and try to lead you up to

23   October 1, 2010, and talk a little bit about you and a little

24   bit about the relationship with Microsoft.

25           First, I heard and already knew, obviously, that you're

1    both a lawyer and an engineer?

2    A    Right.

3    Q    So which profession did you start out first in?

4    A    So, I joined Motorola in 1989 as an electrical engineer.

5    Q    And what happened that you joined the dark side?  When did

6    you become a lawyer?

7    A    So I did engineering for about a year and-a-half.  And

8    then I moved into the patent department where we wrote

9    patents and licensed patents to -- at that time we were

10   licensing a lot in Japan.  And then I went to night school

11   for law school until 1994.  I graduated in 1994.

12   Q    I think you joined the patent department when?

13   A    The end of 1990.

14   Q    Between 1990 and the time you graduated from law school,

15   were you involved at all in patent negotiations?

16   A    I did a lot of patent licensing in Japan.  I wrote a lot

17   of patent applications as well.

18        In fact, I recall flying home on a plane from Tokyo

19   writing my final exam for one of my classes.  So it was an

20   interesting time.

21   Q    So why did you take the effort to go to law school to get

22   the law degree?  How did that help you in your work?

23   A    I was very interested -- once I started working in patents

24   I found it to be very interesting.  And I wanted to become a

25   lawyer so I could do licensing and other types of

1    engagements, learn about the law.

2    Q    After you graduated, did you use that combined knowledge

3    to continue at Motorola working in negotiations or licensing?

4    A    I did.  I worked in different capacities.  I moved to

5    London for a couple of years.  I lived in Boston for a couple

6    of years managing intellectual property issues for different

7    business units.

8         Then in 2000 I came back to focus on the mobile device

9    business.

10   Q    So 2000.  Then you're in the United States.  What city are

11   you in?

12   A    I work outside of Chicago in Libertyville.

13   Q    You said that at that time you focused on cellular?

14   A    It was a cellular phone or the mobile device business.

15   Q    Could you tell us, then, how long were you or have you

16   been in that?

17   A    Since 2000 I've been with the mobile -- or I was with the

18   mobile device business until I more recently moved to Google.

19   Q    When was it that you "Moved to Google."

20   A    September of 2012.

21   Q    That's because at that point Google had a transaction with

22   Motorola, right?

23   A    Right.  They had completed the acquisition of us.

24   Q    So, in the cellular mobile area when you were at Motorola

25   up until 2012, did there come a time when you started

1    focusing very much on licensing?

2    A    Yes.  So from the 2000 to 2006 timeframe, I wasn't focused

3    on patent licensing, it was more strategic relationships,

4    software licenses, and things of that nature.

5         In 2006 I moved out of the law department, actually, to

6    take a role in strategy to manage the "patent business" we

7    called it.  But really managing freedom of action for our

8    business so we could build the products that we wanted to

9    build.

10   Q    Can you tell us what you mean by that when you say your

11   goal was to kind of manage this freedom of action?

12   A    Our goals were to look at kind of the world and identify

13   relevant patent holders, and then understand how we could

14   engage with them and negotiate freedom of action or

15   cross-license deals so we could all build products.

16        And there was obviously money that would flow in one

17   direction or the other, depending on who built more products

18   and who had better patents.  But that was the goal.

19   Q    So why was it necessary to deal with other companies so

20   that you could have freedom of action?

21   A    Because we don't own all the patents that we need in order

22   to build our equipment, and either do they.  There's a lot of

23   patents in the world.  And in order to build a product, in

24   many cases you need a license from other people that hold

25   those patents.

1  Q   So the idea was to meet with companies so there could be

2  some arrangement where you can both operate and be

3  competitive?

4       THE COURT:  Mr. Price, watch your leading on this.

5  A   Yeah.  Sure.  So we did.  We got together and negotiated

6  licenses that allowed both companies to operate.

7  Q   What kind of companies are we talking about that you had

8  these negotiations with?

9  A   So a lot of them were -- a majority of them were in the

10  mobile space, competitors of ours, direct competitors of

11  ours.  Hardware manufacturers like Nokia, Samsung, RIM or

12  Blackberry.  And there are also other ones from time to time

13  like Kodak, or something.

14  Q   Now, before getting more current on your experience with

15  those licensing negotiations, I want to talk to you about

16  your experience with Microsoft in the 2000 - 2010 timeframe.

17  A   Sure.

18  Q   Now, did there come a time -- well, let me ask you this.

19  In the 2000 - 2010 timeframe, did Motorola use some of

20  Microsoft's intellectual property?

21  A   Yes.  We had, in the mobile space we're talking about, we

22  had an early -- we were an early adopter of the ActiveSync

23  technology in 2003.  We had struck a deal, a four-year deal

24  for $100,000 to use Microsoft's ActiveSync technology.  And

25  along with that came a patent license.  But it wasn't really

1   part of the deal.

2       We also --

3   Q   Can you tell us what the ActiveSync thing is?

4   A   ActiveSync is the technology, it's a protocol as to how

5   you get your e-mail on your smartphone.  So how do you get it

6   out of the Exchange server?  And so you get the same kind of

7   mirror image of what you would normally get on your computer,

8   on your smartphone.  So it was the syncing of the e-mail

9   technology.

10  Q   Why was Motorola an early adopter of that from Microsoft?

11  A   I don't recall all the reasoning.  But we wanted to have a

12  compelling product.  And providing e-mail on a phone in the

13  2003 or 2004 timeframe was a pretty novel idea.

14  Q   Was this agreement with Microsoft a pure patent license,

15  or what kind of agreement was it?

16  A   No.  It was a technology license, because Microsoft had,

17  you know, they had their servers that they sold.  So most

18  people were using Microsoft for their e-mail.

19      And so it was the protocol or technology related to

20  accessing that server remotely with your handset.

21  Q   Now, you said at some point this agreement expired?

22  A   It expired in 2007.

23  Q   What happened in 2007 after that agreement expired with

24  Microsoft with respect to this ActiveSync stuff?

25  A   So we started renegotiation of the ActiveSync license.  It

1    was no longer $100,000, it was now per-unit royalties

2    associated with it.  And we negotiated all the way through

3    the end of 2007.  And we sent, sometime in December,

4    December 27th I would say, what we believed to be the final

5    agreement.  We were willing to sign it.  We were going

6    through the approval process and we asked Microsoft to sign

7    it and send it to us so we could then execute that agreement.

8    Q   So what happened after that point?

9    A   It was a little bit strange, but they didn't respond right

10   away.  And then there was -- and I don't know the details of

11   it, but Microsoft had a settlement with the European

12   government.  And don't quote me on that.  But they then made

13   the specification, the technology, available for free, except

14   for the patents.

15       So, instead of needing a license with Microsoft for the

16   technology, that was available and you could build your

17   products.  But then in --

18           MR. PRITIKIN:  Your Honor, may we see you at side

19   bar?

20           THE COURT:  Yes.

21       (Court and counsel met at side bar as follows:)

22           THE COURT:  I was wondering how long it would take to

23   get an objection.

24           MR. PRITIKIN:  We're getting into the motion in

25   limine.  If they want to talk about the fact that they

1    couldn't reach an agreement on the renegotiation, fine.  But

2    now he's injected -- I mean, it was pretty subtle.  But it

3    was the European antitrust authority.

4         MR. PRICE:  I agree to a motion to strike that.  That

5    was not the intended response.  It switched from the business

6    to the patent, and I don't think they got it.

7         THE COURT:  I'm afraid what they heard was not what

8    they were supposed to hear.

9         MR. PRITIKIN:  We need to short-circuit some of this.

10   I understand the point, and it is fair for them to make the

11   point that they weren't negotiating --

12        THE COURT:  Are you going to move on?  What is your

13   next question?

14        MR. PRICE:  And my next question is here's an e-mail

15   that you reached out to them trying to get a resolution on

16   this.

17              (The side bar concluded.)

18        THE COURT:  Ladies and gentlemen, one of the

19   challenges of this is we start with a very big world and we

20   try and narrow it down to the issues that are going to be in

21   this lawsuit.  Part of that is a process of something called

22   motions in limine in which both sides have suggested areas

23   that we not talk about and I go through and sort those all

24   out.  The witness has inadvertently wandered into one of

25   those areas.  So I'm going to ask you to strike from your

1  memory -- since we seem to talk about memory around here a

2  lot -- strike from your memory the testimony in regards to

3  what was happening in Europe and the rest of that

4  speculation.

5      And Mr. Price is going to ask a fresh question.

6  Q   So, Mr. Dailey, the negotiations changed from -- I'm going

7  to lead just a second here Your Honor to proceed smoothly,

8  hopefully -- led from this discussion for a business sort of

9  technology-arrangement to a patent-arrangement?

10 A   Yes.

11 Q   And in doing that, what happened in the discussions

12 between Microsoft and Motorola?

13 A   Later in 2008, I think it was April/May timeframe,

14 Microsoft sent a pure patent license for us to sign.  And so

15 our response was we would like to understand what patents

16 Microsoft had relative to this ActiveSync specification.  So

17 we requested claim charts, like we request from everyone else

18 that we negotiate a patent license with.

19     And they didn't respond for a very long time with the

20 claim charts.  At some point they sent some patent numbers.

21 Then finally in November of 2009 they sent the claim charts.

22 But that was well more than a year after we had asked for

23 them.

24 Q   Were you in any way miffed or upset or anything with

25 Microsoft because of this that took awhile?

1  A    No.   I assumed it wasn't that important to them, or if it

2  was they would have contacted us.

