1          UNITED STATES DISTRICT COURT

2      WESTERN DISTRICT OF WASHINGTON AT SEATTLE

3  _____

4   MICROSOFT CORPORATION,          )
                                    )
5                    Plaintiff,     )  C10-1823-JLR
                                    )
6   v.                              )  SEATTLE, WASHINGTON
                                    )
7   MOTOROLA INC., et al,           )  August 28,2013
                                    )
8                    Defendant.     )       TRIAL
                                    )
9  _____

10            VERBATIM REPORT OF PROCEEDINGS
         BEFORE THE HONORABLE JAMES L. ROBART
11           UNITED STATES DISTRICT JUDGE
   _____

12

13

    APPEARANCES:
14

15

16   For the Plaintiff:     Arthur Harrigan, Christopher
                            Wion, David Pritikin Richard
17                          Cederoth, Andy Culbert,Nathaniel
                            Love and Ellen Robbins
18

19

20
     For the Defendants:    Ralph Palumbo, William Price
21                          Brian Cannon, Kathleen Sullivan
                            Andrea Roberts and Philip McCune
22

23

24

25

```
 1                    EXAMINATION INDEX

 2   EXAMINATION OF:                                      PAGE
                        CROSS-EXAMINATION                  21
 3                      REDIRECT EXAMINATION               25
                        REDIRECT EXAMINATION               37
 4                      By Mr. Pritikin:
                        RECROSS EXAMINATION                55
 5                      BY MR. PRICE:
                        REDIRECT EXAMINATION               59
 6                      BY MR. PRITIKIN:
        GARRETT GLANZ   DIRECT EXAMINATION                 61
 7                      BY MR. HARRIGAN:
                        CROSS EXAMINATION                  78
 8                      BY MR. CANNON:
        JENNIFER OCHS   EXAMINATION                        85
 9                      BY MS. ROBBINS:
                        EXAMINATION                        96
10                      BY MR. PALUMBO:
                        EXAMINATION                       112
11                      BY MS. ROBBINS:
        HORACIO GUTIERREZ,   REDIRECT EXAMINATION         118
12                      By Mr. Pritikin:
                        CROSS-EXAMINATION                 163
13                      By Mr. Price:

14

15

16                    EXHIBIT INDEX

17
     EXHIBITS ADMITTED                                    PAGE
18      2833                                                 9
        3162                                                28
19      7241                                                32
        1581                                                66
20      1139                                                69
        1583                                                71
21      1584                                                73
        1179                                                74
22      16, 1608, 1610, 3404 and 3412                      112
        7254                                               159
23      7119                                               194

24

25
```

1          THE COURT:  The clerk will call this matter.

2          THE CLERK:  C10-1823, Microsoft versus Motorola.

3    Counsel, please make your appearances for the record.

4          MR. HARRIGAN:  Good morning, your Honor.  Art

5    Harrigan representing Microsoft.  To my right is Shubham

6    Mukherjee from the Sidley firm, Mr. Pritikin, Mr. Cederoth,

7    and Mr. Culbert from Microsoft, Ms. Robbins and my partner,

8    Chris Wion.

9          MR. PALUMBO:  Ralph Palumbo from Motorola, and we

10   have our usual crew with us this morning, Mr. Price,

11   Mr. Cannon, Ms. Sullivan, Ms. Roberts.

12         THE COURT:  Thank you.  It is my job to keep you

13   apprised of any communications I received from the jury.  One

14   has called to say she is getting off the bus right now and

15   will arrive here shortly.  A different one from the one

16   yesterday.  Another one has asked if she could use a pad with

17   a backing as opposed to a steno notebook.  And I have

18   consented to that without consulting with you.  Third, we

19   have one who wanted us to bring in a large pad of paper and a

20   lot of stickies.  Apparently in anticipation for jury

21   deliberations.  I have said that's fine also.

22      The juror who was very concerned about her employer not

23   paying for her second week of jury service, the general

24   counsel has kindly consented they would be delighted to pay

25   for a second week.  And they don't even have any cases

 1   pending in federal court.  That's good.  I think that's

 2   everything we have heard from them recently.  They are all

 3   exclusively housekeeping details.

 4       In terms of housekeeping details, I would like to run

 5   through with you my notes about where we are and our

 6   remaining time.  I have been leaving on your tables a summary

 7   of how much time you have used each day and how much time you

 8   have remaining.  Using that as my guide, today is a testimony

 9   day.  Tomorrow is a testimony day.  I would like to schedule

10   the informal jury conference for 4:00 tomorrow, so we will be

11   stopping testimony presentation a half hour early.  Remember,

12   when we had our pretrial conference, that's where you can all

13   take your jackets off, there is no court reporter.  You have

14   had the court's proposed instructions for a while.  It is

15   simply a chance for you to tell us if there are things in

16   there that you think are wrong so we can look at those

17   questions, things that you think -- you have proposed and you

18   think we should give that we haven't given and why.  And then

19   armed with that, we will prepare the final set.  That should

20   give us Friday to do further testimony.  Monday, you will

21   recall, is a holiday.  Tuesday morning we will have

22   exceptions taken.  And that will probably be 8:30.  And those

23   will be on the record, formal exceptions, if you're not

24   familiar with -- I'm not sure what the standards are in the

25   federal circuit, but the standards in the Ninth Circuit are a

1  little unusual.  Please review that.  And by my calculations,

2  you should finish your testimony on Tuesday.

3      If that all works that way, then I'm going to change my

4  allotment of time for you, and give you your full 16 hours

5  for presentation of testimony, because that will leave us

6  Wednesday to finish up any testimony, though I don't think

7  there should be any, for me to read instructions and then for

8  you all to do your closings.  I would like to get you pinned

9  down to a formal length of your closing, because I need to

10  structure that around breaks and lunch.  I really prefer to

11  do closings back-to-back as opposed to having an interlude

12  between them.

13      Mr. Harrigan, I'm not sure who is going to do closing.

14  Can I assume that you will take no more than 90 minutes?

15          MR. HARRIGAN:  That's the number on our schedule --

16  our own internal schedule, your Honor.

17          THE COURT:  Are you willing to more formally commit

18  to that, since I'm afraid you have lost track of time

19  previously?

20          MR. HARRIGAN:  I am happy to abide by 90 minutes.

21          THE COURT:  There is nothing magic about it.  If you

22  want longer, just tell me.  But it changes when I schedule

23  lunch and some of the other considerations.  Please don't

24  feel like I am trying to force this on you, but it is very

25  helpful for me to know.  I'm not sure who is speaking --

1  Mr. Price.

2       MR. PRICE:  Your Honor, 90 minutes seems about right.

3       THE COURT:  Unless the defendant wants to go after

4  lunch, so Microsoft would go, and then you will have a break,

5  that's the other alternative.  In my practice that is not a

6  good idea.  Any thoughts?

7       MR. HARRIGAN:  Just for clarification, your Honor, we

8  would anticipate using 15 minutes or so for --

9       THE COURT:  I understand that.

10       MR. PRICE:  Your Honor, I'm somewhat indifferent.

11  Actually whatever fits the court's schedule.

12       THE COURT:  The second hardest thing we have to do

13  around here, other than get pens and pencils, is get lunch

14  brought in.  They will be ordering lunch early in the

15  morning.  If we can do them back-to-back that will be good,

16  and I will put you down for 90 minutes.  Those were all of my

17  housekeeping details.

18     Mr. Harrigan, I understand you had something?

19       MR. HARRIGAN:  We would like to add one housekeeping

20  detail.  I haven't personally done the arithmetic, but I am

21  informed our remaining time should be ten hours and 44

22  minutes, not 14 minutes.  If you could revisit the math and

23  tell us whether that is right or wrong, we would appreciate

24  it.  Not necessarily this second.  And then we have another

25  matter that Mr. Pritikin will raise.

 1          THE COURT:  Mr. Pritikin.

 2          MR. PRITIKIN:  Good morning, your Honor.  This

 3   relates to two exhibits that were added last night,

 4   presumably for use with Mr. Dailey this morning.  Let me hand

 5   up copies.  I have only handed you the one that we have a

 6   problem with, your Honor.  There is a second exhibit, which

 7   has been marked as 7254, and we don't have a problem with

 8   that one.  7253, Mr. Price tells me that it is not planned

 9   for the direct examination, so we may be dealing with

10   something that is hypothetical here.

11          MR. PRICE:  Your Honor, just to move things along,

12   this one is a complete hypothetical.  It was added only if

13   there is going to be an objection to the foundation of the

14   second one.

15          MR. PRITIKIN:  That would solve the problem, as long

16   as this isn't offered.

17          THE COURT:  All right.

18          MR. PRITIKIN:  That was easy.

19          THE COURT:  Mr. Price, anything on behalf of

20   Motorola?

21          MR. PRICE:  We just need to make sure the only people

22   in the courtroom are folks who signed the protective --

23          THE COURT:  Let me ask one question first.  Do we

24   have our full jury?

25          THE CLERK:  Yes.

1          THE COURT:  Do we have anyone in the courtroom --  If

2     everyone will turn around who is not covered -- or is covered

3     under the protective order.  There are four Starbucks within

4     walking distance.

5     (Closed proceedings.)







































27



10      THE COURT:  Mr. Price, do you have further questions?

11      MR. PRICE:  I was going to wait for the public to

12 come in.

13      THE COURT:  Let's start.

14 By Mr. Price:

15 Q   Mr. Dailey, I would like you to look at a document we

16 looked at yesterday that is in evidence, 7242.  That was a

17 presentation that was made to HTC in 2009.  Do you see that?

18 A   Yes.

19 Q   If we go to Page 11 here, we were focusing on this, which

20 was a presentation to HTC about 802.11 patents.  Do you see

21 that?

22 A   Yes.

23 Q   And this had the --  The third bullet point has what as

24 the standard rate?

25 A   Yes, it had the 2.25 percent.

1    Q    Now, after this presentation, were there further

2    discussions with HTC?

3    A    We did have further discussions, yes.

4    Q    And as a result of further discussions, what happened with

5    respect to what Motorola then suggested to HTC?

6    A    We expanded the scope of the discussion to include more

7    technologies, both essential and nonessential.

8    Q    If you look at Exhibit 3162, could you tell us what 3162

9    is?

10   A    3162 is a copy of a presentation made in 2011 with

11   HTC concerning broadening -- continuing the discussions, but

12   broadening the context.  If you look at --

13   Q    First, let me do something.

14          MR. PRICE:  Your Honor, I would move Exhibit 3162

15   into evidence.

16          THE COURT:  Any objection?

17          MR. PRITIKIN:  No, sir.

18          THE COURT:  It is admitted and it may be published.

19          (Exhibit 3162 admitted.)

20   By Mr. Price:

21   Q    Can you tell us, sir, how the offer changed after

22   negotiations?

23   A    We were continuing negotiations with HTC, and we expanded

24   from just discussing 802.11 to including LTE or 4G

25   technologies, H.264 --  If you look on slide 6, there is a

1   pretty good illustration of all of the technologies we were

2   talking to HTC about at that point, location-based

3   applications, proximity censor, E911, and it should have been

4   wireless e-mail as well, on the right-hand side.

5   Q   Are all of these patents that were being discussed

6   standards-essential patents?

7   A   No, it was a mix of standards and non-standards-essential.

8   Q   What kind of non-standards-essential patents was Motorola

9   offering in its portfolio to HTC?

10  A   The non-standards-essential would have been the wireless

11  e-mail patents.  The E911 may or may not have been a

12  standard.  I'm not sure.  Location-based applications,

13  proximity sensor -- we also -- and application management

14  would have been nonessential portions of the discussion.

15  Q   And so why in the negotiations --  After the initial offer

16  of 2.25 on 802.11, why did Motorola then, during

17  negotiations, come to a point where it was offering all of

18  these non-standards-essential patents and other patents?

19  A   We were doing that because both parties were looking for

20  patent peace and we wanted to resolve all of the patent

21  problems between the companies.  We were looking to broaden

22  the discussion.  Both parties were looking to have a broader

23  agreement, a settlement.

24  Q   And if you would look at the last page, Page 8, did this

25  sort of provide an overview of the terms that you were

1  suggesting?

2  A   Yes.  This is a real high-level term sheet, a 15-year

3  term, which patents, essential and nonessential, would be

4  included, which products would be licensed, and then the

5  royalty rate and base.

6  Q   And so on the royalty rate and base, you have 2.25

7  covering patents that you then list up there under "patents"?

8  A   That's right.  And it would have been on the net selling

9  price of the device.

10 Q   Let me ask you, by the way, at the time in October when

11 Microsoft, after you had been sued, and they asked you to --

12 they said put your patents on the table, how many patents did

13 Motorola have?

14 A   Motorola had approximately 10,000 U.S. patents -- grants

15 of patents.

16 Q   And what sorts of areas did those cover that might have

17 some relevance to Microsoft?

18 A   We knew wireless e-mail would have relevance.  Some voice

19 recognition activity, location-based services they use on

20 smartphones.  It would have been technologies --  We had some

21 early operating system development technologies as well.  So

22 it was a mix of essential and nonessential patents that would

23 have been relevant.

24 Q   Now, I want to take you back now to October 22nd, 2010.

25 And maybe we can put up a timeline --  I will put it up on

1    the monitor so I don't kill anybody with the board.  If you

2    look at the monitor, we have added one little thing here.

3    That is the meeting of GCs in Seattle.  First, let me ask you

4    about an inaccuracy here.  You see that has six people at the

5    table.  How many were actually there?

6    A    There was just four people.

7    Q    Was the table a bit bigger than this one?

8    A    It was.  It was a very nice conference room.

9    Q    After that meeting, and after you left - you talked about

10   it yesterday, so I don't want to summarize it too much - you

11   then sent out the October 29th, 2010, letter?

12   A    Yes.

13   Q    Let me ask you, between October 21st and November 9th,

14   when Microsoft sued Motorola for the third time, between that

15   timeframe, what response did you get from Microsoft to those

16   two letters?

17   A    I don't recall receiving any response.  No response.

18   Q    Now, I would like you to look, if you would, at

19   Exhibit 7241.  Do you recognize what 7241 is?

20   A    This was an e-mail I received from Horacio Gutierrez on

21   November 9th, forwarding the copy of the complaint that they

22   had filed.

23   Q    And when you refer to the complaint they had filed --  If

24   we can go back to the timeline very quickly.  This is the

25   complaint that was filed here on November 9, 2010, where

1   Microsoft sued Motorola in this courtroom, correct?

2   A   Yes.

3           MR. PRICE:  Your Honor, I move 7241 into evidence.

4   It would be the entire exhibit that we will be moving into

5   evidence.

6           MR. PRITIKIN:  This exhibit I would object to, 401,

7   402 and 403, your Honor.

8           THE COURT:  Does someone have a hard copy of the

9   exhibit?

10          MR. PRICE:  Yes.

11          MR. PRITIKIN:  Your Honor, maybe the copy I have in

12  this binder is incomplete.  Let me find out from Mr. Price.

13      No objection to the attachment, your Honor.  It is the

14  cover e-mail my objection relates to.

15          THE COURT:  I will overrule the objection.

16          (Exhibit 7241 admitted.)

17  By Mr. Price:

18  Q   I would ask that you put 7241 up.  If we could look at the

19  bottom of this.  Do you see it says, "From Brad Smith to

20  Scott Offer," dated November 9, 2010?  Could you tell us who

21  is Brad Smith?  Who is sending the e-mail?

22  A   Brad Smith is the general counsel of Microsoft.

23  Q   And then who is the recipient?  Who is it being sent to?

24  A   He is sending it to Scott Offer, who is the general

25  counsel of Motorola Mobility.

Q    And you say, "Scott, as discussed, here are the papers as
filed.  I look forward to talking again and to, no doubt,
reading in the very near the work of your very good
litigation team.  Brad."

     I just want to ask, did you get this yourself from
Mr. Smith?

A    No, I did not.

Q    So how did you get a copy then of this e-mail that
Microsoft's general counsel had sent to Motorola?

A    Horacio Gutierrez forwarded me the e-mail that Brad had
sent to Scott.

     MR. PRICE:  Your Honor, I have no further questions.
I do have a request for a short sidebar.

     THE COURT:  What topic?

     MR. PRICE:  A topic of a corrective instruction.

     THE COURT:  All right.  I will see you at sidebar.

(Sidebar discussion out of the presence of the jury.)

     MR. PRICE:  It is actually a requesting of a
corrective limiting instruction.  One, my understanding is
that when reading the court's order that said there was not
going to be a reference to "the court," and that instead to
"facts."  And one of the facts that was read was that the
court had found that Motorola was wrong, was the substance.
And I believe that went beyond.  I would like to ask that the
jury be instructed to disregard that.

1      The second, because we have gotten into the allegations in

2  the litigation with RIM, and Microsoft has made quite a big

3  deal about the fact that there was an accusation that it was

4  inappropriate to go to the ITC, I think there should be a

5  limiting instruction -- a limiting instruction to the jury

6  that accusation is not to be taken as evidence of a fact that

7  Motorola did anything inappropriate in going to the ITC.

8      MR. PRITIKIN:  Your Honor, you warned the parties

9  before the trial began that if they waded into the subjects

10  that are covered by the findings, particularly where they

11  offer partial testimony where they are going to be impeached,

12  that the findings could and would be used.  They brought this

13  on themselves.  They are trying to kind of slide through and

14  use RIM in a way that is helpful and duck other parts of it.

15  All we did was read the finding.  I think at some point they

16  have crossed the line.  As I said, they brought it upon

17  themselves.  I don't think any kind of further instruction is

18  necessary at this point.

19      THE COURT:  I am not going to go back on the comment

20  about the court.  I think that will only draw more attention

21  to it than it is probably worth.  I am concerned about the

22  ITC provision.  What would you ask the court to say?

23      MR. PRICE:  I would ask the court to say:  There was

24  testimony that there was litigation between RIM and Motorola,

25  and that part of that litigation involved accusations on both

1   sides, and one of those accusations was that Motorola

2   breached its RAND agreement by going to the ITC.  I have

3   instructed you that you are not to take that as any evidence

4   whatsoever that Motorola in fact breached any obligation by

5   going to the ITC.

6           MR. PRITIKIN:  I would strenuously object to an

7   instruction like that.  That will carry over into this case.

8   That is part of the practice and conduct that is at issue

9   here.  I think there is nothing in that -- there is nothing

10  there that is in any way misleading or leads to the

11  impression that going to the ITC was the conduct that was

12  wrong.  What it says is the --  The point of it is that's

13  what put the pressure on them, and that explains why they

14  caved and agreed to the high royalties that were in the

15  agreement.  That's precisely what the court found.

16          MR. PRICE:  Those are two different issues.  And

17  there may be one reason for agreeing on a particular amount.

18  And one reason might be that you have breached patents and

19  there is an injunction looming.  The second issue is whether

20  there was wrongful conduct in connection with that pressure.

21  And what Microsoft is suggesting is that royalty was arrived

22  at by wrongful conduct.  The court never found that conduct

23  was wrongful.  And so the limiting instruction I am asking is

24  that this jury cannot consider that as being evidence of

25  anything wrongful.  That is not this case.  That is a

1    completely different case with different facts.  And

2    obviously Microsoft has told you that is not what --

3         THE COURT:  I am not going to give --  I will break

4    this into two parts.  I am not going to go back and do

5    anything about the reference that the court found something

6    or said something.  I think that's -- I think the jury

7    understands these are findings and they were done by the

8    court.  I don't think there is any reason to do that.

9         As to the latter, I am going to permit the record to stand

10   as it is.  It seems to me that, as I understand Motorola's

11   defense in this, they are saying that they wrote these

12   letters, and that they expected further negotiations.

13   However, they also then took conduct in this case in regards

14   to proceedings that Motorola was involved in and that

15   Microsoft initiated in the ITC.  And I think you will be

16   trying to -- get into trying to parse that out.  I am not

17   willing to draw a clear line as to any fact other than there

18   is a business pressure created by that.  I think that's what

19   the findings said, and that's what I am going to continue to

20   hold.

21        MR. PRICE:  Your Honor, will I get the opportunity to

22   put something in writing?  What I am worried about is the

23   accusation, not the finding; the testimony that one party is

24   accusing somebody of something wrong is not evidence

25   something is wrong.  It is as simple as that.  That's what it

1   is being presented as --

2            THE COURT:  When you prepare something, we will take

3   it up at that time.

4   (End of sidebar conference.)

5            THE COURT:  Mr. Price.

6            MR. PRICE:  Pass the witness, your Honor.

7            THE COURT:  Mr. Pritikin.

8                        REDIRECT EXAMINATION

9   By Mr. Pritikin:

10  Q   Mr. Dailey, I want to set some background here and cover

11  some areas we covered yesterday.  Motorola has a lot of

12  different standards-essential patents, right?

13  A   We have a lot of different portfolios --  Sorry?  In what?

14  Q   Of standards-essential patents?

15  A   Yeah, we have several, sure.

16  Q   And a number of them are essential for cellular telephone

17  communications?

18  A   Yes.

19  Q   So that means if I have a cell phone, and I want to make a

20  call on the cell phone, I have to use a cell standard, right?

21  A   Yes.

22  Q   But to be clear on this, the cellular portfolios were not

23  among the portfolios that Microsoft was offered a license to,

24  or wanted a license to?

25  A   We have had discussions about them --

1   Q   Let me --

2          THE COURT:  Don't cut him off, counsel.

3          THE WITNESS:  We have discussed licensing, and

4   Microsoft has had various -- because they have interest in

5   having a cellular device, is my understanding.

6   By Mr. Pritikin:

7   Q   But to be clear, the 802.11 standard and the H.264

8   standard are different from the cellular standards?

9   A   Yeah.  Some patents overlap between WiFi and cellular.  In

10  general, they are different portfolios.

11  Q   And you testified yesterday that if a licensee uses four

12  or five portfolios, Motorola expects them to pay a royalty of

13  2.25 percent?

14  A   If they use four or five portfolios?

15  Q   Yes.

16  A   Yeah.  We have --  With the no stacking, that's correct.

17  Q   And if a licensee uses just one portfolio, you still want

18  2.25 percent, right?

19  A   In general, yes.

20  Q   Now, if you are asking 2.25 percent for all of them, then

21  one by itself can't be worth 2.25 percent, can it?

22  A   No.  We believe that they are worth 2.25 percent when we

23  develop them, yes.

24  Q   You talk about Motorola's no-stacking policy, and the

25  no-stacking policy takes into account the various Motorola

1    portfolios, right?

2    A    That's correct, sure.

3    Q    Meaning that you don't get another 2.25 percent for each

4    of them, right?

5    A    That's correct, yes.

6    Q    But it doesn't take into account the stacking of

7    Motorola's portfolio with those of other companies that have

8    patents that are essential to the standard, does it?

9    A    Well, the 2.25 is set as a reasonable rate, but we don't

10   take into account what the other party is --  We do through

11   negotiations, it comes out, but not up front, that's correct.

12              THE COURT:  Ladies and gentlemen, the counsel don't

13   know because it just came up recently.  We got a note from

14   one of the jurors asking if we would define the terms

15   "hold-up" and "stacking."  And since we have waded into this,

16   let me read you two definitions that came from a prior order

17   of the court.

18       "The payment of excessive royalties to many different

19   holders of standards-essential patents is referred to as

20   royalty stacking."

21       And in response to the second part of that, the question

22   of hold-up:  "The ability of a holder of a

23   standards-essential patent to demand more than the value of

24   its patented technology, and to attempt to capture the value

25   of the standard itself is referred to as patent hold-up."

1      So with that --  We are all very familiar with these

2   terms.  There was a question that came out with the jury this

3   morning, and I wanted to make sure, since we are into that

4   area, that we answered that question.

5           MR. PRITIKIN:  Thank you, your Honor.

6           JUROR:  I am having a hard time hearing you.

7           THE COURT:  Did you hear what I just said or do you

8   need me to reread it?

9           JUROR:  Just sometimes I can't hear you.

10          THE COURT:  Then I will do it again.  There was a

11  request for a definition.  And the court has previously

12  found:  "The ability of a holder of a standards-essential

13  patent to demand more than the value of its patented

14  technology, and to attempt to capture the value of the

15  standard itself is referred to as patent hold-up."

16     And, secondly:  "The payment of excessive royalties to

17  many different holders of standards-essential patents is

18  referred to as royalty stacking."

19     When you see the final jury instructions, those terms are

20  also defined in there.  You will have a copy of them when you

21  do your jury deliberations.  Thank you.

22     Mr. Pritikin.

23  By Mr. Pritikin:

24  Q   Mr. Dailey, in response to questions from Mr. Price you

25  testified about some licensing discussions with HTC.  Do you

1    recall that?

2    A    Yes.

3    Q    And HTC makes cell phones?

4    A    Smartphones, and I think they made tablets.  I'm not sure

5    if they do.  I think they do.

6    Q    They are one of the largest makers of cell phones, aren't

7    they?

8    A    They were at a point in time.  I don't believe they are

9    now.

10   Q    Were you personally involved in the license discussions

11   with HTC?

12   A    I was, yes, in the 2011 timeframe.

13   Q    So as a part of getting involved you familiarized yourself

14   with the background of prior licenses that Motorola had had

15   with HTC, correct?

16   A    At a high level, sure.

17   Q    And so, therefore, you are aware that HTC had previously

18   taken a license to a portfolio of cellular

19   standards-essential patents in 2003?

20   A    That's correct, yes.

21   Q    And that agreement did not involve 802.11 or H.264, did

22   it?

23   A    Right.  That was the reason we re-engaged with them in

24   2009.

25   Q    So you came back in 2009, and this time you offered a

1  license to your 802.11 portfolio at 2.25 percent; is that

2  right?

3  A  Yes.

4  Q  And the reason you were doing that is you wanted to

5  pressure HTC into renewing the cellular license, correct?

6  A  No.  The cellular license is still in effect.

7  Q  Well, it wasn't in effect then, was it?

8  A  I think it is in effect today, yes.  We still receive

9  payments on it.

10  Q  Motorola did not actually enter into an agreement with HTC

11  for Motorola's 802.11 patents at a rate of 2.25 percent, did

12  you?

13  A  No, we haven't completed those negotiations yet.

14  Q  Well, they haven't agreed to pay you 2.25 percent for your

15  802.11; isn't that a fact, sir?

16  A  Yes.

17  Q  Now, after the presentation that was delivered on

18  September 24th of 2009, you made a change in what you were

19  offering to HTC, didn't you?

20  A  Yes.

21  Q  And let's take a look at Exhibit 3162.  Can we put that

22  up?  This is a presentation that was given to HTC in February

23  of 2011.

24  A  Yes.

25  Q  Would you turn, please, to Page 6?

1    THE COURT:  Counsel, has this been admitted?

2    MR. PRICE:  Yes.  I think I just moved it into

3  evidence, your Honor.

4    MR. PRITIKIN:  I think it is in evidence.

5    THE COURT:  Thank you.

6  By Mr. Pritikin:

7  Q   And on Page 6, at this time you were talking about all of

8  the different standards that you had essential patents for,

9  right?

10  A   Essential and nonessential, yes.

11  Q   And some of these --  CDMA is cellular, right?

12  A   Yes.

13  Q   GSM is cellular?

14  A   Yes.

15  Q   3GPP is cellular?

16  A   Yes.

17  Q   And I think you told us you had a very strong portfolio on

18  cellular, right?

19  A   A strong portfolio.  I don't remember "very."

20  Q   Let's turn to Page 8.  The rate that you were offering for

21  a license to all of these portfolios that we looked at on

22  Page 6 was 2.25 percent, right?

23  A   Yes.

24  Q   So somewhere between 2009 and 2011 Motorola had thrown in

25  another dozen standards-essential patents for the

1    2.25 percent royalty?

2    A   You have to understand, when you expand the scope of a

3    license it is in a bilateral fashion.  So we increased the

4    scope of the license from a narrower license to a broader

5    license, but it was bilateral.  So Motorola was to receive a

6    broader license from HTC and grant a broader license to

7    Motorola.  So it is bilateral in nature.  You're accurate,

8    there is more on the table.

9    Q   The bottom line is, they wouldn't take a license at

10   2.25 percent for 802.11 by itself, and you came back and

11   said, here are our strong cellular patents, here are eleven

12   portfolios of patents, and we want 2.25 percent for that?

13   That was the state of play, wasn't it, sir?

14   A   You are reading --  I'm not sure what HTC thought or

15   whether they would enter into it.  We didn't conclude a

16   license with them on the additional technologies.  They

17   already have a license in place today on some of the cellular

18   standards, and we were looking to have a broader agreement

19   with HTC.

