1            UNITED STATES DISTRICT COURT

2        WESTERN DISTRICT OF WASHINGTON AT SEATTLE

3    _____

4    MICROSOFT CORPORATION,           )
                                      )
5                    Plaintiff,       )  C10-1823-JLR
                                      )
6    v.                               )  SEATTLE, WASHINGTON
                                      )
7    MOTOROLA INC., et al,            )  August 29,2013
                                      )
8                    Defendant.       )        TRIAL
                                      )
9    _____

10             VERBATIM REPORT OF PROCEEDINGS
            BEFORE THE HONORABLE JAMES L. ROBART
11             UNITED STATES DISTRICT JUDGE
     _____

12

13

     APPEARANCES:
14

15


16    For the Plaintiff:      Arthur Harrigan, Christopher
                              Wion, David Pritikin Richard
17                            Cederoth, Andy Culbert,Nathaniel
                              Love and Ellen Robbins
18

19


20    For the Defendants:     Ralph Palumbo, William Price
                              Brian Cannon, Kathleen Sullivan
21                            Andrea Roberts and Philip McCune

22

23

24

25

EXAMINATION INDEX

EXAMINATION OF                                                    PAGE
  HORACIO GUTIERREZ     CROSS EXAMINATION (Cont.)                  15
                        BY MR. PRICE
                        REDIRECT EXAMINATION                       56
                        By Mr. Pritikin:
                        RECROSS-EXAMINATION                        61
                        By Mr. Price:

  JEFF DAVIDSON         DIRECT EXAMINATION                         64
                        By Mr. Harrigan:
                        CROSS-EXAMINATION                          83
                        By Mr. Price:
                        REDIRECT EXAMINATION                       94
                        By Mr. Harrigan:

  BRIAN BLASIUS         EXAMINATION                               104
                        BY MR. PRITIKIN:
  KEVIN MURPHY          DIRECT EXAMINATION                        113
                        BY MR. PRITIKIN:

                                                                 113
                        CROSS-EXAMINATION                         174
                        By Mr. Price:

EXHIBIT INDEX

EXHIBITS ADMITTED                                                 PAGE
  6024                                                             77
  6024                                                             81
  6445                                                             82
  7136                                                             89
  6394                                                            101
  6047 & 6048                                                     112
  6106                                                            114

 1          THE COURT:  Do appearances, please.

 2          MR. HARRIGAN:  Good morning, Your Honor.  Art

 3  Harrigan representing Microsoft.  And to my right is

 4  Ms. Ellen Robbins from the Sidley firm.

 5          MS. ROBBINS:  Good morning, Your Honor.

 6          MR. HARRIGAN:  Mr. Pritikin from the Sidley firm.

 7  Mr. Cederoth from the Sidley firm.

 8          MR. CEDEROTH:  Good morning, Your Honor.

 9          MR. HARRIGAN:  Mr. Culbert, from Microsoft.

10  Mr. Shubham Mukherjee from the Sidley firm.  David Killough

11  from Microsoft.  And my partner, Chris Wion.

12          MR. WION:  Good morning, Your Honor.

13          THE COURT:  Thank you.

14          MR. PALUMBO:  Good morning, Your Honor, Ralph Palumbo

15  from Motorola.  And I've got Ms. Sullivan.

16          MS. SULLIVAN:  Good morning, Your Honor.

17          MR. PALUMBO:  Kirk Dailey, Ellen Roberts and Bill

18  Price.

19          MS. ROBERTS:  Good morning.

20          MR. PRICE:  Good morning.

21          THE COURT:  Counsel, I'm going to read you a note I

22  got from one of the jurors and then ask your consent to my

23  plan in regards to it.  "Judge Robart, thank you for calling

24  my work and getting them to pay me for the difference for the

25  entire length of trial.  It takes a world of stress off my

1  shoulders and I feel better about serving.  I appreciate it."

2  Signed by Justin Albert, which is Juror 7.  I don't intend to

3  file this, which is what I normally do with any note that

4  comes from a juror.  Does anyone have a problem with that?

5          MR. HARRIGAN:  No, Your Honor.

6          MR. PRICE:  No, Your Honor.

7          THE COURT:  If anyone wants a copy, I made one for

8  each of you.

9     And I'm working on a response to the note about indemnity,

10  and I'm looking forward to seeing your language on it.  So

11  hopefully someone is going to pass that up at some point

12  today.

13          MR. PRICE:  And, Your Honor, I hope that -- would

14  that preclude me from asking Mr. Gutierrez what they meant?

15          THE COURT:  No.  I think you'd want to more broadly

16  ask that.  Do you want to ask him why they contacted Marvell,

17  or something?

18          MR. PRICE:  What did they mean when --

19          THE COURT:  Yeah, that's fine.

20          MR. PRICE:  I might ask it in a leading question.

21          MR. PALUMBO:  Your Honor, we discussed this last

22  night.  The indemnity provision that is referenced in

23  Ms. Ochs' testimony comes out of the November 2004 agreement

24  between Marvell and Microsoft, which is Exhibit 1620.  And

25  what we did is we looked at that provision, and as you might

1   imagine, it's the usual very lengthy indemnification

2   provision.  There is some language in the provision that

3   clearly doesn't apply.  It has to do with violations of

4   representations of warranties.  Product liability issues.

5       So what we thought we would do is you could either admit

6   the whole exhibit with reference to that paragraph, and we

7   could redact it -- the language clearly wouldn't apply in

8   this situation -- just to simplify it for the jury.  Or we

9   can simply take that paragraph, do the redaction, and provide

10  that to you so you can give it to the jury and say, this is

11  the indemnity language that is in the November 2004

12  agreement.

13              THE COURT:  Has 1620 been admitted?

14              MR. PALUMBO:  Well, it has not been admitted, Your

15  Honor.

16              THE COURT:  Well, that complicates my proposed

17  response.

18              MR. PALUMBO:  But we're happy to move its admission.

19  If we need to, put a witness on the stand to identify it.

20  But it is identified in Ms. Ochs' testimony.  And she says

21  affirmatively it's the November -- I think it's the

22  November 30, 2004 agreement, which is the agreement Microsoft

23  was referencing when they asked us to go get this RAND

24  license.  So if that's sufficient basis for admission, we

25  would agree to admit 1620.  And we would provide Your Honor

1    at the morning break the language of what we think should be

2    given to the jury and the language that clearly doesn't

3    apply, and just "X" it out so they're not confused by it.

4         MS. ROBBINS:  The language we're referencing is in

5    Section 13.  Indemnity.  Supplier will, at its sole expense

6    and upon Microsoft's written request, defend, indemnify and

7    hold harmless Microsoft subcontractors, their respective

8    successors and assigns, and the respective directors,

9    officers, employees, agents, customers, affiliates, and

10   distributors, each of the foregoing, from and against any and

11   all claims, actions, demands, legal proceedings, liabilities,

12   damages, losses, judgments --

13        MR. PALUMBO:  Why don't we -- we can pass this up,

14   Your Honor.

15        THE COURT:  I don't think you need to read it to me.

16   What is Microsoft's position?

17        MS. ROBBINS:  Our position is that that's what we've

18   agreed to, the language as highlighted, and we would redact

19   the remainder and have 1620 admitted.

20        THE COURT:  All right.  Counsel, what I was thinking

21   about saying was something along the following:  We are

22   coached in our training that when we're asked what does a

23   word mean, to say that a word has its customary English

24   usage.  And that's what I'm going to say is that, unless it's

25   separately defined, it has its customary English usage.  That

1   there has been -- and I will now be able to say, you will

2   find that particular provision in the attached -- wherever

3   we're going to use this.  There has also been testimony about

4   the provision.  And you should be guided by your own

5   recollection of that testimony.

6       I'm not permitted, as you all know, to offer testimony on

7   my own, which is what happens if I try and say:  This is what

8   it means in the context of this.

9       So those are my thoughts on it and I look forward to

10  seeing something --

11          MR. PALUMBO:  That sounds very acceptable to me, Your

12  Honor.  Would you like to see this or should we just give it

13  to you later?

14          THE COURT:  If you can give it to me later, that

15  would be fine.

16      Mr. Cannon.

17          MR. CANNON:  Good morning, Your Honor.  We had an

18  issue that we raised with the clerk, it's now been resolved.

19  But one thing that came up yesterday, Mr. Price mentioned a

20  limiting instruction that we'd like to pass up.  So if it's

21  okay with you, I would pass it up to the court.

22          THE COURT:  Yes.  Who wishes to respond on behalf of

23  Microsoft?

24          MR. PRITIKIN:  I can respond to it, Your Honor.

25  Obviously we would object to an instruction of this sort.  We

1   don't think it's necessary or called for.  And beyond that, I

2   think it's wrong.  I think there is evidence that Motorola

3   breached -- it's not a central point of the case, and it's

4   not a part of ours -- but there's evidence that they did

5   breach their RAND obligations to RIM.  There are a lot of

6   findings the court made on it, on how they had RIM over the

7   barrel and were extracting a lot of money from them on their

8   standards-essential patents.  I don't think we need to go

9   into that, but I don't think it would be correct to say to

10  the jury that there's no evidence that Motorola breached its

11  RAND obligations to RIM.  I don't intend to argue that.

12  Mr. Harrigan doesn't intend to argue it.

13       In any event, the point of it is, they clearly were on

14  notice -- to the extent they were injecting their good faith

15  into this case -- they clearly were on notice that an

16  important licensee was complaining about abuse of licensing

17  practices.

18            THE COURT:  Mr. Cannon, you get the last word.

19            MR. CANNON:  Thank you, Your Honor.  I think this

20  issue was injected into the case yesterday.  And this is a

21  trial about Motorola vis-a-vis Microsoft.  And RIM's

22  allegations are just not part of this case, and it's just a

23  separate case, separate litigation that went on.

24            THE COURT:  You need to be careful, because my

25  recollection is you are the one that interjected this into

1    the case.

2          MR. CANNON:  The RIM license.  But the allegations

3    from the other case.

4          THE COURT:  Could you respond specifically to the

5    last sentence of your proposed limiting instruction?  It

6    seems to me that, "There is no evidence in this case."

7          MR. CANNON:  In this case.

8          THE COURT:  In this case there's findings of fact and

9    conclusion of law 429 through 437, I think, which is not just

10   evidence, it's conclusions.  And it seems to me that I'm not

11   sure that's an accurate statement.

12         MR. CANNON:  I think the findings of fact and

13   conclusions of law certainly are binding on the content of

14   the RIM agreement.  But how the RIM agreement relates to

15   Motorola's RAND obligations vis-a-vis RIM, I think that's not

16   part of the findings.

17         THE COURT:  All right.  I'll give you an answer --

18   actually, I need to look at the findings, then I'll give you

19   an answer.  Thank you.  Anything else, counsel?

20         MR. PRITIKIN:  One item, briefly, Your Honor.  You

21   have the memos that have been provided by the parties on the

22   communications with the Federal Trade Commission.  One of the

23   exhibits that is in the binder that was provided to us that

24   they are planning to use with Mr. Gutierrez is a letter that

25   was written by Microsoft to the Federal Trade Commission.

1    That is bound up in the question of the extent to which we're

2    going to get into communications with the Federal Trade

3    Commission about abusive standards-essential patents.  What

4    we would request is that any questioning on that letter be

5    deferred until the court has had an opportunity to give us

6    guidance on the scope of evidence relating to communications

7    with the Federal Trade Commission.

8             THE COURT:  When did Microsoft file its memo on that

9    question?

10            MR. PRITIKIN:  This morning.  I believe it was at

11   8:30 this morning, Your Honor.

12            THE COURT:  Counsel, how am I going to be able to

13   persuade you that the court has a lot to do, and when you

14   file something at 8:30 this morning, don't come out here at

15   9 o'clock and expect me to have read it.  That's just not

16   feasible.  I don't know what the letter is.  If the letter

17   requires the context of why the FTC is investigating, then

18   I'm going to permit it, because at that point Motorola has

19   opened the door to it.  If it doesn't require that context,

20   I'm probably not going to admit it.

21       I'm having trouble, because both of your pleadings came in

22   quite late.  In our discussions about it, it seems to me it's

23   not a guilty plea or a conviction, it's an investigation.

24   That would argue against admitting anything further in

25   regards to the FTC.

1        The letter that's ultimately -- what do they call it -- a
2   commitment letter or something.  It has a name.  I don't know
3   exactly how to analyze what that does.  It seems to contain a
4   non-admissions provision.  And so I'm still trying to figure
5   out who's on first here in regards to the use of that.

6        I've warned all of you that we're not going to go down
7   rabbit holes.  And that may be a rabbit hole.  It seems to me
8   that it would be appropriate, if the issue has been opened,
9   if Mr. Dailey were on the stand and ask him, what was the
10  policy then and what's the policy now?  And the problem then
11  becomes one of if he says, well, we had an FTC investigation
12  and we decided to change our policy, that just opens that up
13  again.  So I must say that I'm still somewhat struggling and
14  had hoped to get some guidance from you.  But I've not had a
15  chance to review it yet.

16        MR. PRITIKIN:  I appreciate that, Your Honor.  I
17  think their memo came in in the wee hours of the morning.

18        THE COURT:  I wouldn't call it wee hours, but it came
19  in late at night.

20        MR. PRITIKIN:  12:45 a.m., I think, their revised
21  memo.  And in fairness, we should get those to the court
22  earlier, clearly.

23        But what I would request, Your Honor, is that it's laid
24  out in the memos of both sides.  We could argue it.
25  Mr. Harrigan is the one who was planning to address the

1   issue.  What I'm concerned about is that the -- we believe

2   that the letter that they want to use, the communication to

3   the Federal Trade Commission, is intimately bound up in this

4   issue.  It's discussed in our memorandum.  We could preview

5   that for you this morning, but we think that the best way to

6   resolve it would be simply to hold that for now.

7   Mr. Gutierrez is in Redmond.  He can be brought back and

8   questioned on that, if necessary.  But we don't think that it

9   should be injected at this point until the court has given us

10   guidance on it.

11          THE COURT:  All right.  Mr. Price.  Their proposal is

12   that you hold your fire on that one until I can read the

13   memos.

14          MR. PRICE:  Yes.  And that is an attempt, basically,

15   to really restrict a key part of this case.  That letter was

16   written in June 2011.  There was no investigation of Motorola

17   in June 2011.  That letter contains admissions as to what

18   Microsoft thinks about its history.

19          THE COURT:  I haven't seen the letter yet, sir.  I'm

20   not contesting or questioning your representations.  But it

21   seems to, me until I get a chance to see the letter, I don't

22   know any of this chronology.  They're saying it does relate

23   to the FTC, you're saying that it doesn't.

24          MR. PRICE:  I realize if I use it, then Your Honor

25   will judge whether or not that opens the door on a subsequent

 1    FTC investigation.

 2        The letter is, Your Honor, in the Gutierrez binder we gave

 3    you, it's Exhibit 2970.

 4            THE COURT:  All right.  Are you going to get to this

 5    before the 10:30 break?

 6            MR. PRICE:  I hope I'm done by then, because we're

 7    burning time.

 8            THE COURT:  That's for sure.  All right.  Well, I

 9    guess what you're telling me is you're prepared to take your

10    chances.  So that's the way we'll treat it.

11        Mr. Harrigan.

12            MR. HARRIGAN:  Just one comment, Your Honor, to

13    explain this.  According to Mr. Price's opening statement,

14    this letter will be used to suggest that Microsoft was

15    telling the FTC that Motorola's behavior over this period was

16    fine.  And part of the reason for offering these exhibits

17    relating to their investigation is that, in fact, Microsoft

18    told the FTC exactly the opposite, and that generated an

19    investigation into the very practices that are at issue in

20    this case.  And so you cannot put in an exhibit that suggests

21    that Microsoft was telling the FTC that everything was fine,

22    without allowing Microsoft to establish that, in fact, it

23    told the FTC that everything was anything but fine.

24        And I don't think Your Honor wants to hear argument on

25    this whole issue until you've read the briefs, and I don't

 1    plan to do that, but the issue here has to do with the course

 2    of conduct that didn't end until January of 2013 when they

 3    finally dropped their request for injunctive relief.  So

 4    their state of mind is at issue during that entire period.

 5    They're saying everything we were doing is consistent with

 6    custom and practice in the industry.  And during most of that

 7    time they were being investigated by the FTC and the European

 8    Union for hold-up via injunctive actions relating to

 9    standards-essential patents.

10         THE COURT:  Well, counsel, let me close with this

11    comment.  You have a relatively simple issue before the

12    court.  You have a jury that is trying hard to understand

13    this.  Where you want to go with your proof is up to you,

14    subject to 401, 402, and 403.  I will tell you that if you

15    start digging these rabbit holes, I'm going to allow full

16    excavation, because I don't have any choice.  And I'm not

17    sure that's a good use of your time.  But that's your

18    decision.

19         But I'm not going to allow -- as both sides have attempted

20    to do numerous times in this trial -- to get in one sliver of

21    a subject without permitting the other side to introduce a

22    fuller context in order to make that sliver less than

23    misleading.

24         So, with that bit of guidance, as opaque as it may sound,

25    we'll bring out the jury, unless someone has something else.

1   All right.  Madame clerk, bring out the jury, please.

2       Mr. Gutierrez, wherever you are, you're on the stand.

3       (The following occurred in the presence of the jury.)

4           THE COURT:  Mr. Price.

5           MR. PRICE:  Thank you, Your Honor.  Good morning.

6   Good morning ladies and gentlemen.

7                   HORACIO GUTIERREZ

8     Previously being sworn, resumed and testified as follows:

9                   CROSS EXAMINATION (Cont.)

10  BY MR. PRICE:

11  Q   Good morning, Mr. Gutierrez.

12  A   Good morning.

13  Q   I want to go through chronologically now some of the

14  things that happened and some of the things you testified

15  about.  And, Ken, if we could put up that timeline, again.

16       So, Mr. Gutierrez, we were talking about -- I think

17  yesterday we had gotten up to this October 22, 2010 meeting

18  in Seattle.  Do you recall that?

19  A   Yes.

20  Q   After that you received a second letter from Motorola

21  concerning -- it was the H.264?

22  A   Correct.

23  Q   And so if we look at the calendar here at the bottom,

24  that's on the 29th.  During the -- from then through the week

25  of the -- up until November 9th, did you have any discussions

1   about those letters with anyone at Motorola?

2   A   I don't believe so.

3   Q   Well, in fact, between October 22nd and November 9th, did

4   you have any discussions with anyone at Motorola concerning

5   those two letters?

6   A   I can't tell for sure.  But I don't recall having had one.

7   Q   And then on November 10th -- I'm sorry, on November 9th,

8   then, Microsoft sued in the Western District of Washington,

9   here, saying that those letters constituted breach of RAND,

10  correct?

11  A   Correct.

12  Q   And if you look at Exhibit 7241 -- which is already in

13  evidence I believe, Your Honor.

14          THE COURT:  I think the clerk is making sure that it

15  is.  Yes.

16  Q   Would you look at the bottom here.  It says, November 9th.

17  Brad Smith, that's Microsoft's general counsel?

18  A   Yes.

19  Q   And Scott Offer is Motorola's, correct?

20  A   Correct.

21  Q   It says, "As discussed, here are the papers filed.  I'll

22  look forward to talking again and to, no doubt, reading in

23  the very near the work of your very good litigation team."

24  Do you see that?

25  A   Yes.

1  Q   And the discussion that is referred to here is a

2  discussion that had happened on that same day, correct?

3  A   I believe so.

4  Q   So there wasn't any phone call ahead of time saying,

5  "We're going to sue you," correct?

6  A   I don't think there was, no.

7  Q   So the lawsuit itself was the first notice of that

8  lawsuit, correct?

9  A   Yes.

10  Q   And then you forwarded that -

11  A   Let me correct that, Mr. Price.  The call that's

12  referenced in the e-mail -- apparently there was a phone

13  call, I wasn't party to that, but the e-mail by Mr. Smith to

14  Mr. Offer says there had been a discussion, apparently that

15  day.  So that was probably the first notice.  I don't know if

16  the papers had been filed by then or not.

17  Q   I understand.  You don't know whether or not the lawsuit

18  had already been filed?

19  A   Correct.

20  Q   But your understanding is it was filed on November 9th?

21  A   Yes.

22  Q   And if we could look at what was filed, then, it's

23  actually attached to 7241.  And you recall yesterday you gave

24  some testimony that Microsoft was always willing to give

25  respect to Motorola's intellectual property and its patents?

1    A    Yes.  Meaning we would be prepared to provide fair

2    compensation for it.

3    Q    Well, if you look at Paragraph 7 in this complaint, you

4    see it says, "Microsoft does not accept Motorola's

5    representation that any of its patents that it has identified

6    to the IEEE or ITU are, in fact, necessary to implementation

7    of compliant implementations of WLAN or H.264 technologies,

8    nor does Microsoft concede that the particular

9    implementations of such technologies in its products,

10   practice any of Motorola's patents, including those

11   identified by Motorola in relation to these technologies."

12   That was the allegation filed on November 9th, correct?

13   A    Correct.  At that point we're saying we're not accepting

14   their unilateral statement that they are essential, because

15   nobody had really tested that proposition, that those were

16   self-declared essential patents.  So it actually happens in

17   the real world that when you look at the patents, some of

18   them turn out not to be valid, some of them turn out not to

19   be essential.  And I think at this stage in the litigation

20   we're simply saying, we're not taking it at face value, what

21   they're saying.  This is something that we want to review.

22   Q    What you're saying is you're not conceding that it's

23   essential just because it's declared, right?

24   A    Right.

25   Q    And you're saying that, we're not saying we even practice

1    these patents, correct?

2    A    Yes.  And that's the standard statement that one would

3    make at this particular stage in a litigation like this.

4    Q    By this time you had about five months to prepare for the

5    question of whether or not these patents were essential or

6    Microsoft was using these patents, right?  Because you

7    started investigation sometime in April, your preparation?

8    A    No.  These letters had been received just a few weeks

9    before.  So we really had no way of really focusing on these

10   particular patents.  These letters were -- this was November

11   9th.  Letters had been received on October 21st and

12   October 29th.

13   Q    What I'm saying, you testified -- tell me if this is

14   correct -- that beginning in April, Microsoft started

15   investigating public documents to see what patents Motorola

16   might assert against Microsoft, correct?

17   A    Yes.  But that review did not, in any way, consider these

18   particular patent portfolios.  We had not really identified

19   H.264 and 802.11 as patents that we would review.  It was a

20   much -- a higher-level review, based on the overall portfolio

21   of Motorola.  We had no way of being able to focus on these

22   little pieces on these standards.

23   Q    You said you practice WiFi?

24   A    We do.

25   Q    And I think I've heard comments in the courtroom from

1    witnesses that there are declared essential patents that are

2    public?

3    A    That's correct.

4    Q    That it's easy to go and see whether or not Motorola has

5    declared that it has essential patents to these standards,

6    correct?

7    A    It would be if you were focusing, in particular, on those.

8    But at that point we were just looking at the whole portfolio

9    of Motorola.   And it is just a fact, we didn't focus on these

10   patents.   So we really didn't have an opportunity to even

11   begin thinking about these until we got the letters on

12   October 21st and 29th.

13   Q    Let me ask you about that.   You started -- Microsoft used

14   those toggles with Xbox that had WiFi, they started doing

15   that sometime, what, in 2002?

16   A    That sounds right.

17   Q    So Microsoft is practicing the standard in 2002?

18   A    That's correct.

19   Q    And then -- and sold a lot of those toggles?

20   A    Right.

21   Q    And Microsoft, again, is putting the WiFi into the Xbox

22   itself, what, in 2009?

23   A    I don't know the dates for sure.   At some point they were

24   introduced, yes.

25   Q    And Microsoft knew it was practicing the standard?

1  A    Yes.

2  Q    And there's a publication that says, here are the people

3  who declare that they have patents on those standards, right?

4  A    Correct.

5  Q    And I'm not suggesting you're legally required to do this,

6  but since you know that there are all these people who have

7  patents on what you're doing, or say they do --

8         THE COURT:  Just a minute.  Mr. Price, I'm told we're

9  having a mechanical breakdown here.

10                      (The proceedings recessed.)

11         THE COURT:  Please bring the jury in.

12     (The following occurred in the presence of the jury.)

13  Q    So, to be clear about these declared essential patents and

14  about their being public, so Microsoft invested a lot of

15  money into the Xbox and WiFi portion of it over the years

16  from 2002 until 2010, correct?

17  A    Yes.

18  Q    And it collected a lot of money from those products?

19  A    Yes.

20  Q    Could you estimate how much from 2002 to 2010?

21  A    I really cannot.  I know that for a long time, actually,

22  it was a money-losing business, and then it turned into a

23  success.  But I couldn't put a dollar figure to it.

24  Q    In terms of revenues, billions?

25  A    I think it would have been under a billion for most of

1    that time.  I mean, for the whole period?  Probably over a

2    billion, yeah.

3    Q    And I'm going to put up a demonstrative that your counsel

4    has used, I think this is Slide 7.  And these are the folks

5    that we've heard had declared essential patents on WiFi

6    standards, correct?

7    A    I wouldn't be able to say that with certainty for all of

8    them.  But it sounds like a number of the players who would

9    have patents in that field.

10    Q    Okay.  And so from -- certainly you had no obligation from

11    2002 to 2011 -- 2010 -- to go out to all these companies and

12    say, hey, we're using WiFi technology, we'd like to pay you

13    something.  You would agree with that, you had no obligation

14    to do that?

15    A    Yes.  No, I don't believe we had an obligation to do that.

16    What we did is, through the patent pool that had over 2,400

17    patents in the field, we proactively secured a license to

18    what we believed was the bulk of the patents in the field,

19    and then relied on the fact that there were RAND commitments,

20    that if there was ever anyone else who wanted us to pay

21    royalties, that we would have an opportunity to then

22    negotiate a RAND rate and be able to take care of those.