3  Q    So after you got the claim charts, we're talking the

4  2009/2010 timeframe, any other contacts with Microsoft about

5  business issues including this ActiveSync?

6  A    Yes.   So, late in 2009 we started getting notices that

7  they believed our Android products were using ActiveSync and

8  we didn't have a license.   So we kept responding with, we

9  needed the claim charts, which came in late, late 2009.   Then

10  in January of 2010 we spent some time to review those

11  patents.   2010 we get on the phone with, I believe it was Joy

12  Murray, their licensing executive, and asked if we could have

13  a negotiation to talk about -- that's broader than just

14  taking a one-way license from Microsoft.   And she said she

15  didn't have the authority to do that.   So I asked her to ask

16  her management, you know, if we could have a broader

17  discussion, because Motorola had some patents that were

18  relevant to wireless e-mail.   We'd actually done wireless

19  e-mail in the 2000 timeframe in our paging business.   So we

20  knew we had patents that were relevant to, we believed,

21  relevant to Microsoft's stuff.   So we wanted to have a

22  broader discussion.

23  Q    And, by the way, this wireless e-mail patent that you're

24  talking about, or patents, did these have anything to do with

25  the standards-essential patent?

1    A    You know, I think that's been debated, but we don't

2    believe ours were a standard.  But whether or not ActiveSync

3    is a standard is a different issue.

4    Q    I meant the ones that you had --

5    A    No, they were not related to standard.

6    Q    So this wasn't one of the patents that had anything to do

7    with those October 2010 letters?

8    A    That's correct.

9    Q    And before we get on any further, if we can just have you

10   look at Exhibit 7239.  Could you tell us what that is?

11   A    That's the e-mail from Joy Murray, November 12, 2009, with

12   the claim charts attached.

13            MR. PRICE:  Your Honor, we move Exhibit 7239 into

14   evidence.

15            MR. PRITIKIN:  No objection.

16            THE COURT:  Counsel, I don't have anything attached

17   to my copy of this exhibit.  Is there supposed to be more

18   than three pages?

19            MR. PRICE:  This exhibit is just three pages, Your

20   Honor.  There's another string which it refers to which is a

21   separate exhibit.

22            THE COURT:  The three-page Exhibit 7239 is admitted

23   and may be published.

24            (Exhibit No. 7239 was admitted into evidence.)

25   Q    If we can just look at the bottom of the first page.

1   There's an e-mail from you to Joy Murray.  She was with

2   Microsoft?

3   A   Yes.  She was their director of licensing.

4   Q   This is November 4, 2009.  Do you see that?

5   A   Yes.

6   Q   At the bottom of that first paragraph you see it talks

7   about, "Please review Mansour's e-mail dated October 2, 2008

8   in this regard."  Do you see that?

9   A   Yes.

10  Q   And the sentence above that talks about the claim charts?

11  A   Yes.

12  Q   How does this relate to what you told us so far about your

13  communications with Microsoft?

14  A   So we were expecting -- we had requested claim charts so

15  that we could engage in understanding the relevance of the

16  Microsoft patents to our products.  And they eventually sent

17  us some patents, I believe earlier in 2008, but they never

18  sent any claim charts.  So we were asking for the claim

19  charts to figure out how these patents related to the

20  products.

21  Q   And the reference there to Mansour's e-mail dated

22  October 2, 2008, if you could look at what's been marked as

23  Exhibit 7240.

24  A   Yes.

25  Q   And is Exhibit 7240, is this the e-mail string that you

1    were referring to when you said, "Please review Mansour's

2    e-mail dated October 2, 2008?"

3    A   Yes, that's correct.

4           MR. PRICE:  Your Honor, I move Exhibit 7240 into

5    evidence.

6           MR. PRITIKIN:  No objection.

7           THE COURT:  7240 is admitted and may be published.

8           (Exhibit No. 7240 was admitted into evidence.)

9    Q   And if we can just blow up -- we'll start at the bottom

10   where there's October 2, 2008.  That's an e-mail from

11   Ms. Murray actually to Mr. Mansour.  Do you see that?

12   A   Yes.

13   Q   And if you go to the next page, and in the middle of that

14   page there actually -- Ms. Murray says, "Thanks for your

15   patience."  Do you see that?

16   A   Yes.

17   Q   If you look at the middle of that paragraph it says, "Our

18   patent attorney was kind enough to provide me with the

19   attached information that is applicable for a client

20   implementation."  Do you see that?

21   A   Yes.

22   Q   And that was in response, was it not, if you look at the

23   e-mail right before that, October 2, 2008, from Mr. Mansour.

24   "Thanks, Joy.  I have forwarded the list to our team.  You

25   were also going to give me the name of the patent attorney

1   with whom we could talk about these patents and provide us

2   with claim charts."  Do you see that?

3   A   Yes.

4   Q   That's the request you were referring to?

5   A   Yes.

6   Q   So if we go back from the 2008 timeframe to the

7   November 2009 timeframe --

8           THE COURT:  This may be a good time to take a break.

9           MR. PRICE:  May I ask just two, perhaps two or three

10  quick questions on 7239?  I hope it won't take more than a

11  minute.

12  Q   Exhibit 7239, this is the 2009 communication.  You see at

13  the bottom of the second page there there is an e-mail from

14  Ms. Murray saying, "We recently saw in the press your new

15  Android device will connect to Exchange.  I'm curious if you

16  have implemented Exchange ActiveSync, and if so, under what

17  license would you would be operating under."  Do you see

18  that?

19  A   Yes.

20  Q   Is this what sort of kicked off the discussions again

21  between Microsoft and Motorola about these ActiveSync

22  patents?

23  A   Yes.

24  Q   What is that referring to in October of 2009 when it talks

25  about the press, with respect to your new Android?

1  A   There was a lot of press, at least in my world, around the

2  Droid phone we were going to make available for Verizon that

3  used the Android operating system.

4  Q   Very quickly.  Prior to this timeframe, had Motorola been

5  using Windows operating systems in its phones?

6  A   It had, yes.

7        THE COURT:  Ladies and gentlemen, I'm going to let

8  you out for your break and we're going to take up a matter of

9  an exhibit.  We're going to come back out at ten minutes

10  after three, and at that point we will have fully made up our

11  time this morning.  So that wasn't much of a problem.  But

12  I'm sure all of you will remember and take heed in how

13  difficult it is to get here tomorrow.  Hard break at 4:30.

14  Thank you for your patience here.

15    (The following occurred outside the presence of the jury.)

16        THE COURT:  All right.  Mr. Price, 7252, you're going

17  to explain to me why this should be admitted.

18        MR. PRICE:  Yes.  Your Honor, it's a letter from

19  Microsoft to Mr. Dailey concerning a Microsoft offer to grant

20  Motorola Mobility patents dated August 1, 2011.  It's part of

21  these overall negotiations taking place during that

22  timeframe.  And the reason to admit it is that Mr. Dailey had

23  been asked previously, "Do you know of any other letter that

24  had a 20-day timeframe."  And his deposition says, "I can't

25  recall one."  Well, this is actually one that he received

1   from Microsoft which says at the bottom, "Microsoft will

2   leave this offer open for 20 days.  Please confirm whether

3   MMI accepts the offer."  So it's evidence going to whether or

4   not there's anything nefarious, unusual, or sinister about

5   leaving an offer open for 20 days.

6           THE COURT:  H.264 patent license.  It sounds an awful

7   lot like this lawsuit.

8           MR. PRICE:  It is Microsoft offering to license to

9   Motorola H.264.

10          THE COURT:  Doesn't it also say "reciprocity"?

11          MR. PRICE:  Yes.  There's no question this is

12  relevant to this lawsuit.

13          THE COURT:  Not only relevant but it sounds like it's

14  involving settlement negotiations.

15          MR. PRICE:  It involves -- you either say

16  business-settlement negotiations or litigation-settlement.  I

17  don't know which one you characterize this as, because they

18  got really kind of merged at this time.

19          THE COURT:  If I remember, we had a motion in limine

20  on this precise subject and that's exactly what I said, it

21  was hard to tell one from the other on occasion.

22          MR. PRICE:  Yes.

23          THE COURT:  Okay.  I'll hear from Mr. Pritikin.  And

24  this is not on your exhibit list.

25          MR. PRICE:  I don't know if it was amended.  It is

1    not.  We amended last night to put it on.

2           MR. PRITIKIN:  Yes, Your Honor, it was not on the

3    exhibit list.  And point of fact, the question that Mr.

4    Dailey was asked was whether Motorola had ever sent out a

5    letter of the kind that he had sent to Microsoft.  It was not

6    a general question whether he had ever seen one.  The

7    question was whether he had ever sent it.  This letter is on

8    terms that are RAND, very close to RAND.  It is very

9    different.  It would be confusing and prejudicial to the jury

10   to have it come in.  Because what they want to argue is that

11   by saying that the offer is going to be open for 20 days, and

12   so forth, that this somehow validates what they did.  And

13   it's entirely different.

14      This is an offer that is made on terms.  There's no

15   argument that this did not comply with RAND, what was being

16   offered here.  It's a very, very different type of letter.

17   And, as I said, it's confusing and prejudicial.

18           THE COURT:  What is the second sentence or the second

19   line of the letter says, "A worldwide non-exclusive license

20   under Microsoft's portfolio patents and pending applications

21   covering the subject matter of ITU-T recommendation H.264."

22   What's that?

23           MR. PRITIKIN:  I'm assuming it is Microsoft's

24   standards-essential patents on H.264, Your Honor.

25           THE COURT:  Well, ITU-T.  So International

1   Telecommunications Union?

2          MR. PRITIKIN:  That's the standards-setting

3   organization.