20   Q   I want to return to the subject of Marvell.  I think you

21   were asked a few questions by Mr. Price about that.  Can we

22   pull up Exhibit 16?  I think it is in the notebook, or I

23   handed up a copy.  Do you still have it, Mr. Dailey?  If not,

24   I can give you one.

25   A   Jennifer Ochs?  Yeah, I have one.

1   Q   Just to remind everybody --  This is the draft of the

2   proposed license that was sent to Marvell by Motorola; is

3   that correct?

4   A   That's correct, yes.

5   Q   Now, you didn't dispute the fact that Microsoft was carved

6   out of this and wouldn't get any chips sold -- Microsoft

7   wouldn't have the benefit of the license; isn't that correct?

8   A   They were listed as a repudiated party.

9   Q   That meant that they were carved out, right?

10  A   Yes.

11  Q   And you said the reason they were carved out is there was

12  a defensive suspension clause.  I think you said that in

13  response to questions from Mr. Price.  Do you recall that

14  testimony?

15  A   Yes.

16  Q   And a defensive suspension clause is one that allows you

17  to end an agreement or not license someone if they sued you,

18  is that your understanding of it, at a high level?

19  A   At a very high level.  Defensive suspension protects you

20  so you can have a discussion with the customer of a component

21  supplier about patents instead of directly through the

22  component supplier, that's correct.

23  Q   Now, the truth of the matter is, Mr. Dailey, is it not,

24  that the reason Microsoft is carved out of this agreement was

25  not because of a defensive suspension provision?  I can help

1  you with that.  Let's look at Paragraph 3.5.  Let's look at

2  page -- Annex C first.  That might be helpful.  This is the

3  list of repudiating parties.  Do you see that?  Let's put

4  that up.

5  A    Yes.

6  Q    And you see that Microsoft Corporation is listed as a

7  repudiating party?

8  A    Yes, along with Apple and Gemalto, that's correct.

9  Q    Let's turn back to Section 3.5.  This is the section you

10  talked about yesterday that talks about repudiating parties,

11  isn't it?

12  A    Yes.

13  Q    And repudiating parties are defined in this paragraph,

14  right?

15  A    They are, yes.

16  Q    And those are the parties that are not going to get the

17  benefit of a license to Marvell, correct?

18  A    That's correct.

19  Q    Let's see what it says.  Let's pull out this language.  It

20  says, "The grants and covenant under Section 3 shall not

21  apply or extend in any way to any third party, including,

22  without limitation, Marvell customers that have asserted

23  properties against MMI or its affiliates or have otherwise

24  declined, repudiated or failed to accept an offer from MMI to

25  license MMI's essential properties on reasonable and

1    non-discriminatory terms and conditions, each a repudiating

2    party."

3        And Microsoft, in your view, fit into the category of a

4    company that had declined, repudiated or failed to accept an

5    offer from MMI, right?

6    A   I don't know if I testified to that.

7    Q   Well, I am asking you that question now, not what you

8    testified to yesterday.  Microsoft, in your view, fell into

9    the category of a company that had declined, repudiated or

10   failed to accept an offer from MMI to license MMI's essential

11   properties on reasonable and non-discriminatory terms and

12   conditions, right?

13   A   No, I don't --  The reason they are on the list --  I

14   didn't put this draft together, although I did approve it, as

15   you pointed out yesterday.  I'm not sure they fell under the

16   asserted properties, because they have asserted properties

17   against MMI, or whether it fell under those terms.  But it

18   was one of those two.  Because "asserted" refers to

19   litigation and "properties" refers to patents, in general.

20   Q   Now, by November of 2011, when this proposal was sent,

21   Microsoft had said publicly or had said to the court that it

22   was ready, willing and able to take a license on RAND terms,

23   had it not, sir?

24   A   I'm sorry.  I don't know the date in which you said that

25   or when you said that.

1    Q    Now, let me return to HTC for just a second for

2    clarification.  The license HTC took was a license on phones,

3    right?

4    A    HTC is a manufacturer --  Yeah, phones and tablets, I

5    think.

6    Q    That's what they pay a license on, is phones?

7    A    Yes.

8    Q    Now, in 2012, Mr. Dailey, when you were still conducting

9    the negotiations with Microsoft, still pursuing the

10   injunctions on standards-essential patents, it is true, is it

11   not, that you were aware that the Federal Trade Commission

12   was investigating Motorola --

13          MR. PRICE:  Objection, your Honor.  This is improper.

14   403.

15          MR. PRITIKIN:  Can we see you at sidebar, your Honor?

16          THE COURT:  One moment, counsel.  Ladies and

17   gentlemen, I am going to let you go on your break early, as

18   opposed to having you sit through one more sidebar, and then

19   get one more minute of question and answer in and then send

20   you in on your break.  We will see if we can make this more

21   comfortable for you.  I haven't read you your admonition for

22   almost 12 hours, but since there is nothing you can do back

23   there other than talk about yourselves, don't do that.  We

24   will see you back out here at 10:45.  Please rise for the

25   jury.

 1    (At this time the jury left the courtroom.)

 2          MR. PALUMBO:  Your Honor, I must have been asleep

 3    this morning, because I neglected to introduce Cheryl Berry,

 4    who is also with us.

 5          THE COURT:  Thank you.

 6          MR. PRITIKIN:  May I explain?

 7          THE COURT:  Yes.  Where is this going?

 8          MR. PRITIKIN:  Your Honor, they have chosen to inject

 9    into this case the subjective good faith of Motorola, and in

10    particular through the testimony of Mr. Dailey his personal

11    good faith.  And we think that a lot of this is going to be

12    very confusing to the jury, because there are many other

13    grounds on which you can find a breach of the RAND

14    commitment.  But it was their choice to put up Mr. Dailey to

15    say that he had a pure heart.  In point of fact, what we know

16    is that in 2012 when they were seeking these injunctions, the

17    Federal Trade Commission had opened an investigation into the

18    abuse of standards-essential patents by Google and by

19    Motorola, and in particular it covered the subject of their

20    conduct toward Microsoft.  And we know that it culminated in

21    an order that was entered, I believe it was in January

22    of 2013, which is the time when they conveniently dropped the

23    two standards-essential patents from the ITC case, just

24    within days of that order being entered.

25        Now, why is this relevant?  Had they not put Mr. Dailey up

1    to get into this subject of his pure heart, maybe it would be

2    and maybe it wouldn't be.  We think there is still a strong

3    argument that this explains the context of what is happening

4    here and why these patents are being dropped at the time they

5    are dropped.  But having put Mr. Dailey up and listened to

6    him for an hour or two yesterday talking about what his

7    intent was - what his motivations were, what his personal

8    knowledge was, I didn't know this, I didn't know that - I

9    think we are entitled to bring out that one of the things

10   that is overlaying all of this is the fact that in 2012 the

11   company is clearly on notice that there are issues, serious

12   issues, concerning the way that they are approaching their

13   standards-essential patents vis-a-vis Microsoft.

14        THE COURT:  What was the outcome of the FTC

15   proceeding?

16        MR. PRITIKIN:  There was an order that was entered,

17   and there are comments, there are a number of documents that

18   are in -- I believe they are dated in January of 2013.  But

19   the upshot of it was they agreed that they were no longer

20   going to seek injunctions on standards-essential patents.

21   There is a complicated procedure in there where they can go

22   to a third party - an arbitrator, a court - and have that, as

23   you did, adjudicate what RAND royalty is, and sort of took

24   our proceedings, I think, as sort of the template for that.

25   But that was the consent order that was entered.  And that

1    governed their future conduct.  The order, as it was

2    originally entered, there may have been some ambiguity in it.

3    We think that it required that they drop their

4    standards-essential patents at that time that were being

5    asserted, at least for injunctions, against Microsoft.  In

6    the final order that was issued there was a clarification of

7    that.  I'm not clear that it would cover the pending actions,

8    although at that point they had already dismissed the

9    injunctions in the ITC against Microsoft.  But that's what

10   happened.

11       Since they want to talk about what they knew and what they

12   believed, and what they had reason to know and not know, I

13   think those things become very important.

14          THE COURT:  Mr. Cannon, now you get your chance.

15          MR. PRICE:  May I ask leave.  I know you wanted one

16   attorney to argue.  I know nothing about the FTC proceedings.

17   That's why Mr. Cannon stood up.  I do know what Mr. Dailey

18   testified to in this case.

19          THE COURT:  We get one lawyer, counsel.

20          MR. PRICE:  That's why I asked leave.

21          THE COURT:  Mr. Cannon.

22          MR. CANNON:  Your Honor, as a threshold matter,

23   Mr. Dailey gave no testimony in connection with the assertion

24   of injunctions or seeking that sort of relief.  His good

25   faith was the offers and the licensing proposals.

1         With respect to the FTC, we do have a bench memo at the

2    conclusion of my argument I would like to hand up and give a

3    copy to the other side.  I think Microsoft has

4    mischaracterized the FTC proceedings.  The FTC began an

5    investigation after 2010, well after the offer letter and

6    this lawsuit began.  That was very recently settled.  So it

7    is an administrative investigation that was settled.  In the

8    settlement Motorola and Google admitted no liability

9    whatsoever.  That was an agreed-upon settlement.  We are

10   happy to provide those documents to the court.  There is case

11   law that -- on Rule 408 that administrative investigations

12   and settlements are not evidence and should not come into the

13   trial.  In addition, it is an entirely satellite litigation,

14   and we think it would confuse the jury, because then we would

15   have to explain what happened at the FTC.  It is a pretty

16   complicated process.  The bottom line is, though, Motorola

17   did not have to withdraw any injunctions in pending cases.

18   In addition, Motorola and Google admitted in the settlement

19   to no liability whatsoever.  So it is complex, it's true.

20   But the bottom line is, it is a full settlement, under 408 it

21   should not come in, and it is extremely complex.  I think it

22   would take an extremely long time to lay out.  I think it is

23   kind of a surprising end to the testimony, to get it in this

24   fashion.

25             THE COURT:  How long is the FTC consent degree?

1    MR. CANNON:  There is two.  There is one that is very

2    recent that is the final settlement, and then there was a

3    preliminary settlement.  I don't have them with me right this

4    moment, but the final one --  It is an order of 25 pages.

5         THE COURT:  I am not comfortable trying to rule on

6    this without seeing what is in it.

7         MR. PRITIKIN:  I understand, your Honor.  Let me make

8    this suggestion:  Let me provide you --  I have copies of the

9    statement of the FTC that describes it and the two consent

10   orders.  If your Honor would prefer, we would be happy to

11   give you a bench memo first thing tomorrow morning in

12   response.  There are other ways this can be presented to the

13   jury.

14        THE COURT:  That's how we are going to proceed.  I

15   would like to see your bench memo; I would like to see your

16   bench memo.  I will not permit the question at this time.

17   Mr. Dailey is the client representative.  He is here.  We

18   need to recall him.  But until I know what is in the FTC

19   order, I am just not prepared to rule on this area.  It seems

20   to me, just to give you some of my current thinking,

21   Mr. Dailey has somewhat opened the door by saying:  We never

22   would do anything that would violate good faith and fair

23   dealings; this is how we make negotiations proceed.  I agree

24   he did not mention injunctions.  I don't know what is in the

25   FTC order, if it encompasses the broader area or not.  I feel

1    rather incapable of ruling on those matters at this time.

2    But let's get the bench memos in and then we will recall

3    Mr. Dailey to discuss the area, if I find it is appropriate.

4         MR. CANNON:  Thanks, your Honor.  We will distribute

5    the bench memos, and we will file also the latest FTC

6    document.

7         THE COURT:  Counsel, let me give you two matters.

8    After we started this morning and brought the jury in, I got

9    the following note handed up.  "While the trial is underway

10   may we ask for specific info to be presented, such as a

11   formal definition of stacking and hold-up?"  Signed by Juror

12   Number 1.  There is actually some very interesting academic

13   work on allowing jurors to ask questions, but I think it is

14   valuable for the lawyers to know this is an area that at

15   least one of the jurors has an interest in.  Since I have

16   defined those two terms in the findings of fact and

17   conclusions of law, and while I haven't heard from you yet,

18   they are also defined in the final jury instructions, it

19   seemed to me that I could easily read those definitions.  I

20   am not sure that is totally satisfactory to the jury, but all

21   I am going to do is alert you to the fact that is an area

22   that they will need some further guidance on.  If you think

23   what the court said was sufficient, don't go any farther.  If

24   you think it is appropriate and you can fit it into your

25   presentations, then you should.  That is one item.

1    The second is, it is 44 minutes.  That answers that

2    question.  Mr. Harrigan.

3            MR. HARRIGAN:  By the way, I think there is a

4    paragraph in your preliminary instruction that explains what

5    "hold-up" is.

6            THE COURT:  Apparently there was a lot read at that

7    time.

8            MR. HARRIGAN:  They may have forgotten it by now.

9            THE COURT:  We will be in recess until 10:45.  Thank

10   you, counsel.

11                   (The proceedings recessed.)

12           THE COURT:  Mr. Dailey, I think you're still up here.

13   Let's bring the jury in, please.

14       (The following occurred in the presence of the jury.)

15           THE COURT:  Ladies and gentlemen, at the very end

16   before we went out for your morning break, there was a

17   question asked that requires me to do some further homework.

18   So you'll disregard that question and we may take it up

19   later.  We need to do some further work before that.

20       Mr. Pritikin.

21           MR. PRITIKIN:  I have nothing further at this time,

22   Your Honor.

23           MR. PRICE:  A short redirect.

24                    RECROSS EXAMINATION

25   BY MR. PRICE:

1  Q   Mr. Dailey, in your examination you told Mr. Pritikin --

2  he asked you about royalty stacking?

3  A   Yes.

4  Q   Using the definition the court gave the jury, which is

5  about other folks who declared patents essential coming

6  forward?

7  A   Right.

8  Q   He asked if you took that into account, and you said you

9  don't take it into account, not upfront but during

10 negotiations.

11 A   Right.

12 Q   What did you mean by that when you said it's taken into

13 account not upfront but during negotiations?

14 A   So when we engage with a prospective licensee and have

15 discussions with them, from time to time they'll bring up

16 their ability to pay, or what's fair to pay.  And we take

17 that into account.  I recall one agreement that we negotiated

18 with TCL, a company called TCL&Alcatel brand.  They're

19 getting larger.  They're in China.  And at the time they sold

20 a lot of low-margin phones that didn't have a lot of profit.

21 So they said, we can't pay you 2.25 today but we can work on

22 a ramped -- so we have a fairly complex agreement that has

23 low royalties starting off, and then year-on-year it builds.

24 So they said they could pay at a later point in time.  And so

25 we took their ability to pay into account.

1      And I guess the only other thing is, there is a lot of

2   discussion about royalty stacking in a theoretical sense.

3   But, you know, in the mobile phone space, it's a very healthy

4   market, I mean, the concern is --

5   Q    That's a little beyond my question.  I'm just saying, when

6   you say that you take it up, to be taken up during

7   negotiations --

8   A    Right.

9   Q    -- what sort of topics would you expect, in this regard,

10   to be taken up in negotiations?

11   A    So, people would raise that issue of royalty stacking and

12   their ability to pay and what they pay others for similar

13   technology and the value of the technology to their products

14   that they're using.  That would all come out in negotiation.

15   Q    In the negotiations you had with Mr. Gutierrez, did he

16   bring up royalty stacking, that is, others asking for the

17   same rates or greater rates?

18   A    I don't recall any specific conversation on royalty

19   stacking.

20   Q    You were also asked some questions about this draft

21   Marvell license agreement, that was Exhibit 16.  And I want

22   to ask you, you were asked to look at paragraph 3.5?

23   A    Yes.

24   Q    If we could show that.  And you remember you were asked

25   whether Microsoft was included as a repudiating party because

1    they had refused to an take essential license, as opposed to

2    having sued Motorola.  Do you recall that?

3    A    That's correct, yes.

4    Q    If we could look at Exhibit 16, paragraph 3.5.  So, if we

5    go to that first paragraph that says, "For clarity and

6    notwithstanding any provision in this agreement to the

7    contrary, the rights under this agreement, including without

8    limitation," et cetera, "shall not apply or extend in any way

9    to any third party, including, without limitation, Marvell

10   customers that have asserted properties against MMI or its

11   affiliates."  You see that?

12   A    Yes.

13   Q    And MMI refers to?

14   A    Motorola Mobility.

15   Q    And you see that's in capital letters there, that thing,

16   "Asserted"?

17   A    Yes.

18   Q    What does it tell you when it's in capital letters?

19   A    It means it's a defined term.  So you have to go into

20   Section 1, and there's a listing of the definitions.

21   Q    Let me put that up.

22   A    It's 1.3.

23   Q    If we could put up paragraph 1.3 which defines Asserted.

24   It says, "Assert, Asserted, or Assertion means to commence or

25   prosecute patent infringement litigation."  So let me ask

1  you, sir, as of the date of this letter, or e-mail,

2  November 2001, had Microsoft commenced or prosecuted patent

3  infringement litigation against Motorola?

4  A   Yes.

5  Q   And if you go to the page that lists the parties that are

6  covered by that -- and by the way, is this a final agreement?

7  A   No.  This is an early draft.

8  Q   So, for example, let's go -- Gemalto, had Motorola ever

9  gone to Gemalto and asked Gemalto to take licenses on

10  standards-essential patents and Gemalto said no?

11  A   No.  Gemalto had sued us.

12  Q   They had commenced an action?

13  A   Yes.

14        MR. PRICE:  Nothing further.

15        THE COURT:  Anything further, Mr. Pritikin?

16                    REDIRECT EXAMINATION

17  BY MR. PRITIKIN:

18  Q   Mr. Dailey, did you say that -- I thought I heard you say

19  you take stacking into account as you get into negotiations;

20  is that right?

21        THE COURT:  Mr. Pritikin, can you turn and face the

22  microphone?

23        MR. PRITIKIN:  Yes.

24        THE COURT:  I'm the worst offender, I am told.

25  Q   Mr. Dailey, did I hear you say that you take stacking into

1    account once you get into the negotiations?

2    A    Yes.

3    Q    And you don't take stacking into account in putting

4    forward the first offer; is that right?

5    A    Well, we don't -- in the mobile space I haven't seen the

6    effects of it.  I wouldn't know how to take it into account

7    upfront.

8    Q    So that's a no?

9    A    That's correct.

10   Q    And is it correct that you did not consider stacking when

11   you made the initial offers to Microsoft?

12   A    Not external stacking.  Yes, that's correct.

13            MR. PRITIKIN:  Nothing further, Your Honor.

14            MR. PRICE:  Nothing further, Your Honor.

15            THE COURT:  Mr. Dailey, congratulations.

16            THE WITNESS:  Thank you.

17            THE COURT:  Microsoft may call its next witness.

18            MR. HARRIGAN:  Yes, Your Honor.  We'll call Mr.

19   Garrett Glanz.

20            MR. WION:  May I approach, Your Honor?

21            THE COURT:  Yes.

22                        GARRETT GLANZ

23      Having been sworn under oath, testified as follows:

24            THE CLERK:  Will you state your name for the record,

25   please.

1       THE WITNESS:  My name is Garrett Glanz.

2       THE COURT:  You may proceed.

3                       DIRECT EXAMINATION

4   BY MR. HARRIGAN:

5   Q   Mr. Glanz, would you be so kind to give the jury a brief

6   description of your current position, educational background,

7   and the history of your employment at Microsoft?

8   A   Sure.  I have an undergraduate degree in English from

9   Dartmouth College and a master's degree in business from the

10  University of Chicago.  I joined Microsoft in September of

11  2000, and I've held various business-development and

12  licensing roles since then.  My current role is as general

13  manager of licensing within the intellectual property group.

14  Q   And so that's licensing of what, currently?

15  A   That's the licensing of Microsoft's patent portfolio.

16  Q   The whole thing?

17  A   Correct.

18  Q   Okay.  During the course of your career have you had

19  exposure to and involvement in something called patent pools?

20  A   Yes, I have.

21  Q   Specifically, were you involved in the formation of a

22  patent pool related to the H.264 standard?

23  A   Yes.

24  Q   What one or ones?

25  A   There were two pools that were in formation for the H.264

1   video standard.  One facilitated by MPEG LA and one

2   facilitated by Via Licensing.

3   Q    When you say MPEG LA, what is MPEG LA?

4   A    MPEG LA is a licensing company that forms patent pools for

5   the purpose of offering joint patent licenses to the

6   marketplace.

7   Q    Please explain -- using MPEG LA as a specific example,

8   will you tell the jury what a patent pool is and what it

9   does?

10  A    A patent pool is basically formed when a group of

11  companies get together and discuss, and ultimately agree on,

12  the terms of a joint patent license, a license that would

13  include all of the patents related to a particular technology

14  owned by those companies.  And the purpose of that is to

15  provide a one-stop shop for companies that want to implement

16  that technology.  It's for convenience of both the licensees,

17  but also convenient for the licensors, because the

18  patent-pool administrator handles all of the licensing

19  discussions as well as the collection of royalties.

20  Q    So the people who form the pool are the companies that

21  have patents, standards-essential patents that are part of

22  the standard?

23  A    That's correct.  In order to participate in the

24  discussions and ultimately in the pool, you must have at

25  least one essential patent for that particular technology.

1  Q   So -- and then you used the terms "licensors and

2  licensees," which is very accurate, but can we call them

3  patent holders on one side -- those are the licensors, right?

4  A   Correct.

5  Q   Then the companies that would be potentially using the

6  H.264 standard could come to the pool and do what?

7  A   Could request a license and sign the license agreement,

8  then begin to pay royalties for their use of those patents.

9  Q   Okay.  And if they signed one license with the pool and

10 agreed to pay the pool royalty, what would they get a license

11 to?

12 A   They would get a license to the patents from all the

13 companies that were participating in the pool.

14 Q   So they'd have that entire portion of the standard

15 covered?

16 A   Correct.  It could be several hundred, if not thousands,

17 of patents in one license.

18 Q   Okay.  When was the MPEG LA patent pool in the process of

19 formation?

20 A   The formation process started in mid-2003 and extended

21 through mid-2004.

22 Q   About how many patent-holding companies were involved in

23 those discussions?

24 A   I recall there were roughly 20 companies involved at that

25 time.

1    Q    So, another thing about how the pool works that might be

2    good to establish at this point is when a licensee -- the

3    company that wants to use the standard -- gets a license to

4    the pool and starts paying royalties, how does the pool

5    divide the royalties up among all the companies that own

6    patents that are in it?

7    A    Sure.  Typically the royalties are divided on a per-patent

8    basis.  So, for example, if there are one hundred patents in

9    the pool and Company A holds five of those patents, Company A

10   would get roughly five percent of the total royalty revenue

11   generated by the pool.

12   Q    Okay.  So now we just covered -- there were about 20

13   companies, and the work to form the pool was going on in '03

14   to '04.  Could you describe how the pool administrator, MPEG

15   LA, went about trying to get a consensus on what the pool

16   royalty should be.  What was the process?

17   A    The process was typically that MPEG LA would start the

18   discussions by presenting what they would call a strawman

19   proposal, which was basically a set of terms that were used

20   to then elicit a reaction from the patent-holding companies

21   to get their feedback, and then over time to make adjustments

22   to the proposal, ultimately with the goal of reaching

23   consensus in the group on a set of terms.

24   Q    Did MPEG LA reach consensus, eventually?

25   A    Yes.

1  Q   Who were some of the companies, or what were some of the

2  companies that participated in the pool formation for H.264?

3  A   Participants included companies such as Sony, Panasonic,

4  Sharp, Nokia, IBM, and, of course, Microsoft and Motorola.

5  Q   Okay.  Did Microsoft and Motorola both have patents that

6  were part of the H.264 standard?

7  A   Yes.

8  Q   And in this instance is it also true that they both had

9  products that might, at some point, use H.264?

10  A   That's correct.  In the case of Motorola, they made cell

11  phones which could play back video content; and Microsoft,

12  for example, had Windows which was capable of playing back

13  video content, as well as products like Xbox that could play

14  back video.

15  Q   And in this instance did both Motorola and Microsoft also

16  participate in the actual creation of the H.264 standard?

17  A   Yes.  Both companies were active participants in the

18  standards-setting organizations.

19  Q   So you said the way the royalty was arrived at eventually

20  was through a series of -- discussing a strawmen or a

21  strawman.  Was there a meeting for this purpose on July 31st

22  to August 1st '03?

23  A   Yes.

24  Q   And were you there?

25  A   Yes, I was.

1    Q    Was Motorola represented there?

2    A    Yes, Motorola was represented by Paul Bawel.

3    Q    On July 31st did the administrator put forward a strawman?

4    A    Yes.  MPEG LA put forth an initial strawman to start the

5    discussion.

6    Q    You've got Exhibit 1581 in your binder, I think?

7    A    That's right.

8    Q    Can you identify Exhibit 1581?  Generally what is it?

9    A    Yes.  This is the slide presentation that MPEG LA made to

10   the group of patent holders at that meeting.

11   Q    So these are the actual slides that everybody looked at

12   when they were discussing the strawman?

13   A    Yes.

14              MR. HARRIGAN:  We'll offer 1581.

15              MR. CANNON:  No objection.

16              THE COURT:  1581 is admitted.

17              (Exhibit No. 1581 was admitted into evidence.)

18   Q    I'd like you to take a look at an excerpt from 1581, which

19   is page 15 of the presentation.  Basically you can't really

20   see this whole page because the callout covers part of it up.

21   So what are we looking at here?

22   A    This is a slide from the presentation outlining the

23   initial strawman proposal from MPEG LA.

24   Q    And I think the jury has already heard this a few times,

25   but this is talking about encoders, decoders, and codecs.

1   Would you briefly remind us all what a codec is?

2   A   Codec stands for compression, decompression, and it's

3   basically a technology for shrinking the size of a video file

4   so that it's easier to deliver it over the internet, or on a

5   DVD, to a device that's then capable of playing back the

6   video content.

7   Q   So if Windows had H.264 in it, one operating system would

8   have one codec?

9   A   Correct.

10  Q   What was the lowest rate -- now we can do the callouts, if

11  you don't mind.

12         What was the lowest rate that was in this proposal per

13  unit, per codec?

14  A   The lowest rate in this proposal was $0.20 per consumer

15  codec.

16  Q   In terms of the strawman, that would be for all the

17  patents owned by all the companies in the pool, right?

18  A   That's correct.

19  Q   And is that the rate that would be paid -- is that the

20  rate that would actually be paid, or is it blended between

21  some higher rates for lower volume?  And explain that, if you

22  would.

23  A   In this proposal there were three different rate tiers

24  depending on the annual volume of products shipped by the

25  licensee.  So it starts at $1.50 per codec for the first 10

1    million units.  It then goes down to $1 per codec for the

2    next 10 million units.  And then after 20 million units, on

3    an annual basis, the price per codec would go down to $0.20.

4    Q    Okay.  So for high-volume users like Motorola and

5    Microsoft, how would the rate be calculated?

6    A    The rate, as you said before, was blended.  And it would

7    be basically just a count of the units shipped in the year

8    against these different tiers.

9    Q    And as soon as you got up to the high-volume level, you'd

10   start paying $0.20?

11   A    Correct.

12   Q    Who was Motorola's representative at this meeting?

13   A    Paul Bawel.

14   Q    Did Mr. Bawel express Motorola's view with regard to the

15   rates set forth in this strawman?

16   A    Yes, he did.

17   Q    Is there a written record of what he said?

18   A    Yes.  I took detailed notes of the proceedings and

19   specifically what each company said in response to the

20   different proposals.

21   Q    Okay.  In your binder the next exhibit is 1139.  Can you

22   identify that?

23   A    Yes.  This is a copy of my notes from those meetings.

24   Q    Okay.  And we have a callout on this --

25              MR. HARRIGAN:  We'll offer 1139.

1    MR. CANNON:  No objection.

2    THE COURT:  1139 is admitted.

3    (Exhibit No. 1139 was admitted into evidence.)

4  Q   Now, we have -- is this the first page of your notes that

5  we're looking at here on the screen?

6  A   It is.

7  Q   Could we look at the page that has Mr. Bawel's -- notes on

8  Mr. Bawel's comments, please, which is 04 and 05.  Okay.  So

9  is this your note with regard to what Mr. Bawel had to say

10  about the strawman?

11  A   Yes, it is.

12  Q   Did you take similar notes about what the comments of all

13  the other companies were?