23    Q    That's not the WiFi pool.  Wrong technology, isn't it?

24    You're talking about the MPEG LA.

25    A    You're right.  I'm sorry.  Yeah, 802.11 now.  Correct.

1   Q    I'm talking about WiFi.

2   A    Yes.

3   Q    And there really isn't a viable strong pool in the WiFi

4   area?

5   A    There are some pools, but I don't think they're as

6   successful as the one in H.264, you're right.

7   Q    And so no pools that are successful -- you didn't think it

8   was your obligation to go to each and every one of these

9   folks and say, "We're using WiFi and your technology."  You

10  agree with that?

11          MR. PRITIKIN:  Objection, Your Honor.  401, 402, 403.

12          MR. PRICE:  This is foundation.

13          THE COURT:  Let me read, please.  I'll permit the

14  question.

15  Q    It's been awhile since I asked it, let me try again.

16  You'll agree you didn't have an obligation to go to all these

17  folks and say, "We are using the technology, how much money

18  do we owe you?"  You agree with that?

19  A    I agreed that I don't believe we had an obligation.

20  However, we did have licenses in place with multiple of the

21  companies here that would have covered that technology.

22  Q    You didn't have a license with the majority of these

23  companies on WiFi, did you?

24  A    Probably not more than half of the companies, yes.

25  Q    And one of the things that you can rely on, then, is that

1   there is the RAND obligation, correct?

2   A    I'm sorry, could you repeat that.

3   Q    One of the things you can rely on, you don't need to

4   contact these companies, because there's the RAND obligation,

5   correct?

6   A    That's correct.

7   Q    So, for example, I don't want to pick out a company --

8   they might become a client -- so, okay, just say a company

9   here, they could be unreasonable as far as you know, correct?

10  A    Yes, someone could be unreasonable.

11  Q    Someone could be saying, we're declaring a patent when, in

12  fact, their patent doesn't really cover the standard,

13  correct?

14  A    Yes.  And that is actually not an uncommon situation.

15  Q    So you can't look at these declared essentials and

16  actually determine how many people actually have patents, is

17  that what you're saying?

18  A    Not without doing very elaborate and deep technical

19  analysis of the patents and the technical specification of

20  the standard.

21  Q    So, for example, for a royalty-stacking analysis, you

22  couldn't really multiply 92 times anything, because you don't

23  know how many of these people really have patents that cover

24  the standard, right?

25  A    Well, I think for stacking, it is possible to make certain

1    assumptions as to what the patents are, based on the history

2    of the standard, the contribution of the companies that are

3    there.  And that is as much of an economic analysis as it is

4    a technical one.  So I think it is possible to do an analysis

5    of the impact on stacking on the standard, using just

6    standard, you know, evaluation techniques that you would use

7    in the field.

8    Q    My question is different.  You wouldn't use this 92

9    number, because you said it's a common problem, these people

10   probably are declaring patents that aren't really in the

11   standard?

12   A    Yeah.  But it wouldn't be responsible to assume that none

13   of them or that most of them will not have actual patents

14   that will prove to be essential.  I mean, these are serious

15   technology companies, many of which are names that you

16   recognize, that were involved in the development.  So, you

17   know, the probability that most of them will have those

18   patents cannot be ignored.

19   Q    I understand it can't be ignored.  But you're protected

20   because of the RAND commitment, correct?

21   A    Yes.  Including the fact that RAND ought to take into

22   account the stacking factor.

23   Q    So even if you think some people here that you don't know

24   might be unreasonable, Microsoft feels comfortable going

25   forward with its investment in Xbox, because it has the

1   protection of RAND.  These people aren't entitled to more

2   than a reasonable non-discriminatory rate, correct?

3   A   Yes.

4   Q   So now let's talk about your statement yesterday

5   concerning -- I think you said that because of these letters

6   that had been sent out in October, and the rate that they had

7   in them, and that they were essential patents, you said that

8   that affected the negotiations?

9   A   Yes.

10  Q   Do you recall that?  Well, let me call your attention to

11  the date, as to the date of your deposition, okay?  And the

12  second one.  This is the one on May 24, 2013.  Okay?  Focus

13  there.

14       Now, by that time you had all the facts pretty much

15  that you've testified to to the jury about, you know, about

16  these letters going out, about actions being filed, about an

17  action in Germany, even the first part of this trial; you

18  knew all that, correct?

19  A   Correct.

20  Q   So you were -- you knew, then, by May 2013 the

21  circumstances that you testified to this jury about, the

22  circumstances surrounding this case?

23  A   Generally, yes.

24  Q   It's true that, though, as of May 20, 2013 you could not

25  think of any circumstance in which Microsoft would make a

1    counteroffer that was higher than Microsoft thought the

2    patents were actually worth?

3    A    That's correct.  We wouldn't volunteer to overpay.

4    Q    And in the negotiations that you had with Motorola, you

5    didn't volunteer to overpay?

6    A    Well, in the context of the negotiations, as I think we

7    discussed a lot yesterday, where there's an effort to try to

8    find an overall resolution to the case.  In that context

9    there were a number of conversations between Mr. Dailey and

10   me where we tried to find a way in which that settlement

11   could be brought about.  Economic offers were made that try

12   to achieve that.  And in some of those I believe we were

13   prepared to offer compensation to Motorola that we felt we

14   wouldn't be offering in the absence of the threat of the

15   injunctions coming from these patents.

16   Q    You didn't offer to overpay on these patents, correct?

17   A    There was not a discussion specifically about these

18   patents in which I think we would have offered to overpay.

19   We made economic offers on them.  There were offers overall

20   that we believe we were making because of the context of this

21   litigation being in the background.

22   Q    For these standards-essential patents, if we can take an

23   example -- for example, we talked yesterday about

24   Exhibit 7252.  And this was this August 1st, 2011 letter that

25   you sent to Mr. Dailey about H.264.  Do you recall that?

1    A    That Mr. Kaefer sent to Mr. Dailey, yes.

2    Q    Yes, thank you.  And this was about seven days before a

3    mediation was scheduled between the parties, correct?

4    A    That sounds right.

5    Q    So, after this letter, the parties were going to get

6    together with a judicial officer and talk settlement, right?

7            THE COURT:  I'm not sure -- Judge Infante is retired.

8    So I'm going to sustain my own objection to the phrase

9    "judicial officer."

10   Q    A mediator, who had been a former judge.

11           THE COURT:  Thank you, sir.

12   A    Yes.

13           MR. PRICE:  Always a judge in our hearts.

14   Q    And if we look at the second paragraph here.  The rate you

15   offer is .018 per covered MMI device, correct?

16   A    That's correct.

17   Q    Now, as you know, the court in the earlier part of the

18   case has said that the appropriate RAND rate for H.264 is

19   .55, correct?

20   A    Correct.

21   Q    So this is about a third of the RAND rate?

22   A    No, I don't believe so.  You can't ignore the fact that

23   there is a cap of $585,000 per year, which means that if you

24   divided that maximum payment by the number of units, I think

25   you would come up with a different number.

Q    Do you know what the number was?

A    No.  No.  But what I'm saying is, your point is that rate
in and of itself, yes, it is lower than the ones set by the
court.  As I said, this was the rate that we knew other
members of the patent pool were receiving a license for.  So
we felt this was an objective way of presenting what was an
offer based on objective criteria.

Q    So two things.  If there's a cap associated with a rate,
you're saying that changes the rate?

A    Yes.

Q    So if, for example, Motorola offered 2.25 with a cap, that
would actually change the rate, correct?

A    Correct.

Q    And Motorola did that throughout these negotiations,
correct, offered to cap the amount of royalties?

A    I'm not certain that that's the case, no.

Q    Are you denying that?

A    Did they offer a cap?  I mean, their October letters
indicated a 2.25 percent rate based on the final product.
And I don't believe those letters included a cap.

Q    No, sir, I'm talking about the discussions you had when
you said there was this leverage, or discussions you had
after you got together and talked about economic resolutions?

A    Yes.

Q    And there were term sheets?

1    A    Yes.

2    Q    Several of them?

3    A    Correct.

4    Q    Motorola offered a cap?

5    A    Not on these patents.  There was a cap on the overall

6    exchanges for both sides.  They were proposing caps that

7    would cap what they would pay us, too.

8    Q    Right.  So caps change by what the effective rates are?

9    A    Yes.

10   Q    In any event, you said you had this hanging over your

11   head, the idea of an injunction.  But you never came forward

12   and actually offered a rate that was more than what Motorola

13   was entitled to, which is a RAND rate?

14   A    Here's the part that confuses me, Mr. Price.  That's the

15   rate we were offering for a license to our patents.  The

16   letter also says that we would be prepared to pay them RAND

17   royalties.  But we don't say what the rate is that we would

18   be paying them, or that there is a cap.  We're basically

19   saying, royalty rates that are reasonable royalty rates and

20   are substantially similar to the ones we pay to the patent

21   pool.  We're not saying they have to be identical.

22   Q    Let's go to the next paragraph.  Here it has, "Reciprocity

23   in the context of Microsoft's offer to MMI shall include

24   MMI's commitment to grant Microsoft a license on fair and

25   reasonable terms and conditions under MMI's H.264 patent

1    portfolio, with per-patent royalties being considered fair

2    and reasonable royalties, provided they are substantially

3    similar to Microsoft's per-patent share of royalties payable

4    to Microsoft under the MPEG AVC patent portfolio license."

5    Do you see that?

6    A    Yes.   That's exactly what I said.

7    Q    And the Microsoft patent per-share royalties -- the patent

8    per-share royalties payable to Microsoft under that license

9    were .018, correct?

10   A    That's correct.

11   Q    So, we talked about what you offered as a result of this.

12   So let me ask you another question, then, which is, isn't it

13   true that Microsoft didn't say, "We're going to pay a FRAND

14   rate.   We're committed to that," until after the filing of

15   the German lawsuit?

16   A    I don't believe so.   I don't think that's right.   I think

17   there was a principle in this conversation, even from

18   October 1st, where we made it clear to them that we were

19   prepared to pay them fair rate for their patents.   And when

20   we filed this action asking for the determination of RAND, we

21   intended that when that RAND rate was set, we would enter

22   into an agreement and get a license on those rates.

23   Q    And where is that in writing?   Just tell me if you can

24   identify it; where is that in writing?

25   A    Well, you know, I told you about the context of the

1    conversations that happened on October 1st.  So I guess

2    they're in the transcript of my testimony.

3    Q    How about a writing that was created at the time, at the

4    same time you say that you committed to paying a RAND rate.

5    Is there a writing that you created at the time that said

6    that, prior to the German lawsuit being filed?

7    A    I don't think it was put in writing, no.

8    Q    And you also testified on your direct about these

9    lawsuits.  If we can go back to the timeline.  And you see on

10   the timeline, we have the October 21st and October 29th

11   letters.  And correct me if I'm wrong, but I think you said

12   on direct that the purpose of these letters was to clear the

13   way for Motorola filing a lawsuit.  Do you recall that?

14   A    Yes.

15   Q    And let me talk about that.  More than 99 out of 100 times

16   Microsoft rejects the first offer made by someone wanting to

17   license a patent, correct?

18   A    Yes.

19   Q    And that's not uncommon in the industry, is it?

20   A    I'd say probably not.

21   Q    And so it's kind of the expectation that the first offer

22   is going to not be accepted?

23   A    That's correct.  In 99.9 percent of the case you haven't

24   had someone tell you that they will sue you and send you a

25   letter that anyone would read and understand that it's

1    intended not to be accepted, but just to comply with a

2    formality to proceed with it.  So, in the context of this

3    engagement, to us it was very clear that they intended to

4    file an action.  And, by the way, that's exactly what they

5    did.

6    Q   Well, you knew they were going to file an action when you

7    filed your lawsuit -- you testified to that before --

8    October 1st, 2010, you knew they were going to file a

9    lawsuit?

10   A   Yes.  Now I'm talking about specifically a lawsuit on

11   H.264 and 802.11.

12   Q   And you knew they were going to file a lawsuit on any

13   patents they thought they could use against you and say:  We

14   have value.  You have value.  You knew that as of

15   October 1st, 2010?

16   A   We expected that, yes.

17   Q   Therefore you would expect them to file lawsuits on

18   standards-essential patents if they thought they brought

19   value to the table.  You said that yesterday, correct?

20   A   Yes.

21   Q   Now, 99 out of 100 times in the industry, and certainly

22   you, reject first offers, right?

23   A   Yes.  I mean, typically in those cases the letter is the

24   first conversation that happens on the topic.  There was an

25   ongoing conversation with Motorola that had preceded the

1    sending of the letters that provided the context.

2    Q    There was no ongoing discussion with Motorola concerning

3    the lawsuit, or what Motorola was going to assert, prior to

4    this letter being sent out, correct?

5    A    Correct.  I meant more broadly.

6    Q    So if -- Motorola would expect you to reject pretty much

7    any offer they put on the table.  99 percent of the time

8    you're going to reject the first offer and come back with a

9    counterproposal?

10   A    I don't know what they would have expected.  But if they

11   had come forward with a rate that we felt was reasonable,

12   particularly in the context in which we were, we might have

13   chosen to take the license and make sure that we didn't have

14   to worry about those standards-essential patents and

15   potential injunctions.  If the rate had been anywhere near

16   the ballpark of what we considered reasonable, we might have

17   actually taken a license.  It would have been to our benefit.

18   Q    The expectation, though, is you're going to reject it.

19   That's your expectation, right?

20   A    Oh, their expectation I'm sure was that we were going to

21   reject it, because the terms were clearly ones that we could

22   not accept.

23   Q    Pretty much any offer, because you reject 99 percent of

24   offers.

25              THE COURT:  Mr. Price, that's not a question, sir.

1    Q    Pretty much any offer they are going to give you is going

2    to be rejected.  You reject over 99 percent of offers because

3    you want to negotiate for RAND terms, right?

4    A    That's all a function of what the economic terms of the

5    offer are.  If the economic terms of the offer are

6    reasonable, we wouldn't reject 99 percent of them.  It just

7    so happens that if the offer is not an economically

8    reasonable offer, then we wouldn't serve the company and our

9    shareholders by accepting it.

10   Q    So over 99 percent of the time the offers Microsoft gets

11   are unreasonable?

12   A    I think very frequently they are, yeah.

13   Q    I asked a different question.  Over 99 percent of the time

14   the offers Microsoft gets are unreasonable?

15   A    Yes, I think that's a fair statement.

16   Q    So it's a common practice for the first offer to be more

17   than you would want to pay?

18   A    Yes.

19   Q    Over 99 percent of the time that's the case?

20   A    Yes.

21   Q    So we talked about your practice on that.  Now let's talk

22   about the filing of the lawsuits by Motorola.  If we can put

23   the timelines up here.  And you see that after Microsoft sued

24   on November 10th, Motorola filed a number of lawsuits,

25   correct?

1    A    Yes.

2    Q    And in those lawsuits -- you're familiar with them, you

3    testified about them, correct?

4    A    Correct.

5    Q    You've seen the complaints, correct?

6    A    Yes.

7    Q    Okay.  So in any of those lawsuits did Motorola say it was

8    entitled to damages or an injunction because Microsoft

9    rejected the offers in the October 21st and October 29th

10   letters?  If you look at those complaints, does it say that

11   anywhere, that that's what gives Motorola the right to sue?

12   A    It's been a long time since I read those complaints.  And

13   the ones in Germany, I don't read German, so I probably

14   didn't read those.  But I don't remember there having been

15   references to the October letters.  I could be wrong.  But I

16   don't recall there being a reference to those letters.

17   Q    So you don't -- and you don't recall any situation where

18   Motorola has used, or tried to use, Microsoft's rejection of

19   those October letters as a reason to get an injunction or to

20   get higher than RAND royalty rates?

21   A    Yes.  I don't recall that.  But I don't believe the

22   purpose of the letters was that.  The purpose of the letters

23   is to be able to say that they had made an offer that had

24   been rejected, so as to be seen as complying with the

25   practice when it comes to standards-essential patents.  You

1    normally wouldn't sue when you have an obligation to offer a

2    RAND license if you first haven't made that offer.  Whether

3    that was a fact that was cited in the complaints, I really

4    don't know that.

5    Q    Or anywhere.  You don't know of any context in which

6    Motorola has taken the position that because it sent out

7    those October letters, that gave them the right to sue

8    Microsoft for an injunction or for damages.  You know of no

9    context in which that's the case?

10   A    No.

11   Q    Is that correct?

12   A    Correct.

13   Q    And when the lawsuits were filed, Microsoft filed

14   responses to those lawsuits, correct?

15   A    Correct.

16   Q    I take it that it is accurate that in responses to those

17   lawsuits -- let me ask it a better way.  In the responses to

18   those lawsuits did Microsoft say:  We're ready, willing, and

19   able to pay RAND?

20   A    So first I have to say, because I'm not a litigator and I

21   really wasn't handling the litigation, I don't know that I

22   can say that I read any of the responses.  So I don't think

23   I'm -- I don't think I have a factual basis to be able to

24   tell you whether that's the case or not.

25   Q    You don't know -- if you don't know, that's fine.  You

1   don't know?

2   A   I don't.

3   Q   Okay.  Well, do you know whether or not in those -- in the

4   response to those lawsuits, Microsoft said that:  We are not,

5   in fact, infringing those patents.  We are not using the

6   technology at all?

7           MR. PRITIKIN:  Your Honor, I'm going to object to

8   that on 401, 402 and 403 grounds.

9           THE COURT:  I'll permit the question.

10  A   I don't know the answer to that.  I would say, in general

11  --

12  Q   No, I don't want to ask you about things you don't know.

13  A   If you ask me specifically about these answers to these

14  complaints, then I really can't answer.  I don't know.

15  Q   And you don't know firsthand or someone telling you about

16  it; you just have no knowledge of that?

17  A   All I know from someone telling me about it is that at

18  some point during the litigation, we, in court, made the

19  statement that Microsoft is prepared to take a license on

20  RAND terms.  I don't know when in the process or in what

21  document or if it was a written submission or a statement

22  that was made in court.

23  Q   Do you know whether or not at this time Microsoft

24  contended that, in fact --

25          THE COURT:  I'm sorry, sir, "at this time."

1          MR. PRICE:  I'm pointing to my screen, you're

2     correct, Your Honor.  Let the record reflect that I'm

3     pointing to the November timeframe.

4     Q   At that time in November of 2010 it's correct, isn't it,

5     that Microsoft, in fact, took the position that the patents

6     weren't even valid?

7     A   Subject to the fact, as I said before, that when I read

8     those responses was many, many, many months ago.  You know, I

9     think that's possible.  I can't say for sure that's the case.

10    I think that would be kind of the standard response to a

11    complaint like that.  You don't know -- in many cases you

12    really don't know if patents are going to be valid or not --

13         MR. PRITIKIN:  Objection.

14         THE COURT:  He needs to ask you another question.

15         THE WITNESS:  Okay.

16         THE COURT:  The jury will disregard the last portion

17    of the witness's response.

18    Q   So I don't want to waste time asking things you don't know

19    about, okay?  So, if we go forward in the timeline, we talk

20    about the Germany lawsuit, what was done in that.  This is,

21    again, something that you don't feel comfortable to talk

22    about in any detail because you don't have firsthand

23    knowledge of it?

24    A   That's correct.

25    Q   Now, I want to get back, then, to your perception of what

1    was going on in the October and November timeframe, actually

2    through 2010, with respect to negotiations, okay?

3    A    Okay.

4    Q    So focusing on that timeframe, let me ask you the

5    following:  At the time of the receipt of these letters, or

6    around the same timeframe -- October 21st to October 22nd,

7    2010, to be specific -- Microsoft and Motorola were having,

8    parallel with these letters, receipt of these letters,

9    licensing discussions of a broader scope that would have

10   encompassed the subject matter of these letters, true?

11   A    Yes.

12   Q    And these letters cover the subject matter of both 802.11

13   and H.264, correct?

14   A    We wanted them to.  And we expected they would be covering

15   them.

16   Q    Well, those discussions covered, encompassed the subject

17   matter of those letters, correct?

18   A    These were very early discussions.  So they were really

19   not specific.  But the idea would be that if the discussions

20   were fruitful and successful, that there would be a

21   resolution that would achieve complete peace between the two

22   companies.

23   Q    And thereby encompass both of these -- the subject matter

24   of both of these letters, correct?

25   A    That's what we hoped.

Q   In the context of those negotiations, Motorola never
referred to these letters, correct?

A   No, they did not.

Q   In fact, in the context of those negotiations, these sets
of patents and technologies weren't really the focus of
Motorola's presentation, correct?

A   If you're talking about October 2010 and the meeting that
happened then, I think that's right, there was no reference
to that.  There came a time in November and December of 2010
in which we started having discussions about specific terms,
and started exchanging high-level summaries of what a deal
would look like.  And in those, Motorola was insisting
specifically that patents they owned for 802.11 and H.264
that read on Windows would be excluded from the overall
agreement.  So we wouldn't end up having a license to that.
So we would be put in the position where we would agree to
this grand bargain and yet continue to be exposed to
litigation on 802.11 and H.264 patents.

Q   And how many -- is it true there were multiple meetings at
executive levels and others, correct?

A   When?  I'm sorry.

Q   During the timeframe October and November 2010, there were
multiple meetings at executive levels and others, correct?

A   If you choose to call me and Mr. Dailey executives, that
would be right.

Q    Well, would you put it that way?

A    Mr. Dailey and I met -- I would say more talked on the

phone a number of times.  And there was a meeting, and

perhaps even one or two calls at the general-counsel level,

which definitely would be executives.

Q    It's true, and your words would be, that there were

multiple meetings at executive levels and others.  Those

would be your words, right?

A    Yes.

Q    And in your words that in those multiple meetings what the

parties were focused on was trying to resolve the disputes

between the two parties generally, correct?

A    Correct.

Q    And that in those multiple discussions, in those multiple

meetings -- you said there were multiple meetings, correct?

A    Yes.  Now, these meetings can happen in different forms.

They don't have to be face-to-face meetings.

Q    You don't actually have to meet.  When you said multiple

meetings, you meant phone calls?

A    In some cases were face-to-face meetings and some cases

were phone calls.

Q    So in these multiple meetings at executive levels, the

topics of the specific patents were not a priority for either

side, correct?

A    I wouldn't say that.  When, in December, we started to see

1    that Motorola was attempting to exclude the patents they had

2    on H.264 and 802.11 from the scope of the license we would

3    get, we actually focused on that and specifically insisted

4    that if we were going to have an overall resolution, those

5    needed to be part of the deal, and that Windows would have to

6    be covered for those patents.

7    Q    After these overall discussions did not bear fruit in

8    2010, there came a time when, in fact, the parties exchanged

9    term sheets that covered these particular patents, correct?

10   A    Yes.  Eventually they accepted our request that they

11   needed to be covered.

12   Q    Well, what happened is that in 2010 the meetings that you

13   wanted to have that would discuss a broader resolution did

14   not lead to -- is it correct -- those meetings did not lead

15   to an agreement?

16   A    That's correct.

17   Q    And then after the parties said -- or let's say you

18   said -- let's talk about these specific patents, there were

19   then back-and-forth term sheets about specific patents,

20   correct?

21   A    I wouldn't characterize it that way.  The reality is that

22   there was a specific focus on these patents as part of the

23   overall discussions when we started exchanging deal sheets on

24   those.  But they were later in the process throughout the

25   months of engagement that we had.  Some situations in which

1   we -- not having been able to make them part of the overall

2   deal -- started discussing on some occasions whether there

3   would be an opportunity to take care of those independently.

4   Q   And in those discussions there were term sheets that went

5   back and forth about, okay, let's look at these

6   independently, correct?

7   A   Correct.

8   Q   And you know that there were how many of those?  A lot?

9   A   I wouldn't say a lot.  There were a handful of them.

10  Q   Sure, okay.  Well, that's my fault.  Were there, you know,

11  like about ten?

12  A   Probably under ten.

13  Q   And it's your belief that these letters need to be looked

14  at in the context of the realities of the dynamic of the

15  engagement between the two companies at the time.  I'm going

16  to assume that you know what that means.

17  A   What letter --

18          THE COURT:  He hasn't asked you a question.

19          THE WITNESS:  I'm sorry.

20  Q   Is that your belief, that you believed that the

21  October 21st, October 22nd letters have to be looked at in

22  the context of the realities that the dynamic of the

23  engagement between the two companies at the time?

24  A   Yes.

25  Q   And that, in fact, when you guys first got together, there

1    really wasn't -- is this true -- there wasn't any signal from

2    Motorola they wanted to have some kind of separate tracking

3    negotiations; is that correct?

4    A    When we got together at the very beginning in October,

5    there wasn't, no.

6    Q    The time you -- I'm not just talking about the October

7    22nd meeting, I'm talking about the multiple executive-level

8    meetings that took place in the October, November and

9    December timeframe.

10   A    Well, I wouldn't be able to say that there wasn't a

11   separate track, because as I said, in the November and

12   December conversations the position Motorola was taking is

13   that those sets of patents on H.264 and 802.11 would not get

14   licensed in the context of the overall deal.  So I take that

15   to mean that they would have to be handled independently.

16          MR. PRICE:  Your Honor, under Rule 32 I'm going to

17   ask that we be able to play, from Mr. Gutierrez's deposition

18   testimony, page 20, line 18 to page 22, line 1.

19          THE COURT:  What are the pages, again?

20          MR. PRICE:  It's page 20, line 18, to 22, line 1.

21   I'm requesting that under Rule 32 .

22          THE COURT:  Any objection?

23          MR. PRITIKIN:  Give me a moment to read it, Your

24   Honor.

25          THE COURT:  Mr. Price, is this the April 4th

1   deposition?