4          THE COURT:  That's what I want to know, if that's

5   what this is referring to.

6          MR. PRICE:  Yes, it is, Your Honor.  It's not on the

7   exhibit list that was produced.  We have been amending the

8   exhibit list, both parties, every night.  And we had not put

9   this on.  There's no question as to the authenticity.  There

10  is no surprise, because the parties have talked about these

11  discussions going forward with reciprocity.  And I wasn't

12  planning on getting Mr. Dailey to testify about the specific

13  terms, but just to show that this is the type of letter you

14  get when you're in negotiations, that there's nothing unusual

15  about leaving an offer open for 20 days.  They made a huge

16  deal out of this.

17         MR. PRITIKIN:  Your Honor, I would take issue with

18  the statement that both sides have been changing the exhibit

19  list.  The exhibit list was filed on Friday.  They've been

20  doing a lot.  I don't think we have been.

21         THE COURT:  The pot and the kettle shouldn't be

22  calling each other black.

23      Counsel, I'm going to admit it with paragraphs 2, 3 and 4

24  redacted .  I think the point you want to make is that this

25  letter has been sent.

1              MR. PRITIKIN:  If it's going to be admitted, I think

2     the whole document should go into evidence, then.  Then it's

3     even more misleading as to what it is.  I think it's quite

4     important, if it's going to go into evidence, that it all be

5     there.

6              THE COURT:  All right.  Well, then, we'll admit the

7     whole thing.  We'll be in recess.

8                        (The proceedings recessed.)

9              THE COURT:  Mr. Price.

10             MR. PRICE:  I have a relatively smaller timeline, but

11    one I would like to put up.  May I?

12             THE COURT:  That's fine.  "Smaller" meaning smaller

13    period, or smaller board?

14             MR. PRICE:  Smaller board, fewer entries, I think.

15             THE COURT:  Ladies and gentlemen, this is another

16    demonstrative.  They will never be able to read it, unless

17    you move it closer.

18             MR. PRICE:  Every now and then I will have a document

19    on the screen.

20             THE COURT:  You will need to have it close.  Because

21    every now and then they will trade documents.

22             MR. PRICE:  Is that okay?

23    By Mr. Price:

24    Q   Mr. Dailey, we put up a timeline that was used in opening.

25    I want to again, as Microsoft counsel did, put things

1    chronologically.  The first entry here says, "November 2009

2    Motorola releases Droid phones."  Is that about the timeframe

3    that Motorola released its Droid phones?

4    A    It is, yes.

5    Q    And we were talking about Exhibit 7239.  You can put that

6    up on the screen again.  If we look at the top part, you see

7    in November of 2009 Ms. Murray sends an e-mail which includes

8    the first thing, "Per your request I have attached three

9    claim charts for the exchange ActiveSync specification."  Do

10   you see that?

11   A    Yes.

12   Q    I want to get the timeframe now.  You are getting this

13   e-mail in November of 2009, about the time the Droid comes

14   out.  What happened after this, after Ms. Murray sent you the

15   three claim charts?

16   A    So we had -- we had some lawyers and patent people review

17   the claim charts, and then we were -- we scheduled a phone

18   call with Joy Murray in January of 2010 to discuss a license

19   agreement that would -- that maybe was broader than they were

20   suggesting, because we had patents that we believed were

21   relevant to the ActiveSync protocol as well.  So we wanted to

22   talk about a cross-license patent arrangement with Joy

23   Murray.

24   Q    The patents you are talking about are not

25   standards-essential patents, right?

1   A    No, they are nonSEPs.

2   Q    And what exactly did Motorola's nonSEPs involve that you

3   wanted to talk about?

4   A    They were of similar technology as the ActiveSync.  They

5   were about synchronizing wireless e-mail -- e-mail over

6   wireless communication.  Several years ago we had

7   developed -- we had pagers a long time ago, and we developed

8   two-way paging over a wireless, and it allowed you to access

9   e-mail as well.

10  Q    And so when you had this phone call with Ms. Murray, what

11  did she say?

12  A    She said she didn't have authorization to have a broader

13  discussion.  They had sent us a standard patent license

14  agreement, and that's all she was authorized to do.  So I

15  asked her to speak to her management to see if we could have

16  a broader patent discussion.

17  Q    And so what happened at that point?

18  A    Well, I didn't have any further communication with Joy

19  Murray.  I think things kind of got quiet.  And then in May

20  of 2010 I was given an opportunity to speak on a panel, and

21  one of the members of the panel was from Microsoft's legal

22  department.  So I actually agreed to speak at George

23  Washington University.  I believe the guy's name was Jeff

24  Rank.  He was at Microsoft.  I was on a panel with him, so we

25  spent a day talking.  I arranged to have a meeting with Brad

1    Smith and Horacio.  I used Jeff as a conduit to set up a

2    meeting so we could talk about our relationship with

3    Microsoft from a legal perspective.

4    Q   Was this in any way a hostile or adverse discussion that

5    you had at this conference that you went to?

6    A   No, not at all.  We were on the same panel.  I can't

7    remember the topic of the panel, but the whole idea was to --

8    I wanted to meet Microsoft, and we wanted to build a closer

9    relationship with them from a legal perspective.  We were

10   about to spin -- separate out our company from Motorola, so

11   we wanted to make sure we had relationships with the right

12   people.

13   Q   Now, when you say you were about to spin off your company

14   from Motorola, can you explain what you mean by that?

15   A   Sure.  In January of 2011 Motorola had different business

16   units, and they decided to separate the businesses into two

17   companies.  And so the mobile device business, which is the

18   cellular phone business, and the video set-top box cable

19   business were separated from the rest of Motorola.  And we

20   created our own company called Motorola Mobility, Inc.  And

21   that was in January of 2011.

22   Q   And Motorola Mobility, Inc. is one of the defendants here?

23   A   Yes.

24   Q   And why then did you want to have these conversations with

25   Microsoft in lieu of that -- in connection?

1   A   Well, we just thought -- we kind of thought about -- in

2   some of our meetings we thought we should reach out and meet

3   some of the people in our industry, and Microsoft was in our

4   industry.  We had this ActiveSync issue that we knew was an

5   issue.  And so when I spoke with Horacio about an agenda for

6   that meeting, we talked that we should talk about IP issues.

7   It was on the agenda.

8   Q   And by "Horacio," could you tell us who you are talking

9   about?

10  A   Sure.  Horacio Gutierrez is the head of -- I don't know

11  his exact title, but the head of licensing, my counterpart at

12  Microsoft, that I have been talking to about settling a

13  cross-license arrangement over the last several years.

14  Q   So did you eventually come to an agreement that everybody

15  was going to get together and talk about this stuff?

16  A   Yeah, they were very open to it.  We originally scheduled

17  it for August.  But due to people's schedules it got pushed

18  out until the October timeframe, and it was actually October

19  22nd when it was scheduled for us to meet.

20          MR. PRICE:  May I approach?

21          THE COURT:  Yes.

22  By Mr. Price:

23  Q   We didn't think ahead here, so we didn't put this on here.

24  But sometime before October 1st then you had a meeting

25  scheduled --

1    A    Yes.

2    Q    -- with Microsoft?  On October 22nd?

3    A    Yes.

4    Q    Where was this meeting going to take place, some

5    neutral --

6    A    It was in Microsoft's -- it was in Redmond, here in the

7    Seattle area, at one of their large conference places.

8    Q    Now, in the discussions that you had to set up the October

9    22nd meeting, or any meeting prior to that, did Microsoft

10   ever tell you that they had patents, other than the

11   ActiveSync patents, that would cover the Android software

12   that Motorola was putting on its phones?

13   A    No, we hadn't had any discussion like that.  They had

14   never sent me any claim charts or anything like that.

15   Q    Did you --  Prior to October 1st, 2010, had Microsoft ever

16   told you that they were going to sue Motorola?

17   A    No.

18   Q    And asked for an order that Motorola could not sell its

19   Android phones in the United States?

20   A    No, we were very surprised by the lawsuit of October 1st.

21   Q    Prior to October 1st, 2010, had Motorola gone to Microsoft

22   and offered its standards-essential patents to Microsoft?

23   A    No, we had not.

24   Q    Prior to that timeframe, had Microsoft -- prior to

25   October 1st, 2010, had Microsoft asked Motorola to put its

1    patents on the table?

2    A    No.

3    Q    I want to then draw your attention to October 1st of 2010.

4    First, let me ask you, do you recall what day of the week

5    that was?

6    A    It was a Friday.

7    Q    And at that time, October 1st, 2010, did you learn

8    anything about whether Microsoft had taken any action against

9    Motorola?

10   A    We did.  That's the day we learned that they filed at

11   least the ITC complaint, and then there was also district

12   court cases that were filed.

13   Q    Now, those lawsuits, did those lawsuits concern just a few

14   ActiveSync patents?

15   A    No, they were addressing the use of the Android operating

16   system on our phones.  So they were trying to exclude

17   basically most -- a large percentage of Motorola's revenue

18   from the market by excluding us from the U.S., and being able

19   to import Android -- the Droid phones from the U.S. market.

20   Q    Prior to October 1st, 2010, did you feel any significant

21   time pressure in connection with your discussions that you

22   had been having with Microsoft?

23            THE COURT:  Mr. Price, that is leading.

24   By Mr. Price:

25   Q    What kind of time pressure did you have with respect to

1    negotiations with Microsoft prior to October 1st?

2    A    There wasn't a lot.  We had had the communications on

3    ActiveSync.  So I took an initiative and set up a meeting

4    with the general counsel and Horacio.  We thought we would

5    have a normal engagement, which is, if there were big IP

6    issues we would talk about them, they would send us claim

7    charts, we would send them some patents.  As I spoke before,

8    it takes a year or so to conclude one of those licensing

9    deals in my experience.