14  A   I did.

15  Q   So looking at your note, I see it starts out, it says,

16  "Likes grace period.  May need to be even longer."  I don't

17  think we need to talk about that.  Then he says, "Wants

18  minimal threshold.  No projections for mobile.  50 percent of

19  phones with video in 2010.  Too expensive for mobile and will

20  lead to alternatives.  Encoder projections seem to outscale

21  decoding."

22    Having read that, will you tell the jury what Mr. Bawel

23  said in more expansive terms?

24  A   Sure.  Mr. Bawel obviously had a quite of bit of feedback

25  on the proposal.  I think the main points of that feedback

1    were the fact that, as he said, the proposed rates would be

2    too expensive for mobile products.  And companies that

3    develop mobile products, such as Motorola, would likely turn

4    to alternative video-coding technologies if this proposal

5    were to be brought forward.

6        He also expressed strong support, actually, for having

7    capped annual royalties.  And the reason that that was

8    written and circled in my notes is because that was also a

9    position that Microsoft supported.  And so when companies

10   showed similar support, I took specific notes related to that

11   point.

12   Q    Okay.  So, Mr. Bawel had basically, regarding the

13   royalties, two comments.  One had to do with the actual

14   per-unit rate of $0.20 being too high?

15   A    Correct.

16   Q    Okay.  And then how do you know that he wanted caps?  How

17   is that reflected in your notes?

18   A    By the word "cap" with a circle around it.  That appears

19   throughout my notes, every time any company expressed support

20   for the cap concept.

21   Q    So Mr. Bawel said, even at $0.20, we need annual caps?

22   A    Correct.

23   Q    And that $0.20 would be for all the patents owned by all

24   the companies participating in the pool?

25   A    That's right.

1    Q    Did you participate in meetings of another outfit that was

2    also trying to put together an H.264 patent pool during this

3    timeframe?

4    A    Yes, I did.  Via Licensing was also in the process of

5    trying to form a pool for H.264.

6    Q    Did Mr. Bawel attend those meetings also?

7    A    Yes, he did.

8    Q    Did you take notes there, too?

9    A    I did.

10    Q    Can you identify Exhibit 1583 in your book?

11    A    Yes.  These are notes I took at the Via Licensing meeting

12    for H.264 on August 5, 2003.

13    Q    Okay.

14         MR. HARRIGAN:  We'll offer 1583.

15         MR. CANNON:  No objection.

16         THE COURT:  It is admitted and may be published.

17         (Exhibit No. 1583 was admitted into evidence.)

18    Q    Is this page, which is the lawyer-No. 627, your note on

19    Mr. Bawel's comments at the Via Licensing meeting?

20    A    Yes, it is.

21    Q    And what did he say?

22    A    Mr. Bawel made a proposal to the group for a set of terms

23    that Motorola could support.  And that included codec

24    royalties of $0.25 per unit with annual caps of $2 million

25    per year.

1    Q   So how did this -- from the standpoint of a mobile

2    manufacturer with high volume, or Microsoft with high volume

3    for H.264 technology, how did this proposal compare to the

4    one that we just discussed, that was discussed at MPEG LA?

5    A   This proposal was significantly less expensive for a

6    high-volume producer, because of the annual cap set at

7    $2 million per year.

8    Q   So even though the unit rate was $0.05 more, the effective

9    rate for a large-volume user would be --

10   A   Much, much less, yes.

11   Q   So let's turn back to the MPEG LA discussions for a

12   minute.  When did the participants in MPEG LA actually reach

13   a consensus on the ultimate royalty that they would charge

14   per codec to anyone who came to the pool for a license?

15   A   Consensus was reached in November of 2003.

16   Q   Was there a press release that was issued by MPEG LA to

17   lay out the rates?

18   A   Yes.

19   Q   Can you look at Exhibit 1584?  What is that?

20   A   This is the press release that MPEG LA made on

21   November 17, 2003, announcing terms of the H.264 license as

22   determined by the patent pool, as well as the names of the

23   companies that were supporting those rates and this release.

24   Q   Okay.

25        MR. HARRIGAN:  We will offer 1584.

1        MR. CANNON:  No objection.

2        THE COURT:  It's admitted.  It may be published.

3        (Exhibit No. 1584 was admitted into evidence.)

4   Q   Looking at Exhibit 1584, and specifically page 107, what

5   were the rate royalties for codec that were decided?

6   A   I think it's actually the next page.

7   Q   Page 2.

8   A   So the rates that were announced at the time for codecs

9   started at $0.20 per unit, and went down to $0.10 per unit

10  after the first 5 million units shipped in any given year.

11  Q   And how about between zero and 100,000 units, what was the

12  rate?

13  A   The rate was zero, so there was a sort of free threshold.

14  Q   Was there also a cap?

15  A   Yes.  There were caps on those rates.  The caps started at

16  $3.5 million in 2005 and 2006, and went up to $5 million per

17  year in 2009 and 2010.

18  Q   So for a company like Microsoft or Motorola, was the

19  effective rate $0.10 for all the patents in the pool, or less

20  than that?

21  A   No, it was likely less.  Because both companies, at the

22  volumes they were shipping, would have hit the cap and

23  therefore benefited from that.

24  Q   Okay.  So you said that this was a consensus rate.  Was

25  there also -- well, strike that for a second.

1        Looking down at the lower portion of this exhibit -- I

2   guess it's on a different screen.  Did Motorola join in the

3   press release?

4   A    Yes.  There's a list of companies in the release that

5   includes Motorola, as well as Microsoft.

6   Q    Okay.  So this is the section of the release that

7   indicates who joined in it?

8   A    Correct.

9   Q    And we can see Motorola is there.  Could you identify

10  Exhibit 1179 in your book, which should be the next one?

11  A    Yes.  This is an exhibit that includes an e-mail exchange

12  that was sent to what was called the ABC Group, which was

13  basically the Listserv that included all of the companies

14  participating in the patent pool.  And it's primarily between

15  Mr. Bawel at Motorola and Larry Horn at MPEG LA, discussing

16  some details in the press release.  And ultimately giving

17  Motorola's approval and expressing support for the press

18  release.

19             MR. HARRIGAN:  Offer 1179.

20             MR. CANNON:  No objection.

21             THE COURT:  It's admitted and may be published.

22             (Exhibit No. 1179 was admitted into evidence.)

23  Q    And right up there at the top it says, "Okay.  Motorola

24  agrees to the terms of the press release."  Right?

25  A    Correct.

1  Q   Okay.  Were final per-codec rates or royalties agreed to?

2  In other words, this is the consensus in November; was there

3  a final agreement?

4  A   There was a final agreement, but these rates did not

5  change between November and when the license became available

6  in late June.

7  Q   Okay.  And was there another press release issued in May

8  of '04 when the final rates were decided upon?

9  A   Yes.

10 Q   And I think you said per-codec rates were the same?

11 A   That's correct.

12 Q   Did Motorola join in that press release also?

13 A   Yes, it did.

14 Q   During these meetings of MPEG LA, did Mr. Bawel ever

15 contend that Motorola's patents were more valuable than the

16 other patents in H.264?

17 A   No, he never did.

18 Q   Did he ever object to the system of distributing royalties

19 on a per-patent basis?

20         MR. CANNON:  Objection, leading.

21         THE COURT:  Sustained.

22 Q   Did Mr. Bawel ever say anything about the system of

23 distributing royalties on a per-patent basis?

24 A   Not that I recall.

25         THE COURT:  If there's going to be an objection, you

1    need to allow the objection to be made.  Counsel, do you want

2    to make your objection?

3              MR. CANNON:  Objection, leading, Your Honor.

4              THE COURT:  Overruled.

5    A    Not that I recall.

6    Q    So did there come a time, sometime after May of '04, when

7    the second press release was issued, when the formal

8    agreement/contract was signed among all of those who were

9    participating in the patent pool?

10   A    Yes.  Most of the companies signed the agreement in the

11   late June or early July timeframe.

12   Q    And did Motorola sign?

13   A    No.

14   Q    Had you received any forewarning of this?

15   A    No.

16   Q    So ultimately Motorola did not agree to be bound by the

17   pool rates?

18   A    That's correct.

19             THE COURT:  Mr. Harrigan, foundation matters, yes;

20   factual issues, no.

21   Q    So what was your understanding of the effect of Motorola

22   not signing the contract?

23   A    The effect was that Motorola's patents were not available

24   through the joint license.

25   Q    Did that trouble you?

1    A    We would have preferred --

2              MR. CANNON:  Objection, relevance.

3              THE COURT:  Overruled.

4    A    We would have preferred them participating because it

5    would have added additional value to the license.  But

6    because we knew Motorola was obligated to provide a RAND

7    license to the marketplace, it didn't trouble us.

8    Q    Okay.  Were you aware of Motorola's letter, written in

9    October of 2010, relating to its H.264 standards-essential

10   patents, when it came in?

11   A    Yes.  I saw a copy of that letter.

12   Q    At any time during the MPEG LA discussion of royalties,

13   did Motorola mention potential rates in the range of $11 per

14   codec?

15   A    No, nothing remotely close to that was ever mentioned.

16   Q    Did Microsoft contribute its patents to the MPEG LA pool?

17   A    Yes.

18   Q    And so for Microsoft's patents, since the pool was formed,

19   how has Microsoft been compensated?

20   A    Microsoft receives a share of the overall pool royalties

21   as determined by the ratio of our patents to the total number

22   available in the pool.

23   Q    Okay.  So, if Motorola wanted a license to Microsoft's

24   H.264 patents, how could it get one?

25   A    It could go to MPEG LA and sign the joint-patent license.

1   Q   And that would be for all the patents, not just the

2   Microsoft patents?

3   A   Correct.

4   Q   Okay.

5           MR. HARRIGAN:  No further questions.

6           THE COURT:  Mr. Cannon.

7                       CROSS EXAMINATION

8   BY MR. CANNON:

9   Q   Good morning.

10  A   Good morning.

11  Q   You mentioned, I believe, if I heard correctly, that

12  Microsoft was not troubled by Motorola dropping out of the

13  patent pool because Motorola had RAND obligations; is that

14  correct?

15  A   That's correct.

16  Q   You understand, don't you, that Motorola cannot force

17  Microsoft to pay more than RAND?

18  A   I think that's right.

19  Q   And I know you explained patent pools to the jury, but I

20  just want to make sure that we get this point.  You would

21  agree that participation in patent pools is voluntary; is

22  that right?

23  A   Correct.

24  Q   No one forces anyone to be in a patent pool?

25  A   That's right.

1    Q    So Microsoft was not obligated to join?

2    A    No.

3    Q    Nor was Motorola?

4    A    That's correct.

5    Q    And either Microsoft or Motorola could have dropped out of

6    the patent pool, correct?

7    A    That's correct.

8    Q    Would it be fair to characterize a patent pool as a group

9    of companies coming together and pooling their patents so

10   that each of them gets a license to that collection of

11   patents?

12   A    Typically the patent holders that join the pool also

13   become licensees of that pool as well.

14   Q    And there may be business reasons for that, correct?

15   A    Correct.

16   Q    Each company that joins the pool presumably has a business

17   reason to join the pool?

18   A    That's right.

19   Q    And we've heard, in this trial, a lot about standards

20   organizations.  And you would agree that a standards-setting

21   organization is something different from a patent pool,

22   correct?

23   A    Correct.

24   Q    And some of the standards organizations we've been hearing

25   about, like the IEEE and the ITU, those organizations are not

1   directly affiliated with MPEG LA, for instance; is that

2   right?

3   A   That's right.

4   Q   And would you agree in standards setting, companies come

5   together and actually share their technology, some of which

6   may be patented, some of which is not; is that right?

7   A   That's correct.

8   Q   So an actual technical standard is developed as part of

9   the standards-setting body?

10  A   That's right.

11  Q   Whereas a patent pool is more of a business arrangement

12  where the patents are brought together and a license is

13  actually created by the pool?

14  A   Correct.

15  Q   Now, we looked at some of the notes that you took from, I

16  believe it was 2003; do you remember that?

17  A   Yes.

18  Q   And those reflected various inputs from various companies

19  during the meeting, two meetings in 2003, correct?

20  A   Correct.

21  Q   Would it be fair to characterize those notes as

22  reflecting, essentially, negotiations within the patent pool?

23  A   Yes, it was a group negotiation.

24  Q   That's because a pool is a business arrangement between

25  various companies, correct?

1   A   Correct.

2   Q   And it's accurate, isn't it, that Microsoft had a business

3   reason for participating in the pool in 2003, right?

4   A   Yes, we did.

5   Q   And you mentioned another pool run by Via.  Do you

6   remember that?

7   A   Yes.

8   Q   Now, Microsoft was part of the Via negotiations, correct?

9   A   Yes.

10  Q   But then ultimately dropped out?

11  A   Yes.

12  Q   And Microsoft probably had a business reason for dropping

13  out, correct?

14  A   Yes.  We decided to work with the MPEG LA pool.

15  Q   Fair to say that Microsoft was active in negotiating the

16  licensing structure of MPEG LA?

17  A   Yes.

18  Q   Microsoft sells the Windows operating system, correct?

19  A   Correct.

20  Q   And as part of the MPEG LA negotiations in 2003, fair to

21  say that Microsoft wanted the H.264 license when Microsoft

22  got coverage for its OEMs that incorporate Windows?

23  A   That's correct.

24          THE COURT:  You might want to explain what OEM is.

25          MR. CANNON:  My next question, Your Honor.

1    Q    Perhaps you could explain what an OEM is.

2    A    That stands for original equipment manufacturer.  In the

3    case of Windows, our OEMs would be companies like Dell,

4    Lenovo, HP, they build the actual PCs on which Windows runs.

5    Q    And that's an important part of Microsoft's business,

6    correct?

7    A    Correct.

8    Q    So Microsoft had that in mind when it negotiated the rates

9    in MPEG LA?

10   A    Yes.

11   Q    Is it also true that Microsoft negotiated separate caps

12   for PC operating systems that used H.264?

13   A    That's correct.

14   Q    And I think we've heard this phrase, but perhaps you could

15   explain to the jury what a "cap" is?

16   A    A cap is a maximum amount of money that a company would be

17   required to pay in a given period of time, regardless of what

18   their volumes shipped were in that time.

19   Q    Is it fair to say that your group considered getting the

20   particular license structure that resulted in the pool, you

21   considered that a win, didn't you?

22   A    We thought it was important that Microsoft could pay the

23   royalties for Windows devices, yes.

24   Q    Now, you mentioned that Motorola participated in some of

25   the negotiations in 2003, correct?

1   A   Correct.

2   Q   And presumably Motorola had business reasons for

3   participating, right?

4   A   Yes.

5   Q   Then Motorola dropped out of that particular patent pool,

6   correct?

7   A   At the very end, yes.

8   Q   Fair to say that Motorola must have had a business reason

9   for dropping out?

10  A   I presume they did.

11  Q   And you mentioned that -- or it came up in your testimony,

12  the October 2010 letters between Motorola and Microsoft.  Do

13  you recall that?

14  A   Yes.

15  Q   And 2010 -- I just want to make sure we have the timeframe

16  in mind, because the negotiations that you took notes in and

17  testified about was 2003, correct?

18  A   2003 and 2004, correct.

19  Q   So several years before 2010?

20  A   Correct.

21      MR. CANNON:  No further questions.

22      THE COURT:  Any redirect?

23      MR. HARRIGAN:  No questions.

24      THE COURT:  You may step down.  Thank you, Mr. Glanz.

25      Microsoft will call its next witness.

1      MS. ROBBINS:  Your Honor, Microsoft will call

2  Jennifer Ochs.

3      THE COURT:  Ladies and gentlemen, while we get people

4  sorted out here, this person approaching the stand is not

5  Jennifer Ochs, it's a member -- you may step forward -- of

6  Mr. Harrigan's law firm.  Lawyers love to do things like give

7  everything a different name.  And so opposed to questions and

8  answers, we take depositions.  Depositions are conducted

9  during the discovery phase of a trial.  They're the way that

10  lawyers find out what the facts are and what a witness knows

11  about a particular matter.

12      They serve a second purpose, which is they also preserve

13  the witness's testimony.  There are rules about what happens

14  when a witness is unavailable to testify, whether they've

15  died, whether they've moved to Africa, whether they're

16  outside the jurisdiction of the court.  Basically they're not

17  available to testify at trial.  And at that point a party can

18  use a deposition of a witness.

19      Sometimes they do that in video form, they actually have a

20  videotape of the deposition and they play that.  And

21  sometimes someone plays the person, and the question is

22  asked, and the person who's filling in for that person

23  answers.  So you should assume for the purposes of this that

24  it's the same as all other trial testimony, it's simply being

25  presented in deposition form.  Thank you.

1

2                       JENNIFER OCHS

3              Testimony being read by Patricia Eakes:

4                        EXAMINATION

5    BY MS. ROBBINS:

6    Q   Ms. Ochs, by whom are you employed?

7    A   Marvell Semiconductor, Inc.

8    Q   Are you testifying here pursuant to a trial subpoena?

9    A   Yes.

10   Q   What business is Marvell in?

11   A   Marvell designs and markets semiconductor chipsets.

12   Q   What is your position at the company?

13   A   I'm the Director of IP litigation.

14   Q   And as Director of IP litigation, what are your primary

15   responsibilities?

16   A   I oversee all of Marvell's patent litigation cases.  I'm

17   also involved in licensing negotiations, to resolve those

18   litigations, and am involved in indemnity issues.

19   Q   As a part of your work at Marvell, do you have some

20   knowledge and familiarity with Marvell's products and

21   Marvell's patents?

22   A   Yes.

23   Q   How long have you been with Marvell?

24   A   About three years.

25   Q   What did you do before that?

1    A    I was a partner at Wilson Sonsini in the IP litigation

2    group.

3    Q    For how many years?

4    A    '97 to 2009.

5    Q    And do you have any graduate degrees besides your law

6    degree?

7    A    I have a master's in electrical engineering.

8    Q    Did you work before attending law school?

9    A    I worked as an electrical engineer.

10    Q    Now, let's talk about Marvell and its customers.  Is

11    Motorola a customer of Marvell?

12    A    Yes.

13    Q    Is Microsoft a customer of Marvell?

14    A    Yes.

15    Q    What products does Marvell sell to Microsoft for use in

16    Microsoft's Xbox gaming consoles?

17    A    We sell WiFi chips.

18    Q    What is a WiFi chip?

19    A    It's a chip that implements the 802.11 standard.

20    Q    Do the chips sold by Marvell, that you referred to,

21    contain substantially all that is needed to provide 802.11

22    functionality in a product like Xbox?

23    A    Yes.

24    Q    Approximately how much does Marvell charge for the WiFi

25    chips of the kind it sells to Microsoft?

1    A    Between $3 to $4.

2    Q    And does Marvell sell similar WiFi chips to other

3    customers?

4    A    Yes.

5    Q    What sorts of products?  Can you give us some examples of

6    other customers that purchase these and what they're used in?

7    A    The WiFi chips are used in a wide variety of applications,

8    ranging from other gaming systems to automotive applications.

9    Q    So, for example, does the Sony PlayStation contain the

10   Marvell IEEE 11 chip?

11   A    It does.

12   Q    Automobiles.  Can you give us an example of an automobile

13   that contains the Marvell 802.11 chip?

14   A    It was recently announced that the Audi A-8 will have a

15   Marvell chip.

16   Q    Do you have the price range of these various end products

17   that contain Marvell's WiFi chips?

18   A    Roughly.

19   Q    Can you give us some broad range of what it is?

20   A    So, I think the gaming stations are a few hundred dollars.

21   And, of course, the car is, I think, $80,000.  I'm not sure.

22   Q    How do the WiFi chips that are sold to Marvell's other

23   customers compare to those that are sold to Microsoft?

24   A    They're standards-compliant chips, so they're commodity

25   products, essentially.

1   Q    And you have some familiarity with the 802.11 standard?

2   A    Yes.

3   Q    Has it evolved over time?

4   A    It's continually evolving.

5   Q    Has Marvell been involved in that process?

6   A    Yes.  Several Marvell engineers are involved in various

7   802.11 committees.  And, in fact, one of our executives is

8   the chair of the 802.11 working group.

9   Q    Has Marvell made contributions in the standards

10  development process for 802.11?

11  A    Yes.

12  Q    And approximately how many issued 802.11 patents does

13  Marvell have, in the United States?

14  A    We have a few hundred issued patents.

15  Q    How important do you consider the Marvell 802.11 portfolio

16  to new and emerging WiFi products?

17  A    Well, we consider our 802.11 portfolio to be very

18  valuable, particularly with respect to the newer standards.

19  We're a younger company.  The patents we're pursuing

20  currently are new patents, they have a long life ahead of

21  them.  And they relate to the latest 802.11 standards.

22  Q    Just to be clear on that, the current standard is -- or

23  the latest is 802.11-N?

24  A    That's the latest approved standard.  There's the

25  802.11-AC which has been issued, I believe, in draft form.

1   Q   How important do you expect your patents to be in

2   connection with AC products?

3   A   We believe them to be very important.

4   Q   Now, over the past year and a half have you had any

5   dealings with Motorola related to the licensing of Motorola's

6   802.11 essential patents?

7   A   Yes.

8   Q   Have you been personally involved in those discussions?

9   A   Yes.

10   Q   Could you turn to Exhibit 1608 in your binder.

11   A   Yes.

12   Q   Can you tell us what this letter is?

13   A   This is a letter that we drafted to Motorola requesting

14   that they provide us with their -- this is a letter we

15   drafted to Motorola requesting they provide us their RAND

16   license.

17   Q   The letter is signed by whom?

18   A   This was signed by Jinping Yang, who reports to me.

19   Q   Who drafted this letter?

20   A   I drafted it.

21   Q   What is it that prompted you to send this request to

22   Motorola?

23   A   Microsoft made a request to us that we request a license

24   on RAND terms from Motorola.

25   Q   And was that pursuant to an indemnification arrangement?

1    A    Yes.

2    Q    And how would a license for Marvell's WiFi chips have

3    benefited Microsoft?

4    A    Well, we would have ideally obtained a license that would

5    have exhausted any further claims that would have been made

6    by Motorola against our customers.

7    Q    In the first paragraph the letter mentions a March 1994

8    intellectual property statement on the Motorola proposals in

9    the IEEE 802.11 standards body.  Do you understand that to be

10   a letter of assurance?

11   A    Yes.

12   Q    What did you understand Motorola had committed to do based

13   on this letter of assurance?

14          THE COURT:  Ms. Robbins you want to maybe slow down

15   just a little bit.

16   A    I understood that Motorola had committed to license their

17   standard essential patents on fair, reasonable, and

18   non-discriminatory terms.

19   Q    After this letter was sent, did you have some e-mails back

20   and forth with anyone at Motorola?

21   A    I did.

22   Q    With Mr. Kowolski?

23   A    Yes.

24   Q    Did you tell Motorola why you wanted the license?

25   A    Yes.

1    Q    What did you tell them?

2    A    That it was our intent to get a license that would protect

3    our customer, Microsoft.

4    Q    Did Motorola eventually make a license offer to Marvell?

5    A    They did.

6    Q    Could you turn to Exhibit 16 in your binder?

7         And there is an e-mail and a draft license agreement.

8    Can you explain what this is?

9    A    This e-mail and draft license agreement is what

10   Mr. Kowolski sent to me.

11   Q    When did he send it to you?

12   A    Friday, November 25, 2011.

13

14   Q    I want to ask you about some of the provisions of this

15   proposed draft license agreement you got back from Motorola.

16   As you understand it, did it license -- did the agreement

17   actually include a license for Marvell's chips?

18   A    No.

19   Q    What did you understand that it would cover?

20   A    As I read this agreement, it would cover products that use

21   our chips.  But it is not a license to our chips.

22   Q    You said you asked for a license to cover the product you

23   sold to Microsoft?

24   A    Yes.

25   Q    Were any of your customers specifically excluded from this

1  agreement?

2  A   Yes.  There's a section in the back called "repudiating

3  parties".  And those specific parties are excluded from this

4  agreement.  And that includes Microsoft and Apple.

5  Q   Now, what was your reaction to that?

6  A   Well, it was entirely contrary to what we had asked for.

7  We had asked for a license that would enable us to protect

8  our customers, specifically Microsoft in this case.

9  Q   Did you consider a license that applied to products that

10  were sold to some of your customers, but excluded others, to

11  be discriminatory?

12  A   Yes.  I would consider that discriminatory.

13  Q   Let's talk about the financial terms of the license offer.

14  What was the royalty rate that Motorola requested that

15  Marvell pay?

16  A   The royalty rate was 2.25 percent of the net selling price

17  of the end-user product.

18  Q   And did this change based on different end uses of your

19  customer's products?

20  A   Well, the percentage, I assume, would not change.  But you

21  would apply it against different net selling prices, so the

22  amount effectively would change.

23  Q   Let's see how that would work.  So if the net selling

24  price of a gaming system, like an Xbox or a Sony PlayStation,

25  including one of the Marvell 802.11 chips, is $200, as you

1    understand it, the royalty demanded by Motorola would have

2    been $4.50?

3    A    Yes.

4    Q    How does that compare to the price of the WiFi chips that

5    Marvell sells?

6    A    That royalty is slightly higher than the cost of the chip

7    itself.

8    Q    Now, let's see how it would apply in the future if Marvell

9    sold a WiFi chip to a computer manufacturer.  Assume with me

10   that a laptop has a net selling price of $1,000, would the

11   royalty under this proposed license be $22.50?

12   A    Yes.

13   Q    And how does that compare to the price that Marvell

14   charges for the WiFi chips?

15   A    Well, that's several times the price of our chip.

16   Q    Now, you told us earlier that Marvell sells WiFi chips to

17   Audi for use in it's a-8?

18   A    That's right.

19   Q    Now, let's suppose an A-8 sells for $100,000.  How much

20   would the royalty be that Motorola was asking for?

21   A    That would be over $2,000.

22   Q    Now, if Marvell had agreed to the terms of this license,

23   how would that have affected Marvell's chip business, WiFi

24   chip business?

25   A    Well, we could not have agreed to these terms.  That's a

1    going-out-of-business model to pay such rates.

2    Q    Did you consider the royalty provisions of Motorola's

3    offer to be commercially reasonable?

4    A    No.

5    Q    Would it be practical for Marvell to pay different

6    royalties based on the nature of your customers' end-use

7    products like this?

8    A    It would not be practical because in many cases we don't

9    know the end use of our chips.

10   Q    Besides Marvell and Motorola, do you understand that there

11   are other companies that claim to have patents that are

12   essential to the 802.11 standard?

13   A    Yes.

14   Q    And in your view, even if the royalty rate was limited to

15   two and a quarter percent, not of the end price, but just of

16   the Marvell chip, could Marvell afford to pay this royalty to

17   every company that claims that it has essential 802.11

18   patents?

19   A    No.  The profit margin on semiconductor chips is quite

20   small, and at 2.25 percent of even the chip price, you can't

21   pay too many royalties before you just run out of profit.

22   Q    Is patent stacking a concern for you?

23   A    Yes.  That's the patent stacking problem or royalty

24   stacking problem.

25   Q    In your experience have you ever heard of a chip maker

1    paying a running royalty on the end-product price of its

2    customers' products?

3    A    I have not heard of that.

4    Q    In your experience at Marvell, is there a public benchmark

5    Marvell uses to assess the reasonableness of running

6    royalties of semiconductor chips?

7    A    We have in the past used the publicly-reported licensing

8    rate provided by ARM Holdings.  That's a publicly-reported

9    rate of one percent of the average selling price of the chip,

10   in exchange for which ARM provides not only patent licenses,

11   but significant IP that can be readily incorporated into a

12   semiconductor chip.

13   Q    Does that include design and know-how?

14   A    Yes.

15   Q    How does Marvell use this benchmark?

16   A    Well, for one percent we get considerable IP, which is

17   ready to use.  And so we would consider one percent of the

18   average selling price of a chip to be a high ceiling of what

19   a semiconductor company should pay for a royalty.

20   Q    And how does what you license from ARM compare to what you

21   would obtain in a license to a party's 802.11 standard

22   essential patent?

23   A    So, as I've noted, we don't just license patents, but we

24   also license a microprocessor core, or directions on how to

25   design a microprocessor core.  And that's considerable

1    valuable IP.

2    Q   Do you consider a two-and-a-quarter percent royalty on the

3    average selling price of the customer end-product that has

4    your chip in it to be a reasonable starting point for any

5    negotiation?