2         MR. PRICE:  No, Your Honor, I apologize.  It's the

3   May 24, 2013.  And it's 32(a)(3), Your Honor.

4         MR. PRITIKIN:  Your Honor, I'm not sure why they want

5   to do it.  If they want to use their time to play this,

6   they're certainly welcome.

7         THE COURT:  Just tell me if you have an objection.

8         MR. PRITIKIN:  I have no objection to playing this.

9         MR. PRICE:  Thank you, Mr. Pritikin.

10        (The following is an excerpt of the video dep.)

11  Q   Now, Mr. Gutierrez, now given your experience as to how

12  these negotiations typically proceed, is it your

13  understanding that in instances where a license, potential

14  licensor says this offer is open for, you know, X number of

15  days, is it your understanding that that somehow prevents

16  Microsoft from making an offer after that 20 days?

17  A   No, it doesn't prevent the other party from making an

18  offer.  But, in fact, we were having, in parallel with these

19  discussions, with the receipt of these letters, we were

20  having licensing discussions of a broader scope that would

21  have encompassed the subject matter of these letters.  And I

22  think it's noteworthy that in the context of those

23  conversations, these particular set of patents and

24  technologies were never raised by Motorola as the focus of

25  their dialog with us.  Instead, in our multiple meetings at

1    executive levels and others, they were really focused

2    elsewhere in terms of trying to resolve the disputes between

3    the two parties, generally.

4        And these topics were never a priority for them in terms

5    of trying to address them.  But we were having licensing

6    discussions even on the same day in which the first letter

7    was received on October 22nd, there was a face-to-face

8    meeting between the general counsels of both companies,

9    Mr. Kirk Dailey and myself, where we discussed these -- the

10   overall patent dispute between the parties and desire to move

11   forward.

12       So, the letter has to be looked at in the context of the

13   realities, the dynamic of the engagement of the two companies

14   at the time.  And we received no signal from Motorola that

15   this was really a matter that they wanted to handle as a

16   separate track negotiation apart from the overall discussions

17   that we were having.

18                    (The video excerpt concluded.)

19   Q   Getting back to the timeline, then.  Between October 22nd,

20   the end of that meeting, and November 9th, the only response

21   Microsoft gave to Motorola concerning these two letters was

22   the lawsuit that was filed on November 9th, correct?

23   A   Correct.

24   Q   And certainly between those two times, between

25   October 29th, say, and November 9th, you certainly never said

1   you needed more time to analyze the letters.  You explained

2   you had a quick reaction to them, correct?

3   A   Yes.

4   Q   In your direct you gave the opinion that Motorola was an

5   outlier with respect to the Android patents?

6   A   In terms of large companies, yes.  I mean, there were a

7   number of very small companies, too, that have inside

8   licenses with us.  But I think the vast majority of them they

9   have.

10  Q   And, of course, at this time, October 1st, 2010 when

11  Microsoft sued Motorola, there was only one licensee, that

12  was HTC, correct?

13  A   Yes.  Which at the time, I believe, was probably the top

14  vendor of Android phones.  And Motorola was, at the time,

15  either the number two, or climbing up to becoming the number

16  one.

17  Q   And you based that on what?

18  A   On industry analysis that was available.

19  Q   And when you gave your opinion that Motorola was an

20  outlier by contesting these patents, you took into account

21  all the circumstance you know of to date about that, correct?

22  A   No, there may be a misunderstanding.  The reference that I

23  made about Motorola being an outlier is looking at the

24  situation now.  I was talking about how today, when you look

25  at smartphone devices, Android and smartphones that are sold

1    in the U.S., a very large percentage of those come with a

2    license.  At the time when these conversations were

3    happening, as you said, there had only been one significant

4    license with a major Android device vendor.

5    Q    And, in fact, if you look at the situation today, that

6    October 1st lawsuit in the ITC, there was a finding that

7    Motorola did not infringe the Android patents that you

8    allege, except for one ActiveSync patent; isn't that right?

9    A    That's correct.

10   Q    And that was the one you said they had done a

11   design-around on?

12   A    I don't know if they have effectively designed around.  I

13   know that they claim that they have designed around it.  Now,

14   in the ITC it's actually quite normal that only a very small

15   percentage of the patents that are presented are ultimately

16   found to have been violated.  I think we looked at smartphone

17   patent litigation, and generally the ITC, and only four in

18   the last few years has been found.  And one of them is ours.

19   So it's not a bad outcome, from our perspective, given the

20   realities of the ITC litigation.

21   Q    The reality of the ITC if you're seeking an exclusion

22   order, you're telling us that it's really unlikely that

23   you're going to get a finding of infringement?

24   A    No.  I'm saying that it is common for patents that are

25   presented for a determination by the ITC not to make it to a

1    violation.  Like in our case, you can always win on one or

2    two or three patents, and that's a realistic outcome.  It's

3    happened in our case and in others.

4    Q    I'm trying to follow up, though, on what you just said.

5    A    Yeah.

6    Q    We know that with respect to the patents you were claiming

7    that Motorola had infringed that pertained to Android --

8    except for the separate ActiveSync patent -- that there was a

9    finding that Motorola did not infringe those, correct?

10   A    That is not correct.  There were a variety of findings,

11   some of which had nothing to do with whether there was

12   infringement or there wasn't.  That had to do with certain

13   technical tests that the ITC has as to whether there's a

14   domestic industry test that's met, or things like that, that

15   have nothing to do with whether the patent is valid or

16   whether the patent is actually infringed.  But the part that

17   is right is that there was only one patent out of the ones

18   that we filed in the ITC that was ultimately found to be

19   violated under the rules of the ITC.  That was just the ITC,

20   not the other parts of the litigation.

21   Q    Because the other parts of the litigation haven't gone

22   that far yet, correct, either in the state or --

23   A    In the U.S. they haven't.  In some other litigation it

24   has.

25   Q    And you said that's a satisfactory result in the ITC, I

1    think you said, because there are only four cases in recent

2    history where the ITC has found a patent infringed; is that

3    right?

4    A    I'm talking about non-standards-essential patent

5    litigation in the smartphone space, and I think there's only

6    been a handful of them.

7    Q    Wait a second.  So when you gave us those statistics that

8    it's rare to get a finding of infringement in the ITC, you

9    were including standards-essential patents?

10   A    There has actually been other cases more recently, having

11   to do with standards-essential patents, that have resulted in

12   the exclusion of the iPhone and some Samsung devices and

13   things like that.  I'm talking about the patents that we

14   asserted, which are non-standards-essential patents.

15   Q    Are you saying the ITC has different standards for

16   determining infringement on standards-essential patents

17   versus normal patents?

18   A    I think that --

19   Q    Is that what you're saying?

20   A    I think that standards-essential patents are different in

21   nature.  And, therefore, the question is a simpler question

22   for the ITC to look at.  Is the standard implemented?  Is the

23   patent valid?  You really don't have to prove infringement,

24   as long as the standard is being implemented in the product.

25   So I don't know the statistics would necessarily apply the

1    same if you looked at only standards-essential patents.

2    Q    There's no different standard or test whether or not a

3    patent is infringed in the ITC with respect to a normal

4    patent and a standards-essential patent.  There's no

5    different test, is there?

6    A    There is no different test.  The patents are different,

7    and therefore the analysis would be different as to whether

8    the patent's been infringed or not.  It's a simpler question.

9    Is WiFi in the device?  And then if the patent is valid and

10   essential, then you don't have to get into the infringement

11   discussion that you would normally have to get into with a

12   non-standards-essential patent.

13   Q    You've got to prove that you're using the standard, right?

14   A    Right.

15   Q    Which means you're practicing everything that's there,

16   right?

17   A    Correct.

18   Q    The elements.  And then you have to prove that the patent

19   covers a subpart of those elements, correct?

20   A    Yes.

21   Q    And that's what you'd have to do for infringement, that

22   you were using certain elements and the patent covers those

23   elements, right?  Is that correct?

24   A    That's correct.  What I'm saying is that, you know, you

25   either are practicing the standard or you're not.  And that's

1   not a very complicated issue to determine.  Is the device

2   connecting to WiFi?  If the answer is yes, then the inquiry

3   focuses exclusively on whether the patent is valid and met

4   the other tests.

5   Q   It's whether the patent actually is in the standard.

6   That's the same thing as determining infringement.  When you

7   look at claims, you look to see if they're being used, right?

8   A   Well, is it the same thing as determining infringement?  I

9   don't think it is.

10  Q   Okay.

11          MR. PRICE:  I've burned up too much time.

12          THE COURT:  Counsel, we'll take our break at this

13  time.

14      Ladies and gentlemen, I'll spare you your morning warning,

15  because you know not to talk to each other or about the case

16  until you hear all the evidence.  I'll see you back out at

17  10:45.

18    (The following occurred outside the presence of the jury.)

19          THE COURT:  We'll be in recess, counsel.

20              (The proceedings recessed.)

21

22          THE COURT:  Mr. Price, I understand you have

23  something.

24          MR. PRICE:  Very quickly, your Honor.  It's just a

25  verification so we have it on the record.  They are planning

1    on calling Mr. Davidson before lunch.  He is one of the folks

2    that will testify about the German move.  If you recall, a

3    while ago both parties filed letter briefs on the German

4    discovery issue, and whether the violations of the court's

5    orders --

6              THE COURT:  Yes, Mr. Cannon was set to argue that.

7              MR. PRICE:  He was set to argue that.  What we

8    remember you saying was --

9              THE COURT:  It was denied.

10             MR. PRICE:  It was too late.  What I wanted to make

11   sure, your Honor, is that --  There were two parts of the

12   motion.  One was for more discovery, which I felt the too

13   late probably dealt with.  The other was precluding the

14   witnesses from testifying because of that.

15             THE COURT:  I denied that also.  Counsel, I am fond

16   of both of you, but both of you played that particular card,

17   in terms of swords and shields.  I thought you got sufficient

18   discovery, I thought Microsoft got sufficient discovery, and

19   both of you protected way more than I thought was

20   appropriate.  That was hard-fought litigation.  That was the

21   ruling.

22             MR. PRICE:  Thank you.

23             THE COURT:  Let's bring the jury in.  Counsel, before

24   we do, one further matter then.  I am going to respond to the

25   note about indemnity by saying:  "Unless a term has been

1    subject to testimony to the contrary, a term has its normal

2    English usage meaning.  The term 'indemnify' is used in

3    Exhibit 1620, Paragraph 13, which is attached.  In addition,

4    there has been testimony about this term during the trial.

5    You may use this testimony to assist you to determine the

6    meaning of the term."

7         Is that acceptable to Microsoft?

8              MS. ROBBINS:  Yes, your Honor.

9              MR. PRICE:  Yes, your Honor.

10             THE COURT:  Thank you, counsel.

11   (At this time the jury entered the courtroom.)

12             THE COURT:  Mr. Pritikin.

13             MR. PRITIKIN:  Your Honor, there is a portion of

14   Mr. Gutierrez's deposition that I would like to read under

15   the rule of option completeness, since there were portions

16   that were played during the prior examination.  Page 28,

17   Lines 13 to 24.

18             THE COURT:  Any objection, Mr. Price?

19             MR. PRICE:  Let me find it, your Honor.

20             THE COURT:  The pages again, sir?

21             MR. PRITIKIN:  Page 28, Lines 13 through 24.

22             MR. PRICE:  That is not part of the rule of

23   completeness for anything.  I would object.  Since it is not

24   part of the rule of completeness, it is hearsay.

25        Sorry to interrupt.  Go ahead and play it.

 1          THE COURT:  You saved yourself --  Go ahead and play

 2     it.

 3          MR. PRITIKIN:  I will read it.

 4          THE COURT:  All right.

 5          MR. PRITIKIN:  This is from the deposition of

 6     Mr. Gutierrez on May 24th, 2013.  Question by Mr. Price:

 7     "Well, I will ask you about the situation, but I believe that

 8     the topic that you were designated to testify on here is, you

 9     know, topic one is an explanation of how a typical Microsoft

10     patent license negotiation proceeds.  You understand that?"

11     Answer:  "Yes."  "And in preparing for that, you understood

12     in testifying about how a typical Microsoft patent license

13     negotiation proceeds, but you didn't necessarily mean how

14     this one proceeded, you understand that?"  Answer:

15     "Correct."

16                      REDIRECT EXAMINATION

17     By Mr. Pritikin:

18     Q   Mr. Gutierrez, if you have the binder that was provided by

19     the defendants, if you could turn to Tab 7241, please, which

20     is a copy of the complaint?  Let's put up on the screen the

21     paragraph that you were shown by Mr. Price during in his

22     examination, Paragraph 7.  Let's pull out Paragraph 7.

23          Mr. Gutierrez, you may recall on the direct examination

24     your attention was directed to the first sentence of the

25     paragraph.  Do you see that?

1   A   Yes.

2   Q   And in that paragraph, I will read it, it says --

3   paraphrase it, "Microsoft does not accept Motorola's

4   representation that any of its patents that it has identified

5   to the IEEE or ITU are, in fact, necessary to the

6   implementation of compliant implementations, nor does

7   Microsoft concede that the particular implementations in its

8   products practice any Motorola patents, including those

9   identified by Motorola."  And you were asked some questions

10  about that, in which --  I think you were asked whether

11  Microsoft had conceded that it was -- that these patents were

12  being used or whether they were valid.  Do you recall that

13  testimony?

14  A   Yes.

15  Q   Now, there was a second sentence in the paragraph that was

16  not highlighted when you were asked these questions by

17  Mr. Price, and that's the one I want to focus on.  Could you

18  look at the second sentence?  Could you read that one to the

19  jury?

20  A   "Nonetheless, Microsoft has to rely upon Motorola's and

21  other similarly-situated patentholders' representations that

22  all patent controversies may be avoided based on the offer of

23  patent licenses on reasonable rates and non-discriminatory

24  terms."

25  Q   So for the purpose of paying a license, were you prepared

1   to accept that the patents were used?

2   A   Yes.

3   Q   What do you understand that sentence to mean?

4   A   Well, that, you know, for a company like Motorola, when

5   you look at patent assertions that they make, and they have

6   multiple patents on the topic, it might be that eventually in

7   court some of them may be found to be invalid or that the

8   declarations they made saying that they were essential may

9   technically not be so.  But that doesn't mean that there

10  isn't a probability that a number of them will actually end

11  up being valid.  And therefore, if there is an effort to

12  offer a reasonable royalty, we would take that as granted for

13  purposes of trying to avoid the lengthy and uncertain process

14  of trying to invalidate the patents and going behind it.  I

15  think one has to be practical when it comes to these things.

16  And, therefore, we took the offer --

17          MR. PRICE:  I will object, your Honor.  At this point

18  it is beyond the scope of the question.

19          THE COURT:  Sustained.  Ladies and gentlemen, you may

20  accept the first portion of that.  And once it started into

21  the narrative, you are to disregard the rest.

22  By Mr. Pritikin:

23  Q   Let's look further down the same page at Paragraph 9 of

24  the complaint.  Do you see Paragraph 9, it says,

25  "Accordingly, Microsoft seeks a judicial declaration that

1    Motorola's promises to the IEEE, the ITU, and their members

2    and affiliates constitute contractual obligations that are

3    binding and enforceable by Microsoft;" and, ii, "A judicial

4    declaration that Motorola has breached these obligations by

5    demanding excessive and discriminatory royalties from

6    Microsoft;" and, three - and this is the one I want to focus

7    on, Mr. Gutierrez - "A judicial accounting of what

8    constitutes a royalty rate in all respects consistent with

9    Motorola's promises for WLAN patents identified as essential

10   by Motorola and for H.264 patents identified by Motorola."

11        What do you understand "judicial accounting" to refer

12   to, sir?

13        MR. PRICE:  Objection.  Vague as to time and

14   foundation.

15        THE COURT:  Overruled.

16        THE WITNESS:  That we were asking the court to tell

17   us how much the RAND rate would be so that we could pay it.

18   By Mr. Pritikin:

19   Q    Now, in response to questions that were asked of you by

20   Mr. Price, you said, in the investigation you had done of

21   Motorola patents, you hadn't focused on standards-essential

22   patents.  Is there a business reason why a company doesn't

23   focus on standards-essential patents?

24   A    Because there is a RAND declaration that provides us some

25   assurance that we would be entitled to pay reasonable

1    royalties, and that therefore in due course would be able to

2    secure a license on terms that would be acceptable

3    commercially.

4    Q    Now, there were a number of points at which I think

5    Mr. Price had asked you or referenced the deposition

6    testimony you had given, and we have already read that

7    segment for the benefit of the jury.  I want to ask you some

8    questions about some aspects of that, Mr. Gutierrez.  I

9    believe there was reference to testimony you had given that

10   Microsoft would not overpay.  Was that in reference to the

11   typical negotiation?

12   A    Yes.

13   Q    And do you consider this to have been a typical

14   negotiation?

15         THE COURT:  Counsel, you are leading.

16   By Mr. Pritikin:

17   Q    Was this a typical negotiation?

18   A    No, it was not a typical negotiation.

19   Q    I think there also was testimony you gave that you said

20   that in 99 percent of the instances the incoming offers are

21   unreasonable.  Let me ask you first, how often do you get

22   offers for standards-essential patents?

23   A    It is extremely rare.

24   Q    When you provided that testimony, were you referring to

25   standards-essential patents or non-standards-essential

1    patents?

2    A    I'm sorry.  When I provided what testimony?

3    Q    That 99 percent of the offers are unreasonable?

4    A    I was referring to non-standards-essential patents.

5    Q    When you get an offer on a standards-essential patent,

6    what do you expect?

7    A    I expect that it will be a RAND rate or something close to

8    a RAND rate.

9    Q    I think you also were asked on direct, and you provided

10   testimony, that you expected Motorola to sue Microsoft.  Did

11   you, sir, expect them to sue you on standards-essential

12   patents?

13   A    No, I didn't.

14          MR. PRITIKIN:  Nothing further, your Honor.

15          THE COURT:  Mr. Price.

16                      RECROSS-EXAMINATION

17   By Mr. Price:

18   Q    Mr. Gutierrez, you were testifying about the complaint and

19   the request for an accounting.  Do you recall that?

20   A    Yes.

21   Q    Did you draft the complaint?

22   A    No, sir.

23   Q    Did you review it before it was filed?

24   A    I believe I did.

25   Q    Was your approval necessary for the filing of the

1    complaint?

2    A    I don't think so, no.

3    Q    And were there discussions within Microsoft that the

4    purpose of filing this complaint -- one of the purposes was

5    to announce to the world that it was willing to pay any RAND

6    rate on these patents?

7    A    No, there wasn't such discussion.

8    Q    And, in fact, you are aware that in an order in 2012 that

9    there was a finding by the court - if I may, your Honor -

10   that "An express statement that Microsoft seeks a license

11   from Motorola's standards-essential patents is missing from

12   its complaint"?  You are aware of that?

13   A    No, I'm not sure I can say that.

14   Q    Were you aware that in recent papers, though, around -- in

15   connection with what the court was observing, that Microsoft

16   had finally affirmatively stated that it was ready and

17   willing to take a license to patent some RAND terms?

18            MR. PRITIKIN:  Your Honor, I may or may not have an

19   objection.  I would just like to know what the document is so

20   I can look at it to see if --  Your Honor, I have no problem

21   with this being read, provided the entire footnote is read.

22            MR. PRICE:  I would be glad to read it.  Should I

23   read it, your Honor?

24            THE COURT:  Please do.

25            MR. PRICE:  "Although an express statement that

1  Microsoft seeks a license for Motorola's standards-essential

2  patents is missing from its complaint, in its recent papers

3  to the court Microsoft has affirmatively stated that it is

4  ready and willing to take a license to such patents on RAND

5  terms."  And there is a parenthetical, "see example" --

6  Should I interpret this?  "Motion partial SJ Re injunctive

7  relief at 5," paren, quote, "The indisputable evidence is

8  that Microsoft is seeking a license on RAND terms in this

9  very action," close quote, close parens.  Pretty good?

10      And just so the jury is aware, the date of the order is, I

11  believe, May 14th, 2012.

12          THE COURT:  Mr. Price, give me a moment here.  Ladies

13  and gentlemen, they are quoting from an order that I have

14  written.  When I cite a case, I give the name of the case,

15  the name of the order, and then sometimes you put a

16  parenthetical in that takes a quote out of wherever that came

17  from.  That last part of that is a parenthetical.  It makes a

18  lot more sense if you see it in writing.  But that's what was

19  going on.

20          MR. PRICE:  Thank you.  I believe I have no further

21  questions.

22          THE COURT:  Anything else?

23          MR. PRITIKIN:  No, sir.

24          THE COURT:  You may step down, sir.  Microsoft will

25  call its next witness.

1          MR. HARRIGAN:  Yes, your Honor.  We would call

2    Mr. Jeff Davidson.

3                        JEFF DAVIDSON

4        Having been sworn under oath, testified as follows:

5          THE CLERK:  Will you state your full name for the

6    record, please?

7          THE WITNESS:  Jeff Davidson.

8          THE COURT:  You may inquire.

9                      DIRECT EXAMINATION

10   By Mr. Harrigan:

11   Q   Mr. Davidson, would you give the jury a brief synopsis of

12   your education and work experience leading up to your being

13   employed at Microsoft?

14   A   Yes.  I have a degree in business management from the

15   University of Phoenix.  I have been at Microsoft now for

16   eight years.  Prior to Microsoft, I accumulated -- between

17   Microsoft and part of Microsoft - over 20 years of experience

18   in distributional logistics.  I have worked for some very

19   large tech companies, like Intermec Technologies, one of the

20   world's largest wholesale distribution providers, as well as

21   obviously Microsoft.  And then I have also worked with a

22   third-party logistics provider, which provides outsource

23   distribution services similar to what Microsoft uses to run

24   distribution centers.

25   Q   So thirteen minus eight is five.  So you went to work for

1   Microsoft in 2005?

2   A    That's correct.

3   Q    What is your current position?

4   A    General manager of global supply chain operations.

5   Q    And were you in that same position in early 2012?

6   A    No.  I was hired as a senior manager of North America

7   distribution and logistic.

8   Q    And when did you become the general manager?

9   A    Three or four years ago.

10  Q    So in early 2012 you were the general manager?

11  A    Yes.

12  Q    So you are the operation -- if I understand it right, you

13  are the operations guy in the global supply chain for

14  Microsoft?

15  A    Yes.

16  Q    Would you just explain briefly what that means?  What is

17  that job?

18  A    Well, I run distribution and logistics fulfillment

19  operations globally for Microsoft.  Basically that includes

20  all of the warehouses, all of the movement of product from

21  our factories to our distribution centers and out to our

22  customers.  That includes figuring out where we put

23  distribution centers, how big they are, who - meaning what

24  suppliers - are going to run them, and so forth.

25  Q    Does your division, the distribution outfit, handle all

1    Microsoft products?

2    A    All physical Microsoft products, fully packaged products,

3    likes Xbox, Windows, Office, keyboard, mice, Surface --

4    Q    If Windows is delivered in a box, that is your problem?

5    A    Yes.

6    Q    If it is not delivered in a box, if it is electronic, that

7    is not your problem?

8    A    Correct.

9    Q    Did Microsoft have a distribution facility in Germany in

10   late 2011?

11   A    Yes, it did.

12          MR. HARRIGAN:  Your Honor, we would like to put up a

13   demonstrative here, which is PDX 11.

14          THE COURT:  Mr. Price, have you seen this, or whoever

15   is handling this witness?

16          MR. PRICE:  It is from the opening, your Honor.  I

17   have no objection to it as a demonstrative.

18          THE COURT:  Ladies and gentlemen, a demonstrative,

19   not an exhibit.  Please proceed, Mr. Harrigan.

20   By Mr. Harrigan:

21   Q    Using this for reference, Mr. Davidson, would you describe

22   the German distribution facility and what it did?

23   A    Yes.  The German distribution facility was located in

24   Germany.  It basically fulfilled orders to our customers for

25   all products across mainland Europe, basically in the EMEA

1  operations, that included Russia --

2  Q   I'm sorry.  You just said "EMEA."  Would you tell us what

3  that means?

4  A   Europe, Middle East and Africa.  So mainland Europe.

5  Basically everything in Europe, excluding the UK, Ireland and

6  some of the Nordics.  So what it included was Russia,

7  mainland Europe, Middle East and Africa.

8  Q   And how big was the facility approximately?

9  A   The facility itself was 440-, 450,000 square feet, and we

10  allocated about 330,000 square feet of that.

11  Q   And how about the volume, what was the amount of stuff it

12  handled?

13  A   Over 25 million units of product annually.  And that could

14  be anywhere from 80,000 units a day to over half a million

15  units a day that would be shipped, and about 40 to 60 trucks

16  in and out a day.

17  Q   Did Microsoft run this facility itself?

18  A   No.  We outsourced that to a company called Arvato.

19  Q   Is that the normal practice for Microsoft's distribution

20  facilities?

21  A   Yes.

22  Q   Are there other Microsoft distribution facilities in other

23  parts of the world?

24  A   There are.

25  Q   As part of your responsibility, do you periodically review

1   the location of these distribution facilities to see if it

2   still makes sense to have them there?

3   A   Yes, I do.

4   Q   And were you involved in doing that for Duren?

5   A   Yes.

6   Q   As of the end of 2011, what was your view regarding the

7   suitability of the Duren location and facility for doing what

8   it was doing?

9   A   That Duren was the most optimal location to service the

10  same region I described earlier, the most cost effective; it

11  was the right size, it had a stable supplier.  It was closest

12  to our -- the most customers that we would service, close

13  enough to a port, and it was cost effective.