10   Q    Let me ask you, in your examination by Microsoft you were

11   asked about an investigation that Motorola did in the October

12   timeframe, before it sent out the October 21st and

13   October 29th letters.  Do you recall that?

14   A    Yes.

15   Q    Now, in your experience, what was the custom and practice

16   as to how long Motorola would have had for such an

17   investigation in the normal course of its dealings with

18   companies asserting patent claims?

19   A    It would take a couple of months, depending on people's

20   schedules, to review patents, that you could -- you know, the

21   claim charts and patents related to our patents.  We had to

22   find technicians that could speak about the functionality of

23   our products.  It took several months to have those under

24   normal circumstances.

25   Q    Let me call your attention now back to October 1st, 2010.

1    When you heard that you had been sued by Microsoft, what was

2    your reaction?

3    A    I was shocked.  I was upset actually, because we were

4    trying -- we were setting up to spin Motorola out, and there

5    was a lot of work related to that from the legal perspective,

6    and I had taken the proactive move to set up a meeting so we

7    could discuss IP issues in October.  I was very shocked that

8    they took the step of suing before talking with Motorola.

9    Q    On October 1st of 2010, did you hear from anyone at

10   Microsoft?

11   A    Yeah, I received a note from Horacio that he wanted to

12   speak to me, an e-mail.  I called Horacio and we spoke

13   briefly on Friday afternoon.

14   Q    Could you tell us what was said during the phone

15   conversation you had on Friday afternoon?

16   A    Sure.  There were --  It wasn't the only conversation.

17   There were several other conversations between Brad Smith and

18   Scott Offer, and -- between the CEOs and Balmer.  And the

19   theme was:  Don't worry about the lawsuit.  We want you to

20   put your patents on the table.  We would like to resolve this

21   quickly.  Don't be concerned about this.  We really still

22   want to have this meeting on October 22nd.  We want you to

23   come to Seattle and have that meeting.

24        It was a little bit odd to say not to worry about the

25   threat of an injunction on most of our products in the U.S.,

1    but that was the message that I received.

2    Q   Well, after you received that phone call from Mr. -- from

3    Horacio, Mr. Gutierrez, what was kind of on your plate from

4    that point going forward in October, from that point until

5    the time the October 22nd meeting was to take place?

6    A   We had to figure out if we were going to go to the

7    meeting, whether it made sense to go to the meeting, what we

8    should do.  So we were really trying to figure out how do we

9    find a resolution to this.  And we kind of had to -- we had

10   to believe, you know, that we could put the litigation aside

11   and go meet with them on October 22nd, and that's what we

12   did, to find out really what Microsoft was looking for.

13   Q   If you look at the time chart here, we've got on

14   October 1st Microsoft suing here in Seattle, the Western

15   District of Washington, and the ITC.  And, by the way, I

16   think you were asked this, what is the only remedy you can

17   get at the International Trade Commission?

18   A   It is an exclusion order.  So there is no money damages

19   available.  That's right --  Sorry.  Ignore me.

20   Q   What effect would an exclusion order have been on

21   Motorola's business, preventing Motorola from basically using

22   Android software on its phones?

23   A   My understanding is that we wouldn't be able to import

24   phones using the Android operating system into the U.S.  It

25   was traumatic.  It was what we were counting on to rebuild

1    our business in 2010/2011.

2    Q    Would it have been easy for Motorola to switch to the

3    Windows operating system?

4    A    No.  We had actually made a conscious effort --  Motorola

5    had struggled for several years.  So we had a new CEO that

6    came in and streamlined, made decisions about products that

7    we could build and put what development dollars we had left

8    on Android for the mobile business.  So we had gotten rid of

9    our Symbian-based products, and we didn't renew the

10   Microsoft-based products, and we kind of bet on Android.  We

11   had bet on the new operating system with the hopes that it

12   could revive our company.

13   Q    And if we look at the time chart here, you see it says

14   October 11, 2010, Microsoft unveils Windows Phone 7.  Do you

15   have any knowledge about that, about whether or not the

16   Windows Phone 7 was unveiled around that time?

17   A    It was unveiled in October.  There was a lot of press as

18   well after the lawsuit.  I just read it the other -- Steve

19   Balmer was saying, Android is not free, there is going to be

20   a tax.  It was very clear that there was going to be -- it

21   was kind of a marketing thing that Android wasn't free, by

22   suing Motorola.

23   Q    So let's focus then on this October 1st to, let's say, to

24   October 21st timeframe.  In going through, looking --

25        Let me step back a bit.  Are you aware of whether or

1   not there was an expectation in the industry that if you get

2   sued -- companies of this size get sued on patents, whether

3   or not there is going to be another lawsuit on patents --

4           MR. PRITIKIN:  We would object to that, your Honor.

5   Foundation grounds.

6           THE COURT:  I will sustain that objection.  Lay some

7   foundation.

8           MR. PRICE:  Let me lay some foundation.

9   By Mr. Price:

10  Q   Were you familiar with the lawsuits in this industry, the

11  cellular mobile industry, where large companies had sued

12  large companies claiming patent infringement?

13  A   Yes.

14          MR. PRITIKIN:  The same objection, your Honor.

15          THE COURT:  I will overrule it.

16  By Mr. Price:

17  Q   And do you recall a number of times you had seen that

18  happen, or how many times Motorola had been involved?

19          THE COURT:  You have two different questions.

20  By Mr. Price:

21  Q   Do you recall how many times you had seen that happen,

22  including Motorola being involved?

23  A   I don't recall how many times, but certainly whenever

24  there is major litigation between two operating companies,

25  there is lawsuits going in one direction, there is

1    counter-lawsuits coming back, in my experience in the mobile

2    space, at a minimum.  At that time there were lawsuits

3    between Nokia and Apple, and HTC and Apple as well.  They

4    were going in both directions.

5    Q    As someone who has been negotiating licenses and

6    cross-licensing agreements, do you know why that was the

7    pattern, that if one operating company sued another there

8    would be the expectation of there being a lawsuit back?

9              MR. PRITIKIN:  Foundation, your Honor.

10             THE COURT:  I will allow him to testify as to his

11   opinion or understanding why.

12   By Mr. Price:

13   Q    What was your understanding?

14   A    From my perspective, it helped.  If you can't resolve

15   through negotiations, which is what we prefer, then you

16   resort to litigation.  And then you can have -- litigation

17   comes into play as far as how you find a reasonable

18   settlement between the two parties.  If you can't agree among

19   yourselves, you can mediate or you can end up in litigation.

20   Q    If in the negotiation Microsoft had come to you and said,

21   we have these patents that we think you infringed, what would

22   have been your customary response to that?

23             MR. PRITIKIN:  Objection.

24             THE COURT:  Sustained.  Speculation, counsel.

25   By Mr. Price:

1  Q   Let me ask it this way:  If an operating company came to

2  Motorola saying that they had patents that read on, that

3  covered Motorola's technology, did Motorola have a custom and

4  practice as to what it would do in response to such an offer?

5  A   Sure.  We would study our patent portfolio and figure out

6  if we had any patents that were relevant to the business that

7  was making those accusations.

8  Q   And why would you do that?

9  A   So that you can negotiate a fair deal, so that you don't

10  have to take the first offer made by the other company.  You

11  find leverage you have at the negotiating table against that

12  company, and you counteract or counterbalance the leverage

13  that they have against you, and then you hopefully resolve in

14  an amicable settlement.

15  Q   When Mr. Gutierrez talked to you on October 1st, did he

16  tell you why he wanted Motorola to put its patents on the

17  table in response to Microsoft suing Motorola?

18  A   No.  It was more -- he wanted to put them on the table so

19  that we could have a negotiation and settle this quickly.

20  Q   Did you do anything to try to do what Mr. Gutierrez

21  requested that you do, which is to put some patents on the

22  table?

23  A   Yeah.  I didn't personally do it, but we had our engineers

24  and lawyers look through our patent portfolio to find patents

25  that were relevant to Microsoft.  And we sent those two

1   letters that we have talked about today.

2   Q   Let's look at one of those letters, if we can.  Let's go

3   to what has already been marked, I believe, as Exhibit --  We

4   will start with Exhibit 1.  That's a nice one to start with.

5          Now, with respect to this letter, you were asked I

6   think in your examination whether or not you expected

7   Microsoft to accept the terms of this letter.  Do you recall

8   that question?

9   A   Yes.

10  Q   I think you said the answer was "no," right?

11  A   I expected a response, I think was my answer.

12  Q   Why wouldn't you have expected --  Let me step back.  In

13  your custom and practice in negotiations, was it the custom

14  and practice that the other side would immediately accept the

15  first offer you made?

16          MR. PRITIKIN:  Objection, your Honor.

17          THE COURT:  I will permit the question.

18          THE WITNESS:  My standard practice, no --

19          THE COURT:  You were asked custom and practice, not

20  your practice, I believe was the question.

21          THE WITNESS:  Could you read the question back to me?

22          THE COURT:  Why don't we start with a fresh question?

23  I think your question --  You started off with "in the

24  industry" and then "your practice."

25  By Mr. Price:

1    Q    Let's clarify.  As someone who is the head -- involved in

2    licensing at Motorola, did you have an understanding as to

3    what the custom and practice was in the industry as to

4    whether or not a first offer was routinely accepted without a

5    counter-offer?