6    A   No.

7    Q   Do you consider two-and-a-quarter percent of the average

8    selling price, just of your chip, to be a reasonable starting

9    point for a negotiation?

10   A   No.

11       MS. ROBBINS:  Your Honor, the parties stipulated, we

12   move the admission of Exhibit 1608.  No further questions.

13       THE COURT:  Mr. Palumbo.

14       MR. PALUMBO:  Your Honor, may I clarify for the jury

15   the date on which Ms. Ochs gave this testimony?

16       THE COURT:  You may.

17       MR. PALUMBO:  This testimony was given on

18   November 14, 2012.

19                          EXAMINATION

20   BY MR. PALUMBO:

21   Q   Good morning, Ms. Ochs.  My name is Ralph Palumbo.  And as

22   you might have guessed, I represent Motorola in this matter.

23   Where do you reside?

24   A   I live in Palo Alto, California.

25   Q   Where were you served with your trial subpoena?

1    A    I accepted service by e-mail.

2    Q    And were you advised by anyone as to whether or not e-mail

3    acceptance of a subpoena outside the Western District of

4    Washington would compel you to testify here today?

5    A    I'm not sure that it does.

6    Q    You've negotiated several RAND licenses for chipsets, yes?

7    A    Yes.

8    Q    You would agree, in negotiating a RAND license, that

9    process can be very complex and time consuming.  Yes?

10   A    Yes.

11   Q    There are a number of material terms that need to be

12   negotiated in a RAND licensing agreement.  Also agree?

13   A    Yes.

14   Q    And those terms would include -- the material terms, would

15   include representations and warranties.  Yes?

16   A    Yes.

17   Q    Geographic scope of the license?

18   A    Yes.

19   Q    Term of the license that would need to be negotiated.

20   Yes?

21   A    Yes.

22   Q    Scope of release.  Yes?

23   A    Yes.

24   Q    Products covered by the license would have to be

25   negotiated.  Yes?

1  A    Yes.

2  Q    Typically there would be a defensive suspension provision

3  in a RAND license.  Yes?

4  A    No, I would not agree with that.

5  Q    In the back of your binder you have your testimony before

6  the International Trade Commission.  Could you turn to that

7  please, Ms. Ochs?

8  A    Yes.

9  Q    This was testimony that you gave at a hearing before the

10  United States International Trade Commission on Wednesday,

11  January 18th.  Yes?

12  A    Yes.

13  Q    If you'll turn to page 1937, lines 21 to 25, you were --

14  it's the second page of this -- I'm sorry, it's not the

15  second page.  It's 1937.

16  A    Yes.

17  Q    And you were sworn to testify to the truth, the whole

18  truth, and you agreed to do so.  Yes?

19  A    I did.

20  Q    Will you turn to, now, page 1979.  And let's look at,

21  starting at line 3, tell me when you're there, please,

22  Ms. Ochs.

23  A    Yes.

24  Q    The question you were asked, "Are you familiar with that

25  term?  Defensive suspension provision."  And you said, "I

am."  Question: "What is that?"  You said, "I am -- typically

in the context of entering into a standards body with other

competitors, or even in agreements like this, there is a

provision whereby if the other party initiates an action

against you, you may suspend or somehow modify the RAND

obligation."  That was the answer you provided?

A   Yes.  So I'm not sure if you're focusing on the word

"typically".  I am familiar with defensive suspension.  I've

seen them more recently.  And the RAND agreements I've worked

on in the past, we had not included such provisions.  Now I

think the parties are trying to be more sophisticated in

including them.

Q   If you'll turn to the next page, 1980, and we'll start on

line 13.  Tell me when you're there, Ms. Ochs.

A   Yes.

Q   The question was asked, "So the license you would normally

expect, and this would be -- this is not an unusual term in

license agreements, this defensive suspension provision would

exclude a license to Microsoft through Marvell, correct?"

And you answered, "Yes.  Although we had specifically asked

for a license that would cover Microsoft."  That was the

answer you gave on that day.  Yes?

A   I agree with that.  I think as a more nuanced answer, I

think that's the more current trend.  I believe you started

this line of questioning about asking about my background in

1    RAND licenses, and we had not included this previously.

2    Q    Okay.  Negotiation of a RAND license would also involve

3    the negotiation of the royalty rates.  Yes?

4    A    Yes.

5    Q    And RAND licenses also often include or typically include

6    a cross-licensing agreement.  Yes?

7    A    Yes.

8    Q    And the cross-licensing agreement will affect the royalty

9    rate paid to the licensee.  Yes?

10   A    It could.

11   Q    And in this case Motorola offered a license to Marvell for

12   its 802.11 patents, correct?

13   A    Yes.

14   Q    And Marvell made a counterproposal in which it offered to

15   license Marvell's 802.11 patents to Motorola, correct?

16   A    I'm not sure if you would call it a formal

17   counterproposal.  We did have an in-person meeting.

18   Q    You actually provided a red-lined counterproposal?

19   A    We did.  But we didn't provide a number.

20   Q    Under Marvell's proposal you would pay nothing to license

21   Motorola's patents, 802.11 patents, and Motorola would pay

22   nothing to license Marvell's 802.11 patents?

23   A    That's right.

24   Q    So the royalties for your important 802.11 patents and

25   Motorola's 802.11 patents would have canceled each other out,

1    correct?

2    A    Yes.

3    Q    Now, during the time that you are aware Marvell has been

4    selling semiconductor chips, Motorola never told Marvell it

5    needed a license to Motorola's 802.11 patents, correct?

6    A    That's right.

7    Q    And, in fact, Motorola affirmatively told Marvell that it

8    had no intention of asserting its 802.11 patents against

9    Marvell, correct?

10   A    That's right.

11   Q    And after you approached Motorola for a license, you

12   learned that Motorola historically did not license chipset

13   manufacturers, correct?

14   A    Yes.

15   Q    In fact, you understood that Motorola had a

16   well-established program of licensing end-users such as

17   Microsoft on Motorola's 802.11 patents, correct?

18   A    That's what I was told.

19   Q    The only reason that Marvell requested a license of

20   Motorola's 802.11 patents was because Microsoft claimed

21   Marvell was contractually obligated to do so.  Yes?

22   A    Yes.

23   Q    And, in fact, Marvell contests that it is required to get

24   a RAND license for Microsoft, right?

25   A    We have never conceded that the particular indemnity

1    provision that was invoked here by Microsoft is applicable or

2    controlling.  But, nevertheless, we have complied with their

3    request.

4    Q   You never admitted that you actually have an obligation to

5    seek a RAND license from Motorola for Microsoft, correct?

6    A   We haven't admitted that, under our indemnity obligation,

7    that we are bound to do so.  But they're a very significant

8    customer, and so forth.  So we'll try and comply.

9    Q   Could we have Exhibit 1610.  And you will find that in

10   your binder, Ms. Ochs.

11   A   Yes, I have it.

12   Q   This is a letter from Jinping Yang of Marvell, to Leonard

13   Smith of Microsoft, right?

14   A   Yes.

15   Q   Let's see if I can refresh your recollection.  If you can

16   turn, again, to your ITC testimony.  This time let's look at

17   page 1994.  And we'll start at page 9, or line 9.  Tell me

18   when you have it, Ms. Ochs.

19   A   Yes.

20   Q   If you'll notice on your copy of Trial Exhibit 1610,

21   there's a letter designation in the upper right-hand corner,

22   CX 819-C.  Do you see that?

23   A   Yes.

24   Q   If you look at line 9, these are questions about CX 819-C,

25   which is now Trial Exhibit 1610.

1    A    That's fine.

2    Q    It's referring to this letter dated March 24th.  And at

3    line 20 you were asked, "Are you familiar with this letter?"

4    You said, "Yes."  Question:  "You mentioned that you drafted

5    another letter for Jinping Yang.  Did you draft this one?"

6    Your answer is:  "I believe I drafted this one also."

7    A    So, I believe I drafted this one.  I don't specifically

8    remember.  My recollection at the time of the ITC testimony

9    might have been a little fresher than it is now as to whether

10   I drafted this full letter, or as to whether I edited it,

11   which is what I think I did now.

12   Q    If you'll look, Ms. Ochs, at the third paragraph of 1610,

13   the first sentence which says, "The November 30, 2004

14   agreement between Marvell and Microsoft, which you reference

15   in your letter, contains exclusions to our indemnity

16   obligations," and so on.  The November 30, 2004 agreement is

17   the agreement that governs Marvell's sale of chipsets to

18   Microsoft.  Yes?

19   A    Yes.

20   Q    That is also the agreement Microsoft claims requires

21   Marvell to indemnify Microsoft by getting a RAND license for

22   Microsoft to Motorola's 802.11 patents.  Yes?

23   A    Yes.

24   Q    The first paragraph, first sentence says, "This letter is

25   in response to Microsoft Corporation's November 24, 2010 and

1    March 14, 2011 letters to Marvell in relation to the patent

2    infringement suits filed by Motorola."  Do you see that?

3    A   Yes.

4    Q   And those letters, the November 24, 2010 and March 11,

5    2011 letters, are the letters in which Microsoft claimed it

6    had the right to require Marvell to procure a RAND license

7    from Motorola, right?

8    A   Yes.

9    Q   And then if you'll look at the last sentence of the third

10   paragraph which says, "Further, the Motorola action appears

11   to have been a retaliatory effort prompted by Microsoft's

12   initiation of legal proceedings against Motorola.  And as

13   such, it is unclear that Marvell owes an indemnity to

14   Microsoft in these circumstances."  That's your language,

15   correct?

16   A   Yes.

17   Q   And so what you're saying there is, look, Microsoft

18   started this fight and began the litigation with Motorola,

19   it's Microsoft's fight, not Marvell's, and we don't think we

20   ought to be involved.  That's what you're saying, correct?

21   A   In essence, yes.

22   Q   What you're saying to Microsoft is that Marvell doesn't

23   owe an indemnity obligation.  That was your argument.  Yes?

24   A   Yes.

25   Q   Now, if you'll look at 1608, Ms. Ochs, which you testified

1  about here in your direct examination.  This is a letter from

2  Jinping Yang to the patent licensing organization at

3  Motorola.  Yes?

4  A    Yes.

5  Q    And this is another letter that you drafted.  Yes?

6  A    Yes.

7  Q    If you'll look at the last paragraph, this is your

8  request, Marvell's first request to Motorola for a RAND

9  license to Motorola's 802.11 patents, correct?

10  A    Right.

11  Q    And this letter is seven years after Marvell entered into

12  its purchase agreement with Microsoft, that Microsoft claims

13  requires Marvell to get a license, right?

14  A    I don't, off the top of my head, have the date of that

15  agreement.  But I'll take your word for it.  It is seven

16  years.

17  Q    I can refresh your recollection, if you'd like.

18  A    If you'd like.

19  Q    Again, ITC 1999.  And we'll start at line 20.  Again, tell

20  me when you're there, Ms. Ochs.

21  A    Yes, I see that.

22  Q    You were asked the question, "I understand that.  And to

23  put a further point on the timeframe involved here, this

24  letter in July 2011 is seven years after Marvell entered into

25  its purchase agreement with Microsoft that required you to

1   indemnify or obtain patents for Microsoft, correct?"  And

2   your answer was, "Yes."

3   A   Yes.  I'm hesitating, because at the ITC I actually had

4   the agreement in front of me so I could confirm the date.

5   And I don't know if it's here.  That's the only issue.  I'm

6   just not entirely sure what the date was now.

7   Q   But, in any case, that was your testimony?

8   A   That is what the question was.  And I presume I had the

9   agreement in front of me at the time to confirm that was, in

10  fact, the date.

11  Q   So, seven years after Motorola started selling chips to

12  Microsoft, Microsoft came to Marvell and said, we want you to

13  get a license from Motorola for the chips you're selling to

14  us, right?

15  A   Well, to be sure, throughout the course of this agreement,

16  they have on several occasions asked us to indemnify them for

17  patent-related issues that concern our chips.

18  Q   So far as you are aware, Microsoft has not come to Marvell

19  in any other situation in the past seven years and said, we

20  want you to go get a license to these patents to cover our

21  chips, correct?

22  A   Typically they asked us to pay their attorneys fees'

23  rather than invoke the other provision.  So this is the first

24  time, I think, in my knowledge, to my knowledge, they've

25  invoked this provision.

1    Q    You've not heard anything, you're not aware of any

2    instance in the past seven years where Microsoft has come to

3    Marvell and said, we want you to go get a license for patents

4    that cover our chips, right?

5    A    Not to my knowledge.

6    Q    Now, you testified that Microsoft made its first indemnity

7    demand on November 24, 2010.  And then what we see is that

8    Marvell waited eight months, almost eight months until

9    July 18, 2011 to send the letter to Motorola requesting a

10   RAND license, correct?

11   A    That's right.

12   Q    Now, if you'll look at Exhibit 16, Ms. Ochs, which you

13   also testified about in your direct examination.  Exhibit 16

14   are two e-mails from Mr. Kowolski to you, correct?

15   A    Yes.

16   Q    And they both relate to licensing discussions between

17   Motorola and Marvell, right?

18   A    Yes.

19   Q    If you'll look at Mr. Kowolski's November 25th e-mail, top

20   of the page, first paragraph, he says, "Further, pursuant to

21   Marvell's request, attached is a copy of the proposed license

22   agreement for Marvell's consideration."  Yes?

23   A    Yes.

24   Q    So on or about the 25th of November -- well, actually, on

25   the 25th of November, Motorola responded and sent you a

1    proposed license agreement, correct?

2    A    Yes.

3    Q    And Mr. -- and the third paragraph, Mr. Kowolski offers to

4    meet with you the week of December 12th to discuss Motorola's

5    proposed license, correct?

6    A    Yes.

7    Q    But you didn't meet with Mr. Kowolski in December 2011,

8    did you?

9    A    They terminated that meeting, yes.

10   Q    In fact, more than five months later, as of June 2012,

11   Marvell had still not provided Motorola with any comments or

12   counterproposal to Motorola's proposed license, right?

13   A    Well, we wanted to have this meeting so that we could

14   present the Marvell portfolio to them, to establish the value

15   of that.   And they -- after terminating the meeting the week

16   of December 12th, they said they didn't want to meet while

17   the ITC trial was pending.   But after some time had passed,

18   then they were available to meet, and we did meet.

19   Q    You have, in your binder, Trial Exhibit 3412, if you'll

20   look at that, please, Ms. Ochs, and tell me when you have it

21   in front of you.

22   A    Yes.

23   Q    And there are two e-mails on this exhibit, one from

24   Mr. Kowolski to you, and one from you to Mr. Kowolski,

25   correct?

 1  A   Yes.

 2       THE COURT:  Mr. Palumbo, let's stop you for a second.

 3  Ladies and gentlemen, there's about five minutes more

 4  testimony in this.  I'm going to run us a little bit into the

 5  lunch hour and I'll make it up to you on the other end.

 6  Q   They both relate to licensing discussions.  Yes, Ms. Ochs?

 7  A   Yes.

 8  Q   If you look at the second e-mail, which is from

 9  Mr. Kowolski to you on June 4, 2012, in the second sentence

10  he said, "Given that over six months have passed since

11  Motorola Mobility provided Marvell a draft license agreement,

12  please provide Marvell's comments to that draft, or a

13  counterproposal to Motorola Mobility in advance of our

14  meeting so we can prepare to address Marvell's concerns, if

15  any, at our meeting."  That's what Mr. Kowolski wrote you on

16  that day.  Yes?

17  A   Yes.

18  Q   Now, if you'll look at Trial Exhibit 3404, please,

19  Ms. Ochs.  And, again, tell me when you're there.

20  A   Yes.

21  Q   3404 is an e-mail from you to Mr. Kowolski dated

22  November 7, 2012, and an e-mail from Mr. Kowolski to you

23  dated November 6, 2012, correct?

24  A   Yes.

25  Q   Both relate to licensing discussions, correct?

1    A    That's right.

2    Q    Please look at the bottom of the first page of 3404, and

3    continuing on to the second page where Mr. Kowolski writes,

4    "I also write to follow up on our June 26 meeting at

5    Marvell's office.  At that meeting, in response to Motorola

6    Mobility's initial proposal, Marvell presented a

7    counterproposal with a royalty-free cross-license."  So

8    Marvell finally gave Marvell a counterproposal on the 26th of

9    June, 2012, correct?

10    A    Yes.

11    Q    And in the counterproposal Marvell proposed to license

12    Motorola to Marvell's 802.11 patents on a royalty-free basis.

13    The royalties would cancel each other out, correct?

14    A    Yes.

15    Q    Motorola responded to that proposal by asking Marvell to

16    provide claim charts, correct, for these patents?

17    A    Yes.

18    Q    You agreed to do that, correct?

19    A    We did.

20    Q    It's now November 2012, and Marvell still hasn't provided

21    any claim charts to Motorola, correct?

22    A    We have not.  We have some in progress.  I'm afraid it

23    hasn't been a high priority.  We have other things that are

24    more compelling, and given how far apart we were at the

25    negotiations, it just hasn't been a high priority.  But we

1    are almost done.  And we can provide those.

2    Q   So if my calculations are right, it's been 24 months since

3    Microsoft came to Marvell and said, go get us licenses for

4    Motorola's 802.11 patents, right?

5    A   I'll trust your timing.

6    Q   There was eight months between Microsoft saying, go get us

7    licenses to Motorola's patents, and the time you actually

8    wrote a letter to Motorola requesting a license, right?

9    A   Yes.  As we've discussed, we tried to push back on

10   Microsoft as much as we can.  This would be a significant

11   undertaking.  And we needed to get consensus that this is, in

12   fact, the path we wanted to go down.  We were not anxious to

13   go down this path.

14   Q   And it was on the 26th of June that you finally provided a

15   counterproposal, right?

16   A   Well, we provided a red-lined, you know, it was our

17   opening negotiating proposal.

18   Q   Right.  And now we've had, since you provided your

19   red-lined and promised to give claim charts, another five

20   months have passed, right?

21   A   Yes.

22   Q   So it's fair to say, isn't it, Ms. Ochs, that Marvell

23   isn't moving very quickly to get a RAND license for

24   Motorola's 802.11 patents, right?

25   A   I suppose that's relative.  But, you know, we're doing the

1    best we can.

2    Q   Your red-lined proposal to Motorola, when you received

3    Motorola's license, I take it from what you've told us that

4    you didn't think Motorola's license was even in the ballpark,

5    correct?

6    A   That's right.

7    Q   And you've told us that you thought it was just not at all

8    -- it just wasn't vaguely a reasonable RAND offer, correct?

9    A   Right.

10   Q   And so the way you responded to that was you made a

11   counteroffer, right?  You gave them a red-lined -- you said,

12   we'll give you a cross-license, royalty free.  You responded

13   to the offer, despite the fact of the manner in which you

14   viewed it, correct?

15   A   I suppose you could characterize it that way, yes.

16   Q   Thank you.

17           MR. PALUMBO:  Your Honor, just so the record is

18   clear, I think we moved admission of Exhibit 16,

19   Exhibit 1608, Exhibit 1610, Exhibit 3404, Exhibit 3412, which

20   were all admitted when Ms. Ochs testified originally.

21           THE COURT:  And they are admitted here.

22    (Exhibit Nos. 16, 1608, 1610, 3404 and 3412 were admitted.)

23           THE COURT:  Ms. Robbins, you're going to finish up?

24           MS. ROBBINS:  Yes, Your Honor.

25                          EXAMINATION

1    BY MS. ROBBINS:

2    Q   Ms. Ochs, do you think the Marvell and the Motorola 802.11

3    patent portfolios are of equal value?

4    A   No.

5    Q   What's your view?

6    A   Well, I haven't looked at the entire Motorola portfolio.

7    We've only been focused on these two asserted patents.  But

8    those two patents are older.  They don't have much life in

9    them.  They relate to the older versions of the standard.

10   Our portfolio is very valuable.  We're very active in the

11   standards body.  The patents we are getting now have direct

12   applicability to the standards and they have a long life

13   ahead of them.

14   Q   And why, then, were you willing to propose a royalty-free

15   cross-license?

16   A   I think there are some at Marvell who would object and

17   might think that Motorola should be paying us.  But given

18   that Microsoft made this request and they're a valuable

19   customer, we thought if we started and proposed that they pay

20   us money, that that wouldn't be viewed as negotiating in good

21   faith.  And we got internal authority to just propose royalty

22   free.  We thought that's more than fair, even if perhaps we

23   could, you know, get them to be paying us for our portfolio,

24   we have not traditionally asserted patents affirmatively.  We

25   use them only defensively.

1  Q   Now, regardless of whether you did or you did not have an

2  indemnity obligation to Microsoft, did you believe that

3  Marvell was entitled to a license from Motorola on RAND terms

4  if it asked for one?

5  A   As I understand RAND, it means you provide that license to

6  a party that asks.  So, yes.

7           MS. ROBBINS:  Nothing further.  Thank you.

8           THE COURT:  You may step down.

9       Ladies and gentlemen, we'll take our lunch break at this

10  time.  Remember that until the trial is over, do not discuss

11  this case with anyone, including your fellow jurors, members

12  of your family, people involved in the trial, or anyone else.

13  Do not allow anyone else to discuss the case with you.  This

14  includes discussing the case in internet chat rooms, or

15  through internet blogs, bulletin boards, e-mails, or text

16  messaging.  If anyone tries to communicate with you about the

17  case, please let me know about it immediately.

18       Do not read, watch, or listen to any news reports or other

19  accounts about the trial, or anyone associated with it,

20  including any on-line information.  Do not do any research

21  such as consulting dictionaries, searching the internet, or

22  using other reference materials.  And do not make any

23  investigation about the case on your own.

24       Finally, keep an open mind until all the evidence has been

25  presented, and you have heard the arguments of counsel, my

1    instructions on the law, and the views of your fellow jurors.

2    If anyone needs to speak with me about anything, simply give

3    a signed note to the bailiff.

4        Ladies and gentlemen, we'll ask you to be back about --

5    1:35 is when we'll bring you out, so maybe you can be here by

6    1:30, or so.  In the meantime, enjoy your lunch.

7       (The following occurred outside the presence of the jury.)