14  Q   Did Microsoft move this distribution operation out of

15  Duren in 2012?

16  A   Yes.

17  Q   From where to where?

18  A   From Duren, Germany to Venray, Netherlands.

19  Q   Would you please explain the events that triggered

20  considering the relocation out of Germany?

21          MR. PRICE:  I object.  That calls for a narrative.

22          THE COURT:  Let's try and make it down, counsel.

23  By Mr. Harrigan:

24  Q   When did this possibility arise?

25  A   It was early to mid-January of 2012.

```
 1   Q     What happened?

 2   A     I was pulled into a meeting with -- my boss and I -- Owen

 3   Roberts, my boss at the time, as well as myself, were pulled

 4   into a meeting with our legal team, in particular Sean

 5   McKinley, and advised of a patent dispute between Microsoft

 6   and Motorola that had to do with video compression

 7   technology, and that it affected Xbox and Windows products.

 8   Q     What was the situation that affected Xbox and Windows

 9   products?  What did they tell you might happen?

10   A     Well, there was a potential injunction whereby we would

11   not be able to sell or ship, in my case, products within

12   Germany or outside of Germany, and that could go into effect

13   as early as March 30th, 2012.

14   Q     And what did you understand regarding - assuming the

15   injunction was issued - how fast it would stop you from

16   functioning?

17   A     My understanding is it would be immediate and business

18   would halt.

19   Q     And if that happened, what would be the impact to

20   customers and shipping?

21   A     Since we were shipping product to retailers and

22   distributors, the shelves would go dry, empty of Microsoft

23   products, and it would affect their revenue as well.  And

24   they relied on our products to drive their business, as well

25   as Microsoft's business.
```

1    Q    Did you have another spot available where you could switch

2    over and start shipping if that injunction came about?

3    A    No, there was no other suitable site that existed.  In

4    fact, I considered one of our locations in the UK that could

5    be a potential band-aid for maybe a week or two.  But it

6    definitely was not a suitable site.

7    Q    Please tell the jury then what the alternatives were that

8    you looked at in order to avoid this problem?

9    A    There were a few.  One was do nothing.  That was a

10   nonstarter, because the risk of disrupting supply to our

11   customers far outweighed anything else.  There was a need to

12   act.  Two, we looked at potentially converting the

13   existing -- or another location within Germany to what is

14   called a bonded warehouse facility.  And then the third was

15   to move outside of Germany.

16   Q    Would you explain what you understood a bonded warehouse

17   was and why it might have solved the problem?

18   A    Bonded warehouse, I think in the most practical terms

19   would mean that --  It would be a legal and tax structure

20   that we would have to file with the government.  And what

21   that would mean is product could physically land in Germany,

22   but it technically or legally would not be considered

23   imported into Germany or on German soil.  That's essentially

24   what a bonded warehouse would mean.

25   Q    Did you investigate that, and if so, what did you

1    determine?

2    A    Yes.  We investigated it and ruled it out for primarily

3    two reasons.  One was timing.  The more I investigated it,

4    and the team investigated it, the more clear it became that

5    it would take definitely more than six months; a lot more

6    likely, more than twelve months to complete.  Two, the risk

7    associated with it due to the complexity.  Given that we do

8    millions of transactions a year, basically all of those sales

9    activities, inbound receiving of products and sales

10   activities, would have a manual transaction associated with

11   those.  A manual transaction on top of the millions of

12   transactions we already do, each would have a margin of error

13   associated with that.  And my understanding was that we

14   needed to comply with -- if there was an injunction, we would

15   need to comply 100 percent with it, and a scenario that meant

16   risk with compliance was a nonstarter as well.  So we ruled

17   that out.

18   Q    Okay.  So I guess that left you with number three, which

19   was relocating.

20   A    Yes.

21   Q    Once you focused on that alternative, how did you go about

22   deciding where?

23   A    Once isolating that as the most logical option, then it

24   was a matter of finding the next best alternative to Germany.

25   We looked at countries that basically surrounded Germany.  We

1  looked at northern France, Belgium, Luxembourg, Holland,

2  Czech Republic, obviously the Netherlands.  And within each

3  of those countries we also looked at what could be suitable

4  sites.  What I meant by a suitable site, would be, A, it

5  could be ready on time, because the timeline was actually

6  right up at the top of the list as far as what we needed to

7  hit.  B, could it actually accommodate our business, meaning

8  it had the size, scale and capacity to do it.  And, C, there

9  were other factors to consider like tax implications, labor

10  unrest possibilities, the costs associated with them to the

11  degree we could actually analyze the costs.  Those would be

12  all of the things that we would consider.

13  Q   Would you just give the jury a brief description of the

14  resources that you brought to bear in the course of making

15  the decision about the location you were going to choose?

16  A   Fairly substantials resources.  Actually, it stretched

17  across our company, a few groups.  Trade was one, because we

18  needed to be compliant with what other trade rules would be

19  for import and export with any other country's product

20  classifications and such.

21     Finance was another team that we brought in to evaluate

22  it, because there would be tax and financial implications.

23     We flew in resources from around the globe to support the

24  site selection.  Obviously myself, my direct manager as well,

25  and then pulled in people from Dublin.  Also extended that to

1    include two suppliers in the site evaluation process.  One

2    was Arvato, who had -- we considered the incumbent that ran

3    Duren --

4    Q    They were the ones running the Duren facility?

5    A    Yes.  Two, was CEVA, who was someone we wanted to

6    introduce as competition in the bidding process.  So we

7    pulled them in as well to help with the effort.

8    Q    That went by a little fast.  The competition in the

9    bidding process, in other words, I take it you were trying to

10   decide who was going to operate this Venray facility,

11   correct?

12   A    Yes, that would be part of the process.

13   Q    Why did you want competition?

14   A    It is important to have competition because --  We had

15   been running Duren with Arvato for many, many years, since

16   2001 actually, so over ten years.  They knew our business

17   quite well and were confident that it could go nowhere else.

18   We were worried that those bids could come in substantially

19   higher than would be palatable for our business.  So we

20   wanted to introduce competition in the process, and at a

21   minimum have a benchmark for what costs could be or should

22   be, at a maximum an alternative to Arvato.

23   Q    Was all this effort you just described done in sort of a

24   business-as-usual fashion?

25   A    Absolutely not.  There was a very rushed process.

Q     Why did you choose Venray?

A     Chose Venray, A -- one of the primary reasons we actually chose Venray was because it could be ready on time.  When I say "it could be ready on time," A, it was within the size range -- from a size standpoint it was almost identical to the size of Duren as a building.  Number two, the landlord was also the developer.  So any construction that needed to be done on that site, since he was a developer, could accelerate that process through permitting and the actual construction, much of which he would do himself.  And then, C, for economic reasons.  For the customers it was the next-best site -- or country to Duren, Germany.

Q     Without going into great detail, would you give the jury an idea of what physical changes were needed at Venray to get it ready for Microsoft to be able to use it?

A     We needed -- we had to put up fencing, we had to pour foundation, work both inside and outside of the warehouse. There was a shell of a warehouse, which I think it was like three or four buildings kind of put together.  Some of those buildings required foundations poured on the inside so that we could put racking on top of that.  We had to run electrical, we had to run security systems throughout that building, employee parking lot, entrances, put up offices. It was a major construction.

Q     And give the jury an idea of what you had to do in order

1    to get it ready to operate, as opposed to the physical

2    changes?

3    A    To get it ready to operate, one was selecting who was

4    going to run it.  Two was giving them the authorization to go

5    spend the money to buy equipment, get the construction done,

6    sign the lease, start hiring people, so that once we were

7    ready to turn on the lights and start running the building

8    that there were actually people that had training and knew

9    somewhat what to do, so the building could actually start

10   operating, as well as all of the construction supporting

11   activity.  The other thing was developing a plan so that that

12   transition would be as transparent as possible to our

13   customers.  There were a number of things involved with

14   making that work.

15   Q    Thank you.  Have you ever been involved in moving a

16   distribution facility of this size before in your career?

17   A    Oh, yes.

18   Q    So what was the timeframe for that operation?

19   A    It is pretty common for an operation of that size, that

20   involves supplier selection as well, to go anywhere from 12

21   to 18 months in duration.

22   Q    And what was the approximate timeframe here in which you

23   accomplished the same -- more or less the same thing?

24   A    From the point we decided to award the business to the

25   point we went live, 47 days.

1   Q    And who was chosen to operate the new Venray facility?

2   A    CEVA.

3   Q    And did Arvato still have some role there?

4   A    Oh, yes, Arvato still ran our warehouse in the UK.  Arvato

5   still runs our freight management throughout Europe.  They

6   also run a Dubai warehouse, a small operation there.  And

7   then they do --  CEVA would essentially hook up

8   systematically with Arvato so that they could transact.  So

9   basically Arvato still supports many of the system activities

10  in Venray.

11  Q    Were you and the other people in your organization at

12  Microsoft doing anything else during this timeframe?

13  A    We were doing a lot of other things, yes.

14  Q    So was this a convenient time to decide to move a

15  warehouse?

16  A    This was the absolute worst time on our organization.

17  Q    Let's talk about --  I would like to switch now over to

18  what the costs were -- the nature of the costs.  We will have

19  another witness talk about the amounts.  But I would like you

20  to explain to the jury what the nature of the costs were that

21  incurred in connection with the relocation.  Could you

22  identify - you should have an exhibit there - 6024, and tell

23  us just what that exhibit is?

24  A    Yes.

25  Q    Don't go into any detail.  Just tell us --

1  A    6024 is a contract between Microsoft and CEVA.

2  Q    For the Venray facility?

3  A    For the Venray facility.

4         MR. HARRIGAN:  We will offer 6024.

5         MR. PRICE:  No objection.

6         THE COURT:  6024 is admitted and may be published.

7         (6024 admitted.)

8  By Mr. Harrigan:

9  Q    What was the subject that this agreement dealt with?

10  A    The running of the operations of Venray; also, the

11  one-time costs that we incurred associated with the move and

12  the ramp-up of that site.

13  Q    And could you turn to the page --  Let's put up a page of

14  this as the next slide.  This is Section 3.1 of that

15  agreement?

16  A    Correct.

17  Q    And would you just explain what this deals with?

18  A    Yes.  This deals with a one-time lump-sum fee that we paid

19  to CEVA for the start-up and ramp -- what I call "ramp,"

20  meaning going from zero to a productive state.  Of the

21  operation in Venray, it covered everything from developing a

22  warehouse management system so the operation could run, to

23  hiring people, doing the training, to some of the

24  construction activity that would roll into the lease,

25  starting to get engineering work on the material handling

1   equipment, and then subsequently all of the orders and

2   purchasing of that activity.

3   Q    And what was the financial arrangement for that work?

4   A    It cost €7.6 million.  That was a one-time fee.

5   Q    A one-time fee?

6   A    Yes.

7   Q    And did Microsoft pay that?

8   A    Yes.

9   Q    We have another demonstrative.  Did you prepare a list of

10  the one-time expenses that were incurred in connection with

11  the move?

12  A    Yes.

13  Q    Would you put up the next slide, please.  This is a

14  demonstrative.

15           THE COURT:  Have you seen this before?

16           MR. PRICE:  I have been shown it.  It is fine.  It is

17  not evidence.

18           THE COURT:  Ladies and gentlemen, once again, a

19  demonstrative.  It is a chart or summary of testimony you are

20  going to hear.  It is no better or worse than the testimony

21  you hear in terms of your acceptance of that.

22  By Mr. Harrigan:

23  Q    The heading here is, "One time moving/start-up expense

24  categories."  Is that in fact what is on here?

25  A    That covers one-time move and start up, yes.

1  Q   And number one, is that the same €7.6 million item that we

2  just looked at?

3  A   Yes, it is.

4  Q   Would you briefly explain to the jury what the other seven

5  items are, 2 through 8, on this list of one-time moving and

6  start-up expenses.

7  A   Yes.  Number two, the exit and termination of --  That was

8  a fee paid to Arvato for terminating the operation in Duren,

9  Germany.  I think that was €500,000.  Number three was --

10  there was --

11  Q   Let me interrupt you.  So there was a termination fee paid

12  to Arvato for terminating the German contract?

13  A   Yes.

14  Q   Go ahead.

15  A   Number three, in June there was some duplicate warehouse

16  costs, in other words, some bleed-over or layover left in the

17  German warehouse that we needed to pay some duplicate rent

18  on.

19  Q   You had to pay duplicate rent?

20  A   Yes.

21  Q   Meaning?

22  A   Meaning we had Venray up and running in June, and we also

23  had Duren -- had some small amount of products still left to

24  be moved.  And so that was a rent associated with that.

25  Q   So you paid June rent in two places?

1   A   Yes.

2   Q   Go ahead.

3   A   Number four, we had to move approximately 20 to 22,000

4   pallets of product.  And so number four is actually the cost

5   of the trucks to move them from one site to the other.

6   Number five was the cost in the Duren, Germany location to

7   pull product off the shelves and load them into the trucks,

8   the 20 to 22,000 pallets.  Number six, as I described

9   earlier, we had heavy evaluation of multiple countries and

10  sites that we needed to pull our tax and finance and trade

11  teams into.  And so there was some consulting costs.  There

12  was also some costs associated with setting up a new plant

13  systematically, data maintenance and things like that.

14  Number seven were the costs we paid to Arvato for integrating

15  with -- integrating systems with CEVA so they can transact,

16  as well as some of the costs associated with Microsoft

17  receiving feeds from them systematically.  Number eight, we

18  were moving 20 to 22,000 pallets of product that was high

19  value, and so we added security to those moves to prevent

20  theft.

21  Q   So these were all just one-time costs of making the move?

22  A   One-time costs for making the move, yes.

23  Q   And then were there also differences in the operating

24  costs as between the German facility and the new Venray

25  facility?

1    A    Yes, there were.

2    Q    And have you -- could you identify Exhibit 6024?

3    A    Yes.  6024 is the contract that covers those operating

4    expenses as well.

5            MR. HARRIGAN:  We will offer 6024.

6            MR. PRICE:  No objection.

7            THE COURT:  6024 is admitted and may be published.

8            (6024 admitted.)

9    By Mr. Harrigan:

10   Q    Are there two kinds of operating costs?

11   A    Yes.

12   Q    Would you explain what they are?

13   A    One is -- it is called fixed expenses.  Those are expenses

14   like rent that don't vary much month to month.  Two is

15   variable transaction fees.  Those are fees that could change

16   depending on volume and the type of handling unit being

17   touched, so to speak.  For example, if you are shipping a

18   product on a pallet, that's one cost.  If you are shipping --

19   if you are taking product off a box that is on a pallet, that

20   would be another type of cost.  That would be a different

21   unit of measure.  And so each of those activities would have

22   a different fee associated with them.

23   Q    And are those operating costs with respect to Venray

24   covered in Exhibit 6024?

25   A    Yes, they are.

1  Q   And then did you also have -- had you had a contract with

2  Arvato for the German facility that also dealt with operating

3  costs?

4  A   Yes.

5  Q   Could you identify Exhibit 6445?

6  A   6445 is the contract we had in place with Arvato that

7  covered the fees in the Duren location.

8         MR. HARRIGAN:  We will offer 6445.

9         MR. PRICE:  No objection.

10        THE COURT:  6445 is admitted and may be published.

11        (6445 admitted.)

12  By Mr. Harrigan:

13  Q   And last but not least, did you also have a contract with

14  Arvato with respect to the part of the Venray operation that

15  they would be doing?

16  A   Yes.

17  Q   And could you identify Exhibit 6394?

18  A   6394 is the contract and pricing that covers those

19  expenses as well.

20  Q   So that's the continuing distribution work that Arvato

21  did.  The same company that had done all of the German

22  facility was doing the distribution part of the Venray

23  facility, right?

24  A   Yes.  This covers the UK, the systems work they do in

25  Venray, as well as freight management in Dubai.

1  Q   Before this issue with regard to the German injunction on

2  the video patents came up, had you been planning to move the

3  Duren facility?

4  A   No.

5           MR. HARRIGAN:  No further questions.

6                      CROSS-EXAMINATION

7  By Mr. Price:

8  Q   Good morning, Mr. Davidson.

9  A   Good morning.

10  Q   First, let me ask you, was David Treadwell involved in the

11  decision to move the German facility?

12  A   No, not to my knowledge.

13  Q   Let me ask you then about that move and the timing of it.

14  I am going to put up a demonstrative.  It is slide 30.  We

15  will hand them out.  This was used in opening.  It is not

16  evidence.  Maybe I can get some of this into evidence.

17          Let me ask you whether or not you have knowledge of

18  whether or not Motorola filed a patent infringement lawsuit

19  in Germany on July 6th and July 7th, 2001?  Do you know if

20  that is accurate or not?

21  A   I do not.

22  Q   Have you heard anyone talk about the timing of the filing

23  of the lawsuit?

24  A   No.

25  Q   You did testify, though, that you first considered -- you

1  did, moving out of Germany in January 2012, correct?

2  A    Yes.

3  Q    Assuming that the lawsuit was filed July 6th or 7th, 2011,

4  do you have any knowledge as to why Microsoft's attorneys

5  would wait for six months before coming to you and

6  Mr. Roberts and talking about legal issues?

7  A    No.

8  Q    You decided to move out of Germany, you said, in

9  March 2012?

10  A    That would have been the final decision, yes.

11  Q    And before that, in February of 2012, Microsoft had told

12  Arvato that it would be terminating its services, correct?

13  A    Correct.  Arvato requested formal notification in February

14  when they were alerted to the injunction -- the possibility

15  of an injunction as well.

16  Q    Did you have any knowledge as to why it took --  Let me

17  rephrase that.  You mentioned that this move took place at a

18  bad time for you, right?

19  A    A very bad time.

20  Q    It would have been a better time if it had been July 6th

21  or 7th, 2011?

22  A    There wouldn't ever --  I can't actually comment on

23  whether or not that would have been a better time or not.

24  Q    So they are all bad times?

25  A    They are all bad times.  A move of this size --  I mean,

1  the facility was basically -- a practical description would

2  be the size of seven or eight football fields.  And so moving

3  a facility of that size, there was never a good time to do

4  it.  It is not something to take lightly.

5  Q  Always difficult.  When you are rushed, though, costs are

6  higher, correct?

7  A  Perhaps.

8  Q  Is it accurate to say in this case it probably would have

9  cost less to move the facilities if it were stretched over a

10  longer period of time, a few more months, perhaps?  You agree

11  that probably would have cost less?

12  A  Perhaps.  There are areas that we might have spent more on

13  to make it more transparent to our customers.  There are

14  areas we would have saved costs on, yes.

15  Q  Not perhaps, you probably would have saved costs if you

16  had more time?

17  A  Yes, in some areas.

18  Q  Now, I want to talk to you just a second about the

19  conversation that you had with Mr. Roberts, and you said the

20  legal team in January.  Okay?

21  A  Yes.

22  Q  I want you to focus on that.  Ms. McKinley was part of

23  that legal team, correct?

24  A  Yes.

25  Q  Is it true that one of the things she talked about was

1    about the wisdom of having your global logistics tied up in

2    Germany because of things that might happen in the future?

3    A    Can you repeat that, please?

4    Q    Sure.  Did she talk to you about the wisdom of having your

5    global logistics tied up in Germany?  We will start there.

6    A    No.

7    Q    Well, did she say that one of the problems of having a

8    facility in Germany was that there could be future cases

9    filed in Germany against Microsoft, and that injunctions were

10   readily granted in Germany?

11   A    I don't recall that, no.

12   Q    Do you recall her saying that because injunctions are

13   frequent in patent infringement cases in Germany, if you are

14   looking to the future you would perhaps want to move out of

15   Germany because it is just a bad location?

16   A    No.

17   Q    And if someone had told you that you happened to be

18   located in a country where 72 percent of the patent cases are

19   filed, and that the process is quick, and that they

20   frequently grant injunctions, and that could affect

21   Microsoft's products, would that cause to you think about

22   whether or not it was wise to be in Germany?

23             MR. HARRIGAN:  Objection.  Calls for speculation.

24             THE COURT:  I will overrule the objection.

25             THE WITNESS:  Can you repeat the question?

By Mr. Price:

Q   Oh, gosh.  I wish I had a transcript.  If you had been told that -- you are located in Germany, and two-thirds of the patent lawsuits were filed in Germany, and that under the German legal system it is a very quick, efficient system, and injunctions are often issued against products, and that there would likely be future cases against Microsoft by other companies, if you had been told that, would that have troubled you.

A   If I had been told that?  Yes, it would have troubled me.

Q   And why would it trouble you if you had been told because of the location, Germany, and because of the German legal system and all of these patent suits being filed there and the injunctions, why would that trouble you?

A   For the same reasons we would consider making the move from Germany, the risk of the business being disrupted out of the only location that would support all of mainland Europe, Russia, Middle East and Africa.

Q   Now, concerning Arvato, you did think Arvato in Germany was charging too much, right?

A   I always think our suppliers -- we always want to optimize costs with suppliers.  I will always talk that way.

Q   Well, even under oath you talked that way.  You said they cost too much, correct?

A   I did.

1  Q   And I guess their costs have increased by 300 percent in a

2  short period of time?

3  A   Not in total on our business.  There were parts of our

4  business where they were asking for a 300 percent increase

5  on, the parts of our business that we ultimately moved.

6  Q   When you picked CEVA over Arvato to be the main place to

7  go -- main company to run the facility in the Netherlands,

8  was one of the reasons that CEVA had an open book on costs,

9  that is, they were more transparent on costs?

10 A   It was not the primary reason.  It was a consideration.

11 The primary reason was because they were cheaper.

12 Q   Always a good reason.  Now, let me ask you if you could

13 look quickly at Exhibit 7136?

14 A   7136?

15 Q   Yes.  You see that is an e-mail.  At the top it is from

16 Mr. Roberts to Theresa Daly and you, correct?

17 A   Yes, it is.

18        MR. PRICE:  Your Honor, I would move Exhibit 7136

19 into evidence.

20        MR. HARRIGAN:  It is very tiny print.  I need to look

21 at it first.

22        THE COURT:  It is small print, ladies and gentlemen.

23        MR. HARRIGAN:  I have no objection to the part I can

24 read.

25        THE COURT:  The exhibit is admitted and may be

1    published.

2            (7136 admitted.)

3    By Mr. Price:

4    Q   Let me see if I can make it --

5            THE COURT:   Mr. Price, you have the ability to --

6    By Mr. Price:

7    Q   Let's go to the top first.  This is June 12th, 2002, from

8    Mr. Roberts.  He is your boss?

9    A   Yes.

10   Q   And could you tell us who Theresa Daly is?

11   A   Theresa Daly was the general manager of our European

12   operations.

13   Q   This is an e-mail chain that your boss was involved in,

14   correct?  I mean, obviously he looked at the e-mail below

15   this, because sent an e-mail saying thanks for sending it,

16   right?

17   A   Yes.

18   Q   Let's go down to the bottom then and see if we can blow

19   this up in pieces.  This is Theresa Daly --

20           THE COURT:   Counsel, why don't we take a smaller

21   chunk and blow it up a little bigger?

22           MR. PRICE:   We will try.

23   By Mr. Price:

24   Q   This is Theresa Daly.  That is to a number of leadership

25   teams.  Are you copied on this?

1   A    I am not -- I am not on that original mail in any of those

2   distribution groups -- distribution lists.

3   Q    These are large lists?

4   A    These are large lists, relatively large.  They are going

5   to our sales and marketing team.

6   Q    But you got it when your boss sent it and said thanks for

7   sending it?

8   A    Yes.

9   Q    Let's see if we can blow up --

10  A    Correction.  I got it when Theresa sent it to me.

11  Q    That is right above that where it says "FYI" and something

12  else?

13  A    Yes.

14  Q    Is that a yes?

15  A    Yes.

16  Q    And then if we can go down to the bottom of Ms. Daly's

17  e-mail, and see if we can look at the first sentence --

18  Let's try that again.  "Hi everyone.  As a follow-up to my

19  e-mail below, I wanted to share with you an update on the

20  change to our main distribution center in Europe.  Per my

21  previous note, we will transition our European distribution

22  center from Germany to the Netherlands."  What I want to

23  focus on is that second paragraph.  It says, "The decision to

24  move our main distribution center in Europe was made with a

25  vision for the future.  To support growth in our business

1    over the years ahead we need to significantly scale our

2    distribution footprint and capabilities in EMEA.  Transition

3    of this scale is not easy, and has taken significant effort

4    and resources to plan and execute.  As with any project of

5    this magnitude, our EMEA distribution and logistics team have

6    worked to ensure a successful transition, plus a seamless

7    impact to our customers.  However, I would ask you to be

8    vigilant to any customer feedback from June 1st and feedback

9    through our EMEA channel operations team."  I think we have a

10   demonstrative on this, if we could put that up.  Ken retyped

11   it.  That's better.

12        When you received this on your computer, was this the

13   size of it?

14   A   I'm --

15   Q   When you received it on your computer, was it this size?

16   A   No.

17   Q   So when you received this it was easy to read?

18   A   I'm sure, yes.

19   Q   And focusing on the, "To support the growth in our

20   business over the years, we need to significantly scale our

21   distribution footprint and capabilities in EMEA."  Attached

22   there is some numbers on that, correct?

23   A   Correct.

24   Q   If we can blow up our demonstrative on that, since we have

25   the exhibit in evidence.  We will show the demonstrative that

1     is legible.

2          What Ms. Daly says in connection with needing more

3     space and the vision for the future is the German facilities

4     is 22,000 square meters, and the new facility is 42,000

5     square meters, correct?

6     A    That's what the e-mail says.  That wasn't correct.

7     Q    It says --  And I will get back to that.  It says the

8     pallet storage space is 21,000 pallet locations versus 40,000

9     pallet locations in the new Netherlands facility, correct?