6              MR. PRITIKIN:  Your Honor, foundation.

7              THE COURT:  Overruled.

8              THE WITNESS:  My experience, these negotiations take

9    a long period of time.  I have never known a first offer to

10   be accepted.  There is always back and forth about what is

11   appropriate.  This offer letter didn't have all of the

12   necessary terms.  You know, you would have to discuss the

13   length of the license, you know, negotiate a lot of the other

14   terms and negotiate the rate.  And they would probably put

15   their patents on the table with respect to at least the

16   standards that we were offering the license to.

17   By Mr. Price:

18   Q    What expectation did you have as to whether or not --  Let

19   me step back, because you have testified about that.  What

20   expectation did you have about the type of negotiations that

21   would occur between Microsoft and Motorola after you sent out

22   an opening offer?

23   A    My experience is people look for patent peace.  You want

24   to have an engagement with a company --  You want to really

25   do it with it once.  You don't want to have to come back time

1    and time again.  Generally speaking, we negotiate patent

2    license agreements that allow you to know that you're -- that

3    this is the agreement.  The relationship between the two

4    companies is understood with one agreement, at least for a

5    period of time.  That is a broad patent peace agreement.

6    Q    And in your experience, when patent negotiations started

7    out with just like an offer on a subset of patents, what

8    would happen with respect to the scope of that agreement

9    during negotiations?

10   A    It would expand in scope in most cases.  You want to know

11   that there aren't any other issues, that you aren't going to

12   see different patents.  If I agree to licenses, you know, you

13   want to understand that there is peace between the companies.

14   Q    And what kind of issues would you expect then to come up

15   in the negotiations after you sent out an initial offer?

16   A    It is hard to predict.  Every company is a little bit

17   different as to what issues they would bring up.  They have

18   their own issues about whether the patents are valued, how

19   are they valued in their products; maybe I don't understand

20   that; I don't understand how their products are sold or

21   licensed.  All of those things would come up, they would talk

22   about our patents, and then at some point we would hopefully

23   reach a resolution.

24   Q    Now, you said during examination that there was some

25   people at Motorola who, during this timeframe, after the

1    lawsuit, were looking to collect these patents.  Do you

2    recall that?

3    A    Yes.

4    Q    And you said there was whatever investigation that could

5    take place during that timeframe, correct?

6    A    Yes.

7    Q    And I believe you said that you were going to get a better

8    answer from Microsoft as to how the patents apply.  What did

9    you mean when you said to the jury, if you were going to get

10   a better answer from Microsoft as to how your patents apply?

11   A    So the technology with respect to these standards is

12   complex.  The standards are very large.  You may use portions

13   of the standard.  So 802.11 or WiFi technology has

14   different -- it has 802.11(a) and (b) and (g) and (n).  So

15   there is all different types of 802.11 technology.  They may

16   use some of it today, they may plan to use other parts of it

17   tomorrow.  You don't know what their business plans are.

18        The same with H.264, there are different profiles.  I am

19   not an expert, but there is a base profile and there are

20   other profiles.  Depending on the equipment you are building

21   and you are trying to provide compatibility with, you use

22   different portions of the specification.  So I would

23   assume --  They are in a better place to tell me what they

24   use and how they plan to use it in the future.

25   Q    What was your expectation as to the other parties, like in

1    this case Microsoft's incentive to do that?

2    A   Obviously they are in the best position to do it, because,

3    number one, they have the resources; they understand their

4    technology better than we understand their technology looking

5    from the outside.  And then they obviously want to have a

6    debate about the value of our patents, and whether or not the

7    price we asked was appropriate.

8    Q   Were there any particular challenges in trying to come up

9    with an offer to Microsoft as compared with all this other

10   experience that you had?

11   A   Sure.  So in my licensing experience I had licensed

12   mostly -- in the mobile space the mobile competitors,

13   BlackBerry, Nokia, Samsung, LG, and so we understood the

14   business model, and we licensed their finished good products.

15   The FRAND obligation, the nondiscriminatory part of FRAND,

16   means that I can't treat someone different necessarily.  And

17   so I tried -- in that letter I tried to not discriminate, so

18   that my other licensees, who pay on a royalty basis the

19   finished goods, wouldn't be discriminated against if I

20   offered something less than that to Microsoft.  And so we

21   tried to incorporate, you know, my practice onto Microsoft's

22   business.  It wasn't a perfect fit, but we thought we could

23   talk about that and figure out what an appropriate royalty

24   base was and how we could compensate for that.

25   Q   If you look at the letter -- if you look at that first

1  paragraph, you were asked a number of questions that begins

2  with, "This letter is to confirm."  Blow up that paragraph.

3  You were asked a number of questions about the 2.25 percent

4  rate.

5  A   Yes.

6  Q   And you mentioned during your examination that that is a

7  rate Motorola had been using?

8  A   Yes.

9  Q   Let me ask you this:  In your experience when Motorola

10  started out with a 2.25 percent rate offer, was it your

11  experience that that's where it stayed?

12  A   No, a lot of it depended on the negotiations.  It may stay

13  there.  I mean, there are companies that didn't have anything

14  to give back.  They thought it was appropriate.  So sometimes

15  it stayed, but most of the time someone with a large patent

16  portfolio, like Microsoft, would agree to grant patents back,

17  or we could have any type of relationship, cooperation, so

18  that the amount of money flowing would change.  And we had

19  discussions about what the appropriate royalty base is and

20  what the appropriate royalty rate is.

21  Q   And when you say you had discussions about the appropriate

22  royalty base, what are you talking about?

23  A   So we had asked for a rate based on the end product

24  pricing.  But that would be difficult for Microsoft in the

25  case of Windows, which they have talked about.  We could talk

1    about a different sort of arrangement.  We have done it in

2    other cases where a chipset manufacturer may want a license.

3    We provide them a license, but then we build in defensive

4    protection from their customers if they come after us.  We

5    talked about it in regards to Marvell, the draft agreement

6    for Marvell.

7         There is also --  We negotiate caps if we think the money

8    flow is too big.  Or we carve out things that are unrelated

9    to the technology.  So, as an example, if you put a wireless

10   module into an automobile, we don't charge 2.25 percent on

11   the automobile because it is not directly related to the

12   technology.  We have a module licensing program that we would

13   license the module manufacturer if they want to use it in an

14   automobile or in an aircraft or something like that.

15   Q    Now, were any of these considerations discussed in this

16   letter, that is royalty caps, other ways of assessing the

17   business to see whether or not the end-product model made

18   sense?  Is any of this part of your letter?

19   A    No.  As I mentioned, we were scrambling, right.  They had

20   sued us, we were trying to put patents on the table, we sent

21   this as an initial offer with the hope that we would engage

22   in a negotiation.  And we had already set up a meeting for

23   Friday October 22nd, where at least we would start that

24   negotiation.

25   Q    I want you to look, if you could, at Exhibit 7242.  First

1    I want you to tell me what it is.

2    A   This is a copy of a presentation to HTC or High Tech

3    Corporation, which was a mobile device manufacturer.

4            MR. PRICE:  Your Honor, I move Exhibit 7242 into

5    evidence.

6            MR. PRITIKIN:  I think it has been admitted, your

7    Honor.

8            THE COURT:  It hasn't.  It is now.

9            (Exhibit 7274 admitted into evidence.)

10   By Mr. Price:

11   Q   Mr. Dailey, is this an example of an offer that Motorola

12   made to a potential licensee prior to October 1st, 2010?

13   A   Yes.  This is a presentation we made in a meeting

14   September 24th, 2009.

15   Q   You said this was made to?

16   A   HTC or High Tech Computer Corporation.

17   Q   If we go to the 11th page, maybe you can explain what is

18   meant by the third bullet point, "Motorola's 2.25 percent

19   standard rate applied to sales"?  What does that refer to?

20   A   This was applying our 2.25 percent standard rate to what

21   we understood to be HTC's 802.11 or WiFi-enabled equipment

22   that they had sold.

23   Q   Now, did this -- was this -- Did this turn out to be a

24   rate that applied just to SEPs?

25   A   With respect to --  We --  It just depended on the

1    engagement.  So it depended.  With some companies we had

2    broader discussions, with other companies they were just on

3    SEPs.

4    Q    If you look at the last bullet point there, it says,

5    "Deducted royalties paid under the 2003 agreement; no royalty

6    stacking."  What does that refer to within Motorola?

7    A    The "no royalty stacking" --  We have identified different

8    portfolios that we believe have 2.25 percent value, which are

9    WiFi, H.264, many of our cellular wireless portfolios, and

10   also wireless e-mail, which is a nonessential patent

11   portfolio that we have -- and smart phone portfolio.  So we

12   have different portfolios that we believe were worth

13   2.25 percent, and then depending on what products you were

14   building, you would pay 2.25 percent, but you would only do

15   it once.  So if you wanted to use -- if you had a product

16   that used four or five of our portfolios, it was just

17   2.25 percent once, or if you used one of them it was still

18   2.25 percent.

19   Q    And when you sent the October 21st, 2010 offer out --  If

20   we can go back to that, Exhibit 1?  Was it your expectation

21   that the 802.11 patents that were listed in the Annex to that

22   letter would be the only patents that would be discussed

23   between Microsoft and Motorola?

24   A    No.  This was the October 21st letter?

25   Q    Yes.

1    A    We weren't sure, but the expectation was that we were

2    going to have a broader discussion.  We were trying to put

3    our patents on the table.  If Microsoft only wanted an 802.11

4    license, we would discuss that.  But the understanding was

5    that there was a broader peace desired at the time.

6    Q    Now, in the second paragraph here, you see it says,

7    "Microsoft is only interested in licensing some portion of

8    this portfolio.  Motorola is willing to enter into such a

9    license also on RAND terms."  Why was that put in there?