8            THE COURT:  We'll be in recess until 1:35.

9                    (The proceedings recessed.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                        AFTERNOON SESSION
 2         THE COURT:  Counsel, the jury has another couple of
 3    minutes before we bring them out.  In the meantime, we have
 4    another note.  "Could the meaning of", quote, "indemnify,"
 5    unquote --  I'm not sure what the next word is, blank, "in
 6    the contract of the Marvell request for license please be
 7    explained."
 8         MR. PALUMBO:  "In the context," I believe, your
 9    Honor.
10         THE COURT:  Oh, "in the context."  I am open to
11    suggestions.  Mr. Pritikin.
12         MR. PRITIKIN:  I will take a stab at it.  We think it
13    would be helpful for you to answer the question that has been
14    raised.  We have been trying to craft some language.  I would
15    hope this can be done cooperatively and by agreement.  I am
16    willing to take a crack at it.
17         THE COURT:  I am going to say when we bring the jury
18    out, we got the note and we will get back to you.  Since the
19    witness is off the stand, I'm not sure.  Mr. Palumbo.
20         MR. PALUMBO:  Your Honor, the contract between
21    Marvell and Microsoft is part -- it is, in fact, Exhibits 16,
22    17.  It has the usual lawyers indemnification provision,
23    which will be certainly obscure to an old trial lawyer like
24    me, and I think it will be equally obscure to the jury.  I
25    think what we do have is we have Jennifer Ochs' testimony.
```

1    And I asked her, "This letter is in response to Microsoft

2    Corporation November 24, 2010 and March 14, 2011 letters to

3    Marvell in relation to the patent infringement suits?"  And

4    she says, "Those are the letters," quote -- "letters in which

5    Microsoft claimed it had the right to require Marvell to

6    procure a RAND license from Motorola."  If you look at that

7    testimony, it also references the original November 2004

8    agreement, out of which Microsoft claims, and Ms. Ochs

9    agrees, that the indemnity obligation arises.

10        So in the context of this lawsuit, we have testimony from

11   Ms. Ochs who says that Microsoft is claiming that the

12   indemnity obligation, quote, "requires Marvell to procure a

13   RAND license from Motorola."  And it is also clear from

14   Ms. Ochs' testimony that Marvell's position is that indemnity

15   obligation does not require Marvell to seek a license.  Ms.

16   Ochs says --  I asked her the question, "What you are saying

17   to Microsoft is that Marvell doesn't owe an indemnity

18   obligation?  That was your argument?  Yes?"  And she says,

19   "Yes."  So I think if we want to clarify this, the indemnity

20   obligation in this context, Microsoft says requires Marvell

21   to get a license from Motorola for Motorola's 802.11 patents,

22   and Marvell's interpretation of the same provision is that it

23   does not have that obligation.

24        THE COURT:  Why don't both of you do your provisions.

25   I think that is one aspect of indemnify.  I agree that is the

 1   testimony.  I'm not sure that is the exclusive meaning.

 2        MR. PALUMBO:  I was limiting it to the note which

 3   says, "in the context of the Marvell request."  In that

 4   context, that's the evidence that we have in the record in

 5   this case.

 6        THE COURT:  All right.  I won't ask you to get that

 7   done by the 3:00 break, but you can put it on your list of

 8   homework for tonight.

 9      Counsel, are we ready to bring in the jury?  Who is the

10   next witness?

11        MR. PRITIKIN:  The next witness is Mr. Gutierrez,

12   your Honor.

13        THE COURT:  Mr. Palumbo, you did a very nice job of

14   playing yourself.

15   (At this time the jury entered the courtroom.)

16        THE COURT:  The next witness Microsoft calls is

17   Mr. Gutierrez.

18   Whereupon,

19                      HORACIO GUTIERREZ,

20   Called as a witness, was sworn and testified as follows:

21        MR. PRITIKIN:  May I approach and hand up some

22   notebooks?

23        THE COURT:  Yes.  You may inquire.

24                      REDIRECT EXAMINATION

25   By Mr. Pritikin:

1    Q    Good afternoon, Mr. Gutierrez.

2    A    Good afternoon.

3    Q    Where do you work, sir?

4    A    I work at Microsoft.

5    Q    What is your job title?

6    A    Corporate vice-president and deputy general counsel.

7    Q    What areas are you responsible for?

8    A    I am responsible for the intellectual property group, the

9    standards group, the regulatory affairs group and the legal

10   group that supports the research and development function.

11   Q    And can you tell us briefly what your responsibilities are

12   as head of the IP group?

13   A    That group includes the full range of IP support, the

14   patent team, the copyright team, trademarks, licensing.

15   Q    Do the responsibilities of the IP group at Microsoft

16   include patent litigation?

17   A    No, they don't.

18   Q    And who handles that at Microsoft?

19   A    There is a specialized patent litigation team that is part

20   of the litigation department at Microsoft.

21   Q    Let's talk for just a few minutes about your personal

22   background.  Where were you born and where did you grow up?

23   A    I was born in Venezuela, and I was raised there.

24   Q    And can you describe your education for the jury?

25   A    I became licensed as an attorney in Venezuela, and then

1    pursued postgraduate degrees there.  After that I came to the

2    U.S. with a Fulbright scholarship to attend Harvard Law

3    School, where I got a master in law.  Later on, when I moved

4    back to the U.S. for good, I went to law school again to take

5    my juris doctorate degree at night while I was working

6    full-time.

7    Q    What year did you join Microsoft?

8    A    1998.

9    Q    And how long have you been the head of intellectual

10   property?

11   A    Since the summer of 2006, so that's seven years.

12   Q    Now, based on your experience as head of intellectual

13   property for Microsoft for the last seven years, have you

14   become familiar with industry custom and practice in

15   negotiating patent licenses?

16   A    Yes.

17   Q    Could you turn, please --  Do you have a witness binder up

18   there?

19   A    I do.

20   Q    Could you turn, please, to exhibit -- the document that is

21   marked as Exhibit 1.  Let's put that on.  This is in

22   evidence.  Let's put this on the screen.  Is this a letter

23   that you received from Kirk Dailey at Motorola, dated

24   October 21, 2010?

25   A    Yes.

1  Q   And did it offer to license Motorola's 802.11 essential

2  patents?

3  A   Yes.

4  Q   And let's look next at Exhibit 2.  Is this the letter you

5  received from Mr. Daily, dated October 29th, 2010, offering

6  to license Motorola's H.264 essential patents?

7  A   Yes.

8  Q   Let's leave this one on the screen for a few minutes.

9  What is the royalty rate that is offered in this letter?

10 A   It is 2.25, but calculated not on the basis of Microsoft's

11 own component software, but on the basis of the products

12 manufactured by PC and device manufacturers.

13 Q   Let's pull up the last sentence of the second paragraph,

14 if we could.  Is this the sentence you were just referring

15 to?

16 A   Yes, that is the sentence that struck me as highly

17 unusual.

18 Q   And can you explain what your reaction was when you saw

19 this letter, and this sentence in particular?

20 A   Well, it was clear, both from the percentage as well as

21 the base that they were using to calculate it, that the

22 royalty would yield an outrageous amount of money, that in no

23 way could be viewed to be a reasonable royalty demand.

24 Q   Who makes and sells the PCs and laptops that include

25 Windows operating system software?

1   A   Microsoft's business model is traditionally to do the

2   software.  We do the operating system, and then that becomes

3   a component to a full computer -- a computing device that

4   somebody else makes.  So that would be companies like Dell or

5   Hewlett Packard or Lenovo, or Toshiba, companies all over the

6   world, in Taiwan and Japan and everywhere.

7   Q   It also talks about Windows Phone 7 software.  What is

8   that?

9   A   That is the operating system that we make that is

10   optimized for a handheld device, like a phone, or, you know,

11   a mobile device.

12   Q   And, generally, who makes the phones that contain Windows

13   mobile software or Windows phone software?

14   A   Also the hardware manufacturers, in this case the most

15   common ones that people will have heard of are Samsung, HTC,

16   LG, Nokia, companies like that.

17   Q   Now, when the letter said that the royalty would be based

18   on the end-product price and not the component software, what

19   did you understand that to mean for Windows Phone 7 software?

20   A   That Microsoft would have to pay a royalty that would be

21   calculated on the basis of a product that was much more

22   expensive than the product we were selling, so that that

23   would have a multiplying effect on the royalty obligation for

24   us, and would make it incredibly difficult for us to really

25   make the business model of the operating system work.

1    Q    Are you aware of anyone in Microsoft who knows what

2    Microsoft's customers actually receive for their computer

3    products and phones?

4    A    No.  These are the prices they set when they sell their

5    products to their customers.  So we have no influence over

6    that.  We have no visibility over that.  And also, keep in

7    mind, a company like Hewlett Packard has dozens of PC models,

8    and they vary by country and by jurisdiction, and they have

9    different pricing models.  There is really no way that we

10   would have this ability of what they are charging their

11   customers all over the world.  We wouldn't be able to tell

12   for sure what it is.

13   Q    Are you aware of any agreement in which Microsoft has been

14   required to pay a percentage royalty that is calculated on

15   the price of products sold, not by Microsoft but by

16   Microsoft's customers?

17   A    I'm not aware of any.  And I wouldn't agree to an

18   agreement like that.

19   Q    If there were such an agreement, how would Microsoft know

20   how much exactly it owed in royalties?

21   A    We couldn't.  Because it is a percentage of the revenue

22   that dozens of other people generate on the sales of hundreds

23   of devices all over the world.  There would be no way for us

24   to be able to even calculate what the royalty obligation is.

25   Q    Now, I want to ask you some questions, Mr. Gutierrez,

1    about the economics of the offer.  Let's put up a

2    demonstrative that has been used before, PDX 1 at slide 17.

3    Let's assume a case of a $500 laptop.  How much money was

4    Motorola asking Microsoft to pay for a copy of Windows

5    installed on a $500 laptop?

6    A    $11.25.

7    Q    And are some laptops more expensive than that?

8    A    Yes.  I mean, if you go to a store you will find a whole

9    range of laptops, that in some cases go to a thousand or even

10   $2,000.  So even this would be a somewhat conservative

11   estimate.

12   Q    Are you aware of what the court found to be a RAND royalty

13   for Microsoft's H.264 -- for Motorola's H.264 patents?

14   A    Roughly half a cent.

15   Q    Let's take a look at another demonstrative, PDX 1, slide

16   18.  Now, if Microsoft had paid the royalty rate in this

17   letter, how much money would the annual payments have

18   amounted to for Windows?

19   A    If you take into consideration the estimates that are out

20   there about the revenue that the hardware manufacturers make,

21   and applied it to 2.25 percent, that would have been north of

22   $4 billion every year.

23   Q    Would Microsoft have owed royalties for past years as

24   well?

25   A    Yes, on top of that, those are just the annual prospective

1   royalties.  On top of that we would have had to pay past

2   damages, which using the same methodology we would estimate

3   would be north of $20 billion.

4   Q   Using the RAND rate determined by the court for Motorola's

5   H.264 patents, how much would Microsoft's annual royalty

6   payments be?

7   A   Less than $2 million a year.

8   Q   Let's talk for a moment about the economics of the offer

9   as it pertains to the Windows software.  Could you explain

10  that to the jury?

11  A   Yeah.  In that case you are talking about a phone that on

12  average would have a price of between four- and $600.  If you

13  assume it is a $400 phone - that is the actual final phone

14  system, not something we make, something the manufacturer

15  makes - and you applied 2.25 percent, you are talking about a

16  $9 per unit royalty.

17  Q   Did you consider that a reasonable royalty for Motorola's

18  H.264 patents for Windows mobile software?

19  A   No.  It was clearly not a reasonable royalty.

20  Q   The letter also references Xbox.  Do you have an

21  understanding as to how much an Xbox sells for?

22  A   Yes.  It depends on what model of the Xbox.  We have some

23  that are high end and some that are sort of entry level.  I

24  think the high-end Xbox would be $399, and that includes

25  Kinect, that includes a number of things.  Again, if you

1   apply 2.25 percent to roughly $400, that is roughly $9 per

2   unit.

3   Q    And did you consider that to be a reasonable royalty for

4   Motorola's H.264 patents?

5   A    No.

6   Q    Do you have an understanding of what royalty stacking is?

7   A    Yes, I do.

8   Q    Could you explain to the jury what royalty stacking is?

9   A    Sure.  In the context of a standard like H.264, stacking

10  relates to the fact that when a standard is created there are

11  likely to be multiple companies that claim to have IP on it.

12  And, therefore, in determining what a reasonable royalty is

13  for that, you have to think not only of a single person

14  holding a patent, but you have to look at what the cumulative

15  impact would be of all the people who hold the patent.  In

16  trying to calculate a reasonable royalty, you have to take

17  into account all of the patents in the system.  And obviously

18  the standard organizations have an interest in making sure

19  that that burden of the IP cost is not so high that would

20  discourage the adoption of the standard in the industry.

21  Q    Now, let's relate this to H.264.  Do you have an

22  understanding of how many companies own patents that are

23  essential to the H.264 video standard?

24  A    At least 55 companies, if not more.  52.  I'm sorry.

25  Q    And if all of those were entitled to a 2.25 percent

1  royalty, would it have been feasible for Microsoft to support

2  the H.264 video standard in Microsoft's products?

3  A   This is simple math.  You have 52 -- at least 52

4  patentholders, each potentially asking for 2.25 percent.

5  That adds to more than 100 percent.  So essentially the IP

6  cost would be higher than the price at which the product is

7  sold.

8  Q   Suppose some of the companies don't ask for the

9  2.25 percent, does that mean that one company's request is

10 reasonable?

11 A   No, that doesn't make it reasonable.  First of all, you

12 have to look at the overall IP burden.  In calculating your

13 RAND rate you actually have to have a sanity check of what

14 the effect of stacking would be.  Because nobody can really

15 predict which companies are going to ask for a royalty or

16 not.  And once a company is in fact able to extract a high

17 royalty, you are actually going to be encouraging everybody

18 else to come out of the woodwork and be asking for excessive

19 royalties, too.

20 Q   Now, did the concept of royalty stacking play any part in

21 the conclusions that you drew as to the reasonableness of the

22 Motorola request?

23 A   Once again, any outcome in which the royalty that someone

24 is asking amounts to more than the price in which the product

25 is sold, it obviously has a massive stacking problem.  It is

1  a clearly outrageous economic outcome.  It is a demand that

2  can be by no means considered to be consistent with RAND.

3  Q   Are there other standards, besides H.264, that Windows and

4  Windows Phone and Xbox need to comply with?

5  A   There are many.  This is the case for software in general,

6  but especially when you are talking about an operating system

7  that is a platform, whose mission is to be able to integrate

8  with hardware, to connect with the internet, to connect with

9  applications and other software.  There are virtually

10  hundreds of standards that have to be supported, some of them

11  to be able to play video like H.264, some of them connect to

12  the web, or connect to WiFi, or things like that.  Those are

13  just a few examples.  There are literally hundreds of

14  standards that are supported in a modern, sophisticated

15  operating system.

16  Q   Would it have been feasible for Microsoft to pay the level

17  of royalties requested by Motorola to all of the owners of

18  patents essential to all of the standards supported by these

19  products?

20  A   No --  Once again, economically it would have been

21  impossible to pay those royalties.

22  Q   Did you consider the October 29, 2010 letter to be a

23  commercially reasonable offer?

24  A   There is nothing reasonable about this letter.  This

25  letter was blatantly unreasonable on its terms.

1    Q    Let's look at the October 21st letter, which is Exhibit 1.

2    Can we put that on the screen?  Let's look at the last

3    sentence, I believe, in the first paragraph.  What was the

4    royalty base --  Let me stop there for a moment.  Can you

5    explain to the jury what a royalty base is?

6    A    When you are looking at a royalty, it is not enough to

7    just look at the percentage.  The percentage only has a

8    meaning once you determine what you are applying the

9    percentage to.  It is not the same to do a 2.25 percent over

10   a base of $1, or applying 2.25 percent over the base of a

11   billion dollars.  It is important here because, once again,

12   it shows that the 2.25 percent then had to be applied, not to

13   the products that Microsoft makes, and for which we generate

14   revenue, We were basically being asked to pay Motorola a

15   royalty based on the price that third parties, our customers,

16   charge to their own customers.

17   Q    Are you referring to the Windows mobile software?

18   A    That is in the case of the Windows mobile software.

19   Q    To be clear, in the case of the Xbox 360, that is a

20   product that Microsoft makes?

21   A    Microsoft does make the Xbox 360 itself, yes.

22   Q    Now, I want to talk a little bit about the economics of

23   this offer and how it compares with RAND.  Let's put up --

24   Let's just go through this.  I think we can do it quickly.

25   The jury has seen some of this before.  You told us a few

1   minutes ago that an Xbox console, I think, sells for between

2   $200 and $400?

3   A   Correct.

4   Q   So what would the royalty have amounted to, according to

5   this letter, on a $400 Xbox?

6   A   2.25 percent of 400 would be roughly $9.

7   Q   And what is your understanding of what the RAND rate is

8   that has been determined by this court?

9   A   For the 802.11 is, I think, three and a half cents.

10  Q   All right.  And is there a particular component within the

11  Xbox that provides the 802.11 functionality?

12  A   Yeah.  The WiFi functionality is provided by a chip that

13  we obtained from a supplier, and then we install it as a

14  component in the Xbox.

15  Q   And approximately how much was Microsoft paying for that

16  chip?

17  A   Approximately $3 per chip.

18  Q   How does the amount that Motorola was asking for as a

19  royalty on its 802.11 patents compare to the cost of the

20  chip?

21  A   Well, the chip costs $3, and the royalty was $9, so it was

22  roughly three times the cost of the chip that provides the

23  functionality on which they claim to have essential patents.

24  Q   Let's talk again about royalty stacking.  Do you have an

25  understanding of how many companies have declared patents as

1    essential to the 802.11 standard?

2    A    It is at least 92 companies.

3    Q    And, again, I will ask you, if every company with 802.11

4    standards-essential patents was entitled to a 2.25 percent

5    royalty, would it have been practical for Microsoft to pay

6    royalties at that rate to all of the owners of

7    standards-essential patents?

8    A    No.  Again, talking about a 2.25 percent royalty, you

9    multiply that times 92, you are really talking about, you

10   know, a royalty that is double the actual price of the device

11   itself.

12   Q    Did you consider this letter to be a commercially

13   reasonable offer, sir?

14   A    No.

15   Q    Now, I want to ask you about a couple of the terms that

16   appear in both of the letters.  Maybe we can put them up side

17   by side.  Now, let's look at the --  Let's pull out the

18   language on the letter on the left.  It says, "Including a

19   reasonable royalty of" -- down here, "of 2.25 percent."  I

20   want to direct your attention to the language, Mr. Gutierrez,

21   that says, "Subject to a grant-back license under the 802.11

22   essential patents of Microsoft.  Do you see that language?

23   A    I do.

24   Q    And is there comparable language in the October 29th

25   letter relating to the H.264 patents?  We don't have to pull

1    it out.

2    A    Yes.  It is in the second paragraph, the third line,

3    "Subject to a grant-back license under the H.264 patents of

4    Microsoft."

5    Q    And when you received these letters, what did you

6    understand that to mean?

7    A    I understood it to mean what it says, that their royalty

8    offer assumes that they are getting a license back under our

9    portfolio of patents for H.264 and 802.11, and that their

10   calculation assumed that that value was there, so they were

11   getting a license for free to our portfolio.  And mind you,

12   in H.264 specifically, Microsoft had been very involved in

13   the development of that technology, and we held two or three

14   times as many patents as Motorola had.  So they were asking

15   to get that value for free, and on top of that charging us a

16   royalty.

17   Q    Now, each of these letters put forward a 2.25 percent

18   royalty; is that right?

19   A    Yes.

20   Q    One for 802.11 and one for H.264?

21   A    Correct.

22   Q    And in the case of Xbox, both standards are supported?

23   A    Correct.

24   Q    What was your understanding of the combined effect of the

25   royalty rates that were listed in these two letters?

A    Well, again, I read the letters to mean what they say,

which is these are two independent royalty demands based on

different sets of technology that for each of which Motorola

expected to receive a 2.25 percent royalty calculated on the

final product.  So the plain meaning of that is, if you have

a product that uses both, you have to pay for both.  So, in

fact, the royalty for those products would be double

2.25 percent.

Q    Now, you are aware from some of the prior proceedings that

Motorola has said that they only collect one 2.25 percent

royalty, they don't collect it twice.  Is that the way you

read the letters when you got them?

A    No.  I read the letters to say what they say, which is,

they are independent royalty demands based on two sets of

patents on completely different technologies with independent

royalty demands for each of them.

Q    Did you think at the time that Motorola needed additional

information from Microsoft to know whether the demands were

reasonable or unreasonable?

A    No.  The reality is the information about our business

model and the products that we make is, I think, pretty

obvious to everyone.  There is plenty of public information

about this.  There are publicly available estimates of the

sales of PC makers.  It shouldn't have been hard at all for

them to know the magnitude of the royalty demand they were

1    making and the fact that it was just plainly outrageous.

2    Q    Is Motorola an OEM for Microsoft?

3    A    They used to be an OEM.  They used to license both PC

4    operating systems -- they used to make Windows personal

5    computers, and also Windows mobile -- Motorola devices that

6    ran on the Windows operating system.

7    Q    And what conclusions do you draw from that, sir?

8    A    That they --

9         MR. PRICE:  Objection, your Honor.  It is vague.

10   By Mr. Pritikin:

11   Q    How does that figure into how you --

12        THE COURT:  Stop.

13        MR. PRITIKIN:  I was going to rephrase.

14        THE COURT:  Why don't you go ahead and rephrase the

15   question, counsel?

16   By Mr. Pritikin:

17   Q    How did that bear on your assessment of the request?

18   A    Motorola knew --

19        MR. PRICE:  I will object.  Assumes facts not in

20   evidence, which is that he considered this at the time.

21        THE COURT:  Overruled.

22        THE WITNESS:  Motorola knew firsthand because they

23   had been a customer of Microsoft and had licensed our

24   operating system platform, both for PCs and phones, the terms

25   under which we would license those, and they understood our

1  business model.  So it certainly wouldn't have been hard for

2  them to have a pretty good sense of the improper nature of

3  the royalty demand that they were making.

4  By Mr. Pritikin:

5  Q   Now, if you assume that these letters were not asking for

6  4.50 percent combined, but each of them is asking for

7  2.25 percent, does that in any way change your opinion as to

8  the reasonableness of the request?

9  A   No, it doesn't.  On some of the estimates that we have

10 talked about earlier, they are not adding the two royalties,

11 they are just considering what the impact of one of those

12 would be.  So each of them independently contains what is a

13 really outrageous royalty demand, even without the need to

14 add the two royalties rates.

15 Q   Now, Mr. Gutierrez, I want to ask you about what was in

16 your mind when you looked at these letters.  What was your

17 thinking?  Why did you think Motorola was sending letters

18 with terms that Microsoft could not accept?

19          MR. PRICE:  Objection.  Calls for speculation.

20          THE COURT:  Overruled.

21          THE WITNESS:  The letter in and of itself makes it

22 plain that these were not terms that we could accept.  In

23 fact, this letter made it impossible for us to be able to

24 accept this offer.  And this letter was received in the

25 context of earlier conversations that I have had with

1   Mr. Dailey in which he had made it quite clear that Motorola

2   intended to sue Microsoft, and that in fact Microsoft

3   ultimately would regret having taken the step to -- want to

4   have Motorola respect Microsoft's own IP.  To me this was

5   clearly a sham letter, whose purpose was really to clear the

6   way to their filing of an action, which is exactly what they

7   did.

8   By Mr. Pritikin:

9   Q   Let's talk a little bit about the background that led up

10  to these letters.  Let's pull up the timeline, PDX 2.  The

11  jury has seen this before.  Now, did there come a time in

12  2010 when --

13          THE COURT:  Mr. Pritikin, stop for a second.  Ladies

14  and gentlemen, this is a demonstrative.  It is not an exhibit

15  that has been admitted.  Thank you.

16  By Mr. Pritikin:

17  Q   Did there come a time in 2010 when Microsoft filed patent

18  infringement lawsuits against Motorola?

19  A   Yes, we did.

20  Q   And can you identify the date of that?

21  A   That was October 1st of 2010.

22  Q   Did Microsoft sue Motorola on any patents that were

23  essential to 802.11 or H.264?

24  A   No.

25  Q   What products did you accuse in the lawsuit?

1    A    It was Motorola's Android smartphones and tablets.

2    Q    Does Microsoft have an Android licensing program?

3    A    We do.

4    Q    And could you tell the jury a little bit about Microsoft's

5    Android licensing program?

6    A    Sure.

7         MR. PRICE:  Objection.  Vague as to time, your Honor.

8         THE COURT:  Why don't we put a point of time on it?

9    By Mr. Pritikin:

10   Q    Let's talk about the Android licensing program today, and

11   then we can go back.

12   A    So Microsoft has invested, over decades, billions of

13   dollars every year in developing technologies for operating

14   systems, in particular, and applications for devices.  And as

15   a result of that we have developed a portfolio of over 70,000

16   patents and patent applications worldwide.  We've decided as

17   a matter of policy that we are open to licensing those to

18   third parties.  Some companies would just hold those patents

19   and keep them to themselves.  In this case we felt that the

20   Android operating system had a number of features in it that

21   were infringing of our patents, and we decided the way to

22   deal with that that would be most constructive, since many of

23   these companies that make these devices are also our

24   customers, was to enter into license agreements with them in

25   trying to find a way to license or cross-license those

1    portfolios.  So that's what we have done.  And now days about

2    80 percent of all the Android smartphones that are sold in

3    the U.S. come licensed to Microsoft's full portfolio of

4    70,000 patents.  So the vast majority of the Android devices

5    in the U.S. market are covered by a Microsoft -- a license to

6    Microsoft's patents.

7    Q   And are there any notable exceptions that have not agreed

8    to take a license?

9    A   Virtually all of the major companies have signed licenses;

10   the Samsungs, the LGs, HTC, all the major vendors have taken

11   licenses.  I think the outlier in this case is actually

12   Motorola.

13   Q   Now, when you filed the patent infringement cases against

14   Motorola, were you trying to put the Android phones out of

15   business?

16   A   No.  If you are trying --  We are offering a license on

17   our patents.  And you have plenty of examples of companies

18   that are thriving in their Android business models; Samsung

19   is a perfect example, who signed a license agreement with

20   Microsoft and is actually having tremendous success in the

21   marketplace.

22   Q   Let's talk about what happened after the suit was filed on

23   October 1st.  Were there communications with Motorola the

24   same day?

25   A   Can you repeat the question, sir?

1   Q   Yes.  We are going back to the day the lawsuits were first

2   filed.  Were their communications with Motorola the same day?

3   A   Yes.

4   Q   Tell us what those communications were?

5   A   Well, there were communications at different levels within

6   the company.  The same day that we filed the action our CEO,

7   Steve Balmer, called their COE, Sanjay Jha --

8           MR. PRICE:  I will object to lack of foundation on

9   this, your Honor.

10          THE COURT:  Why don't we establish how he would know

11  this?

12  By Mr. Pritikin:

13  Q   How were you aware of the fact that there was outreach or

14  communications that day?

15  A   Well, we had discussed - the Microsoft CEO, the general

16  counsel and myself - that upon filing the action that we

17  should reach out to Motorola, to give them a courtesy call,

18  to let them know that the reasons why the action was being

19  taken, and then to explore whether we could start a

20  discussion that would lead to a path to resolving the issues.

21  Q   So tell us again what the outreach was that was set up?

22  A   So there was --

23          MR. PRICE:  Object as to foundation, as to anyone but

24  him.

25          THE COURT:  Overruled.

1    THE WITNESS:  So the CEO of Microsoft, Steve Balmer,

2  called the CEO of Motorola Mobility, Sanjay Jha; our senior

3  counsel, Brad Smith, called Motorola's general counsel,

4  Mr. Scott Offer; and I called Mr. Dailey directly.

5  By Mr. Pritikin:

6  Q   Since you were on that call, that's the one I am going to

7  ask you about, Mr. Gutierrez.  When did you have your first

8  conversation with Mr. Dailey after the lawsuit was filed?

9  A   It was the same day when the lawsuit was filed.  I

10  remember having tried a couple of times to get through to him

11  and not being able to connect.  But then eventually, late in

12  the afternoon of that Friday, he called me back.  It was the

13  evening, his time, the afternoon of my day here.

14  Q   And what did Mr. Dailey say to you in that conversation?

15  A   Well, he was clearly very agitated.  He was upset.  He

16  told me that Microsoft had made a grave mistake in filing the

17  action.  He said that if Microsoft desired war, that they

18  were fully prepared to go to war, that they would sue us, and

19  that in the end Microsoft would come to regret having taken

20  that step.

21  Q   And what did you say to Mr. Dailey about Motorola's

22  patents?

23  A   I told him that I understood that he would be upset that

24  day, but that the message that I wanted to leave him with is

25  that we were fully prepared to have a conversation with

1   Motorola that would lead to a resolution of the issues

2   between the companies in a fair manner; that if there was a

3   path to something other than protracted litigation, that we

4   were open to doing it; and that we understood that would have

5   to be a two-way street; that we would also have to recognize

6   that they may have patents that read on our products, and

7   that also meant that we needed to be prepared to give them

8   fair compensation for those patents.  And I confirmed to him

9   that, in fact, we were prepared to do that.

10  Q   Now, in the several weeks after Microsoft filed its

11  lawsuit, did someone at Microsoft invite Motorola to identify

12  what patents it thought were pertinent to Microsoft's

13  products?

14  A   Yes.

15  Q   When Microsoft asked Motorola to identify patents that

16  were pertinent to Microsoft's products, did Microsoft invite

17  the October 21 and October 29 letters?

18  A   No.  We did not invite to be held up in the way these

19  letters do.  We invited a conversation about reasonable

20  compensation between the companies.

21  Q   During your conversations with Mr. Dailey, did you make

22  arrangements for an in-person meeting?

23  A   Yes, we did.

24  Q   And tell us about when the meeting was going to occur and

25  how it was set up?

A    So we had been trying to set up a meeting before the

litigation took place, but that actually never happened for,

I think, scheduling reasons.  Once the litigation was filed

and we had that conversation --  Mr. Dailey and I had had

conversations I believe it was the week after the action, in

which we talked about how it was probably a good idea to try

to bring the two general counsel together, have a

face-to-face meeting, and see if, in fact, we could find a

path through which the parties could come together and put an

end to the litigation and prevent further litigation.

Q    Now, the letter relating to 802.11 is dated October 21st.

When did you receive the letter?

A    I actually didn't receive that letter until the next

morning, the morning of October 22nd.

Q    And what was the date that the meeting was planned for?

A    The meeting was planned for the morning of October 22nd.

So I got the letter right before the face-to-face meeting was

supposed to take place.

Q    When you got the letter, what did you do with it?

A    Well, I opened it, it was an attachment to an e-mail, I

read it, and upon reading it I forwarded it to a number of

other people in the legal department.

Q    When you got the letter just before the meeting, did you

think about cancelling it?

A    Well, their general counsel had traveled all the way to

1   Seattle, he was here already physically.  We thought that the

2   right thing to do was actually to focus on trying to find a

3   constructive way forward and to try to focus on solutions as

4   opposed to really focusing our attention on something that

5   was clearly not going to lead to a constructive engagement.

6   Q   Did you discuss the letter at all at the meeting?

7   A   No.  I remember making a joke as a means of defusing the

8   tension, that we had gotten there missive earlier, and then

9   after that there was really no further discussion of it.

10  Q   Who attended the meeting?

11  A   It was the general counsels of both companies; again,

12  Mr. Smith for Microsoft, and Mr. Offer for Motorola, and then

13  Mr. Dailey and myself.

14  Q   Was there any discussion at that meeting of Motorola's

15  standards-essential patents?

16  A   No, I don't believe there was.

17  Q   And, again, can you tell us generally what was said at the

18  meeting?

19  A   During the meeting we tried to explore whether both sides

20  were open to starting this conversation process that would

21  lead to a settlement.  And I think the conclusion of that is

22  that both parties would be willing to undertake such a

23  process.  There was obviously no guarantee that we would be

24  able to get there, but that both parties were interested in

25  having a conversation to try to avert litigation and put an

1    end to the existing litigation.

2    Q    Now, the H.264 letter is dated October 29th, 2010.  Was

3    that a week after the meeting?

4    A    Roughly a week after.

5    Q    And when you received that letter, what did you do with

6    it?

7    A    Well, once again, I opened the letter and I read it.  It

8    seemed to me even more outrageous than the first letter in

9    some significant respects.  And to me, that letter, coming on

10   the heels of having had a discussion where we felt there was

11   a possibility of a constructive path forward, to me it

12   just -- it was very clear that the letters were preparatory

13   steps for an action that they would be filing, and which

14   Mr. Dailey had told me they would be filing.

15   Q    At the time you received the letter on H.264, that's the

16   October 29th letter, were you aware of a patent pool that

17   licensed H.264 patents?

18   A    Yes, I was.

19   Q    And what is that pool?

20   A    It is called the AVC pool, and it is a pool managed by an

21   entity called MPEG LA.  It is a pool that has a number of the

22   key patentholders in the H.264 field.  I think there were

23   roughly 30 patentholders that had committed their patents to

24   that pool.  The pool's mission was to license that whole set

25   of patents from all of those companies broadly to the

1    industry.  And we had been members of that pool, and we were

2    both licensees, in terms of licensing our portfolio out to

3    everyone, as well as we would take a license, and we were

4    paying royalties to the pool members in exchange for the

5    licenses to their patents we were getting.

6    Q    How many patents were there in the pool?

7    A    I believe something over 2,400 patents.  And they have

8    signed over 1,000 license agreements with companies

9    throughout the world.

10   Q    Now, I want to make sure we understand this.  If someone

11   wanted to get a license to Microsoft's H.264

12   standards-essential patents, could they get that license from

13   the MPEG LA pool?

14   A    Yes.  Anyone could get a license.  And the rates were

15   standard rates, and anyone who wanted it was able to get one.

16   Q    Now, does Microsoft receive money back in return for

17   licensing its patents through that pool?

18   A    Yes, we both pay and receive money back from the pool.

19   Q    Let's take the first one, how much money Microsoft gets.

20   How much money does Microsoft get for its H.264 patents

21   annually from all of the licensees of that pool?

22   A    It is between 8- and $9 million a year.

23   Q    And you told us Microsoft also is a licensee.  What does

24   that mean in terms of getting patent rights?  What patents

25   are those?

1    A    That means that we get the benefit of a license on all of

2    these over 2,000 patents from all of these companies, and we

3    pay for that around $13 million a year.

4    Q    Now, did you consider that as a point of reference when

5    you were looking at the Motorola letters?

6              MR. PRICE:  Objection.  Leading.

7              THE COURT:  I was just going to --  Thank you.  It is

8    leading.  Let's stop doing it.

9    By Mr. Pritikin:

10   Q    All right.  What, if any, bearing did the arrangements

11   that Microsoft has with the pool have on your thinking about

12   the Motorola H.264 offer?

13   A    Well, there was this entity that was licensing these

14   patents.  And there was an objective point there.  To me, it

15   is a way of having a sanity check to be able to determine

16   sort of the general area in which royalties in the field are.

17   Q    Now, was it common for Microsoft to receive license offers

18   from other companies on non-standards-essential patents?

19   A    Oh, yes.  We get them all the time.  We might get one a

20   week.

21   Q    Was it common for Microsoft to receive license offers from

22   other companies on standards-essential patents?

23   A    No.  That is very rare.

24   Q    When Microsoft receives a license offer from an operating

25   company, not a patent troll, an operating company, what --

1        THE COURT:  Counsel, why don't you explain what a

2    "patent troll" is?

3    By Mr. Pritikin:

4    Q   Maybe we should stop there.  Could you explain to the jury

5    what a patent troll is?

6    A   Yeah.  It is a name that typically is associated with a

7    company whose whole business model is to acquire patents and

8    then sue people on them.  They don't have an actual product

9    which the patent protects.  Their business is to own the

10   patent and to sue others to try to get money for it.

11   Q   Let me come back to the question.  When Microsoft receives

12   a license offer from an operating company, what do you

13   typically do?

14   A   Well, assuming there is no litigation or threat of

15   litigation with that company, we look at the letter, you

16   know, we consider who the company is, the patents that might

17   be involved, and then we might in some cases respond to them

18   on whether we have interest or not, or in some cases that may

19   actually evolve into a licensing or cross-licensing

20   discussion.

21   Q   Let's put the timeline up again.  Let's talk about when

22   this lawsuit was filed.  If we look at the entry day 20,

23   "Microsoft sues for breach of RAND commitment and royalty

24   accounting."  Can you confirm that Microsoft filed this

25   lawsuit on November 9th, 2010?

1   A    Yes, we did.

2   Q    Did you make a counteroffer to the Motorola letters before

3   this lawsuit was filed?

4   A    No, we did not.

5   Q    Why not?

6   A    Well, it was very clear from looking at the letters that

7   the letters were not intended to elicit a negotiation, that

8   the purpose of the letter was to clear the way for Motorola

9   to file litigation that they said they were going to file.

10  And the royalty demands were so outrageous on their face that

11  we felt it was really important to have an objective

12  determination of what RAND would be, done by someone who

13  would look at it in a non-biased way.

14  Q    After the complaint was filed, how did you expect the RAND

15  royalty rate would be determined?

16  A    Well, we had asked the court to determine the RAND, so I

17  expect the court would determine what a RAND rate would be.

18  Q    And did the court in fact do that?

19  A    Yes, it did.

20  Q    Is Microsoft seeking money damages in this case?

21  A    Yes, we are.

22  Q    Are there any other reasons why Microsoft filed this

23  lawsuit?

24       MR. PRICE:  Objection.  Lack of foundation.  It seems

25  to go under privilege.

1    THE COURT:  Sustained.

2  By Mr. Pritikin:

3  Q   Is there anything else besides money that Microsoft is

4  asking for in this case, sir?

5  A   Yes.  First of all --

6    MR. PRICE:  Objection.  Lack of foundation.  It goes

7  to privilege.

8    THE COURT:  I think he can answer that question.  I

9  will overrule your objection.

10    THE WITNESS:  First of all, we have a responsibility

11  to the company to make sure, if the company is injured by

12  somebody else, that we actually get the damages.  But there

13  is actually a broader principle at stake here.  As I said,

14  this is not just a question of one standard or one company

15  with patents on one standard.  The principle that is at stake

16  here really has to do with the way the standard system works.

17  If people can breach their contract obligation with standard

18  organizations and with others that they will license on RAND

19  terms, then that would really make it impossible for

20  companies to be able to rely on those RAND promises, and

21  would put companies in the position where they would be

22  reluctant to implement those standards, because later on they

23  can be subject to a crippling injunction where they can't

24  sell their most important products.

25    For us, this is a really important issue, that people that

1    violate the promises they make, and the contracts they make

2    with others in the context of standard setting processes,

3    they need to be accountable for them.  And they have to be

4    able to comply -- they have to be forced to comply with it so

5    that the others are able to rely on those promises.

6    By Mr. Pritikin:

7    Q    What was the geographic scope of the licenses that had

8    been offered by Motorola?

9    A    It was a worldwide license.

10   Q    And if you did not accept the offer, where did you expect

11   that Motorola would sue?

12   A    Anywhere --

13        MR. PRICE:  Objection.  Speculation.  Irrelevant.

14        THE COURT:  I think he can give his statement as to

15   where.  It is overruled.

16        THE WITNESS:  The list of patents that were attached

17   to the letters showed patents and patent applications in

18   many, many countries around the world.  The reality was they

19   could sue us anywhere and everywhere.

20   By Mr. Pritikin:

21   Q    Now, let's look back at the timeline, PDX 2, for a moment.

22   Beginning on the 21st day, after the October 21 letter, did

23   Motorola begin filing lawsuits against Microsoft on

24   standards-essential patents?

25   A    Yes, it did.

1    Q    Now, there has been testimony already on where the suits

2    were, but let's just run through it quickly.  On day 21, was

3    there a lawsuit filed that involved 802.11 and H.264 patents?

4    A    Yes.

5    Q    And then on November 22nd, was a lawsuit filed in the

6    International Trade Commission, the ITC, concerning Xbox, on

7    802.11 and H.264?

8    A    Yes.

9    Q    And then in July of 2011, was there a lawsuit filed in

10   Germany involving Windows and Xbox and H.264?

11   A    Yes.

12   Q    Were you aware at the time that Motorola was seeking

13   injunctions based on its standards-essential patents in those

14   lawsuits?

15   A    Yes, I was.

16   Q    And can you explain to the jury what the consequences of

17   an injunction on standards-essential patents, 802.11 and

18   H.264 would have been?

19   A    Would have been crippling consequences, because you are

20   talking about a standard that has been implemented in a

21   personal computer or another computing device that people

22   expect will be there.  People wouldn't buy a computer that

23   doesn't have WiFi.  People wouldn't have a computer that

24   wouldn't be able to play back high-definition video.  These

25   are things that people have come to expect.  And unlike the

1    case of a nonstandard-essential patent --  In the case of a

2    standard-essential patent, like H.264 and 802.11, you really

3    cannot design around the standard.  You either have it or

4    don't have it.  If the patents are essential, then that's

5    what it means, to be essential.  There is no way around it.

6    You have to have it.  So it was really a choice of having a

7    product that had such a degraded experience that nobody would

8    like to buy it, or not dropping it and then be blocked by the

9    courts from being able to sell the product in the

10   marketplace.

11   Q   After the lawsuits were filed in November of 2010, did you

12   have any further discussions with Mr. Dailey about a

13   resolution of the dispute?

14   A   Yeah, we had multiple discussions in that time period.

15   Q   Have you had conversations with him over the last couple

16   of years from time to time?

17   A   Yes.

18   Q   When was the last time you talked to him?

19   A   Probably in the last couple of months.

20   Q   Let me focus first on that period of time right after the

21   lawsuits were filed, the November/December 2010 timeframe.

22   Can you tell us, briefly, about the nature of your

23   discussions with Mr. Dailey during that period?

24   A   Yes.  In November and December, Mr. Dailey and I had

25   multiple conversations trying to determine what shape would a

1   resolution to the litigation take.  So we started to exchange

2   proposals on what patents would be covered, what scope of

3   products would be covered, what products wouldn't be covered,

4   what royalties would be, and terms and conditions like that.

5   Q   And at that time what position did Motorola take regarding

6   licensing its H.264 and 802.11 essential patents for Windows?

7   A   Well, that was one of the oddest things, which is they had

8   sent this letter.  They had filed some of these cases

9   already.  And yet in the discussions with us they were

10  telling us they didn't want to license those patents to us.

11  So they were consistently putting an exclusion in the scope,

12  saying that Microsoft would not get a license for its Windows

13  products on H.264 and 802.11.  And obviously we pushed back

14  on that and we insisted that we were -- you know, they were

15  now seeking injunctions, and a resolution, we expected, would

16  involve a license to those patents.

17  Q   Now, during this period, over this last two-year period,

18  was there concern expressed to you at Microsoft about the

19  injunctions that Motorola was seeking on its

20  standards-essential patents?

21          MR. PRICE:  Objection.  Hearsay.

22          THE COURT:  Sustained.

23  By Mr. Pritikin:

24  Q   Let me ask you directly, were you concerned about the

25  threat of injunctions?

1          MR. PRICE:  Objection.  Irrelevant, given its

2    position.  Not in litigation.

3          THE COURT:  Overruled.

4          THE WITNESS:  I was very concerned about this.

5    Remember, this is a situation in which you are being told

6    that these portfolios of patents are going to be used in

7    order to stop you from selling your franchise products.  This

8    is the livelihood of the company when you think about

9    Windows.  So there was tremendous concern.  Everyone I would

10   talk to, including the executives that were in charge of

11   these product groups, were incredibly anxious about --

12         MR. PRICE:  Objection.  Hearsay.  Move to strike,

13   your Honor.

14         THE COURT:  Ladies and gentlemen, a quick primer on

15   hearsay.  A witness, subject to a whole lot of different

16   exceptions, can't say what someone else said.  That person

17   can testify, or there can be an exception.  The first part of

18   the witness' answer when he is talking about his feelings,

19   his understanding, that is not hearsay.  When he begins to

20   say "someone told me," that is hearsay, and I am sustaining

21   Mr. Price's objection.

22       Please ask a fresh question, counsel.

23   By Mr. Pritikin:

24   Q   Did the threat of injunctions have any bearing on what you

25   were willing to consider doing vis-à-vis Motorola in the

1    licensing discussions?

2    A   Yeah, in a situation like that, the threat of the

3    injunction makes you be prepared to agree to things and

4    accept terms that under normal circumstances you wouldn't

5    have to, because the risk associated with an injunction is

6    just so large for the company that you are going to do

7    everything in your power to try to avoid that risk.

8    Q   And was the concern focused on the standards-essential

9    patents in the injunctions or on something else?

10   A   It was mostly the standards-essential patents because the

11   other non-standards-essential patents in the litigation, we

12   felt we could design around them; that is, we could find

13   other ways of adding the same functionality that did not

14   infringe their patents.  Worst case scenario, you could just

15   drop the feature, and then your product could be sold.  But

16   when it comes to a standard like H.264 or WiFi, you really

17   either have it or not have it.  And the option of having a

18   computer, as I said, that can't connect to WiFi, can't

19   display video is really not realistic.  There is not in the

20   real world an alternative to supporting a standard that is

21   used by everyone all over the world, and in the case of video

22   is used by 80 percent of the high-definition video that

23   people consume on the web.

24   Q   Now, as you look back over it in the last couple of years,

25   while the litigation has continued and you had discussions,

1    did you consider these typical patent licensing negotiations?

2    A   There was nothing typical about these licensing

3    negotiations.

4    Q   And why is that?

5    A   Well, first of all --

6         MR. PRICE:  I will object.  It is ambiguous and calls

7    for a narrative.

8         THE COURT:  Overruled.

9         THE WITNESS:  This is a negotiation that starts with

10   an improper demand in which a party is leveraging the power

11   that comes from patents that read on a standard.  And they

12   are using the power that comes from the fact that the

13   technology has been built into a standard and now is

14   ubiquitous and is absolutely essential for everybody to use

15   it.  So in that context, you cannot call that a typical

16   negotiation.  You are basically negotiating over a barrel.

17   By Mr. Pritikin:

18   Q   Was the threat of an injunction based on

19   standards-essential patents in Germany eventually removed?

20   A   Yes, it was.

21   Q   And how did that come about?

22   A   Well, it was only removed by the actions of this court and

23   the Court of Appeals of the Ninth Circuit.

24   Q   I would like to direct your attention to Exhibit 7252.  I

25   believe it is in the notebook.

1          MR. PRITIKIN:  I believe this is already in evidence,

2    your Honor.

3    By Mr. Pritikin:

4    Q   And is this --  Do you recognize this as a letter dated

5    August 1st, 2011, written by David Kaefer to Mr. Dailey?

6    A   Yes.

7    Q   Does Mr. Kaefer work for you?

8    A   Yes, he does.

9    Q   And have you read this letter?

10   A   Yes, I have.

11   Q   Does this letter relate to --

12          THE COURT:  Mr. Pritikin, stop for a minute.

13   Mr. Price, do you think 7252 has been admitted?

14          MR. PRICE:  I think it has, your Honor.

15          THE COURT:  All right.  If it hasn't before, it is

16   now.

17   By Mr. Pritikin:

18   Q   Did this letter relate to Motorola's -- offer a license

19   Motorola's --  Excuse me.  Did this letter offer a license to

20   Microsoft's H.264 patents?

21   A   Yes.  It was an offer from Microsoft to Motorola, where we

22   were offering to license our H.264 portfolio.

23   Q   And can you explain what the effective royalty rate was

24   that you were offering to Motorola in this letter?

25   A   Yes.  There is a low royalty rate that is cited in the

1   second paragraph, but then you also have a cap associated

2   with it.  So for all intents and purposes, for a company the

3   size of Motorola you were looking at an annual royalty of

4   $585,000.

5   Q   Did you think at the time that the rates that were being

6   offered exceeded RAND?

7   A   No, I didn't believe them to exceed RAND.

8   Q   And how do the rates that you were offering Motorola

9   compare with the rates that Motorola had asked Microsoft to

10  pay in its October 2010 letter?

11  A   Well, their demand of royalties to us was for an annual

12  payment of $4 billion.  Our demand royalty to them under this

13  letter was $585,000.  And I should say, this essentially

14  would have put them in the same position as the other

15  companies that were part of the patent pool.  We basically

16  offered them the same terms that the other companies that

17  held patents in the patent pool were getting from us, the

18  same rates that they could get a license from us on that

19  technology.

20  Q   And did the offer include reciprocity on both companies'

21  H.264 patents?

22  A   It did.  Although in this case the reciprocity meant that

23  we were willing to pay them RAND.  So we were not asking for

24  a grant-back for free of their patents, we were offering them

25  that we would also take a true RAND license on their patents.