10    A    Yes.

11    Q    And increased pallets means you can store more products?

12    A    Yes.

13    Q    The production lanes, it says ten dedicated lanes compared

14    to 20 dedicated lanes.  Do you see that?

15    A    Yes.

16    Q    And that equates to being able to move more products out,

17    correct?

18    A    Yes.

19    Q    And then it says, "Loading bays/doors."  It went from 14

20    bays to 38 bays, and then, again, equates to being able to

21    move out more products, correct?

22    A    Correct.

23    Q    And you said in response when I asked you about these

24    figures, that it is not accurate, correct?

25    A    Correct.

1  Q   And you previously testified to the same thing in your

2  deposition, that these figures are not accurate, correct?

3  A   Yes.

4  Q   In fact, you testified that you had never discussed or

5  reviewed this e-mail, correct?

6  A   Either myself or somebody from my team probably did, yes.

7  Q   But I'm saying --

8  A   I don't recall seeing it at the time.

9  Q   When you testified under oath earlier in this case you

10  denied ever seeing this, correct?

11  A   I don't recall, honestly.

12  Q   Your Honor, if we can just play from Volume I, July 16 --

13  May 9, 2013, 150, Line 22 to 151, Line 1.

14          THE COURT:  Mr. Harrigan, are you going to respond?

15          MR. PRICE:  It is 150, Line 22 to 151, Line 1.

16          MR. HARRIGAN:  No objection.

17          THE COURT:  You may do so.

18  "Q.  Did you discuss this particular e-mail with Ms. Daly

19  before it was sent?

20  A   No.

21  Q   Did you review it --

22  A   I don't believe so."

23  By Mr. Price:

24  Q   In fact, you discussed it with Ms. Daly and you actually

25  sent her those figures -- those very figures that she

1  published?

2  A   I'm certain somebody on my team did, yes.

3  Q   If she said you did, you wouldn't have any reason to deny

4  that, would you?

5  A   As I said in my deposition there, I didn't believe I saw

6  it, but I'm certain that somebody on my team was provided

7  those figures, yes.  Those would only come from me or my

8  team.  Theresa wouldn't make that up.

9  Q   In addition to the figures that you provided, what also

10  was provided was a bunch of photographs showing the facility,

11  correct?

12  A   Yes.

13          MR. PRICE:  No further questions.

14                    REDIRECT EXAMINATION

15  By Mr. Harrigan:

16  Q   Did the move have -- did the move of the distribution

17  facility have any impact at all on Microsoft's customers or

18  anything they had to do because of it?

19          MR. PRICE:  Object.  Beyond the scope of the cross,

20  your Honor.

21          THE COURT:  I will permit the question.

22          THE WITNESS:  Yeah, our customers had to do plenty of

23  things.  I mean, during the transition it was pretty rocky,

24  and so there were some escalations due to late shipments and

25  things like that.  In preparation for the move they needed to

1    make changes in their systems as well, things like

2    replenishment lead time, so that they would trigger an order

3    at the right time because the lead time from Duren would be

4    different from the lead time from Venray.  So they needed to

5    make changes in their systems to account for lead time

6    changes.

7    By Mr. Harrigan:

8    Q    Did Ms. Daly have anything to do with customer relations?

9    A    Yes.

10   Q    And so in this e-mail she is pointing out some benefits,

11   or what she believes to be benefits, of the new facility?

12   A    Yes.

13   Q    One of those relates --  There was the discussion that we

14   just heard about increase in pallets, and there was also a

15   discussion about the increase in size.  Please explain to the

16   jury to what extent either of those was actually an advantage

17   from the standpoint of a distribution manager.

18   A    Well, I mean from a distribution perspective, it provided

19   more capacity.  Yeah, it basically would provide more

20   capacity.

21   Q    And was the capacity at Duren adequate?

22   A    The capacity at Duren was adequate.  I mean, Duren was

23   what we called a shared location.  So the two facilities,

24   Duren and Venray, were very comparable in size as far as

25   overall square footage.  The number of doors would be -- the

1   Netherlands would be 38 or 40, and the Duren location

2   actually would have been 32, as an example.  Now, within that

3   facility it was shared and we occupied a portion of that

4   facility.  We were allocated somewhere around 31,000 square

5   meters, up to 25,000 pallets, and we would flex to 35,000.

6   So within the facility we could scale, absolutely, to a level

7   that we can scale today in Venray.

8   Q   So from the scaling potential, how do they compare?

9   A   Pretty much identical.

10  Q   How do you know this table in the e-mail is not correct?

11  A   Well, I think actually the heading on the current German

12  facility is simply wrong.  That would be probably more

13  representative of what we would have been using at the

14  time -- actually using at the time, meaning our business.

15  Sometimes it is what I call high tide, where the volume is

16  increased because of a particular season, and sometimes it is

17  lower.  Business is pretty seasonal.  And so this would have

18  been a low tide in the business.  So that would probably

19  represent what we were using about that time.

20  Q   So it appears to you to be utilization rather than

21  absolute size?

22  A   Yes.

23  Q   What is the size of the Duren facility today?

24  A   The Duren facility has actually been built out and

25  expanded to roughly 700-, 750,000 square feet today.

```
 1            MR. HARRIGAN:  No further questions.

 2            MR. PRICE:  I don't have the time to spend it with

 3   this witness.  I would love to.  Thank you.

 4            THE COURT:  You just need to say you don't have any

 5   questions.

 6            MR. PRICE:  I don't have any questions.  Thank you.

 7            THE COURT:  You may step down, sir.  Does Microsoft

 8   have another witness?

 9            MS. ROBBINS:  Your Honor, our next witness would be

10   Brian Blasius by deposition.

11            THE COURT:  All right.

12            MS. ROBBINS:  We have a video prepared.

13            THE COURT:  It will be by deposition read or --

14            MS. ROBBINS:  Deposition video.  The total time is

15   approximately 20 minutes for both sides' designations.

16            THE COURT:  Does someone have the transcript that

17   they can give me?  Ladies and gentlemen, we are probably not

18   going to get to start this before lunch.  But remember when

19   we were talking yesterday, we had a woman come in and pretend

20   to be someone and read the answers.  There is another

21   alternative in these depositions.  That alternative is to

22   videotape it.  And there are rules about the camera can only

23   be on one person and it can't be a Hollywood production.  It

24   is a way for you, as you have seen from some of the other

25   snippets that have been played, to present the testimony of
```

1    the deposition.  So it is the same thing, questions and

2    answers, but you will see a videotape of it.  And that's what

3    we are going to get when we get back from lunch.  Apparently

4    it will be about 20 minutes long.  I will give you an

5    additional two minutes for lunch.

6        I haven't read this for a while.  And so before you go:

7    Remember, until the trial is over do not discuss the this

8    case with anyone, including your fellow jurors, members of

9    your family, people involved in the trial or anyone else, and

10   don't allow anyone to discuss the case with you.  This

11   includes discussing the case in internet chat rooms or

12   through internet blogs, internet bulletin boards, e-mails or

13   text messaging.  If anyone tries to communicate with you

14   about the case, please let me know about it immediately.  Do

15   not read, watch or listen to any news reports or other

16   accounts.  Don't do any research, such as consulting

17   dictionaries, searching the internet or using other reference

18   materials.  And, finally, keep an open mind until all of the

19   evidence has been presented and you have heard the arguments

20   of counsel, my instructions of the law and the views of your

21   fellow jurors.

22       To make that even more palatable, we are going to quit

23   today at 4:00, as opposed to 4:30.  The reason is that I am

24   going to be meeting with the lawyers in what we call an

25   informal instructions conference.  We are going to talk about

1    the jury instructions that the court has drafted.  I am going

2    to get their wisdom as to what I got right and what I got

3    wrong.  So that I don't keep the court staff forever, we will

4    do that at 4:00 as opposed to starting at 4:30.  That means

5    can you go home at 4:00.  You can plan accordingly if you

6    need to make any phone calls or whatever at lunch.

7         Ladies and gentlemen, please, rise for the jury.  We will

8    be in recess until 1:30.

9                      (The proceedings recessed.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                    AFTERNOON SESSION

3        THE COURT:  I'm not sure who signed this on behalf of

4   Motorola, I think it's Ms. Sullivan and Mr. Palumbo.  I've

5   looked at your proposed limiting instruction and I am

6   prepared to give it with the following change, which is:  I

7   believe it to be an accurate statement when it says,

8   "Yesterday you heard that in connection with the RIM

9   settlement, RIM and Motorola had filed various lawsuits

10  against each other, and in one suit RIM alleged that Motorola

11  breached its RAND obligations."  I'm not sure we need to give

12  them the cites.  "Allegations in a lawsuit are not proof of

13  the truth of the matter alleged."  I'm not going to give the

14  next sentence which is, "There is no evidence in this case

15  and you cannot infer such a breach from RIM's allegations."

16  One, it's not the court's role in this to decide that there

17  is no evidence in this case.  And secondly, I'm not going to

18  preempt the jury or tell them that they can infer something

19  or not infer something.  So that will be the court's ruling

20  on that.

21        MS. SULLIVAN:  Thank you, Your Honor.

22        THE COURT:  All right.  Let's bring the jury in and

23  we're going to --

24        MR. HARRIGAN:  Your Honor, just two quick ones -- I

25  think quick -- if I may.  First of all, I forgot to offer

 1    6394, the last exhibit with Mr. Davidson.

 2            MR. PRICE:  No objection.

 3            THE COURT:  6394 is admitted.

 4        (Exhibit No. 6394 was admitted into evidence.)

 5            MR. HARRIGAN:  And then I just wanted to advise the

 6    court that we are planning to defer our FTC witness pending

 7    the court's ruling on the matter that was the subject of the

 8    briefs filed earlier today.  And if the FTC -- the letter to

 9    the FTC does not come into evidence, then we think that issue

10    will become moot, at least as the record currently stands,

11    although we don't know what else Motorola may do that would

12    raise that question.

13      So we're going to defer the witness.

14            THE COURT:  I will tell you, if I understand what

15    Mr. Price did this morning, he didn't ask Mr. Gutierrez about

16    the letter.  And therefore right now I don't think the FTC is

17    relevant to this trial.

18            MR. PRICE:  Your Honor, I didn't, because Mr. Heiner

19    will come in, and he actually wrote the letter, or signed it.

20            THE COURT:  Okay.  So it just got postponed.

21            MR. PRICE:  And if Microsoft does not call him, we

22    are putting them on notice now that we want to call him

23    tomorrow, if they rest their case.

24            MR. HARRIGAN:  Basically, Your Honor, all we're

25    saying is if the letter that Mr. Heiner wrote is not coming

1    in, then we believe this issue will be moot.  If it is, then

2    the issue is not moot.

3            THE COURT:  All right.

4            MR. PRICE:  The issue is not moot, Your Honor.

5            MR. CANNON:  Your Honor, the next live witness will

6    be Dr. Murphy.  And so we had one small objection to one of

7    the demonstratives.  I'm not sure if you want to take that up

8    now or after the deposition is played.

9            THE COURT:  Yes, please do.

10           MR. CANNON:  May I approach?

11           THE COURT:  Yes.  Is this Dr. Murphy the Irishman

12   from the last trial?  The person who refers to Judge Posner

13   by his first name?

14           MR. CANNON:  Well, he says he's Irish, but --

15           THE COURT:  Go ahead, Mr. Cannon.

16           MR. CANNON:  So, Your Honor, Professor Murphy wants

17   to use as demonstrative a section of this court's preliminary

18   Jury Instruction No. 2 and label it as such.  And, Your

19   Honor, I think this gives too much weight to one portion of

20   the court's preliminary instruction which the court read in

21   its entirety to the jury and then did not give to the jury to

22   take back with them.  And the court will prepare and read

23   final instructions when this case is done, and I think those

24   final instructions will be the legal standard against which

25   the jury will weigh the evidence.

1        And, in addition, this preliminary instruction is not in

2   his report because it didn't exist at the time of his report.

3   So we've reached agreement on the other demonstrative, but

4   this one, Your Honor, we think it should not go up.

5        THE COURT:  Who has looked at the findings and

6   conclusions with such a fine eye that they can tell me if

7   that's a direct quote out of the findings and conclusions?

8        MR. HARRIGAN:  I believe it is not, Your Honor.  I

9   actually just closed the document where I had your findings.

10   But I don't think the preliminary instruction is a quote.

11        THE COURT:  I'm going to allow the testimony.  I'm

12   not going to allow the demonstrative.  It seems to me that it

13   does suggest that -- it was used as a preliminary jury

14   instruction, but we tried to keep in mind that it's all of

15   the evidence that they're going to hear, and I think that

16   calls it out a bit too much.  But the underlying testimony,

17   that's fine.  Mr. Cannon, anything else?

18        MR. CANNON:  Nothing Your Honor.  Thank you.

19        THE COURT:  Let's bring the jury in.

20     (The following occurred in the presence of the jury.)

21        THE COURT:  Microsoft will call its next witness.

22        MS. ROBBINS:  Microsoft calls Brian Blasius by

23   deposition.

24        THE COURT:  Thank you.

25     (The following are excerpts from a video deposition.)

BRIAN BLASIUS

Having been sworn under oath, testified as follows:

EXAMINATION

BY MR. PRITIKIN:

Q   Good morning, Mr. Blasius.  Could you please state your name for the record?

A   Brian Blasius.

Q   By whom are you currently employed?

A   Google.

Q   And what's your position at Google?

A   Patent licensing manager.

Q   I'm going to hand you what has been marked as Blasius Deposition Exhibits 1 and 2.  If you could take a look at those, please.  You see Exhibit 1 is a Rule 3(b)(6) notice of deposition of Motorola?

A   Yes.

Q   And if you would turn to the deposition topics on the last page.  Are you testifying today as a corporate representative of Motorola with respect to the two topics listed there?

A   Yes.

Q   Could you turn to Exhibit 2?  And do you see that these are Motorola Mobility's Second Supplemental Responses to Plaintiff Microsoft's First Set of Interrogatories Nos. 1, 2 and 4?

A   Yes.

1  Q   And if you turn back to the deposition topics, Topic 2, do

2  you see that it references:  Offers made to and negotiations,

3  discussions, and licenses with the parties identified in this

4  document that has been marked as Exhibit 2?

5  A   Yes.

6  Q   And are you prepared to testify about these offers,

7  negotiations, discussions, and licenses?

8  A   Yes.

9  Q   Did you talk to Kirk Dailey?

10 A   I did briefly talk with Kirk Dailey, yes.

11 Q   About the subject of the 30(b)(6) topics?

12 A   Yes.

13 Q   Did there come a time when you became involved in the

14 licensing of patents or other intellectual property?

15 A   Yes.

16 Q   When was that?

17 A   2007.

18 Q   Have your responsibilities changed since 2007?

19 A   I've taken on additional licensing responsibilities within

20 the organization, but, in general, its been since 2007 at a

21 high level generally licensing Motorola's intellectual

22 property, and then that has changed with the movement to

23 Google.

24 Q   Now, let's go back to the fall of 2010.  What was your job

25 title at that time?

1    A    Director of intellectual property licensing.

2    Q    To whom did you report?

3    A    Kirk Dailey.

4    Q    Who determined what royalty rates would be offered to

5    particular prospective licensees?

6    A    The ultimate decision was made by Kirk Dailey.

7    Q    Now, before reaching out to a prospective licensee, did

8    someone in your group or elsewhere at Motorola try to develop

9    an understanding of what the products were, how the

10   technology that required a license was being used in the

11   products?

12   A    It depends on the level of -- it depends on the type of

13   technology.  If, for example, somebody was using a particular

14   standard and a product was compliant with a particular

15   standard, and we had patents that read on that standard, we

16   would enter into negotiations with the particular company if

17   that was on our prioritization list.

18   Q    Did you generally make an attempt to determine how the

19   standard was being used in the product or the importance of

20   the standard to the product?

21   A    No.  We would enter into discussions.  And through the

22   course of those discussions with the particular third party,

23   we may get additional information to help understand what you

24   described.

25   Q    Which portfolio of essential patents have you been

1    involved in licensing?

2    A    The cellular standards which would include GSM, TDMA,

3    CDMA, 3G, various elements of 3G, 4G, as well as 802.11 and

4    H.264.

5    Q    Are those the only ones?

6    A    We also would -- those were the ones that were always the

7    areas of focus in our discussions.

8    Q    And you said a minute ago that the -- your rate for any of

9    them was 2.25 percent?

10   A    Yes.

11   Q    Was an analysis ever done at Motorola to determine whether

12   2.25 percent was the appropriate royalty for each of the

13   portfolios?

14   A    That was the rate that we had set through our licensing

15   history.

16   Q    Well, to your knowledge, did Motorola ever sue someone for

17   infringing its standards-essential patents before making a

18   license offer to them?

19   A    Not that I'm aware of.

20   Q    Did you understand that you were not permitted to demand

21   unreasonably high royalties?

22   A    I understand that from the definition of FRAND that we

23   agreed to license our patents on fair, reasonable, and in a

24   non-discriminatory fashion.

25   Q    And that meant you couldn't ask for unreasonably high

1    royalties, right?

2    A    It's my understanding is -- well, the opposite of

3    reasonable is unreasonable.  So as you -- if you're

4    characterizing it in that way, then the commitment we made

5    that it had to be reasonable and with respect to a RAND

6    principle.

7    Q    Did you think you were allowed to ask for unreasonably

8    high royalties?

9    A    No.

10   Q    Did you take into account, in picking out this

11   2.25 percent, that there were other companies that might also

12   demand 2.25 percent?

13   A    That rate has been negotiated for 20 years with companies

14   that had patents.  And that rate sometimes is less than

15   2.25 percent based off of the negotiation facts.  It's not a

16   take-it-or-leave-it rate.  It's our starting rate.  We enter

17   into those negotiations, and companies enter into

18   cross-licenses, and may trade value each way.  So we

19   understood that there were other patents out there and have

20   never had a problem with that before.

21   Q    But in starting with the 2.25 percent as your royalty for

22   the 802.11 patents, is it correct that you did not take into

23   account the relative strength or weakness of your patents as

24   compared to those of other companies?

25   A    I don't recall that being taken into account.

1    Q    If, in fact, there are 92 companies that have 802.11

2    essential patents and each of them received 2.25 percent, the

3    combined royalty would be 207 percent.  Do you think that is

4    a reasonable royalty to be able to implement 802.11

5    technology?

6    A    Under your hypothetical, you know, situation that you

7    described, it doesn't appear that that would be a viable

8    business plan.  You would pay more royalties than what you

9    actually sold the product for.  That's a hypothetical that

10   I've never heard exist in the marketplace in reality.

11   Q    Now, if each of the 52 companies that filed a Letter of

12   Assurance with respect to the H.264 standards-essential

13   patents obtained a royalty of 2.25 percent of the product

14   price, the total H.264 royalty for all companies would have

15   amounted to 117 percent of the product price, right?

16   A    So, under that hypothetical, again, it's difficult to

17   understand which patents are actually essential and who has

18   what patents and what their rates are.  But under that

19   hypothetical, I haven't done the math, but it seems to add

20   up.

21   Q    And would you consider a total combined royalty of

22   117 percent of the product price to implement H.264 to be

23   reasonable?

24   A    So under that hypothetical, if people were actually paying

25   that amount, I don't -- it doesn't seem like a viable

1    business.  But, again, it's a hypothetical that I don't

2    believe exists in the marketplace.  I've never heard of that

3    actually happening in reality.

4    Q    Have you ever had occasion to look at the royalty rates

5    that are charged by patent pools?

6    A    Yes.

7    Q    And which pools have you had occasion to look at?

8    A    I've seen cellular pools that used to be called the 3GL.

9    It was a 3G patent pool.  I have seen the MPEG LA patent

10   pools for audio and video codecs.  I have seen the 802.11 Via

11   patent pool.  There may have been a few others.  I can't

12   recall right now.

13   Q    Now, were you also aware of the rates charged by the

14   802.11 -- the Via 802.11 pool?

15   A    Yes.

16   Q    And when did you become aware of those?

17   A    I can't recall the exact date, but probably in the 2009,

18   2010 timeframe.

19   Q    And how did it happen that you became aware of the Via

20   802.11 pool rates?

21   A    They were asking if we wanted to become a member of the

22   pool.

23   Q    And did somebody ask you to look into it?

24   A    Yes.

25   Q    Who?

1    A    Kirk Dailey.

2    Q    Did you communicate what the rates were for the Via 802.11

3    pool to Mr. Dailey?

4    A    I'm sure I've had communications with him on that and had

5    made him aware of those rates.

6    Q    Now, do you understand -- what is your understanding as to

7    whether it is consistent with RAND obligations for a patent

8    owner to condition a license to its standards-essential

9    patents on a grant-back of rights to non-standards-essential

10   patents of the licensee?

11   A    So we have not -- you're asking for what my understanding

12   is for the RAND equipment, or RAND?

13   Q    Yes.

14   A    It would depend on a particular IPR policy, but the way we

15   have licensed our standards-essential patents, we have always

16   conditioned the grant-back to the particular standard getting

17   licensed and never required a grant-back to non-essential

18   patents as part of the license.

19   Q    And so take in the case of 802.11 essential patents, you

20   would condition the license on a grant-back of 802.11

21   essential patents but would not condition it on a grant-back

22   of other non-essential patents, correct?

23   A    Correct.

24   Q    And the same would be true of H.264?

25   A    Correct.

1  Q   And is the reason for that, that you believe that

2  requiring a grant-back of non-essential patents is

3  inconsistent with your RAND commitments?

4  A   I don't know if it's inconsistent with the RAND

5  commitment.  It's just been a practice of ours for as long as

6  I can remember.

7            THE COURT:  Does that conclude it?

8            MS. ROBBINS:  Yes, Your Honor, that concludes our

9  portion.  And we'd like to move into evidence trial exhibits

10 6047 and 6048 that were referenced in the designated

11 deposition testimony.

12           MR. CANNON:  No objection.

13           THE COURT:  They are admitted.

14    (Exhibit Nos. 6047 & 6048 was admitted into evidence.)

15           THE COURT:  All right.  Is Microsoft ready to call

16 its next witness?

17           MR. PRITIKIN:  We are, Your Honor.  As our next

18 witness we call Professor Kevin Murphy.

19                         KEVIN MURPHY

20      Having been sworn under oath, testified as follows:

21           THE CLERK:  Take the stand, please.  Will you state

22 your name for the record, please.

23           THE WITNESS:  Kevin M. Murphy.

24           MR. PRITIKIN:  Your Honor, may we approach and hand

25 out some binders?

1          THE COURT:  Yes.

2                      DIRECT EXAMINATION

3   BY MR. PRITIKIN:

4   Q    Professor Murphy, before we get into the substance of your

5   testimony in this case, I'd like to go over your background,

6   briefly.  Are you on the faculty of a university?

7   A    Yes.  I'm a professor at the University of Chicago.

8   Q    And what is your title there, sir?

9   A    I am the George J. Stigler Distinguished Service Professor

10  of Economics in the department of economics and the graduate

11  school, in the Booth school of business.

12  Q    What kinds of classes do you teach?

13  A    I teach Ph.D. level and MBA-level classes in the two

14  departments in microeconomics, labor economics, the economics

15  of public-policy issues, advanced economics, a variety of

16  areas.

17  Q    And, in general, what are your teaching and research

18  focused on?

19  A    In a broad level, I focus on the application of economics

20  to real-world problems, and the integration of the tools of

21  economics and data to understand business and other outcomes.

22  Q    Do any of the classes you teach deal with the economics of

23  intellectual property, like patents?

24  A    Yes, they do.  That comes up in my Ph.D.-level micro

25  class.  It also comes up in my public-policy class, as well

1   as my advanced micro class.  "Micro" means microeconomics.

2   Q   What are your college and graduate degrees and where are

3   they from?

4   A   I have a BA in economics from UCLA, and a Ph.D. in

5   economics from the University of Chicago.

6   Q   Approximately how many articles and books have you

7   published in the field of economics?

8   A   I have somewhere like 65 or 70 articles, and two books.

9   Q   And, in general, what subjects have they touched on?

10   A   Pretty wide area.  I've done a lot of work in labor

11   economics, a lot of work in growth and development.  I've

12   done a fair amount of work in health.  I've done work on

13   environmental economics, intellectual property, just a wide

14   range of areas in economics.

15   Q   Could you take a look at the exhibit binder that you have

16   and turn, please, to 6106.  And can you identify this as a

17   copy of your curriculum vitae?

18   A   Yes, it does appear to be a copy of my curriculum vitae.

19   Q   And is that your resume'?

20   A   Yeah.  That's what we call a resume' in academics.

21        MR. PRITIKIN:  We would move admission of

22   Exhibit 6106, Your Honor.

23        MR. PRICE:  Object.  It's hearsay.

24        THE COURT:  Overruled.

25        (Exhibit No. 6106 was admitted into evidence.)

Q    Have you received any academic or other awards for your work?

A    Yes.  In 1997 I was awarded the John Bates Clark medal, which at the time was awarded every other year to the outstanding American economist under the age of 40.  I wish I was still under the age of 40.  But I'm not.  I also won the Arrow prize for a paper I published in Health Economics, the Garfield prize for a different paper in Health Economics. And I also was awarded a MacArthur Fellowship.

Q    What year was that?

A    Oh, I don't know, about seven or eight years ago, something like that.

Q    What is a MacArthur Fellowship?

A    A MacArthur Fellowship is a fellowship that's given across a wide-range of areas and it gives you five years of support for whatever your endeavor is.  And they're intended for people that have a lot of promise for the work in the areas they're working.

Q    Are they sometimes referred to as "genius grants"?

A    Yeah, sometimes people call them that.  I don't refer to them that way.

Q    Apart from your work at the University of Chicago, do you have any other positions?