10   A    That was put in because, as we discussed, Microsoft -- we

11   weren't exactly sure of all of the uses Microsoft had of our

12   technology.  And so if they only used a portion of the spec,

13   like the 802.11(a) or (b), then we could discuss a partial

14   license.  It would be unusual to do that, but we offered it

15   because we didn't know what Microsoft would find valuable.

16   Q    Did you expect to learn this sort of stuff when you talked

17   to Microsoft?

18   A    Yes.

19   Q    You see the next paragraph says, "Motorola will leave this

20   offer open for 20 days"?

21   A    Yes.

22   Q    Why was there a time limit involved here?

23   A    In my experience, when you send letters they typically

24   have a time limit so that you elicit a response from the

25   other side within that timeframe, and you don't leave an

1    offer open forever.  But the whole idea is to encourage

2    discussion within that timeframe.

3    Q    And if you would look at what we have already placed

4    before you, 7252, a loose piece of paper, before the break.

5    A    Yes.

6    Q    Could you tell us what 7252 is?

7    A    7252 is a letter that I received from David Kaefer, who is

8    the general manager of Microsoft's intellectual property

9    licensing program, offering us a license in August of 2011.

10             MR. PRICE:  Move Exhibit 7252 into evidence.

11             THE COURT:  I have already noted, over Microsoft's

12   objection, which I have overruled.  The exhibit is admitted

13   and may be published.

14             MR. PRICE:  Thank you, your Honor.

15             (Exhibit 7252 admitted into evidence.)

16   By Mr. Price:

17   Q    You see at the top it appears to be addressed to you on

18   August 1st, 2011.  Do you see that?

19   A    Yes.

20   Q    And if we look at the timeframe, if we are going to put

21   that in there, that would be after Motorola filed a lawsuit

22   in Germany, if this timeline is accurate?

23   A    Okay.

24   Q    If you go on down, you see the subject is the H.264 patent

25   license?

1    A    Yes.

2    Q    And just so we can get the topic of the letter that was

3    sent, you go into the second paragraph -- I'm sorry, the

4    first paragraph.  My apologies.  It says, "This letter is to

5    confirm Microsoft's offer to grant Motorola Mobility, Inc. a

6    worldwide nonexclusive license under Microsoft's portfolio of

7    patents and pending applications covering the subject matter

8    of ITU-T recommendation H.264."  Do you see that?

9    A    Yes.

10   Q    Let me ask you, in your testimony earlier to the jury you

11   talked about grant-backs?

12   A    Yes.

13   Q    And does this relate to what is referred to as a

14   grant-back?

15   A    This was an offer under Microsoft's patents for Motorola

16   to take a license.  And it said it would be -- it would ask

17   for reciprocity from Motorola on their patents.

18   Q    Reciprocity meaning what?

19   A    That we would grant our H.264 patents a license back to

20   them on certain terms.

21   Q    Now, when you set out these letters of October 20, 2010,

22   did you expect that Microsoft would also have

23   standards-essential patents which they could assert against

24   Motorola?

25   A    Yes.  In fact, we were aware that they had H.264 patents,

1    but we didn't know about 802.11.  But it was a reasonable

2    expectation they had a large portfolio.

3    Q   And in your experience when you send out an offer on a

4    standards-essential patent, what was your experience as to

5    what the other side would do if they had standards-essential

6    patents?

7    A   They would respond with, you need to take a license from

8    my patents.

9    Q   And would you take that into account in negotiations, in

10   terms of what each party should be doing in terms of rates

11   and money exchanges?

12   A   Yeah.  I think, if you look at my letter, I tried to

13   indicate that in the letter that we sent to Microsoft,

14   although I have been questioned on it many times.  But it was

15   the 2.25 subject to a reciprocal grant-back, which would

16   obviously reduce the amount of money that would be owed by

17   the prospective licensee.  Our standard rate was

18   2.25 percent, and then you had to take into account whatever

19   patents you were getting back on that same standard for that

20   rate.

21   Q   Would the existence of standards-essential patents on the

22   other side sometimes break down to zero?

23   A   Yes.  Or in some cases the money flowed in the other

24   direction as well.

25   Q   Now, I want to call your attention to another part of this

1    letter in August of 2011.  From the last line on, "Microsoft

2    will leave this offer open."  Through the signature line.

3    And you see at the end it says, "Microsoft will leave this

4    offer open for 20 days.  Please confirm whether MMI accepts

5    the offer."  And it is signed by, it looks like, a David

6    Kaefer?  Do you know who David Kaefer is?

7    A    David was the other person we had spoken to a lot.

8    Horacio and David did a lot of work together.

9    Q    By "spoken to a lot," you meant at Microsoft?

10   A    Yes.  He is the general manager of their intellectual

11   property and licensing group.

12   Q    Now, when you saw this line at the end of the letter

13   saying that Microsoft will leave this offer open for 20 days,

14   and please confirm whether MMI accepts the offer, did you

15   believe that this was somehow some sort of setup, or

16   something was wrong with doing this?

17   A    No.  Actually, what we did was put a response together

18   before the 20 days ran out, and we sent a letter back to

19   Microsoft.

20   Q    In your experience is this sort of thing unusual, that is,

21   at the end of the letter leaving the offer open for so many

22   days?

23   A    No.  It could be 20 or 15 or 30.  They are all different.

24   It is a normal practice so that when you receive it you kind

25   of know what the timeframe is you are working within to

1    respond.

2    Q    Now, let's go back to Exhibit 1, the October 21st letter.

3    And if we can highlight that last line?  How does this

4    language in your letter of October 21st compare with

5    Exhibit 7252, the August 1st, 2011, letter from Mr. Kaefer?

6    A    Well, it looks very similar, except who signed it, and

7    then the company.  It is Microsoft leaving the offer open.

8    It is a Microsoft letter, and it is Motorola leaving our

9    offer open.  So everything else is the same.

10            MR. PRICE:  Your Honor, there is another issue I want

11   to go into, but it would require sealing the courtroom.

12   Should I take that up first thing tomorrow perhaps?

13            THE COURT:  That would probably be a better plan.

14            MR. PRICE:  I will move on for now and come back to

15   another issue, Mr. Dailey.

16            THE COURT:  Stop for a second.  Let me explain

17   something.  Ladies and gentlemen, people who grade my

18   homework, the Ninth Circuit, have some rules about

19   confidential information, confidential documents.  The

20   general presumption is the public has a right to know

21   whatever happens in a trial.  Otherwise, how would you

22   understand the rulings that come from it?  The Court of

23   Appeals and the Supreme Court have carved out an exception to

24   that.  That exception will require us to clear out the

25   courtroom, with the exception of you and the lawyers.  And we

1 | will then talk about that area, and you will hear that
2 | testimony.  And when that is finished, we will go back into
3 | open session, and people are free to come back in again.  If
4 | you come in here and there is no one here, that's why.  It is
5 | a process that we try to keep to a minimum, but there is some
6 | information that the parties have deemed proprietary or
7 | confidential, and we are obligated to acknowledge that.
8 |     Thank you, Mr. Price.
9 | By Mr. Price:
10 | Q   Mr. Dailey, getting back to the question I asked you
11 | before when I asked you to compare the language, we now have
12 | that up on the screen, the language from Microsoft's
13 | August 1, 2011, letter, and the letter that you sent
14 | October 21st, 2010.  Seeing those together, what would you
15 | say the differences were?
16 | A   Just the names of the parties were reversed.  So it is now
17 | Motorola leaving an offer open, which was the original
18 | letter, and now Microsoft sent us a letter, and it says
19 | Microsoft will leave this offer open for 20 days.
20 | Q   Let's get back then to what happened.  We have the
21 | timeline and we have your October 21st letter going out.  You
22 | told us you didn't expect an acceptance.  What did you
23 | expect?
24 | A   On the October 21st letter?
25 | Q   Yes.

1   A    We expected a response.  They had already said, put your

2   patents on the table.  We were going to meet them on the 22nd

3   to talk about --  Well, we didn't know.  We hadn't been

4   invited up there to talk about what we were going to do to

5   resolve this litigation that they had filed against us.  But

6   we expected a negotiation and a response.

7   Q    Let's talk about the 22nd, the next day --

8   A    Sure.

9   Q    -- after you sent this.  First of all, do you know when

10  Microsoft got the letter?

11  A    They at least had it -- received it on the morning we met

12  them, on the 22nd.

13  Q    How do you know that?

14  A    They told us they received it when we met with them on the

15  22nd.

16  Q    Let's describe this meeting.  You came to Seattle?

17  A    We did, yes.

18  Q    And you say "we."  Who came with you?

19  A    Scott Offer, who was the general counsel of Motorola

20  Mobility.  And we met with Brad Smith, the general counsel of

21  Microsoft, and Horacio Gutierrez, the head of licensing for

22  Microsoft.

23  Q    How did you get from the Seattle airport here to

24  Microsoft?

25  A    Microsoft was being overtly friendly.  They had arranged

1    for a limousine to pick us up from the airport and bring us

2    to their meeting place.  They served a very nice lunch at the

3    meeting place.  I just remember Brad Smith shaking my hand

4    with both of his hands and; you know, thank you for coming,

5    and we hope we can get this resolved quickly.  It was a

6    little bit odd, but that's what happened.

7    Q    What do you mean it was "odd"?  Why do you think it was

8    odd?

9    A    I don't conduct licensing meetings quite in the same way.

10   It was just different.  It was out of norm from my

11   experience.

12   Q    Let's talk about then --  You get to the Microsoft

13   facility here, right?