```
1    Q   Did Microsoft ever sue Motorola based on its H.264
2    standards-essential patents?
3    A   No.
4    Q   Now, did there come a time when Microsoft received a
5    response from Mr. Dailey to this letter?
6    A   I believe there was one, yes.
7    Q   Would you turn, please, but don't display this yet, to
8    Exhibit 7254 in your notebook.  Can you identify this as the
9    response that was sent to Mr. Kaefer by Mr. Dailey on
10   August 19th, 2011?
11   A   Yes.
12        MR. PRITIKIN:  Your Honor, we would move the
13   admission of 7254.
14        MR. PRICE:  No objection.
15        THE COURT:  7254 is admitted and may be published.
16        (Exhibit 7254 admitted.)
17   By Mr. Pritikin:
18   Q   Did Motorola accept the offer that you had made on the
19   H.264 patents?
20   A   No, they did not.
21   Q   I would like to direct your attention to a sentence that
22   is in the middle of the long paragraph here.  It begins, "We
23   note that" -- the sentence says, "We note that in view of the
24   extensive litigation between the parties, it may not make
25   sense for the two companies to enter into an H.264 license
```

1   without also addressing the rest of the disputes."  What was

2   your reaction to that, sir?

3   A   So they were basically saying --

4          MR. PRICE:  Objection.  That is calling for

5   speculation, characterization.

6          THE COURT:  Overruled.  He can testify to his own

7   response.  You may answer, sir.

8          THE WITNESS:  What they are saying is that they will

9   not grant us a license on H.264.  First of all, they had made

10  a commitment to the standards organization that they would

11  license it to anybody who asked for it.  But they were saying

12  they wouldn't do it unless we agreed to give them a license

13  on our patents that had absolutely nothing to do with the

14  H.264 standard.  So essentially they are conditioning -- they

15  are offering a RAND obligation on H.264 on obtaining

16  concessions on things that are unrelated to it.  I think that

17  is one of the casebook definitions of what hold-up is about.

18  By Mr. Pritikin:

19  Q   Now, I want to jump forward in time.  You are aware that

20  there was a trial in November of last year in which the court

21  heard evidence on what a RAND royalty was?

22  A   Yes.

23  Q   And did you have a further conversation with Mr. Dailey in

24  December of 2012, after the trial?

25  A   Yes.

1  Q   And in that conversation did Mr. Dailey tell you what

2  royalty rate they wanted for their H.264 and 802.11 patents

3  at that time?

4  A   Yes.

5  Q   What did he tell you?

6  A   It was 2.25 percent.

7  Q   Now, are you familiar --  You have used this term.  Are

8  you familiar with the term "hold-up" in the context of

9  standards-essential patents?

10  A   Yes, I am.

11  Q   And what is your understanding of hold-up?

12        MR. PRICE:  Objection, your Honor.  That is

13  irrelevant.  It questions a legal term.

14        THE COURT:  I will sustain.

15  By Mr. Pritikin:

16  Q   Do you have an understanding, based on your own experience

17  involved in patents, whether a patent owner of the 802.11 or

18  H.264 patents -- of what a RAND royalty is?

19  A   Yes.  I mean --

20        MR. PRICE:  I will object again.  His definition is

21  irrelevant.

22        THE COURT:  I am going to sustain the objection.  I

23  didn't understand what the question was.

24        MR. PRITIKIN:  Let me try it again, your Honor, and

25  see if I can do better.

By Mr. Pritikin:

Q   As you look back on the last three years since you received the letters, the original letters, did any actions or statements by Motorola suggest to you that Motorola wanted to grant a license to its H.264 and 802.11 patents on RAND terms to you?

A   No.

MR. PRICE:  Objection.  That's leading, your Honor.

THE COURT:  Overruled.

THE WITNESS:  No, I don't believe they have.  I think their actions, you know, are --

MR. PRICE:  Objection, your Honor.  It is now beyond the scope of the question.

THE COURT:  That's true.  Sustained.  The first part of the answer stands.  Ask another question, counsel.

By Mr. Pritikin:

Q   What did you understand to be Motorola's ultimate business objective in the conversations that you had?

MR. PRICE:  Objection.  Speculation.

THE COURT:  Overruled.  The question has been placed into evidence.

THE WITNESS:  Motorola actually, throughout our engagement over the last few years, has made it very clear that their goal was to try to obtain a license to Microsoft's patent portfolios in which they didn't have to pay anything.

1   So their objective was to try to get to a point where they

2   would get a free license to Microsoft's 70,000-strong patent

3   portfolio.

4   By Mr. Pritikin:

5   Q   And how did the standards-essential patents, 802.11 and

6   H.264, play into that?

7   A   Well --

8           MR. PRICE:  Objection.  Speculation.

9           THE COURT:  Overruled.

10          THE WITNESS:  I think the August 19 letter is quite

11   on point on this.  They are basically saying that they are

12   refusing to grant us the license on RAND terms on H.264, but

13   they are obligated to grant us, unless we also reach

14   agreement on terms that are acceptable to them on everything

15   else.

16          MR. PRITIKIN:  No further questions, your Honor.

17          THE COURT:  All right.  Mr. Price, you stood up, so I

18   am assuming you are doing the questions.

19          MR. PRICE:  That's correct.  He who makes the

20   objections does the exam.

21          THE COURT:  You are going to have about 14 minutes,

22   and then we will take a break.

23          MR. PRICE:  I might lose track of time.  I'm sure you

24   will remind me.

25                      CROSS-EXAMINATION

By Mr. Price:

Q   Good afternoon, Mr. Gutierrez.  Let me quickly call your

attention to Exhibit 7254, which you were talking about.

This is the August 19th, 2011 letter.

A   Yes.

Q   And prior to looking that --  If we could maybe put that

in context.  Can you put up the timeline, please?  And so at

this time in August of 2011 you --

THE COURT:  Stop.  Mr. Price, hold it for a second.

Ladies and gentlemen, we have another timeline, another

demonstrative exhibit.  It is not an exhibit.  Thank you,

sir.

By Mr. Price:

Q   Maybe this timeline is not terribly helpful.  I just

turned off the screen.  It goes up to the time of the filing

of the lawsuit in Germany.  Do you see that?

A   Yes.

Q   And so at the time of this letter in August there had

been -- you will agree there was a lot of litigation, claims

made among the parties on various patents, correct?

A   Yes.

Q   And at this time is it fair to say that there was some

litigation attorneys involved in the communications between

the companies?

A   Well, my communications were primarily with Mr. Dailey

1    directly.   I don't believe I ever spoke to outside litigation

2    attorneys.

3    Q   Let me try to be more specific.   That wasn't clear.   If

4    you look at the letter before that that you looked at, 7252,

5    which was a letter dated August 1st, 2011, to Mr. Dailey from

6    Mr. Kaefer, I believe it is, was an attorney involved - a

7    litigation attorney, someone who knew about these lawsuits -

8    involved in drafting that letter?

9    A   I don't know that.

10   Q   Well, you just testified about the letter and about the

11   offer here.   Do you know whether or not someone who was

12   involved in all of this litigation was involved in the

13   letter?

14   A   I don't know that for sure, no.

15   Q   Well, were you involved in the letter?

16   A   I remember seeing the letter.   But you are asking me was

17   there a litigation attorney involved in the preparation of

18   the letter.   There might have been, but I really don't know

19   that for sure.

20   Q   You don't know if were you involved in drafting the

21   letter, and you don't know if somebody on the litigation

22   team, after all of these lawsuits, was involved?

23   A   I am a little confused.   You are talking about

24   Exhibit 7254?   That's a letter from Motorola to us.

25   Q   I am talking about 7252.

1    A    Okay.  I'm sorry.

2    Q    I think that's what you are answering about?

3              THE COURT:   No, he is talking about 52.

4    By Mr. Price:

5    Q    7252, the one that was written by Mr. Kaefer.  Someone in

6    litigation was involved in drafting this letter?

7    A    There was probably someone who saw the letter.  If you are

8    asking me do I know that for sure, I really don't.  But I

9    think in the situation that we were with Motorola, it is

10   reasonable that someone in litigation might have been

11   involved in this.

12   Q    So it is reasonable to think when these letters were

13   drafted at this time, they were drafted, in part, basically

14   to make a record to be presented later, if necessary?

15   A    Well, this letter was drafted to make an offer on RAND

16   terms on the license, which Motorola could have accepted.  It

17   was a valid offer on behalf of Microsoft.

18   Q    But my question is a little different.  The crafting of

19   the letter was done in a way that later, if it were

20   presented, it could be presented in a nice way, it could be

21   used?

22   A    I don't know how to answer that.  You are asking me to

23   speculate what was in people's minds.  We intended to make an

24   offer for a license of this portfolio on terms that we felt

25   were clearly within the bounds of RAND.  That's what we did.

1    You know, there was a number of different things that could

2    have happened.  It could have been accepted or it could not

3    have been accepted.  If it was not accepted, you know,

4    obviously that might possibly end up in the record of

5    litigation like this one.

6    Q    And because this letter might end up in litigation like

7    this one, there was an attorney involved in putting those

8    words in the letter, right?

9    A    I cannot tell you.  I honestly cannot say who drafted the

10   words in this letter.  And your question would have me say

11   that I know there was a litigation attorney drafting it.  I

12   think it is fair to assume there was at least a litigation

13   attorney reviewing it.

14   Q    At this time now in August of 2011 --  Now, there has been

15   some testimony, in September of 2011 Microsoft said it would

16   accept a RAND rate, you are aware of that?

17   A    I'm not sure about the significance of the September date,

18   but we had over a very extended period of time told Motorola

19   that we would be prepared to pay fair compensation for a

20   license under their portfolio.

21   Q    My question was different.  When Microsoft first said that

22   it would be willing to accept a RAND rate for Motorola's

23   patents, that was sometime around September of 2011, correct?

24   A    I don't believe so.  I really don't think so.  That might

25   have been the first time it was said in the context of the

1    litigation.  But when we filed this breach of contract action

2    and we were asking the court to set an accounting of what a

3    RAND rate would be, obviously we would take the license on

4    RAND rate.  We had been open to taking reasonable licenses

5    from Motorola from the very day of October 1st, 2010 when we

6    filed the action.  That was the first thing that we said to

7    Motorola.

8    Q    Actually, sir, the words, "we are willing to accept a RAND

9    rate," those are fairly easily written down or articulated,

10   correct?

11   A    Yes.

12   Q    It would be very easy to write down on a piece of paper,

13   "we will accept a RAND rate"?  "We will pay Motorola a RAND

14   rate," you can do that in five seconds, right?  Correct?

15   A    Yes.

16   Q    The first time that was ever done verbally or in writing

17   was in September of 2011, correct?

18   A    I don't know that for sure.

19   Q    But you do know that there have been observations in this

20   courtroom, in connection with motions, that that is in fact

21   the first time that was ever stated?

22   A    I'm sorry, but I am personally not aware of those motions

23   and those discussions, so I really can't tell for sure.

24   Q    Well, what you do know is that prior to there being some

25   discussion about Microsoft being able -- being willing to pay

1    a RAND rate, that prior to that time, in the negotiations you

2    actually took part in, the terms that you offered, "you"

3    meaning Microsoft, for Motorola's patents, those rates were

4    less than the rates determined by this court as RAND rates,

5    correct?

6    A    I'm not sure which communication you are talking about

7    now.  There is a lot of references to specific things that

8    were said in specific settings.  I am not seeing a document,

9    and I'm not sure that I have the kind of memory that would

10   allow me to say, yes, on this date we said this, especially

11   if the statement didn't come from me.

12   Q    No, this is a different question.  I am off of when you

13   said we will pay a RAND rate.  I am talking about, when you

14   are talking specific rates --  And you had exchanges with

15   Motorola about specific rates that Microsoft was willing to

16   pay on the essential patents, right?

17   A    Yes.

18   Q    And in those exchanges, when you gave specific rates,

19   those rates were all lower than the RAND rate which this

20   court later determined was appropriate?

21   A    I don't think it is accurate to say that they were all

22   lower than the rates determined by this court.  I'm not

23   certain that that is the case.  But there might have been in

24   the course of the conversations different rates that were

25   offered.

1    Q    The economic terms of the licenses that Microsoft told

2    Motorola it would agree to were all below the rate that the

3    judge found to be RAND in this case, correct?

4    A    The part that I am having trouble with - and I am really

5    not trying to be difficult, I want to answer - is, you are

6    saying the terms we offered were "all" below.  And I am just

7    having trouble being able to say for sure that at all times

8    rates that were offered were below.

9    Q    Let's just go with your recollection then.  Your

10   recollection is --  It may not be perfect.  Your recollection

11   is that the economic terms Microsoft offered to pay Motorola

12   on the standards-essential patents were all below the rate

13   that the judge found to be RAND in this case?

14   A    I'm really sorry to do this.  But if you are talking about

15   a specific offer or proposal that we made at some point, it

16   would really help me to be able to see it.  In a vacuum it is

17   hard for me to be able to say yes.  Are you saying this was

18   an offer I made?

19        MR. PRICE:  Your Honor, at this point if I could play

20   from the May 24th, 2013 deposition, pages 180.15 to 181 -- I

21   think it is 181.15?

22        MR. PRITIKIN:  Your Honor, I don't think there is

23   anything inconsistent in here.  The questions Mr. Price was

24   asking were about whether all of the offers that were made in

25   the back and forth were below RAND.  This is consistent with

1  that.  He said there was --

2           THE COURT:  I don't have a copy of the deposition,

3  counsel.

4           MR. PRICE:  I'm sorry.  I thought you did.

5           THE COURT:  Ladies and gentlemen, we are going to

6  send you out to take your break.  I will spend my break

7  sitting here answering this question.  Let's see if we can

8  use yours in a better use of time.  Please rise for the jury.

9  (At this time the jury left the courtroom.)

10          THE COURT:  Mr. Price, is there a copy --

11          MR. PRICE:  There is a binder we gave you.  I think

12  it has copies of two days of depositions.

13          THE COURT:  Where are we looking?  Which day --

14          MR. PRICE:  In the back of the binder.  This is

15  May 2013.  It is the last half.

16          THE COURT:  Page?

17          MR. PRICE:  Page 180, Line 15 to 181, line 15.

18          THE COURT:  All right.  I will permit that question

19  when we come back.  We will be in recess until 3:15.

20  (Recess.)

21     THE COURT:  Please bring the jury in.

22     (The following occurred in the presence of the jury.)

23          THE COURT:  Mr. Price.

24  Q   Now, page 180, line 15.

25          THE COURT:  Let's read it.

1      Counsel, I asked to you please read it.

2          MR. PRICE:  I will.

3    Q   "Question:  So -- and that's the only context in which

4    Microsoft has made an unconditional offer to pay RAND rates

5    on the patents that Motorola has identified as standard

6    essential, is the only context the representations to the

7    court in this action?

8          "Answer:  I hate to make this complicated, but there

9    might have been an exchange of correspondence in a

10   negotiation in which we proposed that we would pay RAND rates

11   on these portfolios independent of the rest of the patent

12   portfolio between the two companies.

13         And those negotiations actually never resulted in an

14   agreement because the terms that we were willing to do that

15   were not acceptable to Motorola.

16         "Question:  Were those -- in that context did Microsoft

17   identify what specific rate it was willing to pay or did it

18   tie it to something the court was going to do?

19         "Answer:  I believe we did identify what the economic

20   terms of that license would be.

21         "Question:  Okay.  And were those economic terms within

22   the range of RAND rates that the court has now identified?

23         "Answer:  I think the rate we offered was below the

24   rate that the judge found to be RAND in this case."

25         And, Mr. Gutierrez, going to Exhibit 7254, which you

1    were talking about.  This is the August 19, 2011 letter from

2    Mr. Kaefer -- to Mr. Kaefer from Mr. Dailey.

3         And first, are you aware that, in the context of the

4    rules of this trial, that Mr. Dailey may not be recalled

5    unless good cause is shown?

6    A    I was not aware of that.

7              MR. PRITIKIN:  Objection.  Relevance, Your Honor.

8              THE COURT:  I'm going to sustain the objection to

9    that.  I think that's for the court to advise.

10             MR. PRICE:  Very well, Your Honor.

11   Q    So if we go to 7254, you've given us some testimony on

12   your understanding of Mr. Dailey's e-mail of August 19, 2011.

13   Do you see that?

14   A    Yes.

15   Q    If we can blow up the third paragraph there.  Because you

16   were talking about your understanding of this, saying that

17   you had not been given an H.264 license.  You were testifying

18   about that, correct?

19   A    Correct.

20   Q    And it's correct that, in fact, earlier, as early as

21   October and November of 2010, you were saying that Microsoft

22   wanted an overall resolution where all the patents were put

23   on the table, correct?

24   A    Yes.

25   Q    So here we have some representations.  Is it true that as

1    of this date Microsoft and Motorola were involved in patent

2    infringement lawsuits in several places regarding claims, by

3    each company, of that infringement?

4    A    Yes.

5    Q    Is it true there had been settlement discussion since late

6    2010?  And that, in fact, there was a mediation under the

7    guidance of former Magistrate Judge Edward Infante of the San

8    Francisco office of JAMS, the dispute resolution service?

9    A    Yes.

10   Q    And was Magistrate Infante, after that date, still

11   overseeing discussions among the parties?

12   A    Very briefly, and for -- for a short period of time, yes.

13   Q    And then it says, "Accordingly, we should consider whether

14   it is more appropriate for Microsoft's H.264 offer and

15   further negotiations regarding that offer to be included

16   within these overall discussions to resolve all of our

17   companies' disputes."  Do you see that?

18   A    Yes.

19   Q    And you had said the same thing to Mr. Dailey back in

20   October and November when you said, we want all the patents

21   on the table so that we can resolve all of these disputes and

22   not have to sue each other serially, correct?

23   A    Yes.  But there's a significant difference in their

24   position and ours.  And it is that they were suing us and

25   seeking injunctions on H.264 standards-essential patents.

1    And they have a contractual obligation to license those to

2    anyone who asks for a license.  The patents that we were

3    litigating on were not H.264 or 802.11.  So we didn't have

4    that obligation.  So, at this point there had been an offer

5    to license and cross-license specifically H.264.  And he was

6    refusing to grant us that license, pending some broader

7    resolution.  At that point we were prepared to do a

8    cross-license of all that.  That's the purpose of the

9    August 1st letter.

10   Q   So that would obviously have been true in October after

11   you had been sued by Motorola and their request for

12   injunctive relief in this court, and at the ITC.  That same

13   reasoning would apply in November of 2010, right?

14   A   I think the answer is yes.

15   Q   And in November of 2010, what you said was:  We will only

16   do a resolution if you put all your patents on the table, we

17   put all our patents on the table, and we come to one overall

18   resolution.  That was your position in November 2010,

19   correct?

20   A   Yes.  Our goal was to try to find an overall resolution.

21   The question here is whether, once the conversations have

22   evolved to the point when there is a request for a license

23   only on H.264, they can refuse to grant that license unless

24   there is a license on something else.  And that's the part

25   where their obligations to standards organizations are

1    different than ours on patents that have nothing to do with

2    standards.

3    Q    Okay.  If that was your belief when you saw this letter,

4    that the circumstance had changed, that you had changed your

5    position that there should be an overall resolution, then

6    obviously there's going to be a letter back reviewed by an

7    attorney saying, wait a minute, there's a difference, you

8    can't say we need to resolve all of this together.  Obviously

9    that exists, right?

10           MR. PRITIKIN:  I would object to that question, Your

11    Honor.

12           THE COURT:  On what basis?

13           MR. PRITIKIN:  I'm not sure I understand the

14    question.  But, foundation.

15           THE COURT:  I'll overrule the objection.

16    A    Well, I don't know --

17    Q    That means you can answer.

18           THE COURT:  He's now going to answer, counsel.  Don't

19    start a new question, please.

20    A    So we made an offer to them to license our H.264

21    portfolio, and to take a license to their H.264 portfolio.

22    They responded saying no.  I don't know that there is

23    necessarily follow-up correspondence that needs to happen

24    after that.  We've said we wanted it.  We were prepared to

25    offer a rate that was, I think, what we felt was an

1    objective, fair rate on those, and be willing to pay RAND.

2    They told us no.  And it was very clear they were not

3    prepared to grant us that license.  They said that black and

4    white in the letter.

5    Q    Therefore it says, if you look at this, it says that,

6    "After all, we are sure that Microsoft would agree" -- after

7    all -- "that no two companies would reasonably wish to

8    resolve part of a dispute and yet have to continue to pay

9    substantial litigation costs in connection with unresolved

10   parts of that dispute."

11        Now, just looking at that where Mr. Kaefer -- Mr.

12   Dailey is saying, "We assume you would agree with this."  And

13   let's divide that out.  First of all, you agreed with that in

14   November when you said you wanted everything resolved at

15   once, right?

16   A    Yes.

17   Q    So this now says, Mr. Dailey says, we assume you would

18   agree with this; you see that, correct?

19   A    I do.

20   Q    And what you're telling the jury now is that you thought

21   this letter alone amounted to a violation of a RAND

22   commitment, correct?

23   A    Absolutely.

24   Q    And that you were upset about this.  You were outraged by

25   this?

1    A    I thought it wasn't right.

2    Q    Okay.  So if you think it's not right and Mr. Dailey is

3    saying we're sure you would agree that no two companies would

4    want to resolve some but not all, and you know that, in fact,

5    had been your position for all those months since November,

6    if that's what you really thought, do you think you would

7    have sent a letter saying, "Things have changed.  I don't

8    think that.  You're wrong?"

9    A    No.  No, I wouldn't.  I mean, the reality is when we sent

10   the letter making that offer, you know, there was always a

11   possibility that they wouldn't accept it because they were

12   more interested in maintaining the threat of this injunction

13   hanging over our head.  And this is just consistent with

14   that.  We made yet another -- there were many efforts that

15   were made to try to reach a resolution.  We made this offer.

16   They said no.  It was really -- they were assuming that we

17   would agree and things like that.  Clearly we weren't -- we

18   did not agree, that's why we made an offer.  And they

19   rejected it.  So the way -- to us, in the context it was very

20   clear, they had no intention of granting us that license

21   because they were intent on maintaining the threat of this

22   injunction to try to get us to agree to other things.

23   Q    I'll get back to the threat of injunction later.  But let

24   me just ask you about -- you said, "The reality."  The

25   reality is, there's not a writing anywhere where you sent

1   anything, or anyone at Microsoft sent anything to Motorola

2   saying, no, your assumption is wrong.  We actually think

3   there's some breach of your duty not to accept the offer we

4   made the day before.  It wasn't the day before, let me get

5   the exact date here.  7253.

6   A   A couple weeks before.

7   Q   A couple weeks before.  So the reality is, there is

8   nothing in writing that reflects your current position that

9   you were outraged and you thought this was, itself, some

10  breach, and that they were mistaken in what Microsoft would

11  want as far as resolving everything.  That's the reality.

12  There is nothing in writing that says that?

13  A   There is nothing in writing that I'm aware of.  That

14  doesn't mean that that wasn't our view of the situation then.

15  Q   So, is the first time that you're aware that Microsoft has

16  ever characterized this letter this way, okay, which is that

17  it by itself was some breach of an obligation, was

18  outrageous, is the first time you're aware that Microsoft

19  ever said that, is when you told the jury that in court

20  today?

21  A   Well, that is the whole basis of the breach of contract

22  case that we have before this court, is that there's a

23  pattern of behavior that this confirms in which they violated

24  their obligations.  This is one of a number of  other acts.

25  Q   And --

1    THE COURT:  Stop.  Were you finished?

2    THE WITNESS:  Yes.

3    THE COURT:  Then you can go.

4    MR. PRICE:  Thanks.

5  Q   My question was a little different, sir.  You today have

6  come in here and told the jury that this letter alone was a

7  violation of a RAND commitment, that it misstated or

8  contained an incorrect assumption as to whether or not

9  Microsoft would want to resolve the case altogether or in

10 parts, and that you were outraged.

11       So I'm just asking, is the first time that those facts

12 were ever revealed as to how Microsoft felt about this

13 letter, is the first time that you're aware that that was

14 ever revealed was today when you testified in front of these

15 eight folks?

16 A   You seem to be attaching, in your question, some special

17 significance to this one letter.  The way we looked at this

18 is this letter is just one more piece of continued conduct on

19 the part of Motorola that amounts to their breach of their

20 obligations.  There is nothing magical about this letter,

21 other than the fact that at that point we were prepared to do

22 an H.264 cross-license.  We made the offer.  It was not

23 conditioned on resolving anything else.  And then they come

24 back and they say they will not accept it unless there is a

25 broader resolution.

1    And as I said, their conduct is subject to a different

2    standard because of the nature of the patents in question.

3    They are obligated to make those patents available to anybody

4    who asks for them.  And they don't get to condition it on

5    getting some other value which is unrelated to that standard.

6    Q   And, I'm sorry, I'm focusing on your direct testimony.

7    Okay?

8    A   Okay.

9    Q   And in your direct testimony, I think you told the jury

10   that this letter, alone, was a violation of a RAND

11   obligation, that it was outrageous.  And so what I'm

12   asking -- this is a very simple question -- is the first time

13   Microsoft has ever taken the position that you took in your

14   direct, that this by itself was some kind of breach of an

15   obligation, this letter, is the first time that Microsoft has

16   taken that position when you took the stand today and you

17   were asked questions by Microsoft?  It's a yes -- I think

18   it's a yes or no question.

19   A   I'm not sure it is.  What I said is this letter is a clear

20   example of that kind of behavior.  You have to just look at

21   the letter and see it from the horse's mouth, right there,

22   that you're conditioning an H.264 patent license on some

23   other license that has nothing to do with it.  So, it made it

24   very obvious what the conduct was.  I'm not saying that that

25   letter alone is the basis of our contention.

1    Q    Okay.  So we've clarified that.  There is nothing wrong --

2    in a normal context if you had said to Motorola, sent them

3    the letter that we're looking at with the offer on H.264, if

4    you had done that in another context and Motorola had said,

5    look, we've got some other disputes, you know, we want to

6    resolve everything at the same time, we think you do, too,

7    then that would not be a violation of RAND in your mind.

8    It's only part of a pattern.  By itself it is not, itself, a

9    violation of RAND.  Is that what you're saying now?

10   A    I'm saying that you have to look at the context in which

11   this exchange took place.  And in the context of this

12   exchange, Motorola was seeking injunctions of H.264.  The

13   consequences for us could have been quite significant.  And

14   we made an offer on a license and cross-license on these set

15   of patents, and they chose not to honor their obligation to

16   grant us a license on that.  That is not embodied just in

17   this letter; that results from the course of our engagement

18   over the last three-or-something years since this has

19   happened.

20   Q    Okay.  Let me go on and talk about course of conduct.  And

21   let me start at the beginning here, if I can.  This is

22   October 20, 2010.  And let me start this way:  You were

23   presented in this case as a 30(b)(6) witness for Microsoft,

24   weren't you?

25   A    Yes.

1    Q    I'm going to try to explain what that is, which means that

2    you were offered for sworn testimony at deposition on certain

3    topics where you were the person designated to serve as

4    Microsoft's spokesperson, correct?

5    A    Correct.

6    Q    And one of those topics that you were designated on was

7    how typical Microsoft patent license negotiations proceed,

8    correct?

9    A    Correct.

10   Q    And so let's talk about these typical negotiations.  In

11   the typical negotiations that Microsoft has, Microsoft

12   expects that the other side will come forward with patents of

13   its own so that you can determine a net cash flow.  That's

14   how it typically proceeds, correct?

15   A    There are many cases that proceed that way.  So they

16   wouldn't be uncommon.  I wouldn't go as far as saying that

17   every case proceeds that way.  And I also have to say there's

18   really nothing typical about the situation that we are in and

19   have been in with Motorola.

20   Q    But you don't mind if I ask you about the typical

21   situations, since that was the topic of your deposition,

22   okay?

23   A    Yes.

24   Q    Okay.  So I'm going to use the word "typical" and see if

25   you agree with it.  Do you agree that the typical situation

1  is that Microsoft goes to someone and says, you know, you're

2  using our intellectual property, you need a license.  That

3  the typical situation is that they respond by saying, okay,

4  here are our patents.  That's typical?

5  A    In the typical situation, yes.

6  Q    And it's typical, then, that the reason they do that is

7  the parties then discuss what will be sort of the net value,

8  which way will things flow, correct?

9  A    That's a fairly common scenario in the typical case, yeah.

10  Q    It's a typical case?

11  A    Yeah.

12  Q    Typically, then, what you would expect if you went to

13  someone to say you need to license our patents, Microsoft,

14  you would expect them to come back with the patents that they

15  thought Microsoft should license, correct?

16  A    Yes.

17  Q    And if those are standards-essential patents, if they

18  think that Microsoft is using that technology, you would

19  expect that party to come back and include, among those

20  patents, the standards-essential patents?

21  A    I actually have to say that wouldn't be part of a typical

22  case.  I haven't really been in situations in which the

23  response is a standards-essential patent assertion or

24  contention.  These tend to be more portfolio-wide

25  cross-licensing discussions, the typical cases.

1  Q   The purpose, though, coming forward with the other side

2  with their licenses, is so you can compare value, correct?

3  A   Yes.

4  Q   And so in comparing value you would expect them to come

5  forward with any patents they think are valuable, so that

6  they can negotiate the best deal for themselves, right?

7  A   Yes.  And sometimes they do.  Sometimes they actually

8  don't follow through with that.

9  Q   I'm talking about typically.  So you would expect, if

10  someone thinks they have valuable standards-essential patents

11  among their portfolio, that they're going to come back and

12  say, we have standards-essential patents, we have these

13  patents, whatever they think can give them economic value,

14  correct?

15  A   You're asking me about the typical case.  I'll have to say

16  that is not a typical case where someone comes back with a

17  standards-essential patent portfolio.  But would it be

18  logical that someone trying to do a trade would try to look

19  for its patents in the typical case and try to negotiate?

20  Yes.  But it is really not common.  And, in fact, I can

21  hardly remember a case in which what comes back is a

22  standards-essential patent assertion of that kind.

23  Q   Okay.  Well, let's go with what you said, which is that

24  given the economic incentives where the licensee, proposed

25  licensee, wants to come forward with their portfolio so that

1    there can be some net result, that logically they would come

2    forward with standards-essential patents and whatever other

3    patents to lay on the table?

4    A    As a hypothetical, I'm prepared to say yes to that.

5    Q    Logically.  I'm using your word, "logical"?

6    A    Yeah.

7    Q    And obviously, then, if negotiations don't work, sometimes

8    there are lawsuits, right?

9    A    Yes.  It's relatively rare, but they do happen.

10   Q    And in lawsuits, the typical situation is that if you sue

11   somebody saying you have patents and you were trying to

12   exclude them from the market, then they will come back and

13   sue you and say we have patents also.  That is what you

14   expect?

15   A    Yes.  In the typical case, yes.  But you're talking here

16   about requests for injunction and standards-essential patents

17   that's preceded by an improper -- improperly high royalty

18   demand.

19   Q    We'll get to that.  I'm talking about -- let's go to

20   October 1st, 2010.  Actually, let's go to September 30, 2010.

21   You know that Microsoft is about to sue Motorola?

22   A    Correct.

23   Q    You have an expectation that if Microsoft sues Motorola,

24   then if there's no settlement agreement, Motorola will sue

25   Microsoft on patents it thinks are valuable.  That's what you

1    would expect?

2    A    Correct.

3    Q    In fact, prior to suing Motorola, Microsoft did analyses,

4    defensive analyses to try to figure out:  If we sue Motorola,

5    what can they sue us back on?

6    A    That's correct.

7    Q    And that took a significant period of time, correct?

8    A    Yes.

9    Q    So let's talk about that.  You sue Motorola on October 1,

10   2010.  So how long was it, then, that Microsoft was

11   implementing a plan to sue Motorola and expecting Motorola to

12   sue back?

13   A    I think the whole preparation time took probably a few

14   months.  Probably from late spring until when the action was

15   filed.

16       Now, the decision wasn't made that early.  The decision

17   was made later in the process.  But the analysis that led to

18   the decision started a few months before the action was

19   filed.

20   Q    So I'm going to put a timeline in front of you here.  So

21   we have October 1, 2010, Microsoft sues Motorola in the

22   Western District of Washington.  Do you see that?

23   A    Yes.

24   Q    And so you're saying that the analysis for suing Motorola

25   and expecting what they're going to sue back on took place,

1  you think, several months before that? You said spring?

2  A  I'd say probably the late spring of 2010.

3  Q  So late spring, your seasons may be different from mine,

4  I'm not sure. So give me your best estimate.

5  A  I'm from the tropics. So maybe April.

6  Q  April. So around April 2010 Microsoft is investing the

7  resources to prepare lawsuits against Motorola and trying to

8  figure out what it will get back in a counter-lawsuit,

9  correct?

10  A  Yes. I would clarify that we were investing resources in

11  analyzing whether we should bring those cases and what the

12  implications of those cases would be. The decision wasn't

13  made until later. Just to make it clear, the decision wasn't

14  made in April, and it was just a matter of execution after

15  that. That was a level of preparation that takes -- this is

16  not a decision that a company like Microsoft takes lightly.

17  So there's -- it's not something that we do very easily. You

18  have to consider the consequences of doing that. So you

19  absolutely analyze the risk exposure that you might have. So

20  you do that analysis. And then a decision is made. And then

21  you proceed with the litigation.

22  Q  And in a typical negotiation context, if you want to know

23  what someone's patents are that they might assert against

24  you, right, you would ask them? Typical context?

25  A  Well, let me just -- this may be an area in which maybe I

1    know too much from having done this for so many years.  You

2    first look at public sources.  Patents are public.  You can

3    go to the PTO website.  You can go to the websites of the

4    major countries around the world, and you can find

5    information.  And there are tools that people sell where you

6    can analyze their portfolios.  So you can get a lot of

7    information on your own.

8         Now, when you're in the process of negotiation, you want

9    the parties to really focus on what is it that is important

10   to them that they be compensated for.  And then that's when

11   you ask the other party, what's important to you?  What

12   patents do you have in that field?  How do we have this