A    Yes.  I'm a senior consultant to Charles River and Associates, usually abbreviated CRA, which is a company that

1    specializes in providing economic analysis and economic

2    consulting on legal, regulatory matters.

3    Q    Have you done consulting work in the past for Microsoft?

4    A    Yes, I have.

5    Q    And what types of matters have you consulted on for them,

6    before this case?

7    A    Yeah, generally it's been on antitrust matters.

8    Q    Prior to the various disputes that Microsoft has had with

9    Motorola -- let's put those to one side for a moment -- how

10   many times have you testified in court on behalf of

11   Microsoft?

12   A    Four times, I believe.

13   Q    And were those antitrust cases?

14   A    Yes, they were antitrust cases.

15   Q    Over the last five years, what percentage of your

16   consulting work has been for Microsoft?

17   A    I would say less than ten percent.

18   Q    Now, in the trial that was held in this courtroom last

19   fall to determine the RAND rate, did you testify?

20   A    Yes, I did.

21   Q    And approximately how long have you been working on the

22   RAND issues that are involved in this case?

23   A    For about two years now.

24   Q    How many hours do you think you've spent analyzing those

25   issues?

1   A   Several hundred hours, a couple hundred hours.

2   Q   And prior to this case, what consulting experience have

3   you had involving the economics of intellectual property and

4   patents?

5   A   I've done some patent-valuation work in various consulting

6   matters.  I also do -- I have an ongoing relationship with

7   ASCAP, which is the American Society of Composers, Artists

8   and Producers, that license music works to be used by radio,

9   television, just any place you see a public performance,

10  basically.  So I work with them on their licensing.  I

11  provide economic background and analysis to help them in

12  setting their rates, as well as work with them on any

13  disputes they have with people over those rates.

14  Q   Now, turning to this matter, Professor Murphy, what were

15  you asked to do?

16  A   I was asked to examine Motorola's conduct in this case

17  from an economic perspective, and asked whether that conduct

18  was more consistent with them seeking to license their

19  standards-essential patents on RAND terms or more consistent

20  with an attempt to hold Microsoft up for the value of the

21  standards.

22  Q   And what conduct did you consider?

23  A   I considered a wide-range of their conduct, from the

24  letters they sent out, to their behavior regarding

25  injunctions, to the continuing positions that they took over

1    time.  So it was kind of an analysis that combined all those

2    things together.

3    Q    And I don't want to spend a lot of time on this, but can

4    you tell us, briefly, what kinds of materials you looked at

5    along the way?

6    A    Yeah.  In order to do that, I had to first go back and go

7    through the economic literature and the economic analysis of

8    standards-essential patents, understand standard setting in

9    general, the problems with hold-up and royalty stacking,

10   those kinds of issues.  So understand the economic

11   background.  I also analyzed deposition testimony, documents,

12   went through a number of license agreements.  So, it was kind

13   of put together, both the economic side of things together

14   with facts from the case, to try to do an overall economic

15   analysis of their behavior.

16   Q    What conclusion did you reach?

17   A    I reached the conclusion that their behavior, taken as a

18   whole, was far more consistent with Motorola looking to

19   engage in hold-up, and hold up Microsoft for the value of

20   using the standards, than it was with Motorola attempting to

21   negotiate a license on RAND terms.

22   Q    All right.  Let's start with some of the economic issues

23   that arise in connection with standards and

24   standards-essential patents.  Can you tell the jury, what is

25   an interoperability standard?

1   A    An interoperability standard is a standard that defines

2   the way different pieces of equipment, or equipment and

3   software, work with each other.  Kind of a simple example you

4   could think of that's too simple, but I think it illustrates

5   the point, think about the common plug that you plug an

6   appliance into the wall.  There's a socket that has a

7   particular shape and there's a plug that has a particular

8   form, that fit together so that I can plug a toaster or radio

9   or my computer, whatever, all into the same socket.

10       And, in order to have that happen and work well, we all

11  have to agree on what it is.  You can't have every different

12  piece of equipment have a different plug, because then I'd

13  have to have all these different plugs in my house.

14       And, in fact, the exact shape of the plug doesn't really

15  matter.  What really matters is that we all agree on what the

16  shape is.  So if you have ever traveled to Europe, you'll

17  notice they have a different plug, and all their appliances

18  use those plugs.  So a standard is mostly about agreeing.

19  Now, that's a simple example where it doesn't really matter

20  whether we choose round plugs or square plugs or whatever.

21  We just all have to do the same.

22       So, part of what a standard does is reach that agreement

23  over how we're going to do things, choosing method among many

24  available options, often.

25  Q    Now, are both of the standards that are at issue in this

1   case, 802.11 and H.264, interoperability standards?

2   A   Yes, they are.  Let's just take 802.11.  802.11, I think

3   you and I all know it as WiFi.  It's the standard that

4   governs how my computer or my cell phone, or nowadays my TV,

5   will talk to the wireless network in my house.  But I also

6   want my laptop to be able to connect to the wireless network

7   at the coffee shop if I take it down there.  So that's the

8   element of interoperability we need.  It's like making sure

9   my plug will plug into anybody's outlets.

10  Q   From an economic perspective, are there benefits to the

11  public and to companies in having standards of this type?

12  A   Oh, yes, tremendous benefits in that, again, I can use my

13  laptop and all the other devices with the same network.  I

14  don't have to have a different network for each device.  And

15  I also don't have to have different devices for different

16  places.  I can use the same wireless communication protocol,

17  whether I'm using it at home or using it at the coffee shop

18  or on an airplane these days, or in the shopping mall or at

19  Starbucks or wherever else I want to go.

20  Q   How important are the particular design choices that are

21  made and selected for interoperability standards?

22  A   Well, you know, how you choose is probably more important

23  than it is for the plug, that there is some differences

24  across.  But still a lot of value is created by having a

25  standard, so that we can use the same laptop or the same

1    device in many different ways.

2    Q    Let's put up PDX 25.

3         Is this an illustration --

4         THE COURT:  Counsel, is this intended as a

5    demonstrative?

6         MR. PRITIKIN:  Yes, sir.

7         THE COURT:  Has the other side seen this?

8         MR. PRICE:  No objection as to the demonstrative.

9         THE COURT:  All right.  Ladies and gentlemen, once

10   again, this is a demonstrative to help you understand the

11   witness's testimony.

12   Q    Is this an illustration that you prepared to help explain

13   some of the concepts surrounding these types of standards?

14   A    Yes, it is.

15   Q    And let's start on the left side of the illustration.

16   What is shown there?

17   A    It's trying to depict like how you go about getting to a

18   standard and creating something like an interoperability

19   standard.  So the basic idea is you might have some

20   unpatented technology.  And it might be some existing ways of

21   doing things that's not covered by patents.  And most of

22   these standards will have unpatented technology in it.

23        You also could bring in some patented technology.  And

24   that's kind of where the issue is today.  The standard is not

25   only going to have unpatented elements to it, it's going to

1   have patented.  Then we talk about the consensus, that's in

2   the middle, that's where we decide, okay, we're going to use

3   this element of patented technology, this element of

4   unpatented technology, and that's going to become our

5   standard.  The shape of our plug.  That's going to define how

6   all of these devices are going to talk to each other.

7        Then once we have that consensus, what really makes the

8   standard valuable is that a bunch of people adopt it.

9   Because if you just had the standard and nobody had the

10  corresponding devices, it really wouldn't be worth much.  So

11  what you really want is -- this is what we call widespread

12  adoption.  I think when you heard earlier the role of RAND

13  was to create widespread adoption, this is what we were

14  talking about.  We want lots of places -- my house, the

15  coffee shop, the office building, the airplane -- we want all

16  these places to have places where I can plug in -- really

17  wirelessly plug in.  And I want all the different devices to

18  be able to connect, whether it's a cell phone or laptop, or

19  nowadays my television set even connects by WiFi.

20       So that's the idea.  And the value that you have doesn't

21  come just from any one piece, it comes from that whole system

22  and the ability to work together, forwarded by the standard.

23  Q   Now let's focus on the patented technology portion of it

24  for a moment.  For a standard like 802.11, how many

25  standards-essential patents are potentially implicated?

1   A    There would be lots.  Hundreds, even thousands of patents

2   in some of these standards, that people would claim were

3   standard.  I only put five down here in my picture, but that

4   still makes the point.  I've got my five patent holders down

5   here, who are five of very many who are contributing that

6   patented technology that goes into the standard.

7   Q    Now, does the widespread adoption of the standard have any

8   effect on what a patent owner can demand for the use of a

9   patent that is essential to the standard?

10  A    Absolutely.  And this is really where the whole hold-up

11  concept -- I know people have been asking about hold-up.

12  This is where the hold-up concept comes from.  So, let's say

13  I'm the fifth guy in line here and I have my patent, and I go

14  to somebody who wants to use my patent to create a product

15  and I say, no, you can't create your product unless you get a

16  license from me.  The question is, what does he lose if he

17  doesn't sign the license with me?  Well, he doesn't just lose

18  access to my patent, he loses access to the standard, because

19  he won't be able to connect to all those other patents.  He

20  can't connect to that unpatented technology.  And, also, he

21  loses the ability to interconnect with all those other people

22  out there who have also created devices.

23      He's not going to be able to create a wireless product

24  that will connect up, say, to that wireless network.  Or he

25  won't be able to play the videos that are out there on the

1   web if those are the videos that are out there in the

2   standard format.

3       So, he doesn't just lose my patented technology, he loses

4   access to the standard.  That's what creates the potential

5   for hold-up is that I have the ability to deny them access.

6   So maybe my patent is only worth a penny, but the value of

7   the whole system to him is $10.  Well, I can hold him up for

8   that $10, because if he doesn't get my license he loses out,

9   not just on my penny's worth of value, he loses out on the

10  whole $10.  That's the essence of the hold-up problem.

11  Q   Now, when a standard becomes widely used, how does that

12  affect the ability of the owners of standards-essential

13  patents to gain leverage?

14  A   Well, what it does is it extends the hold-up problem from

15  just losing out on the standard to losing out on the

16  interconnection with all the other devices out there.  So if

17  there are a hundred devices out there, I lose the ability to

18  communicate with a hundred devices.  If there's a thousand

19  devices, I lose the ability to connect with a thousand.  If

20  there's a million, I lose the ability to connect with a

21  million.  So the more stuff that is out there, the more I can

22  potentially be held up for.

23  Q   How does this compare to the situation with patents that

24  aren't essential patents?  Could you explain that, the

25  difference?

1   A    I mean, often with non-essential patents you're not in

2   that same situation where there's a standard that you need to

3   comply with to communicate with everybody else.  You often

4   are more likely to have a work-around.  Because why do we

5   have standards?  We have standards in the cases where it's

6   important so everybody does things the same way.  So this

7   hold-up potential is going to be much more important in the

8   standard context, because that's why we had a standard.  We

9   had a standard in the first place because we needed

10  interconnection.  That's kind of the idea.

11  Q    Now there's been quite a bit of testimony in the course of

12  these proceedings about injunctions.  Can you explain what,

13  if any, bearing injunctions or threats of injunctions have on

14  the risk of hold-up?

15  A    Well, I think injunctions fit right into the story, right?

16  Because if you get an injunction on somebody's product, you

17  say you cannot import the Xbox into the country or you can't

18  sell Windows, you're not just enjoining the use of your

19  patent, you're enjoining them from using this entire

20  standard.  So just like we said, the ability to deny people

21  access to the standard creates the hold-up problem.  The

22  injunction is simply a way of bringing that about, because

23  the injunction is not simply, effectively against using the

24  patent.  Technically it's against using the patent, but

25  because that patent is part of the standard, you can deny

1  people access to the standard and maybe even deny them the

2  ability to sell their products until they can take this

3  feature out.  But taking the feature out is going to make

4  your product really unattractive if this is a widely-adopted

5  standard.

6  Q   Does an injunction or the threat of an injunction have any

7  bearing on what the patent owner can extract?

8  A   Yeah.  In my example before where the patent was worth a

9  penny, but being able to be part of the network or comply

10  with the standard that's worth $10, in principle he could

11  demand up to $10, because that's what you lose if you don't

12  get the license.

13  Q   Now, can you explain this in the context of the Microsoft

14  products that are at issue in this case?

15  A   Yeah.  In the context of the Microsoft products, we have

16  the Xbox console which uses both the H.264 and 802.11

17  technologies.  So the injunction sought there would have

18  blocked the sale of Xbox unless you remove those

19  functionalities.  But I think, as Mr. Gutierrez talked about

20  yesterday, removing those technologies is really kind of

21  suicide from a business standpoint, because complying with

22  the standard is essential.

23      For Windows you're removing H.264 technology, which is

24  important to Windows, that Windows wants to play video.  But,

25  again, it's the value of the standard that they can hold you

1   up for, not necessarily just the value of their individual

2   contribution.

3   Q    What is the effect of hold-up on consumers?

4   A    Well, consumers are going to lose out in several potential

5   ways.  One is if the products aren't available, that's not

6   good.  If the products aren't compatible, that's not good.

7   And if they end up coming to the hold-up and paying higher

8   royalties, that's going to ultimately lend to higher prices.

9   So there's lots of ways consumers could lose out.

10  Q    What is the effect of hold-up on the standards themselves?

11  A    Well, the effect of hold-up doesn't just hurt the person

12  who wanted the license, it also hurts the other patent

13  holders, because those other patent holders aren't going to

14  sell as many units of the product.  The standard is not going

15  to be as widely adopted.  So, when somebody holds up

16  customers or users of the standard, they hold up them, they

17  end up holding up consumers to some extent, they hold up the

18  other providers of patents and other technology.  So there's

19  pretty widespread implication of that.

20  Q    Now, on the demonstrative you prepared I think you've said

21  you have five patent holders here.  How does the number of

22  patent owners, owners of standards-essential patents, affect

23  the problem of hold-up?

24  A    It basically multiplies it.  So if one guy demands an

25  excessive royalty, well then if you have five guys, well

1   that's five times as bad in terms of the effects on prices

2   and effect on the cost of implementing the standard.  If you

3   have 50, that's an even worse situation.  So the more people

4   you have, the more hold-up potential and aggregate exists.

5   And, again, that's often called the royalty-stacking problem.

6   Q   Now we've heard testimony about royalty stacking.  Can you

7   explain to the jury what royalty stacking is?

8   A   Well, royalty stacking simply reflects the fact that if

9   there are multiple patents that I have to get to practice the

10  standard, potentially I might have to pay for each of those,

11  right?  Because if I want to do the standard, I need to pay

12  guys 1, 2, 3, 4 and 5, if they're asking for royalties.  So

13  I'm going to have to pay multiple people.  That's the concept

14  of stacking.

15      And stacking really interacts very closely with hold-up.

16  Because if one guy holds you up and is able to collect a lot

17  of money, what do you think those other guys will want to do?

18  They're not going to stand there passively and say, oh, we'll

19  let him get his billion dollars, I don't want mine.  He's

20  going to ask for his, too.  And if you let that go, it's

21  going to add up -- even if the first one wasn't so bad --

22  it's going to add up to a lot.  That's the stacking issue.

23  Q   And does the concept of royalty stacking have any bearing

24  on what the owner of an individual patent should be entitled

25  to?

1   A   Well, I think it comes in in really two ways.  First, the

2   idea of royalty stacking flows from the fact there's lots of

3   contributors.  So obviously the total value of the product is

4   not -- in that case has to be in some sense attributed to the

5   wide range of people that contribute.  So if there are a

6   hundred contributors, on average at least, each guy is going

7   to have a relatively small part of the overall value.  This

8   has to be by arithmetic.  So that's part of it.

9       Secondly, it also says, in order to keep the overall

10  royalty reasonable, that is, to have a reasonable royalty in

11  the aggregate, each royalty is going to have to be relatively

12  small, so when they add them all together they don't add up

13  to too much to prevent that widespread adoption, right?

14  That's our fear.  Our fear is if we get too much royalties,

15  we might not get widespread adoption.  It's too expensive.

16  If people fear they'll get held up, they won't adopt.

17  Q   Do high-tech products like computers need to support more

18  than one standard?

19  A   Yes.  I think we heard testimony to that effect.  And my

20  understanding is that computers, and like a Windows PC will

21  support dozens -- hundreds of standards, even.  So the

22  problem with stacking kind of goes one layer further.  Not

23  only are there many patents within a standard, there's many

24  standards within a product.  So if each patent holder for

25  each standard demanded a substantial royalty, think about how

1    that could add up, adding up over all the patent holders

2    within the standard, and then add up all those across the

3    standard.  The royalties, in some sense, could potentially

4    become very burdensome.

5    Q    Now, in your opinion, does the proper methodology for

6    determining a RAND royalty have to take into account the risk

7    of royalty stacking?

8    A    I think it does.  You need to take account of the royalty

9    stacking in thinking about what constitutes a reasonable

10   royalty for any one contribution.  Recognizing that that is

11   only one of many contributions to the standard.

12   Q    How have standard-setting organizations like the IEEE and

13   the ITU addressed the problem of hold-up?

14   A    They've addressed the hold-up problem through RAND

15   commitments.

16   Q    And what is the purpose of the RAND commitment?

17   A    The purpose of the RAND commitment is to prevent hold-up.

18   And by preventing hold-up you can promote widespread adoption

19   of the standard.  The basic issue of the RAND commitment is

20   individual patent holders would have an ability to hold up

21   the implementers if you didn't have some commitment.  That

22   is, wait for everybody to get their devices out in the

23   market, and you say, oh, even though I'm a slice of the whole

24   value, you need me in order to make it work.  I'm going to

25   charge you a very high royalty, reflecting the value of the

1  standard.

2      And the concept of the RAND commitment is to limit the

3  individual patent holder to the value that he contributed.

4  Now, he added some value, probably, to the standard.  What he

5  should get is his contribution, not the value created by the

6  standard, not the value created by all that unpatented

7  technology, not the value created by the other patented

8  technology, not the value that came from agreeing on this

9  common standard, which could have substantial value, and not

10  the value created by widespread adoption.

11      Those other components, even though he can try to grab

12  them by holding somebody up and saying, well, I won't let you

13  have any of that value unless you get a deal with me; a RAND

14  commitment says, no, you should be entitled to what you

15  contributed, how much you added, how much better the standard

16  was because you were in it rather than somebody else, and not

17  be able to hold me up for the entire value created by the

18  standard.

19  Q    Now, does the RAND commitment also address the problem of

20  royalty stacking?

21  A    Yes, it does.

22  Q    Can you explain that to the jury?

23  A    Well, because in the process of saying what's reasonable,

24  what's his contribution, you have to recognize that there are

25  all those other contributors.

1       And in order to say what was any one of them worth and

2    what's a reasonable royalty to be paying any one of them, you

3    have to ask, well, is that consistent with the number of

4    people that are there.  So if you said, well, I'm going to

5    give each guy one percent, well, that doesn't seem like much.

6    But if there are 90 people, you can't give each of them one

7    percent because you've chewed up almost the entire value,

8    there's nothing left for all those other contributions to the

9    value.  If you had 150 people and gave them one percent,

10   you'd be over one hundred percent.

11   Q    Is the purpose of the RAND commitment to address the

12   problems of hold-up and royalty stacking?

13   A    Yes, that's what economics says.  Economics tells us that

14   you would have a RAND commitment precisely to address those

15   issues.

16   Q    Now, let me turn back to the subject of royalty stacking

17   again for just a moment.  As an economist, how would you

18   first assess whether a given royalty demand raises stacking

19   concerns?

20   A    I think the simplest place to start is just by thinking

21   about, again, take that royalty demand, think about how many

22   potential people could ask for that.  That is how many patent

23   contributors there were.  Multiply the demand by the number

24   of contributors and say, you know, that's going to be the

25   aggregate implied royalty, right?  That's what the royalty

1    would be if everybody asked for that same amount.  Now, there

2    could be some differences across people, but it's a crude way

3    to at least start thinking about the stacking issue.

4    Q    Now, suppose you had ten patent holders and you wanted to

5    understand whether the royalty demand of one of them

6    implicated stacking concerns.  And suppose that nine of the

7    ten had not made similar royalty demands.  Would stacking

8    still be a concern that would bear on determining whether the

9    demand is reasonable?

10   A    Yes.  Remember, the goal of the RAND commitment is to pay

11   each patent holder the value of what he put in.  The fact

12   that the other nine people haven't collected their value

13   doesn't mean you want to give that value to the one guy who's

14   asking for the money, right?  You don't want to say, well, he

15   hasn't taken their value so I'll just give it to you.  That

16   doesn't make economic sense.  That doesn't make common sense.

17   You don't want to say, just because they're not collecting,

18   I'm entitled to more.

19        Secondly, you have to remember, particularly when it comes

20   to putting this together with hold-up, if you allow that one

21   guy to collect that excessive royalty, even though all those

22   other people aren't currently collecting, once you tell him,

23   okay, it's okay to go out and ask and collect an excessive

24   royalty, you can't believe that those other people are going

25   to just sit by and not try to get theirs, too.  And if they

1  do that, then a full-fledged stacking problem is going to

2  emerge.

3  Q   Suppose nine of them are abiding by their RAND

4  commitments.  From an economic perspective, does that allow

5  the other patent holder to secure more?

6  A   Should it?  I think if you're asking does that change what

7  he should get under RAND commitment?  Absolutely not.

8  Because under RAND commitment he's limited to the value of

9  what he contributed.  And that value is not lowered or not

10 increased simply because the other people didn't collect

11 theirs.

12 Q   Now, I think you've told us that hold-up is where the

13 patent holder uses the standards-essential patents to get --

14 how would you put it -- excessive compensation?  I don't want

15 to put words in your mouth.

16 A   I guess the way I think about it is, what is he trying to

17 collect?  Is he trying to collect the value he contributed to

18 the standard?  Or is he trying to collect the value that the

19 users place on the standard as a whole.  And the value of

20 that standard as a whole reflects the contribution of all the

21 other patent holders, the non-patent technologies, the value

22 of agreeing on a standard, and the value of widespread

23 implementation.  The question is, is he trying to get just

24 what he added, or is he trying to get leverage based on the

25 total value of the standard?  How hard would it be for the

1   end-user to do without compliance with the standard?

2   Q    Now, from an economic perspective can a patent owner be

3   engaged in hold-up where it is seeking something other than

4   money?

5   A    Yes.  I mean, the question of hold-up is what leverage

6   you're exerting to get consideration from the licensee.  It's

7   whether you're trying to exert leverage based on the value of

8   your patents or you're exerting leverage based on the value

9   they place on the standard.

10       And whether I'm using that leverage to get a cash payment,

11   whether I'm using it to trade for a better deal on another

12   patent license that I want from him, or to prevent him from

13   charging me for another patent, doesn't really matter.  The

14   hold-up is coming because you're attempting to grab the value

15   of the standard.  Whether you collect that value in cash or

16   collect that value in the form of a better deal on another

17   patent, it's still hold-up.

18   Q    Suppose the owner of a standards-essential patent used the

19   leverage of the essential patents to try to get a more

20   favorable deal on a grant-back of patents that are not

21   essential to that standard.  Could that be hold-up?

22   A    Yeah, it could be hold-up and it would be hold-up if he's

23   leveraging the value of the standard.  The question of

24   hold-up is what you're threatening that person with is not

25   just losing the value of my patent, but losing the value of

1   the standard as a whole.  If that's where it's coming from,

2   that's the leverage you're using.  It doesn't matter whether

3   you're using that to get a check or using that leverage to

4   get a better deal on other patents, you're engaged in hold-up

5   because you're using leverage.  Fundamentally that's not

6   value you created but, rather, value that people created by

7   using the standard.

8   Q    Now, were you present when Mr. Dailey testified?

9   A    Yes, I was.

10  Q    Do you recall Mr. Dailey's testimony that what he was

11  trying to bargain to was a zero-zero cross-license?

12  A    Yes, I was.

13  Q    How does that relate to your analysis of hold-up?

14  A    Well, I think what it tells us is that just because you're

15  trying to look for a zero-zero cross-license does not mean

16  you're not engaged in hold-up.  And, in fact, the value

17  you're using to barter to get to zero-zero is, hey, if you

18  don't get a deal with me, you're not going to be able to use

19  the standard, then by definition you're engaged in hold-up.

20       That is, a RAND commitment is a commitment not to collect

21  more than the value you contributed, to not appropriate the

22  value of the standard.  And if you're doing the latter, then

23  that would be considered hold-up from an economic standpoint.

24  I'm not a lawyer, so I can't give you a legal opinion.  But

25  from an economic point of view that's what it says.

1    Q    And does the ITU permit owners of patents essential to the

2    802.11 standard to condition their RAND commitments on

3    reciprocity?

4    A    I'm not a lawyer, again, so I can't give you a legal

5    opinion.  But my understanding is they allow you to say, "I

6    will give you a license for my standards-essential patents,

7    for this standard, on the condition that you give me a

8    license for your patents on the same standard."  So you can

9    do that.  You can say, look, I'll give you my 802.11 patents

10   but you have to give me a license, too.

11        But my understanding is you can't demand that the other

12   side give you some back-license on something else.  If they

13   want to give you that, that's fine, but you can't condition,

14   in a sense of demanding that they do that.  That's my

15   understanding.

16   Q    Does that make sense from an economic perspective?

17   A    Absolutely.

18   Q    Why is that?

19   A    Well, the first one, you can see kind of expands the value

20   of the standard because you're saying, look, I'm going to

21   license you my standard-specific technologies, you're going

22   to license me yours.  I get more ability to use the standard,

23   you get more ability to use the standard.  From the point of

24   the view of the standard-setting organization, sounds great.

25   On the other hand, if you allow people to say, I'll only give

1    you access to my standards-essential patents if you give me

2    some other valuable consideration that you have out there,

3    like access to your non-standard-specific patents at great

4    rates, that would allow them to engage in hold-up.  People

5    would say, I don't want to use the standard, because if I do,

6    somebody is going to come demand great rates on my

7    intellectual property.