14   A    Yes.

15   Q    When you got there and you met Mr. Gutierrez and

16   Mr. Smith, was there any discussion about the October 21st,

17   2010, letter?

18   A    Just a note that they received our gift.  It was a bit of

19   a joke at the beginning of the meeting.

20   Q    And who made this joke that they had received your gift?

21   A    That was Horacio.

22   Q    Mr. Gutierrez?

23   A    Yes.

24   Q    Now, when Mr. Gutierrez talked to you after this joke, at

25   any time did Microsoft say that this letter was outrageous or

 1   violated some commitment?

 2           THE COURT:  Mr. Price, you are leading.  You need to

 3   stop that.  The next time I will strike the question and I

 4   will admonish you formally in front of the jury.  We have

 5   gone through this three times now.

 6       Ladies and gentlemen, this witness is now a friendly

 7   witness, and the lawyer can't lead.  He can ask him, what

 8   happened at the meeting?  But he doesn't get to say, did this

 9   happen, did this happen, did this happen.  That's why I am

10   admonishing Mr. Price to stop doing that.  He is going to

11   stop.

12   By Mr. Price:

13   Q   Let me ask you the correct question, which is, what

14   happened after the joke about "we received your gift"?

15   A   Nothing.  We just continued on discussing the meeting.

16   There was no other commentary about the letter that they had

17   received or whether or not there were any issues with the

18   letter.

19   Q   So what issues were talked about at the meeting?

20   A   They talked a lot about their pillars, that they wanted to

21   tax Android --  I don't know if I am free to talk about the

22   rates that we discussed.  But they talked about --  I don't

23   want to --

24   Q   Let's not for right now, because I'm not sure what you are

25   talking about.  Go ahead.

1  A    They said they wanted to get certain royalties for our use

2  of Android.  They understood that we had patents, and they

3  had received the first list today; they were looking forward

4  to us putting our patents on the table, putting them hard on

5  the table; it may even require litigation, they understood

6  that; and they wanted a quick resolution, and they wanted us

7  to be friends.  They wanted the CEOs to be up on a stage and

8  shake hands and say that we have agreed to take -- pay

9  royalties on Android for the Android operating system.

10  Q    What did they say about this might require litigation?

11  A    They just said, you know, you need to put your patents on

12  the table, you may need to put them on hard so we can

13  acknowledge the value of those patents in an arrangement.

14  Q    Do you recall anything else that happened at this meeting

15  on October 22nd?

16  A    The rest of the meeting was -- it was very cordial, very

17  friendly.  We had lunch, like I talked about.  We

18  chitchatted.  And they said, we look forward to receiving

19  your patents and having further discussions.

20  Q    When you left the meeting --  I will ask it this way:  How

21  was the meeting terminated?  How was it left?  What were you

22  to do?

23  A    It was expected that --  We left the meeting, we went back

24  to our plane and flew back to Chicago --

25  Q    Hold on.

1   A    They expect --

2   Q    Just a second.  Let me ask a question so you have

3   something to respond to.  I want to focus at the end of the

4   meeting, how the meeting was rather than what you did.  At

5   the end of the meeting, how was it left?

6   A    It was left that Horacio and I would go work on a

7   framework for settling the patent disputes and put patent

8   peace between the two companies.

9   Q    Any further scheduling?

10  A    No, there were no other meetings scheduled at that time.

11  It was just --  We needed a few weeks to put our patents on

12  the table.  We expressed we were scrambling a bit.

13  Q    When you said you expressed you were scrambling, what did

14  you say?

15  A    We generally talked about we were surprised by the

16  lawsuit, and that we were scrambling to put our patents on

17  the table, and we would do that as quickly as we could.

18          MR. PRICE:  Your Honor, I will check with my

19  colleagues about the material that I am going to see if it

20  can be said in open court.

21          THE COURT:  Talk to Mr. Pritikin, where this is

22  going, so he is not surprised.  Thank you, counsel.

23  By Mr. Price:

24  Q    Mr. Dailey, we have the all-clear now for this question.

25  You earlier were talking about rates that were discussed in

1    the October 22nd meeting --

2    A    Yes.

3    Q    -- by Microsoft.  Can you tell us what was discussed in

4    that regard?

5    A    Sure.  There was discussion around --  Brad Smith was very

6    adamant they were looking for $5 a unit for every Android

7    handset that we shipped, but he wanted to pay us for our

8    patents, but we had to put our patents on the table so he

9    could understand how much.  And we asked a lot of questions

10   about, are you going to pay us this much?  Recognizing the

11   fact that Microsoft was, you know, rough and tough, six to

12   eight times our size in sales, and we both had substantial

13   patent portfolios, we were curious about how that royalty

14   flow would go.  Because at the time Motorola Mobility wasn't

15   making any money, so it was very difficult for us to stomach

16   a $5 per unit tax on every unit we shipped.

17   Q    Now, you just mentioned that you were wondering about

18   which way the money would flow given Microsoft was selling

19   more products.  How would that have anything to do with which

20   way the money would flow?

21   A    So all of these bilateral cross-license arrangements, you

22   have discussions about the use of, you know, your patents by

23   the other company, and our use of their patents by us, and

24   then you talk about the relative value.  And, obviously, the

25   more software and devices that you sell the more royalties

1   that would naturally flow from the other company to you; and

2   vice-versa, that money would flow from us for use of their

3   patents.

4   Q   What specifically, if anything, was said during this

5   conversation about that --  you kind of used your fingers and

6   went like this.

7   A   Yeah, that is exactly what the conversation was about,

8   were we going to get money or were they.  There was no

9   conclusion to that, as to which way the money would flow.  So

10  it was left open.

11  Q   After this October 22nd meeting, were there later

12  discussions about that?

13  A   Yeah.  We had many engagements with Horacio and David

14  Kaefer and myself to talk with Microsoft.  We exchanged term

15  sheets.  We met with them I think a half dozen times before

16  the end of the year, between kind of mid-November through the

17  end of the year.  There was a lot of discussions on terms as

18  to what patents would be included, what products would be

19  licensed, and the scope, this five or six years, seven years,

20  and then the relative exchange of financials was discussed as

21  well.

22  Q   Now, in the discussions --  You said there were some

23  discussions up through the end of the year --  Let me ask

24  this again.  Were there any discussions for the remainder of

25  the year?

1   A    There were, yes.

2   Q    About how many?

3   A    So I think a half dozen through the end of the year.  They

4   started after the third lawsuit Microsoft filed, this one.

5   Q    Focusing on that, what focus was there in those

6   discussions on the October 21st letter or the October 29th

7   letter?

8   A    So the discussions -- the term sheets were about --  There

9   were some exclusions, but it was all Microsoft patents for

10  use in certain Motorola devices, and all of Motorola's

11  patents for use in Microsoft devices, and then there was

12  discussion as to whether it would apply to all of Microsoft's

13  devices or some of Microsoft devices.  And so there was a

14  debate about which products would be covered, but it was all

15  of the patents.

16      And then there was -- the revenue flow or the money flow

17  was debated.  Not surprisingly, through the end of the year

18  Microsoft always suggested that money should flow to them,

19  and I think at that time I suggested all of the money should

20  -- the relative money should flow to us.  We were trying to

21  get to a zero/zero -- we were really trying to get a

22  royalty-free cross license with freedom for the businesses to

23  make their products.  That was the goal.

24  Q    You mentioned "zero/zero."  I want to make sure the jury

25  understands what your goal was here.  What do you mean you

1  said you were looking for a zero/zero?

2  A   We were trying to get to a place where Microsoft would

3  have access to the Motorola patents to build products, and we

4  would have access to Microsoft products to build our

5  products, and the relative exchange of money would be zero.

6  So maybe we pay them money, but maybe they pay us back.  We

7  weren't really tied up in the mechanism, but we were looking

8  at zero/zero is where the relative money flow is even.  It is

9  effectively not paying anything for access.

10 Q   If you would look at the timeline, you see it says,

11 "November 8th, 2010, Microsoft Windows Phone 7 handset in

12 stores."  Do you have any knowledge as to when these

13 Microsoft Windows Phone 7 handsets were in fact in the

14 stores?

15 A   They were in the November 8th timeframe, yes.

16 Q   And how were you aware of that?

17 A   I read about it, and we discussed it.  It was very widely

18 publicized.

19 Q   And on November 9, 2010, it says, "Microsoft sues for the

20 third time."  Do you see that?

21 A   Yes.

22 Q   Did you become aware around that time, November 9, 2010,

23 Microsoft filed its third lawsuit?

24 A   I did.  I was aware of that.  And there were phone calls

25 within Motorola, between Brad Smith and Scott Offer as well.

1    Q    Let me ask you, were you present during those phone calls?

2    A    No.

3    Q    So you don't have any firsthand knowledge as to what was

4    said in those phone calls?

5    A    That's correct.

6    Q    And after Microsoft sued for the third time, after that --

7    I am treading lightly here.  About how many discussions did

8    you guys have through the end of the year trying to resolve

9    this on a business level?

10   A    My recollection is there was approximately a half dozen

11   phone calls and meetings and exchanges between -- at least a

12   half dozen, with Microsoft.

13   Q    Now, in the examination that was done by Microsoft, there

14   were some questions about figures in the billion dollar range

15   of royalties going to Motorola.  Could you tell me what kind

16   of discussions there were about the magnitudes?

17   A    Yeah.  As I said, our goal was to get to zero/zero.  The

18   magnitude of payments --  Microsoft wanted money flowing in

19   their direction for Android.  It was very important for them.