13   discussion?  And that's when the focus of the conversations

14   begins to narrow and sharpen its focus.

15   Q    But in the context of negotiations, one way to find out --

16   in negotiation time:  I have patents that you're infringing.

17   You know, in those contexts you could say to someone, "Tell

18   us what your patents are," which you say you did in this

19   case?

20   A    Yes.  And in other cases, too.

21   Q    And you said, but it wasn't done in this case because

22   negotiations had gone on for more than three years and they

23   failed, and therefore you were getting ready for litigation?

24   A    I'm not sure I understand that last part.  Will you repeat

25   that?

1   Q    Sure.  Is the reason you didn't go to Motorola in April

2   and say:  We have patents we think you're infringing, and you

3   might want to bring your patents to the table, is the reason

4   because negotiations had gone on for more than three years,

5   and having failed in the attempt to do that Microsoft was

6   focused on getting ready for litigation?

7   A    Well, up until that point Motorola had stated to us that

8   they didn't feel there was a need to really reach agreement

9   on the license because they had patents of their own, and

10  that if we were to take any step on that it would amount to,

11  and I quote, "Mutually assured destruction."  But they had

12  never really articulated what those were.

13       And in the meantime, you know, we felt that the

14  infringement situation from Motorola's perspective was such

15  that we really couldn't continue to wait indefinitely.

16  That's why we made the decision to file the suit.

17       But also, as I said, the day we filed the suit, we came

18  forward and we told them, we know that you have been saying

19  for a while that you have patents that are relevant to us, we

20  want you to know that we respect that.  We know this is a

21  two-way street, and we're prepared to explore resolution that

22  takes care of both sides.

23  Q    Sir, the only discussions that have been taking place

24  between Microsoft and Motorola concerning patents prior to --

25  let's say prior to the spring of 2009, up through the summer

1    of 2010 -- up through September of 2010, let's put it that

2    way, up through September 2010, the only discussions that had

3    taken place between Microsoft and Motorola were discussions

4    that were led by a woman named Joy Murray, correct?

5    A    Correct.

6    Q    And this woman was three levels down from you.  Correct?

7    A    She was a licensing executive who was part of my team.

8    Q    And it wasn't until 2010, late, that you started having

9    discussions with Mr. Dailey about those negotiations,

10   correct?

11   A    Correct.

12   Q    So you really have no firsthand knowledge about the

13   negotiations between Ms. Murray and Mr. Dailey, correct?  You

14   weren't part of those negotiations?

15   A    Ms. Murray --

16   Q    Yes or no?

17   A    It's a technical question.  Is getting reports from

18   someone who works for you about the performance of their

19   duties and as part of my management responsibility, having

20   firsthand knowledge?  I think it is.

21   Q    You're a lawyer, right?

22   A    Right.

23   Q    You know what hearsay is, right?

24   A    Well, yes.  I'm not a litigator.

25   Q    But you went to law school, right?

1    A    Yes.  A few times, actually.

2    Q    Passed the bar.  I'm not going to get into that.  And you

3    know when I say "firsthand knowledge" -- in fact, I asked

4    you -- were you present in communications with Mr. Dailey in

5    those negotiations with Ms. Murray?

6    A    No, I was not.

7    Q    And those negotiations concerned an expired license for

8    ActiveSync, correct?

9    A    Correct.

10   Q    That was a four-year $100,000 license that Motorola had

11   between 2003 and 2007, right?

12   A    Yes.

13   Q    And so the negotiations on that were, again, covered by

14   Ms. Murray, not by you, correct?

15   A    Correct.

16   Q    And so you've previously testified -- well, is it your

17   position that the reason you did not negotiate before filing

18   a lawsuit is because negotiations had gone on for three years

19   and they had failed, and therefore that's why we focused on

20   getting ready for litigation?

21   A    I think our sense was that the negotiations were not going

22   to lead to a resolution of the patent disputes, and that

23   there had come the point where Microsoft needed to enforce

24   its IP to make sure that we would be taken seriously and that

25   the issue would be resolved.

1    Q    Let's get this straight, then.  I just want to make sure.

2    So the reason you didn't negotiate any further -- or at least

3    didn't negotiate, or ask Motorola "What patents do you have,"

4    before suing, because negotiations involving Ms. Murray had

5    kind of reached their end and Microsoft thought it might have

6    to sue, correct?

7    A    Yes.

8    Q    That had nothing to do with why Microsoft sued, did it?

9    A    I wouldn't say that, no.

10   Q    Well, let's fast forward to October, 2010.  If you see the

11   timeline, Motorola Droid phones were on the market

12   November of 2009, correct?

13   A    Correct.

14   Q    And at the time you sued, you didn't just sue on the

15   patents for that ActiveSync that had been part of the license

16   between 2003 and 2007, that four years, you didn't sue just

17   on those patents, did you?

18   A    No, we did not.  They were part of the litigation, but

19   they were only a part of it.

20   Q    They were just a tack-on, right?

21   A    No, I'm sorry, I wouldn't characterize them as that.

22   Q    You've obviously seen the complaint, correct?

23   A    Yes.

24   Q    And if we could show you Exhibit 7119.  And you recognize

25   that as a complaint that Microsoft filed against Motorola on

1    October 1st, 2010 here in this court, correct?

2    A    Yes.

3    Q    And if you look at the complaint --

4         MR. PRICE:  And, Your Honor, I'd move the complaint

5    into evidence, 7119.

6         MR. PRITIKIN:  No objection.

7         THE COURT:  It is admitted and may be published.

8         (Exhibit No. 7119 was admitted into evidence.)

9    Q    And if we look at the complaint, and let's go to Count 1,

10   infringement of U.S. patent number -- patents are usually

11   discussed by their last three numbers, correct?

12   A    Correct.

13   Q    So it has this long number, but it would be referred to as

14   the '517 patent, correct?  Right?

15   A    Yes.

16   Q    The '517 patent in Count 1, that was never a patent that

17   was discussed with Motorola prior to the October 1, 2010

18   lawsuit, was it?

19   A    I don't believe it was.

20   Q    Now, it does relate to Android software, doesn't it?

21   A    It relates to functionality that's implemented, we

22   believe, in the kernel of the operating system that's used by

23   Android, yes.

24   Q    And you had known, before filing the lawsuit, that

25   Motorola had -- its business commitment was to start making

1   phones that used Android's operating system and not

2   Microsoft's, correct?

3   A    Yes, we knew that.

4   Q    That's Count 1.  Count 2, you see there's a patent there,

5   the; '352 patent, right?

6   A    Correct.

7   Q    Has nothing to do -- it's not a patent you discussed at

8   all with Motorola prior to filing on October 1, 2010,

9   correct?

10  A    Correct.

11  Q    So let's go to Count 3.  The '746 patent.  That's not a

12  patent that Microsoft had ever discussed with Motorola before

13  October 1, 2010, correct?

14  A    Correct.

15  Q    And go to Count 4 here, that's the '762 patent.  Do you

16  see that?

17  A    Yes.

18  Q    And that's not a patent that Microsoft had ever discussed

19  with Motorola prior to October 1, 2010, correct?

20  A    Correct.

21  Q    Let's go to Count 5, the '910 patent.  That, too, is not a

22  patent that Microsoft had ever discussed with Motorola prior

23  to filing the lawsuit, correct?

24  A    Correct.

25  Q    And these patents so far are patents which Microsoft

1  claimed read-on, covered the Android operating system, right?

2  A   Yes.  But you need to keep going.

3  Q   And then '376.  That patent is not a patent that was

4  discussed between Microsoft and Motorola, was it?

5  A   Correct.

6  Q   So we're at six patents now.  Then we go to seven.  '133.

7  How about that one?

8  A   I don't believe this had been discussed.

9  Q   And we've got seven patents now, and all of them pertain

10 to Android operating software, correct?

11 A   Correct.

12 Q   And none of them were ever discussed with Motorola prior

13 to the lawsuit being filed, correct?

14 A   Correct.

15 Q   There are nine patents that are alleged in this lawsuit,

16 correct?

17 A   Correct.

18 Q   The last two, 8 and 9, relate to ActiveSync?

19 A   Correct.

20 Q   And, in fact, prior to October 1, 2010, you didn't contact

21 Motorola and say, you know, we're fed up with this, we're

22 going to sue you on ActiveSync, did you?

23 A   Well, we had had a conversations with them that had lasted

24 three years in which we had tried to get them to renew the

25 license, and they had refused to do so.  I think they're a

1    sophisticated company.  I think they would understand that

2    their failure to renew the license but continuing to ship the

3    feature in the phone, might result in Microsoft enforcing its

4    IP.

5    Q   Well, the details of those were discussions that your

6    associate had, your colleague, right?

7    A   Right.

8    Q   You've seen the e-mails about those and the request for

9    claim charts.  Did you follow those?

10   A   I believe I've seen some of them.

11   Q   So what happened is that you eventually had a discussion

12   with Mr. Dailey about arranging a meeting for "general

13   counsel to general counsel" to talk about the relationship

14   between Microsoft and Motorola, correct?

15   A   Yes.  And that wasn't really a patent, intended to be a

16   patent-licensing discussion.

17   Q   Right.  You did discuss that, in that discussion, that you

18   wanted -- one of the topics you guys wanted to discuss was

19   these ActiveSync patents, correct?

20   A   Yeah.  And I also mentioned to him in the conversation

21   that another topic that I wanted to talk about is our

22   concerns about infringement by the Android operating system.

23   Q   What you said about that was that was just a passing

24   comment, correct?

25   A   Yes.

1   Q   And that that comment wasn't meant to be a patent

2   assertion at all, correct?

3   A   I didn't intend it to be a patent assertion.  I just

4   wanted to make him aware that we had patent infringement

5   concerns with respect to that, that we thought if the meeting

6   was going to take place, that should be one of the topics of

7   the conversation.

8   Q   Well, and your characterization of this conversation --

9   how long was it?  You had this conversation with Mr. Dailey

10  about setting up this meeting.

11  A   How long was the conversation itself?

12  Q   Yes.

13  A   It was a short conversation.

14  Q   In this short conversation the only thing that you

15  mentioned concerning Android was a comment in passing that

16  you had concerns, correct?

17  A   Yes.

18  Q   And then you set up a meeting for general counsel to

19  general counsel, right?

20  A   Yes.

21  Q   And all the while, while this is going on -- we're now

22  into what period of time in 2010?

23  A   This might have been August of 2010.

24  Q   Okay.  So we've got April, May, June, July, August, five

25  months now Microsoft is looking into suing Motorola in

1  connection with these seven patents that pertain to Android,

2  right?

3  A   Correct.

4  Q   Of course you didn't tell Motorola, during that timeframe,

5  that you thought they infringed those patents or that you

6  were considering suing them, correct?

7  A   Except in this conversation where I told them we had

8  concerns.

9  Q   You said -- your passing comment, we have some concerns

10  about Android.  That's it, correct?

11  A   Yes.  And someone like Mr. Dailey, with his background and

12  experience in the area, would understand exactly what that

13  means.

14  Q   Well, what you would expect, what would be typical, is if

15  you thought that Motorola had infringed you would do what you

16  did with respect to ActiveSync, you would have a discussion.

17  You would send claim charts so that the companies could

18  discuss the matter without having this lawsuit hanging over

19  their head where things were kind of -- where the time

20  pressure was really intense.  That's what usually happens?

21  A   That could commonly happen.  Here we had a situation in

22  which we had an experience of trying to renew a license on a

23  subset of patents, and we had all kinds of trouble getting

24  them to actually renew it.  So that would have meant just

25  postponing a resolution of the issue, perhaps for many more

1    years.

2    Q   But you had presented those claim charts on ActiveSync,

3    you made a specific decision that for four or five months --

4    or April to October, six months -- you were going to prepare

5    yourself to sue Motorola on patents you had never mentioned

6    to them before, correct?

7    A   That's correct.  And there's nothing unusual about that.

8    Q   Well, then it's certainly not true, it is false to say

9    that the reason you sued instead of having discussions was

10   because of the discussions between your colleague and Mr.

11   Dailey about the ActiveSync patents.  That's just not true,

12   is it?

13   A   No, I disagree with that.  I think that was one of the

14   factors that led to the decision to file the action.  Because

15   we had experience dealing with Motorola's patent department

16   and had seen how hard it was to get them to acknowledge other

17   people's IP, because they kept talking about how much IP they

18   had.  And in making the analysis of the patent situation,

19   vis-à-vis Motorola, we realized there was an issue not only

20   with ActiveSync, but there was also a significant

21   infringement issue with Android.  And we had launched a

22   licensing program for Android.  We had already a significant

23   licensee who had agreed to enter into an agreement.  And we

24   were making sure that the other vendors knew about the

25   existence of the licensing program and that they respected

1    Microsoft's intellectual property.  We make those investments

2    and we have an interest in making sure that the billions of

3    dollars that we invest every year are respected.  And we were

4    not asking for outrageous terms.  These are terms that pretty

5    much everyone else in the industry has agreed to.

6    Q    Do you remember my question?

7    A    Yes.  You had a very complicated question that would have

8    me say that there was no relationship whatsoever between our

9    failure to get Motorola to agree to renew the earlier

10   license, was the reason for why we filed the action.  And I'm

11   saying that is not true.

12   Q    It's true that you have -- again, you being a lawyer so I

13   think you understand this -- you had no firsthand knowledge

14   at all about the discussions between Mr. Dailey and

15   Ms. Murray concerning those ActiveSync patents where Motorola

16   had had a license for four years for $100,000, total.  You

17   had no firsthand knowledge of that.  You weren't present in

18   any discussions, right?

19   A    No, I was not.  My only firsthand knowledge came from my

20   direct conversations with Mr. Dailey on that.

21   Q    In your direct conversations with Mr. Dailey, Mr. Dailey

22   never said anything like, you know, we've got massive

23   patents, or anything -- in fact, one thing he was talking

24   about was, he was talking about patents on wireless e-mail,

25   right?  Which are not standard essential.

1    A    Well, he might have talked about those specifically.  But

2    his statement was to the effect that they had patents, that

3    Microsoft should think twice before taking an action on that.

4    And like we had patents, they felt they had patents that they

5    would think relevant to us.

6    Q    He never said that.  He never said, "We have patents so

7    you should think twice about taking an action."  He never

8    said that prior to October 1, 2010, did he?

9    A    Probably not in those words, no.  But he was making the

10   point that Motorola had a patent portfolio.  And if I wanted

11   to talk about patent issues, he would have patent issues that

12   he would put on the table too.

13   Q    What he said was, we would like to get together and have a

14   broader discussion, right?

15   A    He said that too.

16   Q    And, in fact, in connection with asking for that, he never

17   -- in fact, Motorola had never come to Microsoft and tried to

18   say to Microsoft, you're infringing our standards-essential

19   patents and you need a license.  They had never done that,

20   correct?

21   A    No, not prior to the October 21st and 29th letters.

22   Q    And the reason you filed the October 1, 2010 lawsuit

23   without any warning about filing, on Android patents, is that

24   that month you were setting up a publicity campaign,

25   Microsoft was, about Microsoft's new phone and how the

1    Android system is not free and people are going to have to

2    pay for it?

3    A    No.  I don't see why you would say that that was the

4    reason why we were filing the lawsuit when we were filing it.

5    Q    Well, let me ask you about the timing of it, then.  If we

6    can go to the timeline.  It's true, is it not, that the

7    lawsuit was filed on October 1st and Microsoft unveiled its

8    Windows Phone 7 ten days later?

9    A    I believe that's the case.  But that was not the reason

10   why we filed the action.

11   Q    And it's also true, is it not, that two days after filing

12   the lawsuit, that the chief executive officer of Microsoft --

13   that was Mr. Ballmer -- had an interview in the Wall Street

14   Journal.  You're familiar with the Wall Street Journal,

15   correct?

16   A    Oh, yes.

17   Q    You read it every day, right?

18   A    Sometimes.

19   Q    You read it when your chief executive officer has a huge

20   article where he's being interviewed and talking about the

21   business of Microsoft, right?

22   A    Sometimes I read those articles, yes.

23   Q    When your boss -- not just your boss -- but your "boss" is

24   going to be in a major publication talking about the company,

25   you tend to pay attention to it, right?

1   A   I try to.  I can't always say that I find the time to do

2   it.

3   Q   Let me show you what we've marked as Exhibit 9002 for

4   identification.

5        MR. PRITIKIN:  Your Honor, may we see you at side

6   bar, briefly?

7        THE COURT:  Yes.

8        (Court and counsel met at side bar.)

9        MR. PRITIKIN:  Your Honor, we have been very patient

10  through this questioning.  And here's the problem.  This

11  entire line of cross, virtually all of it, has no relevance

12  to any issue in the case.  If one accepts it as true, all of

13  the things that are being brought out and the arguments they

14  want to make, that we didn't give them warning before we

15  filed the lawsuit, that it was a surprise, that we didn't

16  talk about the patents, that we were about to launch Windows

17  Phone 7, it's not a legally cognizable defense.  It just

18  isn't.  It has nothing to do with their obligations on their

19  standards-essential patents.

20       And at some point -- I mean we've sat through all of this

21  -- at some point I think perhaps a curative instruction is

22  going to be in order to tell the jury that this has no

23  bearing on their legal obligations.  It is not relevant to

24  the issue of good faith, even subjective good faith.  The

25  fact that somebody has sued you on patents that are not

1    essential to those standards, it's irrelevant, utterly

2    irrelevant to the question of what they need to do.

3        Now, the latest thing -- and I don't know what on earth

4    there is in this article on Ballmer -- it makes no

5    difference, legally, in terms of the issues in this case

6    whether Microsoft was about to launch its new Windows phone 7

7    or not.  It's just not a defense and I think it's confusing

8    the jury.

9            MR. PRICE:  Your Honor, Mr. Gutierrez and other

10   people from Microsoft have testified about outrage, shock, et

11   cetera, about these two letters and by Motorola's conduct.

12   Our contention is that is make-believe, that the reason they

13   are saying this is they're trying to tell the world, use us

14   as an example to the world, that the reason they're saying

15   they were shocked by these letters, even though they didn't

16   say a thing about them, and shocked by letters later, and

17   filed these lawsuits, was basically to publicize their

18   agenda.

19       Mr. Gutierrez talked forever about his shock and outrage

20   and what the company felt in connection with the actions of

21   Motorola.  And I'm suggesting, and I think there's great

22   evidence to support it, that that is simply made up for this

23   litigation.  It's part of litigation tactics.  These are

24   litigation tactics.  They also create an incredible time

25   pressure with Mr. Dailey, as Mr. Gutierrez knows.  It was

 1    intended to do that, to create that time pressure.  And so

 2    that's what this goes to.  This case is not what plaintiff

 3    thinks it's about and we're entitled to show our theory of

 4    the case.

 5             THE COURT:  In regards to this article, how do you

 6    intend to use it?  Because it's hearsay.

 7             MR. PRICE:  It's hearsay.  I'm going to ask him if he

 8    read it.  And I'm not going to say, is it true, because I'm

 9    not offering it for the truth.

10             THE COURT:  If it's hearsay, it is hearsay.  And if

11    he's read it, it is still hearsay.

12             MR. PRICE:  It's not for it being true that we're

13    infringing, because that's what it says.  Obviously I'm not

14    offering it for that.  What I'm offering it for is this

15    timeframe, Microsoft had a publicity push, and this is

16    publicity that they were pushing.  And they, in fact,

17    specifically mentioned this lawsuit.  What I'm offering it

18    for is to show the reason the lawsuit was filed, the way it

19    was filed, was to tell the world it was filed, you know, that

20    this was part of their publicity campaign, not because of

21    ActiveSync, or these two patents that are nearly worthless.

22    So I'm not offering it for the truth.  I'm offering it to

23    show, yes, there was a publicity campaign and he was aware of

24    it.

25             THE COURT:  The lawsuit -- the letters come after

 1    this.

 2          MR. PRICE:  Yes.

 3          THE COURT:  The lawsuit has nothing to do with the

 4    RAND rates that are on 802.11 or H.264.  I worry that we are

 5    straying so far away that the jury at some point is going to

 6    wonder which country they're in.  How do you respond to that?

 7          MR. PRICE:  The way I respond, Your Honor, it's an

 8    essential part of our defense that Microsoft did not think

 9    those two letters in any way had any effect on the business

10    communications between the companies.  They're pretending

11    that as part of this October/November timeframe, publicity

12    push, to tell the world, we're going to tax Android, and

13    we're going to sue you if you don't pay us.  And then they

14    knew our lawsuits were coming -- not because of anything

15    Mr. Dailey said -- they knew that's what would happen when

16    they sued.  This was all planned out in those four or five

17    months.  They knew this.

18          THE COURT:  Mr. Price, I love your strategy of

19    putting Microsoft on trial.  But I'm going to start to put

20    some limits on it.  One of the limits is you can ask him

21    about specific things.  You're not going to ask him to read

22    this and ask him if he read it.  Because even if he read it,

23    you know, we're just getting way, way too far afield.

24          MR. PRICE:  May I ask him if he read this, if it

25    refreshes his recollection that two days after the lawsuit

1  was filed that their CEO made this statement that the reason

2  they sued Motorola was to show the world that Android is not

3  free?

4          THE COURT:  By the time you've asked him that, then

5  you've put that fact into evidence.  You need to find a

6  better way to ask it.

7          MR. PRICE:  I'll use it to refresh his recollection,

8  and I'm not reading it.  And the only way to do it now is to

9  show him the document.  It's the ham-sandwich approach.

10          THE COURT:  You can ask him does this refresh his

11  recollection that Mr. Ballmer discussed this.  I don't want

12  the content of it to come out.  Because it seems to me it's

13  getting way too far afield.

14          MR. PRITIKIN:  And, Your Honor.

15          THE COURT:  Let me finish.  It's getting too far out

16  under 403.  I've been very patient in this whole theory of:

17  Let's put the company on trial.  It's a really great theory,

18  but at some point we need to start drawing it back.  I'm not

19  going to follow Mr. Pritikin's advice and cut you off here,

20  but we need to move on.  You guys are running through a lot

21  of time on something that is extremely peripheral.  Do you

22  know where you're going?  Are you clear -- have I been clear?

23          MR. PRICE:  Show that, see if it refreshes his

24  recollection about -- give me those words, so I make sure I

25  get them right.

1          THE COURT:  Does this refresh his recollection if

2    Mr. Ballmer ever discussed motivation for filing the lawsuit.

3          MR. PRICE:  Okay.

4                    (The side bar concluded.)

5          THE COURT:  You may proceed.

6    Q   Mr. Gutierrez, do you have Exhibit 9002 in front of you?

7    A   Yes, I do.

8    Q   And have you had a chance to look it over?

9    A   I did.

10   Q   Okay.  Does this refresh your recollection that

11   Mr. Ballmer made statements about the filing of this lawsuit,

12   the October 1st, 2010 lawsuit?  Does it refresh your

13   recollection?

14   A   I'm sorry, I didn't read that part of the article.  Can

15   you direct me to it?

16   Q   Sure.  If you would look at paragraph -- once you get to

17   the picture you go down to the second paragraph.  It's the

18   third paragraph on the page.

19   A   On the second page, right?

20   Q   No, it's on the first page.  You see there's -- it's the

21   third paragraph on the page.

22   A   Okay.  I see it.

23   Q   And my question is, does that refresh your recollection

24   that Mr. Ballmer made statements concerning why this lawsuit,

25   was filed?

1    A    To be honest, I don't remember having seen this article

2    before.

3    Q    And that's not my question.  My question was going to your

4    memory, okay, because the article is hearsay.  Does this

5    refresh your recollection that Mr. Ballmer, in this

6    timeframe, made statements about why this lawsuit, the

7    October 2010 lawsuit was filed?

8    A    It really doesn't.  That paragraph doesn't have a

9    statement from Mr. Ballmer.  That seems to be a paragraph

10   written by the reporter.

11   Q    If you look at the whole paragraph, does this refresh your

12   recollection?

13            THE COURT:  Counsel, let's move on.

14            MR. PRICE:  Sure.

15   Q    So here we have the timeline -- I think that's still in

16   front of you.  We have the timeline.  When you contacted

17   Mr. Dailey on October 1, 2010, one of the things you said

18   was, "I'd like you to put your patents on the table,"

19   correct?

20   A    I think what I said was phrased differently.  But

21   essentially was to the point that Microsoft understood that a

22   resolution of the case might imply Microsoft paying a fair

23   royalty for Motorola's patents and that we were prepared to

24   do that.

25   Q    You were the 30(b)(6) witness on these topics?

1    A    Correct.

2    Q    Is it correct that someone at Microsoft told someone at

3    Motorola that Microsoft wanted Motorola to come forward with

4    its patents?

5    A    Yes.  My point is it wasn't that first conversation

6    between Mr. Dailey and me.  And I don't believe it was me who

7    did that.  But somebody did.

8    Q    That was the plan.  You guys got together and discussed

9    people calling people on October 1st.  And that was the plan

10   that someone was going to tell Motorola, "Put your patents

11   forward?"

12   A    No.  The plan was to tell them, as I said a few times

13   already, that we were open to a resolution of the dispute,

14   and that we understood that that might require us taking a

15   license to their patent portfolio that was relevant to ours

16   and that we were open to do that.  I don't believe in that

17   call -- certainly I didn't, since we're talking about

18   firsthand knowledge here, I didn't say, "Send me a list of

19   patents."  I said, "We're open to having that discussion."

20   And that was appropriate at that particular point in time.

21   It was a brief conversation; and it was a difficult

22   conversation.

23   Q    You've already told us that the expectation is that when

24   you sue someone on patents like these that you're going to

25   get countersued, correct?

1    A    That's a common occurrence.  So we expected that Motorola

2    would.

3    Q    And you were prepared for that.  You were prepared for

4    that for four or five months, correct?

5    A    As best as you can prepare for something like that.  There

6    is only so much preparation that you can do.  But we had

7    tried to scope the risk that we would be incurring ourselves.

8    Q    And if we -- in your direct examination you said that

9    Microsoft was not trying to put Motorola out of business.

10   You said that in response to questions from your counsel,

11   correct?

12   A    That's correct.  That wouldn't be a very good business for

13   us if the companies we do deals with would go out of

14   business.

15   Q    Well, only -- unless you're trying to make an example of

16   the company, correct?

17   A    I can't think of any scenario in which I would want to try

18   to put someone out of business.

19   Q    If you look at Exhibit 7119.  That's the complaint you

20   filed on October 1, 2010, correct?

21   A    Correct.

22   Q    And if we go to page 8, page 8 sets forth what Microsoft

23   is asking for in the complaint, correct?

24   A    Correct.

25           MR. PRITIKIN:  Your Honor, I'm going to object to

1    questions about this on 401, 402 and 403.

2            THE COURT:  I'll overrule that objection for the time

3    being.

4    Q    Now, on direct you said you weren't trying to put Motorola

5    out of business.  If you look at Paragraph F there, you see

6    one of the things Microsoft asked for -- is this correct --

7    is for a grant of a permanent injunction pursuant to 35

8    U.S.C. paragraph 283 enjoining defendant from further acts of

9    infringement.  Do you see that?

10   A    Yes.

11   Q    And a permanent injunction means an order that permanently

12   would prohibit Motorola from selling Android software which

13   is found to infringe Microsoft's patents?

14   A    No.  What this prohibits is the sale of an Android phone

15   that has the infringing functionality.  They can and are

16   technically able to redesign that functionality or remove the

17   functionality in question.  I believe, in fact, they have in

18   some cases done that, to work around the Microsoft patents.

19   So that would be a perfectly fine outcome.  They no longer

20   infringe because they do the same function in a different

21   way, or in a way that doesn't infringe our patents.

22   Q    So before they filed the lawsuit, though, you did an

23   analysis whether or not how it would affect Motorola's

24   business if it had to do a design-around, or someone had to

25   do a design-around and change the Android software.  Someone

1    did that?

2         MR. PRITIKIN:  Your Honor, same objection, 401, 402,

3    403.

4         THE COURT:  We're getting too far afield, counsel.

5    Ladies and gentlemen, Evidence Rule 401 is what is

6    relevant in what you hear.  Evidence Rule 402 is what is not

7    relevant.  It's what you don't hear.  Evidence Rule 403 says

8    sometimes stuff could potentially be relevant, but it takes

9    us off into directions that are not really essential in

10   deciding the lawsuit.  So what you hear now is we're trying

11   to stay on one topic; we don't want to get too far off of it.

12   Mr. Price has done a nice job, we're talking about a whole

13   bunch of stuff.  I want to keep us somewhat centered on the

14   issue that's before you, as interesting as the rest of this

15   might be.  That's what 401, 402 and 403 mean, it's shorthand

16   we all understand.

17   Q    You testified on direct examination that in discussions

18   you had with Mr. Dailey between October 1st through

19   October 22nd, you described him saying things about suing

20   Microsoft, correct?

21   A    Yes.

22   Q    And you knew before you filed the lawsuit that that was

23   probably going to happen, correct?

24   A    That's correct.

25   Q    And you made statements about -- obviously he seemed to be

1  a little upset when you talked to him?

2  A   That's correct.

3  Q   You made statements that he said, you know, "Bring on this

4  fight," or something to that?  Something like that, "Bring on

5  this fight?"

6  A   Yeah, that we're -- "If you want war, we can fight war,

7  and you'll regret it."

8  Q   And you testified under oath that in all these

9  conversations you had with Mr. Dailey in October, he never

10  said anything inappropriate under the circumstances; isn't

11  that your sworn testimony?

12  A   That's correct.  I didn't think anything he said was

13  inappropriate in those conversations.

14  Q   And then if we go to the timeline.  You received the

15  October 21, 2010 letter, correct?

16  A   Correct.

17  Q   You had the meeting the very day you received the letter,

18  right?

19  A   I received it on the 22nd and we had the meeting on that

20  day.

21  Q   And you've explained to the jury how, in your view, the

22  letter was outrageous, correct?

23  A   Yes.

24  Q   In fact, you mention things like, how could we even figure

25  out what the end sales are, we wouldn't know that, correct?

1  A    That's correct.

2  Q    And Motorola wouldn't know that either, would they?

3  A    They wouldn't.

4  Q    And you gave the jury examples of what that would mean to

5  your business and to your product?

6  A    Yes.

7  Q    So you had this conversation on the 22nd.  You were trying

8  to be friendly, correct?

9  A    Yes.

10  Q    So you joked that, "We received your missive," correct?

11  A    Correct.

12  Q    And in a friendly manner, you know, did you say anything

13  like, you know, "This is outrageous.  What are you guys

14  trying to do here?"

15  A    No, I did not.

16  Q    Did you say, in a friendly manner, "Look, you know, this

17  is not a way to start discussions, we're going to move

18  forward as this never happened?"

19  A    No, we didn't say that.  I think, when you have a

20  situation like that you can choose a couple paths.  You can

21  choose a path of acrimony and argument and focus on what

22  separates the people, or you can choose to try to focus on

23  exploring a path forward.  And I felt that the best approach

24  at the time -- and it was the one that we followed -- is to

25  just park that issue aside and try to focus on building some

1    consensus on a path to try to resolve the issue.  And if we

2    were successful on that, then those issues would go away

3    naturally.

4            THE COURT:  Mr. Price, is this a good time to stop?

5            MR. PRICE:  Sure.

6            THE COURT:  Ladies and gentlemen, I'm going to give

7    you the abbreviated version and then send you home for the

8    evening.  Don't discuss the case with anyone -- and I won't

9    pick on your fellow jurors because you won't see them until

10   tomorrow morning.  But I will say, at least in my family when

11   my wife was on jury duty, everyone at the dinner table wanted

12   to know what the case was about and what she thought.  She

13   steadfastly said she couldn't talk about it.  We tried hard.

14       Since then the internet chat room, blogs, Facebook,

15   Twitter, any of those other things that I know you're not

16   doing.  If anyone tries to communicate with you about the

17   case, please let me know about it immediately.  It is an

18   issue in this case not to read, watch, or listen to any news

19   reports or other accounts, or anyone that's associated with

20   it, including any online information.

21       I'm sincere, if you've got someone who wants to clip the

22   paper and save all that for you and keep them around.  And

23   when it's done, you're welcome to read what they have to say.

24       Don't do any research.  Keep an open mind until all the

25   evidence has been presented.  And at that time you're going

1  to hear the arguments of counsel, my instructions, then

2  deliberate with your fellow jurors.  At that point you'll be

3  able to make a decision.

4      We are moving along quite promptly.  Counsel are doing a

5  very fine job of keeping us on track here.  I think that my

6  estimations about your getting the case on Wednesday are,

7  indeed, accurate.  We won't have court on Monday, so plan on

8  a three-day holiday.  The last thing you'll hear on Friday

9  is, "Remember until the trial is over do not discuss this

10 case with anyone."

11     Other than that, I'm not sure what the weather forecast

12 is.  But it will rain for rush hour, then be 80 degrees in

13 the afternoon.  So what can I say?

14  (The following occurred outside the presence of the jury.)

15         THE COURT:  Counsel, once again, I do this on the

16 fly, but by my notes reflect Microsoft used 2 hours

17 28 minutes today, and Motorola used 3 hours 2 minutes.  So

18 I'll give you, tomorrow morning, the formal time count and

19 where you are.

20     Mr. Harrigan, anything we need to take up at this time?

21         MR. HARRIGAN:  Not that I know of Your Honor.

22         THE COURT:  Mr. Price?

23         MR. PRICE:  Just one thing, Your Honor.  And

24 obviously we're on the clock.  And I usually try to take my

25 cue from the judge as to whether or not it's appropriate to

1   move to strike, or ask him to just answer a yes or no

2   question yes or no.  Mr. Gutierrez likes to talk about his

3   entire case -- and I understand that -- when I ask a

4   yes-or-no question.  So my question is, am I on my own?  Or

5   may I start requesting relief from the court if the court

6   thinks it's appropriate?

7          THE COURT:  You would have lost most of those

8   requests today because you have a propensity, sir, to make a

9   very long statement, then ask a yes-or-no question.  I think

10  the witness, then, gets to respond.  If you ask pure yes or

11  no questions, then I'll prompt him on my own.  And if I

12  don't, you're welcome to ask that I do so, and strike it, and

13  he needs to answer.

14    You have to strike a fine balance here.  The balance is

15  between allowing the witness to testify and not making it

16  look like you're going to put words in his mouth.  And the

17  alternative of making sure he's responsive to your questions

18  and not just giving speeches.

19    I'm very complimentary of the fact that you've moved

20  through a lot of material today.  And I didn't hear you being

21  repetitive, except for one exception very early on.  And at

22  that point I was getting ready to say something to both of

23  you, like at the point that one of the parties is described

24  as a horse -- the words are coming from the horse's mouth,

25  normally is a good indication that it's time to move on to a