8    Q   Now let's turn more specifically to some of the facts that

9    are involved here.  In reaching your conclusions in this

10   case, what was the first thing that you looked at, Professor

11   Murphy?

12   A   The first thing I looked at were the offer letters.

13   Q   Let's start with the October 29th letter relating to the

14   H.264 standard.  And we've looked at some exhibits before.

15   We can go through this quickly.  I don't want to belabor

16   something that we've already presented.

17          MR. PRITIKIN:  Let's put up PDX 27.  This is a

18   demonstrative, Your Honor.  We've seen this before, I

19   believe.

20      Can you explain what is shown here in relation to the

21   demand in the October 29th letter?

22   A   Yes.  The roughly half a penny on the left represents what

23   was determined to be the RAND royalty for Motorola's H.264

24   patent portfolio.  So that's a little over half a cent.  If

25   you take the 2.25 percent that Motorola asked for in their

1    opening letter on October 29, 2010, apply that to a $500

2    laptop, that comes out to a demand of $11.25, which is

3    roughly 2,000 times the RAND rate.

4    Q   Why did you pick a $500 laptop as the example?

5    A   It's pretty close to a typical laptop that exists out

6    there in the marketplace.  I think the actual average laptop

7    is a little more like $528, something like that.

8    Q   You're aware that the court determined a RAND rate for the

9    Motorola patents and the Microsoft products.  Did the court

10   also determine a RAND range?

11   A   Yes, they did.

12   Q   And how does the Motorola demand, in this example $11.25,

13   compare to a RAND royalty at the very, very top end of the

14   RAND range set by the court?

15   A   It's still many, many times above -- 70 times or

16   something -- the upper end of the RAND range.  So the basic

17   economics I took away from this is that this was nowhere

18   close to a RAND rate.

19   Q   You understand the top end of the RAND rate found by the

20   court was 16.4 cents?

21   A   Yes.  It's about 16.4 cents.  So if you think about a

22   hundredth of this $11.25 would be about $0.11, so it's a

23   little higher than that, but not much.  So really telling you

24   that this is way out of bounds, not just with respect to the

25   RAND rate, but the RAND range, which covered what potentially

1    could be a reasonable royalty.  So it just says, this isn't

2    close to a reasonable royalty.

3    Q    Let's turn to PDX 28.  And, again, this is a slide I think

4    we've seen before.  Again, how did you go about figuring out

5    the magnitude of Motorola's demand?

6    A    Well, it was a really pretty straightforward calculation.

7    It's like -- you know the 2.25 percent.  You know how many

8    computers are sold, Windows PCs roughly are sold worldwide,

9    you just go to the internet and get that.  You know roughly

10   the average price of a PC.  So you multiply the number of

11   PCs, price per PC, gives you total dollars.  Multiply that by

12   2.25 percent and you get a number very close to $4 billion.

13   Q    Using the same estimate, what would the annual royalty be

14   with what the court determined to be RAND?

15   A    Using that .55 cents multiplied by the exact same numbers,

16   you come up with a little less than $2 million.  Again,

17   there's that 2,000-to-1 ratio.  The RAND royalty would amount

18   to about $2 million a year.  The royalty demand in the letter

19   would amount to about $4 billion a year.  So pretty far out

20   of whack.

21   Q    As we progress through the sequence here I'm going to ask

22   you about what conclusions you reached, Professor Murphy.

23   Did you reach any conclusions from the magnitude of

24   Motorola's H.264 demand?

25   A    Yeah.  I concluded that they were consistent with Motorola

1    desiring to hold Microsoft up.  That is, you know, such a

2    large demand could only be explained by somebody trying to

3    extract the value of the standard.  That is, the value of the

4    individual patents would be a far smaller number than that.

5    And, therefore, such a big demand would have to be reflective

6    of hold-up.

7    Q   Let's turn now to the October 21st letter relating to the

8    802.11 standard.  And let's put up PDX29.  Can you explain

9    what's shown here?

10   A   This is really the same comparison done for a $199 Xbox.

11   So I'll go quickly.  The RAND royalty determined was -- let's

12   call it three-and-a-half cents.  $199 Xbox at 2.25 percent,

13   comes out to $4.48.  So comparing $4.48 to three-and-a-half

14   cents, that's, again, more than one-hundred-to-one in terms

15   of the royalty ratio.

16   Q   Let's take a quick look at PDX30.

17   A   This goes to a more expensive Xbox version.  This one

18   sells for roughly $400.  The RAND royalty is the same,

19   three-and-a-half cents.  In this case they're asking for

20   almost $9.  Again, that's over 200-to-1.

21   Q   Is there any difference in the WiFi functionality between

22   the two?

23   A   No.  The WiFi functionality would be the same.

24   Q   What conclusions do you draw from the fact that the

25   royalty is higher on the $399 model?

1    A    I think it's very consistent with them attempting to hold

2    Microsoft up for the value of the technology.

3    Q    Why is that, sir?

4    A    Again, because there's such a vast difference, even bigger

5    difference for this model than the other.

6    Q    Now, again, have you considered the high end of the RAND

7    royalty range set by the court in connection with 802.11?

8    A    Yes.  I believe that's something on the order of $0.19.

9    Q    Nineteen-and-a-half cents?

10   A    Yeah, on the order of $0.19.  So, 19.5 more, exactly.  You

11   know, 19.5 cents compared to a $9 demand.  So even if you go

12   to the upper end of the range determined by the court,

13   Motorola's demand is nowhere close to that.  Again, you say,

14   well, what does that look like?  Well, such a large demand is

15   certainly very consistent with an effort to hold somebody up,

16   because we know the value of the standard could be quite high

17   even if the value of the individual patent is, as determined

18   by the court, you know, something like three-and-a-half

19   cents.

20   Q    Do you think that these disparities are consistent with a

21   strategy of entering into a RAND license?

22   A    From an economic standpoint I think it doesn't fit well.

23   Because if I'm trying to negotiate a RAND license, I have an

24   incentive to show people I want RAND terms, not that I want

25   to hold them up.  Because, remember, everybody knows there's

1  this hold-up potential out there, that people can demand

2  excessive royalties.  This patent hold-up problem is widely

3  recognized.  So if somebody comes to you with such a high

4  demand, the logical conclusion you're going to reach is, hey,

5  he's holding me up.  And so you would expect somebody who

6  wanted to negotiate on RAND terms would have an incentive to,

7  in fact, communicate that by coming in with a reasonable

8  offer.

9  Q   Let's take a look at PDX31.  And, again, the jury has seen

10 a lot of these.  Briefly can you explain what's shown here,

11 Professor Murphy?

12 A   This is the same exercise.  In this case we use the number

13 of Xbox consoles sold, compare the RAND royalty on the left,

14 which is less than $500,000 a year, to the Motorola demand

15 contained in the October 21st letter, which comes out to more

16 than $75 million a year.  So, half a million versus more than

17 $75 million.  150-to-1, roughly.

18 Q   Now, Professor Murphy, you were aware that Microsoft had

19 sued Motorola on October 1st of 2010, correct?

20 A   Yes.

21 Q   How does that affect your analysis?

22 A   I don't -- it doesn't directly affect the calculations

23 that I've shown you so far.

24       MR. PRICE:  Your Honor, I'm going to object.  I think

25 it's beyond the scope of the report.

 1            THE COURT:  Does somebody want to provide me with a

 2    copy of the report?

 3            MR. PRITIKIN:  We will, Your Honor.

 4       May I approach Your Honor?

 5            THE COURT:  Yes.

 6            MR. PRITIKIN:  I'm going to hand you the rebuttal

 7    report as well, so we have it in case we need it.  And I

 8    would direct the court's attention to paragraph 79.

 9            THE COURT:  The July 24th report goes to paragraph

10    61.

11            MR. PRITIKIN:  I didn't hear, I'm sorry.

12            THE COURT:  The July 24th report goes to paragraph

13    61.  Did you mean to say 79?

14            MR. PRITIKIN:  79, yes, sir.  I'm referring to

15    paragraph, Your Honor, not the page.  I'm sorry.  It's on

16    page 30.

17            THE COURT:  Well, mine goes to page 23 and signed by

18    Dr. Murphy on July 24, 2012.

19            MR. PRICE:  I think he's referring to June 13th.

20            MR. PRITIKIN:  I'm sorry, Your Honor, I handed you

21    the wrong one.  Let me give you my copy.  I'm sorry.

22            MR. PRICE:  Your Honor, if the purpose of the

23    question is to elicit this, I have no objection.  I thought

24    it was broader than that.

25            THE COURT:  I'll overrule the objection.

1    Q    Do you remember the question, Professor Murphy?

2    A    Unfortunately not, sorry.

3    Q    All right.  The question I asked was how did the fact that

4    Microsoft sued Motorola in early October of 2010 affect your

5    analysis?

6    A    I think it doesn't change my analysis of whether hold-up

7    was going on or not.  It actually fits into the analysis

8    because it helps explain what Motorola was attempting to

9    obtain by holding Microsoft up on its standards-essential

10   patents.  In fact, what they were hoping to obtain were

11   better terms of the licenses on those other patents.  So it

12   explains what they were trying to get from the hold-up more

13   than it does change my analysis.  And it really doesn't

14   change the notion that they were using the value of the

15   standard to try to extract more favorable terms from

16   Microsoft at all.

17   Q    Now, after you had looked at Motorola's letters, what did

18   you look at next?

19   A    I looked at their other conduct, in particular their

20   conduct regarding seeking injunctions to, again, back up that

21   hold-up threat.

22   Q    Which injunctions are you referring to?

23   A    The injunctions that have been talked about over the last

24   several days.  The injunctions that flowed in late 2010.

25   Looking for injunctions in both the U.S. courts, as well as

1    International Trade Commission, and injunctions in Germany

2    are the ones that come to my mind.

3    Q    Now, from an economic perspective, how do the October

4    letters relate to the request for injunctions?

5    A    I think the injunctions really are giving you that hold-up

6    threat.  That is, if you don't reach license terms with us,

7    you're going to lose the value of the standards.  You're not

8    going to be able to sell your products that are compatible

9    with those standards.  So you either leave the standards in

10   and you can't sell them, or take the standards out.  And as

11   we heard from Mr. Gutierrez, to try to sell products that are

12   really crippled from an economic standpoint.

13   Q    And as an economist, what conclusion do you draw from

14   Motorola's efforts to obtain injunctions on the 802.11 and

15   H.264 standards-essential patents?

16   A    Again, I think that their efforts to obtain those

17   injunctions are really part of the effort to hold Microsoft

18   up, to deny them access to the value of the standards.

19   Because that injunction, by its very nature, doesn't just say

20   effectively you can't use their product -- use their patents,

21   you lose the value of the standard as a whole.  And that's

22   really the whole source of the patent hold-up problem.

23   Q    Did the timing of Motorola's injunction actions relative

24   to the filing of this lawsuit play any role in your analysis?

25   A    I think it does.  And, in fact, it's not just the filing,

1    but the continued efforts to go after injunctions, after

2    Microsoft had said it was seeking a RAND royalty.  And even

3    after they said explicitly that they wanted -- they were

4    willing to take a RAND royalty, my understanding is that

5    Motorola continued to pursue its injunction, for example, in

6    Germany and in the International Trade Commission.

7        And given that they had already been told they were going

8    to get a RAND rate, the reason to pursue an injunction would

9    logically be, then, from an economic standpoint, to continue

10   to exert that hold-up pressure.

11   Q   Is there any plausible explanation for that beyond

12   hold-up, in your opinion?

13           MR. PRICE:  Objection.  That's beyond the scope of

14   his expertise.

15           MR. PRITIKIN:  I'll withdraw the question, Your

16   Honor.

17   Q   From an economic perspective, and that's what I'm asking

18   Professor Murphy, is there a plausible explanation for

19   Motorola's conduct?

20   A   I don't want to say that one couldn't dream up something.

21   But I don't think there's any logical that comes to my mind.

22   It seems to fit very well with the plan of trying to use the

23   leverage afforded by the standard to get better terms in

24   their licensing endeavors with Microsoft.

25   Q   Are you saying that the holders of standards-essential

1  patents should never be permitted to get injunctions?

2  A   No, I'm not saying that.

3         MR. PRICE:  Objection.  That calls for a legal

4  opinion, I believe.

5         THE COURT:  I'll allow it from the point of view of

6  an economist, not a lawyer.

7  A   That was going to be my first line, actually.  I can't

8  give you a legal opinion on that.  And I was asked this

9  question in my deposition, and I think I led with that same

10  comment.  "I can't give you a legal opinion."  From an

11  economic standpoint, I think you have to recognize that an

12  injunction, by its very nature, is going to impose leverage

13  commensurate with the hold-up value.  It doesn't mean you

14  should never allow an injunction, you just have to be very

15  careful because you have to know that once they give you that

16  injunction it's not just losing the value of the patent, it's

17  losing the value of the standard.  So injunctions on

18  standards-essential patents are going to impose that hold-up

19  leverage, whether you want to or not.  And that's the

20  problem.

21  Q   Now, let's turn to a different topic, Professor Murphy.

22  Are you aware of the argument that has been advanced by

23  Motorola that it didn't have enough time or information to

24  make more refined demands back in October of 2010?

25  A   Yes, I am.

1    Q    All right.  And what is your reaction to that suggestion?

2    A    I don't think that withstands scrutiny.

3    Q    Why is that?

4    A    I think there are a number of things you can look at that

5    would tell you right up front that that demand was

6    unreasonable.  You don't have to do in-depth research to

7    realize that.

8    Q    Are you suggesting they should have known the exact RAND

9    rate then?

10   A    No, I'm not saying that at all.  Remember, for H.264 they

11   were off by a factor of 2,000.  So I'm not saying you have to

12   be real precise.  I'm just saying you have to get some --

13   it's pretty easy to get reasonably close, or at least a lot

14   closer than they got.

15   Q    Have you prepared a chart that summarizes the kinds of

16   information that was readily available to Motorola at the

17   time it sent the letters to Microsoft in 2010?

18   A    Yes.

19   Q    And let's look at PDX33.  Is this the exhibit you

20   prepared?

21   A    Yes, it is.

22   Q    Let's start with the first item.  "The nature of its

23   contributions to the standards and the number of other

24   essential patent owners."  What is your understanding as to

25   that, sir?

1    A    Well, my understanding is that Motorola participated in

2    the formation of these standards.  So they were aware of the

3    number of other contributors.  They are aware of the

4    standards-setting process and the value of all the other

5    things that go into making it a successful standard.  As

6    such, they would have known that their contribution was,

7    while maybe somewhat important, was still a small part of the

8    overall total.

9    Q    To what extent did you take into account the testimony

10   that Motorola's witnesses were unable to say whether their

11   802.11 or H.264 patents are in the top half or bottom half in

12   terms of value?

13   A    Yes --

14         MR. PRICE:  I'm going to object.  That's leading and

15   also goes beyond the scope of his report.

16         THE COURT:  I'm going to sustain on the leading, so

17   let's rephrase it.  In terms of beyond the scope of the

18   report, I need to hear the next question.

19   Q    Do you have any understanding as to what Motorola

20   witnesses have said as to whether their patents ranked in the

21   top half or bottom half in terms of value?

22   A    My understanding from the first trial was that Motorola's

23   witnesses couldn't say whether their patents ranked in the

24   top half or the bottom half.  So if you think about a

25   standard that had many, many contributors, you can think they

1    didn't know whether they were in the better half or worse

2    half of those contributors.  So they were kind of one of many

3    contributors from that point of view.

4         MR. PRICE:  Your Honor, could I just make a standing

5    objection just to preserve on the -- I think I'm required

6    to -- under the previous motion on litigation during the

7    trial, conduct?

8         THE COURT:  I'll see counsel at side bar.

9         (Court and counsel met at side bar as follows.)

10        THE COURT:  Litigation during the trial, conduct?  I

11   didn't understand.

12        MR. PRICE:  I was trying not to be that clear,

13   actually.  I think we filed a motion in limine, Your Honor,

14   on litigation conduct and the position the parties took

15   during the trial as being relevant.

16        THE COURT:  I understand.  Yes, you may have a

17   standing objection to that in regards to that question.  I'm

18   going to overrule it.

19        MR. PRITIKIN:  I have a number of the findings that

20   I'm going to be using with Professor Murphy.  They're

21   undisputed facts, and I'd like to do it as efficiently and

22   economically as I can.  There are a couple of ways I could do

23   it.  We're going to be getting into these in just a few

24   minutes.  I could show him the finding, ask him a question --

25   really the purpose is simply to get the fact out there that

1    it's an undisputed fact.  The court said he can use the

2    findings as a foundation for it.  And it would be helpful,

3    perhaps, to get some guidance on how the court would like us

4    to do that.  I don't want to waste a lot of time with it, but

5    it's important to get into the record.

6            THE COURT:  I think I would continue my practice of

7    asking you to ask the witness:  Do you understand it's an

8    undisputed fact, such and such.  And I would appreciate it if

9    you wouldn't read it so it looks like it's coming out of some

10   prior record.

11           MR. PRITIKIN:  It would be a leading question, by

12   definition.

13           THE COURT:  He can answer yes or no.

14           MR. PRITIKIN:  I'll do it that way.

15           MR. PRICE:  Again, I'm fighting an uphill battle here

16   but have to make a record.  I thought that the court's ruling

17   intent was to have a witness with competence actually testify

18   to the facts.  And obviously this witness isn't competent to

19   testify to these facts.  What's happening here is it's just

20   being read in as an undisputed fact through the question, not

21   throughout a witness's answer.

22           THE COURT:  I assume he's going to then use as a fact

23   in an area that he is competent to testify in.

24           MR. PRITIKIN:  It's the background for his analysis.

25           MR. PRICE:  The distinction I was making is, I

1  thought it was a witness that would say that they knew that

2  was a fact, and we could cross examine them on it.  And this

3  is using it as an undisputed fact and asking him to make a

4  conclusion based on that, which is a very efficient --

5            THE COURT:  Just so we're clear, I believe that the

6  witness is entitled to take findings from the first trial,

7  use them as a basis for an opinion.  And that's what I'm

8  attempting to create, that record.  If he reads a finding in

9  and then doesn't use it, I'm going to go back and strike it

10 out of the record.  Because he doesn't just get to read this

11 stuff in; it has to be something that he's used for his

12 analysis.

13           MR. PRITIKIN:  That's exactly what I intend to do.

14           MR. PRICE:  I understand your ruling.

15                 (The side bar concluded.)

16 Q  Let's talk a little about the nature of the contributions

17 and what it is that was known to Motorola at the time.  Have

18 you prepared an exhibit that summarizes some of the

19 undisputed facts about the H.264 standard that you took into

20 your account in your economic analysis?

21 A  Yes, I did.

22 Q  Let's put up PDX34.  Are these -- is it your

23 understanding, sir, that these are undisputed facts in this

24 proceeding?

25 A  Yes.  My understanding is that these are facts that are

1  undisputed between the parties.

2  Q   Let's start with your explaining to the jury what these

3  are, and then we'll go to how they were used in your

4  analysis.

5  A   So I'll go through them one at a time.

6  Q   All right.

7  A   The first one is, "The H.264 standard is a large and

8  technically-complex standard that resulted from the

9  contributions of roughly 170 entities and that submitted over

10 2,300 documents."

11        THE COURT:  I think the jury can probably read this,

12 counsel.  Why don't we get to the part of his analysis.

13        MR. PRITIKIN:  I don't want to waste time with this,

14 Your Honor, but I do want to make sure that it's in the

15 record.  And so I'd be happy to mark this as an exhibit and

16 we could put it in the record and we could save probably a

17 lot of time that way.

18        THE COURT:  Mr. Price.

19        MR. PRICE:  We object to that, it's undisputed facts.

20 I think it probably shouldn't be read.

21        THE COURT:  All right.  Continue on, sir.

22 A   The second is, "There are at least 52 entities that own

23 H.264 standards-essential patents."  And, number three,

24 "There are at least 2,500 patents throughout the world that

25 are essential to the H.264 standard."

1   Q   Now, how did these undisputed facts bear on your analysis,

2   sir?

3   A   I think they were some of the facts that really went into

4   saying that, again, Motorola's contribution was a relatively

5   small part of the overall H.264 standard.

6   Q   And how does that bear on the question of whether their

7   conduct is more consistent with hold-up or with trying to

8   enter into a RAND license?

9   A   Again, so if we thought about something like Windows, we

10  know that H.264 is only one of many video standards.  Video

11  is only one of the things that a PC does.  Software is only

12  part of what a personal computer, like a laptop, would do.

13  So if Motorola's technology is a small part of that one video

14  standard, which is only a part of what the laptop does,

15  something like a 2.25 percent royalty on the laptop value is

16  just way out of line of what that potentially could be, given

17  that there are so many other people just within that H.264

18  standard.

19  Q   Let's go on to PDX35.

20          THE COURT:  After our break.

21      Ladies and gentlemen, remember that we're going to break

22  at 4 o'clock today.  So we'll have you back out here a little

23  bit after ten after three, and we'll run until about

24  five minutes to four.  Then I'll stop and read you all those

25  wonderful things you love to hear and also chat a little

1    about the schedule for Friday, Monday and Tuesday.

2        (The following occurred outside the presence of the jury.)

3            THE COURT:  We'll be in recess until a little bit

4    after ten after three.

5                        (The proceedings recessed.)

6    (At this time the jury entered the courtroom.)

7    By Mr. Pritikin:

8    Q    Professor Murphy, I want to move on to two more of these

9    that have some background undisputed facts.  We will cover

10   those and then come back to some questions about them.

11           Let's go to PDX 35.  Do you understand these are both

12   undisputed facts?

13   A    Yes.

14   Q    And would you put these into the record, please?

15   A    "Motorola did not provide the invented technology in the

16   H.264 standard, but instead built upon already existing

17   technology."  Second:  "Motorola's H.264 standards-essential

18   patent portfolio only constitutes a sliver of the overall

19   technology incorporated in the H.264 standard."

20   Q    Let's move to PDX 36.  And do you understand these also

21   are undisputed facts?

22   A    Yes.

23   Q    And could you put these into the record, please?

24   A    Yes.  "In reference to Windows video, encoding/decoding is

25   only a tiny part of what Windows software does, and Windows

1  supports other video compression standards in addition to

2  H.264."  Second:  "Motorola's H.264 standards-essential

3  patents are only of minor importance to the overall

4  functionality of Microsoft's Windows product."

5  Q   And the last one relates to Xbox.  What is that undisputed

6  fact?

7  A   "Motorola's H.264 standards-essential patents are of only

8  minor importance to the overall functionality of Microsoft's

9  Xbox product."

10  Q   Now, how do the undisputed facts that we have just

11  covered, how do those bear on your analysis of whether the

12  conduct here is more consistent with hold-up or with entering

13  into a RAND license?

14  A   Again, it tells us that there is going to be a large gap

15  between the hold-up value, which would be the value of the

16  standard, and the value of Motorola's contribution, because

17  all of these facts are telling us they are just a small part,

18  of minor importance, a sliver of the value.  And that makes

19  it relatively easier to say, when you are looking at the

20  data, is that offer more consistent with the hold-up value

21  being a much larger number than the value of the patents,

22  which of course is borne out when we actually look at the

23  comparison to what was determined to be the RAND rate.  That

24  analysis is confirmed by the finding of what the RAND rate

25  actually was relative to Motorola's demands.

1   Q   Now, let's switch gears and talk about some of the

2   background undisputed facts that you considered in your

3   analysis with respect to 802.11.  And let's move to PDX 37.

4   A   Again, my understanding is these are undisputed facts.

5   Number one:  "The 802.11 standard is immense and complex.

6   The current version is 2,793 pages long."  Second:  "There

7   are at least 92 entities that own 802.11 standards-essential

8   patents."  And, three:  "There are possibly thousands of

9   patents essential to the 802.11 standard."

10  Q   We will pick these up all at once.  Let's go on to PDX 38.

11  What are these undisputed facts?

12  A   Again, number one:  "Motorola's 802.11 standards-essential

13  patent portfolio provides only minimal contribution to the

14  802.11 standard."  Number two:  "Motorola's 11 relevant

15  802.11 standards-essential patents constitute only a sliver

16  of the overall technology incorporated in the 802.11

17  standard."

18  Q   And, again, I am going to ask you the question, Professor

19  Murphy, how did these undisputed facts bear on your analysis

20  of whether the conduct was more consistent with hold-up or

21  with trying to enter into a RAND license?

22  A   Again, what it tells us is -- given that Motorola's

23  contribution is only a small part of the overall patented

24  technology in the standard, it tells us that their

25  contribution is going to be even a smaller part of the

1    overall value of the standard, of course, which includes all

2    of those other components.  And, therefore, there is a big

3    gap between the potential hold-up value on the one hand,

4    which is the value of the standard, and the RAND value, which

5    is their contribution, which makes it relatively

6    straightforward.  And then you look at what the offers were

7    and say, are they in line with RAND?  And the answer is, no,

8    they are very far away from what the RAND rates are and very

9    close -- or much higher, which would be much more consistent

10   with the hold-up scenario.

11   Q    As an economist, would you have any expectation as to

12   whether information concerning the significance of Motorola's

13   contributions to the standards would have been available to

14   Motorola?

15   A    It would have been for a couple of reasons.  One, they

16   participated in the standard setting.  In the case of H.264,

17   they also participated in discussions at the patent pool.

18   They didn't ultimately join the pool, but they were there as

19   well.  They had an idea of what their contributions were as a

20   part of the overall standard as part of their ordinary course

21   of business.

22   Q    Let's turn now to the subject of the number of other

23   holders of patents essential to the standards.  As an

24   economist, would you expect that to have raised any concerns

25   in October of 2010 with regard to the royalty rates requested

1    by Motorola?