20   So they always wanted the $5.  At other times it was $12 and

21   $22 for devices using their patents.  But they wanted that

22   money flowing to Microsoft, for whatever reason.  And so we

23   were asking for money in return.  It was in the hundreds of

24   millions.  And the hope was, based on our projections, that

25   it would be a zero/zero.

1         There were other mechanisms we talked about, which were

2    caps.  At one time I think Horacio proposed that $600 million

3    -- that once someone had paid a net $600 million to the other

4    party that the agreement would end.  So there were different

5    mechanisms that we talked about.  But we never talked about

6    billions of dollars flowing in any one direction, as a

7    net/net thing.

8    Q    You just mentioned something called a "cap."  Is that a

9    concept which you had seen before in licensing negotiations?

10   A    Yeah, many agreements -- depending on the success of one

11   company versus the other, the differential payments get

12   large, and then companies aren't comfortable agreeing to such

13   licenses, because they plan on being successful and they

14   don't want to pay too much money.  So they negotiate an

15   enterprise cap where their company won't pay more than X

16   dollars, whatever that cap is that they are comfortable with.

17   So it is all about getting the other party comfortable with

18   the terms, and so caps are used as a mechanism in licensing

19   agreements quite often.

20   Q    And let me ask you, in terms of your experience --  We

21   have talked about a royalty rate applying to an end product,

22   right?  Why was that part of Motorola's standard offer as it

23   would apply to an end product?

24   A    You know, my experience was licensing in the mobile space,

25   and we were licensing end product manufacturers.  So the

1  value of our licenses were associated with the end products.

2  If we wanted to go into a -- if a license was requested by a

3  component manufacturer, you had to still be

4  non-discriminatory and keep it at the level of the end

5  product.  And so we would license at that.  That's why the

6  letters indicated that the value we were looking for was at

7  the end product, knowing we would negotiate something that

8  was rational for the component supplier.  And we had done

9  that before with other component suppliers.

10 Q   And can you give an example without giving any

11 confidential information?

12 A   Sure.  We have a license with Qualcomm that is a component

13 supplier -- a large component supplier in the cellular space.

14      THE COURT:  Mr. Price, are you certain on Qualcomm

15 before you launch into that?

16      MR. PRICE:  I am not going to go into any more

17 detail.  I understand that.

18 By Mr. Price:

19 Q   I will just ask, what was the purpose of the cap in that

20 situation?

21 A   There were a number of provisions that we would negotiate,

22 similar to what we have suggested in Marvell, which is,

23 provides freedom of action, so that if we license a component

24 manufacturer their customers didn't sue us.  And then the

25 purpose of the cap was to cap the amount of value that would

 1   go from a component manufacturer to us, because that's what

 2   they were willing to pay.

 3             THE COURT:  Is this a good time to stop?

 4             MR. PRICE:  This would be fine, your Honor.

 5             THE COURT:  Ladies and gentlemen, I am going to let

 6   you retire to the jury room.  I have some brief matters to

 7   take up with the lawyers about tomorrow.  Thank you for a

 8   great deal of attention today.  Hopefully you now know how

 9   much fun this is, and we will look forward to seeing you

10   tomorrow.  The lawyers have done a nice job of using your

11   time wisely, and I appreciate that, and I know you do also.

12      I'm sure none of you will remember what I am about to tell

13   you.  Remember, until the trial is over, do not discuss this

14   case with anyone, including your fellow jurors, members of

15   your family, people involved in the trial or anyone else, and

16   do not allow others to discuss the case with you.  This

17   includes discussing the case in internet chat rooms or

18   through internet blogs, internet bulletin boards, e-mails or

19   text messaging.  If anyone tries to communicate with you

20   about the case, please let me know about it immediately.  Do

21   not read, watch or listen to any news reports or other

22   accounts about the trial or anyone associated with it,

23   including any online information.

24      I will warn you that apparently, at least in the online

25   version of the Seattle Times, there was a story.  If you

 1    want, have your family members save all of those editions,

 2    and when the trial is over you can read about yourselves.

 3    But don't do it until then.

 4        Please do not conduct any research, including consulting

 5    dictionaries, searching the internet or using other reference

 6    materials, and do not make any investigation about the case

 7    on your own.

 8        Finally, keep an open mind until all of the evidence has

 9    been presented, and you have heard the arguments of counsel,

10    my instructions on the law and the views of your fellow

11    jurors.  If anyone needs to speak to me about anything,

12    simply give a signed note to the clerk to give to me.

13        The same rules as this morning, we need to have you here

14    about 8:50 so that we know you are all here.  And you all

15    know how hard it is, so I won't remind you about that.

16        Ladies and gentlemen, please rise for the jury.

17    (At this time the jury left the courtroom.)

18            THE COURT:  Counsel, I think I have four matters to

19    take up with you.  Mr. Price, I don't know who else is going

20    to be examining witnesses.  My rule on leading is, I allow a

21    fairly substantial amount of it, as long as it is

22    foundational stuff.  When you are getting into the more key

23    details, you need to not lead.

24            MR. PRICE:  I understand.

25            THE COURT:  Understand that is a rule that I enforce.

1    I roughly think that you used today -- let's see, Microsoft

2    used two hours and 55 minutes, and Motorola used two hours

3    and 35 minutes.  So for whoever is keeping track of your

4    time, that was my -- those are my rough notes, but I have a

5    fairly elaborate way of keeping track of this, down to when

6    you stop talking.  I think that is fairly accurate.

7        What is our confidential matter for tomorrow, what kind of

8    matter?

9            MR. PRICE:  It is the RIM contract.

10           THE COURT:  How long do you expect that to take?

11           MR. PRICE:  Ten minutes.

12           THE COURT:  All right.  Then at 9:00 when you come in

13   we will exclude the audience until that information is

14   presented.  Wherever you are, Mr. Pritikin.  How long do you

15   expect --  Do you expect any cross-examination on that?

16           MR. PRITIKIN:  I do, obviously, because they have

17   essentially done their direct now.  It would be longer than a

18   normal redirect --

19           THE COURT:  Just on RIM?

20           MR. PRITIKIN:  Oh, on RIM?  I'm sorry.  Perhaps five

21   minutes, maybe ten.

22           THE COURT:  People, if you are coming, think about

23   9:15 or so.  We won't be taking a break.  So if we don't have

24   the door barricaded, you are welcome to come in; otherwise,

25   there will be a note on it saying that we are in closed

```
 1   session.
 2       Who are our witnesses for tomorrow?
 3           MR. HARRIGAN:  Your Honor, I think it is Garrett
 4   Glanz.  And then we have two depositions, Ms. Ochs, who will
 5   be played by Patty Eakes.  And then we have Mr. Davidson,
 6   Taylor and Curtis, Mr. Gutierrez -- if we get to him,
 7   Mr. Gutierrez, and after that Mr. Davidson.
 8           THE COURT:  I stopped on Ms. Ochs.  Taylor is next?
 9           MR. PRITIKIN:  Your Honor, it may depend in part on
10   when they finish with Mr. Dailey.  I don't know how long that
11   is going to run.
12           THE COURT:  We will find out in a moment.
13           MR. PRITIKIN:  The other witnesses we have tomorrow
14   are -- the live witnesses are Glanz and Gutierrez, and then
15   there is the Ms. Ochs' testimony, and then there are three
16   depositions that would include Taylor, Blasius and Curtis.
17           THE COURT:  All right.
18           MR. PRITIKIN:  What I would --  We will talk to them
19   this evening.  It may be that we can -- perhaps, in light of
20   the testimony today, we may be able to shorten some of these
21   deposition designations.  We will talk about that and see if
22   we can avoid inflicting that on the jury.
23           THE COURT:  Mr. Price, any idea on how much longer
24   you will be with Mr. Dailey?
25           MR. PRICE:  I hope not more than a half hour.  It is
```

1   on the clock.

2       I would like to ask a question about order.  The parties

3   have agreed to tell each other the order of the witnesses two

4   days in advance.  And there has been some change that we are

5   just learning about.  We were told last night that

6   Mr. Gutierrez would be first, and then Mr. Davidson after it

7   looks like a number of depositions.  I am just wondering what

8   has changed.

9           THE COURT:  Counsel, that is a discussion you all can

10  have.  I don't need to be out here.  If you can't figure it

11  out, talk to me tomorrow morning, and I will figure it out

12  for you.

13          MR. PRICE:  Okay.

14          THE COURT:  Other than that, we will be in recess.  I

15  will see you at 9:00 tomorrow.

16          MR. PALUMBO:  Your Honor, one quick matter.  In the

17  Jennifer Ochs deposition, there were a number of exhibits

18  that were admitted in the last trial.  There has been no

19  objection.  Would you like us to move those exhibits into

20  evidence now or are they already considered in evidence?

21  Once we start reading we just want to be able to publish the

22  exhibits as we are reading through the deposition.

23          THE COURT:  Why don't you all discuss it between

24  yourselves and figure that out.  And if you can reach

25  agreement, great.  If not, I will reach one for you.

1            MR. PALUMBO:  Okay.

2            THE COURT:  We will be in recess.  Thank you,

3    counsel.

4                (The proceedings recessed for the day.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    C E R T I F I C A T E

2

3

4      We, Barry Fanning and Debbie Zurn, Official Court

5   Reporters for the United States District Court, Western

6   District of Washington, certify that the foregoing is a true

7   and correct transcript from the record of proceedings in the

8   above-entitled matter.

9

10

11   DATED this ^  day of August, 2013.

12

13

14   /s/ Barry Fanning          /s/ Debbie Zurn

15   Barry Fanning, Court Reporter   Debbie Zurn, Court Reporter

16

17

18

19

20

21

22

23

24

25