```
 1    new subject.

 2              MR. PRICE:  So may the horse's mouth now ask you,

 3    Your Honor, there was some confusion this morning about the

 4    time for closings, not the 90-minute part, but you said

 5    something about getting the full 16 hours for court time.  So

 6    we're trying to figure out, did you mean we're getting

 7    90 minutes closing --

 8              THE COURT:  In addition.

 9              MR. PRICE:  In addition.  I lost my bet.

10              THE COURT:  You're doing a nice job.  We had a bad

11    patch this morning on sidebars.  I really do discourage

12    sidebars, because the jury just sits there and we're not

13    using their time wisely.  But by my recollection, my

14    calculations, we should be doing closing arguments on

15    Wednesday morning.  That's time that I reserved for me to

16    make rulings, and whatever.  And I'm happy to donate it to

17    all of you to make your closings, if it's available.  And it

18    appears it will be.

19         All right.  Who do we have for witnesses tomorrow?

20              MR. HARRIGAN:  We have one deposition which is

21    Mr. Blasius.  We have Mr. Davidson.  We have Mr. Heiner.  We

22    have Mr. Brandenburg and Mr. Killough.  And somebody else --

23    and Dr. Murphy.

24              THE COURT:  You've got a lot to do in 8 hours and

25    16 minutes, if my calculations are right.
```

1         MR. PRICE:  Can we get an idea of the order?

2         THE COURT:  If you can't -- just go over and talk to

3    him.  It's a novel concept, I know, for you guys.  We'll be

4    in recess.  Thank you, counsel.

5                   (The proceedings recessed.)

1              C E R T I F I C A T E

2

3

4     We, Barry Fanning and Debbie Zurn, Official Court

5  Reporters for the United States District Court, Western

6  District of Washington, certify that the foregoing is a true

7  and correct transcript from the record of proceedings in the

8  above-entitled matter.

9

10

11  DATED this 25th day of November, 2013.

12

13

14  /s/ Barry Fanning          /s/ Debbie Zurn

15  Barry Fanning, Court Reporter    Debbie Zurn, Court Reporter

16

17

18

19

20

21

22

23

24

25