2    A   Yes.  In fact, just thinking about the number of other

3    contributors gives you a really quick check on whether what

4    you are asking for is commensurate with your contribution.

5    Remember, for example, Motorola said they didn't know whether

6    they were in the top half or the bottom half.  Just asking

7    the number of contributors can give you a rough idea of

8    whether what you are asking for is reasonable.

9    Q   Let's turn to PDX 39.  Can you explain to the jury what is

10   illustrated on this demonstrative?  Does this relate to

11   royalty stacking?

12   A   Yes, it does.  It is a real simple stacking calculation.

13   We know there were 52 entities that claimed to have

14   standards-essential patents.  Multiply 52 by the 2.25 asked,

15   and that comes out to 117 percent of the price of a laptop.

16   So if all 52 asked for 2.25, they would be asking for

17   117 percent of the price of the laptop.  And think about it.

18   Totally, they really shouldn't get more than the value of

19   H.264, which is a small part of the laptop.  So 117 percent

20   of the laptop, obviously, is way out of bounds.

21   Q   As an economist, would you have expected that information

22   of this sort would have been available to Motorola in October

23   of 2010?

24   A   Yes.  You can get that information from the

25   standard-setting organization, for example.  And they

1  participated in it, so they would have even more fine-grained

2  information, one would presume.

3  Q   Let's turn to PDX 40.  Can you explain what is shown here

4  with respect to 802.11 and royalty stacking?

5  A   Corresponding calculation.  Not to bore with you the

6  details.  Again, here, there are 92 people, patentholders.

7  We multiply that by 2.25, you get 207 percent.  Obviously you

8  can't have 92 people ask for 2.25.  That would be more than

9  the value of the Xbox, just for 802.11, forgetting about all

10  of the other things that go into making an Xbox.  Obviously,

11  just looking at that would tell you that is out of line.

12  Q   Let's go back to PDX 33 for a moment.  This was the chart

13  we talked about earlier where you summarized the information

14  that was readily available to Motorola in October of 2010.  I

15  think we have covered topic one, but I would ask you briefly

16  to summarize what your conclusions were with respect to one?

17  A   I think on number one, really realizing two things,

18  Motorola's technology was a small part of the overall

19  technology contributed to the standards.  That, together with

20  just the number of other contributors and the percentages

21  Motorola was asking for, says those royalties could not

22  reflect the value of each individual's contributions because

23  they would add up to more than the value of the product, let

24  alone the value of the standard.

25  Q   Let's move on to number two on the list, the royalties

1    charged by the MPEG LA pool.  Have you prepared an exhibit

2    that compares the maximum annual royalty charge by the

3    MPEG LA pool to Microsoft with the royalties that Motorola

4    demanded for its H.264 patents?

5    A   Yes, I have.

6    Q   Let's take a look at PDX 41.  What is shown here,

7    Professor Murphy?

8    A   Here is the MPEG LA pool for which the amount that would

9    be paid by Microsoft would be $13 million per year.  That's

10   for 2,400-plus patents contributed by 26 licensors.  So 26

11   companies' patents totaled from over 2,400 patents, the

12   market price, whatever people were paying for that from that

13   from the pool, was $13 million per year.  That's what

14   Microsoft was paying.  On the other hand, Motorola was asking

15   for $4 billion for just their contributions.  Remember, this

16   H.264 pool is the pool that they participated in.  So this

17   kind of information would have been available to them.

18   Q   Now, are you suggesting as an economic matter that a RAND

19   royalty cannot exceed pool rates?

20   A   No, I am not saying that at all.  I am saying it gives you

21   a ballpark that one should be in.  When 26 companies are

22   charging $13 million for one company whose patents they say

23   -- you can't say are better or worse than others, that

24   $4 billion is just way out of line if they have only

25   contributed a sliver of the technology or a small part of

1    that technology.  To ask for $4 billion is really way out of

2    line.

3    Q   Let's turn back to PDX 33, and move on to Item 3, the

4    price of the WiFi chips that provide 802.11 functionality.

5    How did this figure into your analysis of information that

6    was readily available to Motorola in October 2010?

7    A   Again, it is another check that we can do to say what

8    seems reasonable.  The entire chip that provides the WiFi

9    functionality that Microsoft was purchasing to put into its

10   Xbox costs between $3 and $4.  That's for the entire WiFi

11   functionality embedded in that chip.  Again, Motorola, if we

12   go back to the Xbox, was asking somewhere between $4 and $9,

13   roughly, for just their contribution to WiFi.  Again, not an

14   exact calculation, just gives you an idea of the

15   disproportionality.

16   Q   Let's move on to the fourth item you posted here on

17   information readily available to Motorola.  The royalty rates

18   recommended by its hired consultant, InteCap.  What is

19   InteCap and what's the analysis you are referring to here?

20   A   InteCap is a consulting firm that works largely in the

21   patent area.  They consulted for Motorola, evaluating what

22   the value was of their 802.11 patent portfolio.  I believe it

23   was in 2003.

24   Q   Now, are there, again, some undisputed facts relating to

25   InteCap that you took into account in your analysis?

1    A    Yes, there are.

2    Q    Would you turn to PDX 42?  Can you tell the jury what the

3    undisputed facts are that form the background for your

4    analysis of the InteCap study in connection with your

5    conclusions?

6    A    Yes.  Number one, "InteCap recommended an effective

7    royalty of 0.1 percent of the price of 802.11-enabled

8    products by PCs, laptops and game consoles.  InteCap

9    recommended a royalty of 0.5 percent of the price of WiFi

10   chips, like those sold by Marvell.  InteCap significantly

11   overestimated Motorola's contribution to the 802.11 standard;

12   it's rates are 25 times too high."

13   Q    Was the InteCap study performed for Motorola?

14   A    Yes, it was.

15   Q    And how did the royalties that InteCap had recommended

16   that Motorola charge for its 802.11 patents for a product

17   like Xbox compare to what it demanded for Microsoft?

18   A    They were much, much less.  Because, remember, they are

19   asking for 2.25 percent.  Based on the first one, it would be

20   0.1 percent.  Their rates would be roughly 22 and a half

21   times the InteCap rates.  If you go to the chip --  Remember,

22   we said the chips sell between 3 and 4.  Let's use $4.  One

23   percent of $4 is 4¢.  So half a percent is two cents.  So the

24   InteCap rate would give you a number like 2¢ for the chip.

25   Again, they were asking for 4.50 or more.  Again, way out of

1  bounds.

2  Q   So the .5 percent would apply if the royalty is paid on a

3  chip?

4  A   That's correct.

5  Q   And the .1 percent would apply under the InteCap study if

6  it is paid on, for example, the Xbox?

7  A   That's correct.

8  Q   In either case, are the numbers much lower than what

9  Motorola was asking for?

10  A   Far lower.  Many multiples lower.

11  Q   Now, you were present when Mr. Dailey testified that he

12  had not considered the InteCap study before formulating the

13  demands he made on Microsoft?

14  A   Yes, I was.

15  Q   And how does that bear on your analysis?

16          MR. PRICE:  Object, your Honor.  That's beyond the

17  scope of his expertise, evaluating the credibility of a

18  witness.

19          THE COURT:  I will sustain the objection.

20          MR. PRITIKIN:  It was not an artfully framed

21  question, your Honor.  Let me try again.

22  By Mr. Pritikin:

23  Q   Was it your understanding that the information in the

24  InteCap study was available to Motorola?

25  A   It would have been available.  It is my understanding that

1    people who had -- were aware of the InteCap study would still

2    have been at Motorola and would have been available to talk

3    to.

4    Q    From an economic perspective, when a company is entering

5    into license negotiations does it have any incentive to rely

6    on studies of this kind that have been performed for it?

7    A    I think it does, in the sense from an economic point of

8    view, again, you want to show the other side that you are

9    offering a reasonable royalty.  Particularly when you are

10   under a RAND commitment, you would like to communicate that

11   you are offering a RAND rate, or you are interested in

12   getting to a RAND rate, rather than making an offer that is

13   much more like hold-up.

14   Q    We can take that down.  Let me shift gears to another

15   topic, Professor Murphy.  Now, based on what you have learned

16   and the analysis you have done in this case, as of October of

17   2010 had Motorola ever licensed its 802.11 or H.264 patents

18   on a stand-alone basis?

19   A    My understanding is that they had not.

20   Q    And you were present when Mr. Dailey suggested that

21   Motorola had used the 2.25 royalty here because they had

22   previously been used in cellular communications licensing or

23   package licensing involving a number of standards?

24   A    Yes, I was.

25   Q    And as an economist, what is your reaction to that?

1    A    Well, the fact that they were able to license their

2    cellular portfolio for 2.25, or a package of different

3    standards for 2.25, would not be a good economic

4    justification for saying these individual standards not

5    related to cellular would be -- you know, 2.25 would be a

6    good rate for that.

7    Q    Are Motorola's patents essential to the various cellular

8    standards for a cell phone?

9    A    My understanding is that Motorola has standards-essential

10   patents for several of the cellular standards, yes.

11   Q    And are there any important differences between the

12   cellular standards-essential patents and 802.11 and H.264 of

13   Motorola?

14   A    I think there are a couple.  One is, in contrast to 802.11

15   and H.264, where Motorola was not thought of having a

16   particularly strong portfolio, I think it is generally

17   understood Motorola has a very strong cellular portfolio.

18   Secondly, and probably most importantly, if you think about

19   how important a cellular standard is to a cell phone, which

20   is part of what goes into what you are willing to pay or what

21   is the appropriate rate for a component, that's not going to

22   be the same as what H.264 is to a laptop.  That is, cellular

23   functionality is core to the operation and use of the cell

24   phone.  H.264 is one of many things you do with a laptop.  I

25   don't think there is any economic comparison or reason to

1  believe that 2.25 being a reasonable rate for cell phones, if

2  it were, would translate over to these standards for these

3  products.

4  Q   We heard testimony from Mr. Dailey that Motorola wants a

5  royalty of 2.25 for a license to all of its portfolios of

6  standards-essential patents, or for a license to just one of

7  those portfolios.  From an economic standpoint, does that

8  mean that each portfolio is worth 2.25?

9          MR. PRICE:  I will object.  This is beyond the scope

10  of his report.

11          MR. PRITIKIN:  Your Honor, I would direct your

12  attention to Paragraph 74 on Page 27.

13          THE COURT:  Of which one?

14          MR. PRITIKIN:  This is the first report, the opening

15  report.

16          THE COURT:  The July 24th, 2012?

17          MR. PRITIKIN:  June 13th, 2013.  Sorry.

18          THE COURT:  I will sustain the objection to the

19  question as currently constituted.

20          MR. PRITIKIN:  Let me see if I can rephrase the

21  question, your Honor.

22  By Mr. Pritikin:

23  Q   Let me ask you, Professor Murphy, if 2.25 is charged for

24  cellular and other portfolios, how do you unpack that?

25  A   You really can't.  The fact that somebody is willing to

1    pay 2.25 for a collection of standards doesn't tell you what

2    they would be willing to pay for one of those standards.  In

3    particular, if you are taking something sold to a cell phone

4    manufacturer, you would have to start with the belief that

5    the cell phone patents and the cell phone standards are the

6    primary source of value, and therefore that 2.25 for the

7    total wouldn't tell you anything about what they valued the

8    individual components like 802.11 or H.264.

9    Q    A couple of other topics, Professor Murphy.  Now, Motorola

10   suggested that if Microsoft had simply negotiated rather than

11   filed this lawsuit that the parties could have reached a RAND

12   license.  Are you aware of that testimony that has been

13   presented?

14   A    Yes.

15   Q    And as an economist, what is your view of that?

16   A    I don't think that is consistent with the economic

17   evidence that I have seen.

18   Q    Does the fact that a patent owner is willing to negotiate

19   mean that it is not engaged in hold-up?

20   A    No.  If I am holding you up, I may be negotiating, but

21   then we are just negotiating over the hold-up value; we are

22   negotiating over how much I am going to hold you up for.  The

23   question is not whether I am negotiating, the question is

24   what leverage I am exerting on you.  If I am exerting

25   leverage, looking to just get the value of my patent, I am

1    not holding you up.  But if I am using the leverage that

2    comes from the standard and the value of the standard, then I

3    am holding you up, even if I am negotiating over how much I

4    am going to hold you up for.

5    Q    Now, in light of the underlying economics regarding the

6    RAND commitment and the hold-up, can negotiations alone

7    protect against hold-up?

8    A    No.  Because, remember, once the standard is implemented

9    and widely adopted, the value the user places on getting

10   access to that standard.  And therefore, if I can deny him

11   access by denying him access to my patent, the value of what

12   he is willing to pay to get the standard is determined by the

13   hold-up value.  That's what he is going to be willing to pay

14   based on.  So if you just tell me I need to negotiate with

15   him, I will be able to negotiate based on his hold-up value.

16   So there is no way in which a requirement to negotiate could

17   possibly eliminate the ability to hold people up.

18   Q    Were you present when the testimony of Jennifer Ochs from

19   Marvell was provided earlier today?

20   A    Yes, I was here when her testimony was read.

21   Q    It may have been yesterday.

22   A    That's what I was wondering about.

23   Q    How do the terms that Motorola proposed to Marvell bear on

24   your analysis of whether its conduct is more consistent with

25   hold-up or with providing a RAND license to Microsoft?

A    I would say a couple of things.  One, it was substantially

later, yet they still demanded a 2.25 royalty payment from

Marvell, based on the final product price.  That's one thing.

So as I said, they hadn't changed that demand even though

time had passed and presumably had more information.

Secondly, they carved Microsoft out.  They told Marvell,

while we will offer you a license, it won't cover the primary

driver of why you were seeking a license, namely Microsoft.

That was consistent with them trying to maintain the pressure

on Microsoft.

Q    Now, I think you said earlier that you had testified in

this courtroom in the fall trial where the RAND rate was set?

A    Yes, I did.

Q    Have you prepared --  Let's put up PDX 43.

        MR. PRICE:  Your Honor, can we have a sidebar?  We do

have an objection as to this one.

(Sidebar discussion outside of the jury's presence.)

        MR. PRICE:  Your Honor, this is being presented now

as an undisputed fact.  But the problem with this is that

that was not the contention.  It was 2.25 percent minus

offsets and with caps.  This is completely misleading.

        MR. PRITIKIN:  This was taken almost verbatim from

the finding.  It may well be finding of fact 130, if we can

look at it.  This is exactly what the court said.  The fact

is they were using the 2.25 --

1          THE COURT:  Which finding?

2          MR. PRITIKIN:  You wrote it down there, your Honor.

3     For the benefit of the court, it says --

4          MR. PRICE:  Let me get my copy of the findings and

5     show you the other.

6          MR. PRITIKIN:  Page 130.  I'm sorry.

7          THE COURT:  He changed it to --

8          MR. PRITIKIN:  Page 130.

9          THE COURT:  It would be after 406.  And it says,

10    title, "Motorola's Suggested Comparables."  It is on

11    Page 130.

12         MR. PRICE:  If you look on 131, it talks about 2.25

13    end-product royalty, capping that, and then expressing a

14    different rate as a result of that.

15         MR. PRITIKIN:  Your Honor, you had sorted through

16    this in the findings.  That is putting it in a box, where

17    they try to attribute some value to the grant-back from

18    Microsoft.  That was the way it was done.  But the bottom

19    line is they were starting with a value of 2.25 for Xbox and

20    Windows, and then, as you wrote, sought the amount -- they

21    were indifferent as to whether it was in the form of

22    grant-back monetary payments.  And that's the single point I

23    want to bring out.

24         THE COURT:  I am not going to allow you to use one

25    that doesn't have a date on it.  That is misleading.

1        MR. PRITIKIN:  I won't use the date from that.

2        THE COURT:  You are not going to be using it to say

3   it is undisputed, because I don't think there is an

4   undisputed holding to that effect.

5        MR. PRITIKIN:  I will deal with that, your Honor (End

6   of sidebar.)

7   By Mr. Pritikin:

8   Q   Can we put up PDX 43?  Professor Murphy, what is your

9   understanding of the royalty rate that was asked for by

10  Motorola at the November --

11       THE COURT:  I just ruled on this, counsel.  I said

12  you were not to put it up.

13       MR. PRITIKIN:  I'm sorry.  I thought you said I was

14  not to call it --

15       THE COURT:  I said you were not to use it.  Take it

16  down.

17       MR. PRITIKIN:  I won't use it.

18       THE COURT:  Let's go on, counsel.

19       MR. PRITIKIN:  I'm sorry.  I misunderstood, your

20  Honor.

21  By Mr. Pritikin:

22  Q   Just a couple more questions, Professor Murphy.  Putting

23  together the entire course of conduct, can you state again

24  what conclusions you have reached?

25  A   I would say, based on my economic analysis of Motorola's

1   course of conduct, their behavior was much more consistent

2   with them seeking to hold up Microsoft, and therefore

3   leverage the value of the standard to get more favorable

4   terms in their licensing negotiations with Microsoft than it

5   was to offer a RAND rate.  That flows from analysis of the

6   offer that they made and the letters, their continued

7   positions that they took over time, the seeking of

8   injunctions to back that up, the big gap that existed between

9   the value of the standard and their individual contributions,

10   the enormous difference between the rates they requested and

11   what were determined to be the RAND rates.  An economic

12   analysis says it is much more consistent with an effort to

13   hold Microsoft up.  The fact that they didn't make more

14   effort to figure out what the value of the underlying patents

15   were is very consistent with a notion that really what

16   mattered was the ability to exert pressure on Microsoft by

17   denying them access to the standard through their

18   standards-essential patents, which to me is the economic

19   notion of hold-up.

20           MR. PRITIKIN:  I have no further questions, your

21   Honor.

22           THE COURT:  Why don't you get started, Mr. Price?

23                     CROSS-EXAMINATION

24   By Mr. Price:

25   Q   Good afternoon, Professor Murphy.  We will be talking to

1    each other tomorrow, too, I guess.

2    A    It looks that way.

3    Q    Let me start out, since we are at the end of the day, with

4    some fairly simple questions so I don't have to think too

5    much.  And I want to talk about your prior engagements with

6    Microsoft.  If I am correct, those started sometime in the

7    1990s?

8    A    Yeah.  It would have been the late 1990s, yes.

9    Q    And I think you said you testified in four trials?

10   A    I believe that's correct.

11   Q    I will try to get a sense of --  Do you have a sense of

12   how much you have been compensated over the years by

13   Microsoft as a result of consulting with them?

14   A    I have never added it up, no.

15   Q    Okay.  As an economist, you probably have some idea as to

16   the contribution that Microsoft has made to your

17   compensation, at least on a macro economics level -- micro

18   economics level, I'm sorry, over the last -- since the late

19   1990s?  Certainly you have some idea of that.

20   A    I would say over that period it has amounted to several

21   hundred thousand dollars.

22   Q    Do you think it might be higher than that?

23   A    I don't know the total, but it would definitely be several

24   hundred thousand.

25   Q    Let's talk about maybe your hourly rate.  Let's talk about

1   your current hourly rate.  Could you tell us what that is?

2   A   Yeah.  My hourly rate is $1,250 an hour.

3   Q   If we focused just on how much you have made from working

4   on this case --  You said you have been working on this case

5   for two years?

6   A   Yes.

7   Q   How much have you made just working on this case in the

8   last two years?

9   A   Probably around $200,000, something like that, these

10  matters involving Motorola, not just this current matter we

11  are talking about here.

12  Q   You are saying in the past two years alone it has been,

13  you think, somewhere around $200,000?

14  A   That is a really rough estimate, because I don't have the

15  exact figure.

16  Q   Have you been asked this kind of question before when you

17  have testified, how much money you have made?

18  A   I have, yes.

19  Q   Is it a practice not to have available --  You said you

20  don't have the materials available to actually tell me how

21  much you have made.  Is there a reason for that?

22  A   I don't carry them around with me, no.  I could probably

23  go back and total it up.

24  Q   I am asking, because you kind of anticipated I am going to

25  ask that question, how much have you been paid to do this.

1    You get asked that all the time?

2    A    Sometimes, sometimes not.  It just depends.

3    Q    You kind of thought I would ask that, right?

4    A    I thought you would ask my hourly rate.  People generally

5    do.  Sometimes they ask totals, sometimes they don't.

6    Q    Is there a reason you didn't check to see what you had

7    been paid to date before you took the stand?

8    A    No particular reason.  It is just not something I

9    generally do.

10   Q    It is around $200,000 in the last couple of years, so that

11   is from 2010 to 2012?

12   A    Yeah, roughly.  Roughly about two years, I guess.

13   Q    I will ask you again, if you go back to the late '90s, and

14   you have worked on at least four trials, can you give me --

15   with that in mind, give me a better estimate of how much you

16   have been paid, other than just hundreds of thousands of

17   dollars?

18   A    I think that's the best way.  It certainly would be

19   several hundred thousand dollars, no doubt about it.

20   Q    In addition to paying your hourly rate, Microsoft has also

21   funded some of your research?

22   A    I did some research work for Microsoft before I ever did

23   consulting -- litigation consulting for Microsoft.

24   Q    And if someone looked at your curriculum vitae --  Am I

25   pronouncing that right?

1    A    I think so, yes.

2    Q    Your resume.  If someone looked at your resume, would we

3    find on there, for example, some papers that you have written

4    that were funded, at least in part, by Microsoft?

5    A    Oh, yes.

6    Q    So if we looked at it, about how many papers has Microsoft

7    funded?

8    A    Maybe a couple.

9    Q    And is that in addition -- the compensation for that --

10   Let me rephrase that.  The funding for those papers, that

11   would be in addition to the several hundred thousand dollars

12   that you have been paid?

13   A    No, I would have included that.

14   Q    Let me talk about the way you looked at the case.  I am

15   going to put up a timeline.  It is a timeline we created for

16   demonstrative purposes.  Let's see if we can go through the

17   timeline.  You spent a significant amount of time doing

18   analysis and calculations on the October 21st, 2010 and

19   October 29th, 2010 letters, correct?

20   A    That's correct.

21   Q    You see in the timeline that Motorola files a lawsuit

22   November 10, 2010, correct?

23   A    Yes.

24   Q    And one of the things that you are equipped to do is kind

25   of applied economic analysis to see how rational actors would

1   work in certain situations, correct?

2   A   That is generally how we approach economics, yes.

3   Q   And to look at it kind of economically, in terms of what

4   would these letter demands -- what effect would they have on

5   Motorola's ability to win a lawsuit or get an injunction, to

6   apply that analysis you have to know something about the

7   court system and the law, right?

8   A   Not necessarily.  I mean, I didn't in my analysis focus on

9   that side of it.  I mean, you could.  I focused much more on

10  the economic side and what their incentives would be if they

11  were interested in negotiating RAND rates versus interested

12  in engaging in hold-up.

13          THE COURT:  Mr. Price, we are going to run out of

14  time here.

15          MR. PRICE:  Oh, gosh.

16          THE COURT:  I know you are just getting started.

17  Ladies and gentlemen, I am going to spare you the speech,

18  because I am sure you can probably all recite it by heart at

19  this point.  I will tell you tomorrow we will get started at

20  our usual 9:00 a.m.  We will be going to 4:30.  The following

21  week, please remember Monday is the holiday, so all of you

22  who were planning on three days away, you have three days

23  away.

24          And then I have been asked a question about your

25  deliberations.  They are going to start on Wednesday, because

1　the schedule that day is you are going to hear closing

2　arguments, which I'm sure you are all looking forward to, and

3　my instructions, which you are probably not looking forward

4　to.  Because at that point you will be in deliberations, we

5　will buy you lunch.  And you don't get to go outside.  There

6　is a trade-off.  And lunch is really good the first day.

7　After that it may start to look a little routine.

8　　　A question was asked about what are the hours to that.

9　The answer is you should chat about that among yourselves.  I

10　have some flexibility.  You don't have to keep exactly the

11　same hours that you were keeping here.  On the other hand,

12　you all know the difficulty you have had in getting here by

13　9:00.  That is something you should chat about between

14　yourselves.  It is not unusual for people to say that they

15　want to start at 8:30.  Much before 8:00 starts to creat

16　problems.  The courthouse is open, but the clerk's staff

17　isn't.  You have a way to get into the jury room, but you

18　need to be considerate of everybody's schedule.  That is

19　something that you can best decide among yourselves.

20　　　Other than that, thank you for all of your patience today.

21　As I have indicated, we are going to be talking about jury

22　instructions, so when you go by you will see everybody with

23　their coat off working hard, but you in the meantime can flee

24　and go home.  We will see you all tomorrow.

25　(At this time the jury left the courtroom.)

1     THE COURT:  Any matters to take up before we retire

2   for the day?

3     MR. HARRIGAN:  Only what you want to do about jury

4   instructions, which I assume we will find out.

5     THE COURT:  Mr. Price, any formal matters we need on

6   the record?

7     MR. PRICE:  No, your Honor.

8     THE COURT:  I am going to recess for the day.  We

9   have asked the marshals to detain one individual who I would

10  like to talk to.  The rest of you are free to go, and we will

11  be doing jury instructions.  Thank you.  We will be in

12  recess.

13

14              (The proceedings recessed.)

15

16

17

18

19

20

21

22

23

24

25

1              C E R T I F I C A T E

2

3

4        We, Barry Fanning and Debbie Zurn, Official Court

5   Reporters for the United States District Court, Western

6   District of Washington, certify that the foregoing is a true

7   and correct transcript from the record of proceedings in the

8   above-entitled matter.

9

10

11   DATED this ^  day of August, 2013.

12

13

14   /s/ Barry Fanning              /s/ Debbie Zurn

15   Barry Fanning, Court Reporter    Debbie Zurn, Court Reporter

16

17

18

19

20

21

22

23

24

